## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS; | ) |
| | ) |
| STATE OF ALABAMA; | ) |
| | ) |
| STATE OF ARKANSAS; | ) |
| | ) |
| STATE OF LOUISIANA; | ) |
| | ) |
| STATE OF NEBRASKA; | ) |
| | ) |
| STATE OF SOUTH CAROLINA; and | ) |
| | ) |
| STATE OF WEST VIRGINIA; | ) |
| *Plaintiffs,* | ) |
| | ) |
| *v.* | )      Case No. |
| | ) |
| UNITED STATES OF AMERICA; | ) |
| | ) |
| KIRSTJEN M. NIELSEN, Secretary of the U.S. | ) |
| Department of Homeland Security; | ) |
| | ) |
| KEVIN K. MCALEENAN, Commissioner of U.S. | ) |
| Customs and Border Protection; | ) |
| | ) |
| THOMAS D. HOMAN, Deputy Director and Acting | ) |
| Director of U.S. Immigration and Customs | ) |
| Enforcement; | ) |
| | ) |
| L. FRANCIS CISSNA, Director of U.S. Citizenship and | ) |
| Immigration Services; and | ) |
| | ) |
| CARLA L. PROVOST, Acting Chief of U.S. Border | ) |
| Patrol; | ) |
| *Defendants.* | ) |
| | ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     In 2012 and again in 2014, unilateral executive action by the Obama Administration created far-reaching, class-based "deferred action" programs to grant to millions of unlawfully present aliens the legal classification of "lawful presence" in this country and numerous attendant benefits—without congressional authorization.

2.     In a decision affirmed by the divided Supreme Court, the Fifth Circuit upheld this Court's preliminary injunction of the 2014 executive action that created "DAPA" and "Expanded DACA." The Fifth Circuit held this executive action invalid as lacking notice-and-comment procedure and, in any event, contrary to federal law. As the Fifth Circuit noted, the Executive's claim of authority to create these programs "would allow [the Executive] to grant lawful presence and work authorization to *any* illegal alien in the United States—an untenable position in light of the INA's intricate system of immigration classifications and employment eligibility." *Texas v. United States*, 809 F.3d 134, 184 (5th Cir. 2015) (emphasis added), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (per curiam).

3.     In June 2017, after the Supreme Court's ruling, the Executive Branch rescinded prospectively its 2014 executive action creating DAPA and Expanded DACA.

4.     Later that month, Texas and other Plaintiffs proposed to resolve the then-pending litigation if the Executive Branch also rescinded prospectively its 2012 executive action creating "DACA." Otherwise, Plaintiffs wrote, they would amend their complaint in that pending litigation to challenge DACA on the same bases that they challenged DAPA and Expanded DACA.

2

5.      On the September 2017 deadline for accepting Plaintiffs' proposal, the Executive Branch issued a memorandum rescinding DACA by directing that DACA permits would not be issued or renewed starting March 5, 2018. Accordingly, Plaintiffs voluntarily dismissed their then-pending litigation in this Court.

6.      Yet DACA is still in force and will remain in force for the indefinite future. In January 2018, a California district court issued a preliminary injunction of the Executive's 2017 decision to rescind DACA, allowing several challenges to that 2017 executive action to proceed.

7.      In another challenge in the District of Columbia, the district court on April 24, 2018, vacated the Executive's decision to rescind DACA, granted summary judgment that the executive action was substantively unlawful under the APA, and ordered the Executive to continue issuing new DACA applications, staying that order a mere 90 days. *NAACP v. Trump*, No. 1:17-cv-1907, 2018 WL 1920079, at *1, *28 (D.D.C. Apr. 24, 2018).

8.      Plaintiffs abided DACA while the controlling legal issues were decided in the prior litigation and while the Executive reweighed DACA's legality. But the recent injunctions of the 2017 executive action undermine Plaintiffs' express basis for dismissing their prior litigation—and means that Plaintiffs will suffer ongoing harm from DACA for the indefinite future.

9.      Plaintiffs thus bring this lawsuit challenging the 2012 executive action creating DACA in the first place. This lawsuit does not call on this Court to resolve any of the challenges pending in California or elsewhere about the validity of

executive action in 2017. Rather, this lawsuit challenges whether the 2012 executive action unilaterally creating DACA was itself lawful.

10.     This lawsuit also does not challenge the Executive Branch's ability to prioritize removal resources. It does not seek an injunction requiring the Executive to remove any alien from the country. As the Fifth Circuit has noted, those matters are distinct from programs like that here, which grant lawful-presence status.

11.     This lawsuit is emphatically about the rule of law. The policy merits of immigration laws are debated in and decided by Congress. The Executive Branch does not exercise a lawmaking role. Its duty is to take care that the law is faithfully executed—substantive immigration law and procedural administrative law alike.

12.     Under the Fifth Circuit's controlling precedent, DACA is unlawful for the same reasons as DAPA and Expanded DACA were unlawful. *See Texas*, 809 F.3d 134. This lawsuit seeks declaratory and injunctive relief to that effect.

13.     Indeed, Plaintiffs' challenge to the Obama Administration's class-based deferred-action programs has only become stronger since the prior suit challenging DAPA and Expanded DACA. Each memorandum creating DACA, Expanded DACA, or DAPA promised that "[t]his memorandum confers no . . . pathway to citizenship." *See infra* ¶¶ 84, 151. But, as of August 21, 2017, as many as 39,514 aliens had used their DACA status to obtain a pathway to citizenship, through the conferral of lawful-permanent-resident status (commonly known as "LPR" or "green card" status), and

approximately 1,056 alien DACA recipients with LPR status had obtained United States citizenship.[1]

14.     If ever there were a violation of the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, this is it. The Executive unilaterally conferred lawful presence and work authorization on otherwise unlawfully present aliens, and then the Executive used that lawful-presence "dispensation" to unilaterally confer United States citizenship. *Arizona v. United States*, 567 U.S. 387, 435 (2012) (Scalia, J., concurring in part and dissenting in part).

15.     The Attorney General of the United States has announced that DACA suffers from the same legal defects as DAPA and that, if DACA were challenged, "the likeliest outcome is that it would be enjoined just as was DAPA."[2]

16.     That is precisely what the Court should do here. This Court has authority to immediately rescind and cancel all DACA permits currently in existence because they are unlawful. However, Plaintiffs are amenable to a remedy that enjoins Defendants from issuing or renewing DACA permits in the future, effectively phasing out the program within two years.

---

[1] *See* Press Release, Office of Sen. Chuck Grassley, Data Indicate Unauthorized Immigrants Exploited Loophole to Gain Legal Status, Pathway to Citizenship (Sept. 1, 2017), https://www.grassley.senate.gov/news/news-releases/data-indicate-unauthorized-immigrants-exploited-loophole-gain-legal-status. "A valid, unexpired Form I-551, Permanent Resident Card (also known as a 'green card'), is the primary evidence of an alien's status as a Lawful Permanent Resident (LPR) of the United States." U.S. Dep't of State, 9 Foreign Affairs Manual 202.2-6(a)(1) (2018).

[2] Press Release, U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca.

## JURISDICTION AND VENUE

17.    The Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution, art. II, § 3, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The Court also has jurisdiction under 28 U.S.C. § 1346(a)(2) because this is a civil action or claim against the United States. Finally, the Court has jurisdiction to compel an officer or employee of the above-named federal agencies to perform his or her duty under 28 U.S.C. § 1361.

18.    Venue is proper in this District under 28 U.S.C. § 1391(e) because the State of Texas is a resident of this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

19.    This Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the APA, 5 U.S.C. § 706; and 28 U.S.C. § 1361.

## THE PARTIES

20.    Plaintiffs are the States of Texas, Alabama, Arkansas, Louisiana, Nebraska, South Carolina, and West Virginia.

21.    The Plaintiff States have interests that fall within the zone of interests of federal statutes on immigration policy. "The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States," which "bear[ ] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.

22.     Defendant United States of America is sued under the APA. *See* 5 U.S.C. § 703 ("[T]he action for judicial review may be brought against the United States . . . .").

23.     Defendant Kirstjen M. Nielsen is the Secretary of the U.S. Department of Homeland Security ("DHS"). Defendant Nielsen and DHS are responsible for U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"). Defendant Nielsen also is responsible for the continued administration of DACA and Expanded DACA.

24.     Defendant Kevin K. McAleenan is the Commissioner of CBP. Defendant McAleenan shares responsibility for the administration of DACA and Expanded DACA.

25.     Defendant Thomas D. Homan is the Deputy Director and Acting Director for ICE. ICE administers a formal program for allowing unlawfully present aliens to apply for deferred action and to appeal for reconsideration if deferred action is denied.

26.     Defendant L. Francis Cissna is the Director of USCIS. Cissna and USCIS administer the DACA program. USCIS is the principal agency responsible for the continued administration of DACA and Expanded DACA.

27.     Defendant Carla L. Provost is Acting Chief of the U.S. Border Patrol. Provost and the U.S. Border Patrol are responsible for enforcing immigration laws and the detection, interdiction and apprehension of those who attempt to illegally

enter or smuggle people or contraband across U.S. borders between official ports of entry.

## FACTUAL BACKGROUND

**I.     Congress Created an Extensive Statutory Framework in the Area of Immigration, and Congress Has Not Given the Executive Unilateral Power to Confer Lawful Presence and Work Authorization on Unlawfully Present Aliens Simply Because the Executive Chooses Not to Remove Them.**

28.     "Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress." *Arizona*, 567 U.S. at 409 (alteration in original) (quoting *Galvan v. Press*, 347 U.S. 522, 531 (1954)).

29.     Congress has accordingly enacted "extensive and complex" statutes governing "immigration and alien status." *Id*. at 395.

30.     Title 8 of the United States Code, dealing with immigration, functions as a "single integrated and all-embracing system" governing the presence of aliens in the country. *Id*. at 400 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 74 (1941)).

31.     Through the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq*., Congress has delineated "specifi[c] categories of aliens" who may be admitted into and lawfully present in the country as well as the consequences for unlawful presence. *Arizona*, 567 U.S. at 395.

32.     Congress has enacted complex provisions detailing how over forty different classes of immigrants, nonimmigrants, refugees, and other aliens can attain lawful presence in the country. *See Texas*, 809 F.3d at 179.

33.     Moreover, under the Immigration Reform and Control Act of 1986 ("IRCA"), Congress created "a comprehensive framework for 'combating the employment of illegal aliens.'" *Arizona*, 567 U.S. at 404 (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)).

34.     Congress reinforced immigration laws with the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") and the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), responding to the States' concerns about the effects of extending benefits to unlawfully present aliens. *E.g.*, 142 Cong. Rec. 26,680 (1996) (statement of Sen. Kyl) ("With this immigration bill, we have the opportunity to lift this financial burden off the States by forcing the Federal Government to take responsibility for reducing illegal immigration . . . .").

35.     Congress never gave the Executive Branch *carte blanche* to sidestep these statutes and unilaterally permit unlawfully present aliens to be lawfully present or obtain attendant benefits and work authorization simply because the Executive chooses not to remove them.

36.     Lawful presence is an immigration classification created by Congress.

37.     Unlawful presence is an immigration classification created by Congress.

38.     The classification of lawful presence is a necessary prerequisite for aliens to be eligible for Social Security. *See* 8 U.S.C. § 1611(b)(2).

39.     The classification of lawful presence is a necessary prerequisite for aliens to be eligible for Medicare. *See id.* § 1611(b)(3).

40.     The classification of lawful presence is a necessary prerequisite for aliens to be eligible for a retirement benefit in PRWORA. *See id.* § 1611(b)(4).

41.     The classification of unlawful presence makes time spent in that status count towards a reentry ban un IIRIRA, subject to statutory exception. *See id.* § 1182(a)(9)(B)(i) (3-year reentry ban for aliens "unlawfully present in the United States for a period of more than 180 days but less than 1 year"; 10-year reentry ban for aliens "unlawfully present in the United States for one year or more").

42.     The classification of lawful presence is a necessary prerequisite for aliens to be eligible for the Earned Income Tax Credit. *See* 26 U.S.C. § 32(c)(1)(A), (c)(1)(E), (m) (eligibility based on an individual having a valid Social Security number).

## II.     Congress Has Declined to Pass the DREAM Act.

43.     On August 1, 2001, the Development, Relief, and Education for Alien Minors (DREAM) Act was first introduced in Congress. *See* S. 1291, 107th Cong. (2001).

44.     The DREAM Act has been introduced in some form in each Congress since then. *See, e.g.*, S. 1545, 108th Cong. (2003); S. 2075, 109th Cong. (2005); S. 2205, 110th Cong. (2007); S. 729, 111th Cong. (2009); H.R. 1751, 111th Cong. (2009); S. 952, 112th Cong. (2011); S. 744, 113th Cong. (2013); S. 3542, 114th Cong. (2016); H.R. 496, 115th Cong. (2017).

45.     The proposed DREAM Act would have allowed unlawfully present aliens to apply for lawful presence through conditional-permanent-resident status if, among

other things, (1) they entered the United States before the age of 16, and (2) they had been in the United States continuously for five years.

46.     Congress has repeatedly declined to enact the DREAM Act.

47.     Features of the DREAM Act closely resemble DACA and DAPA.

48.     The DREAM Act's coverage criteria are substantially similar to DACA's and Expanded DACA's coverage criteria, as DACA's and Expanded DACA's coverage criteria also require entry into the United States before the age of 16 and at least five years of continuous residence in the United States.

49.     Former President Obama repeatedly urged Congress to pass the DREAM Act.

50.     Former President Obama consistently asserted that he could not achieve the goals of the DREAM Act on his own through unilateral Executive action. He said, for instance:

- "Comprehensive reform, that's how we're going to solve this problem. . . . Anybody who tells you . . . [that] I can wave a magic wand and make it happen hasn't been paying attention [to] how this town works." President Barack Obama, Remarks on Comprehensive Immigration Reform (May 5, 2010), https://obamawhitehouse.archives.gov/blog/2010/05/05/cinco-de-mayo-a-call-comprehensive-immigration-reform.

- "I am president, I am not king. I can't do these things just by myself. . . . [T]here's a limit to the discretion that I can show because I am obliged to execute the law. . . . I can't just make the laws up by myself." President

Barack   Obama,   Interview   with   Univision   (Oct.   25,   2010),

http://latimesblogs.latimes.com/washington/2010/10/transcript-of-

president-barack-obama-with-univision.html.

- In response to a question about whether he could stop deportation of
  unlawfully present students with an executive order: "Well, first of all,
  temporary protective status historically has been used for special
  circumstances where you have immigrants to this country who are fleeing
  persecution in their countries, or there is some emergency situation in their
  native land that required them to come to the United States. So it would
  not be appropriate to use that just for a particular group that came here
  primarily . . . for economic opportunity. With respect to the notion that I
  can just *suspend deportations through executive order, that's just not the
  case*, because there are laws on the books that Congress has passed . . . .
  There are enough laws on the books by Congress that are *very clear in terms
  of how we have to enforce our immigration system* that for me to simply
  through executive order *ignore those congressional mandates* would not
  conform with my appropriate role as President." President Barack Obama,
  Remarks   at   Univision   Town   Hall   (Mar.   28,   2011),
  https://obamawhitehouse.archives.gov/the-press-
  office/2011/03/28/remarks-president-univision-town-hall (emphasis added).
- "I can't solve this problem by myself. . . . We're going to have to change the
  laws in Congress." President Barack Obama, Remarks at a Facebook Town

Hall (Apr. 20, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/04/20/remarks-president-facebook-town-hall.

- "I know some here wish that I could just bypass Congress and change the law myself. But that's not how democracy works. See, democracy is hard. But it's right. Changing our laws means doing the hard work of changing minds and changing votes, one by one." President Barack Obama, Remarks at Miami Dade College Commencement (Apr. 29, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/04/29/remarks-president-miami-dade-college-commencement.

- "And sometimes when I talk to immigration advocates, they wish I could just bypass Congress and change the law myself. But that's not how a democracy works. What we really need to do is to keep up the fight to pass genuine, comprehensive reform. That is the ultimate solution to this problem." President Barack Obama, Remarks on Comprehensive Immigration Reform in El Paso, Texas (May 10, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/05/10/remarks-president-comprehensive-immigration-reform-el-paso-texas.

- "[B]elieve me, the idea of doing things on my own is very tempting. . . . But that's not how . . . our system works. . . . That's not how our democracy functions. That's not how our Constitution is written." President Barack Obama, Remarks to the National Council of La Raza (July 25, 2011),

https://obamawhitehouse.archives.gov/the-press-

office/2011/07/25/remarks-president-national-council-la-raza.

- "Administratively, we can't ignore the law. . . . We are doing everything we can administratively. But the fact of the matter is there are laws on the books that I have to enforce." President Barack Obama, Remarks in an "Open for Questions" Roundtable (Sept. 28, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/09/28/remarks-president-open-questions-roundtable.

51.     Despite former President Obama's statements, Congress refused to pass the DREAM Act.

## III.    The Obama Administration Unilaterally Created DACA, Which Confers Eligibility for Lawful Presence, Work Authorization, and a Host of Attendant Benefits.

52.     On June 15, 2012, former President Obama's Secretary of Homeland Security Napolitano announced the unilateral creation of a program that has become known as Deferred Action for Childhood Arrivals ("DACA"). *See* **Exhibit 1**.

53.     This Department of Homeland Security memorandum creating DACA was issued without APA notice-and-comment procedure.

54.     Through Secretary Napolitano's DACA memo, the Executive Branch ordered federal immigration officials to make qualifying unlawfully present aliens eligible to receive "deferred action" status if they (1) entered the United States before the age of 16; (2) had been in the United States continuously for at least five years; (3) met certain educational standards or were veterans; (4) had not been convicted of a felony, a "significant" misdemeanor or "multiple" misdemeanors, or otherwise posed

14

a threat to national security or public safety; and (5) were not above the age of thirty. *Id.* at 1.

55.    DACA's "deferred action" terms last for 2 years. *Id.* at 2.

56.    DACA's "deferred action" terms are renewable. *Id.*

57.    DACA's criteria would cover approximately 1.7 million otherwise unlawfully present aliens.

58.    As of September 30, 2017, DACA relief had been conferred on approximately 800,000 aliens. *See* USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Fiscal Year 2012-2017, attached as **Exhibit 2** (798,980 initial applications and 1,002,810 renewal applications approved from 2012 through September 2017).

59.    As of September 30, 2017, DACA relief had been conferred on approximately 125,000 aliens in Texas alone. *See id.* at 2 (125,239 initial applications and 128,812 renewal applications approved for Texas residents from 2012 through September 2017).

60.    According to USCIS, deferred action under DACA "may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion." USCIS, Deferred Action for Childhood Arrivals (DACA) Toolkit 16, *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015) (No. 1:14-cv-254), ECF No. 38-6.

61.    DACA's conferral of "deferred action" entails much more than the Executive simply choosing not to remove an alien with DACA.

62.    The Executive Branch treats DACA's conferral of "deferred action" as

also conferring lawful presence: "An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect." *See, e.g.*, *Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/frequently-asked-questions (last visited May 1, 2018).

63.     Thus, "while [a DACA recipient's] deferred action is in effect and, for admissibility purposes, [the DACA recipient is] considered to be lawfully present in the United States during that time." *Id.* This has been true since 2012.

64.     The Executive's implementation of DACA as conferring lawful presence tracks the Executive's practice stated in the 2014 DAPA and Expanded DACA memorandum (the "DAPA Memo") issued by former DHS Secretary Johnson, which stated: "Deferred action . . . means that, for a specified period of time, an individual is permitted to be lawfully present in the United States." **Exhibit 3** at 2.

65.     The United States has also confirmed in court that DACA "approved deferred action status is lawful status that affords a period of authorized stay." *See* United States' Brief as Amicus Curiae in Opposition to rehearing En Banc at 16, *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) (No. 13-16248), ECF No. 75 (internal quotation marks omitted).

66.     DACA's conferral of lawful presence creates eligibility for a host of benefits.

67.    DACA's conferral of lawful presence appears to eliminate predicates necessary under the INA to pursue proceedings to remove an alien from the United States.

68.    An alien is removable if he is "present in the United States in violation of [federal law]." 8 U.S.C. § 1227(a)(1)(B).

69.    An alien may also be removed if he cannot establish that he "is lawfully present in the United States pursuant to a prior admission." *Id.* § 1229a(c)(2)(B).

70.    DACA's conferral of lawful presence negates the removability charge that an alien is "present in the United States in violation of [federal law]." *Id.* § 1227(a)(1)(B).

71.    DACA's conferral of lawful presence negates the removability charge that an alien is present "without being admitted or paroled," *id.* § 1182(a)(6)(A)(i), as the Executive maintains that an alien granted lawful presence is not considered "present in the United States without being admitted or paroled," Pet. Br. at 9 n.3, *Texas*, 136 S. Ct. 2271 (No. 15-674), 2016 WL 836758.

72.    DACA's conferral of lawful presence means a DACA recipient satisfies the lawful-presence prerequisite for the alien to be eligible for Social Security. *See* 8 U.S.C. § 1611(b)(2).

73.    DACA's conferral of lawful presence means a DACA recipient satisfies the lawful-presence prerequisite for the alien to be eligible for Medicare. *See id.* § 1611(b)(3).

74.    DACA's conferral of lawful presence means a DACA recipient satisfies

17

the lawful-presence prerequisite for the alien to be eligible for a retirement benefit in PRWORA. *See id.* § 1611(b)(4).

75.    DACA's conferral of lawful presence means a DACA recipient is eligible for tolling of the IIRIRA reentry-ban clock that accrues during periods of unlawful presence. *See id.* § 1182(a)(9)(B).

76.    DACA's conferral of lawful presence also creates eligibility for various State benefits—including a driver's license in most States.

77.    Additionally, the Executive Branch treats DACA's conferral of "deferred action" as conferring eligibility for "work authorization." **Exhibit 1** at 3.

78.    The Executive has consistently told aliens that their DACA applications *must* be accompanied by applications for a Form I-765 application for work authorization. *See Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/frequently-asked-questions (last visited May 1, 2018).

79.    Work authorization has been granted to the substantial majority of DACA recipients.

80.    "The United States concedes that '[a]n alien with work authorization may obtain a Social Security Number,' 'accrue quarters of covered employment,' and 'correct wage records to add prior covered employment within approximately three years of the year in which the wages were earned or in limited circumstances thereafter.'" *Texas*, 809 F.3d at 149 (citation omitted).

81.    DACA recipients are eligible for earned income tax credits once they received a Social Security number.

82.     Some DACA recipients have received Earned Income Tax Credits.

83.     The nonpartisan congressional Joint Committee on Taxation estimated that, over a 10-year period, DAPA recipients could have received $1.7 billion in Earned Income Tax Credit payments alone. Press Release, Office of Sen. Chuck Grassley, Senators Introduce Bill Disallowing Tax Credit Under 2014 Executive Actions (Mar. 10, 2015), https://www.grassley.senate.gov/news/news-releases/senators-introduce-bill-disallowing-tax-credit-under-2014-executive-actions.

84.     The June 15, 2012 DACA memo stated that "[t]his memorandum confers no . . . pathway to citizenship." **Exhibit 1** at 3.

85.     However, the Executive's implementation of DACA has conferred United States citizenship and a pathway to citizenship on some DACA recipients.

86.     The Executive has given some DACA recipients "advance parole."

87.     The "advance parole" granted to aliens because of their receipt of DACA has resulted in some of those aliens obtaining adjustment to LPR status, for which they would otherwise be ineligible.

88.     LPR status is commonly referred to as possessing a "green card." *See supra* ¶ 13 & n.1.

89.     LPR status provides a pathway to United States citizenship. *See* 8 U.S.C. § 1427(a).

90.     By allowing advance parole, which satisfies a requisite for a green card under the Executive's practice, DACA allowed aliens to obtain citizenship when their

unlawful entry into the United States would otherwise foreclose this pathway to citizenship.

91.     The "advance parole" granted to aliens because of their receipt of DACA has resulted in some of those aliens obtaining United States citizenship.

92.     "Advance parole" is an Executive practice that allows aliens to leave the country and reenter. USCIS, Deferred Action for Childhood Arrivals (DACA) Toolkit, *supra*, 23-24; Letter from León Rodríguez, Dir., USCIS, to Hon. Charles Grassley 3-4 (Oct. 9, 2014), *Texas*, 86 F. Supp. 3d 591 (No. 1:14-cv-254), ECF No. 64-48; *Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/frequently-asked-questions (last visited May 1, 2018).

93.     The Executive has deemed DACA and Expanded DACA recipients who obtain "advance parole" from the Executive—and then leave and reenter the United States—as being lawfully "admitted or paroled into the United States" upon reentry. 8 U.S.C. § 1255(a).

94.     Congressional statutes, however, generally impose a reentry ban for aliens who were unlawfully present in the country for more than 180 days as an adult. *See id.* § 1182(a)(9)(B)(i) (3-year reentry ban for aliens "unlawfully present in the United States for a period of more than 180 days but less than 1 year"; 10-year reentry ban for aliens "unlawfully present in the United States for one year or more"); *id.* § 1182(a)(9)(B)(iii)(I) (unlawful presence before 18 is not counted).

95.     Under DACA's criteria, an alien must have been in the United States for more than 180 days to possibly qualify for DACA.

96.     Thus, Congress's reentry ban applies to all DACA recipients over 18.5 years of age.

97.     The Executive's discretion to waive this reentry ban is significantly limited, as that waiver authority only applies "in the case of an immigrant who is the *spouse or son or daughter* of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to such immigrant alien would result in *extreme hardship* to the citizen or lawfully resident spouse or parent of such alien." *Id.* § 1182(a)(9)(B)(v) (emphases added).

98.     Congressional statutes also significantly limit the Executive's authority to grant aliens temporary "parole" into the country: "The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis *for urgent humanitarian reasons or significant public benefit* any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien *shall forthwith return or be returned to the custody* from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.* § 1182(d)(5)(A) (emphases added).

99.    The Executive considers "advance parole" an exercise of its humanitarian-parole authority. *E.g.*, DHS, DACA National Standard Operating Procedures 125, *Texas*, 86 F. Supp. 3d 591 (No. 1:14-cv-254), ECF No. 64-17.

100.    Unlike other categories of aliens seeking advance parole, the Executive has not required DACA recipients to qualify for the "urgent humanitarian reasons" or "significant public benefit" statutory requirements for parole. 8 U.S.C. § 1182(d)(5)(A). *See* USCIS, Instructions for Application for Travel Document 4-5 (expires Dec. 31, 2018), https://www.uscis.gov/system/files_force/files/form/i-131instr.pdf?download=1.

101.    Instead, the Executive has considered DACA recipients eligible for advance parole based on its own far broader criteria:

- "humanitarian purposes," such as "travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative";

- "educational purposes," such as participating in "semester-abroad programs" or "academic research"; or

- "employment purposes," including "overseas assignments, interviews, conferences or, training, or meetings with clients overseas."

*Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/frequently-asked-questions (last visited May 1, 2018).

102.    The Executive's conferral of advance parole on DACA recipients did not invoke the limited "extreme hardship" exception to the reentry ban that applies to DACA recipients. 8 U.S.C. § 1182(a)(9)(B)(v).

103.    To the contrary, the Executive considers an alien with advance parole not to have made a "departure" from the United States by physically leaving the country, so there would never be a triggering of the reentry bar when that alien returns to the United States and seeks parole into the country at the port of entry. 7 USCIS, Policy Manual, pt. M, ch. 3 (last updated Aug. 23, 2017), https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume7-PartM-Chapter3.html (citing *In re Arrabally and Yerrabelly*, 25 I&N Dec. 771 (BIA 2012)).

104.    Advance parole is unlawful as applied to DACA recipients over 18.5 years of age because those aliens are reentry-barred under 8 U.S.C. § 1182(a)(9)(B) and the Executive has not purported to excuse that bar under the limited exception of § 1182(a)(9)(B)(v).

105.    Independently, advance parole is unlawful as it has been applied to all DACA recipients because the Executive has not required DACA recipients to qualify for the "urgent humanitarian reasons" or "significant public benefit" statutory requirements for parole. *Id.* § 1182(d)(5)(A).

106.    For an alien to be eligible to adjust to lawful-permanent-resident status (and thus obtain a pathway to United States citizenship), the alien must be lawfully "admitted or paroled into the United States." *Id.* § 1255(a).

107.    Thus, leaving and reentering the United States with advance parole removes a significant impediment for some otherwise unlawfully present aliens to seek adjustment to LPR status (which entails a pathway to United States citizenship). *See* Immigrant Legal Res. Ctr., Practice Advisory: DACA, Advance Parole, and Family Petitions 2-3, 7 (June 2016), https://www.ilrc.org/sites/default/files/resources/prac_adv-daca_advance_parole_fam_pet-20160531.pdf.

108.    Indeed, DACA recipients have successfully adjusted their status after being paroled back into the United States. *See, e.g.*, *id.* at 7.

109.    As of December 31, 2015, at least 2,994 DACA recipients were approved for adjustment to LPR status. *See* Letter from León Rodríguez, Dir., USCIS, to Hon. Charles E. Grassley (June 29, 2016), https://www.judiciary.senate.gov/imo/media/doc/2016-06-29%20USCIS%20to%20CEG%20-%20DACA%20Advance%20Parole%20Program.pdf.

110.    As of August 21, 2017, approximately 39,514 DACA recipients were adjusted to LPR status. *See* Press Release, Office of Sen. Chuck Grassley, Data Indicate Unauthorized Immigrants Exploited Loophole to Gain Legal Status, Pathway to Citizenship (Sept. 1, 2017), https://www.grassley.senate.gov/news/news-releases/data-indicate-unauthorized-immigrants-exploited-loophole-gain-legal-status.

111.    Thus, some individuals now have a previously unavailable pathway to United States citizenship on account of receiving DACA, even though the June 15, 2012 DACA memo said that DACA would confer no pathway to United States citizenship.

112.   Of those aliens, as of August 21, 2017, approximately 2,181 DACA recipients have applied for United States citizenship, and approximately 1,056 DACA recipients have been granted United States citizenship. *See id.*

113.   By enabling this pathway to citizenship, DACA provided an additional incentive for unlawfully present aliens, who would otherwise be subject to up to a ten-year reentry ban, to remain in the United States rather than return to their country of nationality. *Cf. Texas*, 86 F. Supp. 3d at 635.

114.   For an alien whose pathway to citizenship (for example, through an immigrant visa from marriage to a United States citizen) is foreclosed by his accrued unlawful presence, traveling to the alien's home country and returning with advance parole is likely preferable to returning to the alien's home country and waiting out a ten-year unlawful-presence reentry bar.

115.   Because it is unlawful to grant advance parole premised on DACA status, it is unlawful for the Executive to adjust an alien's status to lawful-permanent-resident status based on that advance parole.

116.   Consequently, it is unlawful for the Executive to confer lawful-permanent-resident status or United States citizenship on DACA recipients who were ineligible to adjust their status but for advance parole.

117.   Before the 2012 DACA memo issued, former President Obama asked the Department of Justice's Office of Legal Counsel ("OLC") whether DACA "would be legally permissible." Memorandum Opinion for the Secretary of Homeland Security

and the Counsel to the President 18 n.8 (Nov. 19, 2014) ("OLC Memo"), attached as **Exhibit 4**.

118.   The OLC Memo never mentioned that DACA or Expanded DACA confers lawful presence.

119.   The OLC Memo never mentioned that DACA or Expanded DACA could confer a pathway to citizenship.

120.   OLC's "preliminary view was that such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis." *Id*.

121.   OLC explained that "extending deferred action to individuals who satisfied these and other specified criteria on a class-wide basis would raise distinct questions not implicated by ad hoc grants of deferred action." *Id*.

122.   OLC "advised that it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria." *Id*.

## IV.   The Obama Administration's Refusal to Follow Immigration Laws Caused a Humanitarian Crisis.

123.   The Executive Branch did not stop at DACA with dispensing with the Nation's immigration laws. Rather, the former Presidential Administration adopted a policy that encouraged international child smuggling across the Texas-Mexico

border. *See* Order at 2, *United States v. Nava-Martinez*, No. 1:13-cr-00441 (S.D. Tex. Dec. 13, 2013), ECF No. 37.

124.   The defendant in *Nava-Martinez*, an admitted human trafficker, was caught attempting to smuggle a ten-year-old Salvadoran girl into the United States. *Id.* at 1.

125.   In *Nava-Martinez*, the district court noted that this was "the fourth case with the same factual situation this Court has had in as many weeks." *Id.* at 3. Although the human traffickers were apprehended in each case, "the DHS completed the criminal conspiracy . . . by delivering the minors to the custody of the parent." *Id.*

126.   This was done pursuant to DHS's "apparent policy . . . of completing the criminal mission of individuals who are violating the border security of the United States." *Id.* at 2. As the district court observed, "[t]his DHS policy is a dangerous course of action." *Id.* Under the policy, "instead of enforcing the laws of the United States, the Government [takes] direct steps to help the individuals who violated it." *Id.* at 3.

127.   Moreover, the district court found that DHS's policy promotes human trafficking, which in turn "help[s] fund the illegal drug cartels which are a very real danger for both citizens of this country and Mexico." *Id.* at 6. The district court explained that citizens of the United States bear the economic brunt of this policy, because DHS "fund[s] these evil ventures with their tax dollars." *Id.* at 8. In addition, the policy harms the citizens of each country that suffers from the "nefarious activities of the cartels." *Id.*

27

128.    DACA and the policy described in *Nava-Martinez* have had and continue to have dire consequences in Plaintiff States. In the summer of 2014, an enormous wave of unlawfully present aliens surged across the Texas-Mexico border, creating what President Obama described as a "humanitarian crisis." Nick Miroff & Joshua Partlow, *Central American Migrants Overwhelm Border Patrol Station in Texas*, WASH. POST (June 12, 2014).

129.    Law enforcement officers reported "picking up children as young as 4 without their parents and other children with Hello Kitty backpacks, cellphones and the telephone numbers of U.S. relatives on note cards." Miroff & Partlow, *supra*.

130.    But the humanitarian crisis is by no means limited to unaccompanied children. "[A]n unprecedented surge of families crossing illegally into the U.S." has also been recognized. Cindy Carcamo, *Rumors of U.S. Haven for Families Spur Rise in Illegal Immigration*, L.A. TIMES (June 6, 2014). While immigration officials do not have an official count of such families, they have acknowledged that "the numbers appear to be substantial." *Id.*

131.    This wave of immigration was concentrated in the Rio Grande Valley of South Texas. Miroff & Partlow, *supra*. A June 2014 report noted that "[e]very day, hundreds of Central American migrants, in groups as large as 250 people, are wading across the muddy Rio Grande." *Id.*

132.    The crisis has imposed enormous law enforcement costs on Plaintiff States. For example, the Texas Department of Public Safety estimated in 2014 that it spent $1.3 million a week on troopers and resources to deal with the immigration

surge; in addition, former Governor Perry deployed 1,000 National Guard troops to the border at a cost of $38 million.

133.   This crisis was caused by the immigration policies of the federal government, including the policy already held to be unlawful. As Ronald D. Vitiello, then serving as Deputy Chief of U.S. Border Patrol, reportedly explained in a 2014 memorandum ("Vitiello Memorandum"), "[i]f the U.S. government fails to deliver adequate consequences to deter aliens from attempting to illegally enter the U.S., the result will be an even greater increase in the rate of recidivism and first-time illicit entries." The Obama Administration acknowledged that there was a "growing perception minors are crossing the border because they feel they will not be deported by the administration." Brett LoGiurato, *There's a Staggering Humanitarian Crisis on the US Border, and It's Only Going to Get Worse*, BUS. INSIDER (June 16, 2014). Indeed, a research report commissioned by DHS revealed that "[w]ord had spread in Central America about a 'lack of consequences' for illegal entry" and that "[s]mugglers were exploiting the system." Susan Carroll, *Report Warned of Child Migrant Crisis*, HOUSTON CHRON. (June 17, 2014).

134.   Former President Obama himself predicted this outcome. On July 1, 2010, he explained that it would be "both unwise and unfair" to "ignore the laws on the books and put an end to deportation" because it "would suggest to those thinking about coming here illegally that there will be no repercussions for such a decision." That in turn, President Obama recognized, "could lead to a surge in more illegal immigration." As President Obama concluded, "no matter how decent they are, no

matter their reasons, the 11 million who broke these laws should be held accountable." President Barack Obama, Remarks on Comprehensive Immigration Reform (July 1, 2010), https://obamawhitehouse.archives.gov/the-press-office/remarks-president-comprehensive-immigration-reform.

135.   The Obama Administration, however, contributed to the surge of illegal immigration by refusing to enforce the laws on the books. On average, only 1,600 unaccompanied children are removed each year; in 2013, there were over 20,000 detentions of unaccompanied children from Guatemala, Honduras, and El Salvador, but only 496 unaccompanied children from those countries were repatriated. Carroll, *supra*. The total number of unlawfully present children deported by the Obama Administration in 2013 was only 1,669—an 80 percent reduction from 2008. Brian Bennett, *Deportation Data Won't Dispel Rumors Drawing Migrant Minors to U.S.*, L.A. TIMES (July 5, 2014).

136.   By fiscal year 2016, the number of unaccompanied children captured at the border spiked to nearly 60,000. *See* Press Release, United States Border Patrol Southwest Family Unit Subject and Unaccompanied Alien Children Apprehensions Fiscal Year 2016: Statement by Secretary Johnson on Southwest Border Security (Oct. 18, 2016), https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016.

137.   Similarly, adults with children who are detained at the border are routinely released and allowed to travel within the United States. Carcamo, *supra*. And while they may be instructed to show up for a follow-up appointment, "ICE

officials said they couldn't guarantee that they would pursue all cases in which immigrants do not show up for follow-up appointments." *Id.* Tellingly, the immigrants arrested for illegally entering the U.S. refer to ICE's Notice to Appear documents as "permisos," or permits. Byron York, *On Immigrant Surge, White House Story Falls Apart*, WASH. EXAMINER (June 16, 2014).

138.    Unsurprisingly, the unlawfully present aliens crossing the border are motivated primarily by the belief that they will not be deported. The federal government's own analysis demonstrates as much. When Border Patrol agents recently questioned 230 unlawfully present aliens about why they came, "[t]he results showed overwhelmingly that the immigrants, including those classified as . . . unaccompanied children, were motivated by the belief that they would be allowed to stay in the United States." *Id.*

139.    Multiple reports indicate that unlawfully present aliens are counting on federal officials for help in reuniting with their friends or family in the U.S. According to a June 2014 report, hundreds of Central American migrants were "turning themselves in to the Border Patrol" on a daily basis. Miroff & Partlow, *supra*. One unlawfully present alien stated that she and her group "had looked forward to being caught . . . at one point even waving down federal helicopters . . . because of the welcoming treatment they had assumed they would receive." Carcamo, *supra*. Another planned to surrender to Border Patrol because she had heard "that the Americans are helping Hondurans right now," especially women and children. Miroff & Partlow, *supra*. All of the 230 unlawfully present aliens interviewed by Border

Patrol agents for their report "stated that they had family members or, to a lesser extent, friends already living in the U.S." York, *supra*.

140.    The Obama Administration conceded that its failure to enforce the federal immigration laws increased the flow of illegal immigration across the Texas-Mexico border. *See* Vitiello Memorandum, *supra*.

141.    The effects of that failure have caused acute crises in Plaintiff States.

## V.    Former President Obama "Change[d] the Law" Again—Through the 2014 DHS Memorandum Creating Expanded DACA and DAPA.

142.    Between the unveiling of the 2012 DACA memorandum and the midterm elections in November 2014, former President Obama repeatedly stated that any extension of DACA would be unlawful and would have to be accomplished by legislation. He said, for instance:

- "[A]s the head of the executive branch, there's a limit to what I can do. . . . [U]ntil we have a law in place that provides a pathway for legalization and/or citizenship for the folks in question, we're going to . . . continue to be bound by the law." President Barack Obama, Remarks at Univision Town Hall with Jorge Ramos and Maria Elena Salinas (Sept. 20, 2012), https://obamawhitehouse.archives.gov/the-press-office/2012/09/20/remarks-president-univision-town-hall-jorge-ramos-and-maria-elena-salina.

- "We are a nation of immigrants. . . . But we're also a nation of laws. So what I've said is we need to fix a broken immigration system. And I've done everything I can on my own." President Barack Obama, Remarks at Second

Presidential        Debate        (Oct.        16,        2012),

https://obamawhitehouse.archives.gov/the-press-

office/2012/10/17/remarks-president-and-governor-romney-second-

presidential-debate.

- In response to a question about the possibility of a moratorium on deportations for non-criminals: "I'm not a king. I am the head of the executive branch of government. I'm required to follow the law." President Barack Obama, Interview with Univision (Jan. 30, 2013), http://abcnews.go.com/ABC_Univision/Politics/transcript-president-barack-obama-interview-univisions-maria-elena/story?id=18365068.

- In response to the question whether he could do for "an undocumented mother of three" what he did for DACA recipients: "I'm not a king. . . . [W]e can't simply ignore the law. When it comes to the dreamers– we were able to identify that group . . . . But to sort through all the possible cases– of everybody who might have a sympathetic story to tell is very difficult to do. This is why we need comprehensive immigration reform. . . . [I]f this was an issue that I could do unilaterally I would have done it a long time ago. . . . The way our system works is Congress has to pass legislation. I then get an opportunity to sign it and implement it." President Barack Obama, Interview        with        Telemundo        (Jan.        30,        2013), http://nbclatino.com/2013/01/30/obama-tells-telemundo-he-hopes-for-immigration-overhaul-within-6-months/.

- "[T]his is something I've struggled with throughout my presidency. The problem is that . . . I'm the president of the United States. I'm not the emperor of the United States. . . . And what that means is that we have certain obligations to enforce the laws that are in place . . . . [W]e've kind of stretched our administrative flexibility as much as we can." President Barack Obama, Remarks on Immigration Reform (Feb. 14, 2013), https://www.youtube.com/watch?v=-e9lmy_8FZM&feature=youtu.be.

- "I think that it is very important for us to recognize that the way to solve this problem has to be legislative. . . . And we've been able to provide help through deferred action for young people and students . . . . But this is a problem that needs to be fixed legislatively." President Barack Obama, Interview with Univision (July 16, 2013), http://communications-univisionnews.tumblr.com/post/55694544539/univision-news-transcript-adriana-vargas.

- "[M]y job in the executive branch is supposed to be to carry out the laws that are passed. Congress has said 'here is the law' when it comes to those who are undocumented, and they've allocated a whole bunch of money for enforcement. . . . What we can do is then carve out the DREAM Act, saying young people who have basically grown up here are Americans that we should welcome. . . . *But if we start broadening that, then essentially I would be ignoring the law in a way that I think would be very difficult to defend legally. So that's not an option.* . . . What I've said is . . . there's a path to get

34

this done, and that's through Congress." President Barack Obama, Interview with Telemundo (Sept. 17, 2013), https://www.realclearpolitics.com/video/2013/09/17/obama_halting_deport ations_not_an_option_would_be_ignoring_the_law.html (emphasis added).

- "[I]f, in fact, I could solve all these problems without passing laws in Congress, then I would do so. But we're also a nation of laws. That's part of our tradition. And so the easy way out is to try to yell and pretend like I can do something by violating our laws. And what I'm proposing is the harder path, which is to use our democratic processes to achieve the same goal that you want to achieve." President Barack Obama, Remarks on Immigration Reform in San Francisco, California (Nov. 25, 2013), https://obamawhitehouse.archives.gov/the-press-office/2013/11/25/remarks-president-immigration-reform-san-francisco-ca.

- "[W]hat I've said in the past remains true, which is until Congress passes a new law, then I am constrained in terms of what I am able to do. What I've done is to use my prosecutorial discretion . . . . What we've said is focus on folks who are engaged in criminal activity, focus on people who are engaged in gang activity. Do not focus on young people, who we're calling DREAMers . . . . That already stretched my administrative capacity very far. But I was confident that that was the right thing to do. But at a certain point the reason that these deportations are taking place is, Congress said, [']you have to enforce these laws.['] They fund the hiring of officials at the

department that's charged with enforcing. *And I cannot ignore those laws any more than I could ignore, you know, any of the other laws that are on the books*." President Barack Obama, Interview with Univision (Mar. 6, 2014), http://communications-univisionnews.tumblr.com/post/79266471431/univision-news-transcript-interview-with (emphasis added).

143.   Former President Obama repeatedly called on Congress to pass an immigration reform bill. Congress did not do so.

144.   After being rebuffed by Congress again, former President Obama announced that he would unilaterally create a program conferring lawful presence and work authorizations for an additional estimated 4 million unlawfully present aliens.

145.   On November 20, 2014, former DHS Secretary Johnson issued the DAPA memo creating Expanded DACA and DAPA. *See Texas*, 809 F.3d at 146-48; **Exhibit 3**.

146.   Like the DACA memo, the DAPA memo again created a class-based deferred-action program—that confers eligibility for lawful presence and work authorization—without congressional authorization or notice-and-comment procedure.

147.   The DAPA memo first expanded the class eligible for DACA relief by: (1) eliminating the DACA criteria's age cap, (2) increasing the DACA term from two

years to three years, and (3) pushing the DACA date-of-entry deadline from 2007 to 2010. **Exhibit 3** at 3-4.

148.   The DAPA memo then directed USCIS "to establish a process, similar to DACA," for granting three-year terms of deferred action to a new class of aliens: unlawfully present aliens who were parents of United States citizens and other lawful permanent residents who were not enforcement priorities. *Id.* at 4.

149.   Together, the coverage criteria for DAPA and Expanded DACA would have covered approximately 40% of the country's known population of unlawfully present aliens.

150.   The 2014 DAPA and Expanded DACA—like the original 2012 DACA— did not merely forbear from removing aliens who qualified. All three affirmatively granted lawful presence and eligibility for work authorization to those who would otherwise be unlawfully present and unauthorized to work.

151.   The November 20, 2014 DAPA memo stated that "[t]his memorandum confers no . . . pathway to citizenship." *Id.* at 5.

152.   The DAPA memo stated that "deferred action . . . may be terminated at any time at the agency's discretion." *Id.* at 2.

153.   Former President Obama candidly admitted that his plan, through these programs, was unilateral legislation: "What you're not paying attention to is, *I just took an action to change the law.*" Steven T. Dennis, *Obama on Immigration: "I Just Took an Action to Change the Law*," ROLL CALL (Nov. 25, 2014) (emphasis added),

http://www.rollcall.com/news/home/immigration-reform-news-obama-immigration-action-law.

154. Former President Obama further admitted that he was changing the law because Congress chose not to: "[T]o those members of Congress who question my authority to make our immigration system work better . . . I have one answer: Pass a bill. . . . And the day I sign that bill into law, the actions I take will no longer be necessary." President Barack Obama, Remarks by the President in Address to the Nation on Immigration (Nov. 20, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/11/20/remarks-president-address-nation-immigration.

155. Former President Obama also made clear that he was "offer[ing] the following deal" to unlawfully present aliens: "[I]f you've taken responsibility, you've registered, undergone a background check, you're paying taxes, you've been here for five years, you've got roots in the community—you're not going to be deported. . . . If you meet the criteria, you can come out of the shadows, you can get right with the law." President Barack Obama, Remarks by the President on Immigration (Nov. 21, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/11/21/remarks-president-immigration.

156. Through the creation of Expanded DACA and DAPA, the Obama Administration again dispensed with certain of the Nation's immigration laws without congressional approval.

## VI.    Courts Rule that Expanded DACA and DAPA are Unlawful, Stopping Former President Obama's Unlawful Executive Overreach.

157.    On December 3, 2014, Plaintiffs and other States filed a lawsuit in this district court seeking to immediately halt the implementation of Expanded DACA and DAPA.

158.    On February 16, 2015, the district court granted the requested relief and issued a preliminary injunction of Expanded DACA and DAPA. In its opinion, the district court explained, despite the Defendants' claims to the contrary, that the plaintiffs were likely to succeed on the merits of their claim and that they would suffer irreparable harm if Expanded DACA and DAPA went into effect. *Texas*, 86 F. Supp. 3d at 671-72, 674.

159.    The Defendants issued Expanded DACA permits both before and after the district court entered the preliminary injunction of the 2014 memorandum. *Texas v. United States*, No. 1:14-cv-254, 2016 WL 3211803 (S.D. Tex. May 19, 2016).

160.    The district court, *see Texas v. United States*, No. 1:14-cv-254, 2015 WL 1540022, at *8 (S.D. Tex. Apr. 7, 2015), and the Fifth Circuit, *Texas v. United States*, 787 F.3d 733, 769, 784 (5th Cir. 2015), denied a stay of the preliminary injunction.

161.    The Defendants appealed from the district court's preliminary injunction. The Fifth Circuit affirmed, finding that the plaintiffs had standing to challenge the Executive's class-based deferred-action programs that grant lawful presence and work authorization, that such programs are judicially reviewable, that Expanded DACA and DAPA were unlawful both procedurally (as promulgated without notice and comment) and substantively (as foreclosed by substantive federal

statutes), and that the plaintiffs satisfied the equitable requirements for a preliminary injunction. *Texas*, 809 F.3d at 150-88.

162.    On June 23, 2016, the Supreme Court affirmed the Fifth Circuit's judgment by an equally divided Court. *Texas*, 136 S. Ct. 2271.

**VII.    On June 15, 2017, DHS Secretary Kelly Rescinded the 2014 DAPA and Expanded DACA Memo, But the Secretary Left in Effect the 2012 DACA Program and Some Expanded DACA Permits Granted Under the Rescinded 2014 Memo.**

163.    On July 18, 2016, the Defendants filed a petition for rehearing in the Supreme Court. The parties to the DAPA litigation agreed to continue to stay all merits proceedings before the district court until the Supreme Court ruled on the petition. *Texas*, No. 1:14-cv-254 (S.D. Tex. Aug. 31, 2016) (Text Order).

164.    On October 3, 2016, the Supreme Court denied the Defendants' petition for rehearing. *United States v. Texas*, 137 S. Ct. 285 (2016).

165.    On November 18, 2016, the parties to the DAPA lawsuit filed a joint motion to stay the merits proceedings until February 20, 2017, to allow the new Presidential Administration time to consider its position. Joint Motion to Stay Merits Proceedings, *Texas*, No. 1:14-cv-254 (S.D. Tex. Nov. 18, 2016), ECF No. 430.

166.    On January 19, 2017, the district court granted a stay of merits proceedings in the DAPA litigation until March 17, 2017. *Texas*, No. 1:14-cv-254 (S.D. Tex. Jan. 19, 2017) (Order), ECF No. 435.

167.    On March 17, 2017, the Defendants filed another unopposed motion to stay district court proceedings in the DAPA lawsuit—this time seeking until June 15, 2017 to propose a scheduling order. Unopposed Motion to Stay Merits Proceedings,

*Texas*, No. 1:14-cv-254 (S.D. Tex. Mar. 17, 2016), ECF No. 438.

168.    On March 22, 2017, the district court granted the stay of the DAPA litigation and ordered the parties to propose a discovery schedule by June 15, 2017. *Texas*, No. 1:14-cv-254 (S.D. Tex. Mar. 22, 2017) (Order), ECF No. 439.

169.    On June 15, 2017, the Defendants again requested a two-week stay of merits proceedings in the DAPA lawsuit. Unopposed Motion to Stay Merits Proceedings, *Texas*, No. 1:14-cv-254 (S.D. Tex. June 15, 2017), ECF No. 444.

170.    On that same date—June 15, 2017—former DHS Secretary Kelly issued a new memorandum "rescind[ing] the November 20, 2014 DAPA memorandum and the policies announced therein." **Exhibit 5** at 2.

171.    Secretary Kelly added that "[t]he June 15, 2012 DACA memorandum, however, will remain in effect." *Id*.

172.    Secretary Kelly also explained that his memorandum did "not alter the remaining periods of deferred action under the Expanded DACA policy granted between issuance of the November 20, 2014 Memorandum and the February 16, 2015 preliminary injunction order in the Texas litigation, nor does it affect the validity of related Employment Authorization Documents (EADs) granted during the same span of time." *Id*. at 2 n.3.

173.    Secretary Kelly "remind[ed] [USCIS] officers that (1) deferred action, as an act of prosecutorial discretion, may only be granted on a case-by-case basis." *Id*.

174.    This reminder echoes the DACA memo language that the district court found pretextual in Texas's challenge to DAPA and Expanded DACA. *See Texas*, 86 F. Supp. 3d at 669 n.101.

**VIII.  On September 5, 2017, DHS Withdrew the 2012 DACA Memorandum in Response to an Imminent Legal Challenge Threatened by Plaintiffs and Other States.**

175.    On June 29, 2017, Texas Attorney General Ken Paxton, the attorneys general of nine other states (including Alabama, Arkansas, Louisiana, Nebraska, South Carolina, and West Virginia), and the governor of Idaho sent a letter to the federal Executive Branch urging the Trump Administration to phase out DACA. *See* **Exhibit 6**.

176.    Plaintiffs' June 29, 2017 letter requested "that the Secretary of Homeland Security rescind the June 15, 2012 DACA memorandum and order that the Executive Branch will not renew or issue any new DACA or Expanded DACA permits in the future." *Id*. at 2.

177.    Plaintiffs' letter explained how DACA is unlawful under the Fifth Circuit's decision in *Texas*. *Id*. at 1-2.

178.    Plaintiffs' letter proposed a resolution of the then-pending lawsuit, and avoiding additional litigation relating to DACA: "If, by September 5, 2017, the Executive Branch agrees to rescind the June 15, 2012 DACA memorandum and not to renew or issue any new DACA or Expanded DACA permits in the future, then the plaintiffs that successfully challenged DAPA and Expanded DACA will voluntarily dismiss their lawsuit currently pending in the Southern District of Texas. Otherwise,

the complaint in that case will be amended to challenge both the DACA program and the remaining Expanded DACA permits." *Id*. at 2.

179.   On September 4, 2017, United States Attorney General Sessions wrote the DHS Acting Secretary, advising that DHS should rescind DACA. Letter from Attorney General Sessions to Acting Secretary Duke, https://www.dhs.gov/sites/default/files/publications/17_0904_DOJ_AG-letter-DACA.pdf.

180.   Attorney General Sessions noted that "DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result." *Id*.

181.   Attorney General Sessions advised: "Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." *Id*.

182.   On September 5, 2017, United States Attorney General Sessions publicly announced that DHS would rescind the 2012 DACA memorandum. U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017),              https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca.

183.   During his remarks, Attorney General Sessions stated that by implementing DACA the Obama Administration had "deliberately sought to achieve

43

what the legislative branch specifically refused to authorize on multiple occasions" and that "[s]uch an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." *Id*.

184.   Attorney General Sessions further explained that DACA was "vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program" and that if DHS decided to maintain DACA, "the likeliest outcome is that it would be enjoined just as was DAPA." *Id*.

185.   Attorney General Sessions also observed that "[t]he effect of [DACA], among other things, contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences. It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." *Id.*

186.   On September 5, 2017, DHS issued a memorandum rescinding the 2012 DACA memorandum. *See* **Exhibit 7**.

187.   The September 2017 memorandum initiated the DACA wind-down process. The memorandum provided that DHS would "adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of [September 5, 2017], and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017." *Id*. at 5.

188.    The September 2017 memorandum allowed for the orderly phase-out of DACA.

189.    DHS's September 2017 memorandum and the impending wind-down of DACA thus satisfied the condition proposed by Plaintiffs' June 29, 2017 letter for ending the then-pending lawsuit and avoiding additional litigation regarding DACA.

190.    The Plaintiffs therefore did not file an amended complaint challenging DACA in September 2017.

191.    Instead, the parties to the then-pending DAPA/Expanded DACA lawsuit filed a stipulation of dismissal on September 12, 2017, in that suit. Stipulation of Dismissal, *Texas*, No. 1:14-cv-254 (S.D. Tex. Sept. 12, 2017), ECF No. 473,

## IX.    Following the September 2017 Memorandum, Numerous Parties Seek to Halt the Recession of DACA—Acknowledging, in the Process, that DACA Was Never Lawful.

192.    Following DHS's September 2017 DACA rescission memorandum, lawsuits were filed claiming that the decision to rescind DACA was itself unlawful. Five of these actions were filed in the U.S. District Court for the Northern District of California, and at least four other lawsuits were filed in other federal district courts. *See* Complaint, *Trs. of Princeton Univ. v. United States*, No. 1:17-cv-2325 (D.D.C. Nov. 3, 2017), ECF No. 1; Complaint, *NAACP*, No. 1:17-cv-1907 (D.D.C. Apr. 24, 2018), ECF No. 1; 2d Am. Complaint, *Vidal v. Nielsen*, No. 1:16-cv-4756 (E.D.N.Y. Sept. 29, 2017), ECF No. 29; Complaint, *New York v. Trump*, No. 1:17-cv-5228 (E.D.N.Y. Sept. 6, 2017), ECF No. 1.

193.   In those challenges to the 2017 executive action, the plaintiffs' own pleadings essentially concede that DACA itself was unlawful because—as Plaintiff States allege in this suit—it was a substantive rule that modified rights and was thus required to go through APA notice-and-comment procedures.

194.   For example, in a challenge brought by the University of California, the plaintiffs claim that the September 2017 rescission memorandum "constitutes a substantive rule subject to APA's notice-and-comment requirements." Complaint 14, *Regents of Univ. of Cal. v. Dep't of Homeland Sec.*, No. 3:17-cv-5211 (N.D. Cal. Sept. 8, 2017), ECF No. 1. This statement could be true only if DACA, the program being rescinded, was itself a substantive rule.

195.   The University of California plaintiffs further admit that DACA unilaterally modified rights by conferring lawful presence:

> Individuals with DACA status were "not considered to be unlawfully present during the period in which deferred action [was] in effect." USCIS FAQs.

*Id*. at 8.

196.   In the same litigation, the State of California concedes that "DACA Provides Numerous Benefits," which they describe in detail:

> 83. DACA grantees are granted eligibility to receive *employment authorization*.
>
> 84. DACA also opened the door to *allow travel* for DACA grantees. For example, DACA grantees were allowed to briefly depart the U.S. and legally return under certain circumstances, such as to visit an ailing relative, attend funeral services for a family member, seek medical treatment, or further educational or employment purposes. 8 U.S.C. § 1182(a)(9)(B)(i); *see also* Ex. E,

USCIS, Frequently Asked Questions, DHS DACA FAQs ("DACA FAQs") (Apr. 25, 2017) Q57. Travel for vacation is not permitted.

85. Unlike other undocumented immigrants, DACA grantees are not disqualified on the basis of their immigration status from receiving certain public benefits. These include *federal Social Security, retirement, and disability benefits*. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d). As a result, and in reliance on DHS's oft-stated position that DACA and similar programs are a lawful exercise of the agency's authority, Plaintiff States have structured some schemes around DACA which allow, for example, applicants to demonstrate eligibility for state programs by producing documentation that they have been approved under DACA. The rescission of DACA undermines such regulatory frameworks.

86. DACA grantees are able to secure equal access to other *benefits* and opportunities on which Americans depend, including opening bank accounts, obtaining credit cards, starting businesses, purchasing homes and cars, and conducting other aspects of daily life that are otherwise often unavailable for undocumented immigrants.

Complaint at 17-18, *California v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-5235 (N.D. Cal. Sept. 11, 2017), ECF No. 1 (emphases added).

197.   In the *New York* lawsuit, the plaintiffs similarly allege that DACA affirmatively confers benefits—that is, that DACA alters substantive rights:

218. DACA *confers* numerous *benefits* on DACA grantees. Notably, DACA grantees are *granted the right* not to be arrested or detained based solely on their immigration status during the time period their deferred action is in effect. *See* Ex. 14, Question 9. . . . .

220. DACA grantees are eligible to receive certain *public benefits*. These include *Social Security, retirement, and disability benefits*, and, in certain states, benefits such as driver's licenses or unemployment insurance. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d). In the State of Washington, DACA holders also are eligible for certain state financial aid programs and state-funded food assistance. *See* Wash. Rev. Code § 28B.92.010; Wash. Admin.

> Code §§ 388-400-0050, 388-424-0001, 388-424-0030. In the State
> of New York, DACA holders are eligible for teaching and nursing
> licenses. *See* Comm. of Educ. Regs. §§ 59.4; 80-1.3; Ex. 78 (NYS
> Board of Regents Press Release, Feb. 24, 2016).

Complaint at 41, *New York*, No. 1:17-cv-5228, ECF No. 1 (emphases added).

198.   Like the California plaintiffs, the New York plaintiffs have likewise
tacitly admitted that DACA was a substantive rule because it modified rights:

> 289. In implementing the DHS Memorandum, federal
> agencies have changed the substantive criteria by which
> individuals DACA grantees work, live, attend school,
> obtain credit, and travel in the United States. Federal
> agencies did not follow the procedures required by the APA
> before taking action impacting these substantive rights.

*Id.* at 54.

199.   If DACA's rescission affected substantial rights, as the challengers to
DHS's September 2017 memorandum claim, then DACA also affected substantial
rights and was unlawful in the first place as alleged in the instant lawsuit.

## X.   The Northern District of California Enjoins DHS's Wind-Down of DACA.

200.   On January 9, 2018, the U.S. District Court for the Northern District of
California issued an injunction in the challenge brought by the University of
California and other plaintiffs to the 2017 executive action rescinding DACA. *See*
*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011 (N.D.
Cal. 2018). The Northern District of California ordered DHS, "pending final judgment
herein or other order, to maintain the DACA program on a nationwide basis on the
same terms and conditions as were in effect before the rescission on September 5,

2017, including allowing DACA enrollees to renew their enrollments," subject to several exceptions. *See id.* at 1048-49.

201.    The Northern District of California's order stated that "new applications from applicants who have never before received deferred action need not be processed." *Id.* at 1048.

202.    The Northern District of California further indicated that "the advance parole feature need not be continued for the time being for anyone," *id.*, and that this injunction order "will not require advance parole," *id.* at 1049.

203.    The Northern District of California concluded that DHS "may take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application." *Id.* at 1048.

204.    DHS also was ordered to "post reasonable public notice that it will resume receiving DACA renewal applications and prescribe a process consistent with" the Northern District of California's order. *Id.*

205.    On April 24, 2018, the U.S. District Court for the District of Columbia issued an order in the challenge brought by the NAACP and other plaintiffs to the 2017 executive action rescinding DACA. *See NAACP*, 2018 WL 1920079, at *1-28. The district court ordered that it would "vacate the Department's September 5, 2017 decision to rescind the DACA program" and "grant plaintiffs' motion for partial summary judgment as to their substantive APA claim." *Id.* at *28.

206.    The district court found that the "[v]acatur of DACA's rescission will mean that DHS must accept and process new as well as renewal DACA applications." *Id.* at *1.

207.    The District of Columbia district court stated that it would "stay its order of vacatur for 90 days, however, to afford DHS an opportunity to better explain its view that DACA is unlawful." *Id.* at *28.

208.    The Northern District of California's injunction of the Executive's 2017 decision to wind down DACA and the District of Columbia's vacatur of the wind-down decision forced this lawsuit to declare whether the Executive had authority to promulgate DACA in the first place. Because DACA is still in effect, the basis upon which Plaintiffs agreed to resolve the prior litigation has been frustrated, and Plaintiffs therefore effectuate their previously stated plans "to challenge both the DACA program and [any] remaining Expanded DACA permits." **Exhibit 6** at 2.

## THEORIES OF RELIEF

209.    Because permits issued under the Executive's unlawful class-based "deferred action" programs created by the former Presidential Administration remain in existence, Plaintiffs file this Complaint challenging those unlawful acts.

210.    DACA is unlawful for the same reasons that courts held Expanded DACA and DAPA unlawful: The Executive does not have the unilateral power to confer eligibility for lawful presence or work authorization on unlawfully present aliens simply because the Executive chooses not to remove them. *See Texas*, 809 F.3d at 179-81.

50

211.    But for the Executive's implementation of DACA, aliens covered by that program would not be eligible for lawful presence, and would be removable under the INA.

212.    But for the Executive's implementation of DACA, aliens covered by that program would not be eligible for work authorization.

213.    But for the Executive's implementation of the program, many DACA recipients would not be eligible for lawful-permanent-resident status by obtaining advance parole.

214.    But for the Executive's implementation of the program, many DACA recipients would not be eligible for United States citizenship by obtaining advance parole.

215.    Thus, Plaintiffs challenge, at a minimum, (1) the 2012 DACA memo issued by former Secretary Napolitano, (2) the implementation of that 2012 DACA memo, (3) the part of former Secretary Kelly's June 2017 memo retaining the 2012 DACA memo, and (4) any DACA permits that remain in effect.

216.    On belief, no three-year Expanded DACA permits currently remain in effect or will be issued, because such three-year permits were last issued on or before March 2015 (over three years ago) and have not been renewed since that time because of this Court's February 2015 preliminary injunction of Expanded DACA and the Executive Branch's later June 2017 memorandum rescinding Expanded DACA.

217.    If that belief regarding Expanded DACA permits is incorrect, however, Plaintiffs also challenge (1) any part of former Secretary Johnson's 2014 memo

creating Expanded DACA that may remain in effect when combined with former Secretary Kelly's June 2017 memo retaining a subset of previously granted Expanded DACA permits, (2) the part of former Secretary Kelly's June 2017 memo retaining a subset of previously granted Expanded DACA permits, and (3) any Expanded DACA permits that remain in effect. All arguments below concerning DACA equally apply to Expanded DACA.

218.    DACA violates the APA's notice-and-comment requirements, is contrary to law under the APA, and violates the Take Care Clause.

## I.    The Plaintiffs Have Standing.

219.    The Plaintiff States have standing because they have a "personal stake" in the outcome of this litigation. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014).

220.    The Plaintiff States have suffered, and will continue to suffer, concrete injuries that are traceable to DACA, and an injunction of DACA will redress those injuries.

221.    DACA imposes significant costs on Plaintiff States. As the Supreme Court has explained, States "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.

222.    Only one plaintiff needs standing for an Article III case or controversy to exist. *See Texas*, 809 F.3d at 151 (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

223.   Once a concrete injury is shown, the magnitude of that injury is irrelevant to the standing inquiry. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 525-26 (2007).

224.   Both the district court and the Fifth Circuit already have concluded that Plaintiff States have standing to challenge the Executive's unilateral actions conferring class-based deferred action to grant lawful presence and work authorizations.

225.   DACA's conferral of lawful presence triggers eligibility for benefits— some of which are paid for by Plaintiff States. *Id.* at 148-49 (explaining lawful presence status qualifies recipients for Social Security, disability benefits, Medicare, work authorization, unemployment benefits, and driver's licenses).

226.   If Plaintiff States sought to change their benefits programs to prevent DACA recipients from being eligible, Plaintiff States would be threatened with federal preemption through the operation of DACA as it relates to their benefits programs. The Ninth Circuit enjoined—as preempted by federal law—Arizona's state law that prevented the State of Arizona from issuing driver's licenses to DACA recipients. *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 975 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1279 (2018). The Ninth Circuit purported to rest its ruling on the basis that the INA's alien classifications preempted Arizona's law, *id.*, and that is just another way of ruling that DACA is lawful and its lawful-presence designation is lawful as consonant with the INA. DACA's lawful-presence designation, in turn, is what the Ninth Circuit held preempted Arizona's law. After all, without the DACA

program, DACA recipients would not be deemed lawfully present. The Plaintiff States' benefits programs are threatened by such alleged preemption, thus representing an injury imposed by DACA.

227.  Other financial injuries to Plaintiff States are caused by DACA's granting of lawful presence and work authorization. For instance, federal work authorization functions as a precondition for certain professional licenses in Plaintiff States. *See, e.g.*, 16 Tex. Admin. Code § 33.10 (requiring applicants for an alcoholic beverage license to be "legally authorized to work in the United States"); Tex. Bd. of Law Exam'rs, Rules Governing Admission to the Bar of Tex., R. II(a)(5)(J) (making individuals who are "authorized to work lawfully in the United States" eligible to apply for admission as licensed attorneys).

228.  Additionally, Plaintiff States have incurred considerable financial injuries on education, healthcare, and law-enforcement costs caused by DACA.

229.  The Plaintiff States would not otherwise incur certain costs associated with education, healthcare, and law enforcement but for DACA. *See Texas*, 86 F. Supp. 3d at 628-30.

230.  DACA incentivizes aliens—who would otherwise be unlawfully present and unauthorized to work without these programs—to remain in the country. *Id.* at 634-35.

231.  Because additional aliens will remain in Plaintiff States, those aliens will cause Plaintiff States to incur additional financial costs—particularly education, healthcare, and law-enforcement costs.

232.   States are required by federal law to incur some of these costs. For example, the Supreme Court has held that States are constitutionally obligated to provide free education to children of unlawfully present aliens. *Plyler v. Doe,* 457 U.S. 202 (1982). Similarly, both Medicare and Medicaid require provision of emergency services, regardless of lawful-presence status, as a condition of participation. *See* 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255.

233.   As the district court found in Plaintiffs' challenge to DAPA and Expanded DACA, Texas pays about $9,473 per year to educate each unlawfully present alien in its school system. *See Texas*, 86 F. Supp. 3d at 630.

234.   In a single year, "Texas absorbed additional education costs of at least $58,531,100 stemming from illegal immigration." *Id*.

235.   Other expenditures are required by preexisting state law. For example, Texas law requires local governments to provide healthcare for the indigent. *See* Tex. Health & Safety Code §§ 61.001 *et seq*. Texas law also requires nonprofit hospitals to provide unreimbursed care for the indigent as a condition of maintaining their nonprofit status. *See id*. § 311.043. "Evidence in the record . . . shows that in 2008, Texas incurred $716,800,000 in uncompensated medical care provided to illegal aliens." *Texas*, 86 F. Supp. 3d at 630.

236.   Other States besides Texas have similar financial injuries caused by DACA.

237. Under the Article III standing inquiry, courts do not examine whether financial injuries incurred are "offset" by other policies reducing other expenditures. *Texas*, 809 F.3d at 155-56.

238. So any hypothetical financial gains to Plaintiff States caused by DACA are irrelevant for determining whether Plaintiff States have standing.

239. Moreover, Plaintiff States have *parens patriae* standing to protect the quasi-sovereign interest in "the health and well-being" of their citizens. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).

240. Specifically, Plaintiff States seek to protect their citizens' "economic and commercial interests" from labor-market distortion caused by the continued existence of DACA. *Id.*at 609.

241. The Plaintiff States seek the enforcement of federal law "to assure [their] residents that they will have the full benefit of federal laws designed to address th[e] problem" of illegal immigration and labor-market distortion. *Id.* at 609-10.

242. The Plaintiff States also possess "special solicitude" in the Article III standing analysis under *Massachusetts v. EPA*, 549 U.S. at 520. *See Texas*, 809 F.3d at 151.

243. The Plaintiff States do not need special solicitude to establish standing, but *Massachusetts v. EPA*'s special solicitude makes standing an easy question.

244. Just as the Supreme Court found in *Massachusetts v. EPA,* the federal government here has "abdicated its responsibility" to enforce federal statutes. *Texas*,

86 F. Supp. 3d at 663 ("DAPA does not represent mere inadequacy; it is complete abdication.").

245.   The Plaintiff States face a more certain risk of harm than the state plaintiffs who had standing in *Massachusetts v. EPA. Id.* at 629; *see Texas*, 809 F.3d at 159 ("Texas is entitled to the same 'special solicitude' as was Massachusetts, and the causal link is even closer here.").

246.   The Plaintiff States also seek to vindicate a procedural right—namely, the right to be heard under the APA's notice-and-comment procedures.

247.   Separately, Plaintiff States have standing to challenge federal agency action that dispenses with congressional enactments when those congressional enactments preempt state prerogatives.

248.   A State is "an institutional plaintiff." *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 (2015).

249.   An "institutional plaintiff" has standing when it suffers a mere "institutional injury." *Id.*

250.   An "institutional injury" includes when a government's powers are "strip[ped]" or "nullif[ied]." *Id.* at 2663, 2665.

251.   When a federal statute preempts state prerogatives, the State's powers are stripped or nullified.

252.   "When a State enters the Union, it surrenders certain sovereign prerogatives" that become "lodged in the Federal Government." *Massachusetts v. EPA*, 549 U.S. at 519.

253.   A State's agreement to have its authority preempted on such sovereign matters—for instance, determining the citizenship or lawful presence of individuals within its borders—is premised on the understanding that Congress's enactments serve to "protect" the States. *Id.*

254.   Due to the preemption of their sovereign prerogatives, States also have a "quasi-sovereign," if not purely sovereign, interest in the enforcement of federal laws that preempt surrendered prerogatives. *Id.* at 520.

255.   When the Executive Branch "has abdicated its responsibility under [federal statutes]," it negates the basis on which the States agreed to allow federal preemption of their sovereign prerogatives. *Id.* at 505.

256.   States therefore also have "abdication standing" to challenge federal Executive agency action that dispenses with statutes passed by Congress when those statutes preempt state prerogatives. *Texas*, 86 F. Supp. 3d at 636-43.

257.   The Plaintiff States thus have standing to maintain all their claims.

## II.   **This Action Is Timely.**

258.   The Plaintiff States have commenced this action within the applicable limitations periods.

259.   "Unless another statute provides otherwise, civil claims against the United States—including those brought pursuant to the APA—are subject to the statute of limitations contained in 28 U.S.C. § 2401." *Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C. Cir. 2014) (addressing, *inter alia*, APA notice-and-comment claim).

260.    Under this provision, a party must commence an action within six years of the right of action accruing. 28 U.S.C. § 2401(a).

261.    Congress has not adopted a special statute of limitations for the type of claims Plaintiff States bring herein.

262.    The Plaintiff States commenced this action within six years of the promulgation of DACA.

263.    The Plaintiff States commenced this action within six years of the implementation of DACA.

264.    The Plaintiff States' request for injunctive relief preventing the Executive from renewing or issuing any new DACA permits in the future is not barred by any statute of limitations.

## III.    The Plaintiff States' Interests Are At Least Arguably Within the Zone of Interests Protected by Immigration Statutes and the APA.

265.    The Plaintiff States' interests are at least arguably within the zone of interests protected by immigration statutes. *See Texas*, 809 F.3d at 163.

266.    The Plaintiff States' interests are arguably within the zone of interests protected by the APA.

## IV.    DACA Is Reviewable Agency Actions.

267.    The creation of DACA—and its conferral of lawful presence and work authorization—is affirmative agency action, not mere enforcement-discretion inaction. *Id.* at 166-67.

268.    This lawsuit does not challenge the DHS Secretary's separate February 20, 2017 memorandum setting immigration enforcement priorities. Memorandum

from John Kelly, Secretary, DHS, to Kevin McAleenan, Acting Comm'r, CBP, et al,

Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017),

https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-

the-Immigration-Laws-to-Serve-the-National-Interest.pdf.

269.   This lawsuit does not challenge the Executive's "discretion to abandon" the "initiation or prosecution of various stages in the deportation process." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999).

270.   Deferred action under DACA "is much more than nonenforcement: It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens." *Texas*, 809 F.3d at 166.

271.   "Declining to prosecute does not transform presence deemed unlawful by Congress into lawful presence and confer eligibility for otherwise unavailable benefits based on that change." *Id.* at 167.

272.   In contrast to enforcement discretion, DACA confers eligibility for a change in immigration classification that triggers eligibility for attendant benefits.

273.   The Defendants unilaterally deem DACA recipients "lawfully present."

274.   The congressional-created classification of "lawful presence" confers eligibility for Social Security, Medicare, the Earned Income Tax Credit, a driver's license, and a host of other benefits.

275.   DACA also unilaterally confers the ability to obtain work authorization.

276.   DACA has even provided some recipients with United States citizenship or a pathway to citizenship.

277.    Justice Scalia correctly explained that DACA cannot be justified as mere nonenforcement discretion: "the considerable administrative cost of conducting as many as 1.4 million background checks, and ruling on the biennial requests for dispensation that the nonenforcement program envisions, will necessarily be *deducted* from immigration enforcement." *Arizona*, 567 U.S. at 435 (Scalia, J., concurring in part and dissenting in part) (emphasis in original).

278.    The Defendants cannot identify any "clear and convincing evidence of legislative intention to preclude review" of DACA. *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986).

279.    The Defendants have indicated that "DHS has absolute discretion to revoke deferred action unilaterally, without notice or process." Pet. Br. at 5, *supra*, 2016 WL 836758, at *5.

280.    "Revocability, however, is not the touchstone for whether agency . . . action is reviewable." *Texas*, 809 F.3d at 167.

## V.    DACA Is Unlawful.

### A.    DACA Is Unlawful Because It Was Issued Without the Required APA Notice-and-Comment Procedure.

281.    DACA is a substantive rule, not exempt from the Administrative Procedure Act's notice-and-comment requirements as an interpretive rule, as a general statement of policy, or as a rule of agency organization, procedure, or practice, 5 U.S.C. § 553(b)(A). *See Texas*, 809 F.3d at 171-78.

282.    No exceptions to the APA's notice-and-comment requirements are applicable to DACA.

283.    DACA, Expanded DACA, and DAPA are some of the largest immigration policy changes in our Nation's history.

284.    The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

285.    DHS is an "agency" under the APA. *Id.* § 551(1).

286.    The memorandum creating (or continuing) DACA is a "rule" under the APA. *Id.* § 551(4).

287.    The DACA memorandum required notice-and-comment procedure because it is a binding rule.

288.    DACA required notice-and-comment procedure because it modifies substantive rights and interests, as it confers on recipients a legal status (lawful presence) and eligibility for attendant benefits. *See Texas*, 809 F.3d at 176.

289.    Additionally, DACA required notice-and-comment procedure because it does not genuinely leave the agency and its decisionmaker free to exercise discretion.

290.    As the district court found in the DAPA lawsuit, "[n]othing about DAPA '*genuinely* leaves the agency and its [employees] free to exercise discretion.'" *Id.* at 171-72 & n.127 (quoting *Texas*, 86 F. Supp. 3d at 670 (emphasis and second alteration in district court opinion)).

291.    In the DAPA lawsuit, the district court's finding regarding the lack of genuine discretion afforded to USCIS and its employees under DAPA "was partly informed by analysis of the implementation of DACA, the precursor to DAPA." *Id.* at 172 & n.128 (citing *Texas*, 86 F. Supp. 3d at 669-70).

292.   "Like the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis and exercise discretion, but the district court found that those statements were 'merely pretext' . . . ." *Id.* at 172 & n.129 (quoting *Texas*, 86 F. Supp. 3d at 669 n.101).

293.   As the Fifth Circuit recognized, "only about 5% of the 723,000 [DACA] applications accepted for evaluation [through the end of 2014] had been denied." *Id.* at 172 & n.130 (citing *Texas*, 86 F. Supp. 3d at 609).

294.   As the Fifth Circuit explained, "'[d]espite a request by the [district] [c]ourt, the [g]overnment's counsel did not provide the number, if any, of requests that were denied [for discretionary reasons] even though the applicant met the DACA criteria.'" *Id.* at 172 & n.131 (quoting *Texas*, 86 F. Supp. 3d at 609 (alterations in Fifth Circuit opinion)).

295.   The district court's "finding of pretext was also based on a declaration by Kenneth Palinkas, the president of the union representing the USCIS employees processing the DACA applications, that 'DHS management has taken multiple steps to ensure that DACA applications are simply rubberstamped if the applicants meet the necessary criteria.'" *Id.* at 172-73 & n.132 (quoting *Texas*, 86 F. Supp. 3d at 609-10).

296.   The district court's "finding of pretext was also based on . . . DACA's Operating Procedures, which 'contain[] nearly 150 pages of specific instructions for granting or denying deferred action.'" *Id.* at 172-73 & n.133 (quoting *Texas*, 86 F. Supp. 3d at 669 (alteration in Fifth Circuit opinion)).

297.   DACA "[d]enials are recorded in a 'check the box' standardized form, for which USCIS personnel are provided templates." *Id.* at 175 (quoting *Texas*, 86 F. Supp. 3d at 669 (alteration in Fifth Circuit opinion)).

298.   "Certain denials of [DACA] must be sent to a supervisor for approval[, and] there is no option for granting [DACA] to an individual who does not meet each criterion." *Id.* (quoting *Texas*, 86 F. Supp. 3d at 669 (alteration in Fifth Circuit opinion)).

299.   "'[R]outing [DACA] applications through service centers instead of field offices . . . created an application process that bypasses traditional in-person investigatory interviews with trained USCIS adjudications officers' and 'prevents officers from conducting case-by-case investigations, undermines officers' abilities to detect fraud and national-security risks, and ensures that applications will be rubber-stamped.'" *Id.* (quoting *Texas*, 86 F. Supp. 3d at 609-10 (alteration and omission in Fifth Circuit op.)); *see* Decl. of Kenneth Palinkas ¶ 10, *Texas*, 86 F. Supp. 3d 591 (No. 1:14-cv-254), ECF No. 64-42.

300.   DACA relief confers a stamp of approval from the government and encodes a substantive value judgment. *See Texas*, 809 F.3d at 176-77.

301.   DACA does not clearly and directly relate to "public benefits" as that term is used in 5 U.S.C. § 553(a)(2), because the agency administering DACA (USCIS) is not an agency managing benefit programs, much less the kind of public benefit that has been recognized under § 553(a)(2). *See Texas*, 809 F.3d at 178.

302.    Although OLC cautioned the Executive that it was "critical" to DACA's legality that the Executive Branch evaluate every application on a case-by-case basis, **Exhibit 4** at 18 n.8, the President and DHS ignored that advice by granting deferred action mechanically to all applicants who satisfy the threshold criteria specified in the DACA memo.

303.    DHS officials who implement the DACA program exercise, in practice, effectively no discretion to deny DACA to applicants who meet the eligibility criteria in the DACA memo and the administrative application requirements, such as a background check and application fee.

### B.    DACA Is Contrary to Law, Because It Violates Congressional Statutes.

304.    DACA is contrary to law because it is "not authorized by statute," *Texas*, 809 F.3d at 184, and is "foreclosed by Congress's careful plan," *id.* at 186.

305.    The APA requires this Court to hold unlawful and set aside any agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

306.    "In specific and detailed provisions, the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." *Texas*, 809 F.3d at 179.

307.    "Entirely absent from those specific classes is the group of . . . illegal aliens who would be eligible for lawful presence under" DACA. *Id.*

308.   "The INA also specifies classes of aliens eligible and ineligible for work authorization." *Id.* at 180-81 (footnotes omitted).

309.   Federal statutes defining which aliens are eligible for work authorization make "no mention of the class of persons whom" DACA "would make eligible for work authorization." *Id.* at 181.

310.   "[T]he INA flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them eligible for a host of federal and state benefits, including work authorization." *Id.* at 184.

311.   "[H]istorical practice . . . 'does not, by itself, create power.'" *Id.* at 184 & n.193 (quoting *Medellin v. Texas*, 552 U.S. 491, 532 (2008)).

312.   "[I]n any event, previous deferred-action programs are not analogous to [DACA]." *Id.* at 184.

313.   "[M]any of the previous programs were bridges from one legal status to another, whereas [DACA] awards lawful presence to persons who have never had a legal status and may never receive one." *Id.* (footnotes omitted).

314.   DACA has even provided some recipients with United States citizenship or a pathway to citizenship—without any statutory authorization to do so from Congress.

## C.   DACA Violates the Take Care Clause.

315.   DACA violates the Take Care Clause because it dispenses with certain immigration statutes by declaring as lawful conduct that Congress established as unlawful.

66

316.   DACA violates the Take Care Clause because it dispenses with certain immigration statutes by granting United States citizenship or a pathway to citizenship to aliens who would otherwise be unlawfully present but for DACA.

317.   The Take Care Clause has its roots in the dispute between Parliament and King James II, who was overthrown in the Glorious Revolution of 1688. Parliament was infuriated at King James's use of his purported power to suspend or dispense with Parliament's laws. Zachary Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671, 676, 690-91 (2014). The subsequent monarchs, William and Mary, agreed to the English Bill of Rights, which stripped the monarchy of all suspending and dispensing authority. *See* English Bill of Rights of 1689, art. 1.

318.   The Framers of the U.S. Constitution unanimously rejected a proposal to grant dispensing powers to the President.

319.   The Supreme Court has held that the Take Care Clause does not grant the President a power to dispense with statutes: "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution, and entirely inadmissible." *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838). Any other conclusion would "vest[] in the President a dispensing power." *Id.*

320.   DACA dispenses with certain immigration statutes.

321.   Just as King James attempted to make unlawful office-holding lawful, Price, *supra*, at 691, the Executive through DACA, Expanded DACA, and DAPA sought to make unlawful presence lawful.

322. Even worse than that, after the Executive made unlawful presence lawful through DACA, the Executive then used that lawful-presence dispensation to affirmatively confer United States citizenship or a pathway to citizenship on some DACA recipients.

323. As Justice Scalia correctly noted, DACA is a program that involves "biennial requests for *dispensation*" from immigration statutes. *Arizona*, 567 U.S. at 435 (Scalia, J., concurring in part and dissenting in part) (emphasis added).

324. OLC recognized that class-based deferred-action programs like DACA "raise particular concerns about whether immigration officials have undertaken to substantively change" immigration statutes, **Exhibit 4** at 22, and "effectively rewrite the laws to match the Executive's policy preferences," *id.* at 24.

325. DACA is unlawful even under the four-part test established by the OLC Memo under the Obama Administration delineating limitations imposed by "the nature of the Take Care duty." *Id.* at 6-7.

326. First, OLC stated that a class-based deferred-action program must reflect the agency's expert judgment about resource allocation, *id.* at 6, and must not confer legal status, *id.* at 20-21.

327. But DACA deems unlawful presence lawful—a fact never mentioned by the OLC Memo.

328. DACA has even provided some recipients with United States citizenship or a pathway to citizenship—a fact never mentioned by the OLC Memo.

329.    DACA is a programmatic decision to confer benefits on hundreds of thousands of aliens.

330.    Second, OLC stated that a class-based deferred-action program must be "consonant with, rather than contrary to, the congressional policy underlying the [relevant] statutes." *Id.* at 6.

331.    DACA is "incompatible with the express or implied will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

332.    DACA violates explicit and implicit congressional objectives.

333.    Third, OLC stated that a class-based deferred-action program cannot be an "[a]bdication of the duties assigned to the agency by statute." **Exhibit 4** at 7.

334.    But DACA is an "abdication" of immigration statutes enumerating in careful detail which aliens may be lawfully present and obtain work authorization. *Texas*, 86 F. Supp. 3d at 663.

335.    DACA also is an "abdication" of immigration statutes enumerating in careful detail which aliens may obtain United States citizenship or a pathway to citizenship. *Id.*

336.    Fourth, OLC stated that a class-based deferred-action program must allow for "case-by-case" discretion. **Exhibit 4** at 7.

337.    As explained above, *see supra* ¶¶ 289-303, DACA does not allow for case-by-case discretion.

**VI.    The Court Should Declare that DACA Is Unlawful and Enjoin the Defendants Nationwide from Issuing or Renewing DACA Permits.**

338.    For the reasons explained above, the Court should enter a declaratory judgment that DACA is unlawful.

339.    While the Court would have the power to enter an injunction immediately rescinding all DACA permits that confer lawful presence and work authorization, Plaintiff States are amenable to an injunction that prospectively enjoins Defendants in the future from renewing or issuing any new DACA permits that confer lawful presence and work authorization, but does not require the Executive to immediately rescind any existing DACA permits that confer lawful presence or work authorization. Such an injunction would effectively phase out the DACA program within two years.

340.    Such an injunction would account for any alleged reliance interests that aliens claim in DACA permits already received. Any such reliance interest, however, could not possibly extend beyond the existing two-year terms of those permits. The memorandum announcing DACA itself explicitly stated that "DHS cannot provide any assurance that relief will be granted." **Exhibit 1** at 2.

341.    An injunction prohibiting the Executive from issuing or renewing DACA permits should apply to Defendants wherever they may act.

342.    Both the Constitution and Congress have directed that the Nation needs a uniform, nationwide immigration policy. *See Texas*, 809 F.3d at 187-88.

343.    Additionally, the Court should grant any and all other relief to which Plaintiff States may be entitled.

## VII.   The Deferred-Action Work-Authorization Regulation Is Invalid as Applied to DACA and Expanded DACA Recipients.

344.   An executive regulation declares that "an alien who has been granted deferred action" can obtain employment authorization from the federal government. 8 C.F.R. § 274a.12(c)(14).

345.   Defendants have previously asserted that 8 C.F.R. § 274a.12(c)(14) authorizes the federal government to grant work authorization to recipients of DAPA and Expanded DACA. *See* Defs.' Mem. P. & A. in Opp'n to Pls.' Mot. for Prelim. Inj. 7-8, *Texas*, 86 F. Supp. 3d 591 (No. 1:14-cv-254), ECF No. 38.

346.   There is no statutory authorization for the regulation to be applied in this manner. Although 8 C.F.R. § 274a.12(c)(14) may be valid as applied to the four, narrow types of deferred action authorized by statute, it is not valid as applied to recipients of DACA, Expanded DACA, or DAPA—which are not statutorily authorized.

## VIII.   The Federal Benefits Triggered by Lawful Presence Cannot Be Validly Extended to DACA Recipients.

347.   The classification of lawful presence is a requirement for myriad federal benefits, including Social Security, Medicare, and PRWORA-restricted benefits. *See supra* ¶¶ 38-40.

348.   Conversely, time during which an alien lacks the classification of lawful presence counts towards lengths of time that trigger a reentry bar. *See supra* ¶ 41.

349.   DACA confers lawful presence on individuals whose presence in this country is not lawful under the Nation's immigration laws.

71

350.   The statutory provisions conferring eligibility for benefits based on lawful presence cannot be validly applied to DACA recipients.

### FIRST CAUSE OF ACTION
### Violation of the Take Care Clause

351.   The allegations in paragraphs 1-351 are reincorporated herein.

352.   Defendants' actions here in creating and implementing DACA violate the President's constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. To the extent Expanded DACA permits remain in effect, they also violate the same duty.

### SECOND CAUSE OF ACTION
### Violation of the APA's Procedural Requirements, 5 U.S.C. § 553

353.   The allegations in paragraphs 1-353 are reincorporated herein.

354.   Defendants have violated the APA by promulgating, implementing, and relying upon the DACA program without using the required APA notice-and-comment procedure. To the extend Expanded DACA permits remain in effect, they violate the same procedural law.

### THIRD CAUSE OF ACTION
### Violation of the APA's Substantive Requirements, 5 U.S.C. § 706

355.   The allegations in paragraphs 1-355 are reincorporated herein.

356.   Defendants have acted contrary to law and have violated 5 U.S.C. § 706 by creating and implementing DACA. To the extent Expanded DACA permits remain in effect, they violate the same substantive law.

## **PRAYER FOR RELIEF**

Underlying DACA is a dangerously broad conception of Executive power—one that if left unchecked, could allow future Executives to dismantle other duly enacted laws. The Court must not allow that to occur. Plaintiff States respectfully request that the Court issue the following relief regarding DACA (and Expanded DACA, to the extent any permits remain in effect):

A.   An order enjoining Defendants from issuing or renewing any DACA permits in the future;

B.   A declaratory judgment that DACA violates the Take Care Clause;

C.   A declaratory judgment that DACA is procedurally unlawful under the APA;

D.   A declaratory judgment that DACA is substantively unlawful under the APA; and

E.   Any and all other relief to which Plaintiff States may be entitled.

Respectfully submitted.

STEVE MARSHALL
Attorney General of Alabama

KEN PAXTON
Attorney General of Texas

LESLIE RUTLEDGE
Attorney General of Arkansas

JEFFREY C. MATEER
First Assistant Attorney General

JEFF LANDRY
Attorney General of Louisiana

BRANTLEY STARR
Deputy First Assistant Attorney General
Tx. State Bar No. 24046904
Southern District of Texas No. 2972033
Tel.: (512) 463-2100; Fax: (512) 936-0545
brantley.starr@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

DOUGLAS J. PETERSON
Attorney General of Nebraska

ALAN WILSON
Attorney General of South Carolina

PATRICK MORRISEY
Attorney General of West Virginia

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

 /s/ Todd Lawrence Disher
TODD LAWRENCE DISHER
Attorney-in-Charge
Special Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

ADAM ARTHUR BIGGS
Special Counsel for Civil Litigation
Tx. State Bar No. 24077727
Southern District of Texas No. 2964087
Tel.: (512) 463-2100; Fax: (512) 936-0545
adam.biggs@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

**COUNSEL FOR PLAINTIFF STATES**

Dated this 1st day of May, 2018.

# TABLE OF CONTENTS

**Exhibit   Document**

1.      June 15, 2012, Memo from Janet Napolitano, former Secretary of Homeland Security, titled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" ("DACA Memo")

2.      U. S. Citizenship and Immigration Services Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Fiscal Year 2012-2017

3.      November 20, 2014, Memo from Jeh Charles Johnson, former Secretary of Homeland Security, titled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who  Are the Parents of U.S. Citizens or Permanent Residents" ("DAPA Memo")

4.      U.S. Department of Justice's November 19, 2014, Memorandum Opinion for the Secretary of Homeland Security and the Counsel to the President ("OLC Memo")

5.      June 15, 2017, Memo from former Secretary of U.S. Department of Homeland Security John F. Kelly titled "Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents" ("DAPA Rescission Memo")

6.      June 29, 2017, Letter from Texas Attorney General Ken Paxton and ten other states to the U.S. Attorney General, urging the Trump Administration to phase out DACA

7.      September 5, 2017, Memorandum from Elaine C. Duke, Acting Secretary of U. S. Department of Homeland Security Titled "Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" ("DACA Rescission Memo")

# Exhibit 1

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



**Homeland Security**

June 15, 2012

MEMORANDUM FOR:      David V. Aguilar
                     Acting Commissioner, U.S. Customs and Border Protection

                     Alejandro Mayorkas
                     Director, U.S. Citizenship and Immigration Services

                     John Morton
                     Director, U.S. Immigration and Customs Enforcement

FROM:                Janet Napolitano
                     Secretary of Homeland Security

SUBJECT:             Exercising Prosecutorial Discretion with Respect to Individuals
                     Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home. As a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

2

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

3

# Exhibit 2

**U.S. Citizenship and Immigration Services**

**Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status**
**Fiscal Year 2012-2017 (September 30)**

| Period | Intake[1] Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Biometrics[6] Biometrics Scheduled[7] | Requests Under Review[9] | Case Review[8] Approved[10] | Denied[11] | Pending[12] |
|---|---|---|---|---|---|---|---|---|---|
| **Fiscal Year - Total[4]** | | | | | | | | | |
| 2012 | 152,431 | 5,395 | 157,826 | 3,629 | 124,055 | 38,024 | 1,680 | - | 150,751 |
| 2013 | 427,616 | 16,351 | 443,967 | 1,697 | 445,013 | 77,747 | 470,352 | 10,975 | 97,040 |
| 2014 | 238,900 | 24,887 | 263,787 | 952 | 209,670 | 101,568 | 158,336 | 20,992 | 156,612 |
| 2014 Initial | 122,424 | 19,127 | 141,551 | 488 | | | 136,101 | 20,989 | 62,374 |
| 2014 Renewal | 116,476 | 5,760 | 122,236 | 1,370 | | | 22,235 | D | 94,238 |
| 2015 | 448,856 | 35,474 | 484,330 | 1,781 | 525,499 | 48,355 | 510,007 | 21,355 | 74,106 |
| 2015 Initial | 85,303 | 7,477 | 92,780 | 338 | | | 90,613 | 19,070 | 37,994 |
| 2015 Renewal | 363,553 | 27,997 | 391,550 | 1,443 | | | 419,394 | 2,285 | 36,112 |
| 2016 | 260,701 | 12,317 | 273,018 | 1,035 | 68,140 | | 198,702 | 14,427 | 121,678 |
| 2016 Initial | 73,362 | 1,204 | 74,566 | 291 | | | 52,789 | 11,398 | 47,169 |
| 2016 Renewal | 187,339 | 11,113 | 198,452 | 744 | | | 145,913 | 3,029 | 74,509 |
| 2017 | 472,873 | 43,429 | 516,302 | 1,884 | | | 462,713 | 13,193 | 118,645 |
| 2017 Initial | 45,557 | 42 | 45,599 | 194 | | | 47,445 | 9,248 | 36,033 |
| 2017 Renewal | 427,316 | 43,387 | 470,703 | 1,602 | | | 415,268 | 3,945 | 82,612 |
| Total Cumulative | 2,001,377 | 137,853 | 2,139,230 | 1,541 | 1,372,377 | | 1,801,790 | 80,942 | 118,645 |
| Total Cumulative Initial | 906,693 | 49,596 | 956,289 | 698 | | | 798,980 | 71,680 | 36,033 |
| Total Cumulative Renewal | 1,094,684 | 88,257 | 1,182,941 | 1,305 | | | 1,002,810 | 9,262 | 82,612 |
| **Fiscal Year 2017 by Quarter[13]** | | | | | | | | | |
| Q1. October - December | 110,186 | 4,141 | 114,327 | 1,777 | | | 121,919 | 2,720 | 107,225 |
| Q1. October - December Initial | 15,326 | 15 | 15,341 | 247 | | | 18,239 | 2,091 | 42,165 |
| Q1. October - December Renewal | 94,860 | 4,126 | 98,986 | 1,530 | | | 103,680 | 629 | 65,060 |
| Q2. January - March | 132,784 | 19,266 | 152,050 | 2,142 | | | 124,700 | 4,137 | 111,172 |
| Q2. January - March Initial | 10,419 | 8 | 10,427 | 168 | | | 17,220 | 3,024 | 32,340 |
| Q2. January - March Renewal | 122,365 | 19,258 | 141,623 | 1,974 | | | 107,480 | 1,113 | 78,832 |
| Q3. April - June | 94,562 | 8,590 | 103,152 | 1,525 | | | 102,509 | 3,705 | 99,520 |
| Q3. April - June Initial | 10,977 | 8 | 10,985 | 177 | | | 5,827 | 2,719 | 34,771 |
| Q3. April - June Renewal | 83,585 | 8,582 | 92,167 | 1,348 | | | 96,682 | 986 | 64,749 |
| Q4. July - September | 135,341 | 11,432 | 146,773 | 2,115 | | | 113,585 | 2,631 | 118,645 |
| Q4. July - September Initial | 8,835 | 11 | 8,846 | 138 | | | 6,159 | 1,414 | 36,033 |
| Q4. July - September Renewal | 126,506 | 11,421 | 137,927 | 1,977 | | | 107,426 | 1,217 | 82,612 |

D - Data withheld to protect requestors' privacy.

- Represents zero.

[1] Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described in the Secretary of Homeland Security's memorandum issued June 15, 2012.

    Each request is considered on a case-by-case basis.

    See http://www.uscis.gov/childhoodarrivals.

[2] The number of new requests accepted at a Lockbox during the reporting period.

[3] The number of requests rejected at a Lockbox during the reporting period.

[4] The number of requests that were received at a Lockbox during the reporting period.

[5] The number of requests accepted per day at a Lockbox as of the end of the reporting period. Also note the average accepted per day for initial plus renewal will not equal the total average.

[6] Refers to capture of requestors' biometrics.

[7] The number of appointments scheduled to capture requestors' biometrics during the reporting period.

[8] Refers to consideration of deferring action on a case-by-case basis during the reporting period.

[9] The number of new requests received and entered into a case-tracking system during the reporting period.

[10] The number of requests approved during the reporting period.

[11] The number of requests that were denied, terminated, or withdrawn during the reporting period.

[12] The number of requests awaiting a decision as of the end of the reporting period.

[13] Data on biometrics scheduled is not available past January 31, 2016. Totals reflect up to January 31, 2016.

NOTE  1. Some requests approved or denied may have been received in previous reporting periods.

       2. The report reflects the most up-to-date estimate available at the time the report is generated.

Source  Department of Homeland Security, U.S. Citizenship and Immigration Services, Biometrics Capture Systems, CIS Consolidated Operational Repository (CISCOR), September 30th, 2017

# Exhibit 3

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



Homeland
Security

November 20, 2014

MEMORANDUM FOR:     León Rodríguez
                    Director
                    U.S. Citizenship and Immigration Services

                    Thomas S. Winkowski
                    Acting Director
                    U.S. Immigration and Customs Enforcement

                    R. Gil Kerlikowske
                    Commissioner
                    U.S. Customs and Border Protection

FROM:               Jeh Charles Johnson
                    Secretary

SUBJECT:            **Exercising Prosecutorial Discretion with Respect to
                    Individuals Who Came to the United States as
                    Children and with Respect to Certain Individuals
                    Who Are the Parents of U.S. Citizens or Permanent
                    Residents**

This memorandum is intended to reflect new policies for the use of deferred action. By memorandum dated June 15, 2012, Secretary Napolitano issued guidance entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*. The following supplements and amends that guidance.

The Department of Homeland Security (DHS) and its immigration components are responsible for enforcing the Nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. Secretary Napolitano noted two years ago, when she issued her prosecutorial discretion guidance regarding children, that "[o]ur Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case."

Deferred action is a long-standing administrative mechanism dating back decades, by which the Secretary of Homeland Security may defer the removal of an undocumented immigrant for a period of time.[1]  A form of administrative relief similar to deferred action, known then as "indefinite voluntary departure," was originally authorized by the Reagan and Bush Administrations to defer the deportations of an estimated 1.5 million undocumented spouses and minor children who did not qualify for legalization under the *Immigration Reform and Control Act* of 1986.  Known as the "Family Fairness" program, the policy was specifically implemented to promote the humane enforcement of the law and ensure family unity.

Deferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission.  As an act of prosecutorial discretion, deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion.  Deferred action does not confer any form of legal status in this country, much less citizenship; it simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States.  Nor can deferred action itself lead to a green card.  Although deferred action is not expressly conferred by statute, the practice is referenced and therefore endorsed by implication in several federal statutes.[2]

Historically, deferred action has been used on behalf of particular individuals, and on a case-by-case basis, for classes of unlawfully present individuals, such as the spouses and minor children of certain legalized immigrants, widows of U.S. citizens, or victims of trafficking and domestic violence.[3]  Most recently, beginning in 2012, Secretary Napolitano issued guidance for case-by-case deferred action with respect to those who came to the United States as children, commonly referred to as "DACA."

---

[1]  Deferred action, in one form or another, dates back to at least the 1960s.  "Deferred action" per se dates back at least as far as 1975. *See,* Immigration and Naturalization Service, Operation Instructions § 103.1(a)(1)(ii) (1975).

[2]  INA § 204(a)(1)(D)(i)(II), (IV) *(Violence Against Women Act (VAWA) self-petitioners not in removal proceedings are "eligible for deferred action and employment authorization"); INA § 237(d)(2) (DHS may grant stay of removal to applicants for T or U visas but that denial of a stay request "shall not preclude the alien from applying for . . . deferred action");* REAL ID Act of 2005 § 202(c)(2)(B)(viii), Pub. L. 109-13 *(requiring states to examine documentary evidence of lawful status for driver's license eligibility purposes, including "approved deferred action status");* National Defense Authorization Act for Fiscal Year 2004 § 1703(c) (d) Pub. L. 108-136 *(spouse, parent or child of certain U.S. citizen who died as a result of honorable service may self-petition for permanent residence and "shall be eligible for deferred action, advance parole, and work authorization").*

[3]  In August 2001, the former-Immigration and Naturalization Service issued guidance providing deferred action to individuals who were eligible for the recently created U and T visas.  Two years later, USCIS issued subsequent guidance, instructing its officers to use existing mechanisms like deferred action for certain U visa applicants facing potential removal.  More recently, in June 2009, USCIS issued a memorandum providing deferred action to certain surviving spouses of deceased U.S. citizens and their children while Congress considered legislation to allow these individuals to qualify for permanent residence status.

By this memorandum, I am now expanding certain parameters of DACA and issuing guidance for case-by-case use of deferred action for those adults who have been in this country  since January 1, 2010, are the parents of U.S. citizens or lawful permanent residents, and who are otherwise not enforcement priorities, as set forth in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum.

The reality is that most individuals in the categories set forth below are hard-working people who have become integrated members of American society. Provided they do not commit serious crimes or otherwise become enforcement priorities, these people are extremely unlikely to be deported given this Department's limited enforcement resources—which must continue to be focused on those who represent threats to national security, public safety, and border security.  Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests and make common sense, because they encourage these people to come out of the shadows, submit to background checks, pay fees, apply for work authorization (which by separate authority I may grant), and be counted.

## A.     Expanding DACA

DACA provides that those who were under the age of 31 on June 15, 2012, who entered the United States before June 15, 2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis.  The initial DACA announcement of June 15, 2012 provided deferred action for a period of two years.  On June 5, 2014, U.S. Citizenship and Immigration Services (USCIS) announced that DACA recipients could request to renew their deferred action for an additional two years.

In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:

**Remove the age cap.**  DACA will apply to all otherwise eligible immigrants who entered the United States by the requisite adjusted entry date before the age of sixteen (16), regardless of how old they were in June 2012 or are today.  The current age restriction excludes those who were older than 31 on the date of announcement (*i.e.*, those who were born before June 15, 1981).  That restriction will no longer apply.

**Extend DACA renewal and work authorization to three-years**.  The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments.  This change shall apply to all first-time applications as well as all applications for renewal effective November 24, 2014.  Beginning on that date, USCIS should issue all work

3

authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work authorization documents based on the renewal of their DACA grants.  USCIS should also consider means to extend those two-year renewals already issued to three years.

**Adjust the date-of-entry requirement.**  In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010.

USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.

## B.    Expanding Deferred Action

I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;

- have continuously resided in the United States since before January 1, 2010;

- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;

- have no lawful status on the date of this memorandum;

- are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and

- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Applicants must file the requisite applications for deferred action pursuant to the new criteria described above.  Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants.  Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of

the Immigration and Nationality Act.[4]  Deferred action granted pursuant to the program shall be for a period of three years.  Applicants will pay the work authorization and biometrics fees, which currently amount to $465.  There will be no fee waivers and, like DACA, very limited fee exemptions.

USCIS should begin accepting applications from eligible applicants no later than one hundred and eighty (180) days after the date of this announcement.  As with DACA, the above criteria are to be considered for all individuals encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or USCIS, whether or not the individual is already in removal proceedings or subject to a final order of removal.  Specifically:

- ICE and CBP are instructed to immediately begin identifying persons in their custody, as well as newly encountered individuals, who meet the above criteria and may thus be eligible for deferred action to prevent the further expenditure of enforcement resources with regard to these individuals.

- ICE is further instructed to review pending removal cases, and seek administrative closure or termination of the cases of individuals identified who meet the above criteria, and to refer such individuals to USCIS for case-by-case determinations.  ICE should also establish a process to allow individuals in removal proceedings to identify themselves as candidates for deferred action.

- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.  The USCIS process shall also be available to individuals subject to final orders of removal who otherwise meet the above criteria.

Under any of the proposals outlined above, immigration officers will be provided with specific eligibility criteria for deferred action, but the ultimate judgment as to whether an immigrant is granted deferred action will be determined on a case-by-case basis.

This memorandum confers no substantive right, immigration status or pathway to citizenship.  Only an Act of Congress can confer these rights.  It remains within the authority of the Executive Branch, however, to set forth policy for the exercise of prosecutorial discretion and deferred action within the framework of existing law.  This memorandum is an exercise of that authority.

---

[4] INA § 274A(h)(3), 8 U.S.C. § 1324a(h)(3) ("As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the[Secretary]."); 8 C.F.R. § 274a.12 (regulations establishing classes of aliens eligible for work authorization).

# Exhibit 4

# The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others

The Department of Homeland Security's proposed policy to prioritize the removal of certain aliens unlawfully present in the United States would be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of U.S. citizens and legal permanent residents would also be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of recipients of deferred action under the Deferred Action for Childhood Arrivals program would not be a permissible exercise of DHS's enforcement discretion.

November 19, 2014

MEMORANDUM OPINION FOR THE SECRETARY OF HOMELAND SECURITY
AND THE COUNSEL TO THE PRESIDENT

You have asked two questions concerning the scope of the Department of Homeland Security's discretion to enforce the immigration laws. First, you have asked whether, in light of the limited resources available to the Department ("DHS") to remove aliens unlawfully present in the United States, it would be legally permissible for the Department to implement a policy prioritizing the removal of certain categories of aliens over others. DHS has explained that although there are approximately 11.3 million undocumented aliens in the country, it has the resources to remove fewer than 400,000 such aliens each year. DHS's proposed policy would prioritize the removal of aliens who present threats to national security, public safety, or border security. Under the proposed policy, DHS officials could remove an alien who did not fall into one of these categories provided that an Immigration and Customs Enforcement ("ICE") Field Office Director determined that "removing such an alien would serve an important federal interest." Draft Memorandum for Thomas S. Winkowski, Acting Director, ICE, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants* at 5 (Nov. 17, 2014) ("Johnson Prioritization Memorandum").

Second, you have asked whether it would be permissible for DHS to extend deferred action, a form of temporary administrative relief from removal, to certain aliens who are the parents of children who are present in the United States. Specifically, DHS has proposed to implement a program under which an alien could apply for, and would be eligible to receive, deferred action if he or she is not a DHS removal priority under the policy described above; has continuously resided in the United States since before January 1, 2010; has a child who is either a U.S. citizen or a lawful permanent resident; is physically present in the United

1

*Opinions of the Office of Legal Counsel in Volume 38*

States both when DHS announces its program and at the time of application for deferred action; and presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Draft Memorandum for Leon Rodriguez, Director, U.S. Citizenship and Immigration Services, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and Others* at 4 (Nov. 17, 2014) ("Johnson Deferred Action Memorandum"). You have also asked whether DHS could implement a similar program for parents of individuals who have received deferred action under the Deferred Action for Childhood Arrivals ("DACA") program.

As has historically been true of deferred action, these proposed deferred action programs would not "legalize" any aliens who are unlawfully present in the United States: Deferred action does not confer any lawful immigration status, nor does it provide a path to obtaining permanent residence or citizenship. Grants of deferred action under the proposed programs would, rather, represent DHS's decision not to seek an alien's removal for a prescribed period of time. *See generally Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483–84 (1999) (describing deferred action). Under decades-old regulations promulgated pursuant to authority delegated by Congress, *see* 8 U.S.C. §§ 1103(a)(3), 1324a(h)(3), aliens who are granted deferred action—like certain other categories of aliens who do not have lawful immigration status, such as asylum applicants—may apply for authorization to work in the United States in certain circumstances, 8 C.F.R. § 274a.12(c)(14) (providing that deferred action recipients may apply for work authorization if they can show an "economic necessity for employment"); *see also* 8 C.F.R. § 109.1(b)(7) (1982). Under DHS policy guidance, a grant of deferred action also suspends an alien's accrual of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I), provisions that restrict the admission of aliens who have departed the United States after having been unlawfully present for specified periods of time. A grant of deferred action under the proposed programs would remain in effect for three years, subject to renewal, and could be terminated at any time at DHS's discretion. *See* Johnson Deferred Action Memorandum at 2, 5.

For the reasons discussed below, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be permissible exercises of DHS's discretion to enforce the immigration laws. We further conclude that, as it has been described to us, the proposed deferred action program for parents of DACA recipients would not be a permissible exercise of enforcement discretion.

## I.

We first address DHS's authority to prioritize the removal of certain categories of aliens over others. We begin by discussing some of the sources and limits of

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

DHS's enforcement discretion under the immigration laws, and then analyze DHS's proposed prioritization policy in light of these considerations.

## A.

DHS's authority to remove aliens from the United States rests on the Immigration and Nationality Act of 1952 ("INA"), as amended, 8 U.S.C. §§ 1101 *et seq.* In the INA, Congress established a comprehensive scheme governing immigration and naturalization. The INA specifies certain categories of aliens who are inadmissible to the United States. *See* 8 U.S.C. § 1182. It also specifies "which aliens may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Id.* (citing 8 U.S.C. § 1227); *see* 8 U.S.C. § 1227(a) (providing that "[a]ny alien . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien" falls within one or more classes of deportable aliens); *see also* 8 U.S.C. § 1182(a) (listing classes of aliens ineligible to receive visas or be admitted to the United States). Removal proceedings ordinarily take place in federal immigration courts administered by the Executive Office for Immigration Review, a component of the Department of Justice. *See id.* § 1229a (governing removal proceedings); *see also id.* §§ 1225(b)(1)(A), 1228(b) (setting out expedited removal procedures for certain arriving aliens and certain aliens convicted of aggravated felonies).

Before 2003, the Department of Justice, through the Immigration and Naturalization Service ("INS"), was also responsible for providing immigration-related administrative services and generally enforcing the immigration laws. In the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, Congress transferred most of these functions to DHS, giving it primary responsibility both for initiating removal proceedings and for carrying out final orders of removal. *See* 6 U.S.C. §§ 101 *et seq.*; *see also Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005) (noting that the immigration authorities previously exercised by the Attorney General and INS "now reside" in the Secretary of Homeland Security and DHS). The Act divided INS's functions among three different agencies within DHS: U.S. Citizenship and Immigration Services ("USCIS"), which oversees legal immigration into the United States and provides immigration and naturalization services to aliens; ICE, which enforces federal laws governing customs, trade, and immigration; and U.S. Customs and Border Protection ("CBP"), which monitors and secures the nation's borders and ports of entry. *See* Pub. L. No. 107-296, §§ 403, 442, 451, 471, 116 Stat. 2135, 2178, 2193, 2195, 2205; *see also Name Change From the Bureau of Citizenship and Immigration Services to U.S. Citizenship and Immigration Services*, 69 Fed. Reg. 60938, 60938 (Oct. 13, 2004); *Name Change of Two DHS Components*, 75 Fed. Reg. 12445, 12445 (Mar. 16, 2010). The Secretary of Homeland Security is thus now "charged with the administration and

3

enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1).

As a general rule, when Congress vests enforcement authority in an executive agency, that agency has the discretion to decide whether a particular violation of the law warrants prosecution or other enforcement action. This discretion is rooted in the President's constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and it reflects a recognition that the "faithful[]" execution of the law does not necessarily entail "act[ing] against each technical violation of the statute" that an agency is charged with enforcing. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Rather, as the Supreme Court explained in *Chaney*, the decision whether to initiate enforcement proceedings is a complex judgment that calls on the agency to "balanc[e] . . . a number of factors which are peculiarly within its expertise." *Id.* These factors include "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and . . . whether the agency has enough resources to undertake the action at all." *Id.* at 831; *cf. United States v. Armstrong*, 517 U.S. 456, 465 (1996) (recognizing that exercises of prosecutorial discretion in criminal cases involve consideration of "'[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan'" (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985))). In *Chaney*, the Court considered and rejected a challenge to the Food and Drug Administration's refusal to initiate enforcement proceedings with respect to alleged violations of the Federal Food, Drug, and Cosmetic Act, concluding that an agency's decision not to initiate enforcement proceedings is presumptively immune from judicial review. *See* 470 U.S. at 832. The Court explained that, while Congress may "provide[] guidelines for the agency to follow in exercising its enforcement powers," in the absence of such "legislative direction," an agency's non-enforcement determination is, much like a prosecutor's decision not to indict, a "special province of the Executive." *Id.* at 832–33.

The principles of enforcement discretion discussed in *Chaney* apply with particular force in the context of immigration. Congress enacted the INA against a background understanding that immigration is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (internal quotation marks omitted). Consistent with this understanding, the INA vested the Attorney General (now the Secretary of Homeland Security) with broad authority to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the statute. 8 U.S.C. § 1103(a)(3). Years later, when Congress created the Department of Homeland Security, it expressly charged DHS with responsibility for "[e]stablishing national immigration enforcement policies and

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

priorities." Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. § 202(5)).

   With respect to removal decisions in particular, the Supreme Court has recognized that "the broad discretion exercised by immigration officials" is a "principal feature of the removal system" under the INA. *Arizona*, 132 S. Ct. at 2499. The INA expressly authorizes immigration officials to grant certain forms of discretionary relief from removal for aliens, including parole, 8 U.S.C. § 1182(d)(5)(A); asylum, *id.* § 1158(b)(1)(A); and cancellation of removal, *id.* § 1229b. But in addition to administering these statutory forms of relief, "[f]ederal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Arizona*, 132 S. Ct. at 2499. And, as the Court has explained, "[a]t each stage" of the removal process—"commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders"—immigration officials have "discretion to abandon the endeavor." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483 (quoting 8 U.S.C. § 1252(g) (alterations in original)). Deciding whether to pursue removal at each of these stages implicates a wide range of considerations. As the Court observed in *Arizona*:

> Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation's international relations. . . . The foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return. The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities.

132 S. Ct. at 2499.

   Immigration officials' discretion in enforcing the laws is not, however, unlimited. Limits on enforcement discretion are both implicit in, and fundamental to, the Constitution's allocation of governmental powers between the two political branches. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952). These limits, however, are not clearly defined. The open-ended nature of the inquiry under the Take Care Clause—whether a particular exercise of discretion is "faithful[]" to the law enacted by Congress—does not lend itself easily to the application of set formulas or bright-line rules. And because the exercise of enforcement discretion generally is not subject to judicial review, *see*

*Chaney*, 470 U.S. at 831–33, neither the Supreme Court nor the lower federal courts have squarely addressed its constitutional bounds. Rather, the political branches have addressed the proper allocation of enforcement authority through the political process. As the Court noted in *Chaney*, Congress "may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.* at 833. The history of immigration policy illustrates this principle: Since the INA was enacted, the Executive Branch has on numerous occasions exercised discretion to extend various forms of immigration relief to categories of aliens for humanitarian, foreign policy, and other reasons. When Congress has been dissatisfied with Executive action, it has responded, as *Chaney* suggests, by enacting legislation to limit the Executive's discretion in enforcing the immigration laws.[1]

Nonetheless, the nature of the Take Care duty does point to at least four general (and closely related) principles governing the permissible scope of enforcement discretion that we believe are particularly relevant here. First, enforcement decisions should reflect "factors which are peculiarly within [the enforcing agency's] expertise." *Chaney*, 470 U.S. at 831. Those factors may include considerations related to agency resources, such as "whether the agency has enough resources to undertake the action," or "whether agency resources are best spent on this violation or another." *Id*. Other relevant considerations may include "the proper ordering of [the agency's] priorities," *id.* at 832, and the agency's assessment of "whether the particular enforcement action [at issue] best fits the agency's overall policies," *id.* at 831.

Second, the Executive cannot, under the guise of exercising enforcement discretion, attempt to effectively rewrite the laws to match its policy preferences. *See id*. at 833 (an agency may not "disregard legislative direction in the statutory scheme that [it] administers"). In other words, an agency's enforcement decisions should be consonant with, rather than contrary to, the congressional policy underlying the statutes the agency is charged with administering. *Cf. Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (explaining that where Congress has given an agency the power to administer a statutory scheme, a court will not vacate the agency's decision about the proper administration of the statute unless, among other things, the agency "'has relied on factors which Congress had not intended it to consider'" (quoting

---

[1] *See, e.g.*, Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 503–05 (2009) (describing Congress's response to its dissatisfaction with the Executive's use of parole power for refugee populations in the 1960s and 1970s); *see also, e.g.*, *infra* note 5 (discussing legislative limitations on voluntary departure and extended voluntary departure).

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

Third, the Executive Branch ordinarily cannot, as the Court put it in *Chaney*, "'consciously and expressly adopt[] a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc)); *see id.* (noting that in situations where an agency had adopted such an extreme policy, "the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion'"). Abdication of the duties assigned to the agency by statute is ordinarily incompatible with the constitutional obligation to faithfully execute the laws. *But see, e.g.*, *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 200 (1994) (noting that under the Take Care Clause, "the President is required to act in accordance with the laws—including the Constitution, which takes precedence over other forms of law").

Finally, lower courts, following *Chaney*, have indicated that non-enforcement decisions are most comfortably characterized as judicially unreviewable exercises of enforcement discretion when they are made on a case-by-case basis. *See, e.g.*, *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996); *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671, 676–77 (D.C. Cir. 1994). That reading of *Chaney* reflects a conclusion that case-by-case enforcement decisions generally avoid the concerns mentioned above. Courts have noted that "single-shot non-enforcement decisions" almost inevitably rest on "the sort of mingled assessments of fact, policy, and law . . . that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion." *Crowley Caribbean Transp.*, 37 F.3d at 676–77 (emphasis omitted). Individual enforcement decisions made on the basis of case-specific factors are also unlikely to constitute "general polic[ies] that [are] so extreme as to amount to an abdication of [the agency's] statutory responsibilities." *Id.* at 677 (quoting *Chaney*, 477 U.S. at 833 n.4). That does not mean that all "general policies" respecting non-enforcement are categorically forbidden: Some "general policies" may, for example, merely provide a framework for making individualized, discretionary assessments about whether to initiate enforcement actions in particular cases. *Cf. Reno v. Flores*, 507 U.S. 292, 313 (1993) (explaining that an agency's use of "reasonable presumptions and generic rules" is not incompatible with a requirement to make individualized determinations). But a general policy of non-enforcement that forecloses the exercise of case-by-case discretion poses "special risks" that the agency has exceeded the bounds of its enforcement discretion. *Crowley Caribbean Transp.*, 37 F.3d at 677.

## B.

We now turn, against this backdrop, to DHS's proposed prioritization policy. In their exercise of enforcement discretion, DHS and its predecessor, INS, have long

employed guidance instructing immigration officers to prioritize the enforcement of the immigration laws against certain categories of aliens and to deprioritize their enforcement against others. *See, e.g.*, INS Operating Instructions § 103(a)(1)(i) (1962); Memorandum for All Field Office Directors, ICE, et al., from John Morton, Director, ICE, *Re: Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* (June 17, 2011); Memorandum for All ICE Employees, from John Morton, Director, ICE, *Re: Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011); Memorandum for Regional Directors, INS, et al., from Doris Meissner, Commissioner, INS, *Re: Exercising Prosecutorial Discretion* (Nov. 17, 2000). The policy DHS proposes, which is similar to but would supersede earlier policy guidance, is designed to "provide clearer and more effective guidance in the pursuit" of DHS's enforcement priorities; namely, "threats to national security, public safety and border security." Johnson Prioritization Memorandum at 1.

Under the proposed policy, DHS would identify three categories of undocumented aliens who would be priorities for removal from the United States. *See generally id.* at 3–5. The highest priority category would include aliens who pose particularly serious threats to national security, border security, or public safety, including aliens engaged in or suspected of espionage or terrorism, aliens convicted of offenses related to participation in criminal street gangs, aliens convicted of certain felony offenses, and aliens apprehended at the border while attempting to enter the United States unlawfully. *See id.* at 3. The second-highest priority would include aliens convicted of multiple or significant misdemeanor offenses; aliens who are apprehended after unlawfully entering the United States who cannot establish that they have been continuously present in the United States since January 1, 2014; and aliens determined to have significantly abused the visa or visa waiver programs. *See id.* at 3–4. The third priority category would include other aliens who have been issued a final order of removal on or after January 1, 2014. *See id.* at 4. The policy would also provide that none of these aliens should be prioritized for removal if they "qualify for asylum or another form of relief under our laws." *Id.* at 3–5.

The policy would instruct that resources should be directed to these priority categories in a manner "commensurate with the level of prioritization identified." *Id.* at 5. It would, however, also leave significant room for immigration officials to evaluate the circumstances of individual cases. *See id.* (stating that the policy "requires DHS personnel to exercise discretion based on individual circumstances"). For example, the policy would permit an ICE Field Office Director, CBP Sector Chief, or CBP Director of Field Operations to deprioritize the removal of an alien falling in the highest priority category if, in her judgment, "there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority." *Id.* at 3. Similar discretionary provisions would apply to

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

aliens in the second and third priority categories.[2] The policy would also provide a non-exhaustive list of factors DHS personnel should consider in making such deprioritization judgments.[3] In addition, the policy would expressly state that its terms should not be construed "to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities," and would further provide that "[i]mmigration officers and attorneys may pursue removal of an alien not identified as a priority" if, "in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest." *Id*. at 5.

DHS has explained that the proposed policy is designed to respond to the practical reality that the number of aliens who are removable under the INA vastly exceeds the resources Congress has made available to DHS for processing and carrying out removals. The resource constraints are striking. As noted, DHS has informed us that there are approximately 11.3 million undocumented aliens in the country, but that Congress has appropriated sufficient resources for ICE to remove fewer than 400,000 aliens each year, a significant percentage of whom are typically encountered at or near the border rather than in the interior of the country. *See* E-mail for Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from David Shahoulian, Deputy General Counsel, DHS, *Re: Immigration Opinion* (Nov. 19, 2014) ("Shahoulian E-mail"). The proposed policy explains that, because DHS "cannot respond to all immigration violations or remove all persons illegally in the United States," it seeks to "prioritize the use of enforcement personnel, detention space, and removal assets" to "ensure that use of its limited resources is devoted to the pursuit of" DHS's highest priorities. Johnson Prioritization Memorandum at 2.

In our view, DHS's proposed prioritization policy falls within the scope of its lawful discretion to enforce the immigration laws. To begin with, the policy is based on a factor clearly "within [DHS's] expertise." *Chaney*, 470 U.S. at 831. Faced with sharply limited resources, DHS necessarily must make choices about which removals to pursue and which removals to defer. DHS's organic statute itself recognizes this inevitable fact, instructing the Secretary to establish "national

---

[2] Under the proposed policy, aliens in the second tier could be deprioritized if, "in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety, and should not therefore be an enforcement priority." Johnson Prioritization Memorandum at 4. Aliens in the third tier could be deprioritized if, "in the judgment of an immigration officer, the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority." *Id*. at 5.

[3] These factors include "extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length of time in the United States; military service; family or community ties in the United States; status as a victim, witness or plaintiff in civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, a young child or a seriously ill relative." Johnson Prioritization Memorandum at 6.

immigration enforcement policies and priorities." 6 U.S.C. § 202(5). And an agency's need to ensure that scarce enforcement resources are used in an effective manner is a quintessential basis for the use of prosecutorial discretion. *See Chaney*, 470 U.S. at 831 (among the factors "peculiarly within [an agency's] expertise" are "whether agency resources are best spent on this violation or another" and "whether the agency has enough resources to undertake the action at all").

The policy DHS has proposed, moreover, is consistent with the removal priorities established by Congress. In appropriating funds for DHS's enforcement activities—which, as noted, are sufficient to permit the removal of only a fraction of the undocumented aliens currently in the country—Congress has directed DHS to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime." Department of Homeland Security Appropriations Act, 2014, Pub. L. No. 113-76, div. F, tit. II, 128 Stat. 5, 251 ("DHS Appropriations Act"). Consistent with this directive, the proposed policy prioritizes individuals convicted of criminal offenses involving active participation in a criminal street gang, most offenses classified as felonies in the convicting jurisdiction, offenses classified as "aggravated felonies" under the INA, and certain misdemeanor offenses. Johnson Prioritization Memorandum at 3–4. The policy ranks these priority categories according to the severity of the crime of conviction. The policy also prioritizes the removal of other categories of aliens who pose threats to national security or border security, matters about which Congress has demonstrated particular concern. *See, e.g.*, 8 U.S.C. § 1226(c)(1)(D) (providing for detention of aliens charged with removability on national security grounds); *id.* § 1225(b) & (c) (providing for an expedited removal process for certain aliens apprehended at the border). The policy thus raises no concern that DHS has relied "on factors which Congress had not intended it to consider." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658.

Further, although the proposed policy is not a "single-shot non-enforcement decision," neither does it amount to an abdication of DHS's statutory responsibilities, or constitute a legislative rule overriding the commands of the substantive statute. *Crowley Caribbean Transp.*, 37 F.3d at 676–77. The proposed policy provides a general framework for exercising enforcement discretion in individual cases, rather than establishing an absolute, inflexible policy of not enforcing the immigration laws in certain categories of cases. Given that the resources Congress has allocated to DHS are sufficient to remove only a small fraction of the total population of undocumented aliens in the United States, setting forth written guidance about how resources should presumptively be allocated in particular cases is a reasonable means of ensuring that DHS's severely limited resources are systematically directed to its highest priorities across a large and diverse agency, as well as ensuring consistency in the administration of the removal system. The proposed policy's identification of categories of aliens who constitute removal

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

priorities is also consistent with the categorical nature of Congress's instruction to prioritize the removal of criminal aliens in the DHS Appropriations Act.

And, significantly, the proposed policy does not identify any category of removable aliens whose removal may not be pursued under any circumstances. Although the proposed policy limits the discretion of immigration officials to expend resources to remove non-priority aliens, it does not eliminate that discretion entirely. It directs immigration officials to use their resources to remove aliens in a manner "commensurate with the level of prioritization identified," but (as noted above) it does not "prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities." Johnson Prioritization Memorandum at 5. Instead, it authorizes the removal of even non-priority aliens if, in the judgment of an ICE Field Office Director, "removing such an alien would serve an important federal interest," a standard the policy leaves open-ended. *Id*. Accordingly, the policy provides for case-by-case determinations about whether an individual alien's circumstances warrant the expenditure of removal resources, employing a broad standard that leaves ample room for the exercise of individualized discretion by responsible officials. For these reasons, the proposed policy avoids the difficulties that might be raised by a more inflexible prioritization policy and dispels any concern that DHS has either undertaken to rewrite the immigration laws or abdicated its statutory responsibilities with respect to non-priority aliens.[4]

## II.

We turn next to the permissibility of DHS's proposed deferred action programs for certain aliens who are parents of U.S. citizens, lawful permanent residents ("LPRs"), or DACA recipients, and who are not removal priorities under the proposed policy discussed above. We begin by discussing the history and current practice of deferred action. We then discuss the legal authorities on which deferred

---

[4] In *Crane v. Napolitano*, a district court recently concluded in a non-precedential opinion that the INA "mandates the initiation of removal proceedings whenever an immigration officer encounters an illegal alien who is not 'clearly and beyond a doubt entitled to be admitted.'" Opinion and Order Respecting Pl. App. for Prelim. Inj. Relief, No. 3:12-cv-03247-O, 2013 WL 1744422, at *5 (N.D. Tex. Apr. 23) (quoting 8 U.S.C. § 1225(b)(2)(A)). The court later dismissed the case for lack of jurisdiction. *See Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 WL 8211660, at *4 (N.D. Tex. July 31). Although the opinion lacks precedential value, we have nevertheless considered whether, as it suggests, the text of the INA categorically forecloses the exercise of enforcement discretion with respect to aliens who have not been formally admitted. The district court's conclusion is, in our view, inconsistent with the Supreme Court's reading of the INA as permitting immigration officials to exercise enforcement discretion at any stage of the removal process, including when deciding whether to initiate removal proceedings against a particular alien. *See Arizona*, 132 S. Ct. at 2499; *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483–84. It is also difficult to square with authority holding that the presence of mandatory language in a statute, standing alone, does not necessarily limit the Executive Branch's enforcement discretion, *see, e.g.*, *Chaney*, 470 U.S. at 835; *Inmates of Attica Corr. Facility v. Rockefeller*, 477 F.2d 375, 381 (2d Cir. 1973).

action relies and identify legal principles against which the proposed use of deferred action can be evaluated. Finally, we turn to an analysis of the proposed deferred action programs themselves, beginning with the program for parents of U.S. citizens and LPRs, and concluding with the program for parents of DACA recipients.

## A.

In immigration law, the term "deferred action" refers to an exercise of administrative discretion in which immigration officials temporarily defer the removal of an alien unlawfully present in the United States. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (citing 6 Charles Gordon et al., *Immigration Law and Procedure* § 72.03[2][h] (1998)); *see* USCIS, *Standard Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices* at 3 (2012) ("USCIS SOP"); INS Operating Instructions § 103.1(a)(1)(ii) (1977). It is one of a number of forms of discretionary relief—in addition to such statutory and non-statutory measures as parole, temporary protected status, deferred enforced departure, and extended voluntary departure—that immigration officials have used over the years to temporarily prevent the removal of undocumented aliens.[5]

---

[5] Parole is available to aliens by statute "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Among other things, parole gives aliens the ability to adjust their status without leaving the United States if they are otherwise eligible for adjustment of status, *see id.* § 1255(a), and may eventually qualify them for Federal means-tested benefits, *see id.* §§ 1613, 1641(b)(4). Temporary protected status is available to nationals of designated foreign states affected by armed conflicts, environmental disasters, and other extraordinary conditions. *Id.* § 1254a. Deferred enforced departure, which "has no statutory basis" but rather is an exercise of "the President's constitutional powers to conduct foreign relations," may be granted to nationals of appropriate foreign states. USCIS, Adjudicator's Field Manual § 38.2(a) (2014). Extended voluntary departure was a remedy derived from the voluntary departure statute, which, before its amendment in 1996, permitted the Attorney General to make a finding of removability if an alien agreed to voluntarily depart the United States, without imposing a time limit for the alien's departure. *See* 8 U.S.C. §§ 1252(b), 1254(e) (1988 & Supp. II 1990); *cf.* 8 U.S.C. § 1229c (current provision of the INA providing authority to grant voluntary departure, but limiting such grants to 120 days). Some commentators, however, suggested that extended voluntary departure was in fact a form of "discretionary relief formulated administratively under the Attorney General's general authority for enforcing immigration law." Sharon Stephan, Cong. Research Serv., 85-599 EPW, *Extended Voluntary Departure and Other Grants of Blanket Relief from Deportation* at 1 (Feb. 23, 1985). It appears that extended voluntary departure is no longer used following enactment of the Immigration Act of 1990, which established the temporary protected status program. *See U.S. Citizenship and Immigration Services Fee Schedule*, 75 Fed. Reg. 33446, 33457 (June 11, 2010) (proposed rule) (noting that "since 1990 neither the Attorney General nor the Secretary have designated a class of aliens for nationality-based 'extended voluntary departure,' and there no longer are aliens in the United States benefiting from such a designation," but noting that deferred enforced departure is still used); H.R. Rep. No. 102-123, at 2 (1991) (indicating that in establishing temporary protected status, Congress was "codif[ying] and supersed[ing]" extended voluntary departure). *See generally* Andorra Bruno et al., Cong. Research Serv., *Analysis of June 15, 2012 DHS Memorandum,* Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children at 5–10 (July 13, 2012) ("CRS Immigration Report").

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

The practice of granting deferred action dates back several decades. For many years after the INA was enacted, INS exercised prosecutorial discretion to grant "non-priority" status to removable aliens who presented "appealing humanitarian factors." Letter for Leon Wildes, from E. A. Loughran, Associate Commissioner, INS at 2 (July 16, 1973) (defining a "non-priority case" as "one in which the Service in the exercise of discretion determines that adverse action would be unconscionable because of appealing humanitarian factors"); *see* INS Operating Instructions § 103.1(a)(1)(ii) (1962). This form of administrative discretion was later termed "deferred action." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484; *see* INS Operating Instructions § 103.1(a)(1)(ii) (1977) (instructing immigration officers to recommend deferred action whenever "adverse action would be unconscionable because of the existence of appealing humanitarian factors").

Although the practice of granting deferred action "developed without express statutory authorization," it has become a regular feature of the immigration removal system that has been acknowledged by both Congress and the Supreme Court. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (internal quotation marks omitted); *see id.* at 485 (noting that a congressional enactment limiting judicial review of decisions "to commence proceedings, adjudicate cases, or execute removal orders against any alien under [the INA]" in 8 U.S.C. § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations"); *see also, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"). Deferred action "does not confer any immigration status"—i.e., it does not establish any enforceable legal right to remain in the United States— and it may be revoked by immigration authorities at their discretion. USCIS SOP at 3, 7. Assuming it is not revoked, however, it represents DHS's decision not to seek the alien's removal for a specified period of time.

Under longstanding regulations and policy guidance promulgated pursuant to statutory authority in the INA, deferred action recipients may receive two additional benefits. First, relying on DHS's statutory authority to authorize certain aliens to work in the United States, DHS regulations permit recipients of deferred action to apply for work authorization if they can demonstrate an "economic necessity for employment." 8 C.F.R. § 274a.12(c)(14); *see* 8 U.S.C. § 1324a(h)(3) (defining an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]"). Second, DHS has promulgated regulations and issued policy guidance providing that aliens who receive deferred action will temporarily cease accruing "unlawful presence" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); Memorandum for Field Leadership, from Donald Neufeld, Acting Associate Director, Domestic Operations Directorate, USCIS, *Re: Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act* at 42

(May 6, 2009) ("USCIS Consolidation of Guidance") (noting that "[a]ccrual of unlawful presence stops on the date an alien is granted deferred action"); *see* 8 U.S.C. § 1182(a)(9)(B)(ii) (providing that an alien is "unlawfully present" if, among other things, he "is present in the United States after the expiration of the period of stay authorized by the Attorney General").[6]

Immigration officials today continue to grant deferred action in individual cases for humanitarian and other purposes, a practice we will refer to as "ad hoc deferred action." Recent USCIS guidance provides that personnel may recommend ad hoc deferred action if they "encounter cases during [their] normal course of business that they feel warrant deferred action." USCIS SOP at 4. An alien may also apply for ad hoc deferred action by submitting a signed, written request to USCIS containing "[a]n explanation as to why he or she is seeking deferred action" along with supporting documentation, proof of identity, and other records. *Id.* at 3.

For decades, INS and later DHS have also implemented broader programs that make discretionary relief from removal available for particular classes of aliens. In many instances, these agencies have made such broad-based relief available through the use of parole, temporary protected status, deferred enforced departure, or extended voluntary departure. For example, from 1956 to 1972, INS implemented an extended voluntary departure program for physically present aliens who were beneficiaries of approved visa petitions—known as "Third Preference" visa petitions—relating to a specific class of visas for Eastern Hemisphere natives. *See United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 979–80 (E.D. Pa. 1977). Similarly, for several years beginning in 1978, INS granted extended voluntary departure to nurses who were eligible for H-1 visas. *Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses*, 43 Fed. Reg. 2776, 2776 (Jan. 19, 1978). In addition, in more than two dozen instances dating to 1956, INS and later DHS granted parole, temporary protected status, deferred enforced departure, or extended voluntary departure to large numbers of nationals of designated foreign states. *See, e.g.*, CRS Immigration Report at 20–23; Cong. Research Serv., ED206779, *Review of U.S. Refugee Resettlement Programs and Policies* at 9, 12–14 (1980). And in 1990, INS implemented a "Family Fairness" program that authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens who had been granted legal status under the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 ("IRCA"). *See* Memorandum for Regional Commissioners,

---

[6] Section 1182(a)(9)(B)(i) imposes three- and ten-year bars on the admission of aliens (other than aliens admitted to permanent residence) who departed or were removed from the United States after periods of unlawful presence of between 180 days and one year, or one year or more. Section 1182(a)(9)(C)(i)(I) imposes an indefinite bar on the admission of any alien who, without being admitted, enters or attempts to reenter the United States after previously having been unlawfully present in the United States for an aggregate period of more than one year.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

INS, from Gene McNary, Commissioner, INS, *Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) ("Family Fairness Memorandum"); *see also* CRS Immigration Report at 10.

On at least five occasions since the late 1990s, INS and later DHS have also made discretionary relief available to certain classes of aliens through the use of deferred action:

*1. Deferred Action for Battered Aliens Under the Violence Against Women Act.* INS established a class-based deferred action program in 1997 for the benefit of self-petitioners under the Violence Against Women Act of 1994 ("VAWA"), Pub. L. No. 103-322, tit. IV, 108 Stat. 1796, 1902. VAWA authorized certain aliens who have been abused by U.S. citizen or LPR spouses or parents to self-petition for lawful immigration status, without having to rely on their abusive family members to petition on their behalf. *Id.* § 40701(a) (codified as amended at 8 U.S.C. § 1154(a)(1)(A)(iii)–(iv), (vii)). The INS program required immigration officers who approved a VAWA self-petition to assess, "on a case-by-case basis, whether to place the alien in deferred action status" while the alien waited for a visa to become available. Memorandum for Regional Directors et al., INS, from Paul W. Virtue, Acting Executive Associate Commissioner, INS, *Re: Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997). INS noted that "[b]y their nature, VAWA cases generally possess factors that warrant consideration for deferred action." *Id.* But because "[i]n an unusual case, there may be factors present that would militate against deferred action," the agency instructed officers that requests for deferred action should still "receive individual scrutiny." *Id.* In 2000, INS reported to Congress that, because of this program, no approved VAWA self-petitioner had been removed from the country. *See Battered Women Immigrant Protection Act: Hearings on H.R. 3083 Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 106th Cong. at 43 (July 20, 2000) ("H.R. 3083 Hearings").

*2. Deferred Action for T and U Visa Applicants.* Several years later, INS instituted a similar deferred action program for applicants for nonimmigrant status or visas made available under the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), Pub. L. No. 106-386, 114 Stat. 1464. That Act created two new nonimmigrant classifications: a "T visa" available to victims of human trafficking and their family members, and a "U visa" for victims of certain other crimes and their family members. *Id.* §§ 107(e), 1513(b)(3) (codified at 8 U.S.C. § 1101(a)(15)(T)(i), (U)(i)). In 2001, INS issued a memorandum directing immigration officers to locate "possible victims in the above categories," and to use "[e]xisting authority and mechanisms such as parole, deferred action, and stays of removal" to prevent those victims' removal "until they have had the opportunity to avail themselves of the provisions of the VTVPA." Memorandum

15

for Michael A. Pearson, Executive Associate Commissioner, INS, from Michael D. Cronin, Acting Executive Associate Commissioner, INS, *Re: Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* at 2 (Aug. 30, 2001). In subsequent memoranda, INS instructed officers to make "deferred action assessment[s]" for "all [T visa] applicants whose applications have been determined to be bona fide," Memorandum for Johnny N. Williams, Executive Associate Commissioner, INS, from Stuart Anderson, Executive Associate Commissioner, INS, *Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status* at 1 (May 8, 2002), as well as for all U visa applicants "determined to have submitted *prima facie* evidence of [their] eligibility," Memorandum for the Director, Vermont Service Center, INS, from William R. Yates, USCIS, *Re: Centralization of Interim Relief for U Nonimmigrant Status Applicants* at 5 (Oct. 8, 2003). In 2002 and 2007, INS and DHS promulgated regulations embodying these policies. *See* 8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) (promulgated by *New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status*, 67 Fed. Reg. 4784, 4800–01 (Jan. 31, 2002)) (providing that any T visa applicant who presents "*prima facie* evidence" of his eligibility should have his removal "automatically stay[ed]" and that applicants placed on a waiting list for visas "shall maintain [their] current means to prevent removal (deferred action, parole, or stay of removal)"); *id.* § 214.14(d)(2) (promulgated by *New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status*, 72 Fed. Reg. 53014, 53039 (Sept. 17, 2007)) ("USCIS will grant deferred action or parole to U-1 petitioners and qualifying family members while the U-1 petitioners are on the waiting list" for visas.).

   *3. Deferred Action for Foreign Students Affected by Hurricane Katrina.* As a consequence of the devastation caused by Hurricane Katrina in 2005, several thousand foreign students became temporarily unable to satisfy the requirements for maintaining their lawful status as F-1 nonimmigrant students, which include "pursuit of a 'full course of study.'" USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* at 1 (Nov. 25, 2005) (quoting 8 C.F.R. § 214.2(f)(6)), *available at* http://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Special%20Situations/Previous%20Special%20Situations%20By%20Topic/faq-interim-student-relief-hurricane-katrina.pdf (last visited Nov. 19, 2014). DHS announced that it would grant deferred action to these students "based on the fact that [their] failure to maintain status is directly due to Hurricane Katrina." *Id.* at 7. To apply for deferred action under this program, students were required to send a letter substantiating their need for deferred action, along with an application for work authorization. Press Release, USCIS, *USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina* at 1–2 (Nov. 25, 2005), *available at* http://www.uscis.gov/sites/default/files/files/pressrelease/F1Student_11_25_05_PR.pdf (last visited Nov. 19, 2014). USCIS explained that such

requests for deferred action would be "decided on a case-by-case basis" and that it could not "provide any assurance that all such requests will be granted." *Id.* at 1.

*4. Deferred Action for Widows and Widowers of U.S. Citizens.* In 2009, DHS implemented a deferred action program for certain widows and widowers of U.S. citizens. USCIS explained that "no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death" and USCIS had not yet adjudicated a visa petition on the spouse's behalf. Memorandum for Field Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, *Re: Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* at 1 (Sept. 4, 2009). "In order to address humanitarian concerns arising from cases involving surviving spouses of U.S. citizens," USCIS issued guidance permitting covered surviving spouses and "their qualifying children who are residing in the United States" to apply for deferred action. *Id.* at 2, 6. USCIS clarified that such relief would not be automatic, but rather would be unavailable in the presence of, for example, "serious adverse factors, such as national security concerns, significant immigration fraud, commission of other crimes, or public safety reasons." *Id.* at 6.[7]

*5. Deferred Action for Childhood Arrivals.* Announced by DHS in 2012, DACA makes deferred action available to "certain young people who were brought to this country as children" and therefore "[a]s a general matter . . . lacked the intent to violate the law." Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1 (June 15, 2012) ("Napolitano Memorandum"). An alien is eligible for DACA if she was under the age of 31 when the program began; arrived in the United States before the age of 16; continuously resided in the United States for at least 5 years immediately preceding June 15, 2012; was physically present on June 15, 2012; satisfies certain educational or military service requirements; and neither has a serious criminal history nor "poses a threat to national security or public safety." *See id.* DHS evaluates applicants' eligibility for DACA on a case-by-case basis. *See id.* at 2; USCIS, *Deferred Action for Childhood Arrivals (DACA) Toolkit: Resources for Community Partners* at 11 ("DACA Toolkit"). Successful DACA applicants receive deferred action for a

---

[7] Several months after the deferred action program was announced, Congress eliminated the requirement that an alien be married to a U.S. citizen "for at least 2 years at the time of the citizen's death" to retain his or her eligibility for lawful immigration status. Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 568(c), 123 Stat. 2142, 2186 (2009). Concluding that this legislation rendered its surviving spouse guidance "obsolete," USCIS withdrew its earlier guidance and treated all pending applications for deferred action as visa petitions. *See* Memorandum for Executive Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, et al., *Re Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children (REVISED)* at 3, 10 (Dec. 2, 2009).

period of two years, subject to renewal. *See* DACA Toolkit at 11. DHS has stated that grants of deferred action under DACA may be terminated at any time, *id.* at 16, and "confer[] no substantive right, immigration status or pathway to citizenship," Napolitano Memorandum at 3.[8]

Congress has long been aware of the practice of granting deferred action, including in its categorical variety, and of its salient features; and it has never acted to disapprove or limit the practice.[9] On the contrary, it has enacted several pieces of legislation that have either assumed that deferred action would be available in certain circumstances, or expressly directed that deferred action be extended to certain categories of aliens. For example, as Congress was considering VAWA reauthorization legislation in 2000, INS officials testified before Congress about their deferred action program for VAWA self-petitioners, explaining that "[a]pproved [VAWA] self-petitioners are placed in deferred action status," such that "[n]o battered alien who has filed a[n approved] self petition . . . has been deported." H.R. 3083 Hearings at 43. Congress responded by not only acknowledging but also expanding the deferred action program in the 2000 VAWA reauthorization legislation, providing that children who could no longer self-petition under VAWA because they were over the age of 21 would nonetheless be "eligible for deferred action and work authorization." Victims of Trafficking and

---

[8] Before DACA was announced, our Office was consulted about whether such a program would be legally permissible. As we orally advised, our preliminary view was that such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis. We noted that immigration officials typically consider factors such as having been brought to the United States as a child in exercising their discretion to grant deferred action in individual cases. We explained, however, that extending deferred action to individuals who satisfied these and other specified criteria on a class-wide basis would raise distinct questions not implicated by ad hoc grants of deferred action. We advised that it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria. We also noted that, although the proposed program was predicated on humanitarian concerns that appeared less particularized and acute than those underlying certain prior class-wide deferred action programs, the concerns animating DACA were nonetheless consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion.

[9] Congress has considered legislation that would limit the practice of granting deferred action, but it has never enacted such a measure. In 2011, a bill was introduced in both the House and the Senate that would have temporarily suspended DHS's authority to grant deferred action except in narrow circumstances. *See* H.R. 2497, 112th Cong. (2011); S. 1380, 112th Cong. (2011). Neither chamber, however, voted on the bill. This year, the House passed a bill that purported to bar any funding for DACA or other class-wide deferred action programs, H.R. 5272, 113th Cong. (2014), but the Senate has not considered the legislation. Because the Supreme Court has instructed that unenacted legislation is an unreliable indicator of legislative intent, *see Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n.11 (1969), we do not draw any inference regarding congressional policy from these unenacted bills.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

Violence Protection Act of 2000, Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV)).[10]

Congress demonstrated a similar awareness of INS's (and later DHS's) deferred action program for bona fide T and U visa applicants. As discussed above, that program made deferred action available to nearly all individuals who could make a prima facie showing of eligibility for a T or U visa. In 2008 legislation, Congress authorized DHS to "grant . . . an administrative stay of a final order of removal" to any such individual. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 204, 122 Stat. 5044, 5060 (codified at 8 U.S.C. § 1227(d)(1)). Congress further clarified that "[t]he denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for . . . deferred action." *Id.* It also directed DHS to compile a report detailing, among other things, how long DHS's "specially trained [VAWA] Unit at the [USCIS] Vermont Service Center" took to adjudicate victim-based immigration applications for "deferred action," along with "steps taken to improve in this area." *Id.* § 238. Representative Berman, the bill's sponsor, explained that the Vermont Service Center should "strive to issue work authorization and deferred action" to "[i]mmigrant victims of domestic violence, sexual assault and other violence crimes . . . in most instances within 60 days of filing." 154 Cong. Rec. 24603 (2008).

In addition, in other enactments, Congress has specified that certain classes of individuals should be made "eligible for deferred action." These classes include certain immediate family members of LPRs who were killed on September 11, 2001, USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361, and certain immediate family members of certain U.S. citizens killed in combat, National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)–(d), 117 Stat. 1392, 1694. In the same legislation, Congress made these individuals eligible to obtain lawful status as "family-sponsored immigrant[s]" or "immediate relative[s]" of U.S. citizens. Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361; Pub. L. No. 108-136, § 1703(c)(1)(A), 117 Stat. 1392, 1694; *see generally Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191, 2197 (2014) (plurality opinion) (explaining which aliens typically qualify as family-sponsored immigrants or immediate relatives).

Finally, Congress acknowledged the practice of granting deferred action in the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, 302 (codified at

---

[10] Five years later, in the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960, Congress specified that, "[u]pon the approval of a petition as a VAWA self-petitioner, the alien . . . is eligible for work authorization." *Id.* § 814(b) (codified at 8 U.S.C. § 1154(a)(1)(K)). One of the Act's sponsors explained that while this provision was intended to "give[] DHS statutory authority to grant work authorization . . . without having to rely upon deferred action . . . [t]he current practice of granting deferred action to approved VAWA self-petitioners should continue." 151 Cong. Rec. 29334 (2005) (statement of Rep. Conyers).

49 U.S.C. § 30301 note), which makes a state-issued driver's license or identification card acceptable for federal purposes only if the state verifies, among other things, that the card's recipient has "[e]vidence of [l]awful [s]tatus." Congress specified that, for this purpose, acceptable evidence of lawful status includes proof of, among other things, citizenship, lawful permanent or temporary residence, or "approved deferred action status." *Id.* § 202(c)(2)(B)(viii).

## B.

The practice of granting deferred action, like the practice of setting enforcement priorities, is an exercise of enforcement discretion rooted in DHS's authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed. It is one of several mechanisms by which immigration officials, against a backdrop of limited enforcement resources, exercise their "broad discretion" to administer the removal system—and, more specifically, their discretion to determine whether "it makes sense to pursue removal" in particular circumstances. *Arizona*, 132 S. Ct. at 2499.

Deferred action, however, differs in at least three respects from more familiar and widespread exercises of enforcement discretion. First, unlike (for example) the paradigmatic exercise of prosecutorial discretion in a criminal case, the conferral of deferred action does not represent a decision not to prosecute an individual for past unlawful conduct; it instead represents a decision to openly tolerate an undocumented alien's continued presence in the United States for a fixed period (subject to revocation at the agency's discretion). Second, unlike most exercises of enforcement discretion, deferred action carries with it benefits in addition to non-enforcement itself; specifically, the ability to seek employment authorization and suspension of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). Third, class-based deferred action programs, like those for VAWA recipients and victims of Hurricane Katrina, do not merely enable individual immigration officials to select deserving beneficiaries from among those aliens who have been identified or apprehended for possible removal—as is the case with ad hoc deferred action—but rather set forth certain threshold eligibility criteria and then invite individuals who satisfy these criteria to apply for deferred action status.

While these features of deferred action are somewhat unusual among exercises of enforcement discretion, the differences between deferred action and other exercises of enforcement discretion are less significant than they might initially appear. The first feature—the toleration of an alien's continued unlawful presence—is an inevitable element of almost any exercise of discretion in immigration enforcement. Any decision not to remove an unlawfully present alien—even through an exercise of routine enforcement discretion—necessarily carries with it a tacit acknowledgment that the alien will continue to be present in the United States without legal status. Deferred action arguably goes beyond such tacit acknowledgment by expressly communicating to the alien that his or her unlawful

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

presence will be tolerated for a prescribed period of time. This difference is not, in our view, insignificant. But neither does it fundamentally transform deferred action into something other than an exercise of enforcement discretion: As we have previously noted, deferred action confers no lawful immigration status, provides no path to lawful permanent residence or citizenship, and is revocable at any time in the agency's discretion.

With respect to the second feature, the additional benefits deferred action confers—the ability to apply for work authorization and the tolling of unlawful presence—do not depend on background principles of agency discretion under DHS's general immigration authorities or the Take Care Clause at all, but rather depend on independent and more specific statutory authority rooted in the text of the INA. The first of those authorities, DHS's power to prescribe which aliens are authorized to work in the United States, is grounded in 8 U.S.C. § 1324a(h)(3), which defines an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]." This statutory provision has long been understood to recognize the authority of the Secretary (and the Attorney General before him) to grant work authorization to particular classes of aliens. *See* 8 C.F.R. § 274a.12; *see also Perales v. Casillas*, 903 F.2d 1043, 1048–50 (5th Cir. 1990) (describing the authority recognized by section 1324a(h)(3) as "permissive" and largely "unfettered").[11] Although the INA

---

[11] Section 1324a(h)(3) was enacted in 1986 as part of IRCA. Before then, the INA contained no provisions comprehensively addressing the employment of aliens or expressly delegating the authority to regulate the employment of aliens to a responsible federal agency. INS assumed the authority to prescribe the classes of aliens authorized to work in the United States under its general responsibility to administer the immigration laws. In 1981, INS promulgated regulations codifying its existing procedures and criteria for granting employment authorization. *See Employment Authorization to Aliens in the United States*, 46 Fed. Reg. 25079, 25080–81 (May 5, 1981) (citing 8 U.S.C. § 1103(a)). Those regulations permitted certain categories of aliens who lacked lawful immigration status, including deferred action recipients, to apply for work authorization under certain circumstances. 8 C.F.R. § 109.1(b)(7) (1982). In IRCA, Congress introduced a "comprehensive scheme prohibiting the employment of illegal aliens in the United States," *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002), to be enforced primarily through criminal and civil penalties on employers who knowingly employ an "unauthorized alien." As relevant here, Congress defined an "unauthorized alien" barred from employment in the United States as an alien who "is not . . . either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter *or by the Attorney General*." 8 U.S.C. § 1324a(h)(3) (emphasis added). Shortly after IRCA was enacted, INS denied a petition to rescind its employment authorization regulation, rejecting an argument that "the phrase 'authorized to be so employed by this Act or the Attorney General' does not recognize the Attorney General's authority to grant work authorization except to those aliens who have already been granted specific authorization by the Act." *Employment Authorization; Classes of Aliens Eligible*, 52 Fed. Reg. 46092, 46093 (Dec. 4, 1987). Because the same statutory phrase refers both to aliens authorized to be employed by the INA and aliens authorized to be employed by the Attorney General, INS concluded that the only way to give effect to both references is to conclude "that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined 'unauthorized alien' in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the

requires the Secretary to grant work authorization to particular classes of aliens, *see, e.g.*, 8 U.S.C. § 1158(c)(1)(B) (aliens granted asylum), it places few limitations on the Secretary's authority to grant work authorization to other classes of aliens. Further, and notably, additional provisions of the INA expressly contemplate that the Secretary may grant work authorization to aliens lacking lawful immigration status—even those who are in active removal proceedings or, in certain circumstances, those who have already received final orders of removal. *See id.* § 1226(a)(3) (permitting the Secretary to grant work authorization to an otherwise work-eligible alien who has been arrested and detained pending a decision whether to remove the alien from the United States); *id.* § 1231(a)(7) (permitting the Secretary under certain narrow circumstances to grant work authorization to aliens who have received final orders of removal). Consistent with these provisions, the Secretary has long permitted certain additional classes of aliens who lack lawful immigration status to apply for work authorization, including deferred action recipients who can demonstrate an economic necessity for employment. *See* 8 C.F.R. § 274a.12(c)(14); *see also id.* § 274a.12(c)(8) (applicants for asylum), (c)(10) (applicants for cancellation of removal); *supra* note 11 (discussing 1981 regulations).

The Secretary's authority to suspend the accrual of unlawful presence of deferred action recipients is similarly grounded in the INA. The relevant statutory provision treats an alien as "unlawfully present" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I) if he "is present in the United States after the expiration of the period of stay authorized by the Attorney General." 8 U.S.C. § 1182(a)(9)(B)(ii). That language contemplates that the Attorney General (and now the Secretary) may authorize an alien to stay in the United States without accruing unlawful presence under section 1182(a)(9)(B)(i) or section 1182(a)(9)(C)(i). And DHS regulations and policy guidance interpret a "period of stay authorized by the Attorney General" to include periods during which an alien has been granted deferred action. *See* 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); USCIS Consolidation of Guidance at 42.

The final unusual feature of deferred action programs is particular to class-based programs. The breadth of such programs, in combination with the first two features of deferred action, may raise particular concerns about whether immigration officials have undertaken to substantively change the statutory removal system rather than simply adapting its application to individual circumstances. But the salient feature of class-based programs—the establishment of an affirmative application process with threshold eligibility criteria—does not in and of itself cross the line between executing the law and rewriting it. Although every class-wide deferred action program that has been implemented to date has established

---

regulatory process, in addition to those who are authorized employment by statute." *Id.*; *see Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844 (1986) (stating that "considerable weight must be accorded" an agency's "contemporaneous interpretation of the statute it is entrusted to administer").

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

certain threshold eligibility criteria, each program has also left room for case-by-case determinations, giving immigration officials discretion to deny applications even if the applicant fulfills all of the program criteria. *See supra* pp. 15–18. Like the establishment of enforcement priorities discussed in Part I, the establishment of threshold eligibility criteria can serve to avoid arbitrary enforcement decisions by individual officers, thereby furthering the goal of ensuring consistency across a large agency. The guarantee of individualized, case-by-case review helps avoid potential concerns that, in establishing such eligibility criteria, the Executive is attempting to rewrite the law by defining new categories of aliens who are automatically entitled to particular immigration relief. *See Crowley Caribbean Transp.*, 37 F.3d at 676–77; *see also Chaney*, 470 U.S. at 833 n.4. Furthermore, while permitting potentially eligible individuals to apply for an exercise of enforcement discretion is not especially common, many law enforcement agencies have developed programs that invite violators of the law to identify themselves to the authorities in exchange for leniency.[12] Much as is the case with those pro-grams, inviting eligible aliens to identify themselves through an application process may serve the agency's law enforcement interests by encouraging lower-priority individuals to identify themselves to the agency. In so doing, the process may enable the agency to better focus its scarce resources on higher enforcement priorities.

Apart from the considerations just discussed, perhaps the clearest indication that these features of deferred action programs are not per se impermissible is the fact that Congress, aware of these features, has repeatedly enacted legislation appearing to endorse such programs. As discussed above, Congress has not only directed that certain classes of aliens be made eligible for deferred action pro-grams—and in at least one instance, in the case of VAWA beneficiaries, directed the expansion of an existing program—but also ranked evidence of approved deferred action status as evidence of "lawful status" for purposes of the REAL ID Act. These enactments strongly suggest that when DHS in the past has decided to grant deferred action to an individual or class of individuals, it has been acting in a manner consistent with congressional policy "'rather than embarking on a frolic of its own.'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139

---

[12] For example, since 1978, the Department of Justice's Antitrust Division has implemented a "leniency program" under which a corporation that reveals an antitrust conspiracy in which it participated may receive a conditional promise that it will not be prosecuted. *See* Dep't of Justice, *Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (November 19, 2008)*, *available at* http://www.justice.gov/atr/public/criminal/239583.pdf (last visited Nov. 19, 2014); *see also* Internal Revenue Manual § 9.5.11.9(2) (Revised IRS Voluntary Disclosure Practice), *available at* http://www.irs.gov/uac/Revised-IRS-Voluntary-Disclosure-Practice (last visited Nov. 19, 2014) (explaining that a taxpayer's voluntary disclosure of misreported tax information "may result in prosecution not being recommended"); U.S. Marshals Service, *Fugitive Safe Surrender FAQs*, *available at* http://www.usmarshals.gov/safesurrender/faqs.html (last visited Nov. 19, 2014) (stating that fugitives who surrender at designated sites and times under the "Fugitive Safe Surrender" program are likely to receive "favorable consideration").

(1985) (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 375 (1969)); *cf. id.* at 137–39 (concluding that Congress acquiesced in an agency's assertion of regulatory authority by "refus[ing] . . . to overrule" the agency's view after it was specifically "brought to Congress'[s] attention," and further finding implicit congressional approval in legislation that appeared to acknowledge the regulatory authority in question); *Dames & Moore v. Regan*, 453 U.S. 654, 680 (1981) (finding that Congress "implicitly approved the practice of claim settlement by executive agreement" by enacting the International Claims Settlement Act of 1949, which "create[d] a procedure to implement" those very agreements).

Congress's apparent endorsement of certain deferred action programs does not mean, of course, that a deferred action program can be lawfully extended to any group of aliens, no matter its characteristics or its scope, and no matter the circumstances in which the program is implemented. Because deferred action, like the prioritization policy discussed above, is an exercise of enforcement discretion rooted in the Secretary's broad authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed, it is subject to the same four general principles previously discussed. *See supra* pp. 6–7. Thus, any expansion of deferred action to new classes of aliens must be carefully scrutinized to ensure that it reflects considerations within the agency's expertise, and that it does not seek to effectively rewrite the laws to match the Executive's policy preferences, but rather operates in a manner consonant with congressional policy expressed in the statute. *See supra* pp. 6–7 (citing *Youngstown*, 343 U.S. at 637, and *Nat'l Ass'n of Home Builders*, 551 U.S. at 658). Immigration officials cannot abdicate their statutory responsibilities under the guise of exercising enforcement discretion. *See supra* p. 7 (citing *Chaney*, 470 U.S. at 833 n.4). And any new deferred action program should leave room for individualized evaluation of whether a particular case warrants the expenditure of resources for enforcement. *See supra* p. 7 (citing *Glickman*, 96 F.3d at 1123, and *Crowley Caribbean Transp.*, 37 F.3d at 676–77).

Furthermore, because deferred action programs depart in certain respects from more familiar and widespread exercises of enforcement discretion, particularly careful examination is needed to ensure that any proposed expansion of deferred action complies with these general principles, so that the proposed program does not, in effect, cross the line between executing the law and rewriting it. In analyzing whether the proposed programs cross this line, we will draw substantial guidance from Congress's history of legislation concerning deferred action. In the absence of express statutory guidance, the nature of deferred action programs Congress has implicitly approved by statute helps to shed light on Congress's own understandings about the permissible uses of deferred action. Those understandings, in turn, help to inform our consideration of whether the proposed deferred action programs are "faithful[]" to the statutory scheme Congress has enacted. U.S. Const. art. II, § 3.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

**C.**

We now turn to the specifics of DHS's proposed deferred action programs. DHS has proposed implementing a policy under which an alien could apply for, and would be eligible to receive, deferred action if he or she: (1) is not an enforcement priority under DHS policy; (2) has continuously resided in the United States since before January 1, 2010; (3) is physically present in the United States both when DHS announces its program and at the time of application for deferred action; (4) has a child who is a U.S. citizen or LPR; and (5) presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Johnson Deferred Action Memorandum at 4. You have also asked about the permissibility of a similar program that would be open to parents of children who have received deferred action under the DACA program. We first address DHS's proposal to implement a deferred action program for the parents of U.S. citizens and LPRs, and then turn to the permissibility of the program for parents of DACA recipients in the next section.

**1.**

We begin by considering whether the proposed program for the parents of U.S. citizens and LPRs reflects considerations within the agency's expertise. DHS has offered two justifications for the proposed program for the parents of U.S. citizens and LPRs. First, as noted above, severe resource constraints make it inevitable that DHS will not remove the vast majority of aliens who are unlawfully present in the United States. Consistent with Congress's instruction, DHS prioritizes the removal of individuals who have significant criminal records, as well as others who present dangers to national security, public safety, or border security. *See supra* p. 10. Parents with longstanding ties to the country and who have no significant criminal records or other risk factors rank among the agency's lowest enforcement priorities; absent significant increases in funding, the likelihood that any individual in that category will be determined to warrant the expenditure of severely limited enforcement resources is very low. Second, DHS has explained that the program would serve an important humanitarian interest in keeping parents together with children who are lawfully present in the United States, in situations where such parents have demonstrated significant ties to community and family in this country. *See* Shahoulian E-mail.

With respect to DHS's first justification, the need to efficiently allocate scarce enforcement resources is a quintessential basis for an agency's exercise of enforcement discretion. *See Chaney*, 470 U.S. at 831. Because, as discussed earlier, Congress has appropriated only a small fraction of the funds needed for full enforcement, DHS can remove no more than a small fraction of the individuals who are removable under the immigration laws. *See supra* p. 9. The agency must therefore make choices about which violations of the immigration laws it

will prioritize and pursue. And as *Chaney* makes clear, such choices are entrusted largely to the Executive's discretion. 470 U.S. at 831.

The deferred action program DHS proposes would not, of course, be costless. Processing applications for deferred action and its renewal requires manpower and resources. *See Arizona*, 132 S. Ct. at 2521 (Scalia, J., concurring in part and dissenting in part). But DHS has informed us that the costs of administering the proposed program would be borne almost entirely by USCIS through the collection of application fees. *See* Shahoulian E-mail; *see also* 8 U.S.C. § 1356(m); 8 C.F.R. § 103.7(b)(1)(i)(C), (b)(1)(i)(HH). DHS has indicated that the costs of administering the deferred action program would therefore not detract in any significant way from the resources available to ICE and CBP—the enforcement arms of DHS—which rely on money appropriated by Congress to fund their operations. *See* Shahoulian E-mail. DHS has explained that, if anything, the proposed deferred action program might increase ICE's and CBP's efficiency by in effect using USCIS's fee-funded resources to enable those enforcement divisions to more easily identify non-priority aliens and focus their resources on pursuing aliens who are strong candidates for removal. *See id.* The proposed program, in short, might help DHS address its severe resource limitations, and at the very least likely would not exacerbate them. *See id.*

DHS does not, however, attempt to justify the proposed program solely as a cost-saving measure, or suggest that its lack of resources alone is sufficient to justify creating a deferred action program for the proposed class. Rather, as noted above, DHS has explained that the program would also serve a particularized humanitarian interest in promoting family unity by enabling those parents of U.S. citizens and LPRs who are not otherwise enforcement priorities and who have demonstrated community and family ties in the United States (as evidenced by the length of time they have remained in the country) to remain united with their children in the United States. Like determining how best to respond to resource constraints, determining how to address such "human concerns" in the immigration context is a consideration that is generally understood to fall within DHS's expertise. *Arizona*, 132 S. Ct. at 2499.

This second justification for the program also appears consonant with congressional policy embodied in the INA. Numerous provisions of the statute reflect a particular concern with uniting aliens with close relatives who have attained lawful immigration status in the United States. *See, e.g.*, *Fiallo v. Bell*, 430 U.S. 787, 795 n.6 (1977); *INS v. Errico*, 385 U.S. 214, 220 n.9 (1966) ("'The legislative history of the Immigration and Nationality Act clearly indicates that the Congress . . . was concerned with the problem of keeping families of United States citizens and immigrants united.'" (quoting H.R. Rep. No. 85-1199, at 7 (1957)). The INA provides a path to lawful status for the parents, as well as other immediate relatives, of U.S. citizens: U.S. citizens aged twenty-one or over may petition for parents to obtain visas that would permit them to enter and permanently reside

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

in the United States, and there is no limit on the overall number of such petitions that may be granted. *See* 8 U.S.C. § 1151(b)(2)(A)(i); *see also Cuellar de Osorio*, 134 S. Ct. at 2197–99 (describing the process for obtaining a family-based immigrant visa). And although the INA contains no parallel provision permitting LPRs to petition on behalf of their parents, it does provide a path for LPRs to become citizens, at which point they too can petition to obtain visas for their parents. *See, e.g.*, 8 U.S.C. § 1427(a) (providing that aliens are generally eligible to become naturalized citizens after five years of lawful permanent residence); *id.* § 1430(a) (alien spouses of U.S. citizens become eligible after three years of lawful permanent residence); *Demore v. Kim*, 538 U.S. 510, 544 (2003).[13] Additionally, the INA empowers the Attorney General to cancel the removal of, and adjust to lawful permanent resident status, aliens who have been physically present in the United States for a continuous period of not less than ten years, exhibit good moral character, have not been convicted of specified offenses, and have immediate relatives who are U.S. citizens or LPRs and who would suffer exceptional hardship from the alien's removal. 8 U.S.C. § 1229b(b)(1). DHS's proposal to focus on the parents of U.S. citizens and LPRs thus tracks a congressional concern, expressed in the INA, with uniting the immediate families of individuals who have permanent legal ties to the United States.

At the same time, because the temporary relief DHS's proposed program would confer to such parents is sharply limited in comparison to the benefits Congress has made available through statute, DHS's proposed program would not operate to circumvent the limits Congress has placed on the availability of those benefits. The statutory provisions discussed above offer the parents of U.S. citizens and LPRs the prospect of permanent lawful status in the United States. The cancellation of removal provision, moreover, offers the prospect of receiving such status

---

[13] The INA does permit LPRs to petition on behalf of their spouses and children even before they have attained citizenship. *See* 8 U.S.C. § 1153(a)(2). However, the exclusion of LPRs' parents from this provision does not appear to reflect a congressional judgment that, until they attain citizenship, LPRs lack an interest in being united with their parents comparable to their interest in being united with their other immediate relatives. The distinction between parents and other relatives originated with a 1924 statute that exempted the wives and minor children of U.S. citizens from immigration quotas, gave "preference status"—eligibility for a specially designated pool of immigrant visas—to other relatives of U.S. citizens, and gave no favorable treatment to the relatives of LPRs. Immigration Act of 1924, Pub. L. No. 68-139, §§ 4(a), 6, 43 Stat. 153, 155–56. In 1928, Congress extended preference status to LPRs' wives and minor children, reasoning that because such relatives would be eligible for visas without regard to any quota when their LPR relatives became citizens, granting preference status to LPRs' wives and minor children would "hasten[]" the "family reunion." S. Rep. No. 70-245, at 2 (1928); *see* Act of May 29, 1928, ch. 914, 45 Stat. 1009, 1009–10. The special visa status for wives and children of LPRs thus mirrored, and was designed to complement, the special visa status given to wives and minor children of U.S. citizens. In 1965, Congress eliminated the basis on which the distinction had rested by exempting all "immediate relatives" of U.S. citizens, including parents, from numerical restrictions on immigration. Pub. L. No. 89-236, § 1, 79 Stat. 911, 911. But it did not amend eligibility for preference status for relatives of LPRs to reflect that change. We have not been able to discern any rationale for this omission in the legislative history or statutory text of the 1965 law.

immediately, without the delays generally associated with the family-based immigrant visa process. DHS's proposed program, in contrast, would not grant the parents of U.S. citizens and LPRs any lawful immigration status, provide a path to permanent residence or citizenship, or otherwise confer any legally enforceable entitlement to remain in the United States. *See* USCIS SOP at 3. It is true that, as we have discussed, a grant of deferred action would confer eligibility to apply for and obtain work authorization, pursuant to the Secretary's statutory authority to grant such authorization and the longstanding regulations promulgated thereunder. *See supra* pp. 13, 21–22. But unlike the automatic employment eligibility that accompanies LPR status, *see* 8 U.S.C. § 1324a(h)(3), this authorization could be granted only on a showing of economic necessity, and would last only for the limited duration of the deferred action grant, *see* 8 C.F.R. § 274a.12(c)(14).

The other salient features of the proposal are similarly consonant with congressional policy. The proposed program would focus on parents who are not enforcement priorities under the prioritization policy discussed above—a policy that, as explained earlier, comports with the removal priorities set by Congress. *See supra* p. 10. The continuous residence requirement is likewise consistent with legislative judgments that extended periods of continuous residence are indicative of strong family and community ties. *See* IRCA, Pub. L. No. 99-603, § 201(a), 100 Stat. 3359, 3394 (1986) (codified as amended at 8 U.S.C. § 1255a(a)(2)) (granting lawful status to certain aliens unlawfully present in the United States since January 1, 1982); *id.* § 302(a) (codified as amended at 8 U.S.C. § 1160) (granting similar relief to certain agricultural workers); H.R. Rep. No. 99-682, pt. 1, at 49 (1986) (stating that aliens present in the United States for five years "have become a part of their communities[,] . . . have strong family ties here which include U.S. citizens and lawful residents[,] . . . have built social networks in this country[, and] . . . have contributed to the United States in myriad ways"); S. Rep. No. 99-132, at 16 (1985) (deporting aliens who "have become well settled in this country" would be a "wasteful use of the Immigration and Naturalization Service's limited enforcement resources"); *see also Arizona*, 132 S. Ct. at 2499 (noting that "[t]he equities of an individual case" turn on factors "including whether the alien has . . . long ties to the community").

We also do not believe DHS's proposed program amounts to an abdication of its statutory responsibilities, or a legislative rule overriding the commands of the statute. As discussed earlier, DHS's severe resource constraints mean that, unless circumstances change, it could not as a practical matter remove the vast majority of removable aliens present in the United States. The fact that the proposed program would defer the removal of a subset of these removable aliens—a subset that ranks near the bottom of the list of the agency's removal priorities—thus does not, by itself, demonstrate that the program amounts to an abdication of DHS's responsibilities. And the case-by-case discretion given to immigration officials under DHS's proposed program alleviates potential concerns that DHS has

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

abdicated its statutory enforcement responsibilities with respect to, or created a categorical, rule-like entitlement to immigration relief for, the particular class of aliens eligible for the program. An alien who meets all the criteria for deferred action under the program would receive deferred action only if he or she "present[ed] no other factors that, in the exercise of discretion," would "make[] the grant of deferred action inappropriate." Johnson Deferred Action Memorandum at 4. The proposed policy does not specify what would count as such a factor; it thus leaves the relevant USCIS official with substantial discretion to determine whether a grant of deferred action is warranted. In other words, even if an alien is not a removal priority under the proposed policy discussed in Part I, has continuously resided in the United States since before January 1, 2010, is physically present in the country, and is a parent of an LPR or a U.S. citizen, the USCIS official evaluating the alien's deferred action application must still make a judgment, in the exercise of her discretion, about whether that alien presents any other factor that would make a grant of deferred action inappropriate. This feature of the proposed program ensures that it does not create a categorical entitlement to deferred action that could raise concerns that DHS is either impermissibly attempting to rewrite or categorically declining to enforce the law with respect to a particular group of undocumented aliens.

Finally, the proposed deferred action program would resemble in material respects the kinds of deferred action programs Congress has implicitly approved in the past, which provides some indication that the proposal is consonant not only with interests reflected in immigration law as a general matter, but also with congressional understandings about the permissible uses of deferred action. As noted above, the program uses deferred action as an interim measure for a group of aliens to whom Congress has given a prospective entitlement to lawful immigration status. While Congress has provided a path to lawful status for the parents of U.S. citizens and LPRs, the process of obtaining that status "takes time." *Cuellar de Osorio*, 134 S. Ct. at 2199. The proposed program would provide a mechanism for families to remain together, depending on their circumstances, for some or all of the intervening period.[14] Immigration officials have on several

---

[14] DHS's proposed program would likely not permit all potentially eligible parents to remain together with their children for the entire duration of the time until a visa is awarded. In particular, undocumented parents of adult citizens who are physically present in the country would be ineligible to adjust their status without first leaving the country if they had never been "inspected and admitted or paroled into the United States." 8 U.S.C. § 1255(a) (permitting the Attorney General to adjust to permanent resident status certain aliens present in the United States if they become eligible for immigrant visas). They would thus need to leave the country to obtain a visa at a U.S. consulate abroad. *See id.* § 1201(a); *Cuellar de Osorio*, 134 S. Ct. at 2197–99. But once such parents left the country, they would in most instances become subject to the 3- or 10-year bar under 8 U.S.C. § 1182(a)(9)(B)(i) and therefore unable to obtain a visa unless they remained outside the country for the duration of the bar. DHS's proposed program would nevertheless enable other families to stay together without regard to the 3- or 10-year bar. And even as to those families with parents who would become subject to that bar, the proposed deferred action program would have the effect of reducing the

occasions deployed deferred action programs as interim measures for other classes of aliens with prospective entitlements to lawful immigration status, including VAWA self-petitioners, bona fide T and U visa applicants, certain immediate family members of certain U.S. citizens killed in combat, and certain immediate family members of aliens killed on September 11, 2001. As noted above, each of these programs has received Congress's implicit approval—and, indeed, in the case of VAWA self-petitioners, a direction to expand the program beyond its original bounds. *See supra* pp. 18–20.[15] In addition, much like these and other programs Congress has implicitly endorsed, the program serves substantial and particularized humanitarian interests. Removing the parents of U.S. citizens and LPRs—that is, of children who have established permanent legal ties to the United States—would separate them from their nuclear families, potentially for many years, until they were able to secure visas through the path Congress has provided. During that time, both the parents and their U.S. citizen or LPR children would be deprived of both the economic support and the intangible benefits that families provide.

We recognize that the proposed program would likely differ in size from these prior deferred action programs. Although DHS has indicated that there is no reliable way to know how many eligible aliens would actually apply for or would be likely to receive deferred action following individualized consideration under the proposed program, it has informed us that approximately 4 million individuals could be eligible to apply. *See* Shahoulian E-mail. We have thus considered whether the size of the program alone sets it at odds with congressional policy or the Executive's duties under the Take Care Clause. In the absence of express statutory guidance, it is difficult to say exactly how the program's potential size bears on its permissibility as an exercise of executive enforcement discretion. But because the size of DHS's proposed program corresponds to the size of a population to which Congress has granted a prospective entitlement to lawful status

---

amount of time the family had to spend apart, and could enable them to adjust the timing of their separation according to, for example, their children's needs for care and support.

[15] Several extended voluntary departure programs have been animated by a similar rationale, and the most prominent of these programs also received Congress's implicit approval. In particular, as noted above, the Family Fairness policy, implemented in 1990, authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens granted legal status under IRCA—aliens who would eventually "acquire lawful permanent resident status" and be able to petition on behalf of their family members. Family Fairness Memorandum at 1; *see supra* pp. 14–15. Later that year, Congress granted the beneficiaries of the Family Fairness program an indefinite stay of deportation. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 301, 104 Stat. 4978, 5030. Although it did not make that grant of relief effective for nearly a year, Congress clarified that "the delay in effectiveness of this section shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date." *Id.* § 301(g). INS's policies for qualifying Third Preference visa applicants and nurses eligible for H-1 nonimmigrant status likewise extended to aliens with prospective entitlements to lawful status. *See supra* p. 14.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

without numerical restriction, it seems to us difficult to sustain an argument, based on numbers alone, that DHS's proposal to grant a limited form of administrative relief as a temporary interim measure exceeds its enforcement discretion under the INA. Furthermore, while the potential size of the program is large, it is nevertheless only a fraction of the approximately 11 million undocumented aliens who remain in the United States each year because DHS lacks the resources to remove them; and, as we have indicated, the program is limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. There is thus little practical danger that the program, simply by virtue of its size, will impede removals that would otherwise occur in its absence. And although we are aware of no prior exercises of deferred action of the size contemplated here, INS's 1990 Family Fairness policy, which Congress later implicitly approved, made a comparable fraction of undocumented aliens—approximately four in ten— potentially eligible for discretionary extended voluntary departure relief. *Compare* CRS Immigration Report at 22 (estimating the Family Fairness policy extended to 1.5 million undocumented aliens), *with* Office of Policy and Planning, INS, *Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000* at 10 (2003) (estimating an undocumented alien population of 3.5 million in 1990); *see supra* notes 5 & 15 (discussing extended voluntary departure and Congress's implicit approval of the Family Fairness policy). This suggests that DHS's proposed deferred action program is not, simply by virtue of its relative size, inconsistent with what Congress has previously considered a permissible exercise of enforcement discretion in the immigration context.

In light of these considerations, we believe the proposed expansion of deferred action to the parents of U.S. citizens and LPRs is lawful. It reflects considerations—responding to resource constraints and to particularized humanitarian concerns arising in the immigration context—that fall within DHS's expertise. It is consistent with congressional policy, since it focuses on a group—law-abiding parents of lawfully present children who have substantial ties to the community— that Congress itself has granted favorable treatment in the immigration process. The program provides for the exercise of case-by-case discretion, thereby avoiding creating a rule-like entitlement to immigration relief or abdicating DHS's enforcement responsibilities for a particular class of aliens. And, like several deferred action programs Congress has approved in the past, the proposed program provides interim relief that would prevent particularized harm that could otherwise befall both the beneficiaries of the program and their families. We accordingly conclude that the proposed program would constitute a permissible exercise of DHS's enforcement discretion under the INA.

### 2.

We now turn to the proposed deferred action program for the parents of DACA recipients. The relevant considerations are, to a certain extent, similar to those

*Opinions of the Office of Legal Counsel in Volume 38*

discussed above: Like the program for the parents of U.S. citizens and LPRs, the proposed program for parents of DACA recipients would respond to severe resource constraints that dramatically limit DHS's ability to remove aliens who are unlawfully present, and would be limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. And like the proposed program for LPRs and U.S. citizens, the proposed program for DACA parents would preserve a significant measure of case-by-case discretion not to award deferred action even if the general eligibility criteria are satisfied.

But the proposed program for parents of DACA recipients is unlike the proposed program for parents of U.S. citizens and LPRs in two critical respects. First, although DHS justifies the proposed program in large part based on considerations of family unity, the parents of DACA recipients are differently situated from the parents of U.S. citizens and LPRs under the family-related provisions of the immigration law. Many provisions of the INA reflect Congress's general concern with not separating individuals who are legally entitled to live in the United States from their immediate family members. *See, e.g.*, 8 U.S.C. § 1151(b)(2)(A)(i) (permitting citizens to petition for parents, spouses and children); *id.* § 1229b(b)(1) (allowing cancellation of removal for relatives of citizens and LPRs). But the immigration laws do not express comparable concern for uniting persons who lack lawful status (or prospective lawful status) in the United States with their families. DACA recipients unquestionably lack lawful status in the United States. *See* DACA Toolkit at 8 ("Deferred action . . . does not provide you with a lawful status."). Although they may presumptively remain in the United States, at least for the duration of the grant of deferred action, that grant is both time-limited and contingent, revocable at any time in the agency's discretion. Extending deferred action to the parents of DACA recipients would therefore expand family-based immigration relief in a manner that deviates in important respects from the immigration system Congress has enacted and the policies that system embodies.

Second, as it has been described to us, the proposed deferred action program for the parents of DACA recipients would represent a significant departure from deferred action programs that Congress has implicitly approved in the past. Granting deferred action to the parents of DACA recipients would not operate as an interim measure for individuals to whom Congress has given a prospective entitlement to lawful status. Such parents have no special prospect of obtaining visas, since Congress has not enabled them to self-petition—as it has for VAWA self-petitioners and individuals eligible for T or U visas—or enabled their undocumented children to petition for visas on their behalf. Nor would granting deferred action to parents of DACA recipients, at least in the absence of other factors, serve interests that are comparable to those that have prompted implementation of deferred action programs in the past. Family unity is, as we have discussed, a significant humanitarian concern that underlies many provisions of the INA. But a concern with furthering family unity alone would not justify the

proposed program, because in the absence of any family member with lawful status in the United States, it would not explain why that concern should be satisfied by permitting family members to remain in the United States. The decision to grant deferred action to DACA parents thus seems to depend critically on the earlier decision to make deferred action available to their children. But we are aware of no precedent for using deferred action in this way, to respond to humanitarian needs rooted in earlier exercises of deferred action. The logic underlying such an expansion does not have a clear stopping point: It would appear to argue in favor of extending relief not only to parents of DACA recipients, but also to the close relatives of any alien granted deferred action through DACA or any other program, those relatives' close relatives, and perhaps the relatives (and relatives' relatives) of any alien granted any form of discretionary relief from removal by the Executive.

For these reasons, the proposed deferred action program for the parents of DACA recipients is meaningfully different from the proposed program for the parents of U.S. citizens and LPRs. It does not sound in Congress's concern for maintaining the integrity of families of individuals legally entitled to live in the United States. And unlike prior deferred action programs in which Congress has acquiesced, it would treat the Executive's prior decision to extend deferred action to one population as justifying the extension of deferred action to additional populations. DHS, of course, remains free to consider whether to grant deferred action to individual parents of DACA recipients on an ad hoc basis. But in the absence of clearer indications that the proposed class-based deferred action program for DACA parents would be consistent with the congressional policies and priorities embodied in the immigration laws, we conclude that it would not be permissible.

### III.

In sum, for the reasons set forth above, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be legally permissible, but that the proposed deferred action program for parents of DACA recipients would not be permissible.

> KARL R. THOMPSON
> *Principal Deputy Assistant Attorney General*
> *Office of Legal Counsel*

# Exhibit 5

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



Homeland
Security

June 15, 2017

MEMORANDUM FOR:      Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Joseph B. Maher
Acting General Counsel

Michael T. Dougherty
Assistant Secretary for Border, Immigration, and Trade Policy

FROM:      John F. Kelly

SUBJECT:      Rescission of November 20, 2014 Memorandum Providing for
Deferred Action for Parents of Americans and Lawful Permanent
Residents ("DAPA")

     On January 25, 2017, President Trump issued Executive Order No. 13768, "Enhancing
Public Safety in the Interior of the United States." In that Order, the President directed federal
agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable
aliens," and established new immigration enforcement priorities. On February 20, 2017, I issued
an implementing memorandum, stating that "the Department no longer will exempt classes or
categories of removable aliens from potential enforcement," except as provided in the
Department's June 15, 2012 memorandum establishing the Deferred Action for Childhood
Arrivals ("DACA") policy[1] and November 20, 2014 memorandum providing for Deferred
Action for Parents of Americans and Lawful Permanent Residents ("DAPA") and for the

---

[1] Memorandum from Janet Napolitano, Sec'y, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising
Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

**Rescission of November 20, 2014 DAPA Memorandum**
Page 2

expansion of DACA[2].  After consulting with the Attorney General, I have decided to rescind the November 20, 2014 DAPA memorandum and the policies announced therein.[3]  The June 15, 2012 DACA memorandum, however, will remain in effect.

**Background**

      The November 20, 2014 memorandum directed U.S. Citizenship and Immigration Services ("USCIS") "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."  This process was to be known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or "DAPA."

      To request consideration for deferred action under DAPA, the alien must have satisfied the following criteria:  (1) as of November 20, 2014, be the parent of a U.S. citizen or lawful permanent resident; (2) have continuously resided here since before January 1, 2010; (3) have been physically present here on November 20, 2014, and when applying for relief; (4) have no lawful immigration status on that date; (5) not fall within the Secretary's enforcement priorities; and (6) "present no other factors that, in the exercise of discretion, make[ ] the grant of deferred action inappropriate."  The Memorandum also directed USCIS to expand the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and to lengthen the period of deferred action and work authorization from two years to three ("Expanded DACA").

      Prior to implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas.  In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide on the ground that the plaintiff states were likely to succeed on their claim that DHS violated the Administrative Procedure Act ("APA") by failing to comply with notice-and-comment rulemaking requirements.  *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).  The Fifth Circuit Court of Appeals affirmed, holding that Texas had standing, demonstrated a substantial likelihood of success on the merits of its APA claims, and satisfied the other requirements for a preliminary injunction.  *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4) and did not issue a substantive opinion.  *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

      The litigation remains pending before the district court.

---

[2] Memorandum from Jeh Johnson, Sec'y, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

[3] This Memorandum does not alter the remaining periods of deferred action under the Expanded DACA policy granted between issuance of the November 20, 2014 Memorandum and the February 16, 2015 preliminary injunction order in the Texas litigation, nor does it affect the validity of related Employment Authorization Documents (EADs) granted during the same span of time.  I remind our officers that (1) deferred action, as an act of prosecutorial discretion, may only be granted on a case-by-case basis, and (2) such a grant may be terminated at any time at the agency's discretion.

**Rescission of November 20, 2014 DAPA Memorandum**
Page 3


**Rescission of November 20, 2014 DAPA Memorandum**

      I have considered a number of factors, including the preliminary injunction in this matter, the ongoing litigation, the fact that DAPA never took effect, and our new immigration enforcement priorities. After consulting with the Attorney General, and in the exercise of my discretion in establishing national immigration enforcement policies and priorities, I hereby rescind the November 20, 2014 memorandum.

# Exhibit 6



## KEN PAXTON

ATTORNEY GENERAL OF TEXAS

June 29, 2017


The Honorable Jeff Sessions
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Re:   *Texas, et al. v. United States, et al.*, No. 1:14-cv-00254 (S.D. Tex.)

Dear Attorney General Sessions:

The State plaintiffs that successfully challenged the Obama Administration's DAPA and Expanded DACA programs commend the Secretary of Homeland Security for issuing his June 15, 2017 memorandum rescinding, in large part, his predecessor's November 20, 2014 memorandum creating those DAPA and Expanded DACA programs.

As you know, this November 20, 2014 memorandum creating DAPA and Expanded DACA would have granted eligibility for lawful presence and work authorization to over four million unlawfully present aliens. Courts blocked DAPA and Expanded DACA from going into effect, holding that the Executive Branch does not have the unilateral power to confer lawful presence and work authorization on unlawfully present aliens simply because the Executive chooses not to remove them. Rather, "[i]n specific and detailed provisions, the [Immigration and Nationality Act] expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." *Texas v. United States*, 809 F.3d 134, 179 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam). "Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA." *Id.* Likewise, "[t]he INA also specifies classes of aliens eligible and ineligible for work authorization . . . with no mention of the class of persons whom DAPA would make eligible for work authorization." *Id.* at 180-81. Thus, "DAPA is not authorized by statute," *id.* at 184, and "DAPA is foreclosed by Congress's careful plan," *id.* at 186.



## KEN PAXTON

ATTORNEY GENERAL OF TEXAS

For these same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15, 2012 DACA memorandum is also unlawful. The original 2012 DACA program covers over one million otherwise unlawfully present aliens. *Id.* at 147. And just like DAPA, DACA unilaterally confers eligibility for work authorization, *id.*, and lawful presence without any statutory authorization from Congress.[1]

Nevertheless, the Secretary of Homeland Security's June 15, 2017 memorandum provided that "[t]he June 15, 2012 DACA memorandum, however, will remain in effect," and some "Expanded DACA" permits will also remain in effect.

We respectfully request that the Secretary of Homeland Security phase out the DACA program. Specifically, we request that the Secretary of Homeland Security rescind the June 15, 2012 DACA memorandum and order that the Executive Branch will not renew or issue any new DACA or Expanded DACA permits in the future. This request does not require the Executive Branch to immediately rescind DACA or Expanded DACA permits that have already been issued. This request does not require the Secretary to alter the immigration enforcement priorities contained in his separate February 20, 2017 memorandum.[2] And this request does not require the federal government to remove any alien.

If, by September 5, 2017, the Executive Branch agrees to rescind the June 15, 2012 DACA memorandum and not to renew or issue any new DACA or Expanded DACA permits in the future, then the plaintiffs that successfully challenged DAPA and Expanded DACA will voluntarily dismiss their lawsuit currently pending in the Southern District of Texas. Otherwise, the complaint in that case will be amended to challenge both the DACA program and the remaining Expanded DACA permits.

---

[1] *See, e.g.*, USCIS, DACA Frequently Asked Questions, https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions (last visited June 29, 2017) (DACA recipients "are considered to be lawfully present").

[2] *See* DHS, Enforcement of Immigration Laws to Serve the National Interest, https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf.



# KEN PAXTON
ATTORNEY GENERAL OF TEXAS

We appreciate the opportunity to continue working with you, and the entire Presidential Administration, to cooperatively enforce federal immigration laws.

Sincerely,

Ken Paxton
Attorney General of Texas

Steve Marshall
Attorney General of Alabama

Leslie Rutledge
Attorney General of Arkansas

Lawrence G. Wasden
Attorney General of Idaho

C.L. "Butch" Otter
Governor of Idaho

Derek Schmidt
Attorney General of Kansas

Jeff Landry
Attorney General of Louisiana

Doug Peterson
Attorney General of Nebraska

Alan Wilson
Attorney General of South Carolina

Herbert Slatery III
Attorney General and Reporter of Tennessee

Patrick Morrisey
Attorney General of West Virginia

# Exhibit 7

 Official website of the Department of Homeland Security

 U.S. Department of
Homeland Security

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:**  September 5, 2017

**MEMORANDUM FOR:**

James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Joseph B. Maher
Acting General Counsel

Ambassador James D. Nealon
Assistant Secretary, International Engagement

Julie M. Kirchner

Citizenship and Immigration Services Ombudsman

**FROM:**

Elaine C. Duke

Acting Secretary

**SUBJECT:**

**Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," which established the program known as Deferred Action for Childhood Arrivals ("DACA"). For the reasons and in the manner outlined below, Department of Homeland Security personnel shall take all appropriate actions to execute a wind-down of the program, consistent with the parameters established in this memorandum.

# Background

The Department of Homeland Security established DACA through the issuance of a memorandum on June 15, 2012. The program purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis—to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law.[1] (#_ftn1) Specifically, DACA provided certain illegal aliens who entered the United States before the age of sixteen a period of deferred action and eligibility to request employment authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things—such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization from two years to three—the November 20, 2014 memorandum directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide.[2] (#_ftn2) The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied the other requirements for a preliminary injunction.[3] (#_ftn3) The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." According to the court, "DAPA is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary,[4] (#_ftn4) and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4).[5] (#_ftn5) The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum

establishing DACA,[6] (#_ftn6) and the November 20, 2014 memorandum establishing DAPA and expanding DACA.[7] (#_ftn7)

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

## Rescission of the June 15, 2012 DACA Memorandum

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents

that have been accepted by the Department as of the date of this memorandum.

• Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.

• Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.

• Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.

• Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.

• Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.

• Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.

• Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

---

[1] (#_ftnref1) Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as

outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

[2] (# ftnref2) *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] (# ftnref3) *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

[4] (# ftnref4) *Id.*

[5] (# ftnref5) *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

[6] (# ftnref6) Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] (# ftnref7) Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

Topics:  Border Security (/topics/border-security) , Deferred Action (/topics/deferred-action)

Keywords:  DACA (/keywords/daca) , Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

State of Texas; State of Alabama; State of Arkansas; State of Louisiana; State of Nebraska; State of South Carolina; State of West Virginia

**DEFENDANTS**

United States of America, et al.
** See attached

**(b)** County of Residence of First Listed Plaintiff   Cameron County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Todd Lawrence Disher
Office of the Attorney General of Texas, PO Box 12548
Austin, Texas 78711-2548 / (512) 936-1700 ** See attached

Attorneys *(If Known)*
Ryan K. Patrick, United States Attorney for the Southern District of Texas

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☐ 3   Federal Question
*(U.S. Government Not a Party)*

☒ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*      *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☒ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original Proceeding    ☐ 2   Removed from State Court    ☐ 3   Remanded from Appellate Court    ☐ 4   Reinstated or Reopened    ☐ 5   Transferred from Another District *(specify)*    ☐ 6   Multidistrict Litigation - Transfer    ☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
Administrative Procedure Act, 5 U.S.C. 551, et seq
Brief description of cause:
Plaintiffs are suing the United States and federal officials for violations of the Take Care Clause and the APA

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE   Andrew S. Hanen    DOCKET NUMBER   1:14-cv-00254 (S.D. Tex.)

DATE
05/01/2018

SIGNATURE OF ATTORNEY OF RECORD
/s/ Todd L. Disher

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

*State of Texas, et al., v. United States of America, et al.*
In the United States District Court for the Southern District of Texas,
Brownsville Division

**Attachment to Civil Cover Sheet: Names of Parties**

| PLAINTIFFS | DEFENDANTS |
|---|---|
| State of Texas | United States of America |
| State of Alabama | U.S. Department of Homeland Security; Kirstjen M. Nielsen, Secretary |
| State of Arkansas | U.S. Customs and Border Protection; Kevin K. McAleenan, Commissioner |
| State of Louisiana | U.S. Immigration and Customs Enforcement; Thomas D. Homan, Deputy Director and Acting Director |
| State of Nebraska | U.S. Citizenship and Immigration Services; L. Francis Cissna, Director |
| State of South Carolina | U.S. Border Patrol; Carla L. Provost, Acting Chief |
| State of West Virgina | |

*State of Texas, et al., v. United States of America, et al.*
In the United States District Court for the Southern District of Texas,
Brownsville Division

## Attachment to Civil Cover Sheet: Plaintiffs' Attorneys

STEVE MARSHALL
Attorney General of Alabama

LESLIE RUTLEDGE
Attorney General of Arkansas

JEFF LANDRY
Attorney General of Louisiana

DOUGLAS J. PETERSON
Attorney General of Nebraska

ALAN WILSON
Attorney General of South Carolina

PATRICK MORRISEY
Attorney General of West Virginia

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General
Tx. State Bar No. 24046904
Southern District of Texas No. 2972033
Tel.: (512) 463-2100; Fax: (512) 936-0545
brantley.starr@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

TODD LAWRENCE DISHER
Attorney-in-Charge
Special Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

ADAM ARTHUR BIGGS
Special Counsel for Civil Litigation
Tx. State Bar No. 24077727
Southern District of Texas No. 2964087
Tel.: (512) 463-2100; Fax: (512) 936-0545
adam.biggs@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548