## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS; | ) |
| | ) |
| STATE OF ALABAMA; | ) |
| | ) |
| STATE OF ARKANSAS; | ) |
| | ) |
| STATE OF LOUISIANA; | ) |
| | ) |
| STATE OF NEBRASKA; | ) |
| | ) |
| STATE OF SOUTH CAROLINA; AND | ) |
| | ) |
| STATE OF WEST VIRGINIA; | ) |
| *Plaintiffs,* | ) |
| | ) |
| *v.* | )   Case No. 1:18-cv-00068 |
| | ) |
| UNITED STATES OF AMERICA; | ) |
| | ) |
| KIRSTJEN M. NIELSEN, Secretary of the U.S. | ) |
| Department of Homeland Security; | ) |
| | ) |
| KEVIN K. MCALEENAN, Commissioner of U.S. | ) |
| Customs and Border Protection; | ) |
| | ) |
| THOMAS D. HOMAN, Deputy Director and Acting | ) |
| Director of U.S. Immigration and Customs | ) |
| Enforcement; and | ) |
| | ) |
| L. FRANCIS CISSNA, Director of U.S. Citizenship and | ) |
| Immigration Services, | ) |
| | ) |
| CARLA L. PROVOST, Acting Chief of U.S. Border | ) |
| Patrol; | ) |
| *Defendants.* | ) |
| | ) |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
## AND MEMORANDUM IN SUPPORT

# TABLE OF CONTENTS

Table of authorities.................................................................................iii

Introduction ........................................................................................... 1

Statement of the nature of the proceeding .............................................. 4

Statement of the issue to be ruled upon by the Court ............................. 6

Summary of argument............................................................................. 7

Argument ............................................................................................... 9

    I.     Plaintiffs are likely to prevail on the merits. ............................... 9

         A.    Plaintiffs have standing. ................................................. 10

              1.    DACA causes financial harm to Plaintiffs through healthcare, education, and law-enforcement costs. ......... 10

              2.    Plaintiffs have *parens patriae* standing to protect their citizens' economic and commercial interests from labor-market distortions caused by DACA. ............ 13

              3.    Plaintiffs have standing based on the institutional injury they suffer from DACA's dispensing of congressional statutes preempting state prerogatives.......................................................... 15

              4.    Plaintiff States receive special solicitude in the standing inquiry.................................................. 17

         B.    DACA is reviewable agency action. ............................... 17

              1.    Plaintiffs' interests are within the zone of interests protected by immigration statutes and the APA............ 17

              2.    DACA is affirmative agency action—not mere enforcement discretion inaction. ..................................... 18

         C.    DACA is unlawful. ........................................................ 21

              1.    DACA is contrary to substantive federal law. ................. 21

               2.    DACA was issued without the notice-and-comment procedure required by the APA for a program like this.......................................................................... 32

               3.    DACA violates the Take Care Clause of the Constitution. ................................................................. 37

    II.    Plaintiffs will incur irreparable injuries. ............................... 40

i

III.    The balance of equities and the public interest favor an injunction. ................................................................... 42

IV.    The injunction should apply wherever Defendants may act. ............... 48

Conclusion ...................................................................... 49

Certificate of conference .................................................... 51

Certificate of service ....................................................... 51

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alaska v. U.S. Dep't of Transp.*,
 868 F.2d 441 (D.C. Cir. 1989) ............................................................................ 16

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
 458 U.S. 592 (1982) ............................................................................................ 14

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
 995 F.2d 1106 (D.C. Cir. 1993) .......................................................................... 33

*Appalachian Power Co. v. E.P.A.*,
 208 F.3d 1015 (D.C. Cir. 2000) .......................................................................... 47

*Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*,
 135 S. Ct. 2652 (2015) .................................................................................. 15-16

*Arizona v. United States*,
 567 U.S. 387 (2012) ....................................................................................*passim*

*Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*,
 563 U.S. 776 (2011) ............................................................................................ 29

*Bennett v. Spear*,
 520 U.S. 154 (1997) ............................................................................................ 47

*Canal Auth. v. Callaway*,
 489 F.2d 567 (5th Cir. 1974) (per curiam)....................................................41-42

*CASA de Md. v. U.S. Dep't of Homeland Sec.*,
 No. 17-cv-2942, 2018 WL 1156769 (D. Md. Mar. 5, 2018) ...........................*passim*

*Chrysler Corp. v. Brown*,
 441 U.S. 281 (1979) ............................................................................................ 32

*Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*,
 112 F.3d 1283 (5th Cir. 1997) ............................................................................ 46

*EEOC v. Serv. Temps Inc.*,
 679 F.3d 323 (5th Cir. 2012) ................................................................................ 6

*Feinerman v. Bernardi,*
    558 F. Supp. 2d 36 (D.D.C. 2008) ........................................................................ 41

*Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Ed. & Welfare,*
    601 F.2d 199 (5th Cir. 1979) ................................................................................. 7

*Galvan v. Press,*
    347 U.S. 522 (1954) ..................................................................................... 21, 23

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ..................................................................................... 18, 20

*Hoffman Plastic Compounds, Inc. v. NLRB,*
    535 U.S. 137 (2002) ..................................................................................... 14, 30

*Iowa League of Cities v. EPA,*
    711 F.3d 844 (8th Cir. 2013) .............................................................................. 33

*Janvey v. Alguire,*
    647 F.3d 585 (5th Cir. 2011) .............................................................................. 41

*Kendall v. United States,*
    37 U.S. 524 (1838) ............................................................................................. 37

*Korte v. Sebelius,*
    735 F.3d 654 (7th Cir. 2013) ............................................................................... 7

*Lewis v. Casey,*
    518 U.S. 343 (1996) ........................................................................................... 48

*Lewis v. Thompson,*
    252 F.3d 567 (2d Cir. 2001) ............................................................................... 27

*Lujan v. Nat'l Wildlife Fed'n,*
    497 U.S. 871 (1990) ........................................................................................... 46

*Mach Mining, LLC v. EEOC,*
    135 S. Ct. 1645 (2015) ....................................................................................... 18

*Massachusetts v. EPA,*
    549 U.S. 497 (2007) ....................................................................... 10, 14, 16, 17

*McLouth Steel Prods. Corp. v. Thomas,*
    838 F.2d 1317 (D.C. Cir. 1988) .......................................................................... 33

*Medellin v. Texas*,
    552 U.S. 491 (2008) ........................................................................ 31

*Morton v. Ruiz*,
    415 U.S. 199 (1974) .................................................................... 32-33

*Nalco Co. v. EPA*,
    786 F. Supp. 2d 177 (D.D.C. 2011) ............................................... 41

*NAACP v. Trump*,
    No. 1:17-cv-1907, 2018 WL 1920079 (D.D.C. Apr. 24, 2018) ......... 2, 6, 8

*NCAA v. Gov. of N.J.*,
    730 F.3d 208 (3d Cir. 2013) ........................................................... 13

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ....................................................................... 47

*Philip Morris USA Inc. v. Scott*,
    561 U.S. 1301 (2010) (Scalia, J., in chambers) ............................... 41

*Phillips Petrol. Co. v. Johnson*,
    22 F.3d 616 (5th Cir. 1994) ........................................................... 33

*Plyler v. Doe*,
    457 U.S. 202 (1982) ....................................................................... 11

*Regents of Univ. of Calif. v. U.S. Dep't of Homeland Sec.*,
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) ......................................... 5, 6

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ................................................................. 20, 24

*Susan B. Anthony List v. Driehaus*,
    134 S. Ct. 2334 (2014) ............................................................. 10, 48

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ................................................... *passim*
    787 F.3d 733 (5th Cir. 2015) ..................................................... 24, 30
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ......................................... *passim*
    No. 1:14-cv-254, 2016 WL 3211803 (S.D. Tex. May 19, 2016) ......... 45

*United States v. Texas*,
    137 S. Ct. 285 (2016) .................................................................... 43
    136 S. Ct. 2271 (2016) .............................................................. 5, 43

*U.S. Army Corps of Engineers v. Hawkes Co.*,
    136 S. Ct. 1807 (2016) ............................................................. 47

*U.S. Tel. Ass'n v. FCC*,
    28 F.3d 1232 (D.C. Cir. 1994) ................................................ 33

*Vidal v. Nielsen*,
    279 F. Supp. 3d 401 (E.D.N.Y. 2018) ...................................... 6

*Virginian Ry. v. Sys. Fed'n No. 40*,
    300 U.S. 515 (1937) ................................................................ 47

*Winter v. NRDC*,
    555 U.S. 7 (2008) ...................................................................... 7

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ................................................................ 39

## Constitutional Provisions, Statutes, and Rules

U.S. Const.:
    art. I, § 8, cl. 4 ................................................................ 21, 48
    art. II, § 3 .............................................................................*passim*

Administrative Procedure Act, 5 U.S.C.:
    § 553(b)(A) ............................................................................ 32
    § 701(a)(2) ............................................................................ 18
    § 706(2)(D) ........................................................................... 48

Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (2010) ..................... 15

Haitian Refugee Immigration Fairness Act of 1998, Pub. L. No. 105-277,
    div. A, § 101(h), tit. IX, § 902(c)(3), 112 Stat. 2681-538, 2681-539 ...................... 29

Immigration Act of 1990, Pub. L. No. 101-649, tit. III, § 301,
    104 Stat. 4978 ........................................................................ 28

Immigration and Nationality Act, 8 U.S.C.: ...................................................*passim*
   § 1101(a)(15)(A)-(V) ....................................................................... 22
   § 1101(a)(15)(H) ............................................................................. 28
   § 1101(a)(15)(P) .............................................................................. 28
   § 1101(a)(20) .................................................................................. 22
   § 1105a(a) ...................................................................................... 28
   § 1151 ........................................................................................... 22
   § 1153 ........................................................................................... 22
   § 1154(a)(1)(D)(i)(II) ..................................................................... 29
   § 1154(a)(1)(D)(i)(IV) .................................................................... 29
   § 1154(a)(1)(K) .............................................................................. 29
   § 1157 ........................................................................................... 23
   § 1158 ........................................................................................... 23
   § 1158(c)(1)(B) .............................................................................. 28
   § 1158(d)(2) ................................................................................... 28
   § 1159 ........................................................................................... 23
   § 1160 ........................................................................................... 23
   § 1160(d)(3)(A) .............................................................................. 29
   § 1181 ........................................................................................... 22
   § 1182(a)(6)(A)(i) ........................................................................... 24
   § 1182(a)(9)(B) ............................................................................... 25
   § 1182(a)(9)(B)(i) ........................................................................ 24-25
   § 1182(a)(9)(B)(ii) .......................................................................... 25
   § 1182(a)(9)(B)(iv) .......................................................................... 31
   § 1182(d)(5)(A) ........................................................................ 23, 25
   § 1184(p)(6) ................................................................................... 29
   § 1227(a)(1)(B) .............................................................................. 24
   § 1227(d)(1)-(2) ............................................................................. 29
   § 1229b .......................................................................................... 24
   § 1231(b)(3) ................................................................................... 24
   § 1252(g) ....................................................................................... 20
   § 1254a .......................................................................................... 23
   § 1254a(a)(1)(B) ............................................................................. 28
   § 1255(a) ........................................................................................ 26
   § 1255(c)(2) ................................................................................... 31
   § 1255a(b)(3) ................................................................................. 28
   § 1255a(e)(1)-(2) ........................................................................... 28
   § 1255a note .................................................................................. 28
   § 1324a(a) ...................................................................................... 31
   § 1324a(f) ...................................................................................... 31
   § 1427(a) ........................................................................................ 26

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603,
   100 Stat. 3359 ...................................................................................... 28

Internal Revenue Code, 26 U.S.C.
   § 32(c)(1)(E) ......................................................................................... 31
   § 32(m) ................................................................................................. 31
   § 4980H(b) ............................................................................................ 15

National Defense Authorization Act for Fiscal Year 2004,
   Pub. L. No. 108-136, tit. XVII, § 1703(c)(2), 117 Stat. 1392 ................... 29

Nicaraguan Adjustment and Central American Relief Act,
   Pub. L. No. 105-100, tit. II, § 202(c)(3), 111 Stat. 2160 (1997) ............... 29

Omnibus Budget Reconciliation Act of 1986,
   Pub. L. No. 99-509, § 9406(a), 100 Stat. 1874 (1986) ............................ 26

Personal Responsibility and Work Opportunity Reconciliation Act of
   1996, 8 U.S.C.:
   § 1611(a) ............................................................................................... 15
   § 1611(b)(2)-(4) ..................................................................................... 27

USA PATRIOT Act of 2001,
   Pub. L. No. 107-56, tit. IV, § 423(b)(1)-(2), 115 Stat. 272 ...................... 29

28 U.S.C. § 2401(a) ..................................................................................... 46

42 U.S.C.
   § 405(c)(2)(B)(i)(I) ................................................................................ 31
   § 1395dd ................................................................................................ 12
   § 1396b(v)(1) ......................................................................................... 26

Tex. Health & Safety Code
   §§ 61.001 *et seq.* ................................................................................... 12
   § 311.043 ............................................................................................... 12

8 C.F.R.:
   § 1.3(a)(4)(vi) ................................................................................... 20, 27
   § 274a.12(c)(14) .................................................................................... 30

20 C.F.R. § 422.104(a)(2) ............................................................................ 31

42 C.F.R. § 440.255 .................................................................................... 12

45 C.F.R.:

    § 152.2(4)(vi) ................................................................................ 20, 27

    § 152.2(8)......................................................................................... 15

## Other Authorities

2d Am. Complaint, *Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y.
    2018) (No. 1:16-cv-4756), ECF No. 60................................................... 6, 36

Complaint, *California v. Dep't of Homeland Sec.*, No. 3:17-cv-5235
    (N.D. Cal. Sept. 11, 2017), ECF No. 1 .................................................. 35

Complaint, *Garcia v. United States*, No. 3:17-cv-5380 (N.D. Cal. Sept.
    18, 2017), ECF No. 1 ...................................................................... 1, 36

Complaint, *NAACP v. Trump*, No. 1:17-cv-1907 (D.D.C. Sept. 18, 2017),
    ECF No. 1........................................................................................ 6, 36

Complaint, *New York v. Trump*, 2018 WL 1920079 (D.D.C. Apr. 24,
    2018) (No. 1:17-cv-1907), ECF No. 1............................................. 6, 36, 37

Complaint, *Regents of Univ. of Cal. v. Dep't of Homeland Sec.*, No. 3:17-
    cv-5211-WHA (N.D. Cal. Sept. 8, 2017), ECF No. 1............................... 34

Complaint, *Trs. of Princeton Univ. v. United States*, No. 1:17-cv-2325
    (D.D.C. Nov. 3, 2017), ECF No. 1................................................... 5-6, 36

English Bill of Rights of 1689, art. 1............................................................ 37

*Frequently Asked Questions*, USCIS,
    https://www.uscis.gov/archive/frequently-asked-questions ............................ 25-26

H.R. Rep. No. 99-682(I) (1986), as reprinted in 1986 U.S.C.C.A.N. 5649 ................. 30

H.R. Rep. No. 104-725 (1996) (Conf. Rep.), as reprinted in 1996
    U.S.C.C.A.N. 2649 ......................................................................... 27

Letter from León Rodríguez, Dir., USCIS,
    to Sen. Grassley (June 29, 2016) ................................................... 25, 26

Letter from León Rodríguez, Dir., USCIS,
    to Sen. Grassley (Oct. 9, 2014)........................................................ 25

Oral Arg. *Texas v. United States*,
    787 F.3d 733 (5th Cir. 2015) (No. 15-40238) ................................... 13, 45

*Texas v. United States*, No. 1:14-cv-254 (S.D. Tex.)
    Joint Motion to Stay Merits Proceedings, ECF No. 430 ...................................... 43
    Motion to Stay Merits Proceedings, ECF No. 447 ........................................ 43, 44
    Order, ECF No. 164 ...................................................................................... 42-43
    Order, ECF No. 200 ........................................................................................... 43
    Order, ECF No. 320 ........................................................................................... 43
    Order, ECF No. 422 ........................................................................................... 43
    Order, ECF No. 435 ........................................................................................... 43
    Order, ECF No. 439 ........................................................................................... 43
    Stipulation of Dismissal, ECF No. 473 ............................................................... 5
    Unopposed Motion to Stay Merits Proceedings, ECF No. 438 ........................... 43

*United States v. Texas*, 136 S. Ct. 2271 (2016)
    Br. for the State Resp., 2016 WL 1213267 ............................................................ 9
    Pet. Br., 2016 WL 836758 ................................................................................... 24

U.S. Br. as Amicus Curiae in Opp. to Reh'g En Banc, *Ariz. Dream Act*
    *Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014), ECF No. 75 ........................... 19-20

U.S. Dep't of State, 9 Foreign Affairs Manual (2018) ............................................... 22

USCIS, Deferred Action for Childhood Arrivals (DACA) Toolkit .............................. 25

USCIS, How Do I Change to Another Nonimmigrant Status? (Jan. 2016) ............. 28

Zachary Price, *Enforcement Discretion and Executive Duty*,
    67 Vand. L. Rev. 671 (2014) .......................................................................... 37, 38

## INTRODUCTION

This lawsuit is about the rule of law—not the wisdom of any particular immigration policy. Congress may choose to change immigration law to adopt new policies. But the Executive Branch is not free to ignore governing law by conferring a legal status and benefits that are contrary to immigration law, contrary to procedural administrative law, and contrary to the Take Care Clause of the Constitution.

In 2012, the Executive Branch created the program known as DACA. Exh. 1 (App. 2). At the time, the Executive purported to merely define criteria "to be considered" in the "exercise of prosecutorial discretion" for deciding whether to pursue an alien's removal. Exh. 1 at 1, 2 (App. 2, 3). However, DACA actually grants "lawful presence" status and work-authorization eligibility to hundreds of thousands of unlawfully present aliens. DACA recipients themselves admit this. *E.g.*, Complaint at 9 ¶ 27, *Garcia v. United States*, No. 3:17-cv-5380 (N.D. Cal. Sept. 18, 2017), ECF No. 1 ("DACA confers numerous important benefits on those who apply for and are granted DACA status."). And the Executive Branch grants those benefits by rubber-stamping applications that meet the DACA criteria. The result is a quid-pro-quo: satisfy the Executive Branch's unilaterally specified criteria, and receive the status of lawful presence in the United States and numerous benefits otherwise foreclosed by federal law. This is a paradigmatic example of prohibited executive lawmaking.

The Plaintiff States sued over this practice in 2014, when the Executive sought to create similar programs known as DAPA and Expanded DACA. The Fifth Circuit, affirming a preliminary injunction issued by this Court, held those deferred-action

programs contrary to substantive federal law and lacking required notice-and-comment procedure. The Supreme Court then affirmed by an evenly divided vote. After the conclusion of that appellate litigation and a stay to let a new administration reexamine the issues, the federal government agreed in September 2017 to wind down the DACA program. Based on that 2017 directive, the Plaintiff States agreed not to amend their pending complaint to challenge DACA and, instead, to voluntarily dismiss their complaint.

Now, however, district courts in California, New York, and the District of Columbia have blocked implementation of the 2017 directive winding down DACA. Because the federal government has not moved for a stay pending appeal in the California and New York cases, and because the Supreme Court denied a petition for writ of certiorari before judgment in the California case, the Executive's 2017 decision to wind down DACA stands enjoined for the indefinite future. Moreover, in another challenge in the District of Columbia, the district court vacated the executive's decision to wind down DACA and ordered the Executive to continue issuing new DACA applications, staying that order a mere 90 days. *NAACP v. Trump*, No. 1:17-cv-1907, 2018 WL 1920079, at *25, *28 (D.D.C. Apr. 24, 2018).

The Plaintiff States now sue to enjoin the 2012 memorandum creating DACA, for the same reasons that this Court enjoined the 2014 memorandum creating DAPA and Expanded DACA. All of these Obama Administration programs illegally granted the status of lawful presence in this country and work authorization. And these programs rest on a theory of unreviewable power that would allow the Executive to

grant lawful presence and work authorization to *any* alien unlawfully present in the United States—up to an estimated 11 million aliens. The Fifth Circuit correctly held that theory of executive power untenable and contrary to federal law.

The case against the Obama Administration's deferred-action programs has only gotten stronger with time. In creating each of these programs, the Obama Administration promised: "This memorandum confers no . . . pathway to citizenship." Exh. 1 at 3 (App. 4); *accord* Exh. 2 at 5 (App. 10). But, as of August 2017, approximately 1,056 DACA recipients have been given *citizenship* and approximately 39,514 DACA recipients have been given lawful-permanent-resident status (which is a *pathway to citizenship*). *See* Exh. 3 (App. 12). For some, this was a result of receiving DACA status and thus receiving "advance parole," which allows aliens to leave and then be "admitted" back into the country despite an original entry into the country without admission. *See* Complaint ¶¶ 84-116.

In other words, the Executive unilaterally conferred lawful presence and work authorization on otherwise unlawfully present aliens, and then the Executive used that lawful-presence "dispensation" to unilaterally confer United States citizenship on otherwise ineligible aliens. *Arizona v. United States*, 567 U.S. 387, 435 (2012) (Scalia, J., concurring in part and dissenting in part). If ever there were a violation of the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, this is it.

Because controlling Fifth Circuit precedent on DAPA and Expanded DACA dictates that DACA, too, is unlawful—and given the need to prevent new harms to

Plaintiffs and new allegations of reliance by DACA's continued operation—the Court should promptly grant a preliminary injunction that prevents the federal government from implementing the 2012 DACA memo by issuing or renewing DACA permits. Because this case deals with a different executive order than is challenged in the California, New York, and District of Columbia litigation, enjoining implementation of the executive order challenged here will not disrupt those other cases. Under the injunction sought here, Defendants would not be directed to implement their voluntary choice in 2017 to wind down DACA—the subject of the California, New York, and District of Columbia orders. Instead, Defendants will be enjoined from implementing the 2012 memorandum that created DACA in the first place—because it was unlawful to do so.

Plaintiffs respectfully request a hearing on this motion with sufficient time to allow resolution of this motion by July 23, 2018, the date on which the Executive stands ordered to accept new DACA applications.

## STATEMENT OF THE NATURE OF THE PROCEEDING

On June 15, 2012, then-Secretary of Homeland Security Napolitano issued a memorandum creating the program that became known as DACA. Exh. 1 (App. 2). On November 20, 2014, then-Secretary of Homeland Security Johnson issued a memorandum to expand the DACA program and to create a new program, which became known as DAPA, that would have applied to around 4 million unlawfully-present aliens. Exh. 2 (App. 6) ("DAPA Directive"). This Court preliminarily enjoined the 2014 DAPA Directive; that injunction was affirmed by the Fifth Circuit and by

an equally divided vote of the Supreme Court. *Texas v. United States*, 809 F.3d 134, 179 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271 (2016) (per curiam). Texas and other Plaintiff States then threatened to amend their complaint challenging DAPA and Expanded DACA to also challenge DACA on the same grounds, if that program were not rescinded. Exh. 4 (App. 14).

On September 5, 2017, in response to that imminent legal challenge, the Department of Homeland Security ("DHS") issued a memorandum directing that DACA be wound down. Exhs. 5 (App. 18), 6 (App. 27). That 2017 memorandum stated that DHS would reject all new requests for DACA and adjudicate DACA-renewal requests pending "from current beneficiaries that have been accepted by the Department as of [September 5, 2017], and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017." Exh. 5 at 6 (App. 22).

Based on that directive, Plaintiffs did not file an amended complaint challenging DACA. Instead, Plaintiffs voluntarily dismissed their complaint as promised in their letter threatening litigation over DACA. Stipulation of Dismissal, *Texas v. United States*, No. 1:14-cv-254 (S.D. Tex. Sept. 12, 2017), ECF No. 473.

Subsequently, however, multiple lawsuits were filed claiming that the 2017 memorandum rescinding DACA was itself unlawful. Five of these actions were filed and consolidated in the Northern District of California. *See Regents of Univ. of Calif. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1026-27 (N.D. Cal. 2018). At least four other lawsuits have been filed in other federal district courts. *See*

Complaint, *Trs. of Princeton Univ. v. United States*, No. 1:17-cv-2325 (D.D.C. Nov. 3, 2017), ECF No. 1; Complaint*, NAACP*, 2018 WL 1920079 (D.D.C. Apr. 24, 2018) (No. 1:17-cv-1907), ECF No. 1; 2d Am. Complaint, *Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018) (No. 1:16-cv-4756), ECF No. 60; Complaint, *New York v. Trump*, No. 1:17-cv-5228 (E.D.N.Y. Sept. 6, 2017), ECF No. 1. The California and New York district courts have enjoined implementation of the 2017 memorandum winding down DACA, and the District of Columbia court has also ordered DACA to resume by July 23, 2018. *Regents of Univ. of Calif.*, 279 F. Supp. 3d at 1048-50; *Vidal v. Nielsen*, 279 F. Supp. 3d at 409-10, 438; *NAACP*, 2018 WL 1920079, at *28. Appeals of the California and New York preliminary injunctions are pending, but the United States has not sought a stay pending appeal. DACA thus remains in effect indefinitely.

Plaintiffs here are seven States. This lawsuit does not concern the legality of the 2017 executive order directing that DACA be wound down, in the Executive's discretion. Rather, this lawsuit challenges the 2012 directive creating DACA in the first place. As explained below, that memorandum creating DACA is substantively and procedurally unlawful for the same reasons that the Fifth Circuit has already held DAPA and Expanded DACA to be unlawful. Plaintiffs seek a preliminary injunction to avoid irreparable injury from DACA's continuance.

## STATEMENT OF THE ISSUE TO BE RULED UPON BY THE COURT

The issue is whether the DACA program—like the previously-enjoined DAPA and Expanded DACA programs—should be preliminarily enjoined. "[T]he question of whether to award injunctive relief is generally within the trial court's discretion."

6

*EEOC v. Serv. Temps Inc.*, 679 F.3d 323, 338 (5th Cir. 2012). "A plaintiff seeking a preliminary injunction must establish [I] that he is likely to succeed on the merits, [II] that he is likely to suffer irreparable harm in the absence of preliminary relief, [III] that the balance of equities tips in his favor, and [IV] that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). The Court may employ a "sliding scale" approach, issuing the injunction upon a lesser showing of harm when the likelihood of success on the merits is especially high. *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979); *see also Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013).

## SUMMARY OF ARGUMENT

Plaintiffs meet the four-part test for a preliminary injunction.

**I.**    Plaintiffs are likely to prevail on their claims. No threshold issue bars review. As with Expanded DACA and DAPA, Plaintiff States have standing to challenge DACA: Plaintiffs are forced to rely on the federal government's determinations regarding an alien's status, and Plaintiffs are harmed in several ways by Defendants' abdication on a massive scale of their responsibility to faithfully enforce the law. DACA is also reviewable by courts. It is not mere prosecutorial discretion but instead a massive bureaucracy to grant the status of lawful presence and substantial benefits.

On the merits, DACA is unlawful for three reasons. First, the DACA memo violated the *substantive* requirements of the Administrative Procedure Act ("APA") because it is contrary to the statutory regime enacted by Congress, as the Fifth

Circuit correctly concluded that the Executive lacks the power to unilaterally confer lawful presence and work authorization. *Texas*, 809 F.3d at 186. Second, DACA violated the *procedural* requirements of the APA because it was created without notice and comment. Third, DACA violates the President's obligation to "take Care that the Laws be faithfully executed." U.S. CONST. art. II, § 3. DACA purports to make lawful what Congress has declared unlawful. DACA thus dispenses with statutes, which the Take Care Clause forbids the Executive from doing.

II.     Absent a preliminary injunction, Plaintiff States will suffer ongoing irreparable injuries such as the healthcare, law-enforcement, and education costs imposed by aliens who would not remain in the country but for renewal of their unlawful DACA status; and increased job competition for Plaintiff States' citizens. Plaintiff States will not be compensated later by the federal government for any of these losses. And these injuries are being caused on an ongoing basis and will accrue absent a preliminary injunction. Now that the Executive's decision to voluntarily wind down DACA has been enjoined indefinitely, there is no foreseeable end to Plaintiff States' ongoing irreparable injuries, so a preliminary injunction is justified. Indeed, the District of Columbia district court recently ordered the Executive to process not only DACA renewals, but *new* DACA applications. *NAACP*, 2018 WL 1920079, at *1, *25, *28.

III.     The balance of equities favors Plaintiffs. The Plaintiff States face significant irreparable injury, and Defendants face none. Defendants cannot claim any irreparable injury from winding down DACA, since Defendants already agreed

to do just that and were in the process of doing so. Any reliance claims by recipients of DACA carry no material weight in the equitable analysis, as DACA was explained all along as being temporary and revocable at any time in the Executive's sole discretion. Moreover, although the Court has the power to immediately cancel all existing DACA permits, Plaintiff States are amenable to an injunction against issuing or renewing DACA permits in the future, as opposed to an injunction requiring the Executive to immediately cancel existing two-year DACA terms.

IV.     Finally, a preliminary injunction is not contrary to the public interest. A preliminary injunction would support the laws enacted by the People's representatives in Congress, which is necessarily in the public interest. In contrast, DACA is contrary to the public interest because it flouts those laws and would reshape the separation of powers in this country, potentially allowing wholesale executive revisions of the United States Code.

## ARGUMENT

Plaintiffs satisfy each of the four requirements for a preliminary injunction.[1]

## I.     Plaintiffs Are Likely to Prevail on the Merits.

Plaintiffs are likely to succeed on the merits by showing that one or more of Plaintiffs has standing, that DACA is reviewable by courts, and that DACA is unlawful.

---

[1] Plaintiffs incorporate by reference the facts and allegations in their Complaint for Declaratory and Injunctive Relief (ECF. No 1) and the Brief for the State Respondents filed in *United States v. Texas*, 136 S. Ct. 2271 (2016), 2016 WL 1213267.

### A.    Plaintiffs have standing.

For years, Plaintiff States have been involved in a significant Article III "case or controversy" litigating the validity of the Obama Administration's class-based deferred-action programs, and Plaintiff States plainly have a "personal stake" in the outcome of this dispute. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014). After all, States "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397. Plaintiff States have suffered, and will continue to suffer, concrete injuries that are traceable to DACA, and an injunction of DACA and will redress those injuries. Once a concrete injury is shown, the magnitude of that injury is irrelevant to standing. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 525-26 (2007). Any of the following bases is independently sufficient to show standing.

### 1.    DACA causes financial harm to Plaintiffs through healthcare, education, and law-enforcement costs.

Plaintiff States have standing because DACA has caused and will cause them to incur financial injuries in the form of education, healthcare, and law-enforcement costs. As this Court recognized previously, the Plaintiff States would not otherwise incur certain costs associated with education, healthcare, and law enforcement but for programs like DACA. *See Texas v. United States*, 86 F. Supp. 3d 591, 629-30 (S.D. Tex. 2015) (noting Texas's costs for providing these services to aliens).

DACA, Expanded DACA, and DAPA cause those costs because these programs incentivize aliens—who would otherwise be unlawfully present and unauthorized to work without these programs—to remain in the country, including in the Plaintiff States. *See id.* at 634 ("The States rightfully point out that DAPA will increase their

damages with respect to the category of services discussed above because it will increase the number of individuals that demand them."). The Executive previously admitted that Expanded DACA and DAPA are different from prosecutorial discretion precisely *because* they grant valuable inducements. Exh. 7 (App. 759) (J.A. 716, *United States v. Texas*, 136 S. Ct. 2271 (Executive's admission that each program "works in way a that's different than . . . prosecutorial discretion" because it grants inducements "for people to come out and identify themselves")). Those same incentives to continue the alien's unlawful presence are granted by DACA, too. Exh. 8 (App. 858). And, by remaining in the Plaintiff States, aliens impose those continued costs on the States. Exhs. 9 (App. 876), 10 (App. 881).

Indeed, States are required by federal law to incur some of these costs. For example, numerous DACA recipients are in public school. Ex. 9 (App. 876). And the Supreme Court has held that States are constitutionally obligated to provide free education to unlawfully-present aliens. *Plyler v. Doe*, 457 U.S. 202 (1982). As this Court previously found, Texas pays about $9,473 per year to educate each unlawfully present alien in its school system. *See Texas*, 86 F. Supp. 3d at 630. In a single year, "Texas absorbed additional education costs of at least $58,531,100 stemming from illegal immigration." *Id.* Since then, costs have increased and the State of Texas anticipates paying approximately $9,826 per year in the 2019 fiscal year to educate each unlawfully present alien in its school system. Exh. 9 ¶ 5 (App. 878). In the 2017 fiscal year, Texas incurred at least $63,000,000 in additional education costs stemming from illegal immigration. Exh. 9 ¶ 4 (App. 877-78). By incentivizing more

unlawfully present aliens of school age to remain in the Plaintiff States, DACA means more such aliens will be in the Plaintiff States' public school systems—thus imposing additional financial injuries on Plaintiffs. *See* Exh. 8 (App. 858).

Similarly, both Medicare and Medicaid require provision of emergency services, regardless of immigration status, as a condition of participation. *See* 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255. Other expenditures are required by preexisting state law. For example, Texas law requires local governments to provide healthcare for the indigent. *See* Tex. Health & Safety Code §§ 61.001 *et seq.* Texas law also requires nonprofit hospitals to provide unreimbursed care for the indigent as a condition of maintaining their nonprofit status. *See id.* § 311.043. Texas spent approximately $376,000,000 to provide Emergency Medicaid services to unlawfully present aliens over the last 11 years for which data are available. Exh. 10 ¶ 8 (App. 883). Texas spent approximately $136,000,000 to provide CHIP Perinatal Coverage to unlawfully present aliens over the last 9 years for which data are available. Exh. 10 ¶ 10 (App. 884). By incentivizing more unlawfully present aliens to remain in the Plaintiff States, DACA means more such aliens will be in the Plaintiff States' healthcare facilities—thus imposing additional financial costs on Plaintiffs. *See Texas*, 86 F. Supp. 3d at 635. Likewise, Texas spent approximately $6,200,000 to provide Family Violence Program services to undocumented immigrants over the last 11 years for which data are available. Exh. 10 ¶ 9 (App. 884).

In the prior DAPA litigation, this Court declined to rely on these costs to find standing because this Court was unsure whether it could "evaluate the accuracy of

[Defendants'] economic projections" that Plaintiffs' costs would be "offset" by benefits of the Expanded DACA and DAPA. *Texas*, 86 F. Supp. 3d at 635. On appeal, however, the Fifth Circuit clarified that there is no such broad-ranging "offset" inquiry under the Article III standing analysis. *Texas*, 809 F.3d at 155-56. The Fifth Circuit rejected the need to evaluate the extent of the allegedly offsetting benefits alleged by the federal government, because "none of the benefits the government identifies is sufficiently connected to the costs to qualify as an offset." *Id.* at 156. As the Fifth Circuit held, the "standing analysis is not an accounting exercise." *Id.* (quoting *NCAA v. Gov. of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013)).

Accordingly, the Fifth Circuit has dispensed with the only obstacle identified by this Court to finding standing on account of healthcare, education, and law-enforcement costs caused by deferred-action programs such as DACA. Those harms give the Plaintiff States standing to bring this suit.

### 2. Plaintiffs have *parens patriae* standing to protect their citizens' economic and commercial interests from labor-market distortions caused by DACA.

In the prior DAPA litigation, the Executive admitted that "competitor standing" would exist to challenge the Executive's legalization of work by unauthorized aliens, who would compete for jobs with lawful residents. Oral Arg. at 0:06:40-0:07:10, 0:07:55-0:08:19, *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015) (No. 15-40238), http://www.ca5.uscourts.gov/OralArgRecordings/15/15-40238_4-17-2015.mp3. The States have *parens patriae* standing to protect their citizens against such competitive harm—an independent basis of standing in this lawsuit.

13

The Plaintiff States have *parens patriae* standing to protect the quasi-sovereign interests in "the health and well-being" of their citizens. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982). Specifically, Plaintiffs seek to protect their citizens' "economic and commercial interests" from labor-market distortions caused by DACA. *Id.* at 609. Although a State cannot sue the federal government to "protect her citizens *from* the operation of federal statutes," *Massachusetts v. EPA*, 549 U.S. at 520 n.17 (emphasis added), the Plaintiff States here are suing the federal Executive Branch to ensure *compliance* with federal statutes.

Plaintiff States seek the enforcement of federal law "to assure [their] residents that they will have the full benefit of federal laws designed to address th[e] problem" of labor-market distortion from unlawfully present aliens. *Alfred L. Snapp*, 458 U.S. at 609-10. The Immigration Reform and Control Act of 1986 ("IRCA") created "a comprehensive framework for 'combating the employment of illegal aliens.'" *Arizona*, 567 U.S. at 404 (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)). But DACA impairs the operation of that federal law, resulting in aliens receiving unlawful work authorization from the Executive. As the U.S. Attorney General has recognized, DACA will "den[y] jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." Exh. 6 (App. 25); *see also* Exh. 11 (App. 943) (noting that DACA increases competition for available jobs).

The harm goes further than just facing competition for jobs—although that alone suffices to show standing—because it is actually cheaper for employers to hire

DACA recipients than citizens, as a result of the Affordable Care Act. The Affordable Care Act's employer mandate to provide costly health insurance and corresponding penalties do not apply when employers hire deferred-action recipients. 8 U.S.C. § 1611(a); 26 U.S.C. § 4980H(b). As expert evidence demonstrates, that makes it cheaper for employers to hire DACA recipients than citizens. Exh. 11 (App. 943). This Court questioned that *parens patriae* theory as to DAPA only because the Executive had yet to promulgate regulations excluding DAPA recipients from ACA subsidies. *Texas*, 86 F. Supp. 3d at 627-28. But DACA recipients are already barred by *statute* from receiving ACA benefits. 8 U.S.C. § 1611(a); *see also* 45 C.F.R. § 152.2(8). This competitive injury to the economic well-being of the Plaintiff States' citizens "is within the quasi-sovereign interests traditionally protected by *parens patriae* actions." *Texas*, 86 F. Supp. 3d at 627.

### 3. Plaintiffs have standing based on the institutional injury they suffer from DACA's dispensing of congressional statutes preempting state prerogatives.

Independently, Plaintiff States have standing to raise—and are indeed uniquely situated to raise—challenges to the Executive Branch's unlawful dispensing of statutes that preempt state prerogatives. An institutional plaintiff, like a State, has standing to challenge federal agency action that dispenses with congressional enactments when those congressional enactments preempt state prerogatives.

A State is "an institutional plaintiff." *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 (2015). An "institutional plaintiff" has standing when it suffers a mere "institutional injury." *Id.* An "institutional injury"

15

includes when a government's powers are "strip[ped]" or "nullif[ied]." *Id.* at 2663, 2665.

For example, when a federal statute preempts state prerogatives, the State's powers are stripped or nullified. As the Supreme Court recognized in finding State standing, "[w]hen a State enters the Union, it surrenders certain sovereign prerogatives" that become "lodged in the Federal Government." *Massachusetts v. EPA*, 549 U.S. at 519. A State's agreement upon entering the Union to have its authority on such sovereign matters preempted—as with its authority to determine the lawful presence of individuals within its borders—is given on the understanding that Congress's enactments serve to "protect" the States. *Id.*

Due to the preemption of their sovereign prerogatives, States have a "quasi-sovereign," if not purely sovereign, interest in the enforcement of federal laws that preempt the States' surrendered prerogatives. *Id.* at 520. So when the Executive Branch "has abdicated its responsibility under [federal statutes]," it negates the basis on which the States agreed to allow federal preemption of their sovereign prerogatives. *Id.* at 505; *cf. Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (States have a "sovereign interest" in "the power to create and enforce a legal code."). Thus, as this Court previously concluded, States have "abdication standing" to challenge federal Executive agency action that dispenses with statutes passed by Congress when those statutes preempt state prerogatives. *Texas*, 86 F. Supp. 3d at 636-43.

4.    **Plaintiff States receive special solicitude in the standing inquiry.**

Under each of the independent standing theories explained above, Plaintiff States also receive "special solicitude" in the standing analysis under *Massachusetts v. EPA*, 549 U.S. at 520. The Fifth Circuit has so held. *See Texas*, 809 F.3d at 151. Although Plaintiffs do not need special solicitude to establish standing on any of the grounds covered above, special solicitude under *Massachusetts v. EPA* makes standing an especially easy question.

Just as the Supreme Court held in *Massachusetts v. EPA*, the federal government here has "abdicated its responsibility" to enforce federal statutes. *Texas*, 86 F. Supp. 3d at 663 ("DAPA does not represent mere inadequacy; it is complete abdication."). And Plaintiffs face a more certain risk of harm than did the States who had standing in *Massachusetts v. EPA. Id.* at 629; *see Texas*, 809 F.3d at 159 ("Texas is entitled to the same 'special solicitude' as was Massachusetts, and the causal link is even closer here.").

B.    **DACA is reviewable agency action.**

DACA is reviewable agency action, as Plaintiffs are within the zone of interests of the federal laws violated and DACA does not qualify for the narrow "committed to agency discretion by law" exception to APA review.

1.    **Plaintiffs' interests are within the zone of interests protected by immigration statutes and the APA.**

The zone-of-interests test is an easy test to meet and is met here under circuit precedent, which dictates that Plaintiff States pass that test because their interests

are at least arguably within the zone of interests of federal immigration statutes and the APA. *See Texas*, 809 F.3d at 163.

### 2. DACA is affirmative agency action—not mere enforcement discretion inaction.

Like Expanded DACA and DAPA, DACA too does not fall within the APA's narrow exception barring judicial review when an agency decision is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception is "very narrow." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). There is a "strong presumption favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015) (quotation marks omitted).

Unreviewability under *Heckler* applies only to "an agency's refusal to take . . . action," such as "an agency's decision not to take enforcement action." 470 U.S. at 831, 832. *Heckler* thus held that a plaintiff could not use the APA to force the Food and Drug Administration to take enforcement actions related to lethal injection drugs. *Id.* at 827. In contrast, "when an agency does act," the "action itself provides a focus for judicial review" and "can be reviewed to determine whether the agency exceeded its statutory powers." *Id.* at 832.

DACA is not unreviewable prosecutorial discretion for the same reasons the Fifth Circuit held that Expanded DACA and DAPA are not. *See Texas*, 809 F.3d at 169. Indeed, the fact that DACA was agency action, and not mere prosecutorial discretion, has been admitted by the federal government's own attorney in the course of the California litigation. *See* Exh. 12 at 12 (App. 977) ("[DACA] is materially indistinguishable from the DAPA and expanded DACA policies that the Fifth Circuit

18

held were contrary to federal immigration law in a decision that four Justices of this Court voted to affirm"); Exh. 12 at 26 (App. 992) ("The entirety of the Fifth Circuit's reasoning applies equally to the original DACA policy").

As the federal district court in Maryland noted in upholding the DACA rescission memo, "[a]side from the classes of immigrants to which each applies, DACA and DAPA are largely similar programs addressing different classes or subcategories of immigrants." *CASA de Md. v. U.S. Dep't of Homeland Sec.*, No. 17-cv-2942, 2018 WL 1156769, at *3 (D. Md. Mar. 5, 2018). "[T]he judicial decisions throughout the DAPA litigation illustrate" that "challenges to DAPA or analogous immigration programs promulgated by DHS without approval by Congress are justiciable." *Id.*

Although the Executive sometimes frames DACA as simply an announcement of inaction, it is far more. The DACA program creates a massive bureaucracy to grant applicants a status—lawful presence in the United States—that comes with numerous benefits. *See Texas*, 809 F.3d at 184 ("The INA flatly does not permit the [Executive to deem] aliens as 'lawfully present' and thereby make them newly eligible for a host of federal and state benefits."); *id.* at 166 ("Deferred action [in DACA and Expanded DACA] . . . is much more than nonenforcement: It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens."). The Executive has therefore previously acknowledged that DACA confers "deferred action status," which is a "lawful status." U.S. Br. as Amicus Curiae in Opp. to Reh'g En Banc at 16, *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014)

(No. 13-16248), ECF No. 75. And the Executive's own benefits regulations establish a "deferred action status." 8 C.F.R. § 1.3(a)(4)(vi); 45 C.F.R. § 152.2(4)(vi).

This lawsuit does not challenge the Executive's enforcement priorities. For example, DHS has separately defined priorities for "enforcement and removal activities," Exh. 13 at 1 (App. 1000) (Feb. 20, 2017 memorandum). This lawsuit does not challenge the Executive's "discretion to abandon" the "initiation or prosecution of various stages in the deportation process." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999).

But "[d]eclining to prosecute does not transform presence deemed unlawful by Congress into lawful presence and confer eligibility for otherwise unavailable benefits based on that change." *Texas*, 809 F.3d at 167. Like Expanded DACA and DAPA, DACA is executive action creating a massive bureaucracy to confer lawful-presence status and attendant benefits; that executive action provides a "focus for judicial review." *Heckler*, 470 U.S. at 832.

Lastly, review is in no way limited under the INA by 8 U.S.C. § 1252(g). DACA presents no claim "by or on behalf of any alien" to challenge a determination concerning removal proceedings, so judicial review cannot be limited under that statute. 8 U.S.C. § 1252(g). Indeed, "the notion that 8 U.S.C. § 1252(g) precludes judicial review has been rejected repeatedly." *CASA de Md.*, 2018 WL 1156769, at *7.

### C.     DACA is unlawful.

DACA is contrary to law because its violates congressional statutes, it lacks the notice-and-comment procedure required for a program like this, and it violates the Take Care Clause.

### 1.     DACA is contrary to substantive federal law.

Like Expanded DACA and DAPA, DACA is contrary to law because it is "not authorized by statute," *Texas*, 809 F.3d at 184, and is "foreclosed by Congress's careful plan," *id.* at 186; *see also CASA de Md.*, 2018 WL 1156769, at *10 ("DAPA—an analogous program, promulgated by analogous means—had been defeated less than a year prior. The litigation that stopped DAPA included expansions of DACA itself."). As the Fifth Circuit noted, the Executive's claim of authority to create these programs "would allow [the Executive] to grant lawful presence and work authorization to any illegal alien in the United States—an untenable position in light of the INA's intricate system of immigration classifications and employment eligibility." *Texas*, 809 F.3d at 184. "The INA flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." *Id.*

a.     "Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress"—not the Executive. *Arizona*, 567 U.S. at 409 (citing *Galvan v. Press*, 347 U.S. 522, 531 (1954)); *see* U.S. Const. art. I, § 8, cl. 4. Congress has accordingly enacted "extensive and complex" statutory provisions governing when aliens may be lawfully present in the country. *Arizona*, 567 U.S. at

395. Congress uses a person's "lawful presence" (or "unlawful presence") in this country as the predicate for numerous legal consequences, including removability, a reentry bar, eligibility for "advance parole" (which allows a pathway to citizenship), and eligibility for numerous federal benefits. *See Texas*, 809 F.3d at 179, 180, 183, 184.

i. Congress has not given the Executive carte blanche to permit aliens to be lawfully present in the country. When Congress allows aliens to be lawfully present, it identifies these "specified categories of aliens" in statutes. *Id.* at 216 (King, J., dissenting); *accord id.* at 179. Congress has delineated over 40 classes of lawfully present aliens: lawful permanent residents, nonimmigrants, asylees, refugees, and many others. *See id.* at 179. The INA creates two primary categories of aliens permitted to be present in the country:

- Aliens admitted as "nonimmigrant" aliens, who receive temporary permission to be lawfully present in the country according to one of several visa categories. 8 U.S.C. § 1101(a)(15)(A)-(V).

- Aliens admitted for lawful permanent residence, commonly known as possessing "green cards,"[2] who lawfully entered the country with an "immigrant" visa. *Id.* §§ 1101(a)(20), 1151, 1153, 1181.

---

[2] "A valid, unexpired Form I-551, Permanent Resident Card (also known as a 'green card'), is the primary evidence of an alien's status as a Lawful Permanent Resident (LPR) of the United States." U.S. Dep't of State, 9 Foreign Affairs Manual 202.2-6(a)(1) (2018).

Congress also created other avenues to lawful presence, such as admission as a refugee, *id.* §§ 1157, 1159, asylum, *id.* § 1158, and humanitarian "parole" into the country, available only "on a case-by-case basis for urgent humanitarian reasons or significant public benefit," *id.* § 1182(d)(5)(A).

"Entirely absent from those specific classes is the group of . . . illegal aliens who would be eligible for lawful presence under" DACA. *Texas*, 809 F.3d at 179. And, as the Supreme Court has held, policies pertaining to aliens' right to be in this country are "entrusted exclusively to Congress," as opposed to the Executive. *Arizona*, 567 U.S. at 409 (quoting *Galvan v. Press,* 347 U.S. at 531)). When Congress has seen fit to grant lawful presence to a significant portion of the aliens present unlawfully in the country, it has enacted legislation to do so. *E.g.*, 8 U.S.C. §§ 1160, 1254a (1986 legislation). But no such legislation covers aliens unlawfully present who entered the country as minors. Thus, by conferring the status of lawful presence without congressional authorization, DACA violates federal immigration laws. As the Fifth Circuit held with respect to Expanded DACA and DAPA, the Executive has no power to unilaterally create immigration classifications that authorize aliens' presence in this country, for "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." *Texas*, 809 F.3d at 179.

ii.     DACA directly flouts several statutory mechanisms that Congress enacted to discourage aliens from being unlawfully present in the country.

First, the lawful presence purportedly granted by DACA appears to negate the charge that an alien is removable as "present in the United States in violation of

[federal law]," 8 U.S.C. § 1227(a)(1)(B). And lawful presence under DACA may also negate the charge that an alien is removable as present "without being admitted or paroled," *id.* § 1182(a)(6)(A)(i), because the Executive maintains that an alien granted lawful presence is not considered "present in the United States without being admitted or paroled," Pet. Br. at 9 n.3, *Texas*, 136 S. Ct. 2271 (No. 15-674), 2016 WL 836758.

Of course, an alien's unlawful presence does not automatically mean that he must be removed. For example, in four narrow contexts, Congress provided statutory authority to grant class-based deferred action and attendant legal consequences. *See Texas*, 787 F.3d at 759 & n.78 (collecting statutes). Congress has also imposed several statutory limitations on removal. *E.g.*, 8 U.S.C. §§ 1229b (cancellation of removal), 1231(b)(3) (withholding of removal). And due to limited enforcement resources, the Executive generally has "discretion to abandon" removal proceedings on a "case-by-case basis"—forbearance rooted in prosecutorial discretion and traditionally called "deferred action." *Reno*, 525 U.S. at 483-84 & n.8. But that conception of deferred action is far removed from deferred-action status as the Executive now confers it—as granting lawful presence and a host of attendant benefits.

DACA also vitiates another statutory mechanism for discouraging unlawful presence: the INA's reentry bar. Congress directed that the total time in which an alien is "unlawfully present" in the country for more than 180 days as an adult triggers a 3- or 10-year bar on that alien's reentry into the country after departure. 8

U.S.C. § 1182(a)(9)(B)(i). But the lawful presence that DACA purports to assign would stop the reentry-bar clock. *Texas*, 809 F.3d at 166 n.99.

That is contrary to law. "Unlawful presence" is defined as an alien's presence in the United States "after the expiration of the period of stay authorized by the [Executive] or presen[ce] in the United States without being admitted or paroled." 8 U.S.C. § 1182(a)(9)(B)(ii). The disjunctive second clause triggers the reentry-bar clock for aliens who have not been admitted or paroled. The INA does not authorize the Executive to stop this clock for any alien of its choosing or to admit or parole aliens into the country merely because they are not priorities for removal proceedings. *See* 8 U.S.C. § 1182(d)(5)(A) (humanitarian "parole" "shall not be regarded as an admission of the alien" into the country and is available only "on a case-by-case basis for urgent humanitarian reasons or significant public benefit").

For certain DACA recipients, the Executive has ignored the INA reentry bar in another way. Unlawfully present aliens who depart the country are generally inadmissible upon return. *See id.* § 1182(a)(9)(B). But the Executive has given unlawfully present aliens with DACA status access to "advance parole," which allows them to leave and reenter the country.[3] *Cf. id.* § 1182(d)(5)(A). Furthermore, some

_____

[3] *See* Letter from León Rodríguez, Dir., USCIS, to Sen. Grassley 1 (June 29, 2016), (attached as Exh. 18 (App. 1172)). "Advance parole" is an Executive practice that allows aliens to leave the country and reenter. USCIS, Deferred Action for Childhood Arrivals (DACA) Toolkit 23-24, *Texas*, 86 F. Supp. 3d 591 (No. 1:14-cv-254), ECF No. 38-6 (attached as Exh. 20 (App. 1209)); Letter from León Rodríguez, Dir., USCIS, to Sen. Grassley 3-4 (Oct. 9, 2014), *Texas*, 86 F. Supp. 3d 591 (No. 1:14-cv-254), ECF No.

DACA recipients who received "advance parole" subsequently obtained adjustment to LPR status[4]—and thus a pathway to citizenship, *id.* § 1427(a). For an alien to be eligible to adjust to lawful-permanent-resident status, the alien must be lawfully "admitted or paroled into the United States." 8 U.S.C. § 1255(a). Thus, leaving and reentering the United States with advance parole removes a significant impediment for some otherwise unlawfully present aliens to seek adjustment to LPR status. *See* Complaint ¶ 107. The individuals who have a previously unavailable pathway to United States citizenship on account of receiving DACA may number in the tens of thousands, even though the June 15, 2012 DACA memo said that DACA would confer no pathway to United States citizenship. *See* Complaint ¶¶ 111-16.

Finally, DACA violates Congress's 1996 decision to eliminate most federal benefits for unlawfully present aliens whom the Executive has not yet removed. Congress introduced "lawful presence" as a requirement for benefits eligibility in 1996. Before then, certain statutes permitted benefits for aliens "permanently residing in the United States under color of law" (PRUCOL)[5]—interpreted to include

---

64-48 (attached as Exh. 17 (App. 1151)); *Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/frequently-asked-questions (last visited May 1, 2018).

[4] *See* Exh. 3 (App. 12); Exh. 18 (Letter from Rodríguez to Sen. Grassley, *supra*) at 1-2 (App. 1172-73). The Executive's electronic records did not track which of the 2,994 DACA recipients who were approved for advance parole and who were subsequently granted adjustment of status "may have been otherwise eligible for adjustment of status regardless of the grant of advance parole." Exh. 18 at 1 (App. 1172).

[5] *E.g.*, Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9406(a), 100 Stat. 1874, 2057 (1986) (amending 42 U.S.C. § 1396b(v)(1)) (prohibiting

unlawfully present aliens whom the Executive was forbearing from removing. *See, e.g., Lewis v. Thompson*, 252 F.3d 567, 571-72 (2d Cir. 2001). In 1996, Congress eliminated most benefits for these aliens. It did so in part by enacting welfare-reform legislation replacing PRUCOL status with "lawful presence" as the immigration classification triggering eligibility for specified benefits. The legislative history confirmed that "[p]ersons residing under color of law shall be considered to be aliens unlawfully present in the United States." H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.), as reprinted in 1996 U.S.C.C.A.N. 2649, 2771.

As relevant here, Congress required aliens to be "lawfully present in the United States as determined by the [Executive]" to obtain Social Security, Medicare, and another retirement benefit. 8 U.S.C. § 1611(b)(2)-(4). DACA purports to enable access to those benefits. *See* 8 C.F.R. § 1.3(a)(4)(vi); 45 C.F.R. § 152.2(4)(vi). Yet extensive statutory criteria define when an alien's presence is lawful, and these provisions do not mention discretion to deem any alien in the country lawfully present. *See supra* Part I.C.1.a.i. DACA thus does what Congress prohibited in 1996: it qualifies recipients for benefits, not because their presence is authorized by law, but simply because the Executive is forbearing from removing them. *See* Complaint ¶ 225.[6]

---

nonemergency Medicaid payments for aliens "not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law").

[6] In addition to these federal benefits, DACA also makes aliens eligible under some state laws for benefits, such as driver's licenses. *See* Complaint ¶¶ 225-27.

b. Likewise, DACA's conferral of work authorization violates congressional statutes. "The INA also specifies classes of aliens eligible and ineligible for work authorization." *Id.* at ¶ 309. Congress has not given the Executive free rein to grant work authorization. Instead, Congress intricately defined which aliens are authorized for employment in the country. About 20 nonimmigrant-visa categories directly authorize employment. *E.g.*, 8 U.S.C. § 1101(a)(15)(H) (temporary employment of certain nonimmigrants), (P) (entertainment work).[7] Congress also requires the Executive to authorize employment of other categories of aliens, such as:

- Asylum holders, *id.* § 1158(c)(1)(B);

- Temporary protected status, *id.* § 1254a(a)(1)(B);

- Aliens granted and applying for relief under the Immigration Reform and Control Act of 1986 (IRCA), *id.* § 1255a(b)(3), (e)(1)-(2);

- Aliens granted "Family Unity" under the Immigration Act of 1990, Pub. L. No. 101-649, tit. III, § 301, 104 Stat. 4978, 5029 (codified as amended at 8 U.S.C. § 1255a note).

Congress then provided that aliens in certain categories are "eligible" for or "may" receive work authorization from the Executive; those categories include:

- Asylum applicants, 8 U.S.C. § 1158(d)(2);

- Certain battered spouses of nonimmigrants, *id.* § 1105a(a);

---

[7] *See also* USCIS, How Do I Change to Another Nonimmigrant Status? 2 (Jan. 2016), https://www.uscis.gov/sites/default/files/USCIS/Resources/C2en.pdf.

- Certain agricultural worker preliminary applicants, *id.* § 1160(d)(3)(A);

- Certain nationals applying for status adjustment;[8]

- Deferred-action U-visa applicants;[9]

- Deferred-action family members of LPRs killed on September 11, 2001;[10]

- Deferred-action family members of U.S. citizens killed in combat;[11] and

- Deferred-action Violence Against Women Act self-petitioners and family members.[12]

Against the backdrop of that "comprehensive framework," *Arizona*, 567 U.S. at 404, there is no power to unilaterally grant work authorization to any unlawfully present alien whom the Executive chooses not to remove. A view of work authorization that would make Congress's detailed work-authorization provisions surplusage must be rejected. *Bd. of Trs. of Leland Stanford Jr. Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 788 (2011).

---

[8] Haitian Refugee Immigration Fairness Act of 1998, Pub. L. No. 105-277, div. A, § 101(h), tit. IX, § 902(c)(3), 112 Stat. 2681-538, 2681-539; Nicaraguan Adjustment and Central American Relief Act, Pub. L. No. 105-100, tit. II, § 202(c)(3), 111 Stat. 2160, 2195 (1997).

[9] 8 U.S.C. § 1184(p)(6); *see id.* § 1227(d)(1)-(2).

[10] USA PATRIOT Act of 2001, Pub. L. No. 107-56, tit. IV, § 423(b)(1)-(2), 115 Stat. 272, 361.

[11] National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, tit. XVII, § 1703(c)(2), 117 Stat. 1392, 1694-95.

[12] 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV), (a)(1)(K).

Importantly, when Congress wanted to provide work-authorization eligibility to four narrow classes of deferred-action recipients, it did so by statute.[13] Otherwise, the 1986 IRCA "prohibit[s] the employment of aliens who are unauthorized to work in the United States because they either entered the country illegally, or are in an immigration status which does not permit employment." H.R. Rep. No. 99-682(I), at 46, 51-52 (1986), as reprinted in 1986 U.S.C.C.A.N. 5649-50, 5655-56 (emphasis added). Those federal statutes defining which aliens are eligible for work authorization make "no mention of the class of persons whom" DACA "would make eligible for work authorization." *Texas*, 809 F.3d at 181. In sum, "the INA flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." *Id.* at 184.

DACA's work-authorization component thus flouts numerous restrictions that Congress imposed on the employment of unauthorized aliens. In 1986, IRCA created "a comprehensive framework for 'combating the employment of illegal aliens.'" *Arizona*, 567 U.S. at 404 (quoting *Hoffman Plastic Compounds*, 535 U.S. at 147). Breaking with previous law, Congress created penalties for employers who hire "unauthorized aliens"—another mechanism for discouraging unlawful immigration.

---

[13] 8 C.F.R. § 274a.12(c)(14) makes work authorization available to certain aliens granted "deferred action." This provision would cover the four categories of deferred-action recipients that Congress made eligible for work authorization. *See Texas*, 787 F.3d at 762 n.95.

8 U.S.C. § 1324a(a), (f); *see Texas*, 809 F.3d at 181 & n.174. Unauthorized employment also has legal consequences for the alien. It generally makes aliens ineligible to adjust to LPR status, 8 U.S.C. § 1255(c)(2), and forecloses any available tolling of the unlawful-presence clock under the INA's reentry bar, *id.* § 1182(a)(9)(B)(iv).

Furthermore, work authorization allows aliens to obtain a Social Security number, and therefore eligibility for the valuable Earned Income Tax Credit, *Texas*, 809 F.3d at 149 & n.18 (referencing district court citation of IRS Commissioner testimony); *see* 26 U.S.C. § 32(c)(1)(E), (m). The Executive's position on this matter reflects the view that aliens' receipt of work authorization connotes that their "status is so changed as to make it lawful for them to engage in such employment," thus allowing a Social Security number to issue. 42 U.S.C. § 405(c)(2)(B)(i)(I); *accord* 20 C.F.R. § 422.104(a)(2).

c.    Historical practice does not render DACA lawful. "[H]istorical practice . . . 'does not, by itself, create power.'" *Texas*, 809 F.3d at 184 (quoting *Medellin v. Texas*, 552 U.S. 491, 532 (2008)). This point alone forecloses an attempt to justify DACA based on past practice.

"[I]n any event, previous deferred-action programs are not analogous to [DACA]," for the same reasons they are not analogous to Expanded DACA or DAPA. *Id.* "[M]any of the previous programs were bridges from one legal status to another, whereas [DACA] awards lawful presence to persons who have never had a legal status and may never receive one." *Id.* (footnotes omitted). In fact, with DACA, some recipients have even obtained U.S. citizenship or a pathway to citizenship—without

31

any statutory authorization from Congress. Complaint ¶¶ 84-116. The federal Executive Branch has purported to use "humanitarian parole" as the avenue for conferring this citizenship benefit once an alien gets DACA status, yet it has not complied with Congress's limited conditions for granting humanitarian parole. *See* Complaint ¶¶ 98-102.

> ### 2.   DACA was issued without the notice-and-comment procedure required by the APA for a program like this.

**a.**   Even somehow assuming substantive authority existed to create DACA, the program is unlawful because it was created without the notice-and-comment procedure required for a program like this.

As the Fifth Circuit held with respect to DAPA and Expanded DACA, DACA too is a substantive rule, not exempt from the Administrative Procedure Act's notice-and-comment requirements as either an interpretive rule, a general statement of policy, or a rule of agency organization, procedure, or practice, 5 U.S.C. § 553(b)(A). *See Texas*, 809 F.3d at 171-78.

These programs are some of the largest immigration policy changes in our Nation's history. They at least required notice-and-comment procedure because they modify substantive rights and interests, as they confer on recipients lawful presence and eligibility for attendant benefits. *Id.* at 176. Regardless of whether Executive officials have substantive authority to issue DACA permits—and regardless of whether Executive officials have discretion to grant or deny DACA permits—DACA still needed to go through notice-and-comment because it "affect[s] individual rights." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979); *Morton v. Ruiz*, 415 U.S. 199, 232

(1974). DACA changed the law, and is a substantive rule, because "in the absence of the rule there would not be an adequate legislative basis for . . . agency action to confer benefits." *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993).

Besides the fact that DACA changed the law by unilaterally providing a basis to grant lawful presence and work authorization, DACA also required notice-and-comment for an independent reason: It does not genuinely leave the agency and its decisionmaker free to exercise discretion. When a rule purports to allow discretion but is frequently treated as binding in practice, courts uniformly look past the label and find the rule is substantive. *E.g.*, *Phillips Petrol. Co. v. Johnson*, 22 F.3d 616, 619-20 (5th Cir. 1994) (substantive rule even where agency characterized its "Procedure Paper" standard as a "yardstick"); *U.S. Tel. Ass'n v. FCC*, 28 F.3d 1232, 1234-35 (D.C. Cir. 1994) (substantive rule where agency only possibly departed from criteria in 8 out of 300 cases); *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320-21 (D.C. Cir. 1988) (where model was used to resolve 96 out of 100 applications, it was a substantive rule); *see also Iowa League of Cities v. EPA*, 711 F.3d 844, 865 (8th Cir. 2013) (agency's "pro forma reference to . . . discretion" was "Orwellian newspeak"). This Court previously found that "[n]othing about DAPA 'genuinely leaves the agency and its [employees] free to exercise discretion.'" *Texas*, 809 F.3d at 172 (quoting *Texas*, 86 F. Supp. 3d at 670 (second alteration in district court opinion)). And this Court based that finding on "the implementation of DACA." *Id.* at 172. That

same evidence warrants the same conclusion here. *See* Exhs. 14 (App. 1007), 15 (App. 1011), 16 (App. 1014).

**b.** Even the litigants challenging the Executive's 2017 decision to wind down DACA recognize that DACA was a substantive rule that had to go through notice-and-comment procedure. Take, for instance, the University of California plaintiffs in the consolidated actions pending in the Northern District of California. They plead that the DACA-rescission memo "constitutes a substantive rule subject to APA's notice-and-comment requirements." Complaint at 14, *Regents of Univ. of Cal. v. Dep't of Homeland Sec.*, No. 3:17-cv-5211-WHA (N.D. Cal. Sept. 8, 2017), ECF No. 1.

That could be true only if DACA was itself a substantive rule—one that modifies rights and obligations. After all, if DACA were not a substantive rule, then winding down this program also could not be a substantive rule changing rights. Those plaintiffs, however, admit that DACA purported to unilaterally confer lawful presence:

> Individuals with DACA status were "not considered to be unlawfully present during the period in which deferred action [was] in effect." USCIS FAQs.

*Id.* at 8. Moreover, those plaintiffs admit that aliens who received DACA status would not have been able—but for DACA—to lawfully "obtain jobs and access to certain Social Security and Medicare benefits." *Id.* at 2. The necessary implication of that pleading is that DACA was unlawful the entire time, as it was issued without required APA notice-and-comment procedure.

**c.**   The State of California plaintiffs in that same litigation likewise affirmatively plead, in substance, that DACA's attributes meet the test for a substantive rule that required APA notice-and-comment procedure. For instance, those plaintiffs plead that "DACA Provides Numerous Benefits," which are described in detail:

82. DACA grantees are provided with numerous *benefits*. Most importantly, they are granted the *right* not to be arrested or detained based solely on their immigration status during the designated period of their deferred action. [ ].

83. DACA grantees are granted eligibility to receive *employment authorization*.

84. DACA also opened the door to *allow travel* for DACA grantees. For example, DACA grantees were allowed to briefly depart the U.S. and legally return under certain circumstances, such as to visit an ailing relative, attend funeral services for a family member, seek medical treatment, or further educational or employment purposes. 8 U.S.C. § 1182(a)(9)(B)(i); *see also* Ex. E, USCIS, Frequently Asked Questions, DHS DACA FAQs ("DACA FAQs") (Apr. 25, 2017) Q57. Travel for vacation is not permitted.

85. Unlike other undocumented immigrants, DACA grantees are not disqualified on the basis of their immigration status from receiving certain public benefits. These include *federal Social Security, retirement, and disability benefits*. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d). As a result, and in reliance on DHS's oft-stated position that DACA and similar programs are a lawful exercise of the agency's authority, Plaintiff States have structured some schemes around DACA which allow, for example, applicants to demonstrate eligibility for state programs by producing documentation that they have been approved under DACA. The rescission of DACA undermines such regulatory frameworks.

86. DACA grantees are able to secure equal access to *other benefits* and opportunities on which Americans depend, including opening bank accounts, obtaining credit cards, starting businesses, purchasing homes and cars, and conducting other aspects of daily life that are otherwise often unavailable for undocumented immigrants.

Complaint at 17-18, *California v. Dep't of Homeland Sec.*, No. 3:17-cv-5235 (N.D. Cal. Sept. 11, 2017), ECF No. 1 (emphases added).

    **d.**    The *Garcia* plaintiffs in the California litigation admit the same thing. Complaint at 9 ¶ 27, *Garcia v. United States*, No. 3:17-cv-5380 (N.D. Cal. Sept. 18, 2017), ECF No. 1 ("DACA *confers* numerous important *benefits* on those who apply for and are granted DACA status.") (emphases added).

    **e.**    In addition to the five challenges pending in the Northern District of California, at least four other pending lawsuits challenge the DACA-rescission memo. Complaint, *Trs. of Princeton Univ.*, No. 1:17-cv-2325, ECF No. 1; Complaint, *NAACP*, 2018 WL 1920079 (No. 1:17-cv-1907), ECF No. 1; 2d Am. Complaint, *Vidal*, 279 F. Supp. 3d 401 (No. 1:16-cv-4756), ECF No. 60; Complaint, *New York*, No. 1:17-cv-5228, ECF. No. 1. Plaintiffs in those cases similarly have pleaded, in substance, that DACA was unlawful this entire time because it confers substantive rights, yet was issued without notice-and-comment procedure.

    Plaintiffs in the New York lawsuit plead that DACA affirmatively confers benefits, *i.e.*, that DACA alters substantive rights:

> 218. DACA *confers* numerous *benefits* on DACA grantees. Notably, DACA grantees are *granted the right* not to be arrested or detained based solely on their immigration status during the time period their deferred action is in effect. [ ]
>
> . . . .
>
> 220. DACA grantees are eligible to receive certain *public benefits*. These include *Social Security, retirement, and disability benefits*, and, in certain states, benefits such as driver's licenses or unemployment insurance. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d). In the State of Washington, DACA holders also are eligible for certain state financial

> aid pro-grams and state-funded food assistance. *See* Wash. Rev. Code
> § 28B.92.010; Wash. Admin. Code §§ 388-400-0050, 388-424-0001, 388-
> 424-0030. In the State of New York, DACA holders are eligible for
> teaching and nursing licenses. *See* Comm. of Educ. Regs. §§ 59.4; 80-1.3;
> Ex. 78 (NYS Board of Regents Press Release, Feb. 24, 2016).

Complaint at 41, *New York*, No. 1:17-cv-5228, ECF No. 1 (emphases added). In other

words, these plaintiffs essentially admit that DACA needed to go through APA notice-

and-comment procedure because it was a substantive rule, one modifying rights:

> [¶] 289. In implementing the DHS Memorandum, federal agencies have
> changed the *substantive criteria* by which individuals DACA grantees
> *work, live, attend school, obtain credit, and travel* in the United States.
> Federal agencies did not follow the procedures required by the APA be-
> fore taking action impacting these *substantive rights*.

*Id.* at 54 (emphasis added). If DACA's rescission affected substantial rights, as these

plaintiffs allege, then DACA did so too, and was thus unlawful all along and cannot

now be enforced.

### 3.   DACA violates the Take Care Clause of the Constitution.

DACA does not merely lack statutory authorization; DACA violates the Take

Care Clause of the Constitution because DACA "dispens[es]" with certain

immigration statutes. *Kendall v. United States*, 37 U.S. 524, 613 (1838). DACA does

so by declaring lawful conduct that Congress established as unlawful.

The Take Care Clause has its roots in the dispute between Parliament and

King James II, who was overthrown in the Glorious Revolution of 1688. Parliament

was infuriated at King James's use of his purported power to suspend or dispense

with Parliament's laws. Zachary Price, *Enforcement Discretion and Executive Duty*,

67 Vand. L. Rev. 671, 676, 690-91 (2014). The subsequent monarchs, William and

Mary, agreed to the English Bill of Rights, which stripped the monarchy of all suspending and dispensing authority. *See* English Bill of Rights of 1689, art. 1. Just as King James attempted to make unlawful office-holding lawful, Price, *supra*, at 691, the Executive through DACA seeks to make unlawful presence lawful. Complaint ¶¶ 61-64.

Under the Constitution, the Executive cannot exercise such legislative power— it cannot dispense with statutes addressing unlawful presence by merely declaring a class of aliens to henceforth be present lawfully. Yet the Executive did just that through DACA. *See Texas*, 809 F.3d at 166 ("Deferred action, however, is much more than nonenforcement: It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens.").

Worse yet, the Executive then used this lawful-presence dispensation to grant citizenship or a pathway to citizenship to potentially tens of thousands of otherwise unlawfully-present aliens. The Executive did this by using a recipient's DACA status to treat them as eligible for "advance parole," which was granted abundantly (and in violation of strict statutory standards) to allow an unlawfully present alien to leave and then be "admitted" back into the country, manufacturing a lawful "admission" where there was none previously and allowing the alien to obtain a pathway to citizenship. *See* Exhs. 3 (App. 12), 17, 18. As Justice Scalia correctly noted, DACA is a program that involves "biennial requests for dispensation" from immigration statutes. *Arizona*, 567 U.S. at 435 (Scalia, J., concurring in part and dissenting in part). This represents a direct usurpation of congressional authority.

38

Even under the Obama Administration Office of Legal Counsel's (OLC's) four-part analysis, DACA violates the Take Care Clause. *First*, OLC stated that a class-based deferred-action program must reflect the agency's expert judgment about resource allocation, Exh. 19 at 6 (App. 1180), and must not confer legal status, *id.* at 20-21 (App. 1194-95). But DACA purports to convert an alien's unlawful presence into lawful presence—a fact never mentioned by the OLC Memo. And, of course, the OLC Memo also failed to mention that DACA would (and has) provided some recipients with a pathway to United States citizenship, which has in fact now been granted. Complaint ¶¶ 84-116. DACA is a programmatic decision to confer benefits, including legal status, on hundreds of thousands of aliens.

*Second*, OLC stated that a class-based deferred-action program must be "consonant with, rather than contrary to, the congressional policy underlying the [relevant] statutes." Exh. 19 at 6 (App. 1180). DACA and Expanded DACA are "incompatible with the express or implied will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). As explained above, DACA violates explicit and implicit congressional objectives.

*Third*, OLC stated that a class-based deferred-action program cannot be an "[a]bdication of the duties assigned to the agency by statute." Exh. 19 at 7 (App. 1181). But DACA is "complete abdication[s]" of immigration statutes enumerating in careful detail which aliens may be lawfully present and obtain work authorization. *Texas*, 86 F. Supp. 3d at 663. DACA is also "complete abdication" of immigration statutes

enumerating in careful detail which aliens may obtain United States citizenship or a pathway to citizenship. *Id.*

*Fourth*, OLC stated that a class-based deferred-action program must allow for "case-by-case" discretion. Exh. 19 at 7 (App. 1181). As explained above and as this Court previously found, *see supra* pp. 32-33, DACA does not truly represent case-by-case discretion.

\* \* \* \* \*

In sum, because DACA is unlawful substantively, procedurally, and constitutionally, Plaintiff States are likely to succeed in the merits of this litigation.

## II.   PLAINTIFFS WILL INCUR IRREPARABLE INJURIES.

Plaintiff States have demonstrated "a substantial threat of irreparable injury if the injunction is not issued." *Texas*, 809 F.3d at 186. This is not a case of a one-time harm worked by past events, nor can the States collect damages from the federal government for ongoing losses caused by DACA. The option of merely being compensated in the future is not on the table. This is the quintessential case for a preliminary injunction to prevent future harm from a policy that has been demonstrated to be unlawful. Although past harms can perhaps never be fully reversed, that is no reason to countenance the continued future infliction of such harms.

Specifically, as in the prior DAPA litigation, "The states have alleged a concrete threatened injury in the form of millions of dollars of losses." *Id.* at 186 (explaining Plaintiff States' irreparable injury). In the absence of a preliminary

40

injunction, Plaintiff States will suffer ongoing harms such as (a) the healthcare, law enforcement, and education costs imposed by aliens who would not remain in the country but for renewal of their unlawful lawful-presence status and work authorization; and (b) injury to citizens of the States in attempting to secure employment. *See supra* pp. 10-15. It will be difficult or impossible to recover those costs from the federal government. *See, e.g.*, *Philip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304-05 (2010) (Scalia, J., in chambers); *Nalco Co. v. EPA*, 786 F. Supp. 2d 177, 188 (D.D.C. 2011); *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008).

Injuries like these—such as paying millions of dollars every year to provide uncompensated healthcare or for state benefits—are paradigmatic irreparable injury. *See, e.g.*, *Janvey v. Alguire*, 647 F.3d 585, 600-01 (5th Cir. 2011). Plaintiffs' financial injuries are more than sufficient to support a preliminary injunction—as they did with the preliminary injunction of Expanded DACA and DAPA. *See Texas*, 809 F.3d at 186. And these irreparable injuries are being caused on an ongoing basis and will compound continuously absent a preliminary injunction.

This is the second time that the Plaintiff States have been forced to take legal action to prevent those ongoing irreparable injuries—injuries the Fifth Circuit has already recognized as present in DACA's analogous lawful-presence programs (DAPA and Expanded DACA). Plaintiff States withdrew their previous suit only because the Executive agreed to Plaintiffs' request to voluntarily wind down DACA. Now that the Executive's decision to voluntarily wind down the program has been enjoined indefinitely, Plaintiff States must again rely on these irreparable injuries to support

41

a preliminary injunction. And even if DACA is considered the "status quo" at present, there is no "particular magic in [that] phrase." *Canal Auth. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (per curiam). Because "the currently existing status quo itself is causing . . . irreparable injury, it is necessary to alter the situation so as to prevent [that] injury." *Id.*

## III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION.

The equitable factors favor a preliminary injunction not only because of the ongoing irreparable injury to the Plaintiff States but because the absence of any irreparable injury to Defendants. Plus, enjoining future renewal or granting of DACA terms starting now will avoid creating new allegations of supposed reliance that will have to be addressed down the road.

Defendants cannot claim any irreparable injury from enjoining DACA, since Defendants already agreed to do just that and were in the process of doing so. To the extent that the Executive claims injury because it is forced to work with Congress to seek legislative enactment of its preferred immigration policies, that is surely not a cognizable injury under the injunction analysis.

For similar reasons, Defendants cannot argue that the Plaintiff States were not diligent in pursuing these claims. The Plaintiff States demonstrated in the DAPA suit that the legal theories underpinning both DAPA, as well as DACA, were unsupportable. And the passage of time between the DAPA litigation's filing and this suit cannot be attributed to unjust delay by Plaintiff States. During much of the last three years, merits proceedings in district court were on hold due to actions by *the*

42

*Defendants*. Proceedings were initially stayed while Defendants appealed this Court's preliminary injunction. *See Texas*, No. 1:14-cv-254 (S.D. Tex. Mar. 2, 2015) (Order), ECF No. 164. The stay remained in place as the Fifth Circuit upheld the injunction (*see Texas*, 809 F.3d at 146-78), the divided Supreme Court affirmed this decision (136 S. Ct. 2271), and the Supreme Court denied Defendants' rehearing petition (137 S. Ct. 285). *See Texas*, No. 1:14-cv-254 (S.D. Tex.) (Orders), ECF Nos. 200, 320, 422. After the November 2016 election, the Defendants—jointly with the other parties— asked the Court to extend the stay due to the impending change in presidential administration. *See* Joint Motion to Stay Merits Proceedings at 1, *Texas*, No. 1:14-cv-254 (S.D. Tex. Nov. 18, 2016), ECF No. 430 ("[A] brief stay of any further litigation in this Court . . . would serve judicial efficiency and economy so that the parties have a better understanding of how they might choose to move forward."). The Court granted a stay until March 17, 2017. *See Texas*, No. 1:14-cv-254 (S.D. Tex. Jan. 19, 2017) (Order), ECF No. 435. The Defendants later requested, and obtained, a continuance of the stay until June 15, 2017 "to allow for the new administration to consider next steps in this litigation." Unopposed Motion to Stay Merits Proceedings, *Texas*, No. 1:14-cv-254 (S.D. Tex. Mar. 17, 2017), ECF No. 438; *see Texas*, No. 1:14-cv-254 (S.D. Tex. Mar. 22, 2017) (Order), ECF No. 439. None of these extensions establishes unjust delay by Plaintiff States.

The record instead reflects that Plaintiff States have acted promptly when it was their turn to do so. The Plaintiff States sought a further stay of proceedings only once the Defendants rescinded DAPA and Expanded DACA (in part) in June 2017.

43

*See* Motion to Stay Merits Proceedings, *Texas*, No. 1:14-cv-254 (S.D. Tex. July 7, 2017), ECF No. 447. In that request, Plaintiff States noted that the additional time would afford the parties additional time to "attempt to resolve this matter without further litigation." *Id.* at 1. And although the parties in this case subsequently resolved the DAPA litigation through a stipulation of voluntary dismissal, subsequent actions by the California, New York, and District of Columbia litigants in securing an injunction of the 2017 wind-down memorandum have gutted the basis for that stipulation. In short, the prior litigation triggered a series of brief stays leading to the 2016 presidential election, followed by a DACA wind down period, but it is now clear that the wind down cannot happen as promised.

Defendants also cannot identify any reliance interests by DACA recipients compelling enough to change the balance. First, as the Maryland district court recognized in rejecting an estoppel claim, nothing in DACA suggested that it would last forever:

> Nothing in the DACA Memo or in DACA's implementation suggested to Dreamers that the program was permanent, and individuals in the program were aware that their protections were subject to renewal every two years.

*Casa de Md.*, 2018 WL 1156769, at *14. The Executive has expressly warned since DACA begun that: "DHS can terminate or renew deferred action at any time, at the agency's discretion." Exh. 20 at 10 (App. 1218); *see also* Exh. 1 (App. 2).

Moreover, as that court recognized in denying a substantive due process claim, there is no denial of fundamental fairness in rescinding DACA because the program

has always been legally suspect, and the enforcement of immigration laws passed by Congress is not itself inequitable:

> Absent congressional action, the benefits given to Dreamers by DACA were in potential violation of congressional immigration laws; the only thing that has changed is that deferred status will expire, and enforcement of immigration laws may recommence in the absence of action by Congress, which the President has requested.

*Casa de Md.*, 2018 WL 1156769, at *14. In fact, every single alien who currently holds a DACA permit, which last two years, received that permit *after* the Fifth Circuit in November 2015 held that the lawful presence and work authorization conferred by the materially identical Expanded DACA and DAPA programs are unlawful. *See Texas*, 809 F.3d at 174 n.139 ("DACA is an apt comparator to DAPA."). In other words, any reliance interest claimed by DACA recipients is greatly diminished by the legal cloud looming over the program when all existing DACA permits were issued.

In fact, Texas has consistently, clearly, and publicly explained for years, beginning as early as April 2015, how DACA is unlawful. *See* Oral Arg. at 1:16:01-10, *Texas*, 787 F.3d 733 (No. 15-40238), http://www.ca5.uscourts.gov/OralArgRecordings/15/15-40238_4-17-2015.mp3 (stating that DACA was issued in violation of APA notice-and-comment requirements). As this Court noted in addressing Defendants' belated disclosure that 108,000 aliens received three-year Expanded DACA permits before this Court issued its February 2015 preliminary injunction, "[f]rom day one, the Plaintiffs sought to enjoin the entire 2014 DHS Directive. . . . This by definition included the three-year DACA deferrals." *Texas v. United States*, No. 1:14-cv-254, 2016 WL 3211803 (S.D. Tex. May 19, 2016). Those Expanded DACA permits, and the

program under which they issued, are just as much at issue now as at the beginning of and throughout this case.

In any event, although the Court has the authority to enjoin the DACA program in its entirety, which would require immediately cancelling existing permits and lawful-presence status, Plaintiff States are amenable to an injunction against only renewing or issuing new DACA permits in the future—which would essentially wind down the program over two years. That would surely address adequately any claimed reliance interests. And it would make crystal clear that any new allegations of reliance on DACA terms are wholly unsupported.

Nor can Defendants argue that Plaintiffs' claims are barred by limitations. Challenges under the APA are "governed by the general statute of limitations provision of 28 U.S.C. § 2401(a), which provides that every civil action against the United States is barred unless brought within six years of accrual." *Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1286 (5th Cir. 1997). The Plaintiff States have indisputably filed suit within six years of DACA's creation on June 15, 2012. *See supra* p. 1 and accompanying text.

It is immaterial for limitations purposes that DACA purports to confer benefits by reference to previously enacted regulations governing access to benefits like work authorization, because any "application of a rule to a party" triggers a new six-year limitations period so long as it is "final." *Id.* at 1287-88. Defendants cannot dispute that DACA (like DAPA and Expanded DACA) is a final agency action. *Texas*, 809 F.3d at 163 n.82 ("The government does not dispute that DAPA is a 'final agency action.'"

(quoting *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 882 (1990)). For the same reasons, DACA itself triggered a new limitations period because it "gives rise to 'direct and appreciable legal consequences.'" *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1814 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). Even a purported guidance document stating the "settled agency position" that the entire agency intends to follow in its enforcement of its regulations, and that gives "marching orders" to a regulated entity, is "final" agency action against the regulated entity—and this is true even if, as with the DACA Memorandum, the document contains boilerplate denying its legal effect. *See Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1020-23 (D.C. Cir. 2000).

Neither is an injunction contrary to the public interest. *See Texas*, 809 F.3d at 187 ("The public interest easily favors an injunction."). Courts act within the "broad public interest[]" when they "maintain" rather than "derogate[e]" the "proper balance" of "the separation of powers." *Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982). The public interest also is to be measured by the laws enacted by the People's representatives. As the Supreme Court has held, that "is in itself a declaration of [the] public interest." *Virginian Ry. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937). And if accepted, the idea that the Constitution allows unilateral lawmaking like DACA would permanently and profoundly reshape the separation of powers in this country—entirely contrary to the public interest. To the extent that DACA recipients claim a public interest in renewing their DACA terms, that is a policy determination for Congress, not the Court.

## IV.   THE INJUNCTION SHOULD APPLY WHEREVER DEFENDANTS MAY ACT.

As the Fifth Circuit has already held, this Court has the authority to enter a nationwide injunction preventing the Executive from unlawfully conferring lawful presence and work authorization. *See Texas*, 809 F.3d at 187-88. The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D). And a nationwide injunction is proper where a case presents a *facial* challenge, *e.g.*, that DACA was invalid—in its entirety—the moment it was issued. Because "[t]he scope of the injunctive relief is dictated by the extent of the violation established," a nationwide injunction of DACA is proper. *Lewis v. Casey*, 518 U.S. 343, 360 & n.7 (1996).

Moreover, it would be impracticable and unadministrable to try to "confine" the preliminary injunction to Texas or the Plaintiff States. The challenged program confers lawful presence and work permits that are valid *nationwide* and do not limit themselves to only particular States, reflecting the fact that it is Congress's role to set a "uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. A nationwide injunction is needed to fully prevent the irreparable injury to Plaintiff States given the ability of aliens to travel between States, the enormous number of affected aliens, and the size of Plaintiff States' economies. Those points make it a virtual certainty— easily more than a "substantial risk," *Susan B. Anthony List*, 134 S.Ct. at 2341—that irreparable injury will occur if the preliminary injunction is not nationwide.

The existence of an injunction issued by the Northern District of California regarding the Executive's September 2017 DACA wind-down memorandum has no

effect on this Court's injunctive powers in this lawsuit. Nor does the existence of the District of Columbia's order vacating that 2017 executive action. There is no pending claim against the 2012 DACA program in the Northern District of California lawsuit, the Eastern District of New York, or the District of Columbia lawsuit. Nor are any of the Plaintiff States parties to those lawsuits. Plaintiffs cannot be prevented from bringing a challenge to the 2012 DACA program simply because other plaintiffs have challenged a subsequent, 2017 executive memorandum ordering a different executive action.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction should be granted.

Respectfully submitted.

STEVE MARSHALL
Attorney General of Alabama

LESLIE RUTLEDGE
Attorney General of Arkansas

JEFF LANDRY
Attorney General of Louisiana

DOUGLAS J. PETERSON
Attorney General of Nebraska

ALAN WILSON
Attorney General of South Carolina

PATRICK MORRISEY
Attorney General of West Virginia

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General
Tx. State Bar No. 24046904
Southern District of Texas No. 2972033
Tel.: (512) 463-2100; Fax: (512) 936-0545
brantley.starr@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Attorney-in-Charge
Special Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

ADAM ARTHUR BIGGS
Special Counsel for Civil Litigation
Tx. State Bar No. 24077727
Southern District of Texas No. 2964087
Tel.: (512) 463-2100; Fax: (512) 936-0545
adam.biggs@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

Dated this 2nd day of May, 2018.

### CERTIFICATE OF CONFERENCE

I certify that on May 1 and 2, 2018, I conferred with Brett Shumate and Stephen Pezzi, attorneys with the U.S. Department of Justice representing Defendants in this case. Defendants' position is as follows: "Defendants intend to respond to Plaintiffs' motion for a preliminary injunction within the time provided for by the Local Rules."

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Special Counsel for Civil Litigation

**COUNSEL FOR PLAINTIFF STATES**


### CERTIFICATE OF SERVICE

I certify that on May 2, 2018, this *Plaintiffs' Motion for Preliminary Injunction* was electronically filed with the Clerk of the Court using the CM/ECF system and served on Stephen Pezzi, attorney with the U.S. Department of Justice representing Defendants, via electronic mail.

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Special Counsel for Civil Litigation

**COUNSEL FOR PLAINTIFF STATES**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS; <br><br> STATE OF ALABAMA; <br><br> STATE OF ARKANSAS; <br><br> STATE OF LOUISIANA; <br><br> STATE OF NEBRASKA; <br><br> STATE OF SOUTH CAROLINA; AND <br><br> STATE OF WEST VIRGINIA; <br><div align="right">*Plaintiffs,*</div> <br> *v.* <br><br> UNITED STATES OF AMERICA; <br><br> KIRSTJEN M. NIELSEN, Secretary of the U.S. Department of Homeland Security; <br><br> KEVIN K. MCALEENAN, Commissioner of U.S. Customs and Border Protection; <br><br> THOMAS D. HOMAN, Deputy Director and Acting Director of U.S. Immigration and Customs Enforcement; and <br><br> L. FRANCIS CISSNA, Director of U.S. Citizenship and Immigration Services, <br><br> CARLA L. PROVOST, Acting Chief of U.S. Border Patrol; <br><div align="right">*Defendants.*</div> | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )   Case No. 1:18-cv-00068 |

## ORDER GRANTING PLAINTIFFS'
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

On this date, the Court considered Plaintiffs' Motion for Preliminary Injunction.  After considering the Plaintiffs' Motion, Defendants' Response, and all other materials properly before the Court, the Court believes the Motion is meritorious and should be granted.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Preliminary Injunction is hereby GRANTED.

SIGNED on this the _____ day of _____, 2018.


_____
Hon. Andrew S. Hanen
U.S. District Court Judge