**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, et al., | ) |
| *Plaintiffs,* | ) |
| | ) |
| *vs.* | ) Case No.1:18-cv-00068 |
| | ) |
| UNITED STATES OF AMERICA, et al., | ) |
| *Defendants.* | ) |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION AND MEMORANDUM IN SUPPORT**

# Volume 4

# Exhibits 17 - 20

# Exhibit 17

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director (MS 2000)*
Washington, DC 20529-2000



**U.S. Citizenship
and Immigration
Services**

OCT 0 9 2014

The Honorable Charles Grassley
Ranking Member
Committee on the Judiciary
United States Senate
Washington, DC  20510

Dear Senator Grassley:

Thank you for your August 29, 2014 letter to Secretary Johnson requesting information about the
Deferred Action for Childhood Arrivals program implemented by U.S. Citizenship and
Immigration Services.  I was asked to respond to you directly.

I appreciate the opportunity to respond to your request for data and your questions regarding the
program.  In Enclosure 1, to the extent possible in light of limitations on data availability as
described therein, you will find detailed responses to your questions.

Thank you again for your letter and your interest in this important matter.  A separate, identical
response will be sent to Chairman Goodlatte, who cosigned your letter.  Should you wish to
discuss this further, please do not hesitate to contact me.

Respectfully,

León Rodríguez
Director

Enclosures

**Department of Homeland Security Responses to Chairman Goodlatte and Senator Grassley Regarding the Deferred Action for Childhood Arrivals (DACA) Program**

1) **Data**
   a. **How many DACA applications have been approved to date?**

   From August 15, 2012, through July 31, 2014, USCIS approved 591,555 requests for DACA (Form I-821D, *Consideration of Deferred Action for Childhood Arrivals*), including 591,362 initial requests and 193 requests for renewal.

   b. **How many DACA applications have been denied to date?**

   From August 15, 2012, through July 31, 2014, USCIS denied 26,130 requests for DACA, including 26,128 initial requests and 2 requests for renewal.

   c. **How many DACA applications have been rejected to date? Please explain the various reasons why applications are rejected.**

   Beginning August 15, 2012, requests for deferred action under the DACA program have been filed with the USCIS Lockbox facility. From August 15, 2012, through August 31, 2014, USCIS rejected 42,906 requests for DACA (Form I-821D). The top 4 rejection reasons are as follows:
   - Using an expired version of the Form I-821D
   - Failure to provide a valid signature
   - Failure to file the Form I-765, *Application for Employment Authorization*, failure to provide the correct fee associated with that form, or filing an incomplete Form I-765 with the Form I-821D
   - Filing while under the age of 15

   d. **How many times, to date, has DACA status been terminated? Please list the specific reasons for each termination.**

   DACA does not confer any lawful immigration status. Deferred action, for any reason, is an exercise of prosecutorial discretion to defer removal action against an individual for a certain period of time. USCIS guidance provides that DACA can be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion. Some examples of reasons to terminate include, but are not limited to: approval in error, fraud, conviction of a disqualifying offense, and posing a threat to national security or public safety.

   Generally, USCIS will issue a Notice of Intent to Terminate DACA before issuing a Termination Notice. However, DACA terminates automatically as of

the date that U.S. Immigration and Customs Enforcement (ICE) or U.S. Customs and Border Protection (CBP) issue a Notice to Appear (NTA) for removal proceedings. USCIS notifies DACA recipients of the automatic termination by issuing a Notice of Action informing the individual that his or her DACA is terminated as of the date the NTA was issued. DACA also terminates automatically as of the date of departure if an individual travels outside of the United States (on or after August 15, 2012) without advance parole.

As of August 31, 2014, USCIS has terminated 113[1] DACA cases based on the following reasons:

- Issuance of an NTA by U.S. Immigration and Customs Enforcement (ICE) or U.S. Customs and Border Protection (CBP) – 68 cases
- DUI conviction – 11 cases
- USCIS error (e.g., upon further review, USCIS determined the requestor did not satisfy all DACA guidelines at the time of filing) – 11 cases
- Felony conviction – 5 cases
- Acquired lawful status – 5 cases
- ICE enforcement priority (not including issuance of an NTA or deportation after DACA approval) – 4 cases
- Drug-related conviction – 3 cases
- Significant misdemeanor conviction (other than DUI) – 2 cases
- Deportation after DACA approval – 1 case
- International travel without advance parole – 1 case
- Aggravated assault conviction – 1 case
- Gang membership/public safety – 1 case

**e. Of the total number of DACA terminations, how many were terminated on the grounds that the applicant was a member of a criminal alien gang (such as MS-13) or participated in the activities of a criminal alien gang?**

As of August 31, 2014, one case has been terminated on the grounds that the DACA recipient was a member of a criminal street gang. A favorable exercise of discretion would not be extended to a member of a criminal street gang.

---

[1] Based upon its records, USCIS initially determined that 147 DACA cases had been terminated. (The number 147 was also shared in Director Rodriguez's July 29, 2014 testimony before the House Judiciary Committee). USCIS has subsequently determined the number of 147 was inaccurate because USCIS had recorded 34 of these cases as "terminations" in error within USCIS systems, leaving a total of 113 terminations. Of the 34 cases, 10 cases were approved, 11 acquired lawful immigration status through other means, and 13 were denied.

**f. Of the total number of DACA terminations, how many were terminated on criminal activity grounds?  Please break these out as to felonies, significant misdemeanors and other misdemeanors.**

USCIS has terminated DACA cases according to the following criminal grounds:

- 11 cases were terminated due to DUI convictions (significant misdemeanor)
- 2 were terminated due to other significant misdemeanor convictions
- 3 cases were terminated due to disqualifying drug-related convictions (felony)
- 1 case was terminated due to an aggravated assault conviction (felony)
- 5 cases were terminated due to other felony convictions

**g. Of the total number of DACA terminations, how many of those individuals remain in the United States?  What is their status?  How many have been removed?**

Pursuant to an ICE ERO review completed on September 17, 2014 of a USCIS-provided list of 113 alien file numbers reflecting DACA terminations:

- 21 of these aliens were removed in FY13 and FY14YTD.
- 92 aliens remain in the United States.
    - 56 are currently non-detained pending a final order of removal.
    - 7 are currently non-detained with a final order of removal.
    - 3 are currently detained and are all pending a final order of removal.
    - 21 were identified by USCIS as a DACA termination but to date, ICE systems do not reflect any subsequent action taken.
    - 5 acquired lawful status

**h. How many DACA recipients have applied for advance parole?**

As of July 31, 2014, DHS has received 6,458 advance parole applications (Form I-131, *Application for Travel Document*) submitted by DACA recipients.

**i. How many DACA recipients have received advance parole?**

As of July 31, 2014, DHS has approved 4,000 advance parole applications submitted by DACA recipients.

**j. How many DACA recipients have been denied advance parole?**

3

As of July 31, 2014, DHS has denied 566 advance parole applications submitted by DACA recipients.

**k. For each advance parole approval, what purposes has advance parole been approved for DACA recipients and how many grants were based on each purpose?**

DHS does not track this information. However, advance parole may be granted to DACA recipients if they demonstrate that travel abroad will be for the following:
- Educational purposes;
- Employment purposes; or
- Humanitarian purposes.

**l. How many DACA recipients who have received advance parole subsequently applied for lawful permanent resident (LPR) status? Of the number who have applied for LPR, how many have received such status?**

DHS does not track this information for DACA recipients.

**m. How many DACA recipients have no legal status because of a visa overstay?**

DHS does not track this information.

**n. How many individuals who have had their status terminated in SEVIS have been granted DACA? For each, what was the reason for their terminated student visa status? What process do adjudicators follow when an applicant's status is terminated?**

DHS does not track this information.

**o. Please provide a chart that breaks down the number of DACA recipients according to country of origin.**

The total number of individuals approved for DACA as of July 31, 2014, is 591,362.[2] Enclosure 2 provides a breakdown by country of birth.

---

[2] Please note that this number is lower than the 591,555 *total* approved DACA requests stated in response to Question 1)a. above because that response also incorporated renewal requests from 193 individuals previously granted DACA. In order to avoid duplicate counting of individual DACA recipients for this question, we subtracted the renewals.

4

**p. How many DACA recipients are currently enrolled in public school? Private school? Elementary school? Junior high or middle school? High school? An alternative program? Home schooled?**

USCIS does not track this information.

**q. How many DACA recipients have been denied employment authorization?**

As of July 31, 2014, USCIS has denied 635 applications for employment authorization (Form I-765), submitted based on DACA eligibility category (c)(33).

**2) What immigration benefit categories are currently being adjudicated by USCIS adjudicators who will be responsible for adjudicating DACA renewals?**

USCIS uses and shifts its resources as needed to maintain processing times and avoid backlogs to the extent possible. As USCIS has been hiring and training additional adjudicators to meet workload demands, some will be initially assigned to adjudicate DACA requests. Other immigration services officers have been added from the team located at the Nebraska Service Center that adjudicates Form I-90, *Application to Replace Permanent Resident Card*, and from the team at the Texas Service Center that adjudicates Form I-129F, *Petition for Alien Fiancé(e)*, and Form I-130, *Petition for Alien Relative*.

**3) Please provide the definition of "alternative program" as stated in FAQ 33, and the rationale for expanding the education requirement to include this type of program.**

An alternative school or program addresses the needs of students that typically cannot be met in a regular school program either as (i) a stand-alone elementary or secondary school or (ii) a program adjunct to or within a school. The school or program provides nontraditional education and falls outside of the categories of regular education, special education, or vocational education.

**4) On what date did DHS initially contact the Department of Education about the need for a definition for "alternative program"?**

DHS and the Department of Education have been partnering together since 2012 on the development of the DHS education guidelines related to the DACA program, including the understanding of the use of the term "alternative program."

**5) Please provide any communications between DHS and the Department of Education regarding the concept of and definition of "alternative program."**

5

As noted above, DHS and the Department of Education have had multiple discussions regarding the use of the term "alternative program" in order to reach an agreed-upon definition.

**6) Will English as a Second Language, and other programs for which DACA eligibility exists, include programs that last only one or two weeks or a matter of days?**

There is no minimum length requirement.  To be considered "currently in school" under the DACA guidelines, at the time of filing the DACA request an individual must be in:
- a public, private, or charter elementary school, junior high school or middle school, high school, secondary school, alternative program, or homeschool program meeting state requirements;
- an education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment, and the individual is working toward such placement; or
- an education program assisting students either in:
  - obtaining a regular high school diploma or its recognized equivalent under state law (including a certificate of completion, certificate of attendance, or alternate award), or
  - passing a GED exam or other state-authorized exam (e.g., HiSet or TASC) in the United States.

**7) What standard will adjudicators be given to assess the alternative, literacy or language programs?  Will such programs be required to be certified, which is the case for inclusion in the Student Exchange and Visitor Program?**

Adjudicators will evaluate if a requestor is enrolled in a qualifying alternative program by determining whether or not the program addresses student needs that typically cannot be met in a regular school program either as (i) a stand-alone elementary or secondary school or (ii) a program adjunct to or within a school.  Such a school or program provides nontraditional education and falls outside of the categories of regular education, special education, or vocational education.

USCIS adjudicators are instructed that literacy or ESL programs may be acceptable to meet the "currently in school" guideline for DACA, if they are funded in whole or in part by Federal, state, county or municipal grants or are administered by a nonprofit, federally tax exempt organization.  If the literacy or ESL program is not publically funded and not administered by a nonprofit, federally tax exempt organization, then

6

the requestor must show that the program is of demonstrated effectiveness. These programs are not required to be certified.

**8) How many DACA applicants with felony criminal convictions, as defined in FAQ 58, have been granted DACA because the "totality of circumstances" waiver ability set out in FAQ 59 has been utilized?**

As of September 11, 2014, DHS has not granted any DACA request from an individual found to have been convicted of a disqualifying offense. No exceptional circumstances have been found to overcome criminal, national security, or public safety grounds for denial.

**9) Will Congress be briefed about the revised standards for filing of advance parole by DACA applicants prior to the revisions being implemented?**

DHS has previously provided information to congressional staff through GovDelivery as well as teleconferences regarding parameters of the DACA renewal program. We will be glad to provide further information regarding any changes to the standards for advance parole filing prior to implementation of such revisions.

**10) Will there be any exceptions to the limitations set out in FAQ 54 for a DACA applicant or recipient to receive advance parole?**

DHS will continue to evaluate the progress of the DACA program and make any necessary changes to the parameters as appropriate.

**11) Please provide a complete list of situations in which a person was granted advance parole for humanitarian purposes.**

DHS does not track this information. However, examples of acceptable humanitarian purposes include travel to obtain medical treatment, attend funeral services for a family member, or visit an ailing relative.

**12) Does USCIS investigate whether a DACA applicant's diploma was awarded by a diploma mill or was otherwise illegitimately earned? If so, explain how.**

USCIS officers are trained to identify educational documents of questionable authenticity, as well as to identify documents issued by suspect institutions. In those circumstances where a USCIS officer recognizes or suspects that a DACA requestor's educational credentials are awarded by a suspect institution or otherwise question their validity, the USCIS officer will take appropriate action. Specifically, where an entity that does not appear to provide the acceptable educational programs described in USCIS's DACA guidelines or it appears the requestor's credentials were otherwise

App. 1159

illegitimately obtained, the immigration services officer will forward the case to a fraud officer to further investigate the validity of the documents or the institution.

**13) How many cases of diploma mills and/or illegitimate school enrollments by DACA applicants, if any, has USCIS discovered? How many were discovered post-adjudication?**

DHS does not track the number of DACA requests that have been submitted with educational credentials from questionable institutions. USCIS evaluates each DACA request on a case-by-case basis to determine whether or not the requestor's educational credentials meet the guidelines.

**14) Is DACA terminated if the recipient is found to have been enrolled at an illegitimate school or provided evidence from a diploma mill?**

If USCIS discovers it approved a DACA request in error because the requestor did not meet the guidelines—including the educational guidelines for initial requests—the agency may issue a Notice of Intent to Terminate DACA. If the requestor's response does not overcome the grounds of concern, the DACA would subsequently be terminated.

**15) In FAQ 21, and during a June 5, 2014, conference call with congressional staff, USCIS has emphasized the fact that the validity of documentary evidence submitted in support of a DACA application is not routinely verified by government officials. Did you approve including FAQ 21, which clearly announces to applicants that documents, facts, and statements are not routinely verified with educational institutions, other government entities, or employers, in the USCIS materials? Why was this included in the FAQs?**

FAQ 21 does not signify that USCIS will not routinely verify documents, facts, or statements with educational institutions. USCIS immigration officers are trained to evaluate evidence submitted to satisfy the DACA guidelines on a case-by-case basis and to identify indicators of fraud. USCIS has the authority to contact educational institutions, government agencies, employers, or other entities in order to verify information where there is an indication of fraud. DACA requestors are cautioned that knowingly misrepresenting or failing to disclose facts in an attempt to receive DACA subjects them to criminal prosecution and possible removal from the United States.

**16) What actions are taken if DHS finds out that a criminal alien gang member has received DACA? Is the individual issued a Notice of Intent to Terminate and then allowed time to rebut the criminal gang affiliation?**

If an egregious public safety concern, such as certain criminal gang activity, arises after a grant of DACA, USCIS will refer the case to ICE and follow the procedures outlined in the November 7, 2011, Notice to Appear memorandum for egregious public safety cases.

If ICE accepts the case, its issuance of the Notice to Appear will result in automatic termination of DACA and the associated employment authorization. If ICE does not accept the case, USCIS will reopen the case on a service motion and either issue a Notice of Intent to Terminate or a Termination Notice, depending on the specific facts of the case.

If a Notice of Intent to Terminate is issued, and the adverse grounds are not overcome, USCIS will subsequently issue a Termination Notice. This will indicate that the DACA and the associated employment authorization are terminated as of the date of the Termination Notice. USCIS will then refer the case to ICE post-adjudication.

**17) Has USCIS ever allowed an applicant or recipient of DACA to renounce their gang member affiliation in order to receive deferred action?**

No. If USCIS discovers evidence that a requestor is or has been affiliated with a gang, USCIS will evaluate the case based on the totality of evidence available to determine whether the individual poses a threat to public safety. USCIS may conduct a field interview with a suspected gang member or former gang member in an attempt to gather additional information. However, if the information available to USCIS (through background checks, ICE Homeland Security Investigations, and local police) indicates that a DACA requestor is or has been affiliated with a gang, the requestor would have to provide compelling evidence to the contrary. The requestor would also have to show that he or she does not pose a threat to public safety. Simply renouncing gang affiliation would not be sufficient to overcome public safety concerns.

**18) Please explain the interagency cooperation between USCIS and Immigration and Customs Enforcement (ICE) when a DACA recipient has DACA terminated or has committed actions making the individuals eligible for termination.**

ICE generally issues a Notice to Appear if it identifies that a DACA recipient has been convicted of a disqualifying crime or is otherwise an enforcement priority. The NTA automatically terminates the DACA and the accompanying employment authorization. ICE will notify USCIS of the NTA so that USCIS may update its records. USCIS will also inform the DACA recipient of the automatic termination as of the date that ICE issued the notice.

9

If USCIS identifies that a DACA recipient has committed a criminal action that potentially warrants termination of DACA and a NTA has not been issued, USCIS will send the recipient a Notice of Intent to Terminate. After the 33-day period for a response expires, USCIS will review the evidence submitted in response to the Notice of Intent to Terminate , including any response, and determine whether or not to terminate DACA. If DACA and the accompanying employment authorization are terminated, USCIS will notify ICE of the termination.

19) **Please explain the interagency cooperation between USCIS and the Federal Bureau of Investigation when a DACA recipient is the subject of an FBI investigation.**

If USCIS discovers that a DACA requestor is the subject of an FBI investigation, USCIS will contact the FBI record owner to discuss the impact that processing the DACA request may have on the investigation.

The FBI may request that USCIS hold the case in abeyance while the investigation is completed or indicate that the continued processing of the DACA request would not impede their ongoing investigation. USCIS will take into account all relevant information prior to determining whether an exercise of prosecutorial discretion is warranted.

20) **Does USCIS share information in a DACA application with law enforcement agencies or officials, upon request, even if the application is pending?**

USCIS will share information in a pending DACA request with national security and law enforcement agencies, including ICE and CBP, for authorized law enforcement purposes other than removal, including:
- assistance in the consideration of DACA;
- identifying or preventing fraudulent claims;
- national security purposes; or
- investigating or prosecuting a criminal offense.

USCIS will provide such information in accordance with relevant privacy, confidentiality and other disclosure-related laws, regulations, and policies.

21) **In order to *initially* obtain DACA, an alien must show that he or she is enrolled in "a public, or charter elementary school, a junior high or middle school, high school or secondary school; alternative program, or homeschool program meeting state requirements." Will all DACA *renewal* applicants be required to submit evidence showing that they remain enrolled in, or have actually completed, the educational program in which they stated they were enrolled for**

10

the purposes of obtaining the initial DACA grant?  If not, why not?  If so, how will USCIS verify the enrollment of completion?

Individuals who initially received DACA will be considered for renewal unless they engaged in certain criminal activity, departed the country without the government's permission, or stopped residing in the United States.  DHS recognizes that a variety of circumstances may have led individuals enrolled in school at the time of their initial request to stop attending.  DHS has determined that such a circumstance does not, by itself, necessarily merit denying a request to renew DACA.

22) **An alien can have a criminal record and still receive DACA.  Please provide a list of all crimes of which DACA recipients have been convicted and how many DACA recipients have been convicted of each of those crimes.**

DHS does not track this information.

23) **What is USCIS's policy regarding DACA termination for an individual who has, subsequent to the DACA grant, been convicted of a felony?**

If a recipient is convicted of a felony after the DACA grant, the DACA will be terminated in one of two ways:

1.  If the disqualifying criminal offense is deemed to be an egregious public safety concern, USCIS will refer the case to ICE and follow the procedures outlined in the November 7, 2011, Policy Memorandum 602-0050 Revised Guidance for the Referral of Cases and Issuance of Notices to Appear  memorandum for egregious public safety cases.

    If ICE accepts the case, its issuance of the NTA will result in an automatic termination of DACA and employment authorization.  If ICE does not accept the case, USCIS will reopen the case on a service motion and either issue a Notice of Intent to Terminate or a Termination Notice, depending on the specific facts of the case.

    If a Notice of Intent to Terminate is issued, the individual has 33 days to respond.  If the adverse grounds are not overcome, USCIS will subsequently issue a Termination Notice, indicating that the DACA and the associated employment authorization are terminated as of the date of the notice.  USCIS will then refer the case to ICE post-adjudication.

2.  If the disqualifying criminal offense is deemed to be a non-egregious public safety concern, USCIS will reopen the case on a service motion and either issue a Notice

11

of Intent to Terminate or a Termination Notice, depending on the specific facts of the case.

If a Notice of Intent to Terminate is issued, and the adverse grounds are not overcome, USCIS will subsequently issue a Termination Notice. This will indicate that the DACA and the associated employment authorization are terminated as of the date of the notice. USCIS will then refer the case to ICE post-adjudication.

**24)The current DACA fee is $465.00, but that consists of the normal $380 fee to cover the I-765 Application for Employment Authorization processing and the standard $85.00 biometric fee. What funds are used to cover the processing of the form I-821D Consideration of Deferred Action for Childhood Arrivals?**

Most of USCIS's budgetary resources are derived from fee collections. In managing the agency's operations, USCIS works to ensure revenue collected is sufficient to fund the agency's operations. With respect to DACA, total revenue has been sufficient to fund agency costs.

**25)Please provide a list of each document that has been deemed acceptable for purposes of showing continuous presence, lack of criminal history, illegal presence prior to June 15, 2012, illegal entrance prior to age 16, physical presence in the U.S. as of June 15, 2012, and attainment of the education requirements for DACA.**

Under the Secretary of Homeland Security's June 15, 2012 memorandum, in order to be considered for DACA, individuals must submit evidence, including supporting documents, showing that they:

- were under the age of 31 as of June 15, 2012;
- came to the United States before reaching their 16th birthday;
- have continuously resided in the United States since June 15, 2007, up to the present time;
- were physically present in the United States on June 15, 2012, and at the time of making their requests for consideration of deferred action with USCIS;
- had no lawful status on June 15, 2012;
- are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

12

- have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

DHS does not track all of the evidence that has been deemed sufficient to meet these guidelines. Examples of documents that individuals may submit (alone or in conjunction with other evidence) to demonstrate that they meet these guidelines include, but are not limited to:

- Passport with admission stamp
- School records from the U.S. schools they have attended showing the name of the school and periods of school attendance and the educational or grade level achieved
- School records (such as transcripts or report cards) from the school that they are currently attending in the United States showing the name of the school and periods of school attendance and the current educational or grade level
- Any Immigration and Naturalization Service or DHS document stating their date of entry (e.g., Form I-862, *Notice to Appear;* Form I-94/I-95/I-94W with authorized stay expiration date)
- Travel records
- Hospital or medical records
- Rent receipts or utility bills
- Employment records (pay stubs, W-2 forms, etc.)
- Official records from a religious entity confirming participation in a religious ceremony
- Copies of money order receipts for money sent in or out of the country
- Birth certificates of children born in the United States
- Military records (Form DD-214 or NGB Form 22)
- Passport entries
- Dated bank transactions
- Automobile license receipts or registration
- Deeds, mortgages, or rental agreement contracts
- Tax receipts
- Insurance policies
- Final order of exclusion, deportation, or removal issued as of June 15, 2012
- A charging document placing individuals into removal proceedings
- U.S. high school diploma, certificate of completion, or other alternate award
- High school equivalency diploma or certificate recognized under state law
- Evidence that the person passed a state-authorized exam, including the GED or other state-authorized exam (for example, HiSet or TASC) in the United States

Additionally, all DACA requestors who have been arrested for, or charged with, any felony or misdemeanor in the United States, or a crime in any other country, must submit

13

evidence of the results of the arrests or charges. A felony is defined as a Federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year. A misdemeanor is defined as a Federal, state, or local criminal offense for which the maximum term of imprisonment authorized is one year or less but greater than five days. If the charges were handled in juvenile court, and the records are from a state with laws prohibiting their disclosure, this evidence is not required.

If a DACA requestor has ever been arrested for any felony or misdemeanor in the United States, or a crime in any other country, and no charges were filed, he or she must submit an original official statement by the arresting agency or a court order confirming that no charges were filed for each arrest.

If a DACA requestor has ever been charged with or convicted of a felony or misdemeanor in the United States, or a crime in any other country, he or she must submit an original or court-certified copy of the complete arrest record and disposition for each incident. Examples include a conviction and sentencing record, dismissal order, or acquittal order.

If a DACA requestor has ever had any arrest or conviction vacated, set aside, sealed, expunged, or otherwise removed from his or her record, the requestor must submit:

- An original or court-certified copy of the court order vacating, setting aside, sealing, expunging, or otherwise removing the arrest or conviction; or
- An original statement from the court that no record exists of the arrest or conviction.

If the DACA requestor is unable to provide any of the documentation listed above, the requestor must provide an explanation, including a description of his or her efforts to obtain such evidence.

| Consideration of Deferred Action for Childhood Arrivals (I-821D) Initial Application Approvals through July 2014 | |
|---|---|
| **Country of Birth** | **I-821D Approvals** |
| MEXICO | 458,590 |
| EL SALVADOR | 21,458 |
| GUATEMALA | 14,283 |
| HONDURAS | 14,067 |
| PERU | 7,603 |
| SOUTH KOREA | 7,594 |
| BRAZIL | 6,088 |
| COLOMBIA | 5,670 |
| ECUADOR | 5,408 |
| PHILIPPINES | 3,825 |
| ARGENTINA | 3,640 |
| JAMAICA | 2,738 |
| INDIA | 2,711 |
| VENEZUELA | 2,538 |
| DOMINICAN REPUBLIC | 2,331 |
| TRINIDAD AND TOBAGO | 2,155 |
| BOLIVIA | 1,717 |
| COSTA RICA | 1,707 |
| URUGUAY | 1,682 |
| CHILE | 1,453 |
| PAKISTAN | 1,436 |
| POLAND | 1,409 |
| NICARAGUA | 1,169 |
| GUYANA | 1,085 |
| NIGERIA | 1,076 |
| CHINA, PEOPLE'S REPUBLIC OF | 857 |
| BELIZE | 724 |
| KENYA | 702 |
| CANADA | 678 |
| INDONESIA | 616 |
| BANGLADESH | 529 |
| UNITED KINGDOM | 500 |
| GHANA | 480 |
| MONGOLIA | 480 |
| PANAMA | 443 |
| PORTUGAL | 429 |
| ISRAEL | 348 |

| | |
|---|---|
| ITALY | 325 |
| ST. LUCIA | 289 |
| TAIWAN | 276 |
| BAHAMAS | 273 |
| TURKEY | 268 |
| ALBANIA | 266 |
| JORDAN | 242 |
| THAILAND | 217 |
| EGYPT | 205 |
| HONG KONG | 205 |
| PARAGUAY | 202 |
| ARMENIA | 201 |
| SAUDI ARABIA | 199 |
| SOUTH AFRICA | 193 |
| ZAMBIA | 190 |
| UKRAINE | 186 |
| UNITED ARAB EMIRATES | 186 |
| GERMANY | 185 |
| LITHUANIA | 181 |
| GRENADA | 171 |
| MOROCCO | 164 |
| MALAYSIA | 163 |
| RUSSIA | 163 |
| FRANCE | 157 |
| SENEGAL | 157 |
| GUINEA | 153 |
| ST. VINCENT/GRENADINES | 148 |
| GAMBIA | 138 |
| CAMEROON | 136 |
| LIBERIA | 134 |
| ZIMBABWE | 133 |
| LEBANON | 131 |
| SRI LANKA | 131 |
| HAITI | 127 |
| JAPAN | 123 |
| SURINAME | 123 |
| COTE D'IVOIRE | 120 |
| ROMANIA | 115 |
| SIERRA LEONE | 112 |
| SPAIN | 111 |
| BARBADOS | 104 |
| CZECH REPUBLIC | 104 |
| GREECE | 96 |
| FIJI | 94 |

2

| | |
|---|---|
| DOMINICA | 88 |
| HUNGARY | 88 |
| MALAWI | 85 |
| ANTIGUA-BARBUDA | 83 |
| NEPAL | 78 |
| IRAN | 75 |
| TANZANIA | 75 |
| BULGARIA | 73 |
| MACEDONIA | 69 |
| CAPE VERDE | 68 |
| UGANDA | 66 |
| ANGOLA | 60 |
| VIETNAM | 60 |
| KUWAIT | 59 |
| NEW ZEALAND | 58 |
| UZBEKISTAN | 53 |
| SLOVAK REPUBLIC | 51 |
| AUSTRALIA | 49 |
| NETHERLANDS | 48 |
| MALI | 47 |
| TONGA | 47 |
| CAMBODIA | 46 |
| MONTENEGRO | 45 |
| YUGOSLAVIA (FORMER) | 44 |
| ETHIOPIA | 40 |
| NETHERLANDS ANTILLES | 40 |
| DEMOCRATIC REPUBLIC OF CONGO | 36 |
| SINGAPORE | 36 |
| TOGO | 36 |
| SYRIA | 35 |
| ESTONIA | 34 |
| YEMEN-SANAA | 30 |
| QATAR | 29 |
| SWEDEN | 29 |
| AUSTRIA | 28 |
| ST. KITTS-NEVIS | 28 |
| TURKS AND CAICOS ISLANDS | 28 |
| BELGIUM | 27 |
| SERBIA | 27 |
| GEORGIA | 25 |
| BRITISH VIRGIN ISLANDS | 24 |
| GABON | 23 |
| BAHRAIN | 22 |

3

| | |
|---|---|
| BOTSWANA | 22 |
| IRELAND | 22 |
| CONGO | 21 |
| SAMOA | 21 |
| WESTERN SAMOA | 21 |
| USSR (FORMER) | 20 |
| LAOS | 19 |
| BENIN | 18 |
| LATVIA | 18 |
| CAYMAN ISLANDS | 17 |
| KOSOVO | 17 |
| MACAU | 15 |
| SWITZERLAND | 15 |
| AFGHANISTAN | 12 |
| BURKINA FASO | 12 |
| MOLDOVA | 12 |
| NAMIBIA | 12 |
| NIGER | 12 |
| NORTH VIETNAM | 12 |
| ALGERIA | 11 |
| BURUNDI | 11 |
| FRENCH GUIANA | 11 |
| MONTSERRAT | 11 |
| SLOVENIA | 11 |
| LIBYA | 10 |
| NORWAY | 10 |
| OTHER* | 222 |
| UNKNOWN OR NOT REPORTED** | 839 |
| **Grand Total** | **591,362** |

**\*OTHER:** This group includes those countries with fewer than 10 DACA approvals per country.

**\*\*UNKNOWN OR NOT REPORTED:** USCIS has determined that individuals in this group do qualify for DACA based on their nationality even though country of birth is not available.

App. 1170

# Exhibit 18



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Office of the Director (MS 2000)*
Washington, DC 20529-2000

**U.S. Citizenship
and Immigration
Services**

JUN 2 9 2016

The Honorable Charles E. Grassley
Chairman
Committee on the Judiciary
United States Senate
Washington, DC 20510

Dear Chairman Grassley:

Thank you for your March 2, 2016 letter. Secretary Johnson asked that I respond on his behalf.

U.S. Citizenship and Immigration Services (USCIS) appreciates the opportunity to respond to your questions about immigration parole authority and advance parole as it may relate to individuals who have been granted Deferred Action for Childhood Arrivals (DACA).

As this Administration previously emphasized, neither deferred action nor advance parole creates "a path to citizenship." Only individuals who qualify to be classified as an immigrant under the Immigration and Nationality Act (INA) are eligible for lawful permanent residence. The most common basis for such an immigrant classification is a specified family relationship or employment qualification. Obtaining deferred action or advance parole does not alter the requirement that an alien must meet all existing requirements to be classifiable as an immigrant and all other requirements for admissibility.

In your letter, you requested information regarding the population of DACA recipients who have received advance parole. According to USCIS electronic records, of the 713,300 individuals granted DACA through December 31, 2015, a total of 22,340 were subsequently approved for advance parole based on their submission of a separate advance parole request. This calculation is based on our identification of a common A-number associated with both the DACA and advance parole records. From among the 713,300 individuals who have been granted DACA, USCIS electronic records indicate that fewer than one percent were subsequently granted advance parole and also applied for adjustment of status—a total of 5,068. As of December 31, 2015, of those 5,068, a total of 2,994 have been approved for adjustment of status. The 2,994 constitutes less than one-half of one percent of the 713,300 DACA recipients.

It is important to note that some among the group of 2,994 DACA recipients who were approved for advance parole and who were subsequently granted adjustment of status may have been otherwise eligible for adjustment of status regardless of the grant of advance parole. For example, if a DACA recipient had been previously admitted (or paroled) into the United States and subsequently fell out of status, he or she would already meet the inspection and admission

The Honorable Charles E. Grassley
Page 2

(or parole) requirements of INA § 245(a) for adjustment of status. A subsequent parole into the
United States would not affect that eligibility. It would be cost prohibitive and significantly
burdensome to conduct a manual analysis of each of these files to identify such cases.

Without a manual review of each case, USCIS could not electronically determine which
DACA recipients among the 2,994 who were approved for adjustment of status and who had
applied for and received advance parole, actually traveled abroad, returned, and were paroled
into the United States upon return. When an individual applies for adjustment of status, USCIS
verifies on a manual, case-by-case basis whether the adjustment applicant has been inspected and
admitted or paroled into the United States based on the evidence presented, such as a stamped
parole document, and/or the review of the Department's records of that applicant.

Thank you again for your letter and interest in this important issue. Senator Lee, who co-
signed your letter, will receive a separate, identical response. Should you wish to discuss this
matter further, please do not hesitate to contact me.

Respectfully,

León Rodríguez
Director

# Exhibit 19

# The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others

The Department of Homeland Security's proposed policy to prioritize the removal of certain aliens unlawfully present in the United States would be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of U.S. citizens and legal permanent residents would also be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of recipients of deferred action under the Deferred Action for Childhood Arrivals program would not be a permissible exercise of DHS's enforcement discretion.

November 19, 2014

MEMORANDUM OPINION FOR THE SECRETARY OF HOMELAND SECURITY
AND THE COUNSEL TO THE PRESIDENT

You have asked two questions concerning the scope of the Department of Homeland Security's discretion to enforce the immigration laws. First, you have asked whether, in light of the limited resources available to the Department ("DHS") to remove aliens unlawfully present in the United States, it would be legally permissible for the Department to implement a policy prioritizing the removal of certain categories of aliens over others. DHS has explained that although there are approximately 11.3 million undocumented aliens in the country, it has the resources to remove fewer than 400,000 such aliens each year. DHS's proposed policy would prioritize the removal of aliens who present threats to national security, public safety, or border security. Under the proposed policy, DHS officials could remove an alien who did not fall into one of these categories provided that an Immigration and Customs Enforcement ("ICE") Field Office Director determined that "removing such an alien would serve an important federal interest." Draft Memorandum for Thomas S. Winkowski, Acting Director, ICE, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants* at 5 (Nov. 17, 2014) ("Johnson Prioritization Memorandum").

Second, you have asked whether it would be permissible for DHS to extend deferred action, a form of temporary administrative relief from removal, to certain aliens who are the parents of children who are present in the United States. Specifically, DHS has proposed to implement a program under which an alien could apply for, and would be eligible to receive, deferred action if he or she is not a DHS removal priority under the policy described above; has continuously resided in the United States since before January 1, 2010; has a child who is either a U.S. citizen or a lawful permanent resident; is physically present in the United

App. 1175

States both when DHS announces its program and at the time of application for deferred action; and presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Draft Memorandum for Leon Rodriguez, Director, U.S. Citizenship and Immigration Services, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and Others* at 4 (Nov. 17, 2014) ("Johnson Deferred Action Memorandum"). You have also asked whether DHS could implement a similar program for parents of individuals who have received deferred action under the Deferred Action for Childhood Arrivals ("DACA") program.

As has historically been true of deferred action, these proposed deferred action programs would not "legalize" any aliens who are unlawfully present in the United States: Deferred action does not confer any lawful immigration status, nor does it provide a path to obtaining permanent residence or citizenship. Grants of deferred action under the proposed programs would, rather, represent DHS's decision not to seek an alien's removal for a prescribed period of time. *See generally Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483–84 (1999) (describing deferred action). Under decades-old regulations promulgated pursuant to authority delegated by Congress, *see* 8 U.S.C. §§ 1103(a)(3), 1324a(h)(3), aliens who are granted deferred action—like certain other categories of aliens who do not have lawful immigration status, such as asylum applicants—may apply for authorization to work in the United States in certain circumstances, 8 C.F.R. § 274a.12(c)(14) (providing that deferred action recipients may apply for work authorization if they can show an "economic necessity for employment"); *see also* 8 C.F.R. § 109.1(b)(7) (1982). Under DHS policy guidance, a grant of deferred action also suspends an alien's accrual of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I), provisions that restrict the admission of aliens who have departed the United States after having been unlawfully present for specified periods of time. A grant of deferred action under the proposed programs would remain in effect for three years, subject to renewal, and could be terminated at any time at DHS's discretion. *See* Johnson Deferred Action Memorandum at 2, 5.

For the reasons discussed below, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be permissible exercises of DHS's discretion to enforce the immigration laws. We further conclude that, as it has been described to us, the proposed deferred action program for parents of DACA recipients would not be a permissible exercise of enforcement discretion.

## I.

We first address DHS's authority to prioritize the removal of certain categories of aliens over others. We begin by discussing some of the sources and limits of

DHS's enforcement discretion under the immigration laws, and then analyze DHS's proposed prioritization policy in light of these considerations.

### A.

DHS's authority to remove aliens from the United States rests on the Immigration and Nationality Act of 1952 ("INA"), as amended, 8 U.S.C. §§ 1101 *et seq.* In the INA, Congress established a comprehensive scheme governing immigration and naturalization. The INA specifies certain categories of aliens who are inadmissible to the United States. *See* 8 U.S.C. § 1182. It also specifies "which aliens may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Id.* (citing 8 U.S.C. § 1227); *see* 8 U.S.C. § 1227(a) (providing that "[a]ny alien . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien" falls within one or more classes of deportable aliens); *see also* 8 U.S.C. § 1182(a) (listing classes of aliens ineligible to receive visas or be admitted to the United States). Removal proceedings ordinarily take place in federal immigration courts administered by the Executive Office for Immigration Review, a component of the Department of Justice. *See id.* § 1229a (governing removal proceedings); *see also id.* §§ 1225(b)(1)(A), 1228(b) (setting out expedited removal procedures for certain arriving aliens and certain aliens convicted of aggravated felonies).

Before 2003, the Department of Justice, through the Immigration and Naturalization Service ("INS"), was also responsible for providing immigration-related administrative services and generally enforcing the immigration laws. In the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, Congress transferred most of these functions to DHS, giving it primary responsibility both for initiating removal proceedings and for carrying out final orders of removal. *See* 6 U.S.C. §§ 101 *et seq.*; *see also Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005) (noting that the immigration authorities previously exercised by the Attorney General and INS "now reside" in the Secretary of Homeland Security and DHS). The Act divided INS's functions among three different agencies within DHS: U.S. Citizenship and Immigration Services ("USCIS"), which oversees legal immigration into the United States and provides immigration and naturalization services to aliens; ICE, which enforces federal laws governing customs, trade, and immigration; and U.S. Customs and Border Protection ("CBP"), which monitors and secures the nation's borders and ports of entry. *See* Pub. L. No. 107-296, §§ 403, 442, 451, 471, 116 Stat. 2135, 2178, 2193, 2195, 2205; *see also Name Change From the Bureau of Citizenship and Immigration Services to U.S. Citizenship and Immigration Services*, 69 Fed. Reg. 60938, 60938 (Oct. 13, 2004); *Name Change of Two DHS Components*, 75 Fed. Reg. 12445, 12445 (Mar. 16, 2010). The Secretary of Homeland Security is thus now "charged with the administration and

**App. 1177**

enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1).

As a general rule, when Congress vests enforcement authority in an executive agency, that agency has the discretion to decide whether a particular violation of the law warrants prosecution or other enforcement action. This discretion is rooted in the President's constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and it reflects a recognition that the "faithful[]" execution of the law does not necessarily entail "act[ing] against each technical violation of the statute" that an agency is charged with enforcing. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Rather, as the Supreme Court explained in *Chaney*, the decision whether to initiate enforcement proceedings is a complex judgment that calls on the agency to "balanc[e] . . . a number of factors which are peculiarly within its expertise." *Id.* These factors include "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and . . . whether the agency has enough resources to undertake the action at all." *Id.* at 831; *cf. United States v. Armstrong*, 517 U.S. 456, 465 (1996) (recognizing that exercises of prosecutorial discretion in criminal cases involve consideration of "'[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan'" (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985))). In *Chaney*, the Court considered and rejected a challenge to the Food and Drug Administration's refusal to initiate enforcement proceedings with respect to alleged violations of the Federal Food, Drug, and Cosmetic Act, concluding that an agency's decision not to initiate enforcement proceedings is presumptively immune from judicial review. *See* 470 U.S. at 832. The Court explained that, while Congress may "provide[] guidelines for the agency to follow in exercising its enforcement powers," in the absence of such "legislative direction," an agency's non-enforcement determination is, much like a prosecutor's decision not to indict, a "special province of the Executive." *Id.* at 832–33.

The principles of enforcement discretion discussed in *Chaney* apply with particular force in the context of immigration. Congress enacted the INA against a background understanding that immigration is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (internal quotation marks omitted). Consistent with this understanding, the INA vested the Attorney General (now the Secretary of Homeland Security) with broad authority to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the statute. 8 U.S.C. § 1103(a)(3). Years later, when Congress created the Department of Homeland Security, it expressly charged DHS with responsibility for "[e]stablishing national immigration enforcement policies and

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

priorities." Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. § 202(5)).

With respect to removal decisions in particular, the Supreme Court has recognized that "the broad discretion exercised by immigration officials" is a "principal feature of the removal system" under the INA. *Arizona*, 132 S. Ct. at 2499. The INA expressly authorizes immigration officials to grant certain forms of discretionary relief from removal for aliens, including parole, 8 U.S.C. § 1182(d)(5)(A); asylum, *id.* § 1158(b)(1)(A); and cancellation of removal, *id.* § 1229b. But in addition to administering these statutory forms of relief, "[f]ederal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Arizona*, 132 S. Ct. at 2499. And, as the Court has explained, "[a]t each stage" of the removal process—"commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders"—immigration officials have "discretion to abandon the endeavor." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483 (quoting 8 U.S.C. § 1252(g) (alterations in original)). Deciding whether to pursue removal at each of these stages implicates a wide range of considerations. As the Court observed in *Arizona*:

> Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation's international relations. . . . The foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return. The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities.

132 S. Ct. at 2499.

Immigration officials' discretion in enforcing the laws is not, however, unlimited. Limits on enforcement discretion are both implicit in, and fundamental to, the Constitution's allocation of governmental powers between the two political branches. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952). These limits, however, are not clearly defined. The open-ended nature of the inquiry under the Take Care Clause—whether a particular exercise of discretion is "faithful[]" to the law enacted by Congress—does not lend itself easily to the application of set formulas or bright-line rules. And because the exercise of enforcement discretion generally is not subject to judicial review, *see*

**App. 1179**

*Chaney*, 470 U.S. at 831–33, neither the Supreme Court nor the lower federal courts have squarely addressed its constitutional bounds. Rather, the political branches have addressed the proper allocation of enforcement authority through the political process. As the Court noted in *Chaney*, Congress "may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.* at 833. The history of immigration policy illustrates this principle: Since the INA was enacted, the Executive Branch has on numerous occasions exercised discretion to extend various forms of immigration relief to categories of aliens for humanitarian, foreign policy, and other reasons. When Congress has been dissatisfied with Executive action, it has responded, as *Chaney* suggests, by enacting legislation to limit the Executive's discretion in enforcing the immigration laws.[1]

Nonetheless, the nature of the Take Care duty does point to at least four general (and closely related) principles governing the permissible scope of enforcement discretion that we believe are particularly relevant here. First, enforcement decisions should reflect "factors which are peculiarly within [the enforcing agency's] expertise." *Chaney*, 470 U.S. at 831. Those factors may include considerations related to agency resources, such as "whether the agency has enough resources to undertake the action," or "whether agency resources are best spent on this violation or another." *Id*. Other relevant considerations may include "the proper ordering of [the agency's] priorities," *id.* at 832, and the agency's assessment of "whether the particular enforcement action [at issue] best fits the agency's overall policies," *id.* at 831.

Second, the Executive cannot, under the guise of exercising enforcement discretion, attempt to effectively rewrite the laws to match its policy preferences. *See id*. at 833 (an agency may not "disregard legislative direction in the statutory scheme that [it] administers"). In other words, an agency's enforcement decisions should be consonant with, rather than contrary to, the congressional policy underlying the statutes the agency is charged with administering. *Cf. Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (explaining that where Congress has given an agency the power to administer a statutory scheme, a court will not vacate the agency's decision about the proper administration of the statute unless, among other things, the agency "'has relied on factors which Congress had not intended it to consider'" (quoting

---

[1] *See, e.g.*, Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 503–05 (2009) (describing Congress's response to its dissatisfaction with the Executive's use of parole power for refugee populations in the 1960s and 1970s); *see also, e.g.*, *infra* note 5 (discussing legislative limitations on voluntary departure and extended voluntary departure).

**App. 1180**

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

Third, the Executive Branch ordinarily cannot, as the Court put it in *Chaney*, "'consciously and expressly adopt[] a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc)); *see id.* (noting that in situations where an agency had adopted such an extreme policy, "the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion'"). Abdication of the duties assigned to the agency by statute is ordinarily incompatible with the constitutional obligation to faithfully execute the laws. *But see, e.g.*, *Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 200 (1994) (noting that under the Take Care Clause, "the President is required to act in accordance with the laws—including the Constitution, which takes precedence over other forms of law").

Finally, lower courts, following *Chaney*, have indicated that non-enforcement decisions are most comfortably characterized as judicially unreviewable exercises of enforcement discretion when they are made on a case-by-case basis. *See, e.g.*, *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996); *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671, 676–77 (D.C. Cir. 1994). That reading of *Chaney* reflects a conclusion that case-by-case enforcement decisions generally avoid the concerns mentioned above. Courts have noted that "single-shot non-enforcement decisions" almost inevitably rest on "the sort of mingled assessments of fact, policy, and law . . . that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion." *Crowley Caribbean Transp.*, 37 F.3d at 676–77 (emphasis omitted). Individual enforcement decisions made on the basis of case-specific factors are also unlikely to constitute "general polic[ies] that [are] so extreme as to amount to an abdication of [the agency's] statutory responsibilities." *Id.* at 677 (quoting *Chaney*, 477 U.S. at 833 n.4). That does not mean that all "general policies" respecting non-enforcement are categorically forbidden: Some "general policies" may, for example, merely provide a framework for making individualized, discretionary assessments about whether to initiate enforcement actions in particular cases. *Cf. Reno v. Flores*, 507 U.S. 292, 313 (1993) (explaining that an agency's use of "reasonable presumptions and generic rules" is not incompatible with a requirement to make individualized determinations). But a general policy of non-enforcement that forecloses the exercise of case-by-case discretion poses "special risks" that the agency has exceeded the bounds of its enforcement discretion. *Crowley Caribbean Transp.*, 37 F.3d at 677.

## B.

We now turn, against this backdrop, to DHS's proposed prioritization policy. In their exercise of enforcement discretion, DHS and its predecessor, INS, have long

App. 1181

employed guidance instructing immigration officers to prioritize the enforcement of the immigration laws against certain categories of aliens and to deprioritize their enforcement against others. *See, e.g.*, INS Operating Instructions § 103(a)(1)(i) (1962); Memorandum for All Field Office Directors, ICE, et al., from John Morton, Director, ICE, *Re: Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* (June 17, 2011); Memorandum for All ICE Employees, from John Morton, Director, ICE, *Re: Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011); Memorandum for Regional Directors, INS, et al., from Doris Meissner, Commissioner, INS, *Re: Exercising Prosecutorial Discretion* (Nov. 17, 2000). The policy DHS proposes, which is similar to but would supersede earlier policy guidance, is designed to "provide clearer and more effective guidance in the pursuit" of DHS's enforcement priorities; namely, "threats to national security, public safety and border security." Johnson Prioritization Memorandum at 1.

Under the proposed policy, DHS would identify three categories of undocumented aliens who would be priorities for removal from the United States. *See generally id.* at 3–5. The highest priority category would include aliens who pose particularly serious threats to national security, border security, or public safety, including aliens engaged in or suspected of espionage or terrorism, aliens convicted of offenses related to participation in criminal street gangs, aliens convicted of certain felony offenses, and aliens apprehended at the border while attempting to enter the United States unlawfully. *See id.* at 3. The second-highest priority would include aliens convicted of multiple or significant misdemeanor offenses; aliens who are apprehended after unlawfully entering the United States who cannot establish that they have been continuously present in the United States since January 1, 2014; and aliens determined to have significantly abused the visa or visa waiver programs. *See id.* at 3–4. The third priority category would include other aliens who have been issued a final order of removal on or after January 1, 2014. *See id.* at 4. The policy would also provide that none of these aliens should be prioritized for removal if they "qualify for asylum or another form of relief under our laws." *Id*. at 3–5.

The policy would instruct that resources should be directed to these priority categories in a manner "commensurate with the level of prioritization identified." *Id.* at 5. It would, however, also leave significant room for immigration officials to evaluate the circumstances of individual cases. *See id.* (stating that the policy "requires DHS personnel to exercise discretion based on individual circumstances"). For example, the policy would permit an ICE Field Office Director, CBP Sector Chief, or CBP Director of Field Operations to deprioritize the removal of an alien falling in the highest priority category if, in her judgment, "there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority." *Id.* at 3. Similar discretionary provisions would apply to

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

aliens in the second and third priority categories.[2] The policy would also provide a non-exhaustive list of factors DHS personnel should consider in making such deprioritization judgments.[3] In addition, the policy would expressly state that its terms should not be construed "to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities," and would further provide that "[i]mmigration officers and attorneys may pursue removal of an alien not identified as a priority" if, "in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest." *Id*. at 5.

DHS has explained that the proposed policy is designed to respond to the practical reality that the number of aliens who are removable under the INA vastly exceeds the resources Congress has made available to DHS for processing and carrying out removals. The resource constraints are striking. As noted, DHS has informed us that there are approximately 11.3 million undocumented aliens in the country, but that Congress has appropriated sufficient resources for ICE to remove fewer than 400,000 aliens each year, a significant percentage of whom are typically encountered at or near the border rather than in the interior of the country. *See* E-mail for Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from David Shahoulian, Deputy General Counsel, DHS, *Re: Immigration Opinion* (Nov. 19, 2014) ("Shahoulian E-mail"). The proposed policy explains that, because DHS "cannot respond to all immigration violations or remove all persons illegally in the United States," it seeks to "prioritize the use of enforcement personnel, detention space, and removal assets" to "ensure that use of its limited resources is devoted to the pursuit of" DHS's highest priorities. Johnson Prioritization Memorandum at 2.

In our view, DHS's proposed prioritization policy falls within the scope of its lawful discretion to enforce the immigration laws. To begin with, the policy is based on a factor clearly "within [DHS's] expertise." *Chaney*, 470 U.S. at 831. Faced with sharply limited resources, DHS necessarily must make choices about which removals to pursue and which removals to defer. DHS's organic statute itself recognizes this inevitable fact, instructing the Secretary to establish "national

---

[2] Under the proposed policy, aliens in the second tier could be deprioritized if, "in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety, and should not therefore be an enforcement priority." Johnson Prioritization Memorandum at 4. Aliens in the third tier could be deprioritized if, "in the judgment of an immigration officer, the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority." *Id*. at 5.

[3] These factors include "extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length of time in the United States; military service; family or community ties in the United States; status as a victim, witness or plaintiff in civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, a young child or a seriously ill relative." Johnson Prioritization Memorandum at 6.

9

**App. 1183**

immigration enforcement policies and priorities." 6 U.S.C. § 202(5). And an agency's need to ensure that scarce enforcement resources are used in an effective manner is a quintessential basis for the use of prosecutorial discretion. *See Chaney*, 470 U.S. at 831 (among the factors "peculiarly within [an agency's] expertise" are "whether agency resources are best spent on this violation or another" and "whether the agency has enough resources to undertake the action at all").

The policy DHS has proposed, moreover, is consistent with the removal priorities established by Congress. In appropriating funds for DHS's enforcement activities—which, as noted, are sufficient to permit the removal of only a fraction of the undocumented aliens currently in the country—Congress has directed DHS to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime." Department of Homeland Security Appropriations Act, 2014, Pub. L. No. 113-76, div. F, tit. II, 128 Stat. 5, 251 ("DHS Appropriations Act"). Consistent with this directive, the proposed policy prioritizes individuals convicted of criminal offenses involving active participation in a criminal street gang, most offenses classified as felonies in the convicting jurisdiction, offenses classified as "aggravated felonies" under the INA, and certain misdemeanor offenses. Johnson Prioritization Memorandum at 3–4. The policy ranks these priority categories according to the severity of the crime of conviction. The policy also prioritizes the removal of other categories of aliens who pose threats to national security or border security, matters about which Congress has demonstrated particular concern. *See, e.g.*, 8 U.S.C. § 1226(c)(1)(D) (providing for detention of aliens charged with removability on national security grounds); *id.* § 1225(b) & (c) (providing for an expedited removal process for certain aliens apprehended at the border). The policy thus raises no concern that DHS has relied "on factors which Congress had not intended it to consider." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658.

Further, although the proposed policy is not a "single-shot non-enforcement decision," neither does it amount to an abdication of DHS's statutory responsibilities, or constitute a legislative rule overriding the commands of the substantive statute. *Crowley Caribbean Transp.*, 37 F.3d at 676–77. The proposed policy provides a general framework for exercising enforcement discretion in individual cases, rather than establishing an absolute, inflexible policy of not enforcing the immigration laws in certain categories of cases. Given that the resources Congress has allocated to DHS are sufficient to remove only a small fraction of the total population of undocumented aliens in the United States, setting forth written guidance about how resources should presumptively be allocated in particular cases is a reasonable means of ensuring that DHS's severely limited resources are systematically directed to its highest priorities across a large and diverse agency, as well as ensuring consistency in the administration of the removal system. The proposed policy's identification of categories of aliens who constitute removal

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

priorities is also consistent with the categorical nature of Congress's instruction to prioritize the removal of criminal aliens in the DHS Appropriations Act.

And, significantly, the proposed policy does not identify any category of removable aliens whose removal may not be pursued under any circumstances. Although the proposed policy limits the discretion of immigration officials to expend resources to remove non-priority aliens, it does not eliminate that discretion entirely. It directs immigration officials to use their resources to remove aliens in a manner "commensurate with the level of prioritization identified," but (as noted above) it does not "prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities." Johnson Prioritization Memorandum at 5. Instead, it authorizes the removal of even non-priority aliens if, in the judgment of an ICE Field Office Director, "removing such an alien would serve an important federal interest," a standard the policy leaves open-ended. *Id*. Accordingly, the policy provides for case-by-case determinations about whether an individual alien's circumstances warrant the expenditure of removal resources, employing a broad standard that leaves ample room for the exercise of individualized discretion by responsible officials. For these reasons, the proposed policy avoids the difficulties that might be raised by a more inflexible prioritization policy and dispels any concern that DHS has either undertaken to rewrite the immigration laws or abdicated its statutory responsibilities with respect to non-priority aliens.[4]

## II.

We turn next to the permissibility of DHS's proposed deferred action programs for certain aliens who are parents of U.S. citizens, lawful permanent residents ("LPRs"), or DACA recipients, and who are not removal priorities under the proposed policy discussed above. We begin by discussing the history and current practice of deferred action. We then discuss the legal authorities on which deferred

---

[4] In *Crane v. Napolitano*, a district court recently concluded in a non-precedential opinion that the INA "mandates the initiation of removal proceedings whenever an immigration officer encounters an illegal alien who is not 'clearly and beyond a doubt entitled to be admitted.'" Opinion and Order Respecting Pl. App. for Prelim. Inj. Relief, No. 3:12-cv-03247-O, 2013 WL 1744422, at *5 (N.D. Tex. Apr. 23) (quoting 8 U.S.C. § 1225(b)(2)(A)). The court later dismissed the case for lack of jurisdiction. *See Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 WL 8211660, at *4 (N.D. Tex. July 31). Although the opinion lacks precedential value, we have nevertheless considered whether, as it suggests, the text of the INA categorically forecloses the exercise of enforcement discretion with respect to aliens who have not been formally admitted. The district court's conclusion is, in our view, inconsistent with the Supreme Court's reading of the INA as permitting immigration officials to exercise enforcement discretion at any stage of the removal process, including when deciding whether to initiate removal proceedings against a particular alien. *See Arizona*, 132 S. Ct. at 2499; *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483–84. It is also difficult to square with authority holding that the presence of mandatory language in a statute, standing alone, does not necessarily limit the Executive Branch's enforcement discretion, *see, e.g.*, *Chaney*, 470 U.S. at 835; *Inmates of Attica Corr. Facility v. Rockefeller*, 477 F.2d 375, 381 (2d Cir. 1973).

**App. 1185**

action relies and identify legal principles against which the proposed use of deferred action can be evaluated. Finally, we turn to an analysis of the proposed deferred action programs themselves, beginning with the program for parents of U.S. citizens and LPRs, and concluding with the program for parents of DACA recipients.

## A.

In immigration law, the term "deferred action" refers to an exercise of administrative discretion in which immigration officials temporarily defer the removal of an alien unlawfully present in the United States. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (citing 6 Charles Gordon et al., *Immigration Law and Procedure* § 72.03[2][h] (1998)); *see* USCIS, *Standard Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices* at 3 (2012) ("USCIS SOP"); INS Operating Instructions § 103.1(a)(1)(ii) (1977). It is one of a number of forms of discretionary relief—in addition to such statutory and non-statutory measures as parole, temporary protected status, deferred enforced departure, and extended voluntary departure—that immigration officials have used over the years to temporarily prevent the removal of undocumented aliens.[5]

---

[5] Parole is available to aliens by statute "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Among other things, parole gives aliens the ability to adjust their status without leaving the United States if they are otherwise eligible for adjustment of status, *see id.* § 1255(a), and may eventually qualify them for Federal means-tested benefits, *see id.* §§ 1613, 1641(b)(4). Temporary protected status is available to nationals of designated foreign states affected by armed conflicts, environmental disasters, and other extraordinary conditions. *Id.* § 1254a. Deferred enforced departure, which "has no statutory basis" but rather is an exercise of "the President's constitutional powers to conduct foreign relations," may be granted to nationals of appropriate foreign states. USCIS, Adjudicator's Field Manual § 38.2(a) (2014). Extended voluntary departure was a remedy derived from the voluntary departure statute, which, before its amendment in 1996, permitted the Attorney General to make a finding of removability if an alien agreed to voluntarily depart the United States, without imposing a time limit for the alien's departure. *See* 8 U.S.C. §§ 1252(b), 1254(e) (1988 & Supp. II 1990); *cf.* 8 U.S.C. § 1229c (current provision of the INA providing authority to grant voluntary departure, but limiting such grants to 120 days). Some commentators, however, suggested that extended voluntary departure was in fact a form of "discretionary relief formulated administratively under the Attorney General's general authority for enforcing immigration law." Sharon Stephan, Cong. Research Serv., 85-599 EPW, *Extended Voluntary Departure and Other Grants of Blanket Relief from Deportation* at 1 (Feb. 23, 1985). It appears that extended voluntary departure is no longer used following enactment of the Immigration Act of 1990, which established the temporary protected status program. *See U.S. Citizenship and Immigration Services Fee Schedule*, 75 Fed. Reg. 33446, 33457 (June 11, 2010) (proposed rule) (noting that "since 1990 neither the Attorney General nor the Secretary have designated a class of aliens for nationality-based 'extended voluntary departure,' and there no longer are aliens in the United States benefiting from such a designation," but noting that deferred enforced departure is still used); H.R. Rep. No. 102-123, at 2 (1991) (indicating that in establishing temporary protected status, Congress was "codif[ying] and supersed[ing]" extended voluntary departure). *See generally* Andorra Bruno et al., Cong. Research Serv., *Analysis of June 15, 2012 DHS Memorandum,* Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children at 5–10 (July 13, 2012) ("CRS Immigration Report").

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

The practice of granting deferred action dates back several decades. For many years after the INA was enacted, INS exercised prosecutorial discretion to grant "non-priority" status to removable aliens who presented "appealing humanitarian factors." Letter for Leon Wildes, from E. A. Loughran, Associate Commissioner, INS at 2 (July 16, 1973) (defining a "non-priority case" as "one in which the Service in the exercise of discretion determines that adverse action would be unconscionable because of appealing humanitarian factors"); *see* INS Operating Instructions § 103.1(a)(1)(ii) (1962). This form of administrative discretion was later termed "deferred action." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484; *see* INS Operating Instructions § 103.1(a)(1)(ii) (1977) (instructing immigration officers to recommend deferred action whenever "adverse action would be unconscionable because of the existence of appealing humanitarian factors").

Although the practice of granting deferred action "developed without express statutory authorization," it has become a regular feature of the immigration removal system that has been acknowledged by both Congress and the Supreme Court. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (internal quotation marks omitted); *see id.* at 485 (noting that a congressional enactment limiting judicial review of decisions "to commence proceedings, adjudicate cases, or execute removal orders against any alien under [the INA]" in 8 U.S.C. § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations"); *see also, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"). Deferred action "does not confer any immigration status"—i.e., it does not establish any enforceable legal right to remain in the United States— and it may be revoked by immigration authorities at their discretion. USCIS SOP at 3, 7. Assuming it is not revoked, however, it represents DHS's decision not to seek the alien's removal for a specified period of time.

Under longstanding regulations and policy guidance promulgated pursuant to statutory authority in the INA, deferred action recipients may receive two additional benefits. First, relying on DHS's statutory authority to authorize certain aliens to work in the United States, DHS regulations permit recipients of deferred action to apply for work authorization if they can demonstrate an "economic necessity for employment." 8 C.F.R. § 274a.12(c)(14); *see* 8 U.S.C. § 1324a(h)(3) (defining an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]"). Second, DHS has promulgated regulations and issued policy guidance providing that aliens who receive deferred action will temporarily cease accruing "unlawful presence" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); Memorandum for Field Leadership, from Donald Neufeld, Acting Associate Director, Domestic Operations Directorate, USCIS, *Re: Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act* at 42

13

**App. 1187**

(May 6, 2009) ("USCIS Consolidation of Guidance") (noting that "[a]ccrual of unlawful presence stops on the date an alien is granted deferred action"); *see* 8 U.S.C. § 1182(a)(9)(B)(ii) (providing that an alien is "unlawfully present" if, among other things, he "is present in the United States after the expiration of the period of stay authorized by the Attorney General").[6]

Immigration officials today continue to grant deferred action in individual cases for humanitarian and other purposes, a practice we will refer to as "ad hoc deferred action." Recent USCIS guidance provides that personnel may recommend ad hoc deferred action if they "encounter cases during [their] normal course of business that they feel warrant deferred action." USCIS SOP at 4. An alien may also apply for ad hoc deferred action by submitting a signed, written request to USCIS containing "[a]n explanation as to why he or she is seeking deferred action" along with supporting documentation, proof of identity, and other records. *Id.* at 3.

For decades, INS and later DHS have also implemented broader programs that make discretionary relief from removal available for particular classes of aliens. In many instances, these agencies have made such broad-based relief available through the use of parole, temporary protected status, deferred enforced departure, or extended voluntary departure. For example, from 1956 to 1972, INS implemented an extended voluntary departure program for physically present aliens who were beneficiaries of approved visa petitions—known as "Third Preference" visa petitions—relating to a specific class of visas for Eastern Hemisphere natives. *See United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 979–80 (E.D. Pa. 1977). Similarly, for several years beginning in 1978, INS granted extended voluntary departure to nurses who were eligible for H-1 visas. *Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses*, 43 Fed. Reg. 2776, 2776 (Jan. 19, 1978). In addition, in more than two dozen instances dating to 1956, INS and later DHS granted parole, temporary protected status, deferred enforced departure, or extended voluntary departure to large numbers of nationals of designated foreign states. *See, e.g.*, CRS Immigration Report at 20–23; Cong. Research Serv., ED206779, *Review of U.S. Refugee Resettlement Programs and Policies* at 9, 12–14 (1980). And in 1990, INS implemented a "Family Fairness" program that authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens who had been granted legal status under the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 ("IRCA"). *See* Memorandum for Regional Commissioners,

---

[6] Section 1182(a)(9)(B)(i) imposes three- and ten-year bars on the admission of aliens (other than aliens admitted to permanent residence) who departed or were removed from the United States after periods of unlawful presence of between 180 days and one year, or one year or more. Section 1182(a)(9)(C)(i)(I) imposes an indefinite bar on the admission of any alien who, without being admitted, enters or attempts to reenter the United States after previously having been unlawfully present in the United States for an aggregate period of more than one year.

App. 1188

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

INS, from Gene McNary, Commissioner, INS, *Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) ("Family Fairness Memorandum"); *see also* CRS Immigration Report at 10.

On at least five occasions since the late 1990s, INS and later DHS have also made discretionary relief available to certain classes of aliens through the use of deferred action:

*1. Deferred Action for Battered Aliens Under the Violence Against Women Act.* INS established a class-based deferred action program in 1997 for the benefit of self-petitioners under the Violence Against Women Act of 1994 ("VAWA"), Pub. L. No. 103-322, tit. IV, 108 Stat. 1796, 1902. VAWA authorized certain aliens who have been abused by U.S. citizen or LPR spouses or parents to self-petition for lawful immigration status, without having to rely on their abusive family members to petition on their behalf. *Id.* § 40701(a) (codified as amended at 8 U.S.C. § 1154(a)(1)(A)(iii)–(iv), (vii)). The INS program required immigration officers who approved a VAWA self-petition to assess, "on a case-by-case basis, whether to place the alien in deferred action status" while the alien waited for a visa to become available. Memorandum for Regional Directors et al., INS, from Paul W. Virtue, Acting Executive Associate Commissioner, INS, *Re: Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997). INS noted that "[b]y their nature, VAWA cases generally possess factors that warrant consideration for deferred action." *Id.* But because "[i]n an unusual case, there may be factors present that would militate against deferred action," the agency instructed officers that requests for deferred action should still "receive individual scrutiny." *Id.* In 2000, INS reported to Congress that, because of this program, no approved VAWA self-petitioner had been removed from the country. *See Battered Women Immigrant Protection Act: Hearings on H.R. 3083 Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 106th Cong. at 43 (July 20, 2000) ("H.R. 3083 Hearings").

*2. Deferred Action for T and U Visa Applicants.* Several years later, INS instituted a similar deferred action program for applicants for nonimmigrant status or visas made available under the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), Pub. L. No. 106-386, 114 Stat. 1464. That Act created two new nonimmigrant classifications: a "T visa" available to victims of human trafficking and their family members, and a "U visa" for victims of certain other crimes and their family members. *Id.* §§ 107(e), 1513(b)(3) (codified at 8 U.S.C. § 1101(a)(15)(T)(i), (U)(i)). In 2001, INS issued a memorandum directing immigration officers to locate "possible victims in the above categories," and to use "[e]xisting authority and mechanisms such as parole, deferred action, and stays of removal" to prevent those victims' removal "until they have had the opportunity to avail themselves of the provisions of the VTVPA." Memorandum

**App. 1189**

for Michael A. Pearson, Executive Associate Commissioner, INS, from Michael D. Cronin, Acting Executive Associate Commissioner, INS, *Re: Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* at 2 (Aug. 30, 2001). In subsequent memoranda, INS instructed officers to make "deferred action assessment[s]" for "all [T visa] applicants whose applications have been determined to be bona fide," Memorandum for Johnny N. Williams, Executive Associate Commissioner, INS, from Stuart Anderson, Executive Associate Commissioner, INS, *Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status* at 1 (May 8, 2002), as well as for all U visa applicants "determined to have submitted *prima facie* evidence of [their] eligibility," Memorandum for the Director, Vermont Service Center, INS, from William R. Yates, USCIS, *Re: Centralization of Interim Relief for U Nonimmigrant Status Applicants* at 5 (Oct. 8, 2003). In 2002 and 2007, INS and DHS promulgated regulations embodying these policies. *See* 8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) (promulgated by *New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status*, 67 Fed. Reg. 4784, 4800–01 (Jan. 31, 2002)) (providing that any T visa applicant who presents "*prima facie* evidence" of his eligibility should have his removal "automatically stay[ed]" and that applicants placed on a waiting list for visas "shall maintain [their] current means to prevent removal (deferred action, parole, or stay of removal)"); *id.* § 214.14(d)(2) (promulgated by *New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status*, 72 Fed. Reg. 53014, 53039 (Sept. 17, 2007)) ("USCIS will grant deferred action or parole to U-1 petitioners and qualifying family members while the U-1 petitioners are on the waiting list" for visas.).

*3. Deferred Action for Foreign Students Affected by Hurricane Katrina.* As a consequence of the devastation caused by Hurricane Katrina in 2005, several thousand foreign students became temporarily unable to satisfy the requirements for maintaining their lawful status as F-1 nonimmigrant students, which include "pursuit of a 'full course of study.'" USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* at 1 (Nov. 25, 2005) (quoting 8 C.F.R. § 214.2(f)(6)), *available at* http://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Special%20Situati ons/Previous%20Special%20Situations%20By%20Topic/faq-interim-student-relie f-hurricane-katrina.pdf (last visited Nov. 19, 2014). DHS announced that it would grant deferred action to these students "based on the fact that [their] failure to maintain status is directly due to Hurricane Katrina." *Id.* at 7. To apply for deferred action under this program, students were required to send a letter substantiating their need for deferred action, along with an application for work authorization. Press Release, USCIS, *USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina* at 1–2 (Nov. 25, 2005), *available at* http://www.uscis.gov/sites/default/files/files/pressrelease/F1Student_ 11_25_05_PR.pdf (last visited Nov. 19, 2014). USCIS explained that such

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

requests for deferred action would be "decided on a case-by-case basis" and that it could not "provide any assurance that all such requests will be granted." *Id.* at 1.

*4. Deferred Action for Widows and Widowers of U.S. Citizens.* In 2009, DHS implemented a deferred action program for certain widows and widowers of U.S. citizens. USCIS explained that "no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death" and USCIS had not yet adjudicated a visa petition on the spouse's behalf. Memorandum for Field Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, *Re: Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* at 1 (Sept. 4, 2009). "In order to address humanitarian concerns arising from cases involving surviving spouses of U.S. citizens," USCIS issued guidance permitting covered surviving spouses and "their qualifying children who are residing in the United States" to apply for deferred action. *Id.* at 2, 6. USCIS clarified that such relief would not be automatic, but rather would be unavailable in the presence of, for example, "serious adverse factors, such as national security concerns, significant immigration fraud, commission of other crimes, or public safety reasons." *Id.* at 6.[7]

*5. Deferred Action for Childhood Arrivals.* Announced by DHS in 2012, DACA makes deferred action available to "certain young people who were brought to this country as children" and therefore "[a]s a general matter . . . lacked the intent to violate the law." Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1 (June 15, 2012) ("Napolitano Memorandum"). An alien is eligible for DACA if she was under the age of 31 when the program began; arrived in the United States before the age of 16; continuously resided in the United States for at least 5 years immediately preceding June 15, 2012; was physically present on June 15, 2012; satisfies certain educational or military service requirements; and neither has a serious criminal history nor "poses a threat to national security or public safety." *See id.* DHS evaluates applicants' eligibility for DACA on a case-by-case basis. *See id.* at 2; USCIS, *Deferred Action for Childhood Arrivals (DACA) Toolkit: Resources for Community Partners* at 11 ("DACA Toolkit"). Successful DACA applicants receive deferred action for a

---

[7] Several months after the deferred action program was announced, Congress eliminated the requirement that an alien be married to a U.S. citizen "for at least 2 years at the time of the citizen's death" to retain his or her eligibility for lawful immigration status. Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 568(c), 123 Stat. 2142, 2186 (2009). Concluding that this legislation rendered its surviving spouse guidance "obsolete," USCIS withdrew its earlier guidance and treated all pending applications for deferred action as visa petitions. *See* Memorandum for Executive Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, et al., *Re Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children (REVISED)* at 3, 10 (Dec. 2, 2009).

period of two years, subject to renewal. *See* DACA Toolkit at 11. DHS has stated that grants of deferred action under DACA may be terminated at any time, *id.* at 16, and "confer[] no substantive right, immigration status or pathway to citizenship," Napolitano Memorandum at 3.[8]

Congress has long been aware of the practice of granting deferred action, including in its categorical variety, and of its salient features; and it has never acted to disapprove or limit the practice.[9] On the contrary, it has enacted several pieces of legislation that have either assumed that deferred action would be available in certain circumstances, or expressly directed that deferred action be extended to certain categories of aliens. For example, as Congress was considering VAWA reauthorization legislation in 2000, INS officials testified before Congress about their deferred action program for VAWA self-petitioners, explaining that "[a]pproved [VAWA] self-petitioners are placed in deferred action status," such that "[n]o battered alien who has filed a[n approved] self petition . . . has been deported." H.R. 3083 Hearings at 43. Congress responded by not only acknowledging but also expanding the deferred action program in the 2000 VAWA reauthorization legislation, providing that children who could no longer self-petition under VAWA because they were over the age of 21 would nonetheless be "eligible for deferred action and work authorization." Victims of Trafficking and

---

[8] Before DACA was announced, our Office was consulted about whether such a program would be legally permissible. As we orally advised, our preliminary view was that such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis. We noted that immigration officials typically consider factors such as having been brought to the United States as a child in exercising their discretion to grant deferred action in individual cases. We explained, however, that extending deferred action to individuals who satisfied these and other specified criteria on a class-wide basis would raise distinct questions not implicated by ad hoc grants of deferred action. We advised that it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria. We also noted that, although the proposed program was predicated on humanitarian concerns that appeared less particularized and acute than those underlying certain prior class-wide deferred action programs, the concerns animating DACA were nonetheless consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion.

[9] Congress has considered legislation that would limit the practice of granting deferred action, but it has never enacted such a measure. In 2011, a bill was introduced in both the House and the Senate that would have temporarily suspended DHS's authority to grant deferred action except in narrow circumstances. *See* H.R. 2497, 112th Cong. (2011); S. 1380, 112th Cong. (2011). Neither chamber, however, voted on the bill. This year, the House passed a bill that purported to bar any funding for DACA or other class-wide deferred action programs, H.R. 5272, 113th Cong. (2014), but the Senate has not considered the legislation. Because the Supreme Court has instructed that unenacted legislation is an unreliable indicator of legislative intent, *see Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n.11 (1969), we do not draw any inference regarding congressional policy from these unenacted bills.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

Violence Protection Act of 2000, Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV)).[10]

Congress demonstrated a similar awareness of INS's (and later DHS's) deferred action program for bona fide T and U visa applicants. As discussed above, that program made deferred action available to nearly all individuals who could make a prima facie showing of eligibility for a T or U visa. In 2008 legislation, Congress authorized DHS to "grant . . . an administrative stay of a final order of removal" to any such individual. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 204, 122 Stat. 5044, 5060 (codified at 8 U.S.C. § 1227(d)(1)). Congress further clarified that "[t]he denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for . . . deferred action." *Id.* It also directed DHS to compile a report detailing, among other things, how long DHS's "specially trained [VAWA] Unit at the [USCIS] Vermont Service Center" took to adjudicate victim-based immigration applications for "deferred action," along with "steps taken to improve in this area." *Id.* § 238. Representative Berman, the bill's sponsor, explained that the Vermont Service Center should "strive to issue work authorization and deferred action" to "[i]mmigrant victims of domestic violence, sexual assault and other violence crimes . . . in most instances within 60 days of filing." 154 Cong. Rec. 24603 (2008).

In addition, in other enactments, Congress has specified that certain classes of individuals should be made "eligible for deferred action." These classes include certain immediate family members of LPRs who were killed on September 11, 2001, USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361, and certain immediate family members of certain U.S. citizens killed in combat, National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)–(d), 117 Stat. 1392, 1694. In the same legislation, Congress made these individuals eligible to obtain lawful status as "family-sponsored immigrant[s]" or "immediate relative[s]" of U.S. citizens. Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361; Pub. L. No. 108-136, § 1703(c)(1)(A), 117 Stat. 1392, 1694; *see generally Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191, 2197 (2014) (plurality opinion) (explaining which aliens typically qualify as family-sponsored immigrants or immediate relatives).

Finally, Congress acknowledged the practice of granting deferred action in the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, 302 (codified at

---

[10] Five years later, in the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960, Congress specified that, "[u]pon the approval of a petition as a VAWA self-petitioner, the alien . . . is eligible for work authorization." *Id.* § 814(b) (codified at 8 U.S.C. § 1154(a)(1)(K)). One of the Act's sponsors explained that while this provision was intended to "give[] DHS statutory authority to grant work authorization . . . without having to rely upon deferred action . . . [t]he current practice of granting deferred action to approved VAWA self-petitioners should continue." 151 Cong. Rec. 29334 (2005) (statement of Rep. Conyers).

**App. 1193**

49 U.S.C. § 30301 note), which makes a state-issued driver's license or identification card acceptable for federal purposes only if the state verifies, among other things, that the card's recipient has "[e]vidence of [l]awful [s]tatus." Congress specified that, for this purpose, acceptable evidence of lawful status includes proof of, among other things, citizenship, lawful permanent or temporary residence, or "approved deferred action status." *Id.* § 202(c)(2)(B)(viii).

## B.

The practice of granting deferred action, like the practice of setting enforcement priorities, is an exercise of enforcement discretion rooted in DHS's authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed. It is one of several mechanisms by which immigration officials, against a backdrop of limited enforcement resources, exercise their "broad discretion" to administer the removal system—and, more specifically, their discretion to determine whether "it makes sense to pursue removal" in particular circumstances. *Arizona*, 132 S. Ct. at 2499.

Deferred action, however, differs in at least three respects from more familiar and widespread exercises of enforcement discretion. First, unlike (for example) the paradigmatic exercise of prosecutorial discretion in a criminal case, the conferral of deferred action does not represent a decision not to prosecute an individual for past unlawful conduct; it instead represents a decision to openly tolerate an undocumented alien's continued presence in the United States for a fixed period (subject to revocation at the agency's discretion). Second, unlike most exercises of enforcement discretion, deferred action carries with it benefits in addition to non-enforcement itself; specifically, the ability to seek employment authorization and suspension of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). Third, class-based deferred action programs, like those for VAWA recipients and victims of Hurricane Katrina, do not merely enable individual immigration officials to select deserving beneficiaries from among those aliens who have been identified or apprehended for possible removal—as is the case with ad hoc deferred action—but rather set forth certain threshold eligibility criteria and then invite individuals who satisfy these criteria to apply for deferred action status.

While these features of deferred action are somewhat unusual among exercises of enforcement discretion, the differences between deferred action and other exercises of enforcement discretion are less significant than they might initially appear. The first feature—the toleration of an alien's continued unlawful presence—is an inevitable element of almost any exercise of discretion in immigration enforcement. Any decision not to remove an unlawfully present alien—even through an exercise of routine enforcement discretion—necessarily carries with it a tacit acknowledgment that the alien will continue to be present in the United States without legal status. Deferred action arguably goes beyond such tacit acknowledgment by expressly communicating to the alien that his or her unlawful

presence will be tolerated for a prescribed period of time. This difference is not, in our view, insignificant. But neither does it fundamentally transform deferred action into something other than an exercise of enforcement discretion: As we have previously noted, deferred action confers no lawful immigration status, provides no path to lawful permanent residence or citizenship, and is revocable at any time in the agency's discretion.

With respect to the second feature, the additional benefits deferred action confers—the ability to apply for work authorization and the tolling of unlawful presence—do not depend on background principles of agency discretion under DHS's general immigration authorities or the Take Care Clause at all, but rather depend on independent and more specific statutory authority rooted in the text of the INA. The first of those authorities, DHS's power to prescribe which aliens are authorized to work in the United States, is grounded in 8 U.S.C. § 1324a(h)(3), which defines an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]." This statutory provision has long been understood to recognize the authority of the Secretary (and the Attorney General before him) to grant work authorization to particular classes of aliens. *See* 8 C.F.R. § 274a.12; *see also Perales v. Casillas*, 903 F.2d 1043, 1048–50 (5th Cir. 1990) (describing the authority recognized by section 1324a(h)(3) as "permissive" and largely "unfettered").[11] Although the INA

---

[11] Section 1324a(h)(3) was enacted in 1986 as part of IRCA. Before then, the INA contained no provisions comprehensively addressing the employment of aliens or expressly delegating the authority to regulate the employment of aliens to a responsible federal agency. INS assumed the authority to prescribe the classes of aliens authorized to work in the United States under its general responsibility to administer the immigration laws. In 1981, INS promulgated regulations codifying its existing procedures and criteria for granting employment authorization. *See Employment Authorization to Aliens in the United States*, 46 Fed. Reg. 25079, 25080–81 (May 5, 1981) (citing 8 U.S.C. § 1103(a)). Those regulations permitted certain categories of aliens who lacked lawful immigration status, including deferred action recipients, to apply for work authorization under certain circumstances. 8 C.F.R. § 109.1(b)(7) (1982). In IRCA, Congress introduced a "comprehensive scheme prohibiting the employment of illegal aliens in the United States," *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002), to be enforced primarily through criminal and civil penalties on employers who knowingly employ an "unauthorized alien." As relevant here, Congress defined an "unauthorized alien" barred from employment in the United States as an alien who "is not . . . either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter *or by the Attorney General*." 8 U.S.C. § 1324a(h)(3) (emphasis added). Shortly after IRCA was enacted, INS denied a petition to rescind its employment authorization regulation, rejecting an argument that "the phrase 'authorized to be so employed by this Act or the Attorney General' does not recognize the Attorney General's authority to grant work authorization except to those aliens who have already been granted specific authorization by the Act." *Employment Authorization; Classes of Aliens Eligible*, 52 Fed. Reg. 46092, 46093 (Dec. 4, 1987). Because the same statutory phrase refers both to aliens authorized to be employed by the INA and aliens authorized to be employed by the Attorney General, INS concluded that the only way to give effect to both references is to conclude "that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined 'unauthorized alien' in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the

requires the Secretary to grant work authorization to particular classes of aliens, *see, e.g.*, 8 U.S.C. § 1158(c)(1)(B) (aliens granted asylum), it places few limitations on the Secretary's authority to grant work authorization to other classes of aliens. Further, and notably, additional provisions of the INA expressly contemplate that the Secretary may grant work authorization to aliens lacking lawful immigration status—even those who are in active removal proceedings or, in certain circumstances, those who have already received final orders of removal. *See id.* § 1226(a)(3) (permitting the Secretary to grant work authorization to an otherwise work-eligible alien who has been arrested and detained pending a decision whether to remove the alien from the United States); *id.* § 1231(a)(7) (permitting the Secretary under certain narrow circumstances to grant work authorization to aliens who have received final orders of removal). Consistent with these provisions, the Secretary has long permitted certain additional classes of aliens who lack lawful immigration status to apply for work authorization, including deferred action recipients who can demonstrate an economic necessity for employment. *See* 8 C.F.R. § 274a.12(c)(14); *see also id.* § 274a.12(c)(8) (applicants for asylum), (c)(10) (applicants for cancellation of removal); *supra* note 11 (discussing 1981 regulations).

   The Secretary's authority to suspend the accrual of unlawful presence of deferred action recipients is similarly grounded in the INA. The relevant statutory provision treats an alien as "unlawfully present" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I) if he "is present in the United States after the expiration of the period of stay authorized by the Attorney General." 8 U.S.C. § 1182(a)(9)(B)(ii). That language contemplates that the Attorney General (and now the Secretary) may authorize an alien to stay in the United States without accruing unlawful presence under section 1182(a)(9)(B)(i) or section 1182(a)(9)(C)(i). And DHS regulations and policy guidance interpret a "period of stay authorized by the Attorney General" to include periods during which an alien has been granted deferred action. *See* 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); USCIS Consolidation of Guidance at 42.

   The final unusual feature of deferred action programs is particular to class-based programs. The breadth of such programs, in combination with the first two features of deferred action, may raise particular concerns about whether immigration officials have undertaken to substantively change the statutory removal system rather than simply adapting its application to individual circumstances. But the salient feature of class-based programs—the establishment of an affirmative application process with threshold eligibility criteria—does not in and of itself cross the line between executing the law and rewriting it. Although every class-wide deferred action program that has been implemented to date has established

---

regulatory process, in addition to those who are authorized employment by statute." *Id.*; *see Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844 (1986) (stating that "considerable weight must be accorded" an agency's "contemporaneous interpretation of the statute it is entrusted to administer").

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

certain threshold eligibility criteria, each program has also left room for case-by-case determinations, giving immigration officials discretion to deny applications even if the applicant fulfills all of the program criteria. *See supra* pp. 15–18. Like the establishment of enforcement priorities discussed in Part I, the establishment of threshold eligibility criteria can serve to avoid arbitrary enforcement decisions by individual officers, thereby furthering the goal of ensuring consistency across a large agency. The guarantee of individualized, case-by-case review helps avoid potential concerns that, in establishing such eligibility criteria, the Executive is attempting to rewrite the law by defining new categories of aliens who are automatically entitled to particular immigration relief. *See Crowley Caribbean Transp.*, 37 F.3d at 676–77; *see also Chaney*, 470 U.S. at 833 n.4. Furthermore, while permitting potentially eligible individuals to apply for an exercise of enforcement discretion is not especially common, many law enforcement agencies have developed programs that invite violators of the law to identify themselves to the authorities in exchange for leniency.[12] Much as is the case with those programs, inviting eligible aliens to identify themselves through an application process may serve the agency's law enforcement interests by encouraging lower-priority individuals to identify themselves to the agency. In so doing, the process may enable the agency to better focus its scarce resources on higher enforcement priorities.

Apart from the considerations just discussed, perhaps the clearest indication that these features of deferred action programs are not per se impermissible is the fact that Congress, aware of these features, has repeatedly enacted legislation appearing to endorse such programs. As discussed above, Congress has not only directed that certain classes of aliens be made eligible for deferred action programs—and in at least one instance, in the case of VAWA beneficiaries, directed the expansion of an existing program—but also ranked evidence of approved deferred action status as evidence of "lawful status" for purposes of the REAL ID Act. These enactments strongly suggest that when DHS in the past has decided to grant deferred action to an individual or class of individuals, it has been acting in a manner consistent with congressional policy "'rather than embarking on a frolic of its own.'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139

---

[12] For example, since 1978, the Department of Justice's Antitrust Division has implemented a "leniency program" under which a corporation that reveals an antitrust conspiracy in which it participated may receive a conditional promise that it will not be prosecuted. *See* Dep't of Justice, *Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (November 19, 2008)*, *available at* http://www.justice.gov/atr/public/criminal/239583.pdf (last visited Nov. 19, 2014); *see also* Internal Revenue Manual § 9.5.11.9(2) (Revised IRS Voluntary Disclosure Practice), *available at* http://www.irs.gov/uac/Revised-IRS-Voluntary-Disclosure-Practice (last visited Nov. 19, 2014) (explaining that a taxpayer's voluntary disclosure of misreported tax information "may result in prosecution not being recommended"); U.S. Marshals Service, *Fugitive Safe Surrender FAQs*, *available at* http://www.usmarshals.gov/safesurrender/faqs.html (last visited Nov. 19, 2014) (stating that fugitives who surrender at designated sites and times under the "Fugitive Safe Surrender" program are likely to receive "favorable consideration").

(1985) (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 375 (1969)); *cf. id.* at 137–39 (concluding that Congress acquiesced in an agency's assertion of regulatory authority by "refus[ing] . . . to overrule" the agency's view after it was specifically "brought to Congress'[s] attention," and further finding implicit congressional approval in legislation that appeared to acknowledge the regulatory authority in question); *Dames & Moore v. Regan*, 453 U.S. 654, 680 (1981) (finding that Congress "implicitly approved the practice of claim settlement by executive agreement" by enacting the International Claims Settlement Act of 1949, which "create[d] a procedure to implement" those very agreements).

Congress's apparent endorsement of certain deferred action programs does not mean, of course, that a deferred action program can be lawfully extended to any group of aliens, no matter its characteristics or its scope, and no matter the circumstances in which the program is implemented. Because deferred action, like the prioritization policy discussed above, is an exercise of enforcement discretion rooted in the Secretary's broad authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed, it is subject to the same four general principles previously discussed. *See supra* pp. 6–7. Thus, any expansion of deferred action to new classes of aliens must be carefully scrutinized to ensure that it reflects considerations within the agency's expertise, and that it does not seek to effectively rewrite the laws to match the Executive's policy preferences, but rather operates in a manner consonant with congressional policy expressed in the statute. *See supra* pp. 6–7 (citing *Youngstown*, 343 U.S. at 637, and *Nat'l Ass'n of Home Builders*, 551 U.S. at 658). Immigration officials cannot abdicate their statutory responsibilities under the guise of exercising enforcement discretion. *See supra* p. 7 (citing *Chaney*, 470 U.S. at 833 n.4). And any new deferred action program should leave room for individualized evaluation of whether a particular case warrants the expenditure of resources for enforcement. *See supra* p. 7 (citing *Glickman*, 96 F.3d at 1123, and *Crowley Caribbean Transp.*, 37 F.3d at 676–77).

Furthermore, because deferred action programs depart in certain respects from more familiar and widespread exercises of enforcement discretion, particularly careful examination is needed to ensure that any proposed expansion of deferred action complies with these general principles, so that the proposed program does not, in effect, cross the line between executing the law and rewriting it. In analyzing whether the proposed programs cross this line, we will draw substantial guidance from Congress's history of legislation concerning deferred action. In the absence of express statutory guidance, the nature of deferred action programs Congress has implicitly approved by statute helps to shed light on Congress's own understandings about the permissible uses of deferred action. Those understandings, in turn, help to inform our consideration of whether the proposed deferred action programs are "faithful[]" to the statutory scheme Congress has enacted. U.S. Const. art. II, § 3.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

### C.

We now turn to the specifics of DHS's proposed deferred action programs. DHS has proposed implementing a policy under which an alien could apply for, and would be eligible to receive, deferred action if he or she: (1) is not an enforcement priority under DHS policy; (2) has continuously resided in the United States since before January 1, 2010; (3) is physically present in the United States both when DHS announces its program and at the time of application for deferred action; (4) has a child who is a U.S. citizen or LPR; and (5) presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Johnson Deferred Action Memorandum at 4. You have also asked about the permissibility of a similar program that would be open to parents of children who have received deferred action under the DACA program. We first address DHS's proposal to implement a deferred action program for the parents of U.S. citizens and LPRs, and then turn to the permissibility of the program for parents of DACA recipients in the next section.

### 1.

We begin by considering whether the proposed program for the parents of U.S. citizens and LPRs reflects considerations within the agency's expertise. DHS has offered two justifications for the proposed program for the parents of U.S. citizens and LPRs. First, as noted above, severe resource constraints make it inevitable that DHS will not remove the vast majority of aliens who are unlawfully present in the United States. Consistent with Congress's instruction, DHS prioritizes the removal of individuals who have significant criminal records, as well as others who present dangers to national security, public safety, or border security. *See supra* p. 10. Parents with longstanding ties to the country and who have no significant criminal records or other risk factors rank among the agency's lowest enforcement priorities; absent significant increases in funding, the likelihood that any individual in that category will be determined to warrant the expenditure of severely limited enforcement resources is very low. Second, DHS has explained that the program would serve an important humanitarian interest in keeping parents together with children who are lawfully present in the United States, in situations where such parents have demonstrated significant ties to community and family in this country. *See* Shahoulian E-mail.

With respect to DHS's first justification, the need to efficiently allocate scarce enforcement resources is a quintessential basis for an agency's exercise of enforcement discretion. *See Chaney*, 470 U.S. at 831. Because, as discussed earlier, Congress has appropriated only a small fraction of the funds needed for full enforcement, DHS can remove no more than a small fraction of the individuals who are removable under the immigration laws. *See supra* p. 9. The agency must therefore make choices about which violations of the immigration laws it

**App. 1199**

will prioritize and pursue. And as *Chaney* makes clear, such choices are entrusted largely to the Executive's discretion. 470 U.S. at 831.

The deferred action program DHS proposes would not, of course, be costless. Processing applications for deferred action and its renewal requires manpower and resources. *See Arizona*, 132 S. Ct. at 2521 (Scalia, J., concurring in part and dissenting in part). But DHS has informed us that the costs of administering the proposed program would be borne almost entirely by USCIS through the collection of application fees. *See* Shahoulian E-mail; *see also* 8 U.S.C. § 1356(m); 8 C.F.R. § 103.7(b)(1)(i)(C), (b)(1)(i)(HH). DHS has indicated that the costs of administering the deferred action program would therefore not detract in any significant way from the resources available to ICE and CBP—the enforcement arms of DHS—which rely on money appropriated by Congress to fund their operations. *See* Shahoulian E-mail. DHS has explained that, if anything, the proposed deferred action program might increase ICE's and CBP's efficiency by in effect using USCIS's fee-funded resources to enable those enforcement divisions to more easily identify non-priority aliens and focus their resources on pursuing aliens who are strong candidates for removal. *See id.* The proposed program, in short, might help DHS address its severe resource limitations, and at the very least likely would not exacerbate them. *See id.*

DHS does not, however, attempt to justify the proposed program solely as a cost-saving measure, or suggest that its lack of resources alone is sufficient to justify creating a deferred action program for the proposed class. Rather, as noted above, DHS has explained that the program would also serve a particularized humanitarian interest in promoting family unity by enabling those parents of U.S. citizens and LPRs who are not otherwise enforcement priorities and who have demonstrated community and family ties in the United States (as evidenced by the length of time they have remained in the country) to remain united with their children in the United States. Like determining how best to respond to resource constraints, determining how to address such "human concerns" in the immigration context is a consideration that is generally understood to fall within DHS's expertise. *Arizona*, 132 S. Ct. at 2499.

This second justification for the program also appears consonant with congressional policy embodied in the INA. Numerous provisions of the statute reflect a particular concern with uniting aliens with close relatives who have attained lawful immigration status in the United States. *See, e.g.*, *Fiallo v. Bell*, 430 U.S. 787, 795 n.6 (1977); *INS v. Errico*, 385 U.S. 214, 220 n.9 (1966) ("'The legislative history of the Immigration and Nationality Act clearly indicates that the Congress . . . was concerned with the problem of keeping families of United States citizens and immigrants united.'" (quoting H.R. Rep. No. 85-1199, at 7 (1957)). The INA provides a path to lawful status for the parents, as well as other immediate relatives, of U.S. citizens: U.S. citizens aged twenty-one or over may petition for parents to obtain visas that would permit them to enter and permanently reside

**App. 1200**

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

in the United States, and there is no limit on the overall number of such petitions that may be granted. *See* 8 U.S.C. § 1151(b)(2)(A)(i); *see also Cuellar de Osorio*, 134 S. Ct. at 2197–99 (describing the process for obtaining a family-based immigrant visa). And although the INA contains no parallel provision permitting LPRs to petition on behalf of their parents, it does provide a path for LPRs to become citizens, at which point they too can petition to obtain visas for their parents. *See, e.g.*, 8 U.S.C. § 1427(a) (providing that aliens are generally eligible to become naturalized citizens after five years of lawful permanent residence); *id.* § 1430(a) (alien spouses of U.S. citizens become eligible after three years of lawful permanent residence); *Demore v. Kim*, 538 U.S. 510, 544 (2003).[13] Additionally, the INA empowers the Attorney General to cancel the removal of, and adjust to lawful permanent resident status, aliens who have been physically present in the United States for a continuous period of not less than ten years, exhibit good moral character, have not been convicted of specified offenses, and have immediate relatives who are U.S. citizens or LPRs and who would suffer exceptional hardship from the alien's removal. 8 U.S.C. § 1229b(b)(1). DHS's proposal to focus on the parents of U.S. citizens and LPRs thus tracks a congressional concern, expressed in the INA, with uniting the immediate families of individuals who have permanent legal ties to the United States.

At the same time, because the temporary relief DHS's proposed program would confer to such parents is sharply limited in comparison to the benefits Congress has made available through statute, DHS's proposed program would not operate to circumvent the limits Congress has placed on the availability of those benefits. The statutory provisions discussed above offer the parents of U.S. citizens and LPRs the prospect of permanent lawful status in the United States. The cancellation of removal provision, moreover, offers the prospect of receiving such status

---

[13] The INA does permit LPRs to petition on behalf of their spouses and children even before they have attained citizenship. *See* 8 U.S.C. § 1153(a)(2). However, the exclusion of LPRs' parents from this provision does not appear to reflect a congressional judgment that, until they attain citizenship, LPRs lack an interest in being united with their parents comparable to their interest in being united with their other immediate relatives. The distinction between parents and other relatives originated with a 1924 statute that exempted the wives and minor children of U.S. citizens from immigration quotas, gave "preference status"—eligibility for a specially designated pool of immigrant visas—to other relatives of U.S. citizens, and gave no favorable treatment to the relatives of LPRs. Immigration Act of 1924, Pub. L. No. 68-139, §§ 4(a), 6, 43 Stat. 153, 155–56. In 1928, Congress extended preference status to LPRs' wives and minor children, reasoning that because such relatives would be eligible for visas without regard to any quota when their LPR relatives became citizens, granting preference status to LPRs' wives and minor children would "hasten[]" the "family reunion." S. Rep. No. 70-245, at 2 (1928); *see* Act of May 29, 1928, ch. 914, 45 Stat. 1009, 1009–10. The special visa status for wives and children of LPRs thus mirrored, and was designed to complement, the special visa status given to wives and minor children of U.S. citizens. In 1965, Congress eliminated the basis on which the distinction had rested by exempting all "immediate relatives" of U.S. citizens, including parents, from numerical restrictions on immigration. Pub. L. No. 89-236, § 1, 79 Stat. 911, 911. But it did not amend eligibility for preference status for relatives of LPRs to reflect that change. We have not been able to discern any rationale for this omission in the legislative history or statutory text of the 1965 law.

**App. 1201**

immediately, without the delays generally associated with the family-based immigrant visa process. DHS's proposed program, in contrast, would not grant the parents of U.S. citizens and LPRs any lawful immigration status, provide a path to permanent residence or citizenship, or otherwise confer any legally enforceable entitlement to remain in the United States. *See* USCIS SOP at 3. It is true that, as we have discussed, a grant of deferred action would confer eligibility to apply for and obtain work authorization, pursuant to the Secretary's statutory authority to grant such authorization and the longstanding regulations promulgated thereunder. *See supra* pp. 13, 21–22. But unlike the automatic employment eligibility that accompanies LPR status, *see* 8 U.S.C. § 1324a(h)(3), this authorization could be granted only on a showing of economic necessity, and would last only for the limited duration of the deferred action grant, *see* 8 C.F.R. § 274a.12(c)(14).

The other salient features of the proposal are similarly consonant with congressional policy. The proposed program would focus on parents who are not enforcement priorities under the prioritization policy discussed above—a policy that, as explained earlier, comports with the removal priorities set by Congress. *See supra* p. 10. The continuous residence requirement is likewise consistent with legislative judgments that extended periods of continuous residence are indicative of strong family and community ties. *See* IRCA, Pub. L. No. 99-603, § 201(a), 100 Stat. 3359, 3394 (1986) (codified as amended at 8 U.S.C. § 1255a(a)(2)) (granting lawful status to certain aliens unlawfully present in the United States since January 1, 1982); *id.* § 302(a) (codified as amended at 8 U.S.C. § 1160) (granting similar relief to certain agricultural workers); H.R. Rep. No. 99-682, pt. 1, at 49 (1986) (stating that aliens present in the United States for five years "have become a part of their communities[,] . . . have strong family ties here which include U.S. citizens and lawful residents[,] . . . have built social networks in this country[, and] . . . have contributed to the United States in myriad ways"); S. Rep. No. 99-132, at 16 (1985) (deporting aliens who "have become well settled in this country" would be a "wasteful use of the Immigration and Naturalization Service's limited enforcement resources"); *see also Arizona*, 132 S. Ct. at 2499 (noting that "[t]he equities of an individual case" turn on factors "including whether the alien has . . . long ties to the community").

We also do not believe DHS's proposed program amounts to an abdication of its statutory responsibilities, or a legislative rule overriding the commands of the statute. As discussed earlier, DHS's severe resource constraints mean that, unless circumstances change, it could not as a practical matter remove the vast majority of removable aliens present in the United States. The fact that the proposed program would defer the removal of a subset of these removable aliens—a subset that ranks near the bottom of the list of the agency's removal priorities—thus does not, by itself, demonstrate that the program amounts to an abdication of DHS's responsibilities. And the case-by-case discretion given to immigration officials under DHS's proposed program alleviates potential concerns that DHS has

**App. 1202**

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

abdicated its statutory enforcement responsibilities with respect to, or created a categorical, rule-like entitlement to immigration relief for, the particular class of aliens eligible for the program. An alien who meets all the criteria for deferred action under the program would receive deferred action only if he or she "present[ed] no other factors that, in the exercise of discretion," would "make[] the grant of deferred action inappropriate." Johnson Deferred Action Memorandum at 4. The proposed policy does not specify what would count as such a factor; it thus leaves the relevant USCIS official with substantial discretion to determine whether a grant of deferred action is warranted. In other words, even if an alien is not a removal priority under the proposed policy discussed in Part I, has continuously resided in the United States since before January 1, 2010, is physically present in the country, and is a parent of an LPR or a U.S. citizen, the USCIS official evaluating the alien's deferred action application must still make a judgment, in the exercise of her discretion, about whether that alien presents any other factor that would make a grant of deferred action inappropriate. This feature of the proposed program ensures that it does not create a categorical entitlement to deferred action that could raise concerns that DHS is either impermissibly attempting to rewrite or categorically declining to enforce the law with respect to a particular group of undocumented aliens.

Finally, the proposed deferred action program would resemble in material respects the kinds of deferred action programs Congress has implicitly approved in the past, which provides some indication that the proposal is consonant not only with interests reflected in immigration law as a general matter, but also with congressional understandings about the permissible uses of deferred action. As noted above, the program uses deferred action as an interim measure for a group of aliens to whom Congress has given a prospective entitlement to lawful immigration status. While Congress has provided a path to lawful status for the parents of U.S. citizens and LPRs, the process of obtaining that status "takes time." *Cuellar de Osorio*, 134 S. Ct. at 2199. The proposed program would provide a mechanism for families to remain together, depending on their circumstances, for some or all of the intervening period.[14] Immigration officials have on several

---

[14] DHS's proposed program would likely not permit all potentially eligible parents to remain together with their children for the entire duration of the time until a visa is awarded. In particular, undocumented parents of adult citizens who are physically present in the country would be ineligible to adjust their status without first leaving the country if they had never been "inspected and admitted or paroled into the United States." 8 U.S.C. § 1255(a) (permitting the Attorney General to adjust to permanent resident status certain aliens present in the United States if they become eligible for immigrant visas). They would thus need to leave the country to obtain a visa at a U.S. consulate abroad. *See id.* § 1201(a); *Cuellar de Osorio*, 134 S. Ct. at 2197–99. But once such parents left the country, they would in most instances become subject to the 3- or 10-year bar under 8 U.S.C. § 1182(a)(9)(B)(i) and therefore unable to obtain a visa unless they remained outside the country for the duration of the bar. DHS's proposed program would nevertheless enable other families to stay together without regard to the 3- or 10-year bar. And even as to those families with parents who would become subject to that bar, the proposed deferred action program would have the effect of reducing the

**App. 1203**

occasions deployed deferred action programs as interim measures for other classes of aliens with prospective entitlements to lawful immigration status, including VAWA self-petitioners, bona fide T and U visa applicants, certain immediate family members of certain U.S. citizens killed in combat, and certain immediate family members of aliens killed on September 11, 2001. As noted above, each of these programs has received Congress's implicit approval—and, indeed, in the case of VAWA self-petitioners, a direction to expand the program beyond its original bounds. *See supra* pp. 18–20.[15] In addition, much like these and other programs Congress has implicitly endorsed, the program serves substantial and particularized humanitarian interests. Removing the parents of U.S. citizens and LPRs—that is, of children who have established permanent legal ties to the United States—would separate them from their nuclear families, potentially for many years, until they were able to secure visas through the path Congress has provided. During that time, both the parents and their U.S. citizen or LPR children would be deprived of both the economic support and the intangible benefits that families provide.

We recognize that the proposed program would likely differ in size from these prior deferred action programs. Although DHS has indicated that there is no reliable way to know how many eligible aliens would actually apply for or would be likely to receive deferred action following individualized consideration under the proposed program, it has informed us that approximately 4 million individuals could be eligible to apply. *See* Shahoulian E-mail. We have thus considered whether the size of the program alone sets it at odds with congressional policy or the Executive's duties under the Take Care Clause. In the absence of express statutory guidance, it is difficult to say exactly how the program's potential size bears on its permissibility as an exercise of executive enforcement discretion. But because the size of DHS's proposed program corresponds to the size of a population to which Congress has granted a prospective entitlement to lawful status

---

amount of time the family had to spend apart, and could enable them to adjust the timing of their separation according to, for example, their children's needs for care and support.

[15] Several extended voluntary departure programs have been animated by a similar rationale, and the most prominent of these programs also received Congress's implicit approval. In particular, as noted above, the Family Fairness policy, implemented in 1990, authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens granted legal status under IRCA—aliens who would eventually "acquire lawful permanent resident status" and be able to petition on behalf of their family members. Family Fairness Memorandum at 1; *see supra* pp. 14–15. Later that year, Congress granted the beneficiaries of the Family Fairness program an indefinite stay of deportation. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 301, 104 Stat. 4978, 5030. Although it did not make that grant of relief effective for nearly a year, Congress clarified that "the delay in effectiveness of this section shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date." *Id.* § 301(g). INS's policies for qualifying Third Preference visa applicants and nurses eligible for H-1 nonimmigrant status likewise extended to aliens with prospective entitlements to lawful status. *See supra* p. 14.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

without numerical restriction, it seems to us difficult to sustain an argument, based on numbers alone, that DHS's proposal to grant a limited form of administrative relief as a temporary interim measure exceeds its enforcement discretion under the INA. Furthermore, while the potential size of the program is large, it is nevertheless only a fraction of the approximately 11 million undocumented aliens who remain in the United States each year because DHS lacks the resources to remove them; and, as we have indicated, the program is limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. There is thus little practical danger that the program, simply by virtue of its size, will impede removals that would otherwise occur in its absence. And although we are aware of no prior exercises of deferred action of the size contemplated here, INS's 1990 Family Fairness policy, which Congress later implicitly approved, made a comparable fraction of undocumented aliens—approximately four in ten— potentially eligible for discretionary extended voluntary departure relief. *Compare* CRS Immigration Report at 22 (estimating the Family Fairness policy extended to 1.5 million undocumented aliens), *with* Office of Policy and Planning, INS, *Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000* at 10 (2003) (estimating an undocumented alien population of 3.5 million in 1990); *see supra* notes 5 & 15 (discussing extended voluntary departure and Congress's implicit approval of the Family Fairness policy). This suggests that DHS's proposed deferred action program is not, simply by virtue of its relative size, inconsistent with what Congress has previously considered a permissible exercise of enforcement discretion in the immigration context.

In light of these considerations, we believe the proposed expansion of deferred action to the parents of U.S. citizens and LPRs is lawful. It reflects considerations—responding to resource constraints and to particularized humanitarian concerns arising in the immigration context—that fall within DHS's expertise. It is consistent with congressional policy, since it focuses on a group—law-abiding parents of lawfully present children who have substantial ties to the community— that Congress itself has granted favorable treatment in the immigration process. The program provides for the exercise of case-by-case discretion, thereby avoiding creating a rule-like entitlement to immigration relief or abdicating DHS's enforcement responsibilities for a particular class of aliens. And, like several deferred action programs Congress has approved in the past, the proposed program provides interim relief that would prevent particularized harm that could otherwise befall both the beneficiaries of the program and their families. We accordingly conclude that the proposed program would constitute a permissible exercise of DHS's enforcement discretion under the INA.

### 2.

We now turn to the proposed deferred action program for the parents of DACA recipients. The relevant considerations are, to a certain extent, similar to those

**App. 1205**

discussed above: Like the program for the parents of U.S. citizens and LPRs, the proposed program for parents of DACA recipients would respond to severe resource constraints that dramatically limit DHS's ability to remove aliens who are unlawfully present, and would be limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. And like the proposed program for LPRs and U.S. citizens, the proposed program for DACA parents would preserve a significant measure of case-by-case discretion not to award deferred action even if the general eligibility criteria are satisfied.

But the proposed program for parents of DACA recipients is unlike the proposed program for parents of U.S. citizens and LPRs in two critical respects. First, although DHS justifies the proposed program in large part based on considerations of family unity, the parents of DACA recipients are differently situated from the parents of U.S. citizens and LPRs under the family-related provisions of the immigration law. Many provisions of the INA reflect Congress's general concern with not separating individuals who are legally entitled to live in the United States from their immediate family members. *See, e.g.*, 8 U.S.C. § 1151(b)(2)(A)(i) (permitting citizens to petition for parents, spouses and children); *id.* § 1229b(b)(1) (allowing cancellation of removal for relatives of citizens and LPRs). But the immigration laws do not express comparable concern for uniting persons who lack lawful status (or prospective lawful status) in the United States with their families. DACA recipients unquestionably lack lawful status in the United States. *See* DACA Toolkit at 8 ("Deferred action . . . does not provide you with a lawful status."). Although they may presumptively remain in the United States, at least for the duration of the grant of deferred action, that grant is both time-limited and contingent, revocable at any time in the agency's discretion. Extending deferred action to the parents of DACA recipients would therefore expand family-based immigration relief in a manner that deviates in important respects from the immigration system Congress has enacted and the policies that system embodies.

Second, as it has been described to us, the proposed deferred action program for the parents of DACA recipients would represent a significant departure from deferred action programs that Congress has implicitly approved in the past. Granting deferred action to the parents of DACA recipients would not operate as an interim measure for individuals to whom Congress has given a prospective entitlement to lawful status. Such parents have no special prospect of obtaining visas, since Congress has not enabled them to self-petition—as it has for VAWA self-petitioners and individuals eligible for T or U visas—or enabled their undocumented children to petition for visas on their behalf. Nor would granting deferred action to parents of DACA recipients, at least in the absence of other factors, serve interests that are comparable to those that have prompted implementation of deferred action programs in the past. Family unity is, as we have discussed, a significant humanitarian concern that underlies many provisions of the INA. But a concern with furthering family unity alone would not justify the

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

proposed program, because in the absence of any family member with lawful status in the United States, it would not explain why that concern should be satisfied by permitting family members to remain in the United States. The decision to grant deferred action to DACA parents thus seems to depend critically on the earlier decision to make deferred action available to their children. But we are aware of no precedent for using deferred action in this way, to respond to humanitarian needs rooted in earlier exercises of deferred action. The logic underlying such an expansion does not have a clear stopping point: It would appear to argue in favor of extending relief not only to parents of DACA recipients, but also to the close relatives of any alien granted deferred action through DACA or any other program, those relatives' close relatives, and perhaps the relatives (and relatives' relatives) of any alien granted any form of discretionary relief from removal by the Executive.

For these reasons, the proposed deferred action program for the parents of DACA recipients is meaningfully different from the proposed program for the parents of U.S. citizens and LPRs. It does not sound in Congress's concern for maintaining the integrity of families of individuals legally entitled to live in the United States. And unlike prior deferred action programs in which Congress has acquiesced, it would treat the Executive's prior decision to extend deferred action to one population as justifying the extension of deferred action to additional populations. DHS, of course, remains free to consider whether to grant deferred action to individual parents of DACA recipients on an ad hoc basis. But in the absence of clearer indications that the proposed class-based deferred action program for DACA parents would be consistent with the congressional policies and priorities embodied in the immigration laws, we conclude that it would not be permissible.

### III.

In sum, for the reasons set forth above, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be legally permissible, but that the proposed deferred action program for parents of DACA recipients would not be permissible.

KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

**App. 1207**

# Exhibit 20



**U.S. Citizenship and Immigration Services**

# DEFERRED ACTION FOR CHILDHOOD ARRIVALS
## (DACA) TOOLKIT:

Resources for Community Partners

In addition to the resources in this toolkit, USCIS has created a power point presentation on DACA to be used in stakeholder outreach events. To request a copy of the presentation, please contact the USCIS Public Engagement Division at **Public.Engagement@ uscis.dhs.gov**.

# TABLE OF CONTENTS

**4**   Program Overview

**6**   DACA "How Do I" Guide

**9**   Initial vs Renewal DACA Tip Sheet

**10**   Frequently Asked Questions by Topic

    10   *What is DACA?*
    11   *DACA Process*
    14   *Background Checks*
    15   *After USCIS Makes a Decision*
    16   *Initial Requests for DACA*
    22   *Renewal of DACA*
    23   *Travel*
    25   *Criminal Convictions*
    27   *Miscellaneous*

**29**   DACA Process Infographic Flyer

**30**   Avoid Immigration Scams Flyer

**31**   List of Federal Government resources pertaining to DACA

# PROGRAM OVERVIEW

## Background

- USCIS began accepting requests under the Deferred Action for Childhood Arrivals (DACA) program on August 15, 2012. The DACA process was created by the Secretary of Homeland Security to offer relief from removal (in 2-year increments) for undocumented immigrants who came to the United States as children and who met several key criteria. DACA is an exercise of prosecutorial discretion and does not provide lawful status.

- The first USCIS-approved DACA grants were issued in September 2012. The initial 2-year duration will begin to expire for certain individuals in September 2014. Those individuals will be able to request consideration for renewal of DACA for a 2-year period.

- Some individuals were granted DACA by U.S. Immigration and Customs Enforcement (ICE) between June 15, 2012, and August 15, 2012. In February 2014, USCIS provided guidance to these individuals on the process they should follow to request DACA renewals.

- USCIS has updated Form I-821D [dated 6/4/14] to allow individuals to request a 2-year renewal of DACA. Previous versions of the form will not be accepted after June 5, 2014. There will be no grace period for individuals to submit a previous version of Form I-821D to request a renewal of their deferred action.

- Individuals who have not yet requested consideration for DACA must also use the new Form I-821D.

- In addition to the new Form I-821D, all individuals must also submit a Form I-795, Application for Employment Authorization (along with the accompanying fees for that form), and a Form I-765WS, Worksheet, when requesting either initial DACA or renewal of DACA.

- Individuals who allow their initial 2-year period of DACA to expire and do not seek renewal will no longer be considered to be lawfully present for inadmissibility purposes and will no longer be authorized to work legally in the United States. To ensure that their deferred action does not lapse, USCIS recommends that current DACA recipients submit Forms I-821D, I-765, and I-765 Worksheet approximately 120 days (4 months) before their 2-year period of deferred action expires. However, USCIS may reject DACA requests received earlier than 150 days (5 months) before an individual's 2-year period of deferred action expires.

- For more information on requesting DACA, please visit our Web site at **www.uscis.gov/ childhoodarrivals** or call our National Customer Service Center at (800) 375-5283.

## Renewal DACA Requests

- An individual may be considered for renewal of DACA if he or she met the guidelines for initial DACA and he or she:
  - Did not depart the United States on or after June 15, 2007, without advance parole;
  - Has continuously resided in the United States since he or she submitted his or her most recent DACA request that was approved up until the present time; and
  - Has not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and does not otherwise pose a threat to national security or public safety.

- Requests for renewal should be submitted to USCIS no less than 120 days, and no more than 150 days prior to the expiration of the current period of deferred action.

## Initial DACA Requests

- USCIS will also continue to accept initial requests for DACA. An individual may be considered for initial DACA if he or she:

  − Was under the age of 31 as of June 15, 2012;

  − Came to the United States before reaching his or her 16th birthday;

  − Has continuously resided in the United States since June 15, 2007, up to the present time;

  − Was physically present in the United States on June 15, 2012, and at the time of making his or her request for consideration of deferred action with USCIS;

  − Had no lawful status on June 15, 2012.

    **NOTE:**

    No lawful status on June 15, 2012, means that:

    ◆ You never had a lawful immigration status on or before June 15, 2012; or

    ◆ Any lawful immigration status or parole that you obtained prior to June 15, 2012, had expired as of June 15, 2012.

  − Is currently in school, has graduated or obtained a certificate of completion from high school, has obtained a General Education Development (GED) certificate, or is an honorably discharged veteran of the Coast Guard or U.S. Armed Forces; and

  − Has not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and does not otherwise pose a threat to national security or public safety;

- Individuals who were younger than 15 when DACA was first announced and are not in removal proceedings or have a final order may request DACA from USCIS any time after they have reached their 15th birthday. Individuals who are in removal proceedings or who have a final order may request DACA from USCIS even if they are younger than 15 at the time of filing.

## Consideration of DACA

- USCIS has updated Form I-821D [dated 6/4/14] to allow individuals to request renewal of DACA for an additional 2-year period. Previous versions of the form will not be accepted after June 5, 2014.

- There will be no grace period for individuals to submit a previous version of Form I-821D to request a renewal of their deferred action.

- There is no fee for Form I-821D. The fee for Form I-765 and the required biometrics is $465.

## Avoiding Immigration Scams

- Please be aware of immigration scams. Unauthorized practitioners of immigration law may try to take advantage of individuals by charging them money to obtain or submit forms related to DACA or communicate with USCIS on their behalf. Visit **www.uscis.gov/avoidscams** or **www.uscis. gov/eviteestafas** for tips on how to find authorized legal assistance and how to recognize and avoid immigration services scams.

- Protect yourself from immigration scams. Official U.S. Government Web sites should be your main source of information on DACA and immigration services. Go to **www.uscis.gov** to learn more.

- If you need legal immigration advice, be sure to use an authorized professional. This means an attorney in good standing or a Board of Immigration Appeals (BIA) accredited representative. Check the BIA Web site for a list of attorneys who provide immigration services for low to no cost and for a list of disciplined attorneys. You can also check the American Bar Association or your State bar association for legal services in your State.

- If you are a victim of an immigration scam, report it to the Federal Trade Commission at **www.ftc.gov/complaint** or **www.ftc.gov/queja** or by calling (877) FTC-HELP ((877) 372-4357).



# General information F5

## How do I request consideration of deferred action for childhood arrivals (DACA)?


U.S. Citizenship and Immigration Services

On June 15, 2012, the Secretary of Homeland Security announced that certain people who came to the United States as children and meet several key guidelines may request consideration of deferred action for a period of 2 years, subject to renewal. Those granted deferred action are also eligible for work authorization.

Only individuals who can prove through verifiable documentation that they meet these guidelines will be considered for deferred action. Determinations will be made on a case-by-case basis under the guidelines in the Secretary's memorandum.

### How do I know if I may request consideration of deferred action for childhood arrivals?

You may request consideration if you:

1. Were under the age of 31 as of June 15, 2012;
2. Came to the United States before reaching your 16th birthday;
3. Have continuously resided in the United States since June 15, 2007, up to the present time;
4. Were physically present in the United States on June 15, 2012, and at the time of making your request with USCIS;
5. Had no lawful status on June 15, 2012, which means that:
   – You never had a lawful immigration status on or before June 15, 2012; or
   – Any lawful status or parole that you obtained prior to June 15, 2012, had expired as of June 15, 2012.
6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Education Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or U.S. Armed Forces; and
7. Have not been convicted of a felony, significant misdemeanor, or three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

### How do I request consideration of deferred action for childhood arrivals?

You must submit **Form I-821D**, Consideration of Deferred Action for Childhood Arrivals. This form must be completed, properly signed, and accompanied by a **Form I-765**, Application for Employment Authorization, and a **Form I-765WS**, Form I-765 Worksheet. Failure to submit a completed Form I-765, accompanied by the correct fees, will disqualify you from consideration for deferred action. While there is no filing fee for Form I-821D, you must submit the $380 filing fee and $85 biometric services fee for Form I-765, for a total fee of $465. Please read the form instructions to ensure that you submit all the required documentation to support your request. See **www.uscis.gov/I-821D** and **www.uscis.gov/I-765** for complete filing instructions. See **www.uscis.gov/childhoodarrivals** for additional information on the deferred action for childhood arrivals process.

**Please Note:** Once you receive a receipt confirming that your request is properly filed, you will be sent an appointment notice to visit an Application Support Center for biometric services (photograph and fingerprints). Please make sure you read and follow the directions in the notice. Failure to attend your biometrics appointment may delay processing or result in a denial of your request.

### Where do I file my request for consideration of deferred action for childhood arrivals?

Requests for consideration of deferred action for childhood arrivals will be filed by mail to the USCIS Lockbox. Please visit **www.uscis.gov/I-821D** or contact the USCIS National Customer Service Center at **(800) 375-5283** for the most current information and instructions on where to mail your request.

### What evidence should I submit with my initial request for consideration of deferred action for childhood arrivals?

For initial requests, the evidence should show that you meet the guidelines outlined above in "How do I know if I may request consideration of deferred action for childhood arrivals?" This includes evidence that you:

F5—General information…How do I request consideration of deferred action for childhood arrivals?
M-1079B (June 2014) N

App. 1214

1. Were born after June 15, 1981;

2. Arrived in the United States before the age of 16;

3. Have continuously resided in the United States since June 15, 2007, up to the present time;

4. Were present in the United States on June 15, 2012;

5. Had no lawful status on June 15, 2012;

6. Are currently in school, have graduated or received a certificate of completion from high school, obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or U.S. Armed Forces; and

7. Are at least 15 years of age at the time of filing if you have never been in removal proceedings or if your case was terminated before you submit your request for consideration of deferred action for childhood arrivals.

For information about specific documents that may satisfy these guidelines, please read the instructions to Form I-821D at **www.uscis.gov/I-821D** and the frequently asked questions at **www.uscis.gov/childhoodarrivals**.

**Does this process apply to me if I am currently in removal proceedings, have a final removal order, or have a voluntary departure order?**

Yes. This process is open to any individuals who can demonstrate that they meet the guidelines, including those who have never been in removal proceedings as well as those in removal proceedings, with a final order, or with a voluntary departure order (as long as they are not in immigration detention). If you are not in immigration detention and want to affirmatively request consideration of deferred action, you must submit your request to USCIS. You do not need to be 15 years of age or older at the time of filing if you are in removal proceedings, have a final removal order, or have a voluntary departure order. All cases will be considered on an individual basis.

Submit a copy of the removal order or any document issued by the immigration judge or the final decision from the Board of Immigration Appeals, if available. This requirement applies only to people who have been in removal proceedings.

**Do brief departures affect my ability to satisfy the continuous residence in the United States since June 15, 2007, guideline?**

A brief, casual, and innocent absence from the United States will not interrupt your continuous residence. Any absence will be considered brief, casual, and innocent if it occurred before August 15, 2012, and was:

1. Short and reasonably calculated to accomplish the purpose for the absence;

2. Not because of an order of exclusion, deportation, or removal;

3. Not because of an order of voluntary departure, or an administrative grant of voluntary departure before you were placed in exclusion, deportation, or removal proceedings; and

4. The purpose of the absence and/or your actions while outside the United States were not contrary to law.

Any unauthorized travel outside of the United States on or after August 15, 2012, will interrupt your period of continuous residence and you will not be considered for deferred action under this process.

For information about specific documents that may show your absence was brief, casual, and innocent, please read the instructions at **www.uscis.gov/I-821D** and the frequently asked questions at **www.uscis.gov/childhoodarrivals**.

**Will USCIS conduct a background check when reviewing my request for consideration of deferred action for childhood arrivals?**

Yes. You must undergo background checks before USCIS will exercise prosecutorial discretion. You will not be considered for deferred action for childhood arrivals, unless there are exceptional circumstances, if you have been convicted of:

- Any felony;

- A significant misdemeanor offense;

- Three or more misdemeanor offenses (not occurring on the same date and not arising out of the same act, omission or scheme of misconduct); or

- You otherwise pose a threat to national security or public safety.

**What happens after I submit my request for consideration of deferred action for childhood arrivals?**

After receiving your Form I-821D, Form I-765, and Form I-765WS, USCIS will review them for completeness, including the required fees, initial evidence, and signatures. If the request is complete, USCIS will send you a receipt notice. USCIS will then send you a notice scheduling you to visit an Application Support Center for fingerprinting and photographing. You may choose to receive an email and/or text message notifying you that your form has been accepted by completing a **Form G-1145**, E-Notification of Application/Petition Acceptance. Please see **www.uscis.gov/G-1145** for instructions.

Each request for consideration of deferred action for childhood arrivals will be reviewed on an individual, case-by-case basis. You will be notified of USCIS' determination in writing. USCIS may request more information or evidence, or may request that you appear at a USCIS office. There is no appeal or motion to reopen/reconsider the denial of a request for consideration of deferred action for childhood arrivals.

**Can I renew the period for which removal action will be deferred in my case?**

Yes. You may request consideration of renewal of your deferred action for childhood arrivals. Your request for a renewal will be considered on a case-by-case basis. If USCIS renews its exercise of discretion under deferred action for childhood arrivals for your case, you will receive deferred action for another 2 years, and if you demonstrate an economic necessity for employment you may receive employment authorization throughout that period.

**How do I know if I may request a renewal of my deferred action for childhood arrivals?**

You may request consideration of renewal of deferred action for childhood arrivals if you met the guidelines for initial deferred action for childhood arrivals (see above) and you:

1. Did not depart the United States on or after August 15, 2012, without advance parole;

2. Have continuously resided in the United States since you submitted your most recent deferred action for childhood arrivals request that was approved up to the present time;

3. Have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety.

Requests for renewal should be submitted to USCIS around 120 days (but no more than 150 days) before the expiration of the current period of deferred action. To request renewal of your deferred action for childhood arrivals, submit Form I-821D, Form I-765, and Form I-765WS along with the $380 filing fee for the Form I-765 and a $85 biometric services fee, for a total of $465.

You do not need to provide any additional documents at the time you request renewal of deferred action for childhood arrivals unless you have **new** documents related to removal proceedings or criminal history that you did not submit to USCIS in a previously approved deferred action for childhood arrivals request.

### If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?

If your request for consideration of deferred action for childhood arrivals is denied, USCIS will apply its policy guidance governing the referral of cases to U.S. Immigration and Customs Enforcement (ICE) and the issuance of Notices to Appear (NTA). If your case does not involve a criminal offense, fraud, or a threat to national security or public safety, your case will not be referred to ICE for removal proceedings except in exceptional circumstances. For more detailed information, visit **www.uscis.gov/nta**.

### Does this process result in lawful status for people who receive deferred action for childhood arrivals?

No. Deferred action under this process is only a discretionary determination to defer removal action. It is an act of prosecutorial discretion and does not provide you with a lawful status.

### What protections are in place to protect the information I share in my request from being used for immigration enforcement purposes?

The information you provide in your request is protected from disclosure to U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless you meet the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria explained in USCIS' Notice to Appear guidance at **www.uscis.gov/nta**. Individuals whose cases are deferred under the consideration of deferred action for childhood arrivals process will not be referred to ICE.

The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal. These other purposes could include: for assistance in the consideration of deferred action for childhood arrivals, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. This information-sharing clause covers family members and guardians, in addition to the person requesting deferred action.

This policy may be modified, superseded, or rescinded at any time without notice. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

## Key Information

| Key USCIS forms referenced in this guide | Form # |
|---|---|
| Consideration of Deferred Action for Childhood Arrivals | I-821D |
| Application for Employment Authorization | I-765 |
| I-765 Worksheet | I-765WS |
| E-Notification of Application/Petition Acceptance | G-1145 |

| Key USCIS Web sites referenced in this guide | Web site link |
|---|---|
| Information about Deferred Action for Childhood Arrivals process and frequently asked questions | **www.uscis.gov/childhoodarrivals** |
| Consideration of Deferred Action for Childhood Arrivals Form | **www.uscis.gov/I-821D** |
| Application for Employment Authorization | **www.uscis.gov/I-765** |
| E-Notification of Application/Petition Acceptance Form | **www.uscis.gov/G-1145** |
| USCIS Notice to Appear Policy | **www.uscis.gov/NTA** |

| Other U.S. Government Services-Click or Call | |
|---|---|
| General Information | **www.usa.gov** |
| New Immigrants | **www.welcometoUSA.gov** |
| U.S. Immigration & Customs Enforcement | **www.ice.gov** |

For more copies of this guide, or information about other customer guides, please visit **www.uscis.gov/howdoi**.

You can also visit **www.uscis.gov** to download forms, e-file some applications, check the status of an application, and more. It's a great place to start!

If you don't have Internet access at home or work, try your local library.

If you cannot find what you need, please call

**Customer Service at: (800) 375-5283**
*TDD for hearing-impaired: (800) 767-1833.*

**Disclaimer:** *This guide provides basic information to help you become generally familiar with our rules and procedures. For more information, or the law and regulations, please visit our Web site. Immigration law can be complex, and it is impossible to describe every aspect of every process. You may wish to be represented by a licensed attorney or by a nonprofit agency recognized by the Board of Immigration Appeals.*

# Deferred Action for Childhood Arrivals (DACA) Tip Sheet
## At a Glance: Initial vs. Renewal DACA Process

| | **Initial DACA** | **Renewal DACA** |
|---|---|---|
| **Guidelines** | You may request consideration of initial DACA if you:<br><br>• Were under the age of 31 as of June 15, 2012;<br>• Came to the United States before reaching your 16th birthday;<br>• Have continuously resided in the United States since June 15, 2007, up to the present time;<br>• Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;<br>• Had no lawful immigration status on June 15, 2012;<br>• Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a general education development (GED) certificate (or other State-authorized exam in the United States), or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and<br>• Have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety. | You may request consideration of renewal DACA if you met the guidelines for initial DACA and you:<br><br>• Did not depart the United States on or after August Aw15, 2012, without advance parole;<br>• Have continuously resided in the United States since you submitted your most recent request for DACA that was approved up to the present time; and<br>• Have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety. |
| **How to Request** | • Complete and sign:<br>  ❑ Form I-821D, Consideration of Deferred Action for Childhood Arrivals;<br>  ❑ Form I-765, Application for Employment Authorization; and<br>  ❑ Form I-765W, Worksheet.<br>• Submit all three forms, the $465 filing and biometrics fee and any required documentation to USCIS following the instructions on the forms. | • Complete and sign:<br>  ❑ Form I-821D, Consideration of Deferred Action for Childhood Arrivals;<br>  ❑ Form I-765, Application for Employment Authorization; and<br>  ❑ Form I-765W, Worksheet.<br>  ❑ Submit all three forms and the $465 filing and biometrics fee and any required documentation to USCIS following the instructions on the forms.<br>  ❑ Do not provide any additional documents at the time you request renewal of DACA unless you have new documents pertaining to removal proceedings or criminal history that you have not already submitted to USCIS in a previously approved DACA request. |
| **When to File** | You can file a request for initial DACA at any time. | USCIS encourages you to submit your request for renewal approximately 120 days (or four months) prior to the expiration of your current period of deferred action. However, if you file your renewal request more than 150 days (or 5 months) prior to the expiration of your current period of deferred action, USCIS may reject your submission and return it to you with instructions to resubmit your request closer to the expiration date. |



U.S. Citizenship
and Immigration
Services

# FREQUENTLY ASKED QUESTIONS

**WHAT IS DEFERRED ACTION FOR CHILDHOOD ARRIVALS?**

Over the past several years, this Administration has undertaken an unprecedented effort to transform the immigration enforcement system into one that focuses on national security, public safety, border security, and the integrity of the immigration system. As the Department of Homeland Security (DHS) continues to focus its enforcement resources on the removal of individuals who pose a danger to national security or a risk to public safety, DHS will exercise prosecutorial discretion as appropriate to ensure that enforcement resources are not expended on low priority cases, such as individuals who came to the United States as children and meet other key guidelines. Individuals who demonstrate that they meet the guidelines below may request consideration of deferred action for childhood arrivals (DACA) for a period of 2 years, subject to renewal for a period of 2 years, and may be eligible for employment authorization.

**You may request consideration of DACA if you:**

1. Were under the age of 31 as of June 15, 2012;

2. Came to the United States before reaching your 16th birthday;

3. Have continuously resided in the United States since June 15, 2007, up to the present time;

4. Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

5. Had no lawful status on June 15, 2012, meaning that:

   − You never had a lawful immigration status on or before June 15, 2012, or

   − Any lawful immigration status or parole that you obtained prior to June 15, 2012, had expired as of June 15, 2012.

6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

7. Have not been convicted of a felony, a significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

Individuals can call U.S. Citizenship and Immigration Services (USCIS) at 1-800-375-5283 with questions or to request more information on DACA. Those with pending requests can also use a number of **online self-help tools** which include the ability to check case status and processing times, change your address, and send an inquiry about a case pending longer than posted processing times or non-delivery of a card or document.

## What is Deferred Action?

Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion. For purposes of future inadmissibility based upon **unlawful presence**, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect. An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect. However, deferred action does not confer **lawful status** upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence.

Under existing regulations, an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate "an economic necessity for employment." DHS can terminate or renew deferred action at any time, at the agency's discretion.

## What is DACA?

On June 15, 2012, the Secretary of Homeland Security announced that certain people who came to the United States as children and meet several key guidelines may request consideration of deferred action for a period of 2 years, subject to renewal, and would then be eligible for work authorization.

Individuals who can demonstrate through verifiable documentation that they meet these guidelines will be considered for deferred action. Determinations will be made on a case-by-case basis under the DACA guidelines.

## Is there any difference between "deferred action" and DACA under this process?

DACA is one form of deferred action. The relief an individual receives under DACA is identical for immigration purposes to the relief obtained by any person who receives deferred action as an act of prosecutorial discretion.

## If my removal is deferred under the consideration of DACA, am I eligible for employment authorization?

**YES**. Under existing regulations, if your case is deferred, you may obtain employment authorization from USCIS provided you can demonstrate an economic necessity for employment.

## If my case is deferred, am I in lawful status for the period of deferral?

**NO**. Although action on your case has been deferred and you do not accrue unlawful presence (for admissibility purposes) during the period of deferred action, deferred action does not confer any lawful status.

The fact that you are not accruing unlawful presence does not change whether you are in lawful status while you remain in the United States. However, although deferred action does not confer a lawful immigration status, your period of stay is authorized by the Department of Homeland Security while your deferred action is in effect and, for admissibility purposes, you are considered to be lawfully present in the United States during that time. **Individuals granted deferred action are not precluded by Federal law from establishing domicile in the United States.**

Apart from the immigration laws, "lawful presence," "lawful status," and similar terms are used in various other Federal and State laws. For information on how those laws affect individuals who receive a favorable exercise of prosecutorial discretion under DACA, please contact the appropriate Federal, State, or local authorities.

## Can I renew my period of deferred action and employment authorization under DACA?

**YES**. You may request consideration for a renewal of your DACA. Your request for a renewal will be considered on a case-by-case basis. If USCIS renews its exercise of discretion under DACA for your case, you will receive deferred action for another 2 years, and if you demonstrate an economic necessity for employment, you may receive employment authorization throughout that period.

**DACA PROCESS**

## How do I request consideration of DACA?

To request consideration of DACA (either as an initial request or to request a renewal), you must submit **Form I-821D, Consideration of Deferred Action for Childhood Arrivals,** to USCIS. Please visit **www.uscis. gov/i-821d** before you begin the process to make sure you are using the most current version of the form available. This form must be completed, properly signed, and accompanied by a **Form I-765, Application for Employment Authorization**, and a **Form I-765WS, Worksheet**, establishing your economic need for employment. If you fail to submit a completed Form I-765 (along with the accompanying filing fees for that form, totaling $465), USCIS will not consider your request for deferred action. Please read the form instructions to ensure that you answer the appropriate questions (determined by whether you are submitting an initial or renewal request) and that you submit all the required documentation to support your initial request.

You must file your request for consideration of DACA at the USCIS Lockbox. You can find the mailing address and instructions at **www.uscis.gov/i-821d**. As of June 5, 2014, requestors must use the new version of the

form. After your Form I-821D, Form I-765, and Form I-765 Worksheet have been received, USCIS will review them for completeness, including submission of the required fee, initial evidence and supporting documents (for initial filings).

If it is determined that the request is complete, USCIS will send you a receipt notice. USCIS will then send you an appointment notice to visit an Application Support Center (ASC) for biometric services, if an appointment is required. Please make sure you read and follow the directions in the notice. Failure to attend your biometrics appointment may delay processing of your request for consideration of deferred action, or may result in a denial of your request. You may also choose to receive an email and/or text message notifying you that your form has been accepted by completing a **Form G-1145, E-Notification of Application/Petition Acceptance**.

Each request for consideration of DACA will be reviewed on an individual, case-by-case basis. USCIS may request more information or evidence from you, or request that you appear at a USCIS office. USCIS will notify you of its determination in writing.

**Note:** All individuals who believe they meet the guidelines, including those in removal proceedings, with a final removal order, or with a voluntary departure order (and not in immigration detention), may affirmatively request consideration of DACA from USCIS through this process. Individuals who are currently in immigration detention and believe they meet the guidelines may not request consideration of deferred action from USCIS but may identify themselves to their deportation officer or Jail Liaison. You may also contact the ICE Field Office Director. For more information visit ICE's Web site at **www.ice.gov/daca**.

## Can I obtain a fee waiver or fee exemption for this process?

There are no fee waivers available for employment authorization applications connected to DACA. There are very limited fee exemptions available. Requests for fee exemptions must be filed and favorably adjudicated before an individual files his or her request for consideration of DACA without a fee. In order to be considered for a fee exemption, you must submit a letter and supporting documentation to USCIS demonstrating that you meet one of the following conditions:

- You are under 18 years of age, have an income that is less than 150 percent of the U.S. poverty level, and are in foster care or otherwise lacking any parental or other familial support; or

- You are under 18 years of age and homeless; or

- You cannot care for yourself because you suffer from a serious, chronic disability and your income is less than 150 percent of the U.S. poverty level; or

- You have, at the time of the request, accumulated **$10,000** or more in debt in the past 12 months as a result of unreimbursed medical expenses for yourself or an immediate family member, and your income is less than 150 percent of the U.S. poverty level.

You can find additional information on our **Fee Exemption Guidance** Web page. Your request must be submitted and decided before you submit a request for consideration of DACA without a fee. In order to be considered for a fee exemption, you must provide documentary evidence to demonstrate that you meet any of the above conditions at the time that you make the request. For evidence, USCIS will:

- Accept affidavits from community-based or religious organizations to establish a requestor's homelessness or lack of parental or other familial financial support;

- Accept copies of tax returns, bank Statements, pay stubs, or other reliable evidence of income level. Evidence can also include an affidavit from the applicant or a responsible third party attesting that the applicant does not file tax returns, has no bank accounts, and/or has no income to prove income level;

- Accept copies of medical records, insurance records, bank Statements, or other reliable evidence of unreimbursed medical expenses of at least **$10,000**;

- Address factual questions through Requests for Evidence (RFEs).

**If individuals meet the guidelines for consideration of DACA and are encountered by U.S. Customs and Border Protection (CBP) or U.S. Immigration and Customs Enforcement (ICE), will they be placed into removal proceedings?**

DACA is intended, in part, to allow CBP and ICE to focus on priority cases. Under the direction of the Secretary of Homeland Security, if an individual meets the guidelines for DACA, CBP or ICE should exercise their discretion on a case-by-case basis to prevent qualifying individuals from being apprehended, placed into removal proceedings, or removed. If individuals believe that, in light of this policy, they should not have been apprehended or placed into removal proceedings, contact the Law Enforcement Support Center's hotline at (855) 448-6903 (staffed 24 hours a day, 7 days a week).

**Does this process apply to me if I am currently in removal proceedings, have a final removal order, or have a voluntary departure order?**

This process is open to any individual who can demonstrate he or she meets the guidelines for consideration, including those who have never been in removal proceedings as well as those in removal proceedings, with a final order, or with a voluntary departure order (as long as they are not in immigration detention).

**If I am not in removal proceedings but believe I meet the guidelines for consideration of DACA, should I seek to place myself into removal proceedings through encounters with CBP or ICE?**

**NO**. If you are not in removal proceedings but believe that you meet the guidelines, you should submit your DACA request to USCIS under the process outlined below.

**Can I request consideration of DACA from USCIS if I am in immigration detention under the custody of ICE?**

**NO**. If you are currently in immigration detention, you may not request consideration of DACA from USCIS. If you think you may meet the guidelines of this process, you should identify yourself to your deportation officer or Jail Liaison. You may also contact the ICE Field Office Director. For more information, visit ICE's Web site at **www.ice.gov/daca**.

**If I am about to be removed by ICE and believe that I meet the guidelines for consideration of DACA, what steps should I take to seek review of my case before removal?**

If you believe you can demonstrate that you meet the guidelines and are about to be removed, you should immediately contact the Law Enforcement Support Center's hotline at (855) 448-6903 (staffed 24 hours a day, 7 days a week).

**What should I do if I meet the guidelines of this process and have been issued an ICE detainer following an arrest by a State or local law enforcement officer?**

If you meet the guidelines and have been served a detainer, you should immediately contact the Law Enforcement Support Center's hotline at (855) 448-6903 (staffed 24 hours a day, 7 days a week).

**If I accepted an offer of administrative closure under the case-by-case review process or my case was terminated as part of the case-by-case review process, can I be considered for deferred action under this process?**

**YES**. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you have accepted an offer of administrative closure or termination under the case-by-case review process.

**If I declined an offer of administrative closure under the case-by-case review process, can I be considered for deferred action under this process?**

**YES**. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you declined an offer of administrative closure under the case-by-case review process.

**If my case was reviewed as part of the case-by-case review process but I was not offered administrative closure, can I be considered for deferred action under this process?**

**YES**. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA

even if you were not offered administrative closure following review of your case as part of the case-by-case review process.

## Can I request consideration of DACA under this process if I am currently in a nonimmigrant status (e.g., F-1, E-2, H-4) or have Temporary Protected Status (TPS)?

**NO**. You can only request consideration of DACA under this process if you currently have no immigration status and were not in any lawful status on June 15, 2012.

## Will the information I share in my request for consideration of DACA be used for immigration enforcement purposes?

Information provided in this request is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (**www.uscis.gov/NTA**). Individuals whose cases are deferred pursuant to DACA will not be referred to ICE. The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing policy covers family members and guardians, in addition to the requestor. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

## If my case is referred to ICE for immigration enforcement purposes or if I receive an NTA, will information related to my family members and guardians also be referred to ICE for immigration enforcement purposes?

If your case is referred to ICE for purposes of immigration enforcement or you receive an NTA, information related to your family members or guardians that is contained in your request will not be referred to ICE for purposes of immigration enforcement against family members or guardians. However, that information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense.

This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

## Will USCIS verify documents or Statements that I provide in support of a request for DACA?

USCIS has the authority to verify documents, facts, and Statements that are provided in support of requests for DACA. USCIS may contact education institutions, other government agencies, employers, or other entities in order to verify information.

**BACKGROUND CHECKS**

## Will USCIS conduct a background check when reviewing my request for consideration of DACA?

**YES**. You must undergo biographic and biometric background checks before USCIS will consider your DACA request.

## What do background checks involve?

Background checks involve checking biographic and biometric information provided by the individuals against a variety of databases maintained by DHS and other Federal Government agencies.

## What steps will USCIS and ICE take if I engage in fraud through the new process?

If you knowingly make a misrepresentation or knowingly fail to disclose facts, in an effort to obtain DACA or work authorization through this process, you will

be treated as an immigration enforcement priority to the fullest extent permitted by law and be subject to criminal prosecution and/or removal from the United States.

**AFTER USCIS MAKES A DECISION**

## Can I appeal USCIS' determination?

**NO**. You cannot file a motion to reopen or reconsider, and cannot appeal the decision if USCIS denies your request for consideration of DACA.

You may request a review of your I-821D denial by contacting USCIS' Call Centers at (800) 375-5283 to have a Service Request created if you believe that you actually did meet all of the DACA guidelines and you believe that your request was denied due to one of the following errors:

- Denied the request based on abandonment, when you actually responded to an RFE or NOID within the prescribed time;

- Mailed the RFE or NOID to the wrong address although you had submitted a Form AR-11, Change of Address, or changed your address online at www.uscis.gov before USCIS issued the RFE or NOID;

- Denied the request on the grounds that you did not come to the United States prior to your 16th birthday, but the evidence submitted **at the time of filing** shows that you did arrive before reaching that age;

- Denied the request on the grounds that you were under age 15 **at the time of filing** but not in removal proceedings, while the evidence submitted **at the time of filing** show that you indeed were in removal proceedings when the request was filed;

- Denied the request on the grounds that you were 31 or older as of June 15, 2012, but the evidence submitted **at the time of filing** shows that you were **not yet** 31 years old as of that date;

- Denied the request on the grounds that you had lawful status on June 15, 2012, but the evidence

submitted **at the time of filing** shows that you indeed were in an unlawful immigration status on that date;

- Denied the request on the grounds that you were not physically present in the United States on June 15, 2012, and up through the date of filing, but the evidence submitted **at the time of filing** shows that you were, in fact, present;

- Denied the request due to your failure to appear at a USCIS ASC to have your biometrics collected, when you in fact either did appear at a USCIS ASC to have this done or requested prior to the scheduled date of your biometrics appointment to have the appointment rescheduled; or

- Denied the request because you did not pay the filing fees for Form I-765, Application for Employment Authorization, when you actually did pay these fees.

If you believe your request was denied due to any of these administrative errors, you may contact our National Customer Service Center at (800) 375-5283 or (800) 767-1833 (TDD for the hearing impaired). Customer service officers are available Monday – Friday, 8 a.m. – 6 p.m, in each U.S. time zone.

## If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?

If you have submitted a request for consideration of DACA and USCIS decides not to defer action in your case, USCIS will apply its policy guidance governing the referral of cases to ICE and the issuance of a Notice to Appear (NTA). If your case does not involve a criminal offense, fraud, or a threat to national security or public safety, your case will not be referred to ICE for purposes of removal proceedings except where DHS determines there are exceptional circumstances. For more detailed information on the applicable NTA policy, visit **www.uscis.gov/NTA**. If after a review of the totality of circumstances USCIS determines to defer action in your case, USCIS will likewise exercise its discretion and will not issue you an NTA.

## Can my deferred action under the DACA process be terminated before it expires?

**YES**. DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion.

### INITIAL REQUESTS FOR DACA

## What guidelines must I meet to be considered for deferred action for childhood arrivals (DACA)?

Under the Secretary of Homeland Security's June 15, 2012 memorandum, in order to be considered for DACA, you must submit evidence, including supporting documents, showing that you:

1. Were under the age of 31 as of June 15, 2012;

2. Came to the United States before reaching your 16th birthday;

3. Have continuously resided in the United States since June 15, 2007, up to the present time;

4. Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

5. Had no lawful status on June 15, 2012;

6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

7. Have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

These guidelines must be met for consideration of DACA. U.S. Citizenship and Immigration Services (USCIS) retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the guidelines are met.

## How old must I be in order to be considered for deferred action under this process?

- If you have never been in removal proceedings, or your proceedings have been terminated before your request for consideration of DACA, you must be at least 15 years of age or older at the time of filing and meet the other guidelines.

- If you are in removal proceedings, have a final removal order, or have a voluntary departure order, and are not in immigration detention, you can request consideration of DACA even if you are under the age of 15 at the time of filing and meet the other guidelines.

- In all instances, you cannot be the age of 31 or older as of June 15, 2012, to be considered for DACA.

## I first came to the United States before I turned 16 years old and have been continuously residing in the United States since at least June 15, 2007. Before I turned 16 years old, however, I left the United States for some period of time before returning and beginning my current period of continuous residence. May I be considered for deferred action under this process?

**YES**, but only if you established residence in the United States during the period before you turned 16 years old, as evidenced, for example, by records showing you attended school or worked in the United States during that time, or that you lived in the United States for multiple years during that time. In addition to establishing that you initially resided in the United States before you turned 16 years old, you must also have maintained continuous residence in the United States from June 15, 2007, until the present time to be considered for deferred action under this process.

## To prove my continuous residence in the United States since June 15, 2007, must I provide evidence documenting my presence for every day, or every month, of that period?

To meet the continuous residence guideline, you must submit documentation that shows you have been living

in the United States from June 15, 2007, up until the time of your request. You should provide documentation to account for as much of the period as reasonably possible, but there is no requirement that every day or month of that period be specifically accounted for through direct evidence.

It is helpful to USCIS if you can submit evidence of your residence during at least each year of the period. USCIS will review the documentation in its totality to determine whether it is more likely than not that you were continuously residing in the United States for the period since June 15, 2007. Gaps in the documentation as to certain periods may raise doubts as to your continued residence if, for example, the gaps are lengthy or the record otherwise indicates that you may have been outside the United States for a period of time that was not brief, casual, or innocent.

If gaps in your documentation raise questions, USCIS may issue a Request for Evidence to allow you to submit additional documentation that supports your claimed continuous residence.

Affidavits may be submitted to explain a gap in the documentation demonstrating that you meet the five-year continuous residence requirement. If you submit affidavits related to the continuous residence requirement, you must submit two or more affidavits, sworn to or affirmed by people other than yourself who have direct personal knowledge of the events and circumstances during the period as to which there is a gap in the documentation. Affidavits may only be used to explain gaps in your continuous residence; they cannot be used as evidence that you meet the entire 5-year continuous residence requirement.

## Does "currently in school" refer to the date on which the request for consideration of deferred action is filed?

To be considered "currently in school" under the guidelines, you must be enrolled in school on the date you submit a request for consideration of deferred action under this process.

## Who is considered to be "currently in school" under the guidelines?

To be considered "currently in school" under the guidelines, you must be enrolled in:

- A public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or home-school program meeting State requirements;

- An education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement; or

- An education program assisting students either in obtaining a regular high school diploma or its recognized equivalent under State law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other State-authorized exam (e.g., HiSet or TASC) in the United States.

These education, literacy, career training programs (including vocational training), or education programs assisting students in obtaining a regular high school diploma or its recognized equivalent under State law, or in passing a GED exam or other State-authorized exam in the United States include but are not limited to programs funded, in whole or in part, by Federal, State, county or municipal grants or administered by nonprofit organizations. Programs funded by other sources may qualify if they are administered by providers of demonstrated effectiveness, such as institutions of higher education, including community colleges and certain community-based organizations.

In assessing whether such programs not funded in whole or in part by Federal, State, county, or municipal grants or administered by nonprofit organizations are of demonstrated effectiveness, USCIS will consider the duration of the program's existence; the program's track record in assisting students in obtaining a regular high school diploma or its recognized equivalent, in passing a GED or other State-authorized exam (e.g., HiSet or

TASC), or in placing students in postsecondary education, job training, or employment; and other indicators of the program's overall quality. For individuals seeking to demonstrate that they are "currently in school" through enrollment in such a program, the burden is on the requestor to show the program's demonstrated effectiveness.

## How do I establish that I am currently in school?

Documentation sufficient for you to demonstrate that you are currently in school may include but is not limited to:

- Evidence that you are enrolled in a public, private, or charter elementary school, junior high or middle school, high school or secondary school; alternative program, or homeschool program meeting State requirements; or

- Evidence that you are enrolled in an education, literacy, or career training program (including vocational training) that:

  – Has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement; and

  – The program is funded in whole or in part by Federal or State grants or is of demonstrated effectiveness; or evidence that you are enrolled in an education program assisting students in obtaining a high school equivalency diploma or certificate recognized under State law (such as by passing a GED exam or other such State-authorized exam (for example, HiSet or TASC), and that the program is funded in whole or in part by Federal, State, county or municipal grants or are administered by nonprofit organizations or, if funded by other sources is of demonstrated effectiveness.

Such evidence of enrollment may include: acceptance letters, school registration cards, letters from a school or program, transcripts, report cards, or progress reports which may show the name of the school or program, date of enrollment, and current educational or grade level, if relevant.

## What documentation may be sufficient to demonstrate that I have graduated from high school?

Documentation sufficient for you to demonstrate that you have graduated from high school may include but is not limited to: a high school diploma from a public or private high school or secondary school, certificate of completion, certificate of attendance, or alternate award from a public or private high school or secondary school, or a recognized equivalent of a high school diploma under State law, or a GED certificate or certificate from passing another such State-authorized exam (e.g., HiSet or TASC) in the United States.

## What documentation may be sufficient to demonstrate that I have obtained a GED certificate or certificate from passing another such State-authorized exam (e.g., HiSet or TASC)?

Documentation may include but is not limited to, evidence that you have passed a GED exam or other State-authorized exam (e.g., HiSet or TASC), and, as a result, have received the recognized equivalent of a regular high school diploma under State law.

## If I am enrolled in a literacy or career training program, can I meet the guidelines?

**YES**, in certain circumstances. You may meet the guidelines if you are enrolled in an education, literacy, or career training program that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement. Such programs include but are not limited to programs funded, in whole or in part by Federal, State, county or municipal grants, or are administered by nonprofit organizations, or, if funded by other sources, programs of demonstrated effectiveness.

## If I am enrolled in an English as a Second Language (ESL) program, can I meet the guidelines?

**YES**, in certain circumstances. Enrollment in an ESL program may be used to meet the guidelines if the ESL program is funded in whole or in part by Federal, State, county or municipal grants, or administered by

nonprofit organizations, or, if funded by other sources, is a program of demonstrated effectiveness. You must submit direct documentary evidence that the program is funded in whole or part by Federal, State, county, or municipal grants, administered by a nonprofit organization, or of demonstrated effectiveness.

## Will USCIS consider evidence other than that listed in Chart #1 to show that I have met the education guidelines?

**NO**. Evidence not listed in Chart #1 on the following page will not be accepted to establish that you are currently in school, have graduated or obtained a certificate of completion from high school, or have obtained a GED or passed another State-authorized exam (e.g., HiSet or TASC). You must submit any of the documentary evidence listed in Chart #1 to show that you meet the education guidelines.

## Will USCIS consider evidence other than that listed in Chart #1 to show that I have met certain initial guidelines?

Evidence other than those documents listed in Chart #1 may be used to establish the following guidelines and factual showings if available documentary evidence is insufficient or lacking and shows that:

- You were physically present in the United States on June 15, 2012;
- You came to the United States before reaching your 16th birthday;
- You satisfy the continuous residence requirement, as long as you present direct evidence of

your continued residence in the United States for a portion of the required period and the circumstantial evidence is used only to fill in gaps in the length of continuous residence demonstrated by the direct evidence; and

- Any travel outside the United States during the period of required continuous presence was brief, casual, and innocent.

However, USCIS will not accept evidence other than the documents listed in Chart #1 as proof of any of the following guidelines to demonstrate that you:

- Were under the age of 31 on June 15, 2012; and
- Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a GED certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.

For example, even if you do not have documentary proof of your presence in the United States on June 15, 2012, you may still be able to satisfy the guidelines. You may do so by submitting credible documentary evidence that you were present in the United States shortly before and shortly after June 15, 2012, which, under the facts presented, may give rise to an inference of your presence on June 15, 2012 as well. However, evidence other than that listed in Chart #1 will not be accepted to establish that you have graduated high school. You must submit the designated documentary evidence to satisfy that you meet this guideline.

**CHART #1:** on the next page, provides examples of documentation you may submit to demonstrate you meet the initial guidelines for consideration of deferred action under this process. Please see the instructions of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, for additional details of acceptable documentation.

| CHART #1: EXAMPLES OF DOCUMENTS TO SUBMIT TO DEMONSTRATE YOU MEET THE GUIDELINES | |
|---|---|
| Proof of identity | • Passport or national identity document from your country of origin<br>• Birth certificate with photo identification<br>• School or military ID with photo<br>• Any U.S. Government immigration or other document bearing your name and photo |
| Proof you came to U.S. before your 16th birthday | • Passport with admission stamp<br>• Form I-94/I-95/I-94W<br>• School records from the U.S. schools you have attended<br>• Any Immigration and Naturalization Service or DHS document stating your date of entry (Form I-862, Notice to Appear)<br>• Travel records<br>• Hospital or medical records<br>• Rent receipts or utility bills<br>• Employment records (pay stubs, W-2 Forms, etc.)<br>• Official records from a religious entity confirming participation in a religious ceremony<br>• Copies of money order receipts for money sent in or out of the country<br>• Birth certificates of children born in the U.S.<br>• Dated bank transactions<br>• Automobile license receipts or registration<br>• Deeds, mortgages, rental agreement contracts<br>• Tax receipts, insurance policies |
| Proof of immigration status | • Form I-94/I-95/I-94W with authorized stay expiration date<br>• Final order of exclusion, deportation, or removal issued as of June 15, 2012<br>• A charging document placing you into removal proceedings |
| Proof of presence in U.S. on June 15, 2012 | • Rent receipts or utility bills<br>• Employment records (pay stubs, W-2 Forms, etc.)<br>• School records (letters, report cards, etc.)<br>• Military records (Form DD-214 or NGB Form 22) |
| Proof you continuously resided in U.S. since June 15, 2007 | • Official records from a religious entity confirming participation in a religious ceremony<br>• Copies of money order receipts for money sent in or out of the country<br>• Passport entries<br>• Birth certificates of children born in the United States<br>• Dated bank transactions<br>• Automobile license receipts or registration<br>• Deeds, mortgages, rental agreement contracts<br>• Tax receipts, insurance policies |
| Proof of your education status at the time of requesting consideration of DACA | • School records (transcripts, report cards, etc.) from the school that you are currently attending in the United States showing the name(s) of the school(s) and periods of school attendance and the current of requesting consideration of DACA educational or grade level<br>• U.S. high school diploma, certificate of completion, or other alternate award<br>• High school equivalency diploma or certificate recognized under State law<br>• Evidence that you passed a State-authorized exam, including the GED or other State-authorized exam (for example, HiSet or TASC) in the United States |
| Proof you are an honorably discharged veteran of the U.S. Armed Forces or the U.S. Coast Guard | • Form DD-214, Certificate of Release or Discharge from Active Duty<br>• NGB Form 22, National Guard Report of Separation and Record of Service<br>• Military personnel records<br>• Military health records |

## May I file affidavits as proof that I meet the initial guidelines for consideration of DACA?

Affidavits generally will not be sufficient on their own to demonstrate that you meet the guidelines for USCIS to consider you for DACA. However, affidavits may be used to support meeting the following guidelines only if the documentary evidence available to you is insufficient or lacking:

- Demonstrating that you meet the 5-year continuous residence requirement; and
- Establishing that departures during the required period of continuous residence were brief, casual, and innocent.

If you submit affidavits related to the above criteria, you must submit two or more affidavits, sworn to or affirmed by people other than yourself, who have direct personal knowledge of the events and circumstances. Should USCIS determine that the affidavits are insufficient to overcome the unavailability or the lack of documentary evidence with respect to either of these guidelines, it will issue a Request for Evidence indicating that further evidence must be submitted to demonstrate that you meet these guidelines.

USCIS will not accept affidavits as proof of satisfying the following guidelines:

- You are currently in school, have graduated or obtained a certificate of completion or other alternate award from high school, have obtained a high school equivalency diploma or certificate (such as by passing the GED exam or other State-authorized exam [for example, HiSet or TASC]), or are an honorably discharged veteran from the Coast Guard or Armed Forces of the United States;
- You were physically present in the United States on June 15, 2012;
- You came to the United States before reaching your 16th birthday;
- You were under the age of 31 on June 15, 2012; and
- Your criminal history, if applicable.

If the only evidence you submit to demonstrate you meet any of the above guidelines is an affidavit, USCIS will issue a Request for Evidence indicating that you have not demonstrated that you meet these guidelines and that you must do so in order to demonstrate that you meet that guideline.

## Will I be considered to be in unlawful status if I had an application for asylum or cancellation of removal pending before either USCIS or the Executive Office for Immigration Review (EOIR) on June 15, 2012?

**YES**. If you had an application for asylum or cancellation of removal, or similar relief, pending before either USCIS or EOIR as of June 15, 2012, but had no lawful status, you may request consideration of DACA.

## I was admitted for "duration of status" or for a period of time that extended past June 14, 2012, but violated my immigration status (e.g., by engaging in unauthorized employment, failing to report to my employer, or failing to pursue a full course of study) before June 15, 2012. May I be considered for deferred action under this process?

**NO**, unless the Executive Office for Immigration Review terminated your status by issuing a final order of removal against you before June 15, 2012.

## I was admitted for "duration of status" or for a period of time that extended past June 14, 2012, but "aged out" of my dependent nonimmigrant status as of June 15, 2012. May I be considered for deferred action under this process?

**YES**. For purposes of satisfying the "had no lawful status on June 15, 2012," guideline alone, if you were admitted for "duration of status" or for a period of time that extended past June 14, 2012, but "aged out" of your dependent nonimmigrant status on or before June 15, 2012 (meaning you turned 21 years old on or before June 15, 2012), you may be considered for deferred action under this process.

I was admitted for "duration of status" but my status in SEVIS is listed as terminated on or before June 15, 2012. May I be considered for deferred action under this process?

**YES**. For the purposes of satisfying the "had no lawful status on June 15, 2012," guideline alone, if your status as of June 15, 2012, is listed as "terminated" in SEVIS, you may be considered for deferred action under this process.

I am a Canadian citizen who was inspected by CBP but was not issued an I-94 at the time of admission. May I be considered for deferred action under this process?

In general, a Canadian citizen who was admitted as a visitor for business or pleasure and not issued an I-94, Arrival/Departure Record, (also known as a "non-controlled" Canadian nonimmigrant) is lawfully admitted for a period of 6 months. For that reason, unless there is evidence, including verifiable evidence provided by the individual, that he or she was specifically advised that his or her admission would be for a different length of time, the Department of Homeland Security (DHS) will consider, for DACA purposes only, that the alien was lawfully admitted for a period of 6 months. Therefore, if DHS is able to verify from its records that your last non-controlled entry occurred on or before Dec. 14, 2011, DHS will consider your nonimmigrant visitor status to have expired as of June 15, 2012, and you may be considered for deferred action under this process.

I used my Border Crossing Card (BCC) to obtain admission to the United States and was not issued an I-94 at the time of admission. May I be considered for deferred action under this process?

Because the limitations on entry for a BCC holder vary based on location of admission and travel, DHS will assume that the BCC holder who was not provided an I-94 was admitted for the longest period legally possible—30 days—unless the individual can demonstrate, through verifiable evidence, that he or she was specifically advised that his or her admission would be

for a different length of time. Accordingly, if DHS is able to verify from its records that your last admission was using a BCC, you were not issued an I-94 at the time of admission, and it occurred on or before May 14, 2012, DHS will consider your nonimmigrant visitor status to have expired as of June 15, 2012, and you may be considered for deferred action under this process.

Do I accrue unlawful presence if I have a pending initial request for consideration of DACA?

You will continue to accrue unlawful presence while the request for consideration of DACA is pending unless you are under 18 years of age at the time of the request. If you are under 18 years of age at the time you submit your request, you will not accrue unlawful presence while the request is pending, even if you turn 18 while your request is pending with USCIS. If action on your case is deferred, you will not accrue unlawful presence during the period of deferred action. However, having action deferred on your case will not excuse previously accrued unlawful presence.

**RENEWAL OF DACA**

When should I file my renewal request with U.S. Citizenship and Immigration Services (USCIS)?

USCIS encourages you to submit your request for renewal approximately 120 days (or 4 months) before your current period of deferred action under the Deferred Action for Childhood Arrivals (DACA) process expires. If you have filed approximately 120 days before your deferred action and Employment Authorization Document (EAD) expire and USCIS is unexpectedly delayed in processing your renewal request, USCIS may provide deferred action and employment authorization for a short period of time until your renewal is adjudicated. However, if you file your renewal request more than 150 days prior to the expiration of your current period of deferred action, USCIS may reject your submission and return it to you with instructions to resubmit your request closer to the expiration date.

## How will USCIS evaluate my request for renewal of DACA?

You may be considered for renewal of DACA if you met the guidelines for consideration of Initial DACA (see above) AND you:

1. Did not depart the United States on or after Aug. 15, 2012, without advance parole;

2. Have continuously resided in the United States since you submitted your most recent request for DACA that was approved up to the present time; and

3. Have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety.

These guidelines must be met for consideration of DACA renewal. USCIS retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the guidelines are met.

## Do I accrue unlawful presence if I am seeking renewal and my previous period of DACA expires before I receive a renewal of deferred action under DACA? Similarly, what would happen to my work authorization?

**YES**, if your previous period of DACA expires before you receive a renewal of deferred action under DACA, you will accrue unlawful presence for any time between the periods of deferred action unless you are under 18 years of age at the time you submit your renewal request.

Similarly, if your previous period of DACA expires before you receive a renewal of deferred action under DACA, you will not be authorized to work in the United States regardless of your age at time of filing until and unless you receive a new employment authorization document from USCIS.

However, if you have filed your renewal request with USCIS approximately 120 days before your deferred action and EAD expire and USCIS is unexpectedly delayed in processing your renewal request, USCIS may provide deferred action and employment authorization for a short period of time.

## Do I need to provide additional documents when I request renewal of deferred action under DACA?

**NO**, unless you have new documents pertaining to removal proceedings or criminal history that you have not already submitted to USCIS in a previously approved DACA request. USCIS, however, reserves the authority to request at its discretion additional documents, information, or Statements relating to a DACA renewal request determination.

**CAUTION:** If you knowingly and willfully provide materially false information on Form I-821D, you will be committing a Federal felony punishable by a fine, or imprisonment up to 5 years, or both, under 18 U.S.C. Section 1001. In addition, individuals may be placed into removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

## TRAVEL

## May I travel outside of the United States before I submit an initial Deferred Action for Childhood Arrivals (DACA) request or while my initial DACA request remains pending with the Department of Homeland Security (DHS)?

Any unauthorized travel outside of the United States on or after Aug. 15, 2012, will interrupt your continuous residence and you will not be considered for deferred action under this process. Any travel outside of the United States that occurred on or after June 15, 2007, but before Aug. 15, 2012, will be assessed by U.S. Citizenship and Immigration Services (USCIS) to determine whether the travel qualifies as brief, casual, and innocent. (**See Chart #2 on the following page.**)

**CAUTION:** You should be aware that if you have been ordered deported or removed, and you then leave the United States, your departure will likely result in your being considered deported or removed, with potentially serious future immigration consequences.

## If my case is deferred under DACA, will I be able to travel outside of the United States?

Not automatically. If USCIS has decided to defer action in your case and you want to travel outside the United States, you must apply for advance parole by filing a **Form I-131, Application for Travel Document** and paying the applicable fee ($360). USCIS will determine whether your purpose for international travel is justifiable based on the circumstances you describe in your request. Generally, USCIS will only grant advance parole

| Travel Dates | Type of Travel | Does It Affect Continuous Residence |
|---|---|---|
| **On or after June 15, 2007, but before Aug. 15, 2012** | Brief, casual, and innocent | No |
| | For an extended time | |
| | Because of an order of exclusion, deportation, voluntary departure, or removal | Yes |
| | To participate in criminal activity | |
| | | |
| **On or after Aug. 15, 2012, and after you have requested deferred action** | Any | In addition, if you have previously been ordered deported and removed and you depart the United States without taking additional steps to address your removal proceedings, your departure will likely result in your being considered deported or removed, with potentially serious future immigration consequences. |
| | | |

if your travel abroad will be in furtherance of:

- Humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative;

- Educational purposes, such as semester-abroad programs and academic research; or

- Employment purposes such as overseas assignments, interviews, conferences, training, or meetings with clients overseas.

Travel for vacation is not a valid basis for advance parole.

You may not apply for advance parole unless and until USCIS defers action in your case under the consideration of DACA. You cannot apply for advance parole at the same time as you submit your request for consideration of DACA. All advance parole requests will be considered on a case-by-case basis.

If USCIS has deferred action in your case under the DACA process after you have been ordered deported or removed, you may still request advance parole if you meet the guidelines for advance parole described above.

**CAUTION:** However, for those individuals who have been ordered deported or removed, before you actually leave the United States, you should seek to reopen your case before the Executive Office for Immigration Review (EOIR) and obtain administrative closure or termination of your removal proceeding. Even after you have asked EOIR to reopen your case, you should not leave the United States until after EOIR has granted your request. If you depart after being ordered deported or removed, and your removal proceeding has not been reopened and administratively closed or terminated, your departure may result in your being considered deported or removed, with potentially serious future immigration consequences. If you have any questions about this process, you may contact U.S. Immigration and Customs Enforcement (ICE) through the local ICE Office of the Chief Counsel with jurisdiction over your case.

**CAUTION:** If you travel outside the United States on or after Aug. 15, 2012, without first receiving advance parole, your departure automatically terminates your deferred action under DACA.

## Do brief departures from the United States interrupt the continuous residence requirement?

A brief, casual, and innocent absence from the United States will not interrupt your continuous residence. If you were absent from the United States, your absence will be considered brief, casual, and innocent if it was on or after June 15, 2007, and before Aug. 15, 2012, and:

1. The absence was short and reasonably calculated to accomplish the purpose for the absence;

2. The absence was not because of an order of exclusion, deportation, or removal;

3. The absence was not because of an order of voluntary departure, or an administrative grant of voluntary departure before you were placed in exclusion, deportation, or removal proceedings; and

4. The purpose of the absence and/or your actions while outside the United States were not contrary to law.

Once USCIS has approved your request for DACA, you may file **Form I-131**, Application for Travel Document, to request advance parole to travel outside of the United States.

**CAUTION:** If you travel outside the United States on or after Aug. 15, 2012, without first receiving advance parole, your departure automatically terminates your deferred action under DACA.

## May I file a request for advance parole concurrently with my DACA package?

Concurrent filing of advance parole is not an option at this time. DHS is, however, reviewing its policy on concurrent filing of advance parole with a DACA request. In addition, DHS is also reviewing eligibility criteria for advance parole. If any changes to this policy are made, USCIS will update this FAQ and inform the public accordingly.

## CRIMINAL CONVICTIONS

## If I have a conviction for a felony offense, a significant misdemeanor offense, or multiple misdemeanors, can I receive an exercise of prosecutorial discretion under this new process?

**NO.** If you have been convicted of a felony offense, a significant misdemeanor offense, or three or more other misdemeanor offenses not occurring on the same date and not arising out of the same act, omission, or scheme of misconduct, you will not be considered for Deferred Action for Childhood Arrivals (DACA) except where the Department of Homeland Security (DHS) determines there are exceptional circumstances.

## What offenses qualify as a felony?

A felony is a Federal, State, or local criminal offense punishable by imprisonment for a term exceeding 1 year.

## What offenses constitute a significant misdemeanor?

For the purposes of this process, a significant misdemeanor is a misdemeanor as defined by Federal law (specifically, one for which the maximum term of imprisonment authorized is 1 year or less but greater than 5 days) and that meets the following criteria:

1. Regardless of the sentence imposed, is an offense of domestic violence, sexual abuse or exploitation, burglary, unlawful possession or use of a firearm, drug distribution or trafficking, or driving under the influence; or

2. If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days. The sentence must involve time to be served in custody, and therefore does not include a suspended sentence.

The time in custody does not include any time served beyond the sentence for the criminal offense based on a State or local law enforcement agency honoring a detainer issued by U.S. Immigration and Customs Enforcement (ICE). Notwithstanding the above, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking

into account the totality of the circumstances. Therefore, the absence of the criminal history outlined above, or its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion. DHS retains the discretion to determine that an individual does not warrant deferred action on the basis of a single criminal offense for which the individual was sentenced to time in custody of 90 days or less.

## What offenses constitute a non-significant misdemeanor?

For purposes of this process, a non-significant misdemeanor is any misdemeanor as defined by Federal law (specifically, one for which the maximum term of imprisonment authorized is 1 year or less but greater than 5 days) and that meets the following criteria:

1. Is not an offense of domestic violence, sexual abuse or exploitation, burglary, unlawful possession or use of a firearm, drug distribution or trafficking, or driving under the influence; and

2. Is one for which the individual was sentenced to time in custody of 90 days or less. The time in custody does not include any time served beyond the sentence for the criminal offense based on a State or local law enforcement agency honoring a detainer issued by ICE.

Notwithstanding the above, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking into account the totality of the circumstances. Therefore, the absence of the criminal history outlined above, or its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion.

## If I have a minor traffic offense, such as driving without a license, will it be considered a non-significant misdemeanor that counts towards the "three or more non-significant misdemeanors" making me unable to receive consideration for an exercise of prosecutorial discretion under this new process?

A minor traffic offense will not be considered a misdemeanor for purposes of this process. However, your

entire offense history can be considered along with other facts to determine whether, under the totality of the circumstances, you warrant an exercise of prosecutorial discretion.

It is important to emphasize that driving under the influence is a significant misdemeanor regardless of the sentence imposed.

## What qualifies as a national security or public safety threat?

If the background check or other information uncovered during the review of your request for deferred action indicates that your presence in the United States threatens public safety or national security, you will not be able to receive consideration for an exercise of prosecutorial discretion except where DHS determines there are exceptional circumstances. Indicators that you pose such a threat include, but are not limited to: gang membership, participation in criminal activities, or participation in activities that threaten the United States.

## Will offenses criminalized as felonies or misdemeanors by State immigration laws be considered felonies or misdemeanors for purpose of this process?

**NO**. Immigration-related offenses characterized as felonies or misdemeanors by State immigration laws will not be treated as disqualifying felonies or misdemeanors for the purpose of considering a request for consideration of deferred action under this process.

## Will DHS consider my expunged or juvenile conviction as an offense making me unable to receive an exercise of prosecutorial discretion?

Expunged convictions and juvenile convictions will not automatically disqualify you. Your request will be assessed on a case-by-case basis to determine whether, under the particular circumstances, a favorable exercise of prosecutorial discretion is warranted. If you were a juvenile, but tried and convicted as an adult, you will be treated as an adult for purposes of the DACA process.

**MISCELLANEOUS**

## Does this Administration remain committed to comprehensive immigration reform?

**YES**. The Administration has consistently pressed for passage of comprehensive immigration reform, including the DREAM Act, because the President believes these steps are critical to building a 21st century immigration system that meets our Nation's economic and security needs.

## Is passage of the DREAM Act still necessary in light of the new process?

**YES**. The Secretary of Homeland Security's June 15, 2012, memorandum allowing certain people to request consideration for deferred action is one in a series of steps that DHS has taken to focus its enforcement resources on the removal of individuals who pose a danger to national security or a risk to public safety. Deferred Action for Childhood Arrivals (DACA) is an exercise of prosecutorial discretion and does not provide lawful status or a pathway to citizenship. As the President has Stated, individuals who would qualify for the DREAM Act deserve certainty about their status. Only the Congress, acting through its legislative authority, can confer the certainty that comes with a pathway to permanent lawful status.

## Does deferred action provide me with a path to permanent resident status or citizenship?

**NO**. Deferred action is a form of prosecutorial discretion that does not confer lawful permanent resident status or a path to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.

## Can I be considered for deferred action even if I do not meet the guidelines to be considered for DACA?

This process is only for individuals who meet the specific guidelines for DACA. Other individuals may, on a case-by-case basis, request deferred action from U.S. Citizenship and Immigration Services (USCIS) or U.S. Immigration and Customs Enforcement (ICE) in certain circumstances, consistent with longstanding practice.

## How will ICE and USCIS handle cases involving individuals who do not satisfy the guidelines of this process but believe they may warrant an exercise of prosecutorial discretion under the June 2011 Prosecutorial Discretion Memoranda?

If USCIS determines that you do not satisfy the guidelines or otherwise determines you do not warrant an exercise of prosecutorial discretion, then it will decline to defer action in your case. If you are currently in removal proceedings, have a final order, or have a voluntary departure order, you may then request ICE consider whether to exercise prosecutorial discretion.

## How should I fill out question 9 on Form I-765, Application for Employment Authorization?

When you are filing a Form I-765 as part of a DACA request, question 9 is asking you to list those Social Security numbers that were officially issued to you by the Social Security Administration.

## Will there be supervisory review of decisions by USCIS under this process?

**YES**. USCIS has implemented a successful supervisory review process to ensure a consistent process for considering requests for DACA.

## Will USCIS personnel responsible for reviewing requests for DACA receive special training?

**YES**. USCIS personnel responsible for considering requests for consideration of DACA have received special training.

## Must attorneys and accredited representatives who provide pro bono services to deferred action requestors at group assistance events file a Form G-28 with USCIS?

Under 8 C.F.R. §§ 292.3 and 1003.102, practitioners are required to file a Notice of Entry of Appearance as Attorney or Accredited Representative when they engage in practice in immigration matters before DHS, either in person or through the preparation or filing of any brief, application, petition, or other document. Under these rules, a practitioner who consistently violates the requirement to file a Form G-28 may be subject to

disciplinary sanctions; however on Feb. 28, 2011, USCIS issued a Statement indicating that it does not intend to initiate disciplinary proceedings against practitioners (attorneys and accredited representatives) based solely on the failure to submit a Notice of Entry of Appearance as Attorney or Accredited Representative (Form G-28) in relation to pro bono services provided at group assistance events. DHS is in the process of issuing a final rule at which time this matter will be reevaluated.

## When must an individual sign a Form I-821D as a preparer?

Anytime someone other than the requestor prepares or helps fill out the Form I-821D, that individual must complete Part 5 of the form.

## If I provide my employee with information regarding his or her employment to support a request for consideration of DACA, will that information be used for immigration enforcement purposes against me and/or my company?

You may, as you determine appropriate, provide individuals requesting DACA with documentation which verifies their employment. This information will not be shared with ICE for civil immigration enforcement purposes under section 274A of the Immigration and Nationality Act (relating to unlawful employment) unless there is evidence of egregious violations of criminal statutes or widespread abuses.

## Can I request consideration for deferred action under this process if I live in the Commonwealth of the Northern Mariana Islands (CNMI)?

**YES**, in certain circumstances. The CNMI is part of the United States for immigration purposes and is not excluded from this process. However, because of the specific guidelines for consideration of DACA, individuals who have been residents of the CNMI are in most cases unlikely to qualify for the program. You must, among other things, have come to the United States before your 16th birthday and have resided continuously in the United States since June 15, 2007.

Under the Consolidated Natural Resources Act of 2008, the CNMI became part of the United States for purposes of immigration law only on Nov. 28, 2009. Therefore entry into, or residence in, the CNMI before that date is not entry into, or residence in, the United States for purposes of the DACA process.

USCIS has used parole authority in a variety of situations in the CNMI to address particular humanitarian needs on a case-by-case basis since Nov. 28, 2009. If you live in the CNMI and believe that you meet the guidelines for consideration of deferred action under this process, except that your entry and/or residence to the CNMI took place entirely or in part before Nov. 28, 2009, USCIS is willing to consider your situation on a case-by-case basis for a grant of parole. If this situation applies to you, you should make an appointment through INFOPASS with the USCIS ASC in Saipan to discuss your case with an immigration officer.

## Someone told me if I pay them a fee, they can expedite my DACA request. Is this true?

**NO**. There is no expedited processing for deferred action. Dishonest practitioners may promise to provide you with faster services if you pay them a fee. These people are trying to scam you and take your money. Visit our **Avoid Scams** page to learn how you can protect yourself from immigration scams.

Make sure you seek information about requests for consideration of DACA from official government sources such as USCIS or the DHS. If you are seeking legal advice, visit our Find **Legal Services** page to learn how to choose a licensed attorney or accredited representative.

## Am I required to register with the Selective Service?

Most male persons residing in the United States, who are ages 18 through 25, are required to register with Selective Service. Please see link for more information. [**Selective Service, www.sss.gov**].

# CONSIDERATION of DEFERRED ACTION for CHILDHOOD ARRIVALS

Deferred action for childhood arrivals (DACA) allows certain individuals, who meet specific guidelines, to request consideration of deferred action from USCIS. Individuals who receive deferred action will not be placed into removal proceedings or removed from the United States for a specified period of time unless terminated. If you receive deferred action, you may be eligible for employment authorization. You may request deferred action for childhood arrivals if you meet the following guidelines:

## Can I be considered?
### Review Guidelines





You came to the United States before reaching your 16th birthday

You have continuously resided in the United States since June 15, 2007, up to the present time

You were under the age of 31 as of June 15, 2012

You never had a lawful immigration status on or before June 15, 2012, or any lawful immigration status or parole that you obtained had expired as of June 15, 2012

You are currently in school, have graduated or obtained your certificate of completion from high school, have obtained your General Educational Development certification, or you are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States

You have not been convicted of a felony, significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety

You were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS

## How do I file?







Collect documents as evidence you meet the guidelines

Complete USCIS Form I-821D, I-765 and I-765 Worksheet

Mail USCIS forms and fees (total $465)

Visit your local USCIS Application Support Center for a scheduled biometric services appointment

Check the status of your request online — USCIS.gov

## Renew your DACA





### Find your DACA expiration date
SUBMIT renewal request

On your Form I-797, Notice of Action — Form I-797
OR
Form I-766 - The date your Employment Authorization Document (EAD) expires — Form I-766

4 months or 120 days before your current period of DACA expires.

### Ensure you meet the following »

You met the initial DACA requirements

You did not depart the United States on or after August 15, 2012, without advance parole

You have continuously resided in the United States since you submitted your most recent DACA request that was approved

You have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety

## Complete and mail forms to USCIS

1 Form I-821D Consideration of Deferred Action for Childhood Arrivals

2 Form I-765, Application for Employment Authorization

3 Form I-765W, Worksheet

REMEMBER: Read instructions carefully • Sign the forms • Pay $465 fee

If you have questions about your request, please call USCIS Customer Service at 1-800-375-5283 or 1-800-767-1833 (TDD). www.uscis.gov/childhoodarrivals



U.S. Citizenship and Immigration Services

U.S. Department of Homeland Security seal

**U.S. Citizenship and Immigration Services**

Learn how to protect yourself from immigration scams at

# www.uscis.gov/avoidscams

# THE WRONG HELP
# CAN HURT

## BEWARE OF IMMIGRATION SCAMS





### DOWNLOAD
free forms and instructions



### LEARN
about filing fees



### VERIFY
only BIA-accredited representatives or eligible attorneys provide you legal services



### REPORT
scams to the Federal Trade Commission (FTC) or your state attorney general

**www.ftc.gov/complaint**
1-877-FTC-HELP

## About Us
USCIS is your **official** source of information about immigration benefits and services. Contact us for more information on USCIS and its programs.

## Contact Us
**www.uscis.gov**
1-800-375-5283

App. 1238

# DACA RESOURCES

DEPARTMENT OF HOMELAND SECURITY

## U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS)

### DACA resource page

www.uscis.gov/childhoodarrivals
www.uscis.gov/acciondiferida

These English and Spanish Web pages contain important DACA information.

### Avoid Immigration Scams resource center

www.uscis.gov/avoidscams
www.uscis.gov/eviteestafas

These English and Spanish Web pages contain information related to immigration scams, including resources for applicants, community groups, and legal service providers.

### "How Do I" guides

www.uscis.gov/howdoi

This online repository for all USCIS "How Do I" guides includes "How Do I Request Consideration of Deferred Action for Childhood Arrivals (DACA)?"

### Public Engagement Division Outreach page

www.uscis.gov/outreach

This page lists upcoming national engagements, including multilingual engagements, and local outreach events.

### Multilingual resource center

www.uscis.gov/multilingual

This online resource has links to documents in 22 languages, including multilingual DACA resources.

### Online customer service tools

www.uscis.gov/tools

USCIS offers customers a variety of online customer service tools, including the ability to change address, check processing times and case status information, and submit inquiries.

### Systematic Alien Verification for Entitlements (SAVE)

www.uscis.gov/save

The SAVE program is an intergovernmental information service initiative which verifies the immigration status of benefit applicants.

### E-Verify

www.uscis.gov/e-verify

E-Verify is an electronic system that enables employers to verify employment eligibility. The E-Verify program has a variety of resources for employees on worker rights.

## OFFICE FOR CIVIL RIGHTS AND CIVIL LIBERTIES (CRCL)

### Overview of CRCL resources

www.dhs.gov/topic/civil-rights-and-civil-liberties

The mission of CRCL is to advance and safeguard the civil rights and civil liberties of individuals and communities with respect to the Department's immigration-related policies and activities.

## OFFICE OF THE CIS OMBUDSMAN

### Overview of Office of the CIS Ombudsman resources

www.dhs.gov/topic/cis-ombudsman

The Office of the CIS Ombudsman provides individual immigration case assistance and makes recommendations to improve the administration of immigration benefits.

DEPARTMENT OF EDUCATION

## DEPARTMENT OF EDUCATION

### Free Application for Federal Student Aid (FAFSA)

www.studentaid.ed.gov/fafsa

This Web page provides an overview of the FAFSA requirements and process.

## Resources for DACA and immigrant students

www2.ed.gov/about/overview/focus/immigration-resources.html

This resource page includes Q&As on Federal student aid and education records for DACA students and a financial aid guide.

## Migrant Education Program

www2.ed.gov/programs/mep/index.html

The Migrant Education Program supports the development and funding of education and support services for migratory children.

### DEPARTMENT OF JUSTICE

## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW (EOIR)

### List of Board of Immigration Appeals (BIA) recognized organizations and accredited representatives

www.justice.gov/eoir/ra/raroster.htm

BIA accredited representatives working for BIA-recognized organizations are non-attorneys who are authorized to provide immigration legal services.

### List of low cost and free immigration legal service providers

www.justice.gov/eoir/probono/states.htm

EOIR provides a list of free and low-cost immigration attorneys by State as a resource for applicants and petitioners.

## ACCESS TO JUSTICE

### Overview of Access to Justice resources

www.justice.gov/atj

Access to Justice works with Federal agencies, State, and local governments and State Access to Justice commissions to increase access to counsel and legal assistance and to improve the justice delivery systems that serve people who are unable to afford lawyers.

## DACA resource guide

www.justice.gov/atj/daca-resourceguide-atj-feb-27-3013.pdf

This resource guide provides information on the DACA process and links to DACA-related resources.

## OFFICE OF SPECIAL COUNSEL FOR IMMIGRATION-RELATED UNFAIR EMPLOYMENT PRACTICES

### DACA flyer

www.justice.gov/crt/about/osc/pdf/publications/DACA_English2.pdf

The Office of Special Counsel enforces the anti-discrimination provisions of the Immigration and Nationality Act. This flyer provides DACA recipients with information about their right to work in the United States

### DEPARTMENT OF LABOR

## WAGE AND HOUR DIVISION

### We Can Help website

www.dol.gov/wecanhelp

This Web site provides useful information for workers to understand their rights in the workplace and how to file a complaint, regardless of their immigration status.

### YouthRules! Web site

www.youthrules.dol.gov

This Web site provides critical information on the jobs and hours a minor is allowed to work.

