**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

**PROPOSED DEFENDANT-INTERVENORS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR LEAVE TO INTERVENE**

# TABLE OF CONTENTS

**Page**

I.    STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT .................. 1

II.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ..................... 2

III.    SUMMARY OF THE ARGUMENT ................................................................. 7

IV.    THE PROPOSED DEFENDANT-INTERVENORS ARE ENTITLED TO INTERVENTION AS OF RIGHT ...................................................... 8

    A.    The Proposed Defendant-Intervenors' Motion to Intervene Is Timely ................. 8

    B.    The Proposed Defendant-Intervenors Possess a Protectable Interest ................... 11

    C.    The Proposed Defendant-Intervenors' Interests Would Be Subject to Impairment If Intervention Were Denied .......................................... 13

    D.    The Proposed Defendant-Intervenors' Interests Cannot Be Adequately Represented by the Existing Parties .............................................. 14

V.    PERMISSIVE INTERVENTION IS ALSO APPROPRIATE ............................... 18

VI.    CONCLUSION ............................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

<u>**CASES**</u>

*Arpaio v. Obama*,
    No. 14-cv-1966, slip op. at 5 (D.D.C. Dec. 23, 2014) ........................................................ 3

*Black Fire Fighters Ass'n of Dallas v. City of Dallas*,
    19 F.3d 992 (5th Cir. 1994) .............................................................................12, 14

*Ceres Gulf v. Cooper*,
    957 F.2d 1199 (5th Cir. 1992) ............................................................................9, 14

*Chiles v. Thornburgh*,
    865 F.2d 1197 (11th Cir. 1989) ....................................................................... 12, 14

*Day v. Sebelius*,
    227 F.R.D. 668 (D. Kan. 2005)..........................................................................12, 17

*Decker v. United States Dep't of Labor*,
    473 F. Supp. 770 (E.D. Wis. 1979) ....................................................................... 13

*Diaz v. S. Drilling Corp.*,
    427 F.2d 1118 (5th Cir. 1970) ..............................................................................11

*Dimond v. District of Columbia*,
    792 F.2d 179 (D.C. Cir. 1986) ..............................................................................15

*Edwards v. City of Houston*,
    78 F.3d 983 (5th Cir. 1996) ........................................................................8, 10, 15

*Ford v. City of Hunstville*,
    242 F.3d 235 (5th Cir. 2001) ................................................................................9

*Forest Conservation Council v. U.S. Forest Serv.*,
66 F.3d 1489 (9th Cir. 1995), *rev'd on other grounds by Wilderness Soc'y v.*
    *U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011) ...................................................... 14, 15

*Gen. Tel. Co. of the Nw., Inc. v. EEOC*,
    446 U.S. 318 (1980) ......................................................................................... 15

*Grutter v. Bollinger*,
    188 F.3d 394 (6th Cir. 1999) ........................................................................ 13, 14

*In re Lease Oil Antitrust Litig.*,
    570 F.3d 244 (5th Cir. 2009) ........................................................................... 9, 10

*John Doe No. 1 v. Glickman*,
    256 F.3d 371 (5th Cir. 2001) ............................................................................... 8

*Lewis v. Stark*, 312 F. Supp. 197 (N.D. Cal. 1968), *rev'd on other grounds by*
   *Lewis v. Martin*, 397 U.S. 552 (1980) ................................................................12

*Martin v. Travelers Indem. Co.*,
   450 F.2d 542 (5th Cir. 1971) ...............................................................................14

*Mich. State AFL-CIO v. Miller*,
   103 F.3d 1240 (6th Cir. 1997) .............................................................................13

*Natural Res. Def. Council v. Costle*,
   561 F.2d 904 (D.C. Cir. 1977) .............................................................................12

*Ross v. Marshall*,
   426 F.3d 745 (5th Cir. 2005) ...............................................................................11

*Saldano v. Roach*,
   363 F.3d 545 (5th Cir. 2004) .................................................................................8

*Sierra Club v. Espy*,
   18 F.3d 1202 (5th Cir. 1994) ...........................................................................8, 14

*Sierra Club v. Fed. Emergency Mgmt. Agency*,
   No. 07-0608, 2008 U.S. Dist. LEXIS 47405 (S.D. Tex. June 11, 2008)..........................15

*Stallworth v. Monsanto Co.*,
   558 F.2d 257 (5th Cir. 1977) ...........................................................................9, 10

*Trbovich v. United Mine Workers of Am.*,
   404 U.S. 528 (1972) ..............................................................................................14

*United States v. LULAC*,
   793 F.2d 636 (5th Cir. 1986) ...............................................................................18

*Usery v. Brandel*,
   87 F.R.D. 670 (W.D. Mich. 1980) .......................................................................13

## **<u>STATUTES</u>**

DHS Appropriations Act, Pub. L. No. 111-83, 123 Stat 2142, 2149 (2009) .............................3

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

**RULES**

Fed. R. Civ. P. 24 advisory comm. note to 1966 Amendment ....................................................... 13

Fed. R. Civ. P. 24(a)(2) ………………………………………………………………… *passim*

Fed. R. Civ. P. 24(b)........................................................................................................................18

Fed. R. Civ. P. 24(b)(1)(B).......................................................................................................... 1, 18

The Proposed Defendant-Intervenors respectfully request that the Court grant them leave to intervene as defendants in this action as of right pursuant to Federal Rule of Civil Procedure 24(a)(2) or, in the alternative, grant them permissive intervention pursuant to Federal Rule of Civil Procedure 24(b)(1)(B).

Plaintiffs have advised the Proposed Defendant-Intervenors that they do not oppose the motion to intervene.  Defendants have responded that they will review the intervention request after is it filed and respond as appropriate.

## I.      STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

The Proposed Defendant-Intervenors Karla Perez, Maria Rocha, Jose, Magaña-Salgado, Nanci J. Palacios Godinez, Elly Marisol Estrada, Karina Ruiz De Diaz, Carlos Aguilar Gonzalez, Karla Lopez, Luis A. Rafael, Darwin Velasquez, Jin Park, Oscar Alvarez, Nancy Adossi, Denise Romero, Pratishtha Khanna, Jung Woo Kim, Angel Silva, Moses Kamau Chege, Hyo-Won Jeon, Elizabeth Diaz, Maria Diaz, and Blanca Gonzalez (the "Proposed Defendant-Intervenors") are recipients of deferred action pursuant to the Deferred Action for Childhood Arrivals (DACA) initiative[1] and are directly affected by the resolution of the claims in this case. All Proposed Defendant-Intervenors have authorized presence in the United States, are authorized to work, and are eligible for renewal of their grants of deferred action.  If DACA is enjoined, the Proposed Defendant-Intervenors as well as hundreds of thousands of others similarly situated will lose their ability to live in the U.S. and could face deportation and

---

[1] In the June 15, 2012 Memorandum issued by Secretary of the Department of Homeland Security Janet Napolitano entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," the Secretary established guidelines from the Department of Homeland Security ("DHS") for the application of prosecutorial discretion with regard to deferred action for low-priority young individuals brought to the United States as Children.  Dkt. No. 1, Ex. 1.

separation from their families and their communities.   Moreover, they will lose their work authorization which accompanies a grant of deferred action, thereby limiting their access to employment opportunities and directly affecting their ability to support themselves and their families and to contribute to the U.S. economy.  This unique, personal interest supports their intervention.  Accordingly, the Proposed Defendant-Intervenors hereby respectfully submit the following Memorandum of Law in Support of Motion to Intervene as Defendants.

## II.        STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Plaintiffs filed this lawsuit in order to halt the enforcement of the June 15, 2012 memorandum by the Secretary of the U.S. Department of Homeland Security titled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children." (DACA Memo).  Dkt. No. 1, Ex. 1.  The DACA Memo provides guidelines for the application of prosecutorial discretion with regard to specific categories of low-priority young immigrants who were brought to the U.S. as children.  Deferred action is a type of prosecutorial discretion under which DHS does not seek, for a limited period of time, to remove an individual who is present in the U.S. without authorization.  *Id.*  Deferred action under DACA "confers no substantive right, immigration status or pathway to citizenship." *Id*.  DACA provides eligible individuals with the opportunity to apply for work authorization and to live without fear of being unexpectedly separated from their jobs, family members and communities.  *Id.*

The DACA memo recognizes that "[a]s a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them."  *Id.*  The memo seeks "to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities."  *Id.*  In 2014, DHS estimated that there are approximately 11.3 million undocumented immigrants eligible for removal, but the agency only

2

has the resources to remove fewer than 400,000 each year.  *See Arpaio v. Obama*, 27 F.Supp.3d 185, 192-193 (D.D.C. Dec. 23, 2014).

In light of these limited resources, DACA is a consequence of Congress's directive to DHS to prioritize "the identification and removal of [immigrants] … by the severity of the crime."  DHS Appropriations Act, Pub. L. No. 111-83, 123 Stat 214, 2149 (2009).  Eligibility for deferred action under DACA reflects that qualifying individuals are a low priority for enforcement.

For an individual to be considered for an exercise of prosecutorial discretion pursuant to the DACA memo, she (1) must have come to the United States under the age of sixteen; (2) must have continuously resided in the United States since before June 12, 2007, and been present in the U.S. on June 12, 2012; (3) must be in school, have graduated from high school, have obtained a general education development certificate or be an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (4) must not have been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise pose a threat to national security or public safety; and (5) must not be above the age of thirty.  Dkt. No. 1, Ex. 1.

The Proposed Defendant-Intervenors satisfied the DACA guidelines and DHS exercised prosecutorial discretion favorably to grant each of them deferred action and work authorization. If DACA is enjoined, the Proposed Defendant-Intervenors will become subject to arrest, detention, and removal proceedings as soon as their current grants of deferred action expire. They also will lose their work authorization and ability to be employed.  Despite their low priority as candidates for deportation given DHS's limited resources and prioritization mandates, their lives will be upended.  Families could be split apart, including those with elderly parents

requiring care and families with siblings or children who are U.S. citizens who are cared for by these Proposed Defendant-Intervenors.  Community relationships could be undone, education terminated, and work opportunities foreclosed.

The summary of declarations, attached to this Memorandum as Appendix A Tab One, provides a more complete description of Proposed Defendant Intervenors' connections to the United States and experiences with deferred action.  The following paragraphs are a sample of those experiences.

Karla Perez lives in Houston, Texas, and is a DACA recipient.  (Declaration of Karla Perez, Appendix A, Tab 2, ¶¶ 1, 8).  She was born in Mexico and came with her parents to the United States when she was two years old.  (*Id.* ¶ 2)  Ms. Perez graduated from Pasadena Memorial High School in Pasadena, Texas, where she was a member of the National Honor Society and captain of the varsity soccer team.  (*Id.* ¶ 3)  Ms. Perez graduated magna cum laude from the University of Houston, where she received a Bachelor's degree in Business Administration.  (*Id.* ¶ 4)  Ms. Perez is 25 years old and a third-year law student at the University of Houston Law Center.  (*Id.* ¶ 5)  As a law student, Ms. Perez has assisted attorneys at several non-profit organizations to provide legal services to crime victims, DACA recipients, and immigrants who have survived gender-based violence.  (*Id.* ¶ 6)  She is a board member of United We Dream, the largest immigrant youth-led network in the United States.  (*Id.* ¶ 7)  Ms. Perez has served as the statewide coordinator of United We Dream legislative campaigns advocating for improved living conditions for immigrants in Texas.  (*Id.*)  Ms. Perez earned the Texas Center for Public Policy Priorities' 2015 Future of Texas Award, and the Dallas Morning News named her a 2015 Texan of the Year Finalist.  (*Id.*)

Jin Park lives in Cambridge, Massachusetts, and is a DACA recipient.  (Declaration of Jin

Park, Appendix A, Tab 12, ¶¶ 1, 14).  He was born in South Korea and was brought by his parents to the United States when he was seven years old.  (*Id.* ¶ 2)  Mr. Park is now 22 years old and an undergraduate student at Harvard College studying molecular and cellular biology with a minor in government and plans to apply to medical school after he graduates from college.  (*Id.* ¶ 3, 4)  He is currently employed at a university cancer research institute in Cambridge, Massachusetts.  (*Id.* ¶ 5)  Mr. Park previously worked at the New York City Mayor's Office, where he helped implement a care coordination program for undocumented immigrants in the City.  (*Id.* ¶ 6)  He served as the director of naturalization assistance programs at Harvard, which provides services to low-income immigrants, primarily from Boston's Chinatown.  (*Id.* ¶ 7)  Mr. Park incorporated his own 501(c)(3) organization ("HigherDreams, Inc."), which provides training and direct services to undocumented high school students in Boston.  (*Id.* ¶ 8) HigherDreams has recently partnered with Boston Public Schools to provide trainings to guidance counselors in the district regarding the unique challenges that undocumented students face.  (*Id.* ¶ 9) For his work with HigherDreams, the White House selected Mr. Park as a "Champion of Change" for college opportunity in November 2016. (*Id.* ¶ 10) He was also named a White House Asian-American and Pacific Islander Initiative Spokesperson during President Obama's tenure. (*Id.* ¶ 11) At Harvard, Mr. Park is the recipient of the Harvard Presidential Public Service fellowship and was named a John Harvard Scholar. (*Id.* ¶ 12)  Mr. Park was also selected as the 2018 Harvard Orator, one of two student speakers to address the Class of 2018 on Class Day. (*Id.* ¶ 13)

Dr. Nancy Adossi lives in Houston, Texas and is a DACA recipient.  (Declaration of Nancy Adossi, Appendix A, Tab 14, ¶¶ 1, 9).  She was born in Lomé, Togo and was brought to the United States by her parents when she was 9 years old.  (*Id.* ¶ 2)  Dr. Adossi graduated from

the magnet program at George W. Carver High School in the top 10% of her class.  (*Id.* ¶ 3)  She received a bachelor's degree in Political Science and International Relations from the University of Houston, where she graduated as the valedictorian and was keynote speaker for her class.  (*Id.* ¶ 4)  Dr. Adossi earned a master's degree in Public Administration from the University of Houston, which awarded her the 2013 Master's in Public Administration Alumni Award.  (*Id.* ¶ 5)  She also holds a Doctorate of Education in Health Sciences Technology from the University of Houston.  (*Id.* ¶ 6)  She was the youngest graduate of that program.  (*Id.*)  Dr. Adossi is 28 years old and currently works as a 6th grade teacher in the social studies program at Paul Revere Middle School.  (*Id.* ¶ 7)  She also works as a research consultant with Lift a Village and the UndocuBlack Network and has previously worked as a research consultant with the Black Alliance for Just Immigration.  (*Id.* ¶ 8)

Karina Ruiz De Diaz lives in Phoenix, Arizona, and is a DACA recipient.  (Declaration of Karina Ruiz De Diaz, Appendix A, Tab 7, ¶¶ 1, 9).   Mrs. Ruiz De Diaz was born in Mexico City and came with her parents to the United States when she was 15 years old.  (*Id.* ¶ 2)  Mrs. Ruiz De Diaz graduated from Sunnyslope High School in Phoenix.  (*Id.* ¶ 3)  In high school, Mrs. Ruiz De Diaz was a member of the National Honor Society, the Spanish Honor Society, and the Air Force JROTC.  (*Id.*)  Mrs. Ruiz De Diaz earned a scholarship from the Sunburst Foundation to attend college.  (*Id.* ¶ 4)  She attended Arizona State University, from which she earned a Bachelor of Science in Biochemistry in 2015.  (*Id.*)  Mrs. Ruiz De Diaz is currently 33 years old and works as the Executive Director of the Arizona Dream Act Coalition, an immigrant youth-led organization focused on higher education and immigrant rights.  (*Id.* ¶ 5)  Mrs. Ruiz De Diaz is a licensed real estate agent and the mother of three United States citizen children.  (*Id.* ¶¶ 6, 7)  She is an active member of her church, a parent volunteer and President of the Mountain View

Elementary School Parent Teacher Organization (PTO), where two of her children attend school, and a volunteer at HonorHealth John C. Lincoln Medical Center. (*Id.* ¶ 8) She is also a volunteer at One Arizona Table, an organization that promotes civic engagement among Latino and immigrant communities. (*Id.*)

## III.    SUMMARY OF THE ARGUMENT

As set forth below, Plaintiffs' requested injunctive relief, if granted, would substantially impair the interests of the Proposed Defendant-Intervenors, who are recipients of grants of deferred action pursuant to DACA. Defendants' attorneys cannot adequately represent the Proposed Defendant-Intervenors' interests because they are bound to the position of the U.S. Attorney General that DACA is "an unconstitutional exercise of authority by the Executive Branch"[2] and "vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program."[3]

Defendants' attorneys also cannot adequately represent the Proposed Defendant-Intervenors' interests because they are responsible for representing a broad range of public interests and are not subject to the consequences of the implementation of the DACA memo or the consequences of enjoining the implementation of the DACA memo. Allowing the Proposed Defendant-Intervenors to participate as intervenors will ensure that their direct, immediate interests are adequately protected and will provide them with the opportunity to offer evidence and argument that will assist the Court in rendering a decision in this important case. Because the Proposed Defendant-Intervenors meet all the requirements for intervention under Rule 24(a)(2), they respectfully request that their motion to intervene be granted.

---

[2] United States Department of Justice, *Attorney General Sessions Delivers Remarks on DACA*, (September 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca (last visited May 7, 2018).
[3] *Id.*

**IV.**     **THE PROPOSED DEFENDANT-INTERVENORS ARE ENTITLED TO INTERVENTION AS OF RIGHT**

Federal Rule of Civil Procedure 24(a)(2) provides:

On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

To intervene as of right under Rule 24(a)(2), an applicant must meet four requirements: (1) the motion to intervene is timely; (2) the potential intervenor asserts an interest that is related to the basis of the controversy in the underlying case; (3) the disposition of the case may impair or impede the potential intervenor's ability to protect his interest; and (4) the existing parties do not adequately represent the potential intervenor's interests.  *See Saldano v. Roach*, 363 F.3d 545, 551 (5th Cir. 2004).

The Fifth Circuit has construed Rule 24(a) broadly in favor of intervenors. *See id.* at 999 (internal quotation and citation omitted); *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015) ("Federal courts should allow intervention where no one would be hurt and the greater justice could be attained" (*citing Sierra Club v. Espy,* 18 F.3d 1202, 1205 (5th Cir. 1994)) (internal quotation marks omitted)); *See also John Doe No. 1 v. Glickman*, 256 F.3d 371, 375 (5th Cir. 2001) ("[T]he inquiry under subsection (a)(2) is a flexible one, which focuses on the particular facts and circumstances surrounding each application"); *Edwards v. City of Houston*, 78 F.3d 983, 999 (5th Cir. 1996) ("[I]ntervention of right must be measured by a practical rather than technical yardstick") (internal quotation and citation omitted)).

**A.**     **The Proposed Defendant-Intervenors' Motion to Intervene Is Timely**

In determining whether a motion for intervention is timely under Fed. R. Civ. P. 24(a)(2), the Court should consider:  (1) the length of time between the potential intervenor's

learning that its interest is no longer protected by the existing parties and its filing of a motion to intervene, (2) the extent of prejudice to the existing parties from allowing late intervention, (3) the extent of prejudice to the potential intervenor if the motion is denied, and (4) any unusual circumstances. *See Stallworth v. Monsanto Co.*, 558 F.2d 257, 264-66 (5th Cir. 1977); *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 247-48 (5th Cir. 2009).

The Proposed Defendant-Intervenors' Motion to Intervene comes promptly after they learned of their interest in the case via the filing of Plaintiffs' Complaint on May 1, 2018.  The litigation is currently in its earliest stages, and the timing of this motion poses no prospect of prejudicing the parties.  At this early juncture, Defendants have yet to file their answer, no motions have been heard, no discovery has been conducted, no scheduling order has been issued, and no trial date set.

Although Plaintiffs have filed a motion for a preliminary injunction (*see* Dkt. No. 5), the Court has not ruled on this motion.  The Proposed Defendant-Intervenors do not intend to request any modification to the current briefing schedule for the motion for a preliminary injunction, and intervention therefore poses no potential to prejudice the rights of any current party.  *See Ford v. City of Hunstville*, 242 F.3d 235, 240 (5th Cir. 2001) (finding that prejudice is only created by "the intervenor's delay in seeking to intervene after it learns of its interest") (citing *Ceres Gulf v. Cooper*, 957 F.2d 1199, 1203 (5th Cir. 1992))); *see also Stallworth*, 558 F.2d at 265 ("[T]he prejudice to the original parties to the litigation that is relevant to the question of timeliness is only that prejudice which would result from the would-be intervenor's failure to request intervention as soon as he knew or reasonably should have known about his interest in the action").

On the other hand, the Proposed Defendant-Intervenors would be severely prejudiced if this Court denies this motion to intervene.  In *Stallworth*, the Fifth Circuit framed the question

of prejudice against proposed intervenors who are denied intervention in terms of whether "a [Rule 24] section (a) intervenor 'may be seriously harmed if he is not permitted to intervene.'" *Stallworth*, 558 F.2d at 266 (internal quotation and citation omitted).  In this case, distinct from Defendants, the Proposed Defendant-Intervenors have a direct, personal and financial stake in the outcome of this case.   In point of fact, the Proposed Defendant-Intervenors are the individuals meant to be affected by the outcome of this case:  if the Court enjoins DACA, the Proposed Defendant-Intervenors will lose their authorized presence and ability to be employed and will be at risk of losing their jobs, their education, their family members who reside in the U.S., and their communities.

As nonparties, the Proposed Defendant-Intervenors will be directly affected by any court-ordered remedy, but will not be able to participate in presenting evidence and argument in support of their positions or to appeal the ruling.  *See Edwards*, 78 F.3d at 1002–03; *see also Lease Oil Antitrust Litig.*, 570 F.3d at 249–50 ("Intervening in the existing federal lawsuit is the most efficient, and most certain, way for [the potential intervenor] to pursue its claim").  Without the ability to intervene, the Proposed Defendant-Intervenors will be relegated to the sidelines in a case in which their interests will be directly affected by the outcome and their fate will be determined by other parties.

As the individuals directly affected by Plaintiffs' lawsuit, the Proposed Defendant-Intervenors respectfully urge the Court to grant them an opportunity to present their case and protect their interests and the interests of other undocumented immigrants who receive deferred action pursuant to DACA.  Considering each of the factors above, this intervention is timely because (1) the Proposed Defendant-Intervenors promptly filed this motion; (2) the existing parties will not be prejudiced if the Court permits intervention at this juncture; and (3) the

Proposed Defendant-Intervenors will be greatly harmed if this motion is denied because they will not be able to protect their interests before the Court.

### B.      The Proposed Defendant-Intervenors Possess a Protectable Interest

The Proposed Defendant-Intervenors also satisfy the requirements of Rule 24(a)(2) because they have a protectable interest in the subject matter of this litigation that would be otherwise impaired by an adverse decision.  Their protectable interest does not have "to be of a legal nature identical to that of the claims asserted in the main action."  *Diaz v. S. Drilling Corp.*, 427 F.2d 1118, 1124 (5th Cir. 1970).  "In other words, an interest is sufficient if it is of the type that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim."  *Texas*, 805 F.3d at 659. Ultimately, "the interest 'test' is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process."  *Ross v. Marshall*, 426 F.3d 745, 757 (5th Cir. 2005).

Like the prospective recipients of Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") in *Texas v. U.S.* (14-cv-254), the Proposed Defendant-Intervenors "have interests sufficient to support intervention."  *Texas*, 805 F.3d at 660.  First, the Proposed Defendant-Intervenors have an interest in receiving deferred action pursuant to DACA so that they may legally remain in the United States.  *Id*. ("This is not a mere generalized interest in the implementation of DAPA; rather, the Jane Does are the intended beneficiaries of the challenged federal policy").

Second, the Proposed Defendant-Intervenors "have an interest in the employment opportunities that would be available to them if they are granted deferred action and employment authorization, the former of which would make them eligible for the latter."  *Id*.

11

Third, some of the Proposed Defendant-Intervenors are parents and "have an interest in directing the upbringing of their United States-citizen children [which is] a legally protected liberty interest under the Due Process Clause."  *Id.*

Courts have routinely granted intervention to parties seeking to protect their interest in government programs that affect them.  *See, e.g. id.* at 661:

> In short, the Jane Does have a real, concrete stake in the outcome of this litigation—if DAPA is invalidated, the Jane Does will lose their opportunity to obtain deferred action and their opportunity to obtain employment authorization. The Jane Does are not individuals seeking to defend a governmental policy they support on ideological grounds; rather, they are the intended beneficiaries of the program being challenged. Just as the parents in *Brumfield* had a specific, concrete interest in their children's education, and just as the individuals in *Edwards* and *Black Fire Fighters* had a specific, concrete interest in pursuing job opportunities, the Jane Does have interests that are sufficiently concrete and specific to support their intervention by right;

*See also, e.g. Day v. Sebelius*, 227 F.R.D. 668, 670, 676 (D. Kan. 2005) (granting motion to intervene as defendants filed by the Kansas League of United Latin American Citizens, the Hispanic American Leadership Organization, and three college students); *Chiles v. Thornburgh*, 865 F.2d 1197, 1214 (11th Cir. 1989) (detainees seeking to intervene as a matter of right in an action brought by a U.S. Senator to challenge housing of immigrant felons at a particular facility had an interest relating to the main suit); *Lewis v. Stark*, 312 F. Supp. 197 (N.D. Cal. 1968), *rev'd on other grounds by Lewis v. Martin*, 397 U.S. 552 (1980) (granting intervention to families with men assuming the role of spouse in the household in challenge to state welfare law).  In the same way, the Proposed Defendant-Intervenors here have shown strong and legally cognizable interests related to DACA.

The Proposed Defendant-Intervenors stand to lose economic opportunities if the Court grants Plaintiffs' request, because their work authorization will end and they would lose the ability to be employed.  Without the opportunity to apply for work authorization, their ability to

support themselves and their families, including their U.S. citizen children, is extremely limited. Courts have held that economic interests, especially those that would "afford [the Proposed Defendant-Intervenors] greater recompense and satisfaction," are a significant protectable interest. *Usery v. Brandel*, 87 F.R.D. 670, 676 (W.D. Mich. 1980); *see also Decker v. United States Dep't of Labor*, 473 F. Supp. 770 (E.D. Wis. 1979) (holding that a city archdiocese which received financial benefits from a federal statute had a sufficient interest in the action to intervene as of right under Rule 24(a)(2)).

The Proposed Defendant-Intervenors' interests diverge from the broader interests that Defendants pursue: Defendants are responsible for issuing and implementing DACA, but none of them are or ever will be directly affected by DACA. The outcome of this litigation does not jeopardize Defendants' families' well-being or their ability to earn a living, but it does jeopardize the Proposed Defendant-Intervenors, who ask the Court to provide them with the opportunity to defend their own interests under DACA.

## C.   The Proposed Defendant-Intervenors' Interests Would Be Subject to Impairment if Intervention Were Denied

The Proposed Defendant-Intervenors are "so situated that the disposition of the action may as a practical matter impair or impede [its] ability to protect [its] interest." Fed. R. Civ. P. 24(a)(2). Here, the advisory committee notes to Rule 24(a) are instructive: "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." Fed. R. Civ. P. 24 advisory committee note to 1966 Amendment. To demonstrate "impairment," a prospective intervenor "must show only that impairment of its substantial legal interest *is possible* if intervention is denied." *Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999) (citing *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1247 (6th Cir. 1997) (emphasis added)). "This burden is minimal." *See Grutter*, 188 F.3d

13

at 399 (rejecting the notion that Rule 24(a)(2) requires a specific legal or equitable interest).

There is no doubt that the relief Plaintiffs seek in this case—terminating deferred action and work authorization under DACA for hundreds of thousands of undocumented young people— will directly impair the Proposed Defendant-Intervenors' lives, potentially resulting in deportation, disrupting and separating family members, fracturing communities, and preventing access to employment.

The Proposed Defendant-Intervenors cannot wait until the conclusion of the litigation to vindicate their interests.  Courts have recognized that parties seeking intervention would face a "practical disadvantage" in asserting their rights once a court has rendered a decision. *Chiles*, 865 F.2d at 1214.  The Fifth Circuit has recognized that a prospective intervenor's interest may be practically "impaired by the *stare decisis* effect" of a court's rulings in subsequent proceedings. *Sierra Club*, 18 F.3d at 1207 (quoting *Ceres Gulf*, 957 F.2d at 1204) (italics in original)); *see also Martin v. Travelers Indem. Co.*, 450 F.2d 542, 554 (5th Cir. 1971) ("[S]tare decisis . . . would loom large" in any attempt by prospective intervenors "to achieve a favorable resolution of the coverage issue" on their own); *Black Fire Fighters Ass'n of Dallas v. City of Dallas*, 19 F.3d 992, 994 (5th Cir. 1994) (to the extent that a lawsuit involves common legal issues, potential adverse effects on the prospective intervenors favor intervention).

### D.     The Proposed Defendant-Intervenors' Interests Cannot Be Adequately Represented by the Existing Parties

The burden under this prong is "satisfied if [the Proposed Defendant-Intervenors] show[] that representation of [their] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972).  Courts have recognized that "[i]nadequate representation is most likely to be found when the applicant asserts a personal interest that does not belong to the general public." *Forest*

14

*Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489, 1490 (9th Cir. 1995) (internal citation omitted), *rev'd on other grounds by Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173 (9th Cir. 2011).[4]   Intervention is warranted when the proposed intervenors "occup[y] a different position and [have] different interests" than the existing defendants. *Sierra Club v. Fed. Emergency Mgmt. Agency*, No. 07-0608, 2008 U.S. Dist. LEXIS 47405, at \*18-19 (S.D. Tex. June 11, 2008).

Although the Fifth Circuit recognizes two presumptions in favor of adequate representation when "the would-be intervenor has the same ultimate objective as a party to the lawsuit," and when "when the putative representative is a governmental body or officer charged by law with representing the interests of the [intervenor]," *see Texas*, 805 F.3d at 661, *quoting Edwards v. City of Houston*, 78 F.3d 983, 1005 (5th Cir. 1996), that presumption is absent here because the federal government has taken the public position that DACA is unconstitutional.[5]

In addition to the statements by U.S Attorney General Jeff Sessions, that DACA is "an unconstitutional exercise of authority by the Executive Branch"[6] and "vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA

---

[4] Other courts have recognized that governmental representation of private, non-governmental intervenors may be inadequate.  For example, in *Dimond v. District of Columbia*, the court held that because the government was responsible for representing a broad range of public interests rather than the more narrow interests of intervenors, the "application for intervention . . . falls squarely within the relatively large class of cases in this circuit recognizing the inadequacy of governmental representation of the interests of private parties in certain circumstances."  792 F.2d 179, 192 (D.C. Cir. 1986); *see Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 331 (1980) (granting individual aggrieved party's motion to intervene in order to protect its personal interests, which may at times be in conflict with those of the EEOC); *see also Natural Res. Def. Council v. Costle*, 561 F.2d 904, 911-12 (D.C. Cir. 1977) (holding that the government does not adequately represent private organizations because intervenors' interests are different).

[5] *See* n. 2 above.

[6] *Id.*

program,"[7] the United States has referenced and relied upon the Attorney General's statement that DACA is unconstitutional in all four cases challenging the attempted rescission of DACA. *See* Defs.' Notice of Mot. and Mot. to Dismiss All S.D. Cal. DACA Cases, Mem. in Supp. at 39, *Regents of University of California, et al. v. U.S. Department of Homeland Security*, No. 3:17-cv-05211 (N.D.Cal. Nov. 1, 2017) (referencing "the Attorney General's views regarding the legality of DACA"); Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. at 31, *The Trustees of Princeton University, et al. v. U.S., et al.*, No. 1:17-cv-02325 (D.D.C. Nov. 22, 2017) (referencing "[t]he Attorney General's determination that DACA was unconstitutional"); Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. at 48*, Casa de Maryland, et al. v. U.S. Department of Homeland Security, et al.*, No. 8:17-cv-02942 (D.MD. Nov. 15, 2017) ("Here, the Attorney General regarded DACA as unconstitutional in part because it was an 'open-ended' policy that closely tracked 'proposed legislation' that Congress had repeatedly rejected"); Mem. of Law in Opp'n to Pls.' Mot. for a Prelim. Inj., *Martin Jonathan Batalla Vidal, et al. v. Kirstjen M. Nielsen, et al.* at 15, No. 1:16-cv-04756 (E.D.N.Y. Jan. 13, 2018) (referencing "the Attorney General's recommendation to rescind DACA, which explained that because DACA 'has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results'").

For these same reasons, even if the Court were to apply the presumptions in favor of adequate representation, the Administration's public position and court filings demonstrate adversity of interest sufficient to overcome the presumptions. *See Texas*, 805 F.3d at 662 ("In order to show adversity of interest, an intervenor must demonstrate that its interests diverge from the putative representative's interests in a manner germane to the case").

---

[7] *Id.*

The adversity prong is easily satisfied here.  Even assuming that the United States would reverse its adverse position on the legality of DACA in the other pending cases, and defend the initiative here as an appropriate exercise of prosecutorial discretion, Defendants and the Proposed Defendant-Intervenors' interests are profoundly different.

As explained by the Fifth Circuit in *Texas v. United States*, there are particular ways in which the interests of prospective beneficiaries of deferred action initiatives diverge from the interests of the U.S., including divergent interests regarding whether individuals with deferred action must be issued driver's licenses by the states in which they live.  *Texas*, 805 F.3d at 663 ("The disagreement between the Government and the Jane Does on the driver's license issue arises directly from their divergent interests; the Government has an institutional interest in shielding its actions from state intervention through the courts, whereas the Jane Does' interest is in working and providing for their families, for which a driver's license is beneficial").

Furthermore, Defendants are responsible for implementing DACA, but none of them are or ever will be directly affected by DACA. Defendants have no direct personal interest at stake. *See, e.g.*, *Day*, 227 F.R.D. at 674 ("To the court's knowledge, none of these existing defendants are or ever will be personally impacted by [the in-state tuition law]").  Instead, Defendants will be merely required not to implement DACA.  Not so for the Proposed Defendant-Intervenors if Plaintiffs are successful and obtain an injunction.  The Proposed Defendant-Intervenors will experience severe and direct negative consequences, chief among them the constant fear of deportation.

The Proposed Defendant-Intervenors' interests are too divergent from the interests of Defendants, and too vital for the Proposed Defendant-Intervenors to be denied an active role as intervenor.  *See id.* at 674-75 (granting intervention and recognizing direct and personal interests

17

of undocumented immigrant student in defending an in-state tuition law).  For these reasons, the Proposed Defendant-Intervenors seek to participate in this case as intervenors and respectfully request that the Court grant them intervention as a matter of right.

## V.    PERMISSIVE INTERVENTION IS ALSO APPROPRIATE

Even if this Court were to determine that the Proposed Defendant-Intervenors do not satisfy the requirements for intervention as of right, it should grant permissive intervention.  Rule 24(b)(1)(B) grants permissive intervention upon timely motion by anyone who "has a claim or defense that shares with the main action a common question of law or fact."  The Fifth Circuit has recognized that permissive intervention may be granted in the Court's discretion if (1) the motion is timely; (2) an applicant's claim or defense has a question of law or fact in common with the existing action; and (3) intervention will not delay or prejudice the adjudication of the rights of the original parties.  Fed. R. Civ. P. 24(b); *see United States v. LULAC*, 793 F.2d 636, 644 (5th Cir. 1986) ("Although the court erred in granting intervention as of right, it might have granted permissive intervention under Rule 24(b) because the intervenors raise common questions of law and fact.").

As a threshold matter, the Proposed Defendant-Intervenors' motion to intervene is timely. *See supra* Section IV.A.  Second, the Proposed Defendant-Intervenors' defenses will share substantial questions of law and fact with the main action as the Proposed Defendant-Intervenors seek to preserve their deferred action grants pursuant to DACA.  Third, as discussed above, intervention will not create delay or prejudice the existing parties.  *See id.* Adding the Proposed Defendant-Intervenors as defendant-intervenors at this juncture of the lawsuit will not needlessly increase cost, delay disposition of the litigation, or prejudice the existing parties.

Importantly, the Proposed Defendant-Intervenors' participation in this lawsuit will offer

evidence and argument from the young immigrants who are the real targets of this lawsuit and who have a direct and personal stake in the outcome of this case.  At a minimum, therefore, the Proposed Defendant-Intervenors ask the Court to exercise its broad discretion and grant them permissive intervention.

## VI.     <u>CONCLUSION</u>

For the foregoing reasons, the Proposed Defendant-Intervenors respectfully request that the Court grant their motion to intervene in this action as Defendants.

Dated: May 8, 2018                                  Respectfully submitted,

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
By: */s/ Nina Perales*
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
Celina Moreno (Tex. Bar No. 24074754)
(SD of Tex. Bar No. 2867694)
Jack Salmon (Tex. Bar No. 24068914)
(SD of Texas Bar No. 1130532)
Alejandra Ávila (Tex. Bar No. 24089252)
(SD of Tex. Bar No. 2677912)
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone:  (210) 224-5476
Facsimile:  (210) 224-5382
Email: nperales@maldef.org

**GARCÍA & GARCÍA,
ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

Attorneys for Proposed Defendant-
Intervenors

## **CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that, on the eighth day of May, 2018, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Nina Perales*
Nina Perales

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## APPENDIX A: DECLARATIONS

Pursuant to the Court's Civil Procedures, rule 7(b), the Proposed Defendant-Intervenors

Karla Perez, Maria Rocha, Jose Magaña-Salgado, Nanci J. Palacios Godinez, Elly Marisol

Estrada, Karina Ruiz De Diaz, Carlos Aguilar Gonzalez, Karla Lopez, Luis A. Rafael, Darwin

Velasquez, Jin Park, Oscar Alvarez, Nancy Adossi, Denise Romero, Pratishtha Khanna, Jung

Woo Kim, Angel Silva, Moses Kamau Chege, Hyo-Won Jeon, Elizabeth Diaz, Maria Diaz, and

Blanca Gonzalez hereby provide the Court with a summary of declarations and copies of the following declarations cited in support of the Proposed Defendant-Intervenors' Motion for Leave to Intervene and Proposed Defendant-Intervenors' Memorandum of Law in Support of Their Motion for Leave to Intervene.

| NO. | DECLARATION |
|-----|-------------|
| 1.  | Summary of Declaration Testimony by Proposed Defendant Intervenors |
| 2.  | Declaration of Defendant Intervenor Movant Karla Perez |
| 3.  | Declaration of Defendant Intervenor Movant Maria Rocha |
| 4.  | Declaration of Defendant Intervenor Movant Jose Magaña-Salgado |
| 5.  | Declaration of Defendant Intervenor Movant Nanci J. Palacios Godinez |
| 6.  | Declaration of Defendant Intervenor Movant Elly Marisol Estrada |
| 7.  | Declaration of Defendant Intervenor Movant Karina Ruiz de Diaz |
| 8.  | Declaration of Defendant Intervenor Movant Carlos Aguilar Gonzalez |
| 9.  | Declaration of Defendant Intervenor Movant Karla Lopez |
| 10. | Declaration of Defendant Intervenor Movant Luis A. Rafael |
| 11. | Declaration of Defendant Intervenor Movant Darwin Velasquez |
| 12. | Declaration of Defendant Intervenor Movant Jin Park |
| 13. | Declaration of Defendant Intervenor Movant Oscar Alvarez |
| 14. | Declaration of Defendant Intervenor Movant Nancy Adossi |
| 15. | Declaration of Defendant Intervenor Movant Denise Romero |

| 16. | Declaration of Defendant Intervenor Movant Pratishtha Khanna |
| 17. | Declaration of Defendant Intervenor Movant Jung Woo Kim |
| 18. | Declaration of Defendant Intervenor Movant Angel Silva |
| 19. | Declaration of Defendant Intervenor Movant Moses Kamau Chege |
| 20. | Declaration of Defendant Intervenor Movant Hyo-Won Jeon |
| 21. | Declaration of Defendant Intervenor Movant Elizabeth Diaz |
| 22. | Declaration of Defendant Intervenor Movant Maria Diaz |
| 23. | Declaration of Defendant Intervenor Movant Blanca Gonzalez |

Dated: May 8, 2018

Respectfully submitted,

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
By: */s/ Nina Perales*
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
Celina Moreno (Tex. Bar No. 24074754)
(SD of Tex. Bar No. 2867694)
Jack Salmon (Tex. Bar No. 24068914)
(SD of Texas Bar No. 1130532)
Alejandra Ávila (Tex. Bar No. 24089252)
(SD of Tex. Bar No. 2677912)
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone:  (210) 224-5476
Facsimile:  (210) 224-5382
Email: nperales@maldef.org

**GARCÍA & GARCÍA,**
**ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
 (SD of Tex. Bar No. 1081768)

P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

Attorneys for Proposed Defendant
Intervenors

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on the eighth day of May, 2018, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/ Nina Perales*
Nina Perales

# APPENDIX A

# TAB 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## SUMMARY OF DECLARATION TESTIMONY BY PROPOSED DEFENDANT-INTERVENORS

Karla Perez lives in Houston, Texas, and is a DACA recipient.  (Declaration of Karla Quetzalli Perez ¶¶ 1, 8).  She was born in Mexico and came with her parents to the United States when she was two years old.  (*Id.* ¶ 2)  Ms. Perez graduated from Pasadena Memorial High School in Pasadena, Texas, where she was a member of the National Honor Society and captain of the varsity soccer team.  (*Id.* ¶ 3)  Ms. Perez graduated magna cum laude from the University of Houston, where she received a Bachelor's degree in Business Administration.  (*Id.* ¶ 4)  Ms. Perez is 25 years old and a third-year law student at the University of Houston Law Center.  (*Id.* ¶ 5)  As a law student, Ms. Perez has assisted attorneys at several non-profit organizations to

provide legal services to crime victims, DACA recipients, and immigrants who have survived gender-based violence.  (*Id.* ¶ 6)  She is a board member of United We Dream, the largest immigrant youth-led network in the United States.  (*Id.* ¶ 7)  Ms. Perez has served as the statewide coordinator of United We Dream legislative campaigns advocating for improved living conditions for immigrants in Texas.  (*Id.*)  Ms. Perez earned the Texas Center for Public Policy Priorities' 2015 Future of Texas Award, and *The Dallas Morning News* named her a 2015 Texan of the Year Finalist.  (*Id.*)

Maria Rocha lives in San Antonio, Texas, and is a DACA recipient.  (Declaration of Maria Rocha ¶¶ 1, 9). She was born in Mexico and came to the United States when she was three years old.  (*Id.* ¶ 2)  Ms. Rocha is now 30 years old and currently pursuing a master's degree through the Urban School Leader Collaborative program at the University of Texas at San Antonio (UTSA).  (*Id.* ¶ 3)  Ms. Rocha also works as a teacher in San Antonio teaching third grade students.  (*Id.* ¶ 4)  She worked as a teacher through the Teach for America program from 2015 to 2017, and is an active member of her community.  (*Id.* ¶ 5)  In 2011, she began volunteering with the Cesar Chavez Legacy and Educational Foundation to organize food drives and community events. (*Id.* ¶ 6)  Ms. Rocha coaches soccer and basketball to lower elementary schoolchildren.  (*Id.* ¶ 7)  Ms. Rocha received an award from the elementary school at which she works for exemplifying the school's commitment to students.  (*Id.* ¶ 8)

Jose Magaña-Salgado lives in Washington, D.C., and is a DACA recipient.  (Declaration of Jose Magaña-Salgado ¶¶ 1, 7).  He was born in Mexico and was brought by his parents to the United States in 1989 when he was two years old.  (*Id.* ¶ 2)  Mr. Magaña-Salgado graduated high school from St. Paul's Preparatory Academy in Phoenix, Arizona and was valedictorian of his high school class.  (*Id.* ¶ 3)  Mr. Magaña-Salgado earned his bachelor's degree from Arizona State University and his law degree from Baylor School of Law.  (*Id.* ¶ 4)  During law school, Mr. Magaña-Salgado assisted attorneys and non-profit organizations in providing legal services to crime victims, trafficking survivors, Temporary Protected Status (TPS) recipients, and immigrants seeking asylum and fleeing persecution.  (*Id.*)  Additionally, Mr. Magaña-Salgado co-founded the Dream Bar Association, a professional bar association led by and for undocumented immigrants.  (*Id.* ¶ 6)  Mr. Magaña-Salgado is now 31 years old and a small business owner.  (*Id.* ¶¶ 4, 5)  He provides consulting services to local, state, and national immigration non-profit organizations.  (*Id.* ¶ 5)  Previously, Mr. Magaña-Salgado worked as the Managing Policy Attorney at the Immigrant Legal Resource Center.  (*Id.* ¶ 5)  In that role, he developed education materials for attorneys and community members, advocated in Congress for comprehensive immigration reform, and appeared on national and local media to discuss immigration issues.  (*Id.*)

Nanci J. Palacios Godinez lives in Seffner, Florida and is a DACA recipient.  (Declaration of Nanci J. Palacios Godinez ¶¶ 1, 8). She was born in Mexico and came to the United States when she was six years old.  (*Id.* ¶ 2)  Ms. Palacios graduated in the top 10 percent of her class at Durant High School in Plant City, Florida, where she was a member of the National Honor Society and served as the president of the Spanish Honor Society.  (*Id.* ¶ 3)  Ms. Palacios holds an Associate's degree in Health Science from Hillsborough Community College.  (*Id.* ¶ 4)  While she was a student at Hillsborough Community College, she co-founded United We Dream-Tampa Bay and volunteered and served on the Steering Committee of the Florida

2

Immigrant Youth Network, a statewide coalition of organizations focused on immigrant rights. (*Id.*)  Ms. Palacios is now 29 years old and attends University of South Florida in Tampa, Florida, where she is pursuing her bachelor's degree in Political Science with a minor in Anthropology. (*Id.* ¶ 5)  Ms. Palacios works as a Congregation Organizer for the non-profit Faith in Florida and is an active member of her church. (*Id.* ¶¶ 6, 7)

Elly Marisol Estrada Cruz lives in Atlanta, Georgia and is a DACA recipient. (Declaration of Nanci J. Palacios Godinez ¶¶ 1, 7).  She was born in Mexico and came to the United States with her family in 1999 when she was five years old. (*Id.* ¶ 2)  She graduated from Sol C. Johnson High School in Savannah, Georgia in 2013. (*Id.* ¶ 3)  Ms. Estrada excelled in high school and graduated in the top 10 percent of her class. (*Id.*)  Ms. Estrada is 24 and a 2016 magna cum laude graduate of Armstrong State University, where she double majored in Political Science and Government and Spanish. (*Id.* ¶ 4)  While in college, Ms. Estrada was a member of the Savannah Undocumented Youth Alliance, a student-run organization that advocates for access to higher education for undocumented students. (*Id.*)  After college, Ms. Estrada worked as the deputy chief of staff for a state representative in Georgia. (*Id.* ¶ 5)  She currently works as a legal assistant at an immigration law firm in the Atlanta area. (*Id.* ¶ 6)

Karina Ruiz De Diaz lives in Phoenix, Arizona, and is a DACA recipient. (Declaration of Karina Ruiz De Diaz ¶¶ 1, 9).  Mrs. Ruiz De Diaz was born in Mexico City and came with her parents to the United States when she was 15 years old. (*Id.* ¶ 2)  Mrs. Ruiz De Diaz graduated from Sunnyslope High School in Phoenix. (*Id.* ¶ 3)  In high school, Mrs. Ruiz De Diaz was a member of the National Honor Society, the Spanish Honor Society, and the Air Force JROTC. (*Id.*)  Mrs. Ruiz De Diaz earned a scholarship from the Sunburst Foundation to attend college. (*Id.* ¶ 4)  She attended Arizona State University, from which she earned a Bachelor of Science in Biochemistry in 2015. (*Id.*)  Mrs. Ruiz De Diaz is currently 33 years old and works as the Executive Director of the Arizona Dream Act Coalition, an immigrant youth-led organization focused on higher education and immigrant rights. (*Id.* ¶ 5)  Mrs. Ruiz De Diaz is a licensed real estate agent and the mother of three United States citizen children. (*Id.* ¶¶ 6, 7)  She is an active member of her church, a parent volunteer and President of the Mountain View Elementary School Parent Teacher Organization (PTO), where two of her children attend school, and a volunteer at HonorHealth John C. Lincoln Medical Center. (*Id.* ¶ 8)  She is also a volunteer at One Arizona Table, an organization that promotes civic engagement among Latino and immigrant communities. (*Id.*)

Carlos Aguilar Gonzalez lives in Cambridge, Massachusetts and is a DACA recipient. (Declaration of Carlos Aguilar Gonzalez ¶¶ 1, 7).  He was born in Mexico and was brought by his mother to the United States when he was fourteen years old. (*Id.* ¶ 2)  Mr. Aguilar is now 27 years old and currently pursuing a Ph.D. in Education at the Harvard University Graduate School of Education. (*Id.* ¶ 4)  Mr. Aguilar graduated from Tivy High School and earned his bachelor's degree in psychology from Schreiner University, then his master's degree in sociology from the University of Texas at San Antonio (UTSA). (*Id.* ¶ 3)  During this time, Mr. Aguilar volunteered as the coordinator of Immigrant Youth Leadership at UTSA. (*Id.* ¶ 6)  He also worked as a legal assistant at an immigration law firm in San Antonio. (*Id.* ¶ 5)  Mr. Aguilar has also volunteered as a recurring guest speaker at family literacy programs discussing the importance of education with Latino parents, as an instructor of

English as a Second Language, as a presenter for non-profit citizenship and DACA workshops and as a data entry assistant for a non-profit organization that provides legal aid to unaccompanied child migrants.  (*Id.* ¶ 6)

Karla Lopez lives in Mableton, Georgia and is a DACA recipient.  (Declaration of Karla Lopez ¶¶ 1, 6).  She was born in Mexico and was brought by her mother to the United States when she was eight years old.  (*Id.* ¶ 2)  Ms. Lopez graduated from Pebblebrook High School in Mableton, Georgia, where she participated in cheerleading and played the cello.  (*Id.* ¶ 3)  She graduated in the top 10 percent of her class with a 3.9 grade point average on a scale of 4.0.  (*Id.*)  She was a recipient of the Atlanta Journal Constitution Senior of the Year Scholarship for Pebblebrook High School and the Hispanic Scholarship Fund Scholarship.  (*Id.*)  Ms. Lopez is 23 and is pursuing her bachelor's degree in biology at Perimeter College in Atlanta, Georgia.  (*Id.* ¶ 4)  She is an active participant in her college community and has served as a student senator and secretary in her college's student government.  (*Id.*)  In addition to working toward her bachelor's degree, Ms. Lopez works full-time at a combination of two jobs.  (*Id.* ¶ 5)  Ms. Lopez is also active in her community and volunteers at a number of community organizations, including Hosea Feed the Hungry and the American Red Cross.  (*Id.* ¶ 6)

Luis A. Rafael lives in Chicago, Illinois and is a DACA recipient.  (Declaration of Luis A. Rafael ¶¶ 1, 7).  He was born in Mexico and came to the United States with his mother when he was three years old.  (*Id.* ¶ 2)  Mr. Rafael graduated from Morton East High School and is currently a full-time student attending Northeastern University's STEM Pathway Initiative to teach robotics in low-income communities. (*Id.* ¶¶ 3, 4)  Mr. Rafael has worked as a campaign manager for Chicago-area elections in a paid and volunteer capacity.  (*Id.* ¶ 5)  Mr. Rafael has also worked in a coffee shop.  (*Id.*)  Mr. Rafael is 23 years old and currently volunteers his time with various Chicago-based organizations, including New Generation of Leadership, a group of Latinos organizing to seek social justice in the suburb of Cicero, and Increase the Peace, a youth-led initiative to decrease gun violence in the Chicago neighborhood of Englewood.  (*Id.* ¶¶ 4, 6)

Darwin Velasquez lives in Colma, California and is a DACA recipient.  (Declaration of Darwin Velasquez ¶¶ 1, 7).  He was born in El Salvador and came to the United States in 2007 when he was 12 years old.  (*Id.* ¶ 2)  Mr. Velasquez graduated from George Washington High School where he completed advanced placement coursework, was named Mock-Trial All-Star by the Bar Association of San Francisco, was a representative to the San Francisco Public Schools Student Advisory Council, and was named graduation speaker for College Track Bay Area.  (*Id.* ¶ 3)  Mr. Velasquez is 23 years old and in 2017 earned a bachelor's degree from University of San Francisco in International Studies and Global Politics with a minor in European Studies.  (*Id.* ¶ 4)  Mr. Velasquez currently works as the National Dream Coordinator for College Track, a national college access program, where he counsels over 250 Dreamers.  (*Id.* ¶ 5)  Mr. Velasquez previously served as Outreach Ambassador to Educators for Fair Consideration where he advocated for higher education for undocumented youth.  (*Id.* ¶ 6)  Mr. Velasquez also volunteered with the San Francisco Recreation and Park Department where he ran programs for disabled youth and seniors, and volunteered at a summer camp for the visually impaired.  (*Id.*)  In 2013 the San Francisco Youth Commission awarded Mr. Velasquez the Youth of the Year

4

Award for his leadership and strong civic engagement for positive change in his community. (*Id.*)

Jin Park lives in Cambridge, Massachusetts, and is a DACA recipient. (Declaration of Jin Park ¶¶ 1, 14). He was born in South Korea and was brought by his parents to the United States when he was seven years old. (*Id.* ¶ 2) Mr. Park is now 22 years old and an undergraduate student at Harvard College studying molecular and cellular biology with a minor in government and plans to apply to medical school after he graduates college. (*Id.* ¶ 3, 4) He is currently employed at a university cancer research institute in Cambridge, Massachusetts. (*Id.* ¶ 5) Mr. Park previously worked at the New York City Mayor's Office, where he helped implement a care coordination program for undocumented immigrants in the City. (*Id.* ¶ 6) He served as the director of naturalization assistance programs at Harvard, which provides services to low-income immigrants, primarily from Boston's Chinatown. (*Id.* ¶ 7) Mr. Park incorporated his own 501(c)(3) organization ("HigherDreams, Inc."), which provides training and direct services to undocumented high school students in Boston. (*Id.* ¶ 8) HigherDreams has recently partnered with Boston Public Schools to provide trainings to guidance counselors in the district regarding the unique challenges that undocumented students face. (*Id.* ¶ 9) For his work with HigherDreams, the White House selected Mr. Park as a "Champion of Change" for college opportunity in November 2016. (*Id.* ¶ 10) He was also named a White House Asian-American and Pacific Islander Initiative Spokesperson during President Obama's tenure. (*Id.* ¶ 11) At Harvard, Mr. Park is the recipient of the Harvard Presidential Public Service fellowship and was named a John Harvard Scholar. (*Id.* ¶ 12) Mr. Park was also selected as the 2018 Harvard Orator, one of two student speakers to address the Class of 2018 on Class Day. (*Id.* ¶ 13)

Oscar Alvarez lives in Los Angeles, California, and is a DACA recipient. (Declaration of Oscar Alvarez ¶¶ 1, 6). He was born in Mexico and was brought by his parents to the United States in 1997 when he was two years old. (*Id.* ¶ 2) Mr. Alvarez graduated from Ánimo Ralph Bunche Charter High School in Los Angeles. (*Id.* ¶ 3) He was a member of the leadership committee of the National Honor Society at his high school and he volunteered with A Place Called Home, a non-profit organization that provides educational programming for youth of color in Los Angeles. (*Id.*) Mr. Alvarez is now 23 years old and currently pursuing a Bachelor's degree in American Studies with a focus in Public Policy and Education at the University of California, Berkeley. (*Id.* ¶ 4) Mr. Alvarez was a 2016 Fellow with the Public Policy and International Affairs (PPIA) Program at the Goldman School of Public Policy; the PPIA Program promotes the inclusion of students from underserved communities in the public sector and helps prepare those students for graduate level programs and careers in public service. (*Id.*) Mr. Alvarez previously co-led a student group, *Casa Sin Fronteras*, that helps connect undocumented students to housing or assistance while in school and raises awareness about undocumented students and homelessness. (*Id.*) Mr. Alvarez previously interned in Congress through the Congressional Hispanic Caucus Institute, where he worked with Congresswoman Linda Sanchez. (*Id.* ¶ 5)

Dr. Nancy Adossi lives in Houston, Texas and is a DACA recipient. (Declaration of Nancy Adossi ¶¶ 1, 9). She was born in Lomé, Togo and was brought to the United States by her parents when she was nine years old. (*Id.* ¶ 2) Dr. Adossi graduated from the magnet program at George W. Carver High School in the top 10 percent of her class. (*Id.* ¶ 3) She received a

bachelor's degree in Political Science and International Relations from the University of Houston, where she graduated as the valedictorian and was keynote speaker for her class. (*Id.* ¶ 4)  Dr. Adossi earned a master's degree in Public Administration from the University of Houston, which awarded her the 2013 Master's in Public Administration Alumni Award. (*Id.* ¶ 5)  She also holds a Doctorate of Education in Health Sciences Technology from the University of Houston. (*Id.* ¶ 6)  She was the youngest graduate of that program. (*Id.*)  Dr. Adossi is 28 years old and currently works as a sixth grade teacher in the social studies program at Paul Revere Middle School. (*Id.* ¶ 7)  She also works as a research consultant with Lift a Village and the UndocuBlack Network and has previously worked as a research consultant with the Black Alliance for Just Immigration. (*Id.* ¶ 8)

Denise Romero lives in New York City, New York, and is a DACA recipient. (Declaration of Denise Guadalupe Romero Gonzalez ¶¶ 1, 7).  She was born in Mexico and came to the United States in 2001 when she was nine years old. (*Id.* ¶ 2)  Ms. Romero graduated from Long Island City High School, where she participated in Global Kids, a nonprofit educational organization and leadership program that sparked her interest in advocacy and grassroots organizing. (*Id.* ¶ 3)  She is 26 years old and currently pursuing a Bachelor's degree in Journalism from Lehman College at The City University of New York. (*Id.* ¶ 4)  Ms. Romero works as a paralegal and organizer at Mobilization for Justice, a nonprofit organization that provides free legal assistance to low-income tenants in New York. (*Id.* ¶ 5)  Ms. Romero also volunteers with the New York State Youth Leadership Council, the first undocumented youth-led organization in New York, where she has served as a speaker for the organization. (*Id.* ¶ 6)

Pratishtha Khanna lives in Burtonsville, Maryland and is a DACA recipient. (Declaration of Pratishtha Khanna ¶¶ 1, 8).  She was born in India and came to the United States in 2002 when she was 10 years old. (*Id.* ¶ 2)  Ms. Khanna graduated from Reservoir High School where she served as student government treasurer and vice president, and served as president of the Oprah's Ambassadors Program, a student organization that helped raise funds and resources for rural West African schools. (*Id.* ¶ 3)  Ms. Khanna is 26 years old and earned a bachelor's degree in biological sciences from University of Maryland Baltimore County in 2014. (*Id.* ¶¶ 4, 5)  In August 2018 she will begin studies at Western University of Health Sciences, Graduate College of Biomedical Sciences to pursue a master's degree in Biomedical Sciences. (*Id.* ¶ 4)  Ms. Khanna currently works full-time at a hospital in Baltimore, Maryland as a Clinical Technician in a Medical Intensive Care Unit and previously worked part-time at the University of Maryland Baltimore Washington Medical Center as an Emergency Department Scribe. (*Id.* ¶ 6)  Ms. Khanna participates in Pre-Health Dreamers, a community of undocumented students pursuing careers in health. (*Id.* ¶ 7)

Jung Woo Kim lives in Los Angeles, California and is a DACA recipient. (Declaration of Jung Woo Kim ¶¶ 1, 8).  Mr. Kim came to the United States from South Korea when he was 15 years old. (*Id.* ¶ 2)  He graduated from Buena Park High School. (*Id.* ¶ 3)  Mr. Kim, now 33 years old, holds a Bachelor's degree *cum laude* in Kinesiology from California State University-Fullerton. (*Id.* ¶ 4)  Mr. Kim works as a Membership Development Manager at the Korean Resource Center in Los Angeles and also works as the National Campaign Director at the National Korean American Service & Education Consortium, a national grassroots organization

focused on social, economic and racial justice. (*Id.* ¶¶ 5, 6)  Mr. Kim is also a licensed real estate agent in California. (*Id.* ¶ 7)

Angel Silva lives in Silver Spring, Maryland and is a DACA recipient. (Declaration of Angel Silva ¶¶ 1, 7).  He was born in Mexico and was brought by his parents to the United States as a one year old in 1993. (*Id.* ¶ 2)  Mr. Silva graduated from John H. Francis Polytechnic High School in Sun Valley, California. (*Id.* ¶ 3)  He participated in his high school's academic decathlon and served as editor-in-chief of the school newspaper. (*Id.* ¶ 3)  Mr. Silva is 25 years old and earned a bachelor's degree in Journalism with a minor in Political Science from California State University, Northridge. (*Id.* ¶ 4)  Mr. Silva previously attended Glendale Community College in Glendale, California, where he was a managing editor of the college newspaper. (*Id.*)  While in college, Mr. Silva helped develop the DREAM Center, a resource center to help undocumented students access in-state tuition, connect with other undocumented students, and learn about services available to the undocumented student body. (*Id.*)  Mr. Silva also volunteered with the California Dream Network, a group of undocumented students and allies that advocates for greater education access for undocumented students and civic engagement in immigrant communities. (*Id.*)  Mr. Silva interned through the Congressional Hispanic Caucus Institute and worked with Congresswoman Linda Sanchez. (*Id.*)  Mr. Silva currently works at the Congressional Hispanic Caucus Institute in Washington, D.C. as the Scholarship and Administration Specialist. (*Id.* ¶ 5)  In that role, he manages the Scholar Intern Programs which provide students with scholarships and paid internships at community-based health organizations. (*Id.*)  Mr. Silva volunteers with the Gilchrist Immigrant Resource Center in Montgomery County, Maryland, where he works to create a new program for immigrants to gain skills and resources to enter the workforce or start their own businesses. (*Id.* ¶ 6)

Moses Kamau Chege lives in Spokane, Washington and is a DACA recipient. (Declaration of Moses Kamau Chege ¶¶ 1, 8).  He was born in Kenya and was brought by his mother to the United States when he was six years old. (*Id.* ¶ 2)  Mr. Chege graduated from Stadium High School in Tacoma, where he participated in varsity cross country and track and field and was a cadet commander of the Navy JROTC. (*Id.* ¶ 3)  In high school, Mr. Chege participated in the Running Start program at Tacoma Community College and received his associate's degree a few months after his high school graduation. (*Id.*)  Mr. Chege is 23 years old and currently pursuing a Bachelor's of Business Administration in Accounting from Whitworth University. (*Id.* ¶ 4)  He is the recipient of the Act Six Scholarship, a full-tuition scholarship from the Northwest Leadership Foundation. (*Id.* ¶ 5)  Mr. Chege works as a Cultural Events Coordinator at Whitworth University. (*Id.* ¶ 6)  He also co-founded and volunteers at Spokane Dream Project, an organization advocating for undocumented students in the Spokane community. (*Id.* ¶ 7)

Hyo-Won Jeon lives in Chicago, Illinois and is a DACA recipient. (Declaration of Hyo-Won Jeon ¶¶ 1, 8).  She was born in South Korea and came with her parents to the United States when she was three years old. (*Id.* ¶ 2)  Ms. Jeon graduated from high school in Houston, Texas, where she participated in the National Honor Society and graduated as valedictorian. (*Id.* ¶ 3)  Ms. Jeon is 23 years old and pursuing a Bachelor of Arts in Social Studies from Harvard University. (*Id.* ¶ 4)  Ms. Jeon is currently taking a one-year leave of absence from Harvard to work at the National Korean American Service & Education Consortium as an Immigrant Rights Fellow in Chicago. (*Id.* ¶ 5)  At Harvard, she volunteers as Senior Advisor for the Asian

7

American Women's Association and is a Leader at the First Year Urban Program, a mentorship program for freshmen students who are interested in public interest careers.  (*Id.* ¶ 6)  Ms. Jeon was the recipient of the Harvard Foundation Award for Race Relations her sophomore and junior years at the university.  (*Id.* ¶ 7)

Elizabeth Diaz lives in McAllen, Texas and is a DACA recipient.  (Declaration of Elizabeth Diaz Sanchez ¶¶ 1, 7).  Ms. Diaz was born in Mexico and was brought by her parents to the United States when she was six years old.  (*Id.* ¶ 2)  Ms. Diaz graduated from Juarez-Lincoln High School.  (*Id.* ¶ 3)  Ms. Diaz is 23 years old and earned an associate's Degree in early education from South Texas College.  (*Id.* ¶ 4)  While at South Texas College, Ms. Diaz participated in Valley Scholars, a community service organization, and volunteered with Mothers Against Drunk Driving.  (*Id.*)  Ms. Diaz has a certified nursing assistant certification and physical therapy technician certification from the New Start School.  (*Id.* ¶ 5)  Ms. Diaz is married and works as a relocation manager for a security company in McAllen, Texas.  (*Id.* ¶ 6)

Maria Diaz lives in Mission, Texas and is a DACA recipient.  (Declaration of Maria Diaz ¶¶ 1, 6).  She was born in Mexico and was brought by her parents to the United States when she was 12 years old.  (*Id.* ¶ 2)  Ms. Diaz graduated from the South Texas High School for Health Professions.  (*Id.* ¶ 3)  Ms. Diaz then graduated with her nursing degree from The University of Texas Rio Grande Valley.  (*Id.* ¶ 4)  Ms. Diaz is 29 years old and works as a nurse at a hospital in Edinburg, Texas.  (*Id.* ¶¶ 4, 5)

Blanca Gonzalez lives in Mission, Texas and is a DACA recipient.  (Declaration of Blanca Gonzalez ¶¶ 1, 7).  She was born in Mexico and was brought by her parents to the United Sates when she was nine years old.  (*Id.* ¶ 2)  Ms. Gonzalez graduated from Juarez-Lincoln High School in La Joya, Texas where she participated in the student council.  (*Id.* ¶ 3)  Ms. Gonzalez is 27 years old and earned her Associate's Degree in Criminal Justice and Education from South Texas College, where she participated in the student criminal justice society.  (*Id.* ¶ 4)  Ms. Gonzalez is married and has a six-year old daughter who is a U.S. citizen.  (*Id.* ¶ 6)  Ms. Gonzalez currently works as an assistant manager at a restaurant in Palmhurst, Texas.  (*Id.* ¶ 5)

# APPENDIX A

# TAB 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## <u>DECLARATION OF KARLA QUETZALLI PEREZ</u>

My name is Karla Quetzalli Perez.  I am over the age of 18 and fully competent to make this declaration.

1.      I live in Houston, Texas.

2.      I was born in Mexico and came to the United States with my parents in 1995 when I was two years old.

1

3.     I graduated from Pasadena Memorial High School in Pasadena, Texas, where I was a member of the National Honor Society and captain of the varsity soccer team.

4.     I graduated magna cum laude from the University of Houston, where I received a Bachelor of Business Administration in Marketing and a minor in Mexican American Studies.

5.     I am 25 years old and a third-year law student at the University of Houston Law Center.

6.     As a law student, I have worked with several non-profit organizations to provide legal services to crime victims, DACA recipients and immigrants who have survived gender-based violence.

7.     I am a board member of United We Dream (UWD), the largest immigrant youth-led network in the United States.  I have served as the statewide coordinator of UWD legislative campaigns advocating for improved living conditions for immigrants in Texas. In recognition for my community service, I earned the Texas Center for Public Policy Priorities' 2015 Future of Texas Award, and the Dallas Morning News named me a 2015 Texan of the Year Finalist.

8.     I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014, 2016 and 2018.

9.     I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work

in the United States and losing deferred action would impose a great hardship on me.

10.     I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this ___7___ day of May, 2018 in _Houston, Harris County, Texas_____.

_Karla Perez_____
Signature

_Karla Quetzalli Perez Ramirez_
Printed Name

4

# APPENDIX A

# TAB 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## <u>DECLARATION OF MARIA ROCHA</u>

My name is Maria Rocha.  I am over the age of 18 and fully competent to make this declaration.

1.     I live in San Antonio, Texas.

2.     I was born in Mexico and came to the United States when I was three years old.

3.      I am thirty years old and currently pursuing a master's degree through the Urban School Leader Collaborative program at the University of Texas at San Antonio.

4.      I work as a third grade teacher in San Antonio.

5.      I also worked as a teacher through the Teach for America program from 2015 to 2017.

6.      I volunteered with the Cesar Chavez Legacy and Educational Foundation to organize food drives and community events beginning in 2011.

7.      I coach soccer and basketball to lower elementary schoolchildren.

8.      I received an award from the elementary school at which I work for exemplifying the school's commitment to students

9.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).

10.     Since initially receiving DACA, I successfully renewed my deferred action in 2017.

11.     I have lived in the United States for most of my life and I wish to remain in the United States.

12.     Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

13.     I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this __7__ day of May, 2018 in San Antonio, TX.

_____
Signature

Maria Rocha
_____
Printed Name

3

# APPENDIX A

# TAB 4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

**DECLARATION OF JOSE MAGAÑA-SALGADO**

My name is Jose Magaña-Salgado.  I am over the age of 18 and fully competent to make

this declaration.

1.      I live in Washington, D.C.

2.      I was born in Mexico and was brought by my parents to the United States when I

was 2 years old.

1

3.   I graduated from St. Paul's Preparatory Academy in Phoenix, Arizona, where I was valedictorian of my high school class.

4.   I am 31 years old and earned a Bachelor's degree from Arizona State University and a law degree from Baylor School of Law.  During law school, I assisted attorneys and non-profit organizations in providing legal services to crime victims, trafficking survivors, Temporary Protected Status (TPS) recipients, and immigrants seeking asylum and fleeing persecution.

5.   I am a small business owner.  I provide consulting services to local, state, and national immigration non-profit organizations.  Previously, I worked as the Managing Policy Attorney at the Immigrant Legal Resource Center.  In that role, I developed education materials for attorneys and community members, advocated in Congress for comprehensive immigration reform, and appeared on national and local media to discuss immigration issues.

6.   I also co-founded the Dream Bar Association, a professional bar association led by and for undocumented immigrants.

7.   I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014, 2016, and 2018.

8.   I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

9.      I want to participate in this case in order to defend DACA for myself and others in

my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this __7th_ day of May, 2018 in _____ Washington, D.C.

_____
Signature


Jose Magana-Salgado
_____
Printed Name

# APPENDIX A

# TAB 5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

**DECLARATION OF NANCI JUDITH PALACIOS GODINEZ**

My name is Nanci Judith Palacios Godinez.  I am over the age of 18 and fully competent

to make this declaration.

1.    I live in Seffner, Florida.

2.    I was born in Mexico and came to the United States with my parents when I was 6

years old.

1

3.      I graduated in the top 10% of my class at Durant High School in Plant City, Florida, where I was a member of the National Honor Society and served as President of the Spanish Honor Society.

4.      I earned an Associate's degree in Health Science from Hillsborough Community College.  While I was a student at Hillsborough Community College, I co-founded United We Dream-Tampa Bay and volunteered and served on the Steering Committee of the Florida Immigrant Youth Network, a statewide coalition of organizations focused on immigrant rights.

5.      I am 29 years old and attend the University of South Florida in Tampa, Florida, where I am pursuing my Bachelor's degree in Political Science with a minor in Anthropology.

6.      I work as a Congregation Organizer for the non-profit Faith in Florida.

7.      I am an active member of my church.

8.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014 and October of 2016.

9.      I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

10.     I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this __7th__ day of May, 2018 in _____Seffner, Florida_____.

_____
Signature


Nanci Judith Palacios Godinez
_____
Printed Name

# APPENDIX A

# TAB 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

<u>**DECLARATION OF ELLY MARISOL ESTRADA CRUZ**</u>

My name is Elly Marisol Estrada Cruz.  I am over the age of 18 and fully competent to make this declaration.

1.    I live in Atlanta, Georgia.

2.    I was born in Mexico and was brought by my family to the United States when I was five years old.

1

3.    I graduated from Sol C. Johnson High School in Savannah Georgia, where I graduated in the top ten percent of my class.

4.    I am 24 and earned a bachelor of arts in Political Science and Government, and Spanish from Armstrong State University, where I graduated magna cum laude. While in college, I was an active member of the Savannah Undocumented Youth Alliance, a student-run organization that advocates for access to higher education for undocumented students.

5.    After college, I worked as the Deputy Chief of Staff for a state representative in Georgia.

6.    I  currently work as a Legal Assistant at Kuck Baxter Immigration Partners, an Immigration law firm based in Atlanta, Georgia.

7.    I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014 and 2017.

8.    I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

9.    I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this __7th__ day of May, 2018 in __Fulton County, GA_____.

_____
Signature

_____
Elly Marisol Estrada Cruz

Printed Name

# APPENDIX A

# TAB 7

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF KARINA RUIZ DE DIAZ

My name is Karina Ruiz De Diaz.  I am over the age of 18 and fully competent to make

this declaration.

1.      I live in Phoenix, Arizona.

2.      I was born in Mexico City, Mexico and came with my parents to the United States

when I was 15 years old.

1

3.      I graduated from Sunnyslope High School in Phoenix, where I participated in the National Honor Society, the Spanish Honor Society, the Air Force JROTC, and the Cesar E. Chavez Leadership Institute.

4.      I graduated from Arizona State University in 2015 with a Bachelor of Science in Biochemistry.  I earned a scholarship from the Sunburst Foundation to attend college.

5.      I am 33 years old and currently working as the Executive Director of the Arizona Dream Act Coalition, an immigrant youth-led organization focused on higher education and immigrant rights.

6.      I am a licensed real estate agent.

7.      I am the mother of three United States citizen children.

8.      I am also an active member of my church, a parent volunteer and President of the Mountain View Elementary School Parent Teacher Organization (PTO), where two of my children attend, and a volunteer at HonorHealth John C. Lincoln Medical Center.  I am also a volunteer at One Arizona Table, an organization that promotes civic engagement among Latino and immigrant communities.

9.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2015 and 2017.

10.     I have lived in the United States for more than half of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me and my children.

11.     I want to participate in this case in order to defend DACA for myself and others in

my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this __7ᵗʰ__ day of May, 2018 in ___Phoenix, AZ___.

_____
Signature

_____
Karina Isabel Ruiz De Diaz
Printed Name

# APPENDIX A

# TAB 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF CARLOS AGUILAR GONZALEZ

My name is Carlos Aguilar Gonzalez.  I am over the age of 18 and fully competent to make this declaration.

1.     I live in Cambridge, Massachusetts.

2.     I was born in Mexico and was brought by my parents to the United States when I was fourteen years old.

3.  I graduated from Tivy High School and earned my bachelor's degree in psychology from Schreiner University, then my master's degree in sociology from the University of Texas at San Antonio (UTSA).

4.  I am twenty-seven years old and currently pursuing a PhD in Education at the Harvard University Graduate School of Education.

5.  I worked as a legal assistant at an immigration law firm in San Antonio.

6.  I also volunteered as the coordinator of Immigrant Youth Leadership at UTSA, as a recurring guest speaker at family literacy programs discussing the importance of education with Latino parents, as an instructor of English as a Second Language, as a presenter for non-profit citizenship and DACA workshops and as a data entry assistant for non-profit legal aid to unaccompanied child migrants.

7.  I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014 and November 2016.

8.  I have lived in the United States for almost half of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

9.  I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this __7__ day of May, 2018 in _____Cambridge, MA_____.

_____
Signature

_____Carlos Aguilar_____

_____
Printed Name

3

APPENDIX A

TAB 9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF KARLA LÓPEZ

My name is Karla López.  I am over the age of 18 and fully competent to make this

declaration.

1.     I live in Mableton, Georgia.

2.     I was born in Mexico and was brought by my mother to the United States when I

was 8 years old.

3.      I graduated from Pebblebrook High School in Mableton, Georgia, where I graduated in the top ten percent of my class with a 3.9 grade point average out of 4.0. I also received the Atlanta Journal Constitution Senior of the Year Scholarship and the Hispanic Scholarship Fund Scholarship.

4.      I am 23 and pursuing a bachelor's degree in Biology at Perimeter College in Atlanta, Georgia.   While at Perimeter, I have been active in my college community and have served as a senator and secretary in the college's student government.

5.      I work a full-time at a combination of two jobs, in addition to attending school.

6.      I also volunteer at a number of community organizations, including Hosea Feed the Hungry and the American Red Cross.

7.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2015 and 2017.

8.      I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

9.      I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this _____ day of May, 2018 in _____.

_____
Signature

Karla López
Printed Name

# APPENDIX A

# TAB 10

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## <u>DECLARATION OF LUIS ALDAIR RAFAEL</u>

My name is Luis Aldair Rafael.  I am over the age of 18 and fully competent to make this declaration.

1. I live in Chicago, Illinois.

2. I was born in Mexico and was brought by my parents to the United States when I was three years old.

1

3.    I graduated from Morton East High School.

4.    I am twenty-three years old and a full-time student attending Northeastern University's STEM Pathway Initiative to teach robotics in low income communities.

5.    I have also worked in a coffee shop, and worked as a campaign manager for Chicago-area elections in a paid and volunteer capacity.

6.    I also volunteer with various Chicago-based organizations, including New Generation of Leadership, a group of Latinos organizing to seek social justice in the suburb of Cicero; and Increase the Peace, a youth led initiative to decrease gun violence in the Chicago neighborhood of Englewood.

7.    I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2015 and 2017.

8.    I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

9.    I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true

and correct.

Executed this __7___ day of May, 2018 in ____Chicago, IL _____.


_____
Signature


Luis Aldair Rafael_____
Printed Name

# APPENDIX A

# TAB 11

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## <u>DECLARATION OF DARWIN VELASQUEZ</u>

My name is Darwin Velasquez.  I am over the age of 18 and fully competent to make this declaration.

1.  I live in Colma, California.

2.  I was born in El Salvador and came to the United States when I was twelve years old.

1

3.      I graduated from George Washington High School, where I completed advanced placement coursework, was named Mock-Trial All-Star by the Bar Association of San Francisco, was a representative to the San Francisco Public Schools Student Advisory Council, and was named graduation speaker for College Track Bay Area.

4.      I am twenty three years old and earned a bachelor's degree from University of San Francisco in International Studies and Global Politics with a minor in European Studies in 2017.

5.      I work as the National Dream Coordinator for College Track, a national college access program, where I counsel over two hundred fifty Dreamers.

6.      I also previously served as Outreach Ambassador to Educators for Fair Consideration where I advocated for higher education for undocumented youth.  I also volunteered with the San Francisco Recreation and Park Department where I ran programs for disabled youth and seniors, and volunteered at a summer camp for the visually impaired.  In 2013 the San Francisco Youth Commission awarded me the Youth of the Year Award for my leadership and strong civic engagement for positive change in my community.

7.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2015 and 2017.

8.      I have lived in the United States for almost half of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and

work in the United States and losing deferred action would impose a great hardship on me.

9.     I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 7th day of May, 2018 in Oakland, California.

_____
Signature

Darwin Velasquez
_____
Printed Name

# APPENDIX A

# TAB 12

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## <u>DECLARATION OF JIN PARK</u>

My name is Jin Park.  I am over the age of 18 and fully competent to make this declaration.

1.      I live in Cambridge, Massachusetts.

2.      I was born in South Korea and was brought by my parents to the United States when I was seven years old.

1

3.    I am twenty-two years old and currently an undergraduate student at Harvard College studying molecular and cellular biology with a minor in government.

4.    I plan to apply for medical school after I graduate from college.

5.    I work at a university cancer research institute in Cambridge, Massachusetts.

6.    I also worked at the New York City Mayor's Office where I helped implement a care coordination program for undocumented immigrants.

7.    I served as the director of naturalization assistance programs at Harvard, which provides services to low-income immigrants, primarily from Boston's Chinatown.

8.    I incorporated my own 501(c)(3) organization, HigherDreams, Inc., to provide training and direct services to undocumented high school students in Boston.

9.    HigherDreams has recently partnered with Boston Public Schools to provide trainings to guidance counselors in the district regarding the unique challenges that undocumented students face.

10.   For my work with HigherDreams, I was selected by the White House as a "Champion of Change" for college opportunity in November 2016.

11.   I was also named a White House Asian-American and Pacific Islander Initiative Spokesperson during President Obama's tenure.

12.   At Harvard, I received the Harvard Presidential Public Service fellowship and was named a John Harvard Scholar.

13.   I was also selected as the 2018 Harvard Orator, one of two students to address the Class of 2018 on Class Day.

14.     I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014, 2016, and 2018.

15.     I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

16.     I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this ___7___ day of May, 2018 in _Cambridge, MA_____.

_____
Signature

___JIN PARK_____
Printed Name

# APPENDIX A

# TAB 13

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

<u>**DECLARATION OF OSCAR ALVAREZ**</u>

My name is Oscar Alvarez.  I am over the age of 18 and fully competent to make this declaration.

1.      I live in Los Angeles, California.

2.      I was born in Mexico and was brought by my parents to the United States when I was two years old.

3.      I graduated from Ánimo Ralph Bunche Charter High School in Los Angeles, where I was a member of the leadership committee of the National Honor Society. I also volunteered with A Place Called Home, a non-profit organization that provides educational programming for youth of color in Los Angeles.

4.      I am 23 years old and currently pursuing a Bachelor's degree in American Studies with a focus in Public Policy and Education at the University of California, Berkeley.  I was a 2016 Fellow with the Public Policy and International Affairs Program at the Goldman School of Public Policy, which promotes the inclusion of students from under-served communities the public sector and helps prepare those students for graduate level programs and careers in public service.  I previously co-led a student group, *Casa Sin Fronteras*, that helps connect undocumented students to housing or assistance while at school and raises awareness about undocumented students and homelessness.

5.      I also interned in Congress through the Congressional Hispanic Caucus Institute, where I worked with Congresswoman Linda Sanchez.

6.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014 and November 2016.

7.      I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

8.      I want to participate in this case in order to defend DACA for myself and others in
my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this   7th   day of May, 2018 in     Los Angeles, California.

_____
Signature


Oscar Alvarez Mejia
_____
Printed Name

4

# APPENDIX A

# TAB 14

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## <u>DECLARATION OF NANCY ADOSSI</u>

My name is Nancy Adossi.  I am over the age of 18 and fully competent to make this declaration.

1.    I live in Houston, Texas.

2.    I was born in Lomé, Togo and was brought by my parents to the United States when I was 9 years old.

3.      I graduated from George W. Carver High School in the top 10% of my class.

4.      I received a Bachelor's degree in Political Science and International Relations from the University of Houston, where I graduated as the valedictorian and was keynote speaker for my class.

5.      I also earned a Master's degree in Public Administration from the University of Houston, which awarded me the 2013 Master's in Public Administration Alumni Award.

6.      I hold a Doctorate of Education in Health Sciences Technology from the University of Houston.  I was the youngest graduate of my doctoral program.

7.      I am 28 years old and currently work as a 6th grade teacher in the social studies program at Paul Revere Middle School.

8.      I also work as a research consultant with Lift a Village and the UndocuBlack Network.  I have previously worked as a research consultant with the Black Alliance for Just Immigration.

9.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2015 and 2017.

10.     I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

11.     I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this ___7___ day of May, 2018 in ___Houston, Texas___.

___Nancy Azossi___
Signature

___NANCY AZOSSI___
Printed Name

3

# APPENDIX A

# TAB 15

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## DECLARATION OF DENISE GUADALUPE ROMERO GONZALEZ

My name is Denise Guadalupe Romero Gonzalez.  I am over the age of 18 and fully competent to make this declaration.

1.     I live in New York City, New York.

2.     I was born in Mexico and came to the United States with my parents in 2001 when I was 9 years old.

3.      I graduated from Long Island City High School, where I participated in Global Kids, a nonprofit educational organization and leadership program that sparked my interest in advocacy and grassroots organizing.

4.      I am 26 years old and currently pursuing a Bachelor's degree in Journalism from Lehman College at The City University of New York.

5.      I work as a paralegal and organizer at Mobilization for Justice, a nonprofit organization that provides free legal assistance to low-income tenants in New York.

6.      I also volunteer with the New York State Youth Leadership Council, the first undocumented youth-led organization in New York, where I have served as a speaker for the organization.

7.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in October 2016.

8.      I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

9.      I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 7th day of May, 2018 in _____ New York, NY _____.

_____
Signature

_____
Printed Name: Denise Romero

3

# APPENDIX A

# TAB 16

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## <u>DECLARATION OF PRATISHTHA KHANNA</u>

My name is Pratishtha Khanna.  I am over the age of 18 and fully competent to make this

declaration.

1. I live in in Burtonsville, Maryland.

2. I was born in India and came to the United States in 2002 when I was ten years old.

1

3. I graduated from Reservoir High School, where I served as student government treasurer and vice president, and served as President of the Oprah's Ambassadors Program, a student organization that helped raise funds and resources for rural West African schools.

4. I am twenty six years old and will begin studies at Western University of Health Sciences, Graduate College of Biomedical Sciences in August of 2018 to pursue a master's degree in Biomedical Sciences.

5. I earned a bachelor's degree in biological sciences from University of Maryland Baltimore County in 2014.

6. I work full-time at a hospital in Baltimore, Maryland as a Clinical Technician in ICU, and I previously worked part-time at the University of Maryland Baltimore Washington Medical Center as an emergency department scribe.

7. I participate in Pre-Health Dreamers, an informal association of over eight hundred undocumented students pursuing careers in health.

8. I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA). Since initially receiving DACA, I have successfully renewed my deferred action in 2014 and October 2016.

9. I have lived in the United States for most of my life and I wish to remain in the United States. Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

10. I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 7th day of May, 2018 in Burtonsville, Maryland.

_____
Signature

Pratishtha Khanna
_____
Printed Name

# APPENDIX A

# TAB 17

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## <u>DECLARATION OF JUNG WOO KIM</u>

My name is Jung Woo Kim.  I am over the age of 18 and fully competent to make this declaration.

1.    I live in Los Angeles, California.

2.    I was born in South Korea and came to the United States with my parents when I was 15 years old.

1

3.      I graduated from Buena Park High School.

4.      I am 33 years old and earned a Bachelor's degree *cum laude* in Kinesiology from California State University-Fullerton.

5.      I work as a Membership Development Manager at the Korean Resource Center.

6.      I also work as the National Campaign Director at the National Korean American Service & Education Consortium, a national grassroots organization focused on social, economic and racial justice.

7.      I am a licensed real estate agent in California.

8.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014 and 2017.

9.      I have lived in the United States for more than half of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

10.     I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this ___7___ day of May, 2018 in  Los Angeles                                            .

Signature

Printed Name   Jung Woo Kim

# APPENDIX A

# TAB 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

**<u>DECLARATION OF ANGEL SILVA</u>**

My name is Angel Silva.  I am over the age of 18 and fully competent to make this declaration.

1.    I live in Silver Spring, Maryland.

2.    I was born in Mexico and was brought by my parents to the United States when I was 1 year old.

1

3.    I graduated from John H. Francis Polytechnic High School, where I participated in my high school's academic decathlon team and served as editor-in-chief of the school newspaper.

4.    I am 25 years old and earned a bachelor's degree in Journalism with a minor in Political Science from California State University, Northridge.  I previously attended Glendale Community College in Glendale, California, where I was a managing editor of the college newspaper.  While at California State University, Northridge, I helped develop the DREAM Center, a resource center to help undocumented students access in-state tuition, connect with other undocumented students, and learn about services available to the undocumented student body.  I also volunteered with the California Dream Network, a group of undocumented students and allies that advocates for greater education access for undocumented students and civic engagement in immigrant communities.  I interned through the Congressional Hispanic Caucus Institute, and worked with Congresswoman Linda Sanchez.

5.    I work as the Scholarship and Administration Specialist at the Congressional Hispanic Caucus Institute.  In that role, I manage primarily the Scholar Intern Programs which provide students with scholarships and paid internships at community-based health organizations.

6.    I also volunteer with the Gilchrist Immigrant Resource Center in Montgomery County, Maryland, where I help develop resources and programs for immigrants to gain skills and resources to enter the workforce or start their own businesses.

7.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2015 and 2017.

8.      I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

9.      I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this _7th_ day of May, 2018 in _Washington, DC_____.

_____
Signature

_Angel Silva_____
Printed Name

# APPENDIX A

# TAB 19

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

**<u>DECLARATION OF MOSES KAMAU CHEGE</u>**

My name is Moses Kamau Chege.  I am over the age of 18 and fully competent to make this declaration.

1.   I live in Spokane, Washington.

2.   I was born in Kenya and was brought by my parents to the United States when I was 6 years old.

1

3.      I graduated from Stadium High School, where I participated in varsity cross country and track and field and was a cadet commander of the Navy JROTC. In high school, I also participated in the Running Start program at Tacoma Community College, receiving my Associate's degree a few months after my high school graduation.

4.      I am 23 years old and pursuing a Bachelor's of Business Administration in Accounting from Whitworth University.

5.      I am the recipient of the Act Six Scholarship, a full-tuition scholarship from the Northwest Leadership Foundation.

6.      I work as a Cultural Events Coordinator at Whitworth University.

7.      I also co-founded and volunteer at Spokane Dream Project, an organization advocating for undocumented students in the Spokane community.

8.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA). Since initially receiving DACA, I have successfully renewed my deferred action in October 2016.

9.      I have lived in the United States for most of my life and I wish to remain in the United States. Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

10.      I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this __7th__ day of May, 2018 in ___Spokane, WA___.

_(signature)_

Signature

_Moses Kamau Chege_

Printed Name

# APPENDIX A

# TAB 20

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## <u>DECLARATION OF HYO-WON JEON</u>

My name is Hyo-Won Jeon.  I am over the age of 18 and fully competent to make this declaration.

1.  I live in Chicago, Illinois.

2.  I was born in South Korea and came with my parents to the United States when I was 3 years old.

3.      I graduated from high school in Houston, Texas, where I participated in the National Honor Society and graduated as valedictorian.

4.      I am 23 years old and pursuing a Bachelor of Arts in Social Studies from Harvard University.

5.      I am currently taking a one-year leave of absence from Harvard to work at the National Korean American Service & Education Consortium as an Immigrant Rights Fellow in Chicago.

6.      At Harvard University, I volunteer as Senior Advisor to the Asian American Women's Association.  I am also a Leader at the First Year Urban Program, a mentorship program designed to orient freshmen students at Harvard who are interested in public interest careers.

7.      I received the Harvard Foundation Award for Race Relations my sophomore and junior years as a student at Harvard University.

8.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014 and October 2016.

9.      I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

10.     I want to participate in this case in order to defend DACA for myself and others in my situation.

2

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this __7th__ day of May, 2018 in ___Chicago, Illinois___.

_____
Signature

___Hyo-won Jeon___
Printed Name

# APPENDIX A

# TAB 21

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

**<u>DECLARATION OF ELIZABETH DIAZ</u>**

My name is ELIZABETH DIAZ.  I am over the age of 18 and fully competent to make

this declaration.

1.    I live in McAllen, Texas.

2.    I was born in Mexico and was brought by my parents to the United States when I

was 6 years old.

3.      I graduated from Juarez-Lincoln High School.

4.      I am 23 years old and earned an Associates Degree in Early Education from South Texas College.  At South Texas College, I volunteered with Mothers Against Drunk Driving and with Valley Scholars, a community service organization.

5.      I also have a certified nursing assistance certification and physical therapy technician certification from the New Start School.

6.      I am married and work as a relocation manager for a security company in McAllen, Texas.

7.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014 and 2017.

8.      I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

9.      I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this __7__ day of May, 2018 in _____McAllen, Texas_____.

_____
Signature

Elizabeth Diaz
_____
Printed Name

# APPENDIX A

# TAB 22

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

**<u>DECLARATION OF MARIA DIAZ</u>**

My name is MARIA DIAZ.  I am over the age of 18 and fully competent to make this

declaration.

1.      I live in Mission, Texas

2.      I was born in Mexico and was brought by my parents to the United States when I

was 12 years old.

1

3.      I graduated from the South Texas High School for Health Professions.

4.      I am 29 years old and earned a nursing degree from The University of Texas Rio Grande Valley.

5.      I work as a nurse at a hospital in Edinburgh, Texas.

6.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014, 2016, and 2018.

7.      I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

8.      I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this _07_ day of May, 2018 in __Mission TX__ .

_____
Signature

__Maria Diaz Sanchez__
Printed Name

# APPENDIX A

# TAB 23

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

**<u>DECLARATION OF BLANCA GONZALEZ</u>**

My name is BLANCA GONZALEZ. I am over the age of 18 and fully competent to make this declaration.

1.      I live in Mission, Texas.

2.      I was born in Mexico and was brought by my parents to the United States when I was 9 years old.

3.      I graduated from Juarez-Lincoln High School in La Joya, Texas where I participated in the student council.

4.      I am 27 years old and earned an Associated Degree in Criminal Justice and Education from South Texas College.  I participated in the student criminal justice society.

5.      I work as an assistant manager at a restaurant in Palmhurst, Texas.

6.      I am married and have a 6 year old daughter who is a U.S. citizen.

7.      I am a recipient of deferred action through the initiative known as Deferred Action for Childhood Arrivals (DACA).  Since initially receiving DACA, I have successfully renewed my deferred action in 2014 and 2017.

8.      I have lived in the United States for most of my life and I wish to remain in the United States.  Receiving deferred action is critical to my ability to live and work in the United States and losing deferred action would impose a great hardship on me.

9.      I want to participate in this case in order to defend DACA for myself and others in my situation.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this ___8___ day of May, 2018 in _____Mission, Texas_____.

_____Blanca Gonzalez_____
Signature

_____Blanca Gonzalez_____
Printed Name

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, MARIA ROCHA, | § | |
| JOSE MAGAÑA-SALGADO, | § | |
| NANCI J. PALACIOS GODINEZ, | § | |
| ELLY MARISOL ESTRADA, KARINA | § | |
| RUIZ DE DIAZ, CARLOS AGUILAR | § | |
| GONZALEZ, KARLA LOPEZ, LUIS A. | § | |
| RAFAEL, DARWIN VELASQUEZ, | § | |
| JIN PARK, OSCAR ALVAREZ, | § | |
| NANCY ADOSSI, DENISE ROMERO, | § | |
| PRATISHTHA KHANNA, JUNG WOO | § | |
| KIM, ANGEL SILVA, MOSES KAMAU | § | |
| CHEGE, HYO-WON JEON, ELIZABETH | § | |
| DIAZ, MARIA DIAZ, and BLANCA | § | |
| GONZALEZ, | § | |
| | § | |
| Proposed Defendant- | § | |
| Intervenors. | § | |

## **APPENDIX B: AUTHORITIES**

Pursuant to the Court's Civil Procedures, rule 7(a), the Proposed Defendant-Intervenors

Karla Perez, Maria Rocha, Jose Magaña-Salgado, Nanci J. Palacios Godinez, Elly Marisol

Estrada, Karina Ruiz De Diaz, Carlos Aguilar Gonzalez, Karla Lopez, Luis A. Rafael, Darwin

Velasquez, Jin Park, Oscar Alvarez, Nancy Adossi, Denise Romero, Pratishtha Khanna, Jung

Woo Kim, Angel Silva, Moses Kamau Chege, Hyo-Won Jeon, Elizabeth Diaz, Maria Diaz, and

Blanca Gonzalez hereby provide the Court with copies of the following authorities cited in support of the Proposed Defendant-Intervenors' Memorandum of Law in Support of Their Motion for Leave to Intervene.

| NO. | AUTHORITY |
|-----|-----------|
| 1. | DHS Appropriations Act, Pub. L. No. 111-83, 123 Stat 2142, 2149 (2009) |
| 2. | United States Department of Justice, *Attorney General Sessions Delivers Remarks on DACA* (September 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-remarks-daca. |
| 3. | *Sierra Club v. Fed. Emergency Mgmt. Agency*, No. 07-0608, 2008 U.S. Dist. LEXIS 47405 (S.D. Tex. June 11, 2008) |
| 4. | Defs.' Notice of Mot. and Mot. to Dismiss All S.D. Cal. DACA Cases, Mem. in Supp., *Regents of University of California, et al. v. U.S. Department of Homeland Security*, No. 3:17-cv-05211 (N.D.Cal. Nov. 1, 2017) |
| 5. | Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J., *The Trustees of Princeton University, et al. v. U.S., et al.*, No. 1:17-cv-02325 (D.D.C. Nov. 22, 2017) |
| 6. | Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J., *Casa de Maryland, et al. v. U.S. Department of Homeland Security, et al.*, No. 8:17-cv-02942 (D.MD. Nov. 15, 2017) |
| 7. | Mem. of Law in Opp'n to Pls.' Mot. for a Prelim. Inj., *Martin Jonathan Batalla Vidal, et al. v. Kirstjen M. Nielsen, et al.*, No. 1:16-cv-04756 (E.D.N.Y. Jan. 13, 2018) |

Dated: May 8, 2018                    Respectfully submitted,

**MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND**
By: */s/ Nina Perales*
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
Celina Moreno (Tex. Bar No. 24074754)
(SD of Tex. Bar No. 2867694)
Jack Salmon (Tex. Bar No. 24068914)
(SD of Texas Bar No. 1130532)
Alejandra Ávila (Tex. Bar No. 24089252)
(SD of Tex. Bar No. 2677912)
110 Broadway, Suite 300

San Antonio, Texas 78205
Phone:  (210) 224-5476
Facsimile:  (210) 224-5382
Email: nperales@maldef.org

**GARCÍA & GARCÍA,**
**ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
 (SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

Attorneys for Proposed Defendant-
Intervenors

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, hereby certify that, on the eighth day of May, 2018, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ *Nina Perales*
Nina Perales

# APPENDIX B

# TAB 1

PUBLIC LAW 111–83—OCT. 28, 2009

# DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2010

123 STAT. 2142          PUBLIC LAW 111–83—OCT. 28, 2009

Public Law 111–83
111th Congress

An Act

Oct. 28, 2009
[H.R. 2892]

Making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2010, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the Department of Homeland Security for the fiscal year ending September 30, 2010, and for other purposes, namely:

Department of
Homeland
Security
Appropriations
Act of 2010.

TITLE I

DEPARTMENTAL MANAGEMENT AND OPERATIONS

OFFICE OF THE SECRETARY AND EXECUTIVE MANAGEMENT

For necessary expenses of the Office of the Secretary of Homeland Security, as authorized by section 102 of the Homeland Security Act of 2002 (6 U.S.C. 112), and executive management of the Department of Homeland Security, as authorized by law, $147,818,000: *Provided*, That not to exceed $60,000 shall be for official reception and representation expenses, of which $20,000 shall be made available to the Office of Policy solely to host Visa Waiver Program negotiations in Washington, DC: *Provided further*, That $15,000,000 shall not be available for obligation for the Office of Policy until the Secretary submits an expenditure plan for the Office of Policy for fiscal year 2010: *Provided further*, That all official costs associated with the use of government aircraft by Department of Homeland Security personnel to support official travel of the Secretary and the Deputy Secretary shall be paid from amounts made available for the Immediate Office of the Secretary and the Immediate Office of the Deputy Secretary.

Expenditure
plan.

OFFICE OF THE UNDER SECRETARY FOR MANAGEMENT

For necessary expenses of the Office of the Under Secretary for Management, as authorized by sections 701 through 705 of the Homeland Security Act of 2002 (6 U.S.C. 341 through 345), $254,190,000, of which not less than $1,000,000 shall be for logistics training; and of which not to exceed $3,000 shall be for official reception and representation expenses: *Provided*, That of the total amount made available under this heading, $5,500,000 shall remain available until expended solely for the alteration and improvement of facilities, tenant improvements, and relocation costs to consolidate Department headquarters operations at the Nebraska Avenue

PUBLIC LAW 111–83—OCT. 28, 2009    123 STAT. 2143

Complex; and $17,131,000 shall remain available until expended for the Human Resources Information Technology program.

### OFFICE OF THE CHIEF FINANCIAL OFFICER

For necessary expenses of the Office of the Chief Financial Officer, as authorized by section 103 of the Homeland Security Act of 2002 (6 U.S.C. 113), $60,530,000, of which $11,000,000 shall remain available until expended for financial systems consolidation efforts: *Provided*, That of the total amount made available under this heading, $5,000,000 shall not be obligated until the Chief Financial Officer or an individual acting in such capacity submits a financial management improvement plan that addresses the recommendations outlined in the Department of Homeland Security Office of Inspector General report OIG–09–72, including yearly measurable milestones, to the Committees on Appropriations of the Senate and the House of Representatives: *Provided further*, That the plan described in the preceding proviso shall be submitted not later than January 4, 2010.

<div style="float:right">Financial plan.</div>

<div style="float:right">Deadline.</div>

### OFFICE OF THE CHIEF INFORMATION OFFICER

For necessary expenses of the Office of the Chief Information Officer, as authorized by section 103 of the Homeland Security Act of 2002 (6 U.S.C. 113), and Department-wide technology investments, $338,393,000; of which $86,912,000 shall be available for salaries and expenses; and of which $251,481,000, to remain available until expended, shall be available for development and acquisition of information technology equipment, software, services, and related activities for the Department of Homeland Security: *Provided*, That of the total amount appropriated, not less than $82,788,000 shall be available for data center development, of which not less than $38,540,145 shall be available for power capabilities upgrades at Data Center One (National Center for Critical Information Processing and Storage): *Provided further*, That the Chief Information Officer shall submit to the Committees on Appropriations of the Senate and the House of Representatives, not more than 60 days after the date of enactment of this Act, an expenditure plan for all information technology acquisition projects that: (1) are funded under this heading; or (2) are funded by multiple components of the Department of Homeland Security through reimbursable agreements: *Provided further*, That such expenditure plan shall include each specific project funded, key milestones, all funding sources for each project, details of annual and lifecycle costs, and projected cost savings or cost avoidance to be achieved by the project.

<div style="float:right">Deadline.<br>Expenditure plan.</div>

### ANALYSIS AND OPERATIONS

For necessary expenses for intelligence analysis and operations coordination activities, as authorized by title II of the Homeland Security Act of 2002 (6 U.S.C. 121 et seq.), $335,030,000, of which not to exceed $5,000 shall be for official reception and representation expenses; and of which $190,862,000 shall remain available until September 30, 2011: *Provided*, That none of the funds provided in this or any other Act shall be available to commence operations of the National Immigration Information Sharing Operation or any follow-on entity until the Secretary certifies that such program

<div style="float:right">Certification.<br>Notification.</div>

complies with all existing laws, including all applicable privacy and civil liberties standards, the Comptroller General of the United States notifies the Committees on Appropriations of the Senate and the House of Representatives and the Secretary that the Comptroller has reviewed such certification, and the Secretary notifies the Committees on Appropriations of the Senate and the House of Representatives of all funds to be expended on operations of the National Immigration Information Sharing Operation or any follow-on entity pursuant to section 503 of this Act.

### OFFICE OF THE FEDERAL COORDINATOR FOR GULF COAST REBUILDING

For necessary expenses of the Office of the Federal Coordinator for Gulf Coast Rebuilding, $2,000,000.

### OFFICE OF INSPECTOR GENERAL

For necessary expenses of the Office of Inspector General in carrying out the provisions of the Inspector General Act of 1978 (5 U.S.C. App.), $113,874,000, of which not to exceed $150,000 may be used for certain confidential operational expenses, including the payment of informants, to be expended at the direction of the Inspector General.

## TITLE II

## SECURITY, ENFORCEMENT, AND INVESTIGATIONS

### U.S. CUSTOMS AND BORDER PROTECTION

#### SALARIES AND EXPENSES

For necessary expenses for enforcement of laws relating to border security, immigration, customs, agricultural inspections and regulatory activities related to plant and animal imports, and transportation of unaccompanied minor aliens; purchase and lease of up to 4,500 (4,000 for replacement only) police-type vehicles; and contracting with individuals for personal services abroad; $8,064,713,000, of which $3,226,000 shall be derived from the Harbor Maintenance Trust Fund for administrative expenses related to the collection of the Harbor Maintenance Fee pursuant to section 9505(c)(3) of the Internal Revenue Code of 1986 (26 U.S.C. 9505(c)(3)) and notwithstanding section 1511(e)(1) of the Homeland Security Act of 2002 (6 U.S.C. 551(e)(1)); of which not to exceed $45,000 shall be for official reception and representation expenses; of which not less than $309,629,000 shall be for Air and Marine Operations; of which such sums as become available in the Customs User Fee Account, except sums subject to section 13031(f)(3) of the Consolidated Omnibus Budget Reconciliation Act of 1985 (19 U.S.C. 58c(f)(3)), shall be derived from that account; of which not to exceed $150,000 shall be available for payment for rental space in connection with preclearance operations; of which not to exceed $1,000,000 shall be for awards of compensation to informants, to be accounted for solely under the certificate of the Secretary of Homeland Security; and of which not more than $800,000 shall be for procurement of portable solar charging rechargeable battery systems: *Provided*, That for fiscal year 2010,

Determination.

the overtime limitation prescribed in section 5(c)(1) of the Act of February 13, 1911 (19 U.S.C. 267(c)(1)) shall be $35,000; and notwithstanding any other provision of law, none of the funds appropriated by this Act may be available to compensate any employee of U.S. Customs and Border Protection for overtime, from whatever source, in an amount that exceeds such limitation, except in individual cases determined by the Secretary of Homeland Security, or the designee of the Secretary, to be necessary for national security purposes, to prevent excessive costs, or in cases of immigration emergencies: *Provided further*, That of the total amount provided, $1,700,000 shall remain available until September 30, 2011, for the Global Advanced Passenger Information/Passenger Name Record Program.

### AUTOMATION MODERNIZATION

For expenses for U.S. Customs and Border Protection automated systems, $422,445,000, to remain available until expended, of which not less than $227,960,000 shall be for the development of the Automated Commercial Environment: *Provided*, That of the total amount made available under this heading, $50,000,000 may not be obligated for the Automated Commercial Environment program until 30 days after the Committees on Appropriations of the Senate and the House of Representatives receive a report on the results to date and plans for the program from the Department of Homeland Security.

Deadline.
Reports.

### BORDER SECURITY FENCING, INFRASTRUCTURE, AND TECHNOLOGY

For expenses for border security fencing, infrastructure, and technology, $800,000,000, to remain available until expended: *Provided*, That of the total amount made available under this heading, $75,000,000 shall not be obligated until the Committees on Appropriations of the Senate and the House of Representatives receive and approve a plan for expenditure, prepared by the Secretary of Homeland Security, reviewed by the Government Accountability Office, and submitted not later than 90 days after the date of the enactment of this Act, for a program to establish and maintain a security barrier along the borders of the United States, of fencing and vehicle barriers where practicable, and of other forms of tactical infrastructure and technology, that includes—

Expenditure plan.
Deadline.

(1) a detailed accounting of the program's implementation to date for all investments, including technology and tactical infrastructure, for funding already expended relative to system capabilities or services, system performance levels, mission benefits and outcomes, milestones, cost targets, program management capabilities, identification of the maximum investment, including life-cycle costs, related to the Secure Border Initiative program or any successor program, and description of the methodology used to obtain these cost figures;

(2) a description of how specific projects will further the objectives of the Secure Border Initiative, as defined in the Department of Homeland Security Secure Border Plan, and how the expenditure plan allocates funding to the highest priority border security needs;

(3) an explicit plan of action defining how all funds are to be obligated to meet future program commitments, with the planned expenditure of funds linked to the milestone-based

delivery of specific capabilities, services, performance levels, mission benefits and outcomes, and program management capabilities;

(4) an identification of staffing, including full-time equivalents, contractors, and detailees, by program office;

(5) a description of how the plan addresses security needs at the Northern border and ports of entry, including infrastructure, technology, design and operations requirements, specific locations where funding would be used, and priorities for Northern border activities;

(6) a report on budget, obligations and expenditures, the activities completed, and the progress made by the program in terms of obtaining operational control of the entire border of the United States;

(7) a listing of all open Government Accountability Office and Office of Inspector General recommendations related to the program and the status of Department of Homeland Security actions to address the recommendations, including milestones to fully address such recommendations;

(8) a certification by the Chief Procurement Officer of the Department including all supporting documents or memoranda, and documentation and a description of the investment review processes used to obtain such certifications, that—

(A) the program has been reviewed and approved in accordance with the investment management process of the Department, and that the process fulfills all capital planning and investment control requirements and reviews established by the Office of Management and Budget, including as provided in Circular A–11, part 7;

(B) the plans for the program comply with the Federal acquisition rules, requirements, guidelines, and practices, and a description of the actions being taken to address areas of non-compliance, the risks associated with such actions, together with any plans for addressing these risks, and the status of the implementation of such actions; and

(C) procedures to prevent conflicts of interest between the prime integrator and major subcontractors are established and that the Secure Border Initiative Program Office has adequate staff and resources to effectively manage the Secure Border Initiative program and all contracts under such program, including the exercise of technical oversight;

(9) a certification by the Chief Information Officer of the Department including all supporting documents or memoranda, and documentation and a description of the investment review processes used to obtain such certifications that—

(A) the system architecture of the program has been determined to be sufficiently aligned with the information systems enterprise architecture of the Department to minimize future rework, including a description of all aspects of the architectures that were or were not assessed in making the alignment determination, the date of the alignment determination, and any known areas of misalignment together with the associated risks and corrective actions to address any such areas;

(B) the program has a risk management process that regularly and proactively identifies, evaluates, mitigates,

PUBLIC LAW 111–83—OCT. 28, 2009          123 STAT. 2147

and monitors risks throughout the system life-cycle and communicates high-risk conditions to U.S. Customs and Border Protection and Department of Homeland Security investment decision-makers, as well as a listing of all the program's high risks and the status of efforts to address such risks; and

(C) an independent verification and validation agent is currently under contract for the projects funded under this heading;

(10) a certification by the Chief Human Capital Officer of the Department that the human capital needs of the Secure Border Initiative program are being addressed so as to ensure adequate staff and resources to effectively manage the Secure Border Initiative; and

(11) an analysis by the Secretary for each segment, defined as not more than 15 miles, of fencing or tactical infrastructure, of the selected approach compared to other, alternative means of achieving operational control, including cost, level of operational control, possible unintended effects on communities, and other factors critical to the decisionmaking process: *Provided further*, That the Secretary shall report to the Committees on Appropriations of the Senate and the House of Representatives on the progress of the program, and obligations and expenditures for all outstanding task orders, as well as specific objectives to be achieved through the award of current and remaining task orders planned for the balance of available appropriations, at least 15 days before the award of any task order requiring an obligation of funds in an amount greater than $25,000,000 and before the award of a task order that would cause cumulative obligations of funds to exceed 50 percent of the total amount appropriated: *Provided further*, That none of the funds made available under this heading may be obligated unless the Department has complied with section 102(b)(1)(C)(i) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1103 note), and the Secretary certifies such to the Committees on Appropriations of the Senate and the House of Representatives: *Provided further*, That none of the funds made available under this heading may be obligated for any project or activity for which the Secretary has exercised waiver authority pursuant to section 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1103 note) until 15 days have elapsed from the date of the publication of the decision in the Federal Register.

Reports.
Deadline.

Certification.

Waiver authority.
Deadline.
Federal Register,
publication.

AIR AND MARINE INTERDICTION, OPERATIONS, MAINTENANCE, AND PROCUREMENT

For necessary expenses for the operations, maintenance, and procurement of marine vessels, aircraft, unmanned aircraft systems, and other related equipment of the air and marine program, including operational training and mission-related travel, and rental payments for facilities occupied by the air or marine interdiction and demand reduction programs, the operations of which include the following: the interdiction of narcotics and other goods; the provision of support to Federal, State, and local agencies in the enforcement or administration of laws enforced by the Department of Homeland Security; and at the discretion of the Secretary of Homeland Security, the provision of assistance to Federal, State,

123 STAT. 2148          PUBLIC LAW 111–83—OCT. 28, 2009

and local agencies in other law enforcement and emergency humanitarian efforts, $519,826,000, to remain available until expended: *Provided*, That no aircraft or other related equipment, with the exception of aircraft that are one of a kind and have been identified as excess to U.S. Customs and Border Protection requirements and aircraft that have been damaged beyond repair, shall be transferred to any other Federal agency, department, or office outside of the Department of Homeland Security during fiscal year 2010 without the prior approval of the Committees on Appropriations of the Senate and the House of Representatives.

CONSTRUCTION AND FACILITIES MANAGEMENT

For necessary expenses to plan, construct, renovate, equip, and maintain buildings and facilities necessary for the administration and enforcement of the laws relating to customs, immigration, and border security, $319,570,000, to remain available until expended; of which $39,700,000 shall be for constructing and equipping the Advanced Training Center; and of which not more than $3,500,000 shall be for acquisition, design, and construction of U.S. Customs and Border Protection Air and Marine facilities at El Paso International Airport, Texas: *Provided*, That for fiscal year 2011 and thereafter, the annual budget submission of U.S. Customs and Border Protection for "Construction and Facilities Management" shall, in consultation with the General Services Administration, include a detailed 5-year plan for all Federal land border port of entry projects with a yearly update of total projected future funding needs delineated by land port of entry.

Plans.
Deadline.
6 USC 214 note.

U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

SALARIES AND EXPENSES

For necessary expenses for enforcement of immigration and customs laws, detention and removals, and investigations; and purchase and lease of up to 3,790 (2,350 for replacement only) police-type vehicles; $5,342,134,000, of which not to exceed $7,500,000 shall be available until expended for conducting special operations under section 3131 of the Customs Enforcement Act of 1986 (19 U.S.C. 2081); of which not to exceed $15,000 shall be for official reception and representation expenses; of which not to exceed $1,000,000 shall be for awards of compensation to informants, to be accounted for solely under the certificate of the Secretary of Homeland Security; of which not less than $305,000 shall be for promotion of public awareness of the child pornography tipline and anti-child exploitation activities; of which not less than $5,400,000 shall be used to facilitate agreements consistent with section 287(g) of the Immigration and Nationality Act (8 U.S.C. 1357(g)); and of which not to exceed $11,216,000 shall be available to fund or reimburse other Federal agencies for the costs associated with the care, maintenance, and repatriation of smuggled aliens unlawfully present in the United States: *Provided*, That none of the funds made available under this heading shall be available to compensate any employee for overtime in an annual amount in excess of $35,000, except that the Secretary, or the designee of the Secretary, may waive that amount as necessary for national security purposes and in cases of immigration emergencies: *Provided further*, That of the total amount provided, $15,770,000 shall

Waiver authority.

Child labor.

be for activities in fiscal year 2010 to enforce laws against forced child labor, of which not to exceed $6,000,000 shall remain available until expended: *Provided further*, That of the total amount available, not less than $1,500,000,000 shall be available to identify aliens convicted of a crime who may be deportable, and to remove them from the United States once they are judged deportable, of which $200,000,000 shall remain available until September 30, 2011: *Provided further*, That the Secretary, or the designee of the Secretary, shall report to the Committees on Appropriations of the Senate and the House of Representatives, not later than 45 days after the end of each quarter of the fiscal year, on progress in implementing the preceding proviso and the funds obligated during that quarter to make that progress: *Provided further*, That the Secretary shall prioritize the identification and removal of aliens convicted of a crime by the severity of that crime: *Provided further*, That funding made available under this heading shall maintain a level of not less than 33,400 detention beds through September 30, 2010: *Provided further*, That of the total amount provided, not less than $2,545,180,000 is for detention and removal operations, including transportation of unaccompanied minor aliens: *Provided further*, That of the total amount provided, $7,300,000 shall remain available until September 30, 2011, for the Visa Security Program: *Provided further*, That none of the funds provided under this heading may be used to continue a delegation of law enforcement authority authorized under section 287(g) of the Immigration and Nationality Act (8 U.S.C. 1357(g)) if the Department of Homeland Security Inspector General determines that the terms of the agreement governing the delegation of authority have been violated: *Provided further*, That none of the funds provided under this heading may be used to continue any contract for the provision of detention services if the two most recent overall performance evaluations received by the contracted facility are less than "adequate" or the equivalent median score in any subsequent performance evaluation system: *Provided further*, That nothing under this heading shall prevent U.S. Immigation and Customs Enforcement from exercising those authorities provided under immigration laws (as defined in section 101(a)(17) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(17))) during priority operations pertaining to aliens convicted of a crime: *Provided further*, That none of the funds provided under this heading may be obligated to collocate field offices of U.S. Immigration and Customs Enforcement until the Secretary of Homeland Security submits to the Committees on Appropriations of the Senate and the House of Representatives a plan for the nationwide implementation of the Alternatives to Detention Program that identifies: (1) the funds required for nationwide program implementation; (2) the timeframe for achieving nationwide program implementation; and (3) an estimate of the number of individuals who could be enrolled in a nationwide program.

*Margin notes:* Aliens. Reports. Deadlines. Aliens. Detention beds. Determination. Contracts. Implementation plan.

AUTOMATION MODERNIZATION

(INCLUDING TRANSFER OF FUNDS)

For expenses of immigration and customs enforcement automated systems, $90,000,000, to remain available until expended: *Provided*, That of the funds made available under this heading,

*Margin note:* Expenditure plan.

123 STAT. 2150        PUBLIC LAW 111–83—OCT. 28, 2009

$10,000,000 shall not be obligated until the Committees on Appropriations of the Senate and the House of Representatives receive an expenditure plan prepared by the Secretary of Homeland Security: *Provided further*, That of the total amount provided under this heading, up to $10,000,000 may be transferred to U.S. Immigration and Customs Enforcement "Salaries and Expenses" account for data center migration.

CONSTRUCTION

Privatization plan.

For necessary expenses to plan, construct, renovate, equip, and maintain buildings and facilities necessary for the administration and enforcement of the laws relating to customs and immigration, $4,818,000, to remain available until expended: *Provided*, That none of the funds made available in this Act may be used to solicit or consider any request to privatize facilities currently owned by the United States Government and used to detain aliens unlawfully present in the United States until the Committees on Appropriations of the Senate and the House of Representatives receive a plan for carrying out that privatization.

TRANSPORTATION SECURITY ADMINISTRATION

AVIATION SECURITY

Explosive detection systems.

Fees.

For necessary expenses of the Transportation Security Administration related to providing civil aviation security services pursuant to the Aviation and Transportation Security Act (Public Law 107–71; 115 Stat. 597; 49 U.S.C. 40101 note), $5,214,040,000, to remain available until September 30, 2011, of which not to exceed $10,000 shall be for official reception and representation expenses: *Provided*, That of the total amount made available under this heading, not to exceed $4,358,076,000 shall be for screening operations, of which $1,116,406,000 shall be available for explosives detection systems; and not to exceed $855,964,000 shall be for aviation security direction and enforcement: *Provided further*, That of the amount made available in the preceding proviso for explosives detection systems, $778,300,000 shall be available for the purchase and installation of these systems, of which not less than 28 percent shall be available for the purchase and installation of certified explosives detection systems at medium- and small-sized airports: *Provided further*, That any award to deploy explosives detection systems shall be based on risk, the airport's current reliance on other screening solutions, lobby congestion resulting in increased security concerns, high injury rates, airport readiness, and increased cost effectiveness: *Provided further*, That of the total amount provided, $1,250,000 shall be made available for Safe Skies Alliance to develop and enhance research and training capabilities for Transportation Security Officer improvised explosive recognition training: *Provided further*, That security service fees authorized under section 44940 of title 49, United States Code, shall be credited to this appropriation as offsetting collections and shall be available only for aviation security: *Provided further*, That the sum appropriated under this heading from the general fund shall be reduced on a dollar-for-dollar basis as such offsetting collections are received during fiscal year 2010, so as to result in a final fiscal year appropriation from the general fund estimated at not more than $3,114,040,000: *Provided further*, That any security service fees collected in excess

of the amount made available under this heading shall become available during fiscal year 2011: *Provided further*, That Members of the United States House of Representatives and United States Senate, including the leadership; the heads of Federal agencies and commissions, including the Secretary, Deputy Secretary, Under Secretaries, and Assistant Secretaries of the Department of Homeland Security; the United States Attorney General and Assistant Attorneys General and the United States attorneys; and senior members of the Executive Office of the President, including the Director of the Office of Management and Budget; shall not be exempt from Federal passenger and baggage screening.

### SURFACE TRANSPORTATION SECURITY

For necessary expenses of the Transportation Security Administration related to providing surface transportation security activities, $110,516,000, to remain available until September 30, 2011.

### TRANSPORTATION THREAT ASSESSMENT AND CREDENTIALING

For necessary expenses for the development and implementation of screening programs of the Office of Transportation Threat Assessment and Credentialing, $171,999,000, to remain available until September 30, 2011.

### TRANSPORTATION SECURITY SUPPORT

For necessary expenses of the Transportation Security Administration related to providing transportation security support and intelligence pursuant to the Aviation and Transportation Security Act (Public Law 107–71; 115 Stat. 597; 49 U.S.C. 40101 note), $1,001,780,000, to remain available until September 30, 2011: *Provided*, That of the funds appropriated under this heading, $20,000,000 may not be obligated for headquarters administration until the Secretary of Homeland Security submits to the Committees on Appropriations of the Senate and the House of Representatives detailed expenditure plans for air cargo security, and for checkpoint support and explosives detection systems refurbishment, procurement, and installations on an airport-by-airport basis for fiscal year 2010: *Provided further*, That these plans shall be submitted no later than 60 days after the date of enactment of this Act.

Expenditure plans.

Deadline.

### FEDERAL AIR MARSHALS

For necessary expenses of the Federal Air Marshals, $860,111,000.

### COAST GUARD

### OPERATING EXPENSES

For necessary expenses for the operation and maintenance of the Coast Guard, not otherwise provided for; purchase or lease of not to exceed 25 passenger motor vehicles, which shall be for replacement only; purchase or lease of small boats for contingent and emergent requirements (at a unit cost of no more than $700,000) and repairs and service-life replacements, not to exceed a total of $26,000,000; minor shore construction projects not

123 STAT. 2152          PUBLIC LAW 111–83—OCT. 28, 2009

exceeding $1,000,000 in total cost at any location; payments pursuant to section 156 of Public Law 97–377 (42 U.S.C. 402 note; 96 Stat. 1920); and recreation and welfare; $6,805,391,000, of which $581,503,000 shall be for defense-related activities, of which $241,503,000 is designated as being for overseas deployments and other activities pursuant to sections 401(c)(4) and 423(a)(1) of S. Con. Res. 13 (111th Congress), the concurrent resolution on the budget for fiscal year 2010; of which $24,500,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(a)(5)); of which not to exceed $20,000 shall be for official reception and representation expenses; and of which $3,600,000 shall be available until expended for the cost of repairing, rehabilitating, altering, modifying, and making improvements, including customized tenant improvements, to any replacement or expanded Operations Systems Center facility: *Provided*, That none of the funds made available by this or any other Act shall be available for administrative expenses in connection with shipping commissioners in the United States: *Provided further*, That none of the funds made available by this Act shall be for expenses incurred for recreational vessels under section 12114 of title 46, United States Code, except to the extent fees are collected from yacht owners and credited to this appropriation: *Provided further*, That the Coast Guard shall comply with the requirements of section 527 of Public Law 108–136 with respect to the Coast Guard Academy: *Provided further*, That of the funds provided under this heading, $50,000,000 shall be withheld from obligation for Headquarters Directorates until: (1) the fiscal year 2010 second quarter acquisition report required by Public Law 108–7 and the fiscal year 2008 joint explanatory statement accompanying Public Law 110–161; (2) the Revised Deepwater Implementation Plan; and (3) the future-years capital investment plan for fiscal years 2011–2015 are received by the Committees on Appropriations of the Senate and the House of Representatives: *Provided further*, That funds made available under this heading for overseas deployments and other activities pursuant to sections 401(c)(4) and 423(a)(1) of S. Con. Res. 13 (111th Congress), the concurrent resolution on the budget for fiscal year 2010, may be allocated by program, project, and activity, notwithstanding section 503 of this Act.

<div style="margin-left:2em">Coast Guard.

Reports.
Joint explanatory
statement.
Plans.</div>

ENVIRONMENTAL COMPLIANCE AND RESTORATION

For necessary expenses to carry out the environmental compliance and restoration functions of the Coast Guard under chapter 19 of title 14, United States Code, $13,198,000, to remain available until expended.

RESERVE TRAINING

For necessary expenses of the Coast Guard Reserve, as authorized by law; operations and maintenance of the reserve program; personnel and training costs; and equipment and services; $133,632,000.

ACQUISITION, CONSTRUCTION, AND IMPROVEMENTS

For necessary expenses of acquisition, construction, renovation, and improvement of aids to navigation, shore facilities, vessels,

and aircraft, including equipment related thereto; and maintenance, rehabilitation, lease and operation of facilities and equipment, as authorized by law; $1,537,080,000, of which $20,000,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(a)(5)); of which $121,000,000 shall be available until September 30, 2014, to acquire, repair, renovate, or improve vessels, small boats, and related equipment; of which $129,500,000 shall be available until September 30, 2012, for other equipment; of which $27,100,000 shall be available until September 30, 2012, for shore facilities and aids to navigation facilities, including not less than $300,000 for the Coast Guard Academy Pier and not less than $16,800,000 for Coast Guard Station Cleveland Harbor; of which $105,200,000 shall be available for personnel compensation and benefits and related costs; and of which $1,154,280,000 shall be available until September 30, 2014, for the Integrated Deepwater Systems program: *Provided*, That of the funds made available for the Integrated Deepwater Systems program, $269,000,000 is for aircraft and $730,680,000 is for surface ships: *Provided further*, That the Secretary of Homeland Security shall submit to the Committees on Appropriations of the Senate and the House of Representatives, in conjunction with the President's fiscal year 2011 budget, a review of the Revised Deepwater Implementation Plan that identifies any changes to the plan for the fiscal year; an annual performance comparison of Integrated Deepwater Systems program assets to pre-Deepwater legacy assets; a status report of such legacy assets; a detailed explanation of how the costs of such legacy assets are being accounted for within the Integrated Deepwater Systems program; and the earned value management system gold card data for each Integrated Deepwater Systems program asset: *Provided further*, That the Secretary shall submit to the Committees on Appropriations of the Senate and the House of Representatives, in conjunction with the fiscal year 2011 budget request, a comprehensive review of the Revised Deepwater Implementation Plan, and every 5 years thereafter, that includes a complete projection of the acquisition costs and schedule for the duration of the plan: *Provided further*, That the Secretary shall annually submit to the Committees on Appropriations of the Senate and the House of Representatives, at the time that the President's budget is submitted under section 1105(a) of title 31, United States Code, a future-years capital investment plan for the Coast Guard that identifies for each capital budget line item—

(1) the proposed appropriation included in that budget;

(2) the total estimated cost of completion;

(3) projected funding levels for each fiscal year for the next 5 fiscal years or until project completion, whichever is earlier;

(4) an estimated completion date at the projected funding levels; and

(5) changes, if any, in the total estimated cost of completion or estimated completion date from previous future-years capital investment plans submitted to the Committees on Appropriations of the Senate and the House of Representatives:

*Provided further*, That the Secretary shall ensure that amounts specified in the future-years capital investment plan are consistent, to the maximum extent practicable, with proposed appropriations necessary to support the programs, projects, and activities of the

Review.
Reports.
Data.

Review.
Deadline.
14 USC 663 note.

Deadline.
Investment plan.
14 USC 663 note.

Coast Guard in the President's budget as submitted under section 1105(a) of title 31, United States Code, for that fiscal year: *Provided further*, That any inconsistencies between the capital investment plan and proposed appropriations shall be identified and justified: *Provided further*, That subsections (a) and (b) of section 6402 of the U.S. Troop Readiness, Veterans' Care, Katrina Recovery, and Iraq Accountability Appropriations Act, 2007 (Public Law 110–28) shall apply to fiscal year 2010.

Applicability.

### ALTERATION OF BRIDGES

For necessary expenses for alteration or removal of obstructive bridges, as authorized by section 6 of the Truman-Hobbs Act (33 U.S.C. 516), $4,000,000, to remain available until expended: *Provided*, That of the amounts made available under this heading, $4,000,000 shall be for the Fort Madison Bridge in Fort Madison, Iowa.

### RESEARCH, DEVELOPMENT, TEST, AND EVALUATION

For necessary expenses for applied scientific research, development, test, and evaluation; and for maintenance, rehabilitation, lease, and operation of facilities and equipment; as authorized by law; $24,745,000, to remain available until expended, of which $500,000 shall be derived from the Oil Spill Liability Trust Fund to carry out the purposes of section 1012(a)(5) of the Oil Pollution Act of 1990 (33 U.S.C. 2712(a)(5)): *Provided*, That there may be credited to and used for the purposes of this appropriation funds received from State and local governments, other public authorities, private sources, and foreign countries for expenses incurred for research, development, testing, and evaluation.

### RETIRED PAY

For retired pay, including the payment of obligations otherwise chargeable to lapsed appropriations for this purpose, payments under the Retired Serviceman's Family Protection and Survivor Benefits Plans, payment for career status bonuses, concurrent receipts and combat-related special compensation under the National Defense Authorization Act, and payments for medical care of retired personnel and their dependents under chapter 55 of title 10, United States Code, $1,361,245,000, to remain available until expended.

### UNITED STATES SECRET SERVICE

#### SALARIES AND EXPENSES

For necessary expenses of the United States Secret Service, including: purchase of not to exceed 652 vehicles for police-type use for replacement only; hire of passenger motor vehicles; purchase of motorcycles made in the United States; hire of aircraft; services of expert witnesses at such rates as may be determined by the Director of the Secret Service; rental of buildings in the District of Columbia, and fencing, lighting, guard booths, and other facilities on private or other property not in Government ownership or control, as may be necessary to perform protective functions; payment

of per diem or subsistence allowances to employees where a protective assignment during the actual day or days of the visit of a protectee requires an employee to work 16 hours per day or to remain overnight at a post of duty; conduct of and participation in firearms matches; presentation of awards; travel of United States Secret Service employees on protective missions without regard to the limitations on such expenditures in this or any other Act if approval is obtained in advance from the Committees on Appropriations of the Senate and the House of Representatives; research and development; grants to conduct behavioral research in support of protective research and operations; and payment in advance for commercial accommodations as may be necessary to perform protective functions; $1,478,669,000, of which not to exceed $25,000 shall be for official reception and representation expenses; of which not to exceed $100,000 shall be to provide technical assistance and equipment to foreign law enforcement organizations in counterfeit investigations; of which $2,366,000 shall be for forensic and related support of investigations of missing and exploited children; and of which $6,000,000 shall be for a grant for activities related to the investigations of missing and exploited children and shall remain available until expended: *Provided*, That up to $18,000,000 for protective travel shall remain available until September 30, 2011: *Provided further*, That up to $1,000,000 for National Special Security Events shall remain available until expended: *Provided further*, That the United States Secret Service is authorized to obligate funds in anticipation of reimbursements from Federal agencies and entities, as defined in section 105 of title 5, United States Code, receiving training sponsored by the James J. Rowley Training Center, except that total obligations at the end of the fiscal year shall not exceed total budgetary resources available under this heading at the end of the fiscal year: *Provided further*, That none of the funds made available under this heading shall be available to compensate any employee for overtime in an annual amount in excess of $35,000, except that the Secretary of Homeland Security, or the designee of the Secretary, may waive that amount as necessary for national security purposes: *Provided further*, That none of the funds made available to the United States Secret Service by this Act or by previous appropriations Acts may be made available for the protection of the head of a Federal agency other than the Secretary of Homeland Security: *Provided further*, That the Director of the United States Secret Service may enter into an agreement to perform such service on a fully reimbursable basis: *Provided further*, That of the total amount made available under this heading, $33,960,000, to remain available until expended, is for information technology modernization: *Provided further*, That none of the funds made available in the preceding proviso shall be obligated to purchase or install information technology equipment until the Chief Information Officer of the Department of Homeland Security submits a report to the Committees on Appropriations of the Senate and the House of Representatives certifying that all plans for such modernization are consistent with Department of Homeland Security data center migration and enterprise architecture requirements: *Provided further*, That none of the funds made available to the United States Secret Service by this Act or by previous appropriations Acts may be obligated for the purpose of opening a new permanent domestic or overseas office or location unless the Committees on Appropriations of the

Waiver authority.

Reports.
Certification.

Notification.
Deadline.

123 STAT. 2156        PUBLIC LAW 111–83—OCT. 28, 2009

Senate and the House of Representatives are notified 15 days in advance of such obligation.

ACQUISITION, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

For necessary expenses for acquisition, construction, repair, alteration, and improvement of facilities, $3,975,000, to remain available until expended.

TITLE III

PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY

NATIONAL PROTECTION AND PROGRAMS DIRECTORATE

MANAGEMENT AND ADMINISTRATION

For salaries and expenses of the Office of the Under Secretary for the National Protection and Programs Directorate, support for operations, information technology, and the Office of Risk Management and Analysis, $44,577,000: *Provided*, That not to exceed $5,000 shall be for official reception and representation expenses.

INFRASTRUCTURE PROTECTION AND INFORMATION SECURITY

Expenditure plan.

For necessary expenses for infrastructure protection and information security programs and activities, as authorized by title II of the Homeland Security Act of 2002 (6 U.S.C. 121 et seq.), $899,416,000, of which $760,155,000 shall remain available until September 30, 2011: *Provided*, That of the amount made available under this heading, $161,815,000 may not be obligated for the National Cyber Security Division program and $12,500,000 may not be obligated for the Next Generation Networks program until the Committees on Appropriations of the Senate and the House of Representatives receive and approve a plan for expenditure for each of these programs that describes the strategic context of the program, the specific goals and milestones set for the program, and the funds allocated to achieving each of those goals and milestones: *Provided further*, That of the total amount provided, no less than: $20,000,000 is for the National Infrastructure Simulation and Analysis Center; $1,000,000 is for Philadelphia infrastructure monitoring; $3,500,000 is for State and local cyber security training; $3,000,000 is for the Power and Cyber Systems Protection, Analysis, and Testing Program at the Idaho National Laboratory; $3,500,000 is for the Cyber Security Test Bed and Evaluation Center; $3,000,000 is for the Multi-State Information Sharing and Analysis Center; $500,000 is for the Virginia Operational Integration Cyber Center of Excellence; $100,000 is for the Upstate New York Cyber Initiative; and $1,000,000 is for interoperable communications, technical assistance, and outreach programs.

FEDERAL PROTECTIVE SERVICE

Certification. Deadline.

The revenues and collections of security fees credited to this account shall be available until expended for necessary expenses related to the protection of federally-owned and leased buildings and for the operations of the Federal Protective Service: *Provided*,

PUBLIC LAW 111–83—OCT. 28, 2009          123 STAT. 2157

That the Secretary of Homeland Security and the Director of the Office of Management and Budget shall certify in writing to the Committees on Appropriations of the Senate and the House of Representatives no later than December 31, 2009, that the operations of the Federal Protective Service will be fully funded in fiscal year 2010 through revenues and collection of security fees, and shall adjust the fees to ensure fee collections are sufficient to ensure that the Federal Protective Service maintains not fewer than 1,200 full-time equivalent staff and 900 full-time equivalent Police Officers, Inspectors, Area Commanders, and Special Agents who, while working, are directly engaged on a daily basis protecting and enforcing laws at Federal buildings (referred to as "in-service field staff").

UNITED STATES VISITOR AND IMMIGRANT STATUS INDICATOR
TECHNOLOGY

For necessary expenses for the development of the United States Visitor and Immigrant Status Indicator Technology project, as authorized by section 110 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1365a), $373,762,000, to remain available until expended: *Provided*, That of the total amount made available under this heading, $75,000,000 may not be obligated for the United States Visitor and Immigrant Status Indicator Technology project until the Committees on Appropriations of the Senate and the House of Representatives receive a plan for expenditure, prepared by the Secretary of Homeland Security, not later than 90 days after the date of enactment of this Act that meets the statutory conditions specified under this heading in Public Law 110–329: *Provided further*, That not less than $28,000,000 of unobligated balances of prior year appropriations shall remain available and be obligated solely for implementation of a biometric air exit capability. <span style="float:right">Expenditure plan.<br>Deadline.</span>

OFFICE OF HEALTH AFFAIRS

For necessary expenses of the Office of Health Affairs, $139,250,000, of which $30,411,000 is for salaries and expenses: *Provided*, That $108,839,000 shall remain available until September 30, 2011, for biosurveillance, BioWatch, medical readiness planning, chemical response, and other activities, including $5,000,000 for the North Carolina Collaboratory for Bio-Preparedness, University of North Carolina, Chapel Hill: *Provided further*, That not to exceed $3,000 shall be for official reception and representation expenses.

FEDERAL EMERGENCY MANAGEMENT AGENCY

MANAGEMENT AND ADMINISTRATION

For necessary expenses for management and administration of the Federal Emergency Management Agency, $797,650,000, including activities authorized by the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.), the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), the Cerro Grande Fire Assistance Act of 2000 (division C, title I, 114 Stat. 583), the Earthquake Hazards Reduction Act of 1977 (42 U.S.C. 7701 et seq.), the Defense Production Act of 1950 (50 U.S.C. App. 2061 et seq.), sections 107 and 303 of the National

123 STAT. 2158          PUBLIC LAW 111–83—OCT. 28, 2009

Security Act of 1947 (50 U.S.C. 404, 405), Reorganization Plan No. 3 of 1978 (5 U.S.C. App.), the Homeland Security Act of 2002 (6 U.S.C. 101 et seq.), and the Post-Katrina Emergency Management Reform Act of 2006 (Public Law 109–295; 120 Stat. 1394): *Provided*, That not to exceed $3,000 shall be for official reception and representation expenses: *Provided further*, That the President's budget submitted under section 1105(a) of title 31, United States Code, shall be detailed by office for the Federal Emergency Management Agency: *Provided further*, That of the total amount made available under this heading, not to exceed $36,300,000 shall remain available until September 30, 2011, for capital improvements at the Mount Weather Emergency Operations Center: *Provided further*, That of the total amount made available under this heading, $32,500,000 shall be for the Urban Search and Rescue Response System, of which not to exceed $1,600,000 may be made available for administrative costs; and $6,995,000 shall be for the Office of National Capital Region Coordination: *Provided further*, That for purposes of planning, coordination, execution, and decision-making related to mass evacuation during a disaster, the Governors of the State of West Virginia and the Commonwealth of Pennsylvania, or their designees, shall be incorporated into efforts to integrate the activities of Federal, State, and local governments in the National Capital Region, as defined in section 882 of Public Law 107–296, the Homeland Security Act of 2002.

*Federal budget.*

*West Virginia. Pennsylvania. Disaster evacuation.*

STATE AND LOCAL PROGRAMS

(INCLUDING TRANSFER OF FUNDS)

For grants, contracts, cooperative agreements, and other activities, $3,015,200,000 shall be allocated as follows:

(1) $950,000,000 shall be for the State Homeland Security Grant Program under section 2004 of the Homeland Security Act of 2002 (6 U.S.C. 605): *Provided*, That of the amount provided by this paragraph, $60,000,000 shall be for Operation Stonegarden: *Provided further*, That notwithstanding subsection (c)(4) of such section 2004, for fiscal year 2010, the Commonwealth of Puerto Rico shall make available to local and tribal governments amounts provided to the Commonwealth of Puerto Rico under this paragraph in accordance with subsection (c)(1) of such section 2004.

*Puerto Rico.*

(2) $887,000,000 shall be for the Urban Area Security Initiative under section 2003 of the Homeland Security Act of 2002 (6 U.S.C. 604), of which, notwithstanding subsection (c)(1) of such section, $19,000,000 shall be for grants to organizations (as described under section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax section 501(a) of such code) determined by the Secretary of Homeland Security to be at high risk of a terrorist attack.

*Determination.*

(3) $35,000,000 shall be for Regional Catastrophic Preparedness Grants.

(4) $41,000,000 shall be for the Metropolitan Medical Response System under section 635 of the Post-Katrina Emergency Management Reform Act of 2006 (6 U.S.C. 723).

(5) $13,000,000 shall be for the Citizen Corps Program.

(6) $300,000,000 shall be for Public Transportation Security Assistance and Railroad Security Assistance, under sections

1406 and 1513 of the Implementing Recommendations of the 9/11 Commission Act of 2007 (Public Law 110–53; 6 U.S.C. 1135 and 1163), of which not less than $20,000,000 shall be for Amtrak security: *Provided*, That such public transportation security assistance shall be provided directly to public transportation agencies.

(7) $300,000,000 shall be for Port Security Grants in accordance with 46 U.S.C. 70107, notwithstanding 46 U.S.C. 70107(c).

(8) $12,000,000 shall be for Over-the-Road Bus Security Assistance under section 1532 of the Implementing Recommendations of the 9/11 Commission Act of 2007 (Public Law 110–53; 6 U.S.C. 1182).

(9) $50,000,000 shall be for Buffer Zone Protection Program Grants.

(10) $50,000,000 shall be for the Driver's License Security Grants Program in accordance with section 204 of the REAL ID Act of 2005 (49 U.S.C. 30301 note).

(11) $50,000,000 shall be for the Interoperable Emergency Communications Grant Program under section 1809 of the Homeland Security Act of 2002 (6 U.S.C. 579).

(12) $60,000,000 shall be for grants for Emergency Operations Centers under section 614 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5196c) to remain available until expended, of which no less than the amount specified for each Emergency Operations Center shall be provided as follows: $500,000, Benton County Emergency Management Commission, Iowa; $100,000, Brazoria County Emergency Management, Texas; $800,000, Butte-Silver Bow, Montana; $338,000, Calvert County Department of Public Safety, Maryland; $425,000, City of Alamosa Fire Department, Colorado; $600,000, City of Ames, Iowa; $250,000, City of Boerne, Texas; $500,000, City of Brawley, California; $300,000, City of Brigantine, New Jersey; $350,000, City of Brookings, Oregon; $1,000,000, City of Chicago, Illinois; $1,000,000, City of Commerce, California; $300,000, City of Cupertino, California; $1,000,000, City of Detroit, Michigan; $750,000, City of Elk Grove, California; $400,000, City of Green Cove Springs, Florida; $600,000, City of Greenville, North Carolina; $300,000, City of Hackensack, New Jersey; $800,000, City of Hartford, Connecticut; $250,000, City of Hopewell, Virginia; $254,500, City of La Habra, California; $600,000, City of Las Vegas, Nevada; $750,000, City of Lauderdale Lakes, Florida; $750,000, City of Minneapolis, Minnesota; $375,000, City of Monterey Park, California; $400,000, City of Moreno Valley, California; $1,000,000, City of Mount Vernon, New York; $1,000,000, City of Newark, New Jersey; $900,000, City of North Little Rock, Arkansas; $350,000, City of Palm Coast, Florida; $750,000, City of Port Gibson, Mississippi; $500,000, City of Scottsdale, Arizona; $750,000, City of Sunrise, Florida; $500,000, City of Tavares, Florida; $400,000, City of Torrington, Connecticut; $900,000, City of Whitefish, Montana; $500,000, City of Whittier, California; $500,000, City of Wichita, Kansas; $500,000, Columbia County, Oregon; $500,000, County of Union, New Jersey; $400,000, Dorchester County, South Carolina; $200,000, Fulton County (Atlanta) Emergency Management Agency, Georgia; $250,000, Howell County Emergency Preparedness, Missouri; $500,000, Jackson County Sheriff's Office, Missouri;

$750,000, Johnson County, Texas; $500,000, Kentucky Emergency Management, Kentucky; $800,000, Lake County, Florida; $600,000, Lea County, New Mexico; $1,000,000, Lincoln County, Washington; $250,000, Lycoming County, Pennsylvania; $250,000, Macomb County Emergency Management and Communications, Michigan; $300,000, Mercer County Emergency Management Agency, Kentucky; $1,000,000, Middle Rio Grande Development Council, Texas; $250,000, Minooka Fire Protection District, Illinois; $800,000, Mobile County Commission, Alabama; $200,000, Monroe County, Florida; $1,000,000, Morris County, New Jersey Office of Emergency Management, New Jersey; $750,000, New Orleans Emergency Medical Services, Louisiana; $1,000,000, North Carolina Office of Emergency Management, North Carolina; $500,000, North Hudson Regional Fire and Rescue, New Jersey; $980,000, North Louisiana Regional, Lincoln Parish, Louisiana; $1,500,000, Ohio Emergency Management Agency, Columbus, Ohio; $250,000, Passaic County Prosecutor's Office, New Jersey; $980,000, City of Providence, Rhode Island; $800,000, San Francisco Department of Emergency Management, California; $300,000, Sarasota County, Florida; $650,000, Scotland County, North Carolina; $500,000, Somerset County, Maine; $1,500,000, State of Maryland, Maryland; $158,000, City of Maitland, Florida; $500,000, Tohono O'odham Nation; $75,000, Towamencin Township, Pennsylvania; $275,000, Town of Harrison, New York; $500,000, Town of Shorter, Alabama; $750,000, Township of Irvington, New Jersey; $500,000, Township of Old Bridge, New Jersey; $247,000, Township of South Orange Village, South Orange, New Jersey; $500,000, Upper Darby Township Police Department, Pennsylvania; $165,000, Village of Elmsford, New York; $350,000, Washington Parish Government, Louisiana; $900,000, Westmoreland County Department of Public Safety, Pennsylvania; $1,000,000, Williamsburg County, South Carolina; and $20,000, Winston County Commission, Alabama.

(13) $267,200,000 shall be for training, exercises, technical assistance, and other programs, of which—

(A) $164,500,000 shall be for the National Domestic Preparedness Consortium in accordance with section 1204 of the Implementing Recommendations of the 9/11 Commission Act of 2007 (6 U.S.C. 1102), of which $62,500,000 shall be for the Center for Domestic Preparedness; $23,000,000 shall be for the National Energetic Materials Research and Testing Center, New Mexico Institute of Mining and Technology; $23,000,000 shall be for the National Center for Biomedical Research and Training, Louisiana State University; $23,000,000 shall be for the National Emergency Response and Rescue Training Center, Texas A&M University; $23,000,000 shall be for the National Exercise, Test, and Training Center, Nevada Test Site; $5,000,000 shall be for the Natural Disaster Preparedness Training Center, University of Hawaii, Honolulu, Hawaii; $5,000,000 shall be for surface transportation emergency preparedness and response training to be awarded under full and open competition;

(B) $1,700,000 shall be for the Center for Counterterrorism and Cyber Crime, Norwich University, Northfield, Vermont; and

(C) $3,000,000 shall be for the Rural Domestic Preparedness Consortium, Eastern Kentucky University: *Provided*, That 4 percent of the amounts provided under this heading shall be transferred to the Federal Emergency Management Agency "Management and Administration" account for program administration, and an expenditure plan for program administration shall be provided to the Committees on Appropriations of the Senate and the House of Representatives within 60 days after the date of enactment of this Act: *Provided further*, That notwithstanding section 2008(a)(11) of the Homeland Security Act of 2002 (6 U.S.C. 609(a)(11)), or any other provision of law, a grantee may use not more than 5 percent of the amount of a grant made available under this heading for expenses directly related to administration of the grant: *Provided further*, That for grants under paragraphs (1) through (5), the applications for grants shall be made available to eligible applicants not later than 25 days after the date of enactment of this Act, that eligible applicants shall submit applications not later than 90 days after the grant announcement, and that the Administrator of the Federal Emergency Management Agency shall act within 90 days after receipt of an application: *Provided further*, That for grants under paragraphs (6) through (11), the applications for grants shall be made available to eligible applicants not later than 30 days after the date of enactment of this Act, that eligible applicants shall submit applications within 45 days after the grant announcement, and that the Federal Emergency Management Agency shall act not later than 60 days after receipt of an application: *Provided further*, That for grants under paragraphs (1) and (2), the installation of communications towers is not considered construction of a building or other physical facility: *Provided further*, That grantees shall provide reports on their use of funds, as determined necessary by the Secretary: *Provided further*, That (a) the Center for Domestic Preparedness may provide training to emergency response providers from the Federal Government, foreign governments, or private entities, if the Center for Domestic Preparedness is reimbursed for the cost of such training, and any reimbursement under this subsection shall be credited to the account from which the expenditure being reimbursed was made and shall be available, without fiscal year limitation, for the purposes for which amounts in the account may be expended, and (b) the head of the Center for Domestic Preparedness shall ensure that any training provided under (a) does not interfere with the primary mission of the Center to train State and local emergency response providers.

*Expenditure plan.*
*Deadline.*

*Deadlines.*

*Deadlines.*

*Reports.*
*Determination.*

FIREFIGHTER ASSISTANCE GRANTS

For necessary expenses for programs authorized by the Federal Fire Prevention and Control Act of 1974 (15 U.S.C. 2201 et seq.), $810,000,000, of which $390,000,000 shall be available to carry out section 33 of that Act (15 U.S.C. 2229) and $420,000,000 shall be available to carry out section 34 of that Act (15 U.S.C. 2229a), to remain available until September 30, 2011: *Provided*, That not to exceed 5 percent of the amount available under this heading shall be available for program administration, and an expenditure plan for program administration shall be provided to the Committees on Appropriations of the Senate and the House of Representatives within 60 days of the date of enactment of this Act.

*Expenditure plan.*
*Deadline.*

123 STAT. 2162          PUBLIC LAW 111–83—OCT. 28, 2009

EMERGENCY MANAGEMENT PERFORMANCE GRANTS

For necessary expenses for emergency management performance grants, as authorized by the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.), the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), the Earthquake Hazards Reduction Act of 1977 (42 U.S.C. 7701 et seq.), and Reorganization Plan No. 3 of 1978 (5 U.S.C. App.), $340,000,000: *Provided*, That total administrative costs shall not exceed 3 percent of the total amount appropriated under this heading, and an expenditure plan for program administration shall be provided to the Committees on Appropriations of the Senate and the House of Representatives within 60 days of the date of enactment of this Act.

*Expenditure plan. Deadline.*

RADIOLOGICAL EMERGENCY PREPAREDNESS PROGRAM

The aggregate charges assessed during fiscal year 2010, as authorized in title III of the Departments of Veterans Affairs and Housing and Urban Development, and Independent Agencies Appropriations Act, 1999 (42 U.S.C. 5196e), shall not be less than 100 percent of the amounts anticipated by the Department of Homeland Security necessary for its radiological emergency preparedness program for the next fiscal year: *Provided*, That the methodology for assessment and collection of fees shall be fair and equitable and shall reflect costs of providing such services, including administrative costs of collecting such fees: *Provided further*, That fees received under this heading shall be deposited in this account as offsetting collections and will become available for authorized purposes on October 1, 2010, and remain available until expended.

*Fees. Effective date.*

UNITED STATES FIRE ADMINISTRATION

For necessary expenses of the United States Fire Administration and for other purposes, as authorized by the Federal Fire Prevention and Control Act of 1974 (15 U.S.C. 2201 et seq.) and the Homeland Security Act of 2002 (6 U.S.C. 101 et seq.), $45,588,000.

DISASTER RELIEF

(INCLUDING TRANSFERS OF FUNDS)

For necessary expenses in carrying out the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), $1,600,000,000, to remain available until expended: *Provided*, That the Federal Emergency Management Agency shall submit an expenditure plan to the Committees on Appropriations of the Senate and the House of Representatives detailing the use of the funds for disaster readiness and support within 60 days after the date of enactment of this Act: *Provided further*, That the Federal Emergency Management Agency shall submit to such Committees a quarterly report detailing obligations against the expenditure plan and a justification for any changes in spending: *Provided further*, That of the total amount provided, $16,000,000 shall be transferred to the Department of Homeland Security Office of Inspector General for audits and investigations related to disasters, subject to section 503 of this Act: *Provided further*, That

*Expenditure plan. Deadline.*

*Deadlines. Reports.*

$105,600,000 shall be transferred to Federal Emergency Management Agency "Management and Administration" for management and administration functions: *Provided further*, That the amount provided in the previous proviso shall not be available for transfer to "Management and Administration" until the Federal Emergency Management Agency submits an expenditure plan to the Committees on Appropriations of the Senate and the House of Representatives: *Provided further*, That the Federal Emergency Management Agency shall submit the monthly "Disaster Relief" report, as specified in Public Law 110–161, to the Committees on Appropriations of the Senate and the House of Representatives, and include the amounts provided to each Federal agency for mission assignments: *Provided further*, That for any request for reimbursement from a Federal agency to the Department of Homeland Security to cover expenditures under the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.), or any mission assignment orders issued by the Department for such purposes, the Secretary of Homeland Security shall take appropriate steps to ensure that each agency is periodically reminded of Department policies on—

> (1) the detailed information required in supporting documentation for reimbursements; and
> (2) the necessity for timeliness of agency billings.

Expenditure plan.

Deadlines.
Reports.

#### DISASTER ASSISTANCE DIRECT LOAN PROGRAM ACCOUNT

For activities under section 319 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5162), $295,000 is for the cost of direct loans: *Provided*, That gross obligations for the principal amount of direct loans shall not exceed $25,000,000: *Provided further*, That the cost of modifying such loans shall be as defined in section 502 of the Congressional Budget Act of 1974 (2 U.S.C. 661a).

#### FLOOD MAP MODERNIZATION FUND

For necessary expenses under section 1360 of the National Flood Insurance Act of 1968 (42 U.S.C. 4101), $220,000,000, and such additional sums as may be provided by State and local governments or other political subdivisions for cost-shared mapping activities under section 1360(f)(2) of such Act (42 U.S.C. 4101(f)(2)), to remain available until expended: *Provided*, That total administrative costs shall not exceed 3 percent of the total amount appropriated under this heading.

#### NATIONAL FLOOD INSURANCE FUND

For activities under the National Flood Insurance Act of 1968 (42 U.S.C. 4001 et seq.) and the Flood Disaster Protection Act of 1973 (42 U.S.C. 4001 et seq.), $146,000,000, which shall be derived from offsetting collections assessed and collected under section 1308(d) of the National Flood Insurance Act of 1968 (42 U.S.C. 4015(d)), which is available as follows: (1) not to exceed $38,680,000 for salaries and expenses associated with flood mitigation and flood insurance operations; and (2) no less than $107,320,000 for flood plain management and flood mapping, which shall remain available until September 30, 2011: *Provided*, That any additional fees collected pursuant to section 1308(d) of the

National Flood Insurance Act of 1968 (42 U.S.C. 4015(d)) shall be credited as an offsetting collection to this account, to be available for flood plain management and flood mapping: *Provided further*, That in fiscal year 2010, no funds shall be available from the National Flood Insurance Fund under section 1310 of that Act (42 U.S.C. 4017) in excess of: (1) $85,000,000 for operating expenses; (2) $969,370,000 for commissions and taxes of agents; (3) such sums as are necessary for interest on Treasury borrowings; and (4) $120,000,000, which shall remain available until expended for flood mitigation actions, of which $70,000,000 is for severe repetitive loss properties under section 1361A of the National Flood Insurance Act of 1968 (42 U.S.C. 4102a), of which $10,000,000 is for repetitive insurance claims properties under section 1323 of the National Flood Insurance Act of 1968 (42 U.S.C. 4030), and of which $40,000,000 is for flood mitigation assistance under section 1366 of the National Flood Insurance Act of 1968 (42 U.S.C. 4104c) notwithstanding subparagraphs (B) and (C) of subsection (b)(3) and subsection (f) of section 1366 of the National Flood Insurance Act of 1968 (42 U.S.C. 4104c) and notwithstanding subsection (a)(7) of section 1310 of the National Flood Insurance Act of 1968 (42 U.S.C. 4017): *Provided further*, That amounts collected under section 102 of the Flood Disaster Protection Act of 1973 and section 1366(i) of the National Flood Insurance Act of 1968 shall be deposited in the National Flood Insurance Fund to supplement other amounts specified as available for section 1366 of the National Flood Insurance Act of 1968, notwithstanding 42 U.S.C. 4012a(f)(8), 4104c(i), and 4104d(b)(2)–(3): *Provided further*, That total administrative costs shall not exceed 4 percent of the total appropriation.

### NATIONAL PREDISASTER MITIGATION FUND

For the predisaster mitigation grant program under section 203 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5133), $100,000,000, to remain available until expended and to be obligated as detailed in the joint explanatory statement accompanying this Act: *Provided*, That the total administrative costs associated with such grants shall not exceed 3 percent of the total amount made available under this heading.

### EMERGENCY FOOD AND SHELTER

To carry out the emergency food and shelter program pursuant to title III of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11331 et seq.), $200,000,000, to remain available until expended: *Provided*, That total administrative costs shall not exceed 3.5 percent of the total amount made available under this heading.

## TITLE IV

## RESEARCH AND DEVELOPMENT, TRAINING, AND SERVICES

### UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES

For necessary expenses for citizenship and immigration services, $224,000,000, of which $50,000,000 is for processing applications for asylum or refugee status; of which $5,000,000 is for the processing of military naturalization applications; and of which $137,000,000 is for the basic pilot program (E-Verify Program),

as authorized by section 402 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1324a note), to assist United States employers with maintaining a legal workforce: *Provided*, That of the amounts made available for the basic pilot program (E-Verify Program), $30,000,000 shall remain available until September 30, 2011: *Provided further*, That notwithstanding any other provision of law, funds available to United States Citizenship and Immigration Services may be used to acquire, operate, equip, and dispose of up to five vehicles, for replacement only, for areas where the Administrator of General Services does not provide vehicles for lease: *Provided further*, That the Director of United States Citizenship and Immigration Services may authorize employees who are assigned to those areas to use such vehicles to travel between the employees' residences and places of employment: *Provided further*, That none of the funds made available under this heading may be obligated for processing applications for asylum or refugee status unless the Secretary of Homeland Security has published a final rule updating part 103 of title 8, Code of Federal Regulations, to discontinue the asylum/refugee surcharge: *Provided further*, That none of the funds made available under this heading may be obligated for development of the "REAL ID hub" until the Committees on Appropriations of the Senate and the House of Representatives receive a plan for expenditure for that program that describes the strategic context of the program, the specific goals and milestones set for the program, and the funds allocated for achieving each of these goals and milestones: *Provided further*, That none of the funds made available in this Act for grants for immigrant integration may be used to provide services to aliens who have not been lawfully admitted for permanent residence.

*Refugees.*
*Regulations.*
*Federal Register, publication.*

*Expenditure plan.*

*Aliens.*

FEDERAL LAW ENFORCEMENT TRAINING CENTER

SALARIES AND EXPENSES

For necessary expenses of the Federal Law Enforcement Training Center, including materials and support costs of Federal law enforcement basic training; the purchase of not to exceed 117 vehicles for police-type use and hire of passenger motor vehicles; expenses for student athletic and related activities; the conduct of and participation in firearms matches and presentation of awards; public awareness and enhancement of community support of law enforcement training; room and board for student interns; a flat monthly reimbursement to employees authorized to use personal mobile phones for official duties; and services as authorized by section 3109 of title 5, United States Code; $239,356,000, of which up to $47,751,000 shall remain available until September 30, 2011, for materials and support costs of Federal law enforcement basic training; of which $300,000 shall remain available until expended for Federal law enforcement agencies participating in training accreditation, to be distributed as determined by the Federal Law Enforcement Training Center for the needs of participating agencies; and of which not to exceed $12,000 shall be for official reception and representation expenses: *Provided*, That the Center is authorized to obligate funds in anticipation of reimbursements from agencies receiving training sponsored by the Center, except that total obligations at the end of the fiscal year shall not exceed

total budgetary resources available at the end of the fiscal year: *Provided further*, That section 1202(a) of Public Law 107–206 (42 U.S.C. 3771 note), as amended by Public Law 110–329 (122 Stat. 3677), is further amended by striking "December 31, 2011" and inserting "December 31, 2012": *Provided further*, That the Federal Law Enforcement Training Accreditation Board, including representatives from the Federal law enforcement community and non-Federal accreditation experts involved in law enforcement training, shall lead the Federal law enforcement training accreditation process to continue the implementation of measuring and assessing the quality and effectiveness of Federal law enforcement training programs, facilities, and instructors: *Provided further*, That the Director of the Federal Law Enforcement Training Center shall schedule basic or advanced law enforcement training, or both, at all four training facilities under the control of the Federal Law Enforcement Training Center to ensure that such training facilities are operated at the highest capacity throughout the fiscal year.

### ACQUISITIONS, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

For acquisition of necessary additional real property and facilities, construction, and ongoing maintenance, facility improvements, and related expenses of the Federal Law Enforcement Training Center, $43,456,000, to remain available until expended: *Provided*, That the Center is authorized to accept reimbursement to this appropriation from government agencies requesting the construction of special use facilities.

### SCIENCE AND TECHNOLOGY

### MANAGEMENT AND ADMINISTRATION

For salaries and expenses of the Office of the Under Secretary for Science and Technology and for management and administration of programs and activities, as authorized by title III of the Homeland Security Act of 2002 (6 U.S.C. 181 et seq.), $143,200,000: *Provided*, That not to exceed $10,000 shall be for official reception and representation expenses.

### RESEARCH, DEVELOPMENT, ACQUISITION, AND OPERATIONS

For necessary expenses for science and technology research, including advanced research projects; development; test and evaluation; acquisition; and operations; as authorized by title III of the Homeland Security Act of 2002 (6 U.S.C. 181 et seq.); $863,271,000, of which $713,083,000, to remain available until September 30, 2012; and of which $150,188,000, to remain available until September 30, 2014, solely for Laboratory Facilities: *Provided*, That not less than $20,865,000 shall be available for the Southeast Region Research Initiative at the Oak Ridge National Laboratory: *Provided further*, That not less than $3,000,000 shall be available for Distributed Environment for Critical Infrastructure Decision-making Exercises: *Provided further*, That not less than $12,000,000 shall be for construction expenses of the Pacific Northwest National Laboratory: *Provided further*, That not less than $2,000,000 shall be for the Cincinnati Urban Area partnership established through the Regional Technology Integration Initiative: *Provided further*,

That not less than $10,000,000 shall be available for the National Institute for Hometown Security, Kentucky: *Provided further*, That not less than $2,000,000 shall be available for the Naval Post-graduate School: *Provided further*, That not less than $1,000,000 shall be available to continue a homeland security research, development, and manufacturing pilot project: *Provided further*, That not less than $500,000 shall be available for a demonstration project to develop situational awareness and decision support capabilities through remote sensing technologies: *Provided further*, That not less than $4,000,000 shall be available for a pilot program to develop a replicable port security system that would improve maritime domain awareness: *Provided further*, That $32,000,000 shall be for the National Bio- and Agro-defense Facility, of which up to $2,000,000 may be obligated for the National Academy of Sciences to complete the Letter Report required in section 560(b) of this Act.

DOMESTIC NUCLEAR DETECTION OFFICE

MANAGEMENT AND ADMINISTRATION

For salaries and expenses of the Domestic Nuclear Detection Office as authorized by title XIX of the Homeland Security Act of 2002 (6 U.S.C. 591 et seq.) as amended, for management and administration of programs and activities, $38,500,000: *Provided*, That not to exceed $3,000 shall be for official reception and representation expenses.

RESEARCH, DEVELOPMENT, AND OPERATIONS

For necessary expenses for radiological and nuclear research, development, testing, evaluation, and operations, $324,537,000, to remain available until September 30, 2012.

SYSTEMS ACQUISITION

For expenses for the Domestic Nuclear Detection Office acquisition and deployment of radiological detection systems in accordance with the global nuclear detection architecture, $20,000,000, to remain available until September 30, 2012: *Provided*, That none of the funds appropriated under this heading in this Act or any other Act shall be obligated for full-scale procurement of Advanced Spectroscopic Portal monitors until the Secretary of Homeland Security submits to the Committees on Appropriations of the Senate and the House of Representatives a report certifying that a significant increase in operational effectiveness will be achieved by such obligation: *Provided further*, That the Secretary shall submit separate and distinct certifications prior to the procurement of Advanced Spectroscopic Portal monitors for primary and secondary deployment that address the unique requirements for operational effectiveness of each type of deployment: *Provided further*, That the Secretary shall continue to consult with the National Academy of Sciences before making such certifications: *Provided further*, That none of the funds appropriated under this heading shall be used for high-risk concurrent development and production of mutually dependent software and hardware.

Certifications.

Reports.

Consultation.

TITLE V

GENERAL PROVISIONS

(INCLUDING RESCISSIONS OF FUNDS)

SEC. 501. No part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein.

SEC. 502. Subject to the requirements of section 503 of this Act, the unexpended balances of prior appropriations provided for activities in this Act may be transferred to appropriation accounts for such activities established pursuant to this Act, may be merged with funds in the applicable established accounts, and thereafter may be accounted for as one fund for the same time period as originally enacted.

Notifications.
Deadlines.

SEC. 503. (a) None of the funds provided by this Act, provided by previous appropriations Acts to the agencies in or transferred to the Department of Homeland Security that remain available for obligation or expenditure in fiscal year 2010, or provided from any accounts in the Treasury of the United States derived by the collection of fees available to the agencies funded by this Act, shall be available for obligation or expenditure through a re-programming of funds that: (1) creates a new program, project, or activity; (2) eliminates a program, project, office, or activity; (3) increases funds for any program, project, or activity for which funds have been denied or restricted by the Congress; (4) proposes to use funds directed for a specific activity by either of the Commit-tees on Appropriations of the Senate or the House of Representa-tives for a different purpose; or (5) contracts out any function or activity for which funding levels were requested for Federal full-time equivalents in the object classification tables contained in the fiscal year 2010 Budget Appendix for the Department of Homeland Security, as modified by the joint explanatory statement accompanying this Act, unless the Committees on Appropriations of the Senate and the House of Representatives are notified 15 days in advance of such reprogramming of funds.

(b) None of the funds provided by this Act, provided by previous appropriations Acts to the agencies in or transferred to the Depart-ment of Homeland Security that remain available for obligation or expenditure in fiscal year 2010, or provided from any accounts in the Treasury of the United States derived by the collection of fees or proceeds available to the agencies funded by this Act, shall be available for obligation or expenditure for programs, projects, or activities through a reprogramming of funds in excess of $5,000,000 or 10 percent, whichever is less, that: (1) augments existing programs, projects, or activities; (2) reduces by 10 percent funding for any existing program, project, or activity, or numbers of personnel by 10 percent as approved by the Congress; or (3) results from any general savings from a reduction in personnel that would result in a change in existing programs, projects, or activities as approved by the Congress, unless the Committees on Appropriations of the Senate and the House of Representatives are notified 15 days in advance of such reprogramming of funds.

(c) Not to exceed 5 percent of any appropriation made available for the current fiscal year for the Department of Homeland Security by this Act or provided by previous appropriations Acts may be

PUBLIC LAW 111–83—OCT. 28, 2009          123 STAT. 2169

transferred between such appropriations, but no such appropriation, except as otherwise specifically provided, shall be increased by more than 10 percent by such transfers: *Provided*, That any transfer under this section shall be treated as a reprogramming of funds under subsection (b) and shall not be available for obligation unless the Committees on Appropriations of the Senate and the House of Representatives are notified 15 days in advance of such transfer.

(d) Notwithstanding subsections (a), (b), and (c) of this section, no funds shall be reprogrammed within or transferred between appropriations after June 30, except in extraordinary circumstances that imminently threaten the safety of human life or the protection of property.

SEC. 504. The Department of Homeland Security Working Capital Fund, established pursuant to section 403 of Public Law 103–356 (31 U.S.C. 501 note), shall continue operations as a permanent working capital fund for fiscal year 2010: *Provided*, That none of the funds appropriated or otherwise made available to the Department of Homeland Security may be used to make payments to the Working Capital Fund, except for the activities and amounts allowed in the President's fiscal year 2010 budget: *Provided further*, That funds provided to the Working Capital Fund shall be available for obligation until expended to carry out the purposes of the Working Capital Fund: *Provided further*, That all departmental components shall be charged only for direct usage of each Working Capital Fund service: *Provided further*, That funds provided to the Working Capital Fund shall be used only for purposes consistent with the contributing component: *Provided further*, That such fund shall be paid in advance or reimbursed at rates which will return the full cost of each service: *Provided further*, That the Working Capital Fund shall be subject to the requirements of section 503 of this Act.

31 USC 1501 note.

SEC. 505. Except as otherwise specifically provided by law, not to exceed 50 percent of unobligated balances remaining available at the end of fiscal year 2010 from appropriations for salaries and expenses for fiscal year 2010 in this Act shall remain available through September 30, 2011, in the account and for the purposes for which the appropriations were provided: *Provided*, That prior to the obligation of such funds, a request shall be submitted to the Committees on Appropriations of the Senate and the House of Representatives for approval in accordance with section 503 of this Act.

Approval request.

SEC. 506. Funds made available by this Act for intelligence activities are deemed to be specifically authorized by the Congress for purposes of section 504 of the National Security Act of 1947 (50 U.S.C. 414) during fiscal year 2010 until the enactment of an Act authorizing intelligence activities for fiscal year 2010.

SEC. 507. None of the funds made available by this Act may be used to make a grant allocation, grant award, contract award, Other Transaction Agreement, a task or delivery order on a Department of Homeland Security multiple award contract, or to issue a letter of intent totaling in excess of $1,000,000, or to announce publicly the intention to make such an award, including a contract covered by the Federal Acquisition Regulation, unless the Secretary of Homeland Security notifies the Committees on Appropriations of the Senate and the House of Representatives at least 3 full business days in advance of making such an award or issuing such a letter: *Provided*, That if the Secretary of Homeland Security

Grants.
Contracts.
Notification.
Deadlines.

123 STAT. 2170          PUBLIC LAW 111–83—OCT. 28, 2009

determines that compliance with this section would pose a substantial risk to human life, health, or safety, an award may be made without notification and the Committees on Appropriations of the Senate and the House of Representatives shall be notified not later than 5 full business days after such an award is made or letter issued: *Provided further*, That no notification shall involve funds that are not available for obligation: *Provided further*, That the notification shall include the amount of the award, the fiscal year for which the funds for the award were appropriated, and the account from which the funds are being drawn: *Provided further*, That the Federal Emergency Management Agency shall brief the Committees on Appropriations of the Senate and the House of Representatives 5 full business days in advance of announcing publicly the intention of making an award under "State and Local Programs".

Briefing.
Deadline.

SEC. 508. Notwithstanding any other provision of law, no agency shall purchase, construct, or lease any additional facilities, except within or contiguous to existing locations, to be used for the purpose of conducting Federal law enforcement training without the advance approval of the Committees on Appropriations of the Senate and the House of Representatives, except that the Federal Law Enforcement Training Center is authorized to obtain the temporary use of additional facilities by lease, contract, or other agreement for training which cannot be accommodated in existing Center facilities.

Contracts.

SEC. 509. None of the funds appropriated or otherwise made available by this Act may be used for expenses for any construction, repair, alteration, or acquisition project for which a prospectus otherwise required under chapter 33 of title 40, United States Code, has not been approved, except that necessary funds may be expended for each project for required expenses for the development of a proposed prospectus.

SEC. 510. Sections 519, 520, 522, 528, 530, and 531 of the Department of Homeland Security Appropriations Act, 2008 (division E of Public Law 110–161; 121 Stat. 2072, 2073, 2074, 2082) shall apply with respect to funds made available in this Act in the same manner as such sections applied to funds made available in that Act.

Applicability.

SEC. 511. None of the funds made available in this Act may be used in contravention of the applicable provisions of the Buy American Act (41 U.S.C. 10a et seq.).

SEC. 512. None of the funds made available in this Act may be used to amend the oath of allegiance required by section 337 of the Immigration and Nationality Act (8 U.S.C. 1448).

SEC. 513. None of the funds appropriated by this Act may be used to process or approve a competition under Office of Management and Budget Circular A–76 for services provided as of June 1, 2004, by employees (including employees serving on a temporary or term basis) of United States Citizenship and Immigration Services of the Department of Homeland Security who are known as of that date as Immigration Information Officers, Contact Representatives, or Investigative Assistants.

SEC. 514. (a) The Assistant Secretary of Homeland Security (Transportation Security Administration) shall work with air carriers and airports to ensure that the screening of cargo carried on passenger aircraft, as defined in section 44901(g)(5) of title 49, United States Code, increases incrementally each quarter until the requirement of section 44901(g)(2)(B) of title 49 is met.

Deadlines.
Reports.
Air carriers and
airports.

(b) Not later than 45 days after the end of each quarter, the Assistant Secretary shall submit to the Committees on Appropriations of the Senate and the House of Representatives a report on air cargo inspection statistics by airport and air carrier detailing the incremental progress being made to meet the requirement of section 44901(g)(2)(B) of title 49, United States Code.

(c) Not later than 180 days after the date of the enactment of this Act, the Assistant Secretary shall submit to the Committees on Appropriations of the Senate and the House of Representatives, a report on how the Transportation Security Administration plans to meet the requirement for screening all air cargo on passenger aircraft by the deadline under section 44901(g) of title 49, United States Code. The report shall identify the elements of the system to screen 100 percent of cargo transported between domestic airports at a level of security commensurate with the level of security for the screening of passenger checked baggage.

SEC. 515. Within 45 days after the end of each month, the Chief Financial Officer of the Department of Homeland Security shall submit to the Committees on Appropriations of the Senate and the House of Representatives a monthly budget and staffing report for that month that includes total obligations, on-board versus funded full-time equivalent staffing levels, and the number of contract employees for each office of the Department.

*Deadline.*
*Reports.*

SEC. 516. Except as provided in section 44945 of title 49, United States Code, funds appropriated or transferred to Transportation Security Administration "Aviation Security", "Administration" and "Transportation Security Support" for fiscal years 2004, 2005, 2006, 2007, and 2008 that are recovered or deobligated shall be available only for the procurement or installation of explosives detection systems, air cargo, baggage, and checkpoint screening systems, subject to notification: *Provided*, That quarterly reports shall be submitted to the Committees on Appropriations of the Senate and the House of Representatives on any funds that are recovered or deobligated.

*Notification.*

*Deadline.*
*Reports.*

SEC. 517. Any funds appropriated to Coast Guard "Acquisition, Construction, and Improvements" for fiscal years 2002, 2003, 2004, 2005, and 2006 for the 110–123 foot patrol boat conversion that are recovered, collected, or otherwise received as the result of negotiation, mediation, or litigation, shall be available until expended for the Replacement Patrol Boat (FRC–B) program.

SEC. 518. (a) None of the funds provided by this or any other Act may be obligated for the development, testing, deployment, or operation of any portion of a human resources management system authorized by section 9701(a) of title 5, United States Code, or by regulations prescribed pursuant to such section, for an employee, as that term is defined in section 7103(a)(2) of such title.

(b) The Secretary of Homeland Security shall collaborate with employee representatives in the manner prescribed in section 9701(e) of title 5, United States Code, in the planning, testing, and development of any portion of a human resources management system that is developed, tested, or deployed for persons excluded from the definition of employee as that term is defined in section 7103(a)(2) of such title.

*Collaboration.*

SEC. 519. Section 532(a) of Public Law 109–295 (120 Stat. 1384) is amended by striking "2009" and inserting "2010".

123 STAT. 2172          PUBLIC LAW 111–83—OCT. 28, 2009

Classified information.

SEC. 520. The functions of the Federal Law Enforcement Training Center instructor staff shall be classified as inherently governmental for the purpose of the Federal Activities Inventory Reform Act of 1998 (31 U.S.C. 501 note).

Grants. Contracts.

SEC. 521. (a) Except as provided in subsection (b), none of the funds appropriated in this or any other Act to the Office of the Secretary and Executive Management, the Office of the Under Secretary for Management, or the Office of the Chief Financial Officer, may be obligated for a grant or contract funded under such headings by any means other than full and open competition.

(b) Subsection (a) does not apply to obligation of funds for a contract awarded—

(1) by a means that is required by a Federal statute, including obligation for a purchase made under a mandated preferential program, including the AbilityOne Program, that is authorized under the Javits-Wagner-O'Day Act (41 U.S.C. 46 et seq.);

(2) pursuant to the Small Business Act (15 U.S.C. 631 et seq.);

(3) in an amount less than the simplified acquisition threshold described under section 302A(a) of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 252a(a)); or

(4) by another Federal agency using funds provided through an interagency agreement.

Waiver authority.

(c)(1) Subject to paragraph (2), the Secretary of Homeland Security may waive the application of this section for the award of a contract in the interest of national security or if failure to do so would pose a substantial risk to human health or welfare.

Deadline. Notification.

(2) Not later than 5 days after the date on which the Secretary of Homeland Security issues a waiver under this subsection, the Secretary shall submit notification of that waiver to the Committees on Appropriations of the Senate and the House of Representatives, including a description of the applicable contract and an explanation of why the waiver authority was used. The Secretary may not delegate the authority to grant such a waiver.

Review.

(d) In addition to the requirements established by subsections (a), (b), and (c) of this section, the Inspector General of the Department of Homeland Security shall review departmental contracts awarded through means other than a full and open competition to assess departmental compliance with applicable laws and regulations: *Provided*, That the Inspector General shall review selected contracts awarded in the previous fiscal year through means other than a full and open competition: *Provided further*, That in selecting which contracts to review, the Inspector General shall consider the cost and complexity of the goods and services to be provided under the contract, the criticality of the contract to fulfilling Department missions, past performance problems on similar contracts or by the selected vendor, complaints received about the award process or contractor performance, and such other factors as the Inspector General deems relevant: *Provided further*, That the Inspector General shall report the results of the reviews to the Committees on Appropriations of the Senate and the House of Representatives no later than February 5, 2010.

Reports. Deadline.

Waiver authority.

SEC. 522. Except as provided in paragraphs (1) and (2) of this section, none of the funds provided by this or previous appropriations Acts shall be used to fund any position designated as

PUBLIC LAW 111–83—OCT. 28, 2009          123 STAT. 2173

a Principal Federal Official, or any successor position, for any Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5121 et seq.) declared disasters or emergencies—

(1) The Secretary of Homeland Security may waive the application of this section provided that any field position appointed pursuant to this waiver shall not hold the title of Principal Federal Official, shall functionally report through the Federal Coordinating Officer appointed under section 302 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5143), and shall be subject to the provisions of subsection (c) of section 319 of title 6, United States Code. The Secretary may not delegate the authority to grant such a waiver.

(2) Not later than 10 business days after the date on which the Secretary of Homeland Security issues a waiver under this section, the Secretary shall submit notification of that waiver to the Committees on Appropriations of the Senate and the House of Representatives, the Transportation and Infrastructure Committee of the House of Representatives, and the Homeland Security and Governmental Affairs Committee of the Senate explaining the circumstances necessitating the waiver, describing the specific role of any officials appointed pursuant to the waiver, and outlining measures taken to ensure compliance with subsection (c) of section 319 and subsections (c)(3) and (c)(4)(A) of section 313 of title 6, United States Code.

SEC. 523. None of the funds made available in this or any other Act may be used to enforce section 4025(1) of Public Law 108–458 unless the Assistant Secretary of Homeland Security (Transportation Security Administration) reverses the determination of July 19, 2007, that butane lighters are not a significant threat to civil aviation security.

SEC. 524. Funds made available in this Act may be used to alter operations within the Civil Engineering Program of the Coast Guard nationwide, including civil engineering units, facilities design and construction centers, maintenance and logistics commands, and the Coast Guard Academy, except that none of the funds provided in this Act may be used to reduce operations within any Civil Engineering Unit unless specifically authorized by a statute enacted after the date of the enactment of this Act.

SEC. 525. None of the funds provided in this Act shall be available to carry out section 872 of the Homeland Security Act of 2002 (6 U.S.C. 452).

SEC. 526. None of the funds made available in this Act may be used by United States Citizenship and Immigration Services to grant an immigration benefit unless the results of background checks required by law to be completed prior to the granting of the benefit have been received by United States Citizenship and Immigration Services, and the results do not preclude the granting of the benefit.

SEC. 527. None of the funds made available in this Act may be used to destroy or put out to pasture any horse or other equine belonging to the Federal Government that has become unfit for service, unless the trainer or handler is first given the option to take possession of the equine through an adoption program that has safeguards against slaughter and inhumane treatment.

*Deadline.*
*Notification.*

*Butane lighters.*

*Equine.*

Certification.

SEC. 528. None of the funds provided in this Act under the heading "Office of the Chief Information Officer" shall be used for data center development other than for Data Center One (National Center for Critical Information Processing and Storage) until the Chief Information Officer certifies that Data Center One is fully utilized as the Department's primary data storage center at the highest capacity throughout the fiscal year.

SEC. 529. None of the funds in this Act shall be used to reduce the United States Coast Guard's Operations Systems Center mission or its government-employed or contract staff levels.

SEC. 530. None of the funds appropriated by this Act may be used to conduct, or to implement the results of, a competition under Office of Management and Budget Circular A–76 for activities performed with respect to the Coast Guard National Vessel Documentation Center.

SEC. 531. Section 831 of the Homeland Security Act of 2002 (6 U.S.C. 391) is amended—

(1) in subsection (a), by striking "Until September 30, 2009" and inserting "Until September 30, 2010,"; and

(2) in subsection (d)(1), by striking "September 30, 2009," and inserting "September 30, 2010,".

Contracts.

SEC. 532. The Secretary of Homeland Security shall require that all contracts of the Department of Homeland Security that provide award fees link such fees to successful acquisition outcomes (which outcomes shall be specified in terms of cost, schedule, and performance).

SEC. 533. None of the funds made available to the Office of the Secretary and Executive Management under this Act may be expended for any new hires by the Department of Homeland Security that are not verified through the basic pilot program (E-Verify Program) under section 401 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1324a note).

Drugs and drug abuse.

SEC. 534. None of the funds made available in this Act for U.S. Customs and Border Protection may be used to prevent an individual not in the business of importing a prescription drug (within the meaning of section 801(g) of the Federal Food, Drug, and Cosmetic Act) from importing a prescription drug from Canada that complies with the Federal Food, Drug, and Cosmetic Act:

Applicability.

*Provided*, That this section shall apply only to individuals transporting on their person a personal-use quantity of the prescription drug, not to exceed a 90-day supply: *Provided further*, That the prescription drug may not be—

(1) a controlled substance, as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802); or

(2) a biological product, as defined in section 351 of the Public Health Service Act (42 U.S.C. 262).

SEC. 535. None of the funds made available in this Act may be used by the Secretary of Homeland Security or any delegate of the Secretary to issue any rule or regulation which implements the Notice of Proposed Rulemaking related to Petitions for Aliens To Perform Temporary Nonagricultural Services or Labor (H–2B) set out beginning on 70 Fed. Reg. 3984 (January 27, 2005).

Notification.

SEC. 536. The Secretary of Homeland Security, in consultation with the Secretary of the Treasury, shall notify the Committees on Appropriations of the Senate and the House of Representatives of any proposed transfers of funds available under subsection (g)(4)(B) of title 31, Unites States Code (as added by Public Law

PUBLIC LAW 111–83—OCT. 28, 2009          123 STAT. 2175

102–393) from the Department of the Treasury Forfeiture Fund to any agency within the Department of Homeland Security: *Provided*, That none of the funds identified for such a transfer may be obligated until the Committees on Appropriations of the Senate and the House of Representatives approve the proposed transfers.

SEC. 537. None of the funds made available in this Act may be used for planning, testing, piloting, or developing a national identification card.

National identification card.

SEC. 538. If the Assistant Secretary of Homeland Security (Transportation Security Administration) determines that an airport does not need to participate in the basic pilot program (E-Verify Program) under section 402 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1324a note), the Assistant Secretary shall certify to the Committees on Appropriations of the Senate and the House of Representatives that no security risks will result from such non-participation.

Certification.

SEC. 539. (a) Notwithstanding any other provision of this Act, except as provided in subsection (b), and 30 days after the date that the President determines whether to declare a major disaster because of an event and any appeal is completed, the Administrator shall submit to the Committee on Homeland Security and Governmental Affairs of the Senate, the Committee on Homeland Security of the House of Representatives, the Committee on Transportation and Infrastructure of the House of Representatives, the Committees on Appropriations of the Senate and the House of Representatives, and publish on the website of the Federal Emergency Management Agency, a report regarding that decision, which shall summarize damage assessment information used to determine whether to declare a major disaster.

Deadline. President. Web posting. Reports.

(b) The Administrator may redact from a report under subsection (a) any data that the Administrator determines would compromise national security.

(c) In this section—

(1) the term "Administrator" means the Administrator of the Federal Emergency Management Agency; and

(2) the term "major disaster" has the meaning given that term in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122).

Definitions.

SEC. 540. Notwithstanding any other provision of law, should the Secretary of Homeland Security determine that the National Bio- and Agro-defense Facility be located at a site other than Plum Island, New York, the Secretary shall have the Administrator of General Services sell through public sale all real and related personal property and transportation assets which support Plum Island operations, subject to such terms and conditions as necessary to protect government interests and meet program requirements: *Provided*, That the gross proceeds of such sale shall be deposited as offsetting collections into the Department of Homeland Security Science and Technology "Research, Development, Acquisition, and Operations" account and, subject to appropriation, shall be available until expended, for site acquisition, construction, and costs related to the construction of the National Bio- and Agro-defense Facility, including the costs associated with the sale, including due diligence requirements, necessary environmental remediation at Plum Island, and reimbursement of expenses incurred by the General Services Administration which shall not exceed 1 percent of the sale price or $5,000,000, whichever is greater: *Provided further*, That after

New York. Real property.

Notification. Deadline.

123 STAT. 2176          PUBLIC LAW 111–83—OCT. 28, 2009

the completion of construction and environmental remediation, the unexpended balances of funds appropriated for costs in the preceding proviso shall be available for transfer to the appropriate account for design and construction of a consolidated Department of Homeland Security Headquarters project, excluding daily operations and maintenance costs, notwithstanding section 503 of this Act, and the Committees on Appropriations of the Senate and the House of Representatives shall be notified 15 days prior to such transfer.

SEC. 541. The explanatory statement referenced in section 4 of Public Law 110–161 for "National Predisaster Mitigation Fund" under Federal Emergency Management Agency is deemed to be amended—

(1) by striking "Dalton Fire District" and all that follows through "750,000" and inserting the following:

"Franklin Regional Council of Governments, MA ....... 250,000
Town of Lanesborough, MA .......................................... 175,000
University of Massachusetts, MA ................................ 175,000";

(2) by striking "Santee and";
(3) by striking "3,000,000" and inserting "1,500,000";
(4) by inserting after the item relating to Adjutant General's Office of Emergency Preparedness the following:

"Town of Branchville, SC ............................................ 1,500,000";

and

(5) by striking "Public Works Department of the City of Santa Cruz, CA" and inserting "Monterey County Water Resources Agency, CA".

SEC. 542. Any official that is required by this Act to report or certify to the Committees on Appropriations of the Senate and the House of Representatives may not delegate such authority to perform that act unless specifically authorized herein.

SEC. 543. Section 203(m) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5133(m)) is amended by striking "September 30, 2009" and inserting "September 30, 2010".

Deadlines.
Consultation.

SEC. 544. (a) Not later than 3 months after the date of enactment of this Act, the Secretary of Homeland Security shall consult with the Secretaries of Defense and Transportation and develop a concept of operations for unmanned aircraft systems in the United States national airspace system for the purposes of border and maritime security operations.

(b) The Secretary of Homeland Security shall report to the Committees on Appropriations of the Senate and the House of Representatives not later than 30 days after the date of enactment of this Act on any foreseeable challenges to complying with subsection (a).

SEC. 545. From unobligated amounts that are available to the Coast Guard for fiscal year 2008 or 2009 for "Acquisition, Construction, and Improvements" for shoreside facilities and aids to navigation at Coast Guard Sector Buffalo, the Secretary of Homeland Security shall use such sums as may be necessary to make improvements to the land along the northern portion of Sector

Buffalo to enhance public access to the Buffalo Lighthouse and the waterfront.

SEC. 546. For fiscal year 2010 and thereafter, the Secretary may provide to personnel appointed or assigned to serve abroad, allowances and benefits similar to those provided under chapter 9 of title I of the Foreign Service Act of 1990 (22 U.S.C. 4081 et seq.).

6 USC 416.

SEC. 547. Section 401(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1324a note) is amended by striking "at the end of the 11-year period beginning on the first day the pilot program is in effect." and inserting "on September 30, 2012.".

SEC. 548. Section 610(b) of the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993 (8 U.S.C. 1153 note) is amended by striking "for 15 years" and inserting "until September 30, 2012".

SEC. 549. (a) In addition to collection of registration fees described in section 244(c)(1)(B) of the Immigration and Nationality Act (8 U.S.C. 1254a(c)(1)(B)), fees for fingerprinting services, biometric services, and other necessary services may be collected when administering the program described in section 244 of such Act.

8 USC 1254b.

(b) Subsection (a) shall be construed to apply for fiscal year 1998 and each fiscal year thereafter.

Applicability.

SEC. 550. Section 550(b) of the Department of Homeland Security Appropriations Act, 2007 (Public Law 109–295; 6 U.S.C. 121 note) is amended by striking "three years after the date of enactment of this Act" and inserting "on October 4, 2010".

SEC. 551. (a)(1) Sections 401(c)(1), 403(a), 403(b)(1), 403(c)(1), and 405(b)(2) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (division C of Public Law 104–208; 8 U.S.C. 1324a note) are amended by striking "basic pilot program" each place that term appears and inserting "E-Verify Program".

(2) The heading of section 403(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 is amended by striking "Basic Pilot" and inserting "E-Verify".

(b) Section 404(h)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (Public Law 104–208; 8 U.S.C. 1324a note) is amended by striking "under a pilot program" and inserting "under this subtitle".

SEC. 552. (a) None of the funds made available in this or any other Act may be used to release an individual who is detained, as of June 24, 2009, at Naval Station, Guantanamo Bay, Cuba, into the continental United States, Alaska, Hawaii, or the District of Columbia, into any of the United States territories of Guam, American Samoa (AS), the United States Virgin Islands (USVI), the Commonwealth of Puerto Rico and the Commonwealth of the Northern Mariana Islands (CNMI).

Detainees. Cuba.

(b) None of the funds made available in this or any other Act may be used to transfer an individual who is detained, as of June 24, 2009, at Naval Station, Guantanamo Bay, Cuba, into the continental United States, Alaska, Hawaii, or the District of Columbia, into any of the United States territories of Guam, American Samoa (AS), the United States Virgin Islands (USVI), the Commonwealth of Puerto Rico and the Commonwealth of the Northern Mariana Islands (CNMI), for the purpose of detention, except as provided in subsection (c).

123 STAT. 2178          PUBLIC LAW 111–83—OCT. 28, 2009

Deadline.

(c) None of the funds made available in this or any other Act may be used to transfer an individual who is detained, as of June 24, 2009, at Naval Station, Guantanamo Bay, Cuba, into the continental United States, Alaska, Hawaii, or the District of Columbia, into any of the United States territories of Guam, American Samoa (AS), the United States Virgin Islands (USVI), the Commonwealth of Puerto Rico and the Commonwealth of the Northern Mariana Islands (CNMI), for the purposes of prosecuting such individual, or detaining such individual during legal proceedings, until 45 days after the plan described in subsection (d) is received.

President.
Classified
information.
Disposition plan.

(d) The President shall submit to Congress, in classified form, a plan regarding the proposed disposition of any individual covered by subsection (c) who is detained as of June 24, 2009. Such plan shall include, at a minimum, each of the following for each such individual:

(1) A determination of the risk that the individual might instigate an act of terrorism within the continental United States, Alaska, Hawaii, the District of Columbia, or the United States territories if the individual were so transferred.

(2) A determination of the risk that the individual might advocate, coerce, or incite violent extremism, ideologically motivated criminal activity, or acts of terrorism, among inmate populations at incarceration facilities within the continental United States, Alaska, Hawaii, the District of Columbia, or the United States territories if the individual were transferred to such a facility.

(3) The costs associated with transferring the individual in question.

(4) The legal rationale and associated court demands for transfer.

(5) A plan for mitigation of any risks described in paragraphs (1), (2), and (7).

Notification.
Deadline.

(6) A copy of a notification to the Governor of the State to which the individual will be transferred, to the Mayor of the District of Columbia if the individual will be transferred to the District of Columbia, or to any United States territories with a certification by the Attorney General of the United States in classified form at least 14 days prior to such transfer (together with supporting documentation and justification) that the individual poses little or no security risk to the United States.

(7) An assessment of any risk to the national security of the United States or its citizens, including members of the Armed Services of the United States, that is posed by such transfer and the actions taken to mitigate such risk.

President.
Classified
information.
Deadline.

(e) None of the funds made available in this or any other Act may be used to transfer or release an individual detained at Naval Station, Guantanamo Bay, Cuba, as of June 24, 2009, to the country of such individual's nationality or last habitual residence or to any other country other than the United States or to a freely associated State, unless the President submits to the Congress, in classified form, at least 15 days prior to such transfer or release, the following information:

(1) The name of any individual to be transferred or released and the country or the freely associated State to which such individual is to be transferred or released.

(2) An assessment of any risk to the national security of the United States or its citizens, including members of the Armed Services of the United States, that is posed by such transfer or release and the actions taken to mitigate such risk.

(3) The terms of any agreement with the country or the freely associated State for the acceptance of such individual, including the amount of any financial assistance related to such agreement.

(f) None of the funds made available in this Act may be used to provide any immigration benefit (including a visa, admission into the United States or any of the United States territories, parole into the United States or any of the United States territories (other than parole for the purposes of prosecution and related detention), or classification as a refugee or applicant for asylum) to any individual who is detained, as of June 24, 2009, at Naval Station, Guantanamo Bay, Cuba.

(g) In this section, the term "freely associated States" means the Federated States of Micronesia (FSM), the Republic of the Marshall Islands (RMI), and the Republic of Palau.

*Definition.*

(h) Prior to the termination of detention operations at Naval Station, Guantanamo Bay, Cuba, the President shall submit to the Congress a report in classified form describing the disposition or legal status of each individual detained at the facility as of the date of enactment of this Act.

*President. Reports. Classified information.*

SEC. 553. Section 44903(j)(2)(C) of title 49, United States Code, is amended by adding at the end the following new clause:

"(v) INCLUSION OF DETAINEES ON NO FLY LIST.— The Assistant Secretary, in coordination with the Terrorist Screening Center, shall include on the No Fly List any individual who was a detainee held at the Naval Station, Guantanamo Bay, Cuba, unless the President certifies in writing to Congress that the detainee poses no threat to the United States, its citizens, or its allies. For purposes of this clause, the term 'detainee' means an individual in the custody or under the physical control of the United States as a result of armed conflict.".

*Cuba. President. Certification.*

*Definition.*

SEC. 554. For fiscal year 2010 and thereafter, the Secretary of Homeland Security may collect fees from any non-Federal participant in a conference, seminar, exhibition, symposium, or similar meeting conducted by the Department of Homeland Security in advance of the conference, either directly or by contract, and those fees shall be credited to the appropriation or account from which the costs of the conference, seminar, exhibition, symposium, or similar meeting are paid and shall be available to pay the costs of the Department of Homeland Security with respect to the conference or to reimburse the Department for costs incurred with respect to the conference: *Provided*, That in the event the total amount of fees collected with respect to a conference exceeds the actual costs of the Department of Homeland Security with respect to the conference, the amount of such excess shall be deposited into the Treasury as miscellaneous receipts: *Provided further*, That the Secretary shall provide a report to the Committees on Appropriations of the Senate and the House of Representatives not later than January 5, 2011, providing the level of collections and a

*Fees. 6 USC 469a.*

*Reports. Deadline.*

123 STAT. 2180          PUBLIC LAW 111–83—OCT. 28, 2009

summary by agency of the purposes and levels of expenditures for the prior fiscal year, and shall report annually thereafter.

Urban and rural areas.

SEC. 555. For purposes of section 210C of the Homeland Security Act of 2002 (6 U.S.C. 124j) a rural area shall also include any area that is located in a metropolitan statistical area and a county, borough, parish, or area under the jurisdiction of an Indian tribe with a population of not more than 50,000.

SEC. 556. None of the funds made available in this Act may be used for first-class travel by the employees of agencies funded by this Act in contravention of sections 301–10.122 through 301.10–124 of title 41, Code of Federal Regulations.

SEC. 557. None of the funds made available in this Act may be used to propose or effect a disciplinary or adverse action, with respect to any Department of Homeland Security employee who engages regularly with the public in the performance of his or her official duties solely because that employee elects to utilize protective equipment or measures, including but not limited to surgical masks, N95 respirators, gloves, or hand-sanitizers, where use of such equipment or measures is in accord with Department of Homeland Security policy, and Centers for Disease Control and Prevention and Office of Personnel Management guidance.

SEC. 558. None of the funds made available in this Act may be used to employ workers described in section 274A(h)(3) of the Immigration and Nationality Act (8 U.S.C. 1324a(h)(3)).

Termination date.

SEC. 559. (a) Subject to subsection (b), none of the funds appropriated or otherwise made available by this Act may be available to operate the Loran-C signal after January 4, 2010.

Certifications.

(b) The limitation in subsection (a) shall take effect only if:

(1) the Commandant of the Coast Guard certifies that the termination of the operation of the Loran-C signal as of the date specified in subsection (a) will not adversely impact the safety of maritime navigation; and

(2) the Secretary of Homeland Security certifies that the Loran-C system infrastructure is not needed as a backup to the Global Positioning System or to meet any other Federal navigation requirement.

(c) If the certifications described in subsection (b) are made, the Coast Guard shall, commencing January 4, 2010, terminate the operation of the Loran-C signal and commence a phased decommissioning of the Loran-C system infrastructure.

Deadline.
Reports.

(d) Not later than 30 days after such certifications pursuant to subsection (b), the Commandant shall submit to the Committees on Appropriations of the Senate and House of Representatives a report setting forth a proposed schedule for the phased decommissioning of the Loran-C system infrastructure in the event of the decommissioning of such infrastructure in accordance with subsection (c).

(e) If the certifications described in subsection (b) are made, the Secretary of Homeland Security, acting through the Commandant of the Coast Guard, may, notwithstanding any other provision of law, sell any real and personal property under the administrative control of the Coast Guard and used for the Loran-C system, by directing the Administrator of General Services to sell such real and personal property, subject to such terms and conditions that the Secretary believes to be necessary to protect government interests and program requirements of the Coast Guard: *Provided*, That the proceeds, less the costs of sale incurred by the General

Services Administration, shall be deposited as offsetting collections into the Coast Guard "Environmental Compliance and Restoration" account and, subject to appropriation, shall be available until expended for environmental compliance and restoration purposes associated with the Loran-C system, for the costs of securing and maintaining equipment that may be used as a backup to the Global Positioning System or to meet any other Federal navigation requirement, for the demolition of improvements on such real property, and for the costs associated with the sale of such real and personal property, including due diligence requirements, necessary environmental remediation, and reimbursement of expenses incurred by the General Services Administration: *Provided further*, That after the completion of such activities, the unexpended balances shall be available for any other environmental compliance and restoration activities of the Coast Guard.

SEC. 560. (a) None of the funds made available by this Act may be obligated for construction of the National Bio- and Agro-defense Facility on the United States mainland until 30 days after the later of:

(1) the date on which the Secretary of Homeland Security submits to the Committee on Appropriations of the Senate and the House of Representatives a site-specific bio-safety and bio-security mitigation risk assessment, which includes an integrated set of analyses using plume modeling and epidemiologic impact modeling, to determine the requirements necessary to ensure safe operation of the National Bio- and Agro-defense Facility at the approved Manhattan, Kansas, site identified in the January 16, 2009, record of decision published in Federal Register Vol. 74, Number 11, and the results of the National Academy of Sciences' review of the risk assessment as described in paragraph (b): *Provided*, That the integrated set of analyses is to determine the extent of the dispersion of the foot-and-mouth virus following a potential laboratory spill, the potential spread of foot-and-mouth disease in the surrounding susceptible animal population, and its economic impact: *Provided further*, That the integrated set of analyses should also take into account specific local, State, and national risk mitigation strategies; or

(2) the date on which the Secretary of Homeland Security, in coordination with the Secretary of Agriculture, submits to the Committees on Appropriations of the Senate and the House of Representatives a report that:

(A) describes the procedure that will be used to issue the permit to conduct foot-and-mouth disease live virus research under section 7524 of the Food, Conservation, and Energy Act of 2008 (21 U.S.C. 113a note; Public Law 110–246); and

(B) includes plans to establish an emergency response plan with city, regional, and State officials in the event of an accidental release of foot-and-mouth disease or another hazardous pathogen.

(b) With regard to the integrated set of analyses included in the mitigation risk assessment required under paragraph (a)(1), the Secretary of Homeland Security shall enter into a contract with the National Academy of Sciences to evaluate the mitigation risk assessment required by subsection (a)(1) of this section and to submit a Letter Report: *Provided*, That such contract shall be

Diseases.
Deadlines.

Risk assessment.
Kansas.

Reports.

Plans.

Contracts.
Reports.

123 STAT. 2182 PUBLIC LAW 111–83—OCT. 28, 2009

entered into within 90 days from the date of enactment of this Act, and the National Academy of Sciences shall complete its assessment and submit its Letter Report within four months after the date the Department of Homeland Security concludes the risk assessment.

American Communities' Right to Public Information Act. 46 USC 101 note.

SEC. 561. (a) SHORT TITLE.—This section may be cited as the "American Communities' Right to Public Information Act".

(b) IN GENERAL.—Section 70103(d) of title 46, United States Code, is amended to read as follows:

"(d) NONDISCLOSURE OF INFORMATION.—

"(1) IN GENERAL.—Information developed under this section or sections 70102, 70104, and 70108 is not required to be disclosed to the public, including—

"(A) facility security plans, vessel security plans, and port vulnerability assessments; and

"(B) other information related to security plans, procedures, or programs for vessels or facilities authorized under this section or sections 70102, 70104, and 70108.

"(2) LIMITATIONS.—Nothing in paragraph (1) shall be construed to authorize the designation of information as sensitive security information (as defined in section 1520.5 of title 49, Code of Federal Regulations)—

"(A) to conceal a violation of law, inefficiency, or administrative error;

"(B) to prevent embarrassment to a person, organization, or agency;

"(C) to restrain competition; or

"(D) to prevent or delay the release of information that does not require protection in the interest of transportation security, including basic scientific research information not clearly related to transportation security.".

(c) CONFORMING AMENDMENTS.—

(1) Section 114(r) of title 49, United States Code, is amended by adding at the end thereof the following:

"(4) LIMITATIONS.—Nothing in this subsection, or any other provision of law, shall be construed to authorize the designation of information as sensitive security information (as defined in section 1520.5 of title 49, Code of Federal Regulations)—

"(A) to conceal a violation of law, inefficiency, or administrative error;

"(B) to prevent embarrassment to a person, organization, or agency;

"(C) to restrain competition; or

"(D) to prevent or delay the release of information that does not require protection in the interest of transportation security, including basic scientific research information not clearly related to transportation security.".

(2) Section 40119(b) of title 49, United States Code, is amended by adding at the end thereof the following:

"(3) Nothing in paragraph (1) shall be construed to authorize the designation of information as sensitive security information (as defined in section 15.5 of title 49, Code of Federal Regulations)—

"(A) to conceal a violation of law, inefficiency, or administrative error;

"(B) to prevent embarrassment to a person, organization, or agency;

"(C) to restrain competition; or

"(D) to prevent or delay the release of information that does not require protection in the interest of transportation security, including basic scientific research information not clearly related to transportation security.".

SEC. 562. Section 4 of the Act entitled "An Act to prohibit the introduction, or manufacture for introduction, into interstate commerce of switchblade knives, and for other purposes" (commonly known as the Federal Switchblade Act) (15 U.S.C. 1244) is amended—

(1) by striking "or" at the end of paragraph (3);

(2) by striking the period at the end of paragraph (4) and inserting "; or" and

(3) by adding at the end the following:

"(5) a knife that contains a spring, detent, or other mechanism designed to create a bias toward closure of the blade and that requires exertion applied to the blade by hand, wrist, or arm to overcome the bias toward closure to assist in opening the knife.".

SEC. 563. (a) APPLICABLE ANNUAL PERCENTAGE RATE OF INTEREST.—Section 44(f)(1) of the Federal Deposit Insurance Act (12 U.S.C. 1831u(f)(1)) is amended—

(1) in the matter preceding subparagraph (A), by inserting "(or in the case of a governmental entity located in such State, paid)" after "received, or reserved"; and

(2) in subparagraph (B)—

(A) in the matter preceding clause (i), by striking "nondepository institution operating in such State" and inserting "governmental entity located in such State or any person that is not a depository institution described in subparagraph (A) doing business in such State";

(B) by redesignating clause (ii) as clause (iii);

(C) in clause (i)—

(i) in subclause (III)—

(I) in item (aa), by adding "and" at the end;

(II) in item (bb), by striking ", to facilitate" and all that follows through "2009"; and

(III) by striking item (cc); and

(ii) by adding after subclause (III) the following:

"(IV) the uniform accessibility of bonds and obligations issued under the American Recovery and Reinvestment Act of 2009;"; and

(D) by inserting after clause (i) the following:

"(ii) to facilitate interstate commerce through the issuance of bonds and obligations under any provision of State law, including bonds and obligations for the purpose of economic development, education, and improvements to infrastructure; and".

(b) RULE OF CONSTRUCTION.—Section 44(f)(2) of the Federal Deposit Insurance Act (12 U.S.C. 1831u(f)(2)) is amended—

(1) by redesignating subparagraphs (A) and (B) as clauses (i) and (ii), respectively, and moving the margins 2 ems to the right;

(2) by striking "No provision" and inserting the following: "(A) IN GENERAL.—No provision"; and

(3) by adding at the end the following:

123 STAT. 2184          PUBLIC LAW 111–83—OCT. 28, 2009

Loans.

"(B) APPLICABILITY.—This subsection shall be construed to apply to any loan or discount made, or note, bill of exchange, financing transaction, or other evidence of debt, originated by an insured depository institution, a governmental entity located in such State, or a person that is not a depository institution described in subparagraph (A) doing business in such State.".

Applicability.
Contracts.
12 USC 1831u note.

(c) EFFECTIVE PERIOD.—The amendments made by this section shall apply with respect to contracts consummated during the period beginning on the date of enactment of this Act and ending on December 31, 2010.

OPEN FOIA Act of 2009.
5 USC 101 note.

SEC. 564. (a) SHORT TITLE.—This section may be cited as the "OPEN FOIA Act of 2009".

(b) SPECIFIC CITATIONS IN STATUTORY EXEMPTIONS.—Section 552(b) of title 5, United States Code, is amended by striking paragraph (3) and inserting the following:

"(3) specifically exempted from disclosure by statute (other than section 552b of this title), if that statute—

"(A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or

"(ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and

"(B) if enacted after the date of enactment of the OPEN FOIA Act of 2009, specifically cites to this paragraph.".

Protected National Security Documents Act of 2009.
5 USC 552 note.

SEC. 565. (a) SHORT TITLE.—This section may be cited as the "Protected National Security Documents Act of 2009".

(b) Notwithstanding any other provision of the law to the contrary, no protected document, as defined in subsection (c), shall be subject to disclosure under section 552 of title 5, United States Code or any proceeding under that section.

(c) DEFINITIONS.—In this section:

(1) PROTECTED DOCUMENT.—The term "protected document" means any record—

(A) for which the Secretary of Defense has issued a certification, as described in subsection (d), stating that disclosure of that record would endanger citizens of the United States, members of the United States Armed Forces, or employees of the United States Government deployed outside the United States; and

(B) that is a photograph that—

(i) was taken during the period beginning on September 11, 2001, through January 22, 2009; and

(ii) relates to the treatment of individuals engaged, captured, or detained after September 11, 2001, by the Armed Forces of the United States in operations outside of the United States.

(2) PHOTOGRAPH.—The term "photograph" encompasses all photographic images, whether originals or copies, including still photographs, negatives, digital images, films, video tapes, and motion pictures.

(d) CERTIFICATION.—

(1) IN GENERAL.—For any photograph described under subsection (c)(1), the Secretary of Defense shall issue a certification if the Secretary of Defense determines that disclosure of that

PUBLIC LAW 111–83—OCT. 28, 2009          123 STAT. 2185

photograph would endanger citizens of the United States, members of the United States Armed Forces, or employees of the United States Government deployed outside the United States.

(2) CERTIFICATION EXPIRATION.—A certification and a renewal of a certification issued pursuant to subsection (d)(3) shall expire 3 years after the date on which the certification or renewal, is issued by the Secretary of Defense.

(3) CERTIFICATION RENEWAL.—The Secretary of Defense may issue—

(A) a renewal of a certification at any time; and

(B) more than 1 renewal of a certification.

(4) NOTICE TO CONGRESS.—The Secretary of Defense shall provide Congress a timely notice of the Secretary's issuance of a certification and of a renewal of a certification.

(e) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to preclude the voluntary disclosure of a protected document.

(f) EFFECTIVE DATE.—This section shall take effect on the date of enactment of this Act and apply to any protected document.

Applicability.

SEC. 566. The administrative law judge annuitants participating in the Senior Administrative Law Judge Program managed by the Director of the Office of Personnel Management under section 3323 of title 5, United States Code, shall be available on a temporary reemployment basis to conduct arbitrations of disputes as part of the arbitration panel established by the President under section 601 of division A of the American Recovery and Reinvestment Act of 2009 (Public Law 111–5; 123 Stat. 164).

SEC. 567. (a) IN GENERAL.—Any company that collects or retains personal information directly from individuals who participated in the Registered Traveler program shall safeguard and dispose of such information in accordance with the requirements in—

(1) the National Institute for Standards and Technology Special Publication 800–30, entitled "Risk Management Guide for Information Technology Systems"; and

(2) the National Institute for Standards and Technology Special Publication 800–53, Revision 3, entitled "Recommended Security Controls for Federal Information Systems and Organizations,";

(3) any supplemental standards established by the Assistant Secretary, Transportation Security Administration (referred to in this section as the "Assistant Secretary").

(b) CERTIFICATION.—The Assistant Secretary shall require any company through the sponsoring entity described in subsection (a) to provide, not later than 30 days after the date of the enactment of this Act, written certification to the sponsoring entity that such procedures are consistent with the minimum standards established under paragraph (a)(1–3) with a description of the procedures used to comply with such standards.

Deadline.

(c) REPORT.—Not later than 90 days after the date of the enactment of this Act, the Assistant Secretary shall submit a report to Congress that—

(1) describes the procedures that have been used to safeguard and dispose of personal information collected through the Registered Traveler program; and

(2) provides the status of the certification by any company described in subsection (a) that such procedures are consistent

with the minimum standards established by paragraph (a)(1–3).

SEC. 568. (a) SPECIAL IMMIGRANT NONMINISTER RELIGIOUS WORKER PROGRAM AND OTHER IMMIGRATION PROGRAMS.—

(1) EXTENSION.—Subclauses (II) and (III) of section 101(a)(27)(C)(ii) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(27)(C)(ii)) are amended by striking "September 30, 2009," each place such term appears and inserting "September 30, 2012,".

Deadline.
Reports.

(2) STUDY AND PLAN.—Not later than 180 days after the date of the enactment of this Act, the Director of United States Citizenship and Immigration Services shall submit a report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives that includes—

(A) the results of a study conducted under the supervision of the Director to evaluate the Special Immigrant Nonminister Religious Worker Program to identify the risks of fraud and noncompliance by program participants; and

(B) a detailed plan that describes the actions to be taken by United States Citizenship and Immigration Services to improve the integrity of the program.

(3) PROGRESS REPORT.—Not later than 240 days after the submission of the report under paragraph (2), the Director of United States Citizenship and Immigration Services shall submit a report to the Committee on the Judiciary of the Senate and the Committee on the Judiciary of the House of Representatives that describes the progress made in implementing the plan described in clause (a)(2)(B) of this section.

(b) CONRAD STATE 30 J–1 VISA WAIVER PROGRAM.—Section 220(c) of the Immigration and Nationality Technical Corrections Act of 1994 (8 U.S.C. 1182 note) is amended by striking "September 30, 2009" and inserting "September 30, 2012".

(c) RELIEF FOR SURVIVING SPOUSES.—

(1) IN GENERAL.—The second sentence of section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)) is amended by striking "for at least 2 years at the time of the citizen's death".

8 USC 1151 note.

(2) APPLICABILITY.—

(A) IN GENERAL.—The amendment made by paragraph (1) shall apply to all applications and petitions relating to immediate relative status under section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)) pending on or after the date of the enactment of this Act.

(B) TRANSITION CASES.—

Petition.
Deadline.

(i) IN GENERAL.—Notwithstanding any other provision of law, an alien described in clause (ii) who seeks immediate relative status pursuant to the amendment made by paragraph (1) shall file a petition under section 204(a)(1)(A)(ii) of the Immigration and Nationality Act (8 U.S.C. 1154(a)(1)(A)(ii)) not later than the date that is 2 years after the date of the enactment of this Act.

(ii) ALIENS DESCRIBED.—An alien is described in this clause if—

(I) the alien's United States citizen spouse died before the date of the enactment of this Act;

(II) the alien and the citizen spouse were married for less than 2 years at the time of the citizen spouse's death; and

(III) the alien has not remarried.

(d) SURVIVING RELATIVE CONSIDERATION FOR CERTAIN PETITIONS AND APPLICATIONS.—

(1) AMENDMENT.—Section 204 of the Immigration and Nationality Act (8 U.S.C. 1154) is amended by adding at the end the following:

"(l) SURVIVING RELATIVE CONSIDERATION FOR CERTAIN PETITIONS AND APPLICATIONS.—

"(1) IN GENERAL.—An alien described in paragraph (2) who resided in the United States at the time of the death of the qualifying relative and who continues to reside in the United States shall have such petition described in paragraph (2), or an application for adjustment of status to that of a person admitted for lawful permanent residence based upon the family relationship described in paragraph (2), and any related applications, adjudicated notwithstanding the death of the qualifying relative, unless the Secretary of Homeland Security determines, in the unreviewable discretion of the Secretary, that approval would not be in the public interest.

"(2) ALIEN DESCRIBED.—An alien described in this paragraph is an alien who, immediately prior to the death of his or her qualifying relative, was—

"(A) the beneficiary of a pending or approved petition for classification as an immediate relative (as described in section 201(b)(2)(A)(i));

"(B) the beneficiary of a pending or approved petition for classification under section 203 (a) or (d);

"(C) a derivative beneficiary of a pending or approved petition for classification under section 203(b) (as described in section 203(d));

"(D) the beneficiary of a pending or approved refugee/asylee relative petition under section 207 or 208;

"(E) an alien admitted in 'T' nonimmigrant status as described in section 101(a)(15)(T)(ii) or in 'U' nonimmigrant status as described in section 101(a)(15)(U)(ii); or

"(F) an asylee (as described in section 208(b)(3)).".

(2) CONSTRUCTION.—Nothing in the amendment made by paragraph (1) may be construed to limit or waive any ground of removal, basis for denial of petition or application, or other criteria for adjudicating petitions or applications as otherwise provided under the immigration laws of the United States other than ineligibility based solely on the lack of a qualifying family relationship as specifically provided by such amendment.

8 USC 1154 note.

(e) CONFORMING AMENDMENT TO AFFIDAVIT OF SUPPORT REQUIREMENT.—Section 213A(f)(5) of the Immigration and Nationality Act (8 U.S.C. 1183a(5)) is amended by striking clauses (i) and (ii) and inserting:

"(i) the individual petitioning under section 204 of this Act for the classification of such alien died after the approval of such petition, and the Secretary of Homeland Security has determined for humanitarian

123 STAT. 2188 PUBLIC LAW 111–83—OCT. 28, 2009

reasons that revocation of such petition under section 205 would be inappropriate; or

"(ii) the alien's petition is being adjudicated pursuant to section 204(l) (surviving relative consideration).".

Contracts.
Performance fees.

SEC. 569. Notwithstanding any other provision of this Act, none of the funds appropriated or otherwise made available by this Act may be used to pay award or incentive fees for contractor performance that has been judged to be below satisfactory performance or performance that does not meet the basic requirements of a contract.

Contracts.

SEC. 570. None of the funds appropriated or otherwise made available by this Act may be used by the Department of Homeland Security to enter into any federal contract unless such contract is entered into in accordance with the requirements of the Federal Property and Administrative Services Act of 1949 (41 U.S.C. 253) or Chapter 137 of title 10, United States Code, and the Federal Acquisition Regulation, unless such contract is otherwise authorized by statute to be entered into without regard to the above referenced statutes.

SEC. 571. (a) Funds made available by this Act solely for data center migration may be transferred by the Secretary between appropriations for the same purpose, notwithstanding section 503 of this Act.

Deadline.
Notification.

(b) No transfer described in (a) shall occur until 15 days after the Committees on Appropriations of the Senate and the House and Representatives are notified of such transfer.

Earmarks.

SEC. 572. Specific projects contained in the report of the Committee on Appropriations of the House of Representatives accompanying this Act (H. Rept. 111–157) that are considered congressional earmarks for purposes of clause 9 of rule XXI of the Rules of the House of Representatives, when intended to be awarded to a for-profit entity, shall be awarded under a full and open competition.

SEC. 573. From unobligated balances for fiscal year 2009 made available for Federal Emergency Management Agency "Trucking Industry Security Grants", $5,572,000 are rescinded.

SEC. 574. From the unobligated balances of prior year appropriations made available for "Analysis and Operations", $2,358,000 are rescinded.

SEC. 575. From the unobligated balances of prior year appropriations made available for National Protection and Programs Directorate "Infrastructure Protection and Information Security", $8,000,000 are rescinded.

SEC. 576. From the unobligated balances of prior year appropriations made available for Science and Technology "Research, Development, Acquisition, and Operations", $6,944,148 are rescinded.

SEC. 577. From the unobligated balances of prior year appropriations made available for Domestic Nuclear Detection Office "Research, Development, and Operations", $8,000,000 are rescinded.

SEC. 578. From the unobligated balances of prior year appropriations made available for Transportation Security Administration "Research and Development", $4,000,000 are rescinded.

SEC. 579. From the unobligated balances of prior year appropriations made available for Coast Guard "Acquisition, Construction, and Improvements", $800,000 are rescinded: *Provided*, That these rescissions shall be taken from completed projects.

PUBLIC LAW 111–83—OCT. 28, 2009          123 STAT. 2189

SEC. 580. Of the amounts available under the heading "Counter-
terrorism Fund", $5,600,000 are rescinded.
    This Act may be cited as the "Department of Homeland Security
Appropriations Act, 2010".

    Approved October 28, 2009.

LEGISLATIVE HISTORY—H.R. 2892 (S. 1298):

HOUSE REPORTS: Nos. 111–157 (Comm. on Appropriations) and 111–298
        (Comm. of Conference).
SENATE REPORTS: No. 111–31 (Comm. on Appropriations) accompanying S. 1298.
CONGRESSIONAL RECORD, Vol. 155 (2009):
        June 24, considered and passed House.
        July 7–9, considered and passed Senate, amended.
        Oct. 15, House agreed to conference report.
        Oct. 20, Senate agreed to conference report.

○

# APPENDIX B

# TAB 2

Case 1:18-cv-00068 Document 412-2 Filed in TXSD on 07/21/18 Page 55 of 62

## JUSTICE NEWS

### Attorney General Sessions Delivers Remarks on DACA

Washington, DC ~ Tuesday, September 5, 2017

---

### Remarks as prepared for delivery

Good morning. I am here today to announce that the program known as DACA that was effectuated under the Obama Administration is being rescinded.

The DACA program was implemented in 2012 and essentially provided a legal status for recipients for a renewable two-year term, work authorization and other benefits, including participation in the social security program, to 800,000 mostly-adult illegal aliens.

This policy was implemented unilaterally to great controversy and legal concern after Congress rejected legislative proposals to extend similar benefits on numerous occasions to this same group of illegal aliens.

In other words, the executive branch, through DACA, deliberately sought to achieve what the legislative branch specifically refused to authorize on multiple occasions. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch.

The effect of this unilateral executive amnesty, among other things, contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences. It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens.

We inherited from our Founders—and have advanced—an unsurpassed legal heritage, which is the foundation of our freedom, safety, and prosperity.

As the Attorney General, it is my duty to ensure that the laws of the United States are enforced and that the Constitutional order is upheld.

No greater good can be done for the overall health and well-being of our Republic, than preserving and strengthening the impartial rule of law. Societies where the rule of law is treasured are societies that tend to flourish and succeed.

Societies where the rule of law is subject to political whims and personal biases tend to become societies afflicted by corruption, poverty, and human suffering.

To have a lawful system of immigration that serves the national interest, we cannot admit everyone who would like to come here. That is an open border policy and the American people have rightly rejected it.

Therefore, the nation must set and enforce a limit on how many immigrants we admit each year and that means all can not be accepted.

This does not mean they are bad people or that our nation disrespects or demeans them in any way. It means we are properly enforcing our laws as Congress has passed them.

It is with these principles and duties in mind, and in light of imminent litigation, that we reviewed the Obama Administration's DACA policy.

Our collective wisdom is that the policy is vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program, which was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit.

The Fifth Circuit specifically concluded that DACA had not been implemented in a fashion that allowed sufficient discretion, and that DAPA was "foreclosed by Congress's careful plan."

In other words, it was inconsistent with the Constitution's separation of powers. That decision was affirmed by the Supreme Court by an equally divided vote.

If we were to keep the Obama Administration's executive amnesty policy, the likeliest outcome is that it would be enjoined just as was DAPA. The Department of Justice has advised the President and the Department of Homeland Security that DHS should begin an orderly, lawful wind down, including the cancellation of the memo that authorized this program.

Acting Secretary Duke has chosen, appropriately, to initiate a wind down process. This will enable DHS to conduct an orderly change and fulfill the desire of this administration to create a time period for Congress to act—should it so choose. We firmly believe this is the responsible path.

Simply put, if we are to further our goal of strengthening the constitutional order and the rule of law in America, the Department of Justice cannot defend this type of overreach.

George Washington University Law School Professor Jonathan Turley in testimony before the House Judiciary Committee was clear about the enormous constitutional infirmities raised by these policies.

He said: "In ordering this blanket exception, President Obama was nullifying part of a law that he simply disagreed with.....If a president can claim sweeping discretion to suspend key federal laws, the entire legislative process becomes little more than a pretense...The circumvention of the legislative process not only undermines the authority of this branch but destabilizes the tripartite system as a whole."

Ending the previous Administration's disrespect for the legislative process is an important first step. All immigration policies should serve the interests of the people of the United States—lawful immigrant and native born alike.

Congress should carefully and thoughtfully pursue the types of reforms that are right for the American people. Our nation is comprised of good and decent people who want their government's leaders to fulfill their promises and advance an immigration policy that serves the national interest.

We are a people of compassion and we are a people of law. But there is nothing compassionate about the failure to enforce immigration laws.

Enforcing the law saves lives, protects communities and taxpayers, and prevents human suffering. Failure to enforce the laws in the past has put our nation at risk of crime, violence and even terrorism.

The compassionate thing is to end the lawlessness, enforce our laws, and, if Congress chooses to make changes to those laws, to do so through the process set forth by our Founders in a way that advances the interest of the nation.

That is what the President has promised to do and has delivered to the American people.

Under President Trump's leadership, this administration has made great progress in the last few months toward establishing a lawful and constitutional immigration system. This makes us safer and more secure.

It will further economically the lives of millions who are struggling. And it will enable our country to more effectively teach new immigrants about our system of government and assimilate them to the cultural understandings that support it.

The substantial progress in reducing illegal immigration at our border seen in recent months is almost entirely the product of the leadership of President Trump and his inspired federal immigration officers. But the problem is not solved. And without more action, we could see illegality rise again rather than be eliminated.

As a candidate, and now in office, President Trump has offered specific ideas and legislative solutions that will protect American workers, increase wages and salaries, defend our national security, ensure the public safety, and increase the general well-being of the American people.

He has worked closely with many members of Congress, including in the introduction of the RAISE Act, which would produce enormous benefits for our country. This is how our democratic process works.

There are many powerful interest groups in this country and every one of them has a constitutional right to advocate their views and represent whomever they choose.

But the Department of Justice does not represent any narrow interest or any subset of the American people. We represent all of the American people and protect the integrity of our Constitution. That is our charge.

We at Department of Justice are proud and honored to work to advance this vision for America and to do our best each day to ensure the safety and security of the American people.

Thank you.

---

**Speaker:**
Attorney General Jeff Sessions

**Attachment(s):**
Download ag_letter_re_daca.pdf

**Topic(s):**
Immigration

**Component(s):**
Office of the Attorney General

*Updated September 5, 2017*

# APPENDIX B

# TAB 3

✚ Positive
As of: May 8, 2018 6:05 AM Z

## *Sierra Club v. Fed. Emergency Mgmt. Agency*

United States District Court for the Southern District of Texas, Houston Division

June 11, 2008, Decided; June 11, 2008, Filed

CIVIL ACTION NO. H-07-0608

**Reporter**

2008 U.S. Dist. LEXIS 47405 *; 70 Fed. R. Serv. 3d (Callaghan) 1291

SIERRA CLUB, Plaintiff, VS. FEDERAL EMERGENCY MANAGEMENT AGENCY, et al., Defendants.

**Prior History:** *Sierra Club v. FEMA, 2007 U.S. Dist. LEXIS 84230 (S.D. Tex., Nov. 14, 2007)*

## Core Terms

elevation, flood, parties, intervenor, matter of right, intervene, impair, motion to intervene, ability to protect, flood insurance, revised, issues, map, motion to stay, proceedings, watershed, changes, impede, timeliness, asserts, courts, administrative appeal, flood plain, applicant's, modeling, would-be

## Case Summary

### Procedural Posture

Plaintiff, a national nonprofit environmental club, filed suit under the National Flood Insurance Act, *42 U.S.C.S. § 4104(g)*, appealing a final flood elevation determination by defendant Federal Emergency Management Agency (FEMA) for Harris County, Texas, and incorporated areas. A landowner/private developer moved to intervene under *Fed. R. Civ. P. 24(a)(2)*, *(b)*. FEMA moved to stay proceedings.

### Overview

In 2004, FEMA published a preliminary flood insurance study (FIS) proposing base flood elevations for a watershed in northwest Harris County. FEMA later raised the flood elevations on thousands of acres targeted for a community planned by the developer, who had appealed the preliminary FIS pursuant to *42 U.S.C.S. § 4104(b)*. The environmental club protested, alleging technical deficiencies in FEMA's analysis of potential flooding in the affected watershed. FEMA proceeded with its map with the knowledge that parts of

it would likely be changed after the fact to correct inaccuracies. The club sued, and the developer sought intervention as of right. FEMA sought a stay until the county flood control district submitted a letter of map revision (LOMR). The court held that (1) the developer's motion to intervene as of right was timely under *Fed. R. Civ. P. 24(a)(2)*, and *(2)* the developer's interests would not be represented by either the club or by FEMA because changes in the flood plain elevations would require the developer to add fill to the affected areas at great cost. The court deferred ruling on FEMA's motion to stay because the county's LOMR had not been filed on the promised date.

### Outcome

The court granted the developer's motion to intervene as a matter of right and deferred deciding FEMA's motion to stay pending further information as to the status and content of the expected revised LOMR. The court ordered the parties to file by a date certain written submissions stating whether the LOMR had been submitted, the extent of its changes, and the impact of any filing on FEMA's motion to stay.

## LexisNexis® Headnotes

Administrative Law > Judicial Review > Reviewability > General Overview

Insurance Law > ... > Property Insurance > Coverage > Flood Insurance

Administrative Law > Agency Adjudication > Review of Initial Decisions

*HN1*[⬇] Judicial Review, Reviewability

Under the National Flood Insurance Act, any owner or

2008 U.S. Dist. LEXIS 47405, *47405

lessee of real property within the community who believes his property rights to be adversely affected by the Federal Emergency Management Agency's (FEMA's) determination of projected flood elevations may appeal the determination through an administrative review process. *42 U.S.C.S. § 4104(b)*. The application for administrative review must be filed within 90 days after FEMA publishes the proposed flood elevation determination. The application must challenge the scientific or technical basis for the determination. The Act provides for judicial review of final agency determinations in the administrative review. Any appellant aggrieved by any final determination of the director upon administrative appeal, as provided by *§ 4104(b)*, may appeal such determination to the United States district court for the district within which the community is located not more than 60 days after receipt of notice of such determination. *§ 4104(g)*.

Civil
Procedure > Parties > Intervention > Intervention of Right

**HN2[⬇]** Intervention, Intervention of Right

See *Fed. R. Civ. P. 24(a)*.

Civil
Procedure > Parties > Intervention > Intervention of Right

**HN3[⬇]** Intervention, Intervention of Right

*Fed. R. Civ. P. 24(a)(2)* has been interpreted to require that (1) an intervention application be timely; (2) the applicant have an interest relating to the property that is the subject of the action; (3) the applicant is so situated that the disposition may, as a practical matter, impair or impede his ability to protect that interest; and (4) the applicant's interest is inadequately represented by the existing parties.

Civil
Procedure > Parties > Intervention > Permissive Intervention

**HN4[⬇]** Intervention, Permissive Intervention

See *Fed. R. Civ. P. 24(b)(1)*.

Civil
Procedure > Parties > Intervention > Permissive Intervention

**HN5[⬇]** Intervention, Permissive Intervention

Permissive intervention under *Fed. R. Civ. P. 24(b)(1)* is appropriate when (1) timely application is made by an intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights of the original parties. District courts should also consider whether the existing parties adequately represent the proposed intervenor's interests and whether the intervenor's presence is likely to contribute significantly to the development of underlying factual issues.

Civil
Procedure > Parties > Intervention > Intervention of Right

**HN6[⬇]** Intervention, Intervention of Right

To determine timeliness under *Fed. R. Civ. P. 24(a)(2)*, courts consider (1) the length of time during which a would-be intervenor actually knew or reasonably should have known of its interest in the case before it petitioned for leave to intervene; (2) the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as it knew or reasonably should have known of its interest in the case; (3) the extent of the prejudice that the would-be intervenor may suffer if intervention is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely. The analysis is contextual; absolute measures of timeliness should be ignored. Courts have discretion to allow intervention where no one would be hurt and greater justice could be obtained.

Civil
Procedure > Parties > Intervention > Intervention of Right

**HN7[⬇]** Intervention, Intervention of Right

The U.S. Court of Appeals for the Fifth Circuit has rejected the notion that the date on which a would-be intervenor became aware of the pendency of the action should be used to determine whether it acted promptly under *Fed. R. Civ. P. 24(a)(2)*. A better gauge of promptness is the speed with which the would-be intervenor acted when it became aware that its interests would no longer be protected by the original parties. The first factor of the timeliness analysis focuses on the time lapse between the applicant's receipt of actual or constructive knowledge of his interest in the litigation and the filing of his motion for intervention. Filing a motion to intervene before entry of judgment favors finding that the motion was timely.

Civil Procedure > Parties > Intervention > Intervention of Right

*HN8*[ ]  **Intervention, Intervention of Right**

Timeliness for intervention under *Fed. R. Civ. P. 24(a)(2)* is not determined solely by the length of time that passes before a motion to intervene is made. The more important question is not the mere length of time but the possibility of prejudice to existing parties that the delay may cause. This consideration is to be evaluated against the liberal treatment that is to be accorded applications for intervention of right. Where there is no prejudice to existing parties, courts have allowed intervention after an applicant's extended delay in filing.

Civil Procedure > Parties > Intervention > Intervention of Right

*HN9*[ ]  **Intervention, Intervention of Right**

Under *Fed. R. Civ. P. 24(a)(2)*, the practical impairment standard does not require a proposed intervenor to show that it will be bound by the disposition of the action. The ability of a party seeking intervention to raise its concerns in future proceedings is not sufficient to ensure that the party is able to protect its interests because the task of reestablishing the status quo in later proceedings can be difficult and burdensome. Intervention is appropriate where a non-party faces potential consequences in the interim period after entry of judgment. An intervenor's interest may also be practically impaired by the stare decisis effect of the

district court's judgment on subsequent proceedings.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Evidence > Burdens of Proof > General Overview

Governments > Courts > Authority to Adjudicate

*HN10*[ ]  **Judges, Discretionary Powers**

The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. The power to stay calls for the exercise of judgment, which must weigh competing interests and maintain an even balance. A court must not abuse its inherent power to stay. Generally, the moving party bears a heavy burden to show why a stay should be granted absent statutory authorization. To meet this burden, the moving party should show that its motion is supported by genuine necessity. A court should not decide a motion to stay based on a party's speculative concerns.

**Counsel:**  [*1] For Sierra Club, Plaintiff: James B Blackburn, Jr, LEAD ATTORNEY, Blackburn Carter PC, Houston, TX; David Alfred Kahne, Attorney at Law, Houston, TX.

For Federal Emergency Management Agency, Director R David Paulison, Regional Director William E. Peterson, Defendants: Charmaine Michele Aarons Holder, LEAD ATTORNEY, Office of the US Attorney, Houston, TX.

For GGP Bridgeland L.P., Movant: Lewis Steven Wiener, LEAD ATTORNEY, Sutherland Asbill and Brennan, Washington, DC; Craig Alan Olsen, Sutherland Asbill & Brennan LLP, Houston, TX.

R D Smith, President, CCFCC, Amicus, Pro se, Cypress, Tx.

**Judges:** Lee H. Rosenthal, United States District Judge.

**Opinion by:** Lee H. Rosenthal

# Opinion

## MEMORANDUM AND ORDER

The Sierra Club, a national nonprofit environmental organization, filed this suit under *Section 4104(g)* of the National Flood Insurance Act, *42 U.S.C. § 4104(g)*, appealing a final flood elevation determination by the Federal Emergency Management Agency (FEMA) for Harris County, Texas and incorporated areas. (Docket Entry No. 1). GGP Bridgeland L.P., a landowner and developer, has moved to intervene under *Federal Rule of Civil Procedure 24(a)(2)* and *(b)*. (Docket Entry No. 28). The Sierra Club opposed the motion, (Docket **[*2]** Entry No. 31), and GGP replied to the opposition, (Docket Entry No. 37). FEMA filed a Statement of Qualified No Opposition, (Docket Entry No. 36), in which it later clarified to state that it opposed intervention as a matter of right but did not object to permissive intervention. (Docket Entry No. 38). GGP responded to FEMA's filings. (Docket Entry No. 39).

FEMA has also moved to stay the proceedings, asserting that the Digital Flood Insurance Rate Map ("DFIRM") currently contested by the Sierra Club will soon change when the Harris County Flood Control District ("HCFCD") submits a revised Letter of Map Revision ("LOMR"). (Docket Entry No. 46). GGP responded to the motion to stay. (Docket Entry Nos. 48, 52).

Based on a careful review of the motions, responses, and replies, and the applicable law, this court grants GGP's motion to intervene as a matter of right and defers deciding FEMA's motion to stay pending further information as to the status and content of the expected revised LOMR. No later than **July 10, 2008,** the parties must file a written submission stating whether the LOMR has been submitted, the extent of its changes, and the impact of any filing on the motion to stay.

The reasons **[*3]** are explained in detail below.

## I. Background

On September 30, 2004, FEMA published a preliminary version of the Flood Insurance Study ("FIS") report, with the DFIRM, proposing base flood elevations for Harris County. (Docket Entry No. 16 at 6; *id.,* Ex. A at 2). FEMA published the proposed base flood elevations in the local general circulation daily newspaper, the *Houston Chronicle,* on December 16, 2004 and December 23, 2004, and in the Federal Register on July 8, 2005. (Docket Entry No. 16 at 6; *id.,* Ex. A at 2). The notices invited the public, including potentially affected

landowners, to submit written comments on the accuracy of the DFIRM. (Docket Entry No. 16 at 6; *id.,* Ex. A at 2).

*HN1*[🔼] Under the National Flood Insurance Act, "any owner or lessee of real property within the community who believes his property rights to be adversely affected" by FEMA's determination of projected flood elevations "may appeal" the determination through an administrative review process. *42 U.S.C. § 4104(b).* [1] The application for administrative review must be filed within ninety days after FEMA publishes the proposed flood elevation determination. The application must challenge the scientific or technical **[*4]** basis for the determination. *Id.* The Act provides for judicial review of final agency determinations in the administrative review. "Any appellant aggrieved by any final determination of the Director upon administrative appeal, as provided by this section, may appeal such determination to the United States district court for the district within which the community is located not more than sixty days after receipt of notice of such determination." *Id.* at *§ 4104(g).*

GGP owns approximately 11,500 acres in the Upper Cypress Creek area of northwest Harris County and is developing a planned community to be known as Bridgeland. (Docket Entry No. 28 at 2). GGP plans to develop Bridgeland over a twenty-year period. (*Id.*). When completed, the development will include over 20,000 homes and have a population projected at more than 65,000 residents. (*Id.*). Approximately 8,300 acres of the Bridgeland development fall within **[*5]** the Upper Cypress Creek watershed area. (*Id.* at 2-3).

GGP appealed FEMA's preliminary DFIRM under the National Flood Insurance Act, *42. U.S.C. § 4104(b),* alleging that the map did not account for improvements to Bridgeland that had raised the land elevation in certain areas. (*Id.* at 3). FEMA accepted the appeal and revised the flood plain to reflect elevation changes to GGP's property. (*Id.*). Although the final DFIRM increased the total area of Bridgeland falling within the flood plain, GGP was satisfied with the revised map and was prepared to proceed with its development activities. (*Id.*).

The Sierra Club and the Houston Voters Against

---

[1] The National Flood Insurance Act also authorizes suits against the government "upon the disallowance by the Director of any [claims for the payment or adjustment of flood insurance claims]." *42 U.S.C. § 4072.* This lawsuit does not involve the denial of flood insurance claims.

Flooding ("HVAF") filed a formal administrative appeal with FEMA on March 23, 2005, within the ninety-day period set by the Act. The Sierra Club and the HVAF protested the proposed base flood elevations in the part of the map along the Cypress Creek watershed. (Docket Entry No. 1 at 8-10; Docket Entry No. 16 at 6-8; *id.,* Ex. A at 3-4). In the application for administrative review, the Sierra Club and the HVAF asserted that there were technical deficiencies in FEMA's analysis and modeling of the Cypress Creek watershed and that FEMA's base flood elevation **[*6]** determinations were premised on flawed scientific and technical evidence. (Docket Entry No. 1 at 8-10; Docket Entry No. 16 at 6-8; *id.,* Ex. A at 2-4).

In the administrative appeal, FEMA found that the submitted data did not demonstrate that the proposed flood elevations were scientifically or technically incorrect. (Docket Entry No. 16 at 8-9; *id.,* Ex. A at 4-5). FEMA also denied an appeal filed by the Cypress Creek Flood Control Coalition ("CCFCC"), which raised the same objections. (Docket Entry No. 16 at 7; *id.,* Ex. A at 3-5).

On January 3, 2006, the HCFCD sent a letter to FEMA acknowledging a modeling problem with respect to areas that were part of the DFIRM and stating that the HCFCD would address the problem and provide new data. (Docket Entry No. 16 at 10). Both the HCFCD and the CCFCC agreed that even after the proposed FEMA map and base flood elevation determinations became effective, changes could be made through an LOMR. An LOMR could also change the determination that specific pieces of property fell within the flood plain. (Docket Entry No. 16 at 4, 10).

On December 18, 2006, FEMA issued a Letter of Final Determination adopting the DFIRM issued for Harris County, with an **[*7]** anticipated effective date of June 18, 2007. (Docket Entry No. 16 at 11; *id.,* Ex. A at 7). FEMA decided to proceed with the map with the knowledge that parts of it would likely be changed after the fact to correct inaccuracies. The HCFCD and CCFCC continued to work on the modeling problem, intending to seek map revisions through an LOMR. (Docket Entry No. 16 at 10-11).

The Sierra Club filed suit seeking judicial review of FEMA's final base flood elevations and DFIRM for the Upper Cypress Creek watershed area. (Docket Entry No. 1). GGP moved to intervene under *Federal Rule of Civil Procedure 24*. (Docket Entry No. 28). GGP submitted the affidavit of Joseph H. Necker, Jr., Vice President of Development of Bridgeland GP, LLC, in support of its intervention motion. (Docket Entry No. 28, Ex. A). GGP asserted that it is entitled to intervention as a matter of right because: (1) its application is timely; (2) it has a significant property interest relating to the subject of the action; (3) the action's disposition could impair or impede GGP's ability to protect that interest; and (4) neither the Sierra Club nor FEMA adequately represent GGP's interests. (Docket Entry No. 28 at 1). In the alternative, **[*8]** GGP asserted that it satisfies the standard for permissive intervention because: (1) its application is timely and will not result in prejudice to the existing parties; (2) its claims raise issues of law and fact identical to the issues currently pending before the court; and (3) it is likely to contribute to the development of the factual issues. (*Id.*). The Sierra Club opposed GGP's motion to intervene. (Docket Entry No. 31).

On March 6, 2008, FEMA filed a Clarification and Court Advisory objecting to the intervention and suggesting that the court "hold all proceedings in this matter in abeyance pending final resolution of the LOMR, which would then be published in the Federal Register and would then be subject to administrative or judicial challenge by Sierra Club, GGP, or any other eligible party." (Docket Entry No. 38 at 4). FEMA attached a letter from HCFCD dated February 11, 2008, stating that HCFCD was in the process of reevaluating the Upper Cypress Creek watershed and that its "submittal should be ready by March 28, 2000." (Docket Entry No. 38, Ex. A). GGP's response stated that FEMA had failed to meet the legal standards for a stay and had improperly filed its request. (Docket **[*9]** Entry No. 39 at 5). On April 15, 2008, GGP notified the court that HCFCD had not submitted its LOMR to FEMA as anticipated on March 28, 2008. (Docket Entry No. 44).

FEMA now moves to stay this litigation pending final resolution of the HCFCD LOMR through its administrative appeal process. (Docket Entry No. 46). FEMA attached a letter from HCFCD dated April 18, 2008, stating that the LOMR, "with any subsequent changes, will be ready to submit to FEMA on or before June 9, 2008." (Docket Entry No. 46, Ex. A). GGP argued that FEMA has not presented valid grounds for its motion, (Docket Entry No. 48), and that the original basis for the motion no longer exists because FEMA has filed an administrative record, (Docket Entry No. 52).

Both motions are analyzed below.

## II. The Motion to Intervene

### A. The Legal Standards

*Rule 24(a)* provides:

HN2[↑] On timely motion, the court must permit anyone to intervene who (1) is given an unconditional right to intervene by a federal statute; or (2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, **[*10]** unless existing parties adequately represent that interest.

*FED. R. CIV. P. 24(a)*. The courts have interpreted HN3[↑] *Rule 24(a)(2)* to require that: (1) the intervention application be timely; (2) the applicant have an interest relating to the property that is the subject of the action; (3) the applicant is so situated that the disposition may, as a practical matter, impair or impede his ability to protect that interest; and (4) the applicant's interest is inadequately represented by the existing parties. *See Sierra Club v. City of San Antonio, 115 F.3d 311, 314 (5th Cir. 1997)* (citing *Sierra Club v. Glickman, 82 F.3d 106, 108 (5th Cir. 1996))*.

*Rule 24(b)(1)* provides:

HN4[↑] On timely motion, the court may permit anyone to intervene who: (A) is given a conditional right to intervene by a federal statute; or (B) has a claim or defense that shares with the main action a common question of law or fact.

*FED. R. CIV. P. 24(b)*. HN5[↑] Permissive intervention is appropriate when: "(1) timely application is made by the intervenor, (2) the intervenor's claim or defense and the main action have a question of law or fact in common, and (3) intervention will not unduly delay or prejudice the adjudication of the rights **[*11]** of the original parties." *League of United Latin Am. Citizens, Council No. 4434 v. Clements, 884 F.2d 185, 189 n.2 (5th Cir. 1989)*. District courts should also consider whether the existing parties adequately represent the proposed intervenor's interests and whether the intervenor's presence is likely to contribute significantly to the development of underlying factual issues. *Id. at 189*.

### B. Analysis

#### 1. Intervention as a Matter of Right

GGP asserts that it is entitled to intervention as a matter of right because: (1) its application is timely; (2) it has a significant property interest relating to the subject of the action; (3) the disposition of the action could impair or impede its ability to protect that interest; and (4) neither the Sierra Club nor FEMA adequately represent GGP's interests. (Docket Entry No. 28 at 1). The Sierra Club opposes intervention as a matter of right, asserting that GGP's application is untimely and that disposition of this action will not impair or impede GGP's ability to protect its interests. (Docket Entry No. 31 at 7). Specifically, the Sierra Club argues that GGP had a two-year opportunity -- between January 2006 to January 2008 -- to participate in computer **[*12]** modeling work done by HCFCD, and that GGP will have the administrative option of appealing any changes to flood elevation levels under *42 U.S.C. § 4104* and *44 C.F.R. § 67*. (Docket Entry No. 31 at 5). FEMA opposes GGP's motion to intervene as a matter of right, agreeing with the Sierra Club that the result in this case will not impair or impede GGP's ability to protect its interest because it has these administrative review rights. (Docket Entry No. 38 at 1).

GGP argues that the timeliness analysis should focus on postcomplaint conduct. (Docket Entry No. 37 at 4-5). GGP also argues that the availability of posttrial administrative options through which it could theoretically challenge revised flood elevations is irrelevant in light of the practical impairment standard. (*Id.*).

HN6[↑] To determine timeliness under *Rule 24(a)(2)*, courts consider: "(1) [t]he length of time during which the would-be intervenor actually knew or reasonably should have known of its interest in the case before it petitioned for leave to intervene; (2) the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as **[*13]** it knew or reasonably should have known of its interest in the case; (3) the extent of the prejudice that the would-be intervenor may suffer if intervention is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely." *Sierra Club v. Espy, 18 F.3d 1202, 1205 (5th Cir. 1994)* (citing *Stallworth v. Monsanto Co., 558 F.2d 257, 264-66 (5th Cir. 1977))*. "The analysis is contextual; absolute measures of timeliness should be ignored." *Id.* Courts have discretion to allow intervention "where no one

would be hurt and greater justice could be obtained." *Id.* (quoting *McDonald v. E.J. Lavino Co., 430 F.2d 1065, 1074 (5th Cir. 1970)).*

[**HN7**⬆] The Fifth Circuit has "rejected the notion that the date on which the would-be intervenor became aware of the pendency of the action should be used to determine whether it acted promptly." *Espy, 18 F.3d at 1206; Stallworth, 558 F.2d at 264.* "A better gauge of promptness is the speed with which the would-be intervenor acted when it became aware that its interests would no longer be protected by the original parties." *Espy, 18 F.3d at 1206.* The first factor of the timeliness analysis "focuses [*14] on the time lapse between the applicant's receipt of actual or constructive knowledge of his interest in the litigation and the filing of his motion for intervention." *Edwards v. City of Houston, 78 F.3d 983, 1000 (5th Cir. 1996).* Filing a motion to intervene before entry of judgment favors finding that the motion was timely. *Id. at 1001* (citations omitted).

[**HN8**⬆] "Timeliness is not determined solely by the length of time that passes before a motion to intervene is made." *Ass'n of Prof'l Flght Attendants v. Gibbs, 804 F.2d 318, 321 (5th Cir. 1986).* "[T]he more important question is not the mere length of time but the possibility of prejudice to existing parties that the delay may cause. This consideration is to be evaluated against the liberal treatment that is to be accorded applications for intervention of right." *Diaz v. S. Drilling Corp., 427 F.2d 1118, 1126 (5th Cir. 1970).* Where there is no prejudice to existing parties, courts have allowed intervention after an applicant's extended delay in filing. *See id. at 1125-26* (one-year delay not untimely where intervenor's timing caused no prejudice because "few legally significant events" had occurred).

The Sierra Club filed its complaint on [*15] February 15, 2007. (Docket Entry No. 1). The court denied FEMA's motion to dismiss and motion for summary judgment on October 29, 2007. (Docket Entry No. 26). GGP moved to intervene on January 14, 2008. Although GGP waited eleven months to file its motion from the time it reasonably should have known of its interest in the case, its intervention at this stage will not cause prejudice to the Sierra Club or FEMA. *See Diaz, 427 F.2d at 1125-6.* If denied intervention, GGP may suffer prejudice because of its property interests relating to the subject of the action.

The Sierra Club asserts that the fact that GGP had a two-year opportunity to participate in HCFCD's computer modeling is an unusual circumstance

weighing against finding that the intervention motion was timely. (Docket Entry No. 31 at 5). The period before the litigation is not relevant to the timeliness of the motion to intervene; GGP neither knew nor should have known of its interest in this litigation before the litigation was filed. GGP's motion to intervene was timely, satisfying the first factor.

The parties do not dispute that GGP has significant property interests relating to the subject of the action. (Docket Entry No. [*16] 31 at 5). The Sierra Club and FEMA assert that this action's disposition will not impair or impede GGP's ability to protect its interests because it may file an administrative appeal of any future flood plain elevation determinations under *42 U.S.C. § 4104* and *44 C.F.R. § 67.* (Docket Entry No. 31 at 5; Docket Entry No. 38 at 4). [**HN9**⬆] The practical impairment standard does not require a proposed intervenor to show that it will be bound by the disposition of the action. *Edwards, 78 F.3d at 1004-05.* The ability of a party seeking intervention to raise its concerns in future proceedings is not sufficient to ensure that the party is able to protect its interests because "the task of reestablishing the status quo" in later proceedings can be "difficult and burdensome." *Fund for Animals, Inc. v. Norton, 355 U.S. App. D.C. 268, 322 F.3d 728, 735 (D.C. Cir. 2003)* (finding that the ability to reverse an unfavorable ruling by bringing a separate lawsuit did not as a practical matter mean that a party seeking to intervene could protect its interests when its revenue losses during any interim period would be substantial and likely irreparable); *see also Natural Res. Def. Council v. Costle, 183 U.S. App. D.C. 11, 561 F.2d 904, 910 (D.C. Cir. 1977)* [*17] ("[I]t is not enough to deny intervention under *24(a)(2)* because applicants may vindicate their interests in some later, albeit more burdensome, litigation."). Courts have found intervention appropriate where a nonparty faces potential consequences in the interim period after entry of judgment. *See, e.g., Fund for Animals, Inc., 322 F.3d at 735* (holding that the possibility of substantial lost revenues during an interim period warranted intervention). An intervenor's interest may also be practically "impaired by the stare decisis effect of the district court's judgment" on subsequent proceedings. *Espy, 18 F.3d at 1207* (quoting *Ceres Gulf v. Cooper, 957 F.2d 1199, 1204 (5th Cir. 1992)).*

Joseph Necker's affidavit states that the flood plain elevation changes requested by the Sierra Club would require GGP to locate and move more than 5.5 million cubic yards of fill to the affected areas, at a cost estimated at $ 28 million. (Docket Entry No. 28, Ex. A,

P11). Regardless of the availability of an administrative appeal, the results of this case may adversely affect GGP's interests in the interim. See *Fund for Animals, Inc., 322 F.3d at 735*. The disposition of this case may also affect GGP's ability **[\*18]** to protect its interests in subsequent administrative proceedings. See *Espy, 18 F.3d at 1207*. The potential for such effects on GGP's interests supports granting intervention as a matter of right.

The Sierra Club and FEMA do not suggest that they adequately represent GGP's interests in this action. The Sierra Club's position is directly opposed to that of GGP, while FEMA is a government agency representing the public interest. (Docket Entry No. 28 at 13). GGP's unique position as the owner and developer of Bridgeland satisfies the fourth prong of the intervention inquiry. All four factors supporting intervention as a matter of right are satisfied; GGP is entitled to intervene.

Even if GGP was not entitled to intervene as a matter of right, permissive intervention would be warranted. As discussed above, GGP's motion was timely. The Sierra Club and FEMA do not suggest that GGP's intervention will prejudice the adjudication of their rights. Nor do the Sierra Club or FEMA claim to represent GGP's interests. Because GGP's property falls within the Upper Cypress Creek watershed area, GGP will raise issues of law and fact consistent with those presently before the court. As a private land developer, **[\*19]** GGP occupies a different position and has different interests than the Sierra Club and FEMA. GGP is in a position to provide evidence of the impact of modified flood elevation levels on private land development in the area, evidence that neither the Sierra Club nor FEMA have an incentive or even ability to develop or submit.

GGP's intervention motion is granted.

### III. The Motion to Stay

#### A. The Legal Standard

*HN10*[⬆️] "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. N. Am. Co., 299 U.S. 248, 254, 57 S. Ct. 163, 81 L. Ed. 153 (1936)*. The power to stay "calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." *Id. at 254-55*. A court must not abuse its inherent power to stay.

*Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., Inc., 761 F.2d 198, 204 n.6 (5th Cir. 1985)*. "Generally, the moving party bears a heavy burden to show why a stay should be granted absent statutory authorization." *Id*. To meet this burden, the moving party should show that its motion is supported by "genuine necessity." *Id*. A court should not **[\*20]** decide a motion to stay based on a party's speculative concerns. See, e.g., *Provencio v. Vazquez, No. 07-CV-0069-AWI-TAG, 2007 U.S. Dist. LEXIS 40380, 2007 WL 1614827, at \*2-4 (E.D. Cal. June 4, 2007)* (recommending that defendant's motion to stay be granted where plaintiff raised only speculative concerns in opposition); *Crosetto v. Heffernan, No. 88-C-433, 1990 U.S. Dist. LEXIS 3053, 1990 WL 32310, at \*2 (N.D. Ill. February 22, 1990)* (granting defendant's motion to stay where defendant raised issues based on "more than mere speculation").

#### B. Analysis

FEMA moves for a stay of eight months after HCFCD's submission of a complete LOMR and/or until the LOMR issues are finally resolved. (Docket Entry No. 46 at 8). FEMA points to HCFCD's February 1, 2008 letter to show that the not-yet-submitted LOMR will contain "a better calibration" of high water mark and flow data for the Upper Cypress Creek watershed. (Docket Entry No. 46 at 6; Docket Entry No. 38, Ex. A). FEMA asserts that "[i]t would be a waste of resources for all parties to litigate Sierra Club's claim on the current DFIRM that will most likely be changed," particularly because future issues can be resolved through its administrative appeal process. (Docket Entry No. 46 at 5-6).

GGP responds **[\*21]** that FEMA has not demonstrated a genuine necessity for a stay and that it is unnecessary because FEMA has already filed its administrative record. (Docket Entry No. 48 at 4-5; Docket Entry No. 52). GGP also argues that the motion "is based purely on speculation" about the timing and results of HCFCD's pending LOMR. (Docket Entry No. 48 at 4-5). GGP objects to the length of the stay requested and asserts that the results of any later possible administrative action are irrelevant to the issue of whether the current action should be stayed. (*Id*. at 6).

HCFCD did not submit a revised LOMR to FEMA as anticipated on March 28, 2008. (Docket Entry No. 44). HCFCD now expects to submit the LOMR near June 9, 2008. (Docket Entry No. 46, Ex. A). The results are unknown. Decision on the motion to stay is deferred. No later than **July 10, 2008,** the parties must file a written

submission stating whether the LOMR has been submitted, the extent of its changes, and the impact of any filing on the motion to stay.

**IV. Conclusion**

GGP's motion to intervene as a matter of right is granted. FEMA's motion to stay is deferred, subject to reviewing the parties' submissions on the expected LOMR.

SIGNED on June 11,  **[*22]** 2008, at Houston, Texas.

/s/ Lee H. Rosenthal

Lee H. Rosenthal

United States District Judge

---

**End of Document**

# APPENDIX B

# TAB 4

1  CHAD A. READLER
   Acting Assistant Attorney General
2  BRIAN STRETCH
   United States Attorney
3  BRETT A. SHUMATE
   Deputy Assistant Attorney General
4  JENNIFER D. RICKETTS
   Director, Federal Programs Branch
5  JOHN R. TYLER
   Assistant Branch Director
6  BRAD P. ROSENBERG (DC Bar #467513)
   Senior Trial Counsel
7  STEPHEN M. PEZZI (DC Bar #995500)
   KATE BAILEY (MD Bar #1601270001)
8  Trial Attorneys
   United States Department of Justice
9  Civil Division, Federal Programs Branch
   20 Massachusetts Avenue, N.W.
10 Washington, DC 20530
   Telephone: (202) 514-3374
11 Facsimile: (202) 616-8460
   E-mail: brad.rosenberg@usdoj.gov
12
   *Attorneys for Defendants*
13

14              **UNITED STATES DISTRICT COURT FOR THE**
                  **NORTHERN DISTRICT OF CALIFORNIA**
15

16 | REGENTS OF UNIVERSITY OF | No. 3:17-cv-05211-WHA |
   | CALIFORNIA and JANET NAPOLITANO, in | No. 3:17-cv-05235-WHA |
17 | her official capacity as President of the | No. 3:17-cv-05329-WHA |
   | University of California, | No. 3:17-cv-05380-WHA |
18 | | No. 3:17-cv-05813-WHA |
19 | Plaintiffs, | |
   | | **DEFENDANTS' NOTICE OF MOTION** |
20 | v. | **AND MOTION TO DISMISS ALL N.D.** |
   | | **CAL. DACA CASES; MEMORANDUM IN** |
21 | UNITED STATES DEPARTMENT OF | **SUPPORT** |
   | HOMELAND SECURITY and ELAINE | |
22 | DUKE, in her official capacity as Acting | Judge: Honorable William Alsup |
   | Secretary of the Department of Homeland | Hearing: December 20, 2017, 8:00 a.m. |
23 | Security, | Place: San Francisco U.S. Courthouse, |
   | | Courtroom 8, 19th Floor |
24 | Defendants. | |
25

26

27

28

# TABLE OF CONTENTS

PAGE

NOTICE OF MOTION AND MOTION TO DISMISS ........................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................... 1

INTRODUCTION .................................................................................................................. 1

BACKGROUND .................................................................................................................... 5

    A.    Deferred Action Generally ....................................................................... 5

    B.    DAPA and DACA ........................................................................................ 6

    C.    The *Texas* Litigation ................................................................................. 7

    D.    Rescission of DACA ................................................................................... 9

    E.    These Actions ............................................................................................. 10

LEGAL STANDARDS .......................................................................................................... 12

ARGUMENT .......................................................................................................................... 13

I.    THESE CASES ARE NOT JUSTICIABLE ................................................................ 14

    A.    The Rescission Policy Is Not Justiciable Because this Immigration
        Enforcement Policy Is a Matter Committed to Agency Discretion
        by Law ......................................................................................................... 14

    B.    The INA Deprives District Courts of Jurisdiction over Challenges
        to Denials of Deferred Action ................................................................... 17

    C.    The University, State, Municipal, and Union Plaintiffs' Claims Are
        Not Cognizable .......................................................................................... 20

        1.    The University, State, Municipal, and Union Plaintiffs Lack
            Article III Standing ........................................................................ 20

        2.    The University, State, Municipal, and Union Plaintiffs Lack
            a Cause of Action Under the APA ................................................ 21

    D.    The Government's Justiciability Objections Are Not Inconsistent with
        the Acting Secretary's Reliance on the Fifth Circuit's Decision ............ 22

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

i

II.  PLAINTIFFS FAIL TO STATE A CLAIM ................................................................. 23

    A.    The Acting Secretary Rationally Explained Her Decision To Wind
    Down DACA, Particularly Given the Imminent Risk of A Nationwide
    Injunction ........................................................................................................ 23

    B.    The Rescission Policy Is Exempt from Notice and Comment ........................... 29

    C.    Plaintiffs Fail to State an Equal Protection Claim ................................... 32

    D.    Plaintiffs Fail to State a Procedural Due Process Claim......................... 35

    E.    Plaintiffs Fail to State a Substantive Due Process Claim. .................... 38

    F.    Plaintiffs' Regulatory Flexibility Act Claim Fails Because Notice-
    and-Comment Procedures Were Not Required..................................... 41

    G.    Plaintiffs' Equitable Estoppel Claims Fail.......................................... 42

III. NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS
    IMPERMISSIBLE ........................................................................................ 45

CONCLUSION ................................................................................................ 46

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

ii

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Aetna Life Ins. Co. v. Haworth*,
   300 U.S. 227 (1937) .......................................................... 45

*Alexander v. Sandoval*,
   532 U.S. 275 (2001) .......................................................... 42

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
   458 U.S. 592 (1982) .......................................................... 21

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
   526 U.S. 40 (1999) ........................................................... 36

*Arizona v. United States*,
   567 U.S. 387 (2012) .................................................. 5, 15, 34

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ........................................ *passim*

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......................................................... 12

*Bates v. Donley*,
   935 F. Supp. 2d 14 (D.D.C. 2013) ..................................... 12, 13

*Bd. of Regents v. Roth*,
   408 U.S. 564 (1972) .......................................................... 36

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) .......................................................... 12

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
   239 U.S. 441 (1915) .......................................................... 38

*Botezatu v. INS*,
   195 F.3d 311 (7th Cir. 1999) ......................................... 18, 19

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.*,
   419 U.S. 281 (1974) ...................................................... 25, 26

*Brittain v. Hansen*,
   451 F.3d 982 (9th Cir. 2006) ................................................ 40

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

iii

*Califano v. Sanders*,
    430 U.S. 99 (1977) ......................................................................................... 12

*Camp v. Pitts*,
    411 U.S. 138 (1973) ....................................................................................... 24

*Cassirer v. Kingdom of Spain*,
    616 F.3d 1019 (9th Cir. 2010) ....................................................................... 12

*Chaudhry v. Holder*,
    705 F.3d 289 (7th Cir. 2013) ........................................................................... 6

*Chavez v. Martinez*,
    538 U.S. 760 (2003) ....................................................................................... 40

*Chevron U.S.A. Inc. v. Echazabal*,
    536 U.S. 73 (2002) ......................................................................................... 25

*Chrysler Corp. v. Braun*,
    441 U.S. 281 (1979) ....................................................................................... 30

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ................................................................................. 15, 23

*Clarke v. Secs. Indus. Ass'n*,
    479 U.S. 388 (1987) ....................................................................................... 21

*Cmty. Nutrition Inst. v. Young*,
    818 F.2d 943 (D.C. Cir. 1987) ....................................................................... 30

*Conn. Bd. of Pardons v. Dumschat*,
    452 U.S. 458 (1981) ....................................................................................... 40

*Consumer Energy Council v. FERC*,
    673 F.2d 425 (D.C. Cir. 1982) ....................................................................... 29

*Cty. of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ....................................................................................... 40

*De Silva v. Smith*,
    773 F.2d 1021 (9th Cir. 1985) ....................................................................... 37

*Decatur Liquors, Inc. v. Dist. of Columbia*,
    478 F.3d 360 (D.C. Cir. 2007) ....................................................................... 38

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

iv

*Dinh Nguy v. County of Yolo,*
  No. 2:14-cv-229-MCE-EFB PS, 2014 WL 4446829 (N.D. Cal. Sept. 9, 2014)........................ 45

*Elgharib v. Napolitano,*
  600 F.3d 597 (6th Cir. 2010) .................................................................. 18

*Emery Min. Corp. v. Sec'y of Labor,*
  744 F.2d 1411 (10th Cir. 1984) .............................................................. 42

*FCC v. Fox TV Stations, Inc.,*
  556 U.S. 502 (2009)...................................................................... 23, 24

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*
  93 F.3d 897 (D.C. Cir. 1996) ................................................................ 22

*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) ........................................................................ 24

*Gerhart v. Lake Cnty.,*
  637 F.3d 1013 (9th Cir. 2011) .............................................................. 39

*Green v. City of Tucson,*
  340 F.3d 891 (9th Cir. 2003) ............................................................... 35

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ................................................................... *passim*

*Heckler v. Community Health Servs.,*
  467 U.S. 51, 104 S. Ct. 2218 (1984) ........................................................ 43

*Helgeson v. Bureau of Indian Affairs, Dep't of Interior,*
  153 F.3d 1000 (9th Cir. 1998) ........................................................... 14, 19

*Herguan Univ. v. Immigration & Customs Enf't,*
  No. 16-cv-06656-LHK, 2017 WL 2797860 (N.D. Cal. June 28, 2017) .................................. 12

*Hoffman Plastic Compounds, Inc. v. NLRB,*
  535 U.S. 137 (2002)........................................................................ 35

*Hyuk Joon Lim v. Holder,*
  710 F.3d 1074 (9th Cir. 2013) .............................................................. 40

*ICC v. Bhd. of Locomotive Eng'rs (BLE),*
  482 U.S. 270 (1987)..................................................................... 14, 16

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

v

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) .................................................................................... 13

*Ky. Dep't of Corrs. v. Thompson*,
  490 U.S. 454 (1989) ................................................................................................... 36

*Lewis v. Casey*,
  518 U.S. 343 (1996) ................................................................................................... 45

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ................................................................................................... 14

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973) ................................................................................................... 20

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ....................................................................................... 12, 20, 29

*Mada-Luna v. Fitzpatrick*,
  813 F.2d 1006 (9th Cir. 1987) ................................................................................... 16

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ................................................................................................... 46

*Mangindin v. Wash. Mut. Bank*,
  637 F. Supp. 2d 700 (N.D. Cal. 2009) ....................................................................... 45

*Marder v. Lopez*,
  450 F.3d 445 (9th Cir. 2006) ..................................................................................... 13

*Marilley v. Bonham*,
  844 F.3d 841 (9th Cir. Dec. 21, 2016) ....................................................................... 35

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ................................................................................................... 21

*McCarthy v. United States*,
  850 F.2d 558 (9th Cir. 1988) ..................................................................................... 12

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1867) ..................................................................................... 22

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ................................................................................................... 46

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

vi

*Morgan v. United States*,
    304 U.S. 1 (1938) ................................................................................................ 24

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
    463 U.S. 29 (1983) .............................................................................................. 23

*Munoz v. Ashcroft*,
    339 F.3d 950 (9th Cir. 2003) .............................................................................. 41

*N.W. Mining Ass'n v. Babbitt*,
    5 F. Supp. 2d 9 (D.D.C. 1998) ........................................................................... 41

*Nat'l Ass'n of Regulatory Utility Comm'rs v. U.S. Dep't of Energy*,
    851 F.2d 1424 (D.C. Cir. 1988) .......................................................................... 31

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ............................................................................ 30

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ............................................................................................ 42

*Omar v. McHugh*,
    646 F.3d 13 (D.C. Cir. 2011) .............................................................................. 36

*Pac. Gas & Elec. Co. v. FPC*,
    506 F.2d 33 (D.C. Cir. 1974) .............................................................................. 30

*Perales v. Casillas*,
    903 F.2d 1043 (5th Cir. 1990) ............................................................................ 16

*Perez v. Mortgage Bankers Ass'n*,
    135 S. Ct. 1199 (2015) .................................................................................. 28, 43

*Rempfer v. Sharfstein*,
    583 F.3d 860 (D.C. Cir. 2009) ....................................................................... 12, 13

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
    525 U.S. 471 (1999) .................................................................................... *passim*

*Robinson v. United States*,
    586 F.3d 683 (9th Cir. 2009) .............................................................................. 12

*Salgado-Diaz v. Gonzales*,
    395 F.3d 1158 (9th Cir. 2005) ............................................................................ 44

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

vii

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
   411 U.S. 1 (1973) ..................................................................... 35

*San Luis Obispo Mothers for Peace v. U.S. N.R.C.*,
   789 F.2d 26 (D.C. Cir. 1986) ................................................... 24

*Syncor Int'l Corp. v. Shalala*,
   127 F.3d 90 (D.C. Cir. 1997) ................................................... 30

*Syracuse Peace Council v. FCC*,
   867 F.2d 654 (D.C. Cir. 1989) ................................................. 26

*Tefel v. Reno*,
   180 F.3d 1286 (11th Cir. 1999) ............................................... 41

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................. 13

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ............................................ *passim*

*Town of Castle Rock v. Gonzales*,
   545 U.S. 748 (2005) ................................................................. 36

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017) ............................................................. 45

*Troy Corp. v. Browner*,
   120 F.3d 277 (D.C. Cir. 1997) ................................................. 24

*U.S. Telecom Ass'n v. FCC*,
   400 F.3d 29 (D.C. Cir. 2005) ................................................... 41

*United States v. Armstrong*,
   517 U.S. 456 (1996) .......................................................... *passim*

*United States v. Browning*,
   630 F.2d 694 (10th Cir.1980) .................................................. 43

*United States v. Morgan*,
   313 U.S. 409 (1941) ................................................................. 24

*United States v. Ritchie*,
   342 F.3d 903 (9th Cir. 2003) ................................................... 13

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

viii

*United States v. Texas*,
   136 S. Ct. 2271 (2016) ............................................................................... 8

*United States v. Texas*,
   137 S. Ct. 285 (2016) ................................................................................. 8

*Univ. Med. Ctr. of S. Nev. v. Shalala*,
   173 F.3d 438 (D.C. Cir. 1999) .................................................................. 13

*Vasquez v. Aviles*,
   639 F. App'x 898 (3d Cir. 2016) ............................................................... 18

*Velasco-Gutierrez v. Crossland*,
   732 F.2d 792 (10th Cir. 1984) .................................................................. 37

*Washington v. Davis*,
   426 U.S. 229 (1976) .................................................................................. 33

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) .................................................................................. 40

*Watkins v. United States Army*,
   875 F.2d 699 (9th Cir. 1989) ............................................................... 43, 44

*Yassini v. Crosland*,
   618 F.2d 1356 (9th Cir. 1980) .................................................................. 38


**STATUTES**

5 U.S.C. § 553 .............................................................................. 3, 29, 30

5 U.S.C. § 601 ....................................................................................... 41

5 U.S.C. § 604 ....................................................................................... 41

5 U.S.C. § 611 ....................................................................................... 41

5 U.S.C. § 701 .......................................................................... 14, 16, 19

5 U.S.C. § 702 ....................................................................................... 21

5 U.S.C. § 706 ....................................................................................... 23

6 U.S.C. § 202 ....................................................................................... 18

6 U.S.C. § 251 ....................................................................................... 18

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

ix

6 U.S.C. § 557 ................................................................................................ 18

8 U.S.C. § 1103 ................................................................................................ 5

8 U.S.C. § 1227 ................................................................................................ 5

8 U.S.C. § 1229b .............................................................................................. 5

8 U.S.C. § 1252 (g) ................................................................................... *passim*

8 U.S.C. § 1154 ................................................................................................ 5

8 U.S.C. § 1158 ................................................................................................ 5

8 U.S.C. § 1182 ................................................................................................ 5

28 U.S.C. § 2201 ............................................................................................ 45


**RULES**

Fed. R. Civ. P. 8(c) ........................................................................................ 42

Fed. R. Civ. P. 12 ..................................................................................... 12, 13


**REGULATIONS**

8 C.F.R. § 274a.12(c)(14) ........................................................................... 5, 6


**OTHER AUTHORITIES**

Attorney General's Manual on the Administrative Procedure Act 30 (1947) ............................... 30

DHS DACA FAQ,
    https://go.usa.gov/xngCd ............................................................ 7, 28, 37, 39, 44

Press Release, DHS
    Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
    https://go.usa.gov/xncuM ......................................................................... 25

U.S. Dep't of Justice, Office of Legal Counsel,
    *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens
    Unlawfully Present*, 38 Op. O.L.C. (Nov. 19, 2014),
    https://www.justice.gov/file/179206/download ............................................... 28

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

x

USCIS, Policy Memorandum (Nov. 7, 2011),
    https://go.usa.gov/xncPK. ........................................................................................................... 7

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

xi

CHAD A. READLER
Acting Assistant Attorney General
BRIAN STRETCH
United States Attorney
BRETT A. SHUMATE
Deputy Assistant Attorney General
JENNIFER D. RICKETTS
Director, Federal Programs Branch
JOHN R. TYLER
Assistant Branch Director
BRAD P. ROSENBERG (DC Bar #467513)
Senior Trial Counsel
STEPHEN M. PEZZI (DC Bar #995500)
KATE BAILEY (MD Bar #1601270001)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, DC 20530
Telephone: (202) 514-3374
Facsimile: (202) 616-8460
E-mail: brad.rosenberg@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| REGENTS OF UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | No. 3:17-cv-05211-WHA <br> No. 3:17-cv-05235-WHA <br> No. 3:17-cv-05329-WHA <br> No. 3:17-cv-05380-WHA <br> No. 3:17-cv-05813-WHA <br><br> **DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS ALL N.D. CAL. DACA CASES; MEMORANDUM IN SUPPORT** <br><br> Judge: Honorable William Alsup <br> Hearing: December 20, 2017, 8:00 a.m. <br> Place: San Francisco U.S. Courthouse, Courtroom 8, 19th Floor |

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on December 20, 2017, at 8:00 a.m., before the Honorable William Alsup of the United States District Court for the Northern District of California, in Courtroom 8 of the 19th Floor of the Philip E. Burton Courthouse and Federal Building, 450 Golden Gate Avenue, San Francisco, California, Defendants will move this Court to dismiss all claims in the following related matters (hereinafter, "DACA cases"):

- No. 3:17-cv-05211-WHA, *Regents of the University of California, et al. v. U.S. Dep't of Homeland Security, et al.*

- No. 3:17-cv-05235-WHA, *State of California, et al. v. U.S. Dep't of Homeland Security, et al.*

- No. 3:17-cv-05329-WHA, *City of San Jose v. Trump, et al.*

- No. 3:17-cv-05380-WHA, *Garcia, et al. v. United States of America, et al.*

- No. 3:17-cv-05813-WHA, *County of Santa Clara, et al. v. Trump, et al.*

Defendants' motion to dismiss is being made pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The basis for this motion is set forth more fully in the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In 2012, then-Secretary of Homeland Security Janet Napolitano adopted the policy now known as DACA, or Deferred Action for Childhood Arrivals. DACA made deferred action—a practice by which the Secretary exercises individualized enforcement discretion to issue a reversible notification that she does not intend to remove an alien for a set period of time—available to a class of unlawfully present aliens who came to the United States as children. In 2014, one of her successors expanded the parameters of DACA and adopted a similar policy known as DAPA, or Deferred Action for Parents of Americans. DAPA, if implemented, would have made deferred action available to unlawfully present aliens who were parents of U.S. citizens and lawful permanent residents.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

1

DAPA, including its expansion of DACA, was promptly challenged by a coalition of 26 states. Although then-Secretary of Homeland Security Jeh Johnson vigorously defended the policy, he was rebuffed at every turn: the district court for the Southern District of Texas issued a nationwide preliminary injunction; the Fifth Circuit affirmed, declaring the policy "manifestly contrary" to the Immigration and Nationality Act (INA); and an equally divided Supreme Court affirmed, leaving the injunction in place.

Armed with this victory, the states threatened to amend their complaint to challenge not just DAPA, but DACA as well, arguing that it suffers from the same infirmities. In view of the substantial similarities between the two policies, the significant litigation risk posed by the Supreme Court and Fifth Circuit decisions, and the Attorney General's view that DACA was in fact unlawful, Acting Secretary of Homeland Security Elaine C. Duke was faced with two options. On the one hand, she could wind down DACA in an orderly fashion, minimizing the disruption to current recipients. On the other, continued litigation would in all likelihood result in a nationwide injunction abruptly ending the policy, plunging its nearly 800,000 recipients into uncertainty.

The Acting Secretary chose the less disruptive option: an orderly process that formally rescinds DACA but allows it to sunset. Under this Rescission Policy, no DACA recipient will have his or her deferred action abruptly terminated based solely on the Rescission Policy; instead, prior grants will remain valid for the remainder of their stated duration (generally two years) before ending consistent with their stated terms. Any DACA recipient whose deferred action was due to expire within six months was given a month to request another two-year renewal. And although the agency stopped accepting new DACA requests, it will finish processing those it had received when the rescission began.

In these five related cases, Plaintiffs—the University of California system and its president, four states, the City of San Jose, a group of individual DACA recipients, and Santa Clara County and a local labor union—challenge the Rescission Policy on a variety of statutory, constitutional, and common-law grounds, urging the Court to invalidate the agency's decision and enjoin the Acting Secretary from rescinding DACA. There is no basis to do so.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

2

To begin, this case is not justiciable. The Rescission Policy is a classic exercise of enforcement discretion "presumed immune from judicial review," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and particularly unfettered in the context of immigration, *see Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 487–92 (1999). In fact, Congress has stripped district courts of jurisdiction to review "'no deferred action' decisions and similar discretionary determinations" such as the one here. *AADC*, 525 U.S. at 485; *see* 8 U.S.C. § 1252(g). At a minimum, the university, state, municipal, and union Plaintiffs cannot proceed due to their lack of standing and a cause of action. The Court should not permit Plaintiffs to circumvent these bedrock limits on judicial review.

On the merits, Plaintiffs' claims fail as a matter of law. Their claim that the Rescission Policy is arbitrary and capricious under the Administrative Procedure Act (APA) because it was inadequately supported on the record is fundamentally misguided. Agencies are always free to change course on policy matters so long as they provide a rational explanation. Here, the Acting Secretary's explanation of her decision to rescind DACA amply meets that deferential standard, particularly given the adverse ruling from the Fifth Circuit and the Supreme Court's affirmance, the evident similarities between DACA and the policy that expanded DACA and created DAPA, the Attorney General's opinion that DACA was likewise unlawful, and the imminent risk of a nationwide injunction with potentially chaotic results. Importantly, because this claim can be resolved now based on the Complaints, the documents attached or incorporated by reference therein, and other judicially noticeable materials (including those in the administrative record), the Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside the Rescission Policy if it disagrees.

Plaintiffs' notice-and-comment claim is equally unavailing. The APA exempts "general statements of policy" from notice and comment, 5 U.S.C. § 553(b), and the Rescission Policy is a reordering of enforcement priorities that readily qualifies. Indeed, the Department of Homeland Security (DHS) and the former Immigration and Naturalization Service (INS) have adopted more than 20 deferred action or similar policies over the past 50 years. Few have gone through notice and comment, and there is no warrant for those procedures here. Nor does the

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

3

Fifth Circuit's ruling that the states established a substantial likelihood of success on their claim that the promulgation of DAPA required notice and comment mean that the rescission of DACA and a return to the *status quo ante* must likewise meet these procedural demands. Plaintiffs' Regulatory Flexibility Act (RFA) claim fails for the same reason, as that Act applies only where notice and comment is required. And in any event, if DACA's rescission required notice and comment, then DACA was void from the outset because its adoption would also have required notice and comment *a fortiori*.

Plaintiffs' equal protection claims get them no further. To the extent that a discriminatory motive claim—here, that the Policy was motivated by animus toward Mexican nationals—can ever be brought in a context like this one, *but see AADC*, 525 U.S. at 487–92, Plaintiffs must allege a clear case of discrimination given that they challenge an exercise of enforcement discretion, *see United States v. Armstrong*, 517 U.S. 456 (1996). They have failed to do so. Nor can Plaintiffs show that the Rescission Policy trenches on any fundamental right.

Plaintiffs' due process claims also cannot survive a motion to dismiss. DACA recipients have no protected liberty or property interest in the continued availability of deferred action, which is an exercise of prosecutorial discretion that confers no rights and is revocable at any time. Moreover, the Ninth Circuit has held that aliens—including those brought here as children—have no substantive due process right to stay in the United States, thus further dooming Plaintiffs' substantive due process claim.

Finally, Plaintiffs cannot state an equitable estoppel claim because estoppel does not run against the government. And even if they could, Plaintiffs fail to allege facts sufficient to make out such a claim.

In sum, even if Plaintiffs' challenge were somehow justiciable, the assumption underlying it would compel dismissal. DAPA—including its expansion of DACA—was enjoined by the Fifth Circuit, and that holding was affirmed by the Supreme Court. The original DACA policy is materially indistinguishable as a legal matter. At bottom, Plaintiffs' argument is that, when making discretionary enforcement determinations, federal agencies must ignore the legal rulings and reasoning of federal courts. To state the premise of this claim is to refute it.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

4

These five cases should all be dismissed.

## BACKGROUND

### A.    Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the INA along with "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396 (citation omitted). DHS officials must first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum, parole, or cancellation of removal, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b. "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely. *AADC*, 525 U.S. at 483.

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016). Deferred action is a practice by which the Secretary exercises her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period. *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority"). Although originally "developed without express statutory authority," individualized deferred action has been recognized by Congress in certain circumstances inapplicable here, *see, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"), and described by the

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

5

Supreme Court as an "exercise in administrative discretion," *AADC*, 525 U.S. at 484. Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former INS have adopted over 20 such policies over the past 50 years—rarely through notice-and-comment rulemaking.

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, under DHS regulations not challenged here. *See, e.g.*, 8 C.F.R. § 274a.12(c)(14). That decision does not, however, confer lawful immigration status or provide any defense to removal. *Cf. Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (discussing difference between "unlawful presence" and "unlawful status"). To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (citation omitted). DHS thus has discretion to revoke deferred action unilaterally, for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time. *See AADC*, 525 U.S. at 484–85.

## B.     DAPA and DACA

On June 15, 2012, then-Secretary Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals. *See* Admin. R. (AR) 1–3, ECF No. 64-1[1]; *see also* Compl. Ex. D, *State of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05235-WHA, ECF No. 1-4 (DACA Memo). DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws. DACA Memo at 1 (AR 1). Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to indefinite renewal. *Id.* at 2-3 (AR 2-3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests for this relief would "be decided on a case by case basis," *id.* at 2 (AR 2). Accordingly, the Memo provided that this grant of deferred action

---

[1] Unless otherwise noted, all references to the docket refer to the docket in *Regents of the University of California v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211-WHA.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

"confer[red] no substantive right, immigration status or pathway to citizenship.  Only the Congress, acting through its legislative authority, can confer these rights."  *Id.* at 3 (AR 3).

In public guidance published on its website, DHS also informed DACA requestors that information in their requests will be "protected from disclosure to [Immigration & Customs Enforcement (ICE)] and [Customs & Border Patrol (CBP)] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised).  DHS DACA FAQ No. 19, Compl. Ex. E, *State of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05235-WHA, ECF No. 1-5 (https://go.usa.gov/xngCd); *see* USCIS, Policy Memorandum (Nov. 7, 2011) (Notice to Appear Guidance), https://go.usa.gov/xncPK.  DHS instructed, however, that this information-sharing policy creates no rights and "may be modified, superseded, or rescinded at any time without notice."  DHS DACA FAQ No. 19.

In 2014, then-Secretary Jeh Johnson expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. *See* AR 37–41 (DAPA Memo).  DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents."  DAPA Memo at 3 (AR 39).  The DAPA Memo also expanded DACA by relaxing the eligibility criteria and extending the DACA renewal period from two to three years.  *Id.* at 3–4 (AR 39-40).

**C.**   **The *Texas* Litigation**

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states, led by Texas, which sought to enjoin its implementation.  Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of the DAPA Memo.  *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  Like the U.S. District Court for the Southern District of Texas, the Fifth Circuit held that the promulgation of the DAPA Memo was justiciable, in part because it believed that "the INA's intricate regulatory scheme for changing immigration classifications" allowed the court to determine whether DHS had exceeded its statutory authority.  *Id.* at 168.  It stressed, however, that "the *denial* of

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

voluntary departure and work authorization" would be unreviewable. *Id.* Also like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the APA's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Id.* at 178 n.156. And going beyond the district court, the Fifth Circuit held that DAPA was "manifestly contrary" to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one legal status to another," DAPA awarded deferred action "to persons who have never had a legal status and may never receive one." *Id.* at 184, 186 (footnotes omitted).

That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in place. On November 18, 2016, the parties jointly moved the district court to stay merits proceedings to allow them to evaluate "how they might choose to move forward" given the upcoming "change in Administration[s]." Joint Mot. to Stay Merits ¶ 2, *Texas v. United States*, No. 14-254 (S.D. Tex. Nov. 18, 2016) (ECF No. 430).

Faced with continued litigation over a policy that had been enjoined by the courts, DHS rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA. *See* Memorandum for Kevin McAleenan, Acting Commissioner, U.S. Customs and Border Protection, et al., from John F. Kelly, Secretary of Homeland Security, *Re: Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents* (June 15, 2017), AR 235-37. Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to also challenge directly the DACA Memo, arguing that it suffers from the same legal infirmities as the DAPA Memo. *See* AR 238–40 (Paxton Letter).

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

8

### D. Rescission of DACA

Faced again with the prospect of continued litigation, Acting Secretary Duke decided on September 5, 2017, to wind down the DACA policy in an orderly fashion. *See* AR 252–56 (Rescission Policy or Policy); *see also* Compl. Ex. A, *State of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05235-WHA, ECF No. 1-1. As the Acting Secretary explained, "[t]aking into consideration the Supreme Court's and Fifth Circuit's ruling in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy at 4 (AR 255). Specifically, she quoted the Attorney General's September 4 recommendation to rescind DACA, which explained that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254). Invoking her "authority in establishing national immigration policies and priorities," she rescinded the DACA Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on an individualized[,] case-by-case basis," *id.* at 2 (AR 253).

At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

- For *current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods." *Id.* at 4 (AR 255)

- For *initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date. *Id.*

- For *DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017. Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017." *Id.*

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural,

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

9

enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id.* at 4 (AR 255). The Rescission Policy says nothing about (and makes no changes to) DHS's information-sharing policy.

### E. These Actions

Plaintiffs in these five related lawsuits raise seven overlapping sets of claims. First, they allege that the Rescission Policy is arbitrary and capricious and therefore violates the APA because it constitutes a change in agency policy without an adequate explanation or basis. *See Regents of Univ. of Cal.* Compl. ¶¶ 50-58 (Count 1), No. 3:17-cv-05211 ECF No. 1; *State of Cal.* Compl. ¶¶ 152-155 (Count 3), No. 3:17-cv-05235 ECF No. 1; *Garcia* Compl. ¶ 175 (Count 4), No. 3:17-cv-05380 ECF No. 1; *Cty. of Santa Clara* Compl. ¶ 71 (Count 2), No. 3:17-cv-05813 ECF No. 1. The *Garcia* and *County of Santa Clara* Plaintiffs also allege that the rescission is arbitrary and capricious because DHS, in rescinding DACA, allegedly "disregard[ed]" the "reliance" of DACA recipients in providing personal information to the government. *See Garcia* Compl. ¶ 172; *see generally id.* ¶¶ 165-184 (Counts 4 & 5); *Cty. of Santa Clara* Compl. ¶ 72; *see generally id.* ¶¶ 67-73 (Count 2). The *Garcia* Plaintiffs also quarrel with DACA's rescission both by claiming that the government improperly provided for a wind-down period, and then claiming that the wind-down period is unreasonably "short." *Garcia* Compl. ¶¶ 173-174; *see generally id.* ¶¶ 165-184 (Counts 4 & 5). Finally, the Garcia Plaintiffs repackage their constitutional claims under the rubric of the APA. *See Garcia* Compl. ¶¶ 160-164 (Count 3).

Second, Plaintiffs allege that the rescission violates the APA because it was issued without notice and comment. *See Regents of Univ. of Cal.* Compl. ¶¶ 59-66 (Count 2); *State of Cal.* Compl. ¶¶ 146-151 (Count 2); *City of San Jose* Compl. ¶¶ 59-63 (Count 2), No. 3:17-cv-05329 ECF No. 1; *Garcia* Compl. ¶¶ 177-184 (Count 5).

Third, Plaintiffs allege that the rescission violates procedural due process because DACA recipients will be deprived of their interests in their DACA status without notice or an opportunity to be heard. *See Regents of Univ. of Cal.* Compl. ¶¶ 67-73 (Count 3); *Garcia* Compl. ¶¶ 133-147 (Count 1); *Cty. of Santa Clara* Compl. ¶¶ 59-66 (Count 1).

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

10

Fourth, Plaintiffs suggest that the rescission violates DACA recipients' substantive due process rights because the government has allegedly changed its policy regarding the use of DACA-related information, including that the government will allegedly use such information for enforcement purposes in a manner that is not "fundamentally fair." *State of Cal.* Compl. ¶¶ 141-145 (Count 1); *Garcia* Compl. ¶¶ 133-147 (Count 1); *Cty. of Santa Clara* Compl. ¶¶ 59-66 (Count 1).

Fifth, Plaintiffs contend that the rescission violates the Equal Protection component of the Fifth Amendment's Due Process Clause because it was allegedly motivated by discriminatory animus against Mexican and Latino immigrants. *City of San Jose* Compl. ¶¶ 52-58 (Count 1); *Garcia* Compl. ¶¶ 148-159 (Count 2); *Cty. of Santa Clara* Compl. ¶¶ 74-78 (Count 3). The State of California Plaintiffs also claim that the rescission of DACA violates equal protection principles because it "violates fundamental conceptions of justice by depriving DACA grantees . . . of their substantial interests in pursuing a livelihood and to support themselves and further their education." *State of Cal.* Compl. ¶¶ 172-177 (Count 6).

Sixth, Plaintiffs allege that the rescission violates the Regulatory Flexibility Act because it was unaccompanied by a regulatory flexibility analysis. *State of Cal.* Compl. ¶¶ 156-163 (Count 4); *Garcia* Compl. ¶¶ 185-191 (Count 6).

Seventh, Plaintiffs bring equitable estoppel claims, alleging that DACA recipients provided detailed personal information to the government and "rearranged their lives" based on the government's representations, but now face the possibility of removal and deportation. On that basis, Plaintiffs argue that the government should be equitably estopped from terminating DACA or from using DACA information for enforcement purposes. *State of Cal.* Compl. ¶¶ 164-171 (Count 5); *Garcia* Compl. ¶¶ 192-199 (Count 7); *Cty. of Santa Clara* Compl. ¶¶ 79-86 (Count 4).

Finally, Plaintiffs seek declaratory judgments and injunctive relief. *Regents of Univ. of Cal.* Compl. 16, Prayer for Relief; *State of Cal.* Compl. 35-36, Prayer for Relief; *City of San Jose* Compl. 15-16, Prayer for Relief; *Garcia* Compl. 43, Prayer for Relief & ¶¶ 200-205 (Count 8); *Cty. of San Jose* Compl. 26-27, Prayer for Relief.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

11

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must establish a court's jurisdiction through sufficient allegations. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In evaluating its jurisdiction, this Court should not "rely simply on the allegations in the complaint to determine subject matter jurisdiction. [It] must instead look to facts outside the pleadings to determine whether [it] has jurisdiction." *Cassirer v. Kingdom of Spain,* 616 F.3d 1019, 1043 n.7 (9th Cir. 2010) (citing *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009)); *see also McCarthy v. United States,* 850 F.2d 558, 560 (9th Cir. 1988) ("[W]hen considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction."). Furthermore, "[n]o presumptive truthfulness attaches to plaintiffs' allegations. Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence." *Robinson*, 586 F.3d at 685 (citations omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

With respect to Plaintiffs' APA claims, "the Court may consider matters outside the pleadings without converting Defendants' Motion to Dismiss to a motion for summary judgment." *Herguan Univ. v. Immigration & Customs Enf't*, No. 16-cv-06656-LHK, 2017 WL 2797860, at *8 (N.D. Cal. June 28, 2017). "[W]hen a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal." *Id.* (alterations in original) (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)); *see also Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013) (citing *Rempfer*, 583 F.3d at 865). "Accordingly, '[t]he entire case on review is a question of law, and the complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action.'" *Herguan Univ.*, 2017 WL 2797860, at *8 (quoting *Rempfer*,

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

12

583 F.3d at 865).  Under these circumstances, review "is based on the agency record and limited to determining whether the agency acted arbitrarily and capriciously." *Id.* (quoting *Rempfer*, 583 F.3d at 865); *see also Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n. 3 (D.C. Cir. 1999) (explaining that when reviewing agency action the question of whether the agency acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record, regardless of whether it is presented in the context of a motion for judgment on the pleadings or in a motion for summary judgment).

Even outside the context of the APA, the Court may consider "matters of judicial notice." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (citations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The Court may also consider exhibits that are submitted with the complaint, *see Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005), as well as "evidence on which the complaint 'necessarily relies' if:  (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion," *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (citations omitted).  A court may treat such a document as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Ritchie*, 342 F.3d at 908.[2]

## ARGUMENT

In seeking to invalidate the Rescission Policy, Plaintiffs ask the Court to override the Acting Secretary's judgment about how to exercise her discretion in enforcing the Nation's immigration laws.  The Court need not consider this extraordinary request, however, because this case is not justiciable.  The exercise of enforcement discretion in the Rescission Policy is committed to agency discretion by law and is therefore unreviewable.  In fact, Congress has gone so far as to strip district courts of jurisdiction over "no deferred action" decisions such as the one here.  At a minimum, the university, state, municipal, and union Plaintiffs lack standing.  And in all events, Plaintiffs fail to state a claim.  These cases should therefore be dismissed.

---

[2] In the alternative, however, the Court may if it wishes convert this motion to one for summary judgment.  *See Bates*, 935 F. Supp. 2d at 17, 19.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

I. **THESE CASES ARE NOT JUSTICIABLE**

    A. **The Rescission Policy Is Not Justiciable Because this Immigration Enforcement Policy Is a Matter Committed to Agency Discretion by Law**

    **1.** The APA bars judicial review of certain categories of decisions that "courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (quoting 5 U.S.C. § 701(a)(2)). These decisions are typically unreviewable because there exists "no meaningful standard against which to judge the agency's exercise of discretion" in these areas. *Chaney*, 470 U.S. at 830. Moreover, review is particularly inappropriate where "the subject matter is 'an area of executive action in which the courts have long been hesitant to intrude.'" *Helgeson v. Bureau of Indian Affairs, Dep't of Interior*, 153 F.3d 1000, 1003 (9th Cir. 1998) (quoting *Lincoln*, 508 U.S. at 191). This bar applies even when "the agency gives a 'reviewable' reason for otherwise unreviewable action." *ICC v. Bhd. of Locomotive Eng'rs* (*BLE*), 482 U.S. 270, 283 (1987).

    Among the decisions committed to executive discretion are "an agency's exercise of enforcement power." *Chaney*, 470 U.S. at 833. Such judgments involve "a complicated balancing of factors which are peculiarly within [an agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall priorities, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* at 831. As there is "no meaningful standard against which to judge the agency's exercise of discretion" in weighing these factors, an agency's exercise of enforcement powers is "presumed immune from judicial review under § 701(a)(2)." *Id.* at 830, 832.

    For instance, an "agency decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* at 831 (citation omitted). After all, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," and it "is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

14

An agency's decision *to* enforce the law against a particular individual is likewise presumptively unreviewable. Just as "the decision whether or not to prosecute" presumptively "rests entirely in [the prosecutor's] discretion," *Armstrong*, 517 U.S. at 464 (citation omitted), an agency's decision to bring a civil enforcement action is generally not open to judicial scrutiny. Considerations such as "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall priorities" are equally present in enforcement decisions as in nonenforcement decisions, *Chaney*, 470 U.S. at 831, and judicial intrusion into the deliberative process is equally improper, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("there must be a strong showing of bad faith or improper behavior before courts can engage in an "inquiry into the mental processes of administrative decisionmakers" (citation omitted)), *abrogated on other grounds by Califano v. Sanders*, 40 U.S. 99 (1977).

This presumption of nonreviewability applies with particular force when it comes to immigration. On top of the general concerns implicated in any enforcement decision, the enforcement of immigration laws "embraces immediate human concerns," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 396–97. Given these realities, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Id.* at 396. One form of that broad discretion is deferred action, a "discretionary and reversible" decision to notify an alien that DHS has chosen not to seek his removal for a specific period of time. *Arpaio*, 797 F.3d at 17; *see supra* at 5-6. Like other agency nonenforcement decisions, grants of deferred action rest on a complex balancing of policy considerations that cannot serve as "meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830. Such determinations are thus presumptively unreviewable. *See Arpaio*, 797 F.3d at 16.

The converse is equally true: *denials* of deferred action are also committed to agency discretion. *See AADC*, 525 U.S. at 485 (treating "'no deferred action' decisions" as "discretionary determinations"). Because "[g]ranting an illegally present alien permission to

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

remain and work in this country" is fundamentally "a dispensation of mercy," there are "no standards by which judges may patrol its exercise." *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (INS's decision not to grant pre-hearing voluntary departures and work authorizations to a group of aliens non-justiciable). To be sure, a decision "not to grant deferred action status to a particular alien is not precisely a 'decision not to take enforcement action,'" but that does not obscure the fact that "many of the same factors" underlying the latter determinations usually play a role in the former. *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 n.4 (9th Cir. 1987) ("denials of deferred action status applications are not subject to judicial review" under § 701(a)(2)).

**2.** As an exercise of enforcement discretion, the Rescission Policy is a classic example of a discretionary determination that is entrusted to the agency alone. Indeed, any attempt to judge the Policy would quickly entangle this Court in the sort of complex and discretionary balancing that has been entrusted by Congress to the Executive Branch. For example, the judiciary is institutionally ill-equipped to assess whether the Acting Secretary's decision to change "immigration policies and priorities" by rescinding DACA, Rescission Policy at 4 (AR 255), was an appropriate use of "the Department's limited resources," *Arpaio*, 797 F.3d at 16. Nor is this Court well suited to second-guess the Acting Secretary's balancing of the costs and benefits of keeping the policy in place, on one hand, with the risk of "potentially imminent litigation" that could throw DACA into immediate turmoil, on the other. Rescission Policy at 3 (AR 254) (citation omitted).

To be sure, the Acting Secretary *also* gave substantive legal reasons for her decision, *id.* at 2–4 (AR 253–55), but that does not render it justiciable. That is because the Supreme Court has rejected the proposition that if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *BLE*, 482 U.S. at 283. For example, "a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction," which "is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point." *Id.* But that does not change the fact that "it is entirely clear that the refusal to prosecute

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

cannot be the subject of judicial review." *Id.* Likewise, the Acting Secretary's discussion of the question of DACA's legality does not transform her generally unreviewable exercise of enforcement discretion into a matter fit for judicial scrutiny.

Indeed, reviewing the Rescission Policy would be particularly inappropriate given the wide discretion the Secretary enjoys in the enforcement of the immigration laws. In *AADC*, the Supreme Court held that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation," 525 U.S. at 488 (footnote omitted), subject to the "possib[le]" exception "of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome," *id.* at 491. The reason for this highly restrictive rule is that the concerns raised by challenges to the Executive's enforcement discretion "are greatly magnified in the deportation context." *Id.* at 490. An alien subject to removal is, by definition, in continuing violation of the INA, and judicial interference with the Executive's enforcement therefore would compel the Executive to disregard such ongoing violations. The "delay" associated with challenges to discretionary decisions not to forgo enforcement is more likely than in the criminal arena, as "[p]ostponing justifiable deportation (in the hope that the alien's status will change … or simply with the object of extending the alien's unlawful stay) is often the principal object of resistance to a deportation proceeding," and "the consequence is to permit and prolong a continuing violation" of the immigration laws. *Id.* at 490. For another, reviewing immigration decisions may involve "not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives" or other sensitive matters as well. *Id.* at 490–91. Finally, the idea that "an ongoing violation of United States law . . . must be allowed to continue because it has been improperly selected is not powerfully appealing." *Id.* at 491 (emphasis omitted).

**B.    The INA Deprives District Courts of Jurisdiction over Challenges to Denials of Deferred Action**

Not only is the denial of deferred action committed to agency discretion under the APA, but the INA itself deprives federal district courts of jurisdiction over challenges to such denials

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

altogether.  As the Supreme Court explained in *AADC*, the Executive's "exercise of [its] discretion" in granting deferred action in some circumstances had "opened the door to litigation . . . where" the Executive had "chose[n] *not* to exercise it."  *Id.* at 484.  Specifically, some courts had entertained challenges to "the refusal to exercise such discretion" on various bases such as "selective prosecution," the use of "arbitrary or unconstitutional criteria, or on other grounds constituting abuse of discretion."  *Id.* at 485 (citation omitted).  To address what the Supreme Court referred to as this "particular evil"—*i.e.*, "attempts to impose judicial constraints upon prosecutorial discretion"—Congress enacted 8 U.S.C. § 1252(g).  *Id.* at 485 & n.9.

Section 1252(g) commands that, outside of petitions for review from final removal orders and certain other limited channels for review, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security[3]] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act."  These were "the acts … that had prompted challenges to the … exercise of prosecutorial discretion" in denying deferred action, and thus § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed"—namely, an individual removal proceeding.  *AADC*, 525 U.S. at 485 & n.9.

Denials of deferred action—including under DACA itself—thus fall outside the jurisdiction of the federal courts.  *See, e.g.*, *Vasquez v. Aviles*, 639 F. App'x 898, 901 (3d Cir. 2016) ("[Section] 1252(g) … deprives all courts of jurisdiction to review a denial of DACA relief because that decision involves the exercise of prosecutorial discretion not to grant a deferred action."); *Botezatu v. INS*, 195 F.3d 311, 314 (7th Cir. 1999) ("Review of refusal to grant deferred action is … excluded from the jurisdiction of the district court.").

---

[3] *See* 6 U.S.C. § 557; *see also id.* §§ 202, 251; *Elgharib v. Napolitano*, 600 F.3d 597, 607 (6th Cir. 2010) ("[U]nder 6 U.S.C. § 557, . . . the statutory reference to the 'Attorney General' in § 1252(g) now means 'Secretary of DHS.'").

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

To be sure, Plaintiffs brought this challenge to the Rescission Policy before any removal proceedings took place, but that is beside the point. The decision not to continue deferred action is an ingredient to the commencement of enforcement proceedings at some future date, and a person cannot circumvent the bar in 8 U.S.C. § 1252(g) by singling out that single step for a preemptive challenge. Indeed, if aliens (or entities suing on their behalf) could evade § 1252(g)'s bar simply by challenging the forthcoming expiration of deferred action before actual removal proceedings (if any) began, then jurisdiction would turn on a race to the courthouse. Such a framework would create the perverse incentive for DHS to begin removal proceedings immediately rather than to allow, as it did here, for rolling expirations of deferred action status over a two-and-a-half year period. There is no indication that Congress sought to enact such a nonsensical regime. Instead, § 1252(g) precludes review of either "the decision *or action*" by the Acting Secretary "to commence proceedings," and thereby sweeps in the Rescission Policy (emphasis added).

Moreover, at least one court has applied § 1252(g) to actions that are "not … on the list of precluded items"—*i.e.*, "decisions to commence proceedings, adjudicate cases, or execute removal orders"—in order to effectuate the object of this jurisdictional bar. *Botezatu*, 195 F.3d at 313–14. In *Botezatu*, the Seventh Circuit rejected an alien's argument that a court could review the Executive's "refusal to … grant him humanitarian parole or deferred action" simply because that denial occurred in "post-deportation procedures." *Id.* at 313–14. As the Seventh Circuit explained, because *AADC* broadly held that "'no deferred action' decisions and similar discretionary determinations' [were] governed by § 1252(g)," that jurisdictional bar should apply regardless of *when* such determinations occurred. *Id.* at 314 (quoting *AADC*, 525 U.S. at 485). Thus, just as an alien (or entity suing on his behalf) cannot circumvent § 1252(g) by bringing a challenge to a denial of deferred action on the back-end, Plaintiffs' broad front-end assault on the Rescission Policy is beyond the jurisdiction of this Court. At the very least, 8 U.S.C. § 1252(g) reinforces the conclusion that enforcement discretion under the INA is at the core of unreviewable matters committed to agency discretion by law under the APA. 5 U.S.C. § 701(a)(2). *See Helgeson*, 153 F.3d at 1003 (review inappropriate for subject areas where

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

19

courts traditionally hesitant to intrude).[4]

### C. The University, State, Municipal, and Union Plaintiffs' Claims Are Not Cognizable

#### 1. The University, State, Municipal, and Union Plaintiffs Lack Article III Standing

At a minimum, the Court should dismiss the actions brought by the Regents of the University of California (including its president); the States of California, Maine, Maryland, and Minnesota; the City of San Jose; and the County of Santa Clara in conjunction with the Service Employees International Union Local 521 for lack of standing. To establish Article III standing, these parties must at least show that they have suffered an "injury in fact" that is "fairly traceable" to Defendants' challenged conduct and that will likely be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (brackets and citations omitted). They cannot do so. The Rescission Policy does not regulate them, require them to do (or refrain from doing) anything, or restrict them in any way. Instead, these Plaintiffs complain of injury "from the government's allegedly unlawful regulation (or lack of regulation) of someone else," making standing "substantially more difficult to establish." *Id.* at 562 (emphasis added). That burden becomes insurmountable when a plaintiff claims to be injured by the incidental effects of federal enforcement policies, as it is settled that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

These principles apply with particular force where, as here, the parties are relying primarily on the incidental effects of federal immigration policies. *See, e.g.*, *Regents of Univ. of Cal.* Compl. ¶ 2 (alleging harm arising from effect of DACA rescission on "members of [the

---

[4] The Ninth Circuit's decision in *Kwai Fun Wong v. United States*, 373 F.3d 952 (9th Cir. 2004), does not foreclose the application of § 1252(g) to this case. That case did not involve a decision not to continue deferred action, an ingredient to the commencement of enforcement proceedings and a subject directly addressed by *AADC* itself. *See id.* at 964-65. *AADC* thus provides more relevant guidance. Indeed, *Kawi Fun Wong* relied upon the fact that the challenge there did "not pose the threat of obstruction of the institution of removal proceedings or the execution of removal orders about which *AADC* was concerned." *Id.* at 970. The same cannot be said about Plaintiffs' challenge here.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

20

University of California] community" such as "students and employees"); *State of Cal.* Compl. ¶ 10 (alleging that DACA rescission will injure state-run colleges, upset workforces, disrupt statutory and regulatory interests, cause harm to state residents, damage economies, and hurt companies)[5]; *City of San Jose* Compl. ¶ 10 (alleging that San Jose has suffered injury and has third-party standing to bring lawsuit "on behalf of its employees" with whom it allegedly "has a close relationship"); *Cty. of Santa Clara* Compl. ¶¶ 15-16 (alleging injury to county due to large number of foreign-born residents and county employment of DACA recipients); *id.* ¶¶ 18-20 (allegations that local union has members who are DACA recipients). It would be extraordinary to find Article III standing based on these assertions, as virtually any administration of federal law by a federal agency could have such effects. The unavoidable reality that any enforcement of immigration laws will inevitably have some unintended or derivative effects does not provide carte blanche to challenge such enforcement decisions whenever there is a disagreement about federal immigration policy.[6]

### 2. The University, State, Municipal, and Union Plaintiffs Lack a Cause of Action Under the APA

Even if the non-individual Plaintiffs could establish Article III standing, they would lack a cause of action under the APA. The APA does not "allow suit by every person suffering an injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved" in this sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute … in question." *Clarke*, 479 U.S. at 396 (brackets and citation omitted). Here, no provision of the INA even arguably protects the non-individual

---

[5] It is unclear whether and, if so, the extent to which the State of California can rely upon any alleged injury to its "state-run colleges and universities," as the University of California system is a separate plaintiff in the separate *Regents of the University of California* lawsuit.

[6] Plaintiffs cannot overcome their failure to establish standing in their own right by invoking the asserted rights of their citizens or residents as parens patriae. "A State does not have standing as parens patriae to bring an action against the Federal Government," *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) (citation omitted), as "it is no part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government," *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923).

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

Plaintiffs from bearing any incidental effects of a denial of deferred action. *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

### D.   The Government's Justiciability Objections Are Not Inconsistent with the Acting Secretary's Reliance on the Fifth Circuit's Decision

Although the Fifth Circuit in *Texas* included holdings that a challenge to the DAPA Memo was reviewable, 809 F.3d at 165–70, neither that decision nor Acting Secretary Duke's reliance on it forecloses the government from arguing here that the DACA Rescission Policy is unreviewable. First, neither the Acting Secretary's memo nor the Attorney General's letter expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings, and it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place. Second, officers of the Executive Branch have an independent duty to consider the legality of their policies regardless of whether they are judicially reviewable; all swear an oath to uphold the United States Constitution. *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867) (Take Care Clause imposes a generally nonjusticiable duty on the Executive Branch). Finally, even if courts could have reviewed the adoption of DACA as "an abdication of [DHS's] statutory responsibilities," *Chaney*, 470 U.S. at 833 n.4, that would not make the Rescission Policy, a classic exercise of agency enforcement discretion, open to challenge. After all, the Fifth Circuit itself emphasized that "DAPA is much more than a nonenforcement policy, which presumptively would be committed to agency discretion," *Texas*, 809 F.3d at 178 n.156, and pointed out that a "*denial* of voluntary departure and work authorization" by DHS would have been nonjusticiable, *id.* at 168. Denials of deferred action under a return to a more traditional enforcement policy should be treated no differently.[7]

---

[7] Similarly, the fact that the Fifth Circuit held that Texas had standing because it specifically demonstrated that "it would incur significant costs in issuing driver's licenses to DAPA beneficiaries," has no bearing on the States' standing in this case. *Texas*, 809 F.3d at 155. The States here have failed to point to analogous injury similarly traceable to the Rescission Policy.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

## II. PLAINTIFFS FAIL TO STATE A CLAIM

Even if Plaintiffs' claims were justiciable, the Court should dismiss these cases in their entirety for failure to state a claim.

### A. The Acting Secretary Rationally Explained Her Decision To Wind Down DACA, Particularly Given the Imminent Risk of A Nationwide Injunction

Plaintiffs contend that the Rescission Policy is arbitrary and capricious because it constitutes a change in agency policy without an adequate explanation. *Regents of Univ. of Cal.* Compl. ¶¶ 50-58 (Count 1); *State of Cal.* Compl. ¶¶ 152-155 (Count 3); *Garcia* Compl. ¶¶ 175 (Count 4); *Cty. of Santa Clara* Compl. ¶ 71 (Count 2). Plaintiffs' allegations misapprehend the nature of the inquiry under the APA. It is black-letter law that agencies are free to change course on policy matters so long as they provide a rational explanation. Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this deferential standard, particularly in view of the imminent risk of a nationwide injunction, which could have prompted an immediate—and chaotic—end to the policy.

**1.** Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B). The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416. A decision may be held to be arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency." *Id.* And when an agency changes policies, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). Rather, "it suffices that the new policy is permissible under the statute, that there are good

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

23

reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

In assessing whether a decision was arbitrary and capricious, "[t]he task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citation omitted). If the agency's action "is not sustainable on the administrative record made," then the administrative "decision must be vacated and the matter remanded to [the agency] for further consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). This Court should therefore decide whether the Acting Secretary's decision to wind down DACA was arbitrary and capricious on the administrative record she has produced. This Court cannot consider additional materials concerning her deliberative process. It is "not the function of the court to probe the mental processes" of the agency. *Morgan v. United States*, 304 U.S. 1, 18 (1938). "Just as a judge cannot be subjected to such a scrutiny . . . so the integrity of the administrative process must be equally respected." *United States v. Morgan*, 313 U.S. 409, 422 (1941). Deliberative materials are therefore not merely protected from disclosure—they do not form part of the administrative record at all. *See San Luis Obispo Mothers for Peace v. U.S. N.R.C.*, 789 F.2d 26, 45 (D.C. Cir. 1986) (en banc). Thus, while the government submits that the Acting Secretary's decision was plainly not arbitrary and capricious under the record already before this Court, if this Court were to disagree, it should do no more than simply grant Plaintiffs the relief they seek by setting aside the Rescission Policy and remanding to her.

**2.** The Rescission Policy amply meets the "minimal standards of rationality" required by the APA. *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997). Plaintiffs do not deny that "the new policy is permissible under the [INA]." *Fox*, 556 U.S. at 515. And there are eminently "good reasons for it," *id.*, particularly in view of the litigation risk posed by the proceedings in *Texas*. In the Rescission Policy, the Acting Secretary explained that, "[t]aking into consideration the Supreme Court's and Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy at 4 (AR 255). Specifically, after

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

24

summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's conclusion in his letter that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254). The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into uncertainty.

The Acting Secretary was then "faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately." Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://go.usa.gov/xncuM. She reasonably opted for an orderly rescission, which she considered "the least disruptive option." *Id.*

There is nothing at all irrational about this choice or that explanation. *Cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 84 (2002) ("regulation reasonable" based on concerns about subjecting parties to "possible … liability"). Indeed, it is entirely sensible, given the turmoil that an abrupt, court-ordered shutdown would likely have provoked. The Acting Secretary balanced the litigation risk of keeping DACA in place with "the administrative complexities associated with ending the program," and opted for a solution that would "wind it down in an efficient and orderly fashion" accounting for the interests of DACA recipients. Rescission Policy at 3 (AR 254). She explained her reasonable decision to rescind DACA, and the APA requires no more. *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (APA satisfied where agency's explanation is clear enough that its "path may reasonably be discerned").[8] And no matter whether her (or the Attorney General's) judgment about the likely result of the *Texas* litigation would have turned out to be correct, it was surely not an irrational or arbitrary and capricious conclusion in light of the fact that at least the Fifth Circuit and four

---

[8] For these same reasons, the *Garcia* Plaintiffs' inconsistent allegations that the government both improperly provided for a wind-down period and, at the same time, made that wind-down period unreasonably "short," fails to state a claim under the APA. *See Garcia* Compl. ¶¶ 173-74.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

25

1    justices of the Supreme Court had already held that a materially indistinguishable policy was

2    unlawful.

3    **3.** Plaintiffs acknowledge that the State of Texas and nine other states sent a letter to the

4    Attorney General "threaten[ing] to challenge DACA in court unless the federal government

5    rescinded the DACA program by September 5, 2017." *Garcia* Compl. ¶ 115. Plaintiffs

6    nonetheless contend that the decision to rescind DACA was arbitrary and capricious because the

7    Acting Secretary of Homeland Security considered the Attorney General's views regarding the

8    legality of DACA, which views Plaintiffs contend "contradict conclusions previously reached by

9    both the Department of Justice" through the Office of Legal Counsel "and the Department of

10   Homeland Security" through its prior litigation position in the *Texas* litigation. *Id.* ¶ 120; *see*

11   *also Regents of Univ. of Cal.* Compl. ¶¶ 7, 9-12, 40-41, 43; *State of Cal.* Compl. ¶¶ 105-108; *City*

12   *of San Jose* Compl. ¶¶ 44; *Cty. of Santa Clara* Compl. ¶ 57. Plaintiffs' argument suffers from

13   three independent flaws.

14   First, the Acting Secretary did not rely on the Attorney General's September 4 letter

15   solely for its assessment of DACA's legality. Instead, as discussed above, she concluded that

16   DACA "should" be wound down after considering, among other things, his litigation-risk

17   determination that it was "likely" that a legal challenge to DACA "would yield similar results"

18   as the DAPA litigation under Fifth Circuit precedent. Rescission Policy at 3 (AR 254). That

19   independent conclusion, based on a reasonable predictive judgment about litigation risk, is a

20   sufficient basis for upholding the Acting Secretary's decision to rescind DACA. *See Bowman*,

21   419 U.S. at 286.

22   Second, to the extent the Acting Secretary did rely on the proposition that DACA was

23   unlawful, this Court need not agree with that determination to uphold her decision. If an

24   agency's constitutional analysis and policy judgment overlap, courts should presume an

25   independent policy judgment to avoid constitutional questions, even if the two determinations

26   are arguably "intertwined." *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C.

27   Cir. 1989) (if "even in the absence of constitutional problems the [agency] would have reached

28   the same outcome," "we must end our inquiry without reaching that issue"). Here, the Attorney

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

General regarded DACA as unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected. Rescission Policy at 3 (AR 254). But those same concerns equally support a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law." *Id.* at 2 (AR 253). This Court should sustain her decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

Third, although this Court need not decide the issue to resolve this case in favor of the government on the basis that the agency decision was at least rational, the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas* that was affirmed by the Supreme Court. The Fifth Circuit held not only that DAPA—including its proposed expansion of DACA—was likely unlawful, but also that DACA bore many "important similarities" to it. *Texas*, 809 F.3d at 174 & n.139 (noting that "the DAPA Memo's plain language … equates the DACA and DAPA procedure[s]," making DACA an "apt comparator"). Indeed, given that DAPA was enjoined before its implementation, the Fifth Circuit's decision was "informed by analysis of the implementation of DACA" itself. *Id.* at 172. On that score, while, "[l]ike the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id.* at 171–72, the court found that discretion to be illusory in practice: Because relatively few DACA requests were denied, the Fifth Circuit believed "there was evidence from DACA's implementation that [this] discretionary language was pretextual," *id.* at 172–73. Based on these findings by the Fifth Circuit, it would follow that DACA, like DAPA, did not "genuinely leave the agency and its employees free to exercise discretion" on a case-by-case basis, *id.* at 176—which supports the Attorney General's view that DACA was unlawful. And it seems likely that at least four Justices of the Supreme Court agree.

Regardless of whether the Office of Legal Counsel was correct when it previously "orally advised" that its "preliminary view" was that the proposed version of DACA would be lawful,

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

27

the reasoning in that opinion further confirms the invalidity of DACA as actually implemented in practice as found by the Fifth Circuit.[9]  The "preliminary" conclusion was conditioned on the proviso that "it was critical that … the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis."  *Id.*  Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice.  *Texas*, 809 F.3d at 176.  Indeed, because deferred action continues to exist on an individualized basis, the only change made by the Acting Secretary is the elimination of the factors that, according to the Fifth Circuit, led to the policy being applied without sufficient case-by case discretion.  *See id.* at 172–73 (noting testimony that, for DACA, requests were "simply rubberstamped if the applicants meet the necessary criteria").  Further, the original DACA program largely shares the relevant defects of the proposed expansion of deferred action that OLC rejected, rather than the aspects of the new program that it approved.

    **4.**  The *University of California*, *Garcia*, and *County of Santa Clara* plaintiffs also allege that the rescission is arbitrary and capricious because DHS has failed to "tak[e] into account" the "serious reliance interests" of DACA recipients who submitted personal information to DHS.  *Garcia* Compl. ¶ 171 (quoting *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015)); *see also Univ. of Cal.* Compl. ¶ 55 (similar); *Cty. of Santa Clara* Compl. ¶ 72 (similar).  The *Garcia* Complaint's citation to inapposite Supreme Court dicta—which concerned whether agencies could "skirt notice-and-comment provisions" that applied to "regulated entities"—has no bearing here:  DHS made clear that the DACA information-sharing policy on which Plaintiffs allegedly relied created no rights and "may be modified, superseded, or rescinded at any time without notice."  DHS DACA FAQ No. 19.  For these reasons, as described more fully in Part II.E, *infra*, any "reliance" by Plaintiffs on that policy was, at best, misplaced.  Moreover, as set forth in Part II.D, *supra*, the Rescission Memo is merely a statement of policy that—like the original DACA

---

[9] U.S. Dep't of Justice, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*, 38 Op. O.L.C. 1, 18 n.8 (Nov. 19, 2014) (OLC Op.), https://www.justice.gov/file/179206/download.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

28

policy—does not create any enforceable rights and is subject to change at any time.[10] And insofar as Plaintiffs suggest that the Acting Secretary failed to consider the reliance interests of DACA recipients more generally, that assertion ignores her calculus based the looming risk of a nationwide injunction ending the DACA program altogether. Given her view that she faced an imminent, court-ordered end to DACA, the Acting Secretary opted for an orderly wind-down process that would protect the reliance interests of DACA recipients far more than an immediate injunction terminating the program would. *See* Part II.A.2, *supra*. Finally, to the extent that she rationally concluded DACA was illegal, there would be no legitimate reliance interests at all.

In all events, the foregoing analysis confirms that the Acting Secretary's decision was at a minimum reasonable and that Plaintiffs' APA challenge can be resolved at this stage based on the record now before the Court. Indeed, whatever this Court decides, there is no basis for supplementing the record or discovery to assess the Acting Secretary's explanation.

## B.     The Rescission Policy Is Exempt from Notice and Comment

Plaintiffs miss the mark in arguing that the Rescission Policy must be set aside because it is a substantive rule issued without notice and comment. *See Regents of Univ. of Cal.* Compl. ¶¶ 59-66 (Count 2); *State of Cal.* Compl. ¶¶ 146-151; *City of San Jose* Compl. ¶¶ 59-63 (Count 2); *Garcia* Compl. ¶¶ 177-184 (Count 5); *see also* 5 U.S.C. § 553(b)–(c). If winding down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the first place. Critically, though, the DACA Memo itself also was not adopted through notice and comment. So even on Plaintiffs' own theory, it would be void *ab initio*—leaving Plaintiffs without a remedy. That is reason enough to dismiss this claim. *See Lujan*, 504 U.S. at 561 (plaintiff must show "injury will be 'redressed by a favorable decision'" to establish standing).[11]

---

[10] The *Garcia* plaintiffs also allege that DACA's termination violated the APA because it was unconstitutional. *See Garcia* Compl. ¶¶ 160-164 (Count 3). Plaintiffs' allegations that the rescission of DACA was unconstitutional are addressed in Sections II.C-E, *infra*.

[11] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982). That holding, however, concerned the rescission of a rule promulgated after notice and comment that was allegedly defective on other grounds, not a rule

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

29

In any event, Plaintiffs' claim is erroneous. DHS and INS have adopted over 20 deferred action or similar policies over the past 50 years—rarely through notice and comment. That is because such policies, like the Rescission Policy, are not substantive rules at all. Rather, they are classic examples of "general statements of policy" that are exempt from the APA's notice-and-comment requirements. 5 U.S.C. § 553(b)(3)(A).

A "substantive rule establishes a standard of conduct which has the force of law." *Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974). Thus, an "agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

A statement of policy, by contrast, "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947)). It "explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule." *McCarthy*, 758 F.3d at 252. It serves to "appris[e] the regulated community of the agency's intentions" and "inform[] the exercise of discretion by agents and officers in the field." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987). And "a general statement of policy, like a press release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec.*, 506 F.2d at 38. Accordingly, policy statements "are binding on neither the public nor the agency," and the agency "retains the discretion and the authority to change its position … in any specific case." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (citations omitted).

---

that was defective precisely because it had failed to go through notice and comment in the first place. *See id.* at 445–46. When an agency has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go those procedures to cure the underlying defect.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

As these principles make clear, the Rescission Policy is a quintessential policy statement—a point that its text reinforces again and again. It was issued as an "exercise of [the Secretary's] authority in establishing national immigration policies and priorities." Rescission Policy at 4 (AR 255). It explains how the agency intends to exercise its enforcement authority on a prospective basis, a matter that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. It does not immediately deprive any DACA recipients of their current deferred action status, but describes how pending and future deferred action requests will be "adjudicate[d]—on an individual, case-by-case basis." Rescission Policy at 4 (AR 255). It does not categorically forbid the agency from continuing to defer enforcement action against DACA recipients in the future, but instead acknowledges the background principle, recognized by Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such "otherwise lawful enforcement … prerogatives," *id.* at 5 (AR 256). And it explains that it "does not … create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* Thus, in the wake of the Rescission Policy, deferred action "remains discretionary and reversible," *Arpaio*, 797 F.3d at 17—as with the 20-odd deferred action or similar policies that DHS and INS have adopted over the past half-century, generally without going through the full notice-and-comment process.[12]

That is as it should be. An agency's enforcement priorities will inevitably shift over time, whether due to changing circumstances or resource constraints. *See Chaney*, 470 U.S. at 831. Indeed, the DACA policy was originally adopted in part to set enforcement priorities in view of the agency's limited resources. *See Arpaio*, 797 F.3d at 16; DACA Memo at 1 (AR 1); DAPA Memo at 1 (AR 37). Under Plaintiffs' theory, however, even if Congress were to vastly

---

[12] The Fifth Circuit's ruling that the adoption of the DAPA Memo required notice and comment does not imply that the rescission of DACA does as well. Unlike the DAPA or DACA Memos, the Rescission Policy announced a return to an enforcement policy of using deferred action on an individualized basis, which cannot be cast as a substantive rule. Indeed, the Fifth Circuit itself stressed that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Texas*, 809 F.3d at 178 n.156. In any event, if this Court agrees with the Fifth Circuit, then DACA was void *ab initio* and Plaintiffs lack a remedy.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

increase appropriations for immigration enforcement, the agency's hands would be tied:  it would not be free to adjust its enforcement priorities without engaging in "cumbersome and time-consuming rulemaking proceedings."  *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988).  The Court should not endorse such an intrusion into matters that have "long been regarded as the special province of the Executive Branch."  *Chaney*, 470 U.S. at 832.

### C.  Plaintiffs Fail to State an Equal Protection Claim

**1.**  If this Court disagrees with Defendants and concludes that it can review Plaintiffs' equal protection challenges under *AADC*, *but see supra* § I.A, B, it nonetheless should dismiss them for failure to state a claim.  In *Armstrong*, the Supreme Court considered whether criminal defendants could obtain discovery to support a "selective prosecution" claim arising under the Equal Protection Clause.  517 U.S. at 463–64.  The Court recognized that such claims, like the discriminatory-motive claims here, "ask[] a court to exercise judicial power over a 'special province' of the Executive"—specifically, the "constitutional responsibility to 'take Care that the Laws be faithfully executed'"—and thereby risk "impair[ing] the performance of a core executive constitutional function."  *Id*. at 464-65 (citations omitted).  Given these considerations, a "presumption of regularity supports" such enforcement decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  *Id*. at 464 (citation omitted).  Applying this "rigorous standard," *id.* at 468, the Court refused to allow discovery in support of the selective-prosecution claim before it, even though the claimants had provided evidence that in each of the 24 prosecutions for certain drug-trafficking offenses that were closed by the federal defender's office in a single year, the defendant was African-American, *id.* at 459, 469-70.

Although Plaintiffs here allege that the Rescission Policy was motivated by discriminatory animus rather than assert that they have been selectively prosecuted, *Armstrong* still requires them to allege, and ultimately prove, that this is a "clear" case of discrimination in order to overcome the presumption that Defendants have faithfully enforced the laws.  *Id.* at 464.  As in *Armstrong*, Plaintiffs here ask this Court to "exercise judicial power over a 'special

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

32

province' of the Executive," with the associated risk of "impair[ing] the performance of a core executive constitutional function." *Id*. at 464–65 (citations omitted). Plaintiffs consequently must overcome "a significant barrier to the litigation" of their claims. *Id.* at 464. And that is especially true given that they allege an unlawful enforcement of the *immigration* laws. Even if *AADC* permitted the adjudication of Plaintiffs' claims, that decision would at least require them to satisfy a rigorous standard similar to the one in *Armstrong*. As *AADC* explained, the concerns justifying a heightened burden under *Armstrong* "are greatly magnified in the deportation context," 525 U.S. at 490, and all of those considerations are present here, *see supra* p. 17. Accordingly, Plaintiffs must at least meet a heavy burden to survive a motion to dismiss on a claim that Defendants harbored a hidden discriminatory motive in their enforcement of the immigration laws.

Plaintiffs cannot carry that burden here. Their allegations consist of the assertion that 80 percent of DACA recipients were Mexican nationals, *see Cty. of Santa Clara* Compl. ¶ 75, and that approximately 93 percent of DACA recipients are individuals from Latin American countries, *see id.*; *see also Garcia* Compl. ¶ 151, as well as selected references to statements by the President and others relating to immigrants, Mexicans, or Latinos, *see City of San Jose* Compl. ¶¶ 30-36; *Garcia* Compl. ¶¶ 99-113; *Cty. of Santa Clara* Compl. ¶ 9. These allegations are insufficient to overcome the "significant barrier" to moving forward on a claim of this sort. *Armstrong*, 517 U.S. at 464.

The fact that approximately 80 percent of approved DACA recipients are Mexican nationals is an unsurprising accident of geography, not evidence of discrimination, let alone the kind sufficient to establish discriminatory motive in the enforcement of immigration laws. Even in the ordinary domestic equal protection setting, a disparate impact of a facially neutral rule such as the Rescission Policy, standing alone, cannot establish discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 242 (1976), *superseded by statute, see Veasey v. Perry*, 29 F. Supp. 3d 896, 916 (S.D. Tex. 2014). Much less can it do so when the exercise of enforcement discretion is involved: In *Armstrong*, the fact that 100 percent of the relevant defendants were African-American was not enough to justify discovery. 517 U.S. at 459. *A*

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

33

*fortiori*, the fact that approximately 80 percent of DACA recipients are Mexican nationals provides no basis for ordering discovery into the discretionary administration of the immigration laws, especially given the heightened deference owed to the political branches on immigration matters, where sensitive considerations of relations and proximity to particular foreign nations necessarily plays a role.

Nor do the President's statements—most of which were made before he took the oath of office—indicate that the rescission of DACA is a clear case of discrimination. To start, none of these stray remarks concern the Rescission Policy itself. To the contrary, Plaintiffs themselves emphasize that when the President has spoken on this issue, he has shown support for DACA recipients.[13] More importantly, Plaintiffs point to nothing that would suggest Acting Secretary Duke—the decisionmaker ultimately responsible for the Rescission Policy— chose to wind-down DACA due to animus towards Mexican nationals. Given that the statements at issue have no connection to either the relevant decision (the rescission of DACA) or the relevant decision-maker (the Acting Secretary), adopting Plaintiffs' theory would mean that any time DHS enforces the immigration laws in a way that has a statistically significant disparate impact on Mexican nationals, the agency would be subject to intrusive discovery on allegations of a violation of Fifth Amendment equal protection principles. That would set a dangerous precedent, and it would freeze the enforcement discretion of the entire Executive Branch. That ossification would be particularly inappropriate in this context, given that immigration enforcement policies must constantly be adjusted to account for "[t]he dynamic nature of relations with other countries." *Arizona*, 567 U.S. at 397. In all events, Plaintiffs'

---

[13] *See City of San Jose* Compl ¶ 37 (alleging the President "has repeatedly stated his support for DACA recipients" including through statement that "[w]e're going to work something out that's going to make people happy and proud. They got brought here at a very young age, they've worked here, they've gone to school here. Some were good students. Some have wonderful jobs."); *id.* ¶ 38 (President's statement that his plan to address DACA is "going to have a lot of heart"); *id.* ¶ 39 (Presidential statement that DACA grantees "shouldn't be very worried" because "[w]e're going to take care of everybody."); *id.* ¶ 40 (describing DACA recipients as "some absolutely incredible kids – I would say mostly."); *id.* ¶ 42 (Presidential statement that "I do not favor punishing children, most of whom are now adults, for the actions of their parents. But we must also recognize that we are [a] nation of opportunity because we are a nation of laws.").

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

inferences from unrelated remarks cannot qualify as the sort of "clear" allegations of discrimination necessary in this context. *Armstrong*, 517 U.S. at 464.

**2.** The State Plaintiffs advance a separate equal protection theory alleging that "[t]he rescission of DACA violates fundamental conceptions of justice by depriving DACA grantees, as a class, of their substantial interests in pursuing a livelihood to support themselves and further their education." *State of Cal.* Compl. ¶ 174. This claim fails for the simple reason that Plaintiffs have failed to identify any "fundamental rights" implicated by the Rescission Policy. *See Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003) (under equal protection doctrine, strict scrutiny applies if "the statute in question substantially burdens fundamental rights, such as the right to vote"). Even for U.S. citizens, "the right to pursue a calling is not a fundamental right for purposes of the Equal Protection Clause." *Marilley v. Bonham*, 844 F.3d 841, 854-55 (9th Cir. 2016) (citation omitted), *cert. denied*, No. 16-1391, 2017 WL 2256242 (Oct. 10, 2017). Nor, for that matter, is the right to further an education. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37 (1973). If the contrary were true, then all sorts of regulations addressing employment and education, including various licensing laws, would suddenly be subject to strict scrutiny. *A fortiori*, unlawfully present aliens, who do not even have a fundamental right to remain in the United States, *see infra* Part D, cannot invoke a right to pursue a calling or further an education. Indeed, an alternate rule would call into question longstanding immigration laws. *See, e.g.*, *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002) (discussing "[Immigration Reform and Control Act of 1986], a comprehensive scheme prohibiting the employment of illegal aliens in the United States" (citations omitted)). Accordingly, the Rescission Policy can be subject only to rational-basis review, *see* Green, 340 F.3d at 896, and easily survives that standard for the reasons given above, *see* Part II.A, *supra*. Plaintiffs' claim therefore fails as a matter of law.

## D. Plaintiffs Fail to State a Procedural Due Process Claim

The *University of California*, *Garcia*, and *County of Santa Clara* Plaintiffs allege that the rescission violates procedural due process norms to the extent that DACA recipients will be deprived of their interests in their DACA status without notice and an opportunity to be heard.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

35

*See Regents of Univ. of Cal.* Compl. ¶¶ 67-73 (Count 3); *Garcia* Compl. ¶¶ 133-147 (Count 1); *Cty. of Santa Clara* Compl. ¶¶ 59-66 (Count 1). This claim fails on the merits for the simple reason that DACA recipients have no protected liberty or property interest in deferred action entitling them to due process protections.

      The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Thus, the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citation omitted). The "Due Process Clause does not protect everything that might be described as a 'benefit.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). Rather, "'[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Such entitlements "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source"—*e.g.*, statutes or regulations—"that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577.

      A benefit "is not a protected entitlement" for due process purposes where, as here, "government officials may grant or deny it in their discretion." *Castle Rock*, 545 U.S. at 756. For due process purposes, statutes or regulations limit discretion only when they contain "explicitly mandatory language"—*i.e.*, "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 462–63 (1989) (citation omitted). The DACA policy contains no such "explicitly mandatory language." *Id.* The policy is codified in no statute or regulation. Its source—the DACA Memo—describes it as a "policy" for the "exercise of prosecutorial discretion." DACA Memo at 2-3 (AR 2-3); *see Omar v. McHugh*, 646 F.3d 13, 22 n.7 (D.C. Cir. 2011) (the "use of the word 'policy'"—"rather than a word such as 'right'— reinforces the conclusion that Congress did not intend to create an 'entitlement'"). And the

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

36

agency's public guidance makes clear that, under DACA, deferred action "may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion."  DHS DACA FAQ No. 27.

Under DACA, "deferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'"  *Arpaio*, 797 F.3d at 17 (quoting DACA Memo at 3 (AR 3)).  "Only the Congress, acting through its legislative authority, can confer these rights."  DACA Memo at 3 (AR 3).  Simply put, there is "no protectable liberty interest in deferred action."  *Romiero de Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985).  Thus, deferred action is not a protected entitlement for due process purposes, and Plaintiffs' claim fails as a matter of law.  *See Velasco-Gutierrez v. Crossland*, 732 F.2d 792, 798 (10th Cir. 1984) (deferred action guidance "places no effective limitations on official discretion, and thus creates no protected liberty interest in deferred action").

Moreover, even if DACA could be conceived of as an entitlement, Plaintiffs' due process claim would still fail because changes in agency policy do not require individualized process.  Due process doctrine recognizes a "distinction between individualized deprivations, [which] are protected by procedural due process, and policy-based deprivations of the interests of a class, [which] are not protected by procedural due process."  2 Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.2 (5th ed. 2010).  The rescission of DACA falls squarely in the latter category.[14]

Plaintiffs allege that DACA could not be rescinded without first giving recipients "process before depriving them of their work authorizations and DACA status, and the benefits that flow from that status."  *Regents of Univ. of Cal.* Compl. ¶ 16; *see also Cty. of Santa Clara* Compl. ¶¶ 7, 63 (alleging violation of due process rights).  But Plaintiffs' theory is not that individual DACA requests were adjudicated incorrectly (for example, due to factual error)—the sort of mistake that notice and a hearing could conceivably help correct.  Instead, Plaintiff's

---

[14] The *University of California* and *Santa Clara* Plaintiffs also appear to allege that the due process rights of the university and county have somehow been violated.  *See Univ. of Cal.* Compl. ¶ 69; *Cty. of Santa Clara* Compl. ¶¶ 60, 62.  The legal basis for this claim is unclear at best, and in any event to the extent this Court finds that individual DACA recipients lack due process rights, *a fortiori* universities, counties, and other entities would also lack any such rights.

claim appears to be that DHS cannot alter the DACA policy, even on a prospective basis, without providing individualized notice and hearings to nearly 800,000 recipients.

Such individualized process is not required.  The Supreme Court held long ago that where a government policy "applies to more than a few people, it is impracticable that every one should have a direct voice in its adoption," and thus due process does not require individualized pre-deprivation notice.  *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915).  This case presents "the classic *Bi-Metallic* scenario"—the challenged policy applies across-the-board to a large number of people, so "[n]ot only would individualized hearings be impractical, they would be unnecessary."  *Decatur Liquors, Inc. v. Dist. of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007) (citing *Bi-Metallic*, 239 U.S. at 445).

The Ninth Circuit's decision in *Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980), is instructive in this regard.  There, the INS had issued a policy directive granting "deferred voluntary departure"—a form of deferred action—to Iranian nationals who were unwilling to return home due to political instability.  *Id*. at 1359.  Then, in response to the Iranian hostage crisis, the INS issued another policy directive "rescinding the … deferred departure" and requiring its recipients to depart the country within 30 days.  *Id*.  Relying on *Bi-Metallic*, the Ninth Circuit rejected the plaintiff's claim "that he should have had a prior opportunity to contest [the INS's] decision to rescind deferred departure."  *Id*. at 1363.  "Where an agency action is not based on individual grounds, but is a matter of general policy," the court explained, "no hearing is constitutionally required."  *Id*. (citing, *inter alia*, *Bi-Metallic*, 239 U.S. 441).  So too here.

### E.    Plaintiffs Fail to State a Substantive Due Process Claim.

Taking a different tack, the *State of California*, *Garcia*, and *County of Santa Clara* Plaintiffs assert that the Rescission Policy violates substantive due process because DHS has allegedly changed its policy on the use of information contained in DACA requests, including that DHS will allegedly use such information for enforcement purposes in a manner that is not "fundamentally fair."  *State of Cal.* Compl. ¶¶ 141-145 (Count 1); *Garcia* Compl. ¶¶ 133-147 (Count 1); *Cty. of Santa Clara* Compl. ¶¶ 59-66 (Count 1).  None of these claims has merit.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

38

As a threshold matter, no Plaintiff alleges facts sufficient to show that there actually has been a substantive change in policy regarding information sharing.  For example, the State Plaintiffs merely allege that the "Rescission Memorandum does not provide adequate assurances that this information will not be used for enforcement purposes following DACA's termination." *State of Cal.* Compl. ¶ 120; *see also Garcia* Compl. ¶ 126 (similar allegations); *Cty. of Santa Clara* Compl. ¶ 58 (alleging that there "appears" to be a change of policy).  And while they cite language in the Rescission FAQs indicting that information "[g]enerally . . . will not be proactively provided to other law enforcement entities," *State of Cal.* Compl. ¶ 122 (emphasis omitted) (quoting Rescission FAQs), that language is entirely consistent with DHS's policy regarding the protection of DACA information, including its many exceptions that Plaintiffs largely gloss over.  *See State of Cal.* Compl. ¶ 121 (characterizing exceptions to policy as "limited").

Contrary to Plaintiffs' suggestion that DHS has flatly and completely prohibited the use of DACA information for enforcement purposes, *see Garcia* Compl. ¶ 126, the agency's information-sharing policy in fact contains (and has always contained) a number of exceptions. For example, under that policy, information submitted in DACA requests "is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings *unless* the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS'[s] Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised).  DHS DACA FAQ No. 19 (emphasis added); *see* Notice to Appear Guidance.  While this policy "may be modified, superseded, or rescinded at any time" and creates no legal rights, DHS DACA FAQ No. 19, nothing in the Rescission Policy purports to change it, and it currently remains in effect.  *Cf. Gerhart v. Lake Cnty., Mont.*, 637 F.3d 1013, 1020-21 (9th Cir. 2011) ("A person's belief of entitlement to a government benefit, no matter how sincerely or reasonably held, does not create a property right if that belief is not mutually held by the government . . . .  '[A] constitutional entitlement cannot be created—as if by estoppel—merely because a wholly and *expressly*

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

39

discretionary state privilege has been granted generously in the past.'" (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)) (citations omitted)).

In any event, Plaintiffs fail to state a substantive due process claim. Substantive due process protects those rights that rank as "fundamental"—that is, both "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citation omitted). The Supreme Court has also made clear that a plaintiff must provide "a 'careful description' of the asserted fundamental liberty interest" when raising such a claim. *Chavez v. Martinez*, 538 U.S. 760, 775–76 (2003). "[V]ague generalities," like Plaintiffs' wish that DHS would adopt their preferred policies, "will not suffice." *Id.* at 776.

While in rare cases a "denial of fundamental fairness" may rise to the level of a substantive due process violation, to survive dismissal in a "challenge to executive action" such as this one, Plaintiffs must allege behavior that is "so egregious" and "outrageous" as "to shock the contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998). "It is not enough to allege conscience shocking action, however. As a threshold matter, to establish a substantive due process claim a plaintiff must how a government deprivation of life, liberty, or property." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (quotation omitted).

Plaintiffs here cannot meet that standard because the Ninth Circuit—in a context nearly identical to the circumstances presented by Plaintiffs here—squarely rejected the argument that the denial of discretionary relief in the immigration context can give rise to a substantive due process claim. In *Munoz v. Ashcroft*, a Guatemalan citizen who was unlawfully brought to the United States when he was one year old, and who continuously lived in the United States until he was 24 years old, was found to be removable by the Board of Immigration Appeals. 399 F.3d 950, 953-54 (9th Cir. 2003). On review of the Board's decision, the Ninth Circuit rejected petitioner's argument that he had acquired a substantive due process right to stay in the United States due to his unique circumstances, holding that the "denial of [discretionary] relief cannot violate a substantive interest protected by the Due Process clause." *Id.* at 954; *see also Hyuk Joon Lim v. Holder*, 710 F.3d 1074, 1076 (9th Cir. 2013) ("Cancellation of removal is a form of

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

40

discretionary relief which does not give rise to a 'substantive interest protected by the Due Process Clause.'") (quoting *Munoz v. Ashcroft*, 339 F.3d 950, 954 (9th Cir. 2003)); *Tefel v. Reno*, 180 F.3d 1286, 1300-01 (11th Cir. 1999) ("[n]o constitutionally protected interest arises from the INS' actions in granting or denying applications for suspension," that "prior generosity in awarding wholly and expressly discretionary relief does not prove the existence of a constitutional entitlement," and that "awarding and then revoking discretionary relief does not offend due process" (quotation marks omitted)).  The harm alleged by Plaintiffs here—that the alleged use of information for immigration enforcement purposes—therefore cannot give rise to a substantive due process claim because DACA recipients simply "ha[ve] no substantive due process right[s] to stay in the United States." *Munoz*, 339 F.3d at 954.  And even if they did, there is certainly nothing conscience-shocking about DHS's information-sharing policy, which has always been subject to a number of exceptions and in fact remains unchanged.

### F.      Plaintiffs' Regulatory Flexibility Act Claim Fails Because Notice-and-Comment Procedures Were Not Required

Plaintiffs' Regulatory Flexibility Act (RFA) claim fails for the same reasons as its notice-and-comment claim, and it can be quickly dispatched.  *See State of Cal.* Compl. ¶¶ 156-163 (Count 4); *Garcia* Compl. ¶¶ 185-191 (Count 6).  The RFA's requirement that an agency publish analyses of a rule's impact on small businesses applies only "'when an agency promulgates a final rule under section 553 of … title [5], after being required by that section or any other law to publish a general notice of proposed rulemaking,'" *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005) (quoting 5 U.S.C. § 604(a))—in other words, only where notice-and-comment procedures are required.  Because those procedures were not required here, *see supra* § II.B, the RFA does not apply.

Plaintiffs also lack standing to raise an RFA claim:  They allege no facts to demonstrate that they are "small entities" entitled to seek judicial review under the RFA.  *See* 5 U.S.C. § 601(6) (defining "small entity"); *id.* § 611 (restricting judicial review to "a small entity that is adversely affected or aggrieved"); *see also*, *e.g.*, *N.W. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 13 (D.D.C. 1998) ("[T]he language of the RFA extends standing to seek judicial review only to a

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

41

'small entity.'"). Plaintiff states are not, of course, small entities subject to the RFA, and they offer only conclusory allegations about the impact of DACA's rescission on undefined small entities within their respective states. *See State of Cal.* Compl. ¶ 4, 28, 49, 88, 156-163. And the *Garcia* plaintiffs—who are individual DACA recipients—do not offer any substantive RFA allegations at all.

### G. Plaintiffs' Equitable Estoppel Claims Fail.

The *States*, *Garcia*, and *County of Santa Clara* Plaintiffs have brought equitable estoppel claims, alleging that DACA recipients provided detailed personal information to the government and "rearranged their lives" based on the government's representations, but now face removal due to the rescission of DACA. On that basis, those Plaintiffs claim that the government should be equitably estopped from terminating DACA or from using DACA information for enforcement purposes. *See State of Cal.* Compl. ¶¶ 164-171 (Count 5); *Garcia* Compl. ¶¶ 192-199 (Count 7); *Cty. of Santa Clara* Compl. ¶¶ 79-86 (Count 4).

Plaintiffs' equitable estoppel claims cannot succeed for several reasons. As a threshold matter, Plaintiffs cannot succeed because there is no recognized cause of action for estoppel. The Supreme Court has explained that "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Congress has created no such cause of action for estoppel. This is further confirmed by the Federal Rules of Civil Procedure, which expressly recognize estoppel as an affirmative defense—not a cause of action. *See* Fed. R. Civ. P. 8(c).

Even then, the remedy of equitable estoppel does not apply in this context. Even assuming arguendo that this remedy could ever be applied to the federal government, *but see OPM v. Richmond*, 496 U.S. 414, 419, 423 (1990), equitable estoppel does not apply to the policy decisions of the federal government. *See, e.g.*, *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("[T]he government should not be unduly hindered from changing its position if that shift is the result of a change in public policy."), *cited in New Hampshire v. Maine*, 532 U.S. 742, 755 (2001); *Emery Min. Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984) (the doctrine of estoppel cannot be justified against the government where it would "interfere with

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

42

underlying government policies or unduly undermine the correct enforcement of a particular law or regulation"). Indeed, it is axiomatic that the government may alter its policies for any number of reasons, in accordance with any applicable procedures. *See generally Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1210 (2015). Here, the Acting Secretary of Homeland Security issued a memorandum rescinding DACA, which is a matter committed to agency discretion by law.

Finally, even if a cause of action for estoppel were available to challenge the policy here (it is not), Plaintiffs could not satisfy the elements of that claim. Even in situations where an estoppel claim against the government may be appropriate (*e.g.,* individualized challenges to non-policy actions), courts "invoke the doctrine of estoppel against the government with great reluctance." *United States v. Browning,* 630 F.2d 694, 702 (10th Cir. 1980); *see also Heckler v. Cmty. Health Servs.,* 467 U.S. 51, 60 (1984) (government may not be estopped on same terms as any other litigant). In other words, estoppel can only be invoked against the government "where justice and fair play require it." *Watkins v. U.S. Army*, 875 F.2d 699, 706 (9th Cir. 1989) (en banc) (quotation omitted). In the rare circumstances in which equitable estoppel may apply against the government, a party must show "affirmative misconduct going beyond mere negligence" and, "even then, estoppel will only apply where the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability." *Id.* at 707 (quotation omitted). Plaintiffs cannot meet this standard.

First, Plaintiffs have failed to plausibly allege that the government engaged in any "affirmative misconduct going beyond mere negligence." *Id.* To meet that standard, Plaintiffs must plead "an affirmative misrepresentation or affirmative concealment of a material fact by the government." *Id.* The cases that Plaintiffs have previously cited to this Court, *see* Letter from State of Cal. re Equitable Estoppel, ECF No. 51, make clear that Plaintiffs cannot overcome this high bar. In the *Watkins* case, the Army affirmatively misrepresented a soldier's qualifications throughout fourteen years of official records. *Watkins*, 875 F.2d at 707. Similarly, in *Salgado-Diaz v. Gonzales*, the INS was precluded from relying upon a misrepresentation made by an alien petitioner that occurred only after, and as a downstream effect of, the INS's own

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

43

misconduct in denying the alien's due process rights.  395 F.3d 1158, 1166 (9th Cir. 2005).[15]
Here, Plaintiffs have not identified any governmental misconduct, let alone extraordinary
misconduct.  Instead, they have merely pleaded that there was a change in policy.

Second, estoppel for individual claims is only available where the government's act will
cause a "serious injustice" and applying estoppel will not cause the public's interest to "suffer
undue damage."  *Watkins*, 875 F.2d at 707 (quotation omitted).  Plaintiffs have failed to
sufficiently plead facts that would support these necessary threshold elements.  To the contrary,
as reflected in Plaintiffs' exhibits, DHS made clear in its FAQs that "DACA is an exercise of
prosecutorial discretion and deferred action may be terminated at any time, with or without a
Notice of Intent to Terminate, at DHS's discretion."  DHS DACA FAQ No. 27, attached as Ex. E
to *State of Cal.* Compl.  Moreover, nothing in the 2012 DACA Memorandum, the form used to
request DACA (USCIS Form I-821D, attached as Ex. N to *State of Cal.* Compl.), or in the
DACA FAQs generally could be construed to represent to DACA recipients that the DACA
policy was permanent and not subject to change.  There is therefore no "serious injustice" that
Plaintiffs can point to relating to the rescission of this discretionary policy.[16]

At bottom, Plaintiffs' estoppel claims merely repackage their policy challenges.
Equitable estoppel, however, is unavailable for such broad-based challenges.  And even if the
Court were to review Plaintiffs' claims on an individualized basis, those claims still fail.  While
Plaintiffs surely disagree with the rescission of DACA, that disagreement does not mean that
Plaintiffs have alleged that there is a "serious injustice," much less a circumstance in which
estoppel should apply.  For these reasons, Plaintiffs' equitable estoppel claims should be
dismissed.

---

[15] As both of these cases previously cited by Plaintiffs make clear, to the extent equitable
estoppel is available at all, it is only available for individualized claims.  Plaintiffs' authority is
inapplicable to the policy challenges that Plaintiffs present here.

[16] Even if this Court were to conclude that Plaintiffs can somehow meet these threshold
requirements, it would still need to apply traditional estoppel elements to Plaintiffs' claims on an
individualized bases:  "(1) The party to be estopped must know the facts; (2) he must intend that
he conduct shall be acted on or must so act that the party asserting the estoppel has a right to
believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on
the former's conduct to his injury."  *Watkins*, 875 F.2d at 709 (quotation omitted).  Plaintiffs
have failed to plausibly allege facts in support of these elements as well.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

44

### III. NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS IMPERMISSIBLE

The *Garcia* Plaintiffs seek in a separate cause of action a declaratory judgment that DACA is "lawful." *See Garcia* Compl. ¶¶ 200-205 (Count 8). Declaratory relief, however, "is a remedy, not an independent cause of action." *Dinh Nguy v. Cty. of Yolo*, No. 2:14-cv-229-MCE-EFB PS, 2014 WL 4446829, at *8 (E.D. Cal. Sept. 9, 2014); *see Mangindin v. Wash. Mut. Bank*, 637 F. Supp. 2d 700, 708 (N.D. Cal. 2009) (dismissing declaratory relief claim as "duplicative and unnecessary" because relief "is entirely commensurate with the relief sought through their other causes of action"). Moreover, to establish standing and seek relief under the Declaratory Judgment Act, a plaintiff must demonstrate that there is an "actual controversy" necessitating declaratory relief. 28 U.S.C. § 2201(a); *see Garcia* Compl. ¶ 202; *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 239-40 (1937). The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna*, 300 U.S. at 240.

Here, even assuming DACA were "lawful," any declaratory relief that this Court might provide would merely be an academic dispute because the Acting Secretary still would have had the discretion to rescind the policy. *See supra* Part II.A. Instead, the "controversy" (to the extent it is even justiciable) concerns whether the Acting Secretary of Homeland Security's decision to rescind DACA in light of litigation risk that DHS was facing was arbitrary or capricious. Any after-the-fact conclusion by this Court that DACA is "lawful" has no bearing on that decision, which was based on the litigation risk that DHS was then confronting. Thus, any declaratory judgment that this Court might issue would not provide any actual benefits to Plaintiffs.

Plaintiffs also seek injunctive relief. To the extent this Court ultimately concludes that Plaintiffs are entitled to any injunction, it should dismiss the request for nationwide relief. Both constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries. Article III demands that "a plaintiff must demonstrate standing … for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted). "The remedy" sought thus must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996). "The actual-injury requirement would hardly serve [its] purpose … of

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

45

preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *Id.* And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties"). Accordingly, any injunction here should be limited to particular individual Plaintiffs found to have cognizable claims.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss these cases.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

46

Dated: November 1, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRIAN STRETCH
United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Branch Director

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG (DC Bar #467513)
Senior Trial Counsel
STEPHEN M. PEZZI (DC Bar #995500)
KATE BAILEY (MD Bar #1601270001)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.
Washington, DC 20530
Phone: (202) 514-3374
Fax: (202) 616-8460
Email: brad.rosenberg@usdoj.gov

*Attorneys for Defendants*

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

47

# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF CALIFORNIA

REGENTS OF UNIVERSITY OF
CALIFORNIA and JANET NAPOLITANO, in
her official capacity as President of the
University of California,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY and ELAINE
DUKE, in her official capacity as Acting
Secretary of the Department of Homeland
Security,

Defendants.

No. 3:17-cv-05211-WHA
No. 3:17-cv-05235-WHA
No. 3:17-cv-05329-WHA
No. 3:17-cv-05380-WHA
No. 3:17-cv-05813-WHA

**[PROPOSED] ORDER**

This matter comes before the Court on Defendants' Motion to Dismiss. Upon consideration of Defendants' motion and of all materials submitted in relation thereto, it is hereby ORDERED that Defendants' motion shall be, and it hereby is, GRANTED; and it is further ORDERED that the following cases shall be, and hereby are, DISMISSED:

- No. 3:17-cv-05211-WHA, *Regents of the University of California, et. al. v. U.S. Dep't of Homeland Security, et al.*
- No. 3:17-cv-05235-WHA, *State of California, et al. v. U.S. Dep't of Homeland Security, et al.*
- No. 3:17-cv-05329-WHA, *City of San Jose v. Trump, et al.*
- No. 3:17-cv-05380-WHA, *Garcia, et al. v. United States of America, et al.*
- No. 3:17-cv-05813-WHA, *County of Santa Clara, et al. v. Trump, et al.*

IT IS SO ORDERED.

Date:_____

_____
WILLIAM ALSUP
United States District Judge

APPENDIX B

TAB 5

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE TRUSTEES OF PRINCETON UNIVERSITY, *et al.*,<br><br>       *Plaintiffs*,<br><br>v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>       *Defendants*. | Civil Action No. 17-cv-2325 (CRC) |

**DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

For the reasons set forth in the accompanying memorandum of law, Defendants respectfully move the Court to dismiss this action or, in the alternative, to grant summary judgment to Defendants. *See* Fed. R. Civ. P. 12(b)(1), (6), 56.

Dated: November 22, 2017           Respectfully submitted,

                                     CHAD A. READLER
                                     Principal Deputy Assistant Attorney General

                                     BRETT A. SHUMATE
                                     Deputy Assistant Attorney General

                                     JENNIFER D. RICKETTS
                                     Director

                                       JOHN R. TYLER
                                     Assistant Branch Director

1

*/s/ Rachael Westmoreland*
RACHAEL WESTMORELAND (GA Bar. No. 539498)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 514-1280
Fax: (202) 616-8470
Email: rachael.westmoreland@usdoj.gov

*Counsel for Defendants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THE TRUSTEES OF PRINCETON
UNIVERSITY, *et al.*,

           *Plaintiffs*,

    v.

UNITED STATES OF AMERICA, *et al.*,

           *Defendants*.

Civil Action No. 17-cv-2325 (CRC)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION
TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..............................................................................................................1

BACKGROUND ..............................................................................................................5

    A. Deferred Action Generally...................................................................................5

    B. DACA and DAPA..............................................................................................6

    C. The *Texas* Litigation .........................................................................................8

    D. Rescission of DACA...........................................................................................9

    E. The Instant Action...........................................................................................10

LEGAL STANDARDS ....................................................................................................11

ARGUMENT .................................................................................................................13

    I.   THIS CASE IS NOT JUSTICIABLE.....................................................................14

        A. The Rescission Policy Is Not Justiciable Because this Immigration
           Enforcement Policy Is a Matter Committed to Agency Discretion
           by Law .......................................................................................................14

        B. The INA Deprives District Courts of Jurisdiction over Challenges to
           Denials of Deferred Action......................................................................21

        C. The Non Individual Plaintiffs' Claims Are Not Cognizable ......................................24

           1.  Plaintiffs Lack Article III Standing.........................................................24

           2.  Plaintiffs Lack a Cause of Action Under the APA ................................25

        D. The Government's Justiciability Objections Are Not Inconsistent
           with the Acting Secretary's Reliance on the Fifth Circuit's Decision........................26

    II. PLAINTIFFS FAIL TO STATE A CLAIM ..........................................................27

        A. Plaintiffs Fail to State an APA Claim......................................................................27

           1.  The Acting Secretary Rationally Explained Her Decision to Wind
               Down DACA, Particularly Given the Imminent Risk of a Nationwide
               Injunction. ....................................................................................27

2.   The Rescission Policy is Exempt from Notice and Comment .............................34

B.   Plaintiffs Fail to State an Equal Protection Claim ........................................37

C.   Plaintiffs Fail to State a Procedural Due Process Claim.................................38

D.   Plaintiffs Fail to State a Substantive Due Process Claim. ............................41

III.   NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS
IMPERMISSIBLE ...........................................................................................44

CONCLUSION.........................................................................................................45

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Abdelfattah v. U.S. Dep't of Homeland Sec.*,
   787 F.3d 524 (D.C. Cir. 2015) ................................................................. 43

*Abhe & Svoboda, Inc. v. Chao*,
   508 F.3d 1052 (D.C. Cir. 2007) ............................................................... 12

*Aetna Life Ins. Co. of Hartford v. Haworth*,
   300 U.S. 227 (1937) ................................................................................. 44

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
   526 U.S. 40 (1999) ................................................................................... 39

*Am. Nat'l Ins. Co. v. FDIC*,
   642 F.3d 1137 (D.C. Cir. 2011) ............................................................... 11

*Arizona v. United States*,
   567 U.S. 387 (2012) ............................................................................ 5, 16

*Arpaio v. Obama*,
   136 S. Ct. 900 (2016) ................................................................................ 5

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) .......................................................... *passim*

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................. 12

*Assoc. of Civilian Technicians v. Fed. Labor Relations Auth.*,
   283 F.3d 339 (D.C. Cir. 2002) ................................................................. 17

*Bates v. Donley*,
   935 F. Supp. 2d 14 (D.D.C. 2013) ..................................................... 12, 27

*Bd. of Regents v. Roth*,
   408 U.S. 564 (1972) ................................................................................. 39

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................. 12

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................. 34

*Botezatu v. INS,*
  195 F.3d 311 (7th Cir. 1999) ............................................................ 22, 23

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,*
  419 U.S. 281 (1974) ........................................................................ 30, 31

*Browning v. Clinton,*
  292 F.3d 235 (D.C. Cir. 2002) ............................................................ 11

*C&E Servs., Inc. v Dist. of Columbia Water and Sewer Auth.,*
  310 F.3d 197 (D.C. Cir. 2002) ............................................................ 44

*Califano v. Sanders,*
  430 U.S. 99 (1977) ............................................................................ 16

*Camp v. Pitts,*
  411 U.S. 138 (1973) .......................................................................... 29

*Chaudhry v. Holder,*
  705 F.3d 289 (7th Cir. 2013) .............................................................. 6

*Chavez v. Martinez,*
  538 U.S. 760 (2003) .......................................................................... 42

*Chevron U.S.A. Inc. v. Echazabal,*
  536 U.S. 73 (2002) ............................................................................ 30

*Chrysler Corp. v. Brown,*
  441 U.S. 281 (1979) .......................................................................... 35

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ...................................................................... 15, 28

*Clarke v. Secs. Indus. Ass'n,*
  479 U.S. 388 (1987) ...................................................................... 25, 26

*Cmty. Nutrition Inst. v. Young,*
  818 F.2d 943 (D.C. Cir. 1987) ............................................................ 35

*Conn. Bd. of Pardons v. Dumschat,*
  452 U.S. 458 (1981) .......................................................................... 42

*Consumer Energy Council of Am. v. FERC,*
  673 F.2d 425 (D.C. Cir. 1982) ............................................................ 34

*Crowley Caribbean Transp., Inc. v. Pena*,
  37 F.3d 671 (D.C. Cir. 1994) ............................................................... 17

*Cty. of Sacramento v. Lewis*,
  523 U.S. 833 (1998) ............................................................... 42, 44

*Davis v. Fed. Bureau of Prisons*,
  517 F. Supp. 2d 460 (D.D.C. 2007) ............................................................... 14

*Dixon v. District of Columbia*,
  666 F.3d 1337 (D.C. Cir. 2011) ............................................................... 37, 38

*Doe v. Rogers*,
  139 F. Supp. 3d 120 (D.D.C. 2015) ............................................................... 38

*Elgharib v. Napolitano*,
  600 F.3d 597 (6th Cir. 2010) ............................................................... 21

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................... 28, 29

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
  93 F.3d 897 (D.C. Cir. 1996) ............................................................... 26

*Fla. Power & Light Co. v. Lorion*,
  470 U.S. 729 (1985) ............................................................... 28

*George Washington Univ. v. Dist. of Columbia*,
  318 F.3d 203 (D.C. Cir. 2002) ............................................................... 42

*Gerhart v. Lake Cnty.*,
  637 F.3d 1013 (9th Cir. 2011) ............................................................... 42

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ............................................................... *passim*

*Herbert v. Nat'l Acad. of Scis.*,
  974 F.2d 192 (D.C. Cir. 1992) ............................................................... 12

*Hoffman Plastic Compounds, Inc. v. NLRB*,
  535 U.S. 137 (2002) ............................................................... 38

*Hurd v. Dist. of Columbia*,
  864 F.3d 671 (D.C. Cir. 2017) ............................................................... 13

*Hyuk Joon Lim v. Holder*,
   710 F.3d 1074 (9th Cir. 2013) ............................................................... 43

*ICC v. Bhd. of Locomotive Eng'rs* (BLE),
   482 U.S. 270 (1987) ......................................................................... 14, 17

*Ky. Dep't of Corrs. v. Thompson*,
   490 U.S. 454 (1989) ............................................................................... 39

*Lepelletier v. F.D.I.C.*,
   164 F.3d 37 (D.C. Cir. 1999) ............................................................... 25

*Lewis* v. Casey,
   518 U.S. 343 (1996) ............................................................................... 45

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ............................................................................... 14

*Linda R.S. v. Richard D.*,
   410 U.S. 614 (1973) ............................................................................... 24

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................. 11, 24, 34

*Mada-Luna v. Fitzpatrick*,
   813 F.2d 1006 (9th Cir. 1987) ......................................................... 16, 17

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ............................................................................... 45

*Marshall Cty. Health Care Auth. v. Shalala*,
   988 F.2d 1221 (D.C. Cir. 1993) ........................................................... 13

*Mississippi v. Johnson*,
   71 U.S. 475 (1867) ................................................................................. 26

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ............................................................................... 45

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
   463 U.S. 29 (1983) ................................................................................. 28

*Munoz v. Ashcroft*,
   339 F.3d 950 (9th Cir. 2003) ............................................................... 43

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*,
   851 F.2d 1424 (D.C. Cir. 1988) ........................................................... 37

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ............................................................. 35

*Omar v. McHugh*,
   646 F.3d 13 (D.C. Cir. 2011) ............................................................... 40

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n*,
   506 F.2d 33 (D.C. Cir. 1974) .......................................................... 35, 36

*Patterson v. United States*,
   999 F. Supp. 2d 300 (D.D.C. 2013) ...................................................... 13

*Perales v. Casillas*,
   903 F.2d 1043 (5th Cir. 1990) ............................................................. 16

*Plyler v. Doe*,
   457 U.S. 202 (1982) ............................................................................ 37

*Powers v. Ohio*,
   499 U.S. 400 (1991) ............................................................................ 25

*Process Gas Consumers Grp. v. Consumer Energy Council of Am.*,
   463 U.S. 1216 (1983) .......................................................................... 35

*Rempfer v. Sharfstein*,
   583 F.3d 860 (D.C. Cir. 2009) ........................................................ 12, 13

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
   525 U.S. 471 (1999) ..................................................................... *passim*

*Robinson v. Huerta*,
   123 F. Supp. 3d 30 (D.D.C. 2015) ....................................................... 38

*Romeiro de Silva v. Smith*,
   773 F.2d 1021 (9th Cir. 1985) ............................................................. 40

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
   411 U.S. 1 (1973) ............................................................................... 38

*Syncor Int'l Corp. v. Shalala*,
   127 F.3d 90 (D.C. Cir. 1997) .............................................................. 36

*Syracuse Peace Council v. FCC*,
867 F.2d 654 (D.C. Cir. 1989) ............................................................. 31

*Tefel v. Reno*,
180 F.3d 1286 (11th Cir. 1999) ........................................................... 43

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ............................................................................. 13

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ..................................................... *passim*

*Texas v. United States*,
No. 1:14-cv-254 (S.D. Tex. Nov. 18, 2016) ......................................... 9

*Town of Castle Rock v. Gonzales*,
545 U.S. 748 (2005) ............................................................................. 39

*Town of Chester v. Laroe Estates, Inc.*,
137 S. Ct. 1645 (2017) ......................................................................... 45

*Troy Corp. v. Browner*,
120 F.3d 277 (D.C. Cir. 1997) ............................................................. 29

*United States v. Armstrong*,
517 U.S. 456 (1996) ..................................................................... 15, 19

*United States v. Texas*,
136 S. Ct. 900 (2016) ............................................................................. 5

*United States v. Texas*,
136 S. Ct. 2271 (2016) ........................................................................... 8

*United States v. Texas*,
137 S. Ct. 285 (2016) ............................................................................. 8

*Univ. Med. Ctr. of S. Nev. v. Shalala*,
173 F.3d 438 (D.C. Cir. 1999) ............................................................. 13

*Vasquez v. Aviles*,
639 F. App'x 898 (3d Cir. 2016) ......................................................... 22

*Velasco-Gutierrez v. Crossland*,
732 F.2d 792 (10th Cir. 1984) ............................................................. 40

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ................................................................................................ 42

*Washington v. Trump*,
858 F.3d 1168 (9th Cir. 2017) ................................................................................ 25

**Statutes**

5 U.S.C. § 553 ................................................................................................ 3, 34, 35

5 U.S.C. § 701 ................................................................................ 14, 15, 17, 24

5 U.S.C. § 702 ................................................................................................ 26

5 U.S.C. § 704 ................................................................................................ 34

5 U.S.C. § 706 ................................................................................................ 28

6 U.S.C. § 202 ................................................................................................ 21

6 U.S.C. § 251 ................................................................................................ 21

6 U.S.C. § 557 ................................................................................................ 21

8 U.S.C. § 1103 ................................................................................................ 5

8 U.S.C. § 1154 ................................................................................................ 6

8 U.S.C. § 1158 ................................................................................................ 5

8 U.S.C. § 1182 ................................................................................................ 5

8 U.S.C. § 1229b ................................................................................................ 5

8 U.S.C. § 1252 ........................................................................................ *passim*

28 U.S.C. § 2201 ................................................................................................ 44

Personal Responsibility And Work Opportunity Reconciliation Act of 1996,
Pub L. No. 104–193, 110 Stat 2105 .................................................................... 37

**Regulations**

8 C.F.R. § 274a.12(c)(14) ................................................................................ 5, 6

**Federal Rules**

Fed R. Civ. P. 12 .......................................................................................... 11, 12, 19, 26


**Constitution**

U.S. Const. amend. V ................................................................................................... 39


**Other Authorities**

Attorney General's Manual on the Administrative Procedure Act (1947) ................................... 35

Press Release, DHS
    Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
    https://go.usa.gov/xncuM ................................................................................ 30

U.S. Dep't of Justice, Office of Legal Counsel,
    *The Department of Homeland Security's Authority to Prioritize Removal of
    Certain Aliens Unlawfully Present*, 38 Op. O.L.C. (Nov. 19, 2014),
    https://www.justice.gov/file/179206/download .............................................. 6, 20, 33

USCIS, *Frequently Asked Questions* (last updated Oct. 6, 2017),
    https://go.usa.gov/xngCd ...................................................................... 7, 40, 41, 43

USCIS, *Policy Memorandum*  (Nov. 7, 2011),
    https://go.usa.gov/xncPK ........................................................................ 7, 41

# INTRODUCTION

In 2012, then-Secretary of Homeland Security Janet Napolitano adopted the policy now known as DACA, or Deferred Action for Childhood Arrivals. DACA made deferred action—a practice by which the Secretary exercises individualized enforcement discretion to issue a reversible notification that she does not intend to remove an alien for a set period of time—available to a class of unlawfully present aliens who came to the United States as children. In 2014, one of her successors expanded the parameters of DACA and adopted a similar policy known as DAPA, or Deferred Action for Parents of Americans. DAPA, if implemented, would have made deferred action available to unlawfully present aliens who were parents of U.S. citizens and lawful permanent residents.

DAPA, including its expansion of DACA, was promptly challenged by a coalition of 26 states. Although then-Secretary of Homeland Security Jeh Johnson vigorously defended the policy, he was rebuffed at every turn: the United States District Court for the Southern District of Texas issued a nationwide preliminary injunction; the United States Court of Appeals for the Fifth Circuit affirmed, declaring the policy "manifestly contrary" to the Immigration and Nationality Act (INA); and an equally divided Supreme Court affirmed, leaving the injunction in place.

Armed with this victory, the states threatened to amend their complaint to challenge not just DAPA, but DACA as well, arguing that it suffers from the same infirmities. In view of the substantial similarities between the two policies, the significant litigation risk posed by the Supreme Court and Fifth Circuit decisions, and the Attorney General's view that DACA was in fact unlawful, Acting Secretary of Homeland Security Elaine C. Duke was faced with two options. On the one hand, she could wind down DACA in an orderly fashion, minimizing the disruption to current recipients. On the other, continued litigation would in all likelihood result in a nationwide

injunction abruptly ending the policy, plunging its nearly 800,000 recipients into uncertainty.

The Acting Secretary chose the less disruptive option: an orderly process that formally rescinds DACA but allows it to sunset. Under this Rescission Policy, no DACA recipient will have his or her deferred action abruptly terminated based solely on the Rescission Policy; instead, prior grants will generally remain valid for the remainder of their stated duration (usually two years) before ending consistent with their stated terms. Any DACA recipient whose deferred action was due to expire within six months was given a month to request another two-year renewal. And although the agency has stopped accepting new DACA requests, it will finish adjudicating those it had received by September 5, 2017, when the Rescission Policy was announced.

In this case, Plaintiffs—one university, one corporation, and one DACA recipient—challenge the Rescission Policy on a variety of statutory and constitutional grounds, urging the Court to invalidate the agency's decision and enjoin the Acting Secretary from rescinding DACA. Plaintiffs also request that the Court enjoin Defendants from disclosing the information of DACA recipients for immigration enforcement purposes in a manner inconsistent with the Department of Homeland Security's (DHS) information-sharing policy. There is no basis to do so.

To begin, this case is not justiciable. The Rescission Policy is a classic exercise of enforcement discretion "presumed immune from judicial review," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and particularly unfettered in the context of immigration, *see Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 487–92 (1999). In fact, Congress has stripped district courts of jurisdiction to review "'no deferred action' decisions and similar discretionary determinations" such as the one here. *AADC*, 525 U.S. at 485; *see* 8 U.S.C. § 1252(g). Also, at a minimum, the non-individual Plaintiffs cannot proceed due to their lack of standing and a cause of action. The Court should not permit Plaintiffs to circumvent these bedrock

limits on judicial review.

On the merits, Plaintiffs' claims fail as a matter of law. Their claim that the Rescission Policy is arbitrary and capricious under the Administrative Procedure Act (APA) because it was inadequately supported by the record is fundamentally misguided. Agencies are always free to change course on policy matters so long as they provide a rational explanation. Here, the Acting Secretary's explanation of her decision to rescind DACA amply meets that deferential standard, particularly given the adverse ruling from the Fifth Circuit and the Supreme Court's affirmance, the evident similarities between DACA and the policy that expanded DACA and created DAPA, the Attorney General's opinion that DACA was likewise unlawful, and the imminent risk of a nationwide injunction with potentially chaotic results. Because these claims can be resolved now based on the complaint, the documents incorporated therein by reference, and other judicially noticeable materials—including those in the administrative record, served contemporaneously herewith—the Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside the Rescission Policy if it disagrees.

Plaintiffs' notice-and-comment claim is equally unavailing. The APA exempts "general statements of policy" from notice and comment, 5 U.S.C. § 553(b), and the Rescission Policy is a reordering of enforcement priorities that readily qualifies. Indeed, DHS and the former Immigration and Naturalization Service (INS) have adopted more than 20 deferred action or similar policies over the past 50 years. Few have gone through notice and comment, and there is no warrant for those procedures here. Nor does the Fifth Circuit's ruling that the states established a substantial likelihood of success on their claim that the promulgation of DAPA required notice and comment mean that the rescission of DACA and a return to the *status quo ante* must likewise meet these procedural demands. And in any event, if DACA's rescission required notice and

3

comment, then DACA was void from the outset because its adoption would also have required notice and comment *a fortiori*.

Plaintiffs' equal protection claims get them no further.  Plaintiffs have failed to identify a suspect class or a fundamental right implicated by the Rescission Policy, and the Acting Secretary's decision easily survives rational-basis review.

Plaintiffs' due process claims also cannot survive a motion to dismiss.  DACA recipients have no protected liberty or property interest in the continued availability of deferred action, which is an exercise of prosecutorial discretion that confers no rights and is revocable at any time, or in the continuity of DHS's information-sharing policy, which has not changed since DACA was implemented in 2012.  Moreover, Plaintiffs fail to identify any executive conduct that "shocks the conscience" in a manner that would support a claim for the violation of Plaintiffs' substantive due process rights.

In sum, even if Plaintiffs' challenge were somehow justiciable, the assumption underlying it would compel dismissal.  DAPA—including its expansion of DACA—was enjoined by the Fifth Circuit, and that holding was affirmed by the Supreme Court.  The original DACA policy is materially indistinguishable as a legal matter.  At bottom, Plaintiffs' argument is that, when making discretionary enforcement determinations, federal agencies must ignore the legal rulings and reasoning of federal courts.  To state the premise of this claim is to refute it.

This case should be dismissed.

## BACKGROUND

### A.  Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the INA along with "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1).  Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396 (citation omitted).  DHS officials must first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum, parole, or cancellation of removal, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b.  "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely. *AADC*, 525 U.S. at 483.

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016).  Deferred action is a practice by which the Secretary exercises his or her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period. *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the

government which gives some cases lower priority"). Although originally "developed without express statutory authorit[y]," *AADC*, 525 U.S. at 484, individualized deferred action has been recognized by Congress in certain circumstances inapplicable here, *see, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"), and described by the Supreme Court as an "exercise in administrative discretion," *AADC*, 525 U.S. at 484. Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former INS have adopted over 20 such policies over the past 50 years—rarely through notice-and-comment rulemaking.[1]

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, under DHS regulations not challenged here. *See, e.g.*, 8 C.F.R. § 274a.12(c)(14). That decision does not, however, confer lawful immigration status or provide any defense to removal. *Cf. Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (discussing difference between "unlawful presence" and "unlawful status"). To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (citation omitted). DHS thus has discretion to revoke deferred action unilaterally, for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time. *See AADC*, 525 U.S. at 484–85.

## B.  DACA and DAPA

On June 15, 2012, then-Secretary Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals. *See* Admin. R. (AR) 1–3 (hereinafter DACA Memo).

---

[1] *See generally* U.S. Dep't of Justice, Office of Legal Counsel, The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present, 38 Op. O.L.C. 1, 12–20 (Nov. 19, 2014) (OLC Op.), https://www.justice.gov/file/179206/download.

DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws. DACA Memo at 1 (AR 1). Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to indefinite renewal. *Id.* at 2–3 (AR 2–3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests for this relief would "be decided on a case by case basis," *id.* at 2 (AR 2). Accordingly, the Memo provided that this grant of deferred action "confer[red] no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." *Id.* at 3 (AR 3).

In public guidance published on the U.S. Citizenship and Immigration Service website, DHS also informed DACA requestors that information in their requests will be "protected from disclosure to [U.S. Immigration & Customs Enforcement (ICE)] and [U.S. Customs & Border Protection (CBP)] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised). USCIS, *Frequently Asked Questions*, FAQ No. 19 (last updated Oct. 6, 2017), (hereinafter DHS DACA FAQ), https://go.usa.gov/xngCd; *see* USCIS, *Policy Memorandum*, (Nov. 7, 2011) (hereinafter Notice to Appear Guidance), https://go.usa.gov/xncPK. DHS instructed, however, that this information-sharing policy creates no rights and "may be modified, superseded, or rescinded at any time without notice." DHS DACA FAQ No. 19.

In 2014, then-Secretary Jeh Johnson expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA.

*See* AR 37–41 (hereinafter DAPA Memo).  DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents." DAPA Memo at 3 (AR 39).  The DAPA Memo also expanded DACA by relaxing the eligibility criteria and extending the DACA renewal period from two to three years.  *Id.* at 3–4 (AR 39–40).

### C.      The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states, led by Texas, which sought to enjoin its implementation.  Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of the DAPA Memo.  *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  Like the U.S. District Court for the Southern District of Texas, the Fifth Circuit held that the promulgation of the DAPA Memo was justiciable, in part because it believed that "the INA's intricate regulatory scheme for changing immigration classifications" allowed the court to determine whether DHS had exceeded its statutory authority.  *Id.* at 168.  It stressed, however, that "the *denial* of voluntary departure and work authorization" would be unreviewable.  *Id.*  Also like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the APA's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment."  *Id.* at 178 n. 156.  And going beyond the district court, the Fifth Circuit held that DAPA was "manifestly contrary" to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one legal status to another," DAPA awarded deferred action "to persons who have never had a legal status and may never receive one."  *Id.* at 184, 186 (footnotes omitted).

That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing

upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in place. On November 18, 2016, the parties jointly moved the district court to stay merits proceedings to allow them to evaluate "how they might choose to move forward" given the upcoming "change in Administration[s]." Joint Mot. to Stay Merits ¶ 2, *Texas v. United States*, No. 1:14-cv-254 (S.D. Tex. Nov. 18, 2016), ECF No. 430.

Faced with continued litigation over a policy that had been enjoined by the courts, DHS rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA. *See* Memorandum for Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Prot., et al., from John F. Kelly, Sec'y of Homeland Sec. (June 15, 2017) (AR 235–37). Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to also challenge directly the DACA Memo, arguing that it suffers from the same legal infirmities as the DAPA Memo. *See* AR 238–40 (Paxton Letter).

## D.       Rescission of DACA

Faced again with the prospect of continued litigation, Acting Secretary Duke decided on September 5, 2017, to wind down the DACA policy in an orderly fashion. *See* AR 252–56 ("Rescission Policy" or "Policy"). As the Acting Secretary explained, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy at 4 (AR 255). Specifically, she quoted the Attorney General's September 4 recommendation to rescind DACA, which explained that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted).

Invoking her "authority in establishing national immigration policies and priorities," she rescinded the DACA Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on an individualized[,] case-by-case basis," *id.* at 2 (AR 253).

At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

- For *current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods." *Id.* at 4 (AR 255).

- For *initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date. *Id.*

- For *DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017. Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017." *Id.*

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id.* at 4 (AR 255). The Rescission Policy says nothing about (and makes no changes to) DHS's information-sharing policy regarding information provided to USCIS in a DACA request.

### E. The Instant Action

Plaintiffs' complaint raises five claims. In Count I, Plaintiffs allege that the Rescission Policy violates the APA because it was issued without authority and without notice and comment.

Pls.' Compl. ¶¶ 65–72, ECF No. 1.  In Count II, Plaintiffs allege that the Rescission Policy violates the APA because it constitutes a change in agency policy without an adequate explanation.  *Id.* ¶¶ 73–89.  In Count III, Plaintiffs allege that the rescission violates the Equal Protection component of the Fifth Amendment's Due Process Clause because it allegedly discriminates against DACA recipients on the bases of their undocumented status.  *Id.* ¶¶ 90–93.  In Count IV, Plaintiffs allege that the rescission violates procedural due process because, without notice and an opportunity to be heard, (a) Princeton University will be deprived of its interest in having DACA recipients as enrolled students, (b) Microsoft will be deprived of its interests in the investments it made in employees who are DACA recipients, and (c) DACA recipients will be deprived of their interest in their DACA.  *Id.* ¶¶ 94–103.  In Count V, Plaintiffs allege that the government's supposedly new information-sharing policy violates substantive due process.  *Id.* ¶¶ 104–109.  Plaintiffs ask the Court to declare that the DACA policy was lawful, declare that the Rescission Policy is unlawful, and enjoin Defendants from rescinding DACA as well as from allegedly impermissible information sharing.

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must establish the Court's jurisdiction through sufficient allegations.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  When considering such a motion, the Court must accept all well-pleaded allegations as true.  *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  The Court need not, however, accept inferences that are unsupported by facts alleged in the complaint or that amount to mere legal conclusions.  *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In evaluating subject-matter jurisdiction, the court may, when necessary, look beyond the complaint to "undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus

the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (quoting *Twombly*, 550 U.S. at 557). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as ... factual allegation[s]" are "disentitle[d] ... to th[is] presumption of truth." *Id.* at 678, 681 (citation omitted). Although the Court generally may not rely on material outside the pleadings under Rule 12(b)(6), it may consider materials incorporated into the complaint by reference, as well as judicially noticeable materials, without converting the motion into one for summary judgment. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

With respect to Plaintiffs' APA claims, "a court may consider the administrative record and public documents without converting the motion into a motion for summary judgment, or it may convert the motion into a motion for summary judgment under Rule 12(d)." *Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013) (internal citation omitted). "[W]hen a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (alterations in original) (citation omitted); *see also Bates*, 935 F. Supp. 2d at 17. "The entire case on review is a question of law, and only a question of law. And because a court can fully resolve any purely legal question

on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage ... and there is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (citation omitted). Under these circumstances, review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously." *Rempfer*, 583 F.3d at 865; *see also Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n.3 (D.C. Cir. 1999) (explaining that when reviewing agency action the question whether the agency acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record, regardless of whether it is presented in the context of a motion for judgment on the pleadings or in a motion for summary judgment).

Even outside the context of the APA, the Court may consider "matters of ... judicial notice." *Hurd v. Dist. of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (citations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Court may also consider exhibits that are submitted with the complaint, *see Hurd*, 864 F.3d at 678, as well as "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss," such as when the complaint "quotes from and discusses a document extensively." *Patterson v. United States*, 999 F. Supp. 2d 300, 306 (D.D.C. 2013) (internal citations and alterations omitted).

**ARGUMENT**

In seeking to invalidate the Rescission Policy, Plaintiffs ask the Court to override the Acting Secretary's judgment about how to exercise her discretion in enforcing the Nation's immigration laws. The Court need not consider this extraordinary request, however, because this case is not justiciable. The exercise of enforcement discretion in the Rescission Policy is

committed to agency discretion by law and is therefore unreviewable.  In fact, Congress has gone

so far as to strip district courts of jurisdiction over "no deferred action" decisions such as the one

here.  At a minimum, the non-individual plaintiffs lack standing.  And in all events, Plaintiffs fail

to state a claim.  This case should therefore be dismissed.

## I.  THIS CASE IS NOT JUSTICIABLE.

### A.  The Rescission Policy is Not Justiciable because this Immigration Enforcement Policy is a Matter Committed to Agency Discretion by Law.

**1.**  The APA bars judicial review of certain categories of decisions that "courts traditionally

have regarded as 'committed to agency discretion.'"  *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)

(quoting 5 U.S.C. § 701(a)(2)).  These decisions are typically unreviewable because there exists

"no meaningful standard against which to judge the agency's exercise of discretion" in these areas.

*Chaney*, 470 U.S. at 830; *see Davis v. Fed. Bureau of Prisons*, 517 F. Supp. 2d 460, 461 (D.D.C.

2007) ("The APA, however, also provides an exception to the waiver of sovereign immunity ...

when ... agency action is committed to agency discretion."), *aff'd in part and remanded*, 334 F.

App'x 332 (D.C. Cir. 2009).  This bar applies even when "the agency gives a 'reviewable' reason

for otherwise unreviewable action."  *ICC v. Bhd. of Locomotive Eng'rs* (*BLE*), 482 U.S. 270, 283

(1987).

Among the decisions committed to executive discretion are "an agency's exercise of

enforcement power."  *Chaney*, 470 U.S. at 833.  Such judgments involve "a complicated balancing

of … factors which are peculiarly within [an agency's] expertise," including "whether agency

resources are best spent on this violation or another, whether the agency is likely to succeed if it

acts, whether the particular enforcement action requested best fits the agency's overall priorities,

and, indeed, whether the agency has enough resources to undertake the action at all."  *Id.* at 831.

As there is "no meaningful standard against which to judge the agency's exercise of discretion" in

weighing these factors, an agency's exercise of enforcement powers is "presumed immune from judicial review under § 701(a)(2)." *Id.* at 830, 832.

For instance, an "agency [] decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* at 831. After all, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," and it is "far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32. Thus, for example, the Supreme Court in *Chaney* held that the FDA's general policy of refusing to exercise its enforcement authority with respect to states' use of approved drugs in lethal injections was committed to the agency's discretion under § 701(a)(2). *See* 470 U.S. at 824–25, 837–38 (finding FDA's refusal to take the enforcement actions requested by respondents, including broad measures that would have impacted an entire drug market segment, was not subject to judicial review).

An agency's decision *to* enforce the law against a particular individual is likewise presumptively unreviewable. Just as "the decision whether or not to prosecute" presumptively "rests entirely in [the prosecutor's] discretion," *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation omitted), an agency's decision to bring a civil enforcement action is generally not open to judicial scrutiny. Considerations such as "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall policies" are equally present in enforcement decisions as in nonenforcement decisions, *Chaney*, 470 U.S. at 831, and judicial intrusion into the deliberative process is equally improper, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("there must be a strong showing of bad faith or improper behavior before" courts can engage in an "inquiry into the mental processes of administrative

decisionmakers"), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

This presumption of nonreviewability applies with particular force when it comes to immigration. On top of the general concerns implicated in any enforcement decision, the enforcement of immigration laws "embraces immediate human concerns," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 396–97. Given these realities, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Id.* at 396. One form of that broad discretion is deferred action, a "discretionary and reversible" decision to notify an alien that DHS has chosen not to seek his removal for a specific period of time. *Arpaio*, 797 F.3d at 17; *see supra* at 5–6. Like other agency nonenforcement decisions, grants of deferred action rest on a complex balancing of policy considerations that cannot serve as a "meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830. Such determinations are thus presumptively unreviewable. *See Arpaio*, 797 F.3d at 16.

The converse is equally true: *denials* of deferred action are also committed to agency discretion. *See AADC*, 525 U.S. at 485 (treating "'no deferred action' decisions" as "discretionary determinations"). Because "[g]ranting an illegally present alien permission to remain and work in this country" is fundamentally "a dispensation of mercy," there are "no standards by which judges may patrol its exercise." *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (INS's decision not to grant pre-hearing voluntary departures and work authorizations to a group of aliens non-justiciable). To be sure, a decision "not to grant deferred action status to a particular alien is not precisely a 'decision not to take enforcement action,'" but that does not obscure the fact that "many of the same factors" underlying the latter determinations usually play a role in the former. *Mada-*

16

*Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 n.4 (9th Cir. 1987) ("denials of deferred action status applications are not subject to judicial review" under § 701(a)(2)).

**2.** As an exercise of enforcement discretion, the Rescission Policy is a classic example of a discretionary determination that is entrusted to the agency alone. Indeed, any attempt to judge the Policy would quickly entangle this Court in the sort of complex and discretionary balancing that has been entrusted by Congress to the Executive Branch. For example, the judiciary is institutionally ill-equipped to assess whether the Acting Secretary's decision to change "immigration policies and priorities" by rescinding DACA, Rescission Policy at 4 (AR 255), was an appropriate use of "the Department's limited resources," *Arpaio*, 797 F.3d at 16. Nor is this Court well suited to second-guess the Acting Secretary's balancing of the costs and benefits of keeping the policy in place, on one hand, with the risk of "potentially imminent litigation" that could throw DACA into immediate turmoil, on the other. Rescission Policy at 3 (AR 254) (citation omitted).

To be sure, the Acting Secretary *also* gave substantive legal reasons for her decision, *id.* at 2–4 (AR 253–55), but that does not render it justiciable. That is because the Supreme Court has rejected the proposition that if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *BLE*, 482 U.S. at 283.[2] For example, "a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly

---

[2] Of course, if the non-reviewable enforcement policy contains an embedded interpretive rule, that may be reviewable as such. *See Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676–77 (D.C. Cir. 1994), declined to extend by *Assoc. of Civilian Technicians v. Fed. Labor Relations Auth.*, 283 F.3d 339 (D.C. Cir. 2002). It does not follow, however, that the enforcement policy itself is reviewable. *See BLE*, 482 U.S. at 283. For present purposes, the Rescission Policy does not contain an embedded interpretative rule that would be otherwise reviewable. Rather, it merely contains a non-reviewable decision about the exercise of enforcement discretion. *See id.*

stated) that the law will not sustain a conviction," which "is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point." *Id.* But that does not change the fact that "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review." *Id.* Likewise, the Acting Secretary's discussion of the question of DACA's legality does not transform her generally unreviewable exercise of enforcement discretion into a matter fit for judicial scrutiny.

Indeed, reviewing the Rescission Policy would be particularly inappropriate given the wide discretion the Secretary enjoys in the enforcement of the immigration laws. In *AADC*, the Supreme Court held that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation," 525 U.S. at 488, subject to the "possib[le]" exception "of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome," *id.* at 491. The reason for this highly restrictive rule is that the concerns raised by challenges to the Executive's enforcement discretion "are greatly magnified in the deportation context." *Id.* at 490. An alien subject to removal is, by definition, in continuing violation of the INA, and judicial interference with the Executive's enforcement therefore would compel the Executive to disregard such ongoing violations. The "delay" associated with challenges to discretionary decisions not to forgo enforcement is more likely than in the criminal arena, as "[p]ostponing justifiable deportation (in the hope that the alien's status will change … or simply with the object of extending the alien's unlawful stay) is often the principal object of resistance to a deportation proceeding," and "the consequence is to permit and prolong a continuing violation" of the immigration laws. *Id.* at 490. For another, reviewing immigration decisions may involve "not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives" or

18

other sensitive matters as well. *Id.* at 490–91. Finally, the idea that "an ongoing violation of United States law ... must be allowed to continue because it has been improperly selected is not powerfully appealing." *Id.* at 491 (emphasis omitted).

**3.** Notwithstanding these clear concerns that warrant a presumption against judicial review, the court in *Batalla Vidal v. Duke*, a related case presenting similar challenges to the Rescission Policy, held that the Acting Secretary's decision to rescind DACA "was not itself a presumptively unreviewable exercise of enforcement discretion." Mem. & Order at 23, *Batalla Vidal v. Duke*, No. 16-cv-4756 (E.D.N.Y. Nov. 9, 2017), ECF No. 104 (hereinafter *Batalla Vidal* Mem. & Order) (granting in part and denying in part Defendants' Rule 12(b)(1) motion and reserving ruling on Defendants' Rule 12(b)(6) motion). In so holding, however, the court incorrectly labeled the Acting Secretary's decision to rescind DACA as a "constrain[t]" on DHS's prosecutorial discretion with respect to DACA recipients, *see id.* at 24, and incorrectly described the rescission as subjecting "individuals who previously enjoyed some protection from removal to coercive state authority," *id.* at 25. To the contrary, the Acting Secretary's decision to rescind DACA was an act of discretion in and of itself, which is best described as reordering the agency's enforcement priorities in light of litigation risk. *See Arpaio*, 797 F.3d at 17 (citation omitted) (deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship'"). It is, therefore, equally entitled to a presumption of nonreviewability as the enforcement and non-enforcement cases that the Supreme Court has found are committed to executive discretion. *See, e.g.*, *Chaney*, 470 U.S. at 832–33; *Armstrong*, 517 U.S. at 464; *AADC*, 525 U.S. at 485.

Moreover, the court in *Batalla Vidal* found the Rescission Policy reviewable based upon its misinterpretation that the Acting Secretary "exclusively" relied on a legal determination that

DACA was unlawful, a rationale for which the court held there was "law to apply." *Batalla Vidal* Mem. & Order at 22 (citing AR 251 (Sessions Letter); AR 253–55 (Rescission Policy)). The Attorney General's determination that DACA was unconstitutional was but one factor that the Acting Secretary considered. As the Rescission Policy makes clear, in determining to wind down the policy pursuant to the parameters laid out in the memorandum, the Acting Secretary also relied on the history of the *Texas* litigation and potential risk it posed to the continuation of DACA, as well as the self-evident complexities associated with ending DACA, a policy that impacts nearly 800,000 individuals. Rescission Policy at 2–4 (AR 253–55). The balancing of those considerations is not amenable to review in light of the sources cited by the *Batalla Vidal* court, such as statutory text, the history of the use of deferred action, or the 2014 Office of Legal Counsel (OLC) opinion.[3] *Batalla Vidal* Mem. & Order at 22.

The court's reasoning is also contrary to *BLE*, which makes clear that enforcement decisions are committed to agency discretion even where they rest on broad legal policy judgments rather than individualized considerations. *BLE*, 482 U.S. at 283. *BLE* specifically gave the example of a criminal prosecutor's decision not to prosecute a certain category of crimes based on the prosecutor's view of the legal merits of the prosecution. *Id.* Although a court may be qualified to consider those legal merits, "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review." *Id.* Just as in the analogy provided in *BLE*, the Acting Secretary's consideration, among other things, of the lawfulness of the DACA policy merely explains how she plans to exercise her discretion to rescind the policy and that decision, regardless of the court's ability to review the legal merits of DACA, is nonreviewable. *Id. BLE*'s point applies *a fortiori*

---

[3] OLC Op. 18 n. 8.

in the immigration context where the Supreme Court has emphasized the problems with questioning the government's exercise of its broad discretion. *See AADC*, 525 U.S. at 489–90.

### B. The INA Deprives District Courts of Jurisdiction over Challenges to Denials of Deferred Action.

Not only is the denial of deferred action committed to agency discretion under the APA, but the INA itself deprives federal district courts of jurisdiction over challenges to such denials altogether. As the Supreme Court explained in *AADC*, the Executive's "exercise of [its] discretion" in granting deferred action in some circumstances had "opened the door to litigation … where" the Executive had "chose[n] *not* to exercise it." *Id.* at 484. Specifically, some courts had entertained challenges to "the refusal to exercise such discretion" on various bases such as "selective prosecution," the use of "arbitrary or unconstitutional criteria, or on other grounds constituting abuse of discretion." *Id.* at 485 (citation omitted). To address what the Supreme Court referred to as this "particular evil"—*i.e.*, "attempts to impose judicial constraints upon prosecutorial discretion"—Congress enacted 8 U.S.C. § 1252(g). *AADC*, 525 U.S. at 485 & n.9.

Section 1252(g) commands that, outside of petitions for review from final removal orders and certain other limited channels for review, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security[4]] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." These were "the acts … that had prompted challenges to the … exercise of prosecutorial discretion" in denying deferred action, and thus § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be

---

[4] *See* 6 U.S.C. § 557; *see also id.* §§ 202, 251; *Elgharib v. Napolitano*, 600 F.3d 597, 607 (6th Cir. 2010) ("[U]nder 6 U.S.C. § 557, … the statutory reference to the 'Attorney General' in § 1252(g) now means 'Secretary of DHS.'").

made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed"—namely, an individual removal proceeding. *AADC*, 525 U.S. at 485 & n.9.

Denials of deferred action—including under DACA itself—thus fall outside the jurisdiction of the federal courts. *See, e.g.*, *Vasquez v. Aviles*, 639 F. App'x 898, 901 (3d Cir. 2016) ("[Section] 1252(g) … deprives all courts of jurisdiction to review a denial of DACA relief because that decision involves the exercise of prosecutorial discretion not to grant a deferred action."); *Botezatu v. INS*, 195 F.3d 311, 314 (7th Cir. 1999) ("Review of refusal to grant deferred action is … excluded from the jurisdiction of the district court.").

Although the court in *Batalla Vidal* held that § 1252(g) did not divest the court of jurisdiction to review the Rescission Policy, its holding was based on an overly narrow reading of the statute. *Batalla Vidal* Mem. & Order at 28–31. Specifically, it held that § 1252(g) was inapplicable because the plaintiffs' challenge to the Rescission Policy did not arise from one of the three enumerated immigration actions that trigger the statute. *Id.* at 29–30. To be sure, Plaintiffs brought this challenge to the Rescission Policy before any removal proceedings took place, but that is beside the point. The decision not to continue deferred action is an ingredient to the commencement of enforcement proceedings at some future date, and a person cannot circumvent the bar in § 1252(g) by singling out that single step for a preemptive challenge. Indeed, the Supreme Court acknowledged that the apparent purpose of § 1252(g) was to protect "'no deferred action' decisions and similar discretionary determinations," like the Rescission Policy, by preventing challenges to such decisions in "separate rounds of judicial intervention" outside the process designed by Congress, as is the case here. *AADC*, 525 U.S. at 485. If aliens (or entities suing on their behalf) could evade § 1252(g)'s bar simply by challenging the forthcoming

expiration of deferred action before actual removal proceedings (if any) began, then jurisdiction would turn on a race to the courthouse. Such a framework would create the perverse incentive for DHS to begin removal proceedings immediately rather than to allow, as it did here, for rolling expirations of deferred action over a two-and-a-half-year period. There is no indication that Congress sought to enact such a nonsensical regime. Instead, § 1252(g) precludes review of either "the decision *or action*" by the Acting Secretary "to commence proceedings," and thereby sweeps in the Rescission Policy. 8 U.S.C. § 1252(g) (emphasis added).[5]

Moreover, the *Batalla Vidal* court ignored that at least one court has applied § 1252(g) to actions that are "not … on the list of precluded items"—*i.e.*, "decisions to commence proceedings, adjudicate cases, or execute removal orders"—in order to effectuate the object of this jurisdictional bar. *Botezatu*, 195 F.3d at 313–14. In *Botezatu*, the Seventh Circuit rejected an alien's argument that a court could review the Executive's "refusal to … grant him humanitarian parole or deferred action" simply because that denial occurred in "post-deportation procedures." *Id.* at 313–14. As the Seventh Circuit explained, because *AADC* broadly held that "'no deferred action' decisions and similar discretionary determinations' [were] governed by § 1252(g)," that jurisdictional bar

---

[5] The court in *Batalla Vidal* also held that § 1252(g) did not divest the court of jurisdiction to hear claims of the non-individual plaintiffs (several States and an advocacy organization) because the statute bars only suits by or on behalf of an alien. *Batalla Vidal* Mem. & Order at 31. However, the fundamental concerns of § 1252(g) apply whether the challenge is brought by the alien himself or an outside entity (on its own behalf or on behalf of the alien). *See AADC*, 525 U.S. at 485. In either context, the purpose of the jurisdictional bar is to prevent separate judicial review, like the instant suit, outside the streamlined process Congress intended. *Id.* Furthermore, like the American-Arab Anti-Discrimination Committee in *AADC*, itself an organizational plaintiff, the non-individual Plaintiffs in this matter are for purposes of § 1252(b) suing "on behalf" of an alien because the relief they seek will benefit the individual Plaintiff and all other DACA recipients. To the extent the non-individual Plaintiffs would benefit from an order setting aside the Rescission Policy, *but see infra* Section I.C.1, their benefit would be only an indirect and incidental effect of the relief for DACA recipients.

should apply regardless of *when* such determinations occurred. *Id.* at 314 (quoting *AADC*, 525 U.S. at 485). Thus, just as an alien (or entity suing on his behalf) cannot circumvent § 1252(g) by bringing a challenge to a denial of deferred action on the back-end, Plaintiffs' broad front-end assault on the Rescission Policy is beyond the jurisdiction of this Court. At the very least, § 1252(g) reinforces the conclusion that enforcement discretion under the INA is at the core of unreviewable matters committed to agency discretion by law under the APA. 5 U.S.C. § 701(a)(2).

### C. The Non-Individual Plaintiffs' Claims Are Not Cognizable.

#### 1. Plaintiffs Lack Article III Standing.

At a minimum, the Court should dismiss the claims brought by the Trustees of Princeton University and Microsoft Corporation for lack of standing. To establish Article III standing, these parties must at least show that they have suffered an "injury in fact" that is "fairly traceable" to Defendants' challenged conduct and that will likely be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. They cannot do so. The Rescission Policy does not regulate them, require them to do (or refrain from doing) anything, or restrict them in any way. Instead, these Plaintiffs complain of injury "from the government's allegedly unlawful regulation (or lack of regulation) of someone else," making standing "substantially more difficult to establish." *Id.* at 562. That burden becomes insurmountable when a plaintiff claims to be injured by the incidental effects of federal enforcement policies, as it is settled that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

These principles apply with particular force where, as here, the parties are relying primarily on the incidental effects of federal immigration policies. *See* Pls.' Compl. ¶ 61 (alleging that Princeton suffers harm from diminished "economic value of [DACA recipients'] education and

24

Princeton's investment in them" as well as the lost "opportunity to matriculate new [DACA recipients]"); *id.* ¶ 62 (alleging that Microsoft is harmed by "eliminating a valuable pool of employees" and causing Microsoft to "spend additional resources to recruit, train, and promote replacement employees").[6]  It would be extraordinary to find Article III standing based on these assertions, as virtually any administration of federal law by a federal agency could have such effects. The unavoidable reality that any enforcement of immigration laws will inevitably have some unintended or derivative effects does not provide carte blanche to challenge such enforcement decisions whenever there is a disagreement about federal immigration policy.

### 2. Plaintiffs Lack a Cause of Action under the APA.

Even if the non-individual Plaintiffs could establish Article III standing, they would lack a cause of action under the APA.  The APA does not "allow suit by every person suffering [an] injury in fact."  *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987).  Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning

---

[6] Princeton also asserts that it brings this suit "on behalf of its students," *see* Pls.' Compl. at 2, but it fails to allege facts sufficient to demonstrate third-party standing, which requires that (1) Princeton "'ha[s] suffered an 'injury in fact,' thus giving [it] a 'sufficiently concrete interest' in the outcome of the issue in dispute,'" (2) that it "ha[s] a close relation to the third party," and (3) that "there . . . exist[s] some hindrance to the third party's ability to protect his or her own interests." *Lepelletier v. F.D.I.C.,* 164 F.3d 37, 43 (D.C. Cir. 1999) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).  As explained above, the incidental effects of the Rescission Policy allegedly borne by Princeton do not rise to the level of "injury in fact" sufficient to establish standing in Princeton's own right.  And even assuming a close relationship between Princeton and its DACA recipient-students for purposes of the challenge at issue in this suit, Princeton has not shown that circumstances exist that prevent these students from asserting their own interests.  Indeed, such a claim would be rebutted by the fact that one of Princeton's DACA-recipient students, Ms. Perales-Sanchez, is in fact a Plaintiff in this matter.  *See Washington v. Trump*, 858 F.3d 1168, 1188 (9th Cir. 2017) (Bea, J., dissenting from denial of *en banc* rehearing) (holding that the panel's analysis ignored the third-party standing requirements of *Powers* and finding that the States' universities did not show that students, faculty, and scholars allegedly harmed by Executive Order 13769, "Protecting the Nation from Foreign Terrorist Entry Into the United States," were unable to protect their own interests).

of a relevant statute." 5 U.S.C. § 702. To be "aggrieved" in this sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute … in question." *Clarke*, 479 U.S. at 396 (brackets and citation omitted). Here, no provision of the INA even arguably protects the non-individual Plaintiffs from bearing any incidental effects of a denial of deferred action.[7] *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

### D. The Government's Justiciability Objections Are Not Inconsistent with the Acting Secretary's Reliance on the Fifth Circuit's Decision.

Although the Fifth Circuit in *Texas* included holdings that a challenge to the DAPA Memo was reviewable, 809 F.3d at 165–70, neither that decision nor Acting Secretary Duke's reliance on it forecloses the government from arguing here that the DACA Rescission Policy is unreviewable. First, neither the Acting Secretary's memo nor the Attorney General's letter expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings, and it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place. Second, officers of the Executive Branch have an independent duty to consider the legality of their policies regardless of whether they are judicially reviewable; all swear an oath to uphold the United States Constitution. *See Mississippi v. Johnson*, 71 U.S. 475,

---

[7] The court in *Batalla Vidal* held that whether the non-individual plaintiffs asserted interests falling within the "zone of interests" protected by the APA was not a jurisdictional or justiciability question, but rather an issue of prudential standing properly addressed under Rule 12(b)(6). *Batalla Vidal* Mem. & Order at 46–47. Because the court reserved its ruling on Defendants' motion to dismiss for failure to state a claim, it did not address this argument.

499 (1867) (Take Care Clause imposes a generally nonjusticiable duty on the Executive Branch).

Finally, even if courts could have reviewed the adoption of DACA as "an abdication of [DHS's]

statutory responsibilities," *Chaney*, 470 U.S. at 833 n.4, that would not make the Rescission Policy,

a classic exercise of agency enforcement discretion, open to challenge.  After all, the Fifth Circuit

itself emphasized that "DAPA is much more than a nonenforcement policy, which presumptively

would be committed to agency discretion," *Texas*, 809 F.3d at 178 n.156, and pointed out that a

"*denial* of voluntary departure and work authorization" by DHS would have been nonjusticiable,

*id.* at 168.  Denials of deferred action under a return to a more traditional enforcement policy

should be treated no differently.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM.

Even if Plaintiffs could establish standing and justiciability, the Court should dismiss this

case in its entirety for failure to state a claim.[8]

### A.  Plaintiffs Fail to State an APA Claim.

#### 1. The Acting Secretary Rationally Explained Her Decision to Wind Down DACA, Particularly Given the Imminent Risk of a Nationwide Injunction.

Plaintiffs contend that the Rescission Policy is arbitrary and capricious because it

constitutes a change in agency policy without an adequate explanation.  Pls.' Compl. ¶¶ 73–89.

That argument misapprehends the nature of the inquiry under the APA.  It is black-letter law that

agencies are free to change course on policy matters so long as they provide a rational explanation.

Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this

deferential standard, particularly in view of the imminent risk of a nationwide injunction, which

could have prompted an immediate—and chaotic—end to the policy.

---

[8] In the alternative, however, the Court may if it wishes convert this motion to one for summary judgment. *See Bates*, 935 F. Supp. 2d at 17, 19.

**1.**  Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B).[9]  The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park*, 401 U.S. at 416.  A decision may be held to be arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).  The Court may not "substitute its judgment for that of the agency."  *Id.*  And when an agency changes policies, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Id.*

In assessing whether a decision was arbitrary and capricious, "[t]he task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) (citation omitted).  If the agency's action "is not sustainable on the administrative record made," then the administrative "decision must be vacated and the matter remanded to [the

---

[9] Plaintiffs also allege that DACA's termination violated the APA because it was unconstitutional.  *See* Pls.' Compl. ¶ 87.  Plaintiffs' allegations that the rescission of DACA was unconstitutional are addressed in Section II.B–D, *infra*.

28

agency] for further consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). This Court should therefore decide whether the Acting Secretary's decision to wind down DACA was arbitrary and capricious on the administrative record she has produced. While the government submits that the Acting Secretary's decision was plainly not arbitrary and capricious under the Administrative Record, if this Court were to disagree, it should do no more than simply grant Plaintiffs the relief they seek by setting aside the Rescission Policy and remanding to her.

**2.** The Rescission Policy amply meets the "minimal standards of rationality" required by the APA. *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted). Plaintiffs do not deny that "the new policy is permissible under the [INA]." *Fox*, 556 U.S. at 515. And there are eminently "good reasons for it," *id.*, particularly in view of the litigation risk posed by the proceedings in *Texas*. In the Rescission Policy, the Acting Secretary explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy at 4 (AR 255). Specifically, after summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's conclusion in his letter that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted). The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into uncertainty.

The Acting Secretary was then "faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass

legislation; or allow the judiciary to potentially shut the program down completely and immediately."  Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://go.usa.gov/xncuM.  She reasonably opted for an orderly rescission, which she considered "the least disruptive option."  *Id.*

There is nothing at all irrational about this choice or that explanation.  *Cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 84 (2002) ("regulation reasonable" based on concerns about subjecting parties to "possible … liability").  Indeed, it is entirely sensible, given the turmoil that an abrupt, court-ordered shutdown would likely have provoked.  The Acting Secretary balanced the litigation risk of keeping DACA in place with "the administrative complexities associated with ending the program," and opted for a solution that would "wind it down in an efficient and orderly fashion" accounting for the interests of DACA recipients.  Rescission Policy at 3 (AR 254).  She explained her reasonable decision to rescind DACA, and the APA requires no more.  *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted) (APA satisfied where agency's explanation is clear enough that its "path may reasonably be discerned").[10]  And no matter whether her (or the Attorney General's) judgment about the likely result of the *Texas* litigation would have turned out to be correct, it was surely not an irrational or arbitrary and capricious conclusion in light of the fact that at least the Fifth Circuit and four justices of the Supreme Court had already held that a materially indistinguishable policy was unlawful.

**3.**  Plaintiffs' allegations entirely ignore the Acting Secretary's assessment of litigation risk, which is reason enough to reject their arbitrariness claim.  To the extent Plaintiffs suggest that

---

[10] For these same reasons, Plaintiffs' inconsistent allegations that the government both improperly provided for a wind down period, Pls.' Compl. ¶ 86, and, at the same time, inadequately explained the dates chosen for the wind down process and, in any event, made the wind down period unreasonably short, *id.* ¶ 81, fail to state a claim under the APA.

the Acting Secretary's consideration of the Attorney General's views about DACA's legality somehow rendered her decision arbitrary and capricious, the argument suffers from three independent flaws.

First, the Acting Secretary did not rely on the Attorney General's September 4 letter solely for its assessment of DACA's legality. Instead, as discussed above, she concluded that DACA "should" be wound down after considering, among other things, his litigation-risk determination that it was "likely" that a legal challenge to DACA "would yield similar results" as the DAPA litigation under Fifth Circuit precedent. Rescission Policy at 3–4 (AR 254–55). That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis for upholding the Acting Secretary's decision to rescind DACA. *See Bowman*, 419 U.S. at 286.

Second, to the extent the Acting Secretary did rely on the proposition that DACA was unlawful, this Court need not agree with that determination to uphold her decision. If an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment to avoid constitutional questions, even if the two determinations are arguably "intertwined." *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (citation omitted) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue"). Here, the Attorney General regarded DACA as unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected. Rescission Policy at 3 (AR 254) (citation omitted). But those same concerns equally support a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law." *Id.* at 2 (AR 253). This Court

31

should sustain her decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

Third, although this Court need not decide the issue to resolve this case in favor of the government on the basis that the agency decision was at least rational, the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas* that was affirmed by the Supreme Court. The Fifth Circuit held not only that DAPA—including its proposed expansion of DACA—was likely unlawful, but also that DACA bore many "important similarities" to it. *Texas*, 809 F.3d at 174 & n.139 (noting that "the DAPA Memo's plain language … equates the DACA and DAPA procedure[s]," making DACA an "apt comparator"). Indeed, given that DAPA was enjoined before its implementation, the Fifth Circuit's decision was "informed by analysis of the implementation of DACA" itself. *Id*. at 172. On that score, while, "[l]ike the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id*. at 171–72, the court found that discretion to be illusory in practice: Because relatively few DACA requests were denied, the Fifth Circuit believed "there was evidence from DACA's implementation that [this] discretionary language was pretextual," *id*. at 172–73. Based on these findings by the Fifth Circuit, it would follow that DACA, like DAPA, did not "genuinely leave the agency and its employees free to exercise discretion" on a case-by-case basis, *id*. at 176—which supports the Attorney General's view that DACA was unlawful. And it seems likely that at least four justices of the Supreme Court agree.

Regardless of whether OLC was correct when it previously "orally advised" that its "preliminary view" was that the proposed version of DACA would be lawful, the reasoning in that opinion further confirms the invalidity of DACA as actually implemented in practice as found by

the Fifth Circuit. OLC Op. 18 n.8. The "preliminary" conclusion was conditioned on the proviso that "it was critical that … the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis." *Id.* Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice. *Texas*, 809 F.3d at 176. Indeed, because deferred action continues to exist on an individualized basis, the only change made by the Acting Secretary is the elimination of the factors that, according to the Fifth Circuit, led to the policy being applied without sufficient case-by-case discretion. *See id.* at 172–73 (noting testimony that, for DACA, requests were "simply rubberstamped if the applicants meet the necessary criteria" (footnote and citation omitted)). Further, the original DACA policy largely shares the relevant defects of the proposed expansion of deferred action that OLC rejected, rather than the aspects of the new policy that it approved.

**4.** Plaintiffs also allege that the Rescission Policy is arbitrary and capricious because the Acting Secretary failed to sufficiently consider the "serious reliance interests by [DACA] participants." Pls.' Compl. ¶¶ 76–79. But as set forth in 6–8, *supra*, the Rescission Memo is merely a statement of policy that—like the original DACA policy—does not create any enforceable rights and is subject to change at any time. And insofar as Plaintiffs suggest that the Acting Secretary failed to consider the reliance interests of DACA recipients more generally, that assertion ignores her calculus based on the looming risk of a nationwide injunction ending the DACA policy altogether. Given her view that she faced an imminent, court-ordered end to DACA, the Acting Secretary opted for an orderly wind-down process that would protect the reliance interests of DACA recipients far more than would an immediate injunction terminating the policy. *See supra* 9–10. Finally, to the extent that she rationally concluded DACA was illegal, there would be no legitimate reliance interests at all.

33

**5.** Plaintiffs also allege that Defendants violated the APA by failing "to provide any reasoned analysis to support the changes to the confidentiality of applicant information." Pls.' Compl. ¶ 82. As explained *infra*, Section II.D, DHS's information sharing policy has not changed. Thus, there is no "final agency action" for the Court to review. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (holding that "final agency action" must "mark the consummation of the agency's decisionmaking process"); 5 U.S.C. § 704 (providing for judicial review of "final agency action"). Accordingly, such claim fails as a matter of law.

In all events, the foregoing analysis confirms that the Acting Secretary's decision was at a minimum reasonable and that Plaintiffs' APA challenge can be resolved at this stage based on the record now before the Court. Indeed, whatever this Court decides, there is no basis for supplementing the record or discovery to assess the Acting Secretary's explanation.

## 2. The Rescission Policy is Exempt from Notice and Comment.

Plaintiffs likewise miss the mark in arguing that the Rescission Policy must be set aside because it is a substantive rule issued without notice and comment. *See* Pls.' Compl. ¶¶ 65–72; *see also* 5 U.S.C. § 553(b)–(c). If winding down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the first place. Critically, though, the DACA Memo itself also was not adopted through notice and comment. So even on Plaintiffs' own theory, it would be void *ab initio*—leaving Plaintiffs without a remedy. That is reason enough to dismiss this claim. *See Lujan*, 504 U.S. at 561 (plaintiff must show "injury will be 'redressed by a favorable decision'" to establish standing (citation omitted)).[11]

---

[11] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425,

In any event, Plaintiffs' claim is erroneous. DHS and INS have adopted over 20 deferred action or similar policies over the past 50 years—rarely through notice and comment. That is because such policies, like the Rescission Policy, are not substantive rules at all. Rather, they are classic examples of "general statements of policy" that are exempt from the APA's notice-and-comment requirements. 5 U.S.C. § 553(b)(3)(A).

A "substantive rule establishes a standard of conduct which has the force of law." *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974). Thus, an "agency action that purports to impose legally binding obligations or prohibitions on regulated parties— and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

A statement of policy, by contrast, "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's Manual on the APA 30 n.3 (1947)). It "explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule." *McCarthy*, 758 F.3d at 252. It serves to "appris[e] the regulated community of the agency's intentions" and "inform[] the exercise of discretion by agents and officers in the field." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987). And "a general statement of policy, like a press

447 n.79 (D.C. Cir. 1982) *aff'd sub nom, Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983). That holding, however, concerned the rescission of a rule promulgated after notice and comment that was allegedly defective on other grounds, not a rule that was defective precisely because it had failed to go through notice and comment in the first place. *See id.* at 445–46. When an agency has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go through those procedures to cure the underlying defect.

35

release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec.*, 506 F.2d at 38. Accordingly, policy statements "are binding on neither the public nor the agency," and the agency "retains the discretion and the authority to change its position … in any specific case." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (citations omitted).

As these principles make clear, the Rescission Policy is a quintessential policy statement— a point that its text reinforces again and again. It was issued as an "exercise of [the Secretary's] authority in establishing national immigration policies and priorities." Rescission Policy at 4 (AR 255). It explains how the agency intends to exercise its enforcement authority on a prospective basis, a matter that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831 (citations omitted). It does not immediately deprive any DACA recipient of his or her current deferred action, but describes how pending and future deferred action requests will be "adjudicate[d]—on an individual, case-by-case basis." Rescission Policy at 4 (AR 255). It does not categorically forbid the agency from continuing to defer enforcement action against DACA recipients in the future, but instead acknowledges the background principle, recognized by Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such "otherwise lawful enforcement … prerogatives," *id.* at 5 (AR 256). And it explains that it "does not … create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* Thus, in the wake of the Rescission Policy, deferred action "remains discretionary and reversible," *Arpaio*, 797 F.3d at 17—as with the 20-odd deferred action or similar policies that DHS and INS have adopted over the past half-century,

36

generally without going through the full notice-and-comment process.[12]

That is as it should be. An agency's enforcement priorities will inevitably shift over time, whether due to changing circumstances or resource constraints. *See Chaney*, 470 U.S. at 831. Indeed, the DACA policy was originally adopted in part to set enforcement priorities in view of the agency's limited resources. *See Arpaio*, 797 F.3d at 16; DACA Memo at 1 (AR 1); DAPA Memo at 1 (AR 37). Under Plaintiffs' theory, however, even if Congress were to vastly increase appropriations for immigration enforcement, the agency's hands would be tied: it would not be free to adjust its enforcement priorities without engaging in "cumbersome and time-consuming rulemaking proceedings." *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988). The Court should not endorse such an intrusion into matters that have "long been regarded as the special province of the Executive Branch." *Chaney*, 470 U.S. at 832.

### B. Plaintiffs Fail to State an Equal Protection Claim.

Plaintiffs first allege that the Rescission Policy violates equal protection principles by impermissibly discriminating against DACA recipients on the basis of their undocumented status. Pls.' Compl. ¶¶ 90–93. However, because "[u]ndocumented aliens cannot be treated as a suspect class," *Plyler v. Doe*, 457 U.S. 202, 223 (1982), *superseded by statute*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub L. No. 104–193, 110 Stat 2105, and Illegal Immigration Reform & Immigrant Responsibility Act of 1996, Pub L. NO. 104–208, Div. C., 110

---

[12] The Fifth Circuit's ruling that the adoption of the DAPA Memo required notice and comment does not imply that the rescission of DACA does as well. Unlike the DAPA or DACA Memos, the Rescission Policy announced a return to an enforcement policy of using deferred action on an individualized basis, which cannot be cast as a substantive rule. Indeed, the Fifth Circuit itself stressed that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Texas*, 809 F.3d at 178 n.156. In any event, if this Court agrees with the Fifth Circuit, then DACA was void *ab initio* and Plaintiffs lack a remedy.

Stat. 3009, the Rescission Policy can be subject only to rational-basis review. *See Dixon v. District of Columbia*, 666 F.3d 1337, 1342 (D.C. Cir. 2011). The Rescission Policy easily survives that standard for the reasons above, *see supra* Section II.A.1.

Plaintiffs next appear to allege that Defendants violate equal protection principles by depriving "DACA recipients of their interest in furthering their education or pursuing a livelihood." Pls. Compl. ¶ 92. This claim fails for the simple reason that Plaintiffs have failed to identify any "fundamental rights" implicated by the Rescission Policy. Even for U.S. Citizens, "the right to practice a chosen profession" is not a fundamental right. *See Doe v. Rogers*, 139 F. Supp. 3d 120, 154–57 (D.D.C. 2015); *Robinson v. Huerta*, 123 F. Supp. 3d 30, 41 n. 7 (D.D.C. 2015) (collecting cases). Nor, for that matter, is the right to further an education. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37 (1973). If the contrary were true, then all sorts of regulations addressing employment and education, including various licensing laws, would suddenly be subject to strict scrutiny. Unlawfully present aliens, who do not even have a fundamental right to remain in the United States, *see infra* Section II.C, cannot invoke a right to pursue a calling or further an education. Indeed, an alternate rule would call into question longstanding immigration laws. *See, e.g.*, *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002) (discussing "[Immigration Reform and Control Act of 1986], a comprehensive scheme prohibiting the employment of illegal aliens in the United States" (citations omitted)). As Plaintiffs have failed to identify a fundamental right, rational-basis review applies, *see Dixon*, 666 F.3d at 1342, and thus, as demonstrated *supra*, Plaintiffs' claims fail as a matter of law.

### C. Plaintiffs Fail to State a Procedural Due Process Claim.

Plaintiffs allege that the rescission violates due process norms by depriving them of protected liberty and property interests without notice and comment. *See* Pls.' Compl. ¶¶ 94–103.

This claim fails on the merits for the simple reason that no Plaintiff identifies a protected liberty or property interest implicated by the rescission that would entitle them to due process protections.

The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Thus, the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citations omitted). The "Due Process Clause does not protect everything that might be described as a 'benefit.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). Rather, "'[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Such entitlements "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source"—*e.g.*, statutes or regulations—"that secure certain benefits and that support claims of entitlements to those benefits." *Roth*, 408 U.S. at 577.

To the extent that Plaintiffs argue that Ms. Perales-Sanchez possesses a protected liberty interest in her DACA, *see* Pls.' Compl. ¶ 100, DACA is not a protected entitlement because "government officials may grant or deny it in their discretion." *Castle Rock*, 545 U.S. at 756 (citation omitted). For due process purposes, statutes or regulations limit discretion only when they contain "explicitly mandatory language"—*i.e.*, "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 462–63 (1989) (citation omitted).

The DACA policy contains no such "explicitly mandatory language." *Id.* at 463. The policy is codified in no statute or regulation. Its source—the DACA Memo—describes it as a

"policy" for the "exercise of prosecutorial discretion."  DACA Memo 2, 3 (AR 2, 3); *see Omar v. McHugh*, 646 F.3d 13, 22 n.7 (D.C. Cir. 2011) (the "use of the word 'policy'"—"rather than a word such as 'right'—reinforces the conclusion that Congress did not intend to create an 'entitlement'").  And the agency's public guidance makes clear that, under DACA, deferred action "may be terminated at any time, with or without Notice of Intent to Terminate, at DHS's discretion."  DHS DACA FAQ No. 27.

The D.C. Circuit has recognized that, under DACA, "deferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (quoting DACA Memo 3).  Thus, it is not a protected entitlement for due process purposes, and Plaintiffs' claim fails as a matter of law.  *See also, e.g.*, *Velasco-Gutierrez v. Crossland*, 732 F.2d 792, 798 (10th Cir. 1984) (deferred action guidance "places no effective limitations on official discretion, and thus creates no protected liberty interest in deferred action"); *Romiero de Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985) (because "deferred action" "vests the regional commissioner with unfettered discretion to determine whether to grant an informal administrative stay of deportation to an otherwise deportable alien, it creates no protectible liberty interest in deferred action, nor does it create a protectible interest in being considered for deferred action status").

Plaintiffs also allege that the rescission deprives Microsoft and Princeton University of "interests cognizable under the Constitution" without notice and comment to the extent that Microsoft will lose investment in employees who are DACA recipients, as well as suffer business disruptions when these employees lose work authorization, and Princeton will lose the "resources . . . invested in [DACA recipients'] education," as well as "the benefits associated with their future success.  Pls.' Compl. ¶¶ 98–99.  The legal basis for this claim is unclear at best, and in any event

to the extent this Court finds that individual DACA recipients lack due process rights, *a fortiori* universities, corporations, and other entities would also lack any such rights.

### D.  Plaintiffs Fail to State a Substantive Due Process Claim.

Plaintiffs assert that DHS has changed its information-sharing policy and that the alleged "use of information obtained through implementation and operation of DACA ... for any purpose related to immigration enforcement" that was not "previously provided under the DACA program," does not comport with "fundamental fairness" and thus violates substantive due process. Pls.' Compl. ¶ 108.

As a threshold matter, Plaintiffs do not allege facts sufficient to show that there actually has been a substantive change in policy regarding information sharing.  They rely solely on the use of one word in the Rescission FAQs indicating that information will not be "proactively" provided to other law enforcement entities, Pls.' Compl. ¶ 108 (quoting DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals* (Sept. 5, 2017) ("Rescission FAQs"), that language is entirely consistent with DHS's policy regarding the protection of DACA information.  The agency's information-sharing policy in fact contains (and has always contained) a number of exceptions.

For example, under that policy, information submitted in DACA requests "is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings *unless* the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS'[s] Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised). DHS DACA FAQ No. 19 (emphasis added); *see* Notice to Appear Guidance. While this policy "may be modified, superseded, or rescinded at any time" and creates no legal rights, DHS DACA FAQ No. 19,

nothing in the Rescission Policy purports to change it, and it currently remains in effect. *Cf. Gerhart v. Lake Cnty.*, 637 F.3d 1013, 1020–21 (9th Cir. 2011) ("A person's belief of entitlement to a government benefit, no matter how sincerely or reasonably held, does not create a property right if that belief is not mutually held by the government . . . . '[A] constitutional entitlement cannot be created—as if by estoppel—merely because a wholly and *expressly* discretionary state privilege has been granted generously in the past.'" (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)) (citations omitted)).

In any event, Plaintiffs fail to state a substantive due process claim. Substantive due process protects those rights that rank as "fundamental"—that is, both "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citation omitted). The Supreme Court has also made clear that a plaintiff must provide "a 'careful description' of the asserted fundamental liberty interest" when raising such a claim. *Chavez v. Martinez*, 538 U.S. 760, 775–76 (2003). "[V]ague generalities," like Plaintiffs' wish that DHS would adopt their preferred policies, "will not suffice." *Id.* at 776.

While in rare cases a "denial of fundamental fairness" may rise to the level of a substantive due process violation, to survive dismissal in a "challenge to executive action" such as this one, Plaintiffs must allege behavior that is "so egregious" and "outrageous" as "to shock the contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998). "Although that doctrine normally imposes only very slight burdens on the government to justify its actions, it imposes none at all in the absence of a liberty or property interest." *George Wash. Univ. v. Dist. of Columbia*, 318 F.3d 203, 206 (D.C. Cir. 2003). As DHS' information sharing policy has not substantively changed, and Plaintiffs cannot identify an instance where any DACA

42

recipient's information was allegedly shared in violation of this policy, Plaintiffs' substantive due process claim fails for the simple reason that they have not identified any actual deprivation of liberty or property. *See Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 540 (D.C. Cir. 2015) (holding that substantive due process claim failed because Plaintiff "ha[d] not alleged facts [that] suggest[ed] he ha[d] been deprived—arbitrarily or otherwise—of a cognizable liberty or property interest"); *see also Hyuk Joon Lim v. Holder*, 710 F.3d 1074, 1076 (9th Cir. 2013) ("Cancellation of removal is a form of discretionary relief which does not give rise to a 'substantive interest protected by the Due Process Clause.'") (quoting *Munoz v. Ashcroft*, 339 F.3d 950, 954 (9th Cir. 2003)); *Tefel v. Reno*, 180 F.3d 1286, 1300–01 (11th Cir. 1999) ("[n]o constitutionally protected interest arises from the INS' actions in granting or denying applications for suspension," that "prior generosity in awarding wholly and expressly discretionary relief does not prove the existence of a constitutional entitlement," and that "awarding and then revoking discretionary relief does not offend due process" (quotation marks omitted)).[13]

Moreover, DHS's information-sharing policy for DACA recipient information has always contained a number of exceptions and although the policy, in fact, remains unchanged, it has always expressly stated that it "may be modified, superseded, or rescinded at any time." DHS DACA FAQ No. 19. It therefore creates no judicially enforceable rights. And even if Plaintiffs had identified an actual and cognizable deprivation of a liberty or property interest, nothing about

---

[13] Although the court in *Batalla Vidal* found (incorrectly) that, once a DACA recipient's deferred action expires, they may be entitled to a presumption that the Government will enforce the immigration laws against them, *see Batalla Vidal* Mem. & Order at 36, it does not follow and Plaintiffs have not shown that DACA recipients are entitled to a presumption that DHS's information-sharing policy, which has not substantively changed, will be applied differently once DACA recipients lose their deferred action.

DHS' information sharing policy is so outrageous as to "shock the contemporary conscience." *Lewis*, 523 U.S. at 847, n. 8.

## III.   NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS IMPERMISSIBLE.

Finally, in an indirect attack of the Rescission Policy, Plaintiffs seek a declaratory judgment that DACA is "lawful." *See* Pls.' Compl. ¶¶ 110–14.  The Declaratory Judgment Act provides a remedy, not a source of rights independent of substantive federal law.  *C&E Servs., Inc. v Dist. of Columbia Water and Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002).  To establish standing and to seek relief under the Declaratory Judgment Act, a plaintiff must demonstrate that there is an "actual controversy" necessitating declaratory relief.  28 U.S.C. § 2201(a); *see Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 239–40 (1937).  The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests."  *Aetna*, 300 U.S. at 240–41.

Here, even assuming DACA was "lawful," any declaratory relief that this Court might provide would merely be an academic dispute because the Acting Secretary still would have had the discretion to rescind the policy.  *See supra* Section I.A.  Instead, the "controversy" (to the extent it is even justiciable) concerns whether the Acting Secretary's decision to rescind DACA in light of litigation risk that DHS was facing was arbitrary or capricious.  Any after-the-fact conclusion by this Court that DACA was "lawful" has no bearing on that decision, which was based on the litigation risk that DHS was then confronting.  Thus, any declaratory judgment that this Court might issue would not provide any actual benefits to Plaintiffs.

Plaintiffs also seek an "injunction against enforcement and implementation of the DACA Rescission Memorandum" and "an injunction enjoining Defendants from sharing or otherwise using information furnished by Dreamers ... except as previously provided under the DACA program."  Pls.' Compl. at 41, Prayer for Relief.  Even if the Court were to conclude that Plaintiffs

were entitled to any injunction, it should dismiss Plaintiffs' request to the extent they seek nationwide relief.  Both constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries.  Article III demands that "a plaintiff must demonstrate standing … for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted).  "The remedy" sought thus must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996).  "The actual-injury requirement would hardly serve [its] purpose … of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *Id.* (emphasis omitted).  And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties").  Accordingly, any injunction here should be limited to particular individual Plaintiffs found to have cognizable claims.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this case or, in the alternative, grant summary judgment to Defendants on all claims.

Dated: November 22, 2017  Respectfully submitted,

         CHAD A. READLER
         Principal Deputy Assistant Attorney General

         BRETT A. SHUMATE
         Deputy Assistant Attorney General

         JENNIFER D. RICKETTS
         Director

         JOHN R. TYLER
         Assistant Branch Director

         */s/ Rachael Westmoreland*
         RACHAEL WESTMORELAND (GA Bar. No. 539498)
         Trial Attorney
         United States Department of Justice
         Civil Division, Federal Programs Branch
         20 Massachusetts Avenue NW
         Washington, DC 20530
         Phone: (202) 514-1280
         Fax: (202) 616-8470
         Email: rachael.westmoreland@usdoj.gov

         *Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE TRUSTEES OF PRINCETON UNIVERSITY, *et al.*,<br><br>             *Plaintiffs*,<br><br>      v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>             *Defendants*. | Civil Action No. 17-cv-2325 (CRC) |

## [PROPOSED] ORDER

Upon consideration of Defendants' Motion to Dismiss or, In the Alternative, For Summary Judgment, and any response or reply thereto, it is hereby

**ORDERED** that this motion is **GRANTED**; and it is

**FURTHER ORDERED** that this action is **DISMISSED** in its entirety.

This is a final, appealable order. *See* Fed. R. App. P. 4(a).

**SO ORDERED**.


Dated: _____        _____
                                        CHRISTOPHER R. COOPER
                                        United States District Judge

Dated: November 22, 2017         Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

*/s/  Rachael Westmoreland*
RACHAEL WESTMORELAND (GA Bar. No.
539498)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 514-1280
Fax: (202) 616-8470
Email: rachael.westmoreland@usdoj.gov

*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE TRUSTEES OF PRINCETON UNIVERSITY, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 17-cv-2325 (CRC) |
| UNITED STATES OF AMERICA, *et al.*, | |
| *Defendants*. | |

## CERTIFIED INDEX OF ADMINISTRATIVE RECORD

Pursuant to Local Rule 7(n)(1), Defendants in the above-captioned matter hereby file the certified contents of the Administrative Record,[1] which will be served on Plaintiffs today, November 22, 2017. The Administrative Record includes the following documents.

---

[1] The filing of this Administrative Record is not a concession that the decision of the Acting Secretary is subject to judicial review.

1

| DATE | DOCUMENT |
|---|---|
| June 15, 2012 | Janet Napolitano, Secretary of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* |
| November 19, 2014 | Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, Memorandum Opinion for the Secretary of Homeland Security and the Counsel to the President, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* |
| November 20, 2014 | Jeh Charles Johnson, Secretary of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* |
| February 16, 2015 | *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015) |
| November 25, 2015 | *Texas v. United State*s, 809 F.3d 134 (5th Cir. 2015) |
| June 23, 2016 | *Texas v. United States*, 136 S. Ct. 2271 (2016) |
| February 20, 2017 | John Kelly, Secretary of Homeland Security, *Enforcement of the Immigration Laws to Serve the National Interest* |
| June 15, 2017 | John Kelly, Secretary of Homeland Security, *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA")* |
| June 29, 2017 | Letter from the Attorney General of Texas, Ken Paxton, to the Attorney General of the United States, Jefferson B. Sessions III |
| August 1, 2017 | Letter from Congressman John Lewis to the Acting Secretary of Homeland Security, Elaine C. Duke |
| August 1, 2017 | Letter from Congressman Raul M. Grijalva, *et al.* to President of the United States Donald J. Trump |
| August 22, 2017 | Letter from Congressman Daniel M. Donovan, Jr., *et al.* to President of the United States Donald J. Trump |
| September 4, 2017 | Letter from the Attorney General of the United States, Jefferson B. Sessions III, to the Acting Secretary of Homeland Security, Elaine C. Duke |
| September 5, 2017 | Elaine C. Duke, Acting Secretary of Homeland Security, *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* |

## CERTIFICATION OF ADMINISTRATIVE RECORD

I, David J. Palmer, Chief of Staff, Office of the General Counsel at the United States Department of Homeland Security, certify that, to the best of my knowledge, the Administrative Record served on Plaintiffs is a true, correct, and complete copy of the non-privileged documents that were actually considered by Elaine C. Duke, the Acting Secretary of Homeland Security, in connection with her September 5, 2017 decision to rescind the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."

Dated: November 8, 2017                    _____/s/ David J. Palmer_____
                                           DAVID J. PALMER
                                           Chief of Staff, Office of the General Counsel
                                           United States Department of Homeland Security

Dated: November 22, 2017

Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

*/s/   Rachael Westmoreland*
RACHAEL WESTMORELAND (GA Bar. No. 539498)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 514-1280
Fax: (202) 616-8470
Email: rachael.westmoreland@usdoj.gov

*Counsel for Defendants*

4

# APPENDIX B

# TAB 6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| CASA DE MARYLAND, *et al.*,<br><br>      *Plaintiffs*,<br><br>   v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>       *Defendants*. | No. 17-cv-2942 (RWT) |

# DEFENDANTS' MOTION TO DISMISS OR, IN
# THE ALTERNATIVE, FOR SUMMARY JUDGMENT

For the reasons set forth in the accompanying memorandum of law, Defendants respectfully move the Court to dismiss this action or, in the alternative, to grant summary judgment to Defendants.  *See* Fed. R. Civ. P. 12(b)(1), (6), 56.


Dated: November 15, 2017    Respectfully submitted,

           CHAD A. READLER
           Acting Assistant Attorney General

           BRETT A. SHUMATE
           Deputy Assistant Attorney General

           JENNIFER D. RICKETTS
           Director

           JOHN R. TYLER
           Assistant Branch Director

           */s/   Kathryn C. Davis*
           KATHRYN C. DAVIS
           */s/  Rachael Westmoreland*
           RACHAEL WESTMORELAND
           Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 616-8298
Fax: (202) 616-8470
Email: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

CASA DE MARYLAND, *et al.*,

                *Plaintiffs*,

     v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

                *Defendants*.

No. 17-cv-2942 (RWT)

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
# TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND ....................................................................................................................5

    A.  Deferred Action Generally.................................................................................5

    B.  DACA and DAPA .............................................................................................7

    C.  The *Texas* Litigation ........................................................................................8

    D.  Rescission of DACA..........................................................................................9

    E.  The Instant Action...........................................................................................11

LEGAL STANDARDS ........................................................................................................12

ARGUMENT ........................................................................................................................14

    I.  THIS CASE IS NOT JUSTICIABLE..................................................................15

        A.  The Rescission Policy Is Not Justiciable Because this Immigration
             Enforcement Policy Is a Matter Committed to Agency Discretion
             by Law ............................................................................................................15

        B.  The INA Deprives District Courts of Jurisdiction over Challenges to
             Denials of Deferred Action..............................................................................21

        C.  The Plaintiff-Organizations' Claims Are Not Cognizable...........................25

             1.  Plaintiffs Lack Article III Standing.......................................................25

                 a.  Plaintiffs lack organizational standing.........................................25

                 b.  Plaintiffs lack representational standing. .....................................28

             2.  Plaintiffs Lack a Cause of Action Under the APA ...............................29

        D.  The Government's Justiciability Objections Are Not Inconsistent
             with the Acting Secretary's Reliance on the Fifth Circuit's Decision........30

    II.  PLAINTIFFS FAIL TO STATE A CLAIM.......................................................30

        A.  Plaintiffs Fail to State an APA Claim.............................................................31

1.  The Acting Secretary rationally explained her decision to wind
down DACA, particularly given the imminent risk of a nationwide
injunction. ...........................................................................................31

B.  The Rescission Policy Is Exempt from Notice and Comment.....................................41

C.  Plaintiffs Fail to State an Equal Protection Claim .....................................45

D.  Plaintiffs Fail to State a Procedural Due Process Claim...............................................48

E.  Plaintiffs Fail to State a Substantive Due Process Claim. ...........................................52

F.  Plaintiffs' Equitable Estoppel Claims Fail.......................................................54

III. NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS
IMPERMISSIBLE ..................................................................................................57

CONCLUSION.......................................................................................................59

# TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*Aetna Life Ins. Co. of Hartford v. Haworth*,
    300 U.S. 227 (1937) ................................................................................ 57

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) ................................................................................ 54

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
    367 F.3d 212 (4th Cir. 2004) .................................................................. 13

*Am. Legal Found. v. FCC*,
    808 F.2d 84 (D.C. Cir. 1987) .................................................................. 26

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
    526 U.S. 40 (1999) .................................................................................. 48

*Angeles v. Dist. Dir., INS*,
    729 F. Supp. 479 (D. Md. 1990) ............................................................ 55

*Arizona v. United States*,
    567 U.S. 387 (2012) ...................................................................... 5, 17, 47

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ........................................................ *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................ 13

*Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*,
    524 F. Supp. 2d 642 (D. Md. 2007) .................................................. 13, 30

*Bd. of Regents v. Roth*,
    408 U.S. 564 (1972) ................................................................................ 48

*Beck v. McDonald*,
    848 F.3d 262 (4th Cir. 2017) .................................................................. 12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................ 13

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................ 38

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
239 U.S. 441 (1915) .................................................................. 50

*Botezatu v. INS*,
195 F.3d 311 (7th Cir. 1999) ............................................. 23, 24

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
419 U.S. 281 (1974), *reh'g denied*, 420 U.S. 956 (1975) .................. 33, 34

*Califano v. Sanders*,
430 U.S. 99 (1977) .................................................................. 16

*Camp v. Pitts*,
411 U.S. 138 (1973) ................................................................ 32

*Chaudhry v. Holder*,
705 F.3d 289 (7th Cir. 2013) .................................................. 6

*Chavez v. Martinez*,
538 U.S. 760 (2003) ........................................................... 52, 53

*Chen Zhou Chai v. Carroll*,
48 F.3d 1331 (4th Cir. 1995) ............................................... 41, 43

*Chevron U.S.A. Inc. v. Echazabal*,
536 U.S. 73 (2002) ................................................................. 33

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979) ............................................................... 42

*Citizens for the Scenic Severn River Bridge, Inc. v. Skinner*,
802 F. Supp. 1325 (D. Md. 1991),
*aff'd*, No. 91-1267, 1992 WL 180138 (4th Cir. July 29, 1992) ............................................. 14

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ........................................................... 16, 31

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ................................................................. 27

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ............................................................... 25

*Clarke v. Secs. Indus. Ass'n*,
479 U.S. 388 (1987) ............................................................... 29

*Cmty. Nutrition Inst. v. Young*,
   818 F.2d 943 (D.C. Cir. 1987) ................................................................ 43

*Conn. Bd. of Pardons v. Dumschat*,
   452 U.S. 458 (1981) ........................................................................... 52

*Consumer Energy Council of Am. v. FERC*,
   673 F.2d 425 (D.C. Cir. 1982) ................................................................ 42

*Cty. of Sacramento v. Lewis*,
   523 U.S. 833 (1998) ........................................................................... 53

*Dawkins v. Witt*,
   318 F.3d 606 (4th Cir. 2003) ........................................................... 55, 56

*Dawson v. Winter*,
   No. 06-cv-2885-CCB, 2007 WL 1610905 (D. Md. May 21, 2007),
   *aff'd*, 277 F. App'x. 297 (4th Cir. 2008) ................................................. 14

*Decatur Liquors, Inc. v. Dist. of Columbia*,
   478 F.3d 360 (D.C. Cir. 2007) ................................................................ 50

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
   No. 17-1320, 2017 WL 3141907 (D.D.C. July 24, 2017) .............................. 40

*Elgharib v. Napolitano*,
   600 F.3d 597 (6th Cir. 2010) ................................................................. 22

*Elk Grove Unified Sch. Dist. v. Newdow*,
   542 U.S. 1 (2004) ............................................................................. 26

*Emery Min. Corp. v. Sec'y of Labor*,
   744 F.2d 1411 (10th Cir. 1984) .............................................................. 54

*Fares v. U.S. Immigration & Naturalization Service*,
   50 F.3d 6 (4th Cir. 1995) ..................................................................... 39

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ........................................................................... 32

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
   93 F.3d 897 (D.C. Cir. 1996) ................................................................. 29

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ........................................................................... 32

*FW/PBS, Inc. v. City of Dallas*,
    493 U.S. 215 (1990) .......................................................................... 25

*Gibraltar, P.R., Inc. v. Otoki Group, Inc.*,
    104 F.3d 616 (4th Cir. 1997) ............................................................ 57

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .......................................................................... 26

*Hawkins v. Freeman*,
    195 F.3d 732 (4th Cir. 1999) ............................................................ 53

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ................................................................. *passim*

*Heckler v. Cmty. Health Servs.*,
    467 U.S. 51 (1984) ............................................................................ 55

*Hunt v. Wash. State Apple Adver. Comm'n*,
    432 U.S. 333 (1977) .......................................................................... 28

*ICC v. Bhd. of Locomotive Eng'rs* (*BLE*),
    482 U.S. 270 (1987) ............................................................. 15, 18, 21

*Invention Submission Corp. v. Rogan*,
    357 F.3d 452 (4th Cir. 2004) ............................................................ 39

*Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*,
    874 F.2d 205 (4th Cir. 1989) ............................................................ 42

*Johnson v. Sessions*,
    No. 15-cv-3317-RDB, 2017 WL 1207537 (D. Md. Apr. 3, 2017) .......... 57

*Ky. Dep't of Corrs. v. Thompson*,
    490 U.S. 454 (1989) .......................................................................... 49

*Lewis v. Casey*,
    518 U.S. 343 (1996) .......................................................................... 58

*Lexmark Int'l, Inc. v. Static Control Components*,
    134 S. Ct. 1377 (2014) ...................................................................... 26

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) .......................................................................... 15

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ............................................................................. 12, 41

*Mada-Luna v. Fitzpatrick*,
  813 F.2d 1006 (9th Cir. 1987) .............................................................. 17

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ............................................................................. 58

*Marsh v. United States*,
  No. 14-cv-3559-TDC, 2016 WL 247563 (D. Md. Jan. 20, 2016) ........... 13

*Marshall Cty. Health Care Auth. v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993) ............................................................ 14

*McBurney v. Cuccinelli*,
  616 F.3d 393 (4th Cir. 2010) ................................................................ 27

*Md. Highways Contractors Ass'n v. Maryland*,
  933 F.2d 1246 (4th Cir. 1991) ................................................... 26, 27, 28

*Mississippi v. Johnson*,
  71 U.S. 475 (1867) ............................................................................... 30

*Mondragon v. Holder*,
  706 F.3d 535 (4th Cir. 2013) ................................................................ 52

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ............................................................................. 58

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
  463 U.S. 29 (1983) ............................................................................... 31

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*,
  851 F.2d 1424 (D.C. Cir. 1988) ............................................................ 44

*Nat'l Mining Ass'n v. McCarthy*,
  758 F.3d 243 (D.C. Cir. 2014) .............................................................. 42

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir 1995) ............................................................... 26

*New Hampshire v. Maine*,
  532 U.S. 742 (2001) ............................................................................. 54

*O'Shea v. Littleton,*
  414 U.S. 488 (1974)............................................................................................ 27

*Omar v. McHugh,*
  646 F.3d 13 (D.C. Cir. 2011) .............................................................................. 49

*OPM v. Richmond,*
  496 U.S. 414 (1990)............................................................................................ 54

*Pac. Gas & Elec. Co. v. FPC,*
  506 F.2d 33 (D.C. Cir. 1974) ........................................................................ 42, 43

*Perales v. Casillas,*
  903 F.2d 1043 (5th Cir. 1990), *reh'g denied,* 912 F.2d 1465 (5th Cir. 1990) ......... 17

*Perez v. Mortg. Bankers Ass'n,*
  135 S. Ct. 1199 (2015)........................................................................................ 55

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC),*
  525 U.S. 471 (1999)..................................................................................... *passim*

*Romiero De Silva v. Smith,*
  773 F.2d 1021 (9th Cir. 1985) ............................................................................ 49

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC,*
  713 F.3d 175 (4th Cir. 2013) ................................................................... 25, 28, 29

*Sec'y of State for Defence v. Trimble Navigation Ltd.,*
  484 F.3d 700 (4th Cir. 2007) .............................................................................. 13

*Sierra Club v. Larson,*
  882 F.2d 128 (4th Cir. 2011) ........................................................................ 15, 16

*Sierra Club v. Morton,*
  405 U.S. 727 (1972)............................................................................................ 26

*Simon v. E. Ky. Welfare Rights Org.,*
  426 U.S. 26 (1976).............................................................................................. 26, 28

*Smith v. Ashcroft,*
  295 F.3d 425 (4th Cir. 2002) .............................................................................. 49

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009)............................................................................................ 28

*Syncor Int'l Corp. v. Shalala,*
  127 F.3d 90 (D.C. Cir. 1997) ............................................................. 43

*Syracuse Peace Council v. FCC,*
  867 F.2d 654 (D.C. Cir. 1989) ........................................................... 35

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) ...................................................... *passim*

*Town of Castle Rock v. Gonzales,*
  545 U.S. 748 (2005)............................................................................ 48

*Town of Chester v. Laroe Estates, Inc.,*
  137 S. Ct. 1645 (2017)........................................................................ 58

*Troy Corp. v. Browner,*
  120 F.3d 277 (D.C. Cir. 1997), *reh'g denied*, 129 F.3d 1290 (D.C. Cir. 1997) ...................... 32

*United States v. Armstrong,*
  517 U.S. 456 (1996)................................................................... *passim*

*United States v. Browning,*
  630 F.2d 694 (10th Cir. 1980) ........................................................... 55

*United States v. Owens,*
  54 F.3d 271 (6th Cir. 1995) ............................................................... 54

*United States v. Texas,*
  136 S. Ct. 2271 (2016)........................................................................ 9

*United States v. Texas,*
  137 S. Ct. 285 (2016).......................................................................... 9

*Vance v. CHF Int'l,*
  914 F. Supp. 2d 669 (D. Md. 2012) ................................................... 12

*Vasquez v. Aviles,*
  639 F. App'x 898 (3d Cir. 2016) ....................................................... 22

*Veasey v. Perry,*
  29 F. Supp. 3d 896 (S.D. Tex. 2014) ................................................. 46

*Velasco-Gutierrez v. Crossland,*
  732 F.2d 792 (10th Cir. 1984) ........................................................... 49

*Warth v. Seldin,*
    422 U.S. 490 (1975) ............................................................ 25

*Washington v. Davis,*
    426 U.S. 229 (1976) ...................................................... 46, 47

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ............................................................ 52

*Watkins v. U.S. Army,*
    875 F.2d 699 (9th Cir. 1989) .......................................... 55, 56

*Yassini v. Crosland,*
    618 F.2d 1356 (9th Cir. 1980) ........................................ 50, 51

STATUTES

5 U.S.C. § 552 .................................................................... 39

5 U.S.C. § 553 ......................................................... 3, 41, 42

5 U.S.C. § 701 ...................................................... 15, 16, 17, 24

5 U.S.C. § 702 .................................................................... 29

5 U.S.C. § 704 .................................................................... 38

5 U.S.C. § 706 .................................................................... 31

6 U.S.C. § 202 .................................................................... 22

6 U.S.C. § 251 .................................................................... 22

6 U.S.C. § 557 .................................................................... 22

8 U.S.C. § 1103 ................................................................... 5

8 U.S.C. § 1154 ................................................................... 6

8 U.S.C. § 1158 ................................................................... 5

8 U.S.C. § 1182 ................................................................... 5

8 U.S.C. § 1227 ................................................................... 5

8 U.S.C. § 1229b ................................................................................................. 5

8 U.S.C. § 1252 .......................................................................................... *passim*

28 U.S.C. § 2201 ............................................................................................... 57

E-Government Act of 2002,
    Pub. L. No. 107-347, 116 Stat. 2899 ............................................................ 40, 41


REGULATIONS

8 C.F.R. § 274a.12(c)(14) ................................................................................... 6


CONSTITUTION

U.S. Const. amend. V ....................................................................................... 48


FEDERAL RULES

Fed. R. Civ. P. 8(c) .......................................................................................... 54

Fed. R. Civ. P. 12 ........................................................................ 12, 13, 14, 20, 29


OTHER AUTHORITIES

2 Richard J. Pierce, Jr., Administrative Law Treatise § 9.2 (5th ed. 2010) .................................. 50

Attorney General's Manual on the Administrative Procedure Act (1947) ............................ 42, 43

DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals*,
    (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-
    rescission-deferred-action-childhood-arrivals-daca) ............................................... 38

DHS, *Privacy Impact Assessment for the Deferred Action for Childhood Arrivals
    (DACA)* (Aug. 15, 2012),
    https://www.dhs.gov/sites/default/files/publications/privacy_pia_uscis_daca_0.pdf .............. 39

Press Release, DHS
    Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
    https://go.usa.gov/xncuM ............................................................................ 33

USCIS, *Deferred Action for Childhood Arrivals Frequently Asked Questions*,
    (last updated Oct. 6, 2017), https://go.usa.gov/xngCd ....................................... *passim*

USCIS, Policy Memorandum (Nov. 7, 2011),
  https://go.usa.gov/xncPK. ...................................................................................... 8, 38

U.S. Dep't of Justice, Office of Legal Counsel,
  *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens
  Unlawfully Present*, 38 Op. O.L.C. 1 (Nov. 19, 2014),
  https://www.justice.gov/file/179206/download ............................................... 21, 36

# INTRODUCTION

In 2012, then-Secretary of Homeland Security Janet Napolitano adopted the policy now known as DACA, or Deferred Action for Childhood Arrivals.  DACA made deferred action—a practice by which the Secretary exercises individualized enforcement discretion to issue a reversible notification that she does not intend to remove an alien for a set period of time— available to a class of unlawfully present aliens who came to the United States as children.  In 2014, one of her successors expanded the parameters of DACA and adopted a similar policy known as DAPA, or Deferred Action for Parents of Americans.  DAPA, if implemented, would have made deferred action available to unlawfully present aliens who were parents of U.S. citizens and lawful permanent residents.

DAPA, including its expansion of DACA, was promptly challenged by a coalition of 26 states.  Although then-Secretary of Homeland Security Jeh Johnson vigorously defended the policy, he was rebuffed at every turn:  the United States District Court for the Southern District of Texas issued a nationwide preliminary injunction; the United States Court of Appeals for the Fifth Circuit affirmed ("Fifth Circuit"), declaring the policy "manifestly contrary" to the Immigration and Nationality Act (INA); and an equally divided Supreme Court affirmed, leaving the injunction in place.

Armed with this victory, the states threatened to amend their complaint to challenge not just DAPA, but DACA as well, arguing that it suffers from the same infirmities.  In view of the substantial similarities between the two policies, the significant litigation risk posed by the Supreme Court and Fifth Circuit decisions, and the Attorney General's view that DACA was in fact unlawful, Acting Secretary of Homeland Security Elaine C. Duke was faced with two options.  On the one hand, she could wind down DACA in an orderly fashion, minimizing the disruption to

current recipients.  On the other, continued litigation would in all likelihood result in a nationwide injunction abruptly ending the policy, plunging its nearly 800,000 recipients into uncertainty.

The Acting Secretary chose the less disruptive option: an orderly process that formally rescinds DACA but allows it to sunset.  Under this Rescission Policy, no DACA recipient will have his or her deferred action abruptly terminated based solely on the Rescission Policy; instead, prior grants will remain valid for the remainder of their stated duration (generally two years) before ending consistent with their stated terms.  Any DACA recipient whose deferred action was due to expire within six months was given a month to request another two-year renewal.  And although the agency stopped accepting new DACA requests, it will finish processing those it had received when the rescission began.

In this case, Plaintiffs—numerous organizations and a group of individual former and current DACA recipients—challenge the Rescission Policy on a variety of statutory, constitutional, and common-law grounds, urging the Court to invalidate the agency's decision and enjoin the Acting Secretary from rescinding DACA.  Plaintiffs also request that the Court enjoin Defendants from disclosing the information of DACA recipients for immigration enforcement purposes in a manner inconsistent with the Department of Homeland Security's (DHS) information-sharing policy.  There is no basis to do so.

To begin, this case is not justiciable.  The Rescission Policy is a classic exercise of enforcement discretion "presumed immune from judicial review," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and particularly unfettered in the context of immigration, *see Reno v. Am.- Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 487–92 (1999).  In fact, Congress has stripped district courts of jurisdiction to review "'no deferred action' decisions and similar discretionary determinations" such as the one here.  *AADC*, 525 U.S. at 485; *see* 8 U.S.C.

§ 1252(g).  At a minimum, the Plaintiff-organizations cannot proceed due to their lack of standing and a cause of action.  The Court should not permit Plaintiffs to circumvent these bedrock limits on judicial review.

On the merits, Plaintiffs' claims fail as a matter of law.  Their claim that the Rescission Policy is arbitrary and capricious under the Administrative Procedure Act (APA) because it was inadequately supported on the record is fundamentally misguided.  Agencies are always free to change course on policy matters so long as they provide a rational explanation.  Here, the Acting Secretary's explanation of her decision to rescind DACA amply meets that deferential standard, particularly given the adverse ruling from the Fifth Circuit and the Supreme Court's affirmance, the evident similarities between DACA and the policy that expanded DACA and created DAPA, the Attorney General's opinion that DACA was likewise unlawful, and the imminent risk of a nationwide injunction with potentially chaotic results.  Plaintiffs' claim that DHS's change in its policy regarding the use of DACA-related information is arbitrary and capricious and contrary to law under the APA is even more misguided.  Not only have Plaintiffs failed to allege sufficient facts to show a change in the information-sharing policy, but the policy is also clearly compliant with the Privacy Act and E-Government Act.  Because these claims can be resolved now based on the complaint, the documents incorporated therein by reference, and other judicially noticeable materials—including those in the administrative record, filed contemporaneously herewith—the Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside the Rescission Policy if it disagrees.

Plaintiffs' notice-and-comment claim is equally unavailing.  The APA exempts "general statements of policy" from notice and comment, 5 U.S.C. § 553(b), and the Rescission Policy is a reordering of enforcement priorities that readily qualifies.  Indeed, DHS and the former

Immigration and Naturalization Service (INS) have adopted more than 20 deferred action or similar policies over the past 50 years. Few have gone through notice and comment, and there is no warrant for those procedures here. Nor does the Fifth Circuit's ruling that the states established a substantial likelihood of success on their claim that the promulgation of DAPA required notice and comment mean that the rescission of DACA and a return to the *status quo ante* must likewise meet these procedural demands. And in any event, if DACA's rescission required notice and comment, then DACA was void from the outset because its adoption would also have required notice and comment *a fortiori*.

Plaintiffs' equal protection claims get them no further. To the extent that a discriminatory motive claim—here, that the Policy was motivated by animus toward Mexican, Central American, and Latino immigrants—can ever be brought in a context like this one, *but see AADC*, 525 U.S. at 487–92, Plaintiffs must allege a clear case of discrimination given that they challenge an exercise of enforcement discretion, *see United States v. Armstrong*, 517 U.S. 456 (1996). They have failed to do so. Nor can Plaintiffs show that the Rescission Policy trenches on any fundamental right.

Plaintiffs' due process claims also cannot survive a motion to dismiss. DACA recipients have no protected liberty or property interest in the continued availability of deferred action, which is an exercise of prosecutorial discretion that confers no rights and is revocable at any time, or in the continuity of DHS's information-sharing policy, which has not changed since DACA was implemented in 2012. Moreover, Plaintiffs fail to identify any executive conduct that "shocks the conscience" in a manner that would support a claim for the violation of Plaintiffs' substantive due process rights.

Finally, Plaintiffs cannot state an equitable estoppel claim because estoppel does not run against the government. And even if they could, Plaintiffs fail to allege facts sufficient to make

out such a claim.

In sum, even if Plaintiffs' challenge were somehow justiciable, the assumption underlying it would compel dismissal. DAPA—including its expansion of DACA—was enjoined by the Fifth Circuit, and that holding was affirmed by the Supreme Court. The original DACA policy is materially indistinguishable as a legal matter. At bottom, Plaintiffs' argument is that, when making discretionary enforcement determinations, federal agencies must ignore the legal rulings and reasoning of federal courts. To state the premise of this claim is to refute it.

This case should be dismissed.

## BACKGROUND

### A.    Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the INA along with "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396 (citation omitted). DHS officials must first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum, parole, or cancellation of removal, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b. "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely.

5

*AADC*, 525 U.S. at 483.

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016). Deferred action is a practice by which the Secretary exercises her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period. *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority"). Although originally "developed without express statutory authority," *AADC*, 525 U.S. at 484, individualized deferred action has been recognized by Congress in certain circumstances inapplicable here, *see, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"), and described by the Supreme Court as an "exercise in administrative discretion," *AADC*, 525 U.S. at 484. Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former INS have adopted over 20 such policies over the past 50 years—rarely through notice-and-comment rulemaking.

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, under DHS regulations not challenged here. *See, e.g.*, 8 C.F.R. § 274a.12(c)(14). That decision does not, however, confer lawful immigration status or provide any defense to removal. *Cf. Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (discussing difference between "unlawful presence" and "unlawful status"). To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (citation omitted). DHS thus has

6

discretion to revoke deferred action unilaterally, for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time. *See AADC*, 525 U.S. at 484–85.

### B. DACA and DAPA

On June 15, 2012, then-Secretary Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals. *See* Admin. R. (AR) 1–3 (DACA Memo), ECF No. 26-1. DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws. DACA Memo at 1 (AR 1). Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to indefinite renewal. *Id.* at 2-3 (AR 2-3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests for this relief would "be decided on a case by case basis," *id.* at 2 (AR 2). Accordingly, the Memo provided that this grant of deferred action "confer[red] no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." *Id.* at 3 (AR 3).

In public guidance published on the USCIS website, DHS also informed DACA requestors that information in their requests will be "protected from disclosure to [Immigration & Customs Enforcement (ICE)] and [U.S. Customs & Border Protection (CBP)] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised). USCIS, *Deferred Action for Childhood Arrivals Frequently Asked Questions*,

No. 19 (last updated Oct. 6, 2017), https://go.usa.gov/xngCd (DHS DACA FAQ).[1] *see* USCIS, Policy Memorandum (Nov. 7, 2011), https://go.usa.gov/xncPK (Notice to Appear Guidance). DHS instructed, however, that this information-sharing policy creates no rights and "may be modified, superseded, or rescinded at any time without notice."  DHS DACA FAQ No. 19.

In 2014, then-Secretary Jeh Johnson expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. *See* AR 37–41 (DAPA Memo).  DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents."  DAPA Memo at 3 (AR 39).  The DAPA Memo also expanded DACA by relaxing the eligibility criteria and extending the DACA renewal period from two to three years.  *Id.* at 3–4 (AR 39-40).

### C.     The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states, led by Texas, which sought to enjoin its implementation.  Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of the DAPA Memo. *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  Like the U.S. District Court for the Southern District of Texas, the Fifth Circuit held that the promulgation of the DAPA Memo was justiciable, in part because it believed that "the INA's intricate regulatory scheme for changing immigration classifications" allowed the court to determine whether DHS had exceeded its statutory authority.  *Id.* at 168.  It stressed, however, that "the *denial* of voluntary departure and work authorization" would be unreviewable.  *Id.*  Also like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the APA's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional

---

[1] The DHS DACA FAQ has been incorporated by reference in Plaintiffs' Complaint.  *See, e.g.*, Pls.' Compl. ¶ 81, ECF No. 1.

nonenforcement policy would not necessarily be subject to notice and comment." *Id.* at 178 n.156.

And going beyond the district court, the Fifth Circuit held that DAPA was "manifestly contrary"

to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one

legal status to another," DAPA awarded deferred action "to persons who have never had a legal

status and may never receive one." *Id.* at 184, 186 (footnotes omitted).

That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*,

136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing

upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in

place.   On November 18, 2016, the parties jointly moved the district court to stay merits

proceedings to allow them to evaluate "how they might choose to move forward" given the

upcoming "change in Administration[s]."   Joint Mot. to Stay Merits ¶ 2, *Texas v. United States*,

No. 14-cv-254 (S.D. Tex. Nov. 18, 2016), ECF No. 430.

Faced with continued litigation over a policy that had been enjoined by the courts, DHS

rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA.  *See*

Memorandum for Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Prot., et al., from

John F. Kelly, Sec'y of Homeland Sec., *Re: Rescission of November 20, 2014 Memorandum*

*Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents* (June

15, 2017), AR 235-37.  Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to

also challenge directly the DACA Memo, arguing that it suffers from the same legal infirmities as

the DAPA Memo.  *See* AR 238–40 (Paxton Letter).

**D.     Rescission of DACA**

Faced again with the prospect of continued litigation, Acting Secretary Duke decided on

September 5, 2017, to wind down the DACA policy in an orderly fashion.  *See* AR 252–56

(Rescission Policy or Policy).  As the Acting Secretary explained, "[t]aking into consideration the

Supreme Court's and Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017

letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be

terminated."  Rescission Policy at 4 (AR 255).  Specifically, she quoted the Attorney General's

September 4 recommendation to rescind DACA, which explained that because DACA "has the

same legal and constitutional defects that the courts recognized as to DAPA, it is likely that

potentially imminent litigation would yield similar results."  *Id.* at 3 (AR 254).  Invoking her

"authority in establishing national immigration policies and priorities," she rescinded the DACA

Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on

an individualized[,] case-by-case basis," *id.* at 2 (AR 253).

 At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

- For *current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods."  *Id*. at 4 (AR 255)

- For *initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date.  *Id*.

- For *DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017.  Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017."  *Id*.

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does

not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id*. at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id*. at 4 (AR 255). The Rescission Policy says nothing about (and makes no changes to) DHS's information-sharing policy regarding information provided to USCIS in a DACA request.

### E.     The Instant Action

Plaintiffs in this lawsuit raise seven overlapping claims. First, they allege that the Rescission Policy is arbitrary and capricious and therefore violates the APA because it constitutes a change in agency policy without an adequate explanation or basis. *See* Pls.' Compl ¶¶ 162-66 (Count 4), ECF No. 1. Plaintiffs also claim that the alleged decision to change the information-sharing policy is contrary to law, as it purportedly violates the Privacy Act and E-Government Act. *See id.* ¶ 165(c). Finally, Plaintiffs incorporate by reference their constitutional claims under the rubric of the APA. *See id.* ¶ 165(a).

Second, Plaintiffs allege that the Rescission Policy violates the APA because it was issued without notice and comment. *See id.* ¶¶ 167-73 (Count 5).

Third, Plaintiffs allege that the rescission, as well as the alleged change to the information-sharing policy, violate procedural due process because DACA recipients will be deprived of their interests in their DACA status and in the protection of personal information provided with their DACA requests from alleged impermissible sharing without notice or an opportunity to be heard. *See id.* ¶¶ 129-43 (Count 1); *id.* 144-53 (Count 2).

Fourth, Plaintiffs suggest that the rescission, including the alleged change to the information-sharing policy, violate DACA recipients' substantive due process rights because those

decisions were arbitrary and thus not "fundamentally fair."  *See id.* ¶¶ 142, 152.

Fifth, Plaintiffs contend that the rescission violates the Equal Protection component of the Fifth Amendment's Due Process Clause because it was allegedly motivated by discriminatory animus against Mexican, Central American, and Latino immigrants.  *See id.* ¶¶ 154-61 (Count 3).

Sixth, Plaintiffs bring equitable estoppel claims, alleging that DACA recipients provided detailed personal information to the government and "rearranged their lives" based on the government's representations, but now face the possibility of removal and deportation.  *See id.* ¶¶ 174-81 (Count 6).  On that basis, Plaintiffs argue that the government should be equitably estopped from terminating DACA and from using DACA information for enforcement purposes except as previously authorized under DACA.  *See id.* ¶ 179.

Finally, Plaintiffs seek a declaratory judgment that DACA was lawful.  *See id.* ¶¶ 182-85 (Count 7).

Plaintiffs seek declaratory and injunctive relief on their claims, as well as any further relief the Court deems just and proper.  *See id.* at 60, Relief Requested.

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a plaintiff must establish a court's jurisdiction through sufficient allegations.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  When considering such a motion, the Court must "accept as true . . . allegations for which there is sufficient factual matter to render them plausible on their face."  *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (brackets and citation omitted), *cert. denied sub nom. Beck v. Shulkin*, 137 S. Ct. 2307 (2017).  The Court need not, however, "apply the same presumption of truth to conclusory statements and legal conclusions contained in . . . [the] complaint."  *Id.* (citation omitted).  In evaluating subject-matter jurisdiction, the court may, when

necessary, "look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Vance v. CHF Int'l*, 914 F. Supp. 2d 669, 676 (D. Md. 2012) (citation omitted).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]" are "disentitle[d] . . . to th[is] presumption of truth." *Id*. at 678, 681 (citation omitted). Although the Court generally may not rely on material outside the pleadings under Rule 12(b)(6), it may consider any "matters of public record" of which the court may take judicial notice, *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (citations omitted), as well as evidence attached to the motion to dismiss "[if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity," *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (alteration in original) (citation omitted).

With respect to Plaintiffs' APA claims, a court may adjudicate the issues on either a motion to dismiss under Rule 12(b)(6) or on a motion for summary judgment. *See Marsh v. United States*, No. 14-cv-3559-TDC, 2016 WL 247563, at *2 (D. Md. Jan. 20, 2016) (construing defendants' motion as it relates to plaintiff's APA claims as a Rule 12(b)(6) motion where, beyond the

13

complaint and its attachments, the only documents submitted were matters of public record); *see also Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007) (finding that, because APA claims are adjudicated on the basis of an existing administrative record, without a trial or discovery, such claims can also be properly decided on summary judgment). "The entire case on review is a question of law, and only a question of law. And because a court can fully resolve any purely legal question on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage . . . and there is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (citation omitted). Under these circumstances, judicial review is based on the agency record and presents primarily a legal question. *See Citizens for the Scenic Severn River Bridge, Inc. v. Skinner,* 802 F. Supp. 1325, 1332 (D. Md. 1991), *aff'd,* No. 91-1267, 1992 WL 180138, (4th Cir. July 29, 1992); *see also Dawson v. Winter*, No. 06-cv-2885-CCB, 2007 WL 1610905, at *4 (D. Md. May 21, 2007) ("Like appellate courts, district courts . . . address a predominantly legal issue: Did the agency 'articulate a rational connection between the facts found and the choice made?'") (citation omitted), *aff'd,* 277 F. App'x 297 (4th Cir. 2008).

## ARGUMENT

In seeking to invalidate the Rescission Policy, Plaintiffs ask the Court to override the Acting Secretary's judgment about how to exercise her discretion in enforcing the Nation's immigration laws. The Court need not consider this extraordinary request, however, because this case is not justiciable. The exercise of enforcement discretion in the Rescission Policy is committed to agency discretion by law and is therefore unreviewable. In fact, Congress has gone so far as to strip district courts of jurisdiction over "no deferred action" decisions such as the one

here.  At a minimum, the Plaintiff-organizations lack standing.  And in all events, Plaintiffs fail to state a claim.  This case should therefore be dismissed.

# I.    THIS CASE IS NOT JUSTICIABLE.

## A.    The Rescission Policy Is Not Justiciable Because this Immigration Enforcement Policy Is a Matter Committed to Agency Discretion by Law.

**1.**  The APA bars judicial review of certain categories of decisions that "courts traditionally have regarded as 'committed to agency discretion.'"  *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting 5 U.S.C. § 701(a)(2)).  These decisions are typically unreviewable because there exists "no meaningful standard against which to judge the agency's exercise of discretion" in these areas.  *Chaney*, 470 U.S. at 830; *see Sierra Club v. Larson*, 882 F.2d 128, 133 (4th Cir. 1989) (applying *Chaney* in precluding review of an agency's discretionary decision not to seek enforcement of a statute).  This bar applies even when "the agency gives a 'reviewable' reason for otherwise unreviewable action."  *ICC v. Bhd. of Locomotive Eng'rs* (*BLE*), 482 U.S. 270, 283 (1987).

Among the decisions committed to executive discretion are "an agency's exercise of enforcement power."  *Chaney*, 470 U.S. at 833.  Such judgments involve "a complicated balancing of a number of factors which are peculiarly within [an agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall priorities, and, indeed, whether the agency has enough resources to undertake the action at all."  *Id.* at 831.  As there is "no meaningful standard against which to judge the agency's exercise of discretion" in weighing these factors, an agency's exercise of enforcement powers is "presumed immune from judicial review under § 701(a)(2)."  *Id.* at 830, 832.

For instance, an "agency[] decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  *Id.* at 831

(citation omitted). After all, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," and it "is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Chaney*, 470 U.S. at 831–32; *see Sierra Club*, 882 F.2d at 133 (recognizing separation of powers underpinning of the presumption of the unreviewability of agency decisions not to pursue enforcement). Thus, for example, the Supreme Court in *Chaney* held that the FDA's general policy of refusing to exercise its enforcement authority with respect to the use of approved drugs in lethal injections was committed to the agency's discretion under § 701(a)(2). *See* 470 U.S. at 824–25, 837–38 (finding FDA's refusal to take the enforcement actions requested by respondents, including broad measures that would have impacted an entire drug market segment, was not subject to judicial review).

An agency's decision *to* enforce the law against a particular individual is likewise presumptively unreviewable. Just as "the decision whether or not to prosecute" presumptively "rests entirely in [the prosecutor's] discretion," *Armstrong*, 517 U.S. at 464 (citation omitted), an agency's decision to bring a civil enforcement action is generally not open to judicial scrutiny. Considerations such as "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall policies" are equally present in enforcement decisions as in nonenforcement decisions, *Chaney*, 470 U.S. at 831, and judicial intrusion into the deliberative process is equally improper, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("there must be a strong showing of bad faith or improper behavior before" courts can engage in an "inquiry into the mental processes of administrative decisionmakers" (citation omitted)), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

This presumption of nonreviewability applies with particular force when it comes to

immigration.   On top of the general concerns implicated in any enforcement decision, the enforcement of immigration laws "embraces immediate human concerns," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 396–97.   Given these realities, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Id.* at 396.   One form of that broad discretion is deferred action, a "discretionary and reversible" decision to notify an alien that DHS has chosen not to seek his removal for a specific period of time.   *Arpaio*, 797 F.3d at 17; *see supra* at 5-6.   Like other agency nonenforcement decisions, grants of deferred action rest on a complex balancing of policy considerations that cannot serve as "meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830.   Such determinations are thus presumptively unreviewable. *See Arpaio*, 797 F.3d at 16.

The converse is equally true: *denials* of deferred action are also committed to agency discretion.  *See AADC*, 525 U.S. at 485 (treating "'no deferred action' decisions" as "discretionary determinations").   Because "[g]ranting an illegally present alien permission to remain and work in this country" is fundamentally "a dispensation of mercy," there are "no standards by which judges may patrol its exercise." *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (INS's decision not to grant pre-hearing voluntary departures and work authorizations to a group of aliens non-justiciable), *reh'g denied*, 912 F.2d 1465 (5th Cir. 1990).   To be sure, a decision "not to grant deferred action status to a particular alien is not precisely a 'decision not to take enforcement action,'" but that does not obscure the fact that "many of the same factors" underlying the latter determinations usually play a role in the former. *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 n.4 (9th Cir. 1987) ("denials of deferred action status applications are not subject to judicial

review" under § 701(a)(2)).

**2.**   As an exercise of enforcement discretion, the Rescission Policy is a classic example of a discretionary determination that is entrusted to the agency alone.   Indeed, any attempt to judge the Policy would quickly entangle this Court in the sort of complex and discretionary balancing that has been entrusted by Congress to the Executive Branch.   For example, the judiciary is institutionally ill-equipped to assess whether the Acting Secretary's decision to change "immigration policies and priorities" by rescinding DACA, Rescission Policy at 4 (AR 255), was an appropriate use of "the Department's limited resources," *Arpaio*, 797 F.3d at 16.   Nor is this Court well suited to second-guess the Acting Secretary's balancing of the costs and benefits of keeping the policy in place, on the one hand, with the risk of "potentially imminent litigation" that could throw DACA into immediate turmoil, on the other.   Rescission Policy at 3 (AR 254) (citation omitted).

To be sure, the Acting Secretary *also* gave substantive legal reasons for her decision, *id.* at 2–4 (AR 253–55), but that does not render it justiciable.   That is because the Supreme Court has rejected the proposition that if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable."   *BLE*, 482 U.S. at 283.   For example, "a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction," which "is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point."   *Id.*   But that does not change the fact that "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review."   *Id.*   Likewise, the Acting Secretary's discussion of the question of DACA's legality does not transform her generally unreviewable exercise of enforcement discretion into a matter fit for judicial scrutiny.

18

Indeed, reviewing the Rescission Policy would be particularly inappropriate given the wide discretion the Secretary enjoys in the enforcement of the immigration laws. In *AADC*, the Supreme Court held that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation," 525 U.S. at 488 (footnote omitted), subject to the "possib[le]" exception "of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome," *id.* at 491. The reason for this highly restrictive rule is that the concerns raised by challenges to the Executive's enforcement discretion "are greatly magnified in the deportation context." *Id.* at 490. An alien subject to removal is, by definition, in continuing violation of the INA, and judicial interference with the Executive's enforcement therefore would compel the Executive to disregard such ongoing violations. The "delay" associated with challenges to discretionary decisions not to forgo enforcement is more likely than in the criminal arena, as "[p]ostponing justifiable deportation (in the hope that the alien's status will change … or simply with the object of extending the alien's unlawful stay) is often the principal object of resistance to a deportation proceeding," and "the consequence is to permit and prolong a continuing violation" of the immigration laws. *Id.* at 490. For another, reviewing immigration decisions may involve "not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives" or other sensitive matters as well. *Id.* at 490–91. Finally, the idea that "an ongoing violation of United States law . . . must be allowed to continue because it has been improperly selected is not powerfully appealing." *Id.* at 491 (emphasis omitted).

**3.** Notwithstanding these clear concerns that warrant a presumption against judicial review, the court in *Batalla Vidal v. Duke*, a related case presenting similar challenges to the Rescission Policy, held that the Acting Secretary's decision to rescind DACA "was not itself a presumptively

unreviewable exercise of enforcement discretion."  Mem. & Order at 23, *Batalla Vidal v. Duke*,

No. 16-cv-4756 (E.D.N.Y. Nov. 9, 2017), ECF No. 104 (*Batalla Vidal* Mem. & Order) (granting

in part and denying in part Defendants' Rule 12(b)(1) motion and reserving ruling on Defendants'

Rule 12(b)(6) motion).  In so holding, however, the court incorrectly labeled the Acting Secretary's

decision to rescind DACA as a "constrain[t]" on DHS's prosecutorial discretion with respect to

DACA recipients, *see id.* at 24, and incorrectly described the rescission as subjecting "individuals

who previously enjoyed some protection from removal to coercive state authority," *id.* at 25.  To

the contrary, the Acting Secretary's decision to rescind DACA was an act of discretion in and of

itself, which is best described as reordering the agency's enforcement priorities in light of litigation

risk.  *See Arpaio*, 797 F.3d at 17 (citation omitted) (deferred action is "discretionary and reversible,

and 'confers no substantive right, immigration status or pathway to citizenship'").  It is, therefore,

equally entitled to a presumption of nonreviewability as the enforcement and non-enforcement

cases that the Supreme Court has found are committed to executive discretion.  *See, e.g.*, *Chaney*,

470 U.S. at 832-33; *Armstrong*, 517 U.S. at 464; *AADC*, 525 U.S. at 485.

Moreover, the court in *Batalla Vidal* found the Rescission Policy reviewable based upon

its misinterpretation that the Acting Secretary "exclusively" relied on a legal determination that

DACA was unlawful, a rationale for which the court held there was "law to apply."  *Batalla Vidal*

Mem. & Order at 22 (citing AR 251 (Sessions Letter); AR 253-55 (Rescission Policy)).  The

Attorney General's determination that DACA was unconstitutional was but one factor that the

Acting Secretary considered.  As the Rescission Policy makes clear, in determining to wind down

the policy pursuant to the parameters laid out in the memorandum, the Acting Secretary also relied

on the history of the *Texas* litigation and potential risk it posed to the continuation of DACA, as

well as the self-evident complexities associated with ending DACA, a policy that impacts nearly

20

800,000 individuals.  Rescission Policy at 2-4 (AR 253-55).  The balancing of those considerations is not amenable to review in light of the sources cited by the *Batalla Vidal* court, such as statutory text, the history of the use of deferred action, or the Office of Legal Counsel (OLC) opinion.[2] *Batalla Vidal* Mem. & Order at 22.

The court's reasoning is also contrary to *BLE*, which makes clear that enforcement decisions are committed to agency discretion even where they rest on broad legal policy judgments rather than individualized considerations.  *Id.* at 283.  *BLE* specifically gave the example of a criminal prosecutor's decision not to prosecute a certain category of crimes based on the prosecutor's view of the legal merits of the prosecution.  *Id.*  Although a court may be qualified to consider those legal merits, "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review."  *Id.*  Just as in the analogy provided in *BLE*, the Acting Secretary's consideration, among other things, of the lawfulness of the DACA policy merely explains how she plans to exercise her discretion to rescind the policy and that decision, regardless of the court's ability to review the legal merits of DACA, is nonreviewable.  *Id.*  *BLE*'s point applies *a fortiori* in the immigration context where the Supreme Court has emphasized the problems with questioning the government's exercise of its broad discretion.  *See AADC*, 525 U.S. at 489-90.

**B.**     **The INA Deprives District Courts of Jurisdiction over Challenges to Denials of Deferred Action.**

Not only is the denial of deferred action committed to agency discretion under the APA, but the INA itself deprives federal district courts of jurisdiction over challenges to such denials altogether.   As the Supreme Court explained in *AADC*, the Executive's "exercise of [its] discretion" in granting deferred action in some circumstances had "opened the door to litigation

---

[2] U.S. Dep't of Justice, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*, 38 Op. O.L.C. 1, 18 n.8 (Nov. 19, 2014) (OLC Op.), https://www.justice.gov/file/179206/download.

. . . where" the Executive had "chose[n] *not* to exercise it." *Id.* at 484. Specifically, some courts

had entertained challenges to "the refusal to exercise such discretion" on various bases such as

"selective prosecution," the use of "arbitrary or unconstitutional criteria, or on other grounds

constituting abuse of discretion." *Id.* at 485 (citation omitted). To address what the Supreme Court

referred to as this "particular evil"—*i.e.*, "attempts to impose judicial constraints upon

prosecutorial discretion"—Congress enacted 8 U.S.C. § 1252(g). *AADC*, 525 U.S. at 485 & n.9.

Section 1252(g) commands that, outside of petitions for review from final removal orders

and certain other limited channels for review, "no court shall have jurisdiction to hear any cause

or claim by or on behalf of any alien arising from the decision or action by the [Secretary of

Homeland Security[3]] to commence proceedings, adjudicate cases, or execute removal orders

against any alien under this chapter." These were "the acts … that had prompted challenges to the

… exercise of prosecutorial discretion" in denying deferred action, and thus § 1252(g) "seems

clearly designed to give some measure of protection to 'no deferred action' decisions and similar

discretionary determinations, providing that if they are reviewable at all, they at least will not be

made the bases for separate rounds of judicial intervention outside the streamlined process that

Congress has designed"—namely, an individual removal proceeding. *AADC*, 525 U.S. at 485 &

n.9.

Denials of deferred action—including under DACA itself—thus fall outside the

jurisdiction of the federal courts. *See, e.g.*, *Vasquez v. Aviles*, 639 F. App'x 898, 901 (3d Cir.

2016) ("[Section] 1252(g) … deprives all courts of jurisdiction to review a denial of DACA relief

because that decision involves the exercise of prosecutorial discretion not to grant a deferred

---

[3] *See* 6 U.S.C. § 557; *see also id.* §§ 202, 251; *Elgharib v. Napolitano*, 600 F.3d 597, 607 (6th Cir. 2010) ("[U]nder 6 U.S.C. § 557, . . . the statutory reference to the 'Attorney General' in § 1252(g) now means 'Secretary of DHS.'").

action."); *Botezatu v. INS*, 195 F.3d 311, 314 (7th Cir. 1999) ("Review of refusal to grant deferred action is … excluded from the jurisdiction of the district court.").

Although the court in *Batalla Vidal* held that § 1252(g) did not divest the court of jurisdiction to review the Rescission Policy, its holding was based on an overly narrow reading of the statute. *Batalla Vidal* Mem. & Order at 28-31. Specifically, it held that § 1252(g) was inapplicable because the plaintiffs' challenge to the Rescission Policy did not arise from one of the three enumerated immigration actions that trigger the statute. *Id.* at 29-30. To be sure, Plaintiffs brought this challenge to the Rescission Policy before any removal proceedings took place, but that is beside the point. The decision not to continue deferred action is an ingredient to the commencement of enforcement proceedings at some future date, and a person cannot circumvent the bar in 8 U.S.C. § 1252(g) by singling out that single step for a preemptive challenge. Indeed, the Supreme Court acknowledged that the apparent purpose of § 1252(g) was to protect "'no deferred action' decisions and similar discretionary determinations," like the Rescission Policy, by preventing challenges to such decisions in "separate rounds of judicial intervention" outside the process designed by Congress, as is the case here. *AADC*, 525 U.S. at 485. If aliens (or entities suing on their behalf) could evade § 1252(g)'s bar simply by challenging the forthcoming expiration of deferred action before actual removal proceedings (if any) began, then jurisdiction would turn on a race to the courthouse. Such a framework would create the perverse incentive for DHS to begin removal proceedings immediately rather than to allow, as it did here, for rolling expirations of deferred action status over a two-and-a-half year period. There is no indication that Congress sought to enact such a nonsensical regime. Instead, § 1252(g) precludes review of either "the decision *or action*" by the Acting Secretary "to commence

proceedings," and thereby sweeps in the Rescission Policy.  (emphasis added).[4]

Moreover, the *Batalla Vidal* court ignored that at least one court has applied § 1252(g) to actions that are "not … on the list of precluded items"—*i.e.*, "decisions to commence proceedings, adjudicate cases, or execute removal orders"—in order to effectuate the object of this jurisdictional bar.  *Botezatu*, 195 F.3d at 313–14.  In *Botezatu*, the Seventh Circuit rejected an alien's argument that a court could review the Executive's "refusal to … grant him humanitarian parole or deferred action" simply because that denial occurred in "post-deportation procedures."  *Id.* at 313–14.  As the Seventh Circuit explained, because *AADC* broadly held that "'no deferred action' decisions and similar discretionary determinations' [were] governed by § 1252(g)," that jurisdictional bar should apply regardless of *when* such determinations occurred.  *Id.* at 314 (quoting *AADC*, 525 U.S. at 485).  Thus, just as an alien (or entity suing on his behalf) cannot circumvent § 1252(g) by bringing a challenge to a denial of deferred action on the back-end, Plaintiffs' broad front-end assault on the Rescission Policy is beyond the jurisdiction of this Court.  At the very least, 8 U.S.C. § 1252(g) reinforces the conclusion that enforcement discretion under the INA is at the core of unreviewable matters committed to agency discretion by law under the APA.  5 U.S.C. § 701(a)(2).

---

[4] The court in *Batalla Vidal* also held that § 1252(g) did not divest the court of jurisdiction to hear claims of the non-individual plaintiffs (several States and an advocacy organization) because the statute bars only suits by or on behalf of an alien.  *Batalla Vidal* Mem. & Order at 31.  However, the fundamental concerns of § 1252(g) apply no matter if the challenge is brought by the alien himself or an outside entity (on its own behalf or on behalf of the alien).  *See AADC*, 525 U.S. at 485.  In either context, the purpose of the jurisdictional bar is to prevent separate judicial review, like the instant suit, outside the streamlined process Congress intended.  *Id.*  Furthermore, like the American-Arab Anti-Discrimination Committee in *AADC*, itself an organizational plaintiff, the Plaintiff-organizations in this matter are for purposes of § 1252(b) suing "on behalf" of an alien because the relief they seek will benefit the individual Plaintiffs and all other DACA recipients.  To the extent the Plaintiff-organizations would benefit from an order setting aside the Rescission Policy, *but see infra* § I.C.1(a), their benefit would be only an indirect and incidental effect of the relief for DACA recipients.

C.    The Plaintiff-Organizations' Claims Are Not Cognizable.

    1.    Plaintiffs Lack Article III Standing.

The Plaintiff-organizations do not expressly identify the capacity in which they bring this suit.  Regardless, they make little or no attempt to identify any injury whatsoever to their own interests as organizations, nor do they specifically identify any individual members on whose behalf the organizations are suing.  Their allegations are, therefore, patently insufficient to establish standing.

    a.    Plaintiffs lack organizational standing.

To establish Article III standing, an organization suing on its own behalf must meet the familiar standing requirements that apply to individuals: (1) injury in fact; (2) causation; and (3) redressability.  *See, e.g.*, *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).  As the parties invoking the Court's jurisdiction, the Plaintiff-organizations bear the burden "clearly to allege facts demonstrating" each of these three elements.  *Warth v. Seldin*, 422 U.S. 490, 518 (1975).  The necessary facts "must affirmatively appear in the record" and "cannot be inferred argumentatively from averments in the pleadings."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).  The standing inquiry is "especially rigorous" where, as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted).

Plaintiffs' Complaint fails at the first step of the analysis.  Here, the Plaintiff-organizations were not the object of any government policy.  Instead, a generous reading of the Complaint reveals, at most, their dissatisfaction with the alleged effects of a policy decision on undocumented immigrants who came to the United States as children.  Pls.' Compl. ¶¶ 1-2; *see also* ¶¶ 23-24, 26.

But the federal courts do not sit to air arguments "at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences," *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972), or to resolve "generalized grievances more appropriately addressed in the representative branches," *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (citation omitted), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components*, 134 S. Ct. 1377 (2014). Thus, a "mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem," is insufficient to create standing. *Sierra Club*, 405 U.S. at 739. Accordingly, an "organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Article III." *Md. Highways Contractors Ass'n v. Maryland,* 933 F.2d 1246, 1251 (4th Cir. 1991) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

Nor do the Plaintiff-organizations show any injury to their own activities. To satisfy Article III under this theory of standing, an organization must demonstrate a "concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources—constitut[ing] . . . more than simply a setback to the organization's abstract social interests." *Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (alterations in original) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "Such a showing requires 'more than allegations of damage to an interest in "seeing" the law obeyed or a social goal furthered.'" *Id.* (quoting *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987)). Rather, "the organization must allege that discrete programmatic concerns are being directly and adversely affected" by the challenged action. *Id.* (alteration and citation omitted). Here, the vast majority of the Plaintiff-organizations do not even try to meet this test. *See* Pls.' Compl. ¶¶ 30-37. They point to no interference with any immigration-related

26

programming and allege no new expenditure of funds.  The Plaintiff-organizations thus fall well short of their burden to establish a cognizable injury to their own interests.  Their claims of organizational standing should be rejected out of hand.

Only Plaintiff CASA de Maryland, Inc. (CASA) attempts to allege an injury to its own activities, claiming that, as a result of the Rescission Policy, it "reallocate[d] significant resources" to "counsel and assist" eligible individuals to renew their DACA by the October 5, 2017 deadline, "depriving community members of access to other vital legal services."  Pls.' Compl. ¶ 29.  Even assuming this allegation of injury is sufficient for purposes of organizational standing, it fails to allege an ongoing injury that would entitle CASA to the injunctive relief it seeks.  *McBurney v. Cuccinelli*, 616 F.3d 393, 410-11 (4th Cir. 2010) ("to maintain standing for declaratory and injunctive relief" a plaintiff must "plead an[ ] ongoing injury" (emphasis omitted)).  To satisfy the case or controversy requirement of Article III in an action seeking only *prospective* relief through an injunction or declaratory judgment, a plaintiff must show exposure to illegal conduct accompanied by "continuing, present adverse effects."  *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("Absent a sufficient likelihood that he will again be wronged in a similar way, [plaintiff] is no more entitled to an injunction than any other citizen").  Here, the sole allegation of injury that may entitle CASA to organizational standing relates to an alleged diversion of resources to assist individuals with DACA renewal requests, a purported injury that necessarily ceased once that October 5 renewal deadline set forth in the Rescission Policy passed.  In the absence of an ongoing injury to its own activities, consisting of more than harm to its "abstract concern" for immigrant rights, CASA lacks organizational standing to obtain the prospective injunctive relief it seeks.  *Md. Highways Contractors Ass'n,* 933 F.2d at 1251; *McBurney*, 616 F.3d at 411.

### b.      Plaintiffs lack representational standing.

Because the Plaintiff-organizations do not sufficiently allege injury to themselves in their own right, "they can establish standing only as representatives of those of their members who have been injured in fact."  *Simon*, 426 U.S. at 40 (citation omitted).  But the organizations fail to identify any particular member allegedly harmed by the policy change, and that alone dooms any claim of representational standing.

To plead representational standing, the Plaintiff-organizations must allege that "(1) [their] own members would have standing to sue in their own right; (2) the interests the organization[s] seek[] to protect are germane to the organization[s'] purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit."  *Md. Highways Contractors Ass'n,* 933 F.2d at 1251 (citing *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977)).  To satisfy the first of these prongs, an association must at the very least name a specific member with standing for each claim it asserts.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (association must "name the individuals who were harmed"); *S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 184 (association must "identify a single *specific member*" who was injured).

Here, most of the Plaintiff-organizations make no mention whatsoever of any member allegedly harmed by the Rescission Policy, let alone identifying any such specific member.  *See* Pls.' Compl. ¶¶ 30-32, 34-37.  Only CASA and OneAmerica even broach the topic, alleging that CASA "counts more than 2,300 DACA beneficiaries as members," *id.* ¶ 29, and that "many [DACA recipients] are active OneAmerica . . . members," *id.* ¶ 33.  These general allegations, however, do not name any particular member or members and, thus, also do not rise to the specificity required to plead representational standing.  *See Summers*, 555 U.S. at 498.  Moreover,

CASA and OneAmerica's allegations establish that neither organization would meet the limited exception to *Summers*' identification requirement for cases in which all members of an organization are harmed. *See id.* at 498-99; *S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 184. *See also* Pls.' Compl. ¶ 29 (claiming that only 2,300 of more than 90,000 members are DACA recipients); *id.* ¶ 33 (stating "many" but not all One America members are DACA recipients). Accordingly, the Court should likewise reject any claim of representational standing.

### 2. Plaintiffs Lack a Cause of Action Under the APA.

Even if the Plaintiff-organizations could establish Article III standing, they would lack a cause of action under the APA. The APA does not "allow suit by every person suffering [an] injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved" in this sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute … in question." *Clarke*, 479 U.S. at 396 (brackets and citation omitted). Here, no provision of the INA even arguably protects the Plaintiff-organizations from bearing any incidental effects of a denial of deferred action.[5] *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

---

[5] The court in *Batalla Vidal* held that whether the non-individual plaintiffs asserted interests falling within the "zone of interests" protected by the APA was not a jurisdictional or justiciability question, but rather an issue of prudential standing addressed under Rule 12(b)(6). *Batalla Vidal* Mem. & Order at 46-47. Because the court reserved its ruling on Defendants' motion to dismiss for failure to state a claim, it did not address this argument.

**D.      The Government's Justiciability Objections Are Not Inconsistent with the Acting Secretary's Reliance on the Fifth Circuit's Decision.**

Although the Fifth Circuit in *Texas* included holdings that a challenge to the DAPA Memo was reviewable, 809 F.3d at 165–70, neither that decision nor Acting Secretary Duke's reliance on it forecloses the government from arguing here that the DACA Rescission Policy is unreviewable.   First, neither the Acting Secretary's memo nor the Attorney General's letter expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings, and it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place.   Second, officers of the Executive Branch have an independent duty to consider the legality of their policies regardless of whether they are judicially reviewable; all swear an oath to uphold the United States Constitution.   *See Mississippi v. Johnson*, 71 U.S. 475, 499 (1867) (Take Care Clause imposes a generally nonjusticiable duty on the Executive Branch). Finally, even if courts could have reviewed the adoption of DACA as "an abdication of [DHS's] statutory responsibilities," *Chaney*, 470 U.S. at 833 n.4, that would not make the Rescission Policy, a classic exercise of agency enforcement discretion, open to challenge.   After all, the Fifth Circuit itself emphasized that "DAPA is much more than a nonenforcement policy, which presumptively would be committed to agency discretion," *Texas*, 809 F.3d at 178 n.156, and pointed out that a "*denial* of voluntary departure and work authorization" by DHS would have been nonjusticiable, *id.* at 168.   Denials of deferred action under a return to a more traditional enforcement policy should be treated no differently.

**II.      PLAINTIFFS FAIL TO STATE A CLAIM.**

Even if Plaintiffs' claims were justiciable, the Court should dismiss this case in its entirety

for failure to state a claim.[6]

### A.     Plaintiffs Fail to State an APA Claim.

#### 1.     The Acting Secretary rationally explained her decision to wind down DACA, particularly given the imminent risk of a nationwide injunction.

Plaintiffs contend that the Rescission Policy is arbitrary and capricious because it constitutes a change in agency policy without an adequate explanation.[7]  Pls.' Compl. ¶ 165. Plaintiffs' allegations misapprehend the nature of the inquiry under the APA.  It is black-letter law that agencies are free to change course on policy matters so long as they provide a rational explanation.  Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this deferential standard, particularly in view of the imminent risk of a nationwide injunction, which could have prompted an immediate—and chaotic—end to the policy.

**1.** Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B).  The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park*, 401 U.S. at 416.  A decision may be held to be arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

---

[6] In the alternative, however, the Court may, if it wishes, convert this motion to one for summary judgment.  *Audubon*, 524 F. Supp. 2d at 660.

[7] Plaintiffs also allege that DACA's termination violated the APA because it was unconstitutional.  *See* Pls.' Compl. ¶ 165.  Plaintiffs' allegations that the rescission of DACA was unconstitutional are addressed in Sections II.C-E, *infra.*

*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). The Court may not "substitute

its judgment for that of the agency." *Id*. And when an agency changes policies, it "need not

demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons

for the old one." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Rather, "it

suffices that the new policy is permissible under the statute, that there are good reasons for it, and

that the agency *believes* it to be better, which the conscious change of course adequately indicates."

*Id.*

    In assessing whether a decision was arbitrary and capricious, "[t]he task of the reviewing

court is to apply the appropriate APA standard of review to the agency decision based on the record

the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-

44 (1985) (citation omitted). If the agency's action "is not sustainable on the administrative record

made," then the administrative "decision must be vacated and the matter remanded to [the agency]

for further consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). This Court should therefore

decide whether the Acting Secretary's decision to wind down DACA was arbitrary and capricious

on the administrative record she has produced. Thus, while the government submits that the Acting

Secretary's decision was plainly not arbitrary and capricious under the record already before this

Court, if this Court were to disagree, it should do no more than simply grant Plaintiffs the relief

they seek by setting aside the Rescission Policy and remanding to her.

    **2.** The Rescission Policy amply meets the "minimal standards of rationality" required by

the APA. *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted), *reh'g*

*denied*, 129 F.3d 1290 (D.C. Cir. 1997). Plaintiffs do not deny that "the new policy is permissible

under the [INA]." *Fox*, 556 U.S. at 515. And there are eminently "good reasons for it," *id.*,

particularly in view of the litigation risk posed by the proceedings in *Texas*. In the Rescission

Policy, the Acting Secretary explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy at 4 (AR 255). Specifically, after summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's conclusion in his letter that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted). The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into uncertainty.

The Acting Secretary was then "faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately." Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://go.usa.gov/xncuM. She reasonably opted for an orderly rescission, which she considered "the least disruptive option." *Id.*

There is nothing at all irrational about this choice or that explanation. *Cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 84 (2002) ("regulation reasonable" based on concerns about subjecting parties to "possible … liability"). Indeed, it is entirely sensible, given the turmoil that an abrupt, court-ordered shutdown would likely have provoked. The Acting Secretary balanced the litigation risk of keeping DACA in place with "the administrative complexities associated with ending the program," and opted for a solution that would "wind it down in an efficient and orderly fashion" accounting for the interests of DACA recipients. Rescission Policy at 3 (AR 254). She

33

explained her reasonable decision to rescind DACA, and the APA requires no more.  *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted) (APA satisfied where agency's explanation is clear enough that its "path may reasonably be discerned"), *reh'g denied*, 420 U.S. 956 (1975).[8]  And no matter whether her (or the Attorney General's) judgment about the likely result of the *Texas* litigation would have turned out to be correct, it was surely not an irrational or arbitrary and capricious conclusion in light of the fact that at least the Fifth Circuit and four justices of the Supreme Court had already held that a materially indistinguishable policy was unlawful.

**3.**  Plaintiffs nonetheless contend that the decision to rescind DACA was arbitrary and capricious because the Acting Secretary considered the Attorney General's views regarding the legality of DACA, which are views Plaintiffs contend "contradict" "the prior Department of Justice OLC analysis concluding that the program was constitutional."  Pls.' Compl. ¶¶ 120, 165.[9] Plaintiffs' argument suffers from three independent flaws.

First, the Acting Secretary did not rely on the Attorney General's September 4 letter solely for its assessment of DACA's legality.  Instead, as discussed above, she concluded that DACA "should" be wound down after considering, among other things, his litigation risk determination that it was "likely" that a legal challenge to DACA "would yield similar results" as the DAPA litigation under Fifth Circuit precedent.  Rescission Policy at 3 (AR 254).  That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis for upholding the Acting Secretary's decision to rescind DACA.  *See Bowman*, 419 U.S. at 286.

---

[8] For these same reasons, Plaintiffs' allegations that the relevant dates chosen by the Acting Secretary in the wind-down process are arbitrary and capricious fails to state a claim under the APA.  *See* Pls.' Compl. ¶ 165.

[9] Plaintiff also alleges that the Acting Secretary's decision is "directly contravene[ed]" by statements made by President Trump, none of which actually address the litigation risk surrounding DACA.  *See id.* ¶¶ 125, 165.

Second, to the extent the Acting Secretary did rely on the proposition that DACA was unlawful, this Court need not agree with that determination to uphold her decision.  If an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment to avoid constitutional questions, even if the two determinations are arguably "intertwined."  *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue").  Here, the Attorney General regarded DACA as unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected. Rescission Policy at 3 (AR 254).  But those same concerns equally support a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law."  *Id.* at 2 (AR 253).  This Court should, therefore, sustain her decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

Third, although this Court need not decide the issue to resolve this case in favor of the government on the basis that the agency decision was at least rational, the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas*, which was affirmed by the Supreme Court.  The Fifth Circuit held not only that DAPA—including its proposed expansion of DACA—was likely unlawful, but also that DACA bore many "important similarities" to it. *Texas*, 809 F.3d at 174 & n.139 (noting that "the DAPA Memo's plain language … equates the DACA and DAPA procedure[s]," making DACA an "apt comparator").  Indeed, given that DAPA was enjoined before its implementation, the Fifth Circuit's decision was

"informed by analysis of the implementation of DACA" itself. *Id.* at 172.  On that score, while, "[l]ike the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id.* at 171–72, the court found that discretion to be illusory in practice: Because relatively few DACA requests were denied, the Fifth Circuit believed "there was evidence from DACA's implementation that [this] discretionary language was pretextual," *id.* at 172–73.  Based on these findings by the Fifth Circuit, it would follow that DACA, like DAPA, did not "genuinely leave the agency and its employees free to exercise discretion" on a case-by-case basis, *id.* at 176—which supports the Attorney General's view that DACA was unlawful.  And it seems likely that at least four justices of the Supreme Court agree.

Regardless of whether OLC was correct when it previously "orally advised" that its "preliminary view" was that the proposed version of DACA would be lawful, the reasoning in that opinion further confirms the invalidity of DACA as it was actually implemented in practice, as found by the Fifth Circuit.  The "preliminary" conclusion was conditioned on the proviso that "it was critical that … the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis."  OLC Op. 18 n.8.  Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice.  *Texas*, 809 F.3d at 176.  Indeed, because deferred action continues to exist on an individualized basis, the only change made by the Acting Secretary is the elimination of the factors that, according to the Fifth Circuit, led to the policy being applied without sufficient case-by case discretion.  *See id.* at 172–73 (noting testimony that, for DACA, requests were "simply rubberstamped if the applicants meet the necessary criteria").  Further, the original DACA program largely shares the relevant defects of

the proposed expansion of deferred action that OLC rejected, rather than the aspects of the new program that it approved.

**4.** Plaintiffs also allege that the rescission is arbitrary and capricious because DHS has failed to "provide a reasoned analysis sufficient to justify its change of policy in light of the serious reliance interests created by DACA."  Pls.' Compl. ¶ 165(b).  As set forth in pages 7-8, *supra*, the Rescission Memo is merely a statement of policy that—like the original DACA policy—does not create any enforceable rights and is subject to change at any time.  And insofar as Plaintiffs suggest that the Acting Secretary failed to consider the reliance interests of DACA recipients more generally, that assertion ignores her calculus based the looming risk of a nationwide injunction ending the DACA program altogether.  Given her view that she faced an imminent, court-ordered end to DACA, the Acting Secretary opted for an orderly wind-down process that would protect the reliance interests of DACA recipients far more than an immediate injunction terminating the program would.  *See* 9-10, *supra*.  Finally, to the extent that she rationally concluded DACA was illegal, there would be no legitimate reliance interests at all.

**5.** Plaintiffs also allege that DHS changed its information-sharing policy and that such a change was both arbitrary and capricious as well as contrary to law.  *See* Pls.' Compl. ¶ 165.  This claim is unreviewable under the APA because DHS has not changed its information-sharing policy, and has thus not engaged in any final agency action with respect to such policy. Moreover, Plaintiffs' assertions that the alleged change in policy violated the Privacy Act and the E-Government Act fail as a matter of law.

Plaintiffs do not allege facts sufficient to show that there has actually been a substantive change in policy regarding information sharing.  Plaintiffs merely allege that the Rescission Memorandum "provides no assurance to Dreamers" that personal information will not be used in

immigration enforcement proceedings.  Pls.' Compl. ¶ 107.  And while they cite language in the

Rescission FAQs indicating that information "[g]enerally . . . will not be proactively provided to

other law enforcement entities," Pls.' Compl. ¶ 108 (emphasis omitted) (quoting DHS, *Frequently*

*Asked Questions: Rescission of Deferred Action for Childhood Arrivals* (Sept. 5, 2017) (Rescission

FAQs),    https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-deferred-

action-childhood-arrivals-daca), that language is entirely consistent with DHS's policy regarding

the protection of DACA information, including its many exceptions that Plaintiffs largely gloss

over.  *See* Pls.' Compl. ¶ 90 (characterizing "[t]he government's representations that information

provided by a DACA applicant would not be used against him" as "unequivocal").

Contrary to Plaintiffs' suggestion that DHS has flatly and completely prohibited the use of

DACA information for enforcement purposes, *see* Pls.' Compl. ¶ 90, the agency's information-

sharing policy in fact contains (and has always contained) a number of exceptions.  For example,

under that policy, information submitted in DACA requests "is protected from disclosure to ICE

and CBP for the purpose of immigration enforcement proceedings *unless* the requestor meets the

criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in

USCIS'[s] Notice to Appear guidance" (for example, when issues of national security, public

safety, or significant criminal activity are raised).  DHS DACA FAQ No. 19 (emphasis added);

*see* Notice to Appear Guidance.  While this policy "may be modified, superseded, or rescinded at

any time" and creates no legal rights, DHS DACA FAQ No. 19, nothing in the Rescission Policy

purports to change it, and it currently remains in effect.

As there has been no substantive change in DHS's information-sharing policy, there is no

"final agency action" for the Court to review.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997)

(holding that "final agency action" must "mark the consummation of the agency's decisionmaking

process"); 5 U.S.C. § 704 (providing for judicial review of "final agency action").  Accordingly,

the Court should dismiss Plaintiffs' APA claims for lack of jurisdiction to the extent that they

concern an alleged change in the information-sharing policy.  *See Invention Submission Corp. v.*

*Rogan*, 357 F.3d 452, 460 (4th Cir. 2004) (holding that district court should have dismissed APA

claim without final agency action for lack of subject matter jurisdiction).

Even were the Court to find that DHS somehow changed its long-standing information-

sharing policy, any "new" policy does not violate the Privacy Act or the E-Government Act.   As

a threshold matter, records containing personal information about DACA recipients are not

protected by the Privacy Act.  The Privacy Act applies to records pertaining to "individual[s],"

who are defined as "citizen[s] of the United States or [] alien[s] lawfully admitted for permanent

residence."  5 U.S.C. § 552a(a)(2).  By definition, DACA recipients are neither.  As explained

above, DACA is a form of prosecutorial discretion known as deferred action, and DHS has

consistently advised applicants that DACA "does not confer lawful permanent resident status or a

path to Citizenship."   DHS DACA FAQ No. 68.   To the extent that DHS previously extended

protections to individuals who fell outside of the scope of the statute, the practice was rescinded

in February 2017.  *See* Memorandum from John F. Kelly, *Enforcement of the Immigration Laws*

*to Serve the National Interest* (Feb. 20, 2017) (AR 229-34).  Moreover, that DHS's internal policy

once provided additional protections for DACA recipients does not create a statutory right to

coverage under the Privacy Act. *See* Department of Homeland Security, *Privacy Impact*

*Assessment for the Deferred Action for Childhood Arrivals (DACA)* 16 (Aug. 15, 2012) (noting

that DHS policy "does not extend or create a right of judicial review for non-U.S. persons"),

https://www.dhs.gov/sites/default/files/publications/privacy_pia_uscis_daca_0.pdf

(Privacy Impact Assessment)[10]; *see also Fares v. U.S. Immigration & Naturalization Service*, 50 F.3d 6 (4th Cir. 1995) (affirming district court's holding that Plaintiff whose work authorization had expired "was not protected by the Privacy Act").  Plaintiffs attempt to manufacture a cause of action under the Privacy Act by bringing this claim under the Administrative Procedure Act highlights the frivolous nature of their argument.  Accordingly, Plaintiffs' claim that DHS's information-sharing policy violates the Privacy Act fails as a matter of law.

Plaintiffs also argue that DHS's information-sharing policy does not comply with the E-Government Act.  *See* Pls.' Compl. ¶ 165.  Though the E-Government Act itself does not provide a cause of action, *see Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, No. 17-1320, 2017 WL 3141907, at *1 (D.D.C. July 24, 2017), *appeal docketed*, No. 17-5171 (D.C. Cir. July 27, 2017), the Act requires federal agencies to conduct privacy impact assessments before collecting new information. *See* E-Government Act of 2002, Pub. L. No. 107-347, § 208(b), 116 Stat. 2899.  Plaintiff's argument that DHS is in violation of the E-Government Act suffers from two major flaws.  First, as explained above, DHS has not substantively changed its information-sharing policy regarding DACA applicants' personal information.  Plaintiffs mischaracterize DHS's policy as a "promise" that information from DACA applicants would never be shared.  *See* Pls.' Compl. ¶ 165.  But, as consistently represented in the DACA FAQs and the DACA Rescission FAQS, the Privacy Impact Assessment provides for a number of exceptions, including when applicants "meet[] the guidelines for the issuance of a Notice to Appear," for "national security purposes", and for the "investigation or prosecution of a criminal offense." Privacy Impact Assessment 13.  Second, Plaintiffs allege that DHS "violate[d] the E-Government Act provision requiring an agency abide by its Privacy Impact Assessment," Pls.' Compl. ¶

---

[10] This Privacy Impact Assessment is incorporated by reference in Plaintiffs' Complaint.  *See* Pls.' Compl. ¶ 84.

165(c)(ii), but fail to include a citation to any specific provision of the E-Government act requiring

such action.   The E-Government Act requires only that an agency conduct a privacy impact

assessment, ensure review of the assessment by the Chief Information Officer of the Agency, and

make the assessment publically available.  *See* E-Government Act of 2002, Pub. L. No. 107-347,

§ 208(b)(1)(B).  Thus, once DHS properly created and disclosed its Privacy Impact Assessment in

August 2012, it was in full compliance, and Plaintiffs cannot properly state any violation of this

Act.  *Id.*

<p style="text-align:center">*     *     *     *</p>

In all events, the foregoing analysis confirms that the Acting Secretary's decision was at a

minimum reasonable and that Plaintiffs' APA challenge can be resolved at this stage based on the

record now before the Court.   Indeed, whatever this Court decides, there is no basis for

supplementing the record or discovery to assess the Acting Secretary's explanation.

### B.      The Rescission Policy Is Exempt from Notice and Comment.

Plaintiffs miss the mark in arguing that the Rescission Policy must be set aside because it

is a substantive rule issued without notice and comment.  *See* Pls.' Compl. ¶ 169; *see also* 5 U.S.C.

§ 553(b)–(c).  If winding down the DACA policy is a "substantive rule," then *a fortiori* so was

enacting the policy in the first place.   Critically, though, the DACA Memo itself also was not

adopted through notice and comment.  So even on Plaintiffs' own theory, it would be void *ab*

*initio*—leaving Plaintiffs without a remedy.  *See Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341

n.9 (4th Cir. 1995) (noting that if the interim rule at issue were a substantive rule, as the plaintiff

claimed, then it would have been invalid from the date of its issuance for failure to comply with

the APA's notice requirements; finding that interim rule was a policy statement not subject to

notice and comment).  That is reason enough to dismiss this claim.  *See Lujan*, 504 U.S. at 561

(plaintiff must show "injury will be 'redressed by a favorable decision'" to establish standing) (citation omitted).[11]

In any event, Plaintiffs' claim is erroneous.  DHS and INS have adopted over 20 deferred action or similar policies over the past 50 years—rarely through notice and comment.  That is because such policies, like the Rescission Policy, are not substantive rules at all.  Rather, they are classic examples of "general statements of policy" that are exempt from the APA's notice-and-comment requirements.  5 U.S.C. § 553(b)(3).

A "substantive rule establishes a standard of conduct which has the force of law."  *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974); *see Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989) ("[A] substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties.").  Thus, an "agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule."  *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

A statement of policy, by contrast, "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's Manual on the Administrative Procedure Act

---

[11] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation."  *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982).  That holding, however, concerned the rescission of a rule promulgated after notice and comment that was allegedly defective on other grounds, not a rule that was defective precisely because it had failed to go through notice and comment in the first place.  *See id.* at 445–46.  When an agency has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go through those procedures to cure the underlying defect.

42

30 n.3 (1947)).  It "explains how the agency will enforce a statute or regulation—in other words,

how it will exercise its broad enforcement discretion or permitting discretion under some extant

statute or rule."  *McCarthy*, 758 F.3d at 252.  It serves to "appris[e] the regulated community of

the agency's intentions" and "inform[] the exercise of discretion by agents and officers in the

field."  *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987).  And "a general

statement of policy, like a press release," often "announces the course which the agency intends to

follow in future adjudications."  *Pac. Gas & Elec.*, 506 F.2d at 38.  Accordingly, policy statements

"are binding on neither the public nor the agency," and the agency "retains the discretion and the

authority to change its position … in any specific case."  *Syncor Int'l Corp. v. Shalala*, 127 F.3d

90, 94 (D.C. Cir. 1997) (citations omitted); *see Chen Zhou Chai*, 48 F.3d at 1341 (policy statements

announce "tentative intentions for the future without binding [an agency]", they do not "establish

a binding norm and leave[] agency officials free to exercise their discretion").

As these principles make clear, the Rescission Policy is a quintessential policy statement—

a point that its text reinforces again and again.  It was issued as an "exercise of [the Secretary's]

authority in establishing national immigration policies and priorities."  Rescission Policy at 4 (AR

255).  It explains how the agency intends to exercise its enforcement authority on a prospective

basis, a matter that is "generally committed to an agency's absolute discretion."  *Chaney*, 470 U.S.

at 831.  It does not immediately deprive any DACA recipients of their current deferred action

status, but describes how pending and future deferred action requests will be "adjudicate[d]—on

an individual, case-by-case basis."  Rescission Policy at 4 (AR 255).  It does not categorically

forbid the agency from continuing to defer enforcement action against DACA recipients in the

future, but instead acknowledges the background principle, recognized by Congress and the courts,

that deferred action is "an act of prosecutorial discretion" that may be exercised "on an

43

individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the

agency's exercise of such "otherwise lawful enforcement … prerogatives," *id*. at 5 (AR 256).  And

it explains that it "does not … create any right or benefit, substantive or procedural, enforceable at

law by any party." *Id*.  Thus, in the wake of the Rescission Policy, deferred action "remains

discretionary and reversible," *Arpaio*, 797 F.3d at 17—as with the 20-odd deferred action or

similar policies that DHS and INS have adopted over the past half-century, generally without going

through the full notice-and-comment process.[12]

That is as it should be.  An agency's enforcement priorities will inevitably shift over time,

whether due to changing circumstances or resource constraints.  *See Chaney*, 470 U.S. at 831.

Indeed, the DACA policy was originally adopted in part to set enforcement priorities in view of

the agency's limited resources.  *See Arpaio*, 797 F.3d at 16; DACA Memo at 1 (AR 1); DAPA

Memo at 1 (AR 37).  Under Plaintiffs' theory, however, even if Congress were to vastly increase

appropriations for immigration enforcement, the agency's hands would be tied:  it would not be

free to adjust its enforcement priorities without engaging in "cumbersome and time-consuming

rulemaking proceedings." *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851

F.2d 1424, 1430 (D.C. Cir. 1988).  The Court should not endorse such an intrusion into matters

that have "long been regarded as the special province of the Executive Branch." *Chaney*, 470 U.S.

at 832.

---

[12] The Fifth Circuit's ruling that the adoption of the DAPA Memo required notice and comment
does not imply that the rescission of DACA does as well.  Unlike the DAPA or DACA Memos,
the Rescission Policy announced a return to an enforcement policy of using deferred action on an
individualized basis, which cannot be cast as a substantive rule.  Indeed, the Fifth Circuit itself
stressed that "DAPA is much more than a nonenforcement policy," and that "a traditional
nonenforcement policy would not necessarily be subject to notice and comment." *Texas*, 809 F.3d
at 178 n.156.  In any event, if this Court agrees with the Fifth Circuit, then DACA was void *ab
initio* and Plaintiffs lack a remedy.

**C.       Plaintiffs Fail to State an Equal Protection Claim**.

If this Court disagrees with Defendants and concludes that it can review Plaintiffs' equal

protection challenge under *AADC*, *but see supra* Section I.B, it nonetheless should dismiss it for

failure to state a claim.  In *Armstrong*, the Supreme Court considered whether criminal defendants

could obtain discovery to support a "selective prosecution" claim arising under the Equal

Protection Clause.   517 U.S. at 463–64.   The Court recognized that such claims, like the

discriminatory-motive claims here, "ask[] a court to exercise judicial power over a 'special

province' of the Executive"—specifically, the "constitutional responsibility to 'take Care that the

Laws be faithfully executed'"—and thereby risk "impair[ing] the performance of a core executive

constitutional function."   *Id*. at 464-65 (citations omitted).   Given these considerations, a

"presumption of regularity supports" such enforcement decisions and, "in the absence of clear

evidence to the contrary, courts presume that they have properly discharged their official duties."

*Id*. at 464 (citation omitted).   Applying this "rigorous standard," *id.* at 468, the Court refused to

allow discovery in support of the selective prosecution claim before it, even though the claimants

had provided evidence that in each of the 24 prosecutions for certain drug-trafficking offenses that

were closed by the federal defender's office in a single year, the defendant was African-American,

*id.* at 459, 469-70.

Although Plaintiffs here allege that the Rescission Policy was motivated by discriminatory

animus rather than assert that they have been selectively prosecuted, *Armstrong* still requires them

to allege, and ultimately prove, that this is a "clear" case of discrimination in order to overcome

the presumption that Defendants have faithfully enforced the laws.  *Id.* at 464.  As in *Armstrong*,

Plaintiffs here ask this Court to "exercise judicial power over a 'special province' of the

Executive," with the associated risk of "impair[ing] the performance of a core executive

constitutional function." *Id*. at 464–65 (citations omitted). Plaintiffs consequently must overcome "a significant barrier to the litigation" of their claims. *Id.* at 464. And that is especially true given that they allege an unlawful enforcement of the *immigration* laws. Even if *AADC* permitted the adjudication of Plaintiffs' claims, that decision would at least require them to satisfy a rigorous standard similar to the one in *Armstrong*. As *AADC* explained, the concerns justifying a heightened burden under *Armstrong* "are greatly magnified in the deportation context," 525 U.S. at 490, and all of those considerations are present here, *see supra* Section I.B. Accordingly, Plaintiffs must at least meet a heavy burden to survive a motion to dismiss on a claim that Defendants harbored a hidden discriminatory motive in their enforcement of the immigration laws.

Plaintiffs cannot carry that burden here. Their allegations consist of the assertion that 93 percent of DACA recipients were Mexican, Central American, or Latino, *see* Pls.'Compl. ¶¶ 157, 159 and selected references to statements by the President and other administration officials relating to immigrants, Mexicans, and Latinos, *see* Pls.' Compl. ¶¶ 94-96, 125. These allegations are insufficient to overcome the "significant barrier" to moving forward on a claim of this sort. *Armstrong*, 517 U.S. at 464.

The fact that approximately 93 percent of approved DACA recipients are Mexican, Central American, or Latino is an unsurprising accident of geography, not evidence of discrimination, let alone the kind sufficient to establish discriminatory motive in the enforcement of immigration laws. Even in the ordinary domestic equal protection setting, a disparate impact of a facially neutral rule such as the Rescission Policy, standing alone, cannot establish discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 242 (1976), *superseded by statute, see Veasey v. Perry*, 29 F. Supp. 3d 896, 916 (S.D. Tex. 2014). Much less can it do so when the exercise of enforcement discretion is involved: In *Armstrong*, the fact that 100 percent of the relevant defendants were

African-American was not enough to justify discovery.  517 U.S. at 459.  *A fortiori*, the fact that approximately 93 percent of DACA recipients are Mexican, Central American, or Latino provides no basis for setting aside the Rescission Policy, especially given the heightened deference owed to the political branches on immigration matters, where sensitive considerations of relations and proximity to particular foreign nations necessarily plays a role.[13]

Nor do the President's statements—most of which were made before he took the oath of office—indicate that the rescission of DACA is a clear case of discrimination.  The President's statements are largely unrelated to DACA.  Plaintiffs themselves emphasize that when the President has spoken on this issue, he has shown support for DACA recipients.[14]  More importantly, Plaintiffs point to nothing that would suggest Acting Secretary Duke—the decisionmaker ultimately responsible for the Rescission Policy— chose to wind-down DACA due to animus towards Mexican nationals.  Given that the statements at issue have no connection to either the relevant decision (the rescission of DACA) or the relevant decision-maker (the Acting Secretary), adopting Plaintiffs' theory would mean that any time DHS enforces the immigration laws in a way that has a statistically significant disparate impact on Mexicans, Central Americans, or Latinos, the agency would be subject to challenges that it violated Fifth Amendment equal protection principles.  That would set a dangerous precedent, and it would freeze the enforcement

---

[13] Plaintiffs allege that other classes of immigrants, presumably classes that include less than 93% Mexican, Central American, or Latino individuals, remain eligible for deferred action.  *See* Pls.' Compl. ¶ 159.  That other classes of immigrants who received deferred action include less Mexican, Central American, and Latino individuals does not provide any evidence of discriminatory intent, and, as discussed above, a mere disproportionate impact on one group is insufficient to show discriminatory animus.  *See Washington*, 426 U.S. at 242.

[14] *See* Pls.' Compl ¶ 124 (alleging that the President "stated…that he would find an accommodation for dreamers… 'that's going to make people happy and proud;'" alleging that the President stated that his plan for DACA would "have a lot of heart;'' alleging that the President "confirmed that his Administration's policy is not to deport Dreamers, and suggested that they 'should rest easy'").

discretion of the entire Executive Branch. That ossification would be particularly inappropriate in this context, given that immigration enforcement policies must constantly be adjusted to account for "[t]he dynamic nature of relations with other countries." *Arizona*, 567 U.S. at 397. In all events, Plaintiffs' inferences from unrelated remarks cannot qualify as the sort of "clear" allegations of discrimination necessary in this context. *Armstrong*, 517 U.S. at 464.

### D. Plaintiffs Fail to State a Procedural Due Process Claim

**1.** Plaintiffs allege that the rescission violates procedural due process norms to the extent that DACA recipients will be deprived of their interests in their DACA status without notice and an opportunity to be heard. *See* Pls.' Compl. ¶ 138. This claim fails on the merits for the simple reason that DACA recipients have no protected liberty interest or property interest in deferred action entitling them to due process protections.

The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Thus, the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citations omitted). The "Due Process Clause does not protect everything that might be described as a 'benefit.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). Rather, "'[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Such entitlements "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source"—*e.g.*, statutes or regulations—"that secure certain benefits and that support claims of entitlements to those benefits." *Roth*, 408 U.S. at 577.

48

A benefit "is not a protected entitlement" where, as here, "government officials may grant or deny it in their discretion."  *Castle Rock*, 545 U.S. at 756 (citation omitted).  For due process purposes, statutes or regulations limit discretion only when they contain "explicitly mandatory language"—*i.e.*, "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow."  *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 462–63 (1989) (citation omitted); *see also Smith v. Ashcroft*, 295 F.3d 425, 430 (4th Cir. 2002) (holding that the INA does not create a protected interest in seeking waiver of deportation proceedings because the statute grants "broad discretion" to grant or deny relief).  The DACA policy contains no such "explicitly mandatory language."  *Id*. at 463.  The policy is codified in no statute or regulation.  Its source—the DACA Memo—describes it as a "policy" for the "exercise of prosecutorial discretion."  DACA Memo 2, 3 (AR 2, 3); *see Omar v. McHugh*, 646 F.3d 13, 22 n.7 (D.C. Cir. 2011) (the "use of the word 'policy'"—"rather than a word such as 'right'— reinforces the conclusion that Congress did not intend to create an 'entitlement'").  And the agency's public guidance makes clear that, under DACA, deferred action "may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion."  DHS DACA FAQ No. 27.

Under DACA, "deferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'"  *Arpaio*, 797 F.3d at 17 (quoting DACA Memo 3).  Thus, it is not a protected entitlement for due process purposes, and Plaintiffs' claim fails as a matter of law.  *See also, e.g.*, *Velasco-Gutierrez v. Crossland*, 732 F.2d 792, 798 (10th Cir. 1984) (deferred action guidance "places no effective limitations on official discretion, and thus creates no protected liberty interest in deferred action"); *Romiero De Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985) (because "deferred action" "vests the regional commissioner with

49

unfettered discretion to determine whether to grant an informal administrative stay of deportation

to an otherwise deportable alien, it creates no protectable liberty interest in deferred action, nor

does it create a protectable interest in being considered for deferred action status").

**2.** Even if DACA could be conceived of as an entitlement, Plaintiffs' due process claim

would fail because changes in agency policy do not require individualized process.  Due process

doctrine recognizes a "distinction between individualized deprivations, [which] are protected by

procedural due process, and policy-based deprivations of the interests of a class, [which] are not

protected by procedural due process."  2 Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.2

(5th ed. 2010).  The rescission of DACA falls squarely in the latter category.

Plaintiffs allege that, under DACA, termination required "a Notice of Intent to Terminate

which thoroughly explains the grounds for termination" and that recipients of such a notice would

have an opportunity to respond prior to termination. Pls.' Compl. ¶ 78.  But Plaintiffs' theory is

not that individual DACA applications were adjudicated incorrectly (for example, due to factual

error)—the sort of mistake that notice and a hearing could conceivably help correct.  Instead,

Plaintiffs' claim appears to be that DHS cannot alter the DACA policy, even on a prospective

basis, without providing individualized notice and hearings to nearly 800,000 recipients.

Such individualized process is not required.  The Supreme Court held long ago that where

a government policy "applies to more than a few people, it is impracticable that everyone should

have a direct voice in its adoption," and thus due process does not require individualized pre-

deprivation notice.  *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915).

This case presents "the classic *Bi-Metallic* scenario"—the challenged policy applies across-the-

board to a large number of people, so "[n]ot only would individualized hearings be impractical,

they would be unnecessary." *Decatur Liquors, Inc. v. Dist. of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007) (citing *Bi-Metallic*, 239 U.S. at 445).

The Ninth Circuit's decision in *Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980), is instructive in this regard. There, the INS had issued a policy directive granting "deferred voluntary departure"—a form of deferred action—to Iranian nationals who were unwilling to return home due to political instability. *Id.* at 1359. Then, in response to the Iranian hostage crisis, the INS issued another policy directive "rescinding the … deferred departure" and requiring its recipients to depart the country within 30 days. *Id.* Relying on *Bi-Metallic*, the Ninth Circuit rejected the plaintiff's claim "that he should have had a prior opportunity to contest [the INS's] decision to rescind deferred departure." *Yassini*, 618 F.2d at 1363. "Where an agency action is not based on individual grounds, but is a matter of general policy," the court explained, "no hearing is constitutionally required." *Id.* (citing, *inter alia*, *Bi-Metallic*). So too here.

**3.** Plaintiffs also allege that DHS's alleged change in its information-sharing policy violates procedural due process norms to the extent that DACA recipients have been deprived of their interest in the protection of personal information provided with their DACA requests from alleged impermissible sharing without a right to be heard or other individualized procedural protections. *See* Pls.' Compl. ¶ 151. As previously explained, *supra* Section II.A, Plaintiffs have failed to allege sufficient facts that DHS substantively changed its information-sharing policy. In any event, Plaintiffs fail to state a claim that such a change violates procedural due process because they cannot identify an actual deprivation of "sensitive personal information," much less show that this "information" is somehow a protected interest under the Due Process Clause.

No plaintiff alleges that personal information contained in a DACA application has in fact been impermissibly shared. Nor have Plaintiffs alleged facts indicating a new threat of information

sharing beyond the exceptions that have been consistently part of the policy since DACA was implemented in 2012, including in cases of threats to national security.  Although the court in *Batalla Vidal* found (incorrectly) that, once DACA recipients' status expires, they may be entitled to a presumption that the Government will enforce the immigration laws against them*, see Batalla Vidal* Mem. & Order at 36, it does not follow and Plaintiffs have not shown that DACA recipients are entitled to a presumption that DHS's information-sharing policy, which has not substantively changed, will be applied differently once DACA recipients lose their status.

Even if Plaintiffs had, in fact, alleged an actual deprivation of liberty or property, to the extent that personal information was shared in a manner inconsistent with the information-sharing policy, or if the information-sharing policy had, in fact, changed, Plaintiffs were consistently advised that the policy "may be modified, superseded, or rescinded at any time" and creates no legal rights.  DHS DACA FAQ No. 19; *see supra* Section I.B.  Accordingly, no party has a liberty or property right as a result of the information-sharing policy.  *See Mondragon v. Holder*, 706 F.3d 535, 541 (4th Cir. 2013) (It is a "well-established proposition that 'a constitutional entitlement [*i.e.*, one protected by the Due Process clause] cannot 'be created—as if by estoppel—merely because a wholly and expressly discretionary state privilege has been granted generously in the past.'") (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)).

E.       **Plaintiffs Fail to State a Substantive Due Process Claim.**

Plaintiffs allege that both the rescission of DACA and the alleged change in DHS's information-sharing policy violate substantive due process because these actions are not "fundamentally fair."  Pls.' Compl. ¶¶ 142, 152.  Neither of these claims has merit.

Substantive due process protects those rights that rank as "fundamental"—that is, both "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of

ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."
*Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citation omitted). The Supreme Court
has also made clear that a plaintiff must provide "a 'careful description' of the asserted
fundamental liberty interest" when raising such a claim. *Chavez v. Martinez*, 538 U.S. 760, 775-
76 (2003). "[V]ague generalities," like Plaintiffs' wish that DHS would adopt their preferred
policies, "will not suffice." *Id.* at 776.

While in rare cases a "denial of fundamental fairness" may rise to the level of a substantive
due process violation, to survive dismissal in a "challenge to executive action" such as this one,
Plaintiffs must allege behavior that is "so egregious" and "outrageous" as "to shock the
contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998),
*abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001). Conduct can be said to
"shock the conscience" when it involves intentionally "abusing executive power, or employing it
as an instrument of oppression" in a manner that is "unjustifiable by any government interest."
*Hawkins v. Freeman*, 195 F.3d 732, 742 (4th Cir. 1999) (emphasis and citations omitted). By
contrast, "simple negligence . . . can [never] support a claim of substantive due process violation
by executive act." *Id.*

Nothing about the Rescission Policy meets this extraordinarily high standard, and certainly
not with respect to the subject of information sharing. Plaintiffs have failed to put forth any
allegations suggesting that the Acting Secretary's memorandum contained "any element of
vindictiveness or of power exercised simply to oppress," particularly when compared with the
"legitimate governmental interests" she identified. *See id.* at 746. Moreover, DHS's information-
sharing policy for DACA recipient information has always contained a number of exceptions and
although the policy, in fact, remains unchanged, it has always expressly stated that it "may be

modified, superseded, or rescinded at any time" and it therefore creates no judicially enforceable rights. DHS DACA FAQ No. 19. And, most importantly, the Rescission Policy nowhere purports to alter DHS's information-sharing policy, and even if it did, Plaintiffs were on notice that it could be subject to change.

### F.    Plaintiffs' Equitable Estoppel Claims Fail.

Plaintiffs have also brought equitable estoppel claims, alleging that DACA recipients provided sensitive personal information to the government and "rearranged their lives" based on the government's representations, but now face removal due to the rescission of DACA. *See* Pls.' Compl. ¶¶ 176, 178. On that basis, Plaintiffs claim that the government should be equitably estopped from terminating DACA or from using DACA information for enforcement purposes. *See id.* ¶ 179.

Plaintiffs' equitable estoppel claims cannot succeed for several reasons. As a threshold matter, Plaintiffs cannot succeed because there is no recognized cause of action for estoppel. The Supreme Court has explained that "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). Congress has created no such cause of action for estoppel. This is further confirmed by the Federal Rules of Civil Procedure, which expressly recognize estoppel as an affirmative defense—not a cause of action. *See* Fed. R. Civ. P. 8(c).

Even then, the remedy of equitable estoppel does not apply in this context. Assuming arguendo that this remedy could ever be applied to the federal government, *but see OPM v. Richmond*, 496 U.S. 414, 419, 423 (1990), equitable estoppel does not apply to the *policy* decisions of the federal government. *See, e.g.*, *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("[T]he government should not be unduly hindered from changing its position if that shift is the

result of a change in public policy."), *cited in New Hampshire v. Maine*, 532 U.S. 742, 755 (2001);

*Emery Min. Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984) (the doctrine of estoppel

cannot be justified against the government where it would "interfere with underlying government

policies or unduly undermine the correct enforcement of a particular law or regulation"). Indeed,

it is axiomatic that the government may alter its policies for any number of reasons, in accordance

with any applicable procedures. *See generally Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199,

1210 (2015). Here, the Acting Secretary issued a memorandum rescinding DACA, which is a

matter committed to agency discretion by law.

      Finally, even if a cause of action for estoppel were available to challenge the policy here

(and it is not), Plaintiffs could not satisfy the elements of that claim. Even in situations where an

estoppel claim against the government may be appropriate (*e.g.,* individualized challenges to non-

policy actions), courts "invoke the doctrine of estoppel against the government with great

reluctance." *United States v. Browning,* 630 F.2d 694, 702 (10th Cir. 1980); *see also Heckler v.

Cmty. Health Servs.,* 467 U.S. 51, 60 (1984) (government may not be estopped on same terms as

any other litigant). In other words, estoppel can only be invoked against the government "where

justice and fair play require it." *Watkins v. U.S. Army*, 875 F.2d 699, 706 (9th Cir. 1989) (en banc).

In the rare circumstances in which equitable estoppel may apply against the government, a party

must show "affirmative misconduct going beyond mere negligence." *Angeles v. Dist. Dir., INS*,

729 F. Supp. 479, 485 (D. Md. 1990); *see Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003)

("estoppel may only be justified, if ever, in the presence of affirmative misconduct by government

agents"). Plaintiffs cannot meet this standard.

      First, Plaintiffs have failed to plausibly allege that the government engaged in any

"affirmative misconduct going beyond mere negligence." *Angeles*, 729 F. Supp. at 485 (finding

that INS was not estopped from deporting the plaintiff where immigration officers and a government brochure incorrectly advised her that her permanent resident status would remain valid so long as she did not stay outside the country for more than one year). To meet that standard, Plaintiffs must plead "an affirmative misrepresentation or affirmative concealment of a material fact by the government." *Watkins*, 875 F.2d at 707 (estopping government from barring a soldier's reenlistment where the Army affirmatively misrepresented a soldier's qualifications throughout fourteen years of official records). Here, Plaintiffs have not identified any governmental misconduct, let alone extraordinary misconduct. Instead, they have merely pleaded that there was a change in policy (an erroneous allegation vis-a-vis the information-sharing policy).

Second, estoppel for individual claims is only available where the government's act will cause a "serious injustice" and applying estoppel will not cause the public's interest to "suffer undue damage." *Watkins*, 875 F.2d at 707 (quotation omitted). Plaintiffs have failed to sufficiently plead facts that would support these necessary threshold elements. To the contrary, as reflected in documents incorporated by reference in Plaintiffs' Complaint, DHS made clear in its FAQs that "DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion." DHS DACA FAQ No. 27. Moreover, nothing in the 2012 DACA Memorandum, the form used to request DACA (USCIS Form I-821D), or in the DACA FAQs generally could be construed to represent to DACA recipients that the DACA policy was permanent and not subject to change. There is therefore no "serious injustice" that Plaintiffs can point to relating to the rescission of this discretionary policy.[15]

_____

[15] Even if this Court were to conclude that Plaintiffs can somehow meet these threshold requirements, it would still need to apply traditional estoppel elements to Plaintiffs' claims on an individualized bases: "(1) the party to be estopped knew the true facts; (2) the party to be estopped intended for his conduct to be acted upon or acted in such a way that the party asserting estoppel

At bottom, Plaintiffs' estoppel claims merely repackage their policy challenges.  Equitable estoppel, however, is unavailable for such broad-based challenges.  And even if the Court were to review Plaintiffs' claims on an individualized basis, those claims still fail.  While Plaintiffs surely disagree with the rescission of DACA, that disagreement does not mean that Plaintiffs have alleged that there is a "serious injustice," much less a circumstance involving "affirmative misconduct" in which estoppel should apply.  For these reasons, Plaintiffs' equitable estoppel claims should be dismissed.

**III.     NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS IMPERMISSIBLE.**

Finally, in an indirect attack of the Rescission policy, Plaintiffs seek in a separate cause of action a declaratory judgment that DACA is "lawful."  *See* Pls.' Compl. ¶¶ 182-85 (Count 7).  The Declaratory Judgment Act, however, provides a remedy, not a source of rights independent of substantive federal law.  *Gibraltar, P.R., Inc. v. Otoki Grp., Inc.*, 104 F.3d 616, 618-19 (4th Cir. 1997); *see Johnson v. Sessions*, No. 15-cv-3317-RDB, 2017 WL 1207537, at *6 & n.6 (D. Md. Apr. 3, 2017) (noting that the court would not consider declaratory judgment claim, even if it had jurisdiction, because the request for declaratory relief was duplicative of relief sought through the plaintiff's APA claims).  Moreover, to establish standing and seek relief under the Declaratory Judgment Act, a plaintiff must demonstrate that there is an "actual controversy" necessitating declaratory relief.  28 U.S.C. § 2201(a); *see Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 239-40 (1937).  The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests."  *Aetna*, 300 U.S. at 240-41.

Here, even assuming DACA were "lawful," any declaratory relief that this Court might

---

had a right to believe that it was intended; (3) the party claiming estoppel was ignorant of the true facts; and (4) the misconduct was relied upon to the detriment of the parties seeking estoppel."  *Dawkins*, 318 F.3d at 611 n.6.  Plaintiffs have failed to plausibly allege facts in support of these elements as well.

provide would merely be an academic dispute because the Acting Secretary still would have had the discretion to rescind the policy. *See supra* Part I.A. Instead, the "controversy" (to the extent it is even justiciable) concerns whether the Acting Secretary's decision to rescind DACA in light of litigation risk that DHS was facing was arbitrary or capricious. Any after-the-fact conclusion by this Court that DACA is "lawful" has no bearing on that decision, which was based on the litigation risk that DHS was then confronting. Thus, any declaratory judgment that this Court might issue would not provide any actual benefits to Plaintiffs.

Plaintiffs also seek injunctive relief preventing Defendants "from implementing or enforcing the Rescission" and "from disclosing any DACA applicant information [for] immigration enforcement activities in a manner inconsistent with their prior commitments." Pls.' Compl. at 60, Relief Requested. To the extent this Court ultimately concludes that Plaintiffs are entitled to any injunction, it should dismiss Plaintiffs' request to the extent they seek nationwide relief. Both constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries. Article III demands that "a plaintiff must demonstrate standing … for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted). "The remedy" sought thus must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996). "The actual-injury requirement would hardly serve [its] purpose … of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *Id.* (emphasis omitted). And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health*

*Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties").  Accordingly, any injunction here should be limited to particular individual Plaintiffs found to have cognizable claims.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss this case or, in the alternative, should grant summary judgment in Defendants favor on all of Plaintiffs' claims.

Dated: November 15, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

*/s/   Kathryn C. Davis*
KATHRYN C. DAVIS
*/s/   Rachael Westmoreland*
RACHAEL WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 616-8298
Fax: (202) 616-8470
Email: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

59

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CASA DE MARYLAND, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> *Defendants*. | No. 17-cv-2942 (RWT) |

## [PROPOSED] ORDER

Upon consideration of Defendants' Motion to Dismiss or, In the Alternative, For Summary Judgment, and any response or reply thereto, it is hereby

**ORDERED** that this motion is **GRANTED**; and it is

**FURTHER ORDERED** that this action is **DISMISSED** in its entirety.

This is a final, appealable order. *See* Fed. R. App. P. 4(a).

**SO ORDERED**.


Dated: _____          _____

ROGER W. TITUS
United States District Judge

# APPENDIX B

# TAB 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

MARTÍN JONATHAN BATALLA VIDAL, *et al.*,

           Plaintiffs,

    v.

KIRSTJEN M. NIELSEN, *et al.*,

           Defendants.

No. 16-cv-4756 (NGG) (JO)

---

STATE OF NEW YORK, *et al.*,

           Plaintiffs,

    v.

DONALD TRUMP, *et al.*,

           Defendants.

No. 17-cv-5228 (NGG) (JO)

## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A. Deferred Action Generally................................................................. 3

    B. DACA and DAPA............................................................................. 4

    C. The *Texas* Litigation ....................................................................... 5

    D. Rescission of DACA ........................................................................ 6

    E. Plaintiffs' Motions for a Preliminary Injunction ............................. 7

    F. The Northern District of California Preliminary Injunction ............. 8

LEGAL STANDARD ......................................................................................... 9

ARGUMENT ...................................................................................................... 9

    I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS ........................... 10

        A. Plaintiffs' Claims Are Not Justiciable ................................. 10

        B. The Acting Secretary Rationally Explained Her Decision to Rescind DACA .......................................................................... 10

        C. The Rescission is a General Statement of Policy Not Subject to the Requirements of Notice-and-Comment Rulemaking Procedures or the Regulatory Flexibility Act ................................................ 34

        D. The Rescission Does Not Violate Equal Protection Principles........... 41

    II. THE REMAINING FACTORS WEIGH AGAINST A PRELIMINARY INJUNCTION .............................................................................. 46

        A. Plaintiffs Have Not Shown Any Risk of Irreparable Harm That Would Be Remedied By The Injunctive Relief That They Seek........................... 46

        B. Balancing of the Equities and the Public Interest Disfavor Injunctive Relief........................................................................ 49

        C. Any Injunctive Relief Should Be Narrowly Drawn ................... 49

CONCLUSION................................................................................................... 50

# TABLE OF AUTHORITIES

**Cases**                                        **Page(s)**

*A.X.M.S. Corp. v. Friedman,*
   948 F. Supp. 2d 319 (S.D.N.Y. 2013) ............................................................ 48

*Adair v. England,*
   183 F. Supp. 2d 31 (D.D.C. 2002) ................................................................... 33

*Allied Local & Reg'l Mfrs. Caucus v. EPA,*
   215 F.3d 61 (D.C. Cir. 2000) ........................................................................... 20

*Amfac Resorts LLC v. Dep't of Interior,*
   143 F. Supp. 2d 7 (D.D.C. 2001) ..................................................................... 33

*Arizona v. United States,*
   567 U.S. 387 (2012) .................................................................................... 3, 49

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015), *cert denied,* 136 S. Ct. 900 (2016) ................... *passim*

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ......................................................................................... 41

*Brady v. FERC,*
   416 F.3d 1 (D.C. Cir. 2005) ............................................................................. 18

*Buckingham Corp. v. Carp,*
   762 F.2d 257 (2d Cir. 1985) ............................................................................ 48

*Camp v. Pitts,*
   411 U.S. 138 (1973) ......................................................................................... 29

*Chrysler Corp. v. Brown,*
   441 U.S. 281 (1979) ......................................................................................... 35

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) ................................................................................... 11, 33

*Coal. on Sensible Transp. v. Dole,*
   826 F.2d 60 (D.C. Cir. 1987) ........................................................................... 33

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.,*
   598 F.3d 30 (2d Cir. 2010) ................................................................................ 9

iii

*Commercial Drapery Contractors v. United States*,
133 F.3d 1 (D.C. Cir. 1998) ................................................................. 33

*Consumer Energy Council v. FERC*,
673 F.2d 425 (D.C. Cir. 1982) .............................................................. 39

*Dep't of Agriculture v. Moreno*,
413 U.S. 528 (1973) ............................................................................. 44

*Dep't of Natural Res. & Envtl. Control v. EPA*,
785 F.3d 1 (D.C. Cir. 2015) ................................................................. 20

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) ......................................................................... 16

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ......................................................................... 14, 15

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) ............................................................................. 29

*Freedom Holdings, Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005) ................................................................ 46

*Heckler v. Chaney*,
470 U.S. 821 (1985) ................................................................. 19, 35, 42

*Ikelionwu v. United States*,
150 F.3d 233 (2d Cir. 1998) ................................................................ 28

*James Madison Ltd. by Hecht v. Ludwig*,
82 F.3d 1085 (D.C. Cir. 1996) ............................................................ 33

*Kadrmas v. Dickinson Pub. Sch.*,
487 U.S. 450 (1988) ............................................................................. 46

*Lewis v. Casey*,
518 U.S. 343 (1996) ............................................................................. 50

*Lewis v. Thompson*,
252 F.3d 567 (2d Cir. 2001) ................................................................ 46

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ......................................................................... 34, 38

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................ 39

*Mada-Luna v. Fitzpatrick*,
   813 F.2d 1006 (9th Cir. 1987) ................................................. 35

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ................................................................ 50

*Mass. Mut. Life Ins. Co. v. Russell*,
   473 U.S. 134 (1985) ................................................................ 27

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) .................................................................. 9

*Mexichem Specialty Resins, Inc. v. EPA*,
   787 F.3d 544 (D.C. Cir. 2015) ................................................. 24

*Michigan v. EPA*,
   135 S. Ct. 2699 (2015) ............................................................ 19

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
   463 U.S. 29 (1983) .............................................. 11, 13, 18, 20

*Nw. Mining Ass'n v. Babbitt*,
   5 F. Supp. 2d 9 (D.D.C. 1998) ............................................... 41

*N.Y. Progress & Prot. PAC v. Walsh*,
   733 F.3d 483 (2d Cir. 2013) ..................................................... 9

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*,
   851 F.2d 1424 (D.C. Cir. 1988) ............................................... 37

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ................................................................ 33

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ................................................. 35

*New York v. Reilly*,
   969 F.2d 1147 (D.C. Cir. 1992) .......................................... 18, 19

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................ 49

*Noel v. Chapman*,
   508 F.2d 1023 (2d Cir. 1975) ............................................................. 36

*Organized Village of Kake v. U.S. Dep't of Agriculture*,
   795 F.3d 956 (9th Cir. 2015) .............................................................. 23

*Pac. Gas & Elec. Co. v. FPC*,
   506 F.2d 33 (D.C. Cir. 1974) .............................................................. 35

*Perez v. Mortg. Bankers Ass'n*,
   135 S. Ct. 1199 (2015) ................................................................ 34, 35

*Plyler v. Doe*,
   457 U.S. 202 (1982) ..................................................................... 45, 46

*Rajah v. Mukasey*,
   544 F.3d  (2d Cir. 2008) ..................................................................... 42

*Regents of Univ. of Cal. v. DHS*,
   No. 17-5211-WHA, 2018 WL 339144 (N.D. Cal. Jan. 9, 2018) ...................... *passim*

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
   525 U.S. 471 (1999) .............................................................. 3, 4, 37, 42

*Ricci v. DeStefano*,
   557 U.S. 557 (2009) ......................................................................... 22

*Rodriguez v. DeBuono*,
   175 F.3d 227 (2d Cir. 1999) .............................................................. 47

*Romer v. Evans*,
   517 U.S. 620 (1996) ..................................................................... 44, 45

*Rusu v. INS*,
   296 F.3d 316 (4th Cir. 2002) ............................................................. 45

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) .......................................................................... 29

*Sec'y of Agriculture v. Cent. Roig Ref. Co.*,
   338 U.S. 604 (1950) ........................................................................ 18

*Sendra Corp. v. Magaw*,
   111 F.3d 162 (1997) ........................................................................ 28

*Shepard v. NLRB,*
    459 U.S. 344 (1983) ........................................................................................ 13

*Sierra Club v. Jackson,*
    833 F. Supp. 2d 11 (D.D.C. 2012) .................................................................. 23

*Sunward Elecs., Inc. v. McDonald,*
    362 F.3d 17 (2d Cir. 2004) ............................................................................... 9

*Syracuse Peace Council v. FCC,*
    867 F.2d 654 (D.C. Cir. 1989) ....................................................................... 25

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ................................................................ *passim*

*Town of Chester v. Laroe Estates, Inc.,*
    137 S. Ct. 1645 (2017) .................................................................................... 50

*Troy Corp. v. Browner,*
    120 F.3d 277 (D.C. Cir. 1997) ....................................................................... 11

*U.S. ex rel. Parco v. Morris,*
    426 F. Supp. 976 (E.D. Pa. 1977) ................................................................. 39

*U.S. Telecom Ass'n v. FCC,*
    400 F.3d 29 (D.C. Cir. 2005) ......................................................................... 41

*United Mine Workers of America v. U.S. Dep't of Labor,*
    358 F.3d 40 (D.C. Cir. 2004) ......................................................................... 23

*United States v. Armstrong,*
    517 U.S. 456 (1996) ........................................................................................ 42

*United States v. Brignoni-Ponce,*
    422 U.S. 873 (1975) ........................................................................................ 45

*United States v. Merkt,*
    794 F.2d 950 (5th Cir. 1986) .......................................................................... 45

*United States v. Texas,*
    136 S. Ct. 2271 (2016) ...................................................................................... 5

*United States v. Texas,*
    137 S. Ct. 285 (2016) ........................................................................................ 5

*Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ................................................................. 42

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ................................................................. 41

*Washington v. Davis*,
    426 U.S. 229 (1976) ................................................................. 42

*Wayte v. United States*,
    470 U.S. 598 (1985) ............................................................. 38-39

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................. 9, 40

**Statutes**

5 U.S.C. § 553 ................................................... 34, 35, 39, 41

5 U.S.C. § 601 ................................................................. 41

5 U.S.C. § 604 ................................................................. 41

5 U.S.C. § 611 ................................................................. 41

5 U.S.C. § 701 ................................................................. 37

5 U.S.C. § 706 ................................................................. 10

8 U.S.C. § 1103 ......................................................... 3, 22, 30

8 U.S.C. § 1158 ................................................................. 3

8 U.S.C. § 1182 ................................................................. 3

8 U.S.C. § 1227 ................................................................. 3

8 U.S.C. § 1229b ................................................................. 3

8 U.S.C. § 1252(g) .............................................................. 37

15 U.S.C. § 1392 (repealed 1994) .............................................. 20

28 U.S.C. § 1292(b) ............................................................. 37

28 U.S.C. § 2401 ............................................................... 28

42 U.S.C. § 7412 .................................................................................................. 19

**Regulations**

8 C.F.R. § 274a.12(c)(14) ............................................................................... 3, 4, 48

**Other Authorities**

1 Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.3 (5th ed. 2010) .................................. 35

Andorra Bruno, et al., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 20-23, Cong. Research Serv. (July 13, 2012)
   https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-Service-Report1.pdf ................................................................................... 36

Barack Obama, The White House*, Remarks by the President on Immigration* (June 15, 2012), http://go.usa.gov/xnXFY ................................................ 16, 17, 30

Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 PM)
   https://twitter.com/realDonaldTrump/status/905228667336499200) ................................ 31, 32

DOJ, Attorney General's Manual on the Administrative Procedure Act (1947) ......................... 34

Mem. from the Attorney General to All Federal Prosecutors (May 10, 2017),
   https://www.justice.gov/opa/press-release/file/965896/download ........................................ 39

Presidential Memoranda, The White House,
   *President Donald J. Trump's Letter to House and Senate Leaders & Immigration Principles and Policies* (Oct. 8, 2017),
   https://www.whitehouse.gov/the-press-office/2017/10/08/president-donald-j-trumps-letter-house-and-senate-leaders-immigration ......................................................... 31

Press Release, DHS
   Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
   https://go.usa.gov/xncuM ............................................................... 12, 18, 22, 31

Statement from President Trump, Sept. 5, 2017,
   https://www.whitehouse.gov/the-press-office/2017/09/05/statement-president-donald-j-trump ................................................................................ 32-33

USCIS.gov,
*Approximate Active DACA Recipients: Sex and Age Group As of September 4, 2017*,
   https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf .............................................................................. 46

# INTRODUCTION

The Rescission Policy challenged here provides for an orderly wind-down of Deferred Action for Childhood Arrivals (DACA), an exercise of prosecutorial discretion that, from the start, conferred no legally enforceable rights and was explicitly enacted as a temporary, stopgap measure. Pursuant to the Rescission Policy, recipients whose DACA expires before March 5, 2018, had the opportunity to renew their deferred action for an additional two years, and current DACA recipients will maintain their deferred action status for the remaining duration of their deferred-action grants. Plaintiffs in these two related actions nonetheless seek, in the form of what is nominally preliminary injunctive relief, the immediate and wholesale reinstatement of that discretionary enforcement policy.

This Court should reject that invitation because Plaintiffs cannot meet the exacting standard for preliminary relief. Plaintiffs are unlikely to succeed on the merits of their Administrative Procedure Act (APA) claims (even if they are justiciable) because the then-Acting Secretary of Homeland Security Elaine C. Duke adequately explained her decision to wind down DACA: A legally indistinguishable policy (including an expansion of DACA) had been enjoined on a nationwide basis by a district court in Texas; that injunction was upheld by the United States Court of Appeals for the Fifth Circuit; that decision, in turn, was affirmed by an equally divided Supreme Court; and the same plaintiffs were about to sue over DACA before the same judge in Texas. Faced with the nearly inevitable prospect of an immediate, nationwide injunction against DACA, the Acting Secretary chose an orderly wind-down. Due to the near-certainty that DACA otherwise would have been abruptly invalidated in its entirety, that decision was eminently reasonable, and certainly not arbitrary and capricious.

1

Plaintiffs also argue that the Rescission Policy was subject to the APA's notice-and-comment requirements (and the Regulatory Flexibility Act), but those requirements are inapplicable to a general statement of policy like this one, and Plaintiffs' argument is self-defeating in any event because DACA itself likewise was adopted without notice and comment. Some of the Plaintiffs also argue that DACA should be restored because its rescission was secretly motivated by discriminatory animus supposedly harbored by the President of the United States, but even if they had alleged a rigorous factual basis for such a claim—and they have not even attempted to meet that high standard—it would still get them nowhere, as none of their allegations are in any way connected to the actual agency decision maker.

Nor can Plaintiffs demonstrate that any of the harms they have identified can be resolved by a preliminary injunction entered by this Court now. Plaintiffs raise concerns about lost professional opportunities, the inability to make long-term plans, and the angst surrounding the Rescission Policy, but none of these harms can be ameliorated by the temporary judicial relief that Plaintiffs seek, which will last only through the end of this litigation, and will still leave them without any permanent lawful immigration status. Nor can Plaintiffs demonstrate that the balance of the equities and the public interest weigh in their favor. Finally, the relief that Plaintiffs seek— a wholesale but temporary reinstatement of the DACA policy nationwide—is overbroad and improper. That is particularly so now that a district court in the Northern District of California has already entered a preliminary injunction that requires the government to largely maintain the DACA policy, as it existed on September 4, 2017—including for the benefit of these Plaintiffs in the Eastern District of New York.

Plaintiffs' motions for a preliminary injunction should be denied.

# BACKGROUND

## A.    Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the Immigration and Nationality Act (INA) along with "all other laws relating to the immigration and naturalization of aliens."  8 U.S.C. § 1103(a)(1).  Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law."  *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials."  *Arizona*, 567 U.S. at 396 (citation omitted).  Department of Homeland Security (DHS) officials first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum or parole, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b. "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely. *Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 483 (1999).

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016).  Deferred action is a practice by which the Secretary exercises her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period.  *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the

3

government which gives some cases lower priority"). Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former Immigration and Naturalization Service (INS) have adopted more than 20 such policies over the past 50 years.

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, *see, e.g.*, 8 C.F.R. § 274a.12(c)(14), but a grant of deferred action does not confer lawful immigration status or provide a defense to removal. To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (citation omitted). DHS thus has discretion to revoke deferred action for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time. *See AADC*, 525 U.S. at 484-85.

### B. DACA and DAPA

On June 15, 2012, then-Secretary Janet Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals. *See* Admin. R. (AR) 1–3 (hereinafter DACA Memo), *Batalla Vidal* ECF No. 77-1. DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws. *Id.* at 1 (AR 1). Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to renewal. *Id.* at 2–3 (AR 2–3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests would "be decided on a case by case basis," *id.* at 2 (AR 2). Accordingly, the Memo provided that this grant of deferred action "confer[red] no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." *Id.* at 3 (AR 3).

4

In 2014, DHS expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. *See* AR 37-41 (hereinafter DAPA Memo). DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents." DAPA Memo 3 (AR 39). The DAPA Memo also expanded DACA by adjusting the date-of-entry requirement from June 2007 to January 2010, removing the age cap, and extending the DACA renewal period from two to three years. *Id.* at 3-4 (AR 39-40).

### C.  The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states. Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of DAPA and expanded DACA. *Texas v. United States*, 809 F.3d 134, 147-48 (5th Cir. 2015). Like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the Administrative Procedure Act's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Id.* at 178 n.156. The Fifth Circuit also held that DAPA was "manifestly contrary" to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one legal status to another," DAPA and expanded DACA awarded deferred action "to persons who have never had a legal status and may never receive one." *Id.* at 184, 186 (footnotes omitted). That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in place.

5

Faced with continued litigation over a policy that had been enjoined by the courts, DHS rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA. *See* Mem. for Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Prot., et al., from John F. Kelly, Sec'y of Homeland Sec., Re: *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents* (June 15, 2017), AR 235-37. Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to also challenge directly the DACA Memo, noting that it suffers from the same legal flaws that the courts had identified in expanded DACA and DAPA. See AR 238-40 (Paxton Letter).

## D.        Rescission of DACA

Faced with imminent litigation, then-Acting Secretary Duke decided on September 5, 2017, to wind down the DACA policy in an orderly fashion. *See* AR 252–56 (Rescission Policy or Policy). As she explained, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy 4 (AR 255). Specifically, she quoted the Attorney General's recommendation to rescind DACA, which explained that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted). Invoking her "authority in establishing national immigration policies and priorities," she rescinded the DACA Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on an individualized[,] case-by-case basis," *id.* at 2 (AR 253).

At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

- *For current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods." *Id.* at 4 (AR 255).

- *For initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date. *Id.*

- *For DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017. Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017." *Id.*

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id.* at 4 (AR 255).

### E.     Plaintiffs' Motions for a Preliminary Injunction

While the *Batalla Vidal* Plaintiffs have brought a panoply of claims, their motion for a preliminary injunction focuses on two claims brought pursuant to the APA. First, the *Batalla Vidal* Plaintiffs allege that the Rescission Policy is arbitrary and capricious and therefore violates the APA because it lacks a rational explanation; second, they allege that the rescission violates the APA because it was issued without notice and comment. The *Batalla Vidal* Plaintiffs also bring a procedural claim under the Regulatory Flexibility Act (RFA). The *State of New York* Plaintiffs seek a preliminary injunction on similar grounds, as well as under the equal protection component

of the Due Process Clause of the Fifth Amendment, alleging that the rescission of DACA was motivated by discriminatory animus toward Latinos.

The *Batalla Vidal* Plaintiffs ask the Court to "direct[] Defendants to restore the DACA program pending final adjudication on the merits." *Batalla Vidal,* Mem. of Law in Support of Pls.' Mot. for Prelim. Inj. (*Batalla Vidal* Mot.) at 40, ECF No. 123-1. The *State of New York* Plaintiffs seek a more specific order that would among other things, "immediately reinstate the implementation of the DACA program, nationwide, to conditions in existence prior to Defendants' termination, using the same means, methods, and policies for considering granting requests for deferred action, employment authorization, and advanced parole as were utilized prior to Defendants' termination of DACA." *State of New York* Proposed Order at 2, ECF No. 96-3. Plaintiffs thus request an order compelling the government to continue to consider DACA requests (and related discretionary relief) from a broad class of individuals who are not before this Court.

## F. The Northern District of California Preliminary Injunction

On January 9, 2018, the United States District Court for the Northern District of California (Alsup, J.), in parallel litigation challenging the rescission of DACA, entered a nationwide injunction that provides Plaintiffs nearly all of the relief that they are seeking here. *See Regents of Univ. of Cal. v. DHS*, No. 17-5211-WHA, 2018 WL 339144 (N.D. Cal. Jan. 9, 2018). The district court in *Regents* ordered the following relief:

> For the foregoing reasons, defendants **ARE HEREBY ORDERED AND ENJOINED**, pending final judgment herein or other order, to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017, including allowing DACA enrollees to renew their enrollments, with the exceptions (1) that new applications from applicants who have never before received deferred action need not be processed; (2) that the advance parole feature need not be continued for the time being for anyone; and (3) that defendants may take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application.

*Id.* at \*27-28.  Defendants immediately began taking steps to comply with the *Regents* order and, earlier this evening, USCIS issued public guidance with instructions on submitting DACA renewal requests.  *See* USCIS.gov, *Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction* (Jan. 13, 2018), https://www.uscis.gov/humanitarian/deferred-action-childhood-arrivals-response-january-2018-preliminary-injunction.

## LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis and citation omitted).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  And where, as here, "[a] plaintiff . . . seeks a preliminary injunction that will alter the status quo," the plaintiff "must demonstrate a 'substantial' likelihood of success on the merits." *Id.* (citing *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).[1]

## ARGUMENT

Even if they are justiciable, Plaintiffs' claims are deeply flawed on the merits, and Plaintiffs are therefore unlikely to succeed on any of them.  The other preliminary injunction factors also

---

[1] To the extent there is any meaningful distinction between the *Winter* standard and the "serious questions" formulation at times used by the Second Circuit—primarily (but not exclusively) in pre-*Winter* case law, *see Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 36-38 (2d Cir. 2010)—this Court need not consider that nuance here.  Both sets of Plaintiffs explicitly embrace the full *Winter* standard, in which Plaintiffs bear the burden to show all four necessary elements, including that success on the merits is "likely."  *See Batalla Vidal* Mot. at 9; *State of New York*, Mem. of Law in Support of Pls.' Mot. for Prelim. Inj. (*State of New York* Mot.) at 3, ECF No. 96-1.

weigh against temporary injunctive relief—especially now that the United States District Court for the Northern District of California has ordered DHS to provide nearly all the relief that Plaintiffs are looking for here. Only Congress can now provide the certainty and stability that Plaintiffs seek, in the form of a permanent lawful immigration status. This Court need not and should not enter a legally unwarranted and factually unnecessary preliminary injunction.

I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

A. Plaintiffs' Claims Are Not Justiciable.

As explained in Defendants' motions to dismiss, *Batalla Vidal* ECF Nos. 95, 207; *State of New York* ECF No. 71, none of Plaintiffs' claims are justiciable. This Court largely rejected Defendants' jurisdiction and justiciability arguments in its November 9, 2017 Memorandum and Order. *Batalla Vidal* ECF No. 104 (Nov. 9, 2017 Mem. & Order); *State of New York* ECF No. 85. Because that order is now subject to an interlocutory appeal, Defendants will say nothing further about those arguments here, other than that they provide a threshold reason to hold that Plaintiffs are unlikely to succeed on the merits of any of their claims.

B. The Acting Secretary Rationally Explained Her Decision to Rescind DACA.

Even if the decision to rescind DACA were subject to judicial review, it was not arbitrary and capricious. Agencies are free to change course on policy matters so long as they provide a rational explanation and the new policy is legally permissible. Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this deferential standard, particularly in view of the virtual certainty of a nationwide injunction based on controlling Fifth Circuit precedent, which would have prompted an immediate—and chaotic—end to the policy.

Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A)-(B). The agency's

decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citation omitted). Agency action is arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency." *Id.*

The Rescission Policy amply meets these "minimal standards of rationality," *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted), particularly in view of the near-certain litigation loss in the pending *Texas* lawsuit. Then-Acting Secretary Duke explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy 4 (AR 255). Specifically, after summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's view that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted). The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into immediate uncertainty.

The Acting Secretary was thus "faced with two options:  wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately."  Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017) (hereinafter Duke Statement), https://go.usa.gov/xncuM.  She reasonably opted for an orderly rescission, which she considered "the least disruptive option."  *Id*.  There was nothing at all irrational about that decision or the explanation for it.

**1.**  Plaintiffs claim that the Rescission Policy provides "almost no reasons at all" for the rescission of DACA, leaving them merely "to guess" at the Acting Secretary's reasoning.  *Batalla Vidal* Mot. at 13-14.  That argument blinks reality.  Even if the agency were not free to revoke deferred action at any time for any reason—or, indeed, for no reason, *see, e.g.*, *Arpaio*, 797 F.3d at 17; DAPA Memo 2 (AR 38)—no guesswork is required here:  As the balance of their briefs demonstrate, Plaintiffs clearly comprehend the basis for the Acting Secretary's decision.  For example, while Plaintiffs purport to be perplexed by the Acting Secretary's reference to the litigation risk posed by the *Texas* case, *Batalla Vidal* Mot. at 12-13, they understood this rationale well enough to devote separate sections of their briefs to addressing it, *id*. at 20-23 (arguing that "'Litigation Risk' cannot justify the DACA Termination"); *State of New York* Mot. at 5-6 (arguing that an agency may "reverse policy based on a purported risk of litigation" only in certain circumstances).  Likewise, while they claim to be confused by the Attorney General's views on DACA's legality, which they deem too "cursory," *State of New York* Mot. at 7; *see Batalla Vidal* Mot. at 24 n.14, their briefs also separately address this issue, *Batalla Vidal* Mot. at 23-25 (arguing that the "determination that DACA is unlawful is legally erroneous").

At bottom, then, Plaintiffs' argument reduces to a claim that the Rescission Policy was just too short. *See, e.g.*, *id.* at 12 n.5 (complaining that "two of th[e] five pages" of the decision memo are taken up by the "'Background' section"). But under the APA, whether an agency's decision is sustainable turns not on its length, but its rationality. Here, there is no reason to adopt Plaintiffs' myopic focus on the "one sentence" setting forth the Acting Secretary's conclusion, *id.* at 11-12, while ignoring the rest of the document, which lays the foundation for that conclusion and elaborates on the reasoning behind it. *See* Rescission Policy 1 (AR 252) (noting, in the introduction, that DACA will be rescinded "[f]or the reasons . . . outlined below"); *id.* at 2-3 (AR 253–54) (explaining, as background, that DAPA and expanded DACA were "substantially similar" to DACA, that the Fifth Circuit had invalidated the DAPA Memo, and that the Attorney General had concluded that "it is likely that potentially imminent litigation would yield similar results with respect to DACA" (citation omitted)). Indeed, Plaintiffs' suggestion that length should be determinative calls into question the rationality of the original DACA Memo itself, which spanned only three pages. *See* DACA Memo 1-3 (AR 1-3).

The Court must "uphold a decision"—even if it is made with "less than ideal clarity"—as long as "the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quotation omitted); *see also, e.g.*, *Shepard v. NLRB*, 459 U.S. 344, 348, 350-51 (1983). Here, the Acting Secretary's decision is clear, and her path is plain. Plaintiffs' suggestions to the contrary are unconvincing.

The *Batalla Vidal* Plaintiffs also fault DHS for its alleged failure to "explain the change to their information-sharing policy." *Batalla Vidal* Mot. at 14. That explanation is simple: the alleged "change" *never happened*, and there is therefore nothing that DHS could have said about it. As Plaintiffs acknowledge in a footnote (and as is confirmed in an attachment to the *Batalla*

*Vidal* Third Amended Complaint), DHS recently clarified this issue to remove any doubt on the matter. In FAQs issued on November 30 and December 7, 2017, the agency confirmed that its "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy." *Batalla Vidal* 3d Am. Compl. Ex. M, Q5; *see also id.* Ex. L, Q5. While the policy "may be modified, superseded, or rescinded at any time"—which "ha[d] always been the case"—nothing in the Rescission Policy purports to change it. *Id.* Ex. M, Q5. Plaintiffs' refusal to drop this claim—in the face of unequivocal confirmation that it lacks any factual basis—is perplexing. At a minimum, Plaintiffs are unlikely to succeed on the merits of such a claim, nor are Plaintiffs suffering any injury at all, let alone irreparable harm that entitles them to injunctive relief on this basis.

**2.** Plaintiffs next argue that the Acting Secretary failed to sufficiently "acknowledge" or "expla[in]" a "policy reversal." *Batalla Vidal* Mot. at 18-20 (citation omitted). But in the Rescission Policy, the Acting Secretary not only expressly "rescind[ed] the June 15, 2012 [DACA] memorandum," Rescission Policy 1 (AR 252), but fully explained why that policy shift was preferable. That is all the APA requires, as the Supreme Court held in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

In *Fox*, the Court considered the adequacy of the FCC's explanation for a policy change barring the broadcasting of fleeting expletives. *Id.* at 505. The Second Circuit had set aside the policy change under the APA, reasoning that "agency action that changes prior policy" "requir[es] a more substantial explanation" than when an agency acts in the first instance. *Id.* at 514. The Supreme Court reversed, finding "no basis in the [APA] or in our opinions for a requirement that all agency change be subject to more searching review" or some sort of "heightened standard." *Id.* On the contrary, the Court explained, when an agency changes course it "need not demonstrate

14

to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* at 515. Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

Here, the Acting Secretary's explanation was more than adequate. Plaintiffs do not dispute that the Rescission Policy "is permissible" under the INA. *Id.* The Acting Secretary fully explained that there are "good reasons" for it, *id.*, particularly given the substantial doubts about legality and litigation risk posed by the proceedings in *Texas* and the consequent potential for massive disruption were the policy immediately enjoined. And there was of course a "conscious change of course," *id.*, because the Acting Secretary expressly "rescind[ed]" the 2012 DACA Memo. Rescission Policy 1 (AR 252). The APA requires no more.

To be sure, an agency must "sometimes" provide a "more detailed justification than what would suffice for a new policy created on a blank slate"—"when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Fox*, 556 U.S. at 515 (citation omitted). But this is not such a case. The purported "findings" that Plaintiffs pluck from the DACA Memo—*e.g.*, that "Our Nation's immigrations laws must be enforced in a strong and sensible manner," *Batalla Vidal* Mot. at 18 (quoting AR 2)—are not "factual findings" at all, *Fox*, 556 U.S. at 515, but policy pronouncements. Moreover, the Acting Secretary's justification for the policy change was that *controlling legal precedent* had changed: after DACA was enacted, DAPA *and* expanded DACA were invalidated by the Fifth Circuit in a decision that was affirmed by an equally divided Supreme Court and that necessarily applied to DACA itself.

15

*See infra* Part I.B.5. It is difficult to think of a more compelling basis for a change in agency position.[2]

This case thus bears no resemblance to *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016), the only case Plaintiffs cite where an agency's explanation for a policy change was found insufficient in view of the reliance interests at stake. *Batalla Vidal* Mot. at 17; *State of New York* Mot. at 5, 12. In *Encino*, the Department of Labor had long interpreted the Fair Labor Standards Act not to require car dealerships to pay overtime to a category of employees known as "service advisors." 136 S. Ct. at 2122-24. The agency reversed course in 2011, more than 30 years down the line, but "gave almost no reasons at all" for the shift. *Id.* at 2127. The Court declined to give *Chevron* deference to the agency's new interpretation, finding its explanation lacking in view of the "significant reliance interests involved." *Id.* at 2126. In particular, over "decades of industry reliance" on the prior policy, the dealerships and their employees had "negotiated and structured their compensation plans against th[e] background understanding" that overtime pay was not required—plans that the new policy effectively upended. *Id.*

*Encino* is *not* "close on point," *Regents*, 2018 WL 339144, at *24, but inapposite in every material respect. To begin, no similarly "longstanding" reliance interests are present here. *Encino*, 136 S. Ct. at 2126. By its own terms, DACA made deferred action available for only two-year periods, which could "be terminated at any time at the agency's discretion." DAPA Memo 2 (AR 38). And when he announced DACA in 2012, then-President Barack Obama explained that it was a "not a permanent fix" but a "temporary stopgap measure," and urged Congress to act "because these kids deserve to plan their lives in more than two-year increments."

---

[2] For the same reason, the Court should reject Plaintiffs' contention that Defendants inadequately explained their "departure from their prior views regarding DACA's legality," as reflected in their *Texas* briefs and in Office of Legal Counsel opinions, *Batalla Vidal* Mot. at 18–19; *State of New York* Mot. at 7–8, as explained in Part I.B.5, *infra*.

The White House, *Remarks by President Obama on Immigration* (June 15, 2012), https://go.usa.gov/xnZFY.  Even assuming that DACA was lawful, a prosecutorial discretion policy that can be revoked in the agency's discretion, at any time, for any reason, cannot create legally cognizable reliance interests—and certainly not beyond the stated duration (generally two years) of deferred action grants, which were not truncated by the Rescission Policy.  *See* Defs.' Oct. 27, 2017 Mot. to Dismiss, *Batalla Vidal* ECF No. 95, at 34-36 (explaining why Plaintiffs fail to state a procedural due process claim).  And more fundamentally, as discussed, the Acting Secretary here did not make a policy change heedless of any reliance interests, but rather was impelled to act by the near-certain invalidation of DACA by the courts, such that her orderly wind-down process reasonably took into account any reliance interests under the circumstances.[3]

**3.**  Plaintiffs contend that, in adopting the Rescission Policy, the Acting Secretary "failed to consider all factors relevant" to the decision—specifically, the economic effects of rescission and its consequences for DACA recipients.  *Batalla Vidal* Mot. at 19-20; *see State of New York* Mot. at 10-11.  For starters, this argument fails to reckon with the reality—referenced in the Acting Secretary's memo—that continued litigation would, in all likelihood, have led to an abrupt, complete, and court-ordered end to DACA.  Indeed, the Acting Secretary's decision to opt instead for an orderly wind-down of the policy likely ameliorated, rather than exacerbated, the effects about which Plaintiffs complain, as she was fully aware.  Thus, the Acting Secretary cannot fairly

---

[3] Equally unpersuasive is the *Batalla Vidal* Plaintiffs' argument that the Rescission Policy "imposed arbitrary deadlines" that were inadequately explained.  *Batalla Vidal* Mot. at 14.  Given that DACA was an exercise of prosecutorial discretion, revocable at any time, that the agency could well have ended immediately, *see Arpaio*, 797 F.3d at 17, there was certainly nothing arbitrary about deciding to wind it down gradually over a two-and-a-half-year period.  Moreover, Plaintiffs still point to no individual who missed the "October 5, 2017 deadline for receipt of renewal requests" due to a lack of notice, *Batalla Vidal* Mot. at 14, and thus lack standing to challenge it, as the Court already concluded, *see* Defs.' Mot. Dism. 3d Am Compl. (Batalla Vidal ECF No. 207) at 9-10 (citing Mem. & Order at 37-38).  And if Plaintiffs were correct that it is arbitrary to allow individuals to request renewal if their status "expires on March 5, 2018," but to "deny the same opportunity" to those "whose deferred action expires the following day," *Batalla Vidal* Mot. at 14, then the government could never set deadlines for anything; that sort of alleged "arbitrariness" is an unavoidable consequence of all deadlines.

be said to have inadequately weighed other "programmatic objectives . . . [or] reliance interests" against the obvious litigation risk, *Regents*, 2018 WL 339144, at \*24, as the APA did not require her to ponder how to prevent the unavoidable, *see State Farm*, 463 U.S. at 43 (an agency must simply "examine the relevant data and articulate a satisfactory explanation for its action").

Moreover, the Rescission Policy itself recognizes that, while DACA recipients were "eligibl[e] to request employment authorization" documents, enabling them to work lawfully in the United States, Rescission Policy 2 (AR 253), that eligibility would sunset along with the DACA policy, *id*. at 4 (AR 255), necessarily leading to changes in the workforce over the following two and a half years. Likewise, recognizing that DACA recipients would no longer be considered lawfully present once their deferred action expired, the Acting Secretary explained that she was "very aware of the consequences of this action, and . . . sympathize[d] with the DACA recipients whose futures may now be less certain." Duke Statement. It was such considerations—*i.e.*, the "complexities associated with winding down the program," *id.*—that influenced her to allow DACA to sunset over a number of years, rather than abruptly end the policy herself or under court order. That these factors did not upend her ultimate decision to rescind the policy, however, is no reason to set that decision aside, because clinging to DACA in the face of the *Texas* litigation would have been quixotic rather than rational.

Even where a statute sets forth specific factors for an agency to consider, if Congress "did not assign the specific weight the [agency] should accord each of these factors, the [agency] is free to exercise [its] discretion in this area." *New York v. Reilly*, 969 F.2d 1147, 1150 (D.C. Cir. 1992) (citation omitted); *Brady v. FERC*, 416 F.3d 1, 6 (D.C. Cir. 2005); *see also Sec'y of Agric. v. Cent. Roig Ref. Co.*, 338 U.S. 604, 611-12 (1950) (where statutorily mandated "consideration[s]" are not "mechanical or self-defining standards," they indicate Congress's

recognition that they involve "wide areas of judgment and therefore of discretion"). Here, of course, no statute dictates the factors for an agency to consider in granting or rescinding deferred action; on the contrary, deferred action is an exercise of prosecutorial discretion committed to agency discretion, precisely because (among other things) it "involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Indeed, the original DACA memorandum providing for the granting of deferred action expressly stated that it conferred no substantive rights. Thus, Congress has not instructed the agency to give the considerations urged by Plaintiffs any particular weight—or, indeed, any weight at all. That they did not receive conclusive weight in the final calculus, as Plaintiffs demand, is therefore no reason to disturb the agency's decision, especially given their futility in this context. *See, e.g.*, *Reilly*, 969 F.2d at 1150.

Plaintiffs' passing suggestion that the agency was required to conduct some sort of formal cost-benefit analysis before rescinding DACA, *Batalla Vidal* Mot. at 18-19; *State of New York* Mot. at 10, is even farther off the mark. They cite *Michigan v. EPA* for the proposition that to "ignore costs as part of [the] requirement to engage in 'reasoned decisionmaking'" is arbitrary and capricious. *Batalla Vidal* Mot. at 19 (quoting *Michigan v. EPA*, 135 S. Ct. 2699, 2706-07 (2015)). But in that case, the statute itself required consideration of costs: Congress directed the EPA to regulate power plant emissions "if [it] finds such regulation is appropriate and necessary," 42 U.S.C. § 7412(n)(1)(A)—a phrase that the Court viewed as "an instruction to [the] . . . agency" to pay "at least some attention to cost[s]," *Michigan*, 135 S. Ct. at 2706-08. Here, by contrast, there is no such statutory directive—a critical distinction that *Regents* fails to seriously grapple with, 2018 WL 339144, at *25—and thus no compulsion to transform a straightforward legal policy decision concerning enforcement of the immigration laws into an accounting exercise or a

macro-economic assessment. The agency did not perform a formal cost-benefit analysis when it adopted DACA, *see* DACA Memo 1-3 (AR 1-3), and one was not required by its rescission.[4]

Equally unpersuasive is Plaintiffs' contention that the Acting Secretary gave inadequate consideration to their preferred policy alternatives. *Batalla Vidal* Mot. at 19-20; *State of New York* Mot. at 11-12. On arbitrary-and-capricious review, an agency is not held to account for every conceivable policy alternative, *State Farm*, 463 U.S. at 51; it need only explain the rejection of "significant alternatives," *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000), that would "achieve the same outcome" as its chosen course, *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 17 (D.C. Cir. 2015), *as amended* (July 21, 2015). That principle was satisfied here. Plaintiffs suggest that unspecified "chang[es]" to "the way the program is administered" would have been preferable to outright rescission. *Batalla Vidal* Mot. at 20; *see State of New York* Mot. at 12. But that vague suggestion is so devoid of content that it hardly qualifies as a "significant alternative," *Allied Local*, 215 F.3d at 80, and Plaintiffs fail to explain how it would remedy the central flaw identified by the Fifth Circuit—a lack of genuine case-by-case discretion—as effectively as the Rescission Policy. Likewise, while the *Regents* court suggested that DHS could instead "instruct its adjudicators to exercise discretion, on a[n] individualized basis, to make sure applicants" are "deserving of deferred action," 2018 WL 339144, at *20, that is, for all intents and purposes, just what the Rescission Policy does. As the

---

[4] Plaintiffs likewise misread *State Farm*, which, contrary to their assertion, does not require an analysis of "the costs as well as the benefits" of agency action irrespective of the statutory text. *Batalla Vidal* Mot. at 19 (quoting *State Farm*, 463 U.S. at 54); *State of New York* Mot. at 9. Indeed, if that were true, there would have been no need for the Court in *Michigan* to parse the text of the Clean Air Act for such a directive. *Cf. Michigan*, 135 S. Ct. at 2707-08. Rather, in *State Farm*, much as in *Michigan*, the statute directed the agency to issue motor vehicle safety standards that were "reasonable, practicable, and appropriate," *State Farm*, 463 U.S. at 33 (quoting 15 U.S.C. § 1392(f)(3) (repealed 1994)); accordingly, the agency "look[ed] at the costs as well as the benefits" of the regulation, and the Court said merely that "[t]he agency [wa]s correct to" do so, *id*. at 54.

Policy itself makes clear, deferred action remains available today, as it was before DACA, "on an individual, case-by-case basis." Rescission Policy 4 (AR 255).

**4.** Plaintiffs argue that "'litigation risk' cannot justify the DACA termination" because it is a "*post-hoc* rationalization" that, in any event, "cannot suffice as reasoned decisionmaking" lest the APA be rendered a dead letter. *Batalla Vidal* Mot. at 20-22 (capitalization omitted); *see State of New York* Mot. at 6. They are wrong on both counts.[5]

To begin, the notion that "litigation risk" is nothing but an after-the-fact rationalization for the Rescission Policy is squarely refuted by the record, and the court in *Regents* erred in concluding otherwise. The Policy itself discusses the adverse rulings from the Fifth Circuit and Supreme Court with respect to DAPA; the similarities between DAPA and DACA; Texas's threat to amend its complaint to challenge DACA; the Attorney General's view that "it is likely that potentially imminent litigation would yield similar results with respect to DACA," and the Acting Secretary's decision after considering all this that she "should" (*not* "must") wind-down DACA. Rescission Policy 3-4 (AR 254-55) (quoting Sessions Letter (AR 251)). Thus, the *Regents* court was simply wrong to assert that "[n]owhere in the administrative record did the Attorney General or the agency consider . . . litigation risk." 2018 WL 339144, at *23. If there were any doubt on that score, the Acting Secretary's contemporaneous statement dispels it: She clearly noted that her decision was prompted by "recent litigation" that threatened to "allow the judiciary to

---

[5] As the Court noted in the course of addressing Defendants' justiciability arguments, "Plaintiffs must identify some source of law, other than the APA's 'arbitrary and capricious' standard, against which the court can review their claims" in the context of these considerations. Nov. 9, 2017 Mem. & Order at 22. As explained in Defendants' motion to dismiss the *Batalla Vidal* Third Amended Complaint, Plaintiffs have failed to do so, and the sources of law applicable to determining the legality of DACA do not provide a standard by which to judge litigation risk associated with continuing the policy. *See* Defs.' Dec. 26, 2017 Mot. to Dismiss, *Batalla Vidal* ECF No. 207, at 13.

potentially shut the program down completely and immediately." Duke Statement. Plaintiffs' suggestion otherwise is specious.[6]

Plaintiffs' contention that it is irrational for litigation risk to inform an agency's decisionmaking is equally mistaken. The Supreme Court's decision in *Ricci v. DeStefano*, 557 U.S. 557 (2009), provides a useful comparison. There, a city government had to decide whether to certify the results of a promotional exam for firefighters that had a disparate impact on minority applicants. *Id*. at 562. The city faced potential litigation either way: If it certified the results, minority applicants threatened to bring a disparate *impact* lawsuit under Title VII; if it refused, applicants who would have been promoted threatened to bring a disparate *treatment* lawsuit. *Id*. at 562-63. Reconciling these competing obligations, the Court held that the city could rescind the test results—and thereby engage in "intentional discrimination"—so long as it had a "strong basis in evidence to believe it will be subject to disparate-impact liability if it fails" to do so. *Id*. at 585. If it is permissible to make race-conscious employment decisions based on serious litigation risk, then surely it is not irrational for an agency to consider litigation risk when making discretionary policy decisions, let alone a decision to wind-down a non-enforcement policy that conferred no rights on anyone. And here, there was far more than a "strong basis" for the Acting Secretary to

---

[6] Although Plaintiffs have not raised the argument, the *Regents* order was also based in part on the conclusion that, under 8 U.S.C. § 1103(a)(1), then-Acting Secretary Duke had no discretion whatsoever to do anything but immediately rescind the DACA policy once the Attorney General concluded it was unlawful. *See Regents*, 2018 WL 339144, at *23. This argument stems from the unsupported premise that the statutory language in question was intended to apply to a legal policy decision about how DHS exercises its enforcement discretion. In fact, the provision merely provides statutory confirmation that legal determinations by the Board of Immigration Appeals, Immigration Judges, and the Executive Office of Immigration Review (all of which exercise authority delegated from the Attorney General) are not subject to reversal by DHS. And both the Attorney General's letter and the Rescission Policy are drafted on the assumption that the final decision was for the Acting Secretary alone, who chose to wind the policy down in an orderly fashion, rather than end it immediately. In any case, even adopting a broader reading of that statutory language, the Acting Secretary's independent litigation-risk judgment still supports the Rescission, whether or not the Attorney General was correct that DACA was unlawful.

believe that continuing to administer DACA would subject the agency to liability, particularly given the adverse precedent in the Fifth Circuit that was directly on point.

The cases that Plaintiffs cite are not to the contrary:  None deals with circumstances comparable to those presented here, where the agency explained that binding precedent effectively made the outcome of further litigation in the same court preordained.  In *Sierra Club v. Jackson*, 833 F. Supp. 2d 11 (D.D.C. 2012) (cited at *Batalla Vidal* Mot. at 22), for example, the court rejected the agency's reliance on "litigation risk" because the decision on review made "no mention" of that rationale, and the administrative record "belie[d] EPA's purported concern" on that score.  *Id*. at 34.  In *Organized Village of Kake v. U.S. Department of Agriculture*, 795 F.3d 956 (9th Cir. 2015) (en banc) (cited in *Batalla Vidal* Mot. at 22), the court dismissed as "implausible" the agency's explanation that the challenged rule—which exempted one national forest from certain construction and logging restrictions—would "reduce[] the potential for conflicts" *in other lawsuits*, given that those "lawsuits involved forests other than the Tongass, so it is impossible to discern how an exemption for the Alaska forest would affect them."  *Id*. at 969-70.  And in *United Mine Workers of America v. U.S. Department of Labor*, 358 F.3d 40 (D.C. Cir. 2004) (cited in *Batalla Vidal* Mot. at 22; *State of New York* Mot. at 6), the court recognized that an adverse out-of-circuit precedent was "indeed a caution" for the agency, but found the agency's explanation insufficient because it referred only to the "possible adverse effect" of the decision without "explain[ing] why it came to deem the . . . decision fatal" to its policy.  *Id*. at 44 (citation omitted).  Here, in contrast, the Acting Secretary's decision expressly relies on litigation risk, Rescission Policy 3 (AR 254) (finding it "likely" that "potentially imminent litigation" would invalidate DACA), and makes plain why the *Texas* decision spelled the end not just for DAPA

and expanded DACA, but for original DACA as well, given the absence of any material distinction among the policies.

This case also presents no threat of an "end-run around the APA." *Batalla Vidal* Mot. at 21. Unlike in *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015), here the agency has not attempted to "circumvent the rulemaking process"—which was not required in any event—"through litigation concessions." *Id*. at 557. On the contrary, the agency vigorously litigated a materially indistinguishable policy all the way up to the Supreme Court. Having lost that battle, however, the agency reasonably recognized that a challenge to DACA would in all likelihood meet the same fate. Far from end-running the APA, the agency has declined to frontally assault the courts. That is commendable, not irrational.

**5.** Plaintiffs contend that the Rescission Policy should be set aside "[t]o the extent that [it] relied on the Attorney General's determination that DACA is unlawful"—a determination they claim is "legally erroneous." *Batalla Vidal* Mot. at 23-25. This argument is mistaken for several independent reasons.

To begin, the Acting Secretary did not rely on the Attorney General's letter solely for its assessment of DACA's legality, but instead concluded that DACA "should" be wound down after considering, among other things, the assessment that it was "likely" that a legal challenge to DACA "would yield similar results" as the successful challenge to DAPA in view of the resulting Fifth Circuit precedent. Rescission Policy 3 (AR 254). That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis to sustain the agency's decision. In particular, the Fifth Circuit affirmed the invalidation of not just DAPA, but expanded DACA, and the differences between expanded DACA and original DACA—the length of the

deferred-action period and modified age and durational requirements—are indisputably immaterial to the Fifth Circuit's legal rationale.  *See Batalla Vidal* Mot. at 27-28.

Moreover, to the extent the Acting Secretary did rely on the proposition that DACA was unlawful, this Court need not agree with that determination to uphold her decision.  If an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment, even if the two determinations are arguably "intertwined."  *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue").  Here, the Attorney General regarded DACA as unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected.  Sessions Letter (AR 251).  But those same concerns equally support a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits" that "Congress had not otherwise acted to provide by law."  Rescission Policy 2 (AR 253).  This Court could, therefore, sustain the Acting Secretary's decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

In any event, while this Court need not decide the issue to resolve this case in favor of the government on the basis that the agency decision was at least rational, the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas*.  Plaintiffs argue that "DACA is a lawful use of prosecutorial discretion," *Batalla Vidal* Mot. at 23, repeating many of the arguments that the government pressed in the *Texas* case, *see id*. at 23-24; *State of New York* Mot. at 7-8.  The court in *Regents* did the same.  2018 WL 339144, at *17-22.  But for better or worse, those arguments were decisively rejected by the Fifth Circuit, whose

decision was affirmed by an equally divided Supreme Court. Thus, while Plaintiffs emphasize that, on its face, the "DACA program was consistent with th[e] type of discretion long sanctioned under immigration law," *Batalla Vidal* Mot. at 24, the Fifth Circuit disagreed, and found that discretion to be illusory in practice, *Texas*, 809 F.3d at 172-73.

Plaintiffs offer a handful of reasons why the Court should disagree with the Fifth Circuit's decision in *Texas*, encouraging the Court to undertake an independent assessment of DACA's legality. None are persuasive.

First, although *Texas* invalidated DAPA, a "separate program" from DACA, *Batalla Vidal* Mot. at 24; *see State of New York* Mot. at 6 n.5, the Fifth Circuit also upheld the injunction of an *expanded version of DACA* itself, and there is no principled legal distinction between original DACA and expanded DACA. And as for the possibility of drawing a distinction between *DAPA* and DACA, the Fifth Circuit's decision was based on the "important similarities" between the policies. *Texas*, 809 F.3d at 174. As the court explained: "Like the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id.* at 171-72; nevertheless, "there was evidence from *DACA's* implementation that [this] discretionary language was pretextual," *id.* at 173 (emphasis added). While that finding had to be "extrapolat[ed]" to invalidate DAPA, *id.*, it *directly* dooms DACA itself—a point that the *Regents* court failed to appreciate in straining to distinguish the policies. 2018 WL 339144, at *21. At a minimum, the writing was on the wall, which is evident to any reader of the *Texas* opinions and the relevant DHS memos. Indeed, the *Texas* injunction also applied to the DAPA Memo's provisions expanding DACA. And while Plaintiffs note that the Fifth Circuit did not rest its holding on constitutional grounds, *Batalla Vidal* Mot. at 25; *State of New York* Mot. at 6 n.5, they of course do not deny that it nevertheless found DAPA and expanded

DACA unlawful, as the Attorney General and Acting Secretary recognized.  Rescission Memo 3

(AR 254) (noting Attorney General's view that DACA has "the same legal . . . defects" as DAPA

and expanded DACA).

Moreover, that "eligibility for DACA," unlike DAPA, "is not dependent on the

immigration status of family members" hardly points in favor of its legality, as Plaintiffs suggest.

*Batalla Vidal* Mot. at 25; *see Regents*, 2018 WL 339144, at *22 (attempting a similar distinction).

To be sure, the Fifth Circuit found DAPA unlawful in part because it was inconsistent with the

INA, which already "prescribes how parents may derive an immigration classification on the basis

of their child's status."  *Texas*, 809 F.3d at 186.  But if DACA has "no such analogue in the INA,"

*Regents*, 2018 WL 339144, at *22, then it is on even shakier—not firmer—ground than DAPA.

*See, e.g.*, *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985) ("[Where] a statute

expressly provides a particular remedy or remedies, a court must be chary of reading others into

it"—a "presumption that . . . is strongest when Congress has enacted a comprehensive legislative

scheme including an integrated system of procedures for enforcement.").  In any event, as the

Fifth Circuit noted, to the extent Congress has implicitly approved prior deferred action policies,

those policies served as interim measures providing aliens with "bridges from one legal status to

another."  *Texas*, 809 F.3d at 184.  DAPA, however, created no such bridge; rather, it granted

deferred action "to persons who have never had a legal status and may never receive one."  *Id*.

DACA is no different on that score.

Second, although this Court may not be bound by the Fifth Circuit's opinion in *Texas*, *see*

*Batalla Vidal* Mot. at 23, 24 n.15, that is beside the point:  DHS was so bound, because it faced

further litigation—in the same case, before the same judge, bound by the same circuit precedent—over a materially indistinguishable policy that was thus almost certain to be invalidated.[7]

Third, Plaintiffs argue that the *Texas* decision is "not persuasive" when read against the government's previous arguments in that case and elsewhere, *State of New York* Mot. at 6 n.5; *see id.* at 7-8 & n.7—arguments they claim are "inconsistent" with Defendants' position here, *Batalla Vidal* Mot. at 18-19. That, too, is beside the point: Those arguments were firmly rejected in a Fifth Circuit opinion that was affirmed by an equally divided Supreme Court, and the government, having exhausted its appeal options, was bound to respect that decision given the absence of any plausible prospect of a different result in the pending litigation. The same is true of the Office of Legal Counsel's (OLC) preliminary view that the proposed version of DACA would be lawful. *Id.* at 18; *State of New York* Mot. at 7. That "preliminary" conclusion was conditioned on the proviso that "it was critical that . . . the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis." OLC Op. 18 n.8 (AR 21). Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice. *Texas*, 809 F.3d at 176.[8]

---

[7] The *Regents* court was mistaken to suggest that because DACA had been in place for "five years," the "doctrine of laches" would have been a "powerful" defense to the *Texas* plaintiffs' impending challenge. 2018 WL 339144, at *24. Unless another statute provides otherwise, the default six-year statute of limitations for claims against the United States applies to APA actions, 28 U.S.C. § 2401(a); *Sendra Corp. v. Magaw*, 111 F.3d 162, 165 (1997), and "[w]hen a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period," *Ikelionwu v. United States*, 150 F.3d 233, 238 (2d Cir. 1998). In any event, in an agency review case, that a reviewing court might have proceeded differently than the agency decision maker is insufficient to set aside agency action as arbitrary and capricious.

[8] The *Regents* court questioned the Fifth Circuit's conclusion that the low denial rate for DACA requests meant that any discretion afforded to DHS officials was illusory. 2018 WL 339144, at *20. In particular, the *Regents* court pointed to a declaration submitted by DHS in *Texas* asserting that DACA was, in fact, a case-specific process under which there were "several instances of discretionary denials," *id.* (citing *Texas*, 809 F.3d at 175 (citing Decl. of Donald Neufeld)), an argument that persuaded a dissenting judge, *id.* (citing *Texas*, 809 F.3d at 210 (King, J., dissenting)). But the Fifth Circuit majority squarely rejected the argument, concluding that "those denials were not discretionary" at all, "but instead were required because of failures to meet DACA's objective criteria." 809 F.3d at 175 n.140; *see also id.* at 172 n.130. It is that holding, not the views of the dissenting panelist, to which the agency (and the district court in Texas) is now bound.

28

**6.** As a last gasp, Plaintiffs suggest that the Rescission Policy should be set aside because the rationale supporting it was "pretextual" and offered in "bad faith," as evidenced by supposedly "conflicting" statements made by officials other than the actual decisionmaker. *Batalla Vidal* Mot. at 26; *see State of New York* Mot. at 12. Notably, Plaintiffs cannot seem to agree on what, exactly, this was pretext for. The *New York* Plaintiffs claim that the "true basis" for the decision was "animus toward Latinos." *State of New York* Mot. at 13. The *Batalla Vidal* Plaintiffs suggest that it was to gain "political leverage" to encourage Congress to enact legislation addressing this and other immigration issues. *Batalla Vidal* Mot. at 26-27. Regardless, this theory is flawed from start to finish.

**a.** To begin, Plaintiffs' attempts to rely on material outside the administrative record as evidence of pretext, *see id.* at 26 n.19, should be rejected. As the Supreme Court has repeatedly explained, when there is a "contemporaneous explanation" for an agency's decision, its validity "must . . . stand or fall on the propriety of that finding." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). "The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citation omitted), "not some new record made initially in the reviewing court," *Camp*, 411 U.S. at 142. Plaintiffs cannot rely on material outside the administrative record to argue that an agency acted arbitrarily and capriciously any more than an agency can rely on post-hoc rationalizations to defend the rationality of its actions. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). Plaintiffs' attempt to rely on deposition transcripts and other extra-record material should therefore be rejected at the outset.

**b.** Critically, Plaintiffs identify nothing contradictory about the *Acting Secretary's* stated justification for the Rescission Policy. Plaintiffs seek to create a factual issue about who the

<center>29</center>

"actual decisionmaker" was, suggesting variously that it was the President, or the Attorney General, perhaps "joint[ly]" with each other or with the Acting Secretary—only to suggest that, in the end, the Court "need not determine" the issue at all. *Batalla Vidal* Mot. at 27-28 & n.22. But this is not a factual issue, it is a legal one, and as a matter of law, the decision necessarily fell to the Acting Secretary of Homeland Security—the only official vested with authority under the INA to make it. *See* 8 U.S.C. § 1103(a)(1). Because none of the supposedly "conflicting" statements are from the Acting Secretary herself, Plaintiffs fail to show that her reasons for adopting the Rescission Policy were pretextual.

Plaintiffs submit that the Acting Secretary could not truly have been concerned about DACA's legality because, rather than end DACA immediately, she allowed it to gradually sunset. *Batalla Vidal* Mot. at 26-27; *State of New York* Mot. at 12-13. But, as explained above, the orderly wind-down of DACA is an appropriate response to the litigation risk facing the government as well as any legally cognizable reliance interests even potentially at stake (and the agency's own operational needs). In any event, it is difficult to see how this argument helps Plaintiffs: If the wind-down itself is illegal, the solution would not be to extend DACA indefinitely, but to end it immediately. And in any event, Plaintiffs point to no legal authority for the proposition that either the Constitution or the APA forbids an orderly wind-down of a policy in the face of concerns about its legality.

Because there is no basis, let alone a strong one, to conclude that the Acting Secretary did not actually believe and rest on her reasonable concerns about DACA's legality, it would be entirely permissible even if Plaintiffs were correct that she had the *additional* motive of wishing to encourage Congress to enact legislation addressing the legal status of DACA recipients. *Batalla Vidal* Mot. at 22-27. Indeed, spurring legislative action on immigration is a legitimate

policy goal that has been shared across administrations. When the President announced DACA in 2012, he said, "Precisely because this is temporary, Congress needs to act," and he called on it "to pass the DREAM Act." Barack Obama, The White House, *Remarks by the President on Immigration*, *supra* at 16-17. When the former Secretary expanded DACA in 2014, he noted that the policy created no "immigration status or pathway to citizenship. Only an Act of Congress can confer these rights." DAPA Memo 5 (AR 41). Thus, the Acting Secretary was in good company when, in announcing the Rescission Policy, she "urge[d] Congress to use its Constitutional authority to . . . find a legislative solution." Duke Statement. The Acting Secretary's desire for a "legislative solution" mirrors President Trump's goal that Congress "legalize DACA" and adopt "legislation addressing the status of [DACA] recipients." *See* Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 PM), https://twitter.com/realDonaldTrump/status/905228667336499200; Presidential Memoranda, The White House, *President Donald J. Trump's Letter to House and Senate Leaders & Immigration Principles and Policies* (Oct. 8, 2017), https://www.whitehouse.gov/the-press-office/2017/10/08/president-donald-j-trumps-letter-house-and-senate-leaders-immigration. There is nothing at all inappropriate about those suggestions, nor are they inconsistent with the Rescission Policy itself, which rests on the premise that any policy of deferred action on the scale of DACA should be enacted only by Congress.

**c.** Plaintiffs' reliance on statements by officials other than the Acting Secretary is even further afield. That other officials might have supported the Rescission Policy for different reasons does not indicate that the reasons given by the actual decisionmaker—the Acting Secretary—were pretextual.

Moreover, even if statements of officials other than the decisionmaker were relevant, none plausibly gives rise to a cognizable inference of pretext here. Plaintiffs suggest, for example, that the Acting Secretary's assessment of litigation risk with respect to DACA was a pretense because, at one deposition, when asked whether there is "any [DHS] policy on how to deal with threats to sue by state or local officials," one of her subordinates responded: "[T]hat sounds like the craziest policy you could ever have" because "[y]ou could never do anything if you were always worried about being sued." *Batalla Vidal* Ex. MM at 205–207 (Hamilton Dep.) (cited in *Batalla Vidal* Mot. at 27; *State of New York* Mot. at 12-13). But Plaintiffs rip that statement out of context: Read in conjunction with the broader discussion, it is clear that the deponent was responding to the question whether DHS has a *general* policy of considering "litigation risk" in the context of *each* agency decision—something the agency has never claimed and that might make little sense. Regardless, whatever the merits of such a policy as a general matter might be (or whether the agency has any such policy), that says nothing about how DHS might choose to address litigation risk in a *particular* case, especially where, as here, there was controlling adverse precedent and the consequent potential for massive disruption flowing from an abrupt (and highly likely) court-ordered termination. Plaintiffs' reliance on this isolated, off-hand comment as supposed "evidence" of pretext is misplaced.

Plaintiffs also cast aspersions on the President's tweet indicating that, if Congress "can't" pass a legislative fix for DACA recipients, he "will revisit the issue!" *State of New York* Mot. at 13 (quoting Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 p.m); *see Batalla Vidal* Mot. at 26-27. But that comment is fully consistent with the President's clearly stated view that "the program is unlawful and unconstitutional and cannot be successfully defended in court." *See* Statement from President Trump (Sep. 5, 2017), https://www.whitehouse.gov/the-press-

office/2017/09/05/statement-president-donald-j-trump. Far from undercutting the Acting

Secretary's rationale for rescinding the policy, the comment emphasized the need for legislative

action and expressed the President's intention to revisit Administration policies on childhood

arrivals—not the legality and defensibility of the DACA program—if Congress did not timely

act. That stated intention simply reflects the government's obligation to "consider . . . the wisdom

of its policy on a continuing basis, for example, in response to changed factual circumstances, or

a change in administrations." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545

U.S. 967, 981 (2005) (internal citation omitted).

    **d.** More fundamentally, Plaintiffs fall far short of making the "strong showing of bad

faith or improper behavior" necessary to overcome the presumption of regularity. *Overton Park*,

401 U.S. at 420. To do so, they "must make a significant showing—variously described as a

'strong,' 'substantial,' or 'prima facie' showing . . . indicative of bad faith." *Amfac Resorts, LLC*

*v. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001). They cannot meet this burden with

"vague" allegations, *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 72 (D.C. Cir. 1987),

"conclusory statements," *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir.

1996), or "inadmissible hearsay," *Commercial Drapery Contractors, Inc. v. United States*, 133

F.3d 1, 7 (D.C. Cir. 1998). Rather, they must proffer "serious, nonconclusory allegation[s] of bad

faith" or independent evidence of improper conduct. *Coal. on Sensible Transp.*, 826 F.2d at

72. Indeed, Plaintiffs "must present 'well-nigh irrefragable proof' of bad faith or bias on the part

of governmental officials" to overcome the presumption that the agency discharged its duties in

good faith. *Adair v. England*, 183 F. Supp. 2d 31, 60 (D.D.C. 2002) (citations omitted). Plaintiffs

fail to meet this high burden, as none of the statements to which they point even arguably

demonstrates bad faith. In sum, even if generously interpreted, at most the statements invoked

by Plaintiffs show that various officials other than the actual decisionmaker may not have fully agreed with all of the reasons that the Acting Secretary articulated for her decision. That some officials may have different perspectives on these issues may show disagreement, but it is no sign of bad faith, let alone strong evidence of it.[9]

### C. The Rescission is a General Statement of Policy Not Subject to the Requirements of Notice-and-Comment Rulemaking Procedures or the Regulatory Flexibility Act.

Plaintiffs also cannot succeed in arguing that DHS was required to engage in full notice-and-comment rulemaking procedures before rescinding the DACA policy. The APA generally requires an agency to follow notice-and-comment procedures before promulgating rules. 5 U.S.C. § 553(b), (c); *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). But the APA exempts "general statements of policy" from that requirement unless another statute provides otherwise, 5 U.S.C. § 553(b)(3)(A), and none does here. The Rescission Policy is exempt from the APA's notice-and-comment requirements because it is a general statement of policy regarding how DHS will exercise its enforcement discretion under the INA. In attempting to recast the Rescission Policy as a substantive rule, as opposed to policy guidance, Plaintiffs mischaracterize both the nature of the Rescission and its effect on the availability of deferred action.[10]

**1.** General statements of policy "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (quoting Dep't of Justice, Attorney General's Manual on the APA 30 n.3 (1947)). They "serve a dual purpose": both to "inform[] the public concerning the agency's future plans and priorities for

---

[9] The *State of New York* Plaintiffs also suggest that these statements reflect a hidden motive of invidious discrimination. As explained in Part I.D., *infra*, none of these statements are about DACA recipients, none can bear the weight that Plaintiffs ascribe to them, and none have any connection to the actual decision maker.

[10] The district court in *Regents* recently granted the government's motion to dismiss identical notice-and-comment (and Regulatory Flexibility Act) claims. *See Regents*, Order Granting in Part Defs.' Mot. to Dismiss, ECF No. 239 (N.D. Cal. Jan. 12, 2018), at 4 ("[T]he rescission memorandum is a general statement of policy.").

exercising its discretionary power," as well as to "'educate' and provide direction to the agency's personnel in the field, who are required to implement . . . policies and exercise . . . discretionary power in specific cases." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987). And a "general statement of policy, like a press release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974).

By contrast, legislative rules adopted through notice-and-comment procedures have the force and effect of law, and thus create legally-enforceable rights or obligations in regulated parties. *Perez*, 135 S. Ct. at 1203; *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03 (1979). In other words, an "agency action that . . . would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). The APA generally leaves to the agency the choice of which mode to employ. *See* 5 U.S.C. § 553(b). If an agency chooses to issue a statement of policy rather than a legislative rule through notice-and-comment rulemaking, that choice has consequences: The agency's statements in the policy have "no binding effect on members of the public or on courts." 1 Richard J. Pierce, Jr., Administrative Law Treatise § 6.3, at 419 (5th ed. 2010).

A quintessential use of policy statements is for an agency to announce how and when it will pursue (or forbear from) enforcement, in the exercise of its discretion. Such enforcement policies explain how the agency intends to exercise a power that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. Unlike legislative rules adopted after notice-and-comment, such enforcement policies do not establish or alter any legally-enforceable rights or obligations of third parties. And such policies can readily be changed, in response to changing circumstances, funding, and priorities.

35

2. Applying these principles, the Rescission Policy can only be viewed as a general statement of policy. Indeed, DHS and its predecessor, the INS, have exercised their enforcement discretion through the use of deferred action and similar policies dozens of times over more than half a century, without following notice-and-comment procedures. *See* Andorra Bruno et al., Analysis of June 15, 2012 DHS Memorandum, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 20-23, Cong. Research Serv. (July 13, 2012), https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-Service-Report1.pdf. Plaintiffs offer no persuasive reason for treating the Rescission Policy differently.

The text of the Rescission Policy reinforces the point again and again. It is a "memorandum." Rescission Policy 1 (AR 252). The Acting Secretary issued it as an "exercise of [her] authority in establishing national immigration policies and priorities." Rescission Policy 4 (AR 255). It instructs DHS personnel on the manner in which they are to exercise the agency's discretionary enforcement authority on a prospective basis. *See Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975) ("[G]eneral statements of policy are rules directed primarily at the staff of an agency describing how it will conduct agency discretionar[y] functions, while other rules [*i.e.*, legislative rules] are directed primarily at the public in an effort to impose obligations on them." (internal citation omitted; emphasis added)). The Policy does not act to immediately deprive any current DACA recipients of their deferred action, but describes how pending and future requests will be "adjudicate[d]—on an individual, case-by-case basis." Rescission Policy 4 (AR 255). It acknowledges the settled principle, recognized by both Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such

36

"otherwise lawful enforcement . . . prerogatives," *id.* at 5 (AR 256). It "does not . . . create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* And no alien has an enforceable right to obtain deferred action under DACA or any other policy regardless. *See* 8 U.S.C. § 1252(g); *AADC*, 525 U.S. at 485. Deferred action "remains discretionary and reversible," *Arpaio*, 797 F.3d at 17—as it has been through each of the previous policies adopted without "cumbersome and time-consuming rulemaking proceedings." *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988).[11]

**3.** Plaintiffs' attempt to portray the Rescission Policy as a substantive rule is unpersuasive. Plaintiffs argue that "the Duke Memo uses mandatory, definitive language to establish blanket, binding rules that leave no room for an agency's discretion in handling deferred action requests received from childhood arrivals." *Batalla Vidal* Mot. at 30; *see also State of New York* Mot. at 24. This mischaracterizes the nature of the DACA Rescission and the availability of deferred action generally. Deferred action was available on a discretionary basis before the DACA policy (albeit on a more limited and case-specific basis), and it remains available today. DACA is not the only manner by which individuals obtain deferred action, as the long history of similar policies evinces. That a particular policy permitting a class of individuals to seek deferred action based on certain criteria is being rescinded does not mean that DHS officials are prohibited from later

---

[11] This Court's recent opinion certifying an interlocutory appeal under 28 U.S.C. § 1292(b) supports Defendants' understanding of the Rescission Policy as exempt from notice-and-comment requirements. The Court explained correctly that DACA, "at least on [its] face, simply provide[d] guidelines for the exercise of immigration authorities' prosecutorial discretion." Jan. 8, 2018 Mem. & Order at 5 (emphasis added). Even accepting the premise that the termination of DACA "present[s] special considerations not found in *Chaney* and other challenges to non-enforcement decisions," *id.* at 6—which this Court has previously held forecloses Defendants' jurisdictional argument under 5 U.S.C. § 701(a)(2)—that does not change the fact that the rescission of DACA is a general statement of policy directed toward nothing other than modifying "guidelines for the exercise of immigration authorities' prosecutorial discretion." Jan. 8, 2018 Mem. & Order at 5. In other words, regardless of whether *Chaney* is applicable, the Court's (accurate) understanding of the nature of DACA and its rescission confirms that notice-and-comment rulemaking was not required here.

extending that deferred action on an individualized basis to persons regardless of if they are former DACA recipients, and nothing in the Rescission Policy indicates otherwise.

Plaintiffs assert that the Rescission Policy "removed agents' ability to use prosecutorial discretion for individuals who met the DACA eligibility criteria, regardless of individual circumstance[s]," *Batalla Vidal* Mot. at 31, but that is simply untrue. In fact, nothing in the Rescission Policy prevents DHS officials from exercising their pre-existing (and still-existing) discretion to confer deferred action on an individual former DACA recipient, or even upon groups of former DACA recipients, under appropriate individualized criteria. The Secretary remains free to establish (or revoke) other deferred-action policies, in her discretion; to grant (or deny) deferred action as to any individual under other policies, or no policy at all, in her discretion; to revoke a grant of deferred action, in her discretion; and to pursue removal, in her discretion. In short, the Rescission Policy does not bind regulated parties or the courts in any way; it is an announcement of the manner in which DHS currently intends to exercise its prosecutorial discretion on a forward-looking basis. It does not even "bind" DHS in any meaningful sense; the Rescission Policy reflects nothing more than DHS's return to true case-by-case adjudication of requests for deferred action.[12]

Moreover, it is common for senior prosecutors to set bright-line policies directing the exercise of discretion by individual prosecutors. For example, the "passive enforcement policy" adopted by the Attorney General and approved in *Wayte v. United States*, 470 U.S. 598, 601-02,

---

[12] Plaintiffs' argument that the Rescission Policy is a substantive rule because of its effect on the availability of advance parole for DACA recipients, *Batalla Vidal* Mot. at 31; *State of New York* Mot. at 24, is similarly flawed. The potential availability of advance parole, under separate regulations not otherwise at issue in this case, is a highly discretionary consequence of receiving deferred action; it is an aspect of the Secretary's authority under the INA. Accordingly, the Secretary may use statements of policy to "advise the public prospectively of the manner in which [DHS] proposes to exercise [its] discretionary power" concerning deferred action, as well as the consequences that follow from that exercise due to separate regulations. *See Vigil*, 508 U.S. at 197 (citations omitted). The Rescission Policy announced a prospective change instructing the agency to discontinue processing applications for advance parole "under standards associated with the DACA program." Rescission Policy 4 (AR 255). In light of the broader decision to begin an orderly wind-down of DACA itself, the Secretary acted well within her discretion in making adjustments to the availability of advance parole without the full notice-and-comment process.

613 (1985), limited the discretion of prosecutors to pursue charges against those who had not self-reported their violation of the law. And earlier this year the Attorney General issued a memorandum instructing all federal prosecutors to "charge and pursue the most serious, readily provable offense" in all federal criminal prosecutions, expressly rescinding two earlier, more lenient policies. *See* Mem. from the Attorney General to All Federal Prosecutors (May 10, 2017), https://www.justice.gov/opa/press-release/file/965896/download. If enforcement policies lacking an *additional* layer of case-specific discretion triggered notice-and-comment requirements, such policies would be unlawful.[13]

**4.** Plaintiffs' argument is nonsensical for the additional reason that, if winding down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the first place. But because the DACA Memo itself was not adopted through notice and comment, on Plaintiffs' own theory it would be void *ab initio*—leaving Plaintiffs without any remedy. Plaintiffs essentially ask this Court to strike down the rescission of DACA on a legal theory that would immediately thereafter *compel* the rescission of DACA. As explained in Defendants' motions to dismiss, that is reason enough to dismiss this claim. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (plaintiff must show "injury will be 'redressed by a favorable decision'").[14]

---

[13] Curiously, the *State of New York* Plaintiffs rely heavily on an Eastern District of Pennsylvania decision that explicitly declined to follow Second Circuit authority. *See U.S. ex rel. Parco v. Morris*, 426 F. Supp. 976, 984-85 (E.D. Pa. 1977) (noting that the Court was "bound by the Third Circuit's decision" in another case, and explaining that the court "will not follow" the Second Circuit's decision in *Noel*, 508 F.3d at 1023). To be sure, *Noel* itself acknowledged that the definition of a "general statement of policy" is "enshrouded in considerable smog"; but it also noted that "[o]ne scholar has suggested that it may be that 'general statements of policy' are rules directed primarily at the staff of an agency describing how it will conduct agency discretionary functions, while other rules are directed primarily at the public in an effort to impose obligations on them." *Noel*, 508 F.3d at 1030 (internal citation omitted). The government would prevail under that definition.

[14] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect." *Consumer Energy Council v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982). That holding, however, concerned the rescission of a rule, promulgated after notice and comment, which was allegedly defective on other grounds—not a rule that was defective precisely because it had failed to go through notice and comment in the first place. *See id.* at 445-46. If an agency

The *Batalla Vidal* Plaintiffs argue that "[t]he APA requirements apply to rescission regardless of how the program was initially created." *Batalla Vidal* Mot. at 32 n.26. But Defendants' argument is *not* that the APA does not apply because DACA did not go through notice and comment, it is that these Plaintiffs, who seek an order from this Court reinstating the DACA policy, *Batalla Vidal* Mot. at 40; *State of New York* Proposed Order at 2, cannot obtain such an order on a legal theory that would confirm that DACA itself is (and always was) unlawful. Recognizing this common-sense reality would not, as Plaintiffs suggest, "create perverse incentives" in which an agency could "evade notice-and-comment by simply declaring their belief that a prior rule was unlawfully promulgated," *Batalla Vidal* Mot. at 32—the problem is not created by any belief of *DHS*, it is created by the inherent contradiction between *Plaintiffs'* legal theory and the relief that they seek. Plaintiffs ask this Court to do the impossible—to issue an order reinstating a policy on a legal theory that would confirm the illegality of that policy. An injunction—an equitable remedy—is not available under these circumstances, even if Plaintiffs were right about the need for notice-and-comment rulemaking. *See Winter*, 555 U.S. at 32 ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course.").

**5.** The *State of New York* Plaintiffs suggest explicitly (as do the *Batalla Vidal* Plaintiffs implicitly) that the public interest in this particular agency decision supports their claim that notice-and-comment rulemaking is required. *State of New York* Mot. at 26; *see Batalla Vidal* Mot. at 28-29. But they have nothing to cite for that proposition except scattered out-of-circuit dicta. In fact, the question whether an agency rule requires notice-and-comment rulemaking has nothing to do with how "important" the rule is, and Plaintiffs' "important rule" exception is at odds with the

---

has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go those procedures to cure the underlying defect.

well-settled proposition that federal courts do not have the authority to expand the APA's procedural requirements—even if a court is confident that the agency's decision-making process would be improved by such additional process, or because the agency is faced with a particularly important issue. *Cf. Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 545 (1978) (rejecting the argument that the APA "merely establishes lower procedural bounds and that a court may routinely require more than the minimum when an agency's proposed rule addresses complex or technical factual issues or 'Issues of Great Public Import'").

**6.** Plaintiffs' Regulatory Flexibility Act (RFA) claims fail for the same reasons as their notice-and-comment claims. The RFA's requirement that an agency publish analyses of a rule's impact on small businesses applies only "[w]hen an agency promulgates a final rule under section 553 of . . . title [5], after being required by that section or any other law to publish a general notice of proposed rulemaking," *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005) (quoting 5 U.S.C. § 604(a))—in other words, only where notice-and-comment procedures are required. Because those procedures were not required here, the RFA is inapplicable.[15]

### D. The Rescission Does Not Violate Equal Protection Principles

**1.** The *State of New York* Plaintiffs (but not the *Batalla Vidal* Plaintiffs) seek preliminary injunctive relief on their Equal Protection claim. As explained in both of Defendants' motions to dismiss, no Plaintiff states a plausible Equal Protection claim in these matters, and the *State of*

---

[15] Plaintiffs also lack standing to raise an RFA claim for an additional reason: They allege no facts to demonstrate that they are "small entities" entitled to judicial review under the RFA. *See* 5 U.S.C. § 601(6) (defining "small entity"); *id.* § 611(a)(1) (restricting judicial review to "a small entity that is adversely affected or aggrieved"); *see also, e.g.*, *Nw. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 13 (D.D.C. 1998) ("[T]he language of the RFA extends standing to seek judicial review only to a 'small entity.'"). Plaintiffs' conclusory assertions on this score, *see, e.g.*, *State of New York* Am. Compl. ¶¶ 211-16, 228, 273; *Batalla Vidal* 3d Am. Compl. ¶¶ 69, 187, should not be assumed true on a motion to dismiss, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009), nor do they support preliminary injunctive relief. Nor should the Court give any weight to the *State of New York* Plaintiffs' allegations about "small-governmental jurisdictions," businesses, or non-profits that are not before this Court. *State of New York* Am. Compl. ¶¶ 211-16, 228, 273. The mere fact that an entity is geographically located within a state does not provide that state standing to bring claims on its behalf.

*New York* motion for a preliminary injunction does not demonstrate otherwise. To succeed on such a claim, Plaintiffs must overcome the presumption that government officials "properly discharged their official duties" when making prosecutorial decisions, by making plausible and specific factual allegations that offer "clear evidence to the contrary." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). That is because, as in *Armstrong*, Plaintiffs' claim of a hidden discriminatory motive underlying this exercise of prosecutorial discretion invades "a 'special province' of the Executive." *Id.* at 464 (quoting *Chaney*, 470 U.S. at 832). And as "[t]hese concerns are greatly magnified in the deportation context," Plaintiffs must satisfy *Armstrong*'s "particularly demanding" standard. *AADC*, 525 U.S. at 489, 490. They have not done so.

Plaintiffs' have not offered any clear evidence of discriminatory intent. First, Plaintiffs suggest that the rescission of DACA has a disparate impact on Latinos, who allegedly account for 93% of approved DACA requestors. *State of New York* Mot. at 13. But "a racially disproportionate impact" alone is never sufficient to establish discriminatory intent, *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977), even in a purely domestic context, *see Washington v. Davis*, 426 U.S. 229, 242 (1976), and especially in a case like this in which the plausible alternative explanations—*i.e.*, that those statistics are explained by accident of geography, not discrimination—overwhelm the inference Plaintiffs seek to draw. (The Rescission Policy is, of course, facially neutral in its applicability.) Indeed, in *Armstrong*, the Supreme Court found insufficient allegations of discriminatory intent where evidence suggested that 100% of prosecutions for certain drug-trafficking offenses closed by the federal defender's office in a given year involved African-American defendants. 517 U.S. at 470; *see also Rajah v. Mukasey*, 544 F.3d 427, 439 (2d Cir. 2008) (rejecting a similar discriminatory-enforcement challenge, in a case in which individuals were required to register under a program that singled out aliens from certain

identified countries, in which almost all of the selected countries were "predominantly Muslim," rejecting the argument that that fact alone was evidence that "the Program was motivated by an improper animus"). Any change to the DACA policy would likely have had a disparate impact on Latinos—as nearly any change to this country's immigration policies could have a disparate impact on this group; that is not evidence of discrimination.

Second, Plaintiffs rely heavily on allegations of statements made by President Trump (most before he took the oath of office) in arguing that the historical background of the Acting Secretary's decision supports a finding of discriminatory intent. *State of New York* Mot. at 12-15. None of those statements by the President, however, provides any evidence of a secret discriminatory motive for the rescission of DACA by then-Acting Secretary Duke, let alone the sort of clear evidence that would be required to support such a claim. The statements do not address the actual decision at issue—the rescission of DACA—nor were they made by the Acting Secretary, the only official vested with authority under the INA to make the decision at issue. Plaintiffs appear to assume without explanation that any immigration-related statements by President Trump should be attributed to all "Defendants" or "administration officials" or "senior officials." *State of New York* Mot. at 12, 13, 15. But the identity of the relevant decision maker under the APA is not a question of fact; it is a settled issue of law.[16] In any case, although the Court can and should reject

---

[16] As Defendants have explained in this and prior filings, *see, e.g.*, *Batalla Vidal* ECF No. 207 at 22 n.9, Acting Secretary Duke was the only government official with the *legal* authority to rescind a DHS policy that had been operated by DHS for the past five years—regardless of the (undisputed) *factual* involvement by the White House and the Attorney General. In any case, even accepting the premise that the Attorney General is a relevant decision maker, Plaintiffs only cite to one statement made by the Attorney General, and they materially misrepresent it. Plaintiffs are simply incorrect that the Attorney General "described Mexicans as 'filth.'" *State of New York*, Mot. at 15. The full remarks—which are available on the DOJ website, https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-announcing-department-justice-s-renewed—make clear that the Attorney General's reference to "filth" was a reference—with no connection to DACA—to the "brutal machete attacks and beheadings" carried out by "MS-13 and the cartels." It is Plaintiffs alone who have connected and generalized those comments about violent criminal activity to any particular race, ethnicity, or nationality as a whole.

this claim without any analysis of past statements by the President, Plaintiffs ignore the fact that when the President has actually spoken about DACA recipients in particular, he has generally been supportive—which is entirely inconsistent with Plaintiffs' theory of "unambiguous" animus.[17]

Third, Plaintiffs claim that the Acting Secretary's stated reasons for the Rescission Policy are pretextual, and are designed to mask the true motive: invidious discrimination. *State of New York* Mot. at 15. But Plaintiffs' offer no support for a finding that the Acting Secretary's stated reasons for adopting the Rescission Policy were pretextual, as Defendants explained above. *See supra*, at 28. In fact, the Acting Secretary rationally explained her decision to wind down DACA, given the imminent risk of a disruptive, nationwide injunction.

Rather than engaging with the applicable standards set forth in *Armstrong* and *AADC*, Plaintiffs rely almost entirely on *Romer v. Evans*, 517 U.S. 620, 632 (1996), and *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973), but neither case involves decisions relating to prosecutorial discretion or immigration, and neither is inconsistent with Defendants' interpretation of *Armstrong* or *AADC*. *Romer* and *Moreno* stand for the unremarkable proposition that "'a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.'" *Romer*, 517 U.S. at 634-35 (quoting *Moreno*, 413 U.S. at 534). But that principle has no applicability here, as applied to a government action that is neutral on its face (unlike the anti-LGBT state constitutional amendment, in *Romer*, and the congressional enactment restricting food stamps for certain households, in *Moreno*), and as applied to governmental action that is justified by (at an absolute minimum) "legitimate public policies which justify the incidental disadvantages they impose on certain persons," *Romer*, 517 U.S. at 635—such as DHS's rational desire to avoid massive litigation risk and an immediate nationwide injunction shutting down DACA entirely.

---

[17] *See, e.g.*, *Batalla Vidal* 3d Am. Compl. ¶ 110 ("Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!.....").

Defendants agree that "animus can never constitute a legitimate state interest," *State of New York* Mot. at 17, but that principle does not apply here.

Moreover, if Plaintiffs were correct that the "'sheer breadth' of Defendants' termination of DACA" is "'inexplicable by anything but animus,'" *Id.* at 16-17 (quoting *Romer*, 517 U.S. at 632), then it is difficult to understand why, among other things, DHS would allow the program to gradually wind-down over a two-and-a-half year period, rather than end it immediately and entirely. Nor is Plaintiffs' grim view consistent with the President's support of efforts to provide *permanent* (and unquestionably lawful) relief to DACA recipients in the form of legislation.[18]

**2.** The *State of New York* Plaintiffs also argue halfheartedly that this case implicates a "special constitutional sensitivity" under the Supreme Court's decision in *Plyler v. Doe*, 457 U.S. 202 (1982), because DACA recipients were generally brought to this country in violation of federal immigration law through no fault of their own. *State of New York* Mot. at 18-20. The supposed implications of that "sensitivity" are not entirely clear from Plaintiffs' briefs. In any case, *Plyler* holds only that "[i]f the State is to deny a discrete group of innocent children the free public education that it offers to other children residing within its borders, that denial must be justified by a showing that it furthers some substantial state interest." *Plyler*, 457 U.S. at 230. At the outset, this argument is inapplicable on its face to DACA recipients who are *not* children—which includes

---

[18] Although they refuse to concede it explicitly, *see State of New York* Mot. at 17 n.35, Plaintiffs' reliance on *Romer* and *Moreno*—two cases about rational-basis review—suggests that they understand that the rescission of DACA is *not* subject to any form of heightened scrutiny. In fact, under *Armstrong* and *AADC*, Plaintiff must bring a clear case of discrimination to overcome the strong presumption of regularity that attaches to government action of this sort, and they have failed to meet that high substantive standard. In any case, even if some form of strict scrutiny did apply, the orderly and lawful enforcement of the immigration laws is a compelling state interest. *See, e.g.*, *United States v. Merkt*, 794 F.2d 950, 956 (5th Cir. 1986); *cf. United States v. Brignoni-Ponce*, 422 U.S. 873, 878-79 (1975) (public interest demands effective measures to prevent illegal entry of aliens); *Rusu v. INS*, 296 F.3d 316, 321 (4th Cir. 2002) (recognizing that, "[b]ecause of the Government's compelling interest in controlling immigration," due process requirements may be relaxed in immigration context).

the vast majority of DACA recipients.[19]  And the fact that all DACA recipients *used to be* children cannot justify any special constitutional treatment; all of us *used to be* children.

More fundamentally, *Plyler* was explicitly decided in the unique context of public education—a subject about which the Rescission Policy is silent.  *See Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 459 (1988)  ("We have not extended [the holding of *Plyler*] beyond the 'unique circumstances,' *id.*, at 239 (Powell, J., concurring), that provoked its 'unique confluence of theories and rationales,' *id.*, at 243 (Burger, C.J., dissenting).") (quoting *Plyler* 457 U.S at 239, 243).[20]  Before and after the creation of DACA, and before and after the rescission of DACA, minors without lawful immigration status (including but not limited to DACA recipients) may seek a public education, and states that deny them that right may run afoul of *Plyler*.  But there is simply nothing in *Plyler* that has anything to say about the actual enforcement (or lack thereof) of the federal immigration laws, or about how DHS exercises prosecutorial discretion.[21]

## II.   THE REMAINING FACTORS WEIGH AGAINST A PRELIMINARY INJUNCTION

### A.   Plaintiffs Have Not Shown Any Risk of Irreparable Harm That Would Be Remedied By The Injunctive Relief That They Seek.

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).  The moving

---

[19] As of September 4, 2017, approximately 0.3% of DACA recipients were under the age of 16; 28.5% were between the ages of 16 and 20; 36.7% were between 21 and 25; 23.7% were between 26 and 30; and 10.9% were between 31 and 36.  The median age was 23, and the interquartile range was 20 to 27 years old.  USCIS.gov, *Approximate Active DACA Recipients: Sex and Age Group As of September 4, 2017*, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

[20] To be sure, the Second Circuit has once applied *Plyler* outside the context of public education.  *See Lewis v. Thompson*, 252 F.3d 567 (2d Cir. 2001) (holding that the denial of automatic eligibility for Medicaid coverage at birth violated the equal protection rights of certain children).  But that case is no help to Plaintiffs here because, among other reasons, the Second Circuit relied on the fact that the plaintiff-children in *Lewis* were United States citizens, and therefore had an even "stronger" claim than the plaintiff-children in *Plyler*.  *See id.* at 591.

[21] Once again, even if heightened scrutiny under *Plyler* were applicable, the government has a compelling interest in the orderly and lawful enforcement of the immigration laws.  *See supra* at 45 n.18.

party therefore must show that irreparable harm is likely before any other elements may be considered. *See id.* To satisfy the irreparable harm requirement, Plaintiffs "must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if [the Court] waits until the end of trial to resolve the harm.'" *Id.* (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234-35 (2d Cir. 1999)).

Under current circumstances, the harms identified by Plaintiffs are neither likely nor imminent. *Batalla Vidal* Plaintiffs rely on alleged harms to three named plaintiffs and one "putative class member." *Batalla Vidal* Mot. at 36-37. But none of those individuals faces *imminent* expiration of their DACA. *See Batalla Vidal* Mot. Ex. CCC ¶ 47 (Gustavo Galicia's DACA expires August 2018); Ex. EEE ¶ 3 (Carlos Vargas's DACA expires September 2018); Ex. III ¶ 2 (Carolina Fung Feng's DACA expires August 2018); Ex. LLL ¶ 2 (Eliana Fernandez's DACA expires November 2018). This case may very well have been fully litigated to final judgment before any of those harms come to pass—even ignoring the fact that the preliminary injunction already entered in the Northern District of California allows all of them to seek another two-year renewal of their DACA.

Plaintiffs also cite a variety of alleged harms related to the potential loss of work authorization for those whose DACA is set to expire. For example, the *State of New York* Plaintiffs reference alleged harms stemming from (1) the loss of services by "highly qualified employees in government," *State of New York* Mot. at 29; (2) the loss of revenue in the form of student tuition if students choose to stop attending public educational institutions as a result of their inability to work, *id.* at 30 (citing *e.g.* Ex. 17 ¶ 5; Ex. 71 ¶ 7; Ex. 72 ¶ 5); (3) increased costs if individuals lose health care coverage currently obtained through their employer, *id.* at 31-32; and (4) the impact of

47

"smaller consumer and legal workforce bases" for state and local economies, *id*. at 33. The *Batalla Vidal* Plaintiffs allege similar harms. *See Batalla Vidal* Mot. at 37 (discussing access to medical treatment and loss of earnings). As for Plaintiff MRNY, it alleges an "imminent loss of twelve employees." *Id*. at 38.

Even accepting all of these facts as true and that all of those harms are truly irreparable, none of these alleged harms are imminent, or even likely, given the preliminary injunction recently issued in the Northern District of California litigation. That order requires DHS to permit individuals who were previously granted DACA to submit new renewal requests, and to process those requests. If DHS determines that they qualify for a renewal of their DACA, those individuals may also receive new work authorizations, *see* 8 C.F.R. § 274a.12(c)(14), and the harms about which Plaintiffs are concerned would simply not come to pass. Of course, any injunctive relief "must address the injury alleged to be irreparable," and a court "should not grant the injunction if it would not so prevent that injury." *A.X.M.S. Corp. v. Friedman*, 948 F. Supp. 2d 319, 336 (S.D.N.Y. 2013); *see also Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir. 1985) (noting that "[t]he linchpin of . . . interim relief is that the threatened irreparable harm will be prevented by [an] injunction"). Because these alleged harms have *already* been prevented by another court, they provide no basis for granting the request for injunctive relief advanced here.

Finally, the *Batalla Vidal* Plaintiffs refer to alleged longer-term harms stemming from an inability to "plan for the future and make commitments, whether familial, career-based, academic, or otherwise." *Batalla Vidal* Mot. at 38. However, a preliminary injunction would only provide

48

temporary, short-term relief, and would dissolve upon the conclusion of these lawsuits. Only a permanent *legislative* solution will provide DACA recipients with the security that they seek.[22]

## B.    Balancing of the Equities and the Public Interest Disfavor Injunctive Relief.

The final two factors, the public interest and the balance of the equities, also weigh against granting Plaintiffs' motion. These factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The federal government possesses broad authority over the subject of immigration and the status and presence of aliens in this county. *Arizona v. United States*, 567 U.S. 387, 394 (2012). This includes significant discretion as to whether, and under what circumstances, to grant discretionary relief to individuals without a lawful immigration status, including through deferred action. The injunctive relief sought by Plaintiffs would frustrate and displace both the Secretary's substantive judgment as to how her prosecutorial discretion should be exercised, as well as her further judgment as to how best to transition between policies, while providing minimal, if any, relief from the harms identified by Plaintiffs for the reasons discussed above—especially now that DHS is already subject to a similar preliminary injunction. Accordingly, this factor weighs against granting these Plaintiffs an additional injunction.

## C.    Any Injunctive Relief Should Be Narrowly Drawn.

The Court should deny Plaintiffs' motions in their entirety. If, however, the Court were to disagree, it nevertheless should reject Plaintiffs' sweeping request to "immediately reinstate the implementation of the DACA program, nationwide, to conditions in existence prior to Defendants'

---

[22] The court in *Regents* found that the plaintiffs had not "justif[ied] a provisional injunction requiring DHS to resume accepting applications for advance parole" and accordingly did not order any such relief. *Regents*, 2018 WL 339144, at *28. The same applies here. The sole argument offered regarding harm arising from the unavailability of advance parole pertains to the alleged inability of students to "fully participate in a variety of activities," which could allegedly "shrink the capacity of state and private educational institutions to offer such programming to their entire student body." *State of New York* Mot. at 31. Such a suggestion is far too speculative and attenuated to support injunctive relief regarding advance parole.

termination." *State of New York* Proposed Order at 2. Such relief would be clearly overbroad, especially to the extent it applies to individuals who are not parties to this action and whose claims are not currently addressed in Plaintiffs' motions. Constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries. Article III requires that "a plaintiff must demonstrate standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). "The remedy" sought must therefore "be limited to the inadequacy that produced the injury in fact." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). And equitable principles independently require that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

Accordingly, any injunction the Court enters should thus be limited to relieving the specific injury of only those individual Plaintiffs whom the Court determines have a cognizable claim and will suffer irreparable harm in the absence of an injunction. At a minimum, this would require that any injunction sweep no broader than the one already ordered by the district court in the Northern District of California, which, although overbroad itself in the government's view, recognized some important limitations: that "new applications from applicants who have never before received deferred action need not be processed," that "the advance parole feature need not be continued for the time being for anyone," and that "defendants may take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application." *Regents*, 2018 WL 339144, at *27.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions for a preliminary injunction.

Dated: January 13, 2018                    Respectfully submitted,

                                           CHAD A. READLER
                                           Acting Assistant Attorney General

                                           RICHARD P. DONOGHUE
                                           United States Attorney

                                           BRETT A. SHUMATE
                                           Deputy Assistant Attorney General

                                           JENNIFER D. RICKETTS
                                           Director, Federal Programs Branch

                                           JOHN R. TYLER
                                           Assistant Branch Director

                                           BRAD P. ROSENBERG
                                           Senior Trial Counsel

                                           */s/ Stephen M. Pezzi*
                                           STEPHEN M. PEZZI (D.C. Bar #995500)
                                           KATE BAILEY
                                           RACHAEL L. WESTMORELAND
                                           Trial Attorneys
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Ave., N.W.
                                           Washington, DC  20530
                                           Tel.:  (202) 305-8576
                                           Fax:  (202) 616-8470
                                           Email: stephen.pezzi@usdoj.gov

                                           JOSEPH A. MARUTOLLO
                                           Assistant U.S. Attorney
                                           United States Attorney's Office
                                           Eastern District of New York
                                           271-A Cadman Plaza East, 7th Floor
                                           Brooklyn, NY  11201
                                           Tel:  (718) 254-6288
                                           Fax:  (718) 254-7489
                                           Email:  joseph.marutollo@usdoj.gov

                                           *Counsel for Defendants*