IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States Courts
Southern District of Texas
FILED

MAY 2 2 2018

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| Defendants, | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| Defendant-Intervenors, | ) | |
| and | ) | |
| STATE OF NEW JERSEY, | ) | |
| Proposed Defendant-Intervenor. | ) | |

## AMENDED MEMORANDUM OF LAW IN SUPPORT OF PROPOSED DEFENDANT-INTERVENOR'S MOTION TO INTERVENE

## TABLE OF CONTENTS

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT ...................................1

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ................................2

SUMMARY OF ARGUMENT ...................................................................................................4

ARGUMENT ..............................................................................................................................5

I.      NEW JERSEY IS ENTITLED TO INTERVENE AS OF RIGHT.......................................5

        A.      New Jersey's Motion is Timely. ...............................................................5

        B.      New Jersey Has a Substantial Interest in the Subject Matter of this Litigation............7

                1.      DACA Grantees Are Integral Members of the New Jersey Community. ..............8

                2.      Terminating DACA Would Harm New Jersey's Proprietary Interests. .................9

                3.      Terminating DACA Would Harm New Jersey's Sovereign and Quasi-Sovereign Interests. .................................................................................14

        C.      New Jersey's Interest Would Be Impaired If Intervention Were Denied. ...................16

        D.      New Jersey's Interest Cannot Be Adequately Represented by the Existing Parties................................................................................................17

II.     ALTERNATIVELY, THIS COURT SHOULD GRANT NEW JERSEY PERMISSIVE INTERVENTION. ...................................................................................19

CONCLUSION.........................................................................................................................20

## TABLE OF AUTHORITIES

### Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez,*
   458 U.S. 592 (1982) ............................................................................................. 7

*Ass'n of Prof'l Flight Attendants v. Gibbs,*
   804 F.2d 318 (5th Cir. 1986) ............................................................................... 6

*Batalla Vidal v. Nielsen,*
   279 F. Supp. 3d 401 (E.D.N.Y. 2018) ....................................................... 2, 3, 14

*Brumfield v. Dodd,*
   749 F.3d 339 (5th Cir. 2014) ....................................................... 5, 17, 20

*Edwards v. City of Houston,*
   78 F.3d 983 (5th Cir. 1996) ....................................................... 16, 17, 18

*Entergy Gulf States La., LLC v. EPA,*
   817 F.3d 198 (5th Cir. 2016) ............................................................... 17

*Heaton v. Monogram Credit Card Bank,*
   297 F.3d 416 (5th Cir. 2002) ....................................................... 16, 17

*In re Lease Oil Antitrust Litig.,*
   570 F.3d 244 (5th Cir. 2009) ............................................................... 7

*John Doe No. 1 v. Glickman,*
   256 F.3d 371 (5th Cir. 2001) ............................................................... 6

*NAACP v. Trump,*
   Nos. 17-1907 (JDB), 17-2325 (JDB), 2018 WL 1920079 (D.D.C. Apr. 24, 2018) ................. 3

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.,*
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ....................................................... 3

*Sierra Club v. City of San Antonio,*
   115 F.3d 311 (5th Cir. 1997) ............................................................... 7

*Sierra Club v. Espy,*
   18 F.3d 1202 (5th Cir. 1994) ............................................................... 7

*Sierra Club v. Glickman,*
   82 F.3d 106 (5th Cir. 1996) ............................................................... 17

*Stallworth v. Monsanto Co.*,
    558 F.2d 257 (5th Cir. 1977) ................................................................................................. 6

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ............................................................................................... 2

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ................................................................................. 2

*Texas v. United States*,
    805 F.3d 653 (5th Cir. 2015) ........................................................................................... 5, 7

*Trbovich v. United Mine Workers of Am.*,
    404 U.S. 528 (1972) .......................................................................................................... 17

*United States v. League of United Latin Am. Citizens*,
    793 F.2d 636 (5th Cir. 1986) ............................................................................................. 19

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
    834 F.3d 562 (5th Cir. 2016) ...................................................................................... 5, 7, 17

## **Rules**

Fed. R. Civ. P. 24(a) ........................................................................................... 1, 4, 5, 6, 7

Fed. R. Civ. P. 24(b) ........................................................................................... 1, 4, 5, 19

## **Regulations**

N.J. Admin. Code § 10:49-5.4 ................................................................................... 14

The State of New Jersey respectfully moves for leave to intervene as of right as a defendant in this action. *See* Fed. R. Civ. P. 24(a)(2). Intervention as of right is warranted because, as explained more fully below, the State's interests would be seriously harmed if this Court enjoined Deferred Action for Childhood Arrivals ("DACA"). In the alternative, the State requests the Court grant it permissive intervention pursuant to Federal Rule of Civil Procedure 24(b)(1)(B).

Plaintiffs have advised New Jersey that they will oppose this motion to intervene. Defendants have responded that they will review the intervention request and respond as appropriate. Defendant-Intervenors have advised that they do not oppose the motion.

## STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

Plaintiffs request that this Court "enjoin[] Defendants from issuing or renewing DACA permits in the future." Dkt. 1 ¶ 16. The State of New Jersey seeks leave to intervene as a defendant because terminating DACA would seriously harm the State and DACA itself is lawful.

New Jersey is home to 17,400 active DACA grantees. DACA grantees are healthcare professionals, artists, entrepreneurs, teachers, lawyers, bankers, software developers, designers, research assistants, professors, architects, and construction workers. They own homes and cars and have citizen children, siblings, and spouses. Declaration of Dr. Tom K. Wong ("Wong Decl.") ¶ 33 (App. A, Tab 1). They are full members of the New Jersey community—our neighbors and friends, teachers and students, brothers and sisters, and colleagues.

A termination of DACA will directly harm New Jersey and its residents, whose health and well-being the State has a duty to protect. As discussed *infra*, § I.B, terminating DACA would harm New Jersey's proprietary interests by harming state institutions that employ DACA grantees and by harming New Jersey's public colleges and universities. It would also harm the state treasury and the state economy. Terminating DACA would also harm New Jersey's

1

sovereign and quasi-sovereign interests, including its interests in protecting the health and wellbeing of its residents and in enforcing its criminal laws.

New Jersey respectfully moves for leave to intervene in the instant action so it may defend its interests in this litigation, defend against Plaintiffs' legal challenge to DACA, and oppose Plaintiffs' request for a preliminary injunction enjoining Defendants from issuing or renewing DACA permits in the future.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Since 2012, DACA has allowed nearly 800,000 young people to live, work, and build lives in the United States. *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 407 (E.D.N.Y. 2018). Texas and the other Plaintiff States did not challenge DACA when it was initiated in 2012.

Instead, in 2014, twenty-six States sued, seeking to prevent the Department of Homeland Security ("DHS") from implementing Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA") and three specific expansions to DACA contained in a 2014 memorandum issued by former Secretary of Homeland Security Jeh Johnson. *Texas v. United States*, 86 F. Supp. 3d 591, 604, 677–78 (S.D. Tex. 2015). The States explicitly did not challenge DACA as it had been created in 2012. *Id.* at 606. On February 16, 2015, this Court issued a preliminary injunction of DAPA and the three specific expansions of DACA. *Id.* at 677–78. The injunction explicitly did not reach DACA as it had been operating since 2012. *Id.* Defendants appealed and the Fifth Circuit affirmed, as did an equally divided Supreme Court. *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam).

After President Trump took office, then Secretary of Homeland Security John Kelly rescinded DAPA but left DACA in place. *See* Dkt. 1, Ex. 5. On June 29, 2017, Texas and ten other States wrote a letter to the Attorney General threatening to amend their original complaint

to challenge DACA as it was originally created in 2012 if the United States did not terminate

DACA by September 5, 2017. *See* Dkt. 1, Ex. 6. On September 5, 2017, then Acting Secretary of

the Department of Homeland Security Elaine Duke rescinded DACA. *See* Dkt. 1, Ex. 7.

Nine sets of plaintiffs, including the States of California, Colorado, Connecticut,

Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, New Mexico,

New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia,

Washington, and the District of Columbia, filed lawsuits in three district courts in California,

New York, and the District of Columbia, seeking to "enjoin [the Federal Government] from

terminating the DACA program." *See, e.g.*, Compl. ¶ 302(e), *State of New York, et al. v. Trump,

et al.*, No. 1:17-cv-05228 (E.D.N.Y.) (App. A, Tab 16).[1] Neither Texas nor any of the other

Plaintiff States in this action attempted to intervene in those suits or submit amicus briefs

defending their interests.

Instead, Texas and six other states waited until there were three nationwide injunctions in

place requiring DHS "to maintain the DACA program on a nationwide basis . . . , including

allowing DACA enrollees to renew their enrollments," *Regents of the Univ. of Cal. v. U.S. Dep't

of Homeland Sec.*, 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018); *see also Batalla Vidal*, 279 F.

Supp. 3d at 407; *NAACP v. Trump*, Nos. 17-1907 (JDB), 17-2325 (JDB), 2018 WL 1920079, at

*1 (D.D.C. Apr. 24, 2018) (App. A, Tab 17), to file suit in this Court challenging the legality of

---

[1] The other lawsuits include *Batalla Vidal, et al. v. Nielson, et al.*, No. 1:16-cv-04756 (E.D.N.Y.); *Regents of the Univ. of Cal., et al. v. Dep't of Homeland Sec., et al.*, No. 3:17-cv-05211 (N.D. Cal.); *State of Cal., et al. v. U.S. Dep't of Homeland Sec., et al.*, No. 3:17-cv-05235 (N.D. Cal.); *City of San Jose v. Trump, et al.*, No:3:17-cv-05329 (N.D. Cal.); *Garcia, et al. v. United States*, et al., No. 3:17-cv-05380 (N.D. Cal.); *Cnty. of Santa Clara, et al. v. Trump, et al.*, No. 3:17-cv-05813 (N.D. Cal.); *NAACP v. Trump, et al.*, No. 1:17-cv-01907 (D.D.C.); and *Trustees of Princeton Univ., et al. v. United States, et al.*, No. 1:17-cv-02325 (D.D.C.).

DACA as it was created in 2012 and requesting a conflicting injunction preventing "Defendants from issuing or renewing DACA permits in the future." Dkt. 1, ¶ 16.

## SUMMARY OF ARGUMENT

New Jersey meets every requirement for intervention as of right under Federal Rule of Civil Procedure 24(a) or, in the alternative, under Rule 24(b), and respectfully requests that its motion to intervene be granted.

First, New Jersey's application is timely, since the State first knew of its interest recently, intervention would cause no prejudice to any existing party, and a denial of this motion would severely prejudice New Jersey.

Second, New Jersey has a substantial interest in the subject matter of this litigation and will be seriously harmed if DACA is enjoined. New Jersey has a proprietary interest in (i) ensuring the continued operation and vitality of state agencies that employ DACA grantees, (ii) maintaining strong public colleges and universities, where DACA students are vital members of the student community and valued employees, and (iii) protecting its state treasury, which benefits from the economic contributions and state and local taxes of DACA grantees. New Jersey also has a quasi-sovereign interest in protecting the health and well-being of its residents, including protecting families from separation and financial instability. And it has a sovereign interest in enforcing its criminal laws.

Third, Plaintiffs' requested relief, if granted, would significantly impair all of those interests. Fourth, neither the MALDEF Defendant-Intervenors nor Defendants can adequately represent New Jersey's proprietary, sovereign, and quasi-sovereign interests in this action. As to Defendants, they are bound by the new position of the U.S. Attorney General that DACA is an unconstitutional exercise of authority by the Executive Branch and is vulnerable to the same legal challenges as DAPA. As to the MALDEF Defendant-Intervenors, they do not share and

4

cannot protect New Jersey's proprietary, sovereign or quasi-sovereign interests in securing

qualified employees for its agencies; cultivating diverse and multicultural academic

communities; ensuring a robust economy and tax base; preventing its residents from being

separated from their family members; maintaining public health; and enforcing its criminal laws.

Granting New Jersey's request for intervention will ensure that New Jersey's interests are

protected. It will also allow New Jersey to participate fully in developing the underlying facts

and issues contemplated in this case to allow for a full and fair adjudication.

New Jersey meets every requirement for intervention as of right under Rule 24(a) or, in

the alternative, under Rule 24(b), and respectfully requests that the application be granted.

## ARGUMENT

### I.   NEW JERSEY IS ENTITLED TO INTERVENE AS OF RIGHT.

Pursuant to Federal Rule of Civil Procedure 24(a)(2), a party is entitled to intervene as of

right if: (1) its motion is timely; (2) it has an interest "relating to . . . the subject of the action";

(3) the outcome of the action may, "as a practical matter, impair or impede [the potential

intervenor's] ability to protect that interest"; and (4) the existing parties cannot adequately

represent the potential intervenor's interest. *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage

Comm'n*, 834 F.3d 562, 565 (5th Cir. 2016). In the Fifth Circuit, Rule 24 is "liberally construed"

in favor of intervention and any doubts are resolved in favor of the proposed intervenor.

*Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014). In general, intervention is granted if "no

one would be hurt and the greater justice could be attained." *Texas*, 805 F.3d 653, 657 (5th Cir.

2015) (internal quotation marks omitted). Here, New Jersey satisfies all four requirements for

intervention as of right, and its motion should be granted.

### A.   New Jersey's Motion is Timely.

The Fifth Circuit has established four factors to consider in determining whether a motion for intervention is timely under Rule 24(a)(2): (1) the length of time between the potential intervenor's learning of its interest in the litigation and its moving to intervene; (2) the extent of prejudice to the existing parties from any delay by the potential intervenor; (3) the extent of prejudice to the potential intervenor if the motion is denied; and (4) any unusual circumstances. *Stallworth v. Monsanto Co.*, 558 F.2d 257, 264–66 (5th Cir. 1977).

The application of all four supports finding that New Jersey's motion is timely. First, New Jersey knew of its interest in the case only a short time before it moved to intervene. Plaintiffs filed their complaint on May 1, 2018, and filed a motion for preliminary injunction the following day. New Jersey filed its motion to intervene just twenty days later. *See John Doe No. 1 v. Glickman*, 256 F.3d 371, 377 (5th Cir. 2001) (finding timely the application to intervene filed one month after applicant's interest materialized); *Ass'n of Prof'l Flight Attendants v. Gibbs*, 804 F.2d 318, 320–21 (5th Cir. 1986) (finding five-month delay not disqualifying).

Second, because this case is still at the initial stages, intervention would cause no prejudice to any existing party. *See Stallworth*, 558 F.2d at 265 (explaining that the only relevant question is whether prejudice would result from intervenor's delay in seeking to intervene). Defendants have yet to file their answer, no discovery has been taken, and no scheduling order has been issued as to the case in general or the Preliminary Injunction briefing in particular. On May 15, 2018, the Court granted Defendant-Intervenors' unopposed motion to intervene and ordered the parties to submit an agreed upon scheduling order for briefing on Plaintiffs' motion for a Preliminary Injunction on May 25. Dkt. 22. If the parties cannot agree, each party is to submit its own proposed scheduling order on that date. *Id.*

6

Third, New Jersey would be prejudiced if the Court denies its motion to intervene. As explained in the next section, an order enjoining DACA would severely harm New Jersey.

**B.    New Jersey Has a Substantial Interest in the Subject Matter of this Litigation.**

A movant's "concrete, personalized, and legally protectable" interest suffices for intervention as of right under Rule 24(a)(2). *Texas*, 805 F.3d at 658; *see also In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 251–52 (5th Cir. 2009) (permitting intervention where Texas's interest was "not directly related to the underlying dispute but is sufficiently related to the litigation").

"[T]he '[protectable] interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Sierra Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir. 1994) (internal quotation marks omitted). Property interests easily qualify as protectable interests, as do economic or non-property interests "when they are directly related to the litigation." *Wal-Mart*, 834 F.3d at 568; *Texas*, 805 F.3d at 660–61 (allowing intervention of immigrants qualifying for DAPA whose interest in seeking deferred action would be affected by outcome of litigation); *Espy*, 18 F.3d at 1207 (allowing intervention by lumber companies whose income may be affected by changes in federal land-management policy). Further, a state has a quasi-sovereign interest in the physical and economic well-being of its residents, *Sierra Club v. City of San Antonio*, 115 F.3d 311, 315 (5th Cir. 1997) (explaining that, for purposes of intervention, "the state as *parens patriae* has an interest in the physical and economic health and well-being of the citizens"), and a sovereign interest in the enforcement of its criminal laws, *see, e.g., Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). Here, New Jersey has all three.

7

1.    **DACA Grantees Are Integral Members of the New Jersey Community.**

New Jersey is home to an estimated 53,000 DACA-eligible residents. Wong Decl. ¶ 45 (App. A, Tab 1). As of September 4, 2017, New Jersey had 17,400 current, active DACA recipients. *Id.* ¶ 44. And as of March 31, 2018, USCIS had approved 23,102 initial DACA applications and 39,132 renewals for residents of New Jersey. *See* U.S. Citizenship and Immigration Services, *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals* (March 31, 2018) (App. A, Tab 14).

According to a survey of more than 3,000 DACA recipients nationwide, the average DACA recipient was brought to the United States at age 6.5, has lived in this country for 18.8 years, and is currently 25.2 years old. Wong Decl. ¶ 12 (App. A, Tab 1). Seventy-three percent live with an American citizen spouse, child, or sibling. *Id.* ¶ 33, Table 6; ¶ 48 n.30. Ninety-one percent are currently employed, earning on average $36,232 per year. *Id.* ¶ 20. Forty-five percent are currently in school, with seventy-one percent pursuing a bachelor's, master's, or professional degree. *Id.* ¶ 47 nn. 27, 29. Moreover, after being granted DACA, fifty-four percent of grantees got their first job; five percent started their own business; sixty-five percent bought their first car; sixteen percent bought their first home; sixty-one percent opened their first bank account; sixty-six percent got their first credit card; ninety percent got a driver's license or state identification card for the first time; and forty-nine percent became organ donors. *Id.* ¶¶ 17, 21, 32.

DACA grantees are vital members of New Jersey's workforce, educational systems, and broader communities. New Jersey employs DACA grantees in State agencies and institutions, and our public colleges and universities benefit from the enrollment of highly qualified DACA students. DACA grantees are also full participants in New Jersey's economy and make significant contributions to state revenues by paying taxes. Finally, DACA grantees are the

parents, spouses, brothers, sisters, colleagues and friends of United States citizens, and countless New Jersey families would be harmed if DACA were terminated. In New Jersey, 15,904 DACA recipients are currently employed; 940 own their own business; 7,813 are in school; 5,586 are pursuing a bachelor's, master's, or professional degree; and 12,650 have an American citizen sibling, spouse, or child. *Id.* ¶¶ 46–48.

### 2. Terminating DACA Would Harm New Jersey's Proprietary Interests.

<u>State Institutions.</u> Terminating DACA would harm New Jersey's state agencies, which employ DACA grantees in several capacities. For example, New Jersey's Department of Children and Families, Division of Child Protection and Permanency ("DCP&P"), employs Declarant Cinthia Osorio, a DACA grantee, as part of a prestigious, highly competitive program for students graduating from undergraduate social work programs. As year-long interns and then full time DCP&P social workers, participants "play a critical role in protecting New Jersey's most vulnerable children," including by conducting initial home visits in response to referrals for potential child abuse or neglect. Declaration of Rose Arackathara ("Arackathara Decl.") ¶¶ 2, 4, 10 (App. A, Tab 18). Ms. Osorio is particularly adept at connecting with DCP&P client families. *See id.* ¶ 7 ("[B]ecause [Osorio] is a DACA recipient who grew up in a low-income immigrant household and speaks Spanish, she was able to truly understand DCP&P's clients and the challenges they have faced, and connect with them in a natural way."). If DACA were terminated, "Cinthia would be unable to work for DCP&P, and our state's children will lose a particularly skilled, dedicated, and compassionate protector." *Id.* ¶ 10.

<u>Public Universities.</u> Terminating DACA would harm New Jersey's public colleges and universities by depriving them of the incredible diversity that DACA students bring to their institutions, of hundreds of thousands of dollars in tuition revenue, and of valuable employees, whom the institutions have spent money recruiting, training, and retaining.

9

New Jersey has four public research universities, seven public state colleges, and nineteen public county community colleges. Declaration of Dr. Zakiya Smith Ellis ("Smith Ellis Decl.") ¶¶ 5–7 (App. A, Tab 2). Approximately 2,200 students in these state educational institutions are registered DACA recipients, including approximately 500 attending the four public research universities, 200 attending the seven state colleges, and 1,500 students attending New Jersey's community colleges. *Id.* ¶¶ 5, 7.

DACA's work authorization allows recipients to finance the cost of their New Jersey education by working. Without the ability to work to support themselves, many DACA students will be forced to drop out of school without finishing their degree. *Id.* ¶ 8; *see also* Declaration of Daniela Velez ("Velez Decl.") ¶¶ 6, 9 (App. A, Tab 3) (explaining that she would not be able to finish her bachelor's degree at Rutgers if DACA is terminated because without her income she could not afford tuition); Wong Decl. ¶ 26 (App. A, Tab 1) (Ninety-four percent of DACA survey recipients currently in school said that receiving DACA allowed them to pursue "educational opportunities that [they] previously could not" have pursued before DACA). That would cost New Jersey's public educational institutions hundreds of thousands of dollars in lost tuition revenue. *Id.* ¶ 9. In addition, DACA grantees who continue to attend school post-termination may not be able to fully participate in a variety of activities—including travel sports teams, study-abroad programs, research projects, internships and graduate program teaching—because they would lack the necessary work and travel authorizations. *Id.* ¶ 9. These factors may shrink the capacity of the public educational institutions to offer such programming to their entire student body, harming the institution as a whole. *Id.* ¶ 10.

Termination of DACA would also harm the ability of public colleges and universities to advance their commitment to diversity. New Jersey's public institutions emphasize the

importance of diversity, which brings different perspectives and ideas to the classroom. DACA

students are a large part of this diversity, and without them, the institutions and the remaining

students would suffer. *Id.* ¶ 9. As the President of the New Jersey Institute of Technology

(NJIT), which has over fifty DACA students, eloquently explained:

> Difference is a catalyst for learning and human development, which occur through collaboration, questioning, analysis, and debate. Ultimately, these actions result in a deeper understanding of people, enhanced capability to solve problems of all types, and opportunities to improve quality of life for all. NJIT's DACA students are emblematic of the strength that is gained through diversity. They were born in more than 18 different nations, are majoring in disciplines across the academic spectrum, are represented in every class from freshman to senior as well as our graduate programs, and they maintain a cumulative grade point average above a 3.0. Subtracting such a pool of talent and ambition from any learning community would be a deep and painful loss.

Memorandum from Joel S. Bloom, President, NJIT, to NJIT Cmty. (Sept. 5, 2017),

http://www.njit.edu/president/message-president-bloom-0/ (App. A, Tab 11).

The State's public educational institutions would also lose valuable employees. Many

DACA recipients are employed by New Jersey's public colleges and universities. The

institutions have spent money in recruiting, training, and retaining these employees. If DACA is

terminated, these employees lose their work authorizations, and these institutions will have to

spend valuable public resources to recruit, train, and retain new employees. Smith Ellis Decl. ¶¶

5–7 (App. A, Tab 2).

The example of Rutgers is illustrative. Rutgers, the State University of New Jersey, is a

leading national research university and New Jersey's preeminent public institute of higher

education. Rutgers has thirty schools and colleges, nearly 300 research centers and institutes, and

over 69,000 students. Rutgers also has more than 350 students who are registered DACA

recipients. Declaration of Robert Barchi ("Barchi Decl.") ¶¶ 2, 4 (App. A, Tab 4).

Since Defendants announced they would rescind DACA, Rutgers has gone out of its way to reassure DACA recipients that they remain a "vital and valued part of [the university's] community of scholars," and the school would continue "to do all [it could] to support [their] successful completion of a Rutgers degree." *Id.* ¶ 5. But terminating DACA would severely harm Rutgers as a community. As outlined in the Rutgers strategic plan, diversity is not passive, but rather actively creates conditions for inclusion, respect, equality, and fairness on campus. Rutgers "values and relies upon the contributions that all students, faculty, staff, and researchers, from every background and place of birth, make to the richness of the academic community. DACA students contribute to Rutgers' goal of a diverse, inclusive and cohesive culture, and rescinding DACA would undermine our commitment and support to diversity and would cause Rutgers and all of New Jersey harm." *Id.* ¶ 7.

Indeed, DACA grantees have enhanced the educational experience of all students at New Jersey's public colleges and universities. These institutions, which are vital to New Jersey's economy and to the success of New Jersey as a whole, will be harmed if DACA is terminated.

State Treasury. Beyond harming the State's public colleges and universities, terminating DACA would seriously harm the state treasury. As the New Jersey Chamber of Commerce has recognized, DACA grantees "have lived here virtually all of their lives and have become engrained in our communities. Like the rest of our citizens, they work here and they pay taxes here." Press Release, New Jersey Chamber of Commerce, *NJ Chamber of Commerce President Tom Bracken's Statement on DACA*, (Oct. 10, 2017), http://www.njchamber.com/press-releases/449-nj-chamber-of-commerce-president-tom-bracken-s-statement-on-daca (App. A, Tab 12). New Jersey will suffer direct and substantial economic losses if this Court were to enjoin DACA.

12

DACA recipients contribute to the New Jersey economy through purchases of goods and services and the tax receipts that those purchases generate. The spending power of DACA-eligible individuals in New Jersey was estimated at $679.7 million in 2015, New Am. Econ., *Examining the Contributions of the DACA-Eligible Population in Key States*, (Nov. 6, 2017), http://research.newamerican economy.org/report/examining-the-contributions-of-the-daca-eligible-population-in-key-states/ (App. A, Tab 13), and they pay an estimated $57.2 million in state and local taxes. *See* Declaration of Alan Essig, Meg Wiehe, and Misha Hill ("Essig et al. Decl.") ¶ 7 (App. A, Tab 9). If DACA were terminated, the State would lose an estimated $18.7 million per year in taxes. *Id.* For example, DACA grantee Joana Costa paid $1,216 in New Jersey state taxes in Fiscal Year 2017. She also owns and has paid state sales taxes on two New Jersey-registered cars. Declaration of Joana Costa ("Costa Decl.") ¶ 8 (App. A, Tab 5). And DACA grantee Daniela Velez, who came to this country when she was nine years old and lives in Burlington, New Jersey, paid $4,628 in state income taxes to the State of New Jersey in 2017 and $1391 in state income taxes in 2016. Velez Decl. ¶ 8 (App. A, Tab 3).

According to the Cato Institute, terminating DACA would cost New Jersey $384 million in budgetary costs and $1.376 billion in other economic costs over the next ten years, for a total of $1.76 billion. Decl. of Ike Brannon, *State of New York, et al., v. Trump, et al.*, No. 17-cv-5228 (Dec. 15, 2017) (App. A, Tab 10).

Rescinding DACA would also hurt the New Jersey treasury by increasing the number of uninsured individuals in New Jersey and imposing additional health care costs on the State. Fifty-seven percent of DACA recipients got a job with health insurance or other benefits for the first time after receiving DACA. Wong. Decl. ¶ 17 (App. A, Tab 1). Without work authorization, those DACA recipients will lose their employer-sponsored healthcare coverage. This could cause

them to rely more heavily on state-funded health care, primarily the Medical Emergency

Payment Program for Aliens, which pays for medical care (including labor and delivery services

and ambulance services) for immigrants who experience a medical emergency and who meet the

requirements for Medicaid eligibility except for immigration status. *See* N.J. Admin. Code

§ 10:49-5.4 (App. A, Tab 15). If DACA recipients lose access to employer-sponsored health

insurance, New Jersey can anticipate that the costs of this program will rise. *See Batalla Vidal*,

279 F. Supp. 3d at 434 (recognizing that that "[s]ome DACA recipients will lose their employer-

sponsored healthcare coverage, which will . . . impose tremendous burdens on the State

Plaintiffs' public health systems").

New Jersey Businesses. New Jersey also has a substantial interest in preserving DACA

grantees' contribution to the various sectors in its economy. New Jersey businesses have invested

significant time and money in hiring and training DACA recipients. If DACA is rescinded, they

will lose the value of their investments as well as the services of qualified and trained employees.

For example, Joana Costa is a DACA grantee who lives in Union, New Jersey and works at

Chemetall-BASF on the Innovation Team. As part of the development of cutting-edge

technology in the metalworking industry, Joana is responsible for the execution of seven projects

that have profit margins of $200,000-$250,000 each. Costa Decl. ¶ 7 (App. A, Tab 5). If DACA

were terminated, this business would suffer.

### 3. Terminating DACA Would Harm New Jersey's Sovereign and Quasi-Sovereign Interests.

Enjoining DACA would also harm New Jersey's sovereign and quasi-sovereign interests.

Public Health. First, terminating DACA will harm public health in New Jersey, thus

impeding New Jersey's sovereign interest in protecting the health of its residents. As earlier

noted, without work authorization, DACA recipients will not only lose their jobs, they will also

lose their employer-sponsored healthcare coverage. As a result, they will be less likely to receive needed preventative care and may avoid obtaining necessary medical care altogether until an emergency arises. Even then, forty-eight percent of DACA recipients surveyed reported that even if they were injured, they would be less likely to go to the hospital to seek treatment if DACA were rescinded. Wong. Decl. ¶ 37 (App. A, Tab 1).

For example, Cinthia Osorio came to the United States at age three and grew up in Dover, New Jersey. In March of this year, she was diagnosed with Hodgkin's Lymphoma. She just completed her final round of chemotherapy and will soon begin radiation treatment. She has had access to health insurance through her college, and will have access through her job at the New Jersey Department of Children and Families starting in August, but if DACA is terminated "I would lose the ability to get health insurance through my employer, and fear I would not be able to afford the treatments I need in the future." Declaration of Cinthia Osorio ("Osorio Decl.") ¶¶ 1, 13 (App. A, Tab 6).

<u>Harm to Families</u>. Jersey also has a sovereign interest in protecting families that live in the State from coerced separation and financial instability. An estimated 12,650 DACA recipients in New Jersey have an American citizen sibling, spouse, or child, Wong. Decl. ¶ 48 (App. A, Tab 1), and an estimated 4,472 (26% of 17,400) have an American citizen child. *Id.* ¶ 33. Terminating DACA will increase the likelihood of splitting DACA grantees from their citizen family members, causing emotional and economic harm to those New Jersey residents who remain. Moreover, terminating DACA will threaten the financial security of families where DACA grantees provide financial support.

For example, DACA grantee Sara Mora Quesada, who came to the United States when she was four years old from Costa Rica and lives in Hillside, New Jersey, helps to support her

younger brother, who is a U.S. citizen and still in high school. She would no longer be able to do so if DACA were terminated. Declaration of Sara Mora Quesada ("Quesada Decl.") ¶¶ 1, 6, 8 (App. A, Tab 7). And United States citizen Anahi Gonzalez, who has lived in New Jersey for her entire life, is married to DACA grantee Donovan Sanchez, who works as a machine programmer and operator at a company that creates cabinet parts. Together, they are saving to buy a house. If Donavan were to lose DACA, their financial situation would suffer, they would lively have to move, and they would not be able to buy a home, causing direct economic and emotional harm to a citizen of New Jersey. Declaration of Anahi Gonzales ("Gonzales Decl.") ¶¶ 1, 4, 11, 15-16 (App. A, Tab 8).

Enforcement of Criminal Laws. Finally, New Jersey has a sovereign interest in enforcing its criminal laws. Fifty-three percent of DACA recipients reported that they would be less likely to report a crime they witnessed to the police if DACA were rescinded. Wong. Decl. ¶ 37 (App. A, Tab 1). Forty-seven percent reported that they would be less likely to report a crime even if they themselves were the victim, and sixty-percent reported they would be less likely to report if their employer was committing wage theft. *Id.*

If the relief sought by Plaintiffs is granted here, New Jersey's proprietary, sovereign and quasi-sovereign interests would be harmed in all of these ways. That suffices for purposes of intervention as of right.

### C.     New Jersey's Interest Would Be Impaired If Intervention Were Denied.

The third factor for intervention under Rule 24(a)(2) requires New Jersey to "show that disposition of the action may impair or impede [its] ability to protect [its] interest." *Heaton v. Monogram Credit Card Bank*, 297 F.3d 416, 422 (5th Cir. 2002). This is a lenient standard that does not require New Jersey to show that it "will be bound by the disposition of the action." *Edwards v. City of Houston*, 78 F.3d 983, 1004–05 (5th Cir.1996). Rather, "[t]he current

practical impairment standard represents a liberalization of the prerequisites to intervention" and "this more generous measure of impairment favors would-be intervenors." *Id.* Furthermore, the Fifth Circuit has held that the mere potential for an adverse judgment which may operate as *stare decisis*, "constitutes a sufficient impairment to compel intervention." *Sierra Club v. Glickman*, 82 F.3d 106, 109–10 (5th Cir. 1996) (citing *Espy*, 18 F.3d at 1207); *accord Heaton*, 297 F.3d at 424.

It is beyond dispute that the relief Plaintiffs seek in this case—a nationwide injunction forbidding DHS from granting or renewing any DACA applications—may "impair or impede" New Jersey's ability to protect the numerous interests detailed above. *Wal- Mart*, 834 F.3d at 565; *Brumfield*, 749 F.3d at 344–45 (explaining that intervention does not require showing that interests "*will* be impaired" but that they "may" be). Therefore, this element is satisfied.

### D.  New Jersey's Interest Cannot Be Adequately Represented by the Existing Parties.

Finally, no current party can adequately represent New Jersey's interests. *Heaton,* 297 F.3d at 422. This requirement is "minimal" and is satisfied upon a showing that representation of New Jersey's interests "'*may* be' inadequate." *Edwards*, 78 F.3d at 1005 (quoting *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). Although the Fifth Circuit has "created two presumptions of adequate representation"—one when an existing party is a "governmental body or officer charged by law" with representing the proposed intervenor's interests, and the second when the "would-be intervenor has the same ultimate objective as a party to the lawsuit"—neither applies here. *Edwards*, 78 F.3d at 1005.

First, the federal government is not "charged by law" with representing the interests of the State of New Jersey. *See Entergy Gulf States La., LLC v. EPA*, 817 F.3d 198, 203 (5th Cir. 2016) (noting that the EPA is not "a representative of the Sierra Club by law"). Further, New

Jersey seeks to intervene in part based on its proprietary interests and its interests as an

employer, not solely in its capacity as a sovereign. *See Edwards*, 78 F.3d at 1005 (finding that

the presumption does not apply when City seeks to intervene in its capacity as an employer).

More importantly, attorneys for the Federal Government cannot adequately represent

New Jersey's interests in this case because they are bound by the newly-adopted position of the

U.S. Attorney General that DACA is "an unconstitutional exercise of authority by the Executive

Branch" and "vulnerable to the same legal and constitutional challenges that the courts

recognized with respect to the DAPA program." *See* Dkt. 14-2, Tab 2, United States Department

of Justice, Attorney General Sessions Delivers Remarks on DACA, (Sept. 5, 2017),

https://www.justice.gov/opa/speech/ attorney-general-sessions-delivers-remarks-daca. The

United States has cited that position in all of the cases challenging the rescission of DACA listed

above. *See* Dkt. 14-2, Tab 4, Defs.' Notice of Mot. and Mot. to Dismiss all S.D. Cal. DACA

Cases, Mem. in Supp. at 39, *Regents of Univ. of Cal., et al. v. U.S. Dep't of Homeland Sec., et

al.*, No. 3:17-cv-05211 (N.D. Cal. Nov. 1, 2017); Dkt. 14-2, Tab 5, Defs.' Mot. to Dismiss or, in

the Alternative, for Summ. J. at 31, *The Trustees of Princeton Univ., et al. v. United States, et al.*,

No. 1:17-cv-02325 (D.D.C. Nov. 22, 2017) (citing "[t]he Attorney General's determination that

DACA was unconstitutional"); Dkt. 14-2, Tab 7, Defs.' Mem. of Law in Opp'n to Pls.' Mot. for

a Prelim. Inj. at 15, *Batalla Vidal, et al. v. Nielsen, et al*., No. 1:16-cv-04756 (E.D.N.Y. Jan. 13,

2018) (citing "the Attorney General's recommendation to rescind DACA, which explained that

because DACA 'has the same legal and constitutional defects that the courts recognized as to

DAPA, it is likely that potentially imminent litigation would yield similar results'").

New Jersey's interests are also not protected by the MALDEF Defendant-Intervenors. As

set forth in § I.B., New Jersey seeks intervention to protect its unique proprietary, sovereign, and

quasi-sovereign interests. Specific proprietary interests include securing qualified employees at

state institutions, protecting the State's public colleges and universities, and protecting the state

treasury from harm. Quasi-sovereign and sovereign interests include preventing family

separation, maintaining public health, and enforcing the State's criminal laws. These interests are

not, and could not, be fully represented by the Defendants or the MALDEF Defendant-

Intervenors. Thus, no current party adequately represents New Jersey's interests in this litigation,

and all factors favor granting intervention as of right.

## II.     ALTERNATIVELY, THIS COURT SHOULD GRANT NEW JERSEY PERMISSIVE INTERVENTION.

Alternatively, this Court should grant New Jersey permissive intervention under Federal

Rule of Civil Procedure 24(b)(1)(B). This rule authorizes permissive intervention on a timely

motion, where the applicant "has a claim or defense that shares with the main action a common

question of law or fact" and where intervention will not delay or prejudice adjudication of the

existing parties' rights. Fed. R. Civ. P. 24(b)(1)(B), (b)(3); *see United States v. League of United

Latin Am. Citizens*, 793 F.2d 636, 644 (5th Cir. 1986) ("Although the court erred in granting

intervention as of right, it might have granted permissive intervention under Rule 24(b) because

the intervenors raise common questions of law and fact . . . .").

Here, as discussed above, the motion is timely. *See supra*, § I.A. Second, as a defendant,

New Jersey would address the identical questions of law raised in this case by the Plaintiffs: the

legality of DACA and the question of whether the State Plaintiffs are entitled to a preliminary

injunction. As to questions of fact, New Jersey would include essential additional facts for the

Court to consider in the balancing of the equities necessary for a preliminary injunction and an

ultimate adjudication on the merits. For example, in addition to seeking to protect the interests of

its residents—both DACA grantees and those who benefit from the participation of DACA

grantees in multiple layers of our communities—New Jersey also seeks to vindicate its unique interests in its state agencies and institutions, economy, and tax base. Also, intervention will not delay or prejudice the proceeding in any way.

Rule 24 does not "require prospective intervenors to wait on the sidelines until after a court has already decided enough issues contrary to their interests." *Brumfield*, 749 F.3d at 344–45. Instead, "[t]he very purpose of intervention is to allow interested parties to air their views so that a court may consider them before making potentially adverse decisions." *Id.* New Jersey has amply established the extensive harm to itself and its residents that could flow from an adverse judgment or ruling in this action. Thus, New Jersey requests this Court grant permissive intervention if it does not grant intervention as of right.

## CONCLUSION

Granting intervention will cause no prejudice to the existing parties and would allow New Jersey to defend its interests in this litigation. Therefore, New Jersey asks this Court to grant its motion to intervene.

Dated May 22, 2018                    Respectfully submitted,

                                      GURBIR S. GREWAL
                                      ATTORNEY GENERAL OF NEW JERSEY

                          By:    /s/Rachel Wainer Apter
                                 Assistant Attorney General
                                 (application for pro hac vice admission pending)
                                 Attorney-in-Charge
                                 Kenneth S. Levine
                                 Deputy Attorney General
                                 (application for pro hac vice admission pending)
                                 Paul H. Juzdan
                                 Deputy Attorney General
                                 (application for pro hac vice admission pending)
                                 Richard J. Hughes Justice Complex
                                 25 Market Street, 8th Floor
                                 Trenton, New Jersey 08625-0116
                                 Phone: (609) 376-2702
                                 Fax: (609) 777-4015
                                 Rachel.Apter@njoag.gov

                                 Attorneys for Proposed Defendant-Intervenor

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, on the 22nd day of May, 2018, I caused the

foregoing documents to be served by overnight mail on lead counsel of record, and a courtesy

copy by email on counsel of record, as follows:

### Documents

Motion for Leave to Intervene, and exhibits thereto.

### Lead Counsel of Record: Overnight Mail

| | |
|---|---|
| Todd Lawrence Disher<br>Office of the Attorney General of Texas<br>209 W 14th St<br>8th Floor<br>Austin, TX 78701<br>*Lead counsel for Plaintiff States* | Jeffrey S Robins<br>U.S. Department of Justice<br>Office of Immigration Litigation<br>450 5th Street, N.W.<br>Washington, DC 20001<br>*Lead counsel for Defendants* |
| Nina Perales<br>MALDEF<br>110 Broadway<br>Ste 300<br>San Antonio, TX 78205<br>*Lead counsel for Defendant-Intervenors* | |

### Counsel of Record: Email

| *For Plaintiff States* | *For Defendants* |
|---|---|
| Todd Lawrence Disher<br>Email: todd.disher@oag.texas.gov<br><br>Adam Arthur Biggs<br>Email: adam.biggs@oag.texas.gov<br><br>Brantley Starr<br>Email: brantley.starr@texasattorneygeneral.gov | Jeffrey S Robins<br>Email: jeffrey.robins@usdoj.gov<br><br>Brett A Shumate<br>Email: brett.a.shumate@usdoj.gov<br><br>Daniel David Hu<br>Email: daniel.hu@usdoj.gov |
| *For Defendant-Intervenors*<br><br>Nina Perales<br>Email: nperales@maldef.org | |

| | |
|---|---|
| Alejandra Avila<br>Email: aavila@maldef.org<br><br>Carlos Moctezuma Garcia<br>Email: cgarcia@garciagarcialaw.com<br><br>Celina Ysela Moreno<br>Email: cmoreno@maldef.org<br><br>John Paul Salmon<br>Email: jsalmon@maldef.org | |

*/s/ Rachel Wainer Apter*
Rachel Wainer Apter