**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

**DEFENDANT-INTERVENORS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS WITHOUT PREJUDICE OR, IN THE ALTERNATIVE, TO
TRANSFER OR STAY PROCEEDINGS**

## <u>TABLE OF CONTENTS</u>

I.    STATEMENT OF THE ISSUES TO BE RULED UPON
      BY THE COURT .................................................................................................1

II.   STATEMENT OF THE NATURE AND STAGE OF THE
      PROCEEDINGS ...............................................................................................2

      A.    DHS Rescinded the 2012 DACA Memorandum on
            September 5, 2017, and Various Plaintiffs Filed a
            Lawsuit Challenging That Decision in California
            Three Days After ...............................................................................2

      B.    The California Case Addresses the Legality of the
            2012 DACA Memorandum ...................................................................3

      C.    Approximately Eight Months After Judge Alsup
            Issued a Nationwide Injunction, Plaintiffs Filed
            This Lawsuit Challenging the Legality of the
            2012 DACA Memorandum and Seeking a Nationwide
            Injunction Directly at Odds with Judge Alsup's
            Preliminary Injunction ......................................................................7

III.  SUMMARY OF ARGUMENT ..........................................................................7

IV.   DISCUSSION .....................................................................................................8

      A.    This Case Substantially Overlaps with the District
            Court Proceeding in the U.S. District Court for the
            Northern District of California and, Therefore,
            Defendant-Intervenors Request That the Court
            Decline Jurisdiction in the Interest of Comity and
            Sound Judicial Administration ...........................................................8

      B.    Uniformity Considerations Peculiar to the Immigration
            Context Support Application of the First-To File Rule
            in This Case ......................................................................................11

      C.    The Injunctive Relief Plaintiffs Seek in This Case is
            Directly at Odds with the Nationwide Injunction
            Entered by the District Court for the Northern District
            of California Against DHS and Would Significantly
            Impair Judge Alsup's Continuing Jurisdiction .................................12

      D.    Declining to Entertain Jurisdiction is Appropriate
            in This Case ......................................................................................13

V.      CONCLUSION...................................................................................................14

CERTIFICATE OF SERVICE ..................................................................................15

# <u>TABLE OF AUTHORITIES</u>

CASES

*Bergh v. State of Wash.*,
    535 F.2d 505 (9th Cir. 1976) .................................................. 13

*Brittingham v. U.S. C. I. R.*,
    451 F.2d 315 (5th Cir. 1971) .................................................. 9

*Cadle Co. v. Whataburger of Alice, Inc.*,
    174 F.3d 599 (5th Cir. 1999) .................................................. 8, 11

*Common Cause v. Judicial Ethics Comm.*,
    473 F. Supp. 1251 (D.D.C. 1979) .......................................... 13

*Davis v. Hartford Ins. Co. of Midwest*,
    No. CIV.A. 09-5852, 2009 WL 3347090 (E.D. La. Oct. 14, 2009) ........................................ 14

*Dxp Enterprises, Inc. v. Hill*,
    No. 4:15-CV-3471, 2016 WL 4159756 (S.D. Tex. Aug. 3, 2016) ........................................... 9

*Feller v. Brock*,
    802 F.2d 722 (4th Cir. 1986) .................................................. 10

*Gateway Mortg. Grp., L.L.C. v. Lehman Bros. Holdings, Inc.*,
    694 F. App'x 225 (5th Cir. 2017) .......................................... 13

*Gregory-Portland Indep. Sch. Dist. v. Texas Ed. Agency*,
    576 F.2d 81 (5th Cir. 1978) .................................................. 12, 13, 14

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) .................................. *passim*

*Save Power Ltd. v. Syntek Fin. Corp.*,
    121 F.3d 947 (5th Cir. 1997) .................................................. 8, 9

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .................................................. 11

*W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. & Gulf Coast Dist. of ILA, AFL-CIO*,
    751 F.2d 721 (5th Cir. 1985) .................................................. 1, 11, 13

*Zambrana v. Califano*,
    651 F.2d 842 (2d Cir. 1981)................................................... 13

Statutes

28 U.S.C. § 2201(a) ................................................................................................................... 11

## I.    STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT

Defendant-Intervenors respectfully submit this memorandum of law in support of their Motion to Dismiss Without Prejudice or, in the Alternative, to Transfer or Stay Proceedings.  As more fully set forth below, Defendant-Intervenors request that the Court decline to exercise jurisdiction over this case under the first-to-file rule.  *See W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. & Gulf Coast Dist. of ILA, AFL-CIO*, 751 F.2d 721, 728-30 (5th Cir. 1985) (first-to-file rule is a discretionary doctrine that rests on principles of comity and sound judicial administration).  Plaintiffs filed this action approximately eight months after separate plaintiffs filed a case that is currently pending before U.S. District Judge William Alsup of the U.S. District Court for the Northern District of California.  The California case involves the same core issue of the legality of the 2012 Deferred Action for Childhood Arrivals ("DACA") memorandum.  The parties in that California proceeding, including Defendants, are actively litigating the legality of DACA.  Judge Alsup has entered a nationwide injunction temporarily preserving DACA, based in part on his conclusion that DACA is a lawful exercise of Executive authority.  Plaintiffs in this case filed an amicus brief in the California case arguing that DACA is unlawful.  Plaintiffs' participation in the California case as amici curiae further demonstrates the centrality of the question of DACA's legality in the California proceeding.  Plaintiffs now seek to litigate the legality of DACA in this case, approximately five months after Judge Alsup issued his preliminary injunction.  Defendant-Intervenors respectfully request that the Court dismiss this case without prejudice pursuant to the first-to-file rule or, in the alternative, transfer the case to Judge Alsup or stay these proceedings pending resolution of the California case.[1]

---

[1] Defendant-Intervenors reserve the right to raise before the Court additional arguments for dismissal under Rule 12 if the Court denies this motion.

## II.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

### A.     DHS Rescinded the 2012 DACA Memorandum on September 5, 2017, and Various Plaintiffs Filed a Lawsuit Challenging That Decision in California Three Days Later

On September 4, 2017, United States Attorney General Jeff Sessions sent a letter to the Department of Homeland Security ("DHS") advising the agency that the 2012 DACA memorandum "was effectuated . . . without proper statutory authority" and "[s]uch an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch."[2]   On September 5, 2017, DHS issued a memorandum rescinding the 2012 DACA memorandum, noting the legal determination by the Attorney General as a basis for DHS' decision (the "Rescission Memorandum").[3]

Three days later, on September 8, 2017, a group of plaintiffs filed a lawsuit against DHS in the U.S. District Court for the Northern District of California, challenging the Rescission Memorandum.  *See* Compl., *Regents of Univ. of Cal., et al. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Sept. 8, 2017) (Exhibit 3).   Similar challenges to the rescission of DACA were later brought in New York, Maryland, and Washington, D.C.  *See* Compl., *Trs. of Princeton Univ. et al. v. U.S.*, No. 1:17-cv-2325 (D.D.C. Nov. 3, 2017), ECF No. 1 (Exhibit 4); Sec. Am. Compl., *Vidal et al. v. Nielsen*, No. 1:16-cv-4756 (E.D.N.Y. Sept. 19, 2017), ECF No. 60 (Exhibit 5); Compl., *Casa de Md., et al. v. U.S. Dep't of Homeland Sec., et al*., No. 8:17-cv-02942 (D. Md. Oct. 5, 2017), ECF No.1 (Exhibit 6).[4]

---

[2] *See* Letter from Attorney General Jeff Sessions to DHS Acting Secretary Duke, DEP'T OF HOMELAND SEC. (Sept. 4, 2017), https://www.dhs.gov/sites/default/files/publications/17_0904_DOJ_AG-letter-DACA.pdf (Exhibit 1).
[3] *See* Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA), DEP'T OF HOMELAND SEC. (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca (Exhibit 2).
[4] In the proceeding in the U.S. District Court for the Eastern District of New York the plaintiff raised the legality of the 2012 DACA memorandum for the first time in his amended complaint on September 19, 2016, after the California proceeding had been filed.  *See* Am. Compl., *Vidal et al. v. Nielsen*, No. 1:16-cv-4756 (E.D.N.Y. Sept. 19, 2017), ECF No. 60 (Exhibit 5).

The plaintiffs in the California case raised a number of statutory and constitutional claims. Relevant to this motion, the plaintiffs alleged that the Rescission Memorandum violated the Administrative Procedure Act ("APA") because the decision was "arbitrary and capricious, an abuse of discretion, and not in accordance with law because, among other things, [it] was based on the legally incorrect premise that [the 2012] DACA [memorandum] is unlawful." *See* Exhibit 3 ¶ 56.  The plaintiffs also requested that the court enjoin DHS from "implementing or enforcing the Rescission [Memorandum] and from taking any other action to rescind DACA that is not in compliance with applicable law." *Id.* at 16.[5]

**B.      The California Case Addresses the Legality of the 2012 DACA Memorandum**

The California case was assigned to U.S. District Judge William Alsup, who, on January 9, 2018, granted the plaintiffs' request for a preliminary injunction.  *See Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018).  In his decision, Judge Alsup found that the California case presents the question whether DHS' basis for issuing the Rescission Memorandum "was a mistake of law."  *Id*. at 1026.  Judge Alsup entered a nationwide injunction requiring DHS to continue renewing DACA applications pending resolution of the case.  *Id.* at 1048-49 ("For the foregoing reasons, defendants are hereby ordered and enjoined, pending final judgment herein or other order, to maintain the DACA program on a nationwide basis. . . [T]his order finds a nationwide injunction is appropriate.").

The parties in the California case, including the United States, plaintiff states, and plaintiff institutions, have actively litigated the issues for approximately eight months.  DHS petitioned the Supreme Court for certiorari, and the case is currently pending in the Ninth Circuit, which most recently heard oral argument on May 15, 2018.  *See* Pet. for a Writ of Cert.

---

[5] Plaintiffs in the other cases make similar claims under the APA and request similar injunctive relief.  *See* Exhibit 4 at 31, 41; Exhibit 5 at 31, 35; Exhibit 6 at 54-55, 60.

Before J., *U.S. Dep't of Homeland Sec., et al. v. Regents of the Univ. of Cal., et al*., No. 17-1003 (U.S. Jan. 18, 2018) (Exhibit 7); Arg. Recording, No. 18-15068 *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.* (9th Cir. May 15, 2018), https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000013676 (hereinafter "Audio of 9th Cir. Oral Argument").

At all stages of the California case, the legality of the 2012 DACA memorandum has been at the center of the parties' briefing and oral arguments. *See, e.g.*, Pls.' Mot. for Provisional Relief, Memo. in Supp. at 22, *Regents of Univ. of Cal., et al. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Nov. 11, 2017), ECF No. 111 (Exhibit 8) ("To the extent the Rescission [Memorandum] depends on a conclusion that DACA was illegal, that conclusion is wrong:  DACA was a lawful exercise of DHS's enforcement discretion. And if, contrary to the Attorney General's letter, DACA is legal, then the Rescission [Memorandum] must be set aside."); Audio of 9th Cir. Oral Argument at 0:29:55-30:18 ("the key feature of this case is that Defendants based their decision to terminate this important program on the asserted legal conclusion that DACA is unlawful, and this Court can and should review that conclusion under the APA and hold that we are likely to succeed on our claim because it is inadequately explained and is incorrect."); *id*. at 0:44:44-55 ("The government's rescission of DACA was based on an incorrect conclusion of law and it is the quintessential role of the courts to review those conclusions of law and make sure that agencies are abiding by the law."); *id*. at 0:39:22-23 (DACA "is a lawful program.").

DHS has briefed and argued the legality of the 2012 DACA memorandum at length, both before the district court and on appeal. *See, e.g.,* Defs.' Memo. in Opp'n to Pls.' Mot. for Provisional Relief at 17-18, *Regents of Univ. of Cal., et al. v. U.S. Dep't of Homeland Sec.*, No.

3:17-cv-05211 (N.D. Cal. Nov. 22, 2017), ECF No. 204 (Exhibit 9) ("the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's [DAPA] decision in *Texas.*"); Pet. for a Writ of Cert. Before J. at 12, *U.S. Dep't of Homeland Sec., et al. v. Regents of the Univ. of Cal., et al.*, No. 17-1003 (U.S. Jan. 18, 2018) (Exhibit 7) ("The district court has entered a nationwide injunction that requires DHS to keep in place a policy of non-enforcement that no one contends is required by federal law and that DHS has determined is, in fact, unlawful and should be discontinued."); *id*. at 31 ("The Acting Secretary's decision is independently supported by her reasonable conclusion, informed by the Attorney General's advice, that indefinitely continuing the DACA policy would itself have been unlawful."); Audio of 9th Cir. Oral Argument at 0:16:40-56 ("It is the government's position that DACA exceeds the scope of permissible prosecutorial discretion, that a policy of such sweeping magnitude and such categorical nature for the rationale given is not a permissible exercise of enforcement discretion"); *id*. at 17:18-32 ("taking into consideration the Attorney General's opinion that [DACA] is unlawful and the fact that the Texas litigation had struck down similar policies, [DHS determined it] should get rid of DACA. That is a quintessential exercise of enforcement discretion" that is unreviewable); *id*. at 0:26:55-27:27 ("the DACA policy does not consider costs at all . . . if [the California plaintiffs'] view of arbitrary and capricious analysis were correct, and the agency has some sort of a sua sponte obligation to consider all these things, then that's yet another reason why DACA is illegal.").[6]

---

[6] Indeed, the United States has referenced and relied upon the Attorney General's statement that DACA is unconstitutional in all four cases challenging the Rescission Memorandum.  *See* Defs.' Notice of Mot. and Mot. to Dismiss All N.D. Cal. DACA Cases, Mem. in Supp. at 26, *Regents of Univ. of Cal., et al. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Nov. 1, 2017) (Exhibit 10) (referencing "the Attorney General's views regarding the legality of DACA"); Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. at 20, *The Trs. of Princeton Univ., et al. v. U.S., et al.*, No. 1:17-cv-02325 (D.D.C. Nov. 22, 2017) (Exhibit 11) (referencing "[t]he Attorney General's determination that DACA was unconstitutional"); Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. at 35, *Casa de Md., et al. v. U.S. Dep't of Homeland Sec., et al.*, No. 8:17-cv-02942 (D. Md. Nov. 15, 2017) (Exhibit 12) ("Here, the Attorney General regarded DACA as unconstitutional in part because it was an

Judge Alsup held that the plaintiffs were likely to succeed on the merits of their claim that the Rescission Memorandum was arbitrary and capricious and an abuse of discretion because the Rescission Memorandum "was based on the flawed legal premise that the agency lacked authority to implement DACA" and "DACA fell within the agency's enforcement authority.  The contrary conclusion was flawed and should be set aside."  *See Regents of Univ. of Cal.,* 279 F. Supp. 3d at 1037 (internal citation and quotation marks omitted).

Plaintiffs here specifically sought to participate in the California case in order to present arguments on the legality of DACA.  Plaintiffs filed an amicus brief before the Supreme Court in January 2018, arguing that the 2012 DACA memorandum is unlawful.  *See* Br. for the States of Tex., Ala., Ariz., Ark., Fla., Kan., La., Neb., S.C., S.D., and W. Va., Governor Phil Bryant of the State of Miss., and Paul R. Lepage, Governor of Me., as Amici Curiae in Supp. of Pet's at 15-22, *U.S. Dep't of Homeland Sec., et al. v. Regents of the Univ. of Cal., et al.*, No. 17-1003 (U.S. Jan. 2018) (Exhibit 14) ("DACA is unlawful . . . The scant grounds on which the district court relied to conclude that DACA is lawful do not withstand scrutiny . . . DACA is substantively unlawful for the same reasons that the Fifth Circuit held Expanded DACA and DAPA unlawful . . . DACA is also procedurally unlawful . . . because DACA was a substantive rule that had to go through APA notice-and-comment procedure.").  Plaintiffs' arguments in the California case mirror the arguments raised before this Court and further demonstrate that the legality of the 2012 DACA memorandum lies at the center of the California case.

---

'open-ended' policy that closely tracked 'proposed legislation' that Congress had repeatedly rejected"); Mem. of Law in Opp'n to Pls.' Mot. for a Prelim. Inj. at 6, *Batalla Vidal, et al. v. Kirstjen M. Nielsen, et al.*, No. 1:16-cv-04756 (E.D.N.Y. Jan. 13, 2018) (Exhibit 13) (referencing "the Attorney General's recommendation to rescind DACA, which explained that because DACA 'has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results.'").

### C.   Approximately Eight Months After Judge Alsup Issued a Nationwide Injunction, Plaintiffs Filed This Lawsuit Challenging the Legality of the 2012 DACA Memorandum and Seeking a Nationwide Injunction Directly at Odds with Judge Alsup's Preliminary Injunction

Although the Ninth Circuit is currently considering arguments regarding DACA's legality as part of the challenge to the Rescission Memorandum, and almost five months after Judge Alsup entered his nationwide injunction, Plaintiffs filed this action in the U.S. District Court for the Southern District of Texas advancing their same arguments against the legality of the 2012 DACA memorandum and seeking a nationwide injunction "enjoining [DHS] from issuing or renewing any DACA permits in the future"—*i.e.*, an injunction directly at odds with Judge Alsup's order.   Dkt. No. 1 at 73; *see also* Dkt. No. 5 at 15 ("the Court should promptly grant a preliminary injunction that prevents the federal government from implementing the 2012 DACA memo by issuing or renewing DACA permits."); *id*. ("Under the injunction sought here . . . Defendants will be enjoined from implementing the 2012 memorandum that created DACA[.]"); *id*. at 18 (requesting injunction on the basis that "DACA is unlawful").[7]

## III.   SUMMARY OF ARGUMENT

Pursuant to the well-established first-to-file rule, Defendant-Intervenors request that the Court decline jurisdiction in this case because this case substantially overlaps with the California case.   Plaintiffs here argue that the 2012 DACA memorandum is a violation of the APA and is unconstitutional.   The legality of the 2012 DACA memorandum has been a core issue litigated

---

[7] Contrary to the instructions on the civil action cover sheet that only "pending" cases should be related, Plaintiffs marked their complaint as related to *Texas v. United States*, 1:14-cv-00254 (S.D. Tex. 2017).  *See* Civil Cover Sheet: Instructions for Attorneys Completing Civil Cover Sheet Form JS 44 at Section VIII, http://www.uscourts.gov/sites/default/files/js_044_1.pdf ("Related Cases. This section of the JS 44 is used to reference related *pending cases*, if any. If there are related *pending cases*, insert the docket numbers and the corresponding judge names for such cases.") (emphasis added).  *Texas v. United States*, 1:14-cv-00254 (S.D. Tex.), was dismissed on September 12, 2017.  *See Texas v. United States*, 1:14-cv-00254, Dkt. 473 (Plaintiffs' Stipulation of Voluntary Dismissal).

by the parties before Judge Alsup, and he has ruled on this issue and entered a nationwide injunction. In addition, Defendant-Intervenors request that the Court decline jurisdiction because Plaintiffs seek injunctive relief that is directly at odds with the nationwide injunction entered by Judge Alsup approximately five months ago. Plaintiffs' requested relief would impair Judge Alsup's continuing jurisdiction and subject DHS to inconsistent obligations.

## IV.   DISCUSSION

### A.   This Case Substantially Overlaps with the District Court Proceeding in the U.S. District Court for the Northern District of California and, Therefore, Defendant-Intervenors Request That the Court Decline Jurisdiction in the Interest of Comity and Sound Judicial Administration

Under well-established principles of comity and sound judicial administration, courts decline to entertain lawsuits that substantially overlap with well-developed proceedings before sister courts, particularly when the initial courts enter nationwide injunctions contrary to the relief sought in the second case. "Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999) (citations omitted). The first-to-file rule, a discretionary doctrine reviewed for abuse of discretion, "rests on principles of comity and sound judicial administration. The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Id*. "This concern applies where related cases are pending before two judges in the same district . . . as well as where related cases have been filed in different districts." *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997) (citations omitted).

8

The "substantial overlap" test does not "require that cases be identical." *Id.* A "substantial overlap" exists when one or more of the issues in both proceedings is "closely related" and "the core issue" is the same. *See, e.g.*, *West Gulf Mar. Ass'n*, 751 F.2d at 730 (where first and second lawsuit involved "closely related issues" and the "core issue" was the same, holding that "the district court should have dismissed or stayed the action or should have transferred it to the United States District Court for the Southern District of New York"); *Save Power Ltd.*, 121 F.3d at 951-52 (where second lawsuit involved a determination of whether entity A was a senior lender, reversing second court and holding that even though the first-filed court did not decide the issue of whether entity A was a senior lender, the two lawsuits were sufficiently related because they centered on whether entity B could proceed with foreclosure, and a "component issue" involved a determination of whether entity A was a senior lender).

The nature and number of claims raised in the two proceedings need not be identical. *See, e.g.*, *West Gulf Mar. Ass'n*, 751 F.2d at 724, 728-29 (applying first-to-file rule even though additional claims were raised in the second-filed lawsuit); *Dxp Enterprises, Inc. v. Hill*, No. 4:15-CV-3471, 2016 WL 4159756, at *3 (S.D. Tex. Aug. 3, 2016) (same). Similarly, "complete identity of parties" is not required, *i.e.*, the first- and second-filed cases do not need to involve identical parties (or even successor-in-interest parties) for the doctrine to apply. *See Save Power Ltd.*, 121 F.3d at 951 (holding that "[c]omplete identity of parties is not required for dismissal or transfer of a case filed subsequently to a substantially related action" and applying first-to-file rule where counter-claimant in second-filed action was not a party in the first-filed action or an active participant in preliminary injunction hearing in the first-filed action); *Brittingham v. U.S. C. I. R.*, 451 F.2d 315, 316 (5th Cir. 1971) (applying first-to-file rule where plaintiff in second-

filed action was not a party in the first-filed action); *see also Feller v. Brock*, 802 F.2d 722, 728–29 (4th Cir. 1986) (collecting cases).

Here, application of the first-to-file rule is warranted because the legality of the 2012 DACA memorandum is a core issue in the California case.  The United States is defending that lawsuit and its decision to phase out DACA on the grounds that DACA is unlawful.  In the California case, parties are actively litigating the legality of the 2012 DACA memorandum because it is a component issue in the plaintiffs' substantive APA claim.  *See, e.g.*, Exhibit 3 ¶ 56; Exhibit 8 at 22.  Judge Alsup has entered a nationwide preliminary injunction ordering DHS to "maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017."  *See Regents of Univ. of Cal.*, 279 F. Supp. 3d at 1048-49.  In connection with that injunction, he found that the plaintiffs are likely to succeed on the merits of their claim that the Rescission Memorandum was arbitrary and capricious because the 2012 DACA memorandum was lawful and "fell within [DHS's] enforcement authority."  *Id.* at 1037.

Indeed, in their amicus brief before the Supreme Court in the California case, Plaintiffs recognized that Judge Alsup ruled on the legality of DACA and argued that DACA was unlawful.  *See* Exhibit 14 at 15-22 ("DACA is unlawful . . . The scant grounds on which the district court relied to conclude that DACA is lawful do not withstand scrutiny . . . DACA is substantively unlawful for the same reasons that the Fifth Circuit held Expanded DACA and DAPA unlawful . . . DACA is also procedurally unlawful . . . because DACA was a substantive rule that had to go through APA notice-and-comment procedure.").  Plaintiffs now seek to re-litigate in this Court the issues decided by the California court in order to upset an injunction the Supreme Court has let stand.  Although Plaintiffs ask this Court to declare that DACA is

10

unlawful and enjoin its implementation, the issue of the 2012 DACA memorandum's legality is properly before the U.S. District Court for the Northern District of California, the Ninth Circuit, and the Supreme Court through the California case.  In the interest of comity and sound judicial administration, Defendant-Intervenors request that this Court decline to entertain jurisdiction under the first-to-file rule.[8]

### B.    Uniformity Considerations Peculiar to the Immigration Context Support Application of the First-To-File Rule in This Case

This case presents special uniformity considerations that support application of the first-to-file rule.  As noted above, "[t]he concern [of the first-to-file rule] manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result."  *Cadle Co.*, 174 F.3d at 603 (citations omitted); *see also W. Gulf Mar. Ass'n*, 751 F.2d at 731 (reversing second-court that entered injunction where injunction by Texas court "made more likely the piecemeal resolution of a difficult issue" and "[t]he district court in New York was in a position to render a unitary decision").

As the Fifth Circuit held in support of its nationwide injunction of DAPA, "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and *uniformly*'" and "the Supreme Court has described immigration policy as 'a comprehensive and *unified* system.'"  *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015) (emphasis in original) (internal citations omitted).  Indeed, Judge Alsup gave strong consideration to the need to have a "uniform application of immigration law and policy" when he issued his nationwide

---

[8] Even if the Court were to find that the California case does not substantially overlap with this case, the proceeding in the U.S. District Court for the District of Columbia substantially overlaps with this case because the plaintiffs in that case seek a declaration that the 2012 DACA memorandum is lawful.  *See* Exhibit 4 at 41 ("Plaintiffs . . . respectfully request that judgment be entered against the Defendants, and that this Court . . . [d]eclare pursuant to 28 U.S.C. § 2201(a) that the DACA program is lawful and constitutional.")

injunction.  *See Regents of Univ. of Cal.*, 279 F. Supp. 3d at 1049 ("[T]his order finds a nationwide injunction is appropriate.  Our country has a strong interest in the uniform application of immigration law and policy.  Plaintiffs have established injury that reaches beyond the geographical bounds of the Northern District of California.  The problem affects every state and territory of the United States.").  Based on these considerations, the principles of comity and sound judicial administration on which the first-to-file rule is grounded are of particular import here.

### C.   The Injunctive Relief Plaintiffs Seek in This Case is Directly at Odds with the Nationwide Injunction Entered by the District Court for the Northern District of California Against DHS and Would Significantly Impair Judge Alsup's Continuing Jurisdiction

Aside from the question whether a substantial overlap exists, Defendant-Intervenors ask the Court to decline jurisdiction on the grounds that a sister court has entered an injunction contrary to the relief that Plaintiffs seek in this case.

It is well-established that "a district court should defer jurisdiction to another district court if the integrity of that court's continuing injunction jurisdiction is compromised."  *See Gregory-Portland Indep. Sch. Dist. v. Texas Ed. Agency*, 576 F.2d 81, 82 (5th Cir. 1978).  In *Gregory-Portland Indep. Sch. Dist.*, a Texas district court issued an injunction ordering the Texas Education Agency to refuse to fund and accredit schools discriminating on the basis of race.  *Id*. at 82.  A school district subsequently sued the agency in a different district court, arguing that the agency violated its due process rights by terminating its accreditation and seeking an injunction ordering the agency to resume accreditation.  *Id*.  The judge in the second proceeding granted the injunction, and the United States moved to intervene in the second proceeding and challenged the jurisdiction of the district court in the second proceeding.  *Id*.  The Fifth Circuit held that the district court in the second proceeding should have declined

12

jurisdiction and either dismissed or transferred the case to the first court because the second proceeding "seriously interfered with the power of [the first court] to maintain the integrity" of its injunction, and the new, constitutional challenges in second proceeding could be made in the first suit. *Id.* at 83.

As in *Gregory-Portland Indep. Sch. Dist.*, deference to the U.S. District Court for the Northern District of California is warranted here, since the injunctive relief that Plaintiffs seek (1) is directly at odds with Judge Alsup's order, (2) would significantly impair his jurisdiction, and (3) would impose contrary obligations on DHS. *See also Common Cause v. Judicial Ethics Comm.*, 473 F. Supp. 1251, 1253 (D.D.C. 1979) ("the interests of comity mandate respect for the holding of a sister court when a de novo review has the potential effect of subjecting one party to conflicting orders from two courts of comparable jurisdiction and authority."); *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981) (holding that "principles of comity and judicial economy make courts reluctant to exercise jurisdiction over claims involving the orders of coordinate courts" and affirming dismissal of second-filed action); *Bergh v. State of Wash.*, 535 F.2d 505, 507 (9th Cir. 1976), *cert. denied*, 429 U.S. 921 (1976) ("When an injunction sought in one federal proceeding would interfere with another federal proceeding, considerations of comity require more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases.").

### D.     Declining to Entertain Jurisdiction is Appropriate in This Case

This Court may dismiss the case without prejudice or, in the alternative, transfer the case to Judge Alsup, or stay the proceedings until a final resolution is reached in the California case. *See Gateway Mortg. Grp., L.L.C. v. Lehman Bros. Holdings, Inc.*, 694 F. App'x 225, 227 (5th Cir. 2017) (per curiam) (unpublished) (Exhibit 15) (dismissal without prejudice was not abuse of

discretion); *Davis v. Hartford Ins. Co. of Midwest*, No. CIV. A. 09-5852, 2009 WL 3347090, at *2 (E.D. La. Oct. 14, 2009) (dismissing without prejudice).  Indeed, the Fifth Circuit typically reverses when a district court fails to dismiss or transfer a case that substantially overlaps with a case before a sister court or that entertains injunctive relief contrary to relief entered by a sister court.  *See, e.g., W. Gulf Mar. Ass'n,* 751 F.2d at 732 (holding that it was an abuse of discretion to decline jurisdiction and vacating injunction of second-filed court and remanding for entry of order to stay, transfer, or dismiss); *Gregory-Portland Indep. Sch. Dist.*, 576 F.2d at 83 (dissolving injunction of second court and remanding with instruction to transfer to first court or dismiss).

Dismissal without prejudice is warranted here so that Plaintiffs may re-file this action in the U.S. District Court for the Northern District of California.  In the alternative, the Court should decline jurisdiction and either transfer the case to Judge Alsup or stay the proceedings pending resolution of the California case.

## V.   CONCLUSION

For the foregoing reasons, Defendant-Intervenors respectfully request that this Court grant their motion and dismiss the case without prejudice or, in the alternative, transfer the case to U.S. District Judge William Alsup of the U.S. District Court for the Northern District of California, or stay the proceedings pending resolution of the California case.

Dated: May 29, 2018                          Respectfully submitted,

                                             **MEXICAN AMERICAN LEGAL**
                                             **DEFENSE AND EDUCATIONAL FUND**

                                             By:  */s/ Nina Perales*
                                             Nina Perales (Tex. Bar No. 24005046);
                                             (SD of Tex. Bar No. 21127)

Attorney-in-Charge
Celina Moreno (Tex. Bar No. 24074754)
(SD of Tex. Bar No. 2867694)
Jack Salmon (Tex. Bar No. 24068914)
(SD of Texas Bar No. 1130532)
Alejandra Ávila (Tex. Bar No. 24089252)
(SD of Tex. Bar No. 2677912)
110 Broadway, Suite 300
San Antonio, Texas 78205
Phone:  (210) 224-5476
Facsimile:  (210) 224-5382
Email: nperales@maldef.org


**GARCÍA & GARCÍA,**
**ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

Attorneys for Defendant-
Intervenors

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, hereby certify that, on the 29th day of May, 2018, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

_/s/ Nina Perales_____
Nina Perales

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ *et al*., | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

**APPENDIX**

Pursuant to the Court's Civil Procedures, rule 7(a), Defendant-Intervenors Karla Perez, Maria Rocha, Jose Magaña-Salgado, Nanci J. Palacios Godinez, Elly Marisol Estrada, Karina Ruiz De Diaz, Carlos Aguilar Gonzalez, Karla Lopez, Luis A. Rafael, Darwin Velasquez, Jin Park, Oscar Alvarez, Nancy Adossi, Denise Romero, Pratishtha Khanna, Jung Woo Kim, Angel Silva, Moses Kamau Chege, Hyo-Won Jeon, Elizabeth Diaz, Maria Diaz, and Blanca Gonzalez hereby provide the Court with copies of the following authorities cited in support of the their Motion to Dismiss Without Prejudice or, in the Alternative, to Transfer or Stay Proceedings:

| EXH. NO. | AUTHORITY |
|---|---|
| **1.** | Letter from Attorney General Jeff Sessions to DHS Acting Secretary Duke, DEP'T OF HOMELAND SEC. (Sept. 4, 2017) |
| **2.** | Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA), DEP'T OF HOMELAND SEC. (Sept. 5, 2017) |

| 3. | Compl., *Regents of Univ. of Cal., et al. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Sept. 8, 2017) |
|---|---|
| 4. | Compl., *Trs. of Princeton Univ. et al. v. U.S.*, No. 1:17-cv-2325 (D.D.C. Nov. 3, 2017) |
| 5. | Sec. Am. Compl., *Vidal et al. v. Nielsen*, No. 1:16-cv-4756 (E.D.N.Y. Sept. 19, 2017) |
| 6. | Compl., *Casa de Md., et al. v. U.S. Dep't of Homeland Sec., et al.*, No. 8:17-cv-02942 (D. Md. Oct. 5, 2017) |
| 7. | Pet. for a Writ of Cert. Before J., *U.S. Dep't of Homeland Sec., et al. v. Regents of the Univ. of Cal., et al.*, No. 17-1003 (U.S. Jan. 18, 2018) |
| 8. | Pls.' Mot. for Provisional Relief, Memo. in Supp., *Regents of Univ. of Cal., et al. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Nov. 11, 2017) |
| 9. | Defs.' Memo. in Opp'n to Pls.' Mot. for Provisional Relief, *Regents of Univ. of Cal., et al. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Nov. 22, 2017) |
| 10. | Defs.' Notice of Mot. and Mot. to Dismiss All N.D. Cal. DACA Cases, Mem. in Supp., *Regents of Univ. of Cal., et al. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Nov. 1, 2017) |
| 11. | Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J., *Trs. of Princeton Univ., et al. v. U.S.*, et al., No. 1:17-cv-02325 (D.D.C. Nov. 22, 2017) |
| 12. | Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J., *Casa de Md., et al. v. U.S. Dep't of Homeland Sec., et al.*, No. 8:17-cv-02942 (D. Md. Nov. 15, 2017) |
| 13. | Mem. of Law in Opp'n to Pls.' Mot. for a Prelim. Inj., *Batalla Vidal, et al. v. Kirstjen M. Nielsen, et al.*, No. 1:16-cv-04756 (E.D.N.Y. Jan. 13, 2018) |
| 14. | Br. for the States of Tex., Ala., Ariz., Ark., Fla., Kan., La., Neb., S.C., S.D., and W. Va., Governor Phil Bryant of the State of Miss., and Paul R. Lepage, Governor of Me., as Amici Curiae in Supp. of Pet's, *U.S. Dep't of Homeland Sec., et al. v. Regents of the Univ. of Cal., et al.*, No. 17-1003 (U.S. Jan. 2018) |
| 15. | *Gateway Mortgage Group, L.L.C. v. Lehman Brothers*, 694 F. App'x. 225 (5th Cir. 2017) (per curiam) (unpublished) |

Dated: May 29, 2018

Respectfully submitted,

**MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND**
By: */s/ Nina Perales*
Nina Perales (Tex. Bar No. 24005046);
(SD of Tex. Bar No. 21127)
Attorney-in-Charge
Celina Moreno (Tex. Bar No. 24074754)
(SD of Tex. Bar No. 2867694)
Jack Salmon (Tex. Bar No. 24068914)
(SD of Texas Bar No. 1130532)
Alejandra Ávila (Tex. Bar No. 24089252)
(SD of Tex. Bar No. 2677912)

110 Broadway, Suite 300
San Antonio, Texas 78205
Phone:  (210) 224-5476
Facsimile:  (210) 224-5382
Email: nperales@maldef.org

**GARCÍA & GARCÍA,**
**ATTORNEYS AT LAW P.L.L.C.**
Carlos Moctezuma García
(Tex. Bar No. 24065265)
(SD of Tex. Bar No. 1081768)
P.O. Box 4545
McAllen, TX 78502
Phone: (956) 630-3889
Facsimile: (956) 630-3899
Email: cgarcia@garciagarcialaw.com

Attorneys for Defendant-Intervenors

<u>**CERTIFICATE OF SERVICE**</u>

I, the undersigned, hereby certify that, on the 29th day of May, 2018, I electronically filed the above and foregoing document using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

/s/ *Nina Perales*
Nina Perales

# EXHIBIT 1



# Office of the Attorney General
## Washington, D. C. 20530

Dear Acting Secretary Duke,

I write to advise that the Department of Homeland Security (DHS) should rescind the June 15, 2012, DHS Memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," as well as any related memoranda or guidance. This policy, known as "Deferred Action for Childhood Arrivals" (DACA), allows certain individuals who are without lawful status in the United States to request and receive a renewable, two-year presumptive reprieve from removal, and other benefits such as work authorization and participation in the Social Security program.

DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch. The related Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) policy was enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote. *See Texas v. United States*, 86 F. Supp. 3d 591, 669-70 (S.D. Tex.), *aff'd*, 809 F.3d 134, 171-86 (5th Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271 (2016). Then-Secretary of Homeland Security John Kelly rescinded the DAPA policy in June. Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA.

In light of the costs and burdens that will be imposed on DHS associated with rescinding this policy, DHS should consider an orderly and efficient wind-down process.

As Attorney General of the United States, I have a duty to defend the Constitution and to faithfully execute the laws passed by Congress. Proper enforcement of our immigration laws is, as President Trump consistently said, critical to the national interest and to the restoration of the rule of law in our country. The Department of Justice stands ready to assist and to continue to support DHS in these important efforts.

Sincerely,

Jefferson B. Sessions III

# EXHIBIT 2

Case 1:18-cv-00068    Document 52-3    Filed in TXSD on 05/29/18    Page 2 of 8

Official website of the Department of Homeland Security



☰ Menu  **U.S. Department of Homeland Security**

## Archived Content

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:**  September 5, 2017

**MEMORANDUM FOR:**

James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Joseph B. Maher
Acting General Counsel

Ambassador James D. Nealon
Assistant Secretary, International Engagement

Julie M. Kirchner
Citizenship and Immigration Services Ombudsman

**FROM:**

Elaine C. Duke
Acting Secretary

**SUBJECT:**

**Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," which established the program known as Deferred Action for Childhood Arrivals ("DACA"). For the reasons and in the manner outlined below, Department of Homeland Security personnel shall take all appropriate actions to execute a wind-down of the program, consistent with the parameters established in this memorandum.

## Background

The Department of Homeland Security established DACA through the issuance of a memorandum on June 15, 2012. The program purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis—to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law.[1] (#_ftn1) Specifically, DACA provided certain illegal aliens who entered the United States before the age of sixteen a period of deferred action and eligibility to request employment authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things—such as

the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization from two years to three—the November 20, 2014 memorandum directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide.[2] (#_ftn2) The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied the other requirements for a preliminary injunction.[3] (#_ftn3) The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." According to the court, "DAPA is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly enjoined."

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary,[4] (#_ftn4) and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4).[5] (#_ftn5) The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing DACA,[6] (#_ftn6) and the November 20, 2014 memorandum establishing DAPA and expanding DACA.[7] (#_ftn7)

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of

immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

## Rescission of the June 15, 2012 DACA Memorandum

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by the Department as of the date of this memorandum.

- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.

- Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this

memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.

- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.

- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.

- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.

- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.

- Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

---

[1] (#_ftnref1) Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

Case 1:18-cv-00068    Document 52-3    Filed in TXSD on 05/29/18    Page 8 of 8

[2] (#_ftnref2) *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] (#_ftnref3) *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

[4] (#_ftnref4) *Id.*

[5] (#_ftnref5) *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

[6] (#_ftnref6) Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] (#_ftnref7) Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

Topics:  Border Security (/topics/border-security) , Deferred Action (/topics/deferred-action)

Keywords:  DACA (/keywords/daca) , Deferred Action for Childhood Arrivals (/keywords/deferred-action-childhood-arrivals)

Last Published Date: September 5, 2017

# EXHIBIT 3

| | |
|---|---|
| Jeffrey M. Davidson (Bar No. 248620) | Charles F. Robinson (Bar No. 113197) |
| Alan Bersin (Bar No. 63874) | Margaret Wu (Bar No. 184167) |
| COVINGTON & BURLING LLP | Julia Friedlander (Bar No. 165767) |
| One Front Street, 35th Floor | Sonya Sanchez (Bar No. 247541) |
| San Francisco, CA 94111-5356 | Norman Hamill (Bar No. 154272) |
| Telephone: + 1 (415) 591-6000 | Harpreet Chahal (Bar No. 233268) |
| Facsimile: + 1 (415) 591-6091 | Michael Troncoso (Bar No. 221180) |
| Email: jdavidson@cov.com, | University of California |
| abersin@cov.com | Office of the General Counsel |
| | 1111 Franklin Street, 8th Floor |
| Lanny A. Breuer | Oakland, CA 94607-5200 |
| Mark H. Lynch | Telephone: + 1 (510) 987-9800 |
| Alexander A. Berengaut | Facsimile: + 1 (510) 987-9757 |
| Megan A. Crowley | Email: charles.robinson@ucop.edu |
| Ashley Anguas Nyquist | |
| Ivano M. Ventresca | |
| (*pro hac vice* applications forthcoming) | |
| COVINGTON & BURLING LLP | |
| One CityCenter | |
| 850 Tenth Street, NW | |
| Washington, DC 20001-4956 | |
| Telephone: + 1 (202) 662-6000 | |
| Facsimile: +1 (202) 662-6291 | |
| E-mail: lbreuer@cov.com, mlynch@cov.com, | |
| aberengaut@cov.com, mcrowley@cov.com, | |
| anyquist@cov.com, iventresca@cov.com | |

Attorneys for Plaintiffs
THE REGENTS OF THE UNIVERSITY
OF CALIFORNIA and JANET NAPOLITANO,
in her official capacity as President of the
University of California

[*Additional Counsel Listed on Next Page*]

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, *in her official capacity as President of the University of California*, | Civil Case No.: |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, *in her official capacity as Acting Secretary of the Department of Homeland Security*, | |
| Defendants. | |

# ADDITIONAL COUNSEL OF RECORD

Mónica Ramírez Almadani (Bar No. 234893)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: + 1 (424) 332-4800
Facsimile: + (424) 332-4749
Email: mralmadani@cov.com

Erika Douglas (Bar No. 314531)
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94061-1418
Telephone: + 1 (650) 632-4700
Facsimile: + 1 (650) 632-4800
Email: edouglas@cov.com


Attorneys for Plaintiffs THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET
NAPOLITANO, in her official capacity as President of the University of California

Plaintiffs The Regents of the University of California ("UC" or "the University"), on its own behalf and on behalf of all students currently enrolled at the University, and Janet Napolitano, in her official capacity as President of the University of California (together "Plaintiffs"), bring this action for declaratory and injunctive relief against the Department of Homeland Security ("DHS") and Acting Secretary of Homeland Security, Elaine Duke (together, "Defendants"), and allege as follows:

## INTRODUCTION

1.    This lawsuit, brought under the Due Process Clause of the Fifth Amendment to the United States Constitution and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, challenges Defendants' unlawful decision to rescind the Deferred Action for Childhood Arrivals ("DACA") program, which protected from deportation nearly 800,000 individuals brought to this country as children, known as Dreamers.  Under DACA, the Dreamers, who came to the United States through no choice of their own, who have clean records, and who have lived continuously in the United States since 2007, were permitted to live, work, and study in this country without fear of deportation.  The United States, and the University, have benefited enormously from the presence of the Dreamers, accomplished young men and women who are our students, and colleagues, and neighbors.  They are Americans, a fact that Defendants' precipitous decision cannot change.

2.    As a result of Defendants' actions, the Dreamers face expulsion from the only country that they call home, based on nothing more than unreasoned executive whim.  The University faces the loss of vital members of its community, students and employees.  It is hard to imagine a decision less reasoned, more damaging, or undertaken with less care.  As explained below, Defendants' capricious rescission of the DACA program violates both the procedural and substantive requirements of the APA, as well as the Due Process Clause of the Fifth Amendment.  Accordingly, Defendants' unconstitutional, unjust, and unlawful action must be set aside.

3.    On June 15, 2012, former Secretary of Homeland Security Janet Napolitano announced that individuals who arrived in the United States as children and met certain criteria, and who otherwise satisfied DHS's exercise of discretion, could apply for deferred action for two-year periods, subject to renewal.  *See* Memorandum from Janet Napolitano, Sec'y of Homeland Security, to Alejandro Mayorkas, Director, U.S. Citizenship and Immigration Servs. et al., Exercising Prosecutorial Discretion

1

With Respect to Individuals Who Came to the United States as Children (June 15, 2012) ("DACA Memorandum"). DACA allowed these individuals to live, study, and work in the United States without fear that they could be arrested and deported at any time. Because of the program, DACA recipients were able to pursue opportunities in higher education, to more readily obtain driver's licenses and access lines of credit, to obtain jobs and access to certain Social Security and Medicare benefits, and to contribute to their communities and American society in countless ways.

4. The University directly benefited from the DACA program, in its capacities as educator and employer. UC has approximately 4,000 undocumented students, a substantial number of whom are DACA recipients. Many of its staff members are also DACA recipients. These individuals make important contributions to University life, expanding the intellectual vitality of the school, filling crucial roles as medical residents, research assistants, and student government leaders, and increasing the diversity of the community.

5. Over the past five years, DACA recipients have structured their lives—and the University has made significant investments—on the government's express assurances that if they self-identified, registered with federal law enforcement agencies, and passed an extensive background investigation, they would be shielded from deportation and allowed to work in the United States for renewable two-year periods. Yet despite the substantial and well-founded reliance that these individuals and the University placed in the continuation of the DACA program, on September 5, 2017, Defendants suddenly and unilaterally rescinded it. *See* Ex. A, Memorandum on Rescission Of Deferred Action For Childhood Arrivals (Sept. 5, 2017) (hereinafter the "Rescission").

6. The Rescission, which renders DACA recipients once more subject to deportation, has profound consequences for the University and its students. As a result of Defendants' actions, DACA recipients face the loss of their livelihood, education, and country. The University and all of its students will lose the contributions of valued colleagues and employees. The University also will lose intellectual capital and productivity, as DACA recipients are deprived of the work authorizations needed to serve in the professional roles in which both they and the University have so heavily invested.

7. In the Rescission, Defendants offered no reasoned basis for their cancellation of DACA, instead merely pointing to the purported illegality of another program known as Deferred Action for

Parents of Americans and Lawful Permanent Residents ("DAPA"), and stating that in light of the Fifth Circuit's conclusion that DAPA is unlawful, "it is clear that [DACA] should be terminated." As explained below, rescinding DACA on this specious basis was procedurally and substantively invalid under the APA and violated the Due Process Clause of the Fifth Amendment.

8. Agency action is invalid under the APA if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if it is taken "without observance of procedure required by law." 5 U.S.C. § 706(2). To survive judicial review under the APA, an agency must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In determining whether an agency has complied with this requirement, a court must conduct a "thorough, probing, in-depth review" of the agency's reasoning and a "searching and careful" inquiry into the factual underpinnings of the agency's decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971). Here, in multiple respects, Defendants failed to "articulate a satisfactory explanation" for their action that would enable a court to conclude that the decision was "the product of reasoned decisionmaking." *State Farm*, 463 U.S. at 52.

9. As an initial matter, Defendants' reliance on the purported illegality of DAPA is an entirely insufficient basis on which to terminate DACA. DAPA is a separate program from DACA. The two programs were governed by different sets of rules, applied to different individuals, and conferred different benefits. Therefore, the alleged illegality of DAPA does not justify the rescission of DACA, and Defendants' failure to recognize the many differences between the programs renders their decision unreasonable.

10. Because the Rescission is based on an incorrect legal premise—the purported illegality of DACA—it cannot survive judicial review under the APA. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) (holding that action was unlawful under the APA because agency based its decision on incorrect legal conclusion); *Safe Air For Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007) ("Because that flawed premise is fundamental to EPA's determination . . . EPA's outcome on those statutory interpretation questions is arbitrary, capricious, or otherwise not in accordance with law.").

11.     Despite Defendants' conclusory assertion that DACA "has the same legal and constitutional defects" as DAPA, no court has held that DACA is unlawful.  Instead, DHS has previously concluded that programs like DACA are a lawful exercise of the Executive Branch's broad statutory authority to administer and enforce the Immigration and Nationality Act, 8 U.S.C. § 1101, *et seq.  See* Brief for Petitioners, *United States v. Texas*, 2016 WL 836758 (2016) (No. 15-674).  Similarly, the Department of Justice's Office of Legal Counsel ("OLC")—whose legal advice is binding on the Executive Branch—provided a thoughtful and nuanced analysis of DAPA in 2014, concluding that DAPA, as well as DACA, was a lawful exercise of the Executive Branch's prosecutorial discretion. Dep't of Homeland Sec.'s Auth. to Prioritize Removal of Certain Aliens Unlawfully Present in the United States & to Defer Removal of Others, 2014 WL 10788677 (O.L.C. Nov. 19, 2014).

12.     The Rescission fails to acknowledge—let alone explain—the government's departure from its own prior interpretations of the law.  Indeed, DHS vigorously defended the legality of DAPA in the Supreme Court less than two years ago.  *See* Brief for Petitioners, *supra*.  Yet in making the unfounded assertion that DACA is illegal for the same reasons that DAPA is illegal, Defendants neither addressed the compelling arguments set forth in DHS's own brief before the Supreme Court and in OLC's 2014 Opinion, nor offered a reasonable explanation for why their current view of the law is superior to the view they and OLC previously espoused.  Those failures, standing alone, are enough to render their decision unlawful under the APA.

13.     Defendants compound the irrationality of their decision by failing to acknowledge the profound reliance interests implicated by DACA and the hundreds of thousands of individuals, employers, and universities who will be substantially harmed by the termination of the program.  The Supreme Court has emphasized that the presence of serious reliance interests requires an agency to proffer a "more substantial justification" than otherwise would be required when the agency changes course.  *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015); *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009).  Here, Defendants entirely failed to comply with that directive.

14.     Defendants did not analyze the actual costs and benefits of allowing DACA recipients to live and work in this country, nor did they acknowledge the manifold benefits that have resulted from the program or the harm that institutions like the University—as well as its students—would suffer as a

result of the Rescission.  By failing to consider these factors and the interests at stake, Defendants have failed to satisfy the APA's requirement of reasoned decision-making.

15.     The Rescission also should be set aside because it is procedurally invalid.  By prohibiting DHS from granting advance parole or renewing recipients' DACA status after October 5, 2017, the Rescission circumscribes DHS's discretion and therefore constitutes a substantive rule.  *See W.C. v. Bowen*, 807 F.2d 1502, 1505 (9th Cir. 1987), *opinion amended on denial of reh'g*, 819 F.2d 237 (9th Cir. 1987) ("Rules which substantially limit an agency's discretion are generally substantive rules."). Additionally, in contrast to the case-by-case assessment of individual applicants provided under DACA, the Rescission is a categorical rule, which applies to all DACA recipients.  This too underscores the substantive nature of the Rescission, which is subject to the full range of the APA's rulemaking requirements, including the notice-and-comment requirement of 5 U.S.C. § 553.  *See Paulsen v. Daniels*, 413 F.3d 999, 1003-04 (9th Cir. 2005) (holding that Bureau of Prisons "plainly violated the APA" by promulgating a rule that barred category of prisoners from relief without notice).  Defendants' failure to abide by these mandatory procedural requirements renders their action unlawful.

16.     Finally, in rescinding DACA, Defendants violated the Due Process Clause of the United States Constitution by failing to provide the University with any process before depriving it of the value of the public resources it invested in DACA recipients, and the benefits flowing from DACA recipients' contributions to the University.  More fundamentally, they failed to provide DACA recipients with any process before depriving them of their work authorizations and DACA status, and the benefits that flow from that status.

### THE PARTIES

17.     Plaintiff The Regents of the University of California is a California public corporation, authorized and empowered to administer a public trust known as the University of California, pursuant to Article IX, Section 9, subdivisions (a) and (f) of the California Constitution.  Its principal place of business is in Oakland, Alameda County, California.  The University brings this complaint on behalf of itself and on behalf of all students currently enrolled at the University.  Approximately 4,000 undocumented students are enrolled at the University, a substantial number of whom are DACA recipients.  Some of these recipients are also employed by the University.

18. Plaintiff Janet Napolitano is a resident of California. She brings this complaint in her official capacity as President of the University of California.

19. Defendant DHS is a federal cabinet agency responsible for implementing and enforcing the Immigration and Nationality Act ("INA"). DHS is a Department of the Executive Branch of the United States Government and an agency within the meaning of 5 U.S.C. § 551(1). DHS, as well as its component agencies U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"), have responsibility for, among other things, administering and enforcing the nation's immigration laws and policies, including the DACA program.

20. Defendant Elaine Duke is the Acting Secretary of DHS and, in the absence of a Secretary, is the senior official of DHS. She is sued in her official capacity. Acting Secretary Duke issued the Rescission on September 5, 2017.

## JURISDICTION

21. This action arises under the Due Process Clause of the Fifth Amendment, U.S. Const. amend. V; and the APA, 5 U.S.C. § 550 *et seq*. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, and 2201–2202.

22. There exists an actual and justiciable controversy between Plaintiffs and Defendants requiring resolution by this Court. Plaintiffs have no adequate remedy at law.

## VENUE

23. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e), because this is a civil action in which Defendants are an agency, or officers of an agency, of the United States, because a substantial part of the events or omissions giving rise to this action occurred in the District, and, further, because Plaintiffs reside in this District and no real property is involved in the action.

## INTRADISTRICT ASSIGNMENT

24. Pursuant to Local Rule 3-2(c), intradistrict assignment is proper in San Francisco or Oakland because a substantial part of the events or omissions which give rise to the claim occurred in the County of Alameda.

**BACKGROUND**

### A. The DACA Program

25.     On June 15, 2012, the Secretary of Homeland Security Janet Napolitano announced that individuals who arrived in the United States as children and met certain criteria could apply for deferred action for two-year periods, subject to renewal.  *See* DACA Memorandum.  In establishing the program, the Secretary elected to extend deferred action to "certain young people who were brought to this country as children and know only this country as home."  *Id.*  The Secretary emphasized that federal immigration laws are "not designed . . . to remove productive young people to countries where they may not have lived or even speak the language.  Indeed, many of these young people have already contributed to our country in significant ways."  *Id.*  This program is known as Deferred Action for Childhood Arrivals ("DACA").

26.     Individuals were eligible for the program if they (1) came to the United States when they were under the age of sixteen; (2) continuously resided in the United States since June 15, 2007, and were present in the United States on June 15, 2012, and on the date they requested DACA; (3) were currently in school, had graduated from high school, had obtained a general education development certificate, or were an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (4) had not been convicted of a felony, a significant misdemeanor, or three or more other misdemeanors, and otherwise did not pose a threat to national security or public safety; (5) did not have lawful immigration status on June 15, 2012; and (6) were under the age of 31 as of June 15, 2012.  *See id.*; *see also* Ex. B, U.S. Citizenship & Immigration Servs.: Consideration of Deferred Action for Childhood Arrivals Process (Aug. 26, 2017) (hereinafter "USCIS FAQs").  Individuals who met these criteria were then eligible for an exercise of prosecutorial discretion, following an individualized review of their applications.  *See* DACA Memorandum.

27.     When they applied for admission to the program, DACA recipients were required to disclose sensitive, personal information to Defendants, including their lack of lawful immigration status as of June 15, 2012, their date of initial entry into the United States, their country of birth, their current and previous mailing addresses, and other contact information.  *See* USCIS Form I-821D; USCIS Form I-821D Instructions.

28.     Continuing their longstanding practice with respect to deferred-action applications, Defendants repeatedly promised DACA applicants that the information they submitted as part of their applications would not be used for civil immigration enforcement purposes against DACA applicants or their families.  *See* USCIS FAQs; Form I-821D Instructions.  Because only individuals who might be subject to removal proceedings would apply for DACA, this promise was necessary for individuals to submit applications without fear that the Executive Branch was using DACA as a way to find and remove undocumented immigrants.

29.     Individuals who received deferred action under DACA were not subject to removal for a period of two years, subject to renewal.  *See* DACA Memorandum.

30.     DACA recipients also were eligible for work authorizations that allowed them to work legally in the United States, pursuant to a long-standing federal regulation.  *See id.*; 8 C.F.R. § 274a.12(c)(14) (providing that "an alien who has been granted deferred action" may obtain work authorization upon demonstrating economic necessity); USCIS FAQs ("Under existing regulations, an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate 'an economic necessity for employment.'").  An individual's work authorization expires at the same time as his or her DACA status and could be renewed upon a renewal of DACA status.

31.     Individuals with DACA status were "not considered to be unlawfully present during the period in which deferred action [was] in effect."  USCIS FAQs.

32.     Since the program was first introduced in 2012, nearly 800,000 individuals received DACA status.  This includes an estimated 242,339 residents of the State of California.  *See* Number of I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake, Biometrics and Case Status: 2012-2017 (Mar. 31, 2017); Carolyn Jones, California Colleges Undaunted by Trump's Decision to Phase out DACA, EDSOURCE (Sept. 1, 2017), https://edsource.org/2017/california-colleges-undaunted-by-trumps-threat-to-end-daca/586746.

### B.     *The Many Benefits of DACA*

33.     As noted above, DACA recipients have contributed in innumerable ways to the intellectual and social fabric of the University.

34.     As an institution whose core mission is serving the interests of the State of California, the University seeks "to achieve diversity among its student bodies and among its employees." *See* Academic Senate of the Univ. of Cal., *Regents Policy 4400: Policy of University of California Diversity Statement*, UNIV. OF CAL.: BOARD OF REGENTS, http://regents.universityofcalifornia.edu/governance/policies/4400.html.  The University recognizes the importance of diversity to its academic mission, as it allows "students and faculty [to] learn to interact effectively with each other, preparing them to participate in an increasingly complex and pluralistic society." *Id.*  The educational experience of all University students is fuller and more enriching when ideas are "born and nurtured in a diverse community." *Id.*  DACA students at the University are an integral part of that community.  Their talent, perspectives, and experiences are invaluable contributions to University life.

35.     DACA recipients also make significant contributions to University life in their role as employees.  They work at UC campuses and in UC medical centers as teaching assistants, research assistants, post-docs, and health care providers.  DACA recipients often possess valuable foreign language skills.  By allowing DACA recipients to work lawfully, DACA moved recipients out of the informal economy, increasing the pool of talent from which UC could fill positions at the University.

36.     Additional DACA recipients who are enrolled as students support themselves and cover a portion of their tuition through their part-time work for the University.  For many of these students, DACA work authorization plays a significant role in their ability to attend UC and continue each year with their chosen program of study.

37.     The University has invested considerable resources in recruiting and retaining these individuals—as students and employees.  It has made scarce enrollment space available to these students on the basis of their individual achievements.  It also has invested substantial time, financial aid, research dollars, housing benefits, and other resources in them on the expectation that these students will complete their course of study and become productive members of the communities in which the University operates, and other communities throughout the nation.  The University has significant interests in retaining this wealth of talent and in continuing to enjoy the many benefits of their participation in University life.

38.     Furthermore, by allowing recipients to receive deferred action and obtain work authorization, DACA opened myriad opportunities to them.  As noted above, DACA recipients became eligible for federal work authorization, which significantly improved their opportunities for employment and higher paying jobs.  Under the program, DACA recipients received social security numbers and therefore were able to access credit more easily.  DACA also enabled recipients to obtain driver's licenses in a number of states where they otherwise could not.  It also protected these individuals' right to travel freely by making them eligible to receive "advance parole," which allowed them to travel abroad temporarily for humanitarian, educational, or employment purposes, and to return to the United States lawfully.  *See* 8 C.F.R. § 212.5(f); USCIS FAQs.

### C.     *Defendants Unlawfully Rescind DACA*

39.     As recently as February 20, 2017, Defendants had reaffirmed the administration's commitment to DACA, *see* Memorandum from John Kelly, Sec'y of Homeland Security, Enforcement of the Immigration Laws to Serve the National Interest, at 2 (Feb. 20 2017), and up until September 5, 2017, Defendants had continued to approve DACA requests and renewals.  Despite President Trump's claim that DACA recipients "shouldn't be very worried" and that the Administration would treat DACA recipients "with great heart," on September 5, 2017, Defendants announced that they were rescinding the program.  *See* Transcript: ABC News anchor David Muir interviews President Trump, ABC NEWS (Jan. 25, 2017) http://abcnews.go.com/Politics/transcript-abc-news-anchor-david-muir-interviews-president/story?id=45047602; *see also* Madeline Conway, Trump Tells Dreamers To "Rest Easy," Politico.com (Apr. 21, 2017), http://www.politico.com/story/2017/04/21/trump-dreamers-rest-easy-immigration-237463.

40.     Defendants announced their decision on the same day as a "deadline" imposed by ten states that threatened to sue the Trump administration if DACA were not rescinded.  *See* Letter from Gov. Abbott to U.S. Att'y General Sessions (June 29, 2017).  The Rescission expressly states that this threat—rather than any reasoned evaluation of the legality and merits of the program—provoked the decision to terminate DACA.

41.     Prior to DHS's issuance of the Rescission, Attorney General Jeff Sessions held a press conference in which he asserted that "[o]ur collective wisdom is that the policy is vulnerable to the same

---

10

legal and constitutional challenges that the courts recognized with respect to the DAPA program." *See* Ex. C, Attorney General Sessions Delivers Remarks On DACA (Sept. 5, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca ("Press Conference"). Similarly, a September 4, 2017 letter from the Attorney General to Acting Secretary of DHS Duke reiterated that DACA "was effectuated . . . without proper statutory authority" and "was an unconstitutional exercise of authority by the Executive Branch." *See* Ex. D, Letter from Att'y General Sessions to Acting Sec'y of DHS Duke (Sept. 4, 2017). The Attorney General also noted the potential of litigation from several states and that DACA was "likely" to be enjoined in that yet-to-be-filed litigation.

42.     In addition, in his press conference Attorney General Sessions alleged, without offering any evidence, that DACA had "denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." He also made the specious claim that DACA "contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences." *See* Press Conference. That claim is facially false. DACA by its terms applies only to individuals resident in the United States since June 15, 2007—five years before the program began.

43.     After the press conference, Acting Secretary of Homeland Security Duke, purporting to act "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," formally rescinded the DACA Memorandum. The Rescission states that "it is clear" that DACA "should be terminated" in light of the Fifth Circuit's ruling in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), regarding DAPA, the Supreme Court's non-precedential affirmance of that ruling by an equally divided court, and the Attorney General's September 4 letter.

44.     The President, however, does not appear to share the views of DHS or his Attorney General regarding the legality of DACA. In direct contradiction to Defendants' and Attorney General Sessions' position that the prior administration had exceeded the authority of the Executive Branch in establishing DACA, *see* Ex. A and Press Conference, the President tweeted on the night of the Rescission, "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!" *See* Donald J. Trump (@realDonaldTrump), Twitter (Sep. 5, 2017, 8:38 PM), https://twitter.com/realDonaldTrump/status/905228667336499200.

45.     Although the Rescission concludes that DACA is unlawful, it does not immediately revoke any individual's DACA status or work authorization.  Instead, it instructs that "the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications."  Specifically, the Rescission explains that DHS will adjudicate pending DACA requests and associated work authorization applications that already had been accepted by the agency as of September 5, 2017, but will reject new requests and applications filed after September 5, 2017.  It further states that DHS will adjudicate pending renewal requests and applications from current DACA recipients, as well as renewal requests and applications from current DACA recipients for grants of deferred action that expire between September 5, 2017, and March 5, 2018, and that are accepted by the agency as of October 5, 2017.  Any renewal requests filed after October 5, 2017, or any renewal requests for benefits that expire after March 5, 2018, will be rejected.  DHS will not terminate the current grants of deferred action to DACA recipients, but instead will allow individuals' DACA status to expire.  DHS will not approve any new applications for advance parole and will administratively close all pending applications for advance parole.  *See* Ex. A at 4-5.

46.     Defendants' decision to rescind the program will have immense and devastating effects on the University and all of its students.  As a result of the termination of the program, the University and its students will lose the vital contributions that DACA recipients have made as students and employees.  *See Washington v. Trump*, 847 F.3d 1151, 1160 (9th Cir. 2017) ("[S]chools have been permitted to assert the rights of their students.").  The civic life of the school will be diminished, the exchange of ideas will be reduced, teaching and research will be impaired, and diversity will be more difficult to achieve.  The University and its students benefit from cohesive family units, robust civic participation, and the strength of social and educational communities.  The Rescission damages each of these interests, in California and nationwide.

47.     Moreover, UC students and employees have friends or family members who are DACA recipients, and the University will have to expend resources to address the detrimental effects that the rescission of DACA will have on these individuals' lives.  The University also will lose the resources it has spent educating students who ultimately do not graduate.

48.     As a result of the Rescission, DACA students will be unable to plan for the future, apply for and obtain internships and certain financial aid and scholarships, study abroad, or work to pay their tuition and other expenses.  Students subject to these hardships may choose to withdraw from UC altogether.

49.     DACA recipients also will be at risk of removal.  Indeed, in a set of "Talking Points" released the same day of the Rescission, DHS "urge[d] DACA recipients to use the time remaining on their work authorizations to prepare for and arrange their departure from the United States."  *See* Talking Points—DACA Rescission.  Removal will self-evidently result in the loss of employment, education, and relationships with others in the United States.

**FIRST CLAIM FOR RELIEF**
**Agency Action That Is Arbitrary and Capricious,**
**An Abuse of Discretion, and Otherwise Not In Accordance with Law**
**in Violation of 5 U.S.C. § 706(2)(A)**

50.     The above paragraphs are incorporated herein by reference.

51.     DHS is an agency subject to the requirements of the APA.  5 U.S.C. § 701(b)(1).

52.     Under 5 U.S.C. § 706(2), courts shall hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations; or without observance of procedure required by law.

53.     The Rescission constitutes final agency action that is reviewable by this Court.

54.     The Rescission and actions taken by Defendants to rescind DACA are arbitrary and capricious, an abuse of discretion, and not in accordance with law because, among other things, Defendants failed to articulate a reasonable explanation for their actions.  In assessing Defendants' actions under the arbitrary-and-capricious standard, a court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (citation omitted). Here, Defendants have not considered the relevant factors in deciding to revoke DACA.  They also have failed to consider important aspects of the issue, including the arguments previously set forth by OLC and DHS as to why DACA is lawful.

13

55.     Defendants also disregarded the serious reliance interests engendered by the DACA program.  Where, as here, significant reliance interests are at stake, Defendants must, in addition to demonstrating that "there are good reasons" for the new policy, offer "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Fox*, 556 U.S. at 515.  Defendants here have utterly failed in these obligations.

56.     The Rescission and actions taken by Defendants to rescind DACA are arbitrary and capricious, an abuse of discretion, and not in accordance with law because, among other things, they are based on the legally incorrect premise that DACA is unlawful.

57.     The Rescission and actions taken by Defendants to rescind DACA are arbitrary and capricious, an abuse of discretion, and not in accordance with law because, among other things, they are contrary to the constitutional protections of the Fifth Amendment.

58.     The University and its students were harmed and continue to be harmed by these unlawful acts.

### SECOND CLAIM FOR RELIEF
### Agency Action Without Observance of Procedure Required by Law
### in Violation of 5 U.S.C. § 706(2)(D)

59.     The above paragraphs are incorporated herein by reference.

60.     The APA requires administrative agencies to follow notice-and-comment rulemaking procedures to promulgate substantive rules.  *See* 5 U.S.C. § 553.  The APA defines "rule" broadly to include:

> the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages . . . .

5 U.S.C. § 551(4).

61.     The Rescission constitutes a substantive rule subject to APA's notice-and-comment requirements.

62.     The Rescission constitutes a substantive rule because it affirmatively circumscribes DHS's statutory authority in providing deferred action and prohibits DHS from renewing recipients' DACA status after October 5, 2017.

63.     The Rescission constitutes a substantive rule because it includes a ban on current DACA recipients with work authorizations travelling on advance parole.

64.     The Rescission constitutes a substantive rule because it is a categorical rule, which applies to all DACA recipients.

65.     In issuing the Rescission and rescinding DACA, Defendants impermissibly announced a new rule without undertaking notice-and-comment rulemaking.

66.     The University and its students were harmed and continue to be harmed by these unlawful acts.

**THIRD CLAIM FOR RELIEF**
**Violation of Procedural Due Process**
**Under the Fifth Amendment**

67.     The above paragraphs are incorporated herein by reference.

68.     Under the Fifth Amendment to the Constitution, no person may be deprived of life, liberty, or property without due process of law.

69.     The University has constitutionally-protected interests in the multiple educational benefits that flow from a diverse student body.  Thousands of DACA students have earned prized places as undergraduate and graduate students at the University of California through their record of high—even extraordinary—personal achievement in high school and college.  In reliance on DACA, the University has chosen to make scarce enrollment space available to these students and to invest in them substantial time, financial aid, research dollars, housing benefits, and other resources, on the expectation that these students will complete their course of study and become productive members of the communities in which the University operates, and other communities throughout the nation.  If these students leave the University before completing their education, UC will lose the benefits it derives from their contributions, as well as the value of the time and money it invested in these students with the expectation that they would be allowed to graduate and apply their talents in the United States job market.

70.     UC students who are DACA recipients also have constitutionally-protected interests in their DACA status and the benefits that come from that status, including the ability to work, to pursue

15

opportunities in higher education, to more readily obtain driver's licenses and access lines of credit, to obtain jobs, and to access certain Social Security and Medicare benefits.

71.     The Rescission and actions taken by Defendants to rescind DACA unlawfully deprive the University and its students of these and other constitutionally-protected interests without due process of law.  Such deprivation occurred with no notice or opportunity to be heard.

72.     Defendants therefore have violated the Fifth Amendment to the United States Constitution.

73.     The University and its students were harmed and continue to be harmed by these unlawful acts.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

A.     Vacate and set aside the Rescission and any other action taken by Defendants to rescind DACA;

B.     Declare that the Rescission and actions taken by Defendants to rescind DACA are void and without legal force or effect;

C.     Declare that the Rescission and actions taken by Defendants to rescind DACA are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law in violation of 5 U.S.C. §§ 702-706;

D.     Declare that the Rescission and actions taken by Defendants to rescind DACA are in violation of the Constitution and contrary to the laws of the United States;

E.     Preliminarily and permanently enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the Rescission and from taking any other action to rescind DACA that is not in compliance with applicable law;

F.     Grant such further relief as this Court deems just and proper.

DATED: September 8, 2017

COVINGTON & BURLING LLP

By: _____

Jeffrey M. Davidson (Bar No. 248620)
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: + 1 (415) 591-6000
Facsimile: + 1 (415) 591-6091
Email: jdavidson@cov.com

Attorneys for Plaintiffs THE REGENTS OF THE
UNIVERSITY OF CALIFORNIA and JANET
NAPOLITANO, in her official capacity as
President of the University of California

# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE TRUSTEES OF PRINCETON UNIVERSITY <br> Princeton, New Jersey 08544 <br><br> MICROSOFT CORPORATION <br> One Microsoft Way <br> Redmond, WA 98052 <br><br> MARIA DE LA CRUZ PERALES SANCHEZ, <br> Princeton, New Jersey 08544 <br><br>     Plaintiffs, <br><br>     v. <br><br> UNITED STATES OF AMERICA, <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY, <br> 650 Massachusetts Avenue, NW <br> Washington, DC 20001 <br><br> and <br><br> ELAINE C. DUKE, *in her official capacity as Acting Secretary of the Department of Homeland Security*, <br> 650 Massachusetts Avenue, NW <br> Washington, DC 20001 <br><br>     Defendants. | Civil Action No. _____ <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## COMPLAINT

Plaintiff The Trustees of Princeton University ("Princeton" or "the University")—suing on its own behalf and on behalf of its students—Plaintiff Microsoft Corporation ("Microsoft"), and Plaintiff Maria De La Cruz Perales Sanchez ("Perales Sanchez") (collectively, "Plaintiffs") bring this action for declaratory and injunctive relief against Defendants the United States of America; the U.S. Department of Homeland Security ("DHS"); and Elaine C. Duke, in her official capacity as Acting Secretary of DHS ("Duke") (collectively, "Defendants"), and allege as follows:

## INTRODUCTION

1. Millions of young people arrived in the United States as children, brought here by immigrant parents searching for safety, stability, and opportunity. Known as Dreamers, these young people were raised here as Americans: they were educated in American communities, surrounded by American friends, struggling and striving alongside their American peers. Many have grown up to be impressive leaders: star students, educators, soldiers, architects, entrepreneurs, lawyers, and scholars,[1] each advancing on their own merit and making considerable contributions to American society. By any measure, these achievements are extraordinary. They are all the more impressive considering the uncertainty that long defined their lives. Until 2012, Dreamers lived in pervasive fear that they might return home from school or work one day to find immigration authorities on their doorstep, prepared to take them into custody. Instead of turning to the normal routines of their personal lives—dinner, family, homework—they might be suddenly deported to a country that is in no sense their home.

2. DHS finally addressed that untenable situation in 2012 when it created DACA— Deferred Action for Childhood Arrivals. DACA provided up to 2 million Dreamers the chance to obtain protection from deportation and the opportunity to develop their skills through education.

Individuals who received deferred action under DACA were not subject to removal for a period of two years, subject to renewal.  DACA also rendered recipients eligible for work authorization that allowed them to work legally anywhere in the United States.  To qualify for DACA, Dreamers were required to meet strict conditions:  they must have entered this country prior to age sixteen, have resided here continuously since 2007 and been present in the United States on June 15, 2012, and on the date they requested deferred action; be in school, have graduated, or have been discharged honorably from the Armed Forces or Coast Guard; pose no threat to public safety or national security; and have been under the age of 31 as of June 15, 2012.  To demonstrate their eligibility, Dreamers had to provide the government with detailed and highly sensitive personal information, pay a significant fee, and submit to a rigorous background check.

3.      Given that most Dreamers had lived for years in fear of federal immigration authorities, asking them to turn over their private information to those same authorities was a bold request.  The government was aware that Dreamers might reasonably be reluctant to sign up.  It accordingly devoted significant resources to an outreach campaign calling on Dreamers to apply for DACA, assuring potential applicants that it would protect their information (and the information of their families and guardians) from disclosure to other agencies for purposes of immigration enforcement proceedings.

4.      The government's efforts to encourage Dreamers to apply for DACA worked.  Since 2012, nearly 800,000 young people—including Perales Sanchez—have come to rely on

---

[1]      *See, e.g., American Dreamers*, N.Y. TIMES (2017), https://www.nytimes.com/interactive/projects/storywall/american-dreamers/ (featuring stories from individuals who were able to work and study in the United States under DACA); Gregory Korte et al., *Trump Administration Struggles with Fate of 900 DREAMers Serving in the Military*, USA TODAY (Sept. 7, 2017), https://www.usatoday.com/story/news/politics/2017/09/07/trump-administration-struggles-fate-900-dreamers-serving-military/640637001/.

DACA.[2]  They have made educational plans, pursued career paths, and invested in their lives here based on the government's promise that they would be safe from deportation so long as they complied with DACA's rules and procedures.  Many Dreamers have gotten married and started families here in the belief that DACA would allow them to remain in the United States to raise their children.  Other Dreamers have taken out significant student loans to pursue higher education and advanced degrees that make them better able to contribute to a growing American economy.  They have launched and invested in companies, purchased homes and cars, paid taxes, pursued opportunities to serve our country in the military, and generally lived full and productive lives out of the shadows that many undocumented immigrants were forced into by the uncertainty that preceded DACA.

5.      Princeton and Microsoft also have benefited from—and relied upon—DACA.  As one of the nation's premiere universities, Princeton devotes substantial resources to recruiting and admitting the most promising students.  Since 2012, Princeton has admitted and enrolled at least 21 Dreamers who have relied on the government's promises regarding DACA, and 15 DACA beneficiaries are currently enrolled as undergraduate students at the University.  Similarly, Microsoft has invested significant resources in Dreamers, who serve in critical roles at the company.  Together with its subsidiary LinkedIn Corporation, Microsoft employs at least 45 DACA recipients as software engineers, financial analysts, inventory control experts, and in core technical and operations positions and other specialized functions and internships.  The company has invested significant resources in recruiting, retaining, and supporting these individuals, and in training them to develop within the organization.

---

[2]  Jens Manuel Krogstad, Pew Research Ctr., *DACA Has Shielded Nearly 790,000 Young Unauthorized Immigrants from Deportation* (Sept. 1, 2017), http://www.pewresearch.org/fact-tank/2017/09/01/unauthorized-immigrants-covered-by-daca-face-uncertain-future/.

4

6.     Dreamers are particularly promising students and employees because of the significant barriers they have overcome in order to excel.  As children, they were forced not only to navigate a new country, culture, and language, but also to do so knowing that at any moment, they might be taken into custody and sent far from their homes and lives here in the United States. To have achieved educational and career successes under such precarious circumstances suggests that Dreamers have grit and perseverance, can overcome obstacles, and will exceed expectations— all qualities that Princeton values in its students and Microsoft values in its employees.

7.     DACA recipients have made countless contributions to Microsoft in their diverse roles within a number of the company's divisions, including the Office Products Group, Windows and Devices Group, Cloud & Enterprise, Artificial Intelligence and Research Group, LinkedIn, Finance, Worldwide Commercial Business, and Retail division.  Microsoft has significant interests in retaining these employees and in reaping the benefits of their talent over time.  It has conducted its business operations on the understanding that DACA recipients would continue to be eligible to work at the company.

8.     At the University, DACA beneficiaries study in a diverse array of fields, including computer science, molecular biology, mechanical and aerospace engineering, psychology, and politics.  They serve as mentors and peer advisors, class representatives in student government, and as community organizers and campus leaders.  They have earned numerous academic honors, awards, and fellowships, including several competitive and prestigious national or University fellowships.  They have collaborated on important research projects, including as part of the University's Computer Science Summer Programming Experience,[3] and through the University's

---

[3]   Princeton University, Princeton Summer Programming Experiences (SPE), http://www.cs.princeton.edu/academics/ugradpgm/spe/home/ (last visited Nov. 3, 2017).

Keller Center for Innovation.[4]  They have published in campus publications.  They have secured highly competitive internships, including with the United Nations.  They are among the most accomplished and respected students studying at the University.

9.      Among the DACA beneficiaries at Princeton is Plaintiff Maria De La Cruz Perales Sanchez.  Perales Sanchez is an impressive student.  She has received the Arthur Liman public interest summer fellowship, the Fred Fox Fund grant for independent projects, and the Princeton Institute for International and Regional Studies undergraduate fellowship for summer thesis research.  She has also served as a peer academic advisor, as the co-director of the Princeton Dream Team (an immigrants' rights organization), as a member of her undergraduate department's advisory council, and as a volunteer and leader of Community House, a tutoring organization serving underprivileged students.

10.     Dreamers' presence on Princeton's campus also benefits other students and helps fulfill the University's educational mission.  Princeton has long made clear that diversity and inclusion are central to its mission for many reasons:  First, diverse environments are more intellectually and socially stimulating, with research from the fields of psychology, sociology, and economics showing that experiences with diversity improve one's own intellectual skills and performance, improve self-confidence, decrease negative stereotypes and biases, and create awareness of inequalities and discrimination.[5]  Second, because fundamental fairness is a core value of the University, Princeton believes that students of all backgrounds should have an equal opportunity to earn a position at Princeton, and then to contribute and succeed in their subsequent

---

[4] Princeton University, Keller Center, https://kellercenter.princeton.edu/ (last visited Nov. 3, 2017).

[5] Deborah Son Holoien, *Do Differences Make a Difference? The Effects of Diversity on Learning, Intergroup Outcomes, and Civic Engagement* (2003), http://www.princeton.edu/reports/2013/diversity/report/PU-report-diversity-outcomes.pdf.

6

endeavors.  And third, core to its educational mission is the idea that Princeton students should live and learn in an environment that reflects U.S. society and introduces them to the world beyond. In broadening the range of perspectives to which they are exposed, Princeton offers students a better understanding of the world and renders them better equipped to lead and serve others in today's pluralistic society.[6]

11.     Microsoft similarly benefits greatly from a workforce that reflects the diversity of the United States—and the world.  As a worldwide leader in software, services, devices and solutions that help people and businesses reach their full potential, it places a high priority on having a diverse workforce that can reflect the global customer base that it serves.  Similarly, Microsoft's subsidiary LinkedIn benefits from a diverse workforce as the world's largest professional network with members in more than 200 countries and territories worldwide.  DACA helped advance this interest by increasing the breadth of experiences, perspectives, and approaches to problem-solving represented in the workforce through the lenses of the highly qualified and talented DACA beneficiaries hired into the companies.

12.     Because fostering a diversity of perspectives is crucial to Princeton's mission of teaching and research and to Microsoft's core business functions, these two institutions have invested in many initiatives to make their campus and workplaces more welcoming to people of all backgrounds.[7]  DACA recipients are no exception.

13.     For example, Princeton has provided faculty time, attention, privately-funded financial aid for tuition, room and board, and more to DACA recipients with the expectation that

---

[6] Princeton University, Our Commitment to Diversity, https://inclusive.princeton.edu/about/our-commitment-diversity (last visited Nov. 3, 2017).

[7] *See* Princeton University, Initiatives, https://inclusive.princeton.edu/initiatives (last visited Nov. 3, 2017).

they would be allowed to complete their studies at the University and make contributions in the "nation's service and in service of humanity."[8]  Without DACA, Perales Sanchez and other Dreamers have significantly fewer opportunities to work and contribute, substantially diminishing the value of their Princeton education.  And Princeton will have to make up the difference in financial aid to compensate for their inability to contribute through on-campus work.

14.     Princeton's President, Christopher Eisgruber, has described Princeton's significant interest in DACA, noting that DACA "enables law-abiding young people who have grown up in the United States to develop their talents and contribute productively to this country, which is their home."[9]  President Eisgruber joined a group of more than 700 college and university presidents in issuing a statement supporting DACA.[10]  As that statement explains, since the advent of DACA in 2012, universities like Princeton "have seen the critical benefits of this program for our students, and the highly positive impacts on our institutions and communities."[11]  The statement continues:

> DACA beneficiaries on our campuses have been exemplary student scholars and student leaders, working across campus and in the community.  With DACA, our students and alumni have been able to pursue opportunities in business, education, high tech, and the non-profit sector; they have gone to medical school, law school, and graduate schools in numerous disciplines.  They are actively contributing to their local communities and economies.[12]

---

[8] This is Princeton's informal motto.  *See* Princeton University, In Service of Humanity, https://www.princeton.edu/meet-princeton/service-humanity (last visited Nov. 3, 2017).

[9] President Eisgruber's Statement on Deferred Action for Childhood Arrivals (DACA), Office of the President, Princeton, http://www.princeton.edu/president/eisgruber/speeches-writings/archive/?id=17355 (last visited Nov. 3, 2017).

[10] Pomona College, College & University Presidents Call for U.S. to Uphold and Continue DACA (Nov. 21, 2016), https://www.pomona.edu/news/2016/11/21-college-university-presidents-call-us-uphold-and-continue-daca.

[11] *Id.*

[12] *Id.*

Because Princeton has already invested in students based on the expectation that DACA would facilitate their studying and working in this country, and because it desires to continue to so invest due to the significant contributions of DACA beneficiaries, Princeton has significant interests in retaining the DACA program.[13]

15.     Similarly, Microsoft has made significant investments to foster an inclusive and diverse workplace environment, including by recruiting, retaining, and developing its employees who are Dreamers.  Given the persistent demand for high-skilled talent and the tightness of the labor supply for professionals in Microsoft's industry, the costs of recruiting employees are high and unanticipated turnover is incredibly disruptive to business plans.  Microsoft has significant interests in retaining the Dreamers it employs, and in reaping the benefits of their talent over time. It has conducted its business operations on the understanding that these individuals would continue to be eligible to work at the company.

16.     As Microsoft's President Brad Smith has explained, "DACA recipients bring a wide array of educational and professional backgrounds that enable them to contribute in crucial ways to our nation's workforce."[14]  He continued:

> We experience this in a very real way at Microsoft. . . . [E]mployees who are beneficiaries of DACA . . . are software engineers with top technical skills; finance professionals driving our business ambitions forward; and retail and sales associates connecting customers to our technologies. Each of them is actively participating in our collective mission to empower every person and every organization on the planet to achieve more.  They are not only our colleagues, but our friends, our neighbors and valued members of the Microsoft community.[15]

---

[13] Princeton is also interested as an employer in retaining the DACA program because it enables DACA beneficiaries to obtain work authorization.

[14] Microsoft President Brad Smith, DREAMers make our country and communities stronger (Aug. 31, 2017), https://blogs.microsoft.com/on-the-issues/2017/08/31/dreamers-make-country-communities-stronger?lipi=urn%3Ali%3Apage%3Ad_flagship3_pulse_ read%3BVGllRxrxTBirfzbdYk4jSg%3D%3D.

[15] Id.

17.     Microsoft's CEO Satya Nadella has also underscored the importance of Microsoft's DACA-beneficiary employees to its business, explaining that he "see[s] each day the direct contributions that talented employees from around the world bring to our company, our customers and to the broader economy."[16]  As he stated, "[w]e care deeply about the DREAMers who work at Microsoft and fully support them.  We will always stand for diversity and economic opportunity for everyone.  It is core to who we are at Microsoft and I believe it is core to what America is."[17]

18.     The government has also benefited from Dreamers' willingness to participate in the DACA program.  Many DACA recipients have pursued professions in fields suffering from serious labor shortages, such as nursing and home health care; removing them from the economy could dramatically escalate costs that are in large part covered by Medicaid and Medicare.[18]  DACA recipients have also contributed to national security, with approximately 900 DACA recipients serving in the military under a program for persons who possess skills "vital to the national interest."[19]  More broadly, using their education and work authorizations, Dreamers have helped American companies grow and thrive.   They have contributed to valuable technological innovations, promising medical and scientific research, and creative artistic endeavors.

---

[16] Satya Nadella, CEO, Microsoft, DREAMers Make Our Country and Communities Stronger (Aug. 31, 2017), https://www.linkedin.com/pulse/dreamers-make-our-country-communities-stronger-satya-nadella/.

[17] Id.

[18] Noam Scheiber & Rachel Adams, *What Older Americans Stand to Lose if 'Dreamers' Are Deported*, N.Y. TIMES (Sept. 6, 2007), https://www.nytimes.com/2017/09/06/business/economy/daca-dreamers-home-health-care.html.

[19] Alex Horton, *The Military Looked to 'Dreamers' to Use Their Vital Skills.  Now the U.S. Might Deport Them*, WASH. POST (Sept. 7, 2017), https://www.washingtonpost.com/news/checkpoint/wp/2017/09/07/the-military-looked-to-dreamers-to-use-their-vital-skills-now-the-u-s-might-deport-them/?utm_term=.be8c41bb71ef; Korte, *supra* n.1.

19.     The Dreamers have held up their end of the bargain.  But the same cannot be said of the United States.  Although the Trump Administration continued to induce Dreamers to rely on the DACA program for the Administration's first eight months, on September 5, 2017, Attorney General Sessions announced Defendants' decision to end the DACA program.  That same day, Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum formally rescinding DACA.

20.     The termination of the DACA program severely harms Perales Sanchez and other Dreamers, as well as the employers and educational institutions that rely on and benefit from their contributions.  For example, as a result of the rescission of the program, Princeton will suffer the loss of critical members of its community—students who lead vital student organizations, contribute to important research projects, participate in study-abroad programs, and perform on-campus work that aids the activities of the University.  Similarly, Microsoft will lose employees who fill critical positions in the company's workforce and in whom the company has invested—leaving gaps that cannot easily be filled.

21.     Accordingly, the University, Microsoft, and Perales Sanchez bring this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Fifth Amendment of the U.S. Constitution, to enjoin the rescission of DACA and to obtain a declaration that the DACA program was lawful as initially promulgated and remains lawful today.

## **VENUE AND JURISDICTION**

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, including the judicial review provisions of

the Administrative Procedure Act, 5 U.S.C. §§ 701-706; the Fifth Amendment of the U.S. Constitution; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

23.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e).   A substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia. Defendant Duke is a United States officer sued in her official capacity, and her official residence is in the District of Columbia.  Defendant DHS is a U.S. agency with its principal office in the District of Columbia.

## PARTIES

24.     The University is a private, non-profit educational institution with its principal place of business at Princeton University, Princeton, New Jersey 08544. The University is a "person" within the meaning of 5 U.S.C. § 551(2).

25.     Microsoft is a technology corporation organized and existing under the laws of the State of Washington, with its principal place of business in Redmond, Washington.  Microsoft is a "person" within the meaning of 5 U.S.C. § 551(2).

26.     Maria De La Cruz Perales Sanchez is a DACA beneficiary and a current undergraduate student at Princeton University.  Perales Sanchez is a "person" within the meaning of 5 U.S.C. § 551(2).

27.     Defendant the United States of America includes all government agencies and departments responsible for the implementation and rescission of the DACA program.

28.     Defendant DHS is an "agency" within the meaning of 5 U.S.C. § 551(1) and § 552(f).  The Department of Homeland Security has its principal place of business at 650 Massachusetts Avenue NW, Washington, DC 20001.

29.     Defendant Elaine C. Duke is the Acting Secretary of DHS.  She is responsible for implementing and enforcing the Immigration and Nationality Act, and oversees the U.S. Citizenship and Immigration Services and Immigration and Customs Enforcement.  She issued the DHS Memorandum that purports to rescind DACA.  She is being sued in her official capacity.

## FACTUAL ALLEGATIONS

### A.     The DACA Program

30.     On June 15, 2012, the then-Secretary of Homeland Security issued a memorandum establishing the DACA program ("DACA Memorandum").[20]  Under the program, individuals who were brought to the United States as children and met certain criteria could apply for deferred action for a period of two years, subject to renewal.  Deferred action means that the government agrees in its discretion to defer the removal[21] of an individual for a specified period, subject to renewal.  The DACA Memorandum explained that it was intended to set forth "how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home."  Because "these individuals lacked the intent to violate the law," and because this country's immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language," the DACA Memorandum advised that "[p]rosecutorial discretion, which is used in so many other areas, is especially justified here."  The DACA Memorandum acknowledged that it "confers no

---

[20] *See* Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[21] Removal is the legal term used in the Immigration and Naturalization Act for what is commonly known as deportation.  *See generally* 8 U.S.C. § 240.

substantive right," but rather "set[s] forth policy for the exercise of discretion within the framework of the existing law."

31.     The DACA Memorandum also set forth a series of stringent criteria individuals had to meet to qualify for the DACA program.  Individuals were eligible only if they:  (1) came to this country when they were under the age of sixteen; (2) continuously resided in the United States since June 15, 2007, and were present in the United States on June 15, 2012; (3) were currently in school, had graduated from high school, had obtained a general education development certificate, or were an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (4) had not been convicted of a felony, a significant misdemeanor offense, multiple misdemeanor offenses, and otherwise did not pose a threat to national security or public safety; and, (5) were not above the age of 30 as of June 15, 2012.

32.     The government prepared answers to Frequently Asked Questions about the DACA program and posted them online.[22]  They explained that individuals who were granted deferred action are "not considered to be unlawfully present during the period in which deferred action is in effect."[23]  Likewise, despite not having received "lawful status," "[a]n individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect."[24]

33.     In order to apply for the DACA program, individuals including Perales Sanchez were required to pay a substantial fee, submit to biometric and biographical background checks, and hand over highly sensitive personal information, including their date of entry into the United

---

[22] USCIS DACA FAQs, https://www.uscis.gov/archive/frequently-asked-questions (Archived).
[23] *Id.*, Question 1.
[24] *Id.*

14

States, their country of birth, their current and previous mailing addresses, and other contact information.[25]

34.     Many Dreamers, including Perales Sanchez, were reluctant to hand over their personal information to the government.  Accordingly, the government assured them that their information would not be used for other immigration-related purposes, including to facilitate their removal.  The official instructions accompanying USCIS's DACA application form stated:

> *Information provided in this request is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings* unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). The information may be shared with national security and law enforcement agencies, including ICE and CBP, *for purposes other than removal*, including for assistance in the consideration of deferred action for childhood arrivals request itself, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing clause covers family members and guardians, in addition to the requestor.[26]

35.     In the DACA Memorandum, the government also assuaged concerns that it might use information obtained through DACA to facilitate removal.  DHS emphasized that the country's immigration laws are not designed "to remove productive young people to countries where they may not have lived or even speak the language."  DHS also acknowledged that many DACA eligible individuals "have already contributed to [the United States] in significant ways" and that, as a result, the exercise of prosecutorial discretion is "especially justified" as to those eligible for relief under DACA.

36.     In 2016, then-Secretary of Homeland Security Jeh Johnson further explained the government's assurances to Dreamers in a letter to Representative Judy Chu:

---

[25] *See* Instructions for Consideration of Deferred Action for Childhood Arrivals, USCIS Form I-821D at 13 (Jan. 9, 2017), https://www.uscis.gov/sites/default/files/files/form/i-821dinstr.pdf.
[26] *Id.* at 13 (emphasis added).

Since DACA was announced in 2012, DHS has consistently made clear that information provided by applicants will be collected and considered for the primary purpose of adjudicating their DACA requests and would be safeguarded from other immigration-related purposes. More specifically, the U.S. government represented to applicants that the personal information they provided will not later be used for immigration enforcement purposes except where it is independently determined that a case involves a national security or public safety threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law.

We believe these representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored.[27]

Secretary Johnson represented that this practice of not sharing information supplied by people seeking deferred action for immigration enforcement purposes had consistently been applied by DHS and its predecessor INS even before DACA was established. He also acknowledged that "people who requested to be considered under DACA, like those who requested deferred action in the past, have relied on our consistent practice concerning the information they provide about themselves and others."[28]

37. The government devoted significant time and effort to encourage Dreamers to apply for the DACA program, vigorously promoting the program in a variety of ways. Among other initiatives, the government advised universities on how best to encourage eligible individuals to apply.[29] The government also promoted the DACA program by, among other things, honoring ten DACA recipients as White House Champions of Change and inviting some of them to the White House to meet with President Obama.[30] Cecilia Muñoz, Director of the White House Domestic

---

[27] Letter from Secretary Jeh Charles Johnson to The Honorable Judy Chu (Dec. 30, 2016), https://chu.house.gov/sites/chu.house.gov/files/documents/DHS.Signed%20Response%20to%20Chu%2012.30.16.pdf.

[28] *Id.*

[29] *See, e.g.*, U.S. Dep't of Education, Resource Guide: Supporting Undocumented Youth (Oct. 20, 2015), https://www2.ed.gov/about/overview/focus/supporting-undocumented-youth.pdf.

[30] *See* Champions of Change: DACA Champions of Change, Obama White House Archives, https://obamawhitehouse.archives.gov/champions/daca-champions-of-change (last visited Nov. 3,

Policy Council, wrote in a blog post preserved in the Obama White House archives that "[b]ecause the Administration acted, hundreds of thousands of ambitious, hardworking young people have been able to emerge from the shadows, no longer living in fear of deportation."[31]

38.     In order to entice Dreamers to apply, the government also promised that, if eligible, DACA recipients would be entitled not only to a single, two-year deferral of action but also to the ability to renew their deferred action for the foreseeable future. *See* 2012 DACA Memorandum (noting that deferred action was "subject to renewal"). Indeed, the government "strongly encourage[d]" DACA recipients to submit their renewal requests well in advance of the relevant expiration date.[32] To qualify for renewal, DACA recipients must not have left the United States without advance parole, must have continuously resided in the United States after submitting their initial DACA application, and must not have been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, or otherwise pose a threat to national security or public safety.[33]

39.     DHS also made it difficult to terminate a Dreamer's deferred action under DACA. DHS's Standard Operating Procedures implementing the DACA program provided that, absent a disqualifying criminal offense, national security concern, or other extraordinary circumstance, an individual's deferred action under DACA could not be removed until the government provided a

---

2017); Lindsay Holst, *Meet the 6 DREAMers the President Met with in the Oval Office Yesterday* (Feb. 5, 2015), https://obamawhitehouse.archives.gov/blog/2015/02/05/meet-6-dreamers-president-met-oval-office-yesterday.

[31] Cecilia Muñoz, *One Year Anniversary of Implementation of Deferred Action Policy for DREAMers* (Aug. 15, 2013), https://obamawhitehouse.archives.gov/blog/2013/08/15/one-year-anniversary-implementation-deferred-action-policy-dreamers.

[32] USCIS DACA FAQs, Question 49, https://www.uscis.gov/archive/frequently-asked-questions (Archived).

[33] *Id.*, Question 51.

"Notice of Intent to Terminate" that "thoroughly explain[ed]" the grounds for termination.[34] DHS Standard Operating Procedures further provided that recipients of such notice "should be allowed 33 days to file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of deferred action under DACA.[35]

40.    As a result of these policies and procedures, along with other government actions and representations, Perales Sanchez and other Dreamers reasonably expected that they would be allowed to maintain and continue renewing their deferred status, so long as they complied with the government's straightforward rules.

41.    Since its inception in 2012, the DACA program has provided nearly 800,000 young people with the ability to live, study, and work in the United States without hiding in the shadows. For the first time in their lives, DACA recipients, including Perales Sanchez, received Social Security numbers, enabling them to access credit and apply for student loans, obtain driver's licenses, and apply for federal work authorization.  In reliance on the DACA program, Perales Sanchez and other Dreamers have made considerable investments in their American lives, pursuing jobs, and educational programs that cost money, time, and energy, and require a commitment to a future here.  For example, after obtaining her federal work authorization, Perales Sanchez worked as a tutor, a research assistant, a dining hall employee, an office assistant, and an associate for an on-campus center for civic engagement.

42.    Some Dreamers may not have been able or may not have chosen to study at Princeton without DACA, which, among other things, allowed them to obtain a government-issued

---

[34] National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA), at 132, Appendix I (Apr. 4, 2013), https://cliniclegal.org/sites/default/files/attachments/daca_sop_4-4-13.pdf.

[35] *Id.*

photo identification and thus travel back and forth to campus by airplane, and to dream of a future that includes legitimate employment in the United States, helping to justify the dedication and work that goes into a Princeton education. For example, before the DACA program was implemented, Perales Sanchez believed she would never be able to leave her state of residence. After obtaining relief under the DACA program, she was able to fly not only to Princeton as an entering freshman, but also to travel abroad twice—once for a summer internship and once for a study-abroad program.[36] DACA has enabled her to pursue those internships and programs to further her dream of going to law school.

43.     While Dreamers have certainly benefited from DACA, so too has the government. "By removing the threat of deportation for young people brought to this country as children," Cecilia Muñoz acknowledged, "DHS has been able to focus its enforcement efforts on those who endanger our communities rather than students pursuing an education and seeking to better themselves and their communities."[37] Then-Secretary Johnson acknowledged additional benefits from the program in 2016, explaining:

> Since DACA began, thousands of Dreamers have been able to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books. We continue to benefit as a country from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future.[38]

---

[36] Perales Sanchez obtained advance parole for her extraterritorial travel.
[37] *Id.*
[38] Johnson, *supra* n.27.

## B.      Defendants' Unlawful and Unconstitutional Rescission of DACA

44.      On September 5, 2017, Attorney General Sessions announced Defendants' decision to end the DACA program, and Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum formally rescinding the DACA program ("DACA Rescission Memorandum").

45.      President Trump's statements about the DACA program—both before and after its rescission—have been less consistent.  In the speech that launched his campaign, then-candidate Trump promised to "immediately terminate President Obama's illegal executive order on immigration," referring to DACA.[39]  On the same day that he met with the Mexican president in August 2016, he again announced his intent to "immediately terminate" DACA.[40]  But after the election, he told Time magazine: "We're going to work something out that's going to make people happy and proud.  They got brought here at a very young age, they've worked here, they've gone to school here.  Some were good students.  Some have wonderful jobs.  And they're in never-never land because they don't know what's going to happen."[41]  And a few days after his inauguration, President Trump told ABC's David Muir that DACA recipients "shouldn't be very worried."[42]  At a February 16, 2017 press conference, President Trump explained his thinking on the subject:  "The DACA situation is a very difficult thing for me as I love these kids, I love kids, I have kids and grandkids and I find it very, very hard doing what the law says exactly to do and, you know, the law is rough.  It's rough, very very rough."[43]

---

[39] Anu Joshi, *Donald Trump and DACA: A Confusing History*, HUFFINGTON POST (Mar. 3, 2017), http://www.huffingtonpost.com/entry/donald-trump-and-daca-a-confusing-history_us_58b9960be4b0fa65b844b24a.
[40] *Id.*
[41] Michael Scherer, *2016 Person of the Year Donald Trump*, TIME (Dec. 8, 2016), http://time.com/time-person-of-the-year-2016-donald-trump/.
[42] Joshi, *supra* n.39.
[43] *Id.*

46.     On June 29, 2017, officials from ten States, led by Texas Attorney General Ken Paxton, sent a letter to U.S. Attorney General Jeff Sessions, asserting that the DACA program is unlawful and requesting that it be "phase[d] out."[44]  The States threatened to challenge DACA in court unless DACA was rescinded by September 5, 2017.

47.     In response to that letter, other stakeholders weighed in.  A letter from the attorneys general of twenty States, led by California, described how DACA has "been a boon to the communities, universities, and employers with which these Dreamers are connected, and for the American economy as a whole."[45]  A separate, open letter from hundreds of entrepreneurs and business leaders noted that "[a]t least 72 percent of the top 25 Fortune 500 companies count DACA recipients among their employees."  It explained that "Dreamers are vital to the future of our companies and our economy.  With them, we grow and create jobs.  They are part of why we will continue to have a global competitive advantage."  If the DACA program were rescinded, "[o]ur economy would lose $460.3 billion from the national GDP and $24.6 billion in Social Security and Medicare tax contributions."[46]  The letter was signed by, among many others, Satya Nadella

---

[44] *See* Chris Geidner, *Texas Attorney General Threatens to Sue Trump If He Doesn't End DACA*, BUZZFEED NEWS (June 29, 2017), https://www.buzzfeed.com/chrisgeidner/texas-attorney-general-threatens-to-sue-trump-if-he-doesnt?utm_term=.umwR4Ll05#.it7d1JGWx.        The Tennessee Attorney General later reversed course and withdrew Tennessee's threat to sue.  *See* Letter from Tennessee Attorney General Herbert H. Slattery III to Sens. Lamar Alexander and Bob Corker (Sept. 1, 2017), https://www.vox.com/policy-and-politics/2017/9/1/16243944/daca-tennessee-dream-act.  He explained that he had changed his mind because "[t]here is a human element to this," and "[m]any of the DACA recipients, some of whose records I reviewed, have outstanding accomplishments and laudable ambitions, which if achieved, will be of great benefit and service to our country."  *Id.*
[45] Letter from Xavier Becerra (July 21, 2017), https://oag.ca.gov/system/files/attachments/press_releases/7-21-17%20%20Letter%20from%20State%20AGs%20to%20President%20Trump%20re%20DACA.final_.pdf.
[46] Leaders of American Industry on DACA (Aug. 31, 2017), https://dreamers.fwd.us/business-leaders.

and Brad Smith of Microsoft, Jeff Bezos of Amazon, Tim Cook of Apple, Mark Zuckerberg and Sheryl Sandberg of Facebook, and Sundar Pichai of Google.

48.     Despite the overwhelming evidence of DACA's benefits, DACA was rescinded on September 5, 2017—the deadline provided in Texas Attorney General Paxton's letter.  Unlike the DACA program itself, which required case-by-case assessment of individual applications, DACA's rescission is a categorical rule, applicable to all DACA recipients.  The rationale provided by Attorney General Sessions for rescinding DACA, which was echoed by Acting Secretary Duke, was that it is vulnerable to the "same legal and constitutional defects that the courts recognized as to DAPA [Deferred Action for Parents of Americans and Lawful Permanent Residents]," which is a separate program that DHS introduced in November 2014, and which was enjoined prior to its effective date.  Accordingly, the Attorney General and Acting Secretary stated that "it is likely that potentially imminent litigation would yield similar results with respect to DACA."[47]

49.     DHS's rationale is directly at odds with new policies that the agency announced in connection with its rescission of DACA.  For example, when it announced rescission, DHS declared that it would continue to adjudicate pending DACA applications.  DHS also asserted that it would adjudicate any applications for renewal filed by individuals whose deferred status under DACA would expire before March 5, 2018, so long as those applications were filed by October 5, 2017.[48]  This announcement effectively extended DACA for an additional two and a half years.

---

[47]  Letter on Rescission of Deferred Action for Childhood Arrivals (Sept. 4, 2017), https://www.dhs.gov/sites/default/files/publications/17_0904_DOJ_AG-letter-DACA.pdf; Memorandum on Rescission of Deferred Action for Childhood Arrivals (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca#.
[48]  Memorandum on Rescission of Deferred Action for Childhood Arrivals (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca#.

50. DHS's asserted basis for rescinding DACA also conflicts with the position previously taken by the United States, including in an opinion by the Office of Legal Counsel ("OLC") that has not been withdrawn.[49] Its credibility is further undermined by President Trump's own tweet, published less than nine hours after the announcement of DACA's rescission, promising that if Congress does not "legalize DACA" in six months, "I will revisit this issue!"[50]

51. In addition, the government has provided no assurance or commitment that the information collected from DACA applicants will not be used to pursue their deportation. The DACA Rescission Memorandum is silent on the issue. DHS has adopted a new privacy policy pursuant to an Executive Order issued in January 2017 that "permits the sharing of information about immigrants and non-immigrants with federal, state, and local law enforcement."[51] And whereas the government in the past had promised that information provided by DACA applicants "*is protected* from disclosure,"[52] it now states only that such information "will not be *proactively* provided to ICE and CBP for the purpose of immigration enforcement proceedings."[53]

---

[49] *See* Dep't of Homeland Sec.'s Auth. to Prioritize Removal of Certain Aliens Unlawfully Present in the U.S. & to Defer Removal of Others, 2014 WL 10788677 (Op. O.L.C. Nov. 19, 2014).

[50] *See* Donald J. Trump (@realDonaldTrump), Twitter (Sep. 5, 2017, 8:38 PM), https://twitter.com/realDonaldTrump/status/905228667336499200; Josh Blackman, *Trump's DACA Decision Defies All Norms*, LawFare@FP (Sept. 7, 2017), http://foreignpolicy.com/2017/09/07/trumps-daca-decision-defies-all-norms/ ("[T]his latest constitutional whiplash undermines that defense on an even more profound level.").

[51] DHS, Privacy Policy 2017-01 Questions & Answers, at 3 (Apr. 27, 2017), https://www.dhs.gov/sites/default/files/publications/Privacy%20Policy%20Questions%20%20A nswers%2C%2020170427%2C%20Final.pdf.

[52] USCIS DACA FAQs, Question 19 (emphasis added). The referenced Notice to Appearance guidance is USCIS Policy Memorandum 602-0050 (Nov. 7, 2011) ("Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens").

[53] DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals (DACA)* (Sept. 5, 2017) (emphasis added), https://www.dhs.gov/news/2017/09/05/frequently-askedquestions-rescission-deferred-action-childhood-arrivals-daca.

Accordingly, Dreamers reasonably anticipate that the information they provided to the government in order to enroll in the DACA program will be used against them, including to pursue their removal from this country. Indeed, DHS has already "urge[d] DACA recipients to use the time remaining on their work authorizations to prepare for and arrange their departure from the United States."[54]

### C. Plaintiffs' Interest in the DACA Program

#### a. *Princeton University and Perales Sanchez Have Benefited from DACA.*

52.     Plaintiff Princeton is a private, non-profit educational institution that advances learning through scholarship, research, and teaching of extraordinary quality, with an emphasis on undergraduate and doctoral education and a pervasive commitment to serve the nation and the world. The University's defining characteristics and aspirations include, among other things, a commitment to welcome, support, and engage students, faculty, and staff with a broad range of backgrounds and experiences, and to encourage all members of the University community to learn from the robust expression of diverse perspectives.[55]

53.     Every year, the University accepts applications for admission to its undergraduate program from both domestic and international students who have completed or are soon to complete secondary education programs. To achieve the excellence to which it aspires, Princeton must find, attract, and support talented people from a wide range of demographic groups, and it

---

[54] Talking Points - DACA Rescission, MSNBC, http://msnbcmedia.msn.com/i/MSNBC/Sections/NEWS/z-pdf-archive/170905-DACA-Talking-Points.pdf; *see also* Kristen Welker & Daniel Arkin, *Trump Administration Memo: DACA Recipients Should Prepare for 'Departure,'* NBC NEWS (Sept. 5, 2007), https://www.nbcnews.com/news/us-news/white-house-memo-daca-recipients-should-prepare-departure-n799026.

[55] *See* Princeton University, Our Commitment to Diversity, https://inclusive.princeton.edu/about/our-commitment-diversity (last visited Nov. 3, 2017); Princeton University, Academics, https://www.princeton.edu/academics (last visited Nov. 3, 2017).

must provide a campus climate in which people from all backgrounds learn from and share experiences and perspectives with each other. A diverse, inclusive, and collaborative learning community sparks creativity and insight, generates meaningful conversation, and facilitates intercultural connection and understanding. Diversity is essential to Princeton's efforts to meet the needs of a world that requires leaders who come from a wide variety of backgrounds and groups and who are able to work effectively across cultures and political and social divides. Accordingly, the University expends considerable time and resources recruiting high-achieving students from diverse backgrounds to create an exceptional learning community for each incoming class.

54.     Undergraduate admission to the University is highly competitive. For the University's graduating class of 2021 (matriculating in the fall of 2017), 1,991 applicants were admitted out of 31,056 total applicants, for an admissions rate of 6.4 percent.[56]

55.     Since 2012, Princeton has admitted and enrolled at least 21 DACA recipients as students. These students have enrolled in both undergraduate and graduate programs in a diverse array of fields, including sciences, engineering, politics, psychology, and public policy. These individuals have been among the greatest contributors to the campus community. For example, a member of the class of 2015 and a DACA beneficiary, Yessica Martinez, was a co-recipient of the 2015 Pyne Prize, the University's highest general honor for an undergraduate. She was recognized for her "excellent scholarship, strength of character, and effective leadership in support of the best interests of Princeton University."[57] Among her accomplishments at Princeton, Martinez was "a

---

[56] *See* Princeton University, Statistics for Applicants to the Class of 2021, *available at* https://admission.princeton.edu/how-apply/admission-statistics (last visited Nov. 3, 2017).
[57] *See* Princeton University, Introduction by President Christopher L. Eisgruber, *available at* http://alumni.princeton.edu/learntravel/lectures/videodetail/index.xml?videoid=409 (last visited Nov. 3, 2017); Princeton University, Seniors Martinez, Robertson Named Pyne Prize Winners

standout student and writer, and an exceptional community organizer and leader," who served as a residential advisor and excelled in studying comparative literature, creative writing, and Latin American studies.[58]  University President Eisgruber stated in awarding her the Pyne Prize that Martinez had a "profound impact on the Princeton community."[59]

56.     As explained in the Introduction to this Complaint, Princeton benefits from DACA in many ways.  Princeton's DACA recipients—including Perales Sanchez—are exceptionally resilient students who have overcome varied, serious life obstacles in the course of achieving great success.  They have unique insights because of their backgrounds, and they contribute diverse perspectives on a range of issues on campus—both inside and outside the classroom.  Their presence in the classroom, student housing, student organizations, and other campus activities enhances the intellectual experience of all students and faculty at Princeton.  Their membership in Princeton's community helps the University to realize its educational mission.

      b.  *Microsoft Has Benefited from DACA.*

57.     Similarly, Microsoft benefits in myriad ways from the DACA recipients whom it employs as software engineers, financial analysts, inventory control experts, and core technical and operations positions.  Microsoft's mission on behalf of its customers around the world creates a substantial business need for finding, developing, and attracting the brightest and most promising talent from around the country and around the world.  As Microsoft CEO Satya Nadella explained, "smart immigration can help our economic growth and global competitiveness."[60]

---

(Feb. 12, 2005), *available at* https://undergraduateresearch.princeton.edu/news/seniors-martinez-robertson-named-pyne-prize-winners (last visited Nov. 3, 2017).
[58] *Id.*
[59] *Id.*
[60] Nadella, *supra* n.16.

58.     The company places a high priority on having a diverse workforce that can reflect the global customer base Microsoft serves.  The company's products and services—and ultimately its customers—benefit from input and contributions that draw from the diverse backgrounds found among the company's employees.  Microsoft has significant interests in retaining its employees and in reaping the benefits of their talent over time.

59.     DACA beneficiaries are working across a range of Microsoft's business divisions, employing their "tremendous talent" to develop the next generations of Microsoft products and services.[61]  While Microsoft's DACA employees are generally early in their careers, their past accomplishments and promise for the future reflect their significant value to the company.  The company employs DACA beneficiaries in its Office Products Group, which produces its industry-leading suite of productivity applications; the Windows and Devices Group, which is responsible for the software platform, apps, games, store, and devices that power the Windows ecosystem; the Cloud & Enterprise Group, which builds the infrastructure software and developer tools that power the company's cloud platform and services; the Artificial Intelligence and Research Group, which drives the company's strategy for artificial intelligence and forward-looking research and development; and LinkedIn, its online professional network designed to help members find jobs, connect with other professionals, and locate business opportunities.  DACA beneficiaries are also employed in positions within Microsoft's Finance organization as well as its Worldwide Commercial Business and Retail divisions, which engage directly with its customers.  As Microsoft President Brad Smith has explained, these individuals are an integral part of the fabric

---

[61] Brad Smith, President, Microsoft, DREAMers Make Our Country and Communities Stronger (Aug. 31, 2017), https://blogs.microsoft.com/on-the-issues/2017/08/31/dreamers-make-country-communitiesstronger?lipi=urn%3Ali%3Apage%3Ad_flagship3_pulse_read%3BVGlIRxrxTBirfzbdYk4jSg%3D%3D.

of Microsoft's business and its "collective mission to empower every person and organization on the planet to achieve more."[62]

60.    Moreover, by allowing Dreamers to work lawfully, DACA moved these individuals out of the informal economy, increasing the pool of talent from which Microsoft could fill supply gaps in the U.S. job market.  The United States faces a shortage of skilled workers that is only projected to intensify over the next decade, as workers from the baby-boom generation retire from the workforce.  As these gaps continue to widen, DACA recipients play a critical role in filling positions for which there are not enough U.S.-born applicants.  DACA recipients also often possess skills—including foreign language skills—that businesses like Microsoft need.

        c.    *Plaintiffs Will Be Harmed by the Rescission of DACA.*

61.    With DACA's rescission, Princeton and Microsoft will be harmed in several ways. Princeton has devoted substantial resources to recruiting, retaining, and educating Dreamers— including, among other things, investments in financial aid to cover tuition, housing, and other educational expenses, as well as faculty and administrative time.  Those resources were invested with the expectation that those students would be able to deploy their Princeton degree in varied successful careers.  The loss of DACA diminishes the likelihood that Dreamers will be authorized to work in the United States, thus also diminishing the economic value of their education and Princeton's investment in them.  Princeton has also spent additional resources to address the harms of DACA's rescission on Princeton's students and employees, and reasonably expects to spend further resources addressing this issue.  Furthermore, Princeton will lose the opportunity to matriculate new Dreamers, as many may be deterred from studying at Princeton because the

---

[62] *Id.*

tremendous investment of time, effort, and money required to pursue that education may not yield employment prospects without the work authorization provided by DACA.

62.     Microsoft also has expended significant resources in recruiting and training Dreamers, with the expectation that they would continue to be eligible to work at the company. By eliminating a valuable pool of employees, rescission of DACA will cause Microsoft to lose at least 45 employees and interns who make significant contributions to the company. This loss will hinder the company's productivity, leading to a less robust and diverse workforce. Moreover, as a consequence of Defendants' actions, Microsoft will have to spend additional resources to recruit, train, and promote replacement employees. The pool of workers from which to fill these positions will be smaller, inhibiting Microsoft's productivity, reducing the diversity of its workforce, and making it harder to compete globally. Microsoft's corporate interests are best served by a stable, fair, and efficient business environment. Defendants' rescission of DACA injures each of these interests.

63.     DACA's rescission of course inflicts grave harm on not only the University and Microsoft, but also the Dreamers themselves. Some feel that DACA's rescission will impede or diminish their educational experience. For example, they may not be able to pursue research or study abroad, which are important parts of many academic programs. In addition, they may not be able to receive work authorization, which will hinder their ability to enhance their skills, build their resumes, network with campus administrators, professors, and other students, and earn money that can be used to further their educations. For all, the future value of their Princeton education is seriously diminished because they cannot obtain a legitimate job in the United States after graduation. Perales Sanchez, for example, will not be able to obtain financial aid to support her

planned law school education—and even if she could, her inability to work legally in the United States as a lawyer undermines the viability of that planned career path.

64. Of course, the ultimate consequence of DACA's rescission is not just the loss of opportunity in the United States, but the very real threat of deportation from the United States. If that threat is realized, the Dreamers, including Perales Sanchez, stand to lose everything: their homes, their families and friends, and the lives that they have finally been free to live in this country because of DACA. If deported, they will be sent to countries where they have not lived since they were very young, where they have no friends and no known prospects, and that are in every meaningful sense foreign to them. Perales Sanchez, for example, left her native country of Mexico at the age of eight and has only returned once for a single week. Her family, friends, and career prospects are all here in the United States.

## COUNT I

## PROCEDURAL VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT

### *Brought By All Plaintiffs Against All Defendants*

65. Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

66. The APA requires that federal agencies conduct notice-and-comment rulemaking before promulgating a substantive rule. *See* 5 U.S.C. § 553. Agency action is unlawful where it is made "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

67. DHS is an "agency" within the meaning of the APA, and the DACA Rescission Memorandum and the actions that DHS has taken to implement the DACA Rescission Memorandum are a substantive rule within the meaning of the APA. *See* 5 U.S.C. § 551(1), (4).

68.     Defendants' actions affirmatively circumscribe DHS's statutory authority in providing deferred action as they bind DHS to categorically deny applications for deferred action to individuals who fit the original DACA eligibility criteria, prohibit DHS from renewing recipients' deferred status under DACA after October 5, 2017, and prohibit DHS from granting advance parole to DACA recipients.

69.     The DACA Rescission Memorandum and the actions that DHS has taken to implement the DACA Rescission Memorandum have affected the rights and interests of all DACA recipients by changing the substantive criteria by which these individuals work, live, attend school, obtain credit, and travel.  Defendants did not follow the procedures required by the APA before taking action affecting these substantive rights.

70.     Defendants promulgated and implemented these substantive rules without authority and without notice-and-comment rulemaking in violation of the APA.

71.     Plaintiffs have been harmed by these unlawful acts, including because they have not had the opportunity to comment on the rescission of DACA.

72.     Defendants' violation causes ongoing harm to the University, Microsoft, Perales Sanchez, and other members of the University community.  These injuries, including the specific harms alleged above to the University and Microsoft, fall within the zone of interests encompassed by the broad scope of the Immigration and Naturalization Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*

## COUNT II

**SUBSTANTIVE VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT**

*Brought By All Plaintiffs Against All Defendants*

73.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

74. Defendants are subject to the APA. *See* 5 U.S.C. §§ 701(b)(1), 703. Defendants' rescission of DACA is final agency action subject to judicial review because it consummates DHS's decision-making process and is a decision from which legal consequences will flow.

75. The APA prohibits federal agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (B), (C).

76. In creating and implementing DACA, over the course of years, the government repeatedly made promises and assurances to DACA recipients (including Princeton alumni and current students, and Microsoft employees) that if they stepped forward, shared highly sensitive personal information, and passed a background check, they would be granted renewable protection and would be allowed to live and work in the United States as long as they abided by the conditions of the program. The government also specifically and consistently promised that information disclosed through the DACA program would not be used for immigration enforcement purposes outside certain limited circumstances.

77. The University, Microsoft, Perales Sanchez, and nearly 800,000 other vulnerable young people reasonably relied on the government's assurances and promises in taking the irreversible step of identifying themselves and providing the government with highly sensitive and potentially compromising personal information. DACA recipients, including Perales Sanchez, also made numerous life-altering personal and professional decisions in reliance on the government's promises regarding DACA.

78. The establishment and implementation of DACA engendered serious reliance interests by Perales Sanchez and other DACA recipients, their families, and others affected,

including the University and Microsoft. Defendants failed to take these interests into account and failed to provide a rational explanation for the change in policy on which such individuals and institutions have reasonably relied.

79. Defendants' disregard for the reasonable reliance of Perales Sanchez and hundreds of thousands of other vulnerable young people, and others affected by DACA's rescission is the hallmark of arbitrary and capricious action and an abuse of discretion. The decision to rescind DACA is therefore in violation of the APA and must be vacated.

80. Defendants' rescission of DACA also must be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the agency failed to articulate a reasoned explanation for its decision that considered all important aspects of the issue.

81. For example, Defendants provided no justification for many of the details of the rescission of DACA, including but not limited to the September 5, 2017 deadline for initial applications; the October 5, 2017 deadline to file certain renewal applications; and the March 5, 2018 cut-off for renewal eligibility. These deadlines are arbitrary, and they fail to provide sufficient time and notice to DACA recipients.

82. Defendants also failed to provide any reasoned analysis to support the changes to the confidentiality of applicant information.

83. Defendants' purported grounds for rescinding DACA are inadequate to justify termination, are legally erroneous, pretextual, and internally inconsistent, and fail to consider or address relevant factors such as the government's previous conclusion that the DACA program was lawful or other government statements that contradict the agency's stated rationale.

84. Defendants' rescission of DACA and the steps taken to implement that determination are arbitrary and capricious, an abuse of discretion, and not in accordance with law

because, among other things, they are based on the legally incorrect premise that DACA is unlawful.

85.     Defendants' assertion that the Executive Branch lacks authority to continue the DACA program ignores the fact that the government itself previously concluded that it did have the authority to implement the program, including in an OLC opinion that has not been withdrawn or amended.  Defendants' failure to conduct or provide a reasoned analysis for its decision to rescind DACA constitutes a violation of the APA.

86.     Defendants' decision to rescind DACA is also arbitrary and capricious because its purported rationale is inconsistent with DHS's new policy.  In particular, Defendants terminated the program because they purportedly concluded that the Executive Branch lacks authority to continue the program, yet DHS continued to adjudicate pending DACA applications and renewal applications received before October 5, 2017 (for individuals whose benefits would expire before March 5, 2018), effectively extending DACA for an additional two and a half years.  Likewise, the President suggested that he may renew DACA if Congress does not act within six months, which is an inherent admission that the stated rationale for DACA's rescission is arbitrary and capricious.

87.     The rescission of DACA also violates the APA because it is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  For the reasons set forth in this complaint, Defendants' actions in promulgating and implementing the rescission of DACA are unconstitutional and therefore must be vacated.

88.     For all of the reasons stated above and throughout this complaint, Defendants' actions violate the APA.

89.     Defendants' violation causes ongoing harm to the University, Microsoft, Perales Sanchez, and other DACA recipients.  These injuries fall within the zone of interests of the INA, which is intimately related to the ability of Perales Sanchez and other Dreamers to study and work in the United States and to the University and Microsoft's ability to enroll and hire Dreamers.

## COUNT III

## VIOLATIONS OF THE FIFTH AMENDMENT (EQUAL PROTECTION)

### *Brought By All Plaintiffs Against All Defendants*

90.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91.     The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from denying equal protection of the laws.

92.     Rescission of DACA impermissibly discriminates against DACA recipients on the basis of a characteristic over which they have little control—namely, their undocumented status. Defendants' decision to deprive DACA recipients of their interest in furthering their education or pursuing a livelihood presents unreasonable obstacles to advancement based on individual merit, and cannot be sufficiently justified by federal interests.

93.     The University, DACA recipients enrolled at the University, other University students, Microsoft, and Perales Sanchez, have been and continue to be harmed by this violation of the equal protection guarantee of the Fifth Amendment.

## COUNT IV

**VIOLATIONS OF THE FIFTH AMENDMENT (DUE PROCESS—RESCISSION)**

*Brought By All Plaintiffs Against All Defendants*

94.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

95.     DACA recipients—including Perales Sanchez, other University students and alumni, and Microsoft employees—are physically present in the United States and have developed deep and meaningful connections to their communities, including through pursuit of education, occupation, entrepreneurial enterprise, financial and other support for family, friends, and members of the public, and other activities enabled by the government's decision to grant deferred status.

96.     The Due Process Clause applies to individuals and entities present in the United States. *See Zadvydas v. Davis*, 533 U.S. 678, 682, 693-94 (2001) ("[A]liens who were admitted to the United States but subsequently ordered removed" have constitutional due process rights, "whether their presence here is lawful, unlawful, temporary, or permanent.").

97.     The Due Process Clause imposes limits on federal government decisions that deprive individuals of liberty or property interests protected by the Fifth Amendment. *See Mathews v. Eldridge*, 424 U.S. 319, 331 (1976). Protected liberty and property interests may take many forms. *E.g., Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

98.     Rescission will, without due process of law, deprive the University of several interests cognizable under the Constitution. For example, the University currently has enrolled 16 DACA recipients, including 1 graduate student and 15 undergraduate students. The University

has incurred substantial cost to support each student, including costs associated with faculty time and attention, privately-funded financial aid, research grants, housing, and other resources. The University has made these investments on the basis of individual merit, and with the firm belief that each student will make significant contributions to communities within and beyond the University. Were DACA enrollees to leave the University before completing their program of study, the University stands to forfeit the important contributions that the students make on campus, the resources the University has invested in their education, and the benefits associated with their future success, including their continued contributions—socially, academically, and monetarily—to the University.

99.     Rescission also will, without due process of law, deprive Microsoft of several interests cognizable under the Constitution. Microsoft has made significant investments in recruiting, training, and supporting DACA enrollees, and has conducted its business operations based on the well-founded expectation that they would continue to be eligible to work at the company. If DACA enrollees become ineligible to work at Microsoft, the company will lose this crucial talent in which it has heavily invested, as well as the time, money, and resources that it has spent cultivating this human capital. It also will suffer business disruptions as a result of the loss of these employees and will have to spend additional resources to recruit, train, and promote replacement employees.

100.    DACA recipients, including Perales Sanchez, also have constitutionally-cognizable liberty and property interests in their deferred status, as well as rights, benefits, and property that they could not have obtained but for DACA. Because of DACA, some of these individuals, including Perales Sanchez, have become eligible for and obtained work authorization, become able

to open bank accounts, to obtain credit, to secure driver's licenses, to pursue higher education, and to access various federal government benefits, such as Social Security.

101.    The government, through its introduction, implementation, and operation of DACA, cultivated a reasonable expectation among the University, Microsoft, Perales Sanchez, and other DACA recipients that DACA recipients would have an opportunity to maintain and renew their deferred status.

102.    The rescission of DACA occurred with inadequate notice and without any opportunity to be heard and does not provide for any opportunity to be heard.  As a result, rescission and actions taken by Defendants in connection with rescission unlawfully deprive the University, Microsoft, Perales Sanchez, other DACA recipients enrolled at the University, and all other University students of constitutionally-protected interests without due process of law.

103.    The University, Microsoft, Perales Sanchez, other DACA recipients enrolled at the University, and other University students have been and continue to be harmed by these violations of the Due Process Clause of the Fifth Amendment.

## COUNT V

## VIOLATIONS OF THE FIFTH AMENDMENT

## (DUE PROCESS — INFORMATION SHARING)

*Brought By The University and Perales Sanchez Against All Defendants*

104.    The University and Perales Sanchez repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

105.    The Due Process Clause also requires fundamental fairness and limits the government's discretion to make and break assurances, particularly when the government offers benefits to induce conduct that may have severe repercussions.

106.    After introducing DACA, the government invited undocumented individuals brought to the United States as children to apply for deferred status and, in the event an individual was granted relief, work authorization.  Applications for deferred status and for work authorization required that individuals provide sensitive and detailed personal information.  To induce otherwise vulnerable individuals to disclose this information, the government made clear and consistent assurances that it would not be used to facilitate removal.  For example, in official instructions provided to potential applicants, the government represented that information supplied in a request for consideration under DACA "is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement."

107.    In reliance on the government's assurances about information sharing, and the potential to secure relief under DACA, Perales Sanchez, and other individuals enrolled at the University provided the government with sensitive and detailed personal information.

108.    In addition to rescinding DACA, the Defendants have revised assurances about information sharing.  Defendants no longer promise to protect information from use for immigration enforcement.  Instead, they offer only to prevent personal information from being provided "proactively" to agencies responsible for facilitating removal.  Except as previously provided under the DACA program, the use of information obtained through implementation and operation of DACA—information that was provided at the government's invitation, to facilitate an assessment of eligibility for deferred status, and based on assurances that it would be protected—for any purpose related to immigration enforcement violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

109.     The University, Perales Sanchez, other DACA recipients enrolled at the University, and all other University students have been and continue to be harmed by these violations of the Due Process Clause of the Fifth Amendment.

## REQUEST FOR DECLARATORY JUDGMENT

110.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

111.     The DACA program was a lawful exercise of the President's discretion to enforce the immigration laws.  The government, through OLC, concluded that DACA was lawful.  Defendants now claim, as the basis for rescission of the program, that DACA is unlawful.  There is therefore an actual controversy regarding whether the DACA program is lawful.

112.     The Declaratory Judgment Act, 28 U.S.C. § 2201, allows the court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

113.     Because it is a direct beneficiary of the program through its Dreamer students and employees, Princeton and Microsoft have interests in the legality of the DACA program.  Perales Sanchez, as a DACA beneficiary, also has an interest in the legality of the DACA program.  Defendants' decision to terminate DACA on the purported basis that the DACA program was unlawful has harmed Plaintiffs and continues to cause ongoing harm to Plaintiffs.

114.     Plaintiffs are entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the DACA program was lawful and is lawful today.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Princeton University, Microsoft Corporation, and Maria De La Cruz Perales Sanchez respectfully request that judgment be entered against the Defendants, and that this Court:

A. Declare pursuant to 28 U.S.C. § 2201(a) that the DACA program is lawful and constitutional;

B. Declare pursuant to 28 U.S.C. § 2201(a) that the termination of the DACA program was unlawful and unconstitutional;

C. Issue an injunction against enforcement and implementation of the DACA Rescission Memorandum, and enjoining Defendants from terminating or rescinding the DACA program;

D. Issue an injunction enjoining Defendants from sharing or otherwise using information furnished by Dreamers, including Perales Sanchez, pursuant to the DACA program for purposes of immigration enforcement, except as previously provided under the DACA program;

E. In the alternative, remand the action to the Defendants for reconsideration; and

   F. Grant such other and further relief as may be just and proper.

Dated: November 3, 2017      Respectfully submitted,

               THE TRUSTEES OF
               PRINCETON UNIVERSITY;
               MICROSOFT CORPORATION;
               MARIA DE LA CRUZ PERALES
               SANCHEZ

               By: /s/ Thomas J. Perrelli

               Thomas J. Perrelli
                 D.C. Bar No. 438929
               Lindsay C. Harrison
                 D.C. Bar No. 977407
               Marina Jenkins
                 D.C. Bar No. 988059
               Alex Trepp
                 D.C. Bar No. 1031036*

               JENNER & BLOCK LLP
               1099 New York Avenue, NW
               Suite 900
               Washington, DC 20001-4412
               Phone 202 639-6000
               Fax 202 639-6066
               Email: tperrelli@jenner.com
                 lharrison@jenner.com
                 mjenkins@jenner.com
                 atrepp@jenner.com

               *Attorneys for The Trustees of
               Princeton University, Microsoft
               Corporation, and Maria De La Cruz
               Perales Sanchez*

               *\*Application for Admission to District Court
               for District of Columbia Pending*

# EXHIBIT 5

## UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals,<br><br>        *Plaintiffs*,<br><br>        *v.*<br><br>ELAINE C. DUKE, Acting Secretary, Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States,<br><br>        *Defendants*. | **SECOND AMENDED COMPLAINT**<br><br>Case No. 1:16-cv-04756 (NGG) (JO) |

## INTRODUCTION

Plaintiffs Martín Batalla Vidal, Antonio Alarcon, Eliana Fernandez, Carlos Vargas, Mariano Mondragon, and Carolina Fung Feng ("Individual Plaintiffs"), on behalf of themselves and all other similarly situated individuals, and Make the Road New York ("MRNY"), on behalf of itself, its members and clients, and all similarly situated individuals (collectively "Plaintiffs" or "Named Plaintiffs"), bring this action to challenge the Trump Administration's unlawful termination of the Deferred Action for Childhood Arrivals ("DACA") program. Nearly one million young immigrants rely on DACA to work, study, hold driver's licenses, serve in the military, support their families, and live securely in the only country they know as home. Defendants' arbitrary decision to terminate this established and successful program upends the lives of these individuals and threatens to destabilize their families, communities, and

1

workplaces. The termination of DACA violates federal statutes and the Constitution, necessitating this Court's intervention to protect against imminent and devastating harm.

The termination of DACA will prevent Mr. Batalla Vidal from caring for patients at the nursing home where he works. It will prohibit Ms. Fernandez from working to support her two U.S.-citizen children, making her mortgage payments, and paying for health insurance for her family. It will throw into disarray the lives of Mr. Mondragon's two young children and pregnant wife, who depend on his ability to make a living wage. It will bar Mr. Vargas, who recently started attending night classes at City University of New York School of Law, from fulfilling his dream of becoming a lawyer. Defendants' decision to abruptly end the program will force nearly 800,000 people to live with the persistent fear of being separated from their families.

Defendants impose these harms in violation of the procedural requirements meant to protect individuals from arbitrary government action. The termination of DACA binds the Department of Homeland Security to categorically deny deferred action to new applicants as of September 5, 2017, and to deny all renewal applications as of October 5, 2017, without following public notice-and-comment procedures required by the Administrative Procedure Act ("APA"), and without the analysis required by the Regulatory Flexibility Act.

Separately, Defendants' DACA termination reverses longstanding agency policy on which nearly 800,000 people have relied, including assurances to DACA applicants that the information they provided would not be used against them or their loved ones. Under the APA, Defendants must provide a reasoned explanation for choosing to terminate this program. Rather than do so, Defendants have justified the reversal based on fear of a hypothetical lawsuit, the legally erroneous claim that DACA is unlawful, and a variety of inaccurate factual assertions.

Defendants' termination of DACA additionally violates the Fifth Amendment. Defendants have failed to correct misleading notices previously sent to many DACA recipients who are now required to submit renewal applications by October 5, 2017, in violation of procedural due process requirements. Finally, Defendants' contradictory, illogical, and false explanations for terminating DACA evidence that the true reasons for ending this highly successful program are pretextual, in violation of the guarantee of equal protection under law.

Because Plaintiffs and other similarly situated individuals face the imminent loss of their eligibility for DACA status due to Defendants' unlawful actions, Plaintiffs ask this Court to declare the termination of DACA unlawful and to enjoin its enforcement.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the U.S. Constitution, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, and the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601 *et seq.*

2.     Venue properly lies in this district because Individual Plaintiffs reside in the district, and Plaintiff Make the Road New York ("MRNY") operates community centers in Bushwick, Brooklyn; Jackson Heights, Queens; Port Richmond, Staten Island; and Brentwood, Long Island. 28 U.S.C. § 1391(e)(1). Venue also properly lies in this district because a substantial part of the events or omissions giving rise to this action occurred in the district. *Id.* § 1391(b).

## PARTIES

**Plaintiff Martín Batalla Vidal**

3.     Plaintiff Martín Jonathan Batalla Vidal ("Mr. Batalla Vidal") is a recipient of DACA. He has resided in Queens, New York for twenty years.

4.      Mr. Batalla Vidal was born in Mexico and raised in New York since he was a young child. Mr. Batalla Vidal has a younger brother who has also received DACA, and two younger brothers who were born in the United States. Mr. Batalla Vidal considers New York his home, as it is the only place he has lived in since he was a child.

5.      Mr. Batalla Vidal attended Bushwick Leaders High School for Academic Excellence in Brooklyn, New York from September 2004 until his graduation in June 2008.

6.      After graduating from high school, Mr. Batalla Vidal hoped to attend a nursing program at a school such as the City University of New York ("CUNY"), but could not seriously consider these programs because those universities did not offer financial aid to undocumented students. His guidance counselor and other advisors also stressed the difficulty of finding work in the medical field without employment authorization, in light of which Mr. Batalla Vidal chose not to pursue a degree he might not be able to use in the future.

7.      In November 2012, the Obama Administration created DACA. In November 2014, Mr. Batalla Vidal applied for DACA with the assistance of MRNY. To prepare his application, Mr. Batalla Vidal attended a workshop at MRNY's Brooklyn office, where he made follow-up visits. To prove his eligibility for DACA, Mr. Batalla Vidal spent many hours over the course of several months gathering paperwork and obtaining documents from his high school, hospital, and bank. On February 17, 2015, DHS approved Mr. Batalla Vidal's application.

8.      Receiving DACA reinvigorated Mr. Batalla Vidal's dreams of working in the medical profession, and in fall 2015, he enrolled at ASA College in a medical assistant's degree program. With DACA, Mr. Batalla Vidal was able to raise money for school and support his mother and younger siblings. He worked two jobs at the same time, full time at Bocca Catering and part time at the New York Sports Club. He currently works full time at Park Terrace

Rehabilitation and Nursing Center, where he cares for patients with serious health needs. Mr. Batalla Vidal also received a scholarship for DACA recipients from ASA College.

9.      Defendants approved Mr. Batalla Vidal's DACA renewal on February 16, 2017. His current grant will expire on February 15, 2019. Because of Defendants' termination of DACA, Mr. Batalla Vidal is ineligible to apply to renew DACA.

10.     Through employment he was able to obtain with DACA, Mr. Batalla Vidal can financially support himself, his mother, and his younger siblings. Mr. Batalla Vidal's ability to pursue his career and provide for his family has been thrown into jeopardy due to Defendants' termination of DACA. Without Mr. Batalla Vidal's income, he and his family will face significant financial hardship. If Mr. Batalla Vidal is deported, his family will also lose his emotional support and be irreparably harmed.

**Plaintiff Antonio Alarcon**

11.     Plaintiff Antonio Alarcon ("Mr. Alarcon") is a recipient of DACA. He resides in Queens, New York.

12.     Mr. Alarcon was born in Mexico and has lived in New York since he was eleven years old. As a child, he lived in New York with his parents, while his younger brother stayed behind in Mexico with their grandparents. When Mr. Alarcon was seventeen, his grandparents passed away, and his parents felt compelled to return to Mexico to care for his younger brother. When his parents left, Mr. Alarcon moved in with his aunt and uncle.

13.     Mr. Alarcon received DACA on March 26, 2013, with the assistance of MRNY, which then hired Mr. Alarcon as an Immigrant Youth Organizer. Employment by virtue of DACA enabled Mr. Alarcon to financially support himself, his aunt, and his uncle as he pursued his education.

14.     Mr. Alarcon graduated from Flushing High School, and received his associate's degree from LaGuardia Community College in 2015. He is currently pursuing a Bachelor of Arts degree in Film Studies from Queens College, where he is on track to graduate in December 2017.

15.     Through his employment and volunteer activities, Mr. Alarcon has become a leading voice for youth in his community and beyond. From facilitating local youth meetings and retreats, to serving as a regional coordinator on national campaigns, he has worked to expand educational opportunities for immigrant youth throughout New York and the United States.

16.     Defendants granted Mr. Alarcon DACA renewals on March 6, 2015 and again on January 26, 2017. His current grant will expire on January 25, 2019. He is ineligible to renew DACA because of Defendants' termination of the program, thereby jeopardizing his and his family's wellbeing.

**Plaintiff Eliana Fernandez**

17.     Plaintiff Eliana Fernandez ("Ms. Fernandez") is a recipient of DACA. She resides in Suffolk County, New York.

18.     Ms. Fernandez was born in Ecuador and came to the United States at the age of fourteen, where she was finally able to reunite with her parents after not seeing them for many years. She has lived in New York since she was fourteen years old. She has two New York-born, U.S. citizen, children of elementary-school age, whom she is raising.

19.     Ms. Fernandez first received DACA on December 11, 2012 and renewed her status on November 4, 2016. Her current grant will expire on November 20, 2018, and so she is no longer eligible to renew DACA as a result of Defendants' termination of the program.

20.     Ms. Fernandez has worked hard to build a life for herself and her family. Despite being ineligible for financial aid and other types of support, she attended St. Joseph's College,

where she was on the Dean's List many semesters and earned a degree in Sociology in 2015. She now works as an Immigration Case Manager in MRNY's Long Island office. This semester she started graduate school at CUNY School of Professional Studies to obtain an Advanced Certificate on Immigration Law.

21.     Ms. Fernandez is a mother and homeowner who contributes every day to the state of New York by working, studying, and giving back to her community. She was able to achieve these goals because of DACA, which allowed her to go back to school, earn a living wage, and purchase a home in which her children can grow up.

22.     Without DACA, Ms. Fernandez would no longer have a driver's license to drive her children to the doctor or to school. Without the employment authorization that her DACA status provides, she could not afford her mortgage or her family's health insurance. Defendants' termination of the DACA program puts Ms. Fernandez at risk of being separated from her children, as she was from her parents as a child.

**Plaintiff Carlos Vargas**

23.     Plaintiff Carlos Vargas ("Mr. Vargas") is a recipient of DACA. He resides in Staten Island, New York.

24.     Mr. Vargas was born in Puebla, Mexico. He came to the United States with his mother, who was struggling to raise Mr. Vargas and his siblings after Mr. Vargas's father passed away two months before he was born. Mr. Vargas has lived in New York City since he was four, and in Staten Island since he was sixteen.

25.     Mr. Vargas began working in restaurants at age thirteen to help his family, leaving school at 3 P.M. and working shifts from 4 P.M. to midnight, five days a week. He had

hoped to attend college but was told by a school counselor that he could not attend because he was undocumented.

26.     After graduating from James Madison High School in Brooklyn, Mr. Vargas began working sixty hours per week to support his family, while remaining committed to going to college and earning a degree. Mr. Vargas learned that his undocumented status would not prevent him from enrolling in CUNY College of Staten Island ("CUNY CSI"), provided he could pay his tuition without government loans. He applied for admission and was accepted. By taking classes at night and working full time during the day, Mr. Vargas obtained his Bachelor of Science degree in Business in 2014.

27.     Mr. Vargas applied for DACA in August 2012. His application was granted on December 13, 2012. DHS renewed his DACA on November 14, 2014 and again on September 14, 2016, with his current grant expiring on September 13, 2018. Mr. Vargas is no longer eligible to renew DACA as a result of Defendants' termination of the program.

28.     DACA allowed Mr. Vargas to obtain work authorization and a New York driver's license for the first time in his life, thereby opening up new employment and life opportunities.

29.     After volunteering for many years in Staten Island for Make the Road New York, El Centro del Inmigrante, and the Staten Island Community Job Center, Mr. Vargas became accredited as a U.S. Department of Justice Accredited Representative, authorizing him to represent individuals before U.S. Citizenship and Immigration Services and the Executive Office for Immigration Review, the component of the Department of Justice that hears immigration cases.

30.     Mr. Vargas now works at MRNY, where he screens individuals and provides assistance applying for DACA and other forms of immigration relief. He plans to become a

lawyer so that he can be a more effective advocate for his community. Last month, he began attending evening classes at CUNY School of Law.

**Plaintiff Mariano Mondragon**

31.     Plaintiff Mariano Mondragon ("Mr. Mondragon") is a recipient of DACA. He resides in Queens, New York.

32.     Mr. Mondragon was born in Mexico and first came to the United States with his father in 1999, when he was fourteen years old. Six months after they arrived, his father returned to Mexico while Mr. Mondragon remained in the United States with his aunt. He has not seen his parents in seventeen years.

33.     Mr. Mondragon began working at the age of sixteen. Since graduating from Flushing High School in 2005, he has worked in the restaurant industry.

34.     Mr. Mondragon has been married for five years. He and his wife have two U.S.-born children together, ages eight and one, and his wife is pregnant with their third child.

35.     Mr. Mondragon also has a ten-year-old daughter from a previous relationship. Her mother moved to Mexico when she was pregnant. While Mr. Mondragon has never met his daughter in person, he provides financial support for her.

36.     Mr. Mondragon received DACA on April 14, 2014 and renewed it on February 25, 2016. His DACA status will expire on February 24, 2018. In addition, two of Mr. Mondragon's brothers are DACA recipients.

37.     DACA has allowed Mr. Mondragon to support his family by working as a bartender in Manhattan and it has provided assurance that he will not be separated from his children and wife.

38.     At the time of filing this complaint, Mr. Mondragon is making every effort to renew his DACA status before the October 5, 2017 deadline.

**Plaintiff Carolina Fung Feng**

39.     Plaintiff Carolina Fung Feng ("Ms. Fung Feng") is a recipient of DACA. She resides in Middle Village, Queens.

40.     Ms. Fung Feng was born in Costa Rica and came to the United States to live with her aunt in 2001 when she was twelve. She has not seen her father—her only living parent—since she left Costa Rica sixteen years ago. Ms. Fung Feng first applied for DACA around September 2012 and was approved around December 2012. She has successfully renewed DACA twice, in July 2014 and June 2016. Her status expires in September 2018, and so she is no longer eligible to renew DACA as a result of Defendants' termination of the program.

41.     Ms. Fung Feng graduated from Hunter College in January 2013 with a Bachelor of Arts in English-Spanish Translation and Interpretation, and English Language Arts. She also received an English teaching certification from Teaching House in 2015.

42.     Ms. Fung Feng has worked for MRNY since 2015 as a Program Assistant for the Adult Literacy Program. She supports her younger brother, a U.S. citizen who graduated from CUNY City College in 2017, and her younger cousin, who came to the U.S. to study.

**Plaintiff Make the Road New York**

43.     Plaintiff Make the Road New York ("MRNY") brings this action on behalf of itself, as well as on behalf of its clients and members and all similarly situated individuals. MRNY is a nonprofit, membership-based § 501(c)(3) organization dedicated to empowering immigrant, Latino, and working-class communities in New York. With offices in Brooklyn, Queens, Staten Island, and Suffolk County, MRNY integrates adult and youth education, legal

and survival services, and community and civic engagement, in order to assist low-income New Yorkers improve their lives and neighborhoods.

44.     MRNY has a legal department staffed by twenty-three attorneys and eleven advocates who provide a broad range of civil legal services to immigrant New Yorkers. MRNY's immigration team provides individualized assistance to immigrants facing deportation, as well as in affirmative applications for immigration relief. MRNY also directly assists individuals prepare the documentation and paperwork necessary for DACA applications and renewals. Given the immigrant-rich nature of the New York neighborhoods it serves, MRNY's limited staff is unable to fully meet the high demand for its services and resources.

45.     MRNY currently offers weekly DACA clinics in large group settings in Queens and assists DACA-eligible individuals through its Action NYC program, which provides comprehensive immigration screenings to New Yorkers. MRNY also provides assistance with DACA renewals in its Brooklyn, Staten Island, and Long Island offices. Since fall 2012, MRNY has conducted approximately 392 DACA clinics and has submitted more than 2,582 DACA applications on behalf of its clients. MRNY assists its DACA-eligible clients with initial applications as well as renewals.

46.     MRNY has more than 20,000 dues-paying members residing in New York City and Long Island, primarily in the boroughs of Queens and Brooklyn. Its members include Plaintiffs Batalla Vidal, Alarcon, Fernandez, Vargas, Mondragon, and Fung Feng, along with many other members who will lose their DACA status as a result of Defendants' termination of the program.

47.     At least eleven current MRNY employees have DACA, including Plaintiffs Alarcon, Fernandez, Fung Feng, and Vargas.

48.     Approximately forty MRNY members, and a significant additional number of MRNY clients, have DACA that expires between September 5, 2017 and March 5, 2018 and are therefore subject to the mandatory October 5, 2017 renewal deadline. Of these members, MRNY has not been able to reach four DACA recipients to inform them they need to renew now. Some of these MRNY members and clients have received notices from Defendants advising them to renew "as soon as possible" and within 120 to 150 days before their status expires. Defendants' notices have made no mention of the October 5, 2017 deadline. None of these MRNY members or clients have received a corrected notice from Defendants informing them of the mandatory October 5, 2017 deadline for renewals.

49.     At least seven MRNY members, and an additional number of clients, were eligible for DACA as of September 5, 2017, but had not yet submitted their initial applications. Most of them were in the process of assembling the documentation necessary to satisfy the DACA eligibility requirements.

50.     Still, other youth members of MRNY, and an additional number of clients, were not eligible for DACA on September 5, 2017 but will become eligible for DACA in the future, under the terms of the 2012 Guidance. One member received a letter from her GED course indicating she met the education requirement of DACA on September 7, 2017—two days after she lost the ability to apply for DACA.

51.     Plaintiff MRNY, its staff, its members, and its clients are aggrieved by Defendants' final agency action and have exhausted their administrative remedies.

52.     The legal interests of MRNY, its staff, its members, and its clients in not having the DACA program terminated unlawfully, and in having their DACA applications and renewals considered, are germane to MRNY's purpose of advocating for the rights of low-income

immigrant communities, to its role as an employer of individuals with DACA, and are inextricably bound up with the legal services that MRNY attorneys provide the organization's clients.

53.     MRNY's clients face hindrances to bringing suit to protect their own interests, including but not limited to lack of notice, privacy concerns, fear of retaliation (against themselves and/or their families), language barriers, and lack of resources.

54.     Defendants' planned unlawful termination of the DACA program has already directly harmed MRNY by causing the organization to divert its resources from other time-sensitive immigration cases to assist individuals to apply for renewals by October 5, 2017, and to conduct additional screenings of its clients (members and non-members) to determine whether they are eligible for other forms of immigration relief.

55.      Since September 5, 2017, MRNY has already hosted twelve workshops on DACA renewal that they would not have had to host if Defendants had not terminated the program. MRNY's ActionNYC program in Queens, part of an initiative co-sponsored by the N.Y.C. Office of Immigrant Affairs and CUNY that connects New Yorkers with free and safe immigration services, has had to be put on hold for a month. Five Department of Justice Accredited Representative staff members who each do screenings and immigration application assistance had to cancel all of their September appointments and reschedule them for October and later, in order to schedule DACA renewal applications in their September slots. This has also involved the extra administrative burden of calling and rescheduling numerous appointments and delaying work on their other active cases.

56.     In addition, MRNY's legal team has expended its limited resources creating Know-Your-Rights materials, answering calls, addressing walk-in questions, mailing renewal

applications, and coordinating an emergency support plan, including mental health support, for members, clients, and staff due to the termination.

57.     MRNY has spent additional money on application fees for individuals who have received scholarships that would not be granted until after their applications needed to be submitted, as well as on priority shipping fees for renewal applications, to ensure they arrive by the October 5 deadline.

58.     MRNY will sustain further injuries if its DACA employees lose work authorization as a result of the Defendants' actions.

59.     MRNY has also expended extensive resources in bringing the current action to vindicate the rights of its members, its clients, itself, and others who are affected.

60.     These injuries to MRNY, its members, and its clients would be redressed by a favorable decision from this Court.

61.     As a New York-focused, non-profit organization, MRNY is a "small organization" under the RFA. 5 U.S.C. § 601(4). MRNY is directly affected by Defendants' termination of DACA, as the Agency's final action has adversely affected it. *Id.* § 611(a)(1).

**Defendants**

62.     Defendant Elaine C. Duke is the Acting Secretary of the U.S. Department of Homeland Security. She is sued in her official capacity.

63.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States and the head of the U.S. Department of Justice. He is sued in his official capacity.

64.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity.

## STATEMENT OF FACTS

**The 2012 DACA Memorandum**

65.     On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano ("the Secretary") announced the creation of the DACA program, which set out guidelines for U.S. Citizenship and Immigration Services ("USCIS") to use its prosecutorial discretion to extend deferred action to certain young immigrants "who were brought to this country as children and know only this country as home." Mem. from Janet Napolitano, Sec'y of Homeland Security, to Alejandro Mayorkas, Dir., U.S. Citizenship and Immigration Servs., *Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children*, June 15, 2012 ("DACA Memorandum") (attached hereto as Exhibit A). Those granted deferred action also became eligible for employment authorization. 8 C.F.R. § 274a.12(c)(14).

66.     The DACA Memorandum states that individuals who came to the United States as children, lack a serious criminal history, attend school or participate in the Armed Services, and meet other criteria may request that the Secretary grant deferred action, a discretionary form of relief from removal, for a period of two years, subject to renewal. Those granted deferred action in this manner could also obtain employment authorization and a social security card. *See* Ex. A, DACA Memorandum.

67.     The Secretary made findings that the individuals eligible to apply for DACA "have already contributed to our country in significant ways" and "lacked the intent to violate the law." *Id.* at 1. She found that our nation's immigration laws "are not designed to be blindly enforced without consideration given to the individual circumstances of each case," and that the limited resources of DHS must be "focused on people who meet our enforcement priorities." *Id.*

68.     Individuals who met the criteria listed in the DACA Memorandum did not automatically receive deferred action. Instead, DHS was directed to exercise its discretion to consider grants of deferred action "on a case by case basis." *Id*.

69.     Pursuant to the DACA Memorandum, USCIS established an application and background-check procedure to evaluate whether individuals would qualify for deferred action. Applicants were required to disclose extensive sensitive and personal information to Defendants, including their lack of lawful immigration status as of June 15, 2012, current and previous mailing addresses, country of birth, dates of initial and subsequent entries, and contact information. *See* USCIS Form I-821D and Instructions (attached hereto as Exhibit B).

70.     In order to prove that they met the eligibility criteria, DACA applicants also routinely provided Defendants documents containing personal information, including copies of school records, pay stubs, bank statements, passports, birth certificates, and similar records.

71.     The information and records DACA applicants provided Defendants frequently included sensitive and personal information about third parties as well, including family members of DACA applicants.

72.     Defendants consistently represented to DACA applicants that the information they provided would be protected from disclosure to U.S. Immigration and Customs Enforcement ("ICE") and Customs and Border Protection ("CBP") for immigration enforcement proceedings against them and their family members or guardians, except in limited, delineated circumstances. *Id.* at 20; U.S. Citizenship & Immigration Servs.: Frequently Asked Questions (excerpt attached hereto as Exhibit C); Letter from Jeh Johnson, Sec'y of Homeland Sec., to Judy Chu, U.S. House Representative (Dec. 30, 2016) ("[T]he U.S. government represented to [DACA] applicants that the personal information they provided will not later be used for

immigration enforcement purposes. . . . We believe these representations . . . must continue to be honored.") (attached hereto as Exhibit D). These assurances allowed applicants to apply for deferred action without fear that the information they provided would later be used by Defendants to deport them or their families.

**Impact of the DACA Program**

73.    Since the program was first introduced in 2012, nearly 800,000 individuals have received deferred action and employment authorization under DACA. Close to 42,000 DACA recipients live in New York State alone.

74.    As a result of the DACA program, these young immigrants have been able to enroll in colleges and universities, and to obtain jobs, driver's licenses, bank accounts, and health insurance (through employment, college, or state-run programs). DACA recipients have come to rely on the program to allow them to work, study, and live without the constant threat of deportation. Indeed, in reliance on the program, DACA recipients have made significant investments in their futures, such as enrolling in higher education and graduate programs; pursuing employment opportunities; marrying and having children of their own; and purchasing homes and automobiles, to name a few examples.

75.    They have also relied on the availability of renewing DACA. New York DACA recipients have submitted more than 53,000 renewal applications since DACA began—10,000 more than initial applications, meaning that some recipients have renewed more than once.

76.    This reliance has continued since Defendant President Trump took office, because he maintained the program for nearly eight months, accepting both first-time applications and renewals while assuring DACA-eligible immigrants that he would "take care of" them.

77. The Trump Administration's arbitrary decision to terminate DACA reverberates well beyond the nearly 800,000 DACA recipients. The opportunities DACA recipients acquired and created as a result of the program benefitted their families, communities, and employers, as well. All of these groups stand to lose these gains, on which they have come to rely, if Defendants' arbitrary decision to end DACA stands.

78. For example, Ms. Fernandez works as an immigration advocate with MRNY and is enrolled in a graduate program at CUNY School of Professional Studies to obtain an Advanced Certificate on Immigration Law. Without DACA, she will be forced to leave her job and cease her studies. If Ms. Fernandez is deported, her two U.S.-citizen sons will be left without their primary caretaker. Like Ms. Fernandez, many DACA recipients depend on their work authorization to financially support family members, including U.S.-citizen children and siblings.

79. The positive impact DACA has made on the overall U.S. economy would disappear if the Administration's arbitrary decision to terminate the program holds. Economists calculate that DACA has boosted labor-force participation, raised DACA recipients' purchasing power, and increased state and federal tax revenues.

80. Economists estimate that the U.S. economy would lose tens of billions of dollars if the program is terminated. New York state alone stands to lose nearly $2.6 billion if DACA recipients leave the workforce. Terminating the program would have a significant fiscal and economic cost—estimated to be more than $60 billion—borne by the entire U.S. population.

**The Trump Administration's Animus Toward Individuals of Latino and Mexican Heritage**

81. A hallmark of Defendant Trump's campaign and presidency has been unabashed nativism, in both words and deeds, rarely seen in this country's recent history. As part of that

nativist platform, Defendant Trump and some members of his Administration have portrayed immigrants as imminent threats to the health, safety, and wellbeing of the United States.

82. One group that Defendant Trump has repeatedly targeted is Latinos, especially those of Mexican heritage. When Defendant Trump announced his candidacy in June 2015, he labeled Latinos and Mexicans as "criminals," a characterization he used to justify his harsh immigration proposals.

83. In his presidential announcement speech, then-candidate Trump stated: "When Mexico sends its people, they're not sending their best . . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists."

84. Defending these remarks, then-candidate Trump explained: "I can't apologize for the truth. I said tremendous crime is coming across." He later added: "What can be simpler or more accurately stated? The Mexican Government is forcing their most unwanted people into the United States. They are, in many cases, criminals, drug dealers, [and] rapists . . . ."

85. A few weeks after he announced his candidacy, Defendant Trump again described Mexicans as murderers and rapists, stating, "I do business with the Mexican people, but you have people coming through the border that are from all over. And they're bad. They're really bad." He labeled the people who were coming in as "killers and rapists."

86. During a Republican presidential debate in August 2015, then-candidate Trump again characterized Mexicans as criminals. He stated that "the Mexican government is much smarter, much sharper, much more cunning and they send the bad ones over because they don't want to pay for them, they don't want to take care of them."

87. Later that same month, Defendant Trump criticized fellow-candidate Jeb Bush because his wife is Latina, retweeting a post criticizing Governor Bush, which told him to stop speaking "Mexican" and instead speak English.

*88.* In May 2016, then-candidate Trump criticized U.S. District Judge Gonzalo Curiel for his Mexican heritage. Judge Curiel was born a U.S. citizen in Indiana. While Judge Curiel was presiding over a lawsuit against Trump University, then-candidate Trump complained that the jurist would not be able to fairly adjudicate the case because of his ancestry: "He's a Mexican. We're building a wall between here and Mexico. The answer is, he is giving us very unfair rulings—rulings that people can't even believe."

89. Since his inauguration, Defendant Trump has continued to express animus toward Mexicans and Latinos through both his words and actions. In August 2017, in a speech in Arizona, Defendant Trump described some undocumented immigrants as "animals."

90. That same month, Defendant Trump pardoned former Sheriff Joe Arpaio for contempt of court. Sheriff Arpaio had violated an injunction barring the Maricopa County Sheriff's Office from implementing a policy that allowed officers to arrest someone on suspicion of illegal presence and directed officers to consider "race or 'Mexican ancestry'" as a factor. *United States v. Arpaio*, 2017 WL 3268180 (D. Ariz. 2017). By pardoning Sheriff Arpaio, Defendant Trump implicitly approved of unconstitutional discrimination against Latinos and Mexicans, and stated that Sheriff Arpaio was convicted merely for "doing his job."

91. In his speeches since the Inauguration, when discussing the undocumented Latino community, Defendant Trump has characterized them as criminals and gang members.

92.     In his April 2017 prepared remarks announcing the Department of Justice's "Renewed Commitment to Criminal Immigration Enforcement," Defendant Sessions argued for securing the borders by taking a stand against "filth."

**The Trump Administration's Decision to Terminate the DACA Program**

93.     On June 29, 2017, Texas Attorney General Ken Paxton, along with the attorneys general of nine other states, wrote Defendant Sessions threatening to amend their complaint in *Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex.), to challenge the DACA program if Defendants did not terminate DACA by September 5, 2017.

94.     On September 5, 2017, Defendant Duke issued a memorandum announcing that DHS would terminate the DACA program. *See* Mem. from Elaine C. Duke, Acting Sec'y of Homeland Sec., to James W. McCament, Acting Dir., U.S. Citizenship and Immigration Servs., *Memorandum on Rescission of Deferred Action For Childhood Arrivals (DACA)*, Sept. 5, 2017 ("DACA Termination") (attached hereto as Exhibit E).

95.     Defendants Sessions, Duke, and Trump jointly made the decision to end DACA and jointly prepared the DACA Termination.

96.     The DACA Termination directs DHS to categorically reject all new DACA applications received after September 5, 2017. DHS will consider renewal applications from existing DACA recipients whose status expires on or before March 5, 2018, but only if such renewal applications are received by October 5, 2017. DHS will categorically reject renewal applications from DACA recipients whose status expires after March 5, 2018.

97.     Defendant Duke stated that the decision was based on two reasons: (1) the preliminary injunction issued against a separate program, *see Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*,

136 S. Ct. 2271 (2016) (per curiam); and (2) Defendant Sessions' opinion that DACA "was an unconstitutional exercise of authority by the Executive Branch," *see* Ex. E, DACA Termination.

98.     DHS provided no other explanation for its decision to terminate DACA.

99.     The preliminary injunction issued by a Texas court does not reach the original DACA program. Rather, it enjoins the Deferred Action for Parents of Americans and Lawful Permanent Residents program, a different program which is no longer in force.

100.     On September 5, 2017, Defendant Sessions held a press conference, falsely asserting that DACA "contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences." He stated further, "It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." *Attorney General Sessions Delivers Remarks on DACA*, Dep't of Justice (Sept. 5, 2017) (attached hereto as Exhibit F).

101.     While Defendant Duke based the decision to terminate DACA on the legally erroneous conclusion that DHS lacks authority to exercise its discretion in granting deferred action under DACA, Defendant Trump has made contradictory statements that suggest he believes it is within his executive authority. On September 5, 2017, shortly after the DACA Termination was published, Defendant Trump tweeted that if Congress did not act before March 5, 2018, he would "revisit this issue." If the unlawfulness of DACA were the true reason for terminating the program, then the President would lack authority to "revisit" ending DACA.

102.     In addition, on September 14, 2017, a week after the Administration's announcement terminating DACA, and facing multiple suits challenging his actions, Defendant Trump tweeted, "Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!....." This statement is

inconsistent with previous statements by Defendant Trump and the Trump Administration, and reflects the arbitrariness of the Administration's decision to end the program.

103.    The DACA status of more than 150,000 DACA recipients will expire before March 5, 2018. Many of those individuals have received the standard DHS renewal notice directing the recipient to submit a renewal application "as soon as possible," and to avoid a lapse in status by submitting the renewal application 120 to 150 days before expiration. *See* Dep't Homeland Sec., I-797C Notice of Action, July 15, 2017 (attached hereto as Exhibit G).

104.    Defendants' renewal notices do not advise recipients whose status will expire before March 5, 2018 that they, in fact, must submit a renewal application by the October 5, 2017 deadline.

105.    On information and belief, DHS has not provided and does not plan to provide accurate or corrected individualized notices to those DACA recipients who must renew by October 5, 2017, including those individuals whom Defendants have previously advised to renew "as soon as possible" but without mention of the October 5, 2017 deadline.

**Impact of the DACA Termination on Named Plaintiffs and the Putative Class**

106.    The DACA Termination will upend the lives of the nearly 800,000 DACA recipients, as well as those of their families, communities, and employers. Without DACA, the Individual Plaintiffs will lose their work authorization, preventing them from supporting themselves and their families. MRNY will lose approximately a dozen highly valued employees.

107.    For example, Mr. Batalla Vidal relies on his work authorization through DACA to work at a rehabilitation center caring for elderly and disabled patients; he supports himself, his mother, and his younger siblings. Without Mr. Batalla Vidal's income, he and his family will face substantial financial hardship.

108.    Ms. Fernandez depends on her work authorization to support herself and her two U.S.-citizen children.

109.    Additionally, the DACA Termination will prevent DACA recipients from enrolling in university and graduate programs since they will be unable to secure employment after graduating, blocking all future opportunities for professional or educational advancement. Similarly, their inability to secure employment while in school would severely hinder their financial ability to afford their education.

110.    For example, Mr. Alarcon relies on DACA to allow him to enroll as a Bachelor of Arts candidate at Queens College, where he is on track to graduate in December 2017.

111.    Ms. Fernandez has also relied on DACA to graduate from college and has just enrolled in graduate school at CUNY School of Professional Studies to obtain an Advanced Certificate on Immigration Law.

112.    The October 5, 2017 renewal deadline imposed on DACA recipients whose deferred action and work permit expire before March 5, 2018 is untenable for many DACA recipients for various reasons, including financial ones.

113.    For example, eighteen-year-old DACA recipient Guendi Castro and her nineteen-year-old brother Edgar Castro, also a DACA recipient, came to the United States from Mexico as toddlers. They currently live in New Mexico with their parents. Their DACA permits expire in early December 2017, and both must renew by October 5th or risk losing the protections of deferred action.

114.    Ms. Castro and her brother are struggling to muster the funds to pay the renewal fees by October 5th. She, her brother, and both of their parents work full time so they can pay for the family's household expenses, leaving little income to pay for both DACA renewal fees,

which add up to approximately $1,000. Ms. Castro and her brother are actively fundraising to pay the renewal fees, but at this moment still lack sufficient funds to file their renewals.

115.    In addition, the September 5, 2017, cutoff for initial applicants has inflicted severe harm on those who were unable to file by September 5, 2017.

116.    For example, Jose Rangel is DACA eligible, lives in Houston, Texas, and is thirty-four years old. He arrived in the United States from Mexico when he was six. He is married and has a seven-year-old U.S.-citizen daughter.

117.    Mr. Rangel did not apply for DACA in 2012 because he received erroneous legal advice that he was not eligible. Years later, a friend insisted he was eligible and encouraged him to apply.

118.    In mid-to-late August 2017, Mr. Rangel and his lawyer completed his initial application, which was ready to be finalized and mailed. On September 5, 2017, when Mr. Rangel heard Defendant Sessions' announcement, he was relieved that he had finished his DACA application two-weeks earlier and assumed it had been submitted.

119.    After calling his lawyer to confirm, Mr. Rangel found out that due to Hurricane Harvey, his lawyer's office had been closed and they were behind on mailing out applications— preventing his initial DACA application from being filed by September 5, 2017 and depriving him of the opportunity to receive the status.

120.    Similarly, M.J. is an eighteen-year-old Mexican national who has lived in the United States for almost all of her life. M.J.'s U.S.-citizen stepfather had been in the process of petitioning for her to receive permanent resident status. However, her stepfather became abusive and recently abandoned the family petition, leaving M.J. without status.

121.    M.J. met with non-profit attorneys who advised her to apply for DACA. The attorneys started work on the case, but Hurricane Harvey prevented them from completing the application because their homes and offices were flooded and closed.

122.    On the day Harvey landed, the attorneys tried to work with M.J. to get documents together and file for DACA prior to the expected announcement of the program's termination, but Houston was largely under water and the schools were closed, preventing M.J. from getting the requisite documents, the attorneys from getting into the office, and the postal service from sending any mail. There was no viable way for M.J. to file her DACA before September 5th.

123.    The DACA Termination, in most states, including New York, will prevent individuals from obtaining driver's licenses or state identification cards. For example, Ms. Fernandez relies on her driver's license to bring her children to school every day and the doctor when needed. Many DACA recipients rely on a driver's licenses or state identification cards as a form of photo identification for banking, insurance, notarizations, and other everyday services.

124.    Moreover, the DACA Termination places these individuals at risk of immediate apprehension and deportation. Under Defendant Trump, DHS has significantly increased its targeting of DACA recipients whose statuses have lapsed for deportation.

125.    The Trump Administration's new enforcement priorities, which are so all encompassing that they cannot in earnest be called "priorities," target individuals who would qualify for DACA. Trump has directed DHS to prioritize for removal anyone present in the United States without admission or parole, including those eligible for DACA.

126.    In fact, at the same time the DACA Termination was announced, the government issued "talking points" stating, *inter alia*, that: "The Department of Homeland Security urges DACA recipients to use the time remaining on their work authorization to prepare for and

arrange their departure from the United States . . . ." Similarly, a DHS "Frequently Asked Questions" document issued the same day refers to the time period prior to March 5, 2018 as a "grace period for DACA recipients" whose grants of deferred action will soon expire "to make appropriate plans to leave the country."

127.    DHS can easily deport the Plaintiffs because the Department already has their personal information. Plaintiffs and other DACA recipients provided extensive personal information to DHS in reliance on the agency's repeated promises to use the information only to grant them protection from deportation, and not to use that information for immigration-enforcement purposes except in narrow, delineated circumstances.

128.    Notwithstanding those prior assurances, DHS has changed its policy regarding the permissible uses of the information provided by DACA applicants to remove the limitations on using that information for immigration-enforcement purposes.  This policy change constitutes final agency action.

129.    If they are deported from the United States, Plaintiffs and others similarly situated face grievous harm. The Individual Plaintiffs, as well as the members and clients of MRNY, will be forced to leave the only country that many of them have known as home; they have grown up in American neighborhoods, attended American schools, and have structured their lives around living in the United States.

130.    The termination of DACA is already having profound impacts on the lives of DACA recipients. DACA recipients, including Individual Plaintiffs, fear deportation. Some have started to make provisions for what happens if they were deported, such as having difficult conversations with their parents and children about emergency plans.

131.    Faced with the loss of their work authorization, many DACA recipients have taken on additional jobs while they still have work authorization.

## CLASS ACTION ALLEGATIONS

132.    Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, Named Plaintiffs seek to represent a certified Plaintiff class consisting of (1) all persons with DACA as of September 5, 2017; and (2) all persons who are or will be eligible for DACA under the terms of the 2012 Guidance.

133.    Plaintiffs seek to represent the above-described class for all claims except that under the Regulatory Flexibility Act.

134.    This action meets all the Rule 23(a) prerequisites for maintaining a class action.

135.    The class members are sufficiently numerous as to render joinder impracticable, satisfying Rule (23)(a)(1). Defendants' decision to terminate the DACA program without providing adequate reasons and based on legal error, without going through the proper notice-and-comment procedure, without providing corrected notices to individual recipients subject to the October 5, 2017 renewal deadline, and based on animus toward individuals of Latino and Mexican origin, harms millions of individuals residing throughout the United States. In addition, the class action is the only appropriate procedural avenue for the protection of the class members' constitutional rights and rights under the APA.

136.    This action presents common questions of law and fact, resolution of which will not require individualized determinations of the circumstances to any plaintiff, satisfying Rule 23(a)(2). Such common questions of law and fact include, but are not limited to:

    a.    whether the DACA Termination constituted a substantive rule, such that notice-and-comment rulemaking was required under 5 U.S.C. § 706(2)(D);

b.    whether Defendants' termination of DACA and change in the policy regarding the permissible uses of the sensitive information DACA applicants provided was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the law, in violation of 5 U.S.C. § 706(2)(A);

c.    whether Defendants failed to provide corrected notices to individuals whom Defendants had previously written advising them to renew "as soon as possible" but without mention of the October 5, 2017 deadline, in violation of procedural due process; and

d.    whether the termination of DACA was substantially motivated by animus toward individuals of Latino and Mexican origin, and whether it had a disparate impact on such individuals in violation of the equal protection guarantee of the Due Process Clause of the Fifth Amendment.

137.    The Named Plaintiffs' claims are typical of the putative class, satisfying Rule 23(a)(3). Like the other members of the class, the Defendants' termination of the DACA program and change to the confidentiality policy without providing adequate reasons, in violation of 5 U.S.C. § 706(2)(A); failure to go through the proper notice-and-comment procedure, in violation of 5 U.S.C. § 706(2)(D); having its decision substantially motivated by animus, in violation of the equal protection guarantee of the Fifth Amendment; and failure to provide adequate notice to individuals who must renew by October 5, 2017, in violation of the Due Process Clause of the Fifth Amendment, harms the Named Plaintiffs.

138.    The interests of the putative class are fairly and adequately protected by the Named Plaintiffs and their attorneys, satisfying Rule 23(a)(4).

139.     The Named Plaintiffs' interests do not conflict with other members of the class. Instead, the Named Plaintiffs' interests are the same as those of the class: not to be subjected to agency rules that are promulgated without adequate basis, without undergoing the required notice-and-comment procedure, and that are implemented without fair notice and based on animus towards individuals of Latino and Mexican origin.

140.     The legal theories under which the Named Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class would rely, and the harms suffered by the Named Plaintiffs are typical of those suffered by the class members.

141.     With respect to Rule 23(a)(4) adequacy, undersigned counsel are qualified, experienced, and able to conduct the litigation. The attorneys have the necessary knowledge, experience, and resources to litigate this matter. In addition, attorneys have expended the time and effort necessary to identify the class.

142.     Counsel for Plaintiffs do not anticipate any conflicts of interest between the Named Plaintiffs and the other class members, nor does Counsel anticipate any reason that the other class members would dispute the adequacy of Counsel's representation.

143.     This action also meets all the requirements of, and is brought in accordance with, Rule 23(b)(2). Defendants' unlawful termination of the DACA program and changes to the confidentiality policy pose a real and immediate threat generally applicable to each member of the class, thus making final declaratory and injunctive relief with respect to the class as a whole appropriate.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Administrative Procedure Act: Agency Action Without Observance of
Procedure Required By Law
By all Plaintiffs against Defendants Duke and Sessions**

144.    Plaintiffs repeat and incorporate by reference each and every allegation contained

in the preceding paragraphs as if fully set forth herein.

145.    The APA requires that agency action that is substantive in nature follow notice-

and-comment procedures. 5 U.S.C. § 706(2)(D).

146.    The DACA Termination constitutes a substantive rule, as it binds DHS to

categorically deny applications for deferred action to individuals who fit the original DACA

eligibility criteria.

147.    It is undisputed that Defendants failed to follow notice-and-comment rulemaking

procedures prior to issuing the DACA Termination.

148.    Defendants' termination of DACA violated the APA.

### SECOND CLAIM FOR RELIEF
**Administrative Procedure Act: Agency Action that is Arbitrary and Capricious, An Abuse
of Discretion, and Otherwise Not In Accordance with Law
By all Plaintiffs against Defendants Duke and Sessions**

149.    Plaintiffs repeat and incorporate by reference each and every allegation contained

in the preceding paragraphs as if fully set forth herein.

150.    The APA prohibits federal agency action that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

151.    Defendants' DACA Termination and its change to the confidentiality of DACA

applicant information constitute final agency action, and are arbitrary and capricious, an abuse of

discretion, and otherwise not in accordance with the law because they (a) lack a rational

explanation for the change in policy on which persons had reasonably relied, (b) are based on a legal error, and (c) failed to consider all relevant factors.

152.    Defendants justified the DACA Termination on the grounds of litigation risk and the legal conclusion that the program is unlawful. These grounds are inadequate to justify termination, are legally erroneous, and fail to address the government's previous conclusion that the DACA program was lawful. These justifications are also contradicted by Defendant Trump's own subsequent statement that he would "revisit" the termination if necessary.

153.    Defendants provided no justification for many of the details of the DACA Termination, including the September 5, 2017 deadline for initial applications; the October 5, 2017 deadline to file renewal applications; the March 5, 2018 cut-off for renewal eligibility; and changes to the confidentiality of applicant information.

154.    Defendants' termination of DACA and changes to the confidentiality of DACA-applicant information violated the APA.

### THIRD CLAIM FOR RELIEF
#### Regulatory Flexibility Act
#### By Plaintiff MRNY against Defendants Duke and Sessions

155.    Plaintiff repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

156.    DHS failed to conduct any regulatory flexibility analysis to determine how the DACA Termination will affect small entities, such as MRNY, in violation of the Regulatory Flexibility Act. 5 U.S.C. §§ 601 *et seq.*

157.    MRNY, as a "small organization" within the meaning of 5 U.S.C. § 601(4), is directly affected by the DACA Termination, and therefore DHS was required to conduct a regulatory flexibility analysis prior to promulgating the rule.

158.    It is undisputed that Defendants failed to conduct a regulatory flexibility analysis.

159.    Defendants' termination of DACA violated the RFA.

### FOURTH CLAIM FOR RELIEF
### Fifth Amendment (Procedural Due Process)
### By all Plaintiffs against Defendants Duke and Sessions

160.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

161.    The hallmark of due process is notice and a meaningful opportunity to be heard.

162.    The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from depriving individuals of their liberty or property interests without due process of law.

163.    Defendants have not provided DACA recipients with the process to which they are entitled.

164.    Defendants, in individualized written notices, have advised many DACA recipients whose status expires by March 5, 2018 to apply to renew "as soon as possible" and, to ensure no lapse in status, to renew between 120 to 150 days before expiration.

165.    Defendants have not sent corrected notices to these DACA recipients advising them that they must apply to renew DACA by October 5, 2017 or be forever ineligible to renew their status. Nor do Defendants intend to issue such corrected notices, on information and belief.

166.    Defendants' failure to issue corrected notices advising of the October 5, 2017 deadline violates the Due Process Clause of the Fifth Amendment.

## FIFTH CLAIM FOR RELIEF
### Fifth Amendment (Equal Protection)
### By all Plaintiffs against All Defendants

167.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

168.    The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from denying to any person equal protection of the laws.

169.    The DACA Termination targets Latinos and, in particular, Mexicans, and will have a disparate impact on these groups.

170.    Defendants Sessions, Duke, and Trump have violated the equal protection guarantee of the Fifth Amendment because the DACA Termination was substantially motivated by animus toward Latinos and, in particular, Mexicans.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

171.    Declare that the DACA Termination and actions taken by Defendants to terminate DACA and to change the confidentiality of DACA applicant information are void and without legal force or effect;

(a) Declare that the DACA Termination and actions taken by Defendants to terminate DACA and to change the confidentiality of DACA applicant information are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law, in violation of 5 U.S.C. §§ 702–706;

(b) Declare that the DACA Termination and actions taken by Defendants to terminate DACA are in violation of the equal protection and due process guarantees of the Fifth Amendment of the U.S. Constitution and contrary to the law of the United States;

(c) Vacate and set aside the DACA Termination and any other action taken by Defendants to terminate DACA, including the change to the confidentiality of DACA-applicant information;

(d) Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of the Defendants, from implementing or enforcing the DACA Termination and the change in confidentiality of DACA-applicant information, and from taking any other action to terminate DACA that is not in compliance with applicable law or the U.S. Constitution; and

(e) Grant such other relief as this Court deems just and proper.

Dated: September 19, 2017

Respectfully submitted,

/s/ Michael J. Wishnie

David Chen, Law Student Intern
Susanna D. Evarts, Law Student Intern
Victoria Roeck, Law Student Intern[*]
Healy Ko, Law Student Intern[*]
Hannah Schoen, Law Student Intern
Emily Villano, Law Student Intern
Muneer I. Ahmad, Esq. (*pro hac vice*)
Marisol Orihuela, Esq. (*pro hac vice*)
Michael J. Wishnie, Esq. (MW 1952)
JEROME N. FRANK LEGAL SVCS. ORG.
michael.wishnie@yale.edu
Phone: (203) 432-4800

Amy S. Taylor, Esq. (AT 2056)
Deborah Axt, Esq. (DA 4885)
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690

Jessica R. Hanson, Esq. (*pro hac vice*)
Mayra B. Joachin, Esq. (*pro hac vice*)
Melissa Keaney, Esq. (*pro hac vice*)
Karen C. Tumlin, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
P.O. Box 70067
Los Angeles, CA 90070
Phone: (213) 639-3900

Justin B. Cox, Esq. (*pro hac vice*)
NATIONAL IMMIGRATION LAW CENTER
PO Box 170208
Atlanta, GA 30317
Phone: (678) 279-5441

Joshua A. Rosenthal, Esq.[†]
NATIONAL IMMIGRATION LAW CENTER
1121 14th Street NW, Suite 200
Washington, DC 20005
Phone: (202) 216-0261

*Attorneys for Plaintiffs*

[*] Motion for law-student appearance forthcoming
[†] Motion for *pro hac vice* admission pending

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 19, 2017, a true and correct copy of the foregoing Second Amended Complaint was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

/s/ Michael Wishnie
Michael Wishnie, Supervising Attorney (MW 1952)
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06511
Tel: (203) 432-4800
Fax: (203) 432-1426
michael.wishnie@ylsclinics.org

# EXHIBIT 6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| CASA DE MARYLAND<br>8151 15th Ave.<br>Hyattsville, MD 20783<br><br>THE COALITION FOR HUMANE IMMIGRANT<br>RIGHTS (CHIRLA)<br>2533 West 3rd Street<br>Los Angeles, CA 90057<br><br>FAIR IMMIGRATION MOVEMENT (FIRM)<br>1536 U Street NW<br>Washington, DC 20009<br><br>ONE AMERICA<br>1225 S. Weller Street, Suite 430<br>Seattle, WA 98144<br><br>PROMISE ARIZONA<br>701 S 1st Street,<br>Phoenix, Arizona 85004<br><br>MAKE THE ROAD PENNSYLVANIA<br>501 Washington St, 1st Floor<br>Reading, Pennsylvania  19601<br><br>MICHIGAN UNITED<br>4405 Wesson<br>Detroit, Michigan  48210<br><br>ARKANSAS UNITED COMMUNITY<br>COALITION<br>PO Box 9296<br>Fayetteville, AR 72703<br><br>JUNTA FOR PROGRESSIVE ACTION, INC.<br>169 Grand Avenue<br>New Haven, Connecticut 06513, | Case Number 17-02942<br><br>REDACTED COPY |

ANGEL AGUILUZ,  ESTEFANY RODRGIUEZ,    )
HEYMI ELVIR MALDONADO, NATHALY          )
URIBE ROBLEDO, ELISEO MAGES, JESUS      )
EUSEBIO PEREZ, JOSUE AGUILUZ, MISSAEL   )
GARCIA, JOSE AGUILUZ, MARICRUZ          )
ABARCA, ANNABELLE MARTINES HERRA,       )
MARIA JOSELINE CUELLAR BALDELOMAR,      )
BRENDA MORENO MARTINEZ, LUIS            )
AGUILAR,                                )
                                        )
J. M. O., a minor child,                )
                                        )
ADRIANA GONZALES MAGOS, next of friend  )
to J.M.O.                               )
                                        )
A.M., a minor child, and                )
                                        )
ISABEL CRISTINA AGUILAR ARCE, next of   )
friend to A. M.[1]                      )
                                        )
                                        )
        v.                              )
                                        )
                                        )
U.S. DEPARTMENT OF HOMELAND             )
SECURITY                                )
3801 Nebraska Ave. NW                   )
Washington, DC 20016                    )
                                        )
U.S. CITIZENSHIP AND IMMIGRATION        )
SERVICES                                )
20 Massachusetts Ave. NW                )
Washington, DC 20008                    )
                                        )
U.S. IMMIGRATION AND CUSTOMS            )
ENFORCEMENT                             )
500 12th St. SW                         )
Washington, DC 20536                    )
                                        )
U.S. CUSTOMS AND BORDER PROTECTION      )
1300 Pennsylvania Ave. NW               )
Washington, DC 20004                    )
                                        )

---

[1] All of the individual plaintiffs concurrently move to waive their obligations under Local Rule 102.2(a) to provide addresses, on the basis of their objectively reasonable fear that publicizing their home addresses would subject Plaintiffs to harassment (potentially including violence) and threats.

DONALD J. TRUMP, in his official capacity as          )
President of the United States                        )
1600 Pennsylvania Ave. NW                             )
Washington, DC 20500                                  )
                                                      )
JEFFERSON BEAUREGARD SESSIONS III, in                 )
his official capacity as Attorney General of the      )
United States                                         )
950 Pennsylvania Ave. NW                              )
Washington, DC 20530-0001                             )
                                                      )
ELAINE C. DUKE, in her official capacity as           )
Acting Secretary of Homeland Security                 )
Washington, D.C.  20528                               )
                                                      )
JAMES W. MCCAMENT, in his official capacity           )
as Acting Director of U.S. Citizenship and            )
Immigration Services                                  )
20 Massachusetts Ave. NW                              )
Washington, DC 20008                                  )
                                                      )
THOMAS D. HOMAN, in his official capacity as          )
Acting Director of U.S. Immigration and Customs       )
Enforcement                                           )
500 12th St. SW                                       )
Washington, DC 20536                                  )
                                                      )
KEVIN K. MCALEENAN, in his official capacity          )
as Acting Commissioner of Customs and Border          )
Protection                                            )
1300 Pennsylvania Ave. NW                             )
Washington, DC 20004                                  )
                                                      )
UNITED STATES OF AMERICA,                             )
                                                      )
                     Defendants.                      )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## OVERVIEW

1.      American democracy rests on fundamental principles of fairness and equality.

Our system of justice does not punish people for things that they did not do or that they could not

control.  And we expect our government to abide by its commitments.  In its rescission of the

Deferred Action for Childhood Arrivals ("DACA") program, and its draconian immigration

enforcement efforts, the federal government has abandoned these fundamental principles.

2.      In the three decades leading up to 2012, hundreds of thousands of children

immigrated to the United States.  Many of them crossed the border of the United States without

authorization, fleeing violence and desperate circumstances in their home countries, but with no

route to lawful entry under our nation's immigration laws.  Others came through lawful means,

but, for a variety of reasons, later lost their authorization to remain in the United States and did

not return to their countries of origin.  For many of these children, it was not their choice to come

to the United States.  All of them have grown up in this country, gone to school, and contributed

to the fundamental fabric of American society.  Lacking legal status, these young people grew up

in the shadows of American life, facing the fear of deportation, family separation, and hardship.

They were stigmatized, through no fault of their own.

3.       Many of these children dreamed of a better life – where they could live freely and

study, work, and defend their country – a life without fear of their government.

4.      On June 15, 2012, at the direction of President Obama, Janet Napolitano, then-

Secretary of the U.S. Department of Homeland Security, helped this dream come closer to

reality.  On that date, she established the Deferred Action for Childhood Arrivals (DACA)

program.

5.      Under DACA, individuals who came to the United States as children and meet

specific criteria may request "deferred action" for two years, subject to renewal.  "Deferred

action" is a long-standing mechanism under immigration laws allowing the government to

forbear from removal action against an individual for a designated period.  In addition to DACA,

federal law designates other classes as eligible for deferred action.[2]  Individuals granted deferred

action are eligible for certain rights and privileges associated with lawful presence status in the

United States.

6.       In establishing DACA, the federal government recognized that "certain young

people . . . were brought to this country as children and know only this country as home" and that

immigration laws are not "designed to remove productive young people to countries where they

may not have lived or even speak the language."  The government also recognized, among other

things, that children brought to this country had no intent to violate the law and that, with limited

resources, there were more appropriate priorities for immigration enforcement.

7.       DACA provides some sense of stability to individuals who came to the United

States as children and have grown up to become productive members of American society.

Collectively, this group of young people are often referred to as "Dreamers."

8.       To apply for DACA, Dreamers had to (1) submit extensive documentation to the

U.S. Citizenship and Immigration Services (USCIS) establishing that they meet the eligibility

criteria; (2) pay a $495 fee; and (3) submit to a rigorous DHS background check, including

submission of biometric data.

9.       When DACA was first implemented, many eligible Dreamers were reluctant to

apply because of concern that they would be required to disclose information that could help

facilitate their removal from the United States and place their family members at risk.  This

concern was understandable -- the average Dreamer entered the United States at the age of six,

and many had lived their whole lives in fear of deportation.

---

[2] *See generally* U.S. Dep't of Justice Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, Op. O.L.C.  (November 19, 2014).

10.     In an effort to encourage reluctant people to apply for DACA, the government

launched an aggressive outreach campaign urging Dreamers to apply.  These efforts included

well organized efforts to provide DACA application materials to organizations that serve the

immigrant community,[3] enlisting the White House to promote the stories of individual DACA

recipient "Champions of Change,"[4] and targeted outreach to select populations whose

participation in the program lagged.[5]  DHS officials routinely engaged with immigration service

providers and advocates, soliciting their assistance in expanding participation in DACA and

dealing with issues in its implementation.  USCIS officials attended DACA clinics hosted by

non-profits and immigration service providers across the country and held numerous engagement

sessions in person, by phone and via webinar[6] to encourage participation in the program.  In

conjunction with this campaign, USCIS made five promises to Dreamers.

11.     First, USCIS repeatedly promised Dreamers that information they provided about

themselves as part of the DACA application process would be "protected" from use for

immigration enforcement purposes.[7]

12.     Second, USCIS promised Dreamers that "information related to your family

members or guardians that is contained in your request will not be referred to ICE [U.S.

---

[3] *See generally* A. Singer et al., *Local Insights from DACA for Implementing Future Programs for Unauthorized Immigrants*, Brookings Institution (June 2015).
[4] Ginette Magaña, *DACAmented Teachers: Educating and Enriching Their Communities*, Obama White House Archives: Blog (Aug.4, 2015), https://obamawhitehouse.archives.gov/blog/2015/08/04/dacamented-teachers-educating-and-enriching-their-communities; Champions of Change: DACA Champions of Change, Obama White House Archives, https://obamawhitehouse.archives.gov/champions/daca-champions-of-change (last accessed Oct.4, 2017)
[5] White House Initiative on Asian Americans and Pacific Islanders, *Deferred Action for Childhood Arrivals (DACA)*, Department of Education, https://sites.ed.gov/aapi/files/2014/07/E3-TOOLKIT-DACA.pdf (last accessed 10/2/2017)
[6] *See* for example USCIS, National Stakeholder Engagement - DACA Renewal Process (June 2014), https://www.uscis.gov/outreach/notes-previous-engagements/national-stakeholder-engagement-daca-renewal-process
[7] These representations were extensive, and are detailed below in Section X.

Immigration and Customs Enforcement] for purposes of immigration enforcement against family members or guardians."[8]

13.     Third, USCIS promised employers of Dreamers that, except in limited circumstances, if they provided their employees "with information regarding [their] employment to support a request for consideration of DACA . . . . This information will not be shared with ICE for civil immigration enforcement purposes."[9]

14.     Fourth, by establishing internal procedures, USCIS promised that once Dreamers received DACA, they would not be terminated from the program unless they posed an "Egregious Public Safety" issue.  In addition, USCIS promised to provide them with a "Notice of Intent to Terminate" which "thoroughly explain[ed]" the grounds for the termination."[10]

15.     Fifth, USCIS promised  Dreamers that they could seek renewal of their status at the expiration of their two-year DACA term.  USCIS represented that Dreamers "may be considered for renewal of DACA" if they meet the guidelines for consideration and other criteria which "must be met for consideration of DACA renewal."[11]

16.     These repeated and unequivocal assurances were critical to the success of the DACA initiative.  Relying on these representations, more than 800,000 Dreamers brooked the potential risks of deportation and removal and applied for DACA.  Employers, too, relied on these representations to assist their employees in applying for DACA, despite the potential risk of liability for the employers.

---

[8] *See* USCIS, Deferred Action for Childhood Arrivals Frequently Asked Questions ("DACA FAQs") (April 25, 2017) Q20
[9] DACA FAQs Q76.
[10] *See*  DHS, National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (Apr. 4, 2013) ("SOP").
[11]   DACA FAQs Q51

17.      DACA has been a tremendous success, allowing the Dreamers -- -- such as

Plaintiffs Angel Aguiluz, Luis Aguilar, Estefany Rodriguez, Annabelle Martinez Herra, Heymi

Elvir Maldonado, Maricruz Abarca, Nathaly Uribe Robledo, Eliseo Mages, Jeus Eusebio Perez,

Josue Aguiluz, Missael Garcia, Jose Aguiluz, and Brenda Moreno Martinez --  to live, study, and

work in the United States, and to become stable and even more productive members of their

communities, without fear that they could be arrested and placed in deportation proceedings at

any moment.

18.      All of this changed on September 5, 2017, when Attorney General Jefferson

Sessions ("Sessions") announced the rescission of DACA.  Several hours after the

announcement, Acting Secretary of DHS Elaine Duke ("Duke") issued a memorandum

rescinding DACA (the "Rescission Memorandum").[12] At Acting Secretary Duke's direction,

USCIS immediately stopped accepting new applications under DACA, ended DACA recipients'

eligibility to apply for permission to leave the United States and reenter with advance parole, and

declared that DHS will consider DACA renewal applications only for Dreamers whose DACA

expires between September 5, 2017 and March 5, 2018 if, even then, only if these Dreamers

apply for renewal by October 5, 2017.

19.      The consequence of the administration's decision  to rescind DACA is that

approximately 800,000 Dreamers who have received benefits and received protection against

deportation under the program in reliance on the government's assurances will ultimately lose

their benefits and protection, and will be exposed to deportation when their DACA

authorizations expire and they cannot seek renewal.    In addition, hundreds of thousands of other

---

[12] Memorandum from Elaine C. Duke, Acting Sec'y of Homeland Security to James W. McCament, Acting Dir.,
USCIS, et al., Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with
Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017).

potential beneficiaries, many of whom were preparing to submit their requests for DACA, are now unable to benefit from the program.

20.    Specifically, as a direct result of the decision to eliminate DACA, among other things, Dreamers (i) will lose their work authorization, requiring their employers to terminate their employment, (ii) have lost the ability to travel internationally, and (iii) will lose their right to qualify under applicable state law for in-state admissions preferences and tuition.  As a result, many Dreamers will leave college because their inability to work will make higher education unaffordable or because they no longer qualify for in-state tuition.  Still others will leave college because they may no longer be able to achieve career objectives commensurate with their skills and qualifications.

21.    Furthermore, all of the Dreamers are at risk of having their application information shared with immigration enforcement authorities.  Welching on its prior assurances, on September 5, USCIS released guidance suggesting that it may share Dreamer applicant information with ICE and Customs and Border Protection (CBP).  The guidance substantively changes USCIS's policy in a manner that places Dreamers at heightened risk of deportation based on information previously disclosed to USCIS in good faith and in reliance on the promises outlined above.  The Rescission Memorandum does not provide any assurances that immigration enforcement agents will not be provided such information to find and remove those who applied for and/or received benefits or protection under DACA.

22.    Indeed, on September 27, 2017, Acting Secretary Duke shockingly testified before Congress that she had never seen any guidance telling Dreamers their information would not be used for immigration enforcement.

23.     The Defendants' decision to terminate DACA is a double-cross.  It is not only unjustified, but offensive to the basic values of this Nation.  It is arbitrary, capricious, and contrary to law, and therefore it cannot stand.

24.     The decision to rescind DACA is illegal because it is predicated on discriminatory animus against persons of Mexican or Central American origin.  Of the 800,000 DACA recipients, more than 90 percent of DACA recipients are of Mexican or Central American origin.[13]

25.     The evidence of discriminatory animus leading to the rescission is palpable.  The rescission is the culmination of a series of well-publicized statements made by President Trump starting as early as February 2015 revealing an anti-Mexican or anti-Central American immigrant animus and threatening Dreamers.

- Starting on February 24, 2015, President Trump made a series of defamatory and incendiary claims about immigrants from Mexico and Central America. For example, on that date, then-candidate Trump characterized immigrants from Mexico as "criminals."

- During his announcement speech on June 16, 2015, Trump referred to immigrants from Mexico as "rapists."

- In October 2016, Trump referred to immigrants from Mexico and Latin America as "bad hombres."

- On August 22, 2017, President Trump described unauthorized immigrants as "animals' who bring "the drugs, the gangs, the cartels, [and] the crisis of smuggling and trafficking."

26.     The Trump Administration's rescission of DACA is unlawful on a number of grounds.  First, the decision to rescind DACA unconstitutionally violates the due process

---

[13] See USCIS, Consideration of Deferred Action for Childhood Arrivals Fiscal Years 2012-2017 (data as of March 31)  (June 8, 2017),
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr2.pdf.

guarantee of the Fifth Amendment to the United States Constitution by reneging on DHS's prior

assurances regarding DACA (including the pledges not to use of information contained in

DACA applications).  Second, the decision also violates the equal protection guarantee contained

in the Fifth Amendment by treating Dreamers differently than other similarly situated recipients

of deferred action, obstructing them, without justification, from earning a living and furthering

their education.  Third, the rescission violates the Administrative Procedure Act in numerous

aspects.  To begin with, the rescission is contrary to various provisions of law, including the

Privacy Act and the e-Government Act.  It is also arbitrary and capricious because it (1) is

unsupported by a reasoned analysis that addresses the prior conclusion of the government that

the program was legal and constitutional or explains how the justification for the rescission can

be reconciled with the six-month wind down period; (2) is based on discriminatory animus; and

(3) contains deadlines that are arbitrary and treat similarly situated individuals differently based

on caprice.  Finally, the rescission was adopted without a legally sufficient justification and

without notice or the opportunity to comment.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

28.     Venue is proper in this district pursuant to 28 U.S.C. §§ 139l(b)(2) and

1391(e)(I). A substantial part of the events or omissions giving rise to this action occurred in this

district; Plaintiff CASA and many of the Individual Plaintiffs reside in this district.  This is a

civil action in which Defendants are agencies of the United States or officers of such an agency.

## PARTIES

29.     CASA de Maryland, Inc. (CASA) is a non-profit membership organization

headquartered in Langley Park, Maryland, with offices in Maryland, Virginia and Pennsylvania.

Founded in 1979, CASA is the largest membership-based immigrant rights organization in the

mid-Atlantic region, with more than 90,000 members. CASA's mission is to create a more just

society by building power and improving the quality of life in low-income immigrant

communities. In furtherance of this mission, CASA offers a wide variety of social, health, job

training, employment, and legal services to immigrant communities in Maryland, as well as the

greater Washington DC metropolitan area, Virginia, and Pennsylvania. CASA has provided

assistance on nearly 4,000 DACA and DACA renewal applications since 2012, and counts more

than 2,300 DACA beneficiaries as members. Since the September 5, 2017 DACA rescission,

CASA has had to reallocate significant resources to counsel and assist Dreamers who are eligible

to renew their DACA in the arbitrarily narrow window the administration announced. CASA's

small legal team, composed of three attorneys and five support staff, have suspended the

majority of their work to assist DACA renewal applicants, depriving community members of

access to other vital legal services. In addition, members of CASA's community organizing

department, as well as other CASA departments, have reprioritized their work to engage with the

community and educate them about the rescission of DACA and connect eligible individuals to

application assistance services. The rescission of DACA has had a significant negative impact

on CASA's mission, as DACA members and their families who live in our communities face an

uncertain future that may include loss of employment and potential permanent separation from

their families.

   30.  The Coalition for Humane Immigrant Rights (CHIRLA) is a non-profit

organization based in Los Angeles, CA. Founded in 1986, CHIRLA organizes and serves

individuals, institutions and coalitions to transform public opinion and change policies on

human, civil and labor rights. CHIRLA has been recognized by the Board of Immigration

Appeals to provide immigration legal services at low cost to its members; its Legal Services Department has helped thousands of individuals to become citizens and apply to DACA.

31.     FIRM is a coalition of 44 member organizations from across 32 states around the country. Founded in 2004, it is now the largest national network of immigrant-led grassroots organizations. FIRM fights for immigration rights including paths to citizenship and protection from low wages and poor conditions. When DACA went into effect, FIRM groups across the country helped 17,900 young people apply for work permits and relief for deportation.

32.     Michigan United is located in Detroit, Michigan. It was founded in 2012 from the merger of the Michigan Organizing Project and the Alliance for Immigrant Rights to form a statewide coalition of churches, labor, and community groups fighting for the dignity and potential of every person. It conducts extensive community organizing of low-income Latino and Arab American families. It has fought for a stronger national policy against immigration enforcement at schools and churches and for the DREAM Act. It has also been engaged in community education and implementation of DACA.

33.     OneAmerica is located in Seattle, Washington. It was formed directly after September 11, 2001 in response to the hate crimes and discrimination targeting Arabs, Muslims and South Asians. OneAmerica has grown into a leading force for immigrant, civil and human rights. Their mission is "OneAmerica advances the fundamental principles of democracy and justice at the local, state and national levels by building power within immigrant communities in collaboration with key allies." It advocates for immigration policies and practices to best address the needs of immigrant and refugee communities in partnership with immigrant and refugee community members. OneAmerica is advocating for a permanent legislative solution for DACA recipients, many of whom are active OneAmerica volunteers and members.

34.     Promise Arizona is located in Phoenix, Arizona. It was founded in 2010 as a reaction to the passage of the SB 1070 legislation targeting immigrants in the state. It's mission is to promote "diversity, opportunity, and progress…by building power in [their] community, championing family and cultural values, and connecting people to life-changing resources." PAZ advocates for the passage of the DREAM Act and a "humane and comprehensive immigration bill."

35.     Make the Road Pennsylvania is located in Reading, PA. It was founded in 2014 to organize low-income and working class Latino immigrants in Lehigh and Berks Counties to fight for change in their communities.  It has had several "Occupy" movements in various cities to defend DACA, and gives free legal help for DACA renewals.

36.     Arkansas United is located in Fayetteville, AR. It was founded in 2010 to help raise awareness in the immigrant community about how immigrants could become full participants in the state's economic, political and social processes.  It is raising money to assist Dreamers pay for their expedited renewals.

37.     Junta for Progressive Action is located in New Haven, CT.  Its mission is to "provide services, programs and advocacy that improve the social, political and economic conditions of the Latino community in greater New Haven while nurturing and promoting its cultural traditions as it builds bridges with other communities."  It has been pairing applicants eligible for DACA renewal with lawyers for help with their applications. It also put on a joint press conference with New Haven Mayor Toni Harp to advocate for a "clean Dream Act bill."

38.     ████████████████ (A.M.) is a 15 year old resident of Owings Mills, Maryland.  In October 2003, at the age of 12 months, he was brought to the United States from Honduras following the murder of his cousin.  He is currently a high school student with a 3.5

GPA and has been a Boy Scout for five years.  After graduation, his dream is to go to college and become an engineer.  He is frustrated that, due to the DACA rescission, he is no longer eligible to apply for DACA, and he fears he will lose his ability to apply for college or be employed after college, as well as is ability to visit family in Honduras.  He is also concerned that, if he and his mother are deported, they will be separated from his younger siblings, who are U.S. citizens.

39.     Isabel Cristina Aguilar Arce is the mother of A.M and his next of friend in this action.

40.     ███████████████████ (J.M.O.) is a 17 year old resident of Capitol Heights, Maryland.  In April 2005, at the age of 4, he was brought to the United States from Mexico to seek a better life.  At the age of 8, he suffered a stroke, and has been under medical care since that time.  Jose applied for and received DACA in March 2016.  He is currently a high school junior in suburban Maryland.  His dream is to go to college to study chemistry and become a chemical engineer.  His DACA is due to expire on March 6, 2018, one day after the last date as to which DHS will allow renewals.  Due to the DACA rescission, he is concerned that he will be unable to renew his DACA, and he fears he will lose his ability to apply for college.

41.     Adriana Gonzales Magos is the mother of J.M.O. and his next of friend in this action.

42.     Angel Aguiluz is a 20 year old resident of Silver Spring, Maryland.  In June 2005, at the age of 8, he was brought to the United States from Honduras by his parents, who were seeking medical attention for his older brother.  Angel applied for and received DACA.  He is currently a student at Montgomery College, where he is studying math and physics, and he is also employed part-time by a restaurant.  His dream is to become a physicist.  His DACA and

work permit are scheduled to expire in 2018. Due to the DACA rescission, he is concerned that he will lose his job and will be deported to Honduras.

43.     Estefany Rodriguez is a 20 year old resident of Rockville, Maryland. In 2001, at the age of 3, she was brought to the United States from Bolivia. She applied for and received DACA in January 2015. At the age of 18, she was diagnosed with brain cancer, and has been under medical care since that time. She is currently a student at Montgomery College. Her DACA is due to expire in January 2018, but she submitted a renewal application on October 4, 2017. She is concerned that, due to the DACA rescission, she will be unable to renew her DACA once it expires.

44.     Heymi Elvir Maldonado is a 20 year old resident of Baltimore, Maryland. In, 2008, at the age of 8, she was brought to the United States from Honduras by her mother, who was seeking a better life for her daughters. She applied for and received DACA. Since receiving DACA, she has worked as an office assistant for the school system, and has attended classes at Goucher College, where she intends to major in Business Management and Spanish. Her DACA recently expired. She is concerned that, due to the DACA rescission, she is unable to renew her status and will be unable to work or to be able to afford to complete her college degree. She is also concerned that she will be deported to Honduras, where she has no connections.

45.     Nathaly Uribe Robledo is a 22 year old resident of Glen Burnie, Maryland. In 1997, at the age of 2, she was brought to the United States from Chile to seek a better live. Nathaly applied for and received DACA in October 2012. For the last three years, she has worked as an insurance agent, and her dream is one day to have her own agency. She had planned to apply for permanent legal resident status, as well as for advance parole in 2018 to visit her great-grandmother in Chile. Her DACA is scheduled to expire on December 4, 2017;

she submitted a renewal in July, but has not heard whether it has been approved. Due to the

DACA rescission, she has cancelled her plans to travel to Chile, and her plan to apply for legal

permanent status has been put on hold. She is concerned that she will lose her job once she loses

work authorization.

46.     Eliseo Mages is a 23 year old resident of Capital Heights, Maryland. In April

2004, at the age of 11, he was brought to the United States from Mexico so that he and his

brother could have a better education and a better life. Eliseo applied for and received DACA.

Following receipt of his work permit, he worked in a paint store (ultimately being promoted to

manager) while he earned a college degree as a Veterinarian's Assistant. His DACA is due to

expire in 2019. Due to the DACA rescission, he is concerned he will not be able to keep his job

and will not be able to obtain employment with a veterinarian.

47.     Jesus Eusebio Perez is a 25 year old resident of Baltimore, Maryland. In 1997, at

the age of 5, he was brought to the United States from Mexico so that his parents could provide

for his family. Jesus applied for and received DACA in November 2012. For over the last four

years, he has been employed by the Johns Hopkins School of Public Health, first as a Research

Assistant and currently as a Mental Mentor, who works with middle school students. His DACA

and work permit are due to expire in March 2019. Due to the DACA rescission, he is concerned

that he will lose his employment when his work permit expires and that he will be deported to

Mexico.

48.     Josue Aguiluz is a 25 year old resident of Beltsville, Maryland. In June 2005, at

the age of 12, he was brought to the United States from Honduras by his parents, who were

seeking medical attention for his older brother. He applied for and received DACA and a work

permit in November 2012. While maintaining a full time job, he earned an associates' degree in

accounting.  He is currently employed as a billing analyst for a Northern Virginia technology company and is working towards a bachelor's degree in accounting. His DACA and work permit are due to expire in November 2018.   Due to the DACA rescission, he fears that he will be terminated once his work authorization expires, that he will not be able to  complete his bachelor's degree, and that this will delay his ability to take the CPA exam.

49.     Missael Garcia is a 27 year old resident of Dundalk, Maryland.  In September 2002, at the age of 12, he was brought to the United States from Mexico by his parents, who were seeking a better life.  He was valedictorian of his high school class.  He applied for and received DACA and a work permit in August 2015.  He has worked as a community organizer, as a mentor to middle school students, and in the restaurant business, and is expecting his first child to be born in the next few weeks.  His DACA and work authorization expired in August 2017.  Due to the DACA rescission, he is unable to renew his status and will be unable to provide for his young family or to complete the purchase of a house.  He is also concerned that he will be deported to Mexico, where he has no connections.

50.     Jose Aguiluz is a 28 year old resident of  Washington, D.C.  In June 2005, at the age of 15, his parents  brought him to the United States from Honduras to seek medical treatment (spinal surgery) following a car accident.  He earned an associate's degree in nursing in December 2011, but was ineligible to take board examinations to become a Registered Nurse. He applied for and received DACA and a work permit in November 2012.  He has subsequently passed the Nursing Boards and received his bachelor's degree in nursing in 2014.  He is employed as a Registered Nurse in a Maryland hospital, and plans to seek a master's degree in nursing.  His DACA and work permit are due to expire in November 2018.  Due to the DACA

rescission, he fears that he will not be able to pursue his master's degree, that he will be terminated once his work authorization expires, and that he will be deported to Honduras.

51.     Brenda Moreno Martinez is a 28 year old resident of Baltimore, Maryland. In August 2001, at the age of 12, her parents brought her to the United States from Mexico because her father was threatened because of his political views. She applied for and received DACA and a work permit in August 2012. She was subsequently able to attend and graduate from college and has passed her certification to become a teacher. She is currently employed as a teacher in the Baltimore City school system, and plans to seek a master's degree in education. Her DACA and work permit are due to expire in June 2018. Due to the DACA rescission, she is concerned that she will lose her job, and cannot pursue her master's degree. She has postponed her plans to visit her elderly grandmother in Mexico, and because she is scared of travelling even within the United States, has cancelled a family vacation to Hawaii.

52.     Maricruz Abarca is a 29 year old resident of Baltimore, Maryland. In June 2002, at the age of 15, she was brought to the United States from Mexico by her mother, who was trying to reunite their family. She applied for and received DACA in October 2016. Since receiving DACA, she has started a small business and is in the process of acquiring a towing company. She is currently attending classes at Baltimore City Community College to become a legal assistant. Her dream is to attend law school and become a lawyer. Her DACA is scheduled to expire in October 2018. Due to the DACA rescission, she is concerned that she will not be able to continue her education, and that she will be deported to Mexico (where she has no connections) and separated from her three children, who are all U.S. citizens.

53.     Luis Aguilar is a 29 year old resident of Alexandria, Virginia. In 1997, at the age of 9, he was brought to the United States from Mexico. He applied for and received DACA in

2012. He has taught himself how to code, and participated in the 2014 Facebook "hackathon"
and won a national competition by designing a website platform that serves as a tool for users to
search the voting record and stance of all members of Congress on immigration.  Since receiving
DACA, he has worked for a variety of organizations in the immigrant rights movement, and
currently works as CASA's Advocacy Specialist in Virginia.   His DACA and work permit are
scheduled to expire in March 2019.  He is concerned that, due to the DACA rescission, he will
be unable to find work once he loses his work authorization.

54.     Annabelle Martinez Herra is a 33 year old resident of Bowie, Maryland.  In
December 1995, at the age of 11, she was brought to the United States from Costa Rica by her
parents, who were seeking a better life.  She applied for and received DACA and work
authorization in July 2015.  After receiving DACA, she worked doing human resources and
accounting at a painting company, and was able to buy her house.  Her DACA expired in July
2017.  Since the DACA rescission, she has been fired by her employer. She is concerned that,
due to the DACA rescission, she will be unable to renew her status and she will be unable to find
other employment.  She is also concerned that she will lose her house, as well as her food
stamps.  She is also concerned she will be unable to care for her 14 year old son, who is a U.S.
citizen.

55.     María Joseline Cuellar Baldelomar is a 21 year old resident of Springfield,
Virginia.  In July 2001, at the age of 4, she was brought to the United States from Bolivia by her
mother, who was seeking a better life for her children.  She applied for and received DACA in
January 2013.  Since receiving DACA, she became employed by a child development center and
later became the musical director at her church.  She also has started a small business with her
husband. Her DACA is scheduled to expire in January 2018; she did not renew because since

December 2016, she has had an application pending to change her status to legal permanent

resident and she is concerned her information will be shared with immigration enforcement

authorities. Due to the DACA rescission, she is concerned that her application for legal

permanent residence will be denied and she will be deported, separating her from her family --

her husband, son, and siblings are all U.S. citizens.

56.     Defendant DHS is a federal cabinet agency responsible for implementing DACA.

DHS is a Department of the Executive Branch of the United States Government, and is an

agency within the meaning of 5 U.S.C. § 552(f)(l).

57.     Defendant USCIS is an Operational and Support Component agency within DHS.

USCIS is the sub-agency responsible for administering DACA.

58.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is an Operational

and Support Component agency within DHS. ICE is responsible for enforcing federal

immigration law, including identifying, apprehending, detaining, and removing non-citizens.

59.     Defendant U.S. Customs and Border Protection ("CBP") is an Operational and

Support Component agency within DHS. CBP is responsible for administering and enforcing

immigration law at borders.

60.     Defendant Donald J. Trump is the President of the United States, and authorized

the issuance of the Rescission Memorandum that purports to rescind DACA. He is sued in his

official capacity.

61.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the

United States, and announced the rescission of DACA. He is sued in his official capacity.

62.     Defendant Elaine C. Duke is the Acting Secretary of Homeland Security. She is

responsible for implementing and enforcing immigration laws, and oversees DHS. She is the

author of the September 5, 2017 Rescission Memorandum rescinding DACA. She is sued in her official capacity.

63.     Defendant James W. McCament is the Acting Director of U.S. Citizenship and Immigration Services.  He is sued in his official capacity.

64.     Defendant Thomas D. Homan is the Acting Director of U.S. Immigration and Customs Enforcement.  He is sued in his official capacity.

65.     Defendant Kevin K. McAleenan is the Acting Commissioner of U.S. Customs and Border Protection.  He is sued in his official capacity.

66.     Defendant United States of America includes all government agencies and departments responsible for the implementation and rescission of DACA.

## BACKGROUND:  ESTABLISHMENT OF DACA

67.      On June 15, 2012, Secretary Napolitano issued a memorandum establishing the DACA program (the "2012 DACA Memorandum"). Under DACA, individuals who came to the United States as children and meet specific criteria may request deferred action for a period of two years, subject to renewal.

68.     Deferred action is a long-standing mechanism under the immigration laws pursuant to which the government forbears from taking removal action (i.e., starting the process of expelling an immigrant from the United States) against an individual for a designated period. In addition to DACA, federal law and the federal government by executive action have declared various other classes of individuals as eligible for deferred action.  For example:

- In 1990, the Immigration and Naturalization Service implemented a "Family Fairness" program to protect approximately 1.5 million spouses and children

of immigrants who had been granted legal status under the 1986 immigration law.[14]

- Certain aliens who have suffered abuse by U.S. Citizens or LPR spouses or parents may self-petition under the Violence Against Women Act for deferred action status.  8 U.S.C. § 1154(a)(1)(A)(iii)–(iv), (vii)).

- Certain aliens who are victims of human trafficking and their family members are eligible for deferred action status.  8 U.S.C.§ 1101(a)(15)(T)(i).

- Certain aliens who are victims of certain crimes and their family members are eligible for deferred action status.  8 U.S.C.§ 1101(a)(15)(U)(i).

- In 2009, DHS implemented a deferred action program for certain widows and widowers of U.S. Citizens.[15]

- The U.S. government has, in the wake of major natural disasters, allowed foreign students who can no longer satisfy the requirements to maintain their student visas to be eligible for deferred action.[16]

- The U.S. government has, from time to time, allowed aliens of particular nationalities to be eligible for deferred action.[17]

69.     Under the 2012 DACA Memorandum, applicants had to demonstrate that they (i) came to the United States under the age of sixteen; (ii) had continuously resided in the United States since June 15, 2007; (iii) were currently in school, had graduated from high school, had obtained a general education development certificate, or were an honorably discharged veteran; (iv) had not been convicted of a felony,  significant misdemeanor, three or more misdemeanor offenses, or otherwise posed a threat to national security or public safety; and (v) were not over thirty years old as of June 15, 2012.

---

[14] *See* Memorandum for Regional Commissioners, INS, from Gene McNary, Commissioner, INS, Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens (Feb. 2, 1990)

[15] Memorandum for Field Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, Re: Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children at 1 (Sept. 4, 2009)

[16] *See, e.g.,* USCIS, Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ) at 1 (Nov. 25, 2005)

[17] *See, e.g.,* Exec. Order No. 12,711, 3 C.F.R. 284(April 11, 1990) (Policy Implementation with Respect to Nationals of the People's Republic of China).  *See generally* Congressional Research Service, *Analysis of June 15, 2012 DHS Memorandum* (July 13, 2012) Appendix A.

70.     USCIS promised Dreamers that their applications would be considered under a fair process.  Specifically, USCIS assured Dreamers that "[a]ll individuals who believe they meet the guidelines . . . may affirmatively request consideration of DACA from USCIS through this process," and after USCIS receives the applicant's forms, evidence, supporting documents and application fee, "USCIS will review them for completeness." USCIS further affirmatively represented to Dreamers that if it determines that the request is complete, USCIS will send the applicant notices of receipt and for needed appointments, and then review the applications "on an individual, case-by-case basis" and notify applicants of its determination in writing.[18]

## BACKGROUND:  APPLICANTS WERE ADVISED THAT PARTICIPATION IN DACA ENTITLED THEM TO TANGIBLE BENEFITS

71.     In publicizing DACA, the government emphasized that deferred action status made Dreamers eligible for numerous benefits and privileges.

72.     For example, USCIS promised Dreamers if their DACA applications were granted, they "may obtain employment authorization" to work for up to two years.[19]  This commitment was authorized under federal law; under 8 CFR 274a(a)(11) & (c)(14), deferred action recipients (including, but not limited to, Dreamers) may apply for work authorization to be legally employed.  This representation was important to Plaintiffs Josue Aguilaz, Jose Eusebio Perez, and Missael Garcia who were working in low skill, minimum wage jobs; since receiving DACA, Augilaz has been able to obtain employment as an accountant, Garcia has been able to obtain employment as a school mentor, and Perez has been able to obtain employment as a Research Assistant at Johns Hopkins University.

---

[18] DACA FAQs Q7; USCIS, *F5 General Information — How do I request consideration of DACA?* at 2 (June 2014).
[19] DACA FAQs Q4.

73.    USCIS promised Dreamers that if their DACA applications were granted, they

would be eligible to travel outside the United States for educational, employment, or

humanitarian purposes.[20]   In particular, USCIS told Dreamers that they would be eligible to

apply for "advance parole," parole," which permits recipients to leave the country temporarily

without risk that they will be denied readmission.   This commitment opened the door to allow

international travel for Dreamers.   For example, DACA recipients were allowed to briefly depart

the U.S. and legally return under certain circumstances, such as to visit an ailing relative, attend

funeral services for a family member, seek medical treatment, or further educational or

employment purposes. This commitment was authorized under federal law; under 8 USC

212(d)(5)(A), deferred action recipients (including Dreamers) may apply for "parole" to travel

internationally without risk that they will be barred from re-entering the United States.[21]

Plaintiff Jose Aguilaz and Luis Aguilar successfully obtained advance parole to visit family

members in Honduras and Mexico respectively.

74.    USCIS promised Dreamers that if their DACA applications were granted, they

could attend educational institutions.[22]   In particular, USCIS told Dreamers they could attend

"elementary school, junior high or middle school, high school, alternative program," "education,

literacy, or career training program (including vocational training)" as well as an "education

program assisting students in obtaining a regular high school diploma or its recognized

equivalent under state law."   This commitment was authorized under federal law; under 42 USC

2000c-6, educational institutions may not discriminate on the basis of national origin, and under

42 USC 2000d, 28 C.F.R. § 42.104(b)(2), and 34 C.F.R. § 100.3(b)(2), individuals may not be

---

[20] DACA FAQs Q57.
[21] DACA FAQs Q57.
[22] DACA FAQs 32-34.

discriminated against in the receipt of federal financial educational assistance on the basis of

their national origin. *See also Plyler v. Doe*, 457 U.S. 202 (1982). Plaintiff Josue Aguilaz

credits DACA (which allowed him to take his certification to become a Registered Nurse) with

his decision to return to school to obtain an advance nursing degree. Similarly, Plaintiffs Eliseo

Mages, Brenda Moreno Martinez, Nathaly Uribe Robledo, and Angel Aguilaz all credit DACA

with allowing them to attend college.

75.    In publicizing DACA, the federal government emphasized that Dreamers would

pay into and be eligible for certain public benefits such as Social Security and disability.[23]   This

commitment was authorized under federal law; unlike other undocumented immigrants, under 8

USC 1611(b)(2) & (b)(3) and 8 U.S.C. 1621(d), deferred action recipients are eligible for public

benefits, such as Social Security, Medicare, and disability benefits.

76.    USCIS promised Dreamers that if their DACA application was granted, they

would be "authorized by DHS to be present in the United States," "considered by DHS to be

lawfully present," and that their "period of stay is authorized by DHS."[24]  This commitment was

authorized under federal law; under 8 CFR 109.1, deferred action recipients are granted

suspended accrual of unlawful presence for purposes of admission.

77.    In addition to the benefits directly provided by the federal government, these

benefits enabled Dreamers to secure equal access to other benefits and opportunities on which

Americans depend, including opening bank accounts, obtaining credit cards, starting businesses,

purchasing homes and cars, and conducting other aspects of daily life that are often unavailable

for undocumented immigrants.

---

[23] Karen Tumulty, *Illegal Immigrants could receive Social Security, Medicare under Obama Action*, Wash. Post., Nov, 25, 2014.
[24] DACA FAQs Q1, Q5.

78.     DHS recognized that DACA created rights that the government could not take away without affording due process.  Under the DACA "National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals ("SOP"), established by USCIS and DHS, individuals admitted into DACA are not to be terminated from the program absent an "Egregious Public Safety" issue.[25]  In this event, the procedures require USCIS to provide a "Notice of Intent to Terminate" which "thoroughly explain[s]" the grounds for the termination."  Other materials informed Dreamers that only " fraud or misrepresentation" in the application process or "[s]ubsequent criminal activity" would be grounds for revocation of DACA.[26]  The SOP further directed that the recipients of such notice should receive 33 days to "file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of participation in DACA.[27]

## BACKGROUND: THE PRIVACY COMMITMENT TO DREAMERS

79.     The DACA application form required applicants to provide a wealth of personal, sensitive information, including the applicant's lack of lawful immigration status, address, Social Security number, and the name and location of his or her school.  DACA applicants were also required to provide DHS with a detailed history of their criminal arrests and convictions, including all misdemeanors, however minor, and to affirmatively declare whether they had ever been placed in removal proceedings in the past.  The application process also required that all DACA applicants undergo biographic and biometric background checks, which included fingerprinting, before USCIS considered their DACA requests.

---

[25] SOP at 132-34.
[26] USCIS Approval Notice, Form 1-821D, Consideration of Deferred Action for Childhood Arrivals.
[27] SOP at 132.

80.     To induce participation in DACA, USCIS made numerous commitments to Dreamers regarding their rights under the program.

81.     Foremost among these commitments was the promise that DACA applicants' information would not be shared with the DHS components responsible for immigration enforcement – ICE and CBP.  In providing this information, DACA applicants relied on Defendants' promises about the terms of the program and the manner in which their information would be protected.  These promises were documented, among other places:

- In the "Instructions" to Form I-821D -- the DACA application which every DACA applicant had to complete -- stated that "information provided in this request is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the individual meets the guidelines for the issuance of a Notice to Appear (NTA) or a referral to ICE under the guidelines set forth in USCIS's Notice to Appear Guidance."[28]

- In the Frequently Asked Questions for DACA applicants, USCIS affirmatively represented to Dreamers that, except in limited circumstances (i.e., the individual meets the guidelines for a Notice to Appear), their information would not be shared with immigration enforcement authorities. *See, e.g.,* FAQ Q19 ("[i]nformation provided in [a DACA request] is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings").

- In the Frequently Asked Questions for DACA applicants, USCIS affirmatively represented to Dreamers that their information would not be shared with immigration enforcement authorities even if their request for DACA was denied.  *See, e.g.,* FAQ Q26 ("[i]f you have submitted a request for consideration of DACA and USCIS decides not to defer your case ... your case will not be referred to ICE for purposes of removal proceedings").

- In other materials as well, USCIS promised Dreamers that it would not share their information with immigration enforcement authorities.  For example, one slide in a Powerpoint presentation staed: "Protecting Your Information: We *will not* share any information about you with ICE or U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless you meet the criteria for: the issuance of an NTA; or a referral to ICE under the criteria set forth in our NTA guidance."[29]

---

[28] Instructions to Form I-821D.
[29] June 2014 PPT at 30.

- The general guidance on the USCIS website reassured applicants that their applications would be submitted to a "lockbox" and would not be shared with immigration enforcement: "If your case does not involve a criminal offense, fraud, or a threat to national security or public safety, we will not refer your case to ICE for purposes of removal proceedings except where DHS determines there are exceptional circumstances." [30]

- Other guidance also stated "What protections are in place to protect the information I share in my request from being used for immigration enforcement practices?  The information you provide in your request is protected from disclosure to U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless you meet the criteria for issuance of a Notice to Appear or a referral to ICE under the criteria explained in USCIS' Notice to Appear . . . Individuals whose cases are deferred under the consideration of deferred action for childhood arrivals process will not be referred to ICE."[31]

- USCIS also promised employers of Dreamers that any information they provided verifying employment would not be used for enforcement purposes against them or their company absent "evidence of egregious violations of criminal statutes or widespread abuses."[32]

82.    In their receipt, use, maintenance, and protection of personally identifiable

information, DHS and USCIS, among other federal government agencies, are required to comply

with the Privacy Act of 1974 ("Privacy Act").  5 U.S.C. § 552a.  Among other things, the

Privacy Act prohibits an agency's disclosure of information about "individuals" to another

agency or person unless a specific exemption applies.[33]  The Privacy Act also provides that a

---

[30] Consideration of Deferred Action for Childhood Arrivals, "Filing Process" & "If USCIS does not grant DACA in your case."
[31]  USCIS, *F5 General Information — How do I request consideration of DACA?* at 3 (June 2014).
[32] DACA FAQs 76.
[33] *See* 5 U.S.C. § 552a (b) ("No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains").

government agency may not maintain information in its records that is not necessary to

accomplish a purpose required to be accomplished by statute or by executive decree.[34]

83.     Under the Privacy Act, USCIS and DHS stored DACA applicant information in

one of four pre-existing systems of records -- the "Alien File, Index, and National Tracking

System of Records," the "Background Check Service," the "Biometric Storage System," and the

"Benefits Information System."[35]

84.     DHS and USCIS, like other federal government agencies, also are required to

comply with the e-Government Act of 2002.  Pub. L. 107-347 (2002).  Among other things, the

e-Government Act requires a government agency to prepare a Privacy Impact Assessment that

addresses "with whom the information will be shared."  *Id.* § 208(b).

- Under the e-Government Act, on August 15, 2012, USCIS and DHS
  conducted a Privacy Impact Assessment ("PIA-45") for DACA.[36]

- PIA-45 repeatedly refers to DACA applicants as "individuals" (a key statutory
  term under the Privacy Act) and states that "prior to the submission of any
  information, individuals are presented with a Privacy Act Statement, as
  required by Section (e)(3) of the Privacy Act."  PIA-45 4.1.

- PIA-45 instructs that "any [personally identifiable information] that is
  collected, used, maintained, and/or disseminated . . . are to be treated as
  System of Records subject to the Privacy Act regardless of whether the
  information pertains to a U.S. citizen, Legal Permanent Resident, visitor, or
  alien."  PIA-45 7.1.

- PIA-45 expressly declares that "[i]nformation provided in this request is
  protected from disclosure to ICE and CBP for the purpose of immigration
  enforcement proceedings unless the individual meets the guidelines for the
  issuance of a Notice to Appear (NTA) or a referral to ICE under the guidelines
  set forth in USCIS's Notice to Appear Guidance."  PIA-45 3.3.

---

[34] *See* 5 U.S.C. § 552a (c)(1) (an agency "shall maintain in its records **only** such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President") (emphasis added).

[35] DHS/USCIS/PIA-045, Privacy Impact Assessment for the Deferred Action for Childhood Arrivals at 9 ((Aug. 15, 2012).

[36] *Id.*

- When USCIS updated the DACA Application Form (I-821D) to request additional information, DHS issued an updated PIA to provide notice of the new information requested. That updated form similarly said that information provided is "protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings."[37]

85.    PIA-45's treatment of DACA applicant data as covered by the Privacy Act was consistent with DHS policy. Well before the establishment of DACA, DHS set forth its policy to treat all persons' personally identifiable information, regardless of citizenship, the same under the Privacy Act.[38]

86.    Although the Privacy Act prohibition on disclosure includes exceptions that allow an agency to disclose information pursuant to a "routine use" or to "another agency . . . for a civil or criminal law enforcement activity," 5 USC 552a(b)(3&7), USCIS and DHS expressly waived those exceptions insofar as they relate to immigration enforcement activities regarding DACA applicants.

87.    As detailed above in paragraph 84, USCIS and DHS waived the disclosure exceptions by repeatedly and consistently promising Dreamers in agency publications that their data would not be shared with immigration enforcement authorities.

88.    The waiver of the exemptions from the Privacy Act's prohibition on disclosure of personally identifiable information in a system of records is further documented in the USCIS SOP for DACA, which sets forth the standards that DHS applies to DACA applications with nearly 150 pages of specific instructions for granting or denying deferred action. The SOP emphasizes that the "additional measures . . . necessary to ensure that enforcement resources are

---

[37] DHS/USCIS/PIA-045(a), Privacy Impact Assessment Update for the Deferred Action for Childhood Arrivals at 2, 6 (April 2014) ("There is no change in the DHS external sharing and disclosure of information as described in the DHS/USCIS/PIA-045 DACA PIA.")
[38] Guidance Memorandum from Hugo Teufel III, Chief Privacy Officer, U.S. Department of Homeland Security, 2007-01: DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Information on Non-U.S. Persons (Jan. 7, 2009)

not expended on these low priority cases," and includes provisions regarding the "lockbox" to

which applicants were directed to submit data, as well as "Revised Guidance for the Referral of

Cases and Issuance of Notices to Appear" that restricted the referral of cases to ICE. [39]

89.     In addition, USCIS and DHS senior leadership confirmed the waiver.  For

example, in December 2016, then-Secretary of Homeland Security Jeh Johnson sent a letter to

members of Congress regarding the need to protect DACA-related information, acknowledging

that there were, at the time, 750,000 DACA recipients who had "*relied* on the U.S. government's

representations" about prohibitions on the use of such information for immigration enforcement

purposes. Johnson unequivocally stated: "***We believe these representations made by the U.S.***

***government, upon which DACA applicants most assuredly relied, must continue to be***

***honored***." (emphasis added).

90.     The government's representations that information provided by a DACA applicant

would not be used against him or her for later immigration enforcement proceedings are

unequivocal and atypical.  For example, the federal government does not make the same

representations for individuals with similar statuses, such as Temporary Protected Status.[40]

91.     Because every DACA applicant was advised that applicant information would not

be shared with ICE or CBP, and because the government explicitly acknowledged, Dreamers

relied on this commitment in submitting their data, the Due Process Clause and the doctrine of

equitable estoppel preclude Defendants from taking actions breaching their commitments.

---

[39] SOP at 18, 20, 23-24 & App. B.
[40] *See, e.g.*, USCIS, Temporary Protected Status, https://www.uscis.go v/humanitarian/temporary-protected-status
(last updated May 24, 2017).

## THE ROAD TO RESCISSION

92.     DACA fundamentally changed the lives of Dreamers. By no longer having to hide in the shadows, they obtained employment, sought higher education, pursued career paths, and became fully contributing members of society who paid taxes and participated in civic life.  As Secretary Johnson stated in December 2016, DACA has enabled hundreds of thousands of young people "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs— all on the books."[41]

93.     As the Secretary of Homeland Security recognized less than 10 months ago, the United States "continue[s] to benefit . . . from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future ."[42]

94.     Ending DACA, whose participants are mostly of Mexican and Central American origin, fulfills President's Trump, Attorney General Sessions, and their subordinates oft-stated desire to punish and disparage people with Mexican and/or Central American  roots or Latinos generally, as a group, without acknowledging their individual personalities, attributes or circumstances, a failure to differentiate that is the essence of prejudice.  For example:

- In announcing his presidential campaign, then-candidate Trump compared Mexican immigrants to rapists, stating: "When Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. . . . It's coming from more than Mexico. It's coming from all over South and Latin America."[43]

- During the first Republican presidential debate, then-candidate Trump again restated his distaste for immigrants from Mexico: "The Mexican government .

---

[41]  Letter to Judy Chu, Representative, U.S. House of Representatives, from Jeh Johnson, Secretary, U.S. Department of Homeland Security ("Letter from Sec'y Johnson") (Dec. 30, 2016)
[42]  Letter from Sec'y Johnson
[43]  Transcript of Donald Trump's Presidential Bid Announcement, Washington Post (June 16, 2015).

. . send the bad ones over because they don't want to pay for them. They don't want to take care of them."[44]

- In May 2016, then-candidate Trump referred to anti-Trump protestors who carried the Mexican flag on Twitter as "criminals" and "thugs."[45]

- On August 21, 2015, two men urinated on a sleeping Latino man and then beat him with a metal pole. At the police station, they stated "Donald Trump was right; all these illegals need to be deported." When asked about the incident, then-candidate Trump failed to condemn the men, instead stating that they were "passionate." Specifically, Trump stated, "[i]t would be a shame . . . I will say that people who are following me are very passionate. They love this country and they want this country to be great again. They are passionate."[46]

- In June 2016, then-candidate Trump stated that Judge Gonzalo Curiel could not be fair in presiding over a lawsuit because he was Mexican-American and Trump was "very, very strong on the border" and Judge Curiel was "Hispanic" and "pro-Mexican."[47] . . . Now, he is Hispanic, I believe. He is a very hostile judge to me." Ex.

- In August 2016, during a speech in Phoenix, then-candidate Trump said: "We agree on the importance of ending the illegal flow of drugs, cash, guns, and people across our border. . . most illegal immigrants are lower skilled workers with less education . . . these illegal workers draw much more out from the system than they can ever possibly pay back. And they're hurting a lot of our people that cannot get jobs under any circumstances. . . We will immediately terminate President Obama's two illegal executive amnesties in which he defied federal law and the Constitution to give amnesty to approximately five million illegal immigrants, five million. . . . [N]o one will be immune or exempt from enforcement. . . . Anyone who has entered the United States illegally is subject to deportation. That is what it means to have laws and to have a country. Otherwise we don't have a country."[48]

---

[44] Andrew O'Reilly, At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico, Fox News (Aug. 6, 2015).
[45]; Donald Trump (@realDonaldTrump), TWITTER (May 25, 2016 6:39AM), https://twitter.com/realdonaldtrump/status/735465352436408320?lang=en ("The protestors in New Mexico were thugs who were flying the Mexican Flag); Donald Trump (@realDonaldTrump), TWITTER (June 4, 2016 6:04AM), https://twitter.com/realdonaldtrump/status/739080401747120128?lang=en ("Many of the thugs that attacked peaceful Trump supporters in San Jose were illegals").
[46] Adrian Walker, 'Passionate' Trump fans behind homeless man's beating?, The Boston Globe (Aug. 21, 2015).
[47]Transcript of Face the Nation, CBS News, June 5, 2016; Jose A. DelReal and Katie Zezima, Trump's personal, racially tinged attacks on federal judge alarm legal experts, The Washington Post, June 1, 2016.
[48] Transcript: Donald Trump's Full Immigration Speech, Los Angeles Times (Aug. 31, 2016).

- In October 2016, during a presidential debate, then-candidate Trump responded to a question about immigration by stating: "We have some bad hombres here and we're going to get them out."[49]

- In December 2016, Trump referred to an article about a recent crime wave on Long Island and said "They come from Central America. They're tougher than any people you've ever met. They're killing and raping everybody out there. They're illegal. And they are finished."[50]

- On January 26, 2017, referring to immigrants, President Trump said ""We are going to get the bad ones out . . . The criminals and the drug deals, and gangs and gang members and cartel leaders. The day is over when they can stay in our country and wreak havoc."[51]

- On January 27, 2017, newly-inaugurated President Trump and Mexico's President Peña Nieto discussed President Trump's proposal for a border wall over the phone. During that transcribed conversation, President Trump once again referred to Mexicans as "tough hombres."[52]

- In February 2017, President Trump said "What has been allowed to come into our country, when you see gang violence that you've read about like never before, and all of the things — much of that is people that are here illegally . . . They're rough and they're tough . . . So we're getting them out."[53]

- On June 21, 2017, President Trump – implied that thousands of immigrants are members of the Central American gang MS-13. He said "These are true animals. WE are moving them out of the country by the thousands, by the thousands."[54]

- Similarly, on June 28, 2017, President Trump said "They are bad people. And we've gotten many of them out already. . . We're actually liberating towns, if you can believe that we have to do that in the United States of America. But we're doing it, and we're doing it fast."[55]On August 16, 2017 at President Trump's direction, DHS terminated the Central American Minors Program,

---

[49] Katie Zezima, Trump on immigration: There are 'bad hombres' in the United States, The Washington Post (Aug. 30, 2017).

[50] Michael Scherer, Person of the Year 2016, TIME Magazine (Dec. 2016).

[51] Shannon Dooling, Mayor Walsh Vows to Keep Boston a Safe Place For Immigrants Following Trump's Orders , WBUR News (Jan. 26, 2017).

[52] Greg Miller et. al., Full Transcripts of Trump's Calls with Mexico and Australia, Wash. Post. (Aug. 3, 2017).

[53] Michael A. Memoli, One Comment from Trump shows his administration's message on immigration has been muddled, L.A. Times (Feb. 23, 2017).

[54] Michelle Ye Hee Lee, President Trump's claim that MS-13 gang members are being deported 'by the thousands,' Wash. Post. (June 26, 2017).

[55] Press Release, The White House Office of the Press Secretary, Remarks by President Trump During Meeting with Immigration Crime Victims (June 28, 2017).

which allowed unaccompanied minors fleeing violence in El Salvador, Guatemala, and Honduras to settle in the United States.[56]

- On August 25, 2017, President Trump pardoned former Maricopa County Sheriff Joe Arpaio, who was to be sentenced for criminal contempt for failing to comply with a federal judge's order to stop racially profiling Latinos.[57] Before issuing the pardon, President Trump asked rhetorically, "Was Sheriff Joe convicted for doing his job?" After issuing the pardon, President Trump sent a tweet calling Mr. Arpaio "an American patriot."

95.    President Trump's discriminatory statements about people with Mexican and

Central American roots show the root motivation for the DACA rescission.

96.    Other senior officials of the administration have echoed this animus.  For

example:

- On March 27, 2017, Attorney General Sessions cited two crimes committed by Latino immigrants and said "the American people are justifiably angry . . . DUIs, assaults, burglaries, drug crimes, rapes, crimes against children and murders. Countless Americans would be alive today-- and countless loved ones would not be grieving today . . . The President has rightly said that this disregard for the law must end. . . . "[58]

- On July 28, 2017, White House Senior Policy Advisor Stephen Miller said: "a message of tolerance toward illegal immigration is the number-one boon to smugglers and traffickers. And we've seen the results of that over the last eight years in terms of massive human rights violations associated with the Central American migrant surge. . . that permissive approach, we've seen the results, and the results have been deadly and horrific. . .  We also need to get expedited removal for illegal immigrants from Central America."[59]

**THE DACA RESCISSION**

97.    On September 5, 2017-- more than five years after first making numerous

promises to induce individuals to participate in DACA-- DHS abruptly rescinded DACA and

---

[56] Mica Rosenberg, U.S. ends program for Central American minors fleeing violence, Reuters (Aug.16, 2017).
[57] Julie Hirschfield Davis and Maggie Haberman, Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal Immigration, N.Y. Times (Aug. 25, 2017).
[58] Dep't of Justice, Attorney General Jeff Sessions Delivers Remarks on Sanctuary Jurisdictions, https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions (March 27, 2017).
[59]  Press Release, The White House Office of the Press Secretary, *Press Gaggle by Senior Policy Advisor Stephen Miller*, July 27, 2017.

breached those promises.   Defendant Sessions announced the rescission of DACA.  On the same

day, Defendant Duke issued a memorandum formally rescinding DACA.  The Rescission

Memorandum created a new legal regime governing DACA recipients, which imposed rights and

obligations and is legally binding.

98.     Under the Rescission Memorandum, the government will immediately cease

accepting applications under DACA.  Dreamers who were too young to be eligible, such as

Plaintiff A.M, can no longer apply for DACA.

99.     Under the Rescission Memorandum, the federal government will issue renewals

only for recipients whose DACA permits expire between September 5, 2017 and March 5, 2018,

and only if they apply for renewal by October 5, 2017.  DACA recipients who let their status

lapse in the weeks leading up to September 5, 2017, such as Plaintiffs Heymi Elvir Maldonado,

Maricruz Abarca, Annabelle Martinez Herra, and Missael Garcia, can no longer renew their

DACA.

100.     Under the Rescission Memorandum, the federal government will not issue

renewals for recipients whose permits expire after March 5, 2018.  Individuals whose DACA

expires after that date, such as Plaintiff J.M.O. (whose DACA expires on March 6, 2018), Angel

Aguiluz, Luis Aguilar, Eliseo Mages, and Brenda Moreno Martinez, will not be allowed to renew

their DACA.

101.      Under the Rescission Memorandum, the government will not approve any new or

pending applications for advanced parole for DACA recipients, meaning that Dreamers are

prevented from traveling abroad and returning to the United States, even where there are

compelling humanitarian or other reasons for such travel.   Dreamers can no longer travel outside

the United States during their benefit period, including for those who have already submitted

requests for advance parole in reliance on DHS's assurances that advance parole was available to

them.  Those who have pending applications are therefore denied advance parole without any

assessment under the criteria DHS has used for advance parole requests.  Many Dreamers, such

as Plaintiffs Brenda Moreno Martinez and Nathaly Uribe Robdelo have cancelled plans to visit

elderly relatives abroad.

102.     Under the Rescission Memorandum, thousands of Dreamers will lose their work

authorization each day beginning March 6, 2018. Many Dreamers, such as Plaintiffs Angel

Aguiluz, Heymi Elvir Maldonado, Nathaly Uribe Robledo, Eliseo Mages, Jesus Eusebio Perez,

Josue Aguiluz, Jose Aguiluz, and Brenda Moreno Martinez are worried they will lose their jobs

when their work authorization expires.  Other Dreamers, including Annabelle Martinez Herra,

have already lost their employment.

103.     Under the Rescission Memorandum, thousands of Dreamers face the risk of

losing their employment, as well as vital benefits, such as driver licenses, financial aid, disability

and health benefits, among others. They will also lose their protection from deportation, meaning

that they risk permanent separation from their family and community.

104.     Under the Rescission Memorandum, the federal government will break up

hundreds of thousands of families.  Many Dreamers, including Plaintiffs A.M, Annabelle

Martinez Herra, and Maricruz Abarca live in households with American citizen family members.

Deporting Dreamers will split these recipients from their citizen family members.

105.     Under the Rescission Memorandum, Dreamers enrolled in colleges and

universities, including Plaintiffs Angel Aguiluz, Estefany Rodriguez, Maricruz Abarca, and

Josue Aguiluz, will be unable to plan for the future, apply for and obtain internships, study

abroad, simultaneously work to pay costs and fees, and obtain certain financial aid and

scholarships -- forcing many to withdraw from their college or university.

106.    Under the Rescission Memorandum, Dreamers who applied for and received

advance parole from USCIS and have paid the required fees have no assurances that they will be

readmitted into the United States if they travel abroad.  Instead, the Rescission Memorandum

states only that DHS will "generally' honor previously approved applications.  Even individuals

currently travelling abroad based on advance parole granted before September 5, 2017 are at risk

of being denied re-admission.

107.    Despite the federal government's repeated promises that it would not use the

information submitted by DACA applicants to conduct enforcement measures, the Rescission

Memorandum provides no assurance to Dreamers, or direction to USCIS, ICE, and CBP that

information contained in DACA applications or renewal requests cannot be used for the purpose

of future immigration enforcement proceedings.

108.    To the contrary, USCIS and other government agencies have released guidance

suggesting an intention to welch on those promises and to share that information with ICE and

CBP.  While the FAQs to the DACA Memorandum unequivocally represented that, with limited

and specified exceptions, information provided pursuant to a DACA application would be kept

confidential and not used for immigration enforcement, the Rescission FAQs state: "*Generally*,

information provided in DACA requests will not be *proactively* provided to other law

enforcement entities (including ICE and CBP) for the purpose of immigration enforcement

proceedings unless the requestor poses a risk to national security or public safety, or meets the

criteria for the issuance of a Notice To Appear ["NTA"] or a referral to ICE under the [NTA]

criteria."[60]  The addition of the qualifiers "generally" and "proactively" makes the representation

nearly meaningless, arrogating to USCIS the ability to make the sensitive information submitted

by individual DACA applciants available to ICE for previously prohibited purposes, including

immigration enforcement, so long as it does so "specifically" and  not "proactively."  For

example, the language indicates that USCIS would provide DACA applicant data *in response* to

a request from ICE; such action would be directly contrary to the positions USCIS adopted in its

Privacy Impact Assessment.

109.    As noted earlier, the DACA application form required applicants to provide a

wealth of personal, sensitive information.   DACA applicants were also required to provide DHS

with a detailed history of their criminal arrests and convictions, including all misdemeanors,

however minor.  In addition, applicants were required to affirmatively declare whether they had

ever been placed in removal proceedings in the past.

110.    Many DACA recipients have final orders of removal, generally issued *in absentia*

when they were minors.  If their information is shared with ICE or CBP, these individuals will be

subject to an extreme risk of expedited deportation, which can occur within days or even hours,

with minimal procedural safeguards.

111.    Plaintiffs and other Dreamers cannot but be worried, as the Defendants have

threatened them both directly and indirectly (by refusing to reaffirm the privacy of their applicant

data, and by targeting immigrants for deportation who have not been convicted of criminal

activity):

- President Trump has taken affirmative steps to reduce the privacy protections
  applicable to DACA data. In January 2017, President Trump issued Executive

---

[60] DHS, Frequently Asked Questions: Rescission of Deferred Action For Childhood Arrivals (DACA) ("Rescission
FAQs") Q8 (emphasis added), https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-
deferred-action-childhood-arrivals-daca (last published Sept. 5, 2017).

Order 13,768 directing all agencies, including DHS, to "ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information."[61]

Pursuant to Executive Order 13,768, on April 25, 2017, DHS issued a new Privacy Policy Guidance Memorandum introducing new "legal and policy obligations."  Among these obligations is a new "transparency" obligation that requires "all information sharing that relates to immigrants and non-immigrants must be described and justified in the appropriate PIA… " Another obligation listed is "purpose specification," which states that use of any information collected "must be compatible with the purpose for which DHS originally collected the information; the PIA must identify and explain this compatibility."[62]  Notwithstanding these commitments, DHS also stated that its new privacy policy "permits the sharing of information about immigrants and non-immigrants with federal, state, and local law enforcement."[63]

- In February 2017, DHS announced a change in immigration enforcement priorities.  Previously, DHS enforcement priorities were generally consistent with the DACA Memorandum, prioritizing people who had committed serious felonies, serious misdemeanors, or multiple less serious misdemeanors, and making Dreamers (and others similarly situated) the lowest enforcement priority.  The February 2017 Enforcement Priorities Memorandum radically broadened the categories of people who are to be prioritized for removal, to include people "convicted of any criminal offense" (no matter how minor), "charged with any criminal offense" (even if unadjudicated or dismissed), or "committed acts which constitute a chargeable criminal offense" (an astoundingly vague proposition).[64]

- In February 2017, ICE reportedly implemented a new policy authorizing immigration arrests of collateral, nontargeted individuals (i.e., individual bystanders who are not otherwise enforcement priorities) found at the scene of enforcement operations.[65]  Pursuant to this change, a number of Dreamers have been arrested and subjected to immigration enforcement proceedings.

---

[61] Exec. Order No. 13,768, 82 Fed. Reg. 8793, (Jan. 25, 2017) ("Enhancing Public Safety in the Interior of the United States")

[62] Guidance Memorandum from Jonathan R. Cantor, Acting Chief Privacy Officer, U.S. Department of Homeland Security,  2017-01: DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Personally Identifiable Information (Apr. 25, 2017).

[63] DHS, Privacy Policy 2017-01 Questions & Answers (Apr. 27, 2017).

[64] Memorandum for Kevin McAleenan, Acting Commissioner, U.S. Customs and Border Protection, et al., from John Kelly, Secretary, U.S. Department of Homeland Security, Enforcement of the Immigration Laws to Serve the National Interest ("Enforcement Priorities Memorandum") at 2 (Feb. 20, 2017).

[65] See Hamed Aleaziz, Collateral immigration arrests threaten key crime alliances, S.F. Chronicle (Apr. 29, 2017).

- In June 2017, ICE announced a "surge" where other components of DHS provided information to ICE about adults who agreed to take custody over unaccompanied minors.[66]

- In at least six instances since the administration has taken office, DHS has illegally commenced immigration enforcement proceedings against Dreamers. These include cases in active litigation, including claims brought by Jessica Cototltl (where DHS has been enjoined from proceeding with enforcement proceedings), Francisco Rodriguez, Alberto Luciano Gonzales Torres (where DHS has been enjoined from proceeding with enforcement proceedings), Daniela Vargas, Daniel Ramirez-Medina, and Juan Manuel Montes-Bojorquez (who was illegally deported).

- On April 19, 2017, United States Attorney General Jefferson B. Sessions stated in an interview on Fox News' "Happening Now," program—in response to a question regarding the deportation of a Dreamer—that "[e]verybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported -- well, they are. . . . we can't promise people who are here unlawfully that they aren't going to be deported."[67]

- On June 13, 2017, Acting ICE Director Thomas Homan testified in front of the House Appropriations Committee's Subcommittee on Homeland Security, stating as to "every immigrant in the country without papers," that they "should be uncomfortable. You should look over your shoulder. And you need to be worried. . . . No population is off the table. . . . If we wait for them to violate yet another law against a citizen of this country, then it's too late. We shouldn't wait for them to become a criminal."[68]

- On June 29, Homan stated: "people that enter this country illegally violate the laws of this country.  You can't want to be a part of this great nation and not respect its laws.. . .  they already committed one crime by entering the country illegally. . . . As far as fear in the immigrant community. . . My purpose is to dispel the notion that if you enter this country illegally and violate the laws of this nation, you should not be comfortable. . . if you enter this country illegally, you should be concerned that someone is looking for you.  You should be concerned because you violated the laws of this country."[69]

---

[66] *See* Jenny Jarvie, Immigrant rights groups denounce new ICE policy that targets parents of child migrants, L.A. Times (Jun. 30, 2017).

[67] Adam Shaw, Sessions defends immigration policies after reported 'DREAMer' deportation, Fox News (Apr. 19, 2017).

[68] Hearing on the ICE and CBP F.Y. 2018 Budget Before the Subcomm. on Homeland Security of the H. Comm. on Appropriations, 115th Cong. (2017) 2017 WLNR 18737622.

[69] Press Release, The White House Office of the Press Secretary, *Press Gaggle by Director of Immigration and Customs Enforcement Tom Homan et al.* (June 28, 2017).

- On August 22, 2017, Homan again stated: " the message is clear: If you're in the United States illegally, if you happen to get by the Border Patrol, someone is looking for you. And that message is clear."[70]

- An internal White House memo reported on by CNN stated that DHS now is urging Dreamers "to prepare for and arrange their departure from the United States" when their DACA terms end.[71]

- A CBP memo reportedly issued on September 6 directed agents to detain individuals claiming DACA at CPB checkpoints until their DACA and work permit could be verified, and that if there is any derogatory information indicating ineligibility, CPB is to commence deportation proceedings immediately.[72]

- On September 27, 2017, Acting Secretary Duke testified that she had never seen DHS's guidance assuring Dreamers their information would not be used for immigration purposes.

112.     These changes all signal Defendants' intent to renege on their promises and subject Dreamers to immigration enforcement. Dreamers immediately face increased risk that information they provided to the federal government, in reliance of promises not to use it against them, could be used against them, without notice, for purposes of immigration enforcement, including detention or deportation. At the very least, these changes create confusion about the new risk faced by current and former Dreamers and former applicants, particularly those whose DACA protection is ending under the Rescission Memorandum.

113.     The Rescission Memorandum does not explain how DHS or USCIS could legally provide DACA applicant information to ICE or CBP. *See* 5 U.S.C. § 552a (b) ("No agency shall disclose any record which is contained in a system of records by any means of communication to

---

[70] Press Release, The White House Office of the Press Secretary, *Press Gaggle by Press Secretary Sarah Huckabee Sanders et al.* (August 22, 2017).
[71] Tal Kopan & Jim Acosta, Admin Memo: DACA recipients should prepare for departure from the United States, CNN (Sept. 6, 2017).
[72] Valerie Gonzalez, *Border Patrol Memo States Procedures to Process All DACA Applicants*, KRGV-TV (Sep. 25, 2017).

any person, or to another agency, except pursuant to a written request by, or with the prior

written consent of, the individual to whom the record pertains").

114.    The Rescission Memorandum also does not explain how DHS or USCIS  can

justify continuing to maintain applicant data collected for DACA, from individuals relying on

prior agency representations and policies, when the administration has rescinded DACA.  *See* 5

USC § 552a (c)(1) (an agency "shall maintain in its records *only* such information about

an individual as is relevant and necessary to accomplish a purpose of the agency required to be

accomplished by statute or by executive order of the President").

115.    The Rescission Memorandum does not state how providing DACA applicant

information to enforcement authorities would be consistent with DHS' self-adopted privacy

policies or consistent with the agency's procedures and precedent.

116.    The Rescission Memorandum does not state how providing DACA applicant

information to enforcement authorities would not be a retroactive revision to an agency policy

upon which Dreamers relied.

117.    The Rescission Memorandum does not explain how the government will keep

previously-provided DACA applicant information secure, nor does it provide any reason to

believe that immigration enforcement agents will not use such information to find and remove

those who applied for DACA.  This retreat from prior assurances of privacy protection is

particularly alarming in light of Defendant Homan's threats that immigrants should be

"uncomfortable," "should look over your shoulder," and "be worried.

## DHS RESCINDS DACA WITHOUT NOTICE, COMMENT, OR ANY SUFFICIENT EXPLANATION FOR ITS CHANGE IN POSITION

118.    The Rescission Memorandum is a final, substantive agency action that required DHS to comply with the notice and comment requirements set forth in 5 U.S.C. § 553(b).  But the agency provided no opportunity for notice and comment before taking this action.

119.    By failing to comply with these notice and comment requirements, DHS deprived Plaintiffs, and all other interested parties, of the opportunity to present important evidence to the agency about DACA.

120.     In the Rescission Memorandum, DHS did not sufficiently explain its abrupt departure from prior agency statements regarding the necessity and legality of DACA.

   a.      In issuing the Rescission Memorandum, the federal government and Defendant Sessions misleadingly claimed that DACA was unconstitutional, although no court has so held.[73]  The single paragraph in the Rescission Memorandum explaining the rationale behind this sudden shift merely asserts that DACA "should be terminated" based on consideration of two factors: (I) the appellate rulings in a case regarding a 2014 memorandum from then-DHS Secretary Johnson that expanded DACA and created a new program, Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"), *Texas v. United States*, 809 F.3d 134 3 (5th Cir. 20 15), a*ff'd by an equally divided court sub nom. United States v. Texas*,_ U.S. _, 4 136 S. Ct. 2271 (2016); and (2) a September 4, 2017, letter from Attorney General Jefferson B. Sessions arguing that DACA was "unconstitutional" because it had been "effectuated . . . through executive action" and was invalid for the same reasons the Fifth Circuit struck down DAPA in the Texas case.[74]

   b.      DHS and DOJ ignored differences between DACA and DAPA when reaching this conclusion.  Further, DHS ignored the fact that the legality of DACA was never directly at issue in the *Texas v. United States* case, and not ruled on by the Fifth Circuit.

   c.      In concluding that DACA was unconstitutional, Defendant Sessions failed to consider a November 19, 2014 opinion from the Department of Justice

---

[73] Dep't of Justice, Attorney General Sessions Delivers Remarks on DACA, https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca (September 5, 2017).
[74] Letter from Jefferson B. Sessions, U.S. Att'y General, to Elaine C. Duke, Acting Secretary, U.S. Department of Homeland Security (Sept. 4, 2017) ("Sessions Letter").

Office of Legal Counsel that concluded that DACA was constitutional. OLC opinions provide "controlling legal advice" for the executive branch.[75] In contrast to Defendant Session's conclusory assertion, the OLC opinion was thirty-three pages and analyzed the relevant constitutional precedents.

d.     The Rescission Memorandum's conclusion that DACA is unconstitutional is impossible to reconcile with the Defendants decision to continue DACA for six additional months.

121.     The rescission is inconsistent with promises the government made to Dreamers, on which they relied, that only "fraud or misrepresentation" in the application process or "[s]ubsequent criminal activity" are grounds for revocation of DACA.[76]

122.     Beyond Defendant Sessions's conclusory assertions of DACA's legal infirmity, DHS failed to offer any explanation of its own why it believed that rescinding DACA was warranted. The Rescission Memorandum did not address the rationale that DHS expressed in 2012 in the DACA Memorandum regarding the use of prosecutorial discretion to focus resources and priorities on lowest priority individuals, much less offer any explanation as to why those factors had changed so radically as to justify rescinding DACA now.

123.     Hours after DACA was rescinded, President Trump tweeted that, if Congress fails to provide similar protections through legislation, "I will revisit this issue!" This statement undermines DHS' faux constitutional rationale for rescission because it confirms that the President has authority to reinstate some or all of DACA without Congressional authorization.

124.     President Trump's September 5, 2017 statement is the latest in a series of admissions he has made that expressly or implicitly recognize the DACA program was legal, undermining the purported rationale for rescinding the program.  For example:

---

[75] *See, e.g.,* Memorandum to Att'ys of the Office of Legal Counsel, U.S. Dep't of Justice, from David Barron, Acting Assistant Att'y General, Best Practices for OLC Legal Advice and Written Opinions (July 16, 2010).
[76] USCIS Approval Notice, Form 1-821 D, Consideration of Deferred Action for Childhood Arrivals.

- On December 8, 2016, then-President-elect Trump stated in an interview with TIME magazine that he would find an accommodation for Dreamers, stating, "We're going to work something out that's going to make people happy and proud."[77]

- On January 18, 2017, then President-elect Trump promised in an interview with Fox & Friends that he was "working on a plan right now. And that plan, over the next two to three months, is going to come out. And it's a plan that's going to be very firm, but it's going to have a lot of heart."[78]

- On March 29, 2017, Secretary Kelly reaffirmed that "DACA status" is a "commitment . . . by the government towards the DACA person, or the so-called Dreamer."[79]

- On April 21, 2017, President Trump confirmed that his Administration's policy is not to deport Dreamers, and suggested that they "should rest easy."[80]

125.    These statements directly contravening Defendants' purported justification for rescinding DACA confirm that the rescission rests on racist animus against Mexican and Central American immigrants.  Other false and misleading statements by the President and administration officials confirm that the legal justification offered for the rescission is pretextual:

- On September 5, 2017, President Trump issued a written statement on the rescission of DACA that stated: "The temporary implementation of DACA . . . helped spur a humanitarian crisis -- the massive surge of unaccompanied minors from Central America including, in some cases, young people who would become members of violent gangs throughout our country, such as MS-13."[81]

- On the same day, just prior to Attorney General Sessions's announcement rescinding DACA, President Trump tweeted, "No longer will we incentivize illegal immigration. LAW AND ORDER! #MAGA," and "Make no mistake, we are going to put the interest of AMERICAN CITIZENS FIRST!"[82]

---

[77]  Michael Scherer, Person of the Year 2016, TIME Magazine (Dec. 2016).

[78] Francesca Chambers, Trump signals he's softening on immigration as he says he's 'working on a plan' that will make DREAMers 'very happy,' Daily Mail (Jan. 18, 2017).

[79] Ted Hesson & Seung Min Kim, Wary Democrats Look to Kelly for Answers on Immigration, Politico (Mar. 29, 2017).

[80]Transcript of interview with Trump, Associated Press (Apr. 21, 2017).

[81] Press Release, The White House Office of the Press Secretary, Statement from President Donald J. Trump (Sept. 5, 2017).

[82] Donald Trump (@realDonaldTrump), TWITTER (Sep.5, 2017 5:10am), https://twitter.com/the_trump_train/status/905040389610057728?lang=en

- During his announcement rescinding DACA, Attorney General Sessions justified the decision by stating that DACA "contributed to a surge of unaccompanied minors on the southern border" and "denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens."[83]

- Attorney General Sessions, while a United States Senator from Alabama, made similar statements regarding undocumented individuals seeking employment ("I'm a minority in the U.S. Senate ... in questioning whether we should reward people who came into the country illegally with jobs that Americans would like to do.").[84] That same year, then-senator Sessions praised the 1924 Johnson-Reed Act, whose namesake, Representative Albert Johnson, used racial theory as the basis for its severe immigration restrictions, which included barring Asian immigration entirely.[85]

126.    The Rescission Memorandum makes no reference to unaccompanied minors, public safety concerns, or economic interests to explain the agency's action.  These shifting, conflicting, and factually inaccurate statements by the Trump Administration -- that DACA created a surge in illegal immigration, and that DACA recipients take jobs away from other American workers -- expose the cursory legal rationale in the Rescission Memorandum's as a sham.  The APA requires governmental agencies to publicly state a sufficient justification for their actions, particularly where, people have relied upon DHS's prior statements to their detriment.

127.    Moreover, these statements are wholly controverted by available evidence demonstrating the contributions of Dreamers to the United States, as explained above. *See Motor Veh. Mfrs. Ass 'n of U.S. , Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency rule is arbitrary and capricious when the explanation offered by the agency "runs counter to the evidence before the agency").

---

[83] Dep't of Justice, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017).
[84] Seung Min Kim, The Senate's Anti- Immigration Warrior, Politico (Mar. 5, 2015)
[85] *See* Interview by Stephen Bannon with Sen. Jefferson B. Sessions, Breitbart News (Oct. 5, 2015), audio available at https://tinyurl.co111 /y8gbj6vk; see also Adam Serwer, Jeff Sessions 's Unqualified Praise for a 1924 immigration Law, The Atlantic (Jan. 10, 2017)

128.    In making a decision contradicted by the available evidence, providing a false justification for the rescission and promoting the rescission because of discriminatory animus, Defendants abused their discretion and acted in an arbitrary and capricious manner in violation of the APA.

## CAUSES OF ACTION

### FIRST COUNT
### FIFTH AMENDMENT – DUE PROCESS
### (All Defendants)

129.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

130.    Immigrants who are physically present in the United States are guaranteed the protections of the Due Process Clause.

131.    The Constitution imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.

132.    The property interests protected by the Due Process Clause extend beyond tangible property and include anything to which a plaintiff has a legitimate claim of entitlement. A legitimate claim of entitlement is created by rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

133.    The term "liberty" also encompasses the ability to work, raise a family, and form the other enduring attachments of normal life.

134.    Dreamers, including Plaintiffs, have constitutionally protected liberty and property interests in their DACA and the numerous benefits conferred thereunder, including the ability to renew their DACA every two years. These protected interests exist by virtue of the

government's decision to grant Dreamers certain benefits and its repeated representations and promises regarding DACA.

135.    In promoting DACA, USCIS affirmatively promised Dreamers that if their case was deferred, they would be eligible for benefits, including employment authorization, advance parole to travel internationally, and to attend educational institutions.

136.    Dreamers, including certain of the plaintiffs, were granted employment authorization, advance parole to travel internationally, the right to attend educational institutions, public benefits (including Social Security, Medicare, and disability benefits). They were able to secure equal access to other benefits and opportunities on which Americans depend, including opening bank accounts, obtaining credit cards, starting businesses, purchasing homes and cars, and conducting other aspects of daily life that are otherwise often unavailable for undocumented immigrants.

137.    In establishing and continuously operating DACA under a well-defined framework of highly specific criteria—including nearly 150 pages of specific instructions for managing the program—the government created a reasonable expectation among Plaintiffs and other Dreamers that they are entitled to the benefits provided under the program, including the ability to seek renewal of their DACA, as long as they continue to play by the rules and meet the program's nondiscretionary criteria for renewal.

138.    The government deprived Plaintiffs and other Dreamers of their property and liberty interests under this program, including their ability to seek renewal of their DACA, their right to work authorization, and their right to travel internationally without a right to be heard or other individualized procedural protections.

139.     The government's arbitrary termination of DACA and deprivation of the opportunity to renew DACA violates the due process rights of Plaintiffs and other Dreamers.

140.     The government's decision to terminate DACA after vigorously promoting the program and coaxing hundreds of thousands of highly vulnerable young people to step forward is an unconstitutional bait-and-switch.  The government promised Plaintiffs and other young people that if they disclosed highly sensitive personal information, passed a background check, and played by the rules, they would be able to live and work in the United States.

141.     The government did not follow its normal procedures in reversing course and terminating DACA.  In 2014, the OLC concluded, after conducting a detailed analysis, that DACA was a lawful exercise of the Executive Branch's discretion. By contrast, Attorney General Sessions's one-page letter to Acting Secretary Duke contains virtually no legal analysis, and Acting Secretary Duke's Rescission Memorandum relied largely on Attorney General Sessions's letter.

142.     The Due Process Clause also requires that the federal government's immigration enforcement actions be fundamentally fair. Here, the government's arbitrary decisions to terminate DACA is fundamentally unfair.

143.     Defendants' violations of the Due Process Clause have harmed Plaintiffs and will continue to cause ongoing harm to Plaintiffs and other Dreamers.

**SECOND COUNT**
**FIFTH AMENDMENT – DUE PROCESS**
**(All Defendants)**

144.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

145.    Immigrants who are physically present in the United States are guaranteed the protections of the Due Process Clause.

146.    The Constitution imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.

147.    Dreamers, including Plaintiffs, have constitutionally protected liberty and property interests in the sensitive personal information they disclosed to the government in reliance on the government's explicit and repeated assurances that it would not be used for immigration enforcement purposes and would in fact be "protected from disclosure" to ICE and CBP.

148.    The protected interest in the nondisclosure of sensitive personal information exists by virtue of the government's decision to make repeated assurances to Dreamers that this information would not be used for enforcement purposes.

149.    The government's decision to terminate DACA after vigorously promoting the program and coaxing hundreds of thousands of highly vulnerable young people to step forward is an unconstitutional bait-and-switch.  The government promised Plaintiffs and other young people that if they disclosed highly sensitive personal information, passed a background check, and played by the rules, they would be able to live and work in the United States.

150.    The government's retraction of its publicly declared and repeatedly reaffirmed policy not to share with ICE and CPB Dreamers' DACA application information violates due process.  The government has already violated other assurances regarding DACA, and there is imminent danger that it will similarly breach its representations regarding information-sharing.  Indeed, the government already has breached its prior commitments to affirmatively "protect[]

[sensitive information] from disclosure," now asserting only that it will not "proactively provide[]" such information to ICE and CBP for the purpose of immigration enforcement proceedings.

151.    The government deprived Plaintiffs and other Dreamers of their property and liberty interests as to their sensitive personal information without a right to be heard or other individualized procedural protections.

152.    The Due Process Clause also requires that the federal government's immigration enforcement actions be fundamentally fair. Here, the government's arbitrary decisions to terminate DACA and change the policy regarding the use of information provided by Dreamers are fundamentally unfair.

153.    Defendants' violations of the Due Process Clause have harmed Plaintiffs and will continue to cause ongoing harm to Plaintiffs and other Dreamers.

**THIRD COUNT**
**FIFTH AMENDMENT – EQUAL PROTECTION**
**(All Defendants)**

154.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

155.    The equal protection guarantee of the Fifth Amendment forbids federal officials from acting with a discriminatory intent or purpose.

156.    To succeed on an equal protection claim, plaintiffs must show that the defendants discriminated against them as members of an identifiable class and that the discrimination was intentional. Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.

157.     As set forth above, the termination of DACA was motivated by improper discriminatory intent and bias against Mexican nationals, individuals of Mexican and Central American descent, and Latinos, who together account for 93 percent of approved DACA applications.

158.     President Trump's history and that of other senior administration officials of alleging that Mexican, Central American, and Latino immigrants are rapists, criminals, and otherwise bad people demonstrate discriminatory animus. It is this animus that motivated the DACA rescission.

159.     The government allows other classes of immigrants to remain eligible for deferred action, and remain eligible for benefit associated with deferred action.  Because Mexican, Central American, and Latinos account for 93 percent of approved DACA applications, they will be disproportionately impacted by the termination of DACA.

160.     The history, procedure, substance, context, and impact of the decision to terminate DACA demonstrate that the decision was motivated by discriminatory animus against Mexican, Central American, and Latino immigrants. Because it was motivated by a discriminatory purpose, the decision to terminate DACA violates the equal protection guarantee of the Due Process Clause of the Fifth Amendment.

161.     Defendants' violations of the Equal Protection Clause have caused ongoing harm to Plaintiffs and other Dreamers.

**FOURTH COUNT**
**ADMINISTRATIVE PROCEDURE ACT**
**(All Defendants Except Trump)**

162.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

163.    Defendants are subject to the Administrative Procedure Act ("APA"). *See* 5

U.S.C. § 703.

164.    The termination of DACA is final agency action subject to judicial review

because it marks the consummation of the decisionmaking process and is one from which legal

consequences will flow.  The comprehensive scope of the APA provides a default remedy for all

interactions between individuals and all federal agencies.

165.    The APA requires that courts "shall . . . hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law . . . [or] contrary to constitutional right, power, privilege, or

immunity." 5 U.S.C. § 706(2)(A), (B).

    a.    As detailed in Counts I and II, the decision to terminate DACA is unconstitutional in numerous respects and therefore must be vacated.

    b.    The decision to terminate DACA is arbitrary and capricious and contrary to law because, among other reasons, the government failed to consider important aspects of the issue, offered explanations for its decision inconsistent with the evidence before it, and its explanations are so implausible that its decision cannot be due to a difference in opinion or the product of agency expertise.  And because the government failed to provide a reasoned analysis sufficient to justify its change of policy in light of the serious reliance interests created by DACA.

        i.    The purported rationales for rescission of the program contradict the available evidence.  Among other things, the rescission does not provide a reasoned analysis for the rescission, nor does it address the prior Department of Justice OLC analysis concluding the program was constitutional.

        ii.    The purported rationale for rescission of the program – that the Executive Branch purportedly lacked authority to conduct the program -- is inconsistent with the ongoing continuation of the program and the admissions by the President and various administration officials that the President has the authority to continue the program.

        iii.    The government's decision not to accept any DACA renewal applications after October 5, 2017 is also arbitrary. The Rescission

Memorandum does not provide a reasoned analysis to support this deadline, and the government has failed to provide sufficient time and notice to Dreamers.

iv.   The government's decision not to accept new applications after September 5, 2017 is arbitrary.  The Rescission Memorandum does not provide a reasoned analysis to support this deadline.

v.   The government's decision not to accept renewal requests for Dreamers whose status expired before September 5, 2017 is arbitrary. The Rescission Memorandum does not provide a reasoned analysis to support this deadline.

vi.   The government's decision not to accept renewal requests for DACA recipients whose status expires after March 5, 2018 is arbitrary.  The Rescission Memorandum does not provide a reasoned analysis to support this decision.

vii.   The government's decision to terminate DACA is also in violation of the APA because the stated rationale for ending the program is pretextual and incorrect as a matter of law.

c.   The government's decision regarding potential sharing of personal information collected from DACA applicants is arbitrary and capricious and contrary to law.

i.   The government's failure to abide by the specific and consistent promise that information obtained from DACA applicants would not be used for immigration enforcement purposes violates the Privacy Act's prohibition on agency sharing records with another agency.  5 U.S.C. § 552a(b).

ii.   The government's failure to abide by the specific promise in the DACA Privacy Impact Assessment that information collected from DACA applicants would not be used for immigration enforcement purposes violates the e-Government Act provision requiring an agency abide by its Privacy Impact Assessment.  44 U.S.C. § 3501 *et seq.*

iii.   The government's maintenance of records for Dreamers following rescission of DACA violates the Privacy Act prohibition on an agency maintaining records beyond those which are necessary to accomplish a purpose required to be accomplished by executive order of the President.   5 U.S.C. § 552a(c)(1).

iv.   The stated change in the government's protection of DACA applicant data from use for immigration enforcement proceedings is invalid under APA 5 U.S.C. § 551(4) because it carries an

unreasonable retroactive effect, incurring new and harmful legal consequences where individuals submitted their data in detrimental reliance on prior DHS policies and representations.

v. The government's retention of applicants' personally identifiable information and declaration of the potential disclosure of this information for immigration enforcement purposes violates DHS' own policies and established practices without providing a reasoned justification for deviation from its own policies.

vi. The change in the government's policy regarding protection of DACA applicant data from use for immigration enforcement proceedings is not based on a reasoned analysis contained in the Rescission Memorandum.

vii. The change in the government's policy regarding protection of DACA applicant data from use for immigration enforcement proceedings is not adequately explained in the Rescission Memorandum, particularly in light of the DACA recipients' strong reliance on the government's commitment not to use this information for enforcement purposes.

166.    Defendants' violations of the APA have caused ongoing harm to Plaintiffs and other Dreamers.

## FIFTH COUNT
## ADMINISTRATIVE PROCEDURE ACT
### (All Defendants Except Trump)

167.    The APA, 5 U.S.C. §§ 553 and 706(2)(D), requires that federal agencies conduct rulemaking before engaging in action that impacts substantive rights.

168.    DHS and USCIS are each an "agency" under the APA, and the Rescission Memorandum and the actions that DHS and USCIS has taken to implement the Rescission Memorandum are "rules" under the APA. *See* 5 U.S.C. § 551(1), (4).

169.    In implementing the Rescission Memorandum, federal agencies have changed the substantive criteria by which individual Dreamers work, live, attend school, obtain credit, and travel in the United States, thus imposing rights and obligations on Dreamers. The Rescission

Memorandum modifies substantive rights and interests and so is subject to notice and comment rulemaking.

170.     With exceptions that are not applicable here, agency efforts that change substantive rights and interests must go through notice-and-comment rulemaking. *See* 5 U.S.C. § 553.

171.     Defendants promulgated and implemented these changes to Dreamer rights and interests without notice-and-comment rulemaking in violation of the APA.

172.     Plaintiffs will be impacted because they have not had the opportunity to comment on the rescission of DACA.

173.     Defendants' violation of the APA has caused ongoing harm to Plaintiffs and other Dreamers.

**SIXTH COUNT**
**ESTOPPEL**

174.     Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

175.     Through its conduct and statements, the government represented to Plaintiffs and other Dreamers that DACA was lawful and that information collected in connection with DACA would not be used for immigration enforcement purposes absent special circumstances.

176.     In reliance on the government's repeated assurances, Plaintiffs and other Dreamers risked removal and deportation and came forward and identified themselves to the government, and provided sensitive personal information, including their fingerprints and personal history, in order to participate in DACA.

177.     Throughout the life of DACA, the government has continued to make affirmative representations about the use of information as well as the validity and legality of DACA.

Plaintiffs and other Dreamers relied on the government's continuing representations to their detriment.

178.    DACA beneficiaries rearranged their lives to become fully visible and contributing members of society, including by seeking employment, pursuing higher education, and paying taxes, but are now at real risk of removal and deportation.

179.    Accordingly, Defendants should be equitably estopped from terminating DACA or from using information provided pursuant to DACA for immigration enforcement purposes, except as previously authorized under DACA.

180.    An actual controversy between Plaintiffs and Defendants exists as to whether Defendants should be equitably estopped.

181.    Plaintiffs are entitled to a declaration that Defendants are equitably estopped.

**SEVENTH COUNT**
**DECLARATORY JUDGMENT THAT DACA IS LAWFUL**

182.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

183.    DACA was a lawful exercise of the Executive Branch's discretion to enforce the immigration laws. Indeed, after performing a thorough analysis, the government itself concluded that DACA was lawful.  However, the government now claims, as the basis for its rescission of the program, that DACA is unlawful.

184.    The Declaratory Judgment Act, 28 U.S.C. § 2201, allows the court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

185.    As DACA beneficiaries, Plaintiffs have an interest in the legality of DACA. The

government's decision to terminate DACA on the purported basis that DACA was unlawful has

harmed Plaintiffs and continues to cause ongoing harm to Plaintiffs.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that the Rescission and actions taken by Defendants to rescind DACA are

void and without legal force or effect;

B.    Declare that the Rescission and actions taken by Defendants to rescind DACA are

arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without

observance of procedure required by law in violation of 5 U.S.C. §§ 702-706;

C.    Declare that the Rescission and actions taken by Defendants to rescind DACA are

in violation of the Constitution and contrary to the laws of the United States;

D.    Preliminarily and permanently enjoin and restrain Defendants, their agents,

servants, employees, attorneys, and all persons in active concert or participation with any of

them, from implementing or enforcing the Rescission and from taking any other action to rescind

DACA that is not in compliance with applicable law;

E.    Preliminarily and permanently enjoin and restrain Defendants, their agents,

servants, employees, attorneys, and all persons in active concert or participation with any of

them, from disclosing any DACA applicant information to immigration enforcement activities in

a manner inconsistent with their prior commitments;

F.    Grant such further relief as this Court deems just and proper.

Dated: October 5, 2017                            Respectfully submitted,


   /s/ Dennis A. Corkery                                      John A. Freedman (pro hac vice forthcoming)
Matthew K. Handley (D. Md. 18636)                Gaela Gehring Flores (D. Md.14559)
Dennis A. Corkery (D. Md. 19076)                 Ronald A. Schechter (pro hac vice forthcoming)
WASHINGTON LAWYERS'                              Nancy L. Perkins (pro hac vice forthcoming)
  COMMITTEE FOR CIVIL RIGHTS AND              Jeremy Karpatkin (pro hac vice forthcoming)
  URBAN AFFAIRS
11 Dupont Circle, Suite 400                      ARNOLD & PORTER KAYE SCHOLER LLP
Washington, DC 20036                             601 Massachusetts Ave., NW
(202) 319-1000                                   Washington, DC  20001-3743
matthew_handley@washlaw.org                      (202) 942-5000
dennis_corkery@washlaw.org                       John.freedman@apks.com


Elizabeth J. Bower (pro hac vice forthcoming)    Steven L. Mayer (pro hac vice forthcoming)
Kevin B. Clark (pro hac vice forthcoming)        ARNOLD & PORTER KAYE SCHOLER LLP
WILLKIE FARR & GALLAGHER LLP                      10th Floor
1875 K Street, NW                                Three Embarcadero Center
Washington, DC  20006-1238                       San Francisco, CA 94111-4024
EBower@willkie.com                               +1 415.471.3100


Nicholas Katz (pro hac vice forthcoming)         Ajmel Qureshi (D. Md. 28882)
CASA DE MARYLAND                                 HOWARD UNIVERSITY SCHOOL OF
8151 15th Ave.                                     LAW CIVIL RIGHS CLINIC
Hyattsville, MD 20783                            2900 Van Ness Street, NW
(240) 491-5743                                   Washington, DC 20008
NKatz@wearecasa.org                              (202) 806-8000
                                                 aqureshi@law.howard.edu

# EXHIBIT 7

**No.**

# In the Supreme Court of the United States

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT*

**PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT**

NOEL J. FRANCISCO
*Solicitor General*
*Counsel of Record*
CHAD A. READLER
*Acting Assistant Attorney*
*General*
JEFFREY B. WALL
*Deputy Solicitor General*
HASHIM M. MOOPPAN
*Deputy Assistant Attorney*
*General*
JONATHAN Y. ELLIS
*Assistant to the Solicitor*
*General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
*Attorneys*

*Department of Justice*
*Washington, D.C. 20530-0001*
*SupremeCtBriefs@usdoj.gov*
*(202) 514-2217*

## QUESTIONS PRESENTED

This dispute concerns the policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals (DACA).  In 2016, this Court affirmed, by an equally divided Court, a decision of the Fifth Circuit holding that two related Department of Homeland Security (DHS) enforcement policies, including an expansion of the DACA policy, were likely unlawful and should be enjoined.  See *United States* v. *Texas*, 136 S. Ct. 2271 (per curiam).  In September 2017, the former Acting Secretary of Homeland Security determined that the original DACA policy would likely be struck down by the courts on the same grounds and that the policy was unlawful.  Accordingly, she instituted an orderly wind-down of the DACA policy.

The district court here concluded that respondents are likely to succeed in proving that the Acting Secretary's decision to rescind the DACA policy was arbitrary and capricious, and it enjoined DHS from rescinding it on a nationwide basis while this litigation proceeds.  The questions presented are as follows:

1.  Whether the Acting Secretary's decision to wind down the DACA policy is judicially reviewable.

2.  Whether the Acting Secretary's decision to wind down the DACA policy is lawful.

(I)

## PARTIES TO THE PROCEEDING

Petitioners are the United States Department of Homeland Security; Donald J. Trump, President of the United States; Kirstjen M. Nielsen, Secretary of Homeland Security; Jefferson B. Sessions III, Attorney General of the United States; and the United States of America.

Respondents are the Regents of the University of California; Janet Napolitano, President of the University of California; the State of California; the State of Maine; the State of Maryland; the State of Minnesota; the City of San Jose; Dulce Garcia; Miriam Gonzalez Avila; Saul Jimenez Suarez; Viridiana Chabolla Mendoza; Norma Ramirez; Jirayut Latthivongskorn; the County of Santa Clara; and Service Employees International Union Local 521.

**TABLE OF CONTENTS**

Page

Opinions below ................................................................ 1
Jurisdiction ..................................................................... 2
Statutory provisions involved ....................................... 2
Statement ....................................................................... 2
Reasons for granting the petition ................................. 12
   I.   The decision below is in need of immediate review.... 13
   II.  The decision below is wrong ........................................ 15
       A.  The Rescission Memo is not reviewable .............. 16
       B.  The Rescission Memo is lawful ............................. 24
          1.  The rescission was reasonable in light of
             the Fifth Circuit's decision and the
             impending litigation .......................................... 24
          2.  The rescission was reasonable in light of
             the Acting Secretary's determination that
             DACA is unlawful ............................................. 31
Conclusion ..................................................................... 33
Appendix A — District court order (Jan. 9, 2018)................. 1a
Appendix B — District court notice of appeal
               (Jan. 16, 2018) ............................................ 71a
Appendix C — District court order granting in part
               defendants' motion to dismiss under
               FRCP 12(b)(6) (Jan. 12, 2018)................. 76a
Appendix D — Memorandum on Exercising
               Prosecutorial Discretion with Respect
               to Individuals Who Came to the United
               States as Children (June 15, 2012) .......... 95a
Appendix E — Memorandum on Exercising
               Prosecutorial Discretion with Respect
               to Individuals Who Came to the United
               States as Children and with Respect to
               Certain Individuals Who Are the
               Parents of U.S. Citizens or Permanent
               Residents (Nov. 20, 2014) ...................... 100a

(III)

IV

Table of Contents—Continued: Page

Appendix F — Memorandum on Rescission of Deferred
Action for Childhood Arrivals
(Sept. 5, 2017).............................................. 109a
Appendix G — Statutory provisions................................... 118a

## TABLE OF AUTHORITIES

Cases:

*Abbott Laboratories* v. *Gardner*, 387 U.S. 136 (1967)........ 29

*Arizona* v. *United States*, 567 U.S. 387 (2012) ........... 2, 3, 18

*Botezatu* v. *INS*, 195 F.3d 311 (7th Cir. 1999),
cert. denied, 531 U.S. 811 (2000) ...................................... 22

*Bowman Transp., Inc.* v. *Arkansas-Best Freight
Sys., Inc.*, 419 U.S. 281 (1974) ..................................... 24, 25

*Dames & Moore* v. *Regan*, 453 U.S. 654 (1981)................. 14

*Elgin* v. *Department of Treasury*, 567 U.S. 1 (2012)......... 23

*FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502
(2009).................................................................................. 24

*Green* v. *Napolitano*, 627 F.3d 1341 (10th Cir. 2010) ........ 23

*Heckler* v. *Chaney*, 470 U.S. 821 (1985)...................... *passim*

*I.C.C.* v. *Brotherhood of Locomotive Eng'rs*,
482 U.S. 270 (1987)......................................16, 18, 19, 20, 21

*Lewis* v. *Casey*, 518 U.S. 343 (1996)...................................... 33

*Lincoln* v. *Vigil*, 508 U.S. 182 (1993) ...................... 16, 19, 20

*Madsen* v. *Women's Health Ctr., Inc.*, 512 U.S. 753
(1994).................................................................................. 33

*Massachusetts* v. *EPA*, 549 U.S. 497 (2007) ................. 31, 32

*Mistretta* v. *United States*, 488 U.S. 361 (1989)................. 15

*Motor Vehicles Mfrs. Ass'n* v. *State Farm Mut.
Auto. Ins. Co.*, 463 U.S. 29 (1983).......................... 24, 29, 31

*Reno* v. *American-Arab Anti-Discrimination
Comm.*, 525 U.S. 471 (1999) ..........................3, 18, 21, 22, 24

V

Cases—Continued:                                    Page

  *Texas* v. *United States*:

    86 F. Supp. 3d 591 (S.D. Tex.), aff'd, 809 F.3d 134
      (5th Cir. 2015), aff'd, 136 S. Ct. 2271 (2016)............. 5

    809 F.3d 134 (5th Cir. 2015), aff'd, 136 S. Ct. 2271
      (2016) ...............................................5, 26, 27, 28, 29, 32

  *Thunder Basin Coal Co.* v. *Reich*, 510 U.S. 200
    (1994) ................................................................................ 23

  *United States* v. *Armstrong*, 517 U.S. 456 (1996) ............. 17

  *United States* v. *Nixon*, 418 U.S. 683 (1974)...................... 14

  *United States* v. *Texas*, 136 S. Ct. 2271 (2016) ................... 5

  *Vasquez* v. *Aviles*, 639 Fed. Appx. 898 (3d Cir. 2016)........ 22

  *Wayte* v. *United States*, 470 U.S. 598 (1985) ..................... 19

  *Youngstown Sheet & Tube Co.* v. *Sawyer*,
    343 U.S. 579 (1952).............................................................. 14

Constitution, statutes, and rules:

  U.S. Const. Amend. V (Due Process Clause) .................... 11

  Administrative Procedure Act, 5 U.S.C. 551 *et seq.*........... 14

    5 U.S.C. 701(a)(2).............................8, 15, 16, 18, 20, 118a

    5 U.S.C. 706(2)(A)................................................. 24, 119a

  Clean Air Act, 42 U.S.C. 7401 *et seq.* ................................... 32

    42 U.S.C. 7521(a)(1)............................................................ 32

  Federal Food, Drug, and Cosmetic Act,
    21 U.S.C. 301 *et seq.*........................................................ 19

    21 U.S.C. 352(f)................................................................ 19

  Immigration and Nationality Act,
    8 U.S.C. 1101 *et seq.*........................................................ 2

    8 U.S.C. 1103(a)(1)...................................................... 2, 26

    8 U.S.C. 1158(b)(1)(A)...................................................... 3

    8 U.S.C. 1182(a) (2012 & Supp. IV 2016) ........................ 3

    8 U.S.C. 1182(d)(5)(A)....................................................... 3

VI

Statutes and rules—Continued:                                     Page

8 U.S.C. 1182(h) ................................................................ 23
8 U.S.C. 1182(i) ................................................................. 23
8 U.S.C. 1227(a) ................................................................. 3
8 U.S.C. 1229b................................................................ 3, 23
8 U.S.C. 1229c ................................................................... 23
8 U.S.C. 1252................................................... 16, 21, 120a
8 U.S.C. 1252(a)(1)................................................. 22, 120a
8 U.S.C. 1252(a)(2)(B) ........................................... 23, 121a
8 U.S.C. 1252(a)(2)(B)(i) ....................................... 23, 122a
8 U.S.C. 1252(a)(2)(D)............................................ 23, 122a
8 U.S.C. 1252(b)(9) ................................................. 22, 129a
8 U.S.C. 1252(g)....................................8, 21, 22, 23, 134a
8 U.S.C. 1255..................................................................... 23
Railway Labor Act, 45 U.S.C. 151 *et seq.* ........................... 21
Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* ................. 7
6 U.S.C. 202(5) ...................................3, 18, 26, 30, 32
28 U.S.C. 1254 .................................................................. 13
28 U.S.C. 1254(1) .............................................................. 13
28 U.S.C. 1292(a)(1)........................................................ 11
28 U.S.C. 1292(b) ................................................. 11, 12, 13
28 U.S.C. 2101(e) .............................................................. 13
Fed. R. App. P. 5(a) .......................................................... 12
Fed. R. Civ. P.:
    Rule 12(b)(1) ....................................................7, 8, 12
    Rule 12(b)(6) ..................................................7, 11, 12
Sup. Ct. R. 11 .................................................................... 14

Miscellaneous:

The White House, *Remarks by the President on
    Immigration* (June 15, 2012), https://go.usa.gov/
    xnZFY ..............................................................................30

VII

Miscellaneous—Continued:                                   Page

Stephen M. Shapiro et al., *Supreme Court Practice*
(10th ed. 2013) ............................................................ 13, 14

U.S. Citizenship & Immigration Servs., Deferred
Action for Childhood Arrivals:  Response to Janu-
ary 2018 Preliminary Injunction (Jan. 13, 2018),
https://www.uscis.gov/humanitarian/deferred-
action-childhood-arrivals-response-january-2018-
preliminary-injunction. ...................................................... 10

# In the Supreme Court of the United States

————

No.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY,
ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

————

*ON PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT TO THE UNITED STATES
COURT OF APPEALS FOR THE NINTH CIRCUIT*

————

**PETITION FOR A WRIT OF CERTIORARI
BEFORE JUDGMENT**

————

The Solicitor General, on behalf of the United States Department of Homeland Security and other federal parties, respectfully petitions for a writ of certiorari before judgment to the United States Court of Appeals for the Ninth Circuit.

**OPINIONS BELOW**

The order of the district court granting respondents' motion for a preliminary injunction and denying the government's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) (App., *infra*, 1a-70a) is not yet published in the Federal Supplement but is available at 2018 WL 339144. A separate order of the district court granting in part, and denying in part, the government's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) (App., *infra*, 76a-94a) is not yet published

(1)

2

in the Federal Supplement but is available at 2018 WL 401177.

## JURISDICTION

On January 9, 2018, the district court denied the government's Rule 12(b)(1) motion, entered a preliminary injunction, and certified its Rule 12(b)(1) decision for interlocutory appeal.  On January 12, 2018, the district court granted in part and denied in part the government's Rule 12(b)(6) motion and certified several of its rulings for interlocutory appeal.  The government filed a notice of appeal of the order granting a preliminary injunction on January 16, 2018 (App., *infra*, 71a-75a).  The same day, the government filed a petition for permission to appeal both the January 9 and January 12 orders that the district court had certified for interlocutory appeal.  The court of appeals' jurisdiction over the appeal of the preliminary injunction rests on 28 U.S.C. 1292(a)(1).  The court of appeals' jurisdiction over the appeal of the certified rulings would rest on 28 U.S.C. 1292(b).  The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1) and 28 U.S.C. 2101(e).

## STATUTORY PROVISIONS INVOLVED

Pertinent statutory provisions are set forth in the appendix to this petition.  App., *infra*, 118a-134a.

## STATEMENT

1. a. The Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, charges the Secretary of Homeland Security "with the administration and enforcement" of the Act.  8 U.S.C. 1103(a)(1).  Individual aliens are subject to removal if, *inter alia*, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona* v. *United States*, 567 U.S. 387, 396 (2012); see

3

8 U.S.C. 1182(a) (2012 & Supp. IV 2016); see also 8 U.S.C. 1227(a).  As a practical matter, however, the federal government cannot remove every removable alien, and a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.

For any alien subject to removal, Department of Homeland Security (DHS) officials must first "decide whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396.  After removal proceedings begin, government officials may decide to grant discretionary relief, such as asylum, parole, or cancellation of removal.  See 8 U.S.C. 1158(b)(1)(A), 1182(d)(5)(A), 1229b.  And, "[a]t each stage" of the process, "the Executive has discretion to abandon the endeavor." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (*AADC*).  In making these decisions, like other agencies exercising enforcement discretion, DHS must engage in "a complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985).  Recognizing the need for such balancing, Congress has provided that the "Secretary [of Homeland Security] shall be responsible for  *  *  *  [e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. 202(5).

b. In 2012, DHS announced the policy known as Deferred Action for Childhood Arrivals (DACA).  See App., *infra*, 95a-99a (June 15, 2012 memorandum).  Deferred action is a practice in which the Secretary exercises discretion, "for humanitarian reasons or simply for [her] own convenience," to notify an alien of her decision to forbear from seeking his removal for a designated period. *AADC*, 525 U.S. at 484.  A grant of deferred action does not confer lawful immigration status

4

or provide any defense to removal. DHS retains discretion to revoke deferred action unilaterally, and the alien remains removable at any time.

DACA made deferred action available to "certain young people who were brought to this country as children." App., *infra*, 95a. Under the original DACA policy, following successful completion of a background check and other review, an alien would receive deferred action for a period of two years, subject to renewal. *Id.* at 97a-98a. The DACA policy made clear that it "confer[red] no substantive right, immigration status or pathway to citizenship," because "[o]nly the Congress, acting through its legislative authority, can confer these rights." *Id.* at 99a.

In 2014, DHS created a new policy referred to as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). See App., *infra*, 100a-108a. Through a process expressly designed to be "similar to DACA," DAPA made deferred action available for certain individuals who had a child who was a U.S. citizen or lawful permanent resident. *Id.* at 105a. At the same time, DHS also expanded DACA by extending the deferred-action period from two to three years and by loosening the age and residency criteria. *Id.* at 104a-105a.

c. Soon thereafter, Texas and 25 other States brought suit in the Southern District of Texas to enjoin DAPA and the expansion of DACA. The district court issued a nationwide preliminary injunction, finding a likelihood of success on the claim that the DAPA and expanded DACA memorandum was a "'substantive' rule that should have undergone the notice-and-comment rule making procedure" required by the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.*

5

*Texas* v. *United States*, 86 F. Supp. 3d 591, 671 (2015); see *id.* at 607, 647, 665-678.

The Fifth Circuit affirmed the preliminary injunction, holding that the DAPA and expanded DACA policies likely violated both the APA and the INA. *Texas* v. *United States*, 809 F.3d 134, 146, 170-186 (2015). The court of appeals concluded that plaintiffs had "established a substantial likelihood of success on the merits of their procedural claim" that DAPA and expanded DACA were invalidly promulgated without notice and comment. *Id.* at 178. The court also concluded, "as an alternate and additional ground," that the policies were substantively contrary to law. *Ibid.* The court observed that the INA contains an "intricate system of immigration classifications and employment eligibility," and "flatly does not permit the reclassification of millions of illegal aliens as lawfully present" and eligible for "federal and state benefits, including work authorization." *Id.* at 184. And it noted that Congress had repeatedly declined to enact legislation "closely resembl[ing] DACA and DAPA." *Id.* at 185.

After briefing and argument, this Court affirmed the Fifth Circuit's judgment by an equally divided Court, *United States* v. *Texas*, 136 S. Ct. 2271, 2272 (2016) (per curiam), leaving in place the nationwide injunction against DAPA and the expansion of DACA.

d. In June 2017, Texas and other plaintiff States in the *Texas* case announced their intention to amend their complaint to challenge the original DACA policy. App., *infra*, 17a. They asserted that "[f]or the same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15,

6

2012 DACA memorandum is also unlawful." D. Ct. Doc. 64-1, at 239.

On September 5, 2017, rather than engage in litigation in which DACA would be challenged on essentially the same grounds that succeeded in *Texas* before the same court, DHS decided to wind down the original DACA policy in an orderly fashion. See App., *infra*, 109a-117a (Rescission Memo). In the Rescission Memo, the Acting Secretary of Homeland Security explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation," as well as advice from the Attorney General that the original DACA policy was unlawful and that the "potentially imminent" challenge to DACA would "likely * * * yield similar results" to the *Texas* litigation, "it is clear that the June 15, 2012 DACA program should be terminated." *Id.* at 114a-115a. The Acting Secretary accordingly announced that, "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," the June 15, 2012 memorandum was "rescind[ed]." *Id.* at 115a.

In light of the "complexities associated with winding down the program," however, the Rescission Memo explained that DHS would "provide a limited window in which it w[ould] adjudicate certain requests for DACA." App., *infra*, 115a. Specifically, DHS would "adjudicate—on an individual, case-by-case basis—properly filed pending DACA renewal requests * * * from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017." *Id.* at 115a-116a. The Rescission Memo further

7

provided that the government "[w]ill not terminate the grants of previously issued deferred action * * * solely based on the directives in this memorandum" for the remaining two-year periods. *Id.* at 116a.

2. Shortly after the Acting Secretary's decision, respondents brought these five related suits in the Northern District of California challenging the rescission of DACA. App., *infra*, 19a-21a. Collectively, they allege that the termination of DACA is unlawful because it violates the APA's requirement for notice-and-comment rulemaking; is arbitrary and capricious; violates the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*; denies respondents equal protection and due process; and permits the government to use information obtained through DACA in a manner inconsistent with principles of equitable estoppel. See App., *infra*, 21a-22a. Similar challenges have been brought in district courts in New York, Maryland, Virginia, Florida, and the District of Columbia.

In November 2017, the government filed a motion to dismiss all five suits under Federal Rule of Civil Procedure 12(b)(1) and (b)(6).[1]  At the threshold, the govern-

---

[1]  The government filed the administrative record in October 2017. Litigation ensued in which respondents sought and obtained orders from the district court directing a vast expansion of the administration record, in addition to immediate discovery. See, *e.g.*, D. Ct. Doc. 79 (Oct. 17, 2017).  The government sought review of those orders in a petition for a writ of mandamus in the court of appeals, which the Ninth Circuit denied.  See 875 F.3d 1200 (2017).  After granting a stay of the district court's orders, see 138 S. Ct. 371 (2017), this Court granted the government's petition for a writ of certiorari, vacated the Ninth Circuit's judgment, and remanded for further proceedings.  See 138 S. Ct. 443 (2017).  On remand, the district court stayed its orders requiring expansion of the administrative record and authorizing

8

ment argued that respondents' claims are not reviewable because the Acting Secretary's decision to rescind DACA is committed to agency discretion by law, see 5 U.S.C. 701(a)(2); and because judicial review of the denial of deferred action, if available at all, is barred under the INA prior to the issuance of a final removal order, see 8 U.S.C. 1252(g).  The government further argued that respondents' substantive APA claims fail because the Acting Secretary rationally explained her decision to wind down the discretionary DACA policy given the imminent risk of a nationwide injunction and her reasonable conclusion that the policy is unlawful.  Finally, the government argued that respondents' other claims are without merit because the rescission of DACA is exempt from notice-and-comment requirements; does not violate principles of equal protection or due process; and does not change the policies governing the use of aliens' personal information at all.

Respondents opposed the government's motion to dismiss and filed a motion for a preliminary injunction, seeking to prevent the government from rescinding the DACA policy.

3.  On January 9, 2018, the district court denied the motion to dismiss to the extent it was based on Rule 12(b)(1), and entered a preliminary injunction requiring the government to "maintain the DACA program on a nationwide basis."  App., *infra*, 66a; see *id.* at 1a-70a.

---

discovery "pending further order."  See D. Ct. Doc. 225 (Dec. 21, 2017).  The court recently announced its view that "the order to complete the administrative record should be re-issued" and certified for interlocutory appeal.  D. Ct. Doc. 240, at 1 (Jan. 12, 2018).  It has directed the parties to brief by January 19 "whether some narrowing of the order is necessary or appropriate" before the order is re-issued and "the extent to which * * * discovery should resume."  *Id.* at 1-2.

9

The district court first ruled that the Acting Secretary's rescission of DACA was not committed to agency discretion by law.  The court acknowledged that an agency's decisions "not to prosecute or initiate enforcement actions are generally not reviewable as they are 'committed to an agency's absolute discretion.'"  App., *infra*, 27a (quoting *Chaney*, 470 U.S. at 831).  But it concluded that the rescission of DACA was different because it involved a "broad enforcement polic[y]" rather than an "'individual enforcement decision'"; it rescinded a policy of enforcement discretion, instead of announcing a new one; and the "main" rationale for rescinding the prior policy was its "supposed illegality," which the court concluded it was authorized to decide.  *Id.* at 28a-30a (citation omitted).  The court also concluded that the INA did not preclude review because "plaintiffs do not challenge any particular removal but, rather, challenge the abrupt end to a nationwide deferred-action and work-authorization program."  *Id.* at 30a-31a.

The district court then ruled that respondents were entitled to a preliminary injunction, concluding that they had demonstrated a likelihood of success on claims that the rescission of DACA was arbitrary and capricious.  App., *infra*, 41a-62a.  The court acknowledged that "a new administration is entitled to replace old policies with new policies so long as they comply with the law," *id.* at 2a, and the court did not dispute that DACA was a discretionary non-enforcement policy that was neither mandated nor specifically authorized by statute.  The court nonetheless concluded that respondents were likely to succeed on their claims both because "the agency's decision to rescind DACA was based on a flawed legal premise" and because the government's

10

"supposed 'litigation risk' rationale" was an invalid "post hoc rationalization" and, "in any event, arbitrary and capricious." *Id.* at 42a.

Finding that respondents had satisfied the remaining equitable requirements for an injunction, see App., *infra*, 62a-66a, the district court ordered the government, "pending final judgment" or other order, "to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017." *Id.* at 66a. The court specifically directed that the government must "allow[] DACA enrollees to renew their enrollments." *Ibid.*[2] The court also required DHS to post "reasonable public notice that it will resume receiving DACA renewal applications" and to provide "summary reports to the Court (and counsel)" every three months about "its actions on all DACA-related applications." *Id.* at 67a.[3]

---

[2] The district court identified certain "exceptions" to its injunction. The court specified "(1) that new applications from applicants who have never before received deferred action need not be processed; (2) that the advance parole feature need not be continued for the time being for anyone; and (3) that defendants may take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application." App., *infra*, 66a-67a. The court also specified that "[n]othing in [its] order" would prohibit DHS from "remov[ing] any individual, including any DACA enrollee, who it determines poses a risk to national security or public safety, or otherwise deserves, in its judgment, to be removed." *Id.* at 67a.

[3] Consistent with the district court's order, DHS has issued guidance announcing that it has "resumed accepting requests to renew a grant of deferred action under DACA." U.S. Citizenship & Immigration Servs., Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction (Jan. 13, 2018), https://www.uscis.gov/humanitarian/deferred-action-childhood-arrivals-response-january-2018-preliminary-injunction.

11

The district court certified its order for interlocutory appeal under 28 U.S.C. 1292(b), to the extent it denied the "questions interposed by the government in its motion to dismiss under [Rule] 12(b)(1)." App., *infra*, 70a.

4. On January 12, 2018, the district court issued a further order granting in part and denying in part the government's motion to dismiss to the extent it was based on Rule 12(b)(6). App., *infra*, 76a-94a. The court declined to dismiss respondents' substantive APA claims "[f]or the same reasons" stated in its January 9 order. *Id.* at 77a. The court also declined to dismiss respondents' claims that the rescission of DACA violated principles of equal protection based on race, *id.* at 88a-92a, and that DHS had violated the Due Process Clause by allegedly "chang[ing] its policy" on the use of personal information "provided by DACA recipients," *id.* at 84a-86a. The court dismissed respondents' remaining claims, including with respect to procedural notice-and-comment, the Regulatory Flexibility Act, procedural due process, equitable estoppel, and equal protection based on a fundamental right to a job. *Id.* at 77a-84a, 86a-88a, 92a. The court certified various of its holdings—including those adverse to the government—for interlocutory appeal pursuant to 28 U.S.C. 1292(b). See *id.* at 94a.

5. The government filed timely notices of appeal of the district court's January 9 preliminary-injunction order in each of the five suits. App., *infra*, 71a-75a; cf. 28 U.S.C. 1292(a)(1). The appeals have been consolidated and docketed as No. 18-15068, and remain pending before the court of appeals. The government also has filed a timely petition for permission to appeal from the district court's January 9 and January 12 orders granting in part and denying in part the government's

12

motion to dismiss under Rule 12(b)(1) and (b)(6); that petition has been docketed as No. 18-80004.   See 28 U.S.C. 1292(b); Fed. R. App. P. 5(a).

### REASONS FOR GRANTING THE PETITION

This Court's immediate review is warranted.  The district court has entered a nationwide injunction that requires DHS to keep in place a policy of non-enforcement that no one contends is required by federal law and that DHS has determined is, in fact, unlawful and should be discontinued.  The district court's unprecedented order requires the government to sanction indefinitely *an ongoing violation of federal law* being committed by nearly 700,000 aliens—and, indeed, to confer on them affirmative benefits (including work authorization)—pursuant to the DACA policy.  That policy is materially indistinguishable from the DAPA and expanded DACA policies that the Fifth Circuit held were contrary to federal immigration law in a decision that four Justices of this Court voted to affirm.  Without this Court's immediate intervention, the court's injunction will persist at least for months while an appeal is resolved and, if the court of appeals does not reverse the injunction, it could continue for *more than a year* given the Court's calendar.

To be sure, some of these harms could be avoided by a stay of the district court's order.  But a primary purpose of the Acting Secretary's orderly wind-down of the DACA policy was to *avoid* the disruptive effects on all parties of abrupt shifts in the enforcement of the Nation's immigration laws.  Inviting more changes before final resolution of this litigation would not further that interest.  Moreover, a stay would not address the institutional injury suffered by the United States of being embroiled in protracted litigation over an agency decision that falls squarely within DHS's broad discretion

13

over federal immigration policy and that is not even judicially reviewable.  A stay also would not address the risk that the onerous discovery and administrative-record orders that already justified this Court's intervention will be reinstated and create the need for additional rounds of interlocutory appellate review.  Accordingly, the government respectfully submits that the most suitable and efficient way to vindicate the law in these unique circumstances is to grant certiorari before judgment and resolve the dispute this Term.

## I. THE DECISION BELOW IS IN NEED OF IMMEDIATE REVIEW

Congress has vested this Court with jurisdiction to review "[c]ases in the courts of appeals  * * *  [b]y writ of certiorari  * * *  *before or* after rendition of judgment or decree."  28 U.S.C. 1254(1) (emphasis added).  "An application * * * for a writ of certiorari to review a case before judgment has been rendered in the court of appeals may be made at any time before judgment." 28 U.S.C. 2101(e).[4]  This Court will grant certiorari before judgment "only upon a showing that the case is of such imperative public importance as to justify devia-

---

[4] By virtue of the government's notice of appeal, the district court's preliminary-injunction order is already "in the court[] of appeals" within the meaning of 28 U.S.C. 1254 and 2101(e).  See Stephen M. Shapiro et al., *Supreme Court Practice* § 2.4, at 85-86 (10th ed. 2013).  Accordingly, this petition is focused on the validity of that order.  If the court of appeals grants the government's pending petition for interlocutory appeal, however, both the January 9 and January 12 orders will be "in the court[] of appeals" in their entirety, 28 U.S.C. 1254; see 28 U.S.C. 1292(b), and could therefore be reviewed by this Court.

14

tion from normal appellate practice and to require im-
mediate determination in this Court." Sup. Ct. R. 11.
This case satisfies that standard.

An immediate grant of certiorari is necessary in or-
der to obtain an appropriately prompt resolution of this
important dispute. Absent certiorari before judgment,
it is likely that even expedited proceedings in the Ninth
Circuit would entail many months of delay, during
which time the district-court injunction would require
the government to retain in place a discretionary policy
that sanctions the ongoing violation of federal law by
more than half a million people. Even if the losing party
were to seek certiorari immediately following the Ninth
Circuit's decision, this Court would not be able to review
the decision in the ordinary course until next Term at
the earliest.

From the start of these suits, all parties involved
have agreed that time is of the essence. Respondents,
the government, and the district court alike all have re-
peatedly asserted that a speedy resolution is critical.[5]
This Court has granted certiorari before judgment in
order to promptly resolve other time-sensitive disputes,
and it should follow the same course here. See, *e.g.*,
*Dames & Moore* v. *Regan*, 453 U.S. 654, 668 (1981);
*United States* v. *Nixon*, 418 U.S. 683, 686-687 (1974);
*Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579,
584 (1952); cf. Stephen M. Shapiro et al., *Supreme Court
Practice* § 4.20, at 287-288 (10th ed. 2013) (collecting

---

[5] See, *e.g.*, D. Ct. Doc. 87, at 1 (Oct. 23, 2017) (district-court re-
sponse to mandamus petition) (declaring that "[t]ime is of the es-
sence"); 17-801 Regents Br. in Opp. 30 (emphasizing "the time-
sensitive nature of this case"); 9/21/2017 Tr. 18 (statement of gov-
ernment counsel) ("We think your suggestion to get to final judg-
ment quickly makes a lot of sense in this case.").

15

cases where "[t]he public interest in a speedy determination" warranted certiorari before judgment).

Challenges to the rescission of the DACA policy are currently pending before courts in the Second, Fourth, Ninth, Eleventh, and District of Columbia Circuits, and the plaintiffs in nearly all of them are seeking similar nationwide injunctions. There can be no reasonable question that, as in *Texas*, this Court's review will be warranted. The Court is already familiar with the relevant issues in light of its consideration of the *Texas* case. Additional burdensome discovery, vast expansions of the administrative record, and privilege disputes would only burden the courts and parties without bringing any additional clarity to those issues. And given that the Fifth Circuit's decision in *Texas* held DAPA and the DACA expansion unlawful, and (as explained below) that court's reasoning applies to DACA as well, only this Court can resolve the conflict in the lower courts and provide much-needed clarity to the government and DACA recipients alike. See *Mistretta* v. *United States*, 488 U.S. 361, 371 (1989) (granting certiorari before judgment where constitutionality of sentencing guidelines presented question of "'imperative public importance'" and had resulted in "disarray among the Federal District Courts") (citation omitted).

## II. THE DECISION BELOW IS WRONG

Review is further warranted because the decision below is incorrect. The Acting Secretary's decision to rescind DACA—which is simply a policy of enforcement discretion—is a classic determination that is "committed to agency discretion by law," 5 U.S.C. 701(a)(2), and therefore unreviewable under the APA. Even if DHS's prospective denial of deferred action were reviewable, the individual respondents could not obtain such review

16

unless and until a final order of removal were entered against them.  See 8 U.S.C. 1252.  And even if it were reviewable now under the APA, the decision to rescind the DACA policy was not arbitrary and capricious.  The Acting Secretary opted to wind down DACA after reasonably concluding that the policy was likely to be struck down by courts and indeed was unlawful.

### A. The Rescission Memo Is Not Reviewable

1. a. The APA precludes review of agency actions that are "committed to agency discretion by law." 5 U.S.C. 701(a)(2).  "Over the years," this Court has interpreted that provision to apply to various types of agency decisions that "traditionally" have been regarded as unsuitable for judicial review.  *Lincoln* v. *Vigil*, 508 U.S. 182, 191 (1993).  Section 701(a)(2) precludes review, for example, of an agency's decision not to institute enforcement actions, *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985); an agency's refusal to reconsider a prior decision based on an alleged "material error," *I.C.C.* v. *Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987); and an agency's allocation of funds from a lump-sum appropriation, *Lincoln*, 508 U.S. at 192.  Such exercises of discretion, the Court has explained, often require "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise."  *Chaney*, 470 U.S. at 831.

With respect to an agency's enforcement discretion in particular, an agency may "not only assess whether a violation has occurred," but "whether agency resources are best spent on this violation or another"; whether enforcement in a particular scenario "best fits the agency's overall policies"; and whether the agency "has enough resources to undertake the action at all." *Chaney*, 470 U.S. at 831.  In addition, the Court has

17

noted that when an agency declines to enforce, it "generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Id.* at 832.  In this way and others, agency enforcement discretion "shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Ibid.*

b.  The Acting Secretary's decision to discontinue an existing policy of enforcement discretion falls well within the types of agency decisions that traditionally have been understood as "committed to agency discretion." Like the decision to *adopt* a policy of selective nonenforcement, the decision whether to *retain* such a policy can "involve[] a complicated balancing" of factors that are "peculiarly within the expertise" of the agency, including determining how the agency's resources are best spent and how the non-enforcement policy fits with the agency's overall policies.  *Chaney*, 470 U.S. at 831. Likewise, a decision to abandon an existing nonenforcement policy will not, in itself, bring to bear the agency's coercive power over any individual.  Indeed, an agency's decision to reverse a prior policy of civil nonenforcement is akin to changes in policy as to criminal prosecutorial discretion, which regularly occur within the U.S. Department of Justice both within and between presidential administrations, and which have never been considered amenable to judicial review.  See *United States* v. *Armstrong*, 517 U.S. 456, 464 (1996) ("[T]he decision *whether or not* to prosecute, and what charge to file or bring before a grand jury, generally

18

rests entirely in [the prosecutor's] discretion.") (emphasis added) (citation omitted).

This presumption of nonreviewability applies with particular force when it comes to immigration.  On top of the general concerns implicated in any enforcement decision, in the immigration context a decision not to enforce tolerates not merely past misconduct but a "continuing violation of United States law."  *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999).  In addition, the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy." *Arizona* v. *United States*, 567 U.S. 387, 396-397 (2012). Given these realities, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system."  *Id.* at 396.  In the absence of a statutory directive establishing "substantive priorities" or "otherwise circumscribing" the agency's discretion, *Chaney*, 470 U.S. at 833, the Court has found it "impossib[le]" to "devis[e] an adequate standard of review for such agency action," *Brotherhood of Locomotive Eng'rs*, 482 U.S. at 282.  Respondents have not identified any such statutory directive here.  To the contrary, Congress has specifically empowered the Secretary of Homeland Security to "[e]stablish[] national immigration enforcement policies and priorities."   6 U.S.C. 202(5). The revocation of an existing policy establishing such enforcement policies and priorities is therefore a decision that is "committed to agency discretion by law," 5 U.S.C. 701(a)(2), and not subject to arbitrary-and-capricious review.

19

c. The district court's reasons for rejecting that conclusion are both flatly inconsistent with this Court's precedents and unpersuasive on their own terms.

First, the district court reasoned that the rescission of the DACA policy was reviewable because it addressed "broad enforcement policies," instead of an individual enforcement decision. App., *infra*, 28a. That is irrelevant. Agency decisions about how its "resources are best spent" or how certain enforcement activity "best fits the agency's overall policies," *Chaney*, 470 U.S. at 831, are at least as susceptible to implementation through broad guidance as through case-by-case enforcement decisions. See, *e.g.*, *Wayte* v. *United States*, 470 U.S. 598, 601-603 (1985). Conversely, individual enforcement decisions are regularly informed by interpretations of the agency's substantive statute to determine "whether a violation has occurred." *Ibid.*; see *Brotherhood of Locomotive Eng'rs*, 482 U.S. at 283 ("[A] common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction.").

The non-enforcement decision in *Chaney* was not an individualized decision by the Food and Drug Administration (FDA) to forgo enforcement of the Federal Food, Drug, and Cosmetic Act (FDCA) against a particular alleged violator. Rather, the FDA concluded that, as a matter of the agency's discretion, it would *categorically* not enforce the FDCA's misbranding prohibition, 21 U.S.C. 352(f), against the use of certain drugs for capital punishment when those drugs had been approved by the FDA only for other medical purposes. 470 U.S. at 824-825. And, in *Lincoln*, the Indian Health Service's unreviewable decision reallocated funds from an entire regional treatment program in the Southwest

20

to other nationwide Service programs, not from an individual's treatment plan. 508 U.S. at 184, 188. The question for purposes of Section 701(a)(2) is whether the agency's decision is inherently discretionary in nature, not the number of people to whom it applies.

Second, the district court reasoned that the rescission of the DACA policy was reviewable because, rather than adopting a policy of non-enforcement, it rescinded one. App., *infra*, 29a-30a. The DACA policy, the court determined, had "become an important program for DACA recipients and their families" and others, *ibid.*, and "[a]n agency action to terminate [an existing policy] bears no resemblance to an agency decision not to regulate something never before regulated." *Id.* at 30a. That is not so. As explained above, a decision whether to retain an enforcement policy implicates all of the same considerations about agency priorities and resources that inform the decision to adopt such a policy in the first instance. In *Lincoln*, for example, the Indian Health Service had operated its regional service for seven years, providing important medical treatment to disabled Indian children on which the recipients had undoubtedly come to rely. See 508 U.S. at 185-188. But notwithstanding that reliance, because nothing in the relevant statutes constrained the Service's discretion, this Court held that the Service's decision to discontinue the program was "committed to agency discretion by law." The same is true here.

Third, the district court concluded that the Acting Secretary's decision was reviewable because it was based in substantial part on her view of the legality of the original DACA policy. App., *infra*, 30a. In the court's view, "[t]he main, if not exclusive, rationale for

21

ending DACA was its supposed illegality," and "determining illegality is a quintessential role of the courts." *Ibid.* As the court itself recognized, however, that reasoning cannot suffice: "[A] presumptively unreviewable agency action does not become reviewable simply because 'the agency gives a reviewable reason for otherwise unreviewable action.'" *Id.* at 30a n.7 (quoting *Brotherhood of Locomotive Eng'rs*, 482 U.S. at 283). Thus, in *Brotherhood of Locomotive Engineers*, the ICC's decision not to reconsider a prior decision was unreviewable, even though the agency based that denial on an interpretation of its legal obligations under the Railway Labor Act, 45 U.S.C. 151 *et seq.* 482 U.S. at 276, 283. And in *Chaney*, the FDA's decision not to enforce the misbranding prohibition did not become reviewable even though it was based, in part, on the agency's understanding of its authority to initiate such proceedings. 470 U.S. at 824.

2. At a minimum, Congress has foreclosed district courts from adjudicating collateral attacks on the Acting Secretary's discretionary enforcement decisions and policies in the manner pursued by respondents here.

a. Under 8 U.S.C. 1252, judicial review of DHS enforcement decisions is generally available, if at all, only through the review procedures of removal orders set forth in that section. In particular, Section 1252(g) states that "[e]xcept as provided in this section * * * no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this subchapter." In *AADC*, this Court explained that Section 1252(g) is "de-

22

signed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed." 525 U.S. at 485.

The Acting Secretary's rescission of the DACA policy is such a "'no deferred action' decision[]," *AADC*, 525 U.S. at 485, and is an ingredient in the agency's "commence[ment] [of] proceedings" against aliens who are unlawfully in the country, 8 U.S.C. 1252(g). Thus, to the extent the rescission of the DACA policy is reviewable at all, it is reviewable only as otherwise "provided in [Section 1252]," *ibid.*—that is, through "[j]udicial review of a final order of removal," 8 U.S.C. 1252(a)(1). See, *e.g.*, *Vasquez* v. *Aviles*, 639 Fed. Appx. 898, 901 (3d Cir. 2016) (concluding that, under Section 1252(g), "[t]he District Court therefore lacked jurisdiction to consider [plaintiff's] challenge to his denial of DACA relief"); *Botezatu* v. *INS*, 195 F.3d 311, 314 (7th Cir. 1999) ("Review of refusal to grant deferred action is * * * excluded from the jurisdiction of the district court."), cert. denied, 531 U.S. 811 (2000). That conclusion is also reflected in 8 U.S.C. 1252(b)(9), which channels into the review of final removal orders all questions of fact or law arising from any action taken to remove an alien from the United States. See *AADC*, 525 U.S. at 483 (characterizing Section 1252(b)(9) as an "unmistakable 'zipper' clause").[6]

---

[6] Even in instances where the statutory text less clearly precludes review, this Court has held that, where it is fairly discernible that Congress intends a particular review scheme to be exclusive, a plaintiff is not permitted to circumvent that exclusive scheme by filing a preemptive district-court action, but must instead present its

23

The conclusion that Congress intended to foreclose collateral review of the Acting Secretary's prospective rescission of a discretionary deferred-action policy is consistent with Congress's treatment of other kinds of discretionary DHS actions.  For example, in 8 U.S.C. 1252(a)(2)(B), Congress provided that "no court shall have jurisdiction to review" judgments regarding the grant or denial of specified forms of discretionary relief—including cancellation of removal, voluntary departure, certain waivers of inadmissibility, and adjustment of status.  See 8 U.S.C. 1252(a)(2)(B)(i) (citing 8 U.S.C. 1182(h), 1182(i), 1229b, 1229c, 1255).  Congress provided a limited exception to that jurisdictional bar for "review of constitutional claims or questions of law," 8 U.S.C. 1252(a)(2)(D), but it mandated that any such review occur only "upon a petition for review [of a final order of removal] filed with an appropriate court of appeals in accordance with this section," *ibid.*  See, *e.g.*, *Green* v. *Napolitano*, 627 F.3d 1341, 1347 (10th Cir. 2010).

b.  The district court concluded that Section 1252(g) does not apply because respondents challenged "the across-the-board cancellation of a nationwide program," and did so "prior to the commencement of any removal proceedings" against respondents.  App., *infra*, 31a-32a.  But none of that matters.  The denial of deferred action is a step toward the commencement of removal proceedings against an alien.  Respondents cannot escape the INA's careful scheme for such proceedings simply by filing suit before the agency has officially initiated an enforcement proceeding against them.  See *Thunder Basin Coal Co.* v. *Reich*, 510 U.S. 200, 207-208

---

claims or defenses through the review scheme established by Congress.  See *Elgin* v. *Department of Treasury*, 567 U.S. 1, 8-10 (2012); *Thunder Basin Coal Co.* v. *Reich*, 510 U.S. 200, 207-209 (1994).

24

(1994).  Respondents' claims, "if they are reviewable at all," must be litigated in removal proceedings, not through "separate rounds of judicial intervention" in federal district court.  *AADC*, 525 U.S. at 485.

### B. The Rescission Memo Is Lawful

Even if the Acting Secretary's decision is reviewable under the APA, it is plainly valid.  Under the APA, the Acting Secretary's decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. 706(2)(A).  That standard of review is "narrow," *Motor Vehicles Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and requires only that the "agency 'examine the relevant data and articulate a satisfactory explanation for its action,'" *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted).  "[A] court is not to substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, and should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc.* v. *Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).  The Acting Secretary's decision to begin an orderly wind-down of a policy of enforcement discretion that indisputably was not required by law—based on her grave concerns about the legality of that policy, and her knowledge that an impending lawsuit likely would have brought the policy to an immediate and disruptive end—easily passes that test.

### 1. The rescission was reasonable in light of the Fifth Circuit's decision and the impending litigation

The Acting Secretary reasonably rested her decision on her assessment of the risks presented by maintain-

25

ing a policy (original DACA) that was materially indistinguishable to ones (expanded DACA and DAPA) that had been struck down by the Fifth Circuit in a decision affirmed by this Court—and she did so in the face of the threat by Texas and other States to challenge DACA on the same grounds.  That rationale alone provides a permissible reason for initiating an orderly wind-down of the policy.

a. The district court improperly rejected this rationale as a "post hoc rationalization[]" for the Acting Secretary's decision.  App., *infra*, 55a.  In the court's view, "[t]he Attorney General's letter and the Acting Secretary's memorandum can only be reasonably read as stating DACA was illegal and that, *given that DACA must, therefore, be ended,* the best course was 'an orderly and efficient wind-down process,' rather than a potentially harsh shutdown in the Fifth Circuit."  *Id.* at 56a.  But that is plainly not the only rationale that "may reasonably be discerned" from the Rescission Memo. *Bowman*, 419 U.S. at 286.  In that memorandum, the Acting Secretary recounted in significant detail the litigation surrounding the DAPA and expanded DACA policies. See App., *infra*, 111a-114a.  The memorandum noted that the agency's prior June 2017 decision to discontinue DAPA and expanded DACA was made after "considering the [government's] likelihood of success on the merits of th[at] ongoing litigation." *Id.* at 114a.  It described the subsequent letter from Texas and other States to the Attorney General notifying him of those States' intention to amend the existing lawsuit to challenge the original DACA policy.  *Ibid.*  It quoted the Attorney General's statement that "it is likely that potentially imminent litigation would yield similar results with respect to DACA." *Ibid.*  And it stated that, in light

26

of the foregoing, and "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," the Acting Secretary had decided that the DACA policy "should" be terminated and wound down in "an efficient and orderly fashion." *Id.* at 115a; cf. 6 U.S.C. 202(5). A reasonable reading of the Rescission Memo is that the Acting Secretary's decision was informed by the risk that the government was not "likel[y]" to "succe[ed]" on the merits of the "imminent litigation." App., *infra*, 114a.

The district court also posited that litigation risk could not have been a rationale for the Acting Secretary's decision because, "once the Attorney General had determined that DACA was illegal, the Acting Secretary had to accept his ruling as 'controlling.'" App., *infra*, 56a (citing 8 U.S.C. 1103(a)(1)). But even if the Acting Secretary were bound by the Attorney General's legal determination as to DACA's unlawfulness, that is not inconsistent with the Acting Secretary's assertion of an additional, independent litigation-risk rationale for winding down the policy.

b. The Acting Secretary's rationale was eminently reasonable. In *Texas* v. *United States*, the Fifth Circuit concluded that DAPA and expanded DACA were unlawful on both procedural and substantive grounds. 809 F.3d at 178 (2015); see *id.* at 147 n.11 (including the "DACA expansions" within the opinion's references to "DAPA"). The entirety of the Fifth Circuit's reasoning applies equally to the original DACA policy. With respect to procedure, the Fifth Circuit concluded that the memorandum expanding DACA and creating DAPA was not exempt from notice and comment as a statement of policy because of how the *original DACA policy* had been implemented. See *id.* at 171-178. The court found that,

27

"[a]lthough the DAPA Memo facially purports to confer discretion," in fact it would operate as a binding statement of eligibility for deferred action because that is how the original DACA policy had been implemented. *Id*. at 171; see *id.* at 174 n.139.

As a matter of substance, the Fifth Circuit held that DAPA and expanded DACA were contrary to the INA because (1) "[i]n specific and detailed provisions," the INA already "confers eligibility for 'discretionary relief,'" including "narrow classes of aliens eligible for deferred action," 809 F.3d at 179 (citation omitted); (2) the INA's otherwise "broad grants of authority" could not reasonably be construed to assign to the Secretary the authority to create additional categories of aliens of "vast 'economic and political significance,'" *id*. at 182-183 (citations omitted); (3) DAPA and expanded DACA were inconsistent with historical deferred-action policies because they were not undertaken on a "country-specific basis * * * in response to war, civil unrest, or natural disasters" nor served as a "bridge[] from one legal status to another," *id*. at 184 (citation omitted); and (4) "Congress ha[d] repeatedly declined to enact the Development, Relief, and Education for Alien Minors Act ('DREAM Act'), features of which closely resemble DACA and DAPA." *Id*. at 185 (footnote omitted). Every one of those factors also applies to the original DACA policy.

c. The district court here nevertheless faulted the Acting Secretary for failing to address perceived distinctions between DACA and the DAPA and expanded DACA policies. App., *infra*, 57a-58a; see *id*. at 51a-54a. It is true enough that the Fifth Circuit noted that "any extrapolation from DACA [to DAPA] must be done carefully." *Texas*, 809 F.3d at 173. The differences it

28

noted, however, were reasons why DAPA might be law-ful even if DACA were not, rather than the other way around. See *id.* at 174 (noting that the "DAPA Memo contain[ed] additional discretionary criteria"). And, in any event, the Fifth Circuit went on to affirm, "under any standard of review," the district court's comparison of the policies. *Id.* at 174 n.139.

The district court suggested that DAPA might have been more vulnerable to challenge because "Congress had already established a pathway to lawful presence for alien parents of citizens," while "no such analogue" exists for DACA recipients. App., *infra*, 54a. That reasoning is entirely backward. If Congress's creation of pathways to lawful presence is relevant at all, then the fact that Congress has done so only for DAPA recipients—and not DACA recipients—surely must render DACA *more* in-consistent with the INA. In any event, the basis of the Fifth Circuit's *Texas* decision was not the existence of a particular statutory pathway to lawful presence, but the "specific and intricate provisions" of the INA as a whole addressing discretionary relief. 809 F.3d at 186. Those provisions no more include DACA recipients than those of DAPA. As confirmation of that fact, the Fifth Circuit also affirmed the injunction with respect to expanded DACA—which differed from the original DACA policy only in the length of the deferred-action period and in its modified age and duration-of-residence requirements.

The district court also reasoned that DACA might be distinguishable from DAPA because 689,800 aliens are recipients of DACA, whereas 4.3 million aliens poten-tially qualified for DAPA. App., *infra*, 54a. But what-ever the ultimate number of individuals that might be affected, there can be no debate that DACA is, like DAPA and expanded DACA, a policy of "vast 'economic

29

and political significance,'" to which the Fifth Circuit's reasoning would apply. *Texas*, 809 F.3d at 183 (citations omitted). By contrast, the type of historical deferred-action practices that the Fifth Circuit suggested might be permissible were much more "limited in time and extent, affecting only a few thousand aliens for months or, at most, a few years." *Id.* at 185 n.197. The Acting Secretary did not act arbitrarily in failing to credit a distinction between DACA and DAPA that the Fifth Circuit had expressly rejected.

Finally, the district court erred in suggesting that, whether or not the original DACA policy was unlawful as it had been implemented, it could have been fixed "by simply insisting on exercise of discretion" in individual cases. App., *infra*, 54a. The Fifth Circuit relied on the lack of individual discretion only for its conclusion that the DAPA Memorandum was *procedurally* unlawful, not substantively so. Thus, even if the Acting Secretary could have altered the DACA policy sufficiently to overcome that concern, there is no indication that it would have changed the Fifth Circuit's substantive conclusion—at least unless the change were so drastic as to return to a practice of "single, ad hoc grants of deferred action made on a genuinely case-by-case basis," *Texas*, 809 F.3d at 186 n.202, which is precisely what the rescission of the DACA policy achieves.[7]

---

[7] Nor did the Acting Secretary "fail[] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, by not discussing the possibility of defending DACA on the basis of laches. App., *infra*, 57a. That doctrine may provide a defense in an APA action against the government where a plaintiff's unreasonable delay in bringing suit prejudiced the government. See *Abbott Laboratories* v. *Gardner*, 387 U.S. 136, 155 (1967). The district court did not explain what prejudice the government might have established from Texas's failure to bring suit earlier.

30

d.  The district court also ruled that the Acting Sec-retary's decision was arbitrary and capricious because she "should have—but did not—weigh DACA's pro-grammatic objectives as well as the reliance interests of DACA recipients."  App., *infra*, 58a.  By its own terms, however, DACA made deferred action available for only two-year periods, which could "be terminated at any time at the agency's discretion."  *Id.* at 102a.  When he announced DACA in 2012, President Obama explained that it was a "temporary stopgap measure," not a "per-manent fix."  The White House, *Remarks by the Presi-dent on Immigration* (June 15, 2012), https://go.usa. gov/xnZFY.  And he urged Congress to act "because these kids deserve to plan their lives in more than two-year increments."  *Ibid.*  Even assuming DACA was lawful, a discretionary policy that can be revoked at any time cannot create legally cognizable reliance interests —and certainly not beyond the stated duration (gener-ally two years) of deferred-action grants.  Nothing in the INA prevents the Secretary of Homeland Security from changing her "national immigration enforcement policies and priorities."  6 U.S.C. 202(5).[8]

---

[8]  In any event, the Acting Secretary's decision was respectful of the interests of existing DACA recipients.  Based on her reasonable evaluation of the litigation risk posed by the imminent lawsuit against the DACA policy, the choice she faced was between a grad-ual, orderly, and administrative wind-down of the policy, and the risk of an immediate, disruptive, and court-imposed one.  Her deci-sion to phase out the policy over a two-and-a-half-year period, per-mitting a period of additional renewals and permitting renewed and existing grants of deferred action to expire by their terms was, by far, the more humane choice.

31

### 2. *The rescission was reasonable in light of the Acting Secretary's determination that DACA is unlawful*

The Acting Secretary's decision is independently supported by her reasonable conclusion, informed by the Attorney General's advice, that indefinitely continuing the DACA policy would itself have been unlawful. As detailed above, the Fifth Circuit had already concluded that the DAPA and expanded DACA policies were procedurally and substantively invalid in a decision that four Justices of this Court voted to affirm. See pp. 26-27, *supra*. The Attorney General expressed his agreement with the conclusion reached by the Fifth Circuit in a decision that applies equally to the original DACA policy. See App., *infra*, 114a (concluding that the DACA policy was "effectuated * * * without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result"). It cannot be that the Acting Secretary's decision to rescind DACA on the basis of the Fifth Circuit's decision, this Court's equally divided affirmance, and the Attorney General's opinion was the type of "clear error of judgment," *State Farm*, 463 U.S. at 43 (citation omitted), that would make it arbitrary and capricious under the APA.

The district court concluded that the Acting Secretary could not rely on an assessment of DACA's legality unless it was correct as a matter of law. See App., *infra*, 42a ("When agency action is based on a flawed legal premise, it may be set aside as 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citing *Massachusetts* v. *EPA*, 549 U.S. 497, 532 (2007)). Relying on the Secretary's broad discretion in

32

"[e]stablishing national immigration enforcement policies and priorities," 6 U.S.C. 202(5), and DHS's "long and recognized practice" of granting deferred action (along with work authorization and other benefits) on a programmatic basis, the court concluded that, in its view, DACA was lawful. App., *infra*, 45a; see *id.* at 42a-48a.  But the Fifth Circuit rejected those precise considerations when offered in support of the DAPA and expanded DACA policies.  See *Texas*, 809 F.3d at 183.

More fundamentally, the district court was wrong to conclude that the Acting Secretary's discretionary decision to end a particular enforcement policy of doubtful legality must automatically be set aside if a court subsequently decides that the policy was lawful.  App., *infra*, 42a.  The court relied on this Court's decision in *Massachusetts* v. *EPA*, *supra*, for that proposition.  But in that case a provision of the Clean Air Act spoke directly to the agency decision at issue, and *required* EPA to regulate any air pollutant which the agency concluded endangered public health or welfare.  See 42 U.S.C. 7521(a)(1) (mandating that the EPA Administrator "shall" prescribe standards).  The agency had "refused to comply with this clear statutory command" in part because it misunderstood its authority. 549 U.S. at 533.  By contrast here, no one contends that the INA requires DHS to continue the DACA policy of deferred action.  Rather, the DACA policy was created as a matter of the Acting Secretary's broad discretion to set enforcement priorities.  After careful review, she determined to rescind that discretionary policy, and nothing in either the APA or INA demands setting aside her lawful determination.[9]

_____

[9]  The district court also erred in enjoining the rescission of DACA on a "nationwide basis."  App., *infra*, 66a.  As the government has

33

## CONCLUSION

The petition for a writ of certiorari before judgment should be granted.

Respectfully submitted.

NOEL J. FRANCISCO
  *Solicitor General*
CHAD A. READLER
  *Acting Assistant Attorney*
  *General*
JEFFREY B. WALL
  *Deputy Solicitor General*
HASHIM M. MOOPPAN
  *Deputy Assistant Attorney*
  *General*
JONATHAN Y. ELLIS
  *Assistant to the Solicitor*
  *General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
  *Attorneys*

JANUARY 2018

---

explained in its pending petition for a writ of certiorari in *Trump* v. *Hawaii*, No. 17-965 (filed Jan. 5, 2018), both constitutional and equitable principles require that injunctive relief be limited to a plaintiff's own cognizable injuries.  See *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996); *Madsen* v. *Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).  The district court's injunction contravenes that settled rule by sweeping far more broadly than redressing the harms of the specific respondents in this case.

# EXHIBIT 8

Jeffrey M. Davidson (SBN 248620)
Alan Bersin (SBN 63874)
COVINGTON & BURLING LLP
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com,
abersin@cov.com
*Attorneys for Plaintiffs The Regents of the University of California and Janet Napolitano, in her official capacity as President of the University of California*

Theodore J. Boutrous, Jr. (SBN 132099)
Ethan D. Dettmer (SBN 196046)
Jesse S. Gabriel (SBN 263137)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: tboutrous@gibsondunn.com,
edettmer@gibsondunn.com,
jgabriel@gibsondunn.com
*Attorneys for Plaintiffs Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, and Jirayut Latthivongskorn*

Xavier Becerra
Attorney General of California
Michael L. Newman
Supervising Deputy Attorney General
James F. Zahradka II (SBN 196822)
Deputy Attorney General
1515 Clay Street, 20th Floor
Oakland, CA 94612-0550
Telephone: (510) 879-1247
E-mail: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

Joseph W. Cotchett (SBN 36324)
Nancy L. Fineman (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

Jonathan Weissglass (SBN 185008)
Stacey M. Leyton (SBN 203827)
Eric P. Brown (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and Service Employees International Union Local 521*

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| REGENTS OF UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF** <br><br> **MEMORANDUM IN SUPPORT** <br><br> Judge: Honorable William Alsup <br> Hearing: December 20, 2017, 8:00 a.m. <br> Courtroom: 8, 19th Floor |

| STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, STATE OF MINNESOTA, | CASE NO. 17-CV-05235-WHA |
|---|---|
| Plaintiffs, | |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| CITY OF SAN JOSE, a municipal corporation, | CASE NO. 17-CV-05329-WHA |
| Plaintiff, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA, | |
| Defendants. | |
| DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN, | CASE NO. 17-CV-05380-WHA |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |
| County of Santa Clara and Service Employees International Union Local 521, | CASE NO. 17-CV-05813-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, in his official capacity as President of the United States, JEFFERSON BEAUREGARD SESSIONS, in his official capacity as Attorney General of the United States; ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security; and U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

# **TABLE OF CONTENTS**

Notice of Motion and Motion for Provisional Relief.................................................... 1

Memorandum in Support of Motion for Provisional Relief ......................................... 2

Introduction............................................................................................................... 2

Background ............................................................................................................... 4

      A.     History of Deferred Action ........................................................ 4

      B.     The Creation of DACA ............................................................. 6

      C.     Benefits of DACA .................................................................... 7

      D.     The Rescission of DACA .......................................................... 8

      E.     Harm from the Rescission ....................................................... 10

Standard of Review................................................................................................. 15

Argument ............................................................................................................... 15

PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................................. 15

I.     Defendants' Rescission of DACA Is Arbitrary and Capricious. ...................... 15

      A.     Defendants Failed to Explain the Basis for the Rescission................... 16

      B.     Defendants Failed to Consider All Relevant Factors and Articulate a Rational Connection Between the Facts Found and the Choice Made. ............................. 18

      C.     Defendants Failed to Offer a Reasoned Explanation for Their Reversal of Policy. ................................................................................................... 20

      D.     The Rescission Appears to Rely on a False Legal Premise. ................. 22

      E.     The Announced Reason for the Rescission Was Pretextual ................. 29

II.    The Rescission Should Be Vacated Because It Is a Substantive Rule That Did Not Comply with the APA's Notice and Comment Requirements .......................... 31

PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF............................ 34

I.     Plaintiffs Face Irreparable Harm.................................................................. 34

II.    The Balance Of Equities and the Public Interest Weigh Heavily in Favor of Provisional Relief....................................................................................... 35

CONCLUSION ....................................................................................................... 37

i

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alaska v. U.S. Dep't of Transp.,*
    868 F.2d 441 (D.C. Cir. 1989) ..................................................................................................33

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ..................................................................................................16

*Amerijet Int'l, Inc. v. Pistole,*
    753 F.3d 1343 (D.C. Cir. 2014) ................................................................................................18

*Ariz. Dream Act Coal. v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014) ....................................................................................................7

*Ariz. Dream Act Coal. v. Brewer,*
    81 F. Supp. 3d 795 (D. Ariz. 2015) ...........................................................................................8

*Ariz. Dream Act Coal. v. Brewer,*
    855 F.3d 957 (9th Cir. 2017) ...............................................................................21, 26, 35, 36

*Arizona v. United States,*
    567 U.S. 387 (2012) ..................................................................................................................23

*Bair v. Cal. State Dep't of Transp.,*
    867 F. Supp. 2d 1058 (N.D. Cal. 2012) ...................................................................................18

*Batalla Vidal v. Duke,*
    No. 16 cv. 41196 (E.D.N.Y. Oct. 27, 2017) .................................................................. *passim*

*Burlington Truck Lines, Inc. v. United States,*
    371 U.S. 156 (1962) ..................................................................................................................20

*Butte Envtl. Council v. U.S. Army Corps of Eng'rs,*
    620 F.3d 936 (9th Cir. 2010) ....................................................................................................16

*Chalk v. U.S. Dist. Court Cent. Dist. of Cal.,*
    840 F.2d 701 (9th Cir. 1988) ....................................................................................................35

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) ............................................................................................................16, 31

*Cmty. Nutrition Inst. v. Young,*
    818 F.2d 943 (D.C. Cir. 1987) ..................................................................................................32

*Colwell v. Dep't of Health & Human Servs.,*
    558 F.3d 1112 (9th Cir. 2009) ............................................................................................32, 33

*Consumer Energy Council of Am. v. FERC*,
    673 F.2d 425 (D.C. Cir. 1982) ............................................................................34

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) ...............................................................21, 22, 26

*Crickon v. Thomas*,
    579 F.3d 978 (9th Cir. 2009) ..............................................................................20

*Crowley Caribbean Transp., Inc. v. Peña*,
    37 F.3d 671 (D.C. Cir. 1994) ..............................................................................24

*Edison Elec. Inst. v. EPA*,
    996 F.2d 326 (D.C. Cir. 1993) ......................................................................24, 25

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016) ...................................................................................21, 22

*Enyart v. Nat'l Conference of Bar Examiners, Inc.*,
    630 F.3d 1153 (9th Cir. 2011) ............................................................................36

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) .......................................................................................3, 21

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ............................................................................................16

*Gant ex rel. Gant v. E.E.O.C. v. Ethan Allen, Inc.*,
    44 F.3d 116 (2d Cir. 1994) .................................................................................31

*Greene v. McElroy*,
    360 U.S. 474 (1959) ............................................................................................20

*Hernandez v. Hughes Missile Sys. Co.*,
    362 F.3d 564 (9th Cir. 2004) ..............................................................................30

*Humane Soc'y of U.S. v. Locke*,
    626 F.3d 1040 (9th Cir. 2010) ......................................................................18, 23

*Int'l Chem. Workers Union Council of the United Food & Commercial Workers Int'l v.
    NLRB*, 467 F.3d 742 (9th Cir. 2006) ..................................................................25

*Int'l Longshoremen's & Warehousemen's Union v. Meese*,
    891 F.2d 1374 (9th Cir. 1989) ............................................................................25

*Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*,
    358 F.3d 40 (D.C. Cir. 2004) ..............................................................................28

*Jicarilla Apache Nation v. U.S. Dep't of the Interior*,
    613 F.3d 1112 (D.C. Cir. 2010) ..........................................................................20

iii

*Kenney v. Glickman*,
    96 F.3d 1118 (8th Cir. 1996) ........................................................................24

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) .......................................................................36

*Lester v. Parker*,
    235 F.2d 787 (9th Cir. 1956) .......................................................................20

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)....................................................................................33

*California ex rel. Lockyer v. U.S. Dep't of Agric.*,
    459 F. Supp. 2d 874 (N.D. Cal. 2006) .........................................................28

*Mada-Luna v. Fitzpatrick*,
    813 F.2d 1006 (9th Cir. 1987) .....................................................................34

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)....................................................................................23

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015) ....................................................................29

*Michigan v. EPA*,
    135 S. Ct. 2699 (2015) ................................................................................19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)...............................................................................17, 19

*Municipality of Anchorage v. United States*,
    980 F.2d 1320 (9th Cir. 1992) ...............................................................32, 33

*N.E. Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*,
    727 F.2d 1127 (D.C. Cir. 1984) ............................................................17, 31

*Nat'l Ass'n of Home Builders v. Norton*,
    340 F.3d 835 (9th Cir. 2003) .......................................................................18

*Neil v. Biggers*,
    409 U.S. 188 (1972)...............................................................................18, 26

*Noel v. Chapman*,
    508 F.2d 1023 (2d Cir. 1975) ......................................................................34

*Norsworthy v. Beard*,
    87 F. Supp. 3d 1164 (N.D. Cal. 2015) .........................................................35

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
    477 F.3d 668 (9th Cir. 2007) .......................................................................18

*Organized Vill. of Kake v. U.S. Dep't of Agric.*,
   795 F.3d 956 (9th Cir. 2015) ...........................................................................28

*United States ex rel. Parco v. Morris*,
   426 F. Supp. 976 (E.D. Pa. 1977) .............................................................4, 6, 34

*Paulsen v. Daniels*,
   413 F.3d 999 (9th Cir. 2005) ...........................................................................33

*Perez v. Mortg. Bankers Ass'n*,
   135 S. Ct. 1199 (2015)...........................................................................3, 16, 22

*Phillips Petroleum Co. v. FERC*,
   792 F.2d 1165 (D.C. Cir. 1986) .....................................................................23

*Pinho v. Gonzales*,
   432 F.3d 193 (3d Cir. 2005)...........................................................................25

*Pub. Citizen v. Heckler*,
   653 F. Supp. 1229 (D.D.C. 1986) .............................................................17, 31

*Regents of Univ. of Cal. v. Bakke*,
   438 U.S. 265 (1978)...........................................................................20

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999)...........................................................................23

*Rodriguez v. Robbins*,
   715 F.3d 1127 (9th Cir. 2013) .....................................................................36

*Sacora v. Thomas*,
   628 F.3d 1059 (9th Cir. 2010) .....................................................................16

*Safe Air for Everyone v. EPA*,
   488 F.3d 1088 (9th Cir. 2007) .....................................................................23

*San Diego Air Sports Ctr., Inc. v. F.A.A.*,
   887 F.2d 966 (9th Cir. 1989) .....................................................................32

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) (*Chenery I*) .............................................................2, 17, 23

*SEC v. Chenery Corp.*,
   332 U.S. 194 (1947) (*Chenery II*)...........................................................17, 28

*Sierra Club v. Jackson*,
   833 F. Supp. 2d 11 (D.D.C. 2012)...........................................................29

*Squaw Transit Co. v. United States*,
   574 F.2d 492 (10th Cir. 1978) .............................................................17, 31

v

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

*Texas v. United States*,
  787 F.3d 733 (5th Cir. 2015) (*Texas I*) ............................................26, 27

*Texas v. United States* (*Texas II*),
  809 F.3d 134 (5th Cir. 2015) ............................................25, 26, 27

*United States v. Texas*,
  136 S. Ct. 2271 (2016) ............................................ *passim*

**Statutes and Regulations**

8 C.F.R. § 212.5(f) ............................................8

8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) ............................................5

8 C.F.R. § 214.14(d)(2) ............................................5

8 C.F.R. § 274a.12(c)(14) ............................................7

5 U.S.C. § 551(5) ............................................32, 34

5 U.S.C. § 553 ............................................3, 30, 33

5 U.S.C. § 604(a) ............................................3, 33

5 U.S.C. § 706(2)(A) ............................................2, 16

6 U.S.C. § 202(5) ............................................4

8 U.S.C. § 1103(a)(3) ............................................23

8 U.S.C. § 1182(a)(9)(B)–(C) ............................................7, 11

8 U.S.C. §§ 1611(b)(2)–(3), 1621(d) ............................................8

Act of July 25, 1958, Pub. L. No. 85-559, § 2, 72 Stat. 419, 419-20 ............................................4, 14

Act of Sept. 11, 1957, Pub. L. No. 85-316, § 4(d), 71 Stat. 639, 640 ............................................4

Cal. Unemp. Ins. Code § 1264(a)(2) ............................................8

Cal. Veh. Code § 12801(a)-(b) ............................................8

Cal. Veh. Code § 12801.5 ............................................8

Cal. Veh. Code § 1208.9 ............................................8

Cuban Adjustment Act, Pub. L. No. 89-732, §1, 80 Stat. 1161 (1966) ............................................5

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 ............................................5

vi

Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359 (1986)....................................5

## NOTICE OF MOTION AND MOTION FOR PROVISIONAL RELIEF

Please take notice that on December 20, 2017, 8:00 a.m., at 450 Golden Gate Avenue, San Francisco, California, Courtroom 8, plaintiffs in the above-captioned actions will, and hereby do, move for provisional relief enjoining defendants from implementing the September 5, 2017 memorandum rescinding the Deferred Action for Childhood Arrivals program ("the Rescission"). Plaintiffs will demonstrate that (1) they are likely to succeed on the merits of their claims under the Administrative Procedure Act ("APA"), (2) the Rescission is causing irreparable harm, and (3) the balance of equities and the public interest weigh heavily in favor of provisional relief in the form of returning to the status quo existing prior to the Rescission.

As the Court held in its Order Re Motion to Complete Administrative Record (Dkt. No. 79), the administrative record filed by defendants (Dkt. No. 64) is incomplete and must be expanded. Defendants' compliance with that ruling has been stayed by the court of appeals. Nonetheless, as provided in the Court's scheduling order and because of the urgency caused by defendants' arbitrary selection of March 5, 2018 as the termination date for DACA, plaintiffs now move on the basis of the current incomplete administrative record, the discovery they obtained prior to the court of appeals' stay, and the declarations and exhibits submitted in connection with this motion and the accompanying request for judicial notice. Plaintiffs will supplement their motion if the court of appeals permits expansion of the administrative record or if discovery reveals additional relevant information. As demonstrated below, however, the current record establishes that plaintiffs are likely to succeed on the merits of their claim that the rescission of DACA was arbitrary, capricious, and not in accordance with law. Plaintiffs seek injunctive relief at this time only as to their APA claims, but maintain their other constitutional, statutory, and equitable claims for a later stage of this case.

**MEMORANDUM IN SUPPORT OF MOTION FOR PROVISIONAL RELIEF**

**INTRODUCTION**

Since 2012, the Deferred Action for Childhood Arrivals ("DACA") program has enabled nearly 800,000 young people who were brought into the United States as children to live and work in this country without fear of deportation.[1]  Since the program was established, DACA recipients have relied on its protections to become medical residents and teachers, serve in the U.S. military, open businesses and earn degrees, start families, and purchase homes.  Yet on September 5, 2017, defendants rescinded DACA, telling its beneficiaries that "DACA was fundamentally a lie," Appendix ("App.") at 1869-70 (Duke Statement), and that they should "prepare for and arrange their departure from the United States," *id.* at 2199–2200 (Talking Points).  The Rescission already is causing catastrophic and irreparable harm to DACA recipients, as the threat of deportation—to countries where they have not lived since they were children—forces them to make wrenching choices whether to leave their schools, jobs, and even their U.S. citizen children and other family members.  The harm also extends to their loved ones, employers, schools, and communities.  The Rescission is unjust and unlawful, and it violates the fundamental prohibition on arbitrary agency action imposed by the Administrative Procedure Act ("APA").

The APA requires courts to set aside agency action that is "arbitrary, capricious, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This standard requires agency action to be both reasonable and reasonably explained.  The Rescission is neither.  The Rescission contains only a single vague sentence of justification: "Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated."  AR 255.  This conclusory assertion fails the requirement that the basis for agency action "be clearly disclosed and adequately sustained," *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943) (*Chenery I*), especially for an action threatening the expulsion of nearly 700,000 current DACA recipients from their country.

---

[1]  Although 800,000 young people have received DACA at various times, this motion focuses on the irreparable harm to the 700,000 current DACA recipients if defendants are permitted to implement the Rescission.

The government's empty explanation of the Rescission echoes its failure to consider the Rescission's consequences. The government's decision fails to acknowledge the human and economic havoc that it will inflict on DACA recipients, their families, schools, employers, employees, clients, and communities. The record further reveals that the Department of Homeland Security ("DHS") never evaluated the benefits of DACA when rescinding the program. The absence of reasonable consideration or explanation is particularly appalling where, as here, an agency is reversing a "prior policy [that] has engendered serious reliance interests." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015). Reasonable decision-making in these circumstances demands a "more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The government's one-sentence justification for rescinding DACA fails to meet this standard, contradicting its own statements to the Ninth Circuit and the Supreme Court asserting that DACA is both lawful and sound policy, as well as its decision eight months ago to leave DACA intact.

The government's failure to consider relevant factors or plausibly explain the basis for the Rescission suggests that its proffered justifications are pretextual. Inconsistent and shifting explanations for the Rescission reinforce this conclusion. For example, although the government has sought to defend the Rescission as a response to purported "litigation risk," the author of the Rescission memorandum testified that responding to "litigation risk" would be "the craziest policy you could ever have as a department." App. at 1928-26 (Hamilton Dep. 207:20-208:11). Agency action that is based on pretext is arbitrary by definition and must be set aside.

Finally, the Rescission was accomplished without the procedural steps required by law. The Rescission constitutes a substantive rule subject to the APA's notice and comment requirements, 5 U.S.C. § 553, which are designed to ensure that agency action proceeds on the basis of relevant factors. *See also* 5 U.S.C. § 604(a) (requiring consideration of effects on small entities). Had the government considered such factors—including the Rescission's devastating impact on DACA recipients and their families, and its broader consequences for local governments, employers, educators, and the economy— the Rescission could not reasonably have been adopted.

This Court should grant provisional relief enjoining defendants' illegal action and preserving the status quo pending a final judgment in this action.

# BACKGROUND

## A.     History of Deferred Action

DACA is consistent with a series of deferred action programs dating back half a century.  The government has long recognized that "there simply are not enough resources to enforce all of the rules and regulations presently on the books" and that "[i]n some situations, application of the literal letter of the law would simply be unconscionable and would serve no useful purpose."  App. at 1594 (Bernsen Memo).  Accordingly, consistent with their authority to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), DHS and previously the INS have frequently exercised discretion not to remove otherwise removable immigrants.  App. at 1822-23 (Johnson Letter).

Consistency and administrative convenience have often led the government to exercise its discretion programmatically.  Since at least 1956, the government has implemented numerous forms of "discretionary relief," including parole, temporary protected status, deferred enforced departure, extended voluntary departure, and deferred action.  Administrative Record ("AR") (Dkt. No. 64-1) 15.

- In 1956, President Eisenhower "paroled" into the United States roughly 1000 foreign-born orphans who had been adopted by American citizens overseas but were precluded from entering the United States because of statutory quotas, App. at 1602 (Eisenhower Letter — Orphans), as well as tens of thousands of Hungarian refugees after the unsuccessful Hungarian revolution, App. at 1603 (Eisenhower Letter — Hungarians).  In both cases, Congress eventually passed laws enabling the paroled individuals to become lawful permanent residents.  *See* Act of Sept. 11, 1957, Pub. L. No. 85-316, § 4(d), 71 Stat. 639, 640 (orphans); Act of July 25, 1958, Pub. L. No. 85-559, § 2, 72 Stat. 419, 419-20 (Hungarian refugees).

- That same year, the Eisenhower Administration granted "extended voluntary departure" to nonimmigrants present in the United States who had sought, but not received, "Third Preference" visas based on exceptional ability in the arts and sciences.  When the INS rescinded this policy sixteen years later with a perfunctory explanation that the program was "having an increasingly unfavorable effect on the domestic job market," a federal court held that the rescission was ineffective because it did not comply with the APA's notice-and-comment procedures, even though the original policy had not been published in the Federal Register.  *United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 980 n.8, 983, 984, 986 (E.D. Pa. 1977).

- The Eisenhower, Kennedy, Johnson, and Nixon Administrations paroled more than 600,000 Cubans in the United States through a series of discretionary programs.  For example, in 1961, the Kennedy Administration established the Cuban Refugee Program, which directed the routine admission of Cubans under the Attorney General's parole authority.  *See* App. at 1604 (Kennedy Letter).  This program ended through an agreement between the United States and Cuba, followed by legislation providing lawful permanent residence for the individuals who had been paroled under the program.  Cuban Adjustment Act, Pub. L. No. 89-732, §1, 80 Stat. 1161 (1966).

- In 1962, in response to famine in China, President Kennedy established the Hong Kong Parole Program to provide extended voluntary departure to 15,000 Chinese refugees.  App. at 1605

4

(USCIS Refugee Timeline).  This program ended in 1966 with passage of the Immigration and Nationality Act of 1965, which for the first time provided for the regular admission of refugees.

- In 1987, President Reagan instituted the Family Fairness Program, which provided extended voluntary departure to children whose parents were in the process of legalizing their immigration status under the Immigration Reform and Control Act, Pub. L. No. 99-603, 100 Stat. 3359 (1986).  App. at 1607 (1987 INS Analysis).  In 1990, President George H. W. Bush expanded the program to spouses of such immigrants.  *Id.* at 1612-13 (1990 INS Analysis).  Collectively, the Family Fairness Program extended relief to approximately 1.5 million people, estimated to be 40 percent of the undocumented population at the time.  *Id.* at 1613.  The Family Fairness Program ended with the passage of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978, providing a path to permanent residence for the beneficiaries of the program.

- In 1997, the Clinton Administration established a deferred action program for individuals self-petitioning for relief under the Violence Against Women Act of 1994.  App. at 1640-46.  The George W. Bush Administration similarly provided deferred action to certain applicants for T visas (victims of human trafficking) and U visas (victims of crimes such as domestic violence) in 2002 and 2003, respectively.  *Id.* at 1650-51.  These programs are still in place, *see id.* at 1651, and the deferred action programs for T visa and U visa applicants have been codified, *see* 8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) (T visa applicants); 8 C.F.R. § 214.14(d)(2) (U visa applicants).

- The George W. Bush Administration also established a deferred action program in 2005 temporarily granting relief to thousands of foreign students affected by Hurricane Katrina who, because of the hurricane, could not satisfy the requirements of their student visas.  App. at 1661-62.  Because this program was initiated in response to a specific event, USCIS made clear from the outset that all benefits would expire on February 1, 2006.  *Id.*

- In 2009, the Obama Administration established a deferred action program providing relief to widowed spouses who had been married to U.S. citizens for less than two years and therefore could not obtain permanent residence through their spouses.  *Id.* at 1664-71.  Several months later, Congress eliminated the statutory requirement that had prompted the establishment of the program and USCIS accordingly withdrew the program as "obsolete."  *Id.* at 1672-82 (Neufeld Memo).

A chart summarizing the 17 prior deferred action programs is attached as Addendum A.

This history underscores three important points.  First, programmatic grants of deferred action have been common for half a century, across many presidential administrations.  Second, the programmatic use of deferred action has gone largely unchallenged.  Until the Texas DAPA litigation in 2014, there had been no judicial challenge to the creation of any prior deferred action program.  *See* Br. of Former Federal Immigration and Homeland Security Officials as Amici Curiae in Support of the United States at 3, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 922865 ("While [deferred action] policies have at times generated political controversy, until recently their legal underpinnings did not.").

Third, the Rescission is the first time the government has terminated a deferred action program and subjected its existing beneficiaries to deportation.  Virtually all of the prior programs ended either because a statute or regulation was enacted to protect the recipients, or because the program was designed from the outset to address a temporary disruption (e.g., the Hurricane Katrina program).  In the single instance where the executive branch attempted to terminate a deferred action program without providing an opportunity for notice and comment, a court found a violation of the APA.  *See Parco*, 426 F. Supp. at 985.

### B.   The Creation of DACA

On June 15, 2012, then-Secretary of Homeland Security Janet Napolitano issued a memorandum establishing DACA (the "2012 DACA Memorandum").  *See* AR 1–3.  Under DACA, individuals who were brought to the United States as children and met certain criteria could apply for deferred action for renewable two-year terms.  *Id.*  The 2012 DACA Memorandum explained that DACA covers "certain young people who were brought to this country as children and know only this country as home" and that our immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language."  *Id.* at 1–2.

Eligibility for DACA was limited to individuals who (1) came to the United States under the age of sixteen; (2) had continuously resided in the United States since June 15, 2007, and were present in the United States both on June 15, 2012 and on the date they requested DACA; (3) were in school, had graduated from high school, had obtained a GED, or had been honorably discharged from the United States military or Coast Guard; (4) had clean criminal records and were not a threat to national security or public safety; (5) were under the age of 31 as of June 15, 2012; and (6) did not have lawful immigration status.  *See* AR 1.  To apply for DACA, eligible individuals were required to provide the government with sensitive personal information, such as their home addresses and fingerprints, submit to a rigorous DHS background check, and pay a considerable fee.  App. at 1744-45, 47 (USCIS FAQs).  Applicants then were evaluated on a case-by-case basis.  *See* AR 2.

A DACA determination results in an initial two-year deferral, which DHS stated from the outset would be "subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States."  AR 3.  DHS established a straightforward

renewal process and "strongly encourage[d]" DACA recipients to submit renewal requests in advance of the relevant expiration date.  App. at 1756-57 (USCIS FAQs).[2]

Understanding that eligible individuals might be reluctant to step forward and voluntarily disclose information which, absent DACA, could facilitate their removal from the United States, the government launched an extensive outreach campaign to promote applications and renewals.  App. at 1742-61, 1762-64, 1785, 1799 (USCIS DACA Outreach).  The government repeatedly promised that information provided in connection with the program would not be used for immigration enforcement purposes absent special circumstances.  *Id.* at 1763-64, 1747, 1772 (DACA Toolkit).

### C.     Benefits of DACA

DACA has conferred important benefits on recipients.  Most directly, DACA recipients are permitted to reside in the United States and are protected from arrest or detention.  *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1058–59 (9th Cir. 2014); *see also* AR 2.  During the period of deferred action, DACA recipients do not accrue time for "unlawful presence" for purposes of the immigration law's bars on re-entry.  *See* 8 U.S.C. § 1182(a)(9)(B)–(C).

Under longstanding regulations, immigrants benefiting from deferred action may seek social security numbers and employment authorization.  App. at 1742-45 (USCIS FAQs); AR 3; *see also* 8 C.F.R. § 274a.12(c)(14).  DACA recipients also became eligible for "advance parole," allowing them to apply to travel abroad and return lawfully to the United States.  *See* App. at 1787-88 (USCIS Toolkit); 1758-59 (USCIS FAQ); *see also* 8 C.F.R. § 212.5(f).  Advance parole has permitted DACA recipients to

---

[2]     To qualify for renewal, DACA recipients were required to meet just three basic criteria: (1) they must not have left the United States without advance parole; (2) they must have continuously resided in the United States after submitting their DACA applications; and (3) they must not have been convicted of serious or repeated crimes, or otherwise pose a threat to national security or public safety.  App. at 1742, 1757 (USCIS FAQs).

visit ailing family members, attend births and funerals, and participate in educational, cultural, and employment-related conferences. App. at 2202, Topic 3.[3]

DACA recipients also became eligible to receive certain public, private, and practical benefits. For example, the individual plaintiffs have obtained driver's licenses, medical insurance, research funding and tuition benefits. App. at 2203–04, Topic 6; *see also* 8 U.S.C. §§ 1611(b)(2)–(3), 1621(d); *Ariz. Dream Act Coal. v. Brewer*, 81 F. Supp. 3d 795, 811 (D. Ariz. 2015).[4] DACA also has enabled recipients to open bank accounts, obtain credit cards, and purchase homes and vehicles. App. at 2201, Topic 2.

DACA has been transformative for beneficiaries and their families and communities. *See, e.g.*, App. at 1373-74 (Suárez-Orozco Decl. ¶¶ 7-8); App. at 0363-68 (Gonzales Decl. ¶¶ 18-32). As the government has recognized, DACA has enabled hundreds of thousands of young people "to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books." App. at 1822-23 (Johnson Letter); App. at 2201, 2203, Topics 1, 5. Even more fundamentally, DACA has provided recipients with a sense of dignity and security that carries demonstrable benefits to their mental and physical health, family well-being, and ability to make life plans. App. at 2202-03, Topic 4.

### D. The Rescission of DACA

In December 2016, Secretary of Homeland Security Jeh Johnson publically stated that "representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored." App. at 1822-23 (Johnson Letter). And initially, even after the change in

---

[3]     Where multiple declarations provide support for the facts stated herein, the citation provided is to the Topical Index to Plaintiff and Third-Party Declarations within the Appendix, *see* App. at 2201-2210, which identifies and provides a specific citation to each supporting declaration.

[4]     DACA permits otherwise ineligible individuals in California to obtain regular driver's licenses. *See* Cal. Veh. Code §§ 12801(a)-(b), 12801.5, 12801.6(a)-(b). California also provides "AB 60" driver's licenses to undocumented immigrants without DACA, *see* Cal. Veh. Code § 12801.9, but such licenses are "not acceptable for official federal purposes." *Id.* § 12801.9(d)(2). DACA recipients also can obtain unemployment insurance benefits, *see* Cal. Unemp. Ins. Code § 1264(a)(2).

8

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

administrations, Secretary of Homeland Security John Kelly in February 2017 specifically exempted DACA from the administration's broad repeal of other immigration directives, AR 230, and characterized "DACA status" as a "commitment . . . by the government towards the DACA person," App. at 1841.  President Trump himself emphasized that "dreamers should rest easy" and agreed that the "policy of [his] administration [is] to allow the dreamers to stay."  *Id.* at 1853.

No court has ever held DACA to be unlawful.  Yet, in June 2017, government officials, including Attorney General Sessions, began communicating with attorneys general from several states that had previously challenged another deferred action program, Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA").  App. at 2033-34 (*Batalla Vidal* Interrogatory Response).  Those discussions culminated in a June 29, 2017 letter from nine state attorneys general to Attorney General Sessions, threatening to challenge DACA in court unless the federal government rescinded the program by September 5, 2017.  AR 238-40.[5]  A group of 20 other attorneys general sent a competing letter to President Trump urging him to *maintain* DACA, asserting that the arguments against the program were "wrong as a matter of law and policy."  App. at 2089 (Becerra Letter).

On September 4, 2017, Mr. Sessions sent a one-page letter to Acting Secretary of Homeland Security Elaine Duke asserting that DACA "was effectuated . . . without proper statutory authority" and "was an unconstitutional exercise of authority by the Executive Branch."  AR 251.  He noted that DAPA had been "enjoined on a nationwide basis in a decision affirmed by the Fifth Circuit on the basis of multiple legal grounds and then by the Supreme Court by an equally divided vote," and suggested that DACA might encounter the same result.  *Id.*

The next day, the Attorney General held a press conference where he "announce[d] that the program known as DACA . . . is being rescinded."  App. at 1866 (Sessions Press Conf.).  As in his letter to the Acting Secretary, the Attorney General asserted that DACA was an unconstitutional exercise of authority by the executive branch and "vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program."  AR 251.  He also claimed that DACA had

---

[5]     On September 1, 2017, Tennessee Attorney General Herbert H. Slatery III reversed course and decided Tennessee would not join the threatened expansion of the suit, citing "a human element to this [issue]" that "should not be ignored."  App. at 1859-60 (Slatery Letter).

1   "contributed to a surge of unaccompanied minors on the southern border that yielded terrible

2   humanitarian consequences." *Id.* This was nonsensical; DACA eligibility was restricted to a fixed

3   group of individuals who had lived continuously in the United States for at least five years since June

4   15, 2007 and were present in the United States on June 15, 2012; DACA could not have led to any

5   changes at the border in 2017.

6   Minutes after the Attorney General's press conference, Acting Secretary of Homeland Security

7   Duke issued a memorandum formally rescinding the DACA program. *See* AR 252–56. The Rescission

8   instructed DHS to immediately stop accepting DACA applications or approving new applications for

9   advance parole; to accept renewal applications only from individuals whose current deferred action

10  would expire on or before March 5, 2018, and to accept such renewals only through October 5, 2017;

11  and to allow individuals' DACA to expire beginning March 5, 2018. AR at 255.

12  Secretary Duke issued an accompanying statement asserting that the government had decided to

13  end DACA rather than "allow the judiciary to potentially shut the program down completely and

14  immediately." App. at 1869-70 (Duke Statement). Secretary Duke also expressed "sympath[y]" and

15  "frustrat[ion]" on "behalf" of DACA recipients and asserted that "DACA was fundamentally a lie." *Id.*

16  ### E.   Harm from the Rescission

17  The Rescission is causing irreparable injuries right now that will only worsen with time.

18  Because the Rescission threatens nearly 700,000 deeply-rooted immigrants with deportation from the

19  United States, its consequences are enormous and multi-faceted. The accompanying Appendix presents

20  extensive evidence of the severe harm that is being and will be inflicted by the government's action.

21  The discussion below can only begin to describe the Rescission's damaging effects.

22  #### 1.   Direct Legal Consequences

23  As a result of the Rescission, eligible individuals were prevented from applying for DACA, and

24  others were unable to gather sufficient funds in time to pay the renewal fee by the abrupt October 5,

25  2017 cutoff. App. at 2209, Topics 19, 21. As a result, eligible individuals already have been denied the

26  benefits of the program. *Id.* DACA recipients have already lost the ability to seek advance parole and

27  are therefore precluded from traveling outside the United States. App. at 2210, Topic 23. Each day

28

beginning March 5, 2018, an average of more than one thousand individuals will lose DACA and immediately become vulnerable to arrest, detention, and removal. App. at 2097 (CAP Study). If they are removed, most of these individuals will become subject to a 10-year bar on re-entry because they accrued more than one year of "unlawful presence" prior to the creation of DACA. In some cases, DACA recipients will be subject to a *permanent* bar if, in addition to one year of "unlawful presence," they were previously ordered removed or granted voluntary departure and then later re-entered. *See* 8 U.S.C. § 1182(a)(9)(B)–(C).

### 2. Injuries to Individual DACA Recipients

The Rescission has already inflicted severe harm on DACA recipients and their families. DACA recipients are experiencing anxiety, depression, and fear because of the Rescission. App. at 2205, Topic 13.[6] This is taking an immediate toll on DACA recipients' well-being and affecting their studies, work, and families. App. at 2206-07, Topics 12-13. The University of California has observed an increase in demand for mental health services, which it cannot fully meet. App. at 2202, Topic 8; *see also id.*, Topic 7 (allocation of scarce resources). And understandably so: because of the program's age restrictions, DACA recipients are mostly young adults, now making decisions whether to get married, start families, take mortgages, attend college or graduate school, start businesses, or change careers. App. at 2204-06, Topics 9-10. Of course, hundreds of thousands of DACA recipients already have made such life-changing decisions in reliance on DACA, and now face devastating personal, professional, and economic losses as a result of the government's precipitous reversal.

The Rescission carries immediate economic and professional consequences. DACA recipients have invested enormous effort and financial resources into building their lives and careers in this country, which they now stand to lose. App. at 2205-06, Topics 9-10. They face the loss of educational and employment opportunities, and even those early in their two-year DACA grants face immediate losses from the unavailability of advance parole. App. at 2204-05, 2208, Topics 9-10, 23. The Rescission has already prevented more than 70 recipients who have pending advance parole applications

---

[6]    As one researcher found, the physical and emotional manifestations of stress can include chronic headaches, ulcers, sleep loss and eating disorders, and thoughts of suicide. App. at 362 (Gonzales Decl. ¶ 13).

from studying abroad and presenting research.  App. at 1479 (Vazquez-Ramos Decl. ¶¶ 6-7).  For example, Joel Sati—described as a "once-in-a-decade" doctoral candidate and academic prospect in jurisprudence and social policy who had a pending advance parole application at the time of the Rescission—has already been deprived of important opportunities to present his research abroad.  *See* App. at 656-57 (Kutz Decl. ¶ 13); App. at 875 (Morrill Decl. ¶ 21); App. at 1322-23 (Sati Decl. ¶¶ 39-41).

DACA recipients are being forced—right now—to make momentous and irreversible decisions about their educational and professional paths.  For example, plaintiff and first-year UC Irvine law student Viri Chabolla Mendoza is struggling to decide whether to continue making the personal and financial investments required to attend law school, because without a work authorization, the Rescission will limit or eliminate her ability to work as an attorney, App. at 113 (Chabolla Decl. ¶ 69), as it will for other DACA recipient law students, who have been incurring significant debt to finance their legal education.  App. at 448-49 (Gorjian Decl. ¶¶ 15-16).  Medical and doctoral students— including plaintiffs New Latthivongskorn and Norma Ramirez—are wrestling with similar decisions. App. at 670–71 (Latthivongskorn Decl. ¶¶ 47–49); App. at 1161 (Ramirez Decl. ¶ 52).  Medical students at UC are facing the choice of self-selecting out of their only real opportunity to obtain a medical residency position after years of medical training, lest they be rendered unable to care for their patients when their work authorization expires.  App. at 65-67 (Braddock Decl. ¶¶ 4-5, 8); App. at 723-24 (Lucey Decl. ¶¶ 13-18); App. at 1357-59 (Stobo Decl. ¶¶ 6, 10, 12); App. at 0519-20 (Huang Decl. ¶ 16).  And plaintiff Saul Jimenez already has been forced to abandon plans to pursue a master's degree. App. at 0557 (Jimenez Decl. ¶ 45).  Many other DACA recipients are being forced to make choices now that may adversely impact their ability to pursue their education and career objectives.  App. at 2203-04, Topics 9-10.

Beyond its immediate career consequences, the Rescission is imposing economic and financial harms on DACA recipients, many of whom are already looking to minimize or unwind the long-term financial commitments—including student loans and mortgages, office leases, and employee hires— they made in reliance on the program.  App. at 2205-06, 2209, Topics 10, 20.  The Rescission, by

12

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

canceling work authorizations, will deprive DACA recipients of the ability to work legally, and in many cases render them unable to continue their education. App. at 2203-04, Topics 9-10.

The Rescission is also causing irreparable harm to the parents, children, and siblings of DACA recipients. *See, e.g.*, App. at 2206, Topic 11. Approximately 26 percent of DACA recipients have U.S.-citizen children, while approximately 17 percent have a U.S.-citizen spouse, and nearly 60 percent have a U.S.-citizen sibling. App. at 1510 (Wong Decl. ¶ 31). DHS's decision that DACA recipients should "prepare for and arrange their departure from the United States," App. at 2199–2200 (Talking Points); App. at 1510-12 (Wong Decl. ¶ 32), therefore presents DACA recipients with the agonizing decision whether to uproot their loved ones from their country of citizenship or leave them behind. As a result of the Rescission, almost two hundred thousand U.S.-citizen children face the terrifying prospect that their parents may soon be deported. The Rescission has caused some DACA recipients not to begin families at all. For example, as a result of the Rescission, plaintiff Dulce Garcia has put on hold her dream of adopting a child and becoming a mother. App. at 267–68 (Garcia Decl. ¶¶ 64, 700).

### 3. Injuries to State and Local Governments and Educational Institutions

The Rescission is also harming DACA recipients' schools and employers, and the cities, counties, and states where they reside and work. App. at 2206–10, Topics 14, 17, 18, 22. For example, some DACA recipients have decided to cancel their enrollment at the University of California because the Rescission forecloses their ability to work during and after their education. App. at 0512 (Holmes-Sullivan Decl. ¶ 18). The University of California and other educational institutions such as the California State University and the California Community Colleges, thus face the loss of their investments in time, financial aid, research dollars, housing benefits, and other support, and the loss of DACA students and employees is diminishing the research expertise, exchange of ideas, and cultural vitality that are central to their academic missions. App. at 2205, Topic 14; *see also id.* at 2206, Topic 12. And public school districts are also struggling to effectively educate their student populations given decreased attendance and the fear and stress caused by the Rescission. App. at 353–54 (L. Gonzales Decl. ¶¶ 4-5, 10); *id.* at 784–85 (Maxwell Decl. ¶¶ 9, 11).

The interests of the plaintiff States, County of Santa Clara, and City of San Jose are also being irreparably harmed by the Rescission. The DACA program has improved the economic welfare of recipients by providing access to higher-skilled jobs, better job mobility, higher wages, and greater purchasing power. App. at 1500 (Wong Decl. ¶ 12); *see also* App. at 2201-02, 2203, Topics 2, 5. Recent data show that 91 percent of DACA recipients are currently employed (93 percent for those 25 years and older), and hourly wages of DACA recipients have increased by 69 percent (81 percent for those 25 years and older since the program began). App. at 1500, 1503 (Wong Decl. ¶¶ 13, 18).

As DACA employees leave the workforce, the economy as a whole will continue to suffer enormous losses. DACA has greatly benefited state and local economies, including plaintiff States, plaintiff County of Santa Clara, and plaintiff City of San Jose, by increasing DACA recipients' earnings and growing the tax base. App. at 2206–07, Topic 17. As entrepreneurs and employees, DACA recipients are achieving financial independence and purchasing cars and homes, thereby generating additional economic activity, along with tax revenue for state and local governments. App. at 2199-2200, 2206–07, Topics 2, 17. Over a ten-year period, it is estimated that the Rescission will cost the federal government $60 billion in lost revenue and $215 billion in lost GDP. App. at 0073 (Brannon Decl. ¶ 11). The comparable figures for California alone are $19 billion and $71 billion. App. at 0073 (Brannon Decl. ¶¶ 11, 14). State and local governments, including plaintiffs States, County of Santa Clara, and City of San Jose, also employ DACA recipients to provide important public services. App. at 2209, Topic 18.

As DACA recipients continue to lose employment authorization, many will lose their health insurance. App. at 716 (Lorenz Decl. ¶ 7); App. at 1310 (Santos Toledo Decl. ¶ 26); App. at 1324 (Sati Decl. ¶ 48); App. at 1448 (Tabares Decl. ¶ 14). The resulting increase in the uninsured population will place an increased burden on emergency healthcare services in plaintiff States, plaintiff County of Santa Clara, and plaintiff City of San Jose, and will reduce overall public health as fewer people will seek medical care because they lack insurance or because they fear being reported to immigration authorities. App. at 2206, Topic 15.

The separation of families caused by the Rescission will likely bring more children into government child welfare services programs, further increasing government costs. App. at 0779

14

(Márquez Decl. ¶ 18).  Uncertainty about parental immigration status contributes to heightened levels of stress and anxiety in children.  For example, one study found that mothers' eligibility for DACA led to significant improvements in their children's mental health—improvements that will be lost because of the Rescission.  App. at 0814–16 (Mendoza Decl. ¶¶ 4, 6–8); App. at 0464–67 (Hainmueller Decl. ¶¶ 4–11).

Public safety will also suffer.  Effective local law enforcement depends on a trusting relationship between police and the communities they serve.  App. 2206, Topic 16.  DACA recipients face particular vulnerabilities once their DACA grants end, given the information they have already turned over to federal immigration authorities.  *See* App. at 2210, Topic 24.  If DACA recipients lose their protection, and fear that interactions with police could end with their deportation, they will be less likely to call the police if they are victimized or if they witness crimes.  App. at 2206, Topic 16.  By forcing these particularly vulnerable individuals back into undocumented status, the Rescission damages the public safety mission of law enforcement agencies.  *Id.*

## STANDARD OF REVIEW

A preliminary injunction is warranted where the plaintiffs establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities" tips in their favor, and (4) that an "injunction is in the public interest."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

## ARGUMENT

### PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Agency action cannot stand if it is arbitrary, capricious, or contrary to law, or if it is done without appropriate process.  The unexplained rescission of DACA cannot withstand the slightest scrutiny, and therefore plaintiffs are likely to succeed on the merits.

### I. Defendants' Rescission of DACA Is Arbitrary and Capricious.

The Administrative Procedure Act "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."  *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992).  To ensure that agency actions are reasonable and lawful, a court must

conduct a "thorough, probing, in-depth review" of the agency's reasoning and a "searching and careful" inquiry into the factual underpinnings of the agency's decision. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415–16 (1971). After undertaking that review, a court "shall" set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Butte Envtl. Council v. U.S. Army Corps of Eng'rs*, 620 F.3d 936, 945 (9th Cir. 2010).[7] As with formal rulemaking, final agency action achieved through an informal process is subject to review under § 706 of the APA. *See, e.g.*, *Perez*, 135 S. Ct. at 1209 (arbitrary and capricious review is available for agency rules that do not proceed through notice and comment); *Sacora v. Thomas*, 628 F.3d 1059, 1068–69 (9th Cir. 2010) (same).

Agency action should be set aside as arbitrary and capricious if the agency fails to explain the basis of its decision, fails to consider all relevant factors and articulate a "rational connection between the facts found and the choice made," or fails to offer a "reasoned explanation" for departures from preexisting policies. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In cases where the purported rationale for agency action is pretextual, it must be set aside without further inquiry. *See, e.g.*, *N.E. Coal. on Nuclear Pollution v. Nuclear Regulatory Comm'n*, 727 F.2d 1127, 1130–31 (D.C. Cir. 1984); *Squaw Transit Co. v. United States*, 574 F.2d 492, 496 (10th Cir. 1978); *Pub. Citizen v. Heckler*, 653 F. Supp. 1229, 1237 (D.D.C. 1986). Here, defendants violated the APA on each of these grounds.

### A. Defendants Failed to Explain the Basis for the Rescission.

It is a "simple but fundamental rule of administrative law" that "a reviewing court . . . must judge the propriety of [agency] action solely by the grounds invoked by the agency," and not post hoc grounds articulated during litigation. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (*Chenery II*). Meaningful judicial review cannot proceed unless "the grounds upon which the administrative agency acted [are]

---

[7]     An action under the APA requires final agency action that is ripe for review. In the motion to dismiss filed in *Batalla Vidal v. Duke*, No. 16-cv-4196 (E.D.N.Y. Oct. 27, 2017), ECF No. 95-1, defendants did not challenge finality or ripeness. If defendants take a contrary position in this case, plaintiffs will respond either in their opposition to defendants' motion to dismiss or in their reply supporting the instant motion.

16

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

clearly disclosed and adequately sustained." *Chenery I*, 318 U.S. at 94.  Accordingly, an agency action must be set aside unless its basis is "set forth with such clarity as to be understandable." *Chenery II*, 332 U.S. at 196.

The four-page Rescission memorandum flunks this basic test, inflicting grievous harm on millions of people without providing any clear explanation why.  The bulk of the document is a two-and-a-half page "Background" section that provides a generic discussion of the history of the DACA and DAPA programs, including a brief discussion of the DAPA litigation in the Fifth Circuit.  It summarizes the Attorney General's one-page September 4, 2017 letter, and quotes his assertions that DACA was "effectuated without statutory authority," and was "an unconstitutional exercise of authority by the Executive Branch."  DHS's entire purported reasoning for rescinding DACA is then set forth in a 66-word paragraph, which states in full:

> Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated.  In the exercise of my authority in establishing national immigration policies and priorities, except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

AR 255.

This cryptic statement does not remotely meet the APA's requirement that an agency provide a reasoned basis for its actions.  *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) ("[C]onclusory statements will not do; an agency's statement must be one of reasoning." (internal citations omitted)).  Indeed, the memorandum barely states any rationale for the decision at all.  The reference to the Attorney General's one-page letter is not reasoning—the Attorney General's letter contains only a conclusory assertion that DACA is illegal.  AR 251.  Just as perplexing is the reference to the Supreme Court's purported "ruling" in the "ongoing litigation"—presumably referring to the four-four affirmance in the Texas DAPA case.  This even split was no "ruling" at all, let alone a ruling regarding DACA.  *See Neil v. Biggers*, 409 U.S. 188, 192 (1972) ("Nor is an affirmance by an equally divided Court entitled to precedential weight.").

Because DHS failed to provide any comprehensible rationale for its decision, the Rescission must be set aside.  *See Chenery II*, 332 U.S. at 196–97 ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must

17

be precise from what the agency has left vague and indecisive."); *Nat'l Ass'n of Home Builders v. Norton*, 340 F.3d 835, 849 (9th Cir. 2003) (same).

**B.      Defendants Failed to Consider All Relevant Factors and Articulate a Rational Connection Between the Facts Found and the Choice Made.**

To survive review under the arbitrary-and-capricious standard, an agency must "demonstrate a rational connection between the facts it found and the choice it made." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 687 n.15 (9th Cir. 2007); *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010) (same).  Although courts "defer to agency expertise on questions of methodology, they do not ignore an agency's failure to address factors pertinent to an informed decision." *Bair v. Cal. State Dep't of Transp.*, 867 F. Supp. 2d 1058, 1065 (N.D. Cal. 2012) (Alsup, J.). The Rescission addresses none of the considerations appropriate to an action of this magnitude, nor does it articulate a rational connection between the facts found and the action undertaken.

Defendants failed to consider any of DACA's numerous benefits before issuing the Rescission. *See* App. at 2199-2202, Topics 1-6; App. at 1935-36 (Nealon Dep. 151:21-152:13).  Defendants ignored DHS's own finding, when creating DACA, that "many of [the] young people [eligible for DACA] have already contributed to our country in significant ways."  AR 2.  Defendants likewise failed to evaluate the enormous economic benefits of DACA.  *See* App. at 73-74 (Brannon Decl. ¶¶ 10-16); App. at 2205-08, Topics 14, 15, 17, 18, 22; App. at 1873-75 (McCament Dep. 12:14-14:7); App. at 1936-37, 1938 (Nealon Dep. 152:15-153:2, 154:9-22) (acknowledging benefits).

Defendants also failed to assess—at all—the devastating impact that the Rescission will have on DACA recipients, their families and friends, their employers, employees, clients, or universities, or the public at large.  *See State Farm*, 463 U.S. at 52 ("reasoned decisionmaking" requires agencies to "look at the costs as well as the benefits" of their actions).  The fundamental consequence of the Rescission— that nearly 700,000 young people will be vulnerable to deportation to countries that many cannot remember—is not even mentioned.  The collateral consequences—the loss of work, the loss of the

18

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

ability to travel, the damage to DACA recipients' mental and physical health, the destruction of human capital and potential—are not addressed either.[8]

Defendants also ignored the economic and social costs associated with the Rescission. Rescinding DACA will cause massive economic harm, depleting the country's workforce and reducing the demand for goods and services. The American economy will lose an estimated $215 billion in GDP over ten years—a loss equivalent to the entire economic output of Oregon—and the federal government alone will lose an estimated $60 billion as a result of the Rescission. *See* App. at 73 (Brannon Decl. ¶ 11); *see also id.* ¶ 14. None of these costs were referenced in the Rescission or incorporated into the agency's decision-making process. *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (ignoring cost, even where the relevant statutes "leave[] agencies with flexibility," constitutes arbitrary and capricious action).

Defendants also ignored the Rescission's infringement on core constitutional interests. For example, DACA recipients are already being deprived of the ability to travel internationally or practice particular professions. *See, e.g.*, *Lester v. Parker*, 235 F.2d 787, 789 (9th Cir. 1956) (recognizing the "constitutionally protected right to work"); *Greene v. McElroy*, 360 U.S. 474, 492 (1959) (recognizing the constitutionally protected right to "hold specific private employment and to follow a chosen profession"); *Kent v. Dulles*, 357 U.S. 116, 125-26 (1958) (recognizing that the right to travel abroad is a constitutionally protected liberty interest). The interests of educational institutions in choosing whom they will educate and to create a rich and diverse academic climate informed by DACA recipients' perspectives—central aspects of academic freedom protected by the First Amendment—are also being seriously impaired. *See* App. at 504 (Hexter Decl. ¶ 14).[9]

---

[8] *See, e.g.*, App. at 724-25 (Lucey Decl. ¶¶ 19-20) (Rescission impacting medical students' decisions as to whether to enter National Residency Matching Process); App. at 186 (Doe 1 Decl. ¶ 19) (Rescission causing uncertainty about ability to become a lawyer); App. at 1324 (Sati Decl. ¶¶ 45-46) (Rescission causing uncertainty about ability to complete professional school).

[9] Academic freedom is a First Amendment right that protects a university's right "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (internal citation omitted).

19

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

The administrative record here reflects none of the consideration of the benefits or costs that normally would be relevant to agency decisions. Indeed, the decision to rescind DACA was reached after just two-and-a-half hours of meetings and a handful of follow-up conversations. *See, e.g.*, App. at 1878-80, 1884-89, 1890-92 (McCament Dep. 72:22-75:17, 124:22-128:16, 130:2-132:7); App. at 1911-26 (Hamilton Dep. 98:6-113:15). The decision was made without input from any of a host of interested or knowledgeable sources. *See, e.g.*, App. at 1942-45 (Nealon Dep. 165:3-168:18); App. at 1904-06 (McCament Dep. 240:20-242:5); App. at 2023-24 (Neufeld Dep. 187:6-188:8). Indeed, the agency did not even consult with its own personnel responsible for immigration enforcement. *See* App. at 2192-93, 2196 (Miller Dep. 99:12-19, 100:3-7, 204:1-21).

As far as the record reveals, there was no policy rationale for the Rescission at all. Where, as here, there "are no findings and no analysis . . . to justify the choice made," the APA "will not permit" a court to accept the agency's decision. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962); *see also Crickon v. Thomas*, 579 F.3d 978, 985 (9th Cir. 2009) (same).

### C. Defendants Failed to Offer a Reasoned Explanation for Their Reversal of Policy.

When the government reverses its own earlier policy, it has an even greater burden to justify its actions. The agency must "acknowledge and provide an adequate explanation for its departure from established precedent, and an agency that neglects to do so acts arbitrarily and capriciously." *Jicarilla Apache Nation v. U.S. Dep't of the Interior*, 613 F.3d 1112, 1119 (D.C. Cir. 2010) (internal citation omitted); *see also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (agency cannot depart from prior policy without "explaining its changed position"). Thus, reversing a pre-existing policy requires a "more detailed justification than what would suffice for a new policy created on a blank slate." *Fox*, 556 U.S. at 515.

Here, the Rescission represents a 180-degree reversal of DHS's prior position on the merits of deferred action and the legality of DACA. In introducing the program in 2012, the agency explained that DACA was "necessary to ensure that [DHS's] enforcement resources are not expended on [] low priority cases but are instead appropriately focused on people who meet our enforcement priorities." AR 1. It further explained:

20

PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF; MEMORANDUM IN SUPPORT
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

> Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

AR 2. The Rescission did not address these findings at all.

With respect to the program's legality, just two years ago, the government defended DACA before the Ninth Circuit, stating that DACA was "a valid exercise of the Secretary's broad authority and discretion to set policies for enforcing the immigration laws, which includes affording deferred action and work authorization to certain aliens who, in light of real-world resource constraints and weighty humanitarian concerns, warrant deferral rather than removal." United States' Br. as Amicus Curiae, *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957 (9th Cir. 2017), *petition for cert. filed*, No. 15-15307 (U.S. Mar. 31, 2017), 2015 WL 5120846 at *1.[10] DHS made similar arguments before the Fifth Circuit in 2014. *See* Br. for United States, *Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) (No. 14-10049), 2014 WL 10657553; *see also* Br. for United States at 23, *Crane*, 2012 WL 6633751 ("It is in the public interest to focus the government's limited resources to the enforcement of its highest priority cases—such as aliens who pose national security risks, serious criminals, and repeat offenders, rather than to aliens who arrived in the United States as children and have no criminal record.").

Because the Rescission did not address the policy merits of DACA at all, it did not begin to evaluate the reliance interests engendered by the program. *Perez*, 135 S. Ct. at 1209 (government must provide special justification "when its prior policy has engendered serious reliance interests that must be taken into account"). The policy justification for the program has become ever stronger as DACA recipients, in reliance on the program, have become more educated, better-employed, and even more embedded in the fabric of American life. *See supra* Background § C. Since 2012, DACA recipients have structured their lives around the program, making decisions to get married, start families, take out

---

[10] The Ninth Circuit concluded that Arizona's policy of rejecting documents issued to DACA recipients as proof of authorized presence for the purpose of obtaining a state driver's license was preempted by federal law, but declined to consider the legality of DACA. *Ariz. Dream Act*, 855 F.3d at 975.

21

loans, enroll in graduate programs, and build careers in reliance on the government's promises and representations.  *See, e.g.*, App. at 2199-2201, Topics 1, 2, 4, 5.

Employers, employees, and institutions likewise have made important decisions in reliance on the government's representations about DACA.  For example, educational institutions like UC have admitted and hired DACA recipients, with the expectation that they would be able to live and teach, research, pursue professional careers, or otherwise work in the United States for the foreseeable future. *See, e.g.*, App. at 2205-06, Topic 14.  As DACA recipients are being forced to abandon their work and studies—in many cases dropping out of degree programs—their employers and educational institutions are losing the benefits they derive from the contributions of DACA recipients, as well as the value of the considerable time, effort, energy, and financial resources invested in them.  *See, e.g.*, App. at 2205-06, 2208, Topics 14, 22.  The elimination of DACA will force "systemic, significant changes" to these institutions, *see Encino Motors*, 136 S. Ct. at 2126, disrupting education, research, and health care as DACA-recipient teachers, scientists, and hospital workers can no longer fulfill those roles.

The Rescission's failure to weigh the reliance interests created by DACA renders it untenable.

## D.     The Rescission Appears to Rely on a False Legal Premise.

In his one-page letter, the Attorney General opined that DACA was illegal and should be rescinded.  In the Rescission memorandum, the Acting Secretary stated that she was taking this letter "into consideration."  AR 254–55.  To the extent the Rescission depends on a conclusion that DACA was illegal, that conclusion is wrong: DACA was a lawful exercise of DHS's enforcement discretion. And if, contrary to the Attorney General's letter, DACA is legal, then the Rescission must be set aside. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 532 (2007); *Chenery I*, 318 U.S. at 94 ("[A]n order may not stand if the agency has misconceived the law."); *Safe Air for Everyone v. EPA*, 488 F.3d 1088, 1101 (9th Cir. 2007); *Locke*, 626 F.3d at 1051; *see also Phillips Petroleum Co. v. FERC*, 792 F.2d 1165, 1170–71 (D.C. Cir. 1986) (rejecting agency interpretation of statute where agency's position "was based solely on its erroneous reading" of a Supreme Court case and agency "believed itself bound by" that case).

1.     **DACA Is a Lawful Exercise of Enforcement Discretion**

Contrary to the Attorney General's assertion that DACA was an unconstitutional exercise of authority by the Executive Branch, DACA was a lawful exercise of well-established enforcement discretion that has been conferred by Congress.  Deferred action programs like DACA are a lawful exercise of the Secretary's broad statutory authority to "[e]stablish[] national immigration enforcement policies and priorities," 6 U.S.C. § 202(f), and to carry out the "administration and enforcement of th[e INA] and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. § 1103(a), including by authorizing aliens to be lawfully employed, 8 U.S.C. § 1324a(h)(2).

Prosecutorial discretion is well-recognized as important to the enforcement of the immigration laws.  *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999).  This is true both because "[d]iscretion in the enforcement of immigration law embraces immediate human concerns," such as which individuals "pose less danger than" others, *Arizona v. United States*, 567 U.S. 387, 396 (2012), and because there are many more removable aliens than there are enforcement resources.  See AR 4 ("[A]lthough there are approximately 11.3 million undocumented aliens in the country, [DHS] has the resources to remove fewer than 400,000 such aliens each year."); *see also* 8 U.S.C. § 1103(a)(3) (granting DHS Secretary authority to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the [INA]").  Deferred action is explicitly contemplated in DHS's regulations and "has become a regular feature of the immigration removal system that has been acknowledged by both Congress and the Supreme Court." AR 16.  As set forth above, DHS has often exercised enforcement discretion on not just an individual but a programmatic basis, dating to the 1950s.  *See* Background § A.

DACA is entirely consistent with earlier deferred action programs and is a reasonable exercise of DHS's enforcement authority under the INA.  DACA is explicitly framed as an exercise of prosecutorial discretion.  *See* AR 1 (2012 DACA Memorandum sets forth how "in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws").  The 2012 DACA Memorandum identifies certain categories of "criteria" that "should be satisfied before an individual is considered for an exercise of prosecutorial discretion."  *Id.*  Some of the criteria provide guidelines for how DHS employees are to exercise their discretion, such as whether the

23

individual "poses a threat to national security or public safety." *Id.* Moreover, the 2012 DACA Memorandum instructs DHS officials to take deferred action under the policy only "on an individual" and "case by case basis," and to give "consideration . . . to the individual circumstances of each case." AR 2. Just like past deferred action programs, DACA is a use of "[d]iscretion in the enforcement of immigration law" to "embrace[] immediate human concerns" by deprioritizing enforcement for those who were brought to this country as children, have clean records, and have lived continuously in the United States since 2007. *Arizona*, 567 U.S. at 396. ("The equities of an individual case may turn on many factors, including whether the alien has . . . long ties to the community.").

Merely because the creation of DACA was an act of prosecutorial discretion does not mean, however, that the *termination* of DACA is unreviewable. First, courts have emphasized that judicial review of general enforcement policies should proceed. *See, e.g.*, *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671, 676 (D.C. Cir. 1994) ("[A]n agency's statement of a general enforcement policy may be reviewable for legal sufficiency where the agency has . . . articulated it in some form of universal policy statement."); *Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) (distinguishing between a reviewable "Enforcement Policy Statement" and the unreviewable particularized enforcement decision); *Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996) (same and collecting cases)). Here, plaintiffs challenge DHS's wholesale rescission of a program—a clearly justiciable policy choice.

Second, DHS's decision to rescind DACA appears to be based on a legal determination regarding the legality of DACA. Such legal questions fall squarely within the core function of the judiciary; there is "law to apply," and the policies underlying judicial deference to executive discretion do not come into play. *See, e.g.*, *Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d 1374, 1378–79 (9th Cir. 1989) (permitting judicial review of advisory opinion and policy statement in light of agency's interpretation of its organic statute); *Edison*, 996 F.2d at 333 (explaining that plaintiffs' challenge to agency policy statement involves a challenge to "the [agency's] interpretation of [the Act] and its implementing regulations . . . Clearly, this interpretation has to do with the substantive requirements of the law; it is not the type of discretionary judgment [that is] shield[ed] from judicial review."); *Pinho v. Gonzales,* 432 F.3d 193, 203-04 (3d Cir. 2005) ("purely legal determinations made

by the agency [ ] remain subject to judicial review").  Courts can and should say what the law is, rather than abdicating that function to administrative agencies.

### 2. The *Texas* Decision Is Neither Controlling Nor Persuasive with Respect to DACA

The Attorney General's one-page letter focused on a Fifth Circuit decision affirming a preliminary injunction of DAPA.  *See* AR 51; *see also* AR 253–255 (citing *Texas v. United States* (*Texas II*), 809 F.3d 134 (5th Cir. 2015)).  To the extent the Rescission was based on the premise that *Texas* was controlling or persuasive authority for a finding that DACA was illegal, that premise is mistaken.

*First*, *Texas* did not even purport to decide the legality of DACA.  *See, e.g.*, *Texas II*, 809 F.3d at 172–73 (observing that although district court's "finding was partly informed by analysis of the implementation of DACA, the precursor to DAPA, any extrapolation from DACA [to DAPA] must be done carefully"); Br. for Pet'rs at 59, *Texas*, 2016 WL 836758 ("This suit does not challenge the original DACA policy.").

*Second*, *Texas* is an out-of-circuit case that does not control this Court or the Ninth Circuit.  *See, e.g.*, *Int'l Chem. Workers Union Council of the United Food & Commercial Workers Int'l v. NLRB*, 467 F.3d 742, 748 n.3 (9th Cir. 2006).[11]  The Supreme Court's four-four deadlock, *see United States v. Texas*, 136 S. Ct. 2271 (2016), is not a precedential ruling either.  *See Neil v. Biggers*, 409 U.S. at 192 ("If the judges are divided, the reversal cannot be had, for no order can be made.").

*Third*, the executive branch's formal public statements affirming DACA's legality are more persuasive and relevant to evaluating the Rescission than *Texas*'s provisional evaluation of DAPA.  The Office of Legal Counsel expressed its "preliminary view" in 2014 that DACA is "permissible."  AR 21 n.8.  And the government has vigorously advocated DACA's legality in court, explaining that the program is "a valid exercise of the Secretary's broad authority and discretion to set policies for

---

[11]     The Fifth Circuit issued two decisions in *Texas*—one denying the government's motion for a stay pending appeal, *see Texas v. United States*, 787 F.3d 733 (5th Cir. 2015) (*Texas I*), and a second affirming a preliminary injunction of the DAPA program, *see Texas II*, 809 F.3d 134.  Both decisions are accompanied by powerful, lengthy dissents.  *See Texas II*, 809 F.3d at 188-219 (King, J., dissenting); *Texas I*, 787 F.3d at 769-84 (Higginson, J., dissenting).

enforcing the immigration laws." United States' Br. as Amicus Curiae, *Arizona Dream Act*, 2015 WL 5120846; *see also* Br. for United States, *Crane*, 2014 WL 10657553; Br. for United States, *Crane*, 2012 WL 6633751; Br. for Pet'rs at 59–60, *Texas*, 2016 WL 836758.

*Fourth*, *Texas* is distinguishable on the facts and the law. DAPA was a deferred action program for certain individuals who were parents of U.S. citizens or lawful permanent residents. *See Texas II*, 809 F.3d at 191 (King, J., dissenting). The Fifth Circuit found that DAPA was not actually discretionary and therefore violated the APA's notice-and-comment procedures. *See id.* at 170–78. The same cannot be said for DACA. *See* Letter to Judge Garaufis from Counsel for Defs. at 5, *Batalla Vidal v. Duke*, No. 16-cv-4756 (E.D.N.Y. Sept. 29, 2017) (Dkt. No. 69) ("the original DACA policy itself . . . is an exercise of 'prosecutorial discretion' that is 'a special province of the Executive'"). Indeed, the Fifth Circuit has acknowledged that the 2012 DACA Memorandum "makes it clear that [ICE] Agents shall exercise their discretion in deciding to grant deferred action, and this judgment should be exercised on a case-by-case basis." *Crane v. Johnson*, 783 F.3d 244, 254-55 (5th Cir. 2015).

Moreover, the Fifth Circuit concluded that DAPA was foreclosed by statute because the INA contained "an intricate process for illegal aliens to derive a lawful immigration classification from their children's immigration status," and DAPA was inconsistent with the statutory scheme. *Texas II*, 809 F.3d at 179; *see also id.* at 186. There is no comparable pathway for individuals brought to this country as children.

The Fifth Circuit further suggested that the large number of individuals potentially eligible for DAPA suggested administrative overreach. *See id.* at 181, 183. But more than one-third of the entire undocumented population was eligible for DAPA, compared with less than ten percent potentially eligible for deferred action under DACA. *See id.* at 148, 174 n.138.

*Fifth* and finally, any application of the Fifth Circuit's reasoning to DACA would be unfounded, as the government argued to the Supreme Court.[12] The Fifth Circuit's ruling depended heavily on the invalid inference that because an allegedly low percentage of DACA applications had been denied based on discretionary reasons, the discretion embedded in the DAPA program might be illusory. *See id.* at

---

[12]   *See* Br. for Pet'rs, *Texas*, No. 15-674, 2016 WL 836758 (Mar. 1, 2016).

172-76.  But it was entirely consistent with the reasonable exercise of discretion for there to be a low denial rate for DACA.  As even the Fifth Circuit recognized, "DACA involve[s] . . . self-selecting applicants, and persons who expect[] to be denied relief would seem unlikely to apply."  *Texas II*, 809 F.3d at 174; *see also id.* ("Eligibility for DACA was restricted to a younger and less numerous population, which suggests that DACA applicants are less likely to have backgrounds that would warrant a discretionary denial." (footnote omitted)).  A declaration from Donald Neufeld, Associate Director for USCIS Service Center Operations confirmed that "deferred action under DACA is a case-specific process that necessarily involves the exercise of the agency's discretion"; identified "several instances of discretionary denials"; and noted "that approximately 200,000 requests for additional evidence had been made upon receipt of DACA applications."  *Id.* at 175 (alteration and internal quotation marks omitted).

The Fifth Circuit also improperly conflated two separate concepts—lawful *presence* and legal *status*—in finding DAPA was a grant of legal status foreclosed by the INA.  Those are immigration law terms of art that are distinct.  "Whereas legal status implies a right protected by law, legal presence simply reflects an exercise of discretion by a public official."  *Texas I*, 787 F.3d at 774 (Higginson, J., dissenting) (internal citation and emphasis omitted); *see also Texas II*, 809 F.3d at 199 (King, J., dissenting); Reply Br. for Pet'rs at 16-18, *Texas*, 2016 WL 75049.  DACA does not confer a legal status under the immigration laws, which only Congress can do.  Instead, it confers at most lawful presence.

In sum, the Rescission cannot be justified on the premise that *Texas* dictates a finding that DACA was illegal.

### 3.    Purported "Litigation Risk" Cannot Justify the Rescission

Despite the letter from Attorney General Sessions, the government has not in this litigation nor in *Batalla Vidal* asserted that DACA was illegal.  Instead, it has retreated to the position that DHS could rescind DACA based on mere "litigation risk" stemming from a threat by nine state attorneys general that they would seek to amend their complaint in the *Texas* case to encompass DACA.  This post hoc explanation was not asserted at the time of the Rescission and cannot be accepted as a justification for DHS's action.  *Chenery II*, 332 U.S. at 196.

Nor can the "litigation risk" rationale withstand scrutiny. "Litigation risk," standing alone, is not a sufficient reason for the federal government to do anything. The senior DHS official responsible for drafting the Rescission has testified that acting on the basis of "litigation risk" is the "craziest policy you could ever have" as a basis for government action. App. at 1928-26 (Hamilton Dep. 207:20-208:11); *see also* App. at 1938-39 (Nealon Dep. 154:23-155:11) (not aware of any other policy rescinded due to litigation risk); App. at 2025 (Neufeld Dep. 189:8-22) (not aware of termination of other deferred action programs due to litigation risk or illegality).

This case and others illustrate the hollowness of the "litigation risk" rationale. Far from eliminating "litigation risk," the rescission of DACA predictably prompted at least nine lawsuits, including suits by 19 state attorneys general, as well as universities, cities and counties, private individuals, a union, and a civil rights group. App. at 2090 (Becerra Letter). Thus, "[a]t most, the Department deliberately traded one lawsuit for another." *Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 970 (9th Cir. 2015) (agency's desire to avoid litigation did not satisfy its obligation to provide a reasoned explanation for its change in policy); *see also Int'l Union, United Mine Workers of Am. v. U.S. Dep't of Labor*, 358 F.3d 40, 44 (D.C. Cir. 2004) (litigation risk was not valid grounds on which to act); *California ex rel. Lockyer v. U.S. Dep't of Agric.*, 459 F. Supp. 2d 874, 904 (N.D. Cal. 2006) ("legal uncertainty alone [is not] a sufficient justification" for agency action); *Sierra Club v. Jackson*, 833 F. Supp. 2d 11, 34 (D.D.C. 2012) (similar).

To tolerate the "litigation risk" rationale—which could apply to virtually any agency action—would be to countenance an end-run around the APA. An agency could ignore the policy merits of any issue and simply cite litigation risk as a basis for its action. This is untenable. *Cf. Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 557 (D.C. Cir. 2015) ("The risk is that an agency could circumvent the rulemaking process through litigation concessions, thereby denying interested parties the opportunity to oppose or otherwise comment on significant changes in regulatory policy. If an agency could engage in rescission by concession, the doctrine requiring agencies to give reasons before they rescind rules would be a dead letter.").

Even taking "litigation risk" on its own terms, the administrative record does not contain any intelligent assessment of litigation risk that could withstand APA review. A reasonable litigation risk

28

assessment would have to address the probability of prevailing in the district courts, the courts of appeals, and the Supreme Court, the timing of any resolution and the prospects of a stay of an adverse judgment, and the risks of litigation weighed against the benefits of DACA, among other factors. A reasonable litigation risk analysis would have to consider the government's prior position that DACA was legal. A reasonable analysis would also need to address the government's current position that the legality of deferred action programs such as DACA is non-justiciable. If the government were right about that, then there would be no "litigation risk" justifying the Rescission.

The administrative record reflects no consideration of any of these factors. Nor does it reflect any consideration of reasonable policy alternatives that could mitigate "litigation risk" while maintaining the benefits of DACA. The government's "litigation risk" rationale cannot support the Rescission.

### E.    The Announced Reason for the Rescission Was Pretextual

The government's failures to provide a clear explanation for the Rescission, to address DACA's benefits, or to justify the government's reversal of position, suggest that the stated reasons for acting are not the true reasons. In addition, the circumstances surrounding the announcement of the Rescission, and subsequent actions by DHS, DOJ, and the White House, show that the Attorney General's articulated reason for the Rescission—the supposed illegality of DACA—is pretextual:

- The very same day as the Rescission, the President tweeted: "Congress now has 6 months to legalize DACA (something the Obama Administration was unable to do). If they can't, I will revisit this issue!"[13] But if the rationale for the Rescission were a genuine belief that DACA was illegal, there would be no basis to "revisit this issue" and possibly reinstate an illegal policy.

- DHS did not immediately terminate DACA. Instead, it announced that it would continue processing renewal applications for an additional month for benefits that expired between September 5, 2017 and March 5, 2018, and would recognize DACA grants already conferred, leaving the program in place for at least an additional six months. If DACA were illegal, DHS would have no basis to leave it in place for months and years.

- On October 18, 2017, the Attorney General testified to Congress that DACA could be legal under the *Texas* case if it were implemented "on an individualized basis." *See Oversight of the U.S. Department of Justice: Hearing before the S. Comm. on the Judiciary*, 115th Cong. (2017) (testimony of Jefferson B. Sessions, Att'y Gen. of the United States), available at

---

[13]    *See* Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 8:38 PM), https://twitter.com/realDonaldTrump/status/905228667336499200.

https://www.judiciary.senate.gov/meetings/10/18/2017/oversight-of-the-us-department-of-justice. If DACA "lacks statutory authority" and was "an unconstitutional exercise of authority by the Executive Branch," no manner of implementation by DHS could make it legal.

- The motion to dismiss filed by the government in *Batalla Vidal* makes no argument that DACA was effectuated without statutory authority or was an unconstitutional exercise of authority, but relies instead on the "litigation risk" justification.

- The Senior Counselor to the Acting Secretary of DHS, who *drafted* the Rescission, undercut the litigation risk justification when he testified that a policy of reacting to litigation threats would be the "craziest policy you could ever have" because "you could never do anything if you were always worried about being sued." App. at 1928-26 (Hamilton Dep. 207:20-208:11).

- In their motion to dismiss in *Batalla Vidal*, defendants contend that the rescission of DACA is not reviewable under the APA and that the notice and comment requirement, 5 U.S.C. § 553, does not apply to the Rescission. However, if defendants really believed that the *Texas* decision presented an unmanageable litigation risk, they also must believe that the *Texas* decision correctly held that a program like DACA is reviewable and that the notice-and-comment requirement applies.

These facts show that the decision to rescind DACA could not have been based on a good-faith belief that the program was unsupported by legislative authority, was an unconstitutional exercise of authority by the executive branch, or presented unmanageable litigation risk. *Cf. Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 569 (9th Cir. 2004) (conflicting explanations may serve as evidence of pretext); *E.E.O.C. v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994) (same).

The true reason for the Rescission appears to have been revealed on October 8, 2017, when President Trump sent a letter to Congressional leaders setting forth the "Immigration Principles and Policies" that he said "must be included as part of any legislation addressing the status of [DACA] recipients." App. at 1990-99. The *New York Times* described the "Principles and Policies" as "a long list of hard-line immigration measures," including funding for a border wall. App. at 2004. This evidence, linking the Rescission to the administration's legislative strategy, suggests that the decision to rescind DACA was a cynical ploy to make DACA recipients a bargaining chip in order to secure support for harsh immigration legislation from members of Congress who support DACA recipients and would not otherwise support the administration's immigration agenda. A complete administrative record and further discovery, if permitted by the court of appeals, will enable the parties to prove or disprove this

point.[14]  But the current record of shifting explanations is enough evidence of pretext to warrant setting aside the Rescission.  *See Pub. Citizen*, 653 F. Supp. at 1237 ("For an agency to say one thing . . . and do another . . . is the essence of arbitrary action.  It indicates that the Secretary's stated reason may very well be pretextual." (citation omitted)); *see also New England Coal. on Nuclear Pollution*, 727 F.2d at 1130–31 (agency action arbitrary and capricious where agency's stated reason does not line up with action); *Squaw Transit Co.*, 574 F.2d at 496 (agency action is arbitrary and capricious where it "does not apply the criteria it has announced as controlling").

## II.  The Rescission Should Be Vacated Because It Is a Substantive Rule That Did Not Comply with the APA's Notice and Comment Requirements

The Rescission also fails to meet the APA's procedural requirements.  The Rescission is a categorical rule limiting the power of DHS to exercise discretion, and DHS was therefore required to abide by the full panoply of APA procedures including notice and comment in order to promulgate it.  It did not do so.

Under the APA, substantive rules must go through notice and comment rulemaking before they become effective.  *San Diego Air Sports Ctr., Inc. v. F.A.A.*, 887 F.2d 966, 971 (9th Cir. 1989); *see also* 5 U.S.C. § 551(5) (defining "rule making" to include "repealing a rule").  A rule is substantive if it "narrowly limits administrative discretion" or establishes a "binding norm" that "so fills out the statutory scheme that upon application one need only determine whether a given case is within the rule's criterion."  *Colwell v. Dep't of Health & Human Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009) (internal citation omitted).  The ultimate question in discerning between substantive rules and non-binding policy statements "is the agency's intent to be bound."  *Municipality of Anchorage v. United States*, 980 F.2d 1320, 1325 (9th Cir. 1992) (internal citation omitted).

The Rescission is a substantive rule at least because it (1) binds DHS and limits its discretion, and (2) bans DACA recipients from applying for and traveling on advance parole.

---

[14]      Pretextuality is one of the forms of "bad faith or improper behavior" that warrants discovery from agency decisionmakers.  *Overton Park*, 401 U.S. at 420.

There can be no dispute that DHS intends to be bound by the Rescission, and that the Rescission limits the agency's discretion.  *See Colwell*, 558 F.3d at 1124; *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987) ("cabining of an agency's prosecutorial discretion can in fact rise to the level of a substantive, legislative rule").  The Rescission is a blanket prohibition that DHS and its agents must apply in all DACA cases.  As of September 5, 2017, DHS is flatly prohibited from accepting new DACA applications, and as of October 5, 2017, is flatly prohibited from issuing DACA renewals.  Unlike DACA, the Rescission makes no exceptions for case-by-case determinations.  *See, e.g.*, AR 255 (stating that DHS will "reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters" set forth in the Rescission).[15]  By its terms, the Rescission thus ensures that new or renewed requests for deferred action will be categorically denied.  Such mandatory language evinces a substantive rule.  *See Anchorage*, 980 F.2d 1324 (the "critical factor" in evaluating the substantive nature of an agency action is "the extent to which the challenged [action] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case" (internal citation omitted)); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 447 (D.C. Cir. 1989) (holding that agency order was a rule in part due to "mandatory language cabining DOT's enforcement discretion").  The Rescission's only reference to DHS's discretion is its discretion to *terminate*, not continue, grants of deferred action.  *See* AR 255 (DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate").

The Rescission is similarly categorical and substantive in banning current DACA recipients from receiving advance parole based on their DACA eligibility.  *See id.* (DHS "[w]ill not approve any new Form I-131 applications for advance parole under standards associated with the DACA program" and "[w]ill administratively close all pending Form I-131 applications" filed under DACA program).  The

---

[15]     While the face of the Rescission admits no exceptions, DHS's website states that it "will consider DACA requests received from residents of the U.S. Virgin Islands and Puerto Rico on a case-by-case basis."  App. at 1894-95  (McCament Dep. 189:15-190: 13, 192:18-22) (USCIS not considering whether to accept late applications from other geographic areas subject to natural disasters aside from Puerto Rico and U.S. Virgin Islands); App. at 2011-12 (Neufeld Dep. 113:2-114:18) (similar).  *See also* https://www.uscis.gov/archive/i-821d.

ban on advance parole is a "binding norm," such that DHS officials "need only determine whether a given case is within the [the Rescission]'s criterion"; i.e., whether an individual with DACA seeks advance parole. *See Colwell*, 558 F.3d at 1124.

By creating a categorical rule barring DACA recipients from renewing their grants of deferred action and precluding new potential DACA recipients from obtaining deferred action under DACA, DHS promulgated a substantive rule without following the proper procedures including notice and comment, *see* 5 U.S.C. § 553, and an assessment of effects on small entities, *see* 5 U.S.C. § 604(a). The Rescission must therefore be set aside. *See Paulsen v. Daniels*, 413 F.3d 999, 1003-04 (9th Cir. 2005) (concluding that Bureau of Prisons "plainly violated the APA" by promulgating a rule that barred category of prisoners from relief without notice).

In this regard, it is irrelevant that the 2012 DACA Memorandum did not go through the notice-and-comment process. DACA was an exercise of prosecutorial discretion and not required to go through notice and comment. *See* 5 U.S.C. § 553(b)(A); *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993). By contrast, the Rescission does not present itself as an exercise of DHS's discretion, and in fact prohibits the exercise of discretion in the adjudication of applications for deferred action.

In addition, DHS's obligation to follow notice-and-comment procedures for the Rescission exists whether or not DACA itself went through such procedures. *See* 5 U.S.C. § 551(5) (defining "rule making" to include "repealing a rule"); *see also Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 448 (D.C. Cir. 1982) ("[T]he argument that repeal was required because the regulations were defective does not explain why notice and comment could not be provided."); *id.* at 447 n.79 (allowing repeal, without notice and comment, of a defective rule "would ignore the fact that the question whether the regulations are indeed defective is one worthy of notice and an opportunity to comment"). As the Ninth Circuit observed, "when the government seeks to repeal a regulation, it is generally not bound for [notice-and-comment] purposes by the way it classified that regulation at the time of its promulgation." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1018 n.12 (9th Cir. 1987).

Under strikingly similar circumstances, the blanket rescission of a deferred action program has been found to require notice and comment, even where the deferred action program itself was adopted without such procedures. *See Parco*, 426 F. Supp. at 980–81 (holding that memorandum revoking

existing discretion of immigration officials to extend indefinitely the voluntary departure of certain categories of immigrants must be subjected to notice and comment).  Because the rescission in *Parco* left no discretion for agency officials considering requests for deferred action, it was "in reality a flat rule of eligibility" requiring notice and comment.  *Id.* at 984-85 (distinguishing *Noel v. Chapman*, 508 F.2d 1023 (2d Cir. 1975), which considered a program providing the agency official "sole discretion" over applications for departure extensions).

The Rescission illustrates why the notice-and-comment process is so important.  The record developed through a proper procedure would have ensured that DHS did not "undo all that it accomplished" through DACA "without giving all parties an opportunity to comment on the wisdom" of that action.  *See Consumer Energy Council of Am.*, 673 F.2d at 446.  Had DHS considered the evidence that would have been presented in the notice-and-comment process—such as the Rescission's devastating effects on DACA recipients and their families and its broader consequences for employers, educators, and the economy—the Rescission could not reasonably have been adopted.

### PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF

The other preliminary injunction requirements are likewise satisfied because plaintiffs will suffer irreparable harm without provisional relief, the balance of equities tips sharply in their favor, and provisional relief is in the public interest.

### I.  Plaintiffs Face Irreparable Harm.

The Rescission is already inflicting severe and irreparable harm on plaintiffs, as discussed above and in the attached Appendix.  DACA recipients, including the individual plaintiffs and DACA-recipient UC students, have already lost eligibility to travel using advance parole, in some cases with irreparable consequences for their careers.  App. at 2210, Topic 23.  They are being forced right now to make decisions with life-altering personal and professional consequences—such as whether to pursue or continue professional educations and whether to forego the process for matching to a medical residency, an opportunity virtually impossible to recover.  App. 2204-2206, 2209, Topics 9-12, 20.  The "loss of opportunity to pursue one's chosen profession constitutes irreparable harm."  *Ariz. Dream Act Coalition v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017).  This irreparable injury is further "exacerbated by Plaintiffs' young age and fragile economic status."  *Id.*

34

The Rescission has caused serious emotional harm to the individual plaintiffs and DACA-recipient university and community college students, who have lost the security of knowing they will be able to live and work in the United States and are experiencing resulting anxiety, depression, and fear. *See* App. at 2204-05, Topics 12-13; *see also* App. at 2202, Topic 8 (University of California has observed increase in demand for mental health services, which it cannot fully meet). These emotional and psychological injuries constitute irreparable harm. *See, e.g.*, *Chalk v. U.S. Dist. Court Cent. Dist. of Cal.*, 840 F.2d 701, 710 (9th Cir. 1988); *Norsworthy v. Beard*, 87 F. Supp. 3d 1164, 1193 (N.D. Cal. 2015). Beyond the losses experienced by individual DACA recipients, the Rescission is harming their affiliated institutions such as the University of California, and cities and states within which they reside and work, causing imminent, irreparable harm to plaintiff States, plaintiff County of Santa Clara, plaintiff City of San Jose, and plaintiff University of California. *See, e.g.*, App. at 2205-07, Topics 14, 17. As set forth above, DACA has resulted in the integration of hundreds of thousands of individuals into the American social and economic fabric. The decisions made over the next few months by DACA recipients will have irreparable consequences for their communities and State and local governments, including the immediate losses of valued students, employees, and community members, along with erosion of the gains in economic output, public health, and safety that resulted from DACA. In this situation, "[a] delay, even if only a few months, pending trial represents precious, productive time irretrievably lost." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1166 (9th Cir. 2011).

## II. The Balance Of Equities and the Public Interest Weigh Heavily in Favor of Provisional Relief.

The final two elements of the preliminary injunction test—the balance of the equities and the public interest—merge when the government is a party. *See League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 766 (9th Cir. 2014). In assessing these factors, courts consider the impacts of the injunction on nonparties as well. *See id.* at 766.

The balance of the equities and the public interest weigh overwhelmingly in favor of provisional relief. DACA recipients are integral contributors to their families, schools, employers, communities, and the United States as a whole. DACA permits recipients to earn a living in the United States, support

their families, and attend college.  *See, e.g.*, App at 2199-2200, Topic 2; *see also* App. at 2206-07, Topic 17; App. at 224-30 (Essig Decl. ¶¶ 8-10, 12-13); App. at 1347-48 (J. Smith Decl. ¶ 6); App. at 1505, 1515-16, 1518-19, 1520-21 (Wong Decl. ¶¶ 21, 43, 49, 55); App. at 2199-2200, 2206-07, Topics 2, 17; *see also* App. at 1504, 1509 (Wong Decl. ¶¶ 20, 30).

Moreover, the harm of taking DACA away from nearly 700,000 current DACA recipients would be a loss of $215 billion in U.S. GDP over the next ten years, App. at 73 (Brannon Decl. ¶ 11), and those losses are beginning now as DACA recipients prepare for the possibility of deportation.  Enjoining the rescission of the DACA program and allowing these individuals to continue contributing to their communities and the country at large is in the public interest.

An injunction would also further public health and safety, which will suffer due to the Rescission.  For example, as individuals lose DACA protection they may become less likely to interact with law enforcement even if they are victimized or witness crimes.  *See* App. at 1342 (Smith Decl. ¶¶ 7-8); App. at 1287-88 (Rosen Decl. ¶¶ 3, 5).  Without work authorization, DACA recipients will not be able to continue filling crucial positions providing public services.  App. at 2209, Topic 18; *see also* App. at 96 (Carrizales Decl. ¶¶ 9-10); App. at 790-91 (McLeod Decl. ¶ 6); App. at 1109 (Oh Decl. ¶ 6). The Rescission also would cause many DACA recipients to lose health insurance, *see* App. at 716 (Lorenz Decl. ¶ 7); App. at 1310 (Santos Toledo Decl. ¶ 26); App. at 1324 (Sati Decl. ¶ 48); App. at 1448 (Tabares Decl. ¶ 14), and an increased uninsured population will burden emergency healthcare services and reduce overall public health as people become reluctant to seek medical care due to lack of insurance or fear of being reported to immigration authorities, *see* App. 2206, Topic 15; App. at 0177-78 (Cody Decl. ¶¶ 11-13); App. at 777, 0779 (Márquez Decl. ¶¶ 12, 17); App. at 0716 (Lorenz Decl. ¶¶ 6– 7).  The Rescission also will likely contribute to an increase in the number of children using government child welfare services programs, *see* App. at 0779 (Márquez Decl. ¶ 18), and contribute to heightened levels of stress and anxiety in children whose parents face uncertain immigration status, *see* App. at 814-16 (F. Mendoza Decl. ¶¶ 4, 6-8); App. at 464-67 (Hainmueller Decl. ¶¶ 4-11).

The government will not face any harm if a preliminary injunction is granted.  There will be no harm—and much benefit—to the United States if DHS continues to process new applications for DACA status and renewal applications pending a final judgment.  Furthermore, the government has no interest

36

in enforcing unlawful rules. *See Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) ("[The government] cannot suffer harm from an injunction that merely ends an unlawful practice."); *Arizona Dream Act*, 855 F.3d at 978 ("[I]t is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available." (quoting *Valle del Sol v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013)). Moreover, it is estimated that up to 200,000 individuals have had their DACA grants renewed since President Trump took office. App. at 2092 (CAP Study). If the government believed DACA recipients presented a serious harm to its interests, the administration would not have continued granting renewals for almost nine months.

Accordingly, both the balance of the equities and the public interest favor provisional relief.

\*    \*    \*

Plaintiffs have demonstrated a strong prospect of success on the merits, and have established irreparable harm if the Rescission is permitted to proceed. The balance of equities and the public interest likewise point to a single conclusion: the Court should award provisional relief.

## CONCLUSION

For the foregoing reasons, this Court should enjoin defendants from proceeding with the Rescission and should award provisional relief directing the government to restore the DACA program pending adjudication on the merits.

Dated: November 1, 2017

Respectfully submitted,


COVINGTON & BURLING LLP

/s/ Jeffrey M. Davidson
Jeffrey M. Davidson (SBN 248620)
Alan Bersin (SBN 63874)
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com

Lanny A. Breuer (*pro hac vice*)
Mark H. Lynch (*pro hac vice*)
Alexander A. Berengaut (*pro hac vice*)
Megan A. Crowley (*pro hac vice*)
Ashley Anguas Nyquist (*pro hac vice*)
Jonathan Y. Mincer (Bar No. 298795)
Ivano M. Ventresca (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
E-mail: lbreuer@cov.com, mlynch@cov.com,
aberengaut@cov.com, mcrowley@cov.com,
anyquist@cov.com, jmincer@cov.com,
iventresca@cov.com

Mónica Ramírez Almadani (SBN 234893)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: mralmadani@cov.com

Erika Douglas (SBN 314531)
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94061-1418
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
Email: edouglas@cov.com

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General

/s/ James F. Zahradka II
JAMES F. ZAHRADKA II (SBN 196822)
Deputy Attorney General

CHRISTINE CHUANG
REBEKAH A. FRETZ
RONALD H. LEE
KATHLEEN VERMAZEN RADEZ
SHUBHRA SHIVPURI
1515 Clay Street, 20th Floor
Oakland, CA 94612-0550
Telephone: (510) 879-1247

*Attorneys for Plaintiff State of California*

JANET T. MILLS
Attorney General of Maine
SUSAN P. HERMAN (*pro hac vice*)
Deputy Attorney General
6 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8814
Email: susan.herman@maine.gov

*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland
STEVEN M. SULLIVAN (*pro hac vice*)
Solicitor General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Telephone: (410) 576-6325
Email: ssullivan@oag.state.md.us

*Attorneys for Plaintiff State of Maryland*

Charles F. Robinson (SBN 113197)
Margaret Wu (Bar No. 184167)
Julia M. C. Friedlander (SBN 165767)
Sonya Sanchez (SBN 247541)
Norman Hamill (SBN 154272)
Harpreet Chahal (SBN 233268)
Michael Troncoso (SBN 221180)
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, CA 94607-5200
Telephone: (510) 987-9800
Facsimile: (510) 987-9757
Email: charles.robinson@ucop.edu

*Attorneys for Plaintiffs The Regents of the University of California and Janet Napolitano, in her official capacity as President of the University of California*

LORI SWANSON
Attorney General State of Minnesota
JULIANNA F. PASSE (*pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
Telephone: (651) 757-1136
Email: julianna.passe@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

GIBSON, DUNN & CRUTCHER LLP

/s/ Theodore J. Boutrous, Jr.

THEODORE J. BOUTROUS, JR., SBN 132099
tboutrous@gibsondunn.com
KATHERINE M. MARQUART, SBN 248043
kmarquart@gibsondunn.com
JESSE S. GABRIEL, SBN 263137
jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

ETHAN D. DETTMER, SBN 196046
edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

COTCHETT, PITRE & McCARTHY, LLP
OFFICE OF THE CITY ATTORNEY

/s/ *Nancy L. Fineman*

NANCY L. FINEMAN
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
TAMARAH P. PREVOST (SBN 313422)
tprevost@cpmlegal.com
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

RICHARD DOYLE (SBN 88625)
NORA FRIMANN (SBN 93249)
OFFICE OF THE CITY ATTORNEY
200 East Santa Clara Street, 16th Floor
San José, California 95113
Telephone: (408) 535-1900
Facsimile: (408) 998-3131
Email Address: cao.main@sanJoséca.gov

*Attorneys for Plaintiff City of San Jose*

PUBLIC COUNSEL
MARK D. ROSENBAUM, SBN 59940
mrosenbaum@publiccounsel.org
JUDY LONDON, SBN 149431
jlondon@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

BARRERA LEGAL GROUP, PLLC
LUIS CORTES ROMERO, SBN 310852
lcortes@barreralegal.com
19309 68th Avenue South, Suite R102
Kent, WA 98032
Telephone: (253) 872-4730
Facsimile: (253) 237-1591

LAURENCE H. TRIBE, SBN 39441
larry@tribelaw.com Harvard Law School
*Affiliation for identification purposes only
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 495-1767

ERWIN CHEMERINSKY, *pro hac vice*
forthcoming
echemerinsky@law.berkeley.edu
University of California, Berkeley School of
Law
*Affiliation for identification purposes only
215 Boalt Hall
Berkeley, CA 94720-7200
Telephone: (510) 642-6483

LEAH M. LITMAN, *pro hac vice*
forthcoming llitman@law.uci.edu
University of California, Irvine School of Law
*Affiliation for identification purposes only
401 East Peltason Drive Irvine, CA 92697
Telephone: (949) 824-7722

*Attorneys for Plaintiffs DULCE GARCIA,
MIRIAM GONZALEZ AVILA, SAUL
JIMENEZ SUAREZ, VIRIDIANA CHABOLLA
MENDOZA, NORMA RAMIREZ, and JIRAYUT
LATTHIVONGSKORN*

/s/ James R. Williams

JAMES R. WILLIAMS, County Counsel
GRETA S. HANSEN
LAURA S. TRICE
laura.trice@cco.sccgov.org
MARCELO QUIÑONES
marcelo.quinones@cco.sccgov.org
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA 95110-1770
Telephone: (408) 299-5900
Facsimile: (408) 292-7240

*Attorneys for Plaintiff COUNTY OF SANTA CLARA*

/s/ Eric P. Brown

JONATHAN WEISSGLASS
jweissglass@altber.com
STACEY M. LEYTON
sleyton@altber.com
ERIC P. BROWN
ebrown@altber.com
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151

*Attorneys for Plaintiffs COUNTY OF SANTA CLARA AND SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521*

**ATTESTATION**

I, Jeffrey M. Davidson, hereby attest, pursuant to Civil L.R. 5-1, that I have received authorization to electronically sign and file this document from each of the persons identified in the signature block.

Dated: November 1, 2017
/s/ Jeffrey M. Davidson
Jeffrey M. Davidson

*Counsel for Plaintiffs The Regents of the University of California and Janet Napolitano, in her official capacity as President of the University of California*

# ADDENDUM A

## HISTORY OF DEFERRED ACTION

| | Program | Creation | Termination |
|---|---|---|---|
| 1 | 1956: Parole of orphans adopted by U.S. citizens | Presidential statement | Act of Sept. 11, 1957, Pub. L. No. 85-316, § 4(d), 71 Stat. 639, 710 (1957) allowed paroled individuals to become lawful permanent residents |
| 2 | 1956: Parole of Hungarian refugees after unsuccessful Hungarian revolution | Presidential statement | Act of July 25, 1958, Pub. L. No. 85-559, §2, 72 Stat. 419, 419-20 (1958) allowed paroled individuals to become lawful permanent residents |
| 3 | 1956: Third Preference visa petitioners granted voluntary extended departure | INS Operating Instruction 242.10(a)(6)(i) | Notice and comment procedures. The INS originally attempted to terminate the program with a perfunctory explanation in a memo from the INS Associate Commissioner of Operations, but a district court held this violated the APA's notice and comment requirements. |
| 4 | 1961: Cuban Refugee Program | Presidential letter | Memorandum of Understanding with Cuba in 1965 and passage of Cuban Adjustment Act |
| 5 | 1962: Hong Kong Parole Program in response to famine in China | Presidential authorization of Attorney General's use of parole authority | Passage of Immigration and Nationality Act of 1965 |
| 6 | 1975: Parole for Southeast Asian refugees | Presidential authorization of Attorney General's use of parole authority | Passage of the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) |
| 7 | 1981: Polish refugees granted extended voluntary departure | Extended voluntary departure | Reagan Administration ended program when relations improved with Poland; existing beneficiaries retained extended voluntary departure |
| 8 | 1987: Family Fairness Program | INS Commissioner memo | Passage of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990) |
| 9 | 1990: Expansion of Family Fairness Program | INS Commissioner memo | Passage of the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1990) |

1

| 10 | <u>1990</u>: Certain Chinese nationals provided deferred enforced departure after Tiananmen Square protests | Executive Order 12711 | Program was time-limited at inception, terminating January 1, 1994 |
|----|---|---|---|
| 11 | <u>1997</u>: Petitioners for relief under Violence Against Women Act | INS Acting Executive Associate Commissioner memo | N/A – still in place |
| 12 | <u>2001</u>: Applicants for nonimmigrant status or visas made available under the Victims of Trafficking and Violence Protection Act | INS Acting Executive Associate Commissioner memo | Codified into regulations regarding T and U visa status |
| 13 | <u>2002</u>: Certain T visa applicants were provided deferred action | INS Executive Associate Commissioner memo | Promulgation of regulations codifying this policy, 8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) |
| 14 | <u>2003</u>: Certain U visa applicants were provided deferred action | INS Associate Director of Operations memo | Promulgation of regulations codifying this policy, 8 C.F.R. § 214.14(d)(2) |
| 15 | <u>2005</u>: Foreign students affected by Hurricane Katrina were provided deferred action | USCIS Press Release | Program was time-limited from inception, terminating February 1, 2006 |
| 16 | <u>2007</u>: Certain Liberians were provided deferred enforced departure | Presidential memo | N/A – still in place |
| 17 | <u>2009</u>: Certain surviving spouses of U.S. citizens provided were deferred action | USCIS Acting Associate Director memo | Passage of Section 568(c) of the Department of Homeland Security Appropriations Act, Pub. L. No. 111-83, 123 Stat. 4142, 4186 (2009) |

1  JEFFREY M. DAVIDSON (SBN 248620)
   ALAN BERSIN (SBN 63874)
2  COVINGTON & BURLING LLP
   One Front Street, 35th Floor
3  San Francisco, CA 94111-5356
   Telephone: (415) 591-6000
4  Facsimile: (415) 591-6091
   Email: jdavidson@cov.com,
5  abersin@cov.com
   *Attorneys for Plaintiffs The Regents of the*
6  *University of California and Janet Napolitano, in*
   *her official capacity as President of the*
7  *University of California*

8  THEODORE J. BOUTROUS, JR. (SBN 132099)
   ETHAN D. DETTMER (SBN 196046)
9  JESSE S. GABRIEL (SBN 263137)
   GIBSON, DUNN & CRUTCHER LLP
10 333 South Grand Avenue
   Los Angeles, CA 90071-3197
11 Telephone: (213) 229-7000
   Facsimile: (213) 229-7520
12 Email: tboutrous@gibsondunn.com,
   edettmer@gibsondunn.com,
13 jgabriel@gibsondunn.com
   *Attorneys for Plaintiffs Dulce Garcia, Miriam*
14 *Gonzalez Avila, Saul Jimenez Suarez, Viridiana*
   *Chabolla Mendoza, Norma Ramirez, and Jirayut*
15 *Latthivongskorn*

16 *[Additional Counsel Listed on Signature Page]*

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General
JAMES F. ZAHRADKA II (SBN 196822)
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247
Email: James.Zahradka@doj.ca.gov
*Attorneys for Plaintiff State of California*

JOSEPH W. COTCHETT (SBN 36324)
NANCY L. FINEMAN (SBN 124870)
COTCHETT, PITRE & McCARTHY, LLP
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
Email: nfineman@cpmlegal.com
*Attorneys for Plaintiff City of San Jose*

JONATHAN WEISSGLASS (SBN 185008)
STACEY M. LEYTON (SBN 203827)
ERIC P. BROWN (SBN 284245)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: jweissglass@altber.com
*Attorneys for Plaintiffs County of Santa Clara and
Service Employees International Union Local 521*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | CASE NO. 17-CV-05211-WHA <br><br> **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF** |

STATE OF CALIFORNIA, STATE OF MAINE, STATE OF MARYLAND, and STATE OF MINNESOTA,

        Plaintiffs,

        v.

U.S. DEPARTMENT OF HOMELAND SECURITY, ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, and the UNITED STATES OF AMERICA,

        Defendants.

CASE NO. 17-CV-05235-WHA

CITY OF SAN JOSE, a municipal corporation,

        Plaintiffs,

        v.

DONALD J. TRUMP, President of the United States, in his official capacity, ELAINE C. DUKE, in her official capacity, and the UNITED STATES OF AMERICA,

        Defendants.

CASE NO. 17-CV-05329-WHA

DULCE GARCIA, MIRIAM GONZALEZ AVILA, SAUL JIMENEZ SUAREZ, VIRIDIANA CHABOLLA MENDOZA, NORMA RAMIREZ, and JIRAYUT LATTHIVONGSKORN,

        Plaintiffs,

        v.

UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security,

        Defendants.

CASE NO. 17-CV-05380-WHA

COUNTY OF SANTA CLARA and
SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL 521,

                Plaintiffs,

        v.

DONALD J. TRUMP, in his official capacity
as President of the United States, JEFFERSON
BEAUREGARD SESSIONS, in his official
capacity as Attorney General of the United
States; ELAINE DUKE, in her official
capacity as Acting Secretary of the Department
of Homeland Security; and U.S.
DEPARTMENT OF HOMELAND
SECURITY,

                Defendants.

CASE NO. 17-CV-05813-WHA

PLEASE TAKE NOTICE that Plaintiffs The Regents of the University of California, Janet Napolitano, in her official capacity as President of the University of California, the States of California, Maine, Maryland, and Minnesota, Dulce Garcia, Miriam Gonzalez Avila, Saul Jimenez Suarez, Viridiana Chabolla Mendoza, Norma Ramirez, Jirayut Latthivongskorn, City of San Jose, County of Santa Clara and Service Employees International Union Local 521 (collectively, "Plaintiffs") hereby request, pursuant to Rule 201 of the Federal Rules of Evidence, that the Court take judicial notice of the items described below in connection with Plaintiffs' Motion for Provisional Relief, filed concurrently herewith. Plaintiffs request judicial notice of the following documents attached as Exhibits to the Declaration of Jesse Gabriel in Support of Plaintiffs' Motion for Provisional Relief:

1. Exhibit A: Memorandum from INS General Counsel Sam Bernsen to INS Commissioner titled "Legal Opinion Regarding Service Exercise of Prosecutorial Discretion," dated July 15, 1976, available at https://goo.gl/uXW6Sg.

2. Exhibit B: Statement by President Dwight Eisenhower Concerning the Entry Into the United States of Adopted Foreign-Born Orphans, dated October 26, 1956, available at https://goo.gl/VDfcgW.

3. Exhibit C: White House Statement Concerning the Admission of Additional Hungarian Refugees, dated December 1, 1956, available at https://goo.gl/D4DMuS.

4. Exhibit D: Letter from President John F. Kennedy to Secretary Abraham Ribicoff, dated January 27, 1961, available at https://goo.gl/Hnf1LL.

5. Exhibit E: USCIS publication titled "Refugee Timeline," last updated June 27, 2017, available at https://goo.gl/5fhA9y.

6. Exhibit F: "Legalization and Family Fairness – An Analysis" by Alan Nelson, dated October 26, 1987.

7. Exhibit G: Memorandum from INS Commissioner Gene McNary to Regional Commissioners titled "Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens," dated February 2, 1990, available at https://goo.gl/7wcLLy.

8. Exhibit I: Memorandum from Paul Virtue for the Acting Executive Associate Commissioner to Regional Directors, District Directors, Officers-in-Charge, and Service Center Directors, titled "Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues," dated May 6, 1997, available at https://goo.gl/QEp4kX.

9. Exhibit J: Memorandum from Stuart Anderson to Johnny N. Williams, titled "Deferred Action for Aliens with bona fide Applications for T Nonimmigrant Status," dated May 8, 2002, available at https://goo.gl/BUvRpU.

1

10. Exhibit K: Memorandum from USCIS Associate Director of Operations William R. Yates to Director, Vermont Service Center, titled "Centralization for Interim Relief For U Nonimmigrant Status Applications," dated October 8, 2003, available at https://goo.gl/tBvYwN.

11. Exhibit L: USCIS publication titled "Victims of Human Trafficking & Other Crimes," last updated August 25, 2017, available at https://goo.gl/wwV6jF.

12. Exhibit M: USCIS Press Release titled "USCIS Announces Interim Relief For Foreign Students Adversely Impacted By Hurricane Katrina," dated November 25, 2005, available at https://goo.gl/rRmaHm.

13. Exhibit N: Memorandum from Donald Neufeld to USCIS Field Leadership, titled "Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children," dated September 4, 2009, available at https://goo.gl/cAXvUR.

14. Exhibit O: Memorandum from Donald Neufeld to USCIS Executive Leadership, titled "Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children," dated December 2, 2009, available at https://goo.gl/T9dECx.

15. Exhibit Q: Remarks on Immigration Reform and an Exchange with Reporters by President Barack Obama, dated June 15, 2012, available at https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration.

16. Exhibit R: Archived USCIS publication of Frequently Asked Questions regarding DACA, available at https://www.uscis.gov/archive/frequently-asked-questions.

17. Exhibit S: USCIS publication titled "F5—General information… How do I request consideration of deferred action for childhood arrivals?," dated October 2013, available at https://www.uscis.gov/sites/default/files/files/nativedocuments/daca.pdf.

18. Exhibit T: USCIS publication titled "(DACA) Toolkit," dated June 2014, https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Deferred%20Action%20for%20Childhood%20Arrivals/DACA_Toolkit_CP_072914.pdf.

19. Exhibit U: USCIS publication titled "Don't Let Your Work Permit Expire; Follow These DACA Renewal Tips," last updated June 5, 2015, https://www.uscis.gov/archive/dont-let-your-work-permit-expire-follow-these-daca-renewal-tips.

20. Exhibit V: USCIS Form I-821D, titled "Consideration of Deferred Action for Childhood Arrivals," dated January 9, 2017.

21. Exhibit W: Letter from Secretary Jeh Johnson to Congresswoman Judy Chu, dated December 30, 2016, available at https://chu.house.gov/sites/chu.house.gov/files/documents/DHS.Signed%20Response%20to%20Chu%2012.30.16.pdf.

22. Exhibit AA: Letter from Tennessee Attorney General Herbert H. Slatery III to Senators Lamar Alexander and Bob Corker, dated September 1, 2017, available at

http://static1.1.sqspcdn.com/static/f/373699/27673058/1504293882007/DACA%2Bletter%2B9-1-2017.pdf?token%3DstUlwSIo3qeVjBe7%252BUHbTCIuvts%253D.

23. Exhibit CC: Remarks on DACA, as prepared for delivery, by Attorney General Jefferson Sessions, dated September 5, 2017, available at https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca.

24. Exhibit DD: "Statement from Acting Secretary Duke on the Rescission of Deferred Action for Childhood Arrivals (DACA)," dated September 5, 2017, available at https://www.dhs.gov/news/2017/09/05/statement-acting-secretary-duke-rescission-deferred-action-childhood-arrivals-daca.

25. Exhibit KK: Transcript of the testimony of Attorney General Jefferson Sessions before the Senate Judiciary Committee, dated October 18, 2017.

26. Exhibit LL: White House publication titled "President Donald J. Trump's Letter to House and Senate Leaders & Immigration Principles and Policies," dated October 8, 2017, available at https://www.whitehouse.gov/the-press-office/2017/10/08/president-donald-j-trumps-letter-house-and-senate-leaders-immigration.

27. Exhibit PP: Excerpts of the transcript of the testimony of Secretary Elaine Duke before the Senate Committee on Homeland Security and Government Affairs, dated September 27, 2017.

28. Exhibit QQ: Department of Homeland Security publication titled "Fact Sheet: Rescission Of Deferred Action For Childhood Arrivals (DACA)," dated September 5, 2017, available at https://www.dhs.gov/news/2017/09/05/fact-sheet-rescission-deferred-action-childhood-arrivals-daca.

29. Exhibit RR: USCIS publication titled "Consideration of Deferred Action for Childhood Arrivals: Guidance for Employers," dated November 20, 2012, available at https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Deferred%20Action%20for%20Childhood%20Arrivals/DACA-Fact-Sheet-I-9_Guidance-for-employers_nov20_2012.pdf.

30. Exhibit SS: Letter from ICE Director John Morton to All Employees titled "Secretary Napolitano's Memorandum Concerning the Exercise of Prosecutorial Discretion for Certain Removable Individuals Who Entered the United States as a Child," dated June 15, 2012, available at https://www.ice.gov/doclib/about/offices/ero/pdf/s1-certain-young-people-morton.pdf.

31. Exhibit TT: Social Security Administration publication titled "Social Security Number and Card—Deferred Action For Childhood Arrivals," available at https://www.ssa.gov/pubs/deferred_action.pdf.

32. Exhibit UU: USCIS Form G-1145, titled "e-Notification of Application/Petition Acceptance," available to download at https://www.uscis.gov/g-1145.

33. Exhibit VV: USCIS Form I-765, titled "Application for Employment Authorization," dated January 17, 2017, available to download at https://www.uscis.gov/i-765.

34. Exhibit WW: Letter from California Attorney General Xavier Becerra, et al., to President Donald J. Trump (July 21, 2017), available at https://oag.ca.gov/system/files/attachments/press_releases/7-21-17%20%20Letter%20from%20State%20AGs%20to%20President%20Trump%20re%20DACA.final_.pdf.

35. Exhibit YY: USCIS, "I-821D, Consideration of Deferred Action for Childhood Arrivals," last updated October 6, 2017, available at https://www.uscis.gov/archive/i-821d.

36. Exhibit ZZ: Memorandum for Michael A. Pearson, Executive Associate Commissioner, INS, from Michael D. Cronin, Acting Executive Associate Commissioner, INS, *Re: Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* (Aug. 30, 2001), available at http://www.asistahelp.org/documents/resources/Policy_Memo__Cronin__83001_DFC4BA7F5E85D.pdf.

37. Exhibit AAA: USCIS, *DED Granted Country – Liberia*, available at https://www.uscis.gov/humanitarian/deferred-enforced-departure/ded-granted-country-liberia/ded-granted-country-liberia.

38. Exhibit BBB: Gerald R. Ford Presidential Library, *Emergency Program for Parole of Refugees from Vietnam* (Apr. 16, 1975), available at https://www.fordlibrarymuseum.gov/library/document/0164/19077062.pdf.

39. Exhibit CCC: Executive Order 12711, available at U.S. State Department, https://www.state.gov/documents/organization/28450.pdf.

A Court "must take judicial notice" of adjudicative facts "if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2). The Court can judicially notice any "fact that is not subject to reasonable dispute because it: . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

Exhibits A, F, G, I-K, N, O, QQ, and ZZ are all government memoranda—many of which are still publicly available on government websites—establishing or discussing the United States' immigration policies. Exhibit M is a government press release announcing a new deferred action program. Exhibits R-V, RR, UU, VV, WW, and YY are USCIS publications and forms. Exhibit SS is a letter from ICE Director John Morton available on the ICE website. Exhibit TT is a Social Security Administration publication. The Court may take judicial notice of such records and memoranda of government administrative bodies. *See Anderson v. Holder*, 673 F.3d 1089, 1094 n.1 (9th Cir. 2012) (taking judicial notice of USCIS interpretation guidance); *Lee v. City of Los Angeles*, 250 F.3d 668, 689-

4

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

90 (9th Cir. 2001) (a court may take judicial notice of undisputed matters of public record); *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 520 nn.5, 8, 11 (N.D. Cal. 2017) (taking judicial notice of government memoranda and letters); *McCray v. Unite Here! Local 19*, No. 16-CV-01233-BLF, 2017 WL 567319, at *2 n.1 (N.D. Cal. Feb. 13, 2017) (collecting cases).

Exhibits E, L, and AAA are government websites that detail past and current policies providing relief from immigration enforcement. Exhibits B-D are public statements of President Eisenhower and President Kennedy that are hosted on a website maintained by the University of California, Santa Barbara, a public university. Specifically, this website is of the American Presidency Project, "the leading source of presidential documents on the internet." *See* The American Presidency Project, http://www.presidency.ucsb.edu/index.php. Exhibit Q is a statement by President Obama on the White House archived website. Exhibit W is a letter from Secretary Jeh Johnson available on the House of Representatives website. Exhibit AA is a letter from Tennessee Attorney General Herbert H. Slatery III available on the world wide web. Exhibit CC is a prepared statement by Attorney General Jefferson Sessions, available on the Department of Justice website. Exhibit DD is a statement from Acting Secretary Duke available on the DHS website. Exhibit LL is a letter from President Trump found on the White House website. Exhibit BBB is a document posted on the website of the Gerald R. Ford Presidential Library. Exhibit CCC is an Executive Order posted on the U.S. State Department website. Exhibit WW is a letter from California Attorney General Xavier Becerra available on the Office of the Attorney General Website.

The Court may take notice of government documents and publications available on websites. As a general matter, "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1224 (10th Cir. 2007). The Ninth Circuit has held that it is appropriate to take judicial notice of information "made publicly available by government entities" on their websites. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010). *See also Lindsey v. United Airlines, Inc.*, No. C 17-00753, 2017 WL 2404911, at *6 (N.D. Cal. June 2, 2017) (Alsup, J.) (taking judicial notice of certificate of merger because it "is a public document and its authenticity can be accurately and readily determined from the Delaware Secretary of State website"); *Cnty. of Santa Clara v. Astra USA, Inc.*, 401 F. Supp. 2d 1022,

1024 (N.D. Cal. 2005) (Alsup, J.) (taking judicial notice of a price-control regime described on a Department of Health and Human Services website and a report by the same department).

Exhibits KK and PP are transcripts of congressional testimony.  In general, "[l]egislative history is properly a subject of judicial notice."  *Anderson*, 673 F.3d at 1094 n.1.  This is also true of testimony given at congressional hearings.  *See Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1168 n.12 (10th Cir. 2000) (taking "judicial notice of the content of hearings and testimony before [] congressional committees and subcommittees"); *see also Cnty. of Santa Clara*, 250 F. Supp. 3d at nn. 4, 6, 7, 10 (taking judicial notice of government officials' press conference statements, press briefings, and interview statements).

Because the above documents satisfy the criteria of Rule 201(b) of the Federal Rules of Evidence, the Court must take judicial notice of them pursuant to Rule 201(c)(2) of the Federal Rules of Evidence.

Case 3:17-cv-05211-WHA Document 62-9 Filed 11/27/18 Page 6 of 9
Case 1:17-cv-00581-DMR Document 62-9 Filed 11/27/18 Page 6 of 9
Case 1:17-cv-05329 Document 62-9 Filed 11/05/18 Page 64 of 269

Dated: November 1, 2017

COVINGTON & BURLING LLP
/s/ Jeffrey M. Davidson
Jeffrey M. Davidson (SBN 248620)
Alan Bersin (SBN 63874)
One Front Street, 35th Floor
San Francisco, CA 94111-5356
Telephone: (415) 591-6000
Facsimile: (415) 591-6091
Email: jdavidson@cov.com

Lanny A. Breuer (*pro hac vice*)
Mark H. Lynch (*pro hac vice*)
Alexander A. Berengaut (*pro hac vice*)
Megan A. Crowley (*pro hac vice*)
Ashley Anguas Nyquist (*pro hac vice*)
Jonathan Y. Mincer (Bar No. 298795)
Ivano M. Ventresca (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
E-mail: lbreuer@cov.com, mlynch@cov.com,
aberengaut@cov.com, mcrowley@cov.com,
anyquist@cov.com, jmincer@cov.com,
iventresca@cov.com

Mónica Ramírez Almadani (SBN 234893)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: mralmadani@cov.com

Erika Douglas (SBN 314531)
COVINGTON & BURLING LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94061-1418
Telephone: (650) 632-4700
Facsimile: (650) 632-4800
Email: edouglas@cov.com

Charles F. Robinson (SBN 113197)
Margaret Wu (Bar No. 184167)
Julia M. C. Friedlander (SBN 165767)
Sonya Sanchez (SBN 247541)
Norman Hamill (SBN 154272)
Harpreet Chahal (SBN 233268)

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
MICHAEL L. NEWMAN
Supervising Deputy Attorney General

/s/ James F. Zahradka II
JAMES F. ZAHRADKA II
Deputy Attorney General

CHRISTINE CHUANG
REBEKAH A. FRETZ
RONALD H. LEE
KATHLEEN VERMAZEN
RADEZ SHUBHRA SHIVPURI
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
Telephone: (510) 879-1247

*Attorneys for Plaintiff State of California*

JANET T. MILLS
Attorney General of Maine
SUSAN P. HERMAN (*pro hac vice*)
Deputy Attorney General
6 State House Station
Augusta, Maine 04333
Telephone: (207) 626-8814
Email: susan.herman@maine.gov

*Attorneys for Plaintiff State of Maine*

BRIAN E. FROSH
Attorney General of Maryland
STEVEN M. SULLIVAN (*pro hac vice*)
Solicitor General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Telephone: (410) 576-6325
Email: ssullivan@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

Michael Troncoso (SBN 221180)
University of California
Office of the General Counsel
1111 Franklin Street, 8th Floor
Oakland, CA 94607-5200
Telephone: (510) 987-9800
Facsimile: (510) 987-9757
Email: charles.robinson@ucop.edu

*Attorneys for Plaintiffs THE REGENTS OF THE
UNIVERSITY OF CALIFORNIA and JANET
NAPOLITANO, in her official capacity as President
of the University of California*

LORI SWANSON
Attorney General State of Minnesota
JULIANNA F. PASSE (*pro hac vice*)
Assistant Attorney General
445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
Telephone: (651) 757-1136
Email: julianna.passe@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota*

GIBSON, DUNN & CRUTCHER LLP

/s/ Theodore J. Boutrous, Jr.

THEODORE J. BOUTROUS, JR., SBN 132099
tboutrous@gibsondunn.com
KATHERINE M. MARQUART, SBN 248043
kmarquart@gibsondunn.com
JESSE S. GABRIEL, SBN 263137
jgabriel@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

ETHAN D. DETTMER, SBN 196046
edettmer@gibsondunn.com
555 Mission Street
San Francisco, CA 94105
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

PUBLIC COUNSEL
MARK D. ROSENBAUM, SBN 59940
mrosenbaum@publiccounsel.org
JUDY LONDON, SBN 149431
jlondon@publiccounsel.org
610 South Ardmore Avenue
Los Angeles, CA 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

BARRERA LEGAL GROUP, PLLC
LUIS CORTES ROMERO, SBN 310852
lcortes@barreralegal.com
19309 68th Avenue South, Suite R102
Kent, WA 98032

COTCHETT, PITRE & McCARTHY, LLP
OFFICE OF THE CITY ATTORNEY

/s/ *Nancy L. Fineman*

NANCY L. FINEMAN
BRIAN DANITZ (SBN 247403)
bdanitz@cpmlegal.com
TAMARAH P. PREVOST (SBN 313422)
tprevost@cpmlegal.com
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

RICHARD DOYLE (SBN 88625)
NORA FRIMANN (SBN 93249)
OFFICE OF THE CITY ATTORNEY
200 East Santa Clara Street, 16th Floor
San José, California 95113
Telephone: (408) 535-1900
Facsimile: (408) 998-3131
Email Address: cao.main@sanJoséca.gov

*Attorneys for Plaintiff City of San Jose*

Telephone: (253) 872-4730
Facsimile: (253) 237-1591

LAURENCE H. TRIBE, SBN 39441
larry@tribelaw.com Harvard Law School
*Affiliation for identification purposes only
1575 Massachusetts Avenue
Cambridge, MA 02138
Telephone: (617) 495-1767

ERWIN CHEMERINSKY, *pro hac vice*
forthcoming
echemerinsky@law.berkeley.edu
University of California, Berkeley School of Law
*Affiliation for identification purposes only
215 Boalt Hall, Berkeley, CA 94720-7200
Telephone: (510) 642-6483

LEAH M. LITMAN, *pro hac vice*
forthcoming
llitman@law.uci.edu
University of California, Irvine School of Law
*Affiliation for identification purposes only
401 East Peltason Drive Irvine, CA 92697
Telephone: (949) 824-7722

*Attorneys for Plaintiffs DULCE GARCIA,
MIRIAM GONZALEZ AVILA, SAUL
JIMENEZ SUAREZ, VIRIDIANA CHABOLLA
MENDOZA, NORMA RAMIREZ, and JIRAYUT
LATTHIVONGSKORN*


/s/ James R. Williams

JAMES R. WILLIAMS, County Counsel
GRETA S. HANSEN
LAURA S. TRICE
laura.trice@cco.sccgov.org
MARCELO QUIÑONES
marcelo.quinones@cco.sccgov.org
OFFICE OF THE COUNTY COUNSEL
COUNTY OF SANTA CLARA
70 West Hedding Street
East Wing, Ninth Floor
San Jose, CA 95110-1770
Telephone: (408) 299-5900
Facsimile: (408) 292-7240

*Attorneys for Plaintiff COUNTY OF SANTA CLARA*

/s/ Eric P. Brown

JONATHAN WEISSGLASS
jweissglass@altber.com
STACEY M. LEYTON
sleyton@altber.com
ERIC P. BROWN
ebrown@altber.com
ALTSHULER BERZON LLP
177 Post St., Suite 300
San Francisco, CA 94108
Telephone: (415) 421-7151

*Attorneys for Plaintiffs COUNTY OF SANTA
CLARA AND SERVICE EMPLOYEES
INTERNATIONAL UNION LOCAL 521*

9

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA and JANET NAPOLITANO,
*in her official capacity as President of the
University of California*,

        Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY and ELAINE
DUKE, *in her official capacity as Acting
Secretary of the Department of Homeland
Security*,

        Defendants.

CASE NO. 17-CV-05211-WHA

**[PROPOSED] ORDER GRANTING
PLAINTIFFS' MOTION FOR
PROVISIONAL RELIEF**

---

STATE OF CALIFORNIA, STATE OF
MAINE, STATE OF MARYLAND, and
STATE OF MINNESOTA,

        Plaintiffs,

        v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, ELAINE DUKE, *in her official
capacity as Acting Secretary of the Department
of Homeland Security*, and the UNITED
STATES OF AMERICA,

        Defendants.

CASE NO. 17-CV-05235-WHA

---

CITY OF SAN JOSE, a municipal corporation,

Plaintiff,

v.

DONALD J. TRUMP, President of the United
States, in his official capacity, ELAINE C.
DUKE, in her official capacity, and the
UNITED STATES OF AMERICA,

Defendants.

CASE NO. 17-CV-05329-WHA

---

1

2

|  |  |
| --- | --- |
| DULCE GARCIA, MIRIAM GONZALEZ<br>AVILA, SAUL JIMENEZ SUAREZ,<br>VIRIDIANA CHABOLLA MENDOZA,<br>NORMA RAMIREZ, and JIRAYUT<br>LATTHIVONGSKORN,<br><br>           Plaintiffs,<br><br>       v.<br><br>UNITED STATES OF AMERICA, DONALD<br>J. TRUMP, *in his official capacity as President<br>of the United State*s, U.S. DEPARTMENT OF<br>HOMELAND SECURITY, and ELAINE<br>DUKE, *in her official capacity as Acting<br>Secretary of Homeland Security*,<br><br>           Defendants. | CASE NO. 17-CV-05380-WHA |
| COUNTY OF SANTA CLARA and<br>SERVICE EMPLOYEES<br>INTERNATIONAL UNION LOCAL 521,<br><br>           Plaintiffs,<br><br>       v.<br><br>DONALD J. TRUMP, *in his official capacity<br>as President of the United States*; JEFFERSON<br>BEAUREGARD SESSIONS, *in his official<br>capacity as Attorney General of the United<br>States*; ELAINE DUKE, *in her official<br>capacity as Acting Secretary of Homeland<br>Security*; and U.S. DEPARTMENT OF<br>HOMELAND SECURITY,<br><br>           Defendants. | CASE NO. 17-CV-05813-WHA |

Having considered Plaintiffs' Motion For Provisional Relief, ECF No. ___ ("Plaintiffs' Motion"), IT IS HEREBY ORDERED THAT:

1) Plaintiffs have demonstrated that (a) they are likely to succeed on the merits of their claim under the Administrative Procedure Act that the September 5, 2017 memorandum rescinding the Deferred Action for Childhood Arrivals ("DACA") program ("the Rescission") should be set aside, (b) the Rescission is causing and will cause irreparable harm absent provisional relief, and (c) the balance of equities and the public interest weigh heavily in favor of provisional relief in the form of returning to the status quo existing prior to the Rescission. Plaintiffs' Motion is therefore granted.

2) Defendants are enjoined from implementing the Rescission, or any portion thereof.

3) Defendants are directed to immediately return the administration of the DACA program to the state of its existence prior to the Rescission, using the same means, methods and policies for considering and granting deferred action requests and requests for advance parole as were utilized before the Rescission, including without limitation:

    a. restoration of eligibility for initial requests for deferred action and associated employment authorization;

    b. restoration of eligibility for renewals for deferred action and associated employment authorization;

    c. restoration of eligibility for requests for advance parole; and

    d. restoration of its policies relating to the use of information provided by DACA applicants and their employers.

**SO ORDERED**, this __ day of _____, 2017.

_____
Honorable William H. Alsup
United States District Judge

# EXHIBIT 9

CHAD A. READLER
Principal Deputy Assistant Attorney General
BRIAN STRETCH
United States Attorney
BRETT A. SHUMATE
Deputy Assistant Attorney General
JENNIFER D. RICKETTS
Branch Director
JOHN R. TYLER
Assistant Branch Director
BRAD P. ROSENBERG (DC Bar #467513)
Senior Trial Counsel
STEPHEN M. PEZZI (DC Bar #995500)
Trial Attorney
KATE BAILEY
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
20 Massachusetts Avenue, NW
Washington, DC 20530
Telephone: (202) 514-9239
Facsimile: (202) 616-8470
E-mail: kate.bailey@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| REGENTS OF UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security,<br><br>Defendants. | No. 3:17-cv-05211-WHA<br><br><br>**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF**<br><br>Judge: Honorable William Alsup<br>Hearing: December 20, 2017, 8:00 a.m.<br>Place: San Francisco U.S. Courthouse, Courtroom 8, 19th Floor |

STATE OF CALIFORNIA, STATE OF
MAINE, STATE OF MARYLAND, and
STATE OF MINNESOTA,

                Plaintiffs,

       v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, ELAINE DUKE, in her official
capacity as Acting Secretary of the
Department of Homeland Security, and the
UNITED STATES OF AMERICA,

                Defendants.

No. 3:17-cv-05235-WHA

---

CITY OF SAN JOSE, a municipal
corporation,

                Plaintiff,

       v.

DONALD J. TRUMP, President of the United
States, in his official capacity, ELAINE C.
DUKE, in her official capacity, and the
UNITED STATES OF AMERICA,

                Defendants.

No. 3:17-cv-05329-WHA

---

DULCE GARCIA, MIRIAM GONZALEZ
AVILA, SAUL JIMENEZ SUAREZ,
VIRIDIANA CHABOLLA MENDOZA,
NORMA RAMIREZ, and JIRAYUT
LATTHIVONGSKORN,

                Plaintiffs,

       v.

No. 3:17-cv-05380-WHA

---

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

UNITED STATES OF AMERICA,
DONALD J. TRUMP, in his official capacity
as President of the United States, U.S.
DEPARTMENT OF HOMELAND
SECURITY, and ELAINE DUKE, in her
official capacity as Acting Secretary of
Homeland Security,

        Defendants.

COUNTY OF SANTA CLARA and
SERVICE EMPLOYEES INTERNATIONAL
UNION LOCAL 521,

        Plaintiffs,

      v.

DONALD J. TRUMP, President of the United
States, in his official capacity; JEFFERSON
BEAUREGARD SESSIONS, Attorney
General of the United States, in his official
capacity; ELAINE C. DUKE, Acting
Secretary of the Department of Homeland
Security, in her official capacity; and the U.S.
DEPARTMENT OF HOMELAND
SECURITY,

        Defendants.

No. 3:17-cv-05813-WHA

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

BACKGROUND .............................................................................................................2

   A. Deferred Action Generally..................................................................................2

   B. DACA and DAPA............................................................................................3

   C. The *Texas* Litigation .......................................................................................4

   D. Rescission of DACA .........................................................................................5

   E. Plaintiffs' Motion for Provisional Relief ..........................................................6

STANDARD OF REVIEW .............................................................................................7

ARGUMENT ..................................................................................................................7

PLAINTIFFS FAIL TO ESTABLISH A LIKELIHOOD OF SUCCESS ON
THE MERITS OF THEIR APA CLAIMS ......................................................................7

Plaintiffs' APA Claims Are Not Justiciable .................................................................8

   I. The Acting Secretary Rationally Explained Her Decision to Rescind
      DACA, Particularly Given the Imminent Likelihood of a Nationwide
      Injunction Based on Controlling Circuit Precedent ........................................9

   II. The Rescission Is a General Statement of Policy Not Subject To Notice-
       And-Comment Rulemaking Requirements......................................................26

THE REMAINING FACTORS WEIGH AGAINST PRELIMINARY RELIEF .........................32

   III. Plaintiffs Have Not Shown Any Risk of Irreparable Harm Absent
      Preliminary Relief ..........................................................................................32

   IV. Balancing of the Equities and the Public Interest ...........................................35

   V. Any Injunctive Relief Should be Narrowly Drawn ..........................................36

CONCLUSION................................................................................................................37

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

i

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Adair v. England*,
   183 F. Supp. 2d 31 (D.D.C. 2002) ...................................................................... 22

*All. for the Wild Rockies v. Ashe*,
   687 F. App'x 657 (9th Cir. 2017) ...................................................................... 11

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ...................................................................... 7, 36

*Am. Trucking Ass'ns v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) ...................................................................... 7, 32

*Amfac Resorts LLC v. Dep't of Interior*,
   143 F. Supp. 2d 7 (D.D.C. 2001) ...................................................................... 22

*Ariz. Dream Act Coal. v. Brewer*,
   855 F.3d 957 (9th Cir. 2017) ...................................................................... 35

*Arizona v. United States*,
   567 U.S. 387 (2012) ...................................................................... 2, 8, 35

*Arpaio v. Obama*,
   136 S. Ct. 900 (2016) ...................................................................... 2

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) ...................................................................... 2, 3, 10, 28

*Brady v. FERC*,
   416 F.3d 1 (D.C. Cir. 2005) ...................................................................... 12

*Bresgal v. Brock*,
   843 F.2d 1163 (9th Cir. 1987) ...................................................................... 36

*Califano v. Sanders*,
   430 U.S. 99 (1977) ...................................................................... 9

*Cal. ex rel. Lockyer v. U.S. Dep't of Agriculture*,
   459 F. Supp. 2d 874 (N.D. Cal. 2006) ...................................................................... 20

*Camp v. Pitts*,
   411 U.S. 138 (1973) ...................................................................... 21

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

*Chaudhry v. Holder,*
    705 F.3d 289 (7th Cir. 2013) ........................................................... 3

*Chrysler Corp. v. Brown,*
    441 U.S. 281 (1979) ...................................................................... 27

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
    401 U.S. 402 (1971) .................................................................. 9, 22

*Coal. on Sensible Transp. v. Dole,*
    826 F.2d 60 (D.C. Cir. 1987) ...................................................... 22

*Commercial Drapery Contractors v. United States,*
    133 F.3d 1 (D.C. Cir. 1998) ........................................................ 22

*DISH Network Corp. v. FCC,*
    653 F.3d 771 (9th Cir. 2011) ........................................................ 7

*Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.,*
    774 F.2d 1371 (9th Cir. 1985) .................................................... 32

*Drakes Bay Oyster Co. v. Jewell,*
    747 F.3d 1073 (9th Cir. 2014) .................................................... 35

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) ................................................................ 15

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ................................................................ 14, 15

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) .................................................................... 21

*Heckler v. Chaney,*
    470 U.S. 821 (1985) .......................................................... 8, 13, 27

*ICC v. Bhd. of Locomotive Eng'rs (BLE),*
    482 U.S. 270, 283 (1987) .............................................................. 8

*Int'l Union, United Mine Workers of America v. U.S. Department of Labor,*
    358 F.3d 40 (D.C. Cir. 2004) ...................................................... 20

*James Madison Ltd. By Hecht v. Ludwig,*
    82 F.3d 1085 (D.C. Cir. 1996) .................................................... 22

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

*Leiva-Perez v. Holder*,
   640 F.3d 962 (9th Cir. 2011) .................................................................................. 7

*Lewis v. Casey*,
   518 U.S. 343 (1996) ............................................................................................ 36

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ................................................................................. 8, 26, 29

*Mada-Luna v. Fitzpatrick*,
   813 F.2d 1006 (9th Cir. 1987) ....................................................................... 26, 31

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ............................................................................................ 36

*Managed Pharm. Care v. Sebelius*,
   716 F.3d 1235 (9th Cir. 2013) .............................................................................. 11

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) .............................................................................................. 7

*Mexichem Specialty Resins, Inc. v. EPA*,
   787 F.3d 544 (D.C. Cir. 2015) ............................................................................ 21

*Michigan v. EPA*,
   135 S. Ct. 2699 (2015) ................................................................................... 13, 14

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
   463 U.S. 29 (1983) ......................................................................... 9, 11, 13, 14

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*,
   851 F.2d 1424 (D.C. Cir. 1988) .......................................................................... 28

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
   545 U.S. 967 (2005) ............................................................................................ 25

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ..................................................................... 271

*New York v. Reilly*,
   969 F.2d 1147 (D.C. Cir. 1992) ..................................................................... 12, 13

*Noel v. Chapman*,
   508 F.2d 1023 (2d Cir. 1975) .............................................................................. 28

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

iv

*Org. Village of Kake v. U.S. Department of Agriculture*,
   795 F.3d 956 (9th Cir. 2015) .................................................... 20

*Pac. Gas & Elec. Co. v. FPC*,
   506 F.2d 33 (D.C. Cir. 1974) ................................................... 27

*Perez v. Mortg. Bankers Ass'n*,
   135 S. Ct. 1199 (2015) ...................................................... 26, 27

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
   525 U.S. 471 (1999) ................................................... 2, 3, 8, 28

*Ricci v. DeStefano*,
   557 U.S. 557 (2009) .......................................................... 19

*Romeiro De Silva v. Smith*,
   773 F.2d 1021 (9th Cir. 1985) ................................................ 31

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
   804 F. Supp. 2d 1045 (E.D. Cal. 2011) .................................... 32, 33

*Schroll v. Plunkett*,
   760 F. Supp. 1378 (D. Or. 1990) ............................................. 33

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) ........................................................... 22

*Sec'y of Agriculture v. Cent. Roig Ref. Co.*,
   338 U.S. 604 (1950) .......................................................... 12

*Senate of Cal. v. Mosbacher*,
   968 F.2d 974 (9th Cir. 1992) ................................................. 34

*Seto v. Thielen*,
   No. CIV. 10-00351, 2010 WL 2612603 (D. Haw. June 28, 2010) ................... 32

*Sierra Club v. Jackson*,
   833 F. Supp. 2d 11 (D.D.C. 2012) ............................................ 20

*Silva v. Smith*,
   773 F.2d 1021 (9th Cir. 1985) ................................................ 31

*Syracuse Peace Council v. FCC*,
   867 F.2d 654 (D.C. Cir. 1989) ................................................ 17

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

*Taiebat v. Scialabba*,
   No. 17-cv-0805, 2017 WL 747460 (N.D. Cal. Feb. 27, 2017) ................................ 32

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) ..................................................... *passim*

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017) ........................................................... 36

*Troy Corp. v. Browner*,
   120 F.3d 277 (D.C. Cir. 1997) ..................................................... 9

*U.S. ex rel. Parco v. Morris*,
   426 F. Supp. 976 (E.D. Pa. 1977) ............................................. 31, 32

*U.S. Philips Corp. v. KBC Bank N.V.*,
   590 F.3d 1091 (9th Cir. 2010) ..................................................... 34

*United States v. Texas*,
   136 S. Ct. 2271 (2016) ............................................................. 4

*United States v. Texas*,
   137 S. Ct. 285 (2016) .............................................................. 4

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) ............................................................... 32

*Wayte v. United States*,
   470 U.S. 598 (1985) ............................................................... 30

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................. 7

**Statutes**

5 U.S.C. § 553 ............................................................... 26, 27, 31

5 U.S.C. § 701 .................................................................... 8

5 U.S.C. § 706 .................................................................... 9

8 U.S.C. § 1103 ............................................................... 2, 22

8 U.S.C. § 1154 ................................................................... 2

8 U.S.C. § 1158 ................................................................... 2

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

vi

8 U.S.C. § 1182 ............................................................................................ 2

8 U.S.C. § 1227 ............................................................................................ 2

8 U.S.C. § 1229b .......................................................................................... 2

8 U.S.C. § 1252 ...................................................................................... 8, 28

15 U.S.C. § 1392 (repealed 1994) ............................................................. 14

42 U.S.C. § 7412 ........................................................................................ 13

**Regulations**

8 C.F.R. § 274a.12(c)(14) ...................................................................... 2, 3

**Other Authorities**

Andorra Bruno, et al., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 20-23, Cong. Research Serv. (July 13, 2012)
    https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-Service-Report1.pdf ............................................................................................ 27

Barack Obama, The White House, *Remarks by the President on Immigration* (June 15, 2012), http://go.usa.gov/xnXFY ......................................... 16, 23

Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 PM)
    https://twitter.com/realDonaldTrump/status/905228667336499200) ...................................... 24

Dep't of Justice,
    *Attorney General's Manual on the Administrative Procedure Act* (1947) .............................. 26

Presidential Memoranda, The White House,
    *President Donald J. Trump's Letter to House and Senate Leaders & Immigration Principles and Policies* (Oct. 8, 2017),
    https://www.whitehouse.gov/the-press-office/2017/10/08/president-donald-j-trumps-letter-house-and-senate-leaders-immigration ............................................................................ 24

Press Release, DHS,
    Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
    https://go.usa.gov/xncuM ................................................................... 10, 35

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

vii

**INTRODUCTION**

The Rescission policy challenged here provides for an orderly wind-down of Deferred Action for Childhood Arrivals ("DACA"), an exercise of prosecutorial discretion that, from the start, confers no rights and has been subject to change.  Pursuant to the Rescission, recipients whose DACA status expires before March 5, 2018, have the opportunity to renew that status, and current DACA recipients will maintain their status for the remaining duration of their deferred-action grants.  Plaintiffs in these five related actions nonetheless seek, as "provisional relief," the immediate and wholesale reinstatement of that policy.

This Court should reject that gambit because Plaintiffs cannot meet the exacting standard for preliminary relief.  Plaintiffs are unlikely to succeed on the merits of their Administrative Procedure Act ("APA") claims because those claims are not even justiciable.  But even if they were, the Acting Secretary of Homeland Security adequately explained her decision to wind down DACA:  A legally indistinguishable policy (including an expansion of DACA) had been enjoined on a nationwide basis by a district court in Texas; that injunction was upheld by the United States Court of Appeals for the Fifth Circuit; that decision, in turn, was affirmed by an equally divided Supreme Court; and the same plaintiffs were about to sue over DACA before the same judge in Texas.  Faced with the inevitable prospect of an immediate, nationwide injunction against DACA, the Acting Secretary chose an orderly wind-down.  Due to the near-certainty that DACA otherwise would have been abruptly invalidated, that decision was eminently reasonable, and certainly not arbitrary and capricious.  Plaintiffs also argue that the Rescission was subject to the APA's notice-and-comment requirements, but those requirements are inapplicable to a general statement of policy such as the Rescission, and Plaintiffs' argument is self-defeating in any event because DACA itself likewise was adopted without notice and comment.

Nor can Plaintiffs demonstrate that any of the harms they have identified can be resolved by a *preliminary* injunction entered by this Court months before the March 5, 2018 deadline. Plaintiffs complain about lost professional opportunities, the inability to make long-term plans, and the angst surrounding the Rescission Policy, but none of these harms can be ameliorated by the type of temporary relief—which will last only through the end of this litigation—that Plaintiffs

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

seek. Nor can Plaintiffs demonstrate that the balance of the equities and the public interest weigh in their favor. Finally, the relief that Plaintiffs seek—a wholesale but temporary reinstatement of the DACA policy—is overbroad and improper. The Court should deny Plaintiffs' motion.

## BACKGROUND

### A. Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the Immigration and Nationality Act along with "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396 (citation omitted). Department of Homeland Security officials must first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum or parole, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b. "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely. *Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471, 483 (1999).

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016). Deferred action is a practice by which the Secretary exercises her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period. *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority"). Although originally "developed without express statutory authority," individualized deferred action has been recognized by Congress in

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

certain circumstances inapplicable here, *see, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"), and described by the Supreme Court as an "exercise in administrative discretion," *AADC*, 525 U.S. at 484. Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former INS have adopted more than 20 such policies over the past 50 years.

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, *see, e.g.*, 8 C.F.R. § 274a.12(c)(14), but a grant of deferred action does not confer lawful immigration status or provide any defense to removal. *Cf. Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (discussing difference between "unlawful presence" and "unlawful status"). To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (citation omitted). DHS thus has discretion to revoke deferred action unilaterally, for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time. *See AADC*, 525 U.S. at 484–85.

## B.     DACA and DAPA

On June 15, 2012, then-Secretary Janet Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals. *See* Admin. R. (AR) 1–3 (hereinafter DACA Memo), ECF No. 64-1.[1] DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws. *Id*. at 1 (AR 1). Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to indefinite renewal. *Id.* at 2–3 (AR 2–3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests for this relief would "be decided on a case by case basis," *id.* at 2 (AR 2). Accordingly, the Memo provided that this grant of deferred action "confer[red] no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." *Id.* at 3 (AR 3).

---

[1] Unless otherwise noted, all references to the docket refer to the docket in *Regents of the University of California v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211-WHA.
**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

In 2014, then-Secretary Jeh Johnson expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. *See* AR 37–41 (hereinafter DAPA Memo). DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents." DAPA Memo 3 (AR 39). The DAPA Memo also expanded DACA by relaxing some of the guidelines and extending the DACA renewal period from two to three years. *Id.* at 3–4 (AR 39-40).

### C. The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states, led by Texas, which sought to enjoin its implementation. Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of DAPA and expanded DACA. *Texas v. United States*, 809 F.3d 134, 147–48, (5th Cir. 2015). Like the U.S. District Court for the Southern District of Texas, the Fifth Circuit held that the promulgation of the DAPA Memo was justiciable, in part because it believed that "the INA's intricate regulatory scheme for changing immigration classifications" allowed the court to determine whether DHS had exceeded its statutory authority. *Id.* at 168. It stressed, however, that the *denial* of deferred action and work authorization would be unreviewable. *Id.* Also like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the Administrative Procedure Act's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Id.* at 178 n.156. And going beyond the district court, the Fifth Circuit held that DAPA was "manifestly contrary" to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one legal status to another," DAPA and expanded DACA awarded deferred action "to persons who have never had a legal status and may never receive one." *Id.* at 184, 186 (footnotes omitted).

That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

4

place. On November 18, 2016, the parties jointly moved the district court to stay merits proceedings to allow them to evaluate "how they might choose to move forward" given the upcoming "change in Administration[s]." Joint Mot. to Stay Merits ¶ 2, *Texas v. United States*, No. 1:14-cv-254 (S.D. Tex. Nov. 18, 2016), ECF No. 430.

Faced with continued litigation over a policy that had been enjoined by the courts, DHS rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA. *See* Memorandum for Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Prot., et al., from John F. Kelly, Sec'y of Homeland Sec., *Re: Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents* (June 15, 2017), AR 235-37. Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to also challenge directly the DACA Memo, noting that it suffers from the same legal flaws that the courts had identified in expanded DACA and DAPA. *See* AR 238–40 (Paxton Letter).

### D. Rescission of DACA

Faced with a losing case, Acting Secretary Duke decided on September 5, 2017, to wind down the DACA policy in an orderly fashion. *See* AR 252–56 (Rescission Policy or Policy). As she explained, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy 4 (AR 255). Specifically, she quoted the Attorney General's September 4 recommendation to rescind DACA, which explained that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254). Invoking her "authority in establishing national immigration policies and priorities," she rescinded the DACA Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on an individualized[,] case-by-case basis," *id*. at 2 (AR 253).

At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

- For *current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

5

based on the directives in this memorandum for the remaining duration of their validity periods." *Id.* at 4 (AR 255).

- For *initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date. *Id.*

- For *DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017. Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017." *Id.*

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id.* at 4 (AR 255).

### E.    Plaintiffs' Motion for Provisional Relief

While Plaintiffs have brought a panoply of claims, their motion for provisional relief is limited to two claims brought pursuant to the APA. First, Plaintiffs allege that the Rescission Policy is arbitrary and capricious and therefore violates the APA because it constitutes a change in agency policy without an adequate explanation or basis; second, they allege that the rescission violates the APA because it was issued without notice and comment.[2]

Plaintiffs ask the Court to "direct[] . . . the government to restore the DACA program pending adjudication on the merits," Pls. Br. 37, and to order Defendants to adjudicate newly submitted initial requests for deferred action and employment authorizations, renewal requests for deferred action and employment authorizations, and applications for advance parole "using

---

[2] *See Regents of Univ. of Cal.* Compl. ¶¶ 50-58 (Count 1), 59-66 (Count 2), No. 3:17-cv-05211 ECF No. 1; *State of Cal.* Compl. ¶¶ 146-151 (Count 2), 152-155 (Count 3), No. 3:17-cv-05235 ECF No. 1; *Garcia* Compl. ¶ 175 (Count 4), 177-184 (Count 5), No. 3:17-cv-05380 ECF No. 1; *Cty. of Santa Clara* Compl. ¶ 71 (Count 2), No. 3:17-cv-05813 ECF No. 1; *City of San Jose* Compl. ¶¶ 59-63 (Count 2), No. 3:17-cv-05329 ECF No. 1.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

the same means, methods and policies … as were utilized before the Rescission." Pls.' Proposed Order 3, ECF No. 111-3. Plaintiffs thus request an order compelling the government to continue to consider DACA requests from a broad class of individuals who are not before this Court.

## STANDARD OF REVIEW

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948, pp. 129-30 (2d ed. 1995)). A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). A "possibility" of irreparable harm is insufficient; irreparable harm must be *likely* absent an injunction. *Id.*; *see also Winter*, 555 U.S. at 22 (rejecting the Ninth Circuit's earlier rule that the "possibility" of irreparable harm, as opposed to its likelihood, was sufficient in some circumstances to justify a preliminary injunction). The Ninth Circuit has determined that its alternative "sliding scale" test is still valid after *Winter*, but even that approach still requires "'*serious* questions going to the merits' and a balance of hardships that tips *sharply* toward the plaintiff [in order to] support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011). Plaintiffs bear the burden of demonstrating that each of these four factors is met. *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

**ARGUMENT**

**PLAINTIFFS FAIL TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR APA CLAIMS**

**Plaintiffs' APA Claims Are Not Justiciable**

As a threshold matter, Plaintiffs cannot succeed on the merits because, as set forth in Defendants' pending Motion to Dismiss, Plaintiffs' APA claims are not justiciable.  *See* Defs.' Mot. to Dismiss 14-19, ECF No. 114.  The APA bars judicial review of certain categories of decisions that "courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting 5 U.S.C. § 701(a)(2)).  Quintessential among the types of decisions committed to executive discretion are "an agency's exercise of enforcement power," *Heckler v. Chaney*, 470 U.S. 821, 833 (1985), regardless whether that exercise of discretion results in a decision to prosecute or enforce, or to refrain from doing so, *id.* at 831.  This bar applies even when "the agency gives a 'reviewable' reason for otherwise unreviewable action." *ICC v. Bhd. Of Locomotive Eng'rs (BLE)*, 482 U.S. 270, 283 (1987).  This is particularly true in the context of immigration, in which executive decisions implicate distinct foreign-policy and separation-of-powers concerns, and discretion is, accordingly, very broad.  *AADC*, 525 U.S. at 489-90; *Arizona*, 567 U.S. at 396-97.  The Rescission Policy is a classic example of a discretionary enforcement determination entrusted to the agency alone.  Indeed, any attempt to judge the Policy would entangle this Court in the sort of complex and discretionary balancing that has been entrusted by Congress to the Executive Branch.  The decision to rescind DACA is thus unreviewable.  *See* 5 U.S.C. § 701(a)(2).

The INA also deprives federal district courts of jurisdiction over challenges to denials of deferred action, *see* 8 U.S.C. § 1252(g).  This provision, which Congress enacted to prohibit "attempts to impose judicial constraints upon prosecutorial discretion," *AADC*, 525 U.S. at 485 & n.9, "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all,

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

8

they at least will not be made the bases for separate rounds of judicial intervention outside" an individual removal proceeding. *Id.* at 485. Denials of deferred action—including under DACA itself—thus fall outside the jurisdiction of the federal district courts. This is reason enough to deny Plaintiffs' request for provisional relief.

### I. The Acting Secretary Rationally Explained Her Decision to Rescind DACA, Particularly Given the Imminent Likelihood of a Nationwide Injunction Based On Controlling Circuit Precedent

Even were the decision to rescind DACA subject to judicial review, Plaintiffs cannot succeed in showing that decision to be arbitrary and capricious. It is axiomatic that agencies are free to change course on policy matters so long as they provide a rational explanation and the new policy is legally permissible. Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this deferential standard, particularly in view of the virtual certainty of a nationwide injunction based on controlling circuit precedent, which would have prompted an immediate—and chaotic—end to the policy.

Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A)–(B). The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Agency action is arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency." *Id*.

The Rescission Policy amply meets these "minimal standards of rationality," *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted), particularly in view of the near-certain litigation loss in the impending *Texas* lawsuit. In the Policy, the Acting Secretary

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

9

explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy 4 (AR 255). Specifically, after summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's view that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted). The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into immediate uncertainty.

The Acting Secretary was thus "faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately." Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017) (hereinafter Duke Statement), https://go.usa.gov/xncuM. She reasonably opted for an orderly rescission, which she considered "the least disruptive option." *Id.*

That decision was eminently reasonable. There is nothing at all irrational about the choice or the explanation. Plaintiffs' arguments to the contrary are wrong at each turn.

**A.** Plaintiffs principally claim that the Rescission Policy fails to provide "any clear explanation why" DACA was rescinded, leaving them merely "to guess" at the Acting Secretary's reasoning. Pls.' Br. 17. That argument blinks reality. Even if the agency were not free to revoke deferred action at any time for any reason—or, indeed, for no reason, *see, e.g.*, *Arpaio*, 797 F.3d at 17; DAPA Memo 2 (AR 38)—no guesswork is required to understand the agency's reasoning here: As the balance of their brief demonstrates, Plaintiffs clearly comprehend the basis for the Acting Secretary's decision. For example, while Plaintiffs purport to be "perplex[ed]" by the Acting Secretary's reference to the litigation risk posed by the *Texas* case, Pls.' Br. 17, they understood this rationale well enough to devote a separate section of their brief to addressing it,

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

10

*id.* at 27–29 (arguing that "Purported 'Litigation Risk' Cannot Justify the Rescission").[3] Likewise, while they claim to be confused by the Attorney General's views on DACA's legality, which they deem too "conclusory," *id.* at 17, this issue is also directly addressed in a separate section of their brief, *id.* at 23–25 (arguing that "DACA is … lawful").

At bottom, then, Plaintiffs' argument reduces to a claim that the Rescission Policy was just too short. *See, e.g.*, *id.* at 17 (complaining that the "four-page Rescission memorandum" has a "two-and-a-half-page Background section"). But under the APA, whether an agency's decision is sustainable turns not on its length, but its rationality. Here, there is no reason to adopt Plaintiffs' myopic focus on the "66-word paragraph" setting forth the Acting Secretary's conclusion, *id.*, while ignoring the rest of the document, which lays the foundation for that conclusion and elaborates on the reasoning behind it. *See* Rescission Policy 1 (AR 252) (noting, in the introduction, that DACA will be rescinded "[f]or the reasons … outlined below"); *id.* at 2-3 (AR 253–54) (explaining, as background, that DAPA and expanded DACA were "substantially similar" to DACA, that the Fifth Circuit had invalidated the DAPA Memo, and that the Attorney General had concluded that "it is likely that potentially imminent litigation would yield similar results with respect to DACA"). Indeed, Plaintiffs' suggestion that length should be determinative calls into question the rationality of the original DACA Memo itself, which of course spanned only three pages. *See* DACA Memo 1–3 (AR 1–3).

The Court "must uphold an agency action—even if it is made with 'less than ideal clarity'—as long as 'the agency's path may reasonably be discerned' from the record." *Managed Pharm. Care v. Sebelius*, 716 F.3d 1235, 1250 (9th Cir. 2013) (quoting *State Farm*, 463 U.S. at 43); *Shepard v. NLRB*, 459 U.S. 344, 348, 350-51 (1983); *see also, e.g.*, *All. for the Wild Rockies v. Ashe*, 687 F. App'x 657, 659 (9th Cir. 2017) (accepting a "somewhat conclusory" explanation

---

[3] Plaintiffs' assertion that the "Supreme Court's purported 'ruling' … in the *Texas* DAPA case … was no 'ruling' at all," Pls.' Br. 17, is mistaken. The affirmance by an equally divided Supreme Court meant that: (1) the Fifth Circuit's decision invalidating DAPA and expanded DACA would have been controlling precedent in the lower courts in the impending lawsuit challenging DACA; and (2) four Justices agreed with the Fifth Circuit's decision, such that the only way a different result would occur for DACA in the Supreme Court would have been if one of the four changed their mind or the newly seated Justice disagreed.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

11

where "the agencies' 'path may reasonably be discerned' from other evidence in the record") (citation omitted). Here, the Acting Secretary's decision is clear, and her path is plain. Plaintiffs' suggestion to the contrary is unconvincing.

**B.** Plaintiffs next contend that, in adopting the Rescission Policy, the Acting Secretary "failed to consider all relevant factors"—namely, the asserted economic effects of rescission and its consequences for DACA recipients. Pls.' Br. 18–20. For starters, this argument fails to reckon with the reality—referenced in the Acting Secretary's memo—that continued litigation would, in all likelihood, have led to an abrupt, complete, and court-ordered end to DACA, plunging its nearly 800,000 recipients into uncertainty. The APA did not require the Acting Secretary to consider factors that were inevitable or ponder how to prevent the unavoidable. *See State Farm*, 463 U.S. at 43 (noting that an agency must simply "examine the relevant data and articulate a satisfactory explanation for its action").

Indeed, the Acting Secretary's decision instead to opt for an orderly wind-down of the policy thus likely ameliorated, rather than exacerbated, the effects about which Plaintiffs complain, as she was fully aware.

The Rescission Policy itself recognizes that, while DACA recipients were "eligibl[e] to request employment authorization" documents, enabling them to work lawfully in the United States, Rescission Policy 2 (AR 253), that eligibility would sunset along with the DACA policy, *id*. at 4 (AR 255), necessarily leading to changes in the workforce over the following two and a half years. Likewise, recognizing that DACA recipients would no longer be considered lawfully present once their deferred action expired, the Acting Secretary explained that she was "very aware of the consequences of this action, and . . . sympathize[d] with the DACA recipients whose futures may now be less certain." Duke Statement. It was such considerations—*i.e.*, the "complexities associated with winding down the program," Rescission Policy 4 (AR 255)—that influenced her to allow DACA to sunset over a number of years, rather than abruptly end the policy herself or under court order. That these factors did not upend her ultimate decision to rescind the policy, however, is no reason to set that decision aside, because clinging to DACA in the face of the *Texas* litigation would have been quixotic rather than rational.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

Even where a statute sets forth specific factors for an agency to consider, if Congress "did not assign the specific weight the [agency] should accord each of these factors, [the agency] is free to exercise [its] discretion in this area." *New York v. Reilly*, 969 F.2d 1147, 1150 (D.C. Cir. 1992) (citation omitted); *Brady v. FERC*, 416 F.3d 1, 6 (D.C. Cir. 2005); *see also Sec'y of Agriculture v. Cent. Roig Ref. Co.*, 338 U.S. 604, 611–12 (1950) (where statutorily mandated "consideration[s]" are not "mechanical or self-defining standards," they indicate Congress's recognition that they involve "wide areas of judgment and therefore of discretion"). Here, of course, no statute dictates the factors for an agency to consider in granting or rescinding deferred action; on the contrary, deferred action is an exercise of prosecutorial discretion in the government's interests committed to agency discretion, precisely because (among other things) it "involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Chaney*, 470 U.S. at 831. Indeed, the original DACA memorandum providing for the granting of deferred action expressly provided that it conferred no substantive rights. Thus, Congress has not instructed the agency to give the considerations urged by Plaintiffs any particular weight—or, indeed, any weight at all. That they did not receive conclusive weight in the final calculus, as Plaintiffs demand, is therefore no reason to disturb the Acting Secretary's decision, especially given their futility in this context. *See, e.g.*, *Reilly*, 969 F.2d at 1150.

Plaintiffs' passing suggestion that the agency was required to conduct some sort of formal cost-benefit analysis before rescinding DACA, *see* Pls.' Br. 18–19, is even farther off the mark. They cite *Michigan v. EPA* for the proposition that "ignoring cost, even where the relevant statutes 'leave[] agencies with flexibility,' constitutes arbitrary and capricious action." Pls.' Br. 19 (quoting *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015)). But in that case, the statute itself required consideration of costs: Congress directed the EPA to regulate power plant emissions "if [it] finds such regulation is appropriate and necessary," 42 U.S.C. § 7412(n)(1)(A)—a phrase that the Court viewed as "an instruction to [the] … agency" to pay "at least some attention to cost[s]," *Michigan*, 135 S. Ct. at 2707–08. Here, by contrast, there is no such statutory directive, and thus no compulsion to transform a straightforward legal policy decision concerning enforcement of the immigration laws against unlawfully present aliens into an accounting exercise or a macro-

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

13

economic assessment. The agency did not perform a formal cost-benefit analysis when it adopted DACA, *see* DACA Memo 1–3 (AR 1–3), and one was not required by its rescission.[4]

**C.** Plaintiffs argue that the Acting Secretary failed to provide an "adequate explanation" for a "reversal on policy." Pls.' Br. 20. Specifically, they assert that when an agency "reverses its own earlier policy, it has an *even greater burden* to justify its actions." *Id*. (emphasis added). That is not the law, as the Supreme Court squarely held in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

In *Fox*, the Court considered the adequacy of the FCC's explanation for a policy change barring the broadcasting of isolated expletives, which had previously been tolerated so long as they were not repeated. *Id*. at 505. The Second Circuit had set aside the policy change under the APA, reasoning that "agency action that changes prior policy" "requir[es] a more substantial explanation" than when an agency acts in the first instance. *Id*. at 514. The Supreme Court reversed, finding "no basis in the [APA] or in our opinions for a requirement that all agency change be subject to more searching review" or some sort of "heightened standard." *Id*. On the contrary, the Court explained, when an agency changes course it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id*. at 515. Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id*.

Here, the Acting Secretary adequately explained her rescission of the 2012 DACA Memorandum. Plaintiffs do not dispute that the Rescission Policy "is permissible" under the INA. *Id*. The Acting Secretary fully explained that there are "good reasons" for the Rescission

---

[4] Plaintiffs likewise misread *State Farm*, which, contrary to their assertion, does not require an analysis of "the costs as well as the benefits" of agency action irrespective of the statutory text. Pls.' Br. 18 (quoting *State Farm*, 463 U.S. at 52). Indeed, if that were true, there would have been no need for the Court in *Michigan* to parse the text of the Clean Air Act for such a directive. *Cf. Michigan*, 135 S. Ct. at 2707–08. Rather, in *State Farm*, much as in *Michigan*, the statute directed the agency to issue motor vehicle safety standards that were "reasonable, practicable, and appropriate," *State Farm*, 463 U.S. at 33 (quoting 15 U.S.C. § 1392(f)(3) (repealed 1994); accordingly, the agency "look[ed] at the costs as well as the benefits" of the regulation, and the Court said merely that "[t]he agency [wa]s correct to" do so, *id*. at 54.

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

Policy, *id.*, particularly given the substantial doubts about legality and litigation risk posed by the proceedings in *Texas* and the consequent potential for massive disruption were the policy immediately enjoined. And there was of course a "conscious change of course," *id.*, because the Acting Secretary acknowledged the agency's departure from the 2012 Memo. *See supra* at § I. The APA requires no more.

To be sure, an agency must "sometimes" provide a "more detailed justification than what would suffice for a new policy created on a blank slate"—"when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Fox*, 556 U.S. at 515 (citation omitted). But this is not such a case. The purported "findings" that Plaintiffs pluck from the DACA Memo—*e.g.*, that "Our Nation's immigrations laws must be enforced in a strong and sensible manner," Pls.' Br. 21 (quoting AR 2)—are not "factual findings" at all, *Fox*, 556 U.S. at 515, but policy pronouncements. Moreover, the Acting Secretary's justification for the policy change was that *controlling legal precedent* had changed: after DACA was enacted, DAPA *and* expanded DACA were invalidated by the Fifth Circuit in a decision that was affirmed by an equally divided Supreme Court and that necessarily applied to DACA itself. *See infra* § I.D. It is difficult to think of a more compelling basis for a change in agency position.

This case thus bears no resemblance to *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016), the only case Plaintiffs cite where an agency's explanation for a policy change was found insufficient in view of the reliance interests at stake. In *Encino*, the Department of Labor had since 1978 interpreted the Fair Labor Standards Act not to require car dealerships to pay overtime to a category of employees known as "service advisors." *Id.* at 2122–24. The agency reversed course in 2011, more than 30 years down the line, but "gave almost no reasons at all" for the shift. *Id.* at 2127. The Court declined to give *Chevron* deference to the agency's new interpretation, finding its explanation lacking in view of the "significant reliance interests involved." *Id.* at 2126. In particular, over "decades of industry reliance" on the prior policy, the dealerships and their employees had "negotiated and structured their compensation plans against

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

15

th[e] background understanding" that overtime pay was not required—plans that the new policy effectively upended. *Id.*

*Encino* is inapposite in every material respect. To begin, no similarly "longstanding" reliance interests are present here. *Id.* In contrast to *Encino*, where the abandoned policy had a 30-year pedigree, DACA was of recent vintage. Moreover, by its own terms, DACA made deferred action available for only two-year periods, which could "be terminated at any time at the agency's discretion." DAPA Memo 2 (AR 38). And when he announced DACA in 2012, former President Barack Obama explained that it was a "not a permanent fix" but a "temporary stopgap measure," and urged Congress to act "because these kids deserve to plan their lives in more than two-year increments." *Remarks by President Obama on Immigration* (June 15, 2012), https://go.usa.gov/xnZFY. A prosecutorial discretion policy that can be revoked in the agency's discretion, at any time, for any reason, cannot create legally cognizable reliance interests. *See* ECF No. 114, Defs.' Mot. to Dismiss, at II.D, E, & G (explaining why Plaintiffs fail to state a due process claim and cannot assert equitable estoppel against the government). And more fundamentally, as discussed, the Acting Secretary here did not make a voluntary policy change heedless of any reliance interests, but rather was impelled to act by the near-certain invalidation of DACA by the courts, such that her orderly wind-down process reasonably took into account any reliance interests given the circumstances.

**D.** Plaintiffs contend that the Rescission Policy should be set aside because it "appears to rely on [the] false legal premise," set forth in "the Attorney General's letter," "that DACA was illegal." Pls.' Br. 22 (capitalization omitted). This argument is mistaken for several independent reasons, as Defendants have explained. *See* Defs.' Mot. Dism. at 24-28.

To begin, the Acting Secretary did not rely on the Attorney General's letter solely for its assessment of DACA's legality, but instead concluded that DACA "should" be wound down after considering, among other things, his assessment that it was "likely" that a legal challenge to the DACA Memo "would yield similar results" as the successful challenge to the DAPA Memo in light of the resulting Fifth Circuit precedent. Rescission Policy 3 (AR 254). That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis to

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

sustain the Acting Secretary's decision.  *See* Defs.' Mot. Dism. at 26-27.  In particular, the Fifth

Circuit affirmed the invalidation of not just DAPA, but extended DACA; and the differences

between extended DACA and original DACA—the length of the deferred-action period and

modified age and durational requirements—are indisputably immaterial to the Fifth Circuit's legal

rationale.  *See id.* at 27-28.

Moreover, to the extent the Acting Secretary did rely on the proposition that DACA was

unlawful, this Court need not agree with that determination to uphold her decision.  If an agency's

legal analysis and policy judgment overlap, courts should presume an independent policy

judgment, even if the two determinations are arguably "intertwined."  *See Syracuse Peace

Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (if "even in the absence of constitutional

problems the [agency] would have reached the same outcome," "we must end our inquiry without

reaching that issue").  Here, the Attorney General regarded DACA as unconstitutional in part

because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress

had repeatedly rejected.  Rescission Policy 3 (AR 254).  But those same concerns equally support

a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an

individualized case-by-case basis" rather than used as a tool "to confer certain benefits to illegal

aliens that Congress had not otherwise acted to provide by law."  *Id.* at 2 (AR 253).  This Court

could, therefore, sustain her decision based on a reasonable policy judgment that immigration

decisions of this magnitude should be left to Congress.  *See* Defs.' Mot. Dism. at 26-27.

In any event, while this Court need not decide the issue to resolve this case in favor of the

government on the basis that the agency decision was at least rational, the Attorney General's

view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas.*

Plaintiffs spill much ink attempting to show that "DACA was a lawful exercise of well-established

enforcement discretion," Pls.' Br. 23, repeating many of the arguments that the government

pressed in the *Texas* case, *see id.* at 23–25.  But for better or worse, those arguments were

decisively rejected by the Fifth Circuit, whose decision was affirmed by an equally divided

Supreme Court.  Thus, while Plaintiffs emphasize that, on its face, the DACA policy instructs

DHS officials "to exercise their discretion . . . only 'on an individual' and 'case by case' basis,"

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

Pls.' Br. 23–24, the Fifth Circuit found that discretion to be illusory in practice, *Texas*, 809 F.3d at 172–73.

Plaintiffs offer a hodgepodge of reasons why the Court should disagree with the Fifth Circuit's decision in *Texas*, encouraging the Court to undertake an independent assessment of DACA's legality. Pls.' Br. 25–27. None is persuasive.

First, although *Texas* invalidated the DAPA Memo, "not . . . the original DACA policy," *id*. at 25 (citation omitted), it did so based on the "important similarities" between the policies, 809 F.3d at 174, including through use of "evidence from *DACA's* implementation" about its "discretionary language," *id*. at 173 (emphasis added). Though that finding had to be "extrapolat[ed]" to invalidate DAPA, *id*., it directly dooms DACA itself. At a minimum, the writing was on the wall, which is evident to any reader of the *Texas* opinions and the relevant DHS memos. Indeed, the *Texas* injunction also applied to the DAPA memo's provisions expanding DACA. Plaintiffs have not pointed to any material legal distinction between the two policies—because no such legal distinction exists, as discussed above.

Second, although this Court may not be bound by the Fifth Circuit's opinion in *Texas*, *see* Pls.' Br. 25, that is beside the point: DHS was so bound, because it faced further litigation—in the same case, before the same judge, bound by the same circuit precedent—over a materially indistinguishable policy that was thus almost certain to be invalidated.

Third, Plaintiffs argue that the government's briefs in *Texas* and elsewhere are "more persuasive" than the *Texas* decision itself. Pls.' Br. 25. That, too, is beside the point: Those arguments were firmly rejected by a Fifth Circuit opinion that was affirmed by an equally divided Supreme Court, and the government, having exhausted its appeal options, was bound to respect that decision given the absence of any plausible prospect of a different result in the impending litigation. The same is true of the OLC's "preliminary view" that the proposed version of DACA would be lawful. *Id*. That "preliminary" conclusion was conditioned on the proviso that "it was critical that … the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis." OLC Op. 18 n.8 (AR 21). Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice. *Texas*, 809 F.3d at 176.

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

18

Fourth, Plaintiffs claim that "*Texas* is distinguishable" because, while "[t]he Fifth Circuit found that DAPA was not actually discretionary," the "same cannot be said for DACA." Pls.' Br. 26. But that is *exactly* what the Fifth Circuit said about DACA: "Like the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *Texas*, 809 F.3d at 171–72; nevertheless, "there was evidence from DACA's implementation that [this] discretionary language was pretextual," *id.* at 173.

Fifth, Plaintiffs argue that the Fifth Circuit "invalid[ly]" concluded that the low denial rate for DACA requests meant that any discretion afforded to DHS officials was illusory. Pls.' Br. 26. In particular, they point to a declaration submitted by the agency in *Texas* asserting that DACA was, in fact, a "case-specific process" under which there were "several instances of discretionary denials." *Id.* at 27 (quoting *Texas*, 809 F.3d at 175) (citing Decl. of Donald Neufeld). Once again, this is an argument that the government pressed, but the Fifth Circuit rejected: After quoting the same assertions, the court concluded that "those denials were not discretionary" at all, "but instead were required because of failures to meet DACA's objective criteria." *Texas*, 809 F.3d at 175 n.140; *see also id.* at 172 n.130.

Changing gears, Plaintiffs contend that "purported 'litigation risk' cannot justify the rescission" because it is a "post hoc explanation" that, in any event, "is not a sufficient reason for the federal government to do anything." Pls.' Br. 27–28 (capitalization omitted). They are wrong on both counts.

To begin, the notion that "litigation risk" is nothing but an after-the-fact rationalization for the Rescission Policy is squarely refuted by the record. The Policy itself discusses the adverse rulings from the Fifth Circuit and Supreme Court with respect to DAPA; the similarities between DAPA and DACA; Texas's threat to amend its complaint to challenge DACA; the Attorney General's view that "it is likely that potentially imminent litigation would yield similar results with respect to DACA," and the Acting Secretary's decision after considering all this that she "should" (*not* "must") wind-down DACA. Rescission Policy 3–4 (AR 254–55) (citation omitted). Likewise, her contemporaneous statement noted that her decision was prompted by "recent

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

19

litigation" that threatened to "allow the judiciary to potentially shut the program down completely and immediately." Duke Statement. Plaintiffs' suggestion otherwise is specious.

Plaintiffs' contention that it is irrational for litigation risk to inform an agency's decisionmaking is equally mistaken. The Supreme Court's decision in *Ricci v. DeStefano*, 557 U.S. 557 (2009), provides a useful comparison. There, a city government had to decide whether to certify the results of a promotional exam for firefighters that had a disparate impact on minority applicants. *Id.* at 562. The city faced potential litigation either way: If it certified the results, minority applicants threatened to bring a disparate *impact* lawsuit under Title VII; if it refused, applicants who would have been promoted threatened to bring a disparate *treatment* lawsuit. *Id.* at 562–63. Reconciling these competing obligations, the Court held that the city could rescind the test results—and thereby engage in "intentional discrimination"—so long as it had a "strong basis in evidence to believe it will be subject to disparate-impact liability if it fails" to do so. *Id.* at 585.

If it is permissible to make race-conscious employment decisions based on serious litigation risk, then surely it is not irrational for an agency to consider litigation risk when making discretionary policy decisions, let alone a decision to wind-down a non-enforcement policy that conferred no rights on anyone. And here, there was far more than a "strong basis" for the Acting Secretary to believe that continuing to administer DACA would subject the agency to liability, particularly given the adverse precedent in the Fifth Circuit that was directly on point.

The cases that Plaintiffs cite are not to the contrary: None deals with circumstances comparable to those presented here, where the agency explained that binding precedent effectively made the outcome of further litigation in the same court preordained. In *Sierra Club v. Jackson*, 833 F. Supp. 2d 11 (D.D.C. 2012) (cited at Pls.' Br. 28), for example, the court rejected the agency's reliance on "litigation risk" because the decision on review made "no mention" of that rationale, and the administrative record "belie[d] EPA's purported concern" on that score. *Id.* at 34. In *International Union, United Mine Workers of America v. U.S. Department of Labor*, 358 F.3d 40 (D.C. Cir. 2004), the court recognized that an adverse out-of-circuit precedent was "indeed a caution" for the agency, but found the agency's explanation insufficient because it

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

20

referred only to the "possible adverse effect" of the decision without "explain[ing] why it came to deem the . . . decision fatal" to its policy. *Id*. at 44.[5] And in *Organized Village of Kake v. U.S. Department of Agriculture*, 795 F.3d 956 (9th Cir. 2015) (en banc), the court dismissed as "implausible" the agency's explanation that the challenged rule—which exempted one national forest from certain construction and logging restrictions—would "reduce[] the potential for conflicts" *in other lawsuits*, given that those "lawsuits involved forests other than the Tongass, so it is impossible to discern how an exemption for the Alaska forest would affect them." *Id*. at 969–70. This case did not, as Plaintiffs claim, hold that an "agency's desire to avoid litigation did not satisfy its obligation to provide a reasoned explanation for its change in policy," Pls.' Br. 28, and their reliance on that case is entirely misplaced.

This case also presents no threat of an "end-run around the APA." Pls.' Br. 28. Unlike in *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015), here the agency has not attempted to "circumvent the rulemaking process"—which was not required in any event— "through litigation concessions." *Id*. at 557. On the contrary, the agency vigorously litigated a materially indistinguishable policy all the way up to the Supreme Court. Having lost that battle, however, the agency reasonably recognized that a challenge to DACA would in all likelihood meet the same fate. Far from end-running the APA, the Acting Secretary has declined to frontally assault the courts. That is commendable, not irrational.

**E.**     As a last gasp, Plaintiffs suggest that the Rescission Policy should be set aside because the rationale supporting it was "pretextual." Pls.' Br. 29. They contend that the agency's supposedly "shifting" or "conflicting" explanations for the Policy reveal the "true reason" for its adoption: to encourage Congress to enact legislation addressing this and other immigration issues. *Id*. at 29–30. This theory is flawed from start to finish.

1. To begin, Plaintiffs' attempts to rely on material outside the administrative record as evidence of pretext should be rejected. As the Supreme Court has repeatedly explained, when there is a "contemporaneous explanation" for an agency's decision, its validity "must … stand or

---

[5] *California ex rel. Lockyer v. U.S. Dep't of Agriculture*, 459 F. Supp. 2d 874, 904 (N.D. Cal. 2006) (cited at Pls.' Br. 28), cites *International Union* in passing, but offers no relevant analysis.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

21

fall on the propriety of that finding." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). "The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court," *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citation omitted), "not some new record made initially in the reviewing court." *Camp*, 411 U.S. at 142. Plaintiffs cannot rely on material outside the administrative record to argue that an agency acted arbitrarily and capriciously any more than an agency can rely on post-hoc rationalizations to defend the rationality of its actions, *see SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). Because Plaintiffs' request for provisional relief is premised solely on their APA claims, their attempt to rely on deposition transcripts and other extra-record material should be rejected.

2. Critically, Plaintiffs identify no actual shift in the Acting Secretary's stated justification for the Rescission Policy. None of the supposedly "shifting" statements are from the Acting Secretary herself—the only official vested with authority under the INA to make the decision at issue. 8 U.S.C. § 1103(a)(1). Plaintiffs have therefore failed to show that the Acting Secretary's reasons for adopting the Rescission Policy are pretextual.

Plaintiffs submit that the Acting Secretary could not have been concerned about DACA's legality because, rather than end DACA immediately, she allowed it to gradually sunset. Pls.' Br. 29–30. But, as explained above, the orderly wind-down of DACA is an appropriate response to the litigation risk facing the government as well as the reliance interests at stake (and the agency's own operational needs). In any event, it is difficult to see how this argument helps Plaintiffs: If the Court were to deem the wind-down itself illegal, the solution would not be to extend DACA indefinitely, but to end it immediately. And in any event, Plaintiffs point to no legal authority for the proposition that either the Constitution or the APA forbid an orderly wind-down of a program in the face of concerns about its legality.

Plaintiffs similarly claim to see inconsistency between the Acting Secretary's reliance on litigation risk and Defendants' argument that the decision is not reviewable under the APA because, "if defendants really believed that the *Texas* decision presented an unmanageable litigation risk, they also must believe that the *Texas* decision correctly held that a program like

1    DACA is reviewable and that the notice-and-comment requirement applies." Pls.' Br. 30. This

2    is nonsensical. The Fifth Circuit's decision in *Texas* was upheld by an equally divided Supreme

3    Court, and the Acting Secretary therefore agreed with the Attorney General's conclusion that the

4    impending challenge to DACA *in the same case* would likely prove successful—a decision which

5    is eminently rational whether or not she personally agreed with the Fifth Circuit's justiciability

6    determination. Notably, neither the Acting Secretary's memo nor the Attorney General's letter

7    expressly relied upon or gave any indication that they agreed with the Fifth Circuit's *justiciability*

8    rulings, as opposed to its merits rulings. There is no inconsistency here.

9    Finally, because there is no basis, let alone a strong one, to conclude that the Acting

10   Secretary did not actually believe and rest on her reasonable concerns about DACA's legality, it

11   would be entirely permissible even if plaintiffs were correct that she had the *additional* motive of

12   wishing to encourage Congress to enact legislation addressing the legal status of DACA

13   recipients, Pls.' Br. 30. While Plaintiffs describe this "administrat[ive] legislative strategy" as a

14   "cynical ploy," *id*., it is in fact a legitimate policy goal that has been shared across

15   administrations. When the President announced DACA in 2012, he said, "Precisely because this

16   is temporary, Congress needs to act," and he called on it "to pass the DREAM Act." Barack

17   Obama, The White House, *Remarks by the President on Immigration*, *supra* at § I.C. When the

18   former Secretary expanded DACA in 2014, he noted that the policy created no "immigration

19   status or pathway to citizenship. Only an Act of Congress can confer these rights." DAPA Memo

20   5 (AR 41). Thus, the Acting Secretary was in good company when, in announcing the Rescission

21   Policy, she "urge[d] Congress to use its Constitutional authority to … find a legislative

22   solution." Duke Statement. The Acting Secretary's desire for a "legislative solution" mirrors

23   President Trump's goal that Congress "legalize DACA" and adopt "legislation addressing the

24   status of [DACA] recipients." *See* Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017,

25   5:38 PM), https://twitter.com/realDonaldTrump/status/905228667336499200; Presidential

26   Memoranda, The White House, *President Donald J. Trump's Letter to House and Senate Leaders*

27   *& Immigration Principles and Policies* (Oct. 8, 2017), https://www.whitehouse.gov/the-press-

28   office/2017/10/08/president-donald-j-trumps-letter-house-and-senate-leaders-immigration.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

23

There is nothing at all inappropriate about those suggestions, nor are they inconsistent with the Rescission Memo itself, which plainly rests on the conclusion that any policy of deferred action on the scale of DACA should be enacted by Congress.

3. Plaintiffs' reliance on statements by officials other than the Acting Secretary is even further afield. That other officials might have supported the Rescission Policy for different reasons does not indicate that the reasons given by the actual decisionmaker—the Acting Secretary—were pretextual.

Moreover, even if statements of officials other than the decisionmaker were relevant, none plausibly gives rise to a cognizable inference of pretext here. Plaintiffs suggest, for example, that the Acting Secretary's assessment of litigation risk with respect to DACA was a pretense because, at one deposition, when asked whether there is "any [DHS] policy on how to deal with threats to sue by state or local officials," one of her advisors responded: "[T]hat sounds like the craziest policy you could ever have" because "[y]ou could never do anything if you were always worried about being sued."[6] App'x in Supp. of Pls.' Mot. for Prov. Relief (Pls.' App'x) 1929, ECF Nos. 113, 117–19, 121, 124 (Hamilton Dep.) (cited at Pls.' Br. 30). But Plaintiffs rip that statement out of context: read in conjunction with the broader discussion, it is clear that the deponent was responding to the question whether DHS has a *general* policy of considering "litigation risk" in the context of *each* agency decision—something the agency has never claimed and that might make little sense. Regardless, whatever the merits of such a policy as a general matter might be (or whether the agency has any such policy), that says nothing about how DHS might choose to address litigation risk in a *particular* case, especially where, as here, there was controlling adverse precedent and the consequent potential for massive disruption flowing from an abrupt (and highly likely) court-ordered termination. Plaintiffs' reliance on this isolated, off-hand comment as supposed "evidence" of pretext is misplaced.

Plaintiffs next cast aspersions on the President's tweet indicating that, if Congress "can't" pass a legislative fix for DACA recipients, he "will revisit the issue!" Donald J. Trump

---

[6] Although Plaintiffs refer to this official as the "author" of the Rescission Memo, Pls.' Br. 3, this only further confirms their failure to understand administrative law. Mr. Hamilton is no more the "author" of the Acting Secretary's memo than is a law clerk author of a judicial opinion.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

(@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 p.m), *supra* at 27.  But that comment is fully consistent with the President's clearly stated view that "the program is unlawful and unconstitutional and cannot be successfully defended in court."  *See* Statement from President Trump, Sep. 5, 2017, https://www.whitehouse.gov/the-press-office/2017/09/05/statement-president-donald-j-trump.  Far from undercutting the Acting Secretary's rationale for rescinding the policy, the comment emphasized the need for legislative action and expressed the President's intention to revisit Administration policies on childhood arrivals—not the legality and defensibility of the DACA program—if Congress did not timely act.  That stated intention simply reflects the government's obligation to "consider … the wisdom of its policy on a continuing basis, for example, in response to changed factual circumstances, or a change in administrations." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (internal citation omitted).[7]

4.  More fundamentally, Plaintiffs fall far short of making the "strong showing of bad faith or improper behavior" necessary to overcome the presumption of regularity.  *Overton Park*, 401 U.S. at 420.  To do so, they "must make a significant showing—variously described as a 'strong,' 'substantial,' or 'prima facie' showing … indicative of bad faith."  *Amfac Resorts LLC v. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001).  They cannot meet this burden with "vague" allegations, *Coal. on Sensible Transp. v. Dole*, 826 F.2d 60, 72 (D.C. Cir. 1987), "conclusory statements," *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996), or "inadmissible hearsay," *Commercial Drapery Contractors v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998).  Rather, they must proffer "serious, nonconclusory allegation[s] of bad faith" or "independent evidence of improper conduct."  *Coal. on Sensible Transp.*, 826 F.2d at 72.  Indeed, Plaintiffs "must present 'well-nigh irrefragable proof' of bad faith or bias on the part of

---

[7] Plaintiffs grasp at straws by claiming that the government's briefs support their theory of pretext.  Notwithstanding their insistence that the "motion to dismiss filed by the government in *Batalla Vidal* makes no argument that DACA was effectuated without statutory authority or was an unconstitutional exercise of authority, but relies instead on the 'litigation risk' justification," the government's motions to dismiss on both coasts argue that "the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas* that was affirmed by the Supreme Court."  *See* Defs. Mot. to Dism.§ II.A; Defs.' Mot. to Dismiss, *Batalla Vidal v. Donald J. Trump*, No. 16-cv-4756 (E.D.N.Y. Oct. 27, 2017), ECF 95-1.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

25

governmental officials" to overcome the presumption that the agency discharged its duties in good faith. *Adair v. England*, 183 F. Supp. 2d 31, 60 (D.D.C. 2002) (citations omitted). Plaintiffs fail to meet this high burden, as none of the statements to which they point even arguably demonstrates bad faith. In sum, even if generously interpreted, at most the statements invoked by Plaintiffs show that various officials other than the actual decisionmaker may not have fully agreed with the all the reasons that the Acting Secretary articulated for her decision. That different officials may have different perspectives on these issues may show disagreement, but it is no sign of bad faith, let alone strong evidence of it.

## II.    The Rescission Is a General Statement of Policy Not Subject To Notice-And-Comment Rulemaking Requirements

Plaintiffs also cannot succeed in arguing that DHS was required to "abide by the full panoply of APA procedures including notice and comment," Pls.' Br. 31, before rescinding the DACA policy. The APA generally requires an agency to follow notice-and-comment procedures before promulgating rules. 5 U.S.C. § 553(b), (c); *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). But the APA exempts "general statements of policy" from that requirement unless another statute provides otherwise, 5 U.S.C. § 553(b)(3)(A), and none does here. The Rescission Policy is exempt from the APA's notice-and-comment requirements because it is a general statement of policy regarding how DHS will exercise its enforcement discretion under the INA. In attempting to recast the Rescission as a substantive rule, as opposed to a policy guidance, Plaintiffs fundamentally mischaracterize both the nature of the Rescission and its effect on the availability of deferred action. And in any event, Plaintiffs' argument is foreclosed by controlling Ninth Circuit precedent construing INS deferred-action directives as policy statements exempt from notice and comment.

**1.** General statements of policy "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln*, 508 U.S. at 197 (quoting Dep't of Justice, *Attorney General's Manual on the APA* 30 n.3 (1947)). They "serve a dual purpose": both to "inform[] the public concerning the agency's future plans and priorities for exercising its discretionary power," as well as to "'educate' and provide direction to the agency's personnel in

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

the field, who are required to implement … policies and exercise … discretionary power in specific cases." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987). And a "general statement of policy, like a press release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974).

By contrast, legislative rules adopted through notice-and-comment procedures have the force and effect of law, and thus create legally-enforceable rights or obligations in regulated parties. *Perez*, 135 S. Ct. at 1203; *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979). In other words, an "agency action that … would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). The APA leaves to the agency the choice of which mode to employ. *See* 5 U.S.C. § 553(b). If an agency chooses to issue a statement of policy rather than a legislative rule through notice-and-comment rulemaking, that choice has consequences: The agency's statements in the policy have "no binding effect on members of the public or on courts." 1 Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.3, at 419 (5th ed. 2010).

A quintessential use of policy statements is for an agency to announce how and when it will pursue (or forbear from) enforcement, in the exercise of its discretion. Such enforcement policies explain how the agency intends to exercise a power that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. Unlike legislative rules adopted after notice-and-comment, such enforcement policies do not establish or alter any legally-enforceable rights or obligations of third parties. And such policies can readily be changed, in response to changing circumstances, funding, and priorities.

Applying these principles, the Rescission Policy can only be viewed as a general statement of policy. Indeed, DHS and its predecessor, the INS, have exercised their enforcement discretion through the use of deferred action and similar policies dozens of times over more than half a century, without following notice-and-comment procedures. *See* Andorra Bruno et al., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 20-23, Cong. Research Serv. (July 13,

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

27

2012), https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-Service-Report1.pdf. Plaintiffs provide no meritorious reason for treating the Rescission Policy differently.

The text of the Rescission reinforces the point again and again. It is a "memorandum." Rescission Policy at 1 (AR 252). The Acting Secretary issued it as an "exercise of [her] authority in establishing national immigration policies and priorities." Rescission Policy 4 (AR 255). It instructs DHS personnel on the manner in which they are to exercise the agency's discretionary enforcement authority on a prospective basis. *See Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975) ("[G]eneral statements of policy are rules directed primarily at the staff of an agency describing how it will conduct agency discretionar[y] functions, while other rules [i.e., legislative rules] are directed primarily at the public in an effort to *impose obligations* on them.") (internal citation omitted; emphasis added). The Policy does not act to immediately deprive any current DACA recipients of their deferred-action status, but describes how pending and future requests will be "adjudicate[d]—on an individual, case-by-case basis." Rescission Policy 4 (AR 255). It acknowledges the settled principle, recognized by both Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such "otherwise lawful enforcement … prerogatives," *id.* at 5 (AR 256). It "does not … create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* And no alien has an enforceable right to obtain deferred action under DACA or any other policy regardless. *See* 8 U.S.C. § 1252(g); *AADC*, 525 U.S. at 485. Deferred action "remains discretionary and reversible," *Arpaio*, 797 F.3d at 17—as it has been through each of the previous policies adopted without "cumbersome and time-consuming rulemaking proceedings." *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988).

Plaintiffs' attempt to portray the Rescission policy as a substantive rule is unpersuasive. Plaintiffs contend that there "can be no dispute that DHS intends to be bound by the Rescission, and that the Rescission limits the agency's discretion," because, they insist, it is "a categorical rule barring DACA recipients from renewing their grants of deferred action and precluding new

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

28

potential DACA recipients from obtaining deferred action." Pls.' Br. 32-33. This mischaracterizes the nature of the DACA Rescission and the availability of deferred action generally. Deferred action was available on a discretionary basis before the DACA policy (albeit on a more limited and case-specific basis), and it remains available today. DACA is not the only manner by which individuals obtain deferred action, as the long history of similar policies evinces. That a particular policy permitting a class of individuals to seek deferred action based on certain criteria has been rescinded does not mean that DHS officials are "flatly prohibited," *id.* at 32, from later extending that status on an individualized basis to persons regardless of if they are former DACA recipients, and nothing in the Rescission Policy indicates otherwise. To the contrary, nothing in the Rescission Policy prevents DHS officials from later exercising their delegated discretion to confer deferred action on an individual former DACA recipient, or even upon large groups of former DACA recipients under appropriate individualized criteria. The Secretary remains free to establish (or revoke) other deferred-action policies, in her discretion; to grant (or deny) deferred action as to *any* individual under other policies, or no policy at all, in her discretion; to revoke a grant of deferred action, in her discretion; and to pursue removal, in her discretion. In short, the Rescission Policy does not bind regulated parties or the courts in any way. Indeed, DACA itself was indisputably adopted as an exercise of enforcement discretion, and it follows that its rescission was too.

Plaintiffs' argument that the Rescission is a substantive rule because it "bans DACA recipients from applying for and traveling on advance parole" is similarly flawed. *Id.* at 31. The possible availability of advance parole, under separate regulations not otherwise at issue in this case, is a discretionary *consequence* of receiving deferred action—meaning that it is an aspect of the Secretary's authority under the INA. Accordingly, the Secretary may use statements of policy to "advise the public prospectively of the manner in which [DHS] proposes to exercise [its] discretionary power" concerning deferred action, as well as the consequences that follow from that exercise due to separate regulations. *See Vigil*, 508 U.S. at 197 (citations omitted). The Rescission Policy announced a prospective change instructing the agency to discontinue processing applications for advance parole "under standards associated with the DACA

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

1  program." Rescission Policy 4, (AR 255). The Secretary acted well within her discretion in

2  changing this policy without the full notice-and-comment process.

3  Plaintiffs even attempt to argue that *only* the Rescission, and not the 2012 DACA

4  Memorandum, required notice and comment. According to Plaintiffs, "it is irrelevant that the

5  2012 DACA Memorandum did not go through the notice-and-comment process" because "DACA

6  was an exercise of prosecutorial discretion and not required to go through notice and comment,"

7  while "the Rescission does not present itself as an exercise of DHS's discretion, and in fact

8  prohibits the exercise of discretion in the adjudication of applications for deferred action." Pls.'

9  Br. 33. That cannot be. As established above, DHS officials retain the discretion to grant deferred

10 action outside the confines of the DACA policy. But more fundamentally, prosecutorial

11 discretion cannot be a one-way valve whereby the Secretary is free to expand the availability of

12 deferred action through a statement policy, but, once the policy is announced, may not restrict it

13 without a cumbersome rulemaking proceeding. That is not the law, and tellingly, Plaintiffs cite

14 no authority for the remarkable proposition that the notice-and-comment inquiry differs

15 depending on whether an agency is broadening or limiting access to a discretionary program. *See*

16 Pls.' Br. 31–34. Plaintiffs' argument is nonsensical for the additional reason that, if winding

17 down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the

18 first place. Since the DACA Memo itself was not adopted through notice and comment, on

19 Plaintiffs' own theory it would be void *ab initio*—leaving Plaintiffs without a remedy.

20 Moreover, it is common for senior prosecutors to set bright-line policies directing the

21 exercise of discretion by individual prosecutors. For example, the "passive enforcement policy"

22 adopted by the Attorney General and approved in *Wayte v. United States*, 470 U.S. 598, 601–02,

23 613 (1985), limited the discretion of prosecutors to pursue charges against those who had not self-

24 reported their violation of the law. And earlier this year the Attorney General issued a

25 memorandum instructing all federal prosecutors to "charge and pursue the most serious, readily

26 provable offense" in all federal criminal prosecutions, expressly rescinding two earlier, more

27 lenient policies. *See* Memorandum from the Attorney General to All Federal Prosecutors (May

28 10, 2017), https://www.justice.gov/opa/press-release/file/965896/download. If enforcement

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

policies lacking an additional layer of case-specific discretion triggered notice-and-comment requirements, such policies would be unlawful.

2.    In arguing that the Rescission was required to undergo notice-and-comment rulemaking, Plaintiffs elide binding Ninth Circuit precedent that squarely rejected a contention that an INS deferred-action directive was void for failure to abide by notice-and-comment requirements. The petitioner in *Mada-Luna*, 813 F.2d at 1009, challenged the validity of an INS Operating Instruction (i.e., guidelines for the exercise of discretion in considering requests for deferred action) under which his deferred-action application had been denied. Mada-Luna argued that the Operating Instruction, which purported to rescind an earlier directive, was "invalid because the INS promulgated it without the notice-and-comment procedures required" by the APA, and that the agency was thus required to review his application under the "more 'generous' standard" contained in the earlier guidance. *Id.* After thorough consideration of the distinctions between a substantive rule and a general policy statement, the court held the Operating Instruction to be "a clear[] case of a general statement of policy." *Id.* at 1017. The Ninth Circuit expressly rejected the argument that, "if the repeal of an agency directive will cause a 'substantial impact' to the rights of a specific class it cannot be exempt from section 553's notice-and-comment requirements," and explained that the proper inquiry "focuse[s] upon the effect of the regulation or directive upon *agency decisionmaking*, not the public at large." *Id.* at 1016.

Like the Operating Instructions challenged in *Mada-Luna*, the Rescission Policy is a prospective instruction guiding DHS officials in their exercise of discretion. That deferred action may be available on a more limited basis than under DACA does not change the fact that the Rescission is an internal directive about how to handle prosecutorial discretion and thus does not have the force and effect of law. It is thus a "clear[] case of a general statement of policy," *id.* at 1017, not subject to notice and comment. *See also Romeiro de Silva v. Smith*, 773 F.2d 1021, 1025 (9th Cir. 1985) ("INS operations instructions fall within section 553(b)(A)'s exception because the instructions are internal directives not having the force and effect of law," which bind the agency "so long as they remain operative, but [the agency] may repeal them and substitute

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

31

1   new rules in their place.").

2       Plaintiffs ignore *Mada-Luna*'s holding while hinging their procedural APA claim on a

3   single, out-of-circuit district court case, *United States ex rel. Parco v. Morris*, 426 F. Supp. 976,

4   984–86 (E.D. Pa. 1977), which they depict as "strikingly similar"—despite that the case arose in

5   the very different context of a *habeas corpus* petition challenging the refusal to extend an

6   individual's voluntary departure privilege.  Pls.' Br. 33–34.  The *Parco* court, relying on an

7   unusual stipulation by a government official that the petitioner's application would have been

8   approved but for a recent change to an INS Operating Instruction, determined that the petitioner

9   "was entitled to advance notice and an opportunity to comment on the proposed change."  *Parco*,

10  426 F. Supp. at 985.   *Parco* is inapplicable to the broad policy change at issue here and

11  unpersuasive.

12              THE REMAINING FACTORS WEIGH AGAINST PRELIMINARY RELIEF

13      Plaintiffs have failed to demonstrate that they are likely to succeed on the merits.  That,

14  alone, should doom their request for preliminary injunctive relief.  *See Am. Trucking Ass'ns*, 559

15  F.3d at 1052.  Nonetheless, as set forth below, Plaintiffs fail to demonstrate how a preliminary

16  injunction will cure any harm that Plaintiffs claim they will suffer.  Nor do Plaintiffs demonstrate

17  that the balance of the equities or the public interest tips in their favor.  For these reasons as well,

18  Plaintiffs' motion should be denied.

19  **III.    Plaintiffs Have Not Shown Any Risk of Irreparable Harm Absent**
20  **Preliminary Relief**

21      Provisional relief serves the "limited purpose" of "preserv[ing] the relative positions of the

22  parties until a trial on the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395

23  (1981).  Accordingly, "[a]n essential prerequisite" before granting provisional relief "is a showing

24  of irreparable injury to the moving party in its absence."  *Dollar Rent A Car of Wash., Inc. v.*

25  *Travelers Indem. Co*., 774 F.2d 1371, 1375 (9th Cir. 1985).

26      Not just any showing of irreparable harm will suffice.  A party "is only entitled to an

27  injunction that prevents [the] irreparable harm" that is "likely to occur."  *S. Yuba River Citizens*

28  *League v. Nat'l Marine Fisheries Serv*., 804 F. Supp. 2d 1045, 1054 (E.D. Cal. 2011); *see also id*.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

(noting that a party's "showing [of irreparable harm] is required in order to justify the specific measures that [the party] request[s]"); *Seto v. Thielen*, No. CIV. 10-00351, 2010 WL 2612603, at *3 (D. Haw. June 28, 2010) (a movant "should tailor the [injunctive] relief requested to appropriate relief for the alleged violation"). Thus, courts regularly deny requests for provisional relief where the requested injunction would not remedy the irreparable harm alleged by the movant during the period in which the requested injunction would apply. *See Taiebat v. Scialabba*, No. 2017 WL 747460, at *5 (N.D. Cal. Feb. 27, 2017) (denying preliminary injunction where "plaintiff [could not] establish that the mandatory injunction he seeks would address the alleged harm"); *S. Yuba River Citizens League*, 804 F. Supp. 2d at 1057 ("[T]he court declines to order an interim measure that will provide no benefit to the listed species in the interim period."); *Schroll v. Plunkett*, 760 F. Supp. 1378, 1384 (D. Or. 1990) ("Granting plaintiffs' requested injunctive relief would not prevent the alleged" harm).

Plaintiffs fail to make a sufficient showing of irreparable harm to justify the injunctive relief they request. The Court has made clear its intention to render a decision on the merits of Plaintiffs' claims by March 5, 2018, when the DACA Policy begins to wind down. *See* Order re Motion to Complete AR 2, ECF No. 79; *see also* Continuance for Augmented AR & Stay of Disc. 2, ECF No. 193-1. Accordingly, Plaintiffs must demonstrate that the provisional relief they request will remedy irreparable harm that is likely to occur during the interim period between now and that date. *See, e.g.*, *S. Yuba River Citizens League*, 804 F. Supp. 2d at 1057.

For two related reasons, Plaintiffs have not done so. First, the bulk of Plaintiffs' factual support pertains generally to the alleged impact of DHS's rescission of DACA writ large and provides little to no explanation for why irreparable harm is likely to occur between now and March 5, 2018. This includes Plaintiffs' declarations discussing research studies that explore the psychological and emotional impact of DACA's rescission on current recipients, *see, e.g.*, Pls.' App'x 368 (a "repeal of DACA would have disastrous consequences"), as well as declarations from current DACA recipients describing that impact in their own words, *see, e.g.*, *id.* at 401 ("[DACA's] rescission has stripped me of [a] sense of security."). It also includes declarations estimating the financial impact that rescinding DACA will have on federal, state, and local

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

33

economies and governments, which utilize twelve-month and ten-year-based calculations. *See id*. at 73, 224. The same is also true of the declarations identifying potential harms to local communities. *See id*. at 1138 ("[S]ince the rescission of DACA … [people are] decreasing their involvement in civic life.").

These and other attestations do not aid Plaintiffs in carrying their burden of establishing that irreparable harm is likely to occur *prior* to March 5, 2018. Indeed, such harms could not be remedied by a preliminary injunction. The requested injunction would provide only temporary, short-term relief, and would dissolve upon the conclusion of these lawsuits. *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1093 (9th Cir. 2010). Indeed, only a permanent *legislative* fix would provide DACA recipients with the security they seek. But even if this Court could fashion some form of permanent relief, Plaintiffs are not seeking it now, and in any event, they have not shown that such relief is warranted at this time. *See Senate of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992) ("[A] judgment on the merits in the guise of preliminary relief is a highly inappropriate result.").

Second, even where Plaintiffs' declarations identify concrete harm, they nonetheless fail to establish that the harm is likely to occur in the interim period between now and March 5, 2018, or that the injunctive relief they request will remedy such harm. For example, Plaintiffs argue that many declarants will lose opportunities to pursue their chosen profession as a result of their inability to make long-term family, educational, and career decisions, such as whether to pursue a medical residency. Pls.' Br. at 34. As above, however, those individuals' ability to confidently engage in such planning would only be safeguarded through legislative action or some other sort of permanent relief, and not through a grant of injunctive relief through March 5, 2018.[8] Moreover, such relief would be unnecessary for many of Plaintiffs' declarants, who already have been granted deferred action and work authorizations that extend far beyond March 5, 2018. *See, e.g.*, Pls.'

---

[8] Some of Plaintiffs' declarations make this abundantly clear. One declarant, for example, states that she and her fiancé have decided to "put on hold" any decision to start a family because they "just do not think that it would be fair to bring a child into [their] lives if [they] can't guarantee that child a stable, safe home." Pls.' App'x 268. A four-month injunction would provide no such guarantee.

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

App'x 41–42, 108, 186, 401, 448, 553, 1368, 1448.  As for the declarants contemplating pursuing a medical residency, they similarly would stand to benefit little from Plaintiffs' requested injunction because, as one notes, "residencies are three to eight years [long]."  *Id.* at 723.  Plaintiffs also reference the unavailability of advance parole and proffer a declaration from an individual who was invited to present research at conferences in Malta and Germany.  *Id.* at 1,323.  The Malta conference has already taken place, however, and the German conference will conclude within days of this filing.  *See id.*  The declaration mentions no other pending invitations between now and March 5, 2018, and thus does not suffice to demonstrate irreparable harm.[9]

Finally, Plaintiffs submit declarations positing a likelihood of irreparable harm stemming from the expiration of, and inability to renew, work authorizations—for educational officials, lost funding from students who might be unable to pay their tuition costs or qualify for financial aid in the absence of a work authorization, and for nonprofits and local governments, lost services from those who currently work in their communities.  *Id.* at 502–03, 1348–49.  However, those declarations neither explain why such harm is likely to occur between now and March 5, 2018, nor how the requested injunctive relief (which would only affect the discrete group of individuals who lack DACA status or whose status is set to expire by that date) would abate such harm.

## IV.     Balancing of the Equities and the Public Interest

The final two factors, the public interest and the balance of the equities, also weigh against granting Plaintiffs' motion.  These factors merge when the government is a party.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  As noted above, the federal government possesses broad authority over the subject of immigration and the status and presence of aliens in this county.  *Arizona v. United States*, 567 U.S. 387, 394 (2012).  This includes significant discretion as to whether, and under what circumstances, to grant discretionary relief

---

[9] Two other declarations submitted by Plaintiffs also fail to suffice.  One references the Winter 2017 California-Mexico Dreamers Study Abroad Program by the California-Mexico Studies Center, while the other describes international travel that is "common" for students pursuing a Masters degree in public health at the Harvard T.H. Chan School of Public Health to take in January of each year.  Pls.' App'x 670, 1479.  Neither declaration explains, however, how the inability to take such trips renders DACA recipients unable "to pursue [their] chosen profession," much less how any such harm is irreparable.  *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017).

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

to individuals not lawfully in this country, such as deferred action.  Here, the Acting Secretary decided to pursue an approach in which grants of deferred action would "be decided on a case by case basis."  DACA Memo 2 (AR 2).  In adopting this approach, the Secretary sought to implement an orderly rescission of the prior policy and minimize the potential for disruption.  *See* Rescission Policy, 4 (AR 255); *see also* Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://go.usa.gov/xncuM.

The injunctive relief sought by Plaintiffs would frustrate and displace both the Secretary's substantive judgment as to how her prosecutorial discretion should be exercised, as well as her further judgment as to how best to transition between policies, while providing minimal, if any, relief to the harms identified by Plaintiffs for the reasons discussed above.  Accordingly, this factor weighs strongly against granting Plaintiffs' the injunction they seek.  *See All. for the Wild Rockies*, 632 F.3d at 1138 ("We will not grant a preliminary injunction, however, unless those public interests outweigh other public interests that cut in favor of *not* issuing the injunction.").

## V.     Any Injunctive Relief Should be Narrowly Drawn

For the reasons discussed above, the Court should deny Plaintiffs' motion in its entirety. If, however, the Court were to disagree, it nevertheless should reject Plaintiffs' sweeping request to "immediately return the administration of the DACA program to the state of its existence prior to the Rescission."  Pls.' Proposed Order at 3.  Such relief would be clearly overbroad, especially to the extent it applies to individuals who are not parties to this action and whose claims are not currently addressed in Plaintiffs' motion.

Constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries.  Article III requires that "a plaintiff must demonstrate standing . . . for each form of relief that is sought."  *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).  "The remedy" sought must therefore "be limited to the inadequacy that produced the injury in fact."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996).  And equitable principles independently require that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

Any injunction the Court enters should thus be limited to relieving the specific injury of only those individual Plaintiffs whom the Court determines have a cognizable claim and will suffer irreparable harm in the absence of an injunction. *See Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987) ("Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown," and should not extend broader than is "necessary to give prevailing parties the relief to which they are entitled." (emphasis omitted)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for provisional relief should be denied.

Dated: November 22, 2017

Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General

BRIAN STRETCH
United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Branch Director

JOHN R. TYLER
Assistant Branch Director

BRAD P. ROSENBERG
Senior Trial Counsel

STEPHEN M. PEZZI
Trial Attorney

*/s/   Kate Bailey*
KATE BAILEY
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 514-9239
Email: kate.bailey@usdoj.gov

*Attorneys for Defendants*

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

REGENTS OF UNIVERSITY OF
CALIFORNIA and JANET NAPOLITANO, in
her official capacity as President of the
University of California,

             Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY and ELAINE
DUKE, in her official capacity as Acting
Secretary of the Department of Homeland
Security,

             Defendants.

No. 3:17-cv-05211-WHA
No. 3:17-cv-05235-WHA
No. 3:17-cv-05329-WHA
No. 3:17-cv-05380-WHA
No. 3:17-cv-05813-WHA

**[PROPOSED] ORDER**

     Plaintiffs in the above-docketed and related cases have filed a motion for provisional
relief. *See* No. 3:17-cv-05211-WHA, ECF No. 111. Upon consideration of Plaintiffs' motion,
the responses and replies thereto, and the oral argument of the parties, Plaintiffs' motion shall be,
and it hereby is, DENIED. IT IS SO ORDERED.

_____

William Alsup
United States District Judge

_____

Date

# EXHIBIT 10

1   CHAD A. READLER
    Acting Assistant Attorney General
2   BRIAN STRETCH
    United States Attorney
3   BRETT A. SHUMATE
    Deputy Assistant Attorney General
4   JENNIFER D. RICKETTS
    Director, Federal Programs Branch
5   JOHN R. TYLER
    Assistant Branch Director
6   BRAD P. ROSENBERG (DC Bar #467513)
    Senior Trial Counsel
7   STEPHEN M. PEZZI (DC Bar #995500)
    KATE BAILEY (MD Bar #1601270001)
8   Trial Attorneys
    United States Department of Justice
9   Civil Division, Federal Programs Branch
    20 Massachusetts Avenue, N.W.
10  Washington, DC 20530
    Telephone: (202) 514-3374
11  Facsimile: (202) 616-8460
    E-mail: brad.rosenberg@usdoj.gov
12
    *Attorneys for Defendants*
13

14          **UNITED STATES DISTRICT COURT FOR THE**
               **NORTHERN DISTRICT OF CALIFORNIA**
15

16  REGENTS OF UNIVERSITY OF                       No. 3:17-cv-05211-WHA
    CALIFORNIA and JANET NAPOLITANO, in
17  her official capacity as President of the       No. 3:17-cv-05235-WHA
    University of California,
                                                    No. 3:17-cv-05329-WHA
18
                                                    No. 3:17-cv-05380-WHA
19                  Plaintiffs,
                                                    No. 3:17-cv-05813-WHA
20          v.
                                                    **DEFENDANTS' NOTICE OF MOTION**
21  UNITED STATES DEPARTMENT OF                     **AND MOTION TO DISMISS ALL N.D.**
    HOMELAND SECURITY and ELAINE                    **CAL. DACA CASES; MEMORANDUM IN**
22  DUKE, in her official capacity as Acting        **SUPPORT**
    Secretary of the Department of Homeland
23  Security,                                       Judge: Honorable William Alsup
                                                    Hearing: December 20, 2017, 8:00 a.m.
24                  Defendants.                     Place: San Francisco U.S. Courthouse,
                                                    Courtroom 8, 19th Floor
25

26

27

28

# TABLE OF CONTENTS

PAGE

NOTICE OF MOTION AND MOTION TO DISMISS ...................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

INTRODUCTION ................................................................................................................ 1

BACKGROUND .................................................................................................................. 5

    A.     Deferred Action Generally .................................................................... 5

    B.     DAPA and DACA ................................................................................. 6

    C.     The *Texas* Litigation .......................................................................... 7

    D.     Rescission of DACA ........................................................................... 9

    E.     These Actions ..................................................................................... 10

LEGAL STANDARDS ..................................................................................................... 12

ARGUMENT ..................................................................................................................... 13

I.     THESE CASES ARE NOT JUSTICIABLE .......................................................... 14

    A.     The Rescission Policy Is Not Justiciable Because this Immigration
            Enforcement Policy Is a Matter Committed to Agency Discretion
            by Law ................................................................................................ 14

    B.     The INA Deprives District Courts of Jurisdiction over Challenges
            to Denials of Deferred Action ........................................................... 17

    C.     The University, State, Municipal, and Union Plaintiffs' Claims Are
            Not Cognizable ................................................................................. 20

            1.     The University, State, Municipal, and Union Plaintiffs Lack
                    Article III Standing ............................................................. 20

            2.     The University, State, Municipal, and Union Plaintiffs Lack
                    a Cause of Action Under the APA ...................................... 21

    D.     The Government's Justiciability Objections Are Not Inconsistent with
            the Acting Secretary's Reliance on the Fifth Circuit's Decision ....................... 22

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

i

II.     PLAINTIFFS FAIL TO STATE A CLAIM ................................................................ 23

        A.      The Acting Secretary Rationally Explained Her Decision To Wind
                Down DACA, Particularly Given the Imminent Risk of A Nationwide
                Injunction ........................................................................................................... 23

        B.      The Rescission Policy Is Exempt from Notice and Comment............................ 29

        C.      Plaintiffs Fail to State an Equal Protection Claim ................................................. 32

        D.      Plaintiffs Fail to State a Procedural Due Process Claim........................................ 35

        E.      Plaintiffs Fail to State a Substantive Due Process Claim. ..................................... 38

        F.      Plaintiffs' Regulatory Flexibility Act Claim Fails Because Notice-
                and-Comment Procedures Were Not Required...................................................... 41

        G.      Plaintiffs' Equitable Estoppel Claims Fail........................................................... 42

III.    NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS
        IMPERMISSIBLE ............................................................................................................ 45

CONCLUSION ............................................................................................................................. 46

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

ii

# TABLE OF AUTHORITIES

CASES                                                                          PAGE(S)

*Aetna Life Ins. Co. v. Haworth,*
   300 U.S. 227 (1937) ......................................................................... 45

*Alexander v. Sandoval,*
   532 U.S. 275 (2001) ......................................................................... 42

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
   458 U.S. 592 (1982) ......................................................................... 21

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
   526 U.S. 40 (1999) ........................................................................... 36

*Arizona v. United States,*
   567 U.S. 387 (2012) ............................................................. 5, 15, 34

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015) ................................................. *passim*

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ......................................................................... 12

*Bates v. Donley,*
   935 F. Supp. 2d 14 (D.D.C. 2013) ......................................... 12, 13

*Bd. of Regents v. Roth,*
   408 U.S. 564 (1972) ......................................................................... 36

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ......................................................................... 12

*Bi-Metallic Inv. Co. v. State Bd. of Equalization,*
   239 U.S. 441 (1915) ......................................................................... 38

*Botezatu v. INS,*
   195 F.3d 311 (7th Cir. 1999) ................................................. 18, 19

*Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc.,*
   419 U.S. 281 (1974) ................................................................. 25, 26

*Brittain v. Hansen,*
   451 F.3d 982 (9th Cir. 2006) ......................................................... 40

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

iii

*Califano v. Sanders*,
430 U.S. 99 (1977) ........................................................................................ 12

*Camp v. Pitts*,
411 U.S. 138 (1973) ...................................................................................... 24

*Cassirer v. Kingdom of Spain*,
616 F.3d 1019 (9th Cir. 2010) ...................................................................... 12

*Chaudhry v. Holder*,
705 F.3d 289 (7th Cir. 2013) .......................................................................... 6

*Chavez v. Martinez*,
538 U.S. 760 (2003) ...................................................................................... 40

*Chevron U.S.A. Inc. v. Echazabal*,
536 U.S. 73 (2002) ........................................................................................ 25

*Chrysler Corp. v. Braun*,
441 U.S. 281 (1979) ...................................................................................... 30

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ................................................................................ 15, 23

*Clarke v. Secs. Indus. Ass'n*,
479 U.S. 388 (1987) ...................................................................................... 21

*Cmty. Nutrition Inst. v. Young*,
818 F.2d 943 (D.C. Cir. 1987) ...................................................................... 30

*Conn. Bd. of Pardons v. Dumschat*,
452 U.S. 458 (1981) ...................................................................................... 40

*Consumer Energy Council v. FERC*,
673 F.2d 425 (D.C. Cir. 1982) ...................................................................... 29

*Cty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ...................................................................................... 40

*De Silva v. Smith*,
773 F.2d 1021 (9th Cir. 1985) ...................................................................... 37

*Decatur Liquors, Inc. v. Dist. of Columbia*,
478 F.3d 360 (D.C. Cir. 2007) ...................................................................... 38

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

iv

*Dinh Nguy v. County of Yolo,*
    No. 2:14-cv-229-MCE-EFB PS, 2014 WL 4446829 (N.D. Cal. Sept. 9, 2014)........................ 45

*Elgharib v. Napolitano,*
    600 F.3d 597 (6th Cir. 2010) ................................................................................ 18

*Emery Min. Corp. v. Sec'y of Labor,*
    744 F.2d 1411 (10th Cir. 1984) ............................................................................. 42

*FCC v. Fox TV Stations, Inc.,*
    556 U.S. 502 (2009)..................................................................................... 23, 24

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*
    93 F.3d 897 (D.C. Cir. 1996)............................................................................... 22

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985).......................................................................................... 24

*Gerhart v. Lake Cnty.,*
    637 F.3d 1013 (9th Cir. 2011) ............................................................................. 39

*Green v. City of Tucson,*
    340 F.3d 891 (9th Cir. 2003) ............................................................................... 35

*Heckler v. Chaney,*
    470 U.S. 821 (1985)............................................................................... *passim*

*Heckler v. Community Health Servs.,*
    467 U.S. 51, 104 S. Ct. 2218 (1984)..................................................................... 43

*Helgeson v. Bureau of Indian Affairs, Dep't of Interior,*
    153 F.3d 1000 (9th Cir. 1998) ........................................................................ 14, 19

*Herguan Univ. v. Immigration & Customs Enf't,*
    No. 16-cv-06656-LHK, 2017 WL 2797860 (N.D. Cal. June 28, 2017) ................................... 12

*Hoffman Plastic Compounds, Inc. v. NLRB,*
    535 U.S. 137 (2002).......................................................................................... 35

*Hyuk Joon Lim v. Holder,*
    710 F.3d 1074 (9th Cir. 2013) ............................................................................. 40

*ICC v. Bhd. of Locomotive Eng'rs (BLE),*
    482 U.S. 270 (1987).................................................................................... 14, 16

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

v

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005) ........................................................................... 13

*Ky. Dep't of Corrs. v. Thompson*,
   490 U.S. 454 (1989) ......................................................................................... 36

*Lewis v. Casey*,
   518 U.S. 343 (1996) ......................................................................................... 45

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ......................................................................................... 14

*Linda R.S. v. Richard D.*,
   410 U.S. 614 (1973) ......................................................................................... 20

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ........................................................................... 12, 20, 29

*Mada-Luna v. Fitzpatrick*,
   813 F.2d 1006 (9th Cir. 1987) ......................................................................... 16

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ......................................................................................... 46

*Mangindin v. Wash. Mut. Bank*,
   637 F. Supp. 2d 700 (N.D. Cal. 2009) ............................................................. 45

*Marder v. Lopez*,
   450 F.3d 445 (9th Cir. 2006) ........................................................................... 13

*Marilley v. Bonham*,
   844 F.3d 841 (9th Cir. Dec. 21, 2016) ............................................................ 35

*Massachusetts v. Mellon*,
   262 U.S. 447 (1923) ......................................................................................... 21

*McCarthy v. United States*,
   850 F.2d 558 (9th Cir. 1988) ........................................................................... 12

*Mississippi v. Johnson*,
   71 U.S. (4 Wall.) 475 (1867) ........................................................................... 22

*Monsanto Co. v. Geertson Seed Farms*,
   561 U.S. 139 (2010) ......................................................................................... 46

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

vi

*Morgan v. United States,*
  304 U.S. 1 (1938) ............................................................................. 24

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
  463 U.S. 29 (1983) ............................................................................. 23

*Munoz v. Ashcroft,*
  339 F.3d 950 (9th Cir. 2003) ............................................................. 41

*N.W. Mining Ass'n v. Babbitt,*
  5 F. Supp. 2d 9 (D.D.C. 1998) .......................................................... 41

*Nat'l Ass'n of Regulatory Utility Comm'rs v. U.S. Dep't of Energy,*
  851 F.2d 1424 (D.C. Cir. 1988) ......................................................... 31

*Nat'l Mining Ass'n v. McCarthy,*
  758 F.3d 243 (D.C. Cir. 2014) ........................................................... 30

*New Hampshire v. Maine,*
  532 U.S. 742 (2001) ........................................................................... 42

*Omar v. McHugh,*
  646 F.3d 13 (D.C. Cir. 2011) ............................................................. 36

*Pac. Gas & Elec. Co. v. FPC,*
  506 F.2d 33 (D.C. Cir. 1974) ............................................................. 30

*Perales v. Casillas,*
  903 F.2d 1043 (5th Cir. 1990) ........................................................... 16

*Perez v. Mortgage Bankers Ass'n,*
  135 S. Ct. 1199 (2015) ................................................................. 28, 43

*Rempfer v. Sharfstein,*
  583 F.3d 860 (D.C. Cir. 2009) ...................................................... 12, 13

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC),*
  525 U.S. 471 (1999) .................................................................. *passim*

*Robinson v. United States,*
  586 F.3d 683 (9th Cir. 2009) ............................................................. 12

*Salgado-Diaz v. Gonzales,*
  395 F.3d 1158 (9th Cir. 2005) ........................................................... 44

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

vii

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973) ............................................................................ 35

*San Luis Obispo Mothers for Peace v. U.S. N.R.C.*,
    789 F.2d 26 (D.C. Cir. 1986) ........................................................ 24

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) ........................................................ 30

*Syracuse Peace Council v. FCC*,
    867 F.2d 654 (D.C. Cir. 1989) ...................................................... 26

*Tefel v. Reno*,
    180 F.3d 1286 (11th Cir. 1999) .................................................... 41

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...................................................................... 13

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .................................................. *passim*

*Town of Castle Rock v. Gonzales*,
    545 U.S. 748 (2005) ...................................................................... 36

*Town of Chester v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017) .................................................................. 45

*Troy Corp. v. Browner*,
    120 F.3d 277 (D.C. Cir. 1997) ...................................................... 24

*U.S. Telecom Ass'n v. FCC*,
    400 F.3d 29 (D.C. Cir. 2005) ........................................................ 41

*United States v. Armstrong*,
    517 U.S. 456 (1996) .............................................................. *passim*

*United States v. Browning*,
    630 F.2d 694 (10th Cir.1980) ...................................................... 43

*United States v. Morgan*,
    313 U.S. 409 (1941) ...................................................................... 24

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ........................................................ 13

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

viii

*United States v. Texas,*
  136 S. Ct. 2271 (2016) ................................................................. 8

*United States v. Texas,*
  137 S. Ct. 285 (2016) ................................................................. 8

*Univ. Med. Ctr. of S. Nev. v. Shalala,*
  173 F.3d 438 (D.C. Cir. 1999) ..................................................... 13

*Vasquez v. Aviles,*
  639 F. App'x 898 (3d Cir. 2016) ................................................... 18

*Velasco-Gutierrez v. Crossland,*
  732 F.2d 792 (10th Cir. 1984) ..................................................... 37

*Washington v. Davis,*
  426 U.S. 229 (1976) .................................................................. 33

*Washington v. Glucksberg,*
  521 U.S. 702 (1997) .................................................................. 40

*Watkins v. United States Army,*
  875 F.2d 699 (9th Cir. 1989) .................................................. 43, 44

*Yassini v. Crosland,*
  618 F.2d 1356 (9th Cir. 1980) ..................................................... 38


**STATUTES**

5 U.S.C. § 553 ................................................................ 3, 29, 30

5 U.S.C. § 601 ......................................................................... 41

5 U.S.C. § 604 ......................................................................... 41

5 U.S.C. § 611 ......................................................................... 41

5 U.S.C. § 701 ............................................................... 14, 16, 19

5 U.S.C. § 702 ......................................................................... 21

5 U.S.C. § 706 ......................................................................... 23

6 U.S.C. § 202 ......................................................................... 18

6 U.S.C. § 251 ......................................................................... 18

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

ix

6 U.S.C. § 557 .................................................................................................... 18

8 U.S.C. § 1103 ...................................................................................................... 5

8 U.S.C. § 1227 ...................................................................................................... 5

8 U.S.C. § 1229b .................................................................................................... 5

8 U.S.C. § 1252 (g) ........................................................................................ *passim*

8 U.S.C. § 1154 ...................................................................................................... 5

8 U.S.C. § 1158 ...................................................................................................... 5

8 U.S.C. § 1182 ...................................................................................................... 5

28 U.S.C. § 2201 .................................................................................................. 45


RULES

Fed. R. Civ. P. 8(c) ............................................................................................... 42

Fed. R. Civ. P. 12 ........................................................................................... 12, 13


REGULATIONS

8 C.F.R. § 274a.12(c)(14) .................................................................................. 5, 6


OTHER AUTHORITIES

Attorney General's Manual on the Administrative Procedure Act 30 (1947) .............................. 30

DHS DACA FAQ,
    https://go.usa.gov/xngCd ................................................................. 7, 28, 37, 39, 44

Press Release, DHS
    Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
    https://go.usa.gov/xncuM............................................................................. 25

U.S. Dep't of Justice, Office of Legal Counsel,
    *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens
    Unlawfully Present*, 38 Op. O.L.C. (Nov. 19, 2014),
    https://www.justice.gov/file/179206/download ................................................. 28

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

x

USCIS, Policy Memorandum (Nov. 7, 2011),
   https://go.usa.gov/xncPK. ........................................................................................ 7

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

xi

CHAD A. READLER
Acting Assistant Attorney General
BRIAN STRETCH
United States Attorney
BRETT A. SHUMATE
Deputy Assistant Attorney General
JENNIFER D. RICKETTS
Director, Federal Programs Branch
JOHN R. TYLER
Assistant Branch Director
BRAD P. ROSENBERG (DC Bar #467513)
Senior Trial Counsel
STEPHEN M. PEZZI (DC Bar #995500)
KATE BAILEY (MD Bar #1601270001)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, DC 20530
Telephone: (202) 514-3374
Facsimile: (202) 616-8460
E-mail: brad.rosenberg@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

REGENTS OF UNIVERSITY OF
CALIFORNIA and JANET NAPOLITANO, in
her official capacity as President of the
University of California,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY and ELAINE
DUKE, in her official capacity as Acting
Secretary of the Department of Homeland
Security,

Defendants.

No. 3:17-cv-05211-WHA
No. 3:17-cv-05235-WHA
No. 3:17-cv-05329-WHA
No. 3:17-cv-05380-WHA
No. 3:17-cv-05813-WHA

**DEFENDANTS' NOTICE OF MOTION
AND MOTION TO DISMISS ALL N.D.
CAL. DACA CASES; MEMORANDUM IN
SUPPORT**

Judge: Honorable William Alsup
Hearing: December 20, 2017, 8:00 a.m.
Place: San Francisco U.S. Courthouse,
Courtroom 8, 19th Floor

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on December 20, 2017, at 8:00 a.m., before the Honorable William Alsup of the United States District Court for the Northern District of California, in Courtroom 8 of the 19th Floor of the Philip E. Burton Courthouse and Federal Building, 450 Golden Gate Avenue, San Francisco, California, Defendants will move this Court to dismiss all claims in the following related matters (hereinafter, "DACA cases"):

- No. 3:17-cv-05211-WHA, *Regents of the University of California, et al. v. U.S. Dep't of Homeland Security, et al.*

- No. 3:17-cv-05235-WHA, *State of California, et al. v. U.S. Dep't of Homeland Security, et al.*

- No. 3:17-cv-05329-WHA, *City of San Jose v. Trump, et al.*

- No. 3:17-cv-05380-WHA, *Garcia, et al. v. United States of America, et al.*

- No. 3:17-cv-05813-WHA, *County of Santa Clara, et al. v. Trump, et al.*

Defendants' motion to dismiss is being made pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. The basis for this motion is set forth more fully in the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

In 2012, then-Secretary of Homeland Security Janet Napolitano adopted the policy now known as DACA, or Deferred Action for Childhood Arrivals. DACA made deferred action—a practice by which the Secretary exercises individualized enforcement discretion to issue a reversible notification that she does not intend to remove an alien for a set period of time—available to a class of unlawfully present aliens who came to the United States as children. In 2014, one of her successors expanded the parameters of DACA and adopted a similar policy known as DAPA, or Deferred Action for Parents of Americans. DAPA, if implemented, would have made deferred action available to unlawfully present aliens who were parents of U.S. citizens and lawful permanent residents.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

1

DAPA, including its expansion of DACA, was promptly challenged by a coalition of 26 states.  Although then-Secretary of Homeland Security Jeh Johnson vigorously defended the policy, he was rebuffed at every turn:  the district court for the Southern District of Texas issued a nationwide preliminary injunction; the Fifth Circuit affirmed, declaring the policy "manifestly contrary" to the Immigration and Nationality Act (INA); and an equally divided Supreme Court affirmed, leaving the injunction in place.

Armed with this victory, the states threatened to amend their complaint to challenge not just DAPA, but DACA as well, arguing that it suffers from the same infirmities.  In view of the substantial similarities between the two policies, the significant litigation risk posed by the Supreme Court and Fifth Circuit decisions, and the Attorney General's view that DACA was in fact unlawful, Acting Secretary of Homeland Security Elaine C. Duke was faced with two options.  On the one hand, she could wind down DACA in an orderly fashion, minimizing the disruption to current recipients.  On the other, continued litigation would in all likelihood result in a nationwide injunction abruptly ending the policy, plunging its nearly 800,000 recipients into uncertainty.

The Acting Secretary chose the less disruptive option: an orderly process that formally rescinds DACA but allows it to sunset.  Under this Rescission Policy, no DACA recipient will have his or her deferred action abruptly terminated based solely on the Rescission Policy; instead, prior grants will remain valid for the remainder of their stated duration (generally two years) before ending consistent with their stated terms.  Any DACA recipient whose deferred action was due to expire within six months was given a month to request another two-year renewal.  And although the agency stopped accepting new DACA requests, it will finish processing those it had received when the rescission began.

In these five related cases, Plaintiffs—the University of California system and its president, four states, the City of San Jose, a group of individual DACA recipients, and Santa Clara County and a local labor union—challenge the Rescission Policy on a variety of statutory, constitutional, and common-law grounds, urging the Court to invalidate the agency's decision and enjoin the Acting Secretary from rescinding DACA.  There is no basis to do so.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

2

To begin, this case is not justiciable. The Rescission Policy is a classic exercise of enforcement discretion "presumed immune from judicial review," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and particularly unfettered in the context of immigration, *see Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 487–92 (1999). In fact, Congress has stripped district courts of jurisdiction to review "'no deferred action' decisions and similar discretionary determinations" such as the one here. *AADC*, 525 U.S. at 485; *see* 8 U.S.C. § 1252(g). At a minimum, the university, state, municipal, and union Plaintiffs cannot proceed due to their lack of standing and a cause of action. The Court should not permit Plaintiffs to circumvent these bedrock limits on judicial review.

On the merits, Plaintiffs' claims fail as a matter of law. Their claim that the Rescission Policy is arbitrary and capricious under the Administrative Procedure Act (APA) because it was inadequately supported on the record is fundamentally misguided. Agencies are always free to change course on policy matters so long as they provide a rational explanation. Here, the Acting Secretary's explanation of her decision to rescind DACA amply meets that deferential standard, particularly given the adverse ruling from the Fifth Circuit and the Supreme Court's affirmance, the evident similarities between DACA and the policy that expanded DACA and created DAPA, the Attorney General's opinion that DACA was likewise unlawful, and the imminent risk of a nationwide injunction with potentially chaotic results. Importantly, because this claim can be resolved now based on the Complaints, the documents attached or incorporated by reference therein, and other judicially noticeable materials (including those in the administrative record), the Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside the Rescission Policy if it disagrees.

Plaintiffs' notice-and-comment claim is equally unavailing. The APA exempts "general statements of policy" from notice and comment, 5 U.S.C. § 553(b), and the Rescission Policy is a reordering of enforcement priorities that readily qualifies. Indeed, the Department of Homeland Security (DHS) and the former Immigration and Naturalization Service (INS) have adopted more than 20 deferred action or similar policies over the past 50 years. Few have gone through notice and comment, and there is no warrant for those procedures here. Nor does the

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

3

Fifth Circuit's ruling that the states established a substantial likelihood of success on their claim that the promulgation of DAPA required notice and comment mean that the rescission of DACA and a return to the *status quo ante* must likewise meet these procedural demands. Plaintiffs' Regulatory Flexibility Act (RFA) claim fails for the same reason, as that Act applies only where notice and comment is required. And in any event, if DACA's rescission required notice and comment, then DACA was void from the outset because its adoption would also have required notice and comment *a fortiori*.

Plaintiffs' equal protection claims get them no further. To the extent that a discriminatory motive claim—here, that the Policy was motivated by animus toward Mexican nationals—can ever be brought in a context like this one, *but see AADC*, 525 U.S. at 487–92, Plaintiffs must allege a clear case of discrimination given that they challenge an exercise of enforcement discretion, *see United States v. Armstrong*, 517 U.S. 456 (1996). They have failed to do so. Nor can Plaintiffs show that the Rescission Policy trenches on any fundamental right.

Plaintiffs' due process claims also cannot survive a motion to dismiss. DACA recipients have no protected liberty or property interest in the continued availability of deferred action, which is an exercise of prosecutorial discretion that confers no rights and is revocable at any time. Moreover, the Ninth Circuit has held that aliens—including those brought here as children—have no substantive due process right to stay in the United States, thus further dooming Plaintiffs' substantive due process claim.

Finally, Plaintiffs cannot state an equitable estoppel claim because estoppel does not run against the government. And even if they could, Plaintiffs fail to allege facts sufficient to make out such a claim.

In sum, even if Plaintiffs' challenge were somehow justiciable, the assumption underlying it would compel dismissal. DAPA—including its expansion of DACA—was enjoined by the Fifth Circuit, and that holding was affirmed by the Supreme Court. The original DACA policy is materially indistinguishable as a legal matter. At bottom, Plaintiffs' argument is that, when making discretionary enforcement determinations, federal agencies must ignore the legal rulings and reasoning of federal courts. To state the premise of this claim is to refute it.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

4

These five cases should all be dismissed.

## BACKGROUND

### A.    Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the INA along with "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396 (citation omitted). DHS officials must first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum, parole, or cancellation of removal, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b. "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely. *AADC*, 525 U.S. at 483.

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016). Deferred action is a practice by which the Secretary exercises her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period. *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority"). Although originally "developed without express statutory authority," individualized deferred action has been recognized by Congress in certain circumstances inapplicable here, *see, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"), and described by the

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

5

Supreme Court as an "exercise in administrative discretion," *AADC*, 525 U.S. at 484. Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former INS have adopted over 20 such policies over the past 50 years—rarely through notice-and-comment rulemaking.

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, under DHS regulations not challenged here. *See, e.g.*, 8 C.F.R. § 274a.12(c)(14). That decision does not, however, confer lawful immigration status or provide any defense to removal. *Cf. Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (discussing difference between "unlawful presence" and "unlawful status"). To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (citation omitted). DHS thus has discretion to revoke deferred action unilaterally, for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time. *See AADC*, 525 U.S. at 484–85.

### B. DAPA and DACA

On June 15, 2012, then-Secretary Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals. *See* Admin. R. (AR) 1–3, ECF No. 64-1[1]; *see also* Compl. Ex. D, *State of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05235-WHA, ECF No. 1-4 (DACA Memo). DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws. DACA Memo at 1 (AR 1). Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to indefinite renewal. *Id.* at 2-3 (AR 2-3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests for this relief would "be decided on a case by case basis," *id.* at 2 (AR 2). Accordingly, the Memo provided that this grant of deferred action

---

[1] Unless otherwise noted, all references to the docket refer to the docket in *Regents of the University of California v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211-WHA.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5388; 17-5813)

6

"confer[red] no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." *Id.* at 3 (AR 3).

In public guidance published on its website, DHS also informed DACA requestors that information in their requests will be "protected from disclosure to [Immigration & Customs Enforcement (ICE)] and [Customs & Border Patrol (CBP)] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised). DHS DACA FAQ No. 19, Compl. Ex. E, *State of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05235-WHA, ECF No. 1-5 (https://go.usa.gov/xngCd); *see* USCIS, Policy Memorandum (Nov. 7, 2011) (Notice to Appear Guidance), https://go.usa.gov/xncPK. DHS instructed, however, that this information-sharing policy creates no rights and "may be modified, superseded, or rescinded at any time without notice." DHS DACA FAQ No. 19.

In 2014, then-Secretary Jeh Johnson expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. *See* AR 37–41 (DAPA Memo). DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents." DAPA Memo at 3 (AR 39). The DAPA Memo also expanded DACA by relaxing the eligibility criteria and extending the DACA renewal period from two to three years. *Id.* at 3–4 (AR 39-40).

### C.     The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states, led by Texas, which sought to enjoin its implementation. Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of the DAPA Memo. *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015). Like the U.S. District Court for the Southern District of Texas, the Fifth Circuit held that the promulgation of the DAPA Memo was justiciable, in part because it believed that "the INA's intricate regulatory scheme for changing immigration classifications" allowed the court to determine whether DHS had exceeded its statutory authority. *Id.* at 168. It stressed, however, that "the *denial* of

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

7

voluntary departure and work authorization" would be unreviewable. *Id.* Also like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the APA's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Id.* at 178 n.156. And going beyond the district court, the Fifth Circuit held that DAPA was "manifestly contrary" to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one legal status to another," DAPA awarded deferred action "to persons who have never had a legal status and may never receive one." *Id.* at 184, 186 (footnotes omitted).

That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in place. On November 18, 2016, the parties jointly moved the district court to stay merits proceedings to allow them to evaluate "how they might choose to move forward" given the upcoming "change in Administration[s]." Joint Mot. to Stay Merits ¶ 2, *Texas v. United States*, No. 14-254 (S.D. Tex. Nov. 18, 2016) (ECF No. 430).

Faced with continued litigation over a policy that had been enjoined by the courts, DHS rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA. *See* Memorandum for Kevin McAleenan, Acting Commissioner, U.S. Customs and Border Protection, et al., from John F. Kelly, Secretary of Homeland Security, *Re: Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents* (June 15, 2017), AR 235-37. Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to also challenge directly the DACA Memo, arguing that it suffers from the same legal infirmities as the DAPA Memo. *See* AR 238–40 (Paxton Letter).

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

8

### D. Rescission of DACA

Faced again with the prospect of continued litigation, Acting Secretary Duke decided on September 5, 2017, to wind down the DACA policy in an orderly fashion. *See* AR 252–56 (Rescission Policy or Policy); *see also* Compl. Ex. A, *State of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05235-WHA, ECF No. 1-1. As the Acting Secretary explained, "[t]aking into consideration the Supreme Court's and Fifth Circuit's ruling in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy at 4 (AR 255). Specifically, she quoted the Attorney General's September 4 recommendation to rescind DACA, which explained that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254). Invoking her "authority in establishing national immigration policies and priorities," she rescinded the DACA Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on an individualized[,] case-by-case basis," *id.* at 2 (AR 253).

At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

- For *current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods." *Id.* at 4 (AR 255)

- For *initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date. *Id.*

- For *DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017. Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017." *Id.*

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural,

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

9

enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id.* at 4 (AR 255). The Rescission Policy says nothing about (and makes no changes to) DHS's information-sharing policy.

### E. These Actions

Plaintiffs in these five related lawsuits raise seven overlapping sets of claims. First, they allege that the Rescission Policy is arbitrary and capricious and therefore violates the APA because it constitutes a change in agency policy without an adequate explanation or basis. *See Regents of Univ. of Cal.* Compl. ¶¶ 50-58 (Count 1), No. 3:17-cv-05211 ECF No. 1; *State of Cal.* Compl. ¶¶ 152-155 (Count 3), No. 3:17-cv-05235 ECF No. 1; *Garcia* Compl. ¶ 175 (Count 4), No. 3:17-cv-05380 ECF No. 1; *Cty. of Santa Clara* Compl. ¶ 71 (Count 2), No. 3:17-cv-05813 ECF No. 1. The *Garcia* and *County of Santa Clara* Plaintiffs also allege that the rescission is arbitrary and capricious because DHS, in rescinding DACA, allegedly "disregard[ed]" the "reliance" of DACA recipients in providing personal information to the government. *See Garcia* Compl. ¶ 172; *see generally id.* ¶¶ 165-184 (Counts 4 & 5); *Cty. of Santa Clara* Compl. ¶ 72; *see generally id.* ¶¶ 67-73 (Count 2). The *Garcia* Plaintiffs also quarrel with DACA's rescission both by claiming that the government improperly provided for a wind-down period, and then claiming that the wind-down period is unreasonably "short." *Garcia* Compl. ¶¶ 173-174; *see generally id.* ¶¶ 165-184 (Counts 4 & 5). Finally, the Garcia Plaintiffs repackage their constitutional claims under the rubric of the APA. *See Garcia* Compl. ¶¶ 160-164 (Count 3).

Second, Plaintiffs allege that the rescission violates the APA because it was issued without notice and comment. *See Regents of Univ. of Cal.* Compl. ¶¶ 59-66 (Count 2); *State of Cal.* Compl. ¶¶ 146-151 (Count 2); *City of San Jose* Compl. ¶¶ 59-63 (Count 2), No. 3:17-cv-05329 ECF No. 1; *Garcia* Compl. ¶¶ 177-184 (Count 5).

Third, Plaintiffs allege that the rescission violates procedural due process because DACA recipients will be deprived of their interests in their DACA status without notice or an opportunity to be heard. *See Regents of Univ. of Cal.* Compl. ¶¶ 67-73 (Count 3); *Garcia* Compl. ¶¶ 133-147 (Count 1); *Cty. of Santa Clara* Compl. ¶¶ 59-66 (Count 1).

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

10

Fourth, Plaintiffs suggest that the rescission violates DACA recipients' substantive due process rights because the government has allegedly changed its policy regarding the use of DACA-related information, including that the government will allegedly use such information for enforcement purposes in a manner that is not "fundamentally fair." *State of Cal.* Compl. ¶¶ 141-145 (Count 1); *Garcia* Compl. ¶¶ 133-147 (Count 1); *Cty. of Santa Clara* Compl. ¶¶ 59-66 (Count 1).

Fifth, Plaintiffs contend that the rescission violates the Equal Protection component of the Fifth Amendment's Due Process Clause because it was allegedly motivated by discriminatory animus against Mexican and Latino immigrants. *City of San Jose* Compl. ¶¶ 52-58 (Count 1); *Garcia* Compl. ¶¶ 148-159 (Count 2); *Cty. of Santa Clara* Compl. ¶¶ 74-78 (Count 3). The State of California Plaintiffs also claim that the rescission of DACA violates equal protection principles because it "violates fundamental conceptions of justice by depriving DACA grantees . . . of their substantial interests in pursuing a livelihood and to support themselves and further their education." *State of Cal.* Compl. ¶¶ 172-177 (Count 6).

Sixth, Plaintiffs allege that the rescission violates the Regulatory Flexibility Act because it was unaccompanied by a regulatory flexibility analysis. *State of Cal.* Compl. ¶¶ 156-163 (Count 4); *Garcia* Compl. ¶¶ 185-191 (Count 6).

Seventh, Plaintiffs bring equitable estoppel claims, alleging that DACA recipients provided detailed personal information to the government and "rearranged their lives" based on the government's representations, but now face the possibility of removal and deportation. On that basis, Plaintiffs argue that the government should be equitably estopped from terminating DACA or from using DACA information for enforcement purposes. *State of Cal.* Compl. ¶¶ 164-171 (Count 5); *Garcia* Compl. ¶¶ 192-199 (Count 7); *Cty. of Santa Clara* Compl. ¶¶ 79-86 (Count 4).

Finally, Plaintiffs seek declaratory judgments and injunctive relief. *Regents of Univ. of Cal.* Compl. 16, Prayer for Relief; *State of Cal.* Compl. 35-36, Prayer for Relief; *City of San Jose* Compl. 15-16, Prayer for Relief; *Garcia* Compl. 43, Prayer for Relief & ¶¶ 200-205 (Count 8); *Cty. of San Jose* Compl. 26-27, Prayer for Relief.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

11

**LEGAL STANDARDS**

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must establish a court's jurisdiction through sufficient allegations. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In evaluating its jurisdiction, this Court should not "rely simply on the allegations in the complaint to determine subject matter jurisdiction. [It] must instead look to facts outside the pleadings to determine whether [it] has jurisdiction." *Cassirer v. Kingdom of Spain,* 616 F.3d 1019, 1043 n.7 (9th Cir. 2010) (citing *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009)); *see also McCarthy v. United States,* 850 F.2d 558, 560 (9th Cir. 1988) ("[W]hen considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction."). Furthermore, "[n]o presumptive truthfulness attaches to plaintiffs' allegations. Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence." *Robinson*, 586 F.3d at 685 (citations omitted).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

With respect to Plaintiffs' APA claims, "the Court may consider matters outside the pleadings without converting Defendants' Motion to Dismiss to a motion for summary judgment." *Herguan Univ. v. Immigration & Customs Enf't*, No. 16-cv-06656-LHK, 2017 WL 2797860, at *8 (N.D. Cal. June 28, 2017). "[W]hen a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal." *Id.* (alterations in original) (quoting *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009)); *see also Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013) (citing *Rempfer*, 583 F.3d at 865). "Accordingly, '[t]he entire case on review is a question of law, and the complaint, properly read, actually presents no factual allegations, but rather only arguments about the legal conclusion to be drawn about the agency action.'" *Herguan Univ.*, 2017 WL 2797860, at *8 (quoting *Rempfer*,

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

12

583 F.3d at 865). Under these circumstances, review "is based on the agency record and limited to determining whether the agency acted arbitrarily and capriciously." *Id.* (quoting *Rempfer*, 583 F.3d at 865); *see also Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n. 3 (D.C. Cir. 1999) (explaining that when reviewing agency action the question of whether the agency acted in an arbitrary and capricious manner is a legal one which the district court can resolve on the agency record, regardless of whether it is presented in the context of a motion for judgment on the pleadings or in a motion for summary judgment).

Even outside the context of the APA, the Court may consider "matters of judicial notice." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (citations omitted); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The Court may also consider exhibits that are submitted with the complaint, *see Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005), as well as "evidence on which the complaint 'necessarily relies' if: (1) the complaint refers to the document; (2) the document is central to the plaintiff's claim; and (3) no party questions the authenticity of the copy attached to the 12(b)(6) motion," *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (citations omitted). A court may treat such a document as "part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *Ritchie*, 342 F.3d at 908.[2]

## ARGUMENT

In seeking to invalidate the Rescission Policy, Plaintiffs ask the Court to override the Acting Secretary's judgment about how to exercise her discretion in enforcing the Nation's immigration laws. The Court need not consider this extraordinary request, however, because this case is not justiciable. The exercise of enforcement discretion in the Rescission Policy is committed to agency discretion by law and is therefore unreviewable. In fact, Congress has gone so far as to strip district courts of jurisdiction over "no deferred action" decisions such as the one here. At a minimum, the university, state, municipal, and union Plaintiffs lack standing. And in all events, Plaintiffs fail to state a claim. These cases should therefore be dismissed.

---

[2] In the alternative, however, the Court may if it wishes convert this motion to one for summary judgment. *See Bates*, 935 F. Supp. 2d at 17, 19.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

# I. THESE CASES ARE NOT JUSTICIABLE

## A. The Rescission Policy Is Not Justiciable Because this Immigration Enforcement Policy Is a Matter Committed to Agency Discretion by Law

**1.** The APA bars judicial review of certain categories of decisions that "courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) (quoting 5 U.S.C. § 701(a)(2)). These decisions are typically unreviewable because there exists "no meaningful standard against which to judge the agency's exercise of discretion" in these areas. *Chaney*, 470 U.S. at 830. Moreover, review is particularly inappropriate where "the subject matter is 'an area of executive action in which the courts have long been hesitant to intrude.'" *Helgeson v. Bureau of Indian Affairs, Dep't of Interior*, 153 F.3d 1000, 1003 (9th Cir. 1998) (quoting *Lincoln*, 508 U.S. at 191). This bar applies even when "the agency gives a 'reviewable' reason for otherwise unreviewable action." *ICC v. Bhd. of Locomotive Eng'rs* (*BLE*), 482 U.S. 270, 283 (1987).

Among the decisions committed to executive discretion are "an agency's exercise of enforcement power." *Chaney*, 470 U.S. at 833. Such judgments involve "a complicated balancing of factors which are peculiarly within [an agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall priorities, and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* at 831. As there is "no meaningful standard against which to judge the agency's exercise of discretion" in weighing these factors, an agency's exercise of enforcement powers is "presumed immune from judicial review under § 701(a)(2)." *Id.* at 830, 832.

For instance, an "agency decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* at 831 (citation omitted). After all, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," and it "is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

14

An agency's decision *to* enforce the law against a particular individual is likewise presumptively unreviewable. Just as "the decision whether or not to prosecute" presumptively "rests entirely in [the prosecutor's] discretion," *Armstrong*, 517 U.S. at 464 (citation omitted), an agency's decision to bring a civil enforcement action is generally not open to judicial scrutiny. Considerations such as "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall priorities" are equally present in enforcement decisions as in nonenforcement decisions, *Chaney*, 470 U.S. at 831, and judicial intrusion into the deliberative process is equally improper, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("there must be a strong showing of bad faith or improper behavior before courts can engage in an "inquiry into the mental processes of administrative decisionmakers" (citation omitted)), *abrogated on other grounds by Califano v. Sanders*, 40 U.S. 99 (1977).

This presumption of nonreviewability applies with particular force when it comes to immigration. On top of the general concerns implicated in any enforcement decision, the enforcement of immigration laws "embraces immediate human concerns," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 396–97. Given these realities, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Id.* at 396. One form of that broad discretion is deferred action, a "discretionary and reversible" decision to notify an alien that DHS has chosen not to seek his removal for a specific period of time. *Arpaio*, 797 F.3d at 17; *see supra* at 5-6. Like other agency nonenforcement decisions, grants of deferred action rest on a complex balancing of policy considerations that cannot serve as "meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830. Such determinations are thus presumptively unreviewable. *See Arpaio*, 797 F.3d at 16.

The converse is equally true: *denials* of deferred action are also committed to agency discretion. *See AADC*, 525 U.S. at 485 (treating "'no deferred action' decisions" as "discretionary determinations"). Because "[g]ranting an illegally present alien permission to

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

15

remain and work in this country" is fundamentally "a dispensation of mercy," there are "no standards by which judges may patrol its exercise." *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (INS's decision not to grant pre-hearing voluntary departures and work authorizations to a group of aliens non-justiciable). To be sure, a decision "not to grant deferred action status to a particular alien is not precisely a 'decision not to take enforcement action,'" but that does not obscure the fact that "many of the same factors" underlying the latter determinations usually play a role in the former. *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 n.4 (9th Cir. 1987) ("denials of deferred action status applications are not subject to judicial review" under § 701(a)(2)).

**2.** As an exercise of enforcement discretion, the Rescission Policy is a classic example of a discretionary determination that is entrusted to the agency alone. Indeed, any attempt to judge the Policy would quickly entangle this Court in the sort of complex and discretionary balancing that has been entrusted by Congress to the Executive Branch. For example, the judiciary is institutionally ill-equipped to assess whether the Acting Secretary's decision to change "immigration policies and priorities" by rescinding DACA, Rescission Policy at 4 (AR 255), was an appropriate use of "the Department's limited resources," *Arpaio*, 797 F.3d at 16. Nor is this Court well suited to second-guess the Acting Secretary's balancing of the costs and benefits of keeping the policy in place, on one hand, with the risk of "potentially imminent litigation" that could throw DACA into immediate turmoil, on the other. Rescission Policy at 3 (AR 254) (citation omitted).

To be sure, the Acting Secretary *also* gave substantive legal reasons for her decision, *id.* at 2–4 (AR 253–55), but that does not render it justiciable. That is because the Supreme Court has rejected the proposition that if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *BLE*, 482 U.S. at 283. For example, "a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction," which "is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point." *Id.* But that does not change the fact that "it is entirely clear that the refusal to prosecute

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

cannot be the subject of judicial review." *Id.* Likewise, the Acting Secretary's discussion of the question of DACA's legality does not transform her generally unreviewable exercise of enforcement discretion into a matter fit for judicial scrutiny.

Indeed, reviewing the Rescission Policy would be particularly inappropriate given the wide discretion the Secretary enjoys in the enforcement of the immigration laws. In *AADC*, the Supreme Court held that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation," 525 U.S. at 488 (footnote omitted), subject to the "possib[le]" exception "of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome," *id.* at 491. The reason for this highly restrictive rule is that the concerns raised by challenges to the Executive's enforcement discretion "are greatly magnified in the deportation context." *Id.* at 490. An alien subject to removal is, by definition, in continuing violation of the INA, and judicial interference with the Executive's enforcement therefore would compel the Executive to disregard such ongoing violations. The "delay" associated with challenges to discretionary decisions not to forgo enforcement is more likely than in the criminal arena, as "[p]ostponing justifiable deportation (in the hope that the alien's status will change … or simply with the object of extending the alien's unlawful stay) is often the principal object of resistance to a deportation proceeding," and "the consequence is to permit and prolong a continuing violation" of the immigration laws. *Id.* at 490. For another, reviewing immigration decisions may involve "not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives" or other sensitive matters as well. *Id.* at 490–91. Finally, the idea that "an ongoing violation of United States law . . . must be allowed to continue because it has been improperly selected is not powerfully appealing." *Id.* at 491 (emphasis omitted).

**B.    The INA Deprives District Courts of Jurisdiction over Challenges to Denials of Deferred Action**

Not only is the denial of deferred action committed to agency discretion under the APA, but the INA itself deprives federal district courts of jurisdiction over challenges to such denials

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

altogether. As the Supreme Court explained in *AADC*, the Executive's "exercise of [its] discretion" in granting deferred action in some circumstances had "opened the door to litigation . . . where" the Executive had "chose[n] *not* to exercise it." *Id.* at 484. Specifically, some courts had entertained challenges to "the refusal to exercise such discretion" on various bases such as "selective prosecution," the use of "arbitrary or unconstitutional criteria, or on other grounds constituting abuse of discretion." *Id.* at 485 (citation omitted). To address what the Supreme Court referred to as this "particular evil"—*i.e.*, "attempts to impose judicial constraints upon prosecutorial discretion"—Congress enacted 8 U.S.C. § 1252(g). *Id.* at 485 & n.9.

Section 1252(g) commands that, outside of petitions for review from final removal orders and certain other limited channels for review, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security[3]] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this Act." These were "the acts … that had prompted challenges to the … exercise of prosecutorial discretion" in denying deferred action, and thus § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed"—namely, an individual removal proceeding. *AADC*, 525 U.S. at 485 & n.9.

Denials of deferred action—including under DACA itself—thus fall outside the jurisdiction of the federal courts. *See, e.g.*, *Vasquez v. Aviles*, 639 F. App'x 898, 901 (3d Cir. 2016) ("[Section] 1252(g) … deprives all courts of jurisdiction to review a denial of DACA relief because that decision involves the exercise of prosecutorial discretion not to grant a deferred action."); *Botezatu v. INS*, 195 F.3d 311, 314 (7th Cir. 1999) ("Review of refusal to grant deferred action is … excluded from the jurisdiction of the district court.").

---

[3] *See* 6 U.S.C. § 557; *see also id.* §§ 202, 251; *Elgharib v. Napolitano*, 600 F.3d 597, 607 (6th Cir. 2010) ("[U]nder 6 U.S.C. § 557, . . . the statutory reference to the 'Attorney General' in § 1252(g) now means 'Secretary of DHS.'").

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

To be sure, Plaintiffs brought this challenge to the Rescission Policy before any removal proceedings took place, but that is beside the point. The decision not to continue deferred action is an ingredient to the commencement of enforcement proceedings at some future date, and a person cannot circumvent the bar in 8 U.S.C. § 1252(g) by singling out that single step for a preemptive challenge. Indeed, if aliens (or entities suing on their behalf) could evade § 1252(g)'s bar simply by challenging the forthcoming expiration of deferred action before actual removal proceedings (if any) began, then jurisdiction would turn on a race to the courthouse. Such a framework would create the perverse incentive for DHS to begin removal proceedings immediately rather than to allow, as it did here, for rolling expirations of deferred action status over a two-and-a-half year period. There is no indication that Congress sought to enact such a nonsensical regime. Instead, § 1252(g) precludes review of either "the decision *or action*" by the Acting Secretary "to commence proceedings," and thereby sweeps in the Rescission Policy (emphasis added).

Moreover, at least one court has applied § 1252(g) to actions that are "not … on the list of precluded items"—*i.e.*, "decisions to commence proceedings, adjudicate cases, or execute removal orders"—in order to effectuate the object of this jurisdictional bar. *Botezatu*, 195 F.3d at 313–14. In *Botezatu*, the Seventh Circuit rejected an alien's argument that a court could review the Executive's "refusal to … grant him humanitarian parole or deferred action" simply because that denial occurred in "post-deportation procedures." *Id.* at 313–14. As the Seventh Circuit explained, because *AADC* broadly held that "'no deferred action' decisions and similar discretionary determinations' [were] governed by § 1252(g)," that jurisdictional bar should apply regardless of *when* such determinations occurred. *Id.* at 314 (quoting *AADC*, 525 U.S. at 485). Thus, just as an alien (or entity suing on his behalf) cannot circumvent § 1252(g) by bringing a challenge to a denial of deferred action on the back-end, Plaintiffs' broad front-end assault on the Rescission Policy is beyond the jurisdiction of this Court. At the very least, 8 U.S.C. § 1252(g) reinforces the conclusion that enforcement discretion under the INA is at the core of unreviewable matters committed to agency discretion by law under the APA. 5 U.S.C. § 701(a)(2). *See Helgeson*, 153 F.3d at 1003 (review inappropriate for subject areas where

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

19

courts traditionally hesitant to intrude).[4]

### C. The University, State, Municipal, and Union Plaintiffs' Claims Are Not Cognizable

#### 1. The University, State, Municipal, and Union Plaintiffs Lack Article III Standing

At a minimum, the Court should dismiss the actions brought by the Regents of the University of California (including its president); the States of California, Maine, Maryland, and Minnesota; the City of San Jose; and the County of Santa Clara in conjunction with the Service Employees International Union Local 521 for lack of standing. To establish Article III standing, these parties must at least show that they have suffered an "injury in fact" that is "fairly traceable" to Defendants' challenged conduct and that will likely be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (brackets and citations omitted). They cannot do so. The Rescission Policy does not regulate them, require them to do (or refrain from doing) anything, or restrict them in any way. Instead, these Plaintiffs complain of injury "from the government's allegedly unlawful regulation (or lack of regulation) of someone else," making standing "substantially more difficult to establish." *Id*. at 562 (emphasis added). That burden becomes insurmountable when a plaintiff claims to be injured by the incidental effects of federal enforcement policies, as it is settled that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

These principles apply with particular force where, as here, the parties are relying primarily on the incidental effects of federal immigration policies. *See, e.g.*, *Regents of Univ. of Cal.* Compl. ¶ 2 (alleging harm arising from effect of DACA rescission on "members of [the

---

[4] The Ninth Circuit's decision in *Kwai Fun Wong v. United States*, 373 F.3d 952 (9th Cir. 2004), does not foreclose the application of § 1252(g) to this case. That case did not involve a decision not to continue deferred action, an ingredient to the commencement of enforcement proceedings and a subject directly addressed by *AADC* itself. *See id*. at 964-65. *AADC* thus provides more relevant guidance. Indeed, *Kawi Fun Wong* relied upon the fact that the challenge there did "not pose the threat of obstruction of the institution of removal proceedings or the execution of removal orders about which *AADC* was concerned." *Id*. at 970. The same cannot be said about Plaintiffs' challenge here.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

20

University of California] community" such as "students and employees"); *State of Cal.* Compl. ¶ 10 (alleging that DACA rescission will injure state-run colleges, upset workforces, disrupt statutory and regulatory interests, cause harm to state residents, damage economies, and hurt companies)[5]; *City of San Jose* Compl. ¶ 10 (alleging that San Jose has suffered injury and has third-party standing to bring lawsuit "on behalf of its employees" with whom it allegedly "has a close relationship"); *Cty. of Santa Clara* Compl. ¶¶ 15-16 (alleging injury to county due to large number of foreign-born residents and county employment of DACA recipients); *id.* ¶¶ 18-20 (allegations that local union has members who are DACA recipients). It would be extraordinary to find Article III standing based on these assertions, as virtually any administration of federal law by a federal agency could have such effects. The unavoidable reality that any enforcement of immigration laws will inevitably have some unintended or derivative effects does not provide carte blanche to challenge such enforcement decisions whenever there is a disagreement about federal immigration policy.[6]

### 2. The University, State, Municipal, and Union Plaintiffs Lack a Cause of Action Under the APA

Even if the non-individual Plaintiffs could establish Article III standing, they would lack a cause of action under the APA. The APA does not "allow suit by every person suffering an injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved" in this sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute … in question." *Clarke*, 479 U.S. at 396 (brackets and citation omitted). Here, no provision of the INA even arguably protects the non-individual

---

[5] It is unclear whether and, if so, the extent to which the State of California can rely upon any alleged injury to its "state-run colleges and universities," as the University of California system is a separate plaintiff in the separate *Regents of the University of California* lawsuit.

[6] Plaintiffs cannot overcome their failure to establish standing in their own right by invoking the asserted rights of their citizens or residents as parens patriae. "A State does not have standing as parens patriae to bring an action against the Federal Government," *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982) (citation omitted), as "it is no part of [a state's] duty or power to enforce [its citizens'] rights in respect of their relations with the federal government," *Massachusetts v. Mellon*, 262 U.S. 447, 485–86 (1923).

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

Plaintiffs from bearing any incidental effects of a denial of deferred action. *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

**D.  The Government's Justiciability Objections Are Not Inconsistent with the Acting Secretary's Reliance on the Fifth Circuit's Decision**

Although the Fifth Circuit in *Texas* included holdings that a challenge to the DAPA Memo was reviewable, 809 F.3d at 165–70, neither that decision nor Acting Secretary Duke's reliance on it forecloses the government from arguing here that the DACA Rescission Policy is unreviewable.  First, neither the Acting Secretary's memo nor the Attorney General's letter expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings, and it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place.  Second, officers of the Executive Branch have an independent duty to consider the legality of their policies regardless of whether they are judicially reviewable; all swear an oath to uphold the United States Constitution.  *See Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1867) (Take Care Clause imposes a generally nonjusticiable duty on the Executive Branch).  Finally, even if courts could have reviewed the adoption of DACA as "an abdication of [DHS's] statutory responsibilities," *Chaney*, 470 U.S. at 833 n.4, that would not make the Rescission Policy, a classic exercise of agency enforcement discretion, open to challenge.  After all, the Fifth Circuit itself emphasized that "DAPA is much more than a nonenforcement policy, which presumptively would be committed to agency discretion," *Texas*, 809 F.3d at 178 n.156, and pointed out that a "*denial* of voluntary departure and work authorization" by DHS would have been nonjusticiable, *id.* at 168.  Denials of deferred action under a return to a more traditional enforcement policy should be treated no differently.[7]

---

[7] Similarly, the fact that the Fifth Circuit held that Texas had standing because it specifically demonstrated that "it would incur significant costs in issuing driver's licenses to DAPA beneficiaries," has no bearing on the States' standing in this case. *Texas*, 809 F.3d at 155. The States here have failed to point to analogous injury similarly traceable to the Rescission Policy.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

## II. PLAINTIFFS FAIL TO STATE A CLAIM

Even if Plaintiffs' claims were justiciable, the Court should dismiss these cases in their entirety for failure to state a claim.

### A. The Acting Secretary Rationally Explained Her Decision To Wind Down DACA, Particularly Given the Imminent Risk of A Nationwide Injunction

Plaintiffs contend that the Rescission Policy is arbitrary and capricious because it constitutes a change in agency policy without an adequate explanation. *Regents of Univ. of Cal.* Compl. ¶¶ 50-58 (Count 1); *State of Cal.* Compl. ¶¶ 152-155 (Count 3); *Garcia* Compl. ¶¶ 175 (Count 4); *Cty. of Santa Clara* Compl. ¶ 71 (Count 2). Plaintiffs' allegations misapprehend the nature of the inquiry under the APA. It is black-letter law that agencies are free to change course on policy matters so long as they provide a rational explanation. Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this deferential standard, particularly in view of the imminent risk of a nationwide injunction, which could have prompted an immediate—and chaotic—end to the policy.

**1.** Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B). The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416. A decision may be held to be arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency." *Id.* And when an agency changes policies, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). Rather, "it suffices that the new policy is permissible under the statute, that there are good

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

23

reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

In assessing whether a decision was arbitrary and capricious, "[t]he task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citation omitted). If the agency's action "is not sustainable on the administrative record made," then the administrative "decision must be vacated and the matter remanded to [the agency] for further consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). This Court should therefore decide whether the Acting Secretary's decision to wind down DACA was arbitrary and capricious on the administrative record she has produced. This Court cannot consider additional materials concerning her deliberative process. It is "not the function of the court to probe the mental processes" of the agency. *Morgan v. United States*, 304 U.S. 1, 18 (1938). "Just as a judge cannot be subjected to such a scrutiny . . . so the integrity of the administrative process must be equally respected." *United States v. Morgan*, 313 U.S. 409, 422 (1941). Deliberative materials are therefore not merely protected from disclosure—they do not form part of the administrative record at all. *See San Luis Obispo Mothers for Peace v. U.S. N.R.C.*, 789 F.2d 26, 45 (D.C. Cir. 1986) (en banc). Thus, while the government submits that the Acting Secretary's decision was plainly not arbitrary and capricious under the record already before this Court, if this Court were to disagree, it should do no more than simply grant Plaintiffs the relief they seek by setting aside the Rescission Policy and remanding to her.

**2.** The Rescission Policy amply meets the "minimal standards of rationality" required by the APA. *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997). Plaintiffs do not deny that "the new policy is permissible under the [INA]." *Fox*, 556 U.S. at 515. And there are eminently "good reasons for it," *id.*, particularly in view of the litigation risk posed by the proceedings in *Texas*. In the Rescission Policy, the Acting Secretary explained that, "[t]aking into consideration the Supreme Court's and Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy at 4 (AR 255). Specifically, after

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

24

summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's conclusion in his letter that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254). The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into uncertainty.

The Acting Secretary was then "faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately." Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://go.usa.gov/xncuM. She reasonably opted for an orderly rescission, which she considered "the least disruptive option." *Id.*

There is nothing at all irrational about this choice or that explanation. *Cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 84 (2002) ("regulation reasonable" based on concerns about subjecting parties to "possible … liability"). Indeed, it is entirely sensible, given the turmoil that an abrupt, court-ordered shutdown would likely have provoked. The Acting Secretary balanced the litigation risk of keeping DACA in place with "the administrative complexities associated with ending the program," and opted for a solution that would "wind it down in an efficient and orderly fashion" accounting for the interests of DACA recipients. Rescission Policy at 3 (AR 254). She explained her reasonable decision to rescind DACA, and the APA requires no more. *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (APA satisfied where agency's explanation is clear enough that its "path may reasonably be discerned").[8] And no matter whether her (or the Attorney General's) judgment about the likely result of the *Texas* litigation would have turned out to be correct, it was surely not an irrational or arbitrary and capricious conclusion in light of the fact that at least the Fifth Circuit and four

---

[8] For these same reasons, the *Garcia* Plaintiffs' inconsistent allegations that the government both improperly provided for a wind-down period and, at the same time, made that wind-down period unreasonably "short," fails to state a claim under the APA. *See Garcia* Compl. ¶¶ 173-74.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

justices of the Supreme Court had already held that a materially indistinguishable policy was unlawful.

**3.** Plaintiffs acknowledge that the State of Texas and nine other states sent a letter to the Attorney General "threaten[ing] to challenge DACA in court unless the federal government rescinded the DACA program by September 5, 2017." *Garcia* Compl. ¶ 115. Plaintiffs nonetheless contend that the decision to rescind DACA was arbitrary and capricious because the Acting Secretary of Homeland Security considered the Attorney General's views regarding the legality of DACA, which views Plaintiffs contend "contradict conclusions previously reached by both the Department of Justice" through the Office of Legal Counsel "and the Department of Homeland Security" through its prior litigation position in the *Texas* litigation. *Id.* ¶ 120; *see also Regents of Univ. of Cal.* Compl. ¶¶ 7, 9-12, 40-41, 43; *State of Cal.* Compl. ¶¶ 105-108; *City of San Jose* Compl. ¶¶ 44; *Cty. of Santa Clara* Compl. ¶ 57. Plaintiffs' argument suffers from three independent flaws.

First, the Acting Secretary did not rely on the Attorney General's September 4 letter solely for its assessment of DACA's legality. Instead, as discussed above, she concluded that DACA "should" be wound down after considering, among other things, his litigation-risk determination that it was "likely" that a legal challenge to DACA "would yield similar results" as the DAPA litigation under Fifth Circuit precedent. Rescission Policy at 3 (AR 254). That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis for upholding the Acting Secretary's decision to rescind DACA. *See Bowman*, 419 U.S. at 286.

Second, to the extent the Acting Secretary did rely on the proposition that DACA was unlawful, this Court need not agree with that determination to uphold her decision. If an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment to avoid constitutional questions, even if the two determinations are arguably "intertwined." *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue"). Here, the Attorney

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

General regarded DACA as unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected. Rescission Policy at 3 (AR 254). But those same concerns equally support a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law." *Id.* at 2 (AR 253). This Court should sustain her decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

Third, although this Court need not decide the issue to resolve this case in favor of the government on the basis that the agency decision was at least rational, the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas* that was affirmed by the Supreme Court. The Fifth Circuit held not only that DAPA—including its proposed expansion of DACA—was likely unlawful, but also that DACA bore many "important similarities" to it. *Texas*, 809 F.3d at 174 & n.139 (noting that "the DAPA Memo's plain language … equates the DACA and DAPA procedure[s]," making DACA an "apt comparator"). Indeed, given that DAPA was enjoined before its implementation, the Fifth Circuit's decision was "informed by analysis of the implementation of DACA" itself. *Id.* at 172. On that score, while, "[l]ike the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id.* at 171–72, the court found that discretion to be illusory in practice: Because relatively few DACA requests were denied, the Fifth Circuit believed "there was evidence from DACA's implementation that [this] discretionary language was pretextual," *id.* at 172–73. Based on these findings by the Fifth Circuit, it would follow that DACA, like DAPA, did not "genuinely leave the agency and its employees free to exercise discretion" on a case-by-case basis, *id.* at 176—which supports the Attorney General's view that DACA was unlawful. And it seems likely that at least four Justices of the Supreme Court agree.

Regardless of whether the Office of Legal Counsel was correct when it previously "orally advised" that its "preliminary view" was that the proposed version of DACA would be lawful,

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

27

the reasoning in that opinion further confirms the invalidity of DACA as actually implemented in practice as found by the Fifth Circuit.[9] The "preliminary" conclusion was conditioned on the proviso that "it was critical that … the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis." *Id.* Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice. *Texas*, 809 F.3d at 176. Indeed, because deferred action continues to exist on an individualized basis, the only change made by the Acting Secretary is the elimination of the factors that, according to the Fifth Circuit, led to the policy being applied without sufficient case-by case discretion. *See id.* at 172–73 (noting testimony that, for DACA, requests were "simply rubberstamped if the applicants meet the necessary criteria"). Further, the original DACA program largely shares the relevant defects of the proposed expansion of deferred action that OLC rejected, rather than the aspects of the new program that it approved.

     **4.** The *University of California*, *Garcia*, and *County of Santa Clara* plaintiffs also allege that the rescission is arbitrary and capricious because DHS has failed to "tak[e] into account" the "serious reliance interests" of DACA recipients who submitted personal information to DHS. *Garcia* Compl. ¶ 171 (quoting *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015)); *see also Univ. of Cal.* Compl. ¶ 55 (similar); *Cty. of Santa Clara* Compl. ¶ 72 (similar). The *Garcia* Complaint's citation to inapposite Supreme Court dicta—which concerned whether agencies could "skirt notice-and-comment provisions" that applied to "regulated entities"—has no bearing here: DHS made clear that the DACA information-sharing policy on which Plaintiffs allegedly relied created no rights and "may be modified, superseded, or rescinded at any time without notice." DHS DACA FAQ No. 19. For these reasons, as described more fully in Part II.E, *infra*, any "reliance" by Plaintiffs on that policy was, at best, misplaced. Moreover, as set forth in Part II.D, *supra*, the Rescission Memo is merely a statement of policy that—like the original DACA

---

[9] U.S. Dep't of Justice, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*, 38 Op. O.L.C. 1, 18 n.8 (Nov. 19, 2014) (OLC Op.), https://www.justice.gov/file/179206/download.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

policy—does not create any enforceable rights and is subject to change at any time.[10] And insofar as Plaintiffs suggest that the Acting Secretary failed to consider the reliance interests of DACA recipients more generally, that assertion ignores her calculus based the looming risk of a nationwide injunction ending the DACA program altogether. Given her view that she faced an imminent, court-ordered end to DACA, the Acting Secretary opted for an orderly wind-down process that would protect the reliance interests of DACA recipients far more than an immediate injunction terminating the program would. *See* Part II.A.2, *supra*. Finally, to the extent that she rationally concluded DACA was illegal, there would be no legitimate reliance interests at all.

In all events, the foregoing analysis confirms that the Acting Secretary's decision was at a minimum reasonable and that Plaintiffs' APA challenge can be resolved at this stage based on the record now before the Court. Indeed, whatever this Court decides, there is no basis for supplementing the record or discovery to assess the Acting Secretary's explanation.

### B. The Rescission Policy Is Exempt from Notice and Comment

Plaintiffs miss the mark in arguing that the Rescission Policy must be set aside because it is a substantive rule issued without notice and comment. *See Regents of Univ. of Cal.* Compl. ¶¶ 59-66 (Count 2); *State of Cal.* Compl. ¶¶ 146-151; *City of San Jose* Compl. ¶¶ 59-63 (Count 2); *Garcia* Compl. ¶¶ 177-184 (Count 5); *see also* 5 U.S.C. § 553(b)–(c). If winding down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the first place. Critically, though, the DACA Memo itself also was not adopted through notice and comment. So even on Plaintiffs' own theory, it would be void *ab initio*—leaving Plaintiffs without a remedy. That is reason enough to dismiss this claim. *See Lujan*, 504 U.S. at 561 (plaintiff must show "injury will be 'redressed by a favorable decision'" to establish standing).[11]

---

[10] The *Garcia* plaintiffs also allege that DACA's termination violated the APA because it was unconstitutional. *See Garcia* Compl. ¶¶ 160-164 (Count 3). Plaintiffs' allegations that the rescission of DACA was unconstitutional are addressed in Sections II.C-E, *infra*.

[11] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982). That holding, however, concerned the rescission of a rule promulgated after notice and comment that was allegedly defective on other grounds, not a rule

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

29

In any event, Plaintiffs' claim is erroneous. DHS and INS have adopted over 20 deferred action or similar policies over the past 50 years—rarely through notice and comment. That is because such policies, like the Rescission Policy, are not substantive rules at all. Rather, they are classic examples of "general statements of policy" that are exempt from the APA's notice-and-comment requirements. 5 U.S.C. § 553(b)(3)(A).

A "substantive rule establishes a standard of conduct which has the force of law." *Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974). Thus, an "agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

A statement of policy, by contrast, "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947)). It "explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule." *McCarthy*, 758 F.3d at 252. It serves to "appris[e] the regulated community of the agency's intentions" and "inform[] the exercise of discretion by agents and officers in the field." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987). And "a general statement of policy, like a press release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec.*, 506 F.2d at 38. Accordingly, policy statements "are binding on neither the public nor the agency," and the agency "retains the discretion and the authority to change its position … in any specific case." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (citations omitted).

---

that was defective precisely because it had failed to go through notice and comment in the first place. *See id.* at 445–46. When an agency has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go those procedures to cure the underlying defect.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

30

As these principles make clear, the Rescission Policy is a quintessential policy statement—a point that its text reinforces again and again. It was issued as an "exercise of [the Secretary's] authority in establishing national immigration policies and priorities." Rescission Policy at 4 (AR 255). It explains how the agency intends to exercise its enforcement authority on a prospective basis, a matter that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. It does not immediately deprive any DACA recipients of their current deferred action status, but describes how pending and future deferred action requests will be "adjudicate[d]—on an individual, case-by-case basis." Rescission Policy at 4 (AR 255). It does not categorically forbid the agency from continuing to defer enforcement action against DACA recipients in the future, but instead acknowledges the background principle, recognized by Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such "otherwise lawful enforcement … prerogatives," *id.* at 5 (AR 256). And it explains that it "does not … create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* Thus, in the wake of the Rescission Policy, deferred action "remains discretionary and reversible," *Arpaio*, 797 F.3d at 17—as with the 20-odd deferred action or similar policies that DHS and INS have adopted over the past half-century, generally without going through the full notice-and-comment process.[12]

That is as it should be. An agency's enforcement priorities will inevitably shift over time, whether due to changing circumstances or resource constraints. *See Chaney*, 470 U.S. at 831. Indeed, the DACA policy was originally adopted in part to set enforcement priorities in view of the agency's limited resources. *See Arpaio*, 797 F.3d at 16; DACA Memo at 1 (AR 1); DAPA Memo at 1 (AR 37). Under Plaintiffs' theory, however, even if Congress were to vastly

---

[12] The Fifth Circuit's ruling that the adoption of the DAPA Memo required notice and comment does not imply that the rescission of DACA does as well. Unlike the DAPA or DACA Memos, the Rescission Policy announced a return to an enforcement policy of using deferred action on an individualized basis, which cannot be cast as a substantive rule. Indeed, the Fifth Circuit itself stressed that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Texas*, 809 F.3d at 178 n.156. In any event, if this Court agrees with the Fifth Circuit, then DACA was void *ab initio* and Plaintiffs lack a remedy.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

increase appropriations for immigration enforcement, the agency's hands would be tied: it would not be free to adjust its enforcement priorities without engaging in "cumbersome and time-consuming rulemaking proceedings." *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988). The Court should not endorse such an intrusion into matters that have "long been regarded as the special province of the Executive Branch." *Chaney*, 470 U.S. at 832.

### C.     Plaintiffs Fail to State an Equal Protection Claim

**1.** If this Court disagrees with Defendants and concludes that it can review Plaintiffs' equal protection challenges under *AADC*, *but see supra* § I.A, B, it nonetheless should dismiss them for failure to state a claim. In *Armstrong*, the Supreme Court considered whether criminal defendants could obtain discovery to support a "selective prosecution" claim arising under the Equal Protection Clause. 517 U.S. at 463–64. The Court recognized that such claims, like the discriminatory-motive claims here, "ask[] a court to exercise judicial power over a 'special province' of the Executive"—specifically, the "constitutional responsibility to 'take Care that the Laws be faithfully executed'"—and thereby risk "impair[ing] the performance of a core executive constitutional function." *Id.* at 464-65 (citations omitted). Given these considerations, a "presumption of regularity supports" such enforcement decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Id.* at 464 (citation omitted). Applying this "rigorous standard," *id.* at 468, the Court refused to allow discovery in support of the selective-prosecution claim before it, even though the claimants had provided evidence that in each of the 24 prosecutions for certain drug-trafficking offenses that were closed by the federal defender's office in a single year, the defendant was African-American, *id.* at 459, 469-70.

Although Plaintiffs here allege that the Rescission Policy was motivated by discriminatory animus rather than assert that they have been selectively prosecuted, *Armstrong* still requires them to allege, and ultimately prove, that this is a "clear" case of discrimination in order to overcome the presumption that Defendants have faithfully enforced the laws. *Id.* at 464. As in *Armstrong*, Plaintiffs here ask this Court to "exercise judicial power over a 'special

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

province' of the Executive," with the associated risk of "impair[ing] the performance of a core executive constitutional function." *Id*. at 464–65 (citations omitted). Plaintiffs consequently must overcome "a significant barrier to the litigation" of their claims. *Id.* at 464. And that is especially true given that they allege an unlawful enforcement of the *immigration* laws. Even if *AADC* permitted the adjudication of Plaintiffs' claims, that decision would at least require them to satisfy a rigorous standard similar to the one in *Armstrong*. As *AADC* explained, the concerns justifying a heightened burden under *Armstrong* "are greatly magnified in the deportation context," 525 U.S. at 490, and all of those considerations are present here, *see supra* p. 17. Accordingly, Plaintiffs must at least meet a heavy burden to survive a motion to dismiss on a claim that Defendants harbored a hidden discriminatory motive in their enforcement of the immigration laws.

Plaintiffs cannot carry that burden here. Their allegations consist of the assertion that 80 percent of DACA recipients were Mexican nationals, *see Cty. of Santa Clara* Compl. ¶ 75, and that approximately 93 percent of DACA recipients are individuals from Latin American countries, *see id.*; *see also Garcia* Compl. ¶ 151, as well as selected references to statements by the President and others relating to immigrants, Mexicans, or Latinos, *see City of San Jose* Compl. ¶¶ 30-36; *Garcia* Compl. ¶¶ 99-113; *Cty. of Santa Clara* Compl. ¶ 9. These allegations are insufficient to overcome the "significant barrier" to moving forward on a claim of this sort. *Armstrong*, 517 U.S. at 464.

The fact that approximately 80 percent of approved DACA recipients are Mexican nationals is an unsurprising accident of geography, not evidence of discrimination, let alone the kind sufficient to establish discriminatory motive in the enforcement of immigration laws. Even in the ordinary domestic equal protection setting, a disparate impact of a facially neutral rule such as the Rescission Policy, standing alone, cannot establish discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 242 (1976), *superseded by statute, see Veasey v. Perry*, 29 F. Supp. 3d 896, 916 (S.D. Tex. 2014). Much less can it do so when the exercise of enforcement discretion is involved: In *Armstrong*, the fact that 100 percent of the relevant defendants were African-American was not enough to justify discovery. 517 U.S. at 459. *A*

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

*fortiori*, the fact that approximately 80 percent of DACA recipients are Mexican nationals provides no basis for ordering discovery into the discretionary administration of the immigration laws, especially given the heightened deference owed to the political branches on immigration matters, where sensitive considerations of relations and proximity to particular foreign nations necessarily plays a role.

Nor do the President's statements—most of which were made before he took the oath of office—indicate that the rescission of DACA is a clear case of discrimination. To start, none of these stray remarks concern the Rescission Policy itself. To the contrary, Plaintiffs themselves emphasize that when the President has spoken on this issue, he has shown support for DACA recipients.[13] More importantly, Plaintiffs point to nothing that would suggest Acting Secretary Duke—the decisionmaker ultimately responsible for the Rescission Policy— chose to wind-down DACA due to animus towards Mexican nationals. Given that the statements at issue have no connection to either the relevant decision (the rescission of DACA) or the relevant decision-maker (the Acting Secretary), adopting Plaintiffs' theory would mean that any time DHS enforces the immigration laws in a way that has a statistically significant disparate impact on Mexican nationals, the agency would be subject to intrusive discovery on allegations of a violation of Fifth Amendment equal protection principles. That would set a dangerous precedent, and it would freeze the enforcement discretion of the entire Executive Branch. That ossification would be particularly inappropriate in this context, given that immigration enforcement policies must constantly be adjusted to account for "[t]he dynamic nature of relations with other countries." *Arizona*, 567 U.S. at 397. In all events, Plaintiffs'

---

[13] *See City of San Jose* Compl ¶ 37 (alleging the President "has repeatedly stated his support for DACA recipients" including through statement that "[w]e're going to work something out that's going to make people happy and proud. They got brought here at a very young age, they've worked here, they've gone to school here. Some were good students. Some have wonderful jobs."); *id.* ¶ 38 (President's statement that his plan to address DACA is "going to have a lot of heart"); *id.* ¶ 39 (Presidential statement that DACA grantees "shouldn't be very worried" because "[w]e're going to take care of everybody."); *id.* ¶ 40 (describing DACA recipients as "some absolutely incredible kids – I would say mostly."); *id.* ¶ 42 (Presidential statement that "I do not favor punishing children, most of whom are now adults, for the actions of their parents. But we must also recognize that we are [a] nation of opportunity because we are a nation of laws.").

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

inferences from unrelated remarks cannot qualify as the sort of "clear" allegations of discrimination necessary in this context. *Armstrong*, 517 U.S. at 464.

**2.** The State Plaintiffs advance a separate equal protection theory alleging that "[t]he rescission of DACA violates fundamental conceptions of justice by depriving DACA grantees, as a class, of their substantial interests in pursuing a livelihood to support themselves and further their education." *State of Cal.* Compl. ¶ 174. This claim fails for the simple reason that Plaintiffs have failed to identify any "fundamental rights" implicated by the Rescission Policy. *See Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003) (under equal protection doctrine, strict scrutiny applies if "the statute in question substantially burdens fundamental rights, such as the right to vote"). Even for U.S. citizens, "the right to pursue a calling is not a fundamental right for purposes of the Equal Protection Clause." *Marilley v. Bonham*, 844 F.3d 841, 854-55 (9th Cir. 2016) (citation omitted), *cert. denied*, No. 16-1391, 2017 WL 2256242 (Oct. 10, 2017). Nor, for that matter, is the right to further an education. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37 (1973). If the contrary were true, then all sorts of regulations addressing employment and education, including various licensing laws, would suddenly be subject to strict scrutiny. *A fortiori*, unlawfully present aliens, who do not even have a fundamental right to remain in the United States, *see infra* Part D, cannot invoke a right to pursue a calling or further an education. Indeed, an alternate rule would call into question longstanding immigration laws. *See, e.g.*, *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002) (discussing "[Immigration Reform and Control Act of 1986], a comprehensive scheme prohibiting the employment of illegal aliens in the United States" (citations omitted)). Accordingly, the Rescission Policy can be subject only to rational-basis review, *see* Green, 340 F.3d at 896, and easily survives that standard for the reasons given above, *see* Part II.A, *supra*. Plaintiffs' claim therefore fails as a matter of law.

**D.     Plaintiffs Fail to State a Procedural Due Process Claim**

The *University of California*, *Garcia*, and *County of Santa Clara* Plaintiffs allege that the rescission violates procedural due process norms to the extent that DACA recipients will be deprived of their interests in their DACA status without notice and an opportunity to be heard.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

35

*See Regents of Univ. of Cal.* Compl. ¶¶ 67-73 (Count 3); *Garcia* Compl. ¶¶ 133-147 (Count 1); *Cty. of Santa Clara* Compl. ¶¶ 59-66 (Count 1). This claim fails on the merits for the simple reason that DACA recipients have no protected liberty or property interest in deferred action entitling them to due process protections.

The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Thus, the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citation omitted). The "Due Process Clause does not protect everything that might be described as a 'benefit.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). Rather, "'[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Such entitlements "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source"—*e.g.*, statutes or regulations—"that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577.

A benefit "is not a protected entitlement" for due process purposes where, as here, "government officials may grant or deny it in their discretion." *Castle Rock*, 545 U.S. at 756. For due process purposes, statutes or regulations limit discretion only when they contain "explicitly mandatory language"—*i.e.*, "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 462–63 (1989) (citation omitted). The DACA policy contains no such "explicitly mandatory language." *Id.* The policy is codified in no statute or regulation. Its source—the DACA Memo—describes it as a "policy" for the "exercise of prosecutorial discretion." DACA Memo at 2-3 (AR 2-3); *see Omar v. McHugh*, 646 F.3d 13, 22 n.7 (D.C. Cir. 2011) (the "use of the word 'policy'"—"rather than a word such as 'right'— reinforces the conclusion that Congress did not intend to create an 'entitlement'"). And the

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

36

agency's public guidance makes clear that, under DACA, deferred action "may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion."  DHS DACA FAQ No. 27.

Under DACA, "deferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'"  *Arpaio*, 797 F.3d at 17 (quoting DACA Memo at 3 (AR 3)).  "Only the Congress, acting through its legislative authority, can confer these rights."  DACA Memo at 3 (AR 3).  Simply put, there is "no protectable liberty interest in deferred action."  *Romiero de Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985).  Thus, deferred action is not a protected entitlement for due process purposes, and Plaintiffs' claim fails as a matter of law.  *See Velasco-Gutierrez v. Crossland*, 732 F.2d 792, 798 (10th Cir. 1984) (deferred action guidance "places no effective limitations on official discretion, and thus creates no protected liberty interest in deferred action").

Moreover, even if DACA could be conceived of as an entitlement, Plaintiffs' due process claim would still fail because changes in agency policy do not require individualized process.  Due process doctrine recognizes a "distinction between individualized deprivations, [which] are protected by procedural due process, and policy-based deprivations of the interests of a class, [which] are not protected by procedural due process."  2 Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.2 (5th ed. 2010).  The rescission of DACA falls squarely in the latter category.[14]

Plaintiffs allege that DACA could not be rescinded without first giving recipients "process before depriving them of their work authorizations and DACA status, and the benefits that flow from that status."  *Regents of Univ. of Cal.* Compl. ¶ 16; *see also Cty. of Santa Clara* Compl. ¶¶ 7, 63 (alleging violation of due process rights).  But Plaintiffs' theory is not that individual DACA requests were adjudicated incorrectly (for example, due to factual error)—the sort of mistake that notice and a hearing could conceivably help correct.  Instead, Plaintiff's

---

[14] The *University of California* and *Santa Clara* Plaintiffs also appear to allege that the due process rights of the university and county have somehow been violated.  *See Univ. of Cal.* Compl. ¶ 69; *Cty. of Santa Clara* Compl. ¶¶ 60, 62.  The legal basis for this claim is unclear at best, and in any event to the extent this Court finds that individual DACA recipients lack due process rights, *a fortiori* universities, counties, and other entities would also lack any such rights.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

claim appears to be that DHS cannot alter the DACA policy, even on a prospective basis, without providing individualized notice and hearings to nearly 800,000 recipients.

Such individualized process is not required. The Supreme Court held long ago that where a government policy "applies to more than a few people, it is impracticable that every one should have a direct voice in its adoption," and thus due process does not require individualized pre-deprivation notice. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). This case presents "the classic *Bi-Metallic* scenario"—the challenged policy applies across-the-board to a large number of people, so "[n]ot only would individualized hearings be impractical, they would be unnecessary." *Decatur Liquors, Inc. v. Dist. of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007) (citing *Bi-Metallic*, 239 U.S. at 445).

The Ninth Circuit's decision in *Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980), is instructive in this regard. There, the INS had issued a policy directive granting "deferred voluntary departure"—a form of deferred action—to Iranian nationals who were unwilling to return home due to political instability. *Id*. at 1359. Then, in response to the Iranian hostage crisis, the INS issued another policy directive "rescinding the … deferred departure" and requiring its recipients to depart the country within 30 days. *Id*. Relying on *Bi-Metallic*, the Ninth Circuit rejected the plaintiff's claim "that he should have had a prior opportunity to contest [the INS's] decision to rescind deferred departure." *Id*. at 1363. "Where an agency action is not based on individual grounds, but is a matter of general policy," the court explained, "no hearing is constitutionally required." *Id*. (citing, *inter alia*, *Bi-Metallic*, 239 U.S. 441). So too here.

### E. Plaintiffs Fail to State a Substantive Due Process Claim.

Taking a different tack, the *State of California*, *Garcia*, and *County of Santa Clara* Plaintiffs assert that the Rescission Policy violates substantive due process because DHS has allegedly changed its policy on the use of information contained in DACA requests, including that DHS will allegedly use such information for enforcement purposes in a manner that is not "fundamentally fair." *State of Cal.* Compl. ¶¶ 141-145 (Count 1); *Garcia* Compl. ¶¶ 133-147 (Count 1); *Cty. of Santa Clara* Compl. ¶¶ 59-66 (Count 1). None of these claims has merit.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

38

As a threshold matter, no Plaintiff alleges facts sufficient to show that there actually has been a substantive change in policy regarding information sharing. For example, the State Plaintiffs merely allege that the "Rescission Memorandum does not provide adequate assurances that this information will not be used for enforcement purposes following DACA's termination." *State of Cal.* Compl. ¶ 120; *see also Garcia* Compl. ¶ 126 (similar allegations); *Cty. of Santa Clara* Compl. ¶ 58 (alleging that there "appears" to be a change of policy). And while they cite language in the Rescission FAQs indicting that information "[g]enerally . . . will not be proactively provided to other law enforcement entities," *State of Cal.* Compl. ¶ 122 (emphasis omitted) (quoting Rescission FAQs), that language is entirely consistent with DHS's policy regarding the protection of DACA information, including its many exceptions that Plaintiffs largely gloss over. *See State of Cal.* Compl. ¶ 121 (characterizing exceptions to policy as "limited").

Contrary to Plaintiffs' suggestion that DHS has flatly and completely prohibited the use of DACA information for enforcement purposes, *see Garcia* Compl. ¶ 126, the agency's information-sharing policy in fact contains (and has always contained) a number of exceptions. For example, under that policy, information submitted in DACA requests "is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings *unless* the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS'[s] Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised). DHS DACA FAQ No. 19 (emphasis added); *see* Notice to Appear Guidance. While this policy "may be modified, superseded, or rescinded at any time" and creates no legal rights, DHS DACA FAQ No. 19, nothing in the Rescission Policy purports to change it, and it currently remains in effect. *Cf. Gerhart v. Lake Cnty., Mont.*, 637 F.3d 1013, 1020-21 (9th Cir. 2011) ("A person's belief of entitlement to a government benefit, no matter how sincerely or reasonably held, does not create a property right if that belief is not mutually held by the government . . . . '[A] constitutional entitlement cannot be created—as if by estoppel—merely because a wholly and *expressly*

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

39

discretionary state privilege has been granted generously in the past.'" (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)) (citations omitted)).

In any event, Plaintiffs fail to state a substantive due process claim. Substantive due process protects those rights that rank as "fundamental"—that is, both "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citation omitted). The Supreme Court has also made clear that a plaintiff must provide "a 'careful description' of the asserted fundamental liberty interest" when raising such a claim. *Chavez v. Martinez*, 538 U.S. 760, 775–76 (2003). "[V]ague generalities," like Plaintiffs' wish that DHS would adopt their preferred policies, "will not suffice. *Id.* at 776.

While in rare cases a "denial of fundamental fairness" may rise to the level of a substantive due process violation, to survive dismissal in a "challenge to executive action" such as this one, Plaintiffs must allege behavior that is "so egregious" and "outrageous" as "to shock the contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998). "It is not enough to allege conscience shocking action, however. As a threshold matter, to establish a substantive due process claim a plaintiff must how a government deprivation of life, liberty, or property." *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006) (quotation omitted).

Plaintiffs here cannot meet that standard because the Ninth Circuit—in a context nearly identical to the circumstances presented by Plaintiffs here—squarely rejected the argument that the denial of discretionary relief in the immigration context can give rise to a substantive due process claim. In *Munoz v. Ashcroft*, a Guatemalan citizen who was unlawfully brought to the United States when he was one year old, and who continuously lived in the United States until he was 24 years old, was found to be removable by the Board of Immigration Appeals. 399 F.3d 950, 953-54 (9th Cir. 2003). On review of the Board's decision, the Ninth Circuit rejected petitioner's argument that he had acquired a substantive due process right to stay in the United States due to his unique circumstances, holding that the "denial of [discretionary] relief cannot violate a substantive interest protected by the Due Process clause." *Id.* at 954; *see also Hyuk Joon Lim v. Holder*, 710 F.3d 1074, 1076 (9th Cir. 2013) ("Cancellation of removal is a form of

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

40

discretionary relief which does not give rise to a 'substantive interest protected by the Due Process Clause.'") (quoting *Munoz v. Ashcroft*, 339 F.3d 950, 954 (9th Cir. 2003)); *Tefel v. Reno*, 180 F.3d 1286, 1300-01 (11th Cir. 1999) ("[n]o constitutionally protected interest arises from the INS' actions in granting or denying applications for suspension," that "prior generosity in awarding wholly and expressly discretionary relief does not prove the existence of a constitutional entitlement," and that "awarding and then revoking discretionary relief does not offend due process" (quotation marks omitted)).  The harm alleged by Plaintiffs here—that the alleged use of information for immigration enforcement purposes—therefore cannot give rise to a substantive due process claim because DACA recipients simply "ha[ve] no substantive due process right[s] to stay in the United States." *Munoz*, 339 F.3d at 954.  And even if they did, there is certainly nothing conscience-shocking about DHS's information-sharing policy, which has always been subject to a number of exceptions and in fact remains unchanged.

### F.    Plaintiffs' Regulatory Flexibility Act Claim Fails Because Notice-and-Comment Procedures Were Not Required

Plaintiffs' Regulatory Flexibility Act (RFA) claim fails for the same reasons as its notice-and-comment claim, and it can be quickly dispatched.  *See State of Cal.* Compl. ¶¶ 156-163 (Count 4); *Garcia* Compl. ¶¶ 185-191 (Count 6).  The RFA's requirement that an agency publish analyses of a rule's impact on small businesses applies only "'when an agency promulgates a final rule under section 553 of … title [5], after being required by that section or any other law to publish a general notice of proposed rulemaking,'" *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005) (quoting 5 U.S.C. § 604(a))—in other words, only where notice-and-comment procedures are required.  Because those procedures were not required here, *see supra* § II.B, the RFA does not apply.

Plaintiffs also lack standing to raise an RFA claim:  They allege no facts to demonstrate that they are "small entities" entitled to seek judicial review under the RFA.  *See* 5 U.S.C. § 601(6) (defining "small entity"); *id.* § 611 (restricting judicial review to "a small entity that is adversely affected or aggrieved"); *see also, e.g., N.W. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 13 (D.D.C. 1998) ("[T]he language of the RFA extends standing to seek judicial review only to a

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

41

'small entity.'").  Plaintiff states are not, of course, small entities subject to the RFA, and they offer only conclusory allegations about the impact of DACA's rescission on undefined small entities within their respective states.  *See State of Cal.* Compl. ¶ 4, 28, 49, 88, 156-163.  And the *Garcia* plaintiffs—who are individual DACA recipients—do not offer any substantive RFA allegations at all.

### G. Plaintiffs' Equitable Estoppel Claims Fail.

The *States*, *Garcia*, and *County of Santa Clara* Plaintiffs have brought equitable estoppel claims, alleging that DACA recipients provided detailed personal information to the government and "rearranged their lives" based on the government's representations, but now face removal due to the rescission of DACA.  On that basis, those Plaintiffs claim that the government should be equitably estopped from terminating DACA or from using DACA information for enforcement purposes.  *See State of Cal.* Compl. ¶¶ 164-171 (Count 5); *Garcia* Compl. ¶¶ 192-199 (Count 7); *Cty. of Santa Clara* Compl. ¶¶ 79-86 (Count 4).

Plaintiffs' equitable estoppel claims cannot succeed for several reasons.  As a threshold matter, Plaintiffs cannot succeed because there is no recognized cause of action for estoppel. The Supreme Court has explained that "private rights of action to enforce federal law must be created by Congress."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  Congress has created no such cause of action for estoppel.  This is further confirmed by the Federal Rules of Civil Procedure, which expressly recognize estoppel as an affirmative defense—not a cause of action. *See* Fed. R. Civ. P. 8(c).

Even then, the remedy of equitable estoppel does not apply in this context.  Even assuming arguendo that this remedy could ever be applied to the federal government, *but see OPM v. Richmond*, 496 U.S. 414, 419, 423 (1990), equitable estoppel does not apply to the policy decisions of the federal government.  *See, e.g.*, *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("[T]he government should not be unduly hindered from changing its position if that shift is the result of a change in public policy."), *cited in New Hampshire v. Maine*, 532 U.S. 742, 755 (2001); *Emery Min. Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984) (the doctrine of estoppel cannot be justified against the government where it would "interfere with

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

42

underlying government policies or unduly undermine the correct enforcement of a particular law or regulation"). Indeed, it is axiomatic that the government may alter its policies for any number of reasons, in accordance with any applicable procedures. *See generally Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1210 (2015). Here, the Acting Secretary of Homeland Security issued a memorandum rescinding DACA, which is a matter committed to agency discretion by law.

Finally, even if a cause of action for estoppel were available to challenge the policy here (it is not), Plaintiffs could not satisfy the elements of that claim. Even in situations where an estoppel claim against the government may be appropriate (*e.g.,* individualized challenges to non-policy actions), courts "invoke the doctrine of estoppel against the government with great reluctance." *United States v. Browning,* 630 F.2d 694, 702 (10th Cir. 1980); *see also Heckler v. Cmty. Health Servs.,* 467 U.S. 51, 60 (1984) (government may not be estopped on same terms as any other litigant). In other words, estoppel can only be invoked against the government "where justice and fair play require it." *Watkins v. U.S. Army*, 875 F.2d 699, 706 (9th Cir. 1989) (en banc) (quotation omitted). In the rare circumstances in which equitable estoppel may apply against the government, a party must show "affirmative misconduct going beyond mere negligence" and, "even then, estoppel will only apply where the government's wrongful act will cause a serious injustice, and the public's interest will not suffer undue damage by imposition of the liability." *Id.* at 707 (quotation omitted). Plaintiffs cannot meet this standard.

First, Plaintiffs have failed to plausibly allege that the government engaged in any "affirmative misconduct going beyond mere negligence." *Id.* To meet that standard, Plaintiffs must plead "an affirmative misrepresentation or affirmative concealment of a material fact by the government." *Id.* The cases that Plaintiffs have previously cited to this Court, *see* Letter from State of Cal. re Equitable Estoppel, ECF No. 51, make clear that Plaintiffs cannot overcome this high bar. In the *Watkins* case, the Army affirmatively misrepresented a soldier's qualifications throughout fourteen years of official records. *Watkins*, 875 F.2d at 707. Similarly, in *Salgado-Diaz v. Gonzales*, the INS was precluded from relying upon a misrepresentation made by an alien petitioner that occurred only after, and as a downstream effect of, the INS's own

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

43

misconduct in denying the alien's due process rights.  395 F.3d 1158, 1166 (9th Cir. 2005).[15]

Here, Plaintiffs have not identified any governmental misconduct, let alone extraordinary misconduct.  Instead, they have merely pleaded that there was a change in policy.

Second, estoppel for individual claims is only available where the government's act will cause a "serious injustice" and applying estoppel will not cause the public's interest to "suffer undue damage."  *Watkins*, 875 F.2d at 707 (quotation omitted).  Plaintiffs have failed to sufficiently plead facts that would support these necessary threshold elements.  To the contrary, as reflected in Plaintiffs' exhibits, DHS made clear in its FAQs that "DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion."  DHS DACA FAQ No. 27, attached as Ex. E to *State of Cal.* Compl.  Moreover, nothing in the 2012 DACA Memorandum, the form used to request DACA (USCIS Form I-821D, attached as Ex. N to *State of Cal.* Compl.), or in the DACA FAQs generally could be construed to represent to DACA recipients that the DACA policy was permanent and not subject to change.  There is therefore no "serious injustice" that Plaintiffs can point to relating to the rescission of this discretionary policy.[16]

At bottom, Plaintiffs' estoppel claims merely repackage their policy challenges. Equitable estoppel, however, is unavailable for such broad-based challenges.  And even if the Court were to review Plaintiffs' claims on an individualized basis, those claims still fail.  While Plaintiffs surely disagree with the rescission of DACA, that disagreement does not mean that Plaintiffs have alleged that there is a "serious injustice," much less a circumstance in which estoppel should apply.  For these reasons, Plaintiffs' equitable estoppel claims should be dismissed.

---

[15] As both of these cases previously cited by Plaintiffs make clear, to the extent equitable estoppel is available at all, it is only available for individualized claims.  Plaintiffs' authority is inapplicable to the policy challenges that Plaintiffs present here.

[16] Even if this Court were to conclude that Plaintiffs can somehow meet these threshold requirements, it would still need to apply traditional estoppel elements to Plaintiffs' claims on an individualized bases:  "(1) The party to be estopped must know the facts; (2) he must intend that he conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury."  *Watkins*, 875 F.2d at 709 (quotation omitted).  Plaintiffs have failed to plausibly allege facts in support of these elements as well.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

44

III.    **NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS IMPERMISSIBLE**

The *Garcia* Plaintiffs seek in a separate cause of action a declaratory judgment that DACA is "lawful." *See Garcia* Compl. ¶¶ 200-205 (Count 8). Declaratory relief, however, "is a remedy, not an independent cause of action." *Dinh Nguy v. Cty. of Yolo*, No. 2:14-cv-229-MCE-EFB PS, 2014 WL 4446829, at *8 (E.D. Cal. Sept. 9, 2014); *see Mangindin v. Wash. Mut. Bank*, 637 F. Supp. 2d 700, 708 (N.D. Cal. 2009) (dismissing declaratory relief claim as "duplicative and unnecessary" because relief "is entirely commensurate with the relief sought through their other causes of action"). Moreover, to establish standing and seek relief under the Declaratory Judgment Act, a plaintiff must demonstrate that there is an "actual controversy" necessitating declaratory relief. 28 U.S.C. § 2201(a); *see Garcia* Compl. ¶ 202; *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 239-40 (1937). The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna*, 300 U.S. at 240.

Here, even assuming DACA were "lawful," any declaratory relief that this Court might provide would merely be an academic dispute because the Acting Secretary still would have had the discretion to rescind the policy. *See supra* Part II.A. Instead, the "controversy" (to the extent it is even justiciable) concerns whether the Acting Secretary of Homeland Security's decision to rescind DACA in light of litigation risk that DHS was facing was arbitrary or capricious. Any after-the-fact conclusion by this Court that DACA is "lawful" has no bearing on that decision, which was based on the litigation risk that DHS was then confronting. Thus, any declaratory judgment that this Court might issue would not provide any actual benefits to Plaintiffs.

Plaintiffs also seek injunctive relief. To the extent this Court ultimately concludes that Plaintiffs are entitled to any injunction, it should dismiss the request for nationwide relief. Both constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries. Article III demands that "a plaintiff must demonstrate standing … for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted). "The remedy" sought thus must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996). "The actual-injury requirement would hardly serve [its] purpose … of

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

45

preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *Id.* And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties"). Accordingly, any injunction here should be limited to particular individual Plaintiffs found to have cognizable claims.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss these cases.

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

46

Dated:  November 1, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRIAN STRETCH
United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Branch Director

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG (DC Bar #467513)
Senior Trial Counsel
STEPHEN M. PEZZI (DC Bar #995500)
KATE BAILEY (MD Bar #1601270001)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue N.W.
Washington, DC  20530
Phone: (202) 514-3374
Fax: (202) 616-8460
Email: brad.rosenberg@usdoj.gov

*Attorneys for Defendants*

DEFENDANTS' NOTICE OF MOTION & MOTION TO DISMISS; MEM. IN SUPPORT
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

47

# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF CALIFORNIA

REGENTS OF UNIVERSITY OF
CALIFORNIA and JANET NAPOLITANO, in
her official capacity as President of the
University of California,

        Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY and ELAINE
DUKE, in her official capacity as Acting
Secretary of the Department of Homeland
Security,

        Defendants.

No. 3:17-cv-05211-WHA
No. 3:17-cv-05235-WHA
No. 3:17-cv-05329-WHA
No. 3:17-cv-05380-WHA
No. 3:17-cv-05813-WHA

**[PROPOSED] ORDER**

This matter comes before the Court on Defendants' Motion to Dismiss.  Upon consideration of Defendants' motion and of all materials submitted in relation thereto, it is hereby ORDERED that Defendants' motion shall be, and it hereby is, GRANTED; and it is further ORDERED that the following cases shall be, and hereby are, DISMISSED:

- No. 3:17-cv-05211-WHA, *Regents of the University of California, et. al. v. U.S. Dep't of Homeland Security, et al.*
- No. 3:17-cv-05235-WHA, *State of California, et al. v. U.S. Dep't of Homeland Security, et al.*
- No. 3:17-cv-05329-WHA, *City of San Jose v. Trump, et al.*
- No. 3:17-cv-05380-WHA, *Garcia, et al. v. United States of America, et al.*
- No. 3:17-cv-05813-WHA, *County of Santa Clara, et al. v. Trump, et al.*

    IT IS SO ORDERED.

Date:_____

_____
WILLIAM ALSUP
United States District Judge

PROPOSED ORDER
All N.D. Cal. DACA Cases (Nos. 17-5211; 17-5235; 17-5329; 17-5380; 17-5813)

# EXHIBIT 11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE TRUSTEES OF PRINCETON UNIVERSITY, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 17-cv-2325 (CRC) |
| UNITED STATES OF AMERICA, *et al.*, | |
| *Defendants*. | |

## DEFENDANTS' MOTION TO DISMISS
## OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

For the reasons set forth in the accompanying memorandum of law, Defendants respectfully move the Court to dismiss this action or, in the alternative, to grant summary judgment to Defendants. *See* Fed. R. Civ. P. 12(b)(1), (6), 56.

Dated: November 22, 2017

Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

*/s/  Rachael Westmoreland*
RACHAEL WESTMORELAND (GA Bar. No. 539498)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 514-1280
Fax: (202) 616-8470
Email: rachael.westmoreland@usdoj.gov

*Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE TRUSTEES OF PRINCETON UNIVERSITY, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 17-cv-2325 (CRC) |
| UNITED STATES OF AMERICA, *et al.*, | |
| *Defendants*. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ..................................................................................................................5

    A.  Deferred Action Generally..................................................................................5

    B.  DACA and DAPA..............................................................................................6

    C.  The *Texas* Litigation ........................................................................................8

    D.  Rescission of DACA..........................................................................................9

    E.  The Instant Action............................................................................................10

LEGAL STANDARDS ......................................................................................................11

ARGUMENT .....................................................................................................................13

    I.   THIS CASE IS NOT JUSTICIABLE...........................................................14

        A.  The Rescission Policy Is Not Justiciable Because this Immigration
            Enforcement Policy Is a Matter Committed to Agency Discretion
            by Law ........................................................................................................14

        B.  The INA Deprives District Courts of Jurisdiction over Challenges to
            Denials of Deferred Action........................................................................21

        C.  The Non Individual Plaintiffs' Claims Are Not Cognizable ......................24

            1.  Plaintiffs Lack Article III Standing......................................................24

            2.  Plaintiffs Lack a Cause of Action Under the APA ...............................25

        D.  The Government's Justiciability Objections Are Not Inconsistent
            with the Acting Secretary's Reliance on the Fifth Circuit's Decision........26

    II.  PLAINTIFFS FAIL TO STATE A CLAIM ...................................................27

        A.  Plaintiffs Fail to State an APA Claim........................................................27

            1.  The Acting Secretary Rationally Explained Her Decision to Wind
               Down DACA, Particularly Given the Imminent Risk of a Nationwide
               Injunction. .........................................................................................27

2.  The Rescission Policy is Exempt from Notice and Comment ...............................34

B.  Plaintiffs Fail to State an Equal Protection Claim ........................................37

C.  Plaintiffs Fail to State a Procedural Due Process Claim ................................................38

D.  Plaintiffs Fail to State a Substantive Due Process Claim. ...........................................41

III. NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS
    IMPERMISSIBLE ...........................................................................................................44

CONCLUSION....................................................................................................................45

# TABLE OF AUTHORITIES

**Cases**                                          **Page(s)**

*Abdelfattah v. U.S. Dep't of Homeland Sec.*,
   787 F.3d 524 (D.C. Cir. 2015) ................................................. 43

*Abhe & Svoboda, Inc. v. Chao*,
   508 F.3d 1052 (D.C. Cir. 2007) ............................................... 12

*Aetna Life Ins. Co. of Hartford v. Haworth*,
   300 U.S. 227 (1937) ............................................................... 44

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
   526 U.S. 40 (1999) ................................................................. 39

*Am. Nat'l Ins. Co. v. FDIC*,
   642 F.3d 1137 (D.C. Cir. 2011) ............................................... 11

*Arizona v. United States*,
   567 U.S. 387 (2012) ........................................................... 5, 16

*Arpaio v. Obama*,
   136 S. Ct. 900 (2016) ............................................................... *5*

*Arpaio v. Obama*,
   797 F.3d 11 (D.C. Cir. 2015) .......................................... *passim*

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................... 12

*Assoc. of Civilian Technicians v. Fed. Labor Relations Auth.*,
   283 F.3d 339 (D.C. Cir. 2002) ............................................... 17

*Bates v. Donley*,
   935 F. Supp. 2d 14 (D.D.C. 2013) ..................................... 12, 27

*Bd. of Regents v. Roth*,
   408 U.S. 564 (1972) ............................................................... 39

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................... 12

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................... 34

*Botezatu v. INS,*
  195 F.3d 311 (7th Cir. 1999) .......................................................... 22, 23

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,*
  419 U.S. 281 (1974) .......................................................... 30, 31

*Browning v. Clinton,*
  292 F.3d 235 (D.C. Cir. 2002) .......................................................... 11

*C&E Servs., Inc. v Dist. of Columbia Water and Sewer Auth.,*
  310 F.3d 197 (D.C. Cir. 2002) .......................................................... 44

*Califano v. Sanders,*
  430 U.S. 99 (1977) .......................................................... 16

*Camp v. Pitts,*
  411 U.S. 138 (1973) .......................................................... 29

*Chaudhry v. Holder,*
  705 F.3d 289 (7th Cir. 2013) .......................................................... 6

*Chavez v. Martinez,*
  538 U.S. 760 (2003) .......................................................... 42

*Chevron U.S.A. Inc. v. Echazabal,*
  536 U.S. 73 (2002) .......................................................... 30

*Chrysler Corp. v. Brown,*
  441 U.S. 281 (1979) .......................................................... 35

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) .......................................................... 15, 28

*Clarke v. Secs. Indus. Ass'n,*
  479 U.S. 388 (1987) .......................................................... 25, 26

*Cmty. Nutrition Inst. v. Young,*
  818 F.2d 943 (D.C. Cir. 1987) .......................................................... 35

*Conn. Bd. of Pardons v. Dumschat,*
  452 U.S. 458 (1981) .......................................................... 42

*Consumer Energy Council of Am. v. FERC,*
  673 F.2d 425 (D.C. Cir. 1982) .......................................................... 34

iv

*Crowley Caribbean Transp., Inc. v. Pena,*
    37 F.3d 671 (D.C. Cir. 1994) ............................................................. 17

*Cty. of Sacramento v. Lewis,*
    523 U.S. 833 (1998) ............................................................... 42, 44

*Davis v. Fed. Bureau of Prisons,*
    517 F. Supp. 2d 460 (D.D.C. 2007) ........................................................ 14

*Dixon v. District of Columbia,*
    666 F.3d 1337 (D.C. Cir. 2011) ........................................................ 37, 38

*Doe v. Rogers,*
    139 F. Supp. 3d 120 (D.D.C. 2015) ........................................................ 38

*Elgharib v. Napolitano,*
    600 F.3d 597 (6th Cir. 2010) ............................................................ 21

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ............................................................... 28, 29

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*
    93 F.3d 897 (D.C. Cir. 1996) ............................................................ 26

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) .................................................................. 28

*George Washington Univ. v. Dist. of Columbia,*
    318 F.3d 203 (D.C. Cir. 2002) .......................................................... 42

*Gerhart v. Lake Cnty.,*
    637 F.3d 1013 (9th Cir. 2011) .......................................................... 42

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ............................................................. *passim*

*Herbert v. Nat'l Acad. of Scis.,*
    974 F.2d 192 (D.C. Cir. 1992) .......................................................... 12

*Hoffman Plastic Compounds, Inc. v. NLRB,*
    535 U.S. 137 (2002) .................................................................. 38

*Hurd v. Dist. of Columbia,*
    864 F.3d 671 (D.C. Cir. 2017) .......................................................... 13

*Hyuk Joon Lim v. Holder*,
    710 F.3d 1074 (9th Cir. 2013) ........................................................ 43

*ICC v. Bhd. of Locomotive Eng'rs* (BLE),
    482 U.S. 270 (1987)............................................................... 14, 17

*Ky. Dep't of Corrs. v. Thompson*,
    490 U.S. 454 (1989)................................................................... 39

*Lepelletier v. F.D.I.C.*,
    164 F.3d 37 (D.C. Cir. 1999) ...................................................... 25

*Lewis* v. Casey,
    518 U.S. 343 (1996)................................................................... 45

*Lincoln v. Vigil*,
    508 U.S. 182 (1993)................................................................... 14

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973)................................................................... 24

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).................................................... 11, 24, 34

*Mada-Luna v. Fitzpatrick*,
    813 F.2d 1006 (9th Cir. 1987) ................................................ 16, 17

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994)................................................................... 45

*Marshall Cty. Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) .................................................. 13

*Mississippi v. Johnson*,
    71 U.S. 475 (1867)..................................................................... 26

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)................................................................... 45

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
    463 U.S. 29 (1983)..................................................................... 28

*Munoz v. Ashcroft*,
    339 F.3d 950 (9th Cir. 2003) ...................................................... 43

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*,
    851 F.2d 1424 (D.C. Cir. 1988) ............................................................. 37

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ............................................................... 35

*Omar v. McHugh*,
    646 F.3d 13 (D.C. Cir. 2011) ................................................................. 40

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n*,
    506 F.2d 33 (D.C. Cir. 1974) ........................................................... 35, 36

*Patterson v. United States*,
    999 F. Supp. 2d 300 (D.D.C. 2013) ...................................................... 13

*Perales v. Casillas*,
    903 F.2d 1043 (5th Cir. 1990) ............................................................... 16

*Plyler v. Doe*,
    457 U.S. 202 (1982) ............................................................................... 37

*Powers v. Ohio*,
    499 U.S. 400 (1991) ............................................................................... 25

*Process Gas Consumers Grp. v. Consumer Energy Council of Am.*,
    463 U.S. 1216 (1983) ............................................................................. 35

*Rempfer v. Sharfstein*,
    583 F.3d 860 (D.C. Cir. 2009) ......................................................... 12, 13

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
    525 U.S. 471 (1999) ......................................................................*passim*

*Robinson v. Huerta*,
    123 F. Supp. 3d 30 (D.D.C. 2015) ........................................................ 38

*Romeiro de Silva v. Smith*,
    773 F.2d 1021 (9th Cir. 1985) ............................................................... 40

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
    411 U.S. 1 (1973) ................................................................................... 38

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) ................................................................ 36

*Syracuse Peace Council v. FCC*,
  867 F.2d 654 (D.C. Cir. 1989) ........................................................ 31

*Tefel v. Reno*,
  180 F.3d 1286 (11th Cir. 1999) ...................................................... 43

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...................................................................... 13

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ................................................... *passim*

*Texas v. United States*,
  No. 1:14-cv-254 (S.D. Tex. Nov. 18, 2016) ...................................... 9

*Town of Castle Rock v. Gonzales*,
  545 U.S. 748 (2005) ...................................................................... 39

*Town of Chester v. Laroe Estates, Inc.*,
  137 S. Ct. 1645 (2017) .................................................................. 45

*Troy Corp. v. Browner*,
  120 F.3d 277 (D.C. Cir. 1997) ....................................................... 29

*United States v. Armstrong*,
  517 U.S. 456 (1996) ................................................................. 15, 19

*United States v. Texas*,
  136 S. Ct. 900 (2016) ...................................................................... 5

*United States v. Texas*,
  136 S. Ct. 2271 (2016) .................................................................... 8

*United States v. Texas*,
  137 S. Ct. 285 (2016) ...................................................................... 8

*Univ. Med. Ctr. of S. Nev. v. Shalala*,
  173 F.3d 438 (D.C. Cir. 1999) ....................................................... 13

*Vasquez v. Aviles*,
  639 F. App'x 898 (3d Cir. 2016) ..................................................... 22

*Velasco-Gutierrez v. Crossland*,
  732 F.2d 792 (10th Cir. 1984) ....................................................... 40

viii

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ............................................................................................ 42

*Washington v. Trump*,
    858 F.3d 1168 (9th Cir. 2017) ............................................................................. 25

**Statutes**

5 U.S.C. § 553 ............................................................................................... 3, 34, 35

5 U.S.C. § 701 ........................................................................................ 14, 15, 17, 24

5 U.S.C. § 702 ........................................................................................................ 26

5 U.S.C. § 704 ........................................................................................................ 34

5 U.S.C. § 706 ........................................................................................................ 28

6 U.S.C. § 202 ........................................................................................................ 21

6 U.S.C. § 251 ........................................................................................................ 21

6 U.S.C. § 557 ........................................................................................................ 21

8 U.S.C. § 1103 ........................................................................................................ 5

8 U.S.C. § 1154 ........................................................................................................ 6

8 U.S.C. § 1158 ........................................................................................................ 5

8 U.S.C. § 1182 ........................................................................................................ 5

8 U.S.C. § 1229b ...................................................................................................... 5

8 U.S.C. § 1252 ................................................................................................ *passim*

28 U.S.C. § 2201 .................................................................................................... 44

Personal Responsibility And Work Opportunity Reconciliation Act of 1996,
    Pub L. No. 104–193, 110 Stat 2105 ..................................................................... 37

**Regulations**

8 C.F.R. § 274a.12(c)(14) ...................................................................................... 5, 6

**Federal Rules**

Fed R. Civ. P. 12 .............................................................................................. 11, 12, 19, 26

**Constitution**

U.S. Const. amend. V ......................................................................................................... 39

**Other Authorities**

Attorney General's Manual on the Administrative Procedure Act (1947) .................................. 35

Press Release, DHS
    Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
    https://go.usa.gov/xncuM ....................................................................................... 30

U.S. Dep't of Justice, Office of Legal Counsel,
    *The Department of Homeland Security's Authority to Prioritize Removal of
    Certain Aliens Unlawfully Present*, 38 Op. O.L.C. (Nov. 19, 2014),
    https://www.justice.gov/file/179206/download ............................................. 6, 20, 33

USCIS, *Frequently Asked Questions* (last updated Oct. 6, 2017),
    https://go.usa.gov/xngCd ....................................................................... 7, 40, 41, 43

USCIS, *Policy Memorandum*  (Nov. 7, 2011),
    https://go.usa.gov/xncPK ....................................................................................... 7, 41

## INTRODUCTION

In 2012, then-Secretary of Homeland Security Janet Napolitano adopted the policy now known as DACA, or Deferred Action for Childhood Arrivals. DACA made deferred action—a practice by which the Secretary exercises individualized enforcement discretion to issue a reversible notification that she does not intend to remove an alien for a set period of time—available to a class of unlawfully present aliens who came to the United States as children. In 2014, one of her successors expanded the parameters of DACA and adopted a similar policy known as DAPA, or Deferred Action for Parents of Americans. DAPA, if implemented, would have made deferred action available to unlawfully present aliens who were parents of U.S. citizens and lawful permanent residents.

DAPA, including its expansion of DACA, was promptly challenged by a coalition of 26 states. Although then-Secretary of Homeland Security Jeh Johnson vigorously defended the policy, he was rebuffed at every turn: the United States District Court for the Southern District of Texas issued a nationwide preliminary injunction; the United States Court of Appeals for the Fifth Circuit affirmed, declaring the policy "manifestly contrary" to the Immigration and Nationality Act (INA); and an equally divided Supreme Court affirmed, leaving the injunction in place.

Armed with this victory, the states threatened to amend their complaint to challenge not just DAPA, but DACA as well, arguing that it suffers from the same infirmities. In view of the substantial similarities between the two policies, the significant litigation risk posed by the Supreme Court and Fifth Circuit decisions, and the Attorney General's view that DACA was in fact unlawful, Acting Secretary of Homeland Security Elaine C. Duke was faced with two options. On the one hand, she could wind down DACA in an orderly fashion, minimizing the disruption to current recipients. On the other, continued litigation would in all likelihood result in a nationwide

injunction abruptly ending the policy, plunging its nearly 800,000 recipients into uncertainty.

The Acting Secretary chose the less disruptive option: an orderly process that formally rescinds DACA but allows it to sunset. Under this Rescission Policy, no DACA recipient will have his or her deferred action abruptly terminated based solely on the Rescission Policy; instead, prior grants will generally remain valid for the remainder of their stated duration (usually two years) before ending consistent with their stated terms. Any DACA recipient whose deferred action was due to expire within six months was given a month to request another two-year renewal. And although the agency has stopped accepting new DACA requests, it will finish adjudicating those it had received by September 5, 2017, when the Rescission Policy was announced.

In this case, Plaintiffs—one university, one corporation, and one DACA recipient—challenge the Rescission Policy on a variety of statutory and constitutional grounds, urging the Court to invalidate the agency's decision and enjoin the Acting Secretary from rescinding DACA. Plaintiffs also request that the Court enjoin Defendants from disclosing the information of DACA recipients for immigration enforcement purposes in a manner inconsistent with the Department of Homeland Security's (DHS) information-sharing policy. There is no basis to do so.

To begin, this case is not justiciable. The Rescission Policy is a classic exercise of enforcement discretion "presumed immune from judicial review," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and particularly unfettered in the context of immigration, *see Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 487–92 (1999). In fact, Congress has stripped district courts of jurisdiction to review "'no deferred action' decisions and similar discretionary determinations" such as the one here. *AADC*, 525 U.S. at 485; *see* 8 U.S.C. § 1252(g). Also, at a minimum, the non-individual Plaintiffs cannot proceed due to their lack of standing and a cause of action. The Court should not permit Plaintiffs to circumvent these bedrock

2

limits on judicial review.

On the merits, Plaintiffs' claims fail as a matter of law. Their claim that the Rescission Policy is arbitrary and capricious under the Administrative Procedure Act (APA) because it was inadequately supported by the record is fundamentally misguided. Agencies are always free to change course on policy matters so long as they provide a rational explanation. Here, the Acting Secretary's explanation of her decision to rescind DACA amply meets that deferential standard, particularly given the adverse ruling from the Fifth Circuit and the Supreme Court's affirmance, the evident similarities between DACA and the policy that expanded DACA and created DAPA, the Attorney General's opinion that DACA was likewise unlawful, and the imminent risk of a nationwide injunction with potentially chaotic results. Because these claims can be resolved now based on the complaint, the documents incorporated therein by reference, and other judicially noticeable materials—including those in the administrative record, served contemporaneously herewith—the Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside the Rescission Policy if it disagrees.

Plaintiffs' notice-and-comment claim is equally unavailing. The APA exempts "general statements of policy" from notice and comment, 5 U.S.C. § 553(b), and the Rescission Policy is a reordering of enforcement priorities that readily qualifies. Indeed, DHS and the former Immigration and Naturalization Service (INS) have adopted more than 20 deferred action or similar policies over the past 50 years. Few have gone through notice and comment, and there is no warrant for those procedures here. Nor does the Fifth Circuit's ruling that the states established a substantial likelihood of success on their claim that the promulgation of DAPA required notice and comment mean that the rescission of DACA and a return to the *status quo ante* must likewise meet these procedural demands. And in any event, if DACA's rescission required notice and

comment, then DACA was void from the outset because its adoption would also have required notice and comment *a fortiori*.

Plaintiffs' equal protection claims get them no further. Plaintiffs have failed to identify a suspect class or a fundamental right implicated by the Rescission Policy, and the Acting Secretary's decision easily survives rational-basis review.

Plaintiffs' due process claims also cannot survive a motion to dismiss. DACA recipients have no protected liberty or property interest in the continued availability of deferred action, which is an exercise of prosecutorial discretion that confers no rights and is revocable at any time, or in the continuity of DHS's information-sharing policy, which has not changed since DACA was implemented in 2012. Moreover, Plaintiffs fail to identify any executive conduct that "shocks the conscience" in a manner that would support a claim for the violation of Plaintiffs' substantive due process rights.

In sum, even if Plaintiffs' challenge were somehow justiciable, the assumption underlying it would compel dismissal. DAPA—including its expansion of DACA—was enjoined by the Fifth Circuit, and that holding was affirmed by the Supreme Court. The original DACA policy is materially indistinguishable as a legal matter. At bottom, Plaintiffs' argument is that, when making discretionary enforcement determinations, federal agencies must ignore the legal rulings and reasoning of federal courts. To state the premise of this claim is to refute it.

This case should be dismissed.

# BACKGROUND

## A. Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the INA along with "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396 (citation omitted). DHS officials must first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum, parole, or cancellation of removal, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b. "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely. *AADC*, 525 U.S. at 483.

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016). Deferred action is a practice by which the Secretary exercises his or her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period. *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the

5

government which gives some cases lower priority").  Although originally "developed without express statutory authorit[y]," *AADC*, 525 U.S. at 484, individualized deferred action has been recognized by Congress in certain circumstances inapplicable here, *see, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"), and described by the Supreme Court as an "exercise in administrative discretion," *AADC*, 525 U.S. at 484.  Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former INS have adopted over 20 such policies over the past 50 years—rarely through notice-and-comment rulemaking.[1]

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, under DHS regulations not challenged here.  *See, e.g.*, 8 C.F.R. § 274a.12(c)(14).  That decision does not, however, confer lawful immigration status or provide any defense to removal.  *Cf. Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (discussing difference between "unlawful presence" and "unlawful status").  To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'"  *Arpaio*, 797 F.3d at 17 (citation omitted).  DHS thus has discretion to revoke deferred action unilaterally, for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time.  *See AADC*, 525 U.S. at 484–85.

### B.    DACA and DAPA

On June 15, 2012, then-Secretary Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals.  *See* Admin. R. (AR) 1–3 (hereinafter DACA Memo).

---

[1] *See generally* U.S. Dep't of Justice, Office of Legal Counsel, The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present, 38 Op. O.L.C. 1, 12–20 (Nov. 19, 2014) (OLC Op.), https://www.justice.gov/file/179206/download.

DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws. DACA Memo at 1 (AR 1). Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to indefinite renewal. *Id.* at 2–3 (AR 2–3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests for this relief would "be decided on a case by case basis," *id.* at 2 (AR 2). Accordingly, the Memo provided that this grant of deferred action "confer[red] no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." *Id.* at 3 (AR 3).

In public guidance published on the U.S. Citizenship and Immigration Service website, DHS also informed DACA requestors that information in their requests will be "protected from disclosure to [U.S. Immigration & Customs Enforcement (ICE)] and [U.S. Customs & Border Protection (CBP)] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised). USCIS, *Frequently Asked Questions*, FAQ No. 19 (last updated Oct. 6, 2017), (hereinafter DHS DACA FAQ), https://go.usa.gov/xngCd; *see* USCIS, *Policy Memorandum*, (Nov. 7, 2011) (hereinafter Notice to Appear Guidance), https://go.usa.gov/xncPK. DHS instructed, however, that this information-sharing policy creates no rights and "may be modified, superseded, or rescinded at any time without notice." DHS DACA FAQ No. 19.

In 2014, then-Secretary Jeh Johnson expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA.

*See* AR 37–41 (hereinafter DAPA Memo).  DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents." DAPA Memo at 3 (AR 39).  The DAPA Memo also expanded DACA by relaxing the eligibility criteria and extending the DACA renewal period from two to three years.  *Id.* at 3–4 (AR 39–40).

### C.       The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states, led by Texas, which sought to enjoin its implementation.  Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of the DAPA Memo.  *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  Like the U.S. District Court for the Southern District of Texas, the Fifth Circuit held that the promulgation of the DAPA Memo was justiciable, in part because it believed that "the INA's intricate regulatory scheme for changing immigration classifications" allowed the court to determine whether DHS had exceeded its statutory authority.  *Id.* at 168.  It stressed, however, that "the *denial* of voluntary departure and work authorization" would be unreviewable.  *Id.*  Also like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the APA's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment."  *Id.* at 178 n. 156.  And going beyond the district court, the Fifth Circuit held that DAPA was "manifestly contrary" to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one legal status to another," DAPA awarded deferred action "to persons who have never had a legal status and may never receive one."  *Id.* at 184, 186 (footnotes omitted).

That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing

upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in place. On November 18, 2016, the parties jointly moved the district court to stay merits proceedings to allow them to evaluate "how they might choose to move forward" given the upcoming "change in Administration[s]." Joint Mot. to Stay Merits ¶ 2, *Texas v. United States*, No. 1:14-cv-254 (S.D. Tex. Nov. 18, 2016), ECF No. 430.

Faced with continued litigation over a policy that had been enjoined by the courts, DHS rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA. *See* Memorandum for Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Prot., et al., from John F. Kelly, Sec'y of Homeland Sec. (June 15, 2017) (AR 235–37). Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to also challenge directly the DACA Memo, arguing that it suffers from the same legal infirmities as the DAPA Memo. *See* AR 238–40 (Paxton Letter).

### D. Rescission of DACA

Faced again with the prospect of continued litigation, Acting Secretary Duke decided on September 5, 2017, to wind down the DACA policy in an orderly fashion. *See* AR 252–56 ("Rescission Policy" or "Policy"). As the Acting Secretary explained, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy at 4 (AR 255). Specifically, she quoted the Attorney General's September 4 recommendation to rescind DACA, which explained that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted).

Invoking her "authority in establishing national immigration policies and priorities," she rescinded the DACA Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on an individualized[,] case-by-case basis," *id.* at 2 (AR 253).

At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

- For *current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods." *Id.* at 4 (AR 255).

- For *initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date. *Id.*

- For *DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017. Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017." *Id.*

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id.* at 4 (AR 255). The Rescission Policy says nothing about (and makes no changes to) DHS's information-sharing policy regarding information provided to USCIS in a DACA request.

### E.     The Instant Action

Plaintiffs' complaint raises five claims. In Count I, Plaintiffs allege that the Rescission Policy violates the APA because it was issued without authority and without notice and comment.

Pls.' Compl. ¶¶ 65–72, ECF No. 1.  In Count II, Plaintiffs allege that the Rescission Policy violates

the APA because it constitutes a change in agency policy without an adequate explanation.  *Id.* ¶¶

73–89.  In Count III, Plaintiffs allege that the rescission violates the Equal Protection component

of the Fifth Amendment's Due Process Clause because it allegedly discriminates against DACA

recipients on the bases of their undocumented status.  *Id.* ¶¶ 90–93.  In Count IV, Plaintiffs allege

that the rescission violates procedural due process because, without notice and an opportunity to

be heard, (a) Princeton University will be deprived of its interest in having DACA recipients as

enrolled students, (b) Microsoft will be deprived of its interests in the investments it made in

employees who are DACA recipients, and (c) DACA recipients will be deprived of their interest

in their DACA.  *Id.* ¶¶ 94–103.  In Count V, Plaintiffs allege that the government's supposedly

new information-sharing policy violates substantive due process.  *Id.* ¶¶ 104–109.  Plaintiffs ask

the Court to declare that the DACA policy was lawful, declare that the Rescission Policy is

unlawful, and enjoin Defendants from rescinding DACA as well as from allegedly impermissible

information sharing.

## LEGAL STANDARDS

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must establish the Court's

jurisdiction through sufficient allegations.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

When considering such a motion, the Court must accept all well-pleaded allegations as true.  *See*

*Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).  The Court need not, however,

accept inferences that are unsupported by facts alleged in the complaint or that amount to mere

legal conclusions.  *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In evaluating

subject-matter jurisdiction, the court may, when necessary, look beyond the complaint to

"undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus

the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (quoting *Twombly*, 550 U.S. at 557). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as ... factual allegation[s]" are "disentitle[d] ... to th[is] presumption of truth." *Id.* at 678, 681 (citation omitted). Although the Court generally may not rely on material outside the pleadings under Rule 12(b)(6), it may consider materials incorporated into the complaint by reference, as well as judicially noticeable materials, without converting the motion into one for summary judgment. *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

With respect to Plaintiffs' APA claims, "a court may consider the administrative record and public documents without converting the motion into a motion for summary judgment, or it may convert the motion into a motion for summary judgment under Rule 12(d)." *Bates v. Donley*, 935 F. Supp. 2d 14, 17 (D.D.C. 2013) (internal citation omitted). "[W]hen a party seeks review of agency action under the APA [before a district court], the district judge sits as an appellate tribunal." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (alterations in original) (citation omitted); *see also Bates*, 935 F. Supp. 2d at 17. "The entire case on review is a question of law, and only a question of law. And because a court can fully resolve any purely legal question

on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage ...

and there is no real distinction in this context between the question presented on a 12(b)(6) motion

and a motion for summary judgment." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221,

1226 (D.C. Cir. 1993) (citation omitted).  Under these circumstances, review "is based on the

agency record and limited to determining whether the agency acted arbitrarily or capriciously."

*Rempfer*, 583 F.3d at 865; *see also Univ. Med. Ctr. of S. Nev. v. Shalala*, 173 F.3d 438, 440 n.3

(D.C. Cir. 1999) (explaining that when reviewing agency action the question whether the agency

acted in an arbitrary and capricious manner is a legal one which the district court can resolve on

the agency record, regardless of whether it is presented in the context of a motion for judgment on

the pleadings or in a motion for summary judgment).

Even outside the context of the APA, the Court may consider "matters of … judicial

notice."  *Hurd v. Dist. of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (citations omitted); *see

also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  The Court may also

consider exhibits that are submitted with the complaint, *see Hurd*, 864 F.3d at 678, as well as

"documents upon which the plaintiff's complaint necessarily relies even if the document is

produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss," such

as when the complaint "quotes from and discusses a document extensively." *Patterson v.

United States*, 999 F. Supp. 2d 300, 306 (D.D.C. 2013) (internal citations and alterations omitted).

## ARGUMENT

In seeking to invalidate the Rescission Policy, Plaintiffs ask the Court to override the

Acting Secretary's judgment about how to exercise her discretion in enforcing the Nation's

immigration laws.  The Court need not consider this extraordinary request, however, because this

case is not justiciable.  The exercise of enforcement discretion in the Rescission Policy is

committed to agency discretion by law and is therefore unreviewable. In fact, Congress has gone

so far as to strip district courts of jurisdiction over "no deferred action" decisions such as the one

here. At a minimum, the non-individual plaintiffs lack standing. And in all events, Plaintiffs fail

to state a claim. This case should therefore be dismissed.

## I. THIS CASE IS NOT JUSTICIABLE.

### A. The Rescission Policy is Not Justiciable because this Immigration Enforcement Policy is a Matter Committed to Agency Discretion by Law.

**1.** The APA bars judicial review of certain categories of decisions that "courts traditionally

have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)

(quoting 5 U.S.C. § 701(a)(2)). These decisions are typically unreviewable because there exists

"no meaningful standard against which to judge the agency's exercise of discretion" in these areas.

*Chaney*, 470 U.S. at 830; *see Davis v. Fed. Bureau of Prisons*, 517 F. Supp. 2d 460, 461 (D.D.C.

2007) ("The APA, however, also provides an exception to the waiver of sovereign immunity ...

when ... agency action is committed to agency discretion."), *aff'd in part and remanded*, 334 F.

App'x 332 (D.C. Cir. 2009). This bar applies even when "the agency gives a 'reviewable' reason

for otherwise unreviewable action." *ICC v. Bhd. of Locomotive Eng'rs* (*BLE*), 482 U.S. 270, 283

(1987).

Among the decisions committed to executive discretion are "an agency's exercise of

enforcement power." *Chaney*, 470 U.S. at 833. Such judgments involve "a complicated balancing

of … factors which are peculiarly within [an agency's] expertise," including "whether agency

resources are best spent on this violation or another, whether the agency is likely to succeed if it

acts, whether the particular enforcement action requested best fits the agency's overall priorities,

and, indeed, whether the agency has enough resources to undertake the action at all." *Id.* at 831.

As there is "no meaningful standard against which to judge the agency's exercise of discretion" in

weighing these factors, an agency's exercise of enforcement powers is "presumed immune from judicial review under § 701(a)(2)." *Id.* at 830, 832.

For instance, an "agency [] decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* at 831. After all, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," and it is "far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32. Thus, for example, the Supreme Court in *Chaney* held that the FDA's general policy of refusing to exercise its enforcement authority with respect to states' use of approved drugs in lethal injections was committed to the agency's discretion under § 701(a)(2). *See* 470 U.S. at 824–25, 837–38 (finding FDA's refusal to take the enforcement actions requested by respondents, including broad measures that would have impacted an entire drug market segment, was not subject to judicial review).

An agency's decision *to* enforce the law against a particular individual is likewise presumptively unreviewable. Just as "the decision whether or not to prosecute" presumptively "rests entirely in [the prosecutor's] discretion," *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citation omitted), an agency's decision to bring a civil enforcement action is generally not open to judicial scrutiny. Considerations such as "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall policies" are equally present in enforcement decisions as in nonenforcement decisions, *Chaney*, 470 U.S. at 831, and judicial intrusion into the deliberative process is equally improper, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("there must be a strong showing of bad faith or improper behavior before" courts can engage in an "inquiry into the mental processes of administrative

15

decisionmakers"), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

This presumption of nonreviewability applies with particular force when it comes to immigration. On top of the general concerns implicated in any enforcement decision, the enforcement of immigration laws "embraces immediate human concerns," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 396–97. Given these realities, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Id.* at 396. One form of that broad discretion is deferred action, a "discretionary and reversible" decision to notify an alien that DHS has chosen not to seek his removal for a specific period of time. *Arpaio*, 797 F.3d at 17; *see supra* at 5–6. Like other agency nonenforcement decisions, grants of deferred action rest on a complex balancing of policy considerations that cannot serve as a "meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830. Such determinations are thus presumptively unreviewable. *See Arpaio*, 797 F.3d at 16.

The converse is equally true: *denials* of deferred action are also committed to agency discretion. *See AADC*, 525 U.S. at 485 (treating "'no deferred action' decisions" as "discretionary determinations"). Because "[g]ranting an illegally present alien permission to remain and work in this country" is fundamentally "a dispensation of mercy," there are "no standards by which judges may patrol its exercise." *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (INS's decision not to grant pre-hearing voluntary departures and work authorizations to a group of aliens non-justiciable). To be sure, a decision "not to grant deferred action status to a particular alien is not precisely a 'decision not to take enforcement action,'" but that does not obscure the fact that "many of the same factors" underlying the latter determinations usually play a role in the former. *Mada-*

*Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 n.4 (9th Cir. 1987) ("denials of deferred action status applications are not subject to judicial review" under § 701(a)(2)).

**2.** As an exercise of enforcement discretion, the Rescission Policy is a classic example of a discretionary determination that is entrusted to the agency alone. Indeed, any attempt to judge the Policy would quickly entangle this Court in the sort of complex and discretionary balancing that has been entrusted by Congress to the Executive Branch. For example, the judiciary is institutionally ill-equipped to assess whether the Acting Secretary's decision to change "immigration policies and priorities" by rescinding DACA, Rescission Policy at 4 (AR 255), was an appropriate use of "the Department's limited resources," *Arpaio*, 797 F.3d at 16. Nor is this Court well suited to second-guess the Acting Secretary's balancing of the costs and benefits of keeping the policy in place, on one hand, with the risk of "potentially imminent litigation" that could throw DACA into immediate turmoil, on the other. Rescission Policy at 3 (AR 254) (citation omitted).

To be sure, the Acting Secretary *also* gave substantive legal reasons for her decision, *id.* at 2–4 (AR 253–55), but that does not render it justiciable. That is because the Supreme Court has rejected the proposition that if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *BLE*, 482 U.S. at 283.[2] For example, "a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly

---

[2] Of course, if the non-reviewable enforcement policy contains an embedded interpretive rule, that may be reviewable as such. *See Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676–77 (D.C. Cir. 1994), declined to extend by *Assoc. of Civilian Technicians v. Fed. Labor Relations Auth.*, 283 F.3d 339 (D.C. Cir. 2002). It does not follow, however, that the enforcement policy itself is reviewable. *See BLE*, 482 U.S. at 283. For present purposes, the Rescission Policy does not contain an embedded interpretative rule that would be otherwise reviewable. Rather, it merely contains a non-reviewable decision about the exercise of enforcement discretion. *See id.*

stated) that the law will not sustain a conviction," which "is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point." *Id.* But that does not change the fact that "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review." *Id.* Likewise, the Acting Secretary's discussion of the question of DACA's legality does not transform her generally unreviewable exercise of enforcement discretion into a matter fit for judicial scrutiny.

Indeed, reviewing the Rescission Policy would be particularly inappropriate given the wide discretion the Secretary enjoys in the enforcement of the immigration laws. In *AADC*, the Supreme Court held that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation," 525 U.S. at 488, subject to the "possib[le]" exception "of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome," *id.* at 491. The reason for this highly restrictive rule is that the concerns raised by challenges to the Executive's enforcement discretion "are greatly magnified in the deportation context." *Id.* at 490. An alien subject to removal is, by definition, in continuing violation of the INA, and judicial interference with the Executive's enforcement therefore would compel the Executive to disregard such ongoing violations. The "delay" associated with challenges to discretionary decisions not to forgo enforcement is more likely than in the criminal arena, as "[p]ostponing justifiable deportation (in the hope that the alien's status will change … or simply with the object of extending the alien's unlawful stay) is often the principal object of resistance to a deportation proceeding," and "the consequence is to permit and prolong a continuing violation" of the immigration laws. *Id.* at 490. For another, reviewing immigration decisions may involve "not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives" or

other sensitive matters as well. *Id.* at 490–91. Finally, the idea that "an ongoing violation of United States law ... must be allowed to continue because it has been improperly selected is not powerfully appealing." *Id.* at 491 (emphasis omitted).

**3.** Notwithstanding these clear concerns that warrant a presumption against judicial review, the court in *Batalla Vidal v. Duke*, a related case presenting similar challenges to the Rescission Policy, held that the Acting Secretary's decision to rescind DACA "was not itself a presumptively unreviewable exercise of enforcement discretion." Mem. & Order at 23, *Batalla Vidal v. Duke*, No. 16-cv-4756 (E.D.N.Y. Nov. 9, 2017), ECF No. 104 (hereinafter *Batalla Vidal* Mem. & Order) (granting in part and denying in part Defendants' Rule 12(b)(1) motion and reserving ruling on Defendants' Rule 12(b)(6) motion). In so holding, however, the court incorrectly labeled the Acting Secretary's decision to rescind DACA as a "constrain[t]" on DHS's prosecutorial discretion with respect to DACA recipients, *see id.* at 24, and incorrectly described the rescission as subjecting "individuals who previously enjoyed some protection from removal to coercive state authority," *id.* at 25. To the contrary, the Acting Secretary's decision to rescind DACA was an act of discretion in and of itself, which is best described as reordering the agency's enforcement priorities in light of litigation risk. *See Arpaio*, 797 F.3d at 17 (citation omitted) (deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship'"). It is, therefore, equally entitled to a presumption of nonreviewability as the enforcement and non-enforcement cases that the Supreme Court has found are committed to executive discretion. *See, e.g.*, *Chaney*, 470 U.S. at 832–33; *Armstrong*, 517 U.S. at 464; *AADC*, 525 U.S. at 485.

Moreover, the court in *Batalla Vidal* found the Rescission Policy reviewable based upon its misinterpretation that the Acting Secretary "exclusively" relied on a legal determination that

DACA was unlawful, a rationale for which the court held there was "law to apply." *Batalla Vidal* Mem. & Order at 22 (citing AR 251 (Sessions Letter); AR 253–55 (Rescission Policy)). The Attorney General's determination that DACA was unconstitutional was but one factor that the Acting Secretary considered. As the Rescission Policy makes clear, in determining to wind down the policy pursuant to the parameters laid out in the memorandum, the Acting Secretary also relied on the history of the *Texas* litigation and potential risk it posed to the continuation of DACA, as well as the self-evident complexities associated with ending DACA, a policy that impacts nearly 800,000 individuals. Rescission Policy at 2–4 (AR 253–55). The balancing of those considerations is not amenable to review in light of the sources cited by the *Batalla Vidal* court, such as statutory text, the history of the use of deferred action, or the 2014 Office of Legal Counsel (OLC) opinion.[3] *Batalla Vidal* Mem. & Order at 22.

The court's reasoning is also contrary to *BLE*, which makes clear that enforcement decisions are committed to agency discretion even where they rest on broad legal policy judgments rather than individualized considerations. *BLE*, 482 U.S. at 283. *BLE* specifically gave the example of a criminal prosecutor's decision not to prosecute a certain category of crimes based on the prosecutor's view of the legal merits of the prosecution. *Id.* Although a court may be qualified to consider those legal merits, "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review." *Id.* Just as in the analogy provided in *BLE*, the Acting Secretary's consideration, among other things, of the lawfulness of the DACA policy merely explains how she plans to exercise her discretion to rescind the policy and that decision, regardless of the court's ability to review the legal merits of DACA, is nonreviewable. *Id.* *BLE*'s point applies *a fortiori*

---

[3] OLC Op. 18 n. 8.

in the immigration context where the Supreme Court has emphasized the problems with questioning the government's exercise of its broad discretion.  *See AADC*, 525 U.S. at 489–90.

### B.  The INA Deprives District Courts of Jurisdiction over Challenges to Denials of Deferred Action.

Not only is the denial of deferred action committed to agency discretion under the APA, but the INA itself deprives federal district courts of jurisdiction over challenges to such denials altogether.   As the Supreme Court explained in *AADC*, the Executive's "exercise of [its] discretion" in granting deferred action in some circumstances had "opened the door to litigation … where" the Executive had "chose[n] *not* to exercise it."  *Id.* at 484.  Specifically, some courts had entertained challenges to "the refusal to exercise such discretion" on various bases such as "selective prosecution," the use of "arbitrary or unconstitutional criteria, or on other grounds constituting abuse of discretion."  *Id.* at 485 (citation omitted).  To address what the Supreme Court referred to as this "particular evil"—*i.e.*, "attempts to impose judicial constraints upon prosecutorial discretion"—Congress enacted 8 U.S.C. § 1252(g).  *AADC*, 525 U.S. at 485 & n.9.

Section 1252(g) commands that, outside of petitions for review from final removal orders and certain other limited channels for review, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security[4]] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."  These were "the acts … that had prompted challenges to the … exercise of prosecutorial discretion" in denying deferred action, and thus § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be

---

[4] *See* 6 U.S.C. § 557; *see also id.* §§ 202, 251; *Elgharib v. Napolitano*, 600 F.3d 597, 607 (6th Cir. 2010) ("[U]nder 6 U.S.C. § 557, … the statutory reference to the 'Attorney General' in § 1252(g) now means 'Secretary of DHS.'").

made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed"—namely, an individual removal proceeding. *AADC*, 525 U.S. at 485 & n.9.

Denials of deferred action—including under DACA itself—thus fall outside the jurisdiction of the federal courts. *See, e.g.*, *Vasquez v. Aviles*, 639 F. App'x 898, 901 (3d Cir. 2016) ("[Section] 1252(g) … deprives all courts of jurisdiction to review a denial of DACA relief because that decision involves the exercise of prosecutorial discretion not to grant a deferred action."); *Botezatu v. INS*, 195 F.3d 311, 314 (7th Cir. 1999) ("Review of refusal to grant deferred action is … excluded from the jurisdiction of the district court.").

Although the court in *Batalla Vidal* held that § 1252(g) did not divest the court of jurisdiction to review the Rescission Policy, its holding was based on an overly narrow reading of the statute. *Batalla Vidal* Mem. & Order at 28–31. Specifically, it held that § 1252(g) was inapplicable because the plaintiffs' challenge to the Rescission Policy did not arise from one of the three enumerated immigration actions that trigger the statute. *Id.* at 29–30. To be sure, Plaintiffs brought this challenge to the Rescission Policy before any removal proceedings took place, but that is beside the point. The decision not to continue deferred action is an ingredient to the commencement of enforcement proceedings at some future date, and a person cannot circumvent the bar in § 1252(g) by singling out that single step for a preemptive challenge. Indeed, the Supreme Court acknowledged that the apparent purpose of § 1252(g) was to protect "'no deferred action' decisions and similar discretionary determinations," like the Rescission Policy, by preventing challenges to such decisions in "separate rounds of judicial intervention" outside the process designed by Congress, as is the case here. *AADC*, 525 U.S. at 485. If aliens (or entities suing on their behalf) could evade § 1252(g)'s bar simply by challenging the forthcoming

22

expiration of deferred action before actual removal proceedings (if any) began, then jurisdiction would turn on a race to the courthouse. Such a framework would create the perverse incentive for DHS to begin removal proceedings immediately rather than to allow, as it did here, for rolling expirations of deferred action over a two-and-a-half-year period. There is no indication that Congress sought to enact such a nonsensical regime. Instead, § 1252(g) precludes review of either "the decision *or action*" by the Acting Secretary "to commence proceedings," and thereby sweeps in the Rescission Policy. 8 U.S.C. § 1252(g) (emphasis added).[5]

Moreover, the *Batalla Vidal* court ignored that at least one court has applied § 1252(g) to actions that are "not … on the list of precluded items"—*i.e.*, "decisions to commence proceedings, adjudicate cases, or execute removal orders"—in order to effectuate the object of this jurisdictional bar. *Botezatu*, 195 F.3d at 313–14. In *Botezatu*, the Seventh Circuit rejected an alien's argument that a court could review the Executive's "refusal to … grant him humanitarian parole or deferred action" simply because that denial occurred in "post-deportation procedures." *Id.* at 313–14. As the Seventh Circuit explained, because *AADC* broadly held that "'no deferred action' decisions and similar discretionary determinations' [were] governed by § 1252(g)," that jurisdictional bar

---

[5] The court in *Batalla Vidal* also held that § 1252(g) did not divest the court of jurisdiction to hear claims of the non-individual plaintiffs (several States and an advocacy organization) because the statute bars only suits by or on behalf of an alien. *Batalla Vidal* Mem. & Order at 31. However, the fundamental concerns of § 1252(g) apply whether the challenge is brought by the alien himself or an outside entity (on its own behalf or on behalf of the alien). *See AADC*, 525 U.S. at 485. In either context, the purpose of the jurisdictional bar is to prevent separate judicial review, like the instant suit, outside the streamlined process Congress intended. *Id.* Furthermore, like the American-Arab Anti-Discrimination Committee in *AADC*, itself an organizational plaintiff, the non-individual Plaintiffs in this matter are for purposes of § 1252(b) suing "on behalf" of an alien because the relief they seek will benefit the individual Plaintiff and all other DACA recipients. To the extent the non-individual Plaintiffs would benefit from an order setting aside the Rescission Policy, *but see infra* Section I.C.1, their benefit would be only an indirect and incidental effect of the relief for DACA recipients.

should apply regardless of *when* such determinations occurred. *Id.* at 314 (quoting *AADC*, 525 U.S. at 485). Thus, just as an alien (or entity suing on his behalf) cannot circumvent § 1252(g) by bringing a challenge to a denial of deferred action on the back-end, Plaintiffs' broad front-end assault on the Rescission Policy is beyond the jurisdiction of this Court. At the very least, § 1252(g) reinforces the conclusion that enforcement discretion under the INA is at the core of unreviewable matters committed to agency discretion by law under the APA. 5 U.S.C. § 701(a)(2).

### C.  The Non-Individual Plaintiffs' Claims Are Not Cognizable.

#### 1. Plaintiffs Lack Article III Standing.

At a minimum, the Court should dismiss the claims brought by the Trustees of Princeton University and Microsoft Corporation for lack of standing. To establish Article III standing, these parties must at least show that they have suffered an "injury in fact" that is "fairly traceable" to Defendants' challenged conduct and that will likely be "redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61. They cannot do so. The Rescission Policy does not regulate them, require them to do (or refrain from doing) anything, or restrict them in any way. Instead, these Plaintiffs complain of injury "from the government's allegedly unlawful regulation (or lack of regulation) of someone else," making standing "substantially more difficult to establish." *Id.* at 562. That burden becomes insurmountable when a plaintiff claims to be injured by the incidental effects of federal enforcement policies, as it is settled that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).

These principles apply with particular force where, as here, the parties are relying primarily on the incidental effects of federal immigration policies. *See* Pls.' Compl. ¶ 61 (alleging that Princeton suffers harm from diminished "economic value of [DACA recipients'] education and

24

Princeton's investment in them" as well as the lost "opportunity to matriculate new [DACA recipients]"); *id.* ¶ 62 (alleging that Microsoft is harmed by "eliminating a valuable pool of employees" and causing Microsoft to "spend additional resources to recruit, train, and promote replacement employees").[6]  It would be extraordinary to find Article III standing based on these assertions, as virtually any administration of federal law by a federal agency could have such effects. The unavoidable reality that any enforcement of immigration laws will inevitably have some unintended or derivative effects does not provide carte blanche to challenge such enforcement decisions whenever there is a disagreement about federal immigration policy.

### 2. Plaintiffs Lack a Cause of Action under the APA.

Even if the non-individual Plaintiffs could establish Article III standing, they would lack a cause of action under the APA.  The APA does not "allow suit by every person suffering [an] injury in fact."  *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987).  Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning

---

[6] Princeton also asserts that it brings this suit "on behalf of its students," *see* Pls.' Compl. at 2, but it fails to allege facts sufficient to demonstrate third-party standing, which requires that (1) Princeton "'ha[s] suffered an 'injury in fact,' thus giving [it] a 'sufficiently concrete interest' in the outcome of the issue in dispute,'" (2) that it "ha[s] a close relation to the third party," and (3) that "there . . . exist[s] some hindrance to the third party's ability to protect his or her own interests." *Lepelletier v. F.D.I.C.,* 164 F.3d 37, 43 (D.C. Cir. 1999) (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)).  As explained above, the incidental effects of the Rescission Policy allegedly borne by Princeton do not rise to the level of "injury in fact" sufficient to establish standing in Princeton's own right.  And even assuming a close relationship between Princeton and its DACA recipient-students for purposes of the challenge at issue in this suit, Princeton has not shown that circumstances exist that prevent these students from asserting their own interests.  Indeed, such a claim would be rebutted by the fact that one of Princeton's DACA-recipient students, Ms. Perales-Sanchez, is in fact a Plaintiff in this matter.  *See Washington v. Trump*, 858 F.3d 1168, 1188 (9th Cir. 2017) (Bea, J., dissenting from denial of *en banc* rehearing) (holding that the panel's analysis ignored the third-party standing requirements of *Powers* and finding that the States' universities did not show that students, faculty, and scholars allegedly harmed by Executive Order 13769, "Protecting the Nation from Foreign Terrorist Entry Into the United States," were unable to protect their own interests).

25

of a relevant statute." 5 U.S.C. § 702. To be "aggrieved" in this sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute … in question." *Clarke*, 479 U.S. at 396 (brackets and citation omitted). Here, no provision of the INA even arguably protects the non-individual Plaintiffs from bearing any incidental effects of a denial of deferred action.[7] *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

### D. The Government's Justiciability Objections Are Not Inconsistent with the Acting Secretary's Reliance on the Fifth Circuit's Decision.

Although the Fifth Circuit in *Texas* included holdings that a challenge to the DAPA Memo was reviewable, 809 F.3d at 165–70, neither that decision nor Acting Secretary Duke's reliance on it forecloses the government from arguing here that the DACA Rescission Policy is unreviewable. First, neither the Acting Secretary's memo nor the Attorney General's letter expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings, and it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place. Second, officers of the Executive Branch have an independent duty to consider the legality of their policies regardless of whether they are judicially reviewable; all swear an oath to uphold the United States Constitution. *See Mississippi v. Johnson*, 71 U.S. 475,

---

[7] The court in *Batalla Vidal* held that whether the non-individual plaintiffs asserted interests falling within the "zone of interests" protected by the APA was not a jurisdictional or justiciability question, but rather an issue of prudential standing properly addressed under Rule 12(b)(6). *Batalla Vidal* Mem. & Order at 46–47. Because the court reserved its ruling on Defendants' motion to dismiss for failure to state a claim, it did not address this argument.

499 (1867) (Take Care Clause imposes a generally nonjusticiable duty on the Executive Branch).

Finally, even if courts could have reviewed the adoption of DACA as "an abdication of [DHS's]

statutory responsibilities," *Chaney*, 470 U.S. at 833 n.4, that would not make the Rescission Policy,

a classic exercise of agency enforcement discretion, open to challenge. After all, the Fifth Circuit

itself emphasized that "DAPA is much more than a nonenforcement policy, which presumptively

would be committed to agency discretion," *Texas*, 809 F.3d at 178 n.156, and pointed out that a

"*denial* of voluntary departure and work authorization" by DHS would have been nonjusticiable,

*id.* at 168. Denials of deferred action under a return to a more traditional enforcement policy

should be treated no differently.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM.

Even if Plaintiffs could establish standing and justiciability, the Court should dismiss this

case in its entirety for failure to state a claim.[8]

### A.  Plaintiffs Fail to State an APA Claim.

#### 1. The Acting Secretary Rationally Explained Her Decision to Wind Down DACA, Particularly Given the Imminent Risk of a Nationwide Injunction.

Plaintiffs contend that the Rescission Policy is arbitrary and capricious because it

constitutes a change in agency policy without an adequate explanation. Pls.' Compl. ¶¶ 73–89.

That argument misapprehends the nature of the inquiry under the APA. It is black-letter law that

agencies are free to change course on policy matters so long as they provide a rational explanation.

Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this

deferential standard, particularly in view of the imminent risk of a nationwide injunction, which

could have prompted an immediate—and chaotic—end to the policy.

---

[8] In the alternative, however, the Court may if it wishes convert this motion to one for summary judgment. *See Bates*, 935 F. Supp. 2d at 17, 19.

**1.** Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B).[9] The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416. A decision may be held to be arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency." *Id.* And when an agency changes policies, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

In assessing whether a decision was arbitrary and capricious, "[t]he task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985) (citation omitted). If the agency's action "is not sustainable on the administrative record made," then the administrative "decision must be vacated and the matter remanded to [the

---

[9] Plaintiffs also allege that DACA's termination violated the APA because it was unconstitutional. *See* Pls.' Compl. ¶ 87. Plaintiffs' allegations that the rescission of DACA was unconstitutional are addressed in Section II.B–D, *infra*.

agency] for further consideration." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). This Court should therefore decide whether the Acting Secretary's decision to wind down DACA was arbitrary and capricious on the administrative record she has produced. While the government submits that the Acting Secretary's decision was plainly not arbitrary and capricious under the Administrative Record, if this Court were to disagree, it should do no more than simply grant Plaintiffs the relief they seek by setting aside the Rescission Policy and remanding to her.

**2.** The Rescission Policy amply meets the "minimal standards of rationality" required by the APA. *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted). Plaintiffs do not deny that "the new policy is permissible under the [INA]." *Fox*, 556 U.S. at 515. And there are eminently "good reasons for it," *id.*, particularly in view of the litigation risk posed by the proceedings in *Texas*. In the Rescission Policy, the Acting Secretary explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy at 4 (AR 255). Specifically, after summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's conclusion in his letter that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted). The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into uncertainty.

The Acting Secretary was then "faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass

legislation; or allow the judiciary to potentially shut the program down completely and immediately." Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://go.usa.gov/xncuM. She reasonably opted for an orderly rescission, which she considered "the least disruptive option." *Id*.

There is nothing at all irrational about this choice or that explanation. *Cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 84 (2002) ("regulation reasonable" based on concerns about subjecting parties to "possible … liability"). Indeed, it is entirely sensible, given the turmoil that an abrupt, court-ordered shutdown would likely have provoked. The Acting Secretary balanced the litigation risk of keeping DACA in place with "the administrative complexities associated with ending the program," and opted for a solution that would "wind it down in an efficient and orderly fashion" accounting for the interests of DACA recipients. Rescission Policy at 3 (AR 254). She explained her reasonable decision to rescind DACA, and the APA requires no more. *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted) (APA satisfied where agency's explanation is clear enough that its "path may reasonably be discerned").[10] And no matter whether her (or the Attorney General's) judgment about the likely result of the *Texas* litigation would have turned out to be correct, it was surely not an irrational or arbitrary and capricious conclusion in light of the fact that at least the Fifth Circuit and four justices of the Supreme Court had already held that a materially indistinguishable policy was unlawful.

**3.** Plaintiffs' allegations entirely ignore the Acting Secretary's assessment of litigation risk, which is reason enough to reject their arbitrariness claim. To the extent Plaintiffs suggest that

---

[10] For these same reasons, Plaintiffs' inconsistent allegations that the government both improperly provided for a wind down period, Pls.' Compl. ¶ 86, and, at the same time, inadequately explained the dates chosen for the wind down process and, in any event, made the wind down period unreasonably short, *id.* ¶ 81, fail to state a claim under the APA.

the Acting Secretary's consideration of the Attorney General's views about DACA's legality somehow rendered her decision arbitrary and capricious, the argument suffers from three independent flaws.

First, the Acting Secretary did not rely on the Attorney General's September 4 letter solely for its assessment of DACA's legality. Instead, as discussed above, she concluded that DACA "should" be wound down after considering, among other things, his litigation-risk determination that it was "likely" that a legal challenge to DACA "would yield similar results" as the DAPA litigation under Fifth Circuit precedent. Rescission Policy at 3–4 (AR 254–55). That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis for upholding the Acting Secretary's decision to rescind DACA. *See Bowman*, 419 U.S. at 286.

Second, to the extent the Acting Secretary did rely on the proposition that DACA was unlawful, this Court need not agree with that determination to uphold her decision. If an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment to avoid constitutional questions, even if the two determinations are arguably "intertwined." *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (citation omitted) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue"). Here, the Attorney General regarded DACA as unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected. Rescission Policy at 3 (AR 254) (citation omitted). But those same concerns equally support a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law." *Id.* at 2 (AR 253). This Court

31

should sustain her decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

Third, although this Court need not decide the issue to resolve this case in favor of the government on the basis that the agency decision was at least rational, the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas* that was affirmed by the Supreme Court. The Fifth Circuit held not only that DAPA—including its proposed expansion of DACA—was likely unlawful, but also that DACA bore many "important similarities" to it. *Texas*, 809 F.3d at 174 & n.139 (noting that "the DAPA Memo's plain language … equates the DACA and DAPA procedure[s]," making DACA an "apt comparator"). Indeed, given that DAPA was enjoined before its implementation, the Fifth Circuit's decision was "informed by analysis of the implementation of DACA" itself. *Id*. at 172. On that score, while, "[l]ike the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id*. at 171–72, the court found that discretion to be illusory in practice: Because relatively few DACA requests were denied, the Fifth Circuit believed "there was evidence from DACA's implementation that [this] discretionary language was pretextual," *id*. at 172–73. Based on these findings by the Fifth Circuit, it would follow that DACA, like DAPA, did not "genuinely leave the agency and its employees free to exercise discretion" on a case-by-case basis, *id*. at 176—which supports the Attorney General's view that DACA was unlawful. And it seems likely that at least four justices of the Supreme Court agree.

Regardless of whether OLC was correct when it previously "orally advised" that its "preliminary view" was that the proposed version of DACA would be lawful, the reasoning in that opinion further confirms the invalidity of DACA as actually implemented in practice as found by

32

the Fifth Circuit.  OLC Op. 18 n.8.  The "preliminary" conclusion was conditioned on the proviso that "it was critical that … the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis."  *Id.*  Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice.  *Texas*, 809 F.3d at 176.  Indeed, because deferred action continues to exist on an individualized basis, the only change made by the Acting Secretary is the elimination of the factors that, according to the Fifth Circuit, led to the policy being applied without sufficient case-by-case discretion.  *See id.* at 172–73 (noting testimony that, for DACA, requests were "simply rubberstamped if the applicants meet the necessary criteria" (footnote and citation omitted)).  Further, the original DACA policy largely shares the relevant defects of the proposed expansion of deferred action that OLC rejected, rather than the aspects of the new policy that it approved.

**4.**  Plaintiffs also allege that the Rescission Policy is arbitrary and capricious because the Acting Secretary failed to sufficiently consider the "serious reliance interests by [DACA] participants."  Pls.' Compl. ¶¶ 76–79.  But as set forth in 6–8, *supra*, the Rescission Memo is merely a statement of policy that—like the original DACA policy—does not create any enforceable rights and is subject to change at any time.  And insofar as Plaintiffs suggest that the Acting Secretary failed to consider the reliance interests of DACA recipients more generally, that assertion ignores her calculus based on the looming risk of a nationwide injunction ending the DACA policy altogether.  Given her view that she faced an imminent, court-ordered end to DACA, the Acting Secretary opted for an orderly wind-down process that would protect the reliance interests of DACA recipients far more than would an immediate injunction terminating the policy.  *See supra* 9–10.  Finally, to the extent that she rationally concluded DACA was illegal, there would be no legitimate reliance interests at all.

**5.**   Plaintiffs also allege that Defendants violated the APA by failing "to provide any reasoned analysis to support the changes to the confidentiality of applicant information."  Pls.' Compl. ¶ 82.  As explained *infra*, Section II.D, DHS's information sharing policy has not changed. Thus, there is no "final agency action" for the Court to review.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (holding that "final agency action" must "mark the consummation of the agency's decisionmaking process"); 5 U.S.C. § 704 (providing for judicial review of "final agency action"). Accordingly, such claim fails as a matter of law.

In all events, the foregoing analysis confirms that the Acting Secretary's decision was at a minimum reasonable and that Plaintiffs' APA challenge can be resolved at this stage based on the record now before the Court.   Indeed, whatever this Court decides, there is no basis for supplementing the record or discovery to assess the Acting Secretary's explanation.

## 2. The Rescission Policy is Exempt from Notice and Comment.

Plaintiffs likewise miss the mark in arguing that the Rescission Policy must be set aside because it is a substantive rule issued without notice and comment.  *See* Pls.' Compl. ¶¶ 65–72; *see also* 5 U.S.C. § 553(b)–(c).  If winding down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the first place.  Critically, though, the DACA Memo itself also was not adopted through notice and comment.  So even on Plaintiffs' own theory, it would be void *ab initio*—leaving Plaintiffs without a remedy.  That is reason enough to dismiss this claim. *See Lujan*, 504 U.S. at 561 (plaintiff must show "injury will be 'redressed by a favorable decision'" to establish standing (citation omitted)).[11]

---

[11] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation."  *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425,

In any event, Plaintiffs' claim is erroneous. DHS and INS have adopted over 20 deferred action or similar policies over the past 50 years—rarely through notice and comment. That is because such policies, like the Rescission Policy, are not substantive rules at all. Rather, they are classic examples of "general statements of policy" that are exempt from the APA's notice-and-comment requirements. 5 U.S.C. § 553(b)(3)(A).

A "substantive rule establishes a standard of conduct which has the force of law." *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974). Thus, an "agency action that purports to impose legally binding obligations or prohibitions on regulated parties— and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

A statement of policy, by contrast, "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's Manual on the APA 30 n.3 (1947)). It "explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule." *McCarthy*, 758 F.3d at 252. It serves to "appris[e] the regulated community of the agency's intentions" and "inform[] the exercise of discretion by agents and officers in the field." *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987). And "a general statement of policy, like a press

---

447 n.79 (D.C. Cir. 1982) *aff'd sub nom, Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983). That holding, however, concerned the rescission of a rule promulgated after notice and comment that was allegedly defective on other grounds, not a rule that was defective precisely because it had failed to go through notice and comment in the first place. *See id.* at 445–46. When an agency has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go through those procedures to cure the underlying defect.

release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec.*, 506 F.2d at 38. Accordingly, policy statements "are binding on neither the public nor the agency," and the agency "retains the discretion and the authority to change its position … in any specific case." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (citations omitted).

As these principles make clear, the Rescission Policy is a quintessential policy statement— a point that its text reinforces again and again. It was issued as an "exercise of [the Secretary's] authority in establishing national immigration policies and priorities." Rescission Policy at 4 (AR 255). It explains how the agency intends to exercise its enforcement authority on a prospective basis, a matter that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831 (citations omitted). It does not immediately deprive any DACA recipient of his or her current deferred action, but describes how pending and future deferred action requests will be "adjudicate[d]—on an individual, case-by-case basis." Rescission Policy at 4 (AR 255). It does not categorically forbid the agency from continuing to defer enforcement action against DACA recipients in the future, but instead acknowledges the background principle, recognized by Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such "otherwise lawful enforcement … prerogatives," *id*. at 5 (AR 256). And it explains that it "does not … create any right or benefit, substantive or procedural, enforceable at law by any party." *Id*. Thus, in the wake of the Rescission Policy, deferred action "remains discretionary and reversible," *Arpaio*, 797 F.3d at 17—as with the 20-odd deferred action or similar policies that DHS and INS have adopted over the past half-century,

36

generally without going through the full notice-and-comment process.[12]

That is as it should be.  An agency's enforcement priorities will inevitably shift over time, whether due to changing circumstances or resource constraints.  *See Chaney*, 470 U.S. at 831. Indeed, the DACA policy was originally adopted in part to set enforcement priorities in view of the agency's limited resources.  *See Arpaio*, 797 F.3d at 16; DACA Memo at 1 (AR 1); DAPA Memo at 1 (AR 37).  Under Plaintiffs' theory, however, even if Congress were to vastly increase appropriations for immigration enforcement, the agency's hands would be tied:  it would not be free to adjust its enforcement priorities without engaging in "cumbersome and time-consuming rulemaking proceedings."  *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988).  The Court should not endorse such an intrusion into matters that have "long been regarded as the special province of the Executive Branch."  *Chaney*, 470 U.S. at 832.

### B.  Plaintiffs Fail to State an Equal Protection Claim.

Plaintiffs first allege that the Rescission Policy violates equal protection principles by impermissibly discriminating against DACA recipients on the basis of their undocumented status. Pls.' Compl. ¶¶ 90–93.  However, because "[u]ndocumented aliens cannot be treated as a suspect class," *Plyler v. Doe*, 457 U.S. 202, 223 (1982), *superseded by statute*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub L. No. 104–193, 110 Stat 2105, and Illegal Immigration Reform & Immigrant Responsibility Act of 1996, Pub L. NO. 104–208, Div. C., 110

---

[12] The Fifth Circuit's ruling that the adoption of the DAPA Memo required notice and comment does not imply that the rescission of DACA does as well.  Unlike the DAPA or DACA Memos, the Rescission Policy announced a return to an enforcement policy of using deferred action on an individualized basis, which cannot be cast as a substantive rule.  Indeed, the Fifth Circuit itself stressed that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment."  *Texas*, 809 F.3d at 178 n.156.  In any event, if this Court agrees with the Fifth Circuit, then DACA was void *ab initio* and Plaintiffs lack a remedy.

Stat. 3009, the Rescission Policy can be subject only to rational-basis review. *See Dixon v. District of Columbia*, 666 F.3d 1337, 1342 (D.C. Cir. 2011). The Rescission Policy easily survives that standard for the reasons above, *see supra* Section II.A.1.

Plaintiffs next appear to allege that Defendants violate equal protection principles by depriving "DACA recipients of their interest in furthering their education or pursuing a livelihood." Pls. Compl. ¶ 92. This claim fails for the simple reason that Plaintiffs have failed to identify any "fundamental rights" implicated by the Rescission Policy. Even for U.S. Citizens, "the right to practice a chosen profession" is not a fundamental right. *See Doe v. Rogers*, 139 F. Supp. 3d 120, 154–57 (D.D.C. 2015); *Robinson v. Huerta*, 123 F. Supp. 3d 30, 41 n. 7 (D.D.C. 2015) (collecting cases). Nor, for that matter, is the right to further an education. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 37 (1973). If the contrary were true, then all sorts of regulations addressing employment and education, including various licensing laws, would suddenly be subject to strict scrutiny. Unlawfully present aliens, who do not even have a fundamental right to remain in the United States, *see infra* Section II.C, cannot invoke a right to pursue a calling or further an education. Indeed, an alternate rule would call into question longstanding immigration laws. *See, e.g.*, *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002) (discussing "[Immigration Reform and Control Act of 1986], a comprehensive scheme prohibiting the employment of illegal aliens in the United States" (citations omitted)). As Plaintiffs have failed to identify a fundamental right, rational-basis review applies, *see Dixon*, 666 F.3d at 1342, and thus, as demonstrated *supra*, Plaintiffs' claims fail as a matter of law.

### C. Plaintiffs Fail to State a Procedural Due Process Claim.

Plaintiffs allege that the rescission violates due process norms by depriving them of protected liberty and property interests without notice and comment. *See* Pls.' Compl. ¶¶ 94–103.

This claim fails on the merits for the simple reason that no Plaintiff identifies a protected liberty or property interest implicated by the rescission that would entitle them to due process protections.

The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. Thus, the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citations omitted). The "Due Process Clause does not protect everything that might be described as a 'benefit.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). Rather, "'[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Such entitlements "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source"—*e.g.*, statutes or regulations—"that secure certain benefits and that support claims of entitlements to those benefits." *Roth*, 408 U.S. at 577.

To the extent that Plaintiffs argue that Ms. Perales-Sanchez possesses a protected liberty interest in her DACA, *see* Pls.' Compl. ¶ 100, DACA is not a protected entitlement because "government officials may grant or deny it in their discretion." *Castle Rock*, 545 U.S. at 756 (citation omitted). For due process purposes, statutes or regulations limit discretion only when they contain "explicitly mandatory language"—*i.e.*, "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 462–63 (1989) (citation omitted).

The DACA policy contains no such "explicitly mandatory language." *Id*. at 463. The policy is codified in no statute or regulation. Its source—the DACA Memo—describes it as a

"policy" for the "exercise of prosecutorial discretion." DACA Memo 2, 3 (AR 2, 3); *see Omar v. McHugh*, 646 F.3d 13, 22 n.7 (D.C. Cir. 2011) (the "use of the word 'policy'"—"rather than a word such as 'right'—reinforces the conclusion that Congress did not intend to create an 'entitlement'"). And the agency's public guidance makes clear that, under DACA, deferred action "may be terminated at any time, with or without Notice of Intent to Terminate, at DHS's discretion." DHS DACA FAQ No. 27.

The D.C. Circuit has recognized that, under DACA, "deferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (quoting DACA Memo 3). Thus, it is not a protected entitlement for due process purposes, and Plaintiffs' claim fails as a matter of law. *See also, e.g.*, *Velasco-Gutierrez v. Crossland*, 732 F.2d 792, 798 (10th Cir. 1984) (deferred action guidance "places no effective limitations on official discretion, and thus creates no protected liberty interest in deferred action"); *Romiero de Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985) (because "deferred action" "vests the regional commissioner with unfettered discretion to determine whether to grant an informal administrative stay of deportation to an otherwise deportable alien, it creates no protectible liberty interest in deferred action, nor does it create a protectible interest in being considered for deferred action status").

Plaintiffs also allege that the rescission deprives Microsoft and Princeton University of "interests cognizable under the Constitution" without notice and comment to the extent that Microsoft will lose investment in employees who are DACA recipients, as well as suffer business disruptions when these employees lose work authorization, and Princeton will lose the "resources . . . invested in [DACA recipients'] education," as well as "the benefits associated with their future success. Pls.' Compl. ¶¶ 98–99. The legal basis for this claim is unclear at best, and in any event

to the extent this Court finds that individual DACA recipients lack due process rights, *a fortiori* universities, corporations, and other entities would also lack any such rights.

### D.  Plaintiffs Fail to State a Substantive Due Process Claim.

Plaintiffs assert that DHS has changed its information-sharing policy and that the alleged "use of information obtained through implementation and operation of DACA ... for any purpose related to immigration enforcement" that was not "previously provided under the DACA program," does not comport with "fundamental fairness" and thus violates substantive due process. Pls.' Compl. ¶ 108.

As a threshold matter, Plaintiffs do not allege facts sufficient to show that there actually has been a substantive change in policy regarding information sharing.  They rely solely on the use of one word in the Rescission FAQs indicating that information will not be "proactively" provided to other law enforcement entities, Pls.' Compl. ¶ 108 (quoting DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals* (Sept. 5, 2017) ("Rescission FAQs"), that language is entirely consistent with DHS's policy regarding the protection of DACA information.  The agency's information-sharing policy in fact contains (and has always contained) a number of exceptions.

For example, under that policy, information submitted in DACA requests "is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings *unless* the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS'[s] Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised). DHS DACA FAQ No. 19 (emphasis added); *see* Notice to Appear Guidance. While this policy "may be modified, superseded, or rescinded at any time" and creates no legal rights, DHS DACA FAQ No. 19,

nothing in the Rescission Policy purports to change it, and it currently remains in effect. *Cf. Gerhart v. Lake Cnty.*, 637 F.3d 1013, 1020–21 (9th Cir. 2011) ("A person's belief of entitlement to a government benefit, no matter how sincerely or reasonably held, does not create a property right if that belief is not mutually held by the government . . . . '[A] constitutional entitlement cannot be created—as if by estoppel—merely because a wholly and *expressly* discretionary state privilege has been granted generously in the past.'" (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)) (citations omitted)).

In any event, Plaintiffs fail to state a substantive due process claim. Substantive due process protects those rights that rank as "fundamental"—that is, both "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citation omitted). The Supreme Court has also made clear that a plaintiff must provide "a 'careful description' of the asserted fundamental liberty interest" when raising such a claim. *Chavez v. Martinez*, 538 U.S. 760, 775–76 (2003). "[V]ague generalities," like Plaintiffs' wish that DHS would adopt their preferred policies, "will not suffice." *Id.* at 776.

While in rare cases a "denial of fundamental fairness" may rise to the level of a substantive due process violation, to survive dismissal in a "challenge to executive action" such as this one, Plaintiffs must allege behavior that is "so egregious" and "outrageous" as "to shock the contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998). "Although that doctrine normally imposes only very slight burdens on the government to justify its actions, it imposes none at all in the absence of a liberty or property interest." *George Wash. Univ. v. Dist. of Columbia*, 318 F.3d 203, 206 (D.C. Cir. 2003). As DHS' information sharing policy has not substantively changed, and Plaintiffs cannot identify an instance where any DACA

recipient's information was allegedly shared in violation of this policy, Plaintiffs' substantive due process claim fails for the simple reason that they have not identified any actual deprivation of liberty or property. *See Abdelfattah v. U.S. Dep't of Homeland Sec.*, 787 F.3d 524, 540 (D.C. Cir. 2015) (holding that substantive due process claim failed because Plaintiff "ha[d] not alleged facts [that] suggest[ed] he ha[d] been deprived—arbitrarily or otherwise—of a cognizable liberty or property interest"); *see also Hyuk Joon Lim v. Holder*, 710 F.3d 1074, 1076 (9th Cir. 2013) ("Cancellation of removal is a form of discretionary relief which does not give rise to a 'substantive interest protected by the Due Process Clause.'") (quoting *Munoz v. Ashcroft*, 339 F.3d 950, 954 (9th Cir. 2003)); *Tefel v. Reno*, 180 F.3d 1286, 1300–01 (11th Cir. 1999) ("[n]o constitutionally protected interest arises from the INS' actions in granting or denying applications for suspension," that "prior generosity in awarding wholly and expressly discretionary relief does not prove the existence of a constitutional entitlement," and that "awarding and then revoking discretionary relief does not offend due process" (quotation marks omitted)).[13]

Moreover, DHS's information-sharing policy for DACA recipient information has always contained a number of exceptions and although the policy, in fact, remains unchanged, it has always expressly stated that it "may be modified, superseded, or rescinded at any time." DHS DACA FAQ No. 19. It therefore creates no judicially enforceable rights. And even if Plaintiffs had identified an actual and cognizable deprivation of a liberty or property interest, nothing about

---

[13] Although the court in *Batalla Vidal* found (incorrectly) that, once a DACA recipient's deferred action expires, they may be entitled to a presumption that the Government will enforce the immigration laws against them, *see Batalla Vidal* Mem. & Order at 36, it does not follow and Plaintiffs have not shown that DACA recipients are entitled to a presumption that DHS's information-sharing policy, which has not substantively changed, will be applied differently once DACA recipients lose their deferred action.

DHS' information sharing policy is so outrageous as to "shock the contemporary conscience." *Lewis*, 523 U.S. at 847, n. 8.

## III. NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS IMPERMISSIBLE.

Finally, in an indirect attack of the Rescission Policy, Plaintiffs seek a declaratory judgment that DACA is "lawful." *See* Pls.' Compl. ¶¶ 110–14. The Declaratory Judgment Act provides a remedy, not a source of rights independent of substantive federal law. *C&E Servs., Inc. v Dist. of Columbia Water and Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002). To establish standing and to seek relief under the Declaratory Judgment Act, a plaintiff must demonstrate that there is an "actual controversy" necessitating declaratory relief. 28 U.S.C. § 2201(a); *see Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 239–40 (1937). The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna*, 300 U.S. at 240–41.

Here, even assuming DACA was "lawful," any declaratory relief that this Court might provide would merely be an academic dispute because the Acting Secretary still would have had the discretion to rescind the policy. *See supra* Section I.A. Instead, the "controversy" (to the extent it is even justiciable) concerns whether the Acting Secretary's decision to rescind DACA in light of litigation risk that DHS was facing was arbitrary or capricious. Any after-the-fact conclusion by this Court that DACA was "lawful" has no bearing on that decision, which was based on the litigation risk that DHS was then confronting. Thus, any declaratory judgment that this Court might issue would not provide any actual benefits to Plaintiffs.

Plaintiffs also seek an "injunction against enforcement and implementation of the DACA Rescission Memorandum" and "an injunction enjoining Defendants from sharing or otherwise using information furnished by Dreamers ... except as previously provided under the DACA program." Pls.' Compl. at 41, Prayer for Relief. Even if the Court were to conclude that Plaintiffs

44

were entitled to any injunction, it should dismiss Plaintiffs' request to the extent they seek nationwide relief. Both constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries. Article III demands that "a plaintiff must demonstrate standing … for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted). "The remedy" sought thus must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996). "The actual-injury requirement would hardly serve [its] purpose … of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *Id.* (emphasis omitted). And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties"). Accordingly, any injunction here should be limited to particular individual Plaintiffs found to have cognizable claims.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this case or, in the alternative, grant summary judgment to Defendants on all claims.

Dated: November 22, 2017      Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

*/s/   Rachael Westmoreland*
RACHAEL WESTMORELAND (GA Bar. No. 539498)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 514-1280
Fax: (202) 616-8470
Email: rachael.westmoreland@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|   |   |
|---|---|
| THE TRUSTEES OF PRINCETON UNIVERSITY, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES OF AMERICA, *et al.*, <br><br> *Defendants*. | Civil Action No. 17-cv-2325 (CRC) |

**[PROPOSED] ORDER**

Upon consideration of Defendants' Motion to Dismiss or, In the Alternative, For

Summary Judgment, and any response or reply thereto, it is hereby

**ORDERED** that this motion is **GRANTED**; and it is

**FURTHER ORDERED** that this action is **DISMISSED** in its entirety.

This is a final, appealable order. *See* Fed. R. App. P. 4(a).

**SO ORDERED**.

Dated: _____          _____

                                                   CHRISTOPHER R. COOPER
                                                   United States District Judge

Dated: November 22, 2017                    Respectfully submitted,

                                            CHAD A. READLER
                                            Principal Deputy Assistant Attorney General

                                            BRETT A. SHUMATE
                                            Deputy Assistant Attorney General

                                            JENNIFER D. RICKETTS
                                            Director

                                            JOHN R. TYLER
                                            Assistant Branch Director

                                            */s/   Rachael Westmoreland*
                                            RACHAEL WESTMORELAND (GA Bar. No.
                                            539498)
                                            Trial Attorney
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Avenue NW
                                            Washington, DC 20530
                                            Phone: (202) 514-1280
                                            Fax: (202) 616-8470
                                            Email: rachael.westmoreland@usdoj.gov

                                            *Counsel for Defendants*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| THE TRUSTEES OF PRINCETON UNIVERSITY, *et al.*,<br><br>  *Plaintiffs*,<br><br>  v.<br><br>UNITED STATES OF AMERICA, *et al.*,<br><br>  *Defendants*. | Civil Action No. 17-cv-2325 (CRC) |

## CERTIFIED INDEX OF ADMINISTRATIVE RECORD

Pursuant to Local Rule 7(n)(1), Defendants in the above-captioned matter hereby file the certified contents of the Administrative Record,[1] which will be served on Plaintiffs today, November 22, 2017. The Administrative Record includes the following documents.

---

[1] The filing of this Administrative Record is not a concession that the decision of the Acting Secretary is subject to judicial review.

| DATE | DOCUMENT |
|------|----------|
| June 15, 2012 | Janet Napolitano, Secretary of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* |
| November 19, 2014 | Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, Memorandum Opinion for the Secretary of Homeland Security and the Counsel to the President, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others* |
| November 20, 2014 | Jeh Charles Johnson, Secretary of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* |
| February 16, 2015 | *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015) |
| November 25, 2015 | *Texas v. United State*s, 809 F.3d 134 (5th Cir. 2015) |
| June 23, 2016 | *Texas v. United States*, 136 S. Ct. 2271 (2016) |
| February 20, 2017 | John Kelly, Secretary of Homeland Security, *Enforcement of the Immigration Laws to Serve the National Interest* |
| June 15, 2017 | John Kelly, Secretary of Homeland Security, *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA")* |
| June 29, 2017 | Letter from the Attorney General of Texas, Ken Paxton, to the Attorney General of the United States, Jefferson B. Sessions III |
| August 1, 2017 | Letter from Congressman John Lewis to the Acting Secretary of Homeland Security, Elaine C. Duke |
| August 1, 2017 | Letter from Congressman Raul M. Grijalva, *et al.* to President of the United States Donald J. Trump |
| August 22, 2017 | Letter from Congressman Daniel M. Donovan, Jr., *et al.* to President of the United States Donald J. Trump |
| September 4, 2017 | Letter from the Attorney General of the United States, Jefferson B. Sessions III, to the Acting Secretary of Homeland Security, Elaine C. Duke |
| September 5, 2017 | Elaine C. Duke, Acting Secretary of Homeland Security, *Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* |

**CERTIFICATION OF ADMINISTRATIVE RECORD**

I, David J. Palmer, Chief of Staff, Office of the General Counsel at the United States Department of Homeland Security, certify that, to the best of my knowledge, the Administrative Record served on Plaintiffs is a true, correct, and complete copy of the non-privileged documents that were actually considered by Elaine C. Duke, the Acting Secretary of Homeland Security, in connection with her September 5, 2017 decision to rescind the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."

Dated: November 8, 2017                  _____*/s/ David J. Palmer*_____
                                      DAVID J. PALMER
                                        Chief of Staff, Office of the General Counsel
                                        United States Department of Homeland Security

Dated: November 22, 2017       Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

*/s/   Rachael Westmoreland*
RACHAEL WESTMORELAND (GA Bar. No. 539498)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 514-1280
Fax: (202) 616-8470
Email: rachael.westmoreland@usdoj.gov

*Counsel for Defendants*

EXHIBIT 12

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

CASA DE MARYLAND, *et al.*,

                *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

                *Defendants*.

No. 17-cv-2942 (RWT)

## DEFENDANTS' MOTION TO DISMISS OR, IN
## THE ALTERNATIVE, FOR SUMMARY JUDGMENT

For the reasons set forth in the accompanying memorandum of law, Defendants

respectfully move the Court to dismiss this action or, in the alternative, to grant summary

judgment to Defendants.  *See* Fed. R. Civ. P. 12(b)(1), (6), 56.

Dated: November 15, 2017           Respectfully submitted,

                                   CHAD A. READLER
                                   Acting Assistant Attorney General

                                   BRETT A. SHUMATE
                                   Deputy Assistant Attorney General

                                   JENNIFER D. RICKETTS
                                   Director

                                   JOHN R. TYLER
                                   Assistant Branch Director

                                   */s/  Kathryn C. Davis*
                                   KATHRYN C. DAVIS
                                   */s/  Rachael Westmoreland*
                                   RACHAEL WESTMORELAND
                                   Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 616-8298
Fax: (202) 616-8470
Email: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

CASA DE MARYLAND, *et al.*,

        *Plaintiffs*,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

        *Defendants*.

No. 17-cv-2942 (RWT)

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
# TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND ..................................................................................................5

    A.  Deferred Action Generally...................................................................5

    B.  DACA and DAPA..................................................................................7

    C.  The *Texas* Litigation ..........................................................................8

    D.  Rescission of DACA............................................................................9

    E.  The Instant Action.............................................................................11

LEGAL STANDARDS ......................................................................................12

ARGUMENT ......................................................................................................14

    I.  THIS CASE IS NOT JUSTICIABLE.................................................15

        A.  The Rescission Policy Is Not Justiciable Because this Immigration
            Enforcement Policy Is a Matter Committed to Agency Discretion
            by Law ........................................................................................15

        B.  The INA Deprives District Courts of Jurisdiction over Challenges to
            Denials of Deferred Action........................................................21

        C.  The Plaintiff-Organizations' Claims Are Not Cognizable...........25

            1.  Plaintiffs Lack Article III Standing......................................25

                a.  Plaintiffs lack organizational standing......................... 25

                b.  Plaintiffs lack representational standing. ...................... 28

            2.  Plaintiffs Lack a Cause of Action Under the APA ..............29

        D.  The Government's Justiciability Objections Are Not Inconsistent
            with the Acting Secretary's Reliance on the Fifth Circuit's Decision.........................30

    II.  PLAINTIFFS FAIL TO STATE A CLAIM.......................................30

        A.  Plaintiffs Fail to State an APA Claim.........................................31

1. The Acting Secretary rationally explained her decision to wind down DACA, particularly given the imminent risk of a nationwide injunction. ..................................................................................31

B. The Rescission Policy Is Exempt from Notice and Comment.....................................41

C. Plaintiffs Fail to State an Equal Protection Claim ......................................................45

D. Plaintiffs Fail to State a Procedural Due Process Claim..............................................48

E. Plaintiffs Fail to State a Substantive Due Process Claim. ...........................................52

F. Plaintiffs' Equitable Estoppel Claims Fail..................................................................54

III. NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS IMPERMISSIBLE ....................................................................................................57

CONCLUSION.........................................................................................................59

# TABLE OF AUTHORITIES

CASES                                                                              PAGE(S)

*Aetna Life Ins. Co. of Hartford v. Haworth*,
    300 U.S. 227 (1937)......................................................................................................... 57

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)......................................................................................................... 54

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
    367 F.3d 212 (4th Cir. 2004) ......................................................................................... 13

*Am. Legal Found. v. FCC*,
    808 F.2d 84 (D.C. Cir. 1987)......................................................................................... 26

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
    526 U.S. 40 (1999)........................................................................................................... 48

*Angeles v. Dist. Dir., INS*,
    729 F. Supp. 479 (D. Md. 1990) ................................................................................... 55

*Arizona v. United States*,
    567 U.S. 387 (2012)........................................................................................... 5, 17, 47

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ................................................................................ *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)......................................................................................................... 13

*Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*,
    524 F. Supp. 2d 642 (D. Md. 2007) ...................................................................... 13, 30

*Bd. of Regents v. Roth*,
    408 U.S. 564 (1972)......................................................................................................... 48

*Beck v. McDonald*,
    848 F.3d 262 (4th Cir. 2017) ......................................................................................... 12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)......................................................................................................... 13

*Bennett v. Spear*,
    520 U.S. 154 (1997)......................................................................................................... 38

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
    239 U.S. 441 (1915) ................................................................. 50

*Botezatu v. INS*,
    195 F.3d 311 (7th Cir. 1999) ................................................ 23, 24

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974), *reh'g denied*, 420 U.S. 956 (1975) .................. 33, 34

*Califano v. Sanders*,
    430 U.S. 99 (1977) ................................................................. 16

*Camp v. Pitts*,
    411 U.S. 138 (1973) ............................................................... 32

*Chaudhry v. Holder*,
    705 F.3d 289 (7th Cir. 2013) .................................................... 6

*Chavez v. Martinez*,
    538 U.S. 760 (2003) ............................................................ 52, 53

*Chen Zhou Chai v. Carroll*,
    48 F.3d 1331 (4th Cir. 1995) ................................................ 41, 43

*Chevron U.S.A. Inc. v. Echazabal*,
    536 U.S. 73 (2002) ................................................................. 33

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ............................................................... 42

*Citizens for the Scenic Severn River Bridge, Inc. v. Skinner*,
    802 F. Supp. 1325 (D. Md. 1991),
    *aff'd*, No. 91-1267, 1992 WL 180138 (4th Cir. July 29, 1992) ............. 14

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ............................................................ 16, 31

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ................................................................. 27

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ............................................................... 25

*Clarke v. Secs. Indus. Ass'n*,
    479 U.S. 388 (1987) ............................................................... 29

iv

*Cmty. Nutrition Inst. v. Young,*
   818 F.2d 943 (D.C. Cir. 1987) ................................................................. 43

*Conn. Bd. of Pardons v. Dumschat,*
   452 U.S. 458 (1981) ................................................................................ 52

*Consumer Energy Council of Am. v. FERC,*
   673 F.2d 425 (D.C. Cir. 1982) ................................................................. 42

*Cty. of Sacramento v. Lewis,*
   523 U.S. 833 (1998) ................................................................................ 53

*Dawkins v. Witt,*
   318 F.3d 606 (4th Cir. 2003) ............................................................. 55, 56

*Dawson v. Winter,*
   No. 06-cv-2885-CCB, 2007 WL 1610905 (D. Md. May 21, 2007),
   *aff'd,* 277 F. App'x. 297 (4th Cir. 2008) ................................................. 14

*Decatur Liquors, Inc. v. Dist. of Columbia,*
   478 F.3d 360 (D.C. Cir. 2007) ................................................................. 50

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
   No. 17-1320, 2017 WL 3141907 (D.D.C. July 24, 2017) ....................... 40

*Elgharib v. Napolitano,*
   600 F.3d 597 (6th Cir. 2010) ................................................................... 22

*Elk Grove Unified Sch. Dist. v. Newdow,*
   542 U.S. 1 (2004) .................................................................................... 26

*Emery Min. Corp. v. Sec'y of Labor,*
   744 F.2d 1411 (10th Cir. 1984) ............................................................... 54

*Fares v. U.S. Immigration & Naturalization Service,*
   50 F.3d 6 (4th Cir. 1995) ......................................................................... 39

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ................................................................................ 32

*Fed'n for Am. Immigration Reform, Inc. v. Reno,*
   93 F.3d 897 (D.C. Cir. 1996) ................................................................... 29

*Fla. Power & Light Co. v. Lorion,*
   470 U.S. 729 (1985) ................................................................................ 32

*FW/PBS, Inc. v. City of Dallas,*
   493 U.S. 215 (1990) ........................................................... 25

*Gibraltar, P.R., Inc. v. Otoki Group, Inc.,*
   104 F.3d 616 (4th Cir. 1997) ............................................ 57

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ........................................................... 26

*Hawkins v. Freeman,*
   195 F.3d 732 (4th Cir. 1999) ............................................ 53

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ................................................... *passim*

*Heckler v. Cmty. Health Servs.,*
   467 U.S. 51 (1984) ............................................................. 55

*Hunt v. Wash. State Apple Adver. Comm'n,*
   432 U.S. 333 (1977) ........................................................... 28

*ICC v. Bhd. of Locomotive Eng'rs* (BLE),
   482 U.S. 270 (1987) ............................................... 15, 18, 21

*Invention Submission Corp. v. Rogan,*
   357 F.3d 452 (4th Cir. 2004) ............................................ 39

*Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n,*
   874 F.2d 205 (4th Cir. 1989) ............................................ 42

*Johnson v. Sessions,*
   No. 15-cv-3317-RDB, 2017 WL 1207537 (D. Md. Apr. 3, 2017) .......... 57

*Ky. Dep't of Corrs. v. Thompson,*
   490 U.S. 454 (1989) ........................................................... 49

*Lewis* v. Casey,
   518 U.S. 343 (1996) ........................................................... 58

*Lexmark Int'l, Inc. v. Static Control Components,*
   134 S. Ct. 1377 (2014) ....................................................... 26

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ........................................................... 15

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................. 12, 41

*Mada-Luna v. Fitzpatrick*,
    813 F.2d 1006 (9th Cir. 1987) ............................................................ 17

*Madsen v. Women's Health Ctr., Inc.*,
    512 U.S. 753 (1994) ............................................................................ 58

*Marsh v. United States*,
    No. 14-cv-3559-TDC, 2016 WL 247563 (D. Md. Jan. 20, 2016) ........................... 13

*Marshall Cty. Health Care Auth. v. Shalala*,
    988 F.2d 1221 (D.C. Cir. 1993) .......................................................... 14

*McBurney v. Cuccinelli*,
    616 F.3d 393 (4th Cir. 2010) ............................................................. 27

*Md. Highways Contractors Ass'n v. Maryland*,
    933 F.2d 1246 (4th Cir. 1991) ................................................... 26, 27, 28

*Mississippi v. Johnson*,
    71 U.S. 475 (1867) ............................................................................ 30

*Mondragon v. Holder*,
    706 F.3d 535 (4th Cir. 2013) ............................................................. 52

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ........................................................................... 58

*Motor Vehicle Mfrs. Ass'n v. State Farm*,
    463 U.S. 29 (1983) ............................................................................. 31

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*,
    851 F.2d 1424 (D.C. Cir. 1988) .......................................................... 44

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ........................................................... 42

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir 1995) ............................................................ 26

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) ........................................................................... 54

*O'Shea v. Littleton*,
    414 U.S. 488 (1974) ........................................................................ 27

*Omar v. McHugh*,
    646 F.3d 13 (D.C. Cir. 2011) ........................................................ 49

*OPM v. Richmond*,
    496 U.S. 414 (1990) ........................................................................ 54

*Pac. Gas & Elec. Co. v. FPC*,
    506 F.2d 33 (D.C. Cir. 1974) ................................................ 42, 43

*Perales v. Casillas*,
    903 F.2d 1043 (5th Cir. 1990), *reh'g denied*, 912 F.2d 1465 (5th Cir. 1990) ........................ 17

*Perez v. Mortg. Bankers Ass'n*,
    135 S. Ct. 1199 (2015) .................................................................... 55

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
    525 U.S. 471 (1999) .............................................................. *passim*

*Romiero De Silva v. Smith*,
    773 F.2d 1021 (9th Cir. 1985) ...................................................... 49

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
    713 F.3d 175 (4th Cir. 2013) .......................................... 25, 28, 29

*Sec'y of State for Defence v. Trimble Navigation Ltd.*,
    484 F.3d 700 (4th Cir. 2007) ........................................................ 13

*Sierra Club v. Larson*,
    882 F.3d 128 (4th Cir. 2011) .................................................. 15, 16

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) ........................................................................ 26

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) .................................................................. 26, 28

*Smith v. Ashcroft*,
    295 F.3d 425 (4th Cir. 2002) ........................................................ 49

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ........................................................................ 28

*Syncor Int'l Corp. v. Shalala,*
   127 F.3d 90 (D.C. Cir. 1997) ........................................................ 43

*Syracuse Peace Council v. FCC,*
   867 F.2d 654 (D.C. Cir. 1989) ...................................................... 35

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ................................................ *passim*

*Town of Castle Rock v. Gonzales,*
   545 U.S. 748 (2005) ...................................................................... 48

*Town of Chester v. Laroe Estates, Inc.,*
   137 S. Ct. 1645 (2017) .................................................................. 58

*Troy Corp. v. Browner,*
   120 F.3d 277 (D.C. Cir. 1997), *reh'g denied*, 129 F.3d 1290 (D.C. Cir. 1997) ...................... 32

*United States v. Armstrong,*
   517 U.S. 456 (1996) ................................................................ *passim*

*United States v. Browning,*
   630 F.2d 694 (10th Cir. 1980) ...................................................... 55

*United States v. Owens,*
   54 F.3d 271 (6th Cir. 1995) .......................................................... 54

*United States v. Texas,*
   136 S. Ct. 2271 (2016) .................................................................... 9

*United States v. Texas,*
   137 S. Ct. 285 (2016) ...................................................................... 9

*Vance v. CHF Int'l,*
   914 F. Supp. 2d 669 (D. Md. 2012) .............................................. 12

*Vasquez v. Aviles,*
   639 F. App'x 898 (3d Cir. 2016) .................................................. 22

*Veasey v. Perry,*
   29 F. Supp. 3d 896 (S.D. Tex. 2014) ............................................ 46

*Velasco-Gutierrez v. Crossland,*
   732 F.2d 792 (10th Cir. 1984) ...................................................... 49

*Warth v. Seldin*,
　422 U.S. 490 (1975) ................................................................ 25

*Washington v. Davis*,
　426 U.S. 229 (1976) ........................................................ 46, 47

*Washington v. Glucksberg*,
　521 U.S. 702 (1997) ................................................................ 52

*Watkins v. U.S. Army*,
　875 F.2d 699 (9th Cir. 1989) ............................................ 55, 56

*Yassini v. Crosland*,
　618 F.2d 1356 (9th Cir. 1980) .......................................... 50, 51


STATUTES

5 U.S.C. § 552 ........................................................................ 39

5 U.S.C. § 553 ............................................................ 3, 41, 42

5 U.S.C. § 701 ................................................ 15, 16, 17, 24

5 U.S.C. § 702 ........................................................................ 29

5 U.S.C. § 704 ........................................................................ 38

5 U.S.C. § 706 ........................................................................ 31

6 U.S.C. § 202 ........................................................................ 22

6 U.S.C. § 251 ........................................................................ 22

6 U.S.C. § 557 ........................................................................ 22

8 U.S.C. § 1103 ....................................................................... 5

8 U.S.C. § 1154 ....................................................................... 6

8 U.S.C. § 1158 ....................................................................... 5

8 U.S.C. § 1182 ....................................................................... 5

8 U.S.C. § 1227 ....................................................................... 5

8 U.S.C. § 1229b ................................................................................................ 5

8 U.S.C. § 1252 ........................................................................................ *passim*

28 U.S.C. § 2201 .............................................................................................. 57

E-Government Act of 2002,
  Pub. L. No. 107-347, 116 Stat. 2899 .............................................. 40, 41


REGULATIONS

8 C.F.R. § 274a.12(c)(14) ................................................................................. 6


CONSTITUTION

U.S. Const. amend. V ...................................................................................... 48


FEDERAL RULES

Fed. R. Civ. P. 8(c) ......................................................................................... 54

Fed. R. Civ. P. 12 ................................................................... 12, 13, 14, 20, 29


OTHER AUTHORITIES

2 Richard J. Pierce, Jr., Administrative Law Treatise § 9.2 (5th ed. 2010) .................................. 50

Attorney General's Manual on the Administrative Procedure Act (1947) ........................... 42, 43

DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals*,
  (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-
  rescission-deferred-action-childhood-arrivals-daca) .............................................. 38

DHS, *Privacy Impact Assessment for the Deferred Action for Childhood Arrivals
  (DACA)* (Aug. 15, 2012),
  https://www.dhs.gov/sites/default/files/publications/privacy_pia_uscis_daca_0.pdf .............. 39

Press Release, DHS
  Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
  https://go.usa.gov/xncuM ........................................................................ 33

USCIS, *Deferred Action for Childhood Arrivals Frequently Asked Questions*,
  (last updated Oct. 6, 2017), https://go.usa.gov/xngCd ....................................... *passim*

USCIS, Policy Memorandum (Nov. 7, 2011),
   https://go.usa.gov/xncPK. ..................................................................................... 8, 38

U.S. Dep't of Justice, Office of Legal Counsel,
   *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens*
   *Unlawfully Present*, 38 Op. O.L.C. 1 (Nov. 19, 2014),
   https://www.justice.gov/file/179206/download ................................................. 21, 36

## INTRODUCTION

In 2012, then-Secretary of Homeland Security Janet Napolitano adopted the policy now known as DACA, or Deferred Action for Childhood Arrivals.  DACA made deferred action—a practice by which the Secretary exercises individualized enforcement discretion to issue a reversible notification that she does not intend to remove an alien for a set period of time— available to a class of unlawfully present aliens who came to the United States as children.  In 2014, one of her successors expanded the parameters of DACA and adopted a similar policy known as DAPA, or Deferred Action for Parents of Americans.  DAPA, if implemented, would have made deferred action available to unlawfully present aliens who were parents of U.S. citizens and lawful permanent residents.

DAPA, including its expansion of DACA, was promptly challenged by a coalition of 26 states.  Although then-Secretary of Homeland Security Jeh Johnson vigorously defended the policy, he was rebuffed at every turn:  the United States District Court for the Southern District of Texas issued a nationwide preliminary injunction; the United States Court of Appeals for the Fifth Circuit affirmed ("Fifth Circuit"), declaring the policy "manifestly contrary" to the Immigration and Nationality Act (INA); and an equally divided Supreme Court affirmed, leaving the injunction in place.

Armed with this victory, the states threatened to amend their complaint to challenge not just DAPA, but DACA as well, arguing that it suffers from the same infirmities.  In view of the substantial similarities between the two policies, the significant litigation risk posed by the Supreme Court and Fifth Circuit decisions, and the Attorney General's view that DACA was in fact unlawful, Acting Secretary of Homeland Security Elaine C. Duke was faced with two options.  On the one hand, she could wind down DACA in an orderly fashion, minimizing the disruption to

current recipients.  On the other, continued litigation would in all likelihood result in a nationwide injunction abruptly ending the policy, plunging its nearly 800,000 recipients into uncertainty.

The Acting Secretary chose the less disruptive option: an orderly process that formally rescinds DACA but allows it to sunset.  Under this Rescission Policy, no DACA recipient will have his or her deferred action abruptly terminated based solely on the Rescission Policy; instead, prior grants will remain valid for the remainder of their stated duration (generally two years) before ending consistent with their stated terms.  Any DACA recipient whose deferred action was due to expire within six months was given a month to request another two-year renewal.  And although the agency stopped accepting new DACA requests, it will finish processing those it had received when the rescission began.

In this case, Plaintiffs—numerous organizations and a group of individual former and current DACA recipients—challenge the Rescission Policy on a variety of statutory, constitutional, and common-law grounds, urging the Court to invalidate the agency's decision and enjoin the Acting Secretary from rescinding DACA.  Plaintiffs also request that the Court enjoin Defendants from disclosing the information of DACA recipients for immigration enforcement purposes in a manner inconsistent with the Department of Homeland Security's (DHS) information-sharing policy.  There is no basis to do so.

To begin, this case is not justiciable.  The Rescission Policy is a classic exercise of enforcement discretion "presumed immune from judicial review," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and particularly unfettered in the context of immigration, *see Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 487–92 (1999).  In fact, Congress has stripped district courts of jurisdiction to review "'no deferred action' decisions and similar discretionary determinations" such as the one here.  *AADC*, 525 U.S. at 485; *see* 8 U.S.C.

2

§ 1252(g).  At a minimum, the Plaintiff-organizations cannot proceed due to their lack of standing and a cause of action.  The Court should not permit Plaintiffs to circumvent these bedrock limits on judicial review.

On the merits, Plaintiffs' claims fail as a matter of law.  Their claim that the Rescission Policy is arbitrary and capricious under the Administrative Procedure Act (APA) because it was inadequately supported on the record is fundamentally misguided.  Agencies are always free to change course on policy matters so long as they provide a rational explanation.  Here, the Acting Secretary's explanation of her decision to rescind DACA amply meets that deferential standard, particularly given the adverse ruling from the Fifth Circuit and the Supreme Court's affirmance, the evident similarities between DACA and the policy that expanded DACA and created DAPA, the Attorney General's opinion that DACA was likewise unlawful, and the imminent risk of a nationwide injunction with potentially chaotic results.  Plaintiffs' claim that DHS's change in its policy regarding the use of DACA-related information is arbitrary and capricious and contrary to law under the APA is even more misguided.  Not only have Plaintiffs failed to allege sufficient facts to show a change in the information-sharing policy, but the policy is also clearly compliant with the Privacy Act and E-Government Act.  Because these claims can be resolved now based on the complaint, the documents incorporated therein by reference, and other judicially noticeable materials—including those in the administrative record, filed contemporaneously herewith—the Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside the Rescission Policy if it disagrees.

Plaintiffs' notice-and-comment claim is equally unavailing.  The APA exempts "general statements of policy" from notice and comment, 5 U.S.C. § 553(b), and the Rescission Policy is a reordering of enforcement priorities that readily qualifies.  Indeed, DHS and the former

3

Immigration and Naturalization Service (INS) have adopted more than 20 deferred action or similar policies over the past 50 years.  Few have gone through notice and comment, and there is no warrant for those procedures here.  Nor does the Fifth Circuit's ruling that the states established a substantial likelihood of success on their claim that the promulgation of DAPA required notice and comment mean that the rescission of DACA and a return to the *status quo ante* must likewise meet these procedural demands.  And in any event, if DACA's rescission required notice and comment, then DACA was void from the outset because its adoption would also have required notice and comment *a fortiori*.

Plaintiffs' equal protection claims get them no further.  To the extent that a discriminatory motive claim—here, that the Policy was motivated by animus toward Mexican, Central American, and Latino immigrants—can ever be brought in a context like this one, *but see AADC*, 525 U.S. at 487–92, Plaintiffs must allege a clear case of discrimination given that they challenge an exercise of enforcement discretion, *see United States v. Armstrong*, 517 U.S. 456 (1996).  They have failed to do so.  Nor can Plaintiffs show that the Rescission Policy trenches on any fundamental right.

Plaintiffs' due process claims also cannot survive a motion to dismiss.  DACA recipients have no protected liberty or property interest in the continued availability of deferred action, which is an exercise of prosecutorial discretion that confers no rights and is revocable at any time, or in the continuity of DHS's information-sharing policy, which has not changed since DACA was implemented in 2012.  Moreover, Plaintiffs fail to identify any executive conduct that "shocks the conscience" in a manner that would support a claim for the violation of Plaintiffs' substantive due process rights.

Finally, Plaintiffs cannot state an equitable estoppel claim because estoppel does not run against the government.  And even if they could, Plaintiffs fail to allege facts sufficient to make

4

out such a claim.

In sum, even if Plaintiffs' challenge were somehow justiciable, the assumption underlying it would compel dismissal. DAPA—including its expansion of DACA—was enjoined by the Fifth Circuit, and that holding was affirmed by the Supreme Court. The original DACA policy is materially indistinguishable as a legal matter. At bottom, Plaintiffs' argument is that, when making discretionary enforcement determinations, federal agencies must ignore the legal rulings and reasoning of federal courts. To state the premise of this claim is to refute it.

This case should be dismissed.

## BACKGROUND

### A.     Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the INA along with "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396 (citation omitted). DHS officials must first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum, parole, or cancellation of removal, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b. "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely.

5

*AADC*, 525 U.S. at 483.

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016).  Deferred action is a practice by which the Secretary exercises her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period.  *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority").  Although originally "developed without express statutory authority," *AADC*, 525 U.S. at 484, individualized deferred action has been recognized by Congress in certain circumstances inapplicable here, *see, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"), and described by the Supreme Court as an "exercise in administrative discretion," *AADC*, 525 U.S. at 484.  Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former INS have adopted over 20 such policies over the past 50 years—rarely through notice-and-comment rulemaking.

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, under DHS regulations not challenged here.  *See, e.g.*, 8 C.F.R. § 274a.12(c)(14).  That decision does not, however, confer lawful immigration status or provide any defense to removal.  *Cf. Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (discussing difference between "unlawful presence" and "unlawful status").  To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'"  *Arpaio*, 797 F.3d at 17 (citation omitted).  DHS thus has

6

discretion to revoke deferred action unilaterally, for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time. *See AADC*, 525 U.S. at 484–85.

### B.      DACA and DAPA

On June 15, 2012, then-Secretary Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals. *See* Admin. R. (AR) 1–3 (DACA Memo), ECF No. 26-1. DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws. DACA Memo at 1 (AR 1). Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to indefinite renewal. *Id.* at 2-3 (AR 2-3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests for this relief would "be decided on a case by case basis," *id.* at 2 (AR 2). Accordingly, the Memo provided that this grant of deferred action "confer[red] no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." *Id.* at 3 (AR 3).

In public guidance published on the USCIS website, DHS also informed DACA requestors that information in their requests will be "protected from disclosure to [Immigration & Customs Enforcement (ICE)] and [U.S. Customs & Border Protection (CBP)] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised). USCIS, *Deferred Action for Childhood Arrivals Frequently Asked Questions*,

7

No. 19 (last updated Oct. 6, 2017), https://go.usa.gov/xngCd (DHS DACA FAQ).[1] *see* USCIS, Policy Memorandum (Nov. 7, 2011), https://go.usa.gov/xncPK (Notice to Appear Guidance). DHS instructed, however, that this information-sharing policy creates no rights and "may be modified, superseded, or rescinded at any time without notice."  DHS DACA FAQ No. 19.

In 2014, then-Secretary Jeh Johnson expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. *See* AR 37–41 (DAPA Memo).  DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents."  DAPA Memo at 3 (AR 39).  The DAPA Memo also expanded DACA by relaxing the eligibility criteria and extending the DACA renewal period from two to three years.  *Id.* at 3–4 (AR 39-40).

C.    The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states, led by Texas, which sought to enjoin its implementation.  Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of the DAPA Memo.  *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  Like the U.S. District Court for the Southern District of Texas, the Fifth Circuit held that the promulgation of the DAPA Memo was justiciable, in part because it believed that "the INA's intricate regulatory scheme for changing immigration classifications" allowed the court to determine whether DHS had exceeded its statutory authority.  *Id.* at 168.  It stressed, however, that "the *denial* of voluntary departure and work authorization" would be unreviewable.  *Id.*  Also like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the APA's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional

---

[1] The DHS DACA FAQ has been incorporated by reference in Plaintiffs' Complaint.  *See, e.g.*, Pls.' Compl. ¶ 81, ECF No. 1.

nonenforcement policy would not necessarily be subject to notice and comment." *Id.* at 178 n.156.

And going beyond the district court, the Fifth Circuit held that DAPA was "manifestly contrary"

to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one

legal status to another," DAPA awarded deferred action "to persons who have never had a legal

status and may never receive one." *Id.* at 184, 186 (footnotes omitted).

That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*,

136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing

upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in

place.   On November 18, 2016, the parties jointly moved the district court to stay merits

proceedings to allow them to evaluate "how they might choose to move forward" given the

upcoming "change in Administration[s]."   Joint Mot. to Stay Merits ¶ 2, *Texas v. United States*,

No. 14-cv-254 (S.D. Tex. Nov. 18, 2016), ECF No. 430.

Faced with continued litigation over a policy that had been enjoined by the courts, DHS

rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA.  *See*

Memorandum for Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Prot., et al., from

John F. Kelly, Sec'y of Homeland Sec., *Re: Rescission of November 20, 2014 Memorandum*

*Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents* (June

15, 2017), AR 235-37.  Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to

also challenge directly the DACA Memo, arguing that it suffers from the same legal infirmities as

the DAPA Memo.  *See* AR 238–40 (Paxton Letter).

### D.      Rescission of DACA

Faced again with the prospect of continued litigation, Acting Secretary Duke decided on

September 5, 2017, to wind down the DACA policy in an orderly fashion.  *See* AR 252–56

(Rescission Policy or Policy).  As the Acting Secretary explained, "[t]aking into consideration the

Supreme Court's and Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017

letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be

terminated."  Rescission Policy at 4 (AR 255).  Specifically, she quoted the Attorney General's

September 4 recommendation to rescind DACA, which explained that because DACA "has the

same legal and constitutional defects that the courts recognized as to DAPA, it is likely that

potentially imminent litigation would yield similar results."  *Id.* at 3 (AR 254).  Invoking her

"authority in establishing national immigration policies and priorities," she rescinded the DACA

Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on

an individualized[,] case-by-case basis," *id.* at 2 (AR 253).

>   At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

• For *current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods." *Id.* at 4 (AR 255)

• For *initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date.  *Id.*

• For *DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017.  Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017."  *Id.*

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does

not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id*. at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id*. at 4 (AR 255). The Rescission Policy says nothing about (and makes no changes to) DHS's information-sharing policy regarding information provided to USCIS in a DACA request.

### E.      The Instant Action

Plaintiffs in this lawsuit raise seven overlapping claims. First, they allege that the Rescission Policy is arbitrary and capricious and therefore violates the APA because it constitutes a change in agency policy without an adequate explanation or basis. *See* Pls.' Compl ¶¶ 162-66 (Count 4), ECF No. 1. Plaintiffs also claim that the alleged decision to change the information-sharing policy is contrary to law, as it purportedly violates the Privacy Act and E-Government Act. *See id.* ¶ 165(c). Finally, Plaintiffs incorporate by reference their constitutional claims under the rubric of the APA. *See id.* ¶ 165(a).

Second, Plaintiffs allege that the Rescission Policy violates the APA because it was issued without notice and comment. *See id.* ¶¶ 167-73 (Count 5).

Third, Plaintiffs allege that the rescission, as well as the alleged change to the information-sharing policy, violate procedural due process because DACA recipients will be deprived of their interests in their DACA status and in the protection of personal information provided with their DACA requests from alleged impermissible sharing without notice or an opportunity to be heard. *See id.* ¶¶ 129-43 (Count 1); *id.* 144-53 (Count 2).

Fourth, Plaintiffs suggest that the rescission, including the alleged change to the information-sharing policy, violate DACA recipients' substantive due process rights because those

11

decisions were arbitrary and thus not "fundamentally fair."  *See id.* ¶¶ 142, 152.

Fifth, Plaintiffs contend that the rescission violates the Equal Protection component of the Fifth Amendment's Due Process Clause because it was allegedly motivated by discriminatory animus against Mexican, Central American, and Latino immigrants.  *See id.* ¶¶ 154-61 (Count 3).

Sixth, Plaintiffs bring equitable estoppel claims, alleging that DACA recipients provided detailed personal information to the government and "rearranged their lives" based on the government's representations, but now face the possibility of removal and deportation.  *See id.* ¶¶ 174-81 (Count 6).  On that basis, Plaintiffs argue that the government should be equitably estopped from terminating DACA and from using DACA information for enforcement purposes except as previously authorized under DACA.  *See id.* ¶ 179.

Finally, Plaintiffs seek a declaratory judgment that DACA was lawful.  *See id.* ¶¶ 182-85 (Count 7).

Plaintiffs seek declaratory and injunctive relief on their claims, as well as any further relief the Court deems just and proper.  *See id.* at 60, Relief Requested.

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a plaintiff must establish a court's jurisdiction through sufficient allegations.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  When considering such a motion, the Court must "accept as true . . . allegations for which there is sufficient factual matter to render them plausible on their face."  *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (brackets and citation omitted), *cert. denied sub nom. Beck v. Shulkin*, 137 S. Ct. 2307 (2017).  The Court need not, however, "apply the same presumption of truth to conclusory statements and legal conclusions contained in . . . [the] complaint."  *Id.* (citation omitted).  In evaluating subject-matter jurisdiction, the court may, when

necessary, "look beyond the pleadings and the jurisdictional allegations of the complaint and view

whatever evidence has been submitted on the issue to determine whether in fact subject matter

jurisdiction exists." *Vance v. CHF Int'l*, 914 F. Supp. 2d 669, 676 (D. Md. 2012) (citation omitted).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint

must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer

possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's

liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (quoting *Twombly*, 550 U.S. at 557). While the Court accepts well-pleaded factual allegations

as true, "mere conclusory statements" and "legal conclusion[s] couched as . . . factual

allegation[s]" are "disentitle[d] . . . to th[is] presumption of truth." *Id.* at 678, 681 (citation

omitted). Although the Court generally may not rely on material outside the pleadings under Rule

12(b)(6), it may consider any "matters of public record" of which the court may take judicial

notice, *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)

(citations omitted), as well as evidence attached to the motion to dismiss "[if] it was integral to

and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity,"

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (alteration

in original) (citation omitted).

With respect to Plaintiffs' APA claims, a court may adjudicate the issues on either a motion

to dismiss under Rule 12(b)(6) or on a motion for summary judgment. *See Marsh v. United States*,

No. 14-cv-3559-TDC, 2016 WL 247563, at *2 (D. Md. Jan. 20, 2016) (construing defendants'

motion as it relates to plaintiff's APA claims as a Rule 12(b)(6) motion where, beyond the

complaint and its attachments, the only documents submitted were matters of public record); *see also Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007) (finding that, because APA claims are adjudicated on the basis of an existing administrative record, without a trial or discovery, such claims can also be properly decided on summary judgment).  "The entire case on review is a question of law, and only a question of law.  And because a court can fully resolve any purely legal question on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage . . . and there is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment."  *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (citation omitted).  Under these circumstances, judicial review is based on the agency record and presents primarily a legal question.  *See Citizens for the Scenic Severn River Bridge, Inc. v. Skinner,* 802 F. Supp. 1325, 1332 (D. Md. 1991), *aff'd,* No. 91-1267, 1992 WL 180138, (4th Cir. July 29, 1992); *see also Dawson v. Winter*, No. 06-cv-2885-CCB, 2007 WL 1610905, at *4 (D. Md. May 21, 2007) ("Like appellate courts, district courts . . . address a predominantly legal issue: Did the agency 'articulate a rational connection between the facts found and the choice made?'") (citation omitted), *aff'd*, 277 F. App'x 297 (4th Cir. 2008).

## ARGUMENT

In seeking to invalidate the Rescission Policy, Plaintiffs ask the Court to override the Acting Secretary's judgment about how to exercise her discretion in enforcing the Nation's immigration laws.  The Court need not consider this extraordinary request, however, because this case is not justiciable.   The exercise of enforcement discretion in the Rescission Policy is committed to agency discretion by law and is therefore unreviewable.  In fact, Congress has gone so far as to strip district courts of jurisdiction over "no deferred action" decisions such as the one

14

here.  At a minimum, the Plaintiff-organizations lack standing.  And in all events, Plaintiffs fail to state a claim.  This case should therefore be dismissed.

I.    THIS CASE IS NOT JUSTICIABLE.

   A.    The Rescission Policy Is Not Justiciable Because this Immigration Enforcement Policy Is a Matter Committed to Agency Discretion by Law.

   **1.**  The APA bars judicial review of certain categories of decisions that "courts traditionally have regarded as 'committed to agency discretion.'"  *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting 5 U.S.C. § 701(a)(2)).  These decisions are typically unreviewable because there exists "no meaningful standard against which to judge the agency's exercise of discretion" in these areas.  *Chaney*, 470 U.S. at 830; *see Sierra Club v. Larson*, 882 F.2d 128, 133 (4th Cir. 1989) (applying *Chaney* in precluding review of an agency's discretionary decision not to seek enforcement of a statute).  This bar applies even when "the agency gives a 'reviewable' reason for otherwise unreviewable action."  *ICC v. Bhd. of Locomotive Eng'rs* (*BLE*), 482 U.S. 270, 283 (1987).

   Among the decisions committed to executive discretion are "an agency's exercise of enforcement power."  *Chaney*, 470 U.S. at 833.  Such judgments involve "a complicated balancing of a number of factors which are peculiarly within [an agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall priorities, and, indeed, whether the agency has enough resources to undertake the action at all."  *Id.* at 831.  As there is "no meaningful standard against which to judge the agency's exercise of discretion" in weighing these factors, an agency's exercise of enforcement powers is "presumed immune from judicial review under § 701(a)(2)."  *Id.* at 830, 832.

   For instance, an "agency[] decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  *Id.* at 831

15

(citation omitted).  After all, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," and it "is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."  *Chaney*, 470 U.S. at 831–32; *see Sierra Club*, 882 F.2d at 133 (recognizing separation of powers underpinning of the presumption of the unreviewability of agency decisions not to pursue enforcement).  Thus, for example, the Supreme Court in *Chaney* held that the FDA's general policy of refusing to exercise its enforcement authority with respect to the use of approved drugs in lethal injections was committed to the agency's discretion under § 701(a)(2).  *See* 470 U.S. at 824–25, 837–38 (finding FDA's refusal to take the enforcement actions requested by respondents, including broad measures that would have impacted an entire drug market segment, was not subject to judicial review).

An agency's decision *to* enforce the law against a particular individual is likewise presumptively unreviewable.  Just as "the decision whether or not to prosecute" presumptively "rests entirely in [the prosecutor's] discretion," *Armstrong*, 517 U.S. at 464 (citation omitted), an agency's decision to bring a civil enforcement action is generally not open to judicial scrutiny.  Considerations such as "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall policies" are equally present in enforcement decisions as in nonenforcement decisions, *Chaney*, 470 U.S. at 831, and judicial intrusion into the deliberative process is equally improper, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("there must be a strong showing of bad faith or improper behavior before" courts can engage in an "inquiry into the mental processes of administrative decisionmakers" (citation omitted)), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

This presumption of nonreviewability applies with particular force when it comes to

immigration.  On top of the general concerns implicated in any enforcement decision, the enforcement of immigration laws "embraces immediate human concerns," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 396–97.  Given these realities, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Id.* at 396.  One form of that broad discretion is deferred action, a "discretionary and reversible" decision to notify an alien that DHS has chosen not to seek his removal for a specific period of time.  *Arpaio*, 797 F.3d at 17; *see supra* at 5-6.  Like other agency nonenforcement decisions, grants of deferred action rest on a complex balancing of policy considerations that cannot serve as "meaningful standard against which to judge the agency's exercise of discretion."  *Chaney*, 470 U.S. at 830.  Such determinations are thus presumptively unreviewable.  *See Arpaio*, 797 F.3d at 16.

The converse is equally true: *denials* of deferred action are also committed to agency discretion.  *See AADC*, 525 U.S. at 485 (treating "'no deferred action' decisions" as "discretionary determinations").  Because "[g]ranting an illegally present alien permission to remain and work in this country" is fundamentally "a dispensation of mercy," there are "no standards by which judges may patrol its exercise." *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (INS's decision not to grant pre-hearing voluntary departures and work authorizations to a group of aliens non-justiciable), *reh'g denied*, 912 F.2d 1465 (5th Cir. 1990).  To be sure, a decision "not to grant deferred action status to a particular alien is not precisely a 'decision not to take enforcement action,'" but that does not obscure the fact that "many of the same factors" underlying the latter determinations usually play a role in the former.  *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 n.4 (9th Cir. 1987) ("denials of deferred action status applications are not subject to judicial

17

review" under § 701(a)(2)).

**2.**   As an exercise of enforcement discretion, the Rescission Policy is a classic example of a discretionary determination that is entrusted to the agency alone.  Indeed, any attempt to judge the Policy would quickly entangle this Court in the sort of complex and discretionary balancing that has been entrusted by Congress to the Executive Branch.  For example, the judiciary is institutionally ill-equipped to assess whether the Acting Secretary's decision to change "immigration policies and priorities" by rescinding DACA, Rescission Policy at 4 (AR 255), was an appropriate use of "the Department's limited resources," *Arpaio*, 797 F.3d at 16.  Nor is this Court well suited to second-guess the Acting Secretary's balancing of the costs and benefits of keeping the policy in place, on the one hand, with the risk of "potentially imminent litigation" that could throw DACA into immediate turmoil, on the other.  Rescission Policy at 3 (AR 254) (citation omitted).

To be sure, the Acting Secretary *also* gave substantive legal reasons for her decision, *id.* at 2–4 (AR 253–55), but that does not render it justiciable.  That is because the Supreme Court has rejected the proposition that if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *BLE*, 482 U.S. at 283.  For example, "a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction," which "is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point." *Id.*  But that does not change the fact that "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review." *Id.*  Likewise, the Acting Secretary's discussion of the question of DACA's legality does not transform her generally unreviewable exercise of enforcement discretion into a matter fit for judicial scrutiny.

18

Indeed, reviewing the Rescission Policy would be particularly inappropriate given the wide discretion the Secretary enjoys in the enforcement of the immigration laws. In *AADC*, the Supreme Court held that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation," 525 U.S. at 488 (footnote omitted), subject to the "possib[le]" exception "of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome," *id.* at 491. The reason for this highly restrictive rule is that the concerns raised by challenges to the Executive's enforcement discretion "are greatly magnified in the deportation context." *Id.* at 490. An alien subject to removal is, by definition, in continuing violation of the INA, and judicial interference with the Executive's enforcement therefore would compel the Executive to disregard such ongoing violations. The "delay" associated with challenges to discretionary decisions not to forgo enforcement is more likely than in the criminal arena, as "[p]ostponing justifiable deportation (in the hope that the alien's status will change … or simply with the object of extending the alien's unlawful stay) is often the principal object of resistance to a deportation proceeding," and "the consequence is to permit and prolong a continuing violation" of the immigration laws. *Id.* at 490. For another, reviewing immigration decisions may involve "not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives" or other sensitive matters as well. *Id.* at 490–91. Finally, the idea that "an ongoing violation of United States law . . . must be allowed to continue because it has been improperly selected is not powerfully appealing." *Id.* at 491 (emphasis omitted).

**3.** Notwithstanding these clear concerns that warrant a presumption against judicial review, the court in *Batalla Vidal v. Duke*, a related case presenting similar challenges to the Rescission Policy, held that the Acting Secretary's decision to rescind DACA "was not itself a presumptively

19

unreviewable exercise of enforcement discretion."  Mem. & Order at 23, *Batalla Vidal v. Duke*,

No. 16-cv-4756 (E.D.N.Y. Nov. 9, 2017), ECF No. 104 (*Batalla Vidal* Mem. & Order) (granting

in part and denying in part Defendants' Rule 12(b)(1) motion and reserving ruling on Defendants'

Rule 12(b)(6) motion).  In so holding, however, the court incorrectly labeled the Acting Secretary's

decision to rescind DACA as a "constrain[t]" on DHS's prosecutorial discretion with respect to

DACA recipients, *see id.* at 24, and incorrectly described the rescission as subjecting "individuals

who previously enjoyed some protection from removal to coercive state authority," *id.* at 25.  To

the contrary, the Acting Secretary's decision to rescind DACA was an act of discretion in and of

itself, which is best described as reordering the agency's enforcement priorities in light of litigation

risk.  *See Arpaio*, 797 F.3d at 17 (citation omitted) (deferred action is "discretionary and reversible,

and 'confers no substantive right, immigration status or pathway to citizenship'").  It is, therefore,

equally entitled to a presumption of nonreviewability as the enforcement and non-enforcement

cases that the Supreme Court has found are committed to executive discretion.  *See, e.g.*, *Chaney*,

470 U.S. at 832-33; *Armstrong*, 517 U.S. at 464; *AADC*, 525 U.S. at 485.

Moreover, the court in *Batalla Vidal* found the Rescission Policy reviewable based upon

its misinterpretation that the Acting Secretary "exclusively" relied on a legal determination that

DACA was unlawful, a rationale for which the court held there was "law to apply."  *Batalla Vidal*

Mem. & Order at 22 (citing AR 251 (Sessions Letter); AR 253-55 (Rescission Policy)).  The

Attorney General's determination that DACA was unconstitutional was but one factor that the

Acting Secretary considered.  As the Rescission Policy makes clear, in determining to wind down

the policy pursuant to the parameters laid out in the memorandum, the Acting Secretary also relied

on the history of the *Texas* litigation and potential risk it posed to the continuation of DACA, as

well as the self-evident complexities associated with ending DACA, a policy that impacts nearly

800,000 individuals.  Rescission Policy at 2-4 (AR 253-55).  The balancing of those considerations

is not amenable to review in light of the sources cited by the *Batalla Vidal* court, such as statutory

text, the history of the use of deferred action, or the Office of Legal Counsel (OLC) opinion.[2]

*Batalla Vidal* Mem. & Order at 22.

The court's reasoning is also contrary to *BLE*, which makes clear that enforcement

decisions are committed to agency discretion even where they rest on broad legal policy judgments

rather than individualized considerations.  *Id.* at 283.  *BLE* specifically gave the example of a

criminal prosecutor's decision not to prosecute a certain category of crimes based on the

prosecutor's view of the legal merits of the prosecution.  *Id.*  Although a court may be qualified to

consider those legal merits, "it is entirely clear that the refusal to prosecute cannot be the subject

of judicial review."  *Id.*  Just as in the analogy provided in *BLE*, the Acting Secretary's

consideration, among other things, of the lawfulness of the DACA policy merely explains how she

plans to exercise her discretion to rescind the policy and that decision, regardless of the court's

ability to review the legal merits of DACA, is nonreviewable.  *Id.*  *BLE*'s point applies *a fortiori*

in the immigration context where the Supreme Court has emphasized the problems with

questioning the government's exercise of its broad discretion.  *See AADC*, 525 U.S. at 489-90.

**B.      The INA Deprives District Courts of Jurisdiction over Challenges to Denials of Deferred Action.**

Not only is the denial of deferred action committed to agency discretion under the APA,

but the INA itself deprives federal district courts of jurisdiction over challenges to such denials

altogether.   As the Supreme Court explained in *AADC*, the Executive's "exercise of [its]

discretion" in granting deferred action in some circumstances had "opened the door to litigation

---

[2] U.S. Dep't of Justice, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*, 38 Op. O.L.C. 1, 18 n.8 (Nov. 19, 2014) (OLC Op.), https://www.justice.gov/file/179206/download.

. . . where" the Executive had "chose[n] *not* to exercise it."  *Id.* at 484.  Specifically, some courts

had entertained challenges to "the refusal to exercise such discretion" on various bases such as

"selective prosecution," the use of "arbitrary or unconstitutional criteria, or on other grounds

constituting abuse of discretion."  *Id.* at 485 (citation omitted).  To address what the Supreme Court

referred to as this "particular evil"—*i.e.*, "attempts to impose judicial constraints upon

prosecutorial discretion"—Congress enacted 8 U.S.C. § 1252(g).  *AADC*, 525 U.S. at 485 & n.9.

Section 1252(g) commands that, outside of petitions for review from final removal orders

and certain other limited channels for review, "no court shall have jurisdiction to hear any cause

or claim by or on behalf of any alien arising from the decision or action by the [Secretary of

Homeland Security[3]] to commence proceedings, adjudicate cases, or execute removal orders

against any alien under this chapter."  These were "the acts … that had prompted challenges to the

… exercise of prosecutorial discretion" in denying deferred action, and thus § 1252(g) "seems

clearly designed to give some measure of protection to 'no deferred action' decisions and similar

discretionary determinations, providing that if they are reviewable at all, they at least will not be

made the bases for separate rounds of judicial intervention outside the streamlined process that

Congress has designed"—namely, an individual removal proceeding.  *AADC*, 525 U.S. at 485 &

n.9.

Denials of deferred action—including under DACA itself—thus fall outside the

jurisdiction of the federal courts.  *See, e.g.*, *Vasquez v. Aviles*, 639 F. App'x 898, 901 (3d Cir.

2016) ("[Section] 1252(g) … deprives all courts of jurisdiction to review a denial of DACA relief

because that decision involves the exercise of prosecutorial discretion not to grant a deferred

---

[3] *See* 6 U.S.C. § 557; *see also id.* §§ 202, 251; *Elgharib v. Napolitano*, 600 F.3d 597, 607 (6th Cir.
2010) ("[U]nder 6 U.S.C. § 557, . . . the statutory reference to the 'Attorney General' in § 1252(g)
now means 'Secretary of DHS.'").

action."); *Botezatu v. INS*, 195 F.3d 311, 314 (7th Cir. 1999) ("Review of refusal to grant deferred action is … excluded from the jurisdiction of the district court.").

Although the court in *Batalla Vidal* held that § 1252(g) did not divest the court of jurisdiction to review the Rescission Policy, its holding was based on an overly narrow reading of the statute. *Batalla Vidal* Mem. & Order at 28-31. Specifically, it held that § 1252(g) was inapplicable because the plaintiffs' challenge to the Rescission Policy did not arise from one of the three enumerated immigration actions that trigger the statute. *Id.* at 29-30. To be sure, Plaintiffs brought this challenge to the Rescission Policy before any removal proceedings took place, but that is beside the point. The decision not to continue deferred action is an ingredient to the commencement of enforcement proceedings at some future date, and a person cannot circumvent the bar in 8 U.S.C. § 1252(g) by singling out that single step for a preemptive challenge. Indeed, the Supreme Court acknowledged that the apparent purpose of § 1252(g) was to protect "'no deferred action' decisions and similar discretionary determinations," like the Rescission Policy, by preventing challenges to such decisions in "separate rounds of judicial intervention" outside the process designed by Congress, as is the case here. *AADC*, 525 U.S. at 485. If aliens (or entities suing on their behalf) could evade § 1252(g)'s bar simply by challenging the forthcoming expiration of deferred action before actual removal proceedings (if any) began, then jurisdiction would turn on a race to the courthouse. Such a framework would create the perverse incentive for DHS to begin removal proceedings immediately rather than to allow, as it did here, for rolling expirations of deferred action status over a two-and-a-half year period. There is no indication that Congress sought to enact such a nonsensical regime. Instead, § 1252(g) precludes review of either "the decision *or action*" by the Acting Secretary "to commence

proceedings," and thereby sweeps in the Rescission Policy.  (emphasis added).[4]

Moreover, the *Batalla Vidal* court ignored that at least one court has applied § 1252(g) to actions that are "not … on the list of precluded items"—*i.e.*, "decisions to commence proceedings, adjudicate cases, or execute removal orders"—in order to effectuate the object of this jurisdictional bar.  *Botezatu*, 195 F.3d at 313–14.  In *Botezatu*, the Seventh Circuit rejected an alien's argument that a court could review the Executive's "refusal to … grant him humanitarian parole or deferred action" simply because that denial occurred in "post-deportation procedures."  *Id.* at 313–14.  As the Seventh Circuit explained, because *AADC* broadly held that "'no deferred action' decisions and similar discretionary determinations' [were] governed by § 1252(g)," that jurisdictional bar should apply regardless of *when* such determinations occurred.  *Id.* at 314 (quoting *AADC*, 525 U.S. at 485).  Thus, just as an alien (or entity suing on his behalf) cannot circumvent § 1252(g) by bringing a challenge to a denial of deferred action on the back-end, Plaintiffs' broad front-end assault on the Rescission Policy is beyond the jurisdiction of this Court.  At the very least, 8 U.S.C. § 1252(g) reinforces the conclusion that enforcement discretion under the INA is at the core of unreviewable matters committed to agency discretion by law under the APA.  5 U.S.C. § 701(a)(2).

---

[4] The court in *Batalla Vidal* also held that § 1252(g) did not divest the court of jurisdiction to hear claims of the non-individual plaintiffs (several States and an advocacy organization) because the statute bars only suits by or on behalf of an alien.  *Batalla Vidal* Mem. & Order at 31.  However, the fundamental concerns of § 1252(g) apply no matter if the challenge is brought by the alien himself or an outside entity (on its own behalf or on behalf of the alien).  *See AADC*, 525 U.S. at 485.  In either context, the purpose of the jurisdictional bar is to prevent separate judicial review, like the instant suit, outside the streamlined process Congress intended.  *Id.*  Furthermore, like the American-Arab Anti-Discrimination Committee in *AADC*, itself an organizational plaintiff, the Plaintiff-organizations in this matter are for purposes of § 1252(b) suing "on behalf" of an alien because the relief they seek will benefit the individual Plaintiffs and all other DACA recipients.  To the extent the Plaintiff-organizations would benefit from an order setting aside the Rescission Policy, *but see infra* § I.C.1(a), their benefit would be only an indirect and incidental effect of the relief for DACA recipients.

**C.      The Plaintiff-Organizations' Claims Are Not Cognizable.**

 **1.      Plaintiffs Lack Article III Standing.**

The Plaintiff-organizations do not expressly identify the capacity in which they bring this suit.  Regardless, they make little or no attempt to identify any injury whatsoever to their own interests as organizations, nor do they specifically identify any individual members on whose behalf the organizations are suing.  Their allegations are, therefore, patently insufficient to establish standing.

 **a.      Plaintiffs lack organizational standing.**

To establish Article III standing, an organization suing on its own behalf must meet the familiar standing requirements that apply to individuals: (1) injury in fact; (2) causation; and (3) redressability.  *See, e.g.*, *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).  As the parties invoking the Court's jurisdiction, the Plaintiff-organizations bear the burden "clearly to allege facts demonstrating" each of these three elements.  *Warth v. Seldin*, 422 U.S. 490, 518 (1975).  The necessary facts "must affirmatively appear in the record" and "cannot be inferred argumentatively from averments in the pleadings." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).  The standing inquiry is "especially rigorous" where, as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted).

Plaintiffs' Complaint fails at the first step of the analysis.  Here, the Plaintiff-organizations were not the object of any government policy.  Instead, a generous reading of the Complaint reveals, at most, their dissatisfaction with the alleged effects of a policy decision on undocumented immigrants who came to the United States as children.  Pls.' Compl. ¶¶ 1-2; *see also* ¶¶ 23-24, 26.

But the federal courts do not sit to air arguments "at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences," *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972), or to resolve "generalized grievances more appropriately addressed in the representative branches," *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (citation omitted), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components*, 134 S. Ct. 1377 (2014). Thus, a "mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem," is insufficient to create standing. *Sierra Club*, 405 U.S. at 739. Accordingly, an "organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Article III." *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

Nor do the Plaintiff-organizations show any injury to their own activities. To satisfy Article III under this theory of standing, an organization must demonstrate a "concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources—constitut[ing] . . . more than simply a setback to the organization's abstract social interests." *Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (alterations in original) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "Such a showing requires 'more than allegations of damage to an interest in "seeing" the law obeyed or a social goal furthered.'" *Id.* (quoting *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987)). Rather, "the organization must allege that discrete programmatic concerns are being directly and adversely affected" by the challenged action. *Id.* (alteration and citation omitted). Here, the vast majority of the Plaintiff-organizations do not even try to meet this test. *See* Pls.' Compl. ¶¶ 30-37. They point to no interference with any immigration-related

26

programming and allege no new expenditure of funds.  The Plaintiff-organizations thus fall well short of their burden to establish a cognizable injury to their own interests.  Their claims of organizational standing should be rejected out of hand.

Only Plaintiff CASA de Maryland, Inc. (CASA) attempts to allege an injury to its own activities, claiming that, as a result of the Rescission Policy, it "reallocate[d] significant resources" to "counsel and assist" eligible individuals to renew their DACA by the October 5, 2017 deadline, "depriving community members of access to other vital legal services."  Pls.' Compl. ¶ 29.  Even assuming this allegation of injury is sufficient for purposes of organizational standing, it fails to allege an ongoing injury that would entitle CASA to the injunctive relief it seeks.  *McBurney v. Cuccinelli*, 616 F.3d 393, 410-11 (4th Cir. 2010) ("to maintain standing for declaratory and injunctive relief" a plaintiff must "plead an[ ] ongoing injury" (emphasis omitted)).  To satisfy the case or controversy requirement of Article III in an action seeking only *prospective* relief through an injunction or declaratory judgment, a plaintiff must show exposure to illegal conduct accompanied by "continuing, present adverse effects."  *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("Absent a sufficient likelihood that he will again be wronged in a similar way, [plaintiff] is no more entitled to an injunction than any other citizen").  Here, the sole allegation of injury that may entitle CASA to organizational standing relates to an alleged diversion of resources to assist individuals with DACA renewal requests, a purported injury that necessarily ceased once that October 5 renewal deadline set forth in the Rescission Policy passed.  In the absence of an ongoing injury to its own activities, consisting of more than harm to its "abstract concern" for immigrant rights, CASA lacks organizational standing to obtain the prospective injunctive relief it seeks.  *Md. Highways Contractors Ass'n,* 933 F.2d at 1251; *McBurney*, 616 F.3d at 411.

<blockquote>
**b.      Plaintiffs lack representational standing.**
</blockquote>

Because the Plaintiff-organizations do not sufficiently allege injury to themselves in their own right, "they can establish standing only as representatives of those of their members who have been injured in fact." *Simon*, 426 U.S. at 40 (citation omitted).  But the organizations fail to identify any particular member allegedly harmed by the policy change, and that alone dooms any claim of representational standing.

To plead representational standing, the Plaintiff-organizations must allege that "(1) [their] own members would have standing to sue in their own right; (2) the interests the organization[s] seek[] to protect are germane to the organization[s'] purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *Md. Highways Contractors Ass'n,* 933 F.2d at 1251 (citing *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977)).  To satisfy the first of these prongs, an association must at the very least name a specific member with standing for each claim it asserts.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (association must "name the individuals who were harmed"); *S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 184 (association must "identify a single *specific member*" who was injured).

Here, most of the Plaintiff-organizations make no mention whatsoever of any member allegedly harmed by the Rescission Policy, let alone identifying any such specific member.  *See* Pls.' Compl. ¶¶ 30-32, 34-37.  Only CASA and OneAmerica even broach the topic, alleging that CASA "counts more than 2,300 DACA beneficiaries as members," *id.* ¶ 29, and that "many [DACA recipients] are active OneAmerica . . . members," *id.* ¶ 33.  These general allegations, however, do not name any particular member or members and, thus, also do not rise to the specificity required to plead representational standing.  *See Summers*, 555 U.S. at 498.  Moreover,

CASA and OneAmerica's allegations establish that neither organization would meet the limited exception to *Summers*' identification requirement for cases in which all members of an organization are harmed. *See id.* at 498-99; *S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 184. *See also* Pls.' Compl. ¶ 29 (claiming that only 2,300 of more than 90,000 members are DACA recipients); *id.* ¶ 33 (stating "many" but not all One America members are DACA recipients). Accordingly, the Court should likewise reject any claim of representational standing.

## 2.     Plaintiffs Lack a Cause of Action Under the APA.

Even if the Plaintiff-organizations could establish Article III standing, they would lack a cause of action under the APA. The APA does not "allow suit by every person suffering [an] injury in fact." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987). Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. To be "aggrieved" in this sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute … in question." *Clarke*, 479 U.S. at 396 (brackets and citation omitted). Here, no provision of the INA even arguably protects the Plaintiff-organizations from bearing any incidental effects of a denial of deferred action.[5] *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

---

[5] The court in *Batalla Vidal* held that whether the non-individual plaintiffs asserted interests falling within the "zone of interests" protected by the APA was not a jurisdictional or justiciability question, but rather an issue of prudential standing addressed under Rule 12(b)(6). *Batalla Vidal* Mem. & Order at 46-47. Because the court reserved its ruling on Defendants' motion to dismiss for failure to state a claim, it did not address this argument.

### D. The Government's Justiciability Objections Are Not Inconsistent with the Acting Secretary's Reliance on the Fifth Circuit's Decision.

Although the Fifth Circuit in *Texas* included holdings that a challenge to the DAPA Memo was reviewable, 809 F.3d at 165–70, neither that decision nor Acting Secretary Duke's reliance on it forecloses the government from arguing here that the DACA Rescission Policy is unreviewable.   First, neither the Acting Secretary's memo nor the Attorney General's letter expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings, and it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place.   Second, officers of the Executive Branch have an independent duty to consider the legality of their policies regardless of whether they are judicially reviewable; all swear an oath to uphold the United States Constitution.   *See Mississippi v. Johnson*, 71 U.S. 475, 499 (1867) (Take Care Clause imposes a generally nonjusticiable duty on the Executive Branch). Finally, even if courts could have reviewed the adoption of DACA as "an abdication of [DHS's] statutory responsibilities," *Chaney*, 470 U.S. at 833 n.4, that would not make the Rescission Policy, a classic exercise of agency enforcement discretion, open to challenge.   After all, the Fifth Circuit itself emphasized that "DAPA is much more than a nonenforcement policy, which presumptively would be committed to agency discretion," *Texas*, 809 F.3d at 178 n.156, and pointed out that a "*denial* of voluntary departure and work authorization" by DHS would have been nonjusticiable, *id.* at 168.   Denials of deferred action under a return to a more traditional enforcement policy should be treated no differently.

### II.   PLAINTIFFS FAIL TO STATE A CLAIM.

Even if Plaintiffs' claims were justiciable, the Court should dismiss this case in its entirety

for failure to state a claim.[6]

A.    **Plaintiffs Fail to State an APA Claim.**

1.    **The Acting Secretary rationally explained her decision to wind down DACA, particularly given the imminent risk of a nationwide injunction.**

Plaintiffs contend that the Rescission Policy is arbitrary and capricious because it constitutes a change in agency policy without an adequate explanation.[7]  Pls.' Compl. ¶ 165. Plaintiffs' allegations misapprehend the nature of the inquiry under the APA.  It is black-letter law that agencies are free to change course on policy matters so long as they provide a rational explanation.  Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this deferential standard, particularly in view of the imminent risk of a nationwide injunction, which could have prompted an immediate—and chaotic—end to the policy.

**1.**  Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B).  The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park*, 401 U.S. at 416.  A decision may be held to be arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

---

[6] In the alternative, however, the Court may, if it wishes, convert this motion to one for summary judgment.  *Audubon*, 524 F. Supp. 2d at 660.

[7] Plaintiffs also allege that DACA's termination violated the APA because it was unconstitutional.  *See* Pls.' Compl. ¶ 165.  Plaintiffs' allegations that the rescission of DACA was unconstitutional are addressed in Sections II.C-E, *infra.*

*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).  The Court may not "substitute

its judgment for that of the agency."   *Id.*   And when an agency changes policies, it "need not

demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons

for the old one."   *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).   Rather, "it

suffices that the new policy is permissible under the statute, that there are good reasons for it, and

that the agency *believes* it to be better, which the conscious change of course adequately indicates."

*Id.*

In assessing whether a decision was arbitrary and capricious, "[t]he task of the reviewing

court is to apply the appropriate APA standard of review to the agency decision based on the record

the agency presents to the reviewing court."   *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-

44 (1985) (citation omitted).  If the agency's action "is not sustainable on the administrative record

made," then the administrative "decision must be vacated and the matter remanded to [the agency]

for further consideration."   *Camp v. Pitts*, 411 U.S. 138, 143 (1973).  This Court should therefore

decide whether the Acting Secretary's decision to wind down DACA was arbitrary and capricious

on the administrative record she has produced.  Thus, while the government submits that the Acting

Secretary's decision was plainly not arbitrary and capricious under the record already before this

Court, if this Court were to disagree, it should do no more than simply grant Plaintiffs the relief

they seek by setting aside the Rescission Policy and remanding to her.

**2.**  The Rescission Policy amply meets the "minimal standards of rationality" required by

the APA.  *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted), *reh'g*

*denied*, 129 F.3d 1290 (D.C. Cir. 1997).  Plaintiffs do not deny that "the new policy is permissible

under the [INA]."  *Fox*, 556 U.S. at 515.  And there are eminently "good reasons for it," *id.*,

particularly in view of the litigation risk posed by the proceedings in *Texas*.  In the Rescission

Policy, the Acting Secretary explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy at 4 (AR 255).  Specifically, after summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's conclusion in his letter that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted).  The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into uncertainty.

The Acting Secretary was then "faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately."  Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://go.usa.gov/xncuM.  She reasonably opted for an orderly rescission, which she considered "the least disruptive option." *Id.*

There is nothing at all irrational about this choice or that explanation.  *Cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 84 (2002) ("regulation reasonable" based on concerns about subjecting parties to "possible … liability").  Indeed, it is entirely sensible, given the turmoil that an abrupt, court-ordered shutdown would likely have provoked.  The Acting Secretary balanced the litigation risk of keeping DACA in place with "the administrative complexities associated with ending the program," and opted for a solution that would "wind it down in an efficient and orderly fashion" accounting for the interests of DACA recipients.  Rescission Policy at 3 (AR 254).  She

33

explained her reasonable decision to rescind DACA, and the APA requires no more.  *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted) (APA satisfied where agency's explanation is clear enough that its "path may reasonably be discerned"), *reh'g denied*, 420 U.S. 956 (1975).[8]  And no matter whether her (or the Attorney General's) judgment about the likely result of the *Texas* litigation would have turned out to be correct, it was surely not an irrational or arbitrary and capricious conclusion in light of the fact that at least the Fifth Circuit and four justices of the Supreme Court had already held that a materially indistinguishable policy was unlawful.

**3.**  Plaintiffs nonetheless contend that the decision to rescind DACA was arbitrary and capricious because the Acting Secretary considered the Attorney General's views regarding the legality of DACA, which are views Plaintiffs contend "contradict" "the prior Department of Justice OLC analysis concluding that the program was constitutional."  Pls.' Compl. ¶¶ 120, 165.[9]  Plaintiffs' argument suffers from three independent flaws.

First, the Acting Secretary did not rely on the Attorney General's September 4 letter solely for its assessment of DACA's legality.  Instead, as discussed above, she concluded that DACA "should" be wound down after considering, among other things, his litigation risk determination that it was "likely" that a legal challenge to DACA "would yield similar results" as the DAPA litigation under Fifth Circuit precedent.  Rescission Policy at 3 (AR 254).  That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis for upholding the Acting Secretary's decision to rescind DACA.  *See Bowman*, 419 U.S. at 286.

---

[8] For these same reasons, Plaintiffs' allegations that the relevant dates chosen by the Acting Secretary in the wind-down process are arbitrary and capricious fails to state a claim under the APA.  *See* Pls.' Compl. ¶ 165.

[9] Plaintiff also alleges that the Acting Secretary's decision is "directly contravene[ed]" by statements made by President Trump, none of which actually address the litigation risk surrounding DACA.  *See id.* ¶¶ 125, 165.

Second, to the extent the Acting Secretary did rely on the proposition that DACA was unlawful, this Court need not agree with that determination to uphold her decision.  If an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment to avoid constitutional questions, even if the two determinations are arguably "intertwined."  *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue").  Here, the Attorney General regarded DACA as unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected. Rescission Policy at 3 (AR 254).  But those same concerns equally support a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law."  *Id.* at 2 (AR 253).  This Court should, therefore, sustain her decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

Third, although this Court need not decide the issue to resolve this case in favor of the government on the basis that the agency decision was at least rational, the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas*, which was affirmed by the Supreme Court.  The Fifth Circuit held not only that DAPA—including its proposed expansion of DACA—was likely unlawful, but also that DACA bore many "important similarities" to it. *Texas*, 809 F.3d at 174 & n.139 (noting that "the DAPA Memo's plain language … equates the DACA and DAPA procedure[s]," making DACA an "apt comparator").  Indeed, given that DAPA was enjoined before its implementation, the Fifth Circuit's decision was

35

"informed by analysis of the implementation of DACA" itself. *Id*. at 172.  On that score, while, "[l]ike the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id*. at 171–72, the court found that discretion to be illusory in practice: Because relatively few DACA requests were denied, the Fifth Circuit believed "there was evidence from DACA's implementation that [this] discretionary language was pretextual," *id*. at 172–73.  Based on these findings by the Fifth Circuit, it would follow that DACA, like DAPA, did not "genuinely leave the agency and its employees free to exercise discretion" on a case-by-case basis, *id*. at 176—which supports the Attorney General's view that DACA was unlawful.  And it seems likely that at least four justices of the Supreme Court agree.

Regardless of whether OLC was correct when it previously "orally advised" that its "preliminary view" was that the proposed version of DACA would be lawful, the reasoning in that opinion further confirms the invalidity of DACA as it was actually implemented in practice, as found by the Fifth Circuit.  The "preliminary" conclusion was conditioned on the proviso that "it was critical that … the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis."  OLC Op. 18 n.8.  Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice.  *Texas*, 809 F.3d at 176.  Indeed, because deferred action continues to exist on an individualized basis, the only change made by the Acting Secretary is the elimination of the factors that, according to the Fifth Circuit, led to the policy being applied without sufficient case-by case discretion.  *See id.* at 172–73 (noting testimony that, for DACA, requests were "simply rubberstamped if the applicants meet the necessary criteria").  Further, the original DACA program largely shares the relevant defects of

the proposed expansion of deferred action that OLC rejected, rather than the aspects of the new program that it approved.

**4.** Plaintiffs also allege that the rescission is arbitrary and capricious because DHS has failed to "provide a reasoned analysis sufficient to justify its change of policy in light of the serious reliance interests created by DACA."  Pls.' Compl. ¶ 165(b).  As set forth in pages 7-8, *supra*, the Rescission Memo is merely a statement of policy that—like the original DACA policy—does not create any enforceable rights and is subject to change at any time.  And insofar as Plaintiffs suggest that the Acting Secretary failed to consider the reliance interests of DACA recipients more generally, that assertion ignores her calculus based the looming risk of a nationwide injunction ending the DACA program altogether.  Given her view that she faced an imminent, court-ordered end to DACA, the Acting Secretary opted for an orderly wind-down process that would protect the reliance interests of DACA recipients far more than an immediate injunction terminating the program would.  *See* 9-10, *supra*.  Finally, to the extent that she rationally concluded DACA was illegal, there would be no legitimate reliance interests at all.

**5.** Plaintiffs also allege that DHS changed its information-sharing policy and that such a change was both arbitrary and capricious as well as contrary to law.  *See* Pls.' Compl. ¶ 165.  This claim is unreviewable under the APA because DHS has not changed its information-sharing policy, and has thus not engaged in any final agency action with respect to such policy. Moreover, Plaintiffs' assertions that the alleged change in policy violated the Privacy Act and the E-Government Act fail as a matter of law.

Plaintiffs do not allege facts sufficient to show that there has actually been a substantive change in policy regarding information sharing.  Plaintiffs merely allege that the Rescission Memorandum "provides no assurance to Dreamers" that personal information will not be used in

immigration enforcement proceedings.  Pls.' Compl. ¶ 107.  And while they cite language in the

Rescission FAQs indicating that information "[g]enerally . . . will not be proactively provided to

other law enforcement entities," Pls.' Compl. ¶ 108 (emphasis omitted) (quoting DHS, *Frequently*

*Asked Questions: Rescission of Deferred Action for Childhood Arrivals* (Sept. 5, 2017) (Rescission

FAQs),   https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-deferred-

action-childhood-arrivals-daca), that language is entirely consistent with DHS's policy regarding

the protection of DACA information, including its many exceptions that Plaintiffs largely gloss

over.  *See* Pls.' Compl. ¶ 90 (characterizing "[t]he government's representations that information

provided by a DACA applicant would not be used against him" as "unequivocal").

Contrary to Plaintiffs' suggestion that DHS has flatly and completely prohibited the use of

DACA information for enforcement purposes, *see* Pls.' Compl. ¶ 90, the agency's information-

sharing policy in fact contains (and has always contained) a number of exceptions.  For example,

under that policy, information submitted in DACA requests "is protected from disclosure to ICE

and CBP for the purpose of immigration enforcement proceedings *unless* the requestor meets the

criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in

USCIS'[s] Notice to Appear guidance" (for example, when issues of national security, public

safety, or significant criminal activity are raised).  DHS DACA FAQ No. 19 (emphasis added);

*see* Notice to Appear Guidance.  While this policy "may be modified, superseded, or rescinded at

any time" and creates no legal rights, DHS DACA FAQ No. 19, nothing in the Rescission Policy

purports to change it, and it currently remains in effect.

As there has been no substantive change in DHS's information-sharing policy, there is no

"final agency action" for the Court to review.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997)

(holding that "final agency action" must "mark the consummation of the agency's decisionmaking

process"); 5 U.S.C. § 704 (providing for judicial review of "final agency action").  Accordingly,

the Court should dismiss Plaintiffs' APA claims for lack of jurisdiction to the extent that they

concern an alleged change in the information-sharing policy.  *See Invention Submission Corp. v.

Rogan*, 357 F.3d 452, 460 (4th Cir. 2004) (holding that district court should have dismissed APA

claim without final agency action for lack of subject matter jurisdiction).

Even were the Court to find that DHS somehow changed its long-standing information-

sharing policy, any "new" policy does not violate the Privacy Act or the E-Government Act.  As

a threshold matter, records containing personal information about DACA recipients are not

protected by the Privacy Act.  The Privacy Act applies to records pertaining to "individual[s],"

who are defined as "citizen[s] of the United States or [] alien[s] lawfully admitted for permanent

residence."  5 U.S.C. § 552a(a)(2).  By definition, DACA recipients are neither.  As explained

above, DACA is a form of prosecutorial discretion known as deferred action, and DHS has

consistently advised applicants that DACA "does not confer lawful permanent resident status or a

path to Citizenship."  DHS DACA FAQ No. 68.  To the extent that DHS previously extended

protections to individuals who fell outside of the scope of the statute, the practice was rescinded

in February 2017.  *See* Memorandum from John F. Kelly, *Enforcement of the Immigration Laws

to Serve the National Interest* (Feb. 20, 2017) (AR 229-34).  Moreover, that DHS's internal policy

once provided additional protections for DACA recipients does not create a statutory right to

coverage under the Privacy Act. *See* Department of Homeland Security, *Privacy Impact

Assessment for the Deferred Action for Childhood Arrivals (DACA)* 16 (Aug. 15, 2012) (noting

that DHS policy "does not extend or create a right of judicial review for non-U.S. persons"),

https://www.dhs.gov/sites/default/files/publications/privacy_pia_uscis_daca_0.pdf

(Privacy Impact Assessment)[10]; *see also Fares v. U.S. Immigration & Naturalization Service*, 50 F.3d 6 (4th Cir. 1995) (affirming district court's holding that Plaintiff whose work authorization had expired "was not protected by the Privacy Act").  Plaintiffs attempt to manufacture a cause of action under the Privacy Act by bringing this claim under the Administrative Procedure Act highlights the frivolous nature of their argument.  Accordingly, Plaintiffs' claim that DHS's information-sharing policy violates the Privacy Act fails as a matter of law.

Plaintiffs also argue that DHS's information-sharing policy does not comply with the E-Government Act.  *See* Pls.' Compl. ¶ 165.  Though the E-Government Act itself does not provide a cause of action, *see Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, No. 17-1320, 2017 WL 3141907, at *1 (D.D.C. July 24, 2017), *appeal docketed*, No. 17-5171 (D.C. Cir. July 27, 2017), the Act requires federal agencies to conduct privacy impact assessments before collecting new information.  *See* E-Government Act of 2002, Pub. L. No. 107-347, § 208(b), 116 Stat. 2899.  Plaintiff's argument that DHS is in violation of the E-Government Act suffers from two major flaws.  First, as explained above, DHS has not substantively changed its information-sharing policy regarding DACA applicants' personal information.  Plaintiffs mischaracterize DHS's policy as a "promise" that information from DACA applicants would never be shared.  *See* Pls.' Compl. ¶ 165.  But, as consistently represented in the DACA FAQs and the DACA Rescission FAQS, the Privacy Impact Assessment provides for a number of exceptions, including when applicants "meet[] the guidelines for the issuance of a Notice to Appear," for "national security purposes", and for the "investigation or prosecution of a criminal offense."  Privacy Impact Assessment 13.  Second, Plaintiffs allege that DHS "violate[d] the E-Government Act provision requiring an agency abide by its Privacy Impact Assessment," Pls.' Compl. ¶

---

[10] This Privacy Impact Assessment is incorporated by reference in Plaintiffs' Complaint. *See* Pls.' Compl. ¶ 84.

165(c)(ii), but fail to include a citation to any specific provision of the E-Government act requiring such action.  The E-Government Act requires only that an agency conduct a privacy impact assessment, ensure review of the assessment by the Chief Information Officer of the Agency, and make the assessment publically available.  *See* E-Government Act of 2002, Pub. L. No. 107-347, § 208(b)(1)(B).  Thus, once DHS properly created and disclosed its Privacy Impact Assessment in August 2012, it was in full compliance, and Plaintiffs cannot properly state any violation of this Act.  *Id.*

*    *    *    *

In all events, the foregoing analysis confirms that the Acting Secretary's decision was at a minimum reasonable and that Plaintiffs' APA challenge can be resolved at this stage based on the record now before the Court.  Indeed, whatever this Court decides, there is no basis for supplementing the record or discovery to assess the Acting Secretary's explanation.

## B.    The Rescission Policy Is Exempt from Notice and Comment.

Plaintiffs miss the mark in arguing that the Rescission Policy must be set aside because it is a substantive rule issued without notice and comment.  *See* Pls.' Compl. ¶ 169; *see also* 5 U.S.C. § 553(b)–(c).  If winding down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the first place.  Critically, though, the DACA Memo itself also was not adopted through notice and comment.  So even on Plaintiffs' own theory, it would be void *ab initio*—leaving Plaintiffs without a remedy.  *See Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341 n.9 (4th Cir. 1995) (noting that if the interim rule at issue were a substantive rule, as the plaintiff claimed, then it would have been invalid from the date of its issuance for failure to comply with the APA's notice requirements; finding that interim rule was a policy statement not subject to notice and comment).  That is reason enough to dismiss this claim.  *See Lujan*, 504 U.S. at 561

41

(plaintiff must show "injury will be 'redressed by a favorable decision'" to establish standing) (citation omitted).[11]

In any event, Plaintiffs' claim is erroneous.  DHS and INS have adopted over 20 deferred action or similar policies over the past 50 years—rarely through notice and comment.  That is because such policies, like the Rescission Policy, are not substantive rules at all.  Rather, they are classic examples of "general statements of policy" that are exempt from the APA's notice-and-comment requirements.  5 U.S.C. § 553(b)(3).

A "substantive rule establishes a standard of conduct which has the force of law."  *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974); *see Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989) ("[A] substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties.").  Thus, an "agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule."  *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

A statement of policy, by contrast, "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's Manual on the Administrative Procedure Act

---

[11] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation."  *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982).  That holding, however, concerned the rescission of a rule promulgated after notice and comment that was allegedly defective on other grounds, not a rule that was defective precisely because it had failed to go through notice and comment in the first place.  *See id.* at 445–46.  When an agency has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go through those procedures to cure the underlying defect.

30 n.3 (1947)).  It "explains how the agency will enforce a statute or regulation—in other words,

how it will exercise its broad enforcement discretion or permitting discretion under some extant

statute or rule."  *McCarthy*, 758 F.3d at 252.  It serves to "appris[e] the regulated community of

the agency's intentions" and "inform[] the exercise of discretion by agents and officers in the

field."  *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987).  And "a general

statement of policy, like a press release," often "announces the course which the agency intends to

follow in future adjudications."  *Pac. Gas & Elec.*, 506 F.2d at 38.  Accordingly, policy statements

"are binding on neither the public nor the agency," and the agency "retains the discretion and the

authority to change its position … in any specific case."  *Syncor Int'l Corp. v. Shalala*, 127 F.3d

90, 94 (D.C. Cir. 1997) (citations omitted); *see Chen Zhou Chai*, 48 F.3d at 1341 (policy statements

announce "tentative intentions for the future without binding [an agency]", they do not "establish

a binding norm and leave[] agency officials free to exercise their discretion").

As these principles make clear, the Rescission Policy is a quintessential policy statement—

a point that its text reinforces again and again.  It was issued as an "exercise of [the Secretary's]

authority in establishing national immigration policies and priorities."  Rescission Policy at 4 (AR

255).  It explains how the agency intends to exercise its enforcement authority on a prospective

basis, a matter that is "generally committed to an agency's absolute discretion."  *Chaney*, 470 U.S.

at 831.  It does not immediately deprive any DACA recipients of their current deferred action

status, but describes how pending and future deferred action requests will be "adjudicate[d]—on

an individual, case-by-case basis."  Rescission Policy at 4 (AR 255).  It does not categorically

forbid the agency from continuing to defer enforcement action against DACA recipients in the

future, but instead acknowledges the background principle, recognized by Congress and the courts,

that deferred action is "an act of prosecutorial discretion" that may be exercised "on an

individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the

agency's exercise of such "otherwise lawful enforcement … prerogatives," *id.* at 5 (AR 256).  And

it explains that it "does not … create any right or benefit, substantive or procedural, enforceable at

law by any party."  *Id.*  Thus, in the wake of the Rescission Policy, deferred action "remains

discretionary and reversible," *Arpaio*, 797 F.3d at 17—as with the 20-odd deferred action or

similar policies that DHS and INS have adopted over the past half-century, generally without going

through the full notice-and-comment process.[12]

     That is as it should be.  An agency's enforcement priorities will inevitably shift over time,

whether due to changing circumstances or resource constraints.  *See Chaney*, 470 U.S. at 831.

Indeed, the DACA policy was originally adopted in part to set enforcement priorities in view of

the agency's limited resources.  *See Arpaio*, 797 F.3d at 16; DACA Memo at 1 (AR 1); DAPA

Memo at 1 (AR 37).  Under Plaintiffs' theory, however, even if Congress were to vastly increase

appropriations for immigration enforcement, the agency's hands would be tied:  it would not be

free to adjust its enforcement priorities without engaging in "cumbersome and time-consuming

rulemaking proceedings."  *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851

F.2d 1424, 1430 (D.C. Cir. 1988).  The Court should not endorse such an intrusion into matters

that have "long been regarded as the special province of the Executive Branch."  *Chaney*, 470 U.S.

at 832.

_____

[12] The Fifth Circuit's ruling that the adoption of the DAPA Memo required notice and comment does not imply that the rescission of DACA does as well.  Unlike the DAPA or DACA Memos, the Rescission Policy announced a return to an enforcement policy of using deferred action on an individualized basis, which cannot be cast as a substantive rule.  Indeed, the Fifth Circuit itself stressed that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment."  *Texas*, 809 F.3d at 178 n.156.  In any event, if this Court agrees with the Fifth Circuit, then DACA was void *ab initio* and Plaintiffs lack a remedy.

### C.        Plaintiffs Fail to State an Equal Protection Claim.

If this Court disagrees with Defendants and concludes that it can review Plaintiffs' equal

protection challenge under *AADC*, *but see supra* Section I.B, it nonetheless should dismiss it for

failure to state a claim.  In *Armstrong*, the Supreme Court considered whether criminal defendants

could obtain discovery to support a "selective prosecution" claim arising under the Equal

Protection Clause.  517 U.S. at 463–64.  The Court recognized that such claims, like the

discriminatory-motive claims here, "ask[] a court to exercise judicial power over a 'special

province' of the Executive"—specifically, the "constitutional responsibility to 'take Care that the

Laws be faithfully executed'"—and thereby risk "impair[ing] the performance of a core executive

constitutional function."   *Id*. at 464-65 (citations omitted).   Given these considerations, a

"presumption of regularity supports" such enforcement decisions and, "in the absence of clear

evidence to the contrary, courts presume that they have properly discharged their official duties."

*Id*. at 464 (citation omitted).  Applying this "rigorous standard," *id.* at 468, the Court refused to

allow discovery in support of the selective prosecution claim before it, even though the claimants

had provided evidence that in each of the 24 prosecutions for certain drug-trafficking offenses that

were closed by the federal defender's office in a single year, the defendant was African-American,

*id.* at 459, 469-70.

Although Plaintiffs here allege that the Rescission Policy was motivated by discriminatory

animus rather than assert that they have been selectively prosecuted, *Armstrong* still requires them

to allege, and ultimately prove, that this is a "clear" case of discrimination in order to overcome

the presumption that Defendants have faithfully enforced the laws.  *Id.* at 464.  As in *Armstrong*,

Plaintiffs here ask this Court to "exercise judicial power over a 'special province' of the

Executive," with the associated risk of "impair[ing] the performance of a core executive

constitutional function." *Id*. at 464–65 (citations omitted). Plaintiffs consequently must overcome "a significant barrier to the litigation" of their claims. *Id*. at 464. And that is especially true given that they allege an unlawful enforcement of the *immigration* laws. Even if *AADC* permitted the adjudication of Plaintiffs' claims, that decision would at least require them to satisfy a rigorous standard similar to the one in *Armstrong*. As *AADC* explained, the concerns justifying a heightened burden under *Armstrong* "are greatly magnified in the deportation context," 525 U.S. at 490, and all of those considerations are present here, *see supra* Section I.B. Accordingly, Plaintiffs must at least meet a heavy burden to survive a motion to dismiss on a claim that Defendants harbored a hidden discriminatory motive in their enforcement of the immigration laws.

Plaintiffs cannot carry that burden here. Their allegations consist of the assertion that 93 percent of DACA recipients were Mexican, Central American, or Latino, *see* Pls.'Compl. ¶¶ 157, 159 and selected references to statements by the President and other administration officials relating to immigrants, Mexicans, and Latinos, *see* Pls.' Compl. ¶¶ 94-96, 125. These allegations are insufficient to overcome the "significant barrier" to moving forward on a claim of this sort. *Armstrong*, 517 U.S. at 464.

The fact that approximately 93 percent of approved DACA recipients are Mexican, Central American, or Latino is an unsurprising accident of geography, not evidence of discrimination, let alone the kind sufficient to establish discriminatory motive in the enforcement of immigration laws. Even in the ordinary domestic equal protection setting, a disparate impact of a facially neutral rule such as the Rescission Policy, standing alone, cannot establish discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 242 (1976), *superseded by statute, see Veasey v. Perry*, 29 F. Supp. 3d 896, 916 (S.D. Tex. 2014). Much less can it do so when the exercise of enforcement discretion is involved: In *Armstrong*, the fact that 100 percent of the relevant defendants were

African-American was not enough to justify discovery.  517 U.S. at 459.  *A fortiori*, the fact that

approximately 93 percent of DACA recipients are Mexican, Central American, or Latino provides

no basis for setting aside the Rescission Policy, especially given the heightened deference owed to

the political branches on immigration matters, where sensitive considerations of relations and

proximity to particular foreign nations necessarily plays a role.[13]

 Nor do the President's statements—most of which were made before he took the oath of

office—indicate that the rescission of DACA is a clear case of discrimination.  The President's

statements are largely unrelated to DACA.  Plaintiffs themselves emphasize that when the

President has spoken on this issue, he has shown support for DACA recipients.[14]   More

importantly, Plaintiffs point to nothing that would suggest Acting Secretary Duke—the

decisionmaker ultimately responsible for the Rescission Policy— chose to wind-down DACA due

to animus towards Mexican nationals.  Given that the statements at issue have no connection to

either the relevant decision (the rescission of DACA) or the relevant decision-maker (the Acting

Secretary), adopting Plaintiffs' theory would mean that any time DHS enforces the immigration

laws in a way that has a statistically significant disparate impact on Mexicans, Central Americans,

or Latinos, the agency would be subject to challenges that it violated Fifth Amendment equal

protection principles.  That would set a dangerous precedent, and it would freeze the enforcement

---

[13] Plaintiffs allege that other classes of immigrants, presumably classes that include less than
93% Mexican, Central American, or Latino individuals, remain eligible for deferred action.  *See*
Pls.' Compl. ¶ 159.  That other classes of immigrants who received deferred action include less
Mexican, Central American, and Latino individuals does not provide any evidence of
discriminatory intent, and, as discussed above, a mere disproportionate impact on one group is
insufficient to show discriminatory animus.  *See Washington*, 426 U.S. at 242.

[14] *See* Pls.' Compl ¶ 124 (alleging that the President "stated…that he would find an
accommodation for dreamers… 'that's going to make people happy and proud;'" alleging that
the President stated that his plan for DACA would "have a lot of heart;'' alleging that the
President "confirmed that his Administration's policy is not to deport Dreamers, and suggested
that they 'should rest easy'").

discretion of the entire Executive Branch.  That ossification would be particularly inappropriate in this context, given that immigration enforcement policies must constantly be adjusted to account for "[t]he dynamic nature of relations with other countries."  *Arizona*, 567 U.S. at 397.  In all events, Plaintiffs' inferences from unrelated remarks cannot qualify as the sort of "clear" allegations of discrimination necessary in this context. *Armstrong*, 517 U.S. at 464.

### D.   Plaintiffs Fail to State a Procedural Due Process Claim

**1.** Plaintiffs allege that the rescission violates procedural due process norms to the extent that DACA recipients will be deprived of their interests in their DACA status without notice and an opportunity to be heard.  *See* Pls.' Compl. ¶ 138.  This claim fails on the merits for the simple reason that DACA recipients have no protected liberty interest or property interest in deferred action entitling them to due process protections.

The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V. Thus, the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citations omitted).  The "Due Process Clause does not protect everything that might be described as a 'benefit.'"  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).  Rather, "'[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'"  *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  Such entitlements "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source"—*e.g.*, statutes or regulations—"that secure certain benefits and that support claims of entitlements to those benefits."  *Roth*, 408 U.S. at 577.

48

A benefit "is not a protected entitlement" where, as here, "government officials may grant or deny it in their discretion." *Castle Rock*, 545 U.S. at 756 (citation omitted). For due process purposes, statutes or regulations limit discretion only when they contain "explicitly mandatory language"—*i.e.*, "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 462–63 (1989) (citation omitted); *see also Smith v. Ashcroft*, 295 F.3d 425, 430 (4th Cir. 2002) (holding that the INA does not create a protected interest in seeking waiver of deportation proceedings because the statute grants "broad discretion" to grant or deny relief). The DACA policy contains no such "explicitly mandatory language." *Id.* at 463. The policy is codified in no statute or regulation. Its source—the DACA Memo—describes it as a "policy" for the "exercise of prosecutorial discretion." DACA Memo 2, 3 (AR 2, 3); *see Omar v. McHugh*, 646 F.3d 13, 22 n.7 (D.C. Cir. 2011) (the "use of the word 'policy'"—"rather than a word such as 'right'— reinforces the conclusion that Congress did not intend to create an 'entitlement'"). And the agency's public guidance makes clear that, under DACA, deferred action "may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion." DHS DACA FAQ No. 27.

Under DACA, "deferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (quoting DACA Memo 3). Thus, it is not a protected entitlement for due process purposes, and Plaintiffs' claim fails as a matter of law. *See also, e.g.*, *Velasco-Gutierrez v. Crossland*, 732 F.2d 792, 798 (10th Cir. 1984) (deferred action guidance "places no effective limitations on official discretion, and thus creates no protected liberty interest in deferred action"); *Romiero De Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985) (because "deferred action" "vests the regional commissioner with

49

unfettered discretion to determine whether to grant an informal administrative stay of deportation to an otherwise deportable alien, it creates no protectable liberty interest in deferred action, nor does it create a protectable interest in being considered for deferred action status").

**2.** Even if DACA could be conceived of as an entitlement, Plaintiffs' due process claim would fail because changes in agency policy do not require individualized process.  Due process doctrine recognizes a "distinction between individualized deprivations, [which] are protected by procedural due process, and policy-based deprivations of the interests of a class, [which] are not protected by procedural due process."  2 Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.2 (5th ed. 2010).  The rescission of DACA falls squarely in the latter category.

Plaintiffs allege that, under DACA, termination required "a Notice of Intent to Terminate which thoroughly explains the grounds for termination" and that recipients of such a notice would have an opportunity to respond prior to termination. Pls.' Compl. ¶ 78.  But Plaintiffs' theory is not that individual DACA applications were adjudicated incorrectly (for example, due to factual error)—the sort of mistake that notice and a hearing could conceivably help correct.  Instead, Plaintiffs' claim appears to be that DHS cannot alter the DACA policy, even on a prospective basis, without providing individualized notice and hearings to nearly 800,000 recipients.

Such individualized process is not required.  The Supreme Court held long ago that where a government policy "applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption," and thus due process does not require individualized pre-deprivation notice.  *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915). This case presents "the classic *Bi-Metallic* scenario"—the challenged policy applies across-the-board to a large number of people, so "[n]ot only would individualized hearings be impractical,

they would be unnecessary." *Decatur Liquors, Inc. v. Dist. of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007) (citing *Bi-Metallic*, 239 U.S. at 445).

The Ninth Circuit's decision in *Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980), is instructive in this regard.  There, the INS had issued a policy directive granting "deferred voluntary departure"—a form of deferred action—to Iranian nationals who were unwilling to return home due to political instability.  *Id.* at 1359.  Then, in response to the Iranian hostage crisis, the INS issued another policy directive "rescinding the … deferred departure" and requiring its recipients to depart the country within 30 days.  *Id.*  Relying on *Bi-Metallic*, the Ninth Circuit rejected the plaintiff's claim "that he should have had a prior opportunity to contest [the INS's] decision to rescind deferred departure."  *Yassini*, 618 F.2d at 1363.  "Where an agency action is not based on individual grounds, but is a matter of general policy," the court explained, "no hearing is constitutionally required."  *Id.* (citing, *inter alia*, *Bi-Metallic*).  So too here.

**3.** Plaintiffs also allege that DHS's alleged change in its information-sharing policy violates procedural due process norms to the extent that DACA recipients have been deprived of their interest in the protection of personal information provided with their DACA requests from alleged impermissible sharing without a right to be heard or other individualized procedural protections. *See* Pls.' Compl. ¶ 151.  As previously explained, *supra* Section II.A, Plaintiffs have failed to allege sufficient facts that DHS substantively changed its information-sharing policy.  In any event, Plaintiffs fail to state a claim that such a change violates procedural due process because they cannot identify an actual deprivation of "sensitive personal information," much less show that this "information" is somehow a protected interest under the Due Process Clause.

No plaintiff alleges that personal information contained in a DACA application has in fact been impermissibly shared.  Nor have Plaintiffs alleged facts indicating a new threat of information

51

sharing beyond the exceptions that have been consistently part of the policy since DACA was implemented in 2012, including in cases of threats to national security.  Although the court in *Batalla Vidal* found (incorrectly) that, once DACA recipients' status expires, they may be entitled to a presumption that the Government will enforce the immigration laws against them*, see Batalla Vidal* Mem. & Order at 36, it does not follow and Plaintiffs have not shown that DACA recipients are entitled to a presumption that DHS's information-sharing policy, which has not substantively changed, will be applied differently once DACA recipients lose their status.

Even if Plaintiffs had, in fact, alleged an actual deprivation of liberty or property, to the extent that personal information was shared in a manner inconsistent with the information-sharing policy, or if the information-sharing policy had, in fact, changed, Plaintiffs were consistently advised that the policy "may be modified, superseded, or rescinded at any time" and creates no legal rights.  DHS DACA FAQ No. 19; *see supra* Section I.B.  Accordingly, no party has a liberty or property right as a result of the information-sharing policy.  *See Mondragon v. Holder*, 706 F.3d 535, 541 (4th Cir. 2013) (It is a "well-established proposition that 'a constitutional entitlement [*i.e.*, one protected by the Due Process clause] cannot 'be created—as if by estoppel—merely because a wholly and expressly discretionary state privilege has been granted generously in the past.'") (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)).

### E.      Plaintiffs Fail to State a Substantive Due Process Claim.

Plaintiffs allege that both the rescission of DACA and the alleged change in DHS's information-sharing policy violate substantive due process because these actions are not "fundamentally fair."  Pls.' Compl. ¶¶ 142, 152.  Neither of these claims has merit.

Substantive due process protects those rights that rank as "fundamental"—that is, both "objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of

ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citation omitted). The Supreme Court has also made clear that a plaintiff must provide "a 'careful description' of the asserted fundamental liberty interest" when raising such a claim." *Chavez v. Martinez*, 538 U.S. 760, 775-76 (2003). "[V]ague generalities," like Plaintiffs' wish that DHS would adopt their preferred policies, "will not suffice." *Id.* at 776.

While in rare cases a "denial of fundamental fairness" may rise to the level of a substantive due process violation, to survive dismissal in a "challenge to executive action" such as this one, Plaintiffs must allege behavior that is "so egregious" and "outrageous" as "to shock the contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001). Conduct can be said to "shock the conscience" when it involves intentionally "abusing executive power, or employing it as an instrument of oppression" in a manner that is "unjustifiable by any government interest." *Hawkins v. Freeman*, 195 F.3d 732, 742 (4th Cir. 1999) (emphasis and citations omitted). By contrast, "simple negligence . . . can [never] support a claim of substantive due process violation by executive act." *Id.*

Nothing about the Rescission Policy meets this extraordinarily high standard, and certainly not with respect to the subject of information sharing. Plaintiffs have failed to put forth any allegations suggesting that the Acting Secretary's memorandum contained "any element of vindictiveness or of power exercised simply to oppress," particularly when compared with the "legitimate governmental interests" she identified. *See id.* at 746. Moreover, DHS's information-sharing policy for DACA recipient information has always contained a number of exceptions and although the policy, in fact, remains unchanged, it has always expressly stated that it "may be

modified, superseded, or rescinded at any time" and it therefore creates no judicially enforceable rights.  DHS DACA FAQ No. 19.  And, most importantly, the Rescission Policy nowhere purports to alter DHS's information-sharing policy, and even if it did, Plaintiffs were on notice that it could be subject to change.

F.     **Plaintiffs' Equitable Estoppel Claims Fail.**

Plaintiffs have also brought equitable estoppel claims, alleging that DACA recipients provided sensitive personal information to the government and "rearranged their lives" based on the government's representations, but now face removal due to the rescission of DACA.  *See* Pls.' Compl. ¶¶ 176, 178.  On that basis, Plaintiffs claim that the government should be equitably estopped from terminating DACA or from using DACA information for enforcement purposes. *See id.* ¶ 179.

Plaintiffs' equitable estoppel claims cannot succeed for several reasons.  As a threshold matter, Plaintiffs cannot succeed because there is no recognized cause of action for estoppel.  The Supreme Court has explained that "private rights of action to enforce federal law must be created by Congress."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  Congress has created no such cause of action for estoppel.  This is further confirmed by the Federal Rules of Civil Procedure, which expressly recognize estoppel as an affirmative defense—not a cause of action.  *See* Fed. R. Civ. P. 8(c).

Even then, the remedy of equitable estoppel does not apply in this context.  Assuming arguendo that this remedy could ever be applied to the federal government, *but see OPM v. Richmond*, 496 U.S. 414, 419, 423 (1990), equitable estoppel does not apply to the *policy* decisions of the federal government.  *See, e.g.*, *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("[T]he government should not be unduly hindered from changing its position if that shift is the

54

result of a change in public policy."), *cited in New Hampshire v. Maine*, 532 U.S. 742, 755 (2001);

*Emery Min. Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984) (the doctrine of estoppel

cannot be justified against the government where it would "interfere with underlying government

policies or unduly undermine the correct enforcement of a particular law or regulation").  Indeed,

it is axiomatic that the government may alter its policies for any number of reasons, in accordance

with any applicable procedures.  *See generally Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199,

1210 (2015).  Here, the Acting Secretary issued a memorandum rescinding DACA, which is a

matter committed to agency discretion by law.

Finally, even if a cause of action for estoppel were available to challenge the policy here

(and it is not), Plaintiffs could not satisfy the elements of that claim.  Even in situations where an

estoppel claim against the government may be appropriate (*e.g.,* individualized challenges to non-

policy actions), courts "invoke the doctrine of estoppel against the government with great

reluctance."  *United States v. Browning,* 630 F.2d 694, 702 (10th Cir. 1980); *see also Heckler v.

Cmty. Health Servs.,* 467 U.S. 51, 60 (1984) (government may not be estopped on same terms as

any other litigant).  In other words, estoppel can only be invoked against the government "where

justice and fair play require it."  *Watkins v. U.S. Army*, 875 F.2d 699, 706 (9th Cir. 1989) (en banc).

In the rare circumstances in which equitable estoppel may apply against the government, a party

must show "affirmative misconduct going beyond mere negligence."  *Angeles v. Dist. Dir., INS*,

729 F. Supp. 479, 485 (D. Md. 1990); *see Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003)

("estoppel may only be justified, if ever, in the presence of affirmative misconduct by government

agents").  Plaintiffs cannot meet this standard.

First, Plaintiffs have failed to plausibly allege that the government engaged in any

"affirmative misconduct going beyond mere negligence."  *Angeles*, 729 F. Supp. at 485 (finding

that INS was not estopped from deporting the plaintiff where immigration officers and a government brochure incorrectly advised her that her permanent resident status would remain valid so long as she did not stay outside the country for more than one year). To meet that standard, Plaintiffs must plead "an affirmative misrepresentation or affirmative concealment of a material fact by the government." *Watkins*, 875 F.2d at 707 (estopping government from barring a soldier's reenlistment where the Army affirmatively misrepresented a soldier's qualifications throughout fourteen years of official records). Here, Plaintiffs have not identified any governmental misconduct, let alone extraordinary misconduct. Instead, they have merely pleaded that there was a change in policy (an erroneous allegation vis-a-vis the information-sharing policy).

Second, estoppel for individual claims is only available where the government's act will cause a "serious injustice" and applying estoppel will not cause the public's interest to "suffer undue damage." *Watkins*, 875 F.2d at 707 (quotation omitted). Plaintiffs have failed to sufficiently plead facts that would support these necessary threshold elements. To the contrary, as reflected in documents incorporated by reference in Plaintiffs' Complaint, DHS made clear in its FAQs that "DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion." DHS DACA FAQ No. 27. Moreover, nothing in the 2012 DACA Memorandum, the form used to request DACA (USCIS Form I-821D), or in the DACA FAQs generally could be construed to represent to DACA recipients that the DACA policy was permanent and not subject to change. There is therefore no "serious injustice" that Plaintiffs can point to relating to the rescission of this discretionary policy.[15]

---

[15] Even if this Court were to conclude that Plaintiffs can somehow meet these threshold requirements, it would still need to apply traditional estoppel elements to Plaintiffs' claims on an individualized bases: "(1) the party to be estopped knew the true facts; (2) the party to be estopped intended for his conduct to be acted upon or acted in such a way that the party asserting estoppel

At bottom, Plaintiffs' estoppel claims merely repackage their policy challenges. Equitable estoppel, however, is unavailable for such broad-based challenges. And even if the Court were to review Plaintiffs' claims on an individualized basis, those claims still fail. While Plaintiffs surely disagree with the rescission of DACA, that disagreement does not mean that Plaintiffs have alleged that there is a "serious injustice," much less a circumstance involving "affirmative misconduct" in which estoppel should apply. For these reasons, Plaintiffs' equitable estoppel claims should be dismissed.

## III.  NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS IMPERMISSIBLE.

Finally, in an indirect attack of the Rescission policy, Plaintiffs seek in a separate cause of action a declaratory judgment that DACA is "lawful." *See* Pls.' Compl. ¶¶ 182-85 (Count 7). The Declaratory Judgment Act, however, provides a remedy, not a source of rights independent of substantive federal law. *Gibraltar, P.R., Inc. v. Otoki Grp., Inc.*, 104 F.3d 616, 618-19 (4th Cir. 1997); *see Johnson v. Sessions*, No. 15-cv-3317-RDB, 2017 WL 1207537, at *6 & n.6 (D. Md. Apr. 3, 2017) (noting that the court would not consider declaratory judgment claim, even if it had jurisdiction, because the request for declaratory relief was duplicative of relief sought through the plaintiff's APA claims). Moreover, to establish standing and seek relief under the Declaratory Judgment Act, a plaintiff must demonstrate that there is an "actual controversy" necessitating declaratory relief. 28 U.S.C. § 2201(a); *see Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 239-40 (1937). The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests." *Aetna*, 300 U.S. at 240-41.

Here, even assuming DACA were "lawful," any declaratory relief that this Court might

---

had a right to believe that it was intended; (3) the party claiming estoppel was ignorant of the true facts; and (4) the misconduct was relied upon to the detriment of the parties seeking estoppel." *Dawkins*, 318 F.3d at 611 n.6. Plaintiffs have failed to plausibly allege facts in support of these elements as well.

provide would merely be an academic dispute because the Acting Secretary still would have had the discretion to rescind the policy. *See supra* Part I.A. Instead, the "controversy" (to the extent it is even justiciable) concerns whether the Acting Secretary's decision to rescind DACA in light of litigation risk that DHS was facing was arbitrary or capricious. Any after-the-fact conclusion by this Court that DACA is "lawful" has no bearing on that decision, which was based on the litigation risk that DHS was then confronting. Thus, any declaratory judgment that this Court might issue would not provide any actual benefits to Plaintiffs.

Plaintiffs also seek injunctive relief preventing Defendants "from implementing or enforcing the Rescission" and "from disclosing any DACA applicant information [for] immigration enforcement activities in a manner inconsistent with their prior commitments." Pls.' Compl. at 60, Relief Requested. To the extent this Court ultimately concludes that Plaintiffs are entitled to any injunction, it should dismiss Plaintiffs' request to the extent they seek nationwide relief. Both constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries. Article III demands that "a plaintiff must demonstrate standing … for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted). "The remedy" sought thus must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996). "The actual-injury requirement would hardly serve [its] purpose … of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *Id.* (emphasis omitted). And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health*

*Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties"). Accordingly, any injunction here should be limited to particular individual Plaintiffs found to have cognizable claims.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss this case or, in the alternative, should grant summary judgment in Defendants favor on all of Plaintiffs' claims.

Dated: November 15, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

*/s/   Kathryn C. Davis*
KATHRYN C. DAVIS
*/s/   Rachael Westmoreland*
RACHAEL WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 616-8298
Fax: (202) 616-8470
Email: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

CASA DE MARYLAND, *et al.*,

        *Plaintiffs*,

   v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

        *Defendants*.

No. 17-cv-2942 (RWT)

## [PROPOSED] ORDER

Upon consideration of Defendants' Motion to Dismiss or, In the Alternative, For

Summary Judgment, and any response or reply thereto, it is hereby

**ORDERED** that this motion is **GRANTED**; and it is

**FURTHER ORDERED** that this action is **DISMISSED** in its entirety.

This is a final, appealable order.  *See* Fed. R. App. P. 4(a).

**SO ORDERED**.


Dated: _____          _____
                                   ROGER W. TITUS
                                   United States District Judge

# EXHIBIT 13

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>KIRSTJEN M. NIELSEN, *et al.*,<br><br>Defendants. | No. 16-cv-4756 (NGG) (JO) |
| STATE OF NEW YORK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD TRUMP, *et al.*,<br><br>Defendants. | No. 17-cv-5228 (NGG) (JO) |

**MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTIONS FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    A.  Deferred Action Generally ..................................................................................... 3

    B.  DACA and DAPA ................................................................................................... 4

    C.  The *Texas* Litigation ............................................................................................. 5

    D.  Rescission of DACA ............................................................................................. 6

    E.  Plaintiffs' Motions for a Preliminary Injunction ................................................. 7

    F.  The Northern District of California Preliminary Injunction ................................. 8

LEGAL STANDARD ......................................................................................................... 9

ARGUMENT ...................................................................................................................... 9

    I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS ........................... 10

        A.  Plaintiffs' Claims Are Not Justiciable ................................................. 10

        B.  The Acting Secretary Rationally Explained Her Decision to Rescind
            DACA ................................................................................................... 10

        C.  The Rescission is a General Statement of Policy Not Subject to the
            Requirements of Notice-and-Comment Rulemaking Procedures or
            the Regulatory Flexibility Act ............................................................. 34

        D.  The Rescission Does Not Violate Equal Protection Principles.................. 41

    II.  THE REMAINING FACTORS WEIGH AGAINST A PRELIMINARY
        INJUNCTION ................................................................................................... 46

        A.  Plaintiffs Have Not Shown Any Risk of Irreparable Harm That Would
            Be Remedied By The Injunctive Relief That They Seek............................. 46

        B.  Balancing of the Equities and the Public Interest Disfavor Injunctive
            Relief................................................................................................... 49

        C.  Any Injunctive Relief Should Be Narrowly Drawn ................................... 49

CONCLUSION.................................................................................................................. 50

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*A.X.M.S. Corp. v. Friedman*,
    948 F. Supp. 2d 319 (S.D.N.Y. 2013)................................................................... 48

*Adair v. England*,
    183 F. Supp. 2d 31 (D.D.C. 2002) ........................................................................ 33

*Allied Local & Reg'l Mfrs. Caucus v. EPA*,
    215 F.3d 61 (D.C. Cir. 2000) ................................................................................ 20

*Amfac Resorts LLC v. Dep't of Interior*,
    143 F. Supp. 2d 7 (D.D.C. 2001) .......................................................................... 33

*Arizona v. United States*,
    567 U.S. 387 (2012) ......................................................................................... 3, 49

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015), *cert denied*, 136 S. Ct. 900 (2016) ................................... *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................ 41

*Brady v. FERC*,
    416 F.3d 1 (D.C. Cir. 2005) .................................................................................. 18

*Buckingham Corp. v. Carp*,
    762 F.2d 257 (2d Cir. 1985)................................................................................. 48

*Camp v. Pitts*,
    411 U.S. 138 (1973) ............................................................................................ 29

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) ............................................................................................ 35

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ....................................................................................... 11, 33

*Coal. on Sensible Transp. v. Dole*,
    826 F.2d 60 (D.C. Cir. 1987) ................................................................................ 33

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010)..................................................................................... 9

*Commercial Drapery Contractors v. United States*,
133 F.3d 1 (D.C. Cir. 1998) .................................................................. 33

*Consumer Energy Council v. FERC*,
673 F.2d 425 (D.C. Cir. 1982) ............................................................. 39

*Dep't of Agriculture v. Moreno*,
413 U.S. 528 (1973) .............................................................................. 44

*Dep't of Natural Res. & Envtl. Control v. EPA*,
785 F.3d 1 (D.C. Cir. 2015) .................................................................. 20

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) .......................................................................... 16

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ........................................................................ 14, 15

*Fla. Power & Light Co. v. Lorion*,
470 U.S. 729 (1985) .............................................................................. 29

*Freedom Holdings, Inc. v. Spitzer*,
408 F.3d 112 (2d Cir. 2005) ................................................................. 46

*Heckler v. Chaney*,
470 U.S. 821 (1985) .................................................................. 19, 35, 42

*Ikelionwu v. United States*,
150 F.3d 233 (2d Cir. 1998) ................................................................. 28

*James Madison Ltd. by Hecht v. Ludwig*,
82 F.3d 1085 (D.C. Cir. 1996) ............................................................. 33

*Kadrmas v. Dickinson Pub. Sch.*,
487 U.S. 450 (1988) .............................................................................. 46

*Lewis v. Casey*,
518 U.S. 343 (1996) .............................................................................. 50

*Lewis v. Thompson*,
252 F.3d 567 (2d Cir. 2001) ................................................................. 46

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ........................................................................ 34, 38

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................. 39

*Mada-Luna v. Fitzpatrick,*
    813 F.2d 1006 (9th Cir. 1987) .................................................. 35

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) .................................................................. 50

*Mass. Mut. Life Ins. Co. v. Russell,*
    473 U.S. 134 (1985) .................................................................. 27

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) .................................................................... 9

*Mexichem Specialty Resins, Inc. v. EPA,*
    787 F.3d 544 (D.C. Cir. 2015) .................................................. 24

*Michigan v. EPA,*
    135 S. Ct. 2699 (2015) .............................................................. 19

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
    463 U.S. 29 (1983) ................................................ 11, 13, 18, 20

*Nw. Mining Ass'n v. Babbitt,*
    5 F. Supp. 2d 9 (D.D.C. 1998) ................................................ 41

*N.Y. Progress & Prot. PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) ...................................................... 9

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy,*
    851 F.2d 1424 (D.C. Cir. 1988) ................................................ 37

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) .................................................................. 33

*Nat'l Mining Ass'n v. McCarthy,*
    758 F.3d 243 (D.C. Cir. 2014) .................................................. 35

*New York v. Reilly,*
    969 F.2d 1147 (D.C. Cir. 1992) .......................................... 18, 19

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................................. 49

v

*Noel v. Chapman*,
    508 F.2d 1023 (2d Cir. 1975)...................................................................... 36

*Organized Village of Kake v. U.S. Dep't of Agriculture*,
    795 F.3d 956 (9th Cir. 2015) ...................................................................... 23

*Pac. Gas & Elec. Co. v. FPC*,
    506 F.2d 33 (D.C. Cir. 1974) ...................................................................... 35

*Perez v. Mortg. Bankers Ass'n*,
    135 S. Ct. 1199 (2015)........................................................................... 34, 35

*Plyler v. Doe*,
    457 U.S. 202 (1982)............................................................................... 45, 46

*Rajah v. Mukasey*,
    544 F.3d  (2d Cir. 2008)............................................................................... 42

*Regents of Univ. of Cal. v. DHS*,
    No. 17-5211-WHA, 2018 WL 339144 (N.D. Cal. Jan. 9, 2018).................... *passim*

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
    525 U.S. 471 (1999).......................................................................... 3, 4, 37, 42

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ...................................................................................... 22

*Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999)......................................................................... 47

*Romer v. Evans*,
    517 U.S. 620 (1996)............................................................................... 44, 45

*Rusu v. INS*,
    296 F.3d 316 (4th Cir. 2002) ....................................................................... 45

*SEC v. Chenery Corp.*,
    318 U.S. 80 (1943)........................................................................................ 29

*Sec'y of Agriculture v. Cent. Roig Ref. Co.*,
    338 U.S. 604 (1950)...................................................................................... 18

*Sendra Corp. v. Magaw*,
    111 F.3d 162 (1997)...................................................................................... 28

*Shepard v. NLRB,*
    459 U.S. 344 (1983) ........................................................................................ 13

*Sierra Club v. Jackson,*
    833 F. Supp. 2d 11 (D.D.C. 2012) ................................................................ 23

*Sunward Elecs., Inc. v. McDonald,*
    362 F.3d 17 (2d Cir. 2004) .............................................................................. 9

*Syracuse Peace Council v. FCC,*
    867 F.2d 654 (D.C. Cir. 1989) ...................................................................... 25

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ................................................................. *passim*

*Town of Chester v. Laroe Estates, Inc.,*
    137 S. Ct. 1645 (2017) .................................................................................. 50

*Troy Corp. v. Browner,*
    120 F.3d 277 (D.C. Cir. 1997) ...................................................................... 11

*U.S. ex rel. Parco v. Morris,*
    426 F. Supp. 976 (E.D. Pa. 1977) ................................................................ 39

*U.S. Telecom Ass'n v. FCC,*
    400 F.3d 29 (D.C. Cir. 2005) ........................................................................ 41

*United Mine Workers of America v. U.S. Dep't of Labor,*
    358 F.3d 40 (D.C. Cir. 2004) ........................................................................ 23

*United States v. Armstrong,*
    517 U.S. 456 (1996) ...................................................................................... 42

*United States v. Brignoni-Ponce,*
    422 U.S. 873 (1975) ...................................................................................... 45

*United States v. Merkt,*
    794 F.2d 950 (5th Cir. 1986) ........................................................................ 45

*United States v. Texas,*
    136 S. Ct. 2271 (2016) .................................................................................... 5

*United States v. Texas,*
    137 S. Ct. 285 (2016) ...................................................................................... 5

*Vill. of Arlington Heights v. Metro Hous. Dev. Corp.,*
  429 U.S. 252 (1977) ............................................................... 42

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.,*
  435 U.S. 519 (1978) ............................................................... 41

*Washington v. Davis,*
  426 U.S. 229 (1976) ............................................................... 42

*Wayte v. United States,*
  470 U.S. 598 (1985) ............................................................ 38-39

*Winter v. Natural Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ............................................................... 9, 40

**Statutes**

5 U.S.C. § 553 .................................................. 34, 35, 39, 41

5 U.S.C. § 601 ............................................................... 41

5 U.S.C. § 604 ............................................................... 41

5 U.S.C. § 611 ............................................................... 41

5 U.S.C. § 701 ............................................................... 37

5 U.S.C. § 706 ............................................................... 10

8 U.S.C. § 1103 ...................................................... 3, 22, 30

8 U.S.C. § 1158 ............................................................... 3

8 U.S.C. § 1182 ............................................................... 3

8 U.S.C. § 1227 ............................................................... 3

8 U.S.C. § 1229b ............................................................. 3

8 U.S.C. § 1252(g) ........................................................... 37

15 U.S.C. § 1392 (repealed 1994) ............................................ 20

28 U.S.C. § 1292(b) .......................................................... 37

28 U.S.C. § 2401 ............................................................. 28

42 U.S.C. § 7412 .................................................................................................. 19

**Regulations**

8 C.F.R. § 274a.12(c)(14) ......................................................................... 3, 4, 48

**Other Authorities**

1 Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.3 (5th ed. 2010) .................................. 35

Andorra Bruno, et al., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 20-23, Cong. Research Serv. (July 13, 2012)
    https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-Service-Report1.pdf ..................................................................... 36

Barack Obama, The White House*, Remarks by the President on Immigration*
    (June 15, 2012), http://go.usa.gov/xnXFY ........................................... 16, 17, 30

Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 PM)
    https://twitter.com/realDonaldTrump/status/905228667336499200) ................................ 31, 32

DOJ, Attorney General's Manual on the Administrative Procedure Act (1947) ......................... 34

Mem. from the Attorney General to All Federal Prosecutors (May 10, 2017),
    https://www.justice.gov/opa/press-release/file/965896/download ........................... 39

Presidential Memoranda, The White House,
    *President Donald J. Trump's Letter to House and Senate Leaders &*
    *Immigration Principles and Policies* (Oct. 8, 2017),
    https://www.whitehouse.gov/the-press-office/2017/10/08/president-donald-j-trumps-letter-house-and-senate-leaders-immigration ................................ 31

Press Release, DHS
    Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
    https://go.usa.gov/xncuM ...................................................... 12, 18, 22, 31

Statement from President Trump, Sept. 5, 2017,
    https://www.whitehouse.gov/the-press-office/2017/09/05/statement-president
    -donald-j-trump ...................................................................... 32-33

USCIS.gov,
*Approximate Active DACA Recipients: Sex and Age Group As of September 4, 2017*,
    https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and
    %20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA
    /daca_population_data.pdf ............................................................... 46

# INTRODUCTION

The Rescission Policy challenged here provides for an orderly wind-down of Deferred Action for Childhood Arrivals (DACA), an exercise of prosecutorial discretion that, from the start, conferred no legally enforceable rights and was explicitly enacted as a temporary, stopgap measure. Pursuant to the Rescission Policy, recipients whose DACA expires before March 5, 2018, had the opportunity to renew their deferred action for an additional two years, and current DACA recipients will maintain their deferred action status for the remaining duration of their deferred-action grants. Plaintiffs in these two related actions nonetheless seek, in the form of what is nominally preliminary injunctive relief, the immediate and wholesale reinstatement of that discretionary enforcement policy.

This Court should reject that invitation because Plaintiffs cannot meet the exacting standard for preliminary relief. Plaintiffs are unlikely to succeed on the merits of their Administrative Procedure Act (APA) claims (even if they are justiciable) because the then-Acting Secretary of Homeland Security Elaine C. Duke adequately explained her decision to wind down DACA: A legally indistinguishable policy (including an expansion of DACA) had been enjoined on a nationwide basis by a district court in Texas; that injunction was upheld by the United States Court of Appeals for the Fifth Circuit; that decision, in turn, was affirmed by an equally divided Supreme Court; and the same plaintiffs were about to sue over DACA before the same judge in Texas. Faced with the nearly inevitable prospect of an immediate, nationwide injunction against DACA, the Acting Secretary chose an orderly wind-down. Due to the near-certainty that DACA otherwise would have been abruptly invalidated in its entirety, that decision was eminently reasonable, and certainly not arbitrary and capricious.

Plaintiffs also argue that the Rescission Policy was subject to the APA's notice-and-comment requirements (and the Regulatory Flexibility Act), but those requirements are inapplicable to a general statement of policy like this one, and Plaintiffs' argument is self-defeating in any event because DACA itself likewise was adopted without notice and comment. Some of the Plaintiffs also argue that DACA should be restored because its rescission was secretly motivated by discriminatory animus supposedly harbored by the President of the United States, but even if they had alleged a rigorous factual basis for such a claim—and they have not even attempted to meet that high standard—it would still get them nowhere, as none of their allegations are in any way connected to the actual agency decision maker.

Nor can Plaintiffs demonstrate that any of the harms they have identified can be resolved by a preliminary injunction entered by this Court now. Plaintiffs raise concerns about lost professional opportunities, the inability to make long-term plans, and the angst surrounding the Rescission Policy, but none of these harms can be ameliorated by the temporary judicial relief that Plaintiffs seek, which will last only through the end of this litigation, and will still leave them without any permanent lawful immigration status. Nor can Plaintiffs demonstrate that the balance of the equities and the public interest weigh in their favor. Finally, the relief that Plaintiffs seek— a wholesale but temporary reinstatement of the DACA policy nationwide—is overbroad and improper. That is particularly so now that a district court in the Northern District of California has already entered a preliminary injunction that requires the government to largely maintain the DACA policy, as it existed on September 4, 2017—including for the benefit of these Plaintiffs in the Eastern District of New York.

Plaintiffs' motions for a preliminary injunction should be denied.

# BACKGROUND

## A.    Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the Immigration and Nationality Act (INA) along with "all other laws relating to the immigration and naturalization of aliens."  8 U.S.C. § 1103(a)(1).  Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law."  *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials."  *Arizona*, 567 U.S. at 396 (citation omitted).  Department of Homeland Security (DHS) officials first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum or parole, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b. "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely. *Reno v. Am.-Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 483 (1999).

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States."  *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016).  Deferred action is a practice by which the Secretary exercises her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period.  *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the

3

government which gives some cases lower priority"). Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former Immigration and Naturalization Service (INS) have adopted more than 20 such policies over the past 50 years.

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, *see, e.g.*, 8 C.F.R. § 274a.12(c)(14), but a grant of deferred action does not confer lawful immigration status or provide a defense to removal. To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (citation omitted). DHS thus has discretion to revoke deferred action for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time. *See AADC*, 525 U.S. at 484-85.

### B.      DACA and DAPA

On June 15, 2012, then-Secretary Janet Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals. *See* Admin. R. (AR) 1–3 (hereinafter DACA Memo), *Batalla Vidal* ECF No. 77-1. DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws. *Id.* at 1 (AR 1). Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to renewal. *Id.* at 2–3 (AR 2–3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests would "be decided on a case by case basis," *id.* at 2 (AR 2). Accordingly, the Memo provided that this grant of deferred action "confer[red] no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." *Id.* at 3 (AR 3).

In 2014, DHS expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. *See* AR 37-41 (hereinafter DAPA Memo). DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents." DAPA Memo 3 (AR 39). The DAPA Memo also expanded DACA by adjusting the date-of-entry requirement from June 2007 to January 2010, removing the age cap, and extending the DACA renewal period from two to three years. *Id.* at 3-4 (AR 39-40).

### C.     The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states. Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of DAPA and expanded DACA. *Texas v. United States*, 809 F.3d 134, 147-48 (5th Cir. 2015). Like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the Administrative Procedure Act's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Id.* at 178 n.156. The Fifth Circuit also held that DAPA was "manifestly contrary" to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one legal status to another," DAPA and expanded DACA awarded deferred action "to persons who have never had a legal status and may never receive one." *Id.* at 184, 186 (footnotes omitted). That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in place.

Faced with continued litigation over a policy that had been enjoined by the courts, DHS rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA. *See* Mem. for Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Prot., et al., from John F. Kelly, Sec'y of Homeland Sec., Re: *Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents* (June 15, 2017), AR 235-37. Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to also challenge directly the DACA Memo, noting that it suffers from the same legal flaws that the courts had identified in expanded DACA and DAPA. See AR 238-40 (Paxton Letter).

### D.    Rescission of DACA

Faced with imminent litigation, then-Acting Secretary Duke decided on September 5, 2017, to wind down the DACA policy in an orderly fashion. *See* AR 252–56 (Rescission Policy or Policy). As she explained, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy 4 (AR 255). Specifically, she quoted the Attorney General's recommendation to rescind DACA, which explained that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted). Invoking her "authority in establishing national immigration policies and priorities," she rescinded the DACA Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on an individualized[,] case-by-case basis," *id.* at 2 (AR 253).

At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

6

- *For current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods." *Id.* at 4 (AR 255).

- *For initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date. *Id.*

- *For DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017. Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017." *Id.*

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id.* at 4 (AR 255).

### E. Plaintiffs' Motions for a Preliminary Injunction

While the *Batalla Vidal* Plaintiffs have brought a panoply of claims, their motion for a preliminary injunction focuses on two claims brought pursuant to the APA. First, the *Batalla Vidal* Plaintiffs allege that the Rescission Policy is arbitrary and capricious and therefore violates the APA because it lacks a rational explanation; second, they allege that the rescission violates the APA because it was issued without notice and comment. The *Batalla Vidal* Plaintiffs also bring a procedural claim under the Regulatory Flexibility Act (RFA). The *State of New York* Plaintiffs seek a preliminary injunction on similar grounds, as well as under the equal protection component

of the Due Process Clause of the Fifth Amendment, alleging that the rescission of DACA was motivated by discriminatory animus toward Latinos.

The *Batalla Vidal* Plaintiffs ask the Court to "direct[] Defendants to restore the DACA program pending final adjudication on the merits." *Batalla Vidal,* Mem. of Law in Support of Pls.' Mot. for Prelim. Inj. (*Batalla Vidal* Mot.) at 40, ECF No. 123-1.  The *State of New York* Plaintiffs seek a more specific order that would among other things, "immediately reinstate the implementation of the DACA program, nationwide, to conditions in existence prior to Defendants' termination, using the same means, methods, and policies for considering granting requests for deferred action, employment authorization, and advanced parole as were utilized prior to Defendants' termination of DACA." *State of New York* Proposed Order at 2, ECF No. 96-3. Plaintiffs thus request an order compelling the government to continue to consider DACA requests (and related discretionary relief) from a broad class of individuals who are not before this Court.

## F.     The Northern District of California Preliminary Injunction

On January 9, 2018, the United States District Court for the Northern District of California (Alsup, J.), in parallel litigation challenging the rescission of DACA, entered a nationwide injunction that provides Plaintiffs nearly all of the relief that they are seeking here.  *See Regents of Univ. of Cal. v. DHS*, No. 17-5211-WHA, 2018 WL 339144 (N.D. Cal. Jan. 9, 2018).  The district court in *Regents* ordered the following relief:

> For the foregoing reasons, defendants **ARE HEREBY ORDERED AND ENJOINED**, pending final judgment herein or other order, to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017, including allowing DACA enrollees to renew their enrollments, with the exceptions (1) that new applications from applicants who have never before received deferred action need not be processed; (2) that the advance parole feature need not be continued for the time being for anyone; and (3) that defendants may take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application.

*Id.* at *27-28.  Defendants immediately began taking steps to comply with the *Regents* order and, earlier this evening, USCIS issued public guidance with instructions on submitting DACA renewal requests.  *See* USCIS.gov, *Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction* (Jan. 13, 2018), https://www.uscis.gov/humanitarian/deferred-action-childhood-arrivals-response-january-2018-preliminary-injunction.

## LEGAL STANDARD

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis and citation omitted).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  And where, as here, "[a] plaintiff . . . seeks a preliminary injunction that will alter the status quo," the plaintiff "must demonstrate a 'substantial' likelihood of success on the merits."  *Id.* (citing *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 24 (2d Cir. 2004)).[1]

## ARGUMENT

Even if they are justiciable, Plaintiffs' claims are deeply flawed on the merits, and Plaintiffs are therefore unlikely to succeed on any of them.  The other preliminary injunction factors also

---

[1] To the extent there is any meaningful distinction between the *Winter* standard and the "serious questions" formulation at times used by the Second Circuit—primarily (but not exclusively) in pre-*Winter* case law, *see Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 36-38 (2d Cir. 2010)—this Court need not consider that nuance here.  Both sets of Plaintiffs explicitly embrace the full *Winter* standard, in which Plaintiffs bear the burden to show all four necessary elements, including that success on the merits is "likely."  *See Batalla Vidal* Mot. at 9; *State of New York*, Mem. of Law in Support of Pls.' Mot. for Prelim. Inj. (*State of New York* Mot.) at 3, ECF No. 96-1.

weigh against temporary injunctive relief—especially now that the United States District Court for the Northern District of California has ordered DHS to provide nearly all the relief that Plaintiffs are looking for here. Only Congress can now provide the certainty and stability that Plaintiffs seek, in the form of a permanent lawful immigration status. This Court need not and should not enter a legally unwarranted and factually unnecessary preliminary injunction.

## I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

### A. Plaintiffs' Claims Are Not Justiciable.

As explained in Defendants' motions to dismiss, *Batalla Vidal* ECF Nos. 95, 207; *State of New York* ECF No. 71, none of Plaintiffs' claims are justiciable. This Court largely rejected Defendants' jurisdiction and justiciability arguments in its November 9, 2017 Memorandum and Order. *Batalla Vidal* ECF No. 104 (Nov. 9, 2017 Mem. & Order); *State of New York* ECF No. 85. Because that order is now subject to an interlocutory appeal, Defendants will say nothing further about those arguments here, other than that they provide a threshold reason to hold that Plaintiffs are unlikely to succeed on the merits of any of their claims.

### B. The Acting Secretary Rationally Explained Her Decision to Rescind DACA.

Even if the decision to rescind DACA were subject to judicial review, it was not arbitrary and capricious. Agencies are free to change course on policy matters so long as they provide a rational explanation and the new policy is legally permissible. Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this deferential standard, particularly in view of the virtual certainty of a nationwide injunction based on controlling Fifth Circuit precedent, which would have prompted an immediate—and chaotic—end to the policy.

Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A)-(B). The agency's

decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (citation omitted). Agency action is arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983). The Court may not "substitute its judgment for that of the agency." *Id.*

The Rescission Policy amply meets these "minimal standards of rationality," *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted), particularly in view of the near-certain litigation loss in the pending *Texas* lawsuit. Then-Acting Secretary Duke explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy 4 (AR 255). Specifically, after summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's view that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted). The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into immediate uncertainty.

The Acting Secretary was thus "faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately." Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017) (hereinafter Duke Statement), https://go.usa.gov/xncuM. She reasonably opted for an orderly rescission, which she considered "the least disruptive option." *Id*. There was nothing at all irrational about that decision or the explanation for it.

**1.** Plaintiffs claim that the Rescission Policy provides "almost no reasons at all" for the rescission of DACA, leaving them merely "to guess" at the Acting Secretary's reasoning. *Batalla Vidal* Mot. at 13-14. That argument blinks reality. Even if the agency were not free to revoke deferred action at any time for any reason—or, indeed, for no reason, *see, e.g.*, *Arpaio*, 797 F.3d at 17; DAPA Memo 2 (AR 38)—no guesswork is required here: As the balance of their briefs demonstrate, Plaintiffs clearly comprehend the basis for the Acting Secretary's decision. For example, while Plaintiffs purport to be perplexed by the Acting Secretary's reference to the litigation risk posed by the *Texas* case, *Batalla Vidal* Mot. at 12-13, they understood this rationale well enough to devote separate sections of their briefs to addressing it, *id*. at 20-23 (arguing that "'Litigation Risk' cannot justify the DACA Termination"); *State of New York* Mot. at 5-6 (arguing that an agency may "reverse policy based on a purported risk of litigation" only in certain circumstances). Likewise, while they claim to be confused by the Attorney General's views on DACA's legality, which they deem too "cursory," *State of New York* Mot. at 7; *see Batalla Vidal* Mot. at 24 n.14, their briefs also separately address this issue, *Batalla Vidal* Mot. at 23-25 (arguing that the "determination that DACA is unlawful is legally erroneous").

At bottom, then, Plaintiffs' argument reduces to a claim that the Rescission Policy was just too short. *See, e.g.*, *id.* at 12 n.5 (complaining that "two of th[e] five pages" of the decision memo are taken up by the "'Background' section"). But under the APA, whether an agency's decision is sustainable turns not on its length, but its rationality. Here, there is no reason to adopt Plaintiffs' myopic focus on the "one sentence" setting forth the Acting Secretary's conclusion, *id*. at 11-12, while ignoring the rest of the document, which lays the foundation for that conclusion and elaborates on the reasoning behind it. *See* Rescission Policy 1 (AR 252) (noting, in the introduction, that DACA will be rescinded "[f]or the reasons . . . outlined below"); *id*. at 2-3 (AR 253–54) (explaining, as background, that DAPA and expanded DACA were "substantially similar" to DACA, that the Fifth Circuit had invalidated the DAPA Memo, and that the Attorney General had concluded that "it is likely that potentially imminent litigation would yield similar results with respect to DACA" (citation omitted)). Indeed, Plaintiffs' suggestion that length should be determinative calls into question the rationality of the original DACA Memo itself, which spanned only three pages. *See* DACA Memo 1-3 (AR 1-3).

The Court must "uphold a decision"—even if it is made with "less than ideal clarity"—as long as "the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quotation omitted); *see also, e.g.*, *Shepard v. NLRB*, 459 U.S. 344, 348, 350-51 (1983). Here, the Acting Secretary's decision is clear, and her path is plain. Plaintiffs' suggestions to the contrary are unconvincing.

The *Batalla Vidal* Plaintiffs also fault DHS for its alleged failure to "explain the change to their information-sharing policy." *Batalla Vidal* Mot. at 14. That explanation is simple: the alleged "change" *never happened*, and there is therefore nothing that DHS could have said about it. As Plaintiffs acknowledge in a footnote (and as is confirmed in an attachment to the *Batalla*

*Vidal* Third Amended Complaint), DHS recently clarified this issue to remove any doubt on the matter. In FAQs issued on November 30 and December 7, 2017, the agency confirmed that its "information-sharing policy has not changed in any way since it was first announced, including as a result of the Sept. 5, 2017 memo starting a wind-down of the DACA policy." *Batalla Vidal* 3d Am. Compl. Ex. M, Q5; *see also id.* Ex. L, Q5. While the policy "may be modified, superseded, or rescinded at any time"—which "ha[d] always been the case"—nothing in the Rescission Policy purports to change it. *Id.* Ex. M, Q5. Plaintiffs' refusal to drop this claim—in the face of unequivocal confirmation that it lacks any factual basis—is perplexing. At a minimum, Plaintiffs are unlikely to succeed on the merits of such a claim, nor are Plaintiffs suffering any injury at all, let alone irreparable harm that entitles them to injunctive relief on this basis.

**2.** Plaintiffs next argue that the Acting Secretary failed to sufficiently "acknowledge" or "expla[in]" a "policy reversal." *Batalla Vidal* Mot. at 18-20 (citation omitted). But in the Rescission Policy, the Acting Secretary not only expressly "rescind[ed] the June 15, 2012 [DACA] memorandum," Rescission Policy 1 (AR 252), but fully explained why that policy shift was preferable. That is all the APA requires, as the Supreme Court held in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

In *Fox*, the Court considered the adequacy of the FCC's explanation for a policy change barring the broadcasting of fleeting expletives. *Id.* at 505. The Second Circuit had set aside the policy change under the APA, reasoning that "agency action that changes prior policy" "requir[es] a more substantial explanation" than when an agency acts in the first instance. *Id.* at 514. The Supreme Court reversed, finding "no basis in the [APA] or in our opinions for a requirement that all agency change be subject to more searching review" or some sort of "heightened standard." *Id.* On the contrary, the Court explained, when an agency changes course it "need not demonstrate

14

to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id.* at 515. Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

Here, the Acting Secretary's explanation was more than adequate. Plaintiffs do not dispute that the Rescission Policy "is permissible" under the INA. *Id.* The Acting Secretary fully explained that there are "good reasons" for it, *id.*, particularly given the substantial doubts about legality and litigation risk posed by the proceedings in *Texas* and the consequent potential for massive disruption were the policy immediately enjoined. And there was of course a "conscious change of course," *id.*, because the Acting Secretary expressly "rescind[ed]" the 2012 DACA Memo. Rescission Policy 1 (AR 252). The APA requires no more.

To be sure, an agency must "sometimes" provide a "more detailed justification than what would suffice for a new policy created on a blank slate"—"when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Fox*, 556 U.S. at 515 (citation omitted). But this is not such a case. The purported "findings" that Plaintiffs pluck from the DACA Memo—*e.g.*, that "Our Nation's immigrations laws must be enforced in a strong and sensible manner," *Batalla Vidal* Mot. at 18 (quoting AR 2)—are not "factual findings" at all, *Fox*, 556 U.S. at 515, but policy pronouncements. Moreover, the Acting Secretary's justification for the policy change was that *controlling legal precedent* had changed: after DACA was enacted, DAPA *and* expanded DACA were invalidated by the Fifth Circuit in a decision that was affirmed by an equally divided Supreme Court and that necessarily applied to DACA itself.

See *infra* Part I.B.5. It is difficult to think of a more compelling basis for a change in agency position.[2]

This case thus bears no resemblance to *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016), the only case Plaintiffs cite where an agency's explanation for a policy change was found insufficient in view of the reliance interests at stake. *Batalla Vidal* Mot. at 17; *State of New York* Mot. at 5, 12. In *Encino*, the Department of Labor had long interpreted the Fair Labor Standards Act not to require car dealerships to pay overtime to a category of employees known as "service advisors." 136 S. Ct. at 2122-24. The agency reversed course in 2011, more than 30 years down the line, but "gave almost no reasons at all" for the shift. *Id*. at 2127. The Court declined to give *Chevron* deference to the agency's new interpretation, finding its explanation lacking in view of the "significant reliance interests involved." *Id*. at 2126. In particular, over "decades of industry reliance" on the prior policy, the dealerships and their employees had "negotiated and structured their compensation plans against th[e] background understanding" that overtime pay was not required—plans that the new policy effectively upended. *Id*.

*Encino* is *not* "close on point," *Regents*, 2018 WL 339144, at *24, but inapposite in every material respect. To begin, no similarly "longstanding" reliance interests are present here. *Encino*, 136 S. Ct. at 2126. By its own terms, DACA made deferred action available for only two-year periods, which could "be terminated at any time at the agency's discretion." DAPA Memo 2 (AR 38). And when he announced DACA in 2012, then-President Barack Obama explained that it was a "not a permanent fix" but a "temporary stopgap measure," and urged Congress to act "because these kids deserve to plan their lives in more than two-year increments."

---

[2] For the same reason, the Court should reject Plaintiffs' contention that Defendants inadequately explained their "departure from their prior views regarding DACA's legality," as reflected in their *Texas* briefs and in Office of Legal Counsel opinions, *Batalla Vidal* Mot. at 18–19; *State of New York* Mot. at 7–8, as explained in Part I.B.5, *infra*.

16

The White House, *Remarks by President Obama on Immigration* (June 15, 2012), https://go.usa.gov/xnZFY.  Even assuming that DACA was lawful, a prosecutorial discretion policy that can be revoked in the agency's discretion, at any time, for any reason, cannot create legally cognizable reliance interests—and certainly not beyond the stated duration (generally two years) of deferred action grants, which were not truncated by the Rescission Policy.  *See* Defs.' Oct. 27, 2017 Mot. to Dismiss, *Batalla Vidal* ECF No. 95, at 34-36 (explaining why Plaintiffs fail to state a procedural due process claim).  And more fundamentally, as discussed, the Acting Secretary here did not make a policy change heedless of any reliance interests, but rather was impelled to act by the near-certain invalidation of DACA by the courts, such that her orderly wind-down process reasonably took into account any reliance interests under the circumstances.[3]

**3.**  Plaintiffs contend that, in adopting the Rescission Policy, the Acting Secretary "failed to consider all factors relevant" to the decision—specifically, the economic effects of rescission and its consequences for DACA recipients.  *Batalla Vidal* Mot. at 19-20; *see State of New York* Mot. at 10-11.  For starters, this argument fails to reckon with the reality—referenced in the Acting Secretary's memo—that continued litigation would, in all likelihood, have led to an abrupt, complete, and court-ordered end to DACA.  Indeed, the Acting Secretary's decision to opt instead for an orderly wind-down of the policy likely ameliorated, rather than exacerbated, the effects about which Plaintiffs complain, as she was fully aware.  Thus, the Acting Secretary cannot fairly

---

[3] Equally unpersuasive is the *Batalla Vidal* Plaintiffs' argument that the Rescission Policy "imposed arbitrary deadlines" that were inadequately explained.  *Batalla Vidal* Mot. at 14.  Given that DACA was an exercise of prosecutorial discretion, revocable at any time, that the agency could well have ended immediately, *see Arpaio*, 797 F.3d at 17, there was certainly nothing arbitrary about deciding to wind it down gradually over a two-and-a-half-year period.  Moreover, Plaintiffs still point to no individual who missed the "October 5, 2017 deadline for receipt of renewal requests" due to a lack of notice, *Batalla Vidal* Mot. at 14, and thus lack standing to challenge it, as the Court already concluded, *see* Defs.' Mot. Dism. 3d Am Compl. (Batalla Vidal ECF No. 207) at 9-10 (citing Mem. & Order at 37-38).  And if Plaintiffs were correct that it is arbitrary to allow individuals to request renewal if their status "expires on March 5, 2018," but to "deny the same opportunity" to those "whose deferred action expires the following day," *Batalla Vidal* Mot. at 14, then the government could never set deadlines for anything; that sort of alleged "arbitrariness" is an unavoidable consequence of all deadlines.

be said to have inadequately weighed other "programmatic objectives . . . [or] reliance interests" against the obvious litigation risk, *Regents*, 2018 WL 339144, at *24, as the APA did not require her to ponder how to prevent the unavoidable, *see State Farm*, 463 U.S. at 43 (an agency must simply "examine the relevant data and articulate a satisfactory explanation for its action").

Moreover, the Rescission Policy itself recognizes that, while DACA recipients were "eligibl[e] to request employment authorization" documents, enabling them to work lawfully in the United States, Rescission Policy 2 (AR 253), that eligibility would sunset along with the DACA policy, *id*. at 4 (AR 255), necessarily leading to changes in the workforce over the following two and a half years. Likewise, recognizing that DACA recipients would no longer be considered lawfully present once their deferred action expired, the Acting Secretary explained that she was "very aware of the consequences of this action, and . . . sympathize[d] with the DACA recipients whose futures may now be less certain." Duke Statement. It was such considerations—*i.e.*, the "complexities associated with winding down the program," *id.*—that influenced her to allow DACA to sunset over a number of years, rather than abruptly end the policy herself or under court order. That these factors did not upend her ultimate decision to rescind the policy, however, is no reason to set that decision aside, because clinging to DACA in the face of the *Texas* litigation would have been quixotic rather than rational.

Even where a statute sets forth specific factors for an agency to consider, if Congress "did not assign the specific weight the [agency] should accord each of these factors, the [agency] is free to exercise [its] discretion in this area." *New York v. Reilly*, 969 F.2d 1147, 1150 (D.C. Cir. 1992) (citation omitted); *Brady v. FERC*, 416 F.3d 1, 6 (D.C. Cir. 2005); *see also Sec'y of Agric. v. Cent. Roig Ref. Co.*, 338 U.S. 604, 611-12 (1950) (where statutorily mandated "consideration[s]" are not "mechanical or self-defining standards," they indicate Congress's

18

recognition that they involve "wide areas of judgment and therefore of discretion").  Here, of course, no statute dictates the factors for an agency to consider in granting or rescinding deferred action; on the contrary, deferred action is an exercise of prosecutorial discretion committed to agency discretion, precisely because (among other things) it "involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise."  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).  Indeed, the original DACA memorandum providing for the granting of deferred action expressly stated that it conferred no substantive rights.  Thus, Congress has not instructed the agency to give the considerations urged by Plaintiffs any particular weight—or, indeed, any weight at all.  That they did not receive conclusive weight in the final calculus, as Plaintiffs demand, is therefore no reason to disturb the agency's decision, especially given their futility in this context.  *See, e.g.*, *Reilly*, 969 F.2d at 1150.

Plaintiffs' passing suggestion that the agency was required to conduct some sort of formal cost-benefit analysis before rescinding DACA, *Batalla Vidal* Mot. at 18-19; *State of New York* Mot. at 10, is even farther off the mark.  They cite *Michigan v. EPA* for the proposition that to "ignore costs as part of [the] requirement to engage in 'reasoned decisionmaking'" is arbitrary and capricious.  *Batalla Vidal* Mot. at 19 (quoting *Michigan v. EPA*, 135 S. Ct. 2699, 2706-07 (2015)).  But in that case, the statute itself required consideration of costs:  Congress directed the EPA to regulate power plant emissions "if [it] finds such regulation is appropriate and necessary," 42 U.S.C. § 7412(n)(1)(A)—a phrase that the Court viewed as "an instruction to [the] . . . agency" to pay "at least some attention to cost[s]," *Michigan*, 135 S. Ct. at 2706-08.  Here, by contrast, there is no such statutory directive—a critical distinction that *Regents* fails to seriously grapple with, 2018 WL 339144, at *25—and thus no compulsion to transform a straightforward legal policy decision concerning enforcement of the immigration laws into an accounting exercise or a

19

macro-economic assessment.  The agency did not perform a formal cost-benefit analysis when it adopted DACA, *see* DACA Memo 1-3 (AR 1-3), and one was not required by its rescission.[4]

Equally unpersuasive is Plaintiffs' contention that the Acting Secretary gave inadequate consideration to their preferred policy alternatives.  *Batalla Vidal* Mot. at 19-20; *State of New York* Mot. at 11-12.  On arbitrary-and-capricious review, an agency is not held to account for every conceivable policy alternative, *State Farm*, 463 U.S. at 51; it need only explain the rejection of "significant alternatives," *Allied Local & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000), that would "achieve the same outcome" as its chosen course, *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 17 (D.C. Cir. 2015), *as amended* (July 21, 2015).  That principle was satisfied here.  Plaintiffs suggest that unspecified "chang[es]" to "the way the program is administered" would have been preferable to outright rescission.  *Batalla Vidal* Mot. at 20; *see State of New York* Mot. at 12.  But that vague suggestion is so devoid of content that it hardly qualifies as a "significant alternative," *Allied Local*, 215 F.3d at 80, and Plaintiffs fail to explain how it would remedy the central flaw identified by the Fifth Circuit—a lack of genuine case-by-case discretion—as effectively as the Rescission Policy.  Likewise, while the *Regents* court suggested that DHS could instead "instruct its adjudicators to exercise discretion, on a[n] individualized basis, to make sure applicants" are "deserving of deferred action," 2018 WL 339144, at *20, that is, for all intents and purposes, just what the Rescission Policy does.  As the

---

[4] Plaintiffs likewise misread *State Farm*, which, contrary to their assertion, does not require an analysis of "the costs as well as the benefits" of agency action irrespective of the statutory text.  *Batalla Vidal* Mot. at 19 (quoting *State Farm*, 463 U.S. at 54); *State of New York* Mot. at 9.  Indeed, if that were true, there would have been no need for the Court in *Michigan* to parse the text of the Clean Air Act for such a directive.  *Cf. Michigan*, 135 S. Ct. at 2707-08.  Rather, in *State Farm*, much as in *Michigan*, the statute directed the agency to issue motor vehicle safety standards that were "reasonable, practicable, and appropriate," *State Farm*, 463 U.S. at 33 (quoting 15 U.S.C. § 1392(f)(3) (repealed 1994)); accordingly, the agency "look[ed] at the costs as well as the benefits" of the regulation, and the Court said merely that "[t]he agency [wa]s correct to" do so, *id.* at 54.

Policy itself makes clear, deferred action remains available today, as it was before DACA, "on an individual, case-by-case basis." Rescission Policy 4 (AR 255).

**4.** Plaintiffs argue that "'litigation risk' cannot justify the DACA termination" because it is a "*post-hoc* rationalization" that, in any event, "cannot suffice as reasoned decisionmaking" lest the APA be rendered a dead letter. *Batalla Vidal* Mot. at 20-22 (capitalization omitted); *see State of New York* Mot. at 6. They are wrong on both counts.[5]

To begin, the notion that "litigation risk" is nothing but an after-the-fact rationalization for the Rescission Policy is squarely refuted by the record, and the court in *Regents* erred in concluding otherwise. The Policy itself discusses the adverse rulings from the Fifth Circuit and Supreme Court with respect to DAPA; the similarities between DAPA and DACA; Texas's threat to amend its complaint to challenge DACA; the Attorney General's view that "it is likely that potentially imminent litigation would yield similar results with respect to DACA," and the Acting Secretary's decision after considering all this that she "should" (*not* "must") wind-down DACA. Rescission Policy 3-4 (AR 254-55) (quoting Sessions Letter (AR 251)). Thus, the *Regents* court was simply wrong to assert that "[n]owhere in the administrative record did the Attorney General or the agency consider . . . litigation risk." 2018 WL 339144, at *23. If there were any doubt on that score, the Acting Secretary's contemporaneous statement dispels it: She clearly noted that her decision was prompted by "recent litigation" that threatened to "allow the judiciary to

---

[5] As the Court noted in the course of addressing Defendants' justiciability arguments, "Plaintiffs must identify some source of law, other than the APA's 'arbitrary and capricious' standard, against which the court can review their claims" in the context of these considerations. Nov. 9, 2017 Mem. & Order at 22. As explained in Defendants' motion to dismiss the *Batalla Vidal* Third Amended Complaint, Plaintiffs have failed to do so, and the sources of law applicable to determining the legality of DACA do not provide a standard by which to judge litigation risk associated with continuing the policy. *See* Defs.' Dec. 26, 2017 Mot. to Dismiss, *Batalla Vidal* ECF No. 207, at 13.

potentially shut the program down completely and immediately." Duke Statement. Plaintiffs' suggestion otherwise is specious.[6]

Plaintiffs' contention that it is irrational for litigation risk to inform an agency's decisionmaking is equally mistaken. The Supreme Court's decision in *Ricci v. DeStefano*, 557 U.S. 557 (2009), provides a useful comparison. There, a city government had to decide whether to certify the results of a promotional exam for firefighters that had a disparate impact on minority applicants. *Id*. at 562. The city faced potential litigation either way: If it certified the results, minority applicants threatened to bring a disparate *impact* lawsuit under Title VII; if it refused, applicants who would have been promoted threatened to bring a disparate *treatment* lawsuit. *Id*. at 562-63. Reconciling these competing obligations, the Court held that the city could rescind the test results—and thereby engage in "intentional discrimination"—so long as it had a "strong basis in evidence to believe it will be subject to disparate-impact liability if it fails" to do so. *Id*. at 585. If it is permissible to make race-conscious employment decisions based on serious litigation risk, then surely it is not irrational for an agency to consider litigation risk when making discretionary policy decisions, let alone a decision to wind-down a non-enforcement policy that conferred no rights on anyone. And here, there was far more than a "strong basis" for the Acting Secretary to

---

[6] Although Plaintiffs have not raised the argument, the *Regents* order was also based in part on the conclusion that, under 8 U.S.C. § 1103(a)(1), then-Acting Secretary Duke had no discretion whatsoever to do anything but immediately rescind the DACA policy once the Attorney General concluded it was unlawful. *See Regents*, 2018 WL 339144, at *23. This argument stems from the unsupported premise that the statutory language in question was intended to apply to a legal policy decision about how DHS exercises its enforcement discretion. In fact, the provision merely provides statutory confirmation that legal determinations by the Board of Immigration Appeals, Immigration Judges, and the Executive Office of Immigration Review (all of which exercise authority delegated from the Attorney General) are not subject to reversal by DHS. And both the Attorney General's letter and the Rescission Policy are drafted on the assumption that the final decision was for the Acting Secretary alone, who chose to wind the policy down in an orderly fashion, rather than end it immediately. In any case, even adopting a broader reading of that statutory language, the Acting Secretary's independent litigation-risk judgment still supports the Rescission, whether or not the Attorney General was correct that DACA was unlawful.

believe that continuing to administer DACA would subject the agency to liability, particularly given the adverse precedent in the Fifth Circuit that was directly on point.

The cases that Plaintiffs cite are not to the contrary: None deals with circumstances comparable to those presented here, where the agency explained that binding precedent effectively made the outcome of further litigation in the same court preordained. In *Sierra Club v. Jackson*, 833 F. Supp. 2d 11 (D.D.C. 2012) (cited at *Batalla Vidal* Mot. at 22), for example, the court rejected the agency's reliance on "litigation risk" because the decision on review made "no mention" of that rationale, and the administrative record "belie[d] EPA's purported concern" on that score. *Id*. at 34. In *Organized Village of Kake v. U.S. Department of Agriculture*, 795 F.3d 956 (9th Cir. 2015) (en banc) (cited in *Batalla Vidal* Mot. at 22), the court dismissed as "implausible" the agency's explanation that the challenged rule—which exempted one national forest from certain construction and logging restrictions—would "reduce[] the potential for conflicts" *in other lawsuits*, given that those "lawsuits involved forests other than the Tongass, so it is impossible to discern how an exemption for the Alaska forest would affect them." *Id*. at 969-70. And in *United Mine Workers of America v. U.S. Department of Labor*, 358 F.3d 40 (D.C. Cir. 2004) (cited in *Batalla Vidal* Mot. at 22; *State of New York* Mot. at 6), the court recognized that an adverse out-of-circuit precedent was "indeed a caution" for the agency, but found the agency's explanation insufficient because it referred only to the "possible adverse effect" of the decision without "explain[ing] why it came to deem the . . . decision fatal" to its policy. *Id*. at 44 (citation omitted). Here, in contrast, the Acting Secretary's decision expressly relies on litigation risk, Rescission Policy 3 (AR 254) (finding it "likely" that "potentially imminent litigation" would invalidate DACA), and makes plain why the *Texas* decision spelled the end not just for DAPA

and expanded DACA, but for original DACA as well, given the absence of any material distinction among the policies.

This case also presents no threat of an "end-run around the APA." *Batalla Vidal* Mot. at 21. Unlike in *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015), here the agency has not attempted to "circumvent the rulemaking process"—which was not required in any event—"through litigation concessions." *Id.* at 557. On the contrary, the agency vigorously litigated a materially indistinguishable policy all the way up to the Supreme Court. Having lost that battle, however, the agency reasonably recognized that a challenge to DACA would in all likelihood meet the same fate. Far from end-running the APA, the agency has declined to frontally assault the courts. That is commendable, not irrational.

**5.** Plaintiffs contend that the Rescission Policy should be set aside "[t]o the extent that [it] relied on the Attorney General's determination that DACA is unlawful"—a determination they claim is "legally erroneous." *Batalla Vidal* Mot. at 23-25. This argument is mistaken for several independent reasons.

To begin, the Acting Secretary did not rely on the Attorney General's letter solely for its assessment of DACA's legality, but instead concluded that DACA "should" be wound down after considering, among other things, the assessment that it was "likely" that a legal challenge to DACA "would yield similar results" as the successful challenge to DAPA in view of the resulting Fifth Circuit precedent. Rescission Policy 3 (AR 254). That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis to sustain the agency's decision. In particular, the Fifth Circuit affirmed the invalidation of not just DAPA, but expanded DACA, and the differences between expanded DACA and original DACA—the length of the

24

deferred-action period and modified age and durational requirements—are indisputably immaterial to the Fifth Circuit's legal rationale.  *See Batalla Vidal* Mot. at 27-28.

Moreover, to the extent the Acting Secretary did rely on the proposition that DACA was unlawful, this Court need not agree with that determination to uphold her decision.  If an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment, even if the two determinations are arguably "intertwined."  *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue").  Here, the Attorney General regarded DACA as unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected.  Sessions Letter (AR 251).  But those same concerns equally support a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits" that "Congress had not otherwise acted to provide by law."  Rescission Policy 2 (AR 253).  This Court could, therefore, sustain the Acting Secretary's decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

In any event, while this Court need not decide the issue to resolve this case in favor of the government on the basis that the agency decision was at least rational, the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas*.  Plaintiffs argue that "DACA is a lawful use of prosecutorial discretion," *Batalla Vidal* Mot. at 23, repeating many of the arguments that the government pressed in the *Texas* case, *see id*. at 23-24; *State of New York* Mot. at 7-8.  The court in *Regents* did the same.  2018 WL 339144, at *17-22.  But for better or worse, those arguments were decisively rejected by the Fifth Circuit, whose

decision was affirmed by an equally divided Supreme Court. Thus, while Plaintiffs emphasize that, on its face, the "DACA program was consistent with th[e] type of discretion long sanctioned under immigration law," *Batalla Vidal* Mot. at 24, the Fifth Circuit disagreed, and found that discretion to be illusory in practice, *Texas*, 809 F.3d at 172-73.

Plaintiffs offer a handful of reasons why the Court should disagree with the Fifth Circuit's decision in *Texas*, encouraging the Court to undertake an independent assessment of DACA's legality. None are persuasive.

First, although *Texas* invalidated DAPA, a "separate program" from DACA, *Batalla Vidal* Mot. at 24; *see State of New York* Mot. at 6 n.5, the Fifth Circuit also upheld the injunction of an *expanded version of DACA* itself, and there is no principled legal distinction between original DACA and expanded DACA. And as for the possibility of drawing a distinction between *DAPA* and DACA, the Fifth Circuit's decision was based on the "important similarities" between the policies. *Texas*, 809 F.3d at 174. As the court explained: "Like the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *id.* at 171-72; nevertheless, "there was evidence from *DACA's* implementation that [this] discretionary language was pretextual," *id.* at 173 (emphasis added). While that finding had to be "extrapolat[ed]" to invalidate DAPA, *id.*, it *directly* dooms DACA itself—a point that the *Regents* court failed to appreciate in straining to distinguish the policies. 2018 WL 339144, at *21. At a minimum, the writing was on the wall, which is evident to any reader of the *Texas* opinions and the relevant DHS memos. Indeed, the *Texas* injunction also applied to the DAPA Memo's provisions expanding DACA. And while Plaintiffs note that the Fifth Circuit did not rest its holding on constitutional grounds, *Batalla Vidal* Mot. at 25; *State of New York* Mot. at 6 n.5, they of course do not deny that it nevertheless found DAPA and expanded

DACA unlawful, as the Attorney General and Acting Secretary recognized. Rescission Memo 3 (AR 254) (noting Attorney General's view that DACA has "the same legal . . . defects" as DAPA and expanded DACA).

Moreover, that "eligibility for DACA," unlike DAPA, "is not dependent on the immigration status of family members" hardly points in favor of its legality, as Plaintiffs suggest. *Batalla Vidal* Mot. at 25; *see Regents*, 2018 WL 339144, at *22 (attempting a similar distinction). To be sure, the Fifth Circuit found DAPA unlawful in part because it was inconsistent with the INA, which already "prescribes how parents may derive an immigration classification on the basis of their child's status." *Texas*, 809 F.3d at 186. But if DACA has "no such analogue in the INA," *Regents*, 2018 WL 339144, at *22, then it is on even shakier—not firmer—ground than DAPA. *See, e.g.*, *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985) ("[Where] a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it"—a "presumption that . . . is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement."). In any event, as the Fifth Circuit noted, to the extent Congress has implicitly approved prior deferred action policies, those policies served as interim measures providing aliens with "bridges from one legal status to another." *Texas*, 809 F.3d at 184. DAPA, however, created no such bridge; rather, it granted deferred action "to persons who have never had a legal status and may never receive one." *Id*. DACA is no different on that score.

Second, although this Court may not be bound by the Fifth Circuit's opinion in *Texas*, *see Batalla Vidal* Mot. at 23, 24 n.15, that is beside the point: DHS was so bound, because it faced

further litigation—in the same case, before the same judge, bound by the same circuit precedent—over a materially indistinguishable policy that was thus almost certain to be invalidated.[7]

Third, Plaintiffs argue that the *Texas* decision is "not persuasive" when read against the government's previous arguments in that case and elsewhere, *State of New York* Mot. at 6 n.5; *see id.* at 7-8 & n.7—arguments they claim are "inconsistent" with Defendants' position here, *Batalla Vidal* Mot. at 18-19. That, too, is beside the point: Those arguments were firmly rejected in a Fifth Circuit opinion that was affirmed by an equally divided Supreme Court, and the government, having exhausted its appeal options, was bound to respect that decision given the absence of any plausible prospect of a different result in the pending litigation. The same is true of the Office of Legal Counsel's (OLC) preliminary view that the proposed version of DACA would be lawful. *Id.* at 18; *State of New York* Mot. at 7. That "preliminary" conclusion was conditioned on the proviso that "it was critical that . . . the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis." OLC Op. 18 n.8 (AR 21). Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice. *Texas*, 809 F.3d at 176.[8]

---

[7] The *Regents* court was mistaken to suggest that because DACA had been in place for "five years," the "doctrine of laches" would have been a "powerful" defense to the *Texas* plaintiffs' impending challenge. 2018 WL 339144, at *24. Unless another statute provides otherwise, the default six-year statute of limitations for claims against the United States applies to APA actions, 28 U.S.C. § 2401(a); *Sendra Corp. v. Magaw*, 111 F.3d 162, 165 (1997), and "[w]hen a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period," *Ikelionwu v. United States*, 150 F.3d 233, 238 (2d Cir. 1998). In any event, in an agency review case, that a reviewing court might have proceeded differently than the agency decision maker is insufficient to set aside agency action as arbitrary and capricious.

[8] The *Regents* court questioned the Fifth Circuit's conclusion that the low denial rate for DACA requests meant that any discretion afforded to DHS officials was illusory. 2018 WL 339144, at *20. In particular, the *Regents* court pointed to a declaration submitted by DHS in *Texas* asserting that DACA was, in fact, a case-specific process under which there were "several instances of discretionary denials," *id.* (citing *Texas*, 809 F.3d at 175 (citing Decl. of Donald Neufeld)), an argument that persuaded a dissenting judge, *id.* (citing *Texas*, 809 F.3d at 210 (King, J., dissenting)). But the Fifth Circuit majority squarely rejected the argument, concluding that "those denials were not discretionary" at all, "but instead were required because of failures to meet DACA's objective criteria." 809 F.3d at 175 n.140; *see also id.* at 172 n.130. It is that holding, not the views of the dissenting panelist, to which the agency (and the district court in Texas) is now bound.

**6.** As a last gasp, Plaintiffs suggest that the Rescission Policy should be set aside because the rationale supporting it was "pretextual" and offered in "bad faith," as evidenced by supposedly "conflicting" statements made by officials other than the actual decisionmaker. *Batalla Vidal* Mot. at 26; *see State of New York* Mot. at 12. Notably, Plaintiffs cannot seem to agree on what, exactly, this was pretext for. The *New York* Plaintiffs claim that the "true basis" for the decision was "animus toward Latinos." *State of New York* Mot. at 13. The *Batalla Vidal* Plaintiffs suggest that it was to gain "political leverage" to encourage Congress to enact legislation addressing this and other immigration issues. *Batalla Vidal* Mot. at 26-27. Regardless, this theory is flawed from start to finish.

**a.** To begin, Plaintiffs' attempts to rely on material outside the administrative record as evidence of pretext, *see id.* at 26 n.19, should be rejected. As the Supreme Court has repeatedly explained, when there is a "contemporaneous explanation" for an agency's decision, its validity "must . . . stand or fall on the propriety of that finding." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). "The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citation omitted), "not some new record made initially in the reviewing court," *Camp*, 411 U.S. at 142. Plaintiffs cannot rely on material outside the administrative record to argue that an agency acted arbitrarily and capriciously any more than an agency can rely on post-hoc rationalizations to defend the rationality of its actions. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). Plaintiffs' attempt to rely on deposition transcripts and other extra-record material should therefore be rejected at the outset.

**b.** Critically, Plaintiffs identify nothing contradictory about the *Acting Secretary's* stated justification for the Rescission Policy. Plaintiffs seek to create a factual issue about who the

29

"actual decisionmaker" was, suggesting variously that it was the President, or the Attorney General, perhaps "joint[ly]" with each other or with the Acting Secretary—only to suggest that, in the end, the Court "need not determine" the issue at all. *Batalla Vidal* Mot. at 27-28 & n.22. But this is not a factual issue, it is a legal one, and as a matter of law, the decision necessarily fell to the Acting Secretary of Homeland Security—the only official vested with authority under the INA to make it. *See* 8 U.S.C. § 1103(a)(1). Because none of the supposedly "conflicting" statements are from the Acting Secretary herself, Plaintiffs fail to show that her reasons for adopting the Rescission Policy were pretextual.

Plaintiffs submit that the Acting Secretary could not truly have been concerned about DACA's legality because, rather than end DACA immediately, she allowed it to gradually sunset. *Batalla Vidal* Mot. at 26-27; *State of New York* Mot. at 12-13. But, as explained above, the orderly wind-down of DACA is an appropriate response to the litigation risk facing the government as well as any legally cognizable reliance interests even potentially at stake (and the agency's own operational needs). In any event, it is difficult to see how this argument helps Plaintiffs: If the wind-down itself is illegal, the solution would not be to extend DACA indefinitely, but to end it immediately. And in any event, Plaintiffs point to no legal authority for the proposition that either the Constitution or the APA forbids an orderly wind-down of a policy in the face of concerns about its legality.

Because there is no basis, let alone a strong one, to conclude that the Acting Secretary did not actually believe and rest on her reasonable concerns about DACA's legality, it would be entirely permissible even if Plaintiffs were correct that she had the *additional* motive of wishing to encourage Congress to enact legislation addressing the legal status of DACA recipients. *Batalla Vidal* Mot. at 22-27. Indeed, spurring legislative action on immigration is a legitimate

policy goal that has been shared across administrations. When the President announced DACA in 2012, he said, "Precisely because this is temporary, Congress needs to act," and he called on it "to pass the DREAM Act." Barack Obama, The White House, *Remarks by the President on Immigration*, *supra* at 16-17. When the former Secretary expanded DACA in 2014, he noted that the policy created no "immigration status or pathway to citizenship. Only an Act of Congress can confer these rights." DAPA Memo 5 (AR 41). Thus, the Acting Secretary was in good company when, in announcing the Rescission Policy, she "urge[d] Congress to use its Constitutional authority to . . . find a legislative solution." Duke Statement. The Acting Secretary's desire for a "legislative solution" mirrors President Trump's goal that Congress "legalize DACA" and adopt "legislation addressing the status of [DACA] recipients." *See* Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 PM), https://twitter.com/realDonaldTrump/status/905228667336499200; Presidential Memoranda, The White House, *President Donald J. Trump's Letter to House and Senate Leaders & Immigration Principles and Policies* (Oct. 8, 2017), https://www.whitehouse.gov/the-press-office/2017/10/08/president-donald-j-trumps-letter-house-and-senate-leaders-immigration. There is nothing at all inappropriate about those suggestions, nor are they inconsistent with the Rescission Policy itself, which rests on the premise that any policy of deferred action on the scale of DACA should be enacted only by Congress.

**c.** Plaintiffs' reliance on statements by officials other than the Acting Secretary is even further afield. That other officials might have supported the Rescission Policy for different reasons does not indicate that the reasons given by the actual decisionmaker—the Acting Secretary—were pretextual.

31

Moreover, even if statements of officials other than the decisionmaker were relevant, none plausibly gives rise to a cognizable inference of pretext here. Plaintiffs suggest, for example, that the Acting Secretary's assessment of litigation risk with respect to DACA was a pretense because, at one deposition, when asked whether there is "any [DHS] policy on how to deal with threats to sue by state or local officials," one of her subordinates responded: "[T]hat sounds like the craziest policy you could ever have" because "[y]ou could never do anything if you were always worried about being sued." *Batalla Vidal* Ex. MM at 205–207 (Hamilton Dep.) (cited in *Batalla Vidal* Mot. at 27; *State of New York* Mot. at 12-13). But Plaintiffs rip that statement out of context: Read in conjunction with the broader discussion, it is clear that the deponent was responding to the question whether DHS has a *general* policy of considering "litigation risk" in the context of *each* agency decision—something the agency has never claimed and that might make little sense. Regardless, whatever the merits of such a policy as a general matter might be (or whether the agency has any such policy), that says nothing about how DHS might choose to address litigation risk in a *particular* case, especially where, as here, there was controlling adverse precedent and the consequent potential for massive disruption flowing from an abrupt (and highly likely) court-ordered termination. Plaintiffs' reliance on this isolated, off-hand comment as supposed "evidence" of pretext is misplaced.

Plaintiffs also cast aspersions on the President's tweet indicating that, if Congress "can't" pass a legislative fix for DACA recipients, he "will revisit the issue!" *State of New York* Mot. at 13 (quoting Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 p.m); *see Batalla Vidal* Mot. at 26-27. But that comment is fully consistent with the President's clearly stated view that "the program is unlawful and unconstitutional and cannot be successfully defended in court." *See* Statement from President Trump (Sep. 5, 2017), https://www.whitehouse.gov/the-press-

32

office/2017/09/05/statement-president-donald-j-trump.    Far from undercutting the Acting

Secretary's rationale for rescinding the policy, the comment emphasized the need for legislative

action and expressed the President's intention to revisit Administration policies on childhood

arrivals—not the legality and defensibility of the DACA program—if Congress did not timely

act.  That stated intention simply reflects the government's obligation to "consider . . . the wisdom

of its policy on a continuing basis, for example, in response to changed factual circumstances, or

a change in administrations." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545

U.S. 967, 981 (2005) (internal citation omitted).

    **d.**  More fundamentally, Plaintiffs fall far short of making the "strong showing of bad

faith or improper behavior" necessary to overcome the presumption of regularity.  *Overton Park*,

401 U.S. at 420.  To do so, they "must make a significant showing—variously described as a

'strong,' 'substantial,' or 'prima facie' showing . . . indicative of bad faith." *Amfac Resorts, LLC*

*v. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001).  They cannot meet this burden with

"vague" allegations, *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 72 (D.C. Cir. 1987),

"conclusory statements," *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir.

1996), or "inadmissible hearsay," *Commercial Drapery Contractors, Inc. v. United States*, 133

F.3d 1, 7 (D.C. Cir. 1998).  Rather, they must proffer "serious, nonconclusory allegation[s] of bad

faith" or independent evidence of improper conduct.  *Coal. on Sensible Transp.*, 826 F.2d at

72.  Indeed, Plaintiffs "must present 'well-nigh irrefragable proof' of bad faith or bias on the part

of governmental officials" to overcome the presumption that the agency discharged its duties in

good faith.  *Adair v. England*, 183 F. Supp. 2d 31, 60 (D.D.C. 2002) (citations omitted).  Plaintiffs

fail to meet this high burden, as none of the statements to which they point even arguably

demonstrates bad faith.  In sum, even if generously interpreted, at most the statements invoked

by Plaintiffs show that various officials other than the actual decisionmaker may not have fully

agreed with all of the reasons that the Acting Secretary articulated for her decision.  That some

officials may have different perspectives on these issues may show disagreement, but it is no sign

of bad faith, let alone strong evidence of it.[9]

### C. The Rescission is a General Statement of Policy Not Subject to the Requirements of Notice-and-Comment Rulemaking Procedures or the Regulatory Flexibility Act.

Plaintiffs also cannot succeed in arguing that DHS was required to engage in full notice-

and-comment rulemaking procedures before rescinding the DACA policy.  The APA generally

requires an agency to follow notice-and-comment procedures before promulgating rules.  5 U.S.C.

§ 553(b), (c); *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015).  But the APA exempts

"general statements of policy" from that requirement unless another statute provides otherwise, 5

U.S.C. § 553(b)(3)(A), and none does here.  The Rescission Policy is exempt from the APA's

notice-and-comment requirements because it is a general statement of policy regarding how DHS

will exercise its enforcement discretion under the INA.  In attempting to recast the Rescission

Policy as a substantive rule, as opposed to policy guidance, Plaintiffs mischaracterize both the

nature of the Rescission and its effect on the availability of deferred action.[10]

**1.**  General statements of policy "advise the public prospectively of the manner in which

the agency proposes to exercise a discretionary power."  *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993)

(quoting Dep't of Justice, Attorney General's Manual on the APA 30 n.3 (1947)).  They "serve a

dual purpose": both to "inform[] the public concerning the agency's future plans and priorities for

---

[9] The *State of New York* Plaintiffs also suggest that these statements reflect a hidden motive of invidious discrimination.  As explained in Part I.D., *infra*, none of these statements are about DACA recipients, none can bear the weight that Plaintiffs ascribe to them, and none have any connection to the actual decision maker.

[10] The district court in *Regents* recently granted the government's motion to dismiss identical notice-and-comment (and Regulatory Flexibility Act) claims.  *See Regents*, Order Granting in Part Defs.' Mot. to Dismiss, ECF No. 239 (N.D. Cal. Jan. 12, 2018), at 4 ("[T]he rescission memorandum is a general statement of policy.").

exercising its discretionary power," as well as to "'educate' and provide direction to the agency's personnel in the field, who are required to implement . . . policies and exercise . . . discretionary power in specific cases." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987). And a "general statement of policy, like a press release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974).

By contrast, legislative rules adopted through notice-and-comment procedures have the force and effect of law, and thus create legally-enforceable rights or obligations in regulated parties. *Perez*, 135 S. Ct. at 1203; *Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03 (1979). In other words, an "agency action that . . . would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). The APA generally leaves to the agency the choice of which mode to employ. *See* 5 U.S.C. § 553(b). If an agency chooses to issue a statement of policy rather than a legislative rule through notice-and-comment rulemaking, that choice has consequences: The agency's statements in the policy have "no binding effect on members of the public or on courts." 1 Richard J. Pierce, Jr., Administrative Law Treatise § 6.3, at 419 (5th ed. 2010).

A quintessential use of policy statements is for an agency to announce how and when it will pursue (or forbear from) enforcement, in the exercise of its discretion. Such enforcement policies explain how the agency intends to exercise a power that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. Unlike legislative rules adopted after notice-and-comment, such enforcement policies do not establish or alter any legally-enforceable rights or obligations of third parties. And such policies can readily be changed, in response to changing circumstances, funding, and priorities.

35

**2.**   Applying these principles, the Rescission Policy can only be viewed as a general statement of policy.   Indeed, DHS and its predecessor, the INS, have exercised their enforcement discretion through the use of deferred action and similar policies dozens of times over more than half a century, without following notice-and-comment procedures.   *See* Andorra Bruno et al., Analysis of June 15, 2012 DHS Memorandum, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 20-23, Cong. Research Serv. (July 13, 2012),   https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-Service-Report1.pdf.   Plaintiffs offer no persuasive reason for treating the Rescission Policy differently.

The text of the Rescission Policy reinforces the point again and again.   It is a "memorandum."   Rescission Policy 1 (AR 252).   The Acting Secretary issued it as an "exercise of [her] authority in establishing national immigration policies and priorities."   Rescission Policy 4 (AR 255).   It instructs DHS personnel on the manner in which they are to exercise the agency's discretionary enforcement authority on a prospective basis.   *See Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975) ("[G]eneral statements of policy are rules directed primarily at the staff of an agency describing how it will conduct agency discretionar[y] functions, while other rules [*i.e.*, legislative rules] are directed primarily at the public in an effort to impose obligations on them." (internal citation omitted; emphasis added)).   The Policy does not act to immediately deprive any current DACA recipients of their deferred action, but describes how pending and future requests will be "adjudicate[d]—on an individual, case-by-case basis."   Rescission Policy 4 (AR 255).   It acknowledges the settled principle, recognized by both Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such

"otherwise lawful enforcement . . . prerogatives," *id.* at 5 (AR 256). It "does not . . . create any

right or benefit, substantive or procedural, enforceable at law by any party." *Id.* And no alien has

an enforceable right to obtain deferred action under DACA or any other policy regardless. *See* 8

U.S.C. § 1252(g); *AADC*, 525 U.S. at 485. Deferred action "remains discretionary and reversible,"

*Arpaio*, 797 F.3d at 17—as it has been through each of the previous policies adopted without

"cumbersome and time-consuming rulemaking proceedings." *Nat'l Ass'n of Regulatory Util.*

*Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988).[11]

**3.** Plaintiffs' attempt to portray the Rescission Policy as a substantive rule is unpersuasive.

Plaintiffs argue that "the Duke Memo uses mandatory, definitive language to establish blanket,

binding rules that leave no room for an agency's discretion in handling deferred action requests

received from childhood arrivals." *Batalla Vidal* Mot. at 30; *see also State of New York* Mot. at

24. This mischaracterizes the nature of the DACA Rescission and the availability of deferred

action generally. Deferred action was available on a discretionary basis before the DACA policy

(albeit on a more limited and case-specific basis), and it remains available today. DACA is not

the only manner by which individuals obtain deferred action, as the long history of similar policies

evinces. That a particular policy permitting a class of individuals to seek deferred action based on

certain criteria is being rescinded does not mean that DHS officials are prohibited from later

---

[11] This Court's recent opinion certifying an interlocutory appeal under 28 U.S.C. § 1292(b) supports
Defendants' understanding of the Rescission Policy as exempt from notice-and-comment requirements. The Court
explained correctly that DACA, "at least on [its] face, simply provide[d] guidelines for the exercise of immigration
authorities' prosecutorial discretion." Jan. 8, 2018 Mem. & Order at 5 (emphasis added). Even accepting the premise
that the termination of DACA "present[s] special considerations not found in *Chaney* and other challenges to non-
enforcement decisions," *id.* at 6—which this Court has previously held forecloses Defendants' jurisdictional argument
under 5 U.S.C. § 701(a)(2)—that does not change the fact that the rescission of DACA is a general statement of policy
directed toward nothing other than modifying "guidelines for the exercise of immigration authorities' prosecutorial
discretion." Jan. 8, 2018 Mem. & Order at 5. In other words, regardless of whether *Chaney* is applicable, the Court's
(accurate) understanding of the nature of DACA and its rescission confirms that notice-and-comment rulemaking was
not required here.

extending that deferred action on an individualized basis to persons regardless of if they are former DACA recipients, and nothing in the Rescission Policy indicates otherwise.

Plaintiffs assert that the Rescission Policy "removed agents' ability to use prosecutorial discretion for individuals who met the DACA eligibility criteria, regardless of individual circumstance[s]," *Batalla Vidal* Mot. at 31, but that is simply untrue.  In fact, nothing in the Rescission Policy prevents DHS officials from exercising their pre-existing (and still-existing) discretion to confer deferred action on an individual former DACA recipient, or even upon groups of former DACA recipients, under appropriate individualized criteria.  The Secretary remains free to establish (or revoke) other deferred-action policies, in her discretion; to grant (or deny) deferred action as to any individual under other policies, or no policy at all, in her discretion; to revoke a grant of deferred action, in her discretion; and to pursue removal, in her discretion.   In short, the Rescission Policy does not bind regulated parties or the courts in any way; it is an announcement of the manner in which DHS currently intends to exercise its prosecutorial discretion on a forward-looking basis.  It does not even "bind" DHS in any meaningful sense; the Rescission Policy reflects nothing more than DHS's return to true case-by-case adjudication of requests for deferred action.[12]

Moreover, it is common for senior prosecutors to set bright-line policies directing the exercise of discretion by individual prosecutors.  For example, the "passive enforcement policy" adopted by the Attorney General and approved in *Wayte v. United States*, 470 U.S. 598, 601-02,

---

[12] Plaintiffs' argument that the Rescission Policy is a substantive rule because of its effect on the availability of advance parole for DACA recipients, *Batalla Vidal* Mot. at 31; *State of New York* Mot. at 24, is similarly flawed.  The potential availability of advance parole, under separate regulations not otherwise at issue in this case, is a highly discretionary consequence of receiving deferred action; it is an aspect of the Secretary's authority under the INA.  Accordingly, the Secretary may use statements of policy to "advise the public prospectively of the manner in which [DHS] proposes to exercise [its] discretionary power" concerning deferred action, as well as the consequences that follow from that exercise due to separate regulations.  *See Vigil*, 508 U.S. at 197 (citations omitted).  The Rescission Policy announced a prospective change instructing the agency to discontinue processing applications for advance parole "under standards associated with the DACA program."  Rescission Policy 4 (AR 255).  In light of the broader decision to begin an orderly wind-down of DACA itself, the Secretary acted well within her discretion in making adjustments to the availability of advance parole without the full notice-and-comment process.

613 (1985), limited the discretion of prosecutors to pursue charges against those who had not self-reported their violation of the law. And earlier this year the Attorney General issued a memorandum instructing all federal prosecutors to "charge and pursue the most serious, readily provable offense" in all federal criminal prosecutions, expressly rescinding two earlier, more lenient policies. *See* Mem. from the Attorney General to All Federal Prosecutors (May 10, 2017), https://www.justice.gov/opa/press-release/file/965896/download. If enforcement policies lacking an *additional* layer of case-specific discretion triggered notice-and-comment requirements, such policies would be unlawful.[13]

**4.** Plaintiffs' argument is nonsensical for the additional reason that, if winding down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the first place. But because the DACA Memo itself was not adopted through notice and comment, on Plaintiffs' own theory it would be void *ab initio*—leaving Plaintiffs without any remedy. Plaintiffs essentially ask this Court to strike down the rescission of DACA on a legal theory that would immediately thereafter *compel* the rescission of DACA. As explained in Defendants' motions to dismiss, that is reason enough to dismiss this claim. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (plaintiff must show "injury will be 'redressed by a favorable decision'").[14]

---

[13] Curiously, the *State of New York* Plaintiffs rely heavily on an Eastern District of Pennsylvania decision that explicitly declined to follow Second Circuit authority. *See U.S. ex rel. Parco v. Morris*, 426 F. Supp. 976, 984-85 (E.D. Pa. 1977) (noting that the Court was "bound by the Third Circuit's decision" in another case, and explaining that the court "will not follow" the Second Circuit's decision in *Noel*, 508 F.3d at 1023). To be sure, *Noel* itself acknowledged that the definition of a "general statement of policy" is "enshrouded in considerable smog"; but it also noted that "[o]ne scholar has suggested that it may be that 'general statements of policy' are rules directed primarily at the staff of an agency describing how it will conduct agency discretionary functions, while other rules are directed primarily at the public in an effort to impose obligations on them." *Noel*, 508 F.3d at 1030 (internal citation omitted). The government would prevail under that definition.

[14] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect." *Consumer Energy Council v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982). That holding, however, concerned the rescission of a rule, promulgated after notice and comment, which was allegedly defective on other grounds—not a rule that was defective precisely because it had failed to go through notice and comment in the first place. *See id.* at 445-46. If an agency

The *Batalla Vidal* Plaintiffs argue that "[t]he APA requirements apply to rescission regardless of how the program was initially created." *Batalla Vidal* Mot. at 32 n.26. But Defendants' argument is *not* that the APA does not apply because DACA did not go through notice and comment, it is that these Plaintiffs, who seek an order from this Court reinstating the DACA policy, *Batalla Vidal* Mot. at 40; *State of New York* Proposed Order at 2, cannot obtain such an order on a legal theory that would confirm that DACA itself is (and always was) unlawful. Recognizing this common-sense reality would not, as Plaintiffs suggest, "create perverse incentives" in which an agency could "evade notice-and-comment by simply declaring their belief that a prior rule was unlawfully promulgated," *Batalla Vidal* Mot. at 32—the problem is not created by any belief of *DHS*, it is created by the inherent contradiction between *Plaintiffs'* legal theory and the relief that they seek. Plaintiffs ask this Court to do the impossible—to issue an order reinstating a policy on a legal theory that would confirm the illegality of that policy. An injunction—an equitable remedy—is not available under these circumstances, even if Plaintiffs were right about the need for notice-and-comment rulemaking. *See Winter*, 555 U.S. at 32 ("An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course.").

**5.** The *State of New York* Plaintiffs suggest explicitly (as do the *Batalla Vidal* Plaintiffs implicitly) that the public interest in this particular agency decision supports their claim that notice-and-comment rulemaking is required. *State of New York* Mot. at 26; *see Batalla Vidal* Mot. at 28-29. But they have nothing to cite for that proposition except scattered out-of-circuit dicta. In fact, the question whether an agency rule requires notice-and-comment rulemaking has nothing to do with how "important" the rule is, and Plaintiffs' "important rule" exception is at odds with the

---

has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go those procedures to cure the underlying defect.

well-settled proposition that federal courts do not have the authority to expand the APA's procedural requirements—even if a court is confident that the agency's decision-making process would be improved by such additional process, or because the agency is faced with a particularly important issue. *Cf. Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 545 (1978) (rejecting the argument that the APA "merely establishes lower procedural bounds and that a court may routinely require more than the minimum when an agency's proposed rule addresses complex or technical factual issues or 'Issues of Great Public Import'").

**6.** Plaintiffs' Regulatory Flexibility Act (RFA) claims fail for the same reasons as their notice-and-comment claims. The RFA's requirement that an agency publish analyses of a rule's impact on small businesses applies only "[w]hen an agency promulgates a final rule under section 553 of . . . title [5], after being required by that section or any other law to publish a general notice of proposed rulemaking," *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005) (quoting 5 U.S.C. § 604(a))—in other words, only where notice-and-comment procedures are required. Because those procedures were not required here, the RFA is inapplicable.[15]

### D.    The Rescission Does Not Violate Equal Protection Principles

**1.** The *State of New York* Plaintiffs (but not the *Batalla Vidal* Plaintiffs) seek preliminary injunctive relief on their Equal Protection claim. As explained in both of Defendants' motions to dismiss, no Plaintiff states a plausible Equal Protection claim in these matters, and the *State of*

---

[15] Plaintiffs also lack standing to raise an RFA claim for an additional reason: They allege no facts to demonstrate that they are "small entities" entitled to judicial review under the RFA. *See* 5 U.S.C. § 601(6) (defining "small entity"); *id.* § 611(a)(1) (restricting judicial review to "a small entity that is adversely affected or aggrieved"); *see also, e.g.*, *Nw. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 13 (D.D.C. 1998) ("[T]he language of the RFA extends standing to seek judicial review only to a 'small entity.'"). Plaintiffs' conclusory assertions on this score, *see, e.g.*, *State of New York* Am. Compl. ¶¶ 211-16, 228, 273; *Batalla Vidal* 3d Am. Compl. ¶¶ 69, 187, should not be assumed true on a motion to dismiss, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009), nor do they support preliminary injunctive relief. Nor should the Court give any weight to the *State of New York* Plaintiffs' allegations about "small-governmental jurisdictions," businesses, or non-profits that are not before this Court. *State of New York* Am. Compl. ¶¶ 211-16, 228, 273. The mere fact that an entity is geographically located within a state does not provide that state standing to bring claims on its behalf.

*New York* motion for a preliminary injunction does not demonstrate otherwise. To succeed on such a claim, Plaintiffs must overcome the presumption that government officials "properly discharged their official duties" when making prosecutorial decisions, by making plausible and specific factual allegations that offer "clear evidence to the contrary." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). That is because, as in *Armstrong*, Plaintiffs' claim of a hidden discriminatory motive underlying this exercise of prosecutorial discretion invades "a 'special province' of the Executive." *Id.* at 464 (quoting *Chaney*, 470 U.S. at 832). And as "[t]hese concerns are greatly magnified in the deportation context," Plaintiffs must satisfy *Armstrong*'s "particularly demanding" standard. *AADC*, 525 U.S. at 489, 490. They have not done so.

Plaintiffs' have not offered any clear evidence of discriminatory intent. First, Plaintiffs suggest that the rescission of DACA has a disparate impact on Latinos, who allegedly account for 93% of approved DACA requestors. *State of New York* Mot. at 13. But "a racially disproportionate impact" alone is never sufficient to establish discriminatory intent, *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977), even in a purely domestic context, *see Washington v. Davis*, 426 U.S. 229, 242 (1976), and especially in a case like this in which the plausible alternative explanations—*i.e.*, that those statistics are explained by accident of geography, not discrimination—overwhelm the inference Plaintiffs seek to draw. (The Rescission Policy is, of course, facially neutral in its applicability.) Indeed, in *Armstrong*, the Supreme Court found insufficient allegations of discriminatory intent where evidence suggested that 100% of prosecutions for certain drug-trafficking offenses closed by the federal defender's office in a given year involved African-American defendants. 517 U.S. at 470; *see also Rajah v. Mukasey*, 544 F.3d 427, 439 (2d Cir. 2008) (rejecting a similar discriminatory-enforcement challenge, in a case in which individuals were required to register under a program that singled out aliens from certain

42

identified countries, in which almost all of the selected countries were "predominantly Muslim," rejecting the argument that that fact alone was evidence that "the Program was motivated by an improper animus"). Any change to the DACA policy would likely have had a disparate impact on Latinos—as nearly any change to this country's immigration policies could have a disparate impact on this group; that is not evidence of discrimination.

Second, Plaintiffs rely heavily on allegations of statements made by President Trump (most before he took the oath of office) in arguing that the historical background of the Acting Secretary's decision supports a finding of discriminatory intent. *State of New York* Mot. at 12-15. None of those statements by the President, however, provides any evidence of a secret discriminatory motive for the rescission of DACA by then-Acting Secretary Duke, let alone the sort of clear evidence that would be required to support such a claim. The statements do not address the actual decision at issue—the rescission of DACA—nor were they made by the Acting Secretary, the only official vested with authority under the INA to make the decision at issue. Plaintiffs appear to assume without explanation that any immigration-related statements by President Trump should be attributed to all "Defendants" or "administration officials" or "senior officials." *State of New York* Mot. at 12, 13, 15. But the identity of the relevant decision maker under the APA is not a question of fact; it is a settled issue of law.[16] In any case, although the Court can and should reject

---

[16] As Defendants have explained in this and prior filings, *see, e.g.*, *Batalla Vidal* ECF No. 207 at 22 n.9, Acting Secretary Duke was the only government official with the *legal* authority to rescind a DHS policy that had been operated by DHS for the past five years—regardless of the (undisputed) *factual* involvement by the White House and the Attorney General. In any case, even accepting the premise that the Attorney General is a relevant decision maker, Plaintiffs only cite to one statement made by the Attorney General, and they materially misrepresent it. Plaintiffs are simply incorrect that the Attorney General "described Mexicans as 'filth.'" *State of New York*, Mot. at 15. The full remarks—which are available on the DOJ website, https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-announcing-department-justice-s-renewed—make clear that the Attorney General's reference to "filth" was a reference—with no connection to DACA—to the "brutal machete attacks and beheadings" carried out by "MS-13 and the cartels." It is Plaintiffs alone who have connected and generalized those comments about violent criminal activity to any particular race, ethnicity, or nationality as a whole.

this claim without any analysis of past statements by the President, Plaintiffs ignore the fact that when the President has actually spoken about DACA recipients in particular, he has generally been supportive—which is entirely inconsistent with Plaintiffs' theory of "unambiguous" animus.[17]

Third, Plaintiffs claim that the Acting Secretary's stated reasons for the Rescission Policy are pretextual, and are designed to mask the true motive: invidious discrimination. *State of New York* Mot. at 15. But Plaintiffs' offer no support for a finding that the Acting Secretary's stated reasons for adopting the Rescission Policy were pretextual, as Defendants explained above. *See supra*, at 28. In fact, the Acting Secretary rationally explained her decision to wind down DACA, given the imminent risk of a disruptive, nationwide injunction.

Rather than engaging with the applicable standards set forth in *Armstrong* and *AADC*, Plaintiffs rely almost entirely on *Romer v. Evans*, 517 U.S. 620, 632 (1996), and *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973), but neither case involves decisions relating to prosecutorial discretion or immigration, and neither is inconsistent with Defendants' interpretation of *Armstrong* or *AADC*. *Romer* and *Moreno* stand for the unremarkable proposition that "'a bare . . . desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest.'" *Romer*, 517 U.S. at 634-35 (quoting *Moreno*, 413 U.S. at 534). But that principle has no applicability here, as applied to a government action that is neutral on its face (unlike the anti-LGBT state constitutional amendment, in *Romer*, and the congressional enactment restricting food stamps for certain households, in *Moreno*), and as applied to governmental action that is justified by (at an absolute minimum) "legitimate public policies which justify the incidental disadvantages they impose on certain persons," *Romer*, 517 U.S. at 635—such as DHS's rational desire to avoid massive litigation risk and an immediate nationwide injunction shutting down DACA entirely.

---

[17] *See, e.g.*, *Batalla Vidal* 3d Am. Compl. ¶ 110 ("Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!.....").

Defendants agree that "animus can never constitute a legitimate state interest," *State of New York* Mot. at 17, but that principle does not apply here.

Moreover, if Plaintiffs were correct that the "'sheer breadth' of Defendants' termination of DACA is "'inexplicable by anything but animus,'" *Id.* at 16-17 (quoting *Romer*, 517 U.S. at 632), then it is difficult to understand why, among other things, DHS would allow the program to gradually wind-down over a two-and-a-half year period, rather than end it immediately and entirely. Nor is Plaintiffs' grim view consistent with the President's support of efforts to provide *permanent* (and unquestionably lawful) relief to DACA recipients in the form of legislation.[18]

**2.** The *State of New York* Plaintiffs also argue halfheartedly that this case implicates a "special constitutional sensitivity" under the Supreme Court's decision in *Plyler v. Doe*, 457 U.S. 202 (1982), because DACA recipients were generally brought to this country in violation of federal immigration law through no fault of their own. *State of New York* Mot. at 18-20. The supposed implications of that "sensitivity" are not entirely clear from Plaintiffs' briefs. In any case, *Plyler* holds only that "[i]f the State is to deny a discrete group of innocent children the free public education that it offers to other children residing within its borders, that denial must be justified by a showing that it furthers some substantial state interest." *Plyler*, 457 U.S. at 230. At the outset, this argument is inapplicable on its face to DACA recipients who are *not* children—which includes

---

[18] Although they refuse to concede it explicitly, *see State of New York* Mot. at 17 n.35, Plaintiffs' reliance on *Romer* and *Moreno*—two cases about rational-basis review—suggests that they understand that the rescission of DACA is *not* subject to any form of heightened scrutiny. In fact, under *Armstrong* and *AADC*, Plaintiff must bring a clear case of discrimination to overcome the strong presumption of regularity that attaches to government action of this sort, and they have failed to meet that high substantive standard. In any case, even if some form of strict scrutiny did apply, the orderly and lawful enforcement of the immigration laws is a compelling state interest. *See, e.g.*, *United States v. Merkt*, 794 F.2d 950, 956 (5th Cir. 1986); *cf. United States v. Brignoni-Ponce*, 422 U.S. 873, 878-79 (1975) (public interest demands effective measures to prevent illegal entry of aliens); *Rusu v. INS*, 296 F.3d 316, 321 (4th Cir. 2002) (recognizing that, "[b]ecause of the Government's compelling interest in controlling immigration," due process requirements may be relaxed in immigration context).

the vast majority of DACA recipients.[19]  And the fact that all DACA recipients *used to be* children cannot justify any special constitutional treatment; all of us *used to be* children.

More fundamentally, *Plyler* was explicitly decided in the unique context of public education—a subject about which the Rescission Policy is silent.  *See Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 459 (1988)  ("We have not extended [the holding of *Plyler*] beyond the 'unique circumstances,' *id.*, at 239 (Powell, J., concurring), that provoked its 'unique confluence of theories and rationales,' *id.*, at 243 (Burger, C.J., dissenting).") (quoting *Plyler* 457 U.S at 239, 243).[20]  Before and after the creation of DACA, and before and after the rescission of DACA, minors without lawful immigration status (including but not limited to DACA recipients) may seek a public education, and states that deny them that right may run afoul of *Plyler*.  But there is simply nothing in *Plyler* that has anything to say about the actual enforcement (or lack thereof) of the federal immigration laws, or about how DHS exercises prosecutorial discretion.[21]

## II.     THE REMAINING FACTORS WEIGH AGAINST A PRELIMINARY INJUNCTION

### A.     Plaintiffs Have Not Shown Any Risk of Irreparable Harm That Would Be Remedied By The Injunctive Relief That They Seek.

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).  The moving

---

[19] As of September 4, 2017, approximately 0.3% of DACA recipients were under the age of 16; 28.5% were between the ages of 16 and 20; 36.7% were between 21 and 25; 23.7% were between 26 and 30; and 10.9% were between 31 and 36.  The median age was 23, and the interquartile range was 20 to 27 years old.  USCIS.gov, *Approximate Active DACA Recipients: Sex and Age Group As of September 4, 2017*, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

[20] To be sure, the Second Circuit has once applied *Plyler* outside the context of public education.  *See Lewis v. Thompson*, 252 F.3d 567 (2d Cir. 2001) (holding that the denial of automatic eligibility for Medicaid coverage at birth violated the equal protection rights of certain children).  But that case is no help to Plaintiffs here because, among other reasons, the Second Circuit relied on the fact that the plaintiff-children in *Lewis* were United States citizens, and therefore had an even "stronger" claim than the plaintiff-children in *Plyler*.  *See id.* at 591.

[21] Once again, even if heightened scrutiny under *Plyler* were applicable, the government has a compelling interest in the orderly and lawful enforcement of the immigration laws.  *See supra* at 45 n.18.

party therefore must show that irreparable harm is likely before any other elements may be considered. *See id.* To satisfy the irreparable harm requirement, Plaintiffs "must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if [the Court] waits until the end of trial to resolve the harm.'" *Id.* (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234-35 (2d Cir. 1999)).

Under current circumstances, the harms identified by Plaintiffs are neither likely nor imminent. *Batalla Vidal* Plaintiffs rely on alleged harms to three named plaintiffs and one "putative class member." *Batalla Vidal* Mot. at 36-37. But none of those individuals faces *imminent* expiration of their DACA. *See Batalla Vidal* Mot. Ex. CCC ¶ 47 (Gustavo Galicia's DACA expires August 2018); Ex. EEE ¶ 3 (Carlos Vargas's DACA expires September 2018); Ex. III ¶ 2 (Carolina Fung Feng's DACA expires August 2018); Ex. LLL ¶ 2 (Eliana Fernandez's DACA expires November 2018). This case may very well have been fully litigated to final judgment before any of those harms come to pass—even ignoring the fact that the preliminary injunction already entered in the Northern District of California allows all of them to seek another two-year renewal of their DACA.

Plaintiffs also cite a variety of alleged harms related to the potential loss of work authorization for those whose DACA is set to expire. For example, the *State of New York* Plaintiffs reference alleged harms stemming from (1) the loss of services by "highly qualified employees in government," *State of New York* Mot. at 29; (2) the loss of revenue in the form of student tuition if students choose to stop attending public educational institutions as a result of their inability to work, *id.* at 30 (citing *e.g.* Ex. 17 ¶ 5; Ex. 71 ¶ 7; Ex. 72 ¶ 5); (3) increased costs if individuals lose health care coverage currently obtained through their employer, *id.* at 31-32; and (4) the impact of

47

"smaller consumer and legal workforce bases" for state and local economies, *id.* at 33. The *Batalla Vidal* Plaintiffs allege similar harms. *See Batalla Vidal* Mot. at 37 (discussing access to medical treatment and loss of earnings). As for Plaintiff MRNY, it alleges an "imminent loss of twelve employees." *Id.* at 38.

Even accepting all of these facts as true and that all of those harms are truly irreparable, none of these alleged harms are imminent, or even likely, given the preliminary injunction recently issued in the Northern District of California litigation. That order requires DHS to permit individuals who were previously granted DACA to submit new renewal requests, and to process those requests. If DHS determines that they qualify for a renewal of their DACA, those individuals may also receive new work authorizations, *see* 8 C.F.R. § 274a.12(c)(14), and the harms about which Plaintiffs are concerned would simply not come to pass. Of course, any injunctive relief "must address the injury alleged to be irreparable," and a court "should not grant the injunction if it would not so prevent that injury." *A.X.M.S. Corp. v. Friedman*, 948 F. Supp. 2d 319, 336 (S.D.N.Y. 2013); *see also Buckingham Corp. v. Karp*, 762 F.2d 257, 262 (2d Cir. 1985) (noting that "[t]he linchpin of . . . interim relief is that the threatened irreparable harm will be prevented by [an] injunction"). Because these alleged harms have *already* been prevented by another court, they provide no basis for granting the request for injunctive relief advanced here.

Finally, the *Batalla Vidal* Plaintiffs refer to alleged longer-term harms stemming from an inability to "plan for the future and make commitments, whether familial, career-based, academic, or otherwise." *Batalla Vidal* Mot. at 38. However, a preliminary injunction would only provide

temporary, short-term relief, and would dissolve upon the conclusion of these lawsuits. Only a permanent *legislative* solution will provide DACA recipients with the security that they seek.[22]

### B.     Balancing of the Equities and the Public Interest Disfavor Injunctive Relief.

The final two factors, the public interest and the balance of the equities, also weigh against granting Plaintiffs' motion. These factors merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The federal government possesses broad authority over the subject of immigration and the status and presence of aliens in this county. *Arizona v. United States*, 567 U.S. 387, 394 (2012). This includes significant discretion as to whether, and under what circumstances, to grant discretionary relief to individuals without a lawful immigration status, including through deferred action. The injunctive relief sought by Plaintiffs would frustrate and displace both the Secretary's substantive judgment as to how her prosecutorial discretion should be exercised, as well as her further judgment as to how best to transition between policies, while providing minimal, if any, relief from the harms identified by Plaintiffs for the reasons discussed above—especially now that DHS is already subject to a similar preliminary injunction. Accordingly, this factor weighs against granting these Plaintiffs an additional injunction.

### C.     Any Injunctive Relief Should Be Narrowly Drawn.

The Court should deny Plaintiffs' motions in their entirety. If, however, the Court were to disagree, it nevertheless should reject Plaintiffs' sweeping request to "immediately reinstate the implementation of the DACA program, nationwide, to conditions in existence prior to Defendants'

---

[22] The court in *Regents* found that the plaintiffs had not "justif[ied] a provisional injunction requiring DHS to resume accepting applications for advance parole" and accordingly did not order any such relief. *Regents*, 2018 WL 339144, at *28. The same applies here. The sole argument offered regarding harm arising from the unavailability of advance parole pertains to the alleged inability of students to "fully participate in a variety of activities," which could allegedly "shrink the capacity of state and private educational institutions to offer such programming to their entire student body." *State of New York* Mot. at 31. Such a suggestion is far too speculative and attenuated to support injunctive relief regarding advance parole.

termination." *State of New York* Proposed Order at 2. Such relief would be clearly overbroad, especially to the extent it applies to individuals who are not parties to this action and whose claims are not currently addressed in Plaintiffs' motions. Constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries. Article III requires that "a plaintiff must demonstrate standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). "The remedy" sought must therefore "be limited to the inadequacy that produced the injury in fact." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). And equitable principles independently require that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc*., 512 U.S. 753, 765 (1994).

Accordingly, any injunction the Court enters should thus be limited to relieving the specific injury of only those individual Plaintiffs whom the Court determines have a cognizable claim and will suffer irreparable harm in the absence of an injunction. At a minimum, this would require that any injunction sweep no broader than the one already ordered by the district court in the Northern District of California, which, although overbroad itself in the government's view, recognized some important limitations: that "new applications from applicants who have never before received deferred action need not be processed," that "the advance parole feature need not be continued for the time being for anyone," and that "defendants may take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application." *Regents*, 2018 WL 339144, at *27.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions for a preliminary injunction.

Dated: January 13, 2018       Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

RICHARD P. DONOGHUE
United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director, Federal Programs Branch

JOHN R. TYLER
Assistant Branch Director

BRAD P. ROSENBERG
Senior Trial Counsel

*/s/ Stephen M. Pezzi*
STEPHEN M. PEZZI (D.C. Bar #995500)
KATE BAILEY
RACHAEL L. WESTMORELAND
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., N.W.
Washington, DC  20530
Tel.:  (202) 305-8576
Fax:  (202) 616-8470
Email: stephen.pezzi@usdoj.gov

JOSEPH A. MARUTOLLO
Assistant U.S. Attorney
United States Attorney's Office
Eastern District of New York
271-A Cadman Plaza East, 7th Floor
Brooklyn, NY  11201
Tel:  (718) 254-6288
Fax:  (718) 254-7489
Email:  joseph.marutollo@usdoj.gov

*Counsel for Defendants*

# EXHIBIT 14

No. 17-1003

# In the Supreme Court of the United States

UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI BEFORE
JUDGMENT TO THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT*

**BRIEF FOR THE STATES OF TEXAS, ALABAMA,
ARIZONA, ARKANSAS, FLORIDA, KANSAS,
LOUISIANA, NEBRASKA, SOUTH CAROLINA,
SOUTH DAKOTA, AND WEST VIRGINIA,
GOVERNOR PHIL BRYANT OF THE STATE OF
MISSISSIPPI, AND PAUL R. LEPAGE, GOVERNOR
OF MAINE, AS AMICI CURIAE IN SUPPORT OF
PETITIONERS**

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant
  Attorney General

SCOTT A. KELLER
Solicitor General
  *Counsel of Record*

J. CAMPBELL BARKER
Deputy Solicitor General

ARI CUENIN
JOHN C. SULLIVAN
Assistant Solicitors General

OFFICE OF THE
  ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
scott.keller@oag.texas.gov
(512) 936-1700

## QUESTIONS PRESENTED

1.  Whether the Acting Secretary's decision to wind down the DACA policy is judicially reviewable.

2.  Whether the Acting Secretary's decision to wind down the DACA policy is lawful.

(I)

### TABLE OF CONTENTS

Page

Interest of amici curiae.........................................................1

Summary of argument........................................................3

Argument ...........................................................................6

I.   DACA's wind-down satisfies Administrative
     Procedure Act review (second question
     presented). ...................................................................6

   A.   The district court misunderstood APA
          review. ................................................................6

   B.   Texas's threatened litigation against DACA
          raised compelling legal arguments rooted in
          precedent, providing a non-arbitrary basis
          for the Executive to wind down DACA. ...............9

   C.   DACA is unlawful. ..............................................15

      1.   DACA is substantively unlawful. ................15

      2.   DACA is procedurally unlawful, as
              confirmed by plaintiffs' own pleadings.......16

II.  The district court was correct that the DACA-
     wind-down memorandum is reviewable agency
     action (first question presented). ............................23

III. The decision below warrants certiorari before
     judgment. .................................................................26

Conclusion.......................................................................27

(III)

IV

**TABLE OF AUTHORITIES**

Cases:

*Ariz. Christian Sch. Tuition Org. v. Winn,*
  563 U.S. 125 (2011) ...................................................... 8

*Ariz. Dream Act Coal. v. Brewer,*
  757 F.3d 1053 (9th Cir. 2014)................................... 24

*Arizona v. United States,*
  567 U.S. 387 (2012) .................................................... 13

*Chrysler Corp. v. Brown,*
  441 U.S. 281 (1979) .................................................... 17

*Dunn-McCampbell Royalty Interest, Inc. v. Nat'l
  Park Serv.,* 112 F.3d 1283 (5th Cir. 1997)............... 26

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ...................................................... 8

*Freytag v. Comm'r,*
  501 U.S. 868 (1991) ...................................................... 8

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ........................................ 23, 24, 25

*Mach Mining, LLC v. EEOC,*
  135 S. Ct. 1645 (2015) ................................................ 23

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ...................................................... 7

*McLouth Steel Prods. Corp. v. Thomas,*
  838 F.2d 1317 (D.C. Cir. 1988) ................................. 17

*Morton v. Ruiz,*
  415 U.S. 199 (1974) ............................................. 17, 22

*Prof'ls & Patients for Customized Care v.
  Shalala,* 56 F.3d 592 (5th Cir. 1995)........................ 17

*Safe Air for Everyone v. U.S. EPA,*
  488 F.3d 1088 (9th Cir. 2007)...................................... 8

V

*Syncor Int'l Corp. v. Shalala*,
    127 F.3d 90 (D.C. Cir. 1997) ..................................... 17
*Texas v. United States*, 809 F.3d 134 (5th Cir.
    2015), *aff'd sub nom. by an equally divided
    court, United States v. Texas*, 136 S. Ct. 2271
    (2016) (per curiam) ........................................... *passim*
*In re United States*,
    138 S. Ct. 371 (2017) .................................................. 2

Constitutional provision, statutes, and rules:

U.S. Const. art. II § 3........................................... 3, 6, 8, 19
Administrative Procedure Act:
    5 U.S.C. § 551(4)..................................................... 16
    5 U.S.C. § 701(a)(2) ............................................... 23
    5 U.S.C. § 706(2)(A) ............................................ 4, 15
8 U.S.C. § 1611(b)(2)-(3)..................................... 19, 21
8 U.S.C. § 1621(d) ................................................ 19, 21
28 U.S.C. § 2401(a) ................................................... 26
8 C.F.R. § 1.3(a)(4)(vi)................................................ 25
45 C.F.R. § 152.2(4)(vi) ............................................. 25
Sup. Ct. R. 37 ............................................................. 1

VI

Miscellaneous:

*AG Paxton Leads 10-State Coalition Urging
    Trump Administration to Phase Out
    Unlawful Obama-Era DACA Program*,
    http://www.texasattorneygeneral.gov/news/
    releases/ag-paxton-leads-10-state-coalition-
    urging-trump-administration-to-phase-out
    (June 29, 2017) .............................................................. 9

Administrative Record, *Regents of Univ. of Cal. v.
    U.S. Dep't of Homeland Sec.*, No. 3:17-cv-
    05211 (N.D. Cal. Oct. 6, 2017), ECF No. 64-1 ............. 2

Josh Blackman, *The Constitutionality of DAPA
    Part I*, 103 Geo. L.J. Online 96 (2015) ....................... 16

Br. for the State Respondents, *United States v.
    Texas*, 136 S. Ct. 2271 (2016), 2016 WL
    1213267 ........................................................................ 12

Br. for the States of Texas et al., *Brewer v. Ariz.
    Dream Act Coalition* (May 1, 2017) (U.S. No.
    16-1180), https://perma.cc/4SYG-3EX7 ......... 12, 13, 26

Br. for the United States as Amicus Curiae in
    Opp. to Reh'g En Banc at 16, *Ariz. Dream Act
    Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014)
    (No. 13-16248), ECF No. 75 ....................................... 24

3d Am. Complaint, *Batalla Vidal v. Nielsen*, No.
    1:16-cv-4756 (E.D.N.Y. Dec. 11, 2017), ECF
    No. 113 ......................................................................... 21

Complaint, *California v. Dep't of Homeland Sec.*,
    No. 3:17-cv-5235 (N.D. Cal. Sept. 11, 2017),
    ECF No. 1 ..................................................................... 20

Complaint, *Garcia v. United States*, No. 3:17-cv-
    5380 (N.D. Cal. Sept. 18, 2017), ECF No. 1 .............. 20

VII

Complaint, *NAACP v. Trump*, No. 1:17-cv-1907
   (D.D.C. Sept. 18, 2017), ECF. No. 1 ........................... 21

Complaint, *New York v. Trump*, No. 1:17-cv-5228
   (E.D.N.Y. Sept. 6, 2017), ECF. No. 1 ................. 21, 22

Complaint, *Regents of Univ. of Cal. v. U.S. Dep't
   of Homeland Sec.*, No. 3:17-cv-5211 (N.D. Cal.
   Sept. 8, 2017), ECF No. 1 ...................................... 17, 18

Complaint, *Trs. of Princeton Univ. v. United
   States*, No. 1:17-cv-2325 (D.D.C. Nov. 3, 2017),
   ECF No. 1 .................................................................. 21

H.R. Rep. No. 99-682(I) (1986), *reprinted in* 1986
   U.S.C.C.A.N. ............................................................. 14

Oral Arg. Recording, *Texas v. United States*, 787
   F.3d 733 (5th Cir. 2015) (No. 15-40238) ................... 12

Pls.' Stip. of Voluntary Dismissal, *Texas v. United
   States*, No. 1:14-cv-00254 (S.D. Tex. Sept. 12,
   2017), ECF No. 473 ..................................................... 2

### INTEREST OF AMICI CURIAE

Amici curiae are the States of Texas, Alabama, Arizona, Arkansas, Florida, Kansas, Louisiana, Nebraska, South Carolina, South Dakota, and West Virginia, Phil Bryant, Governor of Mississippi, and Paul R. LePage, Governor of Maine.[1]

Plaintiffs' goal in these lawsuits is to force the federal Executive Branch into retaining a "deferred action" program (DACA) that does much more than simply exercise enforcement discretion by deferring deportation proceedings. DACA affirmatively confers "lawful presence" status and work-authorization eligibility on over half a million aliens. DACA is thus materially identical to two programs (Expanded DACA and DAPA) that were invalidated by the Fifth Circuit in a ruling affirmed by an equally divided vote of this Court. *See Texas v. United States*, 809 F.3d 134, 172, 184-86 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam).

Texas led the group of States successfully challenging Expanded DACA and DAPA. Texas then led the group of States notifying the federal government that they would challenge DACA on the same grounds if

---

[1] No counsel for any party authored this brief, in whole or in part. No person or entity other than amici contributed monetarily to its preparation or submission. The parties received timely notice of filing, and consents are on file with the Court. *See* Sup. Ct. R. 37.

(1)

2

DACA was not wound down. A.R. 238-40.[2] And it was because of the Executive's September 2017 DACA-wind-down memorandum that Texas and other States agreed to dismiss their pending lawsuit. Pls.' Stip. of Voluntary Dismissal at 1, *Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex. Sept. 12, 2017), ECF No. 473.

---

[2] A.R. cites the Administrative Record, filed as Notice of Filing Administrative Record, *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211 (N.D. Cal. Oct. 6, 2017), ECF No. 64-1.

3

## SUMMARY OF ARGUMENT

This Court's review of the second question presented is needed now to settle a pressing separation-of-powers dispute: whether the federal Executive Branch can unilaterally grant lawful-presence status and work-authorization eligibility to over half a million aliens otherwise unlawfully present and lacking work authorization. The Court already granted review on this question in *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam) (affirming the Fifth Circuit's decision by an equally divided vote).

This separation-of-powers question continues to be of national importance. It will control several pending lawsuits arguing that the Executive may not wind down the prior presidential administration's controversial DACA program, which was created by executive order. This litigation is already occasioning unwarranted and intrusive discovery requests. *See In re United States*, 138 S. Ct. 371 (2017) (granting mandamus blocking unwarranted discovery in the cases below). And the injunction below impairs the core objective of the challenged memorandum—to obviate further litigation on DACA's legality. Indeed, if the injunction is maintained through June 2018, amici States will be forced to consider filing a lawsuit challenging the original 2012 memorandum creating DACA.

Furthermore, this Court's review of whether DACA validly exercises unilateral executive power is also presented and warranted in Arizona's pending certiorari petition in *Brewer v. Arizona Dream Act Coalition*, No. 16-1180. There, multiple amici States have urged the Court to grant review, and the Court has called for the

4

views of the U.S. Solicitor General. The Court therefore may wish to consider both the instant certiorari petition and the *Brewer* petition at the same time.

The Executive has now decided to wind down DACA after a new administration reexamined the legal issues and concluded that DACA would likely be held unlawful. A.R. 254-55. That decision easily clears Administrative Procedure Act review. Nobody argues that anything in the Immigration and Nationality Act (INA) or any other federal law *requires* DACA. So one cannot maintain, as the district court held, that the challenged action of cancelling DACA is itself "not in accordance with law." 5 U.S.C. § 706(2)(A). The APA would be unrecognizable and would violate the Take Care Clause as applied if, as the district court believed, one judge's subsequent views on a debated legal question forecloses the Executive from acting to rescind a controversial policy that is not required by any law and that the Executive finds unconstitutional.

Nor does the Executive act arbitrarily or capriciously by rescinding a prior administration's policy that is not required by law and is subject to a credible legal challenge. If a legal challenge presents a good-faith basis for questioning a prior administration's legal judgment for a policy originally justified as an exercise of discretion, then withdrawing the challenged policy cannot possibly be "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A). That principle applies here. At a minimum, there is room for reasonable disagreement on the legality of DACA. That is shown by the success of the challenges brought by Texas and other States to Expanded DACA and DAPA. After this divided Court affirmed the Fifth Circuit's decision agreeing with those chal-

5

lenges, Texas then explained, in publicly available documents, how DACA is unlawful on the same grounds.

In all events, DACA is unlawful for the same reasons that Expanded DACA and DAPA were held unlawful in the previous *Texas* litigation. *See* 809 F.3d at 172, 184-86. In fact, plaintiffs' own pleadings here confirm that DACA was unlawful to begin with because it altered substantive rights yet was issued without the required APA notice-and-comment procedure. The Executive cannot be ordered to maintain such an unlawful program. Thus, even on plaintiffs' view of notice-and-comment requirements, the district court's injunction forcing the Executive Branch to continue with DACA cannot be justified.

The district court was, however, correct that the Executive Branch's decision to wind down DACA is reviewable under the APA. Because the creation of DACA is reviewable agency action—not mere prosecutorial-discretion inaction—cancelling that benefits-granting program is likewise more than mere inaction. In each case, the Executive took action that provides a focus for judicial review. Thus, the Court should reject plaintiffs' APA challenge on the merits—but not on reviewability grounds.

The Court should grant the petition for certiorari before judgment and reverse the district court's order enjoining the Executive from implementing its decision to wind down DACA.

6

## ARGUMENT

## I. DACA's Wind-down Satisfies Administrative Procedure Act Review (Second Question Presented).

### A. The district court misunderstood APA review.

The district court concluded that "[t]he agency action was 'not in accordance with law' because it was based on the flawed legal premise that the agency lacked authority to implement DACA." Pet. App. 42a; *see also* Pet. App. 62a (concluding that acting on the Executive's changed view of its authority to create DACA was "arbitrary, capricious, and an abuse of discretion").

But a single judge's subsequent views on a debated legal question about a prior, unilateral executive action does not foreclose the Executive from rescinding that action in favor of an undisputedly lawful policy. The district court cited no authority supporting that view of the APA, which would violate the Executive's Take Care Clause responsibilities.

1. One initial point should be indisputable: Rescinding "deferred action"—however one may define that phrase—is not itself contrary to law. No provision of federal law *requires* DACA. The district court identified nothing in the INA that prohibits the Executive from deciding not to issue or renew deferred-action status. Even the Obama Administration's defense of DACA, Expanded DACA, and DAPA emphasized that their benefits could be *rescinded at any time*. *See, e.g.*, A.R. 16 (Office of Legal Counsel memorandum).

Of course, Texas maintained that these programs were still unlawful. But even the Obama Administration

7

agreed that *not* granting deferred action is not contrary to law. Hence, the district court erred in stating that "[t]he agency action" under review is itself "not in accordance with law." Pet. App. 42a.

2.   Rather than reviewing whether the actual agency action under review accords with law, the district court undertook a different analysis. It reasoned that an agency action, even if itself not contrary to law, can be invalidated if the agency's action was prompted by a legal view with which a judge later disagrees, but which is the subject of reasonable debate and is the basis of a substantial dispute that the agency's lawful policy avoids. *See* Pet. App. 42a-43a. The district court failed to cite any decision supporting that remarkable conception of APA review.

*Massachusetts v. EPA*, 549 U.S. 497 (2007), provides no support for the district court's view of APA review. *Cf.* Pet. App. 42a. Unlike in *Massachusetts*, no one takes the position that federal law *requires* the agency to have or maintain the policy at issue here (DACA). Pet. 32; *see Massachusetts*, 549 U.S. at 533 (holding that the agency "refused to comply" with a "statutory command"). Moreover, in *Massachusetts*, the statutory text was "unambiguous" and "clear" as to the agency's duty. 549 U.S. at 528, 531. In contrast, DHS certainly did not have "unambiguous" statutory authority to create DACA. *See, e.g.*, Pet. 27, 28. At a minimum, that question is subject to reasonable debate. *See infra* Part I.B.

The Ninth Circuit case cited by the district court also is not on point. *See* Pet. App. 42a. There, the Ninth Circuit simply reviewed state law where the *permissibility* of the agency action under review was justified

8

based on a certain conclusion of state law. *Safe Air for Everyone v. U.S. EPA*, 488 F.3d 1088, 1091 (9th Cir. 2007). The agency there was not avoiding challenges to the legality of past policies by taking an undisputedly lawful approach going forward.

The existence of credible questions about agency authority to take prior unilateral action that is undisputedly not *required* by law allows the agency to avoid litigation about that prior action by rescinding it. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency need not meet higher standard for rescinding an existing rule than is required to adopt the rule in the first place). The district court failed to cite any decision applying the APA's "not in accordance with law" standard to block such agency action.

Applying the APA in that manner would intrude on the President's independent Article II obligation to ensure "that the Laws be faithfully executed." U.S. Const. art. II § 3; *see Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011) ("The legislative and executive departments of the Federal Government, no less than the judicial department, have a duty to defend the Constitution."); *Freytag v. Comm'r*, 501 U.S. 868, 906 (1991) (Scalia, J., concurring) (noting the President's power of constitutional review in making enforcement decisions). When the Executive determines that a prior unilateral executive action is unconstitutional and discontinues it, judicial review under the APA should be limited to whether the law affirmatively requires the prior action to be maintained. And here, nothing in the INA or other federal law requires a program like DACA.

9

**B. Texas's threatened litigation against DACA raised compelling legal arguments rooted in precedent, providing a non-arbitrary basis for the Executive to wind down DACA.**

1. An agency does not act arbitrarily or contrary to law by rescinding a prior policy of dubious validity that is challenged in litigation, when no law affirmatively mandates the continued existence of that prior policy. This is especially true here where the Executive tried to justify that prior policy as merely an exercise of executive discretion. A non-arbitrary basis for the Executive Branch's decision to wind down DACA is manifest: The State of Texas made clear, in a publicly available letter, that it would sue to challenge DACA if the Executive Branch did not wind it down.

On June 29, 2017, the Texas Attorney General, nine other State Attorneys General, and one Governor sent a letter to the federal Executive Branch proposing a DACA wind-down as a way to end the States' existing *Texas* litigation challenging the Executive's ability to unilaterally confer lawful presence and work authorization. That letter is in the administrative record. A.R. 238-40.

On the same day that the Texas Attorney General sent the letter, he issued a press release that made the letter public.[3] It explained:

---

[3] *AG Paxton Leads 10-State Coalition Urging Trump Administration to Phase Out Unlawful Obama-Era DACA Program*, https://www.texasattorneygeneral.gov/news/releases/ag-paxton-leads-10-state-coalition-urging-trump-administration-to-phase-out (June 29, 2017).

10

In a letter sent today to the U.S. Attorney General, Texas Attorney General Ken Paxton, nine other state attorneys general and the governor of Idaho urged the Trump Administration to phase out the unlawful Obama-era Deferred Action for Childhood Arrival (DACA) program, which confers lawful presence and work permits for nearly one million unlawfully present aliens in the U.S.

. . . .

Attorney General Paxton and the coalition promised to voluntarily dismiss their lawsuit challenging unlawful deferred-action programs currently pending in district court if the Trump Administration agrees by September 5 to rescind DACA and not renew or issue any new DACA permits in the future.

The letter itself made crystal clear why DACA was unlawful:

As you know, this November 20, 2014 memorandum creating DAPA and Expanded DACA would have granted eligibility for lawful presence and work authorization to over four million unlawfully present aliens. Courts blocked DAPA and Expanded DACA from going into effect, holding that the Executive Branch does not have the unilateral power to confer lawful presence and work authorization on unlawfully present aliens simply because the Executive chooses not to remove them. Rather, "[i]n specific and detailed provisions, the [Immigration and Nationality Act] expressly and

11

carefully provides legal designations allowing defined classes of aliens to be lawfully present." *Texas v. United States*, 809 F.3d 134, 179 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam). "Entirely absent from those specific classes is the group of 4.3 million illegal aliens who would be eligible for lawful presence under DAPA." *Id.* Likewise, "[t]he INA also specifies classes of aliens eligible and ineligible for work authorization . . . with no mention of the class of persons whom DAPA would make eligible for work authorization." *Id.* at 180-81. Thus, "DAPA is not authorized by statute," *id.* at 184, and "DAPA is foreclosed by Congress's careful plan," *id.* at 186.

For these same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15, 2012 DACA memorandum is also unlawful. The original 2012 DACA program covers over one million otherwise unlawfully present aliens. *Id.* at 147. And just like DAPA, DACA unilaterally confers eligibility for work authorization, *id.*, and lawful presence without any statutory authorization from Congress.

A.R. 238-39.

This letter thus (1) threatened litigation over DACA and (2) gave a substantive explanation providing legal arguments, based on precedent, as to why DACA was unlawful. Even if this letter were the *only* cited reason for the Executive's challenged action here, it would

12

provide a non-arbitrary, non-capricious, and perfectly valid basis for the federal Executive Branch's decision to wind down DACA.

2.   Texas has consistently, clearly, and publicly explained for years how DACA is unlawful. The June 2017 letter's explanation of DACA's illegality was based on Texas's victory, leading a 26-State coalition, in challenging the materially identical Expanded DACA and DAPA programs. *See, e.g.*, *Texas*, 809 F.3d at 174 n.139 ("DACA is an apt comparator to DAPA."). In that litigation, as early as April 2015, counsel of record told the Fifth Circuit that DACA was required to go through APA notice-and-comment procedure. Oral Arg. at 1:16:01-10, *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015) (No. 15-40238), http://www.ca5.uscourts.gov /OralArgRecordings/15/15-40238_4-17-2015.mp3   (stay proceedings).

Even more recently, Texas filed a brief for a 13-State coalition urging the Court to grant certiorari in *Brewer v. Arizona Dream Act Coalition*, No. 16-1180. *See* Br. for the States of Texas et al., *Brewer*, *supra* (May 1, 2017) ("Texas *Brewer* Br."), https://perma.cc/ 4SYG-3EX7. Those amici States explicitly maintained that DACA was unlawful—based on the same substantive and procedural arguments successfully made by the 26-State coalition in the *Texas* litigation regarding Expanded DACA and DAPA. *See* Br. for the State Respondents at 44-70, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 1213267 ("Texas DAPA Br.").

The *Brewer* amici States pointed out that DACA is unlawful because "Deferred action under DACA is much more than just a decision not to pursue removal of

13

the alien." Texas *Brewer* Br. at 3. First, the Executive deems deferred action under DACA to confer "lawful presence." *Id.* Conferring that legal status is more than mere inaction. As the States highlighted, Congress used the status of "lawful presence" (or "unlawful presence") as the predicate for numerous consequences, such as removability, *id.* at 9; a 3-year or 10-year reentry bar, *id.* at 10-11; eligibility for "advance parole," *id.* at 11; and eligibility for numerous federal benefits, *id.* at 12-13. Those consequences turn on the "lawful presence" status conferred unilaterally by the Executive under DACA (and DAPA).

Yet, rather than leaving it to the Executive to determine when aliens may be lawfully present in the country, Congress delineated over 40 classes of lawfully present aliens and created other specific, statutorily-defined avenues for aliens to obtain lawful presence—none of which apply here. *Id.* at 8-9. Congress's exercise of that power reflects that policies pertaining to aliens' right to remain in this country are "entrusted exclusively to Congress," not the Executive. *Id.* at 7 (quoting *Arizona v. United States*, 567 U.S. 387, 409 (2012)). As the States explained:

> The Executive has no power to unilaterally "create immigration classifications" that authorize aliens' presence in this country because "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present," *Texas*, 809 F.3d at 179. DACA violates the INA just like the materially identical DAPA program.

*Id.* (citation omitted).

14

Similarly, the States explained that DACA violated statutes governing which aliens are authorized to work in this country:

> [W]hen Congress wanted to provide work-authorization eligibility to four narrow classes of deferred-action recipients, it did so by statute. Otherwise, the 1986 IRCA "prohibit[s] the employment of aliens who are unauthorized to work in the United States because they either *entered the country illegally*, or are in an immigration status which does not permit employment." H.R. Rep. No. 99-682(I), at 46, 51-52 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5650, 5655-56 (emphasis added).

*Id.* at 15-16 (footnote omitted). And the States surveyed various historical practices, explaining how they could not support DACA's unilateral conferral of lawful presence and work authorization. *Id.* at 18-20.

At the very least, this substantial analysis created good-faith, legitimate grounds to doubt that DACA was lawful. That conclusion made it entirely proper for the Executive to conclude that "it is likely that potentially imminent litigation would yield similar results with respect to DACA" as with respect to Expanded DACA and DAPA, which had already been enjoined. A.R. 254.

Even the district court below conceded that Expanded DACA modified the original DACA program in only three "minor ways." Pet. App. 14a. Yet the district court's conclusion that "the DAPA litigation [in the Fifth Circuit] was not a death knell for DACA," Pet. App. 54a, ignored that the Fifth Circuit affirmed the injunction of, not just DAPA, but also of Expanded

15

DACA. *See Texas*, 809 F.3d at 147 n.11 (Fifth Circuit's notation that its opinion uses "DAPA" to include Expanded DACA). Thus, the unrebutted consequence of the district court's own observation—that Expanded DACA is substantially identical to DACA—is that the Fifth Circuit's basis for affirming the injunction of the former applies to both programs.

The Executive's decision to wind down DACA rested on an entirely non-arbitrary judgment about the likely fate of DACA in litigation. Avoiding litigation by rescinding a prior executive policy that is not required by law cannot be blocked as agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## C.  DACA is unlawful.

In all events, DACA is unlawful in the first place. The scant grounds on which the district court relied to conclude that DACA is lawful do not withstand scrutiny.

### 1.  DACA is substantively unlawful.

As explained above, DACA is substantively unlawful for the same reasons that the Fifth Circuit held Expanded DACA and DAPA unlawful. *See supra* Part I.B. The district court's claim of purported differences that can save DACA is mistaken. Pet. App. 50a-54a.

First, the district court relied on the fact that DACA applies to a smaller number of aliens than DAPA. Pet. App. 54a. But DAPA and DACA's unlawfulness turns on those programs unilaterally conferring lawful presence and access to work authorization—not on their comparative size. *Texas*, 809 F.3d at 178-86. Moreover, even were it relevant, DACA and DAPA

16

both far exceed the size of any prior deferred-action program. *See* Texas DAPA Br. 53-59.

The district court also observed that Congress has provided a (demanding) path to lawful presence for some aliens covered by DAPA, while not providing any path at all for the aliens covered by DACA. Pet. App. 54a. But that only undermines the district court's position. It means that DACA has even fewer arguments to support it than did DAPA. *See* Josh Blackman, *The Constitutionality of DAPA Part I: Congressional Acquiescence to Deferred Action*, 103 Geo. L.J. Online 96, 116 (2015). Whereas past instances of deferred action had been defended on the ground that they were stop-gap measures to ultimate lawful status theoretically obtainable under existing law, *see Texas*, 809 F.3d at 184-85 & n.197, the district court's own findings show that DACA cannot possibly be defended on that basis. DACA clearly flouts Congress's detailed scheme for conferring lawful presence.

## 2. DACA is procedurally unlawful, as confirmed by plaintiffs' own pleadings.

Plaintiffs' own pleadings in this litigation confirm that DACA is also procedurally unlawful (even assuming *arguendo* executive power to create it) because DACA was a substantive rule that had to go through APA notice-and-comment procedure.

Nobody has disputed that DACA is a "rule" for APA purposes. 5 U.S.C. § 551(4). Accordingly, DACA had to be issued through notice-and-comment procedure if it was a substantive rule rather than a mere "'general statement[] of policy.'" *Texas*, 809 F.3d at 171 (alteration in original). The key distinction between pol-

17

icy statements and substantive rules is that policy statements cannot be "binding." *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979); *accord Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) ("We thus have said that policy statements are binding on neither the public . . . nor the agency."); *see* Texas DAPA Br. at 61-62.

A rule is binding if it creates or modifies "rights and obligations." *E.g.*, *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995), *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988). In *Morton v. Ruiz*, 415 U.S. 199 (1974), this Court held that a vastly more modest rule concerning benefits eligibility "affect[ed] individual rights and obligations" and therefore had to be treated as a substantive rule. *Id.* at 232. The same is true of DACA, under plaintiffs' own pleadings.

a.   This case involves orders entered in five consolidated actions and, therefore, multiple plaintiffs. *See* Pet. App. 19a. The University of California plaintiffs here contend that the DACA-wind-down memorandum "constitutes a substantive rule subject to APA's notice-and-comment requirements." Complaint at 14, *Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-5211 (N.D. Cal. Sept. 8, 2017), ECF No. 1.

But that could be true only if the creation of DACA was itself a substantive rule—one "affecting individual rights and obligations." *Ruiz*, 415 U.S. at 232. After all, if DACA were not a substantive rule that changed the rights of recipients, then winding down this program also could not be a substantive rule changing rights. Plaintiffs, however, allege that DACA is just such a

18

substantive rule. First, plaintiffs admit that DACA pur-
ports to unilaterally confer lawful presence:

> Individuals with DACA status were "not con-
> sidered to be unlawfully present during the pe-
> riod in which deferred action [was] in effect."
> USCIS FAQs.

Complaint at 8, *Regents of Univ. of Cal.*, No. 3:17-cv-
5211, ECF No. 1. And plaintiffs admit that aliens with
DACA status would not have been able—but for
DACA—to lawfully "obtain jobs and access to certain
Social Security and Medicare benefits." *Id.* at 2. The
necessary implication of those pleadings is that DACA
was unlawful the entire time, as it issued without re-
quired APA notice-and-comment procedure.

Plaintiffs point to no requirement that the govern-
ment must use notice-and-comment procedure to re-
scind a policy whose issuance needed but did not receive
that procedure. If the APA somehow required the fed-
eral Executive Branch to continue enforcing an unlaw-
ful policy while notice-and-comment procedure was
used for the first time to rescind the policy, then the
APA would be unconstitutional as applied to that unlaw-
ful policy.

b.   The State of California plaintiffs here likewise
essentially plead that DACA's attributes meet the test
for a substantive rule requiring APA notice-and-
comment procedure. For instance, these plaintiffs plead
that "DACA Provides Numerous Benefits," which are
described in detail:

19

82. DACA grantees are provided with numerous *benefits*. Most importantly, they are granted the *right* not to be arrested or detained based solely on their immigration status during the designated period of their deferred action.

83. DACA grantees are granted eligibility to receive *employment authorization*.

84. DACA also opened the door to *allow travel* for DACA grantees. For example, DACA grantees were allowed to briefly depart the U.S. and legally return under certain circumstances, such as to visit an ailing relative, attend funeral services for a family member, seek medical treatment, or further educational or employment purposes. Travel for vacation is not permitted.

85. Unlike other undocumented immigrants, DACA grantees are not disqualified on the basis of their immigration status from receiving certain public benefits. These include *federal Social Security, retirement, and disability benefits. See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d). As a result, and in reliance on DHS's oft-stated position that DACA and similar programs are a lawful exercise of the agency's authority, Plaintiff States have structured some schemes around DACA which allow, for example, applicants to demonstrate eligibility for state programs by producing documentation that they have been approved under DACA. The rescission of DACA undermines such regulatory frameworks.

20

86. DACA grantees are able to secure equal access to other *benefits* and opportunities on which Americans depend, including opening bank accounts, obtaining credit cards, starting businesses, purchasing homes and cars, and conducting other aspects of daily life that are otherwise often unavailable for undocumented immigrants.

Complaint at 17-18, *California v. Dep't of Homeland Sec.*, No. 3:17-cv-5235 (N.D. Cal. Sept. 11, 2017), ECF No. 1 (emphases added; citations omitted). The *Garcia* plaintiffs here admit the same thing. Complaint at 9 ¶ 27, *Garcia v. United States*, No. 3:17-cv-5380 (N.D. Cal. Sept. 18, 2017), ECF No. 1 ("DACA *confers* numerous important *benefits* on those who apply for and are granted DACA status.") (emphases added).

Furthermore, the *California* plaintiffs state that the APA does not allow policies to remain in effect when they are "predicated on an incorrect legal premise." Complaint at 22 ¶ 106, *California*, No. 3:17-cv-5235, ECF No. 1. In other words, these plaintiffs agree that the APA does not allow *ultra vires* actions. Since DACA is *ultra vires* action even on plaintiffs' view—because it issued without notice-and-comment procedure—plaintiffs cannot obtain the relief they seek of DACA's continued operation.

21

c.   In addition to the five challenges pending in the Northern District of California, at least four other pending lawsuits challenge the DACA-wind-down memorandum. Complaint, *Trs. of Princeton Univ. v. United States*, No. 1:17-cv-2325 (D.D.C. Nov. 3, 2017), ECF No. 1; Complaint, *NAACP v. Trump*, No. 1:17-cv-1907 (D.D.C. Sept. 18, 2017), ECF No. 1; 3d Am. Complaint, *Batalla Vidal v. Nielsen*, No. 1:16-cv-4756 (E.D.N.Y. Dec. 11, 2017), ECF No. 113; Complaint, *New York v. Trump*, No. 1:17-cv-5228 (E.D.N.Y. Sept. 6, 2017), ECF. No. 1. Plaintiffs in those cases similarly have pleaded, in substance, that DACA was unlawful from the outset because it confers substantive rights yet was issued without notice-and-comment procedure.

Plaintiffs in the *New York* lawsuit plead that DACA affirmatively confers benefits—that is, that DACA alters substantive rights:

> [¶] 218. DACA *confers* numerous *benefits* on DACA grantees. Notably, DACA grantees are *granted the right* not to be arrested or detained based solely on their immigration status during the time period their deferred action is in effect.
>
> . . . .
>
> [¶] 220. DACA grantees are eligible to receive certain *public benefits*. These include *Social Security, retirement, and disability benefits*, and, in certain states, benefits such as driver's licenses or unemployment insurance. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d). In the State of Washington, DACA holders also are eligible for certain state financial aid programs

22

> and state-funded food assistance. In the State
> of New York, DACA holders are eligible for
> teaching and nursing licenses.

Complaint at 41, *New York*, No. 1:17-cv-5228, ECF No.
1 (emphases added; citations omitted).

Accordingly, these plaintiffs essentially admit that
DACA needed to go through APA notice-and-comment
procedure because it was a substantive rule modifying
rights:

> [¶] 289. In implementing the DHS Memo-
> randum, federal agencies have changed the
> *substantive criteria* by which individual DACA
> grantees *work, live, attend school, obtain cred-
> it, and travel* in the United States. Federal
> agencies did not follow the procedures required
> by the APA before taking action impacting
> these *substantive rights.*

*Id.* at 54.

If DACA's rescission "affect[ed] individual rights
and obligations," *Ruiz*, 415 U.S. at 232, as these plain-
tiffs agree, then DACA's creation did so too and was
thus unlawful all along. DACA therefore cannot be en-
forced now, so plaintiffs cannot obtain the relief they
seek.

23

## II. The District Court Was Correct that the DACA-Wind-down Memorandum Is Reviewable Agency Action (First Question Presented).

On the first question presented, the district court was right that the Executive's decisions to create and, later, to wind down DACA are reviewable agency actions under the APA. Amici States disagree with the Executive's unreviewability argument under 5 U.S.C. § 701(a)(2). *See* Pet. 16-24. This is essentially the same unreviewability argument that the Executive raised, and lost, in the *Texas* litigation. *See Texas*, 809 F.3d at 163-70; Texas DAPA Br. at 38-44.

The APA contains a limited exception barring judicial review when an agency decision is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This exception is "very narrow." *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). There is a "strong presumption favoring judicial review of administrative action." *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015) (quotation marks omitted).

Unreviewability under *Heckler* applies only to "an agency's refusal to take . . . action," such as "an agency's decision not to take enforcement action." 470 U.S. at 831, 832. *Heckler* thus held that a plaintiff could not use the APA to force the Food and Drug Administration to take enforcement actions related to lethal-injection drugs. *Id.* at 827. In contrast, "when an agency *does* act," the "action itself provides a focus for judicial review" and "can be reviewed to determine whether the agency exceeded its statutory powers." *Id.* at 832.

24

Here, the Executive did not violate the law in acting to wind down DACA. *See supra* Part I.A. Plaintiffs' underlying claims are therefore meritless.

But the district court was correct that the Executive's memorandum winding down DACA is reviewable under the APA. The Executive here essentially re-raises the same unreviewability argument that it made and lost in the *Texas* litigation regarding Expanded DACA and DAPA. Namely, the Executive asserts that these programs are merely prosecutorial discretion, unreviewable under *Heckler. See, e.g.*, Pet. 17 (characterizing DACA as a mere "policy of civil non-enforcement" committed to the Executive's discretion).

That argument is incorrect, as the Fifth Circuit held when addressing it in *Texas*. 809 F.3d at 169 (holding that Expanded DACA and DAPA do not qualify for the "committed to agency discretion by law" exception to reviewability). DACA is not merely an exercise of prosecutorial discretion. DACA creates a massive bureaucracy to grant applicants a host of benefits—including lawful presence, related benefits eligibility, and work authorization. *See id.* at 184 ("The INA flatly does not permit the [Executive to deem] aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits.").

The Executive's certiorari petition elsewhere admits that DACA "confer[s] on [aliens] affirmative benefits (including work authorization)." Pet. 12. Likewise, the Executive previously acknowledged that DACA "deferred action status" is a "lawful status." Br. for the United States as Amicus Curiae in Opp. to Reh'g En Banc at 16, *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) (No. 13-16248), ECF No. 75. And

25

the Executive's own benefits regulations establish a "deferred action status." 8 C.F.R. § 1.3(a)(4)(vi); 45 C.F.R. § 152.2(4)(vi).

Creating a program conferring a legal status with numerous benefits and work authorization is affirmative governmental action and does not qualify for the narrow *Heckler* reviewability exception, as the Fifth Circuit correctly held. As counsel for the Executive conceded in district court in *Texas* with respect to DAPA, such a program "'works in a way that's different than . . . prosecutorial discretion' because it grants inducements 'for people to come out and identify themselves.'" Texas DAPA Br. 39 (quoting government counsel's statement reproduced at page 716 of the joint appendix there).

The Executive does not dispute that reviewability here rises or falls on the same basis as the reviewability of the memoranda creating DACA and DAPA. *See* Pet. 17 ("Like the decision to *adopt* a policy of selective non-enforcement, the decision to *retain* such a policy [is unreviewable].")). Because the directive creating DACA is reviewable, so is the directive rescinding it. In both cases, the Executive's memorandum creating or rescinding the program provides a "focus for judicial review." *Heckler*, 470 U.S. at 832.

Amici explain their position on this reviewability question because it matters to APA jurisprudence more broadly. The district court should not be reversed on the basis that the DACA-wind-down memorandum is unreviewable under the APA (first question presented). Rather, the district court should be reversed because the DACA-wind-down memorandum is not arbitrary,

26

capricious, or otherwise contrary to law (second question presented).

## III. The Decision Below Warrants Certiorari Before Judgment.

The Court should grant certiorari before judgment. Without this Court's prompt intervention, the district court's injunction could last for over a year—frustrating the very purpose of the Executive's decision to promptly terminate disputes about the legality of a controversial past policy.

Indeed, if the litigation challenging the DACA-wind-down memorandum persists through June of this year, Texas will be forced to consider whether to file suit challenging the June 15, 2012 memorandum *creating* DACA and its continued implementation. Texas will be forced to consider bringing that challenge by June 15, 2018, in order to avoid issues about possible application of the six-year statute of limitations in 28 U.S.C. § 2401(a). *See Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1286 (5th Cir. 1997). That will only further multiply the present burdens to the courts from the existing litigation and could result in an injunction abruptly ending DACA, rather than winding it down as directed by the Executive in the memorandum challenged here.

Review of DACA's legality is also presented and warranted in Arizona's pending certiorari petition in *Brewer v. Arizona Dream Act Coalition*, No. 16-1180, which is ripe for the Court's review. *See* Texas *Brewer* Br. at 1-26. Accordingly, the Court may wish to consider both the instant certiorari petition and the *Brewer* petition at the same time.

27

## CONCLUSION

The petition for a writ of certiorari before judgment should be granted.

Respectfully submitted.

STEVE MARSHALL
Attorney General of
    Alabama

MARK BRNOVICH
Attorney General of
    Arizona

LESLIE RUTLEDGE
Attorney General of
    Arkansas

PAMELA JO BONDI
Attorney General of
    Florida

DEREK SCHMIDT
Attorney General of
    Kansas

JEFF LANDRY
Attorney General of
    Louisiana

BRENT DAVIS
Chief Counsel to the
    Governor of Maine

KEN PAXTON
Attorney General of
    Texas

JEFFREY C. MATEER
First Assistant
    Attorney General

SCOTT A. KELLER
Solicitor General
    *Counsel of Record*

J. CAMPBELL BARKER
Deputy Solicitor General

ARI CUENIN
JOHN C. SULLIVAN
Assistant Solicitors General

OFFICE OF THE
    ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
scott.keller@oag.texas.gov
(512) 936-1700

28

PHIL BRYANT
Governor of
  Mississippi

DOUG PETERSON
Attorney General of
  Nebraska

ALAN WILSON
Attorney General of
  South Carolina

MARTY J. JACKLEY
Attorney General of
  South Dakota

PATRICK MORRISEY
Attorney General of
  West Virginia


JANUARY 2018

# EXHIBIT 15

Gateway Mortgage Group, L.L.C. v. Lehman Brothers..., 694 Fed.Appx. 225...

Case 1:18-cv-00068 Document 52-16 Filed in TXSD on 05/29/18 Page 2 of 4

694 Fed.Appx. 225
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals,
Fifth Circuit.

GATEWAY MORTGAGE GROUP,
L.L.C., Plaintiff–Appellant,
v.
LEHMAN BROTHERS HOLDINGS,
INCORPORATED, Defendant–Appellee.

No. 16-20688
|
Summary Calendar
|
Filed May 30, 2017

Synopsis
**Background:** Mortgage lender brought action in state
court against bank seeking declaration that bank's action
in bankruptcy court seeking indemnification from lender
was barred by statute of limitations and parties' settlement
agreement from prior litigation. Bank removed action to
federal court. The United States District Court for the
Southern District of Texas dismissed action. Mortgage
lender appealed.

**[Holding:]** The Court of Appeals held that district court
did not err by dismissing mortgage lender's action under
first-to-file rule.

Affirmed.

West Headnotes (1)

**[1]**   **Federal Courts**
        👉 Trade, business, and finance
        District court did not err by dismissing
        mortgage lender's action against bank for

declaration that bank's action in bankruptcy
court seeking indemnification from lender was
barred by statute of limitations and parties'
settlement agreement from prior litigation,
pursuant to first-to-file rule, where underlying
facts in both cases related to mortgages
originated by lender and sold to bank,
bank's adversary proceeding presented the
affirmative case for indemnification, while
lender's declaratory judgment action asserted
defenses to bank's affirmative case, and lender
could have enforced forum selection clause of
settlement agreement by seeking transfer of
venue before bankruptcy court.

2 Cases that cite this headnote

Appeal from the United States District Court for the
Southern District of Texas, USDC No. 4:16-CV-2123

**Attorneys and Law Firms**

William A. Worthington, III, Conner & Winters, L.L.P.,
Houston, TX, Daniel E. Gomez, Conner & Winters,
L.L.P., Tulsa, OK, for Plaintiff-Appellant

Michael A. Rollin, Maritza Dominguez Braswell, Rollin
Braswell Fisher, L.L.C., Greenwood Village, CO, Robert
Thompson Mowrey, Locke Lord, L.L.P., Dallas, TX,
Jason Levi Sanders, Esq., Sanders Collins, P.L.L.C.,
Dallas, TX, for Defendant-Appellee

Before HIGGINBOTHAM, PRADO, and HAYNES,
Circuit Judges.

**Opinion**

**\*226** PER CURIAM: [*]

Plaintiff–Appellant Gateway Mortgage Group, L.L.C.
("Gateway") brought this declaratory judgment action
against Lehman Brothers Holdings, Inc. ("LBHI") after
LBHI sued Gateway in the U.S. Bankruptcy Court for
the Southern District of New York. Applying the first-to-
file rule, the district court dismissed this action without
prejudice. For the reasons stated below, we AFFIRM.

## I. BACKGROUND

Gateway is an Oklahoma-based mortgage lender. In 2006, pursuant to a loan purchase agreement, Gateway sold a number of mortgages to Lehman Brothers Bank, FSB, which assigned these mortgages to LBHI. LBHI then packaged these mortgages together with mortgages originated by other lenders and sold them to investors, including the Federal National Mortgage Association ("Fannie Mae"). Many of the mortgages sold in this way wound up in foreclosure, precipitating the 2008 financial crisis and subsequent recession. LBHI declared bankruptcy in 2008.

In 2009, LBHI sued Gateway in Texas state court for breach of contract and breach of warranty regarding certain mortgages sold in 2006. The parties settled these claims in 2012. Pursuant to the settlement agreement, LBHI released its claims against Gateway; however, this release did not cover "any potential claims against [Gateway] that may result from Proofs of Claim filed against LBHI by creditors in LBHI's bankruptcy with respect to loans originated by [Gateway]." The parties also agreed that Harris County, Texas would be the "exclusive venue" for any disputes "aris[ing] under" the settlement agreement.

In LBHI's bankruptcy, Fannie Mae filed a proof of claim against LBHI for approximately $19 billion in 2009. LBHI later settled this claim for approximately $2 billion. LBHI in turn sought indemnification from Gateway and other originators of allegedly defective mortgages. In 2016, LBHI initiated an adversary proceeding in the U.S. Bankruptcy Court for the Southern District of New York against Gateway and 150 other mortgage originators. This adversary proceeding has since been severed into over one hundred separate proceedings.

Later in 2016, Gateway filed the instant declaratory judgment action in Texas state court. This action is in response to LBHI's demand for indemnification. Gateway seeks a declaration that (1) LBHI's claims are barred by the statute of limitations, (2) the claims are barred by the 2012 settlement agreement, (3) LBHI is not entitled to indemnification under the original loan purchase agreement, and (4) LBHI's recovery on these loans is limited to actual losses. After removing this action to federal court, LBHI moved to dismiss or transfer venue.

The district court granted LBHI's motion to dismiss without prejudice based on the first-to-file rule. The district court also noted that discretionary factors weighed in favor of dismissing the declaratory judgment action, see *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590–91 (5th Cir. 1994), and that the forum selection clause in the 2012 settlement agreement did not control. This appeal followed.

## II. DISCUSSION

We limit our discussion to whether the district court erred by dismissing this action **\*227** pursuant to the first-to-file rule. We review a district court's application of the first-to-file rule for abuse of discretion. *Int'l Fid. Ins. v. Sweet Little Mex. Corp.*, 665 F.3d 671, 677 (5th Cir. 2011). "Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999). "In deciding if a substantial overlap exists, this court has looked at factors such as whether 'the core issue ... was the same' or if 'much of the proof adduced ... would likely be identical.' " *Int'l Fid.*, 665 F.3d at 678 (footnotes omitted) (quoting *W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. & Gulf Coast Dist. of the ILA*, 751 F.2d 721, 730 (5th Cir. 1985); *Mann Mfg., Inc. v. Hortex Inc.*, 439 F.2d 403, 407 (5th Cir. 1971)).

Here, the core issue is the same: LBHI's right to indemnification from Gateway. LBHI's adversary proceeding presents the affirmative case for indemnification, while Gateway's declaratory judgment action asserts defenses. The underlying facts in both cases relate to the mortgages originated by Gateway and sold to LBHI in 2006. Thus, the two cases substantially overlap and the district court did not err in applying the first-to-file rule.

Gateway argues that a compelling circumstance—namely, the existence of a forum selection clause—displaces the first-to-file rule in this case. We have noted that "[i]n the absence of compelling circumstances the court initially seized of a controversy should be the one to decide whether it will try the case." *Mann Mfg.*, 439 F.2d at 407. The existence of a forum selection clause is not a compelling circumstance in this case because Gateway

is free to move for a transfer of venue before the bankruptcy court. *Cf. Bank of Am. v. Berringer Harvard Lake Tahoe*, No. 3:13-CV-0585-G, 2013 WL 2627085, at *4 (N.D. Tex. June 12, 2013) (noting that "the issue of whether the forum-selection clause binds the parties does not need to be addressed by the court in the second-filed action"). Gateway does not contend that this procedural path would be prejudicial (apart from generally disparaging "bulk litigation" related to LBHI's bankruptcy). Moreover, as the district court noted, Gateway may return to the Southern District of Texas if its claims are not fully resolved in the Southern District of New York. Accordingly, the district court did not abuse its discretion by dismissing Gateway's declaratory judgment action without prejudice. We express no opinion on whether the forum selection clause is triggered by this dispute.

## III. CONCLUSION

For the foregoing reasons, the district court's dismissal without prejudice is AFFIRMED.

**All Citations**

694 Fed.Appx. 225

Footnotes

*    Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

End of Document      © 2018 Thomson Reuters. No claim to original U.S. Government Works.