# EXHIBIT 4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE TRUSTEES OF PRINCETON UNIVERSITY<br>Princeton, New Jersey 08544 | ) |
| | ) Civil Action No. _____ |
| MICROSOFT CORPORATION<br>One Microsoft Way<br>Redmond, WA 98052 | ) |
| | ) **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| MARIA DE LA CRUZ PERALES SANCHEZ,<br>Princeton, New Jersey 08544 | ) |
| Plaintiffs, | ) |
| v. | ) |
| UNITED STATES OF AMERICA, | ) |
| U.S. DEPARTMENT OF HOMELAND SECURITY,<br>650 Massachusetts Avenue, NW<br>Washington, DC 20001 | ) |
| and | ) |
| ELAINE C. DUKE, *in her official capacity as Acting Secretary of the Department of Homeland Security*,<br>650 Massachusetts Avenue, NW<br>Washington, DC 20001 | ) |
| Defendants. | ) |

## **COMPLAINT**

Plaintiff The Trustees of Princeton University ("Princeton" or "the University")—suing on its own behalf and on behalf of its students—Plaintiff Microsoft Corporation ("Microsoft"), and Plaintiff Maria De La Cruz Perales Sanchez ("Perales Sanchez") (collectively, "Plaintiffs") bring this action for declaratory and injunctive relief against Defendants the United States of America; the U.S. Department of Homeland Security ("DHS"); and Elaine C. Duke, in her official capacity as Acting Secretary of DHS ("Duke") (collectively, "Defendants"), and allege as follows:

## **INTRODUCTION**

1.      Millions of young people arrived in the United States as children, brought here by immigrant parents searching for safety, stability, and opportunity.  Known as Dreamers, these young people were raised here as Americans: they were educated in American communities, surrounded by American friends, struggling and striving alongside their American peers.  Many have grown up to be impressive leaders:  star students, educators, soldiers, architects, entrepreneurs, lawyers, and scholars,[1] each advancing on their own merit and making considerable contributions to American society.  By any measure, these achievements are extraordinary.  They are all the more impressive considering the uncertainty that long defined their lives.  Until 2012, Dreamers lived in pervasive fear that they might return home from school or work one day to find immigration authorities on their doorstep, prepared to take them into custody.  Instead of turning to the normal routines of their personal lives—dinner, family, homework—they might be suddenly deported to a country that is in no sense their home.

2.      DHS finally addressed that untenable situation in 2012 when it created DACA— Deferred Action for Childhood Arrivals.  DACA provided up to 2 million Dreamers the chance to obtain protection from deportation and the opportunity to develop their skills through education.

Individuals who received deferred action under DACA were not subject to removal for a period of two years, subject to renewal. DACA also rendered recipients eligible for work authorization that allowed them to work legally anywhere in the United States. To qualify for DACA, Dreamers were required to meet strict conditions: they must have entered this country prior to age sixteen, have resided here continuously since 2007 and been present in the United States on June 15, 2012, and on the date they requested deferred action; be in school, have graduated, or have been discharged honorably from the Armed Forces or Coast Guard; pose no threat to public safety or national security; and have been under the age of 31 as of June 15, 2012. To demonstrate their eligibility, Dreamers had to provide the government with detailed and highly sensitive personal information, pay a significant fee, and submit to a rigorous background check.

3.    Given that most Dreamers had lived for years in fear of federal immigration authorities, asking them to turn over their private information to those same authorities was a bold request. The government was aware that Dreamers might reasonably be reluctant to sign up. It accordingly devoted significant resources to an outreach campaign calling on Dreamers to apply for DACA, assuring potential applicants that it would protect their information (and the information of their families and guardians) from disclosure to other agencies for purposes of immigration enforcement proceedings.

4.    The government's efforts to encourage Dreamers to apply for DACA worked. Since 2012, nearly 800,000 young people—including Perales Sanchez—have come to rely on

---

[1]    *See, e.g., American Dreamers*, N.Y. Times (2017), https://www.nytimes.com/interactive/projects/storywall/american-dreamers/ (featuring stories from individuals who were able to work and study in the United States under DACA); Gregory Korte et al., *Trump Administration Struggles with Fate of 900 DREAMers Serving in the Military*, USA Today (Sept. 7, 2017), https://www.usatoday.com/story/news/politics/2017/09/07/trump-administration-struggles-fate-900-dreamers-serving-military/640637001/.

DACA.[2]  They have made educational plans, pursued career paths, and invested in their lives here based on the government's promise that they would be safe from deportation so long as they complied with DACA's rules and procedures.  Many Dreamers have gotten married and started families here in the belief that DACA would allow them to remain in the United States to raise their children.  Other Dreamers have taken out significant student loans to pursue higher education and advanced degrees that make them better able to contribute to a growing American economy.  They have launched and invested in companies, purchased homes and cars, paid taxes, pursued opportunities to serve our country in the military, and generally lived full and productive lives out of the shadows that many undocumented immigrants were forced into by the uncertainty that preceded DACA.

5.  Princeton and Microsoft also have benefited from—and relied upon—DACA.  As one of the nation's premiere universities, Princeton devotes substantial resources to recruiting and admitting the most promising students.  Since 2012, Princeton has admitted and enrolled at least 21 Dreamers who have relied on the government's promises regarding DACA, and 15 DACA beneficiaries are currently enrolled as undergraduate students at the University.  Similarly, Microsoft has invested significant resources in Dreamers, who serve in critical roles at the company.  Together with its subsidiary LinkedIn Corporation, Microsoft employs at least 45 DACA recipients as software engineers, financial analysts, inventory control experts, and in core technical and operations positions and other specialized functions and internships.  The company has invested significant resources in recruiting, retaining, and supporting these individuals, and in training them to develop within the organization.

---

[2] Jens Manuel Krogstad, Pew Research Ctr., *DACA Has Shielded Nearly 790,000 Young Unauthorized Immigrants from Deportation* (Sept. 1, 2017), http://www.pewresearch.org/fact-tank/2017/09/01/unauthorized-immigrants-covered-by-daca-face-uncertain-future/.

Case 4:17-cv-00068   Document 52-5   Filed on 05/29/18 in TXSD   Page 6 of 43

6.      Dreamers are particularly promising students and employees because of the significant barriers they have overcome in order to excel.  As children, they were forced not only to navigate a new country, culture, and language, but also to do so knowing that at any moment, they might be taken into custody and sent far from their homes and lives here in the United States.  To have achieved educational and career successes under such precarious circumstances suggests that Dreamers have grit and perseverance, can overcome obstacles, and will exceed expectations—all qualities that Princeton values in its students and Microsoft values in its employees.

7.      DACA recipients have made countless contributions to Microsoft in their diverse roles within a number of the company's divisions, including the Office Products Group, Windows and Devices Group, Cloud & Enterprise, Artificial Intelligence and Research Group, LinkedIn, Finance, Worldwide Commercial Business, and Retail division.  Microsoft has significant interests in retaining these employees and in reaping the benefits of their talent over time.  It has conducted its business operations on the understanding that DACA recipients would continue to be eligible to work at the company.

8.      At the University, DACA beneficiaries study in a diverse array of fields, including computer science, molecular biology, mechanical and aerospace engineering, psychology, and politics.  They serve as mentors and peer advisors, class representatives in student government, and as community organizers and campus leaders.  They have earned numerous academic honors, awards, and fellowships, including several competitive and prestigious national or University fellowships.  They have collaborated on important research projects, including as part of the University's Computer Science Summer Programming Experience,[3] and through the University's

---

[3]     Princeton University, Princeton Summer Programming Experiences (SPE), http://www.cs.princeton.edu/academics/ugradpgm/spe/home/ (last visited Nov. 3, 2017).

Keller Center for Innovation.[4]  They have published in campus publications.  They have secured highly competitive internships, including with the United Nations.  They are among the most accomplished and respected students studying at the University.

9.     Among the DACA beneficiaries at Princeton is Plaintiff Maria De La Cruz Perales Sanchez.  Perales Sanchez is an impressive student.  She has received the Arthur Liman public interest summer fellowship, the Fred Fox Fund grant for independent projects, and the Princeton Institute for International and Regional Studies undergraduate fellowship for summer thesis research.  She has also served as a peer academic advisor, as the co-director of the Princeton Dream Team (an immigrants' rights organization), as a member of her undergraduate department's advisory council, and as a volunteer and leader of Community House, a tutoring organization serving underprivileged students.

10.    Dreamers' presence on Princeton's campus also benefits other students and helps fulfill the University's educational mission.  Princeton has long made clear that diversity and inclusion are central to its mission for many reasons:  First, diverse environments are more intellectually and socially stimulating, with research from the fields of psychology, sociology, and economics showing that experiences with diversity improve one's own intellectual skills and performance, improve self-confidence, decrease negative stereotypes and biases, and create awareness of inequalities and discrimination.[5]  Second, because fundamental fairness is a core value of the University, Princeton believes that students of all backgrounds should have an equal opportunity to earn a position at Princeton, and then to contribute and succeed in their subsequent

---

[4] Princeton University, Keller Center, https://kellercenter.princeton.edu/ (last visited Nov. 3, 2017).

[5] Deborah Son Holoien, *Do Differences Make a Difference? The Effects of Diversity on Learning, Intergroup Outcomes, and Civic Engagement* (2003), http://www.princeton.edu/reports/2013/diversity/report/PU-report-diversity-outcomes.pdf.

endeavors.  And third, core to its educational mission is the idea that Princeton students should live and learn in an environment that reflects U.S. society and introduces them to the world beyond. In broadening the range of perspectives to which they are exposed, Princeton offers students a better understanding of the world and renders them better equipped to lead and serve others in today's pluralistic society.[6]

11.     Microsoft similarly benefits greatly from a workforce that reflects the diversity of the United States—and the world.  As a worldwide leader in software, services, devices and solutions that help people and businesses reach their full potential, it places a high priority on having a diverse workforce that can reflect the global customer base that it serves.  Similarly, Microsoft's subsidiary LinkedIn benefits from a diverse workforce as the world's largest professional network with members in more than 200 countries and territories worldwide.  DACA helped advance this interest by increasing the breadth of experiences, perspectives, and approaches to problem-solving represented in the workforce through the lenses of the highly qualified and talented DACA beneficiaries hired into the companies.

12.     Because fostering a diversity of perspectives is crucial to Princeton's mission of teaching and research and to Microsoft's core business functions, these two institutions have invested in many initiatives to make their campus and workplaces more welcoming to people of all backgrounds.[7]  DACA recipients are no exception.

13.     For example, Princeton has provided faculty time, attention, privately-funded financial aid for tuition, room and board, and more to DACA recipients with the expectation that

---

[6] Princeton University, Our Commitment to Diversity, https://inclusive.princeton.edu/about/our-commitment-diversity (last visited Nov. 3, 2017).
[7] *See* Princeton University, Initiatives, https://inclusive.princeton.edu/initiatives (last visited Nov. 3, 2017).

they would be allowed to complete their studies at the University and make contributions in the "nation's service and in service of humanity."[8]  Without DACA, Perales Sanchez and other Dreamers have significantly fewer opportunities to work and contribute, substantially diminishing the value of their Princeton education.  And Princeton will have to make up the difference in financial aid to compensate for their inability to contribute through on-campus work.

14.     Princeton's President, Christopher Eisgruber, has described Princeton's significant interest in DACA, noting that DACA "enables law-abiding young people who have grown up in the United States to develop their talents and contribute productively to this country, which is their home."[9]  President Eisgruber joined a group of more than 700 college and university presidents in issuing a statement supporting DACA.[10]  As that statement explains, since the advent of DACA in 2012, universities like Princeton "have seen the critical benefits of this program for our students, and the highly positive impacts on our institutions and communities."[11]  The statement continues:

> DACA beneficiaries on our campuses have been exemplary student scholars and student leaders, working across campus and in the community.  With DACA, our students and alumni have been able to pursue opportunities in business, education, high tech, and the non-profit sector; they have gone to medical school, law school, and graduate schools in numerous disciplines.  They are actively contributing to their local communities and economies.[12]

---

[8] This is Princeton's informal motto.  *See* Princeton University, In Service of Humanity, https://www.princeton.edu/meet-princeton/service-humanity (last visited Nov. 3, 2017).

[9] President Eisgruber's Statement on Deferred Action for Childhood Arrivals (DACA), Office of the President, Princeton, http://www.princeton.edu/president/eisgruber/speeches-writings/archive/?id=17355 (last visited Nov. 3, 2017).

[10] Pomona College, College & University Presidents Call for U.S. to Uphold and Continue DACA (Nov. 21, 2016), https://www.pomona.edu/news/2016/11/21-college-university-presidents-call-us-uphold-and-continue-daca.

[11] *Id.*

[12] *Id.*

Because Princeton has already invested in students based on the expectation that DACA would facilitate their studying and working in this country, and because it desires to continue to so invest due to the significant contributions of DACA beneficiaries, Princeton has significant interests in retaining the DACA program.[13]

15.     Similarly, Microsoft has made significant investments to foster an inclusive and diverse workplace environment, including by recruiting, retaining, and developing its employees who are Dreamers.  Given the persistent demand for high-skilled talent and the tightness of the labor supply for professionals in Microsoft's industry, the costs of recruiting employees are high and unanticipated turnover is incredibly disruptive to business plans.  Microsoft has significant interests in retaining the Dreamers it employs, and in reaping the benefits of their talent over time. It has conducted its business operations on the understanding that these individuals would continue to be eligible to work at the company.

16.     As Microsoft's President Brad Smith has explained, "DACA recipients bring a wide array of educational and professional backgrounds that enable them to contribute in crucial ways to our nation's workforce."[14]  He continued:

> We experience this in a very real way at Microsoft. . . . [E]mployees who are beneficiaries of DACA . . . are software engineers with top technical skills; finance professionals driving our business ambitions forward; and retail and sales associates connecting customers to our technologies. Each of them is actively participating in our collective mission to empower every person and every organization on the planet to achieve more.  They are not only our colleagues, but our friends, our neighbors and valued members of the Microsoft community.[15]

---

[13] Princeton is also interested as an employer in retaining the DACA program because it enables DACA beneficiaries to obtain work authorization.

[14] Microsoft President Brad Smith, DREAMers make our country and communities stronger (Aug. 31, 2017), https://blogs.microsoft.com/on-the-issues/2017/08/31/dreamers-make-country-communities-stronger?lipi=urn%3Ali%3Apage%3Ad_flagship3_pulse_read%3BVGlIRxrxTBirfzbdYk4jSg%3D%3D.

[15] Id.

17.     Microsoft's CEO Satya Nadella has also underscored the importance of Microsoft's DACA-beneficiary employees to its business, explaining that he "see[s] each day the direct contributions that talented employees from around the world bring to our company, our customers and to the broader economy."[16]  As he stated, "[w]e care deeply about the DREAMers who work at Microsoft and fully support them.  We will always stand for diversity and economic opportunity for everyone.  It is core to who we are at Microsoft and I believe it is core to what America is."[17]

18.     The government has also benefited from Dreamers' willingness to participate in the DACA program.  Many DACA recipients have pursued professions in fields suffering from serious labor shortages, such as nursing and home health care; removing them from the economy could dramatically escalate costs that are in large part covered by Medicaid and Medicare.[18]  DACA recipients have also contributed to national security, with approximately 900 DACA recipients serving in the military under a program for persons who possess skills "vital to the national interest."[19]  More broadly, using their education and work authorizations, Dreamers have helped American companies grow and thrive.   They have contributed to valuable technological innovations, promising medical and scientific research, and creative artistic endeavors.

---

[16] Satya Nadella, CEO, Microsoft, DREAMers Make Our Country and Communities Stronger (Aug. 31, 2017), https://www.linkedin.com/pulse/dreamers-make-our-country-communities-stronger-satya-nadella/.

[17] Id.

[18] Noam Scheiber & Rachel Adams, *What Older Americans Stand to Lose if 'Dreamers' Are Deported*, N.Y. TIMES (Sept. 6, 2007), https://www.nytimes.com/2017/09/06/business/economy/daca-dreamers-home-health-care.html.

[19] Alex Horton, *The Military Looked to 'Dreamers' to Use Their Vital Skills.  Now the U.S. Might Deport Them*, WASH. POST (Sept. 7, 2017), https://www.washingtonpost.com/news/checkpoint/wp/2017/09/07/the-military-looked-to-dreamers-to-use-their-vital-skills-now-the-u-s-might-deport-them/?utm_term=.be8c41bb71ef; Korte, *supra* n.1.

19.     The Dreamers have held up their end of the bargain.  But the same cannot be said of the United States.  Although the Trump Administration continued to induce Dreamers to rely on the DACA program for the Administration's first eight months, on September 5, 2017, Attorney General Sessions announced Defendants' decision to end the DACA program.  That same day, Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum formally rescinding DACA.

20.     The termination of the DACA program severely harms Perales Sanchez and other Dreamers, as well as the employers and educational institutions that rely on and benefit from their contributions.  For example, as a result of the rescission of the program, Princeton will suffer the loss of critical members of its community—students who lead vital student organizations, contribute to important research projects, participate in study-abroad programs, and perform on-campus work that aids the activities of the University.  Similarly, Microsoft will lose employees who fill critical positions in the company's workforce and in whom the company has invested— leaving gaps that cannot easily be filled.

21.     Accordingly, the University, Microsoft, and Perales Sanchez bring this action pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Fifth Amendment of the U.S. Constitution, to enjoin the rescission of DACA and to obtain a declaration that the DACA program was lawful as initially promulgated and remains lawful today.

## VENUE AND JURISDICTION

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, including the judicial review provisions of

the Administrative Procedure Act, 5 U.S.C. §§ 701-706; the Fifth Amendment of the U.S. Constitution; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

23.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e).  A substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia. Defendant Duke is a United States officer sued in her official capacity, and her official residence is in the District of Columbia.  Defendant DHS is a U.S. agency with its principal office in the District of Columbia.

## PARTIES

24.     The University is a private, non-profit educational institution with its principal place of business at Princeton University, Princeton, New Jersey 08544. The University is a "person" within the meaning of 5 U.S.C. § 551(2).

25.     Microsoft is a technology corporation organized and existing under the laws of the State of Washington, with its principal place of business in Redmond, Washington.  Microsoft is a "person" within the meaning of 5 U.S.C. § 551(2).

26.     Maria De La Cruz Perales Sanchez is a DACA beneficiary and a current undergraduate student at Princeton University.  Perales Sanchez is a "person" within the meaning of 5 U.S.C. § 551(2).

27.     Defendant the United States of America includes all government agencies and departments responsible for the implementation and rescission of the DACA program.

28.     Defendant DHS is an "agency" within the meaning of 5 U.S.C. § 551(1) and § 552(f).  The Department of Homeland Security has its principal place of business at 650 Massachusetts Avenue NW, Washington, DC 20001.

29.     Defendant Elaine C. Duke is the Acting Secretary of DHS.  She is responsible for implementing and enforcing the Immigration and Nationality Act, and oversees the U.S. Citizenship and Immigration Services and Immigration and Customs Enforcement.  She issued the DHS Memorandum that purports to rescind DACA.  She is being sued in her official capacity.

## FACTUAL ALLEGATIONS

### A.     The DACA Program

30.     On June 15, 2012, the then-Secretary of Homeland Security issued a memorandum establishing the DACA program ("DACA Memorandum").[20]  Under the program, individuals who were brought to the United States as children and met certain criteria could apply for deferred action for a period of two years, subject to renewal.  Deferred action means that the government agrees in its discretion to defer the removal[21] of an individual for a specified period, subject to renewal.  The DACA Memorandum explained that it was intended to set forth "how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home."  Because "these individuals lacked the intent to violate the law," and because this country's immigration laws are not "designed to remove productive young people to countries where they may not have lived or even speak the language," the DACA Memorandum advised that "[p]rosecutorial discretion, which is used in so many other areas, is especially justified here."  The DACA Memorandum acknowledged that it "confers no

---

[20] *See* Memorandum from Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[21] Removal is the legal term used in the Immigration and Naturalization Act for what is commonly known as deportation.  *See generally* 8 U.S.C. § 240.

substantive right," but rather "set[s] forth policy for the exercise of discretion within the framework of the existing law."

31.    The DACA Memorandum also set forth a series of stringent criteria individuals had to meet to qualify for the DACA program.  Individuals were eligible only if they:  (1) came to this country when they were under the age of sixteen; (2) continuously resided in the United States since June 15, 2007, and were present in the United States on June 15, 2012; (3) were currently in school, had graduated from high school, had obtained a general education development certificate, or were an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; (4) had not been convicted of a felony, a significant misdemeanor offense, multiple misdemeanor offenses, and otherwise did not pose a threat to national security or public safety; and, (5) were not above the age of 30 as of June 15, 2012.

32.    The government prepared answers to Frequently Asked Questions about the DACA program and posted them online.[22]  They explained that individuals who were granted deferred action are "not considered to be unlawfully present during the period in which deferred action is in effect."[23]  Likewise, despite not having received "lawful status," "[a]n individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect."[24]

33.    In order to apply for the DACA program, individuals including Perales Sanchez were required to pay a substantial fee, submit to biometric and biographical background checks, and hand over highly sensitive personal information, including their date of entry into the United

---

[22] USCIS DACA FAQs, https://www.uscis.gov/archive/frequently-asked-questions (Archived).
[23] *Id.*, Question 1.
[24] *Id.*

States, their country of birth, their current and previous mailing addresses, and other contact information.[25]

34.     Many Dreamers, including Perales Sanchez, were reluctant to hand over their personal information to the government.  Accordingly, the government assured them that their information would not be used for other immigration-related purposes, including to facilitate their removal.  The official instructions accompanying USCIS's DACA application form stated:

> *Information provided in this request is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings* unless the requestor meets the criteria for the issuance of a Notice To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). The information may be shared with national security and law enforcement agencies, including ICE and CBP, *for purposes other than removal*, including for assistance in the consideration of deferred action for childhood arrivals request itself, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing clause covers family members and guardians, in addition to the requestor.[26]

35.     In the DACA Memorandum, the government also assuaged concerns that it might use information obtained through DACA to facilitate removal.  DHS emphasized that the country's immigration laws are not designed "to remove productive young people to countries where they may not have lived or even speak the language."   DHS also acknowledged that many DACA eligible individuals "have already contributed to [the United States] in significant ways" and that, as a result, the exercise of prosecutorial discretion is "especially justified" as to those eligible for relief under DACA.

36.     In 2016, then-Secretary of Homeland Security Jeh Johnson further explained the government's assurances to Dreamers in a letter to Representative Judy Chu:

---

[25] *See* Instructions for Consideration of Deferred Action for Childhood Arrivals, USCIS Form I-821D at 13 (Jan. 9, 2017), https://www.uscis.gov/sites/default/files/files/form/i-821dinstr.pdf.
[26] *Id.* at 13 (emphasis added).

Since DACA was announced in 2012, DHS has consistently made clear that information provided by applicants will be collected and considered for the primary purpose of adjudicating their DACA requests and would be safeguarded from other immigration-related purposes. More specifically, the U.S. government represented to applicants that the personal information they provided will not later be used for immigration enforcement purposes except where it is independently determined that a case involves a national security or public safety threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law.

We believe these representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored.[27]

Secretary Johnson represented that this practice of not sharing information supplied by people seeking deferred action for immigration enforcement purposes had consistently been applied by DHS and its predecessor INS even before DACA was established. He also acknowledged that "people who requested to be considered under DACA, like those who requested deferred action in the past, have relied on our consistent practice concerning the information they provide about themselves and others."[28]

37.    The government devoted significant time and effort to encourage Dreamers to apply for the DACA program, vigorously promoting the program in a variety of ways. Among other initiatives, the government advised universities on how best to encourage eligible individuals to apply.[29] The government also promoted the DACA program by, among other things, honoring ten DACA recipients as White House Champions of Change and inviting some of them to the White House to meet with President Obama.[30] Cecilia Muñoz, Director of the White House Domestic

---

[27] Letter from Secretary Jeh Charles Johnson to The Honorable Judy Chu (Dec. 30, 2016), https://chu.house.gov/sites/chu.house.gov/files/documents/DHS.Signed%20Response%20to%20 Chu%2012.30.16.pdf.

[28] *Id.*

[29] *See, e.g.*, U.S. Dep't of Education, Resource Guide: Supporting Undocumented Youth (Oct. 20, 2015), https://www2.ed.gov/about/overview/focus/supporting-undocumented-youth.pdf.

[30] *See* Champions of Change: DACA Champions of Change, Obama White House Archives, https://obamawhitehouse.archives.gov/champions/daca-champions-of-change (last visited Nov. 3,

Policy Council, wrote in a blog post preserved in the Obama White House archives that "[b]ecause the Administration acted, hundreds of thousands of ambitious, hardworking young people have been able to emerge from the shadows, no longer living in fear of deportation."[31]

38.     In order to entice Dreamers to apply, the government also promised that, if eligible, DACA recipients would be entitled not only to a single, two-year deferral of action but also to the ability to renew their deferred action for the foreseeable future.  *See* 2012 DACA Memorandum (noting that deferred action was "subject to renewal").  Indeed, the government "strongly encourage[d]" DACA recipients to submit their renewal requests well in advance of the relevant expiration date.[32]  To qualify for renewal, DACA recipients must not have left the United States without advance parole, must have continuously resided in the United States after submitting their initial DACA application, and must not have been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, or otherwise pose a threat to national security or public safety.[33]

39.     DHS also made it difficult to terminate a Dreamer's deferred action under DACA. DHS's Standard Operating Procedures implementing the DACA program provided that, absent a disqualifying criminal offense, national security concern, or other extraordinary circumstance, an individual's deferred action under DACA could not be removed until the government provided a

---

2017); Lindsay Holst, *Meet the 6 DREAMers the President Met with in the Oval Office Yesterday* (Feb. 5, 2015), https://obamawhitehouse.archives.gov/blog/2015/02/05/meet-6-dreamers-president-met-oval-office-yesterday.

[31] Cecilia Muñoz, *One Year Anniversary of Implementation of Deferred Action Policy for DREAMers* (Aug. 15, 2013), https://obamawhitehouse.archives.gov/blog/2013/08/15/one-year-anniversary-implementation-deferred-action-policy-dreamers.

[32] USCIS DACA FAQs, Question 49, https://www.uscis.gov/archive/frequently-asked-questions (Archived).

[33] *Id.*, Question 51.

"Notice of Intent to Terminate" that "thoroughly explain[ed]" the grounds for termination.[34] DHS Standard Operating Procedures further provided that recipients of such notice "should be allowed 33 days to file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of deferred action under DACA.[35]

40.     As a result of these policies and procedures, along with other government actions and representations, Perales Sanchez and other Dreamers reasonably expected that they would be allowed to maintain and continue renewing their deferred status, so long as they complied with the government's straightforward rules.

41.     Since its inception in 2012, the DACA program has provided nearly 800,000 young people with the ability to live, study, and work in the United States without hiding in the shadows. For the first time in their lives, DACA recipients, including Perales Sanchez, received Social Security numbers, enabling them to access credit and apply for student loans, obtain driver's licenses, and apply for federal work authorization. In reliance on the DACA program, Perales Sanchez and other Dreamers have made considerable investments in their American lives, pursuing jobs, and educational programs that cost money, time, and energy, and require a commitment to a future here. For example, after obtaining her federal work authorization, Perales Sanchez worked as a tutor, a research assistant, a dining hall employee, an office assistant, and an associate for an on-campus center for civic engagement.

42.     Some Dreamers may not have been able or may not have chosen to study at Princeton without DACA, which, among other things, allowed them to obtain a government-issued

---

[34] National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA), at 132, Appendix I (Apr. 4, 2013), https://cliniclegal.org/sites/default/files/attachments/daca_sop_4-4-13.pdf.
[35] *Id.*

photo identification and thus travel back and forth to campus by airplane, and to dream of a future that includes legitimate employment in the United States, helping to justify the dedication and work that goes into a Princeton education. For example, before the DACA program was implemented, Perales Sanchez believed she would never be able to leave her state of residence. After obtaining relief under the DACA program, she was able to fly not only to Princeton as an entering freshman, but also to travel abroad twice—once for a summer internship and once for a study-abroad program.[36] DACA has enabled her to pursue those internships and programs to further her dream of going to law school.

43.     While Dreamers have certainly benefited from DACA, so too has the government. "By removing the threat of deportation for young people brought to this country as children," Cecilia Muñoz acknowledged, "DHS has been able to focus its enforcement efforts on those who endanger our communities rather than students pursuing an education and seeking to better themselves and their communities."[37] Then-Secretary Johnson acknowledged additional benefits from the program in 2016, explaining:

> Since DACA began, thousands of Dreamers have been able to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books. We continue to benefit as a country from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future.[38]

---

[36] Perales Sanchez obtained advance parole for her extraterritorial travel.
[37] *Id.*
[38] Johnson, *supra* n.27.

### B.    Defendants' Unlawful and Unconstitutional Rescission of DACA

44.    On September 5, 2017, Attorney General Sessions announced Defendants' decision to end the DACA program, and Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum formally rescinding the DACA program ("DACA Rescission Memorandum").

45.    President Trump's statements about the DACA program—both before and after its rescission—have been less consistent. In the speech that launched his campaign, then-candidate Trump promised to "immediately terminate President Obama's illegal executive order on immigration," referring to DACA.[39] On the same day that he met with the Mexican president in August 2016, he again announced his intent to "immediately terminate" DACA.[40] But after the election, he told Time magazine: "We're going to work something out that's going to make people happy and proud. They got brought here at a very young age, they've worked here, they've gone to school here. Some were good students. Some have wonderful jobs. And they're in never-never land because they don't know what's going to happen."[41] And a few days after his inauguration, President Trump told ABC's David Muir that DACA recipients "shouldn't be very worried."[42] At a February 16, 2017 press conference, President Trump explained his thinking on the subject: "The DACA situation is a very difficult thing for me as I love these kids, I love kids, I have kids and grandkids and I find it very, very hard doing what the law says exactly to do and, you know, the law is rough. It's rough, very very rough."[43]

---

[39] Anu Joshi, *Donald Trump and DACA: A Confusing History*, HUFFINGTON POST (Mar. 3, 2017), http://www.huffingtonpost.com/entry/donald-trump-and-daca-a-confusing-history_us_58b9960be4b0fa65b844b24a.

[40] *Id.*

[41] Michael Scherer, *2016 Person of the Year Donald Trump*, TIME (Dec. 8, 2016), http://time.com/time-person-of-the-year-2016-donald-trump/.

[42] Joshi, *supra* n.39.

[43] *Id.*

46.     On June 29, 2017, officials from ten States, led by Texas Attorney General Ken Paxton, sent a letter to U.S. Attorney General Jeff Sessions, asserting that the DACA program is unlawful and requesting that it be "phase[d] out."[44]  The States threatened to challenge DACA in court unless DACA was rescinded by September 5, 2017.

47.     In response to that letter, other stakeholders weighed in.  A letter from the attorneys general of twenty States, led by California, described how DACA has "been a boon to the communities, universities, and employers with which these Dreamers are connected, and for the American economy as a whole."[45]  A separate, open letter from hundreds of entrepreneurs and business leaders noted that "[a]t least 72 percent of the top 25 Fortune 500 companies count DACA recipients among their employees."  It explained that "Dreamers are vital to the future of our companies and our economy.  With them, we grow and create jobs.  They are part of why we will continue to have a global competitive advantage."  If the DACA program were rescinded, "[o]ur economy would lose $460.3 billion from the national GDP and $24.6 billion in Social Security and Medicare tax contributions."[46]  The letter was signed by, among many others, Satya Nadella

---

[44] *See* Chris Geidner, *Texas Attorney General Threatens to Sue Trump If He Doesn't End DACA*, BUZZFEED NEWS (June 29, 2017), https://www.buzzfeed.com/chrisgeidner/texas-attorney-general-threatens-to-sue-trump-if-he-doesnt?utm_term=.umwR4Ll05#.it7d1JGWx.                    The Tennessee Attorney General later reversed course and withdrew Tennessee's threat to sue.  *See* Letter from Tennessee Attorney General Herbert H. Slattery III to Sens. Lamar Alexander and Bob Corker (Sept. 1, 2017), https://www.vox.com/policy-and-politics/2017/9/1/16243944/daca-tennessee-dream-act.  He explained that he had changed his mind because "[t]here is a human element to this," and "[m]any of the DACA recipients, some of whose records I reviewed, have outstanding accomplishments and laudable ambitions, which if achieved, will be of great benefit and service to our country."  *Id.*

[45] Letter from Xavier Becerra (July 21, 2017), https://oag.ca.gov/system/files/attachments/press_releases/7-21-17%20%20Letter%20from%20State%20AGs%20to%20President%20Trump%20re%20DACA.final_.pdf.

[46] Leaders of American Industry on DACA (Aug. 31, 2017), https://dreamers.fwd.us/business-leaders.

and Brad Smith of Microsoft, Jeff Bezos of Amazon, Tim Cook of Apple, Mark Zuckerberg and Sheryl Sandberg of Facebook, and Sundar Pichai of Google.

48.     Despite the overwhelming evidence of DACA's benefits, DACA was rescinded on September 5, 2017—the deadline provided in Texas Attorney General Paxton's letter.  Unlike the DACA program itself, which required case-by-case assessment of individual applications, DACA's rescission is a categorical rule, applicable to all DACA recipients.  The rationale provided by Attorney General Sessions for rescinding DACA, which was echoed by Acting Secretary Duke, was that it is vulnerable to the "same legal and constitutional defects that the courts recognized as to DAPA [Deferred Action for Parents of Americans and Lawful Permanent Residents]," which is a separate program that DHS introduced in November 2014, and which was enjoined prior to its effective date.  Accordingly, the Attorney General and Acting Secretary stated that "it is likely that potentially imminent litigation would yield similar results with respect to DACA."[47]

49.     DHS's rationale is directly at odds with new policies that the agency announced in connection with its rescission of DACA.  For example, when it announced rescission, DHS declared that it would continue to adjudicate pending DACA applications.  DHS also asserted that it would adjudicate any applications for renewal filed by individuals whose deferred status under DACA would expire before March 5, 2018, so long as those applications were filed by October 5, 2017.[48]  This announcement effectively extended DACA for an additional two and a half years.

---

[47]  Letter on Rescission of Deferred Action for Childhood Arrivals (Sept. 4, 2017), https://www.dhs.gov/sites/default/files/publications/17_0904_DOJ_AG-letter-DACA.pdf; Memorandum on Rescission of Deferred Action for Childhood Arrivals (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca#.

[48]  Memorandum on Rescission of Deferred Action for Childhood Arrivals (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca#.

50.     DHS's asserted basis for rescinding DACA also conflicts with the position previously taken by the United States, including in an opinion by the Office of Legal Counsel ("OLC") that has not been withdrawn.[49] Its credibility is further undermined by President Trump's own tweet, published less than nine hours after the announcement of DACA's rescission, promising that if Congress does not "legalize DACA" in six months, "I will revisit this issue!"[50]

51.     In addition, the government has provided no assurance or commitment that the information collected from DACA applicants will not be used to pursue their deportation.  The DACA Rescission Memorandum is silent on the issue.  DHS has adopted a new privacy policy pursuant to an Executive Order issued in January 2017 that "permits the sharing of information about immigrants and non-immigrants with federal, state, and local law enforcement."[51]  And whereas the government in the past had promised that information provided by DACA applicants "*is protected* from disclosure,"[52] it now states only that such information "will not be *proactively* provided to ICE and CBP for the purpose of immigration enforcement proceedings."[53]

---

[49] *See* Dep't of Homeland Sec.'s Auth. to Prioritize Removal of Certain Aliens Unlawfully Present in the U.S. & to Defer Removal of Others, 2014 WL 10788677 (Op. O.L.C. Nov. 19, 2014).

[50]  *See* Donald J. Trump (@realDonaldTrump), Twitter (Sep. 5, 2017, 8:38 PM), https://twitter.com/realDonaldTrump/status/905228667336499200; Josh Blackman, *Trump's DACA Decision Defies All Norms*, LawFare@FP (Sept. 7, 2017), http://foreignpolicy.com/2017/09/07/trumps-daca-decision-defies-all-norms/ ("[T]his latest constitutional whiplash undermines that defense on an even more profound level.").

[51] DHS, Privacy Policy 2017-01 Questions & Answers, at 3 (Apr. 27, 2017), https://www.dhs.gov/sites/default/files/publications/Privacy%20Policy%20Questions%20%20A nswers%2C%2020170427%2C%20Final.pdf.

[52] USCIS DACA FAQs, Question 19 (emphasis added). The referenced Notice to Appearance guidance is USCIS Policy Memorandum 602-0050 (Nov. 7, 2011) ("Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens").

[53]  DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals (DACA)* (Sept. 5, 2017) (emphasis added), https://www.dhs.gov/news/2017/09/05/frequently-askedquestions-rescission-deferred-action-childhood-arrivals-daca.

Accordingly, Dreamers reasonably anticipate that the information they provided to the government in order to enroll in the DACA program will be used against them, including to pursue their removal from this country. Indeed, DHS has already "urge[d] DACA recipients to use the time remaining on their work authorizations to prepare for and arrange their departure from the United States."[54]

### C. Plaintiffs' Interest in the DACA Program

#### a. *Princeton University and Perales Sanchez Have Benefited from DACA.*

52. Plaintiff Princeton is a private, non-profit educational institution that advances learning through scholarship, research, and teaching of extraordinary quality, with an emphasis on undergraduate and doctoral education and a pervasive commitment to serve the nation and the world. The University's defining characteristics and aspirations include, among other things, a commitment to welcome, support, and engage students, faculty, and staff with a broad range of backgrounds and experiences, and to encourage all members of the University community to learn from the robust expression of diverse perspectives.[55]

53. Every year, the University accepts applications for admission to its undergraduate program from both domestic and international students who have completed or are soon to complete secondary education programs. To achieve the excellence to which it aspires, Princeton must find, attract, and support talented people from a wide range of demographic groups, and it

---

[54] Talking Points - DACA Rescission, MSNBC, http://msnbcmedia.msn.com/i/MSNBC/Sections/NEWS/z-pdf-archive/170905-DACA-Talking-Points.pdf; *see also* Kristen Welker & Daniel Arkin, *Trump Administration Memo: DACA Recipients Should Prepare for 'Departure,'* NBC NEWS (Sept. 5, 2007), https://www.nbcnews.com/news/us-news/white-house-memo-daca-recipients-should-prepare-departure-n799026.

[55] *See* Princeton University, Our Commitment to Diversity, https://inclusive.princeton.edu/about/our-commitment-diversity (last visited Nov. 3, 2017); Princeton University, Academics, https://www.princeton.edu/academics (last visited Nov. 3, 2017).

must provide a campus climate in which people from all backgrounds learn from and share experiences and perspectives with each other. A diverse, inclusive, and collaborative learning community sparks creativity and insight, generates meaningful conversation, and facilitates intercultural connection and understanding. Diversity is essential to Princeton's efforts to meet the needs of a world that requires leaders who come from a wide variety of backgrounds and groups and who are able to work effectively across cultures and political and social divides. Accordingly, the University expends considerable time and resources recruiting high-achieving students from diverse backgrounds to create an exceptional learning community for each incoming class.

54.     Undergraduate admission to the University is highly competitive. For the University's graduating class of 2021 (matriculating in the fall of 2017), 1,991 applicants were admitted out of 31,056 total applicants, for an admissions rate of 6.4 percent.[56]

55.     Since 2012, Princeton has admitted and enrolled at least 21 DACA recipients as students. These students have enrolled in both undergraduate and graduate programs in a diverse array of fields, including sciences, engineering, politics, psychology, and public policy. These individuals have been among the greatest contributors to the campus community. For example, a member of the class of 2015 and a DACA beneficiary, Yessica Martinez, was a co-recipient of the 2015 Pyne Prize, the University's highest general honor for an undergraduate. She was recognized for her "excellent scholarship, strength of character, and effective leadership in support of the best interests of Princeton University."[57] Among her accomplishments at Princeton, Martinez was "a

---

[56] *See* Princeton University, Statistics for Applicants to the Class of 2021, *available at* https://admission.princeton.edu/how-apply/admission-statistics (last visited Nov. 3, 2017).

[57] *See* Princeton University, Introduction by President Christopher L. Eisgruber, *available at* http://alumni.princeton.edu/learntravel/lectures/videodetail/index.xml?videoid=409 (last visited Nov. 3, 2017); Princeton University, Seniors Martinez, Robertson Named Pyne Prize Winners

standout student and writer, and an exceptional community organizer and leader," who served as

a residential advisor and excelled in studying comparative literature, creative writing, and Latin

American studies.[58]  University President Eisgruber stated in awarding her the Pyne Prize that

Martinez had a "profound impact on the Princeton community."[59]

    56.    As explained in the Introduction to this Complaint, Princeton benefits from DACA

in many ways.  Princeton's DACA recipients—including Perales Sanchez—are exceptionally

resilient students who have overcome varied, serious life obstacles in the course of achieving great

success.  They have unique insights because of their backgrounds, and they contribute diverse

perspectives on a range of issues on campus—both inside and outside the classroom.  Their

presence in the classroom, student housing, student organizations, and other campus activities

enhances the intellectual experience of all students and faculty at Princeton.  Their membership in

Princeton's community helps the University to realize its educational mission.

        b.  *Microsoft Has Benefited from DACA.*

    57.    Similarly, Microsoft benefits in myriad ways from the DACA recipients whom it

employs as software engineers, financial analysts, inventory control experts, and core technical

and operations positions.  Microsoft's mission on behalf of its customers around the world creates

a substantial business need for finding, developing, and attracting the brightest and most promising

talent from around the country and around the world.  As Microsoft CEO Satya Nadella explained,

"smart immigration can help our economic growth and global competitiveness."[60]

---

(Feb. 12, 2005), *available at* https://undergraduateresearch.princeton.edu/news/seniors-martinez-robertson-named-pyne-prize-winners (last visited Nov. 3, 2017).
[58] *Id.*
[59] *Id.*
[60] Nadella, *supra* n.16.

58. The company places a high priority on having a diverse workforce that can reflect the global customer base Microsoft serves. The company's products and services—and ultimately its customers—benefit from input and contributions that draw from the diverse backgrounds found among the company's employees. Microsoft has significant interests in retaining its employees and in reaping the benefits of their talent over time.

59. DACA beneficiaries are working across a range of Microsoft's business divisions, employing their "tremendous talent" to develop the next generations of Microsoft products and services.[61] While Microsoft's DACA employees are generally early in their careers, their past accomplishments and promise for the future reflect their significant value to the company. The company employs DACA beneficiaries in its Office Products Group, which produces its industry-leading suite of productivity applications; the Windows and Devices Group, which is responsible for the software platform, apps, games, store, and devices that power the Windows ecosystem; the Cloud & Enterprise Group, which builds the infrastructure software and developer tools that power the company's cloud platform and services; the Artificial Intelligence and Research Group, which drives the company's strategy for artificial intelligence and forward-looking research and development; and LinkedIn, its online professional network designed to help members find jobs, connect with other professionals, and locate business opportunities. DACA beneficiaries are also employed in positions within Microsoft's Finance organization as well as its Worldwide Commercial Business and Retail divisions, which engage directly with its customers. As Microsoft President Brad Smith has explained, these individuals are an integral part of the fabric

---

[61] Brad Smith, President, Microsoft, DREAMers Make Our Country and Communities Stronger (Aug. 31, 2017), https://blogs.microsoft.com/on-the-issues/2017/08/31/dreamers-make-country-communitiesstronger?lipi=urn%3Ali%3Apage%3Ad_flagship3_pulse_read%3BVGlIRxrxTBirfz bdYk4jSg%3D%3D.

of Microsoft's business and its "collective mission to empower every person and organization on the planet to achieve more."[62]

60.     Moreover, by allowing Dreamers to work lawfully, DACA moved these individuals out of the informal economy, increasing the pool of talent from which Microsoft could fill supply gaps in the U.S. job market.  The United States faces a shortage of skilled workers that is only projected to intensify over the next decade, as workers from the baby-boom generation retire from the workforce.  As these gaps continue to widen, DACA recipients play a critical role in filling positions for which there are not enough U.S.-born applicants.  DACA recipients also often possess skills—including foreign language skills—that businesses like Microsoft need.

   c.  *Plaintiffs Will Be Harmed by the Rescission of DACA.*

61.     With DACA's rescission, Princeton and Microsoft will be harmed in several ways. Princeton has devoted substantial resources to recruiting, retaining, and educating Dreamers— including, among other things, investments in financial aid to cover tuition, housing, and other educational expenses, as well as faculty and administrative time.  Those resources were invested with the expectation that those students would be able to deploy their Princeton degree in varied successful careers.  The loss of DACA diminishes the likelihood that Dreamers will be authorized to work in the United States, thus also diminishing the economic value of their education and Princeton's investment in them.  Princeton has also spent additional resources to address the harms of DACA's rescission on Princeton's students and employees, and reasonably expects to spend further resources addressing this issue.  Furthermore, Princeton will lose the opportunity to matriculate new Dreamers, as many may be deterred from studying at Princeton because the

---

[62] *Id.*

tremendous investment of time, effort, and money required to pursue that education may not yield employment prospects without the work authorization provided by DACA.

62.     Microsoft also has expended significant resources in recruiting and training Dreamers, with the expectation that they would continue to be eligible to work at the company. By eliminating a valuable pool of employees, rescission of DACA will cause Microsoft to lose at least 45 employees and interns who make significant contributions to the company. This loss will hinder the company's productivity, leading to a less robust and diverse workforce. Moreover, as a consequence of Defendants' actions, Microsoft will have to spend additional resources to recruit, train, and promote replacement employees. The pool of workers from which to fill these positions will be smaller, inhibiting Microsoft's productivity, reducing the diversity of its workforce, and making it harder to compete globally. Microsoft's corporate interests are best served by a stable, fair, and efficient business environment. Defendants' rescission of DACA injures each of these interests.

63.     DACA's rescission of course inflicts grave harm on not only the University and Microsoft, but also the Dreamers themselves. Some feel that DACA's rescission will impede or diminish their educational experience. For example, they may not be able to pursue research or study abroad, which are important parts of many academic programs. In addition, they may not be able to receive work authorization, which will hinder their ability to enhance their skills, build their resumes, network with campus administrators, professors, and other students, and earn money that can be used to further their educations. For all, the future value of their Princeton education is seriously diminished because they cannot obtain a legitimate job in the United States after graduation. Perales Sanchez, for example, will not be able to obtain financial aid to support her

planned law school education—and even if she could, her inability to work legally in the United States as a lawyer undermines the viability of that planned career path.

64.     Of course, the ultimate consequence of DACA's rescission is not just the loss of opportunity in the United States, but the very real threat of deportation from the United States.  If that threat is realized, the Dreamers, including Perales Sanchez, stand to lose everything: their homes, their families and friends, and the lives that they have finally been free to live in this country because of DACA.  If deported, they will be sent to countries where they have not lived since they were very young, where they have no friends and no known prospects, and that are in every meaningful sense foreign to them.  Perales Sanchez, for example, left her native country of Mexico at the age of eight and has only returned once for a single week.  Her family, friends, and career prospects are all here in the United States.

## COUNT I

## PROCEDURAL VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT

*Brought By All Plaintiffs Against All Defendants*

65.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

66.     The APA requires that federal agencies conduct notice-and-comment rulemaking before promulgating a substantive rule.  *See* 5 U.S.C. § 553.  Agency action is unlawful where it is made "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

67.     DHS is an "agency" within the meaning of the APA, and the DACA Rescission Memorandum and the actions that DHS has taken to implement the DACA Rescission Memorandum are a substantive rule within the meaning of the APA.  *See* 5 U.S.C. § 551(1), (4).

68.     Defendants' actions affirmatively circumscribe DHS's statutory authority in providing deferred action as they bind DHS to categorically deny applications for deferred action to individuals who fit the original DACA eligibility criteria, prohibit DHS from renewing recipients' deferred status under DACA after October 5, 2017, and prohibit DHS from granting advance parole to DACA recipients.

69.     The DACA Rescission Memorandum and the actions that DHS has taken to implement the DACA Rescission Memorandum have affected the rights and interests of all DACA recipients by changing the substantive criteria by which these individuals work, live, attend school, obtain credit, and travel.  Defendants did not follow the procedures required by the APA before taking action affecting these substantive rights.

70.     Defendants promulgated and implemented these substantive rules without authority and without notice-and-comment rulemaking in violation of the APA.

71.     Plaintiffs have been harmed by these unlawful acts, including because they have not had the opportunity to comment on the rescission of DACA.

72.     Defendants' violation causes ongoing harm to the University, Microsoft, Perales Sanchez, and other members of the University community.  These injuries, including the specific harms alleged above to the University and Microsoft, fall within the zone of interests encompassed by the broad scope of the Immigration and Naturalization Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*

## COUNT II

## SUBSTANTIVE VIOLATIONS OF THE ADMINISTRATIVE PROCEDURE ACT

*Brought By All Plaintiffs Against All Defendants*

73.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

74.     Defendants are subject to the APA.  *See* 5 U.S.C. §§ 701(b)(1), 703.  Defendants'

rescission of DACA is final agency action subject to judicial review because it consummates

DHS's decision-making process and is a decision from which legal consequences will flow.

75.     The APA prohibits federal agency action that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," "contrary to constitutional right, power,

privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short

of statutory right."  5 U.S.C. § 706(2)(A), (B), (C).

76.     In creating and implementing DACA, over the course of years, the government

repeatedly made promises and assurances to DACA recipients (including Princeton alumni and

current students, and Microsoft employees) that if they stepped forward, shared highly sensitive

personal information, and passed a background check, they would be granted renewable protection

and would be allowed to live and work in the United States as long as they abided by the conditions

of the program.  The government also specifically and consistently promised that information

disclosed through the DACA program would not be used for immigration enforcement purposes

outside certain limited circumstances.

77.     The University, Microsoft, Perales Sanchez, and nearly 800,000 other vulnerable

young people reasonably relied on the government's assurances and promises in taking the

irreversible step of identifying themselves and providing the government with highly sensitive and

potentially compromising personal information.  DACA recipients, including Perales Sanchez,

also made numerous life-altering personal and professional decisions in reliance on the

government's promises regarding DACA.

78.     The establishment and implementation of DACA engendered serious reliance

interests by Perales Sanchez and other DACA recipients, their families, and others affected,

including the University and Microsoft.  Defendants failed to take these interests into account and failed to provide a rational explanation for the change in policy on which such individuals and institutions have reasonably relied.

79.     Defendants' disregard for the reasonable reliance of Perales Sanchez and hundreds of thousands of other vulnerable young people, and others affected by DACA's rescission is the hallmark of arbitrary and capricious action and an abuse of discretion.  The decision to rescind DACA is therefore in violation of the APA and must be vacated.

80.     Defendants' rescission of DACA also must be set aside as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law because the agency failed to articulate a reasoned explanation for its decision that considered all important aspects of the issue.

81.     For example, Defendants provided no justification for many of the details of the rescission of DACA, including but not limited to the September 5, 2017 deadline for initial applications; the October 5, 2017 deadline to file certain renewal applications; and the March 5, 2018 cut-off for renewal eligibility.  These deadlines are arbitrary, and they fail to provide sufficient time and notice to DACA recipients.

82.     Defendants also failed to provide any reasoned analysis to support the changes to the confidentiality of applicant information.

83.     Defendants' purported grounds for rescinding DACA are inadequate to justify termination, are legally erroneous, pretextual, and internally inconsistent, and fail to consider or address relevant factors such as the government's previous conclusion that the DACA program was lawful or other government statements that contradict the agency's stated rationale.

84.     Defendants' rescission of DACA and the steps taken to implement that determination are arbitrary and capricious, an abuse of discretion, and not in accordance with law

because, among other things, they are based on the legally incorrect premise that DACA is unlawful.

85.     Defendants' assertion that the Executive Branch lacks authority to continue the DACA program ignores the fact that the government itself previously concluded that it did have the authority to implement the program, including in an OLC opinion that has not been withdrawn or amended.  Defendants' failure to conduct or provide a reasoned analysis for its decision to rescind DACA constitutes a violation of the APA.

86.     Defendants' decision to rescind DACA is also arbitrary and capricious because its purported rationale is inconsistent with DHS's new policy.  In particular, Defendants terminated the program because they purportedly concluded that the Executive Branch lacks authority to continue the program, yet DHS continued to adjudicate pending DACA applications and renewal applications received before October 5, 2017 (for individuals whose benefits would expire before March 5, 2018), effectively extending DACA for an additional two and a half years.  Likewise, the President suggested that he may renew DACA if Congress does not act within six months, which is an inherent admission that the stated rationale for DACA's rescission is arbitrary and capricious.

87.     The rescission of DACA also violates the APA because it is "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B).  For the reasons set forth in this complaint, Defendants' actions in promulgating and implementing the rescission of DACA are unconstitutional and therefore must be vacated.

88.     For all of the reasons stated above and throughout this complaint, Defendants' actions violate the APA.

89. Defendants' violation causes ongoing harm to the University, Microsoft, Perales Sanchez, and other DACA recipients. These injuries fall within the zone of interests of the INA, which is intimately related to the ability of Perales Sanchez and other Dreamers to study and work in the United States and to the University and Microsoft's ability to enroll and hire Dreamers.

## COUNT III

## VIOLATIONS OF THE FIFTH AMENDMENT (EQUAL PROTECTION)

### *Brought By All Plaintiffs Against All Defendants*

90. Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

91. The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from denying equal protection of the laws.

92. Rescission of DACA impermissibly discriminates against DACA recipients on the basis of a characteristic over which they have little control—namely, their undocumented status. Defendants' decision to deprive DACA recipients of their interest in furthering their education or pursuing a livelihood presents unreasonable obstacles to advancement based on individual merit, and cannot be sufficiently justified by federal interests.

93. The University, DACA recipients enrolled at the University, other University students, Microsoft, and Perales Sanchez, have been and continue to be harmed by this violation of the equal protection guarantee of the Fifth Amendment.

## COUNT IV

**VIOLATIONS OF THE FIFTH AMENDMENT (DUE PROCESS—RESCISSION)**

*Brought By All Plaintiffs Against All Defendants*

94.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

95.     DACA recipients—including Perales Sanchez, other University students and alumni, and Microsoft employees—are physically present in the United States and have developed deep and meaningful connections to their communities, including through pursuit of education, occupation, entrepreneurial enterprise, financial and other support for family, friends, and members of the public, and other activities enabled by the government's decision to grant deferred status.

96.     The Due Process Clause applies to individuals and entities present in the United States. *See Zadvydas v. Davis*, 533 U.S. 678, 682, 693-94 (2001) ("[A]liens who were admitted to the United States but subsequently ordered removed" have constitutional due process rights, "whether their presence here is lawful, unlawful, temporary, or permanent.").

97.     The Due Process Clause imposes limits on federal government decisions that deprive individuals of liberty or property interests protected by the Fifth Amendment. *See Mathews v. Eldridge*, 424 U.S. 319, 331 (1976). Protected liberty and property interests may take many forms. *E.g., Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 576 (1972); *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

98.     Rescission will, without due process of law, deprive the University of several interests cognizable under the Constitution. For example, the University currently has enrolled 16 DACA recipients, including 1 graduate student and 15 undergraduate students. The University

has incurred substantial cost to support each student, including costs associated with faculty time and attention, privately-funded financial aid, research grants, housing, and other resources. The University has made these investments on the basis of individual merit, and with the firm belief that each student will make significant contributions to communities within and beyond the University. Were DACA enrollees to leave the University before completing their program of study, the University stands to forfeit the important contributions that the students make on campus, the resources the University has invested in their education, and the benefits associated with their future success, including their continued contributions—socially, academically, and monetarily—to the University.

99.     Rescission also will, without due process of law, deprive Microsoft of several interests cognizable under the Constitution. Microsoft has made significant investments in recruiting, training, and supporting DACA enrollees, and has conducted its business operations based on the well-founded expectation that they would continue to be eligible to work at the company. If DACA enrollees become ineligible to work at Microsoft, the company will lose this crucial talent in which it has heavily invested, as well as the time, money, and resources that it has spent cultivating this human capital. It also will suffer business disruptions as a result of the loss of these employees and will have to spend additional resources to recruit, train, and promote replacement employees.

100.    DACA recipients, including Perales Sanchez, also have constitutionally-cognizable liberty and property interests in their deferred status, as well as rights, benefits, and property that they could not have obtained but for DACA. Because of DACA, some of these individuals, including Perales Sanchez, have become eligible for and obtained work authorization, become able

to open bank accounts, to obtain credit, to secure driver's licenses, to pursue higher education, and to access various federal government benefits, such as Social Security.

101.    The government, through its introduction, implementation, and operation of DACA, cultivated a reasonable expectation among the University, Microsoft, Perales Sanchez, and other DACA recipients that DACA recipients would have an opportunity to maintain and renew their deferred status.

102.    The rescission of DACA occurred with inadequate notice and without any opportunity to be heard and does not provide for any opportunity to be heard.  As a result, rescission and actions taken by Defendants in connection with rescission unlawfully deprive the University, Microsoft, Perales Sanchez, other DACA recipients enrolled at the University, and all other University students of constitutionally-protected interests without due process of law.

103.    The University, Microsoft, Perales Sanchez, other DACA recipients enrolled at the University, and other University students have been and continue to be harmed by these violations of the Due Process Clause of the Fifth Amendment.

## COUNT V

## VIOLATIONS OF THE FIFTH AMENDMENT

## (DUE PROCESS — INFORMATION SHARING)

*Brought By The University and Perales Sanchez Against All Defendants*

104.    The University and Perales Sanchez repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

105.    The Due Process Clause also requires fundamental fairness and limits the government's discretion to make and break assurances, particularly when the government offers benefits to induce conduct that may have severe repercussions.

106.    After introducing DACA, the government invited undocumented individuals brought to the United States as children to apply for deferred status and, in the event an individual was granted relief, work authorization.  Applications for deferred status and for work authorization required that individuals provide sensitive and detailed personal information.  To induce otherwise vulnerable individuals to disclose this information, the government made clear and consistent assurances that it would not be used to facilitate removal.  For example, in official instructions provided to potential applicants, the government represented that information supplied in a request for consideration under DACA "is protected from disclosure to ICE and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement."

107.    In reliance on the government's assurances about information sharing, and the potential to secure relief under DACA, Perales Sanchez, and other individuals enrolled at the University provided the government with sensitive and detailed personal information.

108.    In addition to rescinding DACA, the Defendants have revised assurances about information sharing.  Defendants no longer promise to protect information from use for immigration enforcement.  Instead, they offer only to prevent personal information from being provided "proactively" to agencies responsible for facilitating removal.  Except as previously provided under the DACA program, the use of information obtained through implementation and operation of DACA—information that was provided at the government's invitation, to facilitate an assessment of eligibility for deferred status, and based on assurances that it would be protected—for any purpose related to immigration enforcement violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

109.     The University, Perales Sanchez, other DACA recipients enrolled at the University, and all other University students have been and continue to be harmed by these violations of the Due Process Clause of the Fifth Amendment.

## REQUEST FOR DECLARATORY JUDGMENT

110.     Plaintiffs repeat and incorporate herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

111.     The DACA program was a lawful exercise of the President's discretion to enforce the immigration laws.  The government, through OLC, concluded that DACA was lawful. Defendants now claim, as the basis for rescission of the program, that DACA is unlawful.  There is therefore an actual controversy regarding whether the DACA program is lawful.

112.     The Declaratory Judgment Act, 28 U.S.C. § 2201, allows the court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

113.     Because it is a direct beneficiary of the program through its Dreamer students and employees, Princeton and Microsoft have interests in the legality of the DACA program.  Perales Sanchez, as a DACA beneficiary, also has an interest in the legality of the DACA program. Defendants' decision to terminate DACA on the purported basis that the DACA program was unlawful has harmed Plaintiffs and continues to cause ongoing harm to Plaintiffs.

114.     Plaintiffs are entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201(a) that the DACA program was lawful and is lawful today.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Princeton University, Microsoft Corporation, and Maria De La Cruz Perales Sanchez respectfully request that judgment be entered against the Defendants, and that this Court:

A. Declare pursuant to 28 U.S.C. § 2201(a) that the DACA program is lawful and constitutional;

B. Declare pursuant to 28 U.S.C. § 2201(a) that the termination of the DACA program was unlawful and unconstitutional;

C. Issue an injunction against enforcement and implementation of the DACA Rescission Memorandum, and enjoining Defendants from terminating or rescinding the DACA program;

D. Issue an injunction enjoining Defendants from sharing or otherwise using information furnished by Dreamers, including Perales Sanchez, pursuant to the DACA program for purposes of immigration enforcement, except as previously provided under the DACA program;

E. In the alternative, remand the action to the Defendants for reconsideration; and

F.  Grant such other and further relief as may be just and proper.

Dated: November 3, 2017                    Respectfully submitted,

                                           THE TRUSTEES OF
                                           PRINCETON UNIVERSITY;
                                           MICROSOFT CORPORATION;
                                           MARIA DE LA CRUZ PERALES
                                           SANCHEZ


                                           By:  /s/ Thomas J. Perrelli_____


                                           Thomas J. Perrelli
                                               D.C. Bar No. 438929
                                           Lindsay C. Harrison
                                               D.C. Bar No. 977407
                                           Marina Jenkins
                                               D.C. Bar No. 988059
                                           Alex Trepp
                                               D.C. Bar No. 1031036*

                                           JENNER & BLOCK LLP
                                           1099 New York Avenue, NW
                                           Suite 900
                                           Washington, DC 20001-4412
                                           Phone 202 639-6000
                                           Fax 202 639-6066
                                           Email: tperrelli@jenner.com
                                                   lharrison@jenner.com
                                                   mjenkins@jenner.com
                                                   atrepp@jenner.com

                                           *Attorneys for The Trustees of
                                           Princeton University, Microsoft
                                           Corporation, and Maria De La Cruz
                                           Perales Sanchez*

                                           *Application for Admission to District Court
                                           for District of Columbia Pending*