# EXHIBIT 6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| CASA DE MARYLAND<br>8151 15th Ave.<br>Hyattsville, MD 20783 | ) |
|  | ) |
|  | ) |
| THE COALITION FOR HUMANE IMMIGRANT<br>RIGHTS (CHIRLA)<br>2533 West 3rd Street<br>Los Angeles, CA 90057 | ) |
|  | ) |
|  | ) |
|  | ) |
| FAIR IMMIGRATION MOVEMENT (FIRM)<br>1536 U Street NW<br>Washington, DC 20009 | ) |
|  | ) |
|  | ) |
| ONE AMERICA<br>1225 S. Weller Street, Suite 430<br>Seattle, WA 98144 | ) |
|  | ) |
|  | ) |
| PROMISE ARIZONA<br>701 S 1st Street,<br>Phoenix, Arizona 85004 | )  Case Number 17-02942 |
|  | ) |
| MAKE THE ROAD PENNSYLVANIA<br>501 Washington St, 1st Floor<br>Reading, Pennsylvania  19601 | )  REDACTED COPY |
|  | ) |
|  | ) |
| MICHIGAN UNITED<br>4405 Wesson<br>Detroit, Michigan  48210 | ) |
|  | ) |
|  | ) |
| ARKANSAS UNITED COMMUNITY<br>COALITION<br>PO Box 9296<br>Fayetteville, AR 72703 | ) |
|  | ) |
|  | ) |
| JUNTA FOR PROGRESSIVE ACTION, INC.<br>169 Grand Avenue<br>New Haven, Connecticut 06513, | ) |
|  | ) |
|  | ) |
|  | ) |
|  | ) |

ANGEL AGUILUZ,  ESTEFANY RODRGIUEZ,    )
HEYMI ELVIR MALDONADO, NATHALY    )
URIBE ROBLEDO, ELISEO MAGES, JESUS    )
EUSEBIO PEREZ, JOSUE AGUILUZ, MISSAEL    )
GARCIA, JOSE AGUILUZ, MARICRUZ    )
ABARCA, ANNABELLE MARTINES HERRA,    )
MARIA JOSELINE CUELLAR BALDELOMAR,    )
BRENDA MORENO MARTINEZ, LUIS    )
AGUILAR,    )
    )
J. M. O., a minor child,    )
    )
ADRIANA GONZALES MAGOS, next of friend    )
to J.M.O.    )
    )
A.M., a minor child, and    )
    )
ISABEL CRISTINA AGUILAR ARCE, next of    )
friend to A. M.[1]    )
    )
    )
          v.    )
    )
    )
U.S. DEPARTMENT OF HOMELAND    )
SECURITY    )
3801 Nebraska Ave. NW    )
Washington, DC 20016    )
    )
U.S. CITIZENSHIP AND IMMIGRATION    )
SERVICES    )
20 Massachusetts Ave. NW    )
Washington, DC 20008    )
    )
U.S. IMMIGRATION AND CUSTOMS    )
ENFORCEMENT    )
500 12th St. SW    )
Washington, DC 20536    )
    )
U.S. CUSTOMS AND BORDER PROTECTION    )
1300 Pennsylvania Ave. NW    )
Washington, DC 20004    )
    )

---

[1] All of the individual plaintiffs concurrently move to waive their obligations under Local Rule 102.2(a) to provide addresses, on the basis of their objectively reasonable fear that publicizing their home addresses would subject Plaintiffs to harassment (potentially including violence) and threats.

2

DONALD J. TRUMP, in his official capacity as            )
President of the United States                          )
1600 Pennsylvania Ave. NW                               )
Washington, DC 20500                                    )
                                                        )
JEFFERSON BEAUREGARD SESSIONS III, in                   )
his official capacity as Attorney General of the        )
United States                                           )
950 Pennsylvania Ave. NW                                )
Washington, DC 20530-0001                               )
                                                        )
ELAINE C. DUKE, in her official capacity as             )
Acting Secretary of Homeland Security                   )
Washington, D.C.  20528                                 )
                                                        )
JAMES W. MCCAMENT, in his official capacity             )
as Acting Director of U.S. Citizenship and              )
Immigration Services                                    )
20 Massachusetts Ave. NW                                )
Washington, DC 20008                                    )
                                                        )
THOMAS D. HOMAN, in his official capacity as            )
Acting Director of U.S. Immigration and Customs         )
Enforcement                                             )
500 12th St. SW                                         )
Washington, DC 20536                                    )
                                                        )
KEVIN K. MCALEENAN, in his official capacity            )
as Acting Commissioner of Customs and Border            )
Protection                                              )
1300 Pennsylvania Ave. NW                               )
Washington, DC 20004                                    )
                                                        )
UNITED STATES OF AMERICA,                               )
                                                        )
                        Defendants.                     )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## OVERVIEW

1.      American democracy rests on fundamental principles of fairness and equality.

Our system of justice does not punish people for things that they did not do or that they could not

control.  And we expect our government to abide by its commitments.  In its rescission of the

3

Deferred Action for Childhood Arrivals ("DACA") program, and its draconian immigration enforcement efforts, the federal government has abandoned these fundamental principles.

2.      In the three decades leading up to 2012, hundreds of thousands of children immigrated to the United States.  Many of them crossed the border of the United States without authorization, fleeing violence and desperate circumstances in their home countries, but with no route to lawful entry under our nation's immigration laws.  Others came through lawful means, but, for a variety of reasons, later lost their authorization to remain in the United States and did not return to their countries of origin.  For many of these children, it was not their choice to come to the United States.  All of them have grown up in this country, gone to school, and contributed to the fundamental fabric of American society.  Lacking legal status, these young people grew up in the shadows of American life, facing the fear of deportation, family separation, and hardship. They were stigmatized, through no fault of their own.

3.       Many of these children dreamed of a better life – where they could live freely and study, work, and defend their country – a life without fear of their government.

4.      On June 15, 2012, at the direction of President Obama, Janet Napolitano, then-Secretary of the U.S. Department of Homeland Security, helped this dream come closer to reality.  On that date, she established the Deferred Action for Childhood Arrivals (DACA) program.

5.      Under DACA, individuals who came to the United States as children and meet specific criteria may request "deferred action" for two years, subject to renewal.  "Deferred action" is a long-standing mechanism under immigration laws allowing the government to forbear from removal action against an individual for a designated period.  In addition to DACA,

federal law designates other classes as eligible for deferred action.[2]   Individuals granted deferred

action are eligible for certain rights and privileges associated with lawful presence status in the

United States.

6.      In establishing DACA, the federal government recognized that "certain young

people . . . were brought to this country as children and know only this country as home" and that

immigration laws are not "designed to remove productive young people to countries where they

may not have lived or even speak the language."  The government also recognized, among other

things, that children brought to this country had no intent to violate the law and that, with limited

resources, there were more appropriate priorities for immigration enforcement.

7.      DACA provides some sense of stability to individuals who came to the United

States as children and have grown up to become productive members of American society.

Collectively, this group of young people are often referred to as "Dreamers."

8.      To apply for DACA, Dreamers had to (1) submit extensive documentation to the

U.S. Citizenship and Immigration Services (USCIS) establishing that they meet the eligibility

criteria; (2) pay a $495 fee; and (3) submit to a rigorous DHS background check, including

submission of biometric data.

9.      When DACA was first implemented, many eligible Dreamers were reluctant to

apply because of concern that they would be required to disclose information that could help

facilitate their removal from the United States and place their family members at risk.  This

concern was understandable -- the average Dreamer entered the United States at the age of six,

and many had lived their whole lives in fear of deportation.

---

[2] *See generally* U.S. Dep't of Justice Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, Op. O.L.C.  (November 19, 2014).

10.     In an effort to encourage reluctant people to apply for DACA, the government launched an aggressive outreach campaign urging Dreamers to apply.  These efforts included well organized efforts to provide DACA application materials to organizations that serve the immigrant community,[3] enlisting the White House to promote the stories of individual DACA recipient "Champions of Change,"[4] and targeted outreach to select populations whose participation in the program lagged.[5]   DHS officials routinely engaged with immigration service providers and advocates, soliciting their assistance in expanding participation in DACA and dealing with issues in its implementation.  USCIS officials attended DACA clinics hosted by non-profits and immigration service providers across the country and held numerous engagement sessions in person, by phone and via webinar[6] to encourage participation in the program.  In conjunction with this campaign, USCIS made five promises to Dreamers.

11.     First, USCIS repeatedly promised Dreamers that information they provided about themselves as part of the DACA application process would be "protected" from use for immigration enforcement purposes.[7]

12.     Second, USCIS promised Dreamers that "information related to your family members or guardians that is contained in your request will not be referred to ICE [U.S.

---

[3] *See generally* A. Singer et al., *Local Insights from DACA for Implementing Future Programs for Unauthorized Immigrants*, Brookings Institution (June 2015).
[4] Ginette Magaña, *DACAmented Teachers: Educating and Enriching Their Communities*, Obama White House Archives: Blog (Aug.4, 2015), https://obamawhitehouse.archives.gov/blog/2015/08/04/dacamented-teachers-educating-and-enriching-their-communities; Champions of Change: DACA Champions of Change, Obama White House Archives, https://obamawhitehouse.archives.gov/champions/daca-champions-of-change (last accessed Oct.4, 2017)
[5] White House Initiative on Asian Americans and Pacific Islanders, *Deferred Action for Childhood Arrivals (DACA)*, Department of Education, https://sites.ed.gov/aapi/files/2014/07/E3-TOOLKIT-DACA.pdf (last accessed 10/2/2017)
[6] *See* for example USCIS, National Stakeholder Engagement - DACA Renewal Process (June 2014), https://www.uscis.gov/outreach/notes-previous-engagements/national-stakeholder-engagement-daca-renewal-process
[7] These representations were extensive, and are detailed below in Section X.

Immigration and Customs Enforcement] for purposes of immigration enforcement against family members or guardians."[8]

13.     Third, USCIS promised employers of Dreamers that, except in limited circumstances, if they provided their employees "with information regarding [their] employment to support a request for consideration of DACA . . . . This information will not be shared with ICE for civil immigration enforcement purposes."[9]

14.     Fourth, by establishing internal procedures, USCIS promised that once Dreamers received DACA, they would not be terminated from the program unless they posed an "Egregious Public Safety" issue.  In addition, USCIS promised to provide them with a "Notice of Intent to Terminate" which "thoroughly explain[ed]" the grounds for the termination."[10]

15.     Fifth, USCIS promised  Dreamers that they could seek renewal of their status at the expiration of their two-year DACA term.  USCIS represented that Dreamers "may be considered for renewal of DACA" if they meet the guidelines for consideration and other criteria which "must be met for consideration of DACA renewal."[11]

16.     These repeated and unequivocal assurances were critical to the success of the DACA initiative.  Relying on these representations, more than 800,000 Dreamers brooked the potential risks of deportation and removal and applied for DACA.  Employers, too, relied on these representations to assist their employees in applying for DACA, despite the potential risk of liability for the employers.

---

[8] *See* USCIS, Deferred Action for Childhood Arrivals Frequently Asked Questions ("DACA FAQs") (April 25, 2017) Q20
[9] DACA FAQs Q76.
[10] *See*  DHS, National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals (Apr. 4, 2013) ("SOP").
[11]   DACA FAQs Q51

17.     DACA has been a tremendous success, allowing the Dreamers -- -- such as Plaintiffs Angel Aguiluz, Luis Aguilar, Estefany Rodriguez, Annabelle Martinez Herra, Heymi Elvir Maldonado, Maricruz Abarca, Nathaly Uribe Robledo, Eliseo Mages, Jeus Eusebio Perez, Josue Aguiluz, Missael Garcia, Jose Aguiluz, and Brenda Moreno Martinez --  to live, study, and work in the United States, and to become stable and even more productive members of their communities, without fear that they could be arrested and placed in deportation proceedings at any moment.

18.     All of this changed on September 5, 2017, when Attorney General Jefferson Sessions ("Sessions") announced the rescission of DACA.  Several hours after the announcement, Acting Secretary of DHS Elaine Duke ("Duke") issued a memorandum rescinding DACA (the "Rescission Memorandum").[12] At Acting Secretary Duke's direction, USCIS immediately stopped accepting new applications under DACA, ended DACA recipients' eligibility to apply for permission to leave the United States and reenter with advance parole, and declared that DHS will consider DACA renewal applications only for Dreamers whose DACA expires between September 5, 2017 and March 5, 2018 if, even then, only if these Dreamers apply for renewal by October 5, 2017.

19.     The consequence of the administration's decision  to rescind DACA is that approximately 800,000 Dreamers who have received benefits and received protection against deportation under the program in reliance on the government's assurances will ultimately lose their benefits and protection, and will be exposed to deportation when their DACA authorizations expire and they cannot seek renewal.    In addition, hundreds of thousands of other

---

[12] Memorandum from Elaine C. Duke, Acting Sec'y of Homeland Security to James W. McCament, Acting Dir., USCIS, et al., Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017).

potential beneficiaries, many of whom were preparing to submit their requests for DACA, are now unable to benefit from the program.

20.     Specifically, as a direct result of the decision to eliminate DACA, among other things, Dreamers (i) will lose their work authorization, requiring their employers to terminate their employment, (ii) have lost the ability to travel internationally, and (iii) will lose their right to qualify under applicable state law for in-state admissions preferences and tuition.  As a result, many Dreamers will leave college because their inability to work will make higher education unaffordable or because they no longer qualify for in-state tuition.  Still others will leave college because they may no longer be able to achieve career objectives commensurate with their skills and qualifications.

21.     Furthermore, all of the Dreamers are at risk of having their application information shared with immigration enforcement authorities.  Welching on its prior assurances, on September 5, USCIS released guidance suggesting that it may share Dreamer applicant information with ICE and Customs and Border Protection (CBP).  The guidance substantively changes USCIS's policy in a manner that places Dreamers at heightened risk of deportation based on information previously disclosed to USCIS in good faith and in reliance on the promises outlined above.  The Rescission Memorandum does not provide any assurances that immigration enforcement agents will not be provided such information to find and remove those who applied for and/or received benefits or protection under DACA.

22.     Indeed, on September 27, 2017, Acting Secretary Duke shockingly testified before Congress that she had never seen any guidance telling Dreamers their information would not be used for immigration enforcement.

23.     The Defendants' decision to terminate DACA is a double-cross.  It is not only unjustified, but offensive to the basic values of this Nation.  It is arbitrary, capricious, and contrary to law, and therefore it cannot stand.

24.     The decision to rescind DACA is illegal because it is predicated on discriminatory animus against persons of Mexican or Central American origin.  Of the 800,000 DACA recipients, more than 90 percent of DACA recipients are of Mexican or Central American origin.[13]

25.     The evidence of discriminatory animus leading to the rescission is palpable.  The rescission is the culmination of a series of well-publicized statements made by President Trump starting as early as February 2015 revealing an anti-Mexican or anti-Central American immigrant animus and threatening Dreamers.

- Starting on February 24, 2015, President Trump made a series of defamatory and incendiary claims about immigrants from Mexico and Central America. For example, on that date, then-candidate Trump characterized immigrants from Mexico as "criminals."

- During his announcement speech on June 16, 2015, Trump referred to immigrants from Mexico as "rapists."

- In October 2016, Trump referred to immigrants from Mexico and Latin America as "bad hombres."

- On August 22, 2017, President Trump described unauthorized immigrants as "animals' who bring "the drugs, the gangs, the cartels, [and] the crisis of smuggling and trafficking."

26.     The Trump Administration's rescission of DACA is unlawful on a number of grounds.  First, the decision to rescind DACA unconstitutionally violates the due process

---

[13] See USCIS, Consideration of Deferred Action for Childhood Arrivals Fiscal Years 2012-2017 (data as of March 31)  (June 8, 2017),
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr2.pdf.

guarantee of the Fifth Amendment to the United States Constitution by reneging on DHS's prior assurances regarding DACA (including the pledges not to use of information contained in DACA applications).  Second, the decision also violates the equal protection guarantee contained in the Fifth Amendment by treating Dreamers differently than other similarly situated recipients of deferred action, obstructing them, without justification, from earning a living and furthering their education.  Third, the rescission violates the Administrative Procedure Act in numerous aspects.  To begin with, the rescission is contrary to various provisions of law, including the Privacy Act and the e-Government Act.  It is also arbitrary and capricious because it (1) is unsupported by a reasoned analysis that addresses the prior conclusion of the government that the program was legal and constitutional or explains how the justification for the rescission can be reconciled with the six-month wind down period; (2) is based on discriminatory animus; and (3) contains deadlines that are arbitrary and treat similarly situated individuals differently based on caprice.  Finally, the rescission was adopted without a legally sufficient justification and without notice or the opportunity to comment.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2201(a).

28.     Venue is proper in this district pursuant to 28 U.S.C. §§ 139l(b)(2) and 1391(e)(I). A substantial part of the events or omissions giving rise to this action occurred in this district; Plaintiff CASA and many of the Individual Plaintiffs reside in this district.  This is a civil action in which Defendants are agencies of the United States or officers of such an agency.

## PARTIES

29.     CASA de Maryland, Inc. (CASA) is a non-profit membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia and Pennsylvania.

Founded in 1979, CASA is the largest membership-based immigrant rights organization in the mid-Atlantic region, with more than 90,000 members.  CASA's mission is to create a more just society by building power and improving the quality of life in low-income immigrant communities.  In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities in Maryland, as well as the greater Washington DC metropolitan area, Virginia, and Pennsylvania.  CASA has provided assistance on nearly 4,000 DACA and DACA renewal applications since 2012, and counts more than 2,300 DACA beneficiaries as members.  Since the September 5, 2017 DACA rescission, CASA has had to reallocate significant resources to counsel and assist Dreamers who are eligible to renew their DACA in the arbitrarily narrow window the administration announced.  CASA's small legal team, composed of three attorneys and five support staff, have suspended the majority of their work to assist DACA renewal applicants, depriving community members of access to other vital legal services.  In addition, members of CASA's community organizing department, as well as other CASA departments, have reprioritized their work to engage with the community and educate them about the rescission of DACA and connect eligible individuals to application assistance services.  The rescission of DACA has had a significant negative impact on CASA's mission, as DACA members and their families who live in our communities face an uncertain future that may include loss of employment and potential permanent separation from their families.

30.     The Coalition for Humane Immigrant Rights (CHIRLA) is a non-profit organization based in Los Angeles, CA. Founded in 1986, CHIRLA organizes and serves individuals, institutions and coalitions to transform public opinion and change policies on human, civil and labor rights. CHIRLA has been recognized by the Board of Immigration

Appeals to provide immigration legal services at low cost to its members; its Legal Services Department has helped thousands of individuals to become citizens and apply to DACA.

31.     FIRM is a coalition of 44 member organizations from across 32 states around the country.  Founded in 2004, it is now the largest national network of immigrant-led grassroots organizations. FIRM fights for immigration rights including paths to citizenship and protection from low wages and poor conditions. When DACA went into effect, FIRM groups across the country helped 17,900 young people apply for work permits and relief for deportation.

32.     Michigan United is located in Detroit, Michigan.  It was founded in 2012 from the merger of the Michigan Organizing Project and the Alliance for Immigrant Rights to form a statewide coalition of churches, labor, and community groups fighting for the dignity and potential of every person.  It conducts extensive community organizing of low-income Latino and Arab American families.  It has fought for a stronger national policy against immigration enforcement at schools and churches and for the DREAM Act.  It has also been engaged in community education and implementation of DACA.

33.     OneAmerica is located in Seattle, Washington.  It was formed directly after September 11, 2001 in response to the hate crimes and discrimination targeting Arabs, Muslims and South Asians.  OneAmerica has grown into a leading force for immigrant, civil and human rights. Their mission is "OneAmerica advances the fundamental principles of democracy and justice at the local, state and national levels by building power within immigrant communities in collaboration with key allies."  It advocates for immigration policies and practices to best address the needs of immigrant and refugee communities in partnership with immigrant and refugee community members.  OneAmerica is advocating for a permanent legislative solution for DACA recipients, many of whom are active OneAmerica volunteers and members.

13

34.     Promise Arizona is located in Phoenix, Arizona. It was founded in 2010 as a reaction to the passage of the SB 1070 legislation targeting immigrants in the state. It's mission is to promote "diversity, opportunity, and progress…by building power in [their] community, championing family and cultural values, and connecting people to life-changing resources." PAZ advocates for the passage of the DREAM Act and a "humane and comprehensive immigration bill."

35.     Make the Road Pennsylvania is located in Reading, PA. It was founded in 2014 to organize low-income and working class Latino immigrants in Lehigh and Berks Counties to fight for change in their communities.  It has had several "Occupy" movements in various cities to defend DACA, and gives free legal help for DACA renewals.

36.     Arkansas United is located in Fayetteville, AR. It was founded in 2010 to help raise awareness in the immigrant community about how immigrants could become full participants in the state's economic, political and social processes.  It is raising money to assist Dreamers pay for their expedited renewals.

37.     Junta for Progressive Action is located in New Haven, CT.  Its mission is to "provide services, programs and advocacy that improve the social, political and economic conditions of the Latino community in greater New Haven while nurturing and promoting its cultural traditions as it builds bridges with other communities."  It has been pairing applicants eligible for DACA renewal with lawyers for help with their applications. It also put on a joint press conference with New Haven Mayor Toni Harp to advocate for a "clean Dream Act bill."

38.     ████████████████████ (A.M.) is a 15 year old resident of Owings Mills, Maryland.  In October 2003, at the age of 12 months, he was brought to the United States from Honduras following the murder of his cousin.  He is currently a high school student with a 3.5

GPA and has been a Boy Scout for five years.  After graduation, his dream is to go to college and become an engineer.  He is frustrated that, due to the DACA rescission, he is no longer eligible to apply for DACA, and he fears he will lose his ability to apply for college or be employed after college, as well as is ability to visit family in Honduras.  He is also concerned that, if he and his mother are deported, they will be separated from his younger siblings, who are U.S. citizens.

39.     Isabel Cristina Aguilar Arce is the mother of A.M and his next of friend in this action.

40.     ████████████████ (J.M.O.) is a 17 year old resident of Capitol Heights, Maryland.  In April 2005, at the age of 4, he was brought to the United States from Mexico to seek a better life.  At the age of 8, he suffered a stroke, and has been under medical care since that time.  Jose applied for and received DACA in March 2016.  He is currently a high school junior in suburban Maryland.  His dream is to go to college to study chemistry and become a chemical engineer.  His DACA is due to expire on March 6, 2018, one day after the last date as to which DHS will allow renewals.  Due to the DACA rescission, he is concerned that he will be unable to renew his DACA, and he fears he will lose his ability to apply for college.

41.     Adriana Gonzales Magos is the mother of J.M.O. and his next of friend in this action.

42.     Angel Aguiluz is a 20 year old resident of Silver Spring, Maryland.  In June 2005, at the age of 8, he was brought to the United States from Honduras by his parents, who were seeking medical attention for his older brother.  Angel applied for and received DACA.  He is currently a student at Montgomery College, where he is studying math and physics, and he is also employed part-time by a restaurant.  His dream is to become a physicist.  His DACA and

work permit are scheduled to expire in 2018.  Due to the DACA rescission, he is concerned that

he will lose his job and will be deported to Honduras.

43.    Estefany Rodriguez is a 20 year old resident of Rockville, Maryland.  In 2001, at

the age of 3, she was brought to the United States from Bolivia.  She applied for and received

DACA in January 2015.  At the age of 18, she was diagnosed with brain cancer, and has been

under medical care since that time.  She is currently a student at Montgomery College.  Her

DACA is due to expire in January 2018, but she submitted a renewal application on October 4,

2017.  She is concerned that, due to the DACA rescission, she will be unable to renew her

DACA once it expires.

44.    Heymi Elvir Maldonado is a 20 year old resident of Baltimore, Maryland.  In,

2008, at the age of 8, she was brought to the United States from Honduras by her mother, who

was seeking a better life for her daughters.  She applied for and received DACA.  Since receiving

DACA, she has worked as an office assistant for the school system, and has attended classes at

Goucher College, where she intends to major in Business Management and Spanish.  Her DACA

recently expired.  She is concerned that, due to the DACA rescission, she is unable to renew her

status and will be unable to work or to be able to afford to complete her college degree.  She is

also concerned that she will be deported to Honduras, where she has no connections.

45.    Nathaly Uribe Robledo is a 22 year old resident of Glen Burnie, Maryland.  In

1997, at the age of 2, she was brought to the United States from Chile to seek a better live.

Nathaly applied for and received DACA in October 2012.  For the last three years, she has

worked as an insurance agent, and her dream is one day to have her own agency.  She had

planned to apply for permanent legal resident status, as well as for advance parole in 2018 to

visit her great-grandmother in Chile.  Her DACA is scheduled to expire on December 4, 2017;

she submitted a renewal in July, but has not heard whether it has been approved.  Due to the

DACA rescission, she has cancelled her plans to travel to Chile, and her plan to apply for legal

permanent status has been put on hold.  She is concerned that she will lose her job once she loses

work authorization.

46.     Eliseo Mages is a 23 year old resident of Capital Heights, Maryland.  In April

2004, at the age of 11, he was brought to the United States from Mexico so that he and his

brother could have a better education and a better life.  Eliseo applied for and received DACA.

Following receipt of his work permit, he worked in a paint store (ultimately being promoted to

manager) while he earned a college degree as a Veterinarian's Assistant.  His DACA is due to

expire in 2019.  Due to the DACA rescission, he is concerned he will not be able to keep his job

and will not be able to obtain employment with a veterinarian.

47.     Jesus Eusebio Perez is a 25 year old resident of Baltimore, Maryland.  In 1997, at

the age of 5, he was brought to the United States from Mexico so that his parents could provide

for his family.  Jesus applied for and received DACA in November 2012.  For over the last four

years, he has been employed by the Johns Hopkins School of Public Health, first as a Research

Assistant and currently as a Mental Mentor, who works with middle school students.  His DACA

and work permit are due to expire in March 2019.  Due to the DACA rescission, he is concerned

that he will lose his employment when his work permit expires and that he will be deported to

Mexico.

48.     Josue Aguiluz is a 25 year old resident of Beltsville, Maryland.  In June 2005, at

the age of 12, he was brought to the United States from Honduras by his parents, who were

seeking medical attention for his older brother.  He applied for and received DACA and a work

permit in November 2012.  While maintaining a full time job, he earned an associates' degree in

accounting.  He is currently employed as a billing analyst for a Northern Virginia technology

company and is working towards a bachelor's degree in accounting. His DACA and work permit

are due to expire in November 2018.    Due to the DACA rescission, he fears that he will be

terminated once his work authorization expires, that he will not be able to  complete his

bachelor's degree, and that this will delay his ability to take the CPA exam.

49.    Missael Garcia is a 27 year old resident of Dundalk, Maryland.  In September

2002, at the age of 12, he was brought to the United States from Mexico by his parents, who

were seeking a better life.  He was valedictorian of his high school class.  He applied for and

received DACA and a work permit in August 2015.  He has worked as a community organizer,

as a mentor to middle school students, and in the restaurant business, and is expecting his first

child to be born in the next few weeks.  His DACA and work authorization expired in August

2017.  Due to the DACA rescission, he is unable to renew his status and will be unable to

provide for his young family or to complete the purchase of a house.  He is also concerned that

he will be deported to Mexico, where he has no connections.

50.    Jose Aguiluz is a 28 year old resident of  Washington, D.C.  In June 2005, at the

age of 15, his parents  brought him to the United States from Honduras to seek medical treatment

(spinal surgery) following a car accident.  He earned an associate's degree in nursing in

December 2011, but was ineligible to take board examinations to become a Registered Nurse.

He applied for and received DACA and a work permit in November 2012.  He has subsequently

passed the Nursing Boards and received his bachelor's degree in nursing in 2014.  He is

employed as a Registered Nurse in a Maryland hospital, and plans to seek a master's degree in

nursing.  His DACA and work permit are due to expire in November 2018.  Due to the DACA

rescission, he fears that he will not be able to pursue his master's degree, that he will be terminated once his work authorization expires, and that he will be deported to Honduras.

51.     Brenda Moreno Martinez is a 28 year old resident of Baltimore, Maryland.  In August 2001, at the age of 12, her parents brought her to the United States from Mexico because her father was threatened because of his political views.  She applied for and received DACA and a work permit in August 2012.  She was subsequently able to attend and graduate from college and has passed her certification to become a teacher.  She is currently employed as a teacher in the Baltimore City school system, and plans to seek a master's degree in education. Her DACA and work permit are due to expire in June 2018.    Due to the DACA rescission, she is concerned that she will lose her job, and cannot pursue her master's degree.  She has postponed her plans to visit her elderly grandmother in Mexico, and because she is scared of travelling even within the United States, has cancelled a family vacation to Hawaii.

52.     Maricruz Abarca is a 29 year old resident of Baltimore, Maryland.  In June 2002, at the age of 15, she was brought to the United States from Mexico by her mother, who was trying to reunite their family.  She applied for and received DACA in October 2016.  Since receiving DACA, she has started a small business and is in the process of acquiring a towing company.  She is currently attending classes at Baltimore City Community College to become a legal assistant.  Her dream is to attend law school and become a lawyer.  Her DACA is scheduled to expire in October 2018.  Due to the DACA rescission, she is concerned that she will not be able to continue her education, and that she will be deported to Mexico (where she has no connections) and separated from her three children, who are all U.S. citizens.

53.     Luis Aguilar is a 29 year old resident of Alexandria, Virginia.  In 1997, at the age of 9, he was brought to the United States from Mexico.  He applied for and received DACA in

2012. He has taught himself how to code, and participated in the 2014 Facebook "hackathon"

and won a national competition by designing a website platform that serves as a tool for users to

search the voting record and stance of all members of Congress on immigration.  Since receiving

DACA, he has worked for a variety of organizations in the immigrant rights movement, and

currently works as CASA's Advocacy Specialist in Virginia.   His DACA and work permit are

scheduled to expire in March 2019.  He is concerned that, due to the DACA rescission, he will

be unable to find work once he loses his work authorization.

54.     Annabelle Martinez Herra is a 33 year old resident of Bowie, Maryland.  In

December 1995, at the age of 11, she was brought to the United States from Costa Rica by her

parents, who were seeking a better life.  She applied for and received DACA and work

authorization in July 2015.  After receiving DACA, she worked doing human resources and

accounting at a painting company, and was able to buy her house.  Her DACA expired in July

2017.  Since the DACA rescission, she has been fired by her employer. She is concerned that,

due to the DACA rescission, she will be unable to renew her status and she will be unable to find

other employment.  She is also concerned that she will lose her house, as well as her food

stamps.  She is also concerned she will be unable to care for her 14 year old son, who is a U.S.

citizen.

55.     María Joseline Cuellar Baldelomar is a 21 year old resident of Springfield,

Virginia.  In July 2001, at the age of 4, she was brought to the United States from Bolivia by her

mother, who was seeking a better life for her children.  She applied for and received DACA in

January 2013.  Since receiving DACA, she became employed by a child development center and

later became the musical director at her church.  She also has started a small business with her

husband. Her DACA is scheduled to expire in January 2018; she did not renew because since

December 2016, she has had an application pending to change her status to legal permanent

resident and she is concerned her information will be shared with immigration enforcement

authorities.  Due to the DACA rescission, she is concerned that her application for legal

permanent residence will be denied and she will be deported, separating her from her family --

her husband, son, and siblings are all U.S. citizens.

56.     Defendant DHS is a federal cabinet agency responsible for implementing DACA.

DHS is a Department of the Executive Branch of the United States Government, and is an

agency within the meaning of 5 U.S.C. § 552(f)(l).

57.     Defendant USCIS is an Operational and Support Component agency within DHS.

USCIS is the sub-agency responsible for administering DACA.

58.     Defendant U.S. Immigration and Customs Enforcement ("ICE") is an Operational

and Support Component agency within DHS. ICE is responsible for enforcing federal

immigration law, including identifying, apprehending, detaining, and removing non-citizens.

59.     Defendant U.S. Customs and Border Protection ("CBP") is an Operational and

Support Component agency within DHS.  CBP is responsible for administering and enforcing

immigration law at borders.

60.     Defendant Donald J. Trump is the President of the United States, and authorized

the issuance of the Rescission Memorandum that purports to rescind DACA. He is sued in his

official capacity.

61.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the

United States, and announced the rescission of DACA.  He is sued in his official capacity.

62.     Defendant Elaine C. Duke is the Acting Secretary of Homeland Security. She is

responsible for implementing and enforcing immigration laws, and oversees DHS. She is the

author of the September 5, 2017 Rescission Memorandum rescinding DACA. She is sued in her official capacity.

63.     Defendant James W. McCament is the Acting Director of U.S. Citizenship and Immigration Services.  He is sued in his official capacity.

64.     Defendant Thomas D. Homan is the Acting Director of U.S. Immigration and Customs Enforcement.  He is sued in his official capacity.

65.     Defendant Kevin K. McAleenan is the Acting Commissioner of U.S. Customs and Border Protection.  He is sued in his official capacity.

66.     Defendant United States of America includes all government agencies and departments responsible for the implementation and rescission of DACA.

## BACKGROUND:  ESTABLISHMENT OF DACA

67.      On June 15, 2012, Secretary Napolitano issued a memorandum establishing the DACA program (the "2012 DACA Memorandum"). Under DACA, individuals who came to the United States as children and meet specific criteria may request deferred action for a period of two years, subject to renewal.

68.     Deferred action is a long-standing mechanism under the immigration laws pursuant to which the government forbears from taking removal action (i.e., starting the process of expelling an immigrant from the United States) against an individual for a designated period. In addition to DACA, federal law and the federal government by executive action have declared various other classes of individuals as eligible for deferred action.  For example:

- In 1990, the Immigration and Naturalization Service implemented a "Family Fairness" program to protect approximately 1.5 million spouses and children

of immigrants who had been granted legal status under the 1986 immigration law.[14]

- Certain aliens who have suffered abuse by U.S. Citizens or LPR spouses or parents may self-petition under the Violence Against Women Act for deferred action status.  8 U.S.C. § 1154(a)(1)(A)(iii)–(iv), (vii)).

- Certain aliens who are victims of human trafficking and their family members are eligible for deferred action status.  8 U.S.C.§ 1101(a)(15)(T)(i).

- Certain aliens who are victims of certain crimes and their family members are eligible for deferred action status.  8 U.S.C.§ 1101(a)(15)(U)(i).

- In 2009, DHS implemented a deferred action program for certain widows and widowers of U.S. Citizens.[15]

- The U.S. government has, in the wake of major natural disasters, allowed foreign students who can no longer satisfy the requirements to maintain their student visas to be eligible for deferred action.[16]

- The U.S. government has, from time to time, allowed aliens of particular nationalities to be eligible for deferred action.[17]

69.     Under the 2012 DACA Memorandum, applicants had to demonstrate that they (i) came to the United States under the age of sixteen; (ii) had continuously resided in the United States since June 15, 2007; (iii) were currently in school, had graduated from high school, had obtained a general education development certificate, or were an honorably discharged veteran; (iv) had not been convicted of a felony,  significant misdemeanor, three or more misdemeanor offenses, or otherwise posed a threat to national security or public safety; and (v) were not over thirty years old as of June 15, 2012.

---

[14] *See* Memorandum for Regional Commissioners, INS, from Gene McNary, Commissioner, INS, Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens (Feb. 2, 1990)

[15] Memorandum for Field Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, Re: Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children at 1 (Sept. 4, 2009)

[16] *See, e.g.,* USCIS, Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ) at 1 (Nov. 25, 2005)

[17] *See, e.g.,* Exec. Order No. 12,711, 3 C.F.R. 284(April 11, 1990) (Policy Implementation with Respect to Nationals of the People's Republic of China).  *See generally* Congressional Research Service, *Analysis of June 15, 2012 DHS Memorandum* (July 13, 2012) Appendix A.

70.     USCIS promised Dreamers that their applications would be considered under a fair process.  Specifically, USCIS assured Dreamers that "[a]ll individuals who believe they meet the guidelines . . . may affirmatively request consideration of DACA from USCIS through this process," and after USCIS receives the applicant's forms, evidence, supporting documents and application fee, "USCIS will review them for completeness." USCIS further affirmatively represented to Dreamers that if it determines that the request is complete, USCIS will send the applicant notices of receipt and for needed appointments, and then review the applications "on an individual, case-by-case basis" and notify applicants of its determination in writing.[18]

### BACKGROUND:  APPLICANTS WERE ADVISED THAT PARTICIPATION IN DACA ENTITLED THEM TO TANGIBLE BENEFITS

71.     In publicizing DACA, the government emphasized that deferred action status made Dreamers eligible for numerous benefits and privileges.

72.     For example, USCIS promised Dreamers if their DACA applications were granted, they "may obtain employment authorization" to work for up to two years.[19]  This commitment was authorized under federal law; under 8 CFR 274a(a)(11) & (c)(14), deferred action recipients (including, but not limited to, Dreamers) may apply for work authorization to be legally employed.  This representation was important to Plaintiffs Josue Aguilaz, Jose Eusebio Perez, and Missael Garcia who were working in low skill, minimum wage jobs; since receiving DACA, Augilaz has been able to obtain employment as an accountant, Garcia has been able to obtain employment as a school mentor, and Perez has been able to obtain employment as a Research Assistant at Johns Hopkins University.

---

[18] DACA FAQs Q7; USCIS, *F5 General Information — How do I request consideration of DACA?* at 2 (June 2014).
[19] DACA FAQs Q4.

73.    USCIS promised Dreamers that if their DACA applications were granted, they would be eligible to travel outside the United States for educational, employment, or humanitarian purposes.[20]  In particular, USCIS told Dreamers that they would be eligible to apply for "advance parole," parole," which permits recipients to leave the country temporarily without risk that they will be denied readmission.  This commitment opened the door to allow international travel for Dreamers.  For example, DACA recipients were allowed to briefly depart the U.S. and legally return under certain circumstances, such as to visit an ailing relative, attend funeral services for a family member, seek medical treatment, or further educational or employment purposes. This commitment was authorized under federal law; under 8 USC 212(d)(5)(A), deferred action recipients (including Dreamers) may apply for "parole" to travel internationally without risk that they will be barred from re-entering the United States.[21] Plaintiff Jose Aguilaz and Luis Aguilar successfully obtained advance parole to visit family members in Honduras and Mexico respectively.

74.    USCIS promised Dreamers that if their DACA applications were granted, they could attend educational institutions.[22]  In particular, USCIS told Dreamers they could attend "elementary school, junior high or middle school, high school, alternative program," "education, literacy, or career training program (including vocational training)" as well as an "education program assisting students in obtaining a regular high school diploma or its recognized equivalent under state law."  This commitment was authorized under federal law; under 42 USC 2000c-6, educational institutions may not discriminate on the basis of national origin, and under 42 USC 2000d, 28 C.F.R. § 42.104(b)(2), and 34 C.F.R. § 100.3(b)(2), individuals may not be

---

[20] DACA FAQs Q57.
[21] DACA FAQs Q57.
[22] DACA FAQs 32-34.

discriminated against in the receipt of federal financial educational assistance on the basis of their national origin.  *See also Plyler v. Doe*, 457 U.S. 202 (1982).  Plaintiff Josue Aguilaz credits DACA (which allowed him to take his certification to become a Registered Nurse) with his decision to return to school to obtain an advance nursing degree.  Similarly, Plaintiffs Eliseo Mages, Brenda Moreno Martinez, Nathaly Uribe Robledo, and Angel Aguilaz all credit DACA with allowing them to attend college.

75.     In publicizing DACA, the federal government emphasized that Dreamers would pay into and be eligible for certain public benefits such as Social Security and disability.[23]   This commitment was authorized under federal law; unlike other undocumented immigrants, under 8 USC 1611(b)(2) & (b)(3) and 8 U.S.C. 1621(d), deferred action recipients are eligible for public benefits, such as Social Security, Medicare, and disability benefits.

76.     USCIS promised Dreamers that if their DACA application was granted, they would be "authorized by DHS to be present in the United States," "considered by DHS to be lawfully present," and that their "period of stay is authorized by DHS."[24]  This commitment was authorized under federal law; under 8 CFR 109.1, deferred action recipients are granted suspended accrual of unlawful presence for purposes of admission.

77.     In addition to the benefits directly provided by the federal government, these benefits enabled Dreamers to secure equal access to other benefits and opportunities on which Americans depend, including opening bank accounts, obtaining credit cards, starting businesses, purchasing homes and cars, and conducting other aspects of daily life that are often unavailable for undocumented immigrants.

---

[23] Karen Tumulty, *Illegal Immigrants could receive Social Security, Medicare under Obama Action*, Wash. Post., Nov, 25, 2014.
[24] DACA FAQs Q1, Q5.

78.     DHS recognized that DACA created rights that the government could not take away without affording due process.  Under the DACA "National Standard Operating Procedures (SOP): Deferred Action for Childhood Arrivals ("SOP"), established by USCIS and DHS, individuals admitted into DACA are not to be terminated from the program absent an "Egregious Public Safety" issue.[25]  In this event, the procedures require USCIS to provide a "Notice of Intent to Terminate" which "thoroughly explain[s]" the grounds for the termination."  Other materials informed Dreamers that only " fraud or misrepresentation" in the application process or "[s]ubsequent criminal activity" would be grounds for revocation of DACA.[26]  The SOP further directed that the recipients of such notice should receive 33 days to "file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate" prior to termination of participation in DACA.[27]

## BACKGROUND: THE PRIVACY COMMITMENT TO DREAMERS

79.     The DACA application form required applicants to provide a wealth of personal, sensitive information, including the applicant's lack of lawful immigration status, address, Social Security number, and the name and location of his or her school.  DACA applicants were also required to provide DHS with a detailed history of their criminal arrests and convictions, including all misdemeanors, however minor, and to affirmatively declare whether they had ever been placed in removal proceedings in the past.  The application process also required that all DACA applicants undergo biographic and biometric background checks, which included fingerprinting, before USCIS considered their DACA requests.

---

[25] SOP at 132-34.
[26] USCIS Approval Notice, Form 1-821D, Consideration of Deferred Action for Childhood Arrivals.
[27] SOP at 132.

80.     To induce participation in DACA, USCIS made numerous commitments to Dreamers regarding their rights under the program.

81.     Foremost among these commitments was the promise that DACA applicants' information would not be shared with the DHS components responsible for immigration enforcement – ICE and CBP.  In providing this information, DACA applicants relied on Defendants' promises about the terms of the program and the manner in which their information would be protected.  These promises were documented, among other places:

- In the "Instructions" to Form I-821D -- the DACA application which every DACA applicant had to complete -- stated that "information provided in this request is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the individual meets the guidelines for the issuance of a Notice to Appear (NTA) or a referral to ICE under the guidelines set forth in USCIS's Notice to Appear Guidance."[28]

- In the Frequently Asked Questions for DACA applicants, USCIS affirmatively represented to Dreamers that, except in limited circumstances (i.e., the individual meets the guidelines for a Notice to Appear), their information would not be shared with immigration enforcement authorities. *See, e.g.,* FAQ Q19 ("[i]nformation provided in [a DACA request] is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings").

- In the Frequently Asked Questions for DACA applicants, USCIS affirmatively represented to Dreamers that their information would not be shared with immigration enforcement authorities even if their request for DACA was denied.  *See, e.g.,* FAQ Q26 ("[i]f you have submitted a request for consideration of DACA and USCIS decides not to defer your case ... your case will not be referred to ICE for purposes of removal proceedings").

- In other materials as well, USCIS promised Dreamers that it would not share their information with immigration enforcement authorities.  For example, one slide in a Powerpoint presentation staed: "Protecting Your Information: We *will not* share any information about you with ICE or U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless you meet the criteria for: the issuance of an NTA; or a referral to ICE under the criteria set forth in our NTA guidance."[29]

---

[28] Instructions to Form I-821D.
[29] June 2014 PPT at 30.

- The general guidance on the USCIS website reassured applicants that their applications would be submitted to a "lockbox" and would not be shared with immigration enforcement: "If your case does not involve a criminal offense, fraud, or a threat to national security or public safety, we will not refer your case to ICE for purposes of removal proceedings except where DHS determines there are exceptional circumstances." [30]

- Other guidance also stated "What protections are in place to protect the information I share in my request from being used for immigration enforcement practices? The information you provide in your request is protected from disclosure to U.S. Immigration and Customs Enforcement (ICE) and U.S. Customs and Border Protection (CBP) for the purpose of immigration enforcement proceedings unless you meet the criteria for issuance of a Notice to Appear or a referral to ICE under the criteria explained in USCIS' Notice to Appear . . . Individuals whose cases are deferred under the consideration of deferred action for childhood arrivals process will not be referred to ICE."[31]

- USCIS also promised employers of Dreamers that any information they provided verifying employment would not be used for enforcement purposes against them or their company absent "evidence of egregious violations of criminal statutes or widespread abuses."[32]

82.     In their receipt, use, maintenance, and protection of personally identifiable information, DHS and USCIS, among other federal government agencies, are required to comply with the Privacy Act of 1974 ("Privacy Act"). 5 U.S.C. § 552a. Among other things, the Privacy Act prohibits an agency's disclosure of information about "individuals" to another agency or person unless a specific exemption applies.[33] The Privacy Act also provides that a

---

[30] Consideration of Deferred Action for Childhood Arrivals, "Filing Process" & "If USCIS does not grant DACA in your case."
[31] USCIS, *F5 General Information — How do I request consideration of DACA?* at 3 (June 2014).
[32] DACA FAQs 76.
[33] *See* 5 U.S.C. § 552a (b) ("No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains").

government agency may not maintain information in its records that is not necessary to accomplish a purpose required to be accomplished by statute or by executive decree.[34]

83.     Under the Privacy Act, USCIS and DHS stored DACA applicant information in one of four pre-existing systems of records -- the "Alien File, Index, and National Tracking System of Records," the "Background Check Service," the "Biometric Storage System," and the "Benefits Information System."[35]

84.     DHS and USCIS, like other federal government agencies, also are required to comply with the e-Government Act of 2002.  Pub. L. 107-347 (2002).  Among other things, the e-Government Act requires a government agency to prepare a Privacy Impact Assessment that addresses "with whom the information will be shared."  *Id.* § 208(b).

- Under the e-Government Act, on August 15, 2012, USCIS and DHS conducted a Privacy Impact Assessment ("PIA-45") for DACA.[36]

- PIA-45 repeatedly refers to DACA applicants as "individuals" (a key statutory term under the Privacy Act) and states that "prior to the submission of any information, individuals are presented with a Privacy Act Statement, as required by Section (e)(3) of the Privacy Act."  PIA-45 4.1.

- PIA-45 instructs that "any [personally identifiable information] that is collected, used, maintained, and/or disseminated . . . are to be treated as System of Records subject to the Privacy Act regardless of whether the information pertains to a U.S. citizen, Legal Permanent Resident, visitor, or alien."  PIA-45 7.1.

- PIA-45 expressly declares that "[i]nformation provided in this request is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the individual meets the guidelines for the issuance of a Notice to Appear (NTA) or a referral to ICE under the guidelines set forth in USCIS's Notice to Appear Guidance."  PIA-45 3.3.

---

[34] *See* 5 U.S.C. § 552a (c)(1) (an agency "shall maintain in its records **only** such information about an individual as is relevant and necessary to accomplish a purpose of the agency required to be accomplished by statute or by executive order of the President") (emphasis added).

[35] DHS/USCIS/PIA-045, Privacy Impact Assessment for the Deferred Action for Childhood Arrivals at 9 ((Aug. 15, 2012).

[36] *Id*.

- When USCIS updated the DACA Application Form (I-821D) to request additional information, DHS issued an updated PIA to provide notice of the new information requested.  That updated form similarly said that information provided is "protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings."[37]

85.    PIA-45's treatment of DACA applicant data as covered by the Privacy Act was consistent with DHS policy.  Well before the establishment of DACA, DHS set forth its policy to treat all persons' personally identifiable information, regardless of citizenship, the same under the Privacy Act.[38]

86.    Although the Privacy Act prohibition on disclosure includes exceptions that allow an agency to disclose information pursuant to a "routine use" or to "another agency . . . for a civil or criminal law enforcement activity," 5 USC 552a(b)(3&7), USCIS and DHS expressly waived those exceptions insofar as they relate to immigration enforcement activities regarding DACA applicants.

87.    As detailed above in paragraph 84, USCIS and DHS waived the disclosure exceptions by repeatedly and consistently promising Dreamers in agency publications that their data would not be shared with immigration enforcement authorities.

88.    The waiver of the exemptions from the Privacy Act's prohibition on disclosure of personally identifiable information in a system of records is further documented in the USCIS SOP for DACA, which sets forth the standards that DHS applies to DACA applications with nearly 150 pages of specific instructions for granting or denying deferred action.  The SOP emphasizes that the "additional measures . . . necessary to ensure that enforcement resources are

---

[37] DHS/USCIS/PIA-045(a), Privacy Impact Assessment Update for the Deferred Action for Childhood Arrivals at 2, 6 (April 2014) ("There is no change in the DHS external sharing and disclosure of information as described in the DHS/USCIS/PIA-045 DACA PIA.")
[38] Guidance Memorandum from Hugo Teufel III, Chief Privacy Officer, U.S. Department of Homeland Security, 2007-01: DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Information on Non-U.S. Persons (Jan. 7, 2009)

not expended on these low priority cases," and includes provisions regarding the "lockbox" to which applicants were directed to submit data, as well as "Revised Guidance for the Referral of Cases and Issuance of Notices to Appear" that restricted the referral of cases to ICE. [39]

89.     In addition, USCIS and DHS senior leadership confirmed the waiver.  For example, in December 2016, then-Secretary of Homeland Security Jeh Johnson sent a letter to members of Congress regarding the need to protect DACA-related information, acknowledging that there were, at the time, 750,000 DACA recipients who had "*relied* on the U.S. government's representations" about prohibitions on the use of such information for immigration enforcement purposes. Johnson unequivocally stated: "***We believe these representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored***." (emphasis added).

90.     The government's representations that information provided by a DACA applicant would not be used against him or her for later immigration enforcement proceedings are unequivocal and atypical.  For example, the federal government does not make the same representations for individuals with similar statuses, such as Temporary Protected Status.[40]

91.     Because every DACA applicant was advised that applicant information would not be shared with ICE or CBP, and because the government explicitly acknowledged, Dreamers relied on this commitment in submitting their data, the Due Process Clause and the doctrine of equitable estoppel preclude Defendants from taking actions breaching their commitments.

---

[39] SOP at 18, 20, 23-24 & App. B.
[40] *See, e.g.*, USCIS, Temporary Protected Status, https://www.uscis.go v/humanitarian/temporary-protected-status (last updated May 24, 2017).

### THE ROAD TO RESCISSION

92.     DACA fundamentally changed the lives of Dreamers. By no longer having to hide

in the shadows, they obtained employment, sought higher education, pursued career paths, and

became fully contributing members of society who paid taxes and participated in civic life.  As

Secretary Johnson stated in December 2016, DACA has enabled hundreds of thousands of young

people "to enroll in colleges and universities, complete their education, start businesses that help

improve our economy, and give back to our communities as teachers, medical professionals,

engineers, and entrepreneurs— all on the books."[41]

93.     As the Secretary of Homeland Security recognized less than 10 months ago, the

United States "continue[s] to benefit . . . from the contributions of those young people who have

come forward and want nothing more than to contribute to our country and our shared future ."[42]

94.     Ending DACA, whose participants are mostly of Mexican and Central American

origin, fulfills President's Trump, Attorney General Sessions, and their subordinates oft-stated

desire to punish and disparage people with Mexican and/or Central American  roots or Latinos

generally, as a group, without acknowledging their individual personalities, attributes or

circumstances, a failure to differentiate that is the essence of prejudice.  For example:

- In announcing his presidential campaign, then-candidate Trump compared
  Mexican immigrants to rapists, stating: "When Mexico sends its people,
  they're not sending their best. . . . They're sending people that have lots of
  problems, and they're bringing those problems with us. They're bringing
  drugs. They're bringing crime. They're rapists. . . . It's coming from more
  than Mexico. It's coming from all over South and Latin America."[43]

- During the first Republican presidential debate, then-candidate Trump again
  restated his distaste for immigrants from Mexico: "The Mexican government .

---

[41]  Letter to Judy Chu, Representative, U.S. House of Representatives, from Jeh Johnson, Secretary, U.S.
Department of Homeland Security ("Letter from Sec'y Johnson") (Dec. 30, 2016)
[42]  Letter from Sec'y Johnson
[43]  Transcript of Donald Trump's Presidential Bid Announcement, Washington Post (June 16, 2015).

. . send the bad ones over because they don't want to pay for them. They don't want to take care of them."[44]

- In May 2016, then-candidate Trump referred to anti-Trump protestors who carried the Mexican flag on Twitter as "criminals" and "thugs."[45]

- On August 21, 2015, two men urinated on a sleeping Latino man and then beat him with a metal pole. At the police station, they stated "Donald Trump was right; all these illegals need to be deported." When asked about the incident, then-candidate Trump failed to condemn the men, instead stating that they were "passionate." Specifically, Trump stated, "[i]t would be a shame . . . I will say that people who are following me are very passionate. They love this country and they want this country to be great again. They are passionate."[46]

- In June 2016, then-candidate Trump stated that Judge Gonzalo Curiel could not be fair in presiding over a lawsuit because he was Mexican-American and Trump was "very, very strong on the border" and Judge Curiel was "Hispanic" and "pro-Mexican."[47]  . . . Now, he is Hispanic, I believe. He is a very hostile judge to me." Ex.

- In August 2016, during a speech in Phoenix, then-candidate Trump said: "We agree on the importance of ending the illegal flow of drugs, cash, guns, and people across our border. . . most illegal immigrants are lower skilled workers with less education . . . these illegal workers draw much more out from the system than they can ever possibly pay back. And they're hurting a lot of our people that cannot get jobs under any circumstances. . . We will immediately terminate President Obama's two illegal executive amnesties in which he defied federal law and the Constitution to give amnesty to approximately five million illegal immigrants, five million. . . . [N]o one will be immune or exempt from enforcement.  . . . Anyone who has entered the United States illegally is subject to deportation. That is what it means to have laws and to have a country. Otherwise we don't have a country."[48]

---

[44] Andrew O'Reilly, At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico, Fox News (Aug. 6, 2015).
[45]; Donald Trump (@realDonaldTrump), TWITTER (May 25, 2016 6:39AM), https://twitter.com/realdonaldtrump/status/735465352436408320?lang=en ("The protestors in New Mexico were thugs who were flying the Mexican Flag);  Donald Trump (@realDonaldTrump), TWITTER (June 4, 2016 6:04AM), https://twitter.com/realdonaldtrump/status/739080401747120128?lang=en ("Many of the thugs that attacked peaceful Trump supporters in San Jose were illegals").
[46] Adrian Walker, 'Passionate' Trump fans behind homeless man's beating?, The Boston Globe (Aug. 21, 2015).
[47]Transcript of Face the Nation, CBS News, June 5, 2016; Jose A. DelReal and Katie Zezima, Trump's personal, racially tinged attacks on federal judge alarm legal experts, The Washington Post, June 1, 2016.
[48] Transcript: Donald Trump's Full Immigration Speech, Los Angeles Times (Aug. 31, 2016).

- In October 2016, during a presidential debate, then-candidate Trump responded to a question about immigration by stating: "We have some bad hombres here and we're going to get them out."[49]

- In December 2016, Trump referred to an article about a recent crime wave on Long Island and said "They come from Central America. They're tougher than any people you've ever met. They're killing and raping everybody out there. They're illegal. And they are finished."[50]

- On January 26, 2017, referring to immigrants, President Trump said ""We are going to get the bad ones out . . . The criminals and the drug deals, and gangs and gang members and cartel leaders. The day is over when they can stay in our country and wreak havoc."[51]

- On January 27, 2017, newly-inaugurated President Trump and Mexico's President Peña Nieto discussed President Trump's proposal for a border wall over the phone. During that transcribed conversation, President Trump once again referred to Mexicans as "tough hombres."[52]

- In February 2017, President Trump said "What has been allowed to come into our country, when you see gang violence that you've read about like never before, and all of the things — much of that is people that are here illegally . . . They're rough and they're tough . . . So we're getting them out."[53]

- On June 21, 2017, President Trump – implied that thousands of immigrants are members of the Central American gang MS-13.  He said "These are true animals. WE are moving them out of the country by the thousands, by the thousands."[54]

- Similarly, on June 28, 2017, President Trump said "They are bad people. And we've gotten many of them out already. . .  We're actually liberating towns, if you can believe that we have to do that in the United States of America.  But we're doing it, and we're doing it fast."[55]On August 16, 2017  at President Trump's direction, DHS terminated the Central American Minors Program,

[49] Katie Zezima, Trump on immigration: There are 'bad hombres' in the United States, The Washington Post (Aug. 30, 2017).
[50] Michael Scherer, Person of the Year 2016, TIME Magazine (Dec. 2016).
[51] Shannon Dooling, Mayor Walsh Vows to Keep Boston a Safe Place For Immigrants Following Trump's Orders , WBUR News (Jan. 26, 2017).
[52] Greg Miller et. al., Full Transcripts of Trump's Calls with Mexico and Australia,  Wash. Post. (Aug. 3, 2017).
[53] Michael A. Memoli, One Comment from Trump shows his administration's message on immigration has been muddled, L.A. Times (Feb. 23, 2017).
[54] Michelle Ye Hee Lee, President Trump's claim that MS-13 gang members are being deported 'by the thousands,' Wash. Post. (June 26, 2017).
[55] Press Release, The White House Office of the Press Secretary, Remarks by President Trump During Meeting with Immigration Crime Victims (June 28, 2017).

which allowed unaccompanied minors fleeing violence in El Salvador, Guatemala, and Honduras to settle in the United States.[56]

- On August 25, 2017, President Trump pardoned former Maricopa County Sheriff Joe Arpaio, who was to be sentenced for criminal contempt for failing to comply with a federal judge's order to stop racially profiling Latinos.[57] Before issuing the pardon, President Trump asked rhetorically, "Was Sheriff Joe convicted for doing his job?" After issuing the pardon, President Trump sent a tweet calling Mr. Arpaio "an American patriot."

95.     President Trump's discriminatory statements about people with Mexican and Central American roots show the root motivation for the DACA rescission.

96.     Other senior officials of the administration have echoed this animus.  For example:

- On March 27, 2017, Attorney General Sessions cited two crimes committed by Latino immigrants and said "the American people are justifiably angry . . . DUIs, assaults, burglaries, drug crimes, rapes, crimes against children and murders. Countless Americans would be alive today-- and countless loved ones would not be grieving today  . . . The President has rightly said that this disregard for the law must end. . . . "[58]

- On July 28, 2017, White House Senior Policy Advisor Stephen Miller said: "a message of tolerance toward illegal immigration is the number-one boon to smugglers and traffickers. And we've seen the results of that over the last eight years in terms of massive human rights violations associated with the Central American migrant surge. . . that permissive approach, we've seen the results, and the results have been deadly and horrific. . .  We also need to get expedited removal for illegal immigrants from Central America."[59]

**THE DACA RESCISSION**

97.     On September 5, 2017-- more than five years after first making numerous promises to induce individuals to participate in DACA-- DHS abruptly rescinded DACA and

---

[56] Mica Rosenberg, U.S. ends program for Central American minors fleeing violence, Reuters (Aug.16, 2017).
[57] Julie Hirschfield Davis and Maggie Haberman, Trump Pardons Joe Arpaio, Who Became Face of Crackdown on Illegal Immigration, N.Y. Times (Aug. 25, 2017).
[58] Dep't of Justice, Attorney General Jeff Sessions Delivers Remarks on Sanctuary Jurisdictions, https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions (March 27, 2017).
[59]  Press Release, The White House Office of the Press Secretary, *Press Gaggle by Senior Policy Advisor Stephen Miller*, July 27, 2017.

breached those promises.   Defendant Sessions announced the rescission of DACA.  On the same

day, Defendant Duke issued a memorandum formally rescinding DACA.  The Rescission

Memorandum created a new legal regime governing DACA recipients, which imposed rights and

obligations and is legally binding.

98.     Under the Rescission Memorandum, the government will immediately cease

accepting applications under DACA.  Dreamers who were too young to be eligible, such as

Plaintiff A.M, can no longer apply for DACA.

99.     Under the Rescission Memorandum, the federal government will issue renewals

only for recipients whose DACA permits expire between September 5, 2017 and March 5, 2018,

and only if they apply for renewal by October 5, 2017.  DACA recipients who let their status

lapse in the weeks leading up to September 5, 2017, such as Plaintiffs Heymi Elvir Maldonado,

Maricruz Abarca, Annabelle Martinez Herra, and Missael Garcia, can no longer renew their

DACA.

100.    Under the Rescission Memorandum, the federal government will not issue

renewals for recipients whose permits expire after March 5, 2018.  Individuals whose DACA

expires after that date, such as Plaintiff J.M.O. (whose DACA expires on March 6, 2018), Angel

Aguiluz, Luis Aguilar, Eliseo Mages, and Brenda Moreno Martinez, will not be allowed to renew

their DACA.

101.     Under the Rescission Memorandum, the government will not approve any new or

pending applications for advanced parole for DACA recipients, meaning that Dreamers are

prevented from traveling abroad and returning to the United States, even where there are

compelling humanitarian or other reasons for such travel.   Dreamers can no longer travel outside

the United States during their benefit period, including for those who have already submitted

requests for advance parole in reliance on DHS's assurances that advance parole was available to

them.  Those who have pending applications are therefore denied advance parole without any

assessment under the criteria DHS has used for advance parole requests.  Many Dreamers, such

as Plaintiffs Brenda Moreno Martinez and Nathaly Uribe Robdelo have cancelled plans to visit

elderly relatives abroad.

102.    Under the Rescission Memorandum, thousands of Dreamers will lose their work

authorization each day beginning March 6, 2018. Many Dreamers, such as Plaintiffs Angel

Aguiluz, Heymi Elvir Maldonado, Nathaly Uribe Robledo, Eliseo Mages, Jesus Eusebio Perez,

Josue Aguiluz, Jose Aguiluz, and Brenda Moreno Martinez are worried they will lose their jobs

when their work authorization expires.  Other Dreamers, including Annabelle Martinez Herra,

have already lost their employment.

103.    Under the Rescission Memorandum, thousands of Dreamers face the risk of

losing their employment, as well as vital benefits, such as driver licenses, financial aid, disability

and health benefits, among others. They will also lose their protection from deportation, meaning

that they risk permanent separation from their family and community.

104.    Under the Rescission Memorandum, the federal government will break up

hundreds of thousands of families.  Many Dreamers, including Plaintiffs A.M, Annabelle

Martinez Herra, and Maricruz Abarca live in households with American citizen family members.

Deporting Dreamers will split these recipients from their citizen family members.

105.    Under the Rescission Memorandum, Dreamers enrolled in colleges and

universities, including Plaintiffs Angel Aguiluz, Estefany Rodriguez, Maricruz Abarca, and

Josue Aguiluz, will be unable to plan for the future, apply for and obtain internships, study

abroad, simultaneously work to pay costs and fees, and obtain certain financial aid and

scholarships -- forcing many to withdraw from their college or university.

106.    Under the Rescission Memorandum, Dreamers who applied for and received

advance parole from USCIS and have paid the required fees have no assurances that they will be

readmitted into the United States if they travel abroad.  Instead, the Rescission Memorandum

states only that DHS will "generally' honor previously approved applications.  Even individuals

currently travelling abroad based on advance parole granted before September 5, 2017 are at risk

of being denied re-admission.

107.    Despite the federal government's repeated promises that it would not use the

information submitted by DACA applicants to conduct enforcement measures, the Rescission

Memorandum provides no assurance to Dreamers, or direction to USCIS, ICE, and CBP that

information contained in DACA applications or renewal requests cannot be used for the purpose

of future immigration enforcement proceedings.

108.    To the contrary, USCIS and other government agencies have released guidance

suggesting an intention to welch on those promises and to share that information with ICE and

CBP.  While the FAQs to the DACA Memorandum unequivocally represented that, with limited

and specified exceptions, information provided pursuant to a DACA application would be kept

confidential and not used for immigration enforcement, the Rescission FAQs state: "*Generally*,

information provided in DACA requests will not be *proactively* provided to other law

enforcement entities (including ICE and CBP) for the purpose of immigration enforcement

proceedings unless the requestor poses a risk to national security or public safety, or meets the

criteria for the issuance of a Notice To Appear ["NTA"] or a referral to ICE under the [NTA]

criteria."[60]  The addition of the qualifiers "generally" and "proactively" makes the representation

nearly meaningless, arrogating to USCIS the ability to make the sensitive information submitted

by individual DACA applciants available to ICE for previously prohibited purposes, including

immigration enforcement, so long as it does so "specifically" and  not "proactively."  For

example, the language indicates that USCIS would provide DACA applicant data *in response* to

a request from ICE; such action would be directly contrary to the positions USCIS adopted in its

Privacy Impact Assessment.

109.    As noted earlier, the DACA application form required applicants to provide a

wealth of personal, sensitive information.   DACA applicants were also required to provide DHS

with a detailed history of their criminal arrests and convictions, including all misdemeanors,

however minor.  In addition, applicants were required to affirmatively declare whether they had

ever been placed in removal proceedings in the past.

110.    Many DACA recipients have final orders of removal, generally issued *in absentia*

when they were minors.  If their information is shared with ICE or CBP, these individuals will be

subject to an extreme risk of expedited deportation, which can occur within days or even hours,

with minimal procedural safeguards.

111.    Plaintiffs and other Dreamers cannot but be worried, as the Defendants have

threatened them both directly and indirectly (by refusing to reaffirm the privacy of their applicant

data, and by targeting immigrants for deportation who have not been convicted of criminal

activity):

> • President Trump has taken affirmative steps to reduce the privacy protections
>   applicable to DACA data. In January 2017, President Trump issued Executive

---

[60] DHS, Frequently Asked Questions: Rescission of Deferred Action For Childhood Arrivals (DACA) ("Rescission FAQs") Q8 (emphasis added), https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-deferred-action-childhood-arrivals-daca (last published Sept. 5, 2017).

Order 13,768 directing all agencies, including DHS, to "ensure that their privacy policies exclude persons who are not United States citizens or lawful permanent residents from the protections of the Privacy Act regarding personally identifiable information."[61]

Pursuant to Executive Order 13,768, on April 25, 2017, DHS issued a new Privacy Policy Guidance Memorandum introducing new "legal and policy obligations."  Among these obligations is a new "transparency" obligation that requires "all information sharing that relates to immigrants and non-immigrants must be described and justified in the appropriate PIA… " Another obligation listed is "purpose specification," which states that use of any information collected "must be compatible with the purpose for which DHS originally collected the information; the PIA must identify and explain this compatibility."[62]  Notwithstanding these commitments, DHS also stated that its new privacy policy "permits the sharing of information about immigrants and non-immigrants with federal, state, and local law enforcement."[63]

- In February 2017, DHS announced a change in immigration enforcement priorities.  Previously, DHS enforcement priorities were generally consistent with the DACA Memorandum, prioritizing people who had committed serious felonies, serious misdemeanors, or multiple less serious misdemeanors, and making Dreamers (and others similarly situated) the lowest enforcement priority.  The February 2017 Enforcement Priorities Memorandum radically broadened the categories of people who are to be prioritized for removal, to include people "convicted of any criminal offense" (no matter how minor), "charged with any criminal offense" (even if unadjudicated or dismissed), or "committed acts which constitute a chargeable criminal offense" (an astoundingly vague proposition).[64]

- In February 2017, ICE reportedly implemented a new policy authorizing immigration arrests of collateral, nontargeted individuals (i.e., individual bystanders who are not otherwise enforcement priorities) found at the scene of enforcement operations.[65]  Pursuant to this change, a number of Dreamers have been arrested and subjected to immigration enforcement proceedings.

---

[61] Exec. Order No. 13,768, 82 Fed. Reg. 8793, (Jan. 25, 2017) ("Enhancing Public Safety in the Interior of the United States")

[62] Guidance Memorandum from Jonathan R. Cantor, Acting Chief Privacy Officer, U.S. Department of Homeland Security,  2017-01: DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Personally Identifiable Information (Apr. 25, 2017).

[63] DHS, Privacy Policy 2017-01 Questions & Answers (Apr. 27, 2017).

[64] Memorandum for Kevin McAleenan, Acting Commissioner, U.S. Customs and Border Protection, et al., from John Kelly, Secretary, U.S. Department of Homeland Security, Enforcement of the Immigration Laws to Serve the National Interest ("Enforcement Priorities Memorandum") at 2 (Feb. 20, 2017).

[65] *See* Hamed Aleaziz, Collateral immigration arrests threaten key crime alliances, S.F. Chronicle (Apr. 29, 2017).

- In June 2017, ICE announced a "surge" where other components of DHS provided information to ICE about adults who agreed to take custody over unaccompanied minors.[66]

- In at least six instances since the administration has taken office, DHS has illegally commenced immigration enforcement proceedings against Dreamers. These include cases in active litigation, including claims brought by Jessica Cotoltl (where DHS has been enjoined from proceeding with enforcement proceedings), Francisco Rodriguez, Alberto Luciano Gonzales Torres (where DHS has been enjoined from proceeding with enforcement proceedings), Daniela Vargas, Daniel Ramirez-Medina, and Juan Manuel Montes-Bojorquez (who was illegally deported).

- On April 19, 2017, United States Attorney General Jefferson B. Sessions stated in an interview on Fox News' "Happening Now," program—in response to a question regarding the deportation of a Dreamer—that "[e]verybody in the country illegally is subject to being deported, so people come here and they stay here a few years and somehow they think they are not subject to being deported -- well, they are. . . . we can't promise people who are here unlawfully that they aren't going to be deported."[67]

- On June 13, 2017, Acting ICE Director Thomas Homan testified in front of the House Appropriations Committee's Subcommittee on Homeland Security, stating as to "every immigrant in the country without papers," that they "should be uncomfortable. You should look over your shoulder. And you need to be worried. . . . No population is off the table. . . . If we wait for them to violate yet another law against a citizen of this country, then it's too late. We shouldn't wait for them to become a criminal."[68]

- On June 29, Homan stated: "people that enter this country illegally violate the laws of this country.  You can't want to be a part of this great nation and not respect its laws.. . .  they already committed one crime by entering the country illegally. . . . As far as fear in the immigrant community. . . My purpose is to dispel the notion that if you enter this country illegally and violate the laws of this nation, you should not be comfortable. . . if you enter this country illegally, you should be concerned that someone is looking for you.  You should be concerned because you violated the laws of this country."[69]

---

[66] *See* Jenny Jarvie, Immigrant rights groups denounce new ICE policy that targets parents of child migrants, L.A. Times (Jun. 30, 2017).

[67] Adam Shaw, Sessions defends immigration policies after reported 'DREAMer' deportation, Fox News (Apr. 19, 2017).

[68] Hearing on the ICE and CBP F.Y. 2018 Budget Before the Subcomm. on Homeland Security of the H. Comm. on Appropriations, 115th Cong. (2017) 2017 WLNR 18737622.

[69] Press Release, The White House Office of the Press Secretary, *Press Gaggle by Director of Immigration and Customs Enforcement Tom Homan et al.* (June 28, 2017).

- On August 22, 2017, Homan again stated: " the message is clear:  If you're in the United States illegally, if you happen to get by the Border Patrol, someone is looking for you.  And that message is clear."[70]

- An internal White House memo reported on by CNN stated that DHS now is urging Dreamers "to prepare for and arrange their departure from the United States" when their DACA terms end.[71]

- A CBP memo reportedly issued on September 6 directed agents to detain individuals claiming DACA at CPB checkpoints until their DACA and work permit could be verified, and that if there is any derogatory information indicating ineligibility, CPB is to commence deportation proceedings immediately.[72]

- On September 27, 2017, Acting Secretary Duke testified that she had never seen DHS's guidance assuring Dreamers their information would not be used for immigration purposes.

112.    These changes all signal Defendants' intent to renege on their promises and subject Dreamers to immigration enforcement. Dreamers immediately face increased risk that information they provided to the federal government, in reliance of promises not to use it against them, could be used against them, without notice, for purposes of immigration enforcement, including detention or deportation.  At the very least, these changes create confusion about the new risk faced by current and former Dreamers and former applicants, particularly those whose DACA protection is ending under the Rescission Memorandum.

113.     The Rescission Memorandum does not explain how DHS or USCIS could legally provide DACA applicant information to ICE or CBP.  *See* 5 U.S.C. § 552a (b) ("No agency shall disclose any record which is contained in a system of records by any means of communication to

---

[70] Press Release, The White House Office of the Press Secretary, *Press Gaggle by Press Secretary Sarah Huckabee Sanders et al.* (August 22, 2017).
[71] Tal Kopan & Jim Acosta, Admin Memo: DACA recipients should prepare for departure from the United States, CNN (Sept. 6, 2017).
[72] Valerie Gonzalez, *Border Patrol Memo States Procedures to Process All DACA Applicants*, KRGV-TV (Sep. 25, 2017).

any person, or to another agency, except pursuant to a written request by, or with the prior

written consent of, the individual to whom the record pertains").

114.     The Rescission Memorandum also does not explain how DHS or USCIS  can

justify continuing to maintain applicant data collected for DACA, from individuals relying on

prior agency representations and policies, when the administration has rescinded DACA.  *See* 5

USC § 552a (c)(1) (an agency "shall maintain in its records *only* such information about

an individual as is relevant and necessary to accomplish a purpose of the agency required to be

accomplished by statute or by executive order of the President").

115.     The Rescission Memorandum does not state how providing DACA applicant

information to enforcement authorities would be consistent with DHS' self-adopted privacy

policies or consistent with the agency's procedures and precedent.

116.     The Rescission Memorandum does not state how providing DACA applicant

information to enforcement authorities would not be a retroactive revision to an agency policy

upon which Dreamers relied.

117.     The Rescission Memorandum does not explain how the government will keep

previously-provided DACA applicant information secure, nor does it provide any reason to

believe that immigration enforcement agents will not use such information to find and remove

those who applied for DACA.  This retreat from prior assurances of privacy protection is

particularly alarming in light of Defendant Homan's threats that immigrants should be

"uncomfortable," "should look over your shoulder," and "be worried.

**DHS RESCINDS DACA WITHOUT NOTICE, COMMENT, OR ANY
SUFFICIENT EXPLANATION FOR ITS CHANGE IN POSITION**

118.    The Rescission Memorandum is a final, substantive agency action that required

DHS to comply with the notice and comment requirements set forth in 5 U.S.C. § 553(b).  But

the agency provided no opportunity for notice and comment before taking this action.

119.    By failing to comply with these notice and comment requirements, DHS deprived

Plaintiffs, and all other interested parties, of the opportunity to present important evidence to the

agency about DACA.

120.    In the Rescission Memorandum, DHS did not sufficiently explain its abrupt

departure from prior agency statements regarding the necessity and legality of DACA.

    a.    In issuing the Rescission Memorandum, the federal government and
Defendant Sessions misleadingly claimed that DACA was
unconstitutional, although no court has so held.[73]  The single paragraph in
the Rescission Memorandum explaining the rationale behind this sudden
shift merely asserts that DACA "should be terminated" based on
consideration of two factors: (I) the appellate rulings in a case regarding a
2014 memorandum from then-DHS Secretary Johnson that expanded
DACA and created a new program, Deferred Action for Parents of
Americans and Lawful Permanent Residents ("DAPA"), *Texas v. United
States*, 809 F.3d 134 3 (5th Cir. 20 15), a*ff'd by an equally divided court
sub nom. United States v. Texas*,_ U.S. _, 4 136 S. Ct. 2271 (2016); and
(2) a September 4, 2017, letter from Attorney General Jefferson B.
Sessions arguing that DACA was "unconstitutional" because it had been
"effectuated . . . through executive action" and was invalid for the same
reasons the Fifth Circuit struck down DAPA in the Texas case.[74]

    b.    DHS and DOJ ignored differences between DACA and DAPA when
reaching this conclusion.  Further, DHS ignored the fact that the legality of
DACA was never directly at issue in the *Texas v. United States* case, and
not ruled on by the Fifth Circuit.

    c.    In concluding that DACA was unconstitutional, Defendant Sessions failed
to consider a November 19, 2014 opinion from the Department of Justice

---

[73] Dep't of Justice, Attorney General Sessions Delivers Remarks on DACA,
https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca (September 5, 2017).
[74] Letter from Jefferson B. Sessions, U.S. Att'y General, to Elaine C. Duke, Acting Secretary, U.S. Department of
Homeland Security (Sept. 4, 2017) ("Sessions Letter").

Office of Legal Counsel that concluded that DACA was constitutional. OLC opinions provide "controlling legal advice" for the executive branch.[75] In contrast to Defendant Session's conclusory assertion, the OLC opinion was thirty-three pages and analyzed the relevant constitutional precedents.

d.     The Rescission Memorandum's conclusion that DACA is unconstitutional is impossible to reconcile with the Defendants decision to continue DACA for six additional months.

121.    The rescission is inconsistent with promises the government made to Dreamers, on which they relied, that only "fraud or misrepresentation" in the application process or "[s]ubsequent criminal activity" are grounds for revocation of DACA.[76]

122.    Beyond Defendant Sessions's conclusory assertions of DACA's legal infirmity, DHS failed to offer any explanation of its own why it believed that rescinding DACA was warranted. The Rescission Memorandum did not address the rationale that DHS expressed in 2012 in the DACA Memorandum regarding the use of prosecutorial discretion to focus resources and priorities on lowest priority individuals, much less offer any explanation as to why those factors had changed so radically as to justify rescinding DACA now.

123.    Hours after DACA was rescinded, President Trump tweeted that, if Congress fails to provide similar protections through legislation, "I will revisit this issue!" This statement undermines DHS' faux constitutional rationale for rescission because it confirms that the President has authority to reinstate some or all of DACA without Congressional authorization.

124.    President Trump's September 5, 2017 statement is the latest in a series of admissions he has made that expressly or implicitly recognize the DACA program was legal, undermining the purported rationale for rescinding the program.  For example:

---

[75] *See, e.g.,* Memorandum to Att'ys of the Office of Legal Counsel, U.S. Dep't of Justice, from David Barron, Acting Assistant Att'y General, Best Practices for OLC Legal Advice and Written Opinions (July 16, 2010).
[76] USCIS Approval Notice, Form 1-821 D, Consideration of Deferred Action for Childhood Arrivals.

- On December 8, 2016, then-President-elect Trump stated in an interview with TIME magazine that he would find an accommodation for Dreamers, stating, "We're going to work something out that's going to make people happy and proud."[77]

- On January 18, 2017, then President-elect Trump promised in an interview with Fox & Friends that he was "working on a plan right now. And that plan, over the next two to three months, is going to come out. And it's a plan that's going to be very firm, but it's going to have a lot of heart."[78]

- On March 29, 2017, Secretary Kelly reaffirmed that "DACA status" is a "commitment . . . by the government towards the DACA person, or the so-called Dreamer."[79]

- On April 21, 2017, President Trump confirmed that his Administration's policy is not to deport Dreamers, and suggested that they "should rest easy."[80]

125.    These statements directly contravening Defendants' purported justification for rescinding DACA confirm that the rescission rests on racist animus against Mexican and Central American immigrants.  Other false and misleading statements by the President and administration officials confirm that the legal justification offered for the rescission is pretextual:

- On September 5, 2017, President Trump issued a written statement on the rescission of DACA that stated: "The temporary implementation of DACA . . . helped spur a humanitarian crisis -- the massive surge of unaccompanied minors from Central America including, in some cases, young people who would become members of violent gangs throughout our country, such as MS-13."[81]

- On the same day, just prior to Attorney General Sessions's announcement rescinding DACA, President Trump tweeted, "No longer will we incentivize illegal immigration. LAW AND ORDER! #MAGA," and "Make no mistake, we are going to put the interest of AMERICAN CITIZENS FIRST!"[82]

---

[77]  Michael Scherer, Person of the Year 2016, TIME Magazine (Dec. 2016).
[78] Francesca Chambers, Trump signals he's softening on immigration as he says he's 'working on a plan' that will make DREAMers 'very happy,' Daily Mail (Jan. 18, 2017).
[79] Ted Hesson & Seung Min Kim, Wary Democrats Look to Kelly for Answers on Immigration, Politico (Mar. 29, 2017).
[80]Transcript of interview with Trump, Associated Press (Apr. 21, 2017).
[81] Press Release, The White House Office of the Press Secretary, Statement from President Donald J. Trump (Sept. 5, 2017).
[82] Donald Trump (@realDonaldTrump), TWITTER (Sep.5, 2017 5:10am), https://twitter.com/the_trump_train/status/905040389610057728?lang=en

- During his announcement rescinding DACA, Attorney General Sessions justified the decision by stating that DACA "contributed to a surge of unaccompanied minors on the southern border" and "denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens."[83]

- Attorney General Sessions, while a United States Senator from Alabama, made similar statements regarding undocumented individuals seeking employment ("I'm a minority in the U.S. Senate ... in questioning whether we should reward people who came into the country illegally with jobs that Americans would like to do.").[84]  That same year, then-senator Sessions praised the 1924 Johnson-Reed Act, whose namesake, Representative Albert Johnson, used racial theory as the basis for its severe immigration restrictions, which included barring Asian immigration entirely.[85]

126.     The Rescission Memorandum makes no reference to unaccompanied minors, public safety concerns, or economic interests to explain the agency's action.  These shifting, conflicting, and factually inaccurate statements by the Trump Administration -- that DACA created a surge in illegal immigration, and that DACA recipients take jobs away from other American workers -- expose the cursory legal rationale in the Rescission Memorandum's as a sham.  The APA requires governmental agencies to publicly state a sufficient justification for their actions, particularly where, people have relied upon DHS's prior statements to their detriment.

127.     Moreover, these statements are wholly controverted by available evidence demonstrating the contributions of Dreamers to the United States, as explained above. *See Motor Veh. Mfrs. Ass 'n of U.S. , Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (an agency rule is arbitrary and capricious when the explanation offered by the agency "runs counter to the evidence before the agency").

---

[83] Dep't of Justice, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017).
[84] Seung Min Kim, The Senate's Anti- Immigration Warrior, Politico (Mar. 5, 2015)
[85] *See* Interview by Stephen Bannon with Sen. Jefferson B. Sessions, Breitbart News (Oct. 5, 2015), audio available at https://tinyurl.co111 /y8gbj6vk; see also Adam Serwer, Jeff Sessions 's Unqualified Praise for a 1924 immigration Law, The Atlantic (Jan. 10, 2017)

128.     In making a decision contradicted by the available evidence, providing a false

justification for the rescission and promoting the rescission because of discriminatory animus,

Defendants abused their discretion and acted in an arbitrary and capricious manner in violation

of the APA.

## CAUSES OF ACTION

### FIRST COUNT
### FIFTH AMENDMENT – DUE PROCESS
### (All Defendants)

129.     Plaintiffs repeat and incorporate by reference each and every allegation contained

in the preceding paragraphs as if fully set forth herein.

130.     Immigrants who are physically present in the United States are guaranteed the

protections of the Due Process Clause.

131.     The Constitution imposes constraints on governmental decisions which deprive

individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of

the Fifth or Fourteenth Amendment.

132.     The property interests protected by the Due Process Clause extend beyond

tangible property and include anything to which a plaintiff has a legitimate claim of entitlement.

A legitimate claim of entitlement is created by rules or understandings that secure certain

benefits and that support claims of entitlement to those benefits.

133.     The term "liberty" also encompasses the ability to work, raise a family, and form

the other enduring attachments of normal life.

134.     Dreamers, including Plaintiffs, have constitutionally protected liberty and

property interests in their DACA and the numerous benefits conferred thereunder, including the

ability to renew their DACA every two years. These protected interests exist by virtue of the

government's decision to grant Dreamers certain benefits and its repeated representations and promises regarding DACA.

135.    In promoting DACA, USCIS affirmatively promised Dreamers that if their case was deferred, they would be eligible for benefits, including employment authorization, advance parole to travel internationally, and to attend educational institutions.

136.    Dreamers, including certain of the plaintiffs, were granted employment authorization, advance parole to travel internationally, the right to attend educational institutions, public benefits (including Social Security, Medicare, and disability benefits).  They were able to secure equal access to other benefits and opportunities on which Americans depend, including opening bank accounts, obtaining credit cards, starting businesses, purchasing homes and cars, and conducting other aspects of daily life that are otherwise often unavailable for undocumented immigrants.

137.    In establishing and continuously operating DACA under a well-defined framework of highly specific criteria—including nearly 150 pages of specific instructions for managing the program—the government created a reasonable expectation among Plaintiffs and other Dreamers that they are entitled to the benefits provided under the program, including the ability to seek renewal of their DACA, as long as they continue to play by the rules and meet the program's nondiscretionary criteria for renewal.

138.    The government deprived Plaintiffs and other Dreamers of their property and liberty interests under this program, including their ability to seek renewal of their DACA, their right to work authorization, and their right to travel internationally without a right to be heard or other individualized procedural protections.

139.    The government's arbitrary termination of DACA and deprivation of the opportunity to renew DACA violates the due process rights of Plaintiffs and other Dreamers.

140.    The government's decision to terminate DACA after vigorously promoting the program and coaxing hundreds of thousands of highly vulnerable young people to step forward is an unconstitutional bait-and-switch.  The government promised Plaintiffs and other young people that if they disclosed highly sensitive personal information, passed a background check, and played by the rules, they would be able to live and work in the United States.

141.    The government did not follow its normal procedures in reversing course and terminating DACA.  In 2014, the OLC concluded, after conducting a detailed analysis, that DACA was a lawful exercise of the Executive Branch's discretion. By contrast, Attorney General Sessions's one-page letter to Acting Secretary Duke contains virtually no legal analysis, and Acting Secretary Duke's Rescission Memorandum relied largely on Attorney General Sessions's letter.

142.    The Due Process Clause also requires that the federal government's immigration enforcement actions be fundamentally fair. Here, the government's arbitrary decisions to terminate DACA is fundamentally unfair.

143.    Defendants' violations of the Due Process Clause have harmed Plaintiffs and will continue to cause ongoing harm to Plaintiffs and other Dreamers.

**SECOND COUNT**
**FIFTH AMENDMENT – DUE PROCESS**
**(All Defendants)**

144.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

145.    Immigrants who are physically present in the United States are guaranteed the protections of the Due Process Clause.

146.    The Constitution imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment.

147.    Dreamers, including Plaintiffs, have constitutionally protected liberty and property interests in the sensitive personal information they disclosed to the government in reliance on the government's explicit and repeated assurances that it would not be used for immigration enforcement purposes and would in fact be "protected from disclosure" to ICE and CBP.

148.    The protected interest in the nondisclosure of sensitive personal information exists by virtue of the government's decision to make repeated assurances to Dreamers that this information would not be used for enforcement purposes.

149.    The government's decision to terminate DACA after vigorously promoting the program and coaxing hundreds of thousands of highly vulnerable young people to step forward is an unconstitutional bait-and-switch.  The government promised Plaintiffs and other young people that if they disclosed highly sensitive personal information, passed a background check, and played by the rules, they would be able to live and work in the United States.

150.    The government's retraction of its publicly declared and repeatedly reaffirmed policy not to share with ICE and CPB Dreamers' DACA application information violates due process.  The government has already violated other assurances regarding DACA, and there is imminent danger that it will similarly breach its representations regarding information-sharing.  Indeed, the government already has breached its prior commitments to affirmatively "protect[]

[sensitive information] from disclosure," now asserting only that it will not "proactively

provide[]" such information to ICE and CBP for the purpose of immigration enforcement

proceedings.

151.    The government deprived Plaintiffs and other Dreamers of their property and

liberty interests as to their sensitive personal information without a right to be heard or other

individualized procedural protections.

152.    The Due Process Clause also requires that the federal government's immigration

enforcement actions be fundamentally fair. Here, the government's arbitrary decisions to

terminate DACA and change the policy regarding the use of information provided by Dreamers

are fundamentally unfair.

153.    Defendants' violations of the Due Process Clause have harmed Plaintiffs and will

continue to cause ongoing harm to Plaintiffs and other Dreamers.

## THIRD COUNT
## FIFTH AMENDMENT – EQUAL PROTECTION
### (All Defendants)

154.    Plaintiffs repeat and incorporate by reference each and every allegation contained

in the preceding paragraphs as if fully set forth herein.

155.    The equal protection guarantee of the Fifth Amendment forbids federal officials

from acting with a discriminatory intent or purpose.

156.    To succeed on an equal protection claim, plaintiffs must show that the defendants

discriminated against them as members of an identifiable class and that the discrimination was

intentional. Determining whether invidious discriminatory purpose was a motivating factor

demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be

available.

157.    As set forth above, the termination of DACA was motivated by improper

discriminatory intent and bias against Mexican nationals, individuals of Mexican and Central

American descent, and Latinos, who together account for 93 percent of approved DACA

applications.

158.    President Trump's history and that of other senior administration officials of

alleging that Mexican, Central American, and Latino immigrants are rapists, criminals, and

otherwise bad people demonstrate discriminatory animus. It is this animus that motivated the

DACA rescission.

159.    The government allows other classes of immigrants to remain eligible for deferred

action, and remain eligible for benefit associated with deferred action.  Because Mexican,

Central American, and Latinos account for 93 percent of approved DACA applications, they will

be disproportionately impacted by the termination of DACA.

160.    The history, procedure, substance, context, and impact of the decision to

terminate DACA demonstrate that the decision was motivated by discriminatory animus against

Mexican, Central American, and Latino immigrants. Because it was motivated by a

discriminatory purpose, the decision to terminate DACA violates the equal protection guarantee

of the Due Process Clause of the Fifth Amendment.

161.    Defendants' violations of the Equal Protection Clause have caused ongoing harm

to Plaintiffs and other Dreamers.

### FOURTH COUNT
### ADMINISTRATIVE PROCEDURE ACT
### (All Defendants Except Trump)

162.    Plaintiffs repeat and incorporate by reference each and every allegation contained

in the preceding paragraphs as if fully set forth herein.

163.    Defendants are subject to the Administrative Procedure Act ("APA"). *See* 5

U.S.C. § 703.

164.    The termination of DACA is final agency action subject to judicial review

because it marks the consummation of the decisionmaking process and is one from which legal

consequences will flow.  The comprehensive scope of the APA provides a default remedy for all

interactions between individuals and all federal agencies.

165.    The APA requires that courts "shall . . . hold unlawful and set aside agency

action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law . . . [or] contrary to constitutional right, power, privilege, or

immunity." 5 U.S.C. § 706(2)(A), (B).

     a.     As detailed in Counts I and II, the decision to terminate DACA is
           unconstitutional in numerous respects and therefore must be vacated.

     b.     The decision to terminate DACA is arbitrary and capricious and contrary
           to law because, among other reasons, the government failed to consider
           important aspects of the issue, offered explanations for its decision
           inconsistent with the evidence before it, and its explanations are so
           implausible that its decision cannot be due to a difference in opinion or the
           product of agency expertise.  And because the government failed to
           provide a reasoned analysis sufficient to justify its change of policy in
           light of the serious reliance interests created by DACA.

          i.     The purported rationales for rescission of the program contradict
                the available evidence.  Among other things, the rescission does
                not provide a reasoned analysis for the rescission, nor does it
                address the prior Department of Justice OLC analysis concluding
                the program was constitutional.

         ii.     The purported rationale for rescission of the program – that the
                Executive Branch purportedly lacked authority to conduct the
                program -- is inconsistent with the ongoing continuation of the
                program and the admissions by the President and various
                administration officials that the President has the authority to
                continue the program.

         iii.     The government's decision not to accept any DACA renewal
                applications after October 5, 2017 is also arbitrary. The Rescission

55

Memorandum does not provide a reasoned analysis to support this deadline, and the government has failed to provide sufficient time and notice to Dreamers.

iv.    The government's decision not to accept new applications after September 5, 2017 is arbitrary.  The Rescission Memorandum does not provide a reasoned analysis to support this deadline.

v.     The government's decision not to accept renewal requests for Dreamers whose status expired before September 5, 2017 is arbitrary. The Rescission Memorandum does not provide a reasoned analysis to support this deadline.

vi.    The government's decision not to accept renewal requests for DACA recipients whose status expires after March 5, 2018 is arbitrary.  The Rescission Memorandum does not provide a reasoned analysis to support this decision.

vii.   The government's decision to terminate DACA is also in violation of the APA because the stated rationale for ending the program is pretextual and incorrect as a matter of law.

c.    The government's decision regarding potential sharing of personal information collected from DACA applicants is arbitrary and capricious and contrary to law.

i.     The government's failure to abide by the specific and consistent promise that information obtained from DACA applicants would not be used for immigration enforcement purposes violates the Privacy Act's prohibition on agency sharing records with another agency.  5 U.S.C. § 552a(b).

ii.    The government's failure to abide by the specific promise in the DACA Privacy Impact Assessment that information collected from DACA applicants would not be used for immigration enforcement purposes violates the e-Government Act provision requiring an agency abide by its Privacy Impact Assessment.  44 U.S.C. § 3501 *et seq*.

iii.   The government's maintenance of records for Dreamers following rescission of DACA violates the Privacy Act prohibition on an agency maintaining records beyond those which are necessary to accomplish a purpose required to be accomplished by executive order of the President.   5 U.S.C. § 552a(c)(1).

iv.    The stated change in the government's protection of DACA applicant data from use for immigration enforcement proceedings is invalid under APA 5 U.S.C. § 551(4) because it carries an

unreasonable retroactive effect, incurring new and harmful legal consequences where individuals submitted their data in detrimental reliance on prior DHS policies and representations.

v.    The government's retention of applicants' personally identifiable information and declaration of the potential disclosure of this information for immigration enforcement purposes violates DHS' own policies and established practices without providing a reasoned justification for deviation from its own policies.

vi.   The change in the government's policy regarding protection of DACA applicant data from use for immigration enforcement proceedings is not based on a reasoned analysis contained in the Rescission Memorandum.

vii.  The change in the government's policy regarding protection of DACA applicant data from use for immigration enforcement proceedings is not adequately explained in the Rescission Memorandum, particularly in light of the DACA recipients' strong reliance on the government's commitment not to use this information for enforcement purposes.

166.   Defendants' violations of the APA have caused ongoing harm to Plaintiffs and other Dreamers.

## FIFTH COUNT
## ADMINISTRATIVE PROCEDURE ACT
### (All Defendants Except Trump)

167.   The APA, 5 U.S.C. §§ 553 and 706(2)(D), requires that federal agencies conduct rulemaking before engaging in action that impacts substantive rights.

168.   DHS and USCIS are each an "agency" under the APA, and the Rescission Memorandum and the actions that DHS and USCIS has taken to implement the Rescission Memorandum are "rules" under the APA. *See* 5 U.S.C. § 551(1), (4).

169.   In implementing the Rescission Memorandum, federal agencies have changed the substantive criteria by which individual Dreamers work, live, attend school, obtain credit, and travel in the United States, thus imposing rights and obligations on Dreamers. The Rescission

Memorandum modifies substantive rights and interests and so is subject to notice and comment rulemaking.

170.    With exceptions that are not applicable here, agency efforts that change substantive rights and interests must go through notice-and-comment rulemaking. *See* 5 U.S.C. § 553.

171.    Defendants promulgated and implemented these changes to Dreamer rights and interests without notice-and-comment rulemaking in violation of the APA.

172.    Plaintiffs will be impacted because they have not had the opportunity to comment on the rescission of DACA.

173.    Defendants' violation of the APA has caused ongoing harm to Plaintiffs and other Dreamers.

**SIXTH COUNT**
**ESTOPPEL**

174.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

175.    Through its conduct and statements, the government represented to Plaintiffs and other Dreamers that DACA was lawful and that information collected in connection with DACA would not be used for immigration enforcement purposes absent special circumstances.

176.    In reliance on the government's repeated assurances, Plaintiffs and other Dreamers risked removal and deportation and came forward and identified themselves to the government, and provided sensitive personal information, including their fingerprints and personal history, in order to participate in DACA.

177.    Throughout the life of DACA, the government has continued to make affirmative representations about the use of information as well as the validity and legality of DACA.

Plaintiffs and other Dreamers relied on the government's continuing representations to their detriment.

178.    DACA beneficiaries rearranged their lives to become fully visible and contributing members of society, including by seeking employment, pursuing higher education, and paying taxes, but are now at real risk of removal and deportation.

179.    Accordingly, Defendants should be equitably estopped from terminating DACA or from using information provided pursuant to DACA for immigration enforcement purposes, except as previously authorized under DACA.

180.    An actual controversy between Plaintiffs and Defendants exists as to whether Defendants should be equitably estopped.

181.    Plaintiffs are entitled to a declaration that Defendants are equitably estopped.

## SEVENTH COUNT
## DECLARATORY JUDGMENT THAT DACA IS LAWFUL

182.    Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

183.    DACA was a lawful exercise of the Executive Branch's discretion to enforce the immigration laws. Indeed, after performing a thorough analysis, the government itself concluded that DACA was lawful.  However, the government now claims, as the basis for its rescission of the program, that DACA is unlawful.

184.    The Declaratory Judgment Act, 28 U.S.C. § 2201, allows the court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

185.    As DACA beneficiaries, Plaintiffs have an interest in the legality of DACA. The government's decision to terminate DACA on the purported basis that DACA was unlawful has harmed Plaintiffs and continues to cause ongoing harm to Plaintiffs.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Declare that the Rescission and actions taken by Defendants to rescind DACA are void and without legal force or effect;

B.    Declare that the Rescission and actions taken by Defendants to rescind DACA are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law in violation of 5 U.S.C. §§ 702-706;

C.    Declare that the Rescission and actions taken by Defendants to rescind DACA are in violation of the Constitution and contrary to the laws of the United States;

D.    Preliminarily and permanently enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the Rescission and from taking any other action to rescind DACA that is not in compliance with applicable law;

E.    Preliminarily and permanently enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from disclosing any DACA applicant information to immigration enforcement activities in a manner inconsistent with their prior commitments;

F.    Grant such further relief as this Court deems just and proper.

Dated: October 5, 2017                          Respectfully submitted,


   /s/ Dennis A. Corkery                        John A. Freedman (pro hac vice forthcoming)
Matthew K. Handley (D. Md. 18636)               Gaela Gehring Flores (D. Md.14559)
Dennis A. Corkery (D. Md. 19076)                Ronald A. Schechter (pro hac vice forthcoming)
WASHINGTON LAWYERS'                             Nancy L. Perkins (pro hac vice forthcoming)
   COMMITTEE FOR CIVIL RIGHTS AND               Jeremy Karpatkin (pro hac vice forthcoming)
   URBAN AFFAIRS
11 Dupont Circle, Suite 400                     ARNOLD & PORTER KAYE SCHOLER LLP
Washington, DC 20036                            601 Massachusetts Ave., NW
(202) 319-1000                                  Washington, DC  20001-3743
matthew_handley@washlaw.org                     (202) 942-5000
dennis_corkery@washlaw.org                      John.freedman@apks.com


Elizabeth J. Bower (pro hac vice forthcoming)   Steven L. Mayer (pro hac vice forthcoming)
Kevin B. Clark (pro hac vice forthcoming)       ARNOLD & PORTER KAYE SCHOLER LLP
WILLKIE FARR & GALLAGHER LLP                     10th Floor
1875 K Street, NW                               Three Embarcadero Center
Washington, DC  20006-1238                      San Francisco, CA 94111-4024
EBower@willkie.com                              +1 415.471.3100


Nicholas Katz (pro hac vice forthcoming)        Ajmel Qureshi (D. Md. 28882)
CASA DE MARYLAND                                HOWARD UNIVERSITY SCHOOL OF
8151 15th Ave.                                    LAW CIVIL RIGHS CLINIC
Hyattsville, MD 20783                           2900 Van Ness Street, NW
(240) 491-5743                                  Washington, DC 20008
NKatz@wearecasa.org                             (202) 806-8000
                                                aqureshi@law.howard.edu