# EXHIBIT 7

**No.**

# In the Supreme Court of the United States

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT*

**PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT**

NOEL J. FRANCISCO
*Solicitor General*
*Counsel of Record*
CHAD A. READLER
*Acting Assistant Attorney General*
JEFFREY B. WALL
*Deputy Solicitor General*
HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*
JONATHAN Y. ELLIS
*Assistant to the Solicitor General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
*Attorneys*

*Department of Justice*
*Washington, D.C. 20530-0001*
*SupremeCtBriefs@usdoj.gov*
*(202) 514-2217*

**QUESTIONS PRESENTED**

This dispute concerns the policy of immigration enforcement discretion known as Deferred Action for Childhood Arrivals (DACA). In 2016, this Court affirmed, by an equally divided Court, a decision of the Fifth Circuit holding that two related Department of Homeland Security (DHS) enforcement policies, including an expansion of the DACA policy, were likely unlawful and should be enjoined. See *United States* v. *Texas*, 136 S. Ct. 2271 (per curiam). In September 2017, the former Acting Secretary of Homeland Security determined that the original DACA policy would likely be struck down by the courts on the same grounds and that the policy was unlawful. Accordingly, she instituted an orderly wind-down of the DACA policy.

The district court here concluded that respondents are likely to succeed in proving that the Acting Secretary's decision to rescind the DACA policy was arbitrary and capricious, and it enjoined DHS from rescinding it on a nationwide basis while this litigation proceeds. The questions presented are as follows:

1. Whether the Acting Secretary's decision to wind down the DACA policy is judicially reviewable.

2. Whether the Acting Secretary's decision to wind down the DACA policy is lawful.

**PARTIES TO THE PROCEEDING**

Petitioners are the United States Department of Homeland Security; Donald J. Trump, President of the United States; Kirstjen M. Nielsen, Secretary of Homeland Security; Jefferson B. Sessions III, Attorney General of the United States; and the United States of America.

Respondents are the Regents of the University of California; Janet Napolitano, President of the University of California; the State of California; the State of Maine; the State of Maryland; the State of Minnesota; the City of San Jose; Dulce Garcia; Miriam Gonzalez Avila; Saul Jimenez Suarez; Viridiana Chabolla Mendoza; Norma Ramirez; Jirayut Latthivongskorn; the County of Santa Clara; and Service Employees International Union Local 521.

**TABLE OF CONTENTS**

Page

Opinions below ... 1
Jurisdiction ... 2
Statutory provisions involved ... 2
Statement ... 2
Reasons for granting the petition ... 12
I. The decision below is in need of immediate review ... 13
II. The decision below is wrong ... 15
A. The Rescission Memo is not reviewable ... 16
B. The Rescission Memo is lawful ... 24
1. The rescission was reasonable in light of the Fifth Circuit's decision and the impending litigation ... 24
2. The rescission was reasonable in light of the Acting Secretary's determination that DACA is unlawful ... 31
Conclusion ... 33
Appendix A — District court order (Jan. 9, 2018) ... 1a
Appendix B — District court notice of appeal (Jan. 16, 2018) ... 71a
Appendix C — District court order granting in part defendants' motion to dismiss under FRCP 12(b)(6) (Jan. 12, 2018) ... 76a
Appendix D — Memorandum on Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012) ... 95a
Appendix E — Memorandum on Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014) ... 100a

Table of Contents—Continued: Page

Appendix F — Memorandum on Rescission of Deferred Action for Childhood Arrivals (Sept. 5, 2017)........................................... 109a
Appendix G — Statutory provisions.................................. 118a

**TABLE OF AUTHORITIES**

Cases:

*Abbott Laboratories* v. *Gardner*, 387 U.S. 136 (1967)........ 29
*Arizona* v. *United States*, 567 U.S. 387 (2012) ........... 2, 3, 18
*Botezatu* v. *INS*, 195 F.3d 311 (7th Cir. 1999), cert. denied, 531 U.S. 811 (2000) ....................................... 22
*Bowman Transp., Inc.* v. *Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ..................................... 24, 25
*Dames & Moore* v. *Regan*, 453 U.S. 654 (1981).................. 14
*Elgin* v. *Department of Treasury*, 567 U.S. 1 (2012)......... 23
*FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502 (2009)......................................................................... 24
*Green* v. *Napolitano*, 627 F.3d 1341 (10th Cir. 2010) ........ 23
*Heckler* v. *Chaney*, 470 U.S. 821 (1985)...................... *passim*
*I.C.C.* v. *Brotherhood of Locomotive Eng'rs*, 482 U.S. 270 (1987).......................................16, 18, 19, 20, 21
*Lewis* v. *Casey*, 518 U.S. 343 (1996)..................................... 33
*Lincoln* v. *Vigil*, 508 U.S. 182 (1993) ....................... 16, 19, 20
*Madsen* v. *Women's Health Ctr., Inc.*, 512 U.S. 753 (1994)......................................................................... 33
*Massachusetts* v. *EPA*, 549 U.S. 497 (2007) ................. 31, 32
*Mistretta* v. *United States*, 488 U.S. 361 (1989) ................. 15
*Motor Vehicles Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).......................... 24, 29, 31
*Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ..........................3, 18, 21, 22, 24

Cases—Continued: Page

*Texas* v. *United States*:
86 F. Supp. 3d 591 (S.D. Tex.), aff'd, 809 F.3d 134 (5th Cir. 2015), aff'd, 136 S. Ct. 2271 (2016) .............. 5
809 F.3d 134 (5th Cir. 2015), aff'd, 136 S. Ct. 2271 (2016) ............................................. 5, 26, 27, 28, 29, 32
*Thunder Basin Coal Co.* v. *Reich*, 510 U.S. 200 (1994) ........................................................................ 23
*United States* v. *Armstrong*, 517 U.S. 456 (1996) .............. 17
*United States* v. *Nixon*, 418 U.S. 683 (1974) ...................... 14
*United States* v. *Texas*, 136 S. Ct. 2271 (2016) ..................... 5
*Vasquez* v. *Aviles*, 639 Fed. Appx. 898 (3d Cir. 2016) ........ 22
*Wayte* v. *United States*, 470 U.S. 598 (1985) ...................... 19
*Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579 (1952) ........................................................... 14

Constitution, statutes, and rules:

U.S. Const. Amend. V (Due Process Clause) ..................... 11
Administrative Procedure Act, 5 U.S.C. 551 *et seq.* ........... 14
5 U.S.C. 701(a)(2) ............................ 8, 15, 16, 18, 20, 118a
5 U.S.C. 706(2)(A) ................................................ 24, 119a
Clean Air Act, 42 U.S.C. 7401 *et seq.* .................................. 32
42 U.S.C. 7521(a)(1) ........................................................ 32
Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 301 *et seq.* ........................................................... 19
21 U.S.C. 352(f) ............................................................... 19
Immigration and Nationality Act, 8 U.S.C. 1101 *et seq.* ............................................................ 2
8 U.S.C. 1103(a)(1) ...................................................... 2, 26
8 U.S.C. 1158(b)(1)(A) ...................................................... 3
8 U.S.C. 1182(a) (2012 & Supp. IV 2016) ........................ 3
8 U.S.C. 1182(d)(5)(A) ...................................................... 3

Statutes and rules—Continued: Page

8 U.S.C. 1182(h) .......... 23
8 U.S.C. 1182(i) .......... 23
8 U.S.C. 1227(a) .......... 3
8 U.S.C. 1229b .......... 3, 23
8 U.S.C. 1229c .......... 23
8 U.S.C. 1252 .......... 16, 21, 120a
8 U.S.C. 1252(a)(1) .......... 22, 120a
8 U.S.C. 1252(a)(2)(B) .......... 23, 121a
8 U.S.C. 1252(a)(2)(B)(i) .......... 23, 122a
8 U.S.C. 1252(a)(2)(D) .......... 23, 122a
8 U.S.C. 1252(b)(9) .......... 22, 129a
8 U.S.C. 1252(g) .......... 8, 21, 22, 23, 134a
8 U.S.C. 1255 .......... 23

Railway Labor Act, 45 U.S.C. 151 *et seq.* .......... 21
Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.* .......... 7
6 U.S.C. 202(5) .......... 3, 18, 26, 30, 32
28 U.S.C. 1254 .......... 13
28 U.S.C. 1254(1) .......... 13
28 U.S.C. 1292(a)(1) .......... 11
28 U.S.C. 1292(b) .......... 11, 12, 13
28 U.S.C. 2101(e) .......... 13
Fed. R. App. P. 5(a) .......... 12
Fed. R. Civ. P.:

Rule 12(b)(1) .......... 7, 8, 12
Rule 12(b)(6) .......... 7, 11, 12

Sup. Ct. R. 11 .......... 14

Miscellaneous:

The White House, *Remarks by the President on Immigration* (June 15, 2012), https://go.usa.gov/xnZFY .......... 30

Miscellaneous—Continued: Page

Stephen M. Shapiro et al., *Supreme Court Practice* (10th ed. 2013) .......... 13, 14

U.S. Citizenship & Immigration Servs., Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction (Jan. 13, 2018), https://www.uscis.gov/humanitarian/deferred-action-childhood-arrivals-response-january-2018-preliminary-injunction. .......... 10

# In the Supreme Court of the United States

No.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS

*v.*

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.

*ON PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT*

**PETITION FOR A WRIT OF CERTIORARI BEFORE JUDGMENT**

The Solicitor General, on behalf of the United States Department of Homeland Security and other federal parties, respectfully petitions for a writ of certiorari before judgment to the United States Court of Appeals for the Ninth Circuit.

**OPINIONS BELOW**

The order of the district court granting respondents' motion for a preliminary injunction and denying the government's motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) (App., *infra*, 1a-70a) is not yet published in the Federal Supplement but is available at 2018 WL 339144. A separate order of the district court granting in part, and denying in part, the government's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) (App., *infra*, 76a-94a) is not yet published

in the Federal Supplement but is available at 2018 WL 401177.

## JURISDICTION

On January 9, 2018, the district court denied the government's Rule 12(b)(1) motion, entered a preliminary injunction, and certified its Rule 12(b)(1) decision for interlocutory appeal. On January 12, 2018, the district court granted in part and denied in part the government's Rule 12(b)(6) motion and certified several of its rulings for interlocutory appeal. The government filed a notice of appeal of the order granting a preliminary injunction on January 16, 2018 (App., *infra*, 71a-75a). The same day, the government filed a petition for permission to appeal both the January 9 and January 12 orders that the district court had certified for interlocutory appeal. The court of appeals' jurisdiction over the appeal of the preliminary injunction rests on 28 U.S.C. 1292(a)(1). The court of appeals' jurisdiction over the appeal of the certified rulings would rest on 28 U.S.C. 1292(b). The jurisdiction of this Court is invoked under 28 U.S.C. 1254(1) and 28 U.S.C. 2101(e).

## STATUTORY PROVISIONS INVOLVED

Pertinent statutory provisions are set forth in the appendix to this petition. App., *infra*, 118a-134a.

## STATEMENT

1. a. The Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.*, charges the Secretary of Homeland Security "with the administration and enforcement" of the Act. 8 U.S.C. 1103(a)(1). Individual aliens are subject to removal if, *inter alia*, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona* v. *United States*, 567 U.S. 387, 396 (2012); see

8 U.S.C. 1182(a) (2012 & Supp. IV 2016); see also 8 U.S.C. 1227(a). As a practical matter, however, the federal government cannot remove every removable alien, and a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.

For any alien subject to removal, Department of Homeland Security (DHS) officials must first "decide whether it makes sense to pursue removal at all." *Arizona*, 567 U.S. at 396. After removal proceedings begin, government officials may decide to grant discretionary relief, such as asylum, parole, or cancellation of removal. See 8 U.S.C. 1158(b)(1)(A), 1182(d)(5)(A), 1229b. And, "[a]t each stage" of the process, "the Executive has discretion to abandon the endeavor." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (*AADC*). In making these decisions, like other agencies exercising enforcement discretion, DHS must engage in "a complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985). Recognizing the need for such balancing, Congress has provided that the "Secretary [of Homeland Security] shall be responsible for * * * [e]stablishing national immigration enforcement policies and priorities." 6 U.S.C. 202(5).

b. In 2012, DHS announced the policy known as Deferred Action for Childhood Arrivals (DACA). See App., *infra*, 95a-99a (June 15, 2012 memorandum). Deferred action is a practice in which the Secretary exercises discretion, "for humanitarian reasons or simply for [her] own convenience," to notify an alien of her decision to forbear from seeking his removal for a designated period. *AADC*, 525 U.S. at 484. A grant of deferred action does not confer lawful immigration status

or provide any defense to removal. DHS retains discretion to revoke deferred action unilaterally, and the alien remains removable at any time.

DACA made deferred action available to "certain young people who were brought to this country as children." App., *infra*, 95a. Under the original DACA policy, following successful completion of a background check and other review, an alien would receive deferred action for a period of two years, subject to renewal. *Id.* at 97a-98a. The DACA policy made clear that it "confer[red] no substantive right, immigration status or pathway to citizenship," because "[o]nly the Congress, acting through its legislative authority, can confer these rights." *Id.* at 99a.

In 2014, DHS created a new policy referred to as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). See App., *infra*, 100a-108a. Through a process expressly designed to be "similar to DACA," DAPA made deferred action available for certain individuals who had a child who was a U.S. citizen or lawful permanent resident. *Id.* at 105a. At the same time, DHS also expanded DACA by extending the deferred-action period from two to three years and by loosening the age and residency criteria. *Id.* at 104a-105a.

c. Soon thereafter, Texas and 25 other States brought suit in the Southern District of Texas to enjoin DAPA and the expansion of DACA. The district court issued a nationwide preliminary injunction, finding a likelihood of success on the claim that the DAPA and expanded DACA memorandum was a "'substantive' rule that should have undergone the notice-and-comment rule making procedure" required by the Administrative Procedure Act (APA), 5 U.S.C. 551 *et seq.*

*Texas* v. *United States*, 86 F. Supp. 3d 591, 671 (2015); see *id.* at 607, 647, 665-678.

The Fifth Circuit affirmed the preliminary injunction, holding that the DAPA and expanded DACA policies likely violated both the APA and the INA. *Texas* v. *United States*, 809 F.3d 134, 146, 170-186 (2015). The court of appeals concluded that plaintiffs had "established a substantial likelihood of success on the merits of their procedural claim" that DAPA and expanded DACA were invalidly promulgated without notice and comment. *Id.* at 178. The court also concluded, "as an alternate and additional ground," that the policies were substantively contrary to law. *Ibid*. The court observed that the INA contains an "intricate system of immigration classifications and employment eligibility," and "flatly does not permit the reclassification of millions of illegal aliens as lawfully present" and eligible for "federal and state benefits, including work authorization." *Id.* at 184. And it noted that Congress had repeatedly declined to enact legislation "closely resembl[ing] DACA and DAPA." *Id.* at 185.

After briefing and argument, this Court affirmed the Fifth Circuit's judgment by an equally divided Court, *United States* v. *Texas*, 136 S. Ct. 2271, 2272 (2016) (per curiam), leaving in place the nationwide injunction against DAPA and the expansion of DACA.

d. In June 2017, Texas and other plaintiff States in the *Texas* case announced their intention to amend their complaint to challenge the original DACA policy. App., *infra*, 17a. They asserted that "[f]or the same reasons that DAPA and Expanded DACA's unilateral Executive Branch conferral of eligibility for lawful presence and work authorization was unlawful, the original June 15,

2012 DACA memorandum is also unlawful." D. Ct. Doc. 64-1, at 239.

On September 5, 2017, rather than engage in litigation in which DACA would be challenged on essentially the same grounds that succeeded in *Texas* before the same court, DHS decided to wind down the original DACA policy in an orderly fashion. See App., *infra*, 109a-117a (Rescission Memo). In the Rescission Memo, the Acting Secretary of Homeland Security explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation," as well as advice from the Attorney General that the original DACA policy was unlawful and that the "potentially imminent" challenge to DACA would "likely * * * yield similar results" to the *Texas* litigation, "it is clear that the June 15, 2012 DACA program should be terminated." *Id*. at 114a-115a. The Acting Secretary accordingly announced that, "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," the June 15, 2012 memorandum was "rescind[ed]." *Id.* at 115a.

In light of the "complexities associated with winding down the program," however, the Rescission Memo explained that DHS would "provide a limited window in which it w[ould] adjudicate certain requests for DACA." App., *infra*, 115a. Specifically, DHS would "adjudicate—on an individual, case-by-case basis—properly filed pending DACA renewal requests * * * from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017." *Id.* at 115a-116a. The Rescission Memo further

provided that the government "[w]ill not terminate the grants of previously issued deferred action * * * solely based on the directives in this memorandum" for the remaining two-year periods. *Id.* at 116a.

2. Shortly after the Acting Secretary's decision, respondents brought these five related suits in the Northern District of California challenging the rescission of DACA. App., *infra*, 19a-21a. Collectively, they allege that the termination of DACA is unlawful because it violates the APA's requirement for notice-and-comment rulemaking; is arbitrary and capricious; violates the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*; denies respondents equal protection and due process; and permits the government to use information obtained through DACA in a manner inconsistent with principles of equitable estoppel. See App., *infra*, 21a-22a. Similar challenges have been brought in district courts in New York, Maryland, Virginia, Florida, and the District of Columbia.

In November 2017, the government filed a motion to dismiss all five suits under Federal Rule of Civil Procedure 12(b)(1) and (b)(6).[1] At the threshold, the govern-

---

[1] The government filed the administrative record in October 2017. Litigation ensued in which respondents sought and obtained orders from the district court directing a vast expansion of the administration record, in addition to immediate discovery. See, *e.g.*, D. Ct. Doc. 79 (Oct. 17, 2017). The government sought review of those orders in a petition for a writ of mandamus in the court of appeals, which the Ninth Circuit denied. See 875 F.3d 1200 (2017). After granting a stay of the district court's orders, see 138 S. Ct. 371 (2017), this Court granted the government's petition for a writ of certiorari, vacated the Ninth Circuit's judgment, and remanded for further proceedings. See 138 S. Ct. 443 (2017). On remand, the district court stayed its orders requiring expansion of the administrative record and authorizing

ment argued that respondents' claims are not reviewable because the Acting Secretary's decision to rescind DACA is committed to agency discretion by law, see 5 U.S.C. 701(a)(2); and because judicial review of the denial of deferred action, if available at all, is barred under the INA prior to the issuance of a final removal order, see 8 U.S.C. 1252(g). The government further argued that respondents' substantive APA claims fail because the Acting Secretary rationally explained her decision to wind down the discretionary DACA policy given the imminent risk of a nationwide injunction and her reasonable conclusion that the policy is unlawful. Finally, the government argued that respondents' other claims are without merit because the rescission of DACA is exempt from notice-and-comment requirements; does not violate principles of equal protection or due process; and does not change the policies governing the use of aliens' personal information at all.

Respondents opposed the government's motion to dismiss and filed a motion for a preliminary injunction, seeking to prevent the government from rescinding the DACA policy.

3. On January 9, 2018, the district court denied the motion to dismiss to the extent it was based on Rule 12(b)(1), and entered a preliminary injunction requiring the government to "maintain the DACA program on a nationwide basis." App., *infra*, 66a; see *id.* at 1a-70a.

---

discovery "pending further order." See D. Ct. Doc. 225 (Dec. 21, 2017). The court recently announced its view that "the order to complete the administrative record should be re-issued" and certified for interlocutory appeal. D. Ct. Doc. 240, at 1 (Jan. 12, 2018). It has directed the parties to brief by January 19 "whether some narrowing of the order is necessary or appropriate" before the order is reissued and "the extent to which * * * discovery should resume." *Id.* at 1-2.

The district court first ruled that the Acting Secretary's rescission of DACA was not committed to agency discretion by law. The court acknowledged that an agency's decisions "not to prosecute or initiate enforcement actions are generally not reviewable as they are 'committed to an agency's absolute discretion.'" App., *infra*, 27a (quoting *Chaney*, 470 U.S. at 831). But it concluded that the rescission of DACA was different because it involved a "broad enforcement polic[y]" rather than an "'individual enforcement decision'"; it rescinded a policy of enforcement discretion, instead of announcing a new one; and the "main" rationale for rescinding the prior policy was its "supposed illegality," which the court concluded it was authorized to decide. *Id.* at 28a-30a (citation omitted). The court also concluded that the INA did not preclude review because "plaintiffs do not challenge any particular removal but, rather, challenge the abrupt end to a nationwide deferred-action and work-authorization program." *Id.* at 30a-31a.

The district court then ruled that respondents were entitled to a preliminary injunction, concluding that they had demonstrated a likelihood of success on claims that the rescission of DACA was arbitrary and capricious. App., *infra*, 41a-62a. The court acknowledged that "a new administration is entitled to replace old policies with new policies so long as they comply with the law," *id.* at 2a, and the court did not dispute that DACA was a discretionary non-enforcement policy that was neither mandated nor specifically authorized by statute. The court nonetheless concluded that respondents were likely to succeed on their claims both because "the agency's decision to rescind DACA was based on a flawed legal premise" and because the government's

"supposed 'litigation risk' rationale" was an invalid "post hoc rationalization" and, "in any event, arbitrary and capricious." *Id.* at 42a.

Finding that respondents had satisfied the remaining equitable requirements for an injunction, see App., *infra*, 62a-66a, the district court ordered the government, "pending final judgment" or other order, "to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017." *Id.* at 66a. The court specifically directed that the government must "allow[] DACA enrollees to renew their enrollments." *Ibid.*[2] The court also required DHS to post "reasonable public notice that it will resume receiving DACA renewal applications" and to provide "summary reports to the Court (and counsel)" every three months about "its actions on all DACA-related applications." *Id*. at 67a.[3]

[2] The district court identified certain "exceptions" to its injunction. The court specified "(1) that new applications from applicants who have never before received deferred action need not be processed; (2) that the advance parole feature need not be continued for the time being for anyone; and (3) that defendants may take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application." App., *infra*, 66a-67a. The court also specified that "[n]othing in [its] order" would prohibit DHS from "remov[ing] any individual, including any DACA enrollee, who it determines poses a risk to national security or public safety, or otherwise deserves, in its judgment, to be removed." *Id.* at 67a.

[3] Consistent with the district court's order, DHS has issued guidance announcing that it has "resumed accepting requests to renew a grant of deferred action under DACA." U.S. Citizenship & Immigration Servs., Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction (Jan. 13, 2018), https://www.uscis.gov/humanitarian/deferred-action-childhood-arrivals-response-january-2018-preliminary-injunction.

The district court certified its order for interlocutory appeal under 28 U.S.C. 1292(b), to the extent it denied the "questions interposed by the government in its motion to dismiss under [Rule] 12(b)(1)." App., *infra*, 70a.

4. On January 12, 2018, the district court issued a further order granting in part and denying in part the government's motion to dismiss to the extent it was based on Rule 12(b)(6). App., *infra*, 76a-94a. The court declined to dismiss respondents' substantive APA claims "[f]or the same reasons" stated in its January 9 order. *Id.* at 77a. The court also declined to dismiss respondents' claims that the rescission of DACA violated principles of equal protection based on race, *id.* at 88a-92a, and that DHS had violated the Due Process Clause by allegedly "chang[ing] its policy" on the use of personal information "provided by DACA recipients," *id.* at 84a-86a. The court dismissed respondents' remaining claims, including with respect to procedural notice-and-comment, the Regulatory Flexibility Act, procedural due process, equitable estoppel, and equal protection based on a fundamental right to a job. *Id.* at 77a-84a, 86a-88a, 92a. The court certified various of its holdings—including those adverse to the government—for interlocutory appeal pursuant to 28 U.S.C. 1292(b). See *id.* at 94a.

5. The government filed timely notices of appeal of the district court's January 9 preliminary-injunction order in each of the five suits. App., *infra*, 71a-75a; cf. 28 U.S.C. 1292(a)(1). The appeals have been consolidated and docketed as No. 18-15068, and remain pending before the court of appeals. The government also has filed a timely petition for permission to appeal from the district court's January 9 and January 12 orders granting in part and denying in part the government's

motion to dismiss under Rule 12(b)(1) and (b)(6); that petition has been docketed as No. 18-80004. See 28 U.S.C. 1292(b); Fed. R. App. P. 5(a).

**REASONS FOR GRANTING THE PETITION**

This Court's immediate review is warranted. The district court has entered a nationwide injunction that requires DHS to keep in place a policy of non-enforcement that no one contends is required by federal law and that DHS has determined is, in fact, unlawful and should be discontinued. The district court's unprecedented order requires the government to sanction indefinitely *an ongoing violation of federal law* being committed by nearly 700,000 aliens—and, indeed, to confer on them affirmative benefits (including work authorization)—pursuant to the DACA policy. That policy is materially indistinguishable from the DAPA and expanded DACA policies that the Fifth Circuit held were contrary to federal immigration law in a decision that four Justices of this Court voted to affirm. Without this Court's immediate intervention, the court's injunction will persist at least for months while an appeal is resolved and, if the court of appeals does not reverse the injunction, it could continue for *more than a year* given the Court's calendar.

To be sure, some of these harms could be avoided by a stay of the district court's order. But a primary purpose of the Acting Secretary's orderly wind-down of the DACA policy was to *avoid* the disruptive effects on all parties of abrupt shifts in the enforcement of the Nation's immigration laws. Inviting more changes before final resolution of this litigation would not further that interest. Moreover, a stay would not address the institutional injury suffered by the United States of being embroiled in protracted litigation over an agency decision that falls squarely within DHS's broad discretion

over federal immigration policy and that is not even judicially reviewable. A stay also would not address the risk that the onerous discovery and administrative-record orders that already justified this Court's intervention will be reinstated and create the need for additional rounds of interlocutory appellate review. Accordingly, the government respectfully submits that the most suitable and efficient way to vindicate the law in these unique circumstances is to grant certiorari before judgment and resolve the dispute this Term.

## I. THE DECISION BELOW IS IN NEED OF IMMEDIATE REVIEW

Congress has vested this Court with jurisdiction to review "[c]ases in the courts of appeals * * * [b]y writ of certiorari * * * *before or* after rendition of judgment or decree." 28 U.S.C. 1254(1) (emphasis added). "An application * * * for a writ of certiorari to review a case before judgment has been rendered in the court of appeals may be made at any time before judgment." 28 U.S.C. 2101(e).[4] This Court will grant certiorari before judgment "only upon a showing that the case is of such imperative public importance as to justify devia-

[4] By virtue of the government's notice of appeal, the district court's preliminary-injunction order is already "in the court[] of appeals" within the meaning of 28 U.S.C. 1254 and 2101(e). See Stephen M. Shapiro et al., *Supreme Court Practice* § 2.4, at 85-86 (10th ed. 2013). Accordingly, this petition is focused on the validity of that order. If the court of appeals grants the government's pending petition for interlocutory appeal, however, both the January 9 and January 12 orders will be "in the court[] of appeals" in their entirety, 28 U.S.C. 1254; see 28 U.S.C. 1292(b), and could therefore be reviewed by this Court.

tion from normal appellate practice and to require immediate determination in this Court." Sup. Ct. R. 11. This case satisfies that standard.

An immediate grant of certiorari is necessary in order to obtain an appropriately prompt resolution of this important dispute. Absent certiorari before judgment, it is likely that even expedited proceedings in the Ninth Circuit would entail many months of delay, during which time the district-court injunction would require the government to retain in place a discretionary policy that sanctions the ongoing violation of federal law by more than half a million people. Even if the losing party were to seek certiorari immediately following the Ninth Circuit's decision, this Court would not be able to review the decision in the ordinary course until next Term at the earliest.

From the start of these suits, all parties involved have agreed that time is of the essence. Respondents, the government, and the district court alike all have repeatedly asserted that a speedy resolution is critical.[5] This Court has granted certiorari before judgment in order to promptly resolve other time-sensitive disputes, and it should follow the same course here. See, *e.g.*, *Dames & Moore* v. *Regan*, 453 U.S. 654, 668 (1981); *United States* v. *Nixon*, 418 U.S. 683, 686-687 (1974); *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 584 (1952); cf. Stephen M. Shapiro et al., *Supreme Court Practice* § 4.20, at 287-288 (10th ed. 2013) (collecting

---

[5] See, *e.g.*, D. Ct. Doc. 87, at 1 (Oct. 23, 2017) (district-court response to mandamus petition) (declaring that "[t]ime is of the essence"); 17-801 Regents Br. in Opp. 30 (emphasizing "the time-sensitive nature of this case"); 9/21/2017 Tr. 18 (statement of government counsel) ("We think your suggestion to get to final judgment quickly makes a lot of sense in this case.").

cases where "[t]he public interest in a speedy determination" warranted certiorari before judgment).

Challenges to the rescission of the DACA policy are currently pending before courts in the Second, Fourth, Ninth, Eleventh, and District of Columbia Circuits, and the plaintiffs in nearly all of them are seeking similar nationwide injunctions. There can be no reasonable question that, as in *Texas*, this Court's review will be warranted. The Court is already familiar with the relevant issues in light of its consideration of the *Texas* case. Additional burdensome discovery, vast expansions of the administrative record, and privilege disputes would only burden the courts and parties without bringing any additional clarity to those issues. And given that the Fifth Circuit's decision in *Texas* held DAPA and the DACA expansion unlawful, and (as explained below) that court's reasoning applies to DACA as well, only this Court can resolve the conflict in the lower courts and provide much-needed clarity to the government and DACA recipients alike. See *Mistretta* v. *United States*, 488 U.S. 361, 371 (1989) (granting certiorari before judgment where constitutionality of sentencing guidelines presented question of "'imperative public importance'" and had resulted in "disarray among the Federal District Courts") (citation omitted).

## II. THE DECISION BELOW IS WRONG

Review is further warranted because the decision below is incorrect. The Acting Secretary's decision to rescind DACA—which is simply a policy of enforcement discretion—is a classic determination that is "committed to agency discretion by law," 5 U.S.C. 701(a)(2), and therefore unreviewable under the APA. Even if DHS's prospective denial of deferred action were reviewable, the individual respondents could not obtain such review

unless and until a final order of removal were entered against them. See 8 U.S.C. 1252. And even if it were reviewable now under the APA, the decision to rescind the DACA policy was not arbitrary and capricious. The Acting Secretary opted to wind down DACA after reasonably concluding that the policy was likely to be struck down by courts and indeed was unlawful.

**A. The Rescission Memo Is Not Reviewable**

1. a. The APA precludes review of agency actions that are "committed to agency discretion by law." 5 U.S.C. 701(a)(2). "Over the years," this Court has interpreted that provision to apply to various types of agency decisions that "traditionally" have been regarded as unsuitable for judicial review. *Lincoln* v. *Vigil*, 508 U.S. 182, 191 (1993). Section 701(a)(2) precludes review, for example, of an agency's decision not to institute enforcement actions, *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985); an agency's refusal to reconsider a prior decision based on an alleged "material error," *I.C.C.* v. *Brotherhood of Locomotive Eng'rs*, 482 U.S. 270, 282 (1987); and an agency's allocation of funds from a lump-sum appropriation, *Lincoln*, 508 U.S. at 192. Such exercises of discretion, the Court has explained, often require "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Chaney*, 470 U.S. at 831.

With respect to an agency's enforcement discretion in particular, an agency may "not only assess whether a violation has occurred," but "whether agency resources are best spent on this violation or another"; whether enforcement in a particular scenario "best fits the agency's overall policies"; and whether the agency "has enough resources to undertake the action at all." *Chaney*, 470 U.S. at 831. In addition, the Court has

noted that when an agency declines to enforce, it "generally does not exercise its *coercive* power over an individual's liberty or property rights, and thus does not infringe upon areas that courts often are called upon to protect." *Id.* at 832. In this way and others, agency enforcement discretion "shares to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the Executive Branch." *Ibid.*

b. The Acting Secretary's decision to discontinue an existing policy of enforcement discretion falls well within the types of agency decisions that traditionally have been understood as "committed to agency discretion." Like the decision to *adopt* a policy of selective non-enforcement, the decision whether to *retain* such a policy can "involve[] a complicated balancing" of factors that are "peculiarly within the expertise" of the agency, including determining how the agency's resources are best spent and how the non-enforcement policy fits with the agency's overall policies. *Chaney*, 470 U.S. at 831. Likewise, a decision to abandon an existing non-enforcement policy will not, in itself, bring to bear the agency's coercive power over any individual. Indeed, an agency's decision to reverse a prior policy of civil non-enforcement is akin to changes in policy as to criminal prosecutorial discretion, which regularly occur within the U.S. Department of Justice both within and between presidential administrations, and which have never been considered amenable to judicial review. See *United States* v. *Armstrong*, 517 U.S. 456, 464 (1996) ("[T]he decision *whether or not* to prosecute, and what charge to file or bring before a grand jury, generally

rests entirely in [the prosecutor's] discretion.") (emphasis added) (citation omitted).

This presumption of nonreviewability applies with particular force when it comes to immigration. On top of the general concerns implicated in any enforcement decision, in the immigration context a decision not to enforce tolerates not merely past misconduct but a "continuing violation of United States law." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999). In addition, the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy." *Arizona* v. *United States*, 567 U.S. 387, 396-397 (2012). Given these realities, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Id.* at 396. In the absence of a statutory directive establishing "substantive priorities" or "otherwise circumscribing" the agency's discretion, *Chaney*, 470 U.S. at 833, the Court has found it "impossib[le]" to "devis[e] an adequate standard of review for such agency action," *Brotherhood of Locomotive Eng'rs*, 482 U.S. at 282. Respondents have not identified any such statutory directive here. To the contrary, Congress has specifically empowered the Secretary of Homeland Security to "[e]stablish[] national immigration enforcement policies and priorities." 6 U.S.C. 202(5). The revocation of an existing policy establishing such enforcement policies and priorities is therefore a decision that is "committed to agency discretion by law," 5 U.S.C. 701(a)(2), and not subject to arbitrary-and-capricious review.

c. The district court's reasons for rejecting that conclusion are both flatly inconsistent with this Court's precedents and unpersuasive on their own terms.

First, the district court reasoned that the rescission of the DACA policy was reviewable because it addressed "broad enforcement policies," instead of an individual enforcement decision. App., *infra*, 28a. That is irrelevant. Agency decisions about how its "resources are best spent" or how certain enforcement activity "best fits the agency's overall policies," *Chaney*, 470 U.S. at 831, are at least as susceptible to implementation through broad guidance as through case-by-case enforcement decisions. See, *e.g.*, *Wayte* v. *United States*, 470 U.S. 598, 601-603 (1985). Conversely, individual enforcement decisions are regularly informed by interpretations of the agency's substantive statute to determine "whether a violation has occurred." *Ibid.*; see *Brotherhood of Locomotive Eng'rs*, 482 U.S. at 283 ("[A] common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction.").

The non-enforcement decision in *Chaney* was not an individualized decision by the Food and Drug Administration (FDA) to forgo enforcement of the Federal Food, Drug, and Cosmetic Act (FDCA) against a particular alleged violator. Rather, the FDA concluded that, as a matter of the agency's discretion, it would *categorically* not enforce the FDCA's misbranding prohibition, 21 U.S.C. 352(f), against the use of certain drugs for capital punishment when those drugs had been approved by the FDA only for other medical purposes. 470 U.S. at 824-825. And, in *Lincoln*, the Indian Health Service's unreviewable decision reallocated funds from an entire regional treatment program in the Southwest

to other nationwide Service programs, not from an individual's treatment plan. 508 U.S. at 184, 188. The question for purposes of Section 701(a)(2) is whether the agency's decision is inherently discretionary in nature, not the number of people to whom it applies.

Second, the district court reasoned that the rescission of the DACA policy was reviewable because, rather than adopting a policy of non-enforcement, it rescinded one. App., *infra*, 29a-30a. The DACA policy, the court determined, had "become an important program for DACA recipients and their families" and others, *ibid.*, and "[a]n agency action to terminate [an existing policy] bears no resemblance to an agency decision not to regulate something never before regulated." *Id.* at 30a. That is not so. As explained above, a decision whether to retain an enforcement policy implicates all of the same considerations about agency priorities and resources that inform the decision to adopt such a policy in the first instance. In *Lincoln*, for example, the Indian Health Service had operated its regional service for seven years, providing important medical treatment to disabled Indian children on which the recipients had undoubtedly come to rely. See 508 U.S. at 185-188. But notwithstanding that reliance, because nothing in the relevant statutes constrained the Service's discretion, this Court held that the Service's decision to discontinue the program was "committed to agency discretion by law." The same is true here.

Third, the district court concluded that the Acting Secretary's decision was reviewable because it was based in substantial part on her view of the legality of the original DACA policy. App., *infra*, 30a. In the court's view, "[t]he main, if not exclusive, rationale for

ending DACA was its supposed illegality," and "determining illegality is a quintessential role of the courts." *Ibid.* As the court itself recognized, however, that reasoning cannot suffice: "[A] presumptively unreviewable agency action does not become reviewable simply because 'the agency gives a reviewable reason for otherwise unreviewable action.'" *Id.* at 30a n.7 (quoting *Brotherhood of Locomotive Eng'rs*, 482 U.S. at 283). Thus, in *Brotherhood of Locomotive Engineers*, the ICC's decision not to reconsider a prior decision was unreviewable, even though the agency based that denial on an interpretation of its legal obligations under the Railway Labor Act, 45 U.S.C. 151 *et seq.* 482 U.S. at 276, 283. And in *Chaney*, the FDA's decision not to enforce the misbranding prohibition did not become reviewable even though it was based, in part, on the agency's understanding of its authority to initiate such proceedings. 470 U.S. at 824.

2. At a minimum, Congress has foreclosed district courts from adjudicating collateral attacks on the Acting Secretary's discretionary enforcement decisions and policies in the manner pursued by respondents here.

a. Under 8 U.S.C. 1252, judicial review of DHS enforcement decisions is generally available, if at all, only through the review procedures of removal orders set forth in that section. In particular, Section 1252(g) states that "[e]xcept as provided in this section * * * no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this subchapter." In *AADC*, this Court explained that Section 1252(g) is "de-

signed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed." 525 U.S. at 485.

The Acting Secretary's rescission of the DACA policy is such a "'no deferred action' decision[]," *AADC*, 525 U.S. at 485, and is an ingredient in the agency's "commence[ment] [of] proceedings" against aliens who are unlawfully in the country, 8 U.S.C. 1252(g). Thus, to the extent the rescission of the DACA policy is reviewable at all, it is reviewable only as otherwise "provided in [Section 1252]," *ibid.*—that is, through "[j]udicial review of a final order of removal," 8 U.S.C. 1252(a)(1). See, *e.g.*, *Vasquez* v. *Aviles*, 639 Fed. Appx. 898, 901 (3d Cir. 2016) (concluding that, under Section 1252(g), "[t]he District Court therefore lacked jurisdiction to consider [plaintiff's] challenge to his denial of DACA relief"); *Botezatu* v. *INS*, 195 F.3d 311, 314 (7th Cir. 1999) ("Review of refusal to grant deferred action is * * * excluded from the jurisdiction of the district court."), cert. denied, 531 U.S. 811 (2000). That conclusion is also reflected in 8 U.S.C. 1252(b)(9), which channels into the review of final removal orders all questions of fact or law arising from any action taken to remove an alien from the United States. See *AADC*, 525 U.S. at 483 (characterizing Section 1252(b)(9) as an "unmistakable 'zipper' clause").[6]

[6] Even in instances where the statutory text less clearly precludes review, this Court has held that, where it is fairly discernible that Congress intends a particular review scheme to be exclusive, a plaintiff is not permitted to circumvent that exclusive scheme by filing a preemptive district-court action, but must instead present its

The conclusion that Congress intended to foreclose collateral review of the Acting Secretary's prospective rescission of a discretionary deferred-action policy is consistent with Congress's treatment of other kinds of discretionary DHS actions. For example, in 8 U.S.C. 1252(a)(2)(B), Congress provided that "no court shall have jurisdiction to review" judgments regarding the grant or denial of specified forms of discretionary relief—including cancellation of removal, voluntary departure, certain waivers of inadmissibility, and adjustment of status. See 8 U.S.C. 1252(a)(2)(B)(i) (citing 8 U.S.C. 1182(h), 1182(i), 1229b, 1229c, 1255). Congress provided a limited exception to that jurisdictional bar for "review of constitutional claims or questions of law," 8 U.S.C. 1252(a)(2)(D), but it mandated that any such review occur only "upon a petition for review [of a final order of removal] filed with an appropriate court of appeals in accordance with this section," *ibid.* See, *e.g.*, *Green* v. *Napolitano*, 627 F.3d 1341, 1347 (10th Cir. 2010).

b. The district court concluded that Section 1252(g) does not apply because respondents challenged "the across-the-board cancellation of a nationwide program," and did so "prior to the commencement of any removal proceedings" against respondents. App., *infra*, 31a-32a. But none of that matters. The denial of deferred action is a step toward the commencement of removal proceedings against an alien. Respondents cannot escape the INA's careful scheme for such proceedings simply by filing suit before the agency has officially initiated an enforcement proceeding against them. See *Thunder Basin Coal Co.* v. *Reich*, 510 U.S. 200, 207-208

---

claims or defenses through the review scheme established by Congress. See *Elgin* v. *Department of Treasury*, 567 U.S. 1, 8-10 (2012); *Thunder Basin Coal Co.* v. *Reich*, 510 U.S. 200, 207-209 (1994).

(1994). Respondents' claims, "if they are reviewable at all," must be litigated in removal proceedings, not through "separate rounds of judicial intervention" in federal district court. *AADC*, 525 U.S. at 485.

**B. The Rescission Memo Is Lawful**

Even if the Acting Secretary's decision is reviewable under the APA, it is plainly valid. Under the APA, the Acting Secretary's decision must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). That standard of review is "narrow," *Motor Vehicles Mfrs. Ass'n* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and requires only that the "agency 'examine the relevant data and articulate a satisfactory explanation for its action,'" *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (citation omitted). "[A] court is not to substitute its judgment for that of the agency," *State Farm*, 463 U.S. at 43, and should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp., Inc.* v. *Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). The Acting Secretary's decision to begin an orderly wind-down of a policy of enforcement discretion that indisputably was not required by law—based on her grave concerns about the legality of that policy, and her knowledge that an impending lawsuit likely would have brought the policy to an immediate and disruptive end—easily passes that test.

***1. The rescission was reasonable in light of the Fifth Circuit's decision and the impending litigation***

The Acting Secretary reasonably rested her decision on her assessment of the risks presented by maintain-

ing a policy (original DACA) that was materially indistinguishable to ones (expanded DACA and DAPA) that had been struck down by the Fifth Circuit in a decision affirmed by this Court—and she did so in the face of the threat by Texas and other States to challenge DACA on the same grounds. That rationale alone provides a permissible reason for initiating an orderly wind-down of the policy.

a. The district court improperly rejected this rationale as a "post hoc rationalization[]" for the Acting Secretary's decision. App., *infra*, 55a. In the court's view, "[t]he Attorney General's letter and the Acting Secretary's memorandum can only be reasonably read as stating DACA was illegal and that, *given that DACA must, therefore, be ended,* the best course was 'an orderly and efficient wind-down process,' rather than a potentially harsh shutdown in the Fifth Circuit." *Id.* at 56a. But that is plainly not the only rationale that "may reasonably be discerned" from the Rescission Memo. *Bowman*, 419 U.S. at 286. In that memorandum, the Acting Secretary recounted in significant detail the litigation surrounding the DAPA and expanded DACA policies. See App., *infra*, 111a-114a. The memorandum noted that the agency's prior June 2017 decision to discontinue DAPA and expanded DACA was made after "considering the [government's] likelihood of success on the merits of th[at] ongoing litigation." *Id.* at 114a. It described the subsequent letter from Texas and other States to the Attorney General notifying him of those States' intention to amend the existing lawsuit to challenge the original DACA policy. *Ibid.* It quoted the Attorney General's statement that "it is likely that potentially imminent litigation would yield similar results with respect to DACA." *Ibid.* And it stated that, in light

of the foregoing, and "[i]n the exercise of [her] authority in establishing national immigration policies and priorities," the Acting Secretary had decided that the DACA policy "should" be terminated and wound down in "an efficient and orderly fashion." *Id.* at 115a; cf. 6 U.S.C. 202(5). A reasonable reading of the Rescission Memo is that the Acting Secretary's decision was informed by the risk that the government was not "likel[y]" to "succe[ed]" on the merits of the "imminent litigation." App., *infra*, 114a.

The district court also posited that litigation risk could not have been a rationale for the Acting Secretary's decision because, "once the Attorney General had determined that DACA was illegal, the Acting Secretary had to accept his ruling as 'controlling.'" App., *infra*, 56a (citing 8 U.S.C. 1103(a)(1)). But even if the Acting Secretary were bound by the Attorney General's legal determination as to DACA's unlawfulness, that is not inconsistent with the Acting Secretary's assertion of an additional, independent litigation-risk rationale for winding down the policy.

b. The Acting Secretary's rationale was eminently reasonable. In *Texas* v. *United States*, the Fifth Circuit concluded that DAPA and expanded DACA were unlawful on both procedural and substantive grounds. 809 F.3d at 178 (2015); see *id.* at 147 n.11 (including the "DACA expansions" within the opinion's references to "DAPA"). The entirety of the Fifth Circuit's reasoning applies equally to the original DACA policy. With respect to procedure, the Fifth Circuit concluded that the memorandum expanding DACA and creating DAPA was not exempt from notice and comment as a statement of policy because of how the *original DACA policy* had been implemented. See *id.* at 171-178. The court found that,

"[a]lthough the DAPA Memo facially purports to confer discretion," in fact it would operate as a binding statement of eligibility for deferred action because that is how the original DACA policy had been implemented. *Id*. at 171; see *id.* at 174 n.139.

As a matter of substance, the Fifth Circuit held that DAPA and expanded DACA were contrary to the INA because (1) "[i]n specific and detailed provisions," the INA already "confers eligibility for 'discretionary relief,'" including "narrow classes of aliens eligible for deferred action," 809 F.3d at 179 (citation omitted); (2) the INA's otherwise "broad grants of authority" could not reasonably be construed to assign to the Secretary the authority to create additional categories of aliens of "vast 'economic and political significance,'" *id.* at 182-183 (citations omitted); (3) DAPA and expanded DACA were inconsistent with historical deferred-action policies because they were not undertaken on a "country-specific basis * * * in response to war, civil unrest, or natural disasters" nor served as a "bridge[] from one legal status to another," *id.* at 184 (citation omitted); and (4) "Congress ha[d] repeatedly declined to enact the Development, Relief, and Education for Alien Minors Act ('DREAM Act'), features of which closely resemble DACA and DAPA." *Id.* at 185 (footnote omitted). Every one of those factors also applies to the original DACA policy.

c. The district court here nevertheless faulted the Acting Secretary for failing to address perceived distinctions between DACA and the DAPA and expanded DACA policies. App., *infra*, 57a-58a; see *id.* at 51a-54a. It is true enough that the Fifth Circuit noted that "any extrapolation from DACA [to DAPA] must be done carefully." *Texas*, 809 F.3d at 173. The differences it

noted, however, were reasons why DAPA might be lawful even if DACA were not, rather than the other way around. See *id.* at 174 (noting that the "DAPA Memo contain[ed] additional discretionary criteria"). And, in any event, the Fifth Circuit went on to affirm, "under any standard of review," the district court's comparison of the policies. *Id.* at 174 n.139.

The district court suggested that DAPA might have been more vulnerable to challenge because "Congress had already established a pathway to lawful presence for alien parents of citizens," while "no such analogue" exists for DACA recipients. App., *infra*, 54a. That reasoning is entirely backward. If Congress's creation of pathways to lawful presence is relevant at all, then the fact that Congress has done so only for DAPA recipients—and not DACA recipients—surely must render DACA *more* inconsistent with the INA. In any event, the basis of the Fifth Circuit's *Texas* decision was not the existence of a particular statutory pathway to lawful presence, but the "specific and intricate provisions" of the INA as a whole addressing discretionary relief. 809 F.3d at 186. Those provisions no more include DACA recipients than those of DAPA. As confirmation of that fact, the Fifth Circuit also affirmed the injunction with respect to expanded DACA—which differed from the original DACA policy only in the length of the deferred-action period and in its modified age and duration-of-residence requirements.

The district court also reasoned that DACA might be distinguishable from DAPA because 689,800 aliens are recipients of DACA, whereas 4.3 million aliens potentially qualified for DAPA. App., *infra*, 54a. But whatever the ultimate number of individuals that might be affected, there can be no debate that DACA is, like DAPA and expanded DACA, a policy of "vast 'economic

and political significance,'" to which the Fifth Circuit's reasoning would apply. *Texas*, 809 F.3d at 183 (citations omitted). By contrast, the type of historical deferred-action practices that the Fifth Circuit suggested might be permissible were much more "limited in time and extent, affecting only a few thousand aliens for months or, at most, a few years." *Id.* at 185 n.197. The Acting Secretary did not act arbitrarily in failing to credit a distinction between DACA and DAPA that the Fifth Circuit had expressly rejected.

Finally, the district court erred in suggesting that, whether or not the original DACA policy was unlawful as it had been implemented, it could have been fixed "by simply insisting on exercise of discretion" in individual cases. App., *infra*, 54a. The Fifth Circuit relied on the lack of individual discretion only for its conclusion that the DAPA Memorandum was *procedurally* unlawful, not substantively so. Thus, even if the Acting Secretary could have altered the DACA policy sufficiently to overcome that concern, there is no indication that it would have changed the Fifth Circuit's substantive conclusion—at least unless the change were so drastic as to return to a practice of "single, ad hoc grants of deferred action made on a genuinely case-by-case basis," *Texas*, 809 F.3d at 186 n.202, which is precisely what the rescission of the DACA policy achieves.[7]

[7] Nor did the Acting Secretary "fail[] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, by not discussing the possibility of defending DACA on the basis of laches. App., *infra*, 57a. That doctrine may provide a defense in an APA action against the government where a plaintiff's unreasonable delay in bringing suit prejudiced the government. See *Abbott Laboratories* v. *Gardner*, 387 U.S. 136, 155 (1967). The district court did not explain what prejudice the government might have established from Texas's failure to bring suit earlier.

d. The district court also ruled that the Acting Secretary's decision was arbitrary and capricious because she "should have—but did not—weigh DACA's programmatic objectives as well as the reliance interests of DACA recipients." App., *infra*, 58a. By its own terms, however, DACA made deferred action available for only two-year periods, which could "be terminated at any time at the agency's discretion." *Id.* at 102a. When he announced DACA in 2012, President Obama explained that it was a "temporary stopgap measure," not a "permanent fix." The White House, *Remarks by the President on Immigration* (June 15, 2012), https://go.usa.gov/xnZFY. And he urged Congress to act "because these kids deserve to plan their lives in more than two-year increments." *Ibid.* Even assuming DACA was lawful, a discretionary policy that can be revoked at any time cannot create legally cognizable reliance interests —and certainly not beyond the stated duration (generally two years) of deferred-action grants. Nothing in the INA prevents the Secretary of Homeland Security from changing her "national immigration enforcement policies and priorities." 6 U.S.C. 202(5).[8]

[8] In any event, the Acting Secretary's decision was respectful of the interests of existing DACA recipients. Based on her reasonable evaluation of the litigation risk posed by the imminent lawsuit against the DACA policy, the choice she faced was between a gradual, orderly, and administrative wind-down of the policy, and the risk of an immediate, disruptive, and court-imposed one. Her decision to phase out the policy over a two-and-a-half-year period, permitting a period of additional renewals and permitting renewed and existing grants of deferred action to expire by their terms was, by far, the more humane choice.

***2. The rescission was reasonable in light of the Acting Secretary's determination that DACA is unlawful***

The Acting Secretary's decision is independently supported by her reasonable conclusion, informed by the Attorney General's advice, that indefinitely continuing the DACA policy would itself have been unlawful. As detailed above, the Fifth Circuit had already concluded that the DAPA and expanded DACA policies were procedurally and substantively invalid in a decision that four Justices of this Court voted to affirm. See pp. 26-27, *supra*. The Attorney General expressed his agreement with the conclusion reached by the Fifth Circuit in a decision that applies equally to the original DACA policy. See App., *infra*, 114a (concluding that the DACA policy was "effectuated * * * without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result"). It cannot be that the Acting Secretary's decision to rescind DACA on the basis of the Fifth Circuit's decision, this Court's equally divided affirmance, and the Attorney General's opinion was the type of "clear error of judgment," *State Farm*, 463 U.S. at 43 (citation omitted), that would make it arbitrary and capricious under the APA.

The district court concluded that the Acting Secretary could not rely on an assessment of DACA's legality unless it was correct as a matter of law. See App., *infra*, 42a ("When agency action is based on a flawed legal premise, it may be set aside as 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (citing *Massachusetts* v. *EPA*, 549 U.S. 497, 532 (2007)). Relying on the Secretary's broad discretion in

"[e]stablishing national immigration enforcement policies and priorities," 6 U.S.C. 202(5), and DHS's "long and recognized practice" of granting deferred action (along with work authorization and other benefits) on a programmatic basis, the court concluded that, in its view, DACA was lawful. App., *infra*, 45a; see *id.* at 42a-48a. But the Fifth Circuit rejected those precise considerations when offered in support of the DAPA and expanded DACA policies. See *Texas*, 809 F.3d at 183.

More fundamentally, the district court was wrong to conclude that the Acting Secretary's discretionary decision to end a particular enforcement policy of doubtful legality must automatically be set aside if a court subsequently decides that the policy was lawful. App., *infra*, 42a. The court relied on this Court's decision in *Massachusetts* v. *EPA*, *supra*, for that proposition. But in that case a provision of the Clean Air Act spoke directly to the agency decision at issue, and *required* EPA to regulate any air pollutant which the agency concluded endangered public health or welfare. See 42 U.S.C. 7521(a)(1) (mandating that the EPA Administrator "shall" prescribe standards). The agency had "refused to comply with this clear statutory command" in part because it misunderstood its authority. 549 U.S. at 533. By contrast here, no one contends that the INA requires DHS to continue the DACA policy of deferred action. Rather, the DACA policy was created as a matter of the Acting Secretary's broad discretion to set enforcement priorities. After careful review, she determined to rescind that discretionary policy, and nothing in either the APA or INA demands setting aside her lawful determination.[9]

---

[9] The district court also erred in enjoining the rescission of DACA on a "nationwide basis." App., *infra*, 66a. As the government has

**CONCLUSION**

The petition for a writ of certiorari before judgment should be granted.

Respectfully submitted.

NOEL J. FRANCISCO
*Solicitor General*
CHAD A. READLER
*Acting Assistant Attorney General*
JEFFREY B. WALL
*Deputy Solicitor General*
HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*
JONATHAN Y. ELLIS
*Assistant to the Solicitor General*
MARK B. STERN
ABBY C. WRIGHT
THOMAS PULHAM
*Attorneys*

JANUARY 2018

---

explained in its pending petition for a writ of certiorari in *Trump* v. *Hawaii*, No. 17-965 (filed Jan. 5, 2018), both constitutional and equitable principles require that injunctive relief be limited to a plaintiff's own cognizable injuries. See *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996); *Madsen* v. *Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). The district court's injunction contravenes that settled rule by sweeping far more broadly than redressing the harms of the specific respondents in this case.