# EXHIBIT 9

CHAD A. READLER
Principal Deputy Assistant Attorney General
BRIAN STRETCH
United States Attorney
BRETT A. SHUMATE
Deputy Assistant Attorney General
JENNIFER D. RICKETTS
Branch Director
JOHN R. TYLER
Assistant Branch Director
BRAD P. ROSENBERG (DC Bar #467513)
Senior Trial Counsel
STEPHEN M. PEZZI (DC Bar #995500)
Trial Attorney
KATE BAILEY
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
20 Massachusetts Avenue, NW
Washington, DC 20530
Telephone: (202) 514-9239
Facsimile: (202) 616-8470
E-mail: kate.bailey@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| REGENTS OF UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, in her official capacity as President of the University of California, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY and ELAINE DUKE, in her official capacity as Acting Secretary of the Department of Homeland Security, <br><br> Defendants. | No. 3:17-cv-05211-WHA <br><br><br> **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PROVISIONAL RELIEF** <br><br> Judge:  Honorable William Alsup <br> Hearing:  December 20, 2017, 8:00 a.m. <br> Place:  San Francisco U.S. Courthouse, Courtroom 8, 19th Floor |

1

2

3    STATE OF CALIFORNIA, STATE OF
     MAINE, STATE OF MARYLAND, and           No. 3:17-cv-05235-WHA
     STATE OF MINNESOTA,
4

5                    Plaintiffs,

6          v.

7    U.S. DEPARTMENT OF HOMELAND
     SECURITY, ELAINE DUKE, in her official
8    capacity as Acting Secretary of the
     Department of Homeland Security, and the
9    UNITED STATES OF AMERICA,

10

11                   Defendants.

12

13

14   CITY OF SAN JOSE, a municipal
     corporation,
15                                            No. 3:17-cv-05329-WHA
                     Plaintiff,
16

17         v.

18   DONALD J. TRUMP, President of the United
     States, in his official capacity, ELAINE C.
19   DUKE, in her official capacity, and the
     UNITED STATES OF AMERICA,
20

21                   Defendants.

22

23   DULCE GARCIA, MIRIAM GONZALEZ           No. 3:17-cv-05380-WHA
     AVILA, SAUL JIMENEZ SUAREZ,
24   VIRIDIANA CHABOLLA MENDOZA,
     NORMA RAMIREZ, and JIRAYUT
25   LATTHIVONGSKORN,

26                   Plaintiffs,

27

28         v.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

| | |
|---|---|
| UNITED STATES OF AMERICA, DONALD J. TRUMP, in his official capacity as President of the United States, U.S. DEPARTMENT OF HOMELAND SECURITY, and ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security, | |
| Defendants. | |

| | |
|---|---|
| COUNTY OF SANTA CLARA and SERVICE EMPLOYEES INTERNATIONAL UNION LOCAL 521, | No. 3:17-cv-05813-WHA |
| Plaintiffs, | |
| v. | |
| DONALD J. TRUMP, President of the United States, in his official capacity; JEFFERSON BEAUREGARD SESSIONS, Attorney General of the United States, in his official capacity; ELAINE C. DUKE, Acting Secretary of the Department of Homeland Security, in her official capacity; and the U.S. DEPARTMENT OF HOMELAND SECURITY, | |
| Defendants. | |

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................1

BACKGROUND ............................................................................................2

    A. Deferred Action Generally.............................................................2

    B. DACA and DAPA.........................................................................3

    C. The *Texas* Litigation ...................................................................4

    D. Rescission of DACA ....................................................................5

    E. Plaintiffs' Motion for Provisional Relief .........................................6

STANDARD OF REVIEW ...........................................................................7

ARGUMENT ................................................................................................7

PLAINTIFFS FAIL TO ESTABLISH A LIKELIHOOD OF SUCCESS ON
THE MERITS OF THEIR APA CLAIMS ....................................................7

Plaintiffs' APA Claims Are Not Justiciable ..................................................8

    I. The Acting Secretary Rationally Explained Her Decision to Rescind
       DACA, Particularly Given the Imminent Likelihood of a Nationwide
       Injunction Based on Controlling Circuit Precedent ..........................9

    II. The Rescission Is a General Statement of Policy Not Subject To Notice-
        And-Comment Rulemaking Requirements ....................................26

THE REMAINING FACTORS WEIGH AGAINST PRELIMINARY RELIEF .......................32

    III. Plaintiffs Have Not Shown Any Risk of Irreparable Harm Absent
        Preliminary Relief .......................................................................32

    IV. Balancing of the Equities and the Public Interest .............................35

    V. Any Injunctive Relief Should be Narrowly Drawn .............................36

CONCLUSION...............................................................................................37

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

i

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Adair v. England,*
    183 F. Supp. 2d 31 (D.D.C. 2002) ........................................................................ 22

*All. for the Wild Rockies v. Ashe,*
    687 F. App'x 657 (9th Cir. 2017) ........................................................................ 11

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ..................................................................... 7, 36

*Am. Trucking Ass'ns v. City of Los Angeles,*
    559 F.3d 1046 (9th Cir. 2009) ..................................................................... 7, 32

*Amfac Resorts LLC v. Dep't of Interior,*
    143 F. Supp. 2d 7 (D.D.C. 2001) ........................................................................ 22

*Ariz. Dream Act Coal. v. Brewer,*
    855 F.3d 957 (9th Cir. 2017) ........................................................................ 35

*Arizona v. United States,*
    567 U.S. 387 (2012) ........................................................................... 2, 8, 35

*Arpaio v. Obama,*
    136 S. Ct. 900 (2016) ........................................................................... 2

*Arpaio v. Obama,*
    797 F.3d 11 (D.C. Cir. 2015) ........................................................... 2, 3, 10, 28

*Brady v. FERC,*
    416 F.3d 1 (D.C. Cir. 2005) ........................................................................ 12

*Bresgal v. Brock,*
    843 F.2d 1163 (9th Cir. 1987) ........................................................................ 36

*Califano v. Sanders,*
    430 U.S. 99 (1977) ........................................................................ 9

*Cal. ex rel. Lockyer v. U.S. Dep't of Agriculture,*
    459 F. Supp. 2d 874 (N.D. Cal. 2006) ........................................................... 20

*Camp v. Pitts,*
    411 U.S. 138 (1973) ........................................................................ 21

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

ii

*Chaudhry v. Holder*,
   705 F.3d 289 (7th Cir. 2013) ............................................................ 3

*Chrysler Corp. v. Brown*,
   441 U.S. 281 (1979) ............................................................ 27

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ............................................................ 9, 22

*Coal. on Sensible Transp. v. Dole*,
   826 F.2d 60 (D.C. Cir. 1987) ............................................................ 22

*Commercial Drapery Contractors v. United States*,
   133 F.3d 1 (D.C. Cir. 1998) ............................................................ 22

*DISH Network Corp. v. FCC*,
   653 F.3d 771 (9th Cir. 2011) ............................................................ 7

*Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co.*,
   774 F.2d 1371 (9th Cir. 1985) ............................................................ 32

*Drakes Bay Oyster Co. v. Jewell*,
   747 F.3d 1073 (9th Cir. 2014) ............................................................ 35

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ............................................................ 15

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ............................................................ 14, 15

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ............................................................ 21

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ............................................................ 8, 13, 27

*ICC v. Bhd. of Locomotive Eng'rs (BLE)*,
   482 U.S. 270, 283 (1987) ............................................................ 8

*Int'l Union, United Mine Workers of America v. U.S. Department of Labor*,
   358 F.3d 40 (D.C. Cir. 2004) ............................................................ 20

*James Madison Ltd. By Hecht v. Ludwig*,
   82 F.3d 1085 (D.C. Cir. 1996) ............................................................ 22

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

*Leiva-Perez v. Holder,*
    640 F.3d 962 (9th Cir. 2011) ......................................................... 7

*Lewis v. Casey,*
    518 U.S. 343 (1996) ..................................................................... 36

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ........................................................... 8, 26, 29

*Mada-Luna v. Fitzpatrick,*
    813 F.2d 1006 (9th Cir. 1987) ................................................. 26, 31

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ..................................................................... 36

*Managed Pharm. Care v. Sebelius,*
    716 F.3d 1235 (9th Cir. 2013) ....................................................... 11

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ....................................................................... 7

*Mexichem Specialty Resins, Inc. v. EPA,*
    787 F.3d 544 (D.C. Cir. 2015) ..................................................... 21

*Michigan v. EPA,*
    135 S. Ct. 2699 (2015) ........................................................... 13, 14

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
    463 U.S. 29 (1983) ...................................................... 9, 11, 13, 14

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy,*
    851 F.2d 1424 (D.C. Cir. 1988) ................................................... 28

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ..................................................................... 25

*Nat'l Mining Ass'n v. McCarthy,*
    758 F.3d 243 (D.C. Cir. 2014) ................................................... 271

*New York v. Reilly,*
    969 F.2d 1147 (D.C. Cir. 1992) ............................................... 12, 13

*Noel v. Chapman,*
    508 F.2d 1023 (2d Cir. 1975) ....................................................... 28

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

iv

*Org. Village of Kake v. U.S. Department of Agriculture*,
   795 F.3d 956 (9th Cir. 2015) .................................................................. 20

*Pac. Gas & Elec. Co. v. FPC*,
   506 F.2d 33 (D.C. Cir. 1974) .................................................................. 27

*Perez v. Mortg. Bankers Ass'n*,
   135 S. Ct. 1199 (2015) .................................................................. 26, 27

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
   525 U.S. 471 (1999) .................................................................. 2, 3, 8, 28

*Ricci v. DeStefano*,
   557 U.S. 557 (2009) .................................................................. 19

*Romeiro De Silva v. Smith*,
   773 F.2d 1021 (9th Cir. 1985) .................................................................. 31

*S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv.*,
   804 F. Supp. 2d 1045 (E.D. Cal. 2011) .................................................................. 32, 33

*Schroll v. Plunkett*,
   760 F. Supp. 1378 (D. Or. 1990) .................................................................. 33

*SEC v. Chenery Corp.*,
   318 U.S. 80 (1943) .................................................................. 22

*Sec'y of Agriculture v. Cent. Roig Ref. Co.*,
   338 U.S. 604 (1950) .................................................................. 12

*Senate of Cal. v. Mosbacher*,
   968 F.2d 974 (9th Cir. 1992) .................................................................. 34

*Seto v. Thielen*,
   No. CIV. 10-00351, 2010 WL 2612603 (D. Haw. June 28, 2010) .................................................................. 32

*Sierra Club v. Jackson*,
   833 F. Supp. 2d 11 (D.D.C. 2012) .................................................................. 20

*Silva v. Smith*,
   773 F.2d 1021 (9th Cir. 1985) .................................................................. 31

*Syracuse Peace Council v. FCC*,
   867 F.2d 654 (D.C. Cir. 1989) .................................................................. 17

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

*Taiebat v. Scialabba*,
No. 17-cv-0805, 2017 WL 747460 (N.D. Cal. Feb. 27, 2017) ................................. 32

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015) ................................................................... *passim*

*Town of Chester v. Laroe Estates, Inc.*,
137 S. Ct. 1645 (2017) ........................................................................... 36

*Troy Corp. v. Browner*,
120 F.3d 277 (D.C. Cir. 1997) .................................................................... 9

*U.S. ex rel. Parco v. Morris*,
426 F. Supp. 976 (E.D. Pa. 1977) ........................................................... 31, 32

*U.S. Philips Corp. v. KBC Bank N.V.*,
590 F.3d 1091 (9th Cir. 2010) .................................................................. 34

*United States v. Texas*,
136 S. Ct. 2271 (2016) ............................................................................. 4

*United States v. Texas*,
137 S. Ct. 285 (2016) ............................................................................... 4

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ............................................................................... 32

*Wayte v. United States*,
470 U.S. 598 (1985) ............................................................................... 30

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) .................................................................................... 7

**Statutes**

5 U.S.C. § 553 ............................................................................. 26, 27, 31

5 U.S.C. § 701 ...................................................................................... 8

5 U.S.C. § 706 ...................................................................................... 9

8 U.S.C. § 1103 ................................................................................. 2, 22

8 U.S.C. § 1154 ..................................................................................... 2

8 U.S.C. § 1158 ..................................................................................... 2

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

vi

8 U.S.C. § 1182 ................................................................................................................. 2

8 U.S.C. § 1227 ................................................................................................................. 2

8 U.S.C. § 1229b ............................................................................................................... 2

8 U.S.C. § 1252 ............................................................................................................ 8, 28

15 U.S.C. § 1392 (repealed 1994) .................................................................................. 14

42 U.S.C. § 7412 ............................................................................................................. 13

**Regulations**

8 C.F.R. § 274a.12(c)(14) ............................................................................................ 2, 3

**Other Authorities**

Andorra Bruno, et al., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 20-23, Cong. Research Serv. (July 13, 2012)
   https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-Service-Report1.pdf ........................................................................................................ 27

Barack Obama, The White House*, Remarks by the President on Immigration*
   (June 15, 2012), http://go.usa.gov/xnXFY ................................................................ 16, 23

Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 PM)
   https://twitter.com/realDonaldTrump/status/905228667336499200) .......................... 24

Dep't of Justice,
   *Attorney General's Manual on the Administrative Procedure Act* (1947) .............. 26

Presidential Memoranda, The White House,
   *President Donald J. Trump's Letter to House and Senate Leaders & Immigration Principles and Policies* (Oct. 8, 2017),
   https://www.whitehouse.gov/the-press-office/2017/10/08/president-donald-j-trumps-letter-house-and-senate-leaders-immigration ............................................................................ 24

Press Release, DHS,
   Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
   https://go.usa.gov/xncuM ......................................................................................... 10, 35

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

vii

## INTRODUCTION

The Rescission policy challenged here provides for an orderly wind-down of Deferred Action for Childhood Arrivals ("DACA"), an exercise of prosecutorial discretion that, from the start, confers no rights and has been subject to change. Pursuant to the Rescission, recipients whose DACA status expires before March 5, 2018, have the opportunity to renew that status, and current DACA recipients will maintain their status for the remaining duration of their deferred-action grants. Plaintiffs in these five related actions nonetheless seek, as "provisional relief," the immediate and wholesale reinstatement of that policy.

This Court should reject that gambit because Plaintiffs cannot meet the exacting standard for preliminary relief. Plaintiffs are unlikely to succeed on the merits of their Administrative Procedure Act ("APA") claims because those claims are not even justiciable. But even if they were, the Acting Secretary of Homeland Security adequately explained her decision to wind down DACA: A legally indistinguishable policy (including an expansion of DACA) had been enjoined on a nationwide basis by a district court in Texas; that injunction was upheld by the United States Court of Appeals for the Fifth Circuit; that decision, in turn, was affirmed by an equally divided Supreme Court; and the same plaintiffs were about to sue over DACA before the same judge in Texas. Faced with the inevitable prospect of an immediate, nationwide injunction against DACA, the Acting Secretary chose an orderly wind-down. Due to the near-certainty that DACA otherwise would have been abruptly invalidated, that decision was eminently reasonable, and certainly not arbitrary and capricious. Plaintiffs also argue that the Rescission was subject to the APA's notice-and-comment requirements, but those requirements are inapplicable to a general statement of policy such as the Rescission, and Plaintiffs' argument is self-defeating in any event because DACA itself likewise was adopted without notice and comment.

Nor can Plaintiffs demonstrate that any of the harms they have identified can be resolved by a *preliminary* injunction entered by this Court months before the March 5, 2018 deadline. Plaintiffs complain about lost professional opportunities, the inability to make long-term plans, and the angst surrounding the Rescission Policy, but none of these harms can be ameliorated by the type of temporary relief—which will last only through the end of this litigation—that Plaintiffs

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

seek.  Nor can Plaintiffs demonstrate that the balance of the equities and the public interest weigh in their favor.  Finally, the relief that Plaintiffs seek—a wholesale but temporary reinstatement of the DACA policy—is overbroad and improper.  The Court should deny Plaintiffs' motion.

## BACKGROUND

### A.    Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the Immigration and Nationality Act along with "all other laws relating to the immigration and naturalization of aliens."  8 U.S.C. § 1103(a)(1).  Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law."  *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials."  *Arizona*, 567 U.S. at 396 (citation omitted).  Department of Homeland Security officials must first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum or parole, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b.  "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely.  *Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*, 525 U.S. 471, 483 (1999).

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States."  *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016).  Deferred action is a practice by which the Secretary exercises her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period.  *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority").  Although originally "developed without express statutory authority," individualized deferred action has been recognized by Congress in

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

certain circumstances inapplicable here, *see, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"), and described by the Supreme Court as an "exercise in administrative discretion," *AADC*, 525 U.S. at 484. Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former INS have adopted more than 20 such policies over the past 50 years.

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, *see, e.g.*, 8 C.F.R. § 274a.12(c)(14), but a grant of deferred action does not confer lawful immigration status or provide any defense to removal. *Cf. Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (discussing difference between "unlawful presence" and "unlawful status"). To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (citation omitted). DHS thus has discretion to revoke deferred action unilaterally, for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time. *See AADC*, 525 U.S. at 484–85.

## B.     DACA and DAPA

On June 15, 2012, then-Secretary Janet Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals. *See* Admin. R. (AR) 1–3 (hereinafter DACA Memo), ECF No. 64-1.[1] DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws. *Id.* at 1 (AR 1). Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to indefinite renewal. *Id.* at 2–3 (AR 2–3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests for this relief would "be decided on a case by case basis," *id.* at 2 (AR 2). Accordingly, the Memo provided that this grant of deferred action "confer[red] no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights." *Id.* at 3 (AR 3).

---

[1] Unless otherwise noted, all references to the docket refer to the docket in *Regents of the University of California v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-05211-WHA.
**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

In 2014, then-Secretary Jeh Johnson expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. *See* AR 37–41 (hereinafter DAPA Memo). DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents." DAPA Memo 3 (AR 39). The DAPA Memo also expanded DACA by relaxing some of the guidelines and extending the DACA renewal period from two to three years. *Id.* at 3–4 (AR 39-40).

### C.   The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states, led by Texas, which sought to enjoin its implementation. Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of DAPA and expanded DACA. *Texas v. United States*, 809 F.3d 134, 147–48, (5th Cir. 2015). Like the U.S. District Court for the Southern District of Texas, the Fifth Circuit held that the promulgation of the DAPA Memo was justiciable, in part because it believed that "the INA's intricate regulatory scheme for changing immigration classifications" allowed the court to determine whether DHS had exceeded its statutory authority. *Id.* at 168. It stressed, however, that the *denial* of deferred action and work authorization would be unreviewable. *Id.* Also like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the Administrative Procedure Act's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Id.* at 178 n.156. And going beyond the district court, the Fifth Circuit held that DAPA was "manifestly contrary" to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one legal status to another," DAPA and expanded DACA awarded deferred action "to persons who have never had a legal status and may never receive one." *Id.* at 184, 186 (footnotes omitted).

That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

place.  On November 18, 2016, the parties jointly moved the district court to stay merits proceedings to allow them to evaluate "how they might choose to move forward" given the upcoming "change in Administration[s]."  Joint Mot. to Stay Merits ¶ 2, *Texas v. United States*, No. 1:14-cv-254 (S.D. Tex. Nov. 18, 2016), ECF No. 430.

Faced with continued litigation over a policy that had been enjoined by the courts, DHS rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA.  *See* Memorandum for Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Prot., et al., from John F. Kelly, Sec'y of Homeland Sec., *Re: Rescission of November 20, 2014 Memorandum Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents* (June 15, 2017), AR 235-37.  Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to also challenge directly the DACA Memo, noting that it suffers from the same legal flaws that the courts had identified in expanded DACA and DAPA.  *See* AR 238–40 (Paxton Letter).

## D.      Rescission of DACA

Faced with a losing case, Acting Secretary Duke decided on September 5, 2017, to wind down the DACA policy in an orderly fashion.  *See* AR 252–56 (Rescission Policy or Policy).  As she explained, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated."  Rescission Policy 4 (AR 255).  Specifically, she quoted the Attorney General's September 4 recommendation to rescind DACA, which explained that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results."  *Id.* at 3 (AR 254).  Invoking her "authority in establishing national immigration policies and priorities," she rescinded the DACA Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on an individualized[,] case-by-case basis," *id.* at 2 (AR 253).

At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

- For *current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

based on the directives in this memorandum for the remaining duration of their validity periods." *Id.* at 4 (AR 255).

- For *initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date. *Id.*

- For *DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017. Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017." *Id.*

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id.* at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id.* at 4 (AR 255).

## E. Plaintiffs' Motion for Provisional Relief

While Plaintiffs have brought a panoply of claims, their motion for provisional relief is limited to two claims brought pursuant to the APA. First, Plaintiffs allege that the Rescission Policy is arbitrary and capricious and therefore violates the APA because it constitutes a change in agency policy without an adequate explanation or basis; second, they allege that the rescission violates the APA because it was issued without notice and comment.[2]

Plaintiffs ask the Court to "direct[] . . . the government to restore the DACA program pending adjudication on the merits," Pls. Br. 37, and to order Defendants to adjudicate newly submitted initial requests for deferred action and employment authorizations, renewal requests for deferred action and employment authorizations, and applications for advance parole "using

---

[2] *See Regents of Univ. of Cal.* Compl. ¶¶ 50-58 (Count 1), 59-66 (Count 2), No. 3:17-cv-05211 ECF No. 1; *State of Cal.* Compl. ¶¶ 146-151 (Count 2), 152-155 (Count 3), No. 3:17-cv-05235 ECF No. 1; *Garcia* Compl. ¶ 175 (Count 4), 177-184 (Count 5), No. 3:17-cv-05380 ECF No. 1; *Cty. of Santa Clara* Compl. ¶ 71 (Count 2), No. 3:17-cv-05813 ECF No. 1; *City of San Jose* Compl. ¶¶ 59-63 (Count 2), No. 3:17-cv-05329 ECF No. 1.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

the same means, methods and policies ... as were utilized before the Rescission." Pls.' Proposed Order 3, ECF No. 111-3. Plaintiffs thus request an order compelling the government to continue to consider DACA requests from a broad class of individuals who are not before this Court.

## STANDARD OF REVIEW

A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (quoting 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948, pp. 129-30 (2d ed. 1995)). A plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). A "possibility" of irreparable harm is insufficient; irreparable harm must be *likely* absent an injunction. *Id.*; *see also Winter*, 555 U.S. at 22 (rejecting the Ninth Circuit's earlier rule that the "possibility" of irreparable harm, as opposed to its likelihood, was sufficient in some circumstances to justify a preliminary injunction). The Ninth Circuit has determined that its alternative "sliding scale" test is still valid after *Winter*, but even that approach still requires "'*serious* questions going to the merits' and a balance of hardships that tips *sharply* toward the plaintiff [in order to] support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011); *see also Leiva-Perez v. Holder*, 640 F.3d 962, 967-68 (9th Cir. 2011). Plaintiffs bear the burden of demonstrating that each of these four factors is met. *DISH Network Corp. v. FCC*, 653 F.3d 771, 776-77 (9th Cir. 2011).

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

7

**ARGUMENT**

**PLAINTIFFS FAIL TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR APA
CLAIMS**

**Plaintiffs' APA Claims Are Not Justiciable**

As a threshold matter, Plaintiffs cannot succeed on the merits because, as set forth in
Defendants' pending Motion to Dismiss, Plaintiffs' APA claims are not justiciable. *See* Defs.'
Mot. to Dismiss 14-19, ECF No. 114. The APA bars judicial review of certain categories of
decisions that "courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln
v. Vigil*, 508 U.S. 182, 191 (1993) (quoting 5 U.S.C. § 701(a)(2)). Quintessential among the types
of decisions committed to executive discretion are "an agency's exercise of enforcement power,"
*Heckler v. Chaney*, 470 U.S. 821, 833 (1985), regardless whether that exercise of discretion
results in a decision to prosecute or enforce, or to refrain from doing so, *id.* at 831. This bar
applies even when "the agency gives a 'reviewable' reason for otherwise unreviewable action."
*ICC v. Bhd. Of Locomotive Eng'rs (BLE)*, 482 U.S. 270, 283 (1987). This is particularly true in
the context of immigration, in which executive decisions implicate distinct foreign-policy and
separation-of-powers concerns, and discretion is, accordingly, very broad. *AADC*, 525 U.S. at
489-90; *Arizona*, 567 U.S. at 396-97. The Rescission Policy is a classic example of a
discretionary enforcement determination entrusted to the agency alone. Indeed, any attempt to
judge the Policy would entangle this Court in the sort of complex and discretionary balancing that
has been entrusted by Congress to the Executive Branch. The decision to rescind DACA is thus
unreviewable. *See* 5 U.S.C. § 701(a)(2).

The INA also deprives federal district courts of jurisdiction over challenges to denials of
deferred action, *see* 8 U.S.C. § 1252(g). This provision, which Congress enacted to prohibit
"attempts to impose judicial constraints upon prosecutorial discretion," *AADC*, 525 U.S. at 485
& n.9, "seems clearly designed to give some measure of protection to 'no deferred action'
decisions and similar discretionary determinations, providing that if they are reviewable at all,

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

8

they at least will not be made the bases for separate rounds of judicial intervention outside" an individual removal proceeding.  *Id.* at 485.  Denials of deferred action—including under DACA itself—thus fall outside the jurisdiction of the federal district courts.  This is reason enough to deny Plaintiffs' request for provisional relief.

### I.  The Acting Secretary Rationally Explained Her Decision to Rescind DACA, Particularly Given the Imminent Likelihood of a Nationwide Injunction Based On Controlling Circuit Precedent

Even were the decision to rescind DACA subject to judicial review, Plaintiffs cannot succeed in showing that decision to be arbitrary and capricious.  It is axiomatic that agencies are free to change course on policy matters so long as they provide a rational explanation and the new policy is legally permissible.  Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this deferential standard, particularly in view of the virtual certainty of a nationwide injunction based on controlling circuit precedent, which would have prompted an immediate—and chaotic—end to the policy.

Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A)–(B).  The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  Agency action is arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).  The Court may not "substitute its judgment for that of the agency." *Id*.

The Rescission Policy amply meets these "minimal standards of rationality," *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted), particularly in view of the near-certain litigation loss in the impending *Texas* lawsuit.  In the Policy, the Acting Secretary

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

9

explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy 4 (AR 255). Specifically, after summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's view that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted). The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into immediate uncertainty.

The Acting Secretary was thus "faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately." Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017) (hereinafter Duke Statement), https://go.usa.gov/xncuM. She reasonably opted for an orderly rescission, which she considered "the least disruptive option." *Id.*

That decision was eminently reasonable. There is nothing at all irrational about the choice or the explanation. Plaintiffs' arguments to the contrary are wrong at each turn.

**A.** Plaintiffs principally claim that the Rescission Policy fails to provide "any clear explanation why" DACA was rescinded, leaving them merely "to guess" at the Acting Secretary's reasoning. Pls.' Br. 17. That argument blinks reality. Even if the agency were not free to revoke deferred action at any time for any reason—or, indeed, for no reason, *see, e.g.*, *Arpaio*, 797 F.3d at 17; DAPA Memo 2 (AR 38)—no guesswork is required to understand the agency's reasoning here: As the balance of their brief demonstrates, Plaintiffs clearly comprehend the basis for the Acting Secretary's decision. For example, while Plaintiffs purport to be "perplex[ed]" by the Acting Secretary's reference to the litigation risk posed by the *Texas* case, Pls.' Br. 17, they understood this rationale well enough to devote a separate section of their brief to addressing it,

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

10

*id.* at 27–29 (arguing that "Purported 'Litigation Risk' Cannot Justify the Rescission").[3]
Likewise, while they claim to be confused by the Attorney General's views on DACA's legality,
which they deem too "conclusory," *id.* at 17, this issue is also directly addressed in a separate
section of their brief, *id.* at 23–25 (arguing that "DACA is … lawful").

At bottom, then, Plaintiffs' argument reduces to a claim that the Rescission Policy was
just too short. *See, e.g.*, *id.* at 17 (complaining that the "four-page Rescission memorandum" has
a "two-and-a-half-page Background section"). But under the APA, whether an agency's decision
is sustainable turns not on its length, but its rationality. Here, there is no reason to adopt Plaintiffs'
myopic focus on the "66-word paragraph" setting forth the Acting Secretary's conclusion, *id.*,
while ignoring the rest of the document, which lays the foundation for that conclusion and
elaborates on the reasoning behind it. *See* Rescission Policy 1 (AR 252) (noting, in the
introduction, that DACA will be rescinded "[f]or the reasons … outlined below"); *id.* at 2-3 (AR
253–54) (explaining, as background, that DAPA and expanded DACA were "substantially
similar" to DACA, that the Fifth Circuit had invalidated the DAPA Memo, and that the Attorney
General had concluded that "it is likely that potentially imminent litigation would yield similar
results with respect to DACA"). Indeed, Plaintiffs' suggestion that length should be
determinative calls into question the rationality of the original DACA Memo itself, which of
course spanned only three pages. *See* DACA Memo 1–3 (AR 1–3).

The Court "must uphold an agency action—even if it is made with 'less than ideal
clarity'—as long as 'the agency's path may reasonably be discerned' from the record." *Managed
Pharm. Care v. Sebelius*, 716 F.3d 1235, 1250 (9th Cir. 2013) (quoting *State Farm*, 463 U.S. at
43); *Shepard v. NLRB*, 459 U.S. 344, 348, 350-51 (1983); *see also, e.g.*, *All. for the Wild Rockies
v. Ashe*, 687 F. App'x 657, 659 (9th Cir. 2017) (accepting a "somewhat conclusory" explanation

---

[3] Plaintiffs' assertion that the "Supreme Court's purported 'ruling' … in the *Texas* DAPA case
… was no 'ruling' at all," Pls.' Br. 17, is mistaken. The affirmance by an equally divided Supreme
Court meant that: (1) the Fifth Circuit's decision invalidating DAPA and expanded DACA would
have been controlling precedent in the lower courts in the impending lawsuit challenging DACA;
and (2) four Justices agreed with the Fifth Circuit's decision, such that the only way a different
result would occur for DACA in the Supreme Court would have been if one of the four changed
their mind or the newly seated Justice disagreed.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

where "the agencies' 'path may reasonably be discerned' from other evidence in the record")
(citation omitted). Here, the Acting Secretary's decision is clear, and her path is plain. Plaintiffs'
suggestion to the contrary is unconvincing.

**B.** Plaintiffs next contend that, in adopting the Rescission Policy, the Acting Secretary
"failed to consider all relevant factors"—namely, the asserted economic effects of rescission and
its consequences for DACA recipients. Pls.' Br. 18–20. For starters, this argument fails to reckon
with the reality—referenced in the Acting Secretary's memo—that continued litigation would, in
all likelihood, have led to an abrupt, complete, and court-ordered end to DACA, plunging its nearly
800,000 recipients into uncertainty. The APA did not require the Acting Secretary to consider
factors that were inevitable or ponder how to prevent the unavoidable. *See State Farm*, 463 U.S.
at 43 (noting that an agency must simply "examine the relevant data and articulate a satisfactory
explanation for its action").

Indeed, the Acting Secretary's decision instead to opt for an orderly wind-down of the
policy thus likely ameliorated, rather than exacerbated, the effects about which Plaintiffs
complain, as she was fully aware.

The Rescission Policy itself recognizes that, while DACA recipients were "eligibl[e] to
request employment authorization" documents, enabling them to work lawfully in the United
States, Rescission Policy 2 (AR 253), that eligibility would sunset along with the DACA policy,
*id.* at 4 (AR 255), necessarily leading to changes in the workforce over the following two and a
half years. Likewise, recognizing that DACA recipients would no longer be considered lawfully
present once their deferred action expired, the Acting Secretary explained that she was "very
aware of the consequences of this action, and . . . sympathize[d] with the DACA recipients whose
futures may now be less certain." Duke Statement. It was such considerations—*i.e.*, the
"complexities associated with winding down the program," Rescission Policy 4 (AR 255)—that
influenced her to allow DACA to sunset over a number of years, rather than abruptly end the
policy herself or under court order. That these factors did not upend her ultimate decision to
rescind the policy, however, is no reason to set that decision aside, because clinging to DACA in
the face of the *Texas* litigation would have been quixotic rather than rational.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

12

Even where a statute sets forth specific factors for an agency to consider, if Congress "did not assign the specific weight the [agency] should accord each of these factors, [the agency] is free to exercise [its] discretion in this area." *New York v. Reilly*, 969 F.2d 1147, 1150 (D.C. Cir. 1992) (citation omitted); *Brady v. FERC*, 416 F.3d 1, 6 (D.C. Cir. 2005); *see also Sec'y of Agriculture v. Cent. Roig Ref. Co.*, 338 U.S. 604, 611–12 (1950) (where statutorily mandated "consideration[s]" are not "mechanical or self-defining standards," they indicate Congress's recognition that they involve "wide areas of judgment and therefore of discretion"). Here, of course, no statute dictates the factors for an agency to consider in granting or rescinding deferred action; on the contrary, deferred action is an exercise of prosecutorial discretion in the government's interests committed to agency discretion, precisely because (among other things) it "involves a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise." *Chaney*, 470 U.S. at 831. Indeed, the original DACA memorandum providing for the granting of deferred action expressly provided that it conferred no substantive rights. Thus, Congress has not instructed the agency to give the considerations urged by Plaintiffs any particular weight—or, indeed, any weight at all. That they did not receive conclusive weight in the final calculus, as Plaintiffs demand, is therefore no reason to disturb the Acting Secretary's decision, especially given their futility in this context. *See, e.g.*, *Reilly*, 969 F.2d at 1150.

Plaintiffs' passing suggestion that the agency was required to conduct some sort of formal cost-benefit analysis before rescinding DACA, *see* Pls.' Br. 18–19, is even farther off the mark. They cite *Michigan v. EPA* for the proposition that "ignoring cost, even where the relevant statutes 'leave[] agencies with flexibility,' constitutes arbitrary and capricious action." Pls.' Br. 19 (quoting *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015)). But in that case, the statute itself required consideration of costs: Congress directed the EPA to regulate power plant emissions "if [it] finds such regulation is appropriate and necessary," 42 U.S.C. § 7412(n)(1)(A)—a phrase that the Court viewed as "an instruction to [the] … agency" to pay "at least some attention to cost[s]," *Michigan*, 135 S. Ct. at 2707–08. Here, by contrast, there is no such statutory directive, and thus no compulsion to transform a straightforward legal policy decision concerning enforcement of the immigration laws against unlawfully present aliens into an accounting exercise or a macro-

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

13

economic assessment. The agency did not perform a formal cost-benefit analysis when it adopted DACA, *see* DACA Memo 1–3 (AR 1–3), and one was not required by its rescission.[4]

**C.** Plaintiffs argue that the Acting Secretary failed to provide an "adequate explanation" for a "reversal on policy." Pls.' Br. 20. Specifically, they assert that when an agency "reverses its own earlier policy, it has an *even greater burden* to justify its actions." *Id*. (emphasis added). That is not the law, as the Supreme Court squarely held in *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009).

In *Fox*, the Court considered the adequacy of the FCC's explanation for a policy change barring the broadcasting of isolated expletives, which had previously been tolerated so long as they were not repeated. *Id*. at 505. The Second Circuit had set aside the policy change under the APA, reasoning that "agency action that changes prior policy" "requir[es] a more substantial explanation" than when an agency acts in the first instance. *Id*. at 514. The Supreme Court reversed, finding "no basis in the [APA] or in our opinions for a requirement that all agency change be subject to more searching review" or some sort of "heightened standard." *Id*. On the contrary, the Court explained, when an agency changes course it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Id*. at 515. Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id*.

Here, the Acting Secretary adequately explained her rescission of the 2012 DACA Memorandum. Plaintiffs do not dispute that the Rescission Policy "is permissible" under the INA. *Id*. The Acting Secretary fully explained that there are "good reasons" for the Rescission

---

[4] Plaintiffs likewise misread *State Farm*, which, contrary to their assertion, does not require an analysis of "the costs as well as the benefits" of agency action irrespective of the statutory text. Pls.' Br. 18 (quoting *State Farm*, 463 U.S. at 52). Indeed, if that were true, there would have been no need for the Court in *Michigan* to parse the text of the Clean Air Act for such a directive. *Cf. Michigan*, 135 S. Ct. at 2707–08. Rather, in *State Farm*, much as in *Michigan*, the statute directed the agency to issue motor vehicle safety standards that were "reasonable, practicable, and appropriate," *State Farm*, 463 U.S. at 33 (quoting 15 U.S.C. § 1392(f)(3) (repealed 1994); accordingly, the agency "look[ed] at the costs as well as the benefits" of the regulation, and the Court said merely that "[t]he agency [wa]s correct to" do so, *id*. at 54.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

Policy, *id.*, particularly given the substantial doubts about legality and litigation risk posed by the proceedings in *Texas* and the consequent potential for massive disruption were the policy immediately enjoined. And there was of course a "conscious change of course," *id.*, because the Acting Secretary acknowledged the agency's departure from the 2012 Memo. *See supra* at § I. The APA requires no more.

To be sure, an agency must "sometimes" provide a "more detailed justification than what would suffice for a new policy created on a blank slate"—"when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *Fox*, 556 U.S. at 515 (citation omitted). But this is not such a case. The purported "findings" that Plaintiffs pluck from the DACA Memo—*e.g.*, that "Our Nation's immigrations laws must be enforced in a strong and sensible manner," Pls.' Br. 21 (quoting AR 2)—are not "factual findings" at all, *Fox*, 556 U.S. at 515, but policy pronouncements. Moreover, the Acting Secretary's justification for the policy change was that *controlling legal precedent* had changed: after DACA was enacted, DAPA *and* expanded DACA were invalidated by the Fifth Circuit in a decision that was affirmed by an equally divided Supreme Court and that necessarily applied to DACA itself. *See infra* § I.D. It is difficult to think of a more compelling basis for a change in agency position.

This case thus bears no resemblance to *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016), the only case Plaintiffs cite where an agency's explanation for a policy change was found insufficient in view of the reliance interests at stake. In *Encino*, the Department of Labor had since 1978 interpreted the Fair Labor Standards Act not to require car dealerships to pay overtime to a category of employees known as "service advisors." *Id*. at 2122–24. The agency reversed course in 2011, more than 30 years down the line, but "gave almost no reasons at all" for the shift. *Id*. at 2127. The Court declined to give *Chevron* deference to the agency's new interpretation, finding its explanation lacking in view of the "significant reliance interests involved." *Id*. at 2126. In particular, over "decades of industry reliance" on the prior policy, the dealerships and their employees had "negotiated and structured their compensation plans against

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

15

th[e] background understanding" that overtime pay was not required—plans that the new policy effectively upended. *Id.*

Encino is inapposite in every material respect. To begin, no similarly "longstanding" reliance interests are present here. *Id.* In contrast to *Encino*, where the abandoned policy had a 30-year pedigree, DACA was of recent vintage. Moreover, by its own terms, DACA made deferred action available for only two-year periods, which could "be terminated at any time at the agency's discretion." DAPA Memo 2 (AR 38). And when he announced DACA in 2012, former President Barack Obama explained that it was a "not a permanent fix" but a "temporary stopgap measure," and urged Congress to act "because these kids deserve to plan their lives in more than two-year increments." *Remarks by President Obama on Immigration* (June 15, 2012), https://go.usa.gov/xnZFY. A prosecutorial discretion policy that can be revoked in the agency's discretion, at any time, for any reason, cannot create legally cognizable reliance interests. *See* ECF No. 114, Defs.' Mot. to Dismiss, at II.D, E, & G (explaining why Plaintiffs fail to state a due process claim and cannot assert equitable estoppel against the government). And more fundamentally, as discussed, the Acting Secretary here did not make a voluntary policy change heedless of any reliance interests, but rather was impelled to act by the near-certain invalidation of DACA by the courts, such that her orderly wind-down process reasonably took into account any reliance interests given the circumstances.

**D.** Plaintiffs contend that the Rescission Policy should be set aside because it "appears to rely on [the] false legal premise," set forth in "the Attorney General's letter," "that DACA was illegal." Pls.' Br. 22 (capitalization omitted). This argument is mistaken for several independent reasons, as Defendants have explained. *See* Defs.' Mot. Dism. at 24-28.

To begin, the Acting Secretary did not rely on the Attorney General's letter solely for its assessment of DACA's legality, but instead concluded that DACA "should" be wound down after considering, among other things, his assessment that it was "likely" that a legal challenge to the DACA Memo "would yield similar results" as the successful challenge to the DAPA Memo in light of the resulting Fifth Circuit precedent. Rescission Policy 3 (AR 254). That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis to

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

sustain the Acting Secretary's decision.  *See* Defs.' Mot. Dism. at 26-27.  In particular, the Fifth

Circuit affirmed the invalidation of not just DAPA, but extended DACA; and the differences

between extended DACA and original DACA—the length of the deferred-action period and

modified age and durational requirements—are indisputably immaterial to the Fifth Circuit's legal

rationale.  *See id.* at 27-28.

Moreover, to the extent the Acting Secretary did rely on the proposition that DACA was

unlawful, this Court need not agree with that determination to uphold her decision.  If an agency's

legal analysis and policy judgment overlap, courts should presume an independent policy

judgment, even if the two determinations are arguably "intertwined."  *See Syracuse Peace*

*Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (if "even in the absence of constitutional

problems the [agency] would have reached the same outcome," "we must end our inquiry without

reaching that issue").  Here, the Attorney General regarded DACA as unconstitutional in part

because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress

had repeatedly rejected.  Rescission Policy 3 (AR 254).  But those same concerns equally support

a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an

individualized case-by-case basis" rather than used as a tool "to confer certain benefits to illegal

aliens that Congress had not otherwise acted to provide by law."  *Id.* at 2 (AR 253).  This Court

could, therefore, sustain her decision based on a reasonable policy judgment that immigration

decisions of this magnitude should be left to Congress.  *See* Defs.' Mot. Dism. at 26-27.

In any event, while this Court need not decide the issue to resolve this case in favor of the

government on the basis that the agency decision was at least rational, the Attorney General's

view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas.*

Plaintiffs spill much ink attempting to show that "DACA was a lawful exercise of well-established

enforcement discretion," Pls.' Br. 23, repeating many of the arguments that the government

pressed in the *Texas* case, *see id*. at 23–25.  But for better or worse, those arguments were

decisively rejected by the Fifth Circuit, whose decision was affirmed by an equally divided

Supreme Court.  Thus, while Plaintiffs emphasize that, on its face, the DACA policy instructs

DHS officials "to exercise their discretion . . . only 'on an individual' and 'case by case' basis,"

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

Pls.' Br. 23–24, the Fifth Circuit found that discretion to be illusory in practice, *Texas*, 809 F.3d at 172–73.

Plaintiffs offer a hodgepodge of reasons why the Court should disagree with the Fifth Circuit's decision in *Texas*, encouraging the Court to undertake an independent assessment of DACA's legality. Pls.' Br. 25–27. None is persuasive.

First, although *Texas* invalidated the DAPA Memo, "not . . . the original DACA policy," *id.* at 25 (citation omitted), it did so based on the "important similarities" between the policies, 809 F.3d at 174, including through use of "evidence from *DACA's* implementation" about its "discretionary language," *id.* at 173 (emphasis added). Though that finding had to be "extrapolat[ed]" to invalidate DAPA, *id.*, it directly dooms DACA itself. At a minimum, the writing was on the wall, which is evident to any reader of the *Texas* opinions and the relevant DHS memos. Indeed, the *Texas* injunction also applied to the DAPA memo's provisions expanding DACA. Plaintiffs have not pointed to any material legal distinction between the two policies—because no such legal distinction exists, as discussed above.

Second, although this Court may not be bound by the Fifth Circuit's opinion in *Texas*, *see* Pls.' Br. 25, that is beside the point: DHS was so bound, because it faced further litigation—in the same case, before the same judge, bound by the same circuit precedent—over a materially indistinguishable policy that was thus almost certain to be invalidated.

Third, Plaintiffs argue that the government's briefs in *Texas* and elsewhere are "more persuasive" than the *Texas* decision itself. Pls.' Br. 25. That, too, is beside the point: Those arguments were firmly rejected by a Fifth Circuit opinion that was affirmed by an equally divided Supreme Court, and the government, having exhausted its appeal options, was bound to respect that decision given the absence of any plausible prospect of a different result in the impending litigation. The same is true of the OLC's "preliminary view" that the proposed version of DACA would be lawful. *Id.* That "preliminary" conclusion was conditioned on the proviso that "it was critical that … the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis." OLC Op. 18 n.8 (AR 21). Yet the Fifth Circuit found that DHS officials did not "genuinely" retain such discretion in practice. *Texas*, 809 F.3d at 176.

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

18

Fourth, Plaintiffs claim that "*Texas* is distinguishable" because, while "[t]he Fifth Circuit found that DAPA was not actually discretionary," the "same cannot be said for DACA." Pls.' Br. 26. But that is *exactly* what the Fifth Circuit said about DACA: "Like the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis," and thus "facially purport[ed] to confer discretion," *Texas*, 809 F.3d at 171–72; nevertheless, "there was evidence from DACA's implementation that [this] discretionary language was pretextual," *id*. at 173.

Fifth, Plaintiffs argue that the Fifth Circuit "invalid[ly]" concluded that the low denial rate for DACA requests meant that any discretion afforded to DHS officials was illusory. Pls.' Br. 26. In particular, they point to a declaration submitted by the agency in *Texas* asserting that DACA was, in fact, a "case-specific process" under which there were "several instances of discretionary denials." *Id*. at 27 (quoting *Texas*, 809 F.3d at 175) (citing Decl. of Donald Neufeld)). Once again, this is an argument that the government pressed, but the Fifth Circuit rejected: After quoting the same assertions, the court concluded that "those denials were not discretionary" at all, "but instead were required because of failures to meet DACA's objective criteria." *Texas*, 809 F.3d at 175 n.140; *see also id.* at 172 n.130.

Changing gears, Plaintiffs contend that "purported 'litigation risk' cannot justify the rescission" because it is a "post hoc explanation" that, in any event, "is not a sufficient reason for the federal government to do anything." Pls.' Br. 27–28 (capitalization omitted). They are wrong on both counts.

To begin, the notion that "litigation risk" is nothing but an after-the-fact rationalization for the Rescission Policy is squarely refuted by the record. The Policy itself discusses the adverse rulings from the Fifth Circuit and Supreme Court with respect to DAPA; the similarities between DAPA and DACA; Texas's threat to amend its complaint to challenge DACA; the Attorney General's view that "it is likely that potentially imminent litigation would yield similar results with respect to DACA," and the Acting Secretary's decision after considering all this that she "should" (*not* "must") wind-down DACA. Rescission Policy 3–4 (AR 254–55) (citation omitted). Likewise, her contemporaneous statement noted that her decision was prompted by "recent

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

19

litigation" that threatened to "allow the judiciary to potentially shut the program down completely and immediately." Duke Statement. Plaintiffs' suggestion otherwise is specious.

Plaintiffs' contention that it is irrational for litigation risk to inform an agency's decisionmaking is equally mistaken. The Supreme Court's decision in *Ricci v. DeStefano*, 557 U.S. 557 (2009), provides a useful comparison. There, a city government had to decide whether to certify the results of a promotional exam for firefighters that had a disparate impact on minority applicants. *Id.* at 562. The city faced potential litigation either way: If it certified the results, minority applicants threatened to bring a disparate *impact* lawsuit under Title VII; if it refused, applicants who would have been promoted threatened to bring a disparate *treatment* lawsuit. *Id.* at 562–63. Reconciling these competing obligations, the Court held that the city could rescind the test results—and thereby engage in "intentional discrimination"—so long as it had a "strong basis in evidence to believe it will be subject to disparate-impact liability if it fails" to do so. *Id.* at 585.

If it is permissible to make race-conscious employment decisions based on serious litigation risk, then surely it is not irrational for an agency to consider litigation risk when making discretionary policy decisions, let alone a decision to wind-down a non-enforcement policy that conferred no rights on anyone. And here, there was far more than a "strong basis" for the Acting Secretary to believe that continuing to administer DACA would subject the agency to liability, particularly given the adverse precedent in the Fifth Circuit that was directly on point.

The cases that Plaintiffs cite are not to the contrary: None deals with circumstances comparable to those presented here, where the agency explained that binding precedent effectively made the outcome of further litigation in the same court preordained. In *Sierra Club v. Jackson*, 833 F. Supp. 2d 11 (D.D.C. 2012) (cited at Pls.' Br. 28), for example, the court rejected the agency's reliance on "litigation risk" because the decision on review made "no mention" of that rationale, and the administrative record "belie[d] EPA's purported concern" on that score. *Id.* at 34. In *International Union, United Mine Workers of America v. U.S. Department of Labor*, 358 F.3d 40 (D.C. Cir. 2004), the court recognized that an adverse out-of-circuit precedent was "indeed a caution" for the agency, but found the agency's explanation insufficient because it

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

20

referred only to the "possible adverse effect" of the decision without "explain[ing] why it came to deem the . . . decision fatal" to its policy. *Id*. at 44.[5]  And in *Organized Village of Kake v. U.S. Department of Agriculture*, 795 F.3d 956 (9th Cir. 2015) (en banc), the court dismissed as "implausible" the agency's explanation that the challenged rule—which exempted one national forest from certain construction and logging restrictions—would "reduce[] the potential for conflicts" *in other lawsuits*, given that those "lawsuits involved forests other than the Tongass, so it is impossible to discern how an exemption for the Alaska forest would affect them." *Id*. at 969–70.  This case did not, as Plaintiffs claim, hold that an "agency's desire to avoid litigation did not satisfy its obligation to provide a reasoned explanation for its change in policy," Pls.' Br. 28, and their reliance on that case is entirely misplaced.

This case also presents no threat of an "end-run around the APA." Pls.' Br. 28.  Unlike in *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544 (D.C. Cir. 2015), here the agency has not attempted to "circumvent the rulemaking process"—which was not required in any event—"through litigation concessions." *Id*. at 557.  On the contrary, the agency vigorously litigated a materially indistinguishable policy all the way up to the Supreme Court.  Having lost that battle, however, the agency reasonably recognized that a challenge to DACA would in all likelihood meet the same fate.  Far from end-running the APA, the Acting Secretary has declined to frontally assault the courts.  That is commendable, not irrational.

**E.**     As a last gasp, Plaintiffs suggest that the Rescission Policy should be set aside because the rationale supporting it was "pretextual." Pls.' Br. 29.  They contend that the agency's supposedly "shifting" or "conflicting" explanations for the Policy reveal the "true reason" for its adoption:  to encourage Congress to enact legislation addressing this and other immigration issues. *Id*. at 29–30.  This theory is flawed from start to finish.

1. To begin, Plaintiffs' attempts to rely on material outside the administrative record as evidence of pretext should be rejected.  As the Supreme Court has repeatedly explained, when there is a "contemporaneous explanation" for an agency's decision, its validity "must … stand or

---

[5] *California ex rel. Lockyer v. U.S. Dep't of Agriculture*, 459 F. Supp. 2d 874, 904 (N.D. Cal. 2006) (cited at Pls.' Br. 28), cites *International Union* in passing, but offers no relevant analysis.

fall on the propriety of that finding." *Camp v. Pitts*, 411 U.S. 138, 143 (1973). "The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court," *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citation omitted), "not some new record made initially in the reviewing court." *Camp*, 411 U.S. at 142. Plaintiffs cannot rely on material outside the administrative record to argue that an agency acted arbitrarily and capriciously any more than an agency can rely on post-hoc rationalizations to defend the rationality of its actions, *see SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943). Because Plaintiffs' request for provisional relief is premised solely on their APA claims, their attempt to rely on deposition transcripts and other extra-record material should be rejected.

2. Critically, Plaintiffs identify no actual shift in the Acting Secretary's stated justification for the Rescission Policy. None of the supposedly "shifting" statements are from the Acting Secretary herself—the only official vested with authority under the INA to make the decision at issue. 8 U.S.C. § 1103(a)(1). Plaintiffs have therefore failed to show that the Acting Secretary's reasons for adopting the Rescission Policy are pretextual.

Plaintiffs submit that the Acting Secretary could not have been concerned about DACA's legality because, rather than end DACA immediately, she allowed it to gradually sunset. Pls.' Br. 29–30. But, as explained above, the orderly wind-down of DACA is an appropriate response to the litigation risk facing the government as well as the reliance interests at stake (and the agency's own operational needs). In any event, it is difficult to see how this argument helps Plaintiffs: If the Court were to deem the wind-down itself illegal, the solution would not be to extend DACA indefinitely, but to end it immediately. And in any event, Plaintiffs point to no legal authority for the proposition that either the Constitution or the APA forbid an orderly wind-down of a program in the face of concerns about its legality.

Plaintiffs similarly claim to see inconsistency between the Acting Secretary's reliance on litigation risk and Defendants' argument that the decision is not reviewable under the APA because, "if defendants really believed that the *Texas* decision presented an unmanageable litigation risk, they also must believe that the *Texas* decision correctly held that a program like

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

22

1   DACA is reviewable and that the notice-and-comment requirement applies." Pls.' Br. 30. This

2   is nonsensical. The Fifth Circuit's decision in *Texas* was upheld by an equally divided Supreme

3   Court, and the Acting Secretary therefore agreed with the Attorney General's conclusion that the

4   impending challenge to DACA *in the same case* would likely prove successful—a decision which

5   is eminently rational whether or not she personally agreed with the Fifth Circuit's justiciability

6   determination. Notably, neither the Acting Secretary's memo nor the Attorney General's letter

7   expressly relied upon or gave any indication that they agreed with the Fifth Circuit's *justiciability*

8   rulings, as opposed to its merits rulings. There is no inconsistency here.

9       Finally, because there is no basis, let alone a strong one, to conclude that the Acting

10  Secretary did not actually believe and rest on her reasonable concerns about DACA's legality, it

11  would be entirely permissible even if plaintiffs were correct that she had the *additional* motive of

12  wishing to encourage Congress to enact legislation addressing the legal status of DACA

13  recipients, Pls.' Br. 30. While Plaintiffs describe this "administrat[ive] legislative strategy" as a

14  "cynical ploy," *id.*, it is in fact a legitimate policy goal that has been shared across

15  administrations. When the President announced DACA in 2012, he said, "Precisely because this

16  is temporary, Congress needs to act," and he called on it "to pass the DREAM Act." Barack

17  Obama, The White House, *Remarks by the President on Immigration*, *supra* at § I.C. When the

18  former Secretary expanded DACA in 2014, he noted that the policy created no "immigration

19  status or pathway to citizenship. Only an Act of Congress can confer these rights." DAPA Memo

20  5 (AR 41). Thus, the Acting Secretary was in good company when, in announcing the Rescission

21  Policy, she "urge[d] Congress to use its Constitutional authority to … find a legislative

22  solution." Duke Statement. The Acting Secretary's desire for a "legislative solution" mirrors

23  President Trump's goal that Congress "legalize DACA" and adopt "legislation addressing the

24  status of [DACA] recipients." *See* Donald J. Trump (@realDonaldTrump), Twitter (Sept. 5, 2017,

25  5:38 PM), https://twitter.com/realDonaldTrump/status/905228667336499200; Presidential

26  Memoranda, The White House, *President Donald J. Trump's Letter to House and Senate Leaders*

27  *& Immigration Principles and Policies* (Oct. 8, 2017), https://www.whitehouse.gov/the-press-

28  office/2017/10/08/president-donald-j-trumps-letter-house-and-senate-leaders-immigration.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

23

There is nothing at all inappropriate about those suggestions, nor are they inconsistent with the Rescission Memo itself, which plainly rests on the conclusion that any policy of deferred action on the scale of DACA should be enacted by Congress.

3. Plaintiffs' reliance on statements by officials other than the Acting Secretary is even further afield. That other officials might have supported the Rescission Policy for different reasons does not indicate that the reasons given by the actual decisionmaker—the Acting Secretary—were pretextual.

Moreover, even if statements of officials other than the decisionmaker were relevant, none plausibly gives rise to a cognizable inference of pretext here. Plaintiffs suggest, for example, that the Acting Secretary's assessment of litigation risk with respect to DACA was a pretense because, at one deposition, when asked whether there is "any [DHS] policy on how to deal with threats to sue by state or local officials," one of her advisors responded: "[T]hat sounds like the craziest policy you could ever have" because "[y]ou could never do anything if you were always worried about being sued."[6] App'x in Supp. of Pls.' Mot. for Prov. Relief (Pls.' App'x) 1929, ECF Nos. 113, 117–19, 121, 124 (Hamilton Dep.) (cited at Pls.' Br. 30). But Plaintiffs rip that statement out of context: read in conjunction with the broader discussion, it is clear that the deponent was responding to the question whether DHS has a *general* policy of considering "litigation risk" in the context of *each* agency decision—something the agency has never claimed and that might make little sense. Regardless, whatever the merits of such a policy as a general matter might be (or whether the agency has any such policy), that says nothing about how DHS might choose to address litigation risk in a *particular* case, especially where, as here, there was controlling adverse precedent and the consequent potential for massive disruption flowing from an abrupt (and highly likely) court-ordered termination. Plaintiffs' reliance on this isolated, off-hand comment as supposed "evidence" of pretext is misplaced.

Plaintiffs next cast aspersions on the President's tweet indicating that, if Congress "can't" pass a legislative fix for DACA recipients, he "will revisit the issue!" Donald J. Trump

---

[6] Although Plaintiffs refer to this official as the "author" of the Rescission Memo, Pls.' Br. 3, this only further confirms their failure to understand administrative law. Mr. Hamilton is no more the "author" of the Acting Secretary's memo than is a law clerk author of a judicial opinion.

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

24

(@realDonaldTrump), Twitter (Sept. 5, 2017, 5:38 p.m), *supra* at 27. But that comment is fully consistent with the President's clearly stated view that "the program is unlawful and unconstitutional and cannot be successfully defended in court." *See* Statement from President Trump, Sep. 5, 2017, https://www.whitehouse.gov/the-press-office/2017/09/05/statement-president-donald-j-trump. Far from undercutting the Acting Secretary's rationale for rescinding the policy, the comment emphasized the need for legislative action and expressed the President's intention to revisit Administration policies on childhood arrivals—not the legality and defensibility of the DACA program—if Congress did not timely act. That stated intention simply reflects the government's obligation to "consider … the wisdom of its policy on a continuing basis, for example, in response to changed factual circumstances, or a change in administrations." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (internal citation omitted).[7]

4. More fundamentally, Plaintiffs fall far short of making the "strong showing of bad faith or improper behavior" necessary to overcome the presumption of regularity. *Overton Park*, 401 U.S. at 420. To do so, they "must make a significant showing—variously described as a 'strong,' 'substantial,' or 'prima facie' showing … indicative of bad faith." *Amfac Resorts LLC v. Dep't of Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001). They cannot meet this burden with "vague" allegations, *Coal. on Sensible Transp. v. Dole*, 826 F.2d 60, 72 (D.C. Cir. 1987), "conclusory statements," *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996), or "inadmissible hearsay," *Commercial Drapery Contractors v. United States*, 133 F.3d 1, 7 (D.C. Cir. 1998). Rather, they must proffer "serious, nonconclusory allegation[s] of bad faith" or "independent evidence of improper conduct." *Coal. on Sensible Transp.*, 826 F.2d at 72. Indeed, Plaintiffs "must present 'well-nigh irrefragable proof' of bad faith or bias on the part of

---

[7] Plaintiffs grasp at straws by claiming that the government's briefs support their theory of pretext. Notwithstanding their insistence that the "motion to dismiss filed by the government in *Batalla Vidal* makes no argument that DACA was effectuated without statutory authority or was an unconstitutional exercise of authority, but relies instead on the 'litigation risk' justification," the government's motions to dismiss on both coasts argue that "the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas* that was affirmed by the Supreme Court." *See* Defs. Mot. to Dism.§ II.A; Defs.' Mot. to Dismiss, *Batalla Vidal v. Donald J. Trump*, No. 16-cv-4756 (E.D.N.Y. Oct. 27, 2017), ECF 95-1.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

governmental officials" to overcome the presumption that the agency discharged its duties in good faith. *Adair v. England*, 183 F. Supp. 2d 31, 60 (D.D.C. 2002) (citations omitted). Plaintiffs fail to meet this high burden, as none of the statements to which they point even arguably demonstrates bad faith.In sum, even if generously interpreted, at most the statements invoked by Plaintiffs show that various officials other than the actual decisionmaker may not have fully agreed with the all the reasons that the Acting Secretary articulated for her decision. That different officials may have different perspectives on these issues may show disagreement, but it is no sign of bad faith, let alone strong evidence of it.

## II.    The Rescission Is a General Statement of Policy Not Subject To Notice-And-Comment Rulemaking Requirements

Plaintiffs also cannot succeed in arguing that DHS was required to "abide by the full panoply of APA procedures including notice and comment," Pls.' Br. 31, before rescinding the DACA policy. The APA generally requires an agency to follow notice-and-comment procedures before promulgating rules. 5 U.S.C. § 553(b), (c); *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). But the APA exempts "general statements of policy" from that requirement unless another statute provides otherwise, 5 U.S.C. § 553(b)(3)(A), and none does here. The Rescission Policy is exempt from the APA's notice-and-comment requirements because it is a general statement of policy regarding how DHS will exercise its enforcement discretion under the INA. In attempting to recast the Rescission as a substantive rule, as opposed to a policy guidance, Plaintiffs fundamentally mischaracterize both the nature of the Rescission and its effect on the availability of deferred action. And in any event, Plaintiffs' argument is foreclosed by controlling Ninth Circuit precedent construing INS deferred-action directives as policy statements exempt from notice and comment.

**1.** General statements of policy "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Lincoln*, 508 U.S. at 197 (quoting Dep't of Justice, *Attorney General's Manual on the APA* 30 n.3 (1947)). They "serve a dual purpose": both to "inform[] the public concerning the agency's future plans and priorities for exercising its discretionary power," as well as to "'educate' and provide direction to the agency's personnel in

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

26

the field, who are required to implement … policies and exercise … discretionary power in specific cases." *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1013 (9th Cir. 1987). And a "general statement of policy, like a press release," often "announces the course which the agency intends to follow in future adjudications." *Pac. Gas & Elec. Co. v. FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974).

By contrast, legislative rules adopted through notice-and-comment procedures have the force and effect of law, and thus create legally-enforceable rights or obligations in regulated parties. *Perez*, 135 S. Ct. at 1203; *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979). In other words, an "agency action that … would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule." *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014). The APA leaves to the agency the choice of which mode to employ. *See* 5 U.S.C. § 553(b). If an agency chooses to issue a statement of policy rather than a legislative rule through notice-and-comment rulemaking, that choice has consequences: The agency's statements in the policy have "no binding effect on members of the public or on courts." 1 Richard J. Pierce, Jr., *Administrative Law Treatise* § 6.3, at 419 (5th ed. 2010).

A quintessential use of policy statements is for an agency to announce how and when it will pursue (or forbear from) enforcement, in the exercise of its discretion. Such enforcement policies explain how the agency intends to exercise a power that is "generally committed to an agency's absolute discretion." *Chaney*, 470 U.S. at 831. Unlike legislative rules adopted after notice-and-comment, such enforcement policies do not establish or alter any legally-enforceable rights or obligations of third parties. And such policies can readily be changed, in response to changing circumstances, funding, and priorities.

Applying these principles, the Rescission Policy can only be viewed as a general statement of policy. Indeed, DHS and its predecessor, the INS, have exercised their enforcement discretion through the use of deferred action and similar policies dozens of times over more than half a century, without following notice-and-comment procedures. *See* Andorra Bruno et al., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* 20-23, Cong. Research Serv. (July 13,

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

27

2012), https://edsource.org/wp-content/uploads/old/Deferred-Action-Congressional-Research-Service-Report1.pdf. Plaintiffs provide no meritorious reason for treating the Rescission Policy differently.

The text of the Rescission reinforces the point again and again. It is a "memorandum." Rescission Policy at 1 (AR 252). The Acting Secretary issued it as an "exercise of [her] authority in establishing national immigration policies and priorities." Rescission Policy 4 (AR 255). It instructs DHS personnel on the manner in which they are to exercise the agency's discretionary enforcement authority on a prospective basis. *See Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir. 1975) ("[G]eneral statements of policy are rules directed primarily at the staff of an agency describing how it will conduct agency discretionar[y] functions, while other rules [i.e., legislative rules] are directed primarily at the public in an effort to *impose obligations* on them.") (internal citation omitted; emphasis added). The Policy does not act to immediately deprive any current DACA recipients of their deferred-action status, but describes how pending and future requests will be "adjudicate[d]—on an individual, case-by-case basis." Rescission Policy 4 (AR 255). It acknowledges the settled principle, recognized by both Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such "otherwise lawful enforcement … prerogatives," *id.* at 5 (AR 256). It "does not … create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* And no alien has an enforceable right to obtain deferred action under DACA or any other policy regardless. *See* 8 U.S.C. § 1252(g); *AADC*, 525 U.S. at 485. Deferred action "remains discretionary and reversible," *Arpaio*, 797 F.3d at 17—as it has been through each of the previous policies adopted without "cumbersome and time-consuming rulemaking proceedings." *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988).

Plaintiffs' attempt to portray the Rescission policy as a substantive rule is unpersuasive. Plaintiffs contend that there "can be no dispute that DHS intends to be bound by the Rescission, and that the Rescission limits the agency's discretion," because, they insist, it is "a categorical rule barring DACA recipients from renewing their grants of deferred action and precluding new

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

potential DACA recipients from obtaining deferred action." Pls.' Br. 32-33. This mischaracterizes the nature of the DACA Rescission and the availability of deferred action generally. Deferred action was available on a discretionary basis before the DACA policy (albeit on a more limited and case-specific basis), and it remains available today. DACA is not the only manner by which individuals obtain deferred action, as the long history of similar policies evinces. That a particular policy permitting a class of individuals to seek deferred action based on certain criteria has been rescinded does not mean that DHS officials are "flatly prohibited," *id.* at 32, from later extending that status on an individualized basis to persons regardless of if they are former DACA recipients, and nothing in the Rescission Policy indicates otherwise. To the contrary, nothing in the Rescission Policy prevents DHS officials from later exercising their delegated discretion to confer deferred action on an individual former DACA recipient, or even upon large groups of former DACA recipients under appropriate individualized criteria. The Secretary remains free to establish (or revoke) other deferred-action policies, in her discretion; to grant (or deny) deferred action as to *any* individual under other policies, or no policy at all, in her discretion; to revoke a grant of deferred action, in her discretion; and to pursue removal, in her discretion. In short, the Rescission Policy does not bind regulated parties or the courts in any way. Indeed, DACA itself was indisputably adopted as an exercise of enforcement discretion, and it follows that its rescission was too.

Plaintiffs' argument that the Rescission is a substantive rule because it "bans DACA recipients from applying for and traveling on advance parole" is similarly flawed. *Id.* at 31. The possible availability of advance parole, under separate regulations not otherwise at issue in this case, is a discretionary *consequence* of receiving deferred action—meaning that it is an aspect of the Secretary's authority under the INA. Accordingly, the Secretary may use statements of policy to "advise the public prospectively of the manner in which [DHS] proposes to exercise [its] discretionary power" concerning deferred action, as well as the consequences that follow from that exercise due to separate regulations. *See Vigil*, 508 U.S. at 197 (citations omitted). The Rescission Policy announced a prospective change instructing the agency to discontinue processing applications for advance parole "under standards associated with the DACA

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

program." Rescission Policy 4, (AR 255). The Secretary acted well within her discretion in changing this policy without the full notice-and-comment process.

Plaintiffs even attempt to argue that *only* the Rescission, and not the 2012 DACA Memorandum, required notice and comment. According to Plaintiffs, "it is irrelevant that the 2012 DACA Memorandum did not go through the notice-and-comment process" because "DACA was an exercise of prosecutorial discretion and not required to go through notice and comment," while "the Rescission does not present itself as an exercise of DHS's discretion, and in fact prohibits the exercise of discretion in the adjudication of applications for deferred action." Pls.' Br. 33. That cannot be. As established above, DHS officials retain the discretion to grant deferred action outside the confines of the DACA policy. But more fundamentally, prosecutorial discretion cannot be a one-way valve whereby the Secretary is free to expand the availability of deferred action through a statement policy, but, once the policy is announced, may not restrict it without a cumbersome rulemaking proceeding. That is not the law, and tellingly, Plaintiffs cite no authority for the remarkable proposition that the notice-and-comment inquiry differs depending on whether an agency is broadening or limiting access to a discretionary program. *See* Pls.' Br. 31–34. Plaintiffs' argument is nonsensical for the additional reason that, if winding down the DACA policy is a "substantive rule," then *a fortiori* so was enacting the policy in the first place. Since the DACA Memo itself was not adopted through notice and comment, on Plaintiffs' own theory it would be void *ab initio*—leaving Plaintiffs without a remedy.

Moreover, it is common for senior prosecutors to set bright-line policies directing the exercise of discretion by individual prosecutors. For example, the "passive enforcement policy" adopted by the Attorney General and approved in *Wayte v. United States*, 470 U.S. 598, 601–02, 613 (1985), limited the discretion of prosecutors to pursue charges against those who had not self-reported their violation of the law. And earlier this year the Attorney General issued a memorandum instructing all federal prosecutors to "charge and pursue the most serious, readily provable offense" in all federal criminal prosecutions, expressly rescinding two earlier, more lenient policies. *See* Memorandum from the Attorney General to All Federal Prosecutors (May 10, 2017), https://www.justice.gov/opa/press-release/file/965896/download. If enforcement

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

policies lacking an additional layer of case-specific discretion triggered notice-and-comment requirements, such policies would be unlawful.

2. In arguing that the Rescission was required to undergo notice-and-comment rulemaking, Plaintiffs elide binding Ninth Circuit precedent that squarely rejected a contention that an INS deferred-action directive was void for failure to abide by notice-and-comment requirements. The petitioner in *Mada-Luna*, 813 F.2d at 1009, challenged the validity of an INS Operating Instruction (i.e., guidelines for the exercise of discretion in considering requests for deferred action) under which his deferred-action application had been denied. Mada-Luna argued that the Operating Instruction, which purported to rescind an earlier directive, was "invalid because the INS promulgated it without the notice-and-comment procedures required" by the APA, and that the agency was thus required to review his application under the "more 'generous' standard" contained in the earlier guidance. *Id.* After thorough consideration of the distinctions between a substantive rule and a general policy statement, the court held the Operating Instruction to be "a clear[] case of a general statement of policy." *Id.* at 1017. The Ninth Circuit expressly rejected the argument that, "if the repeal of an agency directive will cause a 'substantial impact' to the rights of a specific class it cannot be exempt from section 553's notice-and-comment requirements," and explained that the proper inquiry "focuse[s] upon the effect of the regulation or directive upon *agency decisionmaking*, not the public at large." *Id.* at 1016.

Like the Operating Instructions challenged in *Mada-Luna*, the Rescission Policy is a prospective instruction guiding DHS officials in their exercise of discretion. That deferred action may be available on a more limited basis than under DACA does not change the fact that the Rescission is an internal directive about how to handle prosecutorial discretion and thus does not have the force and effect of law. It is thus a "clear[] case of a general statement of policy," *id.* at 1017, not subject to notice and comment. *See also Romeiro de Silva v. Smith*, 773 F.2d 1021, 1025 (9th Cir. 1985) ("INS operations instructions fall within section 553(b)(A)'s exception because the instructions are internal directives not having the force and effect of law," which bind the agency "so long as they remain operative, but [the agency] may repeal them and substitute

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

31

new rules in their place.").

Plaintiffs ignore *Mada-Luna*'s holding while hinging their procedural APA claim on a single, out-of-circuit district court case, *United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 984–86 (E.D. Pa. 1977), which they depict as "strikingly similar"—despite that the case arose in the very different context of a *habeas corpus* petition challenging the refusal to extend an individual's voluntary departure privilege. Pls.' Br. 33–34. The *Parco* court, relying on an unusual stipulation by a government official that the petitioner's application would have been approved but for a recent change to an INS Operating Instruction, determined that the petitioner "was entitled to advance notice and an opportunity to comment on the proposed change." *Parco*, 426 F. Supp. at 985. *Parco* is inapplicable to the broad policy change at issue here and unpersuasive.

THE REMAINING FACTORS WEIGH AGAINST PRELIMINARY RELIEF

Plaintiffs have failed to demonstrate that they are likely to succeed on the merits. That, alone, should doom their request for preliminary injunctive relief. *See Am. Trucking Ass'ns*, 559 F.3d at 1052. Nonetheless, as set forth below, Plaintiffs fail to demonstrate how a preliminary injunction will cure any harm that Plaintiffs claim they will suffer. Nor do Plaintiffs demonstrate that the balance of the equities or the public interest tips in their favor. For these reasons as well, Plaintiffs' motion should be denied.

### III. Plaintiffs Have Not Shown Any Risk of Irreparable Harm Absent Preliminary Relief

Provisional relief serves the "limited purpose" of "preserv[ing] the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Accordingly, "[a]n essential prerequisite" before granting provisional relief "is a showing of irreparable injury to the moving party in its absence." *Dollar Rent A Car of Wash., Inc. v. Travelers Indem. Co*., 774 F.2d 1371, 1375 (9th Cir. 1985).

Not just any showing of irreparable harm will suffice. A party "is only entitled to an injunction that prevents [the] irreparable harm" that is "likely to occur." *S. Yuba River Citizens League v. Nat'l Marine Fisheries Serv*., 804 F. Supp. 2d 1045, 1054 (E.D. Cal. 2011); *see also id*.

All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
Defendants' Mem. In Opp. to Mot. For Provisional Relief

32

1   (noting that a party's "showing [of irreparable harm] is required in order to justify the specific

2   measures that [the party] request[s]"); *Seto v. Thielen*, No. CIV. 10-00351, 2010 WL 2612603, at

3   *3 (D. Haw. June 28, 2010) (a movant "should tailor the [injunctive] relief requested to appropriate

4   relief for the alleged violation").  Thus, courts regularly deny requests for provisional relief where

5   the requested injunction would not remedy the irreparable harm alleged by the movant during the

6   period in which the requested injunction would apply.  *See Taiebat v. Scialabba*, No. 2017 WL

7   747460, at *5 (N.D. Cal. Feb. 27, 2017) (denying preliminary injunction where "plaintiff [could

8   not] establish that the mandatory injunction he seeks would address the alleged harm"); *S. Yuba

9   River Citizens League*, 804 F. Supp. 2d at 1057 ("[T]he court declines to order an interim measure

10   that will provide no benefit to the listed species in the interim period."); *Schroll v. Plunkett*, 760

11   F. Supp. 1378, 1384 (D. Or. 1990) ("Granting plaintiffs' requested injunctive relief would not

12   prevent the alleged" harm).

13        Plaintiffs fail to make a sufficient showing of irreparable harm to justify the injunctive

14   relief they request.  The Court has made clear its intention to render a decision on the merits of

15   Plaintiffs' claims by March 5, 2018, when the DACA Policy begins to wind down.  *See* Order re

16   Motion to Complete AR 2, ECF No. 79; *see also* Continuance for Augmented AR & Stay of Disc.

17   2, ECF No. 193-1.  Accordingly, Plaintiffs must demonstrate that the provisional relief they request

18   will remedy irreparable harm that is likely to occur during the interim period between now and

19   that date.  *See, e.g.*, *S. Yuba River Citizens League*, 804 F. Supp. 2d at 1057.

20        For two related reasons, Plaintiffs have not done so.  First, the bulk of Plaintiffs' factual

21   support pertains generally to the alleged impact of DHS's rescission of DACA writ large and

22   provides little to no explanation for why irreparable harm is likely to occur between now and

23   March 5, 2018.  This includes Plaintiffs' declarations discussing research studies that explore the

24   psychological and emotional impact of DACA's rescission on current recipients, *see, e.g.*, Pls.'

25   App'x 368 (a "repeal of DACA would have disastrous consequences"), as well as declarations

26   from current DACA recipients describing that impact in their own words, *see, e.g.*, *id*. at 401

27   ("[DACA's] rescission has stripped me of [a] sense of security.").  It also includes declarations

28   estimating the financial impact that rescinding DACA will have on federal, state, and local

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

economies and governments, which utilize twelve-month and ten-year-based calculations. *See id.* at 73, 224. The same is also true of the declarations identifying potential harms to local communities. *See id.* at 1138 ("[S]ince the rescission of DACA … [people are] decreasing their involvement in civic life.").

These and other attestations do not aid Plaintiffs in carrying their burden of establishing that irreparable harm is likely to occur *prior* to March 5, 2018. Indeed, such harms could not be remedied by a preliminary injunction. The requested injunction would provide only temporary, short-term relief, and would dissolve upon the conclusion of these lawsuits. *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1093 (9th Cir. 2010). Indeed, only a permanent *legislative* fix would provide DACA recipients with the security they seek. But even if this Court could fashion some form of permanent relief, Plaintiffs are not seeking it now, and in any event, they have not shown that such relief is warranted at this time. *See Senate of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992) ("[A] judgment on the merits in the guise of preliminary relief is a highly inappropriate result.").

Second, even where Plaintiffs' declarations identify concrete harm, they nonetheless fail to establish that the harm is likely to occur in the interim period between now and March 5, 2018, or that the injunctive relief they request will remedy such harm. For example, Plaintiffs argue that many declarants will lose opportunities to pursue their chosen profession as a result of their inability to make long-term family, educational, and career decisions, such as whether to pursue a medical residency. Pls.' Br. at 34. As above, however, those individuals' ability to confidently engage in such planning would only be safeguarded through legislative action or some other sort of permanent relief, and not through a grant of injunctive relief through March 5, 2018.[8] Moreover, such relief would be unnecessary for many of Plaintiffs' declarants, who already have been granted deferred action and work authorizations that extend far beyond March 5, 2018. *See, e.g.*, Pls.'

---

[8] Some of Plaintiffs' declarations make this abundantly clear. One declarant, for example, states that she and her fiancé have decided to "put on hold" any decision to start a family because they "just do not think that it would be fair to bring a child into [their] lives if [they] can't guarantee that child a stable, safe home." Pls.' App'x 268. A four-month injunction would provide no such guarantee.

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

App'x 41–42, 108, 186, 401, 448, 553, 1368, 1448.  As for the declarants contemplating pursuing a medical residency, they similarly would stand to benefit little from Plaintiffs' requested injunction because, as one notes, "residencies are three to eight years [long]."  *Id.* at 723.  Plaintiffs also reference the unavailability of advance parole and proffer a declaration from an individual who was invited to present research at conferences in Malta and Germany.  *Id.* at 1,323.  The Malta conference has already taken place, however, and the German conference will conclude within days of this filing.  *See id.*  The declaration mentions no other pending invitations between now and March 5, 2018, and thus does not suffice to demonstrate irreparable harm.[9]

Finally, Plaintiffs submit declarations positing a likelihood of irreparable harm stemming from the expiration of, and inability to renew, work authorizations—for educational officials, lost funding from students who might be unable to pay their tuition costs or qualify for financial aid in the absence of a work authorization, and for nonprofits and local governments, lost services from those who currently work in their communities.  *Id.* at 502–03, 1348–49.  However, those declarations neither explain why such harm is likely to occur between now and March 5, 2018, nor how the requested injunctive relief (which would only affect the discrete group of individuals who lack DACA status or whose status is set to expire by that date) would abate such harm.

## IV.  Balancing of the Equities and the Public Interest

The final two factors, the public interest and the balance of the equities, also weigh against granting Plaintiffs' motion.  These factors merge when the government is a party.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  As noted above, the federal government possesses broad authority over the subject of immigration and the status and presence of aliens in this county.  *Arizona v. United States*, 567 U.S. 387, 394 (2012).  This includes significant discretion as to whether, and under what circumstances, to grant discretionary relief

---

[9] Two other declarations submitted by Plaintiffs also fail to suffice.  One references the Winter 2017 California-Mexico Dreamers Study Abroad Program by the California-Mexico Studies Center, while the other describes international travel that is "common" for students pursuing a Masters degree in public health at the Harvard T.H. Chan School of Public Health to take in January of each year.  Pls.' App'x 670, 1479.  Neither declaration explains, however, how the inability to take such trips renders DACA recipients unable "to pursue [their] chosen profession," much less how any such harm is irreparable.  *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017).

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

35

to individuals not lawfully in this country, such as deferred action. Here, the Acting Secretary decided to pursue an approach in which grants of deferred action would "be decided on a case by case basis." DACA Memo 2 (AR 2). In adopting this approach, the Secretary sought to implement an orderly rescission of the prior policy and minimize the potential for disruption. *See* Rescission Policy, 4 (AR 255); *see also* Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://go.usa.gov/xncuM.

The injunctive relief sought by Plaintiffs would frustrate and displace both the Secretary's substantive judgment as to how her prosecutorial discretion should be exercised, as well as her further judgment as to how best to transition between policies, while providing minimal, if any, relief to the harms identified by Plaintiffs for the reasons discussed above. Accordingly, this factor weighs strongly against granting Plaintiffs' the injunction they seek. *See All. for the Wild Rockies*, 632 F.3d at 1138 ("We will not grant a preliminary injunction, however, unless those public interests outweigh other public interests that cut in favor of *not* issuing the injunction.").

## V. Any Injunctive Relief Should be Narrowly Drawn

For the reasons discussed above, the Court should deny Plaintiffs' motion in its entirety. If, however, the Court were to disagree, it nevertheless should reject Plaintiffs' sweeping request to "immediately return the administration of the DACA program to the state of its existence prior to the Rescission." Pls.' Proposed Order at 3. Such relief would be clearly overbroad, especially to the extent it applies to individuals who are not parties to this action and whose claims are not currently addressed in Plaintiffs' motion.

Constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries. Article III requires that "a plaintiff must demonstrate standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). "The remedy" sought must therefore "be limited to the inadequacy that produced the injury in fact." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). And equitable principles independently require that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

36

Any injunction the Court enters should thus be limited to relieving the specific injury of only those individual Plaintiffs whom the Court determines have a cognizable claim and will suffer irreparable harm in the absence of an injunction. *See Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987) ("Where relief can be structured on an individual basis, it must be narrowly tailored to remedy the specific harm shown," and should not extend broader than is "necessary to give prevailing parties the relief to which they are entitled." (emphasis omitted)).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for provisional relief should be denied.

Dated: November 22, 2017

Respectfully submitted,

CHAD A. READLER
Principal Deputy Assistant Attorney General

BRIAN STRETCH
United States Attorney

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Branch Director

JOHN R. TYLER
Assistant Branch Director

BRAD P. ROSENBERG
Senior Trial Counsel

STEPHEN M. PEZZI
Trial Attorney

*/s/   Kate Bailey*
KATE BAILEY
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 514-9239
Email: kate.bailey@usdoj.gov

*Attorneys for Defendants*

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**Defendants' Mem. In Opp. to Mot. For Provisional Relief**

# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF CALIFORNIA

REGENTS OF UNIVERSITY OF
CALIFORNIA and JANET NAPOLITANO, in
her official capacity as President of the
University of California,

            Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY and ELAINE
DUKE, in her official capacity as Acting
Secretary of the Department of Homeland
Security,

            Defendants.

No. 3:17-cv-05211-WHA
No. 3:17-cv-05235-WHA
No. 3:17-cv-05329-WHA
No. 3:17-cv-05380-WHA
No. 3:17-cv-05813-WHA

**[PROPOSED] ORDER**

    Plaintiffs in the above-docketed and related cases have filed a motion for provisional relief. *See* No. 3:17-cv-05211-WHA, ECF No. 111. Upon consideration of Plaintiffs' motion, the responses and replies thereto, and the oral argument of the parties, Plaintiffs' motion shall be, and it hereby is, DENIED. IT IS SO ORDERED.

_____

William Alsup
United States District Judge

_____

Date

**All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)**
**PROPOSED ORDER**