# EXHIBIT 12

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

CASA DE MARYLAND, *et al.*,

     *Plaintiffs*,

  v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

     *Defendants*.

No. 17-cv-2942 (RWT)

## DEFENDANTS' MOTION TO DISMISS OR, IN
## THE ALTERNATIVE, FOR SUMMARY JUDGMENT

For the reasons set forth in the accompanying memorandum of law, Defendants

respectfully move the Court to dismiss this action or, in the alternative, to grant summary

judgment to Defendants.  *See* Fed. R. Civ. P. 12(b)(1), (6), 56.

Dated: November 15, 2017

        Respectfully submitted,

        CHAD A. READLER
        Acting Assistant Attorney General

        BRETT A. SHUMATE
        Deputy Assistant Attorney General

        JENNIFER D. RICKETTS
        Director

        JOHN R. TYLER
        Assistant Branch Director

        */s/  Kathryn C. Davis*
        KATHRYN C. DAVIS
        */s/  Rachael Westmoreland*
        RACHAEL WESTMORELAND
        Trial Attorneys

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 616-8298
Fax: (202) 616-8470
Email: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CASA DE MARYLAND, *et al.*,<br><br>              *Plaintiffs*,<br><br>    v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>          *Defendants*. | No. 17-cv-2942 (RWT) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION
<u>TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................5

   A.  Deferred Action Generally................................................................................5

   B.  DACA and DAPA.............................................................................................7

   C.  The *Texas* Litigation ......................................................................................8

   D.  Rescission of DACA........................................................................................9

   E.  The Instant Action.........................................................................................11

LEGAL STANDARDS ....................................................................................................12

ARGUMENT ...................................................................................................................14

   I.  THIS CASE IS NOT JUSTICIABLE......................................................................15

      A.  The Rescission Policy Is Not Justiciable Because this Immigration
          Enforcement Policy Is a Matter Committed to Agency Discretion
          by Law ...........................................................................................................15

      B.  The INA Deprives District Courts of Jurisdiction over Challenges to
          Denials of Deferred Action...........................................................................21

      C.  The Plaintiff-Organizations' Claims Are Not Cognizable.............................25

         1.  Plaintiffs Lack Article III Standing.........................................................25

            a.  Plaintiffs lack organizational standing............................................ 25

            b.  Plaintiffs lack representational standing. ........................................ 28

         2.  Plaintiffs Lack a Cause of Action Under the APA ................................29

      D.  The Government's Justiciability Objections Are Not Inconsistent
          with the Acting Secretary's Reliance on the Fifth Circuit's Decision.........30

   II.  PLAINTIFFS FAIL TO STATE A CLAIM ...........................................................30

      A.  Plaintiffs Fail to State an APA Claim ...........................................................31

i

1.  The Acting Secretary rationally explained her decision to wind
    down DACA, particularly given the imminent risk of a nationwide
    injunction. ...............................................................................................31

    B.  The Rescission Policy Is Exempt from Notice and Comment...................................41

    C.  Plaintiffs Fail to State an Equal Protection Claim .....................................................45

    D.  Plaintiffs Fail to State a Procedural Due Process Claim...............................................48

    E.  Plaintiffs Fail to State a Substantive Due Process Claim. ............................................52

    F.  Plaintiffs' Equitable Estoppel Claims Fail...................................................................54

III. NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS
     IMPERMISSIBLE ................................................................................................57

CONCLUSION...............................................................................................................59

## TABLE OF AUTHORITIES

CASES                                                                                    PAGE(S)

*Aetna Life Ins. Co. of Hartford v. Haworth*,
    300 U.S. 227 (1937) .................................................................................... 57

*Alexander v. Sandoval*,
    532 U.S. 275 (2001) .................................................................................... 54

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
    367 F.3d 212 (4th Cir. 2004) ...................................................................... 13

*Am. Legal Found. v. FCC*,
    808 F.2d 84 (D.C. Cir. 1987) ...................................................................... 26

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
    526 U.S. 40 (1999) ...................................................................................... 48

*Angeles v. Dist. Dir., INS*,
    729 F. Supp. 479 (D. Md. 1990) ................................................................ 55

*Arizona v. United States*,
    567 U.S. 387 (2012) ........................................................................ 5, 17, 47

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ............................................................. *passim*

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................... 13

*Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*,
    524 F. Supp. 2d 642 (D. Md. 2007) ................................................... 13, 30

*Bd. of Regents v. Roth*,
    408 U.S. 564 (1972) .................................................................................... 48

*Beck v. McDonald*,
    848 F.3d 262 (4th Cir. 2017) ...................................................................... 12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .................................................................................... 13

*Bennett v. Spear*,
    520 U.S. 154 (1997) .................................................................................... 38

*Bi-Metallic Inv. Co. v. State Bd. of Equalization*,
    239 U.S. 441 (1915) ............................................................................ 50

*Botezatu v. INS*,
    195 F.3d 311 (7th Cir. 1999) ........................................................ 23, 24

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
    419 U.S. 281 (1974), *reh'g denied*, 420 U.S. 956 (1975) ................. 33, 34

*Califano v. Sanders*,
    430 U.S. 99 (1977) ............................................................................ 16

*Camp v. Pitts*,
    411 U.S. 138 (1973) .......................................................................... 32

*Chaudhry v. Holder*,
    705 F.3d 289 (7th Cir. 2013) .............................................................. 6

*Chavez v. Martinez*,
    538 U.S. 760 (2003) .................................................................... 52, 53

*Chen Zhou Chai v. Carroll*,
    48 F.3d 1331 (4th Cir. 1995) ........................................................ 41, 43

*Chevron U.S.A. Inc. v. Echazabal*,
    536 U.S. 73 (2002) ............................................................................ 33

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979) .......................................................................... 42

*Citizens for the Scenic Severn River Bridge, Inc. v. Skinner*,
    802 F. Supp. 1325 (D. Md. 1991),
    *aff'd*, No. 91-1267, 1992 WL 180138 (4th Cir. July 29, 1992) .............. 14

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) .................................................................... 16, 31

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ............................................................................ 27

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) .......................................................................... 25

*Clarke v. Secs. Indus. Ass'n*,
    479 U.S. 388 (1987) .......................................................................... 29

iv

*Cmty. Nutrition Inst. v. Young*,
   818 F.2d 943 (D.C. Cir. 1987) ................................................................ 43

*Conn. Bd. of Pardons v. Dumschat*,
   452 U.S. 458 (1981) .............................................................................. 52

*Consumer Energy Council of Am. v. FERC*,
   673 F.2d 425 (D.C. Cir. 1982) ................................................................ 42

*Cty. of Sacramento v. Lewis*,
   523 U.S. 833 (1998) .............................................................................. 53

*Dawkins v. Witt*,
   318 F.3d 606 (4th Cir. 2003) ............................................................ 55, 56

*Dawson v. Winter*,
   No. 06-cv-2885-CCB, 2007 WL 1610905 (D. Md. May 21, 2007),
   *aff'd*, 277 F. App'x. 297 (4th Cir. 2008) ................................................ 14

*Decatur Liquors, Inc. v. Dist. of Columbia*,
   478 F.3d 360 (D.C. Cir. 2007) ................................................................ 50

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
   No. 17-1320, 2017 WL 3141907 (D.D.C. July 24, 2017) ........................ 40

*Elgharib v. Napolitano*,
   600 F.3d 597 (6th Cir. 2010) .................................................................. 22

*Elk Grove Unified Sch. Dist. v. Newdow*,
   542 U.S. 1 (2004) .................................................................................. 26

*Emery Min. Corp. v. Sec'y of Labor*,
   744 F.2d 1411 (10th Cir. 1984) .............................................................. 54

*Fares v. U.S. Immigration & Naturalization Service*,
   50 F.3d 6 (4th Cir. 1995) ........................................................................ 39

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) .............................................................................. 32

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
   93 F.3d 897 (D.C. Cir. 1996) .................................................................. 29

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) .............................................................................. 32

*FW/PBS, Inc. v. City of Dallas,*
    493 U.S. 215 (1990) .................................................................. 25

*Gibraltar, P.R., Inc. v. Otoki Group, Inc.,*
    104 F.3d 616 (4th Cir. 1997) ................................................... 57

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) .................................................................. 26

*Hawkins v. Freeman,*
    195 F.3d 732 (4th Cir. 1999) ................................................... 53

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ........................................................... *passim*

*Heckler v. Cmty. Health Servs.,*
    467 U.S. 51 (1984) .................................................................... 55

*Hunt v. Wash. State Apple Adver. Comm'n,*
    432 U.S. 333 (1977) .................................................................. 28

*ICC v. Bhd. of Locomotive Eng'rs* (BLE),
    482 U.S. 270 (1987) ................................................. 15, 18, 21

*Invention Submission Corp. v. Rogan,*
    357 F.3d 452 (4th Cir. 2004) ................................................... 39

*Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n,*
    874 F.2d 205 (4th Cir. 1989) ................................................... 42

*Johnson v. Sessions,*
    No. 15-cv-3317-RDB, 2017 WL 1207537 (D. Md. Apr. 3, 2017) .......................................... 57

*Ky. Dep't of Corrs. v. Thompson,*
    490 U.S. 454 (1989) .................................................................. 49

*Lewis* v. Casey,
    518 U.S. 343 (1996) .................................................................. 58

*Lexmark Int'l, Inc. v. Static Control Components,*
    134 S. Ct. 1377 (2014) .............................................................. 26

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) .................................................................. 15

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) .................................................................................... 12, 41

*Mada-Luna v. Fitzpatrick,*
    813 F.2d 1006 (9th Cir. 1987) ............................................................................ 17

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ............................................................................................ 58

*Marsh v. United States,*
    No. 14-cv-3559-TDC, 2016 WL 247563 (D. Md. Jan. 20, 2016) ........................ 13

*Marshall Cty. Health Care Auth. v. Shalala,*
    988 F.2d 1221 (D.C. Cir. 1993) .......................................................................... 14

*McBurney v. Cuccinelli,*
    616 F.3d 393 (4th Cir. 2010) .............................................................................. 27

*Md. Highways Contractors Ass'n v. Maryland,*
    933 F.2d 1246 (4th Cir. 1991) ................................................................. 26, 27, 28

*Mississippi v. Johnson,*
    71 U.S. 475 (1867) .............................................................................................. 30

*Mondragon v. Holder,*
    706 F.3d 535 (4th Cir. 2013) .............................................................................. 52

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ............................................................................................ 58

*Motor Vehicle Mfrs. Ass'n v. State Farm,*
    463 U.S. 29 (1983) .............................................................................................. 31

*Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy,*
    851 F.2d 1424 (D.C. Cir. 1988) .......................................................................... 44

*Nat'l Mining Ass'n v. McCarthy,*
    758 F.3d 243 (D.C. Cir. 2014) ............................................................................ 42

*Nat'l Taxpayers Union, Inc. v. United States,*
    68 F.3d 1428 (D.C. Cir 1995) ............................................................................ 26

*New Hampshire v. Maine,*
    532 U.S. 742 (2001) ............................................................................................ 54

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ........................................................................ 27

*Omar v. McHugh*,
  646 F.3d 13 (D.C. Cir. 2011) ......................................................... 49

*OPM v. Richmond*,
  496 U.S. 414 (1990) ........................................................................ 54

*Pac. Gas & Elec. Co. v. FPC*,
  506 F.2d 33 (D.C. Cir. 1974) ..................................................... 42, 43

*Perales v. Casillas*,
  903 F.2d 1043 (5th Cir. 1990), *reh'g denied*, 912 F.2d 1465 (5th Cir. 1990) ......................... 17

*Perez v. Mortg. Bankers Ass'n*,
  135 S. Ct. 1199 (2015) ..................................................................... 55

*Reno v. Am.-Arab Anti-Discrimination Comm. (AADC)*,
  525 U.S. 471 (1999) ................................................................. *passim*

*Romiero De Silva v. Smith*,
  773 F.2d 1021 (9th Cir. 1985) ........................................................ 49

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
  713 F.3d 175 (4th Cir. 2013) .................................................. 25, 28, 29

*Sec'y of State for Defence v. Trimble Navigation Ltd.*,
  484 F.3d 700 (4th Cir. 2007) ......................................................... 13

*Sierra Club v. Larson*,
  882 F.2d 128 (4th Cir. 2011) .................................................... 15, 16

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ........................................................................ 26

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) .................................................................... 26, 28

*Smith v. Ashcroft*,
  295 F.3d 425 (4th Cir. 2002) ......................................................... 49

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ........................................................................ 28

*Syncor Int'l Corp. v. Shalala,*
    127 F.3d 90 (D.C. Cir. 1997) ................................................................ 43

*Syracuse Peace Council v. FCC,*
    867 F.2d 654 (D.C. Cir. 1989) .............................................................. 35

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ......................................................... *passim*

*Town of Castle Rock v. Gonzales,*
    545 U.S. 748 (2005)............................................................................. 48

*Town of Chester v. Laroe Estates, Inc.,*
    137 S. Ct. 1645 (2017)......................................................................... 58

*Troy Corp. v. Browner,*
    120 F.3d 277 (D.C. Cir. 1997), *reh'g denied*, 129 F.3d 1290 (D.C. Cir. 1997) ...................... 32

*United States v. Armstrong,*
    517 U.S. 456 (1996)...................................................................... *passim*

*United States v. Browning,*
    630 F.2d 694 (10th Cir. 1980) .............................................................. 55

*United States v. Owens,*
    54 F.3d 271 (6th Cir. 1995) ................................................................. 54

*United States v. Texas,*
    136 S. Ct. 2271 (2016)........................................................................... 9

*United States v. Texas,*
    137 S. Ct. 285 (2016)............................................................................. 9

*Vance v. CHF Int'l,*
    914 F. Supp. 2d 669 (D. Md. 2012) ...................................................... 12

*Vasquez v. Aviles,*
    639 F. App'x 898 (3d Cir. 2016) ........................................................... 22

*Veasey v. Perry,*
    29 F. Supp. 3d 896 (S.D. Tex. 2014) ..................................................... 46

*Velasco-Gutierrez v. Crossland,*
    732 F.2d 792 (10th Cir. 1984) .............................................................. 49

ix

*Warth v. Seldin,*
    422 U.S. 490 (1975) ............................................................... 25

*Washington v. Davis,*
    426 U.S. 229 (1976) ........................................................ 46, 47

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ............................................................... 52

*Watkins v. U.S. Army,*
    875 F.2d 699 (9th Cir. 1989) ........................................... 55, 56

*Yassini v. Crosland,*
    618 F.2d 1356 (9th Cir. 1980) ........................................ 50, 51


## STATUTES

5 U.S.C. § 552 ...................................................................... 39

5 U.S.C. § 553 ........................................................... 3, 41, 42

5 U.S.C. § 701 ................................................. 15, 16, 17, 24

5 U.S.C. § 702 ...................................................................... 29

5 U.S.C. § 704 ...................................................................... 38

5 U.S.C. § 706 ...................................................................... 31

6 U.S.C. § 202 ...................................................................... 22

6 U.S.C. § 251 ...................................................................... 22

6 U.S.C. § 557 ...................................................................... 22

8 U.S.C. § 1103 ...................................................................... 5

8 U.S.C. § 1154 ...................................................................... 6

8 U.S.C. § 1158 ...................................................................... 5

8 U.S.C. § 1182 ...................................................................... 5

8 U.S.C. § 1227 ...................................................................... 5

8 U.S.C. § 1229b ................................................................................................ 5

8 U.S.C. § 1252 ........................................................................................... *passim*

28 U.S.C. § 2201 .............................................................................................. 57

E-Government Act of 2002,
   Pub. L. No. 107-347, 116 Stat. 2899 ............................................... 40, 41


REGULATIONS

8 C.F.R. § 274a.12(c)(14) ................................................................................ 6


CONSTITUTION

U.S. Const. amend. V ....................................................................................... 48


FEDERAL RULES

Fed. R. Civ. P. 8(c) ......................................................................................... 54

Fed. R. Civ. P. 12 ................................................................. 12, 13, 14, 20, 29


OTHER AUTHORITIES

2 Richard J. Pierce, Jr., Administrative Law Treatise § 9.2 (5th ed. 2010) ................................. 50

Attorney General's Manual on the Administrative Procedure Act (1947) ............................ 42, 43

DHS, *Frequently Asked Questions: Rescission of Deferred Action for Childhood Arrivals*,
   (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-
   rescission-deferred-action-childhood-arrivals-daca) ................................................. 38

DHS, *Privacy Impact Assessment for the Deferred Action for Childhood Arrivals
   (DACA)* (Aug. 15, 2012),
   https://www.dhs.gov/sites/default/files/publications/privacy_pia_uscis_daca_0.pdf ............. 39

Press Release, DHS
   Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017),
   https://go.usa.gov/xncuM ................................................................................... 33

USCIS, *Deferred Action for Childhood Arrivals Frequently Asked Questions*,
   (last updated Oct. 6, 2017), https://go.usa.gov/xngCd ..................................... *passim*

USCIS, Policy Memorandum (Nov. 7, 2011),
   https://go.usa.gov/xncPK. ...................................................................................... 8, 38

U.S. Dep't of Justice, Office of Legal Counsel,
   *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens*
   *Unlawfully Present*, 38 Op. O.L.C. 1 (Nov. 19, 2014),
   https://www.justice.gov/file/179206/download ................................................... 21, 36

## INTRODUCTION

In 2012, then-Secretary of Homeland Security Janet Napolitano adopted the policy now known as DACA, or Deferred Action for Childhood Arrivals.  DACA made deferred action—a practice by which the Secretary exercises individualized enforcement discretion to issue a reversible notification that she does not intend to remove an alien for a set period of time—available to a class of unlawfully present aliens who came to the United States as children.  In 2014, one of her successors expanded the parameters of DACA and adopted a similar policy known as DAPA, or Deferred Action for Parents of Americans.  DAPA, if implemented, would have made deferred action available to unlawfully present aliens who were parents of U.S. citizens and lawful permanent residents.

DAPA, including its expansion of DACA, was promptly challenged by a coalition of 26 states.  Although then-Secretary of Homeland Security Jeh Johnson vigorously defended the policy, he was rebuffed at every turn:  the United States District Court for the Southern District of Texas issued a nationwide preliminary injunction; the United States Court of Appeals for the Fifth Circuit affirmed ("Fifth Circuit"), declaring the policy "manifestly contrary" to the Immigration and Nationality Act (INA); and an equally divided Supreme Court affirmed, leaving the injunction in place.

Armed with this victory, the states threatened to amend their complaint to challenge not just DAPA, but DACA as well, arguing that it suffers from the same infirmities.  In view of the substantial similarities between the two policies, the significant litigation risk posed by the Supreme Court and Fifth Circuit decisions, and the Attorney General's view that DACA was in fact unlawful, Acting Secretary of Homeland Security Elaine C. Duke was faced with two options.  On the one hand, she could wind down DACA in an orderly fashion, minimizing the disruption to

current recipients.  On the other, continued litigation would in all likelihood result in a nationwide injunction abruptly ending the policy, plunging its nearly 800,000 recipients into uncertainty.

The Acting Secretary chose the less disruptive option: an orderly process that formally rescinds DACA but allows it to sunset.  Under this Rescission Policy, no DACA recipient will have his or her deferred action abruptly terminated based solely on the Rescission Policy; instead, prior grants will remain valid for the remainder of their stated duration (generally two years) before ending consistent with their stated terms.  Any DACA recipient whose deferred action was due to expire within six months was given a month to request another two-year renewal.  And although the agency stopped accepting new DACA requests, it will finish processing those it had received when the rescission began.

In this case, Plaintiffs—numerous organizations and a group of individual former and current DACA recipients—challenge the Rescission Policy on a variety of statutory, constitutional, and common-law grounds, urging the Court to invalidate the agency's decision and enjoin the Acting Secretary from rescinding DACA.  Plaintiffs also request that the Court enjoin Defendants from disclosing the information of DACA recipients for immigration enforcement purposes in a manner inconsistent with the Department of Homeland Security's (DHS) information-sharing policy.  There is no basis to do so.

To begin, this case is not justiciable.  The Rescission Policy is a classic exercise of enforcement discretion "presumed immune from judicial review," *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985), and particularly unfettered in the context of immigration, *see Reno v. Am.- Arab Anti-Discrimination Comm.* (*AADC*), 525 U.S. 471, 487–92 (1999).  In fact, Congress has stripped district courts of jurisdiction to review "'no deferred action' decisions and similar discretionary determinations" such as the one here.  *AADC*, 525 U.S. at 485; *see* 8 U.S.C.

§ 1252(g).  At a minimum, the Plaintiff-organizations cannot proceed due to their lack of standing and a cause of action.  The Court should not permit Plaintiffs to circumvent these bedrock limits on judicial review.

On the merits, Plaintiffs' claims fail as a matter of law.  Their claim that the Rescission Policy is arbitrary and capricious under the Administrative Procedure Act (APA) because it was inadequately supported on the record is fundamentally misguided.  Agencies are always free to change course on policy matters so long as they provide a rational explanation.  Here, the Acting Secretary's explanation of her decision to rescind DACA amply meets that deferential standard, particularly given the adverse ruling from the Fifth Circuit and the Supreme Court's affirmance, the evident similarities between DACA and the policy that expanded DACA and created DAPA, the Attorney General's opinion that DACA was likewise unlawful, and the imminent risk of a nationwide injunction with potentially chaotic results.  Plaintiffs' claim that DHS's change in its policy regarding the use of DACA-related information is arbitrary and capricious and contrary to law under the APA is even more misguided.  Not only have Plaintiffs failed to allege sufficient facts to show a change in the information-sharing policy, but the policy is also clearly compliant with the Privacy Act and E-Government Act.  Because these claims can be resolved now based on the complaint, the documents incorporated therein by reference, and other judicially noticeable materials—including those in the administrative record, filed contemporaneously herewith—the Court should either uphold the Rescission Policy and grant this motion if it agrees that the record supports Defendants' position, or set aside the Rescission Policy if it disagrees.

Plaintiffs' notice-and-comment claim is equally unavailing.  The APA exempts "general statements of policy" from notice and comment, 5 U.S.C. § 553(b), and the Rescission Policy is a reordering of enforcement priorities that readily qualifies.  Indeed, DHS and the former

Immigration and Naturalization Service (INS) have adopted more than 20 deferred action or similar policies over the past 50 years. Few have gone through notice and comment, and there is no warrant for those procedures here. Nor does the Fifth Circuit's ruling that the states established a substantial likelihood of success on their claim that the promulgation of DAPA required notice and comment mean that the rescission of DACA and a return to the *status quo ante* must likewise meet these procedural demands. And in any event, if DACA's rescission required notice and comment, then DACA was void from the outset because its adoption would also have required notice and comment *a fortiori*.

Plaintiffs' equal protection claims get them no further. To the extent that a discriminatory motive claim—here, that the Policy was motivated by animus toward Mexican, Central American, and Latino immigrants—can ever be brought in a context like this one, *but see AADC*, 525 U.S. at 487–92, Plaintiffs must allege a clear case of discrimination given that they challenge an exercise of enforcement discretion, *see United States v. Armstrong*, 517 U.S. 456 (1996). They have failed to do so. Nor can Plaintiffs show that the Rescission Policy trenches on any fundamental right.

Plaintiffs' due process claims also cannot survive a motion to dismiss. DACA recipients have no protected liberty or property interest in the continued availability of deferred action, which is an exercise of prosecutorial discretion that confers no rights and is revocable at any time, or in the continuity of DHS's information-sharing policy, which has not changed since DACA was implemented in 2012. Moreover, Plaintiffs fail to identify any executive conduct that "shocks the conscience" in a manner that would support a claim for the violation of Plaintiffs' substantive due process rights.

Finally, Plaintiffs cannot state an equitable estoppel claim because estoppel does not run against the government. And even if they could, Plaintiffs fail to allege facts sufficient to make

out such a claim.

In sum, even if Plaintiffs' challenge were somehow justiciable, the assumption underlying it would compel dismissal. DAPA—including its expansion of DACA—was enjoined by the Fifth Circuit, and that holding was affirmed by the Supreme Court. The original DACA policy is materially indistinguishable as a legal matter. At bottom, Plaintiffs' argument is that, when making discretionary enforcement determinations, federal agencies must ignore the legal rulings and reasoning of federal courts. To state the premise of this claim is to refute it.

This case should be dismissed.

## BACKGROUND

### A.    Deferred Action Generally

The Secretary of Homeland Security is charged "with the administration and enforcement" of the INA along with "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). Under these laws, individuals are subject to removal if, among other things, "they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Arizona v. United States*, 567 U.S. 387, 396 (2012) (citation omitted); *see* 8 U.S.C. §§ 1182(a), 1227(a).

Due to resource constraints, the federal government cannot remove every removable alien, which means that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396 (citation omitted). DHS officials must first "decide whether it makes sense to pursue removal at all," *id.*, and once proceedings begin, they may decide to grant certain forms of discretionary relief expressly authorized by statute, such as asylum, parole, or cancellation of removal, 8 U.S.C. §§ 1158(b)(1)(A), 1182(d)(5)(A), 1229b. "At each stage" of the process, "the Executive has discretion to abandon the endeavor" entirely.

5

*AADC*, 525 U.S. at 483.

"One form of discretion the Secretary of Homeland Security exercises is 'deferred action,' which entails temporarily postponing the removal of individuals unlawfully present in the United States." *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (citation omitted), *cert. denied*, 136 S. Ct. 900 (2016).  Deferred action is a practice by which the Secretary exercises her "discretion to abandon" the removal process, and to notify an individual alien of a non-binding decision to forbear from seeking his removal for a set period.  *AADC*, 525 U.S. at 483; *see* 8 C.F.R. § 274a.12(c)(14) (describing "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority").  Although originally "developed without express statutory authority," *AADC*, 525 U.S. at 484, individualized deferred action has been recognized by Congress in certain circumstances inapplicable here, *see, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"), and described by the Supreme Court as an "exercise in administrative discretion," *AADC*, 525 U.S. at 484.  Deferred action (or a similar form of relief) dates back to the 1960s, *Arpaio*, 797 F.3d at 16, and DHS and the former INS have adopted over 20 such policies over the past 50 years—rarely through notice-and-comment rulemaking.

A variety of consequences may flow from a decision to defer removal action, including the ability to apply for work authorization, under DHS regulations not challenged here.  *See, e.g.*, 8 C.F.R. § 274a.12(c)(14).  That decision does not, however, confer lawful immigration status or provide any defense to removal.  *Cf. Chaudhry v. Holder*, 705 F.3d 289, 292 (7th Cir. 2013) (discussing difference between "unlawful presence" and "unlawful status").  To the contrary, deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'"  *Arpaio*, 797 F.3d at 17 (citation omitted).  DHS thus has

6

discretion to revoke deferred action unilaterally, for any reason or no reason, with or without notice, and an individual with deferred action remains removable at any time.  *See AADC*, 525 U.S. at 484–85.

### B.     DACA and DAPA

On June 15, 2012, then-Secretary Napolitano announced the policy now known as DACA, or Deferred Action for Childhood Arrivals.  *See* Admin. R. (AR) 1–3 (DACA Memo), ECF No. 26-1.  DACA made deferred action available to "certain young people who were brought to this country as children" in violation of the immigration laws.  DACA Memo at 1 (AR 1).  Following completion of a background check, successful requestors would receive deferred action for a period of two years, subject to indefinite renewal.  *Id.* at 2-3 (AR 2-3).

The DACA Memo stated that deferred action was an "exercise of prosecutorial discretion," *id.* at 1 (AR 1), and that requests for this relief would "be decided on a case by case basis," *id.* at 2 (AR 2).  Accordingly, the Memo provided that this grant of deferred action "confer[red] no substantive right, immigration status or pathway to citizenship.  Only the Congress, acting through its legislative authority, can confer these rights."  *Id.* at 3 (AR 3).

In public guidance published on the USCIS website, DHS also informed DACA requestors that information in their requests will be "protected from disclosure to [Immigration & Customs Enforcement (ICE)] and [U.S. Customs & Border Protection (CBP)] for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance" (for example, when issues of national security, public safety, or significant criminal activity are raised).  USCIS, *Deferred Action for Childhood Arrivals Frequently Asked Questions*,

No. 19 (last updated Oct. 6, 2017), https://go.usa.gov/xngCd (DHS DACA FAQ).[1] *see* USCIS, Policy Memorandum (Nov. 7, 2011), https://go.usa.gov/xncPK (Notice to Appear Guidance). DHS instructed, however, that this information-sharing policy creates no rights and "may be modified, superseded, or rescinded at any time without notice."  DHS DACA FAQ No. 19.

In 2014, then-Secretary Jeh Johnson expanded DACA and created a new, similar policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents, or DAPA. *See* AR 37–41 (DAPA Memo).  DAPA made deferred action available to certain unlawfully present aliens who were "parents of U.S. citizens or lawful permanent residents."  DAPA Memo at 3 (AR 39).  The DAPA Memo also expanded DACA by relaxing the eligibility criteria and extending the DACA renewal period from two to three years.  *Id.* at 3–4 (AR 39-40).

C.    The *Texas* Litigation

The DAPA Memo—including its expansion of DACA—was challenged by a coalition of 26 states, led by Texas, which sought to enjoin its implementation.  Affirming the district court, the Fifth Circuit upheld a nationwide preliminary injunction against implementation of the DAPA Memo.  *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).  Like the U.S. District Court for the Southern District of Texas, the Fifth Circuit held that the promulgation of the DAPA Memo was justiciable, in part because it believed that "the INA's intricate regulatory scheme for changing immigration classifications" allowed the court to determine whether DHS had exceeded its statutory authority.  *Id.* at 168.  It stressed, however, that "the *denial* of voluntary departure and work authorization" would be unreviewable.  *Id.*  Also like the district court, the Fifth Circuit held that the DAPA Memo failed to comply with the APA's notice-and-comment requirement, but emphasized that "DAPA is much more than a nonenforcement policy," and that "a traditional

---

[1] The DHS DACA FAQ has been incorporated by reference in Plaintiffs' Complaint.  *See, e.g.*, Pls.' Compl. ¶ 81, ECF No. 1.

nonenforcement policy would not necessarily be subject to notice and comment." *Id.* at 178 n.156.

And going beyond the district court, the Fifth Circuit held that DAPA was "manifestly contrary"

to the INA, in part because, unlike prior deferred-action policies that served as "bridges from one

legal status to another," DAPA awarded deferred action "to persons who have never had a legal

status and may never receive one." *Id.* at 184, 186 (footnotes omitted).

That decision was affirmed by an equally divided Supreme Court, *United States v. Texas*,

136 S. Ct. 2271 (2016) (per curiam), which later denied the government's request for a rehearing

upon confirmation of a ninth Justice, 137 S. Ct. 285 (2016), leaving the preliminary injunction in

place.   On November 18, 2016, the parties jointly moved the district court to stay merits

proceedings to allow them to evaluate "how they might choose to move forward" given the

upcoming "change in Administration[s]."   Joint Mot. to Stay Merits ¶ 2, *Texas v. United States*,

No. 14-cv-254 (S.D. Tex. Nov. 18, 2016), ECF No. 430.

Faced with continued litigation over a policy that had been enjoined by the courts, DHS

rescinded the DAPA Memo on June 15, 2017, including its provisions expanding DACA.  *See*

Memorandum for Kevin McAleenan, Acting Comm'r, U.S. Customs and Border Prot., et al., from

John F. Kelly, Sec'y of Homeland Sec., *Re: Rescission of November 20, 2014 Memorandum*

*Providing for Deferred Action for Parents of Americans and Lawful Permanent Residents* (June

15, 2017), AR 235-37.  Plaintiffs do not challenge that decision here.

On June 29, 2017, Texas and several other states threatened to amend their complaint to

also challenge directly the DACA Memo, arguing that it suffers from the same legal infirmities as

the DAPA Memo.  *See* AR 238–40 (Paxton Letter).

**D.      Rescission of DACA**

Faced again with the prospect of continued litigation, Acting Secretary Duke decided on

9

September 5, 2017, to wind down the DACA policy in an orderly fashion. *See* AR 252–56

(Rescission Policy or Policy). As the Acting Secretary explained, "[t]aking into consideration the

Supreme Court's and Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017

letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be

terminated." Rescission Policy at 4 (AR 255). Specifically, she quoted the Attorney General's

September 4 recommendation to rescind DACA, which explained that because DACA "has the

same legal and constitutional defects that the courts recognized as to DAPA, it is likely that

potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254). Invoking her

"authority in establishing national immigration policies and priorities," she rescinded the DACA

Memo, *id.* at 4 (AR 255), and instructed that deferred action should instead be provided "only on

an individualized[,] case-by-case basis," *id*. at 2 (AR 253).

     At the same time, to facilitate an orderly transition, the Rescission Policy provides that:

-     For *current DACA recipients*, DHS "[w]ill not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods." *Id*. at 4 (AR 255)

-     For *initial DACA requests*, DHS "[w]ill adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by [DHS] as of" September 5, 2017, but "[w]ill reject all DACA initial requests and associated applications for Employment Authorization Documents filed after" that date. *Id*.

-     For *DACA renewal requests*, DHS "[w]ill adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by [DHS] as of" September 5, 2017. Further, DHS will similarly adjudicate such requests and applications "from current beneficiaries whose [deferred action under DACA] will expire between [September 5, 2017,] and March 5, 2018[,] that have been accepted by the Department as of October 5, 2017." *Id*.

Like the DACA and DAPA Memos, the Rescission Policy notes that it "is not intended to, does

not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter." *Id*. at 5 (AR 256). Accordingly, DHS will "continue to exercise its discretionary authority to terminate or deny deferred action at any time." *Id*. at 4 (AR 255). The Rescission Policy says nothing about (and makes no changes to) DHS's information-sharing policy regarding information provided to USCIS in a DACA request.

### E.   The Instant Action

Plaintiffs in this lawsuit raise seven overlapping claims. First, they allege that the Rescission Policy is arbitrary and capricious and therefore violates the APA because it constitutes a change in agency policy without an adequate explanation or basis. *See* Pls.' Compl ¶¶ 162-66 (Count 4), ECF No. 1. Plaintiffs also claim that the alleged decision to change the information-sharing policy is contrary to law, as it purportedly violates the Privacy Act and E-Government Act. *See id.* ¶ 165(c). Finally, Plaintiffs incorporate by reference their constitutional claims under the rubric of the APA. *See id.* ¶ 165(a).

Second, Plaintiffs allege that the Rescission Policy violates the APA because it was issued without notice and comment. *See id.* ¶¶ 167-73 (Count 5).

Third, Plaintiffs allege that the rescission, as well as the alleged change to the information-sharing policy, violate procedural due process because DACA recipients will be deprived of their interests in their DACA status and in the protection of personal information provided with their DACA requests from alleged impermissible sharing without notice or an opportunity to be heard. *See id.* ¶¶ 129-43 (Count 1); *id.* 144-53 (Count 2).

Fourth, Plaintiffs suggest that the rescission, including the alleged change to the information-sharing policy, violate DACA recipients' substantive due process rights because those

decisions were arbitrary and thus not "fundamentally fair."  *See id.* ¶¶ 142, 152.

Fifth, Plaintiffs contend that the rescission violates the Equal Protection component of the Fifth Amendment's Due Process Clause because it was allegedly motivated by discriminatory animus against Mexican, Central American, and Latino immigrants.  *See id.* ¶¶ 154-61 (Count 3).

Sixth, Plaintiffs bring equitable estoppel claims, alleging that DACA recipients provided detailed personal information to the government and "rearranged their lives" based on the government's representations, but now face the possibility of removal and deportation.  *See id.* ¶¶ 174-81 (Count 6).  On that basis, Plaintiffs argue that the government should be equitably estopped from terminating DACA and from using DACA information for enforcement purposes except as previously authorized under DACA.  *See id.* ¶ 179.

Finally, Plaintiffs seek a declaratory judgment that DACA was lawful.  *See id.* ¶¶ 182-85 (Count 7).

Plaintiffs seek declaratory and injunctive relief on their claims, as well as any further relief the Court deems just and proper.  *See id.* at 60, Relief Requested.

## LEGAL STANDARDS

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), a plaintiff must establish a court's jurisdiction through sufficient allegations.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  When considering such a motion, the Court must "accept as true . . . allegations for which there is sufficient factual matter to render them plausible on their face."  *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (brackets and citation omitted), *cert. denied sub nom. Beck v. Shulkin*, 137 S. Ct. 2307 (2017).  The Court need not, however, "apply the same presumption of truth to conclusory statements and legal conclusions contained in . . . [the] complaint."  *Id.* (citation omitted).  In evaluating subject-matter jurisdiction, the court may, when

12

necessary, "look beyond the pleadings and the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Vance v. CHF Int'l*, 914 F. Supp. 2d 669, 676 (D. Md. 2012) (citation omitted).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "plausibility" standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id*. (quoting *Twombly*, 550 U.S. at 557). While the Court accepts well-pleaded factual allegations as true, "mere conclusory statements" and "legal conclusion[s] couched as . . . factual allegation[s]" are "disentitle[d] . . . to th[is] presumption of truth." *Id*. at 678, 681 (citation omitted). Although the Court generally may not rely on material outside the pleadings under Rule 12(b)(6), it may consider any "matters of public record" of which the court may take judicial notice, *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (citations omitted), as well as evidence attached to the motion to dismiss "[if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity," *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (alteration in original) (citation omitted).

With respect to Plaintiffs' APA claims, a court may adjudicate the issues on either a motion to dismiss under Rule 12(b)(6) or on a motion for summary judgment. *See Marsh v. United States*, No. 14-cv-3559-TDC, 2016 WL 247563, at *2 (D. Md. Jan. 20, 2016) (construing defendants' motion as it relates to plaintiff's APA claims as a Rule 12(b)(6) motion where, beyond the

13

complaint and its attachments, the only documents submitted were matters of public record); *see also Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 660 (D. Md. 2007) (finding that, because APA claims are adjudicated on the basis of an existing administrative record, without a trial or discovery, such claims can also be properly decided on summary judgment). "The entire case on review is a question of law, and only a question of law. And because a court can fully resolve any purely legal question on a motion to dismiss, there is no inherent barrier to reaching the merits at the 12(b)(6) stage . . . and there is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993) (citation omitted). Under these circumstances, judicial review is based on the agency record and presents primarily a legal question. *See Citizens for the Scenic Severn River Bridge, Inc. v. Skinner,* 802 F. Supp. 1325, 1332 (D. Md. 1991), *aff'd,* No. 91-1267, 1992 WL 180138, (4th Cir. July 29, 1992); *see also Dawson v. Winter*, No. 06-cv-2885-CCB, 2007 WL 1610905, at *4 (D. Md. May 21, 2007) ("Like appellate courts, district courts . . . address a predominantly legal issue: Did the agency 'articulate a rational connection between the facts found and the choice made?'") (citation omitted), *aff'd,* 277 F. App'x 297 (4th Cir. 2008).

## ARGUMENT

In seeking to invalidate the Rescission Policy, Plaintiffs ask the Court to override the Acting Secretary's judgment about how to exercise her discretion in enforcing the Nation's immigration laws. The Court need not consider this extraordinary request, however, because this case is not justiciable. The exercise of enforcement discretion in the Rescission Policy is committed to agency discretion by law and is therefore unreviewable. In fact, Congress has gone so far as to strip district courts of jurisdiction over "no deferred action" decisions such as the one

here.  At a minimum, the Plaintiff-organizations lack standing.  And in all events, Plaintiffs fail to state a claim.  This case should therefore be dismissed.

I.     THIS CASE IS NOT JUSTICIABLE.

    A.     The Rescission Policy Is Not Justiciable Because this Immigration Enforcement Policy Is a Matter Committed to Agency Discretion by Law.

    **1.**  The APA bars judicial review of certain categories of decisions that "courts traditionally have regarded as 'committed to agency discretion.'"  *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (quoting 5 U.S.C. § 701(a)(2)).  These decisions are typically unreviewable because there exists "no meaningful standard against which to judge the agency's exercise of discretion" in these areas.  *Chaney*, 470 U.S. at 830; *see Sierra Club v. Larson*, 882 F.2d 128, 133 (4th Cir. 1989) (applying *Chaney* in precluding review of an agency's discretionary decision not to seek enforcement of a statute).  This bar applies even when "the agency gives a 'reviewable' reason for otherwise unreviewable action."  *ICC v. Bhd. of Locomotive Eng'rs* (*BLE*), 482 U.S. 270, 283 (1987).

    Among the decisions committed to executive discretion are "an agency's exercise of enforcement power."  *Chaney*, 470 U.S. at 833.  Such judgments involve "a complicated balancing of a number of factors which are peculiarly within [an agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall priorities, and, indeed, whether the agency has enough resources to undertake the action at all."  *Id.* at 831.  As there is "no meaningful standard against which to judge the agency's exercise of discretion" in weighing these factors, an agency's exercise of enforcement powers is "presumed immune from judicial review under § 701(a)(2)."  *Id.* at 830, 832.

    For instance, an "agency[] decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."  *Id.* at 831

(citation omitted).  After all, "[a]n agency generally cannot act against each technical violation of the statute it is charged with enforcing," and it "is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities."  *Chaney*, 470 U.S. at 831–32; *see Sierra Club*, 882 F.2d at 133 (recognizing separation of powers underpinning of the presumption of the unreviewability of agency decisions not to pursue enforcement).  Thus, for example, the Supreme Court in *Chaney* held that the FDA's general policy of refusing to exercise its enforcement authority with respect to the use of approved drugs in lethal injections was committed to the agency's discretion under § 701(a)(2).  *See* 470 U.S. at 824–25, 837–38 (finding FDA's refusal to take the enforcement actions requested by respondents, including broad measures that would have impacted an entire drug market segment, was not subject to judicial review).

An agency's decision *to* enforce the law against a particular individual is likewise presumptively unreviewable.  Just as "the decision whether or not to prosecute" presumptively "rests entirely in [the prosecutor's] discretion," *Armstrong*, 517 U.S. at 464 (citation omitted), an agency's decision to bring a civil enforcement action is generally not open to judicial scrutiny.  Considerations such as "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall policies" are equally present in enforcement decisions as in nonenforcement decisions, *Chaney*, 470 U.S. at 831, and judicial intrusion into the deliberative process is equally improper, *see Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("there must be a strong showing of bad faith or improper behavior before" courts can engage in an "inquiry into the mental processes of administrative decisionmakers" (citation omitted)), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

This presumption of nonreviewability applies with particular force when it comes to

immigration. On top of the general concerns implicated in any enforcement decision, the enforcement of immigration laws "embraces immediate human concerns," and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that [immigration] enforcement policies are consistent with this Nation's foreign policy." *Arizona*, 567 U.S. at 396–97. Given these realities, the "broad discretion exercised by immigration officials" has become a "principal feature of the removal system." *Id.* at 396. One form of that broad discretion is deferred action, a "discretionary and reversible" decision to notify an alien that DHS has chosen not to seek his removal for a specific period of time. *Arpaio*, 797 F.3d at 17; *see supra* at 5-6. Like other agency nonenforcement decisions, grants of deferred action rest on a complex balancing of policy considerations that cannot serve as "meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830. Such determinations are thus presumptively unreviewable. *See Arpaio*, 797 F.3d at 16.

The converse is equally true: *denials* of deferred action are also committed to agency discretion. *See AADC*, 525 U.S. at 485 (treating "'no deferred action' decisions" as "discretionary determinations"). Because "[g]ranting an illegally present alien permission to remain and work in this country" is fundamentally "a dispensation of mercy," there are "no standards by which judges may patrol its exercise." *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (INS's decision not to grant pre-hearing voluntary departures and work authorizations to a group of aliens non-justiciable), *reh'g denied*, 912 F.2d 1465 (5th Cir. 1990). To be sure, a decision "not to grant deferred action status to a particular alien is not precisely a 'decision not to take enforcement action,'" but that does not obscure the fact that "many of the same factors" underlying the latter determinations usually play a role in the former. *Mada-Luna v. Fitzpatrick*, 813 F.2d 1006, 1011 n.4 (9th Cir. 1987) ("denials of deferred action status applications are not subject to judicial

17

review" under § 701(a)(2)).

**2.**   As an exercise of enforcement discretion, the Rescission Policy is a classic example of a discretionary determination that is entrusted to the agency alone.  Indeed, any attempt to judge the Policy would quickly entangle this Court in the sort of complex and discretionary balancing that has been entrusted by Congress to the Executive Branch.  For example, the judiciary is institutionally ill-equipped to assess whether the Acting Secretary's decision to change "immigration policies and priorities" by rescinding DACA, Rescission Policy at 4 (AR 255), was an appropriate use of "the Department's limited resources," *Arpaio*, 797 F.3d at 16.  Nor is this Court well suited to second-guess the Acting Secretary's balancing of the costs and benefits of keeping the policy in place, on the one hand, with the risk of "potentially imminent litigation" that could throw DACA into immediate turmoil, on the other.  Rescission Policy at 3 (AR 254) (citation omitted).

To be sure, the Acting Secretary *also* gave substantive legal reasons for her decision, *id.* at 2–4 (AR 253–55), but that does not render it justiciable.  That is because the Supreme Court has rejected the proposition that if an "agency gives a 'reviewable' reason for otherwise unreviewable action, the action becomes reviewable." *BLE*, 482 U.S. at 283.  For example, "a common reason for failure to prosecute an alleged criminal violation is the prosecutor's belief (sometimes publicly stated) that the law will not sustain a conviction," which "is surely an eminently 'reviewable' proposition, in the sense that courts are well qualified to consider the point." *Id.*  But that does not change the fact that "it is entirely clear that the refusal to prosecute cannot be the subject of judicial review." *Id.*  Likewise, the Acting Secretary's discussion of the question of DACA's legality does not transform her generally unreviewable exercise of enforcement discretion into a matter fit for judicial scrutiny.

Indeed, reviewing the Rescission Policy would be particularly inappropriate given the wide discretion the Secretary enjoys in the enforcement of the immigration laws.  In *AADC*, the Supreme Court held that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation," 525 U.S. at 488 (footnote omitted), subject to the "possib[le]" exception "of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome," *id.* at 491.  The reason for this highly restrictive rule is that the concerns raised by challenges to the Executive's enforcement discretion "are greatly magnified in the deportation context."  *Id.* at 490.  An alien subject to removal is, by definition, in continuing violation of the INA, and judicial interference with the Executive's enforcement therefore would compel the Executive to disregard such ongoing violations.   The "delay" associated with challenges to discretionary decisions not to forgo enforcement is more likely than in the criminal arena, as "[p]ostponing justifiable deportation (in the hope that the alien's status will change … or simply with the object of extending the alien's unlawful stay) is often the principal object of resistance to a deportation proceeding," and "the consequence is to permit and prolong a continuing violation" of the immigration laws.  *Id.* at 490. For another, reviewing immigration decisions may involve "not merely the disclosure of normal domestic law enforcement priorities and techniques, but often the disclosure of foreign-policy objectives" or other sensitive matters as well.  *Id.* at 490–91.  Finally, the idea that "an ongoing violation of United States law . . . must be allowed to continue because it has been improperly selected is not powerfully appealing."  *Id.* at 491 (emphasis omitted).

**3.** Notwithstanding these clear concerns that warrant a presumption against judicial review, the court in *Batalla Vidal v. Duke*, a related case presenting similar challenges to the Rescission Policy, held that the Acting Secretary's decision to rescind DACA "was not itself a presumptively

19

unreviewable exercise of enforcement discretion." Mem. & Order at 23, *Batalla Vidal v. Duke*, No. 16-cv-4756 (E.D.N.Y. Nov. 9, 2017), ECF No. 104 (*Batalla Vidal* Mem. & Order) (granting in part and denying in part Defendants' Rule 12(b)(1) motion and reserving ruling on Defendants' Rule 12(b)(6) motion). In so holding, however, the court incorrectly labeled the Acting Secretary's decision to rescind DACA as a "constrain[t]" on DHS's prosecutorial discretion with respect to DACA recipients, *see id.* at 24, and incorrectly described the rescission as subjecting "individuals who previously enjoyed some protection from removal to coercive state authority," *id.* at 25. To the contrary, the Acting Secretary's decision to rescind DACA was an act of discretion in and of itself, which is best described as reordering the agency's enforcement priorities in light of litigation risk. *See Arpaio*, 797 F.3d at 17 (citation omitted) (deferred action is "discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship'"). It is, therefore, equally entitled to a presumption of nonreviewability as the enforcement and non-enforcement cases that the Supreme Court has found are committed to executive discretion. *See, e.g.*, *Chaney*, 470 U.S. at 832-33; *Armstrong*, 517 U.S. at 464; *AADC*, 525 U.S. at 485.

Moreover, the court in *Batalla Vidal* found the Rescission Policy reviewable based upon its misinterpretation that the Acting Secretary "exclusively" relied on a legal determination that DACA was unlawful, a rationale for which the court held there was "law to apply." *Batalla Vidal* Mem. & Order at 22 (citing AR 251 (Sessions Letter); AR 253-55 (Rescission Policy)). The Attorney General's determination that DACA was unconstitutional was but one factor that the Acting Secretary considered. As the Rescission Policy makes clear, in determining to wind down the policy pursuant to the parameters laid out in the memorandum, the Acting Secretary also relied on the history of the *Texas* litigation and potential risk it posed to the continuation of DACA, as well as the self-evident complexities associated with ending DACA, a policy that impacts nearly

20

800,000 individuals.  Rescission Policy at 2-4 (AR 253-55).  The balancing of those considerations

is not amenable to review in light of the sources cited by the *Batalla Vidal* court, such as statutory

text, the history of the use of deferred action, or the Office of Legal Counsel (OLC) opinion.[2]

*Batalla Vidal* Mem. & Order at 22.

The court's reasoning is also contrary to *BLE*, which makes clear that enforcement

decisions are committed to agency discretion even where they rest on broad legal policy judgments

rather than individualized considerations.  *Id.* at 283.  *BLE* specifically gave the example of a

criminal prosecutor's decision not to prosecute a certain category of crimes based on the

prosecutor's view of the legal merits of the prosecution.  *Id.*  Although a court may be qualified to

consider those legal merits, "it is entirely clear that the refusal to prosecute cannot be the subject

of judicial review."  *Id.*   Just as in the analogy provided in *BLE*, the Acting Secretary's

consideration, among other things, of the lawfulness of the DACA policy merely explains how she

plans to exercise her discretion to rescind the policy and that decision, regardless of the court's

ability to review the legal merits of DACA, is nonreviewable.  *Id.*  *BLE*'s point applies *a fortiori*

in the immigration context where the Supreme Court has emphasized the problems with

questioning the government's exercise of its broad discretion.  *See AADC*, 525 U.S. at 489-90.

**B.**     **The INA Deprives District Courts of Jurisdiction over Challenges to Denials of Deferred Action.**

Not only is the denial of deferred action committed to agency discretion under the APA,

but the INA itself deprives federal district courts of jurisdiction over challenges to such denials

altogether.   As the Supreme Court explained in *AADC*, the Executive's "exercise of [its]

discretion" in granting deferred action in some circumstances had "opened the door to litigation

---

[2] U.S. Dep't of Justice, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*, 38 Op. O.L.C. 1, 18 n.8 (Nov. 19, 2014) (OLC Op.), https://www.justice.gov/file/179206/download.

. . . where" the Executive had "chose[n] *not* to exercise it." *Id.* at 484.  Specifically, some courts had entertained challenges to "the refusal to exercise such discretion" on various bases such as "selective prosecution," the use of "arbitrary or unconstitutional criteria, or on other grounds constituting abuse of discretion." *Id.* at 485 (citation omitted).  To address what the Supreme Court referred to as this "particular evil"—*i.e.*, "attempts to impose judicial constraints upon prosecutorial discretion"—Congress enacted 8 U.S.C. § 1252(g).  *AADC*, 525 U.S. at 485 & n.9.

Section 1252(g) commands that, outside of petitions for review from final removal orders and certain other limited channels for review, "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the [Secretary of Homeland Security[3]] to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."  These were "the acts … that had prompted challenges to the … exercise of prosecutorial discretion" in denying deferred action, and thus § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed"—namely, an individual removal proceeding.  *AADC*, 525 U.S. at 485 & n.9.

Denials of deferred action—including under DACA itself—thus fall outside the jurisdiction of the federal courts.  *See, e.g.*, *Vasquez v. Aviles*, 639 F. App'x 898, 901 (3d Cir. 2016) ("[Section] 1252(g) … deprives all courts of jurisdiction to review a denial of DACA relief because that decision involves the exercise of prosecutorial discretion not to grant a deferred

---

[3] *See* 6 U.S.C. § 557; *see also id.* §§ 202, 251; *Elgharib v. Napolitano*, 600 F.3d 597, 607 (6th Cir. 2010) ("[U]nder 6 U.S.C. § 557, . . . the statutory reference to the 'Attorney General' in § 1252(g) now means 'Secretary of DHS.'").

action."); *Botezatu v. INS*, 195 F.3d 311, 314 (7th Cir. 1999) ("Review of refusal to grant deferred action is … excluded from the jurisdiction of the district court.").

Although the court in *Batalla Vidal* held that § 1252(g) did not divest the court of jurisdiction to review the Rescission Policy, its holding was based on an overly narrow reading of the statute. *Batalla Vidal* Mem. & Order at 28-31. Specifically, it held that § 1252(g) was inapplicable because the plaintiffs' challenge to the Rescission Policy did not arise from one of the three enumerated immigration actions that trigger the statute. *Id.* at 29-30. To be sure, Plaintiffs brought this challenge to the Rescission Policy before any removal proceedings took place, but that is beside the point. The decision not to continue deferred action is an ingredient to the commencement of enforcement proceedings at some future date, and a person cannot circumvent the bar in 8 U.S.C. § 1252(g) by singling out that single step for a preemptive challenge. Indeed, the Supreme Court acknowledged that the apparent purpose of § 1252(g) was to protect "'no deferred action' decisions and similar discretionary determinations," like the Rescission Policy, by preventing challenges to such decisions in "separate rounds of judicial intervention" outside the process designed by Congress, as is the case here. *AADC*, 525 U.S. at 485. If aliens (or entities suing on their behalf) could evade § 1252(g)'s bar simply by challenging the forthcoming expiration of deferred action before actual removal proceedings (if any) began, then jurisdiction would turn on a race to the courthouse. Such a framework would create the perverse incentive for DHS to begin removal proceedings immediately rather than to allow, as it did here, for rolling expirations of deferred action status over a two-and-a-half year period. There is no indication that Congress sought to enact such a nonsensical regime. Instead, § 1252(g) precludes review of either "the decision *or action*" by the Acting Secretary "to commence

23

proceedings," and thereby sweeps in the Rescission Policy.  (emphasis added).[4]

Moreover, the *Batalla Vidal* court ignored that at least one court has applied § 1252(g) to actions that are "not … on the list of precluded items"—*i.e.*, "decisions to commence proceedings, adjudicate cases, or execute removal orders"—in order to effectuate the object of this jurisdictional bar.  *Botezatu*, 195 F.3d at 313–14.  In *Botezatu*, the Seventh Circuit rejected an alien's argument that a court could review the Executive's "refusal to … grant him humanitarian parole or deferred action" simply because that denial occurred in "post-deportation procedures."  *Id.* at 313–14.  As the Seventh Circuit explained, because *AADC* broadly held that "'no deferred action' decisions and similar discretionary determinations' [were] governed by § 1252(g)," that jurisdictional bar should apply regardless of *when* such determinations occurred.  *Id.* at 314 (quoting *AADC*, 525 U.S. at 485).  Thus, just as an alien (or entity suing on his behalf) cannot circumvent § 1252(g) by bringing a challenge to a denial of deferred action on the back-end, Plaintiffs' broad front-end assault on the Rescission Policy is beyond the jurisdiction of this Court.  At the very least, 8 U.S.C. § 1252(g) reinforces the conclusion that enforcement discretion under the INA is at the core of unreviewable matters committed to agency discretion by law under the APA.  5 U.S.C. § 701(a)(2).

---

[4] The court in *Batalla Vidal* also held that § 1252(g) did not divest the court of jurisdiction to hear claims of the non-individual plaintiffs (several States and an advocacy organization) because the statute bars only suits by or on behalf of an alien.  *Batalla Vidal* Mem. & Order at 31.  However, the fundamental concerns of § 1252(g) apply no matter if the challenge is brought by the alien himself or an outside entity (on its own behalf or on behalf of the alien).  *See AADC*, 525 U.S. at 485.  In either context, the purpose of the jurisdictional bar is to prevent separate judicial review, like the instant suit, outside the streamlined process Congress intended.  *Id.*  Furthermore, like the American-Arab Anti-Discrimination Committee in *AADC*, itself an organizational plaintiff, the Plaintiff-organizations in this matter are for purposes of § 1252(b) suing "on behalf" of an alien because the relief they seek will benefit the individual Plaintiffs and all other DACA recipients.  To the extent the Plaintiff-organizations would benefit from an order setting aside the Rescission Policy, *but see infra* § I.C.1(a), their benefit would be only an indirect and incidental effect of the relief for DACA recipients.

## C.     The Plaintiff-Organizations' Claims Are Not Cognizable.

### 1.     Plaintiffs Lack Article III Standing.

The Plaintiff-organizations do not expressly identify the capacity in which they bring this suit.  Regardless, they make little or no attempt to identify any injury whatsoever to their own interests as organizations, nor do they specifically identify any individual members on whose behalf the organizations are suing.  Their allegations are, therefore, patently insufficient to establish standing.

#### a.     Plaintiffs lack organizational standing.

To establish Article III standing, an organization suing on its own behalf must meet the familiar standing requirements that apply to individuals: (1) injury in fact; (2) causation; and (3) redressability.  *See, e.g.*, *S. Walk at Broadlands Homeowner's Ass'n v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).  As the parties invoking the Court's jurisdiction, the Plaintiff-organizations bear the burden "clearly to allege facts demonstrating" each of these three elements.  *Warth v. Seldin*, 422 U.S. 490, 518 (1975).  The necessary facts "must affirmatively appear in the record" and "cannot be inferred argumentatively from averments in the pleadings." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990).  The standing inquiry is "especially rigorous" where, as here, "reaching the merits of the dispute would force [a court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted).

Plaintiffs' Complaint fails at the first step of the analysis.  Here, the Plaintiff-organizations were not the object of any government policy.  Instead, a generous reading of the Complaint reveals, at most, their dissatisfaction with the alleged effects of a policy decision on undocumented immigrants who came to the United States as children.  Pls.' Compl. ¶¶ 1-2; *see also* ¶¶ 23-24, 26.

But the federal courts do not sit to air arguments "at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences," *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972), or to resolve "generalized grievances more appropriately addressed in the representative branches," *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (citation omitted), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components*, 134 S. Ct. 1377 (2014). Thus, a "mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem," is insufficient to create standing. *Sierra Club*, 405 U.S. at 739. Accordingly, an "organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Article III." *Md. Highways Contractors Ass'n v. Maryland,* 933 F.2d 1246, 1251 (4th Cir. 1991) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

Nor do the Plaintiff-organizations show any injury to their own activities. To satisfy Article III under this theory of standing, an organization must demonstrate a "concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources—constitut[ing] . . . more than simply a setback to the organization's abstract social interests." *Nat'l Taxpayers Union v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (alterations in original) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "Such a showing requires 'more than allegations of damage to an interest in "seeing" the law obeyed or a social goal furthered.'" *Id.* (quoting *Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987)). Rather, "the organization must allege that discrete programmatic concerns are being directly and adversely affected" by the challenged action. *Id.* (alteration and citation omitted). Here, the vast majority of the Plaintiff-organizations do not even try to meet this test. *See* Pls.' Compl. ¶¶ 30-37. They point to no interference with any immigration-related

26

programming and allege no new expenditure of funds.  The Plaintiff-organizations thus fall well short of their burden to establish a cognizable injury to their own interests.  Their claims of organizational standing should be rejected out of hand.

Only Plaintiff CASA de Maryland, Inc. (CASA) attempts to allege an injury to its own activities, claiming that, as a result of the Rescission Policy, it "reallocate[d] significant resources" to "counsel and assist" eligible individuals to renew their DACA by the October 5, 2017 deadline, "depriving community members of access to other vital legal services."  Pls.' Compl. ¶ 29.  Even assuming this allegation of injury is sufficient for purposes of organizational standing, it fails to allege an ongoing injury that would entitle CASA to the injunctive relief it seeks.  *McBurney v. Cuccinelli*, 616 F.3d 393, 410-11 (4th Cir. 2010) ("to maintain standing for declaratory and injunctive relief" a plaintiff must "plead an[ ] ongoing injury" (emphasis omitted)).  To satisfy the case or controversy requirement of Article III in an action seeking only *prospective* relief through an injunction or declaratory judgment, a plaintiff must show exposure to illegal conduct accompanied by "continuing, present adverse effects."  *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974); *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) ("Absent a sufficient likelihood that he will again be wronged in a similar way, [plaintiff] is no more entitled to an injunction than any other citizen").  Here, the sole allegation of injury that may entitle CASA to organizational standing relates to an alleged diversion of resources to assist individuals with DACA renewal requests, a purported injury that necessarily ceased once that October 5 renewal deadline set forth in the Rescission Policy passed.  In the absence of an ongoing injury to its own activities, consisting of more than harm to its "abstract concern" for immigrant rights, CASA lacks organizational standing to obtain the prospective injunctive relief it seeks.  *Md. Highways Contractors Ass'n,* 933 F.2d at 1251; *McBurney*, 616 F.3d at 411.

### b.      Plaintiffs lack representational standing.

Because the Plaintiff-organizations do not sufficiently allege injury to themselves in their own right, "they can establish standing only as representatives of those of their members who have been injured in fact." *Simon*, 426 U.S. at 40 (citation omitted).  But the organizations fail to identify any particular member allegedly harmed by the policy change, and that alone dooms any claim of representational standing.

To plead representational standing, the Plaintiff-organizations must allege that "(1) [their] own members would have standing to sue in their own right; (2) the interests the organization[s] seek[] to protect are germane to the organization[s'] purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *Md. Highways Contractors Ass'n,* 933 F.2d at 1251 (citing *Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 343 (1977)).  To satisfy the first of these prongs, an association must at the very least name a specific member with standing for each claim it asserts.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (association must "name the individuals who were harmed"); *S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 184 (association must "identify a single *specific member*" who was injured).

Here, most of the Plaintiff-organizations make no mention whatsoever of any member allegedly harmed by the Rescission Policy, let alone identifying any such specific member.  *See* Pls.' Compl. ¶¶ 30-32, 34-37.  Only CASA and OneAmerica even broach the topic, alleging that CASA "counts more than 2,300 DACA beneficiaries as members," *id.* ¶ 29, and that "many [DACA recipients] are active OneAmerica . . . members," *id.* ¶ 33.  These general allegations, however, do not name any particular member or members and, thus, also do not rise to the specificity required to plead representational standing.  *See Summers*, 555 U.S. at 498.  Moreover,

28

CASA and OneAmerica's allegations establish that neither organization would meet the limited exception to *Summers*' identification requirement for cases in which all members of an organization are harmed.  *See id.* at 498-99; *S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 184.  *See also* Pls.' Compl. ¶ 29 (claiming that only 2,300 of more than 90,000 members are DACA recipients); *id.* ¶ 33 (stating "many" but not all One America members are DACA recipients).  Accordingly, the Court should likewise reject any claim of representational standing.

### 2.  Plaintiffs Lack a Cause of Action Under the APA.

Even if the Plaintiff-organizations could establish Article III standing, they would lack a cause of action under the APA.  The APA does not "allow suit by every person suffering [an] injury in fact."  *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 395 (1987).  Rather, it provides a cause of action only to a plaintiff "adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.  To be "aggrieved" in this sense, "the interest sought to be protected by the complainant [must] be arguably within the zone of interests to be protected or regulated by the statute … in question."  *Clarke*, 479 U.S. at 396 (brackets and citation omitted).  Here, no provision of the INA even arguably protects the Plaintiff-organizations from bearing any incidental effects of a denial of deferred action.[5]  *Cf. Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 899 (D.C. Cir. 1996) (dismissing under zone-of-interests a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers).

---

[5] The court in *Batalla Vidal* held that whether the non-individual plaintiffs asserted interests falling within the "zone of interests" protected by the APA was not a jurisdictional or justiciability question, but rather an issue of prudential standing properly addressed under Rule 12(b)(6).  *Batalla Vidal* Mem. & Order at 46-47.  Because the court reserved its ruling on Defendants' motion to dismiss for failure to state a claim, it did not address this argument.

### D. The Government's Justiciability Objections Are Not Inconsistent with the Acting Secretary's Reliance on the Fifth Circuit's Decision.

Although the Fifth Circuit in *Texas* included holdings that a challenge to the DAPA Memo was reviewable, 809 F.3d at 165–70, neither that decision nor Acting Secretary Duke's reliance on it forecloses the government from arguing here that the DACA Rescission Policy is unreviewable. First, neither the Acting Secretary's memo nor the Attorney General's letter expressly relied upon or gave any indication that they agreed with the Fifth Circuit's justiciability rulings, and it was far from arbitrary and capricious for the Acting Secretary to weigh litigation risk based on judicial decisions without regard to whether those courts had been correct to assert jurisdiction in the first place. Second, officers of the Executive Branch have an independent duty to consider the legality of their policies regardless of whether they are judicially reviewable; all swear an oath to uphold the United States Constitution. *See Mississippi v. Johnson*, 71 U.S. 475, 499 (1867) (Take Care Clause imposes a generally nonjusticiable duty on the Executive Branch). Finally, even if courts could have reviewed the adoption of DACA as "an abdication of [DHS's] statutory responsibilities," *Chaney*, 470 U.S. at 833 n.4, that would not make the Rescission Policy, a classic exercise of agency enforcement discretion, open to challenge. After all, the Fifth Circuit itself emphasized that "DAPA is much more than a nonenforcement policy, which presumptively would be committed to agency discretion," *Texas*, 809 F.3d at 178 n.156, and pointed out that a "*denial* of voluntary departure and work authorization" by DHS would have been nonjusticiable, *id.* at 168. Denials of deferred action under a return to a more traditional enforcement policy should be treated no differently.

### II. PLAINTIFFS FAIL TO STATE A CLAIM.

Even if Plaintiffs' claims were justiciable, the Court should dismiss this case in its entirety

for failure to state a claim.[6]

### A.    Plaintiffs Fail to State an APA Claim.

#### 1.    The Acting Secretary rationally explained her decision to wind down DACA, particularly given the imminent risk of a nationwide injunction.

Plaintiffs contend that the Rescission Policy is arbitrary and capricious because it constitutes a change in agency policy without an adequate explanation.[7]  Pls.' Compl. ¶ 165. Plaintiffs' allegations misapprehend the nature of the inquiry under the APA.  It is black-letter law that agencies are free to change course on policy matters so long as they provide a rational explanation.  Here, the Acting Secretary's explanation of her decision to rescind DACA readily meets this deferential standard, particularly in view of the imminent risk of a nationwide injunction, which could have prompted an immediate—and chaotic—end to the policy.

**1.** Under the APA, an agency's decision must be upheld unless arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also id.* § 706(2)(B).  The agency's decision is presumed valid under this standard, and the Court asks only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Overton Park*, 401 U.S. at 416.  A decision may be held to be arbitrary and capricious only when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," or the decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

---

[6] In the alternative, however, the Court may, if it wishes, convert this motion to one for summary judgment. *Audubon*, 524 F. Supp. 2d at 660.

[7] Plaintiffs also allege that DACA's termination violated the APA because it was unconstitutional.  *See* Pls.' Compl. ¶ 165.  Plaintiffs' allegations that the rescission of DACA was unconstitutional are addressed in Sections II.C-E, *infra.*

*Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).  The Court may not "substitute its judgment for that of the agency."  *Id*.  And when an agency changes policies, it "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  Rather, "it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."  *Id.*

In assessing whether a decision was arbitrary and capricious, "[t]he task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing court."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) (citation omitted).  If the agency's action "is not sustainable on the administrative record made," then the administrative "decision must be vacated and the matter remanded to [the agency] for further consideration."  *Camp v. Pitts*, 411 U.S. 138, 143 (1973).  This Court should therefore decide whether the Acting Secretary's decision to wind down DACA was arbitrary and capricious on the administrative record she has produced.  Thus, while the government submits that the Acting Secretary's decision was plainly not arbitrary and capricious under the record already before this Court, if this Court were to disagree, it should do no more than simply grant Plaintiffs the relief they seek by setting aside the Rescission Policy and remanding to her.

**2.** The Rescission Policy amply meets the "minimal standards of rationality" required by the APA.  *Troy Corp. v. Browner*, 120 F.3d 277, 283 (D.C. Cir. 1997) (citation omitted), *reh'g denied*, 129 F.3d 1290 (D.C. Cir. 1997).  Plaintiffs do not deny that "the new policy is permissible under the [INA]."  *Fox*, 556 U.S. at 515.  And there are eminently "good reasons for it," *id*., particularly in view of the litigation risk posed by the proceedings in *Texas*.  In the Rescission

Policy, the Acting Secretary explained that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated." Rescission Policy at 4 (AR 255).   Specifically, after summarizing the *Texas* litigation and the nationwide injunction against DAPA (and its expansion of DACA), she quoted the Attorney General's conclusion in his letter that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results." *Id.* at 3 (AR 254) (citation omitted).   The Acting Secretary thus concluded that maintaining the DACA Policy would, in all likelihood, result in another nationwide injunction plunging the policy, and its nearly 800,000 recipients, into uncertainty.

The Acting Secretary was then "faced with two options: wind the program down in an orderly fashion that protects beneficiaries in the near-term while working with Congress to pass legislation; or allow the judiciary to potentially shut the program down completely and immediately."   Press Release, DHS, Statement from Acting Secretary Duke on the Rescission of DACA (Sept. 5, 2017), https://go.usa.gov/xncuM.   She reasonably opted for an orderly rescission, which she considered "the least disruptive option." *Id.*

There is nothing at all irrational about this choice or that explanation.   *Cf. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 84 (2002) ("regulation reasonable" based on concerns about subjecting parties to "possible … liability").   Indeed, it is entirely sensible, given the turmoil that an abrupt, court-ordered shutdown would likely have provoked.   The Acting Secretary balanced the litigation risk of keeping DACA in place with "the administrative complexities associated with ending the program," and opted for a solution that would "wind it down in an efficient and orderly fashion" accounting for the interests of DACA recipients.   Rescission Policy at 3 (AR 254).   She

33

explained her reasonable decision to rescind DACA, and the APA requires no more.  *See Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (citation omitted) (APA satisfied where agency's explanation is clear enough that its "path may reasonably be discerned"), *reh'g denied*, 420 U.S. 956 (1975).[8]  And no matter whether her (or the Attorney General's) judgment about the likely result of the *Texas* litigation would have turned out to be correct, it was surely not an irrational or arbitrary and capricious conclusion in light of the fact that at least the Fifth Circuit and four justices of the Supreme Court had already held that a materially indistinguishable policy was unlawful.

**3.**  Plaintiffs nonetheless contend that the decision to rescind DACA was arbitrary and capricious because the Acting Secretary considered the Attorney General's views regarding the legality of DACA, which are views Plaintiffs contend "contradict" "the prior Department of Justice OLC analysis concluding that the program was constitutional."  Pls.' Compl. ¶¶ 120, 165.[9] Plaintiffs' argument suffers from three independent flaws.

First, the Acting Secretary did not rely on the Attorney General's September 4 letter solely for its assessment of DACA's legality.  Instead, as discussed above, she concluded that DACA "should" be wound down after considering, among other things, his litigation risk determination that it was "likely" that a legal challenge to DACA "would yield similar results" as the DAPA litigation under Fifth Circuit precedent.  Rescission Policy at 3 (AR 254).  That independent conclusion, based on a reasonable predictive judgment about litigation risk, is a sufficient basis for upholding the Acting Secretary's decision to rescind DACA.  *See Bowman*, 419 U.S. at 286.

---

[8] For these same reasons, Plaintiffs' allegations that the relevant dates chosen by the Acting Secretary in the wind-down process are arbitrary and capricious fails to state a claim under the APA.  *See* Pls.' Compl. ¶ 165.

[9] Plaintiff also alleges that the Acting Secretary's decision is "directly contravene[ed]" by statements made by President Trump, none of which actually address the litigation risk surrounding DACA.  *See id.* ¶¶ 125, 165.

Second, to the extent the Acting Secretary did rely on the proposition that DACA was unlawful, this Court need not agree with that determination to uphold her decision. If an agency's constitutional analysis and policy judgment overlap, courts should presume an independent policy judgment to avoid constitutional questions, even if the two determinations are arguably "intertwined." *See Syracuse Peace Council v. FCC*, 867 F.2d 654, 657–59 (D.C. Cir. 1989) (if "even in the absence of constitutional problems the [agency] would have reached the same outcome," "we must end our inquiry without reaching that issue"). Here, the Attorney General regarded DACA as unconstitutional in part because it was an "open-ended" policy that closely tracked "proposed legislation" that Congress had repeatedly rejected. Rescission Policy at 3 (AR 254). But those same concerns equally support a policy judgment by the Acting Secretary that "deferred action" should "be applied only on an individualized case-by-case basis" rather than used as a tool "to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law." *Id.* at 2 (AR 253). This Court should, therefore, sustain her decision based on a reasonable policy judgment that immigration decisions of this magnitude should be left to Congress.

Third, although this Court need not decide the issue to resolve this case in favor of the government on the basis that the agency decision was at least rational, the Attorney General's view that DACA was unlawful is strongly supported by the Fifth Circuit's decision in *Texas*, which was affirmed by the Supreme Court. The Fifth Circuit held not only that DAPA—including its proposed expansion of DACA—was likely unlawful, but also that DACA bore many "important similarities" to it. *Texas*, 809 F.3d at 174 & n.139 (noting that "the DAPA Memo's plain language … equates the DACA and DAPA procedure[s]," making DACA an "apt comparator"). Indeed, given that DAPA was enjoined before its implementation, the Fifth Circuit's decision was

35

"informed by analysis of the implementation of DACA" itself.  *Id*. at 172.  On that score, while,

"[l]ike the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-

by-case basis," and thus "facially purport[ed] to confer discretion," *id*. at 171–72, the court found

that discretion to be illusory in practice: Because relatively few DACA requests were denied, the

Fifth Circuit believed "there was evidence from DACA's implementation that [this] discretionary

language was pretextual," *id*. at 172–73.  Based on these findings by the Fifth Circuit, it would

follow that DACA, like DAPA, did not "genuinely leave the agency and its employees free to

exercise discretion" on a case-by-case basis, *id*. at 176—which supports the Attorney General's

view that DACA was unlawful.  And it seems likely that at least four justices of the Supreme Court

agree.

Regardless of whether OLC was correct when it previously "orally advised" that its

"preliminary view" was that the proposed version of DACA would be lawful, the reasoning in that

opinion further confirms the invalidity of DACA as it was actually implemented in practice, as

found by the Fifth Circuit.  The "preliminary" conclusion was conditioned on the proviso that "it

was critical that … the DACA program require immigration officials to evaluate each application

for deferred action on a case-by-case basis."  OLC Op. 18 n.8.  Yet the Fifth Circuit found that

DHS officials did not "genuinely" retain such discretion in practice.  *Texas*, 809 F.3d at 176.

Indeed, because deferred action continues to exist on an individualized basis, the only change made

by the Acting Secretary is the elimination of the factors that, according to the Fifth Circuit, led to

the policy being applied without sufficient case-by case discretion.  *See id.* at 172–73 (noting

testimony that, for DACA, requests were "simply rubberstamped if the applicants meet the

necessary criteria").  Further, the original DACA program largely shares the relevant defects of

the proposed expansion of deferred action that OLC rejected, rather than the aspects of the new program that it approved.

4. Plaintiffs also allege that the rescission is arbitrary and capricious because DHS has failed to "provide a reasoned analysis sufficient to justify its change of policy in light of the serious reliance interests created by DACA." Pls.' Compl. ¶ 165(b). As set forth in pages 7-8, *supra*, the Rescission Memo is merely a statement of policy that—like the original DACA policy—does not create any enforceable rights and is subject to change at any time. And insofar as Plaintiffs suggest that the Acting Secretary failed to consider the reliance interests of DACA recipients more generally, that assertion ignores her calculus based the looming risk of a nationwide injunction ending the DACA program altogether. Given her view that she faced an imminent, court-ordered end to DACA, the Acting Secretary opted for an orderly wind-down process that would protect the reliance interests of DACA recipients far more than an immediate injunction terminating the program would. *See* 9-10, *supra*. Finally, to the extent that she rationally concluded DACA was illegal, there would be no legitimate reliance interests at all.

5. Plaintiffs also allege that DHS changed its information-sharing policy and that such a change was both arbitrary and capricious as well as contrary to law. *See* Pls.' Compl. ¶ 165. This claim is unreviewable under the APA because DHS has not changed its information-sharing policy, and has thus not engaged in any final agency action with respect to such policy. Moreover, Plaintiffs' assertions that the alleged change in policy violated the Privacy Act and the E-Government Act fail as a matter of law.

Plaintiffs do not allege facts sufficient to show that there has actually been a substantive change in policy regarding information sharing. Plaintiffs merely allege that the Rescission Memorandum "provides no assurance to Dreamers" that personal information will not be used in

immigration enforcement proceedings.  Pls.' Compl. ¶ 107.  And while they cite language in the
Rescission FAQs indicating that information "[g]enerally . . . will not be proactively provided to
other law enforcement entities," Pls.' Compl. ¶ 108 (emphasis omitted) (quoting DHS, *Frequently
Asked Questions: Rescission of Deferred Action for Childhood Arrivals* (Sept. 5, 2017) (Rescission
FAQs),   https://www.dhs.gov/news/2017/09/05/frequently-asked-questions-rescission-deferred-
action-childhood-arrivals-daca), that language is entirely consistent with DHS's policy regarding
the protection of DACA information, including its many exceptions that Plaintiffs largely gloss
over.  *See* Pls.' Compl. ¶ 90 (characterizing "[t]he government's representations that information
provided by a DACA applicant would not be used against him" as "unequivocal").

Contrary to Plaintiffs' suggestion that DHS has flatly and completely prohibited the use of
DACA information for enforcement purposes, *see* Pls.' Compl. ¶ 90, the agency's information-
sharing policy in fact contains (and has always contained) a number of exceptions.  For example,
under that policy, information submitted in DACA requests "is protected from disclosure to ICE
and CBP for the purpose of immigration enforcement proceedings *unless* the requestor meets the
criteria for the issuance of a Notice to Appear or a referral to ICE under the criteria set forth in
USCIS'[s] Notice to Appear guidance" (for example, when issues of national security, public
safety, or significant criminal activity are raised).  DHS DACA FAQ No. 19 (emphasis added);
*see* Notice to Appear Guidance.  While this policy "may be modified, superseded, or rescinded at
any time" and creates no legal rights, DHS DACA FAQ No. 19, nothing in the Rescission Policy
purports to change it, and it currently remains in effect.

As there has been no substantive change in DHS's information-sharing policy, there is no
"final agency action" for the Court to review.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997)
(holding that "final agency action" must "mark the consummation of the agency's decisionmaking

process"); 5 U.S.C. § 704 (providing for judicial review of "final agency action").  Accordingly, the Court should dismiss Plaintiffs' APA claims for lack of jurisdiction to the extent that they concern an alleged change in the information-sharing policy.  *See Invention Submission Corp. v. Rogan*, 357 F.3d 452, 460 (4th Cir. 2004) (holding that district court should have dismissed APA claim without final agency action for lack of subject matter jurisdiction).

Even were the Court to find that DHS somehow changed its long-standing information-sharing policy, any "new" policy does not violate the Privacy Act or the E-Government Act.  As a threshold matter, records containing personal information about DACA recipients are not protected by the Privacy Act.  The Privacy Act applies to records pertaining to "individual[s]," who are defined as "citizen[s] of the United States or [] alien[s] lawfully admitted for permanent residence."  5 U.S.C. § 552a(a)(2).  By definition, DACA recipients are neither.  As explained above, DACA is a form of prosecutorial discretion known as deferred action, and DHS has consistently advised applicants that DACA "does not confer lawful permanent resident status or a path to Citizenship."  DHS DACA FAQ No. 68.  To the extent that DHS previously extended protections to individuals who fell outside of the scope of the statute, the practice was rescinded in February 2017.  *See* Memorandum from John F. Kelly, *Enforcement of the Immigration Laws to Serve the National Interest* (Feb. 20, 2017) (AR 229-34).  Moreover, that DHS's internal policy once provided additional protections for DACA recipients does not create a statutory right to coverage under the Privacy Act. *See* Department of Homeland Security, *Privacy Impact Assessment for the Deferred Action for Childhood Arrivals (DACA)* 16 (Aug. 15, 2012) (noting that DHS policy "does not extend or create a right of judicial review for non-U.S. persons"), https://www.dhs.gov/sites/default/files/publications/privacy_pia_uscis_daca_0.pdf

(Privacy Impact Assessment)[10]; *see also Fares v. U.S. Immigration & Naturalization Service*, 50 F.3d 6 (4th Cir. 1995) (affirming district court's holding that Plaintiff whose work authorization had expired "was not protected by the Privacy Act").  Plaintiffs attempt to manufacture a cause of action under the Privacy Act by bringing this claim under the Administrative Procedure Act highlights the frivolous nature of their argument.  Accordingly, Plaintiffs' claim that DHS's information-sharing policy violates the Privacy Act fails as a matter of law.

Plaintiffs also argue that DHS's information-sharing policy does not comply with the E-Government Act.  *See* Pls.' Compl. ¶ 165.  Though the E-Government Act itself does not provide a cause of action, *see Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, No. 17-1320, 2017 WL 3141907, at *1 (D.D.C. July 24, 2017), *appeal docketed*, No. 17-5171 (D.C. Cir. July 27, 2017), the Act requires federal agencies to conduct privacy impact assessments before collecting new information. *See* E-Government Act of 2002, Pub. L. No. 107-347, § 208(b), 116 Stat. 2899.  Plaintiff's argument that DHS is in violation of the E-Government Act suffers from two major flaws.  First, as explained above, DHS has not substantively changed its information-sharing policy regarding DACA applicants' personal information.  Plaintiffs mischaracterize DHS's policy as a "promise" that information from DACA applicants would never be shared.  *See* Pls.' Compl. ¶ 165.  But, as consistently represented in the DACA FAQs and the DACA Rescission FAQS, the Privacy Impact Assessment provides for a number of exceptions, including when applicants "meet[] the guidelines for the issuance of a Notice to Appear," for "national security purposes", and for the "investigation or prosecution of a criminal offense." Privacy Impact Assessment 13.  Second, Plaintiffs allege that DHS "violate[d] the E-Government Act provision requiring an agency abide by its Privacy Impact Assessment," Pls.' Compl. ¶

---

[10] This Privacy Impact Assessment is incorporated by reference in Plaintiffs' Complaint. *See* Pls.' Compl. ¶ 84.

165(c)(ii), but fail to include a citation to any specific provision of the E-Government act requiring

such action.   The E-Government Act requires only that an agency conduct a privacy impact

assessment, ensure review of the assessment by the Chief Information Officer of the Agency, and

make the assessment publically available.  *See* E-Government Act of 2002, Pub. L. No. 107-347,

§ 208(b)(1)(B).  Thus, once DHS properly created and disclosed its Privacy Impact Assessment in

August 2012, it was in full compliance, and Plaintiffs cannot properly state any violation of this

Act.  *Id.*

*        *        *        *

In all events, the foregoing analysis confirms that the Acting Secretary's decision was at a

minimum reasonable and that Plaintiffs' APA challenge can be resolved at this stage based on the

record now before the Court.   Indeed, whatever this Court decides, there is no basis for

supplementing the record or discovery to assess the Acting Secretary's explanation.

### B.       The Rescission Policy Is Exempt from Notice and Comment.

Plaintiffs miss the mark in arguing that the Rescission Policy must be set aside because it

is a substantive rule issued without notice and comment.  *See* Pls.' Compl. ¶ 169; *see also* 5 U.S.C.

§ 553(b)–(c).  If winding down the DACA policy is a "substantive rule," then *a fortiori* so was

enacting the policy in the first place.  Critically, though, the DACA Memo itself also was not

adopted through notice and comment.  So even on Plaintiffs' own theory, it would be void *ab*

*initio*—leaving Plaintiffs without a remedy.  *See Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1341

n.9 (4th Cir. 1995) (noting that if the interim rule at issue were a substantive rule, as the plaintiff

claimed, then it would have been invalid from the date of its issuance for failure to comply with

the APA's notice requirements; finding that interim rule was a policy statement not subject to

notice and comment).  That is reason enough to dismiss this claim.  *See Lujan*, 504 U.S. at 561

41

(plaintiff must show "injury will be 'redressed by a favorable decision'" to establish standing) (citation omitted).[11]

In any event, Plaintiffs' claim is erroneous.  DHS and INS have adopted over 20 deferred action or similar policies over the past 50 years—rarely through notice and comment.  That is because such policies, like the Rescission Policy, are not substantive rules at all.  Rather, they are classic examples of "general statements of policy" that are exempt from the APA's notice-and-comment requirements.  5 U.S.C. § 553(b)(3).

A "substantive rule establishes a standard of conduct which has the force of law."  *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974); *see Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 207 (4th Cir. 1989) ("[A] substantive or legislative rule, pursuant to properly delegated authority, has the force of law, and creates new law or imposes new rights or duties.").  Thus, an "agency action that purports to impose legally binding obligations or prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements—is a legislative rule."  *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014).

A statement of policy, by contrast, "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's Manual on the Administrative Procedure Act

---

[11] To be sure, the D.C. Circuit has rejected the "argument that notice and comment requirements do not apply to 'defectively promulgated regulations'" as "untenable because it would permit an agency to circumvent the requirements of § 553 merely by confessing that the regulations were defective in some respect and asserting that modification or repeal without notice and comment was necessary to correct the situation."  *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 447 n.79 (D.C. Cir. 1982).  That holding, however, concerned the rescission of a rule promulgated after notice and comment that was allegedly defective on other grounds, not a rule that was defective precisely because it had failed to go through notice and comment in the first place.  *See id.* at 445–46.  When an agency has already "circumvent[ed] the requirements of § 553," *id.* at 447 n.79, there is no reason why it must go through those procedures to cure the underlying defect.

30 n.3 (1947)).  It "explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule."  *McCarthy*, 758 F.3d at 252.  It serves to "appris[e] the regulated community of the agency's intentions" and "inform[] the exercise of discretion by agents and officers in the field."  *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987).  And "a general statement of policy, like a press release," often "announces the course which the agency intends to follow in future adjudications."  *Pac. Gas & Elec.*, 506 F.2d at 38.  Accordingly, policy statements "are binding on neither the public nor the agency," and the agency "retains the discretion and the authority to change its position … in any specific case."  *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (citations omitted); *see Chen Zhou Chai*, 48 F.3d at 1341 (policy statements announce "tentative intentions for the future without binding [an agency]", they do not "establish a binding norm and leave[] agency officials free to exercise their discretion").

As these principles make clear, the Rescission Policy is a quintessential policy statement— a point that its text reinforces again and again.  It was issued as an "exercise of [the Secretary's] authority in establishing national immigration policies and priorities."  Rescission Policy at 4 (AR 255).  It explains how the agency intends to exercise its enforcement authority on a prospective basis, a matter that is "generally committed to an agency's absolute discretion."  *Chaney*, 470 U.S. at 831.  It does not immediately deprive any DACA recipients of their current deferred action status, but describes how pending and future deferred action requests will be "adjudicate[d]—on an individual, case-by-case basis."  Rescission Policy at 4 (AR 255).  It does not categorically forbid the agency from continuing to defer enforcement action against DACA recipients in the future, but instead acknowledges the background principle, recognized by Congress and the courts, that deferred action is "an act of prosecutorial discretion" that may be exercised "on an

43

individualized case-by-case basis," *id.* at 2 (AR 253), and that places "no limitations" on the agency's exercise of such "otherwise lawful enforcement … prerogatives," *id*. at 5 (AR 256). And it explains that it "does not … create any right or benefit, substantive or procedural, enforceable at law by any party." *Id.* Thus, in the wake of the Rescission Policy, deferred action "remains discretionary and reversible," *Arpaio*, 797 F.3d at 17—as with the 20-odd deferred action or similar policies that DHS and INS have adopted over the past half-century, generally without going through the full notice-and-comment process.[12]

That is as it should be. An agency's enforcement priorities will inevitably shift over time, whether due to changing circumstances or resource constraints. *See Chaney*, 470 U.S. at 831. Indeed, the DACA policy was originally adopted in part to set enforcement priorities in view of the agency's limited resources. *See Arpaio*, 797 F.3d at 16; DACA Memo at 1 (AR 1); DAPA Memo at 1 (AR 37). Under Plaintiffs' theory, however, even if Congress were to vastly increase appropriations for immigration enforcement, the agency's hands would be tied: it would not be free to adjust its enforcement priorities without engaging in "cumbersome and time-consuming rulemaking proceedings." *Nat'l Ass'n of Regulatory Util. Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C. Cir. 1988). The Court should not endorse such an intrusion into matters that have "long been regarded as the special province of the Executive Branch." *Chaney*, 470 U.S. at 832.

---

[12] The Fifth Circuit's ruling that the adoption of the DAPA Memo required notice and comment does not imply that the rescission of DACA does as well. Unlike the DAPA or DACA Memos, the Rescission Policy announced a return to an enforcement policy of using deferred action on an individualized basis, which cannot be cast as a substantive rule. Indeed, the Fifth Circuit itself stressed that "DAPA is much more than a nonenforcement policy," and that "a traditional nonenforcement policy would not necessarily be subject to notice and comment." *Texas*, 809 F.3d at 178 n.156. In any event, if this Court agrees with the Fifth Circuit, then DACA was void *ab initio* and Plaintiffs lack a remedy.

### C.      Plaintiffs Fail to State an Equal Protection Claim.

If this Court disagrees with Defendants and concludes that it can review Plaintiffs' equal protection challenge under *AADC*, *but see supra* Section I.B, it nonetheless should dismiss it for failure to state a claim.  In *Armstrong*, the Supreme Court considered whether criminal defendants could obtain discovery to support a "selective prosecution" claim arising under the Equal Protection Clause.  517 U.S. at 463–64.  The Court recognized that such claims, like the discriminatory-motive claims here, "ask[] a court to exercise judicial power over a 'special province' of the Executive"—specifically, the "constitutional responsibility to 'take Care that the Laws be faithfully executed'"—and thereby risk "impair[ing] the performance of a core executive constitutional function."   *Id.* at 464-65 (citations omitted).   Given these considerations, a "presumption of regularity supports" such enforcement decisions and, "in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Id*. at 464 (citation omitted).  Applying this "rigorous standard," *id.* at 468, the Court refused to allow discovery in support of the selective prosecution claim before it, even though the claimants had provided evidence that in each of the 24 prosecutions for certain drug-trafficking offenses that were closed by the federal defender's office in a single year, the defendant was African-American, *id.* at 459, 469-70.

Although Plaintiffs here allege that the Rescission Policy was motivated by discriminatory animus rather than assert that they have been selectively prosecuted, *Armstrong* still requires them to allege, and ultimately prove, that this is a "clear" case of discrimination in order to overcome the presumption that Defendants have faithfully enforced the laws.  *Id.* at 464.  As in *Armstrong*, Plaintiffs here ask this Court to "exercise judicial power over a 'special province' of the Executive," with the associated risk of "impair[ing] the performance of a core executive

45

constitutional function." *Id*. at 464–65 (citations omitted).  Plaintiffs consequently must overcome "a significant barrier to the litigation" of their claims.  *Id.* at 464.  And that is especially true given that they allege an unlawful enforcement of the *immigration* laws.  Even if *AADC* permitted the adjudication of Plaintiffs' claims, that decision would at least require them to satisfy a rigorous standard similar to the one in *Armstrong*.  As *AADC* explained, the concerns justifying a heightened burden under *Armstrong* "are greatly magnified in the deportation context," 525 U.S. at 490, and all of those considerations are present here, *see supra* Section I.B.  Accordingly, Plaintiffs must at least meet a heavy burden to survive a motion to dismiss on a claim that Defendants harbored a hidden discriminatory motive in their enforcement of the immigration laws.

Plaintiffs cannot carry that burden here.  Their allegations consist of the assertion that 93 percent of DACA recipients were Mexican, Central American, or Latino, *see* Pls.'Compl. ¶¶ 157, 159 and selected references to statements by the President and other administration officials relating to immigrants, Mexicans, and Latinos, *see* Pls.' Compl. ¶¶ 94-96, 125.  These allegations are insufficient to overcome the "significant barrier" to moving forward on a claim of this sort. *Armstrong*, 517 U.S. at 464.

The fact that approximately 93 percent of approved DACA recipients are Mexican, Central American, or Latino is an unsurprising accident of geography, not evidence of discrimination, let alone the kind sufficient to establish discriminatory motive in the enforcement of immigration laws.  Even in the ordinary domestic equal protection setting, a disparate impact of a facially neutral rule such as the Rescission Policy, standing alone, cannot establish discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 242 (1976), *superseded by statute, see Veasey v. Perry*, 29 F. Supp. 3d 896, 916 (S.D. Tex. 2014).  Much less can it do so when the exercise of enforcement discretion is involved: In *Armstrong*, the fact that 100 percent of the relevant defendants were

46

African-American was not enough to justify discovery.  517 U.S. at 459.  *A fortiori*, the fact that

approximately 93 percent of DACA recipients are Mexican, Central American, or Latino provides

no basis for setting aside the Rescission Policy, especially given the heightened deference owed to

the political branches on immigration matters, where sensitive considerations of relations and

proximity to particular foreign nations necessarily plays a role.[13]

Nor do the President's statements—most of which were made before he took the oath of

office—indicate that the rescission of DACA is a clear case of discrimination.  The President's

statements are largely unrelated to DACA.  Plaintiffs themselves emphasize that when the

President has spoken on this issue, he has shown support for DACA recipients.[14]  More

importantly, Plaintiffs point to nothing that would suggest Acting Secretary Duke—the

decisionmaker ultimately responsible for the Rescission Policy— chose to wind-down DACA due

to animus towards Mexican nationals.  Given that the statements at issue have no connection to

either the relevant decision (the rescission of DACA) or the relevant decision-maker (the Acting

Secretary), adopting Plaintiffs' theory would mean that any time DHS enforces the immigration

laws in a way that has a statistically significant disparate impact on Mexicans, Central Americans,

or Latinos, the agency would be subject to challenges that it violated Fifth Amendment equal

protection principles.  That would set a dangerous precedent, and it would freeze the enforcement

---

[13] Plaintiffs allege that other classes of immigrants, presumably classes that include less than
93% Mexican, Central American, or Latino individuals, remain eligible for deferred action.  *See*
Pls.' Compl. ¶ 159.  That other classes of immigrants who received deferred action include less
Mexican, Central American, and Latino individuals does not provide any evidence of
discriminatory intent, and, as discussed above, a mere disproportionate impact on one group is
insufficient to show discriminatory animus.  *See Washington*, 426 U.S. at 242.
[14] *See* Pls.' Compl ¶ 124 (alleging that the President "stated…that he would find an
accommodation for dreamers… 'that's going to make people happy and proud;'" alleging that
the President stated that his plan for DACA would "have a lot of heart;'' alleging that the
President "confirmed that his Administration's policy is not to deport Dreamers, and suggested
that they 'should rest easy'").

discretion of the entire Executive Branch.  That ossification would be particularly inappropriate in this context, given that immigration enforcement policies must constantly be adjusted to account for "[t]he dynamic nature of relations with other countries." *Arizona*, 567 U.S. at 397.  In all events, Plaintiffs' inferences from unrelated remarks cannot qualify as the sort of "clear" allegations of discrimination necessary in this context. *Armstrong*, 517 U.S. at 464.

> **D.      Plaintiffs Fail to State a Procedural Due Process Claim**

**1.** Plaintiffs allege that the rescission violates procedural due process norms to the extent that DACA recipients will be deprived of their interests in their DACA status without notice and an opportunity to be heard.  *See* Pls.' Compl. ¶ 138.  This claim fails on the merits for the simple reason that DACA recipients have no protected liberty interest or property interest in deferred action entitling them to due process protections.

The Fifth Amendment provides that "no person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V. Thus, the "first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citations omitted).  The "Due Process Clause does not protect everything that might be described as a 'benefit.'"  *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).  Rather, "'[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'"  *Id.* (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)).  Such entitlements "are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source"—*e.g.*, statutes or regulations—"that secure certain benefits and that support claims of entitlements to those benefits."  *Roth*, 408 U.S. at 577.

A benefit "is not a protected entitlement" where, as here, "government officials may grant or deny it in their discretion." *Castle Rock*, 545 U.S. at 756 (citation omitted).  For due process purposes, statutes or regulations limit discretion only when they contain "explicitly mandatory language"—*i.e.*, "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 462–63 (1989) (citation omitted); *see also Smith v. Ashcroft*, 295 F.3d 425, 430 (4th Cir. 2002) (holding that the INA does not create a protected interest in seeking waiver of deportation proceedings because the statute grants "broad discretion" to grant or deny relief).  The DACA policy contains no such "explicitly mandatory language." *Id*. at 463.  The policy is codified in no statute or regulation.  Its source—the DACA Memo—describes it as a "policy" for the "exercise of prosecutorial discretion." DACA Memo 2, 3 (AR 2, 3); *see Omar v. McHugh*, 646 F.3d 13, 22 n.7 (D.C. Cir. 2011) (the "use of the word 'policy'"—"rather than a word such as 'right'— reinforces the conclusion that Congress did not intend to create an 'entitlement'").  And the agency's public guidance makes clear that, under DACA, deferred action "may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion." DHS DACA FAQ No. 27.

Under DACA, "deferred action remains discretionary and reversible, and 'confers no substantive right, immigration status or pathway to citizenship.'" *Arpaio*, 797 F.3d at 17 (quoting DACA Memo 3).  Thus, it is not a protected entitlement for due process purposes, and Plaintiffs' claim fails as a matter of law. *See also, e.g.*, *Velasco-Gutierrez v. Crossland*, 732 F.2d 792, 798 (10th Cir. 1984) (deferred action guidance "places no effective limitations on official discretion, and thus creates no protected liberty interest in deferred action"); *Romiero De Silva v. Smith*, 773 F.2d 1021, 1024 (9th Cir. 1985) (because "deferred action" "vests the regional commissioner with

49

unfettered discretion to determine whether to grant an informal administrative stay of deportation

to an otherwise deportable alien, it creates no protectable liberty interest in deferred action, nor

does it create a protectable interest in being considered for deferred action status").

**2.** Even if DACA could be conceived of as an entitlement, Plaintiffs' due process claim

would fail because changes in agency policy do not require individualized process. Due process

doctrine recognizes a "distinction between individualized deprivations, [which] are protected by

procedural due process, and policy-based deprivations of the interests of a class, [which] are not

protected by procedural due process." 2 Richard J. Pierce, Jr., *Administrative Law Treatise* § 9.2

(5th ed. 2010). The rescission of DACA falls squarely in the latter category.

Plaintiffs allege that, under DACA, termination required "a Notice of Intent to Terminate

which thoroughly explains the grounds for termination" and that recipients of such a notice would

have an opportunity to respond prior to termination. Pls.' Compl. ¶ 78. But Plaintiffs' theory is

not that individual DACA applications were adjudicated incorrectly (for example, due to factual

error)—the sort of mistake that notice and a hearing could conceivably help correct. Instead,

Plaintiffs' claim appears to be that DHS cannot alter the DACA policy, even on a prospective

basis, without providing individualized notice and hearings to nearly 800,000 recipients.

Such individualized process is not required. The Supreme Court held long ago that where

a government policy "applies to more than a few people, it is impracticable that everyone should

have a direct voice in its adoption," and thus due process does not require individualized pre-

deprivation notice. *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915).

This case presents "the classic *Bi-Metallic* scenario"—the challenged policy applies across-the-

board to a large number of people, so "[n]ot only would individualized hearings be impractical,

they would be unnecessary." *Decatur Liquors, Inc. v. Dist. of Columbia*, 478 F.3d 360, 363 (D.C. Cir. 2007) (citing *Bi-Metallic*, 239 U.S. at 445).

The Ninth Circuit's decision in *Yassini v. Crosland*, 618 F.2d 1356 (9th Cir. 1980), is instructive in this regard. There, the INS had issued a policy directive granting "deferred voluntary departure"—a form of deferred action—to Iranian nationals who were unwilling to return home due to political instability. *Id.* at 1359. Then, in response to the Iranian hostage crisis, the INS issued another policy directive "rescinding the … deferred departure" and requiring its recipients to depart the country within 30 days. *Id.* Relying on *Bi-Metallic*, the Ninth Circuit rejected the plaintiff's claim "that he should have had a prior opportunity to contest [the INS's] decision to rescind deferred departure." *Yassini*, 618 F.2d at 1363. "Where an agency action is not based on individual grounds, but is a matter of general policy," the court explained, "no hearing is constitutionally required." *Id.* (citing, *inter alia*, *Bi-Metallic*). So too here.

**3.** Plaintiffs also allege that DHS's alleged change in its information-sharing policy violates procedural due process norms to the extent that DACA recipients have been deprived of their interest in the protection of personal information provided with their DACA requests from alleged impermissible sharing without a right to be heard or other individualized procedural protections. *See* Pls.' Compl. ¶ 151. As previously explained, *supra* Section II.A, Plaintiffs have failed to allege sufficient facts that DHS substantively changed its information-sharing policy. In any event, Plaintiffs fail to state a claim that such a change violates procedural due process because they cannot identify an actual deprivation of "sensitive personal information," much less show that this "information" is somehow a protected interest under the Due Process Clause.

No plaintiff alleges that personal information contained in a DACA application has in fact been impermissibly shared. Nor have Plaintiffs alleged facts indicating a new threat of information

51

sharing beyond the exceptions that have been consistently part of the policy since DACA was

implemented in 2012, including in cases of threats to national security.  Although the court in

*Batalla Vidal* found (incorrectly) that, once DACA recipients' status expires, they may be entitled

to a presumption that the Government will enforce the immigration laws against them*, see Batalla*

*Vidal* Mem. & Order at 36, it does not follow and Plaintiffs have not shown that DACA recipients

are entitled to a presumption that DHS's information-sharing policy, which has not substantively

changed, will be applied differently once DACA recipients lose their status.

Even if Plaintiffs had, in fact, alleged an actual deprivation of liberty or property, to the

extent that personal information was shared in a manner inconsistent with the information-sharing

policy, or if the information-sharing policy had, in fact, changed, Plaintiffs were consistently

advised that the policy "may be modified, superseded, or rescinded at any time" and creates no

legal rights.  DHS DACA FAQ No. 19; *see supra* Section I.B.  Accordingly, no party has a liberty

or property right as a result of the information-sharing policy.  *See Mondragon v. Holder*, 706 F.3d

535, 541 (4th Cir. 2013) (It is a "well-established proposition that 'a constitutional entitlement

[*i.e.*, one protected by the Due Process clause] cannot 'be created—as if by estoppel—merely

because a wholly and expressly discretionary state privilege has been granted generously in the

past.'") (quoting *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981)).

### E.        Plaintiffs Fail to State a Substantive Due Process Claim.

Plaintiffs allege that both the rescission of DACA and the alleged change in DHS's

information-sharing policy violate substantive due process because these actions are not

"fundamentally fair."  Pls.' Compl. ¶¶ 142, 152.  Neither of these claims has merit.

Substantive due process protects those rights that rank as "fundamental"—that is, both

"objectively, deeply rooted in this Nation's history and tradition" and "implicit in the concept of

ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citation omitted). The Supreme Court has also made clear that a plaintiff must provide "a 'careful description' of the asserted fundamental liberty interest" when raising such a claim." *Chavez v. Martinez*, 538 U.S. 760, 775-76 (2003). "[V]ague generalities," like Plaintiffs' wish that DHS would adopt their preferred policies, "will not suffice." *Id.* at 776.

While in rare cases a "denial of fundamental fairness" may rise to the level of a substantive due process violation, to survive dismissal in a "challenge to executive action" such as this one, Plaintiffs must allege behavior that is "so egregious" and "outrageous" as "to shock the contemporary conscience." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8, 850 (1998), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194 (2001). Conduct can be said to "shock the conscience" when it involves intentionally "abusing executive power, or employing it as an instrument of oppression" in a manner that is "unjustifiable by any government interest." *Hawkins v. Freeman*, 195 F.3d 732, 742 (4th Cir. 1999) (emphasis and citations omitted). By contrast, "simple negligence . . . can [never] support a claim of substantive due process violation by executive act." *Id.*

Nothing about the Rescission Policy meets this extraordinarily high standard, and certainly not with respect to the subject of information sharing. Plaintiffs have failed to put forth any allegations suggesting that the Acting Secretary's memorandum contained "any element of vindictiveness or of power exercised simply to oppress," particularly when compared with the "legitimate governmental interests" she identified. *See id.* at 746. Moreover, DHS's information-sharing policy for DACA recipient information has always contained a number of exceptions and although the policy, in fact, remains unchanged, it has always expressly stated that it "may be

modified, superseded, or rescinded at any time" and it therefore creates no judicially enforceable rights.  DHS DACA FAQ No. 19.  And, most importantly, the Rescission Policy nowhere purports to alter DHS's information-sharing policy, and even if it did, Plaintiffs were on notice that it could be subject to change.

### F.      Plaintiffs' Equitable Estoppel Claims Fail.

Plaintiffs have also brought equitable estoppel claims, alleging that DACA recipients provided sensitive personal information to the government and "rearranged their lives" based on the government's representations, but now face removal due to the rescission of DACA.  *See* Pls.' Compl. ¶¶ 176, 178.  On that basis, Plaintiffs claim that the government should be equitably estopped from terminating DACA or from using DACA information for enforcement purposes. *See id.* ¶ 179.

Plaintiffs' equitable estoppel claims cannot succeed for several reasons.  As a threshold matter, Plaintiffs cannot succeed because there is no recognized cause of action for estoppel.  The Supreme Court has explained that "private rights of action to enforce federal law must be created by Congress."  *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001).  Congress has created no such cause of action for estoppel.  This is further confirmed by the Federal Rules of Civil Procedure, which expressly recognize estoppel as an affirmative defense—not a cause of action.  *See* Fed. R. Civ. P. 8(c).

Even then, the remedy of equitable estoppel does not apply in this context.  Assuming arguendo that this remedy could ever be applied to the federal government, *but see OPM v. Richmond*, 496 U.S. 414, 419, 423 (1990), equitable estoppel does not apply to the *policy* decisions of the federal government.  *See, e.g.*, *United States v. Owens*, 54 F.3d 271, 275 (6th Cir. 1995) ("[T]he government should not be unduly hindered from changing its position if that shift is the

result of a change in public policy."), *cited in New Hampshire v. Maine*, 532 U.S. 742, 755 (2001);

*Emery Min. Corp. v. Sec'y of Labor*, 744 F.2d 1411, 1416 (10th Cir. 1984) (the doctrine of estoppel

cannot be justified against the government where it would "interfere with underlying government

policies or unduly undermine the correct enforcement of a particular law or regulation").  Indeed,

it is axiomatic that the government may alter its policies for any number of reasons, in accordance

with any applicable procedures.  *See generally Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199,

1210 (2015).  Here, the Acting Secretary issued a memorandum rescinding DACA, which is a

matter committed to agency discretion by law.

Finally, even if a cause of action for estoppel were available to challenge the policy here

(and it is not), Plaintiffs could not satisfy the elements of that claim.  Even in situations where an

estoppel claim against the government may be appropriate (*e.g.,* individualized challenges to non-

policy actions), courts "invoke the doctrine of estoppel against the government with great

reluctance." *United States v. Browning,* 630 F.2d 694, 702 (10th Cir. 1980); *see also Heckler v.

Cmty. Health Servs.,* 467 U.S. 51, 60 (1984) (government may not be estopped on same terms as

any other litigant).  In other words, estoppel can only be invoked against the government "where

justice and fair play require it." *Watkins v. U.S. Army*, 875 F.2d 699, 706 (9th Cir. 1989) (en banc).

In the rare circumstances in which equitable estoppel may apply against the government, a party

must show "affirmative misconduct going beyond mere negligence." *Angeles v. Dist. Dir., INS*,

729 F. Supp. 479, 485 (D. Md. 1990); *see Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003)

("estoppel may only be justified, if ever, in the presence of affirmative misconduct by government

agents").  Plaintiffs cannot meet this standard.

First, Plaintiffs have failed to plausibly allege that the government engaged in any

"affirmative misconduct going beyond mere negligence." *Angeles*, 729 F. Supp. at 485 (finding

that INS was not estopped from deporting the plaintiff where immigration officers and a government brochure incorrectly advised her that her permanent resident status would remain valid so long as she did not stay outside the country for more than one year).  To meet that standard, Plaintiffs must plead "an affirmative misrepresentation or affirmative concealment of a material fact by the government." *Watkins*, 875 F.2d at 707 (estopping government from barring a soldier's reenlistment where the Army affirmatively misrepresented a soldier's qualifications throughout fourteen years of official records).  Here, Plaintiffs have not identified any governmental misconduct, let alone extraordinary misconduct.  Instead, they have merely pleaded that there was a change in policy (an erroneous allegation vis-a-vis the information-sharing policy).

Second, estoppel for individual claims is only available where the government's act will cause a "serious injustice" and applying estoppel will not cause the public's interest to "suffer undue damage." *Watkins*, 875 F.2d at 707 (quotation omitted).  Plaintiffs have failed to sufficiently plead facts that would support these necessary threshold elements.  To the contrary, as reflected in documents incorporated by reference in Plaintiffs' Complaint, DHS made clear in its FAQs that "DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion."  DHS DACA FAQ No. 27.  Moreover, nothing in the 2012 DACA Memorandum, the form used to request DACA (USCIS Form I-821D), or in the DACA FAQs generally could be construed to represent to DACA recipients that the DACA policy was permanent and not subject to change.  There is therefore no "serious injustice" that Plaintiffs can point to relating to the rescission of this discretionary policy.[15]

---

[15] Even if this Court were to conclude that Plaintiffs can somehow meet these threshold requirements, it would still need to apply traditional estoppel elements to Plaintiffs' claims on an individualized bases: "(1) the party to be estopped knew the true facts; (2) the party to be estopped intended for his conduct to be acted upon or acted in such a way that the party asserting estoppel

At bottom, Plaintiffs' estoppel claims merely repackage their policy challenges.  Equitable estoppel, however, is unavailable for such broad-based challenges.  And even if the Court were to review Plaintiffs' claims on an individualized basis, those claims still fail.  While Plaintiffs surely disagree with the rescission of DACA, that disagreement does not mean that Plaintiffs have alleged that there is a "serious injustice," much less a circumstance involving "affirmative misconduct" in which estoppel should apply.  For these reasons, Plaintiffs' equitable estoppel claims should be dismissed.

## III.   NATIONWIDE DECLARATORY AND INJUNCTIVE RELIEF IS IMPERMISSIBLE.

Finally, in an indirect attack of the Rescission policy, Plaintiffs seek in a separate cause of action a declaratory judgment that DACA is "lawful."  *See* Pls.' Compl. ¶¶ 182-85 (Count 7).  The Declaratory Judgment Act, however, provides a remedy, not a source of rights independent of substantive federal law.  *Gibraltar, P.R., Inc. v. Otoki Grp., Inc.*, 104 F.3d 616, 618-19 (4th Cir. 1997); *see Johnson v. Sessions*, No. 15-cv-3317-RDB, 2017 WL 1207537, at *6 & n.6 (D. Md. Apr. 3, 2017) (noting that the court would not consider declaratory judgment claim, even if it had jurisdiction, because the request for declaratory relief was duplicative of relief sought through the plaintiff's APA claims).  Moreover, to establish standing and seek relief under the Declaratory Judgment Act, a plaintiff must demonstrate that there is an "actual controversy" necessitating declaratory relief.  28 U.S.C. § 2201(a); *see Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 239-40 (1937).  The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests."  *Aetna*, 300 U.S. at 240-41.

Here, even assuming DACA were "lawful," any declaratory relief that this Court might

---

had a right to believe that it was intended; (3) the party claiming estoppel was ignorant of the true facts; and (4) the misconduct was relied upon to the detriment of the parties seeking estoppel."  *Dawkins*, 318 F.3d at 611 n.6.  Plaintiffs have failed to plausibly allege facts in support of these elements as well.

provide would merely be an academic dispute because the Acting Secretary still would have had the discretion to rescind the policy. *See supra* Part I.A. Instead, the "controversy" (to the extent it is even justiciable) concerns whether the Acting Secretary's decision to rescind DACA in light of litigation risk that DHS was facing was arbitrary or capricious. Any after-the-fact conclusion by this Court that DACA is "lawful" has no bearing on that decision, which was based on the litigation risk that DHS was then confronting. Thus, any declaratory judgment that this Court might issue would not provide any actual benefits to Plaintiffs.

Plaintiffs also seek injunctive relief preventing Defendants "from implementing or enforcing the Rescission" and "from disclosing any DACA applicant information [for] immigration enforcement activities in a manner inconsistent with their prior commitments." Pls.' Compl. at 60, Relief Requested. To the extent this Court ultimately concludes that Plaintiffs are entitled to any injunction, it should dismiss Plaintiffs' request to the extent they seek nationwide relief. Both constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries. Article III demands that "a plaintiff must demonstrate standing … for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted). "The remedy" sought thus must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis* v. *Casey*, 518 U.S. 343, 357 (1996). "The actual-injury requirement would hardly serve [its] purpose … of preventing courts from undertaking tasks assigned to the political branches[,] if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy all inadequacies in that administration." *Id.* (emphasis omitted). And equitable principles independently require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health*

*Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted); *see also Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (narrowing injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin such an order on the ground that it might cause harm to other parties"). Accordingly, any injunction here should be limited to particular individual Plaintiffs found to have cognizable claims.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss this case or, in the alternative, should grant summary judgment in Defendants favor on all of Plaintiffs' claims.

Dated: November 15, 2017         Respectfully submitted,

        CHAD A. READLER
        Acting Assistant Attorney General

        BRETT A. SHUMATE
        Deputy Assistant Attorney General

        JENNIFER D. RICKETTS
        Director

        JOHN R. TYLER
        Assistant Branch Director

        */s/   Kathryn C. Davis*
        KATHRYN C. DAVIS
        */s/   Rachael Westmoreland*
        RACHAEL WESTMORELAND
        Trial Attorneys
        United States Department of Justice
        Civil Division, Federal Programs Branch
        20 Massachusetts Avenue NW
        Washington, DC 20530
        Phone: (202) 616-8298
        Fax: (202) 616-8470
        Email: Kathryn.C.Davis@usdoj.gov

        *Counsel for Defendants*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| CASA DE MARYLAND, *et al.*, | |
| *Plaintiffs*, | |
| v. | No. 17-cv-2942 (RWT) |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | |
| *Defendants*. | |

**[PROPOSED] ORDER**

Upon consideration of Defendants' Motion to Dismiss or, In the Alternative, For

Summary Judgment, and any response or reply thereto, it is hereby

**ORDERED** that this motion is **GRANTED**; and it is

**FURTHER ORDERED** that this action is **DISMISSED** in its entirety.

This is a final, appealable order. *See* Fed. R. App. P. 4(a).

**SO ORDERED**.

Dated: _____        _____
                                     ROGER W. TITUS
                                     United States District Judge