**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS; | ) | |
| | ) | |
| STATE OF ALABAMA; | ) | |
| | ) | |
| STATE OF ARKANSAS; | ) | |
| | ) | |
| STATE OF LOUISIANA; | ) | |
| | ) | |
| STATE OF NEBRASKA; | ) | |
| | ) | |
| STATE OF SOUTH CAROLINA; | ) | |
| | ) | |
| STATE OF WEST VIRGINIA; | ) | |
| | ) | |
| STATE OF KANSAS; | ) | |
| | ) | |
| GOVERNOR PHIL BRYANT, State of Mississippi; and | ) | |
| | ) | |
| GOVERNOR PAUL R. LePAGE, State of Maine, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| *v.* | ) | Case No. 1:18-cv-00068 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.,* | ) | |
| | ) | |
| *Defendants,* | ) | |
| | ) | |
| *and* | ) | |
| | ) | |
| | ) | |
| KARLA PEREZ, *et al.,* | ) | |
| | ) | |
| *Defendant-Intervenors.* | ) | |

## FIRST AMENDED COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     In 2012 and again in 2014, unilateral executive action by the Obama Administration created far-reaching, class-based "deferred action" programs to grant to millions of unlawfully present aliens the legal classification of "lawful presence" in this country and numerous attendant benefits—without congressional authorization.

2.     In a decision affirmed by the divided Supreme Court, the Fifth Circuit upheld this Court's preliminary injunction of the 2014 executive action that created "DAPA" and "Expanded DACA." The Fifth Circuit held this executive action invalid as lacking notice-and-comment procedure and, in any event, contrary to federal law. As the Fifth Circuit noted, the Executive's claim of authority to create these programs "would allow [the Executive] to grant lawful presence and work authorization to *any* illegal alien in the United States—an untenable position in light of the INA's intricate system of immigration classifications and employment eligibility." *Texas v. United States*, 809 F.3d 134, 184 (5th Cir. 2015) (emphasis added), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016) (per curiam).

3.     In June 2017, after the Supreme Court's ruling, the Executive Branch rescinded prospectively its 2014 executive action creating DAPA and Expanded DACA.

4.     Later that month, Texas and other Plaintiffs proposed to resolve the then-pending litigation if the Executive Branch also rescinded prospectively its 2012 executive action creating "DACA." Otherwise, Plaintiffs wrote, they would amend their complaint in that pending litigation to challenge DACA on the same bases that they challenged DAPA and Expanded DACA.

2

5.      On the September 2017 deadline for accepting Plaintiffs' proposal, the Executive Branch issued a memorandum rescinding DACA by directing that DACA permits would not be issued or renewed starting March 5, 2018. Accordingly, Plaintiffs voluntarily dismissed their then-pending litigation in this Court.

6.      Yet DACA is still in force and will remain in force for the indefinite future. In January 2018, a California district court issued a preliminary injunction of the Executive's 2017 decision to rescind DACA, allowing several challenges to that 2017 executive action to proceed.

7.      In another challenge in the District of Columbia, the district court on April 24, 2018, vacated the Executive's decision to rescind DACA, granted summary judgment that the executive action was substantively unlawful under the APA, and ordered the Executive to continue issuing new DACA applications, staying that order a mere 90 days. *NAACP v. Trump*, No. 1:17-cv-1907, 2018 WL 1920079, at *1, *28 (D.D.C. Apr. 24, 2018).

8.      Plaintiffs abided DACA while the controlling legal issues were decided in the prior litigation and while the Executive reweighed DACA's legality. But the recent injunctions of the 2017 executive action undermine Plaintiffs' express basis for dismissing their prior litigation—and means that Plaintiffs will suffer ongoing harm from DACA for the indefinite future.

9.      Plaintiffs thus bring this lawsuit challenging the 2012 executive action creating DACA in the first place. This lawsuit does not call on this Court to resolve any of the challenges pending in California or elsewhere about the validity of

3

executive action in 2017. Rather, this lawsuit challenges whether the 2012 executive action unilaterally creating DACA was itself lawful.

10.     This lawsuit also does not challenge the Executive Branch's ability to prioritize removal resources. It does not seek an injunction requiring the Executive to remove any alien from the country. As the Fifth Circuit has noted, those matters are distinct from programs like that here, which grant lawful-presence status.

11.     This lawsuit is emphatically about the rule of law. The policy merits of immigration laws are debated in and decided by Congress. The Executive Branch does not exercise a lawmaking role. Its duty is to take care that the law is faithfully executed—substantive immigration law and procedural administrative law alike.

12.     Under the Fifth Circuit's controlling precedent, DACA is unlawful for the same reasons as DAPA and Expanded DACA were unlawful. *See Texas*, 809 F.3d 134. This lawsuit seeks declaratory and injunctive relief to that effect.

13.     Indeed, Plaintiffs' challenge to the Obama Administration's class-based deferred-action programs has only become stronger since the prior suit challenging DAPA and Expanded DACA. Each memorandum creating DACA, Expanded DACA, or DAPA promised that "[t]his memorandum confers no . . . pathway to citizenship." *See infra* ¶¶ 84, 151. But, as of August 21, 2017, as many as 39,514 aliens had used their DACA status to obtain a pathway to citizenship, through the conferral of lawful-permanent-resident status (commonly known as "LPR" or "green card" status), and

4

approximately 1,056 alien DACA recipients with LPR status had obtained United States citizenship.[1]

14.     If ever there were a violation of the President's duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, this is it. The Executive unilaterally conferred lawful presence and work authorization on otherwise unlawfully present aliens, and then the Executive used that lawful-presence "dispensation" to unilaterally confer United States citizenship. *Arizona v. United States*, 567 U.S. 387, 435 (2012) (Scalia, J., concurring in part and dissenting in part).

15.     The Attorney General of the United States has announced that DACA suffers from the same legal defects as DAPA and that, if DACA were challenged, "the likeliest outcome is that it would be enjoined just as was DAPA."[2]

16.     That is precisely what the Court should do here. This Court has authority to immediately rescind and cancel all DACA permits currently in existence because they are unlawful. However, Plaintiffs are amenable to a remedy that enjoins Defendants from issuing or renewing DACA permits in the future, effectively phasing out the program within two years.

---

[1] *See* Press Release, Office of Sen. Chuck Grassley, Data Indicate Unauthorized Immigrants Exploited Loophole to Gain Legal Status, Pathway to Citizenship (Sept. 1, 2017), https://www.grassley.senate.gov/news/news-releases/data-indicate-unauthorized-immigrants-exploited-loophole-gain-legal-status. "A valid, unexpired Form I-551, Permanent Resident Card (also known as a 'green card'), is the primary evidence of an alien's status as a Lawful Permanent Resident (LPR) of the United States." U.S. Dep't of State, 9 Foreign Affairs Manual 202.2-6(a)(1) (2018).

[2] Press Release, U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017)*,* https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca.

## JURISDICTION AND VENUE

17.    The Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under the U.S. Constitution, art. II, § 3, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. The Court also has jurisdiction under 28 U.S.C. § 1346(a)(2) because this is a civil action or claim against the United States. Finally, the Court has jurisdiction to compel an officer or employee of the above-named federal agencies to perform his or her duty under 28 U.S.C. § 1361.

18.    Venue is proper in this District under 28 U.S.C. § 1391(e) because the State of Texas is a resident of this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

19.    This Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the APA, 5 U.S.C. § 706; and 28 U.S.C. § 1361.

## THE PARTIES

20.    Plaintiffs are the States of Texas, Alabama, Arkansas, Louisiana, Nebraska, South Carolina, West Virginia, Kansas, and the Governors of Mississippi and Maine.

21.    The Plaintiff States have interests that fall within the zone of interests of federal statutes on immigration policy. "The pervasiveness of federal regulation does not diminish the importance of immigration policy to the States," which "bear[ ] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.

22.     Defendant United States of America is sued under the APA. *See* 5 U.S.C. § 703 ("[T]he action for judicial review may be brought against the United States . . . .").

23.     Defendant Kirstjen M. Nielsen is the Secretary of the U.S. Department of Homeland Security ("DHS"). Defendant Nielsen and DHS are responsible for U.S. Citizenship and Immigration Services ("USCIS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"). Defendant Nielsen also is responsible for the continued administration of DACA and Expanded DACA.

24.     Defendant Kevin K. McAleenan is the Commissioner of CBP. Defendant McAleenan shares responsibility for the administration of DACA and Expanded DACA.

25.     Defendant Thomas D. Homan is the Deputy Director and Acting Director for ICE. ICE administers a formal program for allowing unlawfully present aliens to apply for deferred action and to appeal for reconsideration if deferred action is denied.

26.     Defendant L. Francis Cissna is the Director of USCIS. Cissna and USCIS administer the DACA program. USCIS is the principal agency responsible for the continued administration of DACA and Expanded DACA.

27.     Defendant Carla L. Provost is Acting Chief of the U.S. Border Patrol. Provost and the U.S. Border Patrol are responsible for enforcing immigration laws and the detection, interdiction and apprehension of those who attempt to illegally

enter or smuggle people or contraband across U.S. borders between official ports of entry.

## FACTUAL BACKGROUND

**I.    Congress Created an Extensive Statutory Framework in the Area of Immigration, and Congress Has Not Given the Executive Unilateral Power to Confer Lawful Presence and Work Authorization on Unlawfully Present Aliens Simply Because the Executive Chooses Not to Remove Them.**

28.    "Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress." *Arizona*, 567 U.S. at 409 (alteration in original) (quoting *Galvan v. Press*, 347 U.S. 522, 531 (1954)).

29.    Congress has accordingly enacted "extensive and complex" statutes governing "immigration and alien status." *Id*. at 395.

30.    Title 8 of the United States Code, dealing with immigration, functions as a "single integrated and all-embracing system" governing the presence of aliens in the country. *Id*. at 400 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 74 (1941)).

31.    Through the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*, Congress has delineated "specifi[c] categories of aliens" who may be admitted into and lawfully present in the country as well as the consequences for unlawful presence. *Arizona*, 567 U.S. at 395.

32.    Congress has enacted complex provisions detailing how over forty different classes of immigrants, nonimmigrants, refugees, and other aliens can attain lawful presence in the country. *See Texas*, 809 F.3d at 179.

33.    Moreover, under the Immigration Reform and Control Act of 1986 ("IRCA"), Congress created "a comprehensive framework for 'combating the employment of illegal aliens.'" *Arizona*, 567 U.S. at 404 (quoting *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002)).

34.    Congress reinforced immigration laws with the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") and the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), responding to the States' concerns about the effects of extending benefits to unlawfully present aliens. *E.g.*, 142 Cong. Rec. 26,680 (1996) (statement of Sen. Kyl) ("With this immigration bill, we have the opportunity to lift this financial burden off the States by forcing the Federal Government to take responsibility for reducing illegal immigration . . . .").

35.    Congress never gave the Executive Branch *carte blanche* to sidestep these statutes and unilaterally permit unlawfully present aliens to be lawfully present or obtain attendant benefits and work authorization simply because the Executive chooses not to remove them.

36.    Lawful presence is an immigration classification created by Congress.

37.    Unlawful presence is an immigration classification created by Congress.

38.    The classification of lawful presence is a necessary prerequisite for aliens to be eligible for Social Security. *See* 8 U.S.C. § 1611(b)(2).

39.    The classification of lawful presence is a necessary prerequisite for aliens to be eligible for Medicare. *See id.* § 1611(b)(3).

40.    The classification of lawful presence is a necessary prerequisite for aliens to be eligible for a retirement benefit in PRWORA. *See id.* § 1611(b)(4).

41.    The classification of unlawful presence makes time spent in that status count towards a reentry ban un IIRIRA, subject to statutory exception. *See id.* § 1182(a)(9)(B)(i) (3-year reentry ban for aliens "unlawfully present in the United States for a period of more than 180 days but less than 1 year"; 10-year reentry ban for aliens "unlawfully present in the United States for one year or more").

42.    The classification of lawful presence is a necessary prerequisite for aliens to be eligible for the Earned Income Tax Credit. *See* 26 U.S.C. § 32(c)(1)(A), (c)(1)(E), (m) (eligibility based on an individual having a valid Social Security number).

## II.    Congress Has Declined to Pass the DREAM Act.

43.    On August 1, 2001, the Development, Relief, and Education for Alien Minors (DREAM) Act was first introduced in Congress. *See* S. 1291, 107th Cong. (2001).

44.    The DREAM Act has been introduced in some form in each Congress since then. *See, e.g.*, S. 1545, 108th Cong. (2003); S. 2075, 109th Cong. (2005); S. 2205, 110th Cong. (2007); S. 729, 111th Cong. (2009); H.R. 1751, 111th Cong. (2009); S. 952, 112th Cong. (2011); S. 744, 113th Cong. (2013); S. 3542, 114th Cong. (2016); H.R. 496, 115th Cong. (2017).

45.    The proposed DREAM Act would have allowed unlawfully present aliens to apply for lawful presence through conditional-permanent-resident status if, among

other things, (1) they entered the United States before the age of 16, and (2) they had been in the United States continuously for five years.

46.     Congress has repeatedly declined to enact the DREAM Act.

47.     Features of the DREAM Act closely resemble DACA and DAPA.

48.     The DREAM Act's coverage criteria are substantially similar to DACA's and Expanded DACA's coverage criteria, as DACA's and Expanded DACA's coverage criteria also require entry into the United States before the age of 16 and at least five years of continuous residence in the United States.

49.     Former President Obama repeatedly urged Congress to pass the DREAM Act.

50.     Former President Obama consistently asserted that he could not achieve the goals of the DREAM Act on his own through unilateral Executive action. He said, for instance:

- "Comprehensive reform, that's how we're going to solve this problem. . . . Anybody who tells you . . . [that] I can wave a magic wand and make it happen hasn't been paying attention [to] how this town works." President Barack Obama, Remarks on Comprehensive Immigration Reform (May 5, 2010), https://obamawhitehouse.archives.gov/blog/2010/05/05/cinco-de-mayo-a-call-comprehensive-immigration-reform.

- "I am president, I am not king. I can't do these things just by myself. . . . [T]here's a limit to the discretion that I can show because I am obliged to execute the law. . . . I can't just make the laws up by myself." President

Barack   Obama,   Interview   with   Univision   (Oct.   25,   2010),
http://latimesblogs.latimes.com/washington/2010/10/transcript-of-
president-barack-obama-with-univision.html.

- In response to a question about whether he could stop deportation of
  unlawfully present students with an executive order: "Well, first of all,
  temporary protective status historically has been used for special
  circumstances where you have immigrants to this country who are fleeing
  persecution in their countries, or there is some emergency situation in their
  native land that required them to come to the United States. So it would
  not be appropriate to use that just for a particular group that came here
  primarily . . . for economic opportunity. With respect to the notion that I
  can just *suspend deportations through executive order, that's just not the
  case*, because there are laws on the books that Congress has passed . . . .
  There are enough laws on the books by Congress that are *very clear in terms
  of how we have to enforce our immigration system* that for me to simply
  through executive order *ignore those congressional mandates* would not
  conform with my appropriate role as President." President Barack Obama,
  Remarks   at   Univision   Town   Hall   (Mar.   28,   2011),
  https://obamawhitehouse.archives.gov/the-press-
  office/2011/03/28/remarks-president-univision-town-hall (emphasis added).

- "I can't solve this problem by myself. . . . We're going to have to change the
  laws in Congress." President Barack Obama, Remarks at a Facebook Town

12

Hall (Apr. 20, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/04/20/remarks-president-facebook-town-hall.

- "I know some here wish that I could just bypass Congress and change the law myself. But that's not how democracy works. See, democracy is hard. But it's right. Changing our laws means doing the hard work of changing minds and changing votes, one by one." President Barack Obama, Remarks at Miami Dade College Commencement (Apr. 29, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/04/29/remarks-president-miami-dade-college-commencement.

- "And sometimes when I talk to immigration advocates, they wish I could just bypass Congress and change the law myself. But that's not how a democracy works. What we really need to do is to keep up the fight to pass genuine, comprehensive reform. That is the ultimate solution to this problem." President Barack Obama, Remarks on Comprehensive Immigration Reform in El Paso, Texas (May 10, 2011), https://obamawhitehouse.archives.gov/the-press-office/2011/05/10/remarks-president-comprehensive-immigration-reform-el-paso-texas.

- "[B]elieve me, the idea of doing things on my own is very tempting. . . . But that's not how . . . our system works. . . . That's not how our democracy functions. That's not how our Constitution is written." President Barack Obama, Remarks to the National Council of La Raza (July 25, 2011),

https://obamawhitehouse.archives.gov/the-press-

office/2011/07/25/remarks-president-national-council-la-raza.

- "Administratively, we can't ignore the law. . . . We are doing everything we
  can administratively. But the fact of the matter is there are laws on the
  books that I have to enforce." President Barack Obama, Remarks in an
  "Open for Questions" Roundtable (Sept. 28, 2011),
  https://obamawhitehouse.archives.gov/the-press-
  office/2011/09/28/remarks-president-open-questions-roundtable.

51.     Despite former President Obama's statements, Congress refused to pass
the DREAM Act.

## III.    The Obama Administration Unilaterally Created DACA, Which Confers Eligibility for Lawful Presence, Work Authorization, and a Host of Attendant Benefits.

52.     On June 15, 2012, former President Obama's Secretary of Homeland
Security Napolitano announced the unilateral creation of a program that has become
known as Deferred Action for Childhood Arrivals ("DACA"). *See* **Exhibit 1**.

53.     This Department of Homeland Security memorandum creating DACA
was issued without APA notice-and-comment procedure.

54.     Through Secretary Napolitano's DACA memo, the Executive Branch
ordered federal immigration officials to make qualifying unlawfully present aliens
eligible to receive "deferred action" status if they (1) entered the United States before
the age of 16; (2) had been in the United States continuously for at least five years;
(3) met certain educational standards or were veterans; (4) had not been convicted of
a felony, a "significant" misdemeanor or "multiple" misdemeanors, or otherwise posed

14

a threat to national security or public safety; and (5) were not above the age of thirty. *Id.* at 1.

55. DACA's "deferred action" terms last for 2 years. *Id.* at 2.

56. DACA's "deferred action" terms are renewable. *Id.*

57. DACA's criteria would cover approximately 1.7 million otherwise unlawfully present aliens.

58. As of September 30, 2017, DACA relief had been conferred on approximately 800,000 aliens. *See* USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, Fiscal Year 2012-2017, attached as **Exhibit 2** (798,980 initial applications and 1,002,810 renewal applications approved from 2012 through September 2017).

59. As of September 30, 2017, DACA relief had been conferred on approximately 125,000 aliens in Texas alone. *See id.* at 2 (125,239 initial applications and 128,812 renewal applications approved for Texas residents from 2012 through September 2017).

60. According to USCIS, deferred action under DACA "may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion." USCIS, Deferred Action for Childhood Arrivals (DACA) Toolkit 16, *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015) (No. 1:14-cv-254), ECF No. 38-6.

61. DACA's conferral of "deferred action" entails much more than the Executive simply choosing not to remove an alien with DACA.

62. The Executive Branch treats DACA's conferral of "deferred action" as

15

also conferring lawful presence: "An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect." *See, e.g.*, *Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/frequently-asked-questions (last visited May 1, 2018).

63.   Thus, "while [a DACA recipient's] deferred action is in effect and, for admissibility purposes, [the DACA recipient is] considered to be lawfully present in the United States during that time." *Id.* This has been true since 2012.

64.   The Executive's implementation of DACA as conferring lawful presence tracks the Executive's practice stated in the 2014 DAPA and Expanded DACA memorandum (the "DAPA Memo") issued by former DHS Secretary Johnson, which stated: "Deferred action . . . means that, for a specified period of time, an individual is permitted to be lawfully present in the United States." **Exhibit 3** at 2.

65.   The United States has also confirmed in court that DACA "approved deferred action status is lawful status that affords a period of authorized stay." *See* United States' Brief as Amicus Curiae in Opposition to rehearing En Banc at 16, *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) (No. 13-16248), ECF No. 75 (internal quotation marks omitted).

66.   DACA's conferral of lawful presence creates eligibility for a host of benefits.

67.    DACA's conferral of lawful presence appears to eliminate predicates necessary under the INA to pursue proceedings to remove an alien from the United States.

68.    An alien is removable if he is "present in the United States in violation of [federal law]." 8 U.S.C. § 1227(a)(1)(B).

69.    An alien may also be removed if he cannot establish that he "is lawfully present in the United States pursuant to a prior admission." *Id.* § 1229a(c)(2)(B).

70.    DACA's conferral of lawful presence negates the removability charge that an alien is "present in the United States in violation of [federal law]." *Id.* § 1227(a)(1)(B).

71.    DACA's conferral of lawful presence negates the removability charge that an alien is present "without being admitted or paroled," *id.* § 1182(a)(6)(A)(i), as the Executive maintains that an alien granted lawful presence is not considered "present in the United States without being admitted or paroled," Pet. Br. at 9 n.3, *Texas*, 136 S. Ct. 2271 (No. 15-674), 2016 WL 836758.

72.    DACA's conferral of lawful presence means a DACA recipient satisfies the lawful-presence prerequisite for the alien to be eligible for Social Security. *See* 8 U.S.C. § 1611(b)(2).

73.    DACA's conferral of lawful presence means a DACA recipient satisfies the lawful-presence prerequisite for the alien to be eligible for Medicare. *See id.* § 1611(b)(3).

74.    DACA's conferral of lawful presence means a DACA recipient satisfies

17

the lawful-presence prerequisite for the alien to be eligible for a retirement benefit in PRWORA. *See id.* § 1611(b)(4).

75.     DACA's conferral of lawful presence means a DACA recipient is eligible for tolling of the IIRIRA reentry-ban clock that accrues during periods of unlawful presence. *See id.* § 1182(a)(9)(B).

76.     DACA's conferral of lawful presence also creates eligibility for various State benefits—including a driver's license in most States.

77.     Additionally, the Executive Branch treats DACA's conferral of "deferred action" as conferring eligibility for "work authorization." **Exhibit 1** at 3.

78.     The Executive has consistently told aliens that their DACA applications *must* be accompanied by applications for a Form I-765 application for work authorization. *See Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/frequently-asked-questions (last visited May 1, 2018).

79.     Work authorization has been granted to the substantial majority of DACA recipients.

80.     "The United States concedes that '[a]n alien with work authorization may obtain a Social Security Number,' 'accrue quarters of covered employment,' and 'correct wage records to add prior covered employment within approximately three years of the year in which the wages were earned or in limited circumstances thereafter.'" *Texas*, 809 F.3d at 149 (citation omitted).

81.     DACA recipients are eligible for earned income tax credits once they received a Social Security number.

82.   Some DACA recipients have received Earned Income Tax Credits.

83.   The nonpartisan congressional Joint Committee on Taxation estimated that, over a 10-year period, DAPA recipients could have received $1.7 billion in Earned Income Tax Credit payments alone. Press Release, Office of Sen. Chuck Grassley, Senators Introduce Bill Disallowing Tax Credit Under 2014 Executive Actions (Mar. 10, 2015), https://www.grassley.senate.gov/news/news-releases/senators-introduce-bill-disallowing-tax-credit-under-2014-executive-actions.

84.   The June 15, 2012 DACA memo stated that "[t]his memorandum confers no . . . pathway to citizenship." **Exhibit 1** at 3.

85.   However, the Executive's implementation of DACA has conferred United States citizenship and a pathway to citizenship on some DACA recipients.

86.   The Executive has given some DACA recipients "advance parole."

87.   The "advance parole" granted to aliens because of their receipt of DACA has resulted in some of those aliens obtaining adjustment to LPR status, for which they would otherwise be ineligible.

88.   LPR status is commonly referred to as possessing a "green card." *See supra* ¶ 13 & n.1.

89.   LPR status provides a pathway to United States citizenship. *See* 8 U.S.C. § 1427(a).

90.   By allowing advance parole, which satisfies a requisite for a green card under the Executive's practice, DACA allowed aliens to obtain citizenship when their

unlawful entry into the United States would otherwise foreclose this pathway to citizenship.

91.     The "advance parole" granted to aliens because of their receipt of DACA has resulted in some of those aliens obtaining United States citizenship.

92.     "Advance parole" is an Executive practice that allows aliens to leave the country and reenter. USCIS, Deferred Action for Childhood Arrivals (DACA) Toolkit, *supra*, 23-24; Letter from León Rodríguez, Dir., USCIS, to Hon. Charles Grassley 3-4 (Oct. 9, 2014), *Texas*, 86 F. Supp. 3d 591 (No. 1:14-cv-254), ECF No. 64-48; *Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/frequently-asked-questions (last visited May 1, 2018).

93.     The Executive has deemed DACA and Expanded DACA recipients who obtain "advance parole" from the Executive—and then leave and reenter the United States—as being lawfully "admitted or paroled into the United States" upon reentry. 8 U.S.C. § 1255(a).

94.     Congressional statutes, however, generally impose a reentry ban for aliens who were unlawfully present in the country for more than 180 days as an adult. *See id.* § 1182(a)(9)(B)(i) (3-year reentry ban for aliens "unlawfully present in the United States for a period of more than 180 days but less than 1 year"; 10-year reentry ban for aliens "unlawfully present in the United States for one year or more"); *id.* § 1182(a)(9)(B)(iii)(I) (unlawful presence before 18 is not counted).

95.     Under DACA's criteria, an alien must have been in the United States for more than 180 days to possibly qualify for DACA.

96. Thus, Congress's reentry ban applies to all DACA recipients over 18.5 years of age.

97. The Executive's discretion to waive this reentry ban is significantly limited, as that waiver authority only applies "in the case of an immigrant who is the *spouse or son or daughter* of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the Attorney General that the refusal of admission to such immigrant alien would result in *extreme hardship* to the citizen or lawfully resident spouse or parent of such alien." *Id.* § 1182(a)(9)(B)(v) (emphases added).

98. Congressional statutes also significantly limit the Executive's authority to grant aliens temporary "parole" into the country: "The Attorney General may, except as provided in subparagraph (B) or in section 1184(f) of this title, in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis *for urgent humanitarian reasons or significant public benefit* any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien *shall forthwith return or be returned to the custody* from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.* § 1182(d)(5)(A) (emphases added).

99.     The Executive considers "advance parole" an exercise of its humanitarian-parole authority. *E.g.*, DHS, DACA National Standard Operating Procedures 125, *Texas*, 86 F. Supp. 3d 591 (No. 1:14-cv-254), ECF No. 64-17.

100.    Unlike other categories of aliens seeking advance parole, the Executive has not required DACA recipients to qualify for the "urgent humanitarian reasons" or "significant public benefit" statutory requirements for parole. 8 U.S.C. § 1182(d)(5)(A). *See* USCIS, Instructions for Application for Travel Document 4-5 (expires Dec. 31, 2018), https://www.uscis.gov/system/files_force/files/form/i-131instr.pdf?download=1.

101.    Instead, the Executive has considered DACA recipients eligible for advance parole based on its own far broader criteria:

- "humanitarian purposes," such as "travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative";

- "educational purposes," such as participating in "semester-abroad programs" or "academic research"; or

- "employment purposes," including "overseas assignments, interviews, conferences or, training, or meetings with clients overseas."

*Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/frequently-asked-questions (last visited May 1, 2018).

102.   The Executive's conferral of advance parole on DACA recipients did not invoke the limited "extreme hardship" exception to the reentry ban that applies to DACA recipients. 8 U.S.C. § 1182(a)(9)(B)(v).

103.   To the contrary, the Executive considers an alien with advance parole not to have made a "departure" from the United States by physically leaving the country, so there would never be a triggering of the reentry bar when that alien returns to the United States and seeks parole into the country at the port of entry. 7 USCIS, Policy Manual, pt. M, ch. 3 (last updated Aug. 23, 2017), https://www.uscis.gov/policymanual/HTML/PolicyManual-Volume7-PartM-Chapter3.html (citing *In re Arrabally and Yerrabelly*, 25 I&N Dec. 771 (BIA 2012)).

104.   Advance parole is unlawful as applied to DACA recipients over 18.5 years of age because those aliens are reentry-barred under 8 U.S.C. § 1182(a)(9)(B) and the Executive has not purported to excuse that bar under the limited exception of § 1182(a)(9)(B)(v).

105.   Independently, advance parole is unlawful as it has been applied to all DACA recipients because the Executive has not required DACA recipients to qualify for the "urgent humanitarian reasons" or "significant public benefit" statutory requirements for parole. *Id.* § 1182(d)(5)(A).

106.   For an alien to be eligible to adjust to lawful-permanent-resident status (and thus obtain a pathway to United States citizenship), the alien must be lawfully "admitted or paroled into the United States." *Id.* § 1255(a).

107.    Thus, leaving and reentering the United States with advance parole removes a significant impediment for some otherwise unlawfully present aliens to seek adjustment to LPR status (which entails a pathway to United States citizenship). *See* Immigrant Legal Res. Ctr., Practice Advisory: DACA, Advance Parole, and Family Petitions 2-3, 7 (June 2016), https://www.ilrc.org/sites/default/files/resources/prac_adv-daca_advance_parole_fam_pet-20160531.pdf.

108.    Indeed, DACA recipients have successfully adjusted their status after being paroled back into the United States. *See, e.g.*, *id.* at 7.

109.    As of December 31, 2015, at least 2,994 DACA recipients were approved for adjustment to LPR status. *See* Letter from León Rodríguez, Dir., USCIS, to Hon. Charles E. Grassley (June 29, 2016), https://www.judiciary.senate.gov/imo/media/doc/2016-06-29%20USCIS%20to%20CEG%20-%20DACA%20Advance%20Parole%20Program.pdf.

110.    As of August 21, 2017, approximately 39,514 DACA recipients were adjusted to LPR status. *See* Press Release, Office of Sen. Chuck Grassley, Data Indicate Unauthorized Immigrants Exploited Loophole to Gain Legal Status, Pathway to Citizenship (Sept. 1, 2017), https://www.grassley.senate.gov/news/news-releases/data-indicate-unauthorized-immigrants-exploited-loophole-gain-legal-status.

111.    Thus, some individuals now have a previously unavailable pathway to United States citizenship on account of receiving DACA, even though the June 15, 2012 DACA memo said that DACA would confer no pathway to United States citizenship.

112.   Of those aliens, as of August 21, 2017, approximately 2,181 DACA recipients have applied for United States citizenship, and approximately 1,056 DACA recipients have been granted United States citizenship. *See id.*

113.   By enabling this pathway to citizenship, DACA provided an additional incentive for unlawfully present aliens, who would otherwise be subject to up to a ten-year reentry ban, to remain in the United States rather than return to their country of nationality. *Cf. Texas*, 86 F. Supp. 3d at 635.

114.   For an alien whose pathway to citizenship (for example, through an immigrant visa from marriage to a United States citizen) is foreclosed by his accrued unlawful presence, traveling to the alien's home country and returning with advance parole is likely preferable to returning to the alien's home country and waiting out a ten-year unlawful-presence reentry bar.

115.   Because it is unlawful to grant advance parole premised on DACA status, it is unlawful for the Executive to adjust an alien's status to lawful-permanent-resident status based on that advance parole.

116.   Consequently, it is unlawful for the Executive to confer lawful-permanent-resident status or United States citizenship on DACA recipients who were ineligible to adjust their status but for advance parole.

117.   Before the 2012 DACA memo issued, former President Obama asked the Department of Justice's Office of Legal Counsel ("OLC") whether DACA "would be legally permissible." Memorandum Opinion for the Secretary of Homeland Security

and the Counsel to the President 18 n.8 (Nov. 19, 2014) ("OLC Memo"), attached as **Exhibit 4**.

118.   The OLC Memo never mentioned that DACA or Expanded DACA confers lawful presence.

119.   The OLC Memo never mentioned that DACA or Expanded DACA could confer a pathway to citizenship.

120.   OLC's "preliminary view was that such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis." *Id.*

121.   OLC explained that "extending deferred action to individuals who satisfied these and other specified criteria on a class-wide basis would raise distinct questions not implicated by ad hoc grants of deferred action." *Id.*

122.   OLC "advised that it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria." *Id.*

## IV.   The Obama Administration's Refusal to Follow Immigration Laws Caused a Humanitarian Crisis.

123.   The Executive Branch did not stop at DACA with dispensing with the Nation's immigration laws. Rather, the former Presidential Administration adopted a policy that encouraged international child smuggling across the Texas-Mexico

26

border. *See* Order at 2, *United States v. Nava-Martinez*, No. 1:13-cr-00441 (S.D. Tex. Dec. 13, 2013), ECF No. 37.

124.    The defendant in *Nava-Martinez*, an admitted human trafficker, was caught attempting to smuggle a ten-year-old Salvadoran girl into the United States. *Id.* at 1.

125.    In *Nava-Martinez*, the district court noted that this was "the fourth case with the same factual situation this Court has had in as many weeks."  *Id.* at 3. Although the human traffickers were apprehended in each case, "the DHS completed the criminal conspiracy . . . by delivering the minors to the custody of the parent." *Id.*

126.    This was done pursuant to DHS's "apparent policy . . . of completing the criminal mission of individuals who are violating the border security of the United States." *Id.* at 2. As the district court observed, "[t]his DHS policy is a dangerous course of action." *Id.* Under the policy, "instead of enforcing the laws of the United States, the Government [takes] direct steps to help the individuals who violated it." *Id.* at 3.

127.    Moreover, the district court found that DHS's policy promotes human trafficking, which in turn "help[s] fund the illegal drug cartels which are a very real danger for both citizens of this country and Mexico." *Id.* at 6. The district court explained that citizens of the United States bear the economic brunt of this policy, because DHS "fund[s] these evil ventures with their tax dollars." *Id.* at 8. In addition, the policy harms the citizens of each country that suffers from the "nefarious activities of the cartels." *Id.*

128.   DACA and the policy described in *Nava-Martinez* have had and continue to have dire consequences in Plaintiff States. In the summer of 2014, an enormous wave of unlawfully present aliens surged across the Texas-Mexico border, creating what President Obama described as a "humanitarian crisis." Nick Miroff & Joshua Partlow, *Central American Migrants Overwhelm Border Patrol Station in Texas*, WASH. POST (June 12, 2014).

129.   Law enforcement officers reported "picking up children as young as 4 without their parents and other children with Hello Kitty backpacks, cellphones and the telephone numbers of U.S. relatives on note cards." Miroff & Partlow, *supra*.

130.   But the humanitarian crisis is by no means limited to unaccompanied children. "[A]n unprecedented surge of families crossing illegally into the U.S." has also been recognized. Cindy Carcamo, *Rumors of U.S. Haven for Families Spur Rise in Illegal Immigration*, L.A. TIMES (June 6, 2014). While immigration officials do not have an official count of such families, they have acknowledged that "the numbers appear to be substantial." *Id.*

131.   This wave of immigration was concentrated in the Rio Grande Valley of South Texas. Miroff & Partlow, *supra*. A June 2014 report noted that "[e]very day, hundreds of Central American migrants, in groups as large as 250 people, are wading across the muddy Rio Grande." *Id.*

132.   The crisis has imposed enormous law enforcement costs on Plaintiff States. For example, the Texas Department of Public Safety estimated in 2014 that it spent $1.3 million a week on troopers and resources to deal with the immigration

surge; in addition, former Governor Perry deployed 1,000 National Guard troops to the border at a cost of $38 million.

133.   This crisis was caused by the immigration policies of the federal government, including the policy already held to be unlawful. As Ronald D. Vitiello, then serving as Deputy Chief of U.S. Border Patrol, reportedly explained in a 2014 memorandum ("Vitiello Memorandum"), "[i]f the U.S. government fails to deliver adequate consequences to deter aliens from attempting to illegally enter the U.S., the result will be an even greater increase in the rate of recidivism and first-time illicit entries." The Obama Administration acknowledged that there was a "growing perception minors are crossing the border because they feel they will not be deported by the administration." Brett LoGiurato, *There's a Staggering Humanitarian Crisis on the US Border, and It's Only Going to Get Worse*, BUS. INSIDER (June 16, 2014). Indeed, a research report commissioned by DHS revealed that "[w]ord had spread in Central America about a 'lack of consequences' for illegal entry" and that "[s]mugglers were exploiting the system." Susan Carroll, *Report Warned of Child Migrant Crisis*, HOUSTON CHRON. (June 17, 2014).

134.   Former President Obama himself predicted this outcome. On July 1, 2010, he explained that it would be "both unwise and unfair" to "ignore the laws on the books and put an end to deportation" because it "would suggest to those thinking about coming here illegally that there will be no repercussions for such a decision." That in turn, President Obama recognized, "could lead to a surge in more illegal immigration." As President Obama concluded, "no matter how decent they are, no

matter their reasons, the 11 million who broke these laws should be held accountable." President Barack Obama, Remarks on Comprehensive Immigration Reform (July 1, 2010), https://obamawhitehouse.archives.gov/the-press-office/remarks-president-comprehensive-immigration-reform.

135.   The Obama Administration, however, contributed to the surge of illegal immigration by refusing to enforce the laws on the books. On average, only 1,600 unaccompanied children are removed each year; in 2013, there were over 20,000 detentions of unaccompanied children from Guatemala, Honduras, and El Salvador, but only 496 unaccompanied children from those countries were repatriated. Carroll, *supra*. The total number of unlawfully present children deported by the Obama Administration in 2013 was only 1,669—an 80 percent reduction from 2008. Brian Bennett, *Deportation Data Won't Dispel Rumors Drawing Migrant Minors to U.S.*, L.A. TIMES (July 5, 2014).

136.   By fiscal year 2016, the number of unaccompanied children captured at the border spiked to nearly 60,000. *See* Press Release, United States Border Patrol Southwest Family Unit Subject and Unaccompanied Alien Children Apprehensions Fiscal Year 2016: Statement by Secretary Johnson on Southwest Border Security (Oct. 18, 2016), https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016.

137.   Similarly, adults with children who are detained at the border are routinely released and allowed to travel within the United States. Carcamo, *supra*. And while they may be instructed to show up for a follow-up appointment, "ICE

officials said they couldn't guarantee that they would pursue all cases in which immigrants do not show up for follow-up appointments." *Id.* Tellingly, the immigrants arrested for illegally entering the U.S. refer to ICE's Notice to Appear documents as "permisos," or permits. Byron York, *On Immigrant Surge, White House Story Falls Apart*, WASH. EXAMINER (June 16, 2014).

138.    Unsurprisingly, the unlawfully present aliens crossing the border are motivated primarily by the belief that they will not be deported. The federal government's own analysis demonstrates as much. When Border Patrol agents recently questioned 230 unlawfully present aliens about why they came, "[t]he results showed overwhelmingly that the immigrants, including those classified as . . . unaccompanied children, were motivated by the belief that they would be allowed to stay in the United States." *Id.*

139.    Multiple reports indicate that unlawfully present aliens are counting on federal officials for help in reuniting with their friends or family in the U.S. According to a June 2014 report, hundreds of Central American migrants were "turning themselves in to the Border Patrol" on a daily basis. Miroff & Partlow, *supra*. One unlawfully present alien stated that she and her group "had looked forward to being caught . . . at one point even waving down federal helicopters . . . because of the welcoming treatment they had assumed they would receive." Carcamo, *supra*. Another planned to surrender to Border Patrol because she had heard "that the Americans are helping Hondurans right now," especially women and children. Miroff & Partlow, *supra*. All of the 230 unlawfully present aliens interviewed by Border

Patrol agents for their report "stated that they had family members or, to a lesser extent, friends already living in the U.S." York, *supra*.

140. The Obama Administration conceded that its failure to enforce the federal immigration laws increased the flow of illegal immigration across the Texas-Mexico border. *See* Vitiello Memorandum, *supra*.

141. The effects of that failure have caused acute crises in Plaintiff States.

## V. Former President Obama "Change[d] the Law" Again—Through the 2014 DHS Memorandum Creating Expanded DACA and DAPA.

142. Between the unveiling of the 2012 DACA memorandum and the midterm elections in November 2014, former President Obama repeatedly stated that any extension of DACA would be unlawful and would have to be accomplished by legislation. He said, for instance:

- "[A]s the head of the executive branch, there's a limit to what I can do. . . . [U]ntil we have a law in place that provides a pathway for legalization and/or citizenship for the folks in question, we're going to . . . continue to be bound by the law." President Barack Obama, Remarks at Univision Town Hall with Jorge Ramos and Maria Elena Salinas (Sept. 20, 2012), https://obamawhitehouse.archives.gov/the-press-office/2012/09/20/remarks-president-univision-town-hall-jorge-ramos-and-maria-elena-salina.

- "We are a nation of immigrants. . . . But we're also a nation of laws. So what I've said is we need to fix a broken immigration system. And I've done everything I can on my own." President Barack Obama, Remarks at Second

Presidential           Debate           (Oct.           16,           2012),

https://obamawhitehouse.archives.gov/the-press-

office/2012/10/17/remarks-president-and-governor-romney-second-

presidential-debate.

- In response to a question about the possibility of a moratorium on

  deportations for non-criminals: "I'm not a king. I am the head of the

  executive branch of government. I'm required to follow the law." President

  Barack   Obama,   Interview   with   Univision   (Jan.   30,   2013),

  http://abcnews.go.com/ABC_Univision/Politics/transcript-president-

  barack-obama-interview-univisions-maria-elena/story?id=18365068.

- In response to the question whether he could do for "an undocumented

  mother of three" what he did for DACA recipients: "I'm not a king. . . . [W]e

  can't simply ignore the law. When it comes to the dreamers– we were able

  to identify that group . . . . But to sort through all the possible cases– of

  everybody who might have a sympathetic story to tell is very difficult to do.

  This is why we need comprehensive immigration reform. . . . [I]f this was

  an issue that I could do unilaterally I would have done it a long time ago. .

  . . The way our system works is Congress has to pass legislation. I then get

  an opportunity to sign it and implement it." President Barack Obama,

  Interview   with   Telemundo   (Jan.   30,   2013),

  http://nbclatino.com/2013/01/30/obama-tells-telemundo-he-hopes-for-

  immigration-overhaul-within-6-months/.

- "[T]his is something I've struggled with throughout my presidency. The problem is that . . . I'm the president of the United States. I'm not the emperor of the United States. . . . And what that means is that we have certain obligations to enforce the laws that are in place . . . . [W]e've kind of stretched our administrative flexibility as much as we can." President Barack Obama, Remarks on Immigration Reform (Feb. 14, 2013), https://www.youtube.com/watch?v=-e9lmy_8FZM&feature=youtu.be.

- "I think that it is very important for us to recognize that the way to solve this problem has to be legislative. . . . And we've been able to provide help through deferred action for young people and students . . . . But this is a problem that needs to be fixed legislatively." President Barack Obama, Interview with Univision (July 16, 2013), http://communications-univisionnews.tumblr.com/post/55694544539/univision-news-transcript-adriana-vargas.

- "[M]y job in the executive branch is supposed to be to carry out the laws that are passed. Congress has said 'here is the law' when it comes to those who are undocumented, and they've allocated a whole bunch of money for enforcement. . . . What we can do is then carve out the DREAM Act, saying young people who have basically grown up here are Americans that we should welcome. . . . *But if we start broadening that, then essentially I would be ignoring the law in a way that I think would be very difficult to defend legally. So that's not an option.* . . . What I've said is . . . there's a path to get

34

this done, and that's through Congress." President Barack Obama, Interview with Telemundo (Sept. 17, 2013), https://www.realclearpolitics.com/video/2013/09/17/obama_halting_deport ations_not_an_option_would_be_ignoring_the_law.html (emphasis added).

- "[I]f, in fact, I could solve all these problems without passing laws in Congress, then I would do so. But we're also a nation of laws. That's part of our tradition. And so the easy way out is to try to yell and pretend like I can do something by violating our laws. And what I'm proposing is the harder path, which is to use our democratic processes to achieve the same goal that you want to achieve." President Barack Obama, Remarks on Immigration Reform in San Francisco, California (Nov. 25, 2013), https://obamawhitehouse.archives.gov/the-press- office/2013/11/25/remarks-president-immigration-reform-san-francisco-ca.

- "[W]hat I've said in the past remains true, which is until Congress passes a new law, then I am constrained in terms of what I am able to do. What I've done is to use my prosecutorial discretion . . . . What we've said is focus on folks who are engaged in criminal activity, focus on people who are engaged in gang activity. Do not focus on young people, who we're calling DREAMers . . . . That already stretched my administrative capacity very far. But I was confident that that was the right thing to do. But at a certain point the reason that these deportations are taking place is, Congress said, [']you have to enforce these laws.['] They fund the hiring of officials at the

35

department that's charged with enforcing. *And I cannot ignore those laws any more than I could ignore, you know, any of the other laws that are on the books.*" President Barack Obama, Interview with Univision (Mar. 6, 2014), http://communications-univisionnews.tumblr.com/post/79266471431/univision-news-transcript-interview-with (emphasis added).

143.   Former President Obama repeatedly called on Congress to pass an immigration reform bill. Congress did not do so.

144.   After being rebuffed by Congress again, former President Obama announced that he would unilaterally create a program conferring lawful presence and work authorizations for an additional estimated 4 million unlawfully present aliens.

145.   On November 20, 2014, former DHS Secretary Johnson issued the DAPA memo creating Expanded DACA and DAPA. *See Texas*, 809 F.3d at 146-48; **Exhibit 3**.

146.   Like the DACA memo, the DAPA memo again created a class-based deferred-action program—that confers eligibility for lawful presence and work authorization—without congressional authorization or notice-and-comment procedure.

147.   The DAPA memo first expanded the class eligible for DACA relief by: (1) eliminating the DACA criteria's age cap, (2) increasing the DACA term from two

36

years to three years, and (3) pushing the DACA date-of-entry deadline from 2007 to 2010. **Exhibit 3** at 3-4.

148.   The DAPA memo then directed USCIS "to establish a process, similar to DACA," for granting three-year terms of deferred action to a new class of aliens: unlawfully present aliens who were parents of United States citizens and other lawful permanent residents who were not enforcement priorities. *Id.* at 4.

149.   Together, the coverage criteria for DAPA and Expanded DACA would have covered approximately 40% of the country's known population of unlawfully present aliens.

150.   The 2014 DAPA and Expanded DACA—like the original 2012 DACA— did not merely forbear from removing aliens who qualified. All three affirmatively granted lawful presence and eligibility for work authorization to those who would otherwise be unlawfully present and unauthorized to work.

151.   The November 20, 2014 DAPA memo stated that "[t]his memorandum confers no . . . pathway to citizenship." *Id.* at 5.

152.   The DAPA memo stated that "deferred action . . . may be terminated at any time at the agency's discretion." *Id.* at 2.

153.   Former President Obama candidly admitted that his plan, through these programs, was unilateral legislation: "What you're not paying attention to is, *I just took an action to change the law.*" Steven T. Dennis, *Obama on Immigration: "I Just Took an Action to Change the Law*," ROLL CALL (Nov. 25, 2014) (emphasis added),

http://www.rollcall.com/news/home/immigration-reform-news-obama-immigration-action-law.

154.    Former President Obama further admitted that he was changing the law because Congress chose not to: "[T]o those members of Congress who question my authority to make our immigration system work better . . . I have one answer: Pass a bill. . . . And the day I sign that bill into law, the actions I take will no longer be necessary." President Barack Obama, Remarks by the President in Address to the Nation on Immigration (Nov. 20, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/11/20/remarks-president-address-nation-immigration.

155.    Former President Obama also made clear that he was "offer[ing] the following deal" to unlawfully present aliens: "[I]f you've taken responsibility, you've registered, undergone a background check, you're paying taxes, you've been here for five years, you've got roots in the community—you're not going to be deported. . . . If you meet the criteria, you can come out of the shadows, you can get right with the law." President Barack Obama, Remarks by the President on Immigration (Nov. 21, 2014),     https://obamawhitehouse.archives.gov/the-press-office/2014/11/21/remarks-president-immigration.

156.    Through the creation of Expanded DACA and DAPA, the Obama Administration again dispensed with certain of the Nation's immigration laws without congressional approval.

## VI.   Courts Rule that Expanded DACA and DAPA are Unlawful, Stopping Former President Obama's Unlawful Executive Overreach.

157.   On December 3, 2014, Plaintiffs and other States filed a lawsuit in this district court seeking to immediately halt the implementation of Expanded DACA and DAPA.

158.   On February 16, 2015, the district court granted the requested relief and issued a preliminary injunction of Expanded DACA and DAPA. In its opinion, the district court explained, despite the Defendants' claims to the contrary, that the plaintiffs were likely to succeed on the merits of their claim and that they would suffer irreparable harm if Expanded DACA and DAPA went into effect. *Texas*, 86 F. Supp. 3d at 671-72, 674.

159.   The Defendants issued Expanded DACA permits both before and after the district court entered the preliminary injunction of the 2014 memorandum. *Texas v. United States*, No. 1:14-cv-254, 2016 WL 3211803 (S.D. Tex. May 19, 2016).

160.   The district court, *see Texas v. United States*, No. 1:14-cv-254, 2015 WL 1540022, at *8 (S.D. Tex. Apr. 7, 2015), and the Fifth Circuit, *Texas v. United States*, 787 F.3d 733, 769, 784 (5th Cir. 2015), denied a stay of the preliminary injunction.

161.   The Defendants appealed from the district court's preliminary injunction. The Fifth Circuit affirmed, finding that the plaintiffs had standing to challenge the Executive's class-based deferred-action programs that grant lawful presence and work authorization, that such programs are judicially reviewable, that Expanded DACA and DAPA were unlawful both procedurally (as promulgated without notice and comment) and substantively (as foreclosed by substantive federal

statutes), and that the plaintiffs satisfied the equitable requirements for a preliminary injunction. *Texas*, 809 F.3d at 150-88.

162.    On June 23, 2016, the Supreme Court affirmed the Fifth Circuit's judgment by an equally divided Court. *Texas*, 136 S. Ct. 2271.

**VII.    On June 15, 2017, DHS Secretary Kelly Rescinded the 2014 DAPA and Expanded DACA Memo, But the Secretary Left in Effect the 2012 DACA Program and Some Expanded DACA Permits Granted Under the Rescinded 2014 Memo.**

163.    On July 18, 2016, the Defendants filed a petition for rehearing in the Supreme Court. The parties to the DAPA litigation agreed to continue to stay all merits proceedings before the district court until the Supreme Court ruled on the petition. *Texas*, No. 1:14-cv-254 (S.D. Tex. Aug. 31, 2016) (Text Order).

164.    On October 3, 2016, the Supreme Court denied the Defendants' petition for rehearing. *United States v. Texas*, 137 S. Ct. 285 (2016).

165.    On November 18, 2016, the parties to the DAPA lawsuit filed a joint motion to stay the merits proceedings until February 20, 2017, to allow the new Presidential Administration time to consider its position. Joint Motion to Stay Merits Proceedings, *Texas*, No. 1:14-cv-254 (S.D. Tex. Nov. 18, 2016), ECF No. 430.

166.    On January 19, 2017, the district court granted a stay of merits proceedings in the DAPA litigation until March 17, 2017. *Texas*, No. 1:14-cv-254 (S.D. Tex. Jan. 19, 2017) (Order), ECF No. 435.

167.    On March 17, 2017, the Defendants filed another unopposed motion to stay district court proceedings in the DAPA lawsuit—this time seeking until June 15, 2017 to propose a scheduling order. Unopposed Motion to Stay Merits Proceedings,

*Texas*, No. 1:14-cv-254 (S.D. Tex. Mar. 17, 2016), ECF No. 438.

168.   On March 22, 2017, the district court granted the stay of the DAPA litigation and ordered the parties to propose a discovery schedule by June 15, 2017. *Texas*, No. 1:14-cv-254 (S.D. Tex. Mar. 22, 2017) (Order), ECF No. 439.

169.   On June 15, 2017, the Defendants again requested a two-week stay of merits proceedings in the DAPA lawsuit. Unopposed Motion to Stay Merits Proceedings, *Texas*, No. 1:14-cv-254 (S.D. Tex. June 15, 2017), ECF No. 444.

170.   On that same date—June 15, 2017—former DHS Secretary Kelly issued a new memorandum "rescind[ing] the November 20, 2014 DAPA memorandum and the policies announced therein." **Exhibit 5** at 2.

171.   Secretary Kelly added that "[t]he June 15, 2012 DACA memorandum, however, will remain in effect." *Id*.

172.   Secretary Kelly also explained that his memorandum did "not alter the remaining periods of deferred action under the Expanded DACA policy granted between issuance of the November 20, 2014 Memorandum and the February 16, 2015 preliminary injunction order in the Texas litigation, nor does it affect the validity of related Employment Authorization Documents (EADs) granted during the same span of time." *Id*. at 2 n.3.

173.   Secretary Kelly "remind[ed] [USCIS] officers that (1) deferred action, as an act of prosecutorial discretion, may only be granted on a case-by-case basis." *Id*.

174.    This reminder echoes the DACA memo language that the district court found pretextual in Texas's challenge to DAPA and Expanded DACA. *See Texas*, 86 F. Supp. 3d at 669 n.101.

**VIII.   On September 5, 2017, DHS Withdrew the 2012 DACA Memorandum in Response to an Imminent Legal Challenge Threatened by Plaintiffs and Other States.**

175.    On June 29, 2017, Texas Attorney General Ken Paxton, the attorneys general of nine other states (including Alabama, Arkansas, Louisiana, Nebraska, South Carolina, and West Virginia), and the governor of Idaho sent a letter to the federal Executive Branch urging the Trump Administration to phase out DACA. *See* **Exhibit 6**.

176.    Plaintiffs' June 29, 2017 letter requested "that the Secretary of Homeland Security rescind the June 15, 2012 DACA memorandum and order that the Executive Branch will not renew or issue any new DACA or Expanded DACA permits in the future." *Id*. at 2.

177.    Plaintiffs' letter explained how DACA is unlawful under the Fifth Circuit's decision in *Texas*. *Id*. at 1-2.

178.    Plaintiffs' letter proposed a resolution of the then-pending lawsuit, and avoiding additional litigation relating to DACA: "If, by September 5, 2017, the Executive Branch agrees to rescind the June 15, 2012 DACA memorandum and not to renew or issue any new DACA or Expanded DACA permits in the future, then the plaintiffs that successfully challenged DAPA and Expanded DACA will voluntarily dismiss their lawsuit currently pending in the Southern District of Texas. Otherwise,

the complaint in that case will be amended to challenge both the DACA program and the remaining Expanded DACA permits." *Id*. at 2.

179.   On September 4, 2017, United States Attorney General Sessions wrote the DHS Acting Secretary, advising that DHS should rescind DACA. Letter from Attorney General Sessions to Acting Secretary Duke, https://www.dhs.gov/sites/default/files/publications/17_0904_DOJ_AG-letter-DACA.pdf.

180.   Attorney General Sessions noted that "DACA was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result." *Id*.

181.   Attorney General Sessions advised: "Because the DACA policy has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." *Id*.

182.   On September 5, 2017, United States Attorney General Sessions publicly announced that DHS would rescind the 2012 DACA memorandum. U.S. Dep't of Justice, Attorney General Sessions Delivers Remarks on DACA (Sept. 5, 2017),           https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-daca.

183.   During his remarks, Attorney General Sessions stated that by implementing DACA the Obama Administration had "deliberately sought to achieve

what the legislative branch specifically refused to authorize on multiple occasions" and that "[s]uch an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." *Id*.

184.   Attorney General Sessions further explained that DACA was "vulnerable to the same legal and constitutional challenges that the courts recognized with respect to the DAPA program" and that if DHS decided to maintain DACA, "the likeliest outcome is that it would be enjoined just as was DAPA." *Id*.

185.   Attorney General Sessions also observed that "[t]he effect of [DACA], among other things, contributed to a surge of unaccompanied minors on the southern border that yielded terrible humanitarian consequences. It also denied jobs to hundreds of thousands of Americans by allowing those same jobs to go to illegal aliens." *Id*.

186.   On September 5, 2017, DHS issued a memorandum rescinding the 2012 DACA memorandum. *See* **Exhibit 7**.

187.   The September 2017 memorandum initiated the DACA wind-down process. The memorandum provided that DHS would "adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of [September 5, 2017], and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017." *Id*. at 5.

188.    The September 2017 memorandum allowed for the orderly phase-out of DACA.

189.    DHS's September 2017 memorandum and the impending wind-down of DACA thus satisfied the condition proposed by Plaintiffs' June 29, 2017 letter for ending the then-pending lawsuit and avoiding additional litigation regarding DACA.

190.    The Plaintiffs therefore did not file an amended complaint challenging DACA in September 2017.

191.    Instead, the parties to the then-pending DAPA/Expanded DACA lawsuit filed a stipulation of dismissal on September 12, 2017, in that suit. Stipulation of Dismissal, *Texas*, No. 1:14-cv-254 (S.D. Tex. Sept. 12, 2017), ECF No. 473,

IX.    **Following the September 2017 Memorandum, Numerous Parties Seek to Halt the Recession of DACA—Acknowledging, in the Process, that DACA Was Never Lawful.**

192.    Following DHS's September 2017 DACA rescission memorandum, lawsuits were filed claiming that the decision to rescind DACA was itself unlawful**.** Five of these actions were filed in the U.S. District Court for the Northern District of California, and at least four other lawsuits were filed in other federal district courts. *See* Complaint, *Trs. of Princeton Univ. v. United States*, No. 1:17-cv-2325 (D.D.C. Nov. 3, 2017), ECF No. 1; Complaint, *NAACP*, No. 1:17-cv-1907 (D.D.C. Apr. 24, 2018), ECF No. 1; 2d Am. Complaint, *Vidal v. Nielsen*, No. 1:16-cv-4756 (E.D.N.Y. Sept. 29, 2017), ECF No. 29; Complaint, *New York v. Trump*, No. 1:17-cv-5228 (E.D.N.Y. Sept. 6, 2017), ECF No. 1.

193.   In those challenges to the 2017 executive action, the plaintiffs' own pleadings essentially concede that DACA itself was unlawful because—as Plaintiff States allege in this suit—it was a substantive rule that modified rights and was thus required to go through APA notice-and-comment procedures.

194.   For example, in a challenge brought by the University of California, the plaintiffs claim that the September 2017 rescission memorandum "constitutes a substantive rule subject to APA's notice-and-comment requirements." Complaint 14, *Regents of Univ. of Cal. v. Dep't of Homeland Sec.*, No. 3:17-cv-5211 (N.D. Cal. Sept. 8, 2017), ECF No. 1. This statement could be true only if DACA, the program being rescinded, was itself a substantive rule.

195.   The University of California plaintiffs further admit that DACA unilaterally modified rights by conferring lawful presence:

> Individuals with DACA status were "not considered to be unlawfully present during the period in which deferred action [was] in effect." USCIS FAQs.

*Id.* at 8.

196.   In the same litigation, the State of California concedes that "DACA Provides Numerous Benefits," which they describe in detail:

> 83. DACA grantees are granted eligibility to receive *employment authorization*.
>
> 84. DACA also opened the door to *allow travel* for DACA grantees. For example, DACA grantees were allowed to briefly depart the U.S. and legally return under certain circumstances, such as to visit an ailing relative, attend funeral services for a family member, seek medical treatment, or further educational or employment purposes. 8 U.S.C. § 1182(a)(9)(B)(i); *see also* Ex. E,

USCIS, Frequently Asked Questions, DHS DACA FAQs ("DACA FAQs") (Apr. 25, 2017) Q57. Travel for vacation is not permitted.

85. Unlike other undocumented immigrants, DACA grantees are not disqualified on the basis of their immigration status from receiving certain public benefits. These include *federal Social Security, retirement, and disability benefits*. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d). As a result, and in reliance on DHS's oft-stated position that DACA and similar programs are a lawful exercise of the agency's authority, Plaintiff States have structured some schemes around DACA which allow, for example, applicants to demonstrate eligibility for state programs by producing documentation that they have been approved under DACA. The rescission of DACA undermines such regulatory frameworks.

86. DACA grantees are able to secure equal access to other *benefits* and opportunities on which Americans depend, including opening bank accounts, obtaining credit cards, starting businesses, purchasing homes and cars, and conducting other aspects of daily life that are otherwise often unavailable for undocumented immigrants.

Complaint at 17-18, *California v. U.S. Dep't of Homeland Sec.*, No. 3:17-cv-5235 (N.D. Cal. Sept. 11, 2017), ECF No. 1 (emphases added).

197. In the *New York* lawsuit, the plaintiffs similarly allege that DACA affirmatively confers benefits—that is, that DACA alters substantive rights:

218. DACA *confers* numerous *benefits* on DACA grantees. Notably, DACA grantees are *granted the right* not to be arrested or detained based solely on their immigration status during the time period their deferred action is in effect. *See* Ex. 14, Question 9. . . . .

220. DACA grantees are eligible to receive certain *public benefits*. These include *Social Security, retirement, and disability benefits*, and, in certain states, benefits such as driver's licenses or unemployment insurance. *See* 8 U.S.C. §§ 1611(b)(2)-(3), 1621(d). In the State of Washington, DACA holders also are eligible for certain state financial aid programs and state-funded food assistance. *See* Wash. Rev. Code § 28B.92.010; Wash. Admin.

47

> Code §§ 388-400-0050, 388-424-0001, 388-424-0030. In the State
> of New York, DACA holders are eligible for teaching and nursing
> licenses. *See* Comm. of Educ. Regs. §§ 59.4; 80-1.3; Ex. 78 (NYS
> Board of Regents Press Release, Feb. 24, 2016).

Complaint at 41, *New York*, No. 1:17-cv-5228, ECF No. 1 (emphases added).

198.   Like the California plaintiffs, the New York plaintiffs have likewise

tacitly admitted that DACA was a substantive rule because it modified rights:

> 289. In implementing the DHS Memorandum, federal
> agencies have changed the substantive criteria by which
> individuals DACA grantees work, live, attend school,
> obtain credit, and travel in the United States. Federal
> agencies did not follow the procedures required by the APA
> before taking action impacting these substantive rights.

*Id.* at 54.

199.   If DACA's rescission affected substantial rights, as the challengers to

DHS's September 2017 memorandum claim, then DACA also affected substantial

rights and was unlawful in the first place as alleged in the instant lawsuit.

## X.   The Northern District of California Enjoins DHS's Wind-Down of DACA.

200.   On January 9, 2018, the U.S. District Court for the Northern District of

California issued an injunction in the challenge brought by the University of

California and other plaintiffs to the 2017 executive action rescinding DACA. *See*

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011 (N.D.

Cal. 2018). The Northern District of California ordered DHS, "pending final judgment

herein or other order, to maintain the DACA program on a nationwide basis on the

same terms and conditions as were in effect before the rescission on September 5,

2017, including allowing DACA enrollees to renew their enrollments," subject to several exceptions. *See id.* at 1048-49.

201.   The Northern District of California's order stated that "new applications from applicants who have never before received deferred action need not be processed." *Id.* at 1048.

202.   The Northern District of California further indicated that "the advance parole feature need not be continued for the time being for anyone," *id.*, and that this injunction order "will not require advance parole," *id.* at 1049.

203.   The Northern District of California concluded that DHS "may take administrative steps to make sure fair discretion is exercised on an individualized basis for each renewal application." *Id.* at 1048.

204.   DHS also was ordered to "post reasonable public notice that it will resume receiving DACA renewal applications and prescribe a process consistent with" the Northern District of California's order. *Id.*

205.   On April 24, 2018, the U.S. District Court for the District of Columbia issued an order in the challenge brought by the NAACP and other plaintiffs to the 2017 executive action rescinding DACA. *See NAACP*, 2018 WL 1920079, at *1-28. The district court ordered that it would "vacate the Department's September 5, 2017 decision to rescind the DACA program" and "grant plaintiffs' motion for partial summary judgment as to their substantive APA claim." *Id.* at *28.

206.    The district court found that the "[v]acatur of DACA's rescission will mean that DHS must accept and process new as well as renewal DACA applications." *Id.* at *1.

207.    The District of Columbia district court stated that it would "stay its order of vacatur for 90 days, however, to afford DHS an opportunity to better explain its view that DACA is unlawful." *Id.* at *28.

208.    The Northern District of California's injunction of the Executive's 2017 decision to wind down DACA and the District of Columbia's vacatur of the wind-down decision forced this lawsuit to declare whether the Executive had authority to promulgate DACA in the first place. Because DACA is still in effect, the basis upon which Plaintiffs agreed to resolve the prior litigation has been frustrated, and Plaintiffs therefore effectuate their previously stated plans "to challenge both the DACA program and [any] remaining Expanded DACA permits." **Exhibit 6** at 2.

## THEORIES OF RELIEF

209.    Because permits issued under the Executive's unlawful class-based "deferred action" programs created by the former Presidential Administration remain in existence, Plaintiffs file this Complaint challenging those unlawful acts.

210.    DACA is unlawful for the same reasons that courts held Expanded DACA and DAPA unlawful: The Executive does not have the unilateral power to confer eligibility for lawful presence or work authorization on unlawfully present aliens simply because the Executive chooses not to remove them. *See Texas*, 809 F.3d at 179-81.

211.    But for the Executive's implementation of DACA, aliens covered by that program would not be eligible for lawful presence, and would be removable under the INA.

212.    But for the Executive's implementation of DACA, aliens covered by that program would not be eligible for work authorization.

213.    But for the Executive's implementation of the program, many DACA recipients would not be eligible for lawful-permanent-resident status by obtaining advance parole.

214.    But for the Executive's implementation of the program, many DACA recipients would not be eligible for United States citizenship by obtaining advance parole.

215.    Thus, Plaintiffs challenge, at a minimum, (1) the 2012 DACA memo issued by former Secretary Napolitano, (2) the implementation of that 2012 DACA memo, (3) the part of former Secretary Kelly's June 2017 memo retaining the 2012 DACA memo, and (4) any DACA permits that remain in effect.

216.    On belief, no three-year Expanded DACA permits currently remain in effect or will be issued, because such three-year permits were last issued on or before March 2015 (over three years ago) and have not been renewed since that time because of this Court's February 2015 preliminary injunction of Expanded DACA and the Executive Branch's later June 2017 memorandum rescinding Expanded DACA.

217.    If that belief regarding Expanded DACA permits is incorrect, however, Plaintiffs also challenge (1) any part of former Secretary Johnson's 2014 memo

creating Expanded DACA that may remain in effect when combined with former Secretary Kelly's June 2017 memo retaining a subset of previously granted Expanded DACA permits, (2) the part of former Secretary Kelly's June 2017 memo retaining a subset of previously granted Expanded DACA permits, and (3) any Expanded DACA permits that remain in effect. All arguments below concerning DACA equally apply to Expanded DACA.

218.   DACA violates the APA's notice-and-comment requirements, is contrary to law under the APA, and violates the Take Care Clause.

## I.   The Plaintiffs Have Standing.

219.   The Plaintiff States have standing because they have a "personal stake" in the outcome of this litigation. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014).

220.   The Plaintiff States have suffered, and will continue to suffer, concrete injuries that are traceable to DACA, and an injunction of DACA will redress those injuries.

221.   DACA imposes significant costs on Plaintiff States. As the Supreme Court has explained, States "bear[] many of the consequences of unlawful immigration." *Arizona*, 567 U.S. at 397.

222.   Only one plaintiff needs standing for an Article III case or controversy to exist. *See Texas*, 809 F.3d at 151 (citing *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

223.    Once a concrete injury is shown, the magnitude of that injury is irrelevant to the standing inquiry. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 525-26 (2007).

224.    Both the district court and the Fifth Circuit already have concluded that Plaintiff States have standing to challenge the Executive's unilateral actions conferring class-based deferred action to grant lawful presence and work authorizations.

225.    DACA's conferral of lawful presence triggers eligibility for benefits—some of which are paid for by Plaintiff States. *Id.* at 148-49 (explaining lawful presence status qualifies recipients for Social Security, disability benefits, Medicare, work authorization, unemployment benefits, and driver's licenses).

226.    If Plaintiff States sought to change their benefits programs to prevent DACA recipients from being eligible, Plaintiff States would be threatened with federal preemption through the operation of DACA as it relates to their benefits programs. The Ninth Circuit enjoined—as preempted by federal law—Arizona's state law that prevented the State of Arizona from issuing driver's licenses to DACA recipients. *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 975 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1279 (2018). The Ninth Circuit purported to rest its ruling on the basis that the INA's alien classifications preempted Arizona's law, *id.*, and that is just another way of ruling that DACA is lawful and its lawful-presence designation is lawful as consonant with the INA. DACA's lawful-presence designation, in turn, is what the Ninth Circuit held preempted Arizona's law. After all, without the DACA

program, DACA recipients would not be deemed lawfully present. The Plaintiff States' benefits programs are threatened by such alleged preemption, thus representing an injury imposed by DACA.

227.   Other financial injuries to Plaintiff States are caused by DACA's granting of lawful presence and work authorization. For instance, federal work authorization functions as a precondition for certain professional licenses in Plaintiff States. *See, e.g.*, 16 Tex. Admin. Code § 33.10 (requiring applicants for an alcoholic beverage license to be "legally authorized to work in the United States"); Tex. Bd. of Law Exam'rs, Rules Governing Admission to the Bar of Tex., R. II(a)(5)(J) (making individuals who are "authorized to work lawfully in the United States" eligible to apply for admission as licensed attorneys).

228.   Additionally, Plaintiff States have incurred considerable financial injuries on education, healthcare, and law-enforcement costs caused by DACA.

229.   The Plaintiff States would not otherwise incur certain costs associated with education, healthcare, and law enforcement but for DACA. *See Texas*, 86 F. Supp. 3d at 628-30.

230.   DACA incentivizes aliens—who would otherwise be unlawfully present and unauthorized to work without these programs—to remain in the country. *Id.* at 634-35.

231.   Because additional aliens will remain in Plaintiff States, those aliens will cause Plaintiff States to incur additional financial costs—particularly education, healthcare, and law-enforcement costs.

232.   States are required by federal law to incur some of these costs. For example, the Supreme Court has held that States are constitutionally obligated to provide free education to children of unlawfully present aliens. *Plyler v. Doe,* 457 U.S. 202 (1982). Similarly, both Medicare and Medicaid require provision of emergency services, regardless of lawful-presence status, as a condition of participation. *See* 42 U.S.C. § 1395dd; 42 C.F.R. § 440.255.

233.   As the district court found in Plaintiffs' challenge to DAPA and Expanded DACA, Texas pays about $9,473 per year to educate each unlawfully present alien in its school system. *See Texas*, 86 F. Supp. 3d at 630.

234.   In a single year, "Texas absorbed additional education costs of at least $58,531,100 stemming from illegal immigration." *Id*.

235.   Other expenditures are required by preexisting state law. For example, Texas law requires local governments to provide healthcare for the indigent. *See* Tex. Health & Safety Code §§ 61.001 *et seq*. Texas law also requires nonprofit hospitals to provide unreimbursed care for the indigent as a condition of maintaining their nonprofit status. *See id*. § 311.043. "Evidence in the record . . . shows that in 2008, Texas incurred $716,800,000 in uncompensated medical care provided to illegal aliens." *Texas*, 86 F. Supp. 3d at 630.

236.   Other States besides Texas have similar financial injuries caused by DACA.

237.    Under the Article III standing inquiry, courts do not examine whether financial injuries incurred are "offset" by other policies reducing other expenditures. *Texas*, 809 F.3d at 155-56.

238.    So any hypothetical financial gains to Plaintiff States caused by DACA are irrelevant for determining whether Plaintiff States have standing.

239.    Moreover, Plaintiff States have *parens patriae* standing to protect the quasi-sovereign interest in "the health and well-being" of their citizens. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982).

240.    Specifically, Plaintiff States seek to protect their citizens' "economic and commercial interests" from labor-market distortion caused by the continued existence of DACA. *Id.*at 609.

241.    The Plaintiff States seek the enforcement of federal law "to assure [their] residents that they will have the full benefit of federal laws designed to address th[e] problem" of illegal immigration and labor-market distortion. *Id.* at 609-10.

242.    The Plaintiff States also possess "special solicitude" in the Article III standing analysis under *Massachusetts v. EPA*, 549 U.S. at 520. *See Texas*, 809 F.3d at 151.

243.    The Plaintiff States do not need special solicitude to establish standing, but *Massachusetts v. EPA*'s special solicitude makes standing an easy question.

244.    Just as the Supreme Court found in *Massachusetts v. EPA,* the federal government here has "abdicated its responsibility" to enforce federal statutes. *Texas,*

86 F. Supp. 3d at 663 ("DAPA does not represent mere inadequacy; it is complete abdication.").

245.   The Plaintiff States face a more certain risk of harm than the state plaintiffs who had standing in *Massachusetts v. EPA. Id.* at 629; *see Texas*, 809 F.3d at 159 ("Texas is entitled to the same 'special solicitude' as was Massachusetts, and the causal link is even closer here.").

246.   The Plaintiff States also seek to vindicate a procedural right—namely, the right to be heard under the APA's notice-and-comment procedures.

247.   Separately, Plaintiff States have standing to challenge federal agency action that dispenses with congressional enactments when those congressional enactments preempt state prerogatives.

248.   A State is "an institutional plaintiff." *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2664 (2015).

249.   An "institutional plaintiff" has standing when it suffers a mere "institutional injury." *Id.*

250.   An "institutional injury" includes when a government's powers are "strip[ped]" or "nullif[ied]." *Id.* at 2663, 2665.

251.   When a federal statute preempts state prerogatives, the State's powers are stripped or nullified.

252.   "When a State enters the Union, it surrenders certain sovereign prerogatives" that become "lodged in the Federal Government." *Massachusetts v. EPA*, 549 U.S. at 519.

253.   A State's agreement to have its authority preempted on such sovereign matters—for instance, determining the citizenship or lawful presence of individuals within its borders—is premised on the understanding that Congress's enactments serve to "protect" the States. *Id.*

254.   Due to the preemption of their sovereign prerogatives, States also have a "quasi-sovereign," if not purely sovereign, interest in the enforcement of federal laws that preempt surrendered prerogatives. *Id.* at 520.

255.   When the Executive Branch "has abdicated its responsibility under [federal statutes]," it negates the basis on which the States agreed to allow federal preemption of their sovereign prerogatives. *Id.* at 505.

256.   States therefore also have "abdication standing" to challenge federal Executive agency action that dispenses with statutes passed by Congress when those statutes preempt state prerogatives. *Texas*, 86 F. Supp. 3d at 636-43.

257.   The Plaintiff States thus have standing to maintain all their claims.

## II.    This Action Is Timely.

258.   The Plaintiff States have commenced this action within the applicable limitations periods.

259.   "Unless another statute provides otherwise, civil claims against the United States—including those brought pursuant to the APA—are subject to the statute of limitations contained in 28 U.S.C. § 2401." *Mendoza v. Perez*, 754 F.3d 1002, 1018 (D.C. Cir. 2014) (addressing, *inter alia*, APA notice-and-comment claim).

260.    Under this provision, a party must commence an action within six years of the right of action accruing. 28 U.S.C. § 2401(a).

261.    Congress has not adopted a special statute of limitations for the type of claims Plaintiff States bring herein.

262.    The Plaintiff States commenced this action within six years of the promulgation of DACA.

263.    The Plaintiff States commenced this action within six years of the implementation of DACA.

264.    The Plaintiff States' request for injunctive relief preventing the Executive from renewing or issuing any new DACA permits in the future is not barred by any statute of limitations.

## III.    The Plaintiff States' Interests Are At Least Arguably Within the Zone of Interests Protected by Immigration Statutes and the APA.

265.    The Plaintiff States' interests are at least arguably within the zone of interests protected by immigration statutes. *See Texas*, 809 F.3d at 163.

266.    The Plaintiff States' interests are arguably within the zone of interests protected by the APA.

## IV.    DACA Is Reviewable Agency Actions.

267.    The creation of DACA—and its conferral of lawful presence and work authorization—is affirmative agency action, not mere enforcement-discretion inaction. *Id.* at 166-67.

268.    This lawsuit does not challenge the DHS Secretary's separate February 20, 2017 memorandum setting immigration enforcement priorities. Memorandum

from John Kelly, Secretary, DHS, to Kevin McAleenan, Acting Comm'r, CBP, et al,

Enforcement of the Immigration Laws to Serve the National Interest (Feb. 20, 2017),

https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-

the-Immigration-Laws-to-Serve-the-National-Interest.pdf.

269.   This lawsuit does not challenge the Executive's "discretion to abandon" the "initiation or prosecution of various stages in the deportation process." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999).

270.   Deferred action under DACA "is much more than nonenforcement: It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens." *Texas*, 809 F.3d at 166.

271.   "Declining to prosecute does not transform presence deemed unlawful by Congress into lawful presence and confer eligibility for otherwise unavailable benefits based on that change." *Id.* at 167.

272.   In contrast to enforcement discretion, DACA confers eligibility for a change in immigration classification that triggers eligibility for attendant benefits.

273.   The Defendants unilaterally deem DACA recipients "lawfully present."

274.   The congressional-created classification of "lawful presence" confers eligibility for Social Security, Medicare, the Earned Income Tax Credit, a driver's license, and a host of other benefits.

275.   DACA also unilaterally confers the ability to obtain work authorization.

276.   DACA has even provided some recipients with United States citizenship or a pathway to citizenship.

277.   Justice Scalia correctly explained that DACA cannot be justified as mere nonenforcement discretion: "the considerable administrative cost of conducting as many as 1.4 million background checks, and ruling on the biennial requests for dispensation that the nonenforcement program envisions, will necessarily be *deducted* from immigration enforcement." *Arizona*, 567 U.S. at 435 (Scalia, J., concurring in part and dissenting in part) (emphasis in original).

278.   The Defendants cannot identify any "clear and convincing evidence of legislative intention to preclude review" of DACA. *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 n.4 (1986).

279.   The Defendants have indicated that "DHS has absolute discretion to revoke deferred action unilaterally, without notice or process." Pet. Br. at 5, *supra*, 2016 WL 836758, at *5.

280.   "Revocability, however, is not the touchstone for whether agency . . . action is reviewable." *Texas*, 809 F.3d at 167.

## V.   DACA Is Unlawful.

### A.   DACA Is Unlawful Because It Was Issued Without the Required APA Notice-and-Comment Procedure.

281.   DACA is a substantive rule, not exempt from the Administrative Procedure Act's notice-and-comment requirements as an interpretive rule, as a general statement of policy, or as a rule of agency organization, procedure, or practice, 5 U.S.C. § 553(b)(A). *See Texas*, 809 F.3d at 171-78.

282.   No exceptions to the APA's notice-and-comment requirements are applicable to DACA.

283.    DACA, Expanded DACA, and DAPA are some of the largest immigration policy changes in our Nation's history.

284.    The APA requires this Court to hold unlawful and set aside any agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

285.    DHS is an "agency" under the APA. *Id.* § 551(1).

286.    The memorandum creating (or continuing) DACA is a "rule" under the APA. *Id.* § 551(4).

287.    The DACA memorandum required notice-and-comment procedure because it is a binding rule.

288.    DACA required notice-and-comment procedure because it modifies substantive rights and interests, as it confers on recipients a legal status (lawful presence) and eligibility for attendant benefits. *See Texas*, 809 F.3d at 176.

289.    Additionally, DACA required notice-and-comment procedure because it does not genuinely leave the agency and its decisionmaker free to exercise discretion.

290.    As the district court found in the DAPA lawsuit, "[n]othing about DAPA '*genuinely* leaves the agency and its [employees] free to exercise discretion.'" *Id.* at 171-72 & n.127 (quoting *Texas*, 86 F. Supp. 3d at 670 (emphasis and second alteration in district court opinion)).

291.    In the DAPA lawsuit, the district court's finding regarding the lack of genuine discretion afforded to USCIS and its employees under DAPA "was partly informed by analysis of the implementation of DACA, the precursor to DAPA." *Id.* at 172 & n.128 (citing *Texas*, 86 F. Supp. 3d at 669-70).

292.    "Like the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis and exercise discretion, but the district court found that those statements were 'merely pretext' . . . ." *Id.* at 172 & n.129 (quoting *Texas*, 86 F. Supp. 3d at 669 n.101).

293.    As the Fifth Circuit recognized, "only about 5% of the 723,000 [DACA] applications accepted for evaluation [through the end of 2014] had been denied." *Id.* at 172 & n.130 (citing *Texas*, 86 F. Supp. 3d at 609).

294.    As the Fifth Circuit explained, "'[d]espite a request by the [district] [c]ourt, the [g]overnment's counsel did not provide the number, if any, of requests that were denied [for discretionary reasons] even though the applicant met the DACA criteria.'" *Id.* at 172 & n.131 (quoting *Texas*, 86 F. Supp. 3d at 609 (alterations in Fifth Circuit opinion)).

295.    The district court's "finding of pretext was also based on a declaration by Kenneth Palinkas, the president of the union representing the USCIS employees processing the DACA applications, that 'DHS management has taken multiple steps to ensure that DACA applications are simply rubberstamped if the applicants meet the necessary criteria.'" *Id.* at 172-73 & n.132 (quoting *Texas*, 86 F. Supp. 3d at 609-10).

296.    The district court's "finding of pretext was also based on . . . DACA's Operating Procedures, which 'contain[] nearly 150 pages of specific instructions for granting or denying deferred action.'" *Id.* at 172-73 & n.133 (quoting *Texas*, 86 F. Supp. 3d at 669 (alteration in Fifth Circuit opinion)).

297.    DACA "[d]enials are recorded in a 'check the box' standardized form, for which USCIS personnel are provided templates." *Id.* at 175 (quoting *Texas*, 86 F. Supp. 3d at 669 (alteration in Fifth Circuit opinion)).

298.    "Certain denials of [DACA] must be sent to a supervisor for approval[, and] there is no option for granting [DACA] to an individual who does not meet each criterion." *Id.* (quoting *Texas*, 86 F. Supp. 3d at 669 (alteration in Fifth Circuit opinion)).

299.    "'[R]outing [DACA] applications through service centers instead of field offices . . . created an application process that bypasses traditional in-person investigatory interviews with trained USCIS adjudications officers' and 'prevents officers from conducting case-by-case investigations, undermines officers' abilities to detect fraud and national-security risks, and ensures that applications will be rubber-stamped.'" *Id.* (quoting *Texas*, 86 F. Supp. 3d at 609-10 (alteration and omission in Fifth Circuit op.)); *see* Decl. of Kenneth Palinkas ¶ 10, *Texas*, 86 F. Supp. 3d 591 (No. 1:14-cv-254), ECF No. 64-42.

300.    DACA relief confers a stamp of approval from the government and encodes a substantive value judgment. *See Texas*, 809 F.3d at 176-77.

301.    DACA does not clearly and directly relate to "public benefits" as that term is used in 5 U.S.C. § 553(a)(2), because the agency administering DACA (USCIS) is not an agency managing benefit programs, much less the kind of public benefit that has been recognized under § 553(a)(2). *See Texas*, 809 F.3d at 178.

302.   Although OLC cautioned the Executive that it was "critical" to DACA's legality that the Executive Branch evaluate every application on a case-by-case basis, **Exhibit 4** at 18 n.8, the President and DHS ignored that advice by granting deferred action mechanically to all applicants who satisfy the threshold criteria specified in the DACA memo.

303.   DHS officials who implement the DACA program exercise, in practice, effectively no discretion to deny DACA to applicants who meet the eligibility criteria in the DACA memo and the administrative application requirements, such as a background check and application fee.

### B.   DACA Is Contrary to Law, Because It Violates Congressional Statutes.

304.   DACA is contrary to law because it is "not authorized by statute," *Texas*, 809 F.3d at 184, and is "foreclosed by Congress's careful plan," *id.* at 186.

305.   The APA requires this Court to hold unlawful and set aside any agency action that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

306.   "In specific and detailed provisions, the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." *Texas*, 809 F.3d at 179.

307.   "Entirely absent from those specific classes is the group of . . . illegal aliens who would be eligible for lawful presence under" DACA. *Id.*

65

308.   "The INA also specifies classes of aliens eligible and ineligible for work authorization." *Id.* at 180-81 (footnotes omitted).

309.   Federal statutes defining which aliens are eligible for work authorization make "no mention of the class of persons whom" DACA "would make eligible for work authorization." *Id.* at 181.

310.   "[T]he INA flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them eligible for a host of federal and state benefits, including work authorization." *Id.* at 184.

311.   "[H]istorical practice . . . 'does not, by itself, create power.'" *Id.* at 184 & n.193 (quoting *Medellin v. Texas*, 552 U.S. 491, 532 (2008)).

312.   "[I]n any event, previous deferred-action programs are not analogous to [DACA]." *Id.* at 184.

313.   "[M]any of the previous programs were bridges from one legal status to another, whereas [DACA] awards lawful presence to persons who have never had a legal status and may never receive one." *Id.* (footnotes omitted).

314.   DACA has even provided some recipients with United States citizenship or a pathway to citizenship—without any statutory authorization to do so from Congress.

## C.   DACA Violates the Take Care Clause.

315.   DACA violates the Take Care Clause because it dispenses with certain immigration statutes by declaring as lawful conduct that Congress established as unlawful.

316.   DACA violates the Take Care Clause because it dispenses with certain immigration statutes by granting United States citizenship or a pathway to citizenship to aliens who would otherwise be unlawfully present but for DACA.

317.   The Take Care Clause has its roots in the dispute between Parliament and King James II, who was overthrown in the Glorious Revolution of 1688. Parliament was infuriated at King James's use of his purported power to suspend or dispense with Parliament's laws. Zachary Price, *Enforcement Discretion and Executive Duty*, 67 Vand. L. Rev. 671, 676, 690-91 (2014). The subsequent monarchs, William and Mary, agreed to the English Bill of Rights, which stripped the monarchy of all suspending and dispensing authority. *See* English Bill of Rights of 1689, art. 1.

318.   The Framers of the U.S. Constitution unanimously rejected a proposal to grant dispensing powers to the President.

319.   The Supreme Court has held that the Take Care Clause does not grant the President a power to dispense with statutes: "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution, and entirely inadmissible." *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838). Any other conclusion would "vest[] in the President a dispensing power." *Id.*

320.   DACA dispenses with certain immigration statutes.

321.   Just as King James attempted to make unlawful office-holding lawful, Price, *supra*, at 691, the Executive through DACA, Expanded DACA, and DAPA sought to make unlawful presence lawful.

322.   Even worse than that, after the Executive made unlawful presence lawful through DACA, the Executive then used that lawful-presence dispensation to affirmatively confer United States citizenship or a pathway to citizenship on some DACA recipients.

323.   As Justice Scalia correctly noted, DACA is a program that involves "biennial requests for *dispensation*" from immigration statutes. *Arizona*, 567 U.S. at 435 (Scalia, J., concurring in part and dissenting in part) (emphasis added).

324.   OLC recognized that class-based deferred-action programs like DACA "raise particular concerns about whether immigration officials have undertaken to substantively change" immigration statutes, **Exhibit 4** at 22, and "effectively rewrite the laws to match the Executive's policy preferences," *id.* at 24.

325.   DACA is unlawful even under the four-part test established by the OLC Memo under the Obama Administration delineating limitations imposed by "the nature of the Take Care duty." *Id.* at 6-7.

326.   First, OLC stated that a class-based deferred-action program must reflect the agency's expert judgment about resource allocation, *id.* at 6, and must not confer legal status, *id.* at 20-21.

327.   But DACA deems unlawful presence lawful—a fact never mentioned by the OLC Memo.

328.   DACA has even provided some recipients with United States citizenship or a pathway to citizenship—a fact never mentioned by the OLC Memo.

329.   DACA is a programmatic decision to confer benefits on hundreds of thousands of aliens.

330.   Second, OLC stated that a class-based deferred-action program must be "consonant with, rather than contrary to, the congressional policy underlying the [relevant] statutes." *Id.* at 6.

331.   DACA is "incompatible with the express or implied will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

332.   DACA violates explicit and implicit congressional objectives.

333.   Third, OLC stated that a class-based deferred-action program cannot be an "[a]bdication of the duties assigned to the agency by statute." **Exhibit 4** at 7.

334.   But DACA is an "abdication" of immigration statutes enumerating in careful detail which aliens may be lawfully present and obtain work authorization. *Texas*, 86 F. Supp. 3d at 663.

335.   DACA also is an "abdication" of immigration statutes enumerating in careful detail which aliens may obtain United States citizenship or a pathway to citizenship. *Id.*

336.    Fourth, OLC stated that a class-based deferred-action program must allow for "case-by-case" discretion. **Exhibit 4** at 7.

337.   As explained above, *see supra* ¶¶ 289-303, DACA does not allow for case-by-case discretion.

**VI.    The Court Should Declare that DACA Is Unlawful and Enjoin the Defendants Nationwide from Issuing or Renewing DACA Permits.**

338.    For the reasons explained above, the Court should enter a declaratory judgment that DACA is unlawful.

339.    While the Court would have the power to enter an injunction immediately rescinding all DACA permits that confer lawful presence and work authorization, Plaintiff States are amenable to an injunction that prospectively enjoins Defendants in the future from renewing or issuing any new DACA permits that confer lawful presence and work authorization, but does not require the Executive to immediately rescind any existing DACA permits that confer lawful presence or work authorization. Such an injunction would effectively phase out the DACA program within two years.

340.    Such an injunction would account for any alleged reliance interests that aliens claim in DACA permits already received. Any such reliance interest, however, could not possibly extend beyond the existing two-year terms of those permits. The memorandum announcing DACA itself explicitly stated that "DHS cannot provide any assurance that relief will be granted." **Exhibit 1** at 2.

341.    An injunction prohibiting the Executive from issuing or renewing DACA permits should apply to Defendants wherever they may act.

342.    Both the Constitution and Congress have directed that the Nation needs a uniform, nationwide immigration policy. *See Texas*, 809 F.3d at 187-88.

343.    Additionally, the Court should grant any and all other relief to which Plaintiff States may be entitled.

## VII. The Deferred-Action Work-Authorization Regulation Is Invalid as Applied to DACA and Expanded DACA Recipients.

344.   An executive regulation declares that "an alien who has been granted deferred action" can obtain employment authorization from the federal government. 8 C.F.R. § 274a.12(c)(14).

345.   Defendants have previously asserted that 8 C.F.R. § 274a.12(c)(14) authorizes the federal government to grant work authorization to recipients of DAPA and Expanded DACA. *See* Defs.' Mem. P. & A. in Opp'n to Pls.' Mot. for Prelim. Inj. 7-8, *Texas*, 86 F. Supp. 3d 591 (No. 1:14-cv-254), ECF No. 38.

346.   There is no statutory authorization for the regulation to be applied in this manner. Although 8 C.F.R. § 274a.12(c)(14) may be valid as applied to the four, narrow types of deferred action authorized by statute, it is not valid as applied to recipients of DACA, Expanded DACA, or DAPA—which are not statutorily authorized.

## VIII. The Federal Benefits Triggered by Lawful Presence Cannot Be Validly Extended to DACA Recipients.

347.   The classification of lawful presence is a requirement for myriad federal benefits, including Social Security, Medicare, and PRWORA-restricted benefits. *See supra* ¶¶ 38-40.

348.   Conversely, time during which an alien lacks the classification of lawful presence counts towards lengths of time that trigger a reentry bar. *See supra* ¶ 41.

349.   DACA confers lawful presence on individuals whose presence in this country is not lawful under the Nation's immigration laws.

350.   The statutory provisions conferring eligibility for benefits based on lawful presence cannot be validly applied to DACA recipients.

## FIRST CAUSE OF ACTION
### Violation of the Take Care Clause

351.   The allegations in paragraphs 1-351 are reincorporated herein.

352.   Defendants' actions here in creating and implementing DACA violate the President's constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. To the extent Expanded DACA permits remain in effect, they also violate the same duty.

## SECOND CAUSE OF ACTION
### Violation of the APA's Procedural Requirements, 5 U.S.C. § 553

353.   The allegations in paragraphs 1-353 are reincorporated herein.

354.   Defendants have violated the APA by promulgating, implementing, and relying upon the DACA program without using the required APA notice-and-comment procedure. To the extend Expanded DACA permits remain in effect, they violate the same procedural law.

## THIRD CAUSE OF ACTION
### Violation of the APA's Substantive Requirements, 5 U.S.C. § 706

355.   The allegations in paragraphs 1-355 are reincorporated herein.

356.   Defendants have acted contrary to law and have violated 5 U.S.C. § 706 by creating and implementing DACA. To the extent Expanded DACA permits remain in effect, they violate the same substantive law.

## **PRAYER FOR RELIEF**

Underlying DACA is a dangerously broad conception of Executive power—one that if left unchecked, could allow future Executives to dismantle other duly enacted laws. The Court must not allow that to occur. Plaintiff States respectfully request that the Court issue the following relief regarding DACA (and Expanded DACA, to the extent any permits remain in effect):

A.      An order enjoining Defendants from issuing or renewing any DACA permits in the future;

B.      A declaratory judgment that DACA violates the Take Care Clause;

C.      A declaratory judgment that DACA is procedurally unlawful under the APA;

D.      A declaratory judgment that DACA is substantively unlawful under the APA; and

E.      Any and all other relief to which Plaintiff States may be entitled.

Respectfully submitted.

STEVE MARSHALL
Attorney General of Alabama

KEN PAXTON
Attorney General of Texas

LESLIE RUTLEDGE
Attorney General of Arkansas

JEFFREY C. MATEER
First Assistant Attorney General

JEFF LANDRY
Attorney General of Louisiana

BRANTLEY STARR
Deputy First Assistant Attorney General
Tx. State Bar No. 24046904
Southern District of Texas No. 2972033
Tel.: (512) 463-2100; Fax: (512) 936-0545
brantley.starr@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

DOUGLAS J. PETERSON
Attorney General of Nebraska

ALAN WILSON
Attorney General of South Carolina

PATRICK MORRISEY
Attorney General of West Virginia

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

 /s/ Todd Lawrence Disher
TODD LAWRENCE DISHER
Attorney-in-Charge
Special Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

ADAM ARTHUR BIGGS
Special Counsel for Civil Litigation
Tx. State Bar No. 24077727
Southern District of Texas No. 2964087
Tel.: (512) 463-2100; Fax: (512) 936-0545
adam.biggs@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

**COUNSEL FOR PLAINTIFF STATES**

Dated this 14th day of June, 2018.

## CERTIFICATE OF SERVICE

I certify that on June 14, 2018, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Special Counsel for Civil Litigation

**COUNSEL FOR PLAINTIFF STATES**