# EXHIBIT C

```
 1            IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK
 2

 3    -------------------------x
                               )
 4    MARTIN JONATHAN BATALLA   )
      VIDAL, et al.,            )
 5                             )
                  Plaintiffs,  )
 6                             ) Case No.
            v                  ) 1:16-CV-04756(NGG)(JO)
 7                             )
      ELAINE C. DUKE, Acting    )
 8    Secretary Department of   )
      Homeland Security         )
 9    JEFFERSON BEAUREGARD      )
      SESSION III, Attorney     )
10    General of the United     )
      States,and DONALD J TRUMP,)
11    President of the UNITED   )
      STATES,                   )
12                             )
                  Defendants.  )
13    -------------------------x

14

15            Deposition of DONALD NEUFELD

16                  Washington, DC

17            Wednesday, October 18, 2017

18                     9:16 a.m.

19

20    Job No.: 37566

21    Pages: 1 - 211

22    Reported by: Donna Marie Lewis, RPR, CSR (HI)
```

Olender Legal Solutions
A Global Litigation Solutions Company

888.445.3376
202.898.1108

www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD                                      10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                    2..5

Page 2

```
1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF NEW YORK
2
3    --------------------------x
                               )
4    MARTIN JONATHAN BATALLA    )
     VIDAL, et al.,             )
5                               )
               Plaintiffs,      )
6                               ) Case No.
          v                     ) 1:16-CV-04756(NGG)(JO)
7                               )
     ELAINE C. DUKE, Acting     )
8    Secretary Department of    )
     Homeland Security          )
9    JEFFERSON BEAUREGARD       )
     SESSION III, Attorney      )
10   General of the United      )
     States,and DONALD J TRUMP,)
11   President of the UNITED    )
     STATES,                    )
12                              )
               Defendants.      )
13                              )
     --------------------------x
14
15          Deposition of DONALD NEUFELD, held at US
16   Conference of Mayors, 1620 I Street, NW,
17   Washington 20006 pursuant to Notice, before Donna
18   Marie Lewis, Registered Professional Reporter and
19   Notary Public of and for the District of Columbia.
20
21
22
```

Page 3

```
1              A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFFS:
3              JEROME N. FRANK LEGAL SERVICES
               ORGANIZATION AT YALE LAW SCHOOL
4              BY:  DAVID CHEN, LAW STUDENT INTERN
                    MICHAEL WISHNIE, ESQUIRE
5                   VICTORIA ROECK, LAW STUDENT INTERN
               Yale Law School
6              127 Wall Street
               New Haven CT 06511
7              Telephone: (203) 432-4800
               Email: michael.wishnie@yale.edu
8
9              NATIONAL IMMIGRATION LAW CENTER
               BY: JOSHUA A. ROSENTHAL, ESQUIRE
10                  KAREN C. TUMLIN, ESQUIRE
               P.O. Box 70067
11             Los Angeles, CA 90070
               Telephone: (213) 639-3900
12
13             GIBSON,DUNN & CRUTCHER, LLP
               BY:  ANDREW WILHELM, ESQUIRE
14             1050 Connecticut Avenue, NW
               Washington, D C 20036
15             Telephone: 202 887-3556
               Email: awilhelm@gibsondunn.com
16
17
               COVINGTON & BURLING, LLP
18             BY:  IVANO M VENTRESCA, ESQUIRE
               Telephone: 202 662-5203
19             Email: iventresca@cov.com
20
21
22
```

Page 4

```
1    APPEARANCES:  (Continued)
2    ON BEHALF OF PLAINTIFFS: (Continued)

               MAKE THE ROAD NEW YORK
4
               BY: CARLOS VARGAS, ESQUIRE
5                  SCOTT FOLETTA, ESQUIRE
                   CAROLINA FUNG FENG, ESQUIRE
6              301 Grove Street
               Brooklyn, NY 11237
7              Telephone: 718 727-1222
                          929 244-3456
8                         917 251-1373
               Emails: carlos.vargas@maketheroadny.org
9                 scott.foletta@maketheroadny.org
                  carolina.fungfen@maketheroadny.org
10
11
               NEW YORK ATTORNEY GENERAL'S OFFICE
12             BY:  SANIA W. KHAN, ESQUIRE
               120 Broadway
13             New York, NY 10271
               Telephone: (212) 416-8534
14             Email: sania.khan@ag.ny.gov
15
16             STATE OF CALIFORNIA, DEPT OF JUSTICE
               OFFICE OF THE ATTORNEY GENERAL
17             BUREAU OF CHILDREN'S JUSTICE
               BY: MICHAEL L. NEWMAN, DIRECTOR
18             300 S. Spring Street
               Suite 1702
19             Los Angeles, CA 90013
               Telephone: 213 897-2642
20             Email: michael.newman@doj.ca.gov
21
22
```

Page 5

```
1    APPEARANCES:  (Continued)
2
3    ON BEHALF OF DEFENDANTS:
4              UNITED STATES DEPARTMENT OF JUSTICE
               BY:  KATE BAILEY, TRIAL ATTORNEY
5
6              U S DEPARTMENT OF HOMELAND SECURITY
               U S CITIZENSHIP AND IMMIGRATION SERVICES
7              BY: EVAN R. FRANKE, ESQUIRE
               20 MASSACHUSETTS AVENUE, NW,
8              Suite 4210
               Washington, DC 20529-2120
9              Telephone: (202) 272-1446
               Facsimile: (202) 272-1405
10             Email: Evan.Franke@dhs.gov
11
12             U S DEPARTMENT OF HOMELAND SECURITY
               OFFICE OF THE GENERAL COUNSEL
13             BY: REID COX, ATTORNEY-ADVISOR
14
15             U S DEPARTMENT OF JUSTICE
               BY: JOHN TYLER, ESQUIRE
16
17
18
19
20
21
22
```

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD
10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE
6..9

Page 6

```
1                I N D E X
2  WITNESS:
3        DONALD NEUFELD
4  EXAMINATION BY:                    PAGE
5     Mr. Chen                         11
6     Ms. Khan                        156
7     Mr. Ventresca                   171
8     Mr. Newman                      190
9
10            E X H I B I T S
11 NEUFELD
   EXHIBITS:       DESCRIPTION        PAGE
12
13 No. 38   Defendant's Objections and Responses  57
14 No. 39   Declaration of Donald Neufeld      171
15
16
17
18
19
20
21
22
```

Page 7

```
1            P-R-O-C-E-E-D-I-N-G-S
2        THE VIDEOGRAPHER:  Good morning.  We are
3  going on the record at 9:16 a.m. on October 18,
4  2017.  Please note that the microphones are
5  sensitive.  They pick up whispering and private
6  conversations and cellular interference.  Please
7  turn off all cell phones or place them away from
8  the microphones as they can interfere with the
9  deposition audio.  The audio/video recording will
10 continue to take place unless all parties agree to
11 go off the record.
12        This is media unit 1 of the video
13 recorded deposition of Donald Neufeld, taken by
14 counsel for the plaintiff in the matter of Martin
15 Jonathan Batalla Vidal, et al., v. Elaine C. Duke,
16 et al., filed in the United States District Court
17 for the Eastern District of New York, Case
18 number 1:16-CV-04756(NGG)(JO).
19        The deposition is being held at
20 United States Conference of Mayors located at 1620
21 I Street, Northwest, 4th floor, Washington, D C.
22        My name is Gene Aronov.  I'm with
```

Page 8

```
1  Veritext Legal Solutions and I'm the videographer.
2  The court reporter is Donna Lewis from the firm
3  Olender Reporting.
4        I'm not authorized to administer an
5  oath.  I'm not related to any party in this
6  action, nor am I financially interested in the
7  outcome.
8        Counsel and all present in the room and
9  everyone attending remotely will now state their
10 appearances and affiliations for the record.  If
11 there are any objections to the proceedings,
12 please state them at the time of your appearance
13 beginning with noticing attorney.
14        MR CHEN:  David Chen, law student intern
15 with the Jerome N. Frank Legal Services
16 Organization at Yale Law School.
17        MR. WISHNIE:  Michael Wishnie, Jerome N.
18 Frank Legal Services Organization, Yale Law
19 School.
20        MS. ROECK:  Victoria Roeck, law student
21 intern with Jerome N. Frank Legal Services
22 Organization at Yale Law School.
```

Page 9

```
1        MR. ROSENTHAL:  Joshua Rosenthal,
2  National Immigration Law Center.
3        MS. TUMLIN:  Karen Tumlin, National
4  Immigration Law Center --(mumbling)
5        MR. WILHELM:  Andrew Wilhelm, Gibson,
6  Dunn & Crutcher for the Garcia matter.
7        MR. VENTRESCA:  Ivano Ventresca,
8  Covington & Burling for the University of
9  California and Janet Napolitano.
10        MR. VARGAS:  Carlos Vargas -- plaintiff.
11        THE COURT REPORTER:  I can't hear you.
12        MR. VARGAS:  Carlos Vargas, plaintiff.
13        MR. FOLETTA:  Scott Foletta, Make the
14 Road, New York.
15        MS. FUNG FENG:  Carolina Fung Feng.
16        MS. KHAN:  Sania Khan for the New York
17 Attorney General's Office on behalf of the United
18 States, the New York division.
19        MR. NEWMAN:  Michael Newman of the
20 California Department of Justice on behalf of
21 plaintiff states in the California versus DHS
22 matter.
```

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE              10..13

Page 10

1        MS. BAILEY:  Kate Bailey, United States
2   Department of Justice, on behalf of defendants.
3        MR. FRANKE:  Evan Franke, United States
4   Citizenship and Immigration Services on behalf of
5   defendants.
6        MR. COX:  Reid Cox, DHS, Office of the
7   General Counsel on behalf of defendants.
8        MR. TYLER:  John Tyler, United States
9   Department of Justice on behalf of defendants.
10        THE WITNESS:  Donald Neufeld, United
11   States Citizenship and Immigration Services, and
12   I'm the deponent.
13        THE VIDEOGRAPHER:  Would the court
14   reporter please swear in the witness.
15   Whereupon,
16        D O N A L D   N E W F E L D
17   after having been first duly sworn by the Notary
18   Public was examined and testified as follows:
19        THE VIDEOGRAPHER:  You may proceed.
20        MR CHEN:  Good morning, Mr. Neufeld.
21   Thank you for being here.  My name is David Chen.
22   I'm the law student intern of the Jerome N. Frank

Page 11

1   Legal Services Organization at Yale Law School and
2   I'll be taking your deposition today.
3        Before we begin we would like to
4   establish for the record that counsel has agreed
5   to the following stipulations; First, does counsel
6   stipulate that all objections except as to form
7   are preserved?
8        MR. TYLER:  Yes.
9        MR CHEN:  Second, does counsel stipulate
10   and waive the right to review and sign the
11   transcript of the deposition?
12        MR. TYLER:  We do not.
13        MR CHEN:  Okay.  Noted.
14        EXAMINATION ON BEHALF OF PLAINTIFF
15   BY MR CHEN:
16   Q    Mr. Neufeld, have you ever taken a
17   deposition before?
18   A    Yes.
19   Q    Well, just to remind you let me go over
20   some of the ground rules before getting to the
21   questions.  First, I will be asking you the
22   questions.  If there is something that you do not

Page 12

1   understand please let me know.  If you answer the
2   question I will assume that you've understood the
3   question.  Do you understand?
4   A    Yes.
5   Q    In order for the court reporter to take
6   an accurate transcript of today's deposition I ask
7   that you -- that all of your responses be made
8   verbally.  For example, please say yes instead of
9   nodding your head.  Do you understand?
10   A    Yes.
11   Q    And your attorney may make an objection
12   to a question but we will not stop the deposition
13   to address the objections.  You are still required
14   to answer the question unless your attorney
15   instructs you not to answer.  Do you understand?
16   A    Yes.
17   Q    If you must consult your attorney I ask
18   that you first answer any pending questions unless
19   you need to talk to your attorney about a matter
20   of privilege.  Do you understand?
21   A    Yes.
22   Q    And, Mr. Neufeld, are you taking any

Page 13

1   medications or drugs of any kind that might make
2   it difficult for you to understand and answer my
3   questions today?
4   A    No.
5   Q    Do you suffer from any conditions that
6   would impair your ability to provide accurate and
7   complete testimony?
8   A    No.
9   Q    Is there any other reason you cannot
10   give full and complete testimony today?
11   A    No.
12   Q    Mr. Neufeld, did you do anything to
13   prepare for today's deposition?
14   A    Other than meeting with counsel
15   yesterday, no.
16   Q    Did you speak with -- did you speak with
17   anyone besides counsel?
18   A    No.
19   Q    Did you review any documents in
20   preparation for today's deposition?
21   A    No.
22   Q    Have you brought any materials with you

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD 10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE 14..17

Page 14

1 to assist with your testimony today?

2     A    No.

3     Q    How long did you speak with counsel in

4 preparation for today's deposition?

5     A    I didn't time it, but it was probably

6 about an hour, hour and a half.

7     Q    And when did you speak with counsel?

8     A    Yesterday afternoon.

9     Q    In total how long have you spent

10 preparing to be deposed?

11     A    An hour, an hour and a half.

12     Q    Other than what we have discussed have

13 you done anything else to prepare for today's

14 deposition?

15     A    No.

16     Q    When you were deposed previously,

17 Mr. Neufeld, in what case were you deposed?

18     A    I don't recall.  A few years ago.

19     Q    When?  Do you know about when you were

20 last deposed?

21     A    Several years ago, I don't recall the

22 specific date.

Page 15

1     Q    Do you know generally around what time

2 that was?

3     A    No.

4     Q    Do you recall in what matter it was

5 concerning that you were deposed?

6     A    I do not.

7     Q    Do you remember what court it was in

8 which you were deposed?

9     A    No.

10     Q    And what was -- do you remember at all

11 what the nature of the case was?

12     A    No.

13     Q    Were there any other times you were

14 deposed?

15     A    I believe there was, but I have a long

16 career and I don't remember specifically another

17 time --

18     Q    -- Do you remember how many -- about how

19 many times you were deposed?

20     A    I'm only confident of one that I was

21 just referencing.

22     Q    So let's turn first to your role at the

Page 16

1 Department of Homeland Security.  What is your

2 current position at the Department of Homeland

3 Security?

4     A    I'm the associate director for Service

5 Center Operations.

6     Q    From this point forward I will refer to

7 Service Center Operations as SCOPS, if that is all

8 right?  And for the court reporter, that's spelled

9 S-C-O-P-S.

10          So is SCOPS within USCIS, Mr. Neufeld?

11     A    Yes.

12     Q    And USCIS is a component within DHS?

13     A    Yes.

14     Q    When did you begin your role as

15 associate director of SCOPS?

16     A    January or February of 2010.

17     Q    Have you held any other positions at

18 DHS?

19     A    Yes.

20     Q    What were those positions?

21     A    I was the deputy associate director for

22 domestic operations.

Page 17

1     Q    And around what time, when were you the

2 deputy associate director for domestic operations?

3     A    That was the position I held before

4 January 2010.

5     Q    When did you begin that position?

6     A    I'm not certain but I think that was

7 2009 and I don't remember the month.

8     Q    And did you -- did you have any position

9 within DHS before that?

10     A    Yes.  I was the chief of field

11 operations immediately before that and that would

12 have begun in 2007.  Again, I'm not clear on the

13 month.

14     Q    And before that?

15     A    I was the service center director for

16 the California service center.

17     Q    And how long were you working at that --

18 in that position?

19     A    I believe I started that position in

20 2003.

21     Q    In total, Mr. Neufeld, how long have you

22 been working at DHS?

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE              18..21

Page 18

1     A    Since it was created.
2     Q    And can you give me the date around what
3  time that it was?
4     A    I should know this.  I think it was
5  March 2010 -- I mean 2003.
6     Q    And were you working in the government
7  prior to that?
8     A    Yes.
9     Q    Where were you working prior to the
10 creation of DHS?
11    A    The Legacy Immigration and
12 Naturalization Service.
13    Q    How long had you been working at that
14 agency for?
15    A    Since September 1983.
16    Q    Okay.  I want to turn to SCOPS and its
17 role.  Can you explain what the SCOPS office does?
18    A    So we are a component within USCIS.  The
19 headquarters component where I -- my offices we
20 oversee the operations of five service centers.
21    Q    Can you expand a bit more on what you
22 mean by the operations of the service centers?

Page 19

1  What are those operations?
2     A    The service centers are responsible for
3  adjudicating benefit requests under the
4  Immigration Nationality Act.
5     Q    Did SCOPS process requests for the
6  Deferred Action for Childhood Arrivals and
7  Accompanying Work Authorization applications?
8     A    Yes.
9     Q    So you are familiar with the DACA
10 program?
11    A    Yes.
12    Q    Can you describe your responsibilities
13 as in your role as the associate director of
14 SCOPS?
15    A    I oversee the operations of the five
16 service centers.
17    Q    Is there anything else that you are
18 responsible for?
19    A    I represent the interests of service
20 center operations with my colleagues and the rest
21 of the agency and the department.
22    Q    Is there anything else?

Page 20

1     A    No.
2     Q    Do you oversee the processing of DACA
3  applications?
4     A    Yes.
5     Q    So who reports directly to you,
6  Mr. Neufeld?
7     A    The deputy associate director for
8  service center operations.
9     Q    Who is that?
10    A    That position is vacant now so there is
11 somebody in an acting capacity.
12    Q    Who is the acting deputy director?
13    A    Carrie Selby.
14    Q    Carrie Selby.  And who reports to Carrie
15 Selby?
16    A    This gets complicated because it is an
17 acting situation.  So right now the service center
18 directors are reporting to me through that
19 position, but that's only for this interim period
20 where there is an acting individual.
21    Q    And normally how does the chain of
22 command work?

Page 21

1     A    Normally the five service center
2  directors would report to the deputy associate
3  director who reports to me.
4     Q    Are you in regular contact with the
5  directors of the service centers?
6     A    Yes.
7     Q    How often are you in contact with them?
8     A    It varies, but usually at least weekly.
9     Q    And in what form does this contact take
10 place?
11    A    Usually by email or telephone or video
12 conferencing, sometimes in person.
13    Q    Do they compile reports for you or
14 documents on a regular basis?
15    A    Yes.
16    Q    Do they keep you apprized of the work
17 performed at the service centers?
18    A    Yes.
19    Q    How often do they update you?
20    A    We have a weekly check-in which they can
21 bring up whatever information they would like to
22 share.

DONALD NEUFELD                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE              22..25

Page 22

1    Q    Can you describe what is communicated
2  during these weekly check-ins?
3    A    Any matters of interest.  Usually they
4  are operationally focused so whatever issues might
5  be arising at the center that need attention, how
6  well they are performing, where the backlogs are
7  developing, that sort of thing.
8    Q    Anything else that they might keep you
9  apprized of?
10   A    Well, it is open to anything anybody
11  wants to bring up.
12   Q    And do they prepare memoranda in
13  preparation for this check-in?
14   A    No.
15   Q    Do they -- do they keep you apprized of
16  the number of immigration related requests that
17  each service center has processed?
18   A    Not normally.
19   Q    Do they keep you apprized of the number
20  of DACA applications processed?
21   A    No, not normally.
22   Q    So within these weekly check-ins with

Page 23

1  the service center directors are there -- is there
2  any agenda created beforehand?
3    A    Infrequently.
4    Q    How often would sometimes these agendas
5  be created?
6    A    So I believe we started having an
7  agenda, maybe within the last two months and it's
8  been weekly since then.
9    Q    Are there minutes coming out of these
10  check-ins?
11   A    No.  No.
12   Q    Are there any written records of what
13  was discussed at these check-ins?
14   A    No.
15   Q    To whom do you directly report,
16  Mr. Neufeld?
17   A    To the deputy director of USCIS.
18   Q    Who is that, Mr. Neufeld?
19   A    James McCament.
20   Q    Do you report to anyone else?
21   A    Directly, no.
22   Q    So let's now turn to the processing of

Page 24

1  DACA applications that was conducted at your
2  office.  As part of your official duties you
3  oversaw the processing of DACA applications.  Is
4  that correct?
5    A    That's correct.
6    Q    So I want to focus my understanding of
7  that process and I want to focus on the process
8  specifically prior to your office learning about
9  the decision to terminate DACA.  So I would like
10  to go step by step through each process beginning
11  with when an individual submits an initial DACA
12  application.  Is that all right?
13   A    Yes.
14   Q    So at the beginning of the application
15  process DACA applications are sent to lockboxes.
16  Is that correct?
17   A    Do you mean DACA applications?
18   Q    Yes?
19   A    Yes.
20   Q    How many of lockboxes are there?
21   A    I don't recall specifically.
22   Q    After arriving at those lockboxes they

Page 25

1  are reviewed for completeness.  Correct?
2    A    Yes.
3    Q    And if an application is missing a
4  component, for example there is no attached filing
5  fee or if it's unsigned it would be rejected.
6  Correct?
7    A    Yes.
8    Q    How did SCOPS handle rejected
9  applications?
10   A    We wouldn't be the ones rejecting them.
11  It would be rejected by the lockbox.
12   Q    How do -- do you know how the lockbox
13  handled rejected applications?
14   A    No.
15   Q    Were application -- were applicants
16  notified of the rejection?
17   A    I believe so, yes.
18   Q    Do you know how they were notified?
19   A    I believe by letter, with the rejected
20  application would come a notice instructing them
21  that it had been rejected.
22   Q    You said that they would be issued a

Page 26

1  letter.  Is that correct?
2      A    I don't know the specific format.  What
3  I do know is that when the physical application or
4  request would be rejected that along with that
5  rejection would be some sort of communication
6  explaining that it had been rejected.
7      Q    Would it be sent back to the applicant?
8      A    Yes.  I am not sure how if they were
9  represented how that would be handled.
10     Q    Who manages those lockboxes, Mr.
11 Neufeld?
12     A    The Treasury Department.
13     Q    So, it would be the Treasury Department
14 that evaluates the applications for completeness
15 and would reject them and send the notice back.
16 Is that correct?
17     A    The Treasury Department has a contract
18 with banks that manage the lockboxes.
19     Q    If upon initial review the application
20 moves forward were applicants also notified?
21     A    Can you repeat that?
22     Q    If upon initial review by the lockboxes

Page 27

1  the application moves forward are applicants
2  notified?
3      A    They would receive a receipt notice.
4      Q    Were renewal applications processed in
5  the same way as initial DACA applications?
6      A    With respect to the lockbox process?
7      Q    Right now we're still on the lockbox
8  process.
9      A    Yes.
10     Q    So they are reviewed for completion,
11 notified of denial, and receive a receipt if the
12 application is forwarded.  Is that correct?
13     A    That's correct.
14     Q    What happens once an application is
15 approved at the lockboxes?
16     A    The lockbox wouldn't approve, they would
17 only accept or reject.
18     Q    What happens if the lockbox -- what
19 happens if an application is accepted by a
20 lockbox?  What happens next?
21     A    Then the lockbox -- I'm not sure of the
22 process that they use.  But they are responsible

Page 28

1  for the data entry into our systems.  I'm not sure
2  exactly how that process works.  I believe they
3  have their own system but they do data entry into
4  it and then it is transmitted to our system so
5  that we have an electronic record of the filing.
6      Q    What system is that?
7      A    Our system?
8      Q    Yes.
9      A    It has changed over time.  It was
10 initially claims 3.  Now it is ELIS.  E-L-I-S.
11         (Court reporter requested
12 clarification.)
13         THE WITNESS:  E-L-I-S.
14 BY MR CHEN:
15     Q    Do you know what the system that the
16 lockbox managers use?
17     A    I do not.
18     Q    Who would know?  Do you know who would
19 know what system that was?
20     A    The manager of our Office of Intake and
21 Document Production.
22     Q    Who, what is the name of your manager?

Page 29

1      A    Ernest DeStefano.
2      Q    Once the accepted applications are
3  logged do they move on to the service centers?
4      A    Yes.
5      Q    At the service centers who reviewed each
6  DACA application?
7      A    The typical process would be that it
8  would be reviewed by an immigration services
9  officer.
10     Q    Were DACA applications processed
11 anywhere else besides these service centers?
12     A    They are only adjudicated at service
13 centers.  A very small percentage in the last
14 several years have been referred to a field office
15 for interview but they did not make the final
16 decision.  They would -- after the interview they
17 would send it back to the service center for the
18 final decision.
19     Q    Do you know approximately how many
20 applications were referred to a field office for
21 an interview?
22     A    It would be a few hundred.

DONALD NEUFELD                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                30..33

Page 30

1    Q    Do you know what percentage of that is
2  to the total number of DACA applications?
3    A    I do not, but it is a very small
4  percentage.
5    Q    Approximately how many USCIS immigration
6  officers work at each service center?
7    A    It varies.  Most of these -- let me
8  clarify.  Things have changed over the years, but
9  for the majority of the time the cases have been
10 processed at either the Nebraska service center.
11 Most of the cases are processed at Nebraska
12 service center or the California service center.
13 The officer component at each of those has also
14 changed.  I would imagine that it's around
15 probably 400 adjudicators, officers at each of
16 those centers.
17   Q    And what about with the other three
18 service centers?
19   A    Vermont service center is approximately
20 the same size.
21        The Texas service center is a smaller
22 center, so it probably -- although it has grown

Page 31

1  recently.  It's probably closer to the 300 range.
2        The Potomac service center is the newest
3  center.  It is the smallest center and I think
4  that they have maybe 200 officers.
5    Q    And so DACA applications are processed,
6  you said that DACA applications are primarily
7  processed in the Nebraska and the California
8  service centers.  Is that correct?
9    A    That's correct.
10   Q    But the other three service centers also
11 process DACA applications.  Is that correct?
12   A    The Vermont service center processes a
13 very small number and those would relate to DACA
14 requests where the requester may have had another
15 benefit request in the T and U nonimmigrant
16 categories or the Violence Against Women Act
17 request.  I just don't -- well, the Potomac
18 service center has never processed DACA requests.
19 I don't recall the Texas service center's role.  I
20 believe that they have processed them at some
21 point in the past but it was a very short period
22 of time and not very large numbers.

Page 32

1    Q    Once a DACA application arrives at a
2  service center what happens next?
3    A    I don't know specifically.  The general
4  process is that the files would be received in the
5  mailroom, processed by a contractor, staged.  The
6  system -- in an automated way the system would
7  conduct background checks.  And depending on the
8  results of those background checks if there were
9  hits then they would go to a dedicated group of
10 officers at the center that would review the --
11 the information.  Other than that the files would
12 sit on a shelf until there was an officer
13 available.  The process usually first in, first
14 out.  They go to an officer for review.  If the
15 officer determines it's approvable then they would
16 approve it.  If there were -- if they determined
17 that additional evidence is necessary then they
18 would initiate a request for additional evidence.
19 If it -- they determined that it should be denied
20 then they would deny it.
21   Q    What criteria do INS adjudicators
22 consider when deciding to approve or deny a

Page 33

1  request for deferred action?
2    A    The criteria listed in the June 2012
3  memo issued by Janet Napolitano.
4    Q    Did immigration adjudicators use any
5  other criteria?
6    A    All of the criteria flows from that.  It
7  was -- the refinement of that criteria has been
8  developed through publication of FAQs, frequently
9  asked questions on the website.
10   Q    And so are all of the criteria that
11 immigration adjudicators would use, are they on
12 the FAQ website?
13   A    Yes.
14   Q    If the request for deferred action is
15 approved were applicants notified of the approval?
16   A    Yes.
17   Q    How were they notified?
18   A    They would receive an approval notice
19 and they would receive an employment authorization
20 document.
21   Q    Is that through the mail or through some
22 other communication?

DONALD NEUFELD                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                34..37

Page 34

1    A    The mail.
2    Q    **If they were denied -- if their**
3    **application was denied were they notified?**
4    A    Yes.
5    Q    **Are they notified of the reasons for**
6    **denial?**
7    A    Yes.
8    Q    **Can you give me an example of what a**
9    **reason for denial might be?**
10   A    One of the criteria is they would have
11   to have arrived under the age of 31 before the
12   date of issuance of the memo.  So if they -- if
13   they had not demonstrated then the case -- then
14   their request would be denied.
15   Q    **Is there any quality control to ensure**
16   **that the -- that immigration adjudicators are**
17   **adjudicating based upon the set criteria?**
18   A    So adjudicators are trained and they are
19   closely monitored by their supervisor.  Cases are
20   reviewed by their supervisor when they first begin
21   to adjudicate them and then when the supervisor is
22   satisfied that they have demonstrated the

Page 35

1    capabilities then typically their cases are not
2    reviewed.
3    Q    **What does the training that immigration**
4    **adjudicators receive involve?**
5    A    It would be training provided on site.
6    I don't know the content or the length of time.
7    Q    **Were there training documents or manuals**
8    **involved?**
9    A    I'm sure there were.
10   Q    **Do you know what those documents were?**
11   A    No.
12   Q    **Let me return back to the notices if an**
13   **applicant -- an applicant's application is**
14   **approved.  You mentioned before that USCIS used**
15   **the Claims 3 system and then the ELIS system.**
16   **Were they notified through those systems?**
17   A    I don't understand the question.
18   Q    **How were applicants whose applications**
19   **were approved, how were they -- how were the**
20   **notices for them generated?**
21   A    I'm actually not entirely clear on that
22   process.  I know that they would be system

Page 36

1    generated notices.  But where they are printed,
2    how they are mailed I know has changed over time
3    and I'm not confident I know the current process.
4    Q    **Do you know what the previous process**
5    **was?**
6    A    They would have been generated on site
7    at the center where the adjudicator was assigned
8    and then the contractor would have placed them in
9    the mail.
10   Q    **Do you know how long it took the notice**
11   **once mailed to reach an individual?**
12   A    I do not.
13   Q    **Do you know who might know that**
14   **information?**
15   A    No.
16   Q    **Were renewal applications processed in**
17   **the same way at the service centers as initial**
18   **applications?**
19   A    No.
20   Q    **What were the differences?**
21   A    So renewal requests, they are processed
22   in ELIS and there is a system processing that goes

Page 37

1    on for them that is different than for the initial
2    filing.  So an initial request is -- every one of
3    those is presented to an adjudicator and they are
4    reviewing either paper that was filed with it or
5    images of paper that are in the system, scanned
6    into the system.  Renewal requests are -- there is
7    a internal process that's automated where
8    depending on the results of background checks,
9    depending on checks that are conducted within the
10   system some cases may go through to completion
11   without being presented individually to an
12   officer.
13   Q    **You mentioned some cases.  How do you --**
14   **what are those cases that go through without being**
15   **presented to an officer?**
16   A    With the renewal request the individual
17   would have already demonstrated eligibility
18   previously for DACA.  So at the time of the
19   renewal request we are basically focused on the
20   results of new background checks that were run and
21   travel.  So part of the -- under the DACA program
22   if the individual travels without advance parole

DONALD NEUFELD                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE              38..41

Page 38

1   that would -- abroad outside of the United States,
2   that would terminate their DACA status.  So the
3   system will check to see if the applicant either
4   answered the question that they had traveled with
5   or without advance parole, but also check other
6   systems to see whether we had record of their
7   travel.  If any of those would have come up
8   positive then the case would fall out of the
9   automated process and get referred to an officer
10  for manual review to determine eligibility.  So
11  typically the process was mini-checks were
12  conducted.  Depending on the results of those
13  checks the case could either be completed
14  automatically in the system or be referred to an
15  individual officer for review.
16      Q    Were there any other differences between
17  renewal processing and initial application
18  processing?
19      A    Not that I can think of.
20      Q    If a renewal application was approved
21  were applicants also notified of the approval?
22      A    Yes.

Page 39

1       Q    And how was that approval -- what form
2   did that notice?
3       A    They would receive an approval notice in
4   the mail and the EAD, employment authorization
5   document.
6       Q    You said that renewal applications were
7   processed through the ELIS system.  Were they
8   processed through any other system?
9       A    Claims 3.  I'm actually not confident in
10  that answer.
11      Q    Do you know who would know whether
12  renewal applications were processed through Claims
13  3?
14      A    Individual officers might know.  I --
15  there -- I don't know -- we have people in our
16  agency who would know that, I just don't recall.
17      Q    Who in your agency supervises these
18  electronic systems?
19      A    That's the chief of our Office of
20  Information Technology.
21      Q    Who is the chief of office --
22      A    That position is currently vacant.

Page 40

1       Q    Is there an acting chief officer?
2       A    Yes.  And his name is Keith Jones.
3       Q    Okay.  So I want to focus now on the
4   notice procedures that SCOPS issued to DACA
5   applicants and DACA recipients.  Now I'm still
6   focusing on the process prior your office learning
7   about the decision to terminate DACA.
8            Did SCOPS have policies directing
9   adjudicators to send notices to DACA applicants
10  about updates to the status of their application?
11      A    I'm not following the question.
12      Q    Did SCOPS have policies about sending
13  notices to DACA applicants when the status of
14  their application changed when it was updated?
15      A    Well, first I need to clarify.  SCOPS
16  doesn't have its own policies.  We only follow the
17  policies of USCIS.
18      Q    Does USCIS have those policies about
19  sending notices?
20      A    I'm not sure whether it's by policy or
21  regulation, but we -- nonetheless, we do issue
22  approval notices, the request for evidence.  And

Page 41

1   that's -- those are policy decisions at some point
2   that were made that people need to be notified of
3   approval, denial.
4       Q    So how were those -- how were those
5   decisions to issue those notices made?
6       A    As I said, I don't recall whether they
7   are by regulation.  I believe they're caught up by
8   regulation.
9       Q    Were you involved in the making of those
10  decisions to send notices?
11      A    No.
12      Q    Were those decisions -- were those
13  policies or regulations written down anywhere?
14      A    If it's a regulation then it's codified
15  in our regulations.
16      Q    So how does -- how does an individual
17  employee, immigration adjudicator know to send a
18  notice when, for example, someone is -- someone's
19  application is approved?
20      A    Well, as I said the system will generate
21  the notice upon approval in the system by the
22  officer.  Same goes for denial notices.

DONALD NEUFELD                                10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE        42..45

Page 42

1    Q    Do you know when these policies were
2  set?
3    A    Are we talking specifically about DACA
4  or all adjudications?
5    Q    Specifically about DACA.
6    A    So it would have been since the
7  beginning of the program.
8    Q    So since the beginning of the program
9  SCOPS or USCIS had sent these -- had sent notice
10 to DACA recipients when their status changed or
11 updated?
12   A    Yes.
13   Q    Did USCIS send notices for when a DACA
14 recipient's DACA status was terminated for
15 whatever reason before it expired?
16   A    Yes.
17   Q    Did USCIS ever send notices to DACA
18 recipients notifying them about changes to the
19 DACA program?
20        MR. TYLER:  Objection.  Vague.
21 BY MR CHEN:
22   Q    Do you understand the question,

Page 43

1  Mr. Neufeld?
2    A    I don't know what you mean by changes to
3  the program.
4    Q    Are you aware of when -- if the DACA
5  program changed since it was first issued in 2012?
6        MR. TYLER:  Objection.  Vague.
7        THE WITNESS:  I still -- I don't know
8  what you mean by program.
9  BY MR CHEN:
10   Q    The -- did USCIS ever issue notices to
11 remind DACA recipients to renew their
12 applications?
13   A    Yes.
14   Q    And about when did they send these
15 notices?
16   A    That changed over time.  I think we
17 started initially with sending them a notice at
18 the 120 day point.  So, 120 days before their
19 current DACA would have expired we would issue a
20 notice.  And then that changed to six months
21 advance notice.
22   Q    When did that change?

Page 44

1    A    I don't recall specifically, probably at
2  least a year ago.
3    Q    So generally it was around 2016, late
4  2016?
5    A    I don't recall specifically.  It might
6  have been earlier.
7    Q    What was the rationale?  Why were -- why
8  did that policy change?
9        MR. TYLER:  Objection.  Lack of
10 foundation.
11 BY MR CHEN:
12   Q    Do you know when the -- why the policies
13 changed from 120 days to 180 days?
14   A    I know that advocacy groups were
15 complaining that that was insufficient notice and
16 that not enough people were applying early enough
17 so that they could prevent a lapse of their DACA
18 status.
19   Q    Do you know who these advocacy groups
20 were?
21   A    I don't recall specific groups.
22   Q    Do you know generally who these groups

Page 45

1  were?
2    A    No.
3    Q    Were there any other reasons for
4  changing the notice from 120 to 180 days?
5    A    Not that I recall.
6    Q    Were you involved in the establishment
7  of these notice processes?
8    A    In some ways, yes.
9    Q    Can you explain what ways you were
10 involved?
11   A    With the stand-up of the DACA program
12 there was a -- there were many meetings in the
13 early days comprised of many people from different
14 parts of the agency working through how best to
15 stand up this program and there were many
16 conversations at that time about whether and when
17 to issue reminder notices and I participated in
18 those conversations.
19   Q    And do you know about when those
20 conversations happened?
21   A    In the first 60 days following the
22 issuance of the memo.

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

Page 46

1    Q    Do you know who else was involved in
2  those conversations?
3    A    There were many people involved in those
4  conversations.  I can recall some of them.
5    Q    Can you name some of the individuals who
6  you can recall?
7    A    Ali Mayorkas (phonetic), Denice Vanison.
8  Laurie Shalabaum (phonetic).  Many different
9  people from counsel.  Dan Renaud, Tracy Renaud.
10  Many people.
11    Q    Were you -- what were some of the
12  factors that you considered in setting those
13  notice policies?
14    A    I need to repeat that SCOPS doesn't set
15  policy.  So there were many discussions at the
16  executive level.  For the most part those
17  conversations were about how to implement policy
18  decisions that were being made at the department
19  level.
20    Q    And can you explain what those policy
21  decisions at the department level were?
22    A    Let me think.  One of them would have

Page 47

1  been -- you know, whether we are going to issue
2  reminder notices again, how far in advance to
3  issue the reminder notices.  There were -- there
4  were a lot of issues in the early days surrounding
5  what types of crimes would be disqualifying.
6    Q    So are you saying that the policy to
7  issue reminder notices was made at the department
8  level?
9    A    I believe so, yes.
10    Q    Do you know who was involved in making
11  those policies?
12    A    At the department level?
13    Q    Yeah.
14    A    No.  Other than our director
15  participated, I'm sure.
16    Q    Do you know when those policies were
17  set?
18    A    Well, the majority of policy decisions
19  needed to be made in the first 60 days because
20  that was the time we had to stand up the program
21  and we needed to inform the public.
22    Q    So were the policy to -- was the policy

Page 48

1  to make, to issue reminder notices made within the
2  60 days?
3    A    I believe so, yes.
4    Q    Were you involved in the making of those
5  policies?
6    A    I was involved in discussions about how
7  we could issue notices.  I was not in the decision
8  making process for that policy.  I was not part of
9  the group that decided that.
10    Q    Were you consulted at all in that
11  decision to make --
12    A    Yes.
13    Q    -- policy?  What was the nature of that
14  consultation?
15    A    To offer how we might implement that
16  policy if it were adopted.
17    Q    What was your recommendation to how
18  SCOPS might implement that policy?
19    MR. TYLER:  Object on the grounds of
20  privilege.  It is deliberative process
21  information.  Direct the witness not to answer.
22

Page 49

1  BY MR CHEN:
2    Q    Were you -- did you write any memoranda
3  or documents in response to the consultation about
4  how to implement the policy?
5    A    I don't believe so.  There may be email
6  messages around that subject dating back to that
7  time period.
8    Q    Do you know -- so around what time were
9  those email messages?
10    A    As I said, this -- all of this was in
11  the first 60 days.
12    Q    Do you know who were the recipients of
13  those email messages?
14    A    No, because I don't even recall specific
15  email messages.
16    Q    Let's return to the DACA notices to
17  renew that were sent to DACA applicants.  What did
18  these notices say?
19    A    I don't know specifically.
20    Q    Do you remember generally what they
21  said?
22    A    It was a reminder that their DACA time

DONALD NEUFELD
10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE
50..53

Page 50

1  period was expiring and that they should submit a
2  new -- a request for renewal if they wanted to
3  extend.
4      Q     Was there a time period that the notices
5  recommended DACA applicants submit their renewals?
6      A     That changed over the course of the
7  years of operation.  I believe originally that
8  recommended time period was 120 to 150 days in
9  advance.  And then that evolved to -- I'm not
10 certain.  I know that we began encouraging people
11 to apply 150 days in advance or more.
12     Q     Did SCOPS have a name for these notices?
13 How did they refer to the notices?
14     A     Reminder notices.
15     Q     Reminder notices.  Did SCOPS send
16 reminder notices to all DACA recipients whose
17 status was about to expire?
18     A     For a period of time, yes.
19     Q     What period of time was that?
20     A     From the beginning of the DACA program
21 until -- I don't recall specifically, but within
22 the last year I believe we have stopped issuing

Page 51

1  those notices.
2      Q     Within the last year, do you know about
3  what time within the last year?
4      A     No.
5      Q     Do you know who might know that
6  information?
7      A     I don't know who, I know there are
8  records that would relate to that.
9      Q     What are the -- do you know who created
10 these records?
11     A     No.
12     Q     Do you know when these records were
13 created?
14     A     No.
15     Q     What were the nature of these records?
16 Were they memoranda or reports?
17     A     I don't know.
18     Q     So how are you aware that there are
19 records relating to the termination of these
20 notices?
21     A     I know that there were communications to
22 the team that would have been responsible for

Page 52

1  development of the capability to issue those
2  notices in ELIS not -- that they did not need to
3  work on that capability.
4      Q     Who are these individuals that were
5  sending these communications?
6      A     I'm not sure.
7      Q     Did they send them to you?  The
8  communications that you referred to, did the --
9  were the communications sent to you, Mr. Neufeld?
10     A     Not that I recall.
11     Q     So how were you aware, made aware of
12 these communications?
13     A     I'm aware that the decision was made and
14 I'm aware that it was communicated in some way.  I
15 don't know specifically the vehicle of
16 communication to the developers.
17     Q     Who informed you that the -- that the
18 decision was made?
19     A     Kathy Nuebel.
20     Q     Do you know about when she informed you
21 of that decision?
22     A     Several months ago.  I don't recall more

Page 53

1  specifically than that.
2      Q     When, in what form did she inform you?
3  Was this a conversation?
4      A     Email messages.
5      Q     Who -- do you know who else -- who else
6  was on that email -- sorry, was CCed on that
7  email?
8      A     I do not.
9      Q     Do you recall what the subject of the
10 email was?
11     A     The subject line, I do not.
12     Q     Was this in response to a previous
13 email?
14     A     It was in response to me raising the
15 question as to whether we would develop that
16 capability in ELIS.
17     Q     Do you know about when you sent that
18 request?
19     A     Several months ago is all I can recall.
20     Q     In that email that was sent to you, do
21 you remember if there were any attachments to the
22 email?

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD                          10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE          54..57

Page 54

1   A   I do not recall.
2   Q   Who is Kathy Nuebel?
3   A   She is the chief of the Office of Policy
4   and Strategy within USCIS.
5   Q   Were there any other communications
6   about the decision not to -- the decision to stop
7   issuing renewal notices?
8       MR. TYLER:  Objection.  Lack of
9   foundation.
10  BY MR CHEN:
11  Q   Are you aware of any other
12  communication?
13  A   Of?
14  Q   Are you aware of any other
15  communications about the decision to terminate
16  those renewal notices?
17  A   I'm aware that -- I know that I sent
18  messages to my subordinate team that that
19  capability would not be being developed.
20  Q   When were those -- how were you made
21  aware of those messages?
22  A   Well, they were my messages.

Page 55

1   Q   Sorry.  You -- when did you send these
2   messages?
3   A   It would have been contemporaneous with
4   the rest of these messages and that was several
5   months ago and I don't recall specific dates.
6   Q   What did you -- do you remember what you
7   communicated to your subordinates in those
8   messages?
9       MR. TYLER:  Objection.  Vague.
10      THE WITNESS:  I communicated to them
11  that the capability would not be being developed
12  in ELIS to issue reminder notices.
13  BY MR CHEN:
14  Q   Do you know why USCIS stopped sending
15  the renewal notices?
16  A   I know that I was asked whether there
17  would be costs involved and I answered yes.
18  Q   Who asked you about those costs?
19  A   Kathy Nuebel.
20  Q   Do you know about when she asked you
21  about them?
22

Page 56

1   A   It's all in the same time period that I
2   don't recall specifically.
3   Q   You said that there would be costs
4   involved.  Do you know what those costs -- what
5   you mean by that?  Can you explain further?
6   A   What I meant by that were the
7   development costs with programming the system to
8   have that capability.
9   Q   What are those development costs?
10  A   I don't know specifically.
11  Q   Did you -- do you know generally what
12  those costs might be?
13  A   We have to pay people to do the
14  programming.
15  Q   Did you ever communicate to Kathy Nuebel
16  about how much those costs were?
17  A   I don't think so because I don't know
18  what they would be specifically.
19  Q   Did you know generally what those costs
20  were at all?
21  A   Not that I recall.
22      MR CHEN:  So I am -- for the record, I

Page 57

1   am now handing to the court reporter what is
2   marked as Exhibit 1.  If you could please mark
3   this as Exhibit 1.
4       (Whereupon, Exhibit No. 1 marked for
5   identification.)
6       MR CHEN:  And I'm also handing a copy of
7   what is marked as Exhibit 1 to Mr. Neufeld.
8       MR. TYLER:  Do you have additional
9   copies for counsel?
10      MR CHEN:  I'm handing a copy to
11  Mr. Tyler.
12      MR. TYLER:  Do you have more than one
13  copy so I can --
14      MR. WISHNIE:  We don't have sufficient
15  copies for the whole table.
16      MR CHEN:  No.  But for myself in
17  addition to the deponent?
18      MR. WISHNIE:  Yes.
19      MR. TYLER:  So there are two copies of
20  that?
21      MR CHEN:  Yes.  We have one copy just
22  for the deponent and one for the court reporter.

DONALD NEUFELD                                      10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE           58..61

Page 58

1  Can I request that this exhibit be marked as
2  Exhibit 38, please.
3          (Whereupon, Exhibit No. 38 was marked
4  for identification.)
5  BY MR CHEN:
6      Q    And for the record the document is
7  titled defendant's objections and responses to
8  plaintiff's first set of interrogatories to
9  defendants dated October 16, 2017.
10         Mr. Neufeld, if you could, it is a long
11 document so you don't need to take -- you don't
12 need to read through the whole thing.  But if you
13 could take a look at page 31, please.  And
14 familiarize yourself with the last three
15 paragraphs, please.
16         MR. TYLER:  Beginning with the automatic
17 generation?
18         MR CHEN:  Yes.
19 BY MR CHEN:
20     Q    Can you let me know when you've
21 familiarized yourself with the document, please?
22     A    Yes.  I've read it.

Page 59

1      Q    Okay.  So according to this document the
2  SCOPS transitioned from the Claims 3 system for
3  printing up renewal notices to the electronic
4  print management server.  Is that correct?
5      A    Yes.
6      Q    Do you know when that transition
7  occurred?
8      A    I don't know anything more than what's
9  stated in this document.
10     Q    And it's dated in the document that
11 transition occurred around July 2017.  Is that
12 correct?
13     A    Yes.
14     Q    According to this document -- well,
15 Mr. Neufeld, is it true that the decision not to
16 develop renewal notice, the renewal notice feature
17 in the electronic print management server was due
18 to significant operational costs associated with
19 rebuilding the service?
20         MR. TYLER:  Objection.  Lack of
21 foundation.
22

Page 60

1  BY MR CHEN:
2      Q    Do you know if that -- if the decision
3  not to develop the renewal notice feature for the
4  electronic print management server was due to
5  significant operation costs associated with
6  rebuilding the service?
7      A    I know that that's what I was told.
8      Q    Who were you told by, Mr. Neufeld?
9      A    Kathy Nuebel.
10     Q    Can you explain the relationship between
11 the electronic print management server, which by
12 the way I will refer to now as EPMS for the
13 record.  Can you explain the relationship between
14 the EPMS system and the ELIS system, Mr. Neufeld?
15     A    No.
16     Q    Do you know who might be able to explain
17 that relationship?
18     A    Someone in our IT shop, so possibly
19 Keith Jones.
20     Q    Is it true that the renewal notice
21 feature was never developed for the ELIS system?
22         MR. TYLER:  Objection.  Lack of

Page 61

1  foundation.
2  BY MR CHEN:
3      Q    Do you know whether the renewal notice
4  feature was ever developed for the ELIS system?
5      A    Yes.
6      Q    And was it developed for the ELIS
7  system?
8      A    No.
9      Q    So let me focus first on the migration
10 from the Claims 3 server, the EPMS print server.
11 And I apologize if I am a bit slow on this because
12 there are quite a few technical details.
13         Do you know how many DACA requests in
14 the Claims 3 system were handled by the EPMS
15 system?
16     A    I do not.
17     Q    Do you know how many -- who would know?
18     A    No, I don't.
19     Q    So according to this document on page 31
20 in the second paragraph towards the end it states
21 that the overwhelming majority of pending DACA
22 requests were then handled by ELIS and had been

Page 62

1  adjudicated in ELIS until approximately February
2  1, 2016.
3          Does that refresh your memory about how
4  many DACA applications were then handled in the
5  Claims 3 system?
6      A    No.
7      Q    Do you know why SCOPS migrated from the
8  Claims 3 system to the EPMS system?
9      A    It's not SCOPS.  These are decisions
10 that are made at the agency level, so I don't know
11 the specific reasons.
12     Q    Would you know the general reason why
13 USCIS migrated?
14     A    That the EPMS is supposed to be more
15 efficient, that was the one reason that I know of.
16     Q    Do you know of any other reasons?
17     A    No.
18     Q    Can you explain further what you mean by
19 more efficient?
20     A    No.
21     Q    Were you involved in the decision to
22 migrate from Claims 3 to the EPMS system?

Page 63

1      A    No.
2      Q    Were you consulted about that decision?
3      A    No.
4      Q    Do you know who was involved in that
5  decision?
6      A    Individuals in our IT shop would have
7  been involved in that.  I don't know specifically
8  who.
9      Q    And did you ever communicate with these
10 individuals in the IT shop about the migration
11 with the decision to migrate?
12     A    Not that I recall specifically.
13     Q    Did you have any general conversations
14 about the migration from the Claims 3 system to
15 the EPMS system?
16     A    Not that I recall.
17     Q    Were you aware that the EPMS print
18 service system did not have the renewal notice
19 functionality when the decision to switch that
20 system was made?
21     A    No.
22     Q    Were you aware -- were you -- did you

Page 64

1  ever become aware that the EPMS system did not
2  have the renewal notice functionality?
3      A    Not specifically that it was because of
4  EPMS.  I knew that in -- we didn't have -- we no
5  longer had the capability of issuing the reminder
6  notices without specifically programming a system
7  to do that.  Whether it was EPMS or Claims 3 I
8  didn't know specifically or I don't remember
9  specifically.
10     Q    Who made you aware of the fact that
11 you -- that SCOPS did not have the capability?
12     A    I believe it was Alex King.
13     Q    And who is Alex King, Mr. Neufeld?
14     A    He is the branch chief with DACA in my
15 SCOPS organization that doesn't -- that has --
16 manages the DACA portfolio for SCOPS.
17     Q    Do you know when he made you aware that
18 you didn't have this functionality?
19     A    No.
20     Q    Do you know around what time?
21     A    No.
22

Page 65

1      Q    Do you remember what -- how Alex King
2  informed you?
3      A    Yes.  He walked into my office.
4      Q    So this was a discussion?
5      A    Yes.
6      Q    Was there anyone else involved in that
7  discussion?
8      A    No.
9      Q    And did you inquire as to why SCOPS no
10 longer had that functionality?
11     A    Not that I recall.
12     Q    Were you concerned at all that SCOPS no
13 longer had that functionality?
14         MR. TYLER:  Objection.  Vague.
15 BY MR CHEN:
16     Q    Were you -- did you inquire as to why
17 there was no -- that SCOPS did not have the
18 functionality to build in renewal notices despite
19 having had renewal notices since the beginning of
20 the program?
21     A    I recall noting to myself that that
22 meant that we wouldn't be able to produce reminder

DONALD NEUFELD                                  10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE            66..69

Page 66

1   notices that had been the standard practice.
2       Q    Did the lack of that functionality
3   bother you at all?
4            MR. TYLER:  Objection.  Vague.
5            THE WITNESS:  I don't get bothered by
6   these things.  I noted it as something that would
7   need to be addressed one way or the other either
8   that we would either build the capability or we
9   wouldn't be able to continue producing the
10  notices.
11  BY MR CHEN:
12      Q    Did you have any reaction at all that
13  SCOPS would no longer have this renewal notice
14  capability?
15           MR. TYLER:  Objection.  Vague.
16           THE WITNESS:  I noted, as I said, that a
17  decision would have to be made of whether to build
18  that capability or not.
19  BY MR CHEN:
20      Q    And were you involved in the decision
21  not to build that capability?
22      A    I elevated the decision, the need for a

Page 67

1   decision to Kathy Nuebel.
2       Q    Do you know approximately when you
3   elevated that?
4       A    Around the same time period.
5       Q    Why did you?  Do you know why you
6   elevated that -- that information to Kathy Nuebel?
7       A    Because policy decisions are not made
8   within SCOPS.
9       Q    Did SCOPS ever make an attempt to build
10  in the renewal notice feature?
11           MR. TYLER:  Objection.  Lack of
12  foundation.
13           THE WITNESS:  SCOPS doesn't build
14  capabilities.  That's -- that would be our OIT
15  shop.
16  BY MR CHEN:
17      Q    Do you know if the IT shop attempted to
18  build in the renewal notice feature?
19      A    I don't -- I really don't understand
20  your question.  You mean after -- like when or?
21      Q    For the EPMS system are you aware of
22  whether SCOPS or the IT department within SCOPS

Page 68

1   made an attempt to build in the renewal notice
2   feature?
3       A    I am not.
4       Q    Do you know what it would have taken to
5   build in the renewal notice feature for the EPMS?
6       A    I do not.
7       Q    You said previously that building in the
8   renewal notice feature would have operational
9   costs.  Is that true?
10      A    It would -- there would have been costs
11  involved in developing that capability.
12      Q    What was the basis for that knowledge,
13  Mr. Neufeld?
14      A    My general knowledge of how IT systems
15  works.  Somebody has to program them to do things
16  and there is a cost associated with that.
17      Q    Did you ever inform Kathy Nuebel about
18  the specific costs of building in that feature?
19      A    Not that I recall.
20      Q    Has USCIS ever before decided not to
21  notify a specific group of DACA recipients about
22  renewal?

Page 69

1       A    Before either of these two times?
2       Q    Yes.
3       A    No.
4       Q    I want to return to the -- the exhibit
5   that I just handed you on page 31.  The document
6   says that USCIS transitioned from the Claims 3
7   system to the ELIS system in which DACA requests
8   have been adjudicated since approximately February
9   1, 2016.  Is that correct?  This is in the --
10  sorry, the first paragraph of page 31, the second
11  sentence.
12      A    I'm sorry.  What is the question?
13      Q    Is it correct that USCIS transitioned
14  from the Claims 3 system to the ELIS system in
15  approximately around February 1, 2016?
16      A    I believe so, yes.
17      Q    So if SCOPS continued its practice of
18  sending out renewal notices 180 days before an
19  applicant's expiration the first notices for cases
20  under the ELIS system would have been sent out
21  approximately August 1, 2017.  Is that correct?
22      A    Yes.

DONALD NEUFELD                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                70..73

Page 70

1    Q    But the renewal notice feature was never
2  developed for that ELIS system?  Is that correct?
3    A    Correct.
4    Q    Do you know if the ELIS system issued
5  other types of notices besides renewal notices?
6    A    The technicalities of which system does
7  what I don't know.  I know that cases that we
8  processed in ELIS will receive approval notices,
9  receipt notice, request for additional evidence,
10  notices of intent to deny.
11    Q    Do you know of any other -- any
12  differences between the ELIS system and the Claims
13  3 system?
14         MR. TYLER:  Objection.  Vague.
15         THE WITNESS:  They're completely
16  different systems.
17  BY MR CHEN:
18    Q    So besides the lack of functionality for
19  renewal notice in ELIS were there other
20  differences regarding notices between the Claims 3
21  system and the ELIS system?
22         MR. TYLER:  Objection.  Lack of

Page 71

1  foundation.  Vague.
2         THE WITNESS:  I don't know specifically
3  the differences between the two system with
4  respect to notice generation.
5  BY MR CHEN:
6    Q    Do you know who would know?
7    A    Someone in our OIT shop.
8    Q    Do you know what the cost of developing
9  ELIS's capacity to issue renewal notices is?
10    A    No.
11    Q    Do you know what the costs for the ELIS
12  system in developing other notices such as the
13  notices that you've just mentioned?
14    A    No.
15    Q    Is the ELIS system more sophisticated
16  than the Claims 3 system?
17         MR. TYLER:  Objection.  Vague.
18         THE WITNESS:  If by sophisticated you
19  mean is it -- use different technology, yes.
20  BY MR CHEN:
21    Q    At the time that you -- do you know who
22  made the decision to transition to the ELIS

Page 72

1  system?
2    A    By individual, no.
3    Q    Do you know what department made the
4  decision to transition to the ELIS system?
5    A    It's an agency wide decision that I am
6  not sure what role the department plays in that or
7  certainly I don't recall what role it played back
8  when this decision was made.
9    Q    Did you have any involvement in the
10  decision to transition to the ELIS system?
11    A    There are -- there have been meetings
12  with the development -- over time with the
13  development of capabilities within ELIS and the
14  migration of case processing from Claims 3 to
15  ELIS.  And I'm part of a group that the membership
16  and the name of that group has changed over time,
17  but overall this time I have been a participant in
18  meetings where there are discussions about what
19  would be appropriate for development in ELIS with
20  respect to which case types would be migrated from
21  Claims 3 into ELIS.  So I would receive updates,
22  participate in discussions.  The final decision

Page 73

1  about what the migration of case work from Claims
2  3 to ELIS is not made by that group, it's made by
3  others and so I don't know.
4    Q    Do you know by others do you know who
5  you're -- who are you referring to?
6    A    I know that our deputy and our director
7  played a role in those decisions.  What I don't
8  know is to what level that role was autonomous or
9  they were consulting with others.  Or were -- you
10  know, whether the decision was made by others at
11  the department above them.
12    Q    Did they ever discuss the transition to
13  the ELIS system specifically with respect to DACA
14  applications with you?
15    A    Yes.
16    Q    When did they discuss this with you?
17    A    It would have been before we migrated,
18  but I don't know how long before.
19    Q    Did they ever consult you about that
20  migration?
21    A    Who is they?
22    Q    The deputy and the director that you

DONALD NEUFELD                                        10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                    74..77

Page 74

1  mentioned, did they consult you about the decision
2  to migrate specifically DACA applications to the
3  ELIS system?
4       A    I don't know if consultation is the
5  right word.  There were discussions about the
6  migration of DACA case work from Claims 3 into
7  ELIS, yes.
8       Q    Do you provide your input into those
9  discussions?
10           MR. TYLER:  Objection.  Vague.
11           THE WITNESS:  I don't know what you mean
12  by input.
13  BY MR CHEN:
14       Q    Did you ever provide any recommendations
15  about whether DACA applications should migrate to
16  the ELIS system or not?
17       A    I don't recall specifically, no.
18       Q    At the time that the DACA applications
19  were transitioned to the ELIS system were you
20  aware that ELIS did not have the renewal notice
21  capability?
22       A    No.

Page 75

1       Q    Did you ever become -- when did you
2  become aware that the ELIS system did not have the
3  renewal notice capability?
4       A    When Alex King came to my office and
5  said so as such.
6       Q    Do you know if your office had planned
7  to implement the renewal notice capability for the
8  ELIS system?
9           MR. TYLER:  Objection.  Vague.
10          THE WITNESS:  I don't understand.
11  BY MR CHEN:
12       Q    Do you know why the -- do you know why
13  SCOPS did not implement the renewal notice
14  capability for the ELIS system?
15       A    SCOPS doesn't develop IT capabilities.
16  The decision not to build that capability was
17  conveyed to me by Kathy Nuebel.
18       Q    Do you know why USCIS did not develop
19  those capabilities?
20       A    Not specifically.
21       Q    Generally, do you know?
22       A    I know that I was asked would there be

Page 76

1  development costs and I said yes.
2       Q    Were you asked about any specifics with
3  regard to development costs?
4       A    Not that I recall.
5       Q    Do you know what it would have taken to
6  develop the renewal notice capability through
7  ELIS?
8           MR. TYLER:  Objection.  Vague.
9  BY MR CHEN:
10       Q    Do you know how much it would have cost?
11       A    No.
12       Q    To implement the renewal notice
13  capability?
14       A    I do not.
15       Q    In your communications with Kathy
16  Nuebel, was the potential for termination of the
17  DACA program ever discussed?
18       A    In which -- I'm confused.
19       Q    When -- in your discussions with Kathy
20  Nuebel about the renew -- about implementing the
21  renewal notices, was the potential termination of
22  the DACA program ever discussed?

Page 77

1           MR. TYLER:  Objection.  Vague.
2  BY MR CHEN:
3       Q    Do you understand the question,
4  Mr. Neufeld?
5       A    If you mean in the email exchange about
6  whether or not we should -- when I elevated the
7  question or the issue that we wouldn't have the
8  capability of issuing those reminder notices
9  without investing in that development, did either
10  of us mention DACA being discontinued?  I don't
11  recall specifically whether that was part of that
12  discussion.
13       Q    Do you remember generally if it was part
14  of that discussion?
15       A    No.
16       Q    Did you ever discuss the potential
17  termination of the DACA program with Kathy Nuebel?
18       A    Yes.
19       Q    In what form did that discussion take
20  place?
21       A    In person, telephone, meetings.
22       Q    Do you know around when those

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

Page 78

1  discussions took place?
2      A    Around when would have been sometime
3  since she arrived, which was after -- sometime
4  after Trump came into office and ever since.
5      Q    Let's start with the meetings.  Were
6  there any -- do you know -- do you recall any
7  specific meetings in which you discussed the
8  potential termination of the DACA program with
9  Kathy Nuebel?
10     A    Yes.
11     Q    When did those specific meetings --
12  specific meetings occur?
13     A    I don't recall the specific date.  On
14  September 5th there was the announcement issued
15  about the wind down of DACA.  And very shortly
16  before that, I believe it was the week before
17  that, there was a specific meeting that involved
18  Kathy Nuebel discussing the wind down.
19     Q    And did you discuss -- did you discuss
20  the fact that ELIS did not have renewal notice
21  capabilities in that meeting?
22     A    No.

Page 79

1      Q    Who else was part of that meeting?
2      A    James McCament, Tracy Renaud.  Gene
3  Hamilton I believe participated by phone.  There
4  was another individual -- individual on the phone
5  that I don't recall his name or even where he
6  worked.  I believe there may have been one or two
7  others.  I couldn't recall specifically who they
8  were.
9      Q    What was the subject of that meeting?
10  Do you remember?
11     A    The wind down of DACA.
12     Q    Was there an agenda for that meeting?
13     A    No.
14     Q    Were there any written materials
15  generated for that meeting?
16     A    Not that I recall.
17     Q    Do you know if someone took notes or
18  minutes of that meetings?
19     A    I don't believe so.
20     Q    Were written minutes shared afterwards?
21     A    No.
22     Q    Do you know what was discussed at that

Page 80

1  meeting?
2      A    Yes.
3      Q    What was the content of the discussion?
4          MR. TYLER:  I'll object on the grounds
5  of deliberative process privilege, attorney/client
6  privilege, attorney work product privilege.
7  Directing the witness not to answer.
8          MR. CHEN:  Just for the record I want to
9  briefly note our objection to the invocation of
10  the deliberative process instruction in this
11  deposition.  First, we don't think it's
12  appropriate to invoke that privilege generally in
13  this case because plaintiffs are challenging the
14  agency's decision making process and even if the
15  privilege does apply in this case we don't think
16  the government has met it's burden of making a
17  sufficient showing of the elements in that
18  specific instance.  And I want to also note that
19  plaintiff's position is that the defendants have
20  waived attorney/client privilege over any
21  materials that bear on the legality of the DACA
22  program.  Defendants stated that one of DHS's

Page 81

1  primary reasons for rescinding DACA was its
2  purported illegality, and thus the agency
3  incorporated by reference into it's policy legal
4  arguments about the lawfulness of the DACA
5  program.  So I just want to put that in the
6  record.
7          Should we take a break at this point?
8          (Multiple voices discussing going off
9  the record.)
10         THE VIDEOGRAPHER:  We are going off of
11  the record.  This is the end of media unit number
12  1.  The time is at 10:41 a.m.
13         (The proceeding recessed from 10:42 a.m.
14  to 10:55 a.m.)
15         THE VIDEOGRAPHER:  This is the beginning
16  of media unit number 2.  The time is 10:55 a.m.
17  BY MR CHEN:
18     Q    Mr. Neufeld, I want to return back to
19  the renewal notices under the ELIS system and just
20  clarify time lines.  So, as you discussed earlier
21  DACA requests were being adjudicated under the
22  ELIS system since approximately February 2016.  Is

DONALD NEUFELD                                        10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                  82..85

Page 82

1   that correct?

2       A    Yes.

3       Q    And you had previous -- previously said

4   that ELIS was generating other types of notices

5   besides renewal notices.  Is that correct?

6       A    Yes.

7       Q    Were those notices printed through the

8   ELIS system?

9       A    I don't know.

10      Q    Do you know if they were printed through

11  the Claims 3 system?

12      A    I don't believe a case adjudicated in

13  ELIS would result in Claims 3 printing notices,

14  no.

15      Q    Do you know if the ELIS system has

16  notice printing capabilities?

17      A    I know that cases we adjudicate in ELIS

18  have notices printed.  I don't know the mechanics

19  of that process.

20      Q    Do you know during the transition in

21  February 2016 if ELIS handled only initial DACA

22  applications or did they also handle renewal

Page 83

1   applications?

2       A    I don't recall.

3       Q    Has SCOPS ever discontinued sending

4   renewal notices for a period of time since the

5   DACA program was initiated?

6       A    Other than what we have been talking

7   about, no.

8       Q    So when you were informed that -- so

9   when you were informed about the decision not to

10  rebuild the renewal notice functionality were you

11  concerned that DACA applicants might not

12  issue their -- apply for renewal notices on time?

13          MR. TYLER:  Objection, vague.

14          THE WITNESS:  I don't have a concern one

15  way or the other.  My concern is to implement the

16  policy objectives of the administration.

17  BY MR CHEN:

18      Q    Did you believe -- did you believe that

19  as a result of not issuing renewal notices that

20  some DACA applicants would not renew on time?

21          MR. TYLER:  Objection.  Vague.  Lacks

22  foundation.

Page 84

1           THE WITNESS:  I don't have an opinion on

2   that.

3   BY MR CHEN:

4       Q    Did you have any belief that DACA

5   applicants would not be able to renew on time

6   because they did not receive renewal notices?

7       A    No.

8       Q    Did SCOPS take other steps to notify

9   DACA recipients about their options for renewal

10  under the ELIS system?

11      A    That's not a function of SCOPS.

12      Q    Do you know if USCIS took steps to

13  notify DACA recipients about renewing under the

14  ELIS system?

15      A    We have a communications component that

16  communicates on issues of how to apply, when to

17  apply, that sort of thing.  And I know that there

18  is information that they post on our website, so

19  yes.

20      Q    Do you know if the communications team

21  issued any notices to DACA recipients about

22  renewal under the ELIS system?

Page 85

1       A    No -- I guess I'm confused about the

2   question.  I thought before you were asking about

3   whether we had communicated in some way to DACA

4   holders.

5       Q    Besides the website do the

6   communications use any other means to communicate

7   that DACA recipients had an option for renewal?

8           MR. TYLER:  Objection.  Vague.

9           THE WITNESS:  I don't know.

10  BY MR CHEN:

11      Q    Do you know who would know?

12      A    Our Office of Communications.  Our

13  Office of Customer Service and Public Engagement.

14      Q    Is that office within SCOPS or is it

15  within USCIS?

16      A    They are components within USCIS.

17      Q    You mentioned earlier there would be

18  development costs to implementing renewal notices

19  under the ELIS system, correct?  I'm curious, who

20  would have added the renewal notice capabilities?

21  Was that someone within SCOPS or was it an outside

22  vendor?

DONALD NEUFELD                                          10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                86..89

Page 86

1    A    It would not have been SCOPS.
2    Q    Would it have been an outside vendor?
3    A    I'm not sure of the arrangement of how
4    the system gets programmed.  It would have been
5    the responsibility of our Office of Information
6    Technology to make that happen and how they do
7    that I do not know.
8    Q    Do you know if they would have
9    contracted out to an outside vendor?
10   A    I know that they do contract out to
11   outside vendors.  I don't know how they -- whether
12   they contracted out -- you know, what they
13   contract out to different vendors or what they do
14   in-house.
15   Q    I want to turn now to your office's
16   implementation of the DACA termination.  Are you
17   familiar with Acting Secretary Duke's September 5,
18   2017 memo terminating the DACA program?
19   A    Yes.
20   Q    When did you first learn that the DACA
21   program would be terminated?
22   A    Well, I knew that it was a campaign

Page 87

1    promise of the president.
2    Q    When did you learn of the final decision
3    to terminate the DACA program?
4    A    The final decision, when it was issued
5    on September 5.
6    Q    You did not -- you didn't learn about --
7    you didn't learn that the DACA program would be
8    terminated prior to that date?
9         MR. TYLER:  Objection.  Vague.
10        THE WITNESS:  I learned that they --
11   there was the meeting that I referenced before
12   where there were discussions about the wind down
13   of the DACA program.
14   BY MR CHEN:
15   Q    At that meeting were you aware that the
16   DACA program would be terminated?
17        MR. TYLER:  Objection.  I will direct
18   the witness not to answer on grounds of privilege,
19   deliberative process privilege, attorney/client
20   privilege, attorney work product privilege.
21        MR CHEN:  I just want to note for the
22   record that plaintiffs again object to the

Page 88

1    deliberative process privilege and the
2    attorney/client privilege instructions for the
3    same reasons as previously stated.  I won't keep
4    repeating it, but that objection stands with
5    respect to all deliberative process privilege
6    instructions going forward and attorney/client
7    privilege instructions going forward.
8    BY MR CHEN:
9    Q    From whom were you made aware of the
10   decision to terminate the DACA program?
11        MR. TYLER:  Vague.  Are you referring to
12   the final decision?
13   BY MR CHEN:
14   Q    The final decision?
15   A    I learned of it from reading the memo on
16   September 5.
17   Q    Did you ever receive that memo prior to
18   September 5?
19   A    No.
20   Q    Did you even receive a draft of that
21   memo?
22   A    No.

Page 89

1    Q    How did you feel about the decision to
2    terminate DACA?
3        MR. TYLER:  Objection.  Vague.
4        THE WITNESS:  What do you mean by feel?
5    BY MR CHEN:
6    Q    Did you have any reaction?
7        MR. TYLER:  Objection.  Vague.
8    BY MR CHEN:
9    Q    Do you understand the question,
10   Mr. Neufeld?
11   A    I don't know what you're getting at.  My
12   reaction was I had to implement the direction of
13   the memo.
14   Q    Did you have an opinion about whether
15   the termination of DACA was a good thing?
16        MR. TYLER:  Objection.  Calls for a
17   personal opinion.
18        THE WITNESS:  I don't have an opinion
19   one way or the other.
20   BY MR CHEN:
21   Q    So you had no opinion about the ending
22   of the program you oversaw on a daily basis?

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

Page 90

1          MR. TYLER:  Objection.  Argumentative,
2    mischaracterizes testimony, vague, and you are
3    asking for a personal opinion.
4    BY MR CHEN:
5          Q    Were you ever consulted about the
6    implementation of the DACA termination?
7          A    Yes.
8          Q    When were you consulted?
9          A    Prior to September 5 and then at times
10   after September 5.
11         Q    Let's start with consultations prior to
12   September 5.  When did those consultations occur?
13         A    The first meeting that I recall is the
14   one that I referenced earlier that was shortly
15   before September 5, probably the week before.
16         Q    And you said that this was an in-person
17   meeting.  Is that correct?
18         A    Many of us were gathered in person
19   around the table and there were as I recall two
20   participants by phone.
21         Q    Did you bring any documents to this
22   meeting?

Page 91

1          A    No --
2          MR. TYLER:  -- Objection.  Asked and
3    answered.
4    BY MR CHEN:
5          Q    What was the nature of the consultation?
6          MR. TYLER:  Objection.  Direct the
7    witness not to answer on grounds of the
8    deliberative process privilege, the
9    attorney/client privilege, the attorney work
10   product.
11   BY MR CHEN:
12         Q    Did you suggest extending the September
13   5 deadline?
14         MR. TYLER:  Same objection.  Directing
15   the witness not to answer.
16   BY MR CHEN:
17         Q    Did you suggest sending notices to
18   individuals to renew?
19         MR. TYLER:  Same objection.  Directing
20   the witness not to answer.
21   BY MR CHEN:
22         Q    Did SCOPS make any preparations to

Page 92

1    change its processing procedures in anticipation
2    of the DACA termination?
3          MR. TYLER:  Objection.  Vague.
4          THE WITNESS:  If you mean did we plan
5    for wind down before the September 5 notice, no.
6    BY MR CHEN:
7          Q    Did you communicate the decision to
8    terminate DACA to SCOPS employees down the chain
9    of command?
10         A    I insured that down the chain of command
11   everyone was aware of the September 5 memo, yes.
12         Q    And when did you make that
13   communication?
14         A    I don't recall specifically.
15         Q    Was that --
16         A    -- It would have been on September 5,
17   but when and how I don't recall specifically.
18         Q    Did your office prepare any memoranda
19   concerning the implementation of the DACA
20   termination?
21         A    No, I don't believe so.
22         Q    Did your office prepare any other

Page 93

1    documents?
2          MR. TYLER:  Objection.  Vague.
3    BY MR CHEN:
4          Q    Concerning the implement of the DACA
5    termination?
6          MR. TYLER:  Same objection.  Vague.
7          THE WITNESS:  I don't understand what
8    you mean by documents?
9    BY MR CHEN:
10         Q    For example memoranda or reports or
11   notes?
12         MR. TYLER:  Same objection.
13         THE WITNESS:  I didn't prepare any
14   memorandum following the memo that came from the
15   secretary, no.
16   BY MR CHEN:
17         Q    Did SCOPS -- did you make any other
18   preparations for the DACA termination?
19         A    No.
20         Q    Were you involved in drafting documents
21   to the public about the DACA termination?
22         A    I don't recall specifically -- SCOPS

DONALD NEUFELD                                        10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE            94..97

Page 94

1   doesn't promulgate external messaging on any
2   topic. But it may have been that I saw drafts
3   that the Office of Communications or customer
4   service and public engagement developed. That
5   often happens and probably has happened. I don't
6   recall specifically though.
7        Q    Do you remember when these -- when you
8   saw these drafts?
9        A    No.
10       Q    Do you remember if it was prior to
11  September 5?
12       A    I didn't see anything drafted on public
13  messaging prior to September 5, no.
14       Q    What were these drafts of, do you
15  remember, Mr. Neufeld?
16       A    What were -- what drafts are we
17  referring to?
18       Q    You mentioned that you saw drafts from
19  the Office of Communications?
20       A    No. I said that it is typical that
21  public messaging goes through a vetting process
22  and SCOPS is one of many components that would be

Page 95

1   included in the vetting of such messages. Most
2   likely I or members of my team were involved in
3   messaging that has happened since September 5. I
4   don't recall specifically which messages those
5   would have been.
6        Q    Do you recall generally what those
7   messages would have been?
8        A    Well, I'm responding to your question
9   about DACA communications, so it would have been
10  about DACA communications.
11       Q    And would these drafts have -- would
12  have been website FAQs or news releases? Are
13  those the types of drafts of communications you
14  are referring to?
15       A    Yes.
16       Q    Do you remember what these documents
17  said?
18       A    No.
19       MR. TYLER: I'll object. Lack of
20  foundation.
21  BY MR CHEN:
22       Q    Do you know what these documents said

Page 96

1   generally?
2        MR. TYLER: Same objection. Lack of
3   foundation.
4        THE WITNESS: I don't know which
5   specific documents you are referring to.
6   BY MR CHEN:
7        Q    You mentioned that other members of your
8   office would have seen these drafts of
9   communications. Who are those members?
10       A    Messages relating to DACA in the vetting
11  process would normally be reviewed by Alex King,
12  branch chief responsible for the DACA portfolio.
13  My chief of staff Susan Arroyo.
14       Q    Anybody else?
15       A    Carrie Selby the acting deputy associate
16  director.
17       Q    Do you know who else would have reviewed
18  these communication drafts?
19       A    No.
20       Q    So prior to September 5 besides the
21  meeting that you referenced did you participate in
22  any other discussions about the termination of the

Page 97

1   DACA program?
2        A    Since the beginning of the DACA program
3   we have talked about the end of the DACA program.
4        Q    Can you explain more? Can you explain
5   what you mean by talking about the end of the DACA
6   program?
7        A    I mean that when it was stood up it was
8   understood that it was a temporary program and
9   that it would likely or maybe terminate or change
10  at some point in the future and those
11  conversations have been ongoing since June 2012.
12       Q    How about from since January 20, 2018
13  when President Trump came into office and
14  September 5, besides that one particular meeting
15  you mentioned did you participate in any other
16  discussions about the potential termination of the
17  DACA program?
18       A    Other than conversations with others
19  about whether it would or would not -- you know,
20  what would the president decide to do, no.
21  Speculation -- speculative conversations would be
22  how I characterize them.

Page 98

1   Q    Mr. Neufeld, apart from the DACA
2  termination memo itself did you receive any other
3  instructions from DHS about how to implement the
4  DACA termination memo?
5   A    Not that I recall.
6   Q    Did you receive any instructions from
7  government officials outside of DHS about how to
8  implement the DACA termination memo?
9   A    No.
10   Q    Did you receive any instruction about
11  how to process late initial applications received
12  after September 5, 2017?
13   A    Late initial applications, yes.
14   Q    What were those instructions?
15   A    That they would be rejected.
16   Q    Where in the process would they be
17  rejected?
18   A    At the lockbox.
19   Q    Did SCOPS receive any instruction about
20  how to process renewal applications received after
21  October 5, 2017?
22   A    Yes.

Page 99

1   Q    And what were those instructions?
2   A    That they would be generally rejected
3  but that we would consider requests for late filed
4  renewal requests coming from Puerto Rico or the
5  Virgin Islands.
6   Q    When you refer to generally rejected
7  were they also -- would they also have been
8  rejected at the lockbox?
9   A    Yes.
10   Q    Who provided these instructions?
11   A    The deputy and the director.
12   Q    And do you remember what form these
13  instructions came in?
14   A    I remember being told verbally in
15  meetings afterwards -- you know, after September
16  5.
17   Q    What were -- do you remember when these
18  meetings took place besides that they were after
19  September 5?
20   A    Discussions about how to handle late
21  renewal filings after October 5 I don't recall
22  specifically, but they happened in the few days

Page 100

1  leading up to that and then afterwards, so end of
2  September, early October.
3   Q    What about the instructions about
4  rejecting late initial applications after
5  September 5, 2017?  When did you receive those
6  instructions?
7   A    Shortly after September 5, I don't
8  recall specifically.
9   Q    Do you remember if it was on the date of
10  September 5 or afterwards?
11   A    I don't recall.
12   Q    So was there at any point after
13  September 5 when SCOPS received late initial
14  applications but did not have any instructions
15  about how to process those applications?
16   A    No.
17   Q    So what did SCOPS do with late initial
18  applications after September 5 but before SCOPS
19  received instructions about how to process them?
20   A    They are currently on hold pending
21  rejection.
22   Q    Were they on hold at the lockboxes?

Page 101

1   A    Yes.  A small number of people have
2  submitted -- I don't know whether they are renewal
3  and initials.  I know that for sure they include
4  initial filings that have been misfiled at --
5  directly to one or more of the service centers.
6  Rather then sending to the lockboxes they are
7  supposed to, people have sent to the wrong
8  address.
9   Q    And how were they handled?
10   A    They were initially held and then within
11  the last couple of days we gave the instruction
12  for them to be forwarded to the lockbox.
13   Q    And at the lockboxes were they then
14  subsequently rejected?
15   A    I don't know whether they have processed
16  them for rejection.  I think they are still on
17  hold, but I'm not sure.
18   Q    Were you part of any meetings in
19  which --
20   A    Let me -- can I clarify?
21   Q    Absolutely.
22   A    I know that the lockbox is holding some

DONALD NEUFELD                                          10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE            102..105

Page 102

1   late filings.  I don't recall as we sit here
2   whether they are only renewal applications or if
3   they are renewal requests and initial requests.
4        Q    So just to clarify, Mr. Neufeld, you are
5   saying the lockboxes are currently as of this
6   moment holding those late filings?
7        A    As of my last awareness of the issue,
8   yeah, I believe that they were holding some cases.
9   Like I said, I don't remember whether they are
10  both types of filings or just the renewals.
11  Thinking about it more I think it might just be
12  the renewals that they are holding.
13       Q    So does this mean, Mr. Neufeld, that
14  immigration officers under SCOPS never saw, never
15  evaluated late initial applications received after
16  September 5, 2017?
17            MR. TYLER:  Objection.  Vague.
18            THE WITNESS:  I think I understand.
19  Officers are not being -- they are not receiving
20  cases that were filed after September 5.
21  BY MR CHEN:
22       Q    Did officers receive applications

Page 103

1   filed -- renewal applications filed after October
2   5, 2017?
3        A    No.
4        Q    You mentioned earlier that you received
5   instructions about how to process applications
6   received after September 5 and applications
7   received after October 5.  Were you in -- were you
8   part of any meetings in which these discussions to
9   formulate these instructions were made?
10       A    Yes.
11       Q    And can you tell me when?  When those
12  meetings occurred?
13       A    Related to renewal filings?
14       Q    Let's start with initial applications
15  after September 5 and then we can move to renewal
16  filings.  So for initial applications?
17            MR. TYLER:  What's the question, please?
18  BY MR CHEN:
19       Q    Were you part of any meetings in which
20  the decision about how to implement -- sorry.
21            Were you part of any meetings in which
22  the decision to create the instructions for

Page 104

1   processing late initial applications was
2   formulated?
3        A    Yes.
4        Q    When were -- when did those meetings
5   occur?
6        A    Either on September 5 or shortly
7   thereafter.
8        Q    Do you know who was present at those
9   meetings?
10       A    No.  There have been many meetings
11  involving many people at different times.  And
12  when I say that there are meetings where this was
13  discussed I don't recall any meetings being called
14  for the specific purpose of this topic.  So the
15  reason I'm having trouble recalling is because
16  they're not meetings that were called solely for
17  this purpose.  They're just general meetings that
18  we have at the executive level and they included
19  these discussions at different times and I don't
20  recall the specific dates.
21       Q    Were there immediate -- were there any
22  meetings within -- that you can recall, within the

Page 105

1   week of September 5 in which instructions about
2   how to process late initial applications were
3   discussed?
4        A    There were definitely meetings in which
5   we discussed that topic.  I don't recall what
6   dates or times.
7        Q    Do you remember how many meetings
8   approximately there were?
9        A    No.
10       Q    Do you keep a calendar of these
11  meetings?
12       A    Well, as I said they weren't -- they
13  weren't meetings for the purpose of discussing how
14  to handle late initial filings, so my calendar
15  wouldn't reflect that.
16       Q    But --
17       A    I have a calendar that has my meetings
18  on it.  It only will indicate what was discussed
19  if the person who scheduled the meeting put a
20  subject on the calendar invitation.
21       Q    You mentioned that this -- these
22  meetings were between members of the agency

DONALD NEUFELD                                      10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                  106..109

Page 106

1  executive level.  Is that correct?
2      A    Yes.
3      Q    And who do you mean by members of the
4  agency executive level?
5      A    So that back in September that would
6  have been the acting director, the acting deputy
7  director, the other associate directors such as
8  myself, the chief of the Office of Policy and
9  Strategy, the Office of Chief Counsel.  Beyond
10  that I'm not sure.
11      Q    Do you remember in these meetings
12  whether you were consulted about how late initial
13  applications would be processed?
14      A    I was not consulted about how we would
15  process them.
16      Q    Did you have any meetings regarding how
17  late renewal applications would be processed?  By
18  late renewal applications I mean ones received
19  after October 5, 2017.
20      A    Again, I don't recall any meeting called
21  for that purpose.  I do know that we had meetings
22  in which that was discussed.

Page 107

1      Q    Do you know what was discussed at those
2  meetings?
3      A    Yes.
4      Q    And what was the subject of those
5  discussions?
6      A    Well, depending on the meeting it could
7  have been any number of things.
8      Q    Do you recall some examples of the
9  subjects that were discussed at those meetings?
10      A    How we would handle requests for --
11  handle filings that were received after October 5
12  coming from areas that may have been impacted by
13  the hurricanes.
14      Q    Do you know approximately when those
15  discussions occurred?
16      A    Again, a few days before October 5 and
17  then thereafter.
18      Q    Who was -- who was involved in
19  discussions about extending this October 5
20  deadline?
21      A    Well, I wouldn't characterize it as
22  extending the October 5 deadline.

Page 108

1      Q    How would you characterize it?
2      A    How to handle requests that were
3  received after October 5 deadline.
4      Q    Who was involved in these discussions
5  about how to handle applications?
6      A    Tracy Renaud, the acting deputy; James
7  McCament, the acting director; Kathy Nuebel,
8  Office of Chief Policy and Strategy; Craig Symons,
9  Office of Chief Counsel.
10      Q    So is it true that several days prior to
11  the October 5 deadline USCIS, DHS announced that
12  it would accept late renewals from Puerto Rico and
13  the U S Virgin Islands?
14      A    I believe so, yes.  That we would
15  consider requests.
16      Q    Did SCOPS receive any renewal
17  applications filed after October 5 from Puerto
18  Rico or the U S Virgin Islands?
19      A    Yes.
20      Q    To your knowledge about how many did
21  SCOPS receive?
22      A    Again, we don't receive them directly.

Page 109

1  They would be filed at the lockbox.  I'm aware of
2  six requests that came in from Puerto Rico after
3  October 5 at the lockbox.
4      Q    And what about from the U S Virgin
5  Islands?
6      A    I don't know whether we had any from the
7  U S Virgin Islands.
8      Q    Do you know who -- do you know who would
9  know?
10      A    Ernest DeStefano, Office of Intake and
11  Document Production.
12      Q    How has SCOPS processed these renewals
13  from Puerto Rico or the U S Virgin Islands?
14      A    The requests are filed at the lockbox.
15  The lockbox was instructed by Tracy Renaud who is
16  now back to her regular position as the associate
17  director for management which oversees the lockbox
18  or the Office of Intake and Document Production
19  that oversees the lockbox.  She gave instruction
20  to Ernest DeStefano that those, they should review
21  those late filed cases and send them to me for my
22  review with a recommendation.  And so as of

DONALD NEUFELD                                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                      110..113

Page 110

1    yesterday I made the decision to go ahead and
2    accept those six late filings.
3        Q    So all six filings from Puerto Rico have
4    been accepted?
5        A    I have given the instruction for them to
6    be accepted.  I don't know where they are in the
7    process.
8        Q    And by giving the instruction to be
9    accepted you mean that they have been granted the
10   request for deferred action?
11       A    No, I did not mean that.
12       Q    What did you mean?
13       A    I mean that the lockbox will receive
14   them and ingest them into the system for normal
15   processing.
16       Q    And so for these applications an
17   immigration officer will review these applications
18   in the same way that they reviewed applications
19   prior to September 5?
20       A    Yes.
21       Q    Is that correct?  Besides your personal
22   review at the lockbox did this process differ at

Page 111

1    all from how DACA normally processes DACA
2    applications prior to September 5?
3            MR. TYLER:  Objection.  Vague.
4            THE WITNESS:  The only processing that's
5    been done is they have been accepted at the
6    lock -- they have been received at the lockbox and
7    I have given the instruction for them to be
8    accepted and processed.
9    BY MR CHEN:
10       Q    Mr. Neufeld, were you consulted in DHS's
11   decision to accept on a case by case basis
12   renewals from Puerto Rico and U S Virgin Islands
13   filed late?
14       A    No.  I wouldn't characterize it as
15   consult.
16       Q    How would you characterize it?
17       A    I would characterize it as me asking
18   what we should do and receiving instruction.
19       Q    When did you ask what SCOPS should do
20   about late filed notices from Puerto Rico?
21       A    When I became aware that there were late
22   filings.

Page 112

1        Q    So you did not ask what should be done
2    with these late filings until after October 5?
3        A    I was aware that the agency had
4    communicated in some way.  I don't remember seeing
5    the actual communication that we would consider
6    late filed requests from Puerto Rico and the
7    Virgin Islands.  I don't know -- I don't -- I
8    don't recall whether we had conversations or not
9    about how that process would work.  But when they
10   were received then it became -- I needed to know
11   so that's when I asked for sure.  Not saying that
12   there weren't any conversation before that, but
13   they weren't decisive if there were any.
14       Q    Prior to October 5 did you participate
15   in any discussions about how to handle late filed
16   applications?
17       A    As I said there were meetings in which
18   the topic of late filed applications was
19   discussed.  I wouldn't necessarily call it being
20   consulted.  There was awareness that that would
21   happen.
22       Q    And you participated in those meetings?

Page 113

1        A    Yes.
2        Q    Do you know if -- do you know if DHS
3    considered waiving or extended the October 5
4    deadline for other applicants outside of Puerto
5    Rico and the U S Virgin Islands?
6        A    I do not know.
7        Q    Do you know who would?
8        A    Whoever -- no, I don't know that they
9    happened so I don't know who would.
10       Q    In those meetings that you just referred
11   to in which you discussed how to handle U S Virgin
12   Islands and Puerto Rico applications did you --
13   were you aware of discussions of late -- how to
14   handle late applications from other locations?
15       A    No.
16       Q    Were you ever aware of -- were you ever
17   aware of considering extending or waiving the
18   October deadline -- October 5 deadline for people
19   living in Houston or Florida who were affected by
20   the hurricanes?
21       A    No.
22       Q    Were you ever aware that extending --

DONALD NEUFELD
10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE
114..117

Page 114

1  deadline for October 5 for those individuals was
2  ever considered?
3      A   No.
4      Q   Do you know why DHS did not extend the
5  October 5 deadline for other applicants besides
6  those living in Puerto Rico and the U S Virgin
7  Islands?
8      A   No.
9      Q   Did you ever inquire about why the
10  October 5 deadline was not extended for other
11  applicants?
12     A   No.
13     Q   Were you ever concerned that it was not
14  extended for other applicants?
15         MR. TYLER:  Objection.  Vague.
16         THE WITNESS:  My only concern is to
17  understand how I'm supposed to process cases that
18  are filed.
19  BY MR CHEN:
20     Q   To your knowledge how many eligible
21  individuals submitted their DACA renewal between
22  September 5 and October 5, 2017?

Page 115

1      A   I don't know.
2      Q   Did you receive any reports about how
3  many eligible individuals submitted their DACA
4  renewal applications?
5      A   I have received email messages that --
6  indicating a number that are eligible and have not
7  filed.
8      Q   Do you know what that number -- do you
9  recall what that number was?
10     A   The last number I saw was like 22,000.
11     Q   Do you remember when was that you
12  received that last communication?
13     A   Either Friday or Tuesday.
14     Q   Of this week?
15     A   Of this week, yes.  And Friday of last
16  week.
17     Q   Between September 25 and October 5, 2017
18  are you aware of any errors SCOPS made in
19  processing individual DACA renewals?
20         MR. TYLER:  Objection.  Vague.
21         THE WITNESS:  I'm not aware of any
22  errors.

Page 116

1  BY MR CHEN:
2      Q   Are you aware of instances in which
3  SCOPS rejected applications filed in that time
4  period that should not have been rejected?
5      A   No.
6      Q   Are you aware of instances in which
7  applications were accepted in that time period but
8  should not have been accepted?
9      A   No.
10     Q   Mr. Neufeld, when did you first become
11  aware that DHS was considering terminating the
12  DACA program?
13     A   I've assumed that they were considering
14  that since the election.
15     Q   What was the basis of that assumption?
16     A   Media reports.
17     Q   Beside -- besides the media were there
18  any other indications that the DHS was considering
19  terminating the DACA program that you were aware
20  of?
21         MR. TYLER:  Objection.  Vague.
22         THE WITNESS:  I'm --

Page 117

1          (Court reporter requested
2  clarification.)
3          THE WITNESS:  What are you getting at?
4  I don't understand.
5  BY MR CHEN:
6      Q   Were there any indications to you
7  besides the media that DHS was actively
8  considering ending the DACA program?
9      A   I have assumed that they were from the
10  beginning and I recall one sentence in a
11  conversation that Kathy Nuebel mentioned that the
12  department is -- you know, considering DACA or
13  something along those lines.
14     Q   When did you recall that this sentence
15  was said?
16     A   I don't recall specifically, but I
17  would -- it has been several weeks.  Like before
18  September 5.  Probably in August timeframe, I
19  would imagine.
20     Q   Was this sentence communicated to you in
21  email?
22     A   No.

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD
10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE
118..121

Page 118

1    Q    In a conversation?

2    A    Yes.

3    Q    And were other people involved in that

4    conversation?

5    A    No.

6    Q    Where did that conversation occur?

7    A    My office.

8    Q    Do you remember what else was discussed

9    as part of that conversation?

10   A    No.

11   Q    Was there anyone else present at the

12   time?

13   A    No.

14   Q    So prior to September 5, 2017 were you

15   aware of any meetings discussing the termination

16   of the DACA program?

17        MR. TYLER:  Objection.  Asked and

18   answered.

19   BY MR CHEN:

20   Q    You can still answer the question,

21   Mr. Neufeld.

22   A    Can you repeat the question?

Page 119

1    Q    Prior to September 5 were you aware of

2    any meetings discussing the decision to terminate

3    the DACA program?

4    A    I was aware of the one meeting that I

5    attended.

6    Q    Was -- were there other meetings that

7    you were aware of?

8    A    No.

9    Q    Were you aware of meetings that you did

10   not attend?

11        MR. TYLER:  I'll object on grounds of

12   vagueness.

13        THE WITNESS:  I'm not aware of specific

14   meetings.  I have an assumption that there were

15   conversations happening at the department level.

16   BY MR CHEN:

17   Q    Were those conversations ever

18   communicated to you?

19   A    No.

20   Q    What was the basis of that assumption?

21   A    Media reports.

22   Q    Were you ever consulted about --

Page 120

1    specifically about setting the October 5, 2017

2    deadline for renewal applications?

3    A    What was the question again?

4    Q    Were you ever consulted specifically

5    about the October 5 -- the decision to set the

6    October 5 deadline?

7    A    I don't think so.

8    Q    Do you know why the October 5 deadline

9    was set?

10   A    No.

11   Q    Were you ever consulted about the

12   decision to set the March 5, 2018 deadline?

13   A    I don't believe so.

14   Q    Do you know why that date was set?

15   A    I don't.

16   Q    Did you ever have discussions with other

17   government officials about the -- let's start with

18   are you aware of the letter from the Texas

19   Attorney General's Office sent on June 29 about

20   requesting that the government rescind the DACA

21   program?

22   A    No.  Had a general awareness that there

Page 121

1    were issues going on with the court.  I don't

2    recall specifically a letter being issued by a --

3    Q    -- Are you aware that the state of Texas

4    sent a letter asking the federal -- asking the

5    Department of Justice and DHS to terminate the

6    DACA programs?

7    A    No.

8    Q    Mr. Neufeld, were you aware of -- were

9    you aware that the state of Texas had requested

10   that the Department of Justice and the Department

11   of Homeland Security terminate the DACA program?

12        MR. TYLER:  I'll object to counsel's

13   characterization of the Texas letter.

14        THE WITNESS:  I'm aware that in the

15   litigation there basically was a threat made that

16   DACA would be added to the litigation if the DACA

17   program had not been terminated by a certain

18   deadline and I don't recall what it was.

19   BY MR CHEN:

20   Q    So did you discuss that threat as you

21   characterized it with other individuals in DHS?

22   A    I'm sure it was mentioned.  We didn't

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

Page 122

1   discuss in a meaningful way what that -- how that
2   should impact my operations.
3       Q      Did you discuss it in any other
4   capacity?
5       A      No.  What I would say is there was
6   speculation in conversations I had with colleagues
7   about whether that would back prompt something
8   from the department or the president.
9       Q      Did you have other conversations?
10      A      No.
11      Q      Are you aware of Attorney General
12  Session's letter recommending to Secretary Duke --
13  Acting Secretary Duke, recommending that DACA be
14  terminated?
15      A      Yes.
16      Q      Did you ever have discussions about that
17  letter with other individuals in DHS?
18      MR. TYLER:  I'll object to the extent
19  that the question calls for a revelation of the
20  consultive discussions, discussions with counsel
21  in regard to that subject matter.
22

Page 123

1   BY MR CHEN:
2       Q      So were you -- did you have discussions
3   with attorney general -- about the -- about the
4   letter with other individuals in DHS?
5       MR. TYLER:  I will try to be clear with
6   my objection.  To the extent that calls for an
7   answer about what might have occurred at the
8   meetings that Mr. Neufeld has testified about.  If
9   it calls for a response that would inform you of
10  the subject matter of that meeting, what was
11  discussed, what factors were discussed I'm
12  directing the witness not to answer that question.
13  BY MR CHEN:
14      Q      To be clear, I'm asking specifically
15  whether you have or have not discussed that, the
16  letter with individuals within DHS?
17      MR. TYLER:  Same objection applies.
18      MR. WISHNIE:  So that the record is
19  clear between objection and instruction, you are
20  instructing him not to answer the yes or no
21  question?
22      MR. TYLER:  I'm asking to the extent

Page 124

1   that counsel is seeking or his question seeks
2   information about what was discussed at this
3   consultative meeting that Mr. Neufeld has
4   testified in which counsel were present and which
5   the termination of DACA was discussed, if that
6   touches upon that meeting, that discussion then
7   I'm directing him not to answer the question.  If
8   you are asking did he have water cooler
9   conversations with colleagues at SCOPS about the
10  AG's letter he can respond to that question.
11  BY MR CHEN:
12      Q      Did you ever discuss the termination of
13  DACA with Acting Secretary Duke?
14      A      No.
15      Q      Did you ever discuss the termination of
16  DACA with acting director of USCIS James McCament?
17      A      Yes.
18      Q      When did you have these discussions?
19      A      Again, the ending of DACA has been a
20  topic of conversation since DACA was instituted
21  and James McCament has been involved in a
22  leadership position of some sort for about that

Page 125

1   whole process, that whole time period.
2       Q      When did James McCament become acting
3   director of USCIS?
4       A      I don't remember the exact timeframe.
5   It was earlier this year.
6       Q      Did you have -- did you have meetings
7   with Mr. McCament about discussing the termination
8   of the DACA program?
9       A      Yes.
10      Q      So where -- when did those meetings
11  occur?  Let's start with any specific meetings
12  that you remember?
13      A      Probably the most recent meeting would
14  have been my biweekly check-in with him in which
15  the topic of the DACA wind down was discussed.
16      Q      Were there meetings prior to September
17  5, 2017 in which you discussed the decision to
18  terminate DACA with Mr. McCament?
19      A      Yes.
20      Q      Let's start from that timeline.  Can
21  you -- what was -- let's start with the specific
22  meetings you might remember with Mr. McCament.  Do

DONALD NEUFELD                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE          126..129

Page 126

1   you know when those meetings occurred?

2        A    Well, the most significant meeting where

3   it was talked in a real way about something that

4   was likely or possible to happen was the meeting

5   that I have already referenced.  It happened the

6   week before the announcement.  During that Labor

7   Day weekend there were telephone conversations

8   about that topic as well.

9        Q    And who was part of those -- who were

10  part of those telephone conversations?

11       A    The same individuals that I referenced

12  as being in the meeting that took place the week

13  before.

14       Q    And were these follow up conversations

15  from that first meeting that you mentioned?

16       A    Yes.

17       Q    What was the subject of discussion of

18  those meetings?

19       A    The wind down of DACA.

20       Q    So at that point had you been aware that

21  DHS had already decided to terminate the DACA

22  program?

Page 127

1            MR. TYLER:  Objection.  Vague.

2   Argumentative.

3            THE WITNESS:  I will -- it needs to be

4   clear that I didn't know about a decision, a final

5   decision until the final decision was issued on

6   September 5.

7   BY MR CHEN:

8        Q    So when you referenced -- when you

9   characterized discussion about the wind down of

10  the DACA program what did you mean by wind down?

11           MR. TYLER:  I'm going to direct the

12  witness not to answer.  He's obviously referring

13  to the consultative process to which we've

14  objected before.  So I'm going to direct the

15  witness not to answer on the same privileges;

16  attorney/client, deliberative process privilege,

17  attorney work product privilege.

18  BY MR CHEN:

19       Q    So besides the one meeting that you

20  referred to a week before September 5 as well as

21  the phone conversations were there any other

22  meetings in which you and Mr. McCament were

Page 128

1   present about the decision to terminate the DACA

2   program?

3            MR. TYLER:  Again, objection.  Vague.

4            THE WITNESS:  There wasn't a decision

5   until September 5 as far as I know.  And so I

6   wouldn't characterize any meeting before then as

7   being about the decision, the final decision.

8   BY MR CHEN:

9        Q    Let me rephrase that.  Were you aware of

10  any -- do you remember any meetings between you

11  and Mr. McCament besides the two conversations

12  that you mentioned about the consideration to

13  terminate the DACA program?

14       A    I remember not specific meetings.  I

15  remember many references to the possible

16  termination of DACA repeatedly prior to September

17  5, but no meetings for the purpose of discussing

18  how to do that or what options might be or

19  anything along those lines.

20       Q    Did you ever discuss consideration of

21  the DACA termination with anyone outside of DHS?

22           MR. TYLER:  Objection.  Vague.

Page 129

1   BY MR CHEN:

2        Q    Do you understand the question.

3   Mr. Neufeld?

4        A    Yes.  And I can answer it, yes.

5        Q    Did you discover -- did you ever discuss

6   the consideration of the termination of DACA

7   within the Department of Justice?

8        A    I don't know whether the individual that

9   I referenced previously as being on the

10  telephone -- I don't know whether he worked for

11  DOJ or worked for the department or any other.  I

12  know he was a government employee, but I don't

13  know whether he was DHS or DOJ or somebody else.

14       Q    Was there anyone else potentially within

15  DOJ that -- or you believe within DOJ that you

16  discussed considering the termination of DACA?

17       A    No.

18       Q    Did you ever discuss the consideration

19  to termination DACA with anyone within the White

20  House?

21       A    No.

22       Q    So you previously said that you had

Page 130

1  discussed the consideration of termination of DACA
2  with people outside of DHS.  Who are those
3  individuals?
4        MR. TYLER:  Objection.  I believe you
5  mischaracterized testimony.
6        THE WITNESS:  I have had conversations
7  since the beginning of DACA about the DACA program
8  and its likely end at some point with neighbors,
9  relatives, many people.
10 BY MR CHEN:
11       Q    Did you discuss the term -- the
12 considerations to terminate DACA with individuals
13 within the government besides those that you just
14 previously mentioned?
15       A    Again, I have numerous colleagues and
16 the possibility of the termination of DACA was
17 widely discussed, but not in a planning sense.
18 More in terms of its news, it would affect our
19 operations and just a topic of conversation like
20 that.  Not for planning purposes or deliberating
21 how to do it.
22       Q    Were the reasons for the DACA

Page 131

1  termination communicated to you?
2        A    In the memo.
3        Q    Were they communicated to you in any
4  other way?
5        MR. TYLER:  I will again object to the
6  extent that you are trying to delve into
7  consultative conversations that the witness has
8  already testified to in which amongst other
9  participants counsel were present.  I going to
10 direct that he not answer that question on grounds
11 of privilege.  Same privileges that I have been
12 citing to.
13 BY MR CHEN:
14       Q    Just to be clear, Mr. Neufeld, I'm
15 simply asking whether the reasons were
16 communicated to you or not, besides those in the
17 memo, not the contents of those reasons.
18       MR. TYLER:  I'll object on vagueness.  I
19 don't know what time we are now talking about.
20 BY MR CHEN:
21       Q    My question applies to any time whether
22 the reasons for the DACA termination?

Page 132

1        A    How about this.  I'm not aware of any
2  other reasons besides those that are stated in the
3  memo.
4        Q    Did you ever inquire into the reasons
5  why DACA was terminated?
6        A    No.  It was clear in the memo.
7        Q    Did you ever inquire whether there were
8  other reasons besides those in the memo?
9        A    No.
10       Q    Besides the memo were there reasons for
11 the October 5 deadline ever communicated to you?
12       A    No.
13       Q    And besides the memo were there reasons
14 for the March 5 deadline ever communicated to you
15 --
16       A    -- No.
17       Q    And did you ever inquire into the
18 reasons other than those in the memo?
19       A    No.
20       Q    About those deadlines?
21       A    No.
22       MR. WISHNIE:  Why don't we go off of the

Page 133

1  record for a moment?
2        MR. TYLER:  Off record.
3        THE VIDEOGRAPHER:  We are going off of
4  the record.  This is the end of media unit
5  number 2.  The time is 11:59 p.m.
6        (The proceeding recessed from 11:59 a.m.
7  to 12:57 p.m.)
8        THE VIDEOGRAPHER:  We are back on the
9  record.  This is the beginning of media unit
10 number 3 and it's 12:57 p.m.
11 BY MR CHEN:
12       Q    Mr. Neufeld, I wanted to circle back to
13 the DACA application process a little bit prior to
14 September 5, 2017.  In your experience as
15 associate director of SCOPS are you aware of how
16 many DACA applicants apply for renewal, how many
17 file for renewal after they fall out of status, in
18 other words after their applications expire?
19       A    I don't know the number.
20       Q    Do you know generally whether it is --
21 what percentage or how many individuals?
22       A    I know -- just to be clear you are

Page 134

1  asking about how many people apply for renewal
2  after their original period expired?
3      Q    Yes.
4      A    It has fluctuated.  I have seen reports.
5  I don't remember the specifics of them.  I know
6  that it is at times it has been -- I think it has
7  been as high as maybe 60 percent that were filing
8  within -- you know, within, ahead of time.  And
9  then other times it has been much less.  In other
10 words where the majority of our receipts in a
11 particular month might be from folks where their
12 status had already expired.
13     Q    And what is -- what are these reports
14 that you are referring to?
15     A    These are weekly reports that are
16 produced by a contractor who no longer works with
17 us but used to work with us.  And now it is
18 somebody in my shop.
19     Q    And they -- these are -- are they
20 updates about the number of DACA applicants, DACA
21 applications that are being processed by SCOPS?
22     A    Yes.  It's -- it's a weekly report

Page 135

1  that -- on renewals and initials and it provides a
2  bunch of different data points with respect to the
3  receipts and pending cases.  I don't think there
4  is anything in it that is about -- you know, those
5  who have not applied, that sort of thing.  It is
6  about the case work that we have either received
7  and have pending or recently completed.
8      Q    Who are those -- so you said previously
9  it used to be an independent contractor.  Do you
10 remember the name of the contractor?
11     A    Oh, it's been different people in that
12 role.
13     Q    Is it -- when -- and then you said has
14 transitioned to someone in your office.  When did
15 that transition occur?
16     A    We ended the contract and took that work
17 in-house probably maybe two months ago, month and
18 a half, something like that.
19     Q    And who in your -- who in SCOPS had been
20 producing these reports after transitioning
21 in-house?
22     A    The name of the individual, I don't

Page 136

1  recall who it got assigned to.  I know that it
2  comes under Bob Baco (phonetic) who is the branch
3  chief for the team that compiles all of our
4  reports.
5      Q    Do you know what office that's within in
6  SCOPS or is there not a particular office that
7  responsibility belongs to?
8      A    I don't remember what the title of the
9  branch is.  We have a branch that is responsible
10 for pulling reports together out of the systems
11 that we process cases in.
12     Q    And are you aware of any data about the
13 number of DACA renewal applicants that file their
14 renewal notices within two weeks of the deadline
15 for when their statuses would expire?
16     A    I have not to my recollection seen any
17 reports like that.
18     Q    Do you know generally how many people --
19 how many DACA applicants usually file for renewal
20 within two weeks or within a few weeks before
21 their application, their statuses expire?
22     A    I don't know.

Page 137

1      Q    So the reports about individuals who
2  file for renewal applications after their statuses
3  expire, was that information ever known to DHS
4  leadership?
5      A    I didn't pass it on to them.  I shared
6  those weekly reports, not necessarily every week
7  but fairly frequently with my leadership, the
8  deputy, and the director.  And I'm not sure who
9  they may have passed that along to.
10     Q    And were you sharing these reports
11 around -- did you ever stop sharing these reports?
12     A    Yes.  But only for a short period of
13 time.
14     Q    But -- so, have you been sharing these
15 reports with DHS leadership or the leadership that
16 you specifically mentioned up until September 5,
17 2017?
18     A    Yes.
19     Q    Regarding the DACA termination and the
20 decision to termination DACA were you ever
21 consulted about the feasibility of the October 5
22 deadline?



Page 138

1          MR. TYLER:  Objection.  Vague.
2          THE WITNESS:  If by consultation you
3   mean operationally -- I guess that would be my
4   question.  What do you mean by feasibility?
5   BY MR CHEN:
6      Q    Before September 5 did anyone from DHS
7   leadership ask you whether the -- ask whether the
8   October 5 deadline would be feasible?
9          MR. TYLER:  I'll object.  Vague.
10         THE WITNESS:  It's still kind of back to
11  what you mean by feasible.
12  BY MR CHEN:
13     Q    Did anybody ask whether it would be
14  possible for your office to process renewal
15  applications who were eligible to be renewed by
16  October 5?
17     A    No.
18     Q    Did anyone inquire into the operational
19  difficulty of or the operational difficulty about
20  processing those renewal applications by October
21  5?
22         MR. TYLER:  Object.  Assumes facts not

Page 139

1   in evidence.
2          THE WITNESS:  No.
3   BY MR CHEN:
4      Q    Did anybody consult you about the
5   feasibility of the March 5 deadline?
6      A    No.
7      Q    So after September 5 how many renewal,
8   late -- sorry.
9          After October 5, 2017 how many late
10  renewal notices to your knowledge did the USCIS
11  receive?
12         MR. TYLER:  Objection.  Vague.
13         THE WITNESS:  Do you mean how many
14  requests were filed after the deadline?
15  BY MR CHEN:
16     Q    I'm sorry, yes.  So renewal requests.
17  How many -- to your knowledge how many were filed
18  after the renewal deadline on October 5?
19     A    I don't know for certain.  I believe
20  that I have heard the number 4,000 have been filed
21  after.
22     Q    And where did you hear that from?

Page 140

1      A    I think from Tracy Renaud.  It was when
2   she was -- well, we have had this transition again
3   where she used to be our acting deputy and now she
4   is the associate director for management.  But
5   either way she would be over the Office of Intake
6   and Document Production.  She is the one I think
7   who has mentioned that number as the number that
8   had been -- come in --
9      Q    And just --
10     A    Since October 5.
11     Q    And just to clarify, from October 5
12  until what date did you hear that this number was
13  for?
14     A    Last week sometime.
15     Q    Do you know about how many late renewal
16  applications were from the state of Texas?
17     A    No.
18     Q    Okay.  Do you know how many applications
19  would have been from the state of Florida?
20     A    No.
21     Q    Do you know who might know this
22  information?

Page 141

1      A    Perhaps the Office of Intake and
2   Document Production.
3      Q    Mr. Neufeld, you stated before that you
4   began your role as associate director of SCOPS
5   around 2010.  Is that correct?
6      A    That's correct.
7      Q    And the DACA program was implemented in
8   2012.  Is that correct?
9      A    Yes.
10     Q    So did you hold your current position
11  when DACA was first implemented?
12     A    Yes.
13     Q    Were you involved in this decision to
14  initiate the DACA program?
15     A    No.
16     Q    Were you involved in the implementation
17  of the DACA program?
18     A    Yes.
19     Q    What was the nature of your involvement
20  in that implementation?
21     A    Ultimately I oversee the operations that
22  adjudicate those benefit requests.  In the initial

DONALD NEUFELD                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                142..145

Page 142

1   stand up of the program I wasn't involved in
2   deciding whether or when to stand it up.  But when
3   the memo came out we had 60 days to stand it up
4   and I was part of the management team that
5   collectively worked out the process that we would
6   employ.
7        Q       Did you ever -- were you ever consulted
8   about the decision to start to initiate the DACA
9   program prior to its initiation?
10       A       No.
11       Q       Do you remember if before -- do you
12  remember if around 2010 you co-authored a memo to
13  the director of USCIS recommending that DHS grant
14  deferred action to certain undocumented
15  immigrants?
16       A       I remember not co-authoring that memo.
17       Q       You remember specifically not
18  co-authoring that memo?
19       A       Yes.
20       Q       Do you know then why your name is on it?
21       A       Because whoever drafted it put my name
22  on it.

Page 143

1        Q       Did you have any involvement in the
2   creation of that memo?
3        A       No.
4        Q       Do you remember -- do you know why
5   whoever drafted it put your name on that memo?
6        A       No.
7        Q       Are you aware of the contents of that
8   memo at all?
9        A       Yes, but I've forgotten most of it.  But
10  I'm aware.
11       Q       What do you remember from that memo?
12       A       It enumerated many options for the
13  administration to consider with respect to policy
14  objectives that they had.
15       Q       And what were some of the options, do
16  you remember?
17       A       Something along the lines of the DACA
18  program was referenced.  I don't think it was
19  called DACA.  But deferred action for childhood
20  arrivals -- not called that, but I think that was
21  in there.  There was an option to embrace some
22  court decisions saying that TPS -- a grant of

Page 144

1   temporary protected status would allow for folks
2   to adjust status even if they had entered
3   illegally.
4        Q       Did the memo site any benefits to the
5   grant of deferred action to these young
6   immigrants?
7        A       I don't remember.
8        Q       Did you authorize that memo?
9        A       No.
10       Q       Did that memo ultimately recommend that
11  DHS should grant deferred action to certain young
12  immigrants?
13       A       I don't remember.  That memo was a
14  draft, is the important thing to keep in mind.
15       Q       Is it your understanding that there are
16  policy benefits to the DACA program?
17       MR. TYLER:  Objection.  Vague.  Asking
18  for personal opinion.
19  BY MR CHEN:
20       Q       You can still answer the question,
21  Mr. Neufeld.
22       A       I'm aware that the people who decided to

Page 145

1   institute it felt that there were benefits in
2   doing so.
3        Q       What do you think?
4        MR. TYLER:  Same objection.  Vague.
5   Personal -- asks for personal opinion.
6        THE WITNESS:  Are you really asking my
7   personal opinion about DACA?
8   BY MR CHEN:
9        Q       I'm interested in what you think about
10  the policy benefits of the DACA program?
11       A       I think that it is unclear what
12  ultimately the benefits are.  Clearly it benefits
13  individuals who receive it for the short run.  I
14  haven't formed an opinion on whether it is good
15  for the country or not.
16       Q       Do you know if these -- the benefits
17  that you said other people had considered were
18  considered in the decision to terminate the DACA
19  program?
20       MR. TYLER:  I'm sorry.  Could you repeat
21  that question?
22

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD
10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE
146..149

Page 146

BY MR CHEN:

2    Q    Do you know if the benefits that you
3 were aware of, were they considered in the
4 decision to terminate the DACA program?
5         MR. TYLER:  Objection.  It's vague.
6 Lack of foundation.
7         THE WITNESS:  I don't know what was
8 considered in the termination of the program.
9 BY MR CHEN:
10   Q    In your tenure as associate director of
11 SCOPS are you aware of any documents of DHS
12 concerning the legality of the DACA program?
13   A    I'm aware of the Sessions letter or memo
14 or whatever it was that cited that.
15   Q    Any other documents that you are aware
16 of?
17   A    No.
18   Q    Are you aware of any documents produced
19 by the Department of Justice about the legality of
20 the DACA program?
21   A    No.
22   Q    Are you aware of any documents produced

Page 147

1 by the White House about the legality of the
2 program?
3    A    No.
4    Q    Are you aware of any communications
5 between DHS and the state of Texas related to the
6 termination of the DACA program?
7         MR. TYLER:  Objection.  Vague.
8         THE WITNESS:  I'm not aware of any
9 communication between the department and the state
10 of Texas.
11 BY MR CHEN:
12   Q    What about the state attorney general of
13 Texas?
14        MR. TYLER:  Same objection.
15        THE WITNESS:  I don't have visibility to
16 communications between the department and the
17 state of Texas, the attorney general.
18 BY MR CHEN:
19   Q    In any communications about the DACA
20 termination has anyone said anything about
21 immigrants that was offensive?
22   A    No.

Page 148

1    Q    You mentioned previously that you have
2 spoken with acting director of the USCIS James
3 McCament about the DACA termination.  Correct?
4    A    Yes.
5    Q    In those conversations has he ever
6 referred to DACA recipients as criminals?
7    A    As a population, no.
8    Q    Has he ever referred to individual DACA
9 recipients as criminals?
10        MR. TYLER:  Objection.  Vague.
11        THE WITNESS:  I will say that all of us
12 who are managing the program are aware that some
13 applicants are criminals and we have terminated
14 DACA -- people with DACA because of criminal
15 activity and that has definitely been discussed.
16 BY MR CHEN:
17   Q    Has he ever suggested that DACA
18 recipients don't deserve to be in this country?
19   A    No.
20   Q    Do you understand the term racial slur?
21   A    As is commonly meant, yes.
22        MR. TYLER:  I'll still object on grounds

Page 149

1 of vagueness.
2 BY MR CHEN:
3    Q    Has he ever used a racial slur in these
4 conversations?
5    A    No.
6    Q    Has he ever referred to DACA recipients
7 as a population by race?
8    A    No.
9    Q    Has he ever referred to individual DACA
10 recipients by race?
11        MR. TYLER:  Objection.  Vague.
12        THE WITNESS:  When there are discussions
13 about particular cases where the individual is
14 from might be part of the facts that are
15 considered -- not facts that are considered, but
16 we would know that somebody is from Mexico or from
17 wherever in discussing that.
18 BY MR CHEN:
19   Q    And has he ever mentioned reasons for
20 terminating DACA besides the legality of the DACA
21 program?
22   A    No.

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD                                           10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                150..153

Page 150

1    Q    And you mentioned previously that you
2  have been in meetings and conversations with Gene
3  Hamilton about the DACA program.  Is that correct?
4    A    Yes.
5    Q    And so, has he ever referred to DACA
6  recipients as criminals?
7         MR. TYLER:  I'll object again to the
8  extent he has identified Mr. Hamilton as having
9  taken part in this meeting that the substance of
10 which we are objecting to on three privileges.  So
11 to the extent you are asking him to go back to
12 that meeting and report what was said by whom I'm
13 going to object on grounds of deliberative process
14 privilege, attorney/client privilege, and attorney
15 work product privilege.
16        MR. WISHNIE:  And you are also going to
17 instruct the witness?  Is that right?  I want to
18 make a clear record here for the court.
19        MR. TYLER:  -- Yes.
20 BY MR CHEN:
21    Q    Outside of that meeting, same question,
22 have you heard Mr. Hamilton refer to DACA

Page 151

1  recipients as criminals?
2    A    No --
3         MR. TYLER:  -- Objection.  Lack of
4  foundation.  You can answer.
5         THE WITNESS:  No.
6  BY MR CHEN:
7    Q    Has Mr. Hamilton ever suggested that
8  DACA recipients do not deserve to be in this
9  country according to your -- to your knowledge?
10        MR. TYLER:  Objection.  Lack of
11 foundation.
12        THE WITNESS:  No.
13 BY MR CHEN:
14    Q    To your knowledge has Mr. Hamilton ever
15 used a racial slur to refer to DACA recipients?
16    A    No.
17    Q    And to your knowledge has he ever
18 referred to DACA recipients as a population by
19 race?
20    A    No.
21    Q    And to your knowledge has Mr. Hamilton
22 ever mentioned reasons to terminate DACA besides

Page 152

1  the legality of the DACA program?
2         MR. TYLER:  Object.  I will direct the
3  witness not to answer if this question elicits
4  conversations that took place in this meeting.
5  BY MR CHEN:
6    Q    To your knowledge outside of the
7  meeting?
8    A    No.
9         MR. WISHNIE:  Let's just have a moment.
10 We are just about done.  We can stay on the record
11 for a moment.
12 BY MR CHEN:
13    Q    I want to return just really quickly to
14 the late filed applications after October 5.  So
15 you mentioned that there were six applications
16 filed late from Puerto Rico.  Is that correct?
17    A    That's correct.
18    Q    You also mentioned that you had approved
19 all six or accepted is the term that you used?
20    A    Directed that they be accepted.
21    Q    You directed that they be accepted.  And
22 did you use any criteria -- what criteria did you

Page 153

1  apply to evaluate whether they should be accepted?
2    A    Whether or not the hurricane that
3  impacted Puerto Rico played a role in preventing
4  the timely filing.
5    Q    And you concluded that it had played
6  some role in the filing of these six applications.
7  Is that correct?
8    A    Yes.
9    Q    How did you come to that conclusion?
10   A    Five of them were postmarked shortly
11 before October 5 and it was reasonable to conclude
12 that the hurricane likely impacted the timely
13 delivery -- you know, that they would be received
14 before October 5.  The other one was filed shortly
15 afterward and as I recall the requester stated
16 that the hurricane had impacted them getting it
17 timely filed.
18   Q    And you had also mentioned that after
19 October 5 you had -- SCOPS had received about
20 4,000 late file notices.  Is that correct?
21   A    No.  What I said is that Tracy Renaud
22 indicated to me that it was approximately 4,000

DONALD NEUFELD                                          10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE          154..157

Page 154

1   that had been filed at the lockbox.
2        Q    Do you know if those 4,000 were all
3   rejected?
4        A    I don't know whether they have in fact
5   been rejected or if they have been flagged for
6   rejection but not yet processed.
7        Q    Do you know if SCOPS or USCIS plans to
8   reject those 4,000 applications?
9        A    Yes, that is the current plan.
10       Q    Do you know if the October 5 deadline
11  caused more applications than usual between the 30
12  day window of October 5 -- sorry, September 5 and
13  October 5?
14       A    No, I don't.
15       Q    Do you know how many usually -- how many
16  applications, renewal applications are usually
17  filed within a 30-day period?
18       A    I do not.  I see reports but I don't
19  remember what the numbers are.
20       Q    And would those -- are these reports
21  that you are referring to the same reports that
22  you mentioned -- mentioned before updating you

Page 155

1   about the work of SCOPS?
2        A    Yes.
3        Q    Did the October 5 deadline cause any
4   operational difficulties at SCOPS?
5             MR. TYLER:  Objection.  Vague.
6             THE WITNESS:  I can answer to the extent
7   that the deadline is a deadline, is a filing
8   deadline.  And so there aren't any impacts from
9   the filing deadline that we would experience in
10  service in our operations.
11  BY MR CHEN:
12       Q    Did the number of applications that came
13  in between -- within that time period cause any
14  operational difficulties?
15       A    No.
16       Q    And finally with the 4,000 notices that
17  Ms. Renaud let you know about that was filed after
18  October 5, do you know if SCOPS is considering the
19  filing -- the postmark date as a reason to
20  consider these applications on a case by case
21  basis?
22       A    It's not a SCOPS's decision.  Lockboxes

Page 156

1   are the ones that handle it.  And what they do
2   comes from direction that they receive through the
3   Office of Intake and Document Production.  But all
4   of that is just reflective of the instruction that
5   the department or USCIS policy or decision on
6   that.  And all of that is to say the -- it's a
7   long way of saying that they are not considering
8   postmarks.  It has to be physically received by
9   the filing deadline.
10            MR CHEN:  Okay.  Nothing further from
11  Batalla Vidal plaintiffs.
12            MR. TYLER:  Going off of the record for
13  change of counsel.
14            THE VIDEOGRAPHER:  We are going off of
15  the record.  The time is 1:23 p.m.
16            (Whereupon, proceedings recessed from
17  1:23 p.m. to 1:26 p.m.)
18            THE VIDEOGRAPHER:  We are back on the
19  record.  The time is 1:26 p.m.
20            EXAMINATION ON DEFENDANTS
21  BY MS. KHAN:
22       Q    Hi, Mr. Neufeld.  My name is Sania Khan.

Page 157

1   I'm from the New York State Attorney General's
2   Office and I represent the plaintiff states which
3   comprises 17 states that are part of the New York
4   v. Trump litigation which is being heard alongside
5   the Batalla Vidal litigation.  But you don't have
6   to worry about that.
7             So I just have a few questions for you
8   today.  The first question is how would you
9   describe your three most important job duties?
10       A    Well, they're all related.  I oversee
11  the operations, service center operations and so I
12  make sure that the group of people that work in
13  the service centers have what they need to
14  effectively do their jobs.  I'm also responsible
15  to make sure that they are performing their work
16  with a high degree of accuracy and quality.  And
17  to the extent possible that we are making timely
18  decisions for those who file.
19       Q    Okay.  Who those -- for those who file
20  DACA or generally?
21       A    For everything.
22       Q    Okay.  So in the context of accuracy


Olender Legal Solutions
A Global Litigation Solutions Company

888.445.3376
202.898.1108

www.olenderreporting.com
Worldwide Coverage

Page 158

1    would efficiency be part of this operational duty?
2        A    Yes, we need to be efficient so that we
3    can make the best use of the resources that we
4    have so that we can timely process requests.
5        Q    How do you -- how do you become more
6    efficient?
7        A    Through constant review of our processes
8    and thinking of ways to be more efficient.  I hate
9    to use the same word, but -- you know, ways that
10   we can achieve the same thing with less of an
11   investment of the cost or resources.
12       Q    So if you could describe to me in a very
13   practical sense how those analyses are done to
14   become more efficient?
15            MR. TYLER:  I'll object.  It calls for a
16   narrative answer.  You can break it down, please.
17   BY MS. KHAN:
18       Q    Do you -- do you create analyses with
19   regard to the efficiency of -- of the operations?
20       A    No.  We have various ways of looking at
21   efficiency.
22       Q    What are those ways?

Page 159

1        A    That primary way is to look at the
2    number of cases that are completed and the
3    investment of officer hours that was required to
4    achieve that number of completions.
5        Q    So in the context of -- sorry.  Are we
6    still on the record?  Okay.  Sorry.
7             So in the context of DACA specifically
8    how did you measure -- how did you measure
9    efficiency of the implementation of the program?
10       A    From an efficiency perspective again, it
11   was what level of resources were invested to
12   achieve the completions that we did.
13       Q    Were there any other sort of operational
14   measurements done on the implementation of DACA?
15            MR. TYLER:  Objection.  Vague.
16   BY MS. KHAN:
17       Q    You can still answer it.
18       A    Can you repeat the question?
19       Q    Sure.  Were there any operation -- on
20   the operational measurements or metrics used on
21   the implementation of DACA?
22       A    Certainly.  So that weekly report that I

Page 160

1    discussed previously gives a lot of like I said
2    different data points.  And among them are -- is
3    an identification of the number of cases and
4    waiting for a particular action and how long they
5    have been waiting for that action to occur.
6        Q    Are there any -- are there any analyses
7    or data collection done -- strike that actually.
8             Is there any data collection done as to
9    the demographics of the DACA applicants?
10            MR. TYLER:  Objection.  Vague.
11   BY MS. KHAN:
12       Q    You can answer.
13       A    I think I can answer this way.  That the
14   office -- let me get this straight.  The Office of
15   Performance and Quality produces -- I think it's a
16   quarterly report that gives some demographic
17   characteristics of the filing population.
18       Q    Who sees that quarterly report?
19       A    It's published on the website.
20       Q    So I'm going to go down a list of
21   specific types of data and I just want to know if
22   any of these types of data were ever compiled by

Page 161

1    your team.  So specifically were there any -- was
2    there any data or analyses done as to how many
3    DACA grantees are federal government employees?
4        A    Not by my team.
5        Q    Was there any data analyses done as to
6    how many DACA grantees are small business owners?
7        A    Not by my team.
8        Q    Was there any data analyses compiled as
9    to the average income of DACA grantees?
10       A    Not by my team.
11       Q    The same question for how many DACA
12   grantees are home owners?
13       A    Not by my team.
14       Q    How many DACA -- the same question for
15   how many DACA grantees are in the military?
16       A    Not by my team.
17       Q    Same question for DACA grantees who are
18   doctors?
19       A    Not by my team.
20       Q    Same question for DACA grantees who are
21   teachers?
22       A    Not by my team.

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD                                          10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE          162..165

Page 162

1    Q    Was there any analysis done as to the
2  impact of the recision of DACA on the operational
3  aspect of your -- of what you oversee?
4          MR. TYLER:  Objection.  Vague.
5  BY MS. KHAN:
6    Q    You can still answer.
7    A    I don't -- can you restate?
8    Q    Yeah, I can restate it.  So were there
9  any analyses done as to the economic impact of the
10 rescission of DACA by your team?
11         MR. TYLER:  Same objection.  Vague.
12         THE WITNESS:  Economic impact on what?
13 BY MS. KHAN:
14   Q    On your -- on the operational aspect of
15 your team?
16         MR. TYLER:  Still vague.  Objection.
17 BY MS. KHAN:
18   Q    Okay.  Let me start over.  So --
19   A    Maybe I can say it this way.  I don't do
20 economic analysis of the costs of the programs
21 that we administer.  That would be done by the
22 chief financial officer.

Page 163

1    Q    Right.  I apologize.  I think this is --
2  this is on me.  The economic -- so you talked
3  earlier about the costs of the database change,
4  the costs of creating a new system for renewal
5  notices.  Is that correct?
6    A    Yes.
7    Q    Okay.  So would you measure that as an
8  economic cost in the context of the operational
9  system of the implementation of DACA?
10   A    I wouldn't.  Like I said, ultimately the
11 CFO would look to all of the costs of
12 administering the program.
13   Q    So what analyses were done with regard
14 to the DACA program?
15         MR. TYLER:  Objection.  Lack of
16 foundation.  Vague.
17 BY MS. KHAN:
18   Q    You can still answer.
19   A    Yeah, but I don't understand what you
20 are asking.
21   Q    Okay.  That's a valid point.  Were there
22 any analyses done as to the efficacy of DACA --

Page 164

1  strike that.
2          Give me one second.
3          So were you ever questioned about the
4  potential operational impact of the termination of
5  DACA?
6          MR. TYLER:  Objection.  Vague.
7  BY MS. KHAN:
8    Q    You can still answer if you understand
9  it.
10   A    I don't know what you mean by
11 operational impacts.
12   Q    How it would -- I'm asking were you ever
13 asked about how the recision of DACA would impact
14 your job, for example?
15   A    No.
16   Q    Okay.  Were you asked about how it would
17 impact the service centers?
18   A    No.
19   Q    Were you asked about how the recision of
20 DACA would impact anyone that you -- that you
21 supervise?
22         MR. TYLER:  I'll object on the grounds

Page 165

1  of vagueness.
2          THE WITNESS:  I was not asked about how
3  ending of DACA would impact the people that I
4  supervise.
5  BY MS. KHAN:
6    Q    Okay.  Moving on.  Are you aware of the
7  information sharing policies with regard to DACA
8  applications and grantees?
9    A    I'm aware that there are some.  I
10 don't -- I don't know the ins and outs
11 specifically what is allowed and what is not
12 allowed.
13   Q    What are you aware of?
14   A    That there is a -- somewhere near where
15 the requester signs there is a statement that
16 spells out what the policies are.
17   Q    And were you ever asked about those
18 policies when they were being formulated?
19         MR. TYLER:  Objection.  Vague.
20         THE WITNESS:  I wasn't asked about them,
21 no.  There were discussions early on in that 60
22 day period, again, as to what that language should

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD                                                   10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                   166..169

Page 166

1  be.  I don't recall specifics of those
2  conversations other than that they happened.
3  BY MS. KHAN:
4      Q    Okay.  So are you aware of what the
5  current policy is with regard to information
6  sharing of DACA applicants or grantees?
7      A    Again, I have a general awareness that
8  there are restrictions on the proper use of it.
9  But I wouldn't want to say specifically because I
10 will get it wrong.
11     Q    Okay.  So it's safe to say that you are
12 not aware of any change in policy on that front?
13     A    That's correct.
14     Q    Did you provide any sort of statistical
15 information with regard to -- strike that.
16          Were you asked to provide any
17 statistical information in the context of the DACA
18 program with regard to the recision?
19          MR. TYLER:  Objection.  Vague.
20          THE WITNESS:  Do you mean the
21 termination?  I'm not --
22

Page 167

1  BY MS. KHAN:
2      Q    -- Yes.  Yes.  The termination of DACA.
3      A    No.
4      Q    You were not asked to provide any sort
5  of statistical information on the operational
6  aspects of the DACA program?
7          MR. TYLER:  Objection.
8  BY MS. KHAN:
9      Q    In the context -- it's a long quest --
10 in the context of the termination?
11         MR. TYLER:  Objection.  Vague.
12         THE WITNESS:  I can answer it this way.
13 I wasn't -- SCOPS has the weekly report that we
14 have produced weekly for a long time.  That report
15 continues to be produced and I was not asked for
16 any other sort of reporting besides that.
17 BY MS. KHAN:
18     Q    And just to be clear, who does the
19 weekly report go to?
20     A    It comes into me and then I forward it
21 to James McCament and back until recently Tracy
22 Renaud in her capacity as the deputy.  And Kathy

Page 168

1  Nuebel who is the chief of policy and strategy.
2      Q    And are you aware if any of those
3  individuals then forward it on to anyone else?
4      A    I am not aware.
5      Q    Have you ever met an unaccompanied
6  minor?
7          MR. TYLER:  Objection.  Vague.
8          THE WITNESS:  What do you mean by
9  unaccompanied minor?
10 BY MS. KHAN:
11     Q    Someone who is DACA eligible?
12     A    Well, in my position I have met with
13 members of the community advocating and among them
14 were people who had DACA, so yes.
15     Q    And what was your impression in those
16 meetings?
17         MR. TYLER:  Objection.  Vague.  Calls
18 for personal opinion.
19         THE WITNESS:  My opinion with respect to
20 what?
21 BY MS. KHAN:
22     Q    To who they are, how they are?

Page 169

1          MR. TYLER:  Same objection.
2          THE WITNESS:  We weren't there for me to
3  form opinions about whether they are good people
4  or not and I didn't form an opinion along those
5  lines.  I was there to listen to what they had to
6  say at the time.
7  BY MS. KHAN:
8      Q    Was any of that done in the context of
9  your professional duties?
10     A    Yes.  What I'm talking about was all in
11 my professional duties.
12     Q    Did that -- did that -- those meetings
13 for example, did they impact any decisions that
14 you made in the operational context?
15     A    So the one meeting that I can think of
16 that comes clear is a meeting at the DHS
17 headquarters that was attended by Ali Mayorkas,
18 the deputy secretary at the time, and others.  And
19 it was different advocacy groups for DACA that
20 were basically pressing for even speedier
21 processing of their cases.
22     Q    And what did you do?

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD                                   10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE      170..173

Page 170

1          MR. TYLER:  Objection.  Vague.
2          THE WITNESS:  We listened to their
3    concerns and took that, considered that as a
4    reason among many why timely processing is
5    important.  But timely processing is important for
6    just about everything that we do.
7          MS. KHAN:  I don't think I have any
8    further question at this point.
9          THE WITNESS:  Thank you.
10         MS. KHAN:  Thank you.
11         (Court reporter requests clarification.)
12         THE COURT REPORTER:  Another examiner?
13         MS. KHAN:  Yes.  There's about three
14   more.
15         MR. VENTRESCA:  Sorry.
16         THE COURT REPORTER:  That's all right.
17   I just need to get the name.
18         MR. VENTRESCA:  Musical chairs exercise
19   here.
20         THE COURT REPORTER:  And you are?
21         MR. VENTRESCA:  Ivano Ventresca.
22         THE COURT REPORTER:  And you're on here?

Page 171

1          MR. VENTRESCA:  Hopefully.  I should be
2    the second one.
3          EXAMINATION ON BEHALF OF DEFENDANTS
4    BY MR. VENTRESCA:
5          Q    Hi, Mr. Neufeld.  My name is Ivano
6    Ventresca. I'm with Covington and Burling and we
7    represent the University of California and Janet
8    Napolitano in the North District of California
9    cases.  I'm going to try not to repeat any ground
10   to not make the day any longer, but I'm just going
11   to have some follow up questions.  First I would
12   like to mark this as Exhibit 38.  I'm not sure
13   where we are on the -- 39.  39.  Copies for the
14   record.
15         (Whereupon, Exhibit No. 39 was marked
16   for identification.)
17   BY MR. VENTRESCA:
18         Q    For the record this is the declaration
19   of Donald W. Neufeld filed in the state of Texas
20   v. United States of America case in the Southern
21   District of Texas.  Mr. Neufeld, do you recognize
22   this document?

Page 172

1          A    Yes.
2          Q    Is this the declaration that you filed
3    in the state of Texas v. United States case in the
4    Southern District of Texas on January 30, 2015?
5          A    I have not reread through the whole
6    thing, but it looks like it probably is.
7          Q    If you turn to --
8          A    It's got my signature.
9          Q    Yeah.  I was going to say if you turn to
10   the last page.  So it is your signature?
11         A    Yes.
12         Q    And you declared under penalty of
13   perjury that what you submitted in this
14   declaration was true and correct?
15         A    Yes.
16         Q    So you don't need to read the whole
17   thing.  I'm just going to direct you to a couple
18   of pages.  But first, who asked you to prepare
19   this declaration?
20         A    Oh, I don't remember.
21         Q    Do you remember what the purpose of the
22   declaration was?

Page 173

1          A    Well, not specifically.  I don't know --
2    what do you mean what was the purpose?
3          Q    Well, do you know why you were asked to
4    submit a declaration in this case, this case being
5    the Texas case?
6          A    If I'm not mistaken I did at least two
7    of them.
8          Q    Right.  I think you did three.
9          A    Three.  Okay.  Yeah.  So I don't -- I
10   don't know without reading this I don't remember,
11   I don't know which one this one is.
12         Q    Okay.  Well, I would like to direct you
13   to paragraph 15.  It's on page -- did you find it?
14         A    Yes.
15         Q    Could you just read the first sentence
16   of paragraph 15?
17         A    Out loud?
18         Q    Yes, please.
19         A    A DACA request is denied when a USCIS
20   adjudicator on a case by case basis determines
21   that the requester has not demonstrated that they
22   satisfy the guidelines for DACA or when an

DONALD NEUFELD                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE              174..177

Page 174

1  adjudicator determines that deferred action should
2  be denied even though the threshold guidelines are
3  met.
4      Q    So do you agree that the USCIS
5  adjudicator could deny a deferred action request
6  under DACA even if the category guidelines for
7  DACA were met?
8      A    Yes.
9      Q    So could we next turn to paragraph 18
10 which should just be on the flip side of the page.
11 And so turning to the first sentence of paragraph
12 18.  I can read this one aloud.  It says; even if
13 it is determined that a requester has satisfied
14 the threshold DACA guidelines the USCIS may
15 exercise discretion to deny a request where other
16 factors make the grant of deferred action
17 inappropriate.
18      Do you agree with that statement?
19     A    Yes.
20     Q    And then in paragraph -- the next two
21 sentences in paragraph 18 give examples of when
22 USCIS exercises that discretion.  Is that right?

Page 175

1      A    Yes.
2      Q    Okay.  And that third sentence that
3  starts with, as another example.  It states; when
4  USCIS learned that a DACA requester falsely
5  claimed to be a U S citizen and had prior removal
6  as an exercise of discretion USCIS denied their
7  request even though those issues are not
8  specifically part of the DACA guidelines.
9      Do you agree with that statement?
10     A    I'm sure that it is accurate.  I don't
11 remember that case at this point in time.
12     Q    So that statement that you made says
13 that there was a case in which USCIS denied a DACA
14 request even where the DACA guidelines were not
15 met?
16     A    Yes.
17     Q    Okay.  And then if we could turn to
18 paragraph 24 which is a couple of pages.  So at
19 the very -- the very last sentence paragraph of
20 24.  Well, it's the -- well, it's the last full
21 sentence.  It states; requests have also been
22 denied on the basis that deferred action was not

Page 176

1  appropriate for other reasons not expressly set
2  forth in 2012 DACA memorandum such as evidence of
3  immigration fraud.
4      Do you agree with that statement?
5      A    Yes.
6      Q    And so is that consistent with what we
7  just discussed in that there were cases in which
8  USCIS denied DACA requests even where the
9  guidelines of DACA were met?
10     A    Yes.
11     Q    And then the sentence in paragraph 24
12 that's going to go onto the next page starts;
13 until very recently USCIS lacked any ability to
14 automatically track and sort the reasons for DACA
15 denials and it still lacks the ability to do so
16 for all DACA denials except for very recent ones.
17     Is it correct -- does that statement
18 mean that as of this date of the declaration
19 January 30, 2015 USCIS had the ability to track
20 the reasons for DACA denials?
21     A    Yes, but I don't know the specific ways
22 we can categorize the type of denial.

Page 177

1      Q    Okay.  So to follow up on that.  So as
2  of this -- as of the day of this declaration, so
3  January 30, 2015 could USCIS determine if a DACA
4  request was denied on the basis of discretion?
5      A    I don't know.
6      Q    Okay.  And just to wrap up this
7  declaration.  On the very last page on your
8  signature page.  So the last sentence above the, I
9  declare, sentence.  So that sentence states;
10 finally in DACA USCIS exercises its discretion by
11 otherwise denying a request for other factors not
12 included in the guidelines but make the grant of
13 deferred action inappropriate.
14     So again, is that consistent with what
15 we have been discussing in that USCIS will deny,
16 could deny DACA requests even where the DACA
17 guidelines were met?
18     A    Yes.
19     Q    Okay.  So I would like to switch
20 documents now.  And this has already been marked I
21 believe as Exhibit 3.  It's the administrative
22 record, specifically the recision memorandum.  I

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE          178..181

Page 178

1   think it has been called the Duke memorandum.

2          THE COURT REPORTER:  Did you want it

3   marked?

4          MR. VENTRESCA:  Well, it's part of what

5   was Exhibit 3.  So we can mark it if that's

6   easier.

7          MR. TYLER:  This is so I'm clear -- this

8   is my first deposition.  This is a continuation of

9   exhibits that have been entered in the previous

10  depositions?

11         MR. VENTRESCA:  Yes.  So the

12  administrative record was previously entered and

13  this is just part of it.  So we can mark it, or.

14         THE COURT REPORTER:  Mark it as what?

15  40 or three?

16         MR. VENTRESCA:  Three.  No?

17         MR. COX:  Except for that's not all of

18  three.  Three, that is the whole administrative

19  record.

20         MR. TYLER:  If you've identified -- you,

21  counsel, has identified Exhibit 3 to be the entire

22  administrative record then I don't know that we

Page 179

1   can refer to this as Exhibit 3.

2          MR. VENTRESCA:  Okay.  We can make it

3   Exhibit 40.

4          MR. NEWMAN:  Can we go off of the

5   record, please?

6          THE VIDEOGRAPHER:  Off of the record.

7   The time is 1:52 p.m.

8          (Whereupon, Exhibit No. 3 previously

9   marked was identified.)

10         (The proceeding recessed from 1:52 p.m.

11  to 1:55 p.m.)

12         THE VIDEOGRAPHER:  We are back on the

13  record.  The time is 1:55 p.m.

14  BY MR. VENTRESCA:

15     Q    Mr. Neufeld, I'm going to show you a

16  portion of Exhibit 3 that starts with the Bates

17  page number ending in 252 and ends with Bates page

18  number 256.  For the record it is the recision of

19  the June 15, 2012 memorandum.  Do you recognize

20  the document?

21     A    Yes.

22     Q    I would like to turn your attention to

Page 180

1   footnote one which is on the Bates page number

2   ending in 253.  Do you see that?

3      A    Yes.

4      Q    Could you read me footnote one?

5      A    Significantly while the DACA denial

6   notice indicates the decision to deny is made in

7   the unreviewable discretion of USCIS, USCIS has

8   not been able to identify specific denial cases

9   where an applicant appeared to satisfy the

10  programmatic categorical criteria as outlined in

11  the June 15, 2012 memorandum but still had his or

12  her application denied based solely upon

13  discretion.

14     Q    Is that a correct statement?

15         MR. TYLER:  Objection.  Foundation.

16  Form.

17         THE WITNESS:  I don't know whether it's

18  correct.

19  BY MR. VENTRESCA:

20     Q    So when you in your declaration, which

21  was Exhibit 39, at paragraph 18 stated that USCIS

22  learned that a DACA requester falsely claimed to

Page 181

1   be a U S citizen and had prior removals, as an

2   exercise of discretion USCIS denied the request

3   even though those issues are not specifically part

4   of the DACA guidelines is that not an example of

5   a -- as this memorandum states, the denial case

6   where the applicant appeared to satisfied the

7   programmatic categorical criteria?

8      A    The difficulty I have with saying

9   whether that's accurate or not is understanding

10  what was intended by identify.

11     Q    What is your understanding?

12     A    I didn't write it so I don't know.  I

13  know that in my declaration I was made aware of

14  cases that were -- that we had denied -- the

15  examples of cases that were denied were presented

16  to me by my staff whom I have every reason to

17  believe was accurate.

18     Q    Right.

19     A    However, I didn't personally review

20  those cases and I don't know whether those cases,

21  how those cases -- I don't know if the cases are

22  identified in some way that you could pull them

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD                                          10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                182..185

Page 182

1  and review them without reviewing all of the cases
2  to find them.
3       Q    But you were able to identify those
4  cases, you or your staff?  Is that right?
5       A    My staff were able to recall that there
6  were cases that had been denied with these fact
7  patterns.
8       Q    Could you tell me who --
9       A    -- did it -- it's a different thing to
10  say -- again, it comes down to what does identify
11  mean.  If it means -- you know -- you know,
12  specific information and that is now identifiable
13  with a case number and whatnot, then I don't know
14  whether we're able to now identify those specific
15  cases that were referenced in my declaration.
16       Q    Okay.  So could you tell me who on your
17  staff identified the cases referenced in your
18  declaration?
19       A    I believe it was Jerry Rigdon who had
20  the position that is now encumbered by Alex King
21  that I have referred to about before.  So it is
22  the branch chief for the branch that has the DACA

Page 183

1  portfolio.
2       Q    Could you spell his last name?
3       A    R-I-G-D-O-N.
4       Q    Anyone else?
5       A    No.
6       Q    So Jerry Rigdon would have the
7  individual who could have identified?
8       A    As I recall -- it is going back a couple
9  of years now.  It's a little fuzzy, but I think
10  that was him.
11       Q    Do you know how Jerry would have found
12  these cases?
13       A    I don't, other than that he was in
14  regular communication with the teams at the
15  centers that were adjudicating cases.
16       Q    Is there a reason why Mr. Rigdon would
17  have been able to find these cases but Acting
18  Secretary Duke would not have been able to find
19  these cases?
20            MR. TYLER:  Objection.  Vague.  Lack of
21  foundation.
22            THE WITNESS:  Can you repeat the

Page 184

1  question?
2  BY MR. VENTRESCA:
3       Q    Sure.  Let's start.  So it seems -- do
4  you agree that Acting Secretary Duke -- well, let
5  me rephrase.  Do you agree that USCIS as
6  represented in the memorandum did not identify
7  specific denial cases where USCIS exercised
8  discretion?
9            MR. TYLER:  I'll object to the form of
10  the question.  I mean the document speaks for
11  itself, so.  I object on form and vagueness.
12  BY MR. VENTRESCA:
13       Q    You can answer.
14       A    I don't understand what you're asking
15  me.
16       Q    So in this memorandum USCIS did not
17  identify specific denial cases where USCIS
18  exercised discretion to deny a DACA request.  Your
19  staff was able to find such specific cases.  Do
20  you know why your staff was able to find such
21  cases but USCIS in this memo was not able to find
22  those cases?

Page 185

1       A    I think it comes back again to what does
2  identify mean.  I don't recall the specific
3  circumstances of how the examples were brought to
4  my attention.  I don't know or at least I don't
5  remember whether they were coming from the memory
6  of adjudicators who had adjudicated those cases,
7  which is different than identifying those cases
8  from the 800,000 that we've adjudicated and
9  putting your finger on that's the case that we're
10  talking about.  There is a difference.  And so
11  that's -- I think that's to me where the tension
12  is coming from here.
13       Q    Were you consulted about the substance
14  of this footnote?
15       A    I don't recall being consulted.
16       Q    Did you review this footnote before it
17  was published in its final form?
18       A    Not that I recall.
19       Q    And could you give me your understanding
20  of the meaning of the word identified that make
21  this footnote accurate?
22       A    It's the difference between putting

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD                                                10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                   186..189

Page 186

1  your -- being able to put your finger on a case,
2  pull it, and review it now versus somebody
3  remembering that they adjudicated this case.  Both
4  you can say -- the case could have been
5  adjudicated but the fact that we can't identify it
6  now in the stack of 800,000 is the difference I'm
7  talking about.
8      Q    Did anyone ask -- did anyone at USCIS or
9  DHS ask to review your declaration that you
10 submitted on January 30, 2016?
11          MR. TYLER:  Objection.  Lack of
12 foundation.
13          THE WITNESS:  Nobody asked me to review
14 my declaration.
15 BY MR. VENTRESCA:
16     Q    Do you know if anyone at DHS reviewed
17 that declaration in the preparation of this
18 recision memorandum?
19     A    I do not know.
20     Q    Just a couple more questions.  We'll
21 switch -- switch topics.  You recently testified
22 about that immigration advocacy groups that you

Page 187

1  had met with them about the change in the
2  processing times.  Is that right?
3      A    No.  The purpose of the meeting was for
4  them to convey their desire that the processing
5  times be quicker.
6      Q    Are you aware if immigration advocacy
7  groups were consulted with respect to the recision
8  of DACA?
9      A    I'm not aware.
10     Q    And you are aware that DACA recipients
11 serve in the military?
12     A    I'm aware of that, yes.
13     Q    Are you aware of whether of any of their
14 supervising officers were contacted with respect
15 to the recision of DACA?
16     A    I'm not aware.
17     Q    And are you aware that DACA recipients
18 are students at schools and universities?
19     A    Yes.
20     Q    Are you aware of whether those
21 universities were contacted with respect to the
22 recision of DACA?

Page 188

1      A    I'm not aware.
2      Q    And are you aware that DACA recipients
3  are employers?
4      A    I believe so.
5      Q    Do you know if any of the employees of
6  DACA recipients have been contacted with respect
7  to the recision of DACA?
8      A    I'm not aware.
9      Q    And one kind of final set of questions.
10 Have you overseen deferred -- other deferred
11 action programs besides DACA?
12     A    A Program is a word that has different
13 meanings, but within -- the SCOPS portfolio of
14 benefit adjudications includes requests under the
15 Violence Against Women Act, VAWA, and T's and U's,
16 nonimmigrants.  And as I recall -- I don't recall
17 the specifics.  All three of those I think have
18 some of those requests can result in deferred
19 action being authorized.
20     Q    Okay.  For ease I'll refer to them as
21 deferred action programs here.
22          MR. TYLER:  I will object to counsel's

Page 189

1  characterization of them as programs.
2  BY MR. VENTRESCA:
3      Q    Have you overseen deferred action
4  programs that have ended, as in they have
5  terminated or lapsed?
6      A    Not that I recall and I don't believe
7  so.
8      Q    Are you aware of any discussions with
9  respect to terminating the deferred action
10 requests that you have discussed, the Violence
11 Against Women Act and the T and U visas -- of any
12 discussions to termination those programs due the
13 litigation risk?
14     A    Not that I'm aware of.
15     Q    Have you -- are you aware of any
16 discussions to terminate those programs due to
17 their illegality?
18          MR. TYLER:  I again object to counsel's
19 mischaracterization of these as programs.
20          THE WITNESS:  I'm not aware of any
21 discussions to change the way deferred action is
22 handled for those programs for any reason.

Olender Legal Solutions
A Global Litigation Solutions Company
888.445.3376
202.898.1108
www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE        190..193

Page 190

1           MR. VENTRESCA:  Okay.  That's all I
2    have.
3           (Court reporter request.)
4           THE VIDEOGRAPHER:  We are going off of
5    the record.  The time is 2:05 p.m.
6           (Whereupon, the proceeding recessed from
7    2:05 p.m. to 2:16 p.m.)
8           THE VIDEOGRAPHER:  We are back on the
9    record.  This is the beginning of media unit
10   number 4.  The time is 2:16 p.m.
11        EXAMINATION ON BEHALF OF DEFENDANTS
12   BY MR. NEWMAN:
13        Q    Hello, sir.  My name is Michael Newman
14   from the California Attorney General's Office on
15   behalf the state of California.  Thank you very
16   much.  I have a few additional questions.
17        A    Sure.
18        Q    Is it accurate to say that you stated in
19   your earlier testimony that you had 4,000
20   applications received at the lockbox after October
21   5 of this year?
22        A    What I said was Tracy Renaud indicated

Page 191

1    that there were about 4,000 that had been filed
2    after October 5 and were at the lockbox.  And I
3    have to say that I don't know for a fact whether
4    those are just renewals or could include some
5    initial filings.  I just don't know.
6         Q    Is it also accurate to state that you
7    said that you anticipate all of those will be
8    rejected?
9         A    Yes.
10        Q    Okay.  Do you have any data on the
11   rejected applications?
12           MR. TYLER:  Objection.  Vagueness.
13   BY MR. NEWMAN:
14        Q    I can rephrase.  Do you capture any data
15   regarding the applications?
16        A    SCOPS does not, but OIDP would have data
17   on rejected requests.
18        Q    What would that data include?
19        A    I don't know specifically.  I have not
20   seen a report.
21        Q    Are you aware as to whether that data
22   will be released publicly?

Page 192

1         A    I'm not aware.
2         Q    You referenced a report.  Do you
3    generally get those reports?
4         A    I'm saying I haven't seen a report.  I'm
5    sure that they capture that data.
6         Q    Okay.  You have not seen a report?
7         A    On the number of rejected -- sorry.  I
8    have not seen a report of the reject -- number of
9    rejected requests after either of the deadlines,
10   at least not to my recollection.
11        Q    Okay.  And I apologize.  It was my fault
12   on the misunderstanding.  I asked you before about
13   a report on the data regarding the rejected
14   application.  Are you referring to data as only
15   the number of applications?
16        A    That was the reference I was making, but
17   I haven't seen any other data either.
18        Q    Okay.  Have you seen data regarding the
19   location of filing or of mailing of the
20   applications?
21        A    I have seen -- I'm aware of the six
22   cases that came from Puerto Rico because they were

Page 193

1    flagged for my attention to review.  Other than
2    that I have not seen specific data on rejected
3    filings based on state of origin or anything else.
4         Q    Are you aware of whether the 4,000
5    applications currently in the lockbox,
6    approximately, will be recorded, will have their
7    data recorded as regards a number of data points
8    including state of origin?
9            MR. TYLER:  I will object on this
10   ground.  Counsel is -- the deponent has testified
11   that he heard hearsay statements about a 4,000
12   number.  So it is just that.  So I will object to
13   counsel's characterization of this as fact.
14           MR. NEWMAN:  Okay.
15           MR. TYLER:  This 4,000 number.
16           MR. NEWMAN:  Okay.
17           THE WITNESS:  So the question is what?
18   BY MR. NEWMAN:
19        Q    The question is are you aware of data
20   points that are obtained from applications that
21   come into the lockbox?
22        A    I am not aware of specific data points.

Page 194

1    Q    Okay.  You stated earlier that you were
2  aware of information sharing policies but not
3  involved in the development of the policy.  Are
4  both of those statements about your earlier
5  statement correct?
6         MR. TYLER:  I'll object.  Compound.
7         THE WITNESS:  What is the first part of
8  that question?
9  BY MR. NEWMAN:
10   Q    Okay.  I will ask it separately.  Do you
11  recall stating earlier that you were aware of
12  information sharing policies generally?
13   A    Yes.
14   Q    Is it accurate to state that you
15  testified earlier that you were not involved in
16  the development of the policies?
17   A    That's difficult for this reasons; I
18  didn't have a role in developing, in deciding what
19  the policy would be.  I was engaged in discussions
20  about the wording that was used on the -- you
21  know, around the signature block on the form
22  itself.

Page 195

1    Q    When you say form, are you referring to
2  the form that the applicant needs to file?
3    A    The form I-821D.
4    Q    Are you involved in any way in
5  evaluating information sharing requests regarding
6  the information on these forms?
7         MR. TYLER:  I'll object.  Vagueness.
8  Vague.
9         THE WITNESS:  I'm confused about what --
10  what do you mean by information sharing and
11  involvement?
12  BY MR. NEWMAN:
13   Q    I will represent to you that there may
14  be requests at various times from different people
15  both within Department of Homeland Security and
16  outside the Department of Homeland Security to
17  obtain information regarding DACA applicants.
18   A    I would not be involved in handling
19  those requests.
20   Q    Do you know who is?
21   A    It would depend on what the request
22  specifically was.

Page 196

1    Q    Can you delineate the different manners
2  in which requests would be made for information
3  and who would handle those?
4         MR. TYLER:  Objection.  Compound.
5  Vague.
6         THE WITNESS:  So depending -- I don't
7  have a lot of personal knowledge about how
8  information is shared with other components in the
9  department or externally.  I am aware, unless it
10  has changed, that there -- I believe there is a
11  form that an individual in ICE can submit to
12  request information.  Other than the general
13  awareness that that form exists I don't know who
14  processes it or what the content is or anything
15  along those lines.
16  BY MR. NEWMAN:
17   Q    Who does process it?
18   A    I just -- I don't know.
19   Q    Do you have any indication of what
20  bureau or sub-unit of the Department of Homeland
21  Security processes it?
22   A    No.  This -- the context that I'm

Page 197

1  talking about it would be a request coming into
2  USCIS from another component outside of USCIS
3  asking for information.  I don't know who would
4  process that.  You know, what information they
5  have to review or anything.  Just generally aware
6  that there is a form for that.
7    Q    At any point are you made aware of
8  whether a request is granted?
9    A    No.
10   Q    Do any of your subordinates have
11  responsibility for collating data?
12        MR. TYLER:  Objection.  Vague.
13        THE WITNESS:  If you mean in reference
14  to responding to a information request?
15  BY MR. NEWMAN:
16   Q    I'm sorry.
17   A    Then my guess here is that it depends on
18  where that information exists.  So it would not
19  surprise me that I have people in service
20  center -- in service centers responding to
21  requests.  But I'm personally not involved in that
22  and I have not had visibility much into the

DONALD NEUFELD                                              10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                 198..201

Page 198

1  specifics of that process.
2      Q   So just --
3      A   These are requests for records, is the
4  context that I'm talking about.  Not data about
5  like the number of people filing or anything.
6  It's about specific information that's tied to a
7  specific individual.  So those are records
8  requests.
9          The records policies are not managed by
10 SCOPS, they are managed by our records division in
11 the -- I forget the name.  The IRIS director.  But
12 I don't remember what I-R-I-S stands for.
13         And many records are housed by that
14 director under that division.  And so I would
15 imagine many of these requests would be processed
16 by them.  If they relate to an active file that we
17 would have in our holdings then I'm sure that we
18 are involved in some way, my staff would be
19 involved in some way in responding to that.  But
20 to what level or what decisions they have to make
21 I'm not personally knowledgeable.
22     Q   Would the process that you just

Page 199

1  delineated be the process whether it comes from
2  within the Department of Homeland Security or
3  outside of the Department of Homeland Security or
4  would there be a different process?
5      A   I don't know of any other process.
6      Q   Okay.  Would the same process apply for
7  both Immigration and Customs Enforcement as for
8  Customs and Border Patrol?
9          MR. TYLER:  Objection.  Vague.
10         THE WITNESS:  The form that I was
11 referencing, I believe, I'm not certain.  I
12 believe it's for use by any other DHS component
13 that would include CBP or ICE.
14 BY MR. NEWMAN:
15     Q   Do you have actual knowledge of any
16 instance in which one of your subordinates was
17 involved in collecting information in response to
18 one of the requests that we have just been
19 referencing?
20         MR. TYLER:  Objection.  Vague.
21         THE WITNESS:  I -- I don't have
22 knowledge of specific requests and how they were

Page 200

1  handled.  I know that we have at each service
2  center there is a background check unit and there
3  is a center fraud detection office component.
4  Either of those components can interact with law
5  enforcement to include ICE and CBP.  And I don't
6  know -- I don't have visibilty to the day-to-day
7  interactions that happen with respect to specific
8  case handling.
9  BY MR. NEWMAN:
10     Q   Are you aware of any changes in policy
11 regarding handling of requests for information
12 within the last year?
13     A   No.
14     Q   Have you ever been involved -- you
15 testified earlier -- I will stop.  Let me rephrase
16 the question.
17         You testified earlier that you had not
18 been involved in the winding down of any other
19 deferred action program.  Is that correct?
20     A   Well, I took issue with calling them
21 programs, but I have not been involved in changes
22 that would affect large numbers of deferred action

Page 201

1  requests.
2      Q   Okay.  So my question is a little
3  broader than that.  Have you been involved in any
4  capacity with the winding down of any program in
5  your federal government career?
6          MR. TYLER:  Objection.  Vague.
7          THE WITNESS:  I have a long career and
8  over the course of that career laws have been
9  enacted that changed things and so I have been
10 involved in those.  I have been involved in the
11 sunset of 245(i), numerous other statutes that
12 have expired or changes that have been made by
13 Congress, policy changes from administrations.
14 BY MR. NEWMAN:
15     Q   And you reference that you had an issue
16 with calling it -- with calling DACA a program?
17     A   Well, not so much whether DACA is a
18 program, but you were asking me whether I had been
19 involved in the wind down of other deferred action
20 programs.  And I wouldn't personally categorize
21 the other context in which we make decision about
22 deferred action as being related to -- as being

DONALD NEUFELD                                      10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE                202..205

Page 202

1  programmatic.  So in the T, U, and VAWA -- the T,
2  U, and VAWA adjudication, that's a program in my
3  mind.  Deferred action goes along with those
4  programs, but it is not an independent program.
5      Q    So are you aware of any other programs
6  that you just referenced as independent programs?
7      A    Involving deferred action --
8      Q    Involving deferred action?
9      A    -- that SCOPS adjudicates?  No.
10     Q    Does the VAWA program utilize renewal
11 notices for people to renew their status under
12 that program?
13     A    No.
14     Q    Does the U visa program utilize renewal
15 notices to renew status under that program?
16     A    I don't believe so, no.
17     Q    Does the T visa program utilize renewal
18 notices to renew status under that program?
19     A    Not that I'm aware of, no.
20     Q    When you were first assigned the
21 responsibility of overseeing the wind down process
22 within -- by your subordinates of DACA program,

Page 203

1  did you come up with a plan or some other road map
2  to guide your subordinates in engaging in the wind
3  down?
4      A    It depends on what you mean by plan.  So
5  we need -- we are in the process of figuring out
6  the allocation of resources for the coming year
7  and so as we are working on that larger -- you
8  know, allocation of resources.  The DACA workload
9  is one of them.  And yes, we are aware of the fact
10 that the DACA program is going away so we will
11 consider that in how we allocate resources.  But
12 that's pretty much the extent -- extent of it.
13 From an operational perspective our work just goes
14 away.
15     Q    When you use the word resources do you
16 mean anything other that employees or staff?
17     A    No.  I mean staff.
18     Q    Okay.  Are there any nonemployee costs
19 associated with the wind down of the DACA program?
20     A    Do you mean costs that are incurred
21 because the program is winding down?
22     Q    Yes.

Page 204

1      A    I'm not aware of any other than whatever
2  costs there are with notices and with the
3  communications strategy, that sort of thing.  I'm
4  sure there is a cost to that.
5      Q    Did you have any contracts in place with
6  contractors to assist with the administration of
7  the DACA program?
8          MR. TYLER:  Objection.  Vague.
9          THE WITNESS:  We have contractors in --
10 that SCOPS utilizes at the service centers in
11 support of all of the benefit requests that we
12 handle there including DACA.  And so frankly,
13 those expenses will be reduced when the DACA
14 workload goes away.
15 BY MR. NEWMAN:
16     Q    So when you say the expenses are being
17 reduced are you terminating contracts?
18     A    No.
19     Q    So are there services for which you have
20 contracted to implement DACA that you are now not
21 going to be utilizing as a result of the
22 non-implementation of DACA?

Page 205

1      A    We -- SCOPS has one contract that would
2  be impacted at all by DACA, that's the overarching
3  contract that provides basic essentially clerical
4  services at all of the service centers.  And for
5  the most part those services are paid for by the
6  piece.  And so when the work is reduced then we
7  pay them less because they are doing less work.
8  But there is not a contract that is going away
9  because of DACA.
10     Q    Okay.  We spoke a little earlier about
11 the strategic plan that you put in place for the
12 wind down of DACA.  Is that correct?
13     A    You asked me a question.
14     Q    Is there any point at which that
15 strategic plan has been not been fulfilled or
16 there have been any issues with the implementation
17 of that strategic plan?
18         MR. TYLER:  I'll object, compound.  I'll
19 object on grounds, vague.  What you mean by
20 strategic plan.
21         THE WITNESS:  If you could restate the
22 question that would be helpful.



DONALD NEUFELD                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE              206..209

Page 206

1  BY MR. NEWMAN:
2      Q    Have you had any technical difficulties
3  with the wind down of DACA?
4      A    No.
5      Q    Did you have to engage in any training
6  of the line staff related to the wind down
7  process?
8      A    No.  As I said, the main operational
9  impact here is that the workload is going away, so
10  that the important thing for employees to
11  understand is that it is going away and when its
12  going away.  The actual adjudications aren't
13  changing that I can -- I can't think of anything
14  that's changing specifically with respect to the
15  adjudications.
16          What will be important for them to
17  understand -- because the cases have not been
18  delivered for adjudication yet.  They will need to
19  understand that for example the six cases that are
20  being accepted after the filing deadline, that
21  those are okay to process even though the memo
22  would indicate that they can't be accepted after

Page 207

1  October 5.
2      Q    Do you have any plans to train them on
3  the processing of additional applications like you
4  just delineated?
5          MR. TYLER:  Objection.  Vague.
6          THE WITNESS:  These are precisely six
7  cases, so it's not going to involve a lot of
8  training.  It would be just conveying to the folks
9  who adjudicate them that they are okay to process.
10  BY MR. NEWMAN:
11      Q    And how do you intend to communicate
12  that?
13      A    I actually haven't thought of that yet.
14      Q    You said you were asked about the costs
15  associated with the wind down of DACA and you
16  replied that there were costs?
17          MR. TYLER:  I'll object to counsel's
18  characterization of the testimony.
19          THE WITNESS:  I don't recall saying
20  that.
21  BY MR. NEWMAN:
22      Q    Okay.  Were you ever asked about costs

Page 208

1  of winding down DACA?
2      A    No.
3      Q    Do you anticipate that you will have any
4  remaining workload on DACA following the March 5
5  termination date of DACA?
6          MR. TYLER:  Objection.  Speculation.
7          THE WITNESS:  We are projecting that we
8  will still have work remaining to be adjudicated
9  after March 5.
10  BY MR. NEWMAN:
11      Q    What will that work consist of?
12      A    Whatever cases that we have not gotten
13  around to completing.
14          MR. NEWMAN:  Okay.  I have no further
15  questions.
16          MR. TYLER:  Done?
17          MR. NEWMAN:  Do we need to confer before
18  we terminate?
19          MR. TYLER:  Off of the record.
20          THE VIDEOGRAPHER:  We are going off of
21  the record.  The time is 2:38 p.m.
22          (The proceeding recessed from 2:38 p.m.

Page 209

1  to 2:40 p.m.)
2          THE VIDEOGRAPHER:  We are back on the
3  record.  The time is 2:40 p.m.  We are off of the
4  record at 2:40 p.m.  And this concludes today's
5  testimony given by Donald Neufeld.  Total number
6  of units used is four and will be retained by
7  Veritext Legal Solutions.
8          (Whereupon, at 2:40 p.m., the above
9  proceedings was adjourned.)
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 210

```
1              REPORTER'S CERTIFICATE

2         I, DONNA M. LEWIS, RPR, Certified

3  Shorthand Reporter, certify;

4         That the foregoing proceedings were

5  taken before me at the time and place therein set

6  forth, at which time the witness, Donald Neufeld,

7  was put under oath by me;

8         That the testimony of the witness, the

9  questions propounded and all objections and

10 statements made at the time of the examination

11 were recorded stenographically by me and were

12 thereafter transcribed;

13        I declare that I am not of counsel to

14 any of the parties, nor in any way interested in

15 the outcome of this action.

16        As witness, my hand and notary seal this

17 19th day of October, 2017.

18

19         _____

           Donna M. Lewis, RPR

20         Notary Public

21 My Commission expires:

   March 14, 2018

22
```



DONALD NEUFELD
10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE
Index: --(mumbling)..additional

---

**Exhibits**

**Newfeld 38**

**Newfeld 39**

---

**-**

--(mumbling) 9:4

---

**1**

**1** 7:12 57:2,3,4,7 62:2 69:9, 15,21 81:12

**10:41** 81:12

**10:42** 81:13

**10:55** 81:14,16

**11:59** 133:5,6

**120** 43:18 44:13 45:4 50:8

**12:57** 133:7,10

**15** 173:13,16 179:19 180:11

**150** 50:8,11

**16** 58:9

**1620** 7:20

**17** 157:3

**18** 7:3 174:9,12,21 180:21

**180** 44:13 45:4 69:18

**1983** 18:15

**1:16-CV-04756(NGG)( JO)** 7:18

**1:23** 156:15,17

**1:26** 156:17,19

**1:52** 179:7,10

**1:55** 179:11,13

---

**2**

**2** 81:16 133:5

**20** 97:12

**200** 31:4

**2003** 17:20 18:5

**2007** 17:12

**2009** 17:7

**2010** 16:16 17:4 18:5 141:5 142:12

**2012** 33:2 43:5 97:11 141:8 176:2 179:19 180:11

**2015** 172:4 176:19 177:3

**2016** 44:3,4 62:2 69:9,15 81:22 82:21 186:10

**2017** 7:4 58:9 59:11 69:21 86:18 98:12,21 100:5 102:16 103:2 106:19 114:22 115:17 118:14 120:1 125:17 133:14 137:17 139:9

**2018** 97:12 120:12

**22,000** 115:10

**24** 175:18,20 176:11

**245(i)** 201:11

**25** 115:17

**252** 179:17

**253** 180:2

**256** 179:18

**29** 120:19

**2:05** 190:5,7

**2:16** 190:7,10

**2:38** 208:21,22

**2:40** 209:1,3,4,8

---

**3**

**3** 28:10 35:15 39:9,13 59:2 61:10,14 62:5,8,22 63:14 64:7 69:6,14 70:13,20 71:16 72:14,21 73:2 74:6 82:11,13 133:10 177:21 178:5,21 179:1,8,16

**30** 154:11 172:4 176:19 177:3 186:10

**30-day** 154:17

**300** 31:1

**31** 34:11 58:13 61:19 69:5, 10

**38** 58:2,3 171:12

**39** 171:13,15 180:21

---

**4**

**4** 190:10

**4,000** 139:20 153:20,22 154:2,8 155:16 190:19 191:1 193:4,11,15

**40** 178:15 179:3

**400** 30:15

**4th** 7:21

---

**5**

**5** 86:17 87:5 88:16,18 90:9, 10,12,15 91:13 92:5,11,16 94:11,13 95:3 96:20 97:14 98:12,21 99:16,19,21 100:5,7,10,13,18 102:16, 20 103:2,6,7,15 104:6 105:1 106:19 107:11,16, 19,22 108:3,11,17 109:3 110:19 111:2 112:2,14 113:3,18 114:1,5,10,22 115:17 117:18 118:14 119:1 120:1,5,6,8,12 125:17 127:6,20 128:5,17 132:11,14 133:14 137:16, 21 138:6,8,16,21 139:5,7, 9,18 140:10,11 152:14 153:11,14,19 154:10,12,13 155:3,18 190:21 191:2 207:1 208:4,9

**5th** 78:14

---

**6**

**60** 45:21 47:19 48:2 49:11 134:7 142:3 165:21

---

**8**

**800,000** 185:8 186:6

---

**9**

**9:16** 7:3

---

**A**

**a.m.** 7:3 81:12,13,14,16 133:6

**ability** 13:6 176:13,15,19

**abroad** 38:1

**Absolutely** 101:21

**accept** 27:17 108:12 110:2 111:11

**accepted** 27:19 29:2 110:4,6,9 111:5,8 116:7,8 152:19,20,21 153:1 206:20,22

**Accompanying** 19:7

**accuracy** 157:16,22

**accurate** 12:6 13:6 175:10 181:9,17 185:21 190:18 191:6 194:14

**achieve** 158:10 159:4,12

**Act** 19:4 31:16 188:15 189:11

**acting** 20:11,12,17,20 40:1 86:17 96:15 106:6 108:6,7 122:13 124:13,16 125:2 140:3 148:2 183:17 184:4

**action** 8:6 19:6 33:1,14 110:10 142:14 143:19 144:5,11 160:4,5 174:1,5, 16 175:22 177:13 188:11, 19,21 189:3,9,21 200:19, 22 201:19,22 202:3,7,8

**active** 198:16

**actively** 117:7

**activity** 148:15

**actual** 112:5 199:15 206:12

**added** 85:20 121:16

**addition** 57:17

**additional** 32:17,18 57:8



DONALD NEUFELD

MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

10/18/2017

Index: address..attorney

70:9 190:16 207:3

**address** 12:13 101:8

**addressed** 66:7

**adjourned** 209:9

**adjudicate** 34:21 82:17 141:22 207:9

**adjudicated** 29:12 62:1 69:8 81:21 82:12 185:6,8 186:3,5 208:8

**adjudicates** 202:9

**adjudicating** 19:3 34:17 183:15

**adjudication** 202:2 206:18

**adjudications** 42:4 188:14 206:12,15

**adjudicator** 36:7 37:3 41:17 173:20 174:1,5

**adjudicators** 30:15 32:21 33:4,11 34:16,18 35:4 40:9 185:6

**adjust** 144:2

**administer** 8:4 162:21

**administering** 163:12

**administration** 83:16 143:13 204:6

**administrations** 201:13

**administrative** 177:21 178:12,18,22

**adopted** 48:16

**advance** 37:22 38:5 43:21 47:2 50:9,11

**advocacy** 44:14,19 169:19 186:22 187:6

**advocating** 168:13

**affect** 130:18 200:22

**affected** 113:19

**affiliations** 8:10

**afternoon** 14:8

**afterward** 153:15

**AG's** 124:10

**age** 34:11

**agency** 18:14 19:21 39:16, 17 45:14 62:10 72:5 81:2 105:22 106:4 112:3

**agency's** 80:14

**agenda** 23:2,7 79:12

**agendas** 23:4

**agree** 7:10 174:4,18 175:9 176:4 184:4,5

**agreed** 11:4

**ahead** 110:1 134:8

**Alex** 64:12,13 65:1 75:4 96:11 182:20

**Ali** 46:7 169:17

**allocate** 203:11

**allocation** 203:6,8

**allowed** 165:11,12

**alongside** 157:4

**aloud** 174:12

**America** 171:20

**analyses** 158:13,18 160:6 161:2,5,8 162:9 163:13,22

**analysis** 162:1,20

**Andrew** 9:5

**announced** 108:11

**announcement** 78:14 126:6

**anticipate** 191:7 208:3

**anticipation** 92:1

**apologize** 61:11 163:1 192:11

**appearance** 8:12

**appearances** 8:10

**appeared** 180:9 181:6

**applicant** 26:7 35:13 38:3 180:9 181:6 195:2

**applicant's** 35:13 69:19

**applicants** 25:15 26:20

27:1 33:15 35:18 38:21 40:5,9,13 49:17 50:5 83:11,20 84:5 113:4 114:5, 11,14 133:16 134:20 136:13,19 148:13 160:9 166:6 195:17

**application** 24:12,14 25:3, 15,20 26:3,19 27:1,12,14, 19 29:6 32:1 34:3 35:13 38:17,20 40:10,14 41:19 133:13 136:21 180:12 192:14

**applications** 19:7 20:3 22:20 24:1,3,15,17 25:9,13 26:14 27:4,5 29:2,10,20 30:2 31:5,6,11 35:18 36:16,18 39:6,12 43:12 62:4 73:14 74:2,15,18 82:22 83:1 98:11,13,20 100:4,14,15,18 102:2,15, 22 103:1,5,6,14,16 104:1 105:2 106:13,17,18 108:5, 17 110:16,17,18 111:2 112:16,18 113:12,14 115:4 116:3,7 120:2 133:18 134:21 137:2 138:15,20 140:16,18 152:14,15 153:6 154:8,11,16 155:12,20 165:8 190:20 191:11,15 192:15,20 193:5,20 207:3

**applied** 135:5

**applies** 123:17 131:21

**apply** 50:11 80:15 83:12 84:16,17 133:16 134:1 153:1 199:6

**applying** 44:16

**apprized** 21:16 22:9,15,19

**approvable** 32:15

**approval** 33:15,18 38:21 39:1,3 40:22 41:3,21 70:8

**approve** 27:16 32:16,22

**approved** 27:15 33:15 35:14,19 38:20 41:19 152:18

**approximately** 29:19 30:5,19 62:1 67:2 69:8,15, 21 81:22 105:8 107:14 153:22 193:6

**areas** 107:12

**Argumentative** 90:1 127:2

**arguments** 81:4

**arising** 22:5

**Aronov** 7:22

**arrangement** 86:3

**arrivals** 19:6 143:20

**arrived** 34:11 78:3

**arrives** 32:1

**arriving** 24:22

**Arroyo** 96:13

**asks** 145:5

**aspect** 162:3,14

**aspects** 167:6

**assigned** 36:7 136:1 202:20

**assist** 14:1 204:6

**associate** 16:4,15,21 17:2 19:13 20:7 21:2 96:15 106:7 109:16 133:15 140:4 141:4 146:10

**assume** 12:2

**assumed** 116:13 117:9

**Assumes** 138:22

**assumption** 116:15 119:14,20

**attached** 25:4

**attachments** 53:21

**attempt** 67:9 68:1

**attempted** 67:17

**attend** 119:10

**attended** 119:5 169:17

**attending** 8:9

**attention** 22:5 179:22 185:4 193:1

**attorney** 8:13 9:17 12:11, 14,17,19 80:6 87:20 91:9 120:19 122:11 123:3 127:17 147:12,17 150:14

Olender Legal Solutions
A Global Litigation Solutions Company

888.445.3376
202.898.1108

www.olenderreporting.com
Worldwide Coverage

157:1 190:14

**attorney/client** 80:5,20
87:19 88:2,6 91:9 127:16
150:14

**audio** 7:9

**audio/video** 7:9

**August** 69:21 117:18

**authorization** 19:7 33:19
39:4

**authorize** 144:8

**authorized** 8:4 188:19

**automated** 32:6 37:7 38:9

**automatic** 58:16

**automatically** 38:14
176:14

**autonomous** 73:8

**average** 161:9

**aware** 43:4 51:18 52:11,
13,14 54:11,14,17,21
63:17,22 64:1,10,17 67:21
74:20 75:2 87:15 88:9
92:11 109:1 111:21 112:3
113:13,16,17,22 115:18,21
116:2,6,11,19 118:15
119:1,4,7,9,13 120:18
121:3,8,9,14 122:11
126:20 128:9 132:1 133:15
136:12 143:7,10 144:22
146:3,11,13,15,18,22
147:4,8 148:12 165:6,9,13
166:4,12 168:2,4 181:13
187:6,9,10,12,13,16,17,20
188:1,2,8 189:8,14,15,20
191:21 192:1,21 193:4,19,
22 194:2,11 196:9 197:5,7
200:10 202:5,19 203:9
204:1

**awareness** 102:7 112:20
120:22 166:7 196:13

---

**B**

**back** 26:7,15 29:17 35:12
49:6 72:7 81:18 106:5
109:16 122:7 133:8,12
138:10 150:11 156:18
167:21 179:12 183:8 185:1

190:8 209:2

**background** 32:7,8 37:8,
20 200:2

**backlogs** 22:6

**Baco** 136:2

**Bailey** 10:1

**banks** 26:18

**based** 34:17 180:12 193:3

**basic** 205:3

**basically** 37:19 121:15
169:20

**basis** 21:14 68:12 89:22
111:11 116:15 119:20
155:21 173:20 175:22
177:4

**Batalla** 7:15 156:11 157:5

**Bates** 179:16,17 180:1

**bear** 80:21

**began** 50:10 141:4

**begin** 11:3 16:14 17:5
34:20

**beginning** 8:13 24:10,14
42:7,8 50:20 58:16 65:19
81:15 97:2 117:10 130:7
133:9 190:9

**begun** 17:12

**behalf** 9:17,20 10:2,4,7,9
11:14 171:3 190:11,15

**belief** 84:4

**belongs** 136:7

**benefit** 19:3 31:15 141:22
188:14 204:11

**benefits** 144:4,16 145:1,
10,12,16 146:2

**bit** 18:21 61:11 133:13

**biweekly** 125:14

**block** 194:21

**Bob** 136:2

**Border** 199:8

**bother** 66:3

**bothered** 66:5

**branch** 64:14 96:12 136:2,
9 182:22

**break** 81:7 158:16

**briefly** 80:9

**bring** 21:21 22:11 90:21

**broader** 201:3

**brought** 13:22 185:3

**build** 65:18 66:8,17,21
67:9,13,18 68:1,5 75:16

**building** 68:7,18

**bunch** 135:2

**burden** 80:16

**bureau** 196:20

**Burling** 9:8 171:6

**business** 161:6

---

**C**

**calendar** 105:10,14,17,20

**California** 9:9,20,21 17:16
30:12 31:7 171:7,8 190:14,
15

**call** 112:19

**called** 104:13,16 106:20
143:19,20 178:1

**calling** 200:20 201:16

**calls** 89:16 122:19 123:6,9
158:15 168:17

**campaign** 86:22

**capabilities** 35:1 67:14
72:13 75:15,19 78:21
82:16 85:20

**capability** 52:1,3 53:16
54:19 55:11 56:8 64:5,11
66:8,14,18,21 68:11 74:21
75:3,7,14,16 76:6,13 77:8

**capacity** 20:11 71:9 122:4
167:22 201:4

**capture** 191:14 192:5

**career** 15:16 201:5,7,8

**Carlos** 9:10,12

**Carolina** 9:15

**Carrie** 20:13,14 96:15

**case** 7:17 14:17 15:11
34:13 38:8,13 72:14,20
73:1 74:6 80:13,15 82:12
111:11 135:6 155:20
171:20 172:3 173:4,5,20
175:11,13 181:5 182:13
185:9 186:1,3,4 200:8

**cases** 30:9,11 34:19 35:1
37:10,13,14 69:19 70:7
82:17 102:8,20 109:21
114:17 135:3 136:11
149:13 159:2 160:3 169:21
171:9 176:7 180:8 181:14,
15,20,21 182:1,4,6,15,17
183:12,15,17,19 184:7,17,
19,21,22 185:6,7 192:22
206:17,19 207:7 208:12

**categorical** 180:10 181:7

**categories** 31:16

**categorize** 176:22 201:20

**category** 174:6

**caught** 41:7

**caused** 154:11

**CBP** 199:13 200:5

**CCED** 53:6

**cell** 7:7

**cellular** 7:6

**center** 9:2,4 16:5,7 17:15,
16 19:20 20:8,17 21:1
22:5,17 23:1 29:17 30:6,
10,12,19,21,22 31:2,3,12,
18 32:2,10 36:7 157:11
197:20 200:2,3

**center's** 31:19

**centers** 18:20,22 19:2,16
21:5,17 29:3,5,11,13
30:16,18 31:8,10 36:17
101:5 157:13 164:17
183:15 197:20 204:10
205:4

**CFO** 163:11

**chain** 20:21 92:8,10



**chairs** 170:18

**challenging** 80:13

**change** 43:22 44:8 92:1 97:9 156:13 163:3 166:12 187:1 189:21

**changed** 28:9 30:8,14 36:2 40:14 42:10 43:5,16, 20 44:13 50:6 72:16 196:10 201:9

**changing** 45:4 206:13,14

**characteristics** 160:17

**characterization** 121:13 189:1 193:13 207:18

**characterize** 97:22 107:21 108:1 111:14,16,17 128:6

**characterized** 121:21 127:9

**check** 38:3,5 200:2

**check-in** 21:20 22:13 125:14

**check-ins** 22:2,22 23:10, 13

**checks** 32:7,8 37:8,9,20 38:13

**Chen** 8:14 10:20,21 11:9, 13,15 28:14 42:21 43:9 44:11 49:1 54:10 55:13 56:22 57:6,10,16,21 58:5, 18,19 60:1 61:2 65:15 66:11,19 67:16 70:17 71:5, 20 74:13 75:11 76:9 77:2 80:8 81:17 83:17 84:3 85:10 87:14,21 88:8,13 89:5,8,20 90:4 91:4,11,16, 21 92:6 93:3,9,16 95:21 96:6 102:21 103:18 111:9 114:19 116:1 117:5 118:19 119:16 121:19 123:1,13 124:11 127:7,18 128:8 129:1 130:10 131:13,20 133:11 138:5,12 139:3,15 144:19 145:8 146:1,9 147:11,18 148:16 149:2,18 150:20 151:6,13 152:5,12 155:11 156:10

**chief** 17:10 39:19,21 40:1 54:3 64:14 96:12,13 106:8,

9 108:8,9 136:3 162:22 168:1 182:22

**childhood** 19:6 143:19

**circle** 133:12

**circumstances** 185:3

**cited** 146:14

**citing** 131:12

**citizen** 175:5 181:1

**Citizenship** 10:4,11

**claimed** 175:5 180:22

**claims** 28:10 35:15 39:9, 12 59:2 61:10,14 62:5,8,22 63:14 64:7 69:6,14 70:12, 20 71:16 72:14,21 73:1 74:6 82:11,13

**clarification** 28:12 117:2 170:11

**clarify** 30:8 40:15 81:20 101:20 102:4 140:11

**clear** 17:12 35:21 123:5, 14,19 127:4 131:14 132:6 133:22 150:18 167:18 169:16 178:7

**clerical** 205:3

**closely** 34:19

**closer** 31:1

**co-authored** 142:12

**co-authoring** 142:16,18

**codified** 41:14

**collating** 197:11

**colleagues** 19:20 122:6 124:9 130:15

**collecting** 199:17

**collection** 160:7,8

**collectively** 142:5

**command** 20:22 92:9,10

**commonly** 148:21

**communicate** 56:15 63:9 85:6 92:7 207:11

**communicated** 22:1 52:14 55:7,10 85:3 112:4

117:20 119:18 131:1,3,16 132:11,14

**communicates** 84:16

**communication** 26:5 33:22 52:16 54:12 92:13 96:18 112:5 115:12 147:9 183:14

**communications** 51:21 52:5,8,9,12 54:5,15 76:15 84:15,20 85:6,12 94:3,19 95:9,10,13 96:9 147:4,16, 19 204:3

**community** 168:13

**compile** 21:13

**compiled** 160:22 161:8

**compiles** 136:3

**complaining** 44:15

**complete** 13:7,10

**completed** 38:13 135:7 159:2

**completely** 70:15

**completeness** 25:1 26:14

**completing** 208:13

**completion** 27:10 37:10

**completions** 159:4,12

**complicated** 20:16

**component** 16:12 18:18, 19 25:4 30:13 84:15 197:2 199:12 200:3

**components** 85:16 94:22 196:8 200:4

**compound** 194:6 196:4 205:18

**comprised** 45:13

**comprises** 157:3

**concern** 83:14,15 114:16

**concerned** 65:12 83:11 114:13

**concerns** 170:3

**conclude** 153:11

**concluded** 153:5

**concludes** 209:4

**conclusion** 153:9

**conditions** 13:5

**conduct** 32:7

**conducted** 24:1 37:9 38:12

**confer** 208:17

**Conference** 7:20

**conferencing** 21:12

**confident** 15:20 36:3 39:9

**confused** 76:18 85:1 195:9

**Congress** 201:13

**consideration** 128:12,20 129:6,18 130:1

**considerations** 130:12

**considered** 46:12 113:3 114:2 145:17,18 146:3,8 149:15 170:3

**consist** 208:11

**consistent** 176:6 177:14

**constant** 158:7

**consult** 12:17 73:19 74:1 111:15 139:4

**consultation** 48:14 49:3 74:4 91:5 138:2

**consultations** 90:11,12

**consultative** 124:3 127:13 131:7

**consulted** 48:10 63:2 90:5,8 106:12,14 111:10 112:20 119:22 120:4,11 137:21 142:7 185:13,15 187:7

**consulting** 73:9

**consultive** 122:20

**contact** 21:4,7,9

**contacted** 187:14,21 188:6

**contemporaneous** 55:3



**content** 35:6 80:3 196:14

**contents** 131:17 143:7

**context** 157:22 159:5,7
163:8 166:17 167:9,10
169:8,14 196:22 198:4
201:21

**continuation** 178:8

**continue** 7:10 66:9

**continued** 69:17

**continues** 167:15

**contract** 26:17 86:10,13
135:16 205:1,3,8

**contracted** 86:9,12
204:20

**contractor** 32:5 36:8
134:16 135:9,10

**contractors** 204:6,9

**contracts** 204:5,17

**control** 34:15

**conversation** 53:3 112:12
117:11 118:1,4,6,9 124:20
130:19

**conversations** 7:6 45:16,
18,20 46:2,4,17 63:13
97:11,18,21 112:8 119:15,
17 122:6,9 124:9 126:7,10,
14 127:21 128:11 130:6
131:7 148:5 149:4 150:2
152:4 166:2

**convey** 187:4

**conveyed** 75:17

**conveying** 207:8

**cooler** 124:8

**copies** 57:9,15,19 171:13

**copy** 57:6,10,13,21

**correct** 24:4,5,16 25:1,6
26:1,16 27:12,13 31:8,9,11
59:4,12 69:9,13,21 70:2,3
82:1,5 85:19 90:17 106:1
110:21 141:5,6,8 148:3
150:3 152:16,17 153:7,20
163:5 166:13 172:14
176:17 180:14,18 194:5
200:19 205:12

**cost** 68:16 71:8 76:10
158:11 163:8 204:4

**costs** 55:17,18 56:3,4,7,9,
12,16,19 59:18 60:5 68:9,
10,18 71:11 76:1,3 85:18
162:20 163:3,4,11 203:18,
20 204:2 207:14,16,22

**counsel** 7:14 8:8 10:7
11:4,5,9 13:14,17 14:3,7
46:9 57:9 106:9 108:9
122:20 124:1,4 131:9
156:13 178:21 193:10

**counsel's** 121:12 188:22
189:18 193:13 207:17

**country** 145:15 148:18
151:9

**couple** 101:11 172:17
175:18 183:8 186:20

**court** 7:16 8:2 9:11 10:13
12:5 15:7 16:8 28:11 57:1,
22 117:1 121:1 143:22
150:18 170:11,12,16,20,22
178:2,14 190:3

**Covington** 9:8 171:6

**Cox** 10:6 178:17

**Craig** 108:8

**create** 103:22 158:18

**created** 18:1 23:2,5 51:9,
13

**creating** 163:4

**creation** 18:10 143:2

**crimes** 47:5

**criminal** 148:14

**criminals** 148:6,9,13
150:6 151:1

**criteria** 32:21 33:2,5,6,7,
10 34:10,17 152:22 180:10
181:7

**Crutcher** 9:6

**curious** 85:19

**current** 16:2 36:3 43:19
141:10 154:9 166:5

**customer** 85:13 94:3

**Customs** 199:7,8

────────────

**D**

────────────

**DACA** 19:9 20:2 22:20
24:1,3,9,11,15,17 27:5
29:6,10 30:2 31:5,6,11,13,
18 32:1 37:18,21 38:2
40:4,5,7,9,13 42:3,5,10,13,
14,17,19 43:4,11,19 44:17
45:11 49:16,17,22 50:5,16,
20 61:13,21 62:4 64:14,16
68:21 69:7 73:13 74:2,6,
15,18 76:17,22 77:10,17
78:8,15 79:11 80:21 81:1,
4,21 82:21 83:5,11,20
84:4,9,13,21 85:3,7 86:16,
18,20 87:3,7,13,16 88:10
89:2,15 90:6 92:2,8,19
93:4,18,21 95:9,10 96:10,
12 97:1,2,3,5,17 98:1,4,8
111:1 114:21 115:3,19
116:12,19 117:8,12 118:16
119:3 120:20 121:6,11,16
122:13 124:5,13,16,19,20
125:8,15,18 126:19,21
127:10 128:1,13,16,21
129:6,16,19 130:1,7,12,16,
22 131:22 132:5 133:13,16
134:20 136:13,19 137:19,
20 141:7,11,14,17 142:8
143:17,19 144:16 145:7,
10,18 146:4,12,20 147:6,
19 148:3,6,8,14,17 149:6,
9,20 150:3,5,22 151:8,15,
18,22 152:1 157:20 159:7,
14,21 160:9 161:3,6,9,11,
14,15,17,20 162:2,10
163:9,14,22 164:5,13,20
165:3,7 166:6,17 167:2,6
168:11,14 169:19 173:19,
22 174:6,7,14 175:4,8,13,
14 176:2,8,9,14,16,20
177:3,10,16 180:5,22
181:4 182:22 184:18
187:8,10,15,17,22 188:2,6,
7,11 195:17 201:16,17
202:22 203:8,10,19 204:7,
12,13,20,22 205:2,9,12
206:3 207:15 208:1,4,5

**daily** 89:22

**Dan** 46:9

**data** 28:1,3 135:2 136:12
160:2,7,8,21,22 161:2,5,8
191:10,14,16,18,21 192:5,
13,14,17,18 193:2,7,19,22
197:11 198:4

**database** 163:3

**date** 14:22 18:2 34:12
78:13 87:8 100:9 120:14
140:12 155:19 176:18
208:5

**dated** 58:9 59:10

**dates** 55:5 104:20 105:6

**dating** 49:6

**David** 8:14 10:21

**day** 43:18 126:7 154:12
165:22 171:10 177:2

**day-to-day** 200:6

**days** 43:18 44:13 45:4,13,
21 47:4,19 48:2 49:11
50:8,11 69:18 99:22
101:11 107:16 108:10
142:3

**deadline** 91:13 107:20,22
108:3,11 113:4,18 114:1,5,
10 120:2,6,8,12 121:18
132:11,14 136:14 137:22
138:8 139:5,14,18 154:10
155:3,7,8,9 156:9 206:20

**deadlines** 132:20 192:9

**decide** 97:20

**decided** 48:9 68:20 126:21
144:22

**deciding** 32:22 142:2
194:18

**decision** 24:9 29:16,18
40:7 48:7,11 52:13,18,21
54:6,15 59:15 60:2 62:21
63:2,5,11,19 66:17,20,22
67:1 71:22 72:4,5,8,10,22
73:10 74:1 75:16 80:14
83:9 87:2,4 88:10,12,14
89:1 92:7 103:20,22 110:1
111:11 119:2 120:5,12
125:17 127:4,5 128:1,4,7
137:20 141:13 142:8
145:18 146:4 155:22 156:5
180:6 201:21



DONALD NEUFELD                                          10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE          Index: decisions..domestic

**decisions** 41:1,5,10,12 46:18,21 47:18 62:9 67:7 73:7 143:22 157:18 169:13 198:20

**decisive** 112:13

**declaration** 171:18 172:2, 14,19,22 173:4 176:18 177:2,7 180:20 181:13 182:15,18 186:9,14,17

**declare** 177:9

**declared** 172:12

**dedicated** 32:9

**defendant's** 58:7

**defendants** 10:2,5,7,9 58:9 80:19,22 156:20 171:3 190:11

**deferred** 19:6 33:1,14 110:10 142:14 143:19 144:5,11 174:1,5,16 175:22 177:13 188:10,18, 21 189:3,9,21 200:19,22 201:19,22 202:3,7,8

**degree** 157:16

**deliberating** 130:20

**deliberative** 48:20 80:5,10 87:19 88:1,5 91:8 127:16 150:13

**delineate** 196:1

**delineated** 199:1 207:4

**delivered** 206:18

**delivery** 153:13

**delve** 131:6

**demographic** 160:16

**demographics** 160:9

**demonstrated** 34:13,22 37:17 173:21

**denial** 27:11 34:6,9 41:3, 22 176:22 180:5,8 181:5 184:7,17

**denials** 176:15,16,20

**Denice** 46:7

**denied** 32:19 34:2,3,14 173:19 174:2 175:6,13,22

**deny** 32:20,22 70:10 174:5,15 177:15,16 180:6 184:18

**denying** 177:11

**department** 9:20 10:2,9 16:1,2 19:21 26:12,13,17 46:18,21 47:7,12 67:22 72:3,6 73:11 117:12 119:15 121:5,10 122:8 129:7,11 146:19 147:9,16 156:5 195:15,16 196:9,20 199:2,3

**depend** 195:21

**depending** 32:7 37:8,9 38:12 107:6 196:6

**depends** 197:17 203:4

**deponent** 10:12 57:17,22 193:10

**deposed** 14:10,16,17,20 15:5,8,14,19

**deposition** 7:9,13,19 11:2, 11,17 12:6,12 13:13,20 14:4,14 80:11 178:8

**depositions** 178:10

**deputy** 16:21 17:2 20:7,12 21:2 23:17 73:6,22 96:15 99:11 106:6 108:6 137:8 140:3 167:22 169:18

**describe** 19:12 22:1 157:9 158:12

**deserve** 148:18 151:8

**desire** 187:4

**Destefano** 29:1 109:10,20

**details** 61:12

**detection** 200:3

**determine** 38:10 177:3

**determined** 32:16,19 174:13

**determines** 32:15 173:20 174:1

**develop** 53:15 59:16 60:3 75:15,18 76:6

**developed** 33:8 54:19 55:11 60:21 61:4,6 70:2 94:4

**developers** 52:16

**developing** 22:7 68:11 71:8,12 194:18

**development** 52:1 56:7,9 72:12,13,19 76:1,3 77:9 85:18 194:3,16

**DHS** 9:21 10:6 16:12,18 17:9,22 18:10 98:3,7 108:11 113:2 114:4 116:11,18 117:7 121:5,21 122:17 123:4,16 126:21 128:21 129:13 130:2 137:3,15 138:6 142:13 144:11 146:11 147:5 169:16 186:9,16 199:12

**DHS's** 80:22 111:10

**differ** 110:22

**difference** 185:10,22 186:6

**differences** 36:20 38:16 70:12,20 71:3

**difficult** 13:2 194:17

**difficulties** 155:4,14 206:2

**difficulty** 138:19 181:8

**direct** 48:21 87:17 91:6 127:11,14 131:10 152:2 172:17 173:12

**directed** 152:20,21

**directing** 40:8 80:7 91:14, 19 123:12 124:7

**direction** 89:12 156:2

**directly** 20:5 23:15,21 101:5 108:22

**director** 16:4,15,21 17:2, 15 19:13 20:7,12 21:3 23:17 47:14 73:6,22 96:16 99:11 106:6,7 108:7 109:17 124:16 125:3 133:15 137:8 140:4 141:4 142:13 146:10 148:2 198:11,14

**directors** 20:18 21:2,5 23:1 106:7

**developed** 33:8 54:19

**discontinued** 77:10 83:3

**discover** 129:5

**discretion** 174:15,22 175:6 177:4,10 180:7,13 181:2 184:8,18

**discuss** 73:12,16 77:16 78:19 121:20 122:1,3 124:12,15 128:20 129:5,18 130:11

**discussed** 14:12 23:13 76:17,22 78:7 79:22 81:20 104:13 105:3,5,18 106:22 107:1,9 112:19 113:11 118:8 123:11,15 124:2,5 125:15,17 129:16 130:1,17 148:15 160:1 176:7 189:10

**discussing** 78:18 81:8 105:13 118:15 119:2 125:7 128:17 149:17 177:15

**discussion** 65:4,7 77:12, 14,19 80:3 124:6 126:17 127:9

**discussions** 46:15 48:6 72:18,22 74:5,9 76:19 78:1 87:12 96:22 97:16 99:20 103:8 104:19 107:5,15,19 108:4 112:15 113:13 120:16 122:16,20 123:2 124:18 149:12 165:21 189:8,12,16,21 194:19

**disqualifying** 47:5

**District** 7:16,17 171:8,21 172:4

**division** 9:18 198:10,14

**doctors** 161:18

**document** 28:21 33:20 39:5 58:6,11,21 59:1,9,10, 14 61:19 69:5 109:11,18 140:6 141:2 156:3 171:22 179:20 184:10

**documents** 13:19 21:14 35:7,10 49:3 90:21 93:1,8, 20 95:16,22 96:5 146:11, 15,18,22 177:20

**DOJ** 129:11,13,15

**domestic** 16:22 17:2



DONALD NEUFELD                                                    10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE        Index: Donald..fall

**Donald** 7:13 10:10 171:19 209:5

**Donna** 8:2

**draft** 88:20 144:14

**drafted** 94:12 142:21 143:5

**drafting** 93:20

**drafts** 94:2,8,14,16,18 95:11,13 96:8,18

**drugs** 13:1

**due** 59:17 60:4 189:12,16

**Duke** 7:15 122:12,13 124:13 178:1 183:18 184:4

**Duke's** 86:17

**duly** 10:17

**Dunn** 9:6

**duties** 24:2 157:9 169:9,11

**duty** 158:1

---

**E**

---

**E-L-I-S** 28:10,13

**EAD** 39:4

**earlier** 44:6 81:20 85:17 90:14 103:4 125:5 163:3 190:19 194:1,4,11,15 200:15,17 205:10

**early** 44:16 45:13 47:4 100:2 165:21

**ease** 188:20

**easier** 178:6

**Eastern** 7:17

**economic** 162:9,12,20 163:2,8

**effectively** 157:14

**efficacy** 163:22

**efficiency** 158:1,19,21 159:9,10

**efficient** 62:15,19 158:2,6, 8,14

**Elaine** 7:15

**election** 116:14

**electronic** 28:5 39:18 59:3,17 60:4,11

**elements** 80:17

**elevated** 66:22 67:3,6 77:6

**elicits** 152:3

**eligibility** 37:17 38:10

**eligible** 114:20 115:3,6 138:15 168:11

**ELIS** 28:10 35:15 36:22 39:7 52:2 53:16 55:12 60:14,21 61:4,6,22 62:1 69:7,14,20 70:2,4,8,12,19, 21 71:11,15,22 72:4,10,13, 15,19,21 73:2,13 74:3,7, 16,19,20 75:2,8,14 76:7 78:20 81:19,22 82:4,8,13, 15,17,21 84:10,14,22 85:19

**ELIS's** 71:9

**email** 21:11 49:5,9,13,15 53:4,6,7,10,13,20,22 77:5 115:5 117:21

**embrace** 143:21

**employ** 142:6

**employee** 41:17 129:12

**employees** 92:8 161:3 188:5 203:16 206:10

**employers** 188:3

**employment** 33:19 39:4

**enacted** 201:9

**encouraging** 50:10

**encumbered** 182:20

**end** 61:20 81:11 97:3,5 100:1 130:8 133:4

**ended** 135:16 189:4

**ending** 89:21 117:8 124:19 165:3 179:17 180:2

**ends** 179:17

**enforcement** 199:7 200:5

**engage** 206:5

**engaged** 194:19

**engagement** 85:13 94:4

**engaging** 203:2

**ensure** 34:15

**entered** 144:2 178:9,12

**entire** 178:21

**entry** 28:1,3

**enumerated** 143:12

**EPMS** 60:12,14 61:10,14 62:8,14,22 63:15,17 64:1, 4,7 67:21 68:5

**Ernest** 29:1 109:10,20

**errors** 115:18,22

**essentially** 205:3

**establish** 11:4

**establishment** 45:6

**et al** 7:15,16

**evaluate** 153:1

**evaluated** 102:15

**evaluates** 26:14

**evaluating** 195:5

**Evan** 10:3

**evidence** 32:17,18 40:22 70:9 139:1 176:2

**evolved** 50:9

**exact** 125:4

**EXAMINATION** 11:14 156:20 171:3 190:11

**examined** 10:18

**examiner** 170:12

**examples** 107:8 174:21 181:15 185:3

**exchange** 77:5

**executive** 46:16 104:18 106:1,4

**exercise** 170:18 174:15 175:6 181:2

**exercised** 184:7,18

**exercises** 174:22 177:10

**exhibit** 57:2,3,4,7 58:1,2,3 69:4 171:12,15 177:21 178:5,21 179:1,3,8,16 180:21

**exhibits** 178:9

**exists** 196:13 197:18

**expand** 18:21

**expenses** 204:13,16

**experience** 133:14 155:9

**expiration** 69:19

**expire** 50:17 133:18 136:15,21 137:3

**expired** 42:15 43:19 134:2, 12 201:12

**expiring** 50:1

**explain** 18:17 45:9 46:20 56:5 60:10,13,16 62:18 97:4

**explaining** 26:6

**expressly** 176:1

**extend** 50:3 114:4

**extended** 113:3 114:10,14

**extending** 91:12 107:19, 22 113:17,22

**extent** 122:18 123:6,22 131:6 150:8,11 155:6 157:17 203:12

**external** 94:1

**externally** 196:9

---

**F**

---

**fact** 64:10 78:20 154:4 182:6 186:5 191:3 193:13 203:9

**factors** 46:12 123:11 174:16 177:11

**facts** 138:22 149:14,15

**fairly** 137:7

**fall** 38:8 133:17


**Olender Legal Solutions**
A Global Litigation Solutions Company

888.445.3376
202.898.1108

www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

10/18/2017
Index: falsely..handled

**falsely** 175:4 180:22

**familiar** 19:9 86:17

**familiarize** 58:14

**familiarized** 58:21

**FAQ** 33:12

**FAQS** 33:8 95:12

**fault** 192:11

**feasibility** 137:21 138:4 139:5

**feasible** 138:8,11

**feature** 59:16 60:3,21 61:4 67:10,18 68:2,5,8,18 70:1

**February** 16:16 62:1 69:8, 15 81:22 82:21

**federal** 121:4 161:3 201:5

**fee** 25:5

**feel** 89:1,4

**felt** 145:1

**Feng** 9:15

**field** 17:10 29:14,20

**figuring** 203:5

**file** 133:17 136:13,19 137:2 153:20 157:18,19 195:2 198:16

**filed** 7:16 37:4 99:3 102:20 103:1 108:17 109:1,14,21 111:13,20 112:6,15,18 114:18 115:7 116:3 139:14,17,20 152:14,16 153:14,17 154:1,17 155:17 171:19 172:2 191:1

**files** 32:4,11

**filing** 25:4 28:5 37:2 134:7 153:4,6 155:7,9,19 156:9 160:17 192:19 198:5 206:20

**filings** 99:21 101:4 102:1, 6,10 103:13,16 105:14 107:11 110:2,3 111:22 112:2 191:5 193:3

**final** 29:15,18 72:22 87:2,4 88:12,14 127:4,5 128:7 185:17 188:9

**finally** 155:16 177:10

**financial** 162:22

**financially** 8:6

**find** 173:13 182:2 183:17, 18 184:19,20,21

**finger** 185:9 186:1

**firm** 8:2

**flagged** 154:5 193:1

**flip** 174:10

**floor** 7:21

**Florida** 113:19 140:19

**flows** 33:6

**fluctuated** 134:4

**focus** 24:6,7 40:3 61:9

**focused** 22:4 37:19

**focusing** 40:6

**Foletta** 9:13

**folks** 134:11 144:1 207:8

**follow** 40:16 126:14 171:11 177:1

**footnote** 180:1,4 185:14, 16,21

**forget** 198:11

**forgotten** 143:9

**form** 11:6 21:9 39:1 53:2 77:19 99:12 169:3,4 180:16 184:9,11 185:17 194:21 195:1,2,3 196:11, 13 197:6 199:10

**format** 26:2

**formed** 145:14

**forms** 195:6

**formulate** 103:9

**formulated** 104:2 165:18

**forward** 16:6 26:20 27:1 88:6,7 167:20 168:3

**forwarded** 27:12 101:12

**found** 183:11

**foundation** 44:10 54:9

59:21 61:1 67:12 71:1 83:22 95:20 96:3 146:6 151:4,11 163:16 180:15 183:21 186:12

**Frank** 8:15,18,21 10:22

**Franke** 10:3

**frankly** 204:12

**fraud** 176:3 200:3

**frequently** 33:8 137:7

**Friday** 115:13,15

**front** 166:12

**fulfilled** 205:15

**full** 13:10 175:20

**function** 84:11

**functionality** 63:19 64:2, 18 65:10,13,18 66:2 70:18 83:10

**Fung** 9:15

**future** 97:10

**fuzzy** 183:9

---

**G**

---

**Garcia** 9:6

**gathered** 90:18

**gave** 101:11 109:19

**Gene** 7:22 79:2 150:2

**general** 10:7 32:3 62:12 63:13 68:14 104:17 120:22 122:11 123:3 147:12,17 166:7 196:12

**General's** 9:17 120:19 157:1 190:14

**generally** 15:1 44:3,22 49:20 56:11,19 75:21 77:13 80:12 95:6 96:1 99:2,6 133:20 136:18 157:20 192:3 194:12 197:5

**generate** 41:20

**generated** 35:20 36:1,6 79:15

**generating** 82:4

**generation** 58:17 71:4

**Gibson** 9:5

**give** 13:10 18:2 34:8 164:2 174:21 185:19

**giving** 110:8

**good** 7:2 10:20 89:15 145:14 169:3

**government** 18:6 80:16 98:7 120:17,20 129:12 130:13 161:3 201:5

**grant** 142:13 143:22 144:5, 11 174:16 177:12

**granted** 110:9 197:8

**grantees** 161:3,6,9,12,15, 17,20 165:8 166:6

**ground** 11:20 171:9 193:10

**grounds** 48:19 80:4 87:18 91:7 119:11 131:10 148:22 150:13 164:22 205:19

**group** 32:9 48:9 68:21 72:15,16 73:2 157:12

**groups** 44:14,19,21,22 169:19 186:22 187:7

**grown** 30:22

**guess** 85:1 138:3 197:17

**guide** 203:2

**guidelines** 173:22 174:2, 6,14 175:8,14 176:9 177:12,17 181:4

---

**H**

---

**half** 14:6,11 135:18

**Hamilton** 79:3 150:3,8,22 151:7,14,21

**handed** 69:5

**handing** 57:1,6,10

**handle** 25:8 82:22 99:20 105:14 107:10,11 108:2,5 112:15 113:11,14 156:1 196:3 204:12

**handled** 25:13 26:9 61:14,



22 62:4 82:21 101:9
189:22 200:1

**handling** 195:18 200:8,11

**happen** 86:6 112:21 126:4
200:7

**happened** 45:20 94:5 95:3
99:22 113:9 126:5 166:2

**happening** 119:15

**hate** 158:8

**head** 12:9

**headquarters** 18:19
169:17

**hear** 9:11 139:22 140:12

**heard** 139:20 150:22 157:4
193:11

**hearsay** 193:11

**held** 7:19 16:17 17:3
101:10

**helpful** 205:22

**high** 134:7 157:16

**hits** 32:9

**hold** 100:20,22 101:17
141:10

**holders** 85:4

**holding** 101:22 102:6,8,12

**holdings** 198:17

**home** 161:12

**Homeland** 16:1,2 121:11
195:15,16 196:20 199:2,3

**hour** 14:6,11

**hours** 159:3

**House** 129:20 147:1

**housed** 198:13

**Houston** 113:19

**hundred** 29:22

**hurricane** 153:2,12,16

**hurricanes** 107:13 113:20

**I**

**I-821D** 195:3

**I-R-I-S** 198:12

**ICE** 196:11 199:13 200:5

**identifiable** 182:12

**identification** 57:5 58:4
160:3 171:16

**identified** 150:8 178:20,21
179:9 181:22 182:17 183:7
185:20

**identify** 180:8 181:10
182:3,10,14 184:6,17
185:2 186:5

**identifying** 185:7

**illegality** 81:2 189:17

**illegally** 144:3

**images** 37:5

**imagine** 30:14 117:19
198:15

**immediately** 17:11

**immigrants** 142:15 144:6,
12 147:21

**immigration** 9:2,4 10:4,11
18:11 19:4 22:16 29:8 30:5
33:4,11 34:16 35:3 41:17
102:14 110:17 176:3
186:22 187:6 199:7

**impact** 122:2 162:2,9,12
164:4,13,17,20 165:3
169:13 206:9

**impacted** 107:12 153:3,
12,16 205:2

**impacts** 155:8 164:11

**impair** 13:6

**implement** 46:17 48:15,18
49:4 75:7,13 76:12 83:15
89:12 93:4 98:3,8 103:20
204:20

**implementation** 86:16
90:6 92:19 141:16,20
159:9,14,21 163:9 205:16

**implemented** 141:7,11

**implementing** 76:20
85:18

**important** 144:14 157:9
170:5 206:10,16

**impression** 168:15

**in-house** 86:14 135:17,21

**in-person** 90:16

**inappropriate** 174:17
177:13

**include** 101:3 191:4,18
199:13 200:5

**included** 95:1 104:18
177:12

**includes** 188:14

**including** 193:8 204:12

**income** 161:9

**incorporated** 81:3

**incurred** 203:20

**independent** 135:9 202:4,
6

**indicating** 115:6

**indication** 196:19

**indications** 116:18 117:6

**individual** 20:20 24:11
36:11 37:16,22 38:15
39:14 41:16 72:2 79:4
115:19 129:8 135:22 148:8
149:9,13 183:7 196:11
198:7

**individually** 37:11

**individuals** 46:5 52:4
63:6,10 91:18 114:1,21
115:3 121:21 122:17
123:4,16 126:11 130:3,12
133:21 137:1 145:13 168:3

**inform** 47:21 53:2 68:17
123:9

**information** 21:21 32:11
36:14 39:20 48:21 51:6
67:6 84:18 86:5 124:2
137:3 140:22 165:7 166:5,
15,17 167:5 182:12 194:2,

12 195:5,6,10,17 196:2,8,
12 197:3,4,14,18 198:6
199:17 200:11

**informed** 52:17,20 65:2
83:8,9

**Infrequently** 23:3

**ingest** 110:14

**initial** 24:11 26:19,22 27:5
36:17 37:1,2 38:17 82:21
98:11,13 100:4,13,17
101:4 102:3,15 103:14,16
104:1 105:2,14 106:12
141:22 191:5

**initially** 28:10 43:17
101:10

**initials** 101:3 135:1

**initiate** 32:18 141:14 142:8

**initiated** 83:5

**initiation** 142:9

**input** 74:8,12

**inquire** 65:9,16 114:9
132:4,7,17 138:18

**ins** 32:21 165:10

**instance** 80:18 199:16

**instances** 116:2,6

**institute** 145:1

**instituted** 124:20

**instruct** 150:17

**instructed** 109:15

**instructing** 25:20 123:20

**instruction** 80:10 98:10,
19 101:11 109:19 110:5,8
111:7,18 123:19 156:4

**instructions** 88:2,6,7
98:3,6,14 99:1,10,13
100:3,6,14,19 103:5,9,22
105:1

**instructs** 12:15

**insufficient** 44:15

**insured** 92:10

**Intake** 28:20 109:10,18
140:5 141:1 156:3



intend 207:11

intended 181:10

intent 70:10

interact 200:4

interactions 200:7

interest 22:3

interested 8:6 145:9

interests 19:19

interfere 7:8

interference 7:6

interim 20:19

intern 8:14,21 10:22

internal 37:7

interrogatories 58:8

interview 29:15,16,21

invested 159:11

investing 77:9

investment 158:11 159:3

invitation 105:20

invocation 80:9

invoke 80:12

involve 35:4 207:7

involved 35:8 41:9 45:6,10
46:1,3 47:10 48:4,6 55:17
56:4 62:21 63:4,7 65:6
66:20 68:11 78:17 93:20
95:2 107:18 108:4 118:3
124:21 141:13,16 142:1
194:3,15 195:4,18 197:21
198:18,19 199:17 200:14,
18,21 201:3,10,19

involvement 72:9 141:19
143:1 195:11

involving 104:11 202:7,8

IRIS 198:11

Islands 99:5 108:13,18
109:5,7,13 111:12 112:7
113:5,12 114:7

issuance 34:12 45:22

issue 40:21 41:5 43:10,19
45:17 47:1,3,7 48:1,7 52:1
55:12 71:9 77:7 83:12
102:7 200:20 201:15

issued 25:22 33:3 40:4
43:5 70:4 78:14 84:21 87:4
121:2 127:5

issues 22:4 47:4 84:16
121:1 175:7 181:3 205:16

issuing 50:22 54:7 64:5
77:8 83:19

Ivano 9:7 170:21 171:5

---

**J**

James 23:19 79:2 108:6
124:16,21 125:2 148:2
167:21

Janet 9:9 33:3 171:7

January 16:16 17:4 97:12
172:4 176:19 177:3 186:10

Jerome 8:15,17,21 10:22

Jerry 182:19 183:6,11

job 157:9 164:14

jobs 157:14

John 10:8

Jonathan 7:15

Jones 40:2 60:19

Joshua 9:1

July 59:11

June 33:2 97:11 120:19
179:19 180:11

Justice 9:20 10:2,9 121:5,
10 129:7 146:19

---

**K**

Karen 9:3

Kate 10:1

Kathy 52:19 54:2 55:19
56:15 60:9 67:1,6 68:17
75:17 76:15,19 77:17 78:9,
18 108:7 117:11 167:22

Keith 40:2 60:19

Khan 9:16 156:21,22
158:17 159:16 160:11
162:5,13,17 163:17 164:7
165:5 166:3 167:1,8,17
168:10,21 169:7 170:7,10,
13

kind 13:1 138:10 188:9

King 64:12,13 65:1 75:4
96:11 182:20

knew 64:4 86:22

knowledge 68:12,14
108:20 114:20 139:10,17
151:9,14,17,21 152:6
196:7 199:15,22

knowledgeable 198:21

---

**L**

Labor 126:6

lack 44:9 54:8 59:20 60:22
66:2 67:11 70:18,22 95:19
96:2 146:6 151:3,10
163:15 183:20 186:11

lacked 176:13

lacks 83:21 176:15

language 165:22

lapse 44:17

lapsed 189:5

large 31:22 200:22

larger 203:7

late 44:3 98:11,13 99:3,20
100:4,13,17 102:1,6,15
104:1 105:2,14 106:12,17,
18 108:12 109:21 110:2
111:13,20,21 112:2,6,15,
18 113:13,14 139:8,9
140:15 152:14,16 153:20

Laurie 46:8

law 8:14,16,18,20,22 9:2,4
10:22 11:1 200:4

lawfulness 81:4

laws 201:8

leadership 124:22 137:4,
7,15 138:7

leading 100:1

learn 86:20 87:2,6,7

learned 87:10 88:15 175:4
180:22

learning 24:8 40:6

Legacy 18:11

legal 8:1,15,18,21 11:1
81:3 209:7

legality 80:21 146:12,19
147:1 149:20 152:1

length 35:6

letter 25:19 26:1 120:18
121:2,4,13 122:12,17
123:4,16 124:10 146:13

level 46:16,19,21 47:8,12
62:10 73:8 104:18 106:1,4
119:15 159:11 198:20

Lewis 8:2

lines 81:20 117:13 128:19
143:17 169:5 196:15

list 160:20

listed 33:2

listen 169:5

listened 170:2

litigation 121:15,16 157:4,
5 189:13

living 113:19 114:6

located 7:20

location 192:19

locations 113:14

lock 111:6

lockbox 25:11,12 27:6,7,
16,18,20,21 28:16 98:18
99:8 101:12,22 109:1,3,14,
15,17,19 110:13,22 111:6
154:1 190:20 191:2 193:5,
21

lockboxes 24:15,20,22
26:10,18,22 27:15 100:22
101:6,13 102:5 155:22

logged 29:3


Olender Legal Solutions
A Global Litigation Solutions Company

888.445.3376
202.898.1108

www.olenderreporting.com
Worldwide Coverage

**long** 14:3,9 15:15 17:17,21
18:13 36:10 58:10 73:18
156:7 160:4 167:9,14
201:7

**longer** 64:5 65:10,13 66:13
134:16 171:10

**lot** 47:4 160:1 196:7 207:7

**loud** 173:17

---

**M**

**made** 12:7 41:2,5 46:18
47:7,19 48:1 52:11,13,18
54:20 62:10 63:20 64:10,
17 66:17 67:7 68:1 71:22
72:3,8 73:2,10 88:9 103:9
110:1 115:18 121:15
169:14 175:12 180:6
181:13 196:2 197:7 201:12

**mail** 33:21 34:1 36:9 39:4

**mailed** 36:2,11

**mailing** 192:19

**mailroom** 32:5

**main** 206:8

**majority** 30:9 47:18 61:21
134:10

**make** 9:13 12:11 13:1
29:15 48:1,11 67:9 86:6
91:22 92:12 93:17 150:18
157:12,15 158:3 171:10
174:16 177:12 179:2
185:20 198:20 201:21

**making** 41:9 47:10 48:4,8
80:14,16 157:17 192:16

**manage** 26:18

**managed** 198:9,10

**management** 59:4,17
60:4,11 109:17 140:4
142:4

**manager** 28:20,22

**managers** 28:16

**manages** 26:10 64:16

**managing** 148:12

**manners** 196:1

**manual** 38:10

**manuals** 35:7

**map** 203:1

**March** 18:5 120:12 132:14
139:5 208:4,9

**mark** 57:2 171:12 178:5,
13,14

**marked** 57:2,4,7 58:1,3
171:15 177:20 178:3 179:9

**Martin** 7:14

**materials** 13:22 79:14
80:21

**matter** 7:14 9:6,22 12:19
15:4 122:21 123:10

**matters** 22:3

**Mayorkas** 46:7 169:17

**Mayors** 7:20

**Mccament** 23:19 79:2
108:7 124:16,21 125:2,7,
18,22 127:22 128:11 148:3
167:21

**meaning** 185:20

**meaningful** 122:1

**meanings** 188:13

**means** 85:6 182:11

**meant** 56:6 65:22 148:21

**measure** 159:8 163:7

**measurements** 159:14,20

**mechanics** 82:18

**media** 7:12 81:11,16
116:16,17 117:7 119:21
133:4,9 190:9

**medications** 13:1

**meeting** 13:14 78:17,21
79:1,9,12,15 80:1 87:11,15
90:13,17,22 96:21 97:14
105:19 106:20 107:6 119:4
123:10 124:3,6 125:13
126:2,4,12,15 127:19
128:6 150:9,12,21 152:4,7
169:15,16 187:3

**meetings** 45:12 72:11,18

**met** 77:21 78:5,7,11,12 79:18
99:15,18 101:18 103:8,12,
19,21 104:4,9,10,12,13,16,
17,22 105:4,7,11,13,17,22
106:11,16,21 107:2,9
112:17,22 113:10 118:15
119:2,6,9,14 123:8 125:6,
10,11,16,22 126:1,18
127:22 128:10,14,17 150:2
168:16 169:12

**members** 95:2 96:7,9
105:22 106:3 168:13

**membership** 72:15

**memo** 33:3 34:12 45:22
86:18 88:15,17,21 89:13
92:11 93:14 98:2,4,8
131:2,17 132:3,6,8,10,13,
18 142:3,12,16,18 143:2,5,
8,11 144:4,8,10,13 146:13
184:21 206:21

**memoranda** 22:12 49:2
51:16 92:18 93:10

**memorandum** 93:14
176:2 177:22 178:1 179:19
180:11 181:5 184:6,16
186:18

**memory** 62:3 185:5

**mention** 77:10

**mentioned** 35:14 37:13
71:13 74:1 85:17 94:18
96:7 97:15 103:4 105:21
117:11 121:22 126:15
128:12 130:14 137:16
140:7 148:1 149:19 150:1
151:22 152:15,18 153:18
154:22

**messages** 49:6,9,13,15
53:4 54:18,21,22 55:2,4,8
95:1,4,7 96:10 115:5

**messaging** 94:1,13,21
95:3

**met** 80:16 168:5,12 174:3,7
175:15 176:9 177:17 187:1

**metrics** 159:20

**Mexico** 149:16

**Michael** 8:17 9:19 190:13

**microphones** 7:4,8

**migrate** 62:22 63:11 74:2,
15

**migrated** 62:7,13 72:20
73:17

**migration** 61:9 63:10,14
72:14 73:1,20 74:6

**military** 161:15 187:11

**mind** 144:14 202:3

**mini-checks** 38:11

**minor** 168:6,9

**minutes** 23:9 79:18,20

**mischaracterization**
189:19

**mischaracterized** 130:5

**mischaracterizes** 90:2

**misfiled** 101:4

**missing** 25:3

**mistaken** 173:6

**misunderstanding**
192:12

**moment** 102:6 133:1
152:9,11

**monitored** 34:19

**month** 17:7,13 134:11
135:17

**months** 23:7 43:20 52:22
53:19 55:5 135:17

**morning** 7:2 10:20

**move** 29:3 103:15

**moves** 26:20 27:1

**Moving** 165:6

**multiple** 81:8

**Musical** 170:18

---

**N**

**Napolitano** 9:9 33:3 171:8

**narrative** 158:16

**National** 9:2,3

**Nationality** 19:4



Olender Legal Solutions
A Global Litigation Solutions Company

888.445.3376
202.898.1108

www.olenderreporting.com
Worldwide Coverage

**Naturalization** 18:12

**nature** 15:11 48:13 51:15
91:5 141:19

**Nebraska** 30:10,11 31:7

**necessarily** 112:19 137:6

**needed** 47:19,21 112:10

**neighbors** 130:8

**Neufeld** 7:13 10:10,20
11:16 12:22 13:12 14:17
16:10 17:21 20:6 23:16,18
26:11 43:1 52:9 57:7 58:10
59:15 60:8,14 64:13 68:13
77:4 81:18 89:10 94:15
98:1 102:4,13 111:10
116:10 118:21 121:8 123:8
124:3 129:3 131:14 133:12
141:3 144:21 156:22
171:5,19,21 179:15 209:5

**newest** 31:2

**Newman** 9:19 179:4
190:12,13 191:13 193:14,
16,18 194:9 195:12 196:16
197:15 199:14 200:9
201:14 204:15 206:1
207:10,21 208:10,14,17

**news** 95:12 130:18

**nodding** 12:9

**non-implementation**
204:22

**nonemployee** 203:18

**nonetheless** 40:21

**nonimmigrant** 31:15

**nonimmigrants** 188:16

**normal** 110:14

**North** 171:8

**Northwest** 7:21

**Notary** 10:17

**note** 7:4 80:9,18 87:21

**noted** 11:13 66:6,16

**notes** 79:17 93:11

**notice** 25:20 26:15 27:3
33:18 36:10 39:2,3 40:4
41:18,21 42:9 43:17,20,21
44:15 45:4,7 46:13 59:16
60:3,20 61:3 63:18 64:2
66:13 67:10,18 68:1,5,8
70:1,9,19 71:4 74:20 75:3,
7,13 76:6,12 78:20 82:16
83:10 85:20 92:5 180:6

**notices** 35:12,20 36:1
40:9,13,19,22 41:5,10,22
42:13,17 43:10,15 45:17
47:2,3,7 48:1,7 49:16,18
50:4,12,13,14,15,16 51:1,
20 52:2 54:7,16 55:12,15
59:3 64:6 65:18,19 66:1,10
69:18,19 70:5,8,10,20
71:9,12,13 76:21 77:8
81:19 82:4,5,7,13,18 83:4,
12,19 84:6,21 85:18 91:17
111:20 136:14 139:10
153:20 155:16 163:5
202:11,15,18 204:2

**noticing** 8:13

**notified** 25:16,18 26:20
27:2,11 33:15,17 34:3,5
35:16 38:21 41:2

**notify** 68:21 84:8,13

**notifying** 42:18

**noting** 65:21

**Nuebel** 52:19 54:2 55:19
56:15 60:9 67:1,6 68:17
75:17 76:16,20 77:17 78:9,
18 108:7 117:11 168:1

**number** 7:18 22:16,19
30:2 31:13 81:11,16 101:1
107:7 115:6,8,9,10 133:5,
10,19 134:20 136:13
139:20 140:7,12 155:12
159:2,4 160:3 179:17,18
180:1 182:13 190:10
192:7,8,15 193:7,12,15
198:5 209:5

**numbers** 31:22 154:19
200:22

**numerous** 130:15 201:11

---

**O**

---

**oath** 8:5

**object** 48:19 80:4 87:22

95:19 119:11 121:12
122:18 131:5,18 138:9,22
148:22 150:7,13 152:2
158:15 164:22 184:9,11
188:22 189:18 193:9,12
194:6 195:7 205:18,19
207:17

**objected** 127:14

**objecting** 150:10

**objection** 12:11 42:20
43:6 44:9 54:8 55:9 59:20
60:22 65:14 66:4,15 67:11
70:14,22 71:17 74:10 75:9
76:8 77:1 80:9 83:13,21
85:8 87:9,17 88:4 89:3,7,
16 90:1 91:2,6,14,19 92:3
93:2,6,12 96:2 102:17
111:3 114:15 115:20
116:21 118:17 123:6,17,19
127:1 128:3,22 130:4
138:1 139:12 144:17 145:4
146:5 147:7,14 148:10
149:11 151:3,10 155:5
159:15 160:10 162:4,11,16
163:15 164:6 165:19
166:19 167:7,11 168:7,17
169:1 170:1 180:15 183:20
186:11 191:12 196:4
197:12 199:9,20 201:6
204:8 207:5 208:6

**objections** 8:11 11:6
12:13 58:7

**objectives** 83:16 143:14

**obtain** 195:17

**obtained** 193:20

**occur** 78:12 90:12 104:5
118:6 125:11 135:15 160:5

**occurred** 59:7,11 103:12
107:15 123:7 126:1

**October** 7:3 58:9 98:21
99:21 100:2 103:1,7
106:19 107:11,16,19,22
108:3,11,17 109:3 112:2,
14 113:3,18 114:1,5,10,22
115:17 120:1,5,6,8 132:11
137:21 138:8,16,20 139:9,
18 140:10,11 152:14
153:11,14,19 154:10,12,13
155:3,18 190:20 191:2
207:1

**offensive** 147:21

**offer** 48:15

**office** 9:17 10:6 18:17
24:2,8 28:20 29:14,20
39:19,21 40:6 54:3 65:3
75:4,6 78:4 85:12,13,14
86:5 92:18,22 94:3,19 96:8
97:13 106:8,9 108:8,9
109:10,18 118:7 120:19
135:14 136:5,6 138:14
140:5 141:1 156:3 157:2
160:14 190:14 200:3

**office's** 86:15

**officer** 29:9 30:13 32:12,
14,15 37:12,15 38:9,15
40:1 41:22 110:17 159:3
162:22

**officers** 30:6,15 31:4
32:10 39:14 102:14,19,22
187:14

**offices** 18:19

**official** 24:2

**officials** 98:7 120:17

**OIDP** 191:16

**OIT** 67:14 71:7

**Olender** 8:3

**ongoing** 97:11

**open** 22:10

**operation** 50:7 60:5
159:19

**operational** 59:18 68:8
138:18,19 155:4,14 158:1
159:13,20 162:2,14 163:8
164:4,11 167:5 169:14
203:13 206:8

**operationally** 22:4 138:3

**operations** 16:5,7,22
17:2,11 18:20,22 19:1,15,
20 20:8 122:2 130:19
141:21 155:10 157:11
158:19

**opinion** 84:1 89:14,17,18,
21 90:3 144:18 145:5,7,14
168:18,19 169:4

**opinions** 169:3


Olender Legal Solutions
A Global Litigation Solutions Company

888.445.3376
202.898.1108

www.olenderreporting.com
Worldwide Coverage

**option** 85:7 143:21

**options** 84:9 128:18 143:12,15

**order** 12:5

**organization** 8:16,18,22 11:1 64:15

**origin** 193:3,8

**original** 134:2

**originally** 50:7

**outcome** 8:7

**outlined** 180:10

**outs** 165:10

**overarching** 205:2

**oversaw** 24:3 89:22

**oversee** 18:20 19:15 20:2 141:21 157:10 162:3

**overseeing** 202:21

**overseen** 188:10 189:3

**oversees** 109:17,19

**overwhelming** 61:21

**owners** 161:6,12

———————

**P**

———————

**P-R-O-C-E-E-D-I-N-G-S** 7:1

**p.m.** 133:5,7,10 156:15,17, 19 179:7,10,11,13 190:5,7, 10 208:21,22 209:1,3,4,8

**pages** 172:18 175:18

**paid** 205:5

**paper** 37:4,5

**paragraph** 61:20 69:10 173:13,16 174:9,11,20,21 175:18,19 176:11 180:21

**paragraphs** 58:15

**parole** 37:22 38:5

**part** 24:2 37:21 46:16 48:8 72:15 77:11,13 79:1 101:18 103:8,19,21 118:9 126:9,10 142:4 149:14

**150:9 157:3 158:1 175:8 178:4,13 181:3 194:7 205:5

**participant** 72:17

**participants** 90:20 131:9

**participate** 72:22 96:21 97:15 112:14

**participated** 45:17 47:15 79:3 112:22

**parties** 7:10

**parts** 45:14

**party** 8:5

**pass** 137:5

**passed** 137:9

**past** 31:21

**Patrol** 199:8

**patterns** 182:7

**pay** 56:13 205:7

**penalty** 172:12

**pending** 12:18 61:21 100:20 135:3,7

**people** 39:15 41:2 44:16 45:13 46:3,9,10 50:10 56:13 101:1,7 104:11 113:18 118:3 130:2,9 134:1 135:11 136:18 144:22 145:17 148:14 157:12 165:3 168:14 169:3 195:14 197:19 198:5 202:11

**percent** 134:7

**percentage** 29:13 30:1,4 133:21

**Performance** 160:15

**performed** 21:17

**performing** 22:6 157:15

**period** 20:19 31:21 49:7 50:1,4,8,18,19 56:1 67:4 83:4 116:4,7 125:1 134:2 137:12 154:17 155:13 165:22

**perjury** 172:13

**person** 21:12 77:21 90:18 105:19

**personal** 89:17 90:3 110:21 144:18 145:5,7 168:18 196:7

**personally** 181:19 197:21 198:21 201:20

**perspective** 159:10 203:13

**phone** 79:3,4 90:20 127:21

**phones** 7:7

**phonetic** 46:7,8 136:2

**physical** 26:3

**physically** 156:8

**pick** 7:5

**piece** 205:6

**place** 7:7,10 21:10 77:20 78:1 99:18 126:12 152:4 204:5 205:11

**plaintiff** 7:14 9:10,12,21 11:14 157:2

**plaintiff's** 58:8 80:19

**plaintiffs** 80:13 87:22 156:11

**plan** 92:4 154:9 203:1,4 205:11,15,17,20

**planned** 75:6

**planning** 130:17,20

**plans** 154:7 207:2

**played** 72:7 73:7 153:3,5

**plays** 72:6

**point** 16:6 31:21 41:1 43:18 81:7 97:10 100:12 126:20 130:8 163:21 170:8 175:11 197:7 205:14

**points** 135:2 160:2 193:7, 20,22

**policies** 40:8,12,16,17,18 41:13 42:1 44:12 46:13 47:11,16 48:5 165:7,16,18 194:2,12,16 198:9

**policy** 40:20 41:1 44:8

**46:15,17,20 47:6,18,22 48:8,13,16,18 49:4 54:3 67:7 81:3 83:16 106:8 108:8 143:13 144:16 145:10 156:5 166:5,12 168:1 194:3,19 200:10 201:13

**population** 148:7 149:7 151:18 160:17

**portfolio** 64:16 96:12 183:1 188:13

**portion** 179:16

**position** 16:2 17:3,5,8,18, 19 20:10,19 39:22 80:19 109:16 124:22 141:10 168:12 182:20

**positions** 16:17,20

**positive** 38:8

**possibility** 130:16

**possibly** 60:18

**post** 84:18

**postmark** 155:19

**postmarked** 153:10

**postmarks** 156:8

**potential** 76:16,21 77:16 78:8 97:16 164:4

**potentially** 129:14

**Potomac** 31:2,17

**practical** 158:13

**practice** 66:1 69:17

**precisely** 207:6

**preparation** 13:20 14:4 22:13 186:17

**preparations** 91:22 93:18

**prepare** 13:13 14:13 22:12 92:18,22 93:13 172:18

**preparing** 14:10

**present** 8:8 104:8 118:11 124:4 128:1 131:9

**presented** 37:3,11,15 181:15



DONALD NEUFELD
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE

10/18/2017
Index: preserved..reason

preserved 11:7

president 87:1 97:13,20 122:8

pressing 169:20

pretty 203:12

prevent 44:17

preventing 153:3

previous 36:4 53:12 82:3 178:9

previously 14:16 37:18 68:7 82:3 88:3 129:9,22 130:14 135:8 148:1 150:1 160:1 178:12 179:8

primarily 31:6

primary 81:1 159:1

print 59:4,17 60:4,11 61:10 63:17

printed 36:1 82:7,10,18

printing 59:3 82:13,16

prior 18:7,9 24:8 40:6 87:8 88:17 90:9,11 94:10,13 96:20 108:10 110:19 111:2 112:14 118:14 119:1 125:16 128:16 133:13 142:9 175:5 181:1

private 7:5

privilege 12:20 48:20 80:5,6,12,15,20 87:18,19, 20 88:1,2,5,7 91:8,9 127:16,17 131:11 150:14, 15

privileges 127:15 131:11 150:10

procedures 40:4 92:1

proceed 10:19

proceeding 81:13 133:6 179:10 190:6 208:22

proceedings 8:11 156:16 209:9

process 19:5 24:7,10,15 27:6,8,22 28:2 29:7 31:11 32:4,13 35:22 36:3,4 37:7 38:9,11 40:6 48:8,20 80:5, 10,14 82:19 87:19 88:1,5

91:8 94:21 96:11 98:11,16, 20 100:15,19 103:5 105:2 106:15 110:7,22 112:9 114:17 125:1 127:13,16 133:13 136:11 138:14 142:5 150:13 158:4 196:17 197:4 198:1,22 199:1,4,5,6 202:21 203:5 206:7,21 207:9

processed 22:17,20 27:4 29:10 30:10,11 31:5,7,18, 20 32:5 36:16,21 39:7,8,12 70:8 101:15 106:13,17 109:12 111:8 134:21 154:6 198:15

processes 31:12 45:7 111:1 158:7 196:14,21

processing 20:2 23:22 24:3 36:22 38:17,18 72:14 92:1 104:1 110:15 111:4 115:19 138:20 169:21 170:4,5 187:2,4 207:3

produce 65:22

produced 134:16 146:18, 22 167:14,15

produces 160:15

producing 66:9 135:20

product 80:6 87:20 91:10 127:17 150:15

Production 28:21 109:11, 18 140:6 141:2 156:3

professional 169:9,11

program 19:10 37:21 42:7, 8,19 43:3,5,8 45:11,15 47:20 50:20 65:20 68:15 76:17,22 77:17 78:8 80:22 81:5 83:5 86:18,21 87:3,7, 13,16 88:10 89:22 97:1,2, 3,6,8,17 116:12,19 117:8 118:16 119:3 120:21 121:11,17 125:8 126:22 127:10 128:2,13 130:7 141:7,14,17 142:1,9 143:18 144:16 145:10,19 146:4,8,12,20 147:2,6 148:12 149:21 150:3 152:1 159:9 163:12,14 166:18 167:6 188:12 200:19 201:4,16,18 202:2,4,10,12,

14,15,17,18,22 203:10,19, 21 204:7

programmatic 180:10 181:7 202:1

programmed 86:4

programming 56:7,14 64:6

programs 121:6 162:20 188:11,21 189:1,4,12,16, 19,22 200:21 201:20 202:4,5,6

projecting 208:7

promise 87:1

prompt 122:7

promulgate 94:1

proper 166:8

protected 144:1

provide 13:6 74:8,14 166:14,16 167:4

provided 35:5 99:10

public 10:18 47:21 85:13 93:21 94:4,12,21

publication 33:8

publicly 191:22

published 160:19 185:17

Puerto 99:4 108:12,17 109:2,13 110:3 111:12,20 112:6 113:4,12 114:6 152:16 153:3 192:22

pull 181:22 186:2

pulling 136:10

purported 81:2

purpose 104:14,17 105:13 106:21 128:17 172:21 173:2 187:3

purposes 130:20

put 81:5 105:19 142:21 143:5 186:1 205:11

putting 185:9,22

Q

quality 34:15 157:16 160:15

quarterly 160:16,18

quest 167:9

question 12:2,3,12,14 35:17 38:4 40:11 42:22 53:15 67:20 69:12 77:3,7 85:2 89:9 95:8 103:17 118:20,22 120:3 122:19 123:12,21 124:1,7,10 129:2 131:10,21 138:4 144:20 145:21 150:21 152:3 157:8 159:18 161:11,14,17,20 170:8 184:1,10 193:17,19 194:8 200:16 201:2 205:13,22

questioned 164:3

questions 11:21,22 12:18 13:3 33:9 157:7 171:11 186:20 188:9 190:16 208:15

quicker 187:5

quickly 152:13

R

R-I-G-D-O-N 183:3

race 149:7,10 151:19

racial 148:20 149:3 151:15

raising 53:14

range 31:1

rationale 44:7

reach 36:11

reaction 66:12 89:6,12

read 58:12,22 172:16 173:15 174:12 180:4

reading 88:15 173:10

real 126:3

reason 13:9 34:9 42:15 62:12,15 104:15 155:19 170:4 181:16 183:16 189:22

 Olender Legal Solutions
A Global Litigation Solutions Company

888.445.3376
202.898.1108

www.olenderreporting.com
Worldwide Coverage

DONALD NEUFELD
10/18/2017
MARTIN JONATHAN BATALLA VIDAL v ELAINE C. DUKE
Index: reasonable..repeating

**reasonable** 153:11

**reasons** 34:5 45:3 62:11, 16 81:1 88:3 130:22 131:15,17,22 132:2,4,8,10, 13,18 149:19 151:22 176:1,14,20 194:17

**rebuild** 83:10

**rebuilding** 59:19 60:6

**recall** 14:18,21 15:4 24:21 31:19 39:16 41:6 44:1,5,21 45:5 46:4,6 49:14 50:21 52:10,22 53:9,19 54:1 55:5 56:2,21 63:12,16 65:11,21 68:19 72:7 74:17 76:4 77:11 78:6,13 79:5,7,16 83:2 90:13,19 92:14,17 93:22 94:6 95:4,6 98:5 99:21 100:8,11 102:1 104:13,20,22 105:5 106:20 107:8 112:8 115:9 117:10, 14,16 121:2,18 136:1 153:15 166:1 182:5 183:8 185:2,15,18 188:16 189:6 194:11 207:19

**recalling** 104:15

**receipt** 27:3,11 70:9

**receipts** 134:10 135:3

**receive** 27:3,11 33:18,19 35:4 39:3 70:8 72:21 84:6 88:17,20 98:2,6,10,19 100:5 102:22 108:16,21,22 110:13 115:2 139:11 145:13 156:2

**received** 32:4 98:11,20 100:13,19 102:15 103:4,6, 7 106:18 107:11 108:3 111:6 112:10 115:5,12 135:6 153:13,19 156:8 190:20

**receiving** 102:19 111:18

**recent** 125:13 176:16

**recently** 31:1 135:7 167:21 176:13 186:21

**recessed** 81:13 133:6 156:16 179:10 190:6 208:22

**recipient's** 42:14

**recipients** 40:5 42:10,18 43:11 49:12 50:16 68:21 84:9,13,21 85:7 148:6,9,18 149:6,10 150:6 151:1,8,15, 18 187:10,17 188:2,6

**recision** 162:2 164:13,19 166:18 177:22 179:18 186:18 187:7,15,22 188:7

**recognize** 171:21 179:19

**recollection** 136:16 192:10

**recommend** 144:10

**recommendation** 48:17 109:22

**recommendations** 74:14

**recommended** 50:5,8

**recommending** 122:12, 13 142:13

**record** 7:3,11 8:10 11:4 28:5 38:6 56:22 58:6 60:13 80:8 81:6,9,11 87:22 123:18 133:1,2,4,9 150:18 152:10 156:12,15,19 159:6 171:14,18 177:22 178:12, 19,22 179:5,6,13,18 190:5, 9 208:19,21 209:3,4

**recorded** 7:13 193:6,7

**recording** 7:9

**records** 23:12 51:8,10,12, 15,19 198:3,7,9,10,13

**reduced** 204:13,17 205:6

**refer** 16:6 50:13 60:12 99:6 150:22 151:15 179:1 188:20

**reference** 81:3 192:16 197:13 201:15

**referenced** 87:11 90:14 96:21 126:5,11 127:8 129:9 143:18 182:15,17 192:2 202:6

**references** 128:15

**referencing** 15:21 199:11, 19

**referred** 29:14,20 38:9,14 52:8 113:10 127:20 148:6,

8 149:6,9 150:5 151:18 182:21

**referring** 73:5 88:11 94:17 95:14 96:5 127:12 134:14 154:21 192:14 195:1

**refinement** 33:7

**reflect** 105:15

**reflective** 156:4

**refresh** 62:3

**regard** 76:3 122:21 158:19 163:13 165:7 166:5,15,18

**regular** 21:4,14 109:16 183:14

**regulation** 40:21 41:7,8, 14

**regulations** 41:13,15

**Reid** 10:6

**reject** 26:15 27:17 154:8 192:8

**rejected** 25:5,8,11,13,19, 21 26:4,6 98:15,17 99:2,6, 8 101:14 116:3,4 154:3,5 191:8,11,17 192:7,9,13 193:2

**rejecting** 25:10 100:4

**rejection** 25:16 26:5 100:21 101:16 154:6

**relate** 31:13 51:8 198:16

**related** 8:5 22:16 103:13 147:5 157:10 201:22 206:6

**relating** 51:19 96:10

**relationship** 60:10,13,17

**relatives** 130:9

**released** 191:22

**releases** 95:12

**remaining** 208:4,8

**remember** 15:7,10,16,18 17:7 49:20 53:21 55:6 64:8 65:1 77:13 79:10 94:7,10, 15 95:16 99:12,14,17 100:9 102:9 105:7 106:11 112:4 115:11 118:8 125:4, 12,22 128:10,14,15 134:5

8 149:6,9 150:5 151:18 182:21

**remembering** 186:3

**remind** 11:19 43:11

**reminder** 45:17 47:2,3,7 48:1 49:22 50:14,15,16 55:12 64:5 65:22 77:8

**remotely** 8:9

**removal** 175:5

**removals** 181:1

**Renaud** 46:9 79:2 108:6 109:15 140:1 153:21 155:17 167:22 190:22

**renew** 43:11 49:17 76:20 83:20 84:5 91:18 202:11, 15,18

**renewal** 27:4 36:16,21 37:6,16,19 38:17,20 39:6, 12 50:2 54:7,16 55:15 59:3,16 60:3,20 61:3 63:18 64:2 65:18,19 66:13 67:10, 18 68:1,5,8,22 69:18 70:1, 5,19 71:9 74:20 75:3,7,13 76:6,12,21 78:20 81:19 82:5,22 83:4,10,12,19 84:6,9,22 85:7,18,20 98:20 99:4,21 101:2 102:2,3 103:1,13,15 106:17,18 108:16 114:21 115:4 120:2 133:16,17 134:1 136:13, 14,19 137:2 138:14,20 139:7,10,16,18 140:15 154:16 163:4 202:10,14,17

**renewals** 50:5 102:10,12 108:12 109:12 111:12 115:19 135:1 191:4

**renewed** 138:15

**renewing** 84:13

**repeat** 26:21 46:14 118:22 145:20 159:18 171:9 183:22

**repeatedly** 128:16

**repeating** 88:4



Olender Legal Solutions
A Global Litigation Solutions Company

888.445.3376
202.898.1108

www.olenderreporting.com
Worldwide Coverage

**rephrase** 128:9 184:5 191:14 200:15

**replied** 207:16

**report** 21:2 23:15,20 134:22 150:12 159:22 160:16,18 167:13,14,19 191:20 192:2,4,6,8,13

**reporter** 8:2 9:11 10:14 12:5 16:8 28:11 57:1,22 117:1 170:11,12,16,20,22 178:2,14 190:3

**reporting** 8:3 20:18 167:16

**reports** 20:5,14 21:3,13 51:16 93:10 115:2 116:16 119:21 134:4,13,15 135:20 136:4,10,17 137:1,6,10,11, 15 154:18,20,21 192:3

**represent** 19:19 157:2 171:7 195:13

**represented** 26:9 184:6

**request** 26:4 31:15,17 32:18 33:1,14 34:14 37:2, 16,19 40:22 50:2 53:18 58:1 70:9 110:10 173:19 174:5,15 175:7,14 177:4, 11 181:2 184:18 190:3 195:21 196:12 197:1,8,14

**requested** 28:11 117:1 121:9

**requester** 31:14 153:15 165:15 173:21 174:13 175:4 180:22

**requesting** 120:20

**requests** 19:3,5 22:16 31:14,18 36:21 37:6 61:13, 22 69:7 81:21 99:3,4 102:3 107:10 108:2,15 109:2,14 112:6 139:14,16 141:22 158:4 170:11 175:21 176:8 177:16 188:14,18 189:10 191:17 192:9 195:5,14,19 196:2 197:21 198:3,8,15 199:18,22 200:11 201:1 204:11

**required** 12:13 159:3

**reread** 172:5

**rescind** 120:20

**rescinding** 81:1

**rescission** 162:10

**resources** 158:3,11 159:11 203:6,8,11,15

**respect** 27:6 71:4 72:20 73:13 88:5 135:2 143:13 168:19 187:7,14,21 188:6 189:9 200:7 206:14

**respond** 124:10

**responding** 95:8 197:14, 20 198:19

**response** 49:3 53:12,14 123:9 199:17

**responses** 12:7 58:7

**responsibilities** 19:12

**responsibility** 86:5 136:7 197:11 202:21

**responsible** 19:2,18 27:22 51:22 96:12 136:9 157:14

**rest** 19:20 55:4

**restate** 162:7,8 205:21

**restrictions** 166:8

**result** 82:13 83:19 188:18 204:21

**results** 32:8 37:8,20 38:12

**retained** 209:6

**return** 35:12 49:16 69:4 81:18 152:13

**revelation** 122:19

**review** 11:10 13:19 26:19, 22 32:10,14 38:10,15 109:20,22 110:17,22 158:7 181:19 182:1 185:16 186:2,9,13 193:1 197:5

**reviewed** 25:1 27:10 29:5, 8 34:20 35:2 96:11,17 110:18 186:16

**reviewing** 37:4 182:1

**Rico** 99:4 108:12,18 109:2, 13 110:3 111:12,20 112:6 113:5,12 114:6 152:16

153:3 192:22

**Rigdon** 182:19 183:6,16

**risk** 189:13

**road** 9:14 203:1

**Roeck** 8:20

**role** 15:22 16:14 18:17 19:13 31:19 72:6,7 73:7,8 135:12 141:4 153:3,6 194:18

**room** 8:8

**Rosenthal** 9:1

**rules** 11:20

**run** 37:20 145:13

—————————————

**S**

**S-C-O-P-S** 16:9

**safe** 166:11

**Sania** 9:16 156:22

**satisfied** 34:22 174:13 181:6

**satisfy** 173:22 180:9

**scanned** 37:5

**scheduled** 105:19

**School** 8:16,19,22 11:1

**schools** 187:18

**SCOPS** 16:7,10,15 18:16, 17 19:5,14 25:8 40:4,8,12, 15 42:9 46:14 48:18 50:12, 15 59:2 62:7,9 64:11,15,16 65:9,12,17 66:13 67:8,9, 13,22 69:17 75:13,15 83:3 84:8,11 85:14,21 86:1 91:22 92:8 93:17,22 94:22 98:19 100:13,17,18 102:14 108:16,21 109:12 111:19 115:18 116:3 124:9 133:15 134:21 135:19 136:6 141:4 146:11 153:19 154:7 155:1,4,18 167:13 188:13 191:16 198:10 202:9 204:10 205:1

**SCOPS's** 155:22

**Scott** 9:13

**secretary** 86:17 93:15 122:12,13 124:13 169:18 183:18 184:4

**Security** 16:1,3 121:11 195:15,16 196:21 199:2,3

**seeking** 124:1

**seeks** 124:1

**sees** 160:18

**Selby** 20:13,14,15 96:15

**send** 26:15 29:17 40:9 41:10,17 42:13,17 43:14 50:15 52:7 55:1 109:21

**sending** 40:12,19 43:17 52:5 55:14 69:18 83:3 91:17 101:6

**sense** 130:17 158:13

**sensitive** 7:5

**sentence** 69:11 117:10, 14,20 173:15 174:11 175:2,19,21 176:11 177:8, 9

**sentences** 174:21

**separately** 194:10

**September** 18:15 78:14 86:17 87:5 88:16,18 90:9, 10,12,15 91:12 92:5,11,16 94:11,13 95:3 96:20 97:14 98:12 99:15,19 100:2,5,7, 10,13,18 102:16,20 103:6, 15 104:6 105:1 106:5 110:19 111:2 114:22 115:17 117:18 118:14 119:1 125:16 127:6,20 128:5,16 133:14 137:16 138:6 139:7 154:12

**serve** 187:11

**server** 59:4,17 60:4,11 61:10

**service** 16:4,7 17:15,16 18:12,20,22 19:2,16,19 20:8,17 21:1,5,17 22:17 23:1 29:3,5,11,12,17 30:6, 10,12,18,19,21 31:2,8,10, 12,18,19 32:2 36:17 59:19 60:6 63:18 85:13 94:4


Olender Legal Solutions
A Global Litigation Solutions Company

888.445.3376
202.898.1108

www.olenderreporting.com
Worldwide Coverage

101:5 155:10 157:11,13 164:17 197:19,20 200:1 204:10 205:4

**services** 8:15,18,21 10:4, 11 11:1 29:8 204:19 205:4, 5

**Session's** 122:12

**Sessions** 146:13

**set** 34:17 42:2 46:14 47:17 58:8 120:5,9,12,14 176:1 188:9

**setting** 46:12 120:1

**Shalabaum** 46:8

**share** 21:22

**shared** 79:20 137:5 196:8

**sharing** 137:10,11,14 165:7 166:6 194:2,12 195:5,10

**shelf** 32:12

**shop** 60:18 63:6,10 67:15, 17 71:7 134:18

**short** 31:21 137:12 145:13

**shortly** 78:15 90:14 100:7 104:6 153:10,14

**show** 179:15

**showing** 80:17

**side** 174:10

**sign** 11:10

**signature** 172:8,10 177:8 194:21

**significant** 59:18 60:5 126:2

**Significantly** 180:5

**signs** 165:15

**simply** 131:15

**sir** 190:13

**sit** 32:12 102:1

**site** 35:5 36:6 144:4

**situation** 20:17

**size** 30:20

**slow** 61:11

**slur** 148:20 149:3 151:15

**small** 29:13 30:3 31:13 101:1 161:6

**smaller** 30:21

**smallest** 31:3

**solely** 104:16 180:12

**Solutions** 8:1 209:7

**someone's** 41:18

**sophisticated** 71:15,18

**sort** 22:7 26:5 84:17 124:22 135:5 159:13 166:14 167:4,16 176:14 204:3

**Southern** 171:20 172:4

**speak** 13:16 14:3,7

**speaks** 184:10

**specific** 14:22 26:2 44:21 49:14 55:5 62:11 68:18,21 78:7,11,12,13,17 80:18 96:5 104:14,20 119:13 125:11,21 128:14 160:21 176:21 180:8 182:12,14 184:7,17,19 185:2 193:2, 22 198:6,7 199:22 200:7

**specifically** 15:16 24:8,21 32:3 42:3,5 44:1,5 49:19 50:21 52:15 53:1 56:2,10, 18 63:7,12 64:3,6,8,9 71:2 73:13 74:2,17 75:20 77:11 79:7 92:14,17 93:22 94:6 95:4 99:22 100:8 117:16 120:1,4 121:2 123:14 137:16 142:17 159:7 161:1 165:11 166:9 173:1 175:8 177:22 181:3 191:19 195:22 206:14

**specifics** 76:2 134:5 166:1 188:17 198:1

**speculation** 97:21 122:6 208:6

**speculative** 97:21

**speedier** 169:20

**spell** 183:2

**spelled** 16:8

**spells** 165:16

**spent** 14:9

**spoke** 205:10

**spoken** 148:2

**stack** 186:6

**staff** 96:13 181:16 182:4,5, 17 184:19,20 198:18 203:16,17 206:6

**staged** 32:5

**stand** 45:15 47:20 142:1,2, 3

**stand-up** 45:11

**standard** 66:1

**stands** 88:4 198:12

**start** 78:5 90:11 103:14 120:17 125:11,20,21 142:8 162:18 184:3

**started** 17:19 23:6 43:17

**starts** 175:3 176:12 179:16

**state** 8:9,12 121:3,9 140:16,19 147:5,9,12,17 157:1 171:19 172:3 190:15 191:6 193:3,8 194:14

**stated** 59:9 80:22 88:3 132:2 141:3 153:15 180:21 190:18 194:1

**statement** 165:15 174:18 175:9,12 176:4,17 180:14 194:5

**statements** 193:11 194:4

**states** 7:16,20 9:18,21 10:1,3,8,11 38:1 61:20 157:2,3 171:20 172:3 175:3,21 177:9 181:5

**stating** 194:11

**statistical** 166:14,17 167:5

**status** 38:2 40:10,13 42:10,14 44:18 50:17 133:17 134:12 144:1,2 202:11,15,18

**statuses** 136:15,21 137:2

**statutes** 201:11

**stay** 152:10

**step** 24:10

**steps** 84:8,12

**stipulate** 11:6,9

**stipulations** 11:5

**stood** 97:7

**stop** 12:12 54:6 137:11 200:15

**stopped** 50:22 55:14

**straight** 160:14

**strategic** 205:11,15,17,20

**strategy** 54:4 106:9 108:8 168:1 204:3

**Street** 7:21

**strike** 160:7 164:1 166:15

**student** 8:14,20 10:22

**students** 187:18

**sub-unit** 196:20

**subject** 49:6 53:9,11 79:9 105:20 107:4 122:21 123:10 126:17

**subjects** 107:9

**submit** 50:1,5 173:4 196:11

**submits** 24:11

**submitted** 101:2 114:21 115:3 172:13 186:10

**subordinate** 54:18

**subordinates** 55:7 197:10 199:16 202:22 203:2

**subsequently** 101:14

**substance** 150:9 185:13

**suffer** 13:5

**sufficient** 57:14 80:17

**suggest** 91:12,17

**suggested** 148:17 151:7



Olender Legal Solutions
A Global Litigation Solutions Company

888.445.3376
202.898.1108

www.olenderreporting.com
Worldwide Coverage

**sunset** 201:11

**supervise** 164:21 165:4

**supervises** 39:17

**supervising** 187:14

**supervisor** 34:19,20,21

**support** 204:11

**supposed** 62:14 101:7 114:17

**surprise** 197:19

**surrounding** 47:4

**Susan** 96:13

**swear** 10:14

**switch** 63:19 177:19 186:21

**sworn** 10:17

**Symons** 108:8

**system** 28:3,4,6,7,15,19 32:6 35:15,22 36:22 37:5, 6,10 38:3,14 39:7,8 41:20, 21 56:7 59:2 60:14,21 61:4,7,14,15 62:5,8,22 63:14,15,18,20 64:1,6 67:21 69:7,14,20 70:2,4,6, 12,13,21 71:3,12,15,16 72:1,4,10 73:13 74:3,16,19 75:2,8,14 81:19,22 82:8, 11,15 84:10,14,22 85:19 86:4 110:14 163:4,9

**systems** 28:1 35:16 38:6 39:18 68:14 70:16 136:10

---

### T

**table** 57:15 90:19

**taking** 11:2 12:22

**talk** 12:19

**talked** 97:3 126:3 163:2

**talking** 42:3 83:6 97:5 131:19 169:10 185:10 186:7 197:1 198:4

**teachers** 161:21

**team** 51:22 54:18 84:20 95:2 136:3 142:4 161:1,4,

7,10,13,16,19,22 162:10, 15

**teams** 183:14

**technical** 61:12 206:2

**technicalities** 70:6

**technology** 39:20 71:19 86:6

**telephone** 21:11 77:21 126:7,10 129:10

**temporary** 97:8 144:1

**tension** 185:11

**tenure** 146:10

**term** 130:11 148:20 152:19

**terminate** 24:9 38:2 40:7 54:15 87:3 88:10 89:2 92:8 97:9 119:2 121:5,11 125:18 126:21 128:1,13 130:12 145:18 146:4 151:22 189:16 208:18

**terminated** 42:14 86:21 87:8,16 121:17 122:14 132:5 148:13 189:5

**terminating** 86:18 116:11, 19 149:20 189:9 204:17

**termination** 51:19 76:16, 21 77:17 78:8 86:16 89:15 90:6 92:2,20 93:5,18,21 96:22 97:16 98:2,4,8 118:15 124:5,12,15 125:7 128:16,21 129:6,16,19 130:1,16 131:1,22 137:19, 20 146:8 147:6,20 148:3 164:4 166:21 167:2,10 189:12 208:5

**terms** 130:18

**testified** 10:18 123:8 124:4 131:8 186:21 193:10 194:15 200:15,17

**testimony** 13:7,10 14:1 90:2 130:5 190:19 207:18 209:5

**Texas** 30:21 31:19 120:18 121:3,9,13 140:16 147:5, 10,13,17 171:19,21 172:3, 4 173:5

**thing** 22:7 58:12 84:17 89:15 135:5 144:14 158:10 172:6,17 182:9 204:3 206:10

**things** 30:8 66:6 68:15 107:7 201:9

**thinking** 102:11 158:8

**thought** 85:2 207:13

**threat** 121:15,20

**threshold** 174:2,14

**tied** 198:6

**time** 8:12 14:5 15:1,17 17:1 18:3 28:9 30:9 31:22 35:6 36:2 37:18 43:16 45:16 47:20 49:7,8,22 50:4,8,18, 19 51:3 56:1 64:20 67:4 71:21 72:12,16,17 74:18 81:12,16,20 83:4,12,20 84:5 116:3,7 118:12 125:1 131:19,21 133:5 134:8 137:13 155:13 156:15,19 167:14 169:6,18 175:11 179:7,13 190:5,10 208:21 209:3

**timeframe** 117:18 125:4

**timeline** 125:20

**timely** 153:4,12,17 157:17 158:4 170:4,5

**times** 15:13,19 69:1 90:9 104:11,19 105:6 134:6,9 187:2,5 195:14

**title** 136:8

**titled** 58:7

**today** 11:2 13:3,10 14:1 157:8

**today's** 12:6 13:13,20 14:4,13 209:4

**told** 60:7,8 99:14

**topic** 94:2 104:14 105:5 112:18 124:20 125:15 126:8 130:19

**topics** 186:21

**total** 14:9 17:21 30:2 209:5

**touches** 124:6

**TPS** 143:22

**track** 176:14,19

**Tracy** 46:9 79:2 108:6 109:15 140:1 153:21 167:21 190:22

**train** 207:2

**trained** 34:18

**training** 35:3,5,7 206:5 207:8

**transcript** 11:11 12:6

**transition** 59:6,11 71:22 72:4,10 73:12 82:20 135:15 140:2

**transitioned** 59:2 69:6,13 74:19 135:14

**transitioning** 135:20

**transmitted** 28:4

**travel** 37:21 38:7

**traveled** 38:4

**travels** 37:22

**Treasury** 26:12,13,17

**trouble** 104:15

**true** 59:15 60:20 68:9 108:10 172:14

**Trump** 78:4 97:13 157:4

**Tuesday** 115:13

**Tumlin** 9:3

**turn** 7:7 15:22 18:16 23:22 86:15 172:7,9 174:9 175:17 179:22

**turning** 174:11

**Tyler** 10:8 11:8,12 42:20 43:6 44:9 48:19 54:8 55:9 57:8,11,12,19 58:16 59:20 60:22 65:14 66:4,15 67:11 70:14,22 71:17 74:10 75:9 76:8 77:1 80:4 83:13,21 85:8 87:9,17 88:11 89:3,7, 16 90:1 91:2,6,14,19 92:3 93:2,6,12 95:19 96:2 102:17 103:17 111:3 114:15 115:20 116:21 118:17 119:11 121:12



Olender Legal Solutions
A Global Litigation Solutions Company

888.445.3376
202.898.1108

www.olenderreporting.com
Worldwide Coverage

122:18 123:5,17,22 127:1,
11 128:3,22 130:4 131:5,
18 133:2 138:1,9,22
139:12 144:17 145:4,20
146:5 147:7,14 148:10,22
149:11 150:7,19 151:3,10
152:2 155:5 156:12 158:15
159:15 160:10 162:4,11,16
163:15 164:6,22 165:19
166:19 167:7,11 168:7,17
169:1 170:1 178:7,20
180:15 183:20 184:9
186:11 188:22 189:18
191:12 193:9,15 194:6
195:7 196:4 197:12 199:9,
20 201:6 204:8 205:18
207:5,17 208:6,16,19

**type** 176:22

**types** 47:5 70:5 72:20 82:4
95:13 102:10 160:21,22

**typical** 29:7 94:20

**typically** 35:1 38:11

─────────────

           U

**U's** 188:15

**ultimately** 141:21 144:10
145:12 163:10

**unaccompanied** 168:5,9

**unclear** 145:11

**understand** 12:1,3,9,15,
20 13:2 35:17 42:22 67:19
75:10 77:3 89:9 93:7
102:18 114:17 117:4 129:2
148:20 163:19 164:8
184:14 206:11,17,19

**understanding** 24:6
144:15 181:9,11 185:19

**understood** 12:2 97:8

**undocumented** 142:14

**unit** 7:12 81:11,16 133:4,9
190:9 200:2

**United** 7:16,20 9:17 10:1,
3,8,10 38:1 171:20 172:3

**units** 209:6

**universities** 187:18,21

**University** 9:8 171:7

**unreviewable** 180:7

**unsigned** 25:5

**update** 21:19

**updated** 40:14 42:11

**updates** 40:10 72:21
134:20

**updating** 154:22

**USCIS** 16:10,12 18:18
23:17 30:5 35:14 40:17,18
42:9,13,17 43:10 54:4
55:14 62:13 68:20 69:6,13
75:18 84:12 85:15,16
108:11 124:16 125:3
139:10 142:13 148:2 154:7
156:5 173:19 174:4,14,22
175:4,6,13 176:8,13,19
177:3,10,15 180:7,21
181:2 184:5,7,16,17,21
186:8 197:2

**usual** 154:11

**utilize** 202:10,14,17

**utilizes** 204:10

**utilizing** 204:21

─────────────

           V

**vacant** 20:10 39:22

**vague** 42:20 43:6 55:9
65:14 66:4,15 70:14 71:1,
17 74:10 75:9 76:8 77:1
83:13,21 85:8 87:9 88:11
89:3,7 90:2 92:3 93:2,6
102:17 111:3 114:15
115:20 116:21 127:1
128:3,22 138:1,9 139:12
144:17 145:4 146:5 147:7
148:10 149:11 155:5
159:15 160:10 162:4,11,16
163:16 164:6 165:19
166:19 167:11 168:7,17
170:1 183:20 195:8 196:5
197:12 199:9,20 201:6
204:8 205:19 207:5

**vagueness** 119:12 131:18
149:1 165:1 184:11 191:12
195:7

**valid** 163:21

**Vanison** 46:7

**Vargas** 9:10,12

**varies** 21:8 30:7

**VAWA** 188:15 202:1,2,10

**vehicle** 52:15

**vendor** 85:22 86:2,9

**vendors** 86:11,13

**Ventresca** 9:7 170:15,18,
21 171:1,4,6,17 178:4,11,
16 179:2,14 180:19 184:2,
12 186:15 189:2 190:1

**verbally** 12:8 99:14

**Veritext** 8:1 209:7

**Vermont** 30:19 31:12

**versus** 9:21 186:2

**vetting** 94:21 95:1 96:10

**Victoria** 8:20

**Vidal** 7:15 156:11 157:5

**video** 7:12 21:11

**Violence** 31:16 188:15
189:10

**Virgin** 99:5 108:13,18
109:4,7,13 111:12 112:7
113:5,11 114:6

**visa** 202:14,17

**visas** 189:11

**visibility** 147:15 197:22

**visibilty** 200:6

**voices** 81:8

─────────────

           W

**waiting** 160:4,5

**waive** 11:10

**waived** 80:20

**waiving** 113:3,17

**walked** 65:3

**wanted** 50:2 133:12

**Washington** 7:21

**water** 124:8

**ways** 45:8,9 158:8,9,20,22
176:21

**website** 33:9,12 84:18
85:5 95:12 160:19

**week** 78:16 90:15 105:1
115:14,15,16 126:6,12
127:20 137:6 140:14

**weekend** 126:7

**weekly** 21:8,20 22:2,22
23:8 134:15,22 137:6
159:22 167:13,14,19

**weeks** 117:17 136:14,20

**whatnot** 182:13

**whispering** 7:5

**White** 129:19 147:1

**wide** 72:5

**widely** 130:17

**Wilhelm** 9:5

**wind** 78:15,18 79:11 87:12
92:5 125:15 126:19 127:9,
10 201:19 202:21 203:2,19
205:12 206:3,6 207:15

**winding** 200:18 201:4
203:21 208:1

**window** 154:12

**Wishnie** 8:17 57:14,18
123:18 132:22 150:16
152:9

**Women** 31:16 188:15
189:11

**word** 74:5 158:9 185:20
188:12 203:15

**wording** 194:20

**words** 133:18 134:10

**work** 19:7 20:22 21:16
30:6 52:3 73:1 74:6 80:6
87:20 91:9 112:9 127:17
134:17 135:6,16 150:15
155:1 157:12,15 203:13
205:6,7 208:8,11



**worked**  79:6 129:10,11
142:5

**working**  17:17,22 18:6,9,
13 45:14 203:7

**workload**  203:8 204:14
206:9 208:4

**works**  28:2 68:15 134:16

**worry**  157:6

**wrap**  177:6

**write**  49:2 181:12

**written**  23:12 41:13 79:14,
20

**wrong**  101:7 166:10

---

**Y**

---

**Yale**  8:16,18,22 11:1

**year**  44:2 50:22 51:2,3
125:5 190:21 200:12 203:6

**years**  14:18,21 29:14 30:8
50:7 183:9

**yesterday**  13:15 14:8
110:1

**York**  7:17 9:14,16,18
157:1,3

**young**  144:5,11

 Olender Legal Solutions
A Global Litigation Solutions Company

888.445.3376
202.898.1108

www.olenderreporting.com
Worldwide Coverage