**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS; | ) |
| | ) |
| STATE OF ALABAMA; | ) |
| | ) |
| STATE OF ARKANSAS; | ) |
| | ) |
| STATE OF KANSAS; | ) |
| | ) |
| STATE OF LOUISIANA; | ) |
| | ) |
| STATE OF NEBRASKA; | ) |
| | ) |
| STATE OF SOUTH CAROLINA; | ) |
| | ) |
| STATE OF WEST VIRGINIA, | ) |
| | ) |
| GOVERNOR PHIL BRYANT, STATE OF MISSISSIPPI; AND | ) |
| | ) |
| GOVERNOR PAUL R. LEPAGE, STATE OF MAINE, | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| *vs.* | )   Case No. 1:18-cv-00068 |
| | ) |
| UNITED STATES OF AMERICA, ET AL.; | ) |
| | ) |
| *Defendants,* | ) |
| | ) |
| *And* | ) |
| | ) |
| KARLA PEREZ, ET AL.; | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| *Defendants-Intervenors.* | ) |

**PLAINTIFF STATES' RESPONSE IN OPPOSITION TO
DEFENDANT-INTERVENORS' MOTION TO DISMISS**

In 2014, Plaintiff States first invoked this Court's jurisdiction to challenge the Obama Administration's assertion of unilateral executive power to confer lawful presence and work authorization on otherwise unlawfully and unauthorized aliens. After an equally divided Supreme Court affirmed this Court's injunction of DAPA and Expanded DACA, Plaintiff States were set to amend their complaint to challenge DACA unless Defendants voluntarily ended this controversial program. Plaintiff States dismissed their case without prejudice based on Defendants' act to wind down DACA—which would eventually end DACA's harms to the Plaintiff States caused by granting lawful presence, work authorization, and other benefits to hundreds of thousands of unlawfully present aliens.

But DACA's wind down did not happen, and Plaintiff States are still incurring massive financial and sovereign injuries caused by DACA's continued existence and implementation. The power of this Court to redress the harms that Plaintiff States are incurring because of the 2012 DACA program's creation and its continued existence in 2018 is clear; it is not now somehow limited because of lawsuits brought by different parties in different jurisdictions over a different 2017 Executive action.

## SUMMARY OF THE ARGUMENT

Defendant-Intervenors' motion to dismiss fails for at least three reasons. First, Plaintiff States are still suffering an Article III injury caused by Defendants' continued 2018 implementation of the DACA program created in 2012. DACA is currently in effect, and Plaintiff States have every right to challenge it—regardless of whether a related 2017 Executive action is being challenged elsewhere. Defendant-

Intervenors' motion wholly ignores *INS v. Chadha*, 462 U.S. 919, 939 (1983), and *United States v. Windsor*, 570 U.S. 744 (2013)—both of which hold there is an Article III controversy if the Executive Branch must take an action even if the Executive agrees with the legal position asserted by plaintiffs. Second, any prudential concerns about this Court exercising jurisdiction are cured by the presence of two groups of intervenors and the expected filing of amicus briefs. And, third, Plaintiff States' harms can be redressed by an injunction of the 2012 memorandum that created DACA, an Executive action that is different from the 2017 rescission of DACA challenged in the other litigation.

## STATEMENT OF ISSUES TO BE RULED UPON BY THE COURT

1.    Plaintiff States challenge the 2012 memorandum that created DACA as well as the continued implementation to this day (in 2018) of DACA. They are opposed by Defendants, who continue to implement the 2012 memorandum and who question Plaintiff States' standing and desired remedy. They are also opposed by individual DACA recipients who have intervened and are now Defendant-Intervenors, as well as the State of New Jersey—parties who seek the indefinite continuation of DACA in full force and effect. The questions presented are:

> a.  Whether the continued existence of DACA and the harms that it is currently causing Plaintiff States presents a live case or controversy;
>
> b.  Whether Defendant-Intervenors, New Jersey, and potential *amici* will defend DACA vigorously enough to satisfy any prudential concerns regarding the presentation of adversarial evidence; and

c. Whether this Court's ability to enjoin the 2012 memorandum and its continued implementation in 2018 is limited by rulings in other jurisdictions granted to other parties seeking to enjoin a different 2017 Executive action.

## ARGUMENT

## I.  DACA is still in effect, so a case or controversy exists.

For years, Plaintiff States have been involved in a significant Article III "case or controversy" litigating the validity of the Obama Administration's assertion of the unilateral power to confer lawful presence and work authorization under the guise of class-based deferred-action programs. This momentous controversy clearly has not disappeared since this Court's preliminary injunction of DAPA and Expanded DACA was upheld by the Supreme Court.

Article III's case or controversy requirement requires adversity between parties. *Chadha*, 462 U.S. at 939. And there is obvious adversity here: The presence of intervenors—who are DACA recipients and another State—defending the challenged law shows that "the concrete adverseness is beyond doubt." *Id.*; *see also City of Springfield v. Wash. Pub. Power Supply Sys.*, 752 F.2d 1423, 1427 (9th Cir. 1985) ("While it appears to us that there was a case or controversy at the outset, the alternate position of the intervenor that the cities lacked authority to enter into the net billing agreements resolves any doubt on that point.").

Even without the presence of the Defendant-Intervenors and New Jersey, Article III adversity remains between Plaintiff States and Defendants. Such

3

adversity exists so long as one party is "aggrieved" by the actions of another, even when the parties may agree about certain legal arguments presented in the case. *Chadha*, 462 U.S. at 939. The Supreme Court decades ago clarified that there is still Article III adverseness in such a scenario even when the U.S. Attorney General agrees with the legal arguments made by plaintiffs: "[I]t would be a curious result if, in the administration of justice, a [plaintiff] could be denied access to the courts because the Attorney General of the United States agreed with the legal arguments asserted by the [plaintiff]." *Id.*

Here, despite Defendants agreeing with Plaintiff States that DACA is unlawful, Defendants continue to accept DACA applications and implement the 2012 memorandum (subject to certain exceptions). So far in fiscal year 2018, Defendants have approved 20,573 initial DACA applications and 185,086 DACA renewal applications. Exh. A. Thus, the cause of Plaintiff States' injuries continues, and Plaintiff States continue to be aggrieved by Defendants' actions.

That is the same fact pattern that the Supreme Court held satisfied Article III in *Chadha*, a case notably ignored by Defendant-Intervenors' second motion to dismiss. There, an immigration judge suspended the plaintiff's impending deportation. *Chadha*, 462 U.S. at 924. However, following the Immigration and Nationality Act's one-House veto provision, the House of Representatives vetoed the immigration judge's suspension and reinstated the deportation. *Id.* at 926-27. The plaintiff then challenged the constitutionality of the one-House veto provision. *Id.* at 928. On appeal the defendant—the Executive Branch (via the Immigration and

Naturalization Service)—agreed that the one-House veto provision was unconstitutional, but the INS was prepared to deport the plaintiff anyway unless a court ordered it not to do so. *Id.* at 928, 930. The Supreme Court explained that even though the Executive Branch agreed with the plaintiff's legal argument, "the INS's agreement with [the plaintiff's] position does not alter the fact that the INS would have deported [the plaintiff] absent the Court of Appeals' judgment." *Id.* at 939. There was a concrete controversy because the INS stood to deport the plaintiff, so the ruling of the Court would have a real effect on the plaintiff. *Id.*

Likewise, in *Windsor*—also ignored by Defendant-Intervenors—the U.S. Attorney General decided not to defend § 3 of the Defense of Marriage Act. 570 U.S. at 753. But, importantly, because the federal government did not give the plaintiff her requested relief (*i.e.*, her tax refund), the case presented a justiciable controversy between the parties. *Id.* at 758-59. The Supreme Court clarified that "the words of *Chadha* make clear its holding that the refusal of the Executive to provide the relief sought suffices to preserve a justiciable dispute as required by Article III." *Id.* at 759.

Here, Plaintiff States seek an end to DACA, and Defendants are continuing to implement DACA. A ruling from this Court declaring that DACA is unlawful and enjoining Defendants from implementing it would put a stop to the cause of Plaintiff States' injuries. Like in *Chadha*, a decision from this Court would have real meaning for Plaintiff States. And like in *Windsor*, Defendants have still not provided the relief sought by Plaintiff States. Accordingly, until Defendants can finally and actually

cease implementing DACA, Plaintiff States and Defendants are adverse parties under Article III, Plaintiff States suffer an Article III injury, and a controversy exists.

This Court, however, does not have to even reach the question of whether there is sufficient adversity between Plaintiffs and the federal government, as there is clear adversity from the intervention of certain DACA recipients and New Jersey.

## II. The adversarial positions of Defendant-Intervenors, New Jersey, and potential *amici* cure any prudential concerns.

As the requirements of Article III are satisfied, so are any prudential concerns about adjudicating a case in which Plaintiff States and Defendants agree on the legal position that DACA is unlawful. First, any allegation that this is somehow a "collusive" lawsuit is simply wrong. While Defendants may agree with Plaintiff States on the merits of the procedural and substantive APA claims, Defendants do not concede that DACA violates the Take Care Clause. *See* Fed. Defs.' Resp. to Pls.' Mot. for Prelim. Inj. 15 n.5, ECF No. 71. Likewise, Defendants do not concede that Plaintiff States have standing, without which Plaintiff States would not be entitled to any relief at all. *See id.* at 15-16. And Defendants oppose the relief sought by Plaintiff States (a nationwide injunction of DACA). *Id.* at 16-18.

Second, the presence of Defendant-Intervenors, New Jersey, and proposed *amici* resolve any doubt of "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Windsor*, 570 U.S. at 760 (citation and quotation marks omitted); *see also Chadha*, 462 U.S. at 939 ("[F]rom the time of Congress' formal

intervention . . . the concrete adverseness is beyond doubt."). This is not the first time a court has considered a posture like this one: Where intervenors and *amici* are prepared to defend the legality of government action, all prudential concerns are satisfied, even when the principal parties agree that the government action is unlawful. *See Windsor*, 570 U.S. at 760-61. Defendants-Intervenors, along with anticipated *amici*, are prepared to defend the merits of DACA, so the Court can be assured of an adequate presentation of all issues.

### III.   Plaintiff States' harm is caused by the 2012 DACA memorandum and its continued implementation in 2018—not the attempted 2017 rescission of DACA—and can be redressed by an order from this Court enjoining the 2012 Executive action or its continued implementation.

Like the Court's earlier orders enjoining DAPA and Expanded DACA, which redressed Plaintiff States' injuries stemming from those programs, a similar order here would redress Plaintiff States' injuries caused by DACA. Despite Defendants' stated desire to end DACA, the program remains in effect and continues to cause harm for Plaintiff States. Until DACA is actually ended, and Plaintiff States no longer face the harm it causes, this Court has the power to enjoin Defendants from enforcing it.

That Defendants face injunctions from other courts on the attempted 2017 rescission of DACA is of no consequence. Those cases deal with a question distinct from the question in this case—whether the attempted 2017 rescission of DACA was lawful. The plaintiffs in those cases argue that the attempted 2017 rescission was unlawful because the stated justification for the rescission was insufficient and

because it did not go through notice and comment as required by the APA. Those questions regarding the lawfulness of the 2017 attempted Executive action are separate from the questions raised by Plaintiff States in this case regarding the unlawfulness of the 2012 Executive action and its continued 2018 implementation. The attempted 2017 rescission cases involve different parties, different courts, different executive actions, and ultimately different legal questions. Defendants have not sought to stay the effect of those injunctions, and Defendants have not issued a new memorandum trying again to rescind DACA in an effort to moot the challenges to the 2017 memorandum. Instead, Defendants continue to implement DACA (with some exceptions) indefinitely. *See* Exh. A. And that implementation will only expand if the order from the District of Columbia district court takes effect and rescinds the 2017 memorandum entirely.

To be clear, this case is not a collateral attack on the injunctions issued in the attempted-rescission cases. Indeed, it does not even touch on the question of whether the attempted 2017 DACA rescission followed proper procedures. This case solely examines whether DACA, from its inception in 2012 to its continued 2018 implementation, is lawful. That is in contrast to the rescission case pending in the Eastern District of New York, which began as a striking collateral attack on this Court's injunction of Expanded DACA. *See* Exh. B, Compl., *Batalla Vidal v. Baran*, No. 1-16-cv-4756 (E.D.N.Y. Aug. 25, 2016). The plaintiff in that case received a three-year Expanded DACA permit one day *after* this Court enjoined Expanded DACA. *Id.* ¶ 32. The plaintiff filed suit in New York asking the court to "[e]njoin Defendants

from revoking Mr. Batalla Vidal's three-year employment authorization on the basis of the injunction in *Texas v. United States*." *Id.* at Prayer (e). If there were ever a request for a competing injunction, that is it—not the instant case properly before this Court. And despite that collateral attack in New York on this Court's injunction, the judge in that case felt in no way constrained by this Court's first-in-time order:

> THE COURT: I understand. I know you have a problem. Understood. But then, again, I have a problem which is the rights of this individual, all right, and whoever else comes along. So I understand that and maybe perhaps I'll decide whatever I decide. Someone will take it up to the Second Circuit and guess what? There might be a circuit split or the circuit will say they agree with the Fifth Circuit or we should give full faith and credit and comity, whatever you want to call it, to the actions of the Fifth Circuit in order to avoid placing the government in an untenable position.
>
> By that time there will be a new president and there will be a new Congress and it may be an issue in the political branches and we may not have anything to do here. I have no idea. But right now the question is the plaintiff has brought this problem to me and, as sympathetic as I am to the government's predicament, the plaintiff has brought the issue to the court and I should be dealing with the issue if I can. Maybe I can't, and we're going to find out if I should. That's all.
>
> So I understand your problem. I sympathize with your problem, but I do not sympathize with the idea that I am hamstrung in dealing with an issue involving individual rights and including the right to go make a living and have a life as an immigrant in the United States. So I don't know what's going on out there to Texas on the border but I know what's going on in New York. And I'm very concerned about it and I have absolutely no intention of simply marching behind in the parade that's going on out there in Texas, if this person has rights here.

Exh. C, Sept. 22, 2016 Conf. Tr. 11:22-12:25, *Batalla Vidal*. Defendant-Intervenors now argue that a ruling from that judge on a different Executive action somehow precludes this Court's ability to enjoin the 2012 Executive action.

9

But this Court need not address any of those issues, because—in contrast to the plaintiff in *Batalla Vidal*—Plaintiff States here are not asking for a competing, collateral injunction regarding the same executive action. And this Court has in front of it plaintiffs that are being harmed by continued consequences of the unlawful action that the Executive took in 2012 and continues to implement in 2018. This Court is in no way "hamstrung" by what other courts are doing in response to a different attempted 2017 Executive action.

Defendant-Intervenors' argument that Plaintiff States' injuries are not redressable by this Court because of the preliminary injunctions that enjoin the attempted 2017 rescission of DACA is wrong on its face. A court's ruling that the rescission of DACA in 2017 was unlawful does not ratify and legalize its creation in 2012 or even its continued implementation in 2018—just like the failure to properly repeal a statute would not cure any legal defects that may exist in the statute as initially created or implemented. Even if the DACA-rescission cases reach a final judgment that the 2017 rescission was unlawful, this Court can still rule on whether DACA's creation in 2012 or its continued implementation was and is unlawful.

Whatever other courts might say about the Executive's attempted 2017 DACA rescission, this Court can take up the question of whether DACA's 2012 creation was lawful in the first place and whether its continued 2018 implementation is lawful today. And if it decides that it is not, the Court can issue an order enjoining DACA's continued enforcement. Such an order will redress Plaintiff States' injuries directly caused by DACA's ongoing implementation.

10

## CONCLUSION

Because this lawsuit presents a genuine Article III controversy and Plaintiff States' injuries can be redressed by an order from this Court, Plaintiff States request that the Court deny Defendant-Intervenors' second motion to dismiss.

July 20, 2018                                         Respectfully submitted.

STEVE MARSHALL                              KEN PAXTON
Attorney General of Alabama               Attorney General of Texas

LESLIE RUTLEDGE                             JEFFREY C. MATEER
Attorney General of Arkansas              First Assistant Attorney General

JEFF LANDRY                                     BRANTLEY STARR
Attorney General of Louisiana             Deputy First Assistant Attorney General

DOUGLAS J. PETERSON                     JAMES E. DAVIS
Attorney General of Nebraska             Deputy Attorney General for Civil Litigation

ALAN WILSON                                    */s/ Todd Lawrence Disher*
Attorney General of South Carolina      TODD LAWRENCE DISHER
                                                          Attorney-in-Charge
PATRICK MORRISEY                           Special Counsel for Civil Litigation
Attorney General of West Virginia        Tx. State Bar No. 24081854
                                                          Southern District of Texas No. 2985472
                                                          Tel.: (512) 463-2100; Fax: (512) 936-0545
                                                          todd.disher@oag.texas.gov
                                                          P.O. Box 12548
                                                          Austin, Texas 78711-2548

                                                          ADAM ARTHUR BIGGS
                                                          Special Counsel for Civil Litigation

                                                          ADAM N. BITTER
                                                          Assistant Attorney General

                                                          **COUNSEL FOR PLAINTIFF STATES**

11

**CERTIFICATE OF SERVICE**

I certify that on July 20, 2018, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Special Counsel for Civil Litigation

**COUNSEL FOR PLAINTIFF STATES**

# Exhibit A



**Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status Fiscal Year 2012-2018 (May 31, 2018)**

| Period | Requests by Intake and Case Status | | | | | | |
|---|---|---|---|---|---|---|---|
| | Intake[1] | | | | Case Review[6] | | |
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Approved[7] | Denied[8] | Pending[9] |
| **Fiscal Year - Total [6]** | | | | | | | |
| 2012 | 152,431 | 5,395 | 157,826 | 3,629 | 1,680 | - | 150,751 |
| 2013 | 427,617 | 16,350 | 443,967 | 1,697 | 470,351 | 10,968 | 97,025 |
| 2014 | 238,900 | 24,887 | 263,787 | 952 | 158,330 | 20,990 | 156,538 |
| 2014 Initial | 122,460 | 19,064 | 141,524 | 488 | 136,100 | 20,987 | 62,333 |
| 2014 Renewal | 116,440 | 5,823 | 122,263 | 464 | 22,230 | 3 | 94,205 |
| 2015 | 448,857 | 35,474 | 484,331 | 1,781 | 509,969 | 21,350 | 73,902 |
| 2015 Initial | 85,304 | 7,150 | 92,454 | 338 | 90,633 | 19,069 | 37,861 |
| 2015 Renewal | 363,553 | 28,324 | 391,877 | 1,443 | 419,336 | 2,281 | 36,041 |
| 2016 | 260,701 | 12,317 | 273,018 | 1,035 | 198,544 | 14,435 | 120,701 |
| 2016 Initial | 73,349 | 1,151 | 74,500 | 291 | 52,710 | 11,399 | 46,231 |
| 2016 Renewal | 187,352 | 11,166 | 198,518 | 744 | 145,834 | 3,036 | 74,470 |
| 2017 | 472,850 | 43,455 | 516,305 | 1,884 | 462,343 | 13,310 | 117,502 |
| 2017 Initial | 45,602 | 44 | 45,646 | 182 | 47,290 | 9,242 | 35,193 |
| 2017 Renewal | 427,248 | 43,411 | 470,659 | 1,702 | 415,053 | 4,068 | 82,309 |
| 2018 | 137,993 | 23,231 | 161,224 | 826 | 205,659 | 8,128 | 41,556 |
| 2018 Initial | 1,495 | 2 | 1,497 | 9 | 20,573 | 4,904 | 11,198 |
| 2018 Renewal | 136,498 | 23,229 | 159,727 | 817 | 185,086 | 3,224 | 30,358 |
| Total Cumulative | 2,139,349 | 161,109 | 2,300,458 | 1,459 | 2,006,876 | 89,181 | 41,556 |
| Total Cumulative Initial | 908,258 | 49,156 | 957,414 | 619 | 819,337 | 76,569 | 11,198 |
| Total Cumulative Renewal | 1,231,091 | 111,953 | 1,343,044 | 840 | 1,187,539 | 12,612 | 30,358 |

| Period | Requests by Intake and Case Status | | | | | | |
|---|---|---|---|---|---|---|---|
| | Intake[1] | | | | Case Review[6] | | |
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Approved[7] | Denied[8] | Pending[9] |
| _Fiscal Year 2018 by Quarter_ [13] | | | | | | | |
| Q1. October - December | 29,527 | 14,537 | 44,064 | 1,139 | 98,639 | 2,545 | 45,820 |
| Q1. October - December Initial | 95 | 1 | 96 | 4 | 5,585 | 1,664 | 28,036 |
| Q1. October - December Renewal | 29,432 | 14,536 | 43,968 | 1,135 | 93,054 | 881 | 17,784 |
| Q2. January-March | 64,501 | 6,239 | 70,740 | 1,141 | 55,049 | 3,910 | 51,283 |
| Q2. January - March Initial | 977 | 0 | 977 | 17 | 9,637 | 2,162 | 17,208 |
| Q2. January - March Renewal | 63,524 | 6,239 | 69,763 | 1,123 | 45,412 | 1,748 | 34,075 |
| Q3. April - June | 43,965 | 2,455 | 46,420 | 1,022 | 51,971 | 1,673 | 41,556 |
| Q3. April - June Initial | 423 | 1 | 424 | 10 | 5,351 | 1,078 | 11,198 |
| Q3. April - June Renewal | 43,542 | 2,454 | 45,996 | 1,013 | 46,620 | 595 | 30,358 |

_D - Data withheld to protect requestors' privacy._

_- Represents zero._

[1] _Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described in the Secretary of Homeland Security's memorandum issued June 15, 2012._

_Each request is considered on a case-by-case basis._

_See http://www.uscis.gov/childhoodarrivals._

[2] _The number of new requests accepted at a Lockbox during the reporting period._

[3] _The number of requests rejected at a Lockbox during the reporting period._

[4] _The number of requests that were received at a Lockbox during the reporting period._

[5] _The number of requests accepted per day at a Lockbox as of the end of the reporting period. Also note the average accepted per day for initial plus renewal will not equal the total average._

[6] _The number of new requests received and entered into a case-tracking system during the reporting period._

[7] _The number of requests approved during the reporting period._

[8] _The number of requests that were denied, terminated, or withdrawn during the reporting period._

[9] _The number of requests awaiting a decision as of the end of the reporting period._

_NOTE: 1. Some requests approved or denied may have been received in previous reporting periods._

_2. The report reflects the most up-to-date estimate available at the time the report is generated._

_3. USCIS previously discovered that the query code used to generate this report had some flaws affecting the data in the "Pending" fields, such that the data in this field was over inclusive because it included cases that were not pending (e.g., cases that had been administratively closed or withdrawn).  USCIS understands that it has corrected these query code issues and that this report provides a more accurate reflection of pending cases.  Note that if this report is compared to versions prior to the March 31, 2018 version that USCIS has published on its website, the prior versions reflect over inclusive data in the "Pending" fields._

_4. The Quarterly Report totals may not match the totals provided within the Demographics Reports due to differences in how the data is generated._

_Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigration Services Centralized Operation Repository (eCISCOR), May 2018_

| Top Countries of Origin | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Grand Total | 908,258 | 1,231,091 | 2,139,349 | 819,337 | 1,187,539 | 2,006,876 |
| Mexico | 707,370 | 966,230 | 1,673,600 | 645,311 | 932,709 | 1,578,020 |
| El Salvador | 34,497 | 46,917 | 81,414 | 29,540 | 45,094 | 74,634 |
| Guatemala | 24,907 | 30,862 | 55,769 | 20,786 | 29,645 | 50,431 |
| Honduras | 22,697 | 29,281 | 51,978 | 19,007 | 28,237 | 47,244 |
| Peru | 9,830 | 14,646 | 24,476 | 9,261 | 14,089 | 23,350 |
| South Korea | 7,901 | 14,700 | 22,601 | 7,409 | 13,940 | 21,349 |
| Brazil | 8,625 | 11,147 | 19,772 | 7,569 | 10,803 | 18,372 |
| Ecuador | 7,795 | 10,484 | 18,279 | 6,848 | 10,063 | 16,911 |
| Colombia | 7,296 | 10,182 | 17,478 | 6,717 | 9,848 | 16,565 |
| Philippines | 5,127 | 7,671 | 12,798 | 4,770 | 7,389 | 12,159 |
| Argentina | 5,263 | 7,088 | 12,351 | 4,925 | 6,873 | 11,798 |
| India | 3,788 | 5,477 | 9,265 | 3,242 | 5,242 | 8,484 |
| Jamaica | 4,448 | 4,950 | 9,398 | 3,507 | 4,767 | 8,274 |
| Venezuela | 3,489 | 4,743 | 8,232 | 3,174 | 4,604 | 7,778 |
| Dominican Republic | 3,840 | 4,196 | 8,036 | 3,247 | 4,070 | 7,317 |
| Uruguay | 2,643 | 3,357 | 6,000 | 2,468 | 3,251 | 5,719 |
| Bolivia | 2,238 | 3,303 | 5,541 | 2,113 | 3,199 | 5,312 |
| Costa Rica | 2,290 | 3,143 | 5,433 | 2,094 | 3,025 | 5,119 |
| Poland | 2,005 | 2,651 | 4,656 | 1,855 | 2,558 | 4,413 |
| Chile | 1,908 | 2,702 | 4,610 | 1,790 | 2,627 | 4,417 |
| Pakistan | 1,948 | 2,677 | 4,625 | 1,720 | 2,567 | 4,287 |
| Nicaragua | 1,908 | 2,395 | 4,303 | 1,648 | 2,313 | 3,961 |
| Tobago | 2,442 | 1,717 | 4,159 | 2,095 | 1,704 | 3,799 |
| Guyana | 1,486 | 1,954 | 3,440 | 1,297 | 1,905 | 3,202 |
| Not Reported | 1,607 | 1,770 | 3,377 | 1,255 | 1,647 | 2,902 |
| All Others | 30,910 | 36,848 | 67,758 | 25,689 | 35,370 | 61,059 |

*D  Data withheld to protect requestors' privacy.*

*- Represents zero.*

[1]  *The number of requests that were accepted to date of the reporting period.*

[2]  *The number of requests that were approved to date of the reporting period.*

[3]  *All fields with a blank in the country of birth field are included in the field "not reported."*

*NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.*

   *2) The report reflects the most up-to-date estimate data available at the time the report is generated.*

   *3) Ranked by total approvals.*

*Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigration Services Centralized Operation Repository (eCISCOR), May 2018*

| Residence | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Grand Total | 908,258 | 1,231,091 | 2,139,349 | 819,337 | 1,187,539 | 2,006,876 |
| California | 246,429 | 279,313 | 525,742 | 228,478 | 274,170 | 502,648 |
| Texas | 142,773 | 149,297 | 292,070 | 127,144 | 146,710 | 273,854 |
| New York | 51,572 | 91,472 | 143,044 | 44,955 | 89,487 | 134,442 |
| Florida | 41,685 | 75,536 | 117,221 | 35,338 | 74,036 | 109,374 |
| Illinois | 46,330 | 49,676 | 96,006 | 43,313 | 48,639 | 91,952 |
| New Jersey | 26,542 | 41,524 | 68,066 | 23,323 | 40,709 | 64,032 |
| Arizona | 31,067 | 31,980 | 63,047 | 28,400 | 31,258 | 59,658 |
| North Carolina | 29,909 | 29,200 | 59,109 | 27,786 | 28,634 | 56,420 |
| Georgia | 29,091 | 30,820 | 59,911 | 24,809 | 30,170 | 54,979 |
| Washington | 20,007 | 23,464 | 43,471 | 18,392 | 23,018 | 41,410 |
| Colorado | 19,378 | 19,249 | 38,627 | 17,619 | 18,842 | 36,461 |
| Virginia | 14,378 | 21,515 | 35,893 | 12,746 | 21,041 | 33,787 |
| Nevada | 14,354 | 16,148 | 30,502 | 13,344 | 15,843 | 29,187 |
| Maryland | 11,868 | 17,921 | 29,789 | 10,295 | 17,551 | 27,846 |
| Massachusetts | 9,976 | 19,608 | 29,584 | 8,589 | 19,185 | 27,774 |
| Oregon | 12,224 | 12,715 | 24,939 | 11,506 | 12,477 | 23,983 |
| Pennsylvania | 7,491 | 14,848 | 22,339 | 6,436 | 14,548 | 20,984 |
| Indiana | 10,848 | 10,863 | 21,711 | 10,022 | 10,675 | 20,697 |
| Utah | 10,634 | 9,822 | 20,456 | 9,850 | 9,630 | 19,480 |
| Michigan | 7,587 | 12,189 | 19,776 | 6,783 | 11,904 | 18,687 |
| Tennessee | 9,447 | 9,649 | 19,096 | 8,515 | 9,457 | 17,972 |
| Minnesota | 7,127 | 9,861 | 16,988 | 6,502 | 9,632 | 16,134 |
| Wisconsin | 8,259 | 8,436 | 16,695 | 7,729 | 8,287 | 16,016 |
| Connecticut | 5,865 | 9,543 | 15,408 | 5,223 | 9,358 | 14,581 |
| Oklahoma | 7,573 | 7,763 | 15,336 | 7,002 | 7,638 | 14,640 |
| Kansas | 7,403 | 7,487 | 14,890 | 6,933 | 7,345 | 14,278 |
| New Mexico | 7,504 | 6,953 | 14,457 | 6,945 | 6,838 | 13,783 |
| South Carolina | 7,266 | 7,197 | 14,463 | 6,552 | 7,056 | 13,608 |
| Ohio | 5,485 | 8,882 | 14,367 | 4,729 | 8,679 | 13,408 |
| Arkansas | 5,680 | 5,520 | 11,200 | 5,198 | 5,410 | 10,608 |
| Alabama | 4,870 | 4,931 | 9,801 | 4,370 | 4,841 | 9,211 |
| Missouri | 3,995 | 5,281 | 9,276 | 3,678 | 5,185 | 8,863 |
| Nebraska | 3,852 | 4,285 | 8,137 | 3,476 | 4,198 | 7,674 |
| Kentucky | 3,522 | 4,162 | 7,684 | 3,147 | 4,081 | 7,228 |
| Iowa | 3,218 | 4,224 | 7,442 | 2,890 | 4,129 | 7,019 |
| Idaho | 3,429 | 3,592 | 7,021 | 3,199 | 3,523 | 6,722 |
| Louisiana | 2,496 | 3,730 | 6,226 | 2,153 | 3,661 | 5,814 |
| Rhode Island | 1,509 | 2,941 | 4,450 | 1,316 | 2,871 | 4,187 |
| Hawaii | 861 | 3,458 | 4,319 | 695 | 3,366 | 4,061 |
| Delaware | 1,645 | 2,098 | 3,743 | 1,496 | 2,070 | 3,566 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Mississippi | 1,724 | 1,896 | 3,620 | 1,501 | 1,874 | 3,375 |
| District of Columbia | 988 | 2,019 | 3,007 | 834 | 1,990 | 2,824 |
| Puerto Rico | 575 | 2,261 | 2,836 | 419 | 2,212 | 2,631 |
| New Hampshire | 480 | 1,197 | 1,677 | 415 | 1,168 | 1,583 |
| Wyoming | 699 | 703 | 1,402 | 627 | 686 | 1,313 |
| Alaska | 216 | 872 | 1,088 | 178 | 858 | 1,036 |
| South Dakota | 316 | 546 | 862 | 274 | 532 | 806 |
| Maine | 148 | 634 | 782 | 120 | 618 | 738 |
| Guam | 115 | 649 | 764 | 93 | 634 | 727 |
| North Dakota | 151 | 571 | 722 | 121 | 559 | 680 |
| Virgin Islands | 168 | 420 | 588 | 112 | 403 | 515 |
| West Virginia | 160 | 380 | 540 | 131 | 370 | 501 |
| Montana | 93 | 287 | 380 | 80 | 276 | 356 |
| Vermont | 66 | 307 | 373 | 50 | 302 | 352 |
| Armed Forces-Pacific | 33 | 146 | 179 | 29 | 142 | 171 |
| Armed Forces-Europe, Middle East, Africa, Canada | 28 | 129 | 157 | 21 | 123 | 144 |
| Armed Forces-Americas (except Canada) | 19 | 84 | 103 | 14 | 84 | 98 |
| Northern Mariana Islands | 32 | 39 | 71 | 13 | 35 | 48 |
| Palau | | 20 | 20 | | 19 | 19 |
| Not Reported | 17,098 | 140,778 | 157,876 | 13,429 | 118,502 | 131,931 |

- Represents zero.

[1] The number of requests that were accepted to date of the reporting period.

[2] The number of requests that were approved to date of the reporting period.

[3] All fields with less than 10 or a blank in the state field are included in the field "not reported."

NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.

   2) The report reflects the most up-to-date estimate data available at the time the report is generated.

   3) Ranked by total approvals.

Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigration Services Centralized Operation Repository (eCISCOR), May 2018

# Exhibit B

# UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| v. | ) |
| | ) |
| KATHY A. BARAN, Director, California | ) |
| Service Center, KELVIN MEDLOCK, | ) |
| Associate Director, California Service | ) |
| Center, SUSAN M. CURDA, District | ) |
| Director, and DONALD W. NEUFELD, | ) |
| Associate Director, Service Center | ) |
| Operations, U.S. Citizenship and | ) |
| Immigration Services, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**COMPLAINT**

CIVIL ACTION NO. _____

Plaintiff Batalla Vidal, by and through his counsel, alleges the following on information and belief:

## INTRODUCTION

This action challenges the Department of Homeland Security's revocation of employment authorization of a young New York City resident, which was done solely on the basis of a preliminary injunction entered by a U.S. District Court in Brownsville, Texas. *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam). Plaintiff Martín Jonathan Batalla Vidal is not and has never been a party to the *Texas v. United States* suit. He did not have a full and fair opportunity to defend his interests in that action, and no other party there adequately represented them. In addition, Texas and the other plaintiffs lack standing to obtain, and the District Court in *Texas v. United States* lacked jurisdiction or authority to enter, an injunction reaching to New York. Defendants' reliance on the unlawfully broad *Texas v. United States*

injunction to revoke Mr. Batalla Vidal's employment authorization violated the Administrative Procedure Act.

Mr. Batalla Vidal came to the United States from Mexico at the age of seven and has lived in New York for nearly twenty years. He is now a student preparing to become a medical assistant and works to help support his family while he pursues his education. In November 2014, Mr. Batalla Vidal submitted an application for Deferred Action for Childhood Arrivals (DACA), a program of temporary immigration relief established in 2012 by the U.S. Department of Homeland Security (DHS). Later that same month, DHS announced certain revisions to DACA, including an expansion of the period of deferred action and employment authorization from two years to three years. In February 2015, the government granted Mr. Batalla Vidal a three-year period of deferred action and employment authorization. On May 14, 2015, however, Defendants revoked Mr. Batalla Vidal's three-year employment authorization, stating as the sole grounds for their action the issuance of a preliminary injunction in *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015). Subsequently, DHS issued Mr. Batalla Vidal a two-year employment authorization.

The government's reliance on the unlawfully broad *Texas v. United States* injunction was legally erroneous. Mr. Batalla Vidal asks this Court to (1) declare that the February 2015 preliminary injunction entered in *Texas v. United States* does not apply to New York residents such as Mr. Batalla Vidal; (2) declare unlawful Defendants' revocation of his employment authorization; (3) vacate and set aside the unlawful revocation and order the reinstatement of Mr. Batalla Vidal's three-year employment authorization; and (4) enjoin Defendants from revoking his employment authorization on the basis of the injunction in *Texas v. United States*.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq*. This Court has remedial authority pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

2.      Venue properly lies in the Eastern District of New York because Plaintiff resides in the district. 28 U.S.C. § 1391(e)(1). Venue also properly lies in the Eastern District of New York because a substantial part of the events or omissions giving rise to this action occurred in the District. 28 U.S.C. § 1391(b).

## PARTIES

3.      Plaintiff Martín Jonathan Batalla Vidal ("Martín Batalla Vidal" or "Mr. Batalla Vidal") is a recipient of Deferred Action for Childhood Arrivals (DACA). He currently resides in Queens, New York.

4.      Defendant Kathy Baran is the Director of the California Service Center of the United States Citizenship and Immigration Services (USCIS). She is sued in her official capacity.

5.      Defendant Donald W. Neufeld is the Associate Director for Service Center Operations of USCIS. He is sued in his official capacity.

6.      Defendant Kelvin Medlock is the Associate Director of the California Service Center of USCIS. He is sued in his official capacity.

7.      Defendant Susan M. Curda is a District Director of USCIS. She is sued in her official capacity.

## STATEMENT OF FACTS

**USCIS Issuance of Employment Authorization to DACA Recipients**

8.      By statute, USCIS may grant employment authorization to certain classes of noncitizens. 8 U.S.C. § 1324a(h)(3)(B). One such class is individuals "who ha[ve] been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, if the alien establishes an economic necessity for employment." 8 C.F.R. § 274a.12(c)(14).

9.      USCIS has granted employment authorization to DACA recipients under this category. When USCIS grants employment authorization, it issues to the applicant an Employment Authorization Document (EAD).

10.      Employment authorization is crucial to young people trying to build their lives in the United States. It allows them to raise the funds necessary for post-secondary education, participate in the workforce, support themselves and their families, and save for the future.

11.      Under USCIS regulations, the agency has discretion to establish the initial period of employment authorization.

12.      Once the agency has exercised its discretion to grant an initial period of work authorization, however, USCIS may revoke employment authorization only under limited circumstances enumerated in the regulations. *See* 8 C.F.R. § 274a.14(a). Otherwise, revocation is permissible when a condition upon which employment authorization was granted has not been met or ceases to exist, or based on "good cause shown." *Id.* § 274a.14(b)(1). None of these circumstances or enumerated grounds for revocation applied to Mr. Batalla Vidal.

13.      USCIS regulations also require the agency to provide written notice of intent to revoke employment authorization. *Id.* § 274a.14(b)(2). The notice must state the reasons

indicating that revocation is warranted. Once notice is served, the affected party is entitled to a period of fifteen days to submit countervailing evidence. *Id.*

14.     The regulations provide that an affected party may not appeal the agency's decision to revoke employment authorization. *Id.*

15.     These regulations bind USCIS and constrain its power to revoke employment authorization for the period of time granted. Accordingly, these regulations create a legal right to a proper process for revocation of employment authorization and a legitimate claim of entitlement to the EAD once granted. *Id.* § 274a.14(b).

16.     The original 2012 DACA guidance announced that USCIS would grant deferred action and employment authorization for a period of two years, subject to renewal for additional two-year periods. Memorandum from Janet Napolitano, Sec'y of Homeland Security, to Alejandro Mayorkas, Director, U.S. Citizenship and Immigration Servs., *Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children*, June 15, 2012 ("2012 DACA Memorandum") (attached hereto as Exhibit A). This memorandum stated that people who came to the United States as children, lack a serious criminal history, attend school, and meet other criteria may request that the Secretary grant deferred action, a temporary form of relief from removal, for a period of two years. Those granted deferred action in this manner would also be eligible for employment authorization and a social security card. *See* Exhibit A, 2012 DACA Memorandum.

17.     On November 20, 2014, President Obama and Secretary of Homeland Security Jeh Johnson announced a series of further executive actions for immigration relief, including the creation of Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA). Memorandum from Jeh Charles Johnson, Sec'y of Homeland Security, to Leon Rodriguez,

Director, U.S. Citizenship and Immigration Servs., *Exercising Prosecutorial Discretion With Respect to Individuals Who Came to the United States as Children and With Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* 3, Nov. 20, 2014 ("2014 DACA/DAPA Memorandum") (attached hereto as Exhibit B).

18.     At the same time, the President and Secretary announced an expansion of DACA, liberalizing the eligibility criteria and authorizing the grant or renewal of deferred action and employment authorization for a period of three years ("expanded DACA"). *Id.*

**The *Texas v. United States* Litigation**

19.     On December 3, 2014, Texas and thirteen other plaintiff states, along with the governors of four other states, filed a civil action in the U.S. District Court for the Southern District of Texas against Secretary of Homeland Security Jeh Johnson and other federal immigration officials, seeking an injunction to halt the implementation of DAPA and expanded DACA. Eight more states and one state attorney general later joined the suit as plaintiffs. Neither the State of New York nor any New York official joined the lawsuit as a plaintiff. Three Texas residents who were potential beneficiaries of DAPA moved to intervene, but the district court denied that motion, which was subsequently overturned on appeal.

20.     Judge Andrew S. Hanen entered a preliminary injunction in favor of plaintiffs on February 16, 2015, enjoining the Secretary's implementation of DAPA and expanded DACA, including, of relevance here, the new DACA provision permitting a grant or renewal of deferred action and employment authorization for a period of three years. By its terms, Judge Hanen's order applied nationwide. *Texas v. United States*, 86 F. Supp. 3d 591, 677-78 (S.D. Tex. 2015).

21.     Judge Hanen's order relied on a finding that Texas had sufficiently satisfied the necessary standing requirements for the granting of the preliminary injunction. *Id.* at 620. The

court observed, "If the majority of the DHS Directive beneficiaries residing in [Texas] apply for driver's licenses, Texas will bear directly a $174.73 per applicant expense, costing the state millions of dollars." *Id*. Judge Hanen's order was also based on a determination that adoption of DAPA and expanded DACA violated the APA's procedural requirements, and that, consequently, Texas and other plaintiff states had a substantial likelihood of success on the merits. *Id.* at 671-72.

22.     The plaintiffs did not include class allegations in their complaint, and did not move for or obtain class certification on a nationwide or other basis.

23.     The government appealed to the U.S. Court of Appeals for the Fifth Circuit. On appeal, fifteen states and the District of Columbia filed an amicus curiae brief in support of the government. The brief included the State of New York. These states and the District of Columbia denied that implementation of DAPA or expanded DACA created an imminent risk of harm to their state, pointing out that the types of costs alleged by Texas are a matter of state choice, not federal coercion, and contending that the district court had little information to determine the cost of licensing under DAPA and expanded DACA outside of Texas. They also argued that, since the only evidence of harm cited was confined to Texas, the injunction was overbroad, and the court should at the very least limit the injunction to encompass solely plaintiff states.

24.     The Fifth Circuit affirmed entry of the preliminary injunction, *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), and reversed the denial of the motion to intervene by three Texas residents, *Texas v. United States*, 805 F.3d 653 (5th Cir. 2015).

25.     On June 23, 2016, the Supreme Court affirmed the Fifth Circuit decision by an equally divided court, leaving the Fifth Circuit opinion in place but setting no precedent. *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam); *see Neil v. Biggers*, 409 U.S. 188 (1972)

(finding that "[t]he legal effect" of an equally divided opinion "would be the same if the appeal, or writ of error, were dismissed").

26.     On May 19, 2016, Judge Hanen issued an expansive sanctions order, directing the government to file under seal a list of the names, addresses, contact information, and alien registration numbers of all individuals in the Plaintiff States granted benefits under the 2014 DACA/DAPA Memorandum between November 20, 2014 and March 3, 2015, for possible future release by Judge Hanen. Memorandum Opinion and Order, *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015) (No. B-14-254), ECF No. 347 ("Sanctions Order") (attached hereto as Exhibit C). He further ordered that "any attorney employed at the Justice Department in Washington, D.C. who appears, or seeks to appear, in a court (state or federal) in any of the 26 Plaintiff States annually attend a legal ethics course" for five years. *Id.* at 25-26.

**Plaintiff Martín Batalla Vidal**

27.     Martín Batalla Vidal was born in Mexico and raised in New York from the age of seven. Mr. Batalla Vidal has a younger brother who has also received DACA, and two younger brothers who were born in the United States. Mr. Batalla Vidal considers New York his home, as it is the only place he has lived as an adult.

28.     Mr. Batalla Vidal attended Bushwick Leaders High School for Academic Excellence in Brooklyn, New York, from September 2004 until his graduation in June 2008.

29.     After graduating from high school, Mr. Batalla Vidal was interested in attending a nursing program at a school such as the City University of New York (CUNY), but could not seriously consider these programs because these universities did not offer financial aid to undocumented students. His guidance counselor and other advisors also repeatedly stressed the

difficulty of finding work in the medical field without employment authorization, in light of which Mr. Batalla Vidal chose not to pursue a degree he might not be able to use in the future.

30.    On November 14, 2014, Mr. Batalla Vidal applied for DACA with the assistance of Make the Road New York (MRNY). MRNY is a nonprofit, membership-based community organization that integrates adult and youth education, legal and survival services, and community/civic engagement, in a holistic approach to help low-income New Yorkers improve their lives and neighborhoods. To prepare his DACA application, Mr. Batalla Vidal attended a workshop at MRNY's office in Brooklyn, New York, where he made multiple follow-up visits. He spent several days gathering the necessary paperwork and obtaining documents from his high school, hospital, and bank.

**Approval of DACA Application and Issuance of Three-Year EAD**

31.    On November 20, 2014, President Obama and the Secretary of Homeland Security announced the expansion of DACA and the creation of DAPA. *See* Exhibit B.

32.    On February 17, 2015—one day after the court entered a preliminary injunction in *Texas v. United States*—DHS approved Mr. Batalla Vidal's application for DACA and, pursuant to the government's November 20, 2014 memorandum, granted Mr. Batalla Vidal a three-year employment authorization, valid from February 17, 2015 to February 16, 2018. Dep't Homeland Sec., I-797C Notice of Action, Feb. 17, 2015 (attached hereto as Exhibit D).

33.    Receiving DACA reinvigorated Mr. Batalla Vidal's dreams of working in the medical profession, and in fall 2015 he enrolled at ASA College in a medical assistant's degree. With DACA, Mr. Batalla Vidal was able to raise money for school and to support his mother and younger siblings, by working initially both full-time at Bocca Catering and part-time at New York Sports Club. He currently works full-time at New York Sports Club. Mr. Batalla Vidal also

received a scholarship for DACA recipients from ASA College that is awarded in $3,120 increments over four semesters. However, Mr. Batalla Vidal's ability to start his career remains uncertain—and additionally so due to Defendants' unlawful actions that are challenged here.

**Revocation of Plaintiff's Three-Year Period of Employment Authorization**

34.     On May 7, 2015, Secretary Johnson informed Judge Hanen that despite the court's February 16, 2015 preliminary injunction in *Texas v. United States*, USCIS had, after the injunction was entered, granted three-year terms of deferred action and employment authorization to approximately 2,000 individuals. Defendants' May 7 Advisory, *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015) (No. B-14-254), ECF No. 247 ("May 7 Advisory") (attached hereto as Exhibit E).

35.     On May 14, 2015, Defendants caused a letter to be sent to Mr. Batalla Vidal, instructing Mr. Batalla Vidal to "immediately return to USCIS the EAD that has a 3-year validity period listed." The letter also stated that Mr. Batalla Vidal's failure to return his EAD might result in adverse action in his case.

36.     Defendants' letter gave only one explanation for the revocation of Mr. Batalla Vidal's three-year employment authorization: "The reason for this action is that, after a court order in *Texas v. United States*, No. B-14-254 (S.D. Tex.), USCIS erroneously issued you a 3-year instead of 2-year approval notice or notices and a 3-year instead of 2-year EAD."

37.     Mr. Batalla Vidal has not appealed USCIS's revocation of his three-year employment authorization because there are no administrative avenues by which to seek relief. 8 C.F.R. § 274a.14(b)(2).

38.     In or around May 2015, Mr. Batalla Vidal received by mail a second approval notice from USCIS (Form I-797C), renewing his DACA status for a two-year period, from

February 17, 2015 to February 16, 2017. On May 26, 2015, Mr. Batalla Vidal separately received by mail a notice that included an EAD card, valid for the period indicated in the approval notice.

39.     Due to Defendants' revocation of his three-year employment authorization, Mr. Batalla Vidal will have to apply for renewal of his employment authorization in less than two years. The renewal process requires locating, acquiring, and submitting documents, getting fingerprinted, paying a total of $465 in fees, and potentially notifying Mr. Batalla Vidal's employer. Further, Mr. Batalla Vidal would potentially need to resign from his future job due to the prolonged and uncertain duration of the renewal process.

40.     In revoking Mr. Batalla Vidal's three-year employment authorization and issuing a two-year employment authorization in its place, USCIS did not refund Mr. Batalla Vidal this $465 in fees or any part thereof.

41.     Although Mr. Batalla Vidal did not participate in the *Texas v. United States* litigation, Defendants revoked and deprived him of his employment authorization on the sole ground of the *Texas* preliminary injunction. Mr. Batalla Vidal had no opportunity to contest the revocation of his three-year employment authorization or to vindicate his rights.

42.     At no point following the *Texas* defendants' May 7 Advisory did any of the parties to *Texas v. United States* attempt to join to that litigation either Mr. Batalla Vidal or others whose three-year employment authorization was revoked, or otherwise allow him his day in court.

43.     The plaintiffs in *Texas v. United States* lacked standing to seek or obtain a nation-wide injunction requiring Defendants to revoke Mr. Batalla Vidal's three-year employment authorization and his duly issued three-year EAD. Further, the plaintiffs in that case lacked

standing to assert injury arising from New York residents receiving three-year terms of employment authorization. Because "[t]he remedy must of course be limited to the inadequacy that produced the injury in fact," *see Lewis v. Casey*, 518 U.S. 343, 357 (1996), the injury in fact found by the *Texas* court in issuing a nationwide injunction—the cost to Texas and potentially to Indiana and Wisconsin of issuing driver's licenses—was "a patently inadequate basis for . . . imposition of system-wide relief," *see id.* at 359.

44.     The court in *Texas* lacked jurisdiction and remedial authority to enter a nationwide preliminary injunction that was broader than necessary to remedy the specific harm to the plaintiffs, *see Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), because it had neither made a final determination as to the lawfulness of any agency rule nor found evidence of irreparable harm to persons or states other than the named plaintiffs, *see Lewis*, 518 U.S. at 349-50, 349 n.1 (finding that a district court's overly broad injunction, in light of the scope of plaintiffs' standing, raised a "jurisdictional" issue).

45.     Mr. Batalla Vidal does not possess a Texas driver's license, has never resided in Texas, and disclaims all intention of applying for a Texas driver's license during the term of the three-year employment authorization that he received from USCIS. The state where Mr. Batalla Vidal resides, New York, has denied that the implementation of the November 20, 2014 memorandum would cause the harm necessary to issue an injunction applicable in that state.

46.     Even if Mr. Batalla Vidal moved to Texas while possessing a three-year EAD, he would be required by law to notify USCIS of a change of address within ten days. 8 C.F.R. § 265.1. At that time, and if still subject to the *Texas v. United States* injunction, USCIS could revoke Mr. Batalla Vidal's three-year employment authorization and provide him with a two-year period of employment authorization instead.

47.     Furthermore, even if Mr. Batalla Vidal had moved to Texas with a three-year EAD in hand and applied for a Texas driver's license without informing USCIS of his change of address, Mr. Batalla Vidal would have been flagged by USCIS's Systematic Alien Verification for Entitlements (SAVE) program, which the Texas Department of Public Safety uses to confirm the eligibility of each applicant for a driver's license. At that point, USCIS could have revoked Mr. Batalla Vidal's three-year employment authorization and provided him with a two-year period of employment authorization instead.

48.     This Court has the jurisdiction and authority to determine whether Defendants' revocation of Mr. Batalla Vidal's three-year employment authorization was not in accordance with law. *See Martin v. Wilks*, 490 U.S. 755, 758-59 (1989) (litigants deprived of legal rights by a prior action to which they were not parties could bring a collateral attack against the consent decree resulting from that action).

49.     Mr. Batalla Vidal is entitled to relief in this court because the *Texas* injunction jeopardizes his legally protected interest in his three-year employment authorization. *See McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 491 (1991) (holding that where employment authorization was granted upon noncitizen's filing of nonfrivolous agricultural worker application, "the impact of a denial on the opportunity to obtain gainful employment [was] plainly sufficient to mandate constitutionally fair procedures").

50.     Defendants' revocation of Mr. Batalla Vidal's three-year employment authorization is not in accordance with the law: USCIS erred in revoking Mr. Batalla Vidal's employment authorization based on an overly broad injunction entered by a court in Texas that lacked jurisdiction to reach New York residents.

51.     Defendants' revocation of Mr. Batalla Vidal's three-year employment authorization violates binding USCIS regulations, which permit revocation only when a condition upon which employment authorization was granted has not been met or ceases to exist, or based on "good cause shown." 8 C.F.R. § 274a.14(b).

52.     Plaintiff is aggrieved by Defendants' final agency action in revoking his three-year employment authorization by letter dated May 14, 2015.

53.     Plaintiff has exhausted his administrative remedies. *See* 8 C.F.R. § 274a.14(b)(2) ("The decision by the district director shall be final and no appeal shall lie from the decision to revoke the authorization.").

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### ADMINISTRATIVE PROCEDURE ACT

54.     Plaintiff Batalla Vidal repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

55.     Defendants' revocation of Mr. Batalla Vidal's employment authorization was not in accordance with law, in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), in that it was based on a legal error—namely, Judge Hanen's unlawfully broad preliminary injunction in *Texas v. United States*, which was entered without jurisdiction.

56.     Plaintiff is entitled to request that this Court declare his legal right not to have his employment authorization revoked based on a legal error. 28 U.S.C. § 2201.

### SECOND CLAIM FOR RELIEF
### ADMINISTRATIVE PROCEDURE ACT

57.     Plaintiff Batalla Vidal repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

58.     Defendants' revocation was not done "for good cause shown" or for any other reason permitted by 8 C.F.R. § 274a.14, and was thus done "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(D).

59.     Plaintiff is entitled to request that this Court declare his legal right not to have his employment authorization revoked without observance of procedure required by law. 28 U.S.C. § 2201.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court to:

(a) Issue a declaratory judgment stating that the February 2015 preliminary injunction entered in *Texas v. United States* does not apply to New York residents such as Mr. Batalla Vidal;

(b) Issue a declaratory judgment stating that Defendants' revocation of Mr. Batalla Vidal's three-year employment authorization based on the injunction issued in *Texas v. United States* was an "agency action" that was "not in accordance with law," in violation of the APA, 5 U.S.C. § 706(2)(A);

(c) Issue a declaratory judgment stating that Defendants' revocation of Mr. Batalla Vidal's three-year employment authorization was an "agency action" that was "without observance of procedure required by law," in violation of the APA, 5 U.S.C. § 706(2)(D), as it was not premised on any circumstance listed in 8 C.F.R. § 274a.14(b)(1)(i);

(d) Hold unlawful and set aside Defendants' revocation of Mr. Batalla Vidal's three-year employment authorization and order Defendants to restore it;

(e) Enjoin Defendants from revoking Mr. Batalla Vidal's three-year employment authorization on the basis of the injunction in *Texas v. United States*;

(f)  Award Mr. Batalla Vidal reasonable attorneys' fees and costs pursuant to 5 U.S.C. § 504

and 28 U.S.C. § 2412; and

(g)  Grant any and all further relief this Court deems just and proper.


Dated: August 25, 2016

Respectfully submitted,

   /s/ Amy Taylor

| | |
|---|---|
| Willem Bloom, Law Student Intern* | Melissa Keaney[†] |
| Jordan Laris Cohen, Law Student Intern* | Karen Tumlin[†] |
| Amit Jain, Law Student Intern* | NATIONAL IMMIGRATION |
| Aaron Korthuis, Law Student Intern* | LAW CENTER |
| Zachary Manfredi, Law Student Intern* | P.O. Box 70067 |
| Muneer I. Ahmad[†] | Los Angeles, CA 90070 |
| Ruben Loyo[†] | Phone: (213) 639-3900 |
| Marisol Orihuela[†] | |
| Michael J. Wishnie (MW 1952) | Justin Cox[†] |
| JEROME N. FRANK | NATIONAL IMMIGRATION |
| LEGAL SERVICES ORGANIZATION | LAW CENTER |
| Yale Law School | 1989 College Ave. NE |
| P.O. Box 209090 | Atlanta, GA 30317 |
| New Haven, Connecticut 06520 | Phone: (678) 404-9119 |
| Phone:  (203) 432-4800 | |

Amy S. Taylor (AT 2056)
Deborah Axt (DA 4885)
Clement Lee[†]
MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Phone: (718) 418-7690



*Attorneys for Plaintiff*

---

\* Motion for law student appearance forthcoming.
[†] *Pro hac vice* motion forthcoming.

16

# Exhibit C

1

<pre>
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF NEW YORK


- - - - - - - - - - - - - - - X

BATALIA VIDAL,                    :      16-CV-4756

              Plaintiff,          :

              v.                  :      United States Courthouse
                                         Brooklyn, New York
DIRECTOR KATHY A. BARAN,          :
                                  :      September 22, 2106
              Defendant.          :      3:15 o'clock p.m.
                                  :

- - - - - - - - - - - - - - - X


                    TRANSCRIPT OF CONFERENCE
                    BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
                    SENIOR UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:               MICHAEL J. WISHNIE, ESQ.
                                 KAREN C. TUMLIN, ESQ.
                                 AMY S. TAYLOR, ESQ.


For the Defendant:               ADAM KIRSCHNER
                                 SCOTT DUNN
                                 Assistant U.S. Attorneys



Court Reporter:                  Anthony M. Mancuso
                                 225 Cadman Plaza East
                                 Brooklyn, New York 11201
                                 (718) 613-2419



Proceedings recorded by mechanical stenography, transcript
produced by CAT.
</pre>

2

1          (Case called; both sides ready.)

2          MR. WISHNIE:  Good afternoon, your Honor.  Michael

3 Wishnie, Jerome N. Frank Legal Services Organization, for the

4 plaintiff.

5          THE COURT:  Nice to meet you, professor.

6          MR. WISHNIE:  With me today is Willem Bloom, a law

7 student intern, who will be handling the hearing.

8          MS. TAYLOR:  Amy Taylor, Make The Road New York, for

9 plaintiff.

10          MS. TUMLIN:  Karen Tumlin, National Immigration Law

11 Center, for plaintiff.

12          MR. KIRSCHNER:  Adam Kirschner with the Department

13 of Justice and with me I think you might know.

14          MR. DUNN:  Scott Dunn from the U.S. Attorney's

15 Office.

16          THE COURT:  Yes, Mr. Dunn and I have done a lot of

17 business over the years.  Nice to see you all.

18          And you are Mr. Bloom?

19          MR. BLOOM:  Willem Bloom.

20          THE COURT:  You are a student where.

21          MR. BLOOM:  In The Jerome Frank Legal Services

22 Organization.

23          THE COURT:  What year are you in at Yale?

24          MR. BLOOM:  Third year.

25          THE COURT:  You are not going to Kirkland & Ellis,

3

1   are you?

2           MR. BLOOM:   No, your Honor.

3           THE COURT:   It's a great law firm.   Let me say that.

4           So, tell me why are you here after my colleague down

5   in the Southern District of Texas, that erudite jurist, has

6   issued nationwide preliminary injunction and you want me to

7   carve out what you might call the Second Circuit exception to

8   that, if you will?

9           MR. BLOOM:   I would like to note to Mr. Vidal is

10  with us in the courtroom.

11          THE COURT:   How old is he?

12          MR. BLOOM:   25.

13          THE COURT:   He fits in under either of these two

14  programs.

15          MR. BLOOM:   He was eligible for originally DACA,

16  Deferred Action for Childhood Arrivals, and received his

17  employment.   It was one of the programs that the president's

18  policies allowed undocumented youth to apply for lawful

19  present status and employment authorization under it.

20          THE COURT:   Just speak very slowly because, as I

21  said before, I've been a lawyer for 41 years and, you know, I

22  want to be able to understand everything.

23          MR. BLOOM:   Of course, your Honor.

24          What gives Mr. Batalia Vidal the right to be in

25  front of you is that he had his employment authorization, a

4

1  three year employment authorization that he was granted by the

2  government revoked in violation of the Administrative

3  Procedure Act.  The revocation was not in accordance with law

4  and it was contrary to established regulatory agency

5  procedures.  The only reason given by government for the

6  revocation of his three year employment authorization was the

7  injunction in United States v. Texas.

8          THE COURT:  No.  It was not an injunction.  It was a

9  preliminary injunction.

10         MR. BLOOM:  Yes, your Honor.  Excuse me.  A

11  preliminary injunction.

12         THE COURT:  Without a hearing.

13         MR. BLOOM:  Yes, to which Mr. Vidal was not a party

14  and to which the court did not have jurisdiction to reach

15  Mr. Vidal here in New York.  Under the principles of the

16  Martin v. Wilks he has every right to come into your court and

17  seek relief under the Administrative Procedure Act.

18         THE COURT:  That's why you feel you can be here and

19  that the preliminary injunctive relief that was granted in the

20  Southern District of Texas and affirmed by the Fifth Circuit

21  would not reach his situation here in New York?  Is that it?

22         MR. BLOOM:  Yes.

23         THE COURT:  So, the case involves one person.  He's

24  your only client.

25         MR. BLOOM:  Well, your Honor, we would like to alert

5

1    you.   We informed opposing counsel yesterday, Make The Road

2    New York will be joining as an organizational plaintiff.

3            MS. TAYLOR:   Make The Road New York.

4            THE COURT:   What does make the road New York do?

5            MS. TAYLOR:   We are a membership-based organization,

6    we have nineteen thousand dues paying members in New York

7    State and we advocate for immigrant and working class families

8    in New York on a whole range of policy issues, including

9    immigrant rights.   We have many members like Martin who have

10   DACA who are eligible for expanded DACA and DAPA and we are

11   here both representing Martin as his lawyer and ready to

12   become an organizational plaintiff.   We have a legal

13   department.   We provide legal services to DACA.

14           THE COURT:   Let me give you fair warning.   Have you

15   heard of the Disability Advocates case regarding

16   representational litigation?  I know about it.   It was my case

17   and the Second Circuit said that Disability Advocates, after I

18   ruled in the case, after a long bench trial and a 212 page

19   decision, drafted in large measure by a graduate of the Yale

20   Law School, a wonderful law clerk that I had, that the Second

21   Circuit ruled that representational standing was not

22   permitted.   There was no Article III standing.

23           So if you want to get involved in this case

24   organizationally, I just warn you that representative status

25   may not be sufficient to meet your Article III standing

6

1    obligations and so just be very careful.

2          There is a plaintiff here, but you may not -- and

3    I'm not sure, you do the research -- be able to appear as a

4    party.  You may have to have individuals who intervene in the

5    case, if that's your plan to intervene.  So let's not cross

6    that unpleasant situation that I had the last time, when in

7    the end the outcome was a positive outcome because the case

8    was settled and now I'm managing the settlement.  But just be

9    careful.

10         MS. TAYLOR:  Thank you, your Honor.  We have

11   researched the issue in-depth and we feel confident that we

12   have standing both organizationally and associational standing

13   and I can explain more if you are interested or another time.

14         THE COURT:  We're not debating that right now.  I'm

15   just mentioning this to you because I don't want to cross that

16   bridge ever again.  You are not going to ask me whether I

17   agreed with the Second Circuit but it is the Second Circuit

18   after all.  Speaking of the Second Circuit, what's my

19   government's position?

20         MR. KIRSCHNER:  Well, your Honor, I would want to

21   first mention that we disagree with the nationwide injunction.

22   That's why we vehemently and strenuously asserted opposition

23   to it in the Southern District of Texas.  In fact, we moved to

24   stay the preliminary injunction proceedings explicitly

25   discussed the nationwide scope of the injunction.  We then

7

1   appealed that to the Fifth Circuit, both the stay decision and

2   under the underlying preliminary injunction, and,

3   unfortunately, we lost.

4           THE COURT:  Both of those decisions were two to one.

5   It was split panel in both cases?

6           MR. KIRSCHNER:  Yes, your Honor.

7           THE COURT:  Did you ask for an en banc on any of

8   that.

9           MR. KIRSCHNER:  On the underlying injunction we went

10  to the supreme court and we had a four/four divided court

11  affirming the Fifth Circuit and pending before the supreme

12  court is our petition rehearing that has not been decided

13  upon.

14          THE COURT:  It's still the same eight justices.

15          MR. KIRSCHNER:  Our rehearing petition is a petition

16  for there to be a rehearing when there is a ninth justice and

17  that's pending currently before the supreme court.

18          THE COURT:  There's no certainty when that will be

19  either.

20          MR. KIRSCHNER:  I mean we could all speculate.  I

21  don't want to be here to speculate.

22          THE COURT:  Exactly.  I understand.  I'm glad you

23  brought me up to date.

24          MR. KIRSCHNER:  The problem is plaintiff is trying

25  to put us in an untenable position.  We are subject to an

ANTHONY M. MANCUSO,   CSR   OFFICIAL COURT REPORTER

8

1   injunction right now.  And there's no way for us, based on

2   plaintiff's complaint, to be subject to the injunction that we

3   are subject to in the Southern District of Texas and the

4   injunction that they are asking this court to issue.  These

5   are completely conflicting injunctions and that we are left in

6   the untenable position to be left with conflicting

7   injunctions.

8         THE COURT:  I understand that.

9         MR. KIRSCHNER:  So our position will be to ask the

10   court to dismiss this case.  The parties have agreed that

11   there's no factual development necessary.  Plaintiff has

12   brought this case as an APA action.  My experience with APA

13   actions, the plaintiff goes first to explain why it's

14   arbitrary and capricious.  Normally we would have moved to

15   dismiss.  We have now reached a proposed briefing schedule

16   where we submitted that for the parties to cross move on

17   dispositive motions for your consideration.

18         THE COURT:  Is it the government's position that an

19   injunction, preliminary injunction, in the Southern District

20   of Texas affirmed by the Fifth Circuit, affirmed by an equally

21   guided supreme court, which has no precedential value as a

22   supreme court decision, all right, the way I learned about

23   federal court -- that was a long time ago -- but I don't think

24   that changed.  That somehow a court sitting in Brooklyn New

25   York, in the Second Circuit, must give full faith and credit

1  to a decision of the Fifth Circuit which may be erroneous?

2           MR. KIRSCHNER:  Well, your Honor, the problem is

3  that it was the nationwide scope of the injunction.  It's not

4  the fact that there's an injunction in the Southern District

5  of Texas.  It is that the Southern District of Texas and the

6  Fifth Circuit explicitly addressed this issue that plaintiff

7  is bringing before you and explicitly ruled as a nationwide

8  injunction.

9           THE COURT:  How does Judge Garaufis issue a

10  nationwide injunction if someone comes to him with a claim

11  that affects the rights of people in California who have not

12  been before the court, when there's been no hearing.  There

13  was no hearing in Texas.  He did it all in three weeks on

14  papers and that was it.  Why should a judge in California --

15  let's keep Texas out of this for a minute -- why should a

16  judge in California in the Ninth Circuit be constrained in

17  adjudicating the individual rights of a resident of let's say

18  the Northern District of California because Judge Garaufis in

19  the Eastern District of New York decided to impose some

20  gargantuan preliminary injunction?  That doesn't sound like

21  justice to me.

22           MR. KIRSCHNER:  Your Honor, a couple of responses.

23  First, I just want to state for the record that there was a

24  hearing on the preliminary injunction proceeding in the

25  Southern District of Texas.

10

1          THE COURT:  Oh, really.

2          MR. KIRSCHNER:  Oral argument.

3          THE COURT:  That's not a hearing.  That's oral

4    argument.  There's a difference.  A hearing is people get on

5    the witness stand and they testify.  Oral argument is lawyers

6    talk and you know how valuable lawyers talking is.

7          MR. KIRSCHNER:  Understood.  I just wanted to note

8    that.

9          THE COURT:  It's not a hearing.  In the parlance of

10   this court, that's not a hearing.  That's an oral argument.

11   It's what you are doing, in effect, here preliminarily.  Go

12   ahead.  I understand your point.

13         MR. KIRSCHNER:  But, your Honor, the issue is the

14   United States was a party in the Southern District of Texas.

15   The United States is a party here.  Mr. Vidal was not a party.

16         In fact, one thing I want to correct for the record,

17   plaintiff just stated that deferred action confers lawful

18   present status.  We vehemently disagree with that

19   characterization.  We stated so in the supreme court.  There

20   is no lawful status provided by DACA that this is a deferral

21   of removal that allows one to have work authorization.

22         THE COURT:  I've read DACA.  I've read DAPA.  I read

23   them both.  I understand what the scope of those policies is.

24   I've read them both.  So I understand your point.  So,

25   whatever was said by counsel, I understand your point.

1          MR. KIRSCHNER:  To answer your question about

2    California residents, the answer is that the United States

3    would be the defendant.  The United States is the same party

4    in that situation that you have described just as it is the

5    same party here.  And a case that's very instructive is a

6    Fourth Circuit case called Feller v. Brock and in that case

7    the Department of Labor was under an injunction in the

8    District of Columbia and there was a conflicting injunction

9    issued in a District Court in West Virginia and the Fourth

10   Circuit said that principles of equity would be that the

11   Department of Labor could not be subject to this conflicting

12   injunction and overturned the injunction that was in West

13   Virginia.

14          One of the things that occurred that is very

15   instructive is that the plaintiff in the District of Columbia

16   brought contempt proceedings against the Department of Labor

17   for complying with the District Court in West Virginia,

18   because the department of labor was in an impossible situation

19   in that case of both complying with the District of Columbia

20   and the District Court in West Virginia and that's the problem

21   here.

22          THE COURT:  I understand.  I know you have a

23   problem.  Understood.  But then, again, I have a problem which

24   is the rights of this individual, all right, and whoever else

25   comes along.  So I understand that and maybe perhaps I'll

12

1    decide whatever I decide.  Someone will take it up to the

2    Second Circuit and guess what?  There might be a circuit split

3    or the circuit will say they agree with the Fifth Circuit or

4    we should give full faith and credit and comity, whatever you

5    want to call it, to the actions of the Fifth Circuit in order

6    to avoid placing the government in an untenable position.

7            By that time there will be a new president and there

8    will be a new Congress and it may be an issue in the political

9    branches and we may not have anything to do here.  I have no

10   idea.  But right now the question is the plaintiff has brought

11   this problem to me and, as sympathetic as I am to the

12   government's predicament, the plaintiff has brought the issue

13   to the court and I should be dealing with the issue if I can.

14   Maybe I can't, and we're going to find out if I should.

15   That's all.

16           So I understand your problem.  I sympathize with

17   your problem, but I do not sympathize with the idea that I am

18   hamstrung in dealing with an issue involving individual rights

19   and including the right to go make a living and have a life as

20   an immigrant in the United States.  So I don't know what's

21   going on out there to Texas on the border but I know what's

22   going on in New York.  And I'm very concerned about it and I

23   have absolutely no intention of simply marching behind in the

24   parade that's going on out there in Texas, if this person has

25   rights here.

13

1          So just bear that in mind.

2          So, now, having said all that, I have this

3    extraordinary letter from Mr. Kirschner about a briefing

4    schedule.  So you all agree to this briefing schedule?

5          MR. BLOOM:  Yes, your Honor?

6          THE COURT:  I don't agree to it.  It's too long.

7    How long will it take to do this brief?  I know it's part of

8    an educational program.  October 6.  You could do it by

9    October 6.

10          MR. WISHNIE:  Yes, your Honor.  And we'll file the

11    amended complaint before then.  So it would be a motion on the

12    amended complaint.

13          THE COURT:  There you go.  And you want November 16.

14    Strangely November 16 is after November 8.  So we're not doing

15    this on November 16.

16          MR. KIRSCHNER:  Your Honor, I do want to say one

17    thing.  Normally we would have 60 days to respond to the

18    complaint.

19          THE COURT:  I don't care.

20          MR. KIRSCHNER:  We would have the 60 days, and it

21    would not be until the end of October.  I do want to note that

22    we would normally have opposed plaintiff moving for early

23    summary judgment to give us an opportunity to move to dismiss

24    and that we had agreed to this schedule in an effort to

25    consolidate the briefing and to make it more streamlined for

14

1    the court.  Otherwise, there would have been three briefs for

2    plaintiff's summary judgment, three briefs for our motion to

3    dismiss.  It would have been elongated.  When we were working

4    on the schedule I have a personal conflict toward the end of

5    October that we were trying to take into account and we are

6    trying to take into account their final schedules and holidays

7    and that's how we came to this agreement.  It took into

8    account all equities for both sides.

9            THE COURT:  Mr. Dunn knows about my view of

10   counsel's issues and schedules.  Do you remember we had a

11   scheduling issue together?

12           MR. DUNN:  Very well, your Honor.

13           THE COURT:  He got it done.  He worked all night.

14   He got it done.  I was very impressed.

15           MR. KIRSCHNER:  The other thing I will say about

16   this case, this is a case that, obviously, these issues are of

17   great importance and as much as I would say it's just me, your

18   Honor, it involves a lot of coordination within the

19   department, coordination with our client.

20           THE COURT:  I understand.  I have worked for the

21   federal government in the executive branch and there is a lot

22   of coordination with these kinds of submissions and you do

23   have problems that are not of you're making.  I appreciate

24   that.  But November 16 is a lot of time.  So all I'm saying is

25   that why don't we cut that back a week.  I want to get it done

15

1   this year is what I am saying, without creating major

2   difficulties for you, sir.  Why don't we make it November 10.

3          MR. KIRSCHNER:  Thank you, your Honor.

4          THE COURT:  And then you can get this done -- a

5   response by November 30?

6          MR. WISHNIE:  Yes, your Honor.

7          THE COURT:  And you have a plaintiff's motion.  We

8   have consolidated opposition by November 10.  Then you had

9   December 6 for the opposition and I have November 30 for the

10   opposition.  What's the fourth item, January?

11          MR. KIRSCHNER:  That's our reply for our dispositive

12   motion.

13          MR. WISHNIE:  That second brief, your Honor, will be

14   both the government's opposition to plaintiff's motion and

15   their opening brief on their motion.  The fourth brief is the

16   last shortest brief and is a reply exclusively on the

17   government's motion.

18          THE COURT:  I got it.

19          December 28 for the defendant's reply to the

20   plaintiff's opposition to defendant's motion.

21          MR. KIRSCHNER:  Your Honor, because it would be a

22   motion to dismiss, it would be in lieu of an answer.  Because

23   of the scheduling, just being where it is, just to formally

24   stay the answer.

25          THE COURT:  Your motion is granted.  I'm going to

16

1    stay the answer to the proposed, expected, anticipated amended
2    complaint until 30 days after the decision of the court on
3    motions in the case.
4         MR. KIRSCHNER:  One other matter, your Honor, is
5    because of this briefing schedule we would have anticipated
6    filing a premotion letter before we filed our motion.  We
7    would asked to be excused from doing a premotion letter.
8         THE COURT:  Absolutely.  You are here.  The purpose
9    of that, that rule, is to alert attorneys that they should
10   come to court and explain why they think a motion is
11   necessary.  I'm really addressing this to the students.  There
12   are times when a party will want to make a motion to dismiss
13   when the case can't be decided on a 12(b) motion and we really
14   need to have some amount of discovery.  It might be a limited
15   discovery, but some discovery is necessary.  And so rather
16   than have a motion made that cannot be granted, it's better to
17   share that problem with the parties and send them to a
18   Magistrate Judge for some discovery and then permit some
19   motion practice after the discovery.  So that's really why I
20   have that rule.
21        And then there are times when the parties come in
22   and the defense explains why one of the claims doesn't have
23   any validity and the plaintiff will say I'm going to withdraw
24   the claim.  So we've narrowed the case in that way.  So that's
25   why a pre-motion conference for me at least is a very valuable

1 | process.

2 |       MR. KIRSCHNER:  Understood.

3 |       THE COURT:  I just wanted to point that out.

4 |       So, the plaintiff is still here on the two-year

5 | permit, right?

6 |       MR. KIRSCHNER:  Yes.

7 |       THE COURT:  His rights, he's not in any danger of

8 | losing his current status between now and January, correct?

9 |       MR. KIRSCHNER:  Correct.  And he currently has

10 | employment authorization as cited in the complaint and also

11 | it's subject to renewal, too.

12 |       THE COURT:  What does he have to do, pay another

13 | fee?

14 |       MR. KIRSCHNER:  Another application process, which

15 | includes a fee.

16 |       THE COURT:  Is that what it costs Texas to process a

17 | driver's license?  That was rhetorical.  Say hi to my friends

18 | at the justice department.  Say hi to my friends at Yale.

19 |       So, is there anything else from the plaintiff and

20 | proposed intervenor?  If you wish to intervene, I wish you

21 | would do it right away so that the government knows who you

22 | are and what your claims are.

23 |       When are you going to file your amended complaint?

24 |       MR. BLOOM:  We should be able to do it by the end of

25 | next week.

18

1        THE COURT:   In terms of intervention when would that

2   be?

3        MR. WISHNIE:   We meant to do the same thing, just to

4   join an additional plaintiff in the amended complaint.

5        THE COURT:   So it will be done through the amended

6   complaint?

7        MR. WISHNIE:   Yes, your Honor.

8        THE COURT:   You understand that?

9        MR. KIRSCHNER:   Yes.

10        THE COURT:   You're okay with that?

11        MR. KIRSCHNER:   We'll see.

12        THE COURT:   You'll address everything at the same

13   time?

14        MR. KIRSCHNER:   Yes.

15        THE COURT:   Anything else from anybody on this side?

16        MR. WISHNIE:   In terms of scheduling, I don't know

17   if you would intend to hold oral argument on the motion or if

18   so you would want to wait and see the papers and decide then.

19        THE COURT:   I think I would like to wait and see the

20   papers.  If you want a date, let me give you a date in

21   January.

22        MR. WISHNIE:   That would be great.  Thank you, your

23   Honor.

24        THE COURT:   Wednesday, January 25 at two p.m. for

25   oral argument on the motions.  Nice to meet you all. OooOooO