**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, *et al.*, | ) |
| | ) |
| Defendants, | ) |
| | ) CIVIL ACTION NO.  1:18-cv-68 |
| KARLA PEREZ, *et al.*, | ) |
| | ) |
| Defendants-Intervenors, | ) |
| | ) |
| and | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| Defendant-Intervenor. | ) |

**BRIEF OF LEGAL SERVICES ORGANIZATIONS AS
*AMICI CURIAE* IN OPPOSITION TO
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Maureen P. Alger, Attorney-in-Charge*
(malger@cooley.com)
(Cal. Bar No. 208522)
Monique R. Sherman*
(msherman@cooley.com)
(Cal. Bar No. 227494)
Joan R. Li*
(jli@cooley.com)
(Cal. Bar No. 312024)
COOLEY LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone:     (650) 843-5000
Facsimile:     (650) 849-7400

Michael J. McMahon*
(mmcmahon@cooley.com)
(Mass. Bar No. 679053)
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Telephone:     (617) 937-2300
Facsimile:     (617) 937-2400

*Pro hac vice* pending

*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................... ii

FRCP 7.1 STATEMENT OF CORPORATE DISCLOSURE .................................. vii

INTEREST OF *AMICI CURIAE* ............................................................................ 1

SUMMARY OF ARGUMENT ................................................................................ 2

ARGUMENT .......................................................................................................... 4

I.  THE HARM TO *AMICI*'S DACA CLIENTS, MOST OF WHOM HAVE NO VIABLE OPTION TO OBTAIN LEGAL IMMIGRATION STATUS AND AVOID DEPORTATION, SIGNIFICANTLY OUTWEIGHS ANY HARM PLAINTIFFS CLAIM. ....................................................................................... 4

    A.  If the Injunction Is Granted, Most DACA Recipients Will Immediately Face Risk of Deportation Because They Are Not Eligible for Any Form of Immigration Relief. ....................................................................... 5

    B.  If the Injunction Is Granted, DACA Recipients Will Lose the Ability to Work, Drive, Pay for College, and Plan for Their Lives. ..................... 11

II.  THE REQUESTED INJUNCTION WOULD EXACERBATE FEAR IN THE COMMUNITY ABOUT ACCESSING PUBLIC SERVICES, WHICH HARMS THE PUBLIC INTEREST. ..................................................................................... 13

    A.  DACA Recipients and Other Immigrants Are Afraid to Access Health and Other Social Services, and Even to Attend School Out of Fear of Deportation. ............................................................................................ 13

    B.  When Immigrants Are Afraid to Access Services, Public Health, Safety, and Community Economic Interests Are Adversely Impacted. ............ 18

CONCLUSION ....................................................................................................... 20

ATTACHMENT A ............................................................................................... A-1

i

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Ayeni v. Holder,*
  617 F.3d 67 (1st Cir. 2010) ................................................................................9

*Batalla Vidal v. Nielsen,*
  279 F. Supp. 3d 401 (E.D.N.Y. 2018) ...........................................................2, 9

*Inland Empire-Immigrant Youth Collective v. Nielsen,*
  No. EDCV 17-2048 PSG (SHKx), 2018 WL 1061408 (C.D. Cal. Feb. 26,
  2018) .................................................................................................................3

*Matter of Castro-Tum,*
  27 I. & N. Dec. 271 (B.I.A. 2018) ....................................................................7

*Nat'l Ass'n for the Advancement of Colored People v. Donald J. Trump,*
  298 F. Supp. 3d 209 (D.D.C 2018) ...................................................................2

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.,*
  279 F. Supp. 3d 1011 (N.D. Cal. 2018) .........................................................2, 9

*Plyler v. Doe,*
  457 U.S. 202 (1982) ........................................................................................16

*Texas v. United States,*
  86 F. Supp. 3d 591 (S.D. Tex. 2015) ............................................................4, 13

**Statutes and Regulations**

8 U.S.C. § 1101 ......................................................................................................6

8 C.F.R. § 204.11 ...................................................................................................6

INA § 101 ..............................................................................................................6

INA § 201 ..............................................................................................................7

INA § 203 ..............................................................................................................7

INA § 212 ...........................................................................................................7, 8

INA § 240A ............................................................................................................8

INA § 244(a) (1994) (repealed 1996) ...................................................................8

INA § 245 ...........................................................................................................6, 7

**Legislative Materials**

H.R. 1918, 107th Cong. (2001) .................................................................................5

H.R. 5131, 109th Cong. (2006) .................................................................................5

H.R. 1275, 110th Cong.(2007) ..................................................................................5

H.R. 1842, 112th Cong. (2011) .................................................................................5

H.R. 1468, 115th Cong. (2017) .................................................................................5

H.R. 3591, 115th Cong. (2017) .................................................................................5

H.R. 3440, 115th Cong. (2017) .................................................................................5

H.R. 4488, 115th Cong. (2017) .................................................................................5

H.R. 4796, 115th Cong. (2018) .................................................................................5

H.R. 4873, 115th Cong. (2018) .................................................................................5

S. 1291, 107th Cong. (2001) .....................................................................................5

S. 1545, 108th Cong. (2003) .....................................................................................5

S. 2075, 109th Cong. (2005) .....................................................................................5

S. 2205, 110th Cong. (2007) .....................................................................................5

S. 729, 111th Cong. (2010) .......................................................................................5

S. 3992, 111th Cong. (2010) .....................................................................................5

S. 952, 112th Cong. (2011) .......................................................................................5

S. 1615, 115th Cong. (2017) .....................................................................................5

S. 2367, 115th Cong. (2018) .....................................................................................5

S. 2464, 115th Cong. (2018) .....................................................................................5

*Report and analysis of immigration and nationality law*, 2 Senate Judiciary
  Subcommittee Holds Hearing on the DREAM Act, 88 No. 25 INTERPRETER
  RELEASES 1594 (July 4, 2011) ................................................................................5

**Administrative & Executive Materials**

Letter from Secretary Jeh Johnson, U.S. Dep't of Homeland Sec., to Honorable
Judy Chu, U.S. House of Rep. (Dec. 30, 2016) ....................................................11

Letter from United States Citizenship and Immigration Services (USCIS) Director
Leon Rodriguez, U.S. Dep't of Homeland Sec., to Honorable Charles E.
Grassley, U.S. Senate (June 29, 2016)................................................................9, 10

Memorandum from Acting Secretary Elaine C. Duke, *Memorandum on
Rescission of Deferred Action for Childhood Arrivals (DACA)* (Sept. 5, 2017) ......................2

Memorandum from Secretary Janet Napolitano, *Exercising Prosecutorial
Discretion with Respect to Individuals Who Came to the United States as
Children* (June 15, 2012) ........................................................................................5, 6

United States Citizenship and Immigration Services, DACA Frequently Asked
Questions..............................................................................................................8, 11

Visa Bulletin for July 2018, U.S. Dep't of State, Bureau of Consular Affairs,
Vol. X, No. 19 (June 11, 2018)....................................................................................7

**Other Authorities**

Annie Lowrey, *Trump's Anti-Immigrant Policies Are Scaring Families Away
From the Safety Net*, The Atlantic (Mar. 24, 2017)....................................16, 17, 18

Anna North, *DACA helped some immigrants finally get health care.  Now they
could lose it*, Vox (Sept. 28, 2017) .......................................................................14, 18

Bill Ong Hing, *Immigration Sanctuary Policies: Constitutional and
Representative of Good Policing and Good Public Policy*, 2 UC IRVINE L.
REV. 247 (2012)..........................................................................................................19

Caitlin Dickerson, *For DACA Recipients, Losing Protection and Work Permits Is
Just the Start*, The New York Times (Sept. 7, 2017)...........................................10, 12

Carolyn Jones, *Immigration crackdown taking heavy toll on California students*,
San Jose Mercury News (Oct. 5, 2017) ....................................................................16

Dara Lind, *What happens to a family when they have equal rights, and then lose
them?* Vox (Dec. 14, 2017)........................................................................................19

David Becerra, *et al.*, *Fear vs. Facts: Examining the Economic Impact of
Undocumented Immigrants in the U.S.*, 39 J. SOC. & SOC. WELFARE 111
(2012)..........................................................................................................................19

iv

Debra J. Robbin, *When Undocumented Immigrants Don't Report Crime, We All Suffer*, WBUR (Sept. 22, 2017) ..............................................................................20

Donald J. Trump, Twitter (Apr. 1, 2018 at 6:56 AM), https://twitter.com/realDonaldTrump ...................................................................13

*Forum: Monday Political News Roundup*, KQED (Feb. 26, 2018)..............................16

Jennifer Medina, *Too Scared to Report Sexual Abuse.  The Fear: Deportation*, The New York Times (Apr. 30, 2017)..............................................................15

Jens Hainmueller, *et al.*, *Protecting unauthorized immigrant mothers improves their children's mental health*, 357 SCIENCE 1041-44 (Sept. 8, 2017) ...................19

Jessica Ferger, *Rescinding DACA Could Spur a Public Health Crisis, from Lost Services to Higher Rates of Depression, Substance Abuse*, Newsweek (Sept. 6, 2017) ..........................................................................................................11, 12

Jose Magaña-Salgado, *et al., Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare*, Immigrant Legal Resource Center (Oct. 2017) .........................................................................................11

Julia Carrie Wong, *Fear and uncertainty for Dreamers as DACA ends: "Where am I going to go?*, The Guardian (Sept. 5, 2017) .............................................12, 13

Julianne Zuber, *Healthcare for the Undocumented: Solving a Public Health Crisis in the U.S.*, 28 J. CONTEMP. HEALTH L. & POLICY 350 (2012) .................................18

Leisy J. Abrego, *Legal Consciousness of Undocumented Latinos: Fear and Stigma as Barriers to Claims-Making for First- and 1.5-Generation Immigrants*, 45 LAW & SOC'Y REV. 337 (2011) ........................................................19

Lori Robertson, *The DACA Population Numbers*, FactCheck.org (Jan. 12, 2018) ........................9

Madeline Kenney, *Berwyn grandmother of 10 facing deportation sues DHS over visa delay*, Chicago Sun Times (Sept. 18, 2017) .......................................................7

Mark Keierleber, *Trump's immigration crackdown is traumatizing a generation of children*, The Guardian (Aug. 23, 2017)....................................................16

Max Greenwood, *Poll: Nearly 9 in 10 want DACA recipients to stay in the US*, The Hill (Jan. 18, 2018) ..............................................................................5

Maya Venkataramani, *et al.*, *Association of Maternal Eligibility for the Deferred Action for Childhood Arrivals Program With Citizen Children's Participation in the Women, Infants, and Children Program*, 172 JAMA PEDIATRICS 7, 699-701 (July 2018) .......................................................................................17

v

Priscilla Alvarez, *Will DACA Parents Be Forced to Leave Their U.S.-Citizen Children Behind?*, The Atlantic (Oct. 21, 2017) ....................................................12

Richard Gonzales, *DACA Recipients Worry What The Government Will Do With Their Private Information*, NPR (Sept. 9, 2017) .............................................10, 11

Stephanie Kuo, *Undocumented Immigrants Putting 'Health On Hold' Out Of Fear, Anxiety In Uncertain Times*, Houston Public Media (Sept. 15, 2017)..........................14

Susana Martinez and Sheila Neville, *Help for Undocumented Victims of Crime*, 44 CLEARINGHOUSE REV. 129 (2010) ........................................................19

Tom K. Wong, *et al., 2017 National DACA Study*, CENTER FOR AMERICAN PROGRESS (Aug. 28, 2017) ................................................................11

Tom K. Wong, *et al.*, *Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey*, 2 J. OF MIGRATION AND HUMAN SECURITY 4 (2014) .................................................................6, 9

Virginia Fay, *Back Into the Shadows: Immigrants Retreat From Needed Services as Deportation Fears Loom*, KQED News (June 15, 2017).......................14, 15, 16

### FRCP 7.1 STATEMENT OF CORPORATE DISCLOSURE

Pursuant to Federal Rule of Civil Procedure 7.1 ("FRCP"), *amici curiae* American Gateways, Asian Law Alliance, BakerRipley, Brooklyn Defender Services (BDS), Canal Alliance, Centro Legal de la Raza, Children's Law Center of Massachusetts (CLCM), Community Legal Services in East Palo Alto (CLSEPA), Dolores Street Community Services, East Bay Sanctuary Covenant, Equal Justice Center (EJC), Hebrew Immigrant Aid Society (HIAS) Pennsylvania, Immigrant Legal Center, Immigrant Legal Resource Center (ILRC), Just Neighbors, Justice Center of Southeast Massachusetts, Legal Aid Justice Center (LAJC), Legal Aid Society of San Mateo County (LASSMC), Legal Services for Children (LSC), Massachussetts Law Reform Institute (MLRI), National Justice for Our Neighbors, New York Legal Assistance Group (NYLAG), Northwest Immigrant Rights Project (NWIRP), OneJustice, Refugee and Immigrant Center for Education and Legal Services (RAICES), Rocky Mountain Immigrant Advocacy Network (RMIAN), Services, Immigrant Rights, and Education Network (SIREN), and Voto Latino, by and through undersigned counsel, state that they are nonprofit organizations and therefore are not publicly held corporations that issue stock, nor do they have parent corporations.

## INTEREST OF *AMICI CURIAE*[1]

*Amici* are twenty-eight legal services organizations that provide immigration legal services.[2] Many of *amici*'s clients are youth who are eligible for Deferred Action for Childhood Arrivals ("DACA"). *Amici* provide legal counseling to these youth to guide them through the intricacies of the immigration system. As a result of their interaction with undocumented immigrants generally and DACA-eligible individuals in particular, *amici* understand the complex legal, emotional, and financial challenges DACA grantees will face if this Court grants the requested preliminary injunction.[3] *Amici* therefore are uniquely positioned to articulate the substantial harm that would result from an injunction and how an injunction would be detrimental to the public interest.[4]

---

[1] All parties have consented to *amici*'s filing of this brief. No party contributed to the drafting of this brief.

[2] *Amici* include: American Gateways, Asian Law Alliance, BakerRipley, Brooklyn Defender Services (BDS), Canal Alliance, Centro Legal de la Raza, Children's Law Center of Massachusetts (CLCM), Community Legal Services in East Palo Alto (CLSEPA), Dolores Street Community Services, East Bay Sanctuary Covenant, Equal Justice Center (EJC), Hebrew Immigrant Aid Society (HIAS) Pennsylvania, Immigrant Legal Center, Immigrant Legal Resource Center (ILRC), Just Neighbors, Justice Center of Southeast Massachusetts, Legal Aid Justice Center (LAJC), Legal Aid Society of San Mateo County (LASSMC), Legal Services for Children (LSC), Massachusetts Law Reform Institute (MLRI), National Justice for Our Neighbors, New York Legal Assistance Group (NYLAG), Northwest Immigrant Rights Project (NWIRP), OneJustice, Refugee and Immigrant Center for Education and Legal Services (RAICES), Rocky Mountain Immigrant Advocacy Network (RMIAN), Services, Immigrant Rights, and Education Network (SIREN), and Voto Latino. Descriptions of each *amicus* organization are provided in Attachment A.

[3] Some legal services organizations and related public interest organizations would experience harm themselves, as institutions, as a result of the preliminary injunction. This issue is addressed in an amicus brief to be filed by the Legal Aid Society of New York. *See* Amicus Brief of Legal Aid Society in Opposition to Plaintiffs' Motion for Preliminary Injunction.

[4] Counsel for *amici* have interviewed and received information from the legal services organizations that are filing this brief. Information throughout the brief that relates to these organizations' clients was obtained through these interviews and related requests for information.

## SUMMARY OF ARGUMENT

DACA recipients and the public at large will suffer severe and tangible harm if the Court grants the requested injunction.  These harms outweigh the monetary harms Plaintiffs allege, and therefore Plaintiffs cannot satisfy the requirements for a preliminary injunction.

Contrary to Plaintiffs' allegations, *DACA does not offer a path to legal status or citizenship*.  DACA grants a renewable two-year period of deferred action (protection from deportation) and work authorization for young immigrants.  DACA allows these young immigrants, most of whom know only the United States as their home, to live without immediate fear of deportation and alleviates many of the fears and hardships associated with their undocumented status.

More than five years after DACA was implemented and after hundreds of thousands of DACA-eligible young people emerged from the shadows to avail themselves of its protections, the Department of Homeland Security ("DHS") rescinded DACA,[5] causing very real harm both to the young people who were eligible for protection from deportation under DACA and to the public interest at large.  DACA's rescission has since been temporarily enjoined by two federal courts and vacated by one federal court.[6]  If this Court now enjoins the administration of DACA,

---

[5] Ex. A to *Amici Curiae* Legal Services Organizations' Appendix of Unreported Authorities, Memorandum from Acting Secretary Elaine C. Duke, *Memorandum on Rescission of Deferred Action For Childhood Arrivals (DACA)* (Sept. 5, 2017).  All exhibits referenced hereto are attached to the Appendix of Unreported Authorities, filed concurrently herewith.

[6] *See Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018) (ordering the federal government to resume processing DACA renewals); *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018) (same).  The U.S. District Court for the District of Columbia also vacated DHS's decision to rescind DACA and ordered the government to begin processing new applications within 90 days unless the government could demonstrate why DACA was unlawful.  *See Nat'l Ass'n for the Advancement of Colored People v. Donald J. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018).  That court has since issued a stay of its order pending briefing on the issue, which will be completed by July 27, 2018.  Scheduling Order, *Nat'l Ass'n for the Advancement of Colored People*, No. 1:17-cv-02325 (D.D.C. June 27, 2018)

the harm caused to DACA recipients and the public would far outweigh the alleged monetary harms that Plaintiffs claim.  Thousands of young people will face a frightening and uncertain future, despite prior assurances by the government that, by coming forward and applying for DACA, they would be protected from immigration enforcement action.[7]  The vast majority of DACA grantees will be left without any protection from deportation if the injunction is granted, and will lose work authorization, jobs, the opportunity to pursue higher education, and, in many cases, health insurance.

The requested injunction will force many young people who have gone to school or joined the military, and who have obeyed the law their entire adult lives, back into a life of hiding and constant fear of removal from the only country they have ever known.  The prospect of terminating DACA has also intensified many immigrants' fear of accessing vital services. Numerous studies and reports have shown that DACA recipients and other immigrants are afraid that if they go to school or work, access medical services, or report a crime, they will become targets for deportation.  This fear is not only harmful to those directly affected but also to the public interest.

Plaintiffs' motion should be denied because the harm caused by the preliminary injunction sought would greatly outweigh any harm to the Plaintiffs, and because the injunction is contrary to the public interest.

---

(ECF No. 72).

[7] Almost immediately after announcing its planned termination of DACA, DHS began arbitrarily revoking DACA grants and work authorizations based on unproven allegations or low-level offenses. *Inland Empire-Immigrant Youth Collective v. Nielsen*, No. EDCV 17-2048 PSG (SHKx), 2018 WL 1061408, at *22 (C.D. Cal. Feb. 26, 2018) (enjoining the government's termination of DACA grants and work permits without notice, explanation, and an opportunity to respond).

**ARGUMENT**

I.   **The Harm to *Amici*'s DACA Clients, Most of Whom Have No Viable Option to Obtain Legal Immigration Status and Avoid Deportation, Significantly Outweighs Any Harm Plaintiffs Claim.**

The balance of equities weighs overwhelmingly in favor of denying the injunction.  This Court has held that a preliminary injunction is never "strictly a matter of right" but rather "a matter of sound judicial discretion" that requires "careful balancing of the interests of—and possible injuries to—the respective parties." *Texas v. United States*, 86 F. Supp. 3d 591, 675 (S.D. Tex. 2015), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) (internal citations and quotations omitted).  Therefore, Plaintiffs must show that they would suffer *more harm* without the injunction than would Defendants if it were granted.  *Id*.  If there is any reason "to believe that an injunction issued prior to a trial on the merits would be burdensome, the balance tips in favor of denying preliminary relief."  *Id*. (internal citations omitted).

Here, a preliminary injunction will inflict tangible, emotional, psychological, and financial harm on hundreds of thousands of young DACA-eligible individuals and their families.  First, the sudden termination of DACA will put DACA recipients at immediate risk for deportation, because most recipients do not qualify for any form of immigration relief, such as humanitarian-based forms of relief or family-based visas.  And for the few who potentially qualify for other relief, actually obtaining it is nearly impossible under current immigration law.  Thus, for the vast majority of DACA grantees*, there are no other options available*.  Second, the sudden termination of DACA will strip DACA grantees of their eligibility for work permits, hurting not only the grantees themselves, but their families, employers, and communities.  The harms to DACA grantees are substantial and the consequences are dire:  they will lose their temporary protection from deportation and will have no means of earning a living.  These harms tip the balance decidedly in favor of denying the injunction.

4

**A.     If the Injunction Is Granted, Most DACA Recipients Will Immediately Face Risk of Deportation Because They Are Not Eligible for Any Form of Immigration Relief.**

The vast majority of DACA recipients are not eligible for humanitarian or other forms of immigration relief.  Indeed, DACA was only necessary because Congress failed to pass the Development, Relief, and Education for Alien Minors Act ("DREAM Act"),[8] which would have provided a much-needed legal solution and a path to citizenship for undocumented young people who had been present in the United States from childhood, and, in many cases were not even aware until adulthood of their undocumented status.  Proponents recognized that even though these young people grew up in the United States, they had no other option for staying here lawfully.[9] *Report and analysis of immigration and nationality law*, 2 Senate Judiciary Subcommittee Holds Hearing on the DREAM Act, 88 No. 25 INTERPRETER RELEASES 1594 (July 4, 2011).  Congress attempted (but failed) to pass legislation protecting them approximately eleven times between 2001 and 2012.[10]  In response to Congress' numerous failed attempts to provide relief, President Obama issued an Executive Order in June 2012 implementing DACA, which granted a renewable two-year period of deferred action and work authorization.  *See* Ex. C, Memorandum from Secretary Janet Napolitano, *Exercising Prosecutorial Discretion with*

---

[8] H.R. 1842, 112th Cong. (2011); S. 952, 112th Cong. (2011).

[9] An "overwhelming majority" of Americans today believe DACA recipients should remain in the United States.  *See* Ex. B, Max Greenwood, *Poll: Nearly 9 in 10 want DACA recipients to stay in the US*, The Hill (Jan. 18, 2018).

[10] *See, e.g.*, H.R. 1918, 107th Cong. (2001); S. 1291, 107th Cong. (2001); S. 1545, 108th Cong. (2003); S. 2075, 109th Cong. (2005); H.R. 5131, 109th Cong. (2006); S. 2205, 110th Cong. (2007); H.R. 1275, 110th Cong. (2007); S. 729, 111th Cong. (2010); S. 3992, 111th Cong. (2010); H.R. 1842, 112th Cong. (2011); S. 952, 112th Cong. (2011).  Congress has tried and failed to pass immigration reform protecting DACA grantees at least nine more times since 2012. *See, e.g.,* H.R. 1468, 115th Cong. (2017); H.R. 3591, 115th Cong. (2017); S. 1615, 115th Cong. (2017); H.R. 3440, 115th Cong. (2017); H.R. 4488, 115th Cong. (2017); H.R. 4796, 115th Cong. (2018); H.R. 4873, 115th Cong. (2018); S. 2367, 115th Cong. (2018); S. 2464, 115th Cong. (2018).

*Respect to Individuals Who Came to the United States as Children* (June 15, 2012).  DACA allowed recipients to live without fear of deportation and to overcome hardships associated with undocumented status.

*Amici* routinely screen DACA-eligible individuals for humanitarian and family-based forms of relief before providing assistance requesting DACA; indeed, ruling out other forms of relief is a crucial part of *amici*'s counseling of DACA requestors, because many other forms of relief, unlike DACA, confer a path to legal permanent residence and citizenship.  However, most DACA recipients have not suffered the requisite trauma to qualify for humanitarian forms of relief.[11]  For example, asylum and withholding of removal require that applicants suffered or will suffer extreme harm in their countries of origin.  8 U.S.C. § 1101(a)(42); INA § 101(a)(42)(A).[12] Similarly, Special Immigrant Juvenile Status ("SIJS") confers status only on young immigrants who have been abused, abandoned or neglected.  INA § 101(a)(27); 8 C.F.R. § 204.11.  "U" and "T" visas provide relief for victims of certain qualifying crimes and human trafficking, respectively, while the Violence Against Women Act ("VAWA") allows certain battered spouses, children, and parents to petition for legal status without the involvement of their abusive spouse, parent, or child.  INA § 101(a)(15)(U) (U visas); INA § 101(a)(15)(T) (T visas); INA §

---

[11] The majority of DACA recipients also do not qualify for student or work visas.  Indeed, a 2014 study found that only 14.3% of DACA-eligible young people potentially qualified for any form of immigration relief.  Ex. D, Tom K. Wong, *et al.*, *Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey*, 2 J. OF MIGRATION AND HUMAN SECURITY 4, 287-304 (2014) ("*Paths to Lawful Immigration Status*").

[12] The Immigration and Nationality Act ("INA") is comprised of a series of sections of Title 8 of the United States Code.  Hereinafter, federal immigration statutes are only referenced by their INA classification.

245(a) (VAWA).[13]  Individuals who spent most of their lives in the United States and have not

experienced significant harm or violence simply do not qualify for these forms of relief.

Most DACA grantees are also not eligible for family-based immigration relief because

they do not have a qualifying relative,[14] and among the few that do, many are not eligible to

apply to adjust status from within the country because they last entered the country unlawfully.[15]

As a result, these DACA recipients would have to leave the country to apply for a family-based

visa, and then would face strict bars to re-entry, due to their previous "unlawful presence" in the

United States.[16]  INA § 212(a)(9)(B)-(C).  Undocumented immigrants who have accrued

unlawful presence are barred from re-entry for three years, ten years, or permanently, depending

on their length of unlawful presence and number of entries.  INA §§ 212(a)(9)(B)(i)(I)-(II) and

212(a)(9)(C).  Those who entered the country more than once without inspection and have been

---

[13] Even in the rare situation that a DACA-eligible individual qualifies for immigration relief, it can take many years to actually obtain such relief (approximately five to ten years for a U visa). Individuals waiting for approval have been subjected to enforcement during this waiting period. *Amici* and others report that U visa applicants have been detained in recent months despite their pending applications.  *See also* Ex. E, Madeline Kenney, *Berwyn grandmother of 10 facing deportation sues DHS over visa delay*, Chicago Sun Times (Sept. 18, 2017).  The Attorney General's recent decision in *Matter of Castro-Tum* ended the practice of administratively closing removal proceedings (effectively placing them on pause) where an application for a form of relief, such as a U visa, is pending with USCIS.  *Matter of Castro-Tum*, 27 I. & N. Dec. 271 (B.I.A. 2018).

[14] To qualify for family-based relief, applicants must be an *"immediate relative,"* defined as a spouse, unmarried child under 21, or a parent (if the child is 21 years or older) of a U.S. citizen.  INA § 201(b)(2)(A)(i).  Older and married children of U.S. citizens and spouses and unmarried children of lawful permanent residents ("LPRs") are also eligible for visas, but are subject to numerical limitations each year.  INA § 203.

[15] Family-based petitions also take years to process.  Seventy-eight percent of DACA recipients are from Mexico, where the wait can stretch anywhere from two to twenty years.  Ex. F, Visa Bulletin for July 2018, U.S. Dep't of State, Bureau of Consular Affairs, Vol. X, No. 19 (June 11, 2018) (currently processing petitions for certain relatives filed in *August 1997*).

[16] "Unlawful presence" accrues when an undocumented immigrant "is present in the United States after the expiration of the period of stay authorized . . . or is present within the United States without being admitted or paroled."  INA § 212(a)(9)(B)(ii).

unlawfully present for a total of more than one year are *permanently* barred.  INA §

212(a)(9)(C).

DACA recipients do not continue to accrue "unlawful presence" once their DACA

request is approved, but if this Court enters the requested injunction, they will again, through no

fault of their own, accrue unlawful presence as their DACA expires.  *See* Ex. G, USCIS, DACA

Frequently Asked Questions ("USCIS DACA FAQs"), Question 1.  They will then be subjected

to these harsh time bars should they have to leave the country for any reason.  In practice, the

three- and ten-year bars effectively act as complete barriers to relief, because applicants would

need to leave their families, jobs, schools, and for most, the only country they have ever known,

in order to wait out the time-bar.  The standards for obtaining a waiver of unlawful presence are

so difficult to meet that even for the very few DACA recipients who might qualify for family-

based adjustment of status, it is an illusory form of relief at best.

Moreover, contrary to popular perception, there is no form of relief available to young

immigrants on the basis that they have lived in the United States for most of their lives, even if

they have been exemplary members of the community and excelled academically.  Prior to

immigration reform in 1996, immigrants in deportation proceedings could ask an immigration

judge to grant "suspension of deportation," which took the "good moral character" of an

immigrant into account.  INA § 244(a) (1994) (repealed 1996).  However, in 1996, Congress

eliminated "suspension of deportation," and replaced it with a form of cancellation of removal

that required applicants to show extreme and unusual hardship to a U.S. citizen or LPR family

member.[17]  INA § 240A(b).  Given that most DACA recipients do not have a qualifying relative

---

[17] This standard is demanding and generally requires a showing that a U.S. citizen or LPR family
member suffers from a severe chronic medical condition and requires special medical attention

at all (Ex. D, *Paths to Lawful Immigration Status*), no less a qualifying relative who would endure extreme hardship, this option is inapplicable to most DACA recipients.

Finally, contrary to Plaintiff's unsubstantiated arguments that DACA "unilaterally" confers citizenship on "otherwise ineligible [undocumented immigrants]," (*see* Plaintiffs' Motion for Preliminary Injunction and Memorandum In Support (ECF No. 5) ("Motion" or "Mot.") at 3) DACA does not offer a path to legal status or citizenship.  *See* Ex. H, Letter from USCIS Director Leon Rodriguez, U.S. Dep't of Homeland Sec., to Honorable Charles E. Grassley, U.S. Senate (June 29, 2016) ("*USCIS Letter*") (noting that "neither deferred action nor advance parole creates a path to citizenship.").  As support for their allegation, Plaintiffs cite statistics (*see* Mot. at 3) showing the number of DACA recipients who have obtained citizenship and lawful permanent residence status—but these are only 0.13% and 5%, respectively, of the approximately 800,000 approved DACA requests.  *See* Ex. I, Lori Robertson, *The DACA Population Numbers*, FactCheck.org (Jan. 12, 2018).  DACA, however, does not make an individual who was previously ineligible, eligible to adjust status or naturalize.  The small proportion of DACA recipients who naturalized or adjusted status represent those who may have been eligible for immigration benefits independent of DACA.

Further, Plaintiffs make much of the concept of "advance parole," which DACA recipients had been able to apply for prior to the rescission of DACA, and which would allow them to travel outside the country and return lawfully without encountering bars to re-entry. (*See, e.g.*, Mot. at 3, 22, 25-26, 38.)[18]  Contrary to Plaintiffs' assertions, though, advance parole

---

and financial support.  *See Ayeni v. Holder*, 617 F.3d 67, 73 (1st Cir. 2010).

[18] The preliminary injunctions limiting the rescission of DACA have not required the government to resume allowing DACA recipients to apply for advance parole.  *See Batalla Vidal*, 279 F. Supp. 3d at 401; *Regents*, 279 F. Supp. 3d at 1011.

does not provide a "pathway to citizenship."  (*Id.* at 22.)  In the limited circumstances in which a

DACA recipient qualified for advance parole and took the extreme risk of traveling outside the

United States, the "lawful re-entry" still did not make a DACA recipient eligible for legal

residence, absent independently-existing eligibility for such relief.  As explained above, a DACA

recipient must still have other grounds for immigration relief under the existing immigration

laws (most do not) and not otherwise be "inadmissible."  In fact, USCIS statistics indicate that

only a small fraction of DACA recipients who obtained legal permanent residence also had

obtained advance parole.  USCIS reported that as of December 31, 2015, 22,340 DACA

recipients were approved for advance parole, and of those, only 5,068 applied for adjustment of

status, with only 2,994 (less than one half of one percent of all DACA recipients) being approved

for adjustment of status.  Ex. H, *USCIS Letter*.  However, these individuals "may have been

otherwise eligible for adjustment of status regardless of the grant of advance parole."  *Id.*

Given the small number of DACA recipients who actually qualify for other forms of

immigration relief and the legal hurdles they face if they do qualify, the reality is that if the

preliminary injunction is granted, most DACA recipients will not be able to work legally and

will not have any protection from deportation—and will suffer numerous harms as a result.  The

elimination of DACA "reverberate[s] far beyond th[e] privileges" of lawfully living and working

in the United States.  Ex. J, Caitlin Dickerson, *For DACA Recipients, Losing Protection and

Work Permits Is Just the Start*, The New York Times (Sept. 7, 2017) ("*Losing Protection*").

These individuals have only DACA to protect them.[19]

---

[19] DACA recipients are at even more risk of deportation than other undocumented immigrants
because they provided personal and sensitive information to the government as part of the
DACA application process, including addresses, employers, photos, and fingerprints.  *See* Ex. K,
Richard Gonzales, *DACA Recipients Worry What The Government Will Do With Their Private*

**B.**     **If the Injunction Is Granted, DACA Recipients Will Lose the Ability to Work, Drive, Pay for College, and Plan for Their Lives.**

The requested preliminary injunction would create significant turmoil for DACA recipients and their families.  If the preliminary injunction is granted, DACA recipients will once again find themselves without the ability to work legally, obtain health insurance, legally drive in many states, pay for college, purchase homes, and make plans for their lives and families.

"Since DACA began, thousands of Dreamers have been able to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books."  Ex. L, Letter from Secretary Jeh Johnson, U.S. Dep't of Homeland Sec., to Honorable Judy Chu, U.S. House of Rep. (Dec. 30, 2016).  After receiving DACA, approximately 65% of DACA grantees age 25 and under and approximately 54% of DACA grantees over age 25 pursued educational opportunities they previously could not pursue.  Ex. M, Results from Tom K. Wong, *et al.*, *2017 National DACA Study*, CENTER FOR AMERICAN PROGRESS at 7 (Aug. 28, 2017) ("*2017 National DACA Study*").  Approximately 70% of DACA recipients "earn[ed] more money, which . . . helped [them] become financially independent."  *Id.* at 3.[20]  Many DACA recipients were also able to obtain employer-based health insurance.  *See*

_____

*Information*, NPR (Sept. 9, 2017).  The government has stated that although the personal information will not be proactively provided to other law enforcement entities and ICE, that may change and be "rescinded at any time without notice."  *See* Ex. G, USCIS DACA FAQs at Question 19.

[20] Ending DACA would have a significant economic effect, including a reduction in contributions made to Social Security and Medicare, both by the employee and employer, of approximately $39.3 billion over 10 years.  Ex. N, Jose Magaña-Salgado, *et al.*, *Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare*, Immigrant Legal Resource Center at 2, 9 (Oct. 2017).

Ex. O, Jessica Ferger, *Rescinding DACA Could Spur a Public Health Crisis, from Lost Services to Higher Rates of Depression, Substance Abuse*, Newsweek (Sept. 6, 2017).

These opportunities will disappear if the requested injunction is granted.  For DACA recipients, this will result in undeniable harm as it will strip them of their ability to continue their education, support themselves and their families independently, and to provide for their families' basic necessities such as "keep[ing] a roof over their heads."  Ex. J, *Losing Protection*.  Many DACA recipients will also be forced to make heart-breaking decisions about the future of their families, and in particular of their U.S. citizen children.  DACA recipients who are parents must choose whether to take their U.S. citizen children with them if they are deported, or face long-term and possibly permanent separation.  Ex. P, Priscilla Alvarez, *Will DACA Parents Be Forced to Leave Their U.S.-Citizen Children Behind?*, The Atlantic (Oct. 21, 2017) (an estimated 200,000 children are at risk of losing their DACA recipient parents).  If they decide to leave their U.S. citizen children in the United States, they need to make legal, practical, and financial arrangements for the care of their children for the decade or longer during which they will be barred from re-entry.

DACA recipients who may be subject to deportation must also spend time and resources to protect their property, assets, and finances in case they are deported.  These harms are not speculative.  A recent study profiled a DACA recipient who "was born in Mexico, but came to the United States at the age of nine.  She received DACA when she was studying for a master's degree at Stanford.  She bought a house, married another DACA recipient, and has two children who are U.S. citizens."  Ex. Q, Julia Carrie Wong, *Fear and uncertainty for Dreamers as DACA ends: "Where am I going to go?,"* The Guardian (Sept. 5, 2017).  This DACA recipient is not eligible for immigration relief, so she and her spouse must consider options "to protect [their]

daughters in case [they] are deported." *Id.*  *Amici* are aware of countless similar situations

among their clients, which cause a significant amount of stress and anxiety.

## II.     The Requested Injunction Would Exacerbate Fear in the Community About Accessing Public Services, Which Harms the Public Interest.

Plaintiffs must show that a preliminary injunction would not be adverse to the public

interest—and if no public interest supports granting an injunction, such relief should be denied,

"even if the public interest would not be harmed by one." *Texas v. United States*, 86 F. Supp. at

675 (internal citations and quotations omitted).  "Consequently, an evaluation of the public

interest should be given *considerable weight* in determining whether a motion for a preliminary

injunction should be granted."  *Id.* (internal quotations omitted) (emphasis added).

Here, a preliminary injunction would be adverse to the public interest.  In light of a

political climate increasingly hostile to immigrants, many in the immigrant community are

understandably fearful of deportation and afraid to access critical services.  This endangers the

public interest, health, and safety.

### A.     DACA Recipients and Other Immigrants Are Afraid to Access Health and Other Social Services, and Even to Attend School Out of Fear of Deportation.

In the wake of recent increasing immigration enforcement activity, the termination of

DACA, the President's tweets,[21] and the federal government's actions, there is evidence that

anxiety is causing undocumented immigrants, including DACA recipients, to avoid utilizing

health services and refrain from reporting crimes.  Some members of the immigrant community

---

[21] Although the President expressed some limited support for DACA recipients after he rescinded the policy, he recently had this to say:  "Border Patrol Agents are not allowed to properly do their job at the Border because of ridiculous liberal (Democrat) laws like Catch & Release.  Getting more dangerous.  'Caravans' coming.  Republicans must go to Nuclear Option to pass tough laws NOW.  NO MORE DACA DEAL!" Ex. R, @realDonaldTrump, Twitter (Apr. 1, 2018 at 6:56 AM).

are even avoiding school and work and declining to access social services.  For example, *amicus* organization Centro Legal de la Raza has a client whose family members stopped working because of fear of workplace raids.  In response to these concerns, some *amici* organizations have been providing "Know Your Rights" presentations in their communities.

### 1.    Evidence Shows Immigrants Are Afraid to Access Healthcare.

Many undocumented immigrants avoid visiting hospitals or clinics for fear of deportation.  *See* Ex. S, Anna North, *DACA helped some immigrants finally get health care. Now they could lose it*, Vox (Sept. 28, 2017) ("*DACA helped get health care*").  For example, undocumented immigrant women may not access necessary prenatal health care, which can lead to a wide range of detrimental health outcomes.  *Id*.  Anecdotal evidence demonstrates that avoidance behavior, motivated by fear, abounds.  As one nonprofit organization observed, "[w]hat we're finding and hearing from all over the country is a huge concern around whether or not seeking routine care and preventative care as well as care for their children, who may be documented, is going to put those families in jeopardy of deportation . . . .  What we heard was a real significant uptick in no-show rates."  Ex. T, Stephanie Kuo, *Undocumented Immigrants Putting 'Health On Hold' Out Of Fear, Anxiety In Uncertain Times*, Houston Public Media (Sept. 15, 2017).

Indeed, fear of deportation is so strong that one undocumented immigrant woman stopped accessing and receiving cancer treatments.  Ex. U, Virginia Fay, *Back Into the Shadows: Immigrants Retreat From Needed Services as Deportation Fears Loom*, KQED News (June 15, 2017) ("*Back Into the Shadows*").  Because of given reports of increased immigration enforcement, she was terrified of being identified and detained if she continued using health services.  *Id*.  *Amici* have observed this phenomenon, as well.  Medical professionals have

informed *amicus* organization ILRC that undocumented immigrants treated in emergency rooms have failed to return to the hospital for critical follow-up treatment out of fear of deportation.

## 2.      Evidence Shows Immigrants Are Afraid to Report Crimes.

Undocumented immigrants, fearing deportation, are also afraid to report crimes to law enforcement.  Police departments across the nation worry about how the increasingly fearful climate will affect their relationships with immigrant communities and their ability to solve crimes.  As one police captain explained, undocumented immigrants "will see law enforcement and the justice system as something that is now less accessible . . .  and potentially threatening . . . because they're concerned that the federal government will somehow get that information and use it to deport them."  Ex. U, *Back Into the Shadows*.  Indeed, police in many major cities observed significantly decreased reporting of sexual and domestic violence by Latina women during the first few months of 2017, after President Trump assumed office, compared to the same time period in 2016.  *Id.* (sharp downturn in Houston, Los Angeles, and San Francisco); *see also* Ex. V, Jennifer Medina, *Too Scared to Report Sexual Abuse.  The Fear: Deportation*, The New York Times (Apr. 30, 2017) (sharp downturn in cities in Colorado and Maryland).  Advocates report that many domestic violence survivors who are undocumented are too afraid of contact with police to seek life-saving restraining orders, report abuse, or seek U visas.  Ex. U, *Back Into the Shadows*.  They further note that many undocumented survivors are now even afraid to stay at shelters for more than a few days.  *Id.  Amici* report experiences with multiple clients who have endured horrific domestic violence but are too afraid to report the abuse due to their immigration status.  Some immigrants are even afraid to come to *amici*'s offices to be screened for immigration relief, for fear of encountering ICE.

### 3.      Evidence Shows Immigrants Are Afraid to Attend School.

Fear in the community has also led to increased absenteeism among immigrant students in schools across the nation.  *See* Ex. W, Carolyn Jones, *Immigration crackdown taking heavy toll on California students*, San Jose Mercury News (Oct. 5, 2017) ("*Immigration crackdown*"); Ex. X, Mark Keierleber, *Trump's immigration crackdown is traumatizing a generation of children*, The Guardian (Aug. 23, 2017) (noting that school officials from New York to New Mexico are preparing for "increased anxiety and absenteeism among students of immigrant families" and that more and more students are dropping out of school); *see also Plyler v. Doe*, 457 U.S. 202, 230 (1982) (striking down statute denying undocumented immigrants the right to an education because "whatever savings might be achieved by denying these children an education, they are wholly insubstantial in light of the costs involved to these children, the State, and the Nation").   Educators have also observed that some students are having increased difficulty concentrating in the classroom as a result of recent anti-immigration policies.  Ex. W, *Immigration crackdown*.   Some immigrant parents have even expressed fear of sending their children to school, in case "they're taken in an ICE raid during the day and their children have no one to return home to."  Ex. U, *Back Into the Shadows*; *see* Ex. Y, *Forum: Monday Political News Roundup*, KQED (Feb. 26, 2018) (families in California afraid to send children to school).

### 4.      Evidence Shows Immigrants Are Afraid to Access Social Services.

Immigrant families are also reluctant to access social services due to fear of deportation. Social scientists have pointed out that "anti-immigrant sentiment and increased deportation activity has had a long history of causing eligible families—many with U.S. citizen children—to drop out and shy away" from safety net programs.  Ex. Z, Annie Lowrey, *Trump's Anti-Immigrant Policies Are Scaring Families Away From the Safety Net*, The Atlantic (Mar. 24, 2017) ("*Trump's Anti-Immigrant Policies*").  In many cases, families eligible for these vital

programs have mixed immigration status, often undocumented parents with U.S. citizen children.[22]  *Id*.  However, even though their children are eligible, parents are afraid to apply for programs such as the Supplemental Nutrition Assistance Program ("SNAP") and Women, Infants, and Children ("WIC"), out of fear that enrollment would put undocumented family members at risk of deportation.  *Id*.  DACA provided some relief from that fear, as demonstrated in a recent study in the journal *JAMA Pediatrics*.  *See* Ex. AA, Maya Venkataramani, *et al.*, *Association of Maternal Eligibility for the Deferred Action for Childhood Arrivals Program With Citizen Children's Participation in the Women, Infants, and Children Program*, 172 JAMA PEDIATRICS 7, 699-701 (July 2018).  That study found that a child of an undocumented mother who met the DACA eligibility requirements was 12.3% more likely than a child of an undocumented mother who did not meet DACA eligibility requirements to participate in the WIC program, which has been shown to improve child health and socioeconomic outcomes.  *Id*.  An injunction would strip these vital programs from children who are eligible and stand to benefit the most from those programs.

*Amici* have seen that even immigrants who have already received a form of immigration relief, such as asylees, are exhibiting anxiety about the termination of DACA and its effect on their status.  Other clients are afraid to apply affirmatively for any form of relief, because they worry about what will happen if relief is denied or later rescinded.

If this Court grants the preliminary injunction, many young people will be thrust into the precarious position of considering whether accessing medical care, reporting crimes, going to school, or enrolling in social services could negatively affect their ability to remain in the United

---

[22] Such mixed immigration family status families are increasingly common—nearly six million citizen children live in such households.  *Id*.

States.  And for the immigrant community at large, the potential termination of DACA has only worsened anxiety, in an era already fraught with uncertainty and fear.

**B.     When Immigrants Are Afraid to Access Services, Public Health, Safety, and Community Economic Interests Are Adversely Impacted.**

Issuing an injunction will cause severe harm to the *public* interest, not just to those individuals who refrain from accessing services.  When individuals are too scared to seek essential services for fear of deportation, the risks to individual and public health and safety increase significantly.  Indeed, the "administration's actions and directives ostensibly target the 11 million unauthorized immigrants who live in the United States, but they will also harm millions of American citizens all across the country who live and work beside these immigrants every day."  Ex. Z, *Trump's Anti-Immigrant Policies*.

The public health is put at considerable risk when individuals do not seek preventive care (including vaccines), fill vital prescriptions, or care for acute conditions until they experience an emergency.  "Ultimately, keeping undocumented immigrants from getting necessary health care is bad for everyone. . . . Health care is more expensive when people can't get it until they're very sick.  And lack of health care increases the risk of chronic illness, which can make people unable to work or be active in their communities."  Ex. S, *DACA helped get health care; see also* Ex. BB, Julianne Zuber, Healthcare for the Undocumented:  *Solving a Public Health Crisis in the U.S.*, 28 J. CONTEMP. HEALTH L. & POLICY 350, 370 (2012) ("Placing barriers to accessing regular health care for undocumented immigrants threaten[s] community resilience because those with pre-existing health conditions are more vulnerable to . . . severe effects from a disease outbreak or public health emergency.").

Moreover, anxiety and fear of the consequences of being undocumented, including deportation and lack of future access to health care, can lead to acute mental health concerns.

*See* Ex. CC, David Becerra, *et al.*, *Fear vs. Facts: Examining the Economic Impact of Undocumented Immigrants in the U.S.*, 39 J. SOC. & SOC. WELFARE 111, 118 (2012); Ex. DD, Leisy J. Abrego, *Legal Consciousness of Undocumented Latinos: Fear and Stigma as Barriers to Claims-Making for First- and 1.5-Generation Immigrants*, 45 LAW & SOC'Y REV. 337, 340 (2011) (describing risk of permanent anxiety for undocumented immigrants).  Young children may be particularly affected by these stresses and fears.  A recent study, published in the journal *Science*, analyzed how the threat of a mother's risk of deportation affects children's health and long-term development.  *See* Ex. EE, Jens Hainmueller, *et al.*, *Protecting unauthorized immigrant mothers improves their children's mental health*, 357 SCIENCE 1041-44 (Sept. 8, 2017).  Researchers found that children of mothers eligible for DACA were diagnosed with mental illness at half the rate of children of mothers at risk of deportation.  *Id.* at 1043; *see also* Ex. FF, Dara Lind, *What happens to a family when they have equal rights, and then lose them?* Vox (Dec. 14, 2017) (reporting elementary school students "wracked with sudden anxiety that their parents won't be there when they come home").

Similarly, when victims of and witnesses to crime are afraid to approach law enforcement, crime goes underreported.  *See* Ex. GG, Susana Martinez and Sheila Neville, *Help for Undocumented Victims of Crime*, 44 CLEARINGHOUSE REV. 129, 141 (2010).  The reluctance to report crime is dangerous not only to undocumented immigrant victims, but to society as a whole.  *See* Ex. HH, Bill Ong Hing, *Immigration Sanctuary Policies: Constitutional and Representative of Good Policing and Good Public Policy*, 2 UC IRVINE L. REV. 247, 303 (2012) (noting that the entire community is safer when the immigrant community trusts law enforcement).  "When the community and law enforcement are not engaged, we miss opportunities to interrupt current and future violence.  As a result, everyone's public safety is put

at risk."  Ex. II, Debra J. Robbin, *When Undocumented Immigrants Don't Report Crime, We All Suffer*, WBUR (Sept. 22, 2017).

The reduction in use of public health, safety, educational, and social services resulting from fear in the immigrant community is harmful to the public interest and should be given "considerable weight" by this Court in denying the requested preliminary injunction.

## CONCLUSION

The tangible, emotional, and financial harm that DACA recipients would suffer should this Court issue a preliminary injunction terminating DACA would far outweigh the monetary harms that Plaintiffs allegedly would suffer without an injunction, and would have serious adverse impacts on the public interest.  On behalf of their clients and the communities they serve, *amici curiae* urge this Court to deny Plaintiffs' motion for a preliminary injunction.

July 20, 2018

Respectfully submitted,

*/s/ Maureen Alger*
Maureen P. Alger, Attorney-in-Charge*
(Cal. Bar No. 208522)

Monique R. Sherman* (Cal Bar No. 227494)
Joan R. Li* (Cal. Bar No. 312024)
COOLEY LLP
3175 Hanover Street
Palo Alto, CA  94304-1130
Telephone:   (650) 843-5000
Facsimile:    (650) 849-7400

Michael J. McMahon* (Mass. Bar No. 679053)
COOLEY LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Telephone:   (617) 937-2300
Facsimile:    (617) 937-2400

*Pro hac vice* pending

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2018, I electronically filed the foregoing Brief of Legal Services Organizations as *Amici Curiae* in Opposition to Plaintiffs' Motion for Preliminary Injunction with the Clerk of the Court using the CM/ECF system, which I understand to have served the parties' counsel who are registered as CM/ECF users.


By:   /s/ Maureen Alger
      Maureen Alger

## ATTACHMENT A

*Amici* include the following legal services organizations:

1. **American Gateways** serves the indigent immigrant population in central Texas by providing legal representation and advocacy, including on DACA.  Its mission is to champion the dignity and human rights of the most vulnerable, including immigrants, refugees, and survivors of persecution and torture, through immigration legal services, education, and advocacy.

2. **Asian Law Alliance** is a community law office that provides individual legal assistance, community legal education, and community advocacy in the Asian Pacific Islander community and immigrant community in the County of Santa Clara, California.  Asian Law Alliance helps individuals, especially those who have limited English proficiency, obtain justice in the immigration system.

3. **BakerRipley** provides services to over 500,000 clients in the Houston region per year, including free legal assistance to DACA recipients.  BakerRipley's immigration services include naturalization, adjustment of status, and renewal of permanent residence cards, and immigration programs that promote the full civic integration of those seeking to navigate the immigration process.

4. **Brooklyn Defender Services** (BDS) provides multi-disciplinary and client-centered criminal, family, and immigration defense, as well as civil legal services, social work support and advocacy, in nearly 40,000 cases in Brooklyn every year.  In 2016 alone, BDS handled more than 1,500 immigration matters across a full spectrum of services, including removal defense and DACA applications.

5. **Canal Alliance** provides comprehensive immigration legal services in Marin County, California, and strives to eliminate barriers to legal integration for the low-income immigrant population.  Canal Alliance provides legal consultations and educational programs to ensure its clients receive the resources and support they need while developing critical skills for long-term success.

6. **Centro Legal de la Raza** is a comprehensive legal services organization that protects and advances the rights of immigrant, low-income, and Latino communities in northern California through bilingual legal representation, education, and advocacy.  Centro Legal de la Raza's immigration practice focuses on serving the needs of the most vulnerable community members, including undocumented immigrants, families, and DACA recipients.

7. **Children's Law Center of Massachusetts** (CLCM) provides legal representation to low-income children and youth throughout the Commonwealth in child welfare, education, immigration, delinquency, and mental health matters. CLCM's immigration practice focuses on serving the needs of the most vulnerable children and youth of our communities, including unaccompanied minors, children seeking asylum, and DACA recipients.

8. **Community Legal Services in East Palo Alto** (CLSEPA) provides legal services to low-income individuals and families in East Palo Alto, California, and beyond. Its practice areas include immigration, housing, workers' rights, and records clearance. CLSEPA provides immigration services to low-income families and youth, and has focused on navigating complex petitions for DACA.

9. **Dolores Street Community Services** strives to improve individuals' lives and affect broader social change through advocacy and community organizing efforts. Dolores Street Community Services' Deportation Defense & Legal Advocacy Program specializes in deportation defense in complex cases, and provides legal services to other immigrant community members, including DACA recipients.

10. **East Bay Sanctuary Covenant** provides protection and advocacy to low-income and indigent refugees and immigrants. East Bay Sanctuary Covenant provides immigrants and refugees with a variety of legal services and representation, including DACA requests, and also provides educational programs to educate and assist clients to advocate for their own rights.

11. **Equal Justice Center** (EJC) provides legal services to low-income working people in immigration and employment matters throughout Texas. Since 2012 and continuing through the present, EJC has provided legal assistance to well over a thousand DACA requestors and recipients across the state.

12. **Hebrew Immigrant Aid Society (HIAS) Pennsylvania** provides services to more than 2,500 persons per year and have served immigrants and refugees for 135 years. HIAS Pennsylvania's legal services program serves immigrant youth through its immigrant youth advocacy initiative, its immigrant victims of domestic violence initiative, and its Latino Outreach Immigration Services initiative. Through these initiatives, HIAS has assisted DACA-eligible youth in applying for DACA when no other remedies were available.

13. **Immigrant Legal Center** specializes in immigration law and provides extensive immigration legal services, including assistance with DACA, across Nebraska and Southwest Iowa. The Immigrant Legal Center's mission is to welcome immigrants into the community by providing legal services, education, and advocacy.

14. **Immigrant Legal Resource Center** (ILRC) is a national nonprofit resource center that provides immigration legal trainings, technical assistance, and educational materials. ILRC attorneys conduct trainings and provide technical support to immigration practitioners assisting individuals in the DACA request process, and advocate at the federal level for a broadly inclusive DACA program.

15. **Just Neighbors** provides immigration legal services, including assistance with DACA requests, to low-income immigrants and refugees in northern Virginia, especially to those who are most vulnerable. Just Neighbors partners with other nonprofit organizations, community volunteers, and pro bono attorneys to empower their clients and educate the community about current immigration laws and policies.

Attachment A-2

16. **Justice Center of Southeast Massachusetts** provides legal services to low-income individuals throughout southeastern Massachusetts. The Justice Center provides services across a broad range of legal issues including housing, education, family law, benefits, and immigration. The immigration unit works with low-income immigrants, including those facing deportation, on a variety of requests for relief including DACA.

17. **Legal Aid Justice Center** (LAJC) provides legal advice, referrals, and direct legal representation to thousands of low-income individuals in Virginia.  Since 2012, LAJC has helped over 300 immigrant youth obtain or renew DACA.  LAJC also brought a lawsuit that ultimately led to the Commonwealth of Virginia recognizing in-state tuition status for DACA recipients, and helped dozens of DACA students with related problems such as access to education and in-state tuition, drivers' licenses, employment issues, and access to housing and credit.

18. **Legal Aid Society of San Mateo County** (LASSMC) provides legal services to San Mateo County, California residents in areas including housing, health, public benefits, education, domestic violence, and immigration.  Through the Linking Immigrants to Benefits, Resources & Education (LIBRE) project, LASSMC collaborates with community partners to educate the immigrant community about safety net services and immigration opportunities.  LASSMC helps teen parent families, youth, and other low-income immigrants apply for DACA and other forms of immigration relief.

19. **Legal Services for Children** (LSC) provides free legal representation and assistance to children and youth in northern California, working to empower clients and actively involve them in critical decisions that impact their lives.  LSC represents youth, including DACA recipients, in immigration cases.

20. **Massachusetts Law Reform Institute** (MLRI) advances economic, racial, and social justice through legal action, policy advocacy, coalition building, and community outreach. MLRI's legal initiatives include litigation and administrative advocacy to ensure access to in-state tuition, state merit scholarships, and state financial aid for college-bound DACA recipients as well as training and technical assistance for legal services lawyers who represent DACA recipients.

21. **National Justice for Our Neighbors** provides free or low-cost immigration legal services for low-income immigrants. National Justice for Our Neighbors supports seventeen Justice for Our Neighbors sites across the country and operates more than 40 clinics nationally.  Attorneys assist clients with deportation defense and applications and requests for asylum, DACA, family-based visas, Special Immigrant Juvenile Status, and U visas.

22. **New York Legal Assistance Group** (NYLAG) provides legal assistance to New York City's poor and near poor in the areas of government benefits, family law, immigration, disability rights, housing law, special education, and consumer debt, among others. NYLAG's Immigrant Protection Unit (IPU) provides individuals in New York's low-income immigrant communities, including DACA recipients, with assistance securing or continuing lawful status in the United States.

23. **Northwest Immigrant Rights Project** (NWIRP) advocates for immigrants in Washington State through direct legal services, systemic advocacy, and community education.  Northwest Immigrant Rights Project provides legal representation in areas such as asylum, DACA, family-based petitions, U visas for survivors of domestic violence and other crimes, naturalization, Special Immigrant Juvenile Status, and deportation defense.

24. **OneJustice** serves as an innovation lab on legal services and works with law schools and students, the private legal sector, and legal service nonprofits to provide legal assistance to those in need.  OneJustice programs include pro bono projects to bring immigration legal services to immigrants, including DACA-eligible youth, living in rural communities.

25. **Refugee and Immigrant Center for Education and Legal Services** (RAICES) provides free and low-cost legal services to underserved immigrant children, families, and refugees in Texas.  RAICES staff provides consultations, direct legal services, and advocacy to immigrants throughout Texas, including DACA-eligible individuals.

26. **Rocky Mountain Immigrant Advocacy Network** (RMIAN) works to ensure equal access to justice for adults in immigration detention and for immigrant children in Colorado and the Mountain West region.  Its DACA Project provides outreach about DACA and quality legal representation to DACA-eligible youth.

27. **Services, Immigrant Rights, and Education Network** (SIREN) empowers low-income immigrants and refugees in Silicon Valley through legal services, policy advocacy, community education, and community organizing.  Through its Immigration Legal Services Program (ILSP), SIREN provides consultations and application assistance in a wide range of immigration areas, including DACA renewals, family-based petitions, removal defense, and U visas.

28. **Voto Latino is** a nonprofit organization that, with the support of its pro bono legal counsel, provides DACA recipients and people at risk of deportation with pro bono legal counsel.  Voto Latino's initiatives utilize social media and innovative messaging to reach people in need who may not be aware of existing pro bono legal resources.