**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES OF AMERICA, *et al.*, )<br><br>Defendants, )<br><br>KARLA PEREZ, *et al.*, )<br><br>Defendants-Intervenors, )<br><br>and )<br><br>STATE OF NEW JERSEY, )<br><br>Defendant-Intervenor. ) | CIVIL ACTION NO. 1:18-CV-68 |

**_AMICI CURIAE_ LEGAL SERVICES ORGANIZATIONS' APPENDIX
OF UNREPORTED AUTHORITIES**

Pursuant to this Court's Civil Procedures, Rule 7, proposed *amici curiae*, the 28 legal services organizations (collectively "*amici*"), hereby provide the Court with copies of the following unreported authorities cited in support of their Brief of Legal Services Organizations as *Amici Curiae* in Opposition to Plaintiffs' Motion for Preliminary Injunction.

| EXHIBIT | AUTHORITY | PAGES |
|---|---|---|
| **A.** | Memorandum from Secretary Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) | 1 – 4 |
| **B.** | Max Greenwood, *Poll: Nearly 9 in 10 want DACA recipients to stay in the US*, The Hill (Jan. 18, 2018), http://thehill.com/blogs/blog- | 5 – 7 |

A-1

| | | |
|---|---|---|
| | briefing-room/news/369487-poll-nearly-nine-in-10-favor-allowing-daca-recipients-to-stay | |
| **C.** | Memorandum from Acting Secretary Elaine C. Duke, *Memorandum on Rescission of Deferred Action for Childhood Arrivals (DACA)* (Sept. 5, 2017) | 8 – 13 |
| **D.** | Tom K. Wong, *et al.*, *Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey*, 2 J. OF MIGRATION AND HUMAN SECURITY 4 (2014) | 14 – 32 |
| **E.** | Madeline Kenney, *Berwyn grandmother of 10 facing deportation sues DHS over visa delay*, Chicago Sun Times (Sept. 18, 2017), https://chicago.suntimes.com/chicago-politics/berwyn-grandmother-of-10-facing-deportation-sues-dhs-over-visa-delay/ | 33 – 36 |
| **F.** | Visa Bulletin for July 2018, U.S. Dep't of State, Bureau of Consular Affairs, Vol. X, No. 19 (June 11, 2018) https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin/2018/visa-bulletin-for-july-2018.html | 37 – 46 |
| **G.** | United States Citizenship and Immigration Services, DACA Frequently Asked Questions, https://www.uscis.gov/archive/frequently-asked-questions | 47 – 70 |
| **H.** | Letter from United States Citizenship and Immigration Services (USCIS) Director Leon Rodriguez, U.S. Dep't of Homeland Sec., to Honorable Charles E. Grassley, U.S. Senate (June 29, 2016) | 71 – 73 |
| **I.** | Lori Robertson, *The DACA Population Numbers*, FactCheck.org (Jan. 12, 2018), https://www.factcheck.org/2018/01/daca-population-numbers/ | 74 – 79 |
| **J.** | Caitlin Dickerson, *For DACA Recipients, Losing Protection and Work Permits Is Just the Start*, The New York Times (Sept. 7, 2017), https://www.nytimes.com/2017/09/07/us/daca-losses-immigration.html | 80 – 84 |
| **K.** | Richard Gonzales, *DACA Recipients Worry What The Government Will Do With Their Private Information*, NPR (Sept. 9, 2017), http://www.npr.org/2017/09/09/549678003/daca-recipients-worry-what-the-government-will-do-with-their-private-information | 85 – 91 |
| **L.** | Letter from Secretary Jeh Johnson, U.S. Dep't of Homeland Sec., to Honorable Judy Chu, U.S. House of Rep. (Dec. 30, 2016) | 92 – 94 |
| **M.** | Tom K. Wong, *et al.*, *2017 National DACA Study*, CENTER FOR AMERICAN PROGRESS (Aug. 28, 2017) | 95 – 108 |
| **N.** | Jose Magaña-Salgado, *et al.*, *Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare*, Immigrant Legal Resource Center (Oct. 2017), | 109 – 121 |

| | https://www.ilrc.org/sites/default/files/resources/2017-09-29_draining_the_trust_funds_final.pdf | |
|---|---|---|
| **O.** | Jessica Ferger, *Rescinding DACA Could Spur a Public Health Crisis, from Lost Services to Higher Rates of Depression, Substance Abuse*, Newsweek (Sept. 6, 2017), http://www.newsweek.com/daca-immigration-heath-care-access-mental-health-660539 | 122 – 125 |
| **P.** | Priscilla Alvarez, *Will DACA Parents Be Forced to Leave Their U.S.-Citizen Children Behind?*, The Atlantic (Oct. 21, 2017), https://www.theatlantic.com/politics/archive/2017/10/donald-trump-daca/543519/. | 126 – 132 |
| **Q.** | Julia Carrie Wong, *Fear and uncertainty for Dreamers as DACA ends: "Where am I going to go?*, The Guardian (Sept. 5, 2017), https://www.theguardian.com/us-news/2017/sep/05/dreamers-daca-trump-ends-program-fears-for-future | 133 – 137 |
| **R.** | Donald J. Trump, @realDonaldTrump, Twitter (Apr. 1, 2018 at 6:56 AM), https://twitter.com/realDonaldTrump | 138 – 139 |
| **S.** | Anna North, *DACA helped some immigrants finally get health care. Now they could lose it*, Vox (Sept. 28, 2017), https://www.vox.com/identities/2017/9/28/16351866/daca-health-care-reproductive-health-undocumented-immigrants | 140 – 145 |
| **T.** | Stephanie Kuo, *Undocumented Immigrants Putting 'Health On Hold' Out Of Fear, Anxiety In Uncertain Times*, Houston Public Media (Sept. 15, 2017), https://www.houstonpublicmedia.org/articles/news/2017/09/15/237573/undocumented-immigrants-putting-health-on-hold-out-of-fear-anxiety-in-uncertain-times/ | 146 – 153 |
| **U.** | Virginia Fay, *Back Into the Shadows: Immigrants Retreat From Needed Services as Deportation Fears Loom*, KQED News (June 15, 2017), https://ww2.kqed.org/news/2017/06/15/back-into-the-shadows-immigrants-retreat-from-needed-services-as-deportation-fears-loom/ | 154 – 170 |
| **V.** | Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation*, The New York Times (Apr. 30, 2017), https://www.nytimes.com/2017/04/30/us/immigrants-deportation-sexual-abuse.html. | 171 – 177 |
| **W.** | Carolyn Jones, *Immigration crackdown taking heavy toll on California students*, San Jose Mercury News (Oct. 5, 2017), http://www.mercurynews.com/2017/10/05/immigration-crackdown-taking-heavy-toll-on-california-students/?platform=hootsuite | 178 – 182 |
| **X.** | Mark Keierleber, *Trump's immigration crackdown is traumatizing a generation of children*, The Guardian (Aug. 23, 2017), | 183 – 187 |

| | https://www.theguardian.com/us-news/2017/aug/23/us-immigration-children-schools-trump | |
|---|---|---|
| **Y.** | *Forum: Monday Political News Roundup*, KQED (Feb. 26, 2018), https://www.kqed.org/forum/2010101864021 | 188 – 197 |
| **Z.** | Annie Lowrey, *Trump's Anti-Immigrant Policies Are Scaring Families Away From the Safety Net*, The Atlantic (Mar. 24, 2017), https://www.theatlantic.com/business/archive/2017/03/trump-safety-net-latino-families/520779/?utm_source=nl-atlantic-weekly-032417 | 198 – 205 |
| **AA.** | Maya Venkataramani, *et al.*, *Association of Maternal Eligibility for the Deferred Action for Childhood Arrivals Program With Citizen Children's Participation in the Women, Infants, and Children Program*, 172 JAMA PEDIATRICS 7, 699-701 (July 2018) | 206 – 209 |
| **BB.** | Julianne Zuber, *Healthcare for the Undocumented: Solving a Public Health Crisis in the U.S.*, 28 J. CONTEMP. HEALTH L. & POLICY 350 (2012) | 210 – 241 |
| **CC.** | David Becerra, *et al.*, *Fear vs. Facts: Examining the Economic Impact of Undocumented Immigrants in the U.S.*, 39 J. SOC. & SOC. WELFARE 111 (2012) | 242 – 268 |
| **DD.** | Leisy J. Abrego, *Legal Consciousness of Undocumented Latinos: Fear and Stigma as Barriers to Claims-Making for First- and 1.5-Generation Immigrants*, 45 LAW & SOC'Y REV. 337 (2011) | 269 – 303 |
| **EE.** | Jens Hainmueller, *et al.*, *Protecting unauthorized immigrant mothers improves their children's mental health*, 357 SCIENCE 1041-44 (Sept. 8, 2017) | 304 – 309 |
| **FF.** | Dara Lind, *What happens to a family when they have equal rights, and then lose them?* Vox (Dec. 14, 2017), https://www.vox.com/policy-and-politics/2017/12/14/16752114/daca-children-us-citizens | 310 – 317 |
| **GG.** | Susana Martinez and Sheila Neville, *Help for Undocumented Victims of Crime*, 44 CLEARINGHOUSE REV. 129 (2010) | 318 – 331 |
| **HH.** | Bill Ong Hing, *Immigration Sanctuary Policies: Constitutional and Representative of Good Policing and Good Public Policy*, 2 UC IRVINE L. REV. 247 (2012) | 332 – 398 |
| **II.** | Debra J. Robbin, *When Undocumented Immigrants Don't Report Crime, We All Suffer*, WBUR (Sept. 22, 2017), http://www.wbur.org/cognoscenti/2017/09/22/undocumented-immigrants-report-crimes-debra-j-robbin | 399 – 403 |

# EXHIBIT A

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528

**Homeland Security**

June 15, 2012

MEMORANDUM FOR:     David V. Aguilar
                    Acting Commissioner, U.S. Customs and Border Protection

                    Alejandro Mayorkas
                    Director, U.S. Citizenship and Immigration Services

                    John Morton
                    Director, U.S. Immigration and Customs Enforcement

FROM:               Janet Napolitano
                    Secretary of Homeland Security

SUBJECT:            Exercising Prosecutorial Discretion with Respect to Individuals
                    Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home. As a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

Our Nation's immigration laws must be enforced in a strong and sensible manner.  They are not designed to be blindly enforced without consideration given to the individual circumstances of each case.  Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language.  Indeed, many of these young people have already contributed to our country in significant ways.  Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal.  No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis.  DHS cannot provide any assurance that relief will be granted in all cases.

1.  With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2.  With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3.  With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

2

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

# EXHIBIT B

## Poll: Nearly 9 in 10 want DACA recipients to stay in US

thehill.com/blogs/blog-briefing-room/news/369487-poll-nearly-nine-in-10-favor-allowing-daca-recipients-to-stay

January 18, 2018



An overwhelming majority of Americans supports legal protections for certain undocumented immigrants brought to the U.S. as children, according to a new CBS News poll.

According to the survey, almost 9 in 10 respondents — 87 percent — said they believe that the so-called Dreamers should be allowed to remain in the U.S. if they meet certain requirements, such as working or going to school.

The findings come as lawmakers struggle to strike a deal to protect those immigrants, who are covered by the Deferred Action for Childhood Arrivals (DACA) program. President Trump rescinded the Obama-era program last September, but he gave Congress until March to come up with a legislative solution for its recipients.

Democrats have insisted that DACA's protections be addressed in a must-pass government funding measure. But Trump has said that any deal on DACA must also provide for increased border security and help fund construction of his long-promised wall between the U.S. and Mexico.

Pollsters found that Americans are more divided on whether the issue is worth the risk of a government shutdown.

Forty-six percent said that it is worth shuttering the federal government if a deal is not reached on DACA, while 48 percent said it is not.

The CBS News poll surveyed 1,225 Americans from Jan. 13 to 16. The margin of error is 3 percentage points.

Poll: Nearly 9 in 10 want DACA recipients to stay in US | TheHill

# EXHIBIT C

Memorandum on Rescission Of DACA | Homeland Security

   

News Archive
    Blog Archive
    Events & Media Advisories Archive
    Fact Sheets Archive    Press Release Archive
    Speeches Archive

Search

**Archived Content**

In an effort to keep DHS.gov current, the archive contains outdated information that may not reflect current policy or programs.

# Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA)

**Release Date:**  September 5, 2017

**MEMORANDUM FOR:**

James W. McCament
Acting Director
U.S. Citizenship and Immigration Services

Thomas D. Homan
Acting Director
U.S. Immigration and Customs Enforcement

Kevin K. McAleenan
Acting Commissioner
U.S. Customs and Border Protection

Joseph B. Maher
Acting General Counsel

Ambassador James D. Nealon
Assistant Secretary, International Engagement

Julie M. Kirchner

Citizenship and Immigration Services Ombudsman

**FROM:**

Elaine C. Duke
Acting Secretary

**SUBJECT:**

**Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children"**

This memorandum rescinds the June 15, 2012 memorandum entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children," which established the program known as Deferred Action for Childhood Arrivals ("DACA"). For the reasons and in the manner outlined below, Department of Homeland Security personnel shall take all appropriate actions to execute a wind-down of the program, consistent with the parameters established in this memorandum.

## Background

The Department of Homeland Security established DACA through the issuance of a memorandum on June 15, 2012. The program purported to use deferred action—an act of prosecutorial discretion meant to be applied only on an individualized case-by-case basis—to confer certain benefits to illegal aliens that Congress had not otherwise acted to provide by law.[1] Specifically, DACA provided certain illegal aliens who entered the United States before the age of sixteen a period of deferred action and eligibility to request employment authorization.

On November 20, 2014, the Department issued a new memorandum, expanding the parameters of DACA and creating a new policy called Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA"). Among other things—such as the expansion of the coverage criteria under the 2012 DACA policy to encompass aliens with a wider range of ages and arrival dates, and lengthening the period of deferred action and work authorization from two years to three—the November 20, 2014 memorandum directed USCIS "to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis," to certain aliens who have "a son or daughter who is a U.S. citizen or lawful permanent resident."

Prior to the implementation of DAPA, twenty-six states—led by Texas—challenged the policies announced in the November 20, 2014 memorandum in the U.S. District Court for the Southern District of Texas. In an order issued on February 16, 2015, the district court preliminarily enjoined the policies nationwide.[2] The district court held that the plaintiff states were likely to succeed on their claim that the DAPA program did not comply with relevant authorities.

The United States Court of Appeals for the Fifth Circuit affirmed, holding that Texas and the other states had demonstrated a substantial likelihood of success on the merits and satisfied the other requirements for a preliminary injunction.[3] The Fifth Circuit concluded that the Department's DAPA policy conflicted with the discretion authorized by Congress. In considering the DAPA program, the court noted that the Immigration and Nationality Act "flatly does not permit the reclassification of millions of illegal aliens as lawfully present and thereby make them newly eligible for a host of federal and state benefits, including work authorization." According to the court, "DAPA is foreclosed by Congress's careful plan; the program is 'manifestly contrary to the statute' and therefore was properly enjoined."

Memorandum on Rescission Of DACA | Homeland Security

Although the original DACA policy was not challenged in the lawsuit, both the district and appellate court decisions relied on factual findings about the implementation of the 2012 DACA memorandum. The Fifth Circuit agreed with the lower court that DACA decisions were not truly discretionary,[4] and that DAPA and expanded DACA would be substantially similar in execution. Both the district court and the Fifth Circuit concluded that implementation of the program did not comply with the Administrative Procedure Act because the Department did not implement it through notice-and-comment rulemaking.

The Supreme Court affirmed the Fifth Circuit's ruling by equally divided vote (4-4).[5] The evenly divided ruling resulted in the Fifth Circuit order being affirmed. The preliminary injunction therefore remains in place today. In October 2016, the Supreme Court denied a request from DHS to rehear the case upon the appointment of a new Justice. After the 2016 election, both parties agreed to a stay in litigation to allow the new administration to review these issues.

On January 25, 2017, President Trump issued Executive Order No. 13,768, "Enhancing Public Safety in the Interior of the United States." In that Order, the President directed federal agencies to "[e]nsure the faithful execution of the immigration laws . . . against all removable aliens," and established new immigration enforcement priorities. On February 20, 2017, then Secretary of Homeland Security John F. Kelly issued an implementing memorandum, stating "the Department no longer will exempt classes or categories of removable aliens from potential enforcement," except as provided in the Department's June 15, 2012 memorandum establishing DACA,[6] and the November 20, 2014 memorandum establishing DAPA and expanding DACA.[7]

On June 15, 2017, after consulting with the Attorney General, and considering the likelihood of success on the merits of the ongoing litigation, then Secretary John F. Kelly issued a memorandum rescinding DAPA and the expansion of DACA—but temporarily left in place the June 15, 2012 memorandum that initially created the DACA program.

Then, on June 29, 2017, Texas, along with several other states, sent a letter to Attorney General Sessions asserting that the original 2012 DACA memorandum is unlawful for the same reasons stated in the Fifth Circuit and district court opinions regarding DAPA and expanded DACA. The letter notes that if DHS does not rescind the DACA memo by September 5, 2017, the States will seek to amend the DAPA lawsuit to include a challenge to DACA.

The Attorney General sent a letter to the Department on September 4, 2017, articulating his legal determination that DACA "was effectuated by the previous administration through executive action, without proper statutory authority and with no established end-date, after Congress' repeated rejection of proposed legislation that would have accomplished a similar result. Such an open-ended circumvention of immigration laws was an unconstitutional exercise of authority by the Executive Branch." The letter further stated that because DACA "has the same legal and constitutional defects that the courts recognized as to DAPA, it is likely that potentially imminent litigation would yield similar results with respect to DACA." Nevertheless, in light of the administrative complexities associated with ending the program, he recommended that the Department wind it down in an efficient and orderly fashion, and his office has reviewed the terms on which our Department will do so.

## Rescission of the June 15, 2012 DACA Memorandum

Taking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation, and the September 4, 2017 letter from the Attorney General, it is clear that the June 15, 2012 DACA program should be terminated. In the exercise of my authority in establishing national immigration policies and priorities,

except for the purposes explicitly identified below, I hereby rescind the June 15, 2012 memorandum.

Recognizing the complexities associated with winding down the program, the Department will provide a limited window in which it will adjudicate certain requests for DACA and associated applications meeting certain parameters specified below. Accordingly, effective immediately, the Department:

- Will adjudicate—on an individual, case-by-case basis—properly filed pending DACA initial requests and associated applications for Employment Authorization Documents that have been accepted by the Department as of the date of this memorandum.
- Will reject all DACA initial requests and associated applications for Employment Authorization Documents filed after the date of this memorandum.
- Will adjudicate—on an individual, case by case basis—properly filed pending DACA renewal requests and associated applications for Employment Authorization Documents from current beneficiaries that have been accepted by the Department as of the date of this memorandum, and from current beneficiaries whose benefits will expire between the date of this memorandum and March 5, 2018 that have been accepted by the Department as of October 5, 2017.
- Will reject all DACA renewal requests and associated applications for Employment Authorization Documents filed outside of the parameters specified above.
- Will not terminate the grants of previously issued deferred action or revoke Employment Authorization Documents solely based on the directives in this memorandum for the remaining duration of their validity periods.
- Will not approve any new Form I-131 applications for advance parole under standards associated with the DACA program, although it will generally honor the stated validity period for previously approved applications for advance parole. Notwithstanding the continued validity of advance parole approvals previously granted, CBP will—of course—retain the authority it has always had and exercised in determining the admissibility of any person presenting at the border and the eligibility of such persons for parole. Further, USCIS will—of course—retain the authority to revoke or terminate an advance parole document at any time.
- Will administratively close all pending Form I-131 applications for advance parole filed under standards associated with the DACA program, and will refund all associated fees.
- Will continue to exercise its discretionary authority to terminate or deny deferred action at any time when immigration officials determine termination or denial of deferred action is appropriate.

This document is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter. Likewise, no limitations are placed by this guidance on the otherwise lawful enforcement or litigation prerogatives of DHS.

---

[1] Significantly, while the DACA denial notice indicates the decision to deny is made in the unreviewable discretion of USCIS, USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion.

[2] *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015).

[3] *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015).

Memorandum on Rescission Of DACA | Homeland Security

[4] *Id.*

[5] *United States v. Texas*, 136 S. Ct. 2271 (2016) (per curiam).

[6] Memorandum from Janet Napolitano, Secretary, DHS to David Aguilar, Acting Comm'r, CBP, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012).

[7] Memorandum from Jeh Johnson, Secretary, DHS, to Leon Rodriguez, Dir., USCIS, et al., "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Whose Parents are U.S. Citizens or Permanent Residents" (Nov. 20, 2014).

Topics:  Border Security, Deferred Action
Keywords:  DACA, Deferred Action for Childhood Arrivals

Last Published Date: September 5, 2017

---

⌂   >   Archive   >   News Archive   >   Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA)



Official website of the Department of Homeland Security

Site Links      Privacy      FOIA      Accessibility      Plug-ins

# EXHIBIT D



Journal on Migration
and Human Security

# Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey[1]

Tom K. Wong
*UC San Diego*

Donald Kerwin
*Center for Migration Studies*

Jeanne M. Atkinson
*Catholic Legal Immigration Network, Inc.*

Mary Meg McCarthy
*National Immigrant Justice Center*

## Executive Summary

Anecdotal evidence suggests that a significant percentage of unauthorized immigrants are potentially eligible for some sort of immigration relief, but they either do not know it or are not able to pursue lawful immigration status for other reasons. However, no published study that we are aware of has systematically analyzed this question. The purpose of this study is thus to evaluate and quantify the number of unauthorized immigrants who, during the course of seeking out legal services, have been determined to be potentially eligible for some sort of immigration benefit or relief that provides lawful immigration status. Using the recent implementation of the Deferred Action for Childhood Arrivals (DACA) program as a laboratory for this work, this study attempts to answer the question of the number of unauthorized immigrants who, without knowing it, may *already* be potentially eligible for lawful immigration status. In surveying 67 immigrant-serving organizations that provide legal services, we find that 14.3 percent of those found to be eligible for DACA were also found to be eligible for some other form of immigration relief—put otherwise, 14.3 percent of individuals that were found to be eligible for DACA, which provides temporary relief from deportation, may now be on a path towards lawful permanent residency. We find that the most common legal remedies available to these individuals are family-based petitions (25.5 percent), U-Visas (23.9 percent), and Special Immigrant Juvenile Status (12.6 percent). These findings make clear that—with comprehensive

1 This study was made possible through the support of the John D. and Catherine T. MacArthur Foundation.

*© 2014 by the Center for Migration Studies of New York. All rights reserved.*

Journal on Migration and Human Security

immigration reform legislation or eligibility for administrative relief — legal screening can have significant and long-lasting implications on the lives of unauthorized immigrants and their families.

## Introduction

Over the past several decades, a comprehensive legislative response to the US unauthorized population has eluded Congress, successive administrations, and states and localities. In the 113th Congress (2013-2014), lawmakers again failed to pass comprehensive immigration reform (CIR) legislation that included an earned legalization program for unauthorized immigrants.[2] Congress has also repeatedly failed to pass more narrow legislation that would legalize discrete groups of unauthorized immigrants, such as those who were brought to the US as children and agricultural laborers.[3] Within this context, the Obama administration has used its prosecutorial discretion to provide temporary relief from deportation, along with work authorization, to an estimated 1.8 million unauthorized immigrant youth via the 2012 Deferred Action for Childhood Arrivals (DACA) program.[4] At the end of 2014 the administration expanded its policy of deferred action to the unauthorized parents of US citizens and lawful permanent residents (LPRs) via the Deferred Action for Parental Accountability (DAPA) program.

The recent implementation of DACA provides a laboratory to analyze one of the largest immigrant legalization programs since the Immigration Reform and Control Act (IRCA) of 1986. The lessons learned from DACA are sure to inform DAPA implementation, as well as future legalization programs. Research on DACA has thus far analyzed the demographic profile of DACA applicants with an eye towards the under-representation of particular immigrant groups (Wong et al. 2013), the societal incorporation experiences of those with DACA (Gonzales, Terriquez, and Ruszczyk 2014; Wong and Valdivia 2014), and the civic engagement and political incorporation of "DACAmented" millennials (Wong and Valdivia 2014). Despite the important contributions of these studies, the perspectives and experiences of immigrant-serving organizations that provide legal services—organizations that are not only on the front lines of DACA implementation, but will also likely be on the front lines of any broader legalization program—have been absent from this emergent literature.

Anecdotal evidence based on the experiences of immigrant-serving organizations that provide legal services suggests that a significant percentage of unauthorized immigrants

---

2  Whereas S. 744 was passed in the Senate by a vote of 68 to 32, the bill was not voted on in the House of Representatives.

3  The impasse at the federal level has created opportunities for states and other localities to pass their own legislation directed at unauthorized immigrants, including so-called self-deportation enforcement measures. At the same time, other states and localities have passed measures that attempt to regularize and normalize day-to-day life for unauthorized immigrants, for example, by allowing unauthorized immigrants to access identification cards, driver's licenses, and in-state tuition. Combined, these laws, policies, and practices can improve the lives of unauthorized immigrants, but they do not offer permanent status or long-term solutions to the challenge of 11 million US unauthorized residents.

4  The administration has also used its prosecutorial discretion to ease enforcement pressures on unauthorized immigrants in the nation's interior who do not fit certain enforcement priorities.

288

are potentially eligible for some sort of immigration benefit or relief, but either they do not know it or are not able to pursue lawful immigration status for other reasons. However, no published study of which we are aware has systematically analyzed this question. The purpose of this study is thus to evaluate and quantify the number of unauthorized immigrants who, during the course of seeking out legal services, have been determined to be potentially eligible for some sort of immigration relief that provides lawful immigration status. Using the implementation of DACA as the backdrop for this work, this study is a first attempt to answer the question of the number of unauthorized immigrants who, without knowing it, may *already* be potentially eligible for lawful immigration status. This study has important implications for those who seek out legal services for deferred action, as permanent immigration remedies may be available to many unauthorized immigrants in addition to temporary relief from deportation.

In a national survey of 67 immigrant-serving organizations that provide legal services, we find that 14.3 percent of those found to be eligible for DACA were also found to be eligible for some other form of immigration benefit or relief—put otherwise, 14.3 percent of individuals that were found to be eligible for DACA, which provides temporary relief from deportation, may now be on the path towards lawful permanent residency. We find that the most common legal remedies available to these individuals are family-based petitions (25.5 percent), U-Visas (23.9 percent), and Special Immigrant Juvenile Status (12.6 percent). These findings make clear that—with or without comprehensive immigration reform legislation or administrative relief—legal screening can have significant and long-lasting implications on the lives of unauthorized immigrants and their families.

## Unmet Needs: Connecting Unauthorized Immigrants to Legal Service Providers

A growing body of literature has demonstrated the overwhelming need for legal services and assistance in immigrant communities (for example, see Bach, 1996; Shannon 2009; Katzmann 2008, 2009; Kerwin 2005). To illustrate, one of the last major national legal needs surveys conducted in immigrant communities was fielded in the early 1990s (Bach 1996). This study was based on a survey of 2,500 low-income households in Los Angeles, New York, Houston, Miami, and Chicago, all communities with relatively robust immigrant service networks. The survey found that while *more than half* of the households surveyed had been involved in a "legal status change," among these households, *less than half* had received legal assistance in the process (Bach 1996, 37). This literature has also drawn attention to the shortage of competent counsel for low-income immigrants (Shannon 2009; Markowitz et al. 2011) and the important role that community-based organizations play in ensuring high levels of participation in programs to change legal status (Baker 1997; Campos 2014; Gonzalez-Barrera et al. 2013; Hagan and Baker 1993).

Given the immense unmet legal needs of low-income immigrants, national, state, and local charitable legal service and community networks have made it a priority to build immigrant service and legal capacity. Capacity building has been a recurrent theme in planning discussions related to the implementation of broad legalization programs like DACA, DAPA and earned legalization (Carson 2014; Kerwin and Laglagaron 2010), as

has improving the quality of legal representation for immigrants more generally (Katzmann 2008, 2009).

The mobilization and coordination of immigrant-serving organizations has also proven successful in increasing participation in legal status programs.[5] For example, a large-scale naturalization campaign after the nationwide immigrant rights marches in 2006 led to a spike in naturalization applications filed between 2006 and 2007 (from 730,642 to 1,382,993), as well as a large increase in persons naturalized from 2007 to 2008 (from 660,477 to 1,046,539) (Gonzalez-Barrera et al. 2013, 30; see also Wang and Winn 2011). Yet, the need for sustained work by immigrant-serving organizations that provide legal services remains acute. For example, 9.7 million immigrants who were eligible for naturalization in 2011 had not yet naturalized, with particularly low naturalization rates among eligible Mexican nationals (Gonzalez-Barrera et al. 2013, 11). Moreover, while nearly 600,000 young people are now "DACAmented," this represents just under half of those who are currently eligible for DACA.[6]

Research in this area has also illustrated the striking differences that legal representation makes in case outcomes (Katzmann 2008; Ramji-Nogales, Schoenholtz, and Schrag 2009; TRAC 2014). These studies have largely concentrated on political asylum-seekers in US immigration courts, although they have also covered cases in removal proceedings involving immigration relief of different kinds and cases before US Citizenship and Immigration Services (USCIS). One study concluded that legal representation is "the single most important factor" affecting political asylum outcomes (Ramji-Nogales, Schoenholtz, and Schrag 2009, 45). Not surprisingly, studies have also concluded that the quality of legal representation matters. Thus, high-quality, time-intensive representation leads to high approval rates (Ramji-Nogales, Schoenholtz, and Schrag 2009), while poor representation negatively influences case outcomes (Markowitz et al. 2011, 23-27). Additional findings include:

- 47 percent of represented unaccompanied minors from FY 2005 to FY 2014 were allowed to stay in the United States, compared to 10 percent of unrepresented unaccompanied minors during the same period (TRAC 2014);
- 25 percent of represented asylum-seekers from FY 2000 and FY 2004 who were arrested at or near the US-Mexico border and initially subject to expedited removal were granted asylum, compared to 2 percent for unrepresented asylum-seekers in this situation (Kuck 2004, 239);
- 39 percent of non-detained, represented asylum-seekers in FY 2003 prevailed in their claims in immigration court, versus 14 percent of non-detained, unrepresented asylum-seekers (Kerwin 2004, 6, 11-12);
- 18 percent of detained, represented asylum-seekers in FY 2003 were granted asylum, compared to 3 percent for detained, unrepresented asylum-seekers (ibid.);
- 87 percent of non-detained, represented persons seeking adjustment to LPR status in FY 2003 were successful, compared to 70 percent for non-detained, unrepresented

5 See Baker 1997 and Hagan and Baker 1993 for examples related to IRCA. See Campos 2014 for more recent examples.
6 As of July 2014, 587,366 initial DACA applications had been approved. This represents 41 percent of the potentially eligible population of 1.7 million (see Batalova et al. 2014).

persons (ibid.);

- 41 percent of detained, represented persons seeking adjustment to LPR status in FY 2003 were successful, compared to 21 percent for detained, unrepresented persons (ibid.);
- 46 percent of represented asylum-seekers in immigration court from January 2000 to August 2004 received asylum, compared to 16 percent for unrepresented asylum-seekers (Ramji-Nogales, Schoenholtz, and Schrag 2009, 45);
- 41 percent of USCIS asylum applicants with legal counsel from FY 2000 to FY 2003 were granted asylum, compared to 24 percent of USCIS asylum applicants without legal counsel during the same period (ibid., 260);
- 74 percent of represented, non-detained cases from October 2005 to July 2010 in New York immigration courts had successful case outcomes, compared to 13 percent for unrepresented, non-detained cases during the same period (Markowitz et al. 2011, 19-20);
- 18 percent of represented detainees achieved successful outcomes in New York immigration courts from October 2005 to July 2010, compared to 3 percent of unrepresented detainees during the same period (ibid.).

As these findings make clear, legal representation is an important determinant of positive immigration case outcomes. Our analysis below further demonstrates that, in the context of DACA, access to legal services and assistance is also an important determinant of identifying the many paths to lawful immigration status that may exist for some unauthorized immigrants.

## The PERSON Survey

In order to empirically evaluate the extent to which DACA-eligible youth are also potentially eligible for other immigration benefits or forms of relief, we conducted a nationwide survey of immigrant-serving organizations that provide legal services during the late summer and early fall months of 2014—the Potential Eligibility for Relief Survey of Non-Profits, or PERSON survey. Sponsored by the Center for Migration Studies of New York (CMS), the Catholic Legal Immigration Network, Inc. (CLINIC), and the National Immigrant Justice Center (NIJC), our online survey used a snowball sampling method that relied on the dense networks of immigration legal service providers supported by or otherwise known to the sponsoring organizations.

Sixty-seven organizations representing 24 states plus the District of Columbia completed the survey. The bulk of organizations that responded to the survey are from Illinois (12 organizations), California (9), and New York (8). When comparing states that are represented in the survey with states that are not, we see that our sample is comprised of states with statistically significantly larger estimated unauthorized populations ($p$ = .036) and statistically significantly larger numbers of estimated DACA-eligible youth ($p$ = .056). Regarding the characteristics of the organizations themselves, there is significant variation in their experience, as measured by number of years in operation, and their capacity, as measured by number of paid staff. Experience ranges from one year in operation to 103 years in operation with a median of 28 years. Capacity ranges from one paid staff to 104 paid staff with a median of seven. This variation provides leverage to evaluate how the

efficacy of legal screening varies by the experience and capacity of the organizations we surveyed.

## Results

Since DACA was first announced on June 15, 2012, the organizations we surveyed combined to screen a total of 126,154 individuals without lawful status. Of this total, 30,733 or 24.4 percent were DACA-related cases. In other words, among the organizations surveyed over 30,000 persons "walked in the door" for DACA. Of course, not all of these individuals were found to be eligible for deferred action. Of the 30,733, 19,095 or 62.1 percent of these DACA-related cases were, in fact, found to be eligible for DACA. The legal remedies available to this particular subset of individuals constitute the primary focus of the analysis below. We also note that 56.0 percent of non-DACA cases on which the surveyed organizations worked were found to be potentially eligible for some form of immigration relief (more on this in the recommendation section).[5]

Having identified the total number of DACA-eligible youth that each of the organizations we surveyed screened, we then asked, "Among the individuals who were judged to be potentially eligible for DACA, approximately how many of these individuals were *also* judged to be potentially eligible for other immigration benefits or forms of relief?" In response, the organizations in our sample reported identifying a combined 2,727 individuals who were eligible for DACA and some other immigration benefit or form of relief. In other words, *14.3 percent of those who "walked in the door" for DACA were not only found to be potentially eligible for deferred action, but were also judged to be potentially eligible for some other immigration benefit or form of immigration relief*. Figure 1 graphically depicts this result.

What specific immigration remedies have these organizations identified for these 2,727 individuals? To answer this question, we asked the organizations to indicate the percentage breakdown of eligibility for non-DACA immigration remedies based on a menu of different forms of immigration relief.[6] As Figure 2 shows, the most common immigration remedies identified for these individuals are family-based petitions (25.5 percent), followed by U-Visas (23.9 percent) and then Special Immigrant Juvenile Status (12.6 percent). As noted above, these alternatives provide potential paths to permanent residency (e.g., a green card) and citizenship.

5  The five most common legal remedies available in non-DACA cases were Special Immigrant Juvenile Status (18.3 percent), asylum or related protection (14.8 percent), family-based petitions (14.6 percent), adjustment (10.5 percent), and cancellation of removal (9.4 percent). The high percentage of Special Immigrant Juvenile Status and asylum or related protection cases are due mostly to an outlier organization. Removing the outlier leads to family-based petitions (20.2 percent), cancellation of removal (14.9 percent), adjustment (14.1 percent), DACA (13.6 percent), and consular processing (11.8 percent) as the leading categories. Whereas 23.9 percent of those eligible for DACA *and* some other form of immigration relief were found to be potentially eligible for a U-Visa, 8.0 percent of non-DACA cases were found to be potentially eligible for a U-Visa (9.6 percent if the outlier is excluded). It is also interesting to note that 3.2 percent (4.4 percent excluding the outlier) of individuals were found to be potentially eligible for derivative citizenship.
6  This menu included, in alphabetical order, Adjustment, Asylum or Related Protection, Cancellation of Removal (only applicable if individual is in immigration court), Consular Processing, Derivative Citizenship/ Naturalization, Employment-Based Visa, Family-Based Petition, Non-Immigrant Visa, Special Immigrant Juvenile Status, T-Visa, U-Visa, VAWA, and Other.

Paths to Lawful Immigration Status

**Figure 1**



**Figure 2**



That 14.3 percent of those found to be eligible for DACA were also found to be potentially eligible for some other immigration benefit or form of relief is an especially significant finding given the large number of estimated DACA-eligible youth across the country.[9] However, we caution that a wholesale generalization of this 14.3 percent figure to the entire DACA-eligible population, or even to the broader unauthorized population, would be unwise. Because a probability-based survey of all attorneys who work on immigration cases, immigration legal service providers, and organizations that serve unauthorized immigrants is currently not possible (this entire universe is not known and the number of unauthorized immigrants who find a path to lawful status and proceed *pro se* would also need to be taken into account), nationally generalizable survey results are currently not obtainable. Methodological limitations notwithstanding, the import of our main finding remains intact.

Moreover, while no publicly available data of which we are aware can definitively tell us whether our main finding represents an upper or lower bound, we can confidently state that among the organizations we surveyed, 14.3 percent of those found to be eligible for DACA were also found to be potentially eligible for some other immigration benefit or form of immigration relief. Our main finding can thus be used as a heuristic for future DACA-related outreach, as well as for outreach related to DAPA and any other legalization program.

## Experience and Capacity

Are organizations with more experience or greater capacity more likely to identify alternative immigration remedies for DACA-eligible youth? To answer this question, we analyze the relationship between the characteristics of the organizations we surveyed and the percentage of individuals that each organization identified who were eligible for DACA *and* some other immigration benefit or form of immigration relief. To recall, among the organizations surveyed, experience ranges from one year in operation to 103 years and capacity ranges from one paid staff to 104.

The analysis proceeds as follows. First, we examine the bivariate relationship between the experience of an organization and the count of the total number of individuals identified as being eligible for DACA and some other immigration benefit or form of relief ($y_{1A}$). We then examine the bivariate relationship between the experience of an organization and the number of individuals identified as being eligible for DACA and some other immigration benefit or form of relief as a percentage of all individuals identified as being eligible for DACA ($y_{1B}$). Given the non-normal distribution of experience across all of the organizations surveyed, we analyze both the total number of years in operation ($x_{1A}$) and the natural log of the total number of years in operation ($x_{1B}$).

Second, we examine the bivariate relationship between the capacity of an organization, as measured by total number of paid staff, and $y_{1A}$ and $y_{1B}$. Because capacity is also not normally distributed across the organizations that we surveyed, we analyze both the total number of paid staff ($x_{2A}$) and the natural log of the total number of paid staff ($x_{2B}$). Lastly, we test the

Paths to Lawful Immigration Status

effect of experience and capacity in a multivariate model that accounts for contextual factors related to social capital that are likely to impact the ability of unauthorized immigrants to access legal services or assistance in the context of a legalization program (Baker 1997; Hagan and Baker 1993; Meissner and Papademetriou 1988; Ong Hing 1992). These are the natural log of the total non-citizen population in the cities that the organizations we surveyed are located, the percentage of the non-citizen population that entered before 2010, the percentage of the non-citizen population that does not speak English very well, and the percentage of the non-citizen population that lives below the poverty line. These data come from the American Community Survey (ACS) 2012 five-year estimates. We note that because more nuanced and granular data on the unauthorized immigrant population are currently not widely available (or reliable) at low levels of geography (e.g., cities) and for places with small populations, we use data from the ACS on the non-citizen population as proxies for the characteristics of the unauthorized.

## Figure 3



As Figure 3 shows, there is no statistically significant relationship between experience and the efficacy of legal screening. As the figure shows, the relationship between the number of years in operation and the count of individuals identified as being eligible for DACA and

some other immigration benefit or form of relief ($y_{1A}$) is statistically insignificant. This is true for both the total number of years in operation ($p = .467$) and the natural log of the total number of years in operation ($p = .782$). Moreover, while there is a positive relationship between experience and the number of individuals identified as being eligible for DACA and some other immigration benefit or form of relief as a percentage of all individuals identified as being eligible for DACA ($y_{1B}$), this relationship is not statistically significant. This is true for both the total number of years in operation ($p = .100$) and the natural log of the total number of years in operation ($p = .237$).

In contrast, as Figure 4 shows, there is a statistically significant relationship between capacity and the efficacy of legal screening. As the left column of the figure shows, the relationship between the number of paid staff and the count of individuals identified as being eligible for DACA and some other immigration benefit or form of relief ($y_{1A}$) is statistically significant. This is especially true for the natural log of the total number of paid staff ($p = .011$). Moreover, there is also a positive and statistically significant relationship between capacity and the number of individuals identified as being eligible for DACA and some other immigration benefit or form of relief as a percentage of all individuals identified as being eligible for DACA ($y_{1B}$), as illustrated in the right column of the figure. This is also especially true for the natural log of the total number of paid staff ($p = .027$).

## Figure 4



Paths to Lawful Immigration Status

Does the effect of capacity hold when taking into account other factors? To answer this question, we now turn to the multivariate analysis. Table 1 reports the results of the analysis of the count of individuals identified as being eligible for DACA and some other immigration benefit or form of relief ($y_{1A}$).  As the table shows, the effect of capacity, when measured by the natural log of the total number of paid staff, remains significant in the multivariate models. Put otherwise, greater capacity means that organizations are able to identify a greater number of individuals who are both eligible for DACA and some other immigration benefit or form of relief. This result holds when accounting for contextual factors related to the social capital of unauthorized immigrants that are likely to impact the ability of unauthorized immigrants to access legal services or assistance.

## Table 1. Modeling the Count of Persons Found Eligible for DACA AND Other Immigration Benefits

|  | Model 1 | Model 2 |
| --- | --- | --- |
| Years in Operation (ln) | -.207 | -.220 |
|  | (.166) | (.167) |
| Paid Staff (ln) | **.530\*\*\*** | **.478\*\*\*** |
|  | **(.183)** | **(.187)** |
| Total Noncitizen Population (ln) |  | .014 |
|  |  | (.088) |
| % Noncitizen Population Entered Before 2010 |  | .006 |
|  |  | (.085) |
| % Noncitizen Population Does Not Speak English Well |  | .007 |
|  |  | (.022) |
| % Noncitizen Population Below Poverty Line |  | -.009 |
|  |  | (.025) |

Negative binomial regressions. Standard errors in parentheses. \*\* significant at the .05 level. \*\*\* significant at the .01 level.

Table 2 reports the analysis of the number of individuals identified as being eligible for DACA and some other immigration benefit or form of relief as a percentage of all individuals identified as being eligible for DACA ($y_{1B}$). As the table shows, the effect of capacity remains generally significant in the multivariate models. Whereas the effect is highly statistically significant in model 3, the impact of capacity just misses conventional levels of statistical significance in model 4.

*Journal on Migration and Human Security*

### Table 2. Modeling Percentage of Persons Found Eligible for Other Immigration Benefits *(i.e., eligible for DACA AND other benefit divided by eligible for DACA)*

|  | Model 1 | Model 2 |
| --- | --- | --- |
| Years in Operation (ln) | 1.352 | .756 |
|  | (2.351) | (2.628) |
| Paid Staff (ln) | **4.628\*\*** | 4.052 |
|  | **(2.327)** | (2.568) |
| Total Noncitizen Population (ln) |  | .813 |
|  |  | (1.399) |
| % Noncitizen Population Entered Before 2010 |  | .301 |
|  |  | (1.047) |
| % Noncitizen Population Does Not Speak English Well |  | -.039 |
|  |  | (.279) |
| % Noncitizen Population Below Poverty Line |  | .104 |
|  |  | (.399) |

OLS regressions. Standard errors in parentheses. \*\* significant at the .05 level. \*\*\* significant at the .01 level.

## Recommendations

Our findings make clear that, just as there are many paths into "illegality," there are also many paths to lawful status. Although obstacles such as cost and accessibility, among others, limit the ability of unauthorized immigrants to seek out and obtain legal services, doing so can potentially mean the difference between "living in the shadows" and lawful permanent residency. This will certainly not be the case for all.[10] However, as the data show—and as the experiences of immigration legal service providers attest —the line demarcating lawful and unauthorized status is often a fluid one, particularly when immigration law intersects the lived experiences of unauthorized immigrants (for example, see Jasso et al. 2008). We end this article by making several recommendations.

To the extent possible, unauthorized immigrants should seek out competent legal services. Because we recognize that we risk stating the obvious, we add additional layers of depth to this recommendation. DACA has provided a laboratory for our empirical research, as the program has given unauthorized youth and their families a reason to seek out legal services and thus an opportunity to potentially access other immigration benefits and forms

10 As many unauthorized immigrants may have previously pursued legal services and assistance (it is not uncommon to hear about individuals or families spending thousands of dollars on several different immigration attorneys over the course of many years), it is important to note that while one may not have been eligible for some form of immigration relief in the past, one could, as with a U-Visa, become eligible at a later point in time.

Paths to Lawful Immigration Status

of immigration relief. However, our recommendation extends beyond the DACA-eligible population. Indeed, many paths to lawful immigration status exist not only for unauthorized youth, but also for the broader unauthorized population.

To recall, our survey shows that since DACA was first announced, 56.0 percent of the combined total number of non-DACA cases on which the organizations we surveyed worked were found to be potentially eligible for some immigration benefit or form of immigration relief. To be clear, this should not be interpreted to mean that over half of the unauthorized population in the United States has a path to lawful permanent residency. Rather, the experiences of immigration legal service providers suggest that a selection effect exists, wherein unauthorized immigrants who *already* believe that they are potentially eligible for some form of immigration relief are more likely to seek out legal support. This means that the broader unauthorized population is less likely to "walk in the door" of immigration legal service providers—these may be the individuals for whom legal screening is most important.

Of course, this begs the question of how to increase access to legal services and assistance. Here, federal, state, local, and private philanthropic initiatives that increase the legal capacity of immigrant-serving organizations, as well as initiatives that support low-income immigrants, should be substantially expanded. Whereas the experience of DACA has proven the success of such initiatives, the recent announcement of the larger-scale DAPA program now magnifies their importance. Moreover, it is likely that, if Congress were to pass legalization legislation, persons with deferred action would be treated favorably.

It is important to be mindful that unauthorized immigrants are often "easy prey for bogus or incompetent attorneys, 'notarios,' scam artists, and other bad actors who take advantage of immigrants' limited knowledge of US law, lack of English fluency, and lack of cultural knowledge to charge exorbitant fees for wild promises of green cards and citizenship that the bad actors cannot—or in some cases never intended to—deliver" (Shannon 2009, 557; see also Katzmann 2008; Langford 2004; Shannon 2011).

We thus propose two potential "firewalls" to the exploitation of unauthorized immigrants as they seek out legal services. The first is ethnic media. Ethnic media, particularly Spanish language media, has played an important role in DACA implementation (Wong et al., 2013). Just as ethnic media have highlighted stories of "DACAmented" youth, we encourage ethnic media to highlight stories of unauthorized youth who "walked in the door" for DACA but left with a path to permanent residency as a result of legal screening. And, just as ethnic media have warned individuals about fraudulent *notarios* in reporting about the process of applying for DACA, so too can it do so when encouraging unauthorized immigrants to seek out legal services.

Community-based organizations (CBOs) are a second "firewall." Scholars of immigrant incorporation have shown that CBOs can facilitate the social, economic, and civic incorporation of immigrant groups (for example see Campos 2014; DeSipio 2001; Marrow 2005; Ramakrishnan and Bloemraad 2008; Wong 2006). Given the important roles that they play in immigrant communities, we encourage CBOs to use their platforms as trusted messengers to not only convey information about potential paths to lawful immigration status beyond DACA—and that such paths may exist even in the absence of comprehensive

immigration reform legislation or eligibility for administrative relief—but also to direct unauthorized immigrants to competent immigration legal service providers.

We also urge CBOs to expand their legal expertise and capacity by becoming US Department of Justice (DOJ) Board of Immigration Appeals (BIA) recognized organizations and by training their non-attorney staff to become BIA accredited representatives. Federally-accredited representatives can represent immigrants who are seeking immigration benefits before US Citizenship and Immigration Services and, if particularly qualified, can provide legal representation before the Executive Office for Immigration Review (EOIR) (e.g., in immigration court).

Our second set of recommendations is directed towards immigrant-serving organizations that provide legal screening services. A subset of these organizations provides legal screening during the course of DACA clinics or workshops. Many, if not most, have created intake forms for basic legal screening, but this screening is often limited to DACA eligibility requirements. Thus, to the extent possible, and in partnership with experienced immigration attorneys or accredited representatives, we encourage CBOs to expand the depth of their legal screening (based on our empirical findings) regarding eligibility for other immigration benefits or forms of relief. To be clear, this is not to suggest that CBOs that lack the legal expertise and capacity should begin taking on complex cases. CBOs should continue to refer complex cases to immigration attorneys. Rather, it is to encourage CBOs that provide legal screening for DACA and plan to provide legal screening for DAPA to use these opportunities to identify other immigration benefits and relief that may be available to the immigrants that they serve.

Current circumstances lend added importance to this need. As unauthorized youth and their families have sought out legal service providers solely because of DACA, a concern exists that should persons be deemed ineligible for deferred action based on limited legal screening, these individuals may not seek out immigration legal services again—at least not until a new executive action is announced or new immigration legislation is passed. Because not all immigration legal service providers offer the same depth of legal screening, many of these recommendations also apply to established legal service providers during their normal office intake or case screening.

Moreover, as the results make clear, the capacity of immigrant-serving organizations is a critical variable. It is important for at least two main reasons. Capacity can mean having the legal experience and expertise necessary to translate comprehensive legal screening into concrete steps towards applying for an immigration benefit or form of relief. It can also mean having the necessary staff hours to engage with those who seek legal screening and services. This is critically important, as some of the immigration remedies discussed here require detailed conversations that delve into difficult and emotional issues. For example, a U-Visa requires, in part, that a person be a victim of certain crimes and have suffered "substantial" physical or emotional abuse as a result. Moreover, Special Immigrant Juvenile Status is intended for young persons who have suffered abuse, abandonment, or neglect. In both examples, a brief and sometimes hurried conversation with an unauthorized immigrant who does not know that these immigration remedies exist is unlikely to result in such sensitive information being shared. We recognize that it is not possible for immigrant-service organizations that provide legal services to add capacity without resources. However, by

combining the insights gained from our empirical findings with their own "on the ground" experiences, it is our hope that organizations can leverage their existing capacity in a way that provides them with the greatest opportunities to connect unauthorized immigrants with the immigration benefits and relief that may be available to them.

Our final recommendations are made with an eye towards DAPA implementation and any potential future "grand bargain" immigration legislation that includes the legalization of unauthorized immigrants. As mentioned at the outset, DACA represents one of the largest immigrant legalization programs in the United States since IRCA in 1986. But while the 580,859 people that had received DACA as of June 2014 is certainly an impressive number, it represents only a small percentage of the total estimated unauthorized population. While DACA has provided a laboratory for us to examine empirically the extent to which unauthorized immigrants are eligible for some form of immigration relief, preparations for a larger legalization program should not be limited to simply "scaling up" based on lessons learned from DACA implementation.

A broader legalization program that is more inclusive than DACA, such as DAPA, will bring a larger cross-section of the unauthorized population—as well as their diverse experiences and complex immigration histories—to the doors of immigrant-serving organizations that provide legal services. It is important to emphasize that many paths to lawful status will continue to exist for many unauthorized immigrants in addition to the specific eligibility criteria of DAPA and any future legalization program. Thus, immigrant-serving organizations should partner with immigration attorneys or legal service providers to identify the range of immigration remedies that may potentially be available to the particular cross-section of the unauthorized population that the program serves, design intake and screening processes accordingly, and, to the extent possible, address issues of capacity with an eye towards the provision of comprehensive legal screening.

## Conclusion

Using the recent implementation of DACA as a laboratory for our work, this study is the first to attempt to answer the question of the number of unauthorized immigrants who, without knowing it, may *already* be potentially eligible for lawful immigration status. In a nationwide survey of 67 immigrant-serving organizations that provide legal services, we find that 14.3 percent of those found to be eligible for DACA were also found to be eligible for some other form of immigration relief—put otherwise, 14.3 percent of individuals that were found to be eligible for DACA, which provides temporary relief from deportation, may now be on the path towards lawful permanent residency.

We have every reason to believe that this phenomenon will persist with DAPA. Our analysis suggests that comprehensive legal screening can potentially mean the difference between discovering a path to lawful permanent residency and citizenship, and continued life "in the shadows" or only a temporary reprieve from removal. Thus, while it is often framed in political terms, our research suggests that the legalization of unauthorized immigrants can also be framed as an access to justice issue, particularly for those who may be eligible for lawful permanent residency, but do not know it or are unable to access legal services or assistance. For these unauthorized immigrants, legalization need not wait for executive

actions such as DACA or DAPA, or even comprehensive immigration reform legislation.

DACA and DAPA will continue to lead many to "walk in the door" of immigrant-serving organizations that provide legal services—organizations should thus view each of these interactions as opportunities to identify paths to legal permanent residency for the immigrants they serve.

## REFERENCES

Bach, Robert L. 1996. *Becoming American, Seeking Justice: The Immigrants' Legal Needs Study*. New York: Institute for Research on Multiculturalism and International Labor, Binghamton University.

Baker, Susan Gonzalez. 1997. "The "Amnesty" Aftermath: Current Policy Issues Stemming From the Legalization Programs of the 1986 Immigration Reform and Control Act." *International Migration Review* 37(1): 5-27. http://dx.doi.org/10.2307/2547255

Batalova, Jeanne, Sarah Hooker, and Randy Capps with James D. Bachmeier. 2014. DACA at the Two-Year Mark: A National and State Profile of Youth Eligible and Applying for Deferred Action. Washington, DC: Migration Policy Institute. http://www.migrationpolicy.org/research/daca-two-year-mark-national-and-state-profile-youth-eligible-and-applying-deferred-action.

Campos, Sara. 2014. "The Influence of Civil Society in U.S. Immigrant Communities and the U.S. Immigration Debate." In *International Migration, U.S. Immigration Law and Civil Society: From the Pre-Colonial Era to the 113th Congress*, edited by Leonir Mario Chiarello and Donald Kerwin, 113-77. New York: Scalabrini International Migration Network.

Carson, Rebecca S. 2014. *Reaching Illinois Immigrant Communities: Building Legal Services Capacity in Advance of Immigration Reform*. Chicago, IL: Illinois Immigration Legal Aid Collaborative.

DeSipio, Louis. 2001. "Building America, One Person at a Time: Naturalization and Political Behavior of the Naturalized in Contemporary US Politics." In *E Pluribus Unum? Immigrant Civic Life and Political Incorporation,* edited by John Mollenkopf and Gary Gerstle, 67-106. New York: Russell Sage Foundation.

Gonzales, Roberto G., Veronica Terriquez, and Stephen P. Ruszczyk. 2014. "Becoming Dacamented: Assessing the Short-Term Benefits of Deferred Action for Childhood Arrivals (DACA)." *American Behavioral Scientist* 58 (14): 1852-72.  http://dx.doi.org/10.1177/0002764214550288

Gonzalez-Barrera, Ana, Mark Hugo Lopez, Jeffrey Passel, and Paul Taylor. 2013. *The Path Not Taken: Two-Thirds of Legal Mexican Immigrants Are Not US Citizens.* Washington, DC: Pew Hispanic Center. http://www.pewhispanic.org/files/2013/02/Naturalizations_Jan_2013_FINAL.pdf

Paths to Lawful Immigration Status

Hagan, Jacqueline Maria, and Susan Gonzalez Baker. 1993. "Implementing the US Legalization Program: The Influence of Immigrant Communities and Local Agencies on Immigration Policy Reform." *International Migration Review* 27(3): 513–36. http://dx.doi.org/10.2307/2547098

Jasso, Guillermina, Douglas S.Massey, Mark R. Rosenzweig, and James P. Smith. 2008. "From Illegal to Legal: Estimating Previous Illegal Experience Among New Legal Immigrants to the United States." *International Migration Review* 42 (4): 803–43. http://dx.doi.org/10.1111/j.1747-7379.2008.00148.x

Katzmann, Robert A. 2008. "The Legal Profession and the Unmet Needs of the Immigrant Poor." *Georgetown Journal of Legal Ethics* 21: 3.

———. 2009. "Deepening the Legal Profession's Pro Bono Commitment to the Immigrant Poor." *Fordham Law Review* 78: 453.

Kerwin, Donald. 2004. "Charitable Legal Programs for Immigrants: What They Do, Why They Matter and How They Can Be Expanded." *Immigration Briefings* no. 04-6: 1-12.

_____. 2005. *Revisiting the Need for Appointed Counsel*. Washington, DC: Migration Policy Institute. http://www.migrationpolicy.org/sites/default/files/publications/Insight_Kerwin.pdf.

Kerwin, Donald, and Laureen Laglagaron. 2010. *Structuring and Implementing an Immigrant Legalization Program: Registration as the First Step*. Washington, DC: Migration Policy Institute. http://www.migrationpolicy.org/research/structuring-and-implementing-immigrant-legalization-program-registration-first-step.

Kuck, Charles H. 2004. *Legal Assistance for Asylum Seekers in Expedited Removal: A Survey of Alternative Practices*. Washington, DC: US Commission on International Religious Freedom.

Langford, Anne E. 2004. "What's In a Name: Notarios in the United States and the Exploitation of a Vulnerable Latino Immigrant Population." *Harvard Latino Law Review* 7(1): 115.

Markowitz, Peter L. et al. 2011. "Accessing Justice: The Availability and Adequacy of Counsel in Removal Proceedings." *Cardozo Law Review* 33: 357-416.

Marrow, Helen. 2005. "New Destinations and Immigrant Incorporation." *Perspectives on Politics* 3(4): 781-99. http://dx.doi.org/10.1017/S1537592705050449

Meissner, Doris M., and Demetrios Papademetriou. 1998. *The Legalization Countdown: A Third-Quarter Assessment*. Washington, DC: Carnegie Endowment for International Peace.

Ong Hing, Bill. 1992. "The Immigration and Naturalization Service, Community-Based Organizations, and the Legalization Experience: Lessons for the Self-Help Immigration Phenomenon." *Georgetown Immigration Law Journal* 6: 413.

303

Journal on Migration and Human Security

Ramakrishnan, Karthick, and Irene Bloemraad. 2008. *Civic Hopes and Political Realities: Immigrants, Community Organizations, and Political Engagement*. New York: Russell Sage Foundation.

Ramji-Nogales, Jaya, Andrew Schoenholtz, Philip Schrag. 2009. *Refugee Roulette: Disparities in Asylum Adjudication and Proposals for Reform*. New York: New York University Press.

Shannon, Careen. 2009. "Regulating Immigration Legal Service Providers: Inadequate Representation and Notario Fraud." *Fordham Law Review* 78(2): 577.

Shannon, Careen. 2011. "To License or Not to License? A Look at Differing Approaches to Policing the Activities of Non-Lawyer Immigration Service Providers," *Cardozo Law Review* 33(2).

TRAC (Transactional Records Access Clearinghouse). 2014. "Representation for Unaccompanied Children in Immigration Court." http://trac.syr.edu/immigration/reports/371/

Wang, Ted, and Robert C. Winn. 2011. "Groundswell Meets Groundwork: Building on the Mobilizations to Empower Immigrant Communities." In *Rallying for Immigrant Rights: The Fight for Inclusion in the 21st Century,* edited by Kim Voss and Irene Bloemraad, 44-69. Berkeley, CA: University of California Press. http://dx.doi.org/10.1525/california/9780520267541.003.0002

Wong, Janelle S. 2006. *Democracy's Promise: Immigrants and American Civic Institutions*. Ann Arbor, MI: University of Michigan Press.

Wong, Tom K., Angela S. García, Marisa Abrajano, David FitzGerald, Karthick Ramakrishnan, and Sally Le. 2013. *Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals, or DACA*. Washington, DC: Center for American Progress. http://cdn.americanprogress.org/wp-content/uploads/2013/09/DACAReportCC-2-1.pdf.

Wong, Tom K., and Carolina Valdivia. 2014. *In Their Own Words: A Nationwide Survey of Undocumented Millennials*. Washington and New York: United We Dream Network and Unbound Philanthropy.

# EXHIBIT E

# Berwyn grandmother of 10 facing deportation sues DHS over visa delay

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

★ **chicago.suntimes.com/**chicago-news/berwyn-grandmother-of-10-facing-deportation-sues-dhs-over-visa-delay



A west suburban grandmother, ordered to leave the country by the end of October after living in the United States on an expired visa for nearly two decades, filed a lawsuit Monday against the Department of Homeland Security.

Genoveva Ramirez, 67, wants a federal judge to order the government to approve her visa application — or, at least, determine she is at least eligible for a visa so she can avoid being removed from the country by Immigration and Customs Enforcement officials.

ADVERTISING

"This lawsuit is really important to me because it determines my future," Ramirez said through a translator in front of a crowd of nearly 30 supporters at Grace Episcopal Church, 637 S. Dearborn. "This agency has my future in their hands and they're showing a great amount of negligence.

"I believe that they're acting this way because of my activism," she said. "And I'm here, willing to struggle until the end. Not one more deportation."



Genoveva Ramirez looks on as she sits besides her attorney Mony Ruiz-Velasco. | Madeline Kenney/Sun-Times

Ramirez, a mother of four and grandmother of 10, filed her visa application after she and her grandson were assaulted in her Berwyn home on Feb. 25, 2015; the attackers threw her against a wall and down a stairwell, according to the lawsuit. Her cooperation with Berwyn police made her eligible for a "U-visa," which is available to victims and witnesses of certain crimes who help investigators.

Ramirez applied for that U-visa in September 2016. Now, nearly a year later, she finds herself facing deportation if she doesn't receive an expedited visa.

Sponsored Content
[Watch] What You Need to Know About the Right Motor Oil
By Jiffy Lube — Learn all about the right oil you need for your vehicle.
Ramirez came to the United States from Mexico in 2001 on a visa that has long since expired.

Although visas sometimes take up to three years to be approved, Ramirez's attorney, Mony Ruiz-Velasco, called her client's delay unnecessary.

"No reason it should take that long especially in cases where people are facing imminent deportation," Ruiz-Velasco said.

"What we have here is an abuse of power and an abuse of discretion," she added. "They are really pushing for the separation of families because they are not adjudicating these cases properly as quickly as we would like."

An ICE spokeswoman said the agency was not able to comment on the lawsuit.

Ramirez's attorneys also filed letters of support from U.S. Rep. Jan Schakowsky, D-Ill. and state Rep. Elizabeth "Lisa" Hernandez, a Democrat whose 24th District includes Berwyn; both attended the Aug. 31 meeting at which ICE officials told Ramirez she had to return at the end of September with proof she'd bought a one-way plane ticket out of the country.

"The United States and City of Chicago are no better off if ICE separates Ms. Ramirez from her family," Schakowsky wrote.

The tone of Hernandez's letter was similar.

"Ramirez is an important person in our community of Berwyn," Hernandez wrote. "She is strongly supported by community members, organizations, faith institutions, political leaders and her union, Service Employees International Union."

Both letters also detail "demeaning behavior" by ICE personnel during her appointment last month.

Ramirez made her announcement alongside the family of Wilmer Catalan-Ramirez, who also faces imminent deportation (he is not related to Genoveva Ramirez).

In May, he sued local ICE officials, including director Ricardo Wong, accusing them of using excessive force and injuring him when he was detained; he remains in custody and is not receiving proper medical care for his injuries, according to his lawsuit. The suit also accused the city and Chicago Police Department of improperly including him in the city's gang database, which led to him being detained by ICE.

The lawsuit was refiled Sept. 7 to add several police officers as defendants.

Catalan-Ramirez's wife, Celene Adame, said through a translator that the decision to list her husband in the gang database was based on "physical appearance" and called it a "racial issue." The suit compared Chicago's gang database to what it said were similarly controversial databases used in Los Angeles, Denver and Minnesota, which it alleges were scrutinized for targeting African Americans.

Tania Unzueta, a policy director for the advocacy group Mijente, said she's determined to help Ramirez and Catalan-Ramirez fight against their pending deportations.

"We're looking at lawsuits, we're looking at community organizing," Unzueta said. "We're looking to get elected officials involved because we really feel at this time we need all the fronts possible because immigration enforcement is basically doing what they want without any accountability, without anyone looking at the way they are treating our families."

View this document on Scribd

# EXHIBIT F



*United States Department of State*
*Bureau of Consular Affairs*

# VISA BULLETIN

**Number 19 Volume X**                                                    **Washington, D.C.**

IMMIGRANT NUMBERS FOR JULY 2018

A.  STATUTORY NUMBERS

This bulletin summarizes the availability of immigrant numbers during July for: "Final Action Dates" and "Dates for Filing Applications," indicating when immigrant visa applicants should be notified to assemble and submit required documentation to the National Visa Center.

Unless otherwise indicated on the U.S. Citizenship and Immigration Services (USCIS) website at www.uscis.gov/visabulletininfo, individuals seeking to file applications for adjustment of status with USCIS in the Department of Homeland Security must use the "Final Action Dates" charts below for determining when they can file such applications. When USCIS determines that there are more immigrant visas available for the fiscal year than there are known applicants for such visas, USCIS will state on its website that applicants may instead use the "Dates for Filing Visa Applications" charts in this Bulletin.

1. Procedures for determining dates. Consular officers are required to report to the Department of State documentarily qualified applicants for numerically limited visas; USCIS reports applicants for adjustment of status. Allocations in the charts below were made, to the extent possible, in chronological order of reported priority dates, for demand received by June 11th. If not all demand could be satisfied, the category or foreign state in which demand was excessive was deemed oversubscribed. The final action date for an oversubscribed category is the  priority date of the first applicant who could not be reached within the numerical limits. If it becomes necessary during the monthly allocation process to retrogress a final action date, supplemental requests for numbers will be honored only if the priority date falls within the new final action date announced in this bulletin. If at any time an annual limit were reached, it would be necessary to immediately make the preference category "unavailable", and no further requests for numbers would be honored.

2. Section 201 of the Immigration and Nationality Act (INA) sets an annual minimum family-sponsored preference limit of 226,000.  The worldwide level for annual employment-based preference immigrants is at least 140,000.  Section 202 prescribes that the per-country limit for preference immigrants is set at 7% of the total annual family-sponsored and employment-based preference limits, i.e., 25,620.  The dependent area limit is set at 2%, or 7,320.

3.  INA Section 203(e) provides that family-sponsored and employment-based preference visas be issued to eligible immigrants in the order in which a petition in behalf of each has been filed. Section 203(d) provides that spouses and children of preference immigrants are entitled to the same status, and the same order of consideration, if accompanying or following to join the principal. The visa prorating provisions of Section 202(e) apply to allocations for a foreign state or dependent area when visa demand exceeds the per-country limit. These provisions apply at present to the following oversubscribed chargeability areas:  CHINA-mainland born, EL SALVADOR, GUATEMALA, HONDURAS, INDIA, MEXICO, PHILIPPINES, and VIETNAM.

4.  Section 203(a) of the INA prescribes preference classes for allotment of Family-sponsored immigrant visas as follows:

**FAMILY-SPONSORED PREFERENCES**

**First**:  (**F1**) Unmarried Sons and Daughters of U.S. Citizens:  23,400 plus any numbers not required for fourth preference.

**Second**:  Spouses and Children, and Unmarried Sons and Daughters of Permanent Residents:  114,200, plus the number (if any) by which the worldwide family preference level exceeds 226,000, plus any unused first preference numbers:

A.  (**F2A**) Spouses and Children of Permanent Residents:  77% of the overall second preference limitation, of which 75% are exempt from the per-country limit;

B.  (**F2B**) Unmarried Sons and Daughters (21 years of age or older) of Permanent Residents:  23% of the overall second preference limitation.

**Third**:  (**F3**) Married Sons and Daughters of U.S. Citizens:  23,400, plus any numbers not required by first and second preferences.

**Fourth**:  (**F4**) Brothers and Sisters of Adult U.S. Citizens:  65,000, plus any numbers not required by first three preferences.

A.  **FINAL ACTION DATES FOR FAMILY-SPONSORED PREFERENCE CASES**

On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragraph 1); "C" means current, i.e., numbers are authorized for issuance to all qualified applicants; and "U" means unauthorized, i.e., numbers are not authorized for issuance. (NOTE: Numbers are authorized for issuance only for applicants whose priority date is **earlier** than the final action date listed below.)

| Family-Sponsored | All Chargeability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|
| F1 | 22APR11 | 22APR11 | 22APR11 | 01AUG97 | 01JUN06 |
| F2A | 22JUN16 | 22JUN16 | 22JUN16 | 08JUN16 | 22JUN16 |
| F2B | 15AUG11 | 15AUG11 | 15AUG11 | 08MAR97 | 01FEB07 |
| F3 | 01MAY06 | 01MAY06 | 01MAY06 | 01DEC95 | 15APR95 |
| F4 | 15NOV04 | 15NOV04 | 22MAR04 | 15JAN98 | 22MAR95 |

*NOTE: For July, F2A numbers EXEMPT from per-country limit are authorized for issuance to applicants from all countries with priority dates earlier than 08JUN16. F2A numbers SUBJECT to per-country limit are authorized for issuance to applicants chargeable to all countries EXCEPT MEXICO with priority dates beginning 08JUN16 and earlier than 22JUN16. All F2A numbers provided for MEXICO are exempt from the per-country limit.

-3-                              July 2018

## B.   DATES FOR FILING FAMILY-SPONSORED VISA APPLICATIONS

The chart below reflects dates for filing visa applications within a timeframe justifying immediate action in the application process. Applicants for immigrant visas who have a priority date earlier than the application date in the chart below may assemble and submit required documents to the Department of State's National Visa Center, following receipt of notification from the National Visa Center containing detailed instructions. The application date for an oversubscribed category is the priority date of the first applicant who cannot submit documentation to the National Visa Center for an immigrant visa. If a category is designated "current," all applicants in the relevant category may file applications, regardless of priority date.

The "C" listing indicates that the category is current, and that applications may be filed regardless of the applicant's priority date. The listing of a date for any category indicates that only applicants with a priority date which is **earlier** than the listed date may file their application.

Visit www.uscis.gov/visabulletininfo for information on whether USCIS has determined that this chart can be used (in lieu of the chart in paragraph 4.A.) this month for filing applications for adjustment of status with USCIS.

| Family-Sponsored | All Chargeability Areas Except Those Listed | CHINA-mainland born | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|
| F1 | 08MAR12 | 08MAR12 | 08MAR12 | 01SEP98 | 15FEB08 |
| F2A | 01DEC17 | 01DEC17 | 01DEC17 | 01DEC17 | 01DEC17 |
| F2B | 08JAN12 | 08JAN12 | 08JAN12 | 08JUN97 | 15DEC07 |
| F3 | 22SEP06 | 22SEP06 | 22SEP06 | 08OCT98 | 01AUG95 |
| F4 | 01MAY05 | 01MAY05 | 01JAN05 | 01JUN98 | 01DEC95 |

5.  Section 203(b) of the INA prescribes preference classes for allotment of Employment-based immigrant visas as follows:

## EMPLOYMENT-BASED PREFERENCES

**First**:  Priority Workers:  28.6% of the worldwide employment-based preference level, plus any numbers not required for fourth and fifth preferences.

**Second**:  Members of the Professions Holding Advanced Degrees or Persons of Exceptional Ability:  28.6% of the worldwide employment-based preference level, plus any numbers not required by first preference.

**Third**:  Skilled Workers, Professionals, and Other Workers:  28.6% of the worldwide level, plus any numbers not required by first and second preferences, not more than 10,000 of which to "*Other Workers".

**Fourth**:  Certain Special Immigrants:  7.1% of the worldwide level.

**Fifth**:  Employment Creation:  7.1% of the worldwide level, not less than 3,000 of which reserved for investors in a targeted rural or high-unemployment area, and 3,000 set aside for investors in regional centers by Sec. 610 of Pub. L. 102-395.

-4-                              July 2018

## A. FINAL ACTION DATES FOR EMPLOYMENT-BASED PREFERENCE CASES

On the chart below, the listing of a date for any class indicates that the class is oversubscribed (see paragraph 1); "C" means current, i.e., numbers are authorized for issuance to all qualified applicants; and "U" means unauthorized, i.e., numbers are not authorized for issuance. (NOTE: Numbers are authorized for issuance only for applicants whose priority date is **earlier** than the final action date listed below.)

| Employment-Based | All Chargeability Areas Except Those Listed | CHINA-mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES | VIETNAM |
|---|---|---|---|---|---|---|---|
| 1st | C | 01JAN12 | C | 01JAN12 | C | C | C |
| 2nd | C | 01JAN15 | C | 15MAR09 | C | C | C |
| 3rd | C | 01JAN13 | C | 01NOV08 | C | 01JAN17 | C |
| Other Workers | C | 01MAY07 | C | 01NOV08 | C | 01JAN17 | C |
| 4th | C | C | 08FEB16 | C | 08FEB16 | C | C |
| Certain Religious Workers | C | C | 08FEB16 | C | 08FEB16 | C | C |
| 5th Non-Regional Center (C5 and T5) | C | 01AUG14 | C | C | C | C | 01AUG14 |
| 5th Regional Center (I5 and R5) | C | 01AUG14 | C | C | C | C | 01AUG14 |

*Employment Third Preference Other Workers Category: Section 203(e) of the Nicaraguan and Central American Relief Act (NACARA) passed by Congress in November 1997, as amended by Section 1(e) of Pub. L. 105—139, provides that once the Employment Third Preference Other Worker (EW) cut-off date has reached the priority date of the latest EW petition approved prior to November 19, 1997, the 10,000 EW numbers available for a fiscal year are to be reduced by up to 5,000 annually beginning in the following fiscal year. This reduction is to be made for as long as necessary to offset adjustments under the NACARA program. Since the EW cut-off date reached November 19, 1997 during Fiscal Year 2001, the reduction in the EW annual limit to 5,000 began in Fiscal Year 2002.

```
                                        -5-                        July 2018
```

**B.  DATES FOR FILING OF EMPLOYMENT-BASED VISA APPLICATIONS**

The chart below reflects dates for filing visa applications within a timeframe justifying immediate action in the application process. Applicants for immigrant visas who have a priority date _earlier than_ the application date in the chart may assemble and submit required documents to the Department of State's National Visa Center, following receipt of notification from the National Visa Center containing detailed instructions. The application date for an oversubscribed category is the priority date of the first applicant who cannot submit documentation to the National Visa Center for an immigrant visa. If a category is designated "current," all applicants in the relevant category may file, regardless of priority date.

The "C" listing indicates that the category is current, and that applications may be filed regardless of the applicant's priority date. The listing of a date for any category indicates that only applicants with a priority date which is **earlier** than the listed date may file their application.

Visit www.uscis.gov/visabulletininfo for information on whether USCIS has determined that this chart can be used (in lieu of the chart in paragraph 5.A.) this month for filing applications for adjustment of status with USCIS.

| Employment-Based | All Charge-ability Areas Except Those Listed | CHINA - mainland born | EL SALVADOR GUATEMALA HONDURAS | INDIA | MEXICO | PHILIPPINES |
|---|---|---|---|---|---|---|
| 1st | C | C | C | C | C | C |
| 2nd | C | 01APR15 | C | 22MAY09 | C | C |
| 3rd | C | 01JAN16 | C | 01MAY09 | C | 01JUL17 |
| Other Workers | C | 01JUN08 | C | 01MAY09 | C | 01JUL17 |
| 4th | C | C | 01MAY16 | C | C | C |
| Certain Religious Workers | C | C | 01MAY16 | C | C | C |
| 5th Non-Regional Center (C5 and T5) | C | 01OCT14 | C | C | C | C |
| 5th Regional Center (I5 and R5) | C | 01OCT14 | C | C | C | C |

6.  The Department of State has a recorded message with the Final Action date information which can be heard at:  (202) 485-7699.  This recording is updated on or about the tenth of each month with information on final action dates for the following month.

-6-                                    July 2018

B.  <u>DIVERSITY IMMIGRANT (DV) CATEGORY FOR THE MONTH OF JULY</u>

Section 203(c) of the INA provides up to 55,000 immigrant visas each fiscal year to permit additional immigration opportunities for persons from countries with low admissions during the previous five years. The NACARA stipulates that beginning with DV-99, and for as long as necessary, up to 5,000 of the 55,000 annually-allocated diversity visas will be made available for use under the NACARA program. **This resulted in reduction of the DV-2018 annual limit to 50,000.** DV visas are divided among six geographic regions. No one country can receive more than seven percent of the available diversity visas in any one year.

For <u>July</u>, immigrant numbers in the DV category are available to qualified DV-2018 applicants chargeable to all regions/eligible countries as follows. When an allocation cut-off number is shown, visas are available only for applicants with DV regional lottery rank numbers <u>BELOW</u> the specified allocation cut-off number:

| Region | All DV Chargeability Areas Except Those Listed Separately | |
|--------|-----------|-----------|
| AFRICA | 38,000 | Except: Egypt 19,700 |
| ASIA | 10,500 | Except: Nepal  6,325 |
| EUROPE | 21,900 | |
| NORTH AMERICA (BAHAMAS) | 18 | |
| OCEANIA | 1,200 | |
| SOUTH AMERICA, and the CARIBBEAN | 1,425 | |

43

Entitlement to immigrant status in the DV category lasts only through the end of the fiscal (visa) year for which the applicant is selected in the lottery. The year of entitlement for all applicants registered for the DV-2018 program ends as of September 30, 2018. DV visas may not be issued to DV-2018 applicants after that date. Similarly, spouses and children accompanying or following to join DV-2018 principals are only entitled to derivative DV status until September 30, 2018. DV visa availability through the very end of FY-2018 cannot be taken for granted. Numbers could be exhausted prior to September 30.

C.   THE DIVERSITY (DV) IMMIGRANT CATEGORY RANK CUT-OFFS WHICH WILL APPLY
     IN AUGUST

For August, immigrant numbers in the DV category are available to qualified DV-2018 applicants chargeable to all regions/eligible countries as follows. When an allocation cut-off number is shown, visas are available only for applicants with DV regional lottery rank numbers BELOW the specified allocation cut-off number:

| Region | All DV Chargeability Areas Except Those Listed Separately | |
|---|---|---|
| AFRICA | CURRENT | Except: Egypt 21,325 |
| ASIA | CURRENT | Except: Nepal  6,950 |
| EUROPE | 23,325 | |
| NORTH AMERICA (BAHAMAS) | CURRENT | |
| OCEANIA | 1,400 | |
| SOUTH AMERICA, and the CARIBBEAN | 1,585 | |

D. SPECIAL IMMIGRANT (SI) TRANSLATOR CATEGORY VISA AVAILABILITY

Given the limited availability of visa numbers and the existing demand, the Department expects to reach the FY-2018 annual limit of 50 Special Immigrant Visas in the SI category early this year. As a result, it has been necessary to maintain a July Final Action Date of April 22, 2012. It is likely that number use will require the SI category to become "unavailable" in the coming months. Once the annual limit of 50 visas is reached, further issuances in the SI category will not be possible until October 2018, under the FY-2019 annual limit. The SQ Special Immigrant Visa category for certain Iraqi and Afghan nationals employed by or on behalf of the U.S. government in Iraq or Afghanistan is not affected and remains current.

E. RETROGRESSION OF JULY EMPLOYMENT-BASED FINAL ACTION DATES

MEXICO E4 and SR:  As readers were advised in item E of the June Visa Bulletin, it has been necessary to retrogress the July Final Action Dates in an effort to hold worldwide number use within the maximum allowed under the FY-2018 annual limits.

The Mexico E4 and SR dates will return to October 22, 2016 for October, the first month of fiscal year 2019.

CHINA E3: There has been an extremely large increase in Employment Third preference applicant demand during the past two months.  This is due to the "downgrading" of status by applicants who had originally filed in the Employment Second preference. As a result, it has been necessary to retrogress the July Final Action Date to January 1, 2013 in an effort to hold number use within the FY-2018 per-country limit.

The China E3 date will return to June 1, 2015 for October, the first month of fiscal year 2019.

F. EMPLOYMENT-BASED VISA AVAILABILTY IN THE COMING MONTHS

In recent weeks there has been a steadily increasing level of Employment-based demand for adjustment of status cases filed with U.S. Citizenship and Immigration Services. A continuation of the current demand pattern would result in a temporary establishment or retrogression of some final action dates in an effort to hold number use within the FY-2018 annual limits.

Should such action be required, there would be a full recovery in the preference category for October, the first month of fiscal year 2019.

```
                              -9-                          July 2018
```

G.   <u>OBTAINING THE MONTHLY VISA BULLETIN</u>


The Department of State's Bureau of Consular Affairs publishes the monthly Visa Bulletin on their website at <u>www.travel.state.gov</u> under the Visas section. Alternatively, visitors may access the Visa Bulletin directly by going to:

   <u>http://www.travel.state.gov/content/visas/english/law-and-policy/bulletin.html</u>.



To be <u>placed on</u> the Department of State's E-mail subscription list for the "Visa Bulletin", please send an E-mail to the following E-mail address:

**listserv@calist.state.gov**

   and in the message body type:
   **Subscribe Visa-Bulletin**
    *(example:  Subscribe Visa-Bulletin)*



To be <u>removed from</u> the Department of State's E-mail subscription list for the  "Visa Bulletin", <u>send an e-mail message to the following E-mail address</u>:

**listserv@calist.state.gov**

   and in the message body type: **Signoff Visa-Bulletin**


The Department of State also has available a recorded message with visa final action dates which can be heard at:  **(202) 485-7699.** The recording is normally updated on/about the 10th of each month with information on final action dates for the following month.


Readers may submit questions regarding Visa Bulletin related items by E-mail at the following address:

**VISABULLETIN@STATE.GOV**

(This address cannot be used to subscribe to the Visa Bulletin.)


Department of State Publication 9514
CA/VO: June 11, 2018

# EXHIBIT G



**U.S. Citizenship and
Immigration Services**

---

**Archived Content**

**This page contains information that is no longer current but remains on our site for reference purposes.**

---

# Frequently Asked Questions

**Important information about DACA requests:** Due to federal court orders, USCIS has resumed accepting requests to renew a grant of deferred action under DACA. USCIS is not accepting requests from individuals who have never before been granted deferred action under DACA. Until further notice, and unless otherwise provided in this guidance, the DACA policy will be operated on the terms in place before it was rescinded on Sept. 5, 2017. For more information, visit Deferred Action for Childhood Arrivals: Response to January 2018 Preliminary Injunction.

### *DHS DACA FAQs*

**DACA ProcessWhat is Deferred Action for Childhood Arrivals?General Information for All Requestors**

- **Background Checks**
- **After USCIS Makes a Decision**

**Initial Requests for DACA**
**Renewal of DACA**
**Travel**
**Criminal Convictions**
**Miscellaneous**

## I. General Information for All Requestors

**A. What is Deferred Action for Childhood Arrivals?**

As the Department of Homeland Security (DHS) continues to focus its enforcement resources on the removal of individuals who pose a danger to national security or a risk to public safety, DHS will exercise prosecutorial discretion as appropriate to ensure that enforcement resources are not expended on low priority cases, such as individuals who came to the United States as children and meet other key guidelines. Individuals who demonstrate that they meet the guidelines below may request consideration of deferred action for childhood arrivals (DACA) for a period of two years, subject to renewal for a period of two years, and may be eligible for employment authorization.

You may request consideration of DACA if you:

1. Were under the age of 31 as of June 15, 2012;

2. Came to the United States before reaching your 16th birthday;

3. Have continuously resided in the United States since June 15, 2007, up to the present time;

4. Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

5. Had no lawful status on June 15, 2012, meaning that:

   - You never had a lawful immigration status on or before June 15, 2012, or
   - Any lawful immigration status or parole that you obtained prior to June 15, 2012, had expired as of June 15, 2012;

6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

7. Have not been convicted of a felony, a significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

**Individuals can call U.S. Citizenship and Immigration Services (USCIS) at 800-375-5283 with questions or to request more information on DACA.** Those with pending requests can also use a number of online self-help tools which include the ability to check case status and processing times, change your address, and send an inquiry about a case pending longer than posted processing times or non-delivery of a card or document.

**Q1: What is deferred action?**
A1: Deferred action is a discretionary determination to defer a removal action of an individual as an act of prosecutorial discretion. For purposes of future inadmissibility based upon **unlawful presence**, an individual whose case has been deferred is not considered to be unlawfully present during the period in which deferred action is in effect. An individual who has received deferred action is authorized by DHS to be present in the United States, and is therefore considered by DHS to be lawfully present during the period deferred action is in effect. However, deferred action does not confer **lawful status** upon an individual, nor does it excuse any previous or subsequent periods of unlawful presence.

Under existing regulations, an individual whose case has been deferred is eligible to receive employment authorization for the period of deferred action, provided he or she can demonstrate "an economic necessity for employment." DHS can terminate or renew deferred action at any time, at the agency's discretion.

**Q2: What is DACA?**
A2: On June 15, 2012, the Secretary of Homeland Security announced that certain people who came to the United States as children and meet several key guidelines may request consideration of deferred action for a period of two years, subject to renewal, and would then be eligible for work authorization.

Individuals who can demonstrate through verifiable documentation that they meet these guidelines will be considered for deferred action. Determinations will be made on a case-by-case basis under the DACA guidelines.

**Q3: Is there any difference between "deferred action" and DACA under this process?**
A3: DACA is one form of deferred action. The relief an individual receives under DACA is identical for immigration purposes to the relief obtained by any person who receives deferred action as an act of prosecutorial discretion.

**Q4: If my removal is deferred under the consideration of DACA, am I eligible for employment authorization?**

A4: Yes. Under existing regulations, if your case is deferred, you may obtain employment authorization from USCIS provided you can demonstrate an economic necessity for employment.

**Q5: If my case is deferred, am I in lawful status for the period of deferral?**
A5: No. Although action on your case has been deferred and you do not accrue unlawful presence (for admissibility purposes) during the period of deferred action, deferred action does not confer any lawful status.

The fact that you are not accruing unlawful presence does not change whether you are in lawful status while you remain in the United States. However, although deferred action does not confer a lawful immigration status, your period of stay is authorized by the Department of Homeland Security while your deferred action is in effect and, for admissibility purposes, you are considered to be lawfully present in the United States during that time. **Individuals granted deferred action are not precluded by federal law from establishing domicile in the U.S.**

Apart from the immigration laws, "lawful presence," "lawful status" and similar terms are used in various other federal and state laws. For information on how those laws affect individuals who receive a favorable exercise of prosecutorial discretion under DACA, please contact the appropriate federal, state or local authorities.

**Q6: Can I renew my period of deferred action and employment authorization under DACA?**
A6: Yes. You may request consideration for a renewal of your DACA. Your request for a renewal will be considered on a case-by-case basis. If USCIS renews its exercise of discretion under DACA for your case, you will receive deferred action for another two years, and if you demonstrate an economic necessity for employment, you may receive employment authorization throughout that period.

Return to top.

**B. DACA Process**

**Q7: How do I request consideration of DACA?**
A7: To request consideration of DACA (either as an initial request or to request a renewal), you must submit Form I-821D, Consideration of Deferred Action for Childhood Arrivals to USCIS. Please visit uscis.gov/i-821d before you begin the process to make sure you are using the most current version of the form available. This form must be completed, properly signed and accompanied by a Form I-765, Application for Employment Authorization, and a Form I-765WS, Worksheet (PDF, 240 KB), establishing your economic need for employment. If you fail to submit a completed Form I-765 (along with the accompanying filing fees for that form, please see the Form I-821D page for more information), USCIS will not consider your request for deferred action. Please read the form instructions to ensure that you answer the appropriate questions (determined by whether you are submitting an initial or renewal request) and that you submit all the required documentation to support your initial request.

You must file your request for consideration of DACA at the USCIS Lockbox. You can find the mailing address and instructions at www.uscis.gov/i-821d. As of June 5, 2014, requestors must use the new version of the form.  After your Form I-821D, Form I-765, and Form I-765 Worksheet have been received, USCIS will review them for completeness, including submission of the required fee, initial evidence and supporting documents (for initial filings).

If it is determined that the request is complete, USCIS will send you a receipt notice. USCIS will then send you an appointment notice to visit an Application Support Center (ASC) for biometric services, if an appointment is required. Please make sure you read and follow the directions in the notice. Failure to attend your biometrics appointment may delay processing of your request for consideration of deferred action, or may result in a denial of your request. You may also choose to receive an email and/or text message notifying you that your form has been accepted by completing a Form G-1145, E-Notification of Application/Petition Acceptance.

Each request for consideration of DACA will be reviewed on an individual, case-by-case basis. USCIS may request more information or evidence from you, or request that you appear at a USCIS office. USCIS will notify you of its determination in writing.

**Note:** All individuals who believe they meet the guidelines, including those in removal proceedings, with a final removal order, or with a voluntary departure order (and not in immigration detention), may affirmatively request consideration of DACA from USCIS through this process. Individuals who are currently in immigration detention and believe they meet the guidelines may not request consideration of deferred action from USCIS but may identify themselves to their deportation officer or Jail Liaison. You may also contact the ICE Field Office Director. For more information visit ICE's website at www.ice.gov/daca.

**Q8: Can I obtain a fee waiver or fee exemption for this process?**
A8: There are no fee waivers available for employment authorization applications connected to DACA. There are very limited fee exemptions available. Requests for fee exemptions must be filed and favorably adjudicated before an individual files his/her request for consideration of DACA without a fee. In order to be considered for a fee exemption, you must submit a letter and supporting documentation to USCIS demonstrating that you meet one of the following conditions:

- You are under 18 years of age, have an income that is less than 150 percent of the U.S. poverty level, and are in foster care or otherwise lacking any parental or other familial support; or
- You are under 18 years of age and homeless; or
- You cannot care for yourself because you suffer from a serious, chronic disability and your income is less than 150 percent of the U.S. poverty level; or,
- You have, at the time of the request, accumulated **$10,000** or more in debt in the past 12 months as a result of unreimbursed medical expenses for yourself or an immediate family member, and your income is less than 150 percent of the U.S. poverty level.

You can find additional information on our Fee Exemption Guidance Web page. Your request must be submitted and decided before you submit a request for consideration of DACA without a fee. In order to be considered for a fee exemption, you must provide documentary evidence to demonstrate that you meet any of the above conditions at the time that you make the request. For evidence, USCIS will:

- Accept affidavits from community-based or religious organizations to establish a requestor's homelessness or lack of parental or other familial financial support.
- Accept copies of tax returns, bank statement, pay stubs, or other reliable evidence of income level. Evidence can also include an affidavit from the applicant or a responsible third party attesting that the applicant does not file tax returns, has no bank accounts, and/or has no income to prove income level.
- Accept copies of medical records, insurance records, bank statements, or other reliable evidence of unreimbursed medical expenses of at least $**10,000**.
- Address factual questions through Requests for Evidence (RFEs).

**Q9: If individuals meet the guidelines for consideration of DACA and are encountered by U.S. Customs and Border Protection (CBP) or U.S. Immigration and Customs Enforcement (ICE), will they be placed into removal proceedings?**
A9: DACA is intended, in part, to allow CBP and ICE to focus on priority cases. Under the direction of the Secretary of Homeland Security, if an individual meets the guidelines for DACA, CBP or ICE should exercise their discretion on a case-by-case basis to prevent qualifying individuals from being apprehended, placed into removal proceedings, or removed. If individuals believe that, in light of this policy, they should not have been apprehended or placed into removal proceedings, contact the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week).

**Q10: Does this process apply to me if I am currently in removal proceedings, have a final removal order, or have a voluntary departure order?**

A10: This process is open to any individual who can demonstrate he or she meets the guidelines for consideration, including those who have never been in removal proceedings as well as those in removal proceedings, with a final order, or with a voluntary departure order (as long as they are not in immigration detention).

**Q11: If I am not in removal proceedings but believe I meet the guidelines for consideration of DACA, should I seek to place myself into removal proceedings through encounters with CBP or ICE?**

A11: No. If you are not in removal proceedings but believe that you meet the guidelines, you should submit your DACA request to USCIS under the process outlined below.

**Q12: Can I request consideration of DACA from USCIS if I am in immigration detention under the custody of ICE?**

A12: No. If you are currently in immigration detention, you may not request consideration of DACA from USCIS. If you think you may meet the guidelines of this process, you should identify yourself to your deportation officer or Jail Liaison. You may also contact the ICE Field Office Director. For more information, visit ICE's website at www.ice.gov/daca.

**Q13: If I am about to be removed by ICE and believe that I meet the guidelines for consideration of DACA, what steps should I take to seek review of my case before removal?**

A13: If you believe you can demonstrate that you meet the guidelines and are about to be removed, you should immediately contact the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week).

**Q14: What should I do if I meet the guidelines of this process and have been issued an ICE detainer following an arrest by a state or local law enforcement officer?**

A14: If you meet the guidelines and have been served a detainer, you should immediately contact the Law Enforcement Support Center's hotline at 1-855-448-6903 (staffed 24 hours a day, 7 days a week).

**Q15: If I accepted an offer of administrative closure under the case-by-case review process or my case was terminated as part of the case-by-case review process, can I be considered for deferred action under this process?**

A15: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you have accepted an offer of administrative closure or termination under the case-by-case review process.

**Q16: If I declined an offer of administrative closure under the case-by-case review process, can I be considered for deferred action under this process?**

A16: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you declined an offer of administrative closure under the case-by-case review process.

**Q17: If my case was reviewed as part of the case-by-case review process but I was not offered administrative closure, can I be considered for deferred action under this process?**

A17: Yes. If you can demonstrate that you meet the guidelines, you will be able to request consideration of DACA even if you were not offered administrative closure following review of your case as part of the case-by-case review process.

**Q18: Can I request consideration of DACA under this process if I am currently in a nonimmigrant status (e.g. F-1, E-2, H-4) or have Temporary Protected Status (TPS)?**

A18: No. You can only request consideration of DACA under this process if you currently have no immigration status and were not in any lawful status on June 15, 2012.

**Q19: Will the information I share in my request for consideration of DACA be used for immigration enforcement purposes?**

A19: Information provided in this request is protected from disclosure to ICE and CBP for the purpose of immigration enforcement proceedings unless the requestor meets the criteria for the issuance of a Notice

To Appear or a referral to ICE under the criteria set forth in USCIS' Notice to Appear guidance (www.uscis.gov/NTA). Individuals whose cases are deferred pursuant to DACA will not be referred to ICE. The information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense. The above information sharing policy covers family members and guardians, in addition to the requestor. This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable by law by any party in any administrative, civil, or criminal matter.

**Q20: If my case is referred to ICE for immigration enforcement purposes or if I receive an NTA, will information related to my family members and guardians also be referred to ICE for immigration enforcement purposes?**
A20: If your case is referred to ICE for purposes of immigration enforcement or you receive an NTA, information related to your family members or guardians that is contained in your request will not be referred to ICE for purposes of immigration enforcement against family members or guardians. However, that information may be shared with national security and law enforcement agencies, including ICE and CBP, for purposes other than removal, including for assistance in the consideration of DACA, to identify or prevent fraudulent claims, for national security purposes, or for the investigation or prosecution of a criminal offense.

This policy, which may be modified, superseded, or rescinded at any time without notice, is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil, or criminal matter.

**Q21: Will USCIS verify documents or statements that I provide in support of a request for DACA?**

A21: USCIS has the authority to verify documents, facts, and statements that are provided in support of requests for DACA. USCIS may contact education institutions, other government agencies, employers, or other entities in order to verify information.

Return to top.

**C. Background Checks**

**Q22: Will USCIS conduct a background check when reviewing my request for consideration of DACA?**
A22: Yes. You must undergo biographic and biometric background checks before USCIS will consider your DACA request.

**Q23: What do background checks involve?**
A23: Background checks involve checking biographic and biometric information provided by the individuals against a variety of databases maintained by DHS and other federal government agencies.

**Q24: What steps will USCIS and ICE take if I engage in fraud through the new process?**
A24: If you knowingly make a misrepresentation, or knowingly fail to disclose facts, in an effort to obtain DACA or work authorization through this process, you will be treated as an immigration enforcement priority to the fullest extent permitted by law, and be subject to criminal prosecution and/or removal from the United States.

Return to top.

**D. After USCIS Makes a Decision**

**Q25: Can I appeal USCIS' determination?**
A25: No. You cannot file a motion to reopen or reconsider, and cannot appeal the decision if USCIS denies your request for consideration of DACA.

You may request a review of your I-821D denial by contacting the USCIS Contact Center at 800-375-5283. For people who are deaf, hard of hearing or have a speech disability: TTY 800-767-1833.

at 1-800-375-5283 to have a service request created if you believe that you actually did meet all of the DACA guidelines and you believe that your request was denied because USCIS:

- Denied the request based on abandonment, when you actually responded to a Request for Evidence (RFE) or Notice of Intent to Deny (NOID) within the prescribed time;
- Mailed the RFE or NOID to the wrong address although you had changed your address online at www.uscis.gov **or** with a customer service representative on the phone and submitted a Form AR-11, Change of Address, before USCIS issued the RFE or NOID.
  - To ensure the address is updated on a pending case as quickly as possible, we recommend that customers submit a change of address request at www.uscis.gov/addresschange.   Please note that only an online change of address or a Form AR-11 submission will satisfy the legal requirements for notifying the agency of an address change. Therefore, if you called a customer service representative to change your address, please be sure you have also submitted your address change online or with a Form AR-11.
- Denied the request on the grounds that you did not come to the United States prior to your 16th birthday, but the evidence submitted at the time of filing shows that you did arrive before reaching that age.
- Denied the request on the grounds that you were under age 15 at the time of filing but not in removal proceedings, while the evidence submitted at the time of filing show that you indeed were in removal proceedings when the request was filed;
- Denied the request on the grounds that you were 31 or older as of June 15, 2012, but the evidence submitted at the time of filing shows that you were under the age of 31 as of June 15, 2012;
- Denied the request on the grounds that you had lawful status on June 15, 2012, but the evidence submitted at the time of filing shows that you indeed were in an unlawful immigration status on that date;
- Denied the request on the grounds that you were not physically present in the United States on June 15, 2012, and up through the date of filing, but the evidence submitted at the time of filing shows that you were, in fact, present;
- Denied the request due to your failure to appear at a USCIS Application Support Center (ASC) to have your biometrics collected, when you in fact either did appear at a USCIS ASC to have this done or requested prior to the scheduled date of your biometrics appointment to have the appointment rescheduled; or
- Denied the request because you did not pay the filing fees for Form I-765, Application for Employment Authorization, when you actually did pay these fees

If you believe your request was denied due to any of these administrative errors, you may contact our USCIS Contact Center at 800-375-5283. For people who are deaf, hard of hearing or have a speech disability: TTY 800-767-1833. Customer service officers are available Monday – Friday from 8 a.m. – 6 p.m. in each U.S. time zone.

**Q26: If USCIS does not exercise deferred action in my case, will I be placed in removal proceedings?**
A26: If you have submitted a request for consideration of DACA and USCIS decides not to defer action in your case, USCIS will apply its policy guidance governing the referral of cases to ICE and the issuance of Notices to Appear (NTA). If your case does not involve a criminal offense, fraud, or a threat to national security or public safety, your case will not be referred to ICE for purposes of removal proceedings except where DHS determines there are exceptional circumstances. For more detailed information on the applicable NTA policy, visit www.uscis.gov/NTA. If after a review of the totality of circumstances USCIS determines to defer action in your case, USCIS will likewise exercise its discretion and will not issue you an NTA.

**Q27: Can my deferred action under the DACA process be terminated before it expires?**

A27: Yes.

DACA is an exercise of prosecutorial discretion and deferred action may be terminated at any time, with or without a Notice of Intent to Terminate, at DHS's discretion.

Return to top.

## II. Initial Requests for DACA

**Q28: What guidelines must I meet to be considered for deferred action for childhood arrivals (DACA)?**
A28: Under the Secretary of Homeland Security's June 15, 2012 memorandum, in order to be considered for DACA, you must submit evidence, including supporting documents, showing that you:

1. Were under the age of 31 as of June 15, 2012;

2. Came to the United States before reaching your 16th birthday;

3. Have continuously resided in the United States since June 15, 2007, up to the present time;

4. Were physically present in the United States on June 15, 2012, and at the time of making your request for consideration of deferred action with USCIS;

5. Had no lawful status on June 15, 2012;

6. Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a General Educational Development (GED) certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States; and

7. Have not been convicted of a felony, significant misdemeanor, three or more other misdemeanors, and do not otherwise pose a threat to national security or public safety.

These guidelines must be met for consideration of DACA. U.S. Citizenship and Immigration Services (USCIS) retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the guidelines are met.

**Q29: How old must I be in order to be considered for deferred action under this process?**
A29:

- If you have never been in removal proceedings, or your proceedings have been terminated before your request for consideration of DACA, you must be at least 15 years of age or older at the time of filing and meet the other guidelines.

- If you are in removal proceedings, have a final removal order, or have a voluntary departure order, and are not in immigration detention, you can request consideration of DACA even if you are under the age of 15 at the time of filing and meet the other guidelines.

- In all instances, you must have been under the age of 31 as of June 15, 2012, to be considered for DACA.

**Q30: I first came to the United States before I turned 16 years old and have been continuously residing in the United States since at least June 15, 2007. Before I turned 16 years old, however, I left the United States for some period of time before returning and beginning my current period of continuous residence. May I be considered for deferred action under this process?**
A30: Yes, but only if you established residence in the United States during the period before you turned 16 years old, as evidenced, for example, by records showing you attended school or worked in the United States during that time, or that you lived in the United States for multiple years during that time. In addition to establishing that you initially resided in the United States before you turned 16 years old, you

must also have maintained continuous residence in the United States from June 15, 2007, until the present time to be considered for deferred action under this process.

**Q31: To prove my continuous residence in the United States since June 15, 2007, must I provide evidence documenting my presence for every day, or every month, of that period?**
A31: To meet the continuous residence guideline, you must submit documentation that shows you have been living in the United States from June 15, 2007, up until the time of your request. You should provide documentation to account for as much of the period as reasonably possible, but there is no requirement that every day or month of that period be specifically accounted for through direct evidence.

It is helpful to USCIS if you can submit evidence of your residence during at least each year of the period. USCIS will review the documentation in its totality to determine whether it is more likely than not that you were continuously residing in the United States for the period since June 15, 2007. Gaps in the documentation as to certain periods may raise doubts as to your continued residence if, for example, the gaps are lengthy or the record otherwise indicates that you may have been outside the United States for a period of time that was not brief, casual or innocent.

If gaps in your documentation raise questions, USCIS may issue a Request for Evidence to allow you to submit additional documentation that supports your claimed continuous residence.

Affidavits may be submitted to explain a gap in the documentation demonstrating that you meet the five-year continuous residence requirement. If you submit affidavits related to the continuous residence requirement, you must submit two or more affidavits, sworn to or affirmed by people other than yourself who have direct personal knowledge of the events and circumstances during the period as to which there is a gap in the documentation. Affidavits may only be used to explain gaps in your continuous residence; they cannot be used as evidence that you meet the entire five-year continuous residence requirement.

**Q32: Does "currently in school" refer to the date on which the request for consideration of deferred action is filed?**
A32: To be considered "currently in school" under the guidelines, you must be enrolled in school on the date you submit a request for consideration of deferred action under this process.

**Q33: Who is considered to be "currently in school" under the guidelines?**
A33: To be considered "currently in school" under the guidelines, you must be enrolled in:

- a public, private, or charter elementary school, junior high or middle school, high school, secondary school, alternative program, or homeschool program that meets state requirements;
- an education, literacy, or career training program (including vocational training) that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement; or
- an education program assisting students either in obtaining a regular high school diploma or its recognized equivalent under state law (including a certificate of completion, certificate of attendance, or alternate award), or in passing a GED exam or other state-authorized exam (e.g., HiSet or TASC) in the United States.

Such education, literacy, career training programs (including vocational training), or education programs assisting students in obtaining a regular high school diploma or its recognized equivalent under state law, or in passing a GED exam or other state-authorized exam in the United States, include, but are not limited to, programs funded, in whole or in part, by federal, state, county or municipal grants or administered by non-profit organizations. Programs funded by other sources may qualify if they are programs of demonstrated effectiveness.

In assessing whether such programs not funded in whole or in part by federal, state, county or municipal grants or administered by non-profit organizations are of demonstrated effectiveness, USCIS will consider the duration of the program's existence; the program's track record in assisting students in obtaining a regular high school diploma or its recognized equivalent, in passing a GED or other state-authorized exam

(e.g., HiSet or TASC), or in placing students in postsecondary education, job training, or employment; and other indicators of the program's overall quality. For individuals seeking to demonstrate that they are "currently in school" through enrollment in such a program, the burden is on the requestor to show the program's demonstrated effectiveness.

**Q34: How do I establish that I am currently in school?**

A34: Documentation sufficient for you to demonstrate that you are currently in school may include, but is not limited to:

- evidence that you are enrolled in a public, private, or charter elementary school, junior high or middle school, high school or secondary school; alternative program, or homeschool program that meets state requirements; or
- evidence that you are enrolled in an education, literacy, or career training program (including vocational training) that:
  - has a purpose of improving literacy, mathematics, or English, or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement; and
  - is funded, in whole or in part, by federal, state, county or municipal grants or is administered by non-profit organizations, or if funded by other sources, is a program of demonstrated effectiveness; or
- evidence that you are enrolled in an education program assisting students in obtaining a high school equivalency diploma or certificate recognized under state law (such as by passing a GED exam or other such state-authorized exam [for example, HiSet or TASC]), and that the program is funded in whole or in part by federal, state, county or municipal grants or is administered by non-profit organizations or if funded by other sources, is of demonstrated effectiveness.

Such evidence of enrollment may include: acceptance letters, school registration cards, letters from a school or program, transcripts, report cards, or progress reports which may show the name of the school or program, date of enrollment, and current educational or grade level, if relevant.

**Q35: What documentation may be sufficient to demonstrate that I have graduated from high school?**
A35: Documentation sufficient for you to demonstrate that you have graduated from high school may include, but is not limited to, a high school diploma from a public or private high school or secondary school, a certificate of completion, a certificate of attendance, or an alternate award from a public or private high school or secondary school, or a recognized equivalent of a high school diploma under state law, or a GED certificate or certificate from passing another such state authorized exam (e.g., HiSet or TASC) in the United States.

**Q36: What documentation may be sufficient to demonstrate that I have obtained a GED certificate or certificate from passing another such state authorized exam (e.g., HiSet or TASC)?**
A36: Documentation may include, but is not limited to, evidence that you have passed a GED exam, or other state-authorized exam (e.g., HiSet or TASC), and, as a result, have received the recognized equivalent of a regular high school diploma under state law.

**Q37: If I am enrolled in a literacy or career training program, can I meet the guidelines?**
A37: Yes, in certain circumstances. You may meet the guidelines if you are enrolled in an education, literacy, or career training program that has a purpose of improving literacy, mathematics, or English or is designed to lead to placement in postsecondary education, job training, or employment and where you are working toward such placement. Such programs include, but are not limited to, programs funded, in whole or in part, by federal, state, county or municipal grants or administered by non-profit organizations, or if funded by other sources, are programs of demonstrated effectiveness.

**Q38: If I am enrolled in an English as a Second Language (ESL) program, can I meet the guidelines?**
A38: Yes, in certain circumstances. Enrollment in an ESL program may be used to meet the guidelines if the ESL program is funded in whole or in part by federal, state, county or municipal grants, or administered by non-profit organizations, or if funded by other sources is a  program of demonstrated effectiveness. You must submit direct documentary evidence that the program is funded in whole or part by federal, state, county or municipal grants, administered by a non-profit organization, or of demonstrated effectiveness.

**Q39: Will USCIS consider evidence other than that listed in Chart #1 to show that I have met the education guidelines?**
A39: No. Evidence not listed in Chart #1 will not be accepted to establish that you are currently in school, have graduated or obtained a certificate of completion from high school, or have obtained a GED or passed another state-authorized exam (e.g., HiSet or TASC). You must submit any of the documentary evidence listed in Chart #1 to show that you meet the education guidelines.

**Q40: Will USCIS consider evidence other than that listed in Chart #1 to show that I have met certain initial guidelines?**
A40: Evidence other than those documents listed in Chart #1 may be used to establish the following guidelines and factual showings if available documentary evidence is insufficient or lacking and shows that:

- You were physically present in the United States on June 15, 2012;
- You came to the United States before reaching your 16th birthday;
- You satisfy the continuous residence requirement, as long as you present direct evidence of your continued residence in the United States for a portion of the required period and the circumstantial evidence is used only to fill in gaps in the length of continuous residence demonstrated by the direct evidence; and
- Any travel outside the United States during the period of required continuous presence was brief, casual, and innocent.

However, USCIS will not accept evidence other than the documents listed in Chart #1 as proof of any of the following guidelines to demonstrate that you:

- Were under the age of 31 on June 15, 2012; and
- Are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a GED certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States.

For example, even if you do not have documentary proof of your presence in the United States on June 15, 2012, you may still be able to satisfy the guideline. You may do so by submitting credible documentary evidence that you were present in the United States shortly before and shortly after June 15, 2012, which, under the facts presented, may give rise to an inference of your presence on June 15, 2012 as well. However, evidence other than that listed in Chart #1 will not be accepted to establish that you have graduated high school. You must submit the designated documentary evidence to satisfy that you meet this guideline.

Chart #1 provides examples of documentation you may submit to demonstrate you meet the initial guidelines for consideration of deferred action under this process. Please see the instructions of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, for additional details of acceptable documentation.

| Chart #1 Examples of Documents to Submit to Demonstrate You Meet the Guidelines |
|---|

| Chart #1 Examples of Documents to Submit to Demonstrate You Meet the Guidelines | |
|---|---|
| Proof of identity | • Passport or national identity document from your country of origin<br>• Birth certificate with photo identification<br>• School or military ID with photo<br>• Any U.S. government immigration or other document bearing your name and photo |
| Proof you came to U.S. before your 16th birthday | • Passport with admission stamp<br>• Form I-94/I-95/I-94W<br>• School records from the U.S. schools you have attended<br>• Any Immigration and Naturalization Service or DHS document stating your date of entry (Form I-862, Notice to Appear)<br>• Travel records<br>• Hospital or medical records<br>• Rent receipts or utility bills<br>• Employment records (pay stubs, W-2 Forms, etc.)<br>• Official records from a religious entity confirming participation in a religious ceremony<br>• Copies of money order receipts for money sent in or out of the country<br>• Birth certificates of children born in the U.S.<br>• Dated bank transactions<br>• Automobile license receipts or registration<br>• Deeds, mortgages, rental agreement contracts<br>• Tax receipts, insurance policies |
| Proof of immigration status | • Form I-94/I-95/I-94W with authorized stay expiration date<br>• Final order of exclusion, deportation, or removal issued as of June 15, 2012<br>• A charging document placing you into removal proceedings |
| Proof of presence in U.S. on June 15, 2012 | • Rent receipts or utility bills<br>• Employment records (pay stubs, W-2 Forms, etc.)<br>• School records (letters, report cards, etc.)<br>• Military records (Form DD-214 or NGB Form 22)<br>• Official records from a religious entity confirming participation in a religious ceremony<br>• Copies of money order receipts for money sent in or out of the country<br>• Passport entries<br>• Birth certificates of children born in the U.S. |

| Chart #1 Examples of Documents to Submit to Demonstrate You Meet the Guidelines | |
|---|---|
| Proof you continuously resided in U.S. since June 15, 2007 | • Dated bank transactions<br>• Automobile license receipts or registration<br>• Deeds, mortgages, rental agreement contracts<br>• Tax receipts, insurance policies |
| Proof of your education status at the time of requesting consideration of DACA | • School records (transcripts, report cards, etc.) from the school that you are currently attending in the United States showing the name(s) of the school(s) and periods of school attendance and the current educational or grade level<br>• U.S. high school diploma, certificate of completion, or other alternate award<br>• High school equivalency diploma or certificate recognized under state law<br>• Evidence that you passed a state-authorized exam, including the GED or other state-authorized exam (for example, HiSet or TASC) in the United States |
| Proof you are an honorably discharged veteran of the U.S. Armed Forces or the U.S. Coast Guard | • Form DD-214, Certificate of Release or Discharge from Active Duty<br>• NGB Form 22, National Guard Report of Separation and Record of Service<br>• Military personnel records<br>• Military health records |

**Q41: May I file affidavits as proof that I meet the initial guidelines for consideration of DACA?**
A41: Affidavits generally will not be sufficient on their own to demonstrate that you meet the guidelines for USCIS to consider you for DACA. However, affidavits may be used to support meeting the following guidelines only if the documentary evidence available to you is insufficient or lacking:

• Demonstrating that you meet the five year continuous residence requirement; and
• Establishing that departures during the required period of continuous residence were brief, casual and innocent.

If you submit affidavits related to the above criteria, you must submit two or more affidavits, sworn to or affirmed by people other than yourself, who have direct personal knowledge of the events and circumstances. Should USCIS determine that the affidavits are insufficient to overcome the unavailability or the lack of documentary evidence with respect to either of these guidelines, it will issue a Request for Evidence, indicating that further evidence must be submitted to demonstrate that you meet these guidelines.

USCIS will not accept affidavits as proof of satisfying the following guidelines:

• You are currently in school, have graduated or obtained a certificate of completion or other alternate award from high school, have obtained a high school equivalency diploma or certificate (such as by passing the GED exam or other state-authorized exam [for example, HiSet or TASC]), or are an honorably discharged veteran from the Coast Guard or Armed Forces of the United States;
• You were physically present in the United States on June 15, 2012;

- You came to the United States before reaching your 16th birthday;
- You were under the age of 31 on June 15, 2012; and
- Your criminal history, if applicable.

If the only evidence you submit to demonstrate you meet any of the above guidelines is an affidavit, USCIS will issue a Request for Evidence, indicating that you have not demonstrated that you meet these guidelines and that you must do so in order to demonstrate that you meet that guideline.

**Q42: Will I be considered to be in unlawful status if I had an application for asylum or cancellation of removal pending before either USCIS or the Executive Office for Immigration Review (EOIR) on June 15, 2012?**
A42: Yes. If you had an application for asylum or cancellation of removal, or similar relief, pending before either USCIS or EOIR as of June 15, 2012, but had no lawful status, you may request consideration of DACA.

**Q43: I was admitted for "duration of status" or for a period of time that extended past June 14, 2012, but violated my immigration status (e.g., by engaging in unauthorized employment, failing to report to my employer, or failing to pursue a full course of study) before June 15, 2012. May I be considered for deferred action under this process?**
A43: No, unless the Executive Office for Immigration Review terminated your status by issuing a final order of removal against you before June 15, 2012.

**Q44: I was admitted for "duration of status" or for a period of time that extended past June 14, 2012 but "aged out" of my dependent nonimmigrant status as of June 15, 2012.  May I be considered for deferred action under this process?**

A44: Yes.  For purposes of satisfying the "had no lawful status on June 15, 2012," guideline alone, if you were admitted for "duration of status" or for a period of time that extended past June 14, 2012 but "aged out" of your dependent nonimmigrant status, on or before June 15, 2012, (meaning you turned 21 years old on or before June 15, 2012), you may be considered for deferred action under this process.

**Q45: I was admitted for "duration of status" but my status in SEVIS is listed as terminated on or before June 15, 2012. May I be considered for deferred action under this process?**

A45: Yes. For the purposes of satisfying the ""had no lawful status on June 15, 2012," guideline alone, if your status as of June 15, 2012, is listed as "terminated" in SEVIS, you may be considered for deferred action under this process.

 **Q46: I am a Canadian citizen who was inspected by CBP but was not issued an I-94 at the time of admission. May I be considered for deferred action under this process?**

A46: In general, a Canadian citizen who was admitted as a visitor for business or pleasure and not issued an I-94, Arrival/Departure Record, (also known as a "non-controlled" Canadian nonimmigrant) is lawfully admitted for a period of six months. For that reason, unless there is evidence, including verifiable evidence provided by the individual, that he or she was specifically advised that his or her admission would be for a different length of time, the Department of Homeland Security (DHS) will consider for DACA purposes only, that the alien was lawfully admitted for a period of six months.  Therefore, if DHS is able to verify from its records that your last non-controlled entry occurred on or before Dec. 14, 2011, DHS will consider your nonimmigrant visitor status to have expired as of June 15, 2012 and you may be considered for deferred action under this process.

**Q47: I used my Border Crossing Card (BCC) to obtain admission to the United States and was not issued an I-94 at the time of admission. May I be considered for deferred action under this process?**

A47: Because the limitations on entry for a BCC holder vary based on location of admission and travel, DHS will assume that the BCC holder who was not provided an I-94 was admitted for the longest period

legally possible—30 days—unless the individual can demonstrate, through verifiable evidence, that he or she was specifically advised that his or her admission would be for a different length of time. Accordingly, if DHS is able to verify from its records that your last admission was using a BCC, you were not issued an I-94 at the time of admission, and it occurred on or before May 14, 2012, DHS will consider your nonimmigrant visitor status to have expired as of June 15, 2012, and you may be considered for deferred action under this process.

**Q48: Do I accrue unlawful presence if I have a pending initial request for consideration of DACA?**
A48: You will continue to accrue unlawful presence while the request for consideration of DACA is pending unless you are under 18 years of age at the time of the request. If you are under 18 years of age at the time you submit your request, you will not accrue unlawful presence while the request is pending, even if you turn 18 while your request is pending with USCIS. If action on your case is deferred, you will not accrue unlawful presence during the period of deferred action. However, having action deferred on your case will not excuse previously accrued unlawful presence.

Return to top.

## III. Renewal of DACA

**Q49: When should I file my renewal request with U.S. Citizenship and Immigration Services (USCIS)?**

A49: USCIS strongly encourages you to submit your Deferred Action for Childhood Arrivals (DACA) renewal request between 150 days and 120 days before the expiration date located on your current Form I-797 DACA approval notice and Employment Authorization Document (EAD). Filing during this window will minimize the possibility that your current period of DACA will expire before you receive a decision on your renewal request.

USCIS' current goal is to process DACA renewal requests within 120 days. You may submit an inquiry about the status of your renewal request after it has been pending more than 105 days. To submit an inquiry online, please visit egov.uscis.gov/e-request.

- **Please Note:** Factors that may affect the timely processing of your DACA renewal request include, but are not limited to:
  - Failure to appear at an Application Support Center (ASC) for a scheduled biometrics appointment to obtain fingerprints and photographs. No-shows or rescheduling appointments will require additional processing time.
  - Issues of national security, criminality or public safety discovered during the background check process that require further vetting.
  - Issues of travel abroad that need additional evidence/clarification.
  - Name/date of birth discrepancies that may require additional evidence/clarification.
  - The renewal submission was incomplete or contained evidence that suggests a requestor may not satisfy the DACA renewal guidelines and USCIS must send a request for additional evidence or explanation

**Q50: Can I file a renewal request outside the recommended filing period of 150 days to 120 days before my current DACA expires?**

A50: USCIS strongly encourages you to file your renewal request within the recommended 150-120 day filing period to minimize the possibility that your current period of DACA will expire before you receive a decision on your renewal request. Requests received earlier than 150 days in advance will be accepted; however, this could result in an overlap between your current DACA and your renewal. This means your renewal period may extend for less than a full two years from the date that your current DACA period expires..

If you file after the recommended filing period (meaning less than 120 days before your current period of DACA expires), there is an increased possibility that your current period of DACA and employment authorization will expire before you receive a decision on your renewal request. If you file after your most recent DACA period expired, but within one year of its expiration, you may submit a request to renew your DACA. If you are filing beyond one year after your most recent period of DACA expired, you may still request DACA by submitting a new initial request.

**Q51: How will USCIS evaluate my request for renewal of DACA:**
A51: You may be considered for renewal of DACA if you met the guidelines for consideration of Initial DACA (see above) AND you:

- Did not depart the United States on or after Aug. 15, 2012, without advance parole;
- Have continuously resided in the United States since you submitted your most recent request for DACA that was approved up to the present time; and
- Have not been convicted of a felony, a significant misdemeanor, or three or more misdemeanors, and do not otherwise pose a threat to national security or public safety.

These guidelines must be met for consideration of DACA renewal. USCIS retains the ultimate discretion to determine whether deferred action is appropriate in any given case even if the guidelines are met.

**Q52 Do I accrue unlawful presence if I am seeking renewal and my previous period of DACA expires before I receive a renewal of deferred action under DACA? Similarly, what would happen to my work authorization?**

A52: Yes, if your previous period of DACA expires before you receive a renewal of deferred action under DACA, you will accrue unlawful presence for any time between the periods of deferred action unless you are under 18 years of age at the time you submit your renewal request.

Similarly, if your previous period of DACA expires before you receive a renewal of deferred action under DACA, you will not be authorized to work in the United States regardless of your age at time of filing until and unless you receive a new employment authorization document from USCIS.

**Q53. Do I need to provide additional documents when I request renewal of deferred action under DACA?**

A53. No, unless you have *new* documents pertaining to removal proceedings or criminal history that you have not already submitted to USCIS in a previously approved DACA request. USCIS, however, reserves the authority to request at its discretion additional documents, information or statements relating to a DACA renewal request determination.

CAUTION: If you knowingly and willfully provide materially false information on Form I-821D, you will be committing a federal felony punishable by a fine, or imprisonment up to five years, or both, under 18 U.S.C. Section 1001. In addition, individuals may be placed into removal proceedings, face severe penalties provided by law, and be subject to criminal prosecution.

**Q54.  If I am no longer in school, can I still request to renew my DACA?**
A54.  Yes. Neither Form I-821D nor the instructions ask renewal requestors for information about continued school enrollment or graduation. The instructions for renewal requests specify that you may be considered for DACA renewal if you met the guidelines for consideration of initial DACA, including the educational guidelines and:

1. Did not depart the United States on or after August 15, 2012, without advance parole;
2. Have continuously resided in the United States, up to the present time, since you submitted your most recent request for DACA that was approved; and

3. Have not been convicted of a felony, a significant misdemeanor or three or more misdemeanors, and are not a threat to national security or public safety.

**Q55.  If I initially received DACA and was under the age of 31 on June 15, 2012, but have since become 31 or older, can I still request a DACA renewal?**
A55. Yes. You may request consideration for a renewal of DACA as long as you were under the age of 31 as of June 15, 2012.

## IV. Travel

**Q56: May I travel outside of the United States before I submit an initial Deferred Action for Childhood Arrivals (DACA) request or while my initial DACA request remains pending with the Department of Homeland Security (DHS)?**
A56: Any unauthorized travel outside of the United States on or after Aug. 15, 2012, will interrupt your continuous residence and you will not be considered for deferred action under this process. Any travel outside of the United States that occurred on or after June 15, 2007, but before Aug. 15, 2012, will be assessed by U.S. Citizenship and Immigration Services (USCIS) to determine whether the travel qualifies as brief, casual and innocent. (See Chart #2.)

CAUTION: You should be aware that if you have been ordered deported or removed, and you then leave the United States, your departure will likely result in your being considered deported or removed, with potentially serious future immigration consequences.

**Q57: If my case is deferred under DACA, will I be able to travel outside of the United States?**
A57: Not automatically. If USCIS has decided to defer action in your case and you want to travel outside the United States, you must apply for advance parole by filing a [Form I-131, Application for Travel Document](#) and paying the applicable fee ($575). USCIS will determine whether your purpose for international travel is justifiable based on the circumstances you describe in your request. Generally, USCIS will only grant advance parole if your travel abroad will be in furtherance of:

- humanitarian purposes, including travel to obtain medical treatment, attending funeral services for a family member, or visiting an ailing relative;
- educational purposes, such as semester-abroad programs and academic research, or;
- employment purposes such as overseas assignments, interviews, conferences or, training, or meetings with clients overseas.

Travel for vacation is not a valid basis for advance parole.

You may not apply for advance parole unless and until USCIS defers action in your case under the consideration of DACA. You cannot apply for advance parole at the same time as you submit your request for consideration of DACA. All advance parole requests will be considered on a case-by-case basis.

If USCIS has deferred action in your case under the DACA process after you have been ordered deported or removed, you may still request advance parole if you meet the guidelines for advance parole described above.

**CAUTION:** However, for those individuals who have been ordered deported or removed, before you actually leave the United States, you should seek to reopen your case before the Executive Office for Immigration Review (EOIR) and obtain administrative closure or termination of your removal proceeding. Even after you have asked EOIR to reopen your case, you should not leave the United States until after EOIR has granted your request. If you depart after being ordered deported or removed, and your removal proceeding has not been reopened and administratively closed or terminated, your departure may result in your being considered deported or removed, with potentially serious future immigration consequences. If you have any questions about this process, you may contact U.S. Immigration and

Customs Enforcement (ICE) through the local ICE Office of the Chief Counsel with jurisdiction over your case.

**CAUTION:** If you travel outside the United States on or after Aug. 15, 2012, without first receiving advance parole, your departure automatically terminates your deferred action under DACA.

**Q58: Do brief departures from the United States interrupt the continuous residence requirement?**
A58: A brief, casual and innocent absence from the United States will not interrupt your continuous residence. If you were absent from the United States, your absence will be considered brief, casual and innocent if it was on or after June 15, 2007, and before Aug. 15, 2012, and:

1. The absence was short and reasonably calculated to accomplish the purpose for the absence;
2. The absence was not because of an order of exclusion, deportation or removal;
3. The absence was not because of an order of voluntary departure, or an administrative grant of voluntary departure before you were placed in exclusion, deportation or removal proceedings; and
4. The purpose of the absence and/or your actions while outside the United States were not contrary to law.

Once USCIS has approved your request for DACA, you may file Form I-131, Application for Travel Document, to request advance parole to travel outside of the United States.

CAUTION: If you travel outside the United States on or after Aug. 15, 2012, without first receiving advance parole, your departure automatically terminates your deferred action under DACA.

**Travel Guidelines (Chart #2)**

| Travel Dates | Type of Travel | Does It Affect Continuous Residence |
|---|---|---|
| On or after June 15, 2007, but before Aug. 15, 2012 | Brief, casual and innocent | No |
| | For an extended time<br><br>Because of an order of exclusion, deportation, voluntary departure, or removal<br><br>To participate in criminal activity | Yes |

| Travel Dates | Type of Travel | Does It Affect Continuous Residence |
|---|---|---|
| On or after Aug. 15, 2012, and before you have requested deferred action | Any | Yes. You cannot apply for advance parole unless and until DHS has determined whether to defer action in your case and you cannot travel until you receive advance parole.<br><br>In addition, if you have previously been ordered deported and removed and you depart the United States without taking additional steps to address your removal proceedings, your departure will likely result in your being considered deported or removed, with potentially serious future immigration consequences. |
| On or after Aug. 15, 2012, and after you have requested deferred action | Any | |
| On or after Aug. 15, 2012 and after receiving DACA | Any | It depends. If you travel after receiving advance parole, the travel will not interrupt your continuous residence. However, if you travel *without* receiving advance parole, the travel *will* interrupt your continuous residence. |

**Q59: May I file a request for advance parole concurrently with my DACA package?**

A59: Concurrent filing of advance parole is not an option at this time.  DHS is, however, reviewing its policy on concurrent filing of advance parole with a DACA request.  In addition, DHS is also reviewing eligibility criteria for advance parole.  If any changes to this policy are made, USCIS will update this FAQ and inform the public accordingly.

Return to top.

## V. Criminal Convictions

**Q60: If I have a conviction for a felony offense, a significant misdemeanor offense, or multiple misdemeanors, can I receive an exercise of prosecutorial discretion under this new process?**

A60: No. If you have been convicted of a felony offense, a significant misdemeanor offense, or three or more other misdemeanor offenses not occurring on the same date and not arising out of the same act,

omission, or scheme of misconduct, you will not be considered for Deferred Action for Childhood Arrivals (DACA) except where the Department of Homeland Security (DHS) determines there are exceptional circumstances.

**Q61: What offenses qualify as a felony?**
A61: A felony is a federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year.

**Q62: What offenses constitute a significant misdemeanor?**
A62: For the purposes of this process, a significant misdemeanor is a misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

1. Regardless of the sentence imposed, is an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; or,

2. If not an offense listed above, is one for which the individual was sentenced to time in custody of more than 90 days. The sentence must involve time to be served in custody, and therefore does not include a suspended sentence.

The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by U.S. Immigration and Customs Enforcement (ICE). Notwithstanding the above, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking into account the totality of the circumstances. Therefore, the absence of the criminal history outlined above, or its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion. DHS retains the discretion to determine that an individual does not warrant deferred action on the basis of a single criminal offense for which the individual was sentenced to time in custody of 90 days or less.

**Q63: What offenses constitute a non-significant misdemeanor?**
A63: For purposes of this process, a non-significant misdemeanor is any misdemeanor as defined by federal law (specifically, one for which the maximum term of imprisonment authorized is one year or less but greater than five days) and that meets the following criteria:

1. Is not an offense of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; and

2. Is one for which the individual was sentenced to time in custody of 90 days or less. The time in custody does not include any time served beyond the sentence for the criminal offense based on a state or local law enforcement agency honoring a detainer issued by ICE.

Notwithstanding the above, the decision whether to defer action in a particular case is an individualized, discretionary one that is made taking into account the totality of the circumstances. Therefore, the absence of the criminal history outlined above, or its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion.

**Q64: If I have a minor traffic offense, such as driving without a license, will it be considered a non-significant misdemeanor that counts towards the "three or more non-significant misdemeanors" making me unable to receive consideration for an exercise of prosecutorial discretion under this new process?**
A64: A minor traffic offense will not be considered a misdemeanor for purposes of this process. However, your entire offense history can be considered along with other facts to determine whether, under the totality of the circumstances, you warrant an exercise of prosecutorial discretion.

It is important to emphasize that driving under the influence is a significant misdemeanor regardless of the sentence imposed.

**Q65: What qualifies as a national security or public safety threat?**
A65: If the background check or other information uncovered during the review of your request for deferred action indicates that your presence in the United States threatens public safety or national security, you will not be able to receive consideration for an exercise of prosecutorial discretion except where DHS determines there are exceptional circumstances. Indicators that you pose such a threat include, but are not limited to, gang membership, participation in criminal activities, or participation in activities that threaten the United States.

**Q66: Will offenses criminalized as felonies or misdemeanors by state immigration laws be considered felonies or misdemeanors for purpose of this process?**
A66: No. Immigration-related offenses characterized as felonies or misdemeanors by state immigration laws will not be treated as disqualifying felonies or misdemeanors for the purpose of considering a request for consideration of deferred action under this process.

**Q67: Will DHS consider my expunged or juvenile conviction as an offense making me unable to receive an exercise of prosecutorial discretion?**
A67: Expunged convictions and juvenile convictions will not automatically disqualify you. Your request will be assessed on a case-by-case basis to determine whether, under the particular circumstances, a favorable exercise of prosecutorial discretion is warranted. If you were a juvenile, but tried and convicted as an adult, you will be treated as an adult for purposes of the DACA process.

Return to top.

## VI. Miscellaneous

**Q68: Does deferred action provide me with a path to permanent resident status or citizenship?**
A68: No. Deferred action is a form of prosecutorial discretion that does not confer lawful permanent resident status or a path to citizenship. Only the Congress, acting through its legislative authority, can confer these rights.

**Q69: Can I be considered for deferred action even if I do not meet the guidelines to be considered for DACA?**
A69: This process is only for individuals who meet the specific guidelines for DACA. Other individuals may, on a case-by-case basis, request deferred action from U.S. Citizenship and Immigration Services (USCIS) or U.S. Immigration and Customs Enforcement (ICE) in certain circumstances, consistent with longstanding practice.

**Q70: How will ICE and USCIS handle cases involving individuals who do not satisfy the guidelines of this process but believe they may warrant an exercise of prosecutorial discretion under the June 2011 Prosecutorial Discretion Memoranda?**
A70: If USCIS determines that you do not satisfy the guidelines or otherwise determines you do not warrant an exercise of prosecutorial discretion, then it will decline to defer action in your case. If you are currently in removal proceedings, have a final order, or have a voluntary departure order, you may then request ICE consider whether to exercise prosecutorial discretion.

**Q71: How should I fill out question 9 on Form I-765, Application for Employment Authorization?**
A71. When you are filing a Form I-765 as part of a DACA request, question 9 is asking you to list those Social Security numbers that were officially issued to you by the Social Security Administration.

**Q72: Will there be supervisory review of decisions by USCIS under this process?**
A72: Yes. USCIS has implemented a successful supervisory review process to ensure a consistent process for considering requests for DACA.

**Q73: Will USCIS personnel responsible for reviewing requests for DACA receive special training?**
A73: Yes. USCIS personnel responsible for considering requests for consideration of DACA have received special training.

**Q74: Must attorneys and accredited representatives who provide pro bono services to deferred action requestors at group assistance events file a Form G-28 with USCIS?**

A74: Under 8 C.F.R. §§ 292.3 and 1003.102, practitioners are required to file a Notice of Entry of Appearance as Attorney or Accredited Representative when they engage in practice in immigration matters before DHS, either in person or through the preparation or filing of any brief, application, petition, or other document. Under these rules, a practitioner who consistently violates the requirement to file a Form G-28 may be subject to disciplinary sanctions; however on Feb. 28, 2011, USCIS issued a statement indicating that it does not intend to initiate disciplinary proceedings against practitioners (attorneys and accredited representatives) based solely on the failure to submit a Notice of Entry of Appearance as Attorney or Accredited Representative (Form G-28) in relation to pro bono services provided at group assistance events. DHS is in the process of issuing a final rule at which time this matter will be reevaluated.

**Q75: When must an individual sign a Form I-821D as a preparer?**
A75: Anytime someone other than the requestor prepares or helps fill out the Form I-821D, that individual must complete Part 5 of the form.

**Q76: If I provide my employee with information regarding his or her employment to support a request for consideration of DACA, will that information be used for immigration enforcement purposes against me and/or my company?**
A76: You may, as you determine appropriate, provide individuals requesting DACA with documentation which verifies their employment. This information will not be shared with ICE for civil immigration enforcement purposes under section 274A of the Immigration and Nationality Act (relating to unlawful employment) unless there is evidence of egregious violations of criminal statutes or widespread abuses.

**Q77: Can I request consideration for deferred action under this process if I live in the Commonwealth of the Northern Mariana Islands (CNMI)?**
A77: Yes, in certain circumstances. The CNMI is part of the United States for immigration purposes and is not excluded from this process. However, because of the specific guidelines for consideration of DACA, individuals who have been residents of the CNMI are in most cases unlikely to qualify for the program. You must, among other things, have come to the United States before your 16th birthday and have resided continuously in the United States since June 15, 2007.

Under the Consolidated Natural Resources Act of 2008, the CNMI became part of the United States for purposes of immigration law only on Nov. 28, 2009. Therefore entry into, or residence in, the CNMI before that date is not entry into, or residence in, the United States for purposes of the DACA process.

USCIS has used parole authority in a variety of situations in the CNMI to address particular humanitarian needs on a case-by-case basis since Nov. 28, 2009. If you live in the CNMI and believe that you meet the guidelines for consideration of deferred action under this process, except that your entry and/or residence to the CNMI took place entirely or in part before Nov. 28, 2009, USCIS is willing to consider your situation on a case-by-case basis for a grant of parole. If this situation applies to you, you should make an appointment through INFOPASS with the USCIS ASC in Saipan to discuss your case with an immigration officer.

**Q78: Someone told me if I pay them a fee, they can expedite my DACA request. Is this true?**
A78: No. There is no expedited processing for deferred action. Dishonest practitioners may promise to provide you with faster services if you pay them a fee. These people are trying to scam you and take your money. Visit our Avoid Scams page to learn how you can protect yourself from immigration scams.

Make sure you seek information about requests for consideration of DACA from official government sources such as USCIS or the DHS. If you are seeking legal advice, visit our Find Legal Services page to

learn how to choose a licensed attorney or accredited representative.

**Q79: Am I required to register with the Selective Service?**

A79:  Most male persons residing in the U.S., who are ages 18 through 25, are required to register with Selective Service. Please see link for more information. [Selective Service].

**Q80: How can I tell if an employer is discriminating against me because I am a DACA recipient?**

A80: An employer may be engaging in discrimination if the employer:

- Demands that an employee show specific documents or asks for more or different documents than are required to complete Form I-9, Employment Eligibility Verification, or create an E-Verify case; or
- Rejects documents from the Lists of Acceptable Documents that reasonably appear to be genuine and relate to the employee, including a work authorization document because it has a future expiration date or because of an employee's prior unauthorized status.

The Civil Rights Division of the U.S. Department of Justice has an office dedicated to ensuring that employers do not discriminate against individuals who are permitted to work in the U.S. These include DACA recipients who have been granted work authorization. If you think your employer may be discriminating against you, contact the Immigrant and Employee Rights Section (IER) at 1-800-255-7688 (TDD for the deaf and hard of hearing: 1-800-237-2515).

For more information about unfair employment practices against DACA recipients, please read IER's factsheet in English (PDF) or Spanish (PDF).

For additional resources and information about workers' rights, visit www.justice.gov/crt/worker-information.

Return to top.

Last Reviewed/Updated: 03/08/2018

# EXHIBIT H



**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director (MS 2000)*
Washington, DC 20529-2000

**U.S. Citizenship
and Immigration
Services**

JUN **29** 2016

The Honorable Charles E. Grassley
Chairman
Committee on the Judiciary
United States Senate
Washington, DC 20510

Dear Chairman Grassley:

Thank you for your March 2, 2016 letter. Secretary Johnson asked that I respond on his behalf.

U.S. Citizenship and Immigration Services (USCIS) appreciates the opportunity to respond to your questions about immigration parole authority and advance parole as it may relate to individuals who have been granted Deferred Action for Childhood Arrivals (DACA).

As this Administration previously emphasized, neither deferred action nor advance parole creates "a path to citizenship." Only individuals who qualify to be classified as an immigrant under the Immigration and Nationality Act (INA) are eligible for lawful permanent residence. The most common basis for such an immigrant classification is a specified family relationship or employment qualification. Obtaining deferred action or advance parole does not alter the requirement that an alien must meet all existing requirements to be classifiable as an immigrant and all other requirements for admissibility.

In your letter, you requested information regarding the population of DACA recipients who have received advance parole. According to USCIS electronic records, of the 713,300 individuals granted DACA through December 31, 2015, a total of 22,340 were subsequently approved for advance parole based on their submission of a separate advance parole request. This calculation is based on our identification of a common A-number associated with both the DACA and advance parole records. From among the 713,300 individuals who have been granted DACA, USCIS electronic records indicate that fewer than one percent were subsequently granted advance parole and also applied for adjustment of status—a total of 5,068. As of December 31, 2015, of those 5,068, a total of 2,994 have been approved for adjustment of status. The 2,994 constitutes less than one-half of one percent of the 713,300 DACA recipients.

It is important to note that some among the group of 2,994 DACA recipients who were approved for advance parole and who were subsequently granted adjustment of status may have been otherwise eligible for adjustment of status regardless of the grant of advance parole. For example, if a DACA recipient had been previously admitted (or paroled) into the United States and subsequently fell out of status, he or she would already meet the inspection and admission

**www.uscis.gov**

The Honorable Charles E. Grassley
Page 2

(or parole) requirements of INA § 245(a) for adjustment of status. A subsequent parole into the United States would not affect that eligibility. It would be cost prohibitive and significantly burdensome to conduct a manual analysis of each of these files to identify such cases.

Without a manual review of each case, USCIS could not electronically determine which DACA recipients among the 2,994 who were approved for adjustment of status and who had applied for and received advance parole, actually traveled abroad, returned, and were paroled into the United States upon return. When an individual applies for adjustment of status, USCIS verifies on a manual, case-by-case basis whether the adjustment applicant has been inspected and admitted or paroled into the United States based on the evidence presented, such as a stamped parole document, and/or the review of the Department's records of that applicant.

Thank you again for your letter and interest in this important issue. Senator Lee, who co-signed your letter, will receive a separate, identical response. Should you wish to discuss this matter further, please do not hesitate to contact me.

Respectfully,

León Rodríguez
Director

73

# EXHIBIT I



FEATURED POSTS › THE WIRE

# The DACA Population Numbers

*By Lori Robertson*

*Posted on January 12, 2018*

751

President Donald Trump said he has "heard" varying numbers on the DACA population — from 650,000 to 3 million. In fact, the U.S. Citizenship and Immigration Services said there were 689,800 active DACA recipients as of Sept. 4, 2017.

DACA, which stands for Deferred Action for Childhood Arrivals, was instituted in 2012 under the Obama administration and enabled certain individuals who had come to the United States illegally as children to avoid deportation proceedings and obtain work authorization for two years, subject to renewal. The Trump administration announced an end to the DACA program on Sept. 5, 2017, saying no new applications would be accepted and a "wind-down" would occur for current enrollees.

Congress is negotiating a deal on what to do about DACA before a March 5 deadline set by the president. A bipartisan group of lawmakers met with the president to discuss immigration on Jan. 9, and the following day, Trump said in a cabinet meeting that they had "agreed to pursue four major areas yesterday of reform: securing our border, including, of course, the wall — which has always been included, it never changed; ending 'chain migration'; canceling the visa lottery; and addressing the status of the DACA population." He then rattled off a few different numbers on the DACA recipients.

> **Trump, Jan. 10:** *We want to see something happen with DACA. It's been spoken of for years. And children are now adults, in many cases. The numbers are very different, very varying. A lot of people say 800,000; some people said — yesterday, first time I heard 650 [thousand]. I also heard 3 million. The fact is, our country was such a mess, nobody even knows what the numbers are. But we'll know what the numbers are.*

Before we go through the numbers, let's start with a summary of who was eligible: Applicants had to be at least 15 years old and prove that they were under the age of 16 when they came to the U.S., according to the U.S. Citizenship and Immigration Services. They had to have been living in the country continuously since June 15, 2007. They had to be under age 31 and with no lawful status as of June 15, 2012, the day then-President Obama announced the DACA policy. Applicants had to be in school or have graduated or completed high school or have been honorably discharged from the military. Those with convictions of a felony, a significant misdemeanor or three or more other misdemeanors were ineligible.

Those who were approved didn't gain lawful status, but they would not face any deportation proceedings for two years. The DACA status could be renewed, and enrollees could get work authorization. Obama instituted the program after Congress repeatedly failed to pass the so-called DREAM Act, which would have enabled those brought to the U.S. as children to eventually gain citizenship.

Republican attorneys general threatened to continue a lawsuit against the executive branch if the Trump administration didn't rescind the 2012 DACA memorandum by Sept. 5, 2017. And that's when the Trump administration announced a phase-out of the program.

Now, let's look at the figures the president mentioned on the DACA population.

**800,000** — This is the total number of people who have ever been approved for DACA since it was launched in 2012. Technically, the number is 798,980, according to figures from the U.S. Citizenship and Immigration Services. Nearly 72,000 initial applications were denied.

**689,800** — This is the total number of people who had DACA status as of Sept. 4, 2017, the day before the Trump administration ended the program, according to USCIS. Nearly 80 percent of the DACA recipients are from Mexico.

What happened to the rest of the cumulative DACA approvals? About 70,000 either didn't renew or had their renewals rejected. And 40,000 became lawful permanent residents, obtaining green cards. As we mentioned, the DACA program didn't provide a path to legal status, but as the Pew Research Center explains, those living in the country illegally can gain legal status "by marrying an American citizen or lawful permanent resident, obtaining asylum, or receiving certain types of visas such as those given to victims of a crime, among other ways." A spokeswoman for USCIS, Claire K. Nicholson, confirmed to FactCheck.org that the 40,000 former DACA recipients applied for green cards after using what's called "advance parole," under which DACA recipients could get permission to travel abroad and reenter the U.S. legally.

**1.3 million** — Trump didn't mention this number, but it's an estimate of how many meet DACA criteria and could have applied, from the Migration Policy Institute, a nonpartisan think tank.

**3 million** — We asked the White House press office where the president got this figure, but we haven't received a response. We have identified two possibilities: The number could refer to a much larger group of immigrants who entered the country illegally as children, beyond those who were eligible for DACA; or it could refer to what Trump calls "chain migration" and a highly unlikely estimate of relatives current DACA recipients could some day sponsor, if those DACA recipients became citizens.

The Migration Policy Institute has estimated how many people could gain legal status under various DREAM Act-like legislation that was introduced in Congress in 2017. Those estimates range from 1.3 million to 3.6 million, with the latter being an outlier among the five bills. Under the "American Hope Act," introduced by Democratic Rep. Luis Gutierrez, 3.6 million people would meet requirements for age at entry and time of residence in the U.S., and all of them would be eligible for legal permanent residence under the bill. But not a single Republican has co-sponsored that bill. The other four pieces of legislation, which have been either sponsored or co-sponsored by Republicans, would make an estimated 1.25 million to 1.7 million eligible for legal permanent residence, according to MPI's analysis.

Or perhaps Trump was referring to claims about "chain migration." For instance, last fall, Republican Rep. Dave Brat of Virginia said that the real number affected by DACA was 3 million or 4 million, claiming that each DACA recipient could, through green card status, end up sponsoring 3.45 family members for legal status. PolitiFact.com gave the claim a "false" rating.

Under such a scenario, all DACA recipients would have to find some way to gain legal status — which 40,000 have, as we explained. But with a green card, they could only sponsor a spouse or unmarried children, according to USCIS. One survey from a professor at the University of California, San Diego found that DACA recipients were 6-and-a-half years old on average when they came to the United States, and most were under 7. It's highly unlikely many of them have spouses or children outside the country today. And to sponsor any extended family members, including parents and siblings, DACA recipients would have to become citizens.

To even get close to a 3 million figure, all 800,000 who once had DACA status would have to find a way to become citizens and then sponsor 3.45 family members on average.

MPI agrees that research has shown immigrants who gain legal status in the U.S. have then sponsored that many relatives on average. But DACA recipients are a distinct group. Michelle Mittelstadt, MPI's director of communications, told us that her organization has estimated that those who were brought to the U.S. as children would sponsor on average one relative each over a lifetime. "[T]hese are people who entered the country as children, and so would 1) be quite unlikely to have children abroad; 2) would most likely marry someone already in the U.S.," Mittelstadt explained in an email. Most also already have parents in the country or have siblings who are U.S.-born citizens, and could then sponsor the parents.

Some DACA recipients were able to renew their status just before or after the Trump administration announced an end to the program. But if Congress doesn't act before the March 5 deadline, DACA authorizations will begin to be terminated at an average rate of 915 per day, MPI estimates, with the last of the authorizations ending in March 2020.

Share The Facts

### Donald Trump

President of the United States



Said the DACA population could be 650,000, 800,000 or even 3 million, because "nobody even knows what the numbers are."



Cabinet meeting – Wednesday, January 10, 2018

SHARE      READ MORE

**Categories**   Featured Posts   The Wire

**Issue**   DACA   Illegal Immigration   Immigration

**People**   Donald Trump

PREVIOUS STORY
Freeman Didn't Say 'Lock Her Up'

NEXT STORY
Pelosi Inflates Tax Cuts

ARCHIVES          PRIVACY          COPYRIGHT POLICY          CONTACT US

© Copyright 2018 FactCheck.org ®

A Project of The Annenberg Public Policy Center of the University of Pennsylvania

# EXHIBIT J

## The New York Times

# For DACA Recipients, Losing Protection and Work Permits Is Just the Start

By Caitlin Dickerson

Sept. 7, 2017

It is not just the threat of deportation that is hanging over Amparo Gonzalez. The 31-year-old single mother could also lose her job at a warehouse company, even if she stays in the country. With it would go the health insurance she gets through her employer, which covers her 13-year-old daughter, as well as the exams and treatments that Ms. Gonzalez needs for her chronic colon disease.

"I lose everything without DACA," she said, referring to the Deferred Action for Childhood Arrivals program that President Trump moved this week to eliminate.

With the news that roughly 800,000 people across the country would begin losing their protected status under DACA, which offered work permits and temporary reprieves from deportation to young undocumented immigrants, the program's beneficiaries are now scrambling to prepare for the various ways the decision could upend their lives.

Living and working in the United States are the two privileges most often associated with DACA. But for many recipients, those are merely the first dominoes to fall if Congress does not pass a replacement. The shutdown of the program could reverberate far beyond those privileges and topple the many others that DACA protection can confer, from state-sponsored health coverage and financial aid to driver's licenses and professional credentials. The loss of these things could, in turn, disrupt recipients' abilities to go to school, support their families and keep a roof over their heads.

Losing the ability to work legally would mean, for an estimated 450,000 people, forfeiting the health insurance and other benefits offered through employers, according to the National Immigration Law Center. Another 290,000 recipients, the center said, may lose their eligibility for state-subsidized health coverage when their protection expires.

The law center's researchers also found that more than half of DACA beneficiaries will be forced to relinquish driver's licenses. And while many might find work under the table or from sympathetic employers, they could not obtain most occupational licenses, like those required for nursing and cosmetology.

---

**You have 4 free articles remaining.**
**Subscribe to The Times**

Although DACA's deportation protections lasted only two years before needing to be renewed, widespread bipartisan support gave many recipients the confidence to make risky life decisions such as buying homes, pursuing graduate degrees and starting families. Those decisions came with major obligations that may be unmanageable without a steady job or benefits, but that cannot be canceled or renegotiated.

"It's just incalculable," Thomas A. Saenz, president and general counsel of the Mexican American Legal Defense and Educational Fund said. "Any of the things that DACA provides are things that we all take for granted and cannot even imagine living without."

The extent of the impact will depend largely on where recipients live. DACA beneficiaries were never eligible for federal health care programs like Medicaid or Medicare, nor for federal student loans; many of the rights and privileges they enjoyed are regulated at the state level. Some state governments may pass new laws or interpret existing law in ways that allow benefits to continue; others may not.

If state efforts in New York and California are unsuccessful, a combined 265,000 DACA recipients in those states will retain access to in-state college tuition, but may lose access to state-subsidized health care benefits.

In New York, they would no longer be eligible for state-funded grants and student loans, and would no longer be able to drive legally. That may have a limited impact on immigrants in transit-rich New York City, but could be debilitating for those who work on farms or construction sites upstate, which can be far from their homes in areas where public transportation options are limited, if they are available at all.

For roughly 120,000 DACA recipients in Texas, the loss of a driver's license could be even more devastating, given the vastness of the state.

Recipients in Arizona and Georgia may face the worst circumstances. The 50,000 in those states are already largely excluded from in-state college tuition, state-funded loans and grants, and subsidized health care; they would also lose the right to drive, and in Alabama, Georgia and South Carolina, they would be barred entirely from enrolling in some colleges and universities.

Some of the estimated 280,000 beneficiaries who have attended college or graduate school have borrowed from two major lenders, Sallie Mae and Discover, which lent money to DACA recipients who could find sponsors who were United States citizens or permanent residents. Those borrowers may now have to make loan payments without the right to work legally.

Denia Perez, who was born in Mexico and was brought to the United States when she was 11 months old, has borrowed about $40,000 from Discover to cover her living expenses at the Quinnipiac University School of Law in Connecticut. A dean's scholarship pays for her tuition, but does not cover rent, food, gas or maintenance for her 2002 Honda CRV. She also purchased a health insurance policy, required by her school, which costs about $3,000 a year.

For her final year of law school, Ms. Perez, 27, said she would borrow another $23,000, but this time from a friend. After her DACA status expires next October, she will not be able to work for a law firm in California, where she was raised and where she had planned to return to practice law. Under the terms of her Discover loans, she can defer repayment for just six months after graduating.

Ms. Perez said that if need be, she would clean houses or work as a nanny to stay afloat, the way she did as an undergraduate student. Her father is a construction worker; her mother works in food service.

"I would do what I have to do to pay my bills," she said. "I am just fully prepared to hassle and make a living and try to continue surviving in any way I can. That is what we did before DACA."

Many DACA recipients became beacons of stability in their families, and immigrant advocates said that the changes would extend beyond the recipients themselves.

Advocates for stronger immigration enforcement celebrated the changes, arguing that the resources of overburdened institutions were going to DACA recipients at the expense of American citizens and legal residents.

"You're essentially allowing parents to pass on to their children the benefits that they broke the law to obtain," said Dan Stein, the president of the Federation for American Immigration Reform, which supported Mr. Trump's decision. Mr. Stein added that the elimination of DACA would serve as a necessary deterrent for people who consider crossing the border illegally.

Mr. Stein's views are representative of many who believe that President Barack Obama did not have the authority to create the DACA program in the first place. "Nor do states have the right to run their own immigration program for people who have no right to be in the country," he said.

But it is too soon to assume that the end of DACA will abruptly roll back all protections for its beneficiaries. The president has called on Congress to pass legislation that would make the benefits permanent, and potentially even provide a path to citizenship.

Mr. Trump said he would support such as bill, as long as it was tied to broader changes in immigration laws. He added to his rollback a six-month grace period, after which current recipients will no longer be able to renew their status. The administration immediately stopped accepting new applications.

The moves may also add pressure on states to pass their own legislation, modeled after the Dream Act, a federal bill that would give a route to citizenship to young undocumented immigrants. That proposal has languished in various forms in Congress for 16 years, and similar bills have been caught in the same political crossfire in state legislatures like New York's.

If such legislative measures fail, Ms. Gonzalez, the single mother who works at a warehouse company, will lose her status in December 2018.

Ms. Perez, the law student, has not given up her dreams of becoming a lawyer, and still thinks of her loan obligations from the perspective of someone who was months away from joining the bar. Asked to entertain the possibility that she could request debt forgiveness if she loses her legal right to work, she replied, "It's an interesting question — not sure it would hold up in court."

*Follow Caitlin Dickerson on Twitter @itscaitlinhd.*

Miriam Jordan contributed reporting.

A version of this article appears in print on Sept. 8, 2017, on Page A13 of the New York edition with the headline: Ripples Beyond Workplace For Most DACA Recipients

# EXHIBIT K

DACA Recipients Worry What The Government Will Do With Their Private Information : NPR


3:26

NATIONAL

# DACA Recipients Worry What The Government Will Do With Their Private Information

September 9, 2017 · 5:36 PM ET

Heard on All Things Considered



RICHARD GONZALES



*Gregory Bull/AP*

President Trump this week tweeted that young immigrants brought to this country illegally by their parents, also known as DREAMers, "have nothing to worry about."

> For all of those (DACA) that are concerned about your status during the 6 month period, you have nothing to worry about - No action!

— Donald J. Trump (@realDonaldTrump) September 7, 2017

DACA Recipients Worry What The Government Will Do With Their Private Information : NPR

But a lot of DREAMers aren't buying it. (DREAMer is a term derived from a proposed bill called the Development, Relief and Education for Alien Minors Act.) In fact, they say the Trump administration gave them a new headache with a veiled threat to use the personal information they gave the government to deport them.

Here's what happened.

Before his tweet, the Trump administration announced that it would end the Obama-era program called Deferred Action for Childhood Arrivals, or DACA, in March unless Congress takes action to salvage it.

It would impact nearly 800,000 young immigrants brought to this country illegally by their parents.



U.S.
5 Questions About DACA Answered

Sheridan Aguirre, now 23, was just 1 year old when his mother brought him to the U.S. from Mexico. She wanted to reunite with her husband, an agricultural worker. Aguirre says she had always planned to return to Mexico, but something happened.

"My teachers noticed I was doing well in school, that I was excelling," he says.

So his mother decided to stay in the U.S.

Aguirre graduated at the top of his high school class and then earned a degree in filmmaking from the University of Texas. Today he's a leader in United We Dream, an advocacy group lobbying for permanent legal status for the DREAMers.

Aguirre says his family collectively decided to take the risk of enrolling him in DACA. It required giving the government information like addresses, photos, fingerprints and bank statements. Aguirre believed the government's assurances that his personal information wouldn't be used against him.

"They were telling me that my private information would be secure, that it would not be shared with

THE TWO-WAY
States Sue To

DACA Recipients Worry What The Government Will Do With Their Private Information : NPR



Block DACA
Termination,
Citing Trump's
'Racial
Animus'

[Immigration and Customs Enforcement], Border
Patrol, or any other agencies. So I did it with
confidence," he says.

But Aguirre says that confidence was shaken by
Trump's decision to end DACA.

"It's a scary situation. It really is."

Perhaps what frightens him the most is an online post by the Department of
Homeland Security. It says that the personal information provided by DACA
recipients won't be "proactively" shared with immigration enforcement agents.
But there's an exception if a person "poses a risk to national security or public
safety, or meets the criteria for the issuance of a Notice To Appear or a referral to
ICE under the criteria." And it says the privacy policy can be modified or
rescinded at any time without notice.

"What that means in plain English is when ICE wants to place someone in
removal proceedings, it can ask for any information it wants to do that," says Leon
Fresco, an immigration attorney in Washington, D.C., who worked in the Obama
Justice Department. "And the administration has not denied this meaning."

Fresco says if DACA is ended and DREAMers lose their status, they would want to
avoid any interaction with law enforcement because their likelihood of being
detained and turned over to ICE would be very high.

Stephen Legomsky was chief counsel at U.S. Citizenship and Immigration
Services when DACA was created back in 2012. He says the government didn't
just give people a promise that their data would remain confidential. It also
actively encouraged people to apply with that assurance.

"If it were to then turn around and say, 'Ha, gotcha,
now we know where you live, we're coming out to
deport you,' then there is at least a fair argument that

ANALYSIS

FACT
CHECK: Are
DACA

DACA Recipients Worry What The Government Will Do With Their Private Information : NPR



Recipients
Stealing Jobs
Away From
Other
Americans?

fundamental fairness has been violated and that means there can be a due process challenge," Legomsky says.

That's an argument being made by 15 states and the District of Columbia in a lawsuit brought this week against the administration.

But Legomsky says a legal challenge may have to wait until the administration actually uses the information to help deport people.

If that day comes, Sheridan Aguirre says his family, including his U.S. citizen siblings, is prepared for when ICE comes knocking.

"If ICE were to come to our door, that they won't open the door, that they'll check to make sure that they have a warrant, that they're recording the situations. Because this is our home and we should feel safe in the places we grew up in," he says.

Aguirre compares it to a fire drill. He says there's strength in knowing he's done all he could do to face an uncertain future.

READ & LISTEN

**Home**

**News**

**Arts & Life**

**Music**

**Podcasts**

DACA Recipients Worry What The Government Will Do With Their Private Information : NPR

**Programs**

CONNECT

**Newsletters**

**Facebook**

**Twitter**

**Instagram**

**Contact**

**Help**

ABOUT NPR

**Overview**

**Finances**

**People**

**Press**

**Ombudsman**

**Corrections**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

**NPR Shop**

**NPR Events**

**Visit NPR**

terms of use

DACA Recipients Worry What The Government Will Do With Their Private Information : NPR

privacy
my privacy choices
text only

# EXHIBIT L



*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528

December 30, 2016

The Honorable Judy Chu
U.S. House of Representatives
Washington, DC  20515

Dear Representative Chu:

On behalf of the Administration, I write in response to the letter you and 110 other members of Congress sent the President on December 5.  In your letter, you ask us "to do everything within [our] power to safeguard the personal identifying information of DACA enrollees."  We share your concerns.

Today there are 750,000 young people enrolled in DACA who, when they applied for enrollment, relied on the U.S. government's representations about the use of their personal identifying information.  Since DACA was announced in 2012, DHS has consistently made clear that information provided by applicants will be collected and considered for the primary purpose of adjudicating their DACA requests and would be safeguarded from other immigration-related purposes.  More specifically, the U.S. government represented to applicants that the personal information they provided will not later be used for immigration enforcement purposes except where it is independently determined that a case involves a national security or public safety threat, criminal activity, fraud, or limited other circumstances where issuance of a notice to appear is required by law.

We believe these representations made by the U.S. government, upon which DACA applicants most assuredly relied, must continue to be honored.

For decades, even dating back before DACA, it has been the long-standing and consistent practice of DHS (and its predecessor INS) to use information submitted by people seeking deferred action or other benefits for the limited purpose of adjudicating their requests, and not for immigration enforcement purposes except in the kinds of specified circumstances described above.  This was true, for example, under the deferred action policies extended to victims of human trafficking, to foreign students affected by Hurricane Katrina, to battered immigrants under the Violence Against Women Act, and to widows and widowers of American citizens.  Accordingly, people who requested to be considered under DACA, like those who requested deferred action in the past, have relied on our consistent practice concerning the information they provide about themselves and others.

The Honorable Judy Chu
Page 2

      The U.S. government's practice of adhering to the assurances it makes to applicants for deferred action is also consistent with the way USCIS (and the INS before it) has long protected information submitted by those seeking other benefits or relief.  This includes but is not limited to individuals requesting temporary protected status, deferred enforced departure, or extended voluntary departure.  In these circumstances, as with deferred action requests, USCIS and INS have abided by a longstanding and consistent practice of using information to adjudicate specific applications, but not for immigration enforcement purposes absent the limited circumstances described above.

      Since DACA began, thousands of Dreamers have been able to enroll in colleges and universities, complete their education, start businesses that help improve our economy, and give back to our communities as teachers, medical professionals, engineers, and entrepreneurs—all on the books.  We continue to benefit as a country from the contributions of those young people who have come forward and want nothing more than to contribute to our country and our shared future.

      The co-signers of your letter will receive separate, identical responses.  Should you wish to discuss this further, please do not hesitate to contact me.

          Sincerely,

          Jeh Charles Johnson

# EXHIBIT M

# Results from Tom K. Wong[1] et al., 2017 National DACA Study

Survey fielded 8/1/2017 to 8/20/2017
$n$ = 3,063

| | | |
|---|---|---|
| Methodology | …………………………… | 1 |
| Economic Integration | …………………………… | 2-5 |
| Education | …………………………… | 6-7 |
| Inclusion and Belonging | …………………………… | 8-9 |

---

[1] Tom K. Wong is associate professor of political science at the University of California, San Diego. tomkwong@ucsd.edu

**Methodology**

The questionnaire was administered to an online panel of DACA recipients recruited by the partner organizations. Several steps were taken to account for the known sources of bias that result from such online panels. To prevent ballot stuffing—one person submitting multiple responses—the authors did not offer an incentive to respondents for taking the questionnaire and used a state-of-the-art online survey platform that does not allow one IP address to submit multiple responses. To prevent spoiled ballots— meaning people responding who are not undocumented—the authors used a unique validation test for undocumented status. Multiple questions were asked about each respondent's migratory history. These questions were asked at different parts of the questionnaire. When repeated, the questions were posed using different wording. If there was agreement in the answers such that there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting pool of respondents. If not, the respondent was excluded. In order to recruit respondents outside of the networks of the partner organizations, Facebook ads were also used. Because there is no phone book of undocumented immigrants, and given the nature of online opt-in surveys, it is not possible to construct a valid margin of error.

## Economic Integration

**Check all that apply. After my DACA application was approved, I...**
(*n* = 3,063)

|  |  |  | > 25 |
|---|---|---|---|
| Got my first job | ........................... | 54.2% | 35.3% |
| Got a job with better pay | ........................... | 68.5% | 77.7% |
| Got a job that better fits my education and training | ........................... | 54.2% | 59.6% |
| Got a job that better fits my long-term career goals | ........................... | 53.9% | 61.4% |
| Got a job with health insurance or other benefits | ........................... | 57.3% | 66.9% |
| Got a job with improved work conditions | ........................... | 56.2% | 64.4% |
| Started my own business | ........................... | 5.4% | 7.9% |
| I have been able to earn more money, which has helped me become financially independent | ........................... | 69.0% | 73.4% |
| I have been able to earn more money, which has helped my family financially | ........................... | 70.8% | 73.7% |
| Opened a bank account | ........................... | 61.0% | 47.3% |
| Got my first credit card | ........................... | 65.7% | 67.9% |
| Bought my first car | ........................... | 64.5% | 67.2% |
| Bought a home | ........................... | 15.7% | 23.5% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

## Are you currently employed?
(*n* = 3,063)

|  |  |  | > 25 |
|---|---|---|---|
| Yes | ........................... | 91.4% | 93.3% |
| No | ........................... | 8.6% | 6.7% |
| No response | ........................... | 0.0% | 0.0% |

Note: percentages may not sum to 100 due to rounding. *n* = 1,662 for all respondents 25 years and older.

······ **Please indicate your average hourly wage OR annual salary.**
($n$ = 2,800, which represents the 91.4% of all respondents who are currently employed)

|  |  |  | > 25 |
|---|---|---|---|
| Average hourly wage | ................................ | $17.46 | $20.05 |
| Median hourly wage | ................................ | $15.34 | $17.90 |
| Average annual earnings | ................................ | $36,231.91 | $41,621.48 |
| Median annual earnings | ................................ | $32,000.00 | $37,595.03 |

Note: percentages may not sum to 100 due to rounding. $n$ = 1,551 for respondents 25 years and older and currently employed.
Figures exclude the bottom 1st and top 99th percentiles

······ **On average, how many hours do you work per week?**
($n$ = 2,800, which represents the 91.4% of all respondents who are currently employed)

|  |  |  | > 25 |
|---|---|---|---|
| Average hours worked per week | ................................ | 37.9 | 39.9 |
| Median hours worked per week | ................................ | 40.0 | 40.0 |

Note: percentages may not sum to 100 due to rounding. $n$ = 1,551 for respondents 25 years and older and currently employed.
Figures exclude the bottom 1st and top 99th percentiles

······ **Were you employed before DACA?**
($n$ = 2,800, which represents the 91.4% of all respondents who are currently employed)

|  |  |  | > 25 |
|---|---|---|---|
| Yes | ................................ | 43.9% | 60.7% |
| No | ................................ | 55.9% | 38.9% |
| No response | ................................ | 0.3% | 0.4% |

Note: percentages may not sum to 100 due to rounding. $n$ = 1,551 for respondents 25 years and older and currently employed.

- 4 -

····· **Please indicate your average hourly wage OR annual salary before DACA.**
($n$ = 1,229, which represents the 43.9% of respondents who are currently employed and were also employed before DACA)

|  |  |  | > 25 |
|---|---|---|---|
| Average hourly wage | ........................................ | $10.29 | $10.87 |
| Median hourly wage | ........................................ | $9.59 | $10.00 |
| Average annual earnings | ........................................ | $20,068.49 | $21,950.47 |
| Median annual earnings | ........................................ | $19,000.00 | $20,857.16 |

Note: percentages may not sum to 100 due to rounding. $n$ = 942 for respondents 25 years and older, currently employed, and were employed before DACA. Figures exclude the bottom 1st and top 99th percentiles

---

····· **On average, how many hours did you work per week before DACA?**
($n$ = 1,229, which represents the 43.9% of respondents who are currently employed and were also employed before DACA)

|  |  |  | > 25 |
|---|---|---|---|
| Average hours worked per week | ........................................ | 37.7 | 39.2 |
| Median hours worked per week | ........................................ | 40.0 | 40.0 |

Note: percentages may not sum to 100 due to rounding. $n$ = 1,551 for respondents 25 years and older, currently employed, and were employed before DACA. Figures exclude the bottom 1st and top 99th percentiles.

---

····· **Does your employer know that you have DACA?**
($n$ = 2,800, which represents the 91.4% of all respondents who are currently employed)

|  |  |  |
|---|---|---|
| Yes | ........................................ | 50.0% |
| No | ........................................ | 11.4% |
| Not applicable | ........................................ | 37.7% |
| No response | ........................................ | 0.9% |

Note: percentages may not sum to 100 due to rounding.

---

...... **Are you bilingual?**
($n$ = 2,800, which represents the 91.4% of all respondents who are currently employed)

| | | |
|---|---|---|
| Yes | ........................................ | 98.1% |
| No | ........................................ | 1.9% |
| No response | ........................................ | 0.1% |

Note: percentages may not sum to 100 due to rounding.

---

...... **Do you agree or disagree with the following statement: "My being bilingual has been an asset to my employer."**
($n$ = 2,746, which represents the 98.1% of respondents who are currently employed and are bilingual)

| | | |
|---|---|---|
| Strongly agree | ........................................ | 80.1% |
| Agree | ........................................ | 12.5% |
| Neither agree nor disagree | ........................................ | 6.1% |
| Disagree | ........................................ | 0.8% |
| Strongly disagree | ........................................ | 0.4% |
| No response | ........................................ | 0.2% |
| | | |
| Agree/strongly agree | ........................................ | 92.6% |
| Neither agree nor disagree | ........................................ | 6.1% |
| Disagree/strongly disagree | ........................................ | 1.2% |
| No response | ........................................ | 0.2% |

Note: percentages may not sum to 100 due to rounding.

- 6 -

# Education

**Check all that apply. After my DACA application was approved, I...**
(*n* = 3,063)

|  |  |  | > 25 |
|---|---|---|---|
| Pursued educational opportunities that I previously could not | ........................................ | 65.3% | 54.2% |
| I haven't pursued more education yet, but I plan to | ........................................ | 33.3% | 42.7% |
| I don't plan to pursue more education | ........................................ | 3.3% | 5.1% |
| Paid off some/all of my student loans | ........................................ | 18.4% | 18.3% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

**Are you currently in school?**
(*n* = 3,063)

|  |  |  | > 25 |
|---|---|---|---|
| Yes | ........................................ | 44.9% | 30.6% |
| No | ........................................ | 55.0% | 69.3% |
| No response | ........................................ | 0.1% | 0.1% |

Note: percentages may not sum to 100 due to rounding. *n* = 1,662 for all respondents 25 years and older.

**What degree are you currently pursuing?**
(*n* = 1,374, which represents 44.9% of all respondents who are currently in school)

|  |  |  | > 25 |
|---|---|---|---|
| GED or equivalent | ........................................ | 0.9% | 2.2% |
| High-school diploma | ........................................ | 2.7% | 0.6% |
| Trade/technical/vocational degree or certificate | ........................................ | 4.3% | 6.3% |
| Associate's degree | ........................................ | 19.4% | 18.5% |
| Bachelor's degree | ........................................ | 52.5% | 42.2% |
| Master's degree | ........................................ | 13.1% | 21.0% |
| Professional degree above a master's degree | ........................................ | 2.3% | 3.1% |
| Doctorate degree | ........................................ | 3.6% | 4.9% |
| No response | ........................................ | 1.2% | 1.2% |
| Bachelor's degree or higher | ........................................ | 71.5% | 71.2% |

Note: percentages may not sum to 100 due to rounding. *n* = 509 for respondents 25 years and older who are currently in school.

- 7 -

**What is the highest degree or level of school you have completed?** *If you are currently enrolled in school, what is the highest degree you have received thus far?*
(*n* = 3,063)

|  | | | > 25 |
|---|---|---|---|
| GED or equivalent | ........................................ | 3.4% | 5.4% |
| High-school diploma | ........................................ | 24.0% | 18.1% |
| Trade/technical/vocational degree or certificate | ........................................ | 3.6% | 4.3% |
| Associate's degree | ........................................ | 15.7% | 15.0% |
| Some college | ........................................ | 23.9% | 20.7% |
| Bachelor's degree | ........................................ | 23.2% | 27.3% |
| Master's degree | ........................................ | 4.4% | 7.3% |
| Professional degree above a master's degree | ........................................ | 0.3% | 0.4% |
| Doctorate degree | ........................................ | 0.3% | 0.5% |
| No response | ........................................ | 1.3% | 0.9% |
| | | | |
| Bachelor's degree or higher | ........................................ | 28.2% | 35.5% |

Note: percentages may not sum to 100 due to rounding. *n* = 1,662 for all respondents 25 years and older.

- 8 -

## Inclusion and Belonging

**Check all that apply. After my DACA application was approved, I...**
(*n* = 3,063)

|  |  |  | > 25 |
|---|---|---|---|
| Got my driver's license for the first time | ........................................ | 79.7% | 80.4% |
| Got a state identification card for the first time | ........................................ | 55.1% | 51.1% |
| Became an organ donor | ........................................ | 48.7% | 49.8% |
| Donated blood for the first time | ........................................ | 17.8% | 13.7% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

---

**Please indicate the immigration status of your immediate family members, meaning a parent, sibling, spouse, or child. (select all that apply)**
(*n* = 3,063)

| | | |
|---|---|---|
| American citizen spouse | ........................................ | 16.6% |
| American citizen child | ........................................ | 25.7% |
| American citizen sibling | ........................................ | 58.9% |
| American citizen spouse, child, or sibling | ........................................ | 72.7% |

Note: percentages do not sum to 100 as individuals may select all that apply.

---

**Do you have an immediate family member, meaning a parent, sibling, spouse, or child, who is a U.S. citizen and is 18 years or older?**
(*n* = 3,063)

| | | |
|---|---|---|
| Yes | ........................................ | 44.6% |
| No | ........................................ | 55.0% |
| No response | ........................................ | 0.4% |

Note: percentages may not sum to 100 due to rounding.

- 9 -

...... **Are any of your immediate family members who are U.S. citizens and are 18 years or older registered to vote?**

($n$ = 1,365, which represents 44.6% of all respondents who have immediate relatives who are U.S. citizens that are 18 years or older)

| | |
|---|---|
| Yes | 81.5% |
| No | 18.3% |
| No response | 0.2% |

Note: percentages may not sum to 100 due to rounding.

- 10 -

**What state do you currently live in?**
(*n* = 3,063)

|  |  | %<br>Poll | %<br>DACA |
|---|---|---|---|
| California | ........................................ | 24.3% | 28.3% |
| Texas | ........................................ | 17.4% | 15.8% |
| New York | ........................................ | 4.8% | 5.3% |
| Illinois | ........................................ | 4.4% | 5.4% |
| Arizona | ........................................ | 4.1% | 3.5% |
| Florida | ........................................ | 3.3% | 4.2% |
| North Carolina | ........................................ | 3.1% | 3.5% |
| Colorado | ........................................ | 2.8% | 2.2% |
| Washington | ........................................ | 2.7% | 2.3% |
| Georgia | ........................................ | 2.6% | 3.1% |
| New Jersey | ........................................ | 1.9% | 2.8% |
| Utah | ........................................ | 1.9% | 1.2% |
| Tennessee | ........................................ | 1.5% | 1.1% |
| Oregon | ........................................ | 1.3% | 1.4% |
| Maryland | ........................................ | 1.3% | 1.2% |
| Michigan | ........................................ | 1.3% | 0.8% |
| New Mexico | ........................................ | 1.2% | 0.9% |
| Massachusetts | ........................................ | 1.2% | 1.0% |
| Kansas | ........................................ | 1.1% | 0.9% |
| Pennsylvania | ........................................ | 1.1% | 0.7% |
| Virginia | ........................................ | 1.1% | 1.5% |
| Minnesota | ........................................ | 1.0% | 0.8% |
| Nevada | ........................................ | 1.0% | 1.7% |
| Oklahoma | ........................................ | 1.0% | 0.9% |
| South Carolina | ........................................ | 1.0% | 0.8% |
| Arkansas | ........................................ | 1.0% | 0.6% |
| Other | ........................................ | 10.6% | 8.1% |

Note: percentages may not sum to 100 due to rounding.

**What is your race/ethnicity?**
(*n* = 3,063)

| | | |
|---|---|---|
| White | ........................................ | 1.7% |
| Black | ........................................ | 1.1% |
| Hispanic/Latino | ........................................ | 92.6% |
| Asian or Pacific Islander | ........................................ | 3.5% |
| Other | ........................................ | 0.9% |
| No Response | ........................................ | 0.2% |

Note: percentages may not sum to 100 due to rounding.

| | | % Poll | % DACA |
|---|---|---|---|
| Hispanic/Latino | ........................................ | 92.8% | 93.5% |
| Other | ........................................ | 7.2% | 6.5% |

**How old are you?**
(*n* = 3,063)

| | | |
|---|---|---|
| Average | ........................................ | 25.2 |
| Median | ........................................ | 25 |
| | | |
| 16 | ........................................ | 0.4% |
| 17 | ........................................ | 1.6% |
| 18 | ........................................ | 3.0% |
| 19 | ........................................ | 4.4% |
| 20 | ........................................ | 5.2% |
| 21 | ........................................ | 6.6% |
| 22 | ........................................ | 7.6% |
| 23 | ........................................ | 8.9% |
| 24 | ........................................ | 8.0% |
| 25 | ........................................ | 7.1% |
| 26 | ........................................ | 8.6% |
| 27 | ........................................ | 7.6% |
| 28 | ........................................ | 7.3% |
| 29 | ........................................ | 6.2% |
| 30 | ........................................ | 5.3% |
| 31 | ........................................ | 3.6% |
| 32 | ........................................ | 3.3% |
| 33 | ........................................ | 2.2% |
| 34 | ........................................ | 1.8% |
| 35 | ........................................ | 1.4% |

Note: percentages may not sum to 100 due to rounding.

**How old were you when you first came to the U.S.?**
($n = 3,063$)

|  |  |  |
|---|---|---:|
| Average | ....................................... | 6.5 |
| Median | ....................................... | 6 |
|  |  |  |
| 0 | ....................................... | 4.5% |
| 1 | ....................................... | 7.6% |
| 2 | ....................................... | 8.3% |
| 3 | ....................................... | 9.7% |
| 4 | ....................................... | 8.0% |
| 5 | ....................................... | 8.7% |
| 6 | ....................................... | 7.4% |
| 7 | ....................................... | 7.4% |
| 8 | ....................................... | 6.5% |
| 9 | ....................................... | 6.2% |
| 10 | ....................................... | 5.6% |
| 11 | ....................................... | 5.0% |
| 12 | ....................................... | 3.9% |
| 13 | ....................................... | 3.5% |
| 14 | ....................................... | 4.1% |
| 15 | ....................................... | 3.7% |

Note: percentages may not sum to 100 due to rounding.

- 13 -

# EXHIBIT N

Policy Report  |  October 2017



# DRAINING THE TRUST FUNDS

*Ending DACA and the Consequences to Social Security and Medicare*

By Jose Magaña-Salgado with Tom K. Wong

## I. Executive Summary[1]

Originally implemented in 2012 by President Barack Obama, Deferred Action for Childhood Arrivals (DACA) is a prosecutorial discretion initiative that provides employment authorization (the ability to lawfully work) and protection from deportation for certain undocumented immigrants who entered the United States before the age of 16. Beginning in 2012 and through June of 2017, U.S. Citizenship and Immigration Services (USCIS) granted deferred action under DACA to 793,026 individuals. Approximately 91.4% of DACA recipients are employed, contributing to the Social Security and Medicare trust funds through the Federal Insurance Contributions Act (FICA) through their own contributions and that of their employers.

On September 5, 2017, President Donald J. Trump, through Attorney General Jeff Sessions, announced that, effective immediately, the federal government would functionally end Deferred Action for Childhood Arrivals (DACA). Under this announcement, the Administration will no longer accept initial requests for DACA and will only accept a small portion of renewal requests before October 5, 2017. Beginning March 6, 2018, DACA recipients will begin to lose their DACA status on a rolling basis until March of 2020. Consequently, DACA recipients will lose the ability to be lawfully employed, forcing employers to terminate them and foregoing the Social Security and Medicare contributions that their employment otherwise would have generated. Using updated survey information from DACA recipients, wage growth projections from Bureau of Labor and Statistics (BLS) data, and the latest data from USCIS, this report provides updated ten-year estimates of the Social Security and Medicare losses stemming from President Trump's decision to end DACA.

- The report concludes that the Administration's decision to end DACA will lead to **$39.3 billion in losses to Social Security and Medicare contributions over ten years**, half of which represents lost employee contributions and half employer contributions.

- Of these losses, **$31.8 billion represents the decrease in Social Security contributions** and **$7.4 billion in Medicare contributions.**

- Moreover, as both trust funds use contributions from today's workers to pay out current obligations, the **reduction in contributions reduces the immediately available funds to pay today's U.S. citizen seniors** and others currently eligible for these programs.

- Thus, passage of legislation to provide permanent relief to all current DACA recipients, such as the Dream Act of 2017 or the Recognizing America's Children Act, **would lead to the contribution of at least these same amounts and likely even more because of the broader population protected under potential legislation.**

---

[1] The authors thank Philip Wolgin for his assistance in this report. For questions regarding this report, please contact Professor Tom K. Wong at tomkwong@ucsd.edu.

This report represents an update of the ILRC's previous estimates on this topic, originally released in December of 2016.[1] As part of the previous report, the ILRC also calculated estimated losses for businesses associated with turnover costs. While this report does not update projected turnover costs to businesses, David Bier of CATO calculated updated turnover costs associated with the loss of DACA, concluding those losses to be at least $6.3 billion.[2]

## II. Background

Deferred action represents an exercise of prosecutorial discretion by the Executive branch that allows it to defer the deportation of an immigrant. Deferred action and prosecutorial discretion in the immigration context have a long legal history and precedent.[3] In light of this firm legal foundation and ongoing pressure by immigrant youth in 2012, President Obama, through then-Secretary of the U.S. Department of Homeland Security (DHS) Janet Napolitano, announced the creation of DACA.[4] DACA allowed immigrant youth who came to the United States before the age of 16 and met a series of other stringent public safety and evidentiary requirements to apply for deferred action through USCIS.[5]

Out of a universe of 1.7 million potentially eligible individuals,[6] USCIS eventually granted DACA to 793,026 individuals as of June 30, 2017.[7] These DACA recipients were able to obtain driver's licenses, obtain employment, pursue their careers, further their educational paths, and more. As of August 2017, approximately 91.4% of DACA recipients secured employment,[8] with many of these individuals working at prestigious businesses, including Fortune 500 companies, such as "Walmart, Apple, General Motors, Amazon, JPMorgan Chase, Home Depot, and Wells Fargo."[9] Critically, with every paycheck, these individuals and their employers contribute to the Social Security[10] and Medicare[11] trust funds, which represent the government's two largest entitlement programs that provide financial support to seniors, disabled, and lower income individuals. These trust funds pay out obligations to seniors and other eligible individuals with the contributions provided by current workers. Consequently, eligible recipients—including U.S. citizens and seniors—who receive payments from Social Security and Medicare today, have been, in part, receiving contributions from DACA recipients since 2012.

While President Trump continued DACA for a short time during the beginning of his Administration, on September 5, 2017, the Administration—through Attorney General Jeff Sessions—announced that DACA would end.[12] Allowing approximately a quarter of DACA recipients to apply for renewal one last time (those with expirations between September 5, 2017 and March 5, 2018), the Administration announced that all other requests for DACA, including first-time requests, other renewals, and those whose DACA expired before September 5, 2017, would no longer be able to apply for or be considered for DACA.[13] Beginning March 6, 2018, DACA recipients will begin to lose their DACA on a rolling basis until the end of February of 2020 where the last DACA grants will expire. Thus, over the course of the next two and a half years, DACA recipients will lose the protections associated with deferred action and—critically—their ability to be lawfully employed.

Under federal law, employers are prohibited from hiring and continuing to employ individuals who do not have a valid employment authorization document, commonly known as a work permit.[14] Consequently, over the next two and a half years, employers will regularly have to terminate the employment of DACA recipients as their DACA expires. Accompanying this termination will be a corresponding reduction in Social Security and Medicare contributions both by the employee and the employer. This report quantifies those losses.

In light of the potential for these economic losses, employers are already strongly advocating for the protection of DACA recipients and Dreamers. Notably, over 800 employers, including major names such as Wal-Mart, Target, and PepsiCo, have called on Congress to provide permanent protection for DACA recipients through legislation.[15] Indeed, Congress is currently contemplating a variety of legislation vehicles to protect this population, including the Dream Act of 2017[16] and Recognizing America's Children Act.[17] Passage of one of these pieces of legislation would substantially help mitigate the projected losses to both the Social Security and Medicare trust funds while kickstarting the nation's economic engine

with collateral, significant economic benefits.[18] It is incumbent on Congress to enact one of these bills, provide protection for this population, and mitigate the losses to the trust funds.

## III. Methodology

### A. Overview

This methodology estimates the losses to the Social Security and Medicare trust funds over the course of ten years. However, for the first two years, it does so on a *monthly* basis due to the rolling nature of DACA expirations. To do so, we first establish the number of DACA recipients that will be affected by the Administration's announcement in March 2018. We determine the approximate number of DACA expirations per month to later discount contributions on a monthly basis. We then calculate the average wage increases on a yearly and monthly basis. Finally, we project the number of DACA recipients who are employed and discount their month-to-month and eventually yearly contributions over the course of ten years, factoring projected wage growth throughout.

### B. Methodology Updates

In December of 2016, the ILRC released a report projecting the losses to the Social Security and Medicare trust funds as a result of potentially ending DACA.[19] The current report updates that methodology in a few key ways. Initially, this report employs the latest data from the annual surveys of the DACA population conducted by Professor Tom K. Wong.[20] The latest survey provides the most up-to-date estimates of the percentage of employed DACA recipients and their average yearly wage.[21] Moreover, the report uses the most recently released data by USCIS regarding the current number of DACA recipients and pending applications.[22] Finally, employing Bureau of Labor Statistics data analyzed by the Federal Reserve Bank of Atlanta,[23] this report projects the average wage earnings increase for DACA recipients over the next decade. This report provides estimates for the ten-year period beginning in March of 2018, the month DACA grants will begin to expire.

### C. DACA Population in March of 2018

To project the total number of individuals with valid grants of DACA in March of 2018 we use the following formula:

$$a + b - c - d = f$$

"a" represents the total number of approved initial requests as of June 30, 2017. "b" represents the projected number of approvals for all pending initial applications as of September 5, 2017. "c" represents those who have adjusted status. "d" represents those who did not renew or were not allowed to renew. And "f" represents the projected total number of individuals with valid grants of DACA in March of 2018. Data for "a" and "b" come from USCIS quarterly statistics. Data for "c" and "d" come from a one-time USCIS data release on September 5, 2017.

### D. Approval Rate

To calculate "b," we need to obtain the overall approval rate, e.g. the rate which accepted requests are eventually approved. To obtain this number, we take the total number of approved initial requests as of June 30 and divide it by the total number of accepted initial requests as of June 30.[24]

| Table A1. Approval Rate for Initial Requests | |
|---|---|
| Accepted initial requests as of June 30 | 897,605 |
| Approved initial requests as of June 30 | 793,026 |
| Approval rate | **88.35%** |

Source: *USCIS Data 2017*

## E. Pending Initial Request as of September 5, 2017 ("b")

The quarterly data shows that there are 34,298 initial accepted applications pending as June 30, 2017.[25] However, this data only represents Quarter 3, e.g. April – June of 2017. Thus, there are 67 days (July 1 through September 5) of initial pending applications not reflected in the data that we must account for when calculating "b".

To do so, we take the average number of initial accepted applications per day for Quarters 1 through 3 of 2017. We obtain this number by dividing the total number of initial accepted applications in these three quarters by 273, the number of total days in all three quarters. We then multiply the average per day by 67 to obtain the number of initial accepted applications filed July through September 5. We add the total number of initial accepted application as of June 30, 2017.

Now that we have the total number of pending applications as of September 5, 2017, we multiply this number by the approval rate to obtain the projected number of initial accepted applications filed by September 5 that will be approved by March 2018 ("b").

| Table A2. Initial Requests Accepted by USCIS | |
| --- | --- |
| Q1. Oct. - Dec. initial accepted | 15,325 |
| Q2. Jan. - March initial accepted | 10,321 |
| Q3. April - June initial accepted | 10,801 |
| Average per day | 134 |
| | |
| June 30 initial accepted | 36,447 |
| July - Sept. 5 initial accepted (projected) | 8,945 |
| Pending initial as of Sept. 5 (projected) | 45,392 |
| | |
| Approvals based on pending initial as of Sept. 5, 2017 (projected) | **40,103** |

Source: *USCIS Data 2017*

## F. DACA Approvals Grants in March of 2018 ("f")

We begin with the total number of approved initial requests as of June 30, 2017, the latest date for which data are available, which represents the total number of DACA grants ever approved ("a").[26] Next, we add the number of approvals based on all pending initial applications as of September 5, 2017 ("b"). We need to adjust this number by subtracting the number of individuals who previously held DACA but no longer do. Thus, we subtract the number of DACA recipients who adjusted status and became lawful permanent residents ("c").[27] We also subtract the number of DACA recipients who did not renew or where USCIS denied the renewal ("d").[28] This leaves us with the projected population of the total number of individuals who will hold DACA in March of 2018, or "f."

DRAINING THE TRUST FUNDS

| Table A3. Projected DACA Recipients in March of 2018 | |
|---|---|
| Approved initial as of June 30 | 793,026 |
| Approvals based on pending initial as of Sept. 5, 2017 (projected) | 40,103 |
| Adjusted status | -39,514 |
| Did not renew or renewal denied | -70,000 |
| March 2018 DACA recipients (projected) | **723,615** |

Source: *USCIS Data 2017; Grassley 2017*

## G. Expirations Per Month

As DACA recipients will lose their DACA on a rolling basis instead of all at once, we need to determine the estimated monthly losses from March 2017 to March 2020. To calculate the average number of expirations per month, we divide the total number of projected DACA recipients in March of 2018 ("f") by 24 (e.g. the number of months in two years). This assumes that previous approvals and renewals are roughly equal on a per month basis. Beginning in March of 2018, we use this number to represent the number of monthly expirations and therefore the monthly decrease in FICA contributions.

| Table B. Expirations per Month | |
|---|---|
| *Total DACA recipients* | *Expirations per month* |
| 723,615 | **30,151** |

Source: *USCIS Data 2017*

## H. Projected Wage Growth

The Current Population Survey (CPS) is a survey conducted monthly by the Bureau of Census on behalf of the Bureau of Labor Statistics (BLS). Using microdata from the CPS survey, the Federal Reserve Bank of Atlanta (the Atlanta branch of the Federal Reserve) calculates the median percentage change for wage growth on a monthly basis.[29] Averaging out the overall wage growth for the most recent ten-year period, we obtain the average median wage growth for a ten-year period—the wage growth percentage.[30] We can then employ this average wage growth to project the increase in earnings for DACA recipients on a monthly and per-year basis.

**Table C. Historic and Average Wage Growth**

| Date | Overall (%) | Date | Overall (%) | Date | Overall (%) | Date | Overall (%) |
|---|---|---|---|---|---|---|---|
| 8/1/2007 | 4.3 | 2/1/2010 | 1.7 | 8/1/2012 | 2.1 | 2/1/2015 | 3 |
| 9/1/2007 | 4.4 | 3/1/2010 | 1.9 | 9/1/2012 | 2.1 | 3/1/2015 | 3.2 |
| 10/1/2007 | 4.3 | 4/1/2010 | 1.9 | 10/1/2012 | 2.1 | 4/1/2015 | 3.3 |
| 11/1/2007 | 4.3 | 5/1/2010 | 1.6 | 11/1/2012 | 2.3 | 5/1/2015 | 3.3 |
| 12/1/2007 | 4.1 | 6/1/2010 | 1.7 | 12/1/2012 | 2.3 | 6/1/2015 | 3.2 |
| 1/1/2008 | 3.9 | 7/1/2010 | 1.8 | 1/1/2013 | 2.4 | 7/1/2015 | 3.1 |
| 2/1/2008 | 3.9 | 8/1/2010 | 2 | 2/1/2013 | 2.3 | 8/1/2015 | 3.1 |
| 3/1/2008 | 4 | 9/1/2010 | 1.9 | 3/1/2013 | 2.2 | 9/1/2015 | 3 |
| 4/1/2008 | 4.1 | 10/1/2010 | 1.7 | 4/1/2013 | 2.2 | 10/1/2015 | 2.9 |
| 5/1/2008 | 4.1 | 11/1/2010 | 1.7 | 5/1/2013 | 2.2 | 11/1/2015 | 3.1 |
| 6/1/2008 | 4.1 | 12/1/2010 | 1.7 | 6/1/2013 | 2.1 | 12/1/2015 | 3.1 |
| 7/1/2008 | 4.1 | 1/1/2011 | 1.9 | 7/1/2013 | 2.3 | 1/1/2016 | 3.1 |
| 8/1/2008 | 4 | 2/1/2011 | 1.9 | 8/1/2013 | 2.3 | 2/1/2016 | 3.2 |
| 9/1/2008 | 4 | 3/1/2011 | 1.9 | 9/1/2013 | 2.4 | 3/1/2016 | 3.2 |
| 10/1/2008 | 4 | 4/1/2011 | 1.9 | 10/1/2013 | 2.2 | 4/1/2016 | 3.4 |
| 11/1/2008 | 4 | 5/1/2011 | 2 | 11/1/2013 | 2 | 5/1/2016 | 3.5 |
| 12/1/2008 | 3.8 | 6/1/2011 | 2.1 | 12/1/2013 | 2.2 | 6/1/2016 | 3.6 |
| 1/1/2009 | 3.7 | 7/1/2011 | 2.1 | 1/1/2014 | 2.3 | 7/1/2016 | 3.4 |
| 2/1/2009 | 3.4 | 8/1/2011 | 2.2 | 2/1/2014 | 2.5 | 8/1/2016 | 3.3 |
| 3/1/2009 | 3.3 | 9/1/2011 | 2.1 | 3/1/2014 | 2.4 | 9/1/2016 | 3.6 |
| 4/1/2009 | 3.2 | 10/1/2011 | 2.2 | 4/1/2014 | 2.3 | 10/1/2016 | 3.9 |
| 5/1/2009 | 3.3 | 11/1/2011 | 2 | 5/1/2014 | 2.3 | 11/1/2016 | 3.9 |
| 6/1/2009 | 3.1 | 12/1/2011 | 2 | 6/1/2014 | 2.3 | 12/1/2016 | 3.5 |
| 7/1/2009 | 3 | 1/1/2012 | 1.9 | 7/1/2014 | 2.4 | 1/1/2017 | 3.2 |
| 8/1/2009 | 2.5 | 2/1/2012 | 1.9 | 8/1/2014 | 2.4 | 2/1/2017 | 3.2 |
| 9/1/2009 | 2.3 | 3/1/2012 | 2 | 9/1/2014 | 2.6 | 3/1/2017 | 3.4 |
| 10/1/2009 | 2.1 | 4/1/2012 | 2.2 | 10/1/2014 | 2.8 | 4/1/2017 | 3.5 |
| 11/1/2009 | 2.1 | 5/1/2012 | 2.1 | 11/1/2014 | 2.9 | 5/1/2017 | 3.4 |
| 12/1/2009 | 1.7 | 6/1/2012 | 2.3 | 12/1/2014 | 2.9 | 6/1/2017 | 3.2 |
| 1/1/2010 | 1.6 | 7/1/2012 | 2.1 | 1/1/2015 | 3 | 7/1/2017 | 3.3 |
| | | | | | | Ten-year average (%) | **2.77** |

*Source: BLS CPS 2017*

To project future wage growth for the DACA population, we begin with the Wong survey regarding the average yearly wage for DACA recipients.[31] From there, we calculate the average yearly wage growth (by increasing the annual wage by the wage growth percentage) and average monthly wage growth (by dividing the yearly wage growth by 12). During the month-by-month rolling expirations, the report uses the average monthly wage growth to determine lost contributions. When all DACA grants expire, we begin to employ the yearly wage growth instead of the monthly wage growth (because there are no longer any monthly decreases of the DACA population).

DRAINING THE TRUST FUNDS

| Table D. Projected DACA Wage Growth | | | |
|---|---|---|---|
| Year | Avg. yearly wage | Avg. yearly wage growth | Avg. monthly wage |
| 2017 | $36,232 | $1,005 | $3,019 |
| 2018 | $37,237 | $1,033 | $3,103 |
| 2019 | $38,270 | $1,062 | $3,189 |
| 2020 | $39,332 | $1,091 | $3,278 |
| 2021 | $40,423 | $1,121 | $3,369 |
| 2022 | $41,544 | $1,153 | $3,462 |
| 2023 | $42,697 | $1,184 | $3,558 |
| 2024 | $43,881 | $1,217 | $3,657 |
| 2025 | $45,099 | $1,251 | $3,758 |
| 2026 | $46,350 | $1,286 | $3,862 |
| 2027 | $47,636 | $1,321 | $3,970 |
| 2028 | $48,957 | $1,358 | $4,080 |

Source: Tom Wong Survey 2017; BLS CPS 2017

## I. Social Security and Medicare Tax Rates

The Federal Insurance Contributions Act (FICA) is a federal employment tax that requires contributions from both employers and employees to fund the Social Security and Medicare trust funds.[32] Both of these trust funds require contributions from workers to fund current, outstanding obligations to individuals who are eligible to receive benefits.[33]

The withholding rate for Social Security is 6.2% for employees[34] and 6.2% for employers,[35] for a total of 12.4%. The withholding rate for Medicare is 1.45% for employees[36] and 1.45% for employers,[37] for a total of 2.9%. Social Security tax is only applied to a certain amount of wages each year, for example, in 2016, that limit was $127,200.[38] Additionally, for Medicare, employers must withhold an additional 0.9% on wages in excess of $200,000.[39] As the average yearly wage for DACA recipients is $36,231.91,[40] we do not incorporate the $118,500 limit or additional withholding requirements into our calculations.

## J. Monthly, Yearly, and Ten-year Social Security and Medicare Losses

To estimate the loss in contributions to the Social Security and Medicare trust funds we, with a starting point of March of 2018, determine the number of individuals who would have contributed to both trust funds but cannot due so due to the end of DACA. We estimate these losses on a monthly basis for the first two years (as a result of rolling expirations) and then yearly for the last eight years (as all DACA grants have expired by this point). Additionally, we only estimate the losses for the percentage of individuals who are likely employed (based on the data from the Wong survey regarding the percentage of employed DACA recipients) as non-employed individuals do not contribute FICA taxes.

First, we determine the number of individuals with valid grants of DACA ("Valid grants") at the end of each month. We then calculate the number of individuals whose DACA will expire during each timeframe, whether monthly or yearly ("Expired grants"). We apply the Wong percentage regarding the percentage of DACA recipients employed to determine the percentage of the individuals with expired DACA who are employed ("Prev. employed."). We then multiply this population by the monthly wage or yearly wage ("Monthly wage" and "Yearly wage") to obtain the total lost wages for that month or year ("Total lost wages.") We multiply the total lost wages by the 12.4% Social Security tax rate to obtain the monthly or yearly losses to the Social Security trust fund ("Soc. sec. losses (12.4%)"). We also multiply the total lost wages by the 2.9% Medicare tax rate to obtain the monthly or yearly losses to the Medicare trust fund ("Medicare losses (2.9%)". We have twenty-four separate monthly calculations to reflect the rolling nature of DACA expiration during the first two years of the time period. We then calculate these numbers on a yearly basis during the last eight years to reflect the

portion of the ten-year time period where 100% of DACA grants are expired. We do, however, switch back to a monthly calculation for January and February of 2028 to complete our ten-year window.

**Table E. Expiration of Employed DACA Recipients and Social Security and Medicare Losses**

| Date | Valid grants | Expired grants | Prev. employed | Monthly wage | Total lost wages | Soc. sec. losses (12.4%) | Medicare lossess (2.9%) |
|---|---|---|---|---|---|---|---|
| **2018** | | | | | | | |
| Feb. | 723,615 | 0 | 0 | $3,103 | $0 | $0 | $0 |
| March | 693,465 | 30,151 | 27,558 | $3,103 | $85,513,887 | $10,603,722 | $2,479,903 |
| April | 663,314 | 60,301 | 55,115 | $3,103 | $171,027,774 | $21,207,444 | $4,959,805 |
| May | 633,163 | 90,452 | 82,673 | $3,103 | $256,541,661 | $31,811,166 | $7,439,708 |
| June | 603,013 | 120,603 | 110,231 | $3,103 | $342,055,548 | $42,414,888 | $9,919,611 |
| July | 572,862 | 150,753 | 137,788 | $3,103 | $427,569,435 | $53,018,610 | $12,399,514 |
| Aug. | 542,711 | 180,904 | 165,346 | $3,103 | $513,083,322 | $63,622,332 | $14,879,416 |
| Sept. | 512,561 | 211,054 | 192,904 | $3,103 | $598,597,209 | $74,226,054 | $17,359,319 |
| Oct. | 482,410 | 241,205 | 220,461 | $3,103 | $684,111,096 | $84,829,776 | $19,839,222 |
| Nov. | 452,260 | 271,356 | 248,019 | $3,103 | $769,624,984 | $95,433,498 | $22,319,125 |
| Dec. | 422,109 | 301,506 | 275,577 | $3,103 | $855,138,871 | $106,037,220 | $24,799,027 |
| **2019** | | | | | | | |
| Jan. | 391,958 | 331,657 | 303,135 | $3,189 | $966,748,033 | $119,876,756 | $28,035,693 |
| Feb. | 361,808 | 361,808 | 330,692 | $3,189 | $1,054,634,218 | $130,774,643 | $30,584,392 |
| March | 331,657 | 391,958 | 358,250 | $3,189 | $1,142,520,403 | $141,672,530 | $33,133,092 |
| April | 301,506 | 422,109 | 385,808 | $3,189 | $1,230,406,587 | $152,570,417 | $35,681,791 |
| May | 271,356 | 452,260 | 413,365 | $3,189 | $1,318,292,772 | $163,468,304 | $38,230,490 |
| June | 241,205 | 482,410 | 440,923 | $3,189 | $1,406,178,957 | $174,366,191 | $40,779,190 |
| July | 211,054 | 512,561 | 468,481 | $3,189 | $1,494,065,142 | $185,264,078 | $43,327,889 |
| Aug. | 180,904 | 542,711 | 496,038 | $3,189 | $1,581,951,327 | $196,161,964 | $45,876,588 |
| Sept. | 150,753 | 572,862 | 523,596 | $3,189 | $1,669,837,511 | $207,059,851 | $48,425,288 |
| Oct. | 120,603 | 603,013 | 551,154 | $3,189 | $1,757,723,696 | $217,957,738 | $50,973,987 |
| Nov. | 90,452 | 633,163 | 578,711 | $3,189 | $1,845,609,881 | $228,855,625 | $53,522,687 |
| Dec. | 60,301 | 663,314 | 606,269 | $3,189 | $1,933,496,066 | $239,753,512 | $56,071,386 |
| **2020\*** | | | | | | | |
| Jan. | 30,151 | 693,465 | 633,827 | $3,278 | $2,077,458,763 | $257,604,887 | $60,246,304 |
| Feb. - Dec. | 0 | 723,615 | 661,384 | $3,278 | $23,845,613,629.89 | $2,956,856,090 | $691,522,795 |
| | | | | Yearly wage | | | |
| **2021** | 0 | 723,615 | 661,384 | $40,423 | $26,735,051,667 | $3,315,146,407 | $775,316,498 |
| **2022** | 0 | 723,615 | 661,384 | $41,544 | $27,476,726,559 | $3,407,114,093 | $796,825,070 |
| **2023** | 0 | 723,615 | 661,384 | $42,697 | $28,238,976,748 | $3,501,633,117 | $818,930,326 |
| **2024** | 0 | 723,615 | 661,384 | $43,881 | $29,022,373,028 | $3,598,774,255 | $841,648,818 |
| **2025** | 0 | 723,615 | 661,384 | $45,099 | $29,827,502,026 | $3,698,610,251 | $864,997,559 |
| **2026** | 0 | 723,615 | 661,384 | $46,350 | $30,654,966,645 | $3,801,215,864 | $888,994,033 |
| **2027** | 0 | 723,615 | 661,384 | $47,636 | $31,505,386,511 | $3,906,667,927 | $913,656,209 |
| | | | | Monthly wage | | | |
| **2028** | | | | | | | |
| Jan. | 0 | 723,615 | 661,384 | $4,080 | $2,698,283,204 | $334,587,117 | $78,250,213 |
| Feb. | 0 | 723,615 | 661,384 | $4,080 | $2,698,283,204 | $334,587,117 | $78,250,213 |
| | | | | Total | $256,885,350,364 | $31,853,783,445 | $7,449,675,161 |
| | | | | Total Social Security and Medicare Losses Over 10 Years | | | $39,303,458,606 |

*Source: USCIS DACA Data 2017; Tom Wong Survey 2017; CPS BLS Data 2017; IRS FICA 2017*

*For Feb. - Dec., monthly wage multiplied by number of prev. employed expired grants and 11 (months Feb. through Dec.).

DRAINING THE TRUST FUNDS

## K. Additional Notes

Employers who are forced to terminate their DACA employees may engage in a variety of different conduct in regard to the open position. Some may choose to consolidate the position with another position to avoid the difficulties and turnover costs associated with identifying a new employee. Others may hire another individual at a lower introductory wage rate. And yet others may struggle to fill the position in a timely manner or at all. All of these actions would lead to a decrease in FICA contributions. This report, however, does not speculate on how employers across the nation would address the economic shock of being forced to terminate close to a million workers over the course of two and a half years or any remunerative steps they would attempt to take.

## IV. Conclusion

The end of DACA will have significant and far reaching economic impacts on contributions to the Social Security and Medicare trust funds. President Trump's decision to end DACA will cost these trust funds at least $39.3 billion over ten years, $31.8 billion from Social Security and $7.4 billion from Medicare. Passing legislation to provide permanent protection to the DACA population, however, will guarantee their contributions over the same ten-year period. Moreover, as pending legislation will likely provide protection to more than just the DACA population, these potential gains represent the floor of the contributions that DACA recipients and other immigrants eligible for relief could potentially contribute over a decade.

## End Notes

[1] Jose Magaña-Salgado, *Money on the Table: The Economic Impact of Ending DACA*, Immigrant Legal Resource Center, Dec. 2016, https://www.ilrc.org/report-daca-economic-cost.

[2] David Bier, *Ending DACA Will Impose Billions in Employer Compliance Costs*, CATO, Sept. 1, 2017, https://www.cato.org/blog/ending-daca-will-impose-billions-employer-compliance-costs.

[3] Letter from Shoba Sivaprasad Wadhia Esq., Samuel Weiss Faculty Scholar & Clinical Professor of Law Director, Center for Immigrants' Rights Clinic, Penn State Law, et. al, to President Donald J. Trump, President, United States Aug. 14, 2017, *available at* https://pennstatelaw.psu.edu/sites/default/files/documents/pdfs/Immigrants/LawProfLetterDACAFinal8.13.pdf.

[4] Memorandum from Janet Napolitano, Secretary, U.S. Department of Homeland Security, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, to David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection, et. al, (June 15, 2012), *available at* http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[5] *See* U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SECURITY, *Frequently Asked Questions* (September 9, 2017), *available at* https://www.uscis.gov/archive/frequently-asked-questions.

[6] *DACA at Four: Participation in the Deferred Action Program and Impacts on Recipients*, Migration Policy Institute, Aug. 2016, http://www.migrationpolicy.org/research/daca-four-participation-deferred-action-program-and-impacts-recipients.

[7] U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SECURITY, NUMBER OF I-821D, CONSIDERATION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS BY FISCAL YEAR, QUARTER, INTAKE, BIOMETRICS AND CASE STATUS FISCAL YEAR 2012-2017 (June 30) Sep. 20, 2017, *available at* https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals [hereinafter "USCIS DACA Data - Intake"].

[8] Tom K. Wong, *Results from Tom K. Wong et al, 2017 National DACA Survey* 3, University of California, San Diego, August 28, 2017, https://cdn.americanprogress.org/content/uploads/2017/08/27164928/Wong-Et-Al-New-DACA-Survey-2017-Codebook.pdf [hereinafter "Wong 2017 Survey"].

[9] Tom K. Wong, et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, CENTER FOR AMERICAN PROGRESS, Aug. 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[10] SOCIAL SECURITY ADMINISTRATION, *Understanding the Benefits*, 2017, https://www.ssa.gov/pubs/EN-05-10024.pdf.

[11] SOCIAL SECURITY ADMINISTRATION, *Medicare*, 2017, https://www.ssa.gov/pubs/EN-05-10043.pdf.

[12] *See* Memorandum from Elaine C. Duke, Acting Secretary, U.S. Department of Homeland Security, Memorandum on Rescission Of Deferred Action For Childhood Arrivals (DACA), to James W. McCament, Acting Director, U.S. Citizenship and Immigration Services, et. al, (Sept. 5, 2017), *available at* https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

[13] *Id.*

[14] 8 U.S.C. 1324a (West 2017).

DRAINING THE TRUST FUNDS

---

[15] *These Fortune 100 Companies Just Joined Facebook-Backed Call for 'Dreamer' Legislation*, Fortune, Sept. 20, 2017, http://fortune.com/2017/09/20/walmart-pepsi-target-dreamer-daca-legislation.

[16] *See* Dream Act of 2017, S.1615, 115th Cong. (2017), https://www.congress.gov/bill/115th-congress/senate-bill/1615.

[17] *See* Recognizing America's Children Act, HR.1468, 115th Cong. (2017), https://www.congress.gov/bill/115th-congress/house-bill/1468.

[18] Tom K. Wong, et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, Center for American Progress, Aug. 28, 2017, https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/.

[19] Jose Magaña-Salgado, *Money on the Table: The Economic Impact of Ending DACA*, Immigrant Legal Resource Center, Dec. 2016, https://www.ilrc.org/report-daca-economic-cost.

[20] Wong 2017 Survey, *supra* note 8, at 3.

[21] *Id.* at 4

[22] USCIS DACA Data - Intake, *supra* note 7.

[23] Federal Reserve Bank of Atlanta, *Wage Growth Tracker*, Sept. 14, 2017, https://www.frbatlanta.org/chcs/wage-growth-tracker.aspx?panel=1.

[24] USCIS DACA Data - Intake, *supra* note 7.

[25] *Id.*

[26] *Id.*

[27] U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, *Approximate Active DACA Recipients as of September 4, 2017 by Month Validity Expires and Status of Associated Renewal as of September 7, 2017 (If Submitted)*, Sept. 4, 2017, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_renewal_data.pdf [hereinafter "USCIS DACA Data – Active Grants"]; U.S. Senate, Office of Senator Chuck Grassley, *Data Indicate Unauthorized Immigrants Exploited Loophole to Gain Legal Status, Pathway to Citizenship*, Sept. 1, 2017, https://www.grassley.senate.gov/news/news-releases/data-indicate-unauthorized-immigrants-exploited-loophole-gain-legal-status ("The data provided indicates 59,778 DACA recipients have applied for Lawful Permanent Resident (LPR) status—also known as a 'green card'—and 39,514 have been approved.").

[28] USCIS DACA Data – Active Grants, *supra* note 27.

[29] Federal Reserve Bank of Atlanta, *Wage Growth Tracker*, Sept. 14, 2017, https://www.frbatlanta.org/chcs/wage-growth-tracker.aspx?panel=1.

[30] *Id.* (To obtain the raw data, select "Export" under the Wage Growth Tracker table).

[31] Wong 2017 Survey, *supra* note 8, at 3.

[32] 26 U.S.C. §§ 3101-3128 (West 2017).

[33] The Social Security trust fund is projected to become insolvent in 2034 while the Medicare trust fund is projected to become insolvent in 2029. *See* Carolyn Y. Johnson, *Medicare's hospital trust fund will run out of money in 2029*, WALL STREET JOURNAL, July 13, 2017, https://www.washingtonpost.com/news/wonk/wp/2017/07/13/medicares-hospital-trust-fund-will-run-out-of-money-in-2029/. A decrease in contributions, e.g. because of the removal of close to three quarter of million employees from the workforce, is thus likely to move forward the insolvency dates for both of these programs.

[34] 26 U.S.C. §3101(a) (West 2017).

[35] *Id.* at § 3111(a).

[36] *Id.* at § 3101(b)(1).

[37] *Id.* at § 3111(b).

[38] INTERNAL REVENUE SERVICE, *Topic 751 - Social Security and Medicare Withholding Rates*, April 14, 2017, https://www.irs.gov/taxtopics/tc751.html.

[39] 26 U.S.C. § 3101 (West 2017).

[40] Wong 2017 Survey, *supra* note 8, at 4.

# EXHIBIT O

# Rescinding DACA Could Spur a Public Health Crisis, From Lost Services to Higher Rates of Depression, Substance Abuse

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

 **newsweek.com**/daca-immigration-heath-care-access-mental-health-660539

Jessica Firger                                                                                      September 6, 2017

The Trump administration's announcement on Tuesday to rescind the Deferred Action for Childhood Arrivals (DACA) program will have an undeniable impact on the lives of dreamers and their families. Obama's program—enacted in 2012—has offered security for at least 800,000 people in the U.S. who grew up as undocumented immigrants.

Antonio Puente, a professor of psychology at the University of North Carolina Wilmington and president of the American Psychological Association, says such sweeping policy changes could vastly impact the health of this population by increasing the risks for depression, substance abuse and other mental health disorders. It also would leave health care services inaccessible to many people with undocumented status. Some will lose health insurance obtained through U.S. employers, while others will shirk essential visits to doctors out of fear for deportation. The result would be a health crisis for a population that is already largely underserved and marginalized.

"If the overall goal is the health and well-being of U.S. citizens, then displacing families and children is highly problematic," he says.

Nathaniel Ivers, an assistant professor of counseling at Wake Forest University in Winston-Salem, North Carolina, has worked with more than 100 clients who are undocumented immigrants, and he's witnessed how the status compromises health and limits medical care. "For undocumented clients with whom I have provided counseling, a decision was often made about whether attending a counseling session was worth the risk of driving without a driver's license, being pulled over, and later being identified by immigration," he says. "Many counseling sessions were missed when word got around that immigration officials were stepping up their enforcement."

Recommended Slideshows

67

The Best Pictures Ever Taken in Space

47

Underwater Photographer of the Year 2018 winners: Stunning sharks, shipwrecks and seahorses

51

Volcanoes from Space: 50 Breathtaking Astronaut and Satellite Photos



Eliminating DACA will mean far less access to health care services, or avoiding help even when it is available.

Gabrielle Lessard, a senior policy attorney at the National Immigration Law Center, says while people enrolled in DACA are not eligible to receive health insurance through the Affordable Care Act or Medicaid, the program has improved employment prospects for immigrants and that, in turn, has provided medical care services to many through employer-subsidized health insurance. A study

conducted by the the Center for American Progress
found 57 percent of DACA recipients reported getting a
job that provided health insurance but that will soon
change.



"There will be a lot of anxiety about not knowing what the
future will hold and fear of returning to undocumented
status," says Lessard. "DACA recipients gave an enormous
amount of information to the federal government and
many fear that it will be used in immigration
enforcement."





Rescinding DACA will compromise the health of the many who came to the U.S. as children and
registered with the federal program. Kyle Grillot/REUTERS

See all of the best photos of the week in these slideshows

Advertisement

As a result, Lessard says thousands of people will now contend with ongoing and persistent stress of losing jobs, homes and health care, which increases and exacerbates just about every chronic medical condition, including heart disease, high blood pressure and mental health problems including anxiety, sleep disorders and depression.

Research already exists that shows DACA has had a positive impact on health, particularly mental health. A study from researchers at the Harvard School of Public Health found a significant reduction in major depression among DACA recipients. The study, published in *The Lancet Public Health,* involved 14,000 Hispanic adults who were not U.S. citizens. The researchers reviewed data from the National Health Interview Survey to ascertain which people were eligible for DACA. All participants had already replied to self-reported questionnaires about their mental health before and after 2012. Overall, the researchers found that people who were eligible for DACA were 50 percent less likely to report symptoms of clinical depression at the time of completing the survey (a point at which DACA was implemented).

The positive health impact of DACA has also extended to offsprings of undocumented parents. A Stanford study found significant improvement in children's mental health when their mothers qualified for DACA. Jens Hainmueller, a professor at Stanford University and Immigration Policy Lab and lead author on the study published last week in *Science,* looked at Medicaid claims of children to track health outcomes, specifically diagnoses of adjustment and anxiety disorders. The study focused on these mental health diagnoses because they're "caused by external stressor rather than a genetic or physiological reason," says Hainmueller. The study found the number of diagnoses dropped by more than half after implementing the DACA program, from a rate of 7.8 percent to 3.3 percent.

Removing the program could put the health at risk of 4 million children who were born in the U.S. and have at least one undocumented parent. The Trump administration's decision could also further tax the U.S. health care system since early childhood mental disorders are the largest pediatric medical expenditure in the U.S. That, of course, depends on whether parents of these children actually seek out health care for their children. Hainmueller suggests that ending DACA could create circumstances in which mothers are faced with immediate deportation, and are afraid to interact with the health care system and the schools on behalf of their children.

"Those results clearly suggest if these families were to be ripped apart, the consequences of the mental health of the children would be highly detrimental," says Hainmueller. "There's pretty strong evidence that these mental health disorders are linked to depression later in life and worse economic outcomes, as well. The consequences of deporting the mothers for the children are likely to be pretty devastating."

# EXHIBIT P

# Will DACA Parents Be Forced to Leave Their U.S.-Citizen Children Behind?

The program offered beneficiaries a sense of security, but with work permits set to expire in the coming months, many of them are having to consider what comes next for their families.



Michael Claros, 8, of Silver Spring, Maryland, attends a rally in favor of immigration reform, at the White House. The eight-year old is a U.S. citizen whose parents would have been eligible for Deferred Action for Parents of Americans, an Obama era policy memo that the Trump administration has since formally revoked.

Jacquelyn Martin / AP

**PRISCILLA ALVAREZ**

OCT 21, 2017    |    POLITICS

Want to receive exclusive insights from The Atlantic—while supporting a sustainable future for independent journalism? Join our new membership program, The Masthead.

With the cancellation of the Deferred Action for Childhood Arrivals program, an estimated 200,000 children are at risk of losing their parents.

In September, the Trump administration announced it was rescinding DACA pending a six-month delay. The program is an Obama-era initiative that shields undocumented immigrants who were brought to the U.S. as children from deportation, and allows them to work legally in the country. Unless the Republican-controlled Congress passes a law granting them legal status, they could soon be subject to deportation. That uncertainty has instilled fear among many of the nearly 700,000 DACA recipients, but particularly those who are parents of U.S. citizens.

"It's been really tough, it's been a rollercoaster of emotion," said Eliana Fernandez, a DACA recipient and mother of two children, ages 10 and 5. "What's going to happen with my life, with my work, with my children? I've been trying to process everything."

The vast majority of DACA expirations will come after March 5, 2018. According to the Department of Homeland Security, 275,344 individuals will have their work permits expire next year and 321,920 work permits are set to run out from January through August 2019. That means that hundreds of thousands of immigrants will suddenly be eligible for deportation and lose their ability to work legally in country.

Though often described as "kids," a majority of DACA beneficiaries are in their 20s —and some of them have children of their own. A recent study conducted by Tom Wong of the University of California at San Diego along with the Center for American Progress, National Immigration Law Center, and United We Dream found that 25.7 percent of DACA recipients have a child who is a U.S. citizen. "If extrapolated to the total population of DACA recipients, this suggests that at least 200,000 U.S. citizen children live in the U.S. currently who have a DACA recipient for a parent," Wong told told *The Daily Beast*.

While DACA was always supposed to be temporary, the ultimate outcome was meant to be legal status for its recipients, not deportation. Lawyers and immigrant-rights groups are working to address that by helping DACA parents map out what few options they have, and prepare for the possibility of deportation, in anticipation of their permits expiring. The National Immigration Law Center hosted a call this

month to discuss the impact of terminating the program on the children of beneficiaries. "Many young people with DACA are parents, the majority to U.S. citizen kids. These children should be entitled to the same rights and opportunities as any other child," said Marielena Hincapié, the executive director of the center.

Trying to obtain legal status is out of the question for many DACA recipients. The process to becoming a lawful permanent resident requires individuals to have a qualifying petitioner and to have entered—and resided in—the country legally. The latter requirement bars a majority of DACA beneficiaries from obtaining legal status since they came into the U.S. illegally to begin with or they overstayed their visas.

## "The bottom line is: If there were some other form of relief, most DACA recipients would've already done it and been in the process."

Some DACA recipients might be eligible for cancellation of removal, which would shield them from deportation and provide them a green card. "What you have to prove is that you've been in the United States for 10 years, that you have a good moral character and your deportation would result in extreme, unusual, and exceptional hardship to a qualifying relative. It can be a child, parent, or spouse," said Michelle Saenz-Rodriguez, an immigration lawyer in Dallas, Texas. Chances of qualifying are slim, however: Immigration judges are only permitted to grant 4,000 cancellations of removal per fiscal year. DACA parents are also having to consider power of attorney, the act of appointing someone to manage private affairs in their absence.

Saenz-Rodriguez's law office has received five or six queries per week about alternatives since the administration's announcement to terminate DACA. "I think all the advocates are looking at whatever mechanisms are available," Saenz-Rodriguez said. "The bottom line is: If there were some other form of relief, most DACA recipients would've already done it and been in the process."

DACA recipients are overwhelmingly from mixed-status families: some relatives are undocumented while others are U.S. citizens. DACA opened the door to opportunities, like earning a legal income, providing its beneficiaries with a sense of security.

For Fernandez, an immigration case manager for Make the Road New York, a Latino advocacy organization, DACA allowed her to provide for her family. "I, thankfully to DACA, was able to graduate [from] college, work in the line of work like I always wanted to do. I became a homeowner," she told me. Now, Fernandez, among other DACA parents, is having to grapple with how she'll take care of her family and what to do if she's detained.

Trump has said that DACA recipients, all of whom must have a clean criminal record to qualify, are not enforcement priorities: "We are focused on criminals, security threats, recent border-crossers, visa overstays, and repeat violators. I have advised the Department of Homeland Security that DACA recipients are not enforcement priorities unless they are criminals, are involved in criminal activity, or are members of a gang," he said in a statement.

But according to Immigration and Customs Enforcement figures, there was an increase in "non-criminal" arrests between January 22 and April 29 compared to the same period in 2016, around 10,800 in 2017 to 4,200 in 2016.

Karina Velasco, a DACA recipient and mother of a two-year-old girl, has had discussions with her husband about the possibility of being detained. "We discussed what would happen if a raid happens. We know that Immigration and Customs Enforcement is not going to honor DACA," she told me. "We're working on a plan: What's going to happen? I don't want my daughter to not have her mother; I don't want my husband to not have his wife." Velasco is in the process of adjusting her status to become a lawful permanent resident.

Concerns about what may happen to an undocumented parent can take an emotional toll on a child and hinder their integration into society. "Although they have a secure status, the constant fear of losing a parent or coming home and not

knowing if your parent is going to be here is something we've seen rise," said Sally Kinoshita, the deputy director of the Immigrant Legal Resource Center, which frequently works with undocumented parents with U.S. citizen children. Kinoshita added that over time, some DACA recipients have adjusted their status to become lawful permanent residents.

Still, the Trump administration's decision to end DACA effects hundreds of thousands of its beneficiaries, and as many prepare to face the risk of deportation again, they'll also have to wrestle with what comes next for their families, including their American children.

## Related Video



ABOUT THE AUTHOR



PRISCILLA ALVAREZ is an assistant editor at The Atlantic.

 Twitter

# EXHIBIT Q



# Fear and uncertainty for Dreamers as Daca ends: 'Where am I going to go?'

As the Trump administration terminates the program that protected young undocumented immigrants, those affected are anxious about the future

●

**Julia Carrie Wong in San Francisco**

Tuesday 5 September 2017 20.07 EDT

Reyna Montoya was on a plane, Sheridan Aguirre was standing outside the White House, and Concepcion Solis had arrived at work early to be in front of her computer when US attorney general Jeff Sessions upended their lives.

"I was debating whether or not I should come to work because I knew it was going to be hard," Solis said. "But what can I do? Now more than ever I need to continue working."

The Trump administration's termination of the policy that protected "Dreamers" – undocumented immigrants who were brought to the US as children – from deportation will affect nearly 800,000 young people. Five years after Barack Obama's implementation of Deferred Action for Childhood Arrivals (Daca) allowed recipients to get driver's licenses, attend college, begin

careers, purchase homes, and do all the other things that US citizens take for granted, Dreamers now face the reality that it could all be taken away.

For Solis, that means preparing for a future without her well-paid job at an insurance company and her rent-controlled apartment in her hometown of Oakland.

"My work permit expires in September, so I have until September," the 30-year-old Daca recipient said. "I need to work as much as I can right now and save as much money as I can."

Among Solis's most pressing concerns is the fact that she provided the federal government with extensive information about herself in order to receive Daca in the first place. "Immigration has my address," she said. "So come September, what's going to happen?

"I can't stay there, but where am I going to go?"

Montoya, a Daca recipient and the founder of a grassroots immigrant rights organization in Phoenix, Arizona, was concerned not just for herself but for the people who work for her.

"I have as an employee a US citizen," she said Tuesday. "What does it mean if I get taken away?"

For Angelica Hernandez, a mechanical engineer at an energy efficiency company in Chandler, Arizona, the stakes are incredibly high. Hernandez was born in Mexico, but came to the US at the age of nine. She received Daca when she was studying for a master's degree at Stanford. She bought a house, married another Daca recipient, and has two children who are US citizens.

"Because of all of the rumors, you kind of mentally prepare for what could happen, but you're never actually fully prepared," she said. "I don't qualify for any type of way for me to become legalized. We're definitely looking at a plan to protect my daughters in case we are deported."

Trump's decision to rescind the program puts the onus on Congress to address the situation of the Dreamers – and all 11 million undocumented immigrants in the US – legislatively. It also raises the prospect of unsavory negotiations pitting one group of immigrants against another: White House press secretary Sarah Huckabee Sanders said Tuesday that Trump would not support a standalone bill granting legal status to Dreamers.

On Tuesday night, more uncertainty was thrown into the mix when Trump tweeted cryptically that if Congress did not act, then he would "revisit this issue".

For activists like Sheridan Aguirre, a Daca recipient and organizer with United We Dream, political dealmaking would be untenable.

"We will not be used as bargaining chips," Aguirre said Tuesday morning from outside the White House, where he had joined a rally and protest. "We do not want any legislation that throws our parents under the bus and results in them being criminalized, or adds more money for border enforcement."

10/17/2017                    Fear and uncertainty for Dreamers as Daca ends: 'Where am I going to go?' | US news | The Guardian



Belen Sisa, Daca recipient and senior at Arizona State University.
Photograph: The Guardian

The recision of Daca was met with outrage from Democratic lawmakers, business and technology leaders, and immigrant rights advocates. Protests erupted in cities across the country, including Denver, where thousands of high school students walked out of school.

Belen Sisa, 23, a Daca recipient and senior at Arizona State University, joined one of those protests, marching with fellow immigrant rights activists to the Immigration and Customs Enforcement (Ice) office in Phoenix after Sessions' announcement Tuesday morning.

But as the march continued, Sisa had to peel away to go inside. She had a 12pm appointment to have her fingerprints taken - one of the steps she must fulfill to have her Daca status renewed for two more years.

"I feel very happy that I'm going to be able to fit into the window of people who are going to be able to renew, but it also makes me a little bit mad," Sisa said. "I'm going through this entire application process, paying fees, and doing all these things that they expect of me, when the message is really clear that I'm not valued as a human.

"They just go about business like nothing happened. The person who was taking my fingerprints asked me how my morning was."

# Since you're here …

… we have a small favour to ask. More people are reading the Guardian than ever but advertising revenues across the media are falling fast. And unlike many news organisations, we haven't put up a paywall - we want to keep our journalism as open as we can. So you can see why we need to ask for your help. The Guardian's independent, investigative journalism takes a lot of time, money and hard work to produce. But we do it because we believe our perspective matters - because it might well be your perspective, too.

I appreciate there not being a paywall: it is more democratic for the media to be available for all and not a commodity to be purchased by a few. I'm happy to make a contribution so others with less means still have access to information. *Thomasine F-R.*
If everyone who reads our reporting, who likes it, helps to support it, our future would be much more secure.

Become a supporter

Make a contribution

Topics

- US immigration
- Trump administration
- Donald Trump
- US domestic policy
- news

# EXHIBIT R

 **Donald J. Trump**
@realDonaldTrump

Follow

Border Patrol Agents are not allowed to properly do their job at the Border because of ridiculous liberal (Democrat) laws like Catch & Release. Getting more dangerous. "Caravans" coming. Republicans must go to Nuclear Option to pass tough laws NOW. NO MORE DACA DEAL!

6:56 AM - 1 Apr 2018

**36,169** Retweets  **129,826** Likes



40K          36K          130K

# EXHIBIT S

7/19/2018                    DACA helped some immigrants finally get health care. Now they could lose it. - Vox

# *Vox*

# DACA helped some immigrants finally get health care. Now they could lose it.

When you're afraid to even go outside, you can't go to the doctor.

By Anna North | Sep 28, 2017, 10:00am EDT



DACA supporters at a rally in Las Vegas on September 10, 2017.  |  Photo by Ethan Miller/Getty Images

When she was working as a family medicine doctor in Fresno, California, earlier this year, Anjani Kolahi brought an ultrasound machine to the fields where some of her patients worked.

She and her colleagues knew that many undocumented farm workers in the area weren't visiting their health center, even though they qualified for affordable care. Kolahi wanted to bring that care to them.

She found two women in their third trimester of pregnancy, one over 40 and one a teenager. Neither had received any prenatal care. "That moment was actually joyous," said Kolahi, a fellow with **Physicians for Reproductive Health**. "They could see their baby; they could hear the baby's heartbeat."

But going without prenatal care can be risky for mother and baby. Unfortunately, lack of insurance and fear of deportation mean undocumented immigrants often don't receive necessary reproductive health care.

Deferred Action for Childhood Arrivals (DACA) helped some recipients get access to health care. But now that President Trump has rescinded the program, leaving Congress to come up with a replacement, DACA recipients' future is in doubt — and that includes their ability to get the care they need to stay healthy and plan their families.

## Rescinding DACA puts some recipients' health insurance at risk

Immigrants face some obstacles to health care even if they are legal residents — as the **National Women's Law Center** notes, they are barred from Medicaid and the Children's Health Insurance Program (CHIP) for the first five years of their legal status. DACA recipients are also barred from Medicaid and CHIP, and from buying insurance on the Obamacare exchanges.

DACA, which granted recipients a **work permit**, helped some people get insurance through work, said Luis Serrano, who works on communications and digital media strategy for the California Immigrant Youth Justice Alliance and is a DACA recipient. In a survey by the **Center for American Progress**, **57 percent** of DACA recipients said they'd gotten a job with health insurance after their DACA application was approved. "I think DACA did bring a lot of stability for folks' health, physically and mentally," Serrano said.

Some of that stability is reflected in public health research. A study recently published in *Science* found that children of mothers who were eligible for DACA had lower rates of anxiety and adjustment disorders than children whose mothers were ineligible.

But due to the president's decision to rescind DACA, recipients are now in a kind of limbo. As **Vox's Dara Lind** explains, the president has promised to "revisit" the issue if Congress doesn't come up with a plan within six months to grant DACA recipients permanent protections. Even if Congress does come up with such a plan, it's not at all clear what would happen to recipients whose protections — and work permits, and ability to access health care — expired in the meantime. And the deadline for applicants to renew, October 5, is fast approaching.

## Another barrier to care is the fear of deportation

Undocumented immigrants sometimes avoid visiting hospitals or clinics because they're afraid of being deported, said Matthew Lopas, a health policy attorney at the National

Immigration Law Center. Kolahi's patients typically didn't come to the health center until they were very sick, she said. One reason: They were afraid of "being in a computer somewhere and giving their information."

The Health Insurance Portability and Accountability Act (HIPAA) prevents some of patients' information from being shared, said Lopas. And the Department of Homeland Security, under President Obama, issued guidance recommending that immigration authorities not enter hospitals or clinics. In the past, authorities have generally followed the guidance, Lopas said. But in May, a Border Patrol agent came to the Texas hospital where Oscar and Irma Sanchez, who are undocumented, had taken their sick infant son, reports **John Burnett at NPR**. Agents followed the couple to another hospital where the baby was to have an operation, and then arrested them. Their lawyer will seek permission for them to stay in the country with their son, now largely recovered, and three other children.

Even if Border Patrol or Immigration and Customs Enforcement (ICE) agents don't enter a medical facility, their presence can be intimidating. Kolahi assured her patients in Fresno that the health center staff would protect their identities, she said. But that didn't carry much weight when her patients saw an ICE van a few blocks away.

In some border areas, getting to a hospital or clinic can mean driving through a Border Patrol checkpoint, noted Kelli Garcia, the director of reproductive justice initiatives at the National Women's Law Center. That poses an added risk for undocumented immigrants seeking care. "When people are afraid to go outside, when they are afraid to get in their cars and drive, when they could get deported for dropping their kids off at school," said Garcia, "that fear is going to keep people from being able to get both health care for themselves and health care for their children."

DACA granted recipients **protection from deportation**, but now the future of that protection is uncertain. Some DACA recipients, including a mother of young children, have already been **detained** or **deported** (**the ACLU**, meanwhile, has filed a complaint against ICE for its treatment of pregnant women in immigration detention). Earlier this year, Attorney General Jeff Sessions said that DACA recipients would not be targeted for deportation, but did not offer any assurance that they would not be deported, according to the **Chicago Tribune**.

Serrano said that inability to afford care was a bigger issue for many DACA recipients than fear of deportation. But, he said, "the removal of DACA is causing a lot of anxiety."

And increases in deportations and raids under President Trump, as well as some of his executive actions, have created a new sense of uncertainty among immigrants, Lopas said. "The lack of solid information that people have to make decisions on right now is really leading folks to be as cautious as they can be."

**Lack of care can lead to unintended pregnancy, illness, and other problems**

Immigrant women in general are at disproportionate risk of a variety of reproductive health problems, in part because of lack of access to care, according to the **National Women's Law Center**. They are less likely to be screened for cervical cancer than women born in the United States, and so Asian and Pacific Islander and Latina immigrant women are more likely to get cervical cancer than US-born women, and more likely to die from it. Immigrant women are also less likely to get contraceptive care and more likely to have an unintended pregnancy.

Lack of prenatal care can mean undocumented immigrant women don't receive screening for conditions like gestational diabetes or infections that could be transmitted to the fetus, said Kolahi. They also miss out on the information and reassurance that a doctor can provide, especially for first-time parents.

When undocumented immigrant women seek abortions, they face all the obstacles women born in the United States face, including restrictive laws and a dearth of providers, along with problems unique to their immigration status, Garcia said. Add in the need to pass through a checkpoint to get to a clinic, and undocumented immigrant women may be unable to get an abortion at all, or may have to push the procedure until later in pregnancy when it is more expensive.

Uncertainty about the future of DACA and other immigration policies can also affect immigrants' family planning decisions. Fears of being deported or of losing a scholarship or other opportunities because of immigration status can keep people from having the children they want to have, Garcia said. "All of those things can get in the way of being able to make the decision that really is the right one for you."

One of Kolahi's former patients, a naturalized citizen in her 20s, is in a relationship with a young man who is a DACA recipient, Kolahi said. When Trump rescinded DACA, they decided to get married. "It's just so awful that this external US policy is now pressuring them to get married," Kolahi said. "It's a very personal decision that you have to be ready for."

**DACA recipients need more access to health care, not less**

To make sure undocumented immigrants get the reproductive health care they need, preserving the Affordable Care Act is an important first step, Garcia said. Then DACA recipients and undocumented immigrants need to be allowed to get Medicaid and CHIP coverage and buy insurance on the exchanges. Beyond that, she said, "we really need to make sure that providers have policies in place that make it possible for people to access care and know that their information is not going to be used to call immigration."

Many reproductive health providers, including Planned Parenthood, have stepped up to offer care regardless of immigration status, said Lopas. Providers have certain legal rights they can assert to prevent patient information being taken by the government (the National Immigration Law Center has **a list** of these rights). For undocumented patients, Lopas said, "one of the biggest protections is really just the providers themselves."

Changes in immigration policy — namely, an end to detention and deportation — are also necessary to truly safeguard all immigrants' access to health care, Serrano said. He also advocates for a single-payer system that includes coverage for immigrants. "Even as we hear conversations about single-payer, we don't hear if immigrants are going to be included," he said.

Ultimately, keeping undocumented immigrants from getting necessary health care is bad for everyone, Garcia said. Health care is more expensive when people can't get it until they're very sick. And lack of health care increases the risk of chronic illness, which can make people unable to work or be active in their communities. When it comes to immigrants and health care, Garcia said, Americans need to take a broad view: "What kind of society do we want to live in?"

# EXHIBIT T

# Undocumented Immigrants Putting 'Health On Hold' Out Of Fear, Anxiety In Uncertain Times

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

✔ **houstonpublicmedia.org**/articles/news/2017/09/15/237573/undocumented-immigrants-putting-health-on-hold-out-of-fear-anxiety-in-uncertain-times

September 15, 2017

## News

From the temporarily delayed Senate Bill 4 , which cracks down on "sanctuary cities," to the decision to wind down a program that gives work permits to...

Stephanie Kuo, KERA News

| Posted on September 15, 2017, 12:33 PM



STEPHANIE KUO / KERA NEWS

Employees at Jefferson Dental Clinic in Dallas have to reassure patients who are undocumented that they are safe. Many undocumented immigrants are forgoing health care out of fear of deportation.

From the temporarily delayed Senate Bill 4, which cracks down on "sanctuary cities," to the decision to wind down a program that gives work permits to young people living in the country illegally, undocumented families in Texas are on edge.

They're afraid of getting deported, and that fear has kept many from feeling safe outside their homes. For some, that means skipping out on doctor's appointments and forgoing necessary medical care.

Listen to the KERA radio story.

Case 1:18-cv-00068   Document 195-2   Filed on 07/20/18 in TXSD   Page 152 of 407

7/19/2018                    Undocumented Immigrants Putting 'Health On Hold' Out Of Fear, Anxiety In Uncertain Times – Houston Public Media

The recent wave of state and federal policies cracking down on illegal immigration and the swirl of what's perceived as anti-immigrant rhetoric over the past year have turned anxiety about deportation into a real fear for many undocumented families.

And that fear has become toxic, Juan Carlos Cerda says.

**Under stress, health falls by the wayside**

Cerda is a "Dreamer" – undocumented and a recipient of the Deferred Action for Childhood Arrivals program, known as DACA. His parents brought him to the U.S. illegally when he was just 7 years old, and for the past 17 years they've called Dallas home. He's now an immigration campaign organizer at the Texas Organizing Project.



"A lot of people in the community are just worried about going out into the streets and coming in contact with a raid or just seeing ICE officers, so there's a lot of fear, a lot of threats coming from a lot different places," Cerda said.

He said his greatest fear is losing family – and many like him are willing to risk a lot to stay together – even their own health.

"Sometimes when we're under a lot of stress, we forget about basic things like breathing. We put our health on hold. We lose sleep, we don't drink enough water, and we don't eat healthy things," Cerda said. "It can be really hard to talk to people even about what we're feeling – why we miss an appointment, why we're acting a certain way, why we're shying away from things. We just want to protect ourselves."

**Higher no-show rates**

It isn't just happening in North Texas. It's widespread, according to Karen Mountain, who is the CEO of the Migrant Clinicians Network. The Austin-based nonprofit provides training and support to 10,000 federally qualified health centers around the country. Last year, they served 24 million people – many of them are undocumented.

"What we're finding and hearing from all over the country is a huge concern around whether or not seeking routine care and preventative care as well as care for their children, who may be documented, is going to put those families in jeopardy of deportation," Mountain said.

In a recent Migrant Clinicians survey, two-thirds of the clinics that responded said their immigrant patients have been reluctant to seek health care.

"What we heard was a real significant uptick in the no-show rates. Parents are unwilling to take their kids to the doctor because even though the children may be documented, the parent may not be," she said. "And they're also concerned about buying insurance for their kids because that would necessitate them specifying where they live and being able to have their economics tagged."

Some clinics from the survey report their patients are worried about providing personal information – wary of where it would go and how it might be used against them. Some are also trying to save money in case loved ones are detained. Mountain said opting out of doctor's visits, though, can be harmful.



"We are looking at immunizations for infectious disease, delaying or preventing very costly care at the end stage of diabetes or hypertension, multiple hospitalizations for children with asthma because they are in poor control because their parents are afraid to bring them into care," she said.

This all comes amid a heightened anxiety among Americans about the future of the Affordable Care Act, and rising medical costs and insurance premiums. Many wonder why citizens, who can barely afford their own health care, should support those living here illegally. One health provider that was surveyed said that they had been receiving animosity from the local non-immigrant community for serving migrant workers and possible undocumented immigrants.

"It's not our job as clinicians to police people. It's not our job as clinicians to deny people care," Mountain said. "When that happens, we all suffer because it is more costly to the healthcare delivery system to treat end-stage disease than to catch it early."

Mountain said it only takes one story about an immigration raid or deportation to scare a family away. For instance, in April, 75 undocumented immigrants were arrested in North Texas in a federal immigration operation – and a third didn't have criminal histories. Mountain said it's up to doctors to placate those fears and support those communities in the few ways they can.

**Calming the community**

The Los Barrios Unidos Community Clinic in West Dallas released a video on its Facebook page earlier this year to address concerns from its patients, the majority of whom are Latino and uninsured. The video clarifies why they ask for certain pieces of information, it promises confidentiality and expresses solidarity with their undocumented patients during what they call "uncertain times."

A clinic spokesperson said this trepidation is nothing new; in fact, they began fielding questions from patients before the presidential election in November.

Doctors and social workers at community clinics are relying on technology like the Los Barrios Unidos video to provide the best possible care for undocumented patients. They're turning to methods like texting appointment reminders and consulting via telemedicine – anything that can effectively reach out to under-served populations and ensure some degree of privacy.

At Jefferson Dental Clinic, they've deployed a social media campaign and a Spanish website called Estamos Contigo, which translates to "We are with you." The network of dental clinics has served low-income, multicultural communities across Dallas-Fort Worth for half a century.



Earlier this year, the clinic hosted a "Know Your Rights" panel with Telemundo, civil rights lawyers and the Mexican Consulate. They livestreamed the event on Facebook for those who were uncomfortable leaving home.

Dr. Renee Townsend is the regional dental director of Jefferson Dental. She said several of their clinics have noticed a downturn in appointments and emptier waiting rooms. It's hard to quantify, she said, but the fear is undeniable.

"We have to constantly assure our patients that we will give them good care in a very private setting," Townsend said. "I can't think of one single time that we've ever had an immigration officer come into our offices. So we give constant assurance that at least in our office, they are safe."

For the medical community, treating undocumented patients isn't just about addressing their physical ailments. It's about understanding and accommodating what patients experience outside the clinic doors.

Copyright 2017 KERA. To see more, visit KERA.

## Share



**Related**



## In-Depth: Houston's Asylum Seekers Face Difficult Legal Paths Ahead



## U.S. House Eyes $5 Billion For Border Wall, Setting Up Showdown With Senate



## How RAICES Plans To Spend $20 Million In Donations To Help Detained Families



## Analysis: An Immigration Fiasco On The U.S.-Mexico Border, In One Government Chart

### Most Viewed

- Uncovered Remains At Forgotten Sugar Land Grave Site Tell Their Own Texas History Story
- Anonymous Gift Of $3 Million Pays Tuition For Entire First Class At UH College Of Medicine
- Firefighters Union Urges City Of Baytown To Drop Lawsuit On Firefighter Who Had Cancer
- Houston Churches Remove 'No Guns' Signs, Citing Safety Concerns
- Corps Funding Will Cover Less Than A Third The Cost Of A Coastal Spine

# EXHIBIT U

BY VIRGINIA FAY / JUNE 12, 2017

# Back into the shadows: Immigrants retreat from needed services as deportation fears loom



Peninsula Press

Back into the shadows

SOUNDCLOUD

Share

O n a recent April afternoon, Maria, paralyzed with fear, shrunk into herself as her abusive husband told a judge hearing her restraining order case that she's an illegal immigrant, a liar, who shouldn't be here and only married him for the visa.

"She was terrified. She was terrified that the judge was going to be like, 'oh, well in that case, we're calling ICE (U.S. Immigration and Customs Enforcement) right now,'" said Sophora Acheson, a manager at Ruby's Place in Hayward, the domestic violence shelter where Maria sought help.

Maria, a pseudonym, because Ruby's Place doesn't identify any of its clients, arrived at the shelter in March. Now in her early thirties, she came to Los Angeles from Mexico over a decade ago, and moved to Northern California to marry her now-husband, who turned out to be abusive and alcoholic. They wed in 2015, and she left her factory job before giving birth prematurely to her son last year.



(http://peninsulapress.com/wp-content/uploads/2017/06/IMG_2938.jpg)

*A room in one of Ruby's Place's apartments for domestic violence survivors. (Virginia Fay/Peninsula Press)*

Afraid that her husband, who had abused her physically, verbally and financially, had begun physically abusing their six-month-old baby, she came to Ruby's Place. Her husband threatened that if she reported the abuse, he'd report her and her parents' undocumented status and have her baby taken away.

After weeks of working with staff at Ruby's Place, Maria overcame fears of deportation enough to seek a restraining order. Now, she worries about keeping custody of her son. Using a mother's undocumented status against her in custody hearings is a typical move for an abuser, Acheson says.

Fear of deportation has always been a barrier to immigrants approaching law enforcement, especially those who are undocumented. Compounding the issue, domestic and sexual violence are chronically underreported from all demographics. But in recent months, that fear has multiplied to a new degree because of President Donald Trump's pledges throughout the campaign and since taking office to crack down on illegal immigration and build a border wall with Mexico.

Julia Mass, an immigration lawyer for the ACLU, said in an interview, "What's changed is, the Trump administration has no priority enforcement, so they're going to enforce against anybody they come across," a policy that has raised anxiety to an extreme for many immigrants.

Even in Northern California, where many cities and counties have designated themselves sanctuaries, indicating local law enforcement will not work with ICE, fear is rife.

Immigrants have retreated not just from law enforcement, but from services of all kinds. Parents are afraid to send their children to school in case they're taken in an ICE raid during the day and their children have no one to return to. Others fear using medical services — clinics note that some patients with chronic illnesses have stopped showing up for treatment. Even legal immigrants are afraid. In some areas, they've unenrolled from CalFresh, government food benefits only available to legal residents.

And, many immigrant women across Northern California are too afraid to file for restraining orders, report abuse or seek U visas — predominately for victims of domestic and sexual violence — which require working with law enforcement.

Acheson said before Trump took office, roughly half of their undocumented domestic violence clients were interested in working with police and filing for U visas. Now, "maybe ten percent are willing or will request any sort of legal services," Acheson said. "And especially [if] they

have to be in direct contact with the police and working with them for prosecution, they'll flat out just say no, absolutely not."



(http://peninsulapress.com/wp-content/uploads/2017/06/IMG_2932.jpg)

*Sophora Acheson reviews the board tracking all families living at Ruby's Place in the intake room. (Virginia Fay/Peninsula Press)*

When survivors do come in for help, they are often so scared that they won't stay more than a few days or a week, even packing up their belongings and bolting in the middle of the night, under cover of darkness. "We haven't really seen that in the past. Maybe once in a blue moon that would happen," Acheson said. "Now, one in five undocumented families that come in will only stay a week and then flee, because they feel that they're safer running, than sort of being a 'sitting duck' as they've called it."

Police chiefs in Houston and Los Angeles have announced concerning decreases in reports of sexual and domestic violence by Hispanic and Latina women. San Francisco's police department's data show a 14 percent decrease in reports of domestic violence by Hispanic women in the first three months of the year, compared to the same time period in the previous year. Sgt. Michael Andraychak of the San Francisco Police

Department said they cannot attribute this drop to any particular reason, though they are aware of deportation concerns in the immigrant community. "Our goal is to reassure the community that victims or witnesses of any crime can come forward and report those incidents to the police without concerns of their immigration status being questioned," Andraychak said in an email.

Many other local law enforcement agencies, immigration lawyers and shelters say it's too early in the administration to release data. But, from Livermore to Sacramento, organizations report observing increased fear causing immigrants to retreat from the services they need, and the data they do have echoes this.

As women shy away from reporting crimes, they turn to resources like hotlines to get help escaping abuse without involving law enforcement. Undocumented immigrants "are already so marginalized, and they're getting nabbed by ICE and detained all the time, so it's really scary for survivors of domestic violence … to come forward right now," said Jill Zawisza, executive director of WOMAN Inc., a nongovernmental agency that serves domestic violence survivors in San Francisco.

Since Trump's election, WOMAN Inc. has received about 10 percent more calls to its domestic violence hotline and an increase in therapy appointments from people who don't want to involve law enforcement. "There's definitely something going on," Zawisza said. "A lot of people who want to connect, people who want to talk to someone, people who don't want to interface with the police department for a myriad of reasons."

Service providers like WOMAN Inc. are uncertain about how to advise their clients. "We basically tell them that anytime they call the police department to their home or into their situation, that they're losing an element of control," Zawisza said. Given San Francisco's sanctuary status, she said undocumented immigrants have a better chance of safely interacting with law enforcement, but fear is still pervasive.

"We can't wholeheartedly assure people that they're not going to get in trouble if they call the police department. It's hard to know how to respond," she said.



([http://peninsulapress.com/wp-content/uploads/2017/06/IMG_2877.jpg](http://peninsulapress.com/wp-content/uploads/2017/06/IMG_2877.jpg))

*The playground at Ruby's Place is strewn with toys used by children staying at the shelter. (Virginia Fay/Peninsula Press)*

Morgan Weibel, executive director of the San Francisco Bay Area office of Tahirih Justice Center, which specializes in legal services for immigrant women, says this is a pressing moral issue for advocates. "The current climate and situation, for me at least, has taken away my personal feeling that I could responsibly tell someone you have absolutely nothing to fear," she said.

Local police departments, however, are also concerned about how this climate is affecting their relationships with immigrant communities, and they're conducting outreach to maintain communication.

Capt. John Spicer, who works closely with the immigrant community in Redwood City, said his department has seen a noticeable dampening effect on victims' and witnesses' willingness to come forward, making it

increasingly difficult for police to intervene. Such fear, he says, "means that crime is able to flourish a little more," which impacts everyone's safety.

This effect extends far beyond domestic and sexual violence survivors. "I don't think it matters what the crime is. I think people will see law enforcement and the justice system as something that is now less accessible to them and potentially threatening to them because they're concerned that the federal government will somehow get that information and use it to deport them."

In early March, a man in Redwood City began shooting through the walls of his apartment and into neighbors' homes in the middle of the night. Police came to the small, gray apartment complex, and began evacuating adjacent residences as the shooter's gunshots blasted through walls, but one resident refused to leave.

This person could hear gunshots and see officers in uniform, but was convinced that the entire situation was "a ruse being used by the federal government to get them out and take them into custody," Spicer said. As an undocumented immigrant, "that person was in peril because they really mistrusted any form of authority."

## Driver's licenses

Fear of interacting with authorities is also affecting immigrants who want to obtain driver's licenses. In January 2015, California passed a law, AB 60, allowing residents without social security numbers to get driver's licenses. A recent Stanford study found that issuing licenses to undocumented immigrants decreased hit-and-run incidents and increased traffic safety.

Data from the DMV shows a steady decrease in AB 60 licenses issued since the program went into effect, which the department attributes to an initial rush of applications when the program began.

But Gina Gates, who runs free Spanish-language driver's education workshops for immigrants applying for AB 60 licenses in San Jose, has noted increased fear and reluctance to apply for licenses since Trump's campaign.

Following the election, she stopped offering classes while reaching out to elected officials and the DMV to see how the program might be affected under Trump.

Gates said many immigrants are worried that, having given their addresses to the DMV to obtain licenses, ICE may find and arrest them. Some have even considering moving. Those who haven't applied for licenses yet are more hesitant to do so.



(http://peninsulapress.com/wp-content/uploads/2017/06/20170523_194416.jpg)

*A group of driver's education students study at Gina Gates' recent class in May, the first she's held since the election. (Photo courtesy of Gina Gates)*

Gates ran her first class since the election in late May, and although she said it went well, still, "everyone is feeling very attacked," expressing worries about being deported if they give their addresses. She's updated her curriculum to include information about rights when approached by ICE, and to encourage parents to make plans for their children in case they're detained.

Mass, the ACLU lawyer, said the risk of obtaining an AB 60 license varies case-by-case. "It's a little different calculus," she said. "Now we just say, it's important to get a driver's license, but it's also important to know that getting a driver's license might make it easier for federal immigration authorities to find you."

Gates will no longer list the locations or times of her classes online as she does not want that information to be available to federal immigration authorities. Instead, details of classes are circulated via word of mouth.

## School attendance and anxiety

Undocumented immigrants' fears of deportation are acute in schools too. In Alameda County, Assistant District Attorney Teresa Drenick saw an uptick in immigrant families embroiled in habitual truancy cases. Rumors of ICE patrolling near schools in largely Hispanic neighborhoods inspired such fear that parents kept their children home from school for extended periods.

"Moms are worried that they're going to drop their kids off in the morning and then get swept up by immigration authorities and not be there in the afternoon, so they're scared to do it at all," Drenick said in a May interview. Her priority was to work with families to keep children in class rather than to prosecute.

(http://peninsulapress.com/wp-content/uploads/2017/06/IMG_2967.jpg)

*Nicole Knight references the Oakland Unified School District's newly created Sanctuary District webpage. (Virginia Fay/Peninsula Press)*



In response to deportation fears and anxiety in schools, Oakland's Board of Education renewed a resolution upholding the district as a sanctuary. Nicole Knight, executive director of the district's English Language Learner and Multilingual Achievement department, led the task force to execute the resolution's ideals, including developing protocol in case ICE comes to campus, there is ICE activity in the community or a student's family member is detained.

Since the resolution was renewed, at least three families have had members detained. In each case, school staff collected details about the time and place of arrest and where the family member was held and reached out to immigrant rights organizations and attorneys to obtain legal help. At the same time, school staff made plans for a safe place for the children to stay until their parents were released.

(http://peninsulapress.com/wp-content/uploads/2017/06/IMG_2857.jpg)

*Gloria Hernandez-Goff checks her phone at the Ravenswood Unified School District office. (Virginia Fay/Peninsula Press)*



As part of its outreach campaign next year the district will plaster posters at all school sites in multiple languages affirming school as a sanctuary. In September, the district is holding a workshop for teachers to share best practices, process their own experiences, and create curricula that addresses trauma experienced by immigrants and other affected communities.

Gloria Hernandez-Goff, superintendent of the East Palo Alto Ravenswood District, said that while attendance has not dropped, students' unease has increased dramatically, causing students to act out and cry in the classroom. Each school in the district has one mental health counselor, which Hernandez-Goff says is no longer enough to manage the mental health issues that have manifested this year.

Ravenswood students recently completed yearly academic assessment tests. "Stress, and not having certain things in place in your everyday life, does affect your academic outcomes," Hernandez-Goff said, "So I'm not really sure what to expect from the [test] results of this year."

# Medical services

The negative effects of anxiety on immigrants' mental health extends past children. "It's really traumatic. [We see] individuals who are going into forms of depression, individuals who now feel that they're unwanted in the country they may have lived in for decades," said Greg Garrett, chief of policy at Alameda Health Consortium, a private, nonprofit group of health centers. "And this is causing trauma, which is actually resulting in severe mental health issues."

Though the Consortium has seen an increase in immigrants seeking mental health services, they've experienced a drop-off in other patients, including immigrants with chronic illnesses. In one instance, a cancer patient was in remission until she recently started showing signs of cancer again. After two sessions, she stopped showing up for treatment.

Caseworkers eventually were able to make contact with her, and discovered she had a friend who was recently deported. Her fear of being similarly identified and detained if she continued using health services caused her to stop accepting treatment for several months.

"You have individuals putting their own lives at risk because of this fear," Garrett said.

Kathleen Clanon, medical director of the Health Care Services Agency of Alameda County, says that though they've heard of immigrants hesitating to enroll or continue enrollment in health services, they've been able to leverage their existing relationships to prevent immigrants from unenrolling thus far.

They worry about people who don't have trusting relationships with doctors and are now not receiving any medical care. Measuring that absence is difficult, she says.

## Food benefits

In the first few months of the year, the San Francisco Human Services Agency began receiving an unusual number of calls. Suddenly, people were picking up the phone to unenroll from CalFresh benefits. Only

legal residents are eligible for CalFresh. But even legal immigrants felt compelled to disconnect from government food assistance because of moves by the Trump administration.

A draft executive order leaked in January seeking to deport immigrants dependent on taxpayer help incited fear that legal immigrants would be deported for using social services.

"That has concerned our immigrant population in terms of feeling safe about applying for CalFresh, because they don't want that to be the reason they might be deported," said Denise Boland, director of employment and benefits services at the Santa Clara County Social Services Agency. "So even legal immigrants are concerned now about CalFresh and don't feel safe."

Chandra Johnson, director of communications at the San Francisco Human Services Agency, said they can't know for sure why people decline services, but households with at least one noncitizen were particularly likely to unenroll. Many mixed-status families are especially prone to disengage from services due to fear of family members being deported even if the person receiving benefits has legal status.

Due to the increase in mixed-status families unenrolling, and a slight decrease in applications from the same group, the San Francisco office has been reaching out to the community to ensure people know that policies have not changed, and anyone who was previously eligible for benefits still is.

"Any time we think that families are turning away from nutrition benefits, or having to make some of those hard choices … in a city as expensive as San Francisco, in between housing or putting food on the table or [paying for] utilities or those sorts of things," Johnson said, "it's a concern to us."

(http://peninsulapress.com/wp-content/uploads/2017/06/DSC2159.jpg)

*Food is passed out at a Second Harvest Food Bank distribution site.*
*(Photo courtesy of Second Harvest Food Bank)*

7/19/2018                    Back into the shadows: Immigrants retreat from needed services as deportation fears loom - Peninsula Press



Second Harvest Food Bank, which both distributes food through several programs independent of the government and helps people enroll in CalFresh at some of their facilities, has seen increased hesitancy in immigrants wanting to take government benefits.

A family of five legal refugees from Nepal living in Sunnyvale pays $2,080 in monthly rent with a monthly income of $2,000. Though they're working to provide for themselves, they need assistance for food. When they came to a food pantry, Second Harvest secured a translator and helped them fill out a CalFresh application.

"They were ready to hit submit in completing the application, and then they decided they just didn't want to put … their ability to stay here in jeopardy. And so they decided not to apply for CalFresh after all, which was kind of heartbreaking," said Anna Dyer, Second Harvest's director of client services. "It's really tough to qualify for [CalFresh], because it's only the lowest income folks, so it means that they're really, really struggling."

## Moving forward

Independent and government agencies alike are struggling with how to counteract the fear of deportation that's causing immigrants to retreat back into the shadows. Nonprofit service providers and local

168

government branches from social services to police departments are partnering with immigration lawyers to orchestrate Know Your Rights events and educate the immigrant community.

Beyond encouraging immigrants to continue engaging with the services they need, which, by and large, they are still entitled to under current policies, many service providers find themselves at a loss for how to inspire confidence. Uncertainty of what the future will bring is a major driving force in the collective anxiety felt by immigrants, and, to a lesser degree, by the service providers themselves.

Lucy Barron lives in East Palo Alto and works in administration at Ravenswood Unified School District. Steep local housing prices have led her to live in a garage with her husband and five children. She and her family are especially conscious of being good neighbors so others in the area won't have reason to seek their eviction by calling ICE, a threat she says many in her neighborhood grapple with.



(http://peninsulapress.com/wp-content/uploads/2017/06/IMG_2981.jpg)

*A truck for the Ravenswood Child Nutrition Department is parked at the district offices. (Virginia Fay/Peninsula Press)*

Barron has legal status here, and volunteers with Ravenswood's food services to help other immigrants, whether documented or not, get healthy food. Her husband, however, is undocumented, and is currently going through a court process with ICE with the potential of being deported. He is working with a lawyer to try to obtain legal status.

"You have to be ready for anything," Barron says. She begins to tear up as she contemplates the possibility of providing for her family without her husband's income, or, worse, returning to Mexico, which she says is impossible given the violence there.

She feels that conditions for immigrants were improving under the previous presidential administration, but now, "It's like a bomb that's going to explode pretty soon," she says. "It's just like nerves that you feel all the time. 'Ok, are we going to be OK today?' That's what it is … Now it's more like we're waiting for the worst."

# EXHIBIT V

## The New York Times

# Too Scared to Report Sexual Abuse. The Fear: Deportation.

**By Jennifer Medina**

April 30, 2017

LOS ANGELES — Cristina's husband had hit and threatened her repeatedly for years, she said, but it wasn't until last year that she began to fear for the safety of her young children, too. Reluctantly, she reported him and filed a police report.

Cristina, an immigrant from Mexico who arrived in the United States as a teenager in the 1980s, began to apply for a special visa for victims of abuse that would set her on a path to citizenship and her own freedom. Then last month, she told her lawyer that she no longer wanted to apply. She was too fearful, she said, not of her husband, but of the government.

"I am scared they will find me," Cristina, who lives in a suburb of Los Angeles, said in an interview, asking that her last name not be used.

Domestic violence has always been a notoriously difficult crime to prosecute. It often takes victims years to seek help, and they frequently have to be persuaded to testify against their assailants. And for many undocumented victims, taking that step has become exceedingly difficult because of fears that the government will detain and deport them if they press charges, according to law enforcement officials, lawyers and advocates from across the country.

Since the presidential election, there has been a sharp downturn in reports of sexual assault and domestic violence among Latinos throughout the country, and many experts attribute the decline to fears of deportation. Law enforcement officials in several large cities, including Los Angeles, Houston and Denver, say the most dangerous fallout of changes in policy and of harsh statements on immigration is that fewer immigrants are willing to go to the police.

The number of Latinos reporting rapes in Houston has fallen by more than 40 percent this year from the same period last year, Art Acevedo, chief of the Houston Police Department, said this month. The drop, he added, "looks like the beginnings of people not reporting crime."

---

**You have 2 free articles remaining.**
**Subscribe to The Times**

---

In Los Angeles this year, reports of domestic violence among Latinos have dropped by 10 percent and reports of sexual assault by 25 percent from a year ago, declines that Charlie Beck, the chief of the Police Department, said were likely due to fear of the federal government. Dozens of service providers and lawyers interviewed said immigrant women were deciding not to report abuse or press charges.

"We've always told our clients that even if you are undocumented, you don't need to worry about it — the officers are going to protect you," said Kate Marr, executive director of the Legal Aid Society of Orange County, Calif. The level of fear now, however, is unlike anything Ms. Marr has seen in her nearly two decades of work with domestic violence survivors, she said.

"Everything we've ever told our clients is out the window," she said. "It's so demoralizing and so frightening to imagine what happens if it continues."



An image from a security video at a courthouse in El Paso showing a woman who was arrested by Immigration and Customs Enforcement agents in February, moments after she received a protective order.

The fear among immigrants was exacerbated by a case in El Paso, where Immigration and Customs Enforcement agents arrested a woman in February moments after she received a protective order against the man she said had abused her. The United States Commission on Civil

Rights, a bipartisan independent agency, urged federal officials this past week to reconsider their courthouse arrest tactics. The agency said the Texas case and other courthouse arrests were having a chilling effect on immigrants throughout the country.

The Department of Justice declined to comment on the concerns about increased fear among immigrants.

Laura's House, which helps hundreds of victims of domestic violence in Orange County each year, routinely asks clients about their immigration status so it can help them apply for visa protections if necessary. Under what is known as a U visa, victims of certain crimes receive permission to stay in the United State if they assist the police — and the promise of the visa often persuades victims of sexual assault and domestic violence to come forward.

Previously, nearly half of the more than 70 new cases that Laura's House received each month came from undocumented immigrants. In the last three months, that number has dropped to less than one a week.

Many women share the concerns of April, 23, who waited for years before pressing charges against the father of her children and who asked that her full name not be used.

"I would call the police and use another name or make a neighbor call," said April, who came across the border from Mexico when she was about 8 and lives in Orange County. "When he came after me, he'd say that I would get sent back to Mexico and never see my kids again. I believed him for a long time."

Capt. James Humphries, who oversees the special victims investigations division in Montgomery County, Md., said he saw the willingness to report drastically backsliding in the county, where immigrants make up a large portion of the population. His unit has received roughly half the calls for sexual assault and domestic violence this year that it did in the same period last year, he said.

"It's a constant challenge for us to reassure the community that the way we work has not changed and that the White House cannot dictate to us how to police," Captain Humphries said. "It affects all crimes across the board, but if you don't have domestic victims coming forward, the reality is that they do not trust the police."

However, Sheriff Chuck Jenkins of nearby Frederick County, Md., has been a vocal proponent of strict immigration enforcement and said he had seen no evidence of decreased crime reporting among the immigrants there.

"They don't want to be victimized by anyone else," Sheriff Jenkins said. "Nothing that we do on the streets has anything to do with immigration status, and folks in the immigrant communities, both legal and illegal, are smart enough to know that."



Noemi Sanchez, 46, emigrated illegally from Mexico nearly 30 years ago and waited for years
before reporting an abusive partner to the police. She now works with other survivors of domestic

violence in Suffolk County, on Long Island, N.Y., and said the "fear is stronger than ever — anyone from above could keep us in custody and deport us."  an Rong Xu for The New York Times

Still, others who work with victims say the impact of the fear is difficult to overstate.

In Austin, Tex., the nonprofit organization SAFE provides forensic exams for sexual assault survivors, and more than half of the clients are Latino. While the organization does not have precise numbers, Kelly White, the chief executive, said that fewer rape victims were coming forward this year, and that many call the organization's hotline for support but say they do not want to contact law enforcement.

In Nassau County on Long Island, N.Y., the district attorney's Office of Immigrant Affairs tip line for crime victims used to get up to 10 calls a week. But it has had none since December. And at End Domestic Abuse Wisconsin, which helps about 700 women a year get restraining orders against their partners, the requests this year have dropped to almost zero, the lead attorney there said.

The Los Angeles County Domestic Violence Council typically received about a half-dozen calls a week, with at least half from Spanish speakers. But since January, it has received only two calls, said Olivia Rodriguez, the executive director.

"This is not normal," Ms. Rodriguez said. "They assume that if they call a government entity it's all connected, that they will be reported to ICE and sent away. So instead they are just taking the abuse."

Yanet, 56, who asked that her last name not be used out of fear of deportation, said she had endured more than a decade of abuse from her husband in El Salvador, where victims of assault have little recourse, before she decided to flee to the United States several years ago. She mostly worked as a cook in Los Angeles kitchens and in 2005 tried to obtain a visa meant for women escaping violence.

But the lawyer she went to tried to force her to perform oral sex in exchange for his help, she said. Yanet initially worried about reporting him to the police, but she did file a report after deciding she would not be victimized again. Now she is reluctant to move ahead with both the charges and her visa application.

"Every day I am scared that something will happen and afraid to even walk out of the door," she said. "Doing something to get the attention of the government is worse. I don't know who to believe or what is safe to do to protect myself."

Worries over deportation will only increase the feelings of fear and isolation for victims of sexual assault or domestic violence, said Wanda Lucibello, a former prosecutor in the Brooklyn district attorney's office.

For years, Ms. Lucibello said, the office and other local law enforcement worked to make people feel comfortable that they could report crimes without fear that they would then become a target for deportation. Under the Obama administration, victims of crime were not considered a priority for deportation, and many local law enforcement agencies went out of their way to make inroads with immigrants.

"When you're talking about immigrant communities, you're talking about perceptions and whether those perceptions are accurate or not," Ms. Lucibello said. "If the perception is that there is a greater risk if you go to the police, you are going to be less likely to do so, and you are more likely to stay in an abusive relationship until you need to seek treatment at a hospital."

She added: "It's really the opposite of what anyone should want. All of this strengthens the abusive partner."

Liz Robbins contributed reporting from New York.

A version of this article appears in print on April 29, 2017, on Page A1 of the New York edition with the headline: Too Scared to Report Abuse, For Fear of Being Deported

# EXHIBIT W

News > Education



# Immigration crackdown taking heavy toll on California students

By **CAROLYN JONES** | EdSource
PUBLISHED: October 5, 2017 at 8:22 am | UPDATED: October 5, 2017 at 8:26 am

The Trump administration's crackdown on immigrants is having a chilling effect in California's classrooms, with schools reporting increased absenteeism and students having difficulty concentrating, even crying in class, teachers and administrators said.

"We may see it all as rhetoric and posturing, but I've witnessed kids from elementary school to college level stressed out and traumatized," said Alejandra Acuna, an assistant professor at Cal State Northridge who studies trauma among urban youth. "We've got 8-year-olds worried their parents will have to go back to Mexico. I saw one student literally crying in the elevator. If you're undocumented, it's not just rhetoric — it's about survival."

Trump has pledged to build a wall along the Mexican border, end protections for young people brought to the U.S. illegally as children, ramp up deportations of undocumented residents and greatly restrict immigration generally. In schools with large immigrant populations, these issues have eclipsed the usual business of reading-writing-and-arithmetic and put student welfare — and civics lessons — at the forefront, teachers said.

Schools around the state are responding to students' fears by offering counseling, lessons on the Constitution and immigrants' rights, and encouraging students to talk about their fears.

At Oakland International High School, where the entire student body is immigrants, teachers have led art projects and government lessons, and paid special attention to students who appear stressed, said co-principal Carmelita Reyes.

"We try to be vigilant in monitoring the pulse of students," she said. "When a kid is acting out, what's the underlying issue? We ask, are you OK? Is your family OK? Can I look at your Facebook news feed? Sometimes they won't tell you what's going on, but their social media news feed is filled with all this terrifying stuff."

The school has therapists who speak Spanish, Arabic, Cantonese, Farsi, Tigrinya and other languages, and teachers encourage students to talk about their family situations. The 11th- graders created "Know Your Rights" posters for the school, translated into students' native languages, and the seniors led deportation teach-ins with younger students.

*Reading this on your phone? Stay up to date with our free mobile app. Get it from the* [Apple app store](#) *or the* [Google Play store](#)*.*

Even the neighbors got involved. After Trump's election, they bought breakfast for the staff and all 360 students. They did it again after Trump announced his Muslim immigration ban, and then set up a scholarship fund for seniors. They also sent dozens of postcards telling students they're welcome in California and the community cares about them. The postcards line the hallway bulletin boards.

"Trump has brought out the ugliness in America, but also this incredible warmth, charity and empathy," Reyes said. "It's made people really see immigrants, in a way maybe they didn't before."

One student, 18-year-old Petrona Mendoza, who moved here six years ago from Guatemala, said that whenever Trump unleashes a new threat against immigrants, she has trouble sleeping and concentrating in school.

"I have family members who don't have papers, and it scares me they might be deported," she said. "My aunt has a new baby. What if she gets sent back, and the baby stays? It's scary to think about the future — if (Deferred Action for Childhood Arrivals) goes away, it'll be hard to go to college and work. I want to go to college and be a doctor, but I don't know how I'll do it."

What made her feel better, she said, were civics lessons on immigrant rights. Until then, she didn't know she had any. Seeing a counselor helps, too.

Her classmate, Ablel Alem, 19, moved to Oakland three years ago from Eritrea, after living in a refugee camp for several years. His family fled Africa because of a lack of adequate food and clean water, he said. After waiting so long to come to the U.S., Alem said he's angered by Trump's threats to curtail immigration.

"It makes me mad, but it doesn't just affect me. It affects all immigrants to the U.S.," he said. "Refugees come here with a lot of hope. It doesn't make sense to me because everyone in America is an immigrant. Immigrants made this country."

In Los Angeles Unified, the Trump administration's anti-immigrant policies have led to a state of near-hysteria among some families, said Jose Navarro, principal at Social Justice Humanitas Academy, which serves primarily low-income Latino students.

"All it takes is for one person to say, 'ICE is on campus' and I'll lose 20 percent of my students," he said. "So not only are these kids facing the trauma of racism, violence and poverty, but now they have these mental health needs. All of this has had a very traumatic effect on children, and makes it very hard for them to focus on school."

Navarro, a former California teacher of the year, encourages teachers to incorporate the immigration crisis into their Common Core curricula. By studying government, current events and law, students can learn narrative and expository writing, critical thinking and research skills, among other things.

Teachers also encourage students to discuss their fears in class.

"We tell the students, 'This is a problem, so let's problem solve.' The students are hungry to talk about it and learn more — that should be embraced," he said. "What are executive orders? What happens if your parents are deported? Let's make a plan. Let's not be reactive."

*Like our [Facebook page](#) for more conversation and news coverage from San Jose, the Bay Area and beyond.*

Journal exercises are also helpful, not just to enhance writing skills but to help students settle their nerves and learn to express themselves, said Acuna at Cal State Northridge.

"The potential of losing a parent is one of the most traumatic things a child can experience," she said. "It's OK to talk about it. Expressing those feelings is better for a student's health and well-being. And for teachers, sometimes you don't need to do anything. You just need to listen."

*This story originally appeared on [EdSource.org](#). EdSource is an independent journalism organization that works to engage Californians on key education challenges with the goal of enhancing learning success.*

 SPONSORED CONTENT



## Demi Lovato's Fabletics Is Bringing You An Outfit For $19 Or 2 Leggings For $24

By Fabletics

Co-Fouded By Kate Hudson, Fabletics Brings You All The Cutest Styles

Tags: **Immigration**



Carolyn Jones

## SUBSCRIBE TODAY!
### ALL ACCESS DIGITAL OFFER FOR JUST 99 CENTS!

# EXHIBIT X



# Trump's immigration crackdown is traumatizing a generation of children

As the president vowed to tighten immigration enforcement during his Arizona trip, educators say an epidemic of fear is boosting school absenteeism and leaving millions of children with crippling anxiety

- Read part 1: '
- Read part 2:
- *This series was reported by , a nonpartisan education news nonprofit, in partnership with the Guardian*

**Mark Keierleber**

Wednesday 23 August 2017 08.26 EDT

Gathered around a camera in their family's kitchen, the four Duarte children pleaded for help. When their undocumented parents were picked up by border patrol agents outside their home in National City, California, the full-time students, aged 12 to 19, were unable to pay for food, let alone rent.

Yarely and Aracely, 12-year-old twin sisters had watched it happen. The girls were eating breakfast last May when their father, an undocumented immigrant from Mexico, went outside to grab a newspaper and was swarmed by US Immigration and Customs Enforcement (Ice) agents. When their mother went outside their home in National City, California, to investigate all the commotion, she, too, was arrested.

"It was pretty traumatizing for my little sisters," said 19-year-old Francisco Duarte, the oldest of the four siblings. "They just took them right in front of them. One day everything was normal, and the next day, my parents were gone."

To raise money for their living expenses and their parents' legal fees, the children, who are all US citizens, launched a GoFundMe campaign, and released a Youtube video about their experience.

For the estimated 1 million undocumented children in the US – and the roughly 4.5 million young people born here who have at least one undocumented parent, like the Duartes – Trump's immigration crackdown is creating high levels of psychological distress. As students head back to school this fall, school officials from New York to New Mexico are preparing for increased anxiety and absenteeism among students of immigrant families.

"Kids start lagging behind academically, having social stress, anxiety, depression," said Lisseth Rojas-Flores, an associate professor of marital and family therapy at Fuller Theological Seminary in California. "With the new administration and all the threats for deportation that are so vivid and so real, and all the rhetoric that's going around, the anxiety escalates to a point that can be very paralyzing for some of these kids, who don't want to go to school, or who go to school and sit in there and still worry about their families."

Across the country, school administrators are taking bold steps to protect students and their families. Superintendents and school board members from districts including Miami; Milwaukee; Chicago; New York City; Des Moines; Portland, Oregon, and many others are declaring their schools "sanctuaries" from Trump's immigration policies. While policies vary, sanctuary schools are offering workshops to students and their families about managing immigration authorities, vowing to shield students' personal data from officials and block federal agents' access to school property unless they present a warrant.

Since Trump took office, immigration arrests have increased 38%, and deportation orders have climbed 31%. Because more than 90% of those detained and deported are men, many immigrant families are losing their breadwinners, with the very real possibility of economic hardship.

"We are seeing more and more students dropping out," Tania Romero, a social worker at Flushing International high school in Queens, New York, said at a panel discussion in May. "Young people are choosing to leave schools to work and save money in case they're deported anytime soon."

In a statement, a spokeswoman for Immigration and Customs Enforcement (Ice), Jennifer Elzea, said the agency was committed to ensuring that enforcement actions did not "unnecessarily disrupt" undocumented parents with underage children – but authorities "will no longer exempt classes or categories of removable aliens from potential enforcement".

In the wake of the Duarte family arrests, immigration officials defended their actions in the face of widespread local protests. Authorities said the children's parents, Francisco Duarte-Tineo and Rosenda Perez-Pelcastre, were connected to a stash house for human smuggling. The Duarte family denied those allegations, and no criminal charges have been filed. Perez-Pelcastre was released on bond in June with an ankle bracelet, but the children's father was denied bond.

A July report by the Center for American Progress, a progressive thinktank, found that emotional distress and economic insecurity can derail the future success of undocumented children and those with undocumented parents, as families are separated and immigrant communities are targeted by heightened enforcement.

The symptoms are most profound among those – like the Duarte family – whose parents have direct contact with the authorities, according to research by Rojas-Flores.



Yarely and Aracely Duarte, 12-year-old twins, at a city council meeting where they shared their story of being separated from their parents. Photograph: David Maung/EPA

### The lessons of Postville

Postville, Iowa, has become a destination for researchers looking to study the effects of immigration enforcement on youth. The small farm town of roughly 2,000 became a staging ground for one of the largest immigration raids in US history. Near the end of the school year in 2008, immigration agents descended on the town in helicopters, SUVs, and buses, arresting 389 workers at a kosher meatpacking plan to cries of "la migra, la migra".

After arrests, criminal convictions, and deportations, the community was left in a shambles. Immigrant families not displaced by the raid skipped town in fear. Many of the high school's current upperclassmen were young children when the raid took place; one teen recalls 19 children hiding – for weeks – in the family's basement. Others claimed sanctuary in a local Catholic church.

The raid had far-reaching effects on the student population. In a 2011 report, researchers at the University of Northern Iowa documented that students stopped coming to class, while schools found increased behavioral issues among the children who remained.

A report in the International Journal of Epidemiology recorded how heightened anxiety from the raid affected Postville's Latino children before they were born: Nine months after the incident, babies born to Latina mothers were 24% more likely to have a low birth weight than those born the previous year.

### 'La Migra'

Though it's been nearly a decade, the 2008 raid haunts Postville's youth, and Trump's immigration crackdown has renewed anxiety. After immigration agents made an arrest in a neighboring town this spring, fear echoed through classrooms and school hallways over rumors that Ice had returned to Postville.

The high school principal contacted federal authorities and announced over the intercom that no enforcement activity had been confirmed in Postville. But still, kids were afraid to walk home, said Joy Minikwu, the district's English as a second language instructional coach.

A school official's undocumented mother barricaded the front door to her home and hid inside. Others packed their bags and fled.

One student said he went into "alert mode" every time he spots a helicopter. Another told his neighbor, the first-grade teacher Lisa Acevada, about his plan should the government deport his parents back to Guatemala: "Mom and Dad said that if they're taken, we'll have to live with you."

Noe Gonzalez, a 14-year-old freshman born in Iowa to undocumented Mexican immigrants, said the thought of his parents being deported preys on his mind. "I don't know what would happen, if I would be deported too or if I'd go to a foster home," he said. "I'd like to stick with them, but yet I don't want to leave the U.S."

*The Guardian's Sam Levin contributed reporting*

*For the latest news about schools and policy, sign up for The 74 Newsletter.*

# Since you're here ...

... we have a small favour to ask. More people are reading the Guardian than ever but advertising revenues across the media are falling fast. And unlike many news organisations, we haven't put up a paywall - we want to keep our journalism as open as we can. So you can see why we need to ask for your help. The Guardian's independent, investigative journalism takes a lot of time, money and hard work to produce. But we do it because we believe our perspective matters - because it might well be your perspective, too.

In these times, it is imperative to have an independent newspaper that allows us to understand what is going on around us. The Guardian is an absolute necessity. *Delphine M, Mexico*
If everyone who reads our reporting, who likes it, helps fund it, our future would be much more secure. **For as little as \$1, you can support the Guardian - and it only takes a minute. Thank you.**

Support the Guardian

   

Topics
- US news
- Scared at School
- US immigration
- news

# EXHIBIT Y

**NOTE:  This is an audiotaped podcast. For the Court's convenience, counsel to *amici* legal services organizations have transcribed the relevant portions of the podcast below.**

# Forum: Monday Political News Roundup, KQED

# Feb. 26, 2018

***Available* at https://www.kqed.org/forum/2010101864021**

Michael Krasny ("MK"):  From KQED Public Radio in San Francisco, I'm Michael Krasny. Oakland Mayor Libby Schaaf issued an extraordinary warning over the weekend.

Libby Schaff ("LS"):  "Yesterday I learned information from multiple sources that there is potentially an ICE activity planned in the Bay Area."

MK:  Immigrant advocates say eleven people were detained in Northern California yesterday but it is unclear if those actions were connected with Mayor Schaaf's warning.  Meanwhile, in a roadblock for the Trump administration, the Supreme Court announced today it would not take up a case related to the Deferred Action for Childhood Arrivals program, or DACA. Coming up on our Monday Morning Political Roundup we talk about those stories and we get the latest on the Russian investigation and the intensifying battles over gun control.  Join us next, right after this.

MK:  Welcome to this morning's forum, I'm Michael Krasny.  On Saturday, Oakland Mayor Millie Schaaff, uh, Libby Schaaf, excuse me, sent out a warning after she received word that Immigration and Customs Enforcement agents were planning raids in the Bay Area.  Her statement in defiance of the Trump administration is drawing national attention, and she spoke to reporters yesterday.

LS: "Um, I did seek legal counsel about what my obligations are in this situation.  And while I am very committed to being a law abiding citizen, I feel confident that my sharing this information, because I did not receive it through official channels, is legal and frankly it's my ethical obligation."

MK:  The Northern California Rapid Immigration Response Network, a coalition of advocacy groups, said that eleven people were detained in the region yesterday.  It's not clear whether those actions are connected with Mayor Schaaf's advisory.  We're going to talk in this first half about Mayor Schaaf's warning as well as today's big news, out of the U.S. Supreme Court, the court announced it would not review a case, a key case, involving the Deferred Action for Childhood Arrivals program, or DACA, until the 9th Circuit Court of Appeals issues a decision. The announcement means that the Obama-era program will remain in place, for now.  And then at 9:30 we're gonna shift our focus to other political news out of Washington.  I'm joined now by Scott Schafer, Senior Editor of KQED's Politics and Government Desk and good morning, Scott.

Scott Schafer ("SS"):  Hi Michael.

MK:  This DACA decision, uh, it just kicks it back to the Circuit Court and what are we to make out of it?

**NOTE:  This is an audiotaped podcast. For the Court's convenience, counsel to _amici_ legal services organizations have transcribed the relevant portions of the podcast below.**

SS:  Well, this is really a return to the uh, order that uh h-has, always happens, I mean the Trump administration was appealing a decision from a judge in San Francisco in the federal court, district court judge, uh Alsup, uh, who ruled in January that uh, the Obama administration had not exceeded its authority when they created the DACA program, and that the uh administration had really abused its discretion uh, a-and was acting sort of uh arbitrarily in trying to end the DACA program and so the Trump administration wanted to leapfrog the 9th Circuit where this is now going, and said to the Supreme Court, hey this is so important we'd like you to take it up and just skip the lower court, and the Supreme Court which rarely does that, I don't think, it's been decades since they've done that – uh, said no.  And so now it's gonna play out in the 9th Circuit, and there's a similar case from a, a judge in Brooklyn who issued a similar ruling also earlier this year, and so those cases will make their way eventually to the Supreme Court.

MK:  And meanwhile the DACA young people are still in limbo.

SS:  They're very much in limbo and uh you know they are -- ones who have had their applications approved in the past can apply to re- you know, reapply, but uh if you hadn't applied for DACA, if you didn't have that protection you're out of luck right now and there is so much uncertainty, I mean, Congress is still trying to come up with a solution, they were unable to do that, tying uh DACA to uh, to border security, uh, so this gives Congress more time, uh but as you say, uh there is still this state of limbo for so many young people, uh some 250,000 or so in California – if, or should they continue in school, should they apply to school, are they in medical school, should they get married, are they going to be able to have kids, I mean, there's so many life questions that people sort of take for granted and, and make their decisions based on what's best for them, there's this whole other legal question hanging over their heads.

MK:  There's also some legal questions and uh, life decisions involved with Mayor Schaaf's statement because uh, there are many people in the shadows and she's essentially saying she has credible sources that are telling her that ICE is going to go into Oakland, although at this point we don't see that.

SS:  Well, ICE uh said that they have uh immigration actions all the time, and there have been uh raids in the last uh few weeks there--

MK:  But nothing like what she was intimating.

SS:  Well, it's unclear exactly what she was – she didn't have a lot of detail, really, she said that there is going to be an escalation in uh, ICE enforcement actions uh soon, um, but uh, you know, it was unclear what exactly she was referring to.  Um, it did create uh, you know, some heightened concern and you know, maybe s-even panic among some people who are worried about uh being deported.  Um, a-and so, i-it's really an escalation of the tension between local governments in California and the Trump administration.

MK:  Well the Trump administration said earlier, well the end of last week that uh, they were gonna take ICE agents – huh, at least Donald Trump tweeted that I believe, he would take ICE agents out of California.

**NOTE:  This is an audiotaped podcast. For the Court's convenience, counsel to _amici_ legal services organizations have transcribed the relevant portions of the podcast below.**

SS:  Yeah, you know, I, I think that was one of his momentary outbursts that uh, people in the government basically ignore.

MK:  Well, let me bring uh Blanca Vasquez on, she's Project Coordinator for Bay Area Based Immigration Liberation Movement and, good to have you back with us on Forum, Blanca Vasquez, welcome.

Blanca Vasquez ("BV"):  Hi, good morning.

MK:  Good morning to you, uh, your reaction to Mayor Schaaf?  I mean, she's certainly within her legal boundaries according to most who have analyzed it, uh, and I assume that you uh, feel it's a good thing?

BV:  Yeah, I mean it, it was definitely, I confer, on a regional level, the Northern California Rapid Response um Networks uh have been preparing for many months for um, for any type of ICE enforcement like this and I, I think that the fact that this news came um from Mayor Libby Schaaf, um, it definitely sent a-a-a an alarm out to all of us who've been constantly on high alert, constantly monitoring ICE practices.  Um, but definitely uh, we're definitely in a place where we're prepared and we're well equipped to be able to adhere to the needs of community members who are potentially arrested, um, by, by, you know, as a result of these immigration raids, um, so we're definitely at this stage where we're prepared and just um, ready on a – with a community infrastructure to be able to adhere to the needs of--

MK:  Well, when you say you're prepared, y-you're talking about li-the mayor was uh, for example, advocating that people go for consultation if they need to, to organizations like Centro Legal de la Raza and uh, in other words, find out about their legal rights.

BV:  Yeah, absolutely, um, uh, we have established rapid response networks all across from California, uh usually have a jurisdiction on county based, and so um we are well equipped to be able to adhere to calls of community members reporting ICE sightings or reporting, you know, that they are themselves dealing with um ICE enforcement at their home, at their work, wherever they may be, uh, we have dispatchers, legal observers that have been trained, and we have a legal team well equipped to be able to uh, be activated and, and be able to adhere to the legal needs of anybody who might be arrested.

[beep]

[crosstalk]

[beep]

MK:  I'm sorry.  We got some interference there for a moment, and I was just going to follow up with a quick question, we've got Blanca Vasquez on the line here, Project Coordinator for Bay Area Based Immigration, excuse me, Immigrant Liberation Movement.  Uh, let me read a statement that ICE put out today, they said, ICE focuses its enforcement resources on individuals who pose a threat to national security, public safety and border security. ICE does not conduct

**NOTE:  This is an audiotaped podcast. For the Court's convenience, counsel to *amici* legal services organizations have transcribed the relevant portions of the podcast below.**

sweeps or raids that target aliens indiscriminately, however, ICE no longer exempts classes or categories over movable aliens from potential enforcement.  Get your response?  Blanca?

BV:  Yeah, I mean, that, that is um inaccurate, inaccurate procedure practices that we're seeing on the ground, I mean, just yesterday, um from the uh first first wave of arrests that we saw across Northern California we know that ICE tactics um actually center around like psychological intimidation [beep] which means that uh they were out in the community, out in public places such as food trucks and convenience stores, and in their conversations just like, uh, mocking and joking about um, as they were seeing community members um [beep] passing by, um, joking about you know, who's going to be next, who's going to be arrested next and, and definitely um profiling people as they were going about their business, um, so we definitely have seen ICE uh being out in loc--in community spaces that are more and more public and just have, even if they're not necessarily arresting and conducting enforcement activity, um they, their mere presence is sending a message of intimidation.  Um and really really lifting this, this sense of crisis among community members because they know they have this [beep] effect and that's, that's the sort of practices that we've seen on the ground.

MK:  All right, thank you Blanca Vasquez, good to have you with us and again, Blanca Vasquez is Project Coordinator, Bay Area Based Immigration, excuse me, make that Immigrant Liberation Movement.  Um, we're going to go to Noel Gallo, who is uh Oakland City Councilmember who I think is uh, not a—going along with uh Mayer Schaaf on this but before I do, Scott, ICE has used tactics before with uh, actually, well, creating fear, I mean that's uh, something they're known for.

SS:  Well they are and uh, you know, they're worrying them for a while there, President Obama was, they were, was being called the Deporter in Chief, I mean, there were a lot of deportations, uh when he was president as well, I think what's happening now though is that uh ICE does these actions and then they're sort of scooping up people who happen to be there, who are also undocumented even if they weren't the target of the initial uh enforcement action and so there's a concern that there'll be sort of collateral damage to people who happen to be at a child care center or a, uh employ—place of employment wherever it might be, uh, this was something that uh the Chief Justice of the California Supreme Court was concerned about when ICE was seen in some of the courthouses.  So, it uh, you know, it is, it is clearly an issue.

MK:  And again, Scott Schafer is here with us in studio, Senior Editor for KQED's California Politics and Government Desk.  Let me bring Noel Gallo into this, who is Oakland city councilmember, District 5 in Oakland and uh Councilman, good to have you with us.

NG:  Thank you, thank you for the invitation.

MK:  Uh, you have some concern about what the Mayor did here, what is it?

NG:  Well, do you know when I think that, you know, there's, you know creating fear, creating ank—ec—anxiety on a daily basis does not help anyone uh any of us, whether we're undocumented or citizens uh of the City of Oakland.  So the reality for us is that you know I, what, what happens with a fear tactic is that some of my families and they're living next door to

**NOTE:  This is an audiotaped podcast. For the Court's convenience, counsel to _amici_ legal services organizations have transcribed the relevant portions of the podcast below.**

me, across the street from me, down the street, you know, do not send their children to school. And then some of us do not report to work, so it has a major impact um, because there is some inaccuracies, I, you know, I, I know I am not a fan of ICE on our streets, we do have productive residents that are trying to make a living and educate their children and I extremely value that, and um, but you know every other day somebody reports a false report that creates fear, anxiety and, and at the other end, this is how Donald Trump controls us, is through fear and uh, and I think that we have to be careful in our neighborhoods to make sure that our children continue to go to school and not fall behind.

MK:  Well we're talking mainly about Oakland, but originally uh, Mayor Schaaf said this is a Bay Area wide alert and Mayor Sam Liccardo of San Jose is actually uh, pretty much said he's concerned as well.  I wonder, uh Councilman, if you agree with somebody like Jesse Vaughan from the Center of Immigration Services who actually labeled this a political stunt on the part of uh Mayor Schaaf and said it's irresponsible.

NG:  Well, do you know I, and I mean I, growing up here in Oakland and you know, we are managed governed by fear.  And what happens to you know, those of us that are trying to make a living, you know, sometimes not only you know we, we're impacted directly and we just keep setting ourselves back.  And so for me, it's uh, we need to be able to provide the information, and this is what we're going door to door is ha—is not only I as a citizen need to know my rights but also those that are undocumented clearly know that, you know, that we just don't open our doors, you know, we can send our children to school, uh, we can work at a workplace that, you know that, that the owner of the business is responsible and accountable to the employees as well.  Uh, so I think that's the information that we're trying to get out, but by on, but on a continuous basis to create fear, well, ICE is down the street, oh ICE is across the street, oh ICE may be coming, or and I think that that just uh, a, a tactic or, or a, a direction that, that just creates fear and people--

MK:  So are you saying it's irresponsible?  Um, um, I think that's what I'm—

NG:  I, you know, in some ways it is.  Now, if it is, if they are coming then tell me who said they're coming and why they're coming.  'Cause clearly we're a sanctuary city and certainly you know, we do not allow it, we have many policies that in terms of ICE coming into our streets -- and I, I understand that immigration is a federal issue, um but at the same time we're here to support our families and we don't want to create a discouragement from kids going to school, and people not showing up to work.

MK:  All right.  Let me thank you, Noel Gallo, good to have you with us this morning.  Appreciate you being with us.

NG:  Thank you, thank you.

MK:  And Noel Gallo is Oakland City Councilmember District 5.  I'm gonna open the phone lines, I know many of you may want to weigh in on this uh, you see Mayor Schaaf's decision to what she says is following an ethical and moral obligation as the right decision, or are you more on the side of uh Councilman Gallo who says perhaps it's arousing too much anxiety.  I'd like to

**NOTE:  This is an audiotaped podcast. For the Court's convenience, counsel to *amici* legal services organizations have transcribed the relevant portions of the podcast below.**

hear what listeners have to say about this and let me tell you how you can join us, you may also want to weigh in on the DACA decision which is a big decision, throwing it back to the court of appeals.  And, you can let us know your thoughts by calling us at our toll-free number 866-733-6786.  This is only a half hour segment so if you have something you'd like to weigh in on, I would suggest you call us now, again the toll-free number for your calls 866-733-6786.  You can also of course let us know your thoughts or raise any questions you might have by emailing us, forum@kqed.org or go to our website kqed.org/forum and click on this segment and you can also Tweet us, we welcome your Tweets.  Our Twitter handle is @kqedforum but please again feel free to join us now, Scott Schafer with us, Senior Editor for KQED's California Politics and Government Desk.  I'm gonna go right to callers here in a moment, Scott, but first I want to find out your thoughts about the big convention of the Democrats, uh, because we're doing a kind of a political news roundup here and uh certainly, nobody got an endorsement really, well I shouldn't say nobody got an endorsement I mean the Secretary of State uh Padilla got an endorsement and uh--

SS:  There were a couple of contested races where there was an endorsement but by and large uh—

MK:  The big uh neon names did not get endorsements.

SS:  Yeah, the governor's race, there was no endorsement, Newsom came in first with 39% you need 60% to get the endorsement so it's a high threshold.  Some of the surprises, though, uh, you know Newsom I think was expected to come in first but John Chiang who is the State Treasurer and hasn't been polling well, he's been maybe in the single digits for sure, he came in second with 30%, Delaine Eastin also polling at about 4% in most of the polls got 20% of the delegates, and then Antonio Villaraigosa the former mayor of Los Angeles, uh who uh has been you know, nipping at the heels of Gavin Newsom in the polls –

MK:  There's been a target for the unions uh--

SS:  Exactly, and that's really my point here too is that uh the delegates here at this convention reflect uh, you know, the most liberal elements of the Democratic Party, just as at the Republican conventions it's the most uh conservative folks.

MK:  Well what do we make out of these though, I mean particularly in terms of uh Diane Feinstein has much more money and certainly by polls much greater recognition.  Uh, on the other hand, you know, she got beaten by Kevin de Leon, he didn't get the 60% he needed for a majority but clearly uh, you know, he's uh bringing some opposition to the table.

SS:  Absolutely and you know Diane Feinstein has -- these have never really been her people, you know, in 1990 when she ran for governor she went there and talked about her support for the death penalty and got booed by the delegates, uh, which is sort of what she wanted uh and she didn't get the endorsement then, and so I think there is a uh restiveness on the part of delegates, it's a combination of her not being liberal enough for them, not being harsh enough in attacking Donald Trump, she said earlier in San Francisco uh that he could still be a good president, you know they pounced on that, that was one of the things that prompted de Leon to get into the race.

**NOTE:  This is an audiotaped podcast. For the Court's convenience, counsel to _amici_ legal services organizations have transcribed the relevant portions of the podcast below.**

MK:  She's also supported some of his nominees, I mean, some of his administrative nominees.

SS:  Right, and she's been you know, vastly uh the majority is she's been very critical but I think some of that has been a response to the criticism of her.  And then there's also for some people, her age is an issue.  She's 84 years old, she's running for another six year term, and there are folks, you know, and I talked to some of the delegates who said that they were concerned, that they you know they wanted a fresh voice, uh they wanted somebody younger and it was time for a change.

MK:  Yeah, I remember reading your reporting on this where uh like at the Academy Awards somebody said your ti—they started playing music, playing it louder and she was still talking.

SS:  Oh boy!

MK:  Said your time is up and then people got that as a cue and started yelling, time is up!

SS:  Yeah, it was, it was uh, yeah, the music came up, she kept talking, and the music got louder and then she said, "Well, I guess my time is up" and then all the de Leon supporters were, were chanting, "Your time is up, your time is up!" and uh, so not a great move on her part and you know she's, she's not as uh she's not as nimble as she once was and, and speaking to a crowd like that, uh, with a barnburner speech is not really her forte.

MK:  Well she's also uh not come down, I mean you were talking about the progressives in the party not coming down on the right side on single payer or marijuana from their perspective.

SS:  I'm sorry?

MK:  They, she hasn't come down on the progressive side—

SS:  Right, yeah, she's got—

MK:  --on either marijuana or on the uh single payer.

SS:  Absolutely.  And you know, you could say that's the – at least on single payer that maybe that's a more responsible position uh because no one has really explained how we're gonna pay for it.  Uh, but nonetheless the activists, the nurses and some of the other unions really want to hear from and support candidates who say that they are going to get single payer healthcare in California as Newsom does and many others, but again, the reality is that that's a very heavy lift uh and you need for one thing, permission from the Trump administration to do that.

MK:  And there were some e-endorsements, Fiona Ma was endorsed and I mentioned Alex Padilla and uh Richard Lara as Insurance Commissioner, Betty Yee uh, uh was also endorsed but those were expected uh, and there was also, I want to get some callers on here but there was also one uh for Tony Thurmond uh, for Superintendent of Education, he got an endorsement.

SS:  He did, he got 89% of the vote, and again, his opponent Marshall Tuck is a big school reformer, uh, despised by the unions, he's very much pro charter school.  Uh, so, you know,

**NOTE:  This is an audiotaped podcast. For the Court's convenience, counsel to *amici* legal services organizations have transcribed the relevant portions of the podcast below.**

again, uh the delegates at this convention are to the left of the electorate in general, uh as a whole, but clearly uh Tony Thurmond was a favorite also uh Ricardo Lara running for the Insurance Commissioner position uh got 68% of the vote so he gets the endorsement.  One, somewhat of a surprise for some people if you're not really paying close attention is that Xavier Becerra, the attorney general got just 42% of the vote of the delegates compared to 56% for Dave Jones, who is now the Insurance Commissioner, he's running for Attorney General—

MK:  Still didn't make the 60 though.

SS:  Still didn't make the 60 but a reflection that he's run statewide several times, Xavier Becerra has never been on the statewide ballot.

MK:  Well, he was appointed after Kamala Harris went to the Senate, right?

SS:  Exactly.

MK:  And here are some calls.  Let me go to San Jose first.  Anna, you're on the air.

Anna:  Yeah.  Yeah, hi, um, I am the wife of a ICE uh agent and I just wanted to kind of uh talk a little bit from the perspective of an ICE agent and what they're out there doing and I think it's this kind of misunderstood or mis—definitely mis um er, represented is um, is the fact that they are out there protecting the very community that they're being um, accused of victimizing.  They are out there, the the people that they are going after, the vast majority, are criminals.  Many of these child molesters, rapers—rapists, murderers, they're going out there to, to arrest and deport people and get them out of the communities that, that wi—that the mayor, for instance is, is um instilling fear in.  Um, not only that but she put my husband's life at danger when she is um alerting uh many of these people of, of what's going on.  Um, it, uh you know i-i-it's very hard to hear, for instance you just reported uh that er or uh talked a little bit about what ICE came out and talked about, what the operations are about, um but got glossed over the fact that these are criminals uh—

MK:  Well some are criminals but there—the, the concern I think and Scott you would perhaps uh echo this, is that there's going to be sweeps and mass deportations of people who are not criminals.

SS:  Yeah, I think it's really a--you have to be clear that sanctuary city policies, whether it's the state policy or the local policies uh here in the Bay Area, uh do not uh prevent local governments from helping ICE agents apprehend people who are wanted for serious crimes like child molesters, murder, you know, those sorts of things.  Uh, it's these other cases where there are sort of random sweeps and people feel like uh they really haven't uh, they haven't broken the law, they're here illegally--illegally but that's a civil matter, it's not a criminal matter.  And so those are the cases where local governments are saying we're not going to cooperate with ICE, it's not to protect murderers and child rap—you know, abusers and rapists, that, that is not happening.

MK:  And Anna I thank you for bringing that perspective to us, I want to read a couple comments which also take a strong perspective uh against Mayor Schaaf, Rick writes, "I think

196

**NOTE:  This is an audiotaped podcast. For the Court's convenience, counsel to *amici* legal services organizations have transcribed the relevant portions of the podcast below.**

the Oakland mayor is being thick here, by forewarning immigrants she puts them in fear while ICE strikes another place this will lead to more self deportation."  And Enrique says, "Will the mayor also provide lookout services for drug dealers, pimps and bank robbers?  Libby the new queen of the No-Snitch movement, amazing what has happened in this country."  And here's Rory Little, professor of law at UC Hastings who Tweets, "I think the DACA denial indicates that the court is losing patience with this administration's repeated requests for unusual emergency relief when there is in fact no emergency."  We'll conclude it there, we're gonna take up some national issues when we return on our Political Monday Roundup.  Thank you Scott.

SS:  Any time.

MK:  Scott Simon – uh, Scott Simon—Scott Schafter again, Senior Editor for KQED's California Politics and Government Desk, and when we return again we're going to be talking about some national news.  Stay tuned for that, it's up ahead.  I'm Michael Kresny.

# EXHIBIT Z

# Trump's Anti-Immigrant Policies Are Scaring Eligible Families Away From the Safety Net

Social-service organizations are reporting a drop in enrollments in food stamps and other programs.



Lucy Nicholson / Reuters

ANNIE LOWREY

MAR 24, 2017    |    BUSINESS

---

Want to receive exclusive insights from The Atlantic—while supporting a sustainable future for independent journalism? Join our new membership program, The Masthead.

---

NEW YORK CITY—As the evening rush hour peaked, Blanca Palomeque stationed herself by the carts selling roasted corn, tamales, and ice cream at the exit to the 90th Street-Elmhurst Avenue subway stop in Queens. She spotted a woman pushing a baby in a pink stroller and tugging along two school-aged girls with pigtails.

"Excuse me, good afternoon, how are you?" Palomeque said in Spanish. "Do you have food stamps for your children? Here is some information." She pushed a flyer into the mother's hand before rushing over to a pregnant woman to speak with her as well. Palomeque repeated this process over and over again until the trains became less crowded, urging mothers and fathers and grandparents to look into their eligibility for the Supplemental Nutrition Assistance Program and Medicaid, for themselves, for their children, for a friend, for a neighbor.

Palomeque works for Make the Road New York, a nonprofit that provides legal aid, community organizing, and language classes to working-class New Yorkers, many of them immigrants. With Donald Trump in the White House, she told me, the tenor of her outreach has changed. "They ask me questions about food stamps," she said. "'Will I have problems now if I apply? Will I be detained? Will I be deported?' I tell them: 'Nothing has been signed yet. You don't need to be scared. You might have the right to these services, or your children might have the right to these services.'"

Still, in New York and across the country, a climate of fear—sparked by Trump's executive order on immigration enforcement, a series of highly public raids, and a draft executive order that would push families off of means-tested benefit programs —has spooked some untold number of families away from the safety net. Of the 20 organizations working with documented and undocumented immigrants that I spoke with in recent weeks, 17 said they had seen legally eligible families declining to enroll or even unenrolling from programs, including SNAP, Medicaid, the Children's Health Insurance Program, free school lunches, and the Women, Infants, and Children program.

"The immigration-enforcement order created chaos and fear," said Wendy Cervantes of CLASP, a Washington-based anti-poverty nonprofit, referring to a Trump initiative to ramp up deportations. "The fear of immigration enforcement creates a chilling effect. We've seen seen this in states that have passed really aggressive and harsh anti-immigrant laws at a local level, and now we might be seeing it nationally."

Through policy changes and simple anti-immigrant posturing, the Trump era will likely increase poverty and hunger in Latino communities, experts said, with children—in many cases, citizen children—among the hardest hit. Experts expect the worst effects to be among the poorest and lowest-information families, including those with significant language barriers and thin social ties in the United States. If the worst comes to pass, it will mean low-income infants and kids eating fewer or lower-quality calories, they said, missing more days of school, growing up in more stressful environments, and going to fewer doctor's appointments.

"Nobody's talking about the downstream effects on kids squeezed out of these programs, because of rule changes or simple fear," said Jim Weill, the president of the Food Research & Action Center, a national anti-hunger nonprofit.

Right now, there is no state or national data showing how the Trump administration might be changing safety-net enrollment levels. But social scientists said anti-immigrant sentiment and increased deportation activity has had a long history of causing eligible families to drop out and shy away. In many cases, those are families with mixed immigration statuses: undocumented parents with children with birthright citizenship, for instance, or visa overstayers married to green-card holders. (Undocumented adults are barred from receiving public benefits, but their citizen kids are not.)

Such families are exceedingly common. New research by Silva Mathema of the Center for American Progress, a liberal think tank, and the University of Southern California's Center for the Study of Immigrant Integration found that 16.7 million people in the United States live in a household with at least one unauthorized family member. Nearly 6 million citizen children live in such households. "There can be no us versus them," Mathema wrote. "The Trump administration's actions and directives ostensibly target the 11 million unauthorized immigrants who live in the United States, but they will also harm millions of American citizens all across the country who live and work beside these immigrants every day."

Fear was the dominant emotion that kept coming up in my conversations with immigration experts, social workers, community organizers, anti-hunger

advocates, lawyers, doctors, and immigrants themselves. Some community workers, like Palomeque at Make the Road New York, said they had continued to advise their client base to apply for programs, and to stress that no laws relating to benefit programs have changed. Others said that they could not in good faith tell immigrants that the deportation risk had not increased, or that signing up for the safety net would not put their families at risk.

"I've been doing this for 29 years," said Stephanie Altman, a lawyer at the Sargent Shriver National Center on Poverty Law. "I've never seen it like this. We've never gotten these kinds of questions before. I'm trying to separate out the fear from the reality too. The fear is real. And I don't know what the reality is now."

The reports of eligible families pulling out of antipoverty programs are broad and, in some cases, acute. Eisner Health, a Los Angeles-based health-care provider with a low-income Latino client base, said it has seen a 20 percent drop in food-stamp enrollments, a 54 percent drop in Medicaid enrollments among children, and a 82 percent drop in enrollments in a local health program that serves indigent adults, including the undocumented. Re-enrollments across all programs had declined 40 percent, as well. (The group compared monthly enrollment averages from December through February with data from 2016.) "I wouldn't have predicted at all that we would have been hit so hard," said Dr. Deborah Lerner, Eisner's chief medical officer. "I was shocked."

In Atlanta, some schools and clinics are advising families with undocumented members not to sign up for anti-poverty programs, said Cynthia Román-Hernández of the Latin American Association, a nonprofit providing legal aid, education, and social services to immigrants. "Every client that comes into this building now, we have a safety plan for them," Román-Hernández told me. "It covers how to prepare for anything that could happen, with a list of immigration lawyers and preparations they should make and information on what their rights are. People are scared, so scared, and we want them to have that information."

At the Esperanza Center, a program of the Catholic Charities of Baltimore, some people were shying away from public programs while at the same time seeking

more free healthcare and legal advice, said Val Twanmoh, the center's director. "This week alone we did 84 consultations with an immigration attorney, which is unheard of," she told me. "We're also doing child-care authorization letters and power-of-attorney documents, so in the event that a household provider or parent is detained or deported, their family is taken care of." A few weeks ago, the organization did 37 child-care authorizations in one day. Before the Trump era, it normally did a handful.

And in New Jersey, parents were pulling away from SNAP and WIC, a program designed to improve the health outcomes of the country's most vulnerable infants and children, said Carlos Rodriguez, the executive director of the FoodBank of Monmouth and Ocean Counties. "I strongly worry that this is going to start increasing food insecurity," he told me. "I worry about the immediate and long-term consequences on the health, nutrition, and school performance of the youngest members of these families. And in most cases, we're talking about citizens." He continued, "If this starts happening at any kind of scale, we can't close the gap in terms of the meals that this will remove from families."

Immigrants themselves said that the message from the Trump White House was clear, with some adding that nothing was worth the risk of deportation. Marie Cruzado Jeanneau, who came to the United States from Peru as a child and is currently shielded from deportation by the Obama-era Deferred Action for Childhood Arrivals policy, has an undocumented mother and younger siblings who are citizens. "We're so scared to see my mother leave the house for work," she told me. "We go out less. We drive less. She won't go in a government building. She hides in the back of the car." Her mother had stopped taking the kids into school, she added.

As social workers and service providers started to witness mothers and fathers pulling back from the safety net after Trump's election and inauguration, they rushed to set up meetings with immigration-law experts. National organizations have struggled to advise local entities what to tell their clients. Another challenge: getting through to anyone in Washington. There is no secretary of agriculture or

SNAP administrator in place, after all, nor is it clear who, if anyone, is managing anti-poverty efforts in the White House. "Who do we call?" said one nonprofit worker, who asked for anonymity to criticize the Trump administration openly. "You tell me who we call about this."

The White House did not respond to repeated requests for comment for this story.

As of now, there have been no policy changes altering safety-net eligibility standards. But social-justice organizations said that Trump's racist attacks on Mexicans and broad anti-immigrant stance had resonated in communities of color and of immigrants. "The administration says that it's going to go after the 'bad dudes,'" said Clarissa Martínez-de-Castro of the National Council of La Raza, the civil-rights organization. "You're seeing all these cases of people—children, documented immigrants, Hispanic and Latino citizens—who are not 'bad dudes' caught in this dragnet. That's adding to the climate of confusion and fear. This is not accidental."

And there have been some signs that the White House might make changes to block mixed-status families' access to the safety net. A draft executive order on public-charge rules leaked to Vox would make families more vulnerable to deportation if they used benefit programs. "The message is: If you're sponsoring a family member, you better be prepared to take care of them," said Audrey Singer of the Urban Institute, the Washington-based think tank. "Because we, the United States government, are not going to take care of them." In that case, poverty, including deep poverty, could increase significantly.

Anti-poverty advocates expressed horror that the Trump administration might use poor citizen children as a wedge to get at their poor undocumented parents. "An American-citizen child could be driven into poverty because their mother or father doesn't have a Social Security Number," said Jackie Vimo of the National Immigration Law Center. "It's bad policy. And it's policy that is targeting U.S.-citizen children."

For now, though, anti-poverty organizations stressed the importance of trying to calm the fears of and give more information to mixed-status families, to help keep kids healthy and to reduce the risks of poverty. Palomeque, herself an immigrant, said that having community members reach out, rather than government workers, seemed to help too. "They trust me," she said. With that, she rushed off to greet a father with young daughters, and to push a Medicaid flyer into the hand of an older man walking with a cane.

ABOUT THE AUTHOR

 **ANNIE LOWREY** is a contributing editor at The Atlantic, covering economic policy.

# EXHIBIT AA

efforts for black children. Ongoing surveillance efforts must reflect the dynamic association between race and age-related risk for youth suicide.

Jeffrey A. Bridge, PhD
Lisa M. Horowitz, PhD, MPH
Cynthia A. Fontanella, PhD
Arielle H. Sheftall, PhD
Joel Greenhouse, PhD
Kelly J. Kelleher, MD
John V. Campo, MD

**Author Affiliations:** Department of Pediatrics, The Ohio State University, Columbus (Bridge, Kelleher); Department of Psychiatry and Behavioral Health, The Ohio State University, Columbus (Bridge, Fontanella, Campo); Center for Suicide Prevention and Research, The Research Institute at Nationwide Children's Hospital, Columbus, Ohio (Bridge, Sheftall); Intramural Research Program, National Institute of Mental Health, National Institutes of Health, Bethesda, Maryland (Horowitz); Department of Statistics, Carnegie Mellon University, Pittsburgh, Pennsylvania (Greenhouse); Center for Innovation in Pediatric Practice, The Research Institute at Nationwide Children's Hospital, Columbus, Ohio (Kelleher).

**Accepted for Publication:** February 7, 2018.

**Corresponding Author:** Jeffrey A. Bridge, PhD, Center for Suicide Prevention and Research, The Research Institute at Nationwide Children's Hospital, 700 Children's Dr, Columbus, OH 43205 (jeff.bridge@nationwidechildrens.org).

**Published Online:** May 21, 2018. doi:10.1001/jamapediatrics.2018.0399

**Author Contributions:** Dr Bridge had full access to all the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Study concept and design:* Bridge, Horowitz, Fontanella.
*Acquisition, analysis, or interpretation of data:* Bridge, Horowitz, Sheftall, Greenhouse, Kelleher, Campo.
*Drafting of the manuscript:* Bridge.
*Critical revision of the manuscript for important intellectual content:* All authors.
*Statistical analysis:* Bridge, Fontanella, Greenhouse.
*Obtained funding:* Bridge.
*Administrative, technical, or material support:* Bridge, Horowitz.
*Study supervision:* Bridge, Kelleher, Campo.

**Conflict of Interest Disclosures:** Drs Bridge and Sheftall reported receiving honoraria for participation in a Substance Abuse and Mental Health Services Administration–sponsored webinar addressing suicide prevention for African American children. No other disclosures were reported.

**Funding/Support:** This study was supported by grant R01-MH093552 from the National Institute of Mental Health, National Institutes of Health (Dr Bridge).

**Role of the Funder/Sponsor:** The sponsor had no role in the design and conduct of the study; collection, management, analysis, and interpretation of the data; preparation, review, or approval of the manuscript; and decision to submit the manuscript for publication.

**1.** Goldsmith SK, Pellmar TC, Kleinman AM, Bunney WE. *Reducing Suicide: A National Imperative.* Washington, DC: National Academy Press; 2002.

**2.** Bridge JA, Asti L, Horowitz LM, et al. Suicide trends among elementary school-aged children in the United States from 1993 to 2012. *JAMA Pediatr.* 2015;169(7):673-677.

**3.** Centers for Disease Control and Prevention. Web-based Injury Statistics Query and Reporting System (WISQARS): Fatal Injury Reports, 1999-2015, for National, Regional, and States. https://www.cdc.gov/injury/wisqars/index.html. Accessed January 24, 2018.

**4.** Joe S, Canetto SS, Romer D. Advancing prevention research on the role of culture in suicide prevention. *Suicide Life Threat Behav.* 2008;38(3):354-362.

**5.** Martin SA, Harris K, Jack BW. The health of young African American men. *JAMA.* 2015;313(14):1415-1416.

**6.** Abraham ZK, Sher L. Adolescent suicide as a global public health issue [published online July 7, 2017]. *Int J Adolesc Med Health.* doi:10.1515/ijamh-2017-0036

## Association of Maternal Eligibility for the Deferred Action for Childhood Arrivals Program With Citizen Children's Participation in the Women, Infants, and Children Program

Nearly 7% of children living in the United States, the vast majority of whom are US citizens, have at least 1 undocumented immigrant parent.[1] These children face several disadvantages, culminating in reduced lifetime socioeconomic mobility and reduced well-being.[1] One mechanism underlying these adverse consequences could be failure to receive critical public benefits despite meeting eligibility criteria because undocumented parents may be less likely to apply for these services on their child's behalf if they fear being discovered by immigration authorities.[2,3]

Policies that bring undocumented parents "out of the shadows," such as the 2012 Deferred Action for Childhood Arrivals (DACA) program, may have positive spillover effects for their children by improving uptake of public benefits. We examined the association of parental DACA eligibility with children's participation in the Women, Infants, and Children (WIC) program, a benefit that has been shown to improve child health and socioeconomic outcomes.[4]

**Methods** | We used data from the 2010-2015 National Health Interview Surveys (NHIS). Our sample consisted of US citizen children who were 5 years of age or younger (reflecting WIC age eligibility criteria) and whose mothers were Hispanic and not US citizens. The latter criterion follows earlier work that noted that a large percentage (>60%) of self-reported noncitizens are undocumented.[5] In addition, we further restricted the sample to children whose mothers had lived in the United States for at least 5 years. We also restricted our sample to children of mothers who were 19 years of age or older and had received at least a high school diploma or General Educational Development certificate, to hold fixed 2 key DACA eligibility criteria.[5] This study was acknowledged as exempt, non-human subjects research by the Johns Hopkins School of Medicine Institutional Review Board.

Our main outcome was whether the child was enrolled in WIC in the previous calendar year (the period queried by the NHIS). Our main exposure—whether the mother met DACA eligibility criteria—was defined on the basis of the mother's age at immigration (≤16 years) and age at DACA implementation (≤31 years at policy implementation).[5]

We estimated a difference-in-difference model that compared changes in WIC enrollment among children whose mothers met the 2 DACA age eligibility criteria before (survey years, 2010-2012) vs after (survey years, 2014-2015) policy introduction with changes among children whose mothers did not meet these criteria. (Survey year 2013 was excluded because it corresponded to WIC participation in the year DACA was implemented.) We adjusted for sociodemographic characteristics of both the child and mother.[6] All descriptive statistics and analyses were performed using NHIS sample weights.

**Results** | Our final sample consisted of 1911 children 5 years or younger, of whom 33.8% had a mother who likely met DACA eligibility criteria (**Table 1**). Overall, 43.1% children participated in the WIC program during the study period.

© 2018 American Medical Association. All rights reserved.

Downloaded From:  by a Reprints Desk User  on 07/12/2018

Letters

**Table 1. Selected Descriptive Statistics of Citizen Children and Noncitizen Hispanic Mothers by Likely DACA Eligibility[a]**

| Variable | Likely DACA-Ineligible Mothers and Children[b] | Likely DACA-Eligible Mothers and Children[c] |
|---|---|---|
| Sample, No. (%) | 66.2 | 33.8 |
| **Child** | | |
| Age, mean (SD), y | 2.65 (1.96) | 2.37 (1.95) |
| Sex, % | | |
| Male | 52.5 | 51.9 |
| Female | 47.5 | 48.1 |
| **Mother** | | |
| Age, mean (SD), y | 34.0 (5.90) | 25.7 (4.08) |
| Educational level, % | | |
| High school[d] | 59.4 | 70.1 |
| Some college | 40.6 | 29.9 |
| Comfortable with English language, %[e] | 46.3 | 59.8 |
| Married, % | 76.9 | 61.9 |
| No. of years in US, % | | |
| 5-9 | 41.3 | 11.1 |
| 10-14 | 33.5 | 27.9 |
| ≥15 | 25.2 | 61 |

Abbreviation: DACA, Deferred Action for Childhood Arrivals.

[a] All descriptive statistics are weighted by National Health Interview Surveys sample weights. The primary analytic sample consists of children age 5 years and younger who are US citizens and who have noncitizen Hispanic mothers with a high school or GED certificate who have lived in the United States for at least 5 years. Mothers likely eligible for DACA are defined as those who, as of June 2012, were 31 years or younger and had lived in the United States for at least 5 years.

[b] Constitutes 1258 unweighted or 2 777 930 weighted individuals.

[c] Constitutes 653 unweighted or 1 418 199 weighted individuals.

[d] Includes receipt of general educational development (GED) certificate.

[e] Considered "comfortable" if the interview was administered in English only.

**Table 2. Association of Maternal DACA Eligibility With Children's Participation in WIC[a]**

| Variable | Children Aged ≤5 y (n = 1911) | Children Aged ≤5 y Likely Meeting WIC Income Eligibility Criteria (n = 1572)[b] | Falsification Test (n = 2986)[c] |
|---|---|---|---|
| Difference-in-difference estimate, % (95% CI) | 12.3 (0.7 to 23.9) | 13.5 (0.81 to 26.3) | 3.7 (−7.2 to 14.6) |
| P value | .04 | .04 | .50 |

Abbreviations: DACA, Deferred Action for Childhood Arrivals; WIC, Women, Infants, and Children program.

[a] Linear probability (ordinary least squares) difference-in-difference estimates. Models were weighted to reflect National Health Interview Surveys sampling weights. Confidence intervals were corrected for clustering at the household level. All models were adjusted for child and mother characteristics in Table 1. Because WIC participation was defined in the previous calendar year and DACA was implemented in June 2012, we chose to exclude 2013 data and define the prepolicy period as 2010 to 2012 and the postpolicy period as 2014 to 2015.

[b] WIC eligibility was defined as family income <185% of the federal poverty level or child receiving Medicaid benefits.

[c] Children with mothers without a high school diploma or General Educational Development certificate.

A mother's DACA eligibility was associated with a 12.3% (95% CI, 0.7%-23.9%) higher likelihood that her child participated in WIC (**Table 2**). Among children whose families met broad WIC income eligibility criteria (family income <185% of the federal poverty level or Medicaid receipt), we found similar estimates (β coefficient, 13.5%; 95% CI, 0.81%-26.3%). We did not find an association among children with noncitizen mothers who likely would not have met DACA eligibility criteria on the basis of educational attainment (falsification test).[5]

Discussion | Maternal eligibility for the DACA program was associated with increased participation in WIC by their citizen children. These results highlight the potential for multigenerational spillover effects of immigration policy.

A limitation of our analysis is that we were unable to explicitly identify undocumented parents or make strict determinations of DACA eligibility. However, these limitations are true of all nationally representative data sets and likely will result in underestimates of program effects.[5] A second limitation is that data were self-reported. Third, even with the quasi-experimental research design, it is possible that the findings were biased by unmeasured confounders.

Our findings—along with growing evidence of the direct health consequences of DACA for both beneficiaries and their children[5,7]—should be considered in ongoing debates around immigration policy.

Maya Venkataramani, MD, MPH
Craig Evan Pollack, MD, MHS
Lisa Ross DeCamp, MD, MSPH
Kathryn M. Leifheit, MSPH
Zackary D. Berger, MD, PhD
Atheendar S. Venkataramani, MD, PhD

**Author Affiliations:** Division of General Internal Medicine, Johns Hopkins University School of Medicine, Baltimore, Maryland (M. Venkataramani, Pollack, Berger); Department of Pediatrics, Johns Hopkins University School of Medicine, Baltimore, Maryland (DeCamp, Leifheit); Department of Epidemiology, Johns Hopkins Bloomberg School of Public Health, Baltimore, Maryland (Leifheit); Johns Hopkins Berman Institute of Bioethics, Baltimore, Maryland (Berger); Department of Medical Ethics and Health Policy, Perelman School of Medicine, University of Pennsylvania, Philadelphia (A. S. Venkataramani); Leonard Davis Institute of Health Economics, University of Pennsylvania, Philadelphia (A. S. Venkataramani).

**Corresponding Author:** Maya Venkataramani, MD, MPH, Division of General Internal Medicine, Johns Hopkins University School of Medicine, 2024 E Monument Street, 2-502, Baltimore, MD 21287 (mvenkat2@jhmi.edu).

**Accepted for Publication:** February 27, 2018.

**Published Online:** May 29, 2018. doi:10.1001/jamapediatrics.2018.0775

**Author Contributions:** Dr M. Venkataramani had full access to all of the data in the study and takes responsibility for the integrity of the data and the accuracy of the data analysis.
*Study concept and design:* M. Venkataramani, Pollack, Leifheit, Berger, A. S. Venkataramani.
*Acquisition, analysis, or interpretation of data:* M. Venkataramani, Pollack, DeCamp, Leifheit, A. S. Venkataramani.
*Drafting of the manuscript:* M. Venkataramani.
*Critical revision of the manuscript for important intellectual content:* All authors.
*Statistical analysis:* M. Venkataramani.
*Administrative, technical, or material support:* Leifheit.
*Study supervision:* A. S. Venkataramani.

**Conflict of Interest Disclosures:** Dr A. S. Venkataramani reported receiving salary support from the National Institutes of Health (NIH Mentored Career Development Award, K23MH106362) and the Robert Wood Johnson Foundation's Evidence for Action program (grant 75167). This funding was unrelated to the study described in this report. No other disclosures were reported.

© 2018 American Medical Association. All rights reserved.

Downloaded From:  by a Reprints Desk User  on 07/12/2018

208

**1.** Capps R, Fix M, Zong J. *A Profile of US Children With Unauthorized Immigrant Parents.* Washington, DC: Migration Policy Institute; 2016.

**2.** Vargas ED, Pirog MA. Mixed-status families and WIC uptake: the effects of risk of deportation on program use. *Soc Sci Q.* 2016;97(3):555-572.

**3.** Toomey RB, Umaña-Taylor AJ, Williams DR, Harvey-Mendoza E, Jahromi LB, Updegraff KA. Impact of Arizona's SB 1070 immigration law on utilization of health care and public assistance among Mexican-origin adolescent mothers and their mother figures. *Am J Public Health.* 2014;104(suppl 1):S28-S34.

**4.** Owen AL, Owen GM. Twenty years of WIC: a review of some effects of the program. *J Am Diet Assoc.* 1997;97(7):777-782.

**5.** Venkataramani AS, Shah SJ, O'Brien R, Kawachi I, Tsai AC. Health consequences of the US Deferred Action for Childhood Arrivals (DACA) immigration programme: a quasi-experimental study. *Lancet Public Health.* 2017;2(4):e175-e181.

**6.** Bitler MP, Currie J, Scholz JK. WIC eligibility and participation. *J Hum Resour.* 2003;38(special issue):1139-1179.

**7.** Hainmueller J, Lawrence D, Martén L, et al. Protecting unauthorized immigrant mothers improves their children's mental health [published online August 31, 2017]. *Science.* 2017;357(6355):1041-1044. doi:10.1126/science.aan5893

## COMMENT & RESPONSE

### Cost-effectiveness of Nusinersen for Spinal Muscular Atrophy

**To the Editor** Prasad's editorial is disappointing, suggesting that nusinersen was given too broad a label and its efficacy is "marginal."[1] He infers insurance companies should decline coverage for milder types of spinal muscular atrophy (SMA). Delegating medical decision making to a company seems ethically unsound.

Prasad states "the randomized data submitted to the FDA [US Food and Drug Administration] supporting the benefit of nusinersen is, to date, for only one particular subgroup of the disease (SMA subtype 1). The broader FDA data approval was made for all subtypes based on uncontrolled data."[1] This is not true. There were 3 clinical trials (CS3B, CS4, and SM202) and multiple uncontrolled trials reviewed. Statistical analysis could only be performed for CS3B, but topline data were reviewed for CS4 (later-onset SMA). This is well-documented in multiple aspects of the FDA review, including the unreferenced clinical efficacy review.[2]

CS3B is a study of infantile-onset SMA, not SMA type 1. Inclusion criteria were biased toward SMA type 1, but SMA exists on a spectrum with typing based on maximum motor milestones. Spinal muscular atrophy is not like cancer, where myriad factors are thought to play a major role in modifying disease pathogenesis. Ninety-five percent of all patients, regardless of type, carry the same *SMN1* deletions. The predominant difference between SMA types is *SMN2* copy numbers. Those with fewer SMN2 copies have more severe disease. Nusinersen acts on *SMN2* transcripts. Common sense predicts an equal or greater drug effect will be seen in SMA types 2 through 4. Prasad recommends "caution in extrapolating benefits shown in severe disease settings to more indolent settings."[1] I generally agree, but when subspecialists and the FDA[3] provide rational arguments to the contrary, perhaps he should listen.

The information from the clinical trials will only address SMA types 1 and 2, accounting for 87% of SMA.[4] Results are also pending for a presymptomatic trial that mimics newborn screening, a logical follow-up study. The sponsor should not be belabored for not crafting appropriate trials. The only areas that I, as a specialist in the field, bemoan are the cost of the drug and time it takes to publish clinical trial data in peer-reviewed journals. This is the best way to allow readers to come to their own opinion about the efficacy of nusinersen.

Randal Charles Richardson, MD, MMS

**Author Affiliation:** Gillette Children's Specialty Healthcare, St Paul, Minnesota.

**Corresponding Author:** Randal Charles Richardson, MD, MMS, Gillette Children's Specialty Healthcare, 200 University Ave E, St Paul, MN 55101 (rrichardson@gillettechildrens.com).

**Published Online:** May 7, 2018. doi:10.1001/jamapediatrics.2018.0772

**Conflict of Interest Disclosures:** Dr Richardson's institution receives funding from Biogen for its involvement in the EMBRACE clinical trial and nusinersen expanded access program. He has also acted as a consultant to Biogen through medical advisory boards.

**1.** Prasad V. Nusinersen for spinal muscular atrophy: are we paying too much for too little? *JAMA Pediatr.* 2018;172(2):123-125.

**2.** Center for Drug Evaluation and Research; US Deptartment of Health and Human Services. Application number: 209531Orig1s000: medical reviews. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/209531Orig1s000MedR.pdf. Accessed January 9, 2018.

**3.** Center for Drug Evaluation and Research; US Deptartment of Health and Human Services. Application number: 209531Orig1s000: cross discipline team leader review. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/209531Orig1s000CrossR.pdf. Accessed January 9, 2018.

**4.** Center for Drug Evaluation and Research; US Deptartment of Health and Human Services. Application number: 209531Orig1s000: office director memo. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2016/209531Orig1s000DMemo.pdf. Accessed January 12, 2018.

**In Reply** Richardson makes 4 errors. First, I note insurers might choose to decline coverage of nusinersen where it does not have randomized data supporting its use.[1] An insurer using controlled data to make coverage decisions for a drug that costs $750 000 in the first year and offers a marginal benefit has become a tragic reality of 2018. Because manufacturers price medications unconscionably, patients, payers, and society are put in the impossible position of choosing between costly, marginal drugs or the health needs of many children.

Second, data from CS4, the CHERISH study, are now published, but at the time of US Food and Drug Administration (FDA) approval it was specifically noted in the medical review as "not submitted as part of this NDA [new drug application] and therefore could not be reviewed."[2] SM202 was ongoing at the time of FDA approval.[2] The FDA makes this clear: "the sham-procedure controlled study CS3B is the one adequate and well-controlled efficacy study that can support approval of nusinersen."[2] Uncontrolled data offer limited value for judging the efficacy of this drug. If uncontrolled data were informative, sham control trials would not have been performed.

The CHERISH study now confirms the effect size of ENDEAR. Nusinersen improves the Hammersmith Functional Motor Scale–Expanded 3.9 points from baseline and 4.9 points vs sham control (final analysis).[3] Given that the mean Hammersmith Functional Motor Scale–Expanded score on entry was 22.4 in the Nusinersen group and 19.9 in the sham group (the scale ranges from 0 to 66), although this is a positive trial, nusinersen does not represent a cure, offers a marginal effect size, and leaves room for more effective agents.

© 2018 American Medical Association. All rights reserved.

Downloaded From:  by a Reprints Desk User  on 07/12/2018

# EXHIBIT BB

# HEALTHCARE FOR THE UNDOCUMENTED:
# SOLVING A PUBLIC HEALTH CRISIS IN THE U.S.

*Julianne Zuber*[*]

## I.   INTRODUCTION

The right to the highest attainable standard of health is a fundamental human right protected by international law.[1]  An important element of the right to health is that health care must be affordable and accessible to all without discrimination.[2]   In the United States, this fundamental right becomes increasingly complicated when discussing undocumented immigrants.   The Department of Homeland Security, in concert with Congress and state and local lawmakers, continues to struggle to find a balance between securing our nation's borders[3] and ensuring human rights are protected.[4]   The mandate under which the Patient Protection and Affordable Care Act of 2010 ("PPACA") was passed was to provide "affordable health care to all."[5]   However, the PPACA does not afford

---

[*] J.D. Candidate, The Catholic University of America, Columbus School of Law, May 2012; M.A., American University; B.S., Denison University.  The author wishes to thank her family and friends for their patience and support, especially Christopher.  She also wishes to thank the staff and editors of the *Journal of Contemporary Health Law and Policy* for all of their input, hard work, and dedication.

1.  PLATFORM FOR INT'L COOPERATION ON UNDOCUMENTED MIGRANTS, ACCESS TO HEALTHCARE FOR UNDOCUMENTED MIGRANTS IN EUROPE 6 (2007), http://www.picum.org/sites/default/files/data/Access%20to%20Health%20Care%20for% 20Undocumented%20Migrants.pdf [hereinafter PICUM].

2.  *Id.* at 60.

3.  *Mission Statement and Core Values*, U.S. CUSTOMS AND BORDER PROT. (Feb. 17, 2009), http://www.cbp.gov/xp/cgov/about/mission/guardians.xml.

4.  Candace Moore, *The Immigration Oversight and Fairness Act: Ending the Violation and Abuse of Immigrants*, 26 J. CONTEMP. HEALTH L. & POL'Y 148, 180-182 (2009).

5.  Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (to be codified as amended in scattered sections of 25 U.S.C., 26 U.S.C., 29 U.S.C., and 42 U.S.C.) (for ease of reference this also includes the amendments from the

350

undocumented immigrants the opportunity to purchase affordable health insurance.[6]

As a result, undocumented immigrants will continue to seek and receive health care under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), which requires hospitals to treat all patients, including undocumented immigrants, in emergency situations.[7]  However, since the EMTALA was enacted in 1986, state governments have spent billions of dollars[8] to offset the cost of treatment of undocumented immigrants.[9]  A 2010 report by the Federation for American Immigration Reform ("FAIR") estimates the total annual costs of undocumented immigration at the federal, state, and local levels to be about $113 billion—nearly $29 billion at the federal level and $84 billion at the state and local levels.[10]  Moreover, dozens of hospitals in Texas, New Mexico, Arizona, and California have been forced to close their doors, or face bankruptcy, because of this federally-mandated program requiring free emergency room services to

---

Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152, 124 Stat. 1029) [hereinafter PPACA].

6.  Vishal Agraharkar, *Deporting the Sick: Regulating International Patient Dumping by U.S. Hospitals*, 41 COLUM. HUM. RTS. L. REV. 569, 569-600 (2010).

7.  Emergency Medical Treatment and Active Labor Act of 1986, 42 U.S.C. § 1396 (1986), 1395dd (2006) [hereinafter EMTALA].

8.  *See Illegal Immigration and Public Health (2009)*, FED'N FOR AM. IMMIGRATION REFORM (FAIR), http://www.fairus.org/issue/illegal-immigration-and-public-health?A=SearchResult&SearchID=1677934&ObjectID=5123819&ObjectType=35 (last visited Apr. 14, 2012) (CA estimates they spend approximately $10.5B annually on providing health care to illegal aliens and their families).

9.  *See* U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-01-747, EMERGENCY CARE: EMTALA IMPLEMENTATION AND ENFORCEMENT ISSUES (2001).  (While the GAO has estimated that billions of dollars have been spent, an exact dollar value cannot be determined as upon entering emergency rooms undocumented immigrants typically provide false names, fake ID's, etc., making it nearly impossible for hospitals to track a specific number).

10.  JACK MARTIN & ERIC RUARK, FED'N FOR AM. IMMIGRATION REFORM (FAIR), THE FISCAL BURDEN OF ILLEGAL IMMIGRATION ON UNITED STATES TAXPAYERS 1 (2010), http://www.fairus.org/site/DocServer/USCostStudy_2010.pdf?docID=4921.

anyone regardless of their ability to pay, including undocumented immigrants.[11]

The budgetary burden placed on states and local hospitals because of the administration of health care to undocumented immigrants, combined with the absence of clear guidance from Congress or the current administration, has led hospitals to step away from their primary mission of patient care to become immigration enforcement.[12] This, more often than not, has led to medical repatriations that increase the health risks of undocumented immigrants.[13]

This Comment will examine how the latest federal health care legislation, PPACA, has left undocumented immigrants without reasonable access to health care while continuing to place an extreme financial burden on federal, state, and local taxpayers. After surveying the existing legislation, this Comment will identify both current and potential financial, social, and public health challenges that could arise if undocumented immigrants continue to be denied health care, or are confronted with substantial barriers to its access. These challenges, however, are not limited to the undocumented immigrant population because the general population is adversely affected as well. With these challenges in mind, this Comment will address why the federal government should take affirmative steps to provide undocumented immigrants with undeterred access to health care. Lastly, this Comment will make recommendations of how federal, state, and local governments can act together to accomplish this goal.

In order to ensure "health care for all Americans,"[14] the driving mandate under which the PPACA was passed, Congress should take legislative action to ensure the protection of a fundamental human right as defined by the international community, and reduce the financial burden being placed on federal, state, and local healthcare programs. Whether the action is in the form of improvements in the mandates provided to state and local lawmakers on existing law,[15] or the development of reform legislation

---

11.  *Id.* at 4.

12.  *See generally* MARTIN & RUARK, *supra* note 10.

13.  Deborah Sontag, *Deported by U.S. Hospitals,* N.Y. TIMES, Aug. 3, 2008, at A1.

14.  *See* PPACA, Pub. L. No. 111-148, 124 Stat. 119 (2010) (to be codified as amended in scattered sections of 25 U.S.C., 26 U.S.C., 29 U.S.C., and 42 U.S.C.).

15.  EMTALA, 42 U.S.C. § 1395dd (2006); *see also* Work Opportunity Reconciliation Act of 1996, 42 U.S.C. § 1396 (2006) [hereinafter Welfare Reform Act].

drawing on the successes in EU countries such as the Netherlands,[16] immediate action should be taken to reduce the financial cost-burden on states and strengthen public health.

## II. REGULATION AFFECTING UNDOCUMENTED IMMIGRANTS' HEALTH CARE

### A. *Emergency Medical Treatment and Leave Act ("EMTALA")*

The Emergency Medical Treatment and Active Labor Act of 1986 ("EMTALA") generally restricts the ability of hospitals to transfer or discharge a patient with an emergency medical condition prior to the patient's stabilization.[17] Specifically, Section 1396(b)(v)(3) of the EMTALA states that an emergency medical condition is:

> a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including extreme pain) such that the absence of immediate medical attention could reasonably be expected to result in A) placing the patient's health in serious jeopardy, B) serious impairment to bodily functions, or C) serious dysfunction of any bodily organ or part.[18]

"EMTALA was passed as a response to public outrage over alarming reports of hospitals engaging in 'patient dumping,'[19] the practice of refusing to treat patients in need of emergency care or transferring such patients prior to their stabilization."[20] Throughout the 1970s and 1980s, the number of uninsured individuals grew considerably, and amidst a recession and shrinking budgets, more and more hospitals began dumping patients for inability to pay or for other discriminatory, non-medical reasons.[21]

---

16. Johan P. Mackenbach & Karien Stronks, *The Development of a Strategy for Tackling Health Inequalities in the Netherlands*, 3 INT'L J. EQUITY HEALTH 1 (2004).

17. *See* EMTALA, 42 U.S.C. § 1395dd.

18. 42 U.S.C. § 1396b(v)(3) (2006).

19. Beverly Cohen, *Disentangling EMTALA from Medical Malpractice: Revising EMTALA's Screening Standard to Differentiate Between Ordinary Negligence and Discriminatory Denials of Care*, 82 TUL. L. REV. 645, 648–53 (2007).

20. Agraharkar, *supra* note 6, at 573.

21. Cohen, *supra* note 19, at 653.

354    *The Journal of Contemporary Health Law and Policy*   Vol. XXVIII:2

EMTALA banned these practices by requiring hospitals to screen all emergency room patients to determine whether or not they have an emergency medical condition.[22] If a hospital determines that a patient has an emergency condition, EMTALA restricts the hospital from transferring the patient until the patient has been stabilized.[23] The only exceptions to this rule are if the patient requests a transfer in writing after being informed of the hospital's obligations, or if a physician determines and certifies that the medical benefits of a transfer outweigh its risks.[24] EMTALA requires that if a hospital decides to transfer a patient, the hospital provide treatment that minimizes risks to the patient, find a receiving facility that is capable and willing to treat the patient, provide that facility with all medical records relating to the condition, and transport the patient using qualified personnel and proper equipment.[25] Additionally, the hospital may not delay in screening the patient or providing stabilizing treatment in order to resolve concerns about the patient's "method of payment or insurance status."[26]

EMTALA provides all individuals, regardless of their ability to pay, relatively equal access to emergency medical treatment.[27] The provisions also subject noncompliant hospitals to private actions by patients who suffer personal harm as a result of violations.[28] However once a patient is considered "stabilized," a hospital's duties to protect the patient under EMTALA are extinguished.[29] Per EMTALA, "stabilized" is defined as the point at which "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility."[30] Additionally, courts have held and

---

22.  *See* Agraharkar, *supra* note 6, at 573-74.

23.  EMTALA, 42 U.S.C. § 1395dd (2006).

24.  *Id.* § 1395dd(c).

25.  *Id.* § 1395dd(c)(2).

26.  *Id.* § 1395dd(h).

27.  *Id.*

28.  *See*, *e.g.*, Sontag, *supra* note 13, at A1.

29.  *Id.*

30.  *Id.*

subsequent regulations have agreed, that a hospital also discharges its obligations under EMTALA once it admits an individual as an inpatient, even if the individual has not yet been stabilized.[31]

### B.   Role of the Medicare and Medicaid Programs

EMTALA helps protect patients who are uninsured as well as those who have Medicare, Medicaid, or private insurance. It requires all hospitals that accept Medicare for any patient to provide necessary emergency care to all patients who come to the emergency department. Therefore, the financial impact of the undocumented immigrant usage of EMTALA "cannot be understood without a general overview of both the Medicare and Medicaid programs, particularly the coverage disjunction between the two as it affects disabled undocumented immigrants."[32]

### 1.   Medicare Reimbursement and Antidumping Laws

Medicare is a federal health insurance program created in 1965 that insures medical care for people sixty-five and over as well as for people under sixty-five who are entitled to disability benefits.[33] Most hospitals receive Medicare payments.[34] The program is funded through payroll taxes paid by U.S. workers and the amount paid is matched by their employers.[35] Medicare does not pay for nursing home care unless the patient requires skilled nursing care for the treatment of an acute medical problem.[36]

---

31.   *See id.*

32.   Kendra Stead, *Critical Condition: Using Asylum Law to Contest Forced Medical Repatriation of Undocumented Immigrants*, 104 Nw. U. L. Rev. 307, 344 (2010).

33.   Marshall W. Raffel & Camille K. Barsukiewicz, The U.S. Health System: Origins and Functions 32 (5th ed. 2002).

34.   *See, e.g.*, Sontag, *supra* note 13, at A1.

35.   *See* Donald A. Barr, Introduction to U.S. Health Policy: The Organization, Financing, and Delivery of Health Care in America 116 (2d ed. 2007). These tax revenues are deposited into a Medicare trust fund. Hospitals that treat Medicare recipients are paid by private companies who have contracted with the government. These companies are subsequently paid from the Medicare trust fund. *Id.*

36.   *Id.*

As previously discussed, under EMTALA, hospitals that receive Medicare funding and have emergency treatment facilities must treat all patients with emergency medical conditions who present themselves in the emergency department, regardless of the patient's insurance status.[37] Hospitals that fail to comply with these so-called "anti-dumping" laws[38] are subject to civil monetary penalties for each violation.[39] If hospitals fail to comply with their obligation to treat all emergency patients, in addition to paying fines, they risk losing their status as Medicare providers.[40] Because most hospitals are dependent on Medicare funds, they therefore comply with the emergency treatment rules.[41]

However, when a patient's discharge plan requires continuing care and the hospital can make no provisions, both the hospital and the patient are left in limbo. The hospital cannot discharge the patient without violating Medicare regulations (in order to receive federal funding), and the patient remains in the hospital but without receiving the type of treatment doctors have deemed medically appropriate.[42] Additionally, because undocumented immigrant patients are ineligible for any sort of federal financial assistance and cannot typically pay out of pocket, the hospital continues to incur the costs of housing and caring for the patient at a much higher daily rate than that associated with long-term care.[43]

Pursuant to EMTALA, all hospitals receiving federal Medicare funds are required to provide emergency care to all patients, regardless of immigration status or ability to pay.[44]   In 2003, the Medicare Modernization Act

---

37.   EMTALA 42 U.S.C. §§1395cc(a)(1)(I), 1395dd(b)(1)(A) (2006).

38.   RAFFEL & BARSUKIEWICZ, *supra* note 33, at 32.

39.   *See* 42 U.S.C. §1395dd(d)(1)(A) (2006).  Penalties can be assessed up to $50,000 per incident or, in a hospital with fewer than 100 beds, $25,000 per incident.  *Id.*

40.   *Id.*

41.   *See* EMTALA, 42 U.S.C. §1395dd(d)(3).

42.   *See generally*, Sontag, *supra* note 13.

43.   *Id.*

44.   *See* Brietta R. Clark, *The Immigrant Health Care Narrative and What It Tells Us About the U.S. Health Care System*, 17 ANNALS HEALTH L. 229, 238 (2008).

("MMA") overhauled the Medicare public health program to improve services, including prescription drugs, provided to eligible individuals.[45] As a part of the MMA, Congress appropriated $1 billion of the $549 billion dollar program[46] to help hospitals and certain other providers cover their costs of "providing emergency services required under [EMTALA] to undocumented immigrants."[47] EMTALA, however, only requires hospitals to stabilize an emergency medical condition and ensure that the transfer will not cause any further deterioration in the patient's condition.[48] It is therefore up to the doctors and hospital staff to determine whether or not the deterioration of the condition is likely. If a facility is found to be refusing patients or transferring them before they're stabilized (i.e. "patient dumping"), the hospital may be found in violation of EMTALA and thus subject to penalties, including civil monetary penalties, and license revocation.[49]

While studies have shown that patient dumping has increased, U.S. Department of Health and Human Services ("HHS") enforcement of EMTALA violations impacting undocumented immigrants has been "lax."[50] Over the past several years, the HHS caseload primarily consisted of cases involving Center for Medicare and Medicaid Services ("CMS") sanctions against nursing homes or HHS Inspector General ("IG") exclusion cases.[51]

---

45. Medicare Modernization Act, Pub. L. No. 108-173, 117 Stat. 2066 (2003) (codified at 26 U.S.C. §§ 139A, 223, 4980G (2006); 42 U.S.C. §§ 299b-7, 1395b-8, 1395b-9, 1395w-3a, 1395w-3b, 1395w-27a, 1395w-29, 1395w-101 to 1395w-104, 1395w-111 to 1395w-116, 1395w-131 to 1395w-134, 1395w-141, 1395w-151, 1395w-152, 1395cc-3, 1395kk-1, 1395zz, 1395hhh, 1396u-5 (2006)) [hereinafter MMA].

46. *Id.*

47. *Hospitals and Immigration: Testimony Before the H. Comm. on Ways and Means*, 109th Cong. (2006) (statement of Thomas Gustafson, Deputy Director, Center for Medicare Management, Centers for Medicare and Medicaid Services), *available at* http://www.hhs.gov/asl/testify/t060726c.html.

48. *See* EMTALA, 42 U.S.C. §§ 1395dd(c), 1395dd(e)(3)(A) (2006).

49. *Id.* § 1395dd(d)(1).

50. Special Advisory Bulletin on the Patient Anti-Dumping Statute, 64 Fed. Reg. 61,353 (Nov. 10, 1999).

51. *The Civil Remedies Division*, U.S. DEP'T OF HEALTH AND HUMAN SERVS., http://www.hhs.gov/dab/divisions/civil/index.html (last visited Apr. 14, 2012).

358    *The Journal of Contemporary Health Law and Policy*   Vol. XXVIII:2

### 2.   *Medicaid Criteria and Administration*

Medicaid, created by the federal government in 1965, is a program that provides health care to the poor.[52]   While Medicare is administered by the federal government, Medicaid is administered by the states and funded through a combination of state and federal funds.[53]   Unlike Medicare, which provides universal coverage for those below the poverty line,[54] particularly those over the age of sixty-five, coverage provided by Medicaid to those below the federal poverty line is dependent on how the state designs its program of coverage.[55]

Although state-specific, the general Medicaid requirements specify that, in most cases, recipients must be U.S. citizens, although certain noncitizen legal immigrants are entitled to Medicaid.[56]   Generally, there are three classes of people whose members are eligible for Medicaid: low-income families with children, elderly people who meet certain income requirements, and disabled people who meet certain income requirements.[57] The Refugee Act of 1980 added to this list by making immigrants who receive a grant of asylum entitled to receive Medicaid funds.[58]   For such

---

52.   *See* BARR, *supra* note 35, at 148.

53.   42 U.S.C. § 1396 (2006). The Medicaid statute specifies three groups of people whose members are eligible for Medicaid, low-income families with children, elderly people who meet certain income requirements, and disabled people who meet certain income requirements; *see also*, Stead, *supra* note 32, at 313. In order for a state to receive federal reimbursement, all members of the specified groups within the state must be eligible for Medicaid under the state's eligibility criteria. *Id.*

54.   *Poverty Guidelines, Research, and Measurement*, U.S. DEP'T OF HEALTH AND HUMAN SERVS., http://aspe.hhs.gov/poverty/index.shtml (last visited Mar. 30, 2012) (provides 2012 poverty line guidelines).

55.   42 U.S.C. §1396.

56.   Refugee Act of 1980, 8 U.S.C. § 1612(a)(2)(A) (2006) (asylees eligible for Medicaid); *see also* 8 U.S.C. § 1612(a)(2)(B) (stating: legal permanent residents of the United States who have worked for forty qualifying quarters of coverage may receive Medicaid).

57.   42 U.S.C. §1396.

58.   8 U.S.C. § 1612(a)(2)(A).

individuals, the statute limits the receipt of Medicaid funds to a period of seven years after asylum is granted.[59]

The burden of providing long-term or lifelong care to "unfunded" immigrant patients, asylum or otherwise, has led some hospitals to repatriate patients to their country of origin.[60]   While under the Medicaid statute each state has the option of covering a particular class of patients who are not in one of the three specified groups, but whose income falls below a state-specified level,[61] hospitals tend to find repatriation or deportation a less burdensome means.[62]

### C.   Seeking Asylum in the U.S. (Refugee Act and the Immigration and Nationality Act ("INA"))

To qualify for asylum in the United States, an applicant must show that he or she is a refugee within the meaning of the Immigration and Nationality Act ("INA").[63]   Because asylees are eligible for Medicaid, a successful asylum claim could be a potential solution to both the patient and the hospital.  Some undocumented immigrants seeking health care may be likely to have strong asylum claims.[64]

---

59.   *See id.*

60.   Stead, *supra* note 32, at 314; *see also, e.g.*, Marcus Barham, *Uninsured Immigrant Patients Sent Home for Care Against Their Will*, ABC News (May 22, 2008), http://abcnews.go.com/Health/Story?id=4903138&page=1.   *See also* 42 U.S.C. §1396 (stating that Medicaid pays for the cost of long-term care, an undocumented immigrant who is hospitalized after a traumatic injury and later requires sub-acute care can be transferred to a nursing home or rehabilitation facility because he will qualify for Medicaid).

61.   *See* Stead, *supra* note 32, at 313.

62.   *Medical deportation? 9OYS Finds Jesus Cornelio's Plight Is Not Unique*, 9 ON YOUR SIDE IMMIGRATION WATCH (Sept. 30, 2011), http://www.kgun9.com/news/local/130889953.html (one of the largest hospitals in Tucson, the University Medical Center, has admitted to having over 15 deportations a year).

63.   Immigration and Nationality Act of 1965, Pub. L. No. 89-236, 79 Stat. 911 (1965) (codified as amended in scattered sections of 8 U.S.C.).

64.   *See* Stead, *supra* note 32, at 317; *see also* Aliens and Nationality Act, 8 U.S.C. § 1158(b)(1)(B)(i) (2006) (stating that the burden of proof is on the applicant to establish that the applicant is a refugee; in establishing the statutory grounds for asylum Congress

360     *The Journal of Contemporary Health Law and Policy*   Vol. XXVIII:2

The INA defines a refugee as a person outside the country of his nationality who is unable or unwilling to return to that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.[65] A refugee applicant must show he or she fits within one of the five protected categories and link the persecution to that status.[66] As judicial interpretation of the Refugee Act has evolved, the restrictions imposed by the five categories have "proved to be among the most substantial barriers to relief."[67]

### D.     *2010 Patient Protection and Affordable Care Act ("PPACA")*

In 2010, the PPACA was passed under the mantra of providing "Health care for All."[68] However, the House version of the bill stated that, "nothing in this subtitle shall allow federal payments for affordability credits on behalf of individuals who are not lawfully present in the United States."[69]

---

sought to bring U.S. law into compliance with the 1951 United Nations Convention Relating to the Status of Refugees ("Convention") and its modifications in the 1967 Protocol ("Protocol")).

65.  *See* Stead, *supra* note 32, at 317; *see also* 8 U.S.C. § 1101(a)(42)(A) (2006) (indicating that the definition of the term "refugee" was modified by the Refugee Act of 1980 specifically to track the language of the Protocol).

66.  *See* Stead, *supra* note 32, at 317; *see also* Hincapie v. Gonzales, 494 F.3d 213, 217 (1st Cir. 2007) (holding that another element of an asylum claim based on persecution involves the nexus requirement, that is, whether the harm, if otherwise sufficient, has occurred (or is anticipated to occur) on account of one of the five statutorily protected grounds).

67.  *See* Stead, *supra* note 32, at 317; *see also* MARK VON STERNBERG, THE GROUNDS OF REFUGEE PROTECTION IN THE CONTEXT OF INTERNATIONAL HUMAN RIGHTS AND HUMANITARIAN LAW: CANADIAN AND UNITED STATES CASE LAW COMPARED (The Hague: MartinusNijhoff 2002) (describing the criteria for applications for asylum, specifically they must be filed within one year of arrival into the United States unless the applicant can demonstrate that extraordinary circumstances beyond his control prevented him from filing or that a change in circumstances has affected his eligibility for asylum).

68.  PPACA, Pub. L. No. 111-148, § 1, 124 Stat. 119, 119 (2010) (to be codified as amended in scattered sections of 25 U.S.C., 26 U.S.C., 29 U.S.C., and 42 U.S.C.).

69.  *See* Patient Protection and Affordable Care Act of 2010, H.R. 3590, 111th Cong. (2010).

Thus, the law explicitly prohibits undocumented immigrants from participating in the new health insurance exchanges.[70] As a result, there is currently no domestic framework in the U.S. to ensure adequate long term access to health care for undocumented immigrants.

One of the objectives of the PPACA was to reduce the use of emergency room ("ER") care by the uninsured through imposing the "individual mandate" requirement.[71] The intention of the PPACA was to reduce the demand on ER care, thus EMTALA is still necessary.[72] If the uninsured could access care in cheaper clinical settings, they could get the same or better services at a lower total cost than the hospital ER facility.[73] In reality, studies conflict on what the actual cost of ER care is in comparison with a specialized clinic, and it is still up for debate how much it is possible to increase efficiency and how much efficiency loss might result from clinical waste in routine services used by the newly insured.[74]

### E.   International Protection of Human Rights

#### 1.   Right to Life and Health Care—Universal Declaration of Human Rights

On December 10, 1948, the General Assembly of the United Nations adopted and proclaimed the Universal Declaration of Human Rights ("UDHR"), which called upon all member countries to publicize the text of the UDHR and "to cause it to be disseminated, displayed, read and expounded principally in schools and other educational institutions, without

---

70.   *Id.*

71.   *See, e.g.,* William F. Frist, *An Individual Mandate for Health Insurance Would Benefit All,* US NEWS (Sept. 28, 2009), http://www.usnews.com/articles/opinion/2009/09/28/frist-an-individual-mandate-for-health-insurance-would-benefit-all.html?PageNr=2.

72.   *See* PPACA, 124 Stat. at 171.

73.   *Id.* at 156.

74.   Press Release, RAND Corporation, RAND Study Shows Relatively Little Public Money Spent Providing Health Care to Undocumented Immigrants (Nov. 14, 2006), http://www.rand.org/news/press/2006/11/14.html.

362     *The Journal of Contemporary Health Law and Policy*   Vol. XXVIII:2

distinction based on the political status of countries or territories."[75] Extrajudicial medical repatriations violate UDHR's guarantee to "the right to life, liberty and security of person."[76]

The United States has fully supported the spirit of the UDHR including signing the two treaties that were intended as legal enforcement mechanisms: the "International Covenant on Civil and Political Rights" and the "International Covenant on Economic, Social and Cultural Rights."[77] While the United States has fully supported the UDHR, it is currently falling short of the intention of these international treaties: by not addressing the fundamental human right and UDHR guarantee of health care for all in the PPACA, continuing to not cover undocumented immigrants, and allowing medical repatriations to continue in the U.S. health care system.

### III.   CHALLENGES TO PROVIDING UNDOCUMENTED IMMIGRANTS WITH HEALTHCARE

U.S. healthcare providers, states, and the federal government continue to react on a case-by-case basis to the undocumented immigrant crisis. Any solution to this crisis should address the following challenges detailed below, including the financial burden that the states and hospitals continue to carry, the risk of the outbreak of a new disease, and the public perception of human rights violations.

#### A.   *States and Hospitals Continue to Burden the Cost*

In 2010, a report by FAIR estimated the total annual cost of undocumented immigrants to be "nearly $29 billion at the federal level and $84 billion at the state and local level," primarily at emergency rooms and free clinics.[78]   The report determined that approximately 21% of those expenditures were related to medical care for undocumented immigrants resulting in $5.9 billion spent at the federal level and approximately a total of $17 billion spent at the state and local levels with primary expenditures

---

75.   Universal Declaration of Human Rights, G.A. Res. 217 (III), at 71, U.N. Doc. A/RES/217(III) (Dec. 10, 1948), *available at* http://www.un.org/en/documents/udhr/index.shtml.

76.   *Id.*

77.   *Id.*

78.   *See* MARTIN & RUARK, *supra* note 10, at 1, 15.

being in the border and port-of-entry states (e.g., CA, AZ, FL, TX, NY, etc.).[79]

While research has been conducted to estimate the amount of taxes that are paid by undocumented immigrant workers, most undocumented immigrants do not pay income taxes, and those who do are typically able to claim tax credits.[80]

### 1.   Example of Failed Congressional Intervention

The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("Welfare Reform Act") was passed by Congress in response to the states' hostility towards the high cost of providing social services to undocumented immigrants.[81]   The Welfare Reform Act reduced reimbursement for hospitals that provided medical care to undocumented immigrants by further restricting Medicaid eligibility.[82]   The Welfare Reform Act provided that "it is a compelling government interest to remove the incentive for [undocumented] immigration provided by the availability of public benefits."[83]   However, the Welfare Reform Act did not remove every avenue of health care for undocumented immigrants, nor did it ease the financial burden on the states.[84]   The legislation contains an exception stating that federal Medicaid assistance is provided for treatment of "emergency medical conditions"[85] and "assistance for immunizations with

---

79.   *Id.* at 2-4.

80.   *Id.* at 1.

81.   Thomas J. Espenshade et al., *Implications of 1996 Welfare and Immigration Reform Acts for U.S. Immigration*, 23 Population & Dev. Rev. 769, 770 (1997).

82.   8 U.S.C. § 1611(a) (2006) (denying federal public benefits to those who are not qualified aliens).  Even qualified aliens are denied federal public-health benefits for five years. *Id.* § 1613(a).

83.   *Id.* § 1601(6). The government estimated cost savings of $54 billion over the course of the six years since its enactment.

84.   8 U.S.C. § 1621 (2006).

85.   8 U.S.C. § 1621(b)(1). The term "emergency medical condition" is defined in Section 1396b(v)(3) of Title 42.

respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases"[86] regardless of immigrant status.[87]

The immigrant provisions in the Welfare Reform Act curtailed states' ability to serve the immigrant population under Medicaid and thus arguably served as a dis-incentive for illegal entry into the United States. However, the Welfare Reform Act did nothing to address the health care issues that result from undocumented immigrants currently in the country.  As a result of the Welfare Reform Act, "states and localities [continue to] bear the brunt of federal policies that attempt to promote immigration policy through programs designed to achieve public-health objectives."[88]  By reducing the availability of federal funds, the Welfare Reform Act merely shifts the financial burden of providing medical care to uninsured, undocumented immigrants to states, localities, and hospitals, but it does not reduce the costs.[89]

### 2.  Annual Cost of EMTALA

As previously mentioned, under EMTALA, hospitals are required to provide emergency medical care to all persons regardless of their immigration status in order to qualify for Medicaid funding.[90]  The Census Bureau data shows that 32% of Hispanics, 20% of African Americans, and 11% of non-Hispanic whites are uninsured.[91]  The percentage of uninsured,

---

86.  8 U.S.C. § 1621(b)(3).

87.  *See* Espenshade et al., *supra* note 81, at 772-773.

88.  *See generally* Janet M. Calvo, *The Consequences of Restricted Health Care Access for Immigrants: Lessons from Medicaid and SCHIP*, 17 ANNALS HEALTH L. 175, 179, 184 (2008) (discussing the conflicting judicial interpretations of the definition of "emergency medical condition" and the conflict between state and federal authorities related to defining the term).

89.  Lindita Bresa, *Uninsured, Illegal, and in Need of Long-Term Care: The Repatriation of Undocumented Immigrants by U.S. Hospitals*, 40 SETON HALL L. REV. 1663, 1667 (2010).

90.  *See* EMTALA, 42 U.S.C. § 1395dd(b)(1) (2006).

91.  Robert Pear, *United States Is Linking Status of Aliens to Hospital Aid*, N.Y. TIMES, Aug. 10, 2004, at A1.

non-citizen Hispanics is 55%.[92]   Moreover, as undocumented immigrants tend to be poor and lack private or employment insurance, they are more likely to use emergency rooms as their principal source of medical care.[93]   It has been estimated that hospitals are collectively spending about $2 billion a year in unpaid medical expenses to treat undocumented immigrants.[94]   This is in addition to the $250 million of reimbursements made to hospitals under EMTALA in 2010.[95]   Between 1993 and 2003, sixty California hospitals were forced to close, and many scaled back their services, due to outstanding bills for services rendered.[96]

Hospitals receive federal funds to stabilize the patients that enter the emergency rooms.[97]   However, cases where patients require extensive medical care after stabilization are especially problematic.   Undocumented immigrants, often uninsured and ineligible for Medicaid, cannot afford such treatments, and no state medical center will accept them without insurance of Medicaid coverage.[98]   Thus, hospitals end up caring for, and absorbing the expenses for, undocumented immigrant patients until they find a way to discharge them.[99]   In doing so, some hospitals go as far as flying or driving the patients to their countries of origin.[100]   Further, the existence of untreated

---

92.   *Id.*

93.   Dana Canedy, *Hospitals Feeling Strain from Illegal Immigrants*, N.Y. TIMES, Aug. 25, 2002.

94.   *Id.*

95.   *See* MARTIN & RUARK, *supra* note 10, at 15.

96.   Madeleine Pelner Cosman, *Illegal Aliens and American Medicine*, 10 J. AM. PHYSICIANS & SURGEONS 6 (2005) (suggesting that one of the country's best emergency medical response organizations, Los Angeles County Trauma Care Network, was mostly dismantled as a result of EMTALA and the burden illegal immigrants place on it).

97.   *See* EMTALA, 42 U.S.C. § 1395dd (2006).

98.   *Id.*

99.   *See* Canedy, *supra* note 93 ("Hospitals insist that they are not turning away critically injured people, but they are becoming more aggressive in seeking ways to release them").

100.   *Id.*

immigrants poses a significant risk to the public health.[101]   According to the federal Centers for Disease Control and Prevention ("CDC"), from 2006 through 2010, the top five countries of origin of foreign-born persons with tuberculosis ("TB") were Mexico, the Philippines, Vietnam, India, and China, with foreign-born Hispanics and Asians together representing 48% of the national case total.[102]   The CDC goes on to state that in order to eliminate TB, efforts to address the disparities (in healthcare) that exist between U.S.-born and foreign-born persons should continue.[103]

In 2003, Congress enacted Section 1011 in the MMA,[104] recognizing that the EMTALA admission requirement constituted a major funding obligation on local medical facilities, and that many medical facilities had begun to close their emergency rooms because of the burden of uncompensated costs.[105]   The largest allocations in the 2005 fiscal year went to California, which received $70.8 million; Texas, $46 million; Arizona, $45 million; New York, $12.3 million; Illinois, $10.3 million; Florida, $8.7 million; and New Mexico, $5.1 million.[106]   The MMA legislation provided for federal reimbursement of emergency medical care extended to undocumented immigrants.[107]   Specifically, it authorized a $1 billion program, at $250 million each year for 2005 through 2008, with a targeted distribution to facilities in the states bordering Mexico.[108]

---

101.  *Id.*

102.  *Reported Tuberculosis in the United States*, CTRS. FOR DISEASE CONTROL AND PREVENTION, http://www.cdc.gov/Features/dsTB2010Data/ (last visited Mar. 30, 2012) (statistics on TB cases within the U.S. through 2010).

103.  *Id.*

104.  MMA, Pub. L. No. 108-173, 117 Stat. 2066 (2003).

105.  John Tanton, *Welfare Costs for Immigrants*, THE SOCIAL CONTRACT (Fall 1992), http://www.thesocialcontract.com/artman2/publish/tsc0301/article_192.shtml.

106.  *See* Pear, *supra* note 91 (identifying which states were given federal aid to relieve the economic burden that illegal immigrants place on local hospitals).

107.  *See* MARTIN & RUARK, *supra* note 10, at 15.

108.  *Id.*

*Healthcare for the Undocumented*

The recently adopted PPACA did not provide for participation by undocumented immigrants.[109] Because the PPACA did not provide any alternative reimbursement means for hospitals treating undocumented immigrants, the only legal means by which a hospital may be reimbursed for services provided to undocumented immigrants remains the EMTALA.[110] This legislation was originally an attempt at a band-aid, however, the federal government cannot continue to bail-out hospitals to alleviate this financial burden. Instead, a more proactive approach should be taken.

### 3. Fraudulent Use of Medicaid

Although undocumented immigrants are precluded from Medicaid coverage, some fraudulently access this program. Only anecdotal information is available about the amount of Medicaid usage by undocumented immigrants who use stolen identities of U.S. citizens or qualified green card permanent residents, however, in a 2010 report, FAIR estimated the annual cost of undocumented immigrants' use of Medicaid to be approximately $2.4 billion dollars per year.[111]

Medicaid generally covers about half the cost of medical treatment to low-income families without health insurance. Over the past several years, because of the recession, the federal contribution to Medicaid coverage has been temporarily increased as part of the American Recovery and Reinvestment Act.[112] While there is no reliable data on Medicaid fraud because there is no requirement that medical facilities providing Medicaid compensated treatment verify the identity of patients, FAIR assumed that it may be roughly equal to the number of undocumented immigrants who are obtaining emergency medical treatment under EMTALA without falsely claiming Medicaid eligibility.[113]

Opponents of providing health care for undocumented immigrants highlight the burden placed on the hospitals to finance and provide medical

---

109. PPACA, Pub. L. No. 111-148, 124 Stat. 119, 143 (2010) (to be codified as amended in scattered sections of 25 U.S.C., 26 U.S.C., 29 U.S.C., and 42 U.S.C.).

110. EMTALA, 42 U.S.C. § 1395dd (2006).

111. MARTIN & RUARK, *supra* note 10, at 17.

112. American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

113. MARTIN & RUARK, *supra* note 10, at 8.

care to undocumented mothers for childbirth.[114]  This is a phenomenon that is commonly referred to as "anchor babies."[115]  Annually, between 300,000 and 350,000 children born to undocumented immigrants will qualify for citizenship under the Fourteenth Amendment to the United States Constitution.[116]  According to the 2010 study completed by FAIR, these "anchor babies" equated to nearly $2.3 billion in additional annual federal expenditures for the federal government.[117]

Other studies have shown higher childbirth related hospitalizations for the undocumented.[118]  For example, 1.7%[119] of the total population in the United States was hospitalized for childbirth-related treatment in 1997.[120]  Whereas in the last year, the U.S. Census Bureau reported that undocumented immigrants accounted for 56.4% of the births among immigrants and 17.2% of all births in the United States.[121]  Moreover, in the border states, such as New Mexico, the figures are much higher than the average.[122]

---

114.  Pelner Cosman, *supra* note 96, at 7 (explaining the incentive behind illegal immigrants giving birth within the United States).

115.  *Id.*

116.  *Id.*  "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside." *Id.*

117.  *See* MARTIN & RUARK, *supra* note 10, at 38.

118.  *See* Pelner Cosman, *supra* note 96 (discussing the fact that many immigrant families have children that are American citizens).

119.  *Id.*

120.  *Id.*  Estimated rates among undocumented immigrants in the survey sites were higher, from 3.4% in Fresno to 4.6% in El Paso. *Id.*

121.  STEVEN A. CAMAROTA, CTR. FOR IMMIGRATION STUDIES, BACKGROUNDER, BIRTH RATES AMONG IMMIGRANTS IN AMERICA: COMPARING FERTILITY IN THE U.S. AND HOME COUNTRIES (2005), http://www.cis.org/articles/2005/back1105.pdf.

122.  *Census 2010 Data*, CENSUS.GOV, http://www.cis.org (last visited Feb. 2, 2011) (ranging between 55.1 and 9.7%; in Texas, 54.8 and 16.6%; and in California, 47.7 and 22.1%).

When an undocumented immigrant gives birth in the U.S., the child is eligible for Medicaid coverage if the household meets the income requirements.[123]   The population of U.S.-born children of undocumented immigrants is about 3.4 million, and approximately 2.3 million have no health insurance.[124]   Furthermore, about one-third of this population, or 770,000, will meet the income eligibility criteria for enrollment in Medicaid.[125]   The share used by the children of undocumented immigrants indicates that the amount of those outlays was nearly $2.4 billion.[126]   In 2003 the U.S. health care system, under EMTALA, provided childbirth support for nearly 250,000 undocumented mothers.[127]

### B.   Public Health Risks—Spreading Disease

Another challenge that is raised by the absence of clear affordable health care for undocumented immigrants is the threat of the spread of disease.[128] Undocumented immigrants, unlike those who are legally admitted for permanent residence, undergo no medical screening to assure that they are not bearing contagious diseases.[129]   This is a tremendous risk to the public health, where we have seen resurgence of contagious diseases that had been

---

123.   *See* Pelner Cosman, *supra* note 96 (discussing the fact that many immigrant families have children that are American citizens); *see also State Medicaid Fact Sheet*, KAISER STATE HEALTH FACTS, http://www.statehealthfacts.org/medicaid.jsp (last visited Mar. 30, 2012) (the number of undocumented immigrants constitutes about 2.6% of all children enrolled in Medicaid; the amount of federal expenditures on Medicaid for children in 2007 is $90.3 billion).

124.   MARTIN & RUARK, *supra* note 10, at 17.

125.   *Id.*

126.   *Id.*

127.   *Id.* at 57.

128.   *TB Notes Newsletter, Communications, Education, and Behavioral Studies Branch     Update     2010*, CTR.   FOR   DISEASE   CONTROL   (CDC), http://www.cdc.gov/tb/publications/newsletters/notes/TBN_1_10/cebsb_update.htm (last visited Mar. 30, 2012).

129.   Pelner Cosman, *supra* note 96, at 8.

370     *The Journal of Contemporary Health Law and Policy*   Vol. XXVIII:2

totally or nearly eradicated.[130]   Excluding undocumented immigrants from
receiving government-funded health care services is unlikely to reduce the
level of immigration and very likely to affect the well-being of the children
who are United States citizens living in immigrant households.[131]   Children
born to undocumented immigrant families in the United States are less likely
to receive available health care due to their parent's immigration status.[132]
This will have long-term, adverse effects on the health of United States
citizens, a result contrary to state and federal objectives.[133]

A crucial component of controlling the spread of infectious diseases is
early identification and treatment.[134]   Placing barriers to accessing regular
health care for undocumented immigrants threaten community resilience
because those with pre-existing health conditions are more vulnerable to
suffer severe effects from a disease outbreak or public health emergency.[135]
The political decision not to allow undocumented immigrants the option to
purchase health care in PPACA could have serious consequences for our
nation's health security, especially in the event of another pandemic, or a
bioterrorist attack.

An example can be seen in the resurgence of TB across several states,
including Maine, Virginia, Florida, Texas, and Michigan.[136]   As of the early
1990's, TB had largely disappeared from the U.S.[137]   However, in 2001 the

---

130.   *Id.*

131.   *Id.*

132.   Leo R. Chavez et al., *Undocumented Latin American Immigrants and United
States Health Services: An Approach to a Political Economy of Utilization*, 6 Med.
Anthropology 6 (1992) (mentioning the case of Sandra Navarrete, the child of an
undocumented Mexican couple who died of chicken pox because her parents did not seek
medical care until it was too late).

133.   Marc L. Berk et al., *Health Care Use Among Undocumented Latino Immigrants:
Is Free Health Care the Main Reason Why Latinos Come to the United States?*, 19
HEALTH AFF. 51, 57 (2000).

134.   *See* Chavez et al., *supra* note 132.

135.   *Id.*

136.   *See Reported Tuberculosis in the United States*, *supra* note 102.

137.   Pelner Cosman, *supra* note 96, at 8.

Indiana School of Medicine studied an outbreak of TB and traced it to Mexican undocumented immigrants.[138]  According to the CDC, 66% of all TB cases coming to America originate in Mexico, the Philippines, and Vietnam.[139]

### C.    Human Rights Concerns

#### 1.    Medical Repatriation—Jimenez

In February 2000, Luis Alberto Jimenez was returning home from working as a landscaper in Florida when the car he was riding in was struck by a drunk driver with a blood alcohol level that was four times the legal limit.[140]  Although the drunk driver was a U.S. citizen with a significant criminal history, Jimenez was a 35 year-old undocumented immigrant who had left his family behind in Guatemala two years prior and immigrated to the United States in pursuit of his dream of working hard, earning significantly more money, and ultimately being able to buy land and cultivate his own garden back home to support his family.[141]  As a result of the head-on crash, Mr. Jimenez was catastrophically injured and two of his fellow immigrant landscapers in the car with him died instantly.[142]

Mr. Jimenez was rushed to Martin Memorial Medical Center and was diagnosed as having sustained traumatic brain damage and severe physical injuries, with his prognosis described as "poor."[143]  Mr. Jimenez was treated and remained hospitalized at Martin Memorial for approximately four months.[144]  In June 2000, Martin Memorial transferred Mr. Jimenez to a

---

138.  *Id.*

139.  *Id.*

140.  Montejo v. Martin Mem'l Med. Ctr., Inc., 874 So. 2d 654, 655-56 (Fla. Dist. Ct. App. 2004); *see also* Sontag, *supra* note 13.

141.  *See, e.g.*, Sontag, *supra* note 13.

142.  *Id.*

143.  *See Montejo*, 874 So. 2d at 656; Sontag, *supra* note 13.

144.  *Montejo*, 874 So. 2d at 656 (illustrating that because the accident left Mr. Jimenez incapacitated, both physically and mentally, a court appointed Mr. Jimenez's cousin as his legal guardian.  While at the nursing home, Mr. Jimenez's health deteriorated dramatically, resulting in his readmission to Martin Memorial for emergency

nursing home for ongoing care and rehabilitation.[145]   When Martin Memorial could not find a long-term care facility that would accept Mr. Jimenez, it sought a court order authorizing it to return him unilaterally to Guatemala.[146]

On June 27, 2003, over the objections of Mr. Jimenez and his guardian Mr. Montejo, the Florida State Circuit Court granted the order allowing Martin Memorial to charter a private plane and medical attendant to return forcibly Mr. Jimenez to Guatemala.[147]   Mr. Jimenez moved for a rehearing but it was denied on July 9, 2003.[148]   On that same day, Mr. Montejo filed a notice of appeal along with an emergency motion for a stay pending appeal.[149]   However, the next morning, before the court had an opportunity to rule on the emergency stay, Martin Memorial forcibly ushered Mr. Jimenez to a hospital in Guatemala that could not treat brain injuries, which subsequently discharged him to his elderly mother's house in a mountainous region of Guatemala where he remains to date.[150]

A New York Times reporter who visited Mr. Jimenez in the summer of 2008 found him largely confined to his bed and suffering from routine seizures;[151] he had not received medical care for over five years.[152]   Martin Memorial spent $1.5 million caring for Mr. Jimenez.[153]   The federal

---

treatment in January 2001.  At the time that Mr. Jimenez was re-admitted, he was "emaciated and suffering from ulcerous bed sores so deep that the tendons behind his knees were exposed."  Mr. Jimenez's infection was so severe that doctors questioned whether the condition might be terminal.  Martin Memorial treated Mr. Jimenez, and he remained in a vegetative state for over a year but then improved).

145.   *Id.*

146.   *See, e.g.*, Sontag, *supra* note 13.

147.   *Id.*

148.   *Id.*

149.   *See Montejo*, 874 So. 2d. at 654.

150.   *Id.*

151.   *See, e.g.*, Sontag, *supra* note 13.

152.   *See Montejo*, 874 So. 2d at 654.

153.   *Id.* at 656.

government reimbursed the hospital approximately $80,000 under the Medicaid provisions for emergency care for undocumented individuals.[154]

Medical repatriations such as what occurred in the *Montejo* case violate several international human rights obligations, including the UDHR and the International Covenant on Civil and Political Rights.[155]   However, with mounting budget pressures and an unstable economy, what alternatives to medical repatriation do health care facilities have?

## IV.  RECOMMENDATIONS FOR REFORM

### A.   *Refugee Status*

Unfortunately, the *Montejo* decision demonstrated that in order for a plaintiff to overcome a hospital's decision for repatriation, he or she would require direct evidence outside of the hospital's discharge plan.[156]   However, simply restricting hospitals from repatriating does not change the patient's medical needs or alleviate the strain on an individual hospital's budget.[157]

There are several ways an undocumented immigrant can qualify for asylum in the U.S., including the changed circumstance exception, membership in a particular social group, and fear of persecution on the basis of that membership.[158]   If an undocumented immigrant is able to meet those elements, then he or she can qualify for Medicaid coverage for up to seven years.[159]

### 1.   *Changed Circumstances*

Some undocumented immigrants may be able to successfully claim asylum under the change in circumstance exception, based on the situation

---

154.  *Id.*

155.  Universal Declaration of Human Rights, G.A. Res. 217 (III), at 71, U.N. Doc. A/RES/217(III) (Dec. 10, 1948), *available at* http://www.un.org/en/documents/udhr/index.shtml.

156.  *See* Stead, *supra* note 32, at 325.

157.  *Id.*

158.  *Id.*

159.  *Id.*

that led to their hospitalization.  Once an undocumented immigrant is granted asylum, he or she would then have clear grounds on which to fight the repatriation or deportation effort.[160]  Because those granted asylum qualify for Medicaid for a period of seven years, a hospital considering repatriation or deportation would likely stop the process to pursue reimbursement from Medicaid.[161]

For example, a serious accident or illness can be such a transformational event as to make one a member of a particular social group to which he did not previously belong.[162]  In Mr. Jimenez's situation, the automobile accident resulted in dramatically reduced cognitive function and his inability to walk or move himself from bed to wheelchair.[163]  As demonstrated by that case, a disability can form the basis of a cognizable social group.[164]  The acquisition of a disability or debilitating illness could be a change in circumstances affecting one's eligibility for asylum.[165]  Therefore, immigrants suffering from a severe disability that was acquired more than one year after they entered the United States should qualify for a changed personal circumstances exception to the one-year filing bar based on the recently acquired disability status.[166]

### 2.   *Particular Social Group*

Once an asylum applicant is granted a change in circumstances exception to the one-year filing period, the applicant will still have to demonstrate membership in a particular social group and a well-founded fear of persecution on the basis of that membership.[167]  In *Tchoukhrova v.*

---

160.  *Id.*

161.  *See, e.g.*, Sontag, *supra* note 13.

162.  Tchoukhrova v. Gonzales, 404 F.3d 1181, 1189 (9th Cir. 2005).

163.  *See, e.g.*, Sontag, *supra* note 13.

164.  *See Tchoukhrova*, 404 F.3d at 1189.

165.  *See, e.g.*, Sontag, *supra* note 13.

166.  *Id.*

167.  *Asylum    Protection    Fact    Sheet*,    U.S.    DEP'T    OF    JUSTICE, http://www.justice.gov/eoir/press/05/AsylumProtectionFactsheetQAApr05.htm    (last visited Feb. 2, 2011).

*Gonzales*, the U.S. Court of Appeals for the Ninth Circuit declined to say whether "disabled persons" qualify as a particular social group in countries other than Russia and the United States.[168]   It is likely, however, that disabled persons will be recognized as a social group regardless of their home country.[169]

The United Nations has recognized people with disabilities as a particular group insofar as it has published a set of goals, known as the "Standard Rules," for promoting and advancing the rights of persons with disabilities.[170]   The Standard Rules, which are not legally binding but are intended to represent a moral commitment of member nations, state that "[i]n all societies of the world there are still obstacles preventing persons with disabilities from exercising their rights and freedoms and making it difficult for them to participate fully in the activities of their societies."[171] The recognition of persons with disabilities as a group by the United Nations, the body that promulgated the five protected categories, certainly lends support to group membership claims based on disability, regardless of the home country.

### 3.   Fear of Future Persecution

Once the applicant has established membership in a particular social group covered by the INA, he still must assert a well-founded fear that he will suffer persecution based upon that membership.[172]   For a patient to claim he fears persecution in his home country based on inadequacy of medical treatment, the applicant must assert not just that disabled persons within the home country receive medical care that is below the standard they would receive within the United States, but also that such persons are discriminated against in the provision of care because of their disabilities.[173]

---

168.   *See Tchoukhrova*, 404 F.3d at 1189.

169.   *Id.*

170.   Standard Rules on the Equalization of Opportunities for Persons with Disabilities, G.A. Res. 48/96, U.N. Doc. A/RES/48/96 (Dec. 20, 1993).

171.   *Id.* at 14-15.

172.   *See Asylum Protection Fact Sheet, supra* note 167.

173.   *Id.*

In *Ramdane v. Mukasey*, while denying the applicant's assertion that he had a well-founded fear of persecution, the U.S. District Court suggested that the appropriate standard for analyzing medical-based persecution was whether the applicant "would suffer such a low standard of medical care in [the home country] that he would suffer deprivation of his life or freedom."[174] If a patient can be kept alive and there are medical opinions that repatriation to the home country's public hospital system is likely to result in the patient's death, the patient in question is clearly facing a threat to life or freedom that his government is unable or unwilling to control.[175] As discussed above, this low standard of care would have to be tied to the patient's disabled status.[176]

Mr. Jimenez's case would likely meet this standard. Not only was he not receiving the rehabilitative services doctors had found he needed, he was not even receiving the most basic levels of hygienic care.[177] Without medication or medical attention, Mr. Jimenez was at risk of death from a seizure-related accident or from infection.[178] It is important to note, however, that many patients will not be able to demonstrate such a low standard of care in the home country that they will be able to claim successfully a legitimate fear of persecution.[179] A standard of care that is merely lower than that available in the United States will not sustain a claim of a well-founded fear of persecution.[180]

## B.   Leaving It Up to the States

The states do not currently have the incentives or the legal authority to take on the cost of health care for the undocumented immigrant population. In *Aliessa v. Novello*, the New York Supreme Court held that state governments were without power to limit the rights of those immigrants

---

174.   Ramdane v. Mukasey, 296 F. App'x 440, 447 (6th Cir. 2008).

175.   *Id.*

176.   *See, e.g.*, Sontag, *supra* note 13.

177.   *See id.*

178.   *Id.*

179.   *See Ramdane*, 296 F. App'x at 447.

180.   *Id.*

deemed qualified for health care and public benefits under the Welfare Reform Act.[181]   In fact in 1994, when California (the border state who spends the most annually out of any other border state on undocumented immigrated health care)[182] attempted to pass its own cost-managing ballot initiative to establish a state-run citizenship screening system and prohibit undocumented immigrants from using health care (known as Proposition 187), a district court judge overruled major portions of Proposition 187 on grounds of preemption.[183]   Therefore, there is very little that the states can do independent of federal intervention.

### C.   *The Netherlands as an Example of Health Care Reform*

Another possible solution to the challenge of healthcare for undocumented immigrants would be a revision of the PPACA or inclusion of a health insurance mandate in any comprehensive immigration reform that moves forward in Congress.  The Netherlands could be used as a potential model of this type of reform legislation.  In 2006, the Dutch government implemented health reform under a competitive market theory, where rather than regulating the supply of health care, the Dutch stimulated competition, thus driving down costs.[184]

---

181.   *See* Aliessa v. Novello, 754 N.E.2d 1085, 1093 n.12 (N.Y. 2001) (holding unconstitutional a New York state statute that denied Medicaid funds to certain legal and "qualified" residents); *see also* Marjorie A. Shields, *Annotation, Validity, Construction, and Application of State Statutes Limiting or Barring Public Health Care to Indigent Aliens,* 113 A.L.R. 5th 95, 102 (2003) (noting that by enacting the Welfare Reform Act, which demanded denial of federal, state, and local health care, welfare and post-secondary education grants to aliens who were not "qualified"—i.e. illegal aliens or immigrants living and working in the United States for fewer than ten years—Congress took away the states' power to regulate allocation of public benefits to those immigrants who were deemed qualified under the Welfare Reform Act).

182.   *See* MARTIN & RUARK, *supra* note 10.

183.   *See* League of United Latin Am. Citizens v. Wilson, 997 F. Supp. 1244, 1261 (C.D. Cal. 1997) (holding that the Personal Responsibility and Work Opportunity Reconciliation Act (Welfare Reform Act) preempted portions of Proposition 187 because it required denial of social benefits and health services to certain non-citizen aliens that are qualified for such benefits under the Welfare Reform Act).

184.   Ryan Lynch & Eline A. Henburg-van den Broek, *The Drawbacks of Dutch-Style Health Care Rules: Lessons for Americans*, THE HERITAGE FOUND. (July 22, 2010), http://www.heritage.org/research/reports/2010/07/the-drawbacks-of-dutch-style-health-care-rules-lessons-for-americans.

378      *The Journal of Contemporary Health Law and Policy*   Vol. XXVIII:2

A distinctive feature of the Dutch health care system is the existence of a health insurance scheme for "exceptional medical expenses" ("AWBZ"), which is compulsory for the entire population, including undocumented immigrants.[185]  The "sickness fund scheme" ("ZFW") is mandatory only for people earning less than a given income (64% of the population).[186]  The remaining high-income earners are left to the private health insurance market.[187]

The principle laid down by the 1998 Linkage Law ("*Koppelingswet*") is embedded in section 10(1) of the current (2000) Aliens Act:[188] "an alien who is not a lawful resident may not claim entitlement to benefits in kind, facilities and social security benefits issued by decision of an administrative authority."[189]  However, section 10(2) of the Linkage Law includes two exceptions that trump the Aliens Act and enable undocumented immigrants to receive healthcare.[190]  These exceptions are the provision of care that is medically necessary and the prevention of situations that would jeopardize public health.[191]  According to the Dutch *Ministerie van Volksgezondheid, Welzijn en Sport* (Ministry of Health) health care should include: a) prevention and treatment of life threatening situations or situations of permanent loss of essential functions; b) diagnosis and treatment of communicable diseases (such as TB and HIV/AIDS); c) pregnancy and maternity care; d) preventive youth health, including the supply of vaccines to children in accordance to the national calendar; and e) compulsory

---

185.  S.B. Fallek, *Health Care for Illegal Aliens: Why it is a Necessity*, 19 HOUS. J. INT'L L. 951, 951-981 (1997).

186.  *Id.* at 970.

187.  *Id.* at 980.

188.  *See* PICUM, *supra* note 1, at 6.

189.  Ray Robinson, *User Changes for Health Care*, *in* EUROPEAN OBSERVATORY ON HEALTH CARE SYSTEMS SERIES, FUNDING HEALTH CARE: OPTIONS FOR EUROPE 161, 164 (Elias Mossialos et al. eds., 2002), http://www.euro.who.int/document/e74485.pdf.

190.  *Id.*

191.  *Id.*

psychiatric treatment.[192]   In the Netherlands, the preventative health measures are universally accessible, even to undocumented immigrants.[193]

## V.   CONCLUSION

Every year, hundreds of thousands of individuals enter the United States without proper documentation.  A great number of these individuals enter the country by crossing the United States-Mexico border.  These individuals cross into the United States to find jobs and provide a better life for their families.[194]   Movement of people across borders is only a natural consequence of ever-increasing cultural and economic globalization.

While several factors exist which make immigration to the United States a desirable choice for Mexicans and other immigrants—unemployment, poverty, governmental instability, corruption, and lack of proper education in the countries of origin—free healthcare and welfare services in the United States are not such factors.[195]

The fact that current healthcare policies have not been successful in deterring illegal entries, coupled with the increasing strain on healthcare institutions providing free emergency services, presents the need to evaluate current immigrant healthcare policies.  Providing prenatal and preventative care to undocumented immigrants relieves emergency care facilities and has positive long-term effects that are in line with state and federal interests of protecting future citizens.  Healthcare workers should not be distracted from providing medical care by having to act as immigration officials.  Charitable and non-federal organizations should be allowed to provide non-emergency medical care to undocumented immigrants.

It is a fact that existing U.S. law does not guarantee the most basic fundamental right—healthcare.  While the recent PPACA healthcare bill was passed under the guise of "providing healthcare for all," the fact that this new law does not include healthcare for the hundreds of thousands of undocumented immigrants clearly shows that the new PPACA falls short in trying to accomplish this mandate.   Whether the answer for the U.S.

---

192.   *See* PICUM, *supra* note 1, at 6.

193.   *Id.*

194.   M. ANGELES VILLARREAL, CONG. RESEARCH SERV., RL 32934, U.S.-MEXICO ECONOMIC RELATIONS: TRENDS, ISSUES AND IMPLICATIONS 4 (2010).

195.   *Id.*

healthcare model going forward is to look to other nations, such as the Netherlands, and create a more sustainable healthcare system, or for Congress to provide clearer guidance on our existing law, the fact remains that if we continue on the same path that the U.S. is currently on, the U.S. healthcare system will be anything but sustainable in the very near future and the U.S. will be at the brink of a public health crisis.

# EXHIBIT CC

# Fear vs. Facts: Examining the Economic Impact of Undocumented Immigrants in the U.S.

DAVID BECERRA

DAVID K. ANDROFF

CECILIA AYÓN

Arizona State University
School of Social Work

JASON T. CASTILLO

University of Utah
College of Social Work

*Undocumented immigration has become a contentious issue in the U.S. over the past decade. Opponents of undocumented immigration have argued that undocumented immigrants are a social and financial burden to the U.S. which has led to the passage of drastic and costly policies. This paper examined existing state and national data and found that undocumented immigrants do contribute to the economies of federal, state, and local governments through taxes and can stimulate job growth, but the cost of providing law enforcement, health care, and education impacts federal, state, and local governments differently. At the federal level, undocumented immigrants tend to contribute more money in taxes than they consume in services, however, the net economic costs or benefits to state and local governments varies throughout the U.S.*

*Key words: immigration, undocumented immigration, social work, policy, Latinos, economy*

Despite the recent reported decrease in undocumented immigrants living in the U.S., undocumented immigration to the

Journal of Sociology & Social Welfare, December 2012, Volume XXXIX, Number 4

111

U.S. continues to be an issue attracting increasing attention from policymakers and the public. An accurate account of the scope of undocumented immigration is impossible, however it is estimated that in 1990 there were 3.5 million undocumented immigrants in the U.S. In almost twenty years, the undocumented immigrant population grew to an estimated 11.9 million people, representing approximately one third of the total U.S. immigrant population (38 million), 4% of the total U.S. population, and 5.4% of the U.S. workforce (8.3 million) (Passel & Cohn, 2009). Undocumented immigrants come to the U.S. from around the world, however the majority, an estimated 76%, are Latino, of which 59% (7 million) are estimated to be from Mexico and 22% (2.1 million) from the rest of Latin America (Passel & Cohn, 2009). Migration, documented and undocumented, is propelled by both 'push' and 'pull' factors. Poverty, violence, crime, and corruption push migrants from sending countries, and the promise of economic prosperity where employers are looking for low-wage workers pull migrants towards receiving countries such as the U.S. (Liebig & Souza-Poza, 2004).

The public policy debate surrounding immigration often involves strident rhetoric, and arguments against undocumented immigrants can be especially harsh, revolving around the burden to U.S. taxpayers. The non-partisan Congressional Budget Office (CBO) reported that undocumented immigrants contribute more in taxes than the costs of providing services at the federal level. There are costs to some state and local governments for providing law enforcement, education, and health care services to undocumented immigrants, but those costs represent a small percentage of their state and local budgets (CBO, 2007). Nevertheless, many politicians continue to argue that undocumented immigrants are a huge economic drain because of the costs associated with law enforcement, education, and use of state and federal health and social services by undocumented immigrants, which lead to diminished economic opportunity for U.S. citizens (Burns, 2011; Stein, 2011).

The economic arguments against undocumented immigrants include the costs to tax payers resulting from the "criminal" and "illegal" nature of undocumented immigration, such as the costs associated with law enforcement, border security,

*Economic Impact of Undocumented Immigrants*          113

measures to prevent, detain, and deport the undocumented, and related crimes such as human smuggling and trafficking. The Heritage Foundation reported that the cost of incarcerating undocumented immigrants "… represent(s) a huge drain on taxpayers" with California, Texas, Arizona, Florida, New York, and Illinois absorbing the greatest financial impact (von Spakovsky, 2011, ¶6).

The perception that "illegal aliens" are responsible for higher crime rates is deeply rooted in American public opinion. These opinions in turn shape political behavior, which ultimately results in public policies and practices that are created absent of rigorous empirical evidence (Chávez, 2001; Lee, 2003). Examples of this are ordinances and bills that have passed and been enacted into law in several localities and states across the U.S. In 2006 the city council of Hazleton, Pennsylvania passed the "Illegal Immigration Relief Act Ordinance," declaring that illegal immigration leads to higher crime rates and the city's legal residents and citizens have the right to live in peace, free of crime committed by illegal aliens (Rumbaut, 2008). Furthermore, several states, including Alabama, Arizona, Georgia, Indiana, and Utah, have enacted laws putting local, county, and state law enforcement personnel in the position of relying on stereotypes about what an "illegal alien" looks or sounds like (American Civil Liberties Union [ACLU], 2011). A related policy goal is to build a fence along the U.S.–Mexico border that would guard national security from the perceived threat of undocumented immigration.

Another argument against undocumented immigration is that local, state, and federal governments are burdened with increased costs through their utilization of educational and social systems such as primary and secondary education, health care programs, emergency rooms, welfare, and other anti-poverty programs to which they do not contribute through taxes. Several anti-immigration organizations, such as The Federation for American Immigration Reform (FAIR) and the Center for Immigration Studies, also argue that undocumented immigrants' use of state and federal social welfare programs such as the Supplemental Nutrition Assistance Program (SNAP), Women, Infants, and Children (WIC), school lunch programs, and Medicaid cost taxpayers billions of dollars

114                              Journal of Sociology & Social Welfare

annually (Camarota, 2011; Federation for American
Immigration Reform, [FAIR], 2000). FAIR also argues that the
cost associated with educating undocumented children in the
U.S. is a major cause of the budget deficits facing many states
(Ewing, 2003).

Although current social work literature discusses the social
impact of various policies on undocumented immigrants in
the U.S. (Androff et al., 2011; Cleaveland, 2010) and calls for
advocacy and action by social workers on behalf of immi-
grants (Padilla, Shapiro, Fernández-Castro, & Faulkner, 2008),
there is a gap in the social work literature regarding the eco-
nomic impact of undocumented immigrants in the U.S. The
purpose of this paper is to begin to fill that gap by examin-
ing the economic impact of undocumented immigration and
to assess the costs and benefits of the undocumented people
living and working in the U.S., as well as the economic and
social costs of public policies that have been enacted to deter
undocumented immigration. Further, this paper will analyze
the available evidence relevant to each of these arguments in
an attempt to provide social workers with an empirical basis
for effective public policy advocacy regarding undocumented
immigration.

## Economic Costs of Undocumented Immigrants

*Crime, Law Enforcement, and Incarceration*

Throughout the first decade of the 2000s, discontent and
controversy erupted among local, state, and federal policy-
makers, business leaders, advocacy groups and organizations,
and citizens regarding the incarceration of "criminal aliens"
in the United States. Since many undocumented immigrants
in the United States are young men from Mexico and Central
America with characteristics similar to native-born popula-
tions who are disproportionately incarcerated (young, male,
poor, high-school dropout, ethnic minority), popular stereo-
types tend to reinforce the impression that undocumented
immigrants and criminality are linked (Butcher & Piehl, 2007;
Rumbaut & Ewing, 2007). However, the existing evidence on
the incarceration of undocumented immigrants, as well as the
costs associated with incarcerating undocumented immigrants

in local, state, and federal penal institutions, does not reflect the popular negative stereotypes and public discourse which often seem to guide the decisions and policy making of many current local, state, and federal legislators.

Previous studies have found that violent and non-violent crime rates among undocumented immigrants decreased during the late-1990s and mid-2000s (Bailey & Hayes, 2006; Butcher & Piehl, 2007; Nadler, 2008; Rumbaut & Ewing, 2007). According to Rumbaut and Ewing (2007), even as the number of undocumented immigrants in the United States doubled during the late 1990s, the rates of violent and property crimes decreased 34% and 26%, respectively. Using data from the annual Federal Bureau of Investigation Unified Crime Reports, Nadler (2008) compared the differences in total crime rates between High Immigrant Jurisdictions (HIJs) (defined as the 19 states with the most resident immigrants) whose resident populations include the highest proportion of immigrants and highest percentage influx of immigrants, and non-HIJs in the United States between 1999 and 2006. The study found that the total crime rates decreased by a little more than 10% across the nation (3808.1 per 100,000 residents in 2006 versus 4273.8 per 100,000 residents in 1999). Crime, both violent and non-violent, decreased at a faster rate in the 19 HIJs than in the non-HIJs. In 2006, the total crime rate in HIJs was lower than non-HIJs (3807.1 per 100,000 residents versus 3809.4 per 100,000 residents). Finally, the total crimes rate decreased from between 7 to 15 percent across all of the jurisdictions between 1999 and 2006. When examining the incarceration rate of undocumented immigrants, researchers found that the rate is lower than that for native-born citizens (Bailey & Hayes, 2006; Butcher & Piehl, 2007; Rumbaut & Ewing, 2007). Furthermore, there is evidence that immigration does not increase crime rates and actually reduces crime rates in urban areas (Reid, Weiss, Adelman & Jaret, 2005; Sampson, Morenoff & Raudenbush, 2005).

The U.S. Government Accountability Office (2005) examined the costs associated with incarcerating undocumented immigrants and found that the cost in local, state, and federal institutions totaled approximately $5.8 billion for calendar years 2001 through 2004, with local jails and state prisons absorbing the most costs ($1.7 billion a year). While the cost of

incarceration is important, estimating this cost is highly variable based upon a number of factors, including whether the local, state, and federal criminal justice institutions collect data on undocumented immigrants. For example, the U.S. Federal Bureau of Prisons (BOP) does not collect or keep information on "criminal aliens," and the numbers that do exist on "criminal aliens" include both documented and undocumented immigrants who are in the U.S. Nevertheless, the CBO reported that the cost to state and local governments for incarcerating undocumented immigrants represents an average of less than 5% of the state and local budgets allocated to law enforcement (CBO, 2007). The highest local cost for law enforcement activities involving undocumented immigrants was incurred by San Diego County ($50.3 million), and that cost represented 90% of the state of California's border counties costs associated with undocumented immigrants for the year, but was almost half of the total dollar amount ($108.2 million) spent on law enforcement activities involving undocumented immigrants by all California, Arizona, New Mexico and Texas border counties in the United States (Salant et al., 2001).

*Health Care*

Health care costs associated with providing care to undocumented immigrants is another contentious issue. The overwhelming majority of undocumented immigrants do not have health insurance because they are not eligible for government programs and are often not eligible for employer-provided health insurance (Goldman, Smith, & Sood, 2006). Although studies indicate that undocumented immigrants underutilize health care compared to the general population, undocumented immigrants often use emergency rooms because they are mandated to provide care regardless of immigration status or ability to pay (Ku & Matani, 2001; Marshall, Urrutia-Rojas, Soto Mas, & Coggin, 2005). This mandate can lead to higher costs for hospitals, especially for non-emergency related health care issues (Okie, 2007). As a result, there is an estimated economic cost associated with providing health care to undocumented immigrants of between $6 and $10 billion per year (Camarota, 2004; Goldman, Smith, & Sood, 2006).

Under the Medicare Modernization Act of 2003, the federal

*Economic Impact of Undocumented Immigrants*          117

government provided $250 million annually through 2008 to reimburse hospitals and other health care providers for the costs associated with providing emergency health care services to undocumented immigrants (CBO, 2007). Although there are costs associated with health care provision to undocumented immigrants, due to their lower rates of use of health care services, these expenditures account for only 1.5% of U.S. medical costs (Okie, 2007) and the estimated tax burden per household was only $11 per year for providing health care to undocumented immigrants (Goldman, Smith, & Sood, 2006). While some may argue that no tax dollars should go toward providing services to a population who many believe should not even be in the U.S., the $11 annual per household tax burden is not the overwhelming financial burden that the media and many politicians claim.

*Education*

   The 1982 Supreme Court decision in Plyler v. Doe guaranteed that undocumented children have a right to be educated in U.S. public schools. Since then, the costs associated with educating undocumented immigrant children have been an issue for state and local governments. The average amount spent by all states during the 2009-2010 academic year was $10,586 per student (National Education Association [NEA], 2010). There are an estimated 1.6 million undocumented children living in the United States (Passel, Capps, & Fix, 2004). By taking into account the national average spent per student (not accounting for pre-K children or dropouts), the amount needed per year to educate undocumented children would be an estimated $17 billion per year. Although undocumented immigrants can be found in all states, six states continue to account for almost two-thirds of the undocumented population (California, Texas, New York, Florida, Illinois, & New Jersey), which indicates that the costs to those states would be higher than to other states (Passel, Capps, & Fix, 2004).

   While there is no question that there are economic costs associated with educating undocumented immigrant children, this represents only 3.3% of the total cost of between $520-$535 billion spent annually to educate all children in the U.S. (NEA, 2010; Passel, Capps, & Fix, 2004; U.S. Department of Education,

118                    Journal of Sociology & Social Welfare

2005). Also, under No Child Left Behind, the federal government has the English Language Acquisition Program to reimburse states for the costs associated with children participating in English acquisition programs, regardless of immigration status. While the federal government reimbursed states $621 million under that program in 2006, that amount only covers the costs associated with English language programs, and not the general education of undocumented immigrants (CBO, 2007).

## The Social and Economic Costs of Anti-Immigrant Policies

The negative rhetoric and public perception of undocumented immigration has led to the implementation of new anti-immigration policies. Not only are there financial implications to implementing anti-immigrant policies, but social impacts as well, because groups of people are subjected to differential treatment. Anti-immigrant policies have deleterious effects on the health of the undocumented population as they live in constant states of fear; individuals are deported, families separated, and they experience discrimination. The Pew Hispanic Center reports that six in ten Latinos worry that they themselves or a family member or close friend will be deported (Pew Hispanic Center, 2010). Many children of undocumented parents are often U.S. citizens, yet despite their citizenship status they also carry the burden of many anti-immigrant policies. There are an estimated 5.5 million children with undocumented parents, approximately three-quarters whom are U.S. citizens (Chaudry et al., 2010). Chaudry and colleagues (2010) found that parent-child separation due to deportation poses serious risks to children's immediate safety, economic security, well-being, and long-term development. Children experience changes in their eating and sleeping, cry more, are more afraid, and are anxious, withdrawn, clingy, or aggressive.

Whereas in 2001, Americans perceived Blacks as the racial/ethnic group that was most discriminated against in the U.S., in 2009 Latinos were perceived as the ethnic group that is most often subjected to discrimination (Pew Hispanic Center, 2010). Perceptions of discrimination vary among Latinos; 70% of foreign born Latinos view discrimination against Latinos as a

*Economic Impact of Undocumented Immigrants*          119

major problem, whereas only 49% of native-born Latinos agree (Lopez, Taylor, & Morin, 2010). Regardless of nativity, one in ten Latinos report being asked by police officers or other authorities about their immigration status (Pew Hispanic Center, 2010). Substantial evidence links discrimination to indicators of poor physical and mental health among immigrants and children of immigrants (Araújo Dawson, 2009; Ayón, Marsiglia, & Parsai, 2010; Ding & Hargraves, 2009; Umaña-Taylor & Updegraff, 2007; Williams, Neighbors, & Jackson, 2008).

In 1997 the Immigration and Naturalization Service (INS) and Social Security Administration (SSA) partnered to implement a basic pilot program, commonly known as E-verify, an automated internet-based verification system that allows employers to voluntarily check the work eligibility of potential new hires (U.S. Citizenship and Immigration Services, 2010). In 2008 the CBO estimated that enacting a mandatory E-verify program would decrease federal revenues by $17.3 billion from 2009-2018 due to workers leaving the formal economy for the unregulated, untaxed underground economy (Orszag, 2008). These projections have materialized in Arizona, one of the first states to mandate the use of E-verify, where businesses are hiring workers off the books without paying income or payroll taxes (Immigration Policy Center, 2010a). In addition, the CBO projected an increase in direct spending of $30 million for the federal judges authorized by this bill, and costs for implementing E-verify are estimated at $10.3 billion over the 2009-2013 period and $23.4 billion over the 2009-2018 period (Orszag, 2008).

The Deficit Reduction Act of 2005 (DRA) requires all individuals to provide proof of citizenship and identity, with a passport or birth certificate, when applying for or renewing Medicaid coverage. As a result, forty-six states had to change their policy, as they previously only required a signed statement of citizenship, under penalty of perjury (Smith et al., 2006; Sommers, 2010). The goal of this policy is to exclude undocumented immigrants from accessing Medicaid or public health insurance (Sommers, 2010).

The findings regarding the effectiveness of this policy have been mixed. Eight months following the implementation of DRA several states experienced significant declines in Medicaid enrollment, particularly among low-income children

120           Journal of Sociology & Social Welfare

(Ross, 2007). Ross (2007) found that this policy is likely to take a toll on working poor families, regardless of documentation status, because they are now required to visit the Medicaid office in person, whereas before they were able to submit the paperwork by mail. In order to meet these new requirements, they have to take time off from work to secure the necessary documentation, such as a birth certificate, visit the Medicaid office, and cover the fees for the documents. In addition, access to Medicaid eligibility has been delayed because it takes time to access the required documents.

Projected costs to states following the passage of DRA ranged from $1.3 million to $19 million (Ross, 2007). Findings from the Current Population Survey (2004-2008) reveal that the policy has been effective in reducing Medicaid enrollment among non-citizens and has not significantly impacted citizens (Sommers, 2010). Results indicate that 1 in 4 non-citizen adults were screened out while 1 in 8 non-citizen children were screened out through the policy. However, the cost-benefit analysis revealed that instead of saving the government money, the policy has actually cost the U.S. approximately $600 million through administrative spending and compliance costs imposed on U.S. citizens applying for Medicaid; every $100 spent on verifying citizenship and residency only saved 14 cents (Sommers, 2010).

In 2005, the Secure Border Initiative (SBI) was launched by the Department of Homeland Security (DHS). The SBI is a multiyear, multibillion-dollar program aimed at securing the U.S. borders and reducing illegal immigration (U.S. Government Accountability Office, 2009). The U.S. Customs and Border Protection (CBP) agency is responsible for managing the SBI program and developing a comprehensive border protection system. The proposal for securing the border has two main components: (1) SBI*net* which utilizes radars, sensors, and cameras to detect, identify and classify the threat level associated with an illegal entry into the U.S.; and (2) the SBI tactical infrastructure (TI), or fencing, roads, and lighting intended to enhance the U.S. Border Patrol agents' ability to respond to the area of the illegal entry and lead to arrest (U.S. Government Accountability Office, 2009). At this time, the focus has been in the Southwest region of the border, as it has been identified as needing the most attention.

The Consolidation Appropriation Act of 2008 required DHS to complete construction of 370 miles of border fence by December 31, 2008. DHS set a goal to complete 670 miles of fencing by December 31, 2008. These goals were not met. By October 31, 2008 CBP had completed 215 miles of primary SBI fencing, costing approximately $625 million. The average cost per mile of pedestrian fencing is $2.8 million per mile with a range of $400,000 to $4.8 million (U.S. Government Accountability Office, 2009). SBI*net* has also been unsuccessful and costly. DHS has spent over $1.5 billion since 2006 (U.S. Government Accountability Office, 2010). Boeing has billed the department more than $850 million since the project began (Bennett, 2010). This large investment has resulted in only 53 miles of unreliable coverage of a more than 2,000 mile border. In January 2011, the SBI*net* project was cancelled by Homeland Security Secretary Janet Napolitano.

## Ecnomic Benefits Provided by Undocumented Immigrants

*Federal Level*

There are economic costs and benefits of having undocumented immigrants and their children living in the United States. The CBO reported that on a federal level, revenues generated by undocumented immigrants are greater than the expense of providing services because undocumented immigrants do not qualify for federal programs (CBO, 2007). In addition to the additional revenue generated through taxes, undocumented immigrants contribute to the U.S. economy in other ways.

The financial solvency of the Social Security and Medicare programs in the U.S. relies on payroll tax revenue (Segal, 2010). Despite the public discourse to the contrary, the majority of undocumented immigrants pay income taxes through the use of Individual Taxpayer Identification Numbers (ITINs) or through false Social Security numbers (National Council of La Raza [NCLR], 2008; U.S. Chamber of Commerce, n.d.). As a result, undocumented immigrants contribute over $7 billion annually to Social Security and over $1.5 billion to Medicare (NCLR, 2008).

Although some undocumented immigrants receive Social Security and Medicare benefits, the majority do not receive any benefits from those programs (NCLR, 2008; Sommers, 2010). Since false Social Security numbers are not appropriately linked to an individual who can take advantage of Social Security benefits, the majority of contributions to Social Security from undocumented immigrants go into an earnings suspense file. The Social Security Administration factors in the over $7 billion annual contributions from undocumented immigrants into the Social Security Administration's calculations and projections for the solvency of Social Security (Porter, 2005; U.S. Chamber of Commerce, n.d.). The retirement of the baby boom generation will lead to increased expenditures for Social Security (Abel, 2003) and additional tax revenue is needed to provide Social Security benefits to current and future retirees. Since undocumented immigrants are ineligible to receive government services, it is estimated that undocumented immigrants pay an average of $1,800 per household, per year more to Social Security and Medicare than they utilize in services (Camarota, 2004). Therefore, undocumented immigrants actually contribute to the solvency of Social Security and Medicare and help to provide services to current and future retirees.

*State and Local Level*

While current rhetoric in the immigration debate decries how undocumented workers steal jobs, immigrants working in the U.S. do not take away jobs from citizens; instead they stimulate the state and local economies and complement the workforce by providing a necessary pool of unskilled labor (U.S. Chamber of Commerce, n.d.). For example, despite the costs, there may be economic benefits associated with having undocumented children in schools that are often not considered. Higher student enrollment may lead to the creation of more jobs, not just for teachers, but in all educational-related services including administrators, maintenance staff, teaching assistants and other paraprofessionals, bus drivers, and other school staff which would help local and state economies. The creation of jobs as a result of higher student enrollment often results in an increase in federal funding for schools (Spradlin, 2008) and can lead to an increase in state and local revenue

generated by income and sales taxes (Harvey, 2011). Higher student enrollment may lead to an increase in economic activity as a result of the purchase of additional textbooks and other educational materials, as well as with families' back-to-school shopping that is done before every academic year. Businesses anticipate the annual surge in sales and higher profits, which benefit the local economy because of the sale taxes generated from back-to-school shoppers (Censky, 2010; Fierro, 2010).

Contrary to the implication that immigrants exacerbate unemployment, high rates of immigration are linked to less unemployment (Riley, 2008). This does not diminish the economy, but encourages specialization and increases wages for native workers (Card, 2007). Most undocumented immigrants in the U.S. work in low-skilled jobs and do not compete with American workers. The influx of low-skilled laborers into the U.S. has been shown to slow the decline of manufacturing industries (Capps et al., 2007) and contribute to the creation of new jobs (Peri, 2006). For example, the Bell Policy Center found that for every job held by an undocumented immigrant in Colorado, 0.8 jobs are created (Boven, 2011; Fairley & Jones, 2011). While there are few official estimates from the federal government regarding how much undocumented immigrants contribute to the U.S. economy, the available evidence indicates that undocumented immigration is part of a positive force that immigration has upon the U.S. economy.

In addition to the economic benefits to Social Security and Medicare, undocumented immigrants also provide revenue to state and local governments as a result of their employment, purchases, and taxes. Unfortunately, state and local governments do not use a consistent method to analyze the economic impact of undocumented immigrants, which prohibits accurate comparisons of positive and negative economic impacts across all states (CBO, 2007). Nevertheless, it is important to present the information that is available, in order to dispel the myths that undocumented immigrants do not pay any taxes and do not have a positive impact on some state and local economies. Table 1 provides the available information that allows for comparisons of the economic contributions through taxes of undocumented immigrants across various states.

124                          Journal of Sociology & Social Welfare

Table 1. State and Local Economic Contributions of Undocumented Immigrants

| State | Type of Tax | Total Tax Contribution |
|-------|-------------|------------------------|
| California | state income | $280 million[1] |
| Colorado | state income, sales, & property | $159 - $194 million[2] |
| Georgia | state income, sales, & property | $215.6 - $252.5 million[3] |
| Indiana | state and county income, sales, & property | $96.8 million[4] |
| Iowa | state income, sales, excise, & property | $40 - $62 million[5] |
| Missouri | state income, excise, & property | $29 - $57 million[6] |
| New Mexico | state income, sales, & property | $64.7 million[7] |
| Oregon | state income, excise, & property | $134 - $187 million[8] |
| Virginia | state income, sales, excise, & property | $145 - $174 million[9] |

[1] Pastor, Scoggins, Tran, & Ortiz (2010); [2] Baker & Jones (2006); [3] Coffey (2006); [4] Heet (2009); [5] Pearson & Sheehan (2007); [6] Ehresman (2006); [7] Immigration Policy Center (2010c); [8] Oregon Center for Public Policy (2007); [9] Cassidy & Okos (2008)

Also, contrary to studies reporting that the cost to states with high numbers of undocumented immigrants outweighs their economic contributions, several states reported that undocumented immigrants contribute more in state and local taxes than they consume in services, as well as stimulating state and local economies. The Texas Comptroller reported that undocumented immigrants provided $17.7 billion in gross state product, including over $424 million more in state revenues than they consumed in state services including education, health care and law enforcement (Strayhorn, 2006). If all undocumented immigrants in Texas were to leave or be deported, not only would Texas lose over $400 million in state revenues, but Texas would also lose 2.3% of jobs in the state because of the economic activity of undocumented immigrants

that supports businesses and employment (Strayhorn, 2006). Arizona, another state with a high undocumented immigrant population, would lose $11.7 billion in gross state product and over 140,000 jobs in the state if all undocumented immigrants living in the state were to leave or be deported (Immigration Policy Center, 2010b).

Even studies that report an overall economic loss as a result of providing services to undocumented immigrants indicate that those losses are negligible once the economic benefits of undocumented immigrants are considered (Hanson, 2007). In Illinois, Mehta and colleagues (Mehta, Theodore, Mora, & Wade, 2002) found that the purchases of undocumented immigrants in the Chicago metropolitan area stimulated an additional $2.56 billion in local spending which supports 31,908 jobs. Iowa estimated that undocumented immigrants subsidize services that only U.S. citizens and documented immigrants can access because undocumented immigrants pay more in state and local taxes than the costs of providing the state and local services they utilize (Pearson & Sheehan, 2007). In Colorado, undocumented immigrants contribute more in income, property, and sales tax revenue than they consume in services provided by the state for education, health care, and incarceration (Fairley & Jones, 2011). In addition to the tax revenue, the economic activity generated by undocumented immigrants in Colorado created an additional 91,000 jobs, $4.7 billion in personal income, and $15 billion in industry output for the state of Colorado (Boven, 2011; Colorado Center on Law & Policy, 2011; Fairley & Jones, 2011).

## Implications for Social Work Practice

The negative public discourse regarding undocumented immigration may lead to increased levels of perceived discrimination among all Latinos, but undocumented Latinos in particular. The mission of the social work profession is to promote social justice and social change on behalf of oppressed and vulnerable populations (NASW, 2008); therefore, the social work profession is uniquely positioned to take action around the impact of the negative public perceptions and public policies regarding undocumented immigration. On the micro level, social workers who work with individuals and

families must be aware of the negative impacts that perceived discrimination can have on the physical and mental health of individuals. As stated earlier, a plethora of studies have found that the physical and mental health of immigrants and children of immigrants is negatively impacted by discrimination. It is therefore necessary for social workers to assess physical and specific mental health conditions that may be associated with perceived and experienced discrimination such as stress, depression, and anxiety (Finch, Hummer, Kol, & Vega, 2001).

At a macro level, social workers must also work with communities and facilitate educational forums to discuss the fears surrounding undocumented immigration. By inviting community members and the media, these forums can be used to dispel misinformation surrounding the economic costs associated with undocumented immigrants' use of public services and demonstrate the positive impact that undocumented immigrants may have on the local, state, and U.S. economies. Social workers must also continue to advocate for social justice for undocumented immigrants. Social work agencies providing services to Latino communities can create coalitions that lobby politicians and advocate for more just and humane policies aimed at undocumented immgrants in the U.S.

Furthermore, social workers need to develop strategies and programs to help immigrants negotiate the effects of anti-immigrant policy and practices. For example, in some states most publicly-funded efforts to promote diversity have been eliminated (i.e., bilingual education and ethnic-based programs in schools). Consistent with a strengths-based approach, social workers in community based settings can engage in developing programs that promote ethnic identity development, as researchers have found that strong ethnic identity promotes well-being and protects youth from the negative effects of discrimination (Smokowski & Bacallao, 2007; Umaña-Taylor & Updegraff, 2007). Social workers can also raise awareness among immigrant commmunities by informing them of their Constitutional rights. For example, the ACLU disseminates "Know Your Rights" information in English and Spanish about individuals' as well as immigrants' rights when interacting with law enforcement agents (ACLU, 2010). Social workers can partner with immigration attorneys to organize

workshops to ensure that immigrant communities know their rights to minimize the potential for civil rights abuses.

The policies that have been enacted to deter undocumented immigration are costly and ineffective. Therefore, all social workers should advocate for policies that will provide more accurate information about the economic impact of undocumented immigrants, that will help meet the demand for labor in the U.S., and that will allow undocumented immigrants to contribute fully to the U.S. while allowing them to improve their lives and provide for their families. All states should conduct a comprehensive cost benefit analysis similar to the one conducted by the Texas Office of the Comptroller in 2006.

The federal government should reassert its role on immigration and pass comprehensive immigration reform which includes a new and expanded guest worker program; this would deter individual states from developing harmful, costly, and ineffective policies. Currently H1 (Specialty Occupations), H2A (Temporary Agricultural Workers) and H2B (Temporary Non-Agricultural Workers) visas allow foreign nationals to enter the U.S. for employment (U.S. Citizenship and Immigration Services, 2010). The current quota, which is set at 65,000 for each type of visa, is far short of what is needed to meet the demand for immigrant labor. Until comprehensive immigration can be enacted by the federal government, the quotas for these visas should be increased to more accurately reflect labor demands. The U.S. Congress must also pass the Development, Relief, and Education, for Alien Minors (DREAM) Act, which would grant conditional permanent residency for undocumented students who graduate from a U.S. high school or earn their GED, and either complete at least 2 years at an institution of higher learning or military service. This would provide undocumented students with the opportunity to not only improve their lives, but to contribute fully to society through military service, increased tax revenue, and civic engagement. Increasing the number of Latino college graduates may generate an additional $7 billion in federal tax revenue to Social Security per 10 year cohort of students (Robles, 2009).

## Conclusion

Although there are costs associated with undocumented immigrants living in the U.S., their overall economic contributions, including employment, purchases, and tax revenue generated may result in a financial benefit to the U.S. at the federal level, and for some local and state governments as well (Immigration Policy Center, 2010b, c; NCLR, 2008; Porter, 2005; Strayhorn, 2006; U.S. Chamber of Commerce, n.d.). Even in states where the costs of providing services to undocumented immigrants is greater than the tax revenue generated, those costs represent less than 5% of those states' total budgets allocated for law enforcement, education, and health care (CBO, 2007), and not the huge economic drain claimed by many politicians and anti-immigrant organizations. The negative depictions of undocumented immigrants by the media and the discussion by some politicians about the economic drain of undocumented immigrants on the U.S. economy, which are based on exaggerations, the distortion of data, or incomplete information, have created a hostile environment for undocumented Latinos in the U.S. (Becerra, 2012). This has led to ineffective and costly policies that deny services to undocumented immigrants and increase immigration enforcement (CBO, 2008; NCLR, 2008; Sommers, 2010; U.S. Chamber of Commerce, n.d., U.S. Government Accountability Office, 2009, 2010).

In addition, the negative public discourse surrounding undocumented immigration has led to the rise of extremist and vigilante groups such as the Minutemen. The implementation of policies, such as Arizona's SB 1070, create fear and lead to higher individual and societal costs (Androff et al., 2011; Becerra et al., 2010). These ineffective anti-immigrant policies may have exacerbated the current financial crisis faced by federal, state, and local governments. The social work profession cannot allow this population to continue to be used as scapegoats. Social workers must utilize accurate information about the economic impact of undocumented immigrants and advocate for humane policies that will help meet the demands for labor and allow undocumented immigrants to be treated fairly for their contributions to the U.S. economy.

*Economic Impact of Undocumented Immigrants* 129

# References

Abel, A.B. (2003). The effects of a baby boom on stock prices and capital accumulation in the presence of Social Security. *Econometrica, 71*(2), 551-578.

American Civil Liberties Union (ACLU). (July 2011). *ACLU and Civil Rights Coalition file lawsuit charging Alabama's racial profiling law is unconstitutional.* Retrieved from http://www.aclu.org/immigrants-rights/aclu-and-civil-rights-coalition-file-lawsuit-charging-alabamas-racial-profiling

American Civil Liberties Union (ACLU). (2010). *Know your rights: What to do if you are stopped by police, immigration agents, or the FBI.* Retrieved from http://www.aclu.org/drug-law-reform-immigrants-rights-racial-justice/know-your-rights-what-do-if-you

Androff, D., Ayón, D., Becerra, D., Gurrola, M., Moya-Salas, L., Krysik, J., Gerdes, K., & Segal,E. (2011). U.S. immigration policy and immigrant children's well-being: The impact of policy shifts. *Journal of Sociology & Social Welfare, 38*(1), 77-98.

Araújo Dawson, B. (2009). Discrimination, stress, and acculturation among Dominican immigrant women. *Hispanic Journal of Behavior Science, 31*(1), 96-111.

Ayón, C., Marsiglia, F., & Parsai, M. (2010). Latino family mental health: Exploring the role of discrimination and familismo. *Journal of Community Psychology, 38*(6), 742–756.

Baker, R., & Jones, R. (2006). *State and local taxes paid in Colorado by undocumented immigrants.* Denver, CO: The Bell Policy Center.

Bailey, A., & Hayes, J. M. (2006). Who's in prisons? The changing demographics of incarceration. *California Counts: Population Trends and Profiles, 8*(1), 1-27.

Becerra, D. (2012). The impact of anti-immigration policies and perceived discrimination in the United States on migration intentions among Mexican adolescents. *International Migration, 50*(4), 20-32.

Becerra, D., Gurrola, M., Ayón, C., Androff, D., Krysik, J., Gerdes, K., Moya-Salas, L., & Segal, E. (2010). Poverty and other factors affecting migration intentions among adolescents in Mexico. *Journal of Poverty, 14*(1), 1-16.

Bennett, B. (2010). Costly virtual border fence in tatters. *The Los Angeles Times.* Retrieved on November 11, 2010 from http://articles.latimes.com/2010/oct/22/nation/la-na-invisible-fence-20101022

Boven, J. (2011). *Study finds illegal immigration in Colorado may pay.* The Bell Policy Center. Retrieved http://bellpolicy.org/content/study-finds-illegal-immigration-colorado-may-pay

Burns, A. (2011, September, 22). *GOP debate dominated by immigration, Social Security.* POLITICO. Retrieved from http://www.politico.com/news/stories/0911/64223.html

Butcher, K. F., & Piehl, A. M. (2007). *Why are immigrants' incarceration rates are so low? Evidence on selective immigration, deterrence, and deportation.* National Bureau of Economic Research. Working Paper No. 13229. Cambridge, MA.

Camarota, S. A (2004). *The high cost of cheap labor: Illegal immigration and the federal budget.* Washington, DC: Center for Immigration Studies.

Camarota, S. A. (2011). *Welfare use by immigrant households with children: A look at cash, Medicaid, housing, and food programs.* Washington, DC: Center for Immigration Studies.

Capps, R., Henderson, E., Kasarda, J., Johnson, J., Appold, S., Croney, D., Hernandez, D., & Fix, M. (2007). *A profile of immigrants in Arkansas.* Washington, DC: Urban Institute. Retrieved February 27, 2011 from http://www.urban.org/publications/411441. html.

Card, D. (2007). *How immigration affects U.S. cities.* Center for Research and Analysis of Migration. Retrieved February 27 from http://www.econ.ucl.ac.uk/cream/pages/CDP/CDP_11_07.pdf

Cassidy, M., & Okos, S. (2008). *Fiscal facts: Tax contributions of Virginia's undocumented immigrants.* Richmond, VA: The Commonwealth Institute. Retrieved from http://www.vacolao.org/Docs/immtaxcontribution.pdf

Censky, A. (2010). Back-to-school shopping starts slowly. *CNN Money.* Retrieved from http://money.cnn.com/2010/08/05/news/economy/chain_store_sales/index.htm?section=money_topstories

Chaudry, A., Capps, R., Pedroza, J. M., Castañeda, R. M., Santos, R., & Scott, M. M. (2010). *Facing our future. Children in the aftermath of immigration enforcement.* The Urban Institute. Retrieved on May 1, 2010, http://www.urban.org/UploadedPDF/412020_FacingOurFuture_final.pdf

Chávez, L.R. (2001). *Covering immigration: Popular images and the politics of the nation.* Berkeley, CA: University of California Press.

Cleveland, C. (2010). "We are not criminals:" Social work advocacy and unauthorized migrants. *Social Work, 55*(1), 74-81.

Coffey, S.B. (2006). *Undocumented immigrants in Georgia: Tax contributions and fiscal concerns.* Atlanta, GA: Georgia Budget and Policy Institute.

Colorado Center on Law & Policy. (2011). *Undocumented workers in Colorado play an important role in the state's economy.* Retrieved from http://www.cclponline.org/uploads/files/CO_undocumented_immigration.pdf

Congressional Budget Office. (2007). *The impact of unauthorized immigrants on the budgets of state and local governments.* Retrieved from http://www.cbo.gov/publication/41645

Ding, H., & Hargraves, L. (2009). Stress-associated poor health among adult immigrants with a language barrier in the United States. *Journal of Immigrant & Minority Health, 11*(6), 446-452.

*Economic Impact of Undocumented Immigrants*                     131

Ehresman, R. (2006). *Undocumented workers: Impact on Missouri's economy*. The Missouri Budget Project. Retrieved from http://www.mobudget.org/files/Undocumented%20Workers%20Impact%20on%20Missouri%20Economy%20June%2006.pdf

Ewing, W. A. (2003). *A study in distortion: FAIR targets immigrant children*. Immigration Policy Center. Retrieved from http://www.immigrationpolicy.org/sites/default/files/docs/FAIR%20Targets%20Immigrant%20Children.pdf

Fairley, E., & Jones, R. (2011). *Colorado's undocumented immigrants: What they pay, what they cost in taxes*. The Bell Policy Center. Retrieved from http://bellpolicy.org/sites/default/files/ImmigrationTaxesCost2011_3.pdf

Federation for American Immigration Reform. (2000). *Immigration 101. A primer on immigration and the need for reform*. Retrieved from http://www.fairus.org/site/DocServer/immigration101.pdf?docID=422

Fierro, C. M. (2010, July 30). Tax holidays: States gamble on back-to-school shopping deals to stimulate consumer spending. *Huffington Post*. Retrieved from http://www.huffingtonpost.com/2010/07/30/tax-free-holidays-state-g_n_665701.html

Finch, B. K., Hummer, R. A., Kol, B., & Vega, W. A. (2001). The role of discrimination and acculturative stress in the physical health of Mexican-origin adults. *Hispanic Journal of Behavioral Sciences, 23*(4), 399-429.

Goldman, D. P., Smith, J. P., & Sood, N. (2006). Immigrants and the cost of medical care. *Health Affairs, 25*, 1700-1711.

Hanson, G. H. (2007). *The economic logic of illegal immigration*. Washington, DC: Council on Foreign Relations.

Harvey, J. (2011, March 4). Community discusses enrollment. *Estes Park Trail Gazette*. Retrieved from http://www.eptrail.com/ci_17531660?source=most_viewed

Heet, J. (2009). *The impact of immigration on Indiana*. Indianapolis, IN: The Sagamore Institute for Policy Research.

Immigration Policy Center (2010a). *How expanding e-verify would hurt American workers and business*. Retrieved from http://www.immigrationpolicy.org/sites/default/files/docs/Everify_030210.pdf

Immigration Policy Center (2010b). *How much will Arizona's immigration bill (SB1070) cost?* Retrieved from http://www.immigrationpolicy.org/newsroom/release/how-much-will-arizonas-immigration-bill-sb1070-cost

Immigration Policy Center (2010c). *Assessing the economic impact of immigration at the state and local level*. Retrieved from http://www.immigrationpolicy.org/sites/default/files/docs/State_and_Local_Study_Survey_041310_1.pdf

Ku, L., & Matani, S. (2001). Left out: Immigrants' access to health care and insurance. *Health Affairs, 20*(1), 247-256. doi: 10.1377/hlthaff.20.1.247

Lee, M. T. (2003). *Crime on the border: Immigration and homicide in urban communities*. New York: LFB Scholarly Publishing.

Liebig, T., & Souza-Poza, A. (2004). Migration, self-selection, and income inequality: An international analysis. *KYKLOS, 57*, 125-146.

Lopez, M. H., Taylor, P., & Morin, R. (2010). *Illegal immigration backlash worries, divides Latinos*. Pew Hispanic Center, Washington, D.C. Retrieved from http://pewhispanic.org/files/reports/128.pdf

Marshall, K. J., Urrutia-Rojas X., Soto Mas F., & Coggin, C. (2005). Health status and access to health care of documented and undocumented immigrant Latino women. *Health Care Women International, 26*(10), 916-936.

Mehta, C., Theodore, N., Mora, I., & Wade, J. (2002). *Chicago's undocumented immigrants: An analysis of wages, working conditions, and economic contributions*. Center for Urban and Economic Development. University of Illinois at Chicago.

Nadler, R. (2008). *Immigration and the wealth of states*. Overland Park, KS: America's Majority Foundation.

National Association of Social Workers (2008). *Code of ethics of the National Association of Social Workers*. Retrieved from http://socialworkers.org/pubs/code/code.asp

National Council of La Raza (2008). Five facts about undocumented workers in the U.S. Retrieved from http://www.immigrationpolicy.org/sites/default/files/docs/5FactsUndocs02-08.pdf

National Education Association (2010). Rankings & estimates: Rankings of the states 2009 and estimates of school statistics 2010. Atlanta, GA: National Education Association. Retrieved from http://www.nea.org/assets/docs/010rankings.pdf

Okie, S. (2007). Immigrants and health care: At the intersection of two broken systems. *The New England Journal of Medicine, 357*(6), 525-529.

Oregon Center for Public Policy (2007). Undocumented workers are taxpayers, too. Retrieved from http://www.ocpp.org/2012/01/25/iss20120120undocumented-workers-are-taxpayers-too/

Orszag P. R. (2008). *Congressional Budget Office Letter*. Retrieved on November 1, 2010 from http://www.cbo.gov/ftpdocs/91xx/doc9100/hr4088ltr.pdf

Padilla, Y. C., Shapiro, E. R., Fernandez-Castro, M. D., & Faulkner, M. (2008). Our nation's immigrants in peril: An urgent call to social workers. *Social Work, 53*(1), 5-8.

Passel, J. S., Capps, R., & Fix, M. E. (2004). *Undocumented immigrants: Facts and figures*. Urban Institute. Retrieved from www.urban.org/url.cfm?ID=1000587&renderforprint=1&CFID=7795237&CFTOKEN=46330853

Passel, J. S., & Cohn, D. (2009). *A portrait of unauthorized immigrants in the United States*. Washington, DC: Pew Hispanic Research Center.

Pastor, M., Scoggins, J., Tran, J., & Ortiz, R. (2010). *The economic benefits of immigrant authorization in California.* Center for the Study of Immigrant Integration. University of Southern California.

Pearson, B., & Sheehan, M. F. (2007). *Undocumented immigrants in Iowa: Estimated tax contributions and fiscal impact.* The Iowa Policy Project. Retrieved from http://www.iowapolicyproject.org/2007docs/071025-undoc.pdf

Peri, G. (2006). Rethinking the effects of immigration on wages: New data and analysis from 1990-2004. *Immigration Policy in Focus, 5*(8), 1-8. Retrieved February 27, 2011 from http://www.econ.ucdavis.edu/faculty/gperi/reports/infocus_10306.pdf.

Pew Hispanic Center (2010). *Hispanics and Arizona's new immigration law.* Retrieved on November 1, 2010 from http://pewresearch.org/pubs/1579/arizona-immigration-law-fact-sheet-hispanic-population-opinion-discrimination.

Plyler v Doe, 457 U.S. 202, 102 S.Ct. 2382 (1982).

Porter, E. (2005, April 5). Illegal immigrants are bolstering Social Security with billions. *New York Times.* Retrieved www.nytimes.com/2005/04/05/business/05immigration.html?_r=1

Reid, L., Weiss, H., Adelman, R., & Jaret, C. (2005). The immigration-crime relationship: Evidence across U.S. metropolitan areas. *Social Science Research, 34,* 757-780.

Riley, J. (2008). *Let them in: The case for open borders.* New York: Gotham Books.

Robles, B. (2009). Exploring the wealth returns of Latino higher educational attainment. *Journal of Hispanic Higher Education, 8*(1), 5-22.

Ross, D. C. (2007). *New Medicaid citizenship documentation requirement is taking a toll: States report enrollment is low and administrative costs are up.* Retrieved on November 10 from http://www.cbpp.org/files/2-2-07health.pdf

Rumbaut, R. G. (2008, August). Undocumented immigration and rates of crime and imprisonment: Popular myths and empirical realities. Paper presented at the Police Foundation National Conference, Washington, DC, August 21-22.

Rumbaut, R. G., & Ewing, W. (2007). *The myth of immigrant criminality.* Washington, DC: Immigration Policy Center.

Salant, T. J., Hover, A. L.., Hench, C., Brenner, C., Rubaii-Barrett, N., & Weeks, J. R. (2001). *Illegal immigrants in U.S.-Mexico border counties: Costs of law enforcement, criminal justice, and emergency medical services.* U.S./Mexico Border Counties Coalition. Institute for Local Government. University of Arizona. Retrieved from https://www.ncjrs.gov/pdffiles1/nij/grants/201491.pdf

Sampson, R., Morenoff, J., & Raudenbush, S. (2005). Social anatomy of racial and ethnic disparities in violence. *American Journal of Public Health, 95*(2), 224-232.

Segal, E. A. (2010). *Social welfare policy and social programs: A values perspective* (2nd ed.). Belmont, CA: Thomson Brooks/Cole Publishing.

Smith, V., Gifford, K., Ellis, E., Wiles, A., Rudowitz, R., O'Malley, M., & Marks, C. (2006). *Low Medicaid spending growth amid rebounding state revenues: Results from a 50-state Medicaid budget survey state fiscal years 2006 and 2007.* Menlo Park, CA: Kaiser Family Foundation.

Smokowski, P. R., & Bacallao, M. L. (2007). Acculturation, internalizing mental health symptoms, and self-esteem: Cultural experiences of Latino adolescents in North Carolina. *Child Psychiatry and Human Development, 37,* 273-292.

Sommers, B. D. (2010). Targeting in Medicaid: The costs and enrollment effects of Medicaid's citizenship documentation requirement. *Journal of Public Economics, 94,* 174-182.

Spradlin, T. (2008, Summer). Education enrollment numbers are a significant matter (Projection implications on the economy). *Entrepreneur.* Retrieved from http://www.entrepreneur.com/tradejournals/article/181462901.html

Stein, S. (2011, December, 3). Bachman on Immigration: Deport all the undocumented. *Huffington Post.* Retrieved from http://www.huffingtonpost.com/2011/12/03/bachmann-immigration-deport-undocumented-_n_1127533.html

Strayhorn, C. (2006). *Undocumented immigrants in Texas: A financial analysis of the impact to the State budget and economy.* Office of the Comptroller, Austin, TX. Retrieved from http://www.window.state.tx.us/specialrpt/undocumented/

Umaña-Taylor, A. J., & Updegraff, K. A. (2007). Latino adolescents' mental health: Exploring the interrelations among discrimination, ethnic identity, cultural orientation, self-esteem, and depressive symptoms. *Journal of Adolescence, 30,* 549-567.

U.S. Chamber of Commerce. (n.d.). *Immigration myths and the facts: Behind the fallacies.* Washinton DC: Labor, Immigration, and Employee Benefits Division, Chamber of Commerce.

U.S. Citizenship and Immigration Services. (2010). *History and milestones.* Retrieved from http://www.uscis.gov/portal/site/uscis

U.S. Department of Education (2005). *10 facts about K-12 education funding.* Washington, DC.

U.S. Government Accountability Office. (2005). *Information on criminal aliens incarcerated in federal and state prisons and local jails.* Washington, DC.

U.S. Government Accountability Office (2009) *Secure border initiative fence construction costs* [GAO-09-244R]. Retrieved on November 1, 2010 from http://www.gao.gov/new.items/d09244r.pdf

U.S. Government Accountability Office (2010). *Secure Border Initiative: DHS needs to reconsider its proposed investment in key technology program* [GAO-10-340]. Retrieved on February 27, 2011 from http://www.gao.gov/new.items/d10340.pdf

von Spakvosky, H. (2011). *Here illegally and criminals as well.* The Heritage Foundation. Retrieved from http://www.heritage.org/Research/Commentary/2011/04/Here-illegally-and-criminals-as-well.

Williams, D. R., Neighbors, H. W., & Jackson, J. S. (2008). Racial/ethnic discrimination and health: Findings from community studies. *American Journal of Public Health, 98,* 29-37.

# EXHIBIT DD

337

# Legal Consciousness of Undocumented Latinos: Fear and Stigma as Barriers to Claims-Making for First- and 1.5-Generation Immigrants

Leisy J. Abrego

This article examines the legal consciousness and incorporation experiences of undocumented immigrants in the United States. Although this population may be disaggregated along several axes, one central distinction among them is their age at migration. Those who migrated as adults live out their daily lives in different social contexts than those who migrated as children. Therefore, although all undocumented immigrants are legally banned, their identities, sense of belonging, and interpretation of their status vary. Based on ethnographic observations and in-depth interviews of Latino undocumented immigrants from 2001 to 2010, I examine how illegality is experienced differently by social position. The findings suggest that the role of life-stage at migration and work-versus-school contexts importantly inform immigrants' legal consciousness. Fear predominates in the legal consciousness of first-generation undocumented immigrants, while the legal consciousness of the 1.5 generation is more heavily infused with stigma. Fear and stigma are both barriers to claims-making, but they may affect undocumented immigrants' potential for collective mobilization in different ways.

At a recent press conference in support of the DREAM Act,[1] undocumented college students openly shared details about their lives as they eagerly waited for the event to begin. Off to the side, an older woman carried a stack of banners and smiled shyly every

I am grateful to Hiroshi Motomura, Sylvanna Falcón, Leo Chavez, and Lilia Soto for their feedback on previous drafts of this article. I am indebted to Carroll Seron and the three anonymous reviewers for their incredibly helpful suggestions. I also benefited from presenting the paper at the 2009 Law & Society Association Conference. Special thanks to Carlos Colorado for his support. This research was generously supported by the University of California Office of the President, the Mellon Foundation, the Ford Foundation, the Haynes Foundation, the UCLA Latin American Center, and the Latin American Studies Association Section on Central America. Please address correspondence to Leisy Abrego, Department of Chicana and Chicano Studies, University of California, Los Angeles, 7357 Bunche Hall, Los Angeles, CA 90095-1559; e-mail: abrego@ucla.edu.

[1] The Development, Relief, and Education for Alien Minors (DREAM) Act (S. 2075, H.R. 5131) is a bipartisan piece of legislation that would provide undocumented students who have grown up in the United States with a pathway to legal permanent residency. At the time of this writing, the DREAM Act was pending in the U.S. Congress.

*Law & Society Review*, Volume 45, Number 2 (2011)
© 2011 Law and Society Association. All rights reserved.

time our eyes met. I walked over to introduce myself, and after some chitchat she cautiously shared her story. Adela[2] is the mother of one of the students who helped organize the press conference. This was the first time she had participated in such a public act, and she was nervous about being so visible. She and her family arrived in the United States from Mexico more than 14 years ago, but she has only recently started to participate in a local immigrant rights organization. After much prodding from her children, she joined them in their volunteer efforts. She hopes that under President Barack Obama's administration she and her family may finally have a pathway to lawful permanent residence. Adela was the only parent in the group of about 30 people. She had invited several other women to the press conference who attended meetings at the organization, but all had declined because they were too afraid of becoming targets for deportation. Meanwhile, the students proudly held up banners that made claims and tied their struggle to mainstream ideals: "Our Dreams Can't Wait" and "My Dream, The American Dream."

The visible contrast between Adela's behavior and that of the students was striking. Adela, whose demographics more closely match those of the imagined undocumented immigrant, is clearly afraid to step out of the shadows. Her children and their peers, on the other hand, seem unafraid to speak out in favor of policies that will help them and their families move out of the margins. This event, like so many other collective mobilization activities in support of undocumented immigrants, illustrates the difference in perspective, legal consciousness, and claims-making behaviors between undocumented immigrant youth and adults. Undocumented youth, many of whom are growing up and coming of age in the United States, are actively demanding full inclusion into U.S. society (Abrego 2008:560; Bloemraad & Trost 2008; Seif 2004). Undocumented adults, on the other hand, have mostly remained in the shadows. In fact, journalistic coverage (Bazar 2009) and a prominent Internet presence of various undocumented youth groups around the country suggest the greater visibility and political claims-making of youth compared to their adult counterparts. Politically, their participation in collective claims-making is important because it may lead to greater inclusion through legalization.[3] However, their stratified participation suggests a diversity of experiences in what is often presumed to be a monolithic undocumented immigrant community.

Drawing on the narratives of undocumented Latino immigrants who arrived in the United States as adults (first generation)

---

[2] The names of individual respondents, locations, and organizations have been disguised to preserve anonymity.

[3] Protests and social movements have the potential to influence policy changes (Meyer & Reyes 2010).

and those who came as children (1.5 generation) (Rumbaut 2004), this article argues that the process of integration into U.S. society for different subgroups of undocumented immigrants is anything but monolithic. It examines how age at migration and socialization via different social institutions in the United States—particularly work and school (Gleeson & Gonzales n.d.)—variably affect immigrants' understanding of their legal statuses. Even though they are all legally banned from residing in the country, asymmetrical claims-making behaviors reveal an interplay between legal status, labor, and education laws, as well as experiences with migration and social institutions that differentially affect their sense of belonging and incorporation experiences.

## Immigrant Incorporation Theories and the Role of Legal Status

Legal status, and undocumented status more specifically, have yet to be fully examined as central determinants of immigrants' life chances in the United States. Contemporary theories of immigrant incorporation, more explicitly than past theories, do try to account for the role of context of reception in contextualizing and shaping immigrants' lives in the host country (Portes & Rumbaut 2001; Portes & Zhou 1993; Reitz 1998). In particular, segmented assimilation—one of the most influential frameworks for the study of immigrant incorporation—identifies context of reception as one of a few key factors determining the various pathways through which immigrants and their children can incorporate into U.S. society (Portes & Rumbaut 2001; Portes & Zhou 1993). In this conceptualization, governmental policies are secondary to coethnic communities (considered the most important mode of incorporation) and societal reception (through the presence or absence of prejudice) in influencing immigrants' educational and occupational attainment (Portes & Zhou 1993:84, 86). Arguably, the framework underemphasizes the significance of legal status (Abrego 2006) in favor of examinations of the role of human, economic, and social capital, and it therefore misses the diversity of experiences among different subgroups of undocumented immigrants.[4]

Diverse experiences of illegality are similarly underemphasized in other contemporary studies of immigrant integration that rely on data sets with only few undocumented immigrant participants (see, for example, Alba & Nee 2003; Kasinitz et al. 2008). Unable to

---

[4] To be fair, the Children of Immigrants Longitudinal Study (CILS)—the survey used to support and develop much of the work on segmented assimilation—did not measure immigration status (see Portes & Rumbaut 2001 for information on the first findings of the survey).

compare across statuses, these studies overlook the complex re-
wards and penalties for immigrants in the United States based,
precisely, on legal status (Massey & Bartley 2005). When legal sta-
tus is analyzed more centrally, its role in determining access to
health care (Holmes 2007; Menjívar 2002), housing (McConnell &
Marcelli 2007; Painter et al. 2001), higher education (Abrego &
Gonzales 2010; Abrego 2006; 2008), and employment (Fortuny
et al. 2007; Uriarte et al. 2003; Valenzuela Jr. 2002; Walter et al.
2004) becomes evident. In general, undocumented immigrants are
more vulnerable; they earn less, work in more dangerous jobs, and
have little access to financial and housing aid. Presumably, like all
immigrants, undocumented immigrants' wages and living condi-
tions should improve when they have resided in the United States
for 10 or more years (Myers 2007).

Existing studies tend to consider the situation of undocu-
mented immigrants or the role of legal status *in general* and there-
fore implicitly contribute to a notion that there is a monolithic
undocumented immigrant experience. For example, although fac-
tors such as gender, national origin, race, order of migration, age at
arrival, educational attainment, and daily social contexts have been
shown to be important in shaping integration experiences of most
immigrants (Chiswick & DebBurman 2004; Feliciano 2006; Hon-
dagneu-Sotelo 2003; Rumbaut 2004; Schaafsma & Sweetman
2001), this kind of diversity has been underexplored among un-
documented immigrants. This article begins to tease out some of
this diversity by examining how illegality intersects with and is ex-
perienced differently across social positions. To this end, I extend
the analysis of immigrant incorporation beyond educational and
occupational outcomes to include immigrants' claims-making be-
havior. The extent to which groups make claims for inclusion in
various sectors of society reveals not only their sense of belonging,
but also what spaces and information are accessible to them (Poll-
etta 2000). In the case of immigrants, aside from how much
schooling and what kinds of jobs they are able to attain, their ability
or inability to voice their concerns and demand rights speaks di-
rectly to their political incorporation, even when their activities are
outside of the realm of traditional electoral politics (Bloemraad
2006; Jones-Correa 1998a). Arguably, such claims-making is a cen-
tral aspect of immigrant incorporation.

## Claims-Making, Legal Consciousness, and Undocumented
## Immigrants

Claims-making requires an awareness of existing or possible
rights (Minow 1987; Polletta 2000). Informed by their legal

consciousness—commonsense understandings of the law (Merry 1990)—people develop stratified levels of rights awareness, pursue various conflict-resolution strategies (Emerson 2008; Hoffmann 2003), and generally interpret their lives in different ways. In their important study on the ways people understand and apply the law in everyday life, Ewick and Silbey (1998) identify predominant types of legal consciousness, each associated with a set of actions. Among these, the authors find that individuals who are "with the law" find it to be accessible, utilize it as a resource, and perceive it as a game (1998:48). These individuals are aware of their rights and are likely to make claims for redress or inclusion. On the other hand, those who are "against the law" are trapped by its pervasive authority and are not likely to make claims (1998:48–9). Based on this framework, the authors predict that members of disenfranchised groups will generally be against the law—distrusting and suspicious of the law and its capricious implementation. Although these categories are loosely correlated with social status, orientations toward law are shifting and contingent (1998:235). Because legal consciousness is socially constructed and leaves room for shifting interpretations and applications of law, Ewick and Silbey's prediction accurately explains the experiences of some marginalized groups (Bumiller 1988; Nielsen 2000) but captures less of the complexity of others (Abrego 2008; Hernandez 2010).

Undocumented immigrants are all banned from residing in the United States. As such, they constitute a vulnerable group, and their legal consciousness should presumably place them unvaryingly "against the law" within national boundaries. This is in line with Calavita's insightful assertion (1998:560) that "despite the rhetoric of control and integration, immigration laws and policies have one conspicuous effect: Instead of controlling immigration, they control the immigrant." She argues that the exclusivist nature of many immigration policies often leads to intense fear of deportation and a life of permanent anxiety for undocumented immigrants. Her findings suggest that undocumented immigrants' legal consciousness is uniformly "against the law." Along these lines, in a recent national survey (Pew Hispanic Center 2007), just over half of Latino adults in the United States expressed worry that one of their close friends or relatives could be deported. Indeed, this sizeable undocumented Latino population is vulnerable and increasingly targeted for detention and deportation (Human Rights Watch 2007; Lovato 2008).

Given their precarious legal situation, undocumented and otherwise liminally legal (Menjívar 2006b) Latino immigrants must look toward the law to understand their place in U.S. society— what rights and services are available to them and what is off limits. However, there is reason to believe that not all immigrants with ten-

uous legal status fare equally. For example, while many undocu-
mented adult immigrants are silenced about their work and living
conditions (Camayd-Freixas 2008; Holmes 2007; Walter et al. 2004),
some undocumented college students organize around and access
educational opportunities (Abrego 2008; Seif 2004). These types of
highly visible collective actions to demand full and legal inclusion in
the United States suggest that members of the 1.5 undocumented
immigrant generation are informed by a legal consciousness that is
driven by less fear than that of their adult counterparts in the first
generation. In the next section, I review some of the policies and
public discourses that contextualize the incorporation experiences of
these subgroups of undocumented immigrants.

## The Social Construction of First and 1.5 Generation
## Undocumented Immigrants

Federal, state, and local laws along with media representations
powerfully produce the category of undocumented immigrants.
Like all laws, immigration laws are socially constructed, and the
people deemed "illegal" are only produced as such through im-
migration laws (De Genova 2005; Ngai 2007). Immigration laws
restrict the movement of some individuals but allow the admission
of others, thereby making and unmaking documented, undocu-
mented (Calavita 1998; Ngai 2004), and quasi-documented im-
migrants (Menjívar 2006b). These practices establish a social
hierarchy based on legal status (Menjívar & Abrego n.d.) and le-
gal categories that grant immigrants access to goods, benefits, and
rights in society (Massey & Bartley 2005). In the current historical
moment, the estimated 11.9 million undocumented immigrants
who reside in the United States (Passel & Cohn 2008) are heavily
criminalized (Stumpf 2006). Mostly punitive immigration policies
at the federal, state, and local levels fundamentally and command-
ingly shape immigrants' lived experiences, creating systematic pat-
terns of disadvantage (Menjívar & Abrego n.d.). However, not all
undocumented immigrants are equally criminalized.

Although historically undocumented immigrants consisted
mainly of adult males, changes in immigration laws and an increase
in neoliberal policies drive larger numbers of Latino immigrants and
their families to settle in the United States (Hondagneu-Sotelo 1994;
Massey et al. 2002). The steep militarization of the southern border
and a lack of available pathways to lawful permanent residency force
immigrants to leave loved ones behind for extended periods of time
(Abrego 2009; Menjívar & Abrego 2009) or settle in the United
States to raise their families (Hondagneu-Sotelo 1994). Therefore,
although media representations continue to focus largely on adult

workers (Chavez 2001, 2008), undocumented immigrants include members of families with various social locations. In fact, undocumented youth under the age of 18 make up 16 percent of undocumented immigrants in the United States (Fortuny et al. 2007:10), and it is likely that their experiences of incorporation vary greatly from those of their first-generation counterparts.

Presumably, all undocumented immigrants' lives are contextualized by immigration laws and ordinances, but deportation rates and media coverage suggest stratified application of the law. For example, the 1996 Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), one of the harshest federal immigration laws in U.S. history (Stumpf 2006), set the stage for the deportation of more than 650,000 immigrants—most of whom were adults.[5] Among other things, it expanded the range of crimes that make noncitizens deportable, increased border control efforts, and made it more difficult for undocumented immigrants to obtain legal permanent residence. One of the most damaging mechanisms created through IIRIRA is the 287(g) program, which allows local police to enter into an agreement with Immigration and Customs Enforcement (ICE) to target and detain "criminal illegal aliens." Prominently broadcast in the media, ICE raids have become more frequent and visible, garnering much public attention. Although the public emphasis has been on the deportation of "criminal aliens," 287(g) has had its largest impact on law-abiding immigrants, such as day laborers, street vendors, and drivers with broken tail-lights (Armenta 2009; Shahani & Greene 2009). In this process, ICE agents have targeted first-generation undocumented immigrant workers while undocumented youth have been largely spared from detention or deportation (Preston 2009).

Despite sharing the legal context created by immigration laws with undocumented adults, undocumented youth have important legal protections not available to their first-generation counterparts (Abrego & Gonzales 2010). Specifically, undocumented youth's lives are also broadly contextualized by education laws. Since 1982, a Supreme Court ruling, *Plyler v. Doe*, has barred public schools from excluding undocumented children, thereby granting them legal access to public education through high school. Their status as students protects members of the undocumented 1.5 generation in various ways. Importantly, it provides them with safe spaces in educational institutions that are not likely to be targets for ICE raids. Moreover, because they occupy a socially acceptable status as students, when they have been apprehended (usually away from educational settings) they have received an outpouring of support

---

[5] See Department of Homeland Security 2009: Table 38, "Aliens Removed by Criminal Status and Region and Country of Nationality: Fiscal Years 2000 to 2009."

from allies nationwide (Preston 2009). Prompted by online organizations, supporters have signed petitions, e-mailed letters, and made phone calls en masse to urge lawmakers to stop the deportation of these youth (Preston 2009). Often, deportations have been at least temporarily halted. Most recently, State Senators Dick Durbin and Richard Lugar, supporters of the DREAM Act, have written to the Obama administration requesting a general halt on the deportation of potential beneficiaries of the DREAM Act.[6] Such public support is rare for undocumented workers.

Media portrayals also vary considerably between 1.5- and first-generation undocumented immigrants. In stark contrast to coverage of undocumented immigrant workers, media coverage of these students' experiences has been relatively positive, highlighting their achievements and contributions (see, for example, Jordan 2008; Preston 2009; Sacchetti 2001; Sanchez 2001). On the other hand, mainstream mass media has mostly reproduced and maintained unambiguously negative portrayals of undocumented adults (Chavez 2008). News media outlets and public officials' discourse on immigration gratuitously highlight the legal status of immigrant workers with negative connotations (see Chavez 2001, 2008; Kil 2006; Menjívar & Kil 2002). Rarely revealing the human side of these stories, the media repeatedly covers immigration raids at work sites in a manner that portrays immigrants as criminals. Right-wing talk show hosts and anti-immigrant groups pejoratively refer to undocumented immigrants as "illegal aliens." Cumulatively, the images and discourse create a social imaginary of undocumented immigrants as a homogeneous group of workers without families or established ties to U.S. communities, arguably making it easier to criminalize and dehumanize them.

It is notably more difficult for the mainstream media to negatively portray undocumented students. Because many arrived in the United States as young children, they are not easy to discern from their documented peers. Undocumented youth are legitimated in educational settings and are able to learn the language, absorb the customs, and make the culture their own in ways that are not available to those who migrate as adults (Abrego 2006; Fernández-Kelly & Curran 2001). For example, whereas working-class adults may signal to others through their clothing and language practices that they are outsiders, undocumented students dress and speak English in ways that typically make them indistinguishable from their U.S.-born peers (Chavez 1998; Olivas

[6] For a copy of the senators' April 21, 2010, letter to then-Attorney General Janet Napolitano, see http://amvoice.3cdn.net/73f55f1afefcefadf6_1zm6bx6rb.pdf (accessed 25 April 2010).

1995).[7] Thus, unlike undocumented first-generation immigrants, undocumented youth can manipulate social assumptions to avoid questions about their legal status (Abrego 2006; Gonzales 2008). When they do share information about their unauthorized status, reporters are often willing to also share information that humanizes these youth.

Ultimately, most undocumented immigrants targeted for detention and deportation are adults. ICE raids take place most visibly at work sites, and anti-immigrant rhetoric is infused with references to unwanted workers. Being so visible and vulnerable, undocumented adults are likely to stand against the law and in fear of legal repercussions. But their experiences are categorically different from those of undocumented youth, for whom protective education policies and safe institutional spaces protect them in various ways. Furthermore, the educational system is central to the development of identity and understanding of social norms (Lopez 2003)—forces that, along with the law, powerfully determine legal consciousness (Abrego 2008). Under current law, however, many immigrants who are undocumented have no pathway to regularize their status, regardless of their age.[8] These different contexts and life experiences are likely to inform the legal consciousness of subgroups of undocumented immigrants in very different ways, thereby shaping how they make claims and incorporate into U.S. society.

## Methods

The data on which this article is based come from two studies. From 2001 to 2006, I carried out a longitudinal study that focused on access to higher education for Guatemalan, Mexican, and Salvadoran undocumented high school and college students in Los Angeles.[9] I located 27 respondents for this study through participant-observation at community-based organizations and various schools and colleges. I initially interviewed 12 undocumented youth. I went on to interview eight of them two more times over the five-year period. The first round of interviews took place in

---

[7] Because undocumented youth share the same neighborhoods and schools, their socialization processes are almost identical to those of other children of immigrants. The most significant difference between the two groups is that legal protections for undocumented youth end when they leave school (Abrego 2006; Abrego & Gonzales 2010).

[8] Family reunification and employment-based categories are the only pathways to legalization. Undocumented immigrants must have an employer or a close relative who is documented, and preferably a U.S. citizen, to petition for them. Moreover, immigrants can file for legalization through these avenues and still have to wait for many years, sometimes more than a decade, before the bureaucratic system grants them legal permanent residence.

[9] Together, immigrants from these three national-origin groups account for roughly 80 percent of the undocumented population (Passel 2005).

2001, the second round in 2002–2003, and the third round in 2005–2006. For the purposes of corroborating some of my observations with the smaller original sample, in the third round I also conducted interviews with 15 more undocumented students who were enrolled at various colleges and universities throughout California. Although many of the students were high-achieving, some of them were performing poorly in school and were unlikely to graduate from high school. With the exception of one student who came to the United States when she was 14, most of the youth migrated between their infancy and age eight. Their ages at the time of the interviews ranged from 17 to 24. All interviews with members of the 1.5 generation were conducted in English. I tape-recorded and transcribed the interviews.

Between June 2004 and September 2006, as part of a larger study, I also conducted 28 in-depth interviews with Salvadoran immigrants who were undocumented or recently formerly undocumented. At the time of the interview, five had only recently been granted legal permanent residency, 14 were undocumented, and 9 had only Temporary Protected Status (TPS).[10] Their average age at migration was 29. They were between ages 25–55 at the time of the interview. I located these respondents by approaching them individually at businesses, day labor sites, and public parks, or by making presentations in churches, union halls, and community-based organizations. I conducted all interviews with members of the first generation in Spanish.[11] I tape-recorded most interviews and had them professionally transcribed.[12]

The interview data are heavily supplemented with participant-observation conducted on a weekly or biweekly basis over the course of several years at community organizations, meetings, and events. From 2006 to 2010, I continued to participate in and observe mobilization efforts of undocumented immigrants. In this process, I have gained access to strikingly similar stories of many more students and adult immigrants in various locations throughout Los Angeles.

The data collection and analytical process for this article were different for each set of interviews. The study of 1.5-generation students was designed to explore the effects of immigration and education laws on their educational trajectories. I asked participants direct questions about their legal status and the role it played in their daily activities. In turn, the analytical process presumed the

[10] TPS grants beneficiaries the legal right to remain in the United States and to work during a designated period (typically 18 months), but it does not lead to permanent resident status.

[11] Excerpts included in the article are my translations from the originals in Spanish.

[12] For information about my own positionality relative to the first-generation immigrant participants in the study, see Abrego (2009).

significance of legal status and sought out the specific ways in which
it mattered. On the other hand, my interviews with first-generation
immigrants were part of a larger project on transnational families'
well-being. In this set of interviews, I did not ask participants to
reveal their legal status. It turned out, however, that legal status
was so central in determining transnational families' well-being that
even without my prodding, they divulged their status and its im-
plications in their lives. For example, my question about how they
made the decision to migrate and leave children behind usually
prompted responses that included details about the dangers of un-
authorized travel across borders. And when I asked about their work
experiences in the United States, first generation immigrants also
often shared the challenges associated with undocumented legal
status for obtaining stable jobs and avoiding exploitation. The larger
project from which I drew these interviews also included interviews
with documented migrants. Comparisons across immigrants' legal
status served to further highlight the uniqueness and prevalence of
legal status in shaping undocumented immigrants' lives. In this
sense, the analysis for this set of interviews was much more induc-
tive, as the narratives led me to the relevance of legal status.

Although the data are based on two different studies, they are
comparable. Perhaps this is most clear in the cases in which I asked
the same questions of both sets of participants. For example, I
asked both youth and adults why they or their family migrated. In
other cases, the data are comparable because I asked parallel
questions of respondents. For example, I asked adult immigrants
to tell me about their work experiences in the United States and
asked youth to tell me about their school experiences in the United
States. Finally, even in cases where I did not ask the same or par-
allel questions of participants in the two studies, the prevalence of
common narratives among both sets of interviewees speaks pow-
erfully to the role of legal status in their lives. For example, al-
though I only asked the 1.5-generation participants directly about
their legal status, the fact that the topic was so prevalent in the
narratives of the first-generation participants serves to accentuate
the centrality of legal status in their lives.

## Differences Between First- and 1.5-Generation
## Undocumented Immigrants

The findings shed light on the diversity of experiences among
undocumented immigrants by underscoring that although both
subgroups are undocumented, they develop different types of legal
consciousness as a result of migrating at different life-stages and
interacting with different social institutions in the United States.

Therefore, members of the undocumented first generation internalize the law most prominently as fear while members of the undocumented 1.5 generation internalize the law most notably as a source of stigma. Although both forms of legal consciousness are likely to limit their claims-making, the fact that they participate in collective political action in different ways suggests a heightened significance of legal consciousness in immigrants' integration processes.

**Life-Stage at Arrival: Decision to Migrate**

Not surprisingly, individuals' life-stage at arrival centrally informed the legal consciousness of undocumented immigrants. Memories of the migration decision making process were prominent in the narratives of undocumented first-generation immigrants but mostly absent in the narratives of 1.5-generation undocumented immigrants. In response to questions about why they had migrated to the United States, most first-generation undocumented immigrants provided concrete responses. Several went on to describe the economic situation they lived in, how much they earned, how many other people shared their household, how many responsibilities they could not fulfill, how they tried to get other jobs, and who helped them. Members of the 1.5 generation, on the other hand, only had vague notions about why they and their families migrated. Most cited "economic" reasons but rarely recalled specific details about their own and their family's situation prior to migration.

In turn, people who migrated as adults took greater ownership over their decision to migrate. Although many expressed that they felt they had no other option—suggesting that they were not entirely in control—they could vividly recall what led them to migrate and the moments when they actively opted (often hesitantly) to leave their homes. Members of the 1.5 generation, on the other hand, shared very different narratives about migration decision making. Except for one young Mexican woman who migrated in search of her mother (and without her mother's consent) at age 14, none of the other youth took responsibility for their migration. They cited their young ages as evidence that they could not have been in a position to decide to migrate.

It matters whether immigrants feel that they actively participated in making the decision to migrate because this informs their sense of responsibility and willingness to deal with the effects of immigration law in their lives. For example, Marta, who was 32 years old at the time of the interview, recalled her migration from El Salvador at age 21. In response to a question about whether she was afraid of the journey by land, she responded:

> Well, yes, because they tell you, you hear how difficult it is to cross [borders and territories] and how dangerous the trip is. But .

> you're filled with desperation when there is nothing more to do,
> and you don't know where the next meal is going to come from,
> so then you're forced to hit the road. You know what awaits you,
> but there's no other way.

As an undocumented immigrant, Marta's work and living experi-
ences in the United States have been difficult. Not only have var-
ious employers exploited her, but she also continues to earn
minimal wages despite working six days per week. When I asked
her how this made her feel, her response was simply:

> Well, one knows, right? You know why you come, which is to
> work. Everything else, you know that maybe they will look at you
> as being inferior because you don't have papers, but you just have
> to keep working. The problem is if they catch [detain/deport]
> you. But everything else doesn't matter.

In effect, those who arrived as adults considered that they did so
mostly according to their own will, so they were more likely to take
some responsibility for the legal consequences of exclusion and hu-
miliation based on their undocumented status. Marta, however, also
minimized the effect of social exclusion when she suggested that it is
not as important or consequential as detention or deportation.

Several youth, on the other hand, expressed that because they
had not participated in the decision making process, they should
not be considered responsible for their unauthorized status. Eve-
lyn, a Mexican immigrant whose narrative was similar to those of
other 1.5-generation undocumented youth in the study, described
her frustration with being undocumented and socially excluded:

> I hate it because on a daily basis I'm reminded that I'm sort of
> cheating the system and I don't want it to be that way. I don't
> think I am. I was little, I've lived all my life here, I didn't choose
> to come here . . . Every time I go to [community college] I think
> about it. . . . Because I didn't have the chance to go [to college]
> where I wanted to go and have financial aid. . . . And that's when I
> realize that because I'm not welcomed here I don't have those
> privileges. I think about it almost all the time.

Like many other undocumented 1.5-generation immigrants, Eve-
lyn felt that she does not deserve the exclusion and humiliation
associated with her legal status. Not having made the decision
to migrate, she considered her current situation unfair. In her
case, consequences included not having access to financial aid for
college and instead having to attend the more affordable but less
academically challenging community college. Unlike first-genera-
tion undocumented immigrants whose narratives focused on de-
portation, her frustration was most evident when she described the
sense of feeling unwelcome in the society where she has lived most

of her life. Legal consciousness for undocumented youth, then, seems to be shaped less by a concrete fear of deportation and more by a sense of stigma from recognizing that there are rights and privileges that are unavailable to them due to their status.

### Life-Stage at Arrival: Memories of the Migration Journey

Deportation is a concrete fear for all first-generation undocumented immigrants in this study. Those who traveled by land to cross the border into the United States vividly recall the journey and do not wish to relive it in another attempt to get back into the United States. The dangers associated with this journey are arguably a form of legal violence (Menjívar & Abrego n.d.). That is, these dangers are created largely as a result of U.S. immigration policies that have militarized the border and increased the risks from getting into the United States without authorization. Immigrants begin to understand their social marginalization in the United States through the experience of crossing territories and borders without authorization. In this process, immigration law powerfully begins to form their legal consciousness.

Although not all undocumented immigrants in the study crossed the border by land, those who did vividly recall their horrendous experiences, even years after crossing. Unprompted to describe their journey, they usually took advantage of the interview setting to share some of what they had survived. Mauricio, a Salvadoran man who was deported from Mexico twice before making it to the United States on his third attempt, still gets emotional when recalling his journeys. Three years after entering the United States, he was still visibly upset and his voice faltered as he recounted some of the torturous experiences he endured and witnessed:

> There were 87 of us and they packed us up into a trailer truck for 16 hours. And for all of us to fit, we had to be so close to each other, and I couldn't take it anymore, I needed to move. . . . And then we started to walk across the desert. All you desire is water and food. We used our shirts to drain some muddy rain water that remained in a plastic bag that was stuck to a tree. That's how thirsty we were! . . . And at one point, we all had to run in different directions, and once the [border patrolmen] were gone, we went back to look for the Guatemalan man who was with us. He was already really tired and we didn't find him. The smuggler wanted to keep going, and who knows what happened to that poor man because we still had to walk many hours and it was so cold that night. I don't know if he survived. He probably didn't.

Similarly, Lydia, a Salvadoran woman, walked so much that she bled between her legs. When six masked men robbed her at gunpoint and forced her onto the floor, it was only the sight of

blood that disturbed the men enough to stop them from raping her. Tales like these are not uncommon among migrants crossing international borders to arrive in the United States (see, for example, Behrens 2009; Coutin 2007; Menjívar 2000). These types of experiences forcefully communicate to these migrants that they are unwelcome in the United States. Understandably, their legal consciousness is strongly shaped by their memories of the journey and a concrete fear of ever having to live through that dreadful experience again should they be deported.

Immigrants who arrived as children, on the other hand, remembered little to nothing about their migration journeys. Miguel, who migrated from Guatemala at age 7, recalled:

> I do remember that we had to hide in like the grass, this area that was like a big field and they would tell me to stay quiet. And I kind of like remember a house that a lot of us stayed in. But that's all I remember from that. Oh, and I remember falling asleep, and then I woke up at a McDonald's where my dad was waiting for us.

Similarly, 19-year-old Evelyn recalled:

> I was 3 years old, and about to be 4. Then I remember, well, I hardly remember, we were passing through the *frontera* [border]. . . . And then we made it through. I didn't know what I was doing. Yeah, when you're small, you don't know what you're doing. You know, I guess, I've been here all my life.

Unable to recall much of the experience, undocumented 1.5-generation immigrants not only claim no responsibility in choosing to come to the United States without authorization, but they also do not comprehend the dangers of unauthorized travel as concretely as their adult counterparts. Consequently, it is less common for undocumented 1.5-generation immigrants to develop a legal consciousness that is rooted in fear.

**Central Social Institutions: Work Versus School**

Once they arrive and begin to settle in the United States, undocumented immigrants at different life-stages interact with different social institutions on a daily basis. Adults, most of whom migrated in search of better wages, join the labor force, and their main contact in the United States is therefore with the social institution of work (Gleeson & Gonzales n.d.). To access work, most have to use false documents or other measures to hide their unauthorized status. This means that their legal status contextualizes their daily experiences in very concrete ways. Members of the undocumented 1.5 generation, on the other hand, are often young enough to enter public schools in grades K–12. Because *Plyler v. Doe* (1982) grants them legal access to public schools during those

years, effectively protecting them legally and legitimating their presence in the most important social institution during this life-stage, their legal status does not explicitly contextualize their daily experiences during their tenure as students.

First-generation undocumented immigrants in the study expressed that they are constantly aware of their unlawful and unwelcome presence at work. Indeed, laws powerfully shape immigrants' work experiences. It is widely known that immigrants earn low wages in back-breaking jobs with no benefits (Milkman et al. 2010). To make matters worse, the current surge in ICE raids increases scrutiny and suspicion of undocumented workers by criminalizing them and facilitating additional forms of exploitation and dehumanization in the work place. Reminders of their status are frequent. For example, Mauricio explained:

> You see that without papers it is very difficult to be hired just anywhere. My brother-in-law found me a job . . . where the trailer trucks come and you pack them and unpack them. That is hard work because they don't care if one is tired, if one needs to rest, or if [the weather is] too hot or too cold. And so, since they didn't even let us rest, I messed up my back and when I told them, they pretended not to hear me, they didn't do anything. I kept complaining and in the end they told me that if I couldn't do the work anymore, I should look for another job because they needed someone who could stay on schedule. And after that I still had to fight with them to get my last paycheck because they were saying that I worked too slowly. Up until now I still can't carry anything too heavy, so I haven't been able to find a steady job.

Because of his undocumented status, Mauricio was afraid to apply for worker's compensation or to denounce the employer who fired him when he complained of back pain. Stories like these are not uncommon among my study participants and among undocumented workers more generally (Holmes 2007; Milkman et al. 2010; Walter et al. 2004). Undocumented immigrants are limited with respect to the kinds of jobs and working conditions they can access. Their unauthorized status makes them vulnerable to unscrupulous employers who pay them low wages and withhold health benefits and other basic legally mandated provisions, such as bathroom breaks, safety training, and protective gear, when necessary for the job (Milkman et al. 2010). Workers in this study mentioned injuries, wage theft, and humiliation as part of their daily work environment, but, fearful of interacting with officials who may inquire about their legal status and possibly report them to ICE agents, few reported the abuse they suffered. Lacking legal recourse, many undocumented immigrants fall prey to similarly dishonest employers and are therefore targeted for rampant labor exploitations (Walter et al. 2004).

Media coverage of highly visible ICE raids at work sites throughout the United States make members of the undocumented first generation even more wary at work. As Maricela, a Salvadoran immigrant in Los Angeles, summed it up:

> You watch the news and you learn. Nobody is safe. They take people from work. . . . For these people [officials], it doesn't matter that we've lived here for 15 years, that we've been raising children who are good people, that we are buying houses. All they see is that we are "illegal." That's the only thing they see. Since we're "illegal," they don't care if our children are well. They will deport you and then what happens to the children?

In the current legal context, the legal consciousness of undocumented first-generation immigrants is heavily infused with fear. Not only are they aware of the horrendous journey they would have to make in order to re-enter the country after a deportation, but they also live in a historical moment in which mass media and vocal anti-immigrant groups make it resoundingly clear that they are unwelcome by reducing them to a label that conjures up images of dangerous criminals. Their tenuous legal status, rather than being recognized as a policy-created category, brands them as outlaws and nullifies their contributions to society. In effect, their well-being and stability are perennially threatened because, as they are constantly reminded, there may be an ICE raid at their place of employment at any time. Given the centrality of the social institution of work in their lives and their willingness to take responsibility for their undocumented status, the legal consciousness of these first-generation immigrants is largely rooted in the fear of detention and deportation.

Members of the undocumented 1.5 generation, on the other hand, do not face the daily threat of raids at school—the central social institution in their lives. On the contrary, several students I interviewed only learned of their unauthorized status in high school when they had to fill out applications for internships, summer jobs, or college admission. Unable to provide a Social Security number for the applications, their parents were forced to explain the situation to them for the first time. Prior to that, most undocumented youth in this study had not had to think about the role of legal status in their lives. As Alex, a Salvadoran junior in high school, described it, "I used to leave my house to go to school every day and I didn't know anything. I didn't know I was undocumented . . . I just went to class, hung out with my friends, you know, whatever normal things." In his worldview, as in the worldview of many other undocumented youth, undocumented status is not part of what is considered "normal" at this stage in their lives. As a result, stigma and embarrassment predominate in their legal consciousness.

Schools are mostly, but not entirely, safe spaces for undocumented youth. Once they learn that they are undocumented, many develop an acute awareness of the negative connotations associated with their illegality. Astrid, an undocumented Salvadoran high school student, recalled feeling uncomfortable at school when the classroom topic turned to immigration: "I hate how they call us 'illegal aliens.' I feel like telling them that I don't have antennae, I'm not a weirdo like they think." Concerned with the potential repercussions, however, she never shared these feelings with her peers. Similarly, Brenda, an undocumented Guatemalan high school student, said, "They call us 'illegals' and they think we're committing crimes all the time and we're not." The undocumented label weighs heavily on these youth who, like any other U.S. teenager, often want nothing more than to fit in.

By the time they learned that they were undocumented, many members of the 1.5 generation whom I interviewed had been mostly socialized in the United States, where, having had legal access to schools, they were able to develop a much stronger sense of belonging than their first-generation counterparts. Isabel, whose family migrated from Mexico when she was only one month old, described her sense of belonging: "I guess I always felt confident that I belonged here, but they always just have that advantage where they can use that 'undocumented' word to address me and that would be my scar." Like other 1.5-generation undocumented youth, Isabel had a strong sense of belonging in the United States that came from being a legitimized member of such an important social institution as school. Like her, 1.5-generation undocumented immigrants do not take responsibility for migrating to the United States, remember little about the migration journey, and have not had to take responsibility for their status. Unlike their first-generation counterparts, they do not feel constantly threatened. Rather, having been socialized in U.S. schools, their legal consciousness is often rooted in stigma associated with the "abnormality" of their legal status, one that Isabel likened to a shameful "scar."

### Internalizing the Law through Legal Consciousness: Fear and Stigma as Barriers to Claims-Making

When fear and stigma centrally inform the legal consciousness of undocumented immigrants, both sentiments can stand as barriers to claims-making. However, it is likely that each force differently informs how undocumented immigrants participate in society and practice or avoid making claims. For undocumented first-generation immigrants whose daily lives are filled with stories about workplace raids and family separations, their fear of deportation can powerfully restrict them from making claims at work or anywhere they feel

threatened. Undocumented 1.5-generation youth, however, develop a legal consciousness based in stigma that is certainly a setback but can be overcome to make way for greater claims-making.

### First-Generation Undocumented Immigrants Limited by Fear

With constant reminders of their criminalized presence, it is understandable that undocumented immigrants begin to internalize the effects of their immigration status. The internalization of the law is particularly evident in the words of a Guatemalan detainee in a 2008 Postville, Iowa raid (Preston 2008). Even though the employers had recruited workers and provided them with false documents, it was the workers who were punished through abrupt separations from their families and community, even after residing in the United States for a decade or longer in some cases. Although a U.S. citizen observing the raid later said that the workers were treated inhumanely, the undocumented first-generation immigrants did little to defend themselves against the charges. Instead, according to the interpreter, they believed that they had no rights. The interpreter described, "No matter how many times his attorney explained it, he kept saying, 'I'm illegal, I have no rights. I'm nobody in this country. Just do whatever you want with me'" (Preston 2008: n.p.). In this man's legal consciousness, he had internalized the most egregious effects of the law by accepting and confirming his own dehumanization (Menjívar & Abrego n.d.). Identifying himself entirely by his "illegal" status, he willingly and uncritically conformed to the false notion that legally he had "no rights."

First-generation undocumented immigrants in this study similarly expressed their legal consciousness. At community meetings, for example, individuals shared stories of common crime and violence that went untold in their neighborhoods because people were worried about the police questioning their legal status. Several people at these meetings made comments to the effect of, "Oh well, there's nothing we can do," while those around them merely shrugged their shoulders, nodding in defeat and agreement. And although parents typically consider schools to be safe spaces (Rogers et al. 2008), after ICE raids in the community, fearful parents may not take their children, including U.S.-born children, to school.[13] Afraid of being apprehended and separated, entire families avoid interacting with officials in various agencies, even when this means denying children the social, medical, and educational services they need (Menjívar 2006a). As Norma, a Mexican

---

[13] See, for example, the story "Immigration Raids Shake California Schools" covered on National Public Radio; http://www.npr.org/templates/story/story.php?storyId=90379927 (accessed on 10 June 2010).

356   **Legal Consciousness of Undocumented Latinos**

undocumented immigrant, summed it up, "We are here and we know this is not our country. They don't want us here, so you have to be careful. Always be careful." As these excerpts suggest, many undocumented first-generation immigrants feel helpless in the face of the law. Society has made it clear that they are unwelcome and targeted for expulsion. Understanding the many signs, undocumented immigrants who arrived as adults have developed a legal consciousness based mostly in fear, and this shapes and limits their participation and incorporation into U.S. society.

Legal status powerfully informs how people see themselves and their rights in the United States. Many begin to internalize the notion that they have no rights. In the following excerpt, Mauricio eloquently described what being undocumented meant to him:

> One comes here thinking that life will be better ... but without papers, one's life is not worth much. Look at me; I have always been a hard worker ... but I messed up my back working, carrying heavy things without any protection ... and I can't do anything about it. What doctor is going to help me if I can't pay? And the worst part is, who's going to hire me now? How will I support my family?

Mauricio, who later shared that he is too afraid to apply for worker's compensation, suffered the consequences of not being able to make claims in the United States. Unable to fulfill his role as a father and provider for his family, Mauricio's undocumented status translated into a personal devaluation when he proclaimed that his life was "not worth much." Trying to remind himself that he only came to the United States in search of economic opportunities, he eloquently described the sense of being less-than-a-person that accompanied his legal status and now pervaded him. Despite his positive qualities—that he was a hard worker who only sought to improve his life—being "without papers" meant being "without any protection," feeling helpless, and being perceived as worthless.

Rooted in fear, the legal consciousness of undocumented first-generation immigrants is notably and understandably a barrier to claims-making. Out of fear, immigrants like Adela, whose experience I highlighted in the opening vignette, never or only rarely participate in collective claims-making. This is problematic because protests, marches, and other nontraditional electoral politics are some of the only outlets undocumented immigrants have to make claims and possibly improve their lives in the United States (Bloemraad & Trost 2008; Meyer & Reyes 2010). Although it is possible to mobilize these immigrants—as evident in the massive May Day marches of 2006 (Cordero-Guzmán et al. 2008)—it is necessary first to target and minimize their fear. Given the ongoing

ICE raids at workplaces and homes throughout the country, minimizing immigrants' fears is likely to entail much work over an extended period of time (Cordero-Guzmán et al. 2008). And as long as these immigrants are driven by fear of deportation, they are unlikely to mobilize collectively, make claims, or participate fully in U.S. society.

### Undocumented 1.5-Generation Immigrants and the Complexity of Stigma

Although stigma is different than fear, it can also stand in the way of immigrants' incorporation and claims-making practices in the host society. Undocumented youth must interact and share their status with gatekeepers and school officials to transition to higher education. Among other things, they have to request letters of recommendation and proof of school attendance to apply to college. Many students expressed difficulty in overcoming the shame involved in revealing their status to school officials. As Isabel described:

> Well, I feel ashamed. I debated so many times whether to tell my counselor. Because you're just scared to tell somebody because you don't know what they're going to think. And you're just so scared of that reaction. Because you do feel inferior to somebody because you don't have the same rights as they do. . . . You feel inferior because you know they have more rights than you. And even though I know I've worked as hard as my friends, they're the ones who are going to get to go to [four-year colleges].

In this case, Isabel noted that her shame, rooted in her undocumented status, was enough to create great stress and hesitation when she had to seek the assistance of her college counselor. Moreover, she was frustrated about her limited rights and especially about the unfairness of not being able to enjoy the fruits of her labor. Unlike first-generation undocumented immigrants who more often take responsibility for their status and limited rights, 1.5-generation undocumented immigrants understand their legal limitations as unfair and, rather than focus on a fear of deportation, experience it as a source of social stigma.

Social stigma can be a considerable barrier for undocumented youth, especially given their life stage. It can be consequential in various daily interactions and in the long term, both in and out of school. In the following excerpt, 18-year-old Mexican immigrant Arturo described the stressful process he went through every time someone asked him where he was from:

> Psychologically, you get damaged, because you know, any time they ask you where you're from, it's such a pain. I mean, your mind goes like, "Whoa, whoa, what do I say? What do I say? What

do I say?" I mean, so it's a lot, I mean a lot. You torture yourself, you get depressed. Anything starts going down.

Not wanting to disclose his status, he had to think quickly about ways to represent himself to others. The stigma clearly weighs heavily on youth and may limit them from making claims.

Relative to members of the undocumented first generation, however, undocumented youth have the advantage that they have been raised and socialized in the United States. Along with the sense of stigma, they have internalized many U.S. social norms and can use their socialization to fit in. This is most evident in the stories that several 1.5-generation participants in the study shared about times when they participated in activities that their parents considered too risky. Evelyn (from El Salvador) and Gabriela (from Mexico), for example, had traveled internationally as children because, back when the border patrol was perceived as being relatively lenient, they felt confident that their unaccented English would not expose them during border crossings back into the United States. Indeed, when border officials did stop to chat with them, they were easily able to answer questions about where they lived and what school they attended. Similarly, Mario, a Guatemalan immigrant, drove on the streets of Los Angeles much more confidently than his parents, both of whom were undocumented. After 9/11, when ICE agents started to apprehend people at bus stations and airports, Mario willingly volunteered to pick up his relatives arriving at the airport from Guatemala because his parents were too afraid. In these examples, and many others, undocumented members of the 1.5 generation demonstrate that, unlike their first-generation counterparts, their legal consciousness is less centrally informed by fear of deportation.

Because their legal consciousness is more powerfully infused by stigma, undocumented youth have more possibilities than undocumented workers of overcoming barriers to make claims in the United States. For example, undocumented youth try to justify their presence in the country by distancing themselves from negative connotations of illegality. In doing so, they underscore that their liminal status differs from the marginalized and criminalized status of their first-generation counterparts. Most notably, they defend themselves by emphasizing that they did not actively choose to come to the United States. Jovani, a Guatemalan student who was in danger of failing most of his classes in his second attempt at junior year in high school when I interviewed him, expressed great disappointment and resentment at the fact that he could not obtain a driver's license or work legally:

When I want to get a job, I can't. I want to drive, but I can't. . . . So, most of the time, I just don't think about it, but I mean,

there's sometimes when it crosses your mind, you know, you gotta get a job, you want to work, you want to have money. . . . So yeah, it's kind of hard for me . . . I get mad because my parents brought me. I didn't tell them to bring me, but I get punished for it, for not having the papers.

Like Jovani, high-achieving students also distance themselves from undocumented first-generation immigrants, but they also use their student status to further distinguish themselves. Isabel's statement summed this strategy up neatly: "The fact that we're students gives us credibility and, in their [anti-immigrant activists'] eyes, that's better." Similarly, Rosaura, a Mexican undocumented college student, pleaded that undocumented students' cases are different from those of first-generation undocumented immigrants:

> I can understand the point of view of natives who are against immigration. But when it comes to education, that's different. All students want is an opportunity to have a career, to have a better life. . . . The fact that we are in high school and college, that says a lot about a person, that we are going to contribute to this country when we get a degree. We are going to contribute to the economy, to the society. And there is nothing wrong about that. We have worked three times as hard as any other student.

Drawing on a meritocratic worldview that is central to U.S. social values (Abrego 2008), members of the undocumented 1.5 generation minimize their stigma, elevate their social standing, and achieve a greater sense of belonging by distancing themselves from undocumented first-generation immigrants. Indeed, in a society that values education and individual effort, an emphasis on the student status will give subjects legitimacy and more opportunities to make claims for greater inclusion (Olivas 2009). This strategy is unavailable to the more marginalized and publicly targeted undocumented workers.

On a more collective level—because their legal consciousness is infused most fundamentally with stigma rather than with fear—it is possible to mobilize undocumented youth by targeting and minimizing their stigma. This is likely why they have been able to make claims as students in school settings and beyond. In effect, undocumented high school and college students who stood to benefit from the DREAM Act were particularly active in 2010. Starting January 1, four students began the widely publicized Trail of Dreams—a 1,500-mile walk from Miami, FL, to Washington, DC. to draw attention to their plight for legalization. Motivated by their courage, and now in a context that glorifies these students' achievements and struggles for justice, 1.5-generation undocumented youth nationwide organized campaigns of collective claims-

making actions that were equally public. In cities like Chicago, Seattle, and Los Angeles, students participated in the Coming out of the Shadows Week campaign by sharing their stories and their undocumented status in front of supportive crowds and media representatives (Associated Press 2010; Preston 2011). By allowing them to publicly highlight their achievements and contributions to society, such acts of collective claims-making help minimize undocumented youth's stigma.

Having created some momentum and a less stigmatizing context, undocumented members of the 1.5 generation throughout the country have put themselves on the line by carrying out various acts of civil disobedience. For example, five undocumented students risked deportation when they sat, refused to be moved from, and were eventually arrested in Senator John McCain's office in Arizona. Similarly, nine U.S. citizen allies of these students were arrested in Los Angeles when they marched on and closed down Wilshire Boulevard—one of the larger thoroughfares in the city— during rush hour. Throughout the country, in cities like Chicago, San Francisco, New York, and Seattle, students are demanding the passage of the DREAM Act as their path to legalization and full inclusion in this society.[14] In each of these cases, undocumented members of the 1.5 generation have managed to collectively make claims for full inclusion in U.S. society through legalization. They shift their legal consciousness to being with the law when they reframe their social location vis-à-vis the law by drawing on different sources to minimize their stigma. By overcoming the barrier of stigma, they can participate in greater claims-making activities.

### The Shifting Nature of Legal Consciousness

Legal consciousness is fluid and contextual (Ewick & Silbey 1998; Hernandez 2010), as is legal status. Members of disadvantaged communities may move from being against the law to being with the law and vice versa. It is imperative, therefore, not to be too celebratory about the claims-making behavior of 1.5-generation undocumented immigrants. Undocumented youth eventually have to transition out of educational institutions where their protections as students end (Abrego & Gonzales 2010). The exponential increase in ICE raids and deportations, along with the passage of draconian immigration laws like Arizona's SB 1070, increases fear and insecurity among all undocumented immigrants nationwide. Although the 1982 Supreme Court ruling in *Plyler v. Doe* bars public schools from excluding undocumented children in grades

---

[14] For more information, see the following useful Web sites: http://www.dreamactivist. org/; http://www.thedreamiscoming.com/; http://www.change.org/ideas/view/the_dream_ act_for_america_in_2010 (all accessed on 10 June 2010).

K–12, these students are not protected from deportation outside of school grounds. Like their adult counterparts, undocumented youth may be targeted, detained, and deported for minor infractions, such as driving without a license (Jordan 2008). As more police departments nationwide work in conjunction with ICE through the 287(g) program, members of the undocumented 1.5 generation increasingly fear the possibility of being deported for minor offenses. And although they are protected in school, the fear of deportation is likely to become more prominent in their lives as they transition out of high school into less protected spaces (see, for example, Abrego & Gonzales 2010).

Undocumented immigrants, whether they arrived as children or as adults, are also interacting with one another as members of families and communities. Inevitably, they hear each other's stories and experiences, rely on similar media sources, and share the same goals of legalization. In these interactions, they inform each other's legal consciousness. Marta, a Salvadoran college student, shared a telling example of this:

> I was in the waiting room at the clinic last week, sitting next to this girl who was like my age. We were talking about where our parents are from and how we haven't been back, when she gets a call on her cell phone. Somebody was calling to tell her that her mother had just been [detained and was going to be] deported! . . . Now, every day I leave the house and I don't know if me or my parents will be back. It could be any of us, any of these days, and it's so scary.

Like Marta, undocumented youth who learn of a recent raid or deportation in the community come to fear that they or their relatives may also be deported.

The older that undocumented 1.5-generation immigrants get and the more frequent these experiences become, it is likely that their legal consciousness will include greater fear along with stigma. Similarly, first-generation undocumented immigrants whose legal consciousness is most heavily informed by fear can also feel pain and frustration for the stigma that their children are made to feel in this society. As Adela, a mother of teenagers, expressed, "I came here and I brought them for a better life. . . . But then I would see them, they were ashamed and they couldn't do what they wanted for their future and it pains me to see that, to see them like that." Therefore, although the legal consciousness of first-generation undocumented immigrants is often based mostly in fear and that of undocumented 1.5-generation youth is mostly informed by stigma, it is possible and likely that fear and stigma intertwine, along with other sentiments, to inform undocumented immigrants' legal consciousness. The mixed legal consciousness

can, in many cases, keep them from participating more fully in social and political life in the United States. Other times, however, they become so indignant and fired up that they are moved to work collectively and make claims for greater inclusion in this society that is already their home.

## Implications and Conclusion

Contemporary immigrant incorporation theories suggest that governmental context of reception is significant but secondary to coethnic and societal contexts of reception in shaping integration experiences (Portes & Rumbaut 2001; Portes & Zhou 1993). For undocumented immigrants, however, governmental context of reception—through immigration laws and the statuses they confer upon individuals—is central to their paths of incorporation. Most notably, their unlawful presence in the country precludes them from full membership. But not all undocumented immigrants share the same experiences, and legal status intersects with other factors to shape their opportunities, interpretations, and behaviors. Just like immigrants at large whose incorporation paths differ based on several factors and characteristics (Jones-Correa 1998b; Kasinitz et al. 2008; Portes & Rumbaut 2001; Portes & Zhou 1993), particularly across generations (Rumbaut 2004), the undocumented immigrant population is also diverse. The diversity among undocumented immigrants merits greater examination to understand how various other factors, including gender, national origin, race, order of migration, and educational attainment differentially affect their integration experiences. In this article, I begin to tease out some of that diversity by examining the generational differences in the integration experiences of first- and 1.5-generation undocumented immigrants.

I draw on the legal consciousness framework to begin to examine how illegality intersects with and is experienced differently across social positions and how this plays out in their integration experiences. Although all undocumented immigrants are equally banned by law from residing in the United States, labor and educational laws, migration experiences, and social institutions play influential roles in developing their legal consciousness. This, in turn, informs how different subgroups participate in and integrate into U.S. society. I find that although immigration laws often "control the immigrant" (Calavita 1998:560), undocumented immigrants' legal consciousness is infused with at least two separate forces that create distinct barriers to mobilization and claims-making. Undocumented first-generation immigrants experience their legal status as a source of fear, while their 1.5-generation counter-

parts experience it as a source of stigma. Fear and stigma are both
barriers to claims-making, but they may require different strategies
for mobilization.

Because they made the decision to migrate and often forged
documents to enter the labor force, many undocumented immi-
grants who arrived as adults feel responsible for their situation and
are willing to accept their marginalized status in this country.
Moreover, as exploited workers who see themselves being car-
icatured and demonized through mass media, they view the pos-
sibility of being apprehended and deported as a concrete reality
that contextualizes their day-to-day life and powerfully prevents
their claims-making. Mobilizing them into collective claims-making
activities such as protests, marches, and other public and visible
actions is likely to require massive organizing campaigns that guar-
antee anonymity and safety from deportation.[15]

Undocumented members of the 1.5 generation, on the other
hand, were often too young to participate in the decision to
migrate, do not recall details of the migration journey, and occupy
legitimized spaces in the United States as students in educational
settings where they are safe from ICE raids and deportation. Many
undocumented youth, therefore, are unwilling to see themselves as
marginal members of this society. For them, being undocumented
is a source of stigma, more so than of fear. While stigma can
certainly be a barrier to claims-making, the threshold to overcome
it is relatively lower. Educational policies and meritocratic
worldviews contextualize undocumented youths' daily lives and
give them legitimacy as students to counterbalance their stigma
(Abrego 2008). Having overcome the stigma, many undocumented
youth, particularly when they are academic high-achievers, will be
moved to make collective claims and demand full inclusion in U.S.
society.[16]

It is worth reiterating that legal context of reception is shifting
as different laws, legal interpretations, and enforcement practices
vary across administrations and geographical locations. In turn,
legal consciousness is also shifting and contingent. Moreover,
because legal consciousness also intersects with and is mutually
constitutive of several other social forces—including norms and

---

[15] Using Arizona's SB 1070 (2010) as an example, in the months leading up to and
directly following Governor Jan Brewer's signing of this bill into law, it seems that first-
generation undocumented immigrants are leaving the state or relying on allies and sup-
porters to protest. Fear of deportation is intensely heightened, making it less likely that
they will make collective claims.

[16] This seems to be happening in the aftermath of the signing of SB 1070 into law in
Arizona. Despite the severe anti-immigrant context during this historical moment, un-
documented youth have publicly protested, organized, and participated in civil disobedi-
ence acts, even risking arrest and deportation in some cases.

institutional settings—it is historically contingent. In the current historical moment, the vast changes and increasing instability in immigration policies at the federal, state, and local levels matter a great deal in determining the spaces and practices of immigrant incorporation. For example, although undocumented youth have been spared the brunt of nativist anti-immigrant hostility to date, their increasingly visible advocacy efforts will likely make them greater targets.[17] Legal context of reception, therefore, merits a closer, more detailed examination as a factor that powerfully determines immigrants' incorporation experiences. Legal consciousness is a useful framework for measuring the claims-making practices of immigrants that speak to their ability to participate and integrate fully into U.S. society.

This empirical study has implications beyond the claims-making practices of undocumented immigrants. It is also useful for understanding the importance of legal consciousness in mobilizing marginalized groups in general. Although current frameworks predict that marginalized groups typically stand against the law (Ewick & Silbey 1998), the collective mobilization of some undocumented immigrants (Abrego 2008; Cordero-Guzmán et al. 2008; Coutin 2000; Seif 2004) suggests that legal consciousness, as informed by several other sources, can be targeted and influenced to shift to be with the law, even among members of deeply marginalized and vulnerable groups. Indeed, asserting the right to inclusion through legalization is a powerful claim to rights when expressed by persons who are legally banned by the state. This study makes evident that legal consciousness may be rooted in and create different kinds of barriers to mobilization. Efforts to mobilize disenfranchised groups, therefore, may benefit from nuanced organizing tactics that first identify important subgroups, learn what sources centrally inform subjects' legal consciousness, and strategize to mitigate and minimize specific barriers, such as fear or stigma. Such targeted approaches are likely to be more efficient and effective than more general calls to action in the mobilization and empowerment of disenfranchised communities.

## References

Abrego, Leisy J. (2006) "'I Can't Go to College Because I Don't Have Papers': Incorporation Patterns of Latino Undocumented Youth," 4 *Latino Studies* 212–31.

---

[17] See, for example, the comments at the end of a brief report in *The Chronicle of Higher Education* about the fact that most U.S. colleges knowingly admit undocumented immigrants. The animosity in these posts is especially noteworthy because it presumably comes from educators whose job it is to assist students (http://chronicle.com/news/index.php?id=6139&utm_source=pm&utm_medium=en; accessed 17 March 2009).

—— (2008) "Legitimacy, Social Identity, and the Mobilization of Law: The Effects of Assembly Bill 540 on Undocumented Students in California," 33 *Law & Social Inquiry* 709–34.

—— (2009) "Economic Well-Being in Salvadoran Transnational Families: How Gender Affects Remittance Practices," 71 *J. of Marriage and Family* 1070–85.

Abrego, Leisy J., & Roberto Gonzales (2010) "Blocked Paths, Uncertain Futures: The Postsecondary Education and Labor Market Prospects of Undocumented Latino Youth," 15 *J. of Education of Students Placed at Risk (JESPAR)* 144–57.

Alba, Richard D., & Victor Nee (2003) *Remaking the American Mainstream: Assimilation and Contemporary Immigration*. Cambridge, MA: Harvard Univ. Press.

Armenta, Amada (2009) "Policing Immigrants: The Local Dilemmas of Immigration Enforcement." Paper presented at the annual conference of the Law and Society Association, Denver, CO.

Associated Press (2010) "Young Illegal Immigrants 'Coming Out' in Illinois," *Daily Herald*, 11 March, http://www.dailyherald.com/story/?id=365140 (accessed 11 March 2010).

Bazar, Emily (2009) "Groups try to delay deportations of illegal immigrant students," *USA Today*, http://www.usatoday.com/news/nation/2009-12-15-deport_N.htm (accessed 10 April 2010).

Behrens, Susan Fitzpatrick (2009) "Plan Mexico and Central American Migration," *North American Congress on Latin America*, http://nacla.org/node/5406 (accessed 12 Jan. 2009).

Bloemraad, Irene (2006) "Becoming a Citizen in the United States and Canada: Structured Mobilization and Immigrant Political Incorporation," 85 *Social Forces* 667–95.

Bloemraad, Irene, & Christine Trost (2008) "It's a Family Affair: Intergenerational Mobilization in the Spring 2006 Protests," 52 *American Behavioral Scientist* 507–32.

Bumiller, Kristin (1988) *The Civil Rights Society: The Social Construction of Victims*. Baltimore: Johns Hopkins Univ. Press.

Calavita, Kitty (1998) "Immigration, Law, and Marginalization in a Global Economy: Notes from Spain," 32 *Law & Society Rev.* 529–66.

Camayd-Freixas, Erik (2008) "Interpreting after the Largest ICE Raid in US History: A Personal Account," Unpublished paper, http://graphics8.nytimes.com/packages/pdf/national/20080711IMMIG.pdf (accessed 10 June 2010).

Chavez, Leo R. (1998) *Shadowed Lives: Undocumented Immigrants in American Society*. Fort Worth, TX: Harcourt Brace.

—— (2001) *Covering Immigration: Popular Images and the Politics of the Nation*. Berkeley: Univ. of California Press.

—— (2008) *The Latino Threat: Constructing Immigrants, Citizens, and the Nation*. Palo Alto, CA: Stanford Univ. Press.

Chiswick, Barry R., & Noyna DebBurman (2004) "Educational Attainment: Analysis by Immigrant Generation," 23 *Economics of Education Rev.* 361–79.

Cordero-Guzmán, Hector, et al. (2008) "Voting With Their Feet: Nonprofit Organizations and Immigrant Mobilization," 52 *American Behavioral Scientist* 598–617.

Coutin, Susan B. (2000) *Legalizing Moves: Salvadoran Immigrants' Struggle for U.S. Residency*. Ann Arbor: Univ. of Michigan Press.

—— (2007) *Nations of Emigrants: Shifting Boundaries of Citizenship in El Salvador and the United States*. Ithaca, NY: Cornell Univ. Press.

De Genova, Nicholas P. (2005) *Working the Boundaries: Race, Space, and "Illegality" in Mexican Chicago*. Durham: Duke Univ. Press.

Department of Homeland Security (2009) "Yearbook of Immigration Statistics," http://www.dhs.gov/xlibrary/assets/statistics/yearbook/2009/ois_yb_2009.pdf (accessed 21 March 2011).

Emerson, Robert M. (2008) "Responding to Roommate Troubles: Reconsidering Informal Dyadic Control," 42 *Law & Society Rev.* 483–512.

Ewick, Patricia, & Susan S. Silbey (1998) *The Common Place of Law: Stories From Everyday Life.* Chicago: Univ. of Chicago Press.

Feliciano, Cynthia (2006) "Beyond the Family: The Influence of Premigration Group Status on the Educational Expectations of Immigrants' Children," 79 *Sociology of Education* 281–303.

Fernández-Kelly, Patricia, & Sara Curran (2001) "Nicaraguans: Voices Lost, Voices Found," in R. G. Rumbaut & A. Portes, eds., *Ethnicities: Children of Immigrants in America.* Berkeley and New York: Univ. of California Press and Russell Sage Foundation.

Fortuny, Karina, et al. (2007) "The Characteristics of Unauthorized Immigrants in California, Los Angeles County, and the United States." Urban Institute, Washington, DC, http://www.urban.org/UploadedPDF/411425_Characteristics_Immigrants.pdf (accessed 10 June 2010).

Gleeson, Shannon, & Roberto G. Gonzales (n.d.) "When Do Papers Matter? An Institutional Analysis of Undocumented Life in the United States," *International Migration.*

Gonzales, Roberto G. (2008) "Born in the Shadows: The Uncertain Futures of the Children of Unauthorized Mexican Migrants." Ph.D. diss., Department of Sociology, University of California, Irvine.

Hernandez, Diana (2010) "'I'm gonna call my lawyer': Shifting Legal Consciousness at the Intersection of Inequality," 51 *Studies in Law, Politics, and Society* 95–121.

Hoffmann, Elizabeth A. (2003) "Legal Consciousness and Dispute Resolution: Different Disputing Behavior at Two Similar Taxicab Companies," 28 *Law & Social Inquiry* 629–57.

Holmes, Seth M. (2007) "'Oaxacans Like to Work Bent Over': The Naturalization of Social Suffering Among Berry Farm Workers," 45 *International Migration* 39–68.

Hondagneu-Sotelo, Pierrette (1994) *Gendered Transitions: Mexican Experiences of Immigration.* Berkeley: Univ. of California Press.

———, ed. (2003) *Gender and U.S. Immigration: Contemporary Trends.* Berkeley: Univ. of California Press.

Human Rights Watch (2007) "Forced Apart: Families Separated and Immigrants Harmed by United States Deportation Policy," Report Volume 19, No. 3(G), http://hrw.org/reports/2007/us0707/ (accessed 3 Sept. 2007).

Jones-Correa, Michael (1998a) *Between Two Nations: The Political Predicament of Latinos in New York City.* Ithaca, NY: Cornell Univ. Press.

——— (1998b) "Different Paths: Gender, Immigration, and Political Participation," 32 *International Migration Rev.* 326–50.

Jordan, Jessica (2008) "Latino College Students Fear Deportation," *Gainesville Times,* October 9. http://www.gainesvilletimes.com/news/article/9556/ (accessed 3 March 2009).

Kasinitz, Philip, et al. (2008) *Inheriting the City: The Children of Immigrants Come of Age.* New York and Cambridge, MA: Russell Sage Foundation and Harvard Univ. Press.

Kil, Sang (2006) "Covering the Border: How the News Media Creates Race, Crime, Nation and the USA-Mexico Divide." Ph.D. diss., School of Justice and Social Inquiry, Arizona State University.

Lopez, Nancy (2003) *Hopeful Girls, Troubled Boys: Race and Gender Disparity in Urban Education.* New York: Routledge.

Lovato, Roberto (2008) "Juan Crow in Georgia," *The Nation,* May 26. http://www.thenation.com/doc/20080526/lovato (accessed 8 May 2008).

Massey, Douglas, & Katherine Bartley (2005) "The Changing Legal Status Distribution of Immigrants: A Caution," 39 *International Migration Rev.* 469–84.

Massey, Douglas, et al. (2002) *Beyond Smoke and Mirrors: Mexican Immigration in an Era of Economic Integration*. New York: Russell Sage Foundation.

McConnell, Eileen Diaz, & Enrico Marcelli (2007) "Buying into the American Dream? Mexican Immigrants, Legal Status, and Homeownership in Los Angeles County," 88 *Social Science Q.* 199–221.

Menjívar, Cecilia (2000) *Fragmented Ties: Salvadoran Immigrant Networks in America*. Berkeley: Univ. of California Press.

—— (2002) "The Ties That Heal: Guatemalan Immigrant Women's Networks and Medical Treatment," 36 *International Migration Rev.* 437–67.

—— (2006a) "Family Reorganization in a Context of Legal Uncertainty: Guatemalan and Salvadoran Immigrants in the United States," 32 *International J. of Sociology of the Family* 223–45.

—— (2006b) "Liminal Legality: Salvadoran and Guatemalan Immigrants' Lives in the United States," 111 *American J. of Sociology* 999–1037.

Menjívar, Cecilia, & Leisy Abrego (2009) "Parents and Children Across Borders: Legal Instability and Intergenerational Relations in Guatemalan and Salvadoran Families," in N. Foner, ed., *Across Generations: Immigrant Families in America*. New York: New York Univ. Press.

—— (n.d.) "Legal Violence: Immigration Law and the Lives of Central American Immigrants." Unpublished paper, Arizona State University and University of California, Los Angeles.

Menjívar, Cecilia, & Sang Kil (2002) "For Their Own Good: Benevolent Rhetoric and Exclusionary Language in Public Officials' Discourse on Immigrant-Related Issues," 29 *Social Justice* 160–76.

Merry, Sally Engle (1990) *Getting Justice and Getting Even: Legal Consciousness Among Working-Class Americans*. Chicago: Univ. of Chicago Press.

Meyer, David S., & Daisy Verduzco Reyes (2010) "Social Movements and Contentious Politics," in K. T. Leicht & J. C. Jenkins, eds., *Handbook of Politics, State, and Society in Global Perspective*. New York: Springer.

Milkman, Ruth, et al. (2010) "Wage Theft and Workplace Violations in Los Angeles: The Failure of Employment and Labor Law for Low-Wage Workers." UCLA Institute for Research on Labor and Employment, Los Angeles, CA.

Minow, Martha (1987) "Interpreting Rights: An Essay for Robert Cover," 96 *Yale Law J.* 1860–915.

Myers, Dowell (2007) *Immigrants and Boomers: Forging a New Social Contract for the Future of America*. New York: Russell Sage Foundation.

Ngai, Mae M. (2004) *Impossible Subjects: Illegal Aliens and the Making of Modern America*. Princeton, NJ: Princeton Univ. Press.

—— (2007) "Book Review: Working the Boundaries: Race, Space, and 'Illegality' in Mexican Chicago," 5 *Latino Studies* 503–6.

Nielsen, Laura Beth (2000) "Situating Legal Consciousness: Experiences and Attitudes of Ordinary Citizens about Law and Street Harassment," 34 *Law & Society Rev.* 1055–90.

Olivas, Michael (1995) "Storytelling Out of School: Undocumented College Residency, Race, and Reaction," 22 *Hastings Constitutional Law Q.* 1019–86.

—— (2009) "The Political Economy of the DREAM Act and the Legislative Process: A Case Study of Comprehensive Immigration Reform," 55 *Wayne Law Rev.* 1757–810.

Painter, Gary, et al. (2001) "Race, Immigrant Status, and Housing Tenure Choice," 49 *J. of Urban Economics* 150–67.

Passel, Jeffrey (2005) "Estimates of the Size and Characteristics of the Undocumented Population," Pew Hispanic Center, Washington, DC, http://pewhispanic.org/files/reports/44.pdf (accessed 10 June 2010).

Passel, Jeffrey, & D'vera Cohn (2008) "Trends in Unauthorized Immigration: Undocumented Inflow Now Trails Legal Inflow," Pew Hispanic Center, Washington, DC, http://pewhispanic.org/files/reports/94.pdf (accessed 10 June 2010).

Pew Hispanic Center (2007) "2007 National Survey of Latinos: As Illegal Immigration Issue Heats Up, Hispanics Feel a Chill," Washington, DC, http://pewhispanic.org/files/reports/84.pdf (accessed 10 June 2010).

Polletta, Francesca (2000) "The Structural Context of Novel Rights Claims: Southern Civil Rights Organizing, 1961–1966," 34 *Law & Society Rev.* 367–406.

Portes, Alejandro, & Rubén G. Rumbaut (2001) *Legacies: The Story of the Immigrant Second Generation.* Berkeley and New York: Univ. of California Press and Russell Sage Foundation.

Portes, Alejandro, & Min Zhou (1993) "The New Second Generation: Segmented Assimilation and Its Variants," 530 *Annals of the American Academy of Political and Social Sciences* 74–96.

Preston, Julia (2008) "An Interpreter Speaking Up for Migrants," *New York Times,* 11 July sec. U.S., http://www.nytimes.com/2008/07/11/us/11immig.html (accessed 11 July 2008).

———— (2009) "Illegal Immigrant Students Publicly Take Up a Cause," *The New York Times,* 11 Dec., http://www.nytimes.com/2009/12/11/us/11student.html (accessed 11 Dec. 2009).

———— (2011) "After a False Dawn, Anxiety for Illegal Immigrant Students," *The New York Times,* 8 Feb., http://www.nytimes.com/2011/02/09/us/09immigration.html (accessed 20 March 2011).

Reitz, Jeffrey G. (1998) *Warmth of the Welcome: The Social Causes of Economic Success for Immigrants in Different Nations and Cities.* Boulder, CO: Westview Press.

Rogers, John, et al. (2008) "Civic Lessons: Public Schools and the Civic Development of Undocumented Students and Parents," 3 *Northwestern J. of Law and Social Policy* 201–18.

Rumbaut, Rubén G. (2004) "Ages, Life Stages, and Generational Cohorts: Decomposing the Immigrant First and Second Generations in the United States," 38 *International Migration Rev.* 1160–205.

Sacchetti, Maria (2001) "Some Students in O.C. Are Graduating into Limbo," *The Orange County Register,* 6 June, sec. News.

Sanchez, Leonel (2001) "Law Grants In-State Tuition to Undocumented Immigrants," *The San Diego Union-Tribune,* 12 Oct., sec. News, p. A-1.

Schaafsma, Joseph, & Arthur Sweetman (2001) "Immigrant Earnings: Age at Immigration Matters," 34 *Canadian J. of Economics* 1066–99.

Seif, Hinda (2004) "'Wise Up!' Undocumented Latino Youth, Mexican-American Legislators, and the Struggle for Higher Education Access," 2 *Latino Studies* 210–30.

Shahani, Aarti, & Judith Greene (2009) "Local Democracy on ICE: Why State and Local Governments Have No Business in Federal Immigration Law Enforcement," Justice Strategies, Brooklyn, NY, http://www.justicestrategies.org/sites/default/files/JS-Democracy-On-Ice.pdf (accessed 10 June 2010).

Stumpf, Juliet (2006) "The Crimmigration Crisis: Immigrants, Crime, and Sovereign Power," 56 *American University Law Rev.* 367–419.

Uriarte, Miren, et al. (2003) "Salvadorans, Guatemalans, Hondurans and Colombians: A Scan of Needs of Recent Latin American Immigrants to the Boston Area," Program in Public Policy, John W. McCormack School of Policy Studies, University of Massachusetts, Boston, http://www.cpcs.umb.edu/~uriarte/Courses/Practicum%2007-08/salv-guat-hond-colo.pdf (accessed 10 June 2010).

Valenzuela, Abel Jr. (2002) "Working on the Margins in Metropolitan Los Angeles: Immigrants in Day-Labor Work," 1 *Migraciones Internacionales* 6–28.

Walter, Nicholas, et al. (2004) "Masculinity and Undocumented Labor Migration: Injured Latino Day Laborers in San Francisco," 59 *Social Science & Medicine* 1159–68.

Abrego     369

## Case Cited

*Plyler v. Doe*, 457 U.S. 202 (1982).

## Statutes Cited

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, H.R. 3610;
   Public Law 104-208, 110 Stat. 3009-546, 104th Cong.
Support Our Law Enforcement and Safe Neighborhoods Act, Arizona Senate Bill 1070,
   2010. 49th leg., 2nd sess., Arizona State Senate.

*Leisy J. Abrego is an Assistant Professor in the César E. Chávez
Department of Chicana and Chicano Studies at the University of
California, Los Angeles. Her research examines how immigrants and
their families experience immigration laws and legal status in their daily
lives and in their efforts toward upward mobility. She is currently writing a
book manuscript about the role of gender and legal status in shaping the
well-being of transnational Salvadoran families.*

370     **Legal Consciousness of Undocumented Latinos**

# EXHIBIT EE

RESEARCH

## SOCIAL SCIENCE

# Protecting unauthorized immigrant mothers improves their children's mental health

Jens Hainmueller,[1,2,3]*† Duncan Lawrence,[2]† Linna Martén,[2,4]† Bernard Black,[5] Lucila Figueroa,[2,6] Michael Hotard,[2] Tomás R. Jiménez,[7] Fernando Mendoza,[8] Maria I. Rodriguez,[9] Jonas J. Swartz,[9] David D. Laitin[1,2]

The United States is embroiled in a debate about whether to protect or deport its estimated 11 million unauthorized immigrants, but the fact that these immigrants are also parents to more than 4 million U.S.-born children is often overlooked. We provide causal evidence of the impact of parents' unauthorized immigration status on the health of their U.S. citizen children. The Deferred Action for Childhood Arrivals (DACA) program granted temporary protection from deportation to more than 780,000 unauthorized immigrants. We used Medicaid claims data from Oregon and exploited the quasi-random assignment of DACA eligibility among mothers with birthdates close to the DACA age qualification cutoff. Mothers' DACA eligibility significantly decreased adjustment and anxiety disorder diagnoses among their children. Parents' unauthorized status is thus a substantial barrier to normal child development and perpetuates health inequalities through the intergenerational transmission of disadvantage.

There is an ongoing, heated debate about the fate of the estimated 11 million unauthorized immigrants living in the United States. One important and often overlooked issue in these policy debates is that unauthorized immigrants are also parents to more than 4 million children who are U.S. citizens by birth (1, 2). How are these children affected by the unauthorized status of their parents? Research has largely focused on the impacts of unauthorized status on the immigrants themselves (3), but we know much less about the potential intergenerational effects of this status on the well-being of their offspring (4).

A growing body of research has demonstrated links between parental immigration status and child development (5–10) and generated insights into how it might affect children's health. Children of unauthorized immigrant parents face challenges beyond low socioeconomic status, including parental anxiety, fear of separation, and acculturative stress. Parent-child separations can be harmful to children's health, economic security, and long-term development. Virtually all of these studies have been qualitative or correla-

tional because of the difficulties in isolating the causal effects of parents' immigration status and collecting systematic data on large samples of unauthorized immigrants.

Families with unauthorized immigrant parents differ from families with authorized immigrant parents in many confounding characteristics (e.g., education, health care, and poverty) that might generate differences in child outcomes (11–13). This nonrandom selection implies that typical observational studies cannot isolate the causal effect of immigration status. Indeed, a recent consensus statement of the Society for Research on Adolescence (14) concludes that "Nonexperimental or quasiexperimental research with strong causal inference…has been lacking to date in studies of policies and practices related to unauthorized status."

The study of unauthorized status is further constrained by the difficulty of collecting systematic samples, because unauthorized immigrants are underrepresented in general population surveys (15). Moreover, questions about the unauthorized status of immigrants are typically avoided given concerns about confidentiality and reporting biases (16). Researchers therefore often have to resort to noisy proxies for unauthorized status, such as the identification of individuals as foreign-born, Hispanic, or Spanish-speaking (17, 18).

We provide causal evidence of the intergenerational impact of parental immigration status on children's health. We focus on the Deferred Action for Childhood Arrivals (DACA) program, which is one of the most extensive policies directed toward unauthorized immigrants in recent decades. The DACA program, announced in 2012 by President Obama, protects recipients from deportation by granting them a 2-year (renewable) deferred action status, while also allow-

ing them to obtain temporary work authorization. More than 780,000 unauthorized immigrants so far have received deferred action from this program (19) (fig. S1). Although DACA recipients arrived in the United States as children, many are now adults and have become parents themselves. An estimated 200,000 children had parents who were eligible for DACA at the time the policy was announced (2). Although some studies have found that DACA recipients have higher rates of employment (20–22) and improved health outcomes (23, 24), the intergenerational effects of DACA are largely unknown.

To address the sampling problem, we used data from Emergency Medicaid, a government program that provides coverage for emergencies and labor and delivery services for low-income individuals who are not eligible for Medicaid. The program mainly serves unauthorized immigrants, but lawful permanent residents with less than 5 years of residency can also obtain coverage. Estimates from states such as California and North Carolina indicate that 90 to 99% of Emergency Medicaid recipients are unauthorized immigrants (25, 26). In addition, because U.S.-born children of unauthorized immigrants are U.S. citizens, they are eligible for full-scope Medicaid benefits and can be tracked with Medicaid claims data.

To overcome the causal identification problem, we applied a regression discontinuity (RD) design (27) that leverages the DACA eligibility criterion (28) stipulating that recipients must have been under age 31 as of 15 June 2012. Hence, a person born on 16 June 1981 meets the DACA age eligibility requirement, whereas a person born on 14 June 1981 does not. The age eligibility criterion was announced when DACA was adopted on 15 June 2012. The Emergency Medicaid enrollment data include the mother's exact date of birth, and this permits us to leverage a quasi-experiment in which DACA eligibility is as good as randomly assigned for those born around the arbitrary birthdate cutoff. We do not observe whether mothers apply for DACA, but given that mothers who were born just before or after the DACA birthdate cutoff are similar in confounding characteristics, we can isolate the intention-to-treat effect of DACA eligibility on the health of their children. Prior studies provide evidence that RD designs that exploit arbitrary cutoff points in eligibility criteria are effective in replicating results from randomized experiments (29–31).

We drew on Medicaid claims data from Oregon to identify 5653 mothers born between 1980 and 1982 who were covered by Emergency Medicaid and gave birth to 8610 children during 2003 to 2015. We then tracked the children's mental health outcomes by using their Medicaid claims. The children in our sample were born in Oregon and are therefore U.S. citizens by birth; 49% are female, 73% are Hispanic, and they were between 0 and 12 years old in 2015 (table S1 provides descriptive statistics).

Although parental DACA eligibility could affect a broad range of child health outcomes, we focused on the impacts on children's mental

[1]Department of Political Science, Stanford University, Stanford, CA 94305, USA. [2]Immigration Policy Lab, Stanford University, Stanford, CA 94305, USA. [3]Graduate School of Business, Stanford University, Stanford, CA 94305, USA. [4]Uppsala Center for Labor Studies, Uppsala University, Uppsala 75120, Sweden. [5]Pritzker Law School and Kellogg School of Management, Northwestern University, Chicago, IL 60611, USA. [6]Department of Politics, University of Virginia, Charlottesville, VA 22903, USA. [7]Department of Sociology, Stanford University, Stanford, CA 94305, USA. [8]Department of Pediatrics, Stanford University School of Medicine, Stanford, CA 94305, USA. [9]Department of Obstetrics and Gynecology, Oregon Health & Science University, Portland, OR 97239, USA.
*Corresponding author. Email: jhain@stanford.edu
†These authors contributed equally to this work.

Downloaded from http://science.sciencemag.org/ on July 12, 2018



**Fig. 1. Results from applying the regression discontinuity design. (Top)** In the post-DACA period (2013 to 2015), children of DACA-eligible mothers (born after 15 June 1981) experienced markedly lower rates of diagnosed adjustment and/or anxiety disorders than children of ineligible mothers (born before 15 June 1981). Lines are average diagnosis rates (with 95% confidence bands) from local linear regressions fitted to the sample of children whose birthdates were within ±150 days of the DACA eligibility cutoff ($n = 2260$), and circles are average diagnosis rates within each 15-day birthdate interval. **(Bottom left)** There was no such difference in children's diagnosis rates in the pre-DACA period (2003 to 2012). **(Bottom right)** There was no statistical evidence for discontinuities in other background characteristics that might confound the comparison at the DACA birthdate eligibility cutoff.

health. Because DACA offered the mothers immediate relief from the risk of deportation, maternal stress might have declined, and their children would no longer have had to fear being separated from them. Therefore, the children's mental well-being could have improved (*4*, *6*). Moreover, examining mental health disorders that originate in childhood is important because they are associated with long-term health issues, low education, and welfare dependence, which generate considerable private and social costs (*32–34*).

We focused on disorders that result from external events, rather than genetic or physiological factors. We prespecified all outcomes and analyses, except when otherwise noted, in a preregistered analysis plan made available at the Evidence in Governance and Politics website under study ID 20170227AC. Our main child outcome is a broad measure of any diagnoses of adjustment disorder, acute stress disorder, or anxiety disorder, measured using all diagnoses in the International Classification of Diseases 9 (ICD-9) categories 309, 308, and 300 (*35*).

Adjustment disorder is a reaction to an identified stressor, leading to an inability to function normally. It is diagnosed on the basis of symptoms of anxiety, depressed mood, and conduct disturbances and often results in considerable impairment in important areas of functioning, such as social activities, school performance, and sleep (*36*, *37*). Acute stress disorder can be a precursor to a diagnosis of a more lasting post-traumatic stress disorder (included in the ICD-9 category 309, adjustment disorder). It is characterized by symptoms or behaviors similar to those that arise from exposure to a traumatic or stressful event, but acute stress disorders cannot (by definition) last longer than 1 month (*36*). Because stress disorder and adjustment disorder

are related, we prespecified both as a combined outcome measure of adjustment disorder. Anxiety disorders are characterized by excessive fear, anxiety, and related behavioral disturbances that can lead to substantial distress or impairment. An external stressor might not be clearly identified, and anxiety disorders can be caused by environmental, genetic, or physiological factors (*36*).

These mental health disorders in childhood are associated with considerable developmental, psychosocial, and psychopathological complications for children and their families (*32*). For the children in our sample who were diagnosed with adjustment disorder, acute stress disorder, or anxiety disorder, the first diagnoses occurred on average at 6.7 years of age with a standard deviation of 2.6 years (tables S1 and S2 provide descriptive statistics). Details about the measures, sample, design, and statistical analysis can be found in the materials and methods section of the supplementary materials.

Figure 1 illustrates the main finding and quasi-experimental nature of the RD design. The percent of children diagnosed with adjustment or anxiety disorders during the post-DACA period (2013 to 2015) dropped by about 4.5 percentage points ($P = 0.037$; local linear regression) at the birthdate cutoff where mothers become eligible for DACA. This reduction, from 7.8 to 3.3%, provides evidence that mothers' DACA eligibility sharply improved their children's mental health.

The causal logic of the RD design is based on the idea that the DACA birthdate cutoff is an arbitrary date, and, therefore, children of ineligible mothers born just before the birthdate cutoff should be similar in all respects, including in possible confounding characteristics, to children of DACA-eligible mothers born just after the cutoff. This continuity assumption was corroborated by a series of checks where we tested for discontinuities in pre-DACA background characteristics at the DACA birthdate cutoff. The results (Fig. 1, bottom left) demonstrate that there was no discernible difference in the prevalence of disorder diagnoses at the same cutoff date for the pre-DACA period (2003 to quarter 2, 2012). The difference in diagnosis rates at the cutoff was an insignificant 0.4 percentage points ($P = 0.817$; local linear regression). Figure 1, bottom right, shows the distribution of $P$ values from similar checks where we tested for discontinuities in other background covariates at the birthdate cutoff, such as the children's ethnicity, race, year of birth, and pre-DACA health care utilization (tables S3 and S4). The distribution of $P$ values is consistent with the uniform distribution that we would expect for balance checks in a randomized experiment, indicating that there were no systematic discontinuities in the covariates at the birthdate cutoff. Furthermore, density tests for manipulation of mothers' birthdates revealed no evidence of sorting around the threshold (fig. S2). All tests suggested that our RD design can isolate the causal effects of mothers' DACA eligibility at the birthdate cutoff.

Downloaded from http://science.sciencemag.org/ on July 12, 2018

Figure 2 shows the point estimates and confidence intervals for the RD estimates of the intention-to-treat effects of mothers' DACA eligibility on the children's mental health outcomes, for the combined measure and its separate components (tables S5 and S6 and fig. S3). The estimates are based on prespecified standard local linear regression models fitted to trimmed samples including only children whose mothers' birthdates were within the adaptive mean squared error optimal bandwidths around the birthdate cutoff [38].

We found that mothers' eligibility for DACA protection led to a significant improvement in their children's mental health. Specifically, mothers' DACA eligibility reduced adjustment and anxiety disorder diagnoses in their children by 4.3 percentage points ($P = 0.023$) from a baseline rate of 7.9% among children of ineligible mothers at the threshold. This represents more than a 50% drop in the rate of these disorders, albeit with a wide 95% confidence interval (CI) for the magnitude of the estimated effect, ranging from 0.6 to 7.9 percentage points. When we looked only at adjustment disorders, which are disorders attributable to an identifiable external stressor, the estimated reduction was 4.4 percentage points ($P = 0.013$; 95% CI, 0.9 to 7.8). There was also a reduction in anxiety disorders, which is a more heterogeneous category of mental illness, but it was insignificant at conventional levels ($P = 0.153$; 95% CI, −0.6 to 4.1). Lastly, we found that for the same sample of children, before the DACA program, there were no discernible differences in these mental health diagnoses at the cutoff (Fig. 2, right).

We conducted several checks that supported the robustness of the results, such as varying the bandwidths (fig. S4), using alternative estimation procedures (fig. S5 and table S7), removing children born in the post-DACA period (fig. S6 and table S8), redefining the post-DACA period to include quarters 3 and 4 of 2012 (fig. S7 and table S9), and using alternative codings of the mental health outcomes based on the Diagnostic and Statistical Manual of Mental Disorders (fig. S8 and table S10; not prespecified). A non-prespecified subgroup analysis (fig. S9) suggested that the effect of mothers' DACA eligibility was concentrated among the older children in our sample (ages 6 to 12; table S12), with no discernible effect among younger children (ages 0 to 5; table S11); younger children are generally much less likely to receive mental health diagnoses. We also conducted a non-prespecified subgroup analysis by gender (fig. S10 and tables S13 and S14) and found that the effect of mothers' DACA eligibility on adjustment disorders was slightly more pronounced among male children, but the effect for males was not statistically significantly different from that for females ($P = 0.209$; local linear regression).

We also confirmed that there were no discernible differences in diagnoses at the same birthdate cutoff among children of mothers who were covered by standard Medicaid at the time that they gave birth (fig. S11 and table S15). These

mothers should not be affected by DACA eligibility, given that standard Medicaid in Oregon is open only to low-income U.S. citizens and long-term lawful permanent residents. This check again underscores that in the absence of changes in DACA eligibility, there is no evidence of confounders associated with having a mother who is born just before or after the cutoff date that could explain the observed post-DACA difference in child mental health outcomes.

Because health care utilization could be affected by immigration status [9], we also checked for the possibility that the drop in diagnoses reflects a DACA-induced change in health care visits, which could affect the probability of detection of mental health disorders. We found no support for this. Mothers' DACA eligibility had no discernible impact on their children's health care utilization during the post-DACA period, as measured either by the total number of visits, the number of emergency room (ER) and urgent care visits, or the number of outpatient visits (fig. S12 and table S16). Consistent with this, in a non-prespecified analysis, we also found that the effects of mothers' DACA eligibility on child mental health were similar when we restricted the sample to children who had at least one health care visit in the post-DACA period (fig. S13 and table S17).

Our results provide causal evidence supporting the theory that parental unauthorized immigration status has important intergenerational effects on the well-being and development of children in immigrant families [4, 6]. Protecting unauthorized immigrants from deportation led to immediate and sizable improvements in the

mental health of their U.S. citizen children. This suggests that parents' unauthorized status is a substantial stressor that stymies normal child development and perpetuates health inequalities by transferring financial disadvantages to children.

Our findings have important implications for immigration and health care policy. As decision-makers evaluate whether to maintain, cancel, or expand the DACA program, our results suggest that a broader consideration is needed, one that goes beyond the impacts for recipients alone and takes into account the intergenerational consequences of deferred action for the health of unauthorized immigrants, most of whom are U.S. citizens [2]. Early childhood exposure to stress and adversity does not only cause poor health and impaired development in the short term; the issues can also persist into adulthood. Anxiety and psychosocial stress are identified as risk factors for depression, substance abuse, cardiovascular diseases, and obesity [32, 34, 39, 40]. Treatment of mental disorders also carries considerable economic costs to society. They account for the highest total health care expenditures of all children's medical conditions [41] and are associated with poor long-term outcomes for school performance and welfare reliance [33, 42]. By reducing mental health problems, deferred action has important multiplier effects through improving the future prospects of the children of unauthorized immigrants.

Our results imply that expanding deferred action to the millions of unauthorized immigrant parents who do not meet the current DACA eligibility criteria could further promote the



**Fig. 2. Effect of mothers' DACA eligibility on their children's mental health. (Left)** Mothers' DACA eligibility reduced child mental health disorders in the post-DACA period. **(Right)** There were no systematic, preexisting differences in the pre-DACA period. Circles with lines represent effect estimates with 95% confidence intervals from the regression discontinuity design, based on local linear regressions fitted to samples of children whose mothers' birthdates were within a symmetric bandwidth of days around the DACA eligibility cutoff. The size of the bandwidth was determined by an adaptive bandwidth selection algorithm for each outcome. The bandwidths and sample sizes for the three outcomes in the post-DACA period (top to bottom) are ±199 days around the cutoff ($n = 3039$ children), ±180 days ($n = 2741$), and ±132 days ($n = 2002$); for the pre-DACA period (top to bottom), the bandwidths and sample sizes are ±108 days ($n = 1325$), ±109 days ($n = 1338$), and ±211 days ($n = 2745$).

Downloaded from http://science.sciencemag.org/ on July 12, 2018

health and well-being of this next generation of American citizens. Moreover, it is reasonable to expect that permanent legal status or a pathway to citizenship would have an equal, if not greater, effect on improving children's health.

Our study also has implications for health policy research. Unauthorized immigration is an important policy issue, but researchers have struggled to generate a reliable evidence base. Although we recognize the limitations of evaluating health outcome data from one state, our sampling strategy of using Emergency Medicaid mothers and Medicaid children provides an effective way to overcome some of the challenges in collecting systematic data from the unauthorized population. This approach opens the door for future studies to examine the impacts of an array of local, state, and federal policies that affect unauthorized immigrant parents and that may have health consequences for their children.

**REFERENCES AND NOTES**

1. J. S. Passel, D. Cohn, J. M. Krogstad, A. Gonzalez-Barrera, *As Growth Stalls, Unauthorized Immigrant Population Becomes More Settled* (Pew Research Center's Hispanic Trends Project, 2014); www.pewhispanic.org/files/2014/09/2014-09-03_Unauthorized-Final.pdf.
2. R. Capps, M. Fix, J. Zong, "A profile of U.S. children with unauthorized immigrant parents" (Migration Policy Institute, 2016).
3. P. M. Orrenius, M. Zavodny, *Cato J.* **32**, 85 (2012).
4. F. D. Bean, S. K. Brown, J. D. Bachmeier, *Parents Without Papers: The Progress and Pitfalls of Mexican American Integration* (Russell Sage Foundation, 2015).
5. S. R. Potochnick, K. M. Perreira, *J. Nerv. Ment. Dis.* **198**, 470–477 (2010).
6. H. Yoshikawa, A. Kalil, *Child Dev. Perspect.* **5**, 291–297 (2011).
7. F. D. Bean, M. A. Leach, S. K. Brown, J. D. Bachmeier, J. R. Hipp, *Int. Migr. Rev.* **45**, 348–385 (2011).
8. C. Suárez-Orozco, H. Yoshikawa, R. Teranishi, M. Suárez-Orozco, *Harv. Educ. Rev.* **81**, 438–473 (2011).
9. K. Yun, E. Fuentes-Afflick, L. A. Curry, H. M. Krumholz, M. M. Desai, *Matern. Child Health J.* **17**, 1913–1921 (2013).
10. T. M. Caballero et al., *Clin. Pediatr.* **6**, 648–658 (2017).
11. F. L. Rivera-Batiz, *J. Popul. Econ.* **12**, 91–116 (1999).
12. J. P. Smith, *J. Labor Econ.* **24**, 203–233 (2006).
13. K. P. Derose, J. J. Escarce, N. Lurie, *Health Aff.* **26**, 1258–1268 (2007).
14. H. Yoshikawa, C. Suárez-Orozco, R. G. Gonzales, *J. Res. Adolsc.* **27**, 4–19 (2017).
15. U.S. Government Accountability Office, *U.S. Labor Force Statistics: Illustrative Simulations of the Likely Effects of Underrepresenting Unauthorized Residents* (Tech. Rep. GAO-10-99, U.S. Government Accountability Office, 2009).
16. National Academies of Sciences, Engineering, and Medicine, *The Integration of Immigrants into American Society*, M. C. Waters and M. G. Pineau, Eds. (National Academies Press, 2015).
17. J. Van Hook, J. D. Bachmeier, D. L. Coffman, O. Harel, *Demography* **52**, 329–354 (2015).
18. R. S. Oropesa, N. S. Landale, M. M. Hillemeier, *Soc. Sci. Med.* **138**, 57–67 (2015).
19. U.S. Citizenship and Immigration Services, Data Set: Form I-821D Deferred Action for Childhood Arrivals (Department of Homeland Security, U.S. Citizenship and Immigration Services, 2012–2016); www.uscis.gov/tools/reports-studies/immigration-forms/data/data-set-form-i-821d-deferred-action-childhood-arrivals.
20. R. G. Gonzales, V. Terriquez, S. P. Ruszczyk, *Am. Behav. Sci.* **58**, 1852–1872 (2014).
21. N. G. Pope, *J. Public Econ.* **143**, 98–114 (2016).
22. C. Amuedo-Dorantes, F. Antman, *J. Popul. Econ.* **30**, 339–373 (2017).
23. A. S. Venkataramani, S. J. Shah, R. O'Brien, I. Kawachi, A. C. Tsai, *Lancet Public Health* **2**, e175–e181 (2017).
24. C. Patler, W. Laster Pirtle, *Soc. Sci. Med.* 10.1016/j.socscimed.2017.03.009 (2017).
25. C. A. DuBard, M. W. Massing, *JAMA* **297**, 1085–1092 (2007).
26. C. H. C. Foundation, *Medi-Cal Facts and Figures: A Program Transforms* (California Health Care Foundation, 2013).
27. G. W. Imbens, T. Lemieux, *J. Econom.* **142**, 615–635 (2008).
28. The other main DACA eligibility criteria include entry to the United States under the age of 16, continuous residence from 15 June 2007 to the present, entry without inspection or falling out of lawful visa status before 15 June 2012, physical presence in the United States on 15 June 2012, current enrollment in school or a high school or GED (General Education Development) degree, and no major criminal convictions.
29. H. Buddelmeyer, E. Skoufias, *An Evaluation of the Performance of Regression Discontinuity Design on PROGRESA* (Policy Research Working Paper, World Bank, 2004).
30. T. D. Cook, W. R. Shadish, V. C. Wong, *J. Policy Anal. Manage.* **27**, 724–750 (2008).
31. R. Berk, G. Barnes, L. Ahlman, E. Kurtz, *J. Exp. Criminol.* **6**, 191–208 (2010).
32. K. Beesdo, S. Knappe, D. S. Pine, *Psychiatr. Clin. North Am.* **32**, 483–524 (2009).
33. J. Currie, M. Stabile, P. Manivong, L. L. Roos, *J. Hum. Resour.* **45**, 517–548 (2010).
34. J. P. Shonkoff et al., *Pediatrics* **129**, e232–e246 (2012).
35. When we use the terms adjustment disorder, acute stress disorder, or anxiety disorder, we refer to all the diagnoses included under the ICD-9 categories 300, 308, and 309, respectively. These categories include several subcategories of diagnoses. For example, we observed 13 subcategories under category 309 (adjustment reaction), such as 309.0 (adjustment disorder, depressed mood), 309.21 (separation anxiety disorder), 309.24 (adjustment disorder, anxiety), 309.3 (adjustment disorder, disturbance of conduct), and 309.81 (posttraumatic stress disorder). Table S2 in the supplementary materials provides a list of all subcategories, as well as descriptive statistics.
36. A. F. Schatzberg, C. DeBattista, *Diagnostic and Statistical Manual of Mental Disorders* (American Psychiatric Association, ed. 5, 2015).
37. L. C. Garfunkel, J. Kaczorowski, C. Christy, *Pediatric Clinical Advisor: Instant Diagnosis and Treatment* (Elsevier Health Sciences, 2007).
38. S. Calonico, M. D. Cattaneo, R. Titiunik, *Econometrica* **82**, 2295–2326 (2014).
39. A. Thapar, S. Collishaw, D. S. Pine, A. K. Thapar, *Lancet* **379**, 1056–1067 (2012).
40. K. R. Merikangas et al., *J. Am. Acad. Child Adolesc. Psychiatry* **49**, 980–989 (2010).
41. A. Soni, *The Five Most Costly Children's Conditions, 2011: Estimates for the US Civilian Noninstitutionalized Children, Ages 0–17* (Statistical Brief #434, Agency for Healthcare Research and Quality, 2014).
42. J. Currie, D. Almond, *Handb. Labor Econ.* **4**, 1315 (2011).

**ACKNOWLEDGMENTS**

This research was funded by a grant from the Russell Sage Foundation (grant no. 93-16-12). We also acknowledge funding from the Ford Foundation for operational support of the Stanford Immigration Policy Lab. For helpful advice, we thank K. Bansak, V. G. Carrion, A. Hainmueller, and J. Wang. Replication code is available through Harvard Dataverse (https://dataverse.harvard.edu/dataset.xhtml?persistentId=doi:10.7910/DVN/8EEDAP). A preregistered analysis plan is available at the Evidence and Governance in Politics website under study ID 20170227AC (http://egap.org/design-registrations). The analysis plan is also reprinted in the supplementary materials. The Institutional Review Boards at Stanford University (protocol 40907) and Oregon Health & Science University (protocol 15633) approved this research.

**SUPPLEMENTARY MATERIALS**

www.sciencemag.org/content/357/6355/1041/suppl/DC1
Materials and Methods
Supplementary Text
Figs. S1 to S13
Tables S1 to S17
References (*43*, *44*)
Preregistered Analysis Plan

5 May 2017; accepted 1 August 2017
Published online 31 August 2017
10.1126/science.aan5893

Downloaded from http://science.sciencemag.org/ on July 12, 2018



## Protecting unauthorized immigrant mothers improves their children's mental health

Jens Hainmueller, Duncan Lawrence, Linna Martén, Bernard Black, Lucila Figueroa, Michael Hotard, Tomás R. Jiménez, Fernando Mendoza, Maria I. Rodriguez, Jonas J. Swartz and David D. Laitin

*Science* **357** (6355), 1041-1044.
DOI: 10.1126/science.aan5893originally published online August 31, 2017

**Life under threat of deportation**

What is the effect on a child of having parents who are at risk of deportation as unauthorized immigrants? Hainmueller *et al.* developed a quasi-experimental protocol to address this complicated question. They selected mothers who had birthdates either just before or just after the cutoff for the United States' Deferred Action for Childhood Arrivals (DACA) program. Children whose mothers were protected from deportation by DACA had 50% fewer diagnoses of adjustment and anxiety disorder than children with mothers whose birthdates, by coincidence, preceded the cutoff and who thus were not protected.

*Science*, this issue p. 1041

Downloaded from http://science.sciencemag.org/ on July 12, 2018

| | |
|---|---|
| ARTICLE TOOLS | http://science.sciencemag.org/content/357/6355/1041 |
| SUPPLEMENTARY MATERIALS | http://science.sciencemag.org/content/suppl/2017/08/30/science.aan5893.DC1 |
| REFERENCES | This article cites 30 articles, 3 of which you can access for free http://science.sciencemag.org/content/357/6355/1041#BIBL |
| PERMISSIONS | http://www.sciencemag.org/help/reprints-and-permissions |

Use of this article is subject to the Terms of Service

*Science* (print ISSN 0036-8075; online ISSN 1095-9203) is published by the American Association for the Advancement of Science, 1200 New York Avenue NW, Washington, DC 20005. 2017 © The Authors, some rights reserved; exclusive licensee American Association for the Advancement of Science. No claim to original U.S. Government Works. The title *Science* is a registered trademark of AAAS.

# EXHIBIT FF

*Vox*

# What happens to a family when they have equal rights, and then lose them?

Immigrant parents struggle with the future — and try to protect their US-born children from the terrible truth.

By Dara Lind | dara@vox.com | Updated Dec 14, 2017, 11:26am EST



A-Digit via Getty Images

DENVER — "You really don't realize how much your kids pay attention when adults are talking," Treisi Martinez, a 25-year-old mother of two who is protected temporarily from deportation through the **Deferred Action for Childhood Arrivals** program, told me in October.

Martinez's oldest daughter is 5. That's old enough to ask heartbreaking questions, like why her mother isn't coming with the rest of the family to visit relatives in Juarez. But it's too young, her mother judges, to be able to handle the answer: that while Martinez's husband is a citizen and their daughters, the younger of whom is 6 months old, were born in the United States, Martinez is still waiting on a green card application.

If Martinez has to go back to Mexico, it wouldn't be for a visit. It would be forever. She doesn't think her daughter is ready to hear that.

Martinez says her daughter, seemingly engrossed in *Dragon Tales* or *Sofia the First*, will absorb the tense conversations among adults and ask, "Mom, why does no one like Trump? Is he really going to send a lot of people away?"

"She was watching Netflix on her iPad," Martinez, who is one of the estimated 200,000 DACA recipients with US-born children, says. "But really, she was listening to everything."

The Trump administration **began phasing out DACA in September**. Congress **remains divided** over whether and how to address the status of the 690,000 DACA recipients; at the moment, it's really a fight about how urgent a priority it is. Republicans would rather put off dealing with the problem until March 5 "deadline" given by Trump in September. Democrats, realizing the only leverage they have is during spending fights, want something done before the end of the year. They point out that as many as 122 DACA recipients **are losing their protections each day**, totaling as many as 22,000 by the time that March deadline rolls around.

In the meantime, thousands are living with a wrenching uncertainty. Uncertainty over whether their renewal applications will be accepted; uncertainty over whether they can sign leases or enroll for another school year; uncertainty in knowing that their days working legally and living securely in the US are numbered; uncertainty that their US-born children could find out how tenuous their parents' presence is.

For many DACA recipients who have US-born children, the struggle against fear is both simple and impossible: They want, desperately, to protect their children from worrying about something they cannot control. DACA recipients are trying to plan for the worst, while hoping they'll never have to speak those plans to their children aloud.

## "You had a taste of what it's like to have equal rights"

Maria Guerrero's work permit isn't set to expire until 2019. But for two months in 2015, when her first work permit under DACA expired before her second one had come through, she got a taste of what life without protection would be like.

Guerrero was like many unauthorized immigrants who came to the US as children and didn't find out the truth about their immigration status until they were a teenager. "I thought everyone was the same," she says wistfully. "My world was so tiny."

When her friends started getting driving permits, she pestered her father to take her to the DMV so she could get hers too. He put her off for a while by promising to do it on his next

day off ("he never had a day off"), but when the day finally arrived, "I think he was just like, 'Okay, we're done beating around the bush, you need to know.'"

In the years since the DREAM Act was first introduced in 2003, politicians have drawn a sharp line between Guerrero's father's generation of unauthorized immigrants, who came to the US as adults, and the children, like Guerrero, they brought with them. To many supporters of the DREAM Act, immigrants like Guerrero were blameless, and it was unfair to keep them in the shadows because of the "sins of their parents."

After 15 years of debate, though, nothing permanent has been done, and a generation of DREAMers has grown up and had children of their own. Instead of their parents being responsible for their misfortune, DACA recipients are now the ones whose unauthorized status could end up jeopardizing their children's lives.



Fairfax Media via Getty Images

Guerrero has a full-time job with a community organizing group. She has children of her own now, 4 and 2 years old, and two nieces and a nephew she often gets charged with taking care of too. All five were born in the US.

Her DACA protection lapsed while she was pregnant with her second child, and she was suddenly returned to the world of her childhood, in which the family's movements were closely circumscribed. "We would be usually at the house every day except either Saturday or Sunday," she recalls, afraid to go out.

Her father, who works in construction, always requests to be excluded from airport projects because "he's terrified of federal places. He does not like courts, does not like airports, does not like really public places" — though with his children now grown, he's gotten over his fear of flea markets.

Now that she has children, she gets it. "I was like, *this is what my parents felt.*"

Guerrero tried to hold off the HR office at Walmart asking her if she'd gotten her new work permit yet, but ultimately got "pulled out." Instead, she grabbed shifts here and there, waitressing and telemarketing — for far less than the minimum wage she was accustomed to as a legal employee.

"In a way, you're grateful that somebody's giving you the opportunity to have some income," she says in October. "But then on another side, you had a taste of what it's like to have equal rights."

There's evidence that the "taste of equal rights" DACA provided was absorbed into the bodies and minds of recipients and their children alike. One **Harvard study** found that immigrants who were eligible for DACA reported better mental health after the program's enactment, in 2012, while those who weren't eligible reported no change.

Meanwhile, a **study of Medicaid recipients in Oregon** led by Stanford researchers found that children of DACA-eligible mothers were diagnosed with attachment and anxiety disorders at much lower rates from 2013 to 2015 than children of immigrants too old to qualify for DACA (which wasn't available to immigrants who were born before June 1982). Before DACA came around, there was no difference between the groups; afterward, attachment and anxiety disorders were detected in 7.8 percent of children of DACA-ineligible mothers, and only 3.3 percent of children whose mothers qualified for protection.

There aren't any studies about what happens after losing DACA. There isn't any precedent for it.

**The fight to keep children fearless**

7/18/2018                        What happens to a family when they have equal rights, and then lose them? - Vox

When the Trump administration announced DACA's end in September, Guerrero held herself together through dinner with her family. "I'm the older sister, so I felt like, 'Oh, you need to be the strong one,'" she says. "I feel like if I freaked out at that point, everybody's gonna freak out."

She put her children to bed. When the girls were asleep, Guerrero allowed herself to start crying again. She looked around the room, trying to reassure herself that she'd be able to put food on the table even without a minimum wage job. "We can just sell everything, we're not born with things," she recalls telling herself. "Once you stop working, you're going to hit a point where you can't pay insurance — then what's the point of having the car?"

Luckily for Guerrero, 4 years old is too young even to ask those heartbreaking questions. And even though Treisi Martinez's 5-year-old seems to overhear everything, Martinez still hasn't burdened her with the full truth.

"It would break my heart, and I know it would break hers. If I need to, I will tell her then."



Amaia Arozena & Gotzon Iraola/Getty Images

But Martinez knows that she can't insulate her daughter from awareness of the wider world forever — and maybe not all that long at all. Children talk to each other and hear snippets of news stories, and when they're older they see Facebook posts about ICE checkpoints and cellphone videos of fathers being taken away.

Martinez herself works as an office administrator at her daughter's elementary school. She's been approached in the middle of the school day at her desk by students not much older than her daughter, wracked with sudden anxiety that their parents won't be there when they come home. She's helped them call their parents from the school's front office phone, to hear their parents' voices and the reassurances it's going to be okay.

Martinez doesn't want that for her daughter. "All she'd be doing is not paying attention in school, and worrying all the time." She knows that future because she sees it in other kids. In the Oregon Medicaid study, the average age at which children of unauthorized immigrant mothers were diagnosed with attachment or anxiety disorders was around 6 and a half.

If Martinez worries her daughter is too fragile to handle the fear of separation — she's already "really attached to us," she says — Guerrero wants to protect her daughters for the opposite reason.

"They are fearless," she says. "I look up to them. They don't even know what's going to happen right after they do something, but they do it if they want to do it. I need to do that."

Sometimes, she allows, they'll pretend to be scared of el cucuy — a folk monster, a boogeyman. "I'm like, monsters are scared of you guys. I feel like they would pull on its hair or horns or whatever, cling onto its feet."

It's getting late in Guerrero's basement apartment, and the children are getting hyper with fatigue. Guerrero's 2-year-old daughter rushes my legs, growling in play ferocity — but she's grinning, with the confidence of someone who's never met something she couldn't face down.

"I can't even imagine them understanding how complicated it is," Guerrero had mused earlier. After all, she herself didn't fully understand that fear until she became a mother. She hopes that's an understanding her children will never need to have. But it will take action from Congress to break the cycle.

*Dara Lind reported this story with the support of the Fund for Journalism on Child Well-Being, a program of the USC Annenberg* **Center for Health Journalism**.

# EXHIBIT GG

# HELP FOR UNDOCUMENTED
# Victims of Crime

By Susana Martinez and Sheila Neville



Alex was only 13 when he was walking down the street with his friends. A car driving down the street slowed down as it approached them, and before he knew what was happening, shots rang out and Alex fell to the ground. He had been wounded by what he later learned were gang members. Alex testified against his attackers, and they were convicted.

Sandra had recently arrived in the country when she began work packing clothing at a factory. Almost immediately her supervisor began brushing up against her as he walked by her in her workplace. Sandra had four little girls in her home country. She needed to feed them, and she desperately needed the job. Because she was undocumented and barely literate, her job prospects were slim. She tried to ignore the sexual assaults on her by her supervisor so that she could feed her children. However, over time the supervisor's assaults became more aggressive until one day he sent her to work at a location where he knew no one else would be and he raped her. She notified the police, and the supervisor was arrested.

Johnny is 7 years old. He lives with his mother and 10-year-old sister. The family is in removal proceedings. An immigration judge denied their application for asylum, and the case is pending at the Board of Immigration Appeals. Not long after the family filed the appeal, Johnny's mother learned that a neighbor had fondled Johnny on several occasions. With the help of her minister, Johnny's mother made a report to the police and brought her son in for an interview. A social worker from child protective services also interviewed Johnny and his mother. The neighbor fled the United States before the police were able to arrest him.

**Susana Martinez**
*Senior Attorney*

**Sheila Neville**
*Senior Attorney*

Legal Aid Foundation of Los Angeles
5228 Whittier Blvd.
Los Angeles, CA 90022
213.640.3909
213.640.3929
smartinez@lafla.org
sneville@lafla.org

These are a few examples of situations in which undocumented victims are now able to petition for immigration relief in the form of U nonimmigrant status. In this article we introduce you to U nonimmigrant status, explain what it is, how to get it, and what benefits accompany it. An extraordinary immigration remedy, it is one that all legal aid advocates should be aware of and consider whenever an undocumented client seeks assistance.

Victims of crime who are undocumented are often reluctant to report crimes to law enforcement officials because they fear that those officials will notify immigration authorities. As a result victims are not helped and criminals are not apprehended. In response, Congress created U nonimmigrant status (U status) in 2000 by adding Section 101(15)(U) to the Immigration and Nationality Act.[1] The availability of

---

[1] Battered Immigrant Women Protection Act of 2000, Pub. L. No. 106-386 § 1513(b), 114 Stat. 1518, 8 U.S.C. § 1101(15)(U) (2000). This Act was Title V of the Violence Against Women Act of 2000, which was Division B of the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1464, as amended by the Violence Against Women Act and Department of Justice Reauthorization Act of 2005, tit. VIII, Pub. L. No. 109-162, 119 Stat. 2960, 3035; the Violence Against Women and Department of Justice Reauthorization Act Technical Corrections, Pub. L. No. 109-271, 120 Stat. 750 (2006); and William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044.

**Help for Undocumented Victims of Crime**

U status strengthens the ability of law enforcement agencies to investigate and prosecute crimes while offering protection from removal to immigrant victims of such crimes.[2] U status allows undocumented victims of certain crimes to report those crimes without fear of removal by immigration authorities by giving them lawful status that allows them to reside in the United States if they cooperate with law enforcement officials.[3]

To be eligible, the victim seeking U status must meet four criteria. First, the victim must have suffered substantial physical or mental abuse as a result of having been a victim of one of the crimes listed in the Immigration and Nationality Act.[4] Among the crimes listed in the Act are rape, torture, trafficking, incest, domestic violence, sexual assault, sexual exploitation, prostitution, false imprisonment, witness tampering, obstruction of justice, felonious assault, manslaughter, and murder.[5] The attempt, conspiracy, or solicitation to commit any of the crimes listed or any similar activity in violation of federal, state, or local criminal law is also covered by the statute.[6]

Second, victims must possess information concerning the criminal activity.[7] Third, victims must show that they have been helpful or are being helpful or are likely to be helpful to law enforcement authorities in the investigation or prosecution of these crimes.[8] Fourth, the criminal activity must have violated the laws of, or occurred in, the United States or its territories and possessions.[9] Victims who meet these requirements may be allowed to remain legally in the United States for four years.[10] Persons who have had U status for three years may be eligible to adjust their status to that of lawful permanent residents.[11]

Victims who apply for or already have U status may apply for U status for undocumented family members by filing an application for each member. The victim is called the "principal" applicant for U status. The principal applicant files on behalf of family members who derive their U status from the principal. Family members do not have to be independently eligible for U status. Principal applicants over 21 may file for U status for their spouse and minor, unmarried children under 21. Principal applicants under 21 may file for U status for their spouse, children, parents, and unmarried siblings who are under 18 on the date the U status application is filed.[12] Neither principal applicants nor their family members must be in the United States to file for U status.[13]

## I.   Filing for U Status

The victim, or principal, applying for U status must be careful to file the correct forms and evidence with the U.S. Citizenship and Immigration Services

---

[2]Battered Immigrant Women Protection Act of 2000 § 1513(a)(2)(A).

[3]Immigration and Nationality Act §§ 101(a)(15)(U), 214(p), 8 U.S.C. §§ 1101(a)(15)(U), 1184(p). Immigration laws are gender neutral. We use feminine pronouns throughout for simplicity.

[4]Id. § 101(a)(15)(U)(iii), 8 U.S.C. § 1101(a)(15)(U)(iii).

[5]Id. Regarding the crimes of manslaughter and murder, the victim's immediate family members may be considered "indirect" victims if they meet all other requirements for U status. If the victim was over 21, the indirect victims are her spouse and minor children. If the victim was under 21, parents and unmarried siblings under 18 will be considered indirect victims (8 C.F.R. § 214.14(a)(14)(i) (2010)).

[6]Immigration and Nationality Act § 101(a)(15)(U)(iii), 8 U.S.C. § 1101(a)(15)(U)(iii).

[7]Id. § 101(a)(15)(U)(i), 8 U.S.C. § 1101(a)(15)(U)(i).

[8]Id.

[9]Id.

[10]Id. § 214(p)(6), 8 U.S.C. § 1184(p)(6).

[11]Id. § 245(m), 8 U.S.C. § 245(m).

[12]Id. § 101(a)(15)(U)(ii), 8 U.S.C. § 1101(a)(15)(U)(ii).

[13]Applicants in the United States apply for U nonimmigrant status (U status); applicants outside the United States apply for U nonimmigrant visas (U visa).

(USCIS). The victim must prove that she meets the criteria for U status, including filing a certification that she has been helpful to law enforcement. The principal and family members must be eligible to be admitted to the United States; that is, they must not fall within certain statutory categories that will make them ineligible to be granted U status. If they do fall within one of those statutory categories, this makes them inadmissible, and they must file a waiver of inadmissibility.

To be eligible for U status the principal must be able to prove that she meets the criteria for U status. She must prove the following:

- she has suffered substantial physical or mental abuse as a result of having been a victim of criminal activity covered by the U status law;[14]

- she has information concerning the criminal activity;[15]

- the criminal activity violated the laws of the United States;[16]

- the principal has been helpful or will be helpful to a federal, state, or local law enforcement official, judge, or prosecutor in the investigation or prosecution of the criminal activity.[17] To prove helpfulness, the applicant must have a law enforcement official complete a certification attesting to her helpfulness.[18]

The victim seeking U status needs the following forms to apply for U status:

- Form I-918, Petition for U Nonimmigrant Status;

- Form I-918, Supplement B, Petition for U Nonimmigrant Certification;[19]

- Form I-192, Application for Advance Permission to Enter as Nonimmigrant (waiver of inadmissibility, if applicable);[20] and

- Form I-918, Supplement A, Petition for Qualifying Family Member of U-1 Recipient (filed on behalf of family members of the victim).[21]

## A. Filing Form I-918 and Required Evidence

To apply for U status, the victim, or principal, must fill out Form I-918, Petition for U Nonimmigrant Status. The principal must file with the application evidence that she is the victim of a crime or criminal activity as defined in the statute and proof that she suffered substantial physical or mental abuse as a result of being the victim of the crime. Some of the factors that USCIS considers in determining what constitutes substantial abuse are

> [t]he nature of the injury inflicted or suffered, the severity of the perpetrator's conduct, the severity of the harm suffered, the duration of the infliction of the harm, and the extent to which there is permanent or serious harm to the appearance, health, or physical or mental soundness of the victim.[22]

---

[14]Immigration and Nationality Act § 101(a)(15)(U)(i)(I), 8 U.S.C. § 1101(a)(15)(U)(i)(I).

[15]*Id.* § 101(a)(15)(U)(i)(II), 8 U.S.C. § 1101(a)(15)(U)(i)(II).

[16]*Id.* § 101(a)(15)(U)(i)(IV), 8 U.S.C. § 1101(a)(15)(U)(i)(IV). The definition covers territories and possessions of the United States.

[17]*Id.* § 101(a)(15)(U)(i)(III), 8 U.S.C. § 1101(a)(15)(U)(i)(III).

[18]*Id.* § 214(p)(1), 8 U.S.C. § 1184(p)(1).

[19]8 C.F.R. § 214.14(c) (2010). For Form I-918 and Supplement B, see U.S. Citizenship and Immigration Services, Department of Homeland Security, OMB No. 1615-0104, Form I-918, Petition for U Nonimmigrant Status, and Supplement B, U Nonimmigrant Status Certification (Aug. 31, 2007), www.uscis.gov/files/form/i-918.pdf. All forms are available on the U.S. Citizenship and Immigration Services (USCIS) website.

[20]U.S. Citizenship and Immigration Services, Department of Homeland Security, OMB No. 1615-0017, Form I-192, Application for Advance Permission to Enter as Nonimmigrant (Jan. 6, 2010).

[21]U.S. Citizenship and Immigration Services, Department of Homeland Security, OMB No. 1615-0104, Form I-918, Supplement A, Petition for Qualifying Family Member of U-1 Recipient (Aug. 31, 2007).

[22]8 C.F.R. § 214.14(b)(1) (2010).

USCIS suggests that the following types of evidence are appropriate to submit with the application to prove that the victim has suffered the requisite harm: trial transcripts, court documents, police reports, news articles, affidavits, and orders of protection.[23]

When considering whether to grant U status, USCIS considers the totality of evidence submitted to determine if the abuse is substantial and recognizes that one single act may not rise to the level of substantial abuse while a series of acts taken together may constitute substantial abuse.[24] This understanding is especially helpful in domestic violence cases where victims report one incident of abuse that may not constitute substantial abuse unless considered in the context of the larger cycle of violence that characterizes domestic violence relationships.

The victim must also file with Form I-918 a personal declaration detailing how she was victimized and how she has suffered as a result of being a victim.[25] If the victim has violated immigration or criminal laws, she may be statutorily "inadmissible" and may not enter the United States. In that case the applicant must file Form I-192 requesting a waver of inadmissibility. (See the detailed discussion of waivers of inadmissibility below.)

## B. Filing Form I-918, Supplement B, Certification

The applicant must file Form I-918, Supplement B, with Form I-918. Supplement B (Form I-918B) is a certification that the victim has been helpful, is being helpful, or is likely to be helpful in the investigation or prosecution of the criminal activity and must so state.[26] Form I-918B must be completed and signed by the federal, state, or local law enforcement agency, prosecutor, judge, or any other authority that has responsibility for the investigation or prosecution of a qualifying crime or criminal activity.[27] Agencies with criminal investigative jurisdiction in their respective areas of expertise, such as child protective services, the U.S. Equal Employment Opportunity Commission, the U.S. Department of Labor, and the U.S. Department of Homeland Security, may complete and sign the certification.[28]

The certification must be signed within the six months immediately preceding the filing of the U status application.[29] To ensure that USCIS recognizes the certification as an original document, the certifying officer should sign it in nonblack ink.[30]

The definition of "criminal investigation" or "prosecution" is the "detection or investigation of a qualifying crime or criminal activity, as well as the prosecution, conviction or sentencing of the perpetrator of the qualifying crime or criminal activity."[31] This language could be useful in persuading a law enforcement agency or official to sign a U status certification. That a perpetrator is not convicted, or is acquitted at trial, should not be a barrier to obtaining a certification.

---

[23]U.S. Citizenship and Immigration Services, Department of Homeland Security, OMB No. 1615-0104, Instructions for Form I-918, at 5.

[24]8 C.F.R. § 214.14(b)(1) (2010).

[25]*Id.* § 214.14(c)(2)(iii).

[26]Immigration and Nationality Act § 101(a)(15)(U)(i), 8 U.S.C. § 1101(a)(15)(U)(i).

[27]*Id.* § 214(p)(1), 8 U.S.C. § 1184(p)(1).

[28]*Id.*; 8 C.F.R. § 214.14(a)(2) (2010). In March 2010 the U.S. Department of Labor announced that it would begin to exercise its authority to certify U status and issue U status certification protocols by midsummer 2010. The Wage and Hour Division will have the authority to certify U status for potential applicants identified during workplace investigations (Fact Sheet, U.S. Department of Labor, Secretary Solis Announces the Department to Exercise Its Authority to Certify U Visas (n.d.), http://bit.ly/dol_0315_uvisa). Most recently the California Department of Fair Employment and Housing issued a directive to its Enforcement Division outlining its procedure for issuing U certifications (California Department of Fair Employment and Housing Enforcement Division, Directive Number 317 (May 6, 2010)).

[29]8 C.F.R. § 214.14(c)(2)(i) (2010).

[30]U.S. Citizenship and Immigration Services, Vermont Service Center Spring Stakeholder Conference (April 6, 2010) (for executive summary of teleconference, see http://bit.ly/uscis_outreach).

[31]8 C.F.R. § 214.14(a)(5) (2010).

A question on Form I-918B asks if the victim "[h]as unreasonably refused to provide assistance in a criminal investigation and/or prosecution of the crime."[32] An advocate may be able to persuade a law enforcement official to sign the I-918B certification even if the victim has not yet provided assistance due to fear or trauma if the refusal to help is reasonable. The victim has a continuing obligation to give "information and assistance reasonably requested" to law enforcement from the time the U status application is filed until she is granted permanent residence.[33]

USCIS may contact the person or agency who signed the Form I-918B certification to assess the helpfulness of the applicant.[34] The victim should be aware that the certifying officer may withdraw U status certification. USCIS may revoke U status that is based on a withdrawn certification.[35]

### C. Filing Form I-918, Supplement A, Petition for Qualifying Family Member

A principal applying for U status may also apply for U status for family members. To do so, the principal must file Form I-918, Supplement A, Petition for Qualifying Family Member of U-1 Recipient.[36] The principal must submit a separate form for each family member and file it either along with the principal's application or

at a later date with a copy of the principal's application.[37] Family members, like the U status principal, must be admissible or file waivers of inadmissibility.[38] The relationship between the principal applicant and the family member must exist at the time of filing, adjudication, and admission to the United States.[39]

### D. Waivers of Inadmissibility for U Status Applicants

Applicants for U status may be denied U status if they are deemed ineligible for admission to the United States; that is, they are "inadmissible."[40] The Immigration and Nationality Act sets forth the inadmissibility grounds that are potential barriers to obtaining U status.[41] There are ten inadmissibility categories—among them being criminal convictions, prior removal orders, unlawful presence, and false claims to U.S. citizenship. Applicants must establish that they are either admissible to the United States or that any ground of inadmissibility has been waived.[42]

The principal and any family member who is inadmissible must seek a waiver by filing Form I-192, Application for Advance Permission to Enter as Nonimmigrant.[43] The waiver application is filed with the application for U status.[44] There

---

[32]Form I-918, Supplement B, *supra* note 19, pt. 4, question 4.

[33]8 C.F.R. § 214.14(b)(3) (2010).

[34]New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status, 72 Fed. Reg. 53014, 53024 (Sept. 17, 2007) (interim rule with request for comments) (to be codified at 8 C.F.R. pts. 103, 212, 214, 248, 274a, and 299) (supplementary information).

[35]8 C.F.R. § 214.14(h)(2) (2010).

[36]*Id.* § 214.14(f)(2); see U.S. Citizenship and Immigration Services, Department of Homeland Security, OMB No. 1615-0104, Form I-918, Supplement A, Petition for Qualifying Family Member of U-1 Recipient.

[37]8 C.F.R. § 214.14(f)(2) (2010).

[38]*Id.* § 214.14(f)(1).

[39]*Id.* § 214.14(f)(4).

[40]Immigration and Nationality Act § 212(d)(14), 8 U.S.C. § 1182(d)(14).

[41]*Id.* § 214(a), 8 U.S.C. § 1184(a).

[42]U status applicants (and others seeking immigrant or nonimmigrant status) who are inadmissible are ineligible to receive visas or be admitted to the United States (*id.* §§ 212(a), 214(d)(14), 8 U.S.C. §§ 1182(a), 1184(d)(14)).

[43]8 C.F.R. §§ 214.14(c)(2)(iv) (principal), 214.14(f)(3)(xiii) (family member) (2010).

[44]8 C.F.R. § 212.17(a) (2010). There may be cases in which the advocate does not file a waiver because the advocate believes the U status applicant to be admissible. If USCIS disagrees, the agency generally sends a notice of a request for evidence in which USCIS asks the applicant to file Form I-192 to waive a specific ground or grounds of inadmissibility.

is no appeal to the denial of a waiver, but the applicant may refile it with USCIS.[45]

USCIS has the discretion to waive any ground of inadmissibility for U status applicants with the exception of certain security grounds.[46] Under a special waiver for those seeking U status, USCIS may waive any ground of inadmissibility for U status applicants apart from "participants in Nazi persecution, genocide, or the commission of any act of torture or extrajudicial killing" as long as it is in the national or public interest to do so.[47] In practice, national or public interest has been interpreted to cover factors such as family unity and medical and psychological hardship. The level of documentation that must be submitted with a waiver application varies with which ground the applicant seeks to waive. We highlight some of the most common grounds of inadmissibility below.

**Immigration Violators and Aliens Previously Removed.** The most common immigration violations requiring a waiver are being present in the United States without admission or parole, misrepresenting a material fact in seeking documentation or entry into the United States, and making a false claim of being a U.S. citizen.[48] Those who have been previously removed or deported from the United States or who have triggered the "unlawful presence" ground are also inadmissible.[49]

**Documentation Requirements—Passports.** Nonimmigrants who are not in possession of a valid passport are inadmissible.[50] USCIS is liberal in its waivers

on this ground of inadmissibility. Thus a U status principal applicant or family member who does not have a passport already may want to avoid the time and expense of obtaining one through their home country's consulate in the United States when a passport waiver is so readily available from USCIS.

In cases involving domestic violence, asking a client to apply for a passport might even be dangerous. Many countries (the United States among them) have a two-parent signature requirement for passport applicants who are minors. A domestic violence survivor with a child who is a U status applicant could risk her family's safety by contacting the abusive father to get his signature on the child's passport application.

Passport waivers are filed on Form I-192 as are other waivers of inadmissibility unless one is outside the United States, in which case the applicant must file Form I-193, Application for Waiver of Passport and/or Visa.[51]

**Health.** Any applicant for lawful status who has a "communicable disease of public health significance" is inadmissible.[52] In the past immigrants who were positive for the human immunodeficiency virus (HIV) and were applying for many types of immigration relief faced significant barriers in obtaining waivers of this ground of inadmissibility. In late 2009 the U.S. Department of Health and Human Services published a rule effective January 4, 2010, that eliminates HIV infection as a ground of inadmissibility.[53]

---

[45]8 C.F.R. § 212.17(b)(3) (2010).

[46]Immigration and Nationality Act § 212(a)(3)(e), (d)(3), 8 U.S.C. § 1182(a)(3)(e), (d)(3).

[47]*Id.* § 212(d)(14), 8 U.S.C. § 1182(d)(14).

[48]*Id.* § 212(a)(6), 8 U.S.C. § 1182(a)(6). Parole is a temporary status that allows a person who is not admitted to enter or stay in the United States lawfully (See 8 C.F.R. § 212.5).

[49]*Id* § 212(a)(9)(B)(i), (C), 8 U.S.C. § 1182(a)(9)(B)(i), (C). Unlawful presence does not relate to an applicant's mode of entry. Unlawful presence applies whenever an applicant is out of status for more than a certain period and leaves the United States. It is the departure that triggers the inadmissibility ground of unlawful presence.

[50]*Id* § 212(a)(7)(B)(i)(I), 8 U.S.C. § 1182(a)(7)(B)(i)(I).

[51]American Immigration Lawyers Association (AILA), AILA Doc. No. 09020261, AILA/VSC Liaison Committee Practice Pointer: VSC Provides Guidance on U Visa Submissions (2009).

[52]Immigration and Nationality Act § 212(a)(1)(A)(i), 8 U.S.C. § 1182(a)(1)(A)(i).

[53]Medical Examination of Aliens—Removal of Human Immunodeficiency Virus (HIV) Infection From Definition of Communicable Disease of Public Health Significance, 74 Fed. Reg. 56547 (Nov. 2, 2009) (codified at 42 C.F.R. pt. 34 (2010)).

**Criminal Violations.** An applicant who has certain criminal convictions or has engaged in criminal activity may be inadmissible.[54] USCIS considers the number and severity of the applicant's criminal convictions in deciding the waiver.[55] USCIS advises applicants seeking a waiver of criminal violations to submit evidence of rehabilitation. For example, an applicant who has had a drug problem could submit proof of participation in a substance abuse program.[56]

**Public Charge.** One often misunderstood ground of inadmissibility relates to persons who are "at any time likely to become a public charge."[57] In 1999 the Immigration and Naturalization Service—whose functions were taken over in 2003 by USCIS—published its first ever guidance on public-charge determinations.[58] In 2009 USCIS issued a fact sheet reiterating that 1999 interpretation.[59] Keep in mind that the public-charge test is prospective, that USCIS must consider the totality of the applicant's circumstances, and that, with the exception of institutionalization for long-term medical care, USCIS does not consider noncash benefits in the public-charge determination.[60] Practically speaking, this ground of inadmissibility should not be a problem for healthy clients who are employed or employable.

This is what you can do if your client is eligible for U status:

- Have your client stay in contact with law enforcement agencies in charge of the criminal case since a law enforcement officer must sign form I-918B attesting to her helpfulness.

- Have your client gather as much evidence as she can about the crime and the harm she has suffered due to being the victim of the crime. Examples of evidence are police reports, medical or psychological evaluations, letters from counseling centers or shelters, photographs of injuries, court documents, and orders of protection.[61]

- Have your client draft a declaration or help her draft a declaration of her victimization and how it has affected her.

- Have a candid discussion with your client about her criminal and immigration history, if any, because USCIS will have her fingerprinted as part of the application process, and you will need to know this to prepare any necessary waivers.

The legal standard for approving an applicant's U status is any credible evidence that is relevant to the application.[62] The applicant has the burden of establishing eligibility for U status.[63]

The forms and supporting evidence are sent to one USCIS location, the Vermont Service Center, which has exclusive jurisdiction over all U status applications. The applicant must submit a fee or fee waiver for biometrics (e.g., fingerprints) with the U status I-918 application.[64] A fee or fee waiver must be submitted with an ap-

---

[54]Immigration and Nationality Act § 212(a)(2), 8 U.S.C. § 1182(a)(2).

[55]8 C.F.R. § 212.17(b)(2) (2010).

[56]U.S. Citizenship and Immigration Services, *supra* note 30.

[57]Immigration and Nationality Act § 212(a)(4)(B), 8 U.S.C § 1182(a)(4)(B).

[58]Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28689 (March 26, 1999) (attachment to notice).

[59]U.S. Citizenship and Immigration Services, Public Charge Fact Sheet (last updated Nov. 6, 2009), http://bit.ly/publicchargepdf.

[60]*Id.* at 2.

[61]New Classification for Victims of Criminal Activity, 72 Fed. Reg. at 53027.

[62]Immigration and Nationality Act § 214(p)(4), 8 U.S.C. § 1184(p)(4); 8 C.F.R. §§ 214.14(c)(4), (f)(5) (2010).

[63]8 C.F.R. §§ 214.14(c)(4), (f)(5) (2010).

[64]*Id.* § 214.14(c)(1), (3); *id.* § 214.14(f)(5).

plication for a waiver of inadmissibility. The cover letter for the U status application should indicate if a fee waiver application is attached and the fees that the applicant seeks to waive. The applicant is not required to appear at a USCIS interview at any stage in the application for U status. If you do not have any experience in filing U status applications, you may wish to discuss the case with a reputable immigration attorney.

## II.  The U Status Decision

After the principal files the U status application for herself and any family members, the principal will get a notice of receipt of the application. Within about one month of applying, U status principals and family members over the age of 14 will receive an appointment for biometrics processing at a USCIS Application Support Center.[65] Applicants outside the United States will receive a request for evidence in which they will be directed to go for biometrics processing at a facility near the applicant.[66] Biometrics processing is the capture of the principal or family member's digital fingerprints, photograph, and signature. USCIS uses the applicant's fingerprints to search government databases for any criminal or immigration violations committed by the applicant. For applicants abroad, the principal applicant's advocate should inquire about the relevant USCIS office's or consulate's procedures for biometrics processing and relay the information to them.

How long USCIS takes to process the application is difficult to predict. If the applicant has had previous contact with immigration enforcement authorities or has filed another application for immigration relief, processing may be longer than normal because USCIS may already have a file on the applicant that the agency must locate and retrieve.

By statute, the number of U status applications that can be approved is limited to 10,000 per fiscal year.[67] The limit applies only to principal applicants, not to family members.[68] Since the U status law was enacted in 2000, this limit has never been reached. However, USCIS recently stated that the limit for this year will be reached in the summer.[69]

Once the numerical limit is reached, USCIS is required to create a waiting list and continue to receive and review applications.[70] Principals who are eligible but cannot be granted U status solely because of the cap will be placed on the waiting list and notified that they are on the waiting list.[71] At the beginning of the fiscal year—October—USCIS will grant U status to those applicants on the waiting list in the order that their applications were properly filed.[72] Those on the waiting list must continue to be eligible for U status and be admissible at the time status is granted.[73] Once all those on the waiting list are granted U status, USCIS will continue to grant status to new applicants in the order in which their petitions were filed until the annual limit is reached.[74]

---

[65]*Id.* §§ 214.14(c)(2)(iv), (f)(5) (see also U.S. Citizenship and Immigration Services, *supra* note 23).

[66]Bureau of Consular Affairs, U.S. Department of State, Reference Document STATE 011736, 02/10, U Nonimmigrant Visas for Victims of Criminal Activity, http://bit.ly/state_visas (updating U.S. Department of State, Foreign Affairs Manual, 9 FAM 41.85, http://bit.ly/state_manual). Overseas applicants get their biometrics captured at a USCIS office, U.S. consulate, or U.S. military installation. The notice requesting evidence is often called a "request for evidence" or "RFE."

[67]Immigration and Nationality Act § 214(p)(2), 8 U.S.C. § 1184(p)(2).

[68]*Id.* § 214(p)(2)(B), 8 U.S.C. § 1184(p)(2)(B).

[69]USCIS Informal Remarks at 7th Annual Federal Bar Association Immigration Law Seminar, Memphis, Tenn., May 14–15, 2010.

[70]8 C.F.R. § 214.14(d)(2) (2010).

[71]*Id.*

[72]*Id.*

[73]*Id.*

[74]*Id.*

Those on the waiting list will be given deferred action or parole allowing them to remain legally in the United States until the start of the next fiscal year, and they will be eligible to apply for work permits. Those on the waiting list will not accrue unlawful presence.[75] USCIS has discretion to remove the applicant from the waiting list and terminate deferred action.[76]

USCIS sends written notice to a principal who filed for U status within the United States that the principal's petition for U status is approved; with the notice is Form I-94 "Arrival-Departure Record" indicating the principal's U status.[77] For a family member who is within the United States and seeking U status, USCIS notifies the principal, not the family member, that the principal's petition for U status on behalf of the family member (Form I-918, Supplement A) is approved.[78]

For principals and family members who are outside the United States, USCIS sends written notice to the principal and forwards the notice of U status approval to the U.S. Department of State for delivery to the appropriate U.S. embassy or consulate.[79] Because consular procedures vary, and consular personnel may not know about U visas, advocates should call or e-mail consular posts to inquire about procedures that applicants should follow when requesting U visas.[80] The approved principal and family members will receive from the consulate a multiple-use visa valid for four years.[81] When the person enters the United States, they

receive their I-94. The State Department recently issued a document informing its consular offices of the U visa and explaining it to them.[82]

If USCIS denies the U status application, it sends a notice with the reasons for the denial to the principal.[83] The failure to submit sufficient evidence to fulfill one or more requirements for U status does not necessarily trigger a denial of the petition. USCIS practice is to send the principal a notice requesting further evidence; USCIS explains why the previously submitted evidence is insufficient and gives the principal an opportunity to submit additional proof. The principal may appeal the denial of U status to USCIS's Administrative Appeals Office within thirty days from the date of the notice.[84] USCIS does not make a practice of placing the applicant in removal proceedings based on the denial of a U status petition alone.

A person who has obtained U status—now a U nonimmigrant—will have questions about employment authorization, travel, possible termination of U status, and what to do about pending removal orders. We discuss these below.

## A. Employment Authorization

Once USCIS grants U status to a principal who is present in the United States, USCIS automatically issues to the principal an employment authorization document valid for four years.[85] A principal U nonimmigrant who is outside the United

[75]Id. § 214.14(d)(3) (2010).

[76]Id. Some reasons for removing applicants from the waiting list are likely to be criminal and immigration violations committed after the U status filing or the discovery that the applicant failed to disclose a criminal conviction or misrepresented a material fact when she applied for U status.

[77]8 C.F.R. § 214.14(c)(5)(i)(A) (2010).

[78]Id. § 214.14(f)(6)(i).

[79]Id. §§ 214.14(c)(5)(ii)(B), (f)(6)(ii).

[80]See Travel.State.Gov, Bureau of Consular Affairs, U.S. Department of State, Country Specific Information, http://bit.ly/state_travel.

[81]Bureau of Consular Affairs, supra note 66, para. 4.

[82]Bureau of Consular Affairs, supra note 66.

[83]8 C.F.R. § 214.14(c)(5)(ii) (2010).

[84]Id.

[85]Immigration and Nationality Act § 214(p)(3)(B), 8 U.S.C. § 1184(p)(3)(B).

States does not automatically receive an employment authorization document. She must first be admitted to the United States, receive her I-94, and only then may she file an I-765 Application for Employment Authorization with the Vermont Service Center.[86] She should submit a copy of the I-94 "Arrival-Departure Record" with the application for employment authorization.[87] No fee is required to apply for employment authorization.[88]

Family members who are granted U status must submit an application for employment authorization since, unlike the principal, they do not automatically receive such authorization.[89] If the principal's family members are within the United States, the principal may file Form I-765, Application for Employment Authorization concurrently with the application for the family member's U status.[90] If the principal does so, USCIS can, upon approval of the family member's U status application, immediately begin processing the application for employment authorization. Family members who are outside the United States must wait until after they enter the United States to file Form I-765 for employment authorization.[91]

USCIS also has the statutory authority to grant employment authorization to anyone with a pending bona fide application for U status.[92] USCIS has not defined what a bona fide application is or issued any employment authorization under

this authority, although USCIS recently indicated that it would issue guidance on this issue before the cap was expected to be reached in the summer of 2010.[93]

**B. Travel**

U nonimmigrants may travel outside the United States but should keep in mind a few rules. If a U nonimmigrant wishes to reenter the United States after travel, the U nonimmigrant must obtain a U visa through a U.S. consulate.[94] A U nonimmigrant who wants to apply for permanent residence status must not be absent from the United States for any period in excess of 90 days or for any periods that exceed 180 days in the aggregate unless it is to assist law enforcement personnel.[95] Also, if a U nonimmigrant triggers an inadmissibility ground (such as unlawful presence) upon departure from the United States, the U nonimmigrant must file a Form I-192 waiver of inadmissibility application with the Vermont Service Center before returning. To return, the U nonimmigrant must have a valid, unexpired passport as well as the U visa.[96] However, a waiver of this requirement is available and can be requested by filing Form I-193 with the Vermont Service Center.[97]

**C. Removal Orders**

Once U status is granted, expedited removal orders issued by the U.S. Department of Homeland Security are cancelled by operation of law.[98] A U nonimmigrant who is subject to an order of removal by

---

[86]8 C.F.R. § 214.14(c)(7) (2010); U.S. Citizenship and Immigration Services, Department of Homeland Security, OMB. No. 1615-0023, I-765, Application for Employment Authorization (2010).

[87]8 C.F.R. § 214.14(c)(7) (2010).

[88]*Id.*

[89]*Id.* § 214.14(f)(7) (2010).

[90]*Id.*

[91]*Id.*

[92]Immigration and Nationality Act § 214(p)(6), 8 U.S.C. § 1184(p)(6).

[93]USCIS Informal Remarks, *supra* note 69.

[94]8 C.F.R. § 212.1 (2010).

[95]Immigration and Nationality Act § 245(m)(2), 8 U.S.C. § 1255(m)(2).

[96]*Id.* § 212(a)(7)(B), 8 U.S.C. § 1182(a)(7)(B).

[97]*Id.* § 212(d)(4)(A), 8 U.S.C. § 1182(d)(4)(A); 8 C.F.R. §§ 212.1(g), 212.1(p) (2010).

[98]8 C.F.R. § 214.14(c)(5)(i) (2010).

an immigration judge or the Board of Immigration Appeals may file a motion to reopen and terminate proceedings.[99] Counsel for the Department of Homeland Security may agree to join the motion to overcome the applicable time and numerical limits on motions to reopen.[100] Removal orders are not a barrier to a U status–based adjustment to lawful permanent residence.

### D.  Termination of U Status

There are two ways that USCIS may terminate a person's U status: by revocation and by the commencement of removal proceedings. Revocation of U status can lead to removal proceedings.

Termination by revocation can be automatic or discretionary.[101] Automatic revocation occurs when a person who has been approved for U status and who is outside the United States notifies USCIS that she will not use the approved petition to enter the United States.[102] Discretionary revocation may occur where (1) the certifying official withdraws the certification; (2) the application for U status was approved in error; (3) the application involved fraud; (4) in the case of a family member, the relationship between a principal and a family member has ended; and (5) in the case of a family member, a principal's U status has been revoked.[103]

If USCIS chooses to revoke by discretion, it must send the U nonimmigrant a notice of intent to revoke the status with an explanation of the reasons for the revocation.[104] The U nonimmigrant has thirty

days from the date of the notice to submit any relevant evidence in rebuttal, but the relevance and weight of any evidence are within the sole discretion of USCIS.[105] The discretionary revocation may be appealed to the USCIS Administrative Appeals Office.[106] The appeal must be submitted within thirty days of the date of the notice of revocation. Appeals are not permitted for automatic revocations.[107]

The second way that USCIS may terminate a person's U status is by commencing removal proceedings.[108] The commencement of removal proceedings can be triggered by the U nonimmigrant's conduct after admission (such as the commission of a crime), by a misrepresentation of material facts on the application or any of its supporting documentation, or by conduct or a condition that was not known to USCIS prior to the grant of U status.[109]

### III.  Adjusting to Permanent Resident Status

U nonimmigrants may adjust their status to that of a lawful permanent resident. U principal nonimmigrants may also obtain lawful permanent resident status for their family members who do not have U status.

U principal nonimmigrants may obtain lawful permanent residence status by filing Form I-485, Application to Register Permanent Residence or Adjust Status, with the Vermont Service Center.[110] The following requirements must be met:

---

[99]*Id.*

[100]*Id.*

[101]Immigration and Nationality Act § 214(a)(1), 8 U.S.C. § 1184(a)(1); 8 C.F.R. § 214.14(h)(4) (2010).

[102]8 C.F.R. § 214.14(h)(1) (2010).

[103]*Id.* § 214.14(h)(2)(i).

[104]*Id.* § 214.14(h)(2)(ii).

[105]*Id.*

[106]*Id.* § 214.14(h)(3).

[107]*Id.* Discretionary revocation is also called "revocation on notice."

[108]Immigration and Nationality Act § 239, 8 U.S.C. § 1229; 8 C.F.R. 214.14(i) (2010).

[109]8 C.F.R. § 214.14(i) (2010).

[110]U.S. Citizenship and Immigration Services, Department of Homeland Security, Form I-485, OMB No. 1615-0023, Application to Register Permanent Residence or Adjust Status (Dec. 3, 2009).

- three years of continuous physical presence in the United States;

- not unreasonably refusing to provide assistance in a criminal investigation or prosecution; and

- establishing that continued presence is justified on humanitarian grounds, to ensure family unity, or is otherwise in the public interest.[111]

Whether the refusal of a U principal nonimmigrant to provide assistance is unreasonable is determined by examining the totality of the circumstances.[112]

Family members who have U nonimmigrant status may become lawful permanent residents in the same way as principal U nonimmigrants: they must file Form I-485 and must meet the conditions described above. U nonimmigrants who file for permanent resident status are eligible to continue to receive employment authorization documents while their applications are pending.[113]

Family members who do not have U nonimmigrant status and for whom the U principal never applied for U status may obtain permanent resident status through the U principal nonimmigrant by following a different route. First, the U principal nonimmigrant must file Form I-929, Petition for Qualifying Family Member of a U-1 Nonimmigrant, with the Vermont Service Center.[114] The U principal nonimmigrant may file Form I-929 concurrently with her application for permanent residency or when her ap-

plication is pending or approved.[115] The family member must never have held U status to be eligible to file a Form I-929 petition.[116]

The U principal nonimmigrant must file with Form I-929 proof that there is a familial relationship as well as proof that either she or the family member "would suffer extreme hardship if the family member is not allowed to remain or join the principal in the United States."[117] USCIS decides on a case-by-case basis whether extreme hardship is demonstrated and considers a variety of factors in making this determination.[118]

After Form I-929 is approved, family members in the United States may file Form I-485 to adjust their status to that of permanent resident.[119] If the family member is outside the United States when the I-929 is approved, the family member will have to visit the local consulate to apply for a visa to enter the United States as a permanent resident.[120]

Obtaining permanent resident status for family members through a Form I-929 petition instead of through regular family-based immigration has one great advantage: it permits family members to file for their permanent residence status as soon as Form I-929 is approved.[121] Under regular family-based immigration, the family member would have to wait years before filing the Form I-485 application for adjustment to permanent residence status.

---

[111]Immigration and Nationality Act § 245(m)(1), 8 U.S.C. § 1255(m)(1).

[112]8 C.F.R. § 245.24(a)(5) (2010).

[113]*Id.* § 274a.12(c)(9).

[114]*Id.* § 245.24(g)–(h); U.S. Citizenship and Immigration Services, Department of Homeland Security, OMB No. 1615-0023, Form I-929, Petition for Qualifying Family Member of a U-1 Nonimmigrant (Nov. 30, 2011).

[115]8 C.F.R. § 245.24(g)(4) (2010).

[116]*Id.* § 245.24(g).

[117]*Id.* § 245.24(h)(1)(iv).

[118]*Id.*

[119]Immigration and Nationality Act § 245(m)(3), 8 U.S.C. § 1255(m)(3); 8 C.F.R. § 245.24(i) (2010).

[120]*Id.* § 245(m)(3), 8 U.S.C. § 1255(m)(3); 8 C.F.R. § 245.24(h)(2)(i) (2010).

[121]8 C.F.R. § 245.24(h)(2)(i) (2010).

## IV. Fees, Confidentiality, Representation

There is no fee to file Form I-918, Application for U Nonimmigrant Status, or Form I-918, Supplement A, Petition for Qualifying Family Member.[122] USCIS routinely grants fee waivers to low-income U status applicants for the Form I-192 waiver of inadmissibility application, biometrics, the Form I-765 Application for Employment Authorization, the Form I-929 Petition for Qualifying Family Member, and the Form I-485 adjustment of status to permanent residence.[123] Applicants outside the United States have to pay consular fees for visas.[124] These fees are not allowed to be waived.[125]

Disclosing information regarding persons with pending or approved U status applications is prohibited by statute except in certain circumstances, such as for legitimate law enforcement purposes, to make eligibility determinations for public benefits, and with prior written consent from the U status applicant.[126] Adverse determinations of admissibility or deportability may not be made on the basis solely of information that comes from the perpetrator of the criminal activity that formed the basis of the U status application.[127]

There are statutory exemptions from the nondisclosure requirement.[128] For example, the U.S. attorney general has the discretion to allow information to be disclosed to law enforcement officials for "legitimate law enforcement purposes."[129] This may mean that USCIS may be obliged to release portions of U status applications to federal prosecutors for disclosure in pending criminal proceedings. At the Vermont Service Center USCIS adjudicators, who are trained in the nondisclosure rules as well as the dynamics of victimization and family violence, review and decide the applications.

Legal Services Corporation (LSC) grantees may use LSC funds for legal assistance directly related to the prevention of, or obtaining relief from, U status crimes.[130] LSC explicitly allows LSC grantees to assist clients in applying for U status.[131] Because this U status is a wide-reaching and extraordinary immigration remedy, you will be able to identify clients who qualify for this relief. Not all of these clients require assistance from an attorney with a specialization in immigration law. If you want to assist a client who is a victim of crime to apply for U status, please feel free to ask us questions. We welcome your request for technical assistance.

---

[122]Immigration and Nationality Act § 245(*l*)(7), 8 U.S.C § 1255(*l*)(7).

[123]8 C.F.R. §§ 103.7(c)(5)(i), (iii), 214.14(f)(7), 245.24(h)(1)(ii) (2010).

[124]See, e.g., Immigration and Nationality Act § 245(m)(3), 8 U.S.C. § 1255(m)(3); 8 C.F.R. § 245.24(h)(2)(i) (2010) (consular fees for Form I-192); Bureau of Consular Affairs, *supra* note 66.

[125]Bureau of Consular Affairs, *supra* note 66.

[126]8 U.S.C. § 1367(a)(2).

[127]*Id.* § 1367(a)(1)(E).

[128]*Id.* § 1367(b).

[129]*Id.* § 1367(b)(2).

[130]Violence Against Women Act and Department of Justice Reauthorization Act of 2005 § 104; Legal Services Corporation, Program Letter 06-2 (Feb. 21, 2006) (http://www.lsc.gov/program/program_letters.php; scroll down to Program Letter 06-2) (To All LSC Program Directors, From Helaine M. Barnett, President; Subject: Violence Against Women Act Amendments 2006).

[131]Legal Services Corporation, *supra* note 130, at 5.

# EXHIBIT HH

# Immigration Sanctuary Policies: Constitutional and Representative of Good Policing and Good Public Policy

### By Bill Ong Hing*

I. Introduction ........................................................................................247

II. Background........................................................................................252

III. Constitutionality .............................................................................260

    A. *City of New York v. United States* ................................................263

    B. *Sturgeon v. Bratton*......................................................................267

    C. The Tenth Amendment and Preemption .............................272

        1. Tenth Amendment .......................................................272

        2. Preemption of State and Local Laws...........................280

            a. Field Preemption ........................................................282

            b. Conflict Preemption ...................................................286

            c. Impeding Federal Objective .....................................288

        3. *Martinez v. Regents of University of California*—An Analogous Example ..............................................................................291

IV. Good Policing....................................................................................297

V. Good Public Policy............................................................................303

VI. Closing...............................................................................................308

## I. INTRODUCTION

In late February 2009, Rita Cote, a mother of four, called police in [the] Central Florida town [of Tavares] because her sister was allegedly attacked by her boyfriend. But when police showed up, rather than focus on the actual crime, they turned on Cote, who doesn't speak English.

Tavares is located in Lake County. And the Lake County sheriff . . .

---

* Professor of Law, University of San Francisco. Many thanks to Maya Manian, Kate Desormeau, and Kristen Holmquist for their suggestions on an early draft of this article. Danielle Johnston, Laurie Furstenfeld, and Emily Gibbs provided excellent research assistance. Special thanks to Amy Wright, the online research services librarian at the University of San Francisco School of Law.

247

had campaigned on the promise that he would deport illegal immigrants.

The police demanded to see Cote's papers, and when she only offered a bank identification card, they arrested *her.*

The man who had allegedly left marks and bruises on her sister was never even picked up.

As bad as that might be, it gets worse. She was held for eight days without being able to contact family. She was transferred to immigration authorities in Broward County, in South Florida, hours away from her family, before finally being released. By the way, her children and husband are all American citizens. . . . In fact, her husband is an Iraq War veteran.[1]

Cote was fortunate to be released from immigration custody. Danny Sigui was not so lucky:

In Providence, Rhode Island, Guatemalan immigrant Danny Sigui helped convict a murderer by providing critical testimony against the accused. During preparation of the case, the state attorney general's office learned that Sigui was an undocumented immigrant, and reported him to the U.S. Department of Homeland Security (DHS). . . . When asked whether he would have come forward again, knowing that doing so would lead to his deportation, Sigui replied: "If I had known they would take my liberty, that they would take my children away from me, that they would put me [in immigration detention], I would not do this." [2]

Sigui was deported following the trial,[3] in spite of an appeal from friends and the state attorney general office to allow him to stay.[4]

As private persons attempting to assist local law enforcement officials apprehend criminals, Cote and Sigui could have been spared the immigration enforcement nightmare had there been sanctuary policies in their communities.[5] Policies that instruct officers to refrain from asking crime victims or witnesses

---

1. Ralph De La Cruz, *'The Police Took Mommy': How Reporting a Crime Nearly Resulted in Deportation for Florida Woman*, FLA. CTR. FOR INVESTIGATIVE REPORTING (Jan. 31, 2011), http://fcir.org/2011/01/31/the-police-took-mommy-how-reporting-a-crime-nearly-resulted-in-deportation-for-florida-woman.

2. LYNN TRAMONTE, IMMIGR. POLICY CTR., DEBUNKING THE MYTH OF "SANCTUARY CITIES" 3 (2009), *available at* http://www.immigrationpolicy.org/sites/default/files/docs/Community PolicingPaper3-09.pdf.

3. *Id.*

4. Tatiana Pina, *Guatemalan Immigrant to Be Deported*, PROVIDENCE J., Aug. 6, 2003, at A1.

5. Admittedly, even in San Francisco, California, where there is a sanctuary policy, its application has not always been consistent. In one high profile incident that occurred in 2004, a stabbing victim reached out to San Francisco police officers for help. Philip Hwang, *Call the Cops, Get Deported*, S.F. BAY GUARDIAN, Feb. 8–14, 2006, at 7. She was shocked when police turned her over to Immigration and Customs Enforcement (ICE) agents, while her assailant went unpunished. *Id.* The Office of Citizen Complaints launched an investigation, concluded that the police had violated the Sanctuary Ordinance, and forwarded the case to the Police Department for discipline. *Id.* The primary officer simply was given retraining. *Id.*; *see also infra* note 328.

about their immigration status are in place in more than seventy cities and states,[6] such as San Francisco and New York, and are also followed by many law enforcement agencies, such as the New Haven and Los Angeles police departments.[7] Thousands of other police agencies are reluctant to be viewed as partners in federal immigration enforcement.[8] The motivation behind these laws and policies is simple: to encourage the entire community—including immigrant members—to trust and cooperate with the police to promote public safety for everyone.[9] If this message is delivered successfully, I also believe that its tone is an important, positive step in encouraging the civic integration of immigrant communities that stands in sharp contrast to the xenophobic undercurrent of measures such as Arizona's S.B. 1070[10] and the billions of dollars spent annually in border and interior enforcement of federal immigration laws.[11]

Sanctuary ordinances or policies that constrain local authorities from assisting in federal immigration enforcement do not receive the same political and media attention as anti-immigrant laws enacted by states and local governments. In the political struggle over the rights of undocumented immigrants in the United States, the greater media and political focus on anti-immigrant measures, such as Arizona's S.B. 1070 and similar policies in cities like Hazleton, Pennsylvania, and Farmers Branch, Texas, is understandable.[12] The widely publicized proposal and

---

6.   TRAMONTE, *supra* note 2, at 4; Benjamin Wachs, *Sanctuary City: Now Endorsed by 17,945 Law Enforcement Agencies Nationwide*, S.F. WEEKLY, Aug. 26, 2008, http://blogs.sfweekly.com/thesnitch /2008/08/sanctuary_city_now_endorsed_by.php. An anti-immigrant organization, Ohio Jobs and Justice PAC, maintains a constantly updated website that lists dozens of cities and localities that it considers sanctuary cities. Steve Salvi, *The Original List of Sanctuary Cities, USA*, http://ojjpac.org/ sanctuary.asp (last visited Nov. 3, 2011).

7.   *See infra* notes 36–43, 80–82 and accompanying text.

8.   Pamela Constable, *Many Officials Reluctant to Help Arrest Immigrants*, WASH. POST, Aug. 23, 2008, at B1.

9.   In the words of Police Chief Charlie Dean of Prince William County, Virginia, "I have a responsibility to provide service to the entire community—no matter how they got here. It is in the best interest of our community to trust the police." DEBRA A. HOFFMASTER ET AL., POLICE EXEC. RESEARCH FORUM, POLICE AND IMMIGRATION: HOW CHIEFS ARE LEADING THEIR COMMUNITIES THROUGH THE CHALLENGES 15–16 (2010), *available at* http://policeforum.org/ library/immigration/PERFImmigrationReportMarch2011.pdf.

10.   Support Our Law Enforcement and Safe Neighborhoods Act, ARIZ. REV. STAT. ANN. § 11-1051 (2010) (commonly known as S.B. 1070).

11.   BILL ONG HING, DEPORTING OUR SOULS 178–82 (2006); BILL ONG HING, ETHICAL BORDERS 29–63 (2010).

12.   Arizona's S.B. 1070 included provisions that required police officers to check the immigration status of everyone arrested in the state, made it a state crime to not have lawful status or to work in the state without authorization, and authorized state officers to enforce the civil provisions of the federal Immigration and Nationality Act. *See generally* United States v. Arizona, 641 F.3d 339 (9th Cir. 2011). In 2006, the northeastern Pennsylvania city of Hazleton passed an ordinance that sought to deny business permits to companies that employ undocumented immigrants, fine landlords who rent to them, and require legal tenants to register and pay for a rental permit. Lozano v. City of Hazleton, 620 F.3d 170, 176–80 (3d Cir. 2010). The Farmers Branch ordinance similarly would require all adults in the city who live in rental housing to register with the city and provide citizenship and immigration information in order to obtain a so-called "residential occupancy license." Villas at

enactment of those laws are countered by vociferous opposition from immigrants and their allies. The protests generally are followed by high-profile lawsuits that challenge the propriety and constitutionality of the laws. Supporters of the subfederal anti-immigrant statutes argue that they must act because federal policymakers and enforcement officials have failed at their jobs. Detractors raise serious legal questions about the ability of state and local officials to act in a field that generally has been viewed as an exclusive federal domain.

With much less fanfare, the legality of sanctuary policies also has been challenged. For example, in *City of New York v. United States*,[13] New York City unsuccessfully argued that a federal statute that appeared to interfere with the city's sanctuary policy violated the Tenth Amendment. The federal Court of Appeals for the Second Circuit reasoned that Congress was not forcing the city to enforce immigration laws, but simply barred any local restrictions that might interfere with voluntary cooperation by state or local officials with federal immigration agents.[14] But in *Sturgeon v. Bratton*,[15] a California court of appeal found no conflict between the same federal statute and the sanctuary policy of the Los Angeles Police Department (LAPD) and dismissed a challenge to the sanctuary policy by a disgruntled taxpayer.[16] Those cases are discussed more fully in Part III.

Understanding why sanctuary policies are constitutional is important to the raging debate over immigration. Seemingly on a daily basis, anti-immigrant measures are proposed or enacted by state and local governments.[17] In contrast, some jurisdictions that regard gaining the trust of immigrant communities as a necessity for public safety or that view themselves as immigrant friendly choose an approach that de-emphasizes the immigration status of those encountered in the course of police work. As *Sturgeon v. Bratton* illustrates, anti-immigrant groups stand ready to challenge those policies.[18] Additionally, the proliferation of litigation challenging the constitutionality of anti-immigrant ordinances raises the question of whether one set of subfederal immigration-related approaches (sanctuary policies) can be constitutional, while a different set (anti-immigrant legislation) is not. To put it bluntly, can those in the immigrant rights community that promote

---

Parkside Partners v. City of Farmers Branch, 701 F. Supp. 2d 835, 839 (N.D. Tex. 2010), *aff'd*, No. 10–10751, 2012 WL 952252 (5th Cir. Mar. 21, 2012).

13.   179 F.3d 29 (2d Cir. 1999).

14.   *See infra* notes 89–111 and accompanying text.

15.   95 Cal. Rptr. 3d 718 (Ct. App. 2009).

16.   *See infra* notes 112–44 and accompanying text.

17.   In the first quarter of 2010 alone, state legislators in forty-five states introduced 1,180 bills and resolutions relating to immigration; by the end of March, thirty-four state legislatures had passed seventy-one laws and adopted eighty-seven such resolutions. Huma Khan, *Immigration Debate: Number of City, State Bills Relating to Immigration Increase*, ABC NEWS (Aug. 2, 2010), http://abcnews.go.com/Politics/immigration-debate-number-city-state-bills-relating-immigration/story?id=11220316.

18.   *See also infra* notes 84–88 and accompanying text discussing how San Francisco Mayor Newsom worried publicly about the constitutionality of the city's sanctuary ordinance—a concern that was partly fueled by advice he received from the city attorney's office.

sanctuary ordinances and attack anti-immigrant proposals have it both ways constitutionally?

In this Article I review the case law that specifically has involved the constitutionality of sanctuary polices and the relevant principles of preemption and states' rights. That process necessarily forces some comparison with the legal challenges over local and state anti-immigrant laws. In my view, while the principles of federalism represented in the Supreme Court's approach to the Tenth Amendment and preemption drive a stake in the heart of subfederal anti-immigrant laws, those same principles guide us to the conclusion that sanctuary policies are on safe footing. That conclusion is consistent with notions of giving voice to the disenfranchised and those who are potentially persecuted by a majority voicing a popular view; we must protect the voiceless from being overwhelmed and stand guard against a majoritarian intolerance of minority groups. So in the immigration field, the concept of preemption is an appropriate check on overzealous subfederal enforcement efforts that directly affect immigration regulation, while the Tenth Amendment is a check on federal intrusion on a local jurisdiction's attempt to be more protective of individual rights when the locality has a legitimate nonimmigration-related purpose, such as public safety.

The discussion on the legality of sanctuary policies will reveal that the reserved police powers and local economic decisions under principles of federalism play a major part in the analysis. For that reason, a deeper understanding of the rationale for sanctuary policies is crucial. We will find that in jurisdictions with sanctuary policies, local policy makers and law enforcement officials have made thoughtful and deliberate public safety decisions, taking great pains to do the right thing for the entire community. Those decisions are critical to principles of inclusion in our ever-growing diverse communities. For that reason, the sanctuary framework is good public policy—especially in contrast to the anti-immigrant examples of Arizona's S.B. 1070 or Hazleton, Pennsylvania.

This Article attempts to provide an understanding of the rationale behind sanctuary policies as a necessary step in addressing constitutional and policy concerns. In Part II, I examine the background and descriptions of some of the sanctuary ordinances and policies that can be found across the country. Part III presents an analysis of the constitutionality of sanctuary policies primarily focusing on Tenth Amendment and preemption analysis. In Part IV, I present the record on why sanctuary policies are being advanced as an important ingredient to good policing in communities with immigrant neighborhoods. Part V extends this discussion to why sanctuary policies are good public policy, especially as an instrument to encourage civic integration. In my closing, I also refer to programs, such as state and local partnership agreements with Immigration and Customs Enforcement (ICE) known as 287(g) agreements, the Secure Communities

program, and the National Crime Information Center database, that threaten to destroy public policy gains offered by sanctuary policies.

## II. Background

Like many cities and jurisdictions across the country in the 1980s, San Francisco declared itself a "city of refuge" or "sanctuary" city in response to the deportation of Central American refugees who had fled to the United States searching for protection from the civil conflicts that were raging in their countries.[19] San Francisco's 1985 resolution, passed by the city and county's Board of Supervisors and signed by the mayor, was considered nonbinding, although its language stated that "federal employees, not City employees, should be considered responsible for implementation of immigration and refugee policy" and that city departments should not act in a manner toward Salvadoran and Guatemalan refugees that would "cause their deportation."[20] However, after two 1989 incidents involving San Francisco police officers who cooperated with the Immigration and Naturalization Service (INS) and the Salvadoran consul, the Board of Supervisors adopted an ordinance that specifically prohibited officials from asking about or disseminating an individual's immigration status "unless required by federal or state law."[21] Now, presumably, the ordinance had teeth; San Francisco officials—including law enforcement officers—were not to inquire about individuals' immigration status.

The exception "unless specifically required" by state or federal law became relevant a few years later and is relevant today under preemption and Tenth Amendment scrutiny.[22] In 1993, the San Francisco Board of Supervisors voted to amend the ordinance, permitting an exception for individuals arrested and booked on felonies. In 1990, Congress passed a law that required states receiving federal block grants for crime and drug control, such as California, to provide certified copies of state criminal conviction records to federal immigration authorities within thirty days of conviction.[23] So, in 1992, the California Office of Criminal Justice Planning (OCJP), which was responsible for administering the federal block grant, played it safe and decided to require grant recipients, such as San Francisco, to report individuals to the INS upon arrest—even prior to

---

19.   Ignatius Bau, *City of Refuge: No Federal Preemption of Ordinances Restricting Local Government Cooperation with the INS*, 7 LA RAZA L.J. 50, 50–53 (1994).

20.   S.F. Bd. of Supervisors Res. 1087-85 (1985).

21.   Bau, *supra* note 19, at 53–54; *see also* S.F., CAL., ADMIN. CODE § 12.H.2 (1989).

22.   Language in sanctuary policies that provide exceptions when federal authorities ask for immigration information that local authorities helps to avoid preemption. *See infra* notes 180–83 and accompanying text.

23.   Immigration Act of 1990, Pub. L. No. 101-649, § 507, 104 Stat. 4978 (1990). The next year, Congress amended the law to require simple notice of conviction in lieu of certified records, unless INS requested the certified records. Miscellaneous and Technical Immigration and Naturalization Amendments of 1991, Pub. L. No. 102-232, § 306(a)(6), 105 Stat. 1751 (1991).

conviction.[24] With some dissent,[25] San Francisco complied by amending the sanctuary ordinance and incorporating the exception for individuals arrested.[26] Thus, the state and San Francisco went beyond the federal requirement of reporting immigrants with convictions, and the new ordinance language required reporting of individuals simply upon arrest. However, outside of those circumstances, the ordinance required officers to refrain from asking individuals about immigration status. Ironically, the federal requirement that recipients of the block grants provide notice of criminal convictions subsequently was eliminated,[27] but San Francisco has never repealed its exception.

The history of San Francisco's ordinance suggests that the ordinance falls into a genre of policies that can be classified as expressions of "solidarity" with the Sanctuary Movement of the 1980s when thousands of refugees from El Salvador and Guatemala fled to the United States seeking refuge from civil strife.[28] Most of the asylum seekers were denied relief under narrow interpretations of the asylum laws, so churches and synagogues protested the decisions by offering their places of worship to house and protect the migrants.[29] Thus, cities like San Francisco stepped into the fray with their own sympathetic policies to make a statement in opposition to the limited grant of asylum by U.S. officials to the migrants.[30]

Though it may be tempting to regard the current multitude of sanctuary policies as statements in opposition to federal immigration enforcement decisions, the public justification offered for the vast majority of such policies generally is presented in terms of public safety. The idea is that by seeking to create good relations and trust with immigrant communities, law enforcement is more effective for the entire community. In fact some immigrant rights advocates and law enforcement officials rail against the "sanctuary" terminology, arguing that the misnomer distracts the public from the real purpose of the policies to provide safe communities for all residents.[31] They prefer "community policing," "confidentiality," or "preventive policing" labels.[32] The LAPD policy, issued in

---

24.    *See, e.g.*, Letter from Cal. Office of Criminal Justice Planning 1 (Sept. 29, 1993).

25.    The San Francisco Board of Supervisors voted six to four to amend the ordinance to comply with OCJP's directive, in order to avoid the loss of federal funding.

26.    Bau, *supra* note 19, at 68–70.

27.    Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 1111, 119 Stat. 2960 (2005).

28.    Bau, *supra* note 19, at 53–54.

29.    TRAMONTE, *supra* note 2, at 4.

30.    Bau, *supra* note 19, at 50–53.

31.    TRAMONTE, *supra* note 2, at 5.

32.    *See Public Safety and Civil Rights Implications of State and Local Enforcement of Fed. Immigration Laws: J. Hearing Before the Subcomm. on Immigration, Citizenship, Refugees, Border Sec., & Int'l Law and the Subcomm. on the Constitution, Civil Rights, & Civil Liberties of the Comm. on the Judiciary H.R.*, 111th Cong. 84 (2009) (testimony of George Gascón, Chief, Mesa Police Dep't, Mesa, Ariz.); DAVID A. HARRIS, GOOD COPS: THE CASE FOR PREVENTIVE POLICING 14–25 (2005); NAT'L IMMIGRATION FORUM, IMMIGRATION LAW ENFORCEMENT BY STATE AND LOCAL POLICE 2–3 (2007); TRAMONTE, *supra* note 2, at 1. A Congressional Research Service report defines a "sanctuary city" this way:

1979, is cited as an early example of a community policy approach implemented prior to the influx of Central American refugees and the Sanctuary Movement.[33]

The evolution of some relatively recent sanctuary policies makes clear that public safety is their main goal.[34] In New Haven, Connecticut, in 2005, the police chief, government officials, and community leaders adopted two initiatives "designed to make New Haven more welcoming and safer for immigrants, and to help police officers during interactions with immigrants."[35] The police issued a general order outlining procedures for police to follow during encounters with immigrants, and the city began issuing identification cards to all city residents regardless of immigration status.[36] New Haven's population was close to a quarter Latino by 2007, and 10,000 to 15,000 residents were undocumented.[37] According to New Haven police, immigrants are often the victims, rather than perpetrators, of crime. They are targets of street robberies and home invasions. The crimes committed by undocumented immigrants include disorderly conduct, public intoxication, and motor vehicle violations. Domestic violence was identified as an "ongoing problem" in immigrant communities.[38] Under the police department's general order, no distinction is made between documented and undocumented immigrants because they are all "part of our community."[39] In other words, the department "would rather solve a homicide than worry about" the immigration

---

Most cities that are considered sanctuary cities have adopted a "don't ask-don't tell" policy where they don't require their employees, including law enforcement officers, to report to federal officials aliens who may be illegally present in the country.

Localities, and in some cases individual police departments, in such areas that are considered "sanctuary cities," have utilized various mechanisms to ensure that unauthorized aliens who may be present in their jurisdiction illegally are not turned in to federal authorities.

LISA M. SEGHETTI ET AL., CONG. RESEARCH SERV., RL32270, ENFORCING IMMIGRATION LAW: THE ROLE OF STATE AND LOCAL LAW ENFORCEMENT 26 (2006).

33.    TRAMONTE, *supra* note 2, at 4.

34.    On the other hand, the justification for the sanctuary policy in Cambridge, Massachusetts, first enacted in 1985 and renewed in 2006 suggests that it falls in the genre of statements of solidarity with immigrants who are victims of unjust U.S. immigration enforcement policies as laws:

RESOLVED: That the City of Cambridge reaffirm its commitment as a Sanctuary City, as declared by City Council Order Number 4 of April 8, 1985; and be it further

RESOLVED: That the City of Cambridge endorses the platform of the National Alliance of Latin American and Caribbean Communities' Keep Our Families Together Campaign:

• Create an opportunity to apply for legal permanent residency status.
• Expedition of family visas.
• Visionary program for future migration flows that respects the rights of immigrants as workers and as human beings.
• The social, political and economic integration of new immigrants into US society . . . .

CAMBRIDGE, MASS., CITY COUNCIL ORDER NO. 16 (May 8, 2006), *available at* http://www.rwinters.com/council/sanctuary2006.htm.

35.    HOFFMASTER ET AL., *supra* note 9, at 2.

36.    *Id.*

37.    *Id.* at 1.

38.    *Id.* at 4.

39.    *Id.*

status of a witness or victim.[40] Officers are prohibited from asking crime victims, witnesses, and anyone who approaches an officer for assistance about immigration status.[41] As a result of the policy and follow-up initiatives, cooperation with police has "increased dramatically" and important strides have been made in getting the community to overcome its "fear of the police."[42]

The process of forging what can loosely be labeled a sanctuary policy was quite different in Prince William County, Virginia.[43] Between 2000 and 2007, the Latino population increased from just under ten percent to almost twenty percent of the total population.[44] Violent crimes decreased, but burglary and larceny increased.[45] Until 2007, as a matter of practice, police officers did not ask individuals about immigration status unless the person was arrested for a serious crime.[46] During the summer of 2006, a series of robberies occurred in which Latinos—including some undocumented immigrants—were the primary victims.[47] Counterintuitively, this led to an immigrant backlash and criticism of the police chief, a forty-year veteran, for condoning a "sanctuary" policy for undocumented immigrants.[48] The Board of County Supervisors (BOCS) reacted by adopting restrictions on social services for undocumented immigrants and ordering the police department to enter into a partnership with ICE to assist in federal immigration enforcement.[49] These agreements are authorized under 8 U.S.C. § 1357(g) or Immigration and Nationality Act (INA) section 287(g). The police chief cautioned that such a policy would discourage crime victims in immigrant communities from coming forward, harm the department's relationship of trust with the community, and subject the county to allegations of racial profiling.[50] Within two months, the BOCS modified the order, partly from fear that racial profiling litigation would ensue, and only required immigration status questions

---

40.   *Id.*

41.   *Id.* at 6.

42.   *Id.* at 7.

43.   The intense debate over the issue of immigration in Prince William County is the subject of a documentary film. 9500 LIBERTY (Interactive Democracy Alliance 2009).

44.   HOFFMASTER ET AL., *supra* note 9, at 14.

45.   *Id.*

46.   *Id.*

47.   *Id.* at 14–15.

48.   *Id.*

49.   *Id.* at 14–18. Under 8 U.S.C. § 1357(g), DHS is authorized to enter into written agreements with state and local law enforcement agencies to delegate immigration enforcement functions to select local law enforcement officers. OFFICE OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., THE PERFORMANCE OF 287(G) AGREEMENTS: REPORT UPDATE 2 (Sept. 2010), *available at* http://www.oig.dhs.gov/assets/Mgmt/OIG_10-124_Sep10.pdf. The agreements outline terms and conditions under which participating local personnel will function as immigration officers. *Id.* Pursuant to these agreements, designated officers who receive appropriate training and function under the supervision of sworn ICE officers are permitted to perform immigration law enforcement duties. *Id.*

50.   HOFFMASTER ET AL., *supra* note 9, at 15.

for those placed under arrest. So the policy became one of postarrest, rather than prearrest inquiry, and every person taken into custody had to be asked about immigration status.[51]

Around the same time and not far from Prince William County, Virginia, police officials in Montgomery County, Maryland also were reassessing their approach to encounters with immigrants. The police chief in Montgomery County was a thirty-year law enforcement veteran in the Washington, D.C. area.[52] Montgomery County experienced growth in the undocumented immigrant population beginning in 2005 and a simultaneous trend in increased crime in immigrant neighborhoods.[53] When the police chief took the helm in 2004, he knew that local political leaders and the community were accepting of the undocumented population; officers generally "did not question individuals about their immigration status."[54] However, as the media began linking crime to undocumented immigrants, the police department's policy was called into question.[55] In formulating an official policy, the chief wanted an approach that would facilitate the apprehension of undocumented immigrant criminals. However, he also wanted to enable officers to maintain positive relationships with immigrant communities.[56] After consulting with other law enforcement departments, the community, staff, and other residents, a new policy was adopted that requires the police only to forward to ICE the names of individuals arrested and charged with specified serious crimes.[57] To prevent racial profiling, the name of every person arrested for those crimes is forwarded to ICE.[58]

Arizona's enactment of S.B. 1070 and the notoriety of Sheriff Joe Arpaio of Maricopa County (Phoenix metropolitan area) contribute to the state's image as a hotbed for subfederal immigration enforcement. S.B. 1070 included a series of provisions that, among other things, made immigration enforcement a priority for local police and criminalized undocumented status under state statute. Arpaio's zealous workplace immigration raids and traffic checkpoint sweeps made the county the largest participant in the 287(g) program, responsible for tens of thousands of deportations of immigrants.[59] Any attempt to counter the state's message of hostility and unwelcome toward undocumented immigrants would appear to be futile. However, at least two Arizona police departments have tried.

The mayor of Phoenix has tried to counteract the anti-immigrant image that the state and county have developed. He accused Sheriff Arpaio of racial profiling

---

51.    *Id.* at 18.
52.    *Id.* at 20.
53.    *Id.* at 21.
54.    *Id.* at 20–21.
55.    *Id.* at 21.
56.    *Id.* at 21–22.
57.    *Id.* at 22.
58.    *Id.* at 23.
59.    *Id.* at 29.

and asked the U.S. Department of Justice (DOJ) to investigate Arpaio for allegedly violating the constitutional rights of immigrants.[60] Moreover, a local think tank concluded that Arpaio's tactics have actually resulted in increased crime, fewer arrests on criminal matters, and slower 911 responses.[61] In contrast to Arpaio, the Phoenix Police Department prefers to focus on serious, violent crime when it comes to undocumented immigrants, and prior to a 2007 killing of a police officer by an undocumented immigrant, the department's policy prohibited officers from contacting federal immigration officials.[62] After the shooting, the mayor proposed a revision to the policy, and now every person arrested is asked about citizenship status.[63] If an officer suspects that the individual is undocumented and a supervisor approves, federal ICE officials are contacted.[64] However, officers are prohibited from asking crime victims and witnesses about immigration status.[65] Traffic stops and other noncriminal encounters can result in a call to ICE if the officer suspects the person is undocumented.[66] The new policy is credited with contributing to a significant decrease in property and violent crimes.[67]

Another Maricopa County city, Mesa, has experienced a drop in crime because of police department policy changes, even though critics label the changes a "sanctuary policy."[68] The Mesa police chief and mayor were critical of Sheriff Arpaio's tactics that were viewed as undermining the police department's "relationship with the immigrant community."[69] Arpaio's sweeps forced residents to stay indoors and discouraged children from attending school, damaging the department's "efforts to build trust."[70] Police were concerned that undocumented immigrants were preying on other Latinos who were hesitant to report crimes out of fear of deportation.[71] A new police chief, who took over the position in 2006,

60.   *Id.* at 30. In March 2009, the DOJ launched a civil rights investigation of the sheriff's enforcement of federal immigration laws to determine whether deputies were engaging in "patterns or practices of discriminatory police practices and unconstitutional searches and seizures." *Id.* at 40. Later, in September 2010, the DOJ filed a lawsuit against the sheriff, his office, and the county for refusing full cooperation with the department's investigation. *Id.* Since 2007, the sheriff's office was responsible for nearly one-fourth of the nationwide total of deportations over a three-year period through its 287(g) program. *Id.* at 29. In October 2009, ICE declined to renew the portion of the county's 287(g) contract that allowed deputies to arrest immigration violators during patrols; however, the sheriff's office retained its authority to check the immigration status of all inmates booked into county jails. *Id.*
    61.   *Id.* at 31.
    62.   *Id.* at 31–32.
    63.   *Id.* at 32.
    64.   *Id.*
    65.   *Id.*
    66.   *Id.*
    67.   *Id.* at 31.
    68.   *Id.* at 38.
    69.   *Id.* at 39.
    70.   *Id.* at 39 (quoting a district commander from the Mesa Police Department).
    71.   *Id.* at 39–40.

sensed suspicion and mistrust between the police and the immigrant community.[72] By 2009, the chief and the mayor forged a city policy that sought to "build public confidence in the police and trust with the communities served."[73] Under the policy, the immigration status of persons arrested for criminal offenses is assessed. However, officers are not to ask about the immigration status of crime victims and witnesses, nor of anyone involved in minor misdemeanors or civil infractions, including traffic stops.[74]

New York City's policy evolved on the heels of the sanctuary movement on behalf of Central Americans. While the public trust and confidence argument is certainly advanced to justify the policy today, there is no doubt that New York City mayors—including current mayor Michael Bloomberg—have a very long and consistent proimmigrant worldview. Essentially, the city prohibits its employees from voluntarily providing federal immigration authorities with information concerning the immigration status of any alien. In August 1989, Edward Koch, then New York City's mayor, issued Executive Order No. 124. The Order prohibited any city officer or employee from transmitting information regarding the immigration status of any individual to federal immigration authorities unless (i) such employee's agency is required by law to disclose such information, (ii) an alien explicitly authorizes a city agency to verify his or her immigration status, or (iii) an alien is suspected by a city agency of engaging in criminal behavior.[75]

---

72. *Id.* at 40.
73. *Id.* at 43.
74. *Id.*
75. Executive Order 124 provides in pertinent part:
    Section 2. Confidentiality of Information Respecting Aliens.
    a. No City officer or employee shall transmit information respecting any alien to federal immigration authorities unless
        (1) Such officer's or employee's agency is required by law to disclose information respecting such alien, or
        (2) such agency has been authorized, in writing signed by such alien, to verify such alien's immigration status, or
        (3) such alien is suspected by such agency of engaging in criminal activity, including an attempt to obtain public assistance benefits through the use of fraudulent documents.
    b. Each agency shall designate one or more officers or employees who shall be responsible for receiving reports from such agency's line workers on aliens suspected of criminal activity and for determining, on a case by case basis, what action, if any, to take on such reports. No such determination shall be made by any line worker, nor shall any line worker transmit information respecting any alien directly to federal immigration authorities.
    c. Enforcement agencies, including the Police Department and the Department of Correction, shall continue to cooperate with federal authorities in investigating and apprehending aliens suspected of criminal activity. However, such agencies shall not transmit to federal authorities information respecting any alien who is the victim of a crime.
    Section 3. Availability of City Services to Aliens.
    Any service provided by a City agency shall be made available to all aliens who are otherwise eligible for such service unless such agency is required by law to deny eligibility for such service to aliens. Every City agency shall encourage aliens to make use of those services provided by such agency for which aliens are not denied eligible by laws.
City Policy Concerning Aliens, New York City Executive Order No. 124 (Aug. 7, 1989).

However, even if a city agency's line workers suspect an alien of criminal activity, the Executive Order prohibits them from transmitting information regarding such alien directly to the federal authorities.[76] Instead, it requires each agency to designate certain officers or employees to receive reports on suspected criminal activity from line workers and to determine on a case-by-case basis what action, if any, to take on such reports.[77] Mayor Koch's successors, David Dinkins and Rudolph Giuliani, reissued the Executive Order.

As noted previously, Los Angeles' 1979 police department policy predates the Central American-focused Sanctuary Movement of the 1980s. Special Order 40 (S.O. 40), entitled "Undocumented Aliens," LAPD's sanctuary policy, has been in place since November 27, 1979.[78] The order restrains police officers from engaging in action when the only purpose is to inquire about immigration status and arresting the person for entering the country illegally. In other words, officers are instructed not to enforce immigration violations that they are not witnessing.[79] On the other hand, when a person is arrested for more than one misdemeanor offense or something more serious, the arresting officers do have to notify a superior if the arrested person is determined to be undocumented. S.O. 40 was implemented to gain the trust of the immigrant community in an effort to encourage undocumented residents to report crimes without intimidation.[80]

---

76. *Id.*

77. *Id.*

78. Sturgeon v. Bratton, 95 Cal. Rptr. 3d 718, 724 (Ct. App. 2009). Prior to 1979, Special Order No. 68 and its Supplemental Fact Sheet, dated November 24, 1972, embodied LAPD policy regarding arrest for illegal entry into this country.

According to this directive, officers were not to initiate police action with the primary objective of discovering the alien status of a person where no crime-related issues were involved.

Whether or not a suspected undocumented alien was booked on criminal charges, the arresting officer was to contact by phone an immigration agent who would then interview the detainee to "determine the legality of the suspected person's presence in the United States." INS could place a teletype "hold" on the suspect which became effective after adjudication of any state criminal matter.

Where the detained person was not booked on a criminal charge and contact with the INS revealed undocumented status, the LAPD policy required an officer to consult divisional detectives or the watch commander for booking approval. Such approval might be obtained where "there is a likelihood that the release of an illegal alien will create additional police problems. (Example: Family dispute calls, possibility of an assault or ADW occurring, etc.)" If booking approval was denied, the suspect was to be released but the officer was to forward all available information as to the suspect's identity to Detective Headquarters Division (DHD).

With respect to suspected illegal aliens who were neither the object of a police investigation nor subject to booking, an officer "need not notify INS" but instead could merely forward information on the suspect to DHD. However, in urgent situations, such as fires or other disasters in which a suspected illegal alien was a victim or involved, an officer could notify DHD, which, in turn, would notify INS "who will take immediate action to aid this Department in alleviating the problem."

Gates v. Superior Court, 238 Cal. Rptr. 592, 595 (Ct. App. 1987). S.O. 40 was enacted to replace Special Order No. 68.

79. *Sturgeon*, 95 Cal. Rptr. 3d at 725.

80. *See* Mariel Garza, *Bratton: Special Order 40 Not Going Anywhere*, L.A. DAILY NEWS, Apr. 14,

Even in San Francisco today, public officials who support the city's sanctuary ordinance tout its public safety purpose. In explaining his support, one member of the San Francisco Board of Supervisors explained,

> If you are the victim of a crime and an undocumented person was the witness to that crime, you want that undocumented person to come forward and report what they saw to the police. . . . They're not going to come forward if they're afraid the police will report them to immigration.[81]

The idea is that the policy shielding immigrants from deportation benefits other San Franciscans as well.[82] Language in San Francisco's ordinance makes clear that actions of local authorities are not to "be construed or implemented so as to discourage any person, regardless of immigration status, from reporting criminal activity to law enforcement agencies."[83]

All of these examples reveal that while some local lawmakers and police officials may be motivated by sympathy for undocumented immigrants, the stated rationale behind the sanctuary or "don't ask" policies with respect to witnesses, victims, and low-level criminal arrests is public safety. The idea is that gaining the trust of all parts of the community is important to keeping the entire community safe.

### III. CONSTITUTIONALITY

The question of whether sanctuary policies of police departments and local jurisdictions are constitutional has been raised in some interesting circumstances. For example, San Francisco's ordinance received special attention in 2008 following accusations that twenty-two-year-old Edwin Ramos committed a triple homicide. It seems that at the age of thirteen, the Salvadoran-born Ramos had served time in San Francisco Juvenile Hall for two felonies and was never deported. Ramos should have been reported to immigration officials under the policy at the time but he fell through the cracks. In what critics regard as an overreaction, Gavin Newsom, the mayor at the time, ordered juvenile probation authorities to treat arrested juveniles prior to conviction the same as arrested adults under the 1993 amendment.[84] Prior to Newsom's order, only arrested (but not yet convicted) adults were reported to immigration authorities. The new order

---

2008, *available at* http://www.insidesocal.com/friendlyfire/2008/04/bratton-special-order-40-not-g.html; *In the Real World: The Myths Surrounding the LAPD's Special Order 40 May Hinder Action on Criminal Deportations*, L.A. TIMES, Apr. 9, 2008, at A16, *available at* http://articles.latimes.com/2008/apr/09/opinion/ed-gangs9.

    81.   Richard Gonzales, *San Francisco Youth Sanctuary Law Prompts Battle*, NPR ALL THINGS CONSIDERED (Nov. 4, 2009), *available at* http://www.wbur.org/npr/120061381/san-francisco-youth-sanctuary-law-prompts-battle (quoting Supervisor David Campos).

    82.   *Id.*

    83.   *See infra* note 85 (text of the ordinance).

    84.   *See infra* notes 85–88 and accompanying text.

required arrested juveniles to be reported to ICE before conviction as well, even if charges were later dropped. Many members of the San Francisco Board of Supervisors bristled at the policy shift, arguing that reporting juveniles prior to any conviction was a stunning setback to sanctuary principles because juveniles are much different from adults under conventional norms of public policy. Within a year, the Board, over Newsom's veto, passed legislation that permits reporting of juveniles to ICE only upon a finding by the juvenile court that the minor committed a felony or if the juvenile is treated as an adult by the superior court.[85]

---

85.  Maria L. La Ganga, *S.F. Overrides Sanctuary Veto*, L.A. TIMES, Nov. 11, 2009, at A3. San Francisco's ordinance currently reads as follows:

   Sec. 12H.2. Use of City Funds Prohibited.

   No department, agency, commission, officer or employee of the City and County of San Francisco shall use any City funds or resources to assist in the enforcement of Federal immigration law or to gather or disseminate information regarding the immigration status of individuals in the City and County of San Francisco unless such assistance is required by Federal or State statute, regulation or court decision. The prohibition set forth in this Chapter shall include, but shall not be limited to:

   (a) Assisting or cooperating, in one's official capacity, with any investigation, detention, or arrest procedures, public or clandestine, conducted by the Federal agency charged with enforcement of the federal immigration law and relating to alleged violations of the civil provisions of the Federal immigration law.

   . . . .

   (c) Requesting information about, or disseminating information regarding, the immigration status of any individual, or conditioning the provision of services or benefits by the City and County of San Francisco upon immigration status, except as required by Federal or State statute or regulation, City and County public assistance criteria, or court decision.

   (d) Including on any application, questionnaire or interview form used in relation to benefits, services or opportunities provided by the City and County of San Francisco any question regarding immigration status other than those required by Federal or State statute, regulation or court decision. Any such questions existing or being used by the City and County at the time this Chapter is adopted shall be deleted within sixty days of the adoption of this Chapter.

   Sec. 12H.2-1. Chapter Provisions Inapplicable to Persons Convicted of Certain Crimes.

   Nothing in this Chapter shall prohibit, or be construed as prohibiting, a Law Enforcement Officer from identifying and reporting any adult pursuant to State or Federal law or regulation who is in custody after being booked for the alleged commission of a felony and is suspected of violating the civil provisions of the immigration laws. In addition, nothing in this Chapter shall prohibit, or be construed as prohibiting, a Law Enforcement Officer from identifying and reporting any juvenile who is suspected of violating the civil provisions of the immigration laws if: (1) . . . (2) the San Francisco Superior Court makes a finding of probable cause after the District Attorney directly files felony criminal charges against the minor in adult criminal court; or (3) the San Francisco Superior Court determines that the minor is unfit to be tried in juvenile court, the minor is certified to adult criminal court, and the Superior Court makes a finding of probable cause in adult criminal court.

   Nothing in this Chapter shall preclude any City and County department, agency, commission, officer or employee from (a) reporting information to the Federal agency charged with enforcement of the Federal immigration law regarding an individual who has been booked at any county jail facility, and who has previously been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under State law; (b) cooperating with a request from the Federal agency charged with enforcement of Federal immigration law for information regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under State law; or (c) reporting information as

Interestingly, the controversy placed a spotlight on the general constitutionality of San Francisco's entire sanctuary ordinance. In response to the Board's override of the Mayor's veto, the San Francisco City Attorney's office warned that the action was "likely to result in a federal legal challenge to the [new legislation] and possibly the entire City of Refuge Ordinance."[86] In his veto message, the Mayor argued that the "sanctuary ordinance as originally conceived . . . was designed to protect those residents . . . who are law abiding. It was never meant to serve as a shield for people accused of committing serious crimes . . . . [The] changes [adopted by the Board of Supervisors] threaten the very existence of our sanctuary ordinance."[87] Newsom's spokesman announced to the press that the supervisors' vote could invite a federal legal challenge to the city's entire sanctuary policy.[88]

Implicit in these expressions of caution that San Francisco's entire sanctuary ordinance may be subject to challenge is a fear that somehow the policy conflicts with or is in violation of federal law. The caution is particularly interesting in today's political environment because state and local anti-immigrant laws, such as those enacted in Arizona, Alabama, Utah, Mississippi, and the cities of Hazleton, Pennsylvania, and Farmers Branch, Texas, have been challenged on the grounds that they conflict with federal immigration laws. The proimmigrant position in the later situations is that only the federal government has the authority to regulate immigrants. The intriguing question is whether that position is consistent with the proimmigrant position that a sanctuary ordinance, such as San Francisco's, is

---

required by Federal or State statute, regulation or court decision, regarding an individual who has been convicted of a felony committed in violation of the laws of the State of California, which is still considered a felony under State law. For purposes of this Section, an individual has been "convicted" of a felony when: (a) there has been a conviction by a court of competent jurisdiction; and (b) all direct appeal rights have been exhausted or waived; or (c) the appeal period has lapsed.

    However, no officer, employee or law enforcement agency of the City and County of San Francisco shall stop, question, arrest or detain any individual solely because of the individual's national origin or immigration status. In addition, in deciding whether to report an individual to the Federal agency charged with enforcement of the Federal immigration law under the circumstances described in this Section, an officer, employee or law enforcement agency of the City and County of San Francisco shall not discriminate among individuals on the basis of their ability to speak English or perceived or actual national origin.

    . . . .

    Nothing herein shall be construed or implemented so as to discourage any person, regardless of immigration status, from reporting criminal activity to law enforcement agencies.

S.F., CAL., ADMIN. CODE §§ 12.H.2 to 12.H.2-1 (1993).

    86.   Legal Issues in Connection with Proposed Amendment to Sanctuary Ordinance, Memorandum from Buck Delventhal, Miriam Morley & Wayne Snodgrass, Deputy City Att'ys of S.F., to Mayor Gavin Newsom (Aug. 18, 2009).

    87.   Letter from Mayor Gavin Newsom to Angela Calvillo, Clerk of the Bd. of Supervisors (Oct. 28, 2009) (on file with author).

    88.   Jesse McKinley, *San Francisco to Delay Reports on Charges Against Immigrants*, N.Y. TIMES, Oct. 20, 2009, at A19.

constitutional and does not contravene the principle that only the federal government has the authority to regulate immigrants.

In this Section, I analyze these constitutional questions. First, I review the approaches that two courts have used in reviewing sanctuary policies in two different contexts to provide a starting point. One involves New York City's ordinance in which the U.S. Court of Appeals for the Second Circuit denied the city's Tenth Amendment challenge to federal statutes that appeared to disrupt the protections afforded by the ordinance. The other is a California court of appeal decision in favor of the LAPD's special order that had been challenged on preemption grounds. With those cases as a background, I look closer at the federal statutes that set their sights on sanctuary ordinances and conclude that the federal provisions have serious Tenth Amendment problems. Since sanctuary policies primarily are enacted for public safety purposes, federal policies that intrude on those goals face serious problems. Although most cities with such policies do not restrain officers from voluntarily providing information to ICE out of fear that such a restraint would violate the federal law, I believe that fear is unwarranted. If the federal law mandates cooperation, serious commandeering problems arise under the Tenth Amendment. However, assuming that the federal statutes survive Tenth Amendment scrutiny, I then address the question of whether sanctuary laws are preempted under the Supremacy Clause. I conclude that sanctuary policies that bar local officials from asking crime victims and witnesses about immigration status are not susceptible to preemption claims (field, implied, or conflict). Sanctuary laws are about public safety and how to prioritize the spending of public funds, not about regulating immigration.

### A. City of New York v. United States

The City of New York directly challenged the constitutionality of two federal antisanctuary laws—8 U.S.C. §§ 1373 and 1644—in the context of the city's own sanctuary ordinance in *City of New York v. United States*.[89] The city argued that the federal laws violated the Tenth Amendment, but the U.S. Court of Appeals for the Second Circuit disagreed.

Sections 1373 and 1644, which have similar language, are from parts of two pieces of legislation enacted by Congress in 1996. The Welfare Reform Act, signed into law by President Clinton in August 1996, contained a provision (section 434), entitled "Communication between State and Local Government Agencies and the Immigration and Naturalization Service," which became 8 U.S.C. § 1644 and reads,

> Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and

---

89.   179 F.3d 29 (2d Cir. 1999).

Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

The Conference Report accompanying the bill made clear that the purpose was to encourage communication from subfederal officials to federal officials:

> The conferees intend to give State and local officials the authority to communicate with the INS regarding the presence, whereabouts, or activities of illegal aliens. . . . The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.[90]

Then in September 1996, Clinton signed an immigration reform law that contained a provision (section 642) entitled "Communication between Government Agencies and the Immigration and Naturalization Service," which essentially expanded on § 1644 and became § 1373:

> (a) In General
>
> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.
>
> (b) Additional Authority of Government Entities
>
> Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:
>
> > (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
> >
> > (2) Maintaining such information.
> >
> > (3) Exchanging such information with any other Federal, State, or local government entity.
>
> (c) Obligation to Respond to Inquiries
>
> The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information. [91]

---

90.   H.R. REP. NO. 104-725, at 383 (1996), *reprinted in* 1996 U.S.C.C.A.N. 2649, 2771.
91.   8 U.S.C. § 1373 (2006); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 642, 110 Stat. 3009-707 (1996).

A Senate committee report accompanying this legislation explained that the purpose of the law was to acquire and "exchange . . . immigration-related information by State and local agencies" pertaining to the regulation of immigration.[92]

After the enactment of these laws, the City of New York became concerned that §§ 1373 and 1644 would jeopardize its sanctuary policy described above.[93] Although no city officials claimed that the city had restrained them from communicating with immigration officials, shortly after the laws went into effect, the city sought declaratory and injunctive relief, asserting that the federal laws did not invalidate the city's Executive Order. The city complained that because §§ 1373 and 1644 were aimed at state and local government entities, the laws violated the Tenth Amendment. In essence, the city argued that Congress could not restrict subfederal entities from controlling any immigration status information they obtained as they saw fit. The city asserted that the federal law was interfering with control of its own employees.[94]

The Second Circuit divided the city's Tenth Amendment arguments into two parts: (1) a state sovereignty claim that included the power to choose not to participate in federal regulatory programs and to stop local officials from participating even on a voluntary basis; and (2) a claim that the federal government cannot act in a manner that disrupts the actual operation of state and local government, such as by dictating the use of state and local resources or duties of local officials.[95] The city relied on *Printz v. United States* (federal gun control) and *New York v. United States* (radioactive waste legislation), both Tenth Amendment cases,[96] to support its claim that states have a choice about participating in federal regulatory programs and that the choice includes the ability to bar voluntary cooperation by local officials.[97]

The Second Circuit did not agree with the city's interpretation of Tenth Amendment case law. The court was cognizant of the Tenth Amendment's language that "[t]he powers not delegated to the United States . . . are reserved to the States," and the court acknowledged that "however plenary Congress's power to legislate in a particular area may be, the Tenth Amendment prohibits Congress from commanding states to administer a federal regulatory program in that area. Moreover, 'Congress cannot circumvent that prohibition by conscripting the State's officers directly.'"[98] However, the court thought that §§ 1373 and 1644 were different. In *Printz* and *New York*, Congress improperly forced states to enact

---

92.   S. REP. NO. 104-249, at 19–20 (1996).
93.   *See supra* notes 75–77 and accompanying text.
94.   *City of New York*, 179 F.3d at 33.
95.   *Id.* at 34.
96.   Both cases are discussed more fully below. *See infra* notes 162–71 and accompanying text.
97.   *City of New York*, 179 F.3d at 34.
98.   *Id.* at 33–34 (citing Printz v. United States, 521 U.S. 898, 935 (1997)).

or administer federal regulatory programs.[99]

The central teaching of these cases is that "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts."[100] Congress may not, therefore, directly compel states or localities to enact or to administer policies or programs adopted by the federal government. It may not directly shift to the states enforcement and administrative responsibilities allocated to the federal government by the Constitution.[101]

However, in the case of §§ 1373 and 1664, Congress was, in the Second Circuit's view, neither forcing subfederal entities to enact or administer a federal program nor conscripting local officials to do federal work. The federal laws simply prevented subfederal rule makers from "directly restricting the voluntary exchange of immigration information" with the immigration officials.[102]

Based on its reading of the Tenth Amendment jurisprudence, the Second Circuit found the city's rule problematic. By prohibiting any city officer or employee from transmitting information regarding the immigration status of any individual to federal immigration authorities, the executive order constituted a mandatory noncooperation directive to even those workers who might want to cooperate voluntarily. That directive was sufficient to forfeit the Tenth Amendment protections as outlined in *Printz* and *New York*.[103]

The city also argued that the federal law violated the Tenth Amendment because §§ 1373 and 1644 interfered with the city's operations by regulating confidential information obtained in the course of official business and seeking to control the actions of city officials. In support of this argument, the city pointed to *Printz*, where the Supreme Court also was critical of Congress for requiring local police officers to report privately obtained "information that belongs to the State and is available to them only in their official capacity," as part of the Brady bill.[104] The city argued that §§ 1373 and 1644 would improperly take control of its information, and that would violate its power to "determine the duties and responsibilities" of its own employees.[105]

Although the Second Circuit acknowledged the federal policy's interference

---

99.   *Id.* at 34. In *Printz*, local law enforcement had to conduct background checks for gun purchases, while in *New York*, state officials had to enact nuclear waste disposal rules and take title of anything that was not properly disposed of. *See infra* notes 169–71 and accompanying text.

100.   New York v. United States, 505 U.S. 144, 166 (1992) (citations omitted).

101.   *City of New York*, 179 F.3d at 34.

102.   *Id.* at 35.

103.   *Id.* After the *City of New York* case, the executive order in New York was changed to make clear that immigration status is a proper subject of inquiry when required by federal officials, and voluntary cooperation by local officials is not barred if they have that information. *See* City Policy Concerning Immigrant Access to City Services, New York City Executive Order No. 34 (May 13, 2003), *available at* http://www.nyc.gov/html/om/pdf/eo/eo_34.pdf.

104.   *City of New York*, 179 F.3d at 36 (citing Printz, 521 U.S. at 933 n.17) (emphasis omitted).

105.   *Id.*

with "the City's control over confidential information obtained in the course of municipal business," the court did not regard this as an "impermissible intrusion" on the city's authority.[106] The only policy cited by the city that was disrupted was the sanctuary executive order that "single[d] out a particular federal policy for non-cooperation."[107] The city's order did not prevent voluntary sharing of immigration information with nonfederal immigration agents, suggesting to the court that the Executive Order was not very "integral" to local government operations.[108]

The Second Circuit's analysis definitely leaves room for subfederal sanctuary-style approaches in spite of §§ 1373 and 1644. Voluntary cooperation with ICE by local officials cannot be thwarted by sanctuary rules according to the Second Circuit.[109] However, this assumes that local officials have information to share, and the *City of New York* decision did not address the policy of instructing local police to not ask about immigration status. Additionally, if the confidentiality policy on immigration status is one that applies generally and is not exclusively aimed at ICE, then the situation is quite different. Finally, nothing in the Second Circuit's opinion suggests that Congress or federal officials could force local officials to gather immigration information about crime victims, crime witnesses, or for that matter, arrestees.

As noted below, the Second Circuit's interpretation of the Tenth Amendment vis-à-vis New York City's sanctuary policies also is subject to criticism. The Second Circuit viewed §§ 1373 and 1644 as prohibitions from restricting voluntary cooperation with immigration officials.[110] However, if the statutes are interpreted as a mandate to permit voluntary cooperation, then there may in fact be a Tenth Amendment problem.[111]

### B. Sturgeon v. Bratton

In *Sturgeon v. Bratton*,[112] Judicial Watch filed a taxpayer lawsuit, on behalf of Harold Sturgeon, against the LAPD in an attempt to put a stop to S.O. 40, the department's sanctuary policy that had been in place since 1979.[113] Judicial Watch is a conservative, educational foundation that boasts as one of its special projects

---

106.   *Id.*

107.   *Id.* at 37.

108.   *Id.* As I argue below, I believe that the city's argument for not asking about immigration status—at least as far as crime victims and witnesses, and even minor offenders—is a good one in terms of invoking the Tenth Amendment when the goal is public safety for everyone through gaining the trust of immigrant communities. *See infra* notes 180–83 and accompanying text.

109.   *City of New York*, 179 F.3d at 34–37.

110.   *Id.* at 34–35.

111.   *See infra* notes 146, 180 and accompanying text.

112.   95 Cal. Rptr. 3d 718 (Ct. App. 2009).

113.   *Id.* at 724; *see also* Tom Fitton, *You Can't Trust ACLU*, JUDICIAL WATCH (Jan. 8, 2010), http://www.judicialwatch.org/weeklyupdate/2010/01-you-cant-trust-aclu.

the removal of undocumented immigrants.[114] The action against the police chief and others sought to enjoin enforcement of S.O. 40, the policy governing the police department's interaction with undocumented immigrants.

S.O. 40 bars LAPD officers from engaging in action when the sole purpose is determining the immigration status of a suspect and arresting such persons for the federal crime of illegally entering the United States. Stated broadly, S.O. 40 prevents LAPD officers from initiating investigations for the purpose of finding violations of civil immigration laws and from arresting a suspect for an immigration misdemeanor not committed in the officers' presence.[115] In an earlier 1987 case, the California Court of Appeal upheld S.O. 40 against a challenge that the "mere questioning of a criminal arrestee about his immigration status" and forwarding the information to the INS amounted to unconstitutional state enforcement of federal civil immigration law.[116] That court found that the U.S. Constitution did not prevent the LAPD from voluntarily transferring arrest information to federal authorities.[117] Under S.O. 40, "undocumented alien status in itself is not a matter for police action," and S.O. 40 directs officers not to "initiate police action with the objective of discovering the alien status of a person." However, "[w]hen an undocumented alien is booked for multiple misdemeanor offenses, a high grade misdemeanor or a felony offense, or has been previously arrested for a similar offense," the arresting officer shall notify Detective Headquarters Division of the arrest which, in turn, relays the information to immigration officials.[118]

Subsequently in 1996, as noted above, Congress enacted 8 U.S.C. § 1373, aimed at invalidating subfederal attempts to restrict local officials from voluntarily providing immigration information to federal immigration officials.[119] In *Sturgeon v. Bratton*, the plaintiff Sturgeon argued that S.O. 40, as a local restriction, was

---

114. *See Our Programs*, JUDICIAL WATCH, http://www.judicialwatch.org/programs (last visited Sept. 22, 2011).

115. *Sturgeon*, 95 Cal. Rptr. 3d at 725.

[S.O.] 40 was promulgated by then Chief of Police Daryl Gates on November 27, 1979. Special orders are directives issued by the chief of police which amend the LAPD Manual. Although the parties and apparently, members of the community continue to refer to the LAPD's policy regarding illegal immigrants as "SO40," the relevant provision is in the LAPD Manual with a different section number. Volume IV, section 264.50 of the LAPD Manual provides, "ENFORCEMENT OF UNITED STATES IMMIGRATION LAWS. Officers shall not initiate police action where the objective is to discover the alien status of a person. Officers shall neither arrest nor book persons for violation of Title 8, Section 1325 of the United States Immigration Code (Illegal Entry)."

*Id.* at 724–25.

116. Gates v. Superior Court, 238 Cal. Rptr. 592, 600 (Ct. App. 1987).

117. *Id. Gates* involved a challenge to LAPD procedures before and after S.O. 40, by individuals encountered by LAPD prior to S.O. 40. The court of appeals concluded that the prior procedures were flawed.

118. *Id.* at 595.

119. 8 U.S.C. § 1373 (2006). The background to § 1373 is set forth in the discussion of *City of New York v. United States. See supra* notes 91–92 and accompanying text.

invalidated by § 1373. Namely, the plaintiff took the position that S.O. 40 violated the Supremacy Clause because S.O. 40 conflicted with § 1373. Sturgeon also argued that federal immigration law preempted S.O. 40.[120]

In turning down the challenge, the state court of appeals began by noting that "[u]nder federal law, matters of immigration are handled by [ICE], a branch of the Department of Homeland Security."[121] Although the Attorney General of the United States may enter into a 287(g) agreement with local officials to help carry out the function of immigration officers, this requires a voluntary agreement, and the local officers would be subject to the supervision of federal officers.[122] Although the Attorney General has the authority to use local law enforcement officers to help respond in an emergency in dealing with a mass influx of aliens, the Attorney General can only act "with the consent of the head of the department, agency, or establishment under whose jurisdiction the individual is serving" in those circumstances.[123]

While the *Sturgeon* court did not rule on whether § 1373 violated the Tenth Amendment, the court noted that the Tenth Amendment "shields state and local governments from the federal government requiring them to administer federal civil immigration law."[124] Although state law permits local police to enforce federal criminal statutes,[125] as a practical matter California police likely would never make an arrest for misdemeanor illegal entry because California officers may arrest for a misdemeanor only committed in the officer's presence.[126]

Turning to the plaintiff's Supremacy Clause and preemption claims, the *Sturgeon* court also considered the language of § 1373(a) that prohibits local authorities from stopping local officers from voluntarily cooperating with ICE.[127] Section 1373(b) goes on to provide that no person or agency may prohibit or restrict a local entity from "(1) sending such information to, or requesting and receiving such information from, [ICE;] (2) maintaining such information[;] or (3) exchanging such information with any other . . . government entity."[128] Finally, § 1373(c) requires ICE to respond to any inquiry by a federal, state, or local government agency "seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose

---

120.   *Sturgeon*, 95 Cal. Rptr. 3d at 723.
121.   *Id.*
122.   8 U.S.C. § 1357(g)(3) (2006).
123.   *Id.* § 1103(a)(10).
124.   *Sturgeon*, 95 Cal. Rptr. 3d at 724. The court's approach appeared to assume that 8 U.S.C. § 1373 was constitutional.
125.   Gates v. Superior Court, 238 Cal. Rptr. 592, 597–98 (Ct. App. 1987).
126.   CAL. PENAL CODE § 836(a) (West 2010).
127.   8 U.S.C. § 1373(a).
128.   *Id.* § 1373(b).

authorized by law, by providing the requested verification or status information."[129]

In attempting to establish that S.O. 40 violates § 1373, the plaintiff took the depositions of high-ranking LAPD officers (past and present), presumably in the hopes of learning how S.O. 40 may have prohibited individual officer action that violated § 1373. However, the plaintiff learned of no specific instance where S.O. 40 was applied. The plaintiff did not produce any evidence of individuals who had been prohibited by S.O. 40 from sending to ICE officials information regarding the immigration status of an individual, evidence of "individuals prohibited by S.O. 40 from receiving information from immigration officials, maintaining immigration information, and exchanging immigration information with any law enforcement agency," nor evidence of any officers who "complained about the prohibitions" of S.O. 40.[130]

The plaintiff argued that S.O. 40 violated the Supremacy Clause simply because S.O. 40 was impermissible under § 1373. To succeed with this facial challenge, the court ruled that Sturgeon had to "establish that S.O. 40's provisions *inevitably* posed a present total and fatal conflict with section 1373";[131] a hypothetical conflict would not suffice. So the court looked closely at the language of the order and the federal statute. The text of S.O. 40 provides: "Officers shall not initiate police action where the objective is to discover the alien status of a person. Officers shall neither arrest nor book persons for violation of Title 8, Section 1325 of the United States Immigration Code (Illegal Entry)." On the other hand, § 1373(a) simply does not allow local officials from prohibiting local officers from voluntarily communicating with ICE. In the court's opinion, the language of these provisions demonstrated no "total and fatal conflict."[132]

In the court's assessment, S.O. 40 simply does not address communication with ICE which is the subject of § 1373; S.O. 40 addresses the initiation of police action and arrests for unauthorized entry. On the other hand, § 1373(a) does not address the initiation of police action or arrests for unauthorized entry; it addresses only communication with ICE. In other words, S.O. 40 bars the initiation of police action solely to discover immigration status, what might be characterized as a "don't ask" policy. However, if local officials are aware of immigration status and want to communicate with federal officials, § 1373 protects those officials from a "don't tell" policy. The court did not agree with Sturgeon that the language of § 1373(a) restricting the "sending" of information to ICE should be read to conflict with a prohibition on "obtaining information" that could be sent to ICE.[133] In the court's view, § 1373(b) applies to restrictions on

---

129.    *Id.* § 1373(c).
130.    Sturgeon v. Bratton, 95 Cal. Rptr. 3d 718, 726 (Ct. App. 2009).
131.    *Id.* at 730.
132.    *Id.* at 731.
133.    *Id.*

local entities that deal with the maintenance and exchange of information. Congress had the opportunity to prohibit restrictions on the obtaining of immigrant status information by local entities, but did not.[134]

Moreover, if "in any way restrict[ing]" communication with ICE is read to include *obtaining information* to give ICE, there would be no need for § 1373(b) to specifically permit local entities to maintain immigration information and exchange it with other governmental entities as maintaining such information and obtaining it from other governmental entities makes the information available to be transmitted to ICE.[135]

In short, the court felt that Sturgeon's "strained interpretation" of § 1373 was not supported by the language of the statute.[136]

The heart of Sturgeon's preemption claim was based on an alleged overlap between S.O. 40 and § 1373 resulting in the federal law preempting the department's order. However, the plaintiff offered no evidence that, as applied, S.O. 40 overlapped with the restrictions of § 1373. The court would not nullify the order on preemption grounds simply based on a "hypothetical possibility" of being applied in contravention to § 1373.[137]

The court acknowledged that the power to regulate immigration generally is viewed as an exclusive federal power. However, that does not mean that every subfederal regulation "touching on aliens" is invalid.[138] Invalid state regulations of immigration involve laws that determine who "should or should not be admitted into the country, and the conditions under which a legal entrant may remain."[139] Short of that, the subfederal law is preempted only when compelled by "affirmative congressional action."[140] Here, S.O. 40 is a "regulation of police conduct and not a regulation of immigration," so preemption did not apply.[141]

The court also concluded that S.O. 40 is not preempted on the grounds that it conflicts with the intent of Congress in enacting § 1373 and "stands as an obstacle to the accomplishment" of that intention.[142] The goal of § 1373 was to make sure that "the voluntary flow of immigration information" to ICE from local officials was not restricted. Here, that "voluntary flow of immigration information" was not affected between LAPD officers and ICE.[143] S.O. 40

---

134.  *Id.* As I explain later in the Article, in my view the Tenth Amendment would prohibit Congress from requiring local entities to obtain immigration information under anticommandeering principles.

135.  *Id.*

136.  *Id.*

137.  *Id.*

138.  *Id.* at 732.

139.  *Id.*

140.  *Id.* (citing *In re* Jose C., 87 Cal. Rptr. 3d 674, 687 (2009)).

141.  *Id.*

142.  *Id.*

143.  *Id.*

concerns the initiation of investigations and does not bar any officers from voluntarily contacting ICE. There was no evidence that S.O. 40 was applied or interpreted in a way that conflicted with § 1373, and the court would not make any assumptions to the contrary.[144]

### C. The Tenth Amendment and Preemption

In order to place *City of New York v. United States* and *Sturgeon v. Bratton* in proper context for evaluating sanctuary policies, we should step back a little, and take a closer look at the Tenth Amendment and the preemption doctrine. We need to ask whether federal laws violate the Tenth Amendment in precluding sanctuary policies. We also need to know if sanctuary policies are threatened by the preemption doctrine.

### 1. Tenth Amendment

A logical place to begin the constitutional analysis is in determining whether the federal law with which sanctuary laws may be in conflict is valid. Namely, we need to address the question of whether 8 U.S.C. §§ 1373 and 1644 are constitutional before we need to concern ourselves with whether they preempt sanctuary laws. Since the field of immigration is clearly within Congress's province to act, in answering the question of the constitutionality of these federal laws, Tenth Amendment jurisprudence becomes relevant.

As discussed above, in *City of New York v. United States*, the city argued that 8 U.S.C. §§ 1373 and 1644 were unconstitutional on the grounds that the federal laws violated the Tenth Amendment by not allowing the city to control immigration status information as it saw fit and interfered with control of its own employees.[145] The Second Circuit did not agree with the city's Tenth Amendment claim because the laws did not, in the court's opinion, compel New York City to enforce federal immigration laws; rather, the law simply forbade restrictions on voluntary cooperation, and the court concluded that the Tenth Amendment did not protect the states from passive resistance.[146] Additionally, the court held that the federal laws did not interfere with the city's general police power to regulate its operations without more evidence that the city's ordinance was intended as a more generalized restriction on the dissemination of confidential information.[147]

---

144.  *Id. Sturgeon* also relied on 8 U.S.C. § 1644, "which prevents prohibitions or restrictions on the communications between any '[s]tate or local government *entity*' and ICE." *Id.* at 725 n.6. However, the court found that this case concerned communication between officers (not entities) and ICE, so § 1644 was not relevant. *Id.*

145.  *See supra* notes 89–111 and accompanying text.

146.  City of New York v. United States, 179 F.3d 29, 37 (2d Cir. 1999).

147.  In fact in 2001, "New York City voters responded by adopting an amendment to the city's charter embodying the structural privacy principles that the [Second Circuit] had tentatively articulated," in order to strengthen the city's Tenth Amendment claim. Anil Kalhan, *The Fourth*

A fair reading of the Supreme Court's most recent cases on the Tenth Amendment (including a Supreme Court case decided after the Second Circuit decision) suggests that the Second Circuit's reasoning is plausible with respect to New York City's policy at the time. However, the cases also suggest that the constitutionality of the federal laws can turn on whether they are interpreted to affirmatively mandate certain behavior by subfederal officials or simply prohibit certain conduct. Whichever reading, the Supreme Court's jurisprudence in the area provides ample support for the constitutionality of sanctuary policies that do not restrict voluntary cooperation with federal immigration authorities. However, in spite of the Second Circuit's opinion to the contrary, in my view, Supreme Court jurisprudence is not definitive on the question of whether federal laws could validly prohibit subfederal laws that restrict even voluntary cooperation with federal officials.

The Tenth Amendment provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The Tenth Amendment has been interpreted "to encompass any implied constitutional limitation on Congress's authority to regulate state activities, whether grounded in the Tenth Amendment itself or in principles of federalism derived generally from the Constitution."[148] And, "the Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States."[149]

In the 1990s, the Supreme Court began using the Tenth Amendment more boldly to place limits on congressional power. Under this approach, the Tenth Amendment is a key protection of states' rights and federalism. The idea is that the Tenth Amendment reserves a zone of activity to the states for their exclusive control, and federal laws intruding into this zone should be declared unconstitutional.[150]

Three common justifications are offered for the use of the Tenth Amendment in protecting federalism. "The first justification for protecting states from federal intrusions is that the division of power vertically, between federal and state governments, lessens the chance of federal tyranny."[151] "A second frequently invoked value of federalism is that states are closer to the people and thus more likely to be responsive to public needs and concerns."[152] Of course this value of federalism could be inconsistent with the first value.

To the extent that voters at the state and local level prefer tyrannical rule

*Amendment and Privacy Implications of Interior Immigration Enforcement*, 41 U.C. DAVIS L. REV. 1137, 1215 (2008).
148.    South Carolina v. Baker, 485 U.S. 505, 511 n.5 (1988).
149.    New York v. United States, 505 U.S. 144, 157 (1992).
150.    ERWIN CHEMERINSKY, CONSTITUTIONAL LAW 313 (3rd ed. 2009).
151.    *Id.* at 313–14.
152.    *Id.* at 314.

or, more likely, rule that abuses a particular minority group, greater responsiveness increases the dangers of subfederal government tyranny. In other words, the substantive result of decreasing tyranny will not always be best achieved by the approach of maximizing electoral responsiveness; indeed, the reverse might well be the result. In fact, there is a greater danger of special interests capturing government at smaller and more local levels.[153]

This concern is important in understanding why subfederal anti-immigrant laws do not earn Tenth Amendment protections, in my view.[154] "A final argument made for protecting federalism is that states can serve as laboratories for experimentation."[155] In the words of Louis Brandeis: "It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country."[156] But again, if local experimentation tyrannizes a particular minority group (e.g., immigrants) then the values of the Tenth Amendment are not achieved through protecting states' rights.

The Tenth Amendment cases of the 1990s were grounded in the Supreme Court's 1976 case, *National League of Cities v. Usery.*[157] There, the court declared unconstitutional the application of the Fair Labor Standards Act, which required the payment of the minimum wage to state and local employees. "[T]here are limits upon the power of Congress to override state sovereignty, even when

---

153.   *Id.* at 314–15.

154.   *See supra* notes 180–83 and accompanying text.

155.   CHEMERINSKY, *supra* note 150, at 315.

156.   *Id.* Some have argued that local experimentation should be permitted in the immigration field. *See, e.g.*, Cristina M. Rodríguez, *The Significance of the Local in Immigration Regulation*, 106 MICH. L. REV. 567 (2008) (arguing that the "primary function state and local governments play [with regard to migration management] is to facilitate the integration of immigrants into public life"); Peter H. Schuck, *Taking Immigration Federalism Seriously*, 2007 U. CHI. LEGAL F. 57 (2007) (advocating local involvement in immigration because "in the administration and enforcement of immigration policy, the federal government needs all the help it can get"); Peter J. Spiro, *Learning to Live with Immigration Federalism*, 29 CONN. L. REV. 1627 (1997) (arguing that local participation serves as a "steam-valve" for federal immigration policy). This argument has been made in response to scholars who have concluded that local efforts to regulate immigration are generally preempted. *See, e.g.*, Pratheepan Gulasekaram & Rose Cuison Villazor, *Sanctuary Policies and Immigration Federalism: A Dialectic Analysis*, 55 WAYNE L. REV. 1683 (2009); Clare Huntington, *The Constitutional Dimension of Immigration Federalism*, 61 VAND. L. REV. 787 (2008); Hiroshi Motomura, *Federalism, International Human Rights, and Immigration Exceptionalism*, 70 U. COLO. L. REV. 1361 (1999); Huyen Pham, *The Constitutional Right Not to Cooperate? Local Sovereignty and the Federal Immigration Power*, 74 U. CIN. L. REV. 1373 (2006); Rick Su, *A Localist Reading of Local Immigration Regulations*, 86 N.C. L. REV. 1619 (2008); Michael J. Wishnie, *Laboratories of Bigotry? Devolution of the Immigration Power, Equal Protection, and Federalism*, 76 N.Y.U. L. REV. 493 (2001); Michael J. Wishnie, *State and Local Police Enforcement of Immigration Laws*, 6 U. PA. J. CONST. L. 1084 (2004). These articles on federalism and immigration offer theoretical suggestions. However, in this Article, I rely on the actual approach that the Supreme Court is using with respect to federalism and the Supremacy Clause.

157.   426 U.S. 833 (1976).

exercising its otherwise plenary powers to tax or to regulate commerce."[158] Requiring states to pay their employees the minimum wage violated the Tenth Amendment because the law "operate[s] to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions."[159] Forcing state and local governments to pay their employees minimum wage would require that they either raise taxes or cut other service to pay these costs. This would displace decisions traditionally left to the states and could "substantially restructure traditional ways in which the local governments have arranged their affairs."[160] Importantly, the court noted that Congress violates the Tenth Amendment when it interferes with traditional state and local government functions.[161] Although the Court did not attempt to define all such traditional functions, establishing a minimum wage was clearly one, and therefore the federal requirement was unconstitutional.

Using these principles, the Supreme Court invalidated a federal law that violated the Tenth Amendment in *New York v. United States* in 1992.[162] The federal Low-Level Radioactive Waste Policy Amendments Act created a statutory duty for states to provide for the safe disposal of radioactive wastes generated within their borders. The Act provided monetary incentives for states to comply with the law and allowed states to impose a surcharge on radioactive wastes received from other states. Additionally, and most controversially, to ensure effective state government action, the law provided that states would "take title" to any wastes within their borders that were not properly disposed of by a certain date, and then would "be liable for all damages directly or indirectly incurred."[163]

Although Congress, pursuant to its authority under the commerce clause, could regulate the disposal of radioactive wastes, the Court held that the "take title" provision of the law was unconstitutional because it gave state governments the choice between "either accepting ownership of waste or regulating according to the instructions of Congress."[164] It was impermissible for Congress to impose either option on the states. Forcing states to accept ownership of radioactive wastes would impermissibly "commandeer" state governments, and requiring state compliance with federal regulatory statutes would impermissibly impose on states a requirement to implement federal legislation. Because of the Tenth Amendment and limits on the scope of Congress's powers under Article I, the Court ruled that the "Federal Government may not compel the States to enact or administer a federal regulatory program."[165] Allowing Congress to commandeer state

---

158.   *Id.* at 842.
159.   *Id.* at 852.
160.   *Id.* at 849.
161.   *Id.* at 842–43.
162.   505 U.S. 144 (1992).
163.   *Id.* at 153.
164.   *Id.* at 175.
165.   *Id.* at 188.

governments would undermine government accountability because Congress could make a decision but the states would take the political heat and be held responsible for a decision that was not theirs.[166] In fact, if a federal law compels a state legislative or regulatory activity, the law is unconstitutional under the Tenth Amendment even if there is a compelling need for the federal action.[167] Thus, the central holding of *New York* is that it is unconstitutional for Congress to compel state legislatures to adopt laws or state agencies to adopt regulations. However, Congress may attach strings on grants to state and local governments and through these conditions induce state and local actions that it cannot directly compel.[168]

A few years later, in *Printz v. United States*,[169] the Supreme Court again used the Tenth Amendment to strike down a federal statute. The Court held that the Brady Handgun Violence Prevention Act violated the Tenth Amendment in requiring that state and local law enforcement officers conduct background checks on prospective handgun purchasers. Congress was impermissibly commandeering state executive officials to implement a federal mandate. The Court felt that Congress violates the Tenth Amendment when it conscripts state governments. The Brady law was unconstitutional because it compelled state officers to act and also violated separation of powers. The Constitution vests executive power in the President, and Congress impermissibly gave the executive authority to implement the law to state and local law enforcement personnel.[170] The Court explained:

> The Brady Act effectively transfers this responsibility to thousands of [chief law enforcement officers] in the fifty states, who are left to implement the program without meaningful presidential control (if indeed meaningful presidential control is possible without the power to appoint and remove). The insistence of the Framers upon unity in the federal executive—to insure both vigor and accountability—is well known. That unity would be shattered, and the power of the President would be subject to reduction, if Congress could act as effectively without the President as with him, by simply requiring state officers to execute its law.[171]

Finally, in *Reno v. Condon*,[172] a unanimous Court rejected a Tenth Amendment challenge in upholding the Driver's Privacy Protection Act. The law "prohibited states from disclosing personal information gained by departments of motor vehicles, such as home addresses, phone numbers, social security numbers, and

---

166.   CHEMERINSKY, *supra* note 150, at 323–24.
167.   *Id.* at 324.
168.   *Id.* In the immigration enforcement area, when local police or sheriff's departments enter into INA section 287(g) agreements to assist in immigration enforcement efforts, funding is an incentive that is provided to the local entities.
169.   521 U.S. 898 (1997).
170.   CHEMERINSKY, *supra* note 150, at 324–25.
171.   *Printz*, 521 U.S. at 922.
172.   528 U.S. 141 (2000).

medical information."[173] "The law was constitutional as an exercise of Congress's commerce clause power because 'Congress found that many States . . . sell this personal information to individuals and businesses [and these] sales generate significant revenues for the States.'"[174] The Court "stressed that the law is not limited to state governments; it also regulates private entities that possess the drivers' license information" for resale and redisclosure.[175] Most importantly, the Court said that the law did not violate the Tenth Amendment because it was a prohibition of conduct, not an affirmative mandate as in *New York* and *Printz*: "It does not require the [state] Legislature to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals."[176]

Thus, *Reno v. Condon* can be interpreted as holding that Congress may prohibit state governments from engaging in *harmful* conduct, particularly if the law applies to private entities as well. However, we know from other Tenth Amendment cases that Congress may not impose affirmative duties on state governments. Whether this distinction between prohibition and obligation makes sense can be questioned. Most duties can be characterized either way. The Driver's Privacy Protection Act could be characterized as imposing the affirmative duty on states to keep information secret. Conversely, the Brady Act in *Printz* could be characterized as a prohibition on state and local governments from issuing gun permits without doing background checks. Also, it can be questioned whether an otherwise impermissible regulation of state governments should become acceptable because it includes private actors as well. Despite all these questions, the court relies on a distinction between affirmative obligations and negative prohibitions that is well established in constitutional law.[177]

*Reno v. Condon*, decided after *City of New York*, arguably lends support to the Second Circuit's decision because 8 U.S.C. § 1373 also does not require state officials to assist in federal immigration law enforcement, but simply bars restrictions on voluntary communications.[178] On the other hand, one could argue

---

173.   CHEMERINSKY, *supra* note 150, at 325.
174.   *Id.* at 325–26 (quoting *Reno*, 528 U.S. at 143–44).
175.   CHEMERINSKY, *supra* note 150, at 326.
176.   *Reno*, 528 U.S. at 151.
177.   CHEMERINSKY, *supra* note 150, at 326.
178.   After *Condon*, the Supreme Court decided another commerce clause case that raised the Tenth Amendment indirectly, providing some food for thought on the sanctuary issue. In *Gonzales v. Raich*, 545 U.S. 1 (2005), medical marijuana patients in California challenged the constitutionality of provisions in the Controlled Substances Act (CSA) that designates marijuana as contraband. Under California law, the plaintiffs were authorized to use marijuana for their serious medical conditions, but federal agents seized and destroyed their cannabis plants. The Supreme Court upheld the CSA, ruling that federal regulation of marijuana was well within congressional authority under the Commerce Clause. After the decision, the California Attorney General opined that under the Tenth Amendment, the federal government's decision to criminalize marijuana "for all purposes does not require California to do the same." Letter from Jonathan K. Renner, Deputy Att'y Gen., State of Cal. Dep't

that § 1373 is more than a "prohibition of conduct" in that it mandates subfederal jurisdictions to enact laws that bar officials from preventing the discussion of immigration status. In *Reno v. Condon*, the federal law barred state governments (and private actors) from selling private information, and the court labeled the federal law a prohibition. However, if a sanctuary law barred local officials from asking about immigration status, a federal law that sought to prevent such local restrictions could just as well be labeled a mandate or a prohibition.

Where does the Tenth Amendment jurisprudence leave us in the context of federal laws (8 U.S.C. §§ 1373 and 1644) that prohibit bars on voluntary communication about immigration status between local officials and federal authorities because of sanctuary laws? We know that Congress could not mandate that subfederal law enforcement officials ask about immigration status without stepping into the minefield of anticommandeering language of cases like *Printz* and *New York v. United States*. Congress cannot require subfederal law enforcement officers to enforce federal immigration laws. In that respect, §§ 1373 and 1644 are certainly on safe footing because they contain no such affirmative mandates. We also know that a sanctuary policy that permits voluntary communication between local authorities and federal officials is probably fine.[179] The murkier question is whether federal prohibitions against subfederal laws that prevent voluntary communications between local officials and federal officials are valid under the Tenth Amendment.

The only decision that has come close to addressing this question is the Second Circuit's *City of New York* case, which leaves some room for interpretation under a different set of facts. Certainly, the decision suggests that the federal prohibitions against laws that close off voluntary cooperation do not violate the Tenth Amendment because they do not force subfederal entities to enact or administer a federal program nor conscript local officials to do federal work.[180] However, the court's approach to the question of whether the federal provisions interfered with the city's operations by regulating confidential information obtained in the course of official business and seeking to control the actions of city officials leaves an important opening. On the facts in *City of New York*, the Second Circuit refused to conclude that there was an "impermissible intrusion"

---

of Justice, to Robert D. Tousignant, Chief Counsel, Cal. Dep't of Health Servs., Department of Health Services's Questions Regarding Medical Marijuana Identification Cards and Federal Law (July 15, 2005), *available at* http://aclu.org/files/FilesPDFs/ca_attorney_general_ltr.pdf. Relying on *Printz* and *New York*, the attorney general decided that even though state law enforcement officers knew the identities of state authorized medical marijuana users, officers were not required to arrest such individuals under the CSA. *Id.* The attorney general did concede, however, that state identity records could be subject to a federal subpoena. *Id.* This is arguably analogous to the sanctuary situation: local authorities are not required to enforce federal immigration laws or to ask about immigration status; once the immigration status is known, however, the federal law provides that the state cannot stop an officer from voluntarily turning over information to federal authorities.

179.   This preemption issue is discussed below. *See infra* notes 183–84 and accompanying text.
180.   City of New York v. United States, 179 F.3d 29, 34–35 (2d Cir. 1999).

into city business because the sanctuary policy "singled out" federal immigration officials in declining to share immigration status information.[181] To the court, that was evidence that the Executive Order was not "integral" to local government operations.[182] The clear implication is that if local officials are barred from gathering and sharing immigration status information to all interested parties because of important public policy considerations, the outcome in the Second Circuit case could have been different.

This is an important lesson for those supporting sanctuary policies. By explaining that the policies are based on community or preventive policing policy goals of gaining the trust of all parts of the community for public safety reasons, federal policies that would intrude on those goals could very well run afoul of the Tenth Amendment. In other words, even though §§ 1373 and 1644 are couched in terms of precluding bars on voluntary communications, those requirements arguably mandate local laws that do not interfere with voluntary communications, but in the process that mandate interferes with the administration of local public safety decisions. Local requirements that bar the seeking and sharing of immigration status information to all would be strong evidence of a serious public policy decision relating to public safety. In my view, therefore, sanctuary policies aimed at preventing local law enforcement officials from delving into the immigration status of criminal victims, witnesses, or minor offenders would be shielded by the Tenth Amendment against federal attempts to delve into that information even under the guise of permitting voluntary communications. Much in the way that the Supreme Court has deferred to state governments in their discrimination against lawful permanent residents in the area of state public functions employment because of legitimate state public interests,[183] public safety and community policy goals of sanctuary ordinances are expressions of public policies on spending and enforcement priorities that also deserve deference.

This reading of the Tenth Amendment jurisprudence may be controversial. Not surprisingly, jurisdictions such as San Francisco, New York City, and Los Angeles retain language in their policies that bar sharing of information "unless required by federal law," presumably responsive to the voluntary communication protections of §§ 1373 and 1644. The City Attorney of San Francisco even has gone so far as to advise that a local official who voluntarily communicates immigration status information to ICE officials is not to be disciplined under the local sanctuary ordinance.[184] These examples demonstrate a concession, however

---

181.   *Id.* at 36–37.
182.   *Id.* at 36.
183.   *See, e.g.,* Ambach v. Norwick, 441 U.S. 68 (1979); Foley v. Connelie, 435 U.S. 291 (1978).
184.   "[I]f the City attempted to enforce the new [sanctuary ordinance] policy by disciplining an employee for violating it, the City could be exposed to damages for unlawful termination." Legal Issues in Connection with Proposed Amendment to Sanctuary City Ordinance, Memorandum from Buck Delventhal, Miriam Morley & Wayne Snodgrass, Deputy City Att'ys of S.F., to Mayor Gavin Newsom, at 5 (Aug. 18, 2009) (on file with author).

unnecessary in my view, on the part of local policy makers that §§ 1373 and 1644 are constitutional. They take a defensive posture thinking that this position is necessary to defend against claims that their sanctuary policies are not preempted by valid federal law. In my view, their concession is unnecessary because §§ 1373 and 1644 have Tenth Amendment problems when they attempt to force local cooperation when resistance is based on a sanctuary policy premised on public safety and spending judgments.

### 2. Preemption of State and Local Laws

If one assumes that §§ 1373 and 1644 do not violate the Tenth Amendment, the next question is whether federal law preempts sanctuary policies. Under Article VI's Supremacy Clause, the Constitution and laws made pursuant to it are the supreme law of the land. When federal and state laws conflict, the state law must yield: "[U]nder the Supremacy Clause, from which our preemption doctrine is derived, 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'"[185]

Although preemption may appear, at first glance, to be a straightforward concept, in fact there is not a bright-line rule for deciding whether a state or local law should be invalidated on preemption grounds. Traditionally, the Supreme Court has identified two major situations where preemption occurs. One is where a federal law expressly preempts state or local law. The other is where preemption is implied by a clear congressional intent to preempt state or local law.

In *Gade v. National Solid Waste Management Association*, the Court noted that the tests for preemption may be either express or implied, and is compelled whether Congress's command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.[186] Of course, express and implied preemption can interact. Even when statutory language expressly preempts state law, Congress rarely is clear about the scope of what is preempted or how particular situations should be handled. Courts must decide what is preempted, and this inevitably is an inquiry into congressional intent. Conversely, implied preemption is often a function of both perceived congressional intent and the language used in the statute or regulation. The problem, of course, is that Congress's intent, especially as to the scope of preemption, is rarely expressed or clear. In fact, I argue below that while 8 U.S.C. § 1373 may have been intended to protect the voluntary exchange of information between local law enforcement and federal immigration authorities, the law does not (and probably could not) mandate local police to ask crime victims and witnesses about immigration status—the heart of sanctuary and confidentiality policies. In fact, the federal statute does not mandate asking about the immigration status of arrested

---

185.    Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 108 (1992) (citations omitted).
186.    *Id.* at 98.

individuals prior to conviction.[187] Congressional intent must be clear to find preemption because of a desire, stemming from federalism concerns, to minimize invalidation of state and local laws.

> [B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all preemption cases, and particularly in those in which Congress has "legislated . . . in a field which the States have traditionally occupied," we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purposes of Congress."[188]

Within the implied preemption situation, three types of implied preemption have been identified. One is termed "field preemption" where the scheme of federal law and regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."[189] The second is where there is a conflict between federal and state law. Even if federal law does not expressly preempt state law, preemption will be found where "compliance with both federal and state regulations is a physical impossibility."[190] Finally, implied preemption also will be found if state law impedes the achievement of a federal objective. Even if federal and state law are not mutually exclusive and even if there is no congressional expression of a desire to preempt state law, preemption will be found if state law "stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress."[191] These categories frequently overlap in practice, and congressional intent, if it can be found, can be determinative.

Provisions in federal statutes expressly preempting state and local laws inevitably require interpretation as to their scope and effect. The explosion of litigation concerning the preemption provision in the Employee Retirement Income Security Act of 1974 (ERISA) demonstrates this. ERISA broadly preempts state laws that "relate to" employee benefit plans.[192] A key problem, though, is the inherent ambiguity in the phrase "relates to." The spectrum of modifiers to the term is potentially wide—directly, slightly, remotely. Thus, employers and others have argued that many state laws—from family leave to workers compensation to health care finance to malpractice claims—are preempted by ERISA because they "relate to" employee benefit plans. The sheer quantity of ERISA litigation shows that an express preemption provision leaves open countless questions about the scope of that preemption. Therefore, simply

---

187.   *See supra* note 91 and accompanying text.
188.   Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996) (citations omitted).
189.   Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947).
190.   Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142–43 (1963).
191.   Hines v. Davidowitz, 312 U.S. 52, 67 (1941).
192.   29 U.S.C. § 1144(a) (2006).

pointing out that a subfederal law or policy "relates to" immigration is not sufficient to strike it down on preemption grounds.

*a. Field Preemption*

Even without express preemption, the Court will find implied preemption if there is a clear congressional intent that federal law should exclusively occupy a field. The Court has said that such preemption exists if "either . . . the nature of the regulated subject matter permits no other exclusion, or that the Congress has unmistakably so ordained." So field preemption can be found either if Congress expresses a clear intent that federal law will be exclusive in an area or if comprehensive federal regulation evidences a congressional desire that federal law should completely occupy the field. Intent can be found from a "scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."[193]

The subjects of foreign policy and immigration provide examples of field preemption. When it comes to managing foreign affairs, the federal government has sole authority, so a state attempt to regulate in the area would be preempted. However, how far the Court would go to strike down a state or local law on preemption grounds is a challenge when the law has an "indirect effect" on immigration or foreign affairs.[194]

A good example is *Hines v. Davidowitz*.[195] Pennsylvania enacted a law that required all immigrants to pay a registration fee and carry a state identification card—a process that the federal government already required. The Supreme Court struck down the state registration law on preemption grounds because registration "is in a field which affects international relations, the one aspect of our government that from the first has been most generally conceded imperatively to demand broad national authority."[196] In what serves as a standard description of federal immigration power, the Court emphasized the "broad and comprehensive plan describing the terms and conditions upon which aliens may enter this country, how they may acquire citizenship, and the manner in which they may be deported."[197] Pervasive federal regulation existed, and in the context of the Pennsylvania statute, a federal law already specifically required alien registration with the federal government.

*Hines* is significant because even though the state law technically complemented and did not interfere with the federal law, the Court still found preemption. The fact that the Court relied on field preemption also is noteworthy because no direct preemption language was contained in the federal immigration

---

193.   *Rice*, 331 U.S. at 230.
194.   CHEMERINSKY, *supra* note 150, at 402.
195.   312 U.S. 52 (1941).
196.   *Hines*, 312 U.S. at 68.
197.   *Id.* at 69.

law. Thus, as Dean Chemerinsky points out, "Field preemption means that federal law is exclusive in the area and preempts state laws even if they serve the same purposes as the federal law and do not impede the implementation of federal law."[198]

Interestingly, in the challenge to Arizona's S.B. 1070, the state argued that its law complements federal law, but as we can see, the *Hines* decision is not helpful to Arizona. In fact, in the Arizona case, the federal court of appeals has agreed with the federal government's argument that the state law actually interferes with the federal government's enforcement plan.[199] However, whether preemption should be found in the absence of an explicit congressional declaration is ultimately "a tension between the desire to effectuate the interests of the federal government and the desire to limit the instances where state power is limited."[200]

Putting the field preemption principles announced in *Hines* to use, the Supreme Court struck down a California law that barred aliens ineligible for citizenship from purchasing commercial fishing licenses.[201] The Court's language was clear:

> The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization. Under the Constitution the states are granted no such powers . . . . State laws which impose *discriminatory burdens* upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration.[202]

Again, Arizona's defense of S.B. 1070 finds no help in a case like *Takahashi* because the state law definitely puts a discriminatory burden on the entrance of lawful immigrants insofar as its terms can lead to racial profiling of citizens and lawful residents.[203]

Similarly, in *Toll v. Moreno*,[204] the Court invoked preemption in striking a Maryland law that denied to "non-immigrant aliens" in-state tuition that was accorded to citizens and to "immigrant aliens." The Court found preemption based on the "broad principle that 'state regulation not congressionally sanctioned that discriminates against aliens lawfully admitted to the country is impermissible if it imposes additional burdens not contemplated by Congress.'"[205] The state had directly contravened the federal approach to G-4 aliens (employees of

---

198.   CHEMERINSKY, *supra* note 150, at 403.
199.   United States v. Arizona, 641 F.3d 339, 350–52 (9th Cir. 2011).
200.   CHEMERINSKY, *supra* note 150, at 403.
201.   Takahashi v. Fish & Game Commission, 334 U.S. 410, 419 (1948).
202.   *Id* (emphasis added).
203.   United States v. Arizona, 641 F.3d 339, 360–66 (9th Cir. 2011).
204.   458 U.S. 1 (1982).
205.   *Id.* at 12–13 (quoting De Canas v. Bica, 424 U.S. 351, 358 (1976)).

international organizations and their dependents). Federal law permitted them to establish domicile and afforded significant tax exemptions on organizational salaries. In such circumstances, the Court could not conclude that Congress ever contemplated that a State, in the operation of a university, might impose discriminatory tuition charges and fees solely on account of the federal immigration classification. Therefore the state bar on G-4 aliens from acquiring in-state status violated the Supremacy Clause.

However, in *De Canas v. Bica*, although the Court reminded that the "[p]ower to regulate immigration is unquestionably exclusively a federal power,"[206] a state employer sanction law was not preempted because there the California law was about protecting lawful workers from unauthorized workers. The Court noted:

> [T]he Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised. . . . [T]he fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain.[207]

Not all state regulations of aliens are ipso facto regulations of immigration.[208] "In this case, California sought to *strengthen its economy* by adopting federal standards in imposing criminal sanctions against state employers who knowingly employed aliens who have no federal right to employment within the country; even if such local regulation had some purely speculative and indirect impact on immigration."[209] The Court reasoned that "it does not thereby become a constitutionally proscribed regulation of immigration that Congress itself would be powerless to authorize or approve. Thus, absent congressional action, [the state law] would not be an invalid state incursion on federal power."[210]

In *Chamber of Commerce of the United States v. Whiting*,[211] the Supreme Court recently reaffirmed its approach in *De Canas*, holding that the Immigration Reform and Control Act of 1986 (IRCA) did not preempt Arizona's Legal Arizona Workers Act (not to be confused with the subsequently enacted S.B. 1070 that is the subject of separate litigation), which targets employers who hire undocumented immigrants and revokes their state business licenses. IRCA, which included a federal employer sanction law punishing employers who knowingly hire unauthorized workers, contains an express preemption provision, as well as a savings clause: "The provisions of this section preempt any State or local law

---

206. *De Canas*, 424 U.S. at 354.
207. *Id.* at 355.
208. *Id.*
209. *Id.* (emphasis added).
210. *Id.* In the Immigration Reform and Control Act of 1986, Congress did in fact enact a federal employer sanction law that likely preempted the California law upheld in *De Canas*.
211. 131 S. Ct. 1968 (2011).

imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ . . . unauthorized aliens."[212] The Court held that the Legal Arizona Workers Act fits within Congress's intended meaning of licensing law in IRCA's savings clause and is therefore not preempted. The Court also held that the INA, which makes the use of E-Verify voluntary, does not impliedly preempt Arizona from mandating that employers use the E-Verify system.

*De Canas* and *Whiting* remind us that without express preemption, states possess broad authority under their police powers to regulate the employment relationship to protect workers within the state. Child labor laws, minimum and other wage laws, laws affecting occupational health and safety, and workmen's compensation laws are only a few examples. As I argue below, sanctuary policies similarly fall within these broad police powers to promote public safety through policies that are designed to gain community trust and allocate enforcement resources in accordance with those policies.

Of course, even state regulation designed to protect vital state interests must give way to paramount federal legislation. But the Court in *De Canas v. Bica* and *Chamber of Commerce v. Whiting* would not

> presume that Congress, in enacting the INA, intended to oust state authority to regulate the employment relationship covered by [the state law] in a manner consistent with pertinent federal laws. Only a demonstration that complete ouster of state power—including state power to promulgate laws not in conflict with federal laws—was "the clear and manifest purpose of Congress" would justify that conclusion.[213]

In contrast to *De Canas*, where the Court found that the state had an important economic goal behind its enactment of an employer sanction law,[214] Arizona's S.B. 1070 and Hazleton, Pennsylvania's no-renting-to-undocumented-immigrants ordinance present different questions. While those jurisdictions might offer an economic basis for the law, evidence is quite clear that the real purpose behind the laws is regulation of immigration—an area that is preempted by federal law. For example, Arizona Governor Jan Brewer signed and supports S.B. 1070 because the federal government "is not doing its job" of securing the border.[215] S.B. 1070 is about the regulation of immigration for its allies and Brewer.[216] When

---

212.   8 U.S.C. § 1324a(h)(2) (2006).

213.   *De Canas*, 424 U.S. at 357 (citations omitted).

214.   Similarly, in *Pacific Gas & Electric v. State Energy Resources Conservation & Development Commission*, the Supreme Court concluded that a California law imposing a moratorium on the construction of nuclear power plants was not preempted because its main purpose was economics and not safety; the state withstood a preemption challenge that Congress had intended to preempt the field of nuclear regulation. 461 U.S. 190, 216, 222–23 (1983); *see infra* notes 231–35 and accompanying text.

215.   Howard Fischer, *Will SB1070 Remain on Hold?*, ARIZ. DAILY SUN, Nov. 2, 2010, http://azdailysun.com/news/state-and-regional/article_cfd0ac68-343a-5fc5-97d1-2464db66d7e8.html.

216.   The Ninth Circuit noted the immigration purpose behind S.B. 1070:
In April 2010, in response to a serious problem of unauthorized immigration along the

Hazleton, Pennsylvania, enacted its ordinance, its supporters made clear that their intent was the control of Latino immigrants:

> The consequences which this immigration disaster holds for our children [are] horrendous. Coloreds will take political control of more states, along with both houses of Congress and the presidency. Whites will quickly be stripped of their rights with our wealth confiscated for redistribution to non-whites as is taking place in South Africa. . . . Will America become the United States of Mexico?[217]

Unfortunately for lawmakers in Arizona and Hazleton, they do not have the authority to regulate immigration.

Thus, in litigation challenging Arizona's S.B. 1070 and Hazleton's ordinance, the federal courts have had little difficulty in finding that the laws are preempted. In the Arizona case, the Ninth Circuit Court of Appeals upheld the injunction of the primary provisions of the law on preemption grounds: the requirement that local law enforcement verify the immigration status of all arrestees; the new state law making it a crime for failing to carry immigration papers; another new law that made it a crime to apply for work without proper documentation; and the attempt to authorize local police to enforce the civil provisions of the Immigration and Nationality Act.[218] The court agreed with the federal government that its enforcement plan would be thwarted by Arizona's law and was therefore preempted as an improper state attempt to regulate immigration.[219] Although the Third Circuit's decision on the Hazleton ordinance has been vacated for reconsideration in light of the *Whiting* decision, the court initially found that the no-renting-to-undocumented-immigrants provision was an attempt to "regulate which [immigrants] may live [here]."[220] In other words, the ordinance attempted to regulate immigration, and was therefore preempted.

### b. Conflict Preemption

If federal law and state law are mutually exclusive, so that a person could not simultaneously comply with both, the state law is deemed preempted. The Supreme Court has explained that such preemption exists when "compliance with

---

Arizona-Mexico border, the State of Arizona enacted its own immigration law enforcement policy [S.B. 1070, which] "make[s] attrition through enforcement the public policy of all state and local government agencies in Arizona."
United States v. Arizona, 641 F.3d 339, 343 (9th Cir. 2011).

217.   Transcript of Record Vol. 2 at 5–6, Lozano v. City of Hazleton, 496 F. Supp. 2d 477 (M.D. Pa. 2007) (No. 3:06-CV-1586), *available at* http://www.aclupa.org/downloads/lozano2.pdf.

218.   United States v. Arizona, 641 F.3d at 366.

219.   *Id.*

220.   Lozano v. City of Hazleton, 620 F.3d 170, 220 (3d Cir. 2010), *vacated*, 131 S. Ct. 2958 (2011). The Supreme Court has asked the Third Circuit to reconsider *Lozano* in light of the Supreme Court's recent decision in *Chamber of Commerce of the U.S. v. Whiting*, 131 S. Ct. 1968 (2011). However, as long as the evidence reveals that the purpose behind the Hazleton ordinance is the regulation of immigration, the ordinance faces serious preemption problems nonetheless.

both federal and state regulation is a physical impossibility."[221] The difficulty with regard to this type of preemption is in deciding whether there is a conflict between federal and state law.

There also are many harder cases that depend on determining federal intent in order to decide whether the federal law and state law are mutually exclusive. For example, if a state law conflicts with a federal goal, the state law can still be preempted even though there is no conflict with a specific federal law and in the absence of field preemption. In short, the state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes or objectives of Congress."[222] Thus, in *Nash v. Florida Industrial Commission*, the Court determined that the filing of unfair labor practices was a primary purpose of the National Labor Relations Act.[223] Any law that punished such a filing, such as the denial of unemployment benefits, was preempted. Likewise, in *Perez v. Campbell*, the Court ruled that the suspension of a driver's license under state law was preempted by federal bankruptcy laws because the debt arising from an auto accident had been discharged by the bankruptcy court.[224] Otherwise, the uniformity goals of the federal bankruptcy laws with respect to debts would be thwarted by state law.

In a challenge to an immigration package enacted by the Alabama state legislature, a federal district court judge upheld two provisions over conflict preemption arguments advanced by the federal government. In *United States v. Alabama*,[225] the provisions that have been allowed to go into force include the authority of local law enforcement officers to detain or arrest anyone who is reasonably suspected of being undocumented and if a person is arrested for driving without a license and the officer is unable to determine that the person has a valid driver's license, the person must be transported to the nearest magistrate; and a reasonable effort shall be made to determine the citizenship of the driver.[226]

---

221.  Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142–43 (1963).

222.  Hines v. Davidowitz, 312 U.S. 52, 67 (1941).

223.  Nash v. Fla. Indus. Comm'n, 389 U.S. 235 (1967).

224.  Perez v. Campbell, 402 U.S. 637 (1971).

225.  No. 2:11-CV-2746-SLB, 2011 WL 4469941, at *19 (N.D. Ala. Sept. 28, 2011).

226.  The contract provision lists two exceptions, that "[n]o court of this state shall enforce the terms of, or otherwise regard as valid, any contract between a party and an alien unlawfully present in the United States." Order Denying Defendants' Motion to Dismiss and Final Consent Judgment, Perez v. GTX Auto Import & Auto Repair, LLC, No. CV 2010-904012, (Cir. Ct. Jefferson County Ala. Oct. 24, 2011), *available at* http://media.al.com/spotnews/other/Judge%20Vowell%20Immigration%20Order%2010.24.2011.pdf. An Alabama Circuit Judge has pointed, however, that the anticontracting provision still has to overcome a big obstacle—the Alabama state constitution's command that
> There can be no law of this state impairing the obligation of contracts by destroying or impairing the remedy for their enforcement; and the legislature shall have no power to revive any right or remedy which may have become barred by lapse of time, or by any statute of this state. After suit has been commenced on any cause of action, the legislature shall have no power to take away such cause of action, or destroy any existing defense to such suit.

*Id.* Because the opinion deals with a breach of contract suit that was filed by an undocumented

On the other hand, the district court did strike down on conflict grounds the Alabama provision that would make it a state crime for an unauthorized alien to solicit or perform work in the state. The court found that the provision directly contravened Congress's decision as part of the Immigration Reform and Control Act of 1986 that unauthorized work by the worker should not be criminalized.[227] If enforced, this provision would stand as an obstacle to IRCA's employer sanctions scheme.[228] Similarly, the district court struck down the state's attempt to make it a state crime to harbor or transport an undocumented alien, to establish a civil cause of action against an employer who fails to hire a citizen while hiring an unauthorized worker, and to forbid employers from claiming a business tax deduction for wages paid to an unauthorized worker. Furthermore, even though the district court initially upheld four controversial provisions—one making it a state misdemeanor for an undocumented person to carry an alien registration document, a second that required public schools to check immigration status of school children for data purposes, and two others attempting to restrict the right of undocumented immigrants to enter into private contracts and business transactions with a state agency—the Eleventh Circuit Court of Appeals has enjoined those four provisions.[229]

### c. Impeding Federal Objective

The challenge in conflict preemption cases often "lies in determing the federal objective and whether a particular type of state law is consistent with it."[230] A comparison of two particular Supreme Court cases is instructive. *Pacific Gas & Electric v. State Energy Resources Conservation & Development Commission*[231] involved a state moratorium on nuclear power plant construction, while *Gade v. National Solid Wastes Management Association*[232] involved a state law enacted for the health and safety of workers handling hazardous wastes.

In *Pacific Gas & Electric*, California halted new nuclear power plants until a state commission could certify that the disposal of high-level nuclear wastes could be done safely. The company wanted to proceed with new construction plans, arguing both that the state law was preempted in the nuclear regulation field by

---

immigrant before the law took effect, the opinion merely holds that the anti-immigrant law cannot constitutionally be applied to those suits because "the legislature shall have no power to take away" people's right to pursue contacts claims that are already pending. *Id.* Nevertheless, the state court also suggests that the entire anticontracting provision may violate the state constitution's requirement that no law may "destroy[] or impair the remedy" for enforcing a contract in court. *Id.*

227.   *Alabama*, 2011 WL4469941, at *21.

228.   *Id.* at *25.

229.   United States v. Alabama, Hispanic Interest Coalition v. Governor of Alabama, No. 11-14532-CC slip op. at 13–15 (11th Cir. Oct. 14, 2011), *modified*, No. 11-14532-CC, (11th Cir. Mar. 8, 2012).

230.   CHEMERINSKY, *supra* note 150, at 413.

231.   Pac. Gas & Elec. v. State Energy Res. Conserv. & Dev. Comm'n, 461 U.S. 190 (1983).

232.   Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88 (1992).

congressional intent and that the state law interfered with the federal goal of developing nuclear power. However, the Court ruled in favor of the state, determining that Congress's goal related to public safety, while California's interest was economic. Congress might intend that the federal government have exclusive control over regulating safety, but "the States retain their traditional responsibility in the field of regulating electrical utilities for determining questions of need, reliability, costs, and other related state concerns."[233] The state's primary purpose was economics and "not radiation hazards. . . . Without a permanent means of disposal, the nuclear waste problem could become critical, leading to unpredictably high costs to contain the problem or, worse, shutdowns in reactors."[234]

The approach of the Court in *Pacific Gas & Electric,* is revealing:

Thus, in determining whether the California law interfered with achieving the federal objective, the Court had to make two major choices: One was in characterizing the federal objective; the other was in characterizing the state law and its purpose. If the Court saw a broad purpose for the Atomic Energy Act in encouraging the development of nuclear power, then the state law, which obviously limited it, would be preempted. The Court avoided preemption by more narrowly characterizing the federal goal as promoting nuclear reactors only when they were economically feasible.

Additionally, if the Court characterized California's purpose as ensuring safety before construction of nuclear power, then the law would have been preempted. The Court avoided preemption by accepting California's claim that its goal was economics, even though the law was written in terms of preventing construction of nuclear plants unless the *safety* of disposal was ensured.

The *Pacific Gas & Electric* case thus illustrates how preemption determinations are very much based on the record and the context of the particular case. It also shows how much the outcome turns on the manner in which the Court chooses to characterize the purposes of the federal and state laws.[235]

In *Gade,* the Court confronted a similar question but reached a different outcome. The federal Occupational Safety and Health Act of 1970 and related federal regulations regulated the health and safety of workers who handled hazardous waste materials. Illinois enacted its own law that sought to protect the health and safety of such workers. The state argued that its purpose was not limited to the workers' health and that public safety was a chief purpose. However, the Court rejected Illinois's argument ruling that the federal law

---

233.   *Pac. Gas & Elec.*, 461 U.S. at 205 (1983).
234.   *Id.* at 213–14.
235.   CHEMERINSKY, *supra* note 150, at 414.

*UC IRVINE LAW REVIEW* [Vol. 2:247

"preempts all state law that constitutes in a direct, clear and substantial way, regulation of worker health and safety."[236]

Arguably, *Gade* is out of step with *Pacific Gas & Electric*. In *Pacific Gas & Electric*, the Court was open to California's two reasons for halting new nuclear power plants—public safety and economics. However, the Court was not open to Illinois's two reasons for regulating workers—worker health and public safety. One could argue that the California nuclear power moratorium was inconsistent with the federal goal of encouraging more nuclear power and that the Illinois law complemented the federal interest in worker health. However, preemption was avoided in *Pacific Gas & Electric* because the Court placed more emphasis on the state economic purpose, while preemption was found in *Gade* because the Court was more impressed with the broad federal purpose in hazardous waste worker safety.[237]

The point is that preemption based on state laws interfering with a federal goal turns on how the court characterizes the federal purpose. If a court wants to avoid preemption, it can narrowly construe the federal objective and interpret the state goal as different from or consistent with the federal purpose. But if a court wants to find preemption, it can broadly view the federal purpose and preempt a vast array of state laws as it did in *Gade*.[238]

In the S.B. 1070 situation, the Ninth Circuit used a conflict preemption technique in addressing the Arizona provision that made it a state crime for an unauthorized alien to seek employment in the state. Congress made an "affirmative choice not to criminalize work as a method of discouraging unauthorized immigrant employment . . . ."[239] Arizona argued that provisions of S.B. 1070 were intended to further "the strong federal policy of prohibiting illegal aliens from seeking employment in the United States."[240] However, by "pulling the lever of criminalizing work—which Congress specifically chose not to pull," the Arizona law becomes an obstacle to the execution of Congress's goals and objectives; the Arizona law was a "substantial departure from the approach Congress" chose to address the problem.[241]

In contrast, sanctuary policies appear immune from preemption if we accept that their goals are about public safety and represent economic decisions on how to spend policing resources and are not about regulating immigrants. Indeed, the language of most sanctuary policies speaks in terms of not expending resources and personnel time asking about immigration status.[242]

---

236. *Gade*, 505 U.S. at 107.
237. CHEMERINSKY, *supra* note 150, at 416.
238. *Id.*
239. United States v. Arizona, 641 F.3d 339, 359 (9th Cir. 2011).
240. *Id.* at 360 (internal quotation marks omitted).
241. *Id.* at 360.
242. *See infra* notes 319–25 and accompanying text.

*3.* Martinez v. Regents of University of California—*An Analogous Example*

The California Supreme Court recently decided a preemption case involving a state law that, like sanctuary policies, sends a message of inclusion to undocumented immigrants. Under state law, California state universities permit undocumented college students who meet certain requirements to pay in-state tuition rates.[243] In *Martinez v. Regents of University of California*, a unanimous state supreme court found that the tuition law was not preempted by a federal statute that prohibits states from making unlawful aliens eligible for postsecondary education benefits under certain circumstances.[244]

In *Martinez*, plaintiffs, who were U.S. citizen residents of other states, challenged the California law, arguing that the state policy violated federal law and that they too should be eligible to pay in-state tuition fees. The main legal issue was this: The federal law, 8 U.S.C. § 1623, provides that an alien not lawfully present in this country shall not be eligible *on the basis of residence within a state* for any postsecondary education benefit unless a U.S. citizen is eligible for that benefit.[245] In general, nonresidents of California who attend the state's colleges and universities must pay nonresident tuition.[246] But California Education Code section 68130.5(a) exempts from this requirement students—including those not lawfully in this country—who meet certain requirements, primarily that they have attended high school in California for at least three years. The question to the court was whether this exemption violated § 1623.

The court held that section 68130.5 does not violate § 1623. The exemption is given to all who have attended high school in California for at least three years (and meet the other requirements), regardless of whether they are California residents. In other words, some who qualify for the exemption qualify as California residents for purposes of in-state tuition, but some do not. Furthermore, not all unlawful aliens who would qualify as residents but for their unlawful status are eligible for the exemption. In essence, the exemption is not based on residence in California. Rather, it is based on other criteria.

Asserting a field preemption theory, the plaintiffs argued that federal immigration law preempted the state statute. The state supreme court acknowledged that the Supremacy Clause makes federal law paramount, that Congress has the power to preempt state law, and that the power "to regulate immigration is unquestionably exclusively a federal power."[247] However, the court reminded us that,

---

243.   Cal. Educ. Code § 68130.5 (Deering 2011).
244.   241 P.3d 855, 870 (Cal. 2010), *cert. denied*, 131 S.Ct. 2961 (2011); 8 U.S.C. § 1623 (2006).
245.   8 U.S.C. § 1623(b). Section 1623 was enacted on September 30, 1996, as part of the omnibus Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, § 505, 110 Stat. 3009-672 (1996).
246.   Cal. Educ. Code § 68050 (Deering 2011).
247.   *Martinez*, 241 P.3d at 861 (citations omitted) (internal quotation marks omitted).

While the immigration power is exclusive, it does not follow that any and all state regulations touching on aliens are preempted. Only if the state statute is in fact a "regulation of immigration," i.e., "a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain," is preemption structural and automatic. Otherwise, the usual rules of statutory preemption analysis apply; state law will be displaced only when affirmative congressional action compels the conclusion it must be.[248]

In the court's view, because section 68130.5 does not "regulate[] who may enter or remain in the United States, [it would] proceed under the usual preemption rules."[249]

Plaintiffs contend that section 68130.5 violates this statute, i.e., that section 68130.5 makes an unlawful alien eligible for a benefit (in-state tuition) on the basis of residence without making a citizen eligible for the same benefit. When it enacted section 68130.5, the Legislature was aware of section 1623. Indeed, Governor Gray Davis had vetoed an earlier version of what eventually became section 68130.5 because he believed section 1623 would require that the same exemption from nonresident tuition be given to all out-of-state legal United States residents. During the legislative process leading to section 68130.5's enactment, the state Legislative Counsel issued an opinion concluding that the provision would not conflict with section 1623. Ultimately, in an uncodified section of the bill enacting section 68130.5, the Legislature found that "[t]his act, as enacted during the 2001–02 Regular Session, does not confer postsecondary education benefits on the basis of residence within the meaning of Section 1623 of Title 8 of the United States Code."[250]

Plaintiffs' central argument was that section 68130.5's exemption from paying out-of-state tuition is based on residence. Section 1623(a) prohibits a state from making unlawful aliens eligible "on the basis of residence within a State" for a postsecondary education benefit.[251] However, the California Supreme Court concluded that the exemption is based on *other* criteria, specifically, that persons possess a California high school degree or equivalent; that if they are unlawful aliens, they file an affidavit stating that they will try to legalize their immigration status; and, especially important here, that they have attended "[h]igh school . . . in California for three or more years."[252] Indeed, both before and after section 68130.5's enactment, the law has been that unlawful aliens cannot be deemed California residents for purposes of paying resident tuition.[253] Moreover, many

---

248.  *Id.* at 861–62 (quoting *In re* Jose C., 198 P.3d 1087, 1098 (Cal. 2009)).

249.  *Id.* at 862 (quoting *In re* Jose C., 198 P.3d at 1098).

250.  *Id.* at 862–63 (citations omitted).

251.  8 U.S.C. § 1623(a) (2006).

252.  CAL. EDUC. CODE § 68130.5(a)(1), (2), (4) (Deering 2011).

253.  CAL. EDUC. CODE § 68062 (Deering 2011); *see also* Regents of the Univ. of Cal. v. Superior Court, 276 Cal. Rptr. 197, 201 (1990).

unlawful aliens who would qualify as California residents but for their unlawful status, and thus would not have to pay out-of-state tuition, will not be eligible for section 68130.5's exemption—only those who attended high school in California for at least three years and meet the other requirements are eligible for the exemption.

The California court noted that if Congress had intended to prohibit states entirely from making unlawful aliens eligible for in-state tuition, it could easily have done so. It could simply have provided, for example, that "an alien who is not lawfully present in the United States shall not be eligible" for a postsecondary education benefit.[254] But it did not do so; instead, it provided that "an alien who is not lawfully present in the United States shall not be eligible *on the basis of residence within a State*" for a postsecondary education benefit.[255] So § 1623 did not preclude California's approach.

Plaintiffs urged the court to consider Congress's overall purpose in its immigration legislation in support of their expansive view of § 1623. After all, in determining Congress's intent, courts may also consider the "structure and purpose of the statute as a whole."[256] Congress has provided statements of national policy concerning immigration. It stated that "[i]t continues to be the immigration policy of the United States that . . . the availability of public benefits not constitute an incentive for immigration to the United States"[257] and that "[i]t is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits."[258] In the court's view, this general immigration policy may have supported an absolute ban on unlawful aliens receiving the exemption, but § 1623 does not impose an absolute ban.

In the California court's view, the fact that the state legislature's primary motivation in enacting section 68130.5 was to give unlawful aliens who reside in California the benefit of resident tuition in a way that does not violate § 1623 did not doom the state law. The legislature found and declared that "[t]here are high school pupils who have attended elementary and secondary schools in this state for most of their lives and who are likely to remain, but are precluded from obtaining an affordable college education because they are required to pay nonresident tuition rates"; and that "[t]hese pupils have already proven their academic eligibility and merit by being accepted into our state's colleges and universities."[259] While this description appears to apply primarily to unlawful aliens, the court found that nothing is legally wrong with the legislature's attempt

---

254. Martinez v. Regents of the Univ. of Cal., 241 P.3d 855, 862 (Cal. 2010).
255. 8 U.S.C. § 1623(a) (2006) (emphasis added).
256. Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992).
257. 8 U.S.C § 1601(2)(B) (2006).
258. 8 U.S.C § 1601(6).
259. 2001 Cal. Stat. ch. 814, § 1, subd. (a)(1), (2). The sentiment is consistent with the Supreme Court's sentiment in *Plyler v. Doe* that reminded us why it is important not to foreclose public education to undocumented students at the K–12 level. *See infra* note 325 and accompanying text.

to avoid § 1623. The mere desire to avoid the restrictions provides no basis to overturn the legislation. This is relevant to sanctuary policies that may be drafted in a manner to avoid preemption or conflict with federal law in order to benefit undocumented immigrants; careful drafting to avoid conflict does not render the policy invalid.

Plaintiffs in *Martinez* also argued that section 68130.5 had a preemption problem with 8 U.S.C. § 1621. Section 1621 was enacted in August 1996, shortly before § 1623, as part of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRA).[260] But the state court disagreed with the plaintiffs on that point as well.

Section 1621 has two parts: (1) a general rule that unlawful aliens are not eligible for state or local public benefits (§ 1621(a)); and (2) a description of the circumstances under which a state *may* make an unlawful alien eligible for those public benefits, namely, by "affirmatively" expressing the benefit (§ 1621(d)).[261] So in order to comply, the state statute must expressly state that it applies to undocumented aliens, rather than conferring a benefit generally without specifying that its beneficiaries may include undocumented aliens. The California court noted that if Congress had intended to require more, Congress should have said so clearly and not set a trap for unwary legislatures.

Plaintiffs argued generally that section 68130.5 is impliedly preempted

---

260. Pub. L. No. 104-193, § 411, 110 Stat. 2105 (1996); *see also* League of United Latin Am. Citizens v. Wilson, 997 F. Supp. 1244, 1249, 1251, 1253 (C.D. Cal. 1997).

261. 8 U.S.C. § 1621 (2006).
    (a) In general
    Notwithstanding any other provision of law and except as provided in subsections (b) and (d) of this section, an alien who is not—
        (1) a qualified alien (as defined in section 1641 of this title),
        . . .
    is not eligible for any State or local public benefit (as defined in subsection (c) of this section).
    . . .
    (c) "State or local public benefit" defined
    (1) Except as provided in paragraphs (2) and (3), for purposes of this subchapter the term "State or local public benefit" means—
        (A) any grant, contract, loan, professional license, or commercial license provided by an agency of a State or local government or by appropriated funds of a State or local government; and
        (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government.
    . . .
    (d) State authority to provide for eligibility of illegal aliens for State and local public benefits
    A State may provide that an alien who is not lawfully present in the United States is eligible for any State or local public benefit for which such alien would otherwise be ineligible under subsection (a) of this section only through the enactment of a State law after August 22, 1996, which affirmatively provides for such eligibility.
Pub. L. No. 104-193, §411.

through both field preemption and conflict preemption because of 8 U.S.C. § 1621. The idea is that Congress's intent to preempt can "be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law."

The California court disagreed. Critical to the implied preemption analysis is the existence of two express preemption statutes, namely §§ 1621 and 1623. However, in this case, Congress did not merely imply that matters beyond the preemptive reach of the statutes are not preempted; it said so expressly. Section 1621(c) says that a state "may" provide public benefits for unlawful aliens if it does so in compliance with the statute's requirements. This language shows Congress did not intend to occupy the field fully. Because section 68130.5 complies with the conditions set out in both §§ 1621 and 1623, those statutes cannot impliedly preempt it.[262]

Strangely, plaintiffs relied substantially on *League of United Latin American Citizens v. Wilson*,[263] which held that federal law preempted the restrictions that Proposition 187, a voter initiative enacted in 1994, had placed on unlawful aliens. Provisions of Proposition 187 denied K–12 access to undocumented students and denied certain public benefits to undocumented immigrants. The court regarded *Wilson* as irrelevant to the issues in *Martinez*. Relying heavily on § 1621, the federal district court in *Wilson* concluded that California "is powerless to enact its own legislative scheme to regulate alien access to public benefits."[264] But the court added that California "can do what the PRA [including § 1621] permits, and nothing more."[265] The California court felt that the *Wilson* opinion indicated what § 1621 barred, but left open the question of what § 1621 permits. And the California court in *Martinez* ruled that California's tuition scheme was well within what is permitted. In short, section 68130.5 was not impliedly preempted.

---

262.   Although the California Supreme Court did address this issue, Congress's definition of restricted "public benefits" does not appear to cover in-state tuition anyway:

(c) "State or local public benefit" defined

(1) Except as provided in paragraphs (2) and (3), for purposes of this subchapter the term "State or local public benefit" means—

(A) any grant, contract, loan, professional license, or commercial license provided by an agency of a State or local government or by appropriated funds of a State or local government; and

(B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government.

8 U.S.C. § 1621(c) (2006). Furthermore, Congress's attempt to restrict state or local benefits appears to raise serious Tenth Amendment problems; restricting state or local benefits that are not necessarily funded by federal dollars would appear to be beyond the reach of Congress.

263.   997 F. Supp. 1244 (C.D. Cal. 1997).

264.   *Id.* at 1261.

265.   *Id.*

The *Martinez*, *Whiting*, and *De Canas* cases teach us that carefully drafted subfederal laws that affect immigrants can avoid preemption problems. When the federal statute leaves room for state restrictions that serve a legitimate state purpose and do not in and of themselves regulate immigration, the subfederal action can be upheld. Under the Supreme Court's preemption discourse, sanctuary policies that require local police to refrain from asking crime victims and witnesses about immigration status appear quite safe from any preemption claims (field, implied, or conflict). If 8 U.S.C. §§ 1373 and 1644 withstand Tenth Amendment scrutiny and are interpreted to bar subfederal policies that prevent the voluntary cooperation of a local officer with a federal officer, then as long as the local policies do not bar voluntary cooperation, no conflict with the federal statute arises. Whether a subfederal law that bars officers from asking about immigration status during traffic stops and other minor encounters is preempted by §§ 1373 and 1644 may turn on whether the bar on asking is interpreted as being a restraint on voluntary cooperation. The DOJ inspector general has determined that at least three high profile "don't ask" sanctuary jurisdictions do not prevent such voluntary cooperation, which suggests no conflict with federal law. Although the inspector general was aware that Oregon and San Francisco have official sanctuary policies, and that New York City's executive order did the same, "in each instance, the local policy either did not preclude cooperation with ICE or else included a statement to the effect that those agencies and officers must assist ICE or share information with ICE as required by federal law."[266]

The question of whether sanctuary policies that bar officers from asking about immigration status would be preempted is also informed by the *Pacific Gas & Electric* case. The case illustrates how preemption determinations are very much based on the record and how the outcome turns on the manner in which the Court chooses to characterize the purposes of the federal and subfederal laws. In that case, the Court characterized the federal goal as promoting nuclear reactors only when they were economically feasible, rather than simply as encouraging the development of nuclear power. Conveniently, the Court characterized California's state law purpose as economic, rather than in terms of preventing construction of nuclear plans unless disposal was safe.

In the sanctuary context, if §§ 1373 and 1644 are construed to simply make sure that voluntary cooperation is not thwarted when a subfederal officer has information and wants to communicate, then a sanctuary policy based on a public policy decision to not ask about immigration status for effective community policing reasons does not conflict. The fact that "don't ask" sanctuary policies generally come in the form of a decision to not spend public funds and resources on delving into immigration questions is more evidence that the decision is one

---

266. Audit Div., U.S. Dep't of Justice, Cooperation of SCAAP Recipients in the Removal of Criminal Aliens from the United States 23 (2007).

about public expenditures for policing—something that is conventionally a local decision. Thus, the subfederal jurisdiction's reliance on careful deliberation relating to public safety in its decision to initiate a sanctuary policy is an important part of the record.

## IV. GOOD POLICING

The processes used by local governments and police departments in deciding to implement sanctuary policies reveal that their primary goal is public safety for the entire community. The long, often painstaking, deliberations have little to do with thwarting enforcement efforts by federal immigration officials. The goal simply is better policing.

Consider the process in New Haven, Connecticut.[267] In establishing its policy of making no distinction between documented and undocumented immigrants, the New Haven Police Department made clear that its mission and goals were to "protect life and property, prevent crime, and resolve problems."[268] Determining the immigration status of the city's residents was not part of its mission. Local policymakers drew a direct analogy between its program and the military's former "don't ask, don't tell policy."[269]

Policymakers in New Haven gave serious consideration to what was happening in the community in arriving at their decision. The police department has stations in the two main immigrant neighborhoods. Each month, the commander of each station holds a meeting with residents to discuss community issues and concerns. In these meetings, the commanders learned that undocumented residents were reluctant to attend; they usually expressed their concerns through a local Catholic priest.[270] Prior to the adoption of the formal policy, officers in these neighborhoods attempted to gain the trust of the immigrant communities through intensive outreach that met with some success. However, some police practices—particularly those related to questions about immigration status or identification documents—were misinterpreted, and immigrants often complained about disrespectful police behavior.[271] This dialogue and the input from immigrant advocacy groups led to the creation of a new policy for the department as well as the city's launch of a municipal identification card program for all residents irrespective of immigration status.[272] New Haven's immigrant-friendly image is one that the city has worked hard to promote through

---

267.    *See supra* notes 35–42 and accompanying text.
268.    HOFFMASTER ET AL., *supra* note 9, at 6.
269.    *Id.*
270.    *Id.* at 4–5.
271.    *Id.* at 5.
272.    *Id.* at 6. Although some officers do not understand the process and stringent requirements for the identification cards, in general, New Haven police officers regard the card as a good tool that helps them identify city residents, saving time and resources by eliminating the need to hold a person until documents are authenticated. *Id.* at 9.

special programs and policies, all with the purpose of "ensuring the safety of all of its residents, including undocumented persons."[273]

Better policing was the motivation for hammering out the current approach to immigrants in Prince William County, Virginia, as well. Evidence of that motivation is symbolized by the process that the police chief followed in order to convince local politicians to modify their plans to implement a very strict anti-immigrant approach to public safety.[274] The community was highly polarized over the issue of immigration. Anti-immigrant protests, email campaigns, and town hall testimony by hundreds of residents pressured county board members. Ultimately the board unanimously approved a policy that restricted social services for undocumented immigrants, instructed the police to enter into a 287(g) agreement with ICE, and required officers to ask about any detained person's immigration status "if there is probable cause to believe such a person is in violation of federal immigration law."[275]

Throughout the volatile process, the police chief urged restraint and a balanced approach because, he said, "I have a responsibility to provide service to the entire community—no matter how they got here. It is in the best interest of our community to trust the police."[276] He feared that the board action would increase the number of "silent victims" in immigrant communities, as the department's relationship with the community soured and public trust eroded.[277] The chief insisted that the order to detain individuals suspected of being undocumented was problematic and could lead to "racial profiling" litigation against the department.[278] After consulting with other police departments and the county attorney, the county board of supervisors revised the policy in two ways: (1) immigration status inquiries are not required unless the person is arrested, not simply detained, and (2) the inquiry is made of every person arrested, not just those suspected of being foreign born.[279] Thus, crime witnesses and victims are not subject to questioning about immigration status.

In contrast to Prince William County, Montgomery County, Maryland, was regarded as having political leadership that was much more liberal and accepting of undocumented immigrants. The police chief in Montgomery County addressed the issue proactively. Certainly, he wanted to get undocumented immigrant criminals "off the streets," but the policy had to "allow officers to maintain the relationships that they had worked to build within various communities."[280] He did not want his officers to be in the business of enforcing federal immigration

---

273. *Id.* at 10.
274. *See supra* notes 43–51 and accompanying text.
275. HOFFMASTER ET AL., *supra* note 9, at 15–17.
276. *Id.* at 15–16 (quoting Police Chief Charlie T. Deane).
277. *Id.* at 15.
278. *Id.* at 17.
279. *Id.* at 18.
280. *Id.* at 21–22.

laws because that would make it difficult for police "to foster trust and cooperation with everyone in these immigrant communities."[281] His meetings with community residents provided the chief with opportunities to clarify any misunderstandings, and the input he received influenced his plan. The policy that was ultimately adopted does require forwarding names of persons arrested and charged with certain serious crimes. However, inquiries about immigration status are not made of crime witnesses and victims. The chief learned of misinformation to the contrary, so he constantly engaged in community outreach on the policy to dispel rumors.[282]

The sanctuary policies for crime victims and witnesses developed in Phoenix and Mesa, Arizona, are also grounded on a theory of public safety and the promotion of better policing. In Phoenix, the focus is on violent crime and on maintaining a positive relationship with the immigrant community. As one officer put it, "The Phoenix Police Department can't afford to squander the trust issue. . . . When we come out of the immigration cloud, we must have our reputation and trust intact."[283] The department constantly invests time and resources into improving communications with the immigrant community and to respond to criminal activity irrespective of immigration status.[284] The department knows that the cooperation of all residents—even those who are in undocumented status—is required to ensure the safety of the entire community.[285]

The philosophy in Mesa, Arizona, is similar. The mayor and police officers were openly critical of Sheriff Arpaio's operations in their city because his actions undermined the police department's relationship with the immigrant community and "set back the Police Department's efforts to build trust."[286] While trust and community confidence are the goals behind the police department's policy of not inquiring about immigration status when it comes to crime victims and witnesses, the battle is difficult because the distinction between federal (ICE), county (Arpaio), and local (police department) law enforcement is confusing for the immigrant community. As one officer put it, "You're not sure if you ever gain the trust. Maybe you just lessen the mistrust."[287] In spite of the tense atmosphere over immigration in Arizona, the Mesa police chief was determined not to adopt a policy that would damage the trust of a significant part of the community who were often victims or witnesses to crime. He held community meetings to encourage residents to discuss priorities and communication and consulted ICE. A new policy finally was adopted after seventeen revisions, followed by several

---

281.   *Id.* at 22 (quoting Police Chief J. Thomas Manger).
282.   *Id.* at 24.
283.   *Id.* at 35.
284.   *Id.*
285.   *Id.* at 36.
286.   *Id.* at 39 (quoting Police District Commander Steve Stahl).
287.   *Id.* at 40.

months of officer training.[288] Although the city takes pains not to be labeled a "sanctuary" for undocumented immigrants, perhaps for political reasons, the focus of the policy is on criminals, not crime victims or witnesses, and the department engages in continuous outreach to the immigration community.[289] In testimony before Congress, Mesa's police chief made clear why the immigration status of crime victims and witnesses needs to remain off the table:

> Community policing efforts are being derailed where immigrants who fear that the police will help deport them rely less on the local authorities and instead give thugs control of their neighborhoods.
>
> . . . . It is nearly impossible to gain the required trust to make community policing a reality in places where the community fears the police will help deport them, or deport a neighbor, friend or relative. [290]

The goal of gaining trust in immigrant communities as an important step in achieving public safety for the entire community through sanctuary policies is evident in many other jurisdictions:

❖ In San Jose, California, the police chief has warned that using a shrinking pool of officers to target undocumented immigrants is inefficient, costly and would make cities more dangerous, not less. Looking to reassure its own large and growing Latino community, San Jose has long broadcast that it does not participate in immigration raids. Officers are ordered not to investigate someone's immigration status even during arrests. San Jose police officers are looking to greatly improve their frayed relationship with immigrant communities amid allegations of overaggressive policing and racial profiling. The chief also discontinued a policy in which cars of unlicensed drivers stopped for minor traffic violations were impounded for a month—a policy many felt unfairly targeted the undocumented Latino community.[291]

❖ Officials in Providence, Rhode Island, ironically where Danny Sigui was deported after testifying as a witness in a 2003 murder trial,[292] want to opt out of ICE's Secure Communities program[293] because the "success of [the] city's community policing program has been based on the trust developed between law enforcement and the

---

288. *Id.* at 42.
289. *Id.* at 43.
290. *Public Safety and Civil Rights Implications of State and Local Enforcement of Federal Immigration Laws: J. Hearing Before the Subcomm. on Immigration, Citizenship, Refugees, Border Sec., & Int'l Law and the Subcomm. on the Constitution, Civil Rights, & Civil Liberties of the Comm. on the Judiciary H.R.*, 111th Cong. 84 (2009) (testimony of George Gascón, Chief, Mesa Police Dep't, Mesa, Ariz.).
291. Sean Webby, *San Jose: Chief Says Local Cops Shouldn't Be Involved in Immigration Enforcement*, SAN JOSE MERCURY NEWS, Mar. 16, 2011.
292. *See supra* notes 2–4 and accompanying text.
293. *See infra* notes 332–34 and accompanying text (describing the Secure Communities Program).

community—especially the immigrant community." City leaders worry that the Secure Communities program will breed fear and mistrust, undermining community policing practices. Witnesses and crime victims—including documented and undocumented immigrants—may shy away from the police, fearing that contact may lead to immigration problems.[294]

❖ The Minneapolis Police Department has had a policy in place for years that prohibits officers from asking about immigration status. That policy predates a city ordinance, passed in 2003, that prohibits all city employees from inquiring about immigration status.[295] Police understand that building trust is a challenge for immigrant communities, including newcomers like Somalis. With the sanctuary policy as a foundation and using bilingual interpreters, the police work to establish trust by building relationships through regular meetings and conversations with community members, accessing Somali radio shows, distributing flyers in neighborhoods, and even making door-to-door visits.[296]

❖ Takoma Park, Maryland, adopted a sanctuary ordinance in 1985 that prohibits all local officials from releasing any information regarding the citizenship or immigration status of any individual to any third party. The city reaffirmed this policy in 2007 by declaring that "enforcement of immigration laws by the Takoma Park Police Department will discourage immigrant residents from reporting crimes and suspicious activity, and cooperating with criminal investigations; and . . . as a matter of public safety, the protection of a person's citizenship and immigrant status will engender trust and cooperation between law enforcement officials and immigrant communities to aid in crime prevention and solving, and will discourage the threat of immigrant and racial profiling and harassment."[297]

❖ Speaking in support of his department's community policing policies, the police chief of Lowell, Massachusetts pointed out, "When immigrant residents of Lowell are afraid to report crimes because they worry that contact with my officers could lead to deportation, criminals are allowed to roam free and the entire community suffers as a result."[298]

❖ The state of Oregon has a statewide sanctuary law prohibiting police agencies and local governments from using any resources to

---

294.   Gregory Smith, *Providence Wants to Opt Out of 'Secure Communities' Database*, PROVIDENCE J., Feb. 23, 2011.

295.   HOFFMASTER ET AL., *supra* note 9, at 50.

296.   *Id.* at 51–52.

297.   City of Takoma Park, Md., Ordinance No. 2007-58 (Oct. 29, 2007), *available at* http://www.takomaparkmd.gov/clerk/agenda/items/2007/102907-2.pdf.

298.   TRAMONTE, *supra* note 2, at 6.

apprehend or report undocumented immigrants.[299] The state's largest city—Portland—has its own official sanctuary ordinance as well. Both measures are promoted as important steps in developing trust in immigrant communities to insure public safety for all residents.[300]

The sanctuary policies discussed in this article fall within what some refer to as "community oriented policy," "confidentiality policies," or "preventive" policing.[301] They prohibit immigration status inquiries of individuals not suspected of having committed crimes.[302] The success of these policies "hinges upon the development of trust between community residents and law enforcement officials. For communities with significant immigrant populations, building trust means getting immigrants to know that if they are victimized by crime or they witness a crime, they can approach the police and not fear immigration-related consequences."[303] These policies are premised in part on the fact that immigrants are often victimized by criminals who assume that no report will be made out of fear of being deported.[304]

By whatever name—sanctuary policies, confidentiality practices, community policing—state and local rules that require law enforcement officers to refrain

---

299.   OR. REV. STAT. § 181.850 (2007).
 Enforcement of federal immigration laws.
 (1) No law enforcement agency of the State of Oregon or of any political subdivision of the state shall use agency moneys, equipment or personnel for the purpose of detecting or apprehending persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws.
 (2) Notwithstanding subsection (1) of this section, a law enforcement agency may exchange information with the United States Bureau of Immigration and Customs Enforcement, the United States Bureau of Citizenship and Immigration Services and the United States Bureau of Customs and Border Protection in order to:
  (a) Verify the immigration status of a person if the person is arrested for any criminal offense; or
  (b) Request criminal investigation information with reference to persons named in records of the United States Bureau of Immigration and Customs Enforcement, the United States Bureau of Citizenship and Immigration Services or the United States Bureau of Customs and Border Protection.
 (3) Notwithstanding subsection (1) of this section, a law enforcement agency may arrest any person who:
  (a) Is charged by the United States with a criminal violation of federal immigration laws under Title II of the Immigration and Nationality Act or 18 U.S.C. 1015, 1422 to 1429 or 1505; and
  (b) Is subject to arrest for the crime pursuant to a warrant of arrest issued by a federal magistrate.
*Id.*
300.   TRAMONTE, *supra* note 2, at 7. In Portland, the relationship between immigrant communities and police improved as police-community dialogue gave immigrants a better sense of security. *Id.*
301.   *See supra* note 32.
302.   NAT'L IMMIGRATION FORUM, IMMIGRATION LAW ENFORCEMENT BY STATE AND LOCAL POLICE 3 (2007).
303.   *Id.* at 2.
304.   TRAMONTE, *supra* note 2, at 7.

from asking crime witnesses, crime victims, and, in some instances, minor offenders about immigration status are intended to promote public safety. Their goal is to gain the immigrant community's trust—trust that is needed for the community's cooperation. Through that cooperation, the entire community is safer. The policies are adopted as measures of good policing.

## V. GOOD PUBLIC POLICY

The success of sanctuary policies is evident:

> As departments around the country embraced community policing, crime rates dropped substantially. Between 1993 and 2005, violent crime rates fell 57 percent for the general population, and 55 percent for the Latino population. The downward trend was attributed in many state and local police agencies, in part, to community policing strategies.[305]

These good policing measures have indeed turned into good public policy decisions that have achieved greater public safety.

Not surprisingly, law enforcement organizations have come to recognize the positive public policy ramifications of sanctuary policies. According to the International Association of Chiefs of Police (IACP), one of the "central benchmarks of a well-commanded police department is establishing good relationships with the local communities, including those composed of immigrants. Working with these communities is critical in preventing and investigating crimes."[306] The IACP warns,

> Immigration enforcement by state and local police could have a chilling effect in immigrant communities and could limit cooperation with police by members of those communities. Local police agencies depend on the cooperation of immigrants, [documented and undocumented], in solving all sorts of crimes and in the maintenance of public order. Without assurances that they will not be subject to an immigration investigation and possible deportation, many immigrants with critical information would not come forward, even when heinous crimes are committed against them or their families. Because many families with undocumented family members also include legal immigrant members, this would drive a potential wedge between police and huge portions of the legal immigrant community as well.

> This will be felt most immediately in situations of domestic violence. For example, many law enforcement agencies have been addressing the difficult issues related to domestic abuse and the reluctance of some victims to contact the police. This barrier is heightened when the victim is an immigrant and rightly or wrongly perceives her tormentor to wield

---

305. NAT'L IMMIGRATION FORUM, *supra* note 302, at 2.
306. INT'L ASS'N OF CHIEFS OF POLICE, POLICE CHIEFS GUIDE TO IMMIGRATION ISSUES 21 (2007).

the power to control her ability to stay in the country. The word will get out quickly that contacting the local police can lead to deportation or being separated by a border from one's children. Should local police begin enforcing immigration laws, more women and children struggling with domestic violence will avoid police intervention and help.[307]

The IACP cautions cannot be taken lightly: the prevalence of mixed families (families with both documented and undocumented members) in the United States and the particular challenge that domestic violence presents render the need for immigration confidentiality particularly high.

The reticence to call police that is born of fear that lack of immigration status will "trump the criminal justice protections afforded crime victims" is a concern that reaches far beyond immigrant communities.[308] If victims are deterred from calling the police, criminals will not be held accountable. That leaves perpetrators free to commit other crimes, perhaps against U.S. citizens and lawful resident aliens.[309]

In spite of these data that verify the decline of crime rates in sanctuary localities and situations that demand confidentiality, critics argue that sanctuary policies forestall the removal of dangerous criminal immigrants.[310] However, a 2007 audit by the DOJ Office of Inspector General found that sanctuary or confidentiality policies "did not violate federal law and did not impede police cooperation with ICE regarding criminals in police custody."[311] Thus, the claim of obstruction appears meritless.

When the Department of Justice audited programs that received federal criminal assistance funds to defray costs of incarcerating criminal aliens, special attention was paid to jurisdictions that had sanctuary policies to determine if police cooperation with ICE was impeded. In fact, when auditors looked closely at the state of Oregon and San Francisco (two jurisdictions with sanctuary laws) as well as New York City (because of its executive order), "in each instance the local policy either did not preclude cooperation with ICE or else included a statement to the effect that those agencies and officers will assist ICE or share information

---

307. GENE VOEGTLIN, INT'L. ASS'N OF CHIEFS OF POLICE, ENFORCING IMMIGRATION LAW: THE ROLE OF STATE, TRIBAL AND LOCAL LAW ENFORCEMENT 5 (2004), *available at* http://www.theiacp.org/Portals/0/pdfs/Publications/ImmigrationEnforcementconf.pdf.

308. TRAMONTE, *supra* note 2, at 6 (quoting Leslye Orloff, Director of the Immigrant Women Program of Legal Momento and cofounder of the National Network to End Violence Against Immigrant Women).

309. *Id.*

310. For example, this "sanctuary cities resource" website, which keeps track of sanctuary jurisdictions, maligns those jurisdictions that have adopted sanctuary policies. *About the Sanctuary Cities Resource Site*, http://www.sanctuarycities.info/sanctuary_cities_about.htm (last visited Dec. 8, 2011). The website claims that these jurisdictions are "defying ICE and other federal agencies whose goal it is to reduce terrorism and keep criminals and other law breakers out of the United States." *Id.*

311. NAT'L IMMIGRATION FORUM, *supra* note 302, at 4.

with ICE as required by federal law."[312] There simply is no truth to the assertion that serious criminal aliens are averting immigration consequences because of sanctuary policies. In the words of DHS Secretary Michael Chertoff in 2007, "I'm not aware of any city . . . that actually interfered with our ability to enforce the law."[313] Once a noncitizen is convicted of a serious offense, the person is reported to immigration authorities in every sanctuary jurisdiction.

In contrast, serious public policy problems can arise in cities that do not have clear sanctuary or confidentiality policies. Community trust in the police can be eroded, and public safety for everyone can be negatively affected. For example, in 2007, the New Jersey Attorney General issued a directive ordering police to question individuals about their immigration status upon arrest for a serious crime. If an officer has "reason to believe" that such an individual is an undocumented immigrant, the individual must be referred to ICE. However, the directive was silent as to whether police should question a person about immigration status and refer to ICE in other contexts, such as traffic stops or street encounters. A survey of sixty-eight individuals referred to ICE by New Jersey law enforcement officials when only a minor offense or no offense was charged revealed troubling data:

❖ Sixty-five were Latino;

❖ Forty-nine were questioned about their immigration status and turned over to ICE following a traffic stop, either based on a minor infringement, such as rolling through a stop sign, or based on no identifiable reason at all (forty-one as drivers, eight as passengers); and

❖ Nineteen were stopped by police on the street and questioned about their immigration status (seven for drinking in public, the others for no apparent reason at all).[314]

In addition to these individuals, other persons who were witnesses or victims of crime also were questioned about their immigration status. One man called the police after he had been assaulted on the street by two men. The victim was detained for two days and transferred to ICE custody because he could not produce any identification.[315] Police questioned another man in his home as part of the investigation of a neighbor. The police detained the man after asking about

---

312.   AUDIT DIV., U.S. DEP'T OF JUSTICE, COOPERATION OF SCAAP RECIPIENTS IN THE REMOVAL OF CRIMINAL ALIENS FROM THE UNITED STATES viii, x–xi, 27–28 (2007).

313.   TRAMONTE, *supra* note 2, at 9. One might be concerned that sanctuary policies would hamper efforts to deal with criminal aliens or even terrorists. *See, e.g.,* Orde F. Kittrie, *Federalism, Deportation, and Crime Victims Afraid to Call the Police,* 91 IOWA L. REV. 1449 (2006). However, the assurances by Secretary Chertoff and the DOJ audit should dispel such concerns.

314.   BASSINA FARBENBLUM & JESSICA JANSYN, SETON HALL UNIV. SCH. OF LAW, CROSSING THE LINE: DAMAGING IMMIGRATION ENFORCEMENT PRACTICES BY NEW JERSEY POLICE FOLLOWING ATTORNEY GENERAL LAW ENFORCEMENT DIRECTIVE 2007-3, at 4 (2009).

315.   *Id.* at 15.

*UC IRVINE LAW REVIEW* [Vol. 2:247

his immigration status.[316] Individuals involved in car accidents were detained after police arrived and asked about immigration status.[317]

These incidents send the wrong message to immigrant communities for those who are concerned about public safety for the entire community. Little wonder that victims and witnesses are hesitant to come forward if they fear being questioned about their own immigration status. In the words of the former Newark Police Chief,

> The reluctance of local police to enforce federal immigration law grows out of the difficulty of balancing federal and local interests in ways that do not diminish the ability of the police to maintain their core mission of maintaining public safety, which depends heavily on public trust. In communities where people fear the police, very little information is shared with officers, undermining the police capacity for crime control and quality service delivery. As a result, these areas become breeding grounds for drug trafficking, human smuggling, terrorist activity, and other serious crimes. As a police chief . . . asked, "How do you police a community that will not talk to you?[318]

Voicing similar concerns about the aftereffects of a joint operation by federal agents and Chandler, Arizona police, the Attorney General of Arizona at the time, Grant Wood, called for an investigation because the operation "created an atmosphere of fear and uncertainty [that] greatly harmed the trust relationship" between police and residents.[319]

In contrast, police took a preventive police approach in Austin, Texas, when they realized that forty-seven percent of reported robbery victims were Latino, even though Latinos constituted only twenty-eight percent of the population and many robberies went unreported.[320] Police initiated an outreach campaign to the Spanish-speaking community to encourage undocumented residents to report crimes if they were victims or witnesses. Their message was clear: "Trust us. We are not immigration, we are not going to arrest you, and we are not going to deport you."[321] A twenty-percent increase in robbery reports followed. But then the police did more. To reduce the victimization of undocumented residents, they negotiated with banks to accept Mexican consul-issued identification cards for

---

316. *Id.*
317. *Id.*
318. *Public Safety and Civil Rights Implications of State and Local Enforcement of Fed. Immigration Laws: J. Hearing Before the Subcomm. on Immigration, Citizenship, Refugees, Border Sec., & Int'l Law and the Subcomm. on the Constitution, Civil Rights, & Civil Liberties of the Comm. on the Judiciary* H.R., 111th Cong. 81–82 (2009) (statement of Hubert Williams, President, Police Foundation).
319. DAVID A. HARRIS, GOOD COPS 189 (2005).
320. *Id.* at 191.
321. *Id.*

purposes of opening bank accounts. Undocumented residents no longer had to hide or carry their cash around, and robberies declined.[322]

In short, sanctuary policies are a better public policy choice. They work. They encourage trust—a necessary ingredient to problem-solving community policing models, providing hope to police departments across the country.[323] They promote public safety for everyone.

Sanctuary policies also are good public policy in an era when, unfortunately, anti-immigrant rhetoric that breeds hatred and distrust runs high in many quarters; and at times, the hate turns violent.[324] Sanctuary policies are important emblems of inclusion, public statements that counter the vitriol spawned by misguided souls. Sanctuary policies make sense because, like it or not, undocumented immigrants are a part of the community and shunning them does harm to all of us. Sanctuary policies send a message of rapport and trust.

The Supreme Court confronted an analogous public policy decision in 1982 when it struck down Texas's attempt to deny undocumented children access to elementary and secondary public schools. Even though undocumented status was not deemed a suspect classification and the right to education was not regarded as fundamental, in *Plyler v. Doe*, the Court noted,

> [M]any of the undocumented children disabled by this classification will remain in this country indefinitely, and . . . some will become lawful residents or citizens of the United States. It is difficult to understand precisely what the State hopes to achieve by promoting the creation and perpetuation of a subclass of illiterates within our boundaries, surely adding to the problems and costs of unemployment, welfare, and crime. It is thus clear that whatever savings might be achieved by denying these children an education, they are wholly insubstantial in light of the costs involved to these children, the State, and the Nation.[325]

This remarkable statement of inclusion was an important philosophical policy announcement that also was wise as a practical matter—the entire country would pay the price if these students were not afforded the opportunity to be educated.

Similarly, the entire community loses when we force a segment into the shadows of mistrust and fear of local law enforcement officials. Many in the so-called undocumented community will someday become lawful residents and citizens. Many are members of mixed families where a parent, a child, or a sibling already is a lawful resident or citizen. Most interact with other residents of the entire community on a daily basis and might be present to witness a crime or

---

322.    *Id.* at 192–93.
323.    *Id.* at 222.
324.    *See* Bill Ong Hing, *Vigilante Racism: The De-Americanization of Immigrant America*, 7 MICH. J. RACE & L. 441 (2002).
325.    *Id.* at 230.

provide aid to someone who is in trouble. The members of these communities need to be integrated, not shunned, for good public policy reasons.

Governmental institutions need to play a lead role in integration efforts, and sanctuary policies set the necessary tone. The influence of local leaders and government agencies can have overwhelmingly positive and immediate effects on the lives of immigrants. Important forms of civic engagement are not predicated on formal U.S. citizenship. Schools, neighborhoods, community groups, and public service programs can all benefit from the immediate involvement of immigrants. The alternative—as illustrated in the hellish environment created by Sheriff Joe Arpaio in Maricopa County, Arizona[326]—breeds fear and distrust within the immigrant community, while promoting hate by misguided community residents who follow Arpaio's lead. Rejecting the Arpaio world through alternative public policy choices is a legitimate decision that should be promoted.

## VI. CLOSING

In the interest of public safety, thousands of law enforcement agencies across the country engage in some form of sanctuary policy—officially or unofficially.[327] This is an important message of inclusion, integration, and outreach to immigrant communities in our increasingly diverse nation. Official numbers likely understate the actual level of de-emphasis that local law enforcement officials practice when it comes to checking the immigration status of individuals they encounter for minor matters, traffic offenses,[328] or as crime witnesses or

---

326. Prior to Arizona S.B. 1070, Sheriff Arpaio received widespread attention for his immigration enforcement antics pursuant to a 287(g) agreement with ICE. As part of his aggressive enforcement practices, Arpaio trained deputies to use minor traffic violations as an opportunity to check individuals' legal status. At Arpaio's county jail, prisoners were forced to wear black-and-white striped uniforms, with pink socks and underwear. Randy James, *Sheriff Joe Arpaio*, TIME (Oct. 13, 2009), http://www.time.com/time/nation/article/0,8599,1929920,00.html. In opening a new jail facility, he ordered seven hundred maximum-security prisoners to march four blocks to a new jail facility wearing only pink underwear and flip-flops. *Id.* Arpaio, who refers to himself as the "toughest sheriff" in the country is under investigation for breaking civil rights laws. Pierre Thomas, *Controversial Arizona Sheriff Joe Arpaio Under Investigation for Allegedly Violating Civil Rights*, ABC NEWS (Sept. 13, 2010), http://abcnews.go.com/WN/arizona-sheriff-joe-arpaio-investigation-us-department-justice/story?id=11556736. The allegations include: "unlawful searches and seizures, discriminatory police conduct, and a failure to provide basic services to individuals with limited English." *Id.* The Justice Department also has filed a lawsuit accusing Arpaio of obstructing the department's civil rights investigation. *Id.*

327. *See supra* note 17 and accompanying text.

328. I realize that for traffic stops, if the driver does not offer at least a form of identification that is acceptable to the officer, this can lead to immigration status questioning. That makes the issuance of driver's licenses to undocumented immigrants vitally important. Short of that, the issuance of local municipal identification cards that are acceptable to local police (as in New Haven) or the recognition of Mexican Consul-issued matriculas are very necessary. An incident in sanctuary-friendly San Francisco underscores the problem. Katie Worth, *Driver's Arrest Ignites Sanctuary City Debate*, S.F. EXAMINER (July 10, 2010), http://www.sfexaminer.com/local/driver-s-arrest-ignites-sanctuary-city-debate. On June 2, 2010, police stopped a driver who failed to come to a complete stop at a stop sign.

victims. Even without an "official" sanctuary policy, the officer's choice is one born of a sense that most folks in these categories that they encounter who are likely immigrants should be allowed to go about their lives without an intrusion from federal immigration officials. Even if they are not intending to send a message of inclusion, these officers find it unwise, or at least unnecessary, to send an Arizona S.B. 1070 message of unwelcome.

The constitutionality of sanctuary policies is clear. Unlike anti-immigrant subfederal laws intended to regulate immigration, sanctuary policies, community policing, and confidentiality approaches are not about regulating the admission of immigrants. Sanctuary policies are about public safety and decisions on how to spend public funds and establish priorities, and therefore are not preempted. Congress cannot commandeer local authorities to enforce federal immigration laws. Thus, as long as sanctuary communities that choose not to ask about immigration status do not bar volunteer communications and follow other federal requirements of cooperation, they clearly are not preempted. In fact, I believe that there is a good argument that policies that instruct police officers not to ask about immigration status and also not to talk about immigration status that they are aware of may also be protected; a federal statute that is intended to mandate subfederal entities to allow voluntary communication could very well run afoul of the Tenth Amendment depending on how courts view the mandate-prohibition distinction. The central teaching of the Tenth Amendment cases is that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the states to require or prohibit those acts. Congress may not, therefore, directly compel states or localities to enact or to administer policies or programs adopted by the federal government. It may not directly shift to the states enforcement and administrative responsibilities allocated to the federal government by the Constitution. Such a reallocation would not only diminish the political accountability of both state and federal officers, but it would also compromise the structural framework of dual sovereignty and separation of powers. Thus, Congress may not directly force states to assume enforcement or administrative responsibilities constitutionally vested in the federal government. Forcing subfederal entities to allow voluntary cooperation raises the specter of violating those principles.

Sanctuary policies can, however, be thwarted by the use of overzealous federal initiatives. For example, 287(g) agreements between ICE and local law enforcement officials were meant to focus on the identification and removal of

---

*Id.* The driver did not have a driver's license, but did provide a name and date of birth. *Id.* When officers performed a background check in the patrol car computer—standard procedure for every traffic stop—no criminal history was found, but a federal immigration warrant popped up with the same name and date of birth. *Id.* Since police could not confirm that the driver was the same person with the immigration warrant, he was arrested on suspicion of driving without a license and reported to ICE. *Id.*

*UC IRVINE LAW REVIEW*                    [Vol. 2:247

dangerous criminal aliens. However, we have seen these agreements abused not simply by the likes of Sheriff Arpaio, but by other local officials as well—more than half of those deported under 287(g) were for minor offenses,[329] and even some citizens have been mistakenly deported.[330] In many 287(g) jurisdictions, immigrants fear the police and avoid public spaces.[331] Likewise, the Secure Communities initiative that refers fingerprint information to DHS via the FBI for all participating jurisdictions was also intended to focus on serious criminals. Yet, the vast majority of individuals removed as a result of Secure Communities referrals also have been noncriminal or low-level offenders.[332] And DHS has taken the strict position on Secure Communities that it can access all fingerprints submitted to the FBI by local law enforcement officials even without the permission of state and local officials.[333] Secure Communities "casts too wide a

329.   TRAMONTE, *supra* note 2, at 8 (citing a Migration Policy Institute report); Nate Rau, *287(g) Deportation Program Snags Few Felons, Memos from Feds Show; Critics Hit Deportation Program*, THE TENNESSEAN (Nashville) (Oct. 24, 2010), *available at* http://mexicanexpulsions.blogspot.com/2010/10/287g-deportation-program-snags-few.html.

330.   Pedro Guzman, a U.S. citizen born in California, is a developmentally disabled man who was deported after the Los Angeles Sheriff's Department mistakenly referred him to ICE pursuant to a 287(g) agreement. Sam Quinones, *Disabled Man Found After 89-Day Ordeal*, L.A. TIMES (Aug. 8, 2007), http://articles.latimes.com/2007/aug/08/local/me-found8; Joanne Lin, *End It: 287(g) is Beyond Repair and Harms Local Communities Every Day*, ACLU BLOG OF RIGHTS (Apr. 5, 2010), http://www.aclu.org/blog/immigrants-rights/end-it-287g-beyond-repair-and-harms-local-communities-every-day. Mark Lyttle, a U.S. citizen was deported even though immigration officials had criminal record checks that said he was a U.S. citizen. Kristin Collins, *N.C. Native Wrongly Deported to Mexico*, CHARLOTTE OBSERVER (Aug. 30, 2009), http://www.charlotteobserver.com/2009/08/30/917007/nc-native-wrongly-deported-to.html. They had his Social Security number and the names of his parents. *Id.* They had Lyttle's own sworn statement that he had been born in North Carolina. *Id.* CNN researchers have found that every year hundreds of U.S. citizens are deported by mistake. Lisa DiVirgilio, *Report: Hundreds of U.S. Citizens Wrongfully Deported Every Year*, THE POST STANDARD (Syracuse, NY) (July 26, 2010), http://www.syracuse.com/news/index.ssf/2010/07/report_hundreds_of_us_citizens.html.

331.   TRAMONTE, *supra* note 2, at 8–9 (citing a Migration Policy Institute report).

332.   *Id.* at 8; *see* MICHELE WASLIN, IMMIGR. POLICY CTR., THE SECURE COMMUNITIES PROGRAM: UNANSWERED QUESTIONS AND CONTINUING CONCERNS, Nov. 2011, *available at* http://www.immigrationpolicy.org/sites/default/files/docs/Secure_Communities_112911_updated.pdf; Rachel R. Ray, *Insecure Communities: Examining Local Government Participation in U.S. Immigration and Customs Enforcement's 'Secure Communities' Program* (Seattle J. for Social Justice, 2011), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1941826. For example, an abused woman in San Francisco worked up the courage to call police, but she was arrested as well because the police saw a "red mark" on the alleged abuser's check. Lee Romney & Paloma Esquivel, *Caught in a Very Wide Net: A Federal Deportation Program Snares Many Noncriminals and Low-Level Offenders*, L.A. TIMES, Apr. 25, 2011, at A1. The charges against her were dropped, but her fingerprints were already forwarded to ICE under the Secure Communities program, and she faced deportation. *Id.* This case was an exact replica of one that occurred in Maryland.

333.   Tara Bahrampour, *Immigration Authority Terminates Secure Communities Agreements*, WASH. POST (Aug. 7, 2011), http://www.washingtonpost.com/local/immigration-authority-terminates-secure-communities-agreements/2011/08/05/gIQAlwx80I_story.html. ICE Director John Morton announced, "We're going to continue the program, but we're going to do it without [written agreements]." *Id.* All states have signed agreements with the FBI to send arrestees' fingerprints to the FBI for criminal history checks. This is important for local law enforcement who need to know if an

net and scoops up the fingerprints of everyone not born in the United States whether or not they pose a criminal risk."[334] Similarly, many local law enforcement officials who use the National Crime Information Center database, a catalog of information on arrest warrants and wanted persons, can receive civil immigration violation information or erroneous immigration information that has led to the removal of noncriminal aliens.[335] Given these outcomes, the challenge that many sanctuary and other forward-thinking communities have launched against the misuse of such programs is critical to ensuring that their communities do not become Gestapo-esque.[336]

The adoption of sanctuary policies at a time when segments of our nation are in a frenzy over immigration is an important, bold statement of support for a nation of immigrants. Choosing sanctuary policies over policies of fear tells immigrants and the rest of us what type of community our leaders and law enforcement officials are choosing. The nonsanctuary choice is closed-minded, resistant to continuing changes that will only breed tension and threaten public safety. The choice of sanctuary, confidentiality, or "don't ask" is one of smart policing—one that embraces change and encourages integration in the hopes of building a stronger, safer community. That choice also represents an important step toward avoiding the pitfalls of division, hate, and insular living.

---

arrestee is wanted by another jurisdiction, for example. However, the confiscation of the fingerprints from the FBI by ICE is not part of these agreements, and the ICE action raises serious Tenth Amendment commandeering practices that will likely be subject to constitutional challenge. *See supra* notes 169–171 and accompanying text.

334.   Michael Hennessey, *Secure Communities Destroys Public Trust*, S.F. CHRONICLE, May 1, 2011 (Hennessey was the Sheriff of San Francisco until January 2012, when he retired); *see also infra* note 336.

335.   HOFFMASTER ET AL., *supra* note 9, at viii, 14, 21, 23, 62; Laura Sullivan, Comment, *Enforcing Nonenforcement: Countering the Threat Posed to Sanctuary Laws by the Inclusion of Immigration Records in the National Crime Information Center Database*, 97 CALIF. L. REV. 567 (2009).

336.   Many police departments are critical of the problems with the National Crime Information Center database, arguing that "controls are needed to eliminate the entering of civil detainers into a system intended for criminal warrants, which creates confusion for local policy, and may cause them to exceed their authority by arresting a person on a civil detainer." HOFFMASTER ET AL., *supra* note 9, at viii, 14, 62. Local jurisdictions that have attempted to opt out of the Secure Communities initiative include Santa Clara County, California, Artlington County, Virginia, and the City and County of San Francisco. WASLIN, *supra* note 332, at 11–12. The governors of Illinois and Massachusetts have sought to terminate their Secure Communities agreement with ICE, and the governor of Massachusetts declined to sign an agreement with ICE. *Id.* However, in August 2011, ICE took the position that it did not need written agreements with state officials to have access to fingerprints submitted to the FBI. *Id.* ICE argues that under 8 U.S.C. § 1722(a)(2), federal agencies can share information with impunity. *Id.* In other words, Secure Communities is "mandatory." *Id.*

312                     *UC IRVINE LAW REVIEW*                    [Vol. 2:247

# EXHIBIT II

# When Undocumented Immigrants Don't Report Crimes, We All Suffer

 **wbur.org**/cognoscenti/2017/09/22/undocumented-immigrants-report-crimes-debra-j-robbin

Skip to main content

Listen Live: On Point

↗

 Cognoscenti

- Donate 🖤
- Search 🔍

Support the news

## Commentary



 closemore

(Annie Spratt/Unsplash)

*Like what you read here? Sign up for our twice-weekly newsletter.*

Imagine if nearly three-quarters of the people living in a particular community did not report being raped, beaten or burglarized. Politicians, law enforcement and advocates would search for explanations and worry about the implications for public safety.

But this scenario isn't hypothetical. It is playing out in Massachusetts and across the country as the federal government seeks to erode the rights of immigrants and the sanctity of our legal system. Indeed, recent news coverage about the increased presence of U.S. Immigration and Customs Enforcement in courthouses has highlighted the vulnerability facing immigrants in this chilling environment.

A 2013 survey of Latinos about their perceptions of police found that 70 percent of undocumented immigrants said they are "less likely" to report crimes to law enforcement if they are victimized because they fear questions about their immigration status. (Roughly 80 percent of undocumented immigrants come from Mexico and Central and South America, which are mostly Latino.)

A recent survey of 715 advocates and attorneys from 46 states and the District of Columbia indicated that 78 percent of sexual and domestic violence survivors who are immigrants expressed concerns about contacting the police. Nearly half of all these advocates reported that they worked with immigrants who dropped their civil and criminal cases because they were fearful of going forward. Local sexual and domestic violence programs throughout Massachusetts have reported to Jane Doe Inc. that many undocumented immigrants are also hesitant to contact law enforcement.

> A recent survey ... indicated that 78 percent of sexual and domestic violence survivors who are immigrants have concerns about contacting the police.

Why is this happening? Victims of sexual and domestic violence face many barriers to reporting including: fears of deportation for themselves or others; witness intimidation, such as threats of being reported to ICE; lack of legal representation; unfamiliarity with the legal system; language barriers; expectations of not being believed; and distrust of the government to protect their rights.

The implications are clear. For undocumented immigrants who experience sexual and domestic violence, these barriers are compounded by threats of exposing their immigration status and threats as well as fear of being separated from their families. When the community and law enforcement are not engaged, we miss opportunities to interrupt current and future violence. As a result, everyone's public safety is put at risk.

The federal Violence Against Women Act recognizes this unique status and vulnerability. Since 2005, Congress has encouraged immigrant victims to report crimes without fear of the deportation. U-Visas and T-Visas were created for victims of violent crime and trafficking so that immigrants who are crime victims can safely cooperate with law enforcement investigations. While the current limit of 10,000 U-Visas and T-Visas per year does not adequately meet the need, the established principles behind these forms of legal protections should inform our current efforts to protect human rights.

> The Safe Communities Act would ensure that police officers in Massachusetts do not act as ICE agents by asking about immigration status before providing protection ...

## Most Viewed Stories

Policies that blur the lines between immigration and community law enforcement endanger the safety of victims, their families and communities. Immigrant survivors' access to justice is blocked when they cannot safely contact community law enforcement because of their immigration status. The Massachusetts Legislature and governor have an opportunity to shift this scenario in the Commonwealth. The Safe Communities Act would help ensure that people — regardless of their immigrant status — will reach out for help and report crimes to the police.

Specifically, the Safe Communities Act would ensure that police officers in Massachusetts do not act as ICE agents by asking about immigration status before providing protection or detaining or deporting members of our communities. In addition, the legislation prohibits access to information in state databases for use in any federal registry program based on national origin, religion or other protected characteristics. It ensures basic due process rights for people detained in state and local facilities for civil immigration violations.

Just last month the Massachusetts Supreme Judicial Court ruled in Lunn v. Commonwealth that state and local law enforcement have no authorization to hold people solely on the basis of their immigration status. The legislation filed by Gov. Charlie Baker in response — allowing law enforcement to detain some unauthorized immigrants — not only flouts this ruling but uses the issues of sexual and domestic violence to demonize immigrants as violent perpetrators. Rather than increasing community safety, this approach will have the unintended consequence of silencing of immigrant victims who fear coming forward because of an unfair and uncertain immigration system.

Keeping an open channel between all communities and local police improves public safety for everyone. The outcome would be positive: Families would feel safe visiting their health care providers; parents wouldn't fear sending their children to school and victims of gender-based violence, hate crimes and other violence would feel more able to speak up.

This law would help keep Massachusetts' communities safe. Survivors of sexual and domestic violence and other forms of violence deserve nothing less.

*Follow Cognoscenti on Facebook and Twitter, and sign up for our twice-weekly newsletter.*

## Related:

Debra J. Robbin  Cognoscenti contributor

Debra J. Robbin is the executive director of Jane Doe Inc. and has more than 35 years of experience in work preventing sexual and domestic violence.



More...

Join the discussion



## More from Cognoscenti

Support the news

When Undocumented Immigrants Don't Report Crimes, We All Suffer | Cognoscenti