**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **STATE OF TEXAS**, *et al.*, | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 1:18-cv-00068** |
| | § | |
| **UNITED STATES OF AMERICA**, *et al.*, | § | |
| | § | |
| **Defendants,** | § | |
| | § | |
| **KARLA PEREZ**, *et al.*, | § | |
| | § | |
| **Defendants-Intervenors.** | § | |
| | § | |

# APPENDIX IN SUPPORT OF BRIEF OF 114 COMPANIES AND ASSOCIATIONS AS *AMICI CURIAE*

# VOLUME 2

# EXHIBITS 38-52

# EXHIBIT 38

**Importing workers** ▼
(HTTP://WWW.LATIMES.COM/)



f  y

# Wages rise on California farms. Americans still don't want the job

Trump's immigration crackdown is supposed to help U.S. citizens. For California farmers, it's worsening a desperate labor shortage.

By NATALIE KITROEFF (HTTP://WWW.LATIMES.COM/LA-BIO-NATALIE-KITROEFF-STAFF.HTML) AND
GEOFFREY MOHAN (HTTP://WWW.LATIMES.COM/LA-BIO-GEOFFREY-MOHAN-STAFF.HTML)

MARCH 17, 2017 | REPORTING FROM STOCKTON, CALIF.

**A**rnulfo Solorio's desperate mission to recruit farmworkers for the Napa Valley took him far from the pastoral vineyards to a raggedy parking lot in Stockton, in the heart of the Central Valley.

Carrying a fat stack of business cards for his company, Silverado Farming, Solorio approached one prospect, a man with only his bottom set of teeth. He told Solorio that farm work in Stockton pays $11 to $12 an hour. Solorio

countered: "Look, we are paying $14.50 now, but we are going up to $16."
The man nodded skeptically.

**Solorio recruiting workers in Stockton**



Solorio moved on to two men huddled nearby, and returned quickly. "They
were drug addicts," he said. "And, they didn't have a car."

Before the day was through, Solorio would make the same pitch to dozens
of men and women, approaching a taco truck, a restaurant and a homeless
encampment. Time was short: He needed to find 100 workers to fill his
ranks by April 1, when grapevines begin to grow and need constant
attention.

Solorio is one of a growing number of agricultural businessmen who say
they face an urgent shortage of workers. The flow of labor began drying up
when President Obama tightened the border. Now President Trump is
promising to deport more people, raid more companies and build a wall on
the southern border.



Workers prune grapevines at the Napa Valley vineyard of Silverado Farming. Cabernet Sauvignon grapes in Napa go for nearly $6,900 per ton, 10 times more than in San Joaquin County. (Gary Coronado / Los Angeles Times)

That has made California farms a proving ground for the Trump team's theory that by cutting off the flow of immigrants they will free up more jobs for American-born workers and push up their wages.

So far, the results aren't encouraging for farmers or domestic workers.

Farmers are being forced to make difficult choices about whether to abandon some of the state's hallmark fruits and vegetables, move operations abroad, import workers under a special visa or replace them altogether with machines.

Growers who can afford it have already begun raising worker pay well beyond minimum wage. Wages for crop production in California increased by 13% from 2010 to 2015, twice as fast as average pay in the state,

according to a Los Angeles Times analysis of data from the Bureau of Labor Statistics.



**Farmworker pay soars**

California field laborer wages have risen nearly 50% since 1996.

In 2015 dollars

1990:
**$22,622**

1996:
**$20,343**

2015:
**$29,632**

'90    '95    '00    '05    '10    '15

Source: Bureau of Labor Statistics, Times analysis          @latimesgraphics

Today, farmworkers in the state earn about $30,000 a year if they work full time — about half the overall average pay in California. Most work fewer hours.

Some farmers are even giving laborers benefits normally reserved for white-collar professionals, like 401(k) plans, health insurance, subsidized housing and profit-sharing bonuses. Full-timers at Silverado Farming, for example, get most of those sweeteners, plus 10 paid vacation days, eight paid holidays, and can earn their hourly rate to take English classes.

ADVERTISEMENT

But the raises and new perks have not tempted native-born Americans to leave their day jobs for the fields. Nine in 10 agriculture workers in California are still foreign born, and more than half are undocumented, according to a federal survey.

Instead, companies growing high-value crops, like Cabernet Sauvignon grapes in Napa, are luring employees from fields in places like Stockton that produce cheaper wine grapes or less profitable fruits and vegetables.

Growers who can't raise wages are losing their employees and dealing with it by mechanizing, downsizing or switching to less labor-intensive crops.

Jeff Klein is doing all of the above. Last year Klein, a fourth-generation Stockton farmer, ran a mental ledger, trying to sort out the pros and cons of persevering in the wine business or quitting. He couldn't make the math work.

Wineries pay Klein a tiny fraction of what they pony up for the same grape variety grown in Napa, and the rising cost of labor meant he was losing money on his vineyards. So in October, Klein decided to rip out 113,000 Chardonnay grapevines that once blanketed land his family has owned for decades. Now they lay heaped into hundreds of piles, waiting to be taken to the dump.



Jeff Klein, a fourth-generation Stockton farmer, knew his vines were done for when California passed laws raising the minimum wage to $15 by 2023 and requiring overtime for field laborers. (Gary Coronado / Los Angeles Times)

"I try to make any decision I make not emotional. When you're running a business, it has to be a financial decision," he says, sifting through the mangled metal posts.

Five years ago, Klein had a crew of 100 workers pruning, tying and suckering his grapevines. Wineries paid $700 for a ton of grapes, and Klein could make a solid profit paying $8 an hour, the minimum wage.

Last year he could barely get together 45 laborers, and his grapes sold for only $350 per ton. Klein knew his vines were done for when California passed laws raising the minimum wage to $15 by 2023 and requiring overtime for field laborers.

"There's not enough guys, and everybody is fighting for everybody else's guys," he says. "In Napa and Sonoma, they're getting $2,000 a ton [for grapes]. So, those guys can afford to pay $15. For me, I'm just trying to break even."

**California farmers can't find enough laborers**



Although Trump earned Klein's vote, he worries that recent executive orders ratcheting up deportation plans and calling for a wall are putting a chokehold on an already tight pool of workers.

"That's killing our labor force," says the 35-year-old grower.

Already, fewer Mexicans had been willing to risk border crossings as security and deportations escalated under the Obama Administration. At the same time, Mexico's own economy was mushrooming, offering decent jobs for people who stayed behind.

With the grapevines he has left, Klein is doing what he can to pare his crews. Last year, he bought a leaf puller for $50,000, which turns the delicate process of culling grapevine canopies into an exercise in brute force. The puller hooks onto a tractor and, like an oddly shaped vacuum cleaner, sucks leaves from grapevines.

He used to spend $100 an acre culling the canopies, which allows the right amount of sunlight to hit the grapes and turn them into sugar balls. Now, he says, "It will cost me 20 bucks, and I can get rid of some labor."

Klein says he'll spend the next five years replacing his 1,000 acres of grapevines with almond and olive trees, which require a fraction of the human contact to grow.

About 80 miles west in Napa, growers aren't facing quite the same challenge. Cabernet Sauvignon grapes in Napa go for nearly $6,900 per ton, 10 times more than in San Joaquin County.

# Napa farm workers are state's highest paid

Areas like Napa County, where high-value wine grapes are grown, are luring workers from lower-paying areas like San Joaquin County.



San Joaquin County: **$30,544**

Napa County: **$41,940**

**Average crop worker wages, 2015**

- > $40,000
- $30,000 – $40,000
- $20,000 – $30,000
- $10,000 – $20,000
- No data available

Source: Bureau of Labor Statistics, Times analysis

Joe Fox / @latimesgraphics

That's the reason that Napa County pays its farmworkers $41,940 a year, the highest in California, our analysis of federal data shows.

That's also why Leovijildo Martinez clambers into a van around 4:40 a.m. every morning to travel from Stockton to the Napa Valley.

By 6:30 a.m. he is on a Napa vineyard, and 12 hours later, he returns to his two-bedroom apartment.

"You get home, you shower, you eat a couple of tortillas with whatever is here," Martinez says. He gets to see his kids' faces and give them a hug before turning in at 9:30 p.m. They still complain about not seeing him enough.

"It's hard for me as a man and as a father," he says.



Leovijildo Martinez, who commutes to the Napa Valley from Stockton each day, earns $19.50 an hour working vineyards that produce grapes for a winery whose bottles go for about $300. (Gary Coronado / Los Angeles Times)

 

**Farmworker** Leobijildo Martinez tends to the grapevines at **Silverado** Farming in Napa Valley. (Gary Coronado / Los **Angeles** Times)

Workers at Silverado Farming take a break. Full-timers at Silverado get benefits that include 10 paid vacation days, eight paid holidays and pay for taking English classes. (Gary Coronado / Los Angeles Times)

But the commute is paying off. A year ago, the 31-year-old from Mexico was earning $14.75 an hour doing the same work for a different Napa company. He joined Silverado in April and now he's making $19.50 working vineyards that produce grapes for a winery whose bottles go for about $300.

"Everything in Napa is different. They treat you differently there, they don't pressure you, and they respect the law," he says. "If you work here, in Stockton, you don't have enough money."

According to the economic theory behind Trump's immigration crackdown, Americans should be following Martinez's van into the fields.

"The law of supply and demand doesn't stop being true just because you're talking about people," says George Borjas, a Harvard economist and prominent foe of unfettered immigration. "[Farmers] have had an almost endless supply of low-skill workers for a long time, and now they are finding it difficult to transition to a situation where they don't."

Borjas believes the ones who reap the rewards of immigration are employers — not just farmers, but restaurant owners and well-to-do homeowners who hire landscapers and housekeepers. The people who

suffer most are American workers, who contend with more competition for jobs and lower pay.

But Silverado, the farm labor contracting company in Napa, has never had a white, American-born person take an entry-level gig, even after the company increased hourly wages to $4 above the minimum. And Silverado is far from unique.

U.S. workers filled just 2% of a sample of farm labor vacancies advertised in 1996, according to a report published by the Labor Department's office of inspector general (https://www.oig.dol.gov/public/reports/oa/1998/04-98-004-03-321r.htm#Interstate Clearance System has Little Impact). "I don't think anybody would dispute that that's roughly the way it is now" as well, says Philip Martin, an economist at UC Davis and one of the country's leading experts on agriculture.

Indeed, Chalmers R. Carr III, the president of Titan Farms, a South Carolina peach giant, told lawmakers at a 2013 hearing that he advertised 2,000 job openings from 2010 through 2012. Carr said he was paying $9.39, $2 more than the state's minimum wage at the time.



**You don't need a deep analysis to understand why farm work wouldn't be attractive to young Americans**



— Philip Martin, agriculture expert

 ▾ SHARE

He hired 483 U.S. applicants, slightly less than a quarter of what he needed; 109 didn't show up on the first day. Another 321 of them quit, "the vast majority in the first two days," Carr testified. Only 31 lasted for the entire peach season.

Borjas, the Harvard economist, says that it may just be that wages are still too low. "Believe me, if the wages were really, really high, you and I would be lining up," Borjas says.

Or perhaps farms are just not a place where native-born Americans want to work. The job is seasonal, so laborers have to alternate between long stretches without any income and then months of 60-hour weeks. They work in extreme heat and cold, and spend all day bending over to reach vegetables or climbing up and down ladders to pluck fruit in trees.

"You don't need a deep analysis to understand why farm work wouldn't be attractive to young Americans," says Martin, the agriculture expert.

If farmers upped the average wage to, say, $25 an hour, people born here might think twice. But that's a pipe dream, many argue.

"Well before we got to $25, there would be machines out in the fields, doing pruning or harvesting, or we would lose crops," Martin says.

Already, strawberry growers in Ventura are experimenting with robots that plant seedlings, and growers in Central Coast counties are culling, weeding and even harvesting heads of lettuce with machines. At the outer edge, engineers are trying to teach machines to pick fruit.

Brad Goehring, a fourth-generation farmer, is re-engineering his vineyards so they can be harvested entirely by machines.

The 52-year-old owns 500 acres of wine grapes in Lodi, near Stockton. He tends another 10,000 or so acres of vineyards that belong to several clients across Northern California.

Being the boss used to be fun for Goehring, but his labor problems are wearying.

In the last five years, he has advertised in local newspapers and accepted more than a dozen unemployed applicants from the state's job agency. Even when the average rate on his fields was $20 an hour, the U.S.-born workers lost interest, fast.

"We've never had one come back after lunch," he says.

For now, Goehring is betting his future on 10 floppy rows of Malbec vines. The vines, visible from the slender country road that borders Goehring's house, were among his first experiments in mechanization.

About five years ago, Goehring changed the wiring holding up parts of his vines so that no metal stakes exceed the height of the wire. The setup allows for a machine to prune the top of the vine, as well as both sides.



Brad Goehring, a fourth-generation farmer, is re-engineering his vineyards so they can be harvested entirely by machines. Above, Goehring with a grape harvester. (Gary Coronado / Los Angeles Times)

"I think we can eliminate, I'm just guessing, 85% of the labor on these new vineyards," he says, reducing pruning costs from $300 per acre, on average, to $80. He plans to keep spending more on machinery, like his $350,000 tractor-like vehicle that shakes grapes off the vine and catches them before they fall to the ground.

Now, he's replanting entire ranches for clients interested in machine-managed vineyards.

Goehring's long game is hundreds of acres of wine grapes harvested without ever touching human hands. If that doesn't work, he'd reluctantly replace it all with almonds.

"If we have to, we'd go there," he says. If filled with nut trees, his entire property could be managed, he says, by three employees.

*Times staff writer Ben Welsh contributed data analysis to this report. The analysis has been published as open-source software (https://github.com/datadesk/california-crop-production-wages-analysis/blob/master/03-analysis.ipynb).*

Credits: Produced by Andrea Roberson

**UPDATES:**
- 3:30 p.m.: This article was updated to clarify farmworker hours.

**More from the Los Angeles Times**



(http://www.latimes.com/projects/la-fi-construction-trump/)

**Immigrants flooded California construction. Worker pay sank. Here's why** (http://www.latimes.com/projects/la-fi-construction-trump/)



(http://www.latimes.com/projects/la-fi-farm-labor-guestworkers/)

**To keep crops from rotting in the field, farmers say they need Trump to let in more temporary workers** (http://www.latimes.com/projects/la-fi-farm-labor-guestworkers/)



**Desired for their labor, rejected as neighbors. Farmworkers in California face hostile communities** (http://www.latimes.com/projects/la-fi-farmworker-housing/)



(http://www.latimes.com/projects/la-fi-farmworker-housing/)



**As California's labor shortage grows, farmers race to replace workers with robots** (http://www.latimes.com/projects/la-fi-farm-mechanization/)

(http://www.latimes.com/projects/la-fi-farm-mechanization/)

Terms of Service (//www.tronc.com/central-terms-of-service/) | Privacy (//www.tronc.com/privacy-policy/) | Ads (//www.latimes.com/lat-about-our-ads,0,3875412.htmlstory) | © 2018 (//www.latimes.com/services/site/la-reprint-request-splash,0,6731163.htmlstory) | (//www.latimes.com/about/)

# EXHIBIT 39

 Money       Companies     Markets     Tech     Media                                                                    U.S. ▾

American Opportunity

# The worker shortage facing America's farmers

by Octavio Blanco  @CNNMoney

September 29, 2016: 2:55 PM ET

Recommend 0       ✉   f   t   i

Trump's immigration policy could hurt U.S. farmers

American farmers say they are facing a severe worker shortage.

More than half of U.S. farm workers are undocumented immigrants, according to the U.S. Department of Labor. Yet, that pool of workers is shrinking.

A recent Pew Research report found that more Mexican immigrants are now leaving the U.S. than coming into the country, citing tougher enforcement of immigration laws and the slow economic recovery here in the U.S. (The report accounted for both documented and undocumented immigrants).

With fewer workers, farm owners say costs are rising and they often must leave unpicked fruit to rot in the fields. Many producers are even opting to leave the U.S. for countries with lower costs and fewer regulations, said Tom Nassif, CEO of Western Growers, a trade organization that represents farm owners both in the U.S. and abroad.

"We're pretty much begging for workers. It's very bleak," he said.

**Related: 7 things to know about our food system**

The competition for workers has sent average farm worker wages up 5% in the past year, to $12 an hour, according to the U.S. Department of Agriculture figures. That's $2 higher than California's $10 minimum wage, with some farmers saying they pay as much as $15 an hour, according to Nassif.


Advertisement

Personal Finance

Open a New Account

Featured

synchro

High-Yield Savings
Account                      1.7
Member FDIC                  $0

Open Account

CIT Bank.                    1.
Member FDIC

Money Market Account         Open A

Sponsors of BankingRates     Advertise

The Motley Fool              P




A fruit picker balances on a ladder.

And costs keep rising. Two weeks ago, California said it will expand its overtime rules to include migrant farm workers starting in 2019. That means farm owners will have to pay one and half times the employee's regular rate after they have worked a certain number of consecutive hours.

With increased competition for labor, workers are also asking for and winning better working conditions, such as a 15-minute shade break for each hour of work.

"If they don't like how they're being treated or what they're being paid, they'll just go to another farm," said Nassif.

Still, the increased pay, improved working conditions and overtime benefits have failed to attract many American workers.

"Of the 300 workers I have in the field, two are Americans," said Joe Del Bosque, a farm owner in Firebaugh, California.

One big reason: The work can be very labor intensive, said Nassif. Picking strawberries, tomatoes or melons requires bending down or kneeling all day. Picking tree fruits, like oranges and peaches, means carrying 10- to 20-pound bushels while balancing on ladders in all sorts of weather conditions.

### Related: How farmers use 'digital agriculture' to grow more crops

Jorge Negrete, a formerly undocumented immigrant farm worker who is now a citizen and a farm manager in California, says that of the Americans he's seen come to work on the farm he manages, few stick around for more than a day.

But it's not just the physical labor that's problematic. It's the seasonal and migratory nature of the job that's likely a deterrent, Nassif said.

"If you told Amazon delivery people that every several weeks or several months they'd have to move to a different city or county, I doubt that they'd be working for the company," he said. "Americans want stable jobs with vacation and other benefits. That doesn't exist in agriculture."

The only way Nassif believes American workers could be enticed back onto the fields is through the use of technology, like crop-picking robots, he said, where they would be able to put their

You Can Still Buy This "Million Maker" Stock

Bitcoin Up 30,000X -- Here's Backdoor In

Motley Fool Issues Rare Triple Alert

This Stock Could Be Like Buy Amazon for $3.19

Paid Content

Here's What A College Degre Cost In 2018
Online College Degre Sponsored Listings


The Cost Of Al Accident Attor Might Surprise
Best Attorney For Ac
Sponsored Links

New York Say Goodbye To Yo Mortgage If Yo
Harp Benefits

[Pics] This Bat Elephant Decir Spend His Las

LendingTree

Your best mortgage rates fc 2018

Experts are urging Americai refinance in 2018

Brilliant tip for paying off yo mortgage in half the time

Crush your mortgage intere a 15 yr fixed

Rates now at 3.93% APR - $ mortgage for $1,650/mo

higher educations as engineers and technicians to use. But he noted that advances have been too slow and not enough money is being invested into research and development.



More farms are using drones to monitor crops.

"Millions of dollars are being invested into this technology, but it should be in the multi-billions," Nassif said.

Western Growers has created a center for innovation and technology in Salinas, California, to develop new technologies like these. The organization also brings in entrepreneurs to work and meet with farmers who would buy or invest in their technology. It also brings in venture capitalists and creates funds for investors.

"That's where we see the future," Nassif said.

-- *CNNMoney's Cristina Alesci and Logan Whiteside contributed to this report.*

CNNMoney (New York)
First published September 29, 2016: 6:33 AM ET

**PAID CONTENT**



**Switch to Progressive and you could save $668 on car insurance**
Sponsored: Progressive



**Glasses-Wearers Are Going Crazy Over This Website**
Sponsored: GlassesUSA



Newsletter

**CNN** Money

BEFORE
THE BELL

Sponsored by E✲TRADE

**Key market news. In your in**
**Every morning.**

Start your day right with the latest
driving global markets, from major
movers and key economic headlin
important events on the calendar.
newsletter. Sunday through Frid

**Sign up  >**

CNNMoney Sponsors

SmartAsset

**Top Bank Announces 1.65% /
Savings Account**

**Certificate of Deposit Rates**

**Want a stress-free retirement
to a financial advisor**

**Is a Money Market Account or
Right for You?**

NextAdvisor

**An outrageous card offering (
Interest until August 2019**

**7 outrageous credit cards if y
excellent credit**

**Cards charging 0% interest u
2020**

**The highest paying cash bacl
has hit the market**

| Paid Content | More from CNN Money |
|---|---|
| Put more of the world within reach with the Citi®/AAdvantage® Platinum Select® Mastercard®<br>*Citi* | After internet mockery, 'Permit Patty' resigns as CEO of cannabis-products company |
| Pay No Interest Until 2020 With These Cards<br>*NextAdvisor* | Why banning plastic straws upsets people with disabilities |
| A Fast Way To Pay Off $10,000 In Credit Card Debt<br>*NerdWallet* | Pros, Cons of Roman Reigns, Bobby Lashley Facing Brock Lesnar at WWE SummerSlam |
| If You Have Good Credit, This Card Is For You<br>*Credit.com* | New Toyota Century, one of Japan's most luxurious cars, will cost $180,000 |

Recommended by

**Paid Links**

| HOUSES IN DISTRICT OF COLUMBIA | AVERAGE RETIREMENT SAVINGS |
|---|---|
| SOLAR PANEL PRICES | ANNUITY RATES OF 2018 |
| BEST FRANCHISES TO OWN | TOP TRUCK DRIVING COMPANIES |
| SENIOR AIRFARE TICKETS | 3% INTEREST SAVINGS ACCOUNTS |

Advertisement



Contact Us

Closed Captioning

Site Map

   

Most stock quote data provided by BATS. Market indices are shown in real time, except for the DJIA, which is delayed by two minutes. All times are ET. Disclaimer. Morningstar: © 2018 Morningstar, Inc. All Rights Reserved. Factset: FactSet Research Systems Inc.2018. All rights reserved. Chicago Mercantile Association: Certain market data is the property of Chicago Mercantile Exchange Inc. and its licensors. All rights reserved. Dow Jones: The Dow Jones branded indices are proprietary to and are calculated, distributed and marketed by DJI Opco, a subsidiary of S&P Dow Jones Indices LLC and have been licensed for use to S&P Opco, LLC and CNN. Standard & Poor's and S&P are registered trademarks of Standard & Poor's Financial Services LLC and Dow Jones is a registered trademark of Dow Jones Trademark Holdings LLC. All content of the Dow Jones branded indices © S&P Dow Jones Indices LLC 2018 and/or its affiliates.

© 2018 Cable News Network. A WarnerMedia Company. All Rights Reserved.Terms under which this service is provided to you. Privacy Policy. AdChoices

# EXHIBIT 40



Center for American Progress

≡

IMMIGRATION

# A New Threat to DACA Could Cost States Billions of Dollars

By Nicole Prchal Svajlenka, Tom Jawetz, and Angie Bautista-Chavez  |  Posted on July 21, 2017, 10:05 am



AP/Jacquelyn Martin

In this June 15, 2012 photo, undocumented immigrants who live in Maryland, hold signs saying "Thank You President Obama" in Washington, D.C.

Over the course of its five-year history, Deferred Action for Childhood Arrivals (DACA), has changed the lives of nearly 800,000 young people who have lived in the United States since their childhood.

By providing the opportunity for individuals to come forward, pass rigorous background checks, and obtain permission to live and work in the United States lawfully, DACA has helped its recipients achieve milestones typically associated with the American dream, such as pursuing higher education, earning better wages to support their families, and buying homes. Nearly 8 in 10 voters support allowing DREAMers to remain permanently in the country, including almost three-quarters of Trump voters, and only 14 percent believe they should be forced to leave.

But despite the benefits of the popular program, DACA is now facing a dangerous new attack. In late June, officials from 10 states led by Texas Attorney General Ken Paxton issued an ultimatum to the Trump administration and Attorney General Jeff Sessions: End the DACA program by September 5 or face a lawsuit in front of the same federal judge who halted a separate initiative that would have provided similar temporary protections to the parents of U.S. citizens and lawful permanent residents. If DACA ends—whether because the administration accedes to the demands of DACA opponents or the initiative is enjoined by a federal court—hundreds of thousands of young people will be forced out of the workforce, upending their lives and the lives of their families, creating tremendous disruption for businesses, and sending shockwaves through the economies of most states.

According to the U.S. Citizenship and Immigration Services (USCIS), 787,580 people received DACA through March 2017. The data presented in this column update previous columns from November 2016 and January 2017, accounting for the additional DACA applicants that were approved since their publications.

Using data from two Center for American Progress publications—a report that estimates the gross domestic product (GDP) declines that would accompany removing all unauthorized workers from the country and a survey that estimates the share of DACA recipients who are employed—CAP estimates that ending DACA would result in a loss of $460.3 billion from the national GDP over the next decade. Ending DACA would remove an estimated 685,000 workers from the nation's economy.

Altogether, the 10 states demanding that the Trump administration end DACA—Alabama, Arkansas, Idaho, Kansas, Louisiana, Nebraska, Tennessee, Texas, South Carolina, and West Virginia—stand to lose more than $8 billion annually in state GDP if they get their wish.

TABLE 1
**State-by-state annual GDP loss from removing workers with DACA**

| State | Number of DACA recipients | Estimated number of DACA workers | Estimated annual GDP loss from removing DACA workers |
|---|---|---|---|
| Alabama | 4,270 | 3,715 | $182,030,100 |
| Alaska | 138 | 120 | $8,572,284 |

| | | |
|---|---|---|
| Alaska | 138 | 120 | $6,372,284 |
| Arizona | 27,865 | 24,243 | $1,322,494,899 |
| Arkansas | 5,099 | 4,436 | $236,028,211 |
| California | 222,795 | 193,832 | $11,620,786,775 |
| Colorado | 17,258 | 15,014 | $856,946,796 |
| Connecticut | 4,929 | 4,288 | $315,289,496 |
| Delaware | 1,444 | 1,256 | $88,119,069 |
| District of Columbia | 764 | 665 | $48,219,513 |
| Florida | 32,795 | 28,532 | $1,524,721,538 |
| Georgia | 24,135 | 20,997 | $1,025,191,287 |
| Hawaii | 558 | 485 | $28,844,415 |
| Idaho | 3,132 | 2,725 | $159,526,996 |
| Illinois | 42,376 | 36,867 | $2,296,685,031 |
| Indiana | 9,840 | 8,561 | $516,409,548 |
| Iowa | 2,798 | 2,434 | $188,481,274 |
| Kansas | 6,803 | 5,919 | $335,913,999 |
| Kentucky | 3,062 | 2,664 | $155,574,096 |
| Louisiana | 2,049 | 1,783 | $91,007,953 |
| Maine | 95 | 83 | $3,967,200 |
| Maryland | 9,785 | 8,513 | $509,446,852 |
| Massachusetts | 7,934 | 6,903 | $606,598,730 |
| Michigan | 6,430 | 5,594 | $418,625,150 |
| Minnesota | 6,255 | 5,442 | $376,707,375 |
| Mississippi | 1,460 | 1,270 | $62,337,508 |
| Missouri | 3,524 | 3,066 | $209,005,419 |
| Montana | 72 | 63 | $3,507,840 |
| Nebraska | 3,371 | 2,933 | $150,222,997 |
| Nevada | 13,070 | 11,371 | $603,921,133 |
| New Hampshire | 367 | 319 | $26,873,575 |
| New Jersey | 22,024 | 19,161 | $1,587,108,546 |
| New Mexico | 6,815 | 5,929 | $384,647,119 |
| New York | 41,970 | 36,514 | $2,598,303,273 |
| North Carolina | 27,385 | 23,825 | $1,198,925,683 |
| North Dakota | 98 | 85 | $8,611,260 |
| Ohio | 4,442 | 3,865 | $251,609,158 |
| Oklahoma | 6,865 | 5,973 | $343,573,469 |
| Oregon | 11,281 | 9,814 | $605,603,130 |
| Pennsylvania | 5,889 | 5,123 | $357,080,795 |
| Rhode Island | 1,229 | 1,069 | $61,058,661 |
| South Carolina | 6,406 | 5,573 | $252,065,985 |
| South Dakota | 252 | 219 | $12,204,360 |
| Tennessee | 8,340 | 7,256 | $347,345,511 |
| Texas | 124,300 | 108,141 | $6,294,162,134 |
| Utah | 9,711 | 8,449 | $476,470,215 |
| Vermont | 42 | 37 | $2,429,910 |

| | | | |
|---|---|---|---|
| Virginia | 12,134 | 10,557 | $711,429,519 |
| Washington | 17,843 | 15,523 | $1,098,330,382 |
| West Virginia | 117 | 102 | $5,445,765 |
| Wisconsin | 7,565 | 6,582 | $427,041,340 |
| Wyoming | 621 | 540 | $39,079,530 |

Source: See Methodology.

**CAP**

The present threat to those with DACA is real. Moreover, because DACA recipients are so well integrated into families, communities, schools, and workplaces throughout the country, the economic and social effects of ending DACA would be widespread and significant. In the short term, the fate of DACA rests entirely in the hands of President Donald Trump, who has at times expressed great support for DREAMers and has encouraged them to "rest easy." But ultimately, it is Congress that must act to provide a permanent solution so that these young people can contribute even more fully to the country they call home. Yesterday's introduction of the DREAM Act of 2017, which has bipartisan sponsorship from Sens. Dick Durbin (D-IL), Jeff Flake (R-AZ), Lindsey Graham (R-SC), and Chuck Schumer (D-NY), is an encouraging step.

# Methodology

This column uses the same methodology employed in CAP's November 2016 and January 2017 estimates of the cost of ending DACA.

The USCIS publishes quarterly data on DACA applicants and recipients since the program's beginning in 2012. In addition to national numbers, the USCIS also provides state-level data.

An October 2016 survey of DACA recipients—conducted by political scientist Tom K. Wong, United We Dream, the National Immigration Law Center, and CAP—estimated that nationally, 87 percent of DACA recipients were employed. The survey does not provide employment rates for individual states. Thus, this column uses the 87 percent benchmark for employment levels in each state.

The number of DACA recipients working in each state is a combination of the latest USCIS data and the survey findings.

A 2016 CAP report authored by Ryan Edwards and Francesc Ortega estimated the national and state-by-state GDP loss that would result from removing unauthorized workers from the workforce, both annually and over the next decade. This column uses the GDP loss and number of unauthorized workers by each state to identify the contributions of each unauthorized worker to the state GDP. By

both assuming that the skill distribution of the workforce with DACA reflects that of the broader unauthorized workforce and expressing data in 2013 dollars, this analysis reflects a conservative estimate.

The GDP losses associated with ending DACA for each state are derived by multiplying the number of employed DACA recipients with the losses associated with each unauthorized worker.

*Nicole Prchal Svajlenka is a senior policy analyst for the Immigration Policy team at the Center for American Progress. Tom Jawetz is vice president for Immigration Policy at the Center. Angie Bautista-Chavez is an intern for the Immigration Policy team at the Center.*



Center for American Progress

© 2018 - Center for American Progress

# EXHIBIT 41



POLICY BRIEF

# Money on the Table:
## The Economic Cost of Ending DACA

Immigrant Legal Resource Center   |   By Jose Magaña-Salgado   |   December 2016



# ACKNOWLEDGEMENTS

The author extends his thanks to the Immigrant Legal Resource Center (ILRC) and colleagues for their assistance in developing and editing this report, including Angie Junck and Kemi Bello. The author is also grateful to Philip Wolgin, Silva Mathema, Harry Stein, and professor Tom K. Wong. Additionally, the author extends his thanks for the support of ILRC's Executive Director, Eric Cohen, and the ILRC's Board of Directors.

Founded in 1979, ILRC is a national resource center that provides training, consultations, publications, and advocacy support to individuals and groups assisting low-income persons with immigration matters. ILRC works with a broad array of individuals, agencies, and institutions, including immigration attorneys and advocates, criminal defense attorneys, civil rights advocates, social workers, law enforcement, judges, and local and state elected officials.

For more on the Immigrant Legal Resource Center, please visit http://www.ilrc.org.

© 2016 Immigrant Legal Resource Center

All Rights Reserved.

Suggested citation: Jose Magaña-Salgado, *Money on the Table: The Economic Cost of Ending DACA*, IMMIGRANT LEGAL RESOURCE CENTER, Dec. 2016, available at https://www.ilrc.org/report-daca-economic-cost.



# TABLE OF CONTENTS

I. EXECUTIVE SUMMARY.................................................................................................. 4

II. INTRODUCTION........................................................................................................... 5

III. METHODOLOGY.......................................................................................................... 5

      A. MEDICARE AND SOCIAL SECURITY CALCULATIONS....................................... 6

      B. TURNOVER COST CALCULATIONS...................................................................... 7

IV. CONCLUSION............................................................................................................. 7

V. CITATIONS.................................................................................................................... 8



# I. EXECUTIVE SUMMARY

Deferred Action for Childhood Arrivals (DACA) provides employment authorization, e.g. the ability to lawfully work in the United States, and protection from deportation for undocumented immigrants who entered the United States before the age of 16 and meet other requirements. **Through June of 2016, U.S. Citizenship and Immigration Services (USCIS) has granted DACA to 741,546 individuals.**

DACA represents an immense success in the context of immigration policy, building the foundation for young immigrants to put their skills and education to better use for themselves, their families, and the American economy. **Eighty-seven percent, or 645,145 of DACA recipients are currently employed with businesses in the United States.** Through this employment, DACA has also broadened the payroll tax base, dramatically increasing Social Security and Medicare contributions.

DACA recipients bring a variety of educational and professional backgrounds to a wide spectrum of industries, from educators and community service providers to retail, manufacturing and hospitality workers. With DACA, many individuals have gotten their first job; contributed greater amounts in state, local, and federal taxes; increased their educational attainment; supported their families; and obtained state identification and driver's licenses.

> **Through June of 2016, U.S. Citizenship and Immigration Services (USCIS) has granted DACA to 741,546 individuals.**

Yet these boosts to our nation's income are at risk of being cut as early as next month. President-elect Trump has promised to end DACA, which would **lead to the immediate unemployment of the 645,145 DACA recipients who are currently employed**. This massive unemployment would lead businesses and employers to **incur turnover costs, e.g. costs associated with termination and potential replacement of an employee, of at least $3.4 billion.**

**In the tax context, ending DACA would reduce Social Security and Medicare tax contributions by $24.6 billion over a decade, half of which would have been paid by employers. Of these contributions, the reduction in Social Security contributions would be $19.9 billion, while the reduction to Medicare contributions would be $4.6 billion.**

From an economic perspective, the incoming Administration would be wise to leave DACA fully intact. Our nation is significantly better off when our economy is driven by a healthy and robust workforce that is able to keep pace with industry demand. The billions of dollars in tax contributions resulting from the program should be reinvested in our nation's workers and retirees, not left on the table.

As the President-elect gears up to prepare his fiscal policy, one thing is clear: ending DACA is bad for business and bad for American workers.



## II. INTRODUCTION

As one of his first post-inauguration actions, President-elect Trump has promised to end President Obama's executive actions on immigration, including Deferred Action for Childhood Arrivals or DACA.[1] Originally announced on June 15, 2012, DACA represents a prosecutorial discretion initiative that provides employment authorization and protection from deportation for certain young adults who entered the age before the age of 16 and meet other, stringent requirements.[2] Over 741,546 undocumented immigrants currently hold DACA, all of whom are at risk of losing their employment authorization and being targeted for deportation when President-elect Trump takes office on January 20, 2017. The Center of American Progress estimates that ending DACA would reduce the nation's GDP by $433.4 billion over a decade.[3] This brief expands on those findings and provides estimates on the negative impact on certain payroll tax revenues and increased replacement and retraining costs for employers, or turnover costs.

This policy brief synthesizes existing research—including a comprehensive survey conducted by political scientist Tom K. Wong, Center for American Progress, United We Dream, and National Immigration Law Center ("Professor Wong's study");[4] federal tax law; the Federal Income Contributions Act; and studies regarding turnover cost—

**Eighty-seven percent, or 645,145 of DACA recipients are currently employed with businesses in the United States.**

to calculate the economic impact of ending DACA in two key areas: (a) Social Security and Medicare revenues and (b) employer turnover costs. The policy brief concludes that ending DACA would have a significantly negative economic impact in these areas, shrinking the tax base, and imposing unneeded and burdensome turnover costs on employers.

## III. METHODOLOGY

As of June 30, 2016, USCIS granted DACA to 741,546 individuals.[5] Professor Wong's study surveyed over 1,000 DACA recipients and concluded that 87% were employed,[6] with the average hourly wage being $13.96.[7] According to the Organisation for Economic Co-operation and Development, the average number of hours worked by employees in the United States is 1,790. Consequently, to calculate the average yearly wage for a DACA recipient, we multiply $13.96 by 1,790,[8] yielding $24,988.40. To calculate the number of DACA Recipients who are actually employed, we multiply 87% by 741,546 and obtain 645,145. Using these baseline numbers, we are able to apply certain tax and employment cost assumptions to yield the conclusions of this report.

This report assumes that the DACA population would not increase over the course of a decade. The Migration Policy Institute, however, estimates the total potentially eligible population for DACA at 1.9 million individuals.[9]



Due to the uncertainty of DACA's continued existence and future application rates, this brief does not attempt to estimate the number of individuals who could potentially obtain DACA in the future and the associated economic impact of subsequently revoking DACA for those individuals. Additionally, USCIS' data regarding the total number of DACA recipients are from June of 2016, but since then, USCIS has likely approved tens of thousands additional DACA requests, e.g. in June USCIS had over 40,000 pending requests for initial DACA alone.[10] However, as the June 2016 data represents the most recent data release by USCIS, this report uses those numbers. In light of these two limitations, the estimates in this report likely undercount the true economic impact of ending DACA.

### A. MEDICARE AND SOCIAL SECURITY CALCULATIONS

The Federal Insurance Contributions Act (FICA) is a federal employment tax that requires contributions from both employers and employees to fund the Social Security and Medicare trust funds.[11] Both of these trust funds require contributions from workers to fund current, outstanding obligations to individuals who are eligible to receive benefits.[12]

The withholding rate for Social Security is 6.2% for employees[13] and 6.2% for employers,[14] for a total of 12.4%. The withholding rate for Medicare is 1.45% for employees[15] and 1.45% for employers,[16] for a total of 2.9%. Social Security tax is only applied to a certain amount of wages each year, for example, in 2016, that limit was $118,500.[17] Additionally, for Medicare, employers must withhold an additional 0.9% on wages in excess of $200,000.[18] As the average yearly wage for DACA recipients is $24,988.40, we do not incorporate the $118,500 limit or additional withholding requirements into our calculations.

**...ending DACA would reduce Social Security and Medicare tax contributions by $24.6 billion over a decade, half of which would have been paid by employers.**

To obtain the amount the average DACA employee and employer contributes in Social Security taxes per year, we multiply $24,988.40 (the average yearly wage) by 12.4% (the total Social Security tax rate), which yields $3,098.56. To obtain the amount all DACA employees and employers contribute to Social Security taxes per year, we multiply $3,098.56 by 645,145 (the number of DACA recipients employed), yielding $1,999,021,585.40. To obtain the total amount contributed through Social Security taxes over a decade, we multiply $1,999,021,585.40 by 10, yielding $19,990,215,854.03 or $19.9 billion. By dividing $19,990,215,854.03 by half, we obtain $9,995,107,927.02, which represents both the DACA employer and employee contribution over a decade.

To obtain the amount the average DACA employee and employer contribute to Medicare taxes per year, we multiply $24,988.40 (the average yearly wage) by 2.9% (the total Medicare tax rate), which yields $724.66. To obtain the amount all average DACA employees and employers contribute to Medicare taxes per year,



we multiply $724.66 by 645,145 (the number of DACA recipients employed), yielding $467,513,112.72. To obtain the total amount contributed to Medicare taxes over a decade, we multiply $467,513,112.72 by 10, yielding $4,675,131,127.15 or $4.6 billion. By dividing $4,675,131,127.15 by half, we obtain $2,337,565,563.58, which represents both the DACA employer and employee Medicare contribution over a decade.

Combining $19,990,215,854.03 (DACA employer and employee Social Security contribution over ten years) and $4,675,131,127.15 (DACA employer and employee Medicare contribution over ten years) yields $24,665,346,981.19 or $24.6 billion, the total amount of FICA contributions over a decade by DACA employers and employees.

### B. TURNOVER COST CALCULATION

The end of DACA would mean that the 645,145 DACA recipients who are employed would lose their employment authorization—which allows lawful employment in the United States. Consequently, employers would have to lay off these individuals and incur turnover costs. Employers incur a variety of turnover costs when an employee leaves a position, costs compounded when that employer must replace the absent employee. These costs can include the cost to temporarily cover an employee's responsibilities, replacement costs (such as searching, interviewing, and hiring replacement candidates), training costs of new employees, and more.[19] Analyzing a variety of case studies, the Center for American Progress estimates that the cost of turnover is approximately 21.4% of an employee's yearly salary.[20]

To obtain the turnover cost for the massive lay-off of close to three quarter of a million DACA employees, we multiply $24,988.40 (the average yearly salary of a DACA recipient) by 645,145 to obtain $16,121,141,817.77. We then multiply $16,121,141,817.77 by 21.4% (the turnover cost) to yield $3,449,924,349.00 or $3.4 billion, the total turnover cost for the wholesale lay-off of the entire employed DACA population.

## IV. CONCLUSION

The costs of ending DACA are immense, not only the personal costs to nearly one million individuals and their families, but also to our country's economic engine. President-elect Trump prides himself on his business prowess. As such, the continued existence of DACA represents one of the President-elect's first major economic tests. The failure of this test would undoubtedly lead to significant, unnecessary costs to our nation's businesses and the undermining of the Social Security and Medicare trust funds. DACA represents a good deal for our nation, and President-elect Trump would be wise to continue what amounts to one our nation's most successful immigration and economic policies.



# V. CITATIONS

[1] Julia Preston and Jennifer Medina, *Immigrants Who Came to U.S. as Children Fear Deportation Under Trump*, N.Y. TIMES, Nov. 19, 2016, http://www.nytimes. com/2016/11/20/us/immigrants-donald-trump-daca.html.

[2] See Memorandum from Janet Napolitano, Secretary, U.S. Department of Homeland Security, Memorandum on Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), available at http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[3] Philip E. Wolgin, *The High Cost of Ending Deferred Action for Childhood Arrivals*, CENTER FOR AMERICAN PROGRESS, Nov. 18, 2016, https://www. americanprogress.org/issues/immigration/news/2016/11/18/292550/the-high-cost-of-ending-deferred-action-for-childhood-arrivals/.

[4] Tom K. Wong, Greisa Martinez Rosas, Adrian Reyna, Ignacia Rodriguez, Patrick O'Shea, Tom Jawetz, and Philip E. Wolgin, *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*, CENTER FOR AMERICAN PROGRESS, Oct. 18, 2016, https://cdn.americanprogressaction.org/content/uploads/2016/10/21111136/2016-daca_survey_draft_updated-FINAL2.pdf [hereinafter "Professor Wong study"].

[5] U.S. CITIZENSHIP AND IMMIGRATION SERVICES, U.S. DEPARTMENT OF HOMELAND SECURITY, NUMBER OF I-821D, CONSIDERATION OF DEFERRED ACTION FOR CHILDHOOD ARRIVALS BY FISCAL YEAR, QUARTER, INTAKE, BIOMETRICS AND CASE STATUS: 2012-2016, 1 (Sep. 13, 2016), https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals [hereinafter "USCIS DACA Data"].

[6] Professor Wong study, *supra* note 4, at 4.

[7] *Id.* at 5.

[8] *Average annual hours actually worked per worker*, ORGANISATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, 2015, http://stats.oecd.org/index. aspx?DataSetCode=ANHRS.

[9] Faye Hipsman, Bárbara Gómez-Aguiñaga, and Randy Capps, *DACA at Four: Participation in the Deferred Action Program and Impacts on Recipients*, MIGRATION POLICY INSTITUTE 2, Aug. 2016, available at http://www.migrationpolicy.org/research/daca-four-participation-deferred-action-program-and-impacts-recipients.

[10] USCIS DACA Data, *supra* note 5, at 1.

[11] 26 U.S.C. §§ 3101-3128 (West 2016).

[12] The Social Security trust fund is projected to become insolvent in 2034 while the Medicare trust fund is projected to become insolvent in 2028. See Nick Timiraos, *Social Security, Medicare Face Insolvency Over 20 Years, Trustees Report*, WALL STREET JOURNAL, June 22, 2016, http://www.wsj.com/articles/social-security-medicare-trust-funds-face-insolvency-over-20-years-trustees-report-1466605893. A decrease in contributions, e.g. because of the removal of close to three quarter of million employees from the workforce, is thus likely to move forward the insolvency dates for both of these programs.

[13] 26 U.S.C. §3101(a) (West 2016).

[14] *Id.* at § 3111(a).

[15] *Id.* at § 3101(b)(1).

[16] *Id.* at § 3111(b).

[17] INTERNAL REVENUE SERVICE, *Topic 751 - Social Security and Medicare Withholding Rates*, Oct. 10, 2016, https://www.irs.gov/taxtopics/tc751.html.

[18] 26 U.S.C. §3101 (West 2016).

[19] Heather Boushey and Sarah Jane Glynn, *There Are Significant Business Costs to Replacing Employees*, CENTER FOR AMERICAN PROGRESS, Nov. 16, 2012, https://www.americanprogress.org/issues/economy/reports/2012/11/16/44464/there-are-significant-business-costs-to-replacing-employees/.

[20] *Id.*

# EXHIBIT 42

.us ≡

(/)

STUDY

# THE IMPACT OF DACA PROGRAM REPEAL ON JOBS

*A Timeline of the Devastating and Far-reaching Job Loss Consequences If Deferred Action for Childhood Arrivals (DACA) Is Repealed. Developed by FWD.us.*

Earlier this year, FWD.us issued a report outlining the devastating consequences of a potential repeal of the DACA program, specifically outlining the dramatic and immediate job losses. Since that time, President Trump repealed DACA, urging Congress to pass a legislative fix by March 5th. Although some 22,000 individuals will already have lost DACA by that date, March 6th is when the number of DACA recipients losing work authorizations and protection from deportation will take a sharp and dramatic upturn.

The following report further details the escalating job losses that will occur beginning on March 6th and continuing for two years until all of the nearly 800,000 DACA recipients are prevented from participating in the workforce and subject to deportation.  Specifically, this report looks at the job loss impact between March 6th and November 6th, the first 9 months when all DACA recipients will be barred from renewals. The findings reinforce the devastating consequences a repeal would inflict on DACA recipients and their families, as well as the dire, far-reaching consequences to communities across the country, to employers, and to the American economy across all regions and sectors. **This report specifically finds that a total of nearly 300,000 DACA recipients, 1,700 per business day, will be removed from the workforce between March 6th and November 6th.** In total, nearly 700,000 individuals who are currently employed and contributing as a productive part of the American workforce would be stripped of their ability to work and could be fired over the course of the next two years.,

Since the Deferred Action for Childhood Arrivals (DACA) program was established in 2012, nearly 800,000 young people who came to this country as children have been granted temporary protection from deportation and allowed to live, work, and contribute to the only country most of them have ever known (U.S. Citizenship and Immigration Services, 2017). Over the past five years, 91% of DACA recipients have found gainful employment, and are currently working for companies across the country (Wong, T., et al., (2017)).

ⓕ (HTTPS://WWW.FACEBOOK.COM/SHARER.PHP?
U=HTTPS%3A%2F%2FDREAMERS.FWD.US%2FIMPACT-
REPORT%3FUTM_SOURCE%3DFACEBOOK%26UTM_MEDI

ⓣ (HTTPS://TWITTER.COM/INTENT/TWEET?
TEXT=NEW%20REPORT%20FROM%20%40FWD_US%3A%2
REPORT%3FUTM_SOURCE%3DTWITTER%26UTM_MEDIUI

Five years ago, the Department of Homeland Security issued a memo establishing the DACA program (Department of Homeland Security, 2012). DHS delineated a set of criteria by which "certain young people who were brought to the United States as young children, do not present a risk to national security or public safety, and meet several key criteria" would be able to receive a temporary protection from deportation, for a period of two years, and be eligible to apply for work authorization. Individuals who are eligible are required to complete an application process and undergo a thorough background check, including fingerprinting, and are required to renew their deferred action every two years. Further, the DHS Secretary issued a memo directing the heads of Immigration and Customs Enforcement (ICE), U.S. Citizenship and Immigration Services (USCIS), and Customs and Border Protection (CBP) to establish a process to implement this exercise of prosecutorial discretion across their agencies to ensure that "enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities" (Department of Homeland Security, 2012).

Despite the positive economic benefits of the program, and overwhelming public support for DACA recipients, President Trump made the decision to terminate the program on September 5th. By announcing that no further renewals would be permitted for any person whose DACA protection expires on March 6 or later, the Administration set in motion the elimination of work permits for all DACA recipients and subjected these young people to the threat of immediate deportation, putting their safety, livelihoods, and wellbeing risk. Additionally, about 22,000 DACA recipients who have deferrals that expire before March 5th were unable to meet the renewal deadline and will be forced from their jobs and subject to deportation before March 5th.

DACA recipients are upstanding members of our communities, and everyone in the program has gone through an application process, passed one or more extensive background checks including fingerprinting, paid the required fee, and is a student, or servicemember, or holds a job. DACA recipients are required to renew their deferral every two years in order to maintain their work authorization and their protection from deportation, and to show that they have continued to meet the program requirements. An estimated 200,000 DACA recipients have had their Deferred Action renewed by President Trump since he took office in January.

## DACA Recipients With Job
## Forced Job Loss Chart

| Quarter | Months | Total DACA Expirations Per Quarter | Estiamted DACA Job Losses (91 percent employed) | Estimated DACA Recipient Job Loss Per Month | Estimated DACA Recipient Job Loss Per Business Week | Estimated DACA Recipient Job Loss Per Business Day | Estimated DACA Recipient Job Loss Per Business Hour | Estimated DACA Recipient Job Loss Per Business Minute | Every XXX seconds, a DACA recipient loses their job? |
|---|---|---|---|---|---|---|---|---|---|
| Q1 2018 | Oct-Dec | 90,299 | 82,172 | 27,391 | 6,735 | 1,347 | 168 | 2.8 | 21.4 |
| Q2 2018 | Jan-Mar | 115,380 | 104,996 | 34,999 | 8,467 | 1,693 | 212 | 3.5 | 17.0 |
| Q3 2018 | Apr-Jun | 86,165 | 78,410 | 26,137 | 6,126 | 1,225 | 153 | 2.6 | 23.5 |
| Q4 2018 | July-Sept | 152,429 | 138,710 | 46,237 | 11,009 | 2,202 | 275 | 4.6 | 13.1 |
| Q1 2019 | Oct-Dec | 120,287 | 109,461 | 36,487 | 8,828 | 1,766 | 221 | 3.7 | 16.3 |
| Q2 2019 | Jan-Mar | 36,427 | 33,149 | 11,050 | 2,717 | 543 | 68 | 1.1 | 53.0 |
| Quarterly average | | 100,165 | 91,150 | 30,383 | 7,331 | 1,466 | 183 | 3.1 | 19.6 |
| Period March 6 - November 6 | | | 293,434 | | 8,580 | 1,716 | 214 | 3.6 | 16.8 |

Fig1. Benefit Expiration with Loss of Work Authorization &
Subject to Deportation and Forced Job Loss Chart

New research has further detailed the dramatic consequences to U.S. employers if DACA is repealed and renewals are put on hold, even for a brief period of time. The chart above outlines the chronological job loss consequences of repealing DACA, resulting in the potential for an average of 8,500 DACA recipients to lose their jobs each businessweek. Furthermore, for every business day that DACA renewals are put on hold, an average of more than 1,700 individuals can be fired from their jobs. And because DACA recipients live in all fifty states and the District of Columbia (U.S. Citizenship and Immigration Services, 2017), the economic consequences will be felt all across the country.

# REPEALING DACA MEANS

# 1,716*  JOBS LOST EVERY DAY.

For the purposes of this study, the number of jobs lost is reflective of the number of DACA recipients who would lose work authorization if they are unable to renew their DACA. While individual job loss will be determined on a case by case basis, individuals who are unable to renew their DACA and therefore fall out of DACA protection will be unable to legally work in the United States.

* BETWEEN MARCH 6TH - NOVEMBER 6TH, 2018

Work authorizations issued to DACA recipients are no different than those issued through countless other visa categories, meaning many U.S. businesses may not even know whether they are employing a DACA recipient. Revoking the ability for current DACA recipients to renew their deferrals would force businesses into the impossible and extremely costly position of having to fire productive employees for no other reason than an arbitrary change in federal policy, potentially resulting in backlash from other employees, or their broader community. DACA recipients are already living openly in our communities. They are our coworkers, teachers, nurses and home health care workers, among many other professions. Repealing this program and forcing businesses around the country to fire hundreds of thousands of people within our communities will have a devastating impact. Further, such action by the federal government would place a staggering cost, both financially and in relationship to their employees, on businesses in nearly every sector of the economy, and, in turn, in the communities across the United States.

# EVERY BUSINESS WEEK DACA RENEWALS ARE HALTED,

## OVER

# 8,580* JOBS ARE LOST.

* BETWEEN MARCH 6TH - NOVEMBER 6TH, 2018

For the purposes of this study, the number of jobs lost is reflective of the number of DACA recipients who would lose work authorization if they are unable to renew their DACA. While individual job loss will be determined on a case by case basis, individuals who are unable to renew their DACA and therefore fall out of DACA protection will be unable to legally work in the United States.

Reporting by the Center for American Progress has found that nearly 91% of DACA recipients (Wong et al., 2017) are currently employed across the country, contributing billions of dollars to our communities, our economy, and in tax revenue. Removing DACA recipients from the workforce will cost $460.3 billion in GDP loss over a decade (Svajlenka, Jawetz and Bautista-Chavez, 2017). It will cost employers $3.4 billion in unnecessary turnover costs, and would cut contributions to Medicare and Social Security by $39.3 billion over a decade (Magaña-Salgado, 2016; Magaña-Salgado and Wong, 2017). Moreover, DACA recipients have been important drivers of economic growth in their communities. Nearly 6% of DACA recipients have launched businesses, many employing American citizens (Wong et al., 2017). Further, almost 55% of DACA recipients purchased a vehicle, and more than one in ten have purchased their first home (Brannon and Albright, 2017).

By every measure, DACA has been extraordinarily beneficial, allowing nearly 800,000 individuals in the United States to live, work legally, and contribute to the only country most of them have ever known. The economic benefits of this program are clear and profound, and the dire consequences of repeal would be devastating. As this report has outlined, Congressional failure to protect Dreamers will result in thousands of Dreamers losing their jobs in the first week that renewals are barred. Every day for eight months, from March 6th till November 6th, will result in more than 1,700 individuals losing their ability to work legally. In addition to the reprehensible moral consequences, ending DACA would place severe economic strain on businesses around the country, putting them into the impossible and extremely costly position of having to fire productive employees for no other reason than an arbitrary change in federal policy, potentially resulting in backlash from other employees, or their broader community.

DACA was never intended to provide permanent protection to Dreamers, but now that the administration has ended the program Congress must act urgently to ensure they aren't ripped out of their jobs and communities. Congress is considering a number of pieces of legislation to protect current DACA recipients statutorily, and we hope members of both parties will recognize the devastating consequences of inaction and pass legislation this year to protect Dreamers.

Ⓕ (HTTPS://WWW.FACEBOOK.COM/SHARER.PHP?
U=HTTPS%3A%2F%2FDREAMERS.FWD.US%2FIMPACT-
REPORT%3FUTM_SOURCE%3DFACEBOOK%26UTM_MEDI

Ⓣ (HTTPS://TWITTER.COM/INTENT/TWEET?
TEXT=NEW%20REPORT%20FROM%20%40FWD_US%3A%
REPORT%3FUTM_SOURCE%3DTWITTER%26UTM_MEDIUM

Attorney General Ken Paxton (2017). AG Paxton Leads 10-State Coalition Urging Trump Administration to Phase Out Unlawful Obama-Era DACA Program.

https://texasattorneygeneral.gov/news/releases/ag-paxton-leads-10-state-coalition-urging-trump-administration-to-phase-out [Accessed 23 Aug. 2017].

Department of Homeland Security (2012).

https://www.dhs.gov/news/2012/06/15/secretary-napolitano-announces-deferred-action-process-young-people-who-are-low [Accessed 23 Aug. 2017].

Brannon, Ike and Albright, Logan (2017). The Economic and Fiscal Impact of Repealing DACA.

https://www.cato.org/blog/economic-fiscal-impact-repealing-daca [Accessed 23 Aug. 2017].

Magaña-Salgado, J. (2016). Money on the Table: The Economic Cost of Ending DACA. [online] Immigrant Legal Resource Center.

https://www.ilrc.org/sites/default/files/resources/2016-12-13_ilrc_report_-_money_on_the_table_economic_costs_of_ending_daca.pdf&sa=D&ust=1503591740102000&usg=AFQjCNEODnpZK0mF [Accessed 24 Aug. 2017].

Magaña-Salgado, J. and Wong, T. (2016). Draining the Trust Funds: Ending DACA and the Consequences to Social Security and Medicare. [online] Immigrant Legal Resource Center.

https://www.ilrc.org/sites/default/files/resources/2017-09-29_draining_the_trust_funds_final.pdf

Svajlenka, N., Jawetz, T. and Bautista-Chavez, A. (2017). A New Threat to DACA Could Cost States Billions of Dollars – Center for American Progress. [online] Center for American Progress.

https://www.americanprogress.org/issues/immigration/news/2017/07/21/436419/new-threat-daca-cost-states-billions-dollars/ [Accessed 24 Aug. 2017].

U.S. Citizenship and Immigration Services (2017). Number of Form I-821D,

Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, Biometrics and Case Status Fiscal Year 2012-2017 (March 31).
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data (https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Dat [Accessed 24 Aug. 2017].

Wong, T., Rosas, G., Luna, A., Manning, H., Reyna, A., O'Shea, P., Jawetz, T. and Wolgin, P. (2017). DACA Recipients' Economic and Educational Gains Continue to Grow. [online] Center for American Progress.

https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/ [Accessed 28 Aug. 2017].

Wolgin, P. (2016). The High Cost of Ending Deferred Action for Childhood Arrivals – Center for American Progress. [online] Center for American Progress.

https://www.americanprogress.org/issues/immigration/news/2016/11/18/292550/the-high-cost-of-ending-deferred-action-for-childhood-arrivals/ [Accessed 24 Aug. 2017].



(https://www.fwd.us)

© 2013–2018 FWD.us
Privacy Policy (https://fwd.us/privacy_policy), Terms of Service (https://fwd.us/terms_of_use)



(https://p.http
u=https%

# EXHIBIT 43

    

**Conflict**

# Immigration limbo is a 'tug of emotions.' It's also a mental health issue.

*August 22, 2017 · 2:15 PM EDT*
By **Tiziana Rinaldi**
and **Angilee Shah**

Listen to the story. 



We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

**OK, I UNDERSTAND**    **CLOSE**

He's walking on the edge of an abyssal, black lake, painfully aware of what lies beneath the water. Ominous waves keep crashing ashore, reaching for him.

That's how Ravi Ragbir sees the trauma that engulfs his long and scarring deportation battle. It didn't spare his mental health: sudden spasms of sadness, his chest closing up, tears choking his throat, his heart racing. They're all signs that he's getting too close to the lake — the imaginary place where he confines his suffering.

"I don't want to fall in; I will break down," says Ragbir. The water is a psychological tool he uses to curb his recurring emotional anguish.

"I basically shut down for a day or two, most of the time closed in myself. It drains me."

As he talks about the lake, he breathes deeply to regain composure, straddling a fine line between trying to describe the fresh pain that wells up unpredictably and not letting that pain overwhelm him.

Ragbir is a former green card holder who became a popular immigrant organizer in New York City when he decided to transform his deportation case into a vehicle of resistance. In March, after nearly a decade of nerve-wracking check-ins with federal immigration agents, he was told to start preparing travel documents to return to Trinidad, which he left in 1994. When he walked out of the meeting, his whole body was trembling.

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND     CLOSE

episodes. He calls them a "tug of emotions" and never talked about them before. But after his last intense crisis in June, he decided to open up.

Over 43 million immigrants who live in the US could be affected, directly or indirectly, by the turn of the screw of the Trump administration's policies on immigration enforcement. Immigration and Customs Enforcement's new policy is to no longer tolerate anyone without papers, and Donald Trump has endorsed legislation that would significantly decrease legal immigration. While the Obama administration came around to a targeted deportation strategy, the Trump administration has proclaimed that it will "take the shackles off" immigration enforcers.

**IN TRUMP'S AMERICA**



We're following the stories of individuals as they navigate the policy and ideological shifts happening during the Trump administration. From an undocumented immigrant to a Nobel Prize winner, here's how immigration affects people. Navigate through their stories here.

"I'm privileged to be able to speak about it," says Ragbir. As the director of the

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND     CLOSE

With nearly 11 million undocumented immigrants nationwide and 17.6 million people with at least one undocumented relative, large communities are now experiencing anxiety about separation from their families. Some are having flashbacks to the violence they experienced in their home countries. Some are retreating into the shadows, afraid to drive, bring their children to school or even seek medical care.

"We have children who have nightmares," says Father Juan Carlos Ruiz, the co-founder of the New Sanctuary Movement, about immigrants who attend his weekly legal clinics. "We have high school kids who don't go to school anymore, that are depressed, that are suicidal because their parents are threatened."

Meanwhile, recent statements made by John Kelly, the former secretary of Homeland Security who recently became Trump's chief of staff, indicate that undocumented immigrants brought to the US as children might no longer be protected. The uncertainty around DACA, Deferred Action for Childhood Arrivals, is testing the emotional fiber of over 750,000 recipients, who depend on the 2012 program for work permits and some relief from their uncertain status.

For Laura López, a 29-year-old DACA recipient in Provo, Utah, the news has reawakened old traumas. Sometimes, when she feels close to having a panic attack, she busies herself to suppress those feelings.

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND     CLOSE



DACA recipient Laura López is shown outdoors with her 5-year-old son Antonio in Utah last month. She worries that her children will feel her anxieties about her immigration status.
Credit: Courtesy of Marina Lopez

"I start talking to myself. I say, 'I'm safe, I've got my family,'" she says. "If I know it's coming but it's not terrible, I have to get up and start doing something. I have to do a physical activity." López was brought to the US from Mexico at age 13. When she hears about other people like herself, with children to care for, being deported, that adrenaline of her own migration experience sets in.

"I wish my body could tell the difference between border crossing danger and the feeling of the unknown, even if I'm just sitting at my desk."

When she was a child new to the US, López learned to curb anxiety by telling

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND    CLOSE

And now, she's looking for other ways to cope. Three years ago, she tried to visit a psychologist, but it didn't help. The session, she says, was dismissive of her concerns about her immigration status.

"Why are you afraid of immigration? They don't know where you are. They're not going to get you," she remembers being told. That didn't help ease her fears of being separated from her family.

"We don't talk about it enough, to be honest," López says about the inner lives of immigrants. There is a lot of political organizing, but "we do not have a lot of resources on dealing with this."

*More about Laura López: 'It's harder than people think, to pack up your bags and leave.'*

But the mental anguish experienced by millions of immigrants has been cause for concern at New York University, where clinicians launched a new psychological program called the Immigration and Human Rights Work Group.

"We want to offer treatment to those who want it," says Dr. Spyros Orfanos, who designed the service to help refugees and people in fear of removal.

The resource is badly needed both in New York City and around the country, he says, due to a lack of both funding and skills. The grief associated with both the uprooting experience and severe immigration enforcement is not imaginary.

"People do suffer," he says. While different people manifest "emotional scars" in various ways, clinicians should take into account individuals' profiles, socio-economic reasons for migration, how long people have been in the US, and the

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND      CLOSE

Since the November election, even his American-born patients have shown anxiety related to the Trump administration and his supporters' tough attitude towards immigrants.

"It's definitely affecting my Jewish patients," he says. Many American Jews who had relatives murdered in the Holocaust are upset. They listen to Trump's speeches, his accusations against the press and against foreigners' impact on the US, and they start worrying that history is repeating itself. The white supremacist protests in Charlottesville last week, and Trump's response to them don't help.

Dr. Margarita Alegría, a professor at Harvard Medical School's Department of Psychiatry, also says that national mental health initiatives with an immigration focus are "minimal compared to the exponential need." Alegría is currently running two trial programs with Latino and Asian immigrants to help them cope with the stress of migration and PTSD. She gets constant requests to deliver the service in other languages — Arabic and Haitian-Creole, recently — but there isn't enough capacity.

According to Alegría, whose research involves listening to psychotherapy sessions recorded by her colleagues, people go into ruminations. They enter ceaseless states of worry about what can happen to them, particularly around deportation. A growing body of literature shows the effects of living with constant uncertainty, she says. Hypervigilance and sleeplessness are among them.

After Ragbir spent over two years in detention centers in New Jersey and Alabama, his sleeping pattern was never the same.

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND      CLOSE

of deportation and their families. The results will be used in court by lawyers to explain to immigration judges how the emotional health of a family can be affected by one deportation.

Orfanos is himself an immigrant from Greece and vividly remembers the toll of harsh enforcement policies on his relatives. As a child, one of his uncles was deported because he was undocumented.

"The family suffers also," he says. "People sometimes forget that."

His work group recently concluded mental health assessments of three children, ages 4, 8 and 12, whose mother is in removal proceedings. If she were to be removed, they found, her children's emotional development would be affected.

"The other tragedy," says Orfanos, "is that emotional scarring gets transmitted to children."

He gives this hypothetical example based on a real-life event: Trump appears on television in January, reading "The Snake" poem to warn Americans of the dangers of welcoming Syrian refugees. And say, in response to that rhetoric, a Muslim father abruptly turns off the TV and a young child in the household notices. If something like that happens repeatedly, and especially if nobody talks about it, a traumatic association will take place. The child will internalize the message that something is wrong, says Orfanos. The child doesn't know why, but he can tell that his father doesn't want to listen to that news and that, perhaps, he gets angry.

"These kind of things are always getting transmitted," says Orfanos. "They're

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND       CLOSE

take over with her 3- and 5-year-old children. She doesn't want them to see their mother breaking down; they are sensitive to her feelings.

"They will have childhood traumas that I do not want them to have," she says.

Ragbir says it is still painful to remember his daughter, then a child, watching him go to immigration detention years ago. Those memories often come at the start of his breakdowns. Recently, though, what can trigger these feelings has become unpredictable.

His latest episode came in June, right after he taught a public speaking workshop for young volunteers in his organization.

"I felt miserable the whole night and the next day," he says.

Ragbir is known for cracking jokes and shouldering his emotional load with bravery, to set an example for others. But sometimes, it's too much to bear. When he got home that night, the dark lake crept closer.

"I started to cry. I couldn't control it," he says.

Amy Gottlieb, Ragbir's wife, has been by his side since they married in 2010.

"It breaks my heart, you know. It just makes me really, really sad. He's gone through so much in his life," she says. "The toughest part is not being able to fix it. I'm a fixer. I want to be able to make things better for people, and I can't reverse what Ravi suffered."

Gottlieb has learned not to allow her husband's reality to overwhelm her but also

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND      CLOSE

Ragbir is scheduled to return to the New York City immigration office in January — with travel documents to Trinidad — where they will again decide whether or not he will be allowed to stay in the US.

Ragbir came to the US as a legal permanent resident. He was convicted for wire fraud after the mortgage company that he worked for was investigated for fraudulent loan applications. He served a five-year jail sentence, then spent two years in immigration detention while he was in deportation proceedings. He is now seeking to vacate, or erase his criminal conviction, saying proper laws were not followed. If successful, Ragbir could try to have his lawful permanent residency restored. But if he is deported before his case moves forward, he would not be allowed back in the US. In the meantime, he requested a presidential pardon from Barack Obama, which is now pending before President Trump.

"I feel betrayed in some instances," says Ragbir, who sometimes feels let down by the US and its justice system.

According to Orfanos, he's not alone. That feeling of betrayal can be especially intense for green card holders who come to the US legally and end up in deportation proceedings.

"There's the sense that somehow the host country betrayed you," he says. "On the one hand, they say, 'Pay your taxes, work hard' and then, boom, somebody says, "You're not really an American.""

But Ragbir wants to fight the feeling of victimization.

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND        CLOSE

Like López, he tried therapy in the past, but it didn't help him much. These days, he keeps his sanity by visualizing the lake and making sure he doesn't fall in.

*To receive services from New York University's Immigration and Human Rights Work Group, contact Dr. Spyros Orfanos at sdo201@nyu.edu.*

*One service some people have reported finding useful in moments where they needed additional support is text message-based counseling from Crisis Counselor. To use that service, text HOME to 741741. You might also seek referrals to health care providers from local immigrants rights organizations might be able to help you find resources where you live: Catholic Charities has a directory of affiliates; the National Immigration Law Center has a list of organizations around the country; as does One America; Welcoming America has a list of nonprofit partners around the country, as well.*

---

**One more thing...**

PRI takes a global approach to the news of the day. We help you understand how what happens around the world matters in Washington and in your neighborhood. Today more than ever, we need conversations, perspectives and diverse voices.

**Support PRI with a monthly donation TODAY! >**

## *Share*



We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND     CLOSE

**Tagged:**  _North America_ , _United States_ , _mental health_ , _anxiety_ , _immigration_ , _DACA_ , _Deferred Action for Childhood Arrivals_ , _green card_ and _Immigration and Customs Enforcement_ .

## Sign up for the weekly Global Nation newsletter

> Your name

Your email

SUBSCRIBE

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND        CLOSE



**Former detainees tell New Mexico legislators about abuses in immigration detention as county seeks to renew contracts**

**Immigrant kids held in second Phoenix office seen bathing in sinks**

**American evangelicals are more diverse than ever. But some don't want to be part of the 'evangelical movement.'**

**Despite losing its state child care license — and years of claims of abuses — an immigrant family detention center in Pennsylvania made room for more families**

**This mother and daughter have been reunited, but there is still much of their life they need to put back together**



We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND    CLOSE

**'Everyone is an enemy who's deserving of death, rape and jail': Death squads have returned to Nicaragua**

**As China gets tough on recycling, will America get cleaner?**

**Former detainees tell New Mexico legislators about abuses in immigration detention as county seeks to renew contracts**

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND          CLOSE

# Conflict & Justice

**How #MeToo changed this year's Running of the Bulls**

**'Everyone is an enemy who's deserving of death, rape and jail': Death squads have returned to Nicaragua**

**Trump sees no reason to believe Russia behind election meddling**

**Protesters in Morocco say they will march until 'the release of our sons'**

**Italy asks other countries to help take in rescued migrants**

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND     CLOSE



## Latest Content

**A tech startup called OMG wants to revolutionize cash for hundreds of millions of 'unbanked' people in Asia**

**Beyoncé and the Bible**

**Day Job: Mastering Quality Control Technician**

**Bill: Jews have 'exclusive right to national self-determination' in Israel**

**White House struggles to contain political outcry over Trump-Putin summit**

---

| Login |

  Write a comment

**3 Comments**                                    Sort  Subscribe  RSS

 **Evgeniy Working**                                    302 days ago

The Green Card Lottery program of the United States is a matter of hope for everyone who wants to live and work in America.

Therefore, I recommend the company USACITO they help clients around the world to process and successfully apply for

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND     CLOSE

SHOULD NEW ACHIEVEMENTS
OUTWEIGH ANY PAST CRIMES?

Should immigration reform include
stated ways for unauthorized foreign nationals
to counter-balance any NEGATIVE factors in their records
with POSITIVE factors
that suggest they should stay in the USA?

For example, even foreign nationals
who have a final order for deportation,
should be permitted to prove that they have been
law-abiding visitors for some years
since the violation that led to the order for deportation.
Old deportation orders should be enforced
for citizens of other countries
who HAVE CONTINUED TO COMMIT ordinary crimes
while waiting for deportation.

But some foreign nationals who once violated the law
have "cleaned up their act".
Each unauthorized foreign national
might create a file of POSITIVE FACTORS
that an immigration judge should consider
in deciding whether or not this individual
should be permitted to stay in the USA.

For example, if a criminal violation took place 20 years ago,
what GOOD THINGS has this person done
in each of those 20 years
that would count in favor of keeping that person in America?

Once the United States of America
creates a reasonable system for deportation
---beginning with the most obvious candidates---
then those NOT being deported THIS YEAR
can improve their record
so that their present and future GOOD behavior
can help to counter-balance any past BAD behavior:
"What could I do beginning right NOW
to prove that I can become a good American citizen?"

Here are some constructive achievements
to support the case for staying in America:
https://s3.amazonaws.com/aws-website-jamesleonardpark---freelibrary-3puxk/CY-EARN.html

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND      CLOSE

anxieties, and would go very well with other clinical help. If there aren't meetings nearby, there are online options. https://www.recoveryinternational.org

Like   Reply   Share

0



Major funding provided by:



A Partner of OZY Media News

About PRI  |  Contact us  |  Donate  |  Meet the PRI.org Team  |  Privacy policy  |  Terms of use

©2018 Public Radio International

We use cookies to understand how you use our site and to improve your experience. To learn more, review our **Cookie Policy**. By continuing to use our site, you accept our use of cookies and **Privacy Policy**.

OK, I UNDERSTAND     CLOSE

# EXHIBIT 44

**FAMILY**

# How Fear of Deportation Puts Stress on Families

The specter of being removed from the United States has devastating effects on the health of undocumented immigrants and their loved ones.

**SARAH ELIZABETH RICHARDS**  MAR 22, 2017



People stand at a wall separating Mexico and the United States in Tijuana in 2010.  (ERIC THAYER / REUTERS)

When Natividad Gonzalez packs her daughters' homework and lunches for school each morning, she slips a freshly charged cell phone into her eldest child's bag. The 11-year-old knows the plan: If she and her younger sister, age 8, walk home from the bus to find an empty house, she's supposed to call Gonzalez's friend who will come get them.

Her daughter also knows the combination to the family safe, inside which is an ATM card and a quickly drafted power-of-attorney letter granting custody to the family friend in case Natividad and her husband are arrested and sent back to Mexico. "These are things that an 11-year-old shouldn't have to be thinking about," says Gonzalez, age 32, who came to Clanton, Alabama with her husband nearly 13 years ago, and is still undocumented.

For the 11 million unauthorized immigrants estimated to be living in the United States, it must be hard to think about much else. The initial shock over President Trump's executive orders that expand the criteria under which immigrants who entered the country illegally can be deported has given way to chronic unease. In a departure from Obama-era guidelines that U.S. Immigration and Customs Enforcement (ICE) focus on removing the most serious criminals, the latest order includes those who have been charged—but not convicted—of a crime as well as those who have committed acts that "constitute a chargeable criminal offense" or pose a risk to public safety or national security in the "judgment of an immigration officer." Another order expands the power of local law enforcement to act as immigration officers. That's in addition to calls from the administration to increase ICE ranks from 20,000 to 30,000.

"Suddenly, you could be subject to removal for driving without a license," says Cristian Avila, a 26-year-old undocumented immigrant who arrived in Phoenix from Mexico at age nine. "And you don't have to be found guilty of a crime—just charged with it. It's the not knowing what will happen. It's the uncertainty. It's the stories we hear over and over on the news that are putting people on edge."

He's referring to the arrests of two undocumented immigrants at a church-run shelter in Virginia, a father in Los Angles after he dropped off his 12-year-old daughter at school and most recently, a mother of six who had lived in Chicago for 18 years and was married to an American citizen.

"The fear is affecting every part of their lives," explains Ginette Arguello, a counselor with Catholic Charities Archdiocese of New Orleans who works with immigrant children and families. She ticks off examples of the psychological toll: increased tardiness or absences from school. Difficulty concentrating. Getting in fights at school. "They're having recurring nightmares or eating too much or too little," she says. "One child simply told me 'My body aches.'"

Many parents are too scared to leave their houses, except to take their kids to school, adds her colleague, social worker Alejandra Salinas. "I know families that wouldn't take their kids to the Mardi Gras parade," she says. "They say, 'I heard they might be picking people up there.' There's a fear of everything, even going to the grocery store." People are worried they'll lose their jobs. They're reluctant to seek out other work. And the biggest kick in the gut: "Clients tell me 'I don't know

what would happen if I got taken away. There's no one here to take care of my kids,'" says Salinas.

Pediatrician Ursula Pertl of Oceanside, California says she's seeing an increased number of patients with sleep and school problems and is making more referrals to mental heath specialists. "Kids are suffering from anxiety about not wanting to leave their parents or being worried [about if] they'll still be there when they get home," says Pertl, who says about 40 percent of her caseload is Mexican or Mexican-American patients.

Gonzalez's 11-year-old daughter expresses her anxiety in constant texts to her mother, especially on Mondays and Wednesdays, when she doesn't take the bus and stays late at school for an extra-curricular science class. The progression goes something like: "Are you okay?" to "Will you be able to get me?" to "I love you a lot." "As a mom I try to do everything so they don't worry when they're not with me," says Gonzalez. "But I don't know what to do for them to not have to go through this. I feel so helpless."

Gonzalez prays more lately, saying: "God, please protect my family. I'm placing my family in your hands. You brought us this far to this country for opportunity." She also channels her distress by organizing community "know your rights" workshops to help immigrants prepare for the worst. "People call me all the time, saying 'What can we do?' They are so stressed out," she says.

Across the country, attorneys and immigrants' rights groups are urging people at risk of deportation to create family preparedness plans, such as this one by the Immigrant Legal Resource Center, that offers careful checklists, such as documenting your child's allergies, teachers and doctors. (They also include reminders that you don't have to let ICE officials into your home unless they have a signed warrant.) Counselors like Salinas of Catholic Charities urge clients to think through all potential medical and financial scenarios in case they're arrested. "You want to make sure you have access to your insulin," she says.

Yet what are meant to be helpful coping strategies make the anxiety worse for some. Graciela, a 51-year-old mother of four who declined to give her last name, made a plan to leave her two teenagers, ages 13 and 14, with her 24-year-old daughter, if she's forced to return to Mexico after living in Phoenix since 2004. "I want them to be able to finish their studies, but she won't be able to handle them

for very long," says Graciela. "She has two kids of her own, and it's a lot to ask her. I've got to be prepared to take them back with me." Graciela is also devastated by the idea of leaving her older children behind. "I can't imagine not seeing my grandkids grow up," she says. "Since Trump became president, I'm so depressed. I'm eating out of control, and I wake up in the middle of the night and can't go back to sleep. I have bags under my eyes. It's really starting to wear on me."

Cristian Avila and his siblings constantly monitor their mother's whereabouts. "Me, my brother and sister know her schedule and where she's supposed to be at all times," says Avila, the national civic-engagement coordinator for the non-profit Mi Familia Vota, which promotes Latino representation in politics. They know how long it takes her to get to the homes of the different families for whom she cleans or babysits. They know when she might stop at her brother's house to play with their little cousin and about how much time she usually spends at the grocery store. If their mother doesn't answer her cell phone, his sister, age 21, calls him in a panic. Sometimes she's crying. "When I get these calls, it's like I have this big knot inside my stomach. I have that feeling when you wake up and you feel like you're falling off the bed," he says. "But I'm trying to be strong for my family. I keep thinking 'Where could she be?' rather than think the worst."

Avila is part of the Deferred Action for Childhood Arrivals (DACA) program, which gives him the right to work and study in the U.S. (President Trump appears to be sparing the program for now.) He also holds a driver's license after a federal appeals court last year forced the state of Arizona, which forbids applications from undocumented immigrants, to make exceptions for DACA recipients. Yet his mother doesn't have a license, and he and his siblings are terrified she'll get pulled over while making her daily 30 to 45-minute trip to the affluent suburbs, where she works.

During the day, Avila's mind often wanders. He visualizes agents putting handcuffs on his 52-year-old mother and walking her through the booking process. He imagines her sitting behind bars. He thinks about her arriving by bus to the village an hour south of Mexico City that she left 17 years ago. He wonders how the family would send her money and clothes or how many years would pass before he would be able to see her again, since he's not allowed to travel outside the U.S. "My mom doesn't deal well with stress. Her side of the family has a history of heart problems," he says. "I worry that her body wouldn't be physically able to handle

this kind of emotional rollercoaster. What if she has a heart attack in Mexico? What am I going to do?"

Rosa-Maria, age 65, who has lived in Phoenix after leaving Mexico 18 years ago, hates driving with a license. (She also declined to give her last name.) Whenever she sees a police officer on the road, her heart races. "All I can think is 'Please pass me!'" she says. Even if she needs to make a turn, she keeps going straight because she doesn't want the officer to think she's evading him. But she's more terrified of the prospect of her 35-year-old son, who lives nearby and is married with three daughters, getting pulled over and arrested on the way to his construction job. "I know he won't stay in Mexico. I worry he will find a way to come back and try to cross the desert and die," says Rosa-Maria. She has trouble sleeping and wakes up early every morning to walk down the block to see if his car is still there. If she can't see it, she calls several relatives to make sure he is okay. "My son acts like a big man and tells people to be strong," she says. "But I've talked to his wife, and she says he's starting to get scared. It's not fair to have to live with this fear every day."

The harms of deportation on families have been well-documented. Sometimes bread-winners are sent away or children witness their parents getting arrested, which often happens at home in the early morning. But less attention has been paid to the trauma of living with the constant duress of the *potential* of a family member getting deported. Earlier this year, the American Academy of Pediatrics issued a statement warning about how constant exposure to serious stress—called "toxic stress"—can hurt children's short- and long-term health and even hurt their developing brains.

Not surprisingly, such threats are particularly damaging to a community that's vulnerable to begin with, explains the psychologist Kalina Brabeck, an associate professor at Rhode Island College who's studied the effects of deportation on children. Such risk factors include: language barriers, poverty, discrimination, lack of social support or medical care, and working long hours for low pay under harsh conditions. Yet even kids who were born in the U.S. suffer emotionally and socially if their parents are undocumented. In a pair of recent studies of 180 families with parents who immigrated from the Dominican Republic, Mexico, and Central America, Brabeck found that children ages 7 to 10 whose parents didn't have residency did worse in school and experienced more anxiety than those whose parents had legal status.

"They feel nervous and afraid and worry about things outside their control," says Brabeck. "What was interesting was that children of undocumented parents had fewer behavior problems and were less likely to be hyperactive. They sit still and are quiet, but they're experiencing a lot of internal stress that might not be so apparent externally. They slip under the radar. They might not be recognized as needing help."

Yet those fears manifest on the playground, says Joanna Dreby, a sociologist at the State University of New York at Albany who studies immigration and families. She recently observed students at a school with a majority of Mexican or Dominican children playing what they called *migra*, the Spanish word for immigration police. "Instead of cops and robber, it was ICE chasing the immigrant," she says. "That's chilling!" Her 12-year-old son, who's Mexican-American, recently attended a birthday party where the kids were playing a game they called "climb the border fence"—apparently a politically contemporary version of "capture the flag." "I did research on the impact of deportation fears during the Obama Administration," she says. "But the level of insecurity and fear has been ratcheted up."

Even though Natividad Gonzalez's daughters were born in Alabama and are U.S. citizens, they can't escape the fallout from the political climate. Soon after the election, their classmates asked them, 'When are you going back to Mexico?" Gonzalez says she tries to put on a brave face when she drops them off at school, saying: "Today will be a great day. I want you to learn a lot. When you get home, we will play together or maybe we'll go shopping."

But as soon as she drives away, the familiar anxiety grips her. "I worry that at any time the cops could detain me," she says. "I feel uncertain all the time because it seems as if every day there's more bad news against our community. We are at greater risk of having our families broken apart, and we haven't even committed a crime."

*We want to hear what you think. Submit a letter to the editor or write to letters@theatlantic.com.*

# EXHIBIT 45

# NATIONS FOR MENTAL HEALTH



# Mental health and work:

## Impact, issues and good practices



Mental Health Policy and Service Development
Department of Mental Health
and Substance Dependence
Noncommunicable Diseases and Mental Health

**World Health Organization**



Target Group Unit
InFocus Program on
Knowledge,  Skills and Employability

**International Labour Organisation**

**Geneva**
2000

## Mental health policy and service development team

### Objectives and strategies

- To strengthen mental health policies, legislation and plans through: increasing awareness of the burden associated with mental health problems and the commitment of governments to reduce this burden; helping to build up the technical capacity of countries to create, review and develop mental health policies, legislation and plans; and developing and disseminating advocacy and policy resources.

- To improve the planning and development of services for mental health through: strengthening the technical capacity of countries to plan and develop services; supporting demonstration projects for mental health best practices; encouraging operational research related to service delivery; and developing and disseminating resources related to service development and delivery.

Financial support is provided from the Eli Lilly and Company Foundation, the Johnson and Johnson European Philanthropy Committee, the Government of Italy, the Government of Japan, the Government of Norway, the Government of Australia and the Brocher Foundation.

Further information can be obtained by contacting:

Dr Michelle Funk
Mental health policy and service development (MPS)
Department of Mental Health and
Substance Dependence (MSD)
World Health Organization
CH - 1211 Geneva 27, Switzerland
E-mail: funkm@who.int
Telephone: (41) 22 791 3855
Fax: (41) 22 791 41 60



# NATIONS FOR MENTAL HEALTH

# Mental health and work:

## Impact, issues and good practices

Gaston Harnois
Phyllis Gabriel



Mental Health Policy and Service Development
Department of Mental Health
and Substance Dependence
Noncommunicable Diseases and Mental Health

**World Health Organization**



Target Group Unit
InFocus Program on
Knowledge, Skills and Employability

**International Labour Organisation**

**Geneva**
2000

**WHO Library Cataloguing-in-Publication Data**

Harnois, Gaston.
Mental health and work : impact, issues and good practices  / Gaston Harnois, Phyllis Gabriel.

(Nations for mental health)

1.Mental health  2.Workplace  3.Mental disorders - therapy  4.Mental health services - standards
5.Occupational health services - standards 6.Benchmarking  7.Cost of illness
I.Gabriel, Phyllis.  II.Title  III.Series

ISBN 92 4 159037 8                              (NLM classification: WA 495)
ISSN 1726-1155

This publication is a reprint of material originally distributed as WHO/MSD/MPS/00.2

This publication is a joint product of the World Health Organization and the
International Labour Organisation.

© World Health Organization 2002

All rights reserved. Publications of the World Health Organization can be obtained from Marketing
and Dissemination, World Health Organization, 20 Avenue Appia, 1211 Geneva 27, Switzerland (tel:
+41 22 791 2476; fax: +41 22 791 4857; email: bookorders@who.int). Requests for permission to
reproduce or translate WHO publications – whether for sale or for noncommercial distribution –
should be addressed to Publications, at the above address (fax: +41 22 791 4806; email:
permissions@who.int).

The designations employed and the presentation of the material in this publication do not imply the
expression of any opinion whatsoever on the part of the World Health Organization  or the
International Labour Organisation concerning the legal status of any country, territory, city or area
or of its authorities, or concerning the delimitation of its frontiers or boundaries. Dotted lines on
maps represent approximate border lines for which there may not yet be full agreement.

The mention of specific companies or of certain manufacturers' products does not imply that they
are endorsed or recommended by the World Health Organization or the International Labour
Organisation in preference to others of a similar nature that are not mentioned. Errors and
omissions excepted, the names of proprietary products are distinguished by initial capital letters.

The World Health Organization and the International Labour Organisation does not warrant that the
information contained in this publication is complete and correct and shall not be liable for any
damages incurred as a result of its use.

Printed in Switzerland. Layout by rsdesigns.com.

# Contents

Preface                                                                                        vi

Chapter 1
**Introduction**

1.1   Scope of the problem                                                            1
1.2   Mental health problems cause disability                                 1
1.3   Using the workplace to prevent mental health problems and
       provide solutions for referral and rehabilitation                      3

Chapter 2
**The importance of work to an individual's mental health**

2.1   The workplace and mental well-being                                   5
2.2   Categories of psychological experience                               5

Chapter 3
**The workplace and mental health**

3.1   Promotion of mental health in the workplace                        6

Good Practice: Workplace activities for mental health – United Kingdom       7
3.2   Job stress – the stressful characteristics of work                    6
3.3   Consequences of mental health problems in the workplace     8
3.4   Mental health and unemployment                                       9

Chapter 4
**Mental health – an imperative concern**

4.1   Issues facing employers and managers                                11

Good Practice: Promotion/prevention – a case study on organizational stress   12
4.2   Country examples                                                            13
       4.2.1   United Kingdom – the health of the nation               14
       4.2.2   Mental health issues in Finnish workplaces              14

Good Practice: Total wellness programme, Finland                                    15
       4.2.3   Targeted intervention to facilitate return to work in Canada   14

Good Practice: The use of group process to facilitate work reintegration         16
4.3   Action needed                                                               15
       4.3.1   Specific steps an employer can take to help an employee
                 return to work after treatment for a mental health
                 problem such as depression                                    15
       4.3.2   Employee assistance programmes (EAPs)                 16
       4.3.3   Practical suggestions for small businesses               17

Good Practice: Employee Assistance Programme, USA                             18

iv

Chapter 5

**Work as a mechanism for reintegrating persons with serious mental illness**

5.1   Size and profile of this group                                          19

5.2   Historical perspective                                                  19

    5.2.1   Deinstitutionalization                                      19

    5.2.2   Organization of services                                    21

    5.2.3   Psychosocial rehabilitation                                 21

    5.2.4   Developing work skills                                      22

5.3   Current context: changes in the nature of work                          23

5.4   Overcoming obstacles affecting clients' ability to access work          24

    5.4.1   Context                                                     25

    5.4.2   Overcoming obstacles linked to the illness                  25

    5.4.3   Overcoming obstacles linked to lack of
           educational training and lack of work experience    26

**Good Practice:** Supported education in Boston – Choose/Get/Keep              27

    5.4.4   Overcoming obstacles linked to prejudice and stigma         28

    5.4.5   Myths about mental illness and the workplace                29

    5.4.6   Overcoming obstacles linked to government policy            30

    5.4.7   Overcoming obstacles linked to the labour market            31

5.5   The perspective of international agencies                                32

    5.5.1   United Nations                                              32

    5.5.2   World Bank and the Harvard Report                           33

    5.5.3   International Labour Organisation                            34

    5.5.4   World Health Organization                                   36

    5.5.5   Nongovernmental organizations                               37

    5.5.6   Overseeing training and employment of persons with disabilities   37

**Good Practice:** Vocational rehabilitation for individuals with a psychiatric disability –   38
                the Australia experience

5.6   Rights of persons with serious mental health problems with
    respect to access to work                                             39

5.7   International variations pertaining to culture, social structure and
    economics that may exist in developing countries                      39

    5.7.1   Countries in transition                                     39

**Good Practice:** A cotton factory in Beijing, China                          40

5.8   Promoting the employment of persons with mental health problems          41

    5.8.1   Political will and legislation                              41

**Good Practice:** Towards "reasonable accommodation" of persons with mental health problems   42

    5.8.2   Quota system                                                43

    5.8.3   Support                                                     43

    5.8.4   Coordinated action                                          43

5.9   Research findings                                                                       44

  5.9.1   Potential predictors of successful participation                  44

  5.9.2   Developing work skills                                                       44

  5.9.3   Costs                                                                            47

  5.9.4   Useful research tools                                                        47

5.10 Successful work programmes at the international level                    48

  5.10.1   Utilization of supported employment programmes              48

  5.10.2   Finding a job on the regular market                                   48

  5.10.3   Developing social firms                                                    49

  5.10.4   Utilizing the cooperative movement                                  51

  5.10.5   Other international examples                                            52

**Good Practice**: An American Bank                                              52

**Good Practice**: Service Cooperative, Italy                                    53

**Good Practice**: A complete furniture factory, Spain                       53

**Good Practice**: Gardening project in Milan, Italy                          54

**Good Practice**: An Olympic task, Montreal, Canada                       54

**Good Practice**: A Mental Health NGO in Northern Ireland              55

Chapter 6
**Discussion**                                                                          **56**

Chapter 7
**Conclusion**                                                                         **60**

**References**                                                                         **61**

vi

# Preface

All of us have the right to decent and productive work in conditions of freedom, equity, security and human dignity. For persons with mental health problems, achieving this right is particularly challenging. The importance of work in enhancing the economic and social integration of people with mental health problems is highlighted in this monograph.

The International Labour Organisation (ILO) has long recognized the importance of documenting the extent of disabilities among the labour force and setting up effective preventive and rehabilitative programmes. The ILO's activities promote the inclusion of individuals with disabilities in mainstream training and employment structures. The importance of addressing specific issues related to the employment of persons with mental health problems has also been recognized.

ILO promotes increased investment in human resource development, particularly the human resource needs of vulnerable groups, including persons with mental health problems. Employees' mental health problems and their impact on an enterprise's productivity and disability/medical costs are critical human resource issues. Increasingly, employers' organizations, trade unions and government policy-makers are realizing that the social and economic costs of mental health problems in the workplace cannot be ignored.

Because of the extent and pervasiveness of mental health problems, the World Health Organization (WHO) recognizes mental health as a top priority.

Using instruments that allow us to see not how people die but rather how they live (*1*), we now know that the problems of mental illness loom large around the world. It accounts for 12% of all disability-adjusted life-years (DALYs), and 23% in high-income countries.

Five of the 10 leading causes of disability worldwide are mental problems (major depression, schizophrenia, bipolar disorders, alcohol use and obsessive-compulsive disorders). These disorders – together with anxiety, depression and stress – have a definitive impact on any working population and should be addressed within that context. They may also develop into long-term disorders with accompanying forms of disability.

Given the fact that numerous affordable interventions exist, the time has come to challenge both the low priority given to mental health and the stigma that those with mental ill-health still endure around the world.

We now know that when essential drugs, if needed, are made available and access is offered to a psychosocial rehabilitation programme (including the access to meaningful and realistic employment) many persons will be able to lead more socially and personally satisfying lives.

WHO has made a renewed commitment to mental health in making it one of its priorities. Mental health will be the theme of World Health Day 2001 and also the *World Health Report 2001*. Given the multifaceted nature of the factors that contribute to good mental health, WHO is ever mindful of the need to highlight activities that foster good practices in mental health. In this monograph the issue of work as it relates to mental health is addressed.

The publication of this document is particularly important because it has brought together two large United Nations agencies involved in rehabilitation, namely WHO and ILO. The document examines the importance of mental health in the workplace in general, and suggests appropriate management for workers with mental health problems. In addition, it takes a practical look at strategies to promote and sustain good mental health while highlighting examples of good practices.

The document was written jointly by Dr Gaston Harnois on behalf of WHO and Phyllis Gabriel on behalf of ILO. Dr Harnois is Director of the Montreal WHO Collaborating Centre at the Douglas Hospital in Montreal, Canada. He is also Associate Professor of Psychiatry at McGill University, and former President of the World Association for Psychosocial Rehabilitation. Phyllis Gabriel MPH, MA is a Vocational Rehabilitation Specialist at the ILO headquarters in Geneva. She has worked as a Vocational Rehabilitation Counsellor in US community-based social service agencies as well as in mental health care facilities.

It is hoped that this important document will assist employers and employees in raising awareness of the benefits of good mental health practices and encourage the implementation of strategies to maintain a healthy working environment.

**Dr Benedetto Saraceno**
Director
Department of Mental Health and
Substance Dependence (MSD)
World Health Organization

**Mr Pekka Aro**
Director
InFocus Programme on
Knowledge, Skills and Employability
International Labour Organization

1

# Chapter 1
# Introduction

## 1.1. Scope of the problem

There is growing evidence of the global impact of mental illness. Mental health problems are among the most important contributors to the burden of disease and disability worldwide. Five of the 10 leading causes of disability worldwide are mental health problems. They are as relevant in low-income countries as they are in rich ones, cutting across age, gender and social strata. Furthermore, all predictions indicate that the future will see a dramatic increase in mental health problems (*2*).

The burden of mental health disorders on health and productivity has long been underestimated. The United Kingdom Department of Health and the Confederation of British Industry have estimated that 15-30% of workers will experience some form of mental health problem during their working lives. In fact, mental health problems are a leading cause of illness and disability (*3*). The European Mental Health Agenda of the European Union (EU) has recognized the prevalence and impact of mental health disorders in the workplace in EU countries. It has been estimated that 20% of the adult working population has some type of mental health problem at any given time (*4*). In the USA, it is estimated that more than 40 million people have some type of mental health disorder and, of that number, 4-5 million adults are considered seriously mentally ill (*5*). Depressive disorders, for example, represent one of the most common health problems of adults in the United States workforce.

The impact of mental health problems in the workplace has serious consequences not only for the individual but also for the productivity of the enterprise. Employee performance, rates of illness, absenteeism, accidents and staff turnover are all affected by employees' mental health status. In the United Kingdom, for example, 80 million days are lost every year due to mental illnesses, costing employers £1-2 billion each year (*6*). In the United States, estimates for national spending on depression alone are US$ 30-40 billion, with an estimated 200 million days lost from work each year (*7*, *8*).

## 1.2 Mental health problems cause disability

As illustrated in this monograph, mental health problems affect functional and working capacity in numerous ways. Depending on the age of onset of a mental health disorder, an individual's working capacity may be significantly reduced. Mental disorders are usually one of the three leading causes of disability, together with cardiovascular disease and musculo-skeletal disorders. In the EU, for example, mental health disorders are a major reason for granting disability pensions (*9*).

Disability not only affects individuals but also impacts on the entire community. The cost to society of excluding people with disabilities from taking an active part



**Costs of occupational and work-related diseases**

- 40% Musculoskeletal
- 16% Heart disease
- 7% Mental disorders
- 14% Accidents
- 9% Respiratory disorders
- 8% CNS
- 3% Tumours
- 3% Skin diseases

*Source*: Takala J. (ILO) Indicators of death, disability and disease at work. African Newsletter on Occupational Health and Safety, December 1999, 9(3):60-65.

in community life is high. This exclusion often leads to diminished productivity and losses in human potential. The United Nations estimates that 25% of the world's population is adversely affected in one way or another as a result of disabilities. The cost of disability has three components (*10*):

- the direct cost of welfare services and treatment, including the costs of disability benefits, travel and access, possible medication, etc;

- the indirect cost to those who are not directly affected (carers);

- the opportunity costs of income foregone as a result of incapacity.

For example, analysis of Tanzanian survey data has revealed that households with a member who has a disability have a mean consumption less than 60% of that of the average household. This leads the authors to conclude that disability is a hidden aspect of African poverty (*11*).

People with disabilities, particularly psychiatric disabilities, face numerous barriers in obtaining equal opportunities – environmental, access, legal, institutional and



*Source*: United Kingdom Department for International Development. Disability, Poverty and Development, February 2000 (modified)

attitudinal barriers which cause social exclusion (*12*). For people with mental illness, social exclusion is often the hardest barrier to overcome and is usually associated with feelings of shame, fear and rejection.

It is clear that mental illness imposes a heavy burden in terms of human suffering, social exclusion, stigmatization of the mentally ill and their families and economic costs. Unfortunately, the burden is likely to grow over time as a result of ageing of the global population and stresses resulting from social problems and unrest, including violence, conflict and natural disasters (*13*).

## 1.3 Using the workplace to prevent mental health problems and provide solutions for referral and rehabilitation

Globalization and interdependence have opened new opportunities for the growth of the world economy and development. While globalization has been a powerful and dynamic force for growth, work conditions and the labour market have changed dramatically during the last two decades. The key elements in these changes are increased automation and the rapid implementation of information technology. Workers worldwide confront as never before an array of new organizational structures and processes – downsizing, contingent employment and increased workload.

Employers have tended to take the view that work and/or the workplace are not etiological factors in mental health problems. However, whatever the causal factors, the prevalence of mental health problems in employees makes mental health a pressing issue in its own right (*14*). Although, effective mental health services are multidimensional, the workplace is an appropriate environment in which to educate individuals about, and raise their awareness of, mental health problems. For example, the workplace can promote good mental health practices and pro-

**4**     **Nations for Mental Health**

vide tools for recognition and early identification of mental health problems, and can establish links with local mental health services for referral, treatment and rehabilitation. Ultimately, these efforts will benefit all by reducing the social and economic costs to society of mental health problems.

For people with mental health problems, finding work in the open labour market or returning to work and retaining a job after treatment is often a challenge. Stigma surrounds those with mental illness and the recovery process is often misunderstood.

This monograph addresses these issues. It provides a practical guide and resource for human resource managers, mental health professionals, rehabilitation workers, policy-makers, trade unionists and other concerned individuals.

The central themes of this monograph are:

- To examine the importance of mental health problems in the workplace.
- To consider the role of the workplace in promoting good mental health practices for employees.
- To examine the importance of work for persons with mental health problems.
- To discuss the different vocational strategies and programmes for persons with mental health problems.
- To provide examples of good practices. These examples illustrate:
  - good mental health promotional practices in the workplace by employers;
  - how to handle an employee who becomes ill with a mental health problem, such as depression;
  - vocational rehabilitation models/programmes for persons with long-term mental health problems.

# Chapter 2
# The importance of work to an individual's mental health

## 2.1 The workplace and mental well-being

The workplace is one of the key envi-
ronments that affect our mental well-
being and health. There is an
acknowledgement and growing aware-
ness of the role of work in promoting or
hindering mental wellness and its corol-
lary – mental illness. Although it is diffi-
cult to quantify the impact of work
alone on personal identity, self-esteem
and social recognition, most mental

> Work is at the very core of
> contemporary life for most people,
> providing financial security, personal
> identity, and an opportunity to make a
> meaningful contribution to
> community life.
>
> **Source: NAMI (15).**

health professionals agree that the workplace environment can have a significant
impact on an individual's mental well-being.

## 2.2 Categories of psychological experience (16)

Employment provides five categories of psychological experience that promote
mental well-being:

- time structure (an absence of time structure can be a major psychological burden);

- social contact;

- collective effort and purpose (employment offers a social context outside the family);

- social identity (employment is an important element in defining oneself);

- regular activity (organizing one's daily life).

Many large companies now realize that their employees' productivity is connect-
ed to their health and well-being. However, more emphasis has traditionally been
placed on physical health than on mental health and well-being.

Several factors at a workplace can promote employees' psychosocial well-being
and mental health. Especially important in this respect is the opportunity to be
included in planning and carrying out activities and events in the workplace (e.g.
the opportunity to decide and act in one's chosen way and the potential to pre-
dict the consequences of one's action). A related feature is the degree to which
the environment encourages or inhibits the utilization or development of skills.
Physical security, opportunity for interpersonal contact, and equitable pay are
also important.

# Chapter 3
# The workplace and mental health

## 3.1 Promotion of mental health in the workplace

Notions of mental health at work tend to focus on the individual rather than the organization. A comprehensive policy of mental health at work includes, however, an assessment of the mental health of the organization itself. The gain to both individuals and the organization from promoting good mental health at work is reflected in increased presence, well-being and production.

> "We at the CBI are convinced that the mental health of a company's employees can have an important impact on business performance in the same way as do industrial relations climate or inadequate training. That is why the CBI continues to add its voice to the campaign to raise the profile of mental health as a workplace issue."
>
> **Howard Davies, Director General, Confederation of British Industry.**

The constant and unremitting rate of change that affects all businesses today is increasingly motivating employers to address the health of their staff. Moreover, it is taking its toll on employees, some of whom fail to cope with the changes and need support to help them avoid under-performance and absenteeism. The global marketplace is forcing organizations to upgrade their efficiency and this, in turn, is encouraging employers to seek ways of enhancing the performance of employees and to avoid losses associated with health and safety (see example of Marks & Spencer, UK on page 7).

## 3.2 Job stress – stressful characteristics of work

Job stress can be defined as the harmful physical and emotional response that occurs when the requirements of the job do not match the capabilities, resources or needs of the worker (*18*). Job stress can cause poor health and can increase rates of work-related injuries and accidents. Some potential causes of work-related stress are overwork, lack of clear

> The nature of work is changing at whirlwind speed. Perhaps now more than ever before, job stress poses a threat to the health of workers and, in turn, to the health of organizations.
>
> **Source: National Institute for Occupational Safety and Health, 1998.**

instructions, unrealistic deadlines, lack of decision-making, job insecurity, isolated working conditions, surveillance, and inadequate child-care arrangements (*19*) (see examples on page 10). Although sexual harassment and discrimination are often excluded from lists of traditional job stressors, they must be included in any comprehensive analysis of the causes of workplace stress. Sexual harassment is a stressor for women in the workplace; and discrimination is a stronger predictor of health outcomes, including mental ill-health, for ethnic minorities than traditional job stressors (*20*). Some of the many effects of stress include numerous physical ailments as well as mental health problems such as depression and increased rates of suicide (*21*).

## Good practice: Workplace activities for mental health, United Kingdom

A large international retailer with 696 stores in many parts of the world including North America, Asia and Europe employs some 56,000 people. Over 52,000 of these are employed in stores. 83% of the workforce is female and 62% of these are part-time.

Their stated policy is to take the mental health of its workforce seriously: "We realize that in ensuring the mental well-being of staff we benefit from an individual and company point of view."

### Strategy for health promotion

The strategy for overall health promotion, which includes mental health, is based on the following:

- health education to raise awareness of factors affecting health and well-being;
- screening programmes to detect risk factors or early signs of disease;
- action programmes to do something about them.

### The role of the occupational health service

The occupational health service works closely with personnel and line management regarding all aspects of mental and physical health of employees. The occupational health team is available to look at the effects of health on work or of work on health, to discuss with staff any health problems they may have and to promote good health through health education, screening and action programmes. The company believes that an occupational health service can play a major role in helping:

- to identify work problems caused by mental ill-health;
- to take action to improve the health of employees;
- to assist employers in modifying the work and work environment;
- to enable employees to remain at work rather than withdraw.

The organization assists in preventing mental ill-health by giving people a good working environment and a clearly defined job. Following absence, it is often essential to be able to modify working hours during the rehabilitation period and to provide a gradual return to usual working practices through a good sick pay scheme. Financial support at this time allays anxiety and encourages a speedier return to work.

Regular honest appraisals are important and problems in performance should be discussed when they occur, with an opportunity to follow up and review progress. People should feel able to contribute to their development and feel accountable for their jobs.

On-site counselling facilities from personnel or health professionals are available, reducing time away from work (*17*).

There is growing global concern about the impact of job stress, including issues related to gender, ethnicity, sexual harassment, violence and mobbing at work, family, and underemployment (*22*). Job stress is one of the most common work-related health problems in EU countries. The Second European Survey on Working Conditions indicated that 28% of workers reported that their work causes stress. In Japan, the proportion of workers who report serious anxieties or stress in relation to their working life increased from 53% in 1982 to 63% in 1997. In developing countries, there is increasing concern regarding the health impact of job stress. For example, an increased risk of work-related illnesses and accidents has been observed in South-east Asian countries that have experienced rapid industrialization (*23*).

In most countries there is no specific legislation addressing the impact of job stress. Most countries have at least minimum standards for safety and health features of the workplace. These standards tend to focus on the physical aspects of the workplace and do not explicitly include the psychological and/or mental health aspects of working conditions. Notable exceptions include the Netherlands and the Nordic countries (*24*).

### 3.3 Consequences of mental health problems in the workplace

The consequences of mental health problems in the workplace can be summarized as follows (*25*):

### Absenteeism

- increase in overall sickness absence, particularly frequent short periods of absence;
- poor health (depression, stress, burnout);
- physical conditions (high blood pressure, heart disease, ulcers, sleeping disorders, skin rashes, headache, neck- and backache, low resistance to infections).

### Work performance

- reduction in productivity and output;
- increase in error rates;
- increased amount of accidents;
- poor decision-making;
- deterioration in planning and control of work.

### Staff attitude and behaviour

- loss of motivation and commitment
- burnout

- staff working increasingly long hours but for diminishing returns
- poor timekeeping
- labour turnover (particularly expensive for companies at top levels of management).

### Relationships at work

- tension and conflicts between colleagues;
- poor relationships with clients;
- increase in disciplinary problems.

Workers' health is a separate goal in its own right. Addressing mental health issues in the workplace means incorporating social responsibility in a firm's every-day practices and routines.

## 3.4 Mental health and unemployment

Re-employment has been shown to be one of the most effective ways of pro-moting the mental health of the unem-ployed (*26*).

A review of studies of the mental and physical health effects of unemployment and the mechanisms by which unem-ployment causes adverse health out-comes reveals a complex relationship. There has been a serious debate about the direction of causality. Does unem-ployment cause deterioration in health, both mental and physical? Are the sick more likely to become unemployed?

> **Fact:** The National Institute of Mental Health estimates that more than 3 million adults aged 18-69 have a serious mental illness. Estimates of unemployment among this group are 70-90%, a rate higher than for any other group of people with disabilities in the USA. Recent surveys report that approximately 70% of those with psychiatric problems rank employment as an important goal.
>
> Source: **NAMI (27)**.

In a study reported in the *Journal of Community Psychology* (*28*), an analysis of employed respondents revealed that those who became unemployed had over twice the risk of increased depressive symptoms and diagnosis of clinical depres-sion than those who remained employed. Furthermore, the data did not support any relationship between clinical depression and becoming unemployed. In the respondents' community at the time of the study, depression was not a causal fac-tor for the unemployment rate. The incidence and prevalence of depression increased once individuals became unemployed.

## Stressful characteristics of work

| Work characteristics | Condition defining hazard (demands, control and support) |
| --- | --- |
| **CONTEXT** | |
| Organizational function and culture | Poor task environment and lack of definition of objective |
| | Poor problem solving environment |
| | Poor development environment |
| | Poor communication |
| | Non-supportive culture |
| Role in organization | Role ambiguity |
| | Role conflict |
| | High responsibility for people |
| Career development | Career uncertainty |
| | Career stagnation |
| | Poor status or status incongruity |
| | Poor pay |
| | Job insecurity and redundancy |
| | Low social value to work |
| Decision latitude/control | Low participation in decision-making |
| | Lack of control over work |
| | Little decision-making in work |
| Interpersonal relationships at work | Social or physical isolation |
| | Poor relationships with supervisors |
| | Interpersonal conflict and violence |
| | Lack of social or practical support at home |
| | Dual career problems |
| **CONTENT** | |
| Task design | Ill-defined work |
| | High uncertainty in work |
| | Lack of variety of short work cycles |
| | Fragmented or meaningless work |
| | Underutilization of skill |
| | Continual exposure of client/customer groups |
| Workload/work pace | Lack of control over pacing |
| Quantities and quality | Work overload or underload |
| | High levels of pacing or time pressure |
| Work schedule | Shift working |
| | Inflexible work schedule |
| | Unpredictable working hours |
| | Long or unsociable working hours |

Consensus from literature outlining nine different characteristics of jobs, work environment and organization which are hazardous.

*Source*: HSE Contract Research Report No. 61/1993. Cox T. *Stress Research and Stress Management: Putting Theory to Work.*

# Chapter 4
# Mental health: an imperative concern

## 4.1 Issues facing employers and managers

Although our knowledge of mental health issues has increased over the past few decades, employers and enterprises have lagged behind in their understanding and acceptance of the pervasiveness, treatment and impact of mental health problems on organizational life (*29*). Most human resource management and public administration training programmes do not cover adequately the area of mental health and employment. Recognition of mental illness in the workplace is often difficult for there is often a psychological component to physical symptoms and physical ailments may be present in some mental disorders (*30*). Whatever the original cause, employers and managers are faced with three main issues as they attempt to address the mental health needs of their employees:

### Recognition and acceptance of mental health as a legitimate concern of organizations (31)

There is a need among employers to recognize mental health issues as a legitimate workplace concern. As disability costs and absenteeism increase in the workplace due to mental ill-health (whatever the precipitating factors), more and more employers are faced with the challenge of developing policies and guidelines to address these issues.

### Effective implementation of a country's anti-discrimination provisions (32)

The last decade has seen a significant increase in anti-discrimination legislation specific to employment for people with disabilities. Although many of these laws and statutes have weak enforcement mechanisms, there is an increasing need for employers and their human resource managers to understand how these laws affect their company's employment policies.

### Preventive, treatment, and rehabilitation programmes that address employees mental health needs

The development of appropriate prevention and mental health promotion policies in the workplace is an increasing concern for many employers. Understanding the need for early intervention and treatment, as well as reintegrating an employee into the work environment, is also a critical challenge.

## Good practice: Promotion/prevention – a case study in organizational stress, United Kingdom

### A Mental Health Trust – organizational stress pilot for employees (33)

A Mental Health Trust employs some 846 people and provides mental health services to a large catchment area in Britain. The trust's data showed that stress-related illness was responsible for 25% of all absence. To address this issue, the trust implemented the Health Education Authority's anti-stress pilot programme designed to reduce the anxiety and tension of employees within the organization. The programme was introduced at a time of major organizational change at the trust. As a result of the programme, absenteeism due to stress-related conditions was reduced. Moreover, a "general sense" of improved morale among the employees was noted.

### Key components

- Formation of a Stress Management Group (SMG). The SMG managed the programme. It was usually led by the human resource director with the full support of the chief executive.

- The Listening Group. This was a two-day event for 25-30 people representing all sections of the organization. The Listening Group was led by the consultants to the programme. Its aim was to develop a preliminary analysis of the nature and extent of organizational stress by listening to the views of the staff.

- Post -Listening Group action. Following the Listening Group, the SMG worked with consultants to plan the Organizational Stress Workshop on the basis of the findings of the Listening Group.

- The Organizational Stress Workshop. This was a second two-day event for 30-60 people who had a particular involvement in the findings of the Listening Group. Their role was to draw up action plans.

- The Action Groups. A number of groups were formed, coordinated by the SMG, to see through the action plans over a period of months or even years.

### Reasons for stress as expressed by the employees in the Listening Group

- Staff felt uninvolved in the planning and process of change, leading to a loss of control, of choice and ownership and a sense of devaluation and powerlessness.

- Staff did not know what was happening when it happened. Decisions could change from one week to the next.

- Many were struggling to cope with changes in their work environment, such as service relocations and new methods of recording information.

---

**Outcomes/effectiveness**

Sickness absence in the Mental Health Trust

| **1993-4** | **1994-5** | **1995-6** | **1996-7** | **1997-8** |
|------------|------------|------------|------------|------------|
| 6.17% | 5.72% | 5.59% | 5.6% | 4.79% |

Proportion of sickness absence due to stress, 1993-1997

| **1993-4** | **1994-5** | **1995-6** | **1996-7** | **1997-8** |
|------------|------------|------------|------------|------------|
| 19.9% | 20.4% | 20.2% | 19% | 16.8% |

**Employees' comments after participation**

Managers were generally more enthusiastic about the programme than staff. Most partici-pants in workshops or action groups felt they had benefited. Several described the pro-gramme as "therapeutic" and constructive.

Communications were better, more information was getting through, the lead up to the move was better. It felt as though there was more support and team effort. "Things are changing in my department - there's more on offer, training, support but don't know if it's the result of this intervention."

A few identified other beneficial changes in attitudes or culture. Before the project it had not been possible to admit to certain feelings, such as being upset about the closure, but now it was.

Some felt more confident that things could be influenced from the bottom up.

---

## 4.2 Country examples

### 4.2.1 United Kingdom – The health of the nation (34)

The Health of the Nation is a national response to WHO's campaign for *Health for all by the year 2000*. It sets goals for health outcomes and selects mental ill-nesses as a priority area.

The overall mental illness goals are to prevent mental illness, improve health and social functioning of people with mental illness, reduce mortality from mental ill-ness, reduce stigma, deliver effective services, and continue research into causes, care and consequences of mental illness.

The national targets for mental illness are:

- to significantly improve the health and social functioning of mentally ill people;

- to reduce the overall suicide rate by at least 15% by the year 2000 from the 1990 level of 11 per 100,000;

- to reduce the lifetime suicide rate of severely mentally ill people by at least 33% by the year 2000.

The overall strategy to achieve the targets is:

- to improve information and understanding about mental illness;

- to continue developing local comprehensive services;

- to promote good practice in mental health promotion, primary, secondary and tertiary prevention, and prevention of mortality.

The mental illness key area encompasses the National Health Service (NHS) as well as a whole range of organizations and settings such as local authorities, the voluntary sector, the criminal justice system, schools, workplaces, cities and rural areas.

Since the United Kingdom does not have a national occupational health service, many large employers have established their own occupational health services for their employees.

## 4.2.2 Mental health issues in the Finnish workplace (35)

Measures most commonly taken at the Finnish workplace aim to:

- improve work environment (e.g. enhancing occupational safety and ergonomics, communication, clear goals, independence at work);

- provide further training and learning opportunities (e.g. improving occupational skills and team work or promoting independent studying);

- promote health (e.g. promoting physical activities, healthy lifestyle, offering rehabilitation and preventing substance abuse).

The Finnish Institute of Occupational Health recommends the following means to promote mental health in work organizations (*36*):

- to implement models of good workplace practices and disseminate this information in the community;

- to increase the cooperation of mental health and occupational health professionals in promoting mental health activities at the workplace;

- to train occupational health care professionals in mental health issues and mental health professionals in work-life issues.

- to increase the general knowledge of the whole population regarding the preconditions for and value of good mental health in working life, and develop self-help skills for creating satisfactory working conditions.

## 4.2.3 Targeted intervention to facilitate return to work

The Association of Canadian insurance companies estimates that 30-50% of disability allowances are paid on account of mental health problems. This is therefore the principal cause of long-term absences from one's job. The experience of many employers is that once an employee is absent for "mental health" reasons for 3 months, the likelihood is very high that the absence will last more than 1 year.

## 4.3 Action needed

### 4.3.1 Specific steps an employer can take to help an employee return to work after treatment for a mental health problem such as depression (37)

- Inform the attending physician or appropriate mental health professional of the exact duties of the job before the physician makes a final decision on return to work.

- In consultation with the individual's physician or other mental health professional, encourage an early to return to work. The longer an employee is out of work due to treatment, the more he/she will worry about losing the job. Furthermore, the longer a person is away from the job, the more mentally detached he or she will become.

- Consider gradual return to work. Allowing part-time work for several weeks may help reduce stress, leave time for additional medical counselling and allow the worker to quickly get back into a normal routine. Flexitime, temporarily changed duties that involve less job-related stress or other flexible arrangements may be useful. However, there should be a clear understanding between the employee and the employer as to the details of the return-to-work programme: the expected length of time for which special accommodations will be granted, what day-to-day flexibility is allowed, the exact duties of the employee and who will supervise the work.

---

**Good practice: Total Wellness Programme, Finland**

One of the world's leading wireless and wireline telecommunications firms runs a total wellness programme which includes mental health issues for its employees. The programme's purpose is to create an efficient and healthy workplace and health promoting working conditions. This company's human resources and occupational medicine departments are responsible for workplace health promotion and prevention programmes. The Total Wellness Programme was developed in collaboration with the Finnish Institute of Occupational Health.

To plan its health promotion activities, the company uses its own statistics on working days lost due to illness, industrial accidents and occupational diseases, as well as data on staff satisfaction and the health of employees. The occupational medicine department organizes medical examinations and assessments of the need for rehabilitation. As part of the fitness survey, employees are assessed on a scale of one to five on health-related issues such as work, physical condition, and ability to cope with stress, family life, social contacts and hobbies. Receiving the lowest score in any of these sections prompts quick intervention to determine how the situation can be improved. Participation in the programme is evaluated on a regular basis. Work stressors and health and career development are part of the agenda of annual development discussions between employees and their superiors. The company places great emphasis on continuing professional education. It has established its own global learning centre network.

- Other possible stress-reducing accommodations include:
  - altering the pace of work;
  - lowering the noise level of work;
  - providing water, tea or soda and crushed ice to combat a dry mouth caused by some medications;
  - extra encouragement and praise of job performance, but only if warranted and not obviously excessive;
  - while taking steps to reduce stress, avoidance of over-protection of the employee;
  - making sure the employee is treated as a member of the team and not excluded from social events, business meetings or other activities relevant to the job.

### 4.3.2 Employee assistance programmes

Employee assistance programmes (EAPs) are company-sponsored programmes designed to alleviate and assist in eliminating workplace problems caused by per-

---

**Good practice: the use of group process to facilitate work reintegration of employees with mental health problems in Canada**

A 12-week programme was created to bring about a "synergetic partnership" and a dynamic alliance between employee, employer, health professionals, unions and insurance companies.

The programme, offered to no more than 12 individuals at any one time, combines group intervention and an individual action plan; it is action-oriented and centred on the regaining of power for the person.

First, the programme aims at:

- identifying and resolving collective and individual problems;
- reviewing vocational skills and interpersonal relationships;
- consolidating job skills.

Secondly, the employee is accompanied in the negotiation of his/her progressive return to work. A joint supervisory process (involving the employee, the vocational consultant and the employer) takes place on the job scene. This serves to give confidence to the employee while at the same "sensitizing" other workers.

Thirdly, in order to avoid relapses and to consolidate job stability, the individual is followed up for 6 months and as needed thereafter.

*Results:* After 2 years, 85% of the employees who took the programme have returned to their jobs and are still in them.

*Cost:* The programme costs Cdn.$ 2600 (US$ 1700) for 12 weeks.

Charbonneau, C.: Accès Cible S.M.T. Dix ans à faire renaître la confiance. November 1998.

sonal problems. These programmes typically provide supportive, diagnostic, referral and counselling treatment services. Many EAPs began as occupational alcoholism programmes and gradually evolved into broader-based efforts as employers recognized that alcoholism was not the only problem that could negatively affect job performance.

Although some EAPs continue to focus only on identifying and assisting workers who are substance abusers, most now offer a wide range of other services to help employees resolve personal and work-related problems. These services may include:

- on-site and telephone counselling;
- referral for psychological symptoms or mental health disorders (e.g. depression, stress, anxiety);
- marital or family-related issues;
- legal and financial problems;
- catastrophic medical problems (e.g. AIDS, cancer);
- pre-retirement planning needs;
- career-related difficulties (*38*).

Many EAPs have been affected by changes in national and regional legislation. As an employer develops programmes to respond to national policies as well as legislation, EAP professionals have had to become knowledgeable about the statutes and how they affect their company's employees and policies (*39*).

### 4.3.3 Practical suggestions for small businesses (40)

Often the smaller employer (with fewer than 25 employees) cannot afford to have a specific EAP or medical and rehabilitation experts on the staff. However, the model that is often used by many large employers can be adapted to a small setting:

- The personnel or human resource director or other appropriate officer of the company should visit the employee who is on a medical/disability leave as soon as possible to demonstrate concern and to encourage an early return to work.
- Always try to return the worker to his or her old job, even if an accommodation or flexible work time is required. This minimizes complications to the employee, reduces stress which may trigger a reoccurrence of depressive symptoms, and maximizes the company's advantage of having a trained employee.
- Use community resources. Local rehabilitation agencies and support groups may aid in a successful return to work with minimal or no expense to the business.
- Make a special effort to inform the employee's physician or mental health professional regarding the requirements of the job and possible changes and accommodations.

18        **Nations for Mental Health**

**Good practice: Employee assistance programme, USA**

A large diversified health care company with more than 54,000 employees.

The following psychiatric disability case illustrates the benefits of an effective workplace programme to manage mental health problems. An office assistant in her early thirties was a divorced single mother with two children. Her manager, having observed her recent problems with concentration and productivity, referred her to the company's EAP.

Due to the severity of the employee's condition, the EAP recommended that she be placed on medical leave. The employee, who had a history of childhood abuse and symptoms of depression, had been under the care of a psychiatrist and therapist. These providers were not responsive to the EAP's request for additional evaluation and more intensive outpatient treatment. Therefore, with the employee's agreement, she was referred to in-network providers, a psychiatrist and psychologist team, who quickly determined that she needed more timely intensive care. Her medications were modified and she began partial hospitalization treatment. The EAP case manager also arranged for the employee to receive financial assistance through a company programme, which helped to reduce her level of stress.

After seven weeks, the woman had stabilized and was returned to work. However, shortly thereafter she had a relationship break-up and quickly slipped back into crisis mode, including suicide ideation. The employee was again placed on medical leave and her providers admitted her to an inpatient programme. After a few days in the hospital, the employee stabilized again, returned to partial hospitalization and began attending a depression support group.

Within six weeks, the employee returned to work for a second time. This time, she was eased back into the work routine, beginning on a part-time basis and slowly increasing her work hours. Within a month, she returned to full-time work. The EAP case manager maintained contact with her after the return to work, and also worked with the employee's manager to ensure a successful transition back to work. The employee has since demonstrated positive progress with a good prognosis.

Over a 10-month period, the EAP had made a total of 163 contacts with the employee, providers and company personnel. This investment in support has enabled an employee who had been a probable candidate for long-term disability to remain productive (*41*).

# Chapter 5
# Work as a mechanism for reintegrating persons with serious mental illness

## 5.1 Size and profile of this group

According to WHO, more than 500 million people around the world are afflicted with serious mental illness, alcoholism and/or drug addiction. Expressed differently, 1.5-2% of the population of each country has to face this issue.

According to ILO (*43*), mental illness hits more human lives and gives rise to a greater waste of human resources than all other forms of disability.

> "We have been asking for the means to actively construct the real access to rights for years: not only the right to medical care, but also the right to produce, to have a house, an activity, a relationship, economic means, value."
>
> **Source: Franco Rotelli (42)**

The unemployment rate of this group is around 90% — in contrast to that of persons with physical or sensorial disabilities, which is approximately 50%. Again, expressed differently, only 10% of persons with a serious psychiatric background who wish to work and are judged capable of working are in fact working. Women fare less well than men.

It has long been known that severe mental illness often impairs dramatically one's capacity to work and to earn a living. It can lead to impoverishment, which in turn may worsen the illness. Thus, all efforts to find employment for these persons are essential since they improve quality of life and reduce both impoverishment and the high service and welfare costs engendered by this group (*44*).

## 5.2 Historical perspective

Tremendous changes have taken place in the management of persons with severe mental illness over the past 50 years.

### 5.2.1 Deinstitutionalization

Until the early 1950s we had to resort to long-term hospitalization, usually in a psychiatric hospital, since few very effective treatments were available. The negative side of prolonged hospitalization was that patients not only had the signs and symptoms of their illness but also had a tendency to lose the social skills which they possessed that are required in order to live in society (such as the ability to



**Disabled people with mental health problems and work, United Kingdom**

(Total of working age with mental health problems = 475,000)

Economically **active**

In employment **12%**   57 000

"Looking for work" **4%**   20 000

Economically **inactive**

"Not actively looking for work" **84%**   398 000

*Source*: Labour Force Survey, Spring 1998. United Kingdom Educational and Employment Committee, Opportunities for Disabled People

dress and to feed oneself appropriately, to relate to other persons, to take the bus, or go to the bank, etc.). This phenomenon, referred to as "institutionalization", became more evident when the first neuroleptic drugs ("tranquillizers") were discovered in the 1950s. These had the capacity to control symptoms such as thought disorder, hallucinations, restlessness and agitation. Their discovery had a dramatic impact on the life of many long-term psychiatric patients who could then be discharged much more rapidly and also benefit from other treatments such as psychotherapy. However, a good number of patients whose active symptoms were well looked after with the first and successive generations of neuroleptic medication were still showing other symptoms such as withdrawal, lack of motivation, a certain degree of apathy, and the so-called "negative symptoms" of major psychiatric illness, most notably schizophrenia. It is only since 1985 that we have medications available (so-called atypical neuroleptics) that can significantly impact on negative symptoms.

All the above medications are powerful and they must always be carefully prescribed and monitored. Several can cause secondary effects such as thirst, involuntary movements and problems with vision, although this is less frequent with the newer molecules.

The other categories of illnesses normally included under the term "severe mental illness" are the major depressions, be they unipolar or bipolar ("manic-depressive illness"). Tricyclic antidepressants and MAO inhibitors are used for the former and mood stabilizers (mostly lithium carbonate) for the latter.

## 5.2.2 Organization of services

In developed countries today, most admissions take place in general hospitals rather than in psychiatric hospitals.

A substantial percentage of persons are able to return to live in society, either with their own families or in different types of living arrangements with more or less need for supervision and support. Many patients can be treated in day or night hospital programmes. By far the majority of patients are treated as outpatients, ideally by a multidisciplinary team that participates in carrying out a plan or project that has been developed jointly with the patient.

Today, the vast majority of persons with mental illness live in the community and not in institutions.

## 5.2.3 Psychosocial rehabilitation

Coincidental with these changes, we have witnessed a rapid development in the field and practice of psychosocial rehabilitation, a discipline which aims to overcome the difficulties of playing a social role and living in a social environment (*45*). The emphasis is on skills and abilities rather than on symptoms and disabilities, and the focus is on the areas of activities of daily living, socialization and work. The practice of psychosocial rehabilitation can be done by existing professionals such as psychiatrists, psychologists, social workers, occupational therapists and nurses if they have the necessary skills and training, or by persons who have received specific training in psychosocial rehabilitation in university programmes which are growing more numerous nowadays. All groups share a belief that most persons with serious mental health problems can improve if properly evaluated, trained and supported in the community (*46*).

Whereas physicians (mostly psychiatrists) are responsible for hospital admissions and treatment, including the prescription of appropriately monitored medication (which a majority of patients will require, often for long periods of time), most facets of reintegration and life in the community are looked after by professionals who use a psychoeducational approach rather than a medical one.

With appropriate treatment and psychosocial rehabilitation programmes, many people who would formerly have had to spend years in psychiatric institutions are now able to lead fairly interesting lives in the community.

Mental illness should be distinguished from mental retardation. The latter refers to subnormal intellectual functioning which usually begins before adulthood (*47*).

### 5.2.4 Developing work skills

While our focus is on access to paid employment, we know that a majority of persons with severe mental health problems have been exposed to programmes that focus more on developing work skills than on actual paid work. These programmes are summarized briefly (*48*).

- Hospital-based programmes of training and work integration

These are less used now than in the past; their aim is to increase self-confidence and general functioning and the type of activities that one finds in such programmes include food distribution, gardening, running a small store, etc. While participants tend to have reduced numbers of days of hospitalization, it appears that few obtain successful permanent employment.

- Sheltered workshops

This is another traditional approach where subcontract work is used. It is felt that this type of work does not prepare very well for remunerative employment and that the person tends to remain in a patient role. However, 10-15% of participants have been found capable of moving to a more intensive programme.

- Training in community living

These programmes have been developed through the pioneering efforts of Stein, Test & Marx (*49*). They attend to basic needs and feature strong individual management as well as a global approach. While participation in such programmes reduces hospitalization and increases independent living, it has not been found to have a great impact on keeping a permanent job.

- Programmes of assertive community treatment (PACT)

These programmes were also developed by Stein, Test & Marx in response to the growing need for community-based services for persons with severe mental illness. The focus has been on recovery from illness and enhanced quality of life. This training has been implemented in Canada and in several areas of the United States. PACT is an interdisciplinary team approach including a psychiatrist, registered nurses, peer specialists, vocational specialists, an addiction specialist and a programme administrator. Crisis care is available 24 hours a day.

This integrated, community-based model provides "the treatment, rehabilitation, and support services that persons with severe mental illness need to live successfully in the community" (*50*).

The clinical principles of treatment include, in part, an assertive approach to keeping individuals involved; continuous monitoring to maintain current knowledge of their functioning and to facilitate intervention when necessary; and individually tailored treatment and rehabilitation programmes (*51*).

PACT appears to be the model that has resulted in the most candidates being able to obtain increased competitive employment.

Other approaches are described later under 5.10.

## 5.3 Current context: changes in the nature of work

Obtaining competitively paid employment for a person with a background of serious mental illness remains a challenge at the best of times. It is even more difficult in periods of high unemployment when the availability of nondisabled workers is plentiful.

Globalization, technological development and changes in the organization of work are having an impact worldwide (*52*).

In the manufacturing sector of OECD countries, the employment of unskilled labourers has fallen by 20% (*53*) and there is a definitive trend towards the hiring of highly-skilled workers.

We are forced to acknowledge that important changes have taken place in the very nature and organization of work: the free-market economy which predominates, is often accompanied by downsizing of human resources and increased loss of job security. Moreover, various governments, in order to balance their budgets, have felt the need to reduce their social costs from which persons with serious mental illness traditionally get support: conditions of eligibility have been made stricter and the duration of the support programme often shorter.

With respect to the near future, there seem to be two schools of thought – one pessimistic and the other more optimistic.

The pessimist's viewpoint, as represented by sociologist Jeremy Rifkin (*54*), states that we are nearing the "end of work". The recent technological advances have resulted in a sharp reduction of new jobs in the industrial sector and he predicts that, with the assistance of computer technology, the reduction will be even greater in the services sector.

The optimists, as represented by Charles Goldfinger, are of the opinion that "each time a new technology is developed, it brings not a decrease, but an increase in job opportunities, albeit, not necessarily of the same kind as before". The new economy contains huge pools of new jobs which can more than make up for the inevitable loss of traditional jobs" (*55*). This latter viewpoint seems to be borne out in several countries that have experienced sustained growth in the

last few years: this has "revived the demand for a great variety of workers in many spheres of economic activity" (*56*).

Supporters of both viewpoints seem to agree that the organization of work is becoming more intangible and that regular 8 to 5 jobs may be less common, to be replaced by "flexible schedule, increased part-time work, short-time contracts, often done in the employee's own home…"

There seems to be agreement that the newer jobs will be in the following sectors:

- handling information and knowledge;
- information technology;
- the health sector;
- the leisure economy.

Whenever they have been successful in finding a paid job in the past, persons with a backgound of serious mental illness tended to work either in the traditional industrial sector or in service areas that did not require high technological capacity.

While it is too early to predict what will happen in the 21st century, it is obvious that work programmes for these persons will have to take into account the changes in the nature of work. This will include the need for a better education and the development of professional skills in keeping with the requirements of the new jobs.

## 5.4 Overcoming obstacles affecting clients' ability to access work (57)

Individuals with mental illness want to work but are often discouraged by many barriers in the current public system. A recent survey in the United States showed that 72% of unemployed people with disabilities, including people with severe mental illness have a strong desire to work. Several recent surveys have found this rate to be as high as 80% for adults with mental illnesses (*58*).

Employment is an essential part of recovery for people with mental illnesses and recent advances in treatment services and medications have increased the capacity of people with mental illnesses to join the mainstream and live independently.

Six principal barriers to the employment of individuals with severe mental illness:

1. Lack of choice in employment services and providers.
2. Inadequate work opportunities.
3. Complexity of the existing work incentive systems.
4. Financial penalties of working.
5. Stigma and discrimination.
6. Loss of health benefits.

## 5.4.1 Context

Shorter periods of hospitalization when needed and appropriate follow-up in the community prevent people from losing the social skills that are essential to adequate living in the community. The approach is also somewhat less costly to governments. However, we find that, while they are saving millions of dollars by closing psychiatric beds, at least in most developed countries, few governments have promulgated policies and developed community resources necessary to ensure the social integration of these patients. It takes greater political will and skills to put in place the conditions and programmes that will permit the meaningful return to life and society (including work) of persons with serious mental illness than it does to close a psychiatric hospital.

In the past, policies and programmes have tended to lump together the requirements of persons with mental retardation and those of persons with serious mental illness. Whereas they can have several needs in common, it has to be realized that the requirements for both groups are vastly different when it comes to "reasonable accommodation".

It is useful to review how to overcome the main obstacles that impact on the ability of persons with serious mental illness to have access to work.

## 5.4.2 Overcoming obstacles linked to the illness

A substantial majority of persons with serious mental illness take medication. When appropriately prescribed and monitored, these medications, especially the newer molecules, not only control the positive symptoms of illness (agitation, restlessness, etc.), but also have a significant impact on negative symptoms such as apathy, passivity and social withdrawal, as well as interpersonal relationships. All in all, 60-80% of persons with serious mental illness can be substantially helped with a well monitored medication regime and an appropriate psychosocial management and support programme.

It remains essential for persons with serious mental illness to have access to (and be able to afford) both appropriate medication and a psychosocial programme that will focus on the person's living conditions, his/her ability to relate to others, and his/her willingness and capacity to work. In all instances the person's choices must be sought and taken into account.

There is still a debate as to how much an employer should (or wants to) know concerning an employee's psychiatric background. In all modern legislation, disability cannot be sufficient grounds to refuse employment if otherwise the person can do the job.

The assurance that there will be a quick and easy access to appropriate medical and psychological help has been found to influence very positively the willingness of employers to offer jobs to persons with mental health problems.

In the past, and still today, many persons with psychiatric backgrounds have had to lie to a potential employer about their illness. Some of the most successful programmes are those where a mutual trusting and respectful attitude has been developed so that issues that may arise are easier to address.

### 5.4.3 Overcoming obstacles linked to lack of educational training and lack of work experience

Mental illness can strike at any age of life: some of the most severe forms begin in the late teens and early twenties and usually prevent the person from completing secondary education, college and/or university. This renders the person ill-equipped to face the requirements of a job, especially in today's world. Other forms of illnesses start in the late twenties and early thirties while the person is already working.

The work milieu is often intolerant of a colleague suffering from mental illness; the first episode may result in a demotion or a change of job, if not an outright firing. The impact on the person's self-esteem is usually very negative. The loss of one's remuneration brings with it economic hardship, notwithstanding the various aid programmes that exist in developed countries.

Research has shown a constant positive relationship between the skills of a client and his/her vocational outcome (*59*) and that persons with severe psychiatric disability can indeed learn new skills (*60*). With the ever-increasing importance of technology, we find that the "low-tech jobs" to which many persons with serious mental illness had access in the past are no longer available, at least in developed countries.

We need to develop training programmes that take into account the needs of persons with mental health problems as well as the requirements of potential employers.

In low-income countries, greater use should be made of the apprenticeship model.

We now believe that it makes eminent sense to encourage someone whose academic career was interrupted by mental illness to go back to school, college or university, in order to complete a qualification and therefore have access to a much wider choice of jobs and opportunities. Whereas government programmes have traditionally supported direct employment, there now exists a number of support programmes that will allow one to return to school.

## Good practice: Supported education in Boston – Choose/Get/Keep

As part of its array of rehabilitation services, a University-based Centre for Psychiatric Rehabilitation has developed an extensive programme of "supported education". The centre applied a basic model (*61*) called "Choose/Get/Keep" which was initially developed for persons seeking a return to employment.

Supported education has been defined (*62*) as "the provision of post-secondary education in integrated educational settings for people with psychiatric disabilities whose education has been interrupted, intermittent or has not yet occurred because of a severe psychiatric disability, and who, because of this psychiatric impairment, need ongoing support services in order to be successful in the educational environment." The programme utilizes "supported learning specialists" with a masters degree in psychiatric rehabilitation (practitioners) who assist and accompany the person with a former psychiatric disability throughout the three phases of the programme. The guiding principle is to focus on "participant process" rather than on "practitioner activity."

- In the "Choosing" phase the participant is helped in describing why he/she wishes to go back to school and in making an enlightened choice as to the type of environment which suits his/her needs, as well as in making a choice as to which school might meet expectations. The eliciting of educational goals, the assessment of personal criteria, and the realistic objective evaluation of the student's abilities are paramount in facilitating the decision-making process. Part of this phase also involves the identification and securing of other sources of support for the student, including family and friends.

- In the "Getting" phase a decision is made by the practitioner and the student concerning the assignment of responsibility for getting enrollment in the academic facility chosen, including obtaining the financial support needed. A decision has to be made concerning the amount of information which the student may wish (or may not wish) to disclose concerning the psychiatric disability.

- In the "Keeping" phase efforts are made to continue to support students in enrollment and in academic success. The practitioner needs to provide the teaching of special skills which the student might need to pursue the programme. Coordination also applies to those facets of academic life with which the students might encounter some difficulties. Experience has shown that the need for greater support arises during stressful periods such as examinations.

All in all, the relationship established between the practitioner and the participant (student) is a crucial factor. It has to be egalitarian, continuous and very flexible.

As with other successful rehabilitation programmes, the outcome has an impact on the person's illness. There tend to be fewer rehospitalizations and a need for lower doses of medication (occasionally the need for medication may disappear) for persons involved in the programme.

### 5.4.4 Overcoming obstacles linked to prejudice and stigma

Stigma is basically an attitude that aims at marginalizing and ostracizing some-one because that person has a mental health problem. While the stigma can be quite overt, it tends nowadays to be more subtle. For instance, a person may find it very difficult to obtain appropri-ate lodging or to join a social club. It may include fears of violent behaviour on the part of the person with the mental health problems.

> "There is a growing awareness that disability is not so much an impairment of the individual as a product of the environment in which he or she lives."
>
> **Source: ILO (63).**

While violence attributable to mental illness exists, it is very low when compared to other forms of violence. The risk of violence is much greater when severe men-tal illness is associated with alcoholism and drug abuse (*64*) and when there is a past history of violent behaviour.

In its most advanced forms, stigma leads to exclusion of the person from several spheres of social functioning. Stigma may have disastrous consequences when a person with a mental health problem starts believing that he/she deserves to be treated in such a way. Stigma can also manifest itself in the "denial" of the per-son's competence, ability and potential.

The best way to fight stigma is through appropriate education and information. This may include a public information campaign, courses, conferences, etc. It is important to delineate very precisely what component of "general stigma" one wants to address and to develop a specific plan of action for it.

The mass media often portray persons with mental illness in a most unfavourable light. It has been shown (*65*) that nearly half of health journalists have serious misconceptions concerning mental illness. Codes of ethics should be strength-ened and rigorously applied to eradicate the altogether frequent "sensationalism" with which the press treats stories involving persons with "alleged" or "real" mental health problems. Since the media play a crucial role in filtering informa-tion that reaches the public, it is obvious that all efforts should be made by men-tal health professionals to work closely with them and to correct the misconceptions which they may harbour.

Recently, advocates in the mental health/illness field have made progress with the mass media, stirring up interest and controversy at both the international and national levels. In general, there has been more widespread discussion in the press and on television regarding the situation of this traditionally overlooked disability group and more in-depth presentations about some of the political and profes-sional issues in this field.

Today, advocates are more successful at working with the press and on the Internet to bring mental health/illness issues both into the mainstream of the

disability rights movement and to the attention of the public. At the international level, advocates are combining three themes to attract media coverage: redefining the bottom line as a universal human rights issue, subjecting residential institutions to worldwide exposure, and building support for community based services (*66*). Ultimately, this type of advocacy can ameliorate negative myths and stereotypes and, in turn, can impact and influence work opportunities for individuals with mental health problems.

Another important way to fight stigma is to inform the community of "good practices" and of programmes that work.

### 5.4.5 Myths about mental illness and the workplace

The following are major myths and facts regarding the impact of mental illness on the workplace (*67*):

> The facts dispute major myths about mental illness in the workplace.

- Myth 1: Mental illness is the same as mental retardation.

*Facts:* These are two distinct disorders. A diagnosis of mental retardation is chiefly characterized by limitation in intellectual functioning as well as difficulties with certain daily living skills. In contrast, among persons with psychiatric disabilities, intellectual functioning varies as it does across the general population.

- Myth 2: Recovery from mental illness is not possible.

*Facts:* Long-term studies have shown that the majority of people with mental illnesses show genuine improvement over time and lead stable, productive lives. For many decades mental illness was thought to be permanent and untreatable. People with mental illness were separated from the rest of society through institutionalization in mental hospitals. As medications were discovered which helped to alleviate the symptoms of mental illness, there was a gradual evolution towards the provision of treatment and rehabilitation services in the community.

- Myth 3: Mentally ill and mentally restored employees (the term denotes when the disorder is effectively treated) tend to be second-rate workers.

*Facts:* Employers who have hired these individuals report that they are higher than average in attendance and punctuality and as good or better than other employees in motivation, quality of work, and job tenure. Studies reported by US National Institute of Mental Health and National Alliance for the Mentally Ill conclude that there are no differences in productivity when compared to other employees.

- Myth 4: People with psychiatric disabilities cannot tolerate stress on the job.

*Facts:* This oversimplifies the complex human response to stress. People with a variety of medical conditions, such as cardiovascular disease, multiple sclerosis, and psychiatric disorders, may find their symptoms exacerbated by high levels of stress. However, the source of personal and job-related stress varies substantially

between individuals. Some people find an unstructured schedule to be very stressful while others struggle with a regimented workflow. Some people thrive on public visibility or high levels of social contact, while others require minimal interaction in order to focus and complete tasks. Workers with psychiatric disabilities vary in their response to stressors on the job. In essence, all jobs are stressful to some extent. Productivity is maximized when there is a good match between the employee's needs and working conditions, whether or not the individual has a psychiatric disability.

- Myth 5: Mentally ill and mentally restored individuals are unpredictable, violent, and dangerous.

*Facts:* The vast majority of these individuals are not dangerous or violent. Upon learning that an applicant has a mental illness, some employers may expect that the individual is likely to become violent. This myth is reinforced by portrayals in the media of people with mental illnesses as frequently and randomly violent. A scholarly review of the research literature by Cornell University indicates that "none of the data give any support to the sensationalized caricature of the mentally disordered served up in the media".

Although stigma and shame are still the dominant attitudes towards mental health and mental illness, there has been a dramatic shift in perception during the last 10 years. Advancement and improvements in the legal system have had a positive impact on attitudes and knowledge relating to all disabilities and to mental illness in particular. This has, in turn, created a greater openness towards all mental health issues. Additional contributing factors include public and professional awareness that prolonged hospital stays can be disabling, advances in pharmacology, and a shift in focus from pathology to strengths and abilities. More importantly, a variety of service models have been developed and implemented over the past decade which are successful in helping people with a depressive illness and other mental illnesses to secure and maintain employment.

## 5.4.6 Overcoming obstacles linked to government policy

While there exists, in developed countries, a number of programmes to help disabled unemployed persons (unemployment insurance, income support, job training, job search clubs, subsidies to employers, etc.) each programme has its set of fairly complicated rules and it becomes apparent that the philosophy underlying such programmes was not conceived for persons with mental health problems in mind. The programmes are either too short in duration or have requirements of rigid working hours or high output which persons with serious mental illness cannot be expected to fulfil, at least initially.

A cursory look at existing programmes in many countries reveals that, notwithstanding the fact that persons with mental illness may represent a majority of "persons with a disability", only a very small number of structured programmes exist and are adapted to the needs of this group, as compared to programmes for physical or sensorial disabilities.

A paradoxical situation exists in some developed countries. The disability benefits paid to someone officially classified as a "person with a disability" and without any obligation to work may be very close to the minimum wage which the same person would earn if working. To compound the problem, the person may also lose an entitlement to free medication, to transportation subsidies, or other social benefits by accepting the status of employee. This often constitutes a powerful disincentive for a person with a disability to join the labour force.

In the USA, the impact of welfare reform on the employment of people with psychiatric disabilities is an issue worth noting. Many of the problems associated with welfare reform as it concerns people with mental illness are not unique to the USA, particularly as many European countries are trying to decrease their social welfare costs. (Many people receiving welfare benefits have either mental health problems or are at increased risk of them.) In the USA, by focusing on the importance of work and training, the current national trend in welfare reform has the potential to expand employment opportunities for people with psychiatric disabilities. However, many mental health experts express concern about this impact. The reasons cited for concern are:

- increased competition for employment from welfare recipients entering the job market could crowd out people with psychiatric disabilities;

- employment and training programmes designed for the general welfare population are unlikely to address the special needs of people with psychiatric disabilities;

- disincentives to work inherent in many government benefit programmes can make it difficult for persons with psychiatric disabilities to enter and remain in the workforce.

Despite these concerns, many mental health advocates hope that welfare reform will encourage state and local mental health agencies to adopt more innovative and effective strategies to help people with psychiatric disabilities to enter or reenter the workforce. It is hoped that welfare reform will create an environment that encourages state and local agencies to work together in new ways to address the issue of employment and training. In addition, welfare reform offers an opportunity for the mental health system to contribute its considerable expertise and experience to promoting and supporting employment in the effort to assist welfare recipients to enter the world of work (*68*).

## 5.4.7 Overcoming obstacles linked to the labour market

Previous successful work history has traditionally been mentioned as a key factor in predicting successful return to employment. This obviously puts persons with a background of serious mental illness at a disadvantage.

With a few exceptions (notably the USA), unemployment rates in many countries are around 10%. Changes in the labour structure mean that there are fewer low-tech jobs available. Training may be needed to acquire the competence which newer jobs may demand.

Professionals and workers in the disability field must remember that employers are not social agencies and are traditionally reluctant to hire persons with a background of serious mental illness. Employers are concerned that there will be a loss of productivity and this concern has to be addressed.

## 5.5 The perspective of international agencies

### 5.5.1 United Nations

The United Nations, which proclaimed the International Year of Disabled Persons in 1991, adopted the World Programme of Action concerning Disabled Persons in 1992. This emphasized the right of persons with disabilities to "the same opportunities as other citizens and to an equal share in the improvements in living conditions resulting from economic and social development". On the same occasion, it defined "handicap" as a function of the relationship between persons with disabilities and their environment.

In 1994 the United Nations published the "Standard Rules on the Equalization of Opportunities for Persons with Disabilities" (*69*).

The term "equalization of opportunities" means the process through which the various systems of society and the environment such as services, activities, information and documentation are made available to all, particularly persons with disabilities. "Persons with disabilities are members of society which have the right to remain within their local communities. They should receive the support they need within the ordinary structures of education, health, employment and social services."

Article 7 deals specifically with employment; it mentions that "States should recognize the principle that persons with disabilities must be empowered to exercise their human rights particularly in the field of employment. In both rural and urban areas they must have equal opportunities for productive and gainful employment in the labour market."

Sub-article 2 mentions that "States should actively support the integration of persons with disabilities into open employment. This active support could occur through a variety of measures, such as vocational training, incentive-oriented quota schemes, reserve or designated employment, loans or grants for small business, exclusive contracts or priority production rights, tax concessions, contract compliance or other technical financial assistance to enterprises employing workers with disabilities. States should also encourage employers to make reasonable adjustments to accommodate persons with disabilities."

Article 7 also proposes public awareness-raising campaigns and further mentions that the goal should always be for persons with disabilities to obtain employment in the open labour market. However, for those whose needs cannot be met in open employment, "small units of sheltered or supported employment may be an alternative."

### 5.5.2 World Bank and the Harvard Report

With few exceptions, severe mental illness does not represent an immediate threat to life. Therefore, mortality rates are of little use to measure the true impact of mental illness on an individual, family or society as a whole.

To address this issue, the World Bank has introduced (*70*) the concept of DALYs, or disability-adjusted life-years: "this is a measure that combines healthy life years lost because of both premature mortality and losses resulting from disability."

The sum of DALYs is referred to as the Global Burden of Disease (GBD).

The seminal 1995 Harvard Report (*71*) on *World Mental Health: Problems and Priorities in Low-Income Countries* points out that whereas there have been, over the last 50 years, marked improvements in the physical health of low-income countries (owing among other things to better control of fertility rates, improved perinatal care, and prevention and treatment of several infectious diseases, resulting in reduced mortality rates), on the other hand the mental health of these populations has either remained stagnant or has decreased.

According to *The World Health Report 1999*, neuropsychiatric disorders account for 11.5% of the burden of disease worldwide – as measured by DALYs – which is more than the proportion of the burden imposed by respiratory infections and diseases (10.7%), cardiovascular diseases (10.3%), or malignant neoplasms (5.8%). Even in the low-income and middle-income countries of the world – where it is often assumed that infectious and parasitic diseases are of paramount importance – one finds that neuropsychiatric disorders account for 10.5% of the burden of disease.

Data from the *Global Burden of Disease* provide further evidence. In 1990, among people between the ages of 15 and 44, fully 30% of DALYs were the consequence of mental health problems – about twice the burden imposed by infectious and parasitic diseases, five times that of cardiovascular diseases, and seven and a half times that of malignant neoplasms. For this age group, unipolar major depression accounted for more than 10% of all DALYs and was the single leading cause of disease burden in the world. Put another way, neuropsychiatric conditions were the greatest cause of disability in what is a particularly active and productive age group (*72*).

It has been reported (*73*) that for the USA, the United Kingdom and Australia, 43% of DALYs are traceable to mental disorders and that the latter account for 22% of the GBD. The much higher percentages in developed countries reflect the fact that perinatal death and disability from infectious disease are much lower than in developing countries.

We are aware that criticisms have been leveled against the DALY and GBD concepts (*74*), to the effect that they do not give sufficient importance to social and environmental factors. According to our experience, they remain very useful ways

to describe disabilities in a manner which is clear and likely to be understood by decision-makers who can influence policies.

### 5.5.3 International Labour Organisation

ILO generally agrees with WHO estimates that more than 500 million people, or 7-10%[1] of the world's population, are disabled. ILO also feels that this number is increasing owing to greater longevity and the physical and psychological ravages of wars.

Today, ILO has a new organizational structure in which the disability programme is part of the Employment Sector which reflects the principle of mainstreaming. The Employment Sector is responsible for developing and promoting employment strategies, job creation programmes, and human resources development policies, and for initiating actions to respond rapidly to economic crisis in conflict countries and to the needs of those devastated by natural disasters. Within the Employment Sector, the disability programme has been integrated into a broader unit (Target Groups Unit of the InFocus Programme on Skills, Knowledge and Employability). The aim behind the establishment of this new unit is to enhance synergy between the ILO's different programmes targeting disadvantaged groups such as youth, older workers, displaced workers and people with disabilities which include mental health disorders. The disability programme works in close cooperation with the ILO's occupational safety and health programmes, especially the InFocus Programme on SafeWorks. The latter focuses on preventive policies and programmes to protect workers in hazardous occupations and sectors.

ILO's focus on persons with disability is outlined in its Constitution's Convention number 159 (*75*) and its recommendation 168 (*76*) (Recommendation concerning vocational rehabilitation and employment – Disabled Persons).

For the purpose of the Convention, the term "disabled person" means an "individual whose prospects of securing, retaining and advancing in suitable employment are substantially reduced as a result of a duly recognized physical or mental impairment."

Part II of the Convention urges Member States to "formulate, implement and periodically review a National Policy on vocational rehabilitation and employment of disabled persons," restates the principle of equal opportunity between disabled workers and workers in general, and puts forward the fact that "representative organizations of employers and workers shall be consulted on the implementation of the said policy."

Recommendation 168 is much more explicit and contains 9 sections. After restating that disability can arise "as a result of a duly recognized physical or mental

---

[1] Dr Gro Harlem Brundtland, Director-General of WHO, Interagency Consultation on Disability, 15-16 June 1999.

impairment" (terms which are not defined), section 2 on vocational rehabilitation and employment opportunities stresses the following:

- Disabled persons should enjoy equality of opportunity and treatment in respect of access to, retention of and advancement in employment which, whenever possible, corresponds to their own choice and takes account of their individual suitability for such employment.

- Measures for disabled persons should conform to employment and salary standards applicable to workers generally.

- Measures which are recommended include:
  - measures to create job opportunities on the open labour market;
  - appropriate government support for the establishment of various types of sheltered employment for disabled persons for whom access to open employment is not practicable;
  - appropriate government support for vocational training and vocational guidance, placement services, etc.;
  - encouragement of the establishment and development of cooperatives by and for disabled persons;
  - elimination by stages if necessary of physical, communication and architectural barriers and obstacles;
  - nondiscrimination and information on successful instances of integration;
  - research on the various types of disability.

The third part of the Recommendation deals with community participation in both urban and rural areas, in particular with that of representatives of employers, workers and disabled persons' organizations.

Other sections deal with vocational rehabilitation in rural areas, the training of staff, the contribution of employers' and workers' organizations to the development of vocational rehabilitation services, the contribution of disabled persons and their organizations to developmental vocational rehabilitation services, vocational rehabilitation under social security schemes and, lastly, coordination, where Article 42 states:

"Measures should be taken to ensure, as far as practicable, that policies and programmes concerning vocational rehabilitation are coordinated with policies and programmes of social and economic development (including scientific research and advanced technology) affecting labour administration, general employment policy and promotion, vocational training, social integration, social security, cooperatives, rural development, small-scale industry and crafts, safety and health at work, adaptation of methods and organization of work to the needs of the individual and the improvement of working conditions."

Both the Convention and its Recommendations cover very extensively the field of disability. Measures described clearly address disability arising from physical and

sensorial problems. Although there is little elaboration of what might be required for persons with disability arising from mental health problems, both the Convention and its Recommendations apply equally to mental health disabilities.

## 5.5.4 World Health Organization

WHO was founded in 1948 as the main international organization to oversee world health. Its constitution (*77*) gives the organization and member countries the objective of the attainment by all people of the highest possible level of health. It further states that the enjoyment of the highest standard of health is one of the fundamental rights of every human being. In 1977, the World Health Assembly expressed this as *"Health for all by the year 2000"* (*78*).

The 9th General Programme of Work of WHO establishes the global health policy framework for action by the world health community (international organizations of the United Nations system, including WHO, nongovernmental organizations, bilateral and multilateral donor and development agencies, banks and countries themselves).

In 1981, WHO adopted primary health care as the way to achieve the goal of health for all. As a strategy, primary health care seeks reorientation of health systems to enable the whole population to have effective and essential care and to promote individual and community involvement in health, as well as intersectoral collaboration.

Appropriate treatment of common diseases and injuries and mental health care are integral components of primary health care.

Much of the attention of WHO's Department of Mental Health and Substance Abuse is focused on the most effective ways to ensure the highest quality of life for persons with serious mental health problems. Several projects deal specifically with rehabilitation issues, including access to employment.

Throughout the 9th General Programme of Work there is a constant reference to the necessity to improve the quality of life of people and to integrate health and human development in public policies.

The *World Health Report 1998* has the theme "Life in the 21st century: a vision for all" (*79*). The report states that there is increasing life expectancy due mainly to a reduction in premature death and a steady reduction in major infectious diseases. The report identifies as major problems the HIV epidemic and the enormous rise in violent death and injuries from violence.

On the issue of work, the report states that "more working days are lost as a result of mental disorders than physical conditions". It also recognizes that, whereas mental disorders contribute little to mortality, they make a huge contribution to the Global Burden of Disease.

## 5.5.5 Nongovernmental organizations

There are perhaps thousands of consumer and professional groups for individuals with mental health disabilities and their families in many countries of the world. These groups have had a vital role in raising the awareness of mental health issues, reducing stigma and discrimination, and advocating for appropriate legislation. Jobs and other meaningful activities are important for a person to be included in the social and economic mainstream. Recently, there has been impetus by some NGOs to frame the discussion and advocacy of mental health issues within a "human rights" perspective.

Often NGOs work closely with government agencies, business groups, corporate sponsors and community-based mental health services. They are an important source of expertise and provide opportunities to reach people with mental health problems. They serve as a policy monitor and a catalyst for change.

## 5.5.6 Overseeing training and employment of persons with disabilities

In a recent worldwide survey undertaken by ILO (*80*), it was found that the "organization" of vocational rehabilitation is very diverse and occasionally quite diffused in many countries. There is often an obvious lack of communication between the different agencies responsible for policies and programming.

In more economically developed countries, the increase in vocational rehabilitation programmes parallels the increasing strength of the "disability organizations" and their lobby. This has led to continuous surveillance of national policies and programmes by people with disabilities.

For obvious reasons, the lobby representing physical and sensorial disability has traditionally been much stronger and more vocal than that representing mental health problems. For its part, the mental retardation lobby has become strong and vocal owing to the fact that, by and large, families now view the condition as having a physical origin about which one should not be ashamed.

Over the last two decades, the "users" (or "survivors") movement in mental health has grown very significantly and has become an increasingly powerful lobby group, especially in more economically advanced countries. It is making good use of the ever-increasing knowledge that we have of the biological and genetic components of most major mental illnesses to challenge the stigma that is still too often associated with these illnesses.

### Good practice: vocational rehabilitation for individuals with a psychiatric disability – the Australia experience

The National Employment and Psychological Services (NEPS) centre was founded in 1992. The centre operates in both Victoria and Queensland. NEPS has employment services, a work crew and two commercial businesses. Most of their clients (85%) have a psychiatric disability. The centre also has a secondary focus on people from non-English speaking background.

The following example illustrates "good practices" that have been effective in assisting people with mental illness obtain and maintain employment. The main features are that this programme is consumer-driven and fully integrated into the community.

According to Leonie Exel from the NEPS centre: "Our staff and clients have been through many an exponential learning curve in the last six years, particularly as we are among the first wave of specialist providers in Australia. Nowadays, we can define some of the service features which are likely to assist our clients to find and maintain relevant jobs. Our knowledge has come from a combination of research, hard work and sometimes painful trial and error. Our experience has taught us that many or most successful factors in our agency can be attributed to plain and simple, garden variety common sense."

The primary factors which ensure that NEPS clients obtain and maintain relevant employment are:

- high levels of client (consumer) participation;
- client-driven processes, goal-setting and methodology;
- an empowerment focus;
- flexibility in service delivery schedules and service re-entry processes;
- strong policies of nondisclosure and confidentiality;
- staff personalization of service delivery.

Implementing these factors involves the following strategies:

- clients (consumers) are highly involved in the design, management and implementation of vocational services;
- clients do what they choose to do ("we don't do things" for people and "we don't chose their goals);
- clients choose the manner in which they are assisted (in group work, one-to-one, or via peer consultancy services);
- clients fail, succeed, try again, and test the jobs, vocations, careers and periods of unemployment until they decide what they would like to do;
- clients can keep their personal lives private from other people if they want to.

Service delivery phases are as follows:

- substantial time is spent working with the client on pre-vocational factors such as medication and illness management in the workplace;
- substantial time is spent on vocational counselling and developing community, social and service provider networks for vocational support;

- substantial time is spent talking with other service providers trying largely to increase their optimism about the client's chance of finding and keeping work in the hope that they will be supportive throughout what can be a difficult process for the job-seeker;
- an emphasis is placed on the staff's own mental health in the workplace with a very strong sense of community and mutual support and emphasis on training and further education for staff.

*Source*: Exel L. *Vocational rehabilitation of people who have a psychiatric disability: the Australian experience*. Proceedings of the Asia and the Pacific Regional Conference Campaign'98 for Asia and Pacific Decade of Disabled Persons 1993-2000, Hong Kong, 23-28 August 1998.

## 5.6 Rights of persons with serious mental health problems with respect to access to work

While access to paid work for persons with serious mental health problems can be influenced by a number of contingencies such as low level of development, traditions, culture, and high level of unemployment, we fully share the viewpoint expressed in the ILO Convention and in many countries' legislation that disability, including mental health disabilities, cannot be used as an excuse to refuse access to employment to someone who wishes to work and is capable of working.

We therefore believe that:

- work represents a most important value in society;

- work represents for a person a privileged way to exercise a role in society;

- persons with serious mental health problems have the right to exercise the same social roles as other citizens;

- work is a right for these persons to the extent that they desire to exercise this right;

- services must be developed to answer the work needs of these persons.

## 5.7 International variations pertaining to culture, social structure and economics that may exist in developing countries

Chronic mental illness is ubiquitous. In developing countries with understaffed mental health services, a paucity of structured programmes and case managers, and very high rates of unemployment, it becomes much more difficult to find a paid job for someone with serious mental illness.

### 5.7.1 Countries in transition

Effective action to promote the availability of employment for people with mental health problems has been hindered by the difficult conditions in the labour market. The transformation of the economic system has included a massive effort to create new jobs for society and has required individuals to acquire new voca-

tional skills. There have been insufficient resources available to assist individuals with psychiatric disabilities in vocational rehabilitation efforts so they may compete and succeed in the job market.

In rural areas, for economic and pragmatic reasons, there are strong pressures to involve the mentally ill individual in the "field". If community leaders have been sensitized and the individual receives adequate medication and support, this may lead to quite productive employment.

In Viet Nam, we have seen a few examples of women being involved in cultivating rice after discharge from the psychiatric hospital. This was not systematically used, but was always more successful when the "People's Committees" representatives were involved in the process (*82*).

In some countries of Africa (Kenya, Nigeria), there exist so-called "psychiatric villages" where many former patients live with members of their families. In these enclaves, which are quite well accepted by the community at large, the former patients can be reintegrated to a useful role and involved in the production of goods which are then purchased by the community at large. In Abeokuta, Nigeria, we have seen former patients making and selling candles for a reasonable profit from which they derive much of their subsistence.

In large, fast-moving urban areas, with crowded living space and no alternative accommodations available, the situation is often quite difficult.

Success stories, nevertheless, exist.

---

**Good practice: a cotton factory in Beijing, China**

In China's urban areas, until recently, the trend was for someone to join a factory and to stay in the same employment more or less for life. The employer was responsible not only for providing a salary as well as living accommodation, but also for the rehabilitation of employees back to their job in cases of serious physical or mental illness.

In Beijing, one of the country's largest cotton factories also has several hundred apartments for its employees as well as a 140-bed hospital and two schools. On a recent visit we talked at length with a 29-year-old woman who had been diagnosed as suffering from schizophrenia and had been hospitalized for a year. On leaving the hospital (where she had been visited regularly by factory workers and managers), she returned to her apartment and to her former job on the "cotton chain" with full pay. After one month, she could not keep the pace of her co-workers in the assembly line and had to be transferred to an office job.

There is little doubt that without a legal obligation on the part of the employer to take her back, she would be unemployed.

We are informed that in recent years, with changing economic conditions, the law is applied much less strictly than in the past.

Harnois, G.: La Chine… Incoutournable! Editorial, WAPR Bulletin, Vol. 7, No. 4, October 1995.

Programmes must be culture-relevant and culture-sensitive. While a sharp division often exists between rural and urban settings, the family remains at the core of provision of services and the main link towards involvement in natural community support.

Currently, in Poland there are occupational therapy workshops and centres for work activities for people with moderate and severe mental health disorders. The primary aim of therapy workshops is to promote the social skills necessary for independent living, including work. There are approximately 300 occupational therapy workshops in Poland which ensure temporary employment for people with mental illness who have lost their jobs. They receive a small stipend for their work. There is one experimental Centre for Work Activities, in which the staff consists of people with severe mental illness. This centre is supported financially by the State Fund for Rehabilitation of the Disabled (*81*).

## 5.8 Promoting the employment of persons with mental health problems

### 5.8.1 Political will and legislation

Most countries have legislation which postulates that disability shall not be a barrier to a meaningful life. With respect to access to work, these laws (as is the case with the American Disability Act) dictate that reasonable accommodations should be made by an employer and describe what is meant by this concept.

Because it is in many ways a model legislation, some of the features of the American Disability Act are mentioned here in some detail.

The American Disability Act (*83*) was passed in 1990 after many years of experimentation. Its "Title I" describes the standards of accessibility for persons with physical or mental disabilities in employment and further defines that "reasonable accommodation standards" will also apply to the private sector.

The majority of reasonable accommodation standards pertain to physical disability and include making facilities used by employees readily accessible, the acquisition or modification of equipment or devices, the provision of readers or interpreters, etc. The provisions that apply most often to persons with mental health problems have to be developed individually and have to do mostly with part-time or modified work schedules, job restructuring to eliminate or exchange auxiliary job functions that increase pressure for the worker, and time off for therapy.

Whereas the accommodations necessitated for physical disability are very often technical or a one-time affair, those required for psychiatric disabilities tend often to be quite simple but will last in time and require an attitudinal change on the part of the employer and, quite often, co-workers.

The law also foresees that the cost of bringing about "reasonable accommodations" should not be "unreasonable or unbearable" for the employer.

### Good practice: towards "Reasonable Accommodation" for persons with mental health problems

We reproduce here a list of accommodations proposed by Mancuso (*84*):

#### Changes in interpersonal communication

- Arranging for all work requests to be put in writing for a library assistant who becomes anxious and confused when given verbal instructions.
- Training a supervisor to provide positive feedback along with criticisms of performance for an employee re-entering the workforce who needs reassurance of his/her abilities after a long psychiatric hospitalization.
- Allowing a worker who personalizes negative comments about his/her work performance to provide a self-appraisal before receiving feedback from a supervisor.
- Scheduling daily planning sessions with a co-worker at the start of each day to develop hourly goals for someone who functions best with added time structure.

#### Modifications to the physical environment

- Purchasing room dividers for a data entry operator who has difficulty maintaining concentration (and thus accuracy) in an open work area.
- Arranging for an entry-level worker to have an enclosed office to reduce noise and interruptions that provoke disabling anxiety.

#### Job modifications

- Arranging for someone who cannot drive or use public transportation to work at home.
- Restructuring a receptionist job by eliminating lunchtime switchboard duty normally handled by someone in this position.
- Exchanging problematic secondary tasks for part of another employee's job description.

#### Schedule modification

- Allowing a worker with poor physical stamina to extend his/her schedule to allow for additional breaks or rest periods during the day.
- Allowing a worker to shift his/her schedule by 1? hours twice per month to attend psychotherapy appointments.

In the United States until recently recipients of social security lost cash and medical benefits if they earned US$ 500 per month. This has now been raised to US$ 700 per month in order to create an incentive for social security recipients to go back to work.

### 5.8.2 Quota system

The quota system that is used, for instance, in 10 European countries is an obligation requiring employers to hire a certain percentage of disabled persons as part of their workforce. If they fail to do so, a fine or "levy" is assessed which is then pooled in a fund to promote the employment of disabled persons. The quota usually applies to all of the public sector and to several components of the private sector, under certain conditions.

In Germany (*85*), the quota is usually (it may be increased or decreased) 6% and applies to all employers with at least 16 employees. A compensation tax of DM 200 per month must be paid for unfulfilled "compulsory places" thus constituting a pool which, in 1992, amounted to DM 960 million.

### 5.8.3 Support

One needs to emphasize once again the necessity of providing continuing support to both the individual and, most often, to the employer, in order to establish a "working relationship" based on known expectations, cooperation and partnership.

Trial periods on the job site have been found to be very successful and predictive of the employer's capacity to "integrate" the job.

### 5.8.4 Coordinated action

To help employers and to facilitate access to work for our clientele, it has been found very useful to regroup potential employers. For instance, in the United Kingdom, the Employers Forum on Disability acts as the authoritative employers' voice on disability as it affects employers and service providers. "The Forum is funded and managed by over 350 members who employ nearly 20% of the United Kingdom workforce."

"The Employers Forum on Disability Employment agenda provides the framework for employers committed to developing best practice in the employment of disabled people" (*86*).

For planning purposes, it has been found very useful to have formal input from representatives of employers and from labour unions who can facilitate the required openness to create jobs for persons with a background of serious mental illness.

While they will benefit immensely from initiatives stemming from the private sector, the most successful programmes will require government support.

It is not always easy to decide where the primary responsibility rests among the departments or ministries of a government. Effective intersectoral collaboration will involve the departments of health, labour, employment, education, income support, regional development, social services, etc. A specific formal mechanism which allows for this intersectoral collaboration is a highly effective tool.

## 5.9 Research findings

### 5.9.1 Potential predictors of successful participation

Given the size of the mental health population that can and would like to work, there are very few effective vocational programmes available. It would therefore be extremely useful to develop criteria that will identify the likelihood of successful outcomes.

Using a research sample of 279 participants, matched as far as possible with an equivalent number of nonparticipants, project WINS in the USA (*87*) identified three major principles: 1) toward zero exclusion; 2) choose/get/keep; 3) consumers determination.

The variables that were found to be relevant were:

- work expectation (those who expected to be working within a year were 4.5 times as likely to be enrolled in the programme);
- attitudes about work as a source of pride and accomplishment (each increment on the scale resulted in double participation);
- work history (individuals with fewer than 5 paid jobs since age 15 were only 0.4 times as likely to receive services as those with more extensive work experience);
- age was negatively related (with each additional 5 years of age, corresponding to 0.8 times the odds of participation);
- education was positively related (each increase in educational level yielded an increase of 1.48 times the odds of participation).

### 5.9.2 Developing work skills

In another recently completed (*88*) vast inquiry in the Province of Quebec, Canada, 70% of 115 programmes filled out a lengthy questionnaire which was later followed by 26 thematic group discussions involving 235 persons (127 participant users, 48 nonparticipant users, 60 employers).

The findings revealed two broad categories of programmes:

Group 1: Developing employability
These are much more frequent than programmes offering paid employment. The vast majority (85%) are managed by nonprofit organizations and take place in the community (93%); they evaluate capacities and interest (85%); offer individual follow-up (83%) and programme support; help the acquisition and maintenance of basic work skills (75%); evaluate work competence (72%); and offer training in social skills (60%).

Most programmes have admission criteria that tend:

- to be motivated;
- to have capacities and aptitudes for work;
- to have a good level of overall functioning.

With respect to remuneration (pay):

- a majority receive an increase in social welfare payments;
- receive a "work allowance";
- receive a salary;
- receive nothing.

The majority of programmes rely on government grants while one-third utilize revenues from the production of goods and services.

The most important obstacles identified by programme directors included self-deprecating attitudes, emotional instability, stigma, programmes not well adapted to the person's needs, and lack of recognition of the individual's potential.

Among the most favourable conditions to achieve the programme objectives were positive attitudes of users, openness of the environment, matching the needs of the user, individual follow-up, and sufficient financial resources.

In the thematic groups, support from relatives and families and from programme staff scored very high.

The majority of employers highlighted the importance of being well informed with respect to the illness, developing financial incentives, establishing partnerships, and adapting the work environment.

### Group 2

Group 2 consists of the 19% of the programmes which offered what could be called a salary, although in most instances it was not extremely competitive. These programmes tended to function more or less as social firms, which are described later.

### Myth re: low productivity

Recent Australian research (*89*) aimed to challenge the idea that disabled employees are less productive than nondisabled persons. With a sample of 196 usable cases, the research revealed that:

- with respect to length of service, workers with a disability served longer;
- there was no difference in absenteeism between disabled and nondisabled workers;
- log-on ratio (subjects' total hours of work) showed no significant difference;

- with respect to contact efficiency, there were no significant differences;

- with respect to upgrades and sales effectiveness, there was no significant difference.

### Support in the workplace

Findings of a large inter-state study in the USA (featuring 243 individuals in 10 programmes across 8 states, and utilizing an 85-item questionnaire about individuals, disability information, employment features, employers and community connections) included:

- staff support to a "disabled" employee on the job has a negative effect on work rate, work quality, co-worker relations and typical employment conditions (this is especially true when symptoms are present at work);

- staff support to workplace personnel has a positive effect on work rate, work quality, co-worker relationships, typical employment conditions, and employee satisfaction;

In trying to explain these findings, the authors propose that direct support can possibly be stigmatizing and that believing that the supported employee needs an expert to provide support for his/her symptoms may actually hinder successful outcomes (*90*).

### Mental health at work – why is this field so under-researched?

In the United Kingdom, Jenkins has pointed out (*91*) that 14% of the certified absences and of NHS and patient's costs are due to mental illness, which also accounts for 23% of NHS pharmaceutical costs.

Depression alone is estimated to cost approximately £2 billion a year in Britain and, on top of absenteeism, has an impact on reduced productivity, labour turnover, poor timekeeping and accidents.

The author points out that, even if employers take the view that work does not constitute an etiological factor for mental illness, the fact that there are 30 working days lost to depression and anxiety for every single day lost to industrial disputes makes the issue a paramount one. This viewpoint is now apparently shared by employers, employees and trade unions.

The author feels that the main issues for research in this field are:

- more accurate prevalence studies of a wide range of different work settings;

- elucidation of risk factors;

- evaluation of techniques for primary prevention;

- evaluation of techniques for secondary prevention;

- evaleation of occupational mental health services, provisions and policies;

- more accurate estimation of the impact of minor psychiatric morbidity on sickness absence, work performance, relationships with colleagues, accidents and labour turnover.

### 5.9.3 Costs

There are few complete evaluations of the costs of programmes and services, including subsidies and parity in mental health insurance, as well as the savings accrued to governments from not having to pay social benefits to this clientele.

In the United States, the cost of equal health insurance coverage for mental and physical health services has been one of the most hotly debated issues at national and state levels. Despite vehement opposition by special interests who claimed that parity would be too costly for businesses, the Federal Mental Health Parity Act was passed in 1996, requiring the level of insurance coverage for mental illness to be similar to that for physical illness. Multiple studies show that the cost impact is minimal and that many employers (those with over 50 employees) are instigating policies to provide parity for their workers. The introduction of parity in combination with managed care results in, at worst, very modest cost increases. In fact, lowered costs and lowered health insurance premiums were reported within the first year of the Mental Health Parity Act[2] (*92*).

A recent Canadian study (*93*) found that, over a period of 10 years, 240 persons with serious mental health problems have been able to keep a job, largely owing to the work reintegration programme. Using conservative figures, these persons earned $5 million (all figures in Canadian dollars), paid $1.3 million mostly in income tax, and saved the government an estimated $700,000 in social costs which they would have received had they been unemployed. The net result is therefore an increase in "collective wealth" of the order of $2 million.

### 5.9.4 Useful research tools

Given the explosion of data in the complex and developing field of disability and mental health, the Internet has become an invaluable tool for obtaining and accessing information on research, policies, legislation, promotion and preventive programmes, rehabilitation and medical treatment. There are numerous databases and websites on disability, mental health, mental illness, psychiatric disabilities and employment issues. Fortunately, with the spread of information technology, most regions of the world now have access to the most up-to-date information on these topics.

In response to this growth, the Global Applied Disability Research and Information Network on Employment and Training (GLADNET) was created a few years ago. This network brings together universities, research centres, employers, worker's organizations, government agencies, and organizations of persons with disabilities.

---

[2] A recent survey by the US General Accounting Office found that 14% of employers in 26 states were not complying with the federal standards. Most of those companies had lifetime limites on mental health benefits of $100.00 or less but set higher ceilings for medical and surgical benefits. (Many employers found to violate law requiring parity for mental health coverage. *New York Times*, 18 May 2000.)

GLADNET is a nonprofit organization, affiliated with the ILO's Target Groups Unit in the InFocus Programme on Skills, Knowledge and Employability. While it does not deal specifically with disability related to mental health problems, it contains several elements that are related and remains a very useful tool for persons to keep abreast of developments in the field. It can be found at the following Internet address: http://www.gladnet.org.

## 5.10   Successful work programmes at the international level

### 5.10.1   Utilization of supported employment programmes

While the obtaining of permanent competitive employment remains a major goal, many persons with severe mental health problems will not be able to achieve this. Many are involved in so-called "supported employment" (SE) programmes.

The American Rehabilitation Act defines supported employment as follows:

"Competitive employment in an integrated setting with ongoing-support services for individuals with the most severe disabilities:

- for whom competitive employment has not traditionally occurred or for whom competitive employment has been interrupted or intermittent as a result of a severe disability;

- who, because of the nature and severity of their disabilities, need intensive supported employment services from the designated state unit (Division of Vocational Rehabilitation) and extended services after transition in order to perform this work; or,

- transitional employment for individuals with the most severe disabilities due to mental illness."

Therefore, most SE programmes will help the individual find a job and may offer assistance before the individual starts working, and usually throughout the employment period. Quite often the jobs found are at the lower end of the salary scale, near the minimum wage. They may include clerks, shippers, helpers, etc.

Substantially more persons who have participated in SE programmes get and maintain a job than comparison groups. While participants report overall improvements in quality of life and job satisfaction, only a minority are able to earn enough so as to be able to do away with the various existing government support programmes.

### 5.10.2   Finding a job on the regular market (the work integration contract)

In order to foster the progressive reintegration of persons in the job market, individual "work integration contracts" may be used. The employers tend to be small to medium-sized businesses or community agencies.

The contracts, which vary in duration (many do not have any time limits), all receive government support in a decreasing proportion. For instance, in Quebec,

Canada, the government will give the employer a grant of up to 85% of the person's salary for the first year and of up to 75% in subsequent years. The grant will also pay for "special needs" such as access to worksite, accompaniment, evaluation of capacities, and medical treatment, in a proportion ranging from 50% to 100%.

In one such programme, (*94*) 300 of the 3000 persons with work integration contracts have a background of serious mental health problems and the state contributes (after several years) 40% of their salary.

## 5.10.3  Developing social firms (enterprises)

Social firms are small to medium-sized firms which have been developed with the primary purpose of providing employment for persons with a disability in a context which is more or less the same as that of a regular firm, while at the same time offering the required support to workers who need it.

In social firms, persons with disabilities work side by side with nondisabled individuals. All are paid regular wages and work on the basis of a regular work contract. They all have the same rights and obligations (*95*).

"The balance between commerce and care is the single most critical issue which faces social firms, and this balance is achieved differently according to the origins of the firm and the orientation of its founders." (*96*)

Social firms have developed mostly in the last 20 years in order to deal realistically with increasing unemployment ratios and major changes in the nature of work itself, characterized by downsizing, increasing requirement for specialized training, and an ongoing demand for higher productivity. These are all factors that tend to exclude many persons who have experienced severe mental illness.

Mention should be made of the exemplary support offered by the EU for the development and evaluation of social firms, mostly through its Azimuth and Horizon I and II projects. The projects have fostered transnational cooperation which has allowed participating countries to exchange views, experiences, problems and solutions.

The concurrent existence of the Confederation of European Firms, Employment Initiatives and Cooperatives for People with Psychosocial Handicaps (CEFEC) has been extremely useful. CEFEC has acted as a leader and a broker on many transnational issues regarding the employment of persons with disabilities. Recently CEFEC has extended its membership to other countries, and specifically to North America.

CEFEC's charter, principles and guidelines (*97*) provide very useful orientation for the development of social firms.

Using a broad definition of social firms, and including Italian cooperatives, there are said to be in excess of 2000 social firms at this point in time in Europe offering employment to persons with psychiatric disabilities.

"There are some key differences between social firms and regular businesses:

- First of all it is the mission of a social firm to create jobs for people with disabilities and disadvantaged people. Social firms have a social and a commercial mission.

- One of the most important characteristics of a workplace in a social firm is the 'empowering atmosphere' for their employees with disabilities. While in a regular business people with disabilities might be considered as a disturbing factor, social firms do actively recruit from this target group and provide the necessary reasonable accommodations.

- The emphasis is on the potential and abilities of the worker rather than on potential problems and barriers. With this flexible approach work tasks can be arranged and adjusted to accommodate worker needs. This often results in the job being accomplished as quickly and to as high a standard as in any other workplace" (*98*).

All social firms initially receive support from the state. In the most advanced firms, a full market analysis and business plan must be developed prior to receiving the go-ahead.

Several firms, once established, reach 85% self-financing. All firms employ, side-by-side, handicapped and non-handicapped workers. All are paid the regular rate for the sector of employment in which they work.

While the majority of workers are permanent employees, approximately 25% may use the firm as transitional work while 10-15% receive "qualifying training". A good majority of workers are trained on site and all of them receive ongoing support as necessary.

The firms are involved either in the provision of services (office work, recycling, restaurant, catering, landscaping, etc.) or in manufacturing (textiles, computer hardware, furniture, etc.).

---

**Country list of social firms in Europe (1999)**

| Country | Social firms | Employees | Disabled employees |
|---|---|---|---|
| Germany (1998) | Approx. 300 | Approx. 6000 | 50% |
| Italy (1997) | Approx. 1,600 | Approx. 40,000 | 40% |
| (type B social cooperatives) | | | |
| Spain (Andalusia) | 8 | 340 | 50% |
| United Kingdom | 72* | 370 | 36% |
| Austria | 8 | 200 | 50-60% |
| (Carinthia & Styria, 1999) | | | |
| **Total** | **Approx. 2000** | **Approx. 47,000** | **40-50%** |

\* Includes 50 "emerging social firms"

*Source*: Schwartz G, Higgins G. *"Marienthal": a social firm's network*. Netherne Printing Services – Social Firms, United Kingdom, 1999:4.

Because of the differing contexts and variations of each individual's disabilities, and because of the lack of evaluative studies with comparative groups, it is difficult to judge the social firm's efficacy solely in terms of economic independence of its members (*99*). "The performance of an integration company (social firm) may not be judged merely in economic terms, it must also be seen in terms of integration" (*100*).

### 5.10.4   Utilizing the cooperative movement

There exist various models of cooperatives around the world, but perhaps the best known examples are in Italy where more than 700 cooperatives exist.

Italy is well known for its *avant garde* mental health legislation. Law 180, passed in 1978, stopped admissions to psychiatric hospitals, prescribed treatment and follow-up in "community mental health centres", and allowed hospitalization only in general hospitals of fewer than 15 beds. Regions, departments and municipalities (the mayors themselves) play a key role in the operationalization of the law whose philosophy is based on equality of rights, community integration, and full citizenship, including the right of access to work.

Although they function independently from the mental health services, social cooperatives maintain a close working liaison with them. Many cooperatives share the social firms' philosophy of the need to find a place in the labour market. At the same time they provide a protected workplace for persons with disabilities (*101*).

The importance of social cooperatives was acknowledged in 1991 by Law 381 which describes two types of social cooperatives:

- type A which aim to provide social and health assistance (here the workers are involved in the management of care centres; many provide rehabilitation packages and professional education and programmes);

- type B which aim to promote job opportunities for people with disabilities.

Both types of social cooperative must employ a minimum of 30% of persons with disabilities in order to receive government grants.

Given the fact that several younger persons are no longer satisfied with the type of work which traditional cooperatives have been offering them, there has been considerable effort in the last few years to find new types of work which would be more suitable to a younger people who often have more education than in the past (*102*).

### 5.10.5 Other international examples

Several examples show the great variety of possibilities which exist in the development of social firms and other types of programmes that promote the employment of persons with serious mental illness.

More recently, a number of initiatives have involved the provision of white collar jobs for persons with serious mental health problems, as opposed to jobs which are close to the minimum wage.

In the United States, Project Employ (part of the President's Committee on Employment of People with Disabilities) has identified programmes which offer white collar office occupations (*105*). The common features of most of these new programmes involve the following: many were initiated by large corporations themselves and corporate contacts were systematically used; individualization of job development is the rule rather than the exception, even though it is more costly; several initiatives came from local governments.

**Good practice: an American bank**

A large US credit card lender provides a variety of jobs for people with cognitive disabilities. This includes positions in clerical support, the mail centre, the copy centre, the fitness centre, environmental services, fleet services, and landscaping. In 1990, a parent advocate approached the company to discuss jobs for people with cognitive disabilities. The chairman made the initial corporate commitment. An in-house staff member assists the managers and co-workers who are mentors to the individuals with disabilities with techniques to give meaningful instructions, encouragement and needed support.

Of the 36 jobs at the company, 20 are nontraditional. Salaries are between US$ 13,000 and US$ 20,000 annually, plus up to US$ 2000 in individual and company performance incentives. All personnel are evaluated after six months and are eligible for merit increases. People receive full company benefits, including health care, life and disability insurance, pension and retirement plans.

Thirty-five employees with disabilities work 40 hours per week, and one works 20 hours per week.

*Source: Supported Employment InfoLines* (*106*).

### Good practice: A complete furniture factory, Spain

A major Spanish NGO has created 12 service centres employing more than 800 handicapped persons who fill 183 service contracts (*104*).

In Cabra, Andalusia, they run a commercial furniture factory employing 212 persons, the vast majority having had long stays in psychiatric hospitals. The factory is very modern and has several separate assembly chains where the needs of individual workers are taken into account. There is also a large showroom and the products are sent throughout Europe and even to America.

Most workers live where the NGO is located and they are very well accepted owing, among other things, to the constant cooperation between the city council and the workshop leaders. Seventy workers live in an Andalusian type of residence with a swimming pool next to the factory.

The NGO also has a research centre affiliated to the University of Cordoba where the emphasis is placed on scientific and technical research in rehabilitation with emphasis on computer technologies.

All workshop workers receive salaries equivalent to those of workers in regular industries. The workshop is 90% self-financing.

Like all European programmes mentioned here, this NGO receives material help within the framework of the Horizon and Helios 1 and 2 programmes put together by the EU.

### Good practice: Service Cooperative, Italy

This cooperative was founded in 1981 as an "integrated cooperative" because its members both worked together and supported each other.

The cooperative has grown from 9 members to more than 500.

The cooperative offers:

- cleaning services (interior and exterior cleaning in schools, public offices, private homes, industrial buildings and district health offices);
- social services (assistance to elderly and handicapped persons, programmes for children, and work training programmes;
- upkeep of parks and gardens, and reclamation of run-down green areas, using specially trained staff (defence of the environment in cooperation with private individuals, firms, and public entities);
- general maintenance activities (plumbing, electrical work, house painting) (*103*).

## Good practice: Gardening project in Milan, Italy

A few years ago, 12 patients were discharged from a psychiatric hospital in Milan, Italy, to be followed up as outpatients. They all found living accommodation either with their families or in apartments with some supervision close to the hospital. They tended to be somewhat passive until a formal work training programme was offered to them in gardening by a cooperative that had been recently created and subsidized by the regional government.

After an apprenticeship of a few months, the cooperative obtained a formal, year-round contract from three suburbs of Milan. This included seeding, planting, looking after flower arrangements and grass, and general maintenance of public gardens.

Within 4 months of initiating their work, all ex-patients had moved to the areas where they were working.

The project includes two monitors who are professional gardeners. All employees are paid the regular rate corresponding to their job.

Harnois, G.: The Role of Work in Psychosocial Rehabilitation – European Union Symposium on Training and Employment for People with Psychosocial Disabilities, Sweden, October 14-16, 1994.

## Good practice: An olympic task, Montreal, Canada

An adapted work centre with a yearly budget of $5 million Canadian dollars, of which 25% comes from the Quebec Office of Handicapped Persons (OPHQ). This centre has a staff of 203 persons, of whom 55% have had serious mental health problems.

A small factory at the head location makes carton products for offices. The larger portion of the enterprise has a 5-year contract for cleaning of the Olympic sites and village.

There are 11 teams of 12-16 persons deployed around the clock. In order to ensure full availability, 20 persons are on a standby list. Most of the workers are unionized and are paid union wages.

The employees are very proud to wear their company uniforms. There are very few dropouts.

In order to lessen the stigma problems associated with mental illness, a special educational programme is offered to the non-handicapped employees.

Taking the OPHQ subsidy into account, the company is 75% self-financing.

The majority of handicapped employees freely admit that they would be unemployed but for the existence of the programme.

The board of directors comprises 10 persons, of which 5 are from the private sector, mostly banking. The board also includes one user.

## Good practice: A mental health NGO in Northern Ireland

"Through work to health" is the motto of this NGO which operates in Northern Ireland to promote employment opportunities for people who are recovering from mental ill-health. It is one of the largest regional voluntary sector organizations in the United Kingdom providing vocational rehabilitation and personal development training programmes with employment placement and support. Over 1000 adults participate in a range of programmes each year and about a quarter of them move to either full or part-time employment or other training organizations.

### A quality provision

This success is due to a number of factors. One clearly relates to the encouragement and training provided to the trainees. The organization's efforts have obtained regional and national recognition in the United Kingdom National Training Awards competition in 1997 and 1999. The other has to do with the strong links which have been established with over 300 of the largest employers in Northern Ireland. Indeed, since its earliest days the work of the organization has been led by businessmen helped by health professionals.

### Partnership working

Great importance is attached to maintaining ongoing links with employers and this is promoted on two levels. One had been secured as the result of the organization being successful in attracting subcontract work – based on quality, price and time delivery – from a range of companies. The other is due to the personal links established with human resources departments by the employment service officers. This has helped to overcome the stigma which is still attached to mental illness and, more importantly, has ensured that ongoing help is available to both the employer and the trainee once a job placement has been secured. A range of organizations from many parts of Europe has studied the methods employed by this NGO.

### Good mental health makes good business sense

The organization has also recently adopted a more proactive approach by encouraging employers to promote positive "mental health in the workplace" policies. This makes good business sense, as there is clear evidence about the loss of production allied to the litigation which can arise if employees seek compensation payments as the result of work-related stress. To that end, a consultancy and training service to industry has just been launched with the full support of employer organizations, including the Institute of Directors.

### There is no health without mental health

This NGO is also proactive in promoting a positive understanding about mental health and has launched a "Design for Life" competition aimed at the student population. Information packs about this innovative competition were circulated to all post-primary schools and youth groups across Northern Ireland. The response was encouraging.

Further information can be obtained from: Cecil Graham, Chief Executive, Action Mental Health, 19 Knockbracken Healthcare Park, Saintfield Road, Belfast, BT8 8BH, Northern Ireland.

56

# Chapter 6
# Discussion

The issue of work and mental health has been explored from two different perspectives. The first emphasized mental health problems that may arise in employees who have an employment history. The second addressed the issue of making employment accessible to persons who never had a job, or have lost it due to serious mental illness.

The magnitude of mental health problems in the general population and in the working population tends to be highly underestimated. The percentages of the population that admitted having had any psychiatric disorder during their life were: Brazil (36.3%), Canada (37.5%), Netherlands (40.9%), USA (48.6%), Mexico (22.2%) and Turkey (12.2%) (*107*). It was also found that the highest prevalence rates occurred amongst the youngest age group with the lowest socioeconomic status. Further, most individuals with mental health problems do not receive professional help.

With respect to the impact of mental health problems at work, a major study (*108*) suggested a prevalence of 18.2% for any mental health problems. Work impairment is always higher in workers with comorbid psychiatric disorders (more than one disease at the same time). "The average number of psychiatric work days loss was 6 days per month per 100 workers, and the average number of psychiatric work cutback days was 31 days per month per 100 workers."

Loss of productivity is often substantial, especially since absenteeism caused by mental health problems can be prolonged, the more so if it is not officially recognized and adequately addressed as part of the health coverage benefits available to the employee. There will be instances in which mental health problems appear to be mostly related to difficult working conditions. In other cases, the illness may appear regardless of the nature of the work environment. Whatever the etiology, the issues must be addressed adequately.

> Clinical depression is a major workplace health issue. Employers are beginning to recognize its implications for productivity and, fortunately, there are effective treatments which lead to positive long-term results.

Employers of all sizes are beginning to recognize that depressive disorders often constitute their single highest mental health (medical) and disability cost. Employers experience expensive consequences of depression through absenteeism, lower productivity, disability, accidents and the inappropriate use of medical services (*109*). A large percentage of employers understand the relationship between health and productivity and are improving their management strategies by developing and implementing programmes supportive of work/family/life issues, such as flexitime, part-time schedules, child care benefits, personal leave, wellness health programmes, and family counselling. Innovative employers have developed prac-

tices in conjunction with their health and human resource systems for managing both the direct and indirect cost consequences of mental illness in general and depressive disorders in particular. To recap briefly, these employers are encouraging early recognition, appropriate and cost-effective care management, accommodations, and timely return to work. This is especially evident with the larger employer (over 1000 employees) who is more apt to have the resources in terms of time, staff and capital expenditure. It is important to note, though, that smaller enterprises (under 50 employees) can partially implement aspects of these programmes without incurring financial costs.

Access to sustained employment for individuals with serious mental health problems is a more difficult issue to address.

Serious mental illness affects approximately 2% of the world's population. It results in persons having much difficulty in fulfilling the role which they may have set for themselves in life. Those individuals no longer live in institutions for long periods of time; the vast majority are in the community where they often receive inadequate follow-up.

Even though more than 70% of these people would like to work, only 10-12% do in fact work, all too often in jobs that do not correspond to their liking and capacities. In contrast, the employment rate of other forms of disability is in the vicinity of 50%.

Most countries have legislation which basically states that disability does not constitute valid grounds to deny someone the right of access to equal opportunities, including that of competitive employment.

Within the realm of disability, persons with serious mental illness are particularly vulnerable. We have reviewed how one can overcome obstacles related to ignorance, prejudice and stigma. The concept of rights to equal opportunity fully justifies taking all measures to facilitate access to paid work for those who wish it and are capable of it. Globalization, privatization and downsizing are not valid excuses for social and economic exclusion of individuals with mental health problems.

The "users" themselves now increasingly utilize "empowerment strategies" to demand proactive policies and coordinated action.

> Perhaps the single most important myth that has been dispelled is that nothing much can be done for the clientele with serious mental health problems.

Perhaps the single most important myth that has been dispelled is that nothing much can be done for the clientele with serious mental health problems. There is now a very important body of scientific knowledge attesting to the contrary. The skills and tools exist to treat and to facilitate meaningful life in the community and they have been proven successful. Numerous examples of "good practices" have been mentioned. Very often, the most successful stories involve cooperation between the private and public sectors.

**Nations for Mental Health**

The ongoing creation of social firms (enterprises) testifies to the fact that it is possible to function in an entrepreneurial manner and to be competitive, while at the same time not sacrificing the social needs of persons with serious mental illness on the altar of unrestricted profitability. Data now prove that successful employment programmes not only exist but that they can be very cost-effective.

Given the magnitude of the problem, it is expected that government-supported initiatives will remain the rule rather than the exception. We have noticed with approval the active involvement of the EU in support of the development of "model programmes" in 11 countries. Many of these programmes now function in a largely autonomous manner.

Once an employer recognizes that mental health problems are probably the single most important factor responsible for the disability of employees, it makes sense to recognize mental health as a legitimate concern of the organization.

We now know that there are effective preventive and promotion programmes as well as those for treatment and rehabilitation.

The promotion and prevention programmes will attempt to create a climate that fosters motivation and commitment, reduces obvious stressful agents and promotes harmony among co-workers. The good practices in this monograph illustrate the importance of health education in order to increase awareness of factors affecting mental health and well-being; screening programmes to detect risk factors or early signs of stress-related illness; and communication, clear work goals and participation of employees in this process. In addition, occupational health services and employee assistance programmes are instrumental in implementing promotion and prevention activities.

Treatment programmes should include the capacity for correct diagnosis, remembering that often mental illness "hides behind physical signs and symptoms". Quick access to and intervention by competent medical and professional staff will be called for. Integral to quick access and early intervention of appropriate medical treatment for individuals is reducing the stigma and shame associated with mental health problems. As discussed, often an individual will not seek treatment or will delay seeking it because of the stigma associated with mental illness. Furthermore, there is a need for more easily accessible mental health treatment programmes.

Rehabilitation programmes will emphasize the requirements for a prompt return to work by focusing on necessary accommodations to the work situation, as well as required support to the individual. The good rehabilitation practices highlighted in the monograph encourage high levels of client participation in all aspects of the rehabilitation process. This also includes the participation of an individual's support system such as family members, a mental health professional, case manager, vocational counsellor and work supervisor. A successful timely return to work and the identification of necessary accommodations needs to involve the client as well as his/her support system.

Breaking the cycle of discouragement and eliminating the numerous societal barriers that affect employment are key to enhancing the economic and social integration of people with mental health problems (*110*). We must consider the mental health system and its influence on challenging negative stereotypes as well as encouraging employers to implement good practices. It is important to recognize that in many parts of the world the mental health delivery system often discourages an individual from entering the workforce or returning to work after a diagnosis of mental ill-health, despite stabilization of symptoms. Although there is an increasing emphasis on employment and re-employment, there is still a tendency by mental health and rehabilitation professionals to minimize the importance of work for many individuals, particularly for strengthening and maintaining recovery. Furthermore, the system of financial supports for individuals with mental health disability is a disincentive for employment. Financial concerns are often cited as a major contributing factor to discouraging a person with a mental illness from seeking employment, education and training opportunities (*111*). It is important that these issues be fully understood as they impact employment prospects.

Breaking the cycle of discouragement and eliminating the numerous societal barriers that effect employment are key to enhancing the economic and social integration of people with mental health problems.

This monograph has illustrated that steps can be taken to help reduce barriers to employment and the systematic cycle of discouragement. For example, early and timely intervention, networking and client participation in identifying and setting goals are all elements of effective programmes sponsored by some employers and vocational rehabilitation agencies. Engaging all individuals in early discussions about work and recognizing that the purpose of early discussions may ultimately help an individual identify realistic goals and strategies for achieving these goals. Early intervention, for example, in recognizing and ameliorating the impact of workplace stress has shown to be effective in reducing stress-related absenteeism. Accessing resources and referral information to become more knowledgeable in assisting individuals in exploring vocational supports and services are important components of networking. Furthermore, using community resources such as state or local rehabilitation agencies and support groups may aid in the successful return to work of an employee. For the mental health and rehabilitation professional, in particular, learning about all of the options available within the surrounding community – including details about types of employment programmes, eligibility criteria and key contact personnel – is a good practice in assisting the individual to find employment or re-employment (*112*). Lastly, it is important to recognize the impact of family and/or significant others on an individual's choice to engage in education, training or employment activities. A person recovering from mental illness may be reluctant to pursue work-related goals that may reflect the concerns of the family who fears that stressors may occur that could trigger a relapse. Within this context, the family and significant others are often relying on the mental health professional for information regarding resources in their communities for rehabilitation and support.

60

# Chapter 7
# Conclusion

The central themes of this monograph were: to address the importance of work for people with mental health problems; to discuss the different vocational strategies and programmes for people with a mental health disorder; and to consider the role of the workplace in promoting good mental health practices for employees. Integral to these themes is the identification of good practices by employers as well as vocational rehabilitation agencies and professionals.

It is clear that there are many factors involved in addressing the importance of work for people with mental health problems, as well as identifying effective practices that encourage employment, re-employment and retention. Social support systems, mental health professionals and employers all have a significant role in helping individuals define options, make choices, learn to manage potentially disabling conditions, and avoid long-term hospitalization. The ultimate goal is for individuals to obtain and/or return to gainful, worthwhile activity, such as meaningful work (*113*).

Access to satisfying work remains one of the most sought-after goals of the adult population of most countries. Employers, employees and unions are starting to realize that, for this population, mental health problems are the single most important cause of disability responsible for a global burden of disease larger than that due to infections, AIDS, cancer and physical accidents. The impact of mental health problems on absenteeism, productivity and job satisfaction is only starting to be realized.

Given the importance of work, and due to advances made in the prevention, treatment and rehabilitation of persons with mental health problems, it makes eminent sense to address all aspects of the mental well-being of employees.

For the same reasons, the disability associated with severe mental health problems can no longer serve as an excuse to deny those who so wish reasonable access to competitive employment. It is a precondition to full citizenship.

# References

1. Brundtland GH. Mental health in the 21ˢᵗ century. *Bulletin of the World Health Organization*, 2000, 78(4):411.

2. Ibid.

3. Mental illness: key area handbook. *The health of the nation*. London, UK Department of Health, 1993:11-24.

4. STAKES. *Introduction to mental health issues in the EU*. Helsinki, Finnish Ministry of Social Affairs and Health, 1999 (www.stakes.fi/mentalhealth).

5. *Strategies, employment, mental illness: strategies to secure and maintain employment for people with long-term mental illness*. United States National Institute on Disability and Rehabilitation Research (NIDRR), 1993, XV(10).

6. *The cost of mental health problems. The fundamental fact*. The Mental Health Foundation, UK, 2000 (www.mentalhealth.org.uk//ffcost.htm).

7. Conti DJ, Burton WH. The economic impact of depression in a workplace. *Journal of Occupational Medicine*, 1994, 36:983-988.

8. *Managing the impact of depression in the workplace: an integrated approach*. Washington Business Group on Health. D/ART National Worksite Program, 1995.

9. Lahtinen E, Lehtinen V et al. (eds). *Framework for promoting mental health in Europe*. STAKES National Research and Development Centre for Welfare and Health, 1999.

10. *Disability, poverty and development*. Issues papers. UK Department for International Development, 2000:4-9.

11. Ibid., p. 7.

12. Ibid., p. 8.

13. Ibid., p. 9.

14. Jenkins R. Mental health at work – Why is it so under-researched? *Occupational Medicine*, 1993, 43:65-67.

15. National Alliance for the Mentally Ill (NAMI). Fact sheet. *Facts about mental illness and work*. August 1999 (www.nami.org). (NAMI is a United States non-profit self-help advocacy organization.)

16. Warr PB. *Work, unemployment and mental health*. Oxford, Oxford University Press, 1987.

17. Miller D. Work problems caused by mental ill health and their management. In: Jenkins & Coney, *Prevention of mental ill-health at work: a conference*. 1992.

18. US National Institute for Occupational Safety & Health (NIOSH). *Stress at work*. 1998.

19. UK Trades Union Congress (TUC). *Stressing the law*. 2000.

20. Kelly-Radford L. *Diversity*. Greensboro, North Carolina, Center for Creative Leadership. Paper presented at the Work, Stress and Health '99 Conference. NIOSH & American Psychological Association.

21. UK Trades Union Congress (TUC). *Stressing the law*. 2000.

22. Haratani T, Kawakami N. *International perspectives*. National Institute of Industrial Health. Paper presented at the Work, Stress and Health '99 Conference. NIOSH & American Psychological Association.

23. Ibid.

24. *Employment strategies for people with disabilities: the role of employers*. Report prepared by a study group, 1993–1994 Programme of Coordinated Research in the Social Field. Council of Europe, 1995.

25. *Stress at work: a guide for employers*. UK Health & Safety Executive. Crown, 1995.

26. Lehtinen V, Riikonen E, Lehtinen E. *Promotion of mental health on the European agenda*. STAKES National Research & Development Centre for Welfare and Health, 1998.

27. National Alliance for the Mentally Ill (NAMI). Fact sheet. *Facts about mental illness and work*. August 1999 (www.nami.org).

28. Dooley D et al. Depression and unemployment: panel findings from the Epidemiologic Catchment Area Study. *Journal of Community Psychology*, 1994, 22(6):745-765.

29. Schott R. Managers and mental health: mental illness and the workplace. Washington, *Public Personnel Management*, 1999, 161183-161197.

30. Ibid., p.161183

31. Ibid., p.161190

32. Ibid.

33. N.E. Essex Mental Health Trust Organisational Stress Pilot. *Health at work in the NHS*. UK Health Education Authority.

34. Jenkins R. Psychiatry and the health of the nation: the view from the Department of Health. *British Journal of Hospital Medicine*, 1996, 56(4).

35. Liimatainen M. *Finland: mental health in the workplace – a situational analysis*. Geneva, International Labour Organisation (in preparation).

36. Kalimo R. *Balanced mentally healthy working life*. Finnish Institute of Occupational Health, 1999.

37. Frierson J. *Employer's guide to the Americans with Disabilities Act* (2nd edition). Washington, DC, Bureau of National Affairs, 1995 (adaptation).

38. BNA Policy and Practice Series, 1996–1999. *Counselling and employee assistance programs*. Washington, DC, Bureau of National Affairs.

39. D/ART Worksite Program. US National Institute of Mental Health, Washington Business Group on Health (WBGH). In: *Good company. Developing EAP strategies for clinical depression*. A series of educational/training material distributed by WBGH, 1998.

40. Gabriel P. *Mental health in the workplace. Situation analysis United States*. Geneva, International Labour Organisation (in preparation).

41. Burgess A, Davidoff I, Goff V. *Investing in workplace productivity: Innovation in managing indirect mental health costs*. Washington Business Group on Health, National Institute of Mental Health, National Worksite Program, 1999.

42. Rotelli F. *Introductory remarks to the Parma Conference,* January, 1991.

43. Jansen M. Emotional disorders and the labour force: prevalence, costs, prevention and rehabilitation. *International Labour Review*, 1986:605.

44. Henderson, C., Thornicroft, G. & Glover, G.: *Inequalities in mental health*. Br. J. Psychiatry, 173, 105-109. 1998.

45. Bennett D. Feature article. *Bulletin of the World Association for Psychosocial Rehabilitation*, January 1995.

46. Anthony W, Cohen M, Farkas M. *Psychiatric rehabilitation*. Boston, MA, Center for Psychiatric Rehabilitation, 1990.

47. Campbell RJ. Psychiatric dictionary (1996), p. 629.

48. Tessier L, Clement M. *La réadaptation psychosociale en pschiatrie: Défis des années 90*. Le Comité de la santé mentale du Québec (Morin G, ed.), 1992.

49. Stein LI, Test MA, Marx AJ. Alternative to the hospital: a controlled study. *American Journal of Psychiatry*, 1975, 132:517-522.

50. Allness D, Knoedler WH. *The PACT model*. Arlington, VA, NAMI Anti-Stigma Foundation, 1998.

51. Stein L et al. Work and social support: a comparison of consumers who have achieved stability in ACT and clubhouse programs. *Community Mental Health Journal*, 1999:193-204.

52. ILO. *World employment report, 1998-99. Employability and the global economy – how training matters*. Geneva, International Labour Organisation, 1998:35.

53. Ibid, p. 36.

54. Rifkin J. *La fin du travail*. Éditions du Boréal, 1996:242-246.

55. Goldfinger C. The future of work. *UNESCO Courier*, December 1998.

56. Poirier Y. Centre d'étude sur l'emploi et la technologie. *Le Devoir*, 25 juin 2000.

57. *Document d'orientation*. Comité Santé Mentale et Travail de Montréal, 1995.

58. National Alliance for the Mentally Ill (NAMI). *Facts about mental illness*. 2000.

59. Strauss JD, Carpenter WT. The prediction of outcome in schizophrenia, II. Relationships between predictor and outcome variables. *Archives of General Psychiatry*, 1974, 31(3):37-42.

60. Anthony WA, Cohen MR, Cohen BF. Psychiatric rehabilitation. In: Talbott JA (ed). *The chronic mental patient: five years later*. Orlando, FL, Grune & Stratton, 1984: 137-157.

61. Sullivan A et al. Choose/get/keep: a psychiatric rehabilitation approach to supported education. *Psychosocial Rehabilitation Journal*, 1993, 17(1).

62. Unger KV. *Adults with psychiatric disabilities on campus*. American Council on Education. HEALTH Resource Center, Resource Paper, 1992:1-6.

63. ILO. *World employment report, 1998-99. Employability and the global economy – how training matters.* Geneva, International Labour Organisation, 1998:35.

64. Mulvey EP. Assessing the evidence of a link between mental illness and violence. *Hospital and Community Psychiatry*, 1994, 45:663-668.

65. *World Schizophrenia Fellowship Newsletter*, 3rd Quarter, 1997.

66. Duncan B. *The media and mental illness.* March 2000 (www.disabilityworld.org).

67. *Employing and accommodating workers with psychiatric disabilities.* Cornell University, School of Industrial & Labour Relations, January 1994. Frierson, *Employer's guide to the Americans with Disabilities Act* (2nd edition), 1995:257-259.

68. *The impact of welfare reform on employment of people with psychiatric disabilities.* Networks National Tech. Assistance Center, State Mental Health Planning, Winter 1997.

69. United Nations. *The standard rules on the equalization of opportunities for persons with disabilities.* Adopted at the 48th Session, 20 Dec. 1993 (Resolution 48/96).

70. *World development report. Investigating health* (Executive summary). Washington, DC, World Bank, 1993.

71. Desjarlais R et al. *World mental health: problems and priorities in low-income countries.* Oxford, Oxford University Press, 1995:35.

72. WHR Rivers lecture & workshop. *Placing mental health on the international health agenda.* Harvard Medical School, Dept. of Social Medicine & WHO Dept. of Mental Health, 10-11 April 2000.

73. Andrew G, Sanderson K, Beard J. Burden of disease. *British Journal of Psychiatry*, 1008, 173:123-131.

74. Metts RL. *Disability issues, trends and recommendations for the World Bank.* Washington, DC, World Bank, 2000.

75. International Labour Conference. Convention 159. *Convention concerning vocational rehabilitation and employment (disabled persons).*

76. International Labour Conference. Convention Recommendation 168. *Recommendation concerning vocational rehabilitation and employment (disabled persons).*

77. WHO. *Basic documents*, 8th edition. Geneva, 1990:1.

78. WHO. *Alma Alta 1978. "Health for All"* series No. 1. Geneva, 1978.

79. WHO. *World health report, 1998. Life in the 21st century: a vision for all.*, Geneva, 1998.

80. ILO. *A summary review of the replies to the ILO General Survey on Convention 159 and Recommendation 168.* Geneva, 1997.

81. Cabala C. Institute of Psychiatry and Neurology, Warsaw. *Mental health in the workplace: situation analysis, Poland.* Geneva, International Labour Organisation (in preparation).

82. Harnois GP. *Mission report to WHO Regional Office for South-East Asia.* October 1999.

83. *The Americans with Disabilities Act (ADA), 1990.*

84. Mancuso LL. Reasonable accommodation for workers with psychiatric disabilities. *Psychosocial Rehabilitation Journal*, 1990, 14 (2).

85. Bybee D, Mowbray CT, McCrohan NM. Towards zero exclusion in vocational opportunities for persons with psychiatric disabilities: prediction of service receipt on a hybrid vocational/case management service program. *Psychiatric Rehabilitation Journal,* 1996, 19(4).

86. Mind. *Managing for mental health – the Mind employers resource pack.* Guide No. 2. Mind Publications, 2000.

87. Thornton P, Lundt N. *Employment policies for disabled people in 18 countries: a review.* York, University of York Social Policy Research Unit, 1997.

88. Mercier C et al. *Rapport final de la recherche-action Impact Travail – Le développement de l'employabilité et l'intégration au travail pour les personnes ayant des problèmes de santé mentale.* Montreal, Centre de recherche de l'Hôpital Douglas, 1999.

89. Hindle K, Noble J, Phillips B. *Are workers with a disability less productive? An empirical challenge to a suspect axiom.* September 1999.

90. Banks D, Munk D, Grosal T. *Indiana University, natural supports research projects.* Presented at the VII WAPR Congress, Paris, May 2000.

91. Jenkins R. Mental health at work – why is it so under-researched? *Occupational Medicine,* 1993:65-67.

92. UCLA/Rand Center for Research on Managed. William Mercer, Inc., Senate report No. 104-368. Cited in: National Alliance for Mentally Ill (NAMI), *Cost data on parity for mental illness.* 1999.

93. Lauzon G, Charbonneau C. *Favoriser l'intégration au travail en santé mentale: l'urgence d'agir.* Association québécoise pour la réadaptation psychosociale, 2000 (in preparation).

94. Office des personnes handicappées du Québec. *Programme de subventions aux employeurs 1999-2000.* Contrat d'intégration au travail (CIT):8.

95. Schwartz G, Higgins G. *"Marienthal": a social firm's network.* Netherne Printing Services – Social Firms, UK, 1999.

96. Grove B et al. *The social firm handbook.* South Hampton, Ashford Press, p. 11.

97. Ibid., p. 75.

98. Schwartz G, Higgins G. *"Marienthal": a social firm's network.* Netherne Printing Services – Social Firms, UK, 1999, p. 3.

99. Grove B et al. *The social firm handbook.* South Hampton, Ashford Press, p. 58.

100. Seyfried & Lambert, p. 84.

101. Conte S. *Memorandum to WAPR board of directors,* 1994.

102. Rotelli F. *Address to the 1st Trieste International Meeting for Mental Health.* October 1998.

103. Cooperative service Noncello balance sheet for 10th anniversary.

104. Marin JP. *Insercion socio-laboral de la minus-valida psiquica: la experencia PROMI.* Cadiz, University of Cadiz, 1004:210.

105. Chafkin R. In: *Supported Employment InfoLines,* 2000, 11(2).

106. *Supported Employment InfoLines,* 2000, 11 (2).

107. Cross-national comparisons of the prevalences and correlates of mental disorders. WHO International Consortium in Psychiatric Epidemiology. *Bulletin of the World Health Organization*, 2000, 78(4):417.

108. Kessler RC, Frank RG. *The impact of psychiatric disorders on work loss days. Psychol. Med.*, 1997, 27:861-873.

109. Burgess et al. *Investing in workplace productivity. Innovations in managing indirect mental health costs.* Washington Business Group on Health & Naional Institute of Mental Health,1999.

110. Palmer-Erbs V, Donegan K. Promoting the importance of work for persons with psychiatric disabilities – the role of the psychiatric nurse. *Journal of Psychosocial Nursing and Mental Health Services*, April 1998:13-25.

111. Ibid., p. 17.

112. Ibid., p.16.

113. Ibid., p. 20.

## Publications produced or distributed by Nations for Mental Health

### Publications

Gender differences in the epidemiology of affective disorders and schizophrenia.
WHO/MSA/NAM/97.1. *(Out of print)*

Nations for Mental Health: An overview of a strategy to improve the mental health of underserved populations.
WHO/MSA/NAM/97.3. Rev.1

Nations for Mental Health: A focus on women.*
WHO/MSA/NAM/97.4.
Order n° 1930123. Sw.Fr. 12.–/in developing countries Sw.Fr. 8.40

Nations for Mental Health: Supporting governments and policy makers.*
WHO/MSA/NAM/97.5.
Order n° 1930136. Sw.Fr. 10.–/in developing countries Sw.Fr. 7.–

Nations for Mental Health: Schizophrenia and public health.*
WHO/MSA/NAM/97.6.
Order n° 1930144. Sw.Fr. 10.–/in developing countries Sw.Fr. 7.–

Nations for Mental Health: Recommendations for evaluation.
WHO/MSA/NAM/98.1.

Nations for Mental Health: The mental health of indigenous peoples
WHO/MNH/NAM/99.1.
Order n° 1930168. Sw.Fr. 10.–/in developing countries Sw.Fr. 7.–

### Videos

Nations for Mental Health video: Sriyawathie – Rehabilitation of chronic psychiatric patients in Sri Lanka.

Priced publications can be ordered through WHO,
Marketing and Dissemination, 1211, Geneva 27, Switzerland.
Tel: +4122 791 2476. Fax: +4122 791 4857. E-mail: bookorders@who.int

* These documents have been translated into Russian by the Geneva Initiative on Psychiatry. Requests for copies in Russian should be directed through Dr Robert Van Voren, General Secretary, Geneva Initiative on Psychiatry, PO Box 1282, 1200 BG Hilversum, Netherlands. Tel: 0031-35-6838727. Fax: 0031-35-6833646. E-mail: rvvoren@geneva-initiative.org.

These documents are available from our website:
http://www.who.int/mental_health

# EXHIBIT 46



# CATO AT LIBERTY

**SEPTEMBER 1, 2017 10:51AM**

# Ending DACA Will Impose Billions in Employer Compliance Costs

*By* DAVID BIER

**President Trump is** reportedly considering **pulling the plug on the Deferred Action for Childhood Arrivals (DACA) program, which allows about 800,000 immigrants who came to the U.S. as children to live and work here lawfully. If the president does decide to end the program, it will impose a massive cost on employers who currently employ these workers. The cost of recruiting and hiring new employees is expensive. Here are the facts:**

- **DACA rescission will cost employers $6.3 billion in employee turnover costs, including recruiting, hiring, and training 720,000 new employees.**

- **Every week for the next two years, U.S. employers will have to terminate 6,914 employees who currently participate in DACA at a weekly cost of $61 million.**

- **Ending DACA would be the equivalent of 31 "major" regulations.**

DACA recipients receive employment authorization documents (EADs). It is not illegal to work without authorization, but it is illegal for employers to hire someone who lacks authorization. Thus, DACA EADs essentially grant permission to employers to hire DACA beneficiaries for a given period—in this case, two years—without fear of employer sanctions for hiring an unauthorized worker. Note that the law prohibits employers from discriminating against foreign-born applicants purely because they have temporary authorization. Thus, if President Trump rescinds DACA, employers are the ones who will have to actually implement the policy by policing their workforce and firing DACA recipients. **DACA repeal's regulatory compliance burden will fall *directly* on American employers.**

To estimate these costs, I reviewed 11 studies of the cost of turnover to employers. These studies included a wide variety of occupations with radically different wage levels. The most important component of turnover cost is the leaving employee's wage, which is the marginal value of the worker's production. The Table below displays the cost as a percent of annual wages.

As the Table shows, the estimated turnover cost ranges from 12 percent to 37 percent of annual wages with a median of 25 percent (the average is 26 percent). This estimate is slightly lower than a U.S. Department of Labor estimate that concluded that turnover costs an employer 30 percent of the leaving employee's salary. It is slightly higher than a 2012 literature survey by Boushey and Glynn (2012) that found a median turnover cost of 21 percent of an employee's annual salary.

**Table: Costs of Turnover in Various Occupations**

| | Turnover Cost Studies | Industries | Percent of Annual Wages | Average Costs | Hourly Wage |
|---|---|---|---|---|---|
| 1 | Seninger, et al (2002) | Supported Living | 24% | $3,631 | $7.56 |
| 2 | Larson, et al (2004) | Direct support professionals | 17% | $4,333 | $12.45 |
| 3 | Patterson, et al. (2010) | Emergency medical | 25% | $7,926 | $15.71 |
| 4 | Hinkin & Tracey (2000) | Hotels | 29% | $13,104 | $15.95 |
| 5 | Frank (2000) | Grocery Stores | 31% | $10,848 | $17.50 |
| 6 | Dube, et al (2010) | Various | 12% | $4,563 | $18.55 |

| | | | | |
|---|---|---|---|---|
| 7 Jones (1990) | Nurses | 37% | $19,402 | $25.94 |
| 8 Barnes, et al. (2007) | Teachers | 36% | $13,446 | $30.23 |
| 9 Appelbaum & Milkman (2006) | Various | 25% | $16,461 | $32.92 |
| 10 Wise (1990) | Nurses | 31% | $22,557 | $36.89 |
| 11 Milanowski & Odden (2007) | Teachers | 17% | $13,969 | $41.44 |
| **Median** | **All Above** | **25%** | **$13,104** | **$18.55** |

*Sources: See links in table and table text*

An August 2017 Center for American Progress survey of DACA recipients found that their wages had risen to $17.46 hourly (or $34,920 annually). It also found that 91 percent of DACA recipients have jobs. According to my projections based on U.S. Citizenship and Immigration Services data, 790,148 people have DACA or will have DACA by September 1, 2017. Thus, 719,035 immigrants are earning $25.1 billion per year. **If the federal government forces employers to fire all of DACA recipients, it will cost employers $6.3 billion.**

The fact that some employers will receive advanced notice of the expiration of their employees' work authorization could mitigate these costs, but according to these studies, the primary cost associated with turnover is the lower productivity of new hires. Additionally, because DACA recipients' wages have grown 69 percent over the last five years, it is likely that those DACA participants whose cancellations occur in 2018 and 2019 will have higher wages than those today. Finally, DACA participants' employment rate has also risen year after year—four percentage points since 2016—and older participants have a higher employment rate. This again indicates that the number of firings could be higher than this projection estimates.

The costs will likely not be imposed all at once as the program will slowly unwind over a two-year period. I previously estimated the quarterly rate of expirations, based on U.S. Citizenship and Immigration Services data, which can give us an estimate of how a DACA cancellation would distribute the costs over time. **Every week U.S. employers will have to terminate 6,914 DACA employees at a weekly cost of $61 million.**

**Figure: DACA Employee Terminations and DACA Recession Turnover Costs**



*Source: See Table 1 and Cato Institute (Note that 886,000 people have received DACA at some point, but many have had their renewals rejected or have failed to renew for other reasons. 720,000 had jobs in 2017)*

For context, the Congressional Review Act regards any new administrative rule as a "major rule" if it will have a likely annual impact of more than $100 million. CRS requires major rules to go through a 60-day notice and public comment period and to allow Congress the opportunity to review it and reject it. Because DACA was not created through a rule-making process, it likely does not require this process to be terminated, but its rescission would still impose $3.2 billion in annual costs. Thus, **ending DACA would be the equivalent of more than 30 major regulations.**

President Trump is considering DACA rescission only under the threat of a lawsuit that claims DACA was unconstitutionally implemented. If that claim is valid, Congress should immediately act to pass legislation to extend employment authorization and legal status for these young immigrant workers. It should not choose to impose massive costs on employers and immigrants.

**Topics:** International Economics, Development & Immigration

**Tags:** Immigration; DACA; Dreamers; Trump; Legalization



This work by Cato Institute is licensed under a Creative Commons Attribution-NonCommercial-
ShareAlike 4.0 International License.

PRINTED FROM CATO.ORG

# EXHIBIT 47



Center for American Progress

# There Are Significant Business Costs to Replacing Employees

By Heather Boushey and Sarah Jane Glynn          November 16, 2012

## Introduction

Implementing workplace policies that benefit workers and help boost employee reten-
tion is not simply a "nice" thing for businesses to do for their employees. Maintaining
a stable workforce by reducing employee turnover through better benefits and flexible
workplace policies also makes good business sense, as it can result in significant cost
savings to employers.

Thirty case studies taken from the 11 most-relevant research papers on the costs of
employee turnover demonstrate that it costs businesses about one-fifth of a worker's
salary to replace that worker. For businesses that experience high levels of turnover, this
can add up to represent significant costs that can potentially be avoided by implement-
ing workplace flexibility and earned sick days at little or no cost at all.[1]

Indeed, it is costly to replace workers because of the productivity losses when someone
leaves a job, the costs of hiring and training a new employee, and the slower productivity
until the new employee gets up to speed in their new job.[2] Our analysis reviews 30 case
studies in 11 research papers published between 1992 and 2007 that provide estimates
of the cost of turnover, finding that businesses spend about one-fifth of an employee's
annual salary to replace that worker. (see Figure 1)

Specifically, the economic studies we examined reveal a number of patterns about the
cost of turnover:

- For all positions except executives and physicians—jobs that require very specific
  skills—across the remaining 27 case studies, the typical (median) cost of turnover was
  21 percent of an employee's annual salary.

- For workers earning less than $50,000 annually—which covers three-quarters of all
  workers in the United States—the 22 case studies show a typical cost of turnover of

20 percent of salary, the same as across positions earning $75,000 a year or less, which includes 9 in 10 U.S. workers.[3]

- Among positions earning $30,000 or less, which includes more than half of all U.S. workers, the cost of replacing an employee is slightly less than among positions earning less than $75,000 annually.[4] The typical cost of turnover for positions earning less than $30,000 annually is 16 percent of an employee's annual salary.



**FIGURE 1**

**Replacing employees is costly for companies' bottom line**

The cost of turnover is remarkably consistent across jobs at different pay levels, except the very highest-paid jobs, 1992 to 2007

Source: Author's analysis of 30 case studies on the cost of turnover from 1992 through 2007.

Jobs that are very complex and that require higher levels of education and specialized training tend to have even higher turnover costs.[5] In one study, economist Eileen Appelbaum and sociologist Ruth Milkman find that executive positions, which are well-compensated and likely have stringent educational credential requirements, have higher turnover costs than jobs with low educational requirements.[6] Very highly paid jobs and those at the senior or executive levels tend to have disproportionately high turnover costs as a percentage of salary (up to 213 percent), which skews the data upwards.

Because some jobs have very high costs of turnover and others are less significant, there is a wide range of estimates across all types of employment. Above, we reported the "typical" cost of turnover using the median among the case studies. This means that half of the case studies had a cost above what is "typical" and half had a cost below. The estimates of the cost of turnover in the 30 case studies analyzed here range from 5.8 percent up to 213 percent, depending on the job and employee skills. But the estimates are clustered around the "typical" (median) values. Looking only at estimates of the cost of turnover for workers earning, on average, $75,000 per year or less, 17 case studies find a cost of turnover in the range of 10 percent to 30 percent. (see Figure 2)

The cost of turnover is an important economic issue because about one-fifth of workers voluntarily leave their job each year and an additional one-sixth are fired or otherwise let go involuntarily.[7] While workers who were laid off might not be replaced at all, for other kinds of workplace exits it doesn't matter whether an employee left a firm voluntarily or whether they were fired—the reality is that it will cost the firm to replace that

employee. In the long-term, even if a firm saves money by firing an employee who has stolen or has very low productivity, in the short-term the firm must address the costs of replacing that worker with one who will perform the job better than the one fired.

The Great Recession sharply increased the share of workers involuntarily leaving their jobs. At its peak in early 2009, the share of the total labor force subject to what the Bureau of Labor Statistics calls "layoffs and discharges"—but what those affected might refer to as "getting canned"—was 2 percent, up from 1.2 percent in 2006, before the recession began.[8] As unemployment remained high, the recession and subsequent recovery reduced the number of workers who voluntarily left a job. In 2011, 23.6 million workers—or 17.9 percent of the total workforce—quit their jobs, down from 22.6 percent of the workforce in 2006.[9] Due to the collapse of the housing bubble and the ensuing economic recession, workers employed in construction especially experienced spikes in unemployment and increased turnover rates. (see Figure 3)

High quit rates are often due to workplace policies. The Bureau of Labor Statistics data show that the accommodations—including hotels and motels—and food-services industries have the highest voluntary quit rate, with 37 percent of employees reporting that they quit their jobs in 2011, nearly twice as many as left their jobs involuntarily.[10] These are jobs that tend to pay low wages and often have little in the way of workplace benefits or policies to help workers address conflicts between work and family.



**FIGURE 2**

**Across jobs, the cost of replacing an employee is clustered between 10 percent and 30 percent of an employee's annual salary**

Range of estimates of the cost of turnover from 30 case studies spanning 1992 to 2007

Source: Author's analysis of 30 case studies on the cost of turnover from 1992 through 2007.

**FIGURE 3**

**Job losses by industry**

Share of workers who quit or were involuntarily let go by industry, 2011

- Share of workers let go annually
- Share of workers quitting positions annually

Source: Bureau of Labor Statistics, Job Openings and Labor Turnover Survey - January 2012

* **Correction, August 31, 2015:** This figure previously contained some mislabeled data. The labels for professional and business services; construction; and trade, transportation, and utilities have been corrected in this version.

Researchers find that high rates of turnover could be lowered through changes in workplace policies. Harvard Business School professor Zeynep Ton recently wrote in Harvard Business Review:

> Highly successful retail chains ... have demonstrated that ... bad jobs are not a cost-driven necessity but a choice. And they have proven that the key to breaking the trade-off is a combination of investment in the workforce and operational practices that benefit employees, customers, and the company ... I believe that the model these retailers have created can be applied in other service organizations ... [such as] hospitals, restaurants, banks, and hotels.[11]

## Conclusion

This brief documents that the cost of employee turnover for businesses is high, regardless of the level of wages being paid to the departing or incoming employees. Companies typically pay about one-fifth of an employee's salary to replace that employee. While it costs businesses more to replace their very-highest-paid employees, the costs for most employers remains significant and does become less significant for those with low earnings.

Workplace policies that improve employee retention can help companies reduce their turnover costs. Family-friendly policies such as paid family leave and workplace flexibility help retain valuable employees who need help balancing work and family. For example, research has found that access to any form of parental leave makes women more likely to return to work after giving birth. Moreover, by 2050 up to 20 percent of Americans will be older than age 65, and improved leave policies would allow workers to provide the care their elderly parents may need without having to sacrifice their livelihoods.[12]

## Appendix

The analysis presented in figures 1 and 2 is based on a thorough review of academic studies on the costs of employee turnover between 1992 and 2012. We found 11 published papers that provide empirical analysis of the cost of the turnover with detailed information on their methodology.[13] Most of the research focused on a specific occupation within an industry, which meant that the 11 research papers provided 31 separate case studies. We then pooled these case studies to evaluate the typical cost of turnover across firms as a share of an employee's annual salary.[14]

The research papers examined a variety of turnover costs, but they can be broken down into two main categories—direct and indirect, which vary depending on the specifics of the job. Both direct and indirect costs will vary within and across firms in terms of skills and training needs for a particular job. There will also be differences in the cost

to replace an employee based on the industry, the region, and general economic conditions, as it may cost more to recruit employees to a remote location or if the unemployment rate is very low.

In the late 1990s, for example, when the U.S. economy was close to full employment, there was a great deal of media coverage about how employers were scrambling to fill positions. One story from the Associated Press was simply titled "Fewer workers mean more picky applicants" and detailed the creative ways employers would try and attract employees. The article highlighted one employer, an apparel maker, who offered eight paid days of vacation for each friend an employee recruited to the company.[15]

The first type of cost is direct costs. This category includes:

- Separation costs such as exit interviews, severance pay, and higher unemployment taxes

- The cost to temporarily cover an employee's duties such as overtime for other staff or temporary staffing

- Replacement costs such as advertising, search and agency fees, screening applicants, including physicals or drug testing, interviewing and selecting candidates, background verification, employment testing, hiring bonuses, and applicant travel and relocation costs

- Training costs such as orientation, classroom training, certifications, on-the-job training, uniforms, and informational literature

The second category of turnover costs to businesses is indirect costs. This includes:

- Lost productivity for the departing employee who may spend their last days on the job writing exit memos or with reduced morale

- Lost productivity due to the need to hire temporary employees

- Coping with a vacancy or giving additional work to other employees

- Costs incurred as the new employee learns his or her job, including reduced quality, errors, and waste

- Reduced morale

- Lost clients and lost institutional knowledge

While direct costs may be easy to measure, by their very nature indirect costs may be hidden and difficult to ascertain. Because of this, out of the 11 research papers that we looked at, only 2 included indirect costs.

Table 1 describes the 31 case studies and their key findings.

**TABLE 1**

## Studies estimating the cost of employee turnover, 1992 to 2007

| Study | Study summary | Job category as described by study | Cost cited in study |
|---|---|---|---|
| Blake Frank, "New Ideas for Retaining Store-Level Employees" (Coca-Cola Company Retailing Research Council, 2000). | The author examines survey data from 2000 for 10 companies representing 18 grocery stores acrss the United States. The companies provided a total of nearly 600 surveys outlining costs associated with employee turnover and provided additional personnel data on more than 170,000 employees. | Grocery store manager | $34,735 |
| | | Grocery department manager | $9,962 to $7,045 |
| | | Cashier | $4,313 to $2,286 |
| | | Hourly store personnel | $4,291 to $3,372 |
| Timothy R. Hinkin and J. Bruce Tracey, "The Cost of Turnover: Putting a Price on the Learning Curve," Cornell Hospitality Quarterly 41 (3) (2000): 14-21. | The authors develop a computer program that used algorithms to determine the direct and indirect costs of turnover for employees in the hospitality industry. The study was conducted in 2000 but used earlier studies as a starting point. | Hotel front-office | $5,688 to $5,965 |
| | | Loss-prevention (security) associate | $3,026 |
| | | Line cook | $2,077 |
| | | Administration, sales, catering | $7,658 |
| | | Gift-shop clerk | $3,383 |
| | | Room-service wait staff* | $1,332 |
| Michelle I. Graef and Erik L. Hill, "Costing Child Protective Services Staff Turnover," Welfare 79 (5) (2000): 517-533. | The authors use a "utility analysis" method to determine the total cost of Child Protective Services staff turnover in one midwestern state in 2000. The costs considered were those of separation, replacement, and training of employees. | Child protective services worker | $10,000 |
| Frank Kelly and others, "The Shocking Cost of Turnover in Health Care," Health Care Management Review 29 (1) (2004): 2-7. | The authors review the turnover costs incurred by hiring, training, and productivity loss of employees at a large medical center in mid-2000. They use and improve upon previous empirical work done in quantifying turnover costs. | Physicians | $66,137 |
| | | Registered nurses | $23,487 |
| | | Allied Health personnel | $6,368 |
| | | Technical staff | $5,662 |
| | | Support | $3,162 |
| | | Admininistrative assistants or managers | $10,031 |

| Study | Study summary | Job category as described by study | Cost cited in study |
|---|---|---|---|
| Cheryl Bland Jones, "The Costs of Nurse Turnover, Part 2: Application of the Nursing Turnover Cost Calculation Methodology," Journal of Nursing Administration 35 (1) (2005): 41-49. | The author uses a human resource accounting method to determine the cost of registered nurse turnover in a large acute-care hospital for FY 2002. Jones calculated both prehire costs and posthire costs. | Registered nurse | $62,100 to $67,100 |
| Robert C. Atchley and Jane Karnes Straker, "Recruiting and Retaining Frontline Workers in Long-Term Care: Usual Organizational Practices in Ohio" (Oxford, Ohio: Miami University, 1999). | The authors conducted interviews with administrators at 100 Ohio home health agencies and 112 nursing homes in 1999. Seventeen percent of those interviewed had calculated the cost of turnover in their organization based upon the cost or savings of an employee leaving and the costs of a new hire. | Nursing home workers<br><br>Home health agency workers | $1,685 to $2,100<br><br>$952 to $1,242 |
| M. Zahrt, "The Cost of Turnover in a Home Care Agency," CARING (April 1992). | The author calculates the cost of turnover among home care aides in a single public home-care agency with a 50 percent turnover rate in 1992. The costs included in the calculations were recruiting, orienting, training, equipping, supervising, and replacing the departing aides with a substitute. | Home care aide | $3,362 |
| Steve Traci and Meg A. Seninger, "Direct Service Staff Turnover in Supported Living Arrangements: Preliminary Results and Observations" (RTC: Rural, University of Montana, 2002). | The authors survey seven private Montanan service corporations in 2002 on the operational costs incurred by turnover among direct service staff. The average corporation size was 102 employees and staff wages averaged $7.56/hour. | Direct service workers for individuals with developmental disabilities | $2,627 |
| Gary Barnes, Edward Crowe, and Benjamin Schaefer, "The Cost of Teacher Turnover in Five School Districts: A Pilot Study" (Washington: National Commission on Teaching and America's Future, 2007). | The authors use the results of a pilot study to determine the costs of teacher turnover in five school districts in 2007. They base the cost estimates on the costs that stem from recruiting, hiring, and training new teachers. | School teacher | $4,366 to $17,872 |

| Study | Study summary | Job category as described by study | Cost cited in study |
|---|---|---|---|
| Barbara Hillmer, Steve Hillmer, and Gale McRoberts, "The Real Costs of Turnover: Lessons from a Call Center," Human Resource Planning 27 (3) (2004): 34-41. | The authors develop a model to estimate the cost of turnover in 2004 using a call center. They aim to provide a conservative estimate of the direct and indirect (or intangible) costs of employee turnover. | Call-center employees | $21,551.00 |
| Eileen Appelbaum and Ruth Milkman, "Achieving a Workable Balance: New Jersey Employers' Experiences Managing Employee Leaves and Turnover" (New Brunswick, New Jersey: Center for Women and Work, 2006). | The authors conduct case studies of 13 employers (ranging from three employees to more than 3,000 employees) in 2005 in New Jersey and broke down turnover costs for hourly employess and for managerial and professional employees. | Heavy manufacturing plant employee | $760 |
| | | Registered nurse | $1,200 |
| | | Financial professional | $8,500 to $13,000 |
| | | Senior manager at a residential construction company | $80,000 to $90,000 |
| | | Middle manager at a consumer products company (making $50-125k) | $98,000 to $117,000 |
| | | Lower-level executive at a consumer products company (making $125k) | $185,000 |
| | | Senior-level executive at a consumer products company (making $200k) | $260,000 |

*Information on the average earnings of room-service wait staff was not available and so is not included in the case studies referenced in this report.

# Endnotes

1  Heather Boushey and Tanya Doriss began this analysis while they were staff at the Congressional Joint Economic Committee. For more analysis on this issue, please also see Tanya Doriss, "Meta-Analysis: Cost of Employee Turnover as a Percentage of Employee Salary" unpublished manuscript, 2010. The authors also wish to thank the committee staff and the leadership of Rep. Carolyn Maloney (D-NY) for her dedication to the issues of work-family balance.

2  Timothy R. Hinkin and J. Bruce Tracey, "The Cost of Turnover: Putting a Price on the Learning Curve," Cornell Hospitality Quarterly 41 (3) (2000): 14–21; Dorie Seavey, "The Cost of Frontline Turnover in Long-Term Care," (Washington: Better Jobs Better Care, 2004), available at http://www.directcare-clearinghouse.org/download/TOCostReport.pdf.

3  Author's analysis of the Center for Economic and Policy Research extracts of the Annual Social and Economic Supplement for calendar year 2010.

4  U.S. Bureau of the Census, "Current Population Survey: Population and Per Capita Money Income, All Races: 1967 to 2011" ( 2012).

5  J. Bruce Tracey and Timothy R. Hinkin, "Contextual Factors and Cost Profiles Associated with Employee Turnover," Cornell Hospitality Quarterly 49 (1) (2008): 12–27.

6  Eileen Appelbaum and Ruth Milkman, "Achieving a Work-able Balance: New Jersey Employers' Experiences Managing Employee Leaves and Turnover" (New Brunswick, New Jersey: Center for Women and Work, 2006).

7  Bureau of Labor Statistics, Job Openings and Labor Turnover – January 2012 (U.S. Department of Labor, 2012), available at http://www.bls.gov/news.release/archives/jolts_03132012.htm.

8  Ibid.

9  Bureau of Labor Statistics, Job Openings and Labor Turnover: 2006 Annual Data (U.S. Department of Labor, 2007).

10  Bureau of Labor Statistics, Job Openings and Labor Turnover – January 2012.

11  Zeynep Ton, "Why 'Good Jobs' Are Good for Retailers," Harvard Business Review (2012).

12  Sarah Jane Glynn, "Fact Sheet: Paid Family and Medical Leave" (Washington: Center for American Progress, 2012).

13  The 11 studies included here are: Appelbaum and Milkman, "Achieving a Workable Balance: New Jersey Employers' Experiences Managing Employee Leaves and Turnover"; Robert C. Atchley and Jane Karnes Straker, "Recruiting and Retaining Frontline Workers in Long-Term Care: Usual Organizational Practices in Ohio" (Oxford, Ohio: Miami University, 1999); Gary Barnes, Edward Crowe, and Benjamin Schaefer, "The Cost of Teacher Turnover in Five School Districts: A Pilot Study " (Washington: National Commission on Teaching and America's Future, 2007); Blake Frank, "New Ideas for Retaining Store-Level Employees" (Coca-Cola Company Retailing Research Council, 2000); Michelle I. Graef and Erik L. Hill, "Costing Child Protective Services Staff Turnover," Welfare 79 (5) (2000): 517–533; Barbara Hillmer, Steve Hillmer, and Gale McRoberts, "The Real Costs of Turnover: Lessons from a Call Center," Human Resource Planning 27 (3) (2004): 34–41; Hinkin and Tracey, "The Cost of Turnover: Putting a Price on the Learning Curve"; Cheryl Bland Jones, "The Costs of Nurse Turnover, Part 2: Application of the Nursing Turnover Cost Calculation Methodology," Journal of Nursing Administration 35 (1) (2005): 41–49; Steve Seninger and Meg A. Traci, "Direct Service Staff Turnover in Supported Living Arrangements: Preliminary Results and Observations" (RTC: Rural, University of Montana, 2002); J Deane Waldman and others, "The Shocking Cost of Turnover in Health Care," Health Care Management Review 29 (1) (2004): 2–7; M. Zahrt, "The Cost of Turnover in a Home Care Agency," CARING (April 1992).

14  The research most often examined the cost of replacing a worker but did not provide the salary level of the worker, and so we assigned the mean salary for each occupation using the National Compensation Survey's Occupational Wages in the United States. In instances where the annual wage data was not available for the year of the study because the job category was not yet included in the survey, the cost of turnover was inflated to the closest year for which data was available.

15  AP, "Fewer Workers Mean More Picky Applicants," The Robe-sonian, August 15, 1994.

# EXHIBIT 48

7/20/2018                                  The Thorny Economics of Illegal Immigration - WSJ

▼

DOW JONES, A NEWS CORP COMPANY

| DJIA 25065.18 0.00% ▲ | S&P 500 2804.21 -0.01% ▼ | Nasdaq 7841.28 0.20% ▲ | U.S. 10 Yr -6/32 Yield 2.862% ▼ | Crude Oil 69.94 0.69% ▲ |

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

https://www.wsj.com/articles/the-thorny-economics-of-illegal-immigration-1454984443

U.S. ECONOMY

# The Thorny Economics of Illegal Immigration

Arizona's economy took a hit when many illegal immigrants left, but benefits also materialized



Rob Knorr, on his farm in Maricopa, Ariz., says it became harder to hire field hands after the state passed tough anti-immigration laws. **PHOTO:** BRANDON SULLIVAN FOR THE WALL STREET JOURNAL

*By Bob Davis*
Updated Feb. 9, 2016 10:49 a.m. ET

MARICOPA, Ariz.—After Arizona passed a series of tough anti-immigration laws, Rob Knorr couldn't find enough Mexican field hands to pick his jalapeño peppers. He sharply reduced his acreage and invested $2 million developing a machine to remove pepper stems. His goal was to cut the number of laborers he needed by 90% and to hire higher-paid U.S. machinists instead.

"We used to have many migrant families. They aren't coming back," says Mr. Knorr, who owns RK Farms LLC, an hour's drive from Phoenix.

Few issues in the presidential campaign are more explosive than whether and how much to crack down on illegal immigration, which some Republican candidates in particular blame for America's economic woes. Arizona is a test case of what happens to an economy when such migrants leave, and it illustrates the economic tensions fueling the immigration debate.

---

RELATED

- Immigrants Push Down Wages for Low-Income Workers—But How Much?

Economists of opposing political views agree the state's economy took a hit when large numbers of illegal immigrants left for Mexico and other border states, following a broad crackdown. But they also say the reduced competition for low-skilled jobs was a boon for some native-born construction and agricultural workers who got jobs or raises, and that the departures also saved the state money on education and health care. Whether those gains are worth the economic pain is the crux of the debate.

Gordon Hanson, a University of California at San Diego economist who has studied the issue for the nonpartisan Council on Foreign Relations, has detailed how large-scale immigration undermines wages for low-skilled workers. In Arizona's case, he thinks the state is paying an economic price for its decision. "As the U.S. economy continues to recover, the Arizona

economy will be weighed down by slower growth and by less export production in traditional industries" such as agriculture where illegal immigrants play a big role, he says.

Proponents of doing more to curb illegal immigration say the mass departures helped the state economically in several ways. Government spending on health care and education for illegal immigrants and their U.S.-born children dropped. Wages for plasterers, landscapers, farmworkers and other low-skilled laborers jumped because of scarcity, according to employers and federal data.

"Even if the size of the state's GDP decreased, the decrease in immigration redistributed income from employers to employees, particularly at the bottom end of the labor market," says Steven Camarota, research director of the Center for Immigration Studies, in Washington, which favors reduced illegal immigration. "That's a good deal."

### Big drop

Between 2007 and 2012, Arizona's population of undocumented workers dropped by 40%—by far the biggest percentage decline of any state—according to the Pew Research Center, a nonpartisan think tank whose numbers are cited by pro and anti-immigration groups. California, the biggest border state, lost just 12.5% of its illegal immigrants during that time period. Since 2012, Arizona's illegal-immigrant population hasn't grown much, if at all, according to state economists and employers and preliminary data from Pew. Since 2007, about 200,000 undocumented immigrants have left the state, which has a population of 6.7 million.

The cost of illegal immigration has been a big political issue in Arizona for years. But pinning down exactly how much it costs the state, and how much is collected from illegal immigrants through taxation, is surprisingly hard to do. The state doesn't count it. Estimates vary widely, depending in part on debatable issues such as whether to include the cost of educating U.S.-born children of illegal immigrants.

In 2004, the Federation for American Immigration Reform, a Washington-based group that seeks to reduce immigration, calculated that undocumented workers cost Arizona taxpayers more than $1 billion a year for education, medical care and incarceration, after subtracting the estimated taxes they pay.

Four years later, Judith Gans, then manager of the immigration-policy program at the University of Arizona's Udall Center for Studies in Public Policy, examined the issue for all immigrants, not just illegal ones. She concluded that immigrants accounted for nearly $1 billion more in annual tax revenue than they cost the state.

Moody's Analytics looked at Arizona's economic output for The Wall Street Journal, with an eye toward distinguishing between the effects of the mass departures of illegal immigrants and the recession that hit the state hard beginning in 2008. It concluded that the departures alone had reduced Arizona's gross domestic product by an average of 2% a year between 2008 and 2015. Because of the departures, total employment in the state was 2.5% lower, on average, than it otherwise would have been between 2008 and 2015, according to Moody's.

The recession, of course, also hurt the state's economy. Mr. Hanson, the immigration economist, said the economic downturn led many migrants to leave.

Economic activity produced by immigrants—what economists call the "immigration surplus"—shrank because there were fewer immigrants around to buy clothing and groceries, to work and to start businesses.

These days, construction, landscaping and agriculture industries, long dependent on migrants, complain of worker shortages. While competition for some jobs eased, there were fewer job openings overall for U.S.-born workers or legal immigrants.

According to the Moody's analysis, low-skilled U.S. natives and legal Hispanic immigrants since 2008 picked up less than 10% of the jobs once held by undocumented immigrants. In a separate analysis, economists Sarah Bohn and Magnus Lofstrom of the Public Policy Institute of California and Steven Raphael of the University of California at Berkeley conclude that employment declined for low-skilled white native workers in Arizona between 2008 and 2009, the height of the out-migration. One bright spot: the median income of low-skilled whites who did manage to get jobs rose above 6% during that period, the economists estimate.



## Departed

Estimated change in illegal-immigrant population, 2007-12, in seven big states and the U.S.

| | |
|---|---|
| Arizona | **-40.0%** |
| New York | **-25.0%** |
| Illinois | **-13.6%** |
| California | **-12.5%** |
| Florida | **-11.9%** |
| U.S. | **-8.2%** |
| New Jersey | **-4.5%** |
| Texas | **6.5%** |

Source: Pew Research Center

THE WALL STREET JOURNAL.

Arizona's population of illegal immigrants grew nearly fivefold between 1990 and 2005, to about 450,000, according to Pew Research. Starting around 2004, the state approved a series of measures, either by ballot initiatives or legislation, aimed at discouraging illegal immigration. Undocumented immigrants in Arizona, about 85% of whom came from Mexico, are barred from receiving government benefits, including nonemergency hospital care. They can't receive punitive damages in civil lawsuits. Many can't get drivers' licenses and aren't eligible for in-state tuition rates. Arizona developed a national reputation for tough enforcement of the rules.

Some current Republican presidential contenders also take a tough line on immigration. GOP front-runner Donald Trump backs a "deportation force" to send home those here illegally, and he wants to build a wall on the Mexican border to keep out others. Texas Sen. Ted Cruz also wants a wall and would end Obama administration measures that have halted deportations of many undocumented workers.

On the Democratic side, former Secretary of State Hillary Clinton and Vermont Sen. Bernie Sanders would allow illegal immigrants already here to become citizens, and would continue the Obama administration policies.

Arizona's immigration flow started to reverse in 2008 after the state became the first to require all employers to use the federal government's E-Verify system, which searches Social Security records to check whether hires are authorized to work in the U.S. That law coincided with the collapse of the construction industry and the recession. The combination persuaded many illegal immigrants to leave for neighboring states or Mexico.



Mr. Knorr, right, says he is relying more on machinery because he can't find enough Mexican field hands. **PHOTO:** BRANDON SULLIVAN FOR THE WALL STREET JOURNAL

In 2010, as the state economy began to recover, the Legislature stepped up pressure. Under a new law, SB 1070, police could use traffic stops to check immigration status. Another section of the law, later struck down by the Supreme Court, made it illegal for day laborers to stand on city streets and sign up for work on construction crews.

"It was like, 'Where did everybody go?' " says Teresa Acuna, a Phoenix real-estate agent who works in Latino neighborhoods. Real-estate agent Patti Gorski says her sales records show that prices of homes owned by Spanish-speaking customers fell by 63% between 2007 and 2010, compared with a 44% drop for English-speaking customers, a difference she attributes partly to financial pressure on owners who had been renting homes to immigrants who departed.

SB 1070 prompted some unions and other organizations to boycott the state, in some cases canceling conventions. In Latino neighborhoods, sales declined at grocery stores and other businesses catering to migrants. At the Maryvale Market, in an immigrant community of ranch homes, Ashok Patel says his business is down by half since 2008.

On the other side of the economic ledger, government spending on immigrants fell. State and local officials don't track total spending on undocumented migrants or how many of their children attend public schools. But the number of students enrolled in intensive English courses in Arizona public schools fell from 150,000 in 2008 to 70,000 in 2012 and has remained constant since. Schooling 80,000 fewer students would save the state roughly $350 million a year, by one measure.

During that same period, annual emergency-room spending on noncitizens fell 37% to $106 million, from $167 million. And between 2010 and 2014, the annual cost to state prisons of incarcerating noncitizens convicted of felonies fell 11% to $180 million, from $202 million.

"The economic factor is huge in terms of what it saves Arizona taxpayers," primarily on reduced education costs, says Russell Pearce, who as a state senator sponsored SB 1070.

## Worker shortage

As the Arizona economy recovered, a worker shortage began surfacing in industries relying on immigrants, documented or not. Wages rose about 15% for Arizona farmworkers and about 10% for construction between 2010 and 2014, according to the Bureau of Labor Statistics. Some employers say their need for workers has increased since then, leading them to boost wages more rapidly and crimping their ability to expand.

Before the immigration crackdown, Precise Drywall Inc., of Phoenix, would deploy 50 people for jobs building luxury homes. "I could pull out phone books where I had 300 or 400 guys' numbers" to fill out crews, recalls company President Jeremy Barbosa. No longer. Many immigrants left and haven't returned, while other workers moved on to other industries.

"Now you have to put out feelers, buy ads, go on Craigslist, tap job agencies just to get a few men," says Mr. Barbosa. "Growth is based on the ability to hire."

At a Home Depot store in Maryvale recently, a dozen men from Mexico and Central America milled around the parking lot looking for work. Juan Castillo, a gregarious Mexican who said he had regularly crossed the border illegally over the past 10 years, said he and his colleagues can do landscaping, concrete work, drywall or whatever else is needed.

Before E-Verify, 30 to 40 men would show up at 4:30 a.m. and would usually find jobs by 10 a.m. Since then, the job seekers rarely thin out during the day despite the worker shortage because employers are shying away from hiring undocumented workers.

"E-Verify is a problem for us," Mr. Castillo said. "We can work for a week. It takes that long for the paperwork. Then we're out."

Another would-be worker, Manuel Bernal, noted that because the Mexican economy has improved, laborers with families in that country are more inclined to stay there. Pew Research says that, nationally, more Mexicans now are heading home than coming into the U.S. The Center for Migration Studies estimated the number of undocumented immigrants fell to 10.9 million in 2014, from 12 million in 2008.

The Thorny Economics of Illegal Immigration - WSJ



The labor shortage has caused some wages to rise. Carlos Avelar, a placement officer at Phoenix Job Corps, a federal job-training center, says graduates now often mull two or three jobs offers from construction firms and occasionally start at $14.65 an hour instead of $10.

At DTR Landscape Development LLC, the firm's president, Dick Roberts, says he has increased his starting wage by 60% to $14.50 an hour because he is having trouble finding reliable workers.

One immigrant-heavy industry, construction, has added about 15,000 jobs in Arizona since 2011 and now has total employment of 127,000, according to the Bureau of Labor Statistics, half the number of 2006. Employment in farming, which also depends on immigrants, has rarely exceeded 9,500 since 2008, according to the bureau, whose numbers mainly cover workers on large farms.

Mr. Knorr, the pepper grower, says he planted just 120 acres last year, down from as many as 550 in years past, because he couldn't find enough harvest workers.

Some peppers he was unable to harvest by Thanksgiving turned red on the vine—"chocolate," in farmer parlance. That made them useless to salsa makers, who want only green peppers. He plowed the plants under.

He says mechanization is his future. He continues to pour time and money into a laser-guided device to remove stems from peppers, which pickers now do by hand in the field. Another farmer in the area developed a mechanical carrot harvester.

Mr. Knorr says he is willing to pay $20 an hour to operators of harvesters and other machines, compared with about $13 an hour for field hands. He says he can hire skilled machinists at community colleges, so he can rely less on migrant labor.

"I can find skilled labor in the U.S.," he says. "I don't have to go to bed and worry about whether harvesting crews will show up."

**Write to** Bob Davis at bob.davis@wsj.com

*Appeared in the February 9, 2016, print edition as 'illegal immigration's.'*

Copyright &copy;2017 Dow Jones &amp; Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit http://www.djreprints.com.

# EXHIBIT 49

# Do E-Verify Mandates Improve Labor Market Outcomes of Low-Skilled Native and Legal Immigrant Workers?

Sarah Bohn
Public Policy Institute of California
bohn@ppic.org

Magnus Lofstrom
Public Policy Institute of California and IZA
lofstrom@ppic.org

Steven Raphael
University of California, Berkeley and IZA
stevenraphael@berkeley.edu

May 2014

## Abstract

We examine the impact of state level legislation against the hiring of unauthorized immigrants on employment opportunities among competing low-skilled workers. Our focus is on the role of E-Verify mandates and specifically, we test for effects of the 2007 Legal Arizona Workers Act (LAWA) on employment outcomes of low-skilled native-born and legal immigrant workers in Arizona. We use the synthetic control method developed by Abadie, Diamond and Hainmueller (2010) to select a group of states against which the labor market trends of Arizona can be compared. Our results suggest that contrary to its intent, the Legal Arizona Workers Act does not appear to have improved labor market outcomes of competing legal low-skilled workers. In fact, we find some evidence of diminished employment and increased unemployment among legal low-skilled workers in Arizona. These findings are concentrated on the largest demographic group of workers – non-Hispanic white men.  While they are less likely to find employment, those who do have on average higher earnings as a result of LAWA.  The pattern of results points to a labor supply contraction as the primary mechanism at work.

## 1. Introduction

Lawmakers in the U.S. Congress are once again considering changes to the country's immigration policy though comprehensive immigration reform. The future of these efforts remains uncertain and not many policy experts will be surprised if these efforts meet the fate of past unsuccessful attempts. A key reason behind the Congressional gridlock on immigration is the controversial issue of how to address the country's unauthorized immigrant population, which has grown from about 3 million in the late 1980s to around 11.7 million in 2012 (Passel, Cohn and Gonzalez-Barrera, 2013). Although the concerns regarding unauthorized immigrants cover a broad range of issues, one frequently cited apprehension is that the presence of such a large number of unauthorized workers negatively affects labor market outcomes of legal workers.

In this paper, we take advantage of legislation in Arizona against the hiring of unauthorized immigrants to assess whether these changes had any impacts on the employment opportunities of low-skilled U.S. born and legal immigrant workers. Our previous research finds that this policy – the 2007 Legal Arizona Workers Act – significantly and quickly decreased the state's unauthorized immigrant population and limited their employment opportunities, especially in formal wage and salary work (Bohn, Lofstrom and Raphael (forthcoming) and Bohn and Lofstrom (2013)). The Legal Arizona Workers Act (LAWA) is the first of now numerous state policies to require employers to use of E-Verify, a federal electronic system, to check the work authorization of new hires, and to set forth sanctions for employers who do not.

LAWA and similar policies in other states respond to the fact that employment is the primary draw for most unauthorized immigrants. Arizona is a state leading the charge against illegal immigration, highlighted by the publicized and controversial Senate Bill 1070 in April

2010.[1] But Arizona had been making ground-breaking policy targeting unauthorized immigrants years before; the Legal Arizona Worker Act (LAWA) was passed in July 2007 and implemented in January 2008. The law imposes strict employer sanctions against firms knowingly hiring unauthorized workers - business licenses suspension and possible revocation for repeat offenders. The arguably most important feature of LAWA is the requirement that all employers use E-Verify for all new hires. Since LAWA was enacted in 2008 (and upheld in May 2011 by the U.S. Supreme Court) many other states have followed suit.[2] Six states have since implemented similar mandates (Utah, South Carolina, Mississippi, Georgia, North Carolina, and Oklahoma) and other states – as well as the federal government – have implemented E-Verify requirements for public contractors. Arizona provides arguably the best natural experiment for understanding the impacts of state legislation on employment of unauthorized immigrants, being the first mover and having implemented a broad E-Verify mandate, with strong employer sanctions attached.

Very little is known about the impacts of these laws but our previous research shows that LAWA induced sizeable responses among the unauthorized population. Bohn, Lofstrom and Raphael (forthcoming) finds that the population of non-citizen Hispanic immigrants in Arizona – a high proportion of whom are unauthorized immigrants –fell by more than 90,000 due to LAWA. Bohn and Lofstrom (2013) extends the work to assess whether the policy affected labor market outcomes of unauthorized immigrants. We find evidence of a substantial decrease in the

---

[1] SB 1070 targets unauthorized immigrants directly, as opposed to employers, and criminalizes failure to carry immigration documents and give the police broad power to detain anyone suspected of being in the country illegally. The constitutionality of the law is in question and prior to enactment a federal judge issued an injunction blocking the most controversial provisions, including the one requiring police to check individual's immigration status while enforcing other laws if there was reason to believe the person was in the country illegally.
[2] Although the legislation has faced a number of legal challenges, it has been upheld by the federal district and appellate courts. The challenges to LAWA focus on the right of states to legislate on immigration enforcement. The U.S. Supreme Court heard arguments in the case, Chamber of Commerce et al v Whiting, in December 2010 and ruled in favor of the legislation in May 2011. The clearing of the constitutional hurdle may spur additional interest in passing such laws.

3

rate of formal employment by about 11 percentage points among likely unauthorized immigrants, defined as Hispanic non-naturalized low-skilled men, as well as a doubling of the self-employment rate. The timing of these changes coincides with LAWA and the changes are not found in comparison states. With these substantial impacts on the unauthorized population, the policy change in Arizona appears to be an excellent opportunity to assess whether competing authorized low-skilled workers benefitted from the legislation.

A few papers have assessed the impact of E-Verify on the labor market outcomes of legal workers in a context broader than Arizona. Good (2013) estimates sizeable negative employment effects among competing authorized workers as a result of omnibus state policies, which include E-Verify mandates and other state actions. Amuedo-Dorantes and Bansak (2012, 2013) provide some of the first evidence on the impact of E-Verify on employment and wages among native-born non-Hispanics, a relatively broad group. Nationwide, in states that passed E-verify laws (of varying degree), native-born non-Hispanic men are more likely to be employed (2 percentage points) and at higher wages (nearly 3 percent) than similar men in other states. We add to this literature by explicitly addressing the endogeneity of E-Verify passage and creating robust counterfactual, especially crucial for assessing employment impacts in a recessionary period.


## 2. E-Verify as a State-level Enforcement Tool

The failure of federal reform has spurred an unprecedented level of state legislative activity in immigration policy in recent years. The new state laws related to employment of unauthorized immigrants vary greatly in terms of restrictiveness and implementation. Most of the

comprehensive laws include mandated use of E-Verify to varying degree. Arizona's LAWA was the first comprehensive mandate issued and remains arguably the most restrictive.

*E-Verify*

E-Verify is a voluntary online system created and managed by the federal government to provide information to employers about whether an individual is authorized to work in the United States. E-Verify checks workers' Form I-9 information for authenticity and work authorization status against Social Security Administration (SSA) and Citizenship and Immigration Services (USCIS) databases. The system applies to all workers, citizens and noncitizens alike, and employers are not permitted to use E-Verify until a new hire has been made.

E-Verify provides fast results, if identity and work authorization are confirmed—which, according to Westat (2009), occurs about 95 percent of the time. When confirmation is not granted ("tentative non confirmation" or TNC), the employee may appeal. While a TNC is being contested by a new hire, employers are not allowed to dismiss the worker solely on the basis of the record. If an employee fails to or is unable to correct a TNC within two weeks, employers must terminate the employee.  Cited problems with E-Verify include delays in correcting tentative non-confirmations, erroneous confirmations, and insufficient capacity as more employers enroll. Intensive refinement of the system in recent years has led to improvements, especially in error rates.[3] The costs – primarily time and energy – of correcting errors fall on the new hires as well as on local DHS and SSA offices where individuals must go to correct errors. Verification can be circumvented if employers avoid use or if applicants submit false documents.

---

[3] For authorized workers, the accuracy rate of E-Verify is at least 99 percent, but for unauthorized workers the error rate may be as much as 54 percent (Westat 2009).

A photo identification tool was added to E-Verify in 2009 to address this latter concern, though most E-Verify polices include penalties for identity theft as well.

The results of E-Verify at this time are not reported to any agency responsible for immigration enforcement. That is, even if a new hire is found to be unauthorized, these results are not transmitted to DHS or ICE for investigation, detainment, or deportation of the individual. Thus, enforcing use of E-Verify must come from an external source.

*The 2007 Legal Arizona Workers Act*

The Legal Arizona Workers Act (LAWA) was signed into law in July 2007 and enacted on January 1, 2008.  LAWA mandates the use of E-Verify by all employers in Arizona to ensure the legal authorization to work for all new hires. The law also imposes sanctions on employers who "knowingly" hire unauthorized immigrants: a business license suspension for the first offense and license revocation upon a second. LAWA is unique among subsequent state E-Verify mandates in that it covers all firms, not just public agencies or those with state government contracts. It also mandates that employers of all sizes use E-Verify as of the implementation date.  Many states that have since implemented E-Verify often phase in employers by business size and/or include exemptions. LAWA does include an exemption we find to be highly relevant: independent contractors are not subject to the mandate. Its broad range makes LAWA a good example of state legislation that mimics recent federal reform proposals. Importantly, Arizona is also one of a few places where all employers have been required to use E-Verify for a sufficient period of time to allow for a reliable empirical evaluation.

We expect that LAWA's impacts to-date largely stem from a deterrent or compliance effect prompted by the E-Verify mandate rather than from employer sanctioning. To date few

employer sanctions have been assessed.  Through April 2010, more than two full years following LAWA's enactment, only three prosecutions had been pursued, and all in a single county (Maricopa). Few sanctions may reflect the lack of resources in the County Attorney offices responsible for investigating claims.  Or, few sanctions may reflect high compliance among employers. Statistics from the E-Verify system indicate growth in number of firms enrolled: from 300 in March 2007 in Arizona, to 38,000 in January 2010 (Westat (2009), Arizona Attorney General's Office (2010)).  At that time, Arizona firm enrollment represented roughly one-third of all firms enrolled nationwide.  Further, estimates suggest that roughly 700,000 new hires made between October 2008 and September 2009 were run through E-Verify in Arizona (Arizona Republic (2010)).  This correlates to roughly 50% of all new hires in the state.

## 3. Theoretical Predictions of the Labor Market Impacts of E-Verify Mandates

The intention of E-Verify mandates in general and LAWA specifically is to reduce the unauthorized immigrant population by deterring the hiring of unauthorized workers. Legislation such as LAWA can potentially achieve this goal by affecting both the supply and demand side of the labor market.  The extent to which these labor market effects change the employment opportunities of competing authorized workers depends largely on their substitutability with targeted unauthorized immigrants.

On the supply side, the E-Verify requirement makes it more difficult for unauthorized immigrants to find work in Arizona, making the state less desirable for unauthorized workers and ostensibly increasing employment opportunities of competing legal workers. Our previous work finds strong evidence of a labor supply effect among unauthorized; the law induced a noticeable decline in the unauthorized population and a decline in employment among unauthorized

7

workers who continued to reside in Arizona.  Employment declines were attenuated by a shift from salary work to self-employment among the targeted immigrants. These results are consistent with – but not limited to – a decline in labor supply.  All else equal, substitutable legal workers should experience improved labor market opportunities.

However, LAWA may also impact labor demand in a number of ways, making impacts on authorized workers ambiguous. The E-Verify mandate increases the cost of hiring generally speaking, potentially driving down labor demand.[4]  But in particular, if employers can distinguish between unauthorized and authorized workers, employer sanctions increase the cost to employers of hiring unauthorized immigrants, thus reducing employers' desire to hire them and increasing their demand for legal workers. Standard labor demand theory predicts that this would induce reinforcing downward effects on the employment opportunities for unauthorized immigrants but offsetting effects on other workers.

Whether these standard effects occur depends in large part on the degree to which authorized and unauthorized workers compete with one another in the labor market.  But the substitutability of authorized workers for unauthorized is limited by differences in skills of workers and their availability. Overall, this suggests that the labor market effects of LAWA are likely to vary by skill, nativity, ethnicity, gender, and the interaction of these dimensions and that, if there are benefits to be had, those authorized workers most likely to benefit are those most closely substitutable for unauthorized workers.

An additional complication arises when employers cannot easily distinguish the documented from the unauthorized. Specifically, if employers cannot tell with certainty who is and who is not authorized, employers may infer legal status through such visible signals as

---

[4] Various Chambers of Commerce have often opposed E-Verify mandates, bringing a case all the way to the U.S. Supreme Court, suggesting the mandate imposes significant costs on employers.

ethnicity, accent, or surname. This likelihood is heightened by details of the E-Verify mandate; employers use the system after a hiring decision is made and cannot terminate a worker whose status is not confirmed, pending a two-week period in which the worker can contest the database's personal information. This element adds uncertainty and increases the expected hiring cost, and if relevant, possible training cost. Employers wishing to avoid the risk of hiring undocumented workers may reduce their hiring of Latino applicants in particular and increase their hiring of applicants who are deemed lower risk for whatever reason. Concern that sanctions targeting the hiring of unauthorized immigrants would result in employment discrimination against Hispanics is not new. In fact, this was a key point of contention in the legislative debate surrounding the 1986 Immigration Reform and Control Act (IRCA) and research finds that in the immediate aftermath of IRCA's passage, the hourly earnings of Latinos did decline (Bansak and Raphael 2001).[5]

It is clear that there are many standard labor demand channels through which LAWA may impact authorized workers. Since it is impossible to theoretically predict the net effects on employment of the channels discussed here, analyzing the impacts of these laws on native and legal immigrants requires an empirical analysis.

## 4. Data and Empirical Strategy

To assess the labor market effects of LAWA on authorized workers, we analyze data from the Current Population Survey (CPS) data collected between 1998 and 2010. These data provide details on the employment, work, and earnings of individuals in each state as well as information

---

[5] IRCA created the legal obligation for employers to verify the identity and work eligibility of all applicants, and introduced a series of graduated sanctions for employers who failed to comply with the verification, record keeping, and hiring provisions of the law. Opponents of the legislation expressed concern that these provisions would lead to discrimination against all Hispanics.

on race/ethnicity, education, age, and other demographic characteristics including immigration status (native-US born or foreign- born naturalized citizen, or not a citizen). The CPS data does not allow for direct identification of work authorization status.  However, we estimate that in Arizona upwards of 80 to 90 percent of noncitizen men of working age and of Hispanic origin with relatively low levels of education (high school or less) are likely to be unauthorized (Bohn, Lofstrom and Raphael (forthcoming) based on Passel and Cohn (2009a)).[6] For the present analysis of competing workers, then, we utilize the same criterion but switch self-reported citizenship to require naturalized or native-born status. While these citizenship questions are unlikely to be reported with no error and some noncitizen men may be authorized to work (for example, via nonimmigrant visa program), as defined the worker groups we examine contain a high share of truly authorized individuals.

As described above, LAWA's effects might vary to the degree employers can substitute similar workers and distinguish unauthorized from authorized workers.  For that reason, we examine three groups defined by race-ethnicity and citizenship status with plausibly varying degrees of similarity with unauthorized immigrants: Foreign-born naturalized citizen Hispanics, Native-born Hispanics, and Native-born non-Hispanic whites. Among all groups, we restrict analysis to working age men (16-60) with high school education or less.  While other racial-ethnic group outcomes are of interest (in particular, native-born non-Hispanic blacks), the small population of minority groups beyond those of Hispanic origin in Arizona preclude robust analysis. The native-born, less-skilled male workforce in Arizona is comprised primarily of

---

[6] For example, our calculations from Census data indicate roughly 517,000 non-citizen Hispanic immigrants resided in Arizona in 2008. For this same year, Passel and Cohn (2009) estimate that there were 475,000 unauthorized immigrants in the state. Similarly, for our finer definition of likely unauthorized *workers* used in the traditional difference-in-difference approach, based on ACS data, we estimate 229,000 likely unauthorized in Arizona in 2008 whereas Passel and Cohn (2009) estimate 240,000 unauthorized immigrants in Arizona's labor force in the same year.

white men (roughly 60 percent), followed by Hispanic men (30 percent). To the extent that authorized workers defined here are not perfect substitutes for unauthorized workers in Arizona – or do not fully capture the true substitute workers – our estimates may attenuate LAWA's true effect.

The CPS provides a wealth of information on labor market outcomes and at high frequency (monthly).  We pool monthly data within year in order to obtain sufficient sample size for analysis on the narrowly defined population groups necessitated by this study. The average sample size within the population groups of interest is given in the first row of Table 1. We restrict our sample period to 1998-2009.  Additional years of data are available; however, harsh immigration policies (namely the controversial SB 1070) were passed in Arizona after 2009, potentially biasing estimates of LAWA's impact beyond 2009. Larger samples are available in the American Community Survey, but do not provide the long time series and high frequency data necessitated by our empirical approach, discussed below. We estimate impacts on a number of outcomes:  employment, unemployment, and labor force participation and earnings measured at the annual, weekly, and hourly level. Table 1 presents the average values of these outcome variables for the three population groups of interest, in both Arizona and the potential comparison states.

In order to identify the causal impact of LAWA on employment outcomes in Arizona, we employ the synthetic control approach of Abadie, Diamond and Hainmueller (2010).  Key to the identification strategy is charting the appropriate counterfactual path for Arizona in absence of LAWA.  There are a number of approaches one could employ. One is to select states that share similar population and economic characteristics and trends as Arizona; for example, the states bordering Arizona (a traditional difference-in-difference approach). Another would be to employ

11

a data-driven search for comparison states based on pre-LAWA population and employment characteristics and trends (the synthetic control method of Abadie et al (2010)). We focus on the latter because it is arguably the most reliable and essentially incorporates the first strategy. It allows the data to tell us which states best match Arizona's pre-LAWA experience.

The synthetic control method allows for robust analysis in the single policy change – single state context. We summarize the methodology for charting a counterfactual post-LAWA path for Arizona here.  The basic idea is to generate a comparison group from a convex combination of states in a large donor pool. Let the index j =(0,1,...,J) denote states.  The value j=0 corresponds to Arizona and  j=(1,...,J) correspond to each of the other J states that are candidate contributors to the control group (or in the language of Abadie et. al, the donor pool). Define $F_0$ as a 9x1 vector with elements equal to the group-specific employment outcome in Arizona in years 1998 through 2006 (the nine years we use throughout this paper as our pre-intervention period).  Similarly, define the 9xJ matrix $F_1$ as the collection of comparable time series for each of the J states in the donor pool (with each column corresponding to a separate state-level time series for the period 1998 through 2006).

The synthetic control method identifies a convex combination of the J states in the donor pool that best approximates the pre-intervention time series for the treated state.  Define the Jx1 weighting vector $W = (w_1, w_2, ..., w_J)'$ such that $\sum_{j=1}^{J} w_j = 1$, and  $w_j \geq 0$ for j=(1,...,J).  The product $F_1 W$ then gives a weighted average of the pre-intervention time series for all states omitting Arizona, with the difference between Arizona and this average given by $F_0 - F_1 W$.  The synthetic control method essentially chooses a value for the weighting vector, $W$, that yields a synthetic comparison group (consisting of an average of some subset of donor states) that best

12

approximates the pre-intervention path for Arizona. Specifically, the weighting vector is chosen by solving the constrained quadratic minimization problem

$$W^* = \underset{W}{\arg\min}(F_0 - F_1 W)'V(F_0 - F_1 W)$$

$$s.t.$$

$$W'i = 1, w_j \geq 0, j = (1,...J)$$

where $V$ is a 9x9, diagonal positive-definite matrix with diagonal elements providing the relative weights for the contribution of the square of the elements in the vector $F_0 - F_1 W$ to the objective function being minimized.

Once an optimal weighting vector $W^*$ is chosen, both the pre-intervention path as well as the post-intervention values for the dependent variable in "synthetic Arizona" can be tabulated by calculating the corresponding weighted average for each year using the donor states with positive weights. The post-intervention values for the synthetic control group serve as our counterfactual outcomes for Arizona.

Our principal estimate of the impacts of LAWA on labor market outcomes uses the synthetic control group to calculate a simple difference-in-differences estimate. Specifically, define $Outcome_{pre}^{AZ}$ as the average value of the outcome of interest for Arizona for the pre-intervention period 1998 through 2006 and $Outcome_{post}^{AZ}$ as the corresponding average for the two post-treatment years 2008 and 2009. Define the similar averages $Outcome_{pre}^{AZ}$ and $Outcome_{post}^{AZ}$ for the synthetic control group. Our difference-in-differences estimate subtracts the pre-intervention difference between the averages for Arizona and synthetic Arizona from the comparable post-intervention difference, or

$$DD_{AZ} = (Outcome_{post}^{AZ} - Outcome_{post}^{synth}) - (Outcome_{pre}^{AZ} - Outcome_{pre}^{synth})$$

13

To formally test the significance of any observed relative decline in Arizona's foreign-born population, we apply the permutation test suggested by Abadie et. al. (2010) to the difference-in-difference estimator $DD$.[7]   Specifically, for each state in the donor pool, we identify synthetic comparison groups based on the solution to the quadratic minimization problem in equation (1). We then estimate the difference-in-difference in (2) for each state as if these states had passed the equivalent of a LAWA with comparable timing. The distribution of these "placebo" difference-in-difference estimates then provides the equivalent of a sampling distribution for the estimate $DD_{AZ}$. To be specific, if the cumulative density function of the complete set of $DD$ estimates is given by $F(.)$, the p-value from a one-tailed test of the hypothesis that $DD_{AZ} < 0$ is given by $F(DD_{AZ})$.

To interpret $DD_{AZ}$ as a causal estimate of LAWA's effects, we must make the case that LAWA represents an exogenous shock to the labor market and is not coincident with other policy that could affect employment of authorized workers.  A full examination is given in Bohn, Lofstrom, and Raphael (forthcoming) and Bohn and Lofstrom (2013).  In short, we argue that while LAWA was implemented at the beginning of the Great Recession, it was the result of a lengthy legislative process that began well before – that is, was exogenous to – the recession. Second, we find no evidence of coincident immigration enforcement either at the border or internal to Arizona that could have generated the same effects we identify via the synthetic control.

Nonetheless, the "Great Recession" occurred at approximately the same time of the enactment of LAWA, presenting a potentially confounding factor. Our empirical approach

---

[7] Buchmueller, DiNardo and Valletta (2009) use a similar permutation test to that described here to test for an impact of Hawaii's employer-mandate to provide health insurance benefits to employees on benefits coverage, health care costs, wages and employment.

14

comparing trends in Arizona to other states accounts for any changes that affect the country as a whole (or the selected comparison states). However, one of the industries hit hardest, construction, is a leading employer of less-skilled workers.  Furthermore, construction is one of the biggest industries in Arizona (representing close to 11 percent of total private employment in 2006).  To validate our empirical approach, we assess official statistics on employment trends in Arizona and neighboring states during the recession.

The recent recession caused a clear reduction in Arizona's workforce. Figure 1 shows strong employment growth 2003-2006 with a noticeable slow down in 2007. This was followed by three and eight percent decreases in 2008 and 2009, respectively. Figure 1 also shows that the negative employment effects of the recession on employment were not any stronger in Arizona than it was in neighboring areas, including inland California (an area that shares many of the characteristics and trends of Arizona, is hence used in our empirical analysis). Lastly, an application of the synthetic cohort method to employment growth fails to reveal a LAWA effect in Arizona.

Importantly, the recession was precipitated by a housing crisis, which brought new housing construction to a near standstill. The fact that many unauthorized immigrants and less-skilled workers generally are employed in the construction sector means that they may have been particularly affected by the recession. However, a look at construction employment data reveals no evidence that Arizona's construction industry fared much differently in the recession than its neighboring areas (Figure 2).

Overall, the data indicates that while Arizona's labor market was strongly affected by the recession, so were other states', including its neighbors. The similarity in trends indicates that our empirical strategy is appropriate for identifying causality despite the recent recession.

15

### 5. Empirical Results - Did LAWA have labor market effects on authorized workers?

LAWA induced a sizeable population reduction among unauthorized men in the Arizona labor markets. Presuming that men born in the U.S. or naturalized citizens with similar education levels are substitutes, the labor supply shock alone should have improved their employment outcomes.  However, as detailed above, a number of demand-related adjustments due to LAWA are also plausible.  In this section we analyze employment rates and wage levels among authorized subgroups to better understand LAWA's impacts and possibly mechanisms.

*LAWA Effects on Employment*

We begin our analysis of whether LAWA affected employment opportunities of low-skilled authorized workers in Arizona by examining employment rates (defined here as the ratio of persons employed). As discussed above, for those workers who remained in Arizona following LAWA, a variety of employment effects are plausible. To the extent that firms are hiring and are in compliance with LAWA, authorized workers who are close substitutes for unauthorized workers are more likely to find employment. However, three effects in the opposite direction may also be at play: scale effects due the increased cost of hiring, statistical discrimination against observably similar authorized workers, or complementarity between authorized and unauthorized workers. For these reasons, the impact of LAWA on authorized workers is theoretically ambiguous.

The data indicates that all authorized low-skilled men in Arizona experienced a post-LAWA drop in employment. Figure 3 shows that both before and after the passage of LAWA in 2007, the employment rate of less-skilled naturalized Hispanic men was higher than that of non-

16

Hispanic native-born white men, which was in turn higher than that of Hispanic native-born men.
(averaging 85 and 72 percent and 64 percent over the entire period , respectively). The
employment rate of native-born men fell more drastically – over 11 percentage points –
following LAWA than it did for the other groups (7 points for naturalized Hispanic immigrants
and 6 points for native-born Hispanics).

To probe the employment changes further, we apply the synthetic control approach and use
the comparison states, which mimic Arizona's 1998–2006 employment trend. In this exercise,
we omit from the donor pool four states with broadly applied restrictions on the employment of
unauthorized immigrants (Mississippi, Rhode Island, South Carolina, and Utah) even though the
timing of their legislation post-dates LAWA. In identifying synthetic control states for placebo
tests on each of the other states in the donor pool, we omit Arizona. Moreover, the donor pool of
states is further restricted due to sample size limitations in the monthly CPS, and these
limitations vary across the groups of workers we analyze. Generally the donor pool is most
restricted for the group of naturalized Hispanic men and is broader for native-born men.  As
stated previously, these sample size restrictions to some extent drive our focus on the largest
group – native-born white men.

We assess whether the observed declines in employment among low-skilled authorized
workers in Arizona following LAWA stand out from the counterfactual trend based on states in
the donor pool.  Figure 4 shows that prior to the passing of LAWA, the employment rate of
native-born non-Hispanic white men in Arizona matched those of in the synthetic control
("synthetic Arizona") quite well. Pre-intervention differences between Arizona and the synthetic
control group average near zero (0.0007).  Hence, the synthetic control approach passes the first
hurdle – succeeds in obtaining of convex combination of states that match Arizona's pre-LAWA

trend. After 2007, however, we observe a divergent pattern. In the two post-LAWA years the employment rate for non-Hispanic white low-skilled men in Arizona is, on average, 4 percentage points lower than in the counterfactual.

Average differences between Arizona and the synthetic control are calculated in the pre-LAWA period (1998-2006) and post-LAWA period (2008-2009). These and the difference-in-difference estimate, $DD_{AZ}$, are presented in Table 1. Following LAWA, the employment rate of non-Hispanic native-born white men with lower levels of educational attainment fell 4.4 percentage points relative to the synthetic control. To obtain a p-value on $DD_{AZ}$ as well its non-parametric rank, we replicate the synthetic control method on each state in the donor pool and obtain a distribution of difference-in-difference estimates.

Figure 5 graphically displays the raw data needed to conduct the permutation test of the significance of the relative declines in Arizona. Specifically, for each of the donor states as well as for Arizona, the figure displays the year-by-year difference between the outcome variable for the "treated" state and the outcome variable for its synthetic control. The differences for each of the donor states are displayed with the thin black lines while the differences for Arizona are displayed by the red thick line. While the difference between Arizona and its synthetic control in the pre-LAWA period is well-inside the placebo distribution, in post-LAWA years the difference in Arizona begins to stand out.

The set of difference-in-difference point estimates estimated from this placebo distribution, $DD$, is used to calculate the p-value and rank of $DD_{AZ}$. These statistics are given in the last two columns of Table 2. We find that the difference-in-difference estimate for Arizona stands out as a clear outlier in the distribution of placebo estimates. The 4.4 point decline is the third largest

decline among all forty-five states in the donor pool, and is statistically significant at the 7%
level (the minimum p-value would be 0.022).[8]

Among the competing groups of Hispanic authorized workers, we find less convincing
evidence of a decline in employment due to LAWA.  The difference-in-difference estimates for
both Hispanic native-born and naturalized men do not stand out among the placebo distribution
of the synthetic control. The donor pool of states contributing to the distribution is smaller for
each of these groups due to sample size, but are large enough that we would expect to detect
significant impacts if they exist.  If anything, the 4.5 point decline in employment among
naturalized Hispanic immigrants is closer to significance and combined with the similar result
for white native-born men suggests that authorized low-skilled workers may have faced a small
decline in employment following LAWA. Using the size of the low-skilled working age non-
Hispanic white male population in Arizona in 2006 as the base (about 409,000), our estimates
suggest that LAWA caused a drop in employment of roughly 18,000 such workers.  If our
estimated decline in employment among Hispanic naturalized immigrants is in fact valid but we
fail to detect due to sample size limitations, the 4.5 point drop for this group would translate to
roughly 9,800 workers.

Our previous work (Bohn and Lofstrom, 2013) documented a shift in employment from
formal work (wage and salary jobs) to less formal (as measured by self-employment) among
likely unauthorized men in Arizona due to LAWA.  In the same study, we found no such
evidence among competing low-skilled authorized workers – the same groups examined here.

---

[8] Note that not all states in the donor pool achieve a well-matched synthetic control in the placebo exercise.  The
District of Columbia is the observation for which the match is markedly off in 2007.  Our results are not sensitive to
the inclusion of the District of Columbia in the donor pool, and it is not one of the states assigned weight in the
synthetic control.  The states that do receive positive weight and contribute to the "synthetic Arizona" for
employment rates among native-born white men are: Alaska (0.332), Illinois (0.054), Indiana (0.527), and Kentucky
(0.087).

Thus, we next turn to additional outcome measures that may shed light on the effects of LAWA for authorized men.

The second and third panels of Table 2 present the impacts of LAWA on the unemployment rate and share of workers out of the labor force, among the three low-skilled authorized groups of men in Arizona. Overall, we fail to detect any strong statistical relationship between the passage of LAWA and unemployment or labor force participation. Among native-born low-skilled workers, unemployment rates jumped in Arizona relative to the synthetic control following LAWA on the order of 2 to 4 points. While towards the top range of estimates found in any state under the placebo test, the $DD_{AZ}$ estimates are significant at only the 20% level, outside the typically acceptable range. For white native-born in particular, we find a 1.8 point increase in the unemployment rate (shown graphically in Figure 6 and 7). The differential change in unemployment among naturalized immigrants is close to zero.

LAWA-induced changes in labor force participation for these groups go in different directions and are similarly imprecise. Following LAWA, a higher share of white native-born and Hispanic naturalized low-skilled men reported non-participation in the labor market relative to the synthetic control (1.8 and 3.7 points, respectively). But a higher share of Hispanic native-born workers reported participation in the labor market, relatively speaking. Again, however, the results are not statistically significant at levels that would lead us to make strong conclusions.

Note that all results presented in Table 2 are robust to alternative definition of the post-LAWA period. While our main results assume the official post-LAWA years are the relevant period in which to examine impacts, we also test including 2007 in the treatment period. LAWA was passed in July of 2007 and implemented in January 2008, so including 2007 in the treatment period may catch some anticipatory effects. In general this alternative specification yields

20

slightly attenuated results.  For example, the employment rate for white native-born men is 1 point lower. We conducted similar robustness checks for all results that follow, with similar conclusions. Full results are available upon request.

Combined with previous results, the pattern of findings suggests that LAWA had small, negative impacts on authorized workers, experienced as employment declines not likely to have been compensated by a shift to self-employment.[9] Rather, we observe a disproportionate (though not strongly significant) increase in unemployment and exiting the labor force. The strongest findings suggest that employment effect effects were concentrated on low-skilled white workers, who experienced a small but statistically significant drop in employment and likely became unemployed or exited the labor force as a result.  Considering the simultaneous outflow of unauthorized low-skilled immigrants from Arizona's labor force, these findings on slightly diminished employment opportunities among competing workers suggests that not only labor supply was constricted but employers likely reduced their demand to some extent as a result of LAWA.

*LAWA Effects on Earnings*

We next turn to earnings data to shed more light on plausible mechanisms driving employment declines observed for both authorized and – from previous work – unauthorized men in Arizona due to LAWA. If the employment decreases were entirely due to a decline in labor demand (for instance a purely scale effect due to increased cost of hiring), we would expect a corresponding decline in wages.  If the employment declines were due entirely to a labor supply contraction, however, we would expect an increase in wages.

---

[9] Regulations regarding business licensure vary by city and county. At the state level, the Arizona Department of Revenue does not require licensing of businesses that employ withholding-exempt employees only. This includes seasonal workers and domestic help. (Telephone communication with Arizona Department of Revenue 7/13/2010).

Assessing wage outcomes in the manner of this study is challenging.  As discussed earlier, the synthetic control requires high frequency data over a long time period and our research question pertains to relatively small demographic groups.  Questions on individual earnings are only asked of a large enough sample in the month of March in the CPS (the "Annual Social and Economic Supplement").  And even though this is a quite large sample relative to other months of the survey, it is not sufficient to estimate robust earnings outcomes for enough states to conduct the synthetic control approach on any of our subgroups except non-Hispanic White native-born low-skilled men.  Fortunately – likely for similar reasons – this is the subgroup for which we estimated the most strongly significant and consistent results in terms of employment outcomes.  Thus, we focus in this section exclusively on the earnings outcomes of non-Hispanic white native-born working age men with a high school education or less.

We utilize both reported earnings in a respondent's current job (the "usual" earnings per week) and reported wage and salary earnings for the full year prior to the survey. In both cases we align the reference period for the earnings question with the pre- and post-LAWA analysis years.  Thus we use different samples and different respondents to create the two sets of earnings outcome variables at the state level: 1999-2010 surveys for the "earnings last year" outcomes and 1998-2009 surveys for the "current earnings" outcomes.  The "earnings last year" outcomes we calculate at the state-year level reflect earnings of state residents who did not move between surveys.  Though we expect low-skilled white male migration rates to be quite low, as they typically are compared to other groups, a strong selectivity in the flow could bias our results but the direction is a priori unclear.  A negatively selected outflow (for example those leaving because they earn low wages or are unemployed) may lead to an overestimate in the DD

22

framework, whereas a positively selected outflow (for example high ability workers leaving for better opportunities) may lead to an understatement of LAWA's true effect.

Table 3 presents synthetic control estimates for a number of earnings-related outcomes for white low-skilled men in Arizona following LAWA. We find consistent evidence that earnings increased in Arizona following LAWA relative to comparison states. Average weekly earnings for low-skilled white men fell in 2008 and 2009 in both Arizona and the synthetic control states (Figure 8) but declined relatively less in Arizona, by about $150. Median earnings, not surprisingly, changed relatively less, about $116 higher in Arizona relative to the synthetic control following LAWA. Both results are in the tails of the placebo distribution and are statistically significant beyond the 10 percent level.

Higher relative wages in Arizona following LAWA for low-skilled native-born white men are estimated regardless of which set of survey questions are utilized. Effects on average weekly earnings measured over the entire year are slightly smaller, possibly reflecting job loss, job change, or migration during the full year. On an annual basis, earnings in Arizona for this subgroup were $5500 higher on average – and $1400 higher at the median – following LAWA than in the synthetic control. All estimates are in the tails of the placebo distribution among donor pool states, but results pertaining to mean earnings are more strongly outliers. Also, hourly earnings are relatively higher by about $2 in Arizona following LAWA. This last result on hourly wages affirms that it was not simply an adjustment in hours worked that generated earnings changes at the weekly or annual level.

The evident increase in wages for low-skilled native-born white men following LAWA, coupled with their falling employment rate, suggests the primary mechanism at play was a

23

constriction in labor supply.  This does not preclude a concomitant shrinking of labor demand, of smaller magnitude.

In addition, because data does not permit assessment of wages among competing groups of Hispanic workers, we are limited in the ability to draw strong conclusions about the likelihood employers engage in statistical discrimination as a result of LAWA. We find patterns of restricted employment opportunities (though imprecise) among Hispanic naturalized low-skilled men, perhaps the most likely to be impacted by statistical discrimination.  Lacking better data on changes in earnings, however, it is impossible to discern whether or how much labor supply and demand shocks generated these patterns.  Statistical discrimination could present itself as a demand shock for this group but absent among competing white workers, for example.

## 6. Conclusions

Using the synthetic control approach for assessing the impact of a single policy change in single area, we estimate the impact of the Legal Arizona Workers Act of 2007 on labor market outcomes for legal workers in Arizona.  Evidence to-date implies that LAWA was largely successful in meeting its goal of deterring unauthorized immigration to the state and preventing employment of unauthorized workers.  In previous work, we estimated a roughly 17 percent decline in unauthorized population of the state and an 11 percentage point decline in formal employment  both suggesting worsening labor market conditions for unauthorized due to LAWA. However, we also identified a shift towards informal employment, as measured by the 8 point increase in self-employment among unauthorized workers due to LAWA, hinting at one unintended consequence of the policy.  In this paper we examine outcomes for workers likely to compete with – or substitute for – unauthorized immigrants. We find, in sum, no evidence that LAWA improved the labor market outcomes for low-skilled legal workers. In fact, we find some

24

evidence of the opposite, which may be viewed as an additional unintended consequence of the policy.

Specifically, we find restricted employment opportunities – though much smaller than among unauthorized workers and non-existent for some demographic subgroups. We find the strongest pattern of evidence towards slightly lower employment levels but higher earnings among competing low-skilled white men. These findings point towards a labor supply shock as the primary mechanism by which LAWA impacted Arizona's labor market.

In particular, we find that low-skilled native born white men in Arizona faced a lower employment rate on the order of 4 percent due to LAWA. Their unemployment rate increased by 2 points and the share who are out of the labor force increased as well, but these effect cannot be reliably attributed to LAWA. The earnings of this group, among those who were employed, increased as a result – likely of the shock to labor supply.

Although Arizona's E-Verify mandate achieved its goal of deterring unauthorized immigration and employment, it also generated unintended consequences on the labor market. In addition to constricting employment among unauthorized immigrants, LAWA also reduced employment opportunities among some low-skilled legal workers. Though these negative employment effects are very small in magnitude, they are ostensibly the opposite of hoped-for effects among some supporters of the law. However, for the largest group of low-skilled authorized men in Arizona, non-Hispanic whites, they earned higher wages on average as a result. Impacts on other, smaller, groups of low-skilled authorized workers remain unknown and are worthy of further study.

Policymakers should weigh this mixed set of impacts when considering E-Verify mandates. Since LAWA, a number of states have instituted mandates of varying degree. As

25

more places have similar policies, the labor market mechanisms and impacts of E-Verify policy may change. In Arizona, LAWA's impacts appear to have been driven primarily by a reduction in labor supply, a decline in unauthorized workers who left for or chose other states over Arizona. As more states introduce E-Verify, however, fewer migration alternatives exist and the less likely we are to observe sizeable labor supply reductions.  Hypothetically a federal E-Verify mandate, such as those included in previous reform proposals in the U.S. Congress, would clamp down on this mechanism even further.  In addition, differences in the E-Verify mandates (such as the independent contractor loophole in LAWA) or their implementation (varying degree of enforcement, for instance) across states could result in very different outcomes.  Thus, it is important to use caution when generalizing impacts of LAWA to broader policy debates. However, there are lessons to be learned from a single state's experience. While LAWA appears to have achieved its goal of reducing employment of unauthorized immigrants in the state, no evidence suggests that it markedly improved the likelihood of employment for competing workers.  In fact, it appears to have worsened outcomes for some legal workers.

# References

Abadie, Alberto; Diamond, Alexis and Jens Hainmueller (2010). "Synthetic Control Methods for Comparative Case Studies: Estimating the Effect of California's Tobacco Control Program," *Journal of the American Statistical Association*, 105(490): 493-505.

Arizona Attorney General (2010). Website: Arizona Employers Enrolled in E-Verify, http://www.azag.gov/LegalAZWorkersAct/EVerifyList.html, accessed March 2010.

Bansak, Cynthia and Steven Raphael (2001) "Immigration Reform and the Earnings of Latino Workers: Do Employer Sanctions Cause Discrimination?" *Industrial & Labor Relations Review*, 54(2): 275-295.

Bohn, Sarah and Magnus Lofstrom (2013). "Employment Effects of State Legislation", in David Card and Steven Raphael (eds.) Immigration, Poverty, and Socioeconomic Inequality, Russell Sage, pp. 282-314.

Bohn, Sarah, Magnus Lofstrom and Steven Raphael (forthcoming). "Did the 2007 Legal Arizona Workers Act Reduce the State's Unauthorized Immigrant Population?" *Review of Economics and Statistics*.

Buchmueller, Thomas C, DiNardo, John and Robert G. Valleta (2009). "The Effect of An Employer Health Insurance Mandate on Health Insurance Coverage and the Demand for Labor: Evidence from Hawaii," Federal Reserve Bank of San Francisco Working Paper #2009-08.

Congressional Budget Office (2008). Memo from Director Orzag to Committee on the Judiciary dated April 4, 2008.

De Soto, Hernando (1989). The Other Path. New York: Harper & Row Publishers

Good, Michael (2013). Do immigrant outflows lead to native inflows? An empirical analysis of the migratory responses to US state immigration legislation. Applied Economics 45:4275-97.

Hoefer, Michael, Nancy Rytina, and Bryan Baker (2010). Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2009. Washington DC, Department of Homeland Security Office of Immigration Statistics.

Lofstrom, Magnus, Laura Hill and Joe Hayes (2013). "Wage and Mobility Effects of Legalization: Evidence from the New Immigrant Survey", *Journal of Regional Science*, 2013, 53:1, pp.171-197.

Los Angeles Times (April 19,2010). Arizona has rarely invoked its last tough immigration law, by Nicole Santa Cruz.

Meissner, D. and M. Rosenblum (2009). The Next Generation of E-Verify: Getting Employment Verificiation Right. Washington DC, Migration Policy Institute.

National Conference of State Legislatures (2006-2010). 2006-2010 State Legislation Related to Immigratns: Enacted and Vetoed. Washington DC.

Office of Immigration Statistics (2010). "2009 Yearbook of Immigration Statistics", Department of Homeland Security.

Passel, Jeffrey,  D'Vera Cohn and Ana Gonzalez-Barrera (2013).  Population Decline of Unauthorized Immigrants Stalls, May Have Reversed.  Washington DC, Pew Hispanic Center.

Passel, Jeffrey and D'Vera Cohn (2009a).  A Portrait of Unauthorized Immigrants in the United States.  Washington DC, Pew Hispanic Center.

Passel, Jeffrey and D'Vera Cohn (2009b).  Mexican Immigrants: How Many Come? How Many leave? Washington DC, Pew Hispanic Center.

Rosenblum, M. (2009). The Basics of E-Verify, the US Employer Verification System. Washington DC, Migration Policy Institute.

Stark, Oded and Marcin Jakubek (2012). Employer sanctions and the welfare of native workers. Economics Letters 117:533-6.

Westat (2007) Findings of the Web Basic Pilot Evaluation.  Rockville, MD.

Westat (2009). Findings of the E-Verify Program Evaluation. Rockville, MD

**Figure 1: Annual Employment Growth in Arizona and Bordering States, 1999-2009**



SOURCE: Author's calculations from the 1998-2009 Quarterly Census of Employment and Wages (QCEW)

**Figure 2: Annual Employment Growth in Construction in Arizona and Bordering States, 1999-2009**

SOURCE: Author's calculations from the 1998-2009 Quarterly Census of Employment and Wages (QCEW)

**Figure 3.**
**Employment Rates for Low-Skilled Working-Age Authorized Men in Arizona, 1998-2009**



SOURCE: Author's calculations from the 1998-2009 monthly CPS

**Figure 4.**
**Employment Rates for White Native-born Working-Age Men with High School or Less, Arizona and Synthetic Arizona, 1998-2009**



SOURCE: Author's calculations from the 1998-2009 monthly CPS
NOTE: Synthetic Arizona consists of the following states (with weights in parentheses): Alaska (0.32), Illinois (0.054), Indiana (0.527), and Kentucky (0.087).

31

**Figure 5. Difference in Employment Rates Relative to the Synthetic Control Group, White Native-born Working-Age Men with High School or Less, All States (Arizona Displayed with Thick Red Line)**



SOURCE: Author's calculations from the 1998-2009 monthly CPS

**Figure 6.**
**Unemployment Rates for White Native-born Working-Age Men with High School or Less, Arizona and Synthetic Arizona, 1998-2009**



SOURCE: Author's calculations from the 1998-2009 monthly CPS
NOTE: Synthetic Arizona consists of the following states (with weights in parentheses): Idaho (0.362), Iowa (0.385) Massachusetts (0.172), Pennsylvania (0.063), and West Virginia (0.017).

**Figure 7. Difference in Unemployment Rates Relative to the Synthetic Control Group, White Native-born Working-Age Men with High School or Less, All States (Arizona Displayed with Thick Red Line).**



SOURCE: Author's calculations from the 1998-2009 monthly CPS

**Figure 8.**
**Average Weekly Earnings for White Native-born Working-Age Men with High School or Less, Arizona and Synthetic Arizona, 1998-2009**



SOURCE: Author's calculations from the 1998-2009 monthly CPS
Notes: Weekly earnings calculated for all employed persons using reported amount typically earned on a weekly basis at current job, in 1999 dollars. Synthetic Arizona consists of the following states (with weights in parentheses): Arkansas (0.257), Delaware (0.056), Hawaii (0.077), Missouri (0.237), Oklahoma (0.129), and Oregon (0.244).

33

**Table 1.**
**Descriptive Statistics, Low-skilled Working-Age Men, 1998-2009**

| | Arizona | | | Donor Pool States | | |
|---|---|---|---|---|---|---|
| | White native-born | Hispanic native-born | Hispanic naturalized | White native-born | Hispanic native-born | Hispanic naturalized |
| Avg Sample size | 1,475 | 625 | 733 | 3,078 | 354 | 452 |
| Avg Weighted sample size | 355,587 | 151,013 | 179,238 | 531,723 | 72,612 | 97,776 |
| Employment rate | 72% | 64% | 85% | 74% | 69% | 86% |
| Unemployment rate | 6% | 9% | 5% | 5% | 8% | 5% |
| Share not in labor force | 22% | 27% | 10% | 21% | 23% | 9% |
| *Earnings at current job:* | | | | | | |
| weekly (mean) | 569.27 | 451.00 | 335.79 | 570.73 | 485.43 | 395.85 |
| weekly (median) | 498.89 | 407.40 | 303.46 | 514.96 | 459.70 | 367.54 |
| *Earnings last year:* | | | | | | |
| weekly (mean) | 580.75 | 592.38 | 374.66 | 593.91 | 471.25 | 394.76 |
| weekly (median) | 488.73 | 396.22 | 311.95 | 501.31 | 405.49 | 339.37 |
| annual (mean) | 28,206.28 | 23,634.19 | 17,800.64 | 27,981.10 | 22,028.12 | 18,347.71 |
| annual (median) | 23,929.00 | 18,248.88 | 15,973.98 | 24,326.71 | 19,190.93 | 16,172.17 |
| hourly (mean) | 14.10 | 15.38 | 9.47 | 14.72 | 11.82 | 9.85 |

NOTES: Author's calculations from the 1998-2010 monthly CPS. All but the final five rows utilize 1998-2009 data only. Earnings calculated for employed persons only. Donor pool states include all except those with similar subsequent legislation (Mississippi, Rhode Island, South Carolina, and Utah) and two with missing values for many groups in multiple years (North Dakota and Vermont).

**Table 2.**
**Estimated Impact of LAWA in Arizona: Employment Outcomes among Low-skilled Working-Age Men**

|  | Pre-average difference relative to synthetic cohort | Post-average difference relative to synthetic cohort | Change (Difference-in-difference estimate) | Rank, difference-in-difference estimate | P-value from one-tailed test, $P(|\Delta|<|\Delta AZ|)$ |
|---|---|---|---|---|---|
| **Employment Rate** |  |  |  |  |  |
| White native-born | 0.0007 | -0.0436 | -0.0443 | 43/45 | 0.067 |
| Hispanic native-born | -0.0009 | 0.0308 | 0.0316 | 15/40 | 0.650 |
| Hispanic naturalized | -0.0011 | -0.0456 | -0.0446 | 28/38 | 0.244 |
| **Unemployment Rate** |  |  |  |  |  |
| White native-born | -0.0004 | 0.0180 | 0.0184 | 37/45 | 0.200 |
| Hispanic native-born | 0.00001 | 0.0445 | 0.0444 | 33/40 | 0.200 |
| Hispanic naturalized | -0.0026 | -0.0037 | -0.0011 | 14/25 | 0.480 |
| **Share Not in Labor Force** |  |  |  |  |  |
| White native-born | -0.0011 | 0.0172 | 0.0183 | 35/45 | 0.244 |
| Hispanic native-born | 0.0009 | -0.0869 | -0.0879 | 34/40 | 0.175 |
| Hispanic naturalized | 0.0009 | 0.0375 | 0.0365 | 22/25 | 0.160 |

NOTES: Estimates based on 1998–2009 Current Population Survey basic monthly files. Includes men age 16-60 with a high school education or less. The donor pool size is represented as the denominator of the rank.

**Table 3.**
**Estimated Impact of LAWA in Arizona: Earnings of Low-skilled Working-Age Men**

|  | Pre-average difference relative to synthetic cohort | Post-average difference relative to synthetic cohort | Change (Difference-in-difference estimate) | Rank, difference-in-difference estimate | P-value from one-tailed test, $P(|\Delta|<|\Delta AZ|)$ |
|---|---|---|---|---|---|
| **Earnings at Current Job** |  |  |  |  |  |
| Weekly earnings (mean) | -5.26 | 148.94 | 154.20 | 42/44 | 0.068 |
| Weekly earnings (median) | -5.16 | 111.17 | 116.34 | 41/44 | 0.091 |
| **Earnings over Full Year** |  |  |  |  |  |
| Weekly earnings (mean) | -2.45 | 122.27 | 124.73 | 45/45 | 0.022 |
| Weekly earnings (median) | -2.32 | 21.65 | 23.97 | 38/45 | 0.178 |
| Annual earnings (mean) | -16.16 | 5443.40 | 5459.56 | 43/45 | 0.067 |
| Annual earnings (median) | 50.54 | 1420.18 | 1369.64 | 39/45 | 0.156 |
| Hourly wage (mean) | -0.01 | 2.11 | 2.12 | 42/45 | 0.089 |

NOTES: Estimates based on 1998–20010 Annual Social and Economic Supplement to the Current Population Survey. Current or "usual" earnings at current job outcomes utilize 1998-2009 years of the CPS. Earnings in the full year prior to the survey use 1999-2010 CPS data and align reference period with pre- and post-LAWA periods appropriately. Only non-missing and non-zero observations are used to calculate state-wide outcomes.

# EXHIBIT 50

Skip to Main Content

## POLITICO



Mexican farmworkers legally employed under the Bracero Program are processed in Hidalgo, Texas, June 18, 1959. | AP Photos

HISTORY DEPT.

### Does Kicking Out Mexicans Create Jobs?

Here's what happened the last time an American president promised to create jobs by removing Mexican immigrants.

By MICHAEL A. CLEMENS | February 15, 2017

The president pledges to remove more than a third of the Mexicans who work in the United States. He says this will improve "the wage and employment conditions of domestic workers." That's obvious, researchers tell Congress, since not even lawmakers can "repeal the law of supply and demand." If the supply of workers goes down, wages must go up, right? The administration and Congress act together, and within a few years, those Mexicans are gone.

This is not 2017. It was 1962. The administration and both houses of Congress were controlled by Democrats. It was the last large-scale, targeted removal of Mexicans living in the U.S. And what happened next was nothing like what President John F. Kennedy promised.

For more than two decades leading up to 1964, the U.S. and Mexico created a lawful channel for Mexican *braceros* (manual laborers) to work temporarily in the U.S., mostly on farms. There were half a million at the program's height. In 1964, President Lyndon Johnson accomplished what Kennedy had pushed for: ending the program and expelling the *braceros* from the country.

They did it to help U.S. workers. Did they succeed? Until recently, nobody knew.

I just completed a two-year study of the removal of these *braceros* together with Ethan Lewis of Dartmouth College and Hannah Postel, my colleague at the Center for Global Development. Prior to our work, no one had ever systematically tested whether the exclusion of *braceros* achieved its economic goal. Historians had focused almost entirely on the politics. Kennedy's beliefs about the economic effects of the *braceros* relied on the findings of a Department of Labor commission that hadn't actually analyzed economic data and was, in fact, led by Rufus von KleinSmid, charter member of a society of eugenicists that had advocated blocking Mexican immigration, believing that Mexicans constituted a genetically inferior race.

We had to start by gathering detailed data on farm wages and employment from that period. The reason our study took us two years is that no one had ever assembled data on how many *braceros* were working in each state; we had to dig into boxes of yellowing paper archives all over America to uncover the data that would enable us to measure what really happened to U.S. workers' wages and employment when the *braceros* were suddenly gone.

What we discovered was a surprise: Excluding the Mexican *braceros* did not affect the wages or employment of U.S. farmworkers.

To illustrate, here's a small sample of our data. Below are the average U.S. farm wages in the states most heavily exposed to *bracero* exclusion, compared to wages in states barely affected, or entirely unaffected by exclusion at the end of 1964:

## Farm Wage Trends, By Exposure to *Bracero* Exclusion



No Exposure   Low Exposure (<20■ braceros)   High Exposure (>20■ braceros)

Share                                                                            POLITI

*Bracero* exclusion meant that in some states, farms lost more than a third of their hired seasonal workforce. If *bracero* exclusion had raised wages for American farmworkers, you would see wages rising faster in the heavily affected states after exclusion. There just isn't a hint of that. If anything, wages grew more in the states untouched by the removal of Mexican workers. That's remarkable, since when an economic good like labor becomes more scarce, you might expect its price to rise.

Does this mean, as one researcher sarcastically told Congress in a 1961 hearing about *braceros*, that the law of supply and demand had been repealed? Not quite. In immigration debates, it is common to assert that "basic economics" holds that when workers are scarce, firms must raise wages. But the economic truth is that in a free market, firms have various ways to respond to fluctuations in supply or demand.

American firms—in this case, farms—are remarkably adaptable and innovative. When workers they depend on aren't available, businesses can adapt. They can reduce production, shift to less labor-intensive products, create new production technology, adopt existing mechanization technology, adjust product quality for a different consumer segment, shift production overseas, merge or even exit the sector. They can also jack up wages, but whether that's the best choice depends on myriad factors, including the supply of U.S. workers at any given wage. In hand-harvest agriculture, that supply was low in 1965 and has gotten even lower since.

We show that U.S. farms primarily responded to the absence of *braceros* in some of these alternative ways, not by raising wages. In crops with readily available mechanization technologies for harvesting and field preparation, those technologies were quickly adopted. The starkest example is California tomato picking, where the excluded *braceros* were mostly replaced by mass-adoption of mechanized harvesters within just one year. In crops where technologies didn't exist for quick mechanization—like asparagus and fresh strawberries—exclusion of *bracero* caused sharp declines in production. That reflects some combination of U.S. agriculture changing its crop mix, moving production abroad and farmers being forced out of business.

You might think that unauthorized Mexican workers simply substituted for the *braceros*. That did happen to some degree, but only about 10 years later. The *braceros* of 1964 didn't stay illegally into 1965, since almost all of them were registered upon return to Mexico. Nor was there a wave of unauthorized arrivals in 1965: Border apprehensions barely budged for several years, even though enforcement efforts steadily expanded throughout the 1960s. The *braceros* were not replaced by unauthorized Mexican workers or by U.S. farmworkers; they were replaced by machines and innovation.

Politicians who claim to know the effects of excluding foreign workers, and lecture the public about "basic supply and demand," simply fail to account for the complexity of the U.S. economy and the agile adaptability of U.S. firms. Kennedy's statements were just as confident, but we know now that he was simply wrong. When you are preached to about the "obvious" effects of future worker exclusions, be skeptical—and look for guidance in hard facts from the lived experience of American history.

# EXHIBIT 51



| 111TH CONGRESS<br>*1st Session* | HOUSE OF REPRESENTATIVES | REPORT<br>111–157 |
| --- | --- | --- |

# DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS BILL, 2010

JUNE 16, 2009.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. PRICE of North Carolina, from the Committee on Appropriations, submitted the following

# R E P O R T

together with

# ADDITIONAL VIEWS

[To accompany H.R. 2892]

The Committee on Appropriations submits the following report in explanation of the accompanying bill making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2010.

### INDEX TO BILL AND REPORT

|  | Page number | |
| --- | :-: | :-: |
|  | Bill | Report |
| **TITLE I—DEPARTMENTAL MANAGEMENT AND OPERATIONS** | | |
| Office of the Secretary and Executive Management | 2 | 14 |
| Office of the Under Secretary for Management | 2 | 20 |
| Office of the Chief Financial Officer | 3 | 24 |
| Office of the Chief Information Officer | 3 | 26 |
| Analysis and Operations | 4 | 28 |
| Office of the Federal Coordinator for Gulf Coast Rebuilding | 4 | 29 |
| Office of Inspector General | 5 | 30 |
| **TITLE II—SECURITY, ENFORCEMENT, AND INVESTIGATIONS** | | |
| U.S. Customs and Border Protection | 5 | 32 |
| Salaries and Expenses | 5 | 32 |
| Automation Modernization | 7 | 40 |
| Border Security Fencing, Infrastructure, and Technology | 7 | 41 |
| Air and Marine Interdiction, Operations, Maintenance, and Procurement | 14 | 46 |

50–276

2

| | Page number | |
|---|---|---|
| | Bill | Report |
| Facilities Management .................................................. | 15 | 47 |
| U.S. Immigration and Customs Enforcement .................................. | 15 | 48 |
| Salaries and Expenses .................................................... | 15 | 48 |
| Federal Protective Service .............................................. | 18 | 57 |
| Automation Modernization .............................................. | 19 | 59 |
| Construction ............................................................ | 20 | 59 |
| Transportation Security Administration .................................... | 20 | 60 |
| Aviation Security ........................................................ | 20 | 60 |
| Surface Transportation Security .......................................... | 22 | 68 |
| Transportation Threat Assessment and Credentialing .......... | 23 | 69 |
| Transportation Security Support .......................................... | 24 | 72 |
| Federal Air Marshals .................................................... | 24 | 73 |
| Coast Guard ................................................................ | 24 | 74 |
| Operating Expenses ...................................................... | 24 | 74 |
| Environmental Compliance and Restoration ............................ | 25 | 79 |
| Reserve Training ........................................................ | 26 | 80 |
| Acquisition, Construction, and Improvements ........................ | 26 | 80 |
| Alteration of Bridges .................................................... | 29 | 85 |
| Research, Development, Test, and Evaluation ........................ | 29 | 85 |
| Medicare Eligible Retiree Health Care Fund Contribution ..... | 30 | 86 |
| Retired Pay .............................................................. | 30 | 87 |
| United States Secret Service ............................................ | 30 | 87 |
| Salaries and Expenses .................................................... | 30 | 87 |
| Acquisition, Construction, Improvements, and Related Expenses ...... | 33 | 91 |
| TITLE III—PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY | | |
| National Protection and Programs Directorate .............................. | 33 | 91 |
| Management and Administration .......................................... | 33 | 91 |
| Infrastructure Protection and Information Security ................ | 33 | 92 |
| United States Visitor and Immigrant Status Indicator Technology ...... | 34 | 96 |
| Office of Health Affairs .................................................... | 38 | 102 |
| Federal Emergency Management Agency .................................... | 38 | 104 |
| Management and Administration .......................................... | 38 | 104 |
| State and Local Programs ................................................ | 39 | 108 |
| Firefighter Assistance Grants .......................................... | 44 | 116 |
| Emergency Management Performance Grants ............................ | 45 | 118 |
| Radiological Emergency Preparedness Program ........................ | 46 | 118 |
| United States Fire Administration ...................................... | 46 | 119 |
| Disaster Relief .......................................................... | 46 | 119 |
| Disaster Assistance Direct Loan Program Account ................ | 48 | 123 |
| Flood Map Modernization Fund .......................................... | 49 | 124 |
| National Flood Insurance Fund .......................................... | 49 | 125 |
| National Predisaster Mitigation Fund .................................... | 51 | 126 |
| Emergency Food and Shelter ............................................ | 52 | 127 |
| TITLE IV—RESEARCH AND DEVELOPMENT, TRAINING, AND SERVICES | | |
| United States Citizenship and Immigration Services .................... | 52 | 128 |
| Federal Law Enforcement Training Center .............................. | 53 | 132 |
| Salaries and Expenses .................................................... | 53 | 132 |
| Acquisitions, Construction, Improvements, and Related Expenses ...... | 55 | 133 |
| Science and Technology .................................................... | 56 | 134 |
| Management and Administration .......................................... | 56 | 134 |
| Research, Development, Acquisition, and Operations ............. | 56 | 134 |
| Domestic Nuclear Detection Office ........................................ | 57 | 140 |
| Management and Administration .......................................... | 57 | 140 |
| Research, Development, and Operations .................................... | 58 | 140 |

3

|  | Page number | |
|  | Bill | Report |
| TITLE V—GENERAL PROVISIONS | | |
| This Act | 58 | 144 |
| Compliance with House Rules | ........ | 151 |
| Tables | ........ | 151 |
| Summary of the Total Bill | ........ | 180 |

The Committee report refers to the following laws and organizations as follows: Implementing Recommendations of the 9/11 Commission Act of 2007, Public Law 110–53, is referenced as the 9/11 Act; Security and Accountability for Every Port Act of 2006, Public Law 109–347, is referenced as the SAFE Port Act; the Intelligence Reform and Terrorism Prevention Act of 2004, Public Law 108–458, is referenced as the Intelligence Reform Act; the American Recovery and Reinvestment Act of 2009, P.L. 111–5 is referenced as ARRA; the Department of Homeland Security is referenced as DHS; the Government Accountability Office is referenced as GAO; and the Office of Inspector General of the Department of Homeland Security is referenced as the IG.

The accompanying bill contains recommendations for new budget (obligational) authority for fiscal year 2010 for the Department of Homeland Security. The following table summarizes these recommendations and reflects comparisons with the budget, as amended, and with amounts appropriated to date for fiscal year 2009:

[In thousands of dollars]

| Bureau/Agency | New budget (obligational) authority fiscal year 2009 enacted to date [1] | Budget estimates of new (obligational) authority, fiscal year 2010 | Recommended by the House | House compared with | |
| --- | --- | --- | --- | --- | --- |
| | | | | New budget authority fiscal year 2009 | Budget estimate, fiscal year 2010 |
| Departmental Management and Operations | 1,070,439 | 1,389,892 | 1,238,670 | 168,231 | −151,222 |
| Security, Enforcement and Investigations | 28,714,570 | 30,760,707 | 30,758,323 | 2,043,753 | −2,384 |
| Protection, Preparedness, Response and Recovery | 8,294,360 | 8,691,755 | 8,777,241 | 482,881 | 85,486 |
| Research, Development, Training, and Services | 1,881,504 | 1,987,339 | 1,864,504 | −17,000 | −122,835 |
| General Purpose Appropriations | 100,000 | ................ | ................ | −100,000 | ................ |
| Rescission of Unobligated Balances | −72,373 | ................ | −13,738 | 58,635 | −13,738 |
| Grand total | 39,988,500 | 42,829,693 | 42,625,000 | 2,636,500 | −204,693 |

[1] Does not include emergency funding provided in the Fiscal Year 2009 Omnibus Appropriations Act (P.L. 111–8) or the American Recovery and Reinvestment Act (P.L. 111–5).

## SUMMARY OF MAJOR RECOMMENDATIONS IN THE BILL

The Committee recommends $42,625,000,000 in discretionary resources for the Department of Homeland Security, $204,693,000 below the amount requested and $2,636,500,000 above fiscal year 2009 enacted levels (excluding emergency funding).

In order to invest in the critical priorities identified in this bill, and in an effort to build an economy on a solid foundation for growth and put the Nation on a path toward prosperity, the Committee includes $406,788,000 in program terminations. In addition, the Committee recommends a number of reductions and other savings from the budget request totaling $855,489,000. These adjustments, no matter their size, in conjunction with the other directions to the Administration included in this bill are important in

4

setting the right priorities within the spending allocation, for getting the deficit under control, and creating a government that is as efficient as it is effective.

PRIORITIES IN THE BILL

In this, the seventh annual appropriations bill produced by the House Appropriations Subcommittee on Homeland Security, the Committee addresses the multiple challenges faced by this Department—challenges of coordination and management, to be sure, but also the substantive challenges of policy-making and priority-setting in the post-9/11 world. The bill aims to strengthen the nation's protective measures against attacks, reduce vulnerabilities to a full range of catastrophic events, and enhance recovery from such events. The bill will equip our country with necessary new capabilities while enhancing the conventional capabilities of the Department's constituent agencies.

The bill reflects a period of information-gathering and analysis that involved probing areas of Departmental policy and procedure, the extent of which is only afforded during times of transition in the government. Because the Administration's fiscal year 2010 budget request was not presented to Congress until May 7, 2009, the 15 hearings that the Subcommittee conducted were not dominated by the budget request. Rather, the Committee tackled some of the broader questions and cross-cutting issues that touch every component of the Department of Homeland Security—from preparing for a National Special Security Event to recovering from natural disasters; from acquiring technology to improve DHS operations to expeditiously obligating funds for critical grant programs; and from immigration enforcement to meeting the basic medical needs of those in the custody of U.S. Immigration and Customs Enforcement. On occasion, hearing panels paired departmental officials with experts from the Government Accountability Office, public organizations, and State governments to ensure that the Committee received a full range of information and analysis about departmental activities. After these topical hearings were completed, the Secretary presented the fiscal year 2010 budget request for DHS. By developing this broader perspective, culminating with the Secretary's testimony, the Committee was better equipped to set budget priorities that prepare the Department to face the diversity of challenges to our homeland.

Citizens look to their government to make good use of taxpayer dollars by planning appropriately, targeting scarce resources to meet the most urgent and compelling needs, and carefully measuring program performance. The Department has made significant progress in each of these areas, and more work needs to be done.

The Committee is pleased to note that, in general, the budget request for 2010 did not continue the disingenuous practice of leaving funding voids where the Administration knows Congress has strong interests, such as with State and local grants. In doing so, the Department made some hard decisions about investments that cannot move forward at this time because of technical problems, such as advanced spectroscopic portal monitors. Or it took a more pragmatic approach to solving complex problems, for example by requesting no additional funding for implementation of a biometric exit program under US–VISIT, at least until technical, regulatory

5

and diplomatic issues can be resolved. This reality check makes it easier for the Committee to allocate resources to areas that have real needs, albeit in ways that may differ slightly from the Administration.

The Committee understands the demanding nature of the Department's mission, as well as resource and technology limitations that make it difficult to consistently satisfy the wide range of expectations from Congress, State and local governments, industries, citizens, other federal Departments and foreign governments. However, the Committee expects the departmental leadership to be frank and clear about the limitations it faces as well as the unmet needs it has inherited, so that we can work together to address these challenges. Described below is how the Committee addressed some of these matters for fiscal year 2010.

ENSURING TAXPAYER DOLLARS ARE WELL SPENT

Since its establishment, DHS has at times had difficulty spending appropriated funds in an effective and timely manner. While some departmental components have improved their financial and management oversight, others continue to have problems. Some DHS components continue to maintain high unobligated balances, or are slow to spend funds Congress designated for specific tasks. Transit grants, public safety interoperable communications grants, Coast Guard financial problems, and research funding are some of the key areas this Committee has singled out for review this year.

In the area of transit and rail security, "funds available for drawdown" has been the refrain heard throughout this hearing season. Based on the latest estimates from the Federal Emergency Management Agency (FEMA), about 90 percent of funds appropriated in fiscal year 2006 for rail and transit security grants are not drawn down. In trying to uncover reasons why critical homeland security funds were sitting in the U.S. Treasury waiting to be spent, this Committee was repeatedly presented with hazy responses, necessitating repeat appearances by FEMA and the Transportation Security Administration (TSA) to clarify the situation. Since those hearings, TSA and FEMA have changed their 2009 decision-making process so the project approval process takes place before grant awards, instead of up to 270 days afterwards. TSA and FEMA are also meeting with transit agencies to spur faster draw-down of previously appropriated funds. They are to report back to the Committee by August 2009 on their findings.

Public safety interoperable communications grants have similar draw-down problems, with about 93 percent remaining unexpended from 2007. While much of this delay was caused by the need for States to complete their interoperability plans, the Committee remains concerned about the slow rate of expenditure, particularly because Congress repeatedly hears from many first responders and emergency managers about the outstanding needs for interoperable communications equipment.

Questions about the effectiveness of investments by the Coast Guard have dogged the Department almost since its establishment. Cost growth has plagued the National Security Cutter, and false starts on developing the replacement for the 110-foot patrol boat, the new offshore patrol cutter, and an unmanned aerial system intended for use at sea have cost the taxpayers tens of millions of

6

dollars. The Coast Guard holds 95 percent of the unauditable balances on the Department's books and the material weaknesses in its internal financial controls are the single largest obstacle standing in the way of the Department being able to get a clean audit. There have been signs of progress, however, with the Coast Guard submitting a comprehensive plan for putting their financial house in order—the Financial Strategy for Transformation and Audit Readiness. Additionally, this year's budget request includes several initiatives to improve internal oversight, including $20,000,000 to modernize the Coast Guard's financial management structure. The Committee has fully funded these activities.

On a positive note, Science and Technology (S&T) has made progress in reducing its unobligated balances by tracking research expenditures more closely to make sure they align with the Department's priorities, and by recovering or realigning funds that have lain dormant due to expired programs. The increased vigilance with which S&T is managing its projects is encouraging and should continue.

FOCUSING ON OUR BORDERS

The Department's work to prevent illicit goods and unauthorized individuals from crossing our borders is more important than ever. Yet the challenge of border security remains daunting. DHS's resources must be targeted toward the most pressing threats to American communities, and our border challenges must be addressed in a comprehensive fashion that takes into account the various forces that feed the movement of people and goods.

*Southwest Border Initiative.*—The Committee fully supports efforts to address the security needs of the Southwest Border. This includes improving the capability of U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE) to reduce the import of illegal narcotics to the United States as well as the smuggling of weapons and currency that feed violent Mexican drug cartels. These investments will help close a critical vulnerability in operations at ports of entry and in all the border areas in between. Initiated in fiscal year 2009 through the reprogramming of existing funds, the Southwest Border Initiative is an effort involving DHS, the Department of State, and the Justice Department, which attacks the organizations and resources of the Mexican drug cartels. The initiative also supports the Mexican government's efforts to go after the cartels where they are based, and it provides additional resources to the communities along the border whose authorities are playing a role in the crack-down.

The bill includes $26,100,000, as requested, for an additional 65 CBP Officers and mission support staff, as well as security infrastructure such as license plate readers to cover the outbound lanes at ports of entry where no such enforcement capacity now exists. It also provides for 44 new Border Patrol agents and mission support staff to enhance outbound and other security operations on the Southwest Border. The bill funds the full costs of the planned target staffing level of 20,019 Border Patrol agents, of whom over 17,000 will be based on the Southwest Border—an increase of 6,000, or more than 50 percent, since 2006.

The Committee also provides $97,809,000 for ICE programs that support the Southwest Border Initiative, $27,809,000 more than re-

7

quested. These funds will support expansion of critical ICE efforts to target the cartels, such as the Border Enforcement Security Task Force (BEST) initiative; Southwest Border intelligence analysis; criminal gang, drug, weapons smuggling and human trafficking investigations; and Mexico-based investigatory agents who will coordinate U.S. efforts with Mexican law enforcement agencies.

The bill also includes $732,000,000 for the Border Security Fencing, Infrastructure, and Technology (BSFIT) appropriation, of which $692,000,000 is for Southwest Border investments. This will bring total BSFIT funding for the Southwest Border to $4.3 billion since the program began in 2006. The Committee expects this funding to be used for the testing, validation, and deployment of technological solutions for border security, including additional tactical communications capability for the Border Patrol. This sizable appropriation should help maintain and operate the substantial infrastructure investment already placed on the Southwest Border. The bill also provides the resources for the Department to employ the most effective means of environmental planning and mitigation in the execution of the Secure Border Initiative along the Southwest Border.

*Northern Border.*—The Committee strongly supports efforts to secure the 4,000 miles of the sparsely populated, often remote Northern Border between Canada and the 48 continental States, which presents unique challenges. The Committee includes full funding for Border Patrol staffing and recruitment efforts to bring the number of agents stationed along the border to 2,212 by 2010. This will amount to more than six times the 350 agents stationed on that border in 2001 and an increase of more than 140 percent above the number stationed there in 2006.

Technological solutions are essential in this vast area, and the Committee includes an additional $40,000,000 in BSFIT funding as requested to continue investments in mobile and remote video surveillance systems. The Committee also supports the effort to integrate all CBP technology investment along the border, to include legacy systems of monitors, sensors, and communications. As CBP Air and Marine is a key part of the effort to maintain operational control of the Northern Border, the Committee includes the funding requested to add 144 new pilots, interdiction agents, and mission support staff to enable full staffing for the new air branches established along the Northern Border.

In addition, the Committee observes that ARRA included $420,000,000 in new funding to rebuild and upgrade CBP-owned ports of entry. Most of those are on the Northern Border, and the Committee will be carefully monitoring those projects to ensure they are on time and within budget. Related to this, the Committee provides $140,000,000 for the Western Hemisphere Travel Initiative, including $16,000,000 for new initiatives such as communications and outreach for the 2010 Vancouver Olympics, auditing enhanced drivers licenses, and improving the technical infrastructure at ports of entry to expedite secure processing for passengers and pedestrians.

### SETTING IMMIGRATION PRIORITIES

*Immigration Enforcement.*—In fiscal year 2008, DHS's immigration agencies set several new records: deporting the most people in

8

any year in U.S. history (369,409); holding more people in immigration detention per day than ever before (30,429); and initiating 1,191 worksite enforcement investigations that resulted in 6,287 arrests, the largest numbers since the formation of DHS. These figures reflect the billions of dollars the Committee has invested in immigration enforcement activities since 2003. But rather than simply rounding up as many illegal immigrants as possible, which is sometimes achieved by targeting the easiest and least threatening among the undocumented population, DHS must ensure that the government's huge investments in immigration enforcement are producing the maximum return in actually making our country safer. A closer examination of the data may give some pause:

- Since 2002, ICE has increased the deportation of non-criminals by 400 percent, while criminal deportations have only gone up 60 percent.
- Of the nearly 370,000 deported by ICE in fiscal year 2008, less than a third, or 114,358, were ever convicted of a criminal offense. This, despite the fact that up to 450,000 criminals eligible for deportation are in penal custody in any given year, according to ICE estimates.
- Less than one-quarter of those interdicted by ICE's Fugitive Operations Teams last year were actually convicted of criminal offenses.
- Over three-quarters of those arrested in ICE worksite enforcement raids last year were not charged with any crime.

Since 2007, the Committee has emphasized how ICE should have no higher immigration enforcement priority than deporting those who have proved their intent to do harm and have been convicted of serious crimes. In fiscal year 2008, ICE received $200 million to identify incarcerated criminal aliens and remove them once judged deportable. In fiscal year 2009, ICE was directed to use $1 billion of its resources to identify and remove aliens convicted of crimes, whether in custody or at large, and the Congress mandated this be ICE's number one mission. In this bill, the Committee directs ICE to use $1.5 billion of its budget to expand efforts to locate and remove those criminal aliens who have proved they are a threat to our communities.

Over the past 18 months, ICE has developed a promising collaborative approach, working with State and local law enforcement agencies to streamline the identification of individuals who have been convicted of serious crimes and who may be in the country illegally. Known as "Secure Communities," this program allows local law enforcement agencies to check the fingerprints of individuals booked on criminal charges against both national criminal and immigration databases. It is planned for nation-wide deployment by 2011. When individuals are identified as illegally present in the United States, ICE can take appropriate steps to ensure the most dangerous of these criminals are deported upon completion of their jail sentences, while those convicted of lesser crimes are identified and deported as resources allow. This approach respects the traditional separation of local law enforcement responsibilities from the Federal role of enforcing immigration law, and requires no specialized training in Federal immigration law for local officials. The Committee is optimistic that Secure Communities will eventually prove more effective than many of the agreements ICE has estab-

9

lished to delegate immigration enforcement authority to local patrol officers. The Committee also encourages ICE to ensure it is consistently measuring the results of Secure Communities deployments and other State and local partnerships so that these different approaches can be adequately evaluated in the future.

*Effective and Humane Immigration Detention.*—The ICE detention program has expanded dramatically since the creation of the Department of Homeland Security, from an average daily capacity of 19,922 in 2002 to 33,400 in 2009, an increase of more than 67 percent. Based on recent and repeated reports about detainee deaths that appear to have been preventable, the Committee is concerned that ICE has not made adequate improvements in programs that manage and oversee ICE detention activities, particularly those that ICE procures through contracts. Certainly not every death is preventable or avoidable. However, the incidence of deaths among ICE detainees, as well as the conditions under which some of these deaths occurred, raises serious questions about the health care provided by ICE for those it detains and whether the individuals who died were given appropriate and timely medical attention. When ICE holds individuals in federal custody, it has a responsibility to treat those people fairly and humanely, and to provide access to necessary medical care when requested. Unfortunately, ICE and the local and contract prisons it uses to detain illegal immigrants do not always seem able or willing to fulfill that responsibility.

Last year, Congress provided $2,000,000 for ICE and the DHS Office of Health Affairs to hire outside experts to review the ICE medical system and offer recommendations on how it could be improved. The Committee is disappointed that it took ICE more than six months to award the contract for this study, and as a result, that evaluation has not yet been completed. This year, the Committee provides $8,800,000 to expand ICE detention oversight in its field offices and $20,400,000 to initiate acquisition of an electronic health records system for ICE detainees. In addition, the Committee denies a request from ICE to authorize the sale of Federally-owned detention centers to pay for consolidation of ICE field offices, which would result in all ICE detention being provided as a contracted service. The Committee believes this proposal is unwise given the serious questions about ICE's ability to oversee the health care provided to its detainees at some contract facilities. Until ICE is able to prove that it can adequately oversee compliance with detention standards, including the delivery of timely and appropriate medical care by all of its detention contractors, the Committee will not support the liquidation of Federal detention facilities.

*Ensuring a Legal Workforce.*—United States Citizenship and Immigration Services (USCIS) has created and maintains an internet-based system through which employers can verify the work eligibility of their new hires. As of May 2009, USCIS had enrolled over 125,000 companies in this system, which is commonly known as E-Verify. The Committee continues to recognize the need for a voluntary computer-based employment verification system, and therefore provides $112,000,000 for the on-going operation, maintenance and enhancement of the E-Verify system. In addition, the Com-

10

mittee includes a 2-year extension of the E-Verify authorization, as requested in the budget.

STRENGTHENING TRANSPORTATION AND MARITIME SECURITY EFFORTS

*Transportation Security.*—Since 9/11, known threats to our aviation system have led to improved explosive detection technologies and better mechanisms to detect other threats in baggage, cargo, and carried by individuals. Yet, the screening systems still employed at many airports are inefficient and not well-suited to meet aviation demand. A baggage screening investment study concluded that capital funding requirements to procure and install new optimal screening systems would cost $8.2 billion over 20 years. This year, the President recognized the importance of addressing these needs and requested a record amount of funding. The Committee has provided $1.05 billion, including $250,000,000 in mandatory funding, to procure and install explosive detection systems in-line at our nation's airports. This funding, coupled with the $700,000,000 provided in ARRA, will more than fully fund the $1.5 billion in high priority needs TSA identified earlier this year. According to TSA, more than two dozen airports had completed the necessary design work to move forward with the installation of these more efficient systems. With funding provided in this bill, TSA expects to acquire and install 41 in-line systems so that additional airports have optimal systems installed at some or at all terminals, as well as retain 100 percent electronic checked baggage screening compliance at airports that otherwise may not be maintained due to anticipated growth or recapitalization needs.

In the area of air cargo, TSA has met the 9/11 Act mandate requiring 50 percent of air cargo carried on passenger aircraft be screened for explosives. However, the more challenging mandate of screening 100 percent of that cargo looms ahead, with a deadline of August 2010. TSA has informed Congress that, by that date, it will be able to screen all air cargo that originates domestically before it is carried on passenger aircraft but it may not be able to meet the deadline with international air cargo. Screening international air cargo poses unique challenges since TSA would need to place personnel overseas to screen U.S.-bound cargo and/or strengthen relations with foreign airports and companies to screen cargo before it is placed on an aircraft heading to the United States. This Committee believes that assuring 100 percent of air cargo carried on passenger aircraft is screened is an important mandate, one that TSA can meet within the timeframe Congress has set. Therefore, the Committee has provided $122,849,000 in fiscal year 2010 for these efforts. This recommendation includes funding for TSA to address the international challenge, as well as for increased oversight activities to make sure that the certified shippers, freight forwarders, companies and other entities screening air cargo domestically adhere to our stringent security requirements.

Transit systems are vulnerable to terrorist attack, as demonstrated in London, Madrid, and other locations around the world. Since 9/11, $1.67 billion has been provided to protect those systems in the United States, and the transit industry has estimated that a total of $6 billion is needed for security training, radio communications systems, security cameras, and access controls. The $250,000,000 provided in this bill for transit and rail security, cou-

11

pled with the $150,000,000 provided in ARRA that has not yet been awarded, puts us one step closer to meeting these identified security needs.

In addition to grant dollars provided directly to transit systems, both TSA and S&T have stepped up their efforts in this area. TSA requested additional surface transportation inspectors to participate on Visible Intermodal Protection and Response teams, which conduct unannounced, high-visibility exercises in mass transit or passenger rail facilities. The Committee has provided $25,000,000 for these activities. In addition, the Committee has fully funded 9/11 Act activities for surface transportation, including funding to continue vulnerability and threat assessments of high risk entities, to conduct additional security exercises and training programs, and for critical information sharing activities. S&T has begun a new research program that focuses on the risk of explosives in rail and transit facilities. Prior research has focused on finding effective methods to counteract, defeat, and mitigate the threat of improvised explosive devices (IEDs), with a heavy emphasis on deterring the threat to commercial aviation. Within an overall increase of $24,660,000 in fiscal year 2010 for explosives research is $5,000,000, as requested by the Administration, to expand those efforts to address the specific threat of IEDs to mass transit. As recent attacks worldwide have shown, the threat to mass transit from IEDs must be addressed, and the investments in this bill provide a step forward in that direction.

*Maritime Security.*—Our nation's ports are critical to ensuring that individuals and businesses have access to the many products on which they rely. Port security is in the hands of CBP, Coast Guard, port authorities and local police agencies. In 2002 Coast Guard estimated that $7 billion was needed to implement the sea port security improvements mandated in the Maritime Transportation Security Act. To date, Congress has appropriated $2.18 billion for grants to help ports meet these requirements. The Committee has provided an additional $250,000,000 for port security grants in this bill.

In addition to these grants, over the last two years, the Committee has provided $93,800,000 in additional resources for Coast Guard efforts to increase maritime safety and security, over and above the Administration's requests. These investments brought on more watchstanders and boat and marine inspectors, and increased capacity for security-related activities and investigations. As a result, the Coast Guard has a more robust capability to ensure the safety and security of U.S. ports through domestic and international activities. For example, the Coast Guard helps reduce risk to the U.S. by verifying the use of effective anti-terrorism measures in foreign ports. Out of 500 ports screened in 135 countries, seven were found to have serious flaws, requiring vessels from those ports to take additional security steps as a condition of entry into U.S. ports. The Committee fully funded the Administration's request for $7,500,000 in new investments to improve marine safety by filling the gap between the size of its workforce and the growth of the shipping industry. The Coast Guard is already in the process of using resources provided in previous years to add more qualified marine inspectors and other personnel to their ranks under the Marine Safety Enhancement Plan the Commandant submitted to

12

Congress in 2007. This year's funding will deploy 25 apprentice marine inspectors to 11 ports, establish Senior Marine Inspector Training Officers in seven critical "feeder ports," and expand the Coast Guard's capacity to train inspectors and investigators. This bill also makes permanent the highly successful biometrics at sea pilot program. This tool has helped ensure that known felons, those already deported, or those on terrorist watchlists who are attempting to enter our country illegally are tried and punished, rather than simply being sent back to try again.

*Maritime Cargo Security.*—The Committee remains strongly supportive of efforts to secure the nation's economic lifelines by detecting dangerous cargo and preventing it from reaching U.S. soil. The bill includes $804,000,000 in funding for work at CBP and the Domestic Nuclear Detection Office (DNDO) to develop and deploy systems to screen cargo for weapons or nuclear precursor materials. The Committee is aware that there are monumental obstacles to meeting the 2012 deadline set by the 9/11 Act for 100 percent scanning of U.S.-bound cargo and welcomes the Administration's candor in this regard. However, there should be no diminution of the effort to strengthen the overseas operation to monitor and target cargo, and to develop better technology to accomplish this mission. In addition, the Committee expects to see tangible results from CBP's new secure filing rule, also known as "10+2", which will bring about improved information for both enforcement and facilitation of cargo.

The bill provides $162,000,000, a nine percent increase over fiscal year 2009, for the Container Security and Secure Freight Initiatives, which are designed to "push the borders out" by basing cargo inspection and monitoring activity at overseas ports. These initiatives target high risk cargo for appropriate action, either before it is loaded on vessels or before those vessels reach the U.S. The Committee also includes $143,563,000, as requested, for inspection and detection technology, which will fund 12 replacement and 5 new large-scale nonintrusive inspection (NII) systems, as well as 600 smaller NII systems for ports of entry. The bill continues to support robust research and development for newer, more effective technologies to improve container security. The Committee also includes funding as requested to bolster staffing at the National Targeting Center, as well as to staff the Import Safety and Trade Enforcement Initiative, both which should contribute to improved supply chain security and better protection of the country from illegal and dangerous imports.

REDUCING CYBER SECURITY VULNERABILITIES

Technological advances have strengthened our government's ability to respond to citizens' needs and conduct its work efficiently. However, the broad-based interconnectedness of information technology networks also makes unprotected systems vulnerable to attack and exploitation by those who seek to harm our nation. Furthermore, the expertise necessary to protect vulnerable computer infrastructure has not generally kept pace with the escalating sophistication and intensity of cyber attacks. In order to protect the government's computer networks from sabotage or attack, the Committee provides $381,904,000 to carry out the DHS portion of the National Cyber Security Initiative. These funds will help improve

13

the security of federal computer networks and strengthen Federal assistance to States, localities, and the private sector, all of which face similar threats of disruptive and potentially costly cyber attacks. As the confusion surrounding the 2009 computer virus called "Conficker" showed, there is still a large gap in the understanding of the behavior and anatomy of malware. In order to better protect against future attacks, the bill provides the Administration's request of $19,500,000 to invest in next generation technologies to enhance DHS's capability to deal with cyber attacks.

### MEETING THE NEEDS OF STATE AND LOCAL PARTNERS

The Committee is pleased DHS's budget finally recognizes State and local emergency planners and responders as equal partners in homeland security by requesting $3,867,000,000 for grants that assist them with everything from planning to equipping first responders. The Committee strengthens that commitment to State and local partners by providing $3,959,000,000 for comparable grant programs, including an increase of $15,000,000 for Emergency Management Performance Grants, the one true all-hazards preparedness grant program. The Committee also requires FEMA to post changes to policies online in order to afford State and local partners the opportunity for input. FEMA's National Advisory Council, which is comprised of various emergency management stakeholders, must also review all policy changes.

### CORRECTING LONGSTANDING PROBLEMS

*Food and Shelter.*—The Committee recognizes some shortfalls in the Department of Homeland Security budget request, in part due to the poor economic condition we are currently experiencing. For example, an increasing number of Americans are relying on food and housing assistance to meet basic needs. Since the recession began in December 2007, the U.S. has lost a net total of 5.7 million jobs. As of April 2009, the nationwide unemployment rate stands at 8.9 percent, a quarter-century high. Recent estimates show foreclosure rates rising 30 percent from 2008 as food prices continue to rise. In April 2009, food prices rose nearly 1.5 percent. Yet, the budget proposed cutting the Emergency Food and Shelter Program funding to $100,000,000, or half the fiscal year 2009 enacted level. The Committee has restored funding for this program.

*Housing.*—More than three years after Hurricane Katrina devastated the Gulf Coast, the recovery effort continues to be significantly hampered by what can only be called a housing crisis. Based on the latest estimates from FEMA, nearly 30,000 households are still receiving disaster housing assistance, of which nearly 3,000 are in trailers and about 27,000 are in rental units as part of the joint Department of Housing and Urban Development (HUD)/ FEMA program called the Disaster Housing Assistance Program. In fiscal year 2009 the Committee required the Office of the Federal Coordinator for Gulf Coast Rebuilding to consult experts to draw up a framework for developing and sustaining affordable rental housing in affected Gulf Coast communities. The panel was tasked to provide recommendations for how HUD, the private sector, and the States could achieve a sufficient stock of affordable rental housing to meet the needs of all those displaced after the hurricanes who still lack permanent housing options. The Office's

report focused on issues specific to the Gulf Coast, but several of its recommendations should be studied and incorporated by Federal, State and local governments to deal with future disasters, including improved case management services for families in interim housing and the need for new sources of funding for long-term, post-disaster housing. The Committee is committed to ensuring this type of post-disaster housing disaster never happens again. This bill directs FEMA and HUD to formalize an agreement to bring HUD's expertise to bear for if another Hurricane Katrina-like disaster forces tens of thousands from their homes.

*Firefighter Assistance Grants.*—The needs of the nation's firefighters, who are among the first emergency responders for most disasters, remain great. Yet, the President's request would cut Assistance for Firefighters (AFG) grants by 70 percent compared to fiscal year 2009 even though, for fiscal year 2008 alone, FEMA received 21,022 applications for AFG funds, with requests totaling $3,137,121,053. The Committee provides $800,000,000 for firefighter assistance grants to help address these and other unmet needs of the nation's Fire Service including $380,000,000 for AFG grants.

In conclusion, the bill seeks to push the Department to practice better financial and program management; to set clear and well-reasoned priorities and goals in areas ranging from the security needs of our borders to immigration enforcement, from transportation and maritime security to cyber security vulnerabilities, from improved disaster management to helping our citizens who are most at risk; and to strengthen partnerships with international, federal, state, local and private sector entities. The new Administration faces many homeland security challenges, and this Committee will be its partner as we take on these challenges together.

## TITLE I—DEPARTMENTAL MANAGEMENT AND OPERATIONS

### OFFICE OF THE SECRETARY AND EXECUTIVE MANAGEMENT

| | |
|---|---|
| Appropriation, fiscal year 2009 | $123,456,000 |
| Budget request, fiscal year 2010 | 160,760,000 |
| Recommended in the bill | 147,427,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 | +23,971,000 |
| Budget request, fiscal year 2010 | −13,333,000 |

#### MISSION

The mission of the Office of the Secretary and Executive Management is to provide efficient services to the Department of Homeland Security and to support the Department's efforts to achieve its strategic goals: preventing terrorist attacks within the United States; reducing America's vulnerabilities to terrorism and natural disasters; minimizing the damage from attacks and disasters that may occur; responding to attacks and disasters, in cooperation with states and local governments; and assisting in recovery following disasters and attacks.

#### RECOMMENDATION

The Committee recommends $147,427,000 for the Office of the Secretary and Executive Management, $13,333,000 below the

15

amount requested and $23,971,000 above the amount provided in fiscal year 2009. To adequately oversee expenditures and personnel changes within each office of the Office of the Secretary and Executive Management, the Committee has provided separate funding recommendations as follows:

| | Budget estimate | Recommended |
|---|---|---|
| Immediate Office of the Secretary | $5,061,000 | $3,783,000 |
| Immediate Office of the Deputy Secretary | 1,810,000 | 1,440,000 |
| Chief of Staff | 2,595,000 | 2,926,000 |
| Office of Counternarcotics Enforcement | 3,912,000 | 3,712,000 |
| Executive Secretariat | 8,344,000 | 7,578,000 |
| Office of Policy | 61,564,000 | 51,564,000 |
| Office of Public Affairs | 6,539,000 | 6,039,000 |
| Office of Legislative Affairs | 7,097,000 | 6,797,000 |
| Office of Intergovernmental Programs | 2,800,000 | 2,800,000 |
| Office of General Counsel | 24,028,000 | 24,028,000 |
| Office of Civil Rights and Liberties | 22,104,000 | 22,104,000 |
| Citizenship and Immigration Services Ombudsman | 6,935,000 | 6,685,000 |
| Privacy Officer | 7,971,000 | 7,971,000 |
| Total | 160,760,000 | 147,427,000 |

The Committee notes with dismay that the Department ignored explicit Congressional direction and reconfigured several programs, projects, and activities (PPAs) in its budget request. Without consulting with the Committee, the Department merged the Immediate Office of the Secretary, the Immediate Office of the Deputy Secretary, Chief of Staff and Executive Secretariat into a single new budget line entitled "Executive Leadership and Direction." The Department also created another new line item called "Stakeholder Relations," which would have included the Office of State and Local Law Enforcement, the Private Sector Coordination Office, intergovernmental functions from a number of other components in the Department's executive management, and the Office of Intergovernmental Affairs (to be transferred from FEMA). Since the budget was submitted, the Committee has been told that the creation of the second PPA was canceled, although the transfer of the Office of Intergovernmental Affairs from FEMA is still a part of the request, appearing as the Office of Intergovernmental Programs listed above. This incomplete last minute change has made it difficult to review the budgets for the affected functions with clarity. This is not the first time DHS has submitted budget requests with such deficiencies. The Committee reiterates that structural alterations to the request should only be made after advance consultation with the Committee on Appropriations; and if they are approved for use in the budget request, the budget should carry a complete table comparing new and old elements to allow for seamless tracking of the use of taxpayer dollars.

Many of the activities that the Office of Counternarcotics Enforcement undertakes closely align with actions being reviewed by the Office of Policy. While the Committee recognizes that the Office of Counternarcotics Enforcement is a separately authorized office, there are synergies among these two entities that, if combined, could provide more effective oversight of DHS activities within its component agencies, with other federal agencies, and in working with other governments. As such, the Committee directs the Secretary to evaluate whether it would be appropriate to shift the

16

functions of the Office of Counternarcotics Enforcement into the Office of Policy, and report to the Committee no later than January 15, 2010 on its conclusions.

### NATIONAL SOUTHWEST BORDER COUNTERNARCOTICS STRATEGY

The Committee just received the National Southwest Border Counternarcotics Strategy on June 5, 2009, which is to guide the joint efforts and policy planning of the Department of Homeland Security, the Justice Department, the Office of National Drug Control Policy, and other agencies. The Committee directs DHS to brief the Committee not later than July 15, 2009, on how it will implement the policy in 2009 and 2010, to include any impacts on the fiscal year 2010 budget request for the Department and its component agencies.

### IMMEDIATE OFFICE OF THE SECRETARY

The Committee recommends $3,783,000 for the Immediate Office of the Secretary, $1,278,000 below the amount requested and $643,000 above the amount provided in fiscal year 2009. Funding has been reduced from the request as the Committee rejects the proposed transfer of $1,278,000 from other accounts to pay in advance for projected travel by component agency personnel with the Secretary. The Committee directs the Department to continue to manage travel in the same fashion as the current fiscal year.

### IMMEDIATE OFFICE OF THE DEPUTY SECRETARY

The Committee recommends $1,440,000 for the Immediate Office of the Deputy Secretary, $370,000 below the amount requested and $40,000 above the amount provided in fiscal year 2009. Funding has been reduced from the request as the Committee rejects the proposed transfer of $370,000 from other accounts to pay in advance for projected travel by component agency personnel with the Deputy Secretary. The Committee directs the Department to continue to manage travel in the same fashion as the current fiscal year.

### OFFICE OF THE CHIEF OF STAFF

The Committee recommends $2,926,000 for the Office of the Chief of Staff, $331,000 above the amount requested and $233,000 above the amount provided in fiscal year 2009. The increase above the request is due to the rejection of the proposed transfer of $1,278,000 from other accounts, including $331,000 from this office, to pay in advance for projected travel by component agency personnel with the Secretary.

### OFFICE OF COUNTERNARCOTICS ENFORCEMENT

The Committee recommends $3,712,000 for the Office of Counternarcotics Enforcement, $200,000 below the amount requested and $6,000 below the amount provided in fiscal year 2009. The Committee has made a slight reduction to the request due to vacancies in this office that are expected to continue through the remainder of fiscal year 2009 and into fiscal year 2010.

17

## EXECUTIVE SECRETARIAT

The Committee recommends $7,578,000 for the Executive Secretariat, $766,000 below the amount requested and $130,000 above amount provided in fiscal year 2009. The Committee has made a slight reduction to the request due to vacancies in this office that are estimated to continue through the remainder of fiscal year 2009 and into fiscal year 2010.

## OFFICE OF POLICY

The Committee recommends $51,564,000 for the Office of Policy, $10,000,000 below the amount requested and $8,301,000 above the amount provided in fiscal year 2009. This funding level includes $2,000,000 for the Administration's new program to coordinate assessment of the Department's mission requirements across components, $3,000,000 less than the request. While the Committee supports this effort, this should be an organic function of the Department's leadership, not a separate office. In addition, the Committee provides $3,000,000 for the new Intermodal Security Coordination Office, a joint initiative between the Department of Homeland Security and the Department of Transportation (DOT), $7,000,000 less than the request. While addressing concerns about security at maritime and intermodal facilities is important, the Committee notes that there are already existing structures and arrangements in place among DHS component agencies to coordinate efforts with DOT, and urges the Department to ensure this funding does not create parallel structures or needlessly duplicate efforts.

## OFFICE OF PUBLIC AFFAIRS

The Committee recommends $6,039,000 for the Office of Public Affairs, $500,000 below the amount requested and $48,000 above the amount provided in fiscal year 2009. The Committee has made a slight reduction to the request due to the continued vacancies in this office.

## OFFICE OF LEGISLATIVE AFFAIRS

The Committee recommends $6,797,000 for the Office of Legislative Affairs, $300,000 below the amount requested and $1,800,000 above the level provided in fiscal year 2009. The Committee has made a slight reduction to the request due to unjustified increases in Working Capital Fund expenses. The name of this office has been changed to avoid confusion with the newly proposed Office of Intergovernmental Programs.

## OFFICE OF INTERGOVERNMENTAL PROGRAMS

The Committee supports the shifting of $2,000,000 and 17 FTE from FEMA as requested in the budget for the Office of Intergovernmental Programs, as well as the $800,000 requested for information technology infrastructure. The Committee requires that the Secretary present a detailed organizational plan for the new office within 60 days of enactment of this bill. The plan should outline the cost savings and efficiencies this reorganization is expected to create.

18

### OFFICE OF GENERAL COUNSEL

The Committee recommends $24,028,000 for the Office of General Counsel, as requested, and $3,914,000 above the amounts provided in fiscal year 2009. The Committee fully funds the 10 new full-time employee equivalents (FTEs) requested for fiscal year 2010 within this recommended level.

### CITIZENSHIP AND IMMIGRATION SERVICES OMBUDSMAN

The Committee recommends $6,685,000 for the Citizenship and Immigration Services Ombudsman, $250,000 below the amount requested and $214,000 above the amount provided in fiscal year 2009. The Committee has made a slight reduction to the request due to the continued vacancies in this office.

### USER FEES

The Committee understands that user fee collections, which help pay for several key component activities, have fallen, significantly in some cases. The Committee takes special note that CBP's collections of immigration and customs inspection fees, which fund about 6,500 FTEs and as recently as 2008 exceeded $1,000,000,000, have declined and will likely decrease further if travel continues to decline. The CBP budget estimates that air travel will be five percent lower in fiscal year 2010 than in fiscal year 2009. In addition, the Committee is concerned that FEMA has overestimated fee collection from flood insurance policies for fiscal year 2010 and that the agency will not be able to support the 330 FTE funded with those fees or sustain critical flood plain management activities. During the current fiscal year, FEMA expressed concern to the Committee that fees would not keep up with estimates and that reprogramming actions may be needed. While the Administration is planning to offer legislation to consolidate several currently separate user fees, such action would not address the underlying vulnerability of staffing and operations to resource reductions. The Committee directs the Secretary to report not later than November 1, 2010 on actual fiscal year 2009 collections and projected 2010 collections for all impacted entities at DHS, along with a contingency plan for making up any difference between expected collections and budgeted activities.

### BUDGET JUSTIFICATIONS

For fiscal year 2011, the Committee directs that the congressional budget justifications for the Office of the Secretary and Executive Management include the same level of detail as the table contained in the back of the Committee report. All funding and staffing changes for each individual office must be highlighted and explained. The Committee expects this level of detail to include separate discussions for personnel, compensation, and benefits; travel; training; and other services.

### WORKING CAPITAL FUND

Consistent with prior years, the Committee directs the Department to include a separate appropriation justification for the Working Capital Fund (WCF) in the fiscal year 2011 budget request. This should include a description of each activity funded by the

19

WCF; the basis for the pricing; the number of full-time federal employees funded in each activity; a list of each departmental organization that is allocating funds to the activity; and the funding each organization is providing in fiscal years 2010 and 2011. If a project contained in the WCF is a multi-year activity with a defined cost, scope, and schedule, the estimated costs and schedule shall be clearly delineated.

The Committee expects all initiatives funded by multiple DHS organizations to be included in the WCF. The Committee does not support taxing departmental organizations for cross-cutting initiatives outside of the WCF. As such, the justification should identify any cross-cutting initiatives or activities that benefit more than one organization that are not included in the WCF, and should explain the omission.

The Committee expects to be notified promptly of any additions, deletions, or changes that are made to the WCF during the fiscal year. Furthermore, the Department should not fund any activities within the WCF that the House or Senate Committees on Appropriations have disapproved either in report language or in their responses to reprogramming requests.

### RECEPTION AND REPRESENTATION

Within the Office of the Secretary and Executive Management, the Committee provides $60,000 for official reception and representation expenses, as requested, the same level provided in fiscal year 2009. Within this total, $20,000 shall be for international programs within the Office of Policy for activities related to the visa waiver program.

### DEPARTMENTAL RESPONSIVENESS TO GAO

The Committee is pleased to note that the Department is working with GAO to improve its responsiveness to information requests, and is examining the models of interaction offered by other agencies. In order to improve transparency and oversight, the Committee urges DHS to adopt the practices of most other federal agencies regarding interaction with GAO. These include: ensuring that GAO representatives have direct access to program officials and other relevant DHS employees, including contractors, for purposes of requesting records and obtaining information; expediting the internal review process for requested information by eliminating unnecessary or redundant levels of review; directing program officials and other relevant DHS employees, including contractors, to provide GAO with immediate access to agency records upon request when such records are readily available and do not require further internal review; and providing GAO representatives with access to draft or other non-final agency records when pertinent to GAO's review, consistent with GAO's statutory right of access to agency records and its obligation to handle such information appropriately.

### GREENHOUSE GAS EMISSIONS

The Committee still expects the Secretary to provide Congress, by September 30, 2009, with a detailed inventory of the Department's greenhouse gas emissions, and a plan for how the Department will reduce these emissions. The Committee expects a report

20

every six months thereafter on the progress the Department has made in emission reductions.

## OFFICE OF THE UNDER SECRETARY FOR MANAGEMENT

| | |
|---|---|
| Appropriation, fiscal year 2009[1] ...................................................... | $191,793,000 |
| Budget request, fiscal year 2010 ...................................................... | 337,990,000 |
| Recommended in the bill ...................................................... | 268,690,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 ................................................ | +76,897,000 |
| Budget request, fiscal year 2010 ............................................... | −69,300,000 |

[1] Excludes $200,000,000 in appropriations provided in the American Recovery and Reinvestment Act (P.L. 111–5).

### MISSION

The Office of the Under Secretary for Management's primary mission is to deliver quality administrative support services for human resources and personnel; manage facilities, property, equipment and other material resources; ensure safety, health and environmental protection; and identify and track performance measurements relating to the responsibilities of the Department. This office is also in charge of implementing a mission support structure for the Department of Homeland Security to deliver administrative services while eliminating redundancies and reducing support costs.

### RECOMMENDATION

The Committee recommends $268,690,000 for the Office of the Under Secretary for Management, $69,300,000 below the amount requested and $76,897,000 above the amount provided in fiscal year 2009. In order to adequately oversee expenditures for each office, the Committee has provided separate funding recommendations as detailed in the following table:

| | Budget estimate | Recommended |
|---|---|---|
| Under Secretary for Management ............................................................... | $2,864,000 | $2,864,000 |
| Office of Security ............................................................... | 95,193,000 | 95,193,000 |
| Office of the Chief Procurement Officer ............................................................... | 71,038,000 | 66,538,000 |
| Office of the Chief Human Capital Officer ............................................................... | 44,404,000 | 43,604,000 |
| Office of the Chief Administrative Officer ............................................................... | 124,491,000 | 60,491,000 |
| Total ............................................................... | 337,990,000 | 268,690,000 |

### OFFICE OF SECURITY

The Committee recommends $95,193,000 for the Office of Security, as requested and $34,311,000 above the amount provided in fiscal year 2009. This increase includes $25,000,000 for the Department to begin issuing smart identity cards for large numbers of Departmental employees. The Committee directs the Office of Security to provide a report on its progress in issuing new identity cards and remaining needs for additional infrastructure and materials needed to complete the project. The Committee is pleased to note a large number of new hires approaching the end of the clearance process, and the expected significant reduction in vacancies in this office. Funding is also provided to create a special access program control office, which will improve oversight of sensitive com-

21

partmentalized information, and to improve the timeliness of processing background investigations.

### OFFICE OF THE CHIEF PROCUREMENT OFFICER

The Committee recommends $66,538,000 for the Office of the Chief Procurement Officer (OCPO), $4,500,000 below the amount requested and $27,535,000 above the amount provided in fiscal year 2009. The increase above fiscal year 2009 supports three efforts: the third year of the DHS-wide acquisition workforce intern program, setting up a classified program support office, and expanding the acquisition program management division.

### ACQUISITION PROFESSIONAL CAREER INTERNSHIP PROGRAM

The Committee fully funds the request of $7,000,000 to expand the acquisition career professional internship program in its third year, creating 100 more full-time positions. Congress has been highly critical of the performance of DHS acquisition programs in the past. Across the government, Federal agencies are experiencing shortages of procurement managers as employees retire or move to the private sector. Of the more than 1,300 people managing acquisition at DHS, 300 are eligible to retire in the next three years. These are inherently governmental positions that cannot be filled by contractors. It takes at least four years to train a fully capable acquisition official. This internship program helps recruit and train the procurement staff needed to fill those gaps on the horizon. The Department has indicated that without funding for this program, programs will be short-staffed, leading to schedule delays, cost overruns and decreased performance.

Recognizing the competing demands for this type of staff in government service and the private sector, OCPO shall submit to the Committee no later than 60 days after the date of the enactment of this Act a report outlining all Departmental efforts aimed at decreasing the attrition rate of the DHS acquisition workforce. This report shall include each specific project funded, key milestones, all funding sources for each project, details of annual and lifecycle costs, and projected cost savings or cost avoidance to be achieved by each project. The Committee also directs OCPO to provide a breakdown of where the interns and graduates of the acquisition career professional internship program are serving within 60 days of enactment, and on an annual basis accompanying the budget request.

### CLASSIFIED PROGRAM SUPPORT OFFICE

The Committee recommends $6,500,000 and six FTEs to establish an office to provide support for DHS acquisitions requiring classified contracts, a capacity the Department does not currently possess. As it stands, if an acquisition required a classified contract, the Department would run the risk of either not getting the goods and services it paid for due to the vagueness required by unclassified contracts, or disclosing details of classified programs through the procurement process.

22

ACQUISITION PROGRAM MANAGEMENT DIVISION

The Committee provides $7,000,000 and five FTEs to increase capacity in the acquisition program management division. This division is responsible for creating reviews and analysis procedures for major acquisition programs at the Department to help control costs and ensure success. Currently the office only has the resources to review twenty of the Department's seventy major programs. This funding will allow the Department to increase the number of reviews it conducts on major programs, and provide additional support to ongoing acquisitions by identifying problems earlier in the process. The Committee recommends that the reduction from the Administration's request should come from contractor support rather than in-house expertise.

DHS INVESTMENT REVIEW PROCESS FOR MAJOR PROCUREMENTS

In fiscal year 2008, DHS obligated more than $13.75 billion for the procurement of goods and services to support homeland security missions, making it the fifth-largest federal government agency in terms of procurement. GAO recently reported (GAO–09–29) that while DHS's investment review process calls for executive decision-making at several points in the life cycle of major programs, the implementation of the investment review process at DHS has failed to identify and remediate cost, schedule, and performance problems in a number of its major investments. GAO has found that that the DHS Investment Review Board (IRB) and Joint Requirements Council have been under-powered and under-resourced to address problems once identified. GAO also found that key acquisition documents needed to help illuminate cost, schedule and performance problems were not prepared and approved for several major investments. Specifically, GAO reported in November 2008 that 94 percent of DHS's major investments lacked reviews in accordance with the Department's investment review policy, and 68 percent lacked a life-cycle cost estimate. In fiscal year 2008, $681.2 million of taxpayer dollars were spent on capital assets without a Mission Needs Statement—a document that verifies that the investment is needed and supported by the Department. That reflects 18 of DHS's 57 major investments that year. GAO's key finding was most troubling: "DHS cannot ensure that its investment decisions are appropriate and will ultimately address capability gaps."

While DHS has begun to improve the investment review process, including issuance of a November 2008 interim acquisition directive, the Committee is anxious to see positive results. This Administration has not had a chance to demonstrate a track record on this issue, but the Committee is heartened by the concepts outlined in the Secretary's recent report outlining the top 25 acquisition programs under the Department's purview and how those will be reviewed, as well as the proposed investments in the Administration's budget to improve oversight of DHS acquisitions. The Deputy Secretary shall provide a report to the Committees on Appropriations by October 1, 2009, updating the list of the Department's top 25 investments and their status in the acquisition review process. Furthermore, the report should include information on what progress has been made on improving overall compliance with the reformed investment review policies of the Department, including

23

strengthening the capacities of the Acquisition Review Board and other oversight mechanisms, such as portfolio and component-level reviews.

### OFFICE OF THE CHIEF HUMAN CAPITAL OFFICER

The Committee recommends $43,604,000 for the Office of the Chief Human Capital Officer, $800,000 below the amount requested and $4,777,000 above the amount provided in fiscal year 2009. Of this total, $33,604,000 is recommended for the salaries and expenses of the Office of the Chief Human Capital Officer and $10,000,000 is recommended for human resource activities to enhance employee morale and create a more satisfying work environment.

The Committee is pleased to note the progress made in hiring in several component offices where hiring is administered by the Office of the Chief Human Capital Officer. The Office is directed to continue providing monthly reports to the Committees on Appropriations, summarizing the vacancy situation at the Department, and urges the Office to provide the reports in a more timely fashion. These monthly reports should include the number of new hires brought on-board for each headquarters office in the previous month, as well as the number of applications received as a ratio to the number of vacancies closed. Each report should also include an end-of-the-month snapshot for each headquarters office, with the number of new hires pending security or suitability clearance, the number of open vacancies, and the number of selection referral lists pending with management.

### OFFICE OF THE CHIEF ADMINISTRATIVE OFFICER

The Committee recommends $60,491,000 for the Office of the Chief Administrative Officer, $64,000,000 below the amount requested and $10,064,000 above the amount provided in fiscal year 2009. Of this total, $44,491,000 is recommended for the salaries and expenses of the Office of the Chief Administrative Officer, $6,000,000 is for costs associated with DHS headquarters needs at the Nebraska Avenue Complex, and $10,000,000 is for the DHS headquarters consolidation project. Within the funding level for salaries and expenses is $1,000,000 for logistics and procurement personnel from across the Department to receive training and education through LOGTECH and related programs, which have benefitted Coast Guard personnel. The Committee approves the requested transfer of $10,800,000 and 5 full-time employee equivalents to the Directorate of Operations Coordination for continuity of operations oversight.

### DHS HEADQUARTERS FACILITIES

The Committee is well aware of the expansive needs for departmental facilities, which will exceed what can be provided at the new headquarters slated to be built on the St. Elizabeths campus. While the Committee recognizes that consolidation of some DHS facilities could take place as existing leases expire, before components begin to move to the new site in 2013, the Committee finds the proposal to spend $75,000,000 for this purpose insufficiently justified at this time. Therefore, the Committee instead provides

24

$10,000,000 to begin the needed improvements and security enhancements once leased space is acquired, and directs the Office of the Chief Administrative Officer to provide a detailed briefing to the Committee on the plans for lease consolidation.

### ST. ELIZABETHS CAMPUS DEVELOPMENT

The Committee is aware of continuing concerns about the potential impact of the St. Elizabeths campus development on the surrounding infrastructure and community. The Committee directs DHS to continue to work with the local community and the National Capital Planning Commission to ensure parking and traffic management issues are properly dealt with so that the new headquarters has a positive impact on the neighborhood while meeting the requirements of DHS and its personnel.

### DHS FACILITIES AND RENEWABLE ENERGY

The Department of Homeland Security has facilities in a wide range of geographic locations across the country. This puts the Department in a unique position to seek out opportunities to capitalize on distributed power generation using alternative and renewable energy sources as a means of ensuring operational energy security, saving money, and reducing the Department's environmental impact. The Department is directed to provide a report to the Committee prior to the submission of the Administration's fiscal year 2011 budget request that outlines the best opportunities for each component of the Department to take advantage of distributed power generation using alternative and renewable energy sources, and accounts for the possible risks and rewards involved.

### OFFICE OF THE CHIEF FINANCIAL OFFICER

| | |
|---|---:|
| Appropriation, fiscal year 2009 | $55,235,000 |
| Budget request, fiscal year 2010 | 65,530,000 |
| Recommended in the bill | 63,530,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 | +8,295,000 |
|     Budget request, fiscal year 2010 | −2,000,000 |

### MISSION

The primary responsibilities and functions of the Office of the Chief Financial Officer include budget execution and oversight; performance analysis and evaluation; oversight of the Department's financial management system; oversight of the Department's business and financial management systems across all agencies and directorates; and oversight of credit card programs and audit liaisons.

### RECOMMENDATION

The Committee recommends $63,530,000 for the Office of the Chief Financial Officer (CFO), $2,000,000 below the amount requested and $8,295,000 above the amount provided in fiscal year 2009. In support of more robust internal controls and more well-planned budgets, the Committee has fully funded the new FTEs requested for the Office of Financial Management.

25

### TRANSFORMATION AND SYSTEMS CONSOLIDATION

The Committee is concerned that the Department continues to struggle to produce reliable, timely and useful financial management information and that, to date, auditors have been unable to issue a clean opinion of the Department's financial statements. Within the funding provided for the CFO is $17,800,000 for the Transformation and Systems Consolidation (TASC) project, $2,000,000 below the requested level, due to high unobligated program balances resulting from program delays. This funding shall be used to consolidate the Department's multiple legacy financial management systems, which are obsolete and expensive to maintain, into fewer systems that are able to meet the needs and missions of multiple departmental components.

The Committee is concerned that the cost estimate for TASC may be significantly understated, and that the timeline for implementing this needed reform may continue to be stalled by bid protests and lawsuits. In light of these concerns, the Committee directs the Department to report to the Committee within 90 days of the enactment of this bill, and every six months thereafter on consolidating their financial management system. The report shall include the following matters: a detailed accounting of the Department's progress in assessing, selecting, transitioning to, and implementing a consolidated financial management system; a schedule showing when components will transition to the new financial system, accompanied by an explanation of how the transitions were prioritized; a breakdown of the resources needed to meet the human capital needs of the Department in transitioning to and fully implementing this system; the Department's plans to use an independent validation and verification agent to actively review the program once implementation has begun; and a risk management analysis for the system that identifies and evaluates ongoing risks for the Department, including a list of the program's most significant risks and the status of efforts to mitigate them.

Since 2003, the Coast Guard has had severe weaknesses in its financial management. Recent IG reports indicate that the Coast Guard's financial management practices may be worsening and remain the largest single contributor to the Department's inability to receive a clean audit. The Coast Guard claims that many of its problems will be ameliorated by the implementation of the consolidated financial system. In light of this, the Committee urges the CFO to consider transferring the Coast Guard to the new financial management system as soon as possible to help rectify these longstanding problems.

### CONGRESSIONAL BUDGET JUSTIFICATIONS

The Committee directs the Department to submit all of its fiscal year 2011 budget justifications on the first Monday in February, 2010, concurrent with the official submission of the President's budget to Congress. This should include all classified budgets as well as non-classified budgets. These justifications should have the customary level of detailed data and explanatory statements to support the appropriations requests, including tables that detail each agency's programs, projects, and activities for fiscal years 2009 and 2010. The Committee directs the CFO to ensure that ade-

26

quate justification is given to each increase, decrease, transfer, and staffing change proposed in fiscal year 2011. The CFO should also ensure that each item directed by the Committee to be provided as part of the fiscal year 2011 budget justification is delivered as mandated. There have been several instances in which statutory reporting requirements or other required budget details have not been included in the congressional justifications, one of note is the Coast Guard's Capital Investment Plan, a document this Committee depends on each year.

The CFO shall submit, as part of the 2011 budget justifications, a detailed table identifying the last year that authorizing legislation was provided by Congress for each program, project, or activity; the amount of the authorization; and the appropriation in the last year of the authorization.

### IMPACT OF CHANGING IMMIGRATION LAW FOR GUAM AND THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

The Committee is aware that on November 28, 2009, the Department will implement new rules affecting the entry and departure of travelers to and from Guam and the Commonwealth of the Northern Mariana Islands, pursuant to Title VII of Public Law 110–229, the Consolidated Natural Resources Act of 2008, and associated changes in immigration law and rules administered by the Department. The Committee understands that this change in law and regulation will increase workload and resource requirements for Departmental components who are responsible for administering immigration and travel laws, but the Department included no request for additional funding in its fiscal year 2010 budget request. The Committee therefore directs the Secretary to report to the Committee not later than January 15, 2010, on fiscal year 2010 resource requirements for carrying out the changes mandated in Public Law 110–229, including any required reprogramming or transfer of funds; acquisition or leasing of property; and relocation or hiring of additional personnel.

### MONTHLY REPORTING REQUIREMENTS

The Committee continues bill language requiring monthly budget and staffing reports within 45 days after the close of each month.

### OFFICE OF THE CHIEF INFORMATION OFFICER

| | |
|---|---|
| Appropriation, fiscal year 2009 | $272,169,000 |
| Budget request, fiscal year 2010 | 338,393,000 |
| Recommended in the bill | 299,593,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 | +27,424,000 |
| Budget request, fiscal year 2010 | −38,800,000 |

### MISSION

The Chief Information Office (CIO) has oversight of information technology projects in the Department. The CIO reviews and approves all DHS information technology (IT) acquisitions estimated to cost over $2,500,000, and also approves the hiring and oversees the performance of all DHS component CIOs.

RECOMMENDATION

The Committee recommends $299,593,000 for the Office of the Chief Information Officer, $38,800,000 below the requested level and $27,424,000 above the amount provided in fiscal year 2009. The majority of the reduction from the requested funding level is due to concerns over the data center migration initiative.

A comparison of the budget request to the Committee recommended level by budget activity is as follows:

| | Budget estimate | Recommended |
|---|---|---|
| Salaries and Expenses | $86,912,000 | $86,912,000 |
| Information Technology Activities | 51,417,000 | 51,417,000 |
| Security Activities | 152,403,000 | 113,603,000 |
| Homeland Secure Data Network | 47,661,000 | 47,661,000 |
| Total, Chief Information Officer | 338,393,000 | 299,593,000 |

SECURITY ACTIVITIES

The Committee recommends $113,603,000 for Security Activities, $38,800,000 below the amount requested and $20,980,000 above the amount provided in fiscal year 2009. The Administration requested a total of $200,000,000 throughout DHS to pay for migration of component resources to the Department's two consolidated data centers, including $58,800,000 for the CIO's share. The purpose of operating two data centers is to help manage the significant risk associated with locating all of the Department's data at a single site.

The Committee is disturbed by the recent report from the Department's Inspector General entitled "DHS's Progress in Disaster Recovery Planning for Information Systems." The report notes several problems with the CIO's plans to migrate and consolidate the Department's data centers into two centralized locations for efficiency, security and survivability in the event of a disaster. It notes that the data centers are still missing key infrastructure, such as interconnecting circuits and redundant hardware to allow them to act as effective backups. Some component agencies have plans to migrate their data to one of the centers, but lack an alternate site to actually process the data in the event of a disaster. Guidance provided to or developed by participating components does not conform to government standards, and 85 percent of components had not fully tested their contingency plans that would allow them to continue to operate in the aftermath of a significant event.

The IG found a number of alarming problems and vulnerabilities at these two data centers. Notably, risk assessments for both centers are out of date and are not expected to be updated until the end of the year. Equally disturbing was the failure of the last risk assessment to recommend action plans to deal with a possible hurricane, despite one facility's 20-mile proximity to the Gulf Coast. Among the vulnerabilities identified in the report were single points of failure for telecommunications and power, inadequate security, guards that lacked adequate clearances to protect such sensitive facilities, use of water-based fire extinguishers in computing and power facilities, lack of a perimeter fence, and failure to consider the risks from being located next to a testing facility for rocket engines.

28

This report was made public the day the budget was released. The Office of the CIO was aware of the shortcomings identified in this report for months and agreed with its findings. Yet at no point in outlining their budget before the Committee did the Department acknowledge the shortcomings identified in the report, or indicate that its budget was responsive to these concerns. Until that happens, the Committee cannot in good conscience continue funding migration of component data centers to these sites. Within the funds appropriated for Security Activities is $20,000,000 to update the risk assessments and take steps to remedy the problems identified in the report. The CIO is directed to provide an expenditure plan to the Committee within 60 days of enactment of this Act outlining how these funds will be allocated, and to supply quarterly reports thereafter on the progress in mitigating the risks identified in the report.

### HOMELAND SECURITY DATA NETWORK

The Committee provides $47,661,000, as requested, for the Homeland Security Data Network (HSDN) project, which is the secure computer network for DHS and its State and local partners. Recent press reports have detailed a security breach found in the system that has since been remedied. The Committee encourages the CIO to continue to take proactive steps to ensure the integrity of this investment, and to keep Congress informed of similar threats as they develop.

### CIO-LED INFORMATION TECHNOLOGY ACQUISITIONS

The Committee continues an existing requirement that the CIO report on all IT acquisitions financed directly or managed by the CIO.

### ANALYSIS AND OPERATIONS

| | |
|---|---:|
| Appropriation, fiscal year 2009 ........................................................ | $ 327,373,000 |
| Budget request, fiscal year 2010 ..................................................... | 357,345,000 |
| Recommended in the bill .................................................................. | 345,556,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ................................................. | +18,183,000 |
|     Budget request, fiscal year 2010 ............................................... | −11,789,000 |

### MISSION

Analysis and Operations houses the Office of Intelligence and Analysis and the Directorate of Operations Coordination, which together collect, evaluate, and disseminate intelligence information, as well as provide incident management and operational coordination.

### RECOMMENDATION

The Committee recommends $345,556,000 for Analysis and Operations, $11,789,000 below the amount requested and $18,183,000 above the amount provided in fiscal year 2009.

### STATE AND LOCAL FUSION CENTERS

The Committee provides the funding requested to expand support to all existing State and Local Fusion Centers, but notes that the Office of Intelligence and Analysis has failed to submit the

29

quarterly reports on this activity, as required in the 2009 Appropriations Act. The Committee directs the Office of Intelligence and Analysis to re-establish this quarterly reporting requirement immediately, and to include a national review of fusion center distribution, evaluating the potential for overlapping roles and jurisdictions.

### NATIONAL APPLICATIONS OFFICE AND NATIONAL IMMIGRATION INFORMATION SHARING OPERATION

As specified in the classified annex to this report, the Committee has reduced the funding requested for the National Applications Office (NAO) and National Immigration Information Sharing Operation (NIISO) below the levels requested. The Committee is concerned that although the Department has had at least 18 months to develop and submit operating documents and certifications showing that these programs can be conducted within existing privacy and civil liberties statutes, it has failed to adequately do so. While the Committee strongly supports programs that the Department believes are necessary for the security of the country, it is pointless to sustain funding for programs that are not operational and have been unable to demonstrate they can function within existing law. If the Department continues to promote the necessity of NAO or NIISO, it should use funding provided in the Analysis and Operations appropriation for planning, legal reviews and consultation with the relevant authorizing committees of jurisdiction to ensure these initiatives will operate in compliance with the law.

### DIRECTORATE OF OPERATIONS COORDINATION

The Committee has reduced funding for the Directorate of Operations Coordination below the levels requested. The Committee notes that the Directorate has not been able to hire staff at the pace projected in its 2009 expenditure plan, and therefore does not fund the requested increase for additional personnel in 2010.

The Committee supports the transfer of DHS Continuity of Operations (COOP) activities from the Office of Administration to the Directorate of Operations Coordination. However, the Committee strongly believes that cross-government COOP planning should remain at the Federal Emergency Management Agency (FEMA), and directs the Directorate of Operations Coordination to make no attempt to assume control of cross-government COOP responsibilities currently carried out by FEMA.

### CLASSIFIED PROGRAMS

Recommended adjustments to classified programs are addressed in a classified annex accompanying this report.

### OFFICE OF THE FEDERAL COORDINATOR FOR GULF COAST REBUILDING

| | |
|---|---|
| Appropriation, fiscal year 2009 ....................................................... | $1,900,000 |
| Budget estimate, fiscal year 2010 .................................................... | 2,000,000 |
| Recommended in the bill ................................................................. | 2,000,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ................................................ | +100,000 |
|     Budget estimate, fiscal year 2010 ............................................ | – – – |

30

MISSION

The Office of the Federal Coordinator for Gulf Coast Rebuilding coordinates the Gulf Coast Federal rebuilding efforts and works with State and local officials to identify the priority needs for long-term rebuilding.

RECOMMENDATION

The Committee recommends $2,000,000 for the Office of the Federal Coordinator for Gulf Coast Rebuilding (OFCGCR), the same as the amount requested and $100,000 above the amount provided in fiscal year 2009.

The Committee is concerned by the lack of adequate healthcare for the people of south Louisiana who have relied on Charity Hospital to provide health care to the poor and indigent since 1732. The hospital has been closed since Hurricane Katrina caused severe flooding and wind damage in 2005. The Committee is aware that FEMA Region VI recently denied the State's latest appeal on the level of reimbursement for Charity. The Committee believes the appeals process or arbitration, pursuant to section 601 of ARRA, should be utilized to bring a conclusion to this matter. OFCGCR shall work with FEMA, the Department of Health and Human Services, and the State of Louisiana to identify and pursue the path forward to bring Charity hospital back on-line.

OFFICE OF INSPECTOR GENERAL

(INCLUDING TRANSFER OF FUNDS)

| | |
|---|---|
| Appropriation, fiscal year 2009 [1] ................................................... | $114,513,000 |
| Budget request, fiscal year 2010 ................................................... | 127,874,000 |
| Recommended in the bill [2] ................................................... | 127,874,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 ............................................... | +13,361,000 |
| Budget request, fiscal year 2010 ............................................... | – – – |

[1] Includes a $16,000,000 transfer from the Disaster Relief Fund. Excludes $5,000,000 provided in the American Recovery and Reinvestment Act (P.L. 111–5).
[2] Includes a $16,000,000 transfer from the Disaster Relief Fund.

MISSION

The Homeland Security Act of 2002 established an Office of Inspector General (IG) in the Department of Homeland Security by amendment to the Inspector General Act of 1978. This office was established to provide an objective and independent organization that would be effective in: (1) preventing and detecting fraud, waste, and abuse in departmental programs and operations; (2) providing a means for keeping the Secretary of Homeland Security and the Congress fully and currently informed of problems and deficiencies in the administration of programs and operations; (3) fulfilling statutory responsibilities for the annual audit of the Department's financial statements; (4) ensuring the security of Department of Homeland Security's information technology pursuant to the Federal Information Security Management Act; and (5) reviewing and making recommendations regarding existing and proposed legislation and regulations to the Department's programs and operational components. According to the authorizing legislation, the Inspector General is to report dually to the Secretary of Homeland Security and to the Congress.

31

While oversight of DHS disaster response is included in the IG's mission, Hurricane Katrina brought a renewed focus and a major shift in IG resources to that mission area. In October 2005, in response to the need for enhanced oversight, the Inspector General established the Gulf Coast Hurricane Recovery Office to focus exclusively on preventing problems through a proactive program of internal control reviews and contract audits to ensure that disaster assistance funds were spent wisely. In April 2009, the Administration closed down the office amid public criticism of its performance. FEMA officials characterized the move as one that would speed decision making and improve efficiency in relief efforts. The Committee hopes that this is the case, but urges the IG to maintain its oversight of the continuing relief and reconstruction efforts on the Gulf Coast.

### RECOMMENDATION

The Committee recommends $127,874,000 for the Office of Inspector General, $111,874,000 in a direct appropriation and $16,000,000 by transfer from the Disaster Relief Fund. This total amount is in line with the budget request and $13,361,000 above the amount provided in fiscal year 2009. Consistent with prior years, funding transferred from the Disaster Relief Fund is to continue and expand audits and investigations related to disasters, including the 2005 Gulf Coast hurricanes.

### AUDIT REPORTS

The Committee directs the IG to forward copies of all audit reports to the Committee when they are issued and to immediately make the Committee aware of any review that recommends cancellation of, or modification to, any major acquisition project or grant, or that recommends significant budgetary savings. The Committee notes that distribution on several key reports has not been timely, and urges the IG to take full advantage of opportunities for electronic distribution to help remedy this situation. In addition, the Committee notes that the IG missed the deadline for submission of two audit reports specifically requested in the report accompanying the fiscal year 2009 Appropriations Act. Delays such as this hinder the Committee's ability to make the best decisions regarding matters under review, and as such are unacceptable.

The Committee directs IG to withhold any final audit or investigation reports requested by the House Committee on Appropriations, from public distribution for a period of 15 days.

32

## TITLE II—SECURITY, ENFORCEMENT, AND INVESTIGATIONS

### UNITED STATES CUSTOMS AND BORDER PROTECTION

#### SALARIES AND EXPENSES

| | |
|---|---:|
| Appropriation, fiscal year 2009 [1] | $7,603,206,000 |
| Budget estimate, fiscal year 2010 | 7,623,068,000 |
| Recommended in the bill | 7,576,897,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 | −26,309,000 |
|     Budget estimate, fiscal year 2010 | −46,171,000 |

[1] Excludes $160,000,000 in appropriations in the American Recovery and Reinvestment Act of 2009 (P.L. 111–5).

#### MISSION

The mission of U.S. Customs and Border Protection (CBP) is to protect the borders of the United States by preventing, preempting, and deterring threats against the U.S. through ports of entry and by interdicting illegal crossing between ports of entry. CBP's mission integrates homeland security, safety, and border management in an effort to ensure that goods and persons cross the borders of the U.S. in accordance with applicable laws and regulations, while posing no threat to the country. The priority of CBP is to prevent terrorists and their weapons from entering the United States, and to support related homeland security missions affecting border and airspace security. CBP is also responsible for apprehending individuals attempting to enter the U.S. illegally; stemming the flow of illegal drugs and other contraband, including weapons and bulk cash; protecting U.S. agricultural and economic interests from harmful pests and diseases; protecting American businesses from theft of their intellectual property; regulating and facilitating international trade; collecting import duties; and enforcing U.S. trade laws. CBP has a workforce of over 58,000, including CBP Officers, Air Interdiction Agents, Marine Interdiction Agents, canine enforcement officers, Border Patrol agents, Agriculture Specialists, trade specialists, intelligence analysts, and mission support staff.

#### RECOMMENDATION

The Committee recommends $7,576,897,000 for Salaries and Expenses, $46,171,000 below the amount requested and $26,309,000 below the amount provided in fiscal year 2009. The net reduction in funding from 2009 is chiefly due to the realignment of funding for real property construction, rent and management into the new Facilities Management account. This recommendation provides $981,850,000 for Headquarters Management and Administration, which includes an additional $5,000,000 to protect classified and sensitive CBP internet and computer systems, but no funding for data center migration; Border Security Inspections and Trade Facilitation is funded at $2,250,310,000, including $225,000,000 to annualize the cost of law enforcement officer retirement conversion for CBP Officers; $140,000,000 for the Western Hemisphere Travel Initiative (WHTI); and increases as follows: $9,340,000 for import safety; $18,100,000 to combat southbound smuggling crime and violence, and $3,000,000 for a Global Advance Passenger Information/Passenger Name Record initiative.

33

Border Security and Control between Ports of Entry is funded at $3,557,559,000, reflecting adjustments for pay annualization for the recent increase of Border Patrol agents to 20,019, more than twice the number of agents onboard in 2001. The funding will also support deployment of 367 new Border Patrol agents to the Northern Border for a total deployment of 2,212 by the end of fiscal year 2010, nearly seven times the number deployed to the Northern Border in 2001. The bill will support deployment of over 17,000 to the Southwest Border, almost 90 percent above the number onboard in 2001.

Air and Marine Operations are funded at $309,629,000, as requested, $37,950,000 above fiscal year 2009 funding, and include a net increase of $19,115,000 to hire 144 additional pilots, interdiction agents and support staff to expand and improve patrols and surveillance operations.

A comparison of the budget estimate to the Committee recommended level by budget activity is as follows:

| | Budget estimate | Recommended |
|---|---|---|
| Headquarters, Management, and Administration: | | |
| Management and Administration, Border Security Inspections and Trade Facilitation | $522,825,000 | $503,500,000 |
| Management and Administration, Border Security and Control between Ports of Entry | 497,675,000 | 478,350,000 |
| Subtotal, Headquarters Management and Administration | 1,020,500,000 | 981,850,000 |
| Border Security Inspections and Trade Facilitation: | | |
| Inspections, Trade, and Travel Facilitation at Ports of Entry | 2,255,210,000 | 2,250,310,000 |
| Harbor Maintenance Fee Collection (Trust Fund) | 3,226,000 | 3,226,000 |
| International Cargo Screening | 165,421,000 | 162,000,000 |
| Other international programs | 11,181,000 | 11,181,000 |
| Customs-Trade Partnership Against Terrorism | 62,612,000 | 62,612,000 |
| Trusted Traveler Programs | 11,274,000 | 11,274,000 |
| Inspection and Detection Technology Investments | 143,563,000 | 143,563,000 |
| Automated Targeting Systems | 32,560,000 | 32,560,000 |
| National Targeting Center | 26,355,000 | 26,355,000 |
| Training | 24,778,000 | 24,778,000 |
| Subtotal, Border Security Inspections and Trade Facilitation | 2,736,180,000 | 2,727,859,000 |
| Border Security and Control between Ports of Entry: | | |
| Border Security and Control | 3,505,008,000 | 3,505,808,000 |
| Training | 51,751,000 | 51,751,000 |
| Subtotal, Border Security and Control between POEs | 3,556,759,000 | 3,557,559,000 |
| Air and Marine Operations | 309,629,000 | 309,629,000 |
| Total | 7,623,068,000 | 7,576,897,000 |

MIGRATION TO NEW DEPARTMENT DATA CENTERS

Consistent with funding recommendations contained throughout this report, the Committee provides no new funding for CBP data center migration activities. This is due to the Inspector General's recent findings, described in the Chief Information Officer section of the report, regarding possible unmitigated risks at the destination data center sites. As any failure of CBP systems could have devastating effects on critical customs and immigration enforcement and regulatory programs, it is essential this risk be mini-

34

mized before migration goes forward. To the extent that any of the proposed funding is not directly related to the migration, but is preparatory acquisition or services, the Committee encourages CBP to submit reprogramming proposals if appropriate.

## LAW ENFORCEMENT OFFICER CONVERSION

The Committee commends the Department for requesting funding for the costs associated with retirement and pay costs due to the conversion of CBP Officers to law enforcement officer status, which began on July 1, 2008. This is a critical requirement and the Committee expects the positive impact will result in improved CBP retention and recruitment of the most qualified and dedicated officers. The Committee is aware that there is a potential for retirement and benefit costs associated with conversion to exceed the $225,000,000 requested, but that CBP is planning to manage such a contingency by reallocating funds within accounts. The Committee asks to be notified if such additional costs are incurred, and of the steps taken to fill the shortfall.

## SOUTHWEST BORDER OUTBOUND ENFORCEMENT INITIATIVE

The Committee has included an increase of $26,132,000, as requested, to augment efforts begun in 2009 as part of the Southwest Border Initiative, a targeted effort to stop smuggling of the drugs, weapons and bulk cash on which violent drug cartels depend. This funding includes $16,132,000 for an additional 65 CBP Officers, 44 Border Patrol agents, and 16 support personnel, as well as $10,000,000 for additional license plate readers to be installed at southbound vehicle lanes where such technology is still lacking. In order to stay informed about the progress of this initiative, the Committee directs CBP to include statistics about its outbound enforcement progress in the quarterly Strategic Border Initiative report to the Committees on Appropriations.

## IMPORT SAFETY AND TRADE ENFORCEMENT INITIATIVE

The Committee has included $9,340,000, as requested, for an initiative to implement import safety requirements of Executive Order 13439, as well as to better staff CBP's Office of International Trade to carry out critical trade functions, and help protect the nation against unsafe food and products, such as recently experienced in melamine-contaminated food, and toys painted with lead paint. Although the overall volume of trade may decline this year, the growth in the workload driven by the increase in entities engaged in trade and the increase in trade agreements make this initiative an important one. The Committee directs CBP to provide a briefing not later than December 1, 2009, on the plans for implementing this initiative.

## GLOBAL ADVANCE PASSENGER INFORMATION/PASSENGER NAME RECORD INITIATIVE

The Committee provides an additional $3,000,000, as requested, for the effort to collaborate with foreign governments on sharing travel information. The Committee directs CBP to provide a classified briefing not later than December 1, 2009, on this program.

35

### WESTERN HEMISPHERE TRAVEL INITIATIVE

The Committee includes $140,000,000 for the continued costs of infrastructure, technology and operations for WHTI, which went into effect on June 1, 2009. This includes an increase of $16,000,000 for: (1) expanded program support for the 2010 Winter Olympics and at additional ports of entry; (2) audits of enhanced drivers licenses and wait time studies; (3) deployment of WHTI technology to novel configurations, such as dual use lanes and straddle booths; and (4) coverage of pedestrians and passengers in modes of transportation other than personally operated vehicles.

The Committee expects the WHTI effort will become integrated within the regular inspection and trade/travel facilitation functions, and directs CBP to report not later than December 1, 2009, on the status of WHTI implementation, the transition to regular operations, and the elements and funding that will be non-recurred when WHTI processes are the norm.

### INSPECTION AND DETECTION TECHNOLOGY

The Committee includes $143,563,000, as requested, for Inspection and Detection Technology. The Committee understands that, in addition to ongoing operation and maintenance of CBP's inventory of technology systems, this funding will include 12 new replacement large scale nonintrusive inspection (NII) systems, five additional NII systems for upgraded ports of entry, and approximately 600 small scale and hand-held NII for replacement or to deploy where shortages exist. The Committee expects CBP to award procurement for these items on a fully competitive basis, with the focus for award being on attaining the performance goals for which technology is to be used.

### BORDER PATROL STAFFING

The Committee funds the request for Border Patrol hiring and operations, and strongly supports the plan to achieve a target of 2,212 agents on the Northern Border by the end of fiscal year 2010. As the Border Patrol gains experience with its expanded presence on both borders, it will be doing so in the context of new technology and infrastructure from the Secure Border Initiative, which in turn may affect the operational requirements for the numbers of agents and perhaps lead to changes in how they are deployed. The Committee strongly encourages CBP and the Border Patrol to look carefully at its requirements and provide a briefing to the Committee not later than February 1, 2010, on its planning for long term staffing for the Border Patrol, including the methodology for determining optimal size as well as patterns of deployment.

### NORTHERN BORDER STRATEGIC EFFORTS

The Committee has urged that more resources and attention be devoted to closing vulnerabilities on the extended Northern Border, and as a result, there have been many tangible changes. Border Patrol presence has grown from 336 agents in 2001 to a planned 2010 deployment of 2,212; Air and Marine units have grown to include five primary air branches and additional marine units; and CBP field operations has received more Officers for border processing and initiatives such as WHTI. The number of border en-

36

forcement task forces is increasing, as is the tempo of their work. SBInet will soon deploy mobile and remote video surveillance systems, and improved tactical communications for the Border Patrol. CBP's aging and inadequate ports of entry will be replaced or upgraded with ARRA funding. The implementation of WHTI brings a more robust inspection process to the Northern Border, with new infrastructure, technology, and staffing to support it.

These enhancements will change significantly the way CBP works on the Northern Border, including programs to enforce border security and expedite trade and travel with our Canadian neighbor. To take stock of where the agency is and where it will go, the Committee requests a report, not later than January 15, 2010, that will provide an accounting of Northern Border initiatives, staffing and funding; an assessment of the impact such investments and initiatives have had on CBP's execution of its dual missions to secure the border and facilitate trade and travel; and the priorities CBP has for its operations and programs on the Northern Border going forward.

### ELECTRONIC SYSTEM FOR TRAVEL AUTHORIZATION

The Electronic System for Travel Authorization (ESTA) provides automated electronic vetting of travelers from 35 visa waiver countries, eight of them added in fiscal year 2008. The Committee understands that CBP projects it will process over 17 million ESTA applications in fiscal year 2009, with an estimated rejection rate of 0.2 percent. As ESTA transitions to an "operations and maintenance" phase, the Committee directs CBP to include, as part of its fiscal year 2011 budget request, details on ESTA staffing, funding, and implementation schedule, to include an assessment of ESTA performance in its first two years of operation.

### TRUSTED TRAVELER PROGRAMS

CBP currently operates four "trusted traveler" programs: the Secure Electronic Network for Travelers Rapid Inspection (SENTRI) for travelers on the Southwest border, the NEXUS air and land programs for travelers on the Northern Border, the Free and Secure Trade (FAST) program for commercial travel facilitation, and Global Entry (GE), an expedited clearance program for pre-approved international air travelers. While it has not requested additional funding for the purpose in fiscal year 2010, CBP informed the Committee that it is developing a global enrollment system that will, when fully operational, serve as the application gateway to a single trusted traveler program.

The established systems—SENTRI, FAST, and NEXUS—are all seeing growth in part because, by participating, a traveler will satisfy the requirements of WHTI. GE, by comparison, is yet a fairly small program. GE was initiated in June 2008 on a pilot basis and currently operates at seven U.S. international airports. GE is scheduled to be extended to an additional 13 airports with funding provided by this Committee in fiscal year 2009. The Department reports it had approved 6,100 GE members as of January 2009 and estimates there will be 13,500 by October 2009. Initially limited to U.S. citizens and residents, GE is being expanded on a reciprocal, pilot basis, to participants in Privium, the Dutch expedited clearance program.

37

While the Department reports GE has the potential to exceed this estimated enrollment—to more than 800,000, the number of frequent international travelers projected by DHS—initial registration efforts are clearly proceeding more slowly than expected. Furthermore, while the program collects fees from participants, it is not clear whether GE—or an eventual comprehensive "trusted traveler" program—could operate exclusively on a fee basis and still meet the needs of a significant growth in membership. The Committee needs to understand CBP's capacity and requirements to make this program a success and so directs CBP to provide, not later than January 15, 2010, a detailed report on: (1) its progress in expanding the GE program; (2) the status of efforts to facilitate the migration of NEXUS and SENTRI users into Global Entry; (3) its progress in integrating FAST with the Automated Commercial Environment; and (4) prospects for developing a global enrollment system through a unified trusted traveler program. The report should also identify relevant implementation considerations and resource requirements for these efforts.

### SENTRI LANES AT PORT OF SAN YSIDRO

The Committee recognizes the San Ysidro port of entry as one of the busiest border crossings in the world, which continues to need major renovation and reengineering to handle its massive processing and security requirements. The Committee encourages CBP to explore the possibility of conducting a demonstration project to determine the effectiveness of operating up to ten SENTRI lanes at San Ysidro during peak hours, seven days a week, with the option of opening an additional SENTRI lane during peak crossing times of 5 a.m. to 10 a.m. and 3 p.m. to 9 p.m. whenever wait times exceed 15 minutes.

### INTERNATIONAL CARGO SCREENING

The Committee has great interest in the success of the International Cargo Screening program, which consists of the Container Security Initiative (CSI) and the Secure Freight Initiative (SFI), and funds it at $162,000,000, nine percent above the fiscal year 2009 level. The CSI has deployed CBP Officers and specialists to 58 major international seaports, scanning U.S.-bound cargo in a targeted fashion, based on estimated risk. CBP has been working to establish more permanent positions at its CSI locations, as well as to place more resources at the National Targeting Center. The Committee strongly encourages these efforts.

The SFI, by contrast, is a pilot program to determine the feasibility of 100 percent scanning of U.S.-bound cargo in foreign ports. While these pilots have produced useful data and shown the potential of a 100 percent scanning approach for some ports and trade lanes, they have also revealed considerable challenges. Both the Secretary and the Acting CBP Commissioner have stated they do not expect to be able to meet the statutorily mandated target for 100 percent overseas scanning of U.S.-bound cargo by 2012, and have expressed misgivings about the feasibility of such a goal given the formidable financial, technical and diplomatic obstacles. The Committee welcomes this candor. It has become increasingly clear that, at least for now, a 100 percent scanning goal is not feasible,

38

and even if it were, would come at an unacceptably high cost monetarily and in the displacement of other efforts.

While cargo security efforts should not be tied to one model, the threat of trade supply chains being used to move weapons, or to be themselves a target for economic disruption, remains. A number of programs help contribute to security in this regard, including the Customs-Trade Partnership Against Terrorism (C–TPAT), the new security filing (10+2) rule, and improved exchange of information with friendly governments. However, assuming that 100 percent overseas scanning is not likely soon, if ever, to be achieved, it is not clear what mix of measures the Department assumes it should work toward to take its place. Might SFI be the best approach, based on the risk, for ports in high threat areas? How permanent a solution is CSI, and what is its optimal end-state? The Committee directs CBP to report, not later than January 15, 2010, on its strategy to achieve meaningful cargo and supply chain security in the absence of the total scanning requirement.

### MODEL PORTS OF ENTRY

The Committee strongly desires to see the Model Ports of Entry (MPOE) program significantly improve the quality of the arrival experience for both international visitors to the U.S. as well as returning U.S. citizens and residents. While Congress funded additional CBP Officers for airports in fiscal years 2008 and 2009, the Committee understands CBP has not adjusted staffing allocation and scheduling systems to most effeciency improve the efficiency of passenger processing. As a result, additional CBP Officers has not translated into shorter wait times for international visitors at the 20 MPOE airports. The Committee recognizes that CBP schedulers have limited flexibility as they face a complex scheduling environment, with significant and erratic variation in the number and mix of arriving international passengers, both daily and hourly. Nevertheless, the Committee expects CBP to correct any staffing model deficiencies, improve its scheduling capacity, and if required, automate its scheduling system and employ industrial engineering services to improve its MPOE passenger operations. The Committee is willing to consider reprogramming or reallocation requests to achieve this goal. The Committee directs CBP to report, not later than December 1, 2009, on its progress in making such improvements, to include an update on the information required in the fiscal year 2009 Committee report on MPOE implementation and performance.

### IN-BOND CARGO AND CONTAINER SECURITY

CBP continues to gather information from its tests of commercial off-the-shelf technology as a means to track shipments that transit the United States under CBP bond, including its radio frequency transponder technology demonstration for in-bond shipments. The Committee directs CBP to provide, not later than January 15, 2010, an updated status report on its study of potential technology solutions for tracking and managing in-bond shipments, including the number of such in-bond shipments for fiscal years 2007–2009, and the number of times in-bond documents were not fully reconciled between arrival and destination ports.

39

## TEXTILE TRANSSHIPMENT ENFORCEMENT

The Committee includes $4,750,000, as in previous years, to continue textile transshipment enforcement. The Committee directs CBP to ensure that the activities of the Textile and Apparel Policies and Programs Office, specifically seizures, detention, and special operations, are maintained at least at the level of those activities in prior years. The Committee directs CBP to submit a report with the fiscal year 2011 budget on execution of its five-year strategic plan. The report should include information covering enforcement activities; textile production verification team exercises and special operations; numbers of seizures; penalties imposed; and the numbers and types of personnel responsible for enforcing textile laws (including headquarters staff in the Textile Enforcement Operations Division).

## PROJECT SEAHAWK

The Committee encourages CBP to continue its work with the Department of Justice and local law enforcement on the Project SeaHawk law enforcement task force to the maximum extent possible.

## CONTAINER SECURITY DEVICE

The Committee continues to believe a viable Container Security Device (CSD) is an essential element of an effective supply chain security framework. The Committee is disappointed by the failure of CBP and S&T to develop and deploy a viable CSD, despite years of effort and the expenditure of considerable resources. As numerous security experts have attested and CBP itself has noted such a CSD could be of value in high-risk trade lanes. The Committee remains strongly interested in seeing if this technology can advance, and directs CBP to continue to explore possible solutions with S&T for CSD testing and deployment, and to provide quarterly updates of its progress to the Committee.

## FRESNO AIRPORT

The Committee encourages CBP to review the port-of-entry status of Fresno Yosemite International Airport, which is currently operating at user-fee status, to determine if the airport meets the international flight threshold necessary to be designated a non-reimbursable Port-of-Entry. Further, the Committee asks CBP to provide an estimate on the costs the agency would incur should the status be adjusted at Fresno Yosemite International Airport and report to the Committee whether an increase in programmatic funds is necessary to achieve this change in status, if appropriate.

## JOINT OPERATIONS WITH THE NATIONAL PARK SERVICE

The Committee recognizes the Department's exceptional coordination with the National Park Service along the border, specifically the joint operations and projects at Big Bend National Park and Amistad National Recreation Area. These joint operations are essential to combat illegal activity and keep park visitors safe. Furthermore, the Committee encourages expeditious completion of these projects.

40

PORTABLE SOLAR CHARGING RECHARGEABLE BATTERY SYSTEM

The Border Patrol is frequently required to operate for extended periods of time in remote locations where access to electric power can only be provided by heavy auto and marine type batteries. The Committee includes $800,000 to meet the requirement of the Border Patrol for a quiet, lightweight power source. Solar rechargeable systems will enable agents to access wider areas and to remain deployed for longer periods of time on border observation and criminal interdiction operations. Funding shall be competitively awarded.

## AUTOMATION MODERNIZATION

| | |
|---|---|
| Appropriation, fiscal year 2009 ....................................................... | $511,334,000 |
| Budget estimate, fiscal year 2010 ................................................... | 462,445,000 |
| Recommended in the bill .................................................................. | 462,445,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ............................................... | −48,889,000 |
|     Budget estimate, fiscal year 2010 ........................................... | – – – |

### MISSION

Automation Modernization includes funding for major information technology modernization and development projects for CBP, including the Automated Commercial Environment (ACE) system and the multi-agency International Trade Data System (ITDS); support and transition of the legacy Automated Commercial System (ACS); the integration and connectivity of information technology infrastructure within CBP and DHS as part of Critical Operations Protection and Processing Support (COPPS); modernization of the TECS enforcement and compliance system; and the Terrorism Prevention Systems Enhancements (TPSE) initiative aimed at enhancing system infrastructure to ensure continuity of operations in critical passenger programs.

### RECOMMENDATION

The Committee recommends $462,445,000 for Automation Modernization, the same as the amount requested and $48,889,000 below the amount provided in fiscal year 2009. Not less than $267,960,000 is for ACE development. CBP is directed to provide an expenditure plan detailing how it will distribute this funding to ACE/ITDS, COPPS, TECS, and TPSE, and the Committee includes bill language making $167,960,000 unavailable for obligation for ACE until 30 days after it receives a detailed expenditure plan.

### ACE PROGRAM DELAYS

The Committee is greatly concerned by delays in completing critical releases for ACE, in particular Entry Summary, Accounts, and Revenue (ESAR) and e-Manifest, which are now scheduled to be completed in 2012 and 2013 respectively. The need to field ACE with all its major functionality, and thereby automate all critical customs and trade transactions, has been a Committee priority since the inception of the program at the beginning of the decade. While ACE requirements changed initially due to the increased focus on security after the 9/11 attacks, continued delays in implementing critical functions are disappointing and costly to the effi-

41

ciency of trade. While the reduction in funding for ACE development may be consistent with technical or other development delays, promised ACE functionality would be a boon for the beleaguered trade sector in this economy. To ensure the Committee has information it needs to assess the effectiveness of the ACE effort, the Committee continues to require an expenditure plan to maintain effective oversight of this important modernization effort.

### INTERNATIONAL TRADE DATA SYSTEM

The International Trade Data System (ITDS) is a multi-agency initiative designed to establish a single "window" for the collection and sharing of data and statistics on trade, to be developed along with the Automated Commercial Environment (ACE). CBP has been named the "managing partner" for ITDS, which presently includes 46 participating government agencies (PGAs). However, CBP says that in order to achieve the effective "single window" objective for trade data, there needs to be participation from all 79 key agencies with policy or regulatory roles affecting the collection and use of trade data. Until all 79 agencies are participating, the benefits of ITDS will be limited, as there will continue to be multiple and overlapping requirements for similar trade data. The Committee directs CBP to include in its expenditure plan a report on progress in implementing ITDS, with regard to the technical features of ITDS as well as the recruitment of all PGAs needed to enable ITDS to achieve the benefits of a "single window."

### TECS

Funding for TECS modernization in the amount of $50,000,000, as requested, is included within the COPPS program, project and activity line, and covers the modernization program to replace existing mainframe elements of TECS with a sustainable modern architecture and graphical user interfaces. A joint effort between CBP and U.S. Immigration and Customs Enforcement (ICE), TECS modernization is to be completed in the next five years. The Committee directs CBP to brief the Committee not later than December 1, 2010 on the status of modernization efforts.

### BORDER SECURITY FENCING, INFRASTRUCTURE, AND TECHNOLOGY

| | |
|---|---|
| Appropriation, fiscal year 2009 [1] ................................................ | $775,000,000 |
| Budget estimate, fiscal year 2010 ................................................ | 779,452,000 |
| Recommended in the bill ................................................ | 732,000,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ................................................ | −43,000,000 |
|     Budget estimate, fiscal year 2010 ................................................ | −47,452,000 |

[1] Excludes $100,000,000 in appropriations in the American Recovery and Reinvestment Act of 2009 (P.L. 111–5).

### MISSION

The Border Security Fencing, Infrastructure, and Technology (BSFIT) account funds the technology and tactical infrastructure solutions to achieve effective control of the U.S. borders and coastlines.

42

RECOMMENDATION

The Committee recommends $732,000,000 for Border Security Fencing, Infrastructure, and Technology (BSFIT), $47,452,000 below the amount requested and $43,000,000 below the amount provided in fiscal year 2009. The Committee recommends $440,000,000 for development and deployment, which will fund technology and tactical infrastructure investment, including $40,000,000 for Northern Border technology and $40,000,000 for tactical communications; $200,000,000 for operations and maintenance; and $92,000,000 for program management, including $40,000,000 for environmental assessment and mitigation. Of this total, $150,000,000 may not be obligated until an expenditure plan is approved by the Committees on Appropriations and reviewed by GAO. The Committee retains bill language making no funds available for obligation for fencing or tactical infrastructure for which the Secretary intends to waive environmental or other legislation until 15 days after the intention to invoke such authority is published in the Federal Register. In addition, the Committee continues bill language stating no BSFIT funds may be obligated until the Secretary certifies that DHS has complied with the consultation provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

A comparison of the budget estimate to the Committee recommended level by budget activity is as follows:

| | Budget estimate | Recommended |
|---|---|---|
| Development and Deployment | | |
| • Technology and Infrastructure Investment | 454,000,000 | 400,000,000 |
| • Northern Border Technology Investment | 40,000,000 | 40,000,000 |
| Subtotal, Development and Deployment | 494,000,000 | 440,000,000 |
| Operations, Maintenance and Support (Integrated Logistics) | 200,000,000 | 200,000,000 |
| Program Management | | |
| • Personnel Operations and Support | .................... | 52,000,000 |
| • Regulatory and Environmental Requirements | .................... | 40,000,000 |
| Subtotal, Program Management | 85,452,000 | 92,000,000 |
| Total | 779,452,000 | 732,000,000 |

QUARTERLY REPORTS

The Committee directs the Department to continue its quarterly Secure Border Initiative status reports. The report should include an update on Northern Border and tactical communication investments.

SECURE BORDER TECHNOLOGY INVESTMENT

Congress has appropriated over $3,500,000,000 for BSFIT activities since 2006. To date, this has resulted in completion of about 624 miles (of 670 deemed appropriate and necessary by the previous administration) in pedestrian and vehicle fencing. Initial SBInet technology deployment is scheduled to begin in the Tucson area in summer 2009. This is a year later than originally planned, due in part to the need to ensure systems pass technology qualification testing and to avoid installing technology prematurely. Be-

43

cause this deployment has been delayed, the Committee has included $440,000,000 for Development and Deployment funding, a reduction of $54,000,000 from the request. The Committee will consider reprogramming of funds to accelerate technology deployment should that prove feasible.

NORTHERN BORDER TECHNOLOGY INVESTMENT

The Committee is encouraged to see deployment of technology investments to the Northern Border, with mobile and remote video surveillance systems scheduled to be installed in Detroit, Swanton, and Buffalo this year. The Committee includes $40,000,000, as requested, for continued technology investments to address Northern Border vulnerabilities, and directs that quarterly SBI reports include a status report on technology investments on the Northern Border.

OPERATIONS, MAINTENANCE, AND SUPPORT

The Committee includes $200,000,000, as requested, for the operation and maintenance of systems and infrastructure deployed with BSFIT funding. This represents a 33 percent increase over the fiscal year 2009 appropriated level. Within this amount, the Committee understands that $75,000,000 is for operation and maintenance costs for tactical infrastructure, with the remaining $125,000,000 for support of technology, including tactical communications and integrated logistics support of newly deployed systems. The Committee expects to see a detailed rationale for the application of this funding in the fiscal year 2010 expenditure plan, and directs CBP to continue to provide a monthly report on operations, maintenance, and support obligations and expenditures.

ENVIRONMENTAL AND REGULATORY ASSESSMENTS AND MITIGATION

The Committee includes $40,000,000 for regulatory and environmental assessments and mitigation. The Committee continues to support a policy of minimizing adverse environmental and other negative impacts from SBI construction, and expects CBP to use these funds to work in coordination with the Department of Interior and other government agencies with responsibilities for environmental policy on the border, as well as with State and local governments and subject matter experts from the scientific and environmental community. The funding should, as appropriate, be used for science-based approaches to monitor and mitigate environmental and ecological impacts. In particular, the Committee directs CBP to examine the use of "buffer areas" to accommodate both mitigation and security objectives for detecting and responding to illegal border crossing, such as those employed by the Department of Defense around bases and testing areas, and to report its findings with the submission of the fiscal year 2010 expenditure plan. The Committee also directs CBP to include a detailed environmental mitigation plan and report on mitigation efforts with its fiscal year 2010 expenditure plan submission. The plan should be science-based; include an extensive monitoring protocol; incorporate best practices developed in consultation with relevant federal, state, local and tribal authorities; and support land acquisition efforts for mitigation purposes, where applicable. The plan should

44

also address mitigating and minimizing the impact not only of SBI construction and infrastructure, but also of increasingly intensive Border Patrol operations in sensitive border ecosystems.

The Committee expects the Department to continue to limit any future exercise of the Secretary's waiver authority to specific, narrow, unaggregated segments of the border, and retains bill language requiring the Secretary to provide 15 days' notice in the Federal Register in those instances where a decision is made to invoke such authority.

EXPENDITURE PLAN

The fiscal year 2009 BSFIT expenditure plan represented an improvement over previous submissions. There remain some gaps, however, as identified by the Government Accountability Office, including a failure to adequately show how proposed spending corresponded with the accomplishment of specific strategic objectives, and the lack of a documented comparison of construction alternatives in terms of their impacts, unintended or otherwise, on local communities. To help ensure future BSFIT investment decisions are transparent, maintain a foundation for effective investment, document performance against promises, and support a balanced approach to all threats along the borders, the Committee continues to include bill language restricting the availability of some funding for obligation until approval of an expenditure plan.

The Committee understands that the Department has indicated it does not currently plan to initiate any significant new pedestrian or vehicle fence construction in 2010. Therefore the statutory requirements to explain and justify such decisions, and document the consultation and analytic processes that underlie them, should not pose any significant administrative burden for CBP or the Department. However, the Committee retains existing statutory language so that the process of identifying and pursuing any additional tactical infrastructure will be guided by the same requirements for transparency and rigor. In addition, the future size and growth of funding planned for the complex SBInet technology portion of BSFIT demands the level of accountability that the expenditure plan provides to the Committee. The Committee therefore makes $150,000,000 unavailable for obligation until an expenditure plan has been submitted to the Committee that:

1. Defines activities, milestones, and costs for implementing the program;

2. Demonstrates how specific projects will further the goals and objectives of the Secure Border Initiative (SBI) and how funding will be allocated to the highest priority border security needs;

3. Includes an explicit plan of action for meeting program commitments;

4. Identifies funding and staffing requirements;

5. Describes how the plan addresses Northern Border and Port of Entry security needs;

6. Reports on budgeting, obligations and expenditures, activities completed, and progress made related to obtaining effective operational control of the border.

7. Lists all open GAO and Office of Inspector General recommendations and describes status of efforts to address them;

45

8. Includes Chief Procurement Officer certification that investment management and acquisition requirements are met;

9. Includes Chief Information Officer certification that information technology and risk management requirements are met;

10. Includes Chief Human Capital Officer certification that the human capital needs are met;

11. Includes a detailed analysis, with comparison of alternatives, for any segment of border for which fence or tactical infrastructure solutions are proposed, and includes evaluation of stakeholder-proposed alternatives as potential substitutes for tactical infrastructure; and

12. Is reviewed by GAO.

ALTERNATIVES ANALYSIS

To the extent that additional fencing is proposed, the Committee expects the fiscal year 2010 expenditure plan to contain analyses of alternatives for effective control of the border. These analyses should document the decision process that led to selection of fencing as the optimal solution. The Committee directs that such comparisons include the following:

1. A methodology section to explain how CBP determined ratings and weightings, and the standard guidance applied to all segment analyses;

2. A description of baseline costs of each segment, broken out by personnel, infrastructure, and technology, and a detailed comparison of the cost of each alternative against that baseline;

3. A comparison of estimated level of border control, by segment, under each alternative (deterrence and time/distance) relative to the current level of border control. In defining the latter, CBP's estimates should incorporate natural barriers or other features of the landscape as appropriate and fully describe the contribution of such features in the plan.

Alternatives should consist of reasonable combinations of elements (e.g., agents, sensors, and cameras), instead of being limited to individual elements unlikely to be used in isolation. CBP should also include alternatives proposed by communities or other stakeholder groups, such as eradication of vegetation; enhancement of natural barriers; or incorporation of security features into projects.

CONSULTATION WITH FEDERAL AGENCIES AND LOCAL COMMUNITIES

Section 564(2) of Public Law 110–161 required the Secretary to consult with other cabinet secretaries, State, local and tribal governments, and local landowners to minimize the impact of proposed fencing on the environment, culture, commerce, and quality of life of the affected communities. The Committee continues bill language that makes no BSFIT funding available for obligation until the Secretary certifies that DHS has complied with the consultation provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

46

BORDER INTEROPERABILITY DEMONSTRATION PROJECT

The fiscal year 2009 BSFIT appropriation included $30,000,000, as authorized in section 320 of the 9/11 Act, for Border Interoperability Demonstration Projects in Northern and Southwestern border communities. A report on the implementation of this program was due on April 6, 2009, but has not yet been received. Indeed, the Committee understands no funding has been obligated for this program, and therefore no grants have been made to border communities, although funds were appropriated over eight months ago. The Committee directs the Department to proceed immediately to carry out this program and to report to the Committee as soon as possible on its status.

### AIR AND MARINE INTERDICTION, OPERATIONS, MAINTENANCE, AND PROCUREMENT

| | |
|---|---|
| Appropriation, fiscal year 2009 ...................................................... | $528,000,000 |
| Budget estimate, fiscal year 2010 ................................................... | 505,826,000 |
| Recommended in the bill ................................................................ | 513,826,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ................................................ | − 14,174,000 |
|     Budget estimate, fiscal year 2010 ............................................ | +8,000,000 |

MISSION

CBP Air and Marine provides integrated and coordinated border interdiction and law enforcement support for homeland security missions; provides airspace security for high risk areas or National Special Security Events upon request; and combats efforts to smuggle narcotics and other contraband into the United States. CBP Air and Marine also supports counter-terrorism efforts of many other law enforcement agencies.

RECOMMENDATION

The Committee recommends $513,826,000 for Air and Marine Interdiction, Operations, Maintenance, and Procurement, $8,000,000 above the amount requested and $14,174,000 below the amount provided in fiscal year 2009. The funding includes $374,217,000 for operations and maintenance, and $139,609,000 for procurement. Within the latter, $65,000,000 is included, as requested, to continue P–3 Service Life Extension. The Committee includes $66,600,000, as requested, for continued acquisition of items in the CBP Air and Marine strategic acquisition plan. In addition, the Committee provides $8,000,000 to undertake modernization of the Air and Marine Operations Center (AMOC).

MARINE BOATS

The Committee is aware that there has been an increase in efforts to smuggle illegal drugs and immigrants into the United States by sea. CBP Air and Marine has approximately 200 marine vessels in its inventory, including new interceptor and riverine vessels funded in the past three years. At the same time, the Committee understands that the mission of the fleet has expanded, along with patrol areas, and that such intensive usage is degrading the current fleet. The Committee has included funding, as requested, for marine vessels, and directs CBP to report, not later

47

than January 15, 2010, with an update on its strategic acquisition plan with regard to vessel procurement. The report should describe the operational status of its fleet, requirements to retire or replace vessels, and associated resource implications.

### AIR AND MARINE OPERATIONS CENTER

The Committee recognizes that the U.S. Customs and Border Protection Air and Marine Operations Center (AMOC) has developed the necessary expertise, technical capability, joint agency framework, and law enforcement foundation to serve the nation's needs for general aviation air interdiction and security operations, as well as air investigations support. The Committee has included $8,000,000 towards the cost of upgrading the software and systems needed for AMOC to fulfill its role as a national air security center, and direct CBP to report to the Committee on the role and operation of the AMOC, its place in coordinating homeland security operations, and the status of efforts to modernize the AMOC and fully staff its operations.

### NORTHERN BORDER AIR BRANCHES

The Committee includes funding, as requested, to fill remaining gaps in assets and resources for the five primary air branches established on the Northern Border: Bellingham, Washington; Great Falls, Montana; Grand Forks, North Dakota; Detroit Michigan; and Plattsburg, New York.

### FACILITIES MANAGEMENT

| | |
|---|---|
| Appropriation, fiscal year 2009 [1] | $403,201,000 |
| Budget estimate, fiscal year 2010 | 678,633,000 |
| Recommended in the bill | 682,133,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 | +278,932,000 |
|     Budget estimate, fiscal year 2010 | +3,500,000 |

[1] Excludes $420,000,000 in the American Recovery and Reinvestment Act of 2009 (P.L. 111–5).

### MISSION

The Facilities Management account is a new account that funds all CBP real estate and facilities, including consolidating all funding for construction, leasing acquisition, rent, facility program support, operations, management, headquarters support, and tunnel remediation activities. This consolidates funding previously carried in the Construction account and the Salaries and Expenses activities for rent, leasing, and program management costs. This includes the planning, design, and assembly of Border Patrol infrastructure, including Border Patrol stations, checkpoints, temporary detention facilities, mission support facilities, training facilities, and CBP-owned ports of entry. Tactical infrastructure (fencing, barriers, lighting and road improvements at the border) is funded through the Border Security, Fencing, Infrastructure, and Technology account.

### RECOMMENDATION

The Committee recommends $682,133,000 for Facilities Management, $3,500,000 above the amount requested and $278,932,000 above the amount provided in fiscal year 2009. The funding in-

48

cludes $242,857,000 for Facilities Construction and Sustainment, $402,263,000 for Rent, chiefly related to leases with the General Services Administration (GSA) and rent-related services; and $37,013,000 for Program Oversight and Management.

### LAND PORT OF ENTRY MODERNIZATION

As part of ARRA, $420,000,000 was provided to replace or modernize the 43 land ports of entry owned by CBP. Most land ports of entry are owned by GSA, particularly the largest urban crossings, and the projected cost to upgrade these ports has been estimated by CBP to be as high as $1,500,000,000. The Committee directs CBP to continue working with GSA to prioritize funding for modernizing these facilities.

### RURAL AND REMOTE HOUSING

Over the last five years, the number of Border Patrol agents has nearly doubled. There has also been a major increase in hiring of Customs and Border Protection Officers and other personnel. The border areas where many of these new agents and officers serve are in very rural and remote regions of the country, and in order for them to maintain a satisfactory quality of life, they need adequate access to housing for themselves and their families. These border areas already face housing challenges, which are exacerbated by the influx of new CBP personnel. The Committee recommends the Department provide a Quarters Management Plan that lays out in detail how it will ensure that its agents and officers have adequate housing opportunities in rural and remote areas of the border.

### AIR AND MARINE OPERATIONS EL PASO HANGAR

The Committee includes $3,500,000 for demolition and replacement of a hangar and office space at El Paso International Airport that will facilitate CBP air operations in a high priority mission area; will permit direct access to the longest runway at the airport; and enable CBP to establish a dedicated taxiway for a fully-secured site if required.

## U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

### SALARIES AND EXPENSES

| | |
|---|---:|
| Appropriation, fiscal year 2009 | $4,927,210,000 |
| Budget estimate, fiscal year 2010 | 5,348,000,000 |
| Recommended in the bill | 5,311,493,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 | +384,283,000 |
|     Budget estimate, fiscal year 2010 | −36,507,000 |

### MISSION

U.S. Immigration and Customs Enforcement (ICE) is the lead agency responsible for enforcement of immigration laws, customs laws, and the security of Federal facilities. ICE protects the United States by investigating, deterring, and detecting threats arising from the movement of people and goods into and out of the country. ICE consists of more than 20,000 employees within four major pro-

49

gram areas: Office of Investigations; Federal Protective Service; Office of Intelligence; and Detention and Removal Operations.

## RECOMMENDATION

The Committee recommends $5,311,493,000 for Salaries and Expenses, $36,507,000 below the amount requested and $384,283,000 above the amount provided in fiscal year 2009. Within these amounts, the Committee allocates $1,500,000,000 to finance ICE's various efforts to identify undocumented individuals with criminal records who are incarcerated or at-large and to remove those who are judged deportable in immigration court. Of this amount, $200,000,000 is provided for continued expansion of the Secure Communities program. The Committee believes that ICE should have no greater immigration enforcement priority than to remove deportable aliens with serious criminal histories from the United States, and applauds ICE's efforts to develop productive relationships with local law enforcement and corrections agencies to implement this initiative.

The Committee provides $1,643,360,000 for ICE's domestic investigatory responsibilities, $27,809,000 above the requested amount. In addition to funding the requested expansion of cyber-related investigations of child pornography and on-line fraud, the Committee has increased funding for ICE investigations aimed at disrupting drug-related violence along the Southwest border by providing more than the request for investigations related to transnational criminal gangs, illegal export of firearms, cross-border drug smuggling, and human smuggling and trafficking.

A comparison of the budget estimate to the Committee recommended level by budget activity is as follows:

|  | Budget estimate | Recommended |
|---|---|---|
| Headquarters Management and Administration: |  |  |
|     Personnel, Services and Other Costs | $321,850,000 | $276,973,000 |
|     Headquarters-Managed Information Technology Investments | 243,264,000 | 209,414,000 |
| Legal Proceedings | 221,666,000 | 221,666,000 |
| Domestic Investigations | 1,615,551,000 | 1,643,360,000 |
| International Investigations: |  |  |
|     International Operations | 112,872,000 | 112,872,000 |
|     Visa Security Program | 30,186,000 | 30,186,000 |
|     Subtotal, International Investigations | 143,058,000 | 143,058,000 |
| Intelligence | 67,842,000 | 67,842,000 |
| Detention and Removal Operations: |  |  |
|     Custody Operations | 1,771,168,000 | 1,771,168,000 |
|     Fugitive Operations | 229,682,000 | 229,682,000 |
|     Criminal Alien Program | 192,539,000 | 192,539,000 |
|     Alternatives to Detention | 63,913,000 | 73,913,000 |
|     Transportation and Removal Program | 281,878,000 | 281,878,000 |
|     Subtotal, Detention and Removal Operations | 2,539,180,000 | 2,549,180,000 |
| Identification and Removal of Criminal Aliens | 195,589,000 | 200,000,000 |
|     Total, ICE Salaries and Expenses | 5,348,000,000 | 5,311,493,000 |

## ICE PROGRAMS TO IDENTIFY AND REMOVE CRIMINAL ALIENS

Over the past two years, Congress has emphasized that ICE must have no higher immigration enforcement priority than to identify foreign-born individuals who have been convicted of crimes

50

and sentenced to imprisonment, and to remove those people from the country once they have been judged deportable by immigration court. In the 2008 and 2009 Appropriations Acts, Congress provided $350,000,000 in unrequested funding to initiate the Comprehensive Identification and Removal of Criminal Aliens (CIRCA) program, which ICE has renamed "Secure Communities." In addition, in the 2009 Appropriations Act, Congress directed that at least $1,000,000,000 of ICE's budget be used to identify aliens convicted of crimes, and to ensure their removal once they have been judged deportable.

Using the funds previously appropriated for Secure Communities, ICE has instituted an effective pilot program that locates criminal aliens through coordination with local jail facilities, while maintaining the clear division between the law enforcement roles of Federal and local officers. In brief, the ICE system known as "Interoperability" allows local law enforcement agencies to check fingerprints of individuals booked on criminal charges against both national criminal and immigration databases. If an individual is identified through this system as illegally present in the United States, ICE can take appropriate steps to ensure the most dangerous of these criminals are deported upon completion of their jail sentences, while those convicted of lesser crimes are identified and deported as resources allow.

The Committee is strongly supportive of this approach, since it respects the traditional separation of local law enforcement responsibilities from the Federal role of enforcing immigration law. Because the Interoperability system locates the criminal records of those identified as in the country illegally, it allows ICE to target its resources to remove those illegal aliens who have proved their intent to do harm to U.S. communities. The system also provides important and timely information to local authorities on the criminal backgrounds and identities of individuals in their custody. Furthermore, the program is an economical solution because it requires no specialized training in Federal immigration law for local law enforcement officers. Considering these advantages, the Committee fully expects the Secure Communities program will prove more effective than many of the agreements ICE has established to delegate immigration enforcement authority to local patrol officers, an approach that can be effective but has also generated significant controversy when inappropriately implemented.

Given the advantages of the Secure Communities approach, the Committee provides an additional $200,000,000 in the bill to continue the program's expansion, with the ultimate goal of deploying Interoperability on a nation-wide basis and equipping ICE with adequate personnel and mission support to identify and remove all convicted criminal aliens from the country after they have been judged deportable but before they are released from custody. Consistent with past appropriations for this program, the Committee requires ICE to report every three months on the status of the program. Given problems with these reports being delivered to the Committee on a timely basis, the bill includes a statutory requirement making the reports due 30 days after the end of each quarter of the fiscal year.

While the Committee supports Secure Communities, it also believes ICE must work to make sure the program's implementation

51

does not negatively impact other aspects of the judicial system and allows for appropriate transparency for those prosecuted for immigration violations. In particular, the Committee has heard concerns from some jurisdictions that ICE detains individuals in immigration custody while criminal charges are still pending against them, effectively trumping the administration of criminal justice. To minimize this occurrence, it is imperative for ICE field agents to maintain regular communication with local jails and courts on the actions ICE takes relative to individuals who are identified through the local booking process. Furthermore, in order to track the program's performance and effectiveness, the Committee expects ICE to maintain and regularly update performance data from the locations where the Secure Communities program has been implemented, and to report frequently on the results of the program, both to the public and the Congress.

In addition to its Secure Communities initiative, the Committee believes ICE must do more with its existing programs to ensure that it is focusing its efforts on those who represent the greatest threats to society and civil order. Whether it be efforts to locate at-large criminals through the Fugitive Operations program, disrupt transnational criminal gangs through targeted investigations, or more effective use of the Interoperability system at prisons where ICE personnel are already stationed, the agency must make sure it is doing all that it can to find and remove criminals who have been judged deportable. In an analysis of its 2009 budget, ICE reported to the Committee that it will spend $1,411,795,000 on these efforts, well in excess of the $1,000,000,000 Congress directed be allocated to these activities. Recognizing the increased funding provided both for the Secure Communities program and other activities related to apprehending criminal aliens, the Committee directs ICE to use not less than $1,500,000,000 of its 2010 budget to address this issue.

STATE AND LOCAL PROGRAMS

The Committee provides $117,394,000, as requested, for ICE State and Local programs, which is $17,741,000 more than provided in fiscal year 2009. Within this total, $68,047,000 is for the 287(g) program; $14,357,000 is for the Forensics Document Laboratory, which supports all ICE investigatory programs and offers specialized assistances to State and local law enforcement agencies; and $34,990,000 is for the Law Enforcement Support Center.

Since the 287(g) program delegates federal immigration enforcement authority to local law enforcement officers, ICE must provide appropriate oversight of how this authority is exercised. After reviewing the 287(g) program, GAO reported that ICE oversight was not consistently applied at the various jurisdictions with delegated authority, and in some cases ICE provided little to no oversight at all. Congress has expressed significant concern about the 287(g) program over the past several years. Therefore, the Committee is pleased that over half of the increase to State and Local Programs will be used to expand oversight and outreach for the 287(g) program.

GAO also reported that ICE had not communicated specific program objectives to the local agencies involved in the 287(g) program. For example, GAO found four locations out of 29 jurisdic-

52

tions it reviewed where delegated authority was exercised in a manner inconsistent with ICE's immigration enforcement goals. This, in addition to minimal federal oversight, has resulted in a program that has not been consistently implemented at the various jurisdictions with which ICE has signed Memoranda of Agreement (MOAs). The Committee understands that DHS has begun to develop a standard, legally-enforceable 287(g) contract for new enrollees in the system, and directs ICE to replace existing 287(g) MOAs with new agreements that reflect the accountability measures contained in the standard 287(g) contract as soon as it has been finalized.

The Committee continues a provision enacted in the 2009 Appropriations Act that requires ICE to cancel any 287(g) agreements where the DHS IG has determined the terms of the agreement have been violated. The Commite also continues to direct the IG to review 287(g) agreements for any violation of the terms of such agreements. The IG should consult with GAO to ensure its reviews include the execution of agreements identified as problematic by GAO.

### SOUTHWEST BORDER ENFORCEMENT INITIATIVE

The Committee provides $97,809,000 to expand several ICE investigatory programs aimed at reducing the drug-related violence currently plaguing areas along our country's Southwest border. This is an increase of $27,809,000 over the levels requested in the budget, including: a $10,000,000 expansion of ICE investigations of transnational gangs; an additional $10,000,000 for ICE to improve investigations of cross-border weapons smuggling, including expansion of Operation Armas Cruzadas; $5,000,000 more for ICE drug smuggling investigations; and $2,809,000 to expand human smuggling and trafficking investigations. In addition, the Committee approves the funding increases requested in the budget for the ICE Offices of Investigation, Intelligence, and International Affairs to implement the Administration's Southwest Border Enforcement Initiative. These funds will support ICE's expansion of the Border Enforcement Security Task Force program, additional financial and export investigations, additional overseas ICE agents working directly with Mexican government officials, and increased analytical support from the Border Violence Intelligence Cell.

### COORDINATION OF ILLEGAL WEAPONS INVESTIGATIONS

The Committee is aware of growing concerns in Mexico that many of the firearms and military-grade weapons used in violent attacks by drug cartels have been acquired in the United States and illegally exported to Mexico. While ICE has authority to enforce restrictions on the international trade of firearms and munitions, the Committee believes more can and should be done to ensure that arms sales in the Southwest border region are made legally and in accordance with all applicable regulations. Unfortunately, the Committee has discovered that the interagency Memorandum of Understanding governing investigatory coordination between ICE and the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has not been updated to reflect either agency's current operations. The Committee directs ICE to work expeditiously with ATF to update this important agreement, and to update Con-

53

gress immediately about any impediments that arise in this process.

## ICE CUSTODY OPERATIONS

The Committee provides $1,771,168,000 for ICE custody operations, as requested, which is $49,900,000 over the 2009 appropriations level. This increase will allow ICE to maintain an aggregate annual detention capacity for 33,400 individuals, and funds the full-year salaries and benefits for staff added to Detention and Removals Operations over the past several years. At this point, ICE detention capacity is at the highest level in the agency's history, having grown more than 67 percent since 2002. While there will always be need for ICE to detain individuals who are apprehended while in the country illegally, the Committee believes that further expansion of ICE detention must be based on a rigorous analysis illustrating what compelling need will be met by placing yet more individuals in Federal custody. Furthermore, given that ICE has been unable to implement a nation-wide Alternatives to Detention program despite strong interest and increased funding from the Congress, the Committee questions whether ICE is adequately and equitably evaluating the need to detain every individual the agency apprehends, particularly those without criminal histories and who do not pose a flight risk. At a minimum, until ICE can prove that its low-risk detainees have nation-wide access to supervision programs or bonded parole, the Committee will remain skeptical of expanding detention capacity further.

## MEDICAL CARE FOR ICE DETAINEES

A recent GAO report (GAO 09–308R) highlighted differences in the structure and quality of care provided across ICE detention facilities. In particular, the GAO analysis revealed varying degrees of ICE oversight of contract agreements with non-Federal detention providers, and highlighted the potential for inadequate or inconsistent medical care across the ICE detention system. Further, GAO noted the absence of almost any performance data about ICE detainees' medical conditions or treatments. The Committee believes that if ICE must detain individuals in government custody, it should do so in a manner that provides all detainees equal access to necessary medical care, regardless of the location at which they are held. In addition, ICE detention staff should maintain detailed medical information about the health of their detained populations, not only to better inform management and investment decisions by ICE executives, but also to guard against the outbreak of epidemics and to identify emerging medical needs. The Committee directs ICE to report within 30 days of the end of each quarter of the fiscal year on actions it has taken to address inadequacies in its medical services to detainees.

The Committee is especially concerned about cases of detainee death where it appears detainees did not receive appropriate emergency medical treatment or continuing medical care. The Committee directs the Department to review its medical care standards for all detention facilities, specifically evaluating the enforceability of current standards. Additionally, the Department should revise any standards that do not ensure appropriate medical treatment, the ability to access counsel and family, effective medical grievance

54

procedures, or any other standards necessary for humane treat-
ment of detainees. The Committee also directs the Department to
notify the Congress and the DHS IG within 48 hours of any death
that occurs in ICE custody.

### DETENTION STANDARDS OVERSIGHT AND COMPLIANCE

The Committee supports ICE's proposal to expand the Office of
Professional Responsibility (OPR) and Detention Facilities Inspec-
tion Group (DFIG), and provides an additional $12,400,000 for
these programs in 2010, as requested. These funds will support de-
ployment of DFIG personnel to ICE field offices throughout the
country, growth of the OPR Management Investigations Unit, and
associated mission support costs. As a means improve compliance
with ICE performance standards, the Committee continues a provi-
sion prohibiting ICE expenditure of funds for any contracted deten-
tion facilities that receive two consecutive evaluations of less than
"acceptable" or the equivalent median score of any subsequent eval-
uation system, a requirement established by the fiscal year 2009
Homeland Security Appropriations Act.

The Committee understands that ICE is considering restruc-
turing and possibly renaming the DFIG and other detention over-
sight programs. The Comittee directs ICE to work with the Depart-
ment's Chief Financial Officer to ensure this restructuring complies
with all applicable provisions in the fiscal year 2009 Homeland Se-
curity Appropriations Act.

### DEPORTATION OF PARENTS OF U.S.-BORN CHILDREN

In February 2009, the DHS IG estimated that more than 100,000
parents of U.S.-born children were deported from the country be-
tween 1998 and 2007. The IG also reported that ICE does not con-
sistently track information about the U.S.-born children of those it
deports. As a result, the Committee directs ICE to begin collecting
data to track: the number of instances in which both parents of a
particular child were removed; the length of time a parent lived in
the United States before removal; and whether the U.S. citizen
children remained in the United States after the parents' removal.
ICE should provide this data annually to the Office of Immigration
Statistics, as well as to Congress with the annual budget submis-
sion.

### ALTERNATIVES TO DETENTION

The Committee provides $73,913,000 for ICE Alternatives to De-
tention programs, which is $10,000,000 more than requested. The
Committee continues to recognize the value of Alternatives to De-
tention programs which have yielded a 98-percent appearance rate
at immigration proceedings. When properly implemented and man-
aged, Alternatives to Detention programs augment ICE's regular
detention capacity and provide a cost effective means of accounting
for individuals accused of being in the country illegally but who do
not require administrative custody during their immigration pro-
ceedings. The Committee is very concerned that ICE has not com-
plied with the 2009 Appropriations Act, which required the agency
to submit a plan for nation-wide deployment of the Alternatives to

55

Detention program by January 5, 2009. The Committee directs ICE to submit this plan immediately.

As a matter of principle, DHS should use the least restrictive and least costly means required to supervise individuals in removal proceedings. Whenever practical and appropriate, individuals who cannot be paroled without supervision or on bond should be enrolled in Alternatives to Detention programs, particularly those that are community-based and which emphasize the personal responsibility of the individual. These programs, which cost less per day than detention, are a more humane method for monitoring individuals who may have legitimate immigration claims but for whom detention is unreasonably burdensome, such as asylum seekers, families, and the elderly.

The Committee has heard significant concerns from immigrant advocates about how ICE is using electronic monitoring programs for individuals who would otherwise be eligible for release on parole or bond, or would be eligible to enroll in intensive supervision programs that are not based on technology. The Committee directs ICE to develop a benefit-cost analysis of its various Alternatives to Detention approaches, and include this information in the 2011 budget submission for the program.

CHILD AND FAMILY DETENTION

The Committee believes that detention is not generally appropriate for families and is concerned that the Department does not routinely make Alternatives to Detention available to families it takes into custody. In addition, while the Committee is pleased that ICE developed and implemented detention standards for families held in its custody, it remains concerned that ICE family detention standards are based on adult prison standards. The Committee directs the Department to prioritize the use of Alternatives to Detention program for families who do not need to be held in immigration detention. The Committee further directs the Office of Professional Responsibility to conduct a review of families detained in ICE custody since 2007 and determine whether ICE complied with its own internal guidance for when to hold families in custody and when to release them to Alternatives to Detention programs. The Committee directs ICE to report on the results of this review no later than the submission of the 2011 budget.

In addition, the Committee has heard reports of ICE prosecutors inappropriately using personal information about children when presenting cases in immigration court, such as medical records and psychological reviews. The Committee directs ICE to respect the privacy and confidentiality of detained children's case information, including privileged medical, psychological and social worker reports, and only to request access to those files when relevant to the case.

INAPPROPRIATE TREATMENT OF CHILDREN IN ICE CUSTODY

In last year's appropriation report, the Committee directed ICE to report quarterly on any incidents involving strip searches of children, placement of children in restraints, or use of disciplinary weapons against children. ICE has not provided the Committee any report on these techniques, indicating that they have not been used to date in fiscal year 2009. As a result, the Committee directs ICE

56

to review the necessity of retaining these practices within its child detention standards, and update the Committee on any changes to the policies by November 2, 2009. In addition, ICE is directed to continue to provide reports 30 days after the end of each quarter of the fiscal year on any incidents involving strip searches of children, placement of children in restraints, or use of disciplinary weapons against children.

As in past years, the Committee provides no funding for ICE bone and dental forensic examinations to determine the age of children in ICE custody. This questionable methodology is not based on credible scientific principles, and puts children at risk of erroneous classification as adults and transfer to adult detention centers. The Committee directs the IG to continue to review ICE practices for determining the age of those in its custody, and to report to the Committees on Appropriations on any cases where ICE uses bone or dental forensic examinations.

### TRANSPORTATION OF UNACCOMPANIED ALIEN CHILDREN

In the 2009 Appropriations Act, the Committee directed ICE, the Office of Management and Budget, and the Department of Health and Human Services (HHS) to determine the appropriate agency for managing child transportation between DHS and HHS custody. To date, the Committee has not received this report, which has apparently been under review at the Department of Health and Human Services for several months. As a result, the Committee expects ICE will continue to pay for the cost of child transportation between DHS and HHS custody until the agencies determine the appropriate method for funding this activity.

### HUMANITARIAN REVIEW OF IMMIGRATION ARRESTS

The Committee continues to support ICE's policies that allow for humanitarian review of those arrested in worksite enforcement actions affecting 150 or more individuals. Many who have been arrested in past worksite enforcement actions were primary care givers to infant children or elderly parents, meaning their detention would have harmed those unable to care for themselves. The Committee continues to believe ICE should expand this policy to cover all worksite enforcement activities. If ICE is unable to expand this policy, it must brief the Committee no later than November 2, 2009, about the impediments to doing so.

### TEXTILE TRANSSHIPMENT ENFORCEMENT

Section 352 of the Trade Act of 2002 authorizes funding for Customs Service textile transshipment enforcement, and specifies how the funds must be spent. The Committee includes $4,750,000, as requested, to continue these important activities. The Committee directs ICE to provide a report with its fiscal year 2011 budget request on its actual and projected obligations of this funding, covering fiscal years 2005 to 2010. The report should include staffing levels by fiscal year since 2005, and a five-year enforcement plan for transshipment violations.

57

### ICE DATA CENTER CONSOLIDATION

Consistent with recommendations contained throughout this report, the Committee provides no funding for ICE data center migration activities due to the IG's recent findings described in the Chief Information Officer section of the report regarding possible unmitigated risks at the destination data center sites.

### ICE FIELD OFFICE CO-LOCATION

The Committee provides $47,123,000 for ICE field office co-location. This level includes $45,000,000 for the costs to consolidate disparate field offices, approximately half the requested amount, and $2,123,000 for personnel to manage the ICE field office co-location program. These funds should allow ICE to significantly improve field office coordination by integrating various legacy field locations into single ICE facilities in major U.S. cities, especially those located along or near the Southwest border region. The need to strengthen ICE operations by improving field office efficiencies was last highlighted by the Committee in the 2006 Appropriations Act.

### FEDERAL PROTECTIVE SERVICE

| | |
|---|---|
| Appropriation, fiscal year 2009 ....................................................... | $640,000,000 |
| Budget estimate, fiscal year 2010 [1] .............................................. | 1,115,000,000 |
| Recommended in the bill ................................................................... | 1,115,000,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ................................................ | +475,000,000 |
|     Budget estimate, fiscal year 2010 ........................................... | – – – |

[1] In the 2010 budget, the Administration proposed realigning FPS responsibilities to the National Protection and Programs Directorate. Additionally, CBO re-structured FPS collections in its 2010 re-estimate of the President's budget to include reimbursable contract guard service collections, which had not been included in previous year appropriations.

### MISSION

The Federal Protective Service (FPS) is responsible for the protection of federally owned and leased buildings and properties, particularly those under the charge and control of the General Services Administration. Funding for FPS is provided through a security fee charged to all GSA building tenants in FPS-protected buildings. FPS has three major law enforcement initiatives: Protection Services to all Federal facilities throughout the United States and its territories; expanded intelligence and anti-terrorism capabilities; and Special Programs, including weapons of mass destruction detection, hazardous material detection and response, and canine programs.

### RECOMMENDATION

The Committee recommends $1,115,000,000, the same as the amount requested for fiscal year 2010. At this time, the Committee denies the proposed transfer of FPS managerial oversight from ICE to the National Protection and Programs Directorate (NPPD).

### MANAGEMENT OF THE FEDERAL PROTECTIVE SERVICE

For the past two years Congress has been forced to set in law the staffing levels for the Federal Protective Service since there was no effort made by the Administration to determine the resources required to provide adequate security for Federal buildings.

58

This neglect of the agency charged with protecting Federal workers from risks both small and large is unacceptable, particularly given the fact that Federal buildings have historically been a target of terrorists. As a result, in the 2009 Appropriations Act, the Committee directed the Government Accountability Office to make recommendations about what resources are required for the FPS to be able to adequately protect Federal facilities. That analysis is ongoing.

It is unfortunate that rather than explicitly identifying the staff and funding levels necessary for FPS to perform its mission, the 2010 budget proposes to transfer responsibility for the agency to NPPD. In theory, the FPS mission is probably better aligned with that of NPPD, which is the DHS component responsible for protecting the nation's critical infrastructure. Furthermore, it is true that the managerial relationships between FPS and ICE have been strained, and that the growing significance of ICE enforcement of immigration and customs law does not particularly complement the FPS responsibility to protect Federal offices. However, the justification documents for this proposed transfer include no practical details about how the change will be implemented and identify no particular transition costs associated with the realignment. Furthermore, the justification fails to recognize the host of new and growing programs that NPPD currently manages, such as the National Cyber Security Initiative and the regulation of Ammonium Nitrate. Finally, the justification does not explain whether NPPD managers have the capacity to absorb a law enforcement responsibility like FPS, which would involve extensive field operations and contract oversight. Currently, NPPD field staff is limited, and the contracts it manages do not have the same nation-wide reach as those at FPS.

If the Committee is to take the Administration's FPS realignment proposal seriously, the Department must provide a more detailed discussion of the managerial steps that will be taken to ensure the transition functions smoothly and efficiently. There are too many examples of failed bureaucratic restructuring in the short history of the Department of Homeland Security to allow the Committee to proceed without further detail: the fruitless realignment of the Federal Air Marshals into ICE, the costly restructuring of the DHS Information Analysis and Infrastructure Protection Directorate, and the calamitous dissolution of the Federal Emergency Management Agency to form the Emergency Preparedness and Response Directorate.

The Committee therefore directs the Department to submit, no later than July 30, 2009, a detailed transition plan for the realignment of the Federal Protective Service, including an identification of the resources necessary to support a robust, nation-wide security presence at Federal facilities. Absent further information, it is premature to act on the proposed restructuring.

59

## AUTOMATION MODERNIZATION

| | |
|---|---|
| Appropriation, fiscal year 2009 [1] ...................................................... | $57,000,000 |
| Budget estimate, fiscal year 2010 ...................................................... | 110,000,000 |
| Recommended in the bill ...................................................... | 105,000,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ...................................................... | +48,000,000 |
|     Budget estimate, fiscal year 2010 ...................................................... | −5,000,000 |

[1] Excludes $20,000,000 in appropriations in the American Recovery and Reinvestment Act of 2009 (P.L. 111–5).

### MISSION

The Automation Modernization account funds major information technology (IT) projects for U.S. Immigration and Customs Enforcement (ICE).

### RECOMMENDATION

The Committee recommends $105,000,000 for Automation Modernization, which funds a variety of ICE technology investments critical to the future of the agency. The following table illustrates funding by specific investment project:

| Project name | Budget estimate | Recommended |
|---|---|---|
| ATLAS ...................................................... | $9,000,000 | $9,000,000 |
| Detention and Removals Modernizations ...................................................... | 22,000,000 | 22,000,000 |
| Homeland Enforcement Communications System (HECS) ...................................................... | 16,400,000 | 16,400,000 |
| Field Investigations Support Systems ...................................................... | 23,600,000 | 23,600,000 |
| Electronic Health Records (eHR) ...................................................... | 20,400,000 | 20,400,000 |
| Unspecified Reduction ...................................................... | – – – | −5,000,000 |

### ELECTRONIC HEALTH RECORDS

The Committee is pleased that ICE is tackling a persistent problem for all medical systems: the fallibility of paper-based patient records. Since ICE detainees can often be transferred between several detention facilities before their immigration cases are decided, portable medical records are an important part of ensuring the health of all those held in ICE custody. The Committee understands ICE will use funds provided for this project in 2010 to assess the Division of Immigrant Health Services electronic health records needs, and to initiate an acquisition of the most cost effective electronic health records system that meets those needs. The Committee directs ICE to review the electronic health records systems already used by other Federal agencies such as the Department of Veterans Affairs or the Bureau of Prisons, and to evaluate whether it would be cost effective to procure medical records management services from another Federal agency through an Economy Act transaction. In addition, the Committee directs ICE to ensure that whatever system of electronic health records it decides to implement, the system should be available and required to be used by all detention facilities that house ICE detainees.

### CONSTRUCTION

| | |
|---|---|
| Appropriation, fiscal year 2009 ...................................................... | $5,000,000 |
| Budget estimate, fiscal year 2010 ...................................................... | – – – |
| Recommended in the bill ...................................................... | 11,818,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ...................................................... | +6,818,000 |
|     Budget estimate, fiscal year 2010 ...................................................... | +11,818,000 |

## MISSION

The Construction account funds the planning, design, construction, equipment and maintenance for ICE-owned buildings and facilities.

## RECOMMENDATION

The Committee recommends $11,818,000 for Construction instead of no funding as proposed in the budget. This funding will provide for basic and emergency maintenance at ICE-owned detention facilities, called Service Processing Centers (SPCs). The Committee directs ICE to use the funds provided to address the highest-priority repair and alteration needs at the SPCs.

The budget proposed a general provision allowing ICE to sell its SPCs and retain the proceeds to pay for the cost of consolidating field offices for ICE agents and officers. The Committee does not include this provision. Until ICE is able to prove that it can adequately provide for the medical care and oversight of detention standards at its existing contract detention facilities, the Committee believes it would be premature to move to an exclusively contract detention model.

## TRANSPORTATION SECURITY ADMINISTRATION

### AVIATION SECURITY

| | |
|---|---|
| Appropriation, fiscal year 2009 [1] | $4,754,518,000 |
| Budget estimate, fiscal year 2010 | 5,310,850,000 |
| Recommended in the bill | 5,265,740,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 | +511,222,000 |
| Budget estimate, fiscal year 2010 | −45,110,000 |

[1] Excludes $1,000,000,000 in appropriations in the American Recovery and Reinvestment Act (P.L. 111–5).

## MISSION

Aviation security is focused on protecting the air transportation system against terrorist threats, sabotage and other acts of violence through the deployment of passenger and baggage screeners; detection systems for explosives, weapons, and other contraband; and other, effective security technologies.

## RECOMMENDATION

The Committee recommends $5,265,740,000 for Aviation Security, $45,110,000 below the amount requested and $511,222,000 above the amount provided in fiscal year 2009. Funds within this account are partially offset through the collection of security user fees paid by aviation travelers and airlines. A comparison of the budget estimate to the Committee recommended level by budget activity is as follows:

| | Budget estimate | Recommended |
|---|---|---|
| Screening operations | $4,475,117,000 | $4,409,776,000 |
| Aviation security direction and enforcement | 835,733,000 | 855,964,000 |
| Mandatory aviation security capital fund [1] | 250,000,000 | 250,000,000 |
| Subtotal, aviation security | 5,310,850,000 | 5,265,740,000 |

[1] The Aviation Security Capital Fund is a non-add because it is not directly appropriated and is paid for entirely from user fees.

61

AVIATION SECURITY FEES

In total, the Committee assumes the collection of $2,100,000,000 in aviation security user fees, $128,941,000 less than the budget. This level of fees by the Congressional Budget Office that reflects the downward trend in air travel due to current economic conditions. These fees will be collected from both aviation passengers and the airlines and will partially offset the federal appropriation for aviation security.

SCREENING OPERATIONS

The Committee recommends $4,409,776,000 for passenger and baggage screening operations, $65,341,000 below the amount requested and $474,066,000 above amount provided in fiscal year 2009. A comparison of the budget estimate to the Committee recommended level by budget activity is as follows:

| | Budget estimate | Recommended |
|---|---|---|
| Screener Workforce: | | |
| Privatized screening ................................................ | $149,643,000 | $149,643,000 |
| Screener personnel, compensation and benefits... | 2,788,575,000 | 2,788,575,000 |
| Subtotal, screener workforce ............................. | 2,938,218,000 | 2,938,218,000 |
| Screener training and other ................................... | 203,463,000 | 204,713,000 |
| Checkpoint support ................................................. | 128,739,000 | 128,739,000 |
| EDS/ETD Systems: | | |
| EDS procurement and installation ......................... | 856,591,000 | 800,000,000 |
| Screening technology maintenance and utilities ...... | 326,625,000 | 316,625,000 |
| Operation integration ............................................. | 21,481,000 | 21,481,000 |
| Subtotal, EDS/ETD systems ................................ | 1,204,697,000 | 1,138,106,000 |
| Total, screening operations .............................. | 4,475,117,000 | 4,409,776,000 |

PRIVATIZED SCREENING

The Committee recommends $149,643,000 for privatized screening, the same as the amount requested and $1,629,000 below the amount provided in fiscal year 2009. This reduction reflects cost savings in contracts that were recently renegotiated. To date, nine airports and one heliport across the country have chosen to "opt out" of federalized screening and participate in the Screening Partnership Program (SPP). The Committee is aware of seven airports in Montana that were federalized in early 2008, but which are now in the final process of joining the privatized screening program. When this is completed, a total of 17 airports and heliports will be participating in SPP, and the Committee recommendation fully funds that level of activity. If additional airports are federalized, the Committee expects TSA to continue to provide screener service to airports, either through SPP or with federal screeners, in fiscal year 2010. Should TSA seek to modify some element of an airport's security apparatus, the Committee expects all stakeholders at the affected airport to be fully informed and consulted prior to implementation.

Consistent with prior years, TSA is directed to notify the Committees on Appropriations if it expects to spend less than the appropriated amount for privatized screening due to instances in which no additional privatized screening airports are added or air-

ports currently using privatized screening convert to federal screeners. TSA shall adjust its PPAs within ten days of any changes to personnel, compensation, or benefit levels resulting from the award of SPP contracts, a change in such contracts, or the movement of airports from the SPP to federalized screening.

SCREENER PERSONNEL, COMPENSATION AND BENEFITS

The Committee recommends $2,788,575,000 for screener personnel, compensation, and benefits, the same as the amount requested and $72,561,000 above the amount provided in fiscal year 2009. This level fully funds the pay and cost of living adjustments for all screeners and permits the agency to hire 55 new full-time equivalent bomb appraisal officers (BAOs). BAOs are highly trained individuals who are able to more accurately identify potential improvised explosive devices and their components and are trained in the disposal of these threat objects. After a screener identifies an item of concern, using a BAO for further analysis of the potential threat object can permit the resolution of the situation without the need to call in local law enforcement's bomb disposal unit, thereby reducing airport delays and closures. With the additional FTEs, TSA expects to have BAOs deployed at 158 airports throughout the United States by the end of 2010. TSA is encouraged to ensure that BAOs have all the appropriate tools to do their job effectively.

SCREENER TRAINING AND OTHER

The Committee recommends $204,713,000 for screener training and other, $1,250,000 above the amount requested and $7,395,000 above the amount appropriated in 2009. The Committee notes the continued threat posed by rudimentary and ever evolving improvised explosive devices and recognizes the valuable security testing and evaluation provided by the Safe Skies Alliance. To further these efforts, the Committee provides $1,250,000 to develop and enhance research and training capabilities for Transportation Security Officer improvised explosive detection recognition training by the Safe Skies Alliance.

CHECKPOINT SUPPORT

The Committee recommends $128,739,000 for checkpoint support, the same amount as requested and $121,261,000 below the amount appropriated in 2009. The reduction in funding reflects $300,000,000 provided in ARRA for checkpoint support activities, which permitted TSA to accelerate the testing, piloting, and deployment of next-generation checkpoint technologies. TSA has informed the Committee that with the infusion of ARRA funding, the agency will meet its current nationwide requirements for advanced technology screening systems and liquid bottle scanners at the checkpoint and make significant headway in procuring and deploying other next generation devices. With the funds recommended in 2010, TSA plans to procure 895 additional systems, including whole body imagers, credential authentication technologies, shoe scanners, stand off detectors, enhanced metal detectors, next generation explosive trace machines, and technologies that may permit passengers to carryon larger sized liquids. These funds will also

63

allow the agency to reconfigure airports to accommodate the "checkpoint of the future" layout.

Over the past few years, the Committee has made significant investments in next-generation checkpoint technologies to increase TSA's ability to detect concealed weapons and explosives. It is critically important that these screening technologies are deployed in order to address changing and evolving threats to air passengers and crew members. While new technologies provide protection to the traveling public, it remains critically important to safeguard privacy. Within 45 days of enactment, the Committee directs TSA to report to the Committees on Appropriations the details and strategy for a comprehensive program to ensure passenger privacy related to whole body imaging (WBI). At a minimum, this strategy should include: off-site monitoring; a spend plan for upgrading the existing software to include new privacy algorithms; procedures to prohibit storing, transferring, or copying any images from the machines; and a concept of operations plan for those passengers that choose a physical search rather than the WBI screening.

Consistent with fiscal year 2009, not later than 60 days after enactment of this Act, TSA shall provide the Committees on Appropriations a checkpoint support expenditure plan outlining how these funds will be spent. Also, TSA shall continue to update the Committees quarterly on checkpoint technology expenditures, on an airport-by-airport basis. These updates shall include information on the specific technologies for purchase, project timelines, a schedule for obligation, and a table detailing actual versus anticipated unobligated balances at the close of the fiscal year, with an explanation of any deviation from the original plan.

EXPLOSIVE DETECTION SYSTEMS PROCUREMENT AND INSTALLATION

The Aviation and Transportation Security Act made the Federal government responsible for the electronic screening of all checked baggage using explosive detection machines. Although all commercial airports have explosive detection machines, many airports have older generation systems, which often occupy large amounts of lobby space, are more labor intensive, and are much less efficient than newer explosive detection system (EDS) machines. In 2006, TSA developed the EDS Strategic Plan that identified optimal screening solutions at the top 250 commercial airports, including the installation of in-line EDS and the replacement of explosive trace detection machines, which would address the challenges identified above. Earlier this year, TSA informed the Committee that it had approximately $1.5 billion in identified needs to procure and install in-line EDS machines at airports based on priorities established in the Strategic Plan. According to TSA, these airports had completed a significant amount of design work and could spend the funding expeditiously. As a result, $700,000,000 was provided in ARRA to address these needs. With this funding, TSA expects to acquire and install 41 in-line systems so that additional airports have optimal systems installed at some or at all terminals.

The Committee recommends $800,000,000 for EDS procurement and installation, $56,591,000 below the budget request and $506,000,000 above the amount appropriated in fiscal year 2009. This funding will permit TSA to modify airport facilities to install

64

about 20 additional in-line systems at some or all airport terminals. Including the existing mandatory Aviation Security Capital Fund of $250,000,000, the total appropriation (both mandatory and discretionary) for EDS procurement and installation is $1,050,000,000 in fiscal year 2010. This funding, coupled with the $700,000,000 provided in ARRA earlier in the year, fully satisfies TSA's list of airports that have approved optimal screening designs that could be funded. Within the $800,000,000 of discretionary appropriations, 25 percent shall be applied to the needs of medium and small sized airports.

When finalizing the cost agreements with airports using these funds, TSA may be able to achieve unanticipated cost savings during facility modifications and installation of EDS machines at airports. For example, TSA has already informed the Committee that with the ARRA funding provided earlier this year, airports have calculated project costs below their original estimates. As a result, TSA anticipates savings of between $50,000,000 and $150,000,000. These funds will be applied to the airports that are next on the optimal baggage screening list with completed designs. In addition, it has come to the attention of the Committee that installing an optimal baggage screening solution using a pre-engineered structure outside an existing airport terminal can significantly reduce costs when compared to placing the system inside the terminal. At least three airports are exploring this design. In addition to being cost effective, this approach also speeds implementation while creating minimal disruptions to existing TSA and airline baggage operations. Because this is an eligible activity under 49 U.S.C. 44923, the Committee encourages TSA to consider using some of the recommended funds for dedicated pre-engineered structures related to optimal baggage screening solutions for EDS installations. This may save the Federal government significant time and money.

Last year, the Committee encouraged TSA to continue studying the efficacy of consolidating checked and carryon baggage screening systems at smaller and medium sized airports and to provide a progress report by February 16, 2009. This report has not been received. The Committee remains interested in the topic and urges TSA to provide this report expeditiously.

Consistent with prior years, not later than 60 days after enactment of this Act, TSA shall provide the Committees on Appropriations an expenditure plan outlining how the EDS procurement and installation funds will be spent. If new requirements occur after the plan is submitted, TSA shall reassess and reallocate funds after notifying the Committees of any change. Also, TSA shall continue to update the Committees quarterly on EDS expenditures, on an airport-by-airport basis. These updates shall include information on the specific technologies for purchase, project timelines, a schedule for obligation, and a table detailing actual versus anticipated unobligated balances at the close of the fiscal year, with an explanation of any deviation from the original plan.

### SCREENING TECHNOLOGY MAINTENANCE AND UTILITIES

The Committee recommends $316,625,000 for screening technology maintenance and utilities, $10,000,000 below the amount requested and $11,000,000 more than the amount provided in fiscal year 2009. The Committee notes that the funding requirement for

65

maintenance and utilities of explosive detection systems, check-point systems, and other technologies has grown by 7 percent from fiscal year 2009 to 2010. The maintenance increase is driven primarily by increases in deployed security equipment. Although TSA uses long-term maintenance contracts with fixed prices to try to safeguard the government against potential cost increases for maintaining aging technology systems, the agency nonetheless incurs double digit growth in this area year after year. Because of this, last year the Committee directed TSA to provide a detailed report on maintenance and utility costs for screening technologies and to identify ways that costs may be controlled in the future. That report is delinquent. Without an understanding of why these costs have escalated so dramatically and what TSA is doing about it, the Committee cannot fully support a 7 percent cost escalation.

TSA plans to renegotiate its long term maintenance contract late in 2009 or perhaps in 2010. The Committee encourages TSA to undertake this renegotiation expeditiously and has taken an $11,000,000 reduction from the budget request to reflect cost savings anticipated under this new contract.

AVIATION SECURITY DIRECTION AND ENFORCEMENT

The Committee recommends $855,964,000 for aviation security direction and enforcement, $20,231,000 above the amount requested and $57,156,000 above the amount provided in fiscal year 2009. The following table highlights funding levels by program, project, and activity:

| | Budget estimate | Recommended |
|---|---|---|
| Aviation regulation and other enforcement | $254,064,000 | $254,064,000 |
| Airport management and support | 448,424,000 | 453,924,000 |
| Federal flight deck officer and flight crew training | 25,127,000 | 25,127,000 |
| Air cargo | 108,118,000 | 122,849,000 |
| Subtotal, aviation security direction and enforcement | 835,733,000 | 855,964,000 |

AVIATION REGULATION AND OTHER ENFORCEMENT

The Committee recommends $254,064,000 for aviation regulation and other enforcement, the same level as the budget request and $8,796,000 above the amount provided in fiscal year 2009. Within this funding is $8,696,000 to annualize 9/11 Act activities and to support implementation of new general aviation regulatory activities. Of the funding provided for general aviation, and consistent with prior years, $275,000 shall be used for activities to train and alert general aviation pilots to proper security measures and best practices. Since 2008, this funding has been available to be awarded competitively; however, TSA has been quite slow in doing so. TSA does not plan to award the 2008 funds until late May or June 2009. The Committee is disappointed with the delay in awarding this program and directs the agency to move more expeditiously with the 2009 and 2010 funds.

The Committee understands that TSA is currently working with stakeholders to develop a modified Large Aircraft Security Program rule that minimizes adverse effects on general aviation while addressing security concerns. We also understand that after this consultation TSA plans to issue a new notice of proposed rulemaking

66

to ensure additional public comment. The committee applauds TSA for taking a deliberative approach to this issue and urges TSA to weight all the costs and benefits associated with new security mandates for general aviation operators and airports.

### AIRPORT MANAGEMENT AND SUPPORT

The Committee recommends $453,924,000 for airport management and support, $5,500,000 above the budget request and $52,258,000 above the amount provided in fiscal year 2009. Within this total is $5,500,000 for the flight data initiative, to continue development, analysis and testing of deployable flight data recorders and other technologies to implement section 1620(2)(b) of the 9/11 Act. This initiative will provide near real-time access to data for immediate analysis of potential terrorist threats, provide secondary storage of flight data if the flight data and cockpit voice recorders do not survive, and overcome the delay in recovery of critical flight data from accident locations. This funding will support on aircraft installation and flight testing for all associated technologies by September 30, 2011.

### AIR CARGO

The Committee recommends $122,849,000 for air cargo, $14,731,000 above the amount requested and the same amount provided in fiscal year 2009. Funding above the budget request shall be for additional domestic and international inspectors, for international air cargo activities to strengthen the development of a global air cargo security strategy, to continue air cargo pilots using emerging technologies that are being developed to screen larger sized items, and to convert law enforcement canine teams to TSA proprietary teams.

The 9/11 Act required DHS to establish a system to screen 50 percent of cargo transported on passenger aircraft by February 2009 and 100 percent by August 2010. Screening 100 percent of air cargo carried on passenger aircraft is an important mandate, one that TSA can meet within the timeframe Congress has set for domestic activities.

In February 2009, TSA stated that it was able to meet the 50 percent deadline because of a variety of initiatives the agency undertook, including requiring its personnel to screen 100 percent of cargo carried on passenger aircraft at the nation's 250 smallest airports, removing almost all cargo screening exemptions, and mandating that all nonexempt cargo carried on narrow body aircraft be screened. However, on March 18, 2009, GAO testified that TSA cannot verify that 50 percent of all nonexempt air cargo carried on passenger aircraft is actually being screened. This stems from the fact that TSA did not have a system in place to provide verification and to collect data from screening entities. Since then, TSA has developed a system to verify that this level of cargo screening is occurring.

It will be significantly more difficult to achieve 100 percent screening mandated by August 2010. To do so, TSA is developing the Certified Cargo Screening Program, which would permit certified supply chain facilities to screen air cargo using a variety of technologies prior to its consolidation onto pallets or into containers before it leaves these facilities. The certified cargo screening facili-

67

ties are required to ensure that the chain of custody for this cargo is maintained after it is screened. In the event of a break in the chain of custody, the affected cargo will be rescreened. All certified cargo screening facilities must meet stringent screening, facility, and personnel security standards, which will be validated by TSA. Under this program, all cargo, including palletized and shrink-wrapped cargo, is subject to screening.

Earlier this year, TSA began a limited Phase One rollout in the eighteen major gateways, focusing on shippers in nine cities and freight forwarders in all eighteen airport markets. This work is all being done domestically; a similar program will need to occur overseas. TSA plans to evaluate the success of the Phase One program before expanding the program nationwide later this year. Consistent with the explanatory language accompanying Public Law 110–329, TSA shall brief the Committee on the results of this pilot before it moves to a nationwide rollout. This briefing should detail the processes for securing air cargo through the supply chain and include the schedule, milestones, and performance measures for the program. Assuming that most domestic air cargo screening will permanently move away from the airports to certified off-site facilities (e.g. manufacturers, indirect air carriers, and freight forwarders), the Committee has included additional funds to hire domestic inspectors above the 450 already on board, to validate that these entities are screening appropriately and consistently before they consolidate the air cargo into pallets. Funding may also be used to hire additional personnel to support policy development, rollout, and program management oversight of the Certified Cargo Screening Program, specifically in the areas of enrollment, assessment, and certification; technology management; and international policy coordination/harmonization.

To date, air cargo security has focused almost exclusively on the domestic market. However, a large amount of air cargo, particularly perishable items, is shipped from overseas locations to the United States. At this time, this cargo will be screened once it reaches the United States; however, TSA, in conjunction with U.S. Customs and Border Protection and international agencies, is developing a program to ensure the security of inbound cargo from outside the United States. Screening international air cargo poses unique challenges since TSA would need to place personnel overseas to screen U.S.-bound cargo and/or strengthen relations with foreign airports and companies to screen cargo before it is placed on an aircraft heading to the United States. TSA testified earlier this year that this problem would not be resolved by August 2010. The Committee has provided funding to hire and deploy international cargo transportation security inspectors to examine cargo operations at last points of departure to the United States, to enhance databases that assess risks and vulnerabilities of the air cargo being transported, and to develop a global air cargo security strategy. This additional funding should help TSA strengthen air cargo security throughout the worldwide supply chain.

In addition to funding provided for personnel, the Committee includes $5,000,000 to support the testing, evaluation, and qualification of emerging screening technologies to screen larger sized items for inclusion on TSA's Qualified Technology List. This list will iden-

68

tify appropriate screening technologies for industry to procure to enable TSA to meet the 100 percent screening requirement.

Finally, within the total funding level for air cargo is $7,000,000 to convert 35 canine teams from local law enforcement officer teams to TSA proprietary teams. To date, TSA has been unable to place 35 of the 85 canine teams previously allocated for placement with local law enforcement entities. These funds will enable TSA to convert these 35 teams such that they will be TSA owned and managed. This requires additional funding for TSA handlers, training, and logistics, and for other administrative support. These teams will work predominantly in the air cargo arena.

### NEW FEE COLLECTIONS

The budget requested $16,900,000 in new fee collections under Aviation Security for such activities as the certified cargo screening program ($5,200,000), large aircraft security program ($1,600,000), secure identification display area checks ($10,000,000), and other security threat assessments ($100,000). The Committee has provided this fee authority under the Transportation Threat Assessment and Credentialing program, which manages similar programs.

### SURFACE TRANSPORTATION SECURITY

| | |
|---|---|
| Appropriation, fiscal year 2009 | $49,606,000 |
| Budget estimate, fiscal year 2010 | 128,416,000 |
| Recommended in the bill | 103,416,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 | +53,810,000 |
| Budget estimate, fiscal year 2010 | −25,000,000 |

### MISSION

Surface Transportation Security is responsible for assessing the risk of terrorist attacks for all non-aviation transportation modes, issuing regulations to improve the security of those modes, and enforcing regulations to ensure the protection of the transportation system.

### RECOMMENDATION

The Committee recommends $103,416,000 for Surface Transportation Security, $25,000,000 below the amount requested and $53,810,000 above the amount provided in fiscal year 2009. Within this total, $42,293,000 is for surface transportation staffing and operations and $61,123,000 is for rail security inspectors and canines. Within the amounts provided, the Committee has fully funded activities mandated by the 9/11 Act, including funding to continue vulnerability and threat assessments of high risk entities, to conduct additional security exercises and training programs, and to continue information sharing activities.

In addition to the funds provided for surface transportation security under this heading, the Committee has provided $262,000,000 for rail, transit, and bus security grants under the Federal Emergency Management Agency's "State and Local Programs" appropriation and $5,000,000 for new counter-explosive research and development activities in Science and Technology. S&T has other on-

69

going research activities that may be utilized to enhance security in the mass transit, rail, and bus environments.

VISIBLE INTERMODAL PROTECTION AND RESPONSE TEAMS

The Committee recommends $25,000,000 for new rail inspectors to create new Visible Intermodal Protection and Response (VIPR) teams, half of the amount requested. These teams conduct unannounced, high-visibility exercises in mass transit or passenger rail facilities. TSA has informed the Committee that the requested funding reflects the entire cost to create 15 new teams. Past experience has shown that TSA has had substantial difficulty in hiring rail inspectors. In fact, TSA carried over about 47 percent of its fiscal year 2008 surface transportation appropriation into fiscal year 2009 in part because of delays in hiring inspectors for VIPR teams. At this time, of the total 175 rail inspectors authorized, TSA has 65 inspector positions that remain unfilled. Until TSA can show progress in hiring additional inspectors, it is premature to approve an additional 338 positions.

Over the past two years, a number of entities have expressed concern about the effectiveness of VIPR teams. For example, a February 2009 DHS IG, report noted that surface transportation security inspectors do not add as much value in a VIPR exercise as other TSA participants, such as air marshals or screeners, because they are not trained in behavior detection, have no training in passenger screening, are unable to detect explosives, and are not law enforcement authorities. One year earlier, the IG reported that "participants and outside observers question the value of VIPR exercises." In particular, the Federal Law Enforcement Officers Association described the VIPR exercises as "clearly a waste of scarce Federal Air Marshal resources". Transportation security inspectors (TSI) also considered their participation in VIPR exercises "unproductive". The IG noted that in their survey of TSIs, 70 percent selected VIPR exercises as one of two duties they performed that were the least effective use of their time.

Because of these concerns, last year the report accompanying the fiscal year 2009 Appropriations Act required TSA to report on performance standards to measure the success of its VIPR teams in detecting and disrupting terrorism. In addition, the report was also to identify the methodology used to determine the distribution of VIPR resources and personnel among the various modes of transportation. To date, the Committee has not received this report and cannot determine what is necessary to address these concerns and to make these teams more effective. These issues must be resolved before the agency increases staffing for VIPR teams by over 200 percent as requested.

TRANSPORTATION THREAT ASSESSMENT AND CREDENTIALING

| | |
|---|---|
| Appropriation, fiscal year 2009 .................................................... | $116,018,000 |
| Budget estimate, fiscal year 2010 ................................................ | 191,999,000 |
| Recommended in the bill ............................................................... | 171,999,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ............................................. | +55,981,000 |
|     Budget estimate, fiscal year 2010 ........................................ | −20,000,000 |

70

## MISSION

The mission of Transportation Threat Assessment and Credentialing (TTAC) is to reduce the probability of a successful attack on the transportation system through the application of threat assessment methodologies that are intended to identify known or suspected terrorist threats working in or seeking access to the Nation's transportation system. This appropriation consolidates the management of all TSA vetting and credentialing programs into one office and the following screening programs: Secure Flight; Crew Vetting; Transportation Worker Identification Credential; Registered Traveler; Hazardous Materials; and Alien Flight School.

## RECOMMENDATION

The Committee recommends a direct appropriation of $171,999,000 for TTAC, $20,000,000 below the amount requested and $55,981,000 above the amount provided in fiscal year 2009. In addition, the Committee anticipates TSA will collect $44,900,000 in fees, including $16,900,000 in a variety of new fees TSA proposed under Aviation Security. Because these new fees will be paid for by users undergoing background and credential checks, it is more appropriate to have these activities administered by the TTAC program, which already manages similar activities for transportation workers and hazardous materials truck drivers. A comparison of the budget estimate to the Committee's recommended level by budget activity is as follows:

| | Budget estimate | Recommended |
|---|---|---|
| Direct Appropriation: | | |
| Secure flight | $84,363,000 | $84,363,000 |
| Crew and other vetting programs | 107,636,000 | 87,636,000 |
| Subtotal, direct appropriations | 191,999,000 | 171,999,000 |
| Fee Collections: | | |
| Transportation worker identification credential | 9,000,000 | 9,000,000 |
| Hazardous materials | 15,000,000 | 15,000,000 |
| Alien flight school (transfer from DOJ) | 4,000,000 | 4,000,000 |
| Certified cargo screening program | – – – | 5,200,000 |
| Large aircraft security program | – – – | 1,600,000 |
| Secure identification display area checks | – – – | 10,000,000 |
| Other security threat assessments | – – – | 100,000 |
| Subtotal, fee collections | 28,000,000 | 44,900,000 |

## SECURE FLIGHT

The Committee recommends $84,363,000 for Secure Flight, the same amount as requested and $2,152,000 above the amount provided in fiscal year 2009. Secure Flight became operational in late-January 2009. At that time, TSA began to assume the watch-list matching function for a limited number of domestic flights for one airline, and has since phased in additional flights and airlines. Once Secure Flight's advanced technology is fully implemented, enhanced watch list matching will be done solely by the government. Airlines will gather a passenger's full name, date of birth, and gender when making an airline reservation to determine if the passenger is a match to the No Fly or Selectee lists. By providing the additional data elements of gender and date of birth, Secure Flight

71

will more effectively help prevent misidentification of passengers who have similar names to individuals on the watch-list and better identify individuals who may pose a known or suspected threat to aviation. TSA plans to assume the watch-list-matching function for all domestic flights by March 2010. The agency will then take on the watch-list-matching function for international flights departing to and from the United States by the end of 2010, which is currently the responsibility of CBP.

Since 2005, GAO has been evaluating TSA's progress in developing the Secure Flight program. In May 2009, GAO issued its most recent evaluation of this program (GAO–09–292). The evaluation found that TSA had generally achieved nine of the 10 statutory conditions related to the development of the Secure Flight program and had conditionally achieved one condition. For that one condition, which pertains to life cycle cost estimates and program plans, GAO notes that TSA had defined plans, but had not completed all activities for this condition to be satisfied. GAO also expressed concern that TSA had not yet developed plans to periodically assess the performance of the Secure Flight system's name-matching capabilities, which would help ensure that the system is working as intended. GAO is directed to continue reviewing the Secure Flight program until all ten conditions are generally achieved and periodically update the Committee on its findings.

CREW AND OTHER VETTING PROGRAMS

The Committee provides $87,636,000 for crew and other vetting programs instead of $107,636,000 as requested. This funding shall be used to support personnel working on a variety of vetting activities, including vetting flight crew members and employees with access to secure areas in the airports; the imposition of temporary flight restrictions; reviews of non-scheduled commercial operators (charters) to ensure a level of security equivalent to regularly scheduled airlines; the vetting of general aviation, charter, and business aircraft that fly into Ronald Reagan Washington National Airport and the three Maryland airports within 15 miles of Washington D.C. (Potomac Airpark, Washington Executive, and College Park); checks of alien flight school pilots seeking training in the United States; and infrastructure investments. Within the funds provided, the Committee fully funds the annualization of 9/11 Act vetting activities; includes funding for 33 new positions as requested; and recommends $56,500,000 for vetting infrastructure investments, as discussed below. None of this funding shall be used in support of the Secure Flight program, which has a separate appropriation.

VETTING INFRASTRUCTURE INVESTMENTS

The Committee provides $56,500,000 for vetting infrastructure investments instead of $76,500,000 as requested in the budget. Because TSA has not clearly detailed in its budget justification the investments necessary to enhance its current vetting infrastructure in 2010, and the requested amount does not match data provided to the Committee earlier this spring, numerous questions remain unanswered about this modernization program. As such, the Committee has denied about one-third of the requested increase for this program. However, the Committee recognizes that improvements

72

must be made to the Office of Transportation Threat Assessment and Credentialing's screening infrastructure, including prototype development as well as software and hardware procurements. These investments will consolidate a number of arbitrarily separate screening systems into one system and address new requirements contained in the 9/11 Act to vet a variety of transportation employees.

### TRANSPORTATION SECURITY SUPPORT

| | |
|---|---:|
| Appropriation, fiscal year 2009 | $947,735,000 |
| Budget estimate, fiscal year 2010 | 1,004,580,000 |
| Recommended in the bill | 992,980,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 | +45,245,000 |
| Budget estimate, fiscal year 2010 | −11,600,000 |

### MISSION

The Transportation Security Support account includes financial and human resources support; the Transportation Security Intelligence Service; information technology support; policy development and oversight; performance management and e-government; communications; public information and legislative affairs; training and quality performance; internal conduct and audit; legal advice; and overall headquarters administration.

### RECOMMENDATION

The Committee recommends $992,980,000 for Transportation Security Support, $11,600,000 below the amount requested and $45,245,000 above the amount provided in fiscal year 2009. A comparison of the budget estimate to the Committee recommended level by budget activity is as follows:

| | Budget estimate | Recommended |
|---|---:|---:|
| Headquarters administration | $248,929,000 | $248,929,000 |
| Human capital services | 226,338,000 | 226,338,000 |
| Information technology | 501,110,000 | 489,510,000 |
| Intelligence | 28,203,000 | 28,203,000 |
| Subtotal, transportation security support | 1,004,580,000 | 992,980,000 |

### INFORMATION TECHNOLOGY

The Committee recommends $489,510,000 for information technology, $11,600,000 below the amount requested and $16,711,000 above the amount provided in fiscal year 2009. Consistent with funding recommendations contained throughout this report, the Committee provides no funding for Data Center Migration activities due to the IG's recent findings described in the Chief Information Officer section of this report regarding possible unmitigated risks at the destination data center sites.

### COVERT TESTING

The Committee continues to support covert testing, which helps to identify vulnerabilities in critical systems, and directs TSA to continue developing innovative methods to test the weaknesses of our transportation security systems. Consistent with prior years,

73

TSA shall continue to report biannually on its red teaming and covert testing activities, including specific discussions on the test results at airport checkpoints, in secure areas of airports, at air cargo facilities, and in other transportation modes. This testing is particularly critical in the air cargo arena to ensure that screening conducted at indirect air carriers, certified cargo shipping facilities, and by shippers and distribution centers consistently meets federal security requirements before air cargo is placed on passenger aircraft.

EXPENDITURE PLANS FOR THE PURCHASE AND DEPLOYMENT OF
CHECKPOINT SUPPORT AND EXPLOSIVE DETECTION EQUIPMENT

Similar to actions taken last year, the Committee has included bill language requiring TSA to provide the Committee with a detailed spending and deployment plan for checkpoint support and explosive detection equipment. This plan shall be submitted no later than 60 days after the date of enactment of this Act. The Committee withholds $5,000,000 from obligation until receipt of the plan, which has consistently been received late. As previously discussed, the plan shall detail expenditures for checkpoint support and explosive detection procurement and installation on an airport-by-airport basis for fiscal year 2010. The Committee recognizes that, after TSA has completed its expenditure plan, TSA may become aware of a high priority need that must be addressed. In those instances, TSA shall reassess the expenditure plan and reallocate funds in order to address the new requirement after providing notification to the Committees on Appropriations of this change.

FEDERAL AIR MARSHALS

| | |
|---|---|
| Appropriation, fiscal year 2009 ..................................................... | $819,481,000 |
| Budget estimate, fiscal year 2010 ................................................... | 860,111,000 |
| Recommended in the bill .................................................................. | 860,111,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ................................................. | +40,630,000 |
|     Budget estimate, fiscal year 2010 ............................................ | − − − |

MISSION

The Federal Air Marshals (FAMs) provide security for the nation's civil aviation system through the effective deployment of armed Federal agents to detect, deter, and defeat hostile acts targeting U.S. air carriers, airports, passengers, and crews.

RECOMMENDATION

The Committee recommends $860,111,000, as requested, for the Federal Air Marshals, $40,630,000 above the amounts provided in fiscal year 2009. Of the total funding provided, $762,569,000 is for management and administration and $97,542,000 is for travel and training. The Committee continues to expect quarterly reports on mission coverage, staffing levels, and hiring rates as directed in previous years.

After September 11th, thousands of FAMs were deployed throughout the United States to detect, deter, and defeat hostile acts targeted against U.S. air carriers, airports, airline passengers, and air crews. FAMs protect both domestic and international

74

flights. The federal government as well as airports and airlines have invested billions of dollars to develop and deploy a wide variety of security measures to make it increasingly difficult to attack the aviation sector. These activities include hardening cockpit doors on all aircraft; screening all checked baggage for explosives; deploying next generation technologies at airport checkpoints to look for explosives, weapons, or other threat objectives on a person or in their carry-on baggage; deploying screeners to identify suspicious behavior; random checks of passengers, air crew, and airport employees; perimeter screening at airports; and security threat assessments or background checks against a wide range of workers throughout the airport and airline system. In the meantime, FAMs has been developing a new risk assessment model to better target staff deployments, with a focus on high-risk flights.

The Committee recognizes that the aviation sector continues to be an area of interest for those who wish to do us harm, and has recommended the amount requested for FAMs for 2010, which anticipates continuation of the present FTE level. However, the Committee believes it is time for the Department to reassess the appropriate long term staffing level for FAMs in light of the significantly enhanced security posture described above. This reassessment should include a determination of the appropriate mix of staff required on a day-to-day basis; an identification of the kinds and numbers of flights to which FAMs should be regularly assigned; whether legislative changes may be necessary to better tailor how FAMs deploys its marshals on a daily basis; and a detailed discussion on the methodology used to justify this optimal staffing mix. The results of this assessment should be provided to the Committees no later than February 1, 2010.

## COAST GUARD

### OPERATING EXPENSES

| | |
|---|---:|
| Appropriation, fiscal year 2009[1] ................................................. | $6,194,925,000 |
| Budget estimate, fiscal year 2010 ................................................. | 6,556,188,000 |
| Recommended in the bill ................................................. | 6,822,026,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ................................................. | +627,101,000 |
|     Budget estimate, fiscal year 2010 ................................................. | +265,838,000 |

[1] Excludes $110,000,000 transfer from DoD, pursuant to PL 110–181, for Iraqi war costs.

### MISSION

Coast Guard is the principal Federal agency charged with maritime safety, security and stewardship. The Operating Expenses appropriation provides funding for the operation and maintenance of multipurpose vessels, aircraft, and shore units strategically located along the coasts and inland waterways of the United States and in selected areas overseas. This is the primary appropriation financing operational activities of Coast Guard.

### RECOMMENDATION

The Committee recommends a total appropriation of $6,822,026,000 for Operating Expenses. The recommended funding level is $265,838,000 above the amount requested and $627,101,000 above the amount provided in fiscal year 2009. A comparison of the

75

budget estimate to the Committee recommended level by budget activity is as follows:

| | Budget estimate | Recommended |
|---|---|---|
| Military pay and allowance: | | |
| Military pay and allowance | $2,708,923,000 | $2,727,521,000 |
| Military health care | 371,372,000 | 373,569,000 |
| Permanent change of station | 164,566,000 | 164,153,000 |
| Counterdrug enforcement initiative | 0 | 5,735,000 |
| Subtotal, military pay and allowance | 3,244,861,000 | 3,270,978,000 |
| Civilian pay and benefits | 699,594,000 | 700,490,000 |
| Training and recruiting: | | |
| Training and education | 103,388,000 | 103,847,000 |
| Recruitment | 102,582,000 | 102,929,000 |
| Subtotal, training and recruiting | 205,970,000 | 206,776,000 |
| Operating funds and unit level maintenance: | | |
| Atlantic Command | 177,474,000 | 177,474,000 |
| Pacific Command | 195,943,000 | 195,943,000 |
| 1st District | 60,074,000 | 60,205,000 |
| 5th District | 21,941,000 | 22,011,000 |
| 7th District | 78,338,000 | 78,394,000 |
| 8th District | 49,276,000 | 49,737,000 |
| 9th District | 31,672,000 | 31,795,000 |
| 11th District | 17,641,000 | 17,898,000 |
| 13th District | 23,060,000 | 23,193,000 |
| 14th District | 19,289,000 | 19,289,000 |
| 17th District | 29,829,000 | 31,233,000 |
| Headquarters directorates | 285,193,000 | 291,970,000 |
| Headquarters managed units | 158,901,000 | 159,509,000 |
| Other activities | 882,000 | 911,000 |
| Subtotal, operating funds and unit level maintenance | 1,149,513,000 | 1,159,562,000 |
| Centrally managed accounts | 353,071,000 | 331,058,000 |
| Intermediate and depot level maintenance: | | |
| Aeronautical maintenance | 365,291,000 | 365,291,000 |
| Electronic maintenance | 155,101,000 | 156,767,000 |
| Civil/ocean engineering and shore facilities maintenance | 180,929,000 | 182,743,000 |
| Vessel maintenance | 201,858,000 | 206,858,000 |
| Subtotal, intermediate and depot level maintenance | 903,179,000 | 911,659,000 |
| Overseas Contingency Operations (OIF/OEF Support) | — | 241,503,000 |
| Total, operating expenses | 6,556,188,000 | 6,822,026,000 |

OVERSEAS CONTINGENCY OPERATIONS

The Committee includes $241,503,000 under operating expenses for the costs of the Coast Guard's support for overseas contingencies, including operations in the Persian Gulf and against pirates off the coast of Somalia. These funds in the past had been carried in supplemental appropriations bills under the Department of Defense then transferred to the Coast Guard. The Committee believes moving these funds to regular order appropriations bills and providing them to the Coast Guard directly rather than as a transfer improves transparency and opportunities for effective oversight.

76

### FINANCIAL MANAGEMENT

The Coast Guard's ongoing struggle with internal financial controls is a persistent area of concern. The Committee notes that the Coast Guard lags behind all other DHS components in terms of addressing material weaknesses in these systems, and it is the single largest holder of unauditable balances in the Department of Homeland Security, according to the IG.

At the Committee's direction, in December 2008 the Coast Guard produced an extensive financial management improvement plan for fiscal years 2009 and 2010. The Financial Strategy for Transformation and Audit Readiness (FSTAR) plan should help lead the Coast Guard and DHS out of the financial wilderness. The Committee therefore directs the Coast Guard to provide a report on the progress of this initiative no later than six months after the date of enactment of this Act, and every six months thereafter. This report should include an assessment of the performance of the Coast Guard against the milestones outlined in the FSTAR plan, identify any remaining major roadblocks to achieving a clean audit, and outline proposals on how to remove those roadblocks.

### MARITIME SAFETY AND SECURITY

According to the Coast Guard's posture statement for fiscal year 2010, it plans to obligate $1,924,760,000 for ports, waterways, and coastal security, $137,239,000 above the 2009 funding level, and the largest single increase in any mission area of the Coast Guard. Over the last two years, the Committee has provided nearly $93,800,000 in additional resources for these activities over and above the past Administration's requests, investing in watchstanders, boat and marine inspectors, and increasing capacity for security-related activities and investigations. As a result, the Coast Guard has a more robust capability to ensure the safety and security of U.S. ports through domestic and international activities. For example, the Coast Guard helps reduce risk to the U.S. by verifying the use of effective anti-terrorism measures in foreign ports. Out of 500 ports screened in 135 countries, seven were found to have serious security flaws, requiring vessels from those ports to take additional security steps as a condition of entry into U.S. ports. The Committee has fully funded the budget request of $7,500,000 in new investments to improve marine safety by filling the gap between the size of its workforce and the growth of the shipping industry. The Coast Guard's Marine Safety program inspects 70,000 domestic vessels and examines 11,000 foreign vessel examinations yearly. It is in the process of using resources this Committee provided to add more qualified marine inspectors and personnel to their ranks under the Marine Safety Enhancement Plan developed in 2007. This year, the Coast Guard will continue to grow the force by deploying 25 apprentice marine inspectors to 11 ports, and establish Senior Marine Inspector Training Officers in seven "feeder ports." Also, these new investments will expand training capacity and availability for Coast Guard personnel, and complete staffing for seven centers of expertise around the country to act as resources for inspectors and investigators.

The Committee has provided $1,183,000 to make permanent the highly successful Biometrics at Sea program, as requested. The

77

Coast Guard is directed to brief the Committee on their plans for the future growth of this program within 60 days of the enactment of this bill.

Finally, the Committee has provided $1,088,000 as requested for the sustainment of the Seahawk Charleston Interagency Operations Center.

## COUNTERNARCOTICS ENFORCEMENT

This year, the Coast Guard anticipates spending $1,288,285,000 in support of its role as the lead federal agency for maritime narcotics interdiction. The Coast Guard reports that fiscal year 2008 was a record year for drug seizures, despite smugglers' attempts to use new tactics. The Committee has provided $5,735,000 for counternarcotics enforcement above the budget's proposed $57,116,000 increase in this mission area. Funding includes a total of $2,970,000 to expand the deployment of Airborne Use of Force capabilities in the Coast Guard's helicopter fleet, $2,125,000 above the amount requested. This will increase the capacity of the Helicopter Interdiction Squadron from 1,000 deployment days to 2,200 deployment days per year. The Committee has also provided $3,610,000 above the request to standardize the size of Law Enforcement Detachments, increasing them to 12 members per detachment, and to provide four additional civilian trainers to meet sustainment requirements.

## INTERMEDIATE AND DEPOT LEVEL MAINTENANCE

The Committee recommends $911,659,000 for intermediate and depot level maintenance, $8,480,000 above the budget request and $87,866,000 above the amounts provided in fiscal year 2009. The Committee has expressed concern in the past about the high demands being placed on a Coast Guard Cutter fleet whose key elements, such as the High Endurance Cutter (HEC), are in many cases reaching the end of their expected service lives. The Coast Guard reports a $5,000,000 backlog of maintenance on HECs based on the west coast, while the two HECs based on the east coast are currently not operational and are awaiting completion of structural work before they can return to service. Without investment in sustainment plans or service life extension programs, these vessels will no longer be able to meet the demand for their services. Medium Endurance Cutters and patrol boats have benefitted from such plans and programs, but still face unforseen maintenance issues. Therefore, the Committee has provided an additional $5,000,000 to address priority maintenance needs for all three classes of cutters.

## LORAN–C

Once again, the budget proposed terminating the Long Range Aids to Navigation (LORAN–C) program, as was proposed and rejected two years ago. Last year the Committee rejected another proposal to transfer LORAN–C from Coast Guard to the National Protection and Programs Directorate (NPPD), an agency that had neither the preparation nor the experience to operate the LORAN–C system.

78

In late 2006, the Department of Transportation convened an Independent Assessment Team to determine the future of LORAN in cooperation with DHS, whose final report was released to the public this year as the result of a Freedom of Information Act request. It concluded that eLORAN, a fully modernized and upgraded version of LORAN–C, should serve as a long-term backup for GPS for positioning, navigation and timing for twenty years. On the basis of the report's findings, DHS announced in February 2008 that eLORAN would be the backup system for GPS, and the Coast Guard testified later that year that the existing, upgradable LORAN–C infrastructure was the logical support system for eLORAN. The immediate implementation of a long-term, robust backup system is vital, given the GAO's recent finding that it is unclear whether new GPS satellites can be purchased and put in orbit in time to maintain uninterrupted GPS service to private and public sector consumers. Therefore, the Committee once again rejects termination of LORAN–C, denies the authority to sell existing LORAN–C sites as sought by the Administration, provides $36,000,000 for continuing operation and maintenance, and directs the Coast Guard to provide a plan to the Committee within 30 days of enactment of this Act for upgrading the existing LORAN–C system to eLORAN in a cost-efficient fashion that complies with existing international agreements.

### MANAGEMENT AND TECHNOLOGY EFFICIENCIES

Due to the continuation of the LORAN–C signal, the Committee recommendation includes only $19,723,000 of the proposed $55,723,000 of management efficiencies. Within 60 days of enactment of this Act, the Coast Guard is directed to report in detail on what management efficiencies will be implemented, and what their projected total cost/benefit is for Coast Guard and the American public over the next five years.

### A–76 ACTIVITIES

The Committee continues to provide no funding for A–76 activities in fiscal year 2010. In light of the ongoing challenges facing the Coast Guard, the Committee does not believe scarce resources should be used on A–76 studies.

### DATA CENTER MIGRATION

The Committee does not provide $22,400,000 requested for data center migration activities due to the IG's recent findings described in the Office of the Chief Information Officer section of the report regarding possible unmitigated risks at the destination data center sites.

### POLAR ICEBREAKING OPERATING AND MAINTENANCE COSTS AND FUTURE POLAR NEEDS

The Committee continues to be concerned about Coast Guard's ability to meet its polar operations mission requirements and provide the United States with the capability to support national interests in the polar regions. These interests extend well beyond the realm of scientific research. As such, last year the Committee directed the Coast Guard and the National Science Foundation (NSF)

to renegotiate the existing agreement on polar icebreaking in order to return the budget for operating and maintaining these vessels to the Coast Guard for fiscal year 2010, and to provide a new joint plan for Coast Guard support of scientific research by NSF and other Federal agencies, which was to be included in the 2010 budget request. No agreement was reached, and no plan was submitted. Negotiations are apparently underway between the Coast Guard and NSF, but the budget has yet to be returned to the Coast Guard accounts. Therefore, the Committee directs the Coast Guard to continue negotiating the agreement for the return of icebreaking in the 2011 budget, and to provide the joint plan for Coast Guard support as soon as possible.

The Committee further directs the Coast Guard to use existing appropriations to continue its analysis of national mission needs in the high latitude regions to inform national polar policy.

#### INVASIVE SPECIES PROTECTION

The Committee is concerned about the threat that harmful invasive species, such as the Asian carp, pose to the Great Lakes ecosystem. The Committee is aware that the Chicago Sanitary and Ship Canal second dispersal barrier is not yet operating at maximum capacity and that the voltage could be increased to provide maximum effectiveness. The Coast Guard is directed to initiate safety testing of the second barrier at operational strength of up to 4 volts per inch, in coordination with the US Army Corps of Engineers, within 180 days of enactment of this Act.

### ENVIRONMENTAL COMPLIANCE AND RESTORATION

| | |
|---|---:|
| Appropriation, fiscal year 2009 | $13,000,000 |
| Budget estimate, fiscal year 2010 | 13,198,000 |
| Recommended in the bill | +13,198,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 | +198,000 |
| Budget estimate, fiscal year 2010 | – – – |

#### MISSION

The Environmental Compliance and Restoration appropriation assists in bringing Coast Guard facilities into compliance with applicable environmental regulations; preparing and testing facilities response plans; developing pollution and hazardous waste minimization strategies; conducting environmental assessments; and furnishing necessary program support. These funds permit the continuation of a service-wide program to correct environmental problems, such as through major improvements of storage tanks containing petroleum and regulated substances. The program focuses mainly on Coast Guard facilities, but also includes third party sites where Coast Guard activities have contributed to environmental problems.

#### RECOMMENDATION

The Committee recommends $13,198,000 for Environmental Compliance and Restoration, the same amount as requested and $198,000 more than the amount provided in fiscal year 2009. The Committee is aware of the continuing backlog in environmental compliance projects and expects the Coast Guard to provide a

80

prioritized list outlining the backlog and a five-year remediation plan for the most environmentally damaging and time-sensitive of the contaminated sites within six months of the date of enactment of this Act.

### RESERVE TRAINING

| | |
|---|---|
| Appropriation, fiscal year 2009 ....................................................... | $130,501,000 |
| Budget estimate, fiscal year 2010 .................................................... | 133,632,000 |
| Recommended in the bill .................................................................. | 133,632,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ................................................. | +3,131,000 |
|     Budget estimate, fiscal year 2010 ............................................. | – – – |

#### MISSION

This appropriation provides for the training of qualified individuals who are available for active duty in time of war or national emergency or to augment regular Coast Guard forces in the performance of peacetime missions. Program activities fall into the following categories:

Initial training—The direct costs of initial training for three categories of non-prior service trainees;

Continued training—The training of officer and enlisted personnel;

Operation and maintenance of training facilities—The day-to-day operation and maintenance of reserve training facilities; and

Administration—All administrative costs of the reserve forces program.

#### RECOMMENDATION

The Committee recommends $133,632,000 for Reserve Training, the same as the amount requested and $3,131,000 above the amount provided in fiscal year 2009.

### ACQUISITION, CONSTRUCTION, AND IMPROVEMENTS

| | |
|---|---|
| Appropriation, fiscal year 2009 [1] ................................................... | $1,494,576,000 |
| Budget estimate, fiscal year 2010 .................................................... | 1,383,980,000 |
| Recommended in the bill .................................................................. | 1,347,480,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ................................................. | – 147,096,000 |
|     Budget estimate, fiscal year 2010 ............................................. | – 36,500,000 |

[1] Excludes $98,000,000 in appropriations in the American Recovery and Reinvestment Act (P.L. 111–5).

#### MISSION

The Acquisition, Construction, and Improvements appropriation finances the acquisition of new capital assets, construction of new facilities, and physical improvements to existing facilities and assets. The appropriation covers Coast Guard-owned and operated vessels, aircraft, shore facilities, and other equipment such as computer systems, as well as the personnel needed to manage acquisition activities.

#### RECOMMENDATION

The Committee recommends $1,347,480,000 for Acquisition, Construction, and Improvements, $36,500,000 below the amount requested and $147,096,000 below the amount provided in fiscal year

81

2009. A comparison of the budget estimate to the Committee recommended level by budget activity is as follows:

| | Budget estimate | Recommended |
|---|---|---|
| Vessels and critical infrastructure: | | |
| Response boat medium .................................................. | $103,000,000 | $103,000,000 |
| Subtotal, vessels and critical infrastructure .................. | 103,000,000 | 103,000,000 |
| Deepwater: | | |
| Aircraft: | | |
| Maritime patrol aircraft ......................................... | 175,000,000 | 138,500,000 |
| HH–60 conversions ................................................. | 45,900,000 | 45,900,000 |
| HC–130H conversion/sustainment project ................ | 45,300,000 | 45,300,000 |
| HH–65 conversions ................................................. | 38,000,000 | 38,000,000 |
| H-C130J missionization ......................................... | $1,300,000 | 1,300,000 |
| Subtotal, aircraft ................................................. | 305,500,000 | 269,000,000 |
| Surface ships:. | | |
| National security cutter ......................................... | 281,480,000 | 281,480,000 |
| Offshore patrol cutter ........................................... | 9,800,000 | 9,800,000 |
| Fast Response Cutter/Replacement Patrol Boat ...... | 243,000,000 | 243,000,000 |
| IDS small boats ..................................................... | 3,000,000 | 3,000,000 |
| Patrol Boats sustainment ..................................... | 23,000,000 | 23,000,000 |
| Medium endurance cutter sustainment ................. | 31,100,000 | 31,100,000 |
| Subtotal, surface ships ......................................... | 591,380,000 | 591,380,000 |
| Technology obsolescence prevention ........................... | 1,900,000 | 1,900,000 |
| C4ISR ....................................................................... | 35,000,000 | 35,000,000 |
| Logistics .................................................................... | 37,700,000 | 37,700,000 |
| Systems engineering and integration .......................... | 35,000,000 | 35,000,000 |
| Government program management .............................. | 45,000,000 | 45,000,000 |
| Subtotal, Deepwater ............................................. | 1,051,480,000 | 1,014,980,000 |
| Other equipment: | | |
| Rescue 21 ................................................................. | 117,000,000 | 117,000,000 |
| HF recap ................................................................... | 2,500,000 | 2,500,000 |
| Subtotal, other equipment .................................... | 119,500,000 | 119,500,000 |
| Shore facilities and aids to navigation: | | |
| Survey and design, shore operational and support projects ........... | 6,000,000 | 6,000,000 |
| Waterways aids to navigation ..................................... | 4,000,000 | 4,000,000 |
| Subtotal, shore facilities and aids to navigation ............. | 10,000,000 | 10,000,000 |
| Personnel and related support: | | |
| Direct personnel costs .............................................. | 99,500,000 | 99,500,000 |
| AC&I core ................................................................. | 500,000 | 500,000 |
| Subtotal, personnel and related support ................... | 100,000,000 | 100,000,000 |
| Total .................................................................. | 1,383,980,000 | 1,347,480,000 |

## QUARTERLY REPORTS ON ACQUISITION PROJECTS AND MISSION EMPHASIS

The Committee continues to find Coast Guard's quarterly acquisition reports and mission emphasis reports extremely useful, and as such, directs Coast Guard to continue submitting these comprehensive reports in a timely fashion. The Coast Guard is directed to continue to include in the acquisition reports information on small boat purchases and leases made within the Operating Expenses appropriation.

82

### STATUTORY REPORTING REQUIREMENTS

The Committee is frustrated that the Coast Guard failed to provide several reports required in law that were to accompany the 2010 budget request. Specifically, P.L. 110–329 requires the Coast Guard to submit a Deepwater expenditure plan and a capital investment plan, yet neither was received. While these are not simple documents, these are not new requests. The Coast Guard has been required to submit a capital investment plan every year since the agency moved to DHS. Similarly, the Coast Guard has been required to submit an annual expenditure plan using the fiscal year 2006 revised Deepwater Implementation Plan as the base document since fiscal year 2007. These reports are critical because they provide the Committee with needed data to assess the effectiveness of one of the country's largest annual investments in homeland security. The explanation provided in the budget justification for the lack of data from a Capital Investment Plan is wholly inadequate in satisfying the requirement. Although the Committee had chosen not to carry a withholding provision in the bill this year out of consideration for possible dislocations in the reporting process due to the transition of administrations, these documents should be provided to the Committee immediately, or there is little question that the question of withholdings will be revisited.

### DEEPWATER

The Committee recommends $1,014,980,000 for Deepwater, $36,500,000 below the amount requested and $19,014,000 below the amount provided in fiscal year 2009.

### MARITIME PATROL AIRCRAFT

The Maritime Patrol Aircraft (MPA) serves as the Coast Guard's lead fixed-wing extended surveillance and quick response platform. The Committee recommends $138,500,000 for two additional MPAs, mission pallets, spares, and logistics support as requested. The Committee does not include $36,500,000 requested for accelerating the purchase of a MPA flight simulator ahead of its original schedule.

### MARITIME SURVEILLANCE

The Committee has consistently voiced its concerns over the gap between the Coast Guard's stated mission hour needs for maritime surveillance and available resource hours of surveillance assets. These concerns are based upon the Coast Guard's quantitative analysis of mission requirements and repeated testimony by operational personnel and security experts on the need for increased maritime surveillance capabilities, especially in the source and transit zones of the eastern Pacific Ocean and the Caribbean basin. The Committee is pleased the fiscal year 2010 budget request partially addresses this issue through funding for aircraft acquisition, conversion and sustainment. However, the Committee is concerned by the absence of requested funding to support operational testing and evaluation of either land-based or cutter-based unmanned aerial systems (UAS) in fiscal year 2010 given the unrealized potential of such assets for enhanced maritime surveillance. Furthermore, the Committee notes that even with these additional surveillance

83

resources requested for fiscal year 2010, the Coast Guard's available maritime surveillance hours will only be at approximately 65 percent of stated mission needs. The Coast Guard is directed to report to the Committee no later than November 1, 2009, on its planned efforts to leverage available interagency resources and other temporary surveillance capabilities, including the operational testing and evaluation of UAS, in fiscal year 2010 to address the maritime surveillance mission hour gap.

### NATIONAL SECURITY CUTTER

The National Security Cutter (NSC) is the replacement for the 378-foot High Endurance Cutter, and as such, is capable of worldwide operations, extended on-scene presence, long transit and forward deployments. The Committee recommends $281,480,000 for the NSC as requested, $72,220,000 below the amount provided in fiscal year 2009. The Committee does this despite persistent concerns regarding cost controls and the production schedule for this class of cutter. These concerns are predicated on the fact that the cost of the fourth NSC is more than $73,700,000 and fourteen percent higher than the previous two cutters in this class and that the Coast Guard's current schedule delays the award for the fifth NSC until 2011. The Committee is troubled by a projected production schedule for the remaining NSCs that delays fulfillment of known operational needs and appears to enable further cost growth and delays in cutter delivery. These concerns are exacerbated by the absence of requested funding for known, immediate maintenance needs of the legacy high endurance cutters (HECs) in fiscal year 2010. The Committee views the confluence of the NSC's extended production schedule with the uncertain long-term availability of the legacy HEC fleet as a detriment to offshore maritime security operations and directs the Coast Guard to: prioritize maintenance needs of the HEC fleet, as addressed elsewhere in this report, and inform the Committee no later than July 1, 2009, of its efforts to put in place a contractual structure for the remaining NSCs that will provide expeditious delivery at the least cost and risk to the taxpayer.

### OFFSHORE PATROL CUTTER

The Offshore Patrol Cutter (OPC) is the replacement vessel for the current 210-foot and 270-foot Medium Endurance cutters. The Committee provides the requested $9,800,000 to complete alternatives analysis and required acquisition documentation for the OPC, as well as beginning Phase I of preliminary design. The Committee understands from the Coast Guard that this approach will help reduce the risk of program cost growth. Given that such cost growth was behind the decision to stop work on the initial OPC, the Coast Guard is directed to brief the Committee on the result of the requirements analysis prior to initiating Phase I work on the new OPC.

### FAST RESPONSE CUTTER

The Fast Response Cutter (FRC) is the more capable replacement for the Coast Guard's legacy 110-foot patrol boats. The Committee provides the requested $243,000,000 for full-rate production

84

of four FRCs, $127,700,000 above the amount provided in fiscal year 2009. The Coast Guard is expected to take delivery of the first FRC in fiscal year 2010. The Committee directs the Coast Guard to include in its quarterly briefings to the Committee on the FRC's progress information on the effectiveness of its various efforts to control cost growth.

LEGACY CUTTER SUSTAINMENT

The Committee continues to be concerned about legacy cutter sustainment as new vessels are being slowly brought into service. The Committee understands that the funding level in the request for cutter sustainment allows for these programs to continue on schedule, with the shipyards working at optimal capacity. The Committee is pleased by the increases in vessel availability resulting from the sustainment programs in place for patrol boats and Medium-Endurance Cutters. Coast Guard reporting indicates that the Medium Endurance Cutter Sustainment Program has increased the fully-capable mission availability of 270-foot cutters by 62 percent, and 210-foot cutters by 75 percent. Also, the Committee notes that attention to critical maintenance needs in the 378-foot High Endurance Cutter fleet has resulted in more marginal improvements in availability, and urges the Coast Guard to move ahead on a more robust sustainment option for the High Endurance Cutter.

DEEPWATER REVIEW AND CAPITAL INVESTMENT PLAN

The Committee notes that neither the Secretary's review of the Revised Deepwater Implementation Plan nor the future-years capital investment plan mandated in P.L. 110–329 were provided with the budget request. The Committee strongly urges the Department to produce those items expeditiously, and make sure that similar mandates carried in this legislation are met.

SHORE FACILITIES AND AIDS TO NAVIGATION

The Committee recommends $10,000,000 for shore facilities and aids to navigation as requested, which is $58,000,000 below the amount provided in fiscal year 2009. In 2009, Congress provided a major investment to address the maintenance backlog for the Coast Guard's shore facilities totaling $166,000,000, including funding under ARRA. The Coast Guard shall provide the Committee with a prioritized list of projects in the backlog and the Coast Guard's plan to address them by January 15, 2010.

In addition, a general provision is included to authorize the Coast Guard to use previously appropriated funds for the consolidation of Sector Buffalo to enhance public access to Buffalo Lighthouse. The Coast Guard is directed to brief the Committee within 90 days of the date of enactment of this Act on how this aspect of the project will be completed by the end of fiscal 2011.

RESCUE 21

The Committee recommends $117,000,000 for Rescue 21, the same as the amount requested. Rescue 21 will replace the existing National Distress and Response System with improved coastal communications and command and control capabilities. The Rescue 21

85

system now stands watch along 22,292 miles of coastline, and is deployed at 41 percent of Coast Guard sectors. The Committee is aware of problems with siting some Rescue 21 towers that have resulted in cost increases and program delays, and urges the Coast Guard to be diligent in its planning processes to avoid such problems.

### PERSONNEL AND RELATED SUPPORT

The Committee recommends $100,000,000 for acquisition personnel, as requested, and $7,170,000 above the amount provided in fiscal year 2009. The Committee is supportive of the efforts the Coast Guard has made in confronting problems with its acquisition management and oversight, especially the establishment of an acquisition career path for Coast Guard military personnel.

### ALTERATION OF BRIDGES

| | |
|---|---|
| Appropriation, fiscal year 2009 [1] ..................................................... | $16,000,000 |
| Budget estimate, fiscal year 2010 ................................................... | – – – |
| Recommended in the bill ............................................................... | 10,000,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ............................................... | –6,000,000 |
|     Budget estimate, fiscal year 2010 ............................................ | +10,000,000 |

[1] Excludes $142,000,000 in appropriations in the American Recovery and Reinvestment Act (P.L. 111–5).

### MISSION

The bill includes funding for alteration of bridges deemed a hazard to marine navigation pursuant to the Truman-Hobbs Act. The purpose of these alterations is to improve the safety of marine navigation under the bridge rather than the improvement of surface transportation on the bridge itself.

### RECOMMENDATION

The Committee recommends $10,000,000 for Alteration of Bridges, $10,000,000 above the amount requested and $6,000,000 below the amount provided in fiscal year 2009. The Committee directs the Coast Guard to fund bridges with the most critical needs, giving priority to ongoing projects that have received appropriations in the past but have not attained the Coast Guard's threshold to begin construction.

### RESEARCH, DEVELOPMENT, TEST, AND EVALUATION

| | |
|---|---|
| Appropriation, fiscal year 2009 ..................................................... | $18,000,000 |
| Budget estimate, fiscal year 2010 ................................................... | 19,745,000 |
| Recommended in the bill ............................................................... | 19,745,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ............................................... | +1,745,000 |
|     Budget estimate, fiscal year 2010 ............................................ | – – – |

### MISSION

The purpose of Research, Development, Test, and Evaluation is to allow Coast Guard to maintain its non-homeland security research and development capability, while also partnering with DHS and the Department of Defense to leverage beneficial initiatives.

86

### RECOMMENDATION

The Committee recommends $19,745,000 for Research, Development, Test, and Evaluation, the same as the amount requested and $1,745,000 above the amount provided in fiscal year 2009. The Committee notes the aggressive research agenda laid out in the budget request and requires a report from the Coast Guard within 90 days of the date of enactment of this Act describing how the research projects outlined in the request will be supported with the resources provided.

The report should include Coast Guard activities in support of the development of freshwater ballast treatment technologies.

### UNMANNED AERIAL SYSTEMS

The Committee recognizes the Coast Guard's efforts to examine effective unmanned aerial systems (UAS) that pose low developmental risks and demonstrate cost-effectiveness. Furthermore, the Committee is pleased to see the Coast Guard working with the Department of Defense in an effort to leverage UAS development, testing, and engineering efforts. However, the Committee is concerned the National Security Cutter (NSC) is commencing operations without a viable UAS solution and therefore will not provide its projected surveillance capabilities. The Coast Guard is directed to report to the Committee no later than December 1, 2009, on its efforts and findings to date on determining the most effective UAS for maritime applications, including long range surveillance, mid-altitude/mid-range surveillance, and for use with flight deck equipped cutters. The Coast Guard is further directed to include in this report a projected timeline for the integration and operation of a UAS with the NSC.

### MEDICARE ELIGIBLE RETIREE HEALTH CARE FUND CONTRIBUTION

| | |
|---|---|
| Appropriation, fiscal year 2009 [1] ...................................................... | $257,305,000 |
| Budget estimate, fiscal year 2010 [1] ................................................. | 261,000,000 |
| Recommended in the bill [1] .............................................................. | 261,000,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ................................................ | +3,695,000 |
|     Budget estimate, fiscal year 2010 ............................................ | – – – |

[1] While this expenditure requires no annual action by Congress, it counts as discretionary spending.

### MISSION

The Medicare-eligible retiree health care fund contribution provides funding to the Department of Defense Medicare-eligible health care fund for the health benefits of future Medicare-eligible retirees currently serving active duty in Coast Guard, retiree dependents, and their potential survivors. The authority for Coast Guard to make this payment on an annual basis was provided in the Department of Defense Appropriations Act for Fiscal Year 2005.

### RECOMMENDATION

While this account requires no annual action by Congress, the Committee provides $261,000,000 to fund the Medicare-eligible retiree health care fund contribution. This number is based on a Congressional Budget Office re-estimate.

87

## RETIRED PAY

| | |
|---|---|
| Appropriation, fiscal year 2009 ........................................................... | $1,236,745,000 |
| Budget estimate, fiscal year 2010 ...................................................... | 1,361,245,000 |
| Recommended in the bill .................................................................... | 1,361,245,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ................................................. | +124,500,000 |
|     Budget estimate, fiscal year 2010 ............................................. | – – – |

### MISSION

This appropriation provides for the retired pay of Coast Guard military personnel and Coast Guard Reserve personnel, as well as career status bonuses for active duty personnel. In addition, it provides payments to members of the former Lighthouse Service and beneficiaries pursuant to the retired serviceman's family protection plan and survivor benefit plan, as well as payments for medical care of retired personnel and their dependents under the Dependents' Medical Care Act.

### RECOMMENDATION

The bill provides $1,361,245,000 for Retired Pay, the same as the amount requested and $124,500,000 above the amount provided in fiscal year 2009. The Committee includes bill language allowing funds to remain available until expended. This is scored as a mandatory appropriation in the Congressional budget process.

## UNITED STATES SECRET SERVICE

### SALARIES AND EXPENSES

| | |
|---|---|
| Appropriation, fiscal year 2009 [1] ...................................................... | $1,408,729,000 |
| Budget estimate, fiscal year 2010 ...................................................... | 1,485,609,000 |
| Recommended in the bill .................................................................... | 1,457,409,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ................................................. | +48,680,000 |
|     Budget estimate, fiscal year 2010 ............................................. | −28,200,000 |

[1] Does not include $100,000,000 in emergency funding provided in P.L. 111–8, the Fiscal Year 2009 Omnibus Appropriations Act.

### MISSION

The United States Secret Service has statutory authority to carry out two primary missions: protection of the nation's leaders and investigation of financial and electronic crimes. The Secret Service protects and investigates threats against the President and Vice President, their families, visiting heads of state, and other designated individuals; protects the White House, Vice President's Residence, Foreign Missions, and other buildings within Washington, D.C.; and manages the security at National Special Security Events. The Secret Service also investigates violations of laws relating to counterfeiting of obligations and securities of the United States; financial crimes that include, but are not limited to, access device fraud, financial institution fraud, identity theft, and computer fraud; and computer-based attacks on financial, banking, and telecommunications infrastructure. The agency also provides support for investigations related to missing and exploited children.

88

## RECOMMENDATION

The Committee recommends $1,457,409,000 for Secret Service Salaries and Expenses, $28,200,000 below the amount requested but $48,680,000 above the amount provided in fiscal year 2009. Excluding $26,082,000 of one-time Presidential campaign costs funded in fiscal year 2009, the 2010 funding level provides a 5.4 percent increase in Secret Service operating budgets, significantly above the rate of inflation.

The Committee does not provide the $4,040,000 requested to establish a new compensation framework for the Secret Service Uniformed Division, as discussed below. The Committee also denies $21,260,000 requested for Secret Service computer network investments until the agency develops a plan that integrates Secret Service information technology systems with the Department's long-term plan for data center consolidation. Finally, the Committee reduces the requested budget for White House mail processing by $2,900,000 to reflect one-time equipment purchases made in 2009.

A comparison of the budget estimate to the Committee recommended levels, by budget activity, is as follows:

|  | Budget estimate | Recommended |
|---|---|---|
| Headquarters Management and Administration | $221,045,000 | $199,785,000 |
| Protection: |  |  |
| Protection of Persons and Facilities | 759,561,000 | 755,521,000 |
| Protective Intelligence Activities | 67,824,000 | 67,824,000 |
| National Special Security Event Fund | 1,000,000 | 1,000,000 |
| White House mail screening | 25,315,000 | 22,415,000 |
| Total, Protection | 853,700,000 | 846,760,000 |
| Investigations: |  |  |
| Domestic field operations | 260,892,000 | 260,892,000 |
| International field office administration operations | 30,705,000 | 30,705,000 |
| Electronic Crimes Special Agent Program and Electronic Crimes Task Forces | 56,541,000 | 56,541,000 |
| Support for missing and exploited children | 8,366,000 | 8,366,000 |
| Total, Investigations | 356,504,000 | 356,504,000 |
| Training: |  |  |
| Rowley Training Center | 54,360,000 | 54,360,000 |
| Total, Salaries and Expenses | 1,485,609,000 | 1,457,409,000 |

## PRESIDENTIAL CAMPAIGN AND INAUGURATION

The Committee congratulates the Secret Service on its accomplishments in the 2008 presidential campaign, which was the most demanding in the agency's history. Given the unprecedented interest in the campaign, and the large number of voters who turned out at rallies for both candidates, the Secret Service screened over five million people during the campaign, including nearly half-a-million at the party conventions. These statistics represent a 77 percent increase over the number of attendees at 2004 campaign events. The Secret Service is to be commended for its diligence and professionalism in ensuring the safety and civil rights of those who participate in our democracy, as well as for ensuring the security of the candidates and their families.

Apart from this otherwise sterling record, the Committee was disappointed by a series of missteps in the orchestration of the se-

curity plan for the 2009 presidential inauguration. A variety of factors, not all of which were under direct control of the Secret Service, led to thousands of ticketed guests being unable to witness the inauguration from the observation areas to which they were supposed to have been admitted. Problems such as insufficient pedestrian traffic direction, inadequate crowd control, and narrow entry gates that became bottlenecks all led to significant delays in processing attendees through ticket checkpoints and security screening. The Committee strongly urges the Secret Service, in conjunction with the Capitol Police, to further study the issues highlighted in the "Multi-Agency Response to Concerns Raised by the Joint Congressional Committee on Inaugural Ceremonies for the 56th Presidential Inauguration" and develop a plan for implementing that report's major recommendations so that these mistakes are not repeated at any future inaugural celebration.

### FISCAL YEAR 2009 OMNIBUS APPROPRIATIONS

In response to operational requirements identified by the Secret Service, the Committee provided $61,470,000 in the 2009 Omnibus Appropriations Act for the Secret Service to expand its protective operations, including hiring 150 new Special Agents and 204 technical, administrative and support staff. Buried within the 2010 budget request, the Secret Service proposed altering the number of personnel it planned to hire using these funds, unilaterally reducing the expansion of programs previously directed by Congress. The Committee notes that it is the role of the Congress, not the Executive Branch, to determine the appropriate resource levels for agency programs, and directs the Secret Service to ensure that all staff funded in the 2009 Omnibus Appropriation Act (P.L. 111–8) are indeed hired. The Committee directs the Secret Service to be more forthcoming about its hiring plans in future annual budget briefs. In addition, the Committee directs the Secret Service to provide an immediate briefing on its hiring plans for 2009 and 2010, including its schedule for filling any vacancies created by attrition or retirement, its schedule for hiring and annualizing new personnel funded in the 2009 Omnibus Appropriations Act, and its planned hiring to fill positions proposed in the 2010 budget.

### WHITE HOUSE MAIL SCREENING

The Committee recommends $22,415,000 to screen mail sent to the White House and other Executive Office of the President agencies, which is $2,900,000 below the amount requested. The budget proposed $25,315,000 for mail screening, a reduction of $8,386,000 below the 2009 level. The request includes a cut of $11,600,000 for one-time equipment purchases funded in 2009 that is partially offset by an increase of $3,214,000 to annualize the rental budget for the facility. However, the 2009 appropriation actually included $14,500,000 to equip the White House mail screening facility. As a result, the Committee reduces the White House mail screening budget by an additional $2,900,000 to account for all of the one-time equipment costs funded in 2009.

90

## SECRET SERVICE INFORMATION TECHNOLOGY

The budget proposes $33,960,000 for Secret Service information technology recapitalization, including new network infrastructure, system security, and application stability investments. The Committee is well aware of the threats posed by inadequate network controls and out-of-date technology since it has invested more than $400,000,000 in DHS cybersecurity programs over the past two years. Furthermore, the Committee has also appropriated significant amounts for the construction of two state-of-the-art data centers that are supposed to consolidate all Departmental information storage at highly secure and protected locations. Although work remains to be done to ensure the Department's data centers can provide the robust level of service planned, there is no compelling justification to exempt the Secret Service from this consolidation. Therefore, the Committee provides only $12,700,000 of this request, which will allow the agency to stabilize and secure its mission-critical applications through the database architecture and maintenance, information assurance, and cross-domain application/data environment initiatives. The Committee directs that none of this funding be used for planning or acquiring a stand-alone Secret Service data center. Further, the Committee directs the Secret Service to work with the Office of the Chief Information Officer for the Department of Homeland Security to develop immediately a transition plan to integrate the agency's network systems and data into the Department's data center consolidation effort after the risk assessment and mitigation work discussed elsewhere in this report is complete.

## UNIFORMED DIVISION MODERNIZATION

Included in the budget is a request for $4,040,000 to restructure the Secret Service Uniformed Division's salary and benefits package. Many of the Uniformed Division's governing authorities, including its salary tables, are codified as a section of the District of Columbia code because the White House police force (the ancestor agency of the Uniformed Division) was originally a part of the Metropolitan Police Department. As a result, Secret Service Uniformed Division officers are subject to both Federal and District of Columbia work regulations, which makes administration of the Uniformed Division both complex and burdensome. To address this issue, the Administration has proposed the "Uniformed Division Modernization Act of 2010," which would establish a new pay schedule for Uniformed Division employees as part of the United States Code, and rectify anomalies between the Uniformed Division's personnel authorities and those that apply to other Federal law enforcement agencies. While the Committee is sympathetic to the need to modernize the personnel laws that govern the Uniformed Division, it has no jurisdiction to do so, and therefore has not included the modernization proposal in the 2010 Appropriations bill. Furthermore, there appear to be equity and fairness issues related to other Federal law enforcement agencies also governed by the District of Columbia code that have not been fully addressed in the proposed legislation. As a result of these concerns, the Committee provides no funding to implement a new Uniformed Division pay and benefits system, and encourages the Department

91

to work with the authorizing Committees of jurisdiction to address this issue through regular Congressional processes.

### ACQUISITION, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

| | |
|---|---|
| Appropriation, fiscal year 2009 ..................................................... | $4,225,000 |
| Budget estimate, fiscal year 2010 ................................................. | 3,975,000 |
| Recommended in the bill ............................................................... | 3,975,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ............................................. | −250,000 |
|     Budget estimate, fiscal year 2010 ......................................... | − − − |

#### MISSION

This account supports the acquisition, construction, improvement, equipment, furnishing and related cost for maintenance and support of Secret Service facilities, including the Secret Service Memorial Headquarters Building and the James J. Rowley Training Center (JJRTC).

#### RECOMMENDATION

The Committee recommends $3,975,000, the same levels as requested in the budget, and $250,000 below the 2009 enacted level.

### TITLE III—PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY

#### NATIONAL PROTECTION AND PROGRAMS DIRECTORATE

#### MANAGEMENT AND ADMINISTRATION

| | |
|---|---|
| Appropriation, fiscal year 2009 ..................................................... | $ 51,350,000 |
| Budget estimate, fiscal year 2010 ................................................. | 44,577,000 |
| Recommended in the bill ............................................................... | 44,577,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ............................................. | −6,773,000 |
|     Budget estimate, fiscal year 2010 ......................................... | − − − |

#### MISSION

The National Protection and Programs Directorate (NPPD) includes programs focused on security of the country's physical and cyber infrastructure, interoperable communications systems, and the US–VISIT entry-exit system. The Management and Administration account funds the immediate Office of the Under Secretary for National Protection and Programs; provides for administrative overhead costs such as IT support and shared services; includes a national planning office for development of standard doctrine and policy for infrastructure protection and cyber security; and includes a Risk Management and Analysis office, which develops standard doctrine and policy for DHS risk analyses.

#### RECOMMENDATION

The Committee recommends $44,577,000 for Management and Administration, as requested. This amount is $6,773,000 below the amount provided in fiscal year 2009 due to the reallocation of several administrative budgets to the Infrastructure Protection and Information Security account, as described below.

92

INFRASTRUCTURE PROTECTION AND INFORMATION SECURITY

| | |
|---|---|
| Appropriation, fiscal year 2009 | $806,913,000 |
| Budget estimate, fiscal year 2010 | 918,166,000 |
| Recommended in the bill | 883,346,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 | +76,433,000 |
| Budget estimate, fiscal year 2010 | −34,820,000 |

MISSION

Infrastructure Protection and Information Security (IPIS) works to reduce the vulnerability of the nation's critical infrastructure, key resources, information technology networks, and telecommunications systems to terrorist attacks and natural disasters. IPIS is also responsible for maintaining effective telecommunications for government users in national emergencies, and for establishing policies and promoting solutions for interoperable communications at the Federal, State and local levels.

RECOMMENDATION

The Committee recommends $883,346,000 for IPIS, $34,820,000 below the amount requested, and $76,433,000 above the amount provided in fiscal year 2009. The Committee withholds $180,000,000 from obligation until the Department submits and the Committee approves expenditure plans for two programs, as described below. Given the lateness of the 2010 budget submission, the Committee is unable to re-arrange the Program, Project, and Activity display for the IPIS account, and instead presents funding in the same arrangement as past years. In addition, regardless of any restructuring proposals planned for the 2011 budget, the NPPD Chief Financial Officer is directed to submit the budget in a structure identical to that enacted in the 2010 Appropriations Act so that the Committee can easily compare funding levels for the myriad programs managed by NPPD. A comparison of the budget estimate to the Committee recommended level by budget activity is as follows:

| | Budget estimate | Recommended |
|---|---|---|
| Infrastructure Protection: | | |
| Identification and Evaluation | $86,610,000 | $86,610,000 |
| Coordination and Information Sharing | 50,582,000 | 62,912,000 |
| Mitigation Programs | 196,111,000 | 196,961,000 |
| National Cyber Security Division: | | |
| US-Computer Emergency Response Team | 333,629,000 | 310,629,000 |
| Strategic Initiatives | 57,679,000 | 64,179,000 |
| Outreach and Programs | 9,346,000 | 7,096,000 |
| Office of Emergency Communications | 44,060,000 | 45,060,000 |
| Nat'l Security/Emergency Preparedness Telecom: | | |
| Priority Telecommunications Services | 56,773,000 | 56,773,000 |
| Next Generation Networks | 50,250,000 | 25,000,000 |
| National Command and Coordination Capability (rescission, non-add) | 0 | [1] [−5,963,000] |
| Programs to Study and Enhance Telecommunications | 19,274,000 | 16,774,000 |
| Critical Infrastructure Protection Programs | 13,852,000 | 11,352,000 |
| Total, Infrastructure Protection and Information Security | 918,166,000 | 883,346,000 |

[1] Note: Rescission of balances for the National Command and Coordination Capability included in Title V.

93

### FACILITY RENT

As requested, the Committee includes the 2010 budgets for facility rental payments in the various IPIS program budgets. In previous fiscal years, this funding was reflected in the Management and Administration account.

### CHEMICAL FACILITY ANTI-TERRORISM STANDARDS AND REGULATION OF AMMONIUM NITRATE

For fiscal year 2010, the Committee provides $103,363,000 for the costs of regulating the security of chemical facilities and ammonium nitrate transactions, an increase of $25,363,000, or nearly 33 percent over 2009. Of this increase, $12,000,000 will pay for implementation of new Ammonium Nitrate regulations, $7,000,000 will be used to continue expansion of the Chemical Facility Anti-Terrorism Standards (CFATS) program, and $6,363,000 will fund inflationary increases and staff pay raises. The Committee is pleased that the Administration appears to be taking the security of chemical facilities and the control of potentially dangerous chemicals seriously by requesting these additional funds.

### NATIONAL INFRASTRUCTURE PROTECTION PLAN MANAGEMENT

The 2010 request proposes a 40 percent cut to the budget for NPPD's partnership efforts to implement the National Infrastructure Protection Plan (NIPP) and its subsidiary Sector-Specific Agency (SSA) plans. The previous Administration proposed similar cuts to NIPP and SSA plan implementation programs. As envisioned in the NIPP, DHS and other sector-specific agencies work in conjunction with private stakeholders, State governments, and other participants to identify and mitigate the vulnerability of infrastructure to terrorist attack or natural disaster. The nation's private sector infrastructure owners continue to inform the Committee of the value of collaborative working relationships between industry and government to address infrastructure security vulnerabilities. The Committee believes that such a cooperative approach to the security of the nation's infrastructure is much more cost-effective than either the total absence of government involvement in security planning or the direct application of government security regulations. Given the value of these groups to the protection of our country's infrastructure, the Committee provides $51,390,000 for NIPP and SSA plan partnerships, an increase of $12,390,000 over the requested level.

### OFFICE OF BOMBING PREVENTION

The Office of Bombing Prevention (OBP) is responsible for implementing the DHS National Strategy for Bombing Prevention, and also trains State and local governments in how to identify and safely handle bombs and IEDs. The Committee provides OBP $14,618,000 to carry out this important work.

### PHILADELPHIA INFRASTRUCTURE MONITORING

The Committee provides $1,000,000 for NPPD to continue deployment of infrastructure monitoring and crime cameras in the city of Philadelphia. The Committee directs the agency to work with city administrators to position new cameras in areas of high

94

threat or crime, to ensure that both the local and the Federal governments can benefit from their deployment.

CYBER SECURITY

The Committee provides $381,904,000 for the Cyber Security Division (CSD), which includes the DHS share of the Administration's National Cyber Security Initiative (NCSI). This amount is $68,404,000 more than was provided in fiscal year 2009, reflecting the Committee's support of a robust effort to secure government networks and sensitive private networks, especially those related to critical infrastructure.

The goal of the NCSI is to strengthen the security of government computer networks and reduce their vulnerability to attacks by outside forces by consolidating internet connection points while simultaneously developing and installing monitoring devices that examine network traffic across government computer systems. The Committee is concerned by recent reports from the Department that show costs for the NCSI have risen while schedules for deploying the network devices and consolidating internet connection points have been delayed by approximately one year. In the 2009 Appropriations Act, Congress required DHS to submit an expenditure plan showing how the funds provided for the NCSI would be used to achieve the program's goals, and restricted from obligation half of the budget for the U.S. Computer Emergency Response Team (US–CERT) until the plan was approved. The 2009 expenditure plan for the NCSI, which was submitted on April 29, 2009, provided the Committee with valuable insight into the goals, milestones, and costs of the program. To ensure continued discipline in program execution, the Committee withholds $155,000,000 of the 2010 US–CERT budget until it receives and approves an updated expenditure plan for the NCSI, reflecting any changes in the plan since the submission of the last report and discussing how appropriations provided in this bill will be used.

Because of lack of justification, the Committee has provided none of the $15,250,000 requested for "Cyber Security Coordination" and the "Cyber Security Information Sharing and Collaboration Program." Consistent with funding recommendations contained throughout this report, the Committee also provides none of the $10,000,000 requested for data center migration activities due to the IG's recent findings described in the Chief Information Officer section of the report regarding possible unmitigated risks at the destination data center sites. These reductions are offset by funding for several specific projects discussed below.

CYBER SECURITY INTELLIGENCE ANALYSIS

The 2010 budget proposed to fund a new cadre of cyber security intelligence analysts in the Office of Intelligence and Analysis. While the Committee does not dispute the potential value of a dedicated team of analysts focused on emerging cyber security threats, it believes the expertise necessary for such analysis is best evaluated by the program managers for the NCSI. As a result, if CSD believes it requires additional cyber security analysts focused on intelligence activities, the Committee directs it to enter into a reimbursable agreement with the Office of Intelligence and Analysis to establish this function.

95

### CYBER SECURITY TRAINING

The Committee provides $5,847,000 for Cyber Security Training and Education, $1,000,000 more than requested. The Committee recognizes that protecting our country's cyber infrastructure requires a workforce that is aware of and skilled in protecting computer networks. Therefore, within the total provided, $3,500,000 is for continued development and implementation of State and local cyber security training at the University of Texas at San Antonio, $500,000 is for Virginia's Operational Integration Cyber Center of Excellence (VOICCE) in Hampton, Virginia, and $100,000 is for the Upstate New York Cyber Initiative at Clarkson University.

### CONTROL SYSTEMS SECURITY

Computerized control systems are an often unnoticed but critically important aspect of the nation's physical and cyber infrastructure. These devices ensure the efficient and reliable operation of much of the nation's power, water, information and other critical systems, and many have been shown to be unacceptably vulnerable to malicious attacks. To address this concern, the Committee provides $26,563,000 for Control Systems Security efforts, including $3,000,000 to conduct vulnerability analysis, testing, and protection of full-scale power systems and cyber-connected systems for the Department of Homeland Security, utilizing the range of unique resources available at the Idaho National Laboratory.

### CYBER SECURITY TEST BED AND EVALUATION CENTER

While the Department has made significant progress reducing the vulnerabilities of government computer networks, much remains to be done to mitigate the threats to privately-owned computer systems. Given that many companies have similar network vulnerabilities but are prevented by competitive strategies from sharing security tactics, a trusted third-party organization may be effective at providing both expertise and a neutral forum for information sharing. To address these challenges, the Committee provides $3,500,000 for the Research Triangle Institute in Research Triangle Park, North Carolina, to initiate a Cyber Security Test Bed and Evaluation Center demonstration project focused on creating strong partnerships between the government and private sector companies to promote the security of private information networks.

### MULTI-STATE INFORMATION SHARING AND ANALYSIS CENTER

The New York State Office of Cyber Security and Critical Infrastructure Coordination has developed an effective program to monitor and ensure the security of State and municipally-owned computer networks. This group, known as the Multi-State Information Sharing and Analysis Center (MS–ISAC), is the premier State and local government cyber security entity. While DHS has a current contract with MS–ISAC to support these efforts, the center requires capital investment to expand its operations. In addition to the amounts requested by DHS to continue MS–ISAC operations, the Committee provides $3,000,000 for expansion of the Managed Security Services effort, which will allow the center to protect several more States and localities from cyber attack.

96

## OFFICE OF EMERGENCY COMMUNICATIONS

The Committee recommends $45,060,000 for the Office of Emergency Communications, $1,000,000 over the requested level and $6,760,000 more than provided in fiscal year 2009. Of this amount, $1,000,000 is for SEARCH to provide interoperable communications training, certification, technical assistance, and outreach programs to State, regional, and local first responder communications coordinators.

## NATIONAL SECURITY/EMERGENCY PREPAREDNESS TELECOMMUNICATIONS

The National Security/Emergency Preparedness Telecommunications budget incorporates a group of programs focused on ensuring the availability of land-line and wireless telecommunications channels to Federal, State and local government employees to use in times of emergency. The Committee provides the requested $56,773,000 for the Priority Telecommunications System. The Committee recommends $16,774,000 for the Program to Study and Enhance Telecommunications, $2,500,000 below the request because no funding is provided for the Continuity Communications Architecture due to inadequate justification. The Committee recommends $11,352,000 for Critical Infrastructure Protection Programs, a reduction of $2,500,000 below the request since no funding is provided for Regional Communications Coordinators, which would be duplicative of activities already carried out by FEMA. In the 2009 Appropriations Act, Congress required DHS to submit an expenditure plan showing how $50,250,000 provided for the Next Generation Networks (NGN) program would be used to achieve the program's goals. Half of this amount was restricted from obligation until the plan was approved by the Committees on Appropriations. To date, this plan has not been submitted. As a result, the Committee recommends only $25,000,000 for the NGN program in 2010, withholding the entire amount from obligation until an expenditure plan is provided. Since the unspent 2009 appropriations remain available through the end of fiscal year 2010, the Committee expects that this reduction will not significantly affect execution of the NGN program.

## NATIONAL COMMAND AND COORDINATION CAPABILITY

The fiscal year 2010 budget reports that the National Command and Coordination Capability (NCCC) has been discontinued. Since this program was never adequately explained or justified, the Committee supports this decision. Furthermore, given that NCCC appears never to have produced any meaningful results or products, the Committee also rescinds the 2009 NCCC appropriation, as discussed in Title V of the bill.

## UNITED STATES VISITOR AND IMMIGRANT STATUS INDICATOR TECHNOLOGY

| | |
|---|---|
| Appropriation, fiscal year 2009 ................................................. | $300,000,000 |
| Budget estimate, fiscal year 2010 .............................................. | 356,194,000 |
| Recommended in the bill ........................................................... | 351,800,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 ............................................. | +51,800,000 |
| Budget estimate, fiscal year 2010 ......................................... | −4,394,000 |

97

MISSION

The mission of the United States Visitor and Immigrant Status Indicator Technology (US–VISIT) program is to enhance the security of U.S. citizens and visitors; facilitate legitimate travel and trade; ensure the integrity of the immigration system; and improve and standardize the processes, policies, and systems utilized to collect information on foreign nationals who apply for visas at an embassy or consulate overseas, attempt to enter the country at established ports of entry (POE), request benefits such as change of status or adjustment of status, or depart the United States.

RECOMMENDATION

The Committee recommends $351,800,000 for US–VISIT, $4,394,000 below the amount requested and $51,800,000 above the amount provided in fiscal year 2009. The Committee includes: $118,692,000 for Program Management Services; $128,126,000 for Operations and Maintenance; $31,000,000 for Identity Management and Screening Services; $28,738,000 for Unique Identity/ Interoperability; and $45,244,000 for the costs of mirroring and preparing for the migration of data operations from the current Department of Justice data centers to a DHS data center, and establishing a disaster recovery site at a second DHS data center.

EXPENDITURE PLANS

The Committee denies the request to remove requirements for an expenditure plan. Expenditure plans have proved to be effective means to provide information needed by the Committee to carry out productive oversight, particularly for projects that are long term in nature and where funding requests lack necessary detail. To help ensure funding is used effectively for US–VISIT program management and to support continued implementation of 10-print standards, interoperability, and identity management services, the Committee recommends that $276,800,000 be made available to the program upon enactment of this Act, with $75,000,000 withheld subject to receipt of an expenditure plan.

The bill continues to require that the plan include: (1) a detailed account of program progress; (2) a plan of action showing how the funding will meet future program commitments; (3) the status of open Government Accountability Office and Inspector General recommendations and actions to address them; (4) certifications by the Chief Procurement, Chief Information, and Chief Human Capital Officers that the program satisfies investment and information technology risk management and acquisition control requirements, and reflects adequate human capital planning; and (5) a detailed account of costs associated with identity services. The Committee directs that the expenditure plan also include a current schedule for the transition of operations from the current Department of Justice data centers to the new DHS data centers, and a description of remaining funding required for this transition.

COMPREHENSIVE BIOMETRIC EXIT SOLUTION

For the past two years, this Committee has called upon DHS to either provide a meaningful plan to implement an exit solution within five years or else explain why an exit solution is not fea-

98

sible. In this budget, the Department clearly has taken a conservative and realistic position. No additional funding was requested for biometric exit in fiscal year 2010, and the Committee does not recommend any in this bill.

Despite longstanding Congressional direction through appropriations language and authorization statute for such a system to be developed, tested, and deployed, the United States currently has no biometric exit system in place. At present the only way to know whether a visitor departs the U.S. timely is for US–VISIT to analyze information from the Arrival and Department Information System (ADIS) and other records of travel to see if an exit corresponds with a recorded entry. This is clearly not a "real-time" system, and requires intensive analysis by US–VISIT's Data Integrity Group (DIG) to identify and forward leads for further investigation or for amending databases to indicate a traveler has overstayed. The 9/11 Act called for implementation of a biometric system as a prerequisite for expansion of the visa waiver program, although the former Administration deemed that the law was satisfied by the existing, non-biometric exit record system.

DHS has conducted pilot tests of some exit procedures, using kiosks at selected U.S. international airports (with no effective enforcement mechanism and no real-time capability) and testing radio frequency technology embedded in immigration forms for land ports of entry. These efforts provided some helpful information but did not provide a satisfactory permanent solution. Rather than test other approaches, including mandatory screening, DHS in 2008 issued a notice of proposed rulemaking for a biometric exit solution for air and sea ports that would require air and sea carriers to collect and transmit biometric information to DHS. This received many objections from the airline industry, in particular because they believed cost projections were unrealistic and because there had been no realistic field testing of the proposed policy. The rule has not been implemented.

To better inform rulemaking, Congress provided that no fiscal year 2009 US–VISIT appropriation funding could be obligated to implement a final air exit solution until the Committees on Appropriations received a report on at least two pilot tests, one where the airlines would collect biometric information and another where U.S. Customs and Border Protection would collect the information at airport departure gates. US–VISIT is currently beginning two pilots. One will be at Transportation Security Administration checkpoints, and the other conducted by CBP as described above. The Committee understands that no airline industry pilot will be conducted at this time, and that $34,000,000 in prior year appropriations will be used to conduct the pilot tests, evaluate their findings, and determine how to proceed on a final rule, consistent with 9/11 Act requirements. The Committee recognizes that US–VISIT will use approximately $6,000,000 to complete planning and design for a land exit solution, and $3,600,000 will be used for a kiosk-based pilot test for H–2 Visa agricultural workers. US–VISIT is also planning to deliver a Land Exit Planning document to DHS this year, which will address the viability of a land exit solution, the range of potential solutions under consideration, and any possible timeline for a future land exit solution.

99

The Committee notes that CBP is undertaking significant efforts that could facilitate a land exit solution: the substantial renovation of CBP-owned ports of entry, and new investments in infrastructure and personnel to staff outbound lanes on the Southwest Border. The Department and US–VISIT should leverage these CBP initiatives to the extent possible to ensure that they are compatible with and facilitate planning, testing and implementing biometric exit solutions at land ports of entry.

The Committee expects the Department to conduct its planned pilot tests and evaluations so as to establish a realistic policy and plan for addressing exit information. The Committee directs the Department to provide the Committee with its land exit planning document as soon as it is completed. It also directs US–VISIT to report not later than January 15, 2010, on the results of its exit pilot programs and prospects for implementing any broader exit solutions. In addition, the report should describe the status of continuing discussions with Canadian and Mexican governments on sharing immigration entry information (in lieu of a U.S. exit process).

UNIQUE IDENTITY

The Unique Identity program was established to standardize collection of 10-print biometric information from travelers to the United States; share and compare biometric information collected and held by the Justice and State Departments, as well as other law enforcement agencies such as ICE; and make DHS's automated Biometric Identification System (IDENT) fully compatible with new system and data requirements. Pilot testing of the 10-print system at U.S. international air-, sea-, and land-ports of entry was completed in 2008, and 10-print collection is in place at virtually all ports of entry into the U.S. It is also performed for all visa applicants at U.S. consulates overseas. In 2009, DHS is expanding its support of the ICE Secure Communities program, which may add substantially to the US–VISIT/IDENT workload, with as many as 30,000 new biometric transactions daily. The Department is also developing interoperability with the Defense Department by entering data about known or suspected terrorists into IDENT, as well as helping DOD make near real-time checks of biometric information it collects.

Funding in fiscal year 2009, including $112,000,000 in carry-forward funding, is $178,000,000. The fiscal year 2010 request for $28,700,000 is less than one-sixth of fiscal 2009 spending, which reflects the substantial completion of purchase and deployment of 10-print readers by DHS and CBP, and accomplishment of the initial interoperable capacity between the DOJ's Integrated Automated Fingerprint Identification System (IAFIS) and the IDENT system. The Committee recommends funding this request level, which will continue expanding interoperability between IAFIS and IDENT, support expansion of ICE's Secure Communities, and provide "wrap back", whereby authorized agencies will receive notifications of subsequent criminal activity by individuals with whom an initial encounter has occurred.

One reason for the significant reduction in funding for Unique Identity in fiscal year 2010 is that US–VISIT has only a limited amount of work it can undertake toward achieving full operating

100

capacity (FOC) with the Justice Department. The Justice Department and the FBI have said that they will not have completed necessary work on the Next Generation Identification biometric/fingerprint system (the successor to IAFIS) until 2014. Therefore, FOC will be delayed until that time. In the meantime, the ability of US–VISIT and its users to check records in the Justice databases will continue to be hampered by delays in checking and confirming biometric record matches. So for the time being, the potential benefits of real-time data sharing will not be realized for the purposes of border inspections or encounters with law enforcement or security personnel. Because of the importance of achieving this full interoperability as soon as possible, for border and travel security, as well as for counter terrorism and law enforcement, the Committee directs US–VISIT and its counterparts at the Justice Department to continue providing quarterly interoperability briefings. These should indicate the remaining gaps in system interoperability, the operational impacts such gaps have on agency operations, and measures being taken to close them in the near term.

ENUMERATION

The fiscal year 2009 US–VISIT appropriation called for the 2010 budget request to report on efforts to implement enumeration within the Department—the assignment of a unique numerical identifier for an individual's biometric and biographic records and transactions. The Department has stated that IDENT will provide a unique identifier to any DHS or other U.S. government agency upon their submission of a new set of fingerprints to IDENT, which will enable IDENT to conduct one to one matching in the case of subsequent encounters against records associated with that unique identifier. However, DHS also has taken the position that it will not use any single enumerator for any "public-facing" use, due to potential risks to privacy and security for both DHS and individuals seeking license, privilege or status, without concomitant benefits. It instead has stated that use of multiple identifiers offers more options for individuals interacting the DHS while mitigating security and privacy risks. The Committee understands that the Department is in the process of establishing a policy with regard to its use of identifiers, and directs DHS to report not later than January 15, 2010, on the status of this policy and the steps it will take to ensure compliance of DHS components and programs with such policy.

IDENTITY MANAGEMENT AND SCREENING SERVICES

The Committee includes $31,000,000 for Identity Management and Screening Services, $11,000,000 above the level funded in fiscal year 2009. This comprises four service activities: (1) the Biometric Support Center, which verifies matching fingerprints, processes latent prints, and provides enrollment services for candidates submitted by law enforcement users to include in watchlist or recidivist databases; (2) the Data Integrity Group, which matches arrival, departure, and status adjustments for individuals who overstay their terms of admission to the United States; (3) Law Enforcement and Intelligence, which reviews biometric watchlist encounters, supports U.S. Citizenship and Immigration Services antifraud efforts, and shares information with international partners;

101

and (4) Information Sharing and Technical Assistance, which partners with foreign governments on promoting standards for biometric use and data sharing for common border control and immigration enforcement efforts. These activities are likely to attract more demand for service support as the value of such biometric and analytical services is recognized. The Committee directs US–VISIT to brief the Committee not later than December 1, 2009 on its workload and performance in meeting demand for these services.

OVERSTAYS

The Committee has been concerned about the growing backlog in the identification and resolution of "overstays" (foreign visitors and immigrants who do not leave the U.S. when required to do so based on the terms of their visa or temporary visitor status), which is a critical US–VISIT mission carried out by the agency's DIG. The number of overstays reported to ICE for enforcement in fiscal year 2008 was 13,343—a thousand more than in 2007. This resulted in 715 arrests and 13,276 out of country lookouts—double the numbers in 2007. The number of Port or Visa refusals based on lookouts placed by US–VISIT/DIG tripled to 1,441.

These are encouraging figures, and the Committee is pleased to note that US–VISIT is experiencing efficiencies in DIG operations as it has filled positions and established a stable, experienced workforce. The Committee is troubled, however, by the huge backlog in overstay records that US–VISIT has been unable to review—a number that exceeds 750,000 and is growing. This gap represents a major vulnerability. In the absence of an effective "exit" system, this overstay review process is the only means to detect whether individuals comply with the terms of their presence in the country, and to perhaps determine whether such a person is of concern to national security or general law enforcement. On the other hand, failure to correct a record of overstay that is inaccurate or non-threatening could have the effect of incorrectly retaining derogatory immigration records on individuals, possibly jeopardizing their ability to enter or visit the United States. The Committee strongly supports efforts to extend overstay calculation to all travelers to the United States, while maintaining or improving the accuracy of its investigative leads. The Committee directs US–VISIT to report not later than December 1, 2009, on steps that are being taken to reduce the backlog of "unreviewed" overstay records. The report should also include a summary of DIG performance in meeting targets for credibility and cost identified in the 2010 budget submission.

STAFFING AND CONTRACTOR SUPPORT

The budget includes $8,600,000 in funding for 62 positions currently filled by contractors that will be converted to government employee positions in fiscal year 2010, a change needed to enable US–VISIT to more effectively carry out its governmental operational and contract oversight responsibilities. The Committee is pleased to see this effort, and directs US–VISIT to include a status report on its hiring and conversion effort as part of its quarterly briefings to the Committees.

102

## OFFICE OF HEALTH AFFAIRS

| | |
|---|---:|
| Appropriation, fiscal year 2009 | $157,191,000 |
| Budget estimate, fiscal year 2010 | 138,000,000 |
| Recommended in the bill | 128,400,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 | −28,791,000 |
|     Budget estimate, fiscal year 2010 | −9,600,000 |

### MISSION

The Office of Health Affairs (OHA) serves as the Department of Homeland Security's principal agent for all medical and public health matters. Working across local, State, Federal, Tribal and territorial governments and with the private sector, OHA has the lead DHS role in the establishment of a scientifically rigorous, intelligence-based, medical and biodefense architecture that ensures the health and medical security of our nation.

### RECOMMENDATION

The Committee recommends $128,400,000 for OHA, $9,600,000 below the amount requested and $28,791,000 below the amount provided in fiscal year 2009. A comparison of the budget estimate to the Committee recommended level by budget activity is as follows:

| | Budget Estimate | Recommended |
|---|---:|---:|
| BioWatch | $94,513,000 | $79,413,000 |
| National Biosurveillance Integration System: | | |
|     National Biosurveillance Integration Center | 8,000,000 | 8,000,000 |
|     North Carolina Collaboratory for Bio-Preparedness | 0 | 5,000,000 |
|     Subtotal | 8,000,000 | 13,000,000 |
| Rapidly Deployable Chemical Detection System | 2,600,000 | 2,600,000 |
| Planning and Coordination | 2,476,000 | 2,976,000 |
| Salaries and Expenses | 30,411,000 | 30,411,000 |
|     Total | 138,000,000 | 128,400,000 |

### BIOSURVEILLANCE ACTIVITIES

The Committee recommends $79,413,000 for BioWatch, $15,100,000 less than the amount requested, and $32,193,000 below the amount provided in fiscal year 2009. The Committee has expressed concerns regarding the management and functionality of BioWatch for two years. Unfortunately the Committee's concerns have only increased over the past six months with revelations that Generation 2.5 systems, which were purchased without the direct consent of the Committee and described as necessary and emergency, were recently turned off because of concerns that their sensor readings were not accurate. The Committee understands that the next generation testing, funded last year at $34,498,000, has also fallen short. Specifically, the technology sought by OHA was not as developed as previously described and will require more extensive testing.

The Committee is losing patience with the development of next generation systems and must take action to ensure that the taxpayers' dollars are spent judiciously. The Committee directs S&T to lead the testing for Generation 3 systems. The Committee does

103

not fund the Generation 3 testing in OHA as requested, but instead provides the requested $15,100,000 for Generation 3 testing within S&T. In addition, OHA is to transfer all of its activities related to Generation 3 testing to S&T, where S&T shall apply it in the same manner as originally appropriated. This transfer can be effectuated through a Memorandum of Understanding between OHA and S&T.

In fiscal year 2009, the Committee required OHA to provide an expenditure plan on the BioWatch base program and an expenditure plan on the BioWatch Generation 3 field testing program within 60 days after enactment of that Act. The Committee has yet to receive either of these plans, which leads to the conclusion that OHA is directionless in its management of this program. It is unthinkable that OHA cannot provide the Committee with a complete reporting of its base program, which consists of Generation 1 and 2, after two years of steady state. The Committee expects to receive the long overdue expenditure plan for the base BioWatch program immediately. Fiscal year 2010 funding for BioWatch will be unavailable for obligation until OHA submits that plan. The Committee notes the slow obligation rate of these funds and expects no interruption in the operation of this program due to this withholding.

The Committee continues its requirement for OHA to notify the Committee 15 days prior to deploying any BioWatch device to new locations.

The Committee understands that State and local governments are allowed to purchase chemical and biological sensors as part of certain DHS grant programs. The Committee is concerned that these systems are not fully validated and will be unable to detect deadly pathogens. The Committee directs OHA to work with the Federal Emergency Management Agency's Grants Directorate to validate systems prior to FEMA's approval of such equipment requests.

### NATIONAL BIOSURVEILLANCE INTEGRATION CENTER

The Committee recommends $8,000,000 for the National Bio-Surveillance Integration Center, the same amount as requested and the amount provided in fiscal year 2009. The Committee also includes $5,000,000 for the North Carolina Collaboratory for Bio-Preparedness. The funds will support a demonstration project to support the development of a comprehensive, statewide system to analyze public health trends and detect incidents that may threaten homeland security. The Committee expects the OHA to utilize this demonstration to diversify its biosurveillance activities to include more robust syndromic surveillance, given the lack of confidence in certain BioWatch sensors, and to use the experience to potentially develop a model for a nationwide bio-preparedness system.

### PLANNING AND COORDINATION

The Committee recommends $2,976,000 for planning and coordination activities, $500,000 above the amount requested and $2,799,000 below the amount provided in fiscal year 2009. The Committee supports OHA's role in planning for pandemic flu and provides the increase for OHA's Office of Medical Readiness in support of its pandemic planning and coordination activities.

104

FEDERAL EMERGENCY MANAGEMENT AGENCY

MANAGEMENT AND ADMINISTRATION

| | |
|---|---|
| Appropriation, fiscal year 2009 ....................................................... | $837,437,000 |
| Budget estimate, fiscal year 2010 ................................................... | 852,200,000 |
| Recommended in the bill ................................................................ | 844,500,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 ................................................ | +7,063,000 |
| Budget estimate, fiscal year 2010 ............................................ | −7,700,000 |

MISSION

The Federal Emergency Management Agency (FEMA) manages and coordinates the Federal response to major domestic disasters and emergencies of all types in accordance with the Robert T. Stafford Disaster Relief and Emergency Assistance Act. It supports the effectiveness of emergency response providers at all levels of government in responding to terrorist attacks, major disasters, and other emergencies. FEMA also administers public assistance and hazard mitigation programs to prevent or reduce the risk to life and property from floods and other hazards. Finally, FEMA leads all Federal incident management preparedness and response planning through a comprehensive National Incident Management System that involves Federal, State, Tribal, and local government personnel, agencies, and regional authorities.

FEMA provides for the development and maintenance of an integrated, nationwide capability to prepare for, mitigate against, respond to, and recover from the consequences of major disasters and emergencies of all types in partnership with other Federal agencies, State, local and Tribal governments, volunteer organizations, and the private sector. Management and Administration supports all of FEMA's programs by coordinating all policy, managerial, resource, and administrative actions between headquarters and regional offices.

RECOMMENDATION

The Committee recommends $844,500,000 for Management and Administration, $7,700,000 below the amount requested and $7,063,000 above the amount provided in fiscal year 2009. In addition, up to $90,080,000 may be transferred from the Disaster Relief fund, compared to $50,000,000 requested. As requested, $35,000,000 is to resolve employee pay shortfalls resulting from lax hiring and budgeting guidelines at FEMA. The Committee is perplexed at the notion that FEMA could hire employees at rates above what its budget could support. The Committee directs the IG to investigate the hiring practices of FEMA as it pertains to this issue and report to the Committee within three months after the date of enactment of this Act. As part of the investigation, the IG shall evaluate whether or not the budget request of $35,000,000 is sufficient to rectify FEMA's pay deficiencies. Funding is unavailable for transfer from the Disaster Relief fund until the Committee receives an expenditure plan as specified in the Disaster Relief account.

### NATIONAL CAPITOL REGION

The Committee provides $6,995,000 for the Office of the National Capitol Region Coordination (ONCRC), the same amount as requested and $653,000 above the amount provided in fiscal year 2009. The Committee is supportive of ONCRC's credentialing activities in the capitol region to ensure that first responders and emergency managers have appropriate access to disaster areas. FEMA is directed to capitalize on ONCRC's credentialing program as it works with other parts of the country to implement similar concepts.

### MT. WEATHER

The Committee recommends $36,300,000 for the Mt. Weather facility, $13,600,000 below the amount requested and $23,600,000 below the amount provided in fiscal year 2009. The denial of funding at the requested level is due to FEMA's reluctance to develop and submit to the Committee a comprehensive ten-year capital improvement plan for Mt. Weather, a failure that is contrary to prior Congressional direction and unsuitable in terms of the Committee's standards for the proper justification of funding and for the planning of costly, multi-year capital improvement projects. Until such time as an adequate ten-year capital improvement plan is developed and submitted to the Committee, additional funding will not be provided. Given the strategic importance of this facility and considering that $125,102,000 has been provided for its capital improvements since fiscal year 2007, the Committee believes there is no excuse for insufficient planning and such poor compliance with Congressional oversight.

### EMERGENCY MANAGEMENT INSTITUTE

The Committee recommends $9,000,000 for the Emergency Management Institute (EMI), $1,840,000 above the amount requested. EMI provides training to Federal, State, local, Tribal, public and private sector officials to strengthen emergency management core competencies. The additional funding is for emergency management course development and to increase the capacity of EMI to train additional State and local officials.

### INTERNATIONAL AFFAIRS OFFICE

The Committee understands FEMA is working with certain countries to develop international disaster agreements. To support this effort the Committee provides an additional $300,000 for FEMA to establish an exchange program with partner countries. Funding shall be used to support FEMA staff to travel to countries after disasters to offer and receive best practices and solutions. This program is not meant to establish diplomatic presence or to arrange international aid.

### TANK REMEDIATION

The Committee provides the requested $10,000,000 increase for FEMA to manage its inventory of fuel tanks in compliance with the law, some of which may be leaking and require remediation. The Committee understands this effort may require additional resources in future years. FEMA shall report regularly to the Com-

106

mittee as the Agency updates its estimates on remediating all leaking tanks. To the extent feasible, FEMA is directed to work with the U.S. Environmental Protection Agency, which has vast experience with the issue of storage tank remediation.

DATA CENTER MIGRATION

Consistent with funding recommendations contained throughout this report, the Committee denies FEMA's request of $7,900,000 for data center migration activities due to the IG's recent findings, described in the Chief Information Officer section of this report, regarding possible unmitigated risks at the destination data center sites. Beyond the problems identified by the IG, the Committee is concerned that FEMA does not have a plan for migrating data and has not accounted for the full cost of this project. FEMA shall submit a data migration plan to the Committee prior to any approval of data migration. The plan shall detail the types of data that FEMA will move, safeguards needed to protect that data, and costs associated with moving the data.

CONGRESSIONAL JUSTIFICATION

The Committee continues bill language requiring FEMA to submit its fiscal year 2011 budget request by office. The Committee is pleased that this year's budget submission provided fiscal year 2010 budget request levels for many programs of interest, including: $8,997,000 for the National Earthquake Hazards Reduction Program; $2,156,000 for the National Hurricane Program; $10,281,000 for the National Dam Safety Program; $16,800,000 for the Integrated Public Alert and Warning System; and $16,218,000 for the Mobile Emergency Response System. For the fiscal year 2011 budget submission, FEMA is directed to continue to provide the same level of budget information for programs and activities identified in the fiscal year 2010 budget request.

URBAN SEARCH AND RESCUE RESPONSE SYSTEM

The Committee recommends $32,500,000 for Urban Search and Rescue (US&R) response system, $4,500,000 above the amount requested and the same as the amount provided in fiscal year 2009. The Committee is concerned with the readiness level of US&R teams and provides additional funding to ensure the teams are properly trained and equipped to respond to future disasters. While FEMA estimated in 2006 that each team would require $1,662,200 to operate, the 28 teams received an average of only $1,022,474 in fiscal year 2009, leaving local agencies responsible for meeting shortfalls. In fiscal year 2009, FEMA was directed to report to the Committees on the feasibility of adding an additional team along with geographical preference and any associated costs. This report has not been received. The Committee directs FEMA to submit this report immediately.

TRANSPARENCY

The Committee is concerned that FEMA utilizes grant guidance and policies instead of the regulations process to alter the policies of major programs. That results in little to no public input, even though most changes affect State and local partners. As an exam-

107

ple, the Committee notes that no regulations have ever been issued to guide the Predisaster Mitigation Grant Program, and the Agency's annual grant guidance changes eligibility guidelines every year. Also, FEMA recently published a National Disaster Housing Plan for hurricane season and indicated that it could be changed every year without public input. The Committee directs FEMA to put all policies, including grant guidance that contains policy changes, online for five days prior to implementation. FEMA shall give the public a forum in which to comment. FEMA shall also present all new policies or policy changes to the National Advisory Council prior to approval.

SPECIAL POPULATIONS

In fiscal year 2009, the Committee directed FEMA to report on its efforts to coordinate with Limited English Proficiency populations to address their needs following a disaster. The report has not been provided to the Committee. The Committee is especially concerned that translation of materials is insufficient to ensure that all disaster victims receive necessary information prior to, during, and after disasters. The Committee directs FEMA to consider utilizing the National Virtual Translation Center (NVTC) to enhance its translation services. FEMA is to report to the Committee within six months after enactment of this Act on its translation services and possible uses of NVTC.

EMERGENCY ALERT SYSTEMS

The Committee remains committed to ensuring that emergency alert and notification systems are present in areas at high risk of natural and manmade disasters. The Committee supports the administration's request of $16,800,000 for the Integrated Public Alert and Warning System. FEMA is directed to work with States and urban areas to ensure that alert systems are in place in high risk areas such as New York.

ENHANCING INCIDENT MANAGEMENT

The National Incident Management System (NIMS) provides a systematic, proactive approach to guide departments and agencies at all levels of government, nongovernmental organizations, and the private sector to work seamlessly to prevent, protect against, respond to, recover from, and mitigate the effects of incidents, regardless of cause, size, location, or complexity. NIMS is the backbone of effective emergency management, and the Committee directs FEMA to ensure that all communities are educated and trained on the system. The Committee provides an additional $9,000,000 to support and enhance ongoing incident management efforts that shall include: mutual aid, simulated and virtual emergency operations support, information systems development, technology integration, training on best-practices and standardization guidelines, as well as test and evaluation of first responder tools.

Furthermore, the Committee urges FEMA to examine existing NIMS resources as part of their ongoing efforts with S&T to improve and standardize multi-jurisdictional emergency operations centers.

108

TERRORISM AWARENESS TRAINING

The Committee recognizes ongoing security officer terrorism awareness training programs, which have been used by over 10,000 security officers from all 50 states. Providing professional security officers with critical security, fire prevention, crowd management, and emergency response training is essential in deterring potential criminal and terrorist activity.

STATE AND LOCAL PROGRAMS

(INCLUDING TRANSFER OF FUNDS)

| | |
|---|---|
| Appropriation, fiscal year 2009 [1] ........................................................ | $3,105,700,000 |
| Budget estimate, fiscal year 2010 [2] ................................................... | 3,867,000,000 |
| Recommended in the bill ................................................................. | 2,829,000,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 ................................................. | −276,700,000 |
| Budget estimate, fiscal year 2010 ............................................. | −1,038,000,000 |

[1] Excludes $300,000,000 in appropriations in the American Recovery and Reinvestment Act (P.L. 111–5).
[2] The Administration proposed moving Emergency Management Performance Grants and Firefighter Assistance Grants under State and Local Programs. In fiscal year 2009, these grant programs had separate appropriations totaling $1,090,000,000 within FEMA, not within this program.

MISSION

State and Local Programs help build and sustain the preparedness and response capabilities of the first responder community. These programs include support for various grant programs; training programs; planning activities; and technical assistance.

RECOMMENDATION

The Committee recommends $2,829,000,000 for State and Local Programs, $1,038,000,000 below the amount requested and $276,700,000 below the amount provided in fiscal year 2009. As part of the budget request, the Administration proposed including the Firefighter Assistance Grants and Emergency Management Performance Grants under this program. The Committee has denied this proposal and provides funding for both of these grant programs as separate appropriations, consistent with prior years. A comparison of the budget estimate to the Committee recommended level by budget activity is as follows:

| | Budget estimate | Recommended |
|---|---|---|
| State Homeland Security Grant Program ................................................ | $950,000,000 | $950,000,000 |
| Operation Stonegarden ............................................................... | [60,000,000] | [60,000,000] |
| Urban Area Security Initiative ........................................................ | 887,000,000 | 887,000,000 |
| Regional Catastrophic Preparedness Grants ........................................ | 35,000,000 | 0 |
| Metropolitan Medical Response System .............................................. | 40,000,000 | 40,000,000 |
| Citizen Corps program ................................................................ | 15,000,000 | 15,000,000 |
| Public Transportation Security Assistance and Railroad Security Assistance ....... | 250,000,000 | 250,000,000 |
| Port Security Grants ................................................................... | 250,000,000 | 250,000,000 |
| Over-the-Road Bus Security Assistance ............................................. | 0 | 12,000,000 |
| Buffer Zone Protection Program grants .............................................. | 50,000,000 | 50,000,000 |
| Real ID grants ......................................................................... | 50,000,000 | 50,000,000 |
| Interoperable Emergency Communications Grant Program ....................... | 50,000,000 | 50,000,000 |
| Emergency Operations Centers ...................................................... | 0 | 40,000,000 |
| Firefighter Assistance Grants [1] .................................................... | 590,000,000 | 0 |
| Fire Grants ........................................................................ | [170,000,000] | 0 |
| Staffing for Adequate Fire and Emergency Response (SAFER) grants ........... | [420,000,000] | 0 |
| Emergency Management Performance Grants [1] ................................... | 315,000,000 | 0 |
| National Programs: | | |
| National Domestic Preparedness Consortium .................................... | 51,500,000 | 92,000,000 |

109

| | Budget estimate | Recommended |
|---|---|---|
| Center for Domestic Preparedness ................................................ | 62,500,000 | 40,000,000 |
| National Exercise Program ............................................................. | 42,000,000 | 40,000,000 |
| Technical Assistance ...................................................................... | 13,000,000 | 13,000,000 |
| Continuing Training Program ......................................................... | 23,000,000 | 31,000,000 |
| Evaluations and Assessments ........................................................ | 18,000,000 | 16,000,000 |
| Rural Domestic Preparedness Consortium ..................................... | 0 | 3,000,000 |
| Subtotal, National Programs ................................................. | 210,000,000 | 235,000,000 |
| Management and Administration ..................................................... | 175,000,000 | 0 |
| Total State and Local Programs ............................................ | 3,867,000,000 | 2,829,000,000 |

¹ Funded in a separate account.

The Committee includes bill language allowing the transfer of up to three percent of State and Local program dollars to FEMA's Management and Administration account for costs associated with administering grants and training programs, instead of the request for a direct appropriation of $175,000,000. FEMA is required to submit an expenditure plan within 60 days after the date of enactment of this Act on the use of the administrative funds. The Committee continues bill language mandating timeframes for the application process of certain grants to ensure that funds do not languish at DHS.

For the purposes of eligibility for funds, any county, city, village, town, district, borough, parish, port authority, transit authority, intercity rail provider, commuter rail system, freight rail provider, water district, regional planning commission, council of government, Indian tribe with jurisdiction over Indian country, authorized tribal organization, Alaskan Native village, independent authority, special district, or other political subdivision of any State shall constitute a "local unit of government."

The Committee includes a general provision requiring FEMA to brief the Committee five days prior to any announcement of State and Local Programs grant awards. Such briefings shall include detailed information on the risk analysis employed, the process for determining effectiveness, the process or formula used for selecting grantees, and any changes to methodologies used in the previous fiscal year.

### STATE HOMELAND SECURITY GRANT PROGRAM

The Committee recommends $950,000,000 for the State Homeland Security Grant Program (SHSGP), the same as the amount requested and provided in fiscal year 2009. In accordance with the 9/11 Act, at least 25 percent of SHSGP and Urban Area Security Initiative funds shall be used for Law Enforcement Terrorism Prevention activities. Each state and Puerto Rico shall pass on no less than 80 percent of their grant funding to local units of government within 45 days of receiving the funds.

The Committee is aware that previous grant guidance conflicted with the 9/11 Act by limiting the amount of funds that can be used to pay the salaries and expenses for intelligence analysts. The restriction is not in line with the 9/11 Act, which did not set a limit on paying salaries and expenses for new and existing intelligence analysts. The Committee understands the FEMA has taken steps

110

to correct this in current guidelines and expects FEMA to continue to comply with the 9/11 Act.

Within the funds available, the Committee recommends $60,000,000 for Operation Stonegarden. All awards under Operation Stonegarden shall be made on a competitive basis to tribal governments and units of local government, including towns, cities, and counties along borders of the United States to enhance the coordination between local and Federal law enforcement agencies. Operation Stonegarden's eligible costs include, but shall not necessarily be limited to: overtime; vehicle maintenance; vehicle and equipment rental costs; reimbursement for mileage; fuel costs; equipment replacement costs; and travel costs for law enforcement entities assisting other local jurisdictions in law enforcement activities. The Committee directs that only the U.S. Customs and Border Protection and FEMA make award decisions. No administrative costs shall be deducted from Operation Stonegarden award totals by States.

### URBAN AREA SECURITY INITIATIVE GRANTS

The Committee recommends $887,000,000 for Urban Area Security Initiative Grants, the amount as requested and $49,500,000 above the amount provided in fiscal year 2009. The funds should be distributed based on terrorism risk as called for in the 9/11 Act. Of the amount available, $15,000,000 is for grants to non-profit organizations determined by the Secretary to be at high risk of terrorist attack, the same amount as requested.

### METROPOLITAN MEDICAL RESPONSE SYSTEM

The Committee recommends $40,000,000 for the Metropolitan Medical Response System, the same as the amount requested and $1,000,000 below the amount provided in fiscal year 2009. The Committee directs FEMA to work with the Office of Health Affairs to develop guidelines for the program. This funding enables local jurisdictions to prepare for and respond to all-hazards mass casualty incidents, including terrorism, epidemic disease outbreaks, natural disasters, and large-scale hazardous materials incidents. The Committee does not agree to change the structure of this program to only focus on medical surge capacity. Instead, DHS should work with the Department of Health and Human Services' Assistant Secretary for Preparedness and Response to develop medical surge guidelines for communities.

### CITIZEN CORPS PROGRAM

The Committee recommends $15,000,000 for the Citizen Corps program, the same as the amount requested and provided in fiscal year 2009. This funding supports programs to engage citizens in preventing, preparing for, and responding to all hazards. Eligible activities include planning and evaluation; public education and communication; training; and participation in exercises.

### PUBLIC TRANSPORTATION SECURITY ASSISTANCE AND RAILROAD SECURITY ASSISTANCE

The Committee recommends $250,000,000 for Public Transportation Security Assistance and Railroad Security Assistance, the

111

same amount as requested and $150,000,000 below the amount provided in fiscal year 2009. These funds are in addition to the $150,000,000 provided in the recently passed American Recovery and Reinvestment Act (ARRA) of 2009, which have yet to be awarded. The Committee notes that ARRA grant guidance was only published by DHS on May 29, 2009. Awards will not be made until late fiscal year 2009 and early fiscal year 2010. The Committee continues the requirement that grants be made directly to transit agencies. The Committee is also aware that States serve an integral role in coordinating regional interests in regard to transit security and therefore directs FEMA to allow transit agencies to permit States to act as sub-grantees to better facilitate regional planning and programs.

Since 2002, and including the recently enacted economic recovery package, Congress has appropriated a total of $1.67 billion for mass transit and passenger rail grants. These funds are used for security enhancements, including infrastructure protection, deterrence, facility hardening, and employee training. There are numerous statutory requirements placed on TSA and FEMA as to how quickly this funding must be awarded and provided to transit and passenger rail agencies; however, once the award has been made, the funding commonly remains unspent for up to two years. Based on latest estimates from FEMA, about 90 percent of funds appropriated in fiscal year 2006 for rail and transit have not been drawn down. Partly to address this concern, the 9/11 Act and last year's appropriations bill required grant awards to be made directly to transit and passenger rail agencies instead of being administered through the States. The Committee notes that after two recent hearings, FEMA and TSA understand that they must work diligently to comprehend this issue and provide solutions. The Committee expects FEMA and TSA to report on their progress, by August 2009, in working with the transit agencies to get funds drawn down from fiscal years 2006, 2007 and 2008.

### PORT SECURITY GRANTS

The Committee recommends $250,000,000 for Port Security grants, the same amount as requested and $150,000,000 below the amount provided in fiscal year 2009. These funds are in addition to the $150,000,000 provided in the recently passed American Recovery and Reinvestment Act of 2009, which have yet to be awarded. The Committee notes that ARRA grant guidance was only published by DHS on May 29, 2009. Awards will not be made until late fiscal year 2009 and early fiscal year 2010. The Committee includes bill language waiving the cost-share requirement for these grants.

### OVER-THE-ROAD BUS SECURITY ASSISTANCE

The Committee recommends $12,000,000 for Over-the-Road Bus Security grants, $12,000,000 above the amount requested and the same as the amount provided in fiscal year 2009.

### BUFFER ZONE PROTECTION GRANTS

The Committee includes $50,000,000 for the Buffer Zone Protection (BZP) grants, the same as the amount requested and provided in fiscal year 2009. The Committee is concerned that these grants

112

have done little to eliminate vulnerabilities among critical infrastructure and have instead provided funding to localities for basic security costs. While that is important, the Committee funds other grant programs, such as SHSGP and UASI, for communities to use for security costs. The Committee directs FEMA and The National Protection and Programs Directorate to provide an expenditure plan to the Committee prior to award of any BZP grants. The expenditure plan shall include a new approach to awarding these grants with a focus on eliminating vulnerabilities at high risk assets.

### REAL ID GRANTS

The Committee recommends $50,000,000 for grants to assist States in complying with the largely unfunded mandate of the REAL ID Act, the same as the amount requested and provided in fiscal year 2009. DHS estimates the total cost to States of implementing REAL ID to be $3,965,000,000 over eleven years. An additional $25,000,000 is available in the United States Citizenship and Immigration Services appropriations to support REAL ID hub activities.

### INTEROPERABLE EMERGENCY COMMUNICATIONS GRANTS

The Committee recommends $50,000,000 for interoperable emergency communications grants, the same as the amount requested and provided in fiscal year 2009. FEMA is directed to work with the Office of Emergency Communications to develop program guidance for these grants.

The Committee agrees with FEMA's priority on leadership and governance, common planning and operation protocols, and skills and capabilities. However, States and localities also should be given the flexibility to purchase equipment if they have made progress or have separate funding sources to address FEMA's priority areas. Therefore, FEMA is directed to allow States and local governments to purchase equipment pursuant to requirements in the 9/11 Act.

### EMERGENCY OPERATIONS CENTERS

The Committee recommends $40,000,000 for Emergency Operations Centers (EOCs), $40,000,000 above the amount requested and $5,000,000 above the amount provided in fiscal year 2009. Funding is available until expended. Funding is provided for equipping, upgrading, and constructing EOCs pursuant to section 614 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act.

The Committee provides funding for the Emergency Operations Center projects in the following amounts:

| Emergency Operations Centers | Amount |
|---|---|
| Winston County Commission, AL | $20,000 |
| Lincoln Parish Sheriff Department, LA | 300,000 |
| City of Las Vegas, NV | 600,000 |
| Mobile County Commission, AL | 800,000 |
| City of Moreno Valley, CA | 400,000 |
| Benton County Emergency Management Commission, IA | 500,000 |
| City of Green Cove Springs, FL | 400,000 |
| Lake County, FL | 800,000 |

113

| Emergency Operations Centers | Amount |
|---|---|
| Dorchester County, SC | 400,000 |
| Sarasota County, FL | 300,000 |
| City of Greenville, NC | 600,000 |
| New Orleans Emergency Medical Services, LA | 750,000 |
| Lycoming County, PA | 250,000 |
| Mercer County Emergency Management Agency, KY | 300,000 |
| Jackson County Sheriff's Office, MO | 500,000 |
| Williamsburg County, SC | 1,000,000 |
| City of Brookings, OR | 350,000 |
| Johnson County, TX | 750,000 |
| City of Minneapolis, MN | 750,000 |
| Howell County Emergency Preparedness, MO | 250,000 |
| City of Brawley, CA | 500,000 |
| City of Hopewell, VA | 250,000 |
| Morris County, New Jersey Office of Emergency Management, NJ | 1,000,000 |
| City of Tavares, FL | 500,000 |
| Tohono O'odham Nation | 500,000 |
| Minooka Fire Protection District, IL | 250,000 |
| Township of Old Bridge, NJ | 500,000 |
| City of Cupertino, CA | 300,000 |
| Calvert County Department of Public Safety, MD | 338,000 |
| City of Detroit, MI | 1,000,000 |
| Scotland County, NC | 650,000 |
| The City of Maitland, FL | 158,000 |
| County of Union, NJ | 500,000 |
| Providence Emergency Management Agency & Office of Homeland Security, RI | 500,000 |
| City of Hartford, CT | 800,000 |
| City of Torrington, CT | 400,000 |
| City of Ames, IA | 600,000 |
| Fulton County (Atlanta) Emergency Management Agency, GA | 200,000 |
| City of Brigantine, NJ | 300,000 |
| Village of Elmsford, NY | 165,000 |
| Town of Harrison, NY | 275,000 |
| City of Elk Grove, CA | 750,000 |
| City of Palm Coast, FL | 350,000 |
| Somerset County, ME | 500,000 |
| Macomb County Emergency Management and Communications, MI | 250,000 |
| City of La Habra, CA | 254,500 |
| City of Scottsdale, AZ | 500,000 |
| Westmoreland County Department of Public Safety, PA | 900,000 |
| Brazoria County Emergency Management, TX | 100,000 |
| Township of Irvington, NJ | 750,000 |
| San Francisco Department of Emergency Management, CA | 800,000 |
| North Carolina Office of Emergency Management, NC | 1,000,000 |
| Butte-Silver Bow, MT | 800,000 |
| Middle Rio Grande Development Council, TX | 1,000,000 |
| Town of Shorter, AL | 500,000 |
| Kentucky Emerency Management, KY | 500,000 |
| Monroe County, FL | 200,000 |
| City of Newark, NJ | 1,000,000 |
| Passaic County Prosecutor, NJ | 250,000 |
| City of Commerce, CA | 1,000,000 |
| State of Maryland, MD | 1,500,000 |
| City of Alamosa Fire Department, CO | 425,000 |
| City of Whittier, CA | 500,000 |
| Washington Parish Government, LA | 350,000 |
| City of Monterey Park, CA | 375,000 |
| Towamencin Township, PA | 75,000 |
| Upper Darby Township Police Department, PA | 500,000 |
| North Hudson Regional Fire and Rescue, NJ | 500,000 |
| City of Boerne, TX | 250,000 |
| Lea County, NM | 600,000 |
| City of Port Gibson, MS | 750,000 |
| City of Wichita, KS | 500,000 |
| City of Lauderdale Lakes, FL | 750,000 |
| City of Sunrise, FL | 750,000 |
| Columbia County, OR | 500,000 |

114

The remaining funds, not directed by the Committee, shall be used for program administration.

## NATIONAL PROGRAMS

The Committee recommends $235,000,000 for National Programs, $25,000,000 above the amount requested and $29,200,000 below the amount provided in fiscal year 2009.

### NATIONAL DOMESTIC PREPAREDNESS CONSORTIUM

Included within the amount provided for National Programs, the Committee recommends $132,000,000 for the National Domestic Preparedness Consortium, $18,000,000 above the amount requested and $32,500,000 below the amount provided in fiscal year 2009. Of the total amount, $23,000,000 is for the National Energetic Materials Research and Testing Center, New Mexico Institute of Mining and Technology; $23,000,000 is for the National Center for Biomedical Research and Training, Louisiana State University; $23,000,000 is for the National Emergency Response and Rescue Training Center, Texas A&M University; $23,000,000 is for the National Exercise, Test, and Training Center, Nevada Test Site; and $40,000,000 is for the Center for Domestic Preparedness (CDP). Because the 9/11 Act recognizes CDP as a consortium member, the Committee has reduced funding for this center to make it more in line with funding levels elsewhere under this program.

### NATIONAL EXERCISE PROGRAM

Included within the amount provided for National Programs, the Committee recommends $40,000,000 for the National Exercise Program, $2,000,000 below the amount requested and the same as the amount provided in fiscal year 2009. This program provides the opportunity for key leaders at the Federal, State, local, territory and Tribal levels, along with representatives of nongovernmental organizations and the private sector, to gauge the effectiveness of plans, policies and procedures for responding to natural disasters and terrorist attacks. In fiscal year 2009, the Committee required FEMA to provide a report on incident management lapses during the Top Officials 4 exercise. The Committee is still awaiting that report and directs FEMA to provide the report immediately.

### TECHNICAL ASSISTANCE

Included within the amount provided for National Programs, the Committee recommends $13,000,000 for technical assistance, the same as the amount requested and $2,000,000 above the amount provided in fiscal year 2009. The Committee recognizes that State and local officials require technical assistance to ensure that equipment is used properly and to support effective planning.

### CONTINUING TRAINING GRANTS

Included within the amount provided for National Programs, the Committee recommends $31,000,000 for continuing training grants, $8,000,000 above the amount requested and equal to the amount provided in fiscal year 2009. The Committee recommends full funding for the graduate-level homeland security education programs currently supported by the Department. The Department is di-

115

rected to maintain its strong support for these proven curricula, and to continue to leverage them where appropriate as the Department meets the growing need for education within its own ranks and by States and localities around the Nation.

### EVALUATIONS AND ASSESSMENTS

Included within the amount provided for National Programs, the Committee recommends $16,000,000 for evaluations and assessments, $2,000,000 below the amount requested and the same as the amount provided in fiscal year 2009. FEMA shall brief the Committee every six months on results from completed evaluations.

### RURAL DOMESTIC PREPAREDNESS CONSORTIUM

Included within the amount provided for National Programs, the Committee recommends $3,000,000 for the Rural Domestic Preparedness Consortium. Funds will be used to provide and deliver training to rural first responders consistent with the National Preparedness Goal.

### TRUCKING INDUSTRY SECURITY GRANTS

The Committee is aware that of the $8,000,000 appropriated for trucking industry security grants in fiscal year 2009, only $2,200,000 was awarded due to the lack of worthy applications. Therefore, the Committee includes a provision rescinding the balance of programmatic funds, $5,572,000, from fiscal year 2009. The Committee notes that funds appropriated in fiscal year 2008 are supporting a three year education and training program. The Committee will revisit the needs of that program at the conclusion of that project period.

### MEASURING THE IMPACT OF GRANTS

In fiscal year 2009, the Committee provided $5,000,000 to accelerate efforts at FEMA to develop tools to measure the achievement and effectiveness of certain grant programs. The Committee is aware that the department is developing a system called Cost-to-Capabilities (C2C) aimed at measuring the impact of grants on State and local capabilities. GAO has told the Committee that C2C, as currently designed, would not directly measure preparedness. That revelation gives the Committee grave concerns and directs FEMA to brief the Committee on how it plans to achieve the fiscal year 2009 mandate to develop tools that measure the achievement and effectiveness of certain grant programs within one month after the date of enactment of this Act. GAO shall continue to monitor the development of any DHS system to measure the effectiveness of grant programs and report regularly to the Committee with updates.

### EMERGENCY MEDICAL SERVICES

The Committee supports the Department's efforts to complete capability assessments for emergency medical service (EMS) providers. However, the Committee remains concerned that current funding levels for the EMS community for training and equipment for disaster preparedness may be insufficient to meet capability requirements. Of particular concern is that EMS providers do not

116

have essential personal protection equipment, such as powered air purifying respirators. FEMA is directed, in conjunction with the Office of Health Affairs, to report to the Committee regarding the current state of disaster preparedness capabilities of EMS providers. This report is due no later than six months after the enactment of this Act and shall include an analysis of the gap between current and target capabilities. FEMA is directed to include language in its grants guidance requiring States to include EMS providers in their Statewide Homeland Security Plans as well as their UASI plans. FEMA shall also make States aware that EMS personal protection equipment is an allowable expense under the State and UASI grant programs. If a State provides no funding to EMS providers, the State should justify its lack of funding by demonstrating that related capabilities have been met or by identifying other pressing priorities.

### DISASTER COMMUNICATIONS

The Committee is aware of the capability gap that exists for resilient communications at the State and local level. This gap has exacerbated the impact of many recent disasters, especially in communities with limited vehicle access and during the first 72 hours following the onset of a disaster event. While the Committee is aware of the efforts of FEMA, DHS's Office of Emergency Communications (OEC), and SAFECOM to address communications gaps at the national level, more can be done to leverage the next generation of communications technologies currently available at the State and local level. Therefore, the Committee directs FEMA, OEC, and SAFECOM to report to the Committee no later than 90 days after enactment of this Act on their collective efforts to provide technical assistance to States and localities on effective disaster and resilient communications systems. The report should also identify efforts to encourage States and localities to incorporate resilient communications into their emergency response planning and training. This report shall include a description of completed and planned tests and evaluations of resilient communications systems currently available for purchase or lease by States and localities. Furthermore, the report shall include data on the percentage of Public Safety Interoperable Communications grant funding allocated by States and localities for resilient communications.

### FIREFIGHTER ASSISTANCE GRANTS

| | |
|---|---|
| Appropriation, fiscal year 2009 [1] ..................................................... | $ 775,000,000 |
| Budget estimate, fiscal year 2010 [2] ................................................ | – – – |
| Recommended in the bill ................................................................. | 800,000,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ................................................ | +25,000,000 |
|     Budget estimate, fiscal year 2010 ............................................. | +800,000,000 |

[1] Excludes $210,000,000 in appropriations in the American Recovery and Reinvestment Act (P.L. 111–5).
[2] The budget request includes $590,000,000 for Firefighter Assistance Grants within State and Local Programs.

### MISSION

Firefighter Assistance Grants are provided to local fire departments for the purpose of protecting the health and safety of the public and protecting fire fighting personnel, including volunteers

117

and emergency medical service personnel, against fire and fire-related hazards.

<div align="center">RECOMMENDATION</div>

The Committee recommends $800,000,000 for Firefighter Assistance Grants, $25,000,000 above the amount provided in fiscal year 2009. The budget did not include a separate appropriation for Firefighter Assistance Grants but instead proposed $590,000,000 for this activity within State and Local Programs.

The budget proposed a significant reallocation of funding for the two Firefighter Assistance Grant programs, the Assistance for Firefighters Grants (AFG) and the Staffing for Adequate Firefighter Response (SAFER) programs. The budget requests a cut of almost 70 percent for AFG, from $565,000,000 in fiscal year 2009 to $170,000,000. This level is woefully inadequate given the vast needs of fire departments across the nation for equipment. For the fiscal year 2008 alone, FEMA received 21,022 applications for AFG funds, with requests totaling $3,137,121,053. Therefore, the Committee recommends $380,000,000 for AFG grants, an increase of $210,000,000 above the request. The Committee provides the budget request, of $420,000,000, a $210,000,000 increase above fiscal year 2009, for the SAFER program. The Committee recognizes that communities are in need of assistance during this recession with maintaining critical public safety staff, including firefighters. The additional funding is part of a targeted and temporary effort to stem the tide of layoffs and ensure our communities are protected by an adequate number of firefighters. The Committee urges FEMA to consider the prospect and occurrence of firefighter layoffs at a local fire department when evaluating SAFER grant applications. In addition to the funding, the pending supplemental appropriations bill contains language allowing the waiver of certain restrictions and broadens the use of SAFER to allow the grants to be used for the hiring, rehiring, and retaining of firefighters for fiscal years 2009 or 2010. Also, the cost-share requirements for SAFER were waived for fiscal years 2009 and 2010 in ARRA.

FEMA is directed to continue granting funds directly to local fire departments and to include the United States Fire Administration during the grant decision process. FEMA is also directed to maintain an all-hazards focus and is prohibited from limiting the list of eligible activities, including those related to wellness. According to the National Institute for Occupational Safety and Health, sudden cardiac death represents the most common cause of fire fighter fatalities. Funds are available until September 30, 2011, and no more than five percent may be used for administrative expenses. FEMA is required to submit an expenditure plan within 60 days after the date of enactment of this Act on the use of the administrative funds.

The Committee continues the requirement for FEMA to peer-review FIRE and SAFER grant applications that meet criteria established by FEMA and the Fire Service; to clearly define the criteria for peer-review in the grant application package; to rank order applications according to peer-review; and to fund applications according to their rank order. For those applicants whose grant applications are not reviewed, FEMA must provide an official notification detailing why the application did not meet the criteria for review.

118

## EMERGENCY MANAGEMENT PERFORMANCE GRANTS

| | |
|---|---:|
| Appropriation, fiscal year 2009 | $ 315,000,000 |
| Budget estimate, fiscal year 2010 [1] | – – – |
| Recommended in the bill | 330,000,000 |
| Bill compared with:. | |
|     Appropriation, fiscal year 2009 | +15,000,000 |
|     Budget estimate, fiscal year 2010 | +330,000,000 |

[1] The budget request includes $315,000,000 for Emergency Management Performance Grants within State and Local Programs.

### MISSION

Emergency Management Performance Grant (EMPG) funds are used to support comprehensive emergency management at the State and local levels and to encourage the improvement of mitigation, preparedness, response, and recovery capabilities for all hazards.

### RECOMMENDATION

The Committee recommends $330,000,000 for EMPG, $15,000,000 above the amount provided in fiscal year 2009. The budget did not include a separate appropriation for EMPG but instead proposed $315,000,000 for this activity within State and Local Programs. The Committee does not agree to transfer EMPG to State and Local Programs, continuing instead to fund the EMPG program as a separate appropriation. EMPG is the one true source of funding for emergency managers that is focused on preparing for all hazards. EMPG is the only grant program within FEMA that requires a 50/50 match at the State and local level, which is evidence of the commitment by State and local governments to make emergency management a top priority, especially while most are experiencing financial crisis. Many of the EMPG funds help pay for the personnel to run key programs and funds for this program must remain flexible to ensure they support the full gamut of responsibilities required of emergency managers.

The Committee directs FEMA to continue EMPG grant practices used in fiscal year 2007, including a continued emphasis on all-hazards activities and the inclusion of personnel expenses and Emergency Operations Centers as eligible uses of funding. Up to three percent may be used for program administration.

### RADIOLOGICAL EMERGENCY PREPAREDNESS PROGRAM

| | |
|---|---:|
| Appropriation, fiscal year 2009 | $ −505,000 |
| Budget estimate, fiscal year 2010 | −265,000 |
| Recommended in the bill | −265,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 | +240,000 |
|     Budget estimate, fiscal year 2010 | – – – |

### MISSION

The Radiological Emergency Preparedness Program (REPP) ensures that the public health and safety of citizens living near commercial nuclear power plants will be adequately protected in the event of a nuclear power station incident. In addition, the program informs and educates the public about radiological emergency preparedness. REPP provides funding only for emergency prepared-

119

ness activities of State and local governments that take place beyond nuclear power plant boundaries.

### RECOMMENDATION

The Committee provides for the receipt and expenditure of REPP fees, which are collected as authorized by Public Law 105–276. The request estimates that fee collections will exceed expenditures by $265,000 in fiscal year 2010.

## UNITED STATES FIRE ADMINISTRATION

| | |
|---|---|
| Appropriation, fiscal year 2009 ...................................................... | $44,979,000 |
| Budget estimate, fiscal year 2010 .................................................. | 45,588,000 |
| Recommended in the bill ................................................................ | 45,588,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 ............................................... | +609,000 |
| Budget estimate, fiscal year 2010 ........................................... | – – – |

### MISSION

The mission of the United States Fire Administration (USFA) is to reduce economic losses and loss of life due to fire and related emergencies through leadership, coordination, and support. USFA trains the Nation's first responder and health care leaders to evaluate and minimize community risk, enhance the security of critical infrastructure, and better prepare communities to react to emergencies of all kinds.

### RECOMMENDATION

The Committee recommends $45,588,000 for USFA, the same as the amount requested and $609,000 above the amount provided in fiscal year 2009. The Committee includes $1,419,000 to continue implementation of the National Fire Incident Reporting System, as requested, and $9,304,000 for the National Fire Academy, as requested. The Committee expects the overdue facilities plan to be submitted immediately.

## DISASTER RELIEF

### (INCLUDING TRANSFER OF FUNDS)

| | |
|---|---|
| Appropriation, fiscal year 2009 [1] ...................................................... | $1,400,000,000 |
| Budget estimate, fiscal year 2010 .................................................. | 2,000,000,000 |
| Recommended in the bill ................................................................ | 2,000,000,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 ............................................... | +600,000,000 |
| Budget estimate, fiscal year 2010 ........................................... | – – – |

[1] Excludes the $7,960,000,000 appropriated in Public Law 110–329.

### MISSION

FEMA is responsible for administering disaster assistance programs and coordinating the Federal response following presidential disaster declarations. Major activities under the Disaster Relief fund are: providing aid to families and individuals; supporting the efforts of State and local governments to take emergency protective measures, clearing debris and repairing infrastructure damage; mitigating the effects of future disasters; and helping States and local communities manage disaster response, including the assist-

120

ance of disaster field office staff and automated data processing support.

## RECOMMENDATION

The Committee recommends $2,000,000,000 for Disaster Relief, the same as the amount requested and $600,000,000 above the amount provided in fiscal year 2009, excluding emergency funding. The Committee includes a provision to allow the transfer of up to $90,080,000 to the FEMA Management and Administration account. FEMA shall provide the Committee with an expenditure plan detailing the uses of these funds prior to transfer. The Committee also includes a provision to allow the transfer of $16,000,000 to IG for disaster related audits and investigations.

The Disaster Relief fund (DRF) was appropriated $13,157,000,000 in fiscal year 2008 and $1,400,000,000 has been provided, to date, in fiscal year 2009. Close to 80 percent of these funds were emergency appropriations to respond to floods, tornadoes, hurricanes, and ice storms. Congress often provided these funds in the absence of a formal request from the Administration but based on analysis by FEMA at the request of the Committee. The Committee expects the current Administration to properly monitor the fund and provide timely budget requests that are adequate to continue to support disaster response and recovery costs.

FEMA spends approximately $300,000,000 annually on disaster readiness and support costs from the DRF. FEMA shall submit an expenditure plan to the Committees detailing the use of funds for disaster readiness and support costs within 60 days after the date of enactment of this Act. FEMA shall provide a quarterly report detailing obligations against the expenditure plan and a justification for any changes in spending.

FEMA is directed to notify the Committees prior to transferring funds to the United States Agency for International Development for international disaster assistance. Further, FEMA is to notify the Committees prior to closing or moving logistics distribution centers.

The Committee directs FEMA to continue to submit the monthly report detailing allocations, obligations, and undistributed amounts related to all disasters, including Hurricanes Katrina, Rita, and Wilma. The report shall maintain the same level of data as currently presented to the Committee.

Beginning July 1, 2009, FEMA shall report monthly to the Committee on the number of individuals and households in need of and denied Federal disaster assistance as a result of severe storms, tornados, flooding and mudslides in the Commonwealth of Kentucky in May 2009 (FEMA–1841–DR). The report shall detail the reason and circumstance for each denial.

The Committee is concerned about the costs associated with the establishment of multiple Joint Field Offices (JFOs) after disasters. The Committee directs FEMA to report back to the Committee, no later than 90 days after the date of enactment of this Act, on whether cost efficiencies can be achieved by collocating JFO offices for disasters, especially for disasters that affect multiple States in the same region.

121

### ECONOMIC HARDSHIP AND DISASTER RECOVERY

The Committee is concerned that States and localities that are already suffering from economic crisis are unable to adequately recover when hit by a natural disaster. With many States facing dramatic widespread budget cuts due to the economic downturn, reductions in public services may diminish a state's preparedness and response capabilities. Many governors are eyeing federal funding to offset and supplement these shortfalls. That is especially true after disasters. States that receive Robert T. Stafford Disaster Relief and Emergency Assistance Act Disaster Declarations often receive a 75 percent Federal cost-share for Public Assistance projects. The Committee notes that FEMA can recommend adjustments in Federal-state cost-sharing agreements to assist State and local governments and certain nonprofit entities that incur extraordinary expenses in the wake of disasters. In many cases that assistance can be adjusted to a 100 percent Federal cost-share. However, it is unclear to the Committee and many communities how often, if at all, FEMA takes into consideration a state's economic hardship. FEMA shall report to the Committee on how economic factors contribute to cost-share decisions and on how the agency plans to deal with cost-share adjustments during the recession. The report is due within three months after the date of enactment of this Act.

### REMAINING CHALLENGES IN POST-DISASTER HOUSING

The Committee continues to be concerned with the post-disaster housing situation in the Gulf Coast as a result of hurricanes Katrina and Rita. Based on the latest estimates from FEMA, nearly 30,000 households are still receiving disaster housing assistance, of which nearly 3,000 are in trailers and about 27,000 are in rental units as part of the joint Department of Housing and Urban Development (HUD)/FEMA program called the Disaster Housing Assistance Program (DHAP). In fiscal year 2009 the Committee required the Office of the Federal Coordinator for Gulf Coast Rebuilding to host a panel of experts to develop a framework for developing and sustaining affordable rental housing in affected Gulf Coast communities. The panel was tasked to provide recommendations for how HUD, the private sector, and the States could achieve a sufficient stock of affordable rental housing to meet the needs of all those displaced after the hurricanes who still lack permanent housing options. The Office's report focused on issues specific to the Gulf Coast, but several of its recommendations should be studied and incorporated by Federal, State and local governments to deal with future disasters, including improved case management services for families in interim housing and the need for new sources of funding for long-term, post-disaster housing.

The Committee remains committed to addressing the many challenges that face our citizens in the Gulf Coast and to ensuring this type of failure to provide a long-term, post-disaster housing solution never occurs again. FEMA was never equipped to sustain much more than a short-term housing effort after disasters, focused on travel trailers and mobile homes. HUD must use its expertise following disasters that clearly overwhelm the capacity of FEMA and local governments to provide adequate housing.

122

The Committee notes that the last administration developed the National Disaster Housing Strategy, as mandated by the Post-Katrina Emergency Management Reform Act of 2006. The Strategy states that FEMA and HUD will partner to provide Federal interim housing assistance, each bringing its expertise and experience to bear. It goes on to state that when Federal permanent housing assistance is needed, HUD will have the lead responsibility under this Strategy and will coordinate with its partners to provide housing and community development resources; legislative authority, staffing, and other resources may be required for HUD's new responsibilities.

While the Committee supports the concept of the Strategy, it simply does not go far enough to prepare a response for the next major disaster that displaces large numbers of people over a long period of time. The Committee notes that there are no formal agreements between the agencies and there are no executive orders specifying HUD's role after disasters. The Committee firmly believes that HUD must bring its experience to bear after catastrophic disasters that overwhelm the traditional FEMA mission of providing short-term provisional housing. Therefore, the Committee directs FEMA to formalize an agreement with HUD, outlining the roles and responsibilities of both agencies following a disaster and clearly delineating when and how HUD should take the lead role in the Federal housing response. FEMA is also directed to report to the Committee on the resources and legislative authority needed for HUD to take a formal role in disaster housing. The Committee expects that FEMA would continue to support disaster costs under an agreement between HUD and FEMA, as it does for DHAP in the Gulf Coast.

The Committee is pleased to note that FEMA and HUD have recognized that there must be some interplay between the agencies after disaster. The two agencies work in tandem to operate DHAP in Louisiana, Mississippi, and Texas following Hurricanes Katrina, Rita, and Ike. The Committee expects FEMA to use DHAP as a model as it develops its agreements with HUD.

The Committee remains concerned about FEMA trailers that have high levels of formaldehyde emissions, possibly leading to adverse health effects. The Committee understands FEMA is pursuing alternative housing solutions and demonstration projects and directs FEMA to work with multiple technologies and building solutions during this phase.

CHILDREN AND DISASTERS

The Committee is aware that Central Elementary School, located on the banks of the Illinois River, in Ottawa, Illinois was flooded in September 2008 during a record flood. Water levels rose two feet above the floor elevation of the building, causing damage throughout the building and flooding the crawlspace below the building. The flooding also revealed severe environmental hazards, including the presence of hazardous chemicals on the surface of the grounds and asbestos. The school has since been condemned by the Illinois State Board of Education until such time as the asbestos issues are addressed. A presidential declaration was issued to allow Federal assistance for this community and to address damages such as those at Central Elementary School. Children who attend this

123

school are now attending classes in an abandoned Wal-Mart, attempting to learn in this ill-suited venue. While the Committee understands the pace of public assistance and hazard mitigation is often slow to ensure integrity in the process, the pace of FEMA approval for relocation or repair of this facility is unacceptably slow, given that these children have been in an unfit learning environment for most of the school year.

FEMA should prioritize its disaster work to ensure that decisions on critical facilities are made in a time frame that is least harmful to those who are affected, especially when children and other vulnerable populations are involved. The Committee directs FEMA to expedite its discussions with Ottawa and to come to resolution on this project so that children will not return to an abandoned Wal-Mart for school next year. As they deliberate, FEMA and the affected community should address the continued flooding of this school and area. FEMA and the community should consider taking the mitigation action of moving the school from the floodplain.

The Committee will continue to monitor this situation. FEMA shall act with due haste and report to the Committee when the final project is approved.

### EVALUATING FEMA'S READINESS

The Committee has heard anecdotal evidence from disasters in 2008 and 2009 that the Agency is much improved from the FEMA that responded to Hurricane Katrina. However, unlike government programs that are easily assessed against specific performance goals, FEMA does not lend itself to simple evaluation. The agency is best judged during disaster response and, unfortunately, it is not an option to wait until the next catastrophic disaster to determine FEMA's capabilities. Therefore, the Committee directs GAO to conduct red team exercises during the hurricane season and report to the Committee on its findings. GAO shall evaluate how well the agency provides disaster assistance to survivors and, if possible, to States and localities.

### DISASTER ASSISTANCE DIRECT LOAN PROGRAM ACCOUNT

#### SUBSIDY

| | |
|---|---:|
| Appropriation, fiscal year 2009 | $295,000 |
| Budget estimate, fiscal year 2010 | 295,000 |
| Recommended in the bill | 295,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 | – – – |
| Budget estimate, fiscal year 2010 | – – – |

#### LIMITATION ON DIRECT LOANS

| | |
|---|---:|
| Appropriation, fiscal year 2009 | $25,000,000 |
| Budget estimate, fiscal year 2010 | 25,000,000 |
| Recommended in the bill | 25,000,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 | – – – |
| Budget estimate, fiscal year 2010 | – – – |

#### MISSION

Beginning in 1992, loans made to States under the cost sharing provisions of the Robert T. Stafford Disaster Relief and Emergency

124

Assistance Act were funded in accordance with the Federal Credit Reform Act of 1990. The Disaster Assistance Direct Loan Program Account, which was established as a result of the Federal Credit Reform Act, records the subsidy costs associated with the direct loans obligated beginning in 1992 to the present.

RECOMMENDATION

The Committee recommends $25,000,000 for the limitation on direct loans from the Disaster Assistance Direct Loan Program, pursuant to section 319 of the Stafford Act, and a subsidy of $295,000 to cover the cost of loans.

FLOOD MAP MODERNIZATION FUND

| | |
|---|---|
| Appropriation, fiscal year 2009 ....................................................... | $220,000,000 |
| Budget estimate, fiscal year 2010 ................................................... | 220,000,000 |
| Recommended in the bill ................................................................ | 220,000,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ................................................ | - - - |
|     Budget estimate, fiscal year 2010 ........................................... | - - - |

MISSION

The mission of the Flood Map Modernization Program is to modernize, maintain, and digitize the inventory of over 100,000 of the nation's flood maps. These flood maps are used to determine appropriate risk-based premium rates for the National Flood Insurance Program, complete hazard determinations required for the nation's lending institutions, and develop appropriate disaster response plans for Federal, State, and local emergency management personnel.

RECOMMENDATION

The Committee recommends $220,000,000 for the Flood Map Modernization Fund, the same as the amount requested and provided in fiscal year 2009. In fiscal year 2010, FEMA will continue to focus these funds on reviewing, updating, and maintaining maps to accurately reflect flood hazards. The goal shall be to review and, where necessary, to update and maintain data, methodologies, models and maps that have been modernized, and to issue map updates no later than five years past the modernized dates of the maps. To support this goal, FEMA is directed to provide no less than 20 percent of the funds provided under this heading for map updates and maintenance conducted by Cooperating Technical Partners that provide at least a 25 percent cash match and have a strong record of working effectively with FEMA on floodplain mapping activities. With the fiscal year 2011 budget request, FEMA shall submit to the Committee a status report on the progress made towards the five year Risk Mapping, Assessment, and Planning strategy.

As noted in a recent National Academies of Science report, high resolution elevation data is the cornerstone of quality floodplain maps. FEMA is directed to develop a National Digital Elevation Acquisition and Utilization plan for the purposes of supporting floodplain map updates. FEMA shall collaborate with the United States Geological Survey, the National Oceanic and Atmospheric Administration, the National Aeronautics Space Administration, and States

125

that have experience in acquiring and incorporating high resolution elevation data in the floodplain map updates. FEMA shall submit this plan to the Committee within six months after the date of enactment of this Act.

When allocating map modernization funds, the Committee encourages FEMA to prioritize as criteria the number of stream and coastal miles within the State and the participation of the State in leveraging non-federal contributions.

### NATIONAL FLOOD INSURANCE FUND

| | |
|---|---|
| Appropriation, fiscal year 2009 | $156,599,000 |
| Budget estimate, fiscal year 2010 | 159,469,000 |
| Recommended in the bill | 159,469,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 | +2,870,000 |
|     Budget estimate, fiscal year 2010 | – – – |

#### MISSION

The National Flood Insurance Fund (NFIF), which was established in the Treasury by the National Flood Insurance Act of 1968, is a fee-generated fund that supports the National Flood Insurance Program (NFIP). The Act, as amended, authorizes the Federal Government to provide flood insurance on a national basis.

#### RECOMMENDATION

The Committee includes bill language providing up to $52,149,000 for salaries and expenses to administer the NFIF, the same as the budget request and $2,731,000 above the amount provided in fiscal year 2009. The Committee includes bill language providing up to $70,000,000 for the severe repetitive loss property mitigation pilot program under section 1361A of the National Flood Insurance Act; $10,000,000 for the repetitive insurance claims properties under section 1323 of the National Flood Insurance Act; and $40,000,000 for Flood Mitigation Assistance under section 1366 of the National Flood Insurance Act. No less than $107,320,000 is available for flood plain management and flood mapping. Flood mitigation funds are available until September 30, 2011, and funding is offset by premium collections.

FEMA requests fee authority in the amount of $159,469,000 for fiscal year 2010, an increase of $2,870,000 above the fiscal year 2009 level. The Committee is concerned that FEMA's fee estimates are too optimistic, given that the Agency has acknowledged that flood insurance policies may not increase as expected. A decline in fees would threaten valuable flood plain management and mitigation activities. Given the uncertainty in the fee collection, the Committee includes language allowing FEMA to restructure its budget for salaries and expenses and flood plain management if fee collection does not rise as projected in the budget.

The Community Assistance Program (CAP) is a product-oriented financial assistance program directly related to the flood loss reduction objectives of the National Flood Insurance Program (NFIP). States that are participating in the NFIP are eligible for this Federally funded assistance. The CAP is intended to help States identify, prevent, and resolve floodplain management issues in participating communities before a flood event. The Committee encour-

126

ages FEMA to give ample consideration to population growth when determining grant awards to States. The Committee believes this will ensure that States most at risk of flooding because of rapid growth receive adequate funds to mitigate flood losses through increased floodplain management.

### NATIONAL PREDISASTER MITIGATION FUND

| | |
|---|---:|
| Appropriation, fiscal year 2009 ................................................. | $90,000,000 |
| Budget estimate, fiscal year 2010 ........................................... | 150,000,000 |
| Recommended in the bill ........................................................ | 100,000,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 .................................... | +10,000,000 |
|     Budget estimate, fiscal year 2010 ............................... | −50,000,000 |

### MISSION

The National Predisaster Mitigation Fund provides technical assistance and grants to State, local, and tribal governments, and to universities to reduce the risks associated with disasters. Resources support the development and enhancement of hazard mitigation plans, as well as the implementation of disaster mitigation projects.

### RECOMMENDATION

The Committee recommends $100,000,000 for the National Predisaster Mitigation Fund (PDM), $50,000,000 below the amount requested, and $10,000,000 above the amount provided in fiscal year 2009. The Committee notes that FEMA has $143,000,000 in unobligated balances in its regular program and therefore reduces the request.

As part of the budget, FEMA requested to drastically change the distribution methodology used for awarding PDM grants. However, the Agency was unable to adequately articulate to the Committee the ramifications or benefits of their new approach and signaled that the proposal was still being developed. Due to this lack of forethought, as well as pending legislation that is vastly different from FEMA's new approach, the Committee will not approve the proposed change. Instead, the Committee directs FEMA to continue this program as it operated last fiscal year. The Committee includes bill language extending the authorization of the PDM Grant Program for one year to continue the current program. Up to three percent may be used for program administration.

The Committee includes the following predisaster mitigation projects in the following amounts:

| Predisaster mitigation projects | Amount |
|---|---:|
| City of Hartselle, AL .................................................................. | $245,000 |
| City of Colton, CA ...................................................................... | 200,000 |
| Alabama Emergency Management Agency, AL ........................... | 200,000 |
| Arkansas Department of Emergency Management, AR ................ | 750,000 |
| Brigham City Corporation, UT .................................................... | 250,000 |
| Town of Shelter Island, NY ......................................................... | 200,000 |
| City of Camanche, IA ................................................................. | 187,500 |
| City of Prattville, AL ................................................................. | 500,000 |
| City of Venice, FL ...................................................................... | 200,000 |
| Orange County Fire Authority, CA ............................................. | 252,000 |
| City of Kannapolis, NC .............................................................. | 425,000 |
| Shelby County, Memphis, TN ..................................................... | 325,000 |
| Town of Occoquan, VA ............................................................... | 25,000 |

| Predisaster mitigation projects | Amount |
|---|---|
| City of Hidalgo, TX | 500,000 |
| Harris County Flood Control District, TX | 1,000,000 |
| City of Brooksville, KY | 18,500 |
| City of Maryville, MO | 175,000 |
| City of Reno, NV | 500,000 |
| Town of Union and City of Binghamton, NY | 462,000 |
| Westport Fire Department, CT | 265,000 |
| City of Trenton, NJ | 300,000 |
| Lucas County Engineer, OH | 500,000 |
| City of Coconut Creek, FL | 500,000 |
| Lake County Stormwater Management Agency, OH | 725,000 |
| City of Emeryville, CA | 600,000 |
| Village of La Grange Park, IL | 150,000 |
| Village of Pelham, NY | 562,500 |
| San Miguel County, NM | 400,000 |
| DeKalb County, IL | 350,000 |
| Town of Winthrop, MA | 500,000 |
| City of Santa Clarita, CA | 500,000 |
| City of Miami, FL | 600,000 |
| City of Flagler Beach, FL | 750,000 |
| Town of Hambleton and Town of Davis, WV | 450,000 |
| City of Robstown, TX | 500,000 |
| CHRISTUS St. Elizabeth Hospital, Beaumont, TX | 250,000 |
| North Carolina Office of Emergency Management, NC | 165,000 |
| King County, WA | 750,000 |
| Kentucky Emergency Management, KY | 500,000 |
| Drew County, AR | 366,564 |
| City of Los Angeles, CA | 1,000,000 |
| State of Maryland, MD | 1,000,000 |
| City of Burbank, CA | 225,000 |
| Henry County, GA | 275,000 |
| City of Los Angeles, CA | 500,000 |
| McDowell Hospital, NC | 220,000 |
| City of New Braunfels, TX | 500,000 |
| Arkansas State University-Beebe, AR | 452,000 |
| Lorain County, OH | 200,000 |
| City of Davis, CA | 275,000 |
| Mississippi Homeland Security Office, MS | 500,000 |
| City of Rockville, MD | 650,000 |
| City of Hokah, MN | 590,000 |
| City of Miami Beach, FL | 750,000 |
| Jackson Health System, FL | 500,000 |
| Russell County Fiscal Court, KY | 200,000 |
| Ohio University, OH | 200,000 |
| Louisville-Metro Government, KY | 500,000 |

## EMERGENCY FOOD AND SHELTER

| | |
|---|---|
| Appropriation, fiscal year 2009 [1] | $200,000,000 |
| Budget estimate, fiscal year 2010 | 100,000,000 |
| Recommended in the bill | 200,000,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 | – – – |
|     Budget estimate, fiscal year 2010 | +100,000,000 |

[1] Excludes $100,000,000 in appropriations in the American Recovery and Reinvestment Act (P.L. 111–5).

### MISSION

The Emergency Food and Shelter National Board Program was created in 1983 to supplement the work of local social service organizations within the United States, both private and governmental, to help people in need of emergency assistance. The program provides funds to local communities for homeless programs, including soup kitchens, food banks, shelters, and homeless prevention services.

128

## RECOMMENDATION

The Committee recommends $200,000,000 for the Emergency Food and Shelter Program (EFSP), $100,000,000 above the amount requested and the same as the amount provided in fiscal year 2009. Since the recession began in December 2007, the U.S. has lost a net total of 5.7 million jobs. As of April 2009, the nationwide unemployment rate is 8.9 percent—a quarter-century high. Behind these statistics are people who are in need of the very services provided through EFSP. This funding helps local community organizations provide food, shelter, and support services to the nation's hungry, homeless, and people in economic crisis. EFSP uses measures of unemployment and poverty to allocate the funds it receives from FEMA to city and county jurisdictions around the country. Up to 3.5 percent may be used on administrative costs.

## TITLE IV—RESEARCH AND DEVELOPMENT, TRAINING, AND SERVICES

### UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES

| | |
|---|---:|
| Appropriation, fiscal year 2009 ...................................................... | $101,740,000 |
| Budget estimate, fiscal year 2010 .................................................. | 364,000,000 |
| Recommended in the bill ............................................................... | 248,000,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ............................................... | +146,260,000 |
|     Budget estimate, fiscal year 2010 ........................................... | −116,000,000 |

### MISSION

The mission of United States Citizenship and Immigration Services (USCIS) is to process all immigrant and non-immigrant benefits provided to visitors to the United States; adjudicate naturalization requests; promote national security as it relates to immigration issues; eliminate immigration adjudication backlogs; and implement solutions to improve immigration customer services. USCIS also maintains substantial records and data related to the individuals who have applied for immigration benefits.

### RECOMMENDATION

The Committee recommends $248,000,000 in discretionary appropriations for USCIS, $116,000,000 below the requested level and $146,260,000 above the amount provided in 2009. As requested, the Committee provides $25,000,000 to complete REAL ID hub development within the USCIS appropriation, but withholds the funds from obligation until USCIS, in conjunction with the State or States responsible for developing the system, submits an expenditure plan showing how these funds will be utilized. As discussed below, the Committee provides $100,000,000 of the requested $206,000,000 to pay for processing refugee applications and asylum claims. Consistent with recommendations contained throughout this report, the Committee provides no funding for data center migration activities because of the IG's recent findings described in the Chief Information Officer section of the report regarding possible unmitigated risks at the destination data center sites.

129

USER FEE FUNDED PROGRAMS

The budget estimates that USCIS will make $2,503,232,000 in fee-funded expenditures in fiscal year 2010, which assumes the Congress funds the entire discretionary request for processing asylum, refugee, and military naturalization. Revenues from fees paid by persons applying for immigration benefits constitute the majority of USCIS's resources, and support adjudication of applications for immigration benefits and fraud prevention activities.

The Committee is concerned about several aspects of this fee-funded expenditure estimate. Most significantly, USCIS revenues have fallen 6.2 percent below projections for the first six months of fiscal year 2009, and economic and sociological indicators suggest that fee revenue will continue to be below projections well into fiscal year 2010. Based on the Committee's analysis, without operational changes, fiscal year 2010 processing costs may exceed fee collections by at least $100,000,000. While the Committee does not directly control USCIS fee authorities, it believes that the agency should construct its budget based on anticipated revenue, not anticipated cost. Unlike agencies for which Congress determines appropriate resource levels by legislating specific appropriations, USCIS is supposed to balance its operations with the revenues it collects from its customers. As a result, the Committee cannot in good conscience provide USCIS the authority to expend more on its fee-funded operations than would be supported by projected revenue.

The Committee is also troubled that USCIS has not provided the public with a detailed analysis of whether or how it plans to adjust application fees to finance its 2010 expenditure estimates. The March 2009 Congressional Budget Office (CBO) baseline estimate projects 2010 fee collections at $2,511,000,000, which is roughly equivalent to the 2010 budget estimate, even though the CBO projection assumes the current schedule of immigration application charges and does not account for a change in financing the cost to process refugee applications, asylum claims, or military naturalizations. Alternatively, the USCIS budget assumes that no fee collections will be expended to process refugee applications, asylum claims, and military naturalizations, and that other processing costs will increase due to inflationary cost growth, pay raises, and staff annualizations. These conflicting estimating methodologies, combined with a lack of detailed regulatory analysis on the part of USCIS, make it exceptionally difficult for the Committee and the public to understand the revenue outlook for USCIS.

In recognition of these concerns and the general correlation between CBO's March 2009 estimate of USCIS's collections and the fiscal year 2010 budget estimate, the Committee provides for the requested level of fee-funded expenditures with modest adjustments to reflect only partial approval of the requested appropriation for processing asylum, refugee, and military naturalization applications. Pursuant to Section 503 of the bill, USCIS will be required to submit a reprogramming request if it believes that its expenses will be substantially different from what the Committee has provided. In addition, within 60 days of enactment of this bill, the Committee directs USCIS to provide an operating plan for fiscal year 2010 that reflects how CIS activities will be financed for the

130

year under its current schedule of fees, any additional revenue the agency expects to collect if it implements a new schedule of fees, any prior-year balances the agency plans to spend in 2010 to fund operations, and how discretionary appropriations will be used. The following table illustrates for historical purposes CIS's estimates of prior year fee expenditures in the new budget structure the Committee has included in table at the back of this report:

| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| District Operations ...................... | 606,388 | 649,203 | 755,726 | 745,570 | 1,015,722 | 1,041,687 |
| Service Center Operations ............ | 346,025 | 367,941 | 409,057 | 418,213 | 536,397 | 519,334 |
| International Operations .............. | 135,977 | 140,256 | 143,043 | 140,638 | 174,227 | 168,728 |
| Records Operations ...................... | 86,890 | 86,599 | 88,174 | 88,080 | 113,324 | 109,920 |
| Business Transformation .............. | .............. | .............. | .............. | 53,000 | 139,000 | 139,000 |
| National Customer Service Centers ...................................... | 50,997 | 46,000 | 47,000 | 48,000 | 55,600 | 53,747 |
| Information Services ...................... | 101,996 | 92,001 | 94,000 | 95,999 | 112,199 | 114,052 |
| Administration ............................ | 235,727 | 233,000 | 237,000 | 214,500 | 373,899 | 373,899 |
| SAVE ............................................ | .............. | .............. | .............. | .............. | 18,504 | 18,818 |

Within the total fees collected, the Committee directs USCIS to provide no less than $29,000,000 to convert immigration records to digital format, as requested in the budget. No more than $10,000 of the fees collected shall be used for official reception and representation expenses.

### REFUGEE APPLICATIONS, ASYLUM CLAIMS, AND MILITARY NATURALIZATIONS

USCIS does not currently charge application fees to individuals who apply for refugee status or make asylum claims, and likewise processes without charge naturalization applications from active-duty military members. Instead of collecting fees from these individuals, the agency imposes a surcharge on all other immigration applications to pay for these special programs. In its 2007 fee rule, USCIS estimated this surcharge at $40 per application.

The 2010 budget proposes that the cost of processing refugee applications, asylum claims, and military naturalizations be paid by direct appropriations rather than the surcharge on other immigration applications. As a national policy, it may be appropriate for the costs of these programs to be paid from general tax revenues since they support fundamental values of the United States such as freedom from persecution, compassion for the disadvantaged, and gratitude for those who serve our country in the military. However, because the Administration has published no Federal Register notice detailing how discontinuing the surcharge will affect the schedule of fees for other application types, it is impossible for the Committee to evaluate the practicality of the proposal or to comprehend the full impact of a new and large appropriation on agency operations that historically have been funded by fees.

In addition, GAO reported in January 2009 that the methodology used by USCIS to develop its 2007 fee rule included several significant flaws that led to an overstatement of agency processing costs. GAO encouraged USCIS to conduct timely fee reviews to ensure that the agency is making regular efforts to identify and reduce processing costs (GAO reports 09–70 and 09–180). The Committee itself has urged USCIS to make every attempt to lower its costs and application fees so that legal immigration is available to all

131

who seek it. Moreover, the current economic downturn has likely decreased the number of people who can afford to become U.S. citizens. The Committee strongly encourages USCIS to conduct regular reviews of fee rules, as recommended by GAO, and to incorporate equitable processes for fee waivers and other consideration for those who may not possess the financial wherewithal to afford application charges.

Since it will take the Administration at least several months to effectuate a new schedule of immigration application fees, the Committee provides USCIS $100,000,000 in discretionary appropriations to process refugee applications and asylum claims, which is half the requested amount. The Committee provides none of the requested $5,100,000 for military naturalizations, and instead expects USCIS to be reimbursed by the Department of Defense for the foregone revenue associated with military naturalization fee waivers. In order to make sure the public and Congress have an accounting of how this direct appropriation will reduce the amounts USCIS charges immigration applicants, and of how the agency will further adjust fees to address issues raised by GAO, the Committee restricts obligation of the $100,000,000 until the Administration publishes a final rule in the Federal Register implementing a new schedule of fees for immigration applications.

### BASIC PILOT/E-VERIFY

While the Committee provides $112,000,000, as requested, for the Basic Pilot/E-Verify system, it is concerned that USCIS does not have an updated analytical audit for the system. The most recent audit, which is nearly two years old, shows an unacceptably high rate of individuals falsely identified as ineligible to work. Of particular concern is the report's conclusion that nearly 1 in 10 naturalized citizens is reported by Basic Pilot/E-Verify as non-work authorized. While USCIS claims these results have improved as the system's functionality has evolved, new evidence of increased accuracy has been largely anecdotal. The Committee strongly urges USCIS to update and publish regular Basic Pilot/E-Verify accuracy and performance audits, so that Congress and Administration policy makers can remain informed of the system's strengths and weaknesses.

The Committee strongly supports efforts by USCIS to establish a compliance group to monitor use of the Basic Pilot/E-Verify system and to ensure that companies enrolled in the program are not using it to take inappropriate or illegal employment actions. Within the additional funds provided for Basic Pilot/E-Verify in the Bill, USCIS will hire 40 Monitoring and Compliance staff to ensure the system is not used for prohibited purposes.

In the budget, the Administration proposed a 3-year extension of the Basic Pilot/E-Verify program. The Committee has included an extension in the general provisions section of the bill.

### IMMIGRATION INTEGRATION PROGRAMS

An important responsibility for USCIS is the promotion of legal paths to U.S. citizenship and outreach to immigrant communities. Encouraging individuals to seek naturalized citizenship not only helps non-native-born residents better assimilate into their communities, but also affirms our country's policy of welcoming those who

132

chose to become Americans. The Committee notes the unprecedented demand from approximately 700 non-profit and immigrant-serving organizations that filed notices of intent to apply for the $1,200,000 appropriated for immigration integration grants in fiscal year 2009. As a result, the Committee provides $11,000,000 for this program in 2010, $1,000,000 more than requested. These additional funds shall be used by the USCIS Office of Citizenship to hire up to 10 additional staff to support the review, award, and oversight of the grants and other activities related to immigration integration.

### VISA FRAUD

The budget included a request to expand the use of H and L Visa Fraud collections to include fraud investigations in other programs, pursuant to the priorities identified by the Fraud Detection and National Security Division of USCIS. The Committee has included this revision in the general provisions section of the Bill.

### CHANGES TO FEES CHARGED TO TEMPORARY PROTECTED STATUS APPLICANTS

The budget included a request to raise the statutorily-capped $50 application fee for those seeking Temporary Protected Status (TPS), and to clarify that USCIS is permitted to charge TPS applicants for related application services such as fingerprint collection. In the general provisions section of the Bill, the Committee has clarified that USCIS is allowed to charge fees for services related to TPS applications. The Committee has not acted to raise the $50 application charge since Congress has determined in the past that this humanitarian program should be available for a modest fee.

### NATURALIZATION CEREMONIES

The Committee directs USCIS to identify, in the 2011 budget submission, all funds allocated to naturalization and oath of allegiance ceremonies. In addition, the Committee directs USCIS to work with local public and private groups to ensure that naturalization and oath of allegiance ceremonies are held as part of Independence Day celebrations.

## FEDERAL LAW ENFORCEMENT TRAINING CENTER

### SALARIES AND EXPENSES

| | |
|---|---|
| Appropriation, fiscal year 2009 ........................................................ | $246,530,000 |
| Budget estimate, fiscal year 2010 .................................................... | 245,356,000 |
| Recommended in the bill ................................................................. | 239,356,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 .................................................. | −7,174,000 |
|     Budget estimate, fiscal year 2010 .............................................. | −6,000,000 |

### MISSION

The Federal Law Enforcement Training Center (FLETC) provides the necessary facilities, equipment, and support services to conduct advanced, specialized, and refresher training for Federal law enforcement personnel. Specifically, FLETC serves as an interagency law enforcement training organization for over 80 Federal agencies with personnel located throughout the United States and

133

its territories. FLETC also provides services to State, local, and international law enforcement agencies, and on a space available basis, to other Federal agencies with related law enforcement missions.

FLETC is headquartered in Glynco, GA and has facilities in Artesia, NM and Charleston, SC. Each of these facilities is designed primarily for residential training operations. A fourth training facility is located in Cheltenham, MD, and provides in-service and re-qualification training for officers and agents in the Washington, D.C. area.

### RECOMMENDATION

The Committee recommends $239,356,000 for FLETC, $6,000,000 below the amount requested and $7,174,000 below the amount provided in fiscal year 2009. Within the funds provided is $1,309,000 for the Federal Law Enforcement Training Accreditation Board and $4,100,000 for the Train21 program, a business training and transformation initiative to examine the best training and business practices across the Agency. Since 2001, CBP has doubled its number of Border Patrol agents and has begun to slow additional hiring of Border Patrol agents in 2010. Accordingly, the President's budget decreased funding for basic training requirements by $12,512,000. The Committee provides no funding for Data Center Migration activities due to the recent IG report findings regarding possible unmitigated risks at the destination data center sites, as described in the Chief Information Officer section of this report This action is consistent with funding recommendations contained throughout this report.

### ACQUISITION, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

| | |
|---|---|
| Appropriation, fiscal year 2009 ...................................................... | $86,456,000 |
| Budget estimate, fiscal year 2010 ................................................. | 43,456,000 |
| Recommended in the bill .................................................................. | 43,456,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 ............................................... | −43,000,000 |
|     Budget estimate, fiscal year 2010 ........................................... | – – – |

### MISSION

This account provides for the acquisition, construction, improvements, equipment, furnishings, and related costs for expansion and maintenance of facilities of the Federal Law Enforcement Training Center.

### RECOMMENDATION

The Committee recommends $43,456,000 for Acquisition, Construction, Improvements, and Related Expenses, the same as the amount requested and $43,000,000 below the amount provided in fiscal year 2009. The decrease is due to a deletion of one-time costs.

134

## SCIENCE AND TECHNOLOGY

### MANAGEMENT AND ADMINISTRATION

| | |
|---|---:|
| Appropriation, fiscal year 2009 | $132,100,000 |
| Budget estimate, fiscal year 2010 | 142,200,000 |
| Recommended in the bill | 142,200,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 | +10,100,000 |
| Budget estimate, fiscal year 2010 | – – – |

#### MISSION

The Management and Administration (M&A) appropriation provides for the salaries and expenses of Science and Technology (S&T).

#### RECOMMENDATION

The Committee recommends $142,200,000 for Science and Technology Management and Administration, the same amount as requested and $10,100,000 above the amount provided in fiscal year 2009. Within this total, the Committee provides $10,000 for reception and representation costs.

The Committee is pleased with the progress that S&T has made in filling vacant positions within the agency and hopes that S&T can reach a steady-state of employment in fiscal year 2010.

### RESEARCH, DEVELOPMENT, ACQUISITION, AND OPERATIONS

| | |
|---|---:|
| Appropriation, fiscal year 2009 | $800,487,000 |
| Budget estimate, fiscal year 2010 | 826,191,000 |
| Recommended in the bill | 825,356,000 |
| Bill compared with: | |
| Appropriation, fiscal year 2009 | +24,869,000 |
| Budget estimate, fiscal year 2010 | −835,000 |

#### MISSION

The mission of Science and Technology is to develop and deploy technologies and capabilities to secure our homeland. This Directorate conducts, stimulates, and enables research, development, testing, evaluation, and the timely transition of homeland security capabilities to Federal, State, and local operational end-users. This activity includes investments in both evolutionary and revolutionary capabilities with high payoff potential; early deployment of off-the-shelf, proven technologies to provide for initial defense capability; near-term utilization of emerging technologies to counter current terrorist threats; and development of new capabilities to thwart future and emerging threats.

#### RECOMMENDATION

The Committee recommends $825,356,000 for Research, Development, Acquisition, and Operations (RDA&O), $835,000 below the amount requested and $24,869,000 above the amount provided in fiscal year 2009. A comparison of the budget estimate to the Committee recommended level by budget activity is as follows:

| | Budget estimate | Recommended |
|---|---:|---:|
| Border and Maritime Security | $40,181,000 | $40,181,000 |
| Chemical and Biological | 206,800,000 | 221,900,000 |

135

| | Budget estimate | Recommended |
|---|---|---|
| Command, Control and Interoperability | 80,264,000 | 80,764,000 |
| Explosives | 120,809,000 | 120,809,000 |
| Human Factors | 15,087,000 | 16,887,000 |
| Infrastructure and Geophysical | 44,742,000 | 52,093,000 |
| Innovation | 44,000,000 | 44,000,000 |
| Laboratory Facilities | 154,500,000 | 123,188,000 |
| Test and Evaluations/Standards | 28,674,000 | 29,000,000 |
| Transition | 45,134,000 | 46,134,000 |
| University Programs | 46,000,000 | 50,400,000 |
| | 826,191,000 | 825,356,000 |

### BORDER AND MARITIME SECURITY

The Committee recommends $40,181,000 for border and maritime security, the same as the amount requested and $7,131,000 above the amount provided in fiscal year 2009. Included in this amount is $4,000,000 for a pilot to develop a replicable port security system that would improve maritime domain awareness. The Committee denies the Administration's request for additional funding for basic research in border and maritime security. The Committee continues to believe that funding for basic research on new maritime technologies is better conducted within the Coast Guard's Research, Development, Test, and Evaluation account. The Committee recognizes that it is in S&T's mission to provide science and technology management to all components of DHS, and encourages S&T to maintain a working relationship with the Coast Guard despite this denial of funds.

The Committee continues to believe that a viable container security device (CSD) is an essential tool within an effective cargo supply chain security regime. The Committee is disappointed that it has taken so long to produce a viable container security device. The Committee maintains its interest in both the container security device, and the advanced container security device as possible solutions, and is eager to see progress from S&T on both of those efforts, as well as the mobile asset tag tracking system and the hybrid-composite container project. S&T is directed to continue its quarterly updates on its efforts to explore a viable CSD solution.

### CHEMICAL AND BIOLOGICAL

The Committee recommends $221,900,000 for chemical and biological, $15,100,000 above the amount requested, and $21,492,000 above the amount provided in fiscal year 2009. The Committee approves the additional funding requested to enable DHS to provide the basic research needed to help secure food and agricultural sectors from potential security threats in support of Homeland Security Presidential Directive 9.

### BIOWATCH

As previously discussed under the Office of Health Affairs, the Committee is frustrated with the slow development and testing of the next generation BioWatch program. It appears that since this program was transferred from S&T to OHA two years ago, development and testing efforts have fallen significantly behind where S&T planned to be at this time, largely because OHA decided to instead focus on an alternative technology that has since been de-

136

activated. As a result, $15,100,000 is included within S&T's Chemical and Biological program to resume developmental testing of the BioWatch Generation 3 systems. In addition, S&T shall assume control of all activities related to Generation 3, and shall enter into a Memorandum of Understanding with OHA so that any monies provided to OHA in fiscal year 2009 shall be utilized by S&T for the originally intended purpose of Generation 3 testing.

The Committee recognizes a troubling lack of coordination across the federal government with regards to development of the BioWatch program. Therefore, S&T is directed to coordinate with the Department of Health and Human Services, specifically the Centers for Disease Control and Prevention (CDC), in developing assays for use in any BioWatch system. Additionally, CDC shall approve any assays developed for a final Generation 3 system.

### COMMAND, CONTROL, AND INTEROPERABILITY

The Committee recommends $80,764,000 for command, control, and interoperability, $500,000 above the amount requested and $5,874,000 above the amount provided in fiscal year 2009. Included in this amount is $500,000 for a demonstration project to develop situational awareness and decision support capabilities through remote sensing technologies. Within the funds provided, the Committee includes $19,498,000 to invest in next generation technologies to improve cyber security and $2,000,000, as requested, for S&T to continue its web-distributed environment for critical infrastructure decision making exercises.

### FIRST RESPONDER COMMUNICATIONS EQUIPMENT STANDARDS

Federal funding for first responder communications equipment shall comply with common system standards for public safety communications (voice and data), as appropriate, to ensure interoperability. Where programs exist, standards-based equipment must be assessed for compliance to existing standards. This includes, but is not limited to, the Project 25 Compliance Assessment Program for P25 products and the National Incident Management System Supporting Technology Evaluation Program for Emergency Data Exchange Language products. The Office for Interoperability and Compatibility, in conjunction with the Director of the National Institute of Standards and Technology, shall continue assessing the compliance of first responder communications equipment, and shall establish additional compliance assessment programs for emerging technology as necessary.

### EXPLOSIVES

The Committee recommends $120,809,000 for explosives, the same as the amount requested and $24,660,000 above the amount provided in fiscal year 2009. Within the amount provided, $5,000,000 is to improve detection capabilities of improvised explosive devices (IEDs) specifically in non-aviation, mass transit settings. The Committee eagerly awaits the development of new technologies that can preemptively detect, effectively mitigate, and defeat IEDs.

Over the past two years, the explosives program has received strong support from this Committee, as reflected in a 56 percent

137

growth in funding (+$43,155,000). In light of this large investment, S&T is encouraged to accelerate its efforts to achieve results in the nearer term, specifically within the next one or two years, and is directed to brief the Committee no later than January 15, 2010 on the status of new technologies and research within the explosives program.

### HUMAN FACTORS

The Committee recommends $16,887,000 for human factors, $1,800,000 above the request and $4,427,000 above the amount provided in fiscal year 2009. Within this total, $4,000,000 is for the biometrics program in the Personal Identification Thrust Area of S&T, $1,200,000 above the request; and $1,000,000 is for the credentialing program, $600,000 above the request. Advanced capabilities in the field of biometrics would have positive effects across all DHS components, and the Committee provides a corresponding investment in order to develop new techniques as well as improve flexibility of biometric apparatus and the overall capability of biometric detectors, screening capabilities, and credentialing.

### INFRASTRUCTURE AND GEOPHYSICAL

The Committee recommends $52,093,000 for infrastructure and geophysical, $7,351,000 above the amount requested and $23,723,000 below the amount provided in fiscal year 2009. Included within these funds is $10,000,000 for the National Institute for Hometown Security to support existing work in research, development and application of technology for community-based critical infrastructure protection. The Committee includes $5,979,000, as requested, for continued development of emergency responder tracking, monitoring and rescue systems. Such systems would permit incident commanders to wirelessly locate, track, and monitor individual first responders throughout multi-story structures in real-time.

### NEW TECHNOLOGIES

New technologies may significantly help the Department as it seeks to secure our homeland. The Committee encourages S&T to assess technologies and evaluate research opportunities in areas such as energy and sensor informatics; rural community resiliency to disaster; large scale high wind infrastructure resistance testing; 3D simulation environment technologies to help first responders with coordination and planning; large-scale graph analytic technologies; energetic materials and the structure and behavior of explosives; and threat analysis techniques to better understand and predict potential terrorist behavior.

### MULTI-FUNCTION PHASED ARRAY RADARS

The Committee notes that S&T has been engaged with a working group on the development of a Multi-Function Phased Array Radar that includes the Department of Defense, the National Oceanic and Atmospheric Administration, and the Federal Aviation Administration. The Committee encourages S&T to continue its involvement with this working group and to contribute to the development of

138

this technology if it is determined to provide clear advantages to DHS components.

## LABORATORY FACILITIES

The Committee recommends $123,188,000 for laboratory facilities, $31,312,000 below the amount requested, and $38,752,000 below the amount provided in fiscal year 2009. Included in the amount provided for laboratory facilities is $12,000,000 for ongoing construction at Area 300 of the Pacific Northwest National Laboratory (PNNL). This will fully fund the last year of DHS's obligations to PNNL pursuant to the multi-agency memorandum of understanding.

The Committee recommends no funding for construction of the National Bio and Agro defense Facility (NBAF), instead of the $36,312,000 requested. In January 2009, DHS published an Environmental Impact Statement which detailed the site selection process, including a risk assessment for the proposed NBAF site. A recent GAO review has found the design and execution of that study to be seriously flawed, specifically as it relates to the risk of researching Foot-and-Mouth Disease (FMD) on the U.S. mainland. Therefore, the Committee cannot currently support construction of the NBAF as proposed.

The bill contains language that continues to prohibit obligation of funds for NBAF design and construction until a third party risk analysis is completed to determine whether FMD research can be done safely on the U.S. mainland. The Committee provides $5,000,000 for DHS to contract with a third party to conduct and complete another risk assessment before any funding can be obligated. The Committee expects that such third party should have the appropriate expertise to conduct an in-depth analysis of whether FMD work can be done safely on the mainland, should have access to validated plume modeling capabilities, and should have experience with or could contract for experts who have worked with FMD.

## BIOLOGICAL SURETY

With the increased use of and need to manage biological select agents and toxins at DHS laboratories, the Committee recognizes the need for a reliable and consistent method for maintaining biological surety. The Committee recommends that DHS develop a Department-wide bio-surety policy and program to be implemented across all DHS laboratories. S&T is directed to brief the Committee, no later than January 15, 2010, on the development and implementation of such a plan.

## TEST AND EVALUATIONS/STANDARDS

The Committee recommends $29,000,000 for Test and Evaluations/Standards, $326,000 above the budget request and the amount provided in fiscal year 2009. Included within this funding is $5,000,000 to continue work supporting the first responder community through objective assessments and validations of emergency responder equipment. This initiative provides valuable information to decision-makers in the selection, procurement, use and maintenance of equipment available to the first responder commu-

139

nity including urban search and rescue, law enforcement, fire services, and hazardous material response. The Committee believes this to be a cost- and time-saving asset to federal, State and local emergency responders.

## TRANSITION

The Committee recommends $46,134,000 for transition, $1,000,000 above the budget request and $17,304,000 above the amount provided in fiscal year 2009. Included in the funds provided is $2,000,000, the same as requested, for DHS to continue its work with the Naval Postgraduate School regarding field experiments for first responder technologies. The Committee is aware of numerous challenges confronting industry in keeping up with the growing demand for critical homeland security equipment, and the fact that such challenges have contributed to expenditure delays in State and local first responder funding. Therefore, within the funds provided is $1,000,000 to continue a pilot program to identify, research, develop and transition advanced technologies and manufacturing processes that would achieve significant productivity and efficiency gains in the homeland security industrial base.

## UNIVERSITY PROGRAMS

The Committee recommends $50,400,000 for university programs, $4,400,000 above the amount requested and $130,000 above the amount provided in fiscal year 2009. Within this funding level, a total of $39,380,000 has been provided for the Centers of Excellence, $4,400,000 above the budget request.

The Committee is concerned that the office of university programs continues to request inadequate funding to support the research missions of its Centers of Excellence. The Committee notes that in each of the last three years, the budget either proposed reductions in funding for previously established Centers in order to establish new Centers and/or reductions to overall program funding. This seriously undermines the ability of the Centers to contribute to the research mission of the Department and the protection of the homeland.

Within the recommended level for university programs is $3,870,000 for minority serving institutions, as requested. S&T should continue to explore ways to prepare minority youths for careers in homeland security by promoting skills and educational curriculum in this field.

## UNOBLIGATED BALANCES

The Committee is pleased that S&T has been making progress in reducing high unexpended obligations throughout its RDA&O account. The increased level of detail that S&T uses to track both its obligations and expenditures is encouraging, and should continue as a means of both efficiency and oversight to better track S&T funds. Furthermore, the Committee is pleased with the efforts that S&T has made to recover and realign funds that have lain dormant due to expired programs, or lack of expenditure. S&T is directed to continue briefing the Committee on the results of its quarterly validation and verification reviews, report the amount

140

available to de-obligate, and identify how S&T plans to use these funds.

## DOMESTIC NUCLEAR DETECTION OFFICE

### MANAGEMENT AND ADMINISTRATION

| | |
|---|---|
| Appropriation, fiscal year 2009 ..................................................... | $37,500,000 |
| Budget estimate, fiscal year 2010 ................................................. | 39,599,000 |
| Recommended in the bill .............................................................. | 39,599,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 .............................................. | +2,099,000 |
|     Budget estimate, fiscal year 2010 ........................................... | – – – |

### MISSION

The Management and Administration (M&A) appropriation provides for the salaries and expenses of Domestic Nuclear Detection Office (DNDO) employees. This is a jointly-staffed office that consists of both federal employees and interagency detailees.

### RECOMMENDATION

The Committee recommends $39,599,000 for Management and Administration, the amount requested and $2,099,000 above the amount provided in fiscal year 2009. The Committee funds the full request for 130 FTE positions. Although DNDO currently has 16 vacancies, it has identified candidates for those positions who are either awaiting clearance or in the hiring process at this time. The Committee encourages the Department to expedite the background investigations and related clearance process to fill these positions as soon as possible.

### RESEARCH, DEVELOPMENT, AND OPERATIONS

| | |
|---|---|
| Appropriation, fiscal year 2009 ..................................................... | $323,200,000 |
| Budget estimate, fiscal year 2010 ................................................. | 326,537,000 |
| Recommended in the bill .............................................................. | 326,537,000 |
| Bill compared with: | |
|     Appropriation, fiscal year 2009 .............................................. | +3,337,000 |
|     Budget estimate, fiscal year 2010 ........................................... | – – – |

### MISSION

The Research, Development and Operations appropriation funds all DHS nuclear detection research, development, test, evaluation and operational support activities. DNDO has developed a global nuclear detection architecture (GNDA) that the Federal government will use to detect and report attempts to import or transport a nuclear device or fissile or radiological material intended for illicit use. DNDO is continuing to improve the domestic portion of this architecture through an integrated research, development, test, and evaluation program, while providing support to current operations.

### RECOMMENDATION

The Committee recommends $326,537,000 for Research, Development, and Operations, the amount requested, and $3,337,000 above the amount provided in fiscal year 2009. A comparison of the budget estimate to the Committee recommended level by budget activity is as follows:

Case 1:18-cv-00068 Document 204-4 Filed on 07/21/18 in TXSD Page 357 of 456



| | Budget estimate | Recommended |
|---|---|---|
| Systems Engineering and Architecture | $25,448,000 | $25,448,000 |
| Systems Development | 100,000,000 | 100,000,000 |
| Transformational Research and Development | 110,537,000 | 110,537,000 |
| Assessments | 32,416,000 | 32,416,000 |
| Operational Support | 38,436,000 | 38,436,000 |
| National Technical Nuclear Forensics Center | 19,700,000 | 19,700,000 |
| Total | 326,537,000 | 326,537,000 |

DEFINING AND RESPONDING TO FUTURE THREATS

While DNDO has been heavily engaged in acquiring and deploying radiation detection technology to scan cargo for radioactive and nuclear materials at ports of entry, it has moved to fulfill more broadly its preventive radiation/nuclear detection (PRND) mission. DNDO plans for and designs architecture for nuclear detection, and supports pilot studies and assessments of new technologies to reduce vulnerabilities from aircraft, both commercial and general aviation; small vessels and other potential risk in the maritime environment; land border threats, including rail and in areas beyond ports of entry; and to threats in urban areas and critical locations in the nation's interior. DNDO is also guiding and implementing strategies for the GNDA, both at home and internationally. In addition to cross-cutting research and development work, DNDO has adopted an approach to align systems development work to four principal mission areas: the maritime domain, aviation, land borders, and the interior. The Committee directs DNDO to continue quarterly briefings to the Committees on Appropriations on its progress designing architecture to underpin technology research and applications; the status of such technologies, with their strengths and weaknesses; and timetables to develop and deploy such technologies.

SYSTEMS DEVELOPMENT

The Committee includes $100,000,000, as requested, for Systems Development. Within this, the Committee provides $43,000,000 for mission-directed efforts, including $18,000,000 for maritime projects such as maritime standoff detection, on-dock rail detection, and architecture for other challenging maritime environments, including inland waterways, the Great Lakes, and non-container modes of commercial shipping. The Committee believes it is important to continue the advancement of next generation technology that will address the vulnerability gaps that exist in rail cargo and transshipment without interruptions to productivity at the port. The Committee understands work towards solutions for on-dock rail detection will proceed in 2010 to further testing of straddle portal prototypes and mobile radiation detection systems. The Committee also urges DNDO to consider additional testing of spreader bar configurations for monitors, including by demonstrating this technology in a port environment, as it understands that there have been significant improvements in the capability of such systems since prototypes were tested in 2008. The Committee encourages this work to proceed apace, and notes that the experience gained in managing testing at the Tacoma test site and various national laboratory sites should facilitate the ability of DNDO to ini-

142

tiate and carry out tests of promising systems and technologies in the cargo environment.

### CARGO ADVANCED AUTOMATED RADIOGRAPHY SYSTEM AND THE JOINT INTEGRATED NON INTRUSIVE INSPECTION

Among several major systems development efforts, the Cargo Advanced Automated Radiography System and the Joint Integrated Non Intrusive Inspection program are scheduled to move into test and evaluation of prototypes, including cost/benefit analyses, and broad area announcements to manufacturers for the production of prototype systems, with the potential award of contracts for such work in fiscal year 2010. The Committee encourages DNDO to meet these test and evaluation objectives, and includes $29,000,000, as requested, for this effort. The Committee expects to receive information about the status of this endeavor as part of quarterly project update briefings.

### RED TEAM EXERCISES AND ASSESSMENTS

Within the assessments budget, $10,000,000 is provided as requested for red teaming and net assessments. The Committee expects this will support red teaming through covert and overt exercises, including key initiatives such as the West Coast Maritime pilot. The Committee directs DNDO to continue providing quarterly reports on exercises and assessments, including vulnerabilities identified and recommendations for addressing such vulnerabilities.

### NATIONAL TECHNICAL NUCLEAR FORENSICS

The Committee includes $19,700,000 as requested for the National Technical Nuclear Forensics Center. Collection, analysis, evaluation and interpretation of pre- and post-detonation evidence are critical to enable accurate attribution for such an incident and to enhance deterrence against an event. DHS and DNDO play a critical role in this mission by integrating the federal government effort across domestic and international activities, as well as through law enforcement, regulatory, defense, and intelligence communities. The Committee supports technical improvements in the ability to identify and track materials, and encourages joint demonstrations to test forensic capabilities. In addition, the Committee supports the initiative to expand the development program by increasing the number of graduate and post-doctoral fellowships and enhancing recruitment from academia.

In addition, the Committee includes $3,000,000 as requested under System Development to expand and demonstrate new tools for Nuclear Forensics pattern analysis and predictive modeling, including the Knowledge Management and Assessment System. The Committee directs DNDO to report, along with its fiscal year 2011 budget submission, on its progress in employing this system.

The Committee understands that DNDO, along with the Defense and Energy Departments, is sponsoring a study through the National Academies on sustaining and improving the nation's nuclear forensics capabilities that is expected to be completed in 2009. The results of this study should be shared with the Committee.

143

### HUMAN PORTABLE RADIATION DETECTION SYSTEMS (HPRDS)

The Human Portable Radiation Detection Systems (HPRDS) systems development effort is funded, as requested, at $12,000,000. The Committee strongly supports the effort to develop handheld and backpack systems, including tripwire and wide area search programs. The Committee understands this funding will support operational testing for handheld systems, including production of a new technology for advanced operations. The Committee directs DNDO to report on this effort as part of quarterly update briefings provided to the Committees on Appropriations.

### TRANSFORMATIONAL RESEARCH AND DEVELOPMENT

The Committee is extremely interested in research to find alternatives to existing detection materials and systems, including scintillators and semiconductors that might result in smaller, more reliable, and more accurate radiation and nuclear detection devices. In addition, the Committee strongly supports DNDO efforts to accelerate development of alternatives to neutron detectors that are based on Helium–3, and directs DNDO to report on its progress in this area with its 2011 budget submission.

### SYSTEM ACQUISITION

### RADIATION PORTAL MONITOR PROGRAM

The Committee agrees with the Department's decision to request no new funding for the advanced spectroscopic portal (ASP) systems in fiscal year 2010. DNDO has informed the Committee to expect Secretarial certification of the ASP systems—originally promised for 2008—to be completed by first quarter of fiscal year 2010, and that prior year funding balances will be sufficient for 2010 acquisition and deployment. The Committee continues bill language prohibiting full scale procurement of ASP systems until the Secretary has certified and reported to the Committees that a significant increase in operational effectiveness merits such a decision. Separate and distinct certification must be made for primary and secondary deployments. Should certification not occur or be further delayed, the Committee expects the Department to submit a reprogramming proposal, to include additional procurement of polyvinyl toluene (PVT) monitors, if requirements remain.

The Committee underscores that it wants the Department to make the best possible decision about future portal monitor solutions, with no rush to judgment, and so urges the Department to ensure certification decisions are based on adequate test information, to include appropriate use of modeling, and robust cost-benefit analysis. To the extent existing low rate initial production ASP systems (improved as necessary and feasible) can be deployed in operational environments to generate data to inform this decision, the Committee encourages DNDO to work with CBP to undertake such deployments.

Should this funding be used for ASP procurement in fiscal year 2010, the Committee will regard it as base funding for purposes of comparison against any additional funding considered in fiscal year 2011.

144

SECURING THE CITIES

The request includes no funding for further development or acquisition costs associated with the Securing the Cities (STC) pilot program. The Committee agrees with this decision, as the activity undertaken by DNDO—structured as a three-year pilot test of an approach to urban detection systems—has run its course for that purpose. The Committee does not disagree with advocates for continued funding of the program who point to the distinct improvements STC has brought to cooperative efforts to detect and defend against nuclear and radiological threats in the greater New York City area, one of the most critical and potentially vulnerable urban complexes in the world.

However, the scope of the work within DNDO was for a test, and the testing stage is completed. By the end of fiscal year 2009, DNDO will have deployed over 4,000 personal radiation detectors, 50 radioisotope identifiers with associated communications and computer support, 100 backpack detectors, and 30 mobile detection systems, along with associated training. The issue at this point is whether this should continue as an operational program. DNDO has indicated, properly, that it plans to take the results of the pilot program and incorporate them into development of the next version of architecture and systems that could be applied to these efforts, to include examining the possibility of pilot efforts in other urban centers. It has also made the argument, and the Committee agrees, that DNDO's mission is not to manage ongoing, operational regional PRND programs.

The Committee believes that a decision to continue STC is the responsibility of the greater New York City community, to include whether and how to apply homeland security grants to the costs of continuing operations. In November 2008 the Department issued guidance to State, local, and tribal governments on the potential application of Homeland Security Grant Program funding for planning, equipment, training and exercise support. In addition, the Committee understands that DNDO will continue to provide technical guidance and other informational support on a 24/7 basis. The Committee supports this potential use of grant funding, as ongoing acquisition and operations costs for STC should properly be borne by the regional governments using the system. DNDO, which has been assigned the mission to design and test technologies, should be permitted to build on its STC experience in developing yet more advanced and effective PRND architecture and systems, including ones that New York may benefit from in the future.

TITLE V—GENERAL PROVISIONS—THIS ACT

Section 501. The Committee continues a provision providing that no part of any appropriation shall remain available for obligation beyond the current year unless expressly provided.

Section 502. The Committee continues a provision providing that unexpended balances of prior appropriations may be merged with new appropriation accounts and used for the same purpose, subject to reprogramming guidelines.

Section 503. The Committee continues and modifies a provision providing reprogramming authority for funds within an account and not to exceed 5 percent transfer authority between appropria-

tions accounts with the requirement for a 15-day advance Congressional notification. A detailed funding table identifying each Congressional control level for reprogramming purposes is included at the end of this Report. These reprogramming guidelines shall be complied with by all agencies funded by the Department of Homeland Security Appropriations Act, 2010.

The Department shall submit reprogramming requests on a timely basis and provide complete explanations of the reallocations proposed, including detailed justifications of the increases and offsets, and any specific impact the proposed changes will have on the budget request for the following fiscal year and future-year appropriations requirements. Each request submitted to the Committees on Appropriations should include a detailed table showing the proposed revisions at the account, program, project, and activity level to the funding and staffing (full-time equivalent position) levels for the current fiscal year and to the levels requested in the President's budget for the following fiscal year.

The Department shall manage its programs and activities within the levels appropriated. The Department should only submit reprogramming or transfer requests in the case of an unforeseeable emergency or situation that could not have been predicted when formulating the budget request for the current fiscal year. When the Department submits a reprogramming or transfer request to the Committees on Appropriations and does not receive identical responses from the House and Senate, it is the responsibility of the Department to reconcile the House and Senate differences before proceeding, and if reconciliation is not possible, to consider the reprogramming or transfer request unapproved.

The Department is not to submit a reprogramming or transfer of funds after June 30 except in extraordinary circumstances that imminently threaten human life or the protection of property. If a reprogramming or transfer is needed after June 30, the notice should contain sufficient documentation as to why it meets this statutory exception.

Section 504. The Committee continues a provision that prohibits funds appropriated or otherwise made available to the Department to make payment to the Department's Working Capital Fund (WCF), except for activities and amounts allowed in the President's fiscal year 2010. Funds provided to the WCF are available until expended. The Department can only charge components for direct usage of the WCF and these funds may be used only for the purposes consistent with the contributing component. Any funds paid in advance or reimbursed must reflect the full cost of each service. The WCF shall be subject to the requirements of section 503 of this Act.

Section 505. The Committee continues a provision providing that not to exceed 50 percent of unobligated balances remaining at the end of fiscal year 2010 from appropriations made for salaries and expenses shall remain available through fiscal year 2011 subject to reprogramming guidelines.

Section 506. The Committee continues a provision providing that funds for intelligence activities are deemed to be specifically authorized during fiscal year 2010 until the enactment of an Act authorizing intelligence activities for fiscal year 2010.

146

Section 507. The Committee continues and modifies a provision requiring notification of the Committees on Appropriations three days before grant allocations, grant awards, contract awards, letters of intent, or other transactional agreements totaling $1,000,000 or more are announced by the Department. The Department is required to brief the Committees on Appropriations five full day business days prior to announcing the intention to make a grant under State and Local Programs. Notification shall include a description of the project or projects to be funded, including city, county and state.

Section 508. The Committee continues a provision providing that no agency shall purchase, construct, or lease additional facilities for federal law enforcement training without advance approval of the Committees on Appropriations.

Section 509. The Committee continues a provision providing that none of the funds may be used for any construction, repair, alteration, and acquisition project for which a prospectus, if required under chapter 33 of title 40, United States Code, has not been approved.

Section 510. The bill continues a provision that consolidates by reference prior year statutory bill language into one provision. These provisions relate to reporting requirements of the privacy officer; contracting officer's technical representative training; sensitive security information; federal building performance and requirements outlined in title V of the National Energy Conservation Policy Act or subtitle A of title I of the Energy Policy Act of 2005; use of funds in conformance with section 303 of the Energy Policy Act of 1992; and Executive Order 13149 relating to fleet and transportation efficiency.

Section 511. The Committee continues a provision that none of the funds may be used in contravention of the Buy American Act.

Section 512. The Committee continues a provision regarding competitive sourcing.

Section 513. The Committee continues and modifies a provision directing TSA to research, develop, and procure new technologies to inspect and screen air cargo. In the interim, TSA shall utilize existing checked baggage explosive detection equipment and screeners to screen cargo on passenger aircraft when practicable. TSA shall work with air carriers and airports to ensure the screening of cargo carried on passenger aircraft, as required by the 9/11 Act, increases incrementally each quarter. TSA shall take all possible measures to ensure air carriers are submitting data consistent with current security directives, including enforcement actions for non-compliance. TSA is required to report air cargo inspection statistics detailing how incremental progress is being made to the Committees within 45 days of the end of each quarter of the fiscal year. Finally, TSA shall submit a report on how they plan to meet the 100 percent mandate contained in the 9/11 Act.

Section 514. The Committee continues a provision that directs that any funds appropriated or transferred to TSA "Aviation Security", "Administration", and "Transportation Security Support" in fiscal years 2004, 2005, 2006, and 2007, which are recovered or deobligated, shall be available only for procurement and installation of explosive detection systems for air cargo, baggage and checkpoint screening systems, subject to section notification. The

147

Committee also requires quarterly reports on recovered or deobligated funds.

Section 515. The Committee continues a provision requiring any funds appropriated to the Coast Guard's 110–123 foot patrol boat conversion that are recovered, collected, or otherwise received as a result of negotiation, mediation, or litigation, shall be available until expended for the Fast Response Cutter program.

Section 516. The Committee continues a provision requiring the Chief Financial Officer to submit monthly budget execution and staffing reports within 45 days after the close of each month.

Section 517. The Committee continues a provision relating to undercover investigative operations authority of the Secret Service for fiscal year 2010.

Section 518. The Committee continues and modifies a provision classifying the functions of the instructor staff at the Federal Law Enforcement Training Center as inherently governmental for purposes of the of the Federal Activities Inventory Reform Act.

Section 519. The bill continues a provision pertaining to the human resource management system.

Section 520. The Committee continues a provision regarding the enforcement of section 4025(1) of Public Law 108–458.

Section 521. The Committee continues a provision prohibiting the Secretary of Homeland Secretary from reducing operations within the Coast Guard's civil engineering program except as specifically authorized in statute after enactment of this Act.

Section 522. The Committee continues a provision prohibiting the obligation of funds to the Office of the Secretary and Executive Management, the Office of the Under Secretary for Management, and the Office of the Chief Financial Officer for grants or contracts awarded by any means other than full and open competition. Certain exceptions apply, and this provision does not require new competitions of existing contracts during their current terms. The bill also requires the IG to review Departmental contracts awarded noncompetitively and report on the results to the Committees.

Section 523. The Committee continues a provision that prohibits funding for any position designated as a Principal Federal Official (PFO) during a Stafford Act declared disaster or emergency.

This prohibition shall apply to any PFO, successors to that position, and any similar position created by the Department. The Committee is concerned that the Department has not defined a clear role for a PFO and that the position conflicts with the Federal Coordinating Official's (FCO) role during Presidentially-declared disasters and emergencies. States and emergency management organizations have also expressed concern that use of both an FCO and PFO leads to confusion in the field following disasters and undermines FEMA's emergency management role. The Committee understands there may be instances in which FEMA should not be the lead agency in charge of response, such as pandemic outbreak or an Olympic event, and therefore limits the prohibition to Presidentially-declared disasters or emergencies that require Stafford Act assistance. The Department must work with all homeland security partners to achieve common understanding regarding incident management.

Section 524. The Committee continues a provision prohibiting funding to grant an immigration benefit to any individual unless

148

the results of background checks required in statute to be completed prior to the grant of the benefit have been received by DHS.

Section 525. The Committee continues a provision prohibiting use of funds to destroy or put out to pasture any horse or other equine belonging to the Federal government unless adoption has been offered first to its trainer or handler.

Section 526. The Committee continues a provision that precludes the Secretary from using funds in this Act to carry out unilateral reorganization of the Department.

Section 527. The Committee continues a provision prohibiting funds to be used to conduct or implement the results of a competition under Office of Management and Budget Circular A–76 with respect to the Coast Guard National Vessel Documentation Center.

Section 528. The Committee continues a provision that requires the Secretary to link all contracts that provide award fees to successful acquisition outcomes.

Section 529. The Committee continues a provision prohibiting the obligation of funds for the Office of Secretary and Executive Management for any new hires at DHS if they are not verified through the basic pilot program (E-Verify).

Section 530. The Committee continues a provision related to prescription drugs.

Section 531. The Committee continues a provision prohibiting funds available in this Act from being used to implement a rule or regulation which implements the notice of proposed rulemaking related to Petitions for Aliens to Perform Temporary Nonagricultural Services or Labor (H–2B) set out beginning on 70 Federal Register 3984 (January 27, 2005).

Section 532. The Committee continues and modifies a provision relating to other transactional authority of the DHS through fiscal year 2010. Language continues to require the Secretary to issue policy guidance detailing the appropriate use of other transactional authority and provide training to each employee that has authority to handle procurements under this authority. The Secretary shall report on projects for which this authority was used.

Section 533. The Committee continues a provision prohibiting funds for planning, testing, piloting or developing a national identification card.

Section 534. The Committee continues a provision that requires a report summarizing damage assessment information used to determine whether to declare a major disaster.

Section 535. The Committee continues and modifies a provision relating to the liquidation of Plum Island assets and how the proceeds from this sale may be applied to construction costs of the new National Bio and Agro-defense Facility.

Section 536. The Committee continues a provision directing that any official required by this Act to report or certify to the Committees on Appropriation may not delegate any authority unless expressly authorized to do so in this Act.

Section 537. The Committee continues a provision requiring the Secretary of Homeland Security, in conjunction with the Secretary of the Treasury, to notify the Committees of any proposed transfers from the Department of Treasury Forfeiture Fund to any agency within the Department of Homeland Security. No funds may be obligated until the Subcommittees approve the proposed transfers.

149

Section 538. The Committee continues a provision requiring the Assistant Secretary of Homeland Security (Transportation Security Administration) to certify that no security risks will result if an airport does not participate in the basic pilot program.

Section 539. The Committee rescinds $2,203,000 from the unobligated balances of prior year appropriations made available for "Analysis and Operations".

Section 540. The Committee includes a new provision on fiscal year 2008 predisaster mitigation grants.

Section 541. The Committee continues and modifies a provision extending the authority of the Predisaster Mitigation Fund until September 30, 2010.

Section 542. The Committee rescinds $5,963,000 from unobligated balances of prior year appropriations made available to Infrastructure Protection and Information Security.

Section 543. The Committee includes a new provision permitting unobligated amounts of appropriations made available to the Coast Guard in fiscal years 2008 and 2009 for Sector Buffalo to be used to make improvements to the land for public access to Buffalo Lighthouse.

Section 544. The Committee includes a new provision that permits the Secretary to extend certain travel benefits and reimbursements for those overseas personnel consistent with the Foreign Service Act of 1980.

Section 545. The Committee continues a provision that extends E-Verify until September 30, 2011, ensures the protection of Social Security benefits and requires two GAO studies.

Section 546. The Committee includes a new provision on the use of H and L visa fraud prevention and detection fees.

Section 547. The Committee includes a new provision clarifying the Temporary Protected Status fee.

Section 548. The Committee includes a new provision that extends the date of the chemical security program.

Section 549. The Committee includes a new provision that permits the Department to collect fees from non-Federal participants in a conference, seminar, exhibition, symposium, or similar meeting and those fees will be credited to the costs of the conference, seminar, exhibition, symposium, or meeting. Any excess fees will be deposited into the treasury as miscellaneous receipts.

Section 550. The Committee rescinds $5,572,000 from unobligated balances of fiscal year 2009 appropriations made available to Federal Emergency Management Agency "Trucking Industry Security Grants".

Section 551. The Committee continues a provision that prohibits full scale procurement of ASPs until the Secretary certifies and reports that they are operationally more effective. Separate certifications are required for primary and secondary screening.

Section 552. The Committee includes a new provision that requires an individualized threat assessment of each and every individual detained at Naval Station Guantanamo Bay, Cuba, as of April 30, 2009; inclusion of the names of such detainees on the No Fly List; and a limitation on funds from being used to grant an immigration benefit to such detainees, except for the purposes of prosecution.

150

APPROPRIATIONS CAN BE USED ONLY FOR THE PURPOSES FOR WHICH MADE

Title 31 of the United States Code makes clear that appropriations can be used only for the purposes for which they were appropriated as follows:

Section 1301. Application.

(a) Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.

HOUSE OF REPRESENTATIVES REPORT REQUIREMENTS

The following items are included in accordance with various requirements of the Rules of the House of Representatives.

TRANSFER OF FUNDS

Pursuant to clause 3(f)(2), rule XIII of the Rules of the House of Representatives, the following is submitted describing the transfer of funds provided in the accompanying bill.

The table shows, by title, department and agency, the appropriations affected by such transfers:

APPROPRIATION TRANSFERS RECOMMENDED IN THE BILL

| Account to which transfer is to be made | Amount | Account from which transfer is to be made | Amount |
|---|---|---|---|
| Office of Inspector General ......................... | 16,000,000 | Disaster Relief Fund ...................................... | 16,000,000 |
| FEMA, Management and Administration ...... | 90,080,000 | Disaster Relief Fund ...................................... | 90,080,000 |

RESCISSION OF FUNDS

Pursuant to clause 3(f)(2) of rule XIII of the Rules of the House of Representatives, the following table is submitted describing the rescissions recommended in the accompanying bill:

| Account/Activity | Rescissions |
|---|---|
| Analysis and Operations ................................................................................. | $2,203,000 |
| Infrastructure Protection and Information Security ..................................... | $5,963,000 |
| State and Local Programs/Trucking Industry Security Grants ................... | $5,572,000 |

APPROPRIATIONS NOT AUTHORIZED BY LAW

Pursuant to clause 3(f)(1)(B) of rule XIII of the Rules of the House of Representatives, the following table lists the appropriations in the accompanying bill that are not authorized by law:

151

## Department of Homeland Security
### Schedule of Unauthorized Appropriations
#### (Dollars in thousands)

| Agency/Program | Last Year of Authorization | Authorized Level | Appropriation in Last Year of Authorization | Appropriations in this Bill |
|---|---|---|---|---|
| Office of the Federal Coordinator for Gulf Coast Rebuilding[1] | NA | NA | NA | $2,000 |
| Customs and Border Protection, Salaries and Expenses | 2003 | $2,739,695[2] | $3,195,094[3] | $7,576,897 |
| Customs and Border Protection, Salaries and Expenses | 2002[4] | Such sums | $730,710 | $7,576,897 |
| Customs and Border Protection, Salaries and Expenses | 2004[5] | $1,399,592 | | $7,576,897 |
| Customs and Border Protection, Salaries and Expenses | 2004[6] | $1,683,667 | | $7,576,897 |
| Customs and Border Protection, Automation Modernization | 2004[7] | $308,000 | NA | $462,445 |
| Customs and Border Protection, Air and Marine Interdiction, Operations, Maintenance, and Procurement | 2004[8] | $175,099,725 | NA | $513,826 |
| Customs and Border Protection, Facilities Management | NA | NA | NA | $682,133 |
| Immigration and Customs Enforcement, Salaries and Expenses | 2003[7]/2004[11] | NA[7] / $1,399,592.4[10] | $3,032,094[11]/NA[12] | $5,311,493 |
| Immigration and Customs Enforcement, Automation Modernization | 2003[9] | NA | $380,000[13] | $110,000 |
| Immigration and Customs Enforcement, Construction | 2003[9] | NA | $258,637[9] | $6,818 |

[1] Created by Executive Order 13390 on November 1, 2005.
[2] Immigration and Naturalization Service – inspection, investigations, Border Patrol, detention and deportation only.
[3] Includes $2,862,094,000 from the FY 2003 INS Salaries and Expenses appropriations, and $333,000,000 included in the FY 2003 Wartime Supplemental Appropriations Act, P.L. 108-11.
[4] Agriculture Plant and Health Inspection Service only.
[5] P.L. 107-210, section 311(b)(2) for Noncommercial Activities only.
[6] P.L. 107-210, section 311(b)(1) for Commercial Activities only.
[7] P.L. 107-210, section 311(b)(2) for Automated Commercial Environment only.
[8] P.L. 107-210, section 311(b)(2) for Air and Marine Interdiction
[9] Immigration and Naturalization Service – inspection, investigations, Border Patrol, detention and deportation only. (8 U.S.C. 1101, note; Immigration and Nationality Act, section 404(a))
[10] Customs Service, including the investigations function (19 U.S.C. 2075(b)(1)).
[11] Includes $2,862,094,000 from the FY 2003 INS Salaries and Expenses appropriations, and $170,000,000 included in the FY 2003 Wartime Supplemental Appropriations Act, P.L. 108-11
[12] No 2004 appropriation for the U.S. Customs Service
[13] For Entry-Exit system.

| | | | | |
|---|---|---|---|---|
| Transportation Security Administration, Transportation Threat Assessment and Credentialing[14] | 2005 | Such sums | $69,919 | $171,999 |
| Transportation Security Administration, Transportation Security Support | 2006 | NA | NA | $992,980 |
| Coast Guard, Operating Expense | 2006 | $5,633,900 | $5,492,331 | $6,822,026 |
| Coast Guard, Environmental Compliance and Restoration | 2006 | $12,000 | $12,000 | $13,198 |
| Coast Guard, Reserve Training | 2006 | $119,000 | $119,000 | $133,632 |
| Coast Guard, Acquisition, Construction, and Improvements | 2006 | $1,903,821 | $1,141,800 | $1,347,480 |
| Coast Guard, Alteration of Bridges | 2006 | $38,400 | $15,000 | $10,000 |
| Coast Guard, Research, Development, Test, and Evaluation | 2006 | $24,000 | $17,750 | $19,745 |
| Coast Guard, Retired Pay | 2006 | $1,014,080 | $1,014,080 | $1,361,245 |
| U.S. Secret Service, Salaries and Expenses[15] | NA | NA | NA | $1,457,409 |
| U.S. Secret Service, Acquisition, Construction, Improvements, and Related Expenses | NA | NA | NA | $3,975 |
| Office of Health Affairs[16] | NA | NA | NA | $128,400 |
| FEMA, Management and Administration: Urban Search and Rescue Response System | 2008 | $45,000 | $32,500 | $32,500 |
| FEMA, State and Local Programs: Citizen Corps Program | NA | NA | NA | $15,000 |
| FEMA, State and Local Programs: Metropolitan Medical Response System | 2008 | $63,000 | $41,000 | $40,000 |
| FEMA, State and Local Programs: REAL ID | 2009 | NA | $50,000 | $50,000 |
| FEMA, State and Local Programs: Buffer Zone Protection Program grants | NA | NA | NA | $50,000 |
| FEMA, Assistance for Firefighters grants | 2009 | $1,000,000 | $565,000 | $380,000 |
| FEMA, Flood Map Modernization Fund | NA | NA | NA | $220,000 |
| FEMA, National Predisaster Mitigation Fund | 2009 | NA | $90,000 | $100,000 |
| FEMA, Emergency Food and Shelter | 1994 | $187,560 | $130,000 | $200,000 |
| United States Citizen and Immigration Services | 2002 | $631,745 | $707,392 | $248,000 |
| Federal Law Enforcement Training Center, Salaries and Expenses | 1991[17] | NA | NA | $239,356 |

[14] Throughout FY 2005, Secure Flight, Crew Vetting, Register Traveler Program, and Alien Flight School were under the Aviation Program and were therefore authorized. The Transportation Threat Assessment and Credentialing Appropriation has not been authorized.

[15] The Secret Service is established in 18 U.S.C. 3056 and 18 U.S.C. 3056A. 18 U.S.C. 1029 and 1030 specifically authorize the Service to investigate offenses under those sections.

[16] The Chief Medical Officer is authorized in P.L. 109-295 and the National Biosurveillance Integration Center is authorized in P.L. 110-053, Section 1101

[17] P.L. 106-690, Section 6164

153

| Federal Law Enforcement Training Center, Acquisition, Construction, Improvements and Related Expenses | NA | NA | NA | $43,456 |

NA indicates not authorized.

154

COMPARISON WITH BUDGET RESOLUTION

Section 308(a)(1)(A) of the Congressional Budget Act requires the report accompanying a bill providing new budget authority to contain a statement comparing the levels in the bill to the suballocations submitted under section 302(b) of the Act for the most recently agreed to concurrent resolution on the budget for the applicable fiscal year. That information is provided in the table headed "Comparison of Reported Bill to Section 302(b) Suballocation."

[In millions of dollars]

|  | 302(b) Allocation | | This Bill | |
|---|---|---|---|---|
|  | Budget Authority | Outlays | Budget Authority | Outlays |
| Comparison of amounts in the bill with Committee allocations to its subcommittees of amounts in the First Concurrent Department of Homeland Security appropriations Act, 2010: | | | | |
| General purpose discretionary .......................................... | 42,384 | 46,062 | 42,625 | ¹46,256 |
| Mandatory ........................................................................ | 1,265 | 1,262 | 1,265 | 1,262 |

¹ Includes outlays from prior year budget authority.

FIVE YEAR OUTLAY PROJECTIONS

In compliance with clause (3)(c)(2) of rule XIII and section 308(a)(1)(B) of the Congressional Budget Act of 1974 (Public Law 93–344), as amended, the following table contains five-year projections associated with the budget authority provided in the accompanying bill:

Projection of outlays associated with the recommendation:

| | |
|---|---|
| 2010 ...................................................................................... | ²26,330 |
| 2011 ...................................................................................... | 8,453 |
| 2012 ...................................................................................... | 5,259 |
| 2013 ...................................................................................... | 1,982 |
| 2014 and future years ........................................................ | 1,421 |

² Excludes outlays from prior year budget authority.

ASSISTANCE TO STATE AND LOCAL GOVERNMENTS

In accordance with section 308(a)(1)(C) of the Congressional Budget Act of 1974 (Public Law 93–344), as amended, the financial assistance to state and local governments is as follows:

| | |
|---|---|
| Budget Authority ................................................................. | 4,813 |
| Outlays ................................................................................. | ²482 |

² Excludes outlays form prior year budget authority.

REVENUES AND COMPLIANCE WITH PAY-AS-YOU-GO RULE

CONSTITUTIONAL AUTHORITY

Clause 3(d)(1) of rule XIII of the Rules of the House of Representatives states that:

Each report of a committee on a bill or joint resolution of a public character, shall include a statement citing the specific powers granted to the Congress in the Constitution to enact the law proposed by the bill or joint resolution.

The Committee on Appropriations bases its authority to report this legislation from Clause 7 of Section 9 of Article I of the Constitution of the United States of America that states:

155

No money shall be drawn from the Treasury but in consequence of Appropriations made by law . . .

Appropriations contained in this Act are made pursuant to this specific power granted by the Constitution.

STATEMENT OF GENERAL PERFORMANCE GOALS AND OBJECTIVES

Pursuant to clause 3(c)(4) of rule XIII of the Rules of the House of Representatives, the following is a statement of general performance goals and objectives for which this measure authorizes funding:

The Committee on Appropriations considers program performance, including a program's success in developing and attaining outcome-related goals and objectives, in developing funding recommendations.

DIRECTED SPENDING BY CONGRESS AND BY THE EXECUTIVE BRANCH

This bill contains $2.7 billion in grant funding awarded solely at the discretion of the Administration, and $112.6 million in funding requested by the President for specific projects. The Committee has taken unprecedented action to increase transparency and reduce funding for member earmarks. In this bill since 2006, the total funding earmarked solely at the request of members has been reduced by 50 percent as seen in the table below. When combined with earmarked funding from the Senate, it is expected that the total member requested earmark funding will be nearly 5 percent below last year, and will equal just over one half of one percent of the cost of the bill. It should also be noted that under the policies adopted by the Committee the use of member earmarks awarded to for-profit entities as a functional equivalent of no bid contracts is ended. In cases where the Committee funds an earmark designated for a for-profit entity, the Committee includes legislative language requiring the Executive Branch to nonetheless issue a request for proposal that gives other entities an opportunity to apply and requires the agency to evaluate all bids received and make a decision based on merit. This gives the original designee an opportunity to be brought to the attention of the agency, but with the possibility that an alternative entity may be selected.

[Dollars in Millions]

| FY 2006 | FY 2008 | FY 2009 | FY 2010 Committee |
|---------|---------|---------|-------------------|
| $469    | $242    | $231    | $110              |

## DISCLOSURE OF EARMARKS AND CONGRESSIONALLY DIRECTED SPENDING ITEMS

The following table is submitted in compliance with clause 9 of rule XXI, and lists the congressional earmarks (as defined in paragraph (e) of clause 9) contained in the bill or in this report. Neither the bill nor the report contain any limited tax benefits or limited tariff benefits as defined in paragraphs (f) or (g) of clause 9 of rule XXI.

156

## DEPARTMENT OF HOMELAND SECURITY
### [Presidentially Directed Spending Items]

| Agency | Account | Project | Amount | Administration | Requester(s) House |
|---|---|---|---|---|---|
| CG | Operating Expenses | Project Seahawk, SC | $1,088,000 | The President | |
| CG | Acquisition, Construction, and Improvements | Shore and Operational Support projects, various locations | $6,000,000 | The President | |
| FEMA | State and Local Programs | National Domestic Preparedness Consortium, various locations | $92,000,000 | The President | Edwards (TX), Carter; Alexander |
| FEMA | State and Local Programs | Center for Domestic Preparedness, AL | $40,000,000 | The President | Rogers (AL) |
| S&T | Research, Development, Acquisition, and Operations | Naval Postgraduate School, CA | $2,000,000 | The President | Farr |
| S&T | Research, Development, Acquisition, and Operations | Physical Science Facility, Pacific Northwest National Laboratory, WA | $12,000,000 | The President | Dicks; Hastings (WA) |

## DEPARTMENT OF HOMELAND SECURITY
### [Congressionally Directed Spending Items]

| Agency | Account | Project | Amount | Requester(s) |
|---|---|---|---|---|
| DHS | Office of the Under Secretary for Management | Center of Excellence in Logistics and Technology (LOGTECH), Institute for Defense and Business, The University of North Carolina, Chapel Hill, NC | $1,000,000 | Price (NC) |
| CBP | Salaries and Expenses | Portable Solar Charging Rechargeable Battery System, Global Solar, AZ | $800,000 | Pastor (AZ) |
| CBP | Facilities Management | Hangar and Offices for U.S. Customs and Border Patrol, City of El Paso, TX | $3,500,000 | Reyes |

157

| TSA | Aviation Security | Transportation Security Research and Training Center, National Safe Skies Alliance, TN | $1,250,000 | Duncan |
|---|---|---|---|---|
| NPPD | Infrastructure Protection and Information Security | Philadelphia Buffer Zone Protection Video Surveillance Expansion Project, City of Philadelphia, PA | $1,000,000 | Fattah |
| NPPD | Infrastructure Protection and Information Security | Multi-State Information Sharing and Analysis Center (MS-ISAC), NY, Office of State Cyber Security & Critical Infrastructure Coordination | $3,000,000 | Lowey, Clarke |
| NPPD | Infrastructure Protection and Information Security | The Upstate NY Cyber Initiative, Clarkson University, NY | $100,000 | McHugh |
| NPPD | Infrastructure Protection and Information Security | Cyber Security Test Bed & Evaluation Center, RTI International, NC | $3,500,000 | Price (NC) |
| NPPD | Infrastructure Protection and Information Security | State and Local Cyber Security Training, University of Texas, San Antonio, TX | $3,500,000 | Rodriguez |
| NPPD | Infrastructure Protection and Information Security | SEARCH, Sacramento, CA | $1,000,000 | Rothman (NJ) |
| NPPD | Infrastructure Protection and Information Security | Power and Cyber Systems Protection, Analysis, and Testing Program at the Idaho National Laboratory, Idaho National Laboratory, ID | $3,000,000 | Simpson |
| NPPD | Infrastructure Protection and Information Security | Virginia Operational Integration Cyber Center of Excellence (VOICCE), City of Hampton, VA | $500,000 | Nye, Wittman |
| DHS | Office of Health Affairs | North Carolina Collaboratory for Bio-Preparedness (NC B-Prepared), School of Information & Library Science, The University of North Carolina at Chapel Hill, NC | $5,000,000 | Price (NC); Etheridge; Miller (NC) |
| FEMA | State and Local Programs | Rural Domestic Preparedness Consortium, Eastern Kentucky University, KY | $3,000,000 | Rogers (KY) |
| FEMA | State and Local Programs | Emergency Operations Center, Winston County Commission, AL | $20,000 | Aderholt |
| FEMA | State and Local Programs | Emergency Operations Center, Lincoln Parish Sheriff Department, LA | $300,000 | Alexander |

## DEPARTMENT OF HOMELAND SECURITY—Continued
### [Congressionally Directed Spending Items]

| Agency | Account | Project | Amount | Requester(s) |
|--------|---------|---------|--------|--------------|
| FEMA | State and Local Programs | Emergency Operations Center, City of Las Vegas, NV | $600,000 | Berkley; Titus |
| FEMA | State and Local Programs | Emergency Operations Center, Mobile County Commission, AL | $800,000 | Bonner |
| FEMA | State and Local Programs | Emergency Operations Center, City of Moreno Valley, CA | $400,000 | Bono Mack |
| FEMA | State and Local Programs | Emergency Operations Center, Benton County Emergency Management Commission, IA | $500,000 | Boswell |
| FEMA | State and Local Programs | Emergency Operations Center, City of Green Cove Springs, FL | $400,000 | Brown, Corrine |
| FEMA | State and Local Programs | Emergency Operations Center, Lake County, FL | $800,000 | Brown, Corrine; Stearns |
| FEMA | State and Local Programs | Emergency Operations Center, Dorchester County, SC | $400,000 | Brown (SC) |
| FEMA | State and Local Programs | Emergency Operations Center, Sarasota County, FL | $300,000 | Buchanan |
| FEMA | State and Local Programs | Emergency Operations Center, City of Greenville, NC | $600,000 | Butterfield |
| FEMA | State and Local Programs | Emergency Operations Center, New Orleans Emergency Medical Services, LA | $750,000 | Cao, Scalise |
| FEMA | State and Local Programs | Emergency Operations Center, Lycoming County, PA | $250,000 | Carney |
| FEMA | State and Local Programs | Emergency Operations Center, Mercer County Emergency Management Agency, KY | $300,000 | Chandler |
| FEMA | State and Local Programs | Emergency Operations Center, Jackson County Sheriff's Office, MO | $500,000 | Cleaver |
| FEMA | State and Local Programs | Emergency Operations Center, Williamsburg County, SC | $1,000,000 | Clyburn |
| FEMA | State and Local Programs | Emergency Operations Center, City of Brookings, OR | $350,000 | DeFazio |

| | | | | |
|---|---|---|---|---|
| FEMA | State and Local Programs | Emergency Operations Center, Johnson County, TX | $750,000 | Edwards (TX) |
| FEMA | State and Local Programs | Emergency Operations Center, City of Minneapolis, MN | $750,000 | Ellison |
| FEMA | State and Local Programs | Emergency Operations Center, Howell County Emergency Preparedness, MO | $250,000 | Emerson |
| FEMA | State and Local Programs | Emergency Operations Center, City of Brawley, CA | $500,000 | Filner |
| FEMA | State and Local Programs | Emergency Operations Center, City of Hopewell, VA | $250,000 | Forbes |
| FEMA | State and Local Programs | Emergency Operations Center, Morris County, New Jersey Office of Emergency Management, NJ | $1,000,000 | Frelinghuysen |
| FEMA | State and Local Programs | Emergency Operations Center, City of Tavares, FL | $500,000 | Grayson |
| FEMA | State and Local Programs | Emergency Operations Center, Tohono O'odham Nation | $500,000 | Grijalva |
| FEMA | State and Local Programs | Emergency Operations Center, Minooka Fire Protection District, IL | $250,000 | Halvorson |
| FEMA | State and Local Programs | Emergency Operations Center, Township of Old Bridge, NJ | $500,000 | Holt |
| FEMA | State and Local Programs | Emergency Operations Center, City of Cupertino, CA | $300,000 | Honda |
| FEMA | State and Local Programs | Emergency Operations Center, Calvert County Department of Public Safety, MD | $338,000 | Hoyer |
| FEMA | State and Local Programs | Emergency Operations Center, City of Detroit, MI | $1,000,000 | Kilpatrick (MI); Conyers |
| FEMA | State and Local Programs | Emergency Operations Center, Scotland County, NC | $650,000 | Kissell |
| FEMA | State and Local Programs | Emergency Operations Center, The City of Maitland, FL | $158,000 | Kosmas |
| FEMA | State and Local Programs | Emergency Operations Center, County of Union, NJ | $500,000 | Lance |
| FEMA | State and Local Programs | Emergency Operations Center, Providence Emergency Management Agency & Office of Homeland Security, RI | $500,000 | Langevin |

## DEPARTMENT OF HOMELAND SECURITY—Continued
### [Congressionally Directed Spending Items]

| Agency | Account | Project | Amount | Requester(s) |
|---|---|---|---|---|
| FEMA | State and Local Programs | Emergency Operations Center, City of Hartford, CT | $800,000 | Larson (CT) |
| FEMA | State and Local Programs | Emergency Operations Center, City of Torrington, CT | $400,000 | Larson (CT); Murphy (CT) |
| FEMA | State and Local Programs | Emergency Operations Center, City of Ames, IA | $600,000 | Latham |
| FEMA | State and Local Programs | Emergency Operations Center, Fulton County (Atlanta) Emergency Management Agency, GA | $200,000 | Lewis (GA), Scott (GA) |
| FEMA | State and Local Programs | Emergency Operations Center, City of Brigantine, NJ | $300,000 | LoBiondo |
| FEMA | State and Local Programs | Emergency Operations Center, Village of Elmsford, NY | $165,000 | Lowey |
| FEMA | State and Local Programs | Emergency Operations Center, Town of Harrison, NY | $275,000 | Lowey |
| FEMA | State and Local Programs | Emergency Operations Center, City of Elk Grove, CA | $750,000 | Lungren, Dan |
| FEMA | State and Local Programs | Emergency Operations Center, City of Palm Coast, FL | $350,000 | Mica |
| FEMA | State and Local Programs | Emergency Operations Center, Somerset County, ME | $500,000 | Michaud |
| FEMA | State and Local Programs | Emergency Operations Center, Macomb County Emergency Management and Communications, MI | $250,000 | Miller (MI) |
| FEMA | State and Local Programs | Emergency Operations Center, City of La Habra, CA | $254,500 | Miller, Gary |
| FEMA | State and Local Programs | Emergency Operations Center, City of Scottsdale, AZ | $500,000 | Mitchell |
| FEMA | State and Local Programs | Emergency Operations Center, Westmoreland County Department of Public Safety, PA | $900,000 | Murtha |
| FEMA | State and Local Programs | Emergency Operations Center, Brazoria County Emergency Mangement, TX | $100,000 | Paul |

| | | | | |
|---|---|---|---|---|
| FEMA | State and Local Programs | Emergency Operations Center, Township of Irvington, NJ | $750,000 | Payne |
| FEMA | State and Local Programs | Emergency Operations Center, San Francisco Department of Emergency Management, CA | $800,000 | Pelosi |
| FEMA | State and Local Programs | Emergency Operations Center, North Carolina Office of Emergency Management, NC | $1,000,000 | Price (NC) |
| FEMA | State and Local Programs | Emergency Operations Center, Butte-Silver Bow, MT | $800,000 | Rehberg |
| FEMA | State and Local Programs | Emergency Operations Center, Middle Rio Grande Development Council, TX | $1,000,000 | Rodriguez |
| FEMA | State and Local Programs | Emergency Operations Center, Town of Shorter, AL | $500,000 | Rogers (AL) |
| FEMA | State and Local Programs | Emergency Operations Center, Kentucky Emergency Management, KY | $500,000 | Rogers (KY) |
| FEMA | State and Local Programs | Emergency Operations Center, Monroe County, FL | $200,000 | Ros-Lehtinen |
| FEMA | State and Local Programs | Emergency Operations Center, City of Newark, NJ | $1,000,000 | Rothman (NJ) |
| FEMA | State and Local Programs | Emergency Operations Center, Passaic County Prosecutor, NJ | $250,000 | Rothman (NJ) |
| FEMA | State and Local Programs | Emergency Operations Center, City of Commerce, CA | $1,000,000 | Roybal-Allard |
| FEMA | State and Local Programs | Emergency Operations Center, State of Maryland, MD | $1,500,000 | Ruppersberger |
| FEMA | State and Local Programs | Emergency Operations Center, City of Alamosa Fire Department, CO | $425,000 | Salazar |
| FEMA | State and Local Programs | Emergency Operations Center, City of Whittier, CA | $500,000 | Sánchez, Linda |
| FEMA | State and Local Programs | Emergency Operations Center, Washington Parish Government, LA | $350,000 | Scalise |
| FEMA | State and Local Programs | Emergency Operations Center, City of Monterey Park, CA | $375,000 | Schiff |
| FEMA | State and Local Programs | Emergency Operations Center, Towamencin Township, PA | $75,000 | Schwartz |

## DEPARTMENT OF HOMELAND SECURITY—Continued
[Congressionally Directed Spending Items]

| Agency | Account | Project | Amount | Requester(s) |
|---|---|---|---|---|
| FEMA | State and Local Programs | Emergency Operations Center, Upper Darby Township Police Department, PA | $500,000 | Sestak |
| FEMA | State and Local Programs | Emergency Operations Center, North Hudson Regional Fire and Rescue, NJ | $500,000 | Sires |
| FEMA | State and Local Programs | Emergency Operations Center, City of Beerne, TX | $250,000 | Smith (TX) |
| FEMA | State and Local Programs | Emergency Operations Center, Lea County, NM | $600,000 | Teague |
| FEMA | State and Local Programs | Emergency Operations Center, City of Port Gibson, MS | $750,000 | Thompson (MS) |
| FEMA | State and Local Programs | Emergency Operations Center, City of Wichita, KS | $500,000 | Tiahrt |
| FEMA | State and Local Programs | Emergency Operations Center, City of Lauderdale Lakes, FL | $750,000 | Wasserman Schultz; Hastings (FL) |
| FEMA | State and Local Programs | Emergency Operations Center, City of Sunrise, FL | $750,000 | Wasserman Schultz; Weeler; Hastings (FL) |
| FEMA | State and Local Programs | Emergency Operations Center, Columbia County, OR | $500,000 | Wu |
| FEMA | Predisaster Mitigation | City of Hartselle, AL | $245,000 | Aderholt |
| FEMA | Predisaster Mitigation | City of Colton, CA | $200,000 | Baca |
| FEMA | Predisaster Mitigation | Alabama Emergency Management Agency, AL | $200,000 | Bachus |
| FEMA | Predisaster Mitigation | Arkansas Department of Emergency Management, AR | $750,000 | Berry |
| FEMA | Predisaster Mitigation | Town of Shelter Island, NY | $200,000 | Bishop (NY) |
| FEMA | Predisaster Mitigation | Brigham City Corporation, UT | $250,000 | Bishop (UT) |
| FEMA | Predisaster Mitigation | City of Camanche, IA | $187,500 | Braley (IA) |

| | | | | |
|---|---|---|---|---|
| FEMA | Predisaster Mitigation | City of Prattville, AL | $500,000 | Bright |
| FEMA | Predisaster Mitigation | City of Venice, FL | $200,000 | Buchanan |
| FEMA | Predisaster Mitigation | Orange County Fire Authority, CA | $252,000 | Calvert |
| FEMA | Predisaster Mitigation | City of Kannapolis, NC | $425,000 | Coble |
| FEMA | Predisaster Mitigation | Shelby County, Memphis, TN | $325,000 | Cohen |
| FEMA | Predisaster Mitigation | Town of Occoquan, VA | $25,000 | Connolly (VA) |
| FEMA | Predisaster Mitigation | City of Hidalgo, TX | $500,000 | Cuellar |
| FEMA | Predisaster Mitigation | Harris County Flood Control District, TX | $1,000,000 | Culberson |
| FEMA | Predisaster Mitigation | City of Brooksville, KY | $18,500 | Davis (KY) |
| FEMA | Predisaster Mitigation | City of Maryville, MO | $175,000 | Graves |
| FEMA | Predisaster Mitigation | City of Reno, NV | $500,000 | Heller |
| FEMA | Predisaster Mitigation | Westport Fire Department, CT | $265,000 | Himes |
| FEMA | Predisaster Mitigation | Town of Union and City of Binghamton, NY | $462,000 | Hinchey |
| FEMA | Predisaster Mitigation | City of Trenton, NJ | $300,000 | Holt; Smith (NJ) |
| FEMA | Predisaster Mitigation | Lucas County Engineer, OH | $500,000 | Kaptur |
| FEMA | Predisaster Mitigation | City of Coconut Creek, FL | $500,000 | Klein (FL); Wexler |
| FEMA | Predisaster Mitigation | Lake County Stormwater Management Agency, OH | $725,000 | LaTourette |
| FEMA | Predisaster Mitigation | City of Emeryville, CA | $600,000 | Lee (CA) |
| FEMA | Predisaster Mitigation | Village of La Grange Park, IL | $150,000 | Lipinski |
| FEMA | Predisaster Mitigation | Village of Pelham, NY | $562,500 | Lowey |

164

## DEPARTMENT OF HOMELAND SECURITY—Continued
### [Congressionally Directed Spending Items]

| Agency | Account | Project | Amount | Requester(s) |
|---|---|---|---|---|
| FEMA | Predisaster Mitigation | San Miguel County, NM | $400,000 | Luján |
| FEMA | Predisaster Mitigation | DeKalb County, IL | $350,000 | Manzullo |
| FEMA | Predisaster Mitigation | Town of Winthrop, MA | $500,000 | Markey (MA) |
| FEMA | Predisaster Mitigation | City of Santa Clarita, CA | $500,000 | McKeon |
| FEMA | Predisaster Mitigation | City of Miami, FL | $600,000 | Meek (FL); Ros-Lehtinen |
| FEMA | Predisaster Mitigation | City of Flagler Beach, FL | $750,000 | Mica |
| FEMA | Predisaster Mitigation | Town of Hambleton and Town of Davis | $450,000 | Mollohan |
| FEMA | Predisaster Mitigation | City of Robstown, TX | $500,000 | Ortiz |
| FEMA | Predisaster Mitigation | CHRISTUS St. Elizabeth Hospital, Beaumont, TX | $250,000 | Poe (TX) |
| FEMA | Predisaster Mitigation | North Carolina Office of Emergency Management, NC | $165,000 | Price (NC) |
| FEMA | Predisaster Mitigation | King County, WA | $750,000 | Reichert |
| FEMA | Predisaster Mitigation | Kentucky Emergency Management, KY | $500,000 | Rogers (KY) |
| FEMA | Predisaster Mitigation | Drew County, AR | $366,564 | Ross |
| FEMA | Predisaster Mitigation | City of Los Angeles, CA | $1,000,000 | Roybal-Allard |
| FEMA | Predisaster Mitigation | State of Maryland, MD | $1,000,000 | Ruppersberger |
| FEMA | Predisaster Mitigation | City of Burbank, CA | $225,000 | Schiff |
| FEMA | Predisaster Mitigation | Henry County, GA | $275,000 | Scott (GA) |

| Agency | Program | Recipient/Project | Amount | Member |
|---|---|---|---|---|
| FEMA | Predisaster Mitigation | City of Los Angeles, CA | $500,000 | Sherman |
| FEMA | Predisaster Mitigation | McDowell Hospital, NC | $220,000 | Shuler |
| FEMA | Predisaster Mitigation | City of New Braunfels, TX | $500,000 | Smith (TX) |
| FEMA | Predisaster Mitigation | Arkansas State University-Beebe, AR | $452,000 | Snyder |
| FEMA | Predisaster Mitigation | Lorain County, OH | $200,000 | Sutton |
| FEMA | Predisaster Mitigation | City of Davis, CA | $275,000 | Thompson (CA) |
| FEMA | Predisaster Mitigation | Mississippi Homeland Security Office, MS | $500,000 | Thompson (MS) |
| FEMA | Predisaster Mitigation | City of Rockville, MD | $650,000 | Van Hollen |
| FEMA | Predisaster Mitigation | City of Hokah, MN | $590,000 | Walz |
| FEMA | Predisaster Mitigation | City of Miami Beach, FL | $750,000 | Wasserman Schultz |
| FEMA | Predisaster Mitigation | Jackson Health System, FL | $500,000 | Wasserman Schultz, Meek (FL), Diaz-Balart, Mario, Ros-Lehtinen |
| FEMA | Predisaster Mitigation | Russell County Fiscal Court, KY | $200,000 | Whitfield |
| FEMA | Predisaster Mitigation | Ohio University, OH | $200,000 | Wilson (OH) |
| FEMA | Predisaster Mitigation | Louisville-Metro Government, KY | $500,000 | Yarmuth |
| S&T | Research, Development, Acquisition, and Operations | Homeland Security Research, Development, and Manufacturing Pilot, Long Island Forum for Technology, NY | $1,000,000 | Israel, King (NY) |
| S&T | Research, Development, Acquisition, and Operations | Remote Sensing for Situational Awareness and Decision Support, Rochester Institute of Technology, NY | $500,000 | Maffei, Lee (NY) |
| S&T | Research, Development, Acquisition, and Operations | National Institute for Hometown Security, KY | $10,000,000 | Rogers (KY) |

166

## DEPARTMENT OF HOMELAND SECURITY—Continued
### [Congressionally Directed Spending Items]

| Agency | Account | Project | Amount | Requester(s) |
|---|---|---|---|---|
| S&T | Research, Development, Acquisition, and Operations | Maritime Domain Awareness and Maritime Security Technology Pilot, SRI International, FL | $4,000,000 | Young (FL) |
| General Provisions | | Town of Branchville, SC | | Clyburn |
| General Provisions | | Monterey County Water Resource Agency, CA | | Farr |
| General Provisions | | Sector Buffalo, NY, Coast Guard | | Higgins |
| General Provisions | | Office of Environmental Health and Safety, Umass, MA | | Olver |
| General Provisions | | Town of Lanesborough, MA | | Olver |
| General Provisions | | Franklin Regional Council of Governments, MA | | Olver |

167

COMPLIANCE WITH RULE XIII, CL. 3(e) (RAMSEYER RULE)

In compliance with clause 3(e) of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

## SECTION 1202 OF THE ACT OF AUGUST 2, 2002

(Public Law 107–206)

AN ACT Making supplemental appropriations for further recovery from and response to terrorist attacks on the United States for the fiscal year ending September 30, 2002, and for other purposes.

SEC. 1202. (a) The Federal Law Enforcement Training Center may, for a period ending not later than [December 31, 2011] *December 31, 2012,* appoint and maintain a cadre of up to 350 Federal annuitants: (1) without regard to any provision of title 5, United States Code, which might otherwise require the application of competitive hiring procedures; and (2) who shall not be subject to any reduction in pay (for annuity allocable to the period of actual employment) under the provisions of section 8344 or 8468 of such title 5 or similar provision of any other retirement system for employees. A reemployed Federal annuitant as to whom a waiver of reduction under paragraph (2) applies shall not, for any period during which such waiver is in effect, be considered an employee for purposes of subchapter III of chapter 83 or chapter 84 of title 5, United States Code, or such other retirement system (referred to in paragraph (2)) as may apply.

\*       \*       \*       \*       \*       \*       \*

## SECTION 532 OF THE ACT OF OCTOBER 4, 2006

(Public Law 109–295)

AN ACT Making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2007, and for other purposes.

Sec. 532. (a) UNITED STATES SECRET SERVICE USE OF PROCEEDS DERIVED FROM CRIMINAL INVESTIGATIONS.—During fiscal year [2009] *2010,* with respect to any undercover investigative operation of the United States Secret Service (hereafter referred to in this section as the "Secret Service") that is necessary for the detection and prosecution of crimes against the United States—

(1) \* \* \*

\*       \*       \*       \*       \*       \*       \*

## HOMELAND SECURITY ACT OF 2002

\*       \*       \*       \*       \*       \*       \*

168

# TITLE VIII—COORDINATION WITH NON-FEDERAL ENTITIES; INSPECTOR GENERAL; UNITED STATES SECRET SERVICE; COAST GUARD; GENERAL PROVISIONS

\*　　\*　　\*　　\*　　\*　　\*　　\*

## Subtitle D—Acquisitions

**SEC. 831. RESEARCH AND DEVELOPMENT PROJECTS.**

(a) AUTHORITY.—[Until September 30, 2009] *Until September 30, 2010,* and subject to subsection (d), the Secretary may carry out a pilot program under which the Secretary may exercise the following authorities:

(1) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(d) ADDITIONAL REQUIREMENTS.—

(1) IN GENERAL.—The authority of the Secretary under this section shall terminate [September 30, 2009] *September 30, 2010,* unless before that date the Secretary—

(A) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

---

## ROBERT T. STAFFORD DISASTER RELIEF AND EMERGENCY ASSISTANCE ACT

\*　　\*　　\*　　\*　　\*　　\*　　\*

# TITLE II—DISASTER PREPAREDNESS AND MITIGATION ASSISTANCE

\*　　\*　　\*　　\*　　\*　　\*　　\*

**SEC. 203. PREDISASTER HAZARD MITIGATION.**

(a) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(m) TERMINATION OF AUTHORITY.—The authority provided by this section terminates [September 30, 2009] *September 30, 2010.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

---

## SECTION 143 OF THE CONSOLIDATED SECURITY, DISASTER ASSISTANCE, AND CONTINUING APPROPRIATIONS ACT, 2009

SEC. 143. Section 401(b) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (8 U.S.C. 1324a note) shall be applied by substituting [September 30, 2009] *September 30,*

169

*2011* for "the 11-year period beginning on the first day the pilot program is in effect".

\*     \*     \*     \*     \*     \*     \*

<hr>

**CONSOLIDATED APPROPRIATIONS ACT, 2005**

\*     \*     \*     \*     \*     \*     \*

DIVISION J—OTHER MATTERS

\*     \*     \*     \*     \*     \*     \*

# TITLE IV—VISA REFORM

\*     \*     \*     \*     \*     \*     \*

## Subtitle B—H–1B Visa Reform

\*     \*     \*     \*     \*     \*     \*

**SEC. 426. FRAUD PREVENTION AND DETECTION FEE.**

(a) * * *

(b) ESTABLISHMENT OF ACCOUNT; USE OF FEES.—Section 286 of the Immigration and Nationality Act (8 U.S.C. 1356) is amended by adding at the end the following:

"(v) H–1B AND L FRAUD PREVENTION AND DETECTION ACCOUNT.—

"(1) IN GENERAL.—There is established in the general fund of the Treasury a separate account, which shall be known as the 'H–1B and L Fraud Prevention and Detection Account'. Notwithstanding any other provision of law, there shall be deposited as offsetting receipts into the account all fees collected under section 214(c)(12).

"(2) USE OF FEES TO COMBAT FRAUD.—

["(A) SECRETARY OF STATE.—One-third of the amounts deposited into the H–1B and L Fraud Prevention and Detection Account shall remain available to the Secretary of State until expended for programs and activities at United States embassies and consulates abroad—

["(i) to increase the number diplomatic security personnel assigned exclusively to the function of preventing and detecting fraud by applicants for visas described in subparagraph (H)(i) or (L) of section 101(a)(15);

["(ii) otherwise to prevent and detect such fraud pursuant to the terms of a memorandum of understanding or other cooperative agreement between the Secretary of State and the Secretary of Homeland Security; and

["(iii) upon request by the Secretary of Homeland Security, to assist such Secretary in carrying out the fraud prevention and detection programs and activities described in subparagraph (B).

【"(B) Secretary of Homeland Security.—One-third of the amounts deposited into the H–1B and L Fraud Prevention and Detection Account shall remain available to the Secretary of Homeland Security until expended for programs and activities to prevent and detect fraud with respect to petitions under paragraph (1) or (2)(A) of section 214(c) to grant an alien nonimmigrant status described in subparagraph (H)(i) or (L) of section 101(a)(15).

【"(C) Secretary of Labor.—One-third of the amounts deposited into the H–1B and L Fraud Prevention and Detection Account shall remain available to the Secretary of Labor until expended for enforcement programs and activities described in section 212(n).】

*"(A) Secretaray of State.—One-third of the amounts deposited into the Fraud Prevention and Detection Account shall remain available to the Secretary of State until expended for programs and activities—*

> *"(i) to increase the number of consular and diplomatic security personnel assigned primarily to the function of preventing and detecting fraud by applicants for visas described in subparagraph (H)(i), (H)(ii), or (L) of section 101(a)(15);*
>
> *"(ii) otherwise to prevent and detect visa fraud, including fraud by applicants for visas described in subparagraph (H)(i), (H)(ii), or (L) of section 101(a)(15), as well as the purchase, lease, construction, and staffing of facilities for the processing of these classes of visa, in consultation with the Secretary of Homeland Security as appropriate; and*
>
> *"(iii) upon request by the Secretary of Homeland Security, to assist such Secretary in carrying out the fraud prevention and detection programs and activities described in subparagraph (B).*

*"(B) Secretary of Homeland Security.—One-third of the amounts deposited into the Fraud Prevention and Detection Account shall remain available to the Secretary of Homeland Security until expended for programs and activities to prevent and detect immigration benefit fraud, including fraud with respect to petitions filed under paragraph (1) or (2)(A) of section 214(c) to grant an alien nonimmigrant status described in subparagraph (H) or (L) of section 101(a)(15).*

*"(C) Secretary of Labor.—One-third of the amounts deposited into the Fraud Prevention and Detection Account shall remain available to the Secretary of Labor until expended for wage and hour enforcement programs and activities otherwise authorized to be conducted by the Secretary of Labor that focus on industries likely to employ nonimmigrants, including enforcement programs and activities described in section 212(n) and enforcement programs and activities related to section 214(c)(14)(A)(i).*

\*　　\*　　\*　　\*　　\*　　\*　　\*

171

# DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS ACT, 2007

\*　　\*　　\*　　\*　　\*　　\*　　\*

## TITLE V—GENERAL PROVISIONS

\*　　\*　　\*　　\*　　\*　　\*　　\*

Sec. 550. (a) \* \* \*

(b) Interim regulations issued under this section shall apply until the effective date of interim or final regulations promulgated under other laws that establish requirements and standards referred to in subsection (a) and expressly supersede this section: *Provided,* That the authority provided by this section shall terminate [three years after the date of enactment of this Act] *October 4, 2010.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

## SECTION 44903 OF TITLE 49, UNITED STATES CODE

### § 44903.  Air transportation security

(a) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(j) SHORT-TERM ASSESSMENT AND DEPLOYMENT OF EMERGING SECURITY TECHNOLOGIES AND PROCEDURES.—

(1) \* \* \*

(2) COMPUTER-ASSISTED PASSENGER PRESCREENING SYSTEM.—

(A) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

(C) ADVANCED AIRLINE PASSENGER PRESCREENING.—

(i) \* \* \*

\*　　\*　　\*　　\*　　\*　　\*　　\*

*(v) INCLUSION OF DETAINEES ON NO FLY LIST.—The Assistant Secretary, in coordination with the Terrorist Screening Center, shall include on the No Fly List any individual who was a detainee held at the Naval Station, Guantanamo Bay, Cuba, unless the President certifies in writing to Congress that the detainee poses no threat to the United States, its citizens, or its allies. For purposes of this clause, the term "detainee" means an individual in the custody or under the physical control of the United States as a result of armed conflict.*

\*　　\*　　\*　　\*　　\*　　\*　　\*

COMPLIANCE WITH RULE XIII, CLAUSE 3(f)(1)(A)

Pursuant to clause 3(f)(1) of rule XIII of the Rules of the House of Representatives, the Committee has inserted at the appropriate place in the report a description of the effects of provisions proposed in the accompanying bill which may be considered, under certain circumstances, to change the application of existing law, either directly or indirectly.

The bill provides, in some instances, funding of agencies and activities where legislation has not yet been finalized. In addition, the

172

bill carries language, in some instances, permitting activities not authorized by law. Additionally, the Committee includes a number of general provisions.

## TITLE I—DEPARTMENT MANAGEMENT AND OPERATIONS

### OFFICE OF THE SECRETARY AND EXECUTIVE MANAGEMENT

The Committee includes language providing funds for reception and representation expenses.

### OFFICE OF THE UNDER SECRETARY FOR MANAGEMENT

The Committee includes language providing funds for reception and representation expenses; for logistics training; for costs necessary to consolidate headquarters operations, including tenant improvements and relocation costs; and for the human resources information technology program.

### OFFICE OF THE CHIEF FINANCIAL OFFICER

The Committee includes language providing funds for the Chief Financial Officer.

### OFFICE OF THE CHIEF INFORMATION OFFICER

The Committee includes language providing funds for the Chief Information Officer (CIO) and for the development and acquisition of information technology equipment, software, services, and related activities.

### ANALYSIS AND OPERATIONS

The Committee includes language providing funds for information analysis and operations coordination activities, including funding for official representation expenses.

### OFFICE OF THE FEDERAL COORDINATOR FOR GULF COAST REBUILDING

The Committee includes language providing funds for the Office of the Federal Coordinator for Gulf Coast Rebuilding.

### OFFICE OF INSPECTOR GENERAL

The Committee includes language providing funds for certain confidential operational expenses, including the payment of informants.

## TITLE II—SECURITY, ENFORCEMENT, AND INVESTIGATIONS

### CUSTOMS AND BORDER PROTECTION

#### SALARIES AND EXPENSES

The Committee includes language making funds available for border security, immigration, customs, and agricultural inspections and regulatory activities; purchase or lease of vehicles; contracting with individuals for personal services; Harbor Maintenance Fee collections; official reception and representation expenses; Customs

173

User Fee collections; and payment of rental space in connection with pre-clearance operations; compensation of informants.

### AUTOMATION MODERNIZATION

The Committee includes language making funds available until expended for automated systems and includes language requiring the submission of an expenditure plan prior to the obligation of funds.

### BORDER SECURITY FENCING, INFRASTRUCTURE, AND TECHNOLOGY

The Committee includes language making funds available until expended for border security fencing, infrastructure, and technology and includes language requiring the submission of an expenditure plan prior to the obligation of funds. In addition, language is included requiring Committee notification on the award of task orders requiring an obligation of greater than $25,000,000 or a task order that would cause cumulative obligations of funds to exceed 50 percent of the total amount appropriated. Finally, the Committee prohibits obligating any funds unless the Department complies with consultation requirements in the law.

### AIR AND MARINE INTERDICTION, OPERATIONS, MAINTENANCE, AND PROCUREMENT

The Committee includes language making funds available for the operation, maintenance and procurement of marine vessels, aircraft, unmanned aircraft systems, and other equipment; travel; rental payments for facilities; and assistance to other law enforcement agencies and humanitarian efforts. The Committee includes language prohibiting the transfer of aircraft and related equipment out of U.S. Customs and Border Protection unless certain conditions are met.

### FACILITIES MANAGEMENT

The Committee includes language making funds available until expended for the planning, construction, renovating, equipping, and maintaining of buildings and facilities and permits payment for rental space in conjunction with preclearance operations.

### IMMIGRATION AND CUSTOMS ENFORCEMENT

#### SALARIES AND EXPENSES

The Committee includes language making funds available for enforcement of immigration and customs laws, detention and removals, and investigations; purchase of replacement vehicles; special operations; official reception and representation expenses; compensation to informants; and reimbursement of other Federal agencies for certain costs. The Committee includes language regarding overtime compensation and forced child labor laws. The Committee also includes language that requires the Secretary to identify illegal aliens held in custody who are eligible for removal and initiate their removal when such individuals are released from custody. The Committee prohibits the delegation of law enforcement authority for the 287(g) program if terms of the agreement have been violated. The Committee prohibits funds to continue any contract for

174

detention services if two recent evaluations are less than adequate. Finally, the Committee prohibits funds to be obligated to co-locate field offices until receipt of a nation-wide Alternatives to Detention plan.

### FEDERAL PROTECTIVE SERVICE

The Committee includes language making funds available until expended for the operations of the Federal Protective Service. The Committee prohibits funds provided in this Act, previous appropriations Act or any revenue or collections of security fees credited to the Federal Protective Service to be used to reduce the number of in-service police officers unless certain conditions are met. The Committee prohibits the restructuring of the Federal Protective Service.

### AUTOMATION MODERNIZATION

The Committee includes language making funds available until expended for automated systems.

### CONSTRUCTION

The Committee includes language making funds available until expended for the planning, constructing, renovating, equipping, and maintaining of buildings and facilities. The Committee prohibits funds to solicit or consider any request to privatize facilities and to detain aliens unlawfully in the United States until receipt of a plan for carrying out such privatization.

### TRANSPORTATION SECURITY ADMINISTRATION

### AVIATION SECURITY

The Committee includes language making funds available until expended for civil aviation security; and establishing conditions under which security fees are collected and credited. The Committee also includes language providing funds for reception and representation expenses. Finally, the bill includes language clarifying a variety of people are not exempt from screening.

### SURFACE TRANSPORTATION SECURITY

The Committee includes language providing funds for surface transportation security programs of the Transportation Security Administration.

### TRANSPORTATION THREAT ASSESSMENT AND CREDENTIALING

The Committee includes language on the development and implementation of screening programs. The Committee requires the Assistant Secretary to notify the Committee that there are no security risks if the Secure Flight program does not check airline passenger names against the full terrorist watch list.

### TRANSPORTATION SECURITY SUPPORT

The Committee includes language providing funds for transportation security support and intelligence programs of the Transportation Security Administration. The Committee includes language requiring the submission of a detailed spend plan for checkpoint

175

support systems and explosive detection systems refurbishment, procurement and installation.

FEDERAL AIR MARSHALS

The Committee includes language providing funds for the Federal Air Marshals.

COAST GUARD

OPERATING EXPENSES

The Committee includes a provision regarding passenger motor vehicles, small boats, repairs and service life-replacements, minor shore construction projects, recreation and welfare, the Oil Spill Liability Trust Fund, and prohibits the use of funds for yacht documentation except under certain circumstances and for administrative expenses in connection with shipping commissioners in the United States. The Committee also includes language on reception and representation expenses, and on reporting sexual assaults.

ENVIRONMENTAL COMPLIANCE AND RESTORATION

The Committee includes language providing funds for environmental compliance and restoration of the Coast Guard.

RESERVE TRAINING

The Committee includes language providing funds for the Coast Guard reserve, including maintenance and operation of the reserve program, personnel and training costs, equipment and services.

ACQUISITIONS, CONSTRUCTION AND IMPROVEMENTS

The Committee includes language providing for funds for the Coast Guard acquisition, construction, renovation, and improvement of aids to navigation, shore facilities, vessels, and aircraft as well as for maintenance, rehabilitation, lease and operations of facilities and equipment. The Committee includes a provision requiring a capital investment plan for future appropriations years with certain conditions. The Committee includes language requiring that the Commandant of the Coast Guard submit revisions to the acquisition schedule of the Deepwater program with the fiscal year 2011 budget request, as well as other Deepwater related reporting requirements.

ALTERATION OF BRIDGES

The Committee provides funds for bridge alteration projects.

RESEARCH, DEVELOPMENT, TEST, AND EVALUATION

The Committee includes language providing funds for applied scientific research, development, test, and evaluation; and for maintenance, rehabilitation, lease and operation of facilities and equipment. The Committee includes language allowing funds to remain available until expended; authorizing funds to be derived from the Oil Spill Liability Trust Fund; and authorizing funds received from State and local governments, other public authorities, private sources, and foreign countries to be credited to this account and used for certain purposes.

176

### RETIRED PAY

The Committee includes language providing funds for retired pay and medical care for the Coast Guard's retired personnel and their dependents and makes these funds available until expended.

### UNITED STATES SECRET SERVICE

#### SALARIES AND EXPENSES

The Committee includes language that provides funds for the purchase and replacement of vehicles; the hire of aircraft; purchase of motorcycles; services of expert witnesses as may be necessary; rental of certain buildings; improvements to buildings as may be necessary for protective missions; per diem and subsistence allowances; firearms matches; presentation of awards; protective travel; research and development; grants for behavioral research; official reception and representation expenses; technical assistance and equipment to foreign law enforcement organizations; advance payment for commercial accommodations; and uniforms. The Committee provides for two year availability of funds for protective travel. The Committee authorizes the obligation of funds in anticipation of reimbursements for training, under certain conditions. The Committee also restricts the obligation of funds to compensate employees for overtime in an annual amount in excess of $35,000 except under certain conditions. Finally the Committee prohibits funds to be available for the protection of the head of a Federal agency other than the Secretary of Homeland Security unless the Secret Service has entered into a reimbursable agreement.

#### ACQUISITION, CONSTRUCTION, IMPROVEMENTS, AND RELATED EXPENSES

The Committee includes language providing funds for the acquisition, construction, improvement, and related expenses of Secret Service facilities and makes these funds available until expended.

### TITLE III—PREPAREDNESS AND RECOVERY

#### NATIONAL PROTECTION AND PROGRAMS DIRECTORATE

##### MANAGEMENT AND ADMINISTRATION

The Committee includes language providing funds for the Office of the Under Secretary for National Protection and Programs and the National Planning Office as well as to support business operations, information technology and risk management. The Committee also includes language providing funds for official reception and representation expenses.

##### INFRASTRUCTURE PROTECTION AND INFORMATION SECURITY

The Committee includes language making funds available until September 30, 2010. The Committee limits the amount of funds available for obligation for cyber security activities until an expenditure plan is provided.

177

UNITED STATES VISITOR AND IMMIGRANT STATUS INDICATOR
TECHNOLOGY

The Committee includes language making funds available until
expended for the US–VISIT program and includes language requir-
ing the submission of an expenditure plan prior to the obligation
of funds.

OFFICE OF HEALTH AFFAIRS

The Committee includes language making funds available for
biosurveillance, BioWatch, medical readiness planning, and chem-
ical detection. The Committee also includes language providing
funds for official reception and representation expenses.

FEDERAL EMERGENCY MANAGEMENT AGENCY

MANAGEMENT AND ADMINISTRATION

The Committee includes language that provides funds for man-
agement and administration. The Committee also includes a provi-
sion providing funds for reception and representation expenses, a
provision limiting administrative costs for Urban Search and Res-
cue response system, and funding for the Office of National Capital
Region Coordination.

STATE AND LOCAL PROGRAMS

The Committee includes language that provides funds for grants,
contracts, cooperative agreements, other activities, including grants
to State and local governments for terrorism prevention. The Com-
mittee also includes a provision identifying the amount of funds
available for homeland security grants, including State Homeland
Security Grants and Operation Stonegarden; urban area security
initiative grants, nonprofit security grants; rail and transit security
grants; port security grants; intercity bus security grants; buffer
zone protection grants; Metropolitan Medical Response System;
Citizen Corp; interoperable communication grants, REAL ID; emer-
gency operations centers; training, exercises, technical assistance,
and other programs. The Committee includes language specifying
the conditions under which both applications and grants are made
to certain grants made in the Act. The Committee also includes
language specifying the conditions for distribution of certain grants
and the availability of funds.

FIREFIGHTER ASSISTANCE GRANTS

The Committee includes language providing that not to exceed
five percent of the total is available for program administration and
requires an expenditure plan for program administration.

EMERGENCY MANAGEMENT PERFORMANCE GRANTS

The Committee includes language providing that not to exceed
three percent of the total appropriation is available for administra-
tive costs.

178

### RADIOLOGICAL EMERGENCY PREPAREDNESS PROGRAM

The Committee includes a provision regarding charges assessed for the radiological emergency preparedness program, including conditions and methodology for the assessment and collection of fees.

### UNITED STATES FIRE ADMINISTRATION

The Committee includes language that provides funds for expenses of the U.S. Fire Administration.

### DISASTER RELIEF

The Committee includes language making funds available until expended and requires a variety of reporting requirements. The Committee includes language permitting the transfer of these funds to FEMA management and administration and by the IG.

### DISASTER ASSISTANCE DIRECT LOAN PROGRAM ACCOUNT

The Committee includes a provision limiting gross obligations for direct loans; includes a provision regarding the cost of modifying loans; and provides for administrative expenses of the direct loan program.

### FLOOD MAP MODERNIZATION FUND

The Committee includes provisions regarding non-Federal sums for cost-shared mapping activities and limiting total administrative costs to 3 percent of the total appropriation. The Committee also includes language making funds available until expended.

### NATIONAL FLOOD INSURANCE FUND

The Committee includes language limiting funds available for salaries and expenses; language making funds available for floodplain management and flood mapping available until September 30, 2011; and language authorizing the transfer of funds to the National Flood Mitigation Fund. The Committee includes provisions limiting operating expenses; for interest on Treasury borrowings; for agents' commissions and taxes; for fees collected and available for floodplain management; and for flood mitigation activities associated with sections 1361A and 1323 of the National Flood Insurance Act of 1968. The Committee includes language permitting additional fees collected be credited as an offsetting collection and available for floodplain management. The Committee includes language providing that not to exceed four percent of the total appropriation is available for administrative costs.

### NATIONAL PREDISASTER MITIGATION FUND

The Committee includes language authorizing grant awards to be available until expended. The Committee includes a provision limiting total administrative costs to 3 percent of the total appropriation.

179

### EMERGENCY FOOD AND SHELTER

The Committee includes language making funds available until expended and limiting total administrative costs to 3.5 percent of the total appropriation.

## TITLE IV—RESEARCH AND DEVELOPMENT, TRAINING, AND SERVICES

### UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES

The Committee includes language making funds available for citizenship and immigration services, E-Verify, REAL ID hub development, and for replacement vehicles.

### FEDERAL LAW ENFORCEMENT TRAINING CENTER

#### SALARIES AND EXPENSES

The Committee includes language making funds available for official representation expenses; purchase of police type pursuit vehicles; student athletic and related recreational activities; conducting and participating in firearms matches; public awareness and community support; marketing; room and board; services; services authorized by 5 U.S.C. 3109; law enforcement accreditation; reimbursements for certain mobile phone expenses. The Committee includes language authorizing the training of certain law enforcement personnel; authorizes the use of appropriations and reimbursements for such training and establishes a cap on total obligations. The Committee also includes language authorizing funds for the compensation of accreditation costs for participating agencies; authorizing the hiring of retired Federal employees until 2011; and on the scheduling of basic or advanced law enforcement training.

#### ACQUISITION, CONSTRUCTION, IMPROVEMENTS AND RELATED EXPENSES

The Committee includes language making funds available until expended for real property and facilities and authorizes reimbursement from government agencies requesting construction of special use facilities.

### SCIENCE AND TECHNOLOGY

#### MANAGEMENT AND ADMINISTRATION

The Committee includes language providing funds for reception and representation expenses.

#### RESEARCH, DEVELOPMENT, ACQUISITION AND OPERATIONS

The Committee includes language making funds available until expended and prohibits funds for construction of the National Bio and Agro-defense Facility until a risk assessment of foot-and-mouth disease work being studied on the mainland is prepared.

180

DOMESTIC NUCLEAR DETECTION OFFICE

MANAGEMENT AND ADMINISTRATION

The Committee includes language that provides funds for management and administration. The Committee also includes a provision providing funds for reception and representation expenses.

RESEARCH, DEVELOPMENT, ACQUISITION, AND OPERATIONS

The Committee includes language making funds for nuclear detection research, development, testing and evaluation. Language is included making funds available until expended.

TITLE V—GENERAL PROVISIONS

Section 501. The Committee continues a provision providing that no part of any appropriation shall remain available for obligation beyond the current year unless expressly provided.

Section 502. The Committee continues a provision providing that unexpended balances of prior appropriations may be merged with new appropriation accounts and used for the same purpose, subject to reprogramming guidelines.

Section 503. The Committee continues and modifies a provision providing reprogramming authority for funds within an account and not to exceed 5 percent transfer authority between appropriations accounts with the requirement for a 15-day advance Congressional notification. A detailed funding table identifying each Congressional control level for reprogramming purposes is included at the end of this Report. These reprogramming guidelines shall be complied with by all agencies funded by the Department of Homeland Security Appropriations Act, 2010.

Section 504. The Committee continues a provision that prohibits funds appropriated or otherwise made available to the Department to make payment to the Department's Working Capital Fund, except for activities and amounts allowed in the President's fiscal year 2010. Funds provided to the WCF are available until expended. The Department can only charge components for direct usage of the WCF and these funds may be used only for the purposes consistent with the contributing component. Any funds paid in advance or reimbursed must reflect the full cost of each service. The WCF shall be subject to the requirements of section 503 of this Act.

Section 505. The Committee continues a provision providing that not to exceed 50 percent of unobligated balances remaining at the end of fiscal year 2010 from appropriations made for salaries and expenses shall remain available through fiscal year 2011 subject to reprogramming guidelines.

Section 506. The Committee continues a provision providing that funds for intelligence activities are deemed to be specifically authorized during fiscal year 2010 until the enactment of an Act authorizing intelligence activities for fiscal year 2010.

Section 507. The Committee continues and modifies a provision requiring notification of the Committees on Appropriations three days before grant allocations, grant awards, contract awards, letters of intent, or other transactional agreements totaling $1,000,000 or more are announced by the Department. The Depart-

181

ment is required to brief the Committees on Appropriations five full business days prior to announcing the intention to make a grant under State and Local Programs. Notification shall include a description of the project or projects to be funded, including city, county and state.

Section 508. The Committee continues a provision providing that no agency shall purchase, construct, or lease additional facilities for federal law enforcement training without advance approval of the Committees on Appropriations.

Section 509. The Committee continues a provision providing that none of the funds may be used for any construction, repair, alteration, and acquisition project for which a prospectus, if required under chapter 33 of title 40, United States Code, has not been approved.

Section 510. The bill continues a provision that consolidates by reference prior year statutory bill language into one provision. These provisions relate to reporting requirements of the privacy officer; contracting officer's technical representative training; sensitive security information; federal building performance and requirements outlined in title V of the National Energy Conservation Policy Act or subtitle A of title I of the Energy Policy Act of 2005; use of funds in conformance with section 303 of the Energy Policy Act of 1992; and Executive Order 13149 relating to fleet and transportation efficiency.

Section 511. The Committee continues a provision that none of the funds may be used in contravention of the Buy American Act.

Section 512. The Committee continues a provision regarding competitive sourcing.

Section 513. The Committee continues and modifies a provision directing TSA to research, develop, and procure new technologies to inspect and screen air cargo. The Committee also requires the quarterly submission of air cargo inspection statistics and a report on how TSA will meet the 100 percent mandate contained in the 9/11 Act.

Section 514. The Committee continues a provision that directs that any funds appropriated or transferred to TSA "Aviation Security", "Administration", and "Transportation Security Support" in fiscal years 2004, 2005, 2006, and 2007, which are recovered or deobligated, shall be available only for procurement and installation of explosive detection systems for air cargo, baggage and checkpoint screening systems, subject to section notification. The Committee also requires quarterly reports on recovered or deobligated funds.

Section 515. The Committee continues a provision requiring any funds appropriated to the Coast Guard's 110–123 foot patrol boat conversion that are recovered, collected, or otherwise received as a result of negotiation, mediation, or litigation, shall be available until expended for the Fast Response Cutter program.

Section 516. The Committee continues a provision requiring the Chief Financial Officer to submit monthly budget execution and staffing reports within 45 days after the close of each month.

Section 517. The Committee continues a provision relating to undercover investigative operations authority of the Secret Service for fiscal year 2010.

Section 518. The Committee continues and modifies a provision classifying the functions of the instructor staff at the Federal Law Enforcement Training Center as inherently governmental for purposes of the Federal Activities Inventory Reform Act.

Section 519. The bill continues a provision pertaining to the human resource management system.

Section 520. The Committee continues a provision regarding the enforcement of section 4025(1) of Public Law 108–458.

Section 521. The Committee continues a provision prohibiting the Secretary of Homeland Security from reducing operations within the Coast Guard's civil engineering program except as specifically authorized in statute after enactment of this Act.

Section 522. The Committee continues a provision prohibiting the obligation of funds to the Office of the Secretary and Executive Management, the Office of the Under Secretary for Management, and the Office of the Chief Financial Officer for grants or contracts awarded by any means other than full and open competition. Certain exceptions apply. The bill also requires the IG to review Departmental contracts awarded noncompetitively and report on the results to the Committees.

Section 523. The Committee continues a provision that prohibits funding for any position designated as a Principal Federal Official (PFO) during a Stafford Act declared disaster or emergency.

Section 524. The Committee continues a provision prohibiting funding to grant an immigration benefit to any individual unless the results of background checks required in statute to be completed prior to the grant of the benefit have been received by DHS.

Section 525. The Committee continues a provision prohibiting use of funds to destroy or put out to pasture any horse or other equine belonging to the Federal government unless adoption has been offered first.

Section 526. The Committee continues a provision that precludes DHS from using funds in this Act to carry out reorganization authority.

Section 527. The Committee continues a provision prohibiting funds to be used to conduct or implement the results of a competition under Office of Management and Budget Circular A–76 with respect to the Coast Guard National Vessel Documentation Center.

Section 528. The Committee continues a provision that requires the Secretary to link all contracts that provide award fees to successful acquisition outcomes.

Section 529. The Committee continues a provision prohibiting the obligation of funds for the Office of Secretary and Executive Management for any new hires at DHS if they are not verified through the basic pilot program (E-Verify).

Section 530. The Committee continues a provision related to prescription drugs.

Section 531. The Committee continues a provision prohibiting funds available in this Act from being used to implement a rule or regulation which implements the notice of proposed rulemaking related to Petitions for Aliens to Perform Temporary Nonagricultural Services or Labor (H–2B) set out beginning on 70 Federal Register 3984 (January 27, 2005).

Section 532. The Committee continues and modifies a provision relating to other transactional authority of the DHS through fiscal

183

year 2010. Language continues to require the Secretary to issue policy guidance detailing the appropriate use of other transactional authority and provide training to each employee that has authority to handle procurements under this authority. The Secretary shall report on projects for which this authority was used.

Section 533. The Committee continues a provision prohibiting funds for planning, testing, piloting or developing a national identification card.

Section 534. The Committee continues a provision that requires a report summarizing damage assessment information used to determine whether to declare a major disaster.

Section 535. The Committee continues and modifies a provision relating to the liquidation of Plum Island assets and how the proceeds from this sale may be applied to construction costs of the new National Bio and Agro-defense Facility.

Section 536. The Committee continues a provision directing that any official required by this Act to report or certify to the Committees on Appropriation may not delegate any authority unless expressly authorized to do so in this Act.

Section 537. The Committee continues a provision requiring the Secretary of Homeland Security, in conjunction with the Secretary of the Treasury, to notify the Committees of any proposed transfers from the Department of Treasury Forfeiture Fund to any agency within the Department of Homeland Security. No funds may be obligated until the Subcommittees approve the proposed transfers.

Section 538. The Committee continues a provision requiring the Assistant Secretary of Homeland Security (Transportation Security Administration) to certify that no security risks will result if an airport does not participate in the basic pilot program.

Section 539. The Committee rescinds $2,203,000 from the unobligated balances of prior year appropriations made available for "Analysis and Operations".

Section 540. The Committee includes a new provision on fiscal year 2008 predisaster mitigation grants.

Section 541. The Committee continues and modifies a provision extending the authority of the Predisaster Mitigation Fund until September 30, 2010.

Section 542. The Committee rescinds $5,963,000 from unobligated balances of prior year appropriations made available to Infrastructure Protection and Information Security.

Section 543. The Committee includes a new provision permitting unobligated amounts of appropriations made available to the Coast Guard in fiscal years 2008 and 2009 for Sector Buffalo to be used to make improvements to the land for public access to Buffalo Lighthouse.

Section 544. The Committee includes a new provision that permits the Secretary to extend certain travel benefits and reimbursements for those overseas personnel consistent with the Foreign Service Act of 1980.

Section 545. The Committee continues a provision that extends E-Verify until September 30, 2011, ensures the protection of Social Security benefits and requires two GAO studies.

Section 546. The Committee includes a new provision on the use of H and L visa fraud prevention and detection fees.

184

Section 547. The Committee includes a new provision clarifying the Temporary Protected Status fee.

Section 548. The Committee includes a new provision that extends the date of the chemical security program.

Section 549. The Committee includes a new provision that permits the Department to collect fees from non-Federal participants in a conference, seminar, exhibition, symposium, or similar meeting and those fees will be credited to the costs of the conference, seminar, exhibition, symposium, or meeting. Any excess fees will be deposited into the treasury as miscellaneous receipts.

Section 550. The Committee rescinds $5,572,000 from unobligated balances of fiscal year 2009 appropriations made available to Federal Emergency Management Agency "Trucking Industry Security Grants".

Section 551. The Committee continues a provision on operational effectiveness and certification requirements for ASP monitors.

Section 552. The Committee includes a new provision that requires an individualized threat assessment of each and every individual detained at Naval Station Guantanamo Bay, Cuba, as of April 30, 2009; inclusion of the names of such detainees on the No Fly List; and a limitation on funds from being used to grant an immigration benefit to such detainees, except for the purposes of prosecution.

### DETAILED EXPLANATIONS IN REPORT

It should be emphasized again that a more detailed statement describing the effect of the above provisions inserted by the Committee which directly or indirectly change the application of existing law may be found at the appropriate place in this report.

185

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

ROLL CALL NO. 1

Date: June 12, 2009
Measure: Homeland Security Appropriations Bill, 2010
Motion by: Mr. Rogers
Description of Motion: An amendment to direct the Secretary of Homeland Security to conduct individual threat assessments for detainees held at Guantanamo Bay prior to transfer to the United States; require the inclusion of detainees on the No Fly List, unless the President certifies the individual poses no threat; and prohibits the use of the bill's funds to provide any immigration benefit to any detainees. The Rogers' amendment was perfected by an amendment offered by Mr. Lewis. This amendment stated that nothing in the no-fly and immigration sections of the Rogers amendment should be interpreted to prohibit a Guantanamo detainee from being brought to the United States for prosecution.
Results:   Adopted  34 yeas to 24 nays.

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Aderholt | Mr. Berry |
| Mr. Alexander | Ms. DeLauro |
| Mr. Bishop | Mr. Dicks |
| Mr. Bonner | Mr. Farr |
| Mr. Boyd | Mr. Fattah |
| Mr. Calvert | Mr. Hinchey |
| Mr. Carter | Mr. Honda |
| Mr. Chandler | Mr. Israel |
| Mr. Cole | Mr. Jackson |
| Mr. Crenshaw | Ms. Kaptur |
| Mr. Culberson | Ms. Kilpatrick |
| Mr. Davis | Ms. Lee |
| Mr. Edwards | Mrs. Lowey |
| Mrs. Emerson | Ms. McCollum |
| Mr. Frelinghuysen | Mr. Mollohan |
| Ms. Granger | Mr. Moran |
| Mr. Kingston | Mr. Murtha |
| Mr. Kirk | Mr. Olver |
| Mr. Latham | Mr. Pastor |
| Mr. LaTourette | Mr. Rothman |
| Mr. Lewis | Mr. Serrano |
| Mr. Obey | Mr. Tiahrt |
| Mr. Price | Mr. Visclosky |
| Mr. Rehberg | Ms. Wasserman Schultz |
| Mr. Rodriguez | |
| Mr. Rogers | |
| Ms. Roybal-Allard | |
| Mr. Ryan | |
| Mr. Salazar | |
| Mr. Schiff | |
| Mr. Simpson | |
| Mr. Wamp | |
| Mr. Wolf | |
| Mr. Young | |

186

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

ROLL CALL NO. 2

Date: June 12, 2009
Measure:  Homeland Security Appropriations Bill, 2010
Motion by:  Mr. Calvert
Description of Motion: — An amendment to make the E-Verify program permanent.
Results: Rejected, 21 yeas to 36 nays.

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Aderholt | Mr. Berry |
| Mr. Alexander | Mr. Bishop |
| Mr. Calvert | Mr. Boyd |
| Mr. Carter | Mr. Chandler |
| Mr. Cole | Mr. Davis |
| Mr. Crenshaw | Ms. DeLauro |
| Mr. Culberson | Mr. Dicks |
| Mrs. Emerson | Mr. Edwards |
| Mr. Frelinghuysen | Mr. Farr |
| Ms. Granger | Mr. Fattah |
| Mr. Kingston | Mr. Hinchey |
| Mr. Kirk | Mr. Honda |
| Mr. Latham | Mr. Israel |
| Mr. LaTourette | Mr. Jackson |
| Mr. Lewis | Ms. Kaptur |
| Mr. Rehberg | Ms. Kilpatrick |
| Mr. Rogers | Ms. Lee |
| Mr. Simpson | Mrs. Lowey |
| Mr. Tiahrt | Ms. McCollum |
| Mr. Wamp | Mr. Mollohan |
| Mr. Wolf | Mr. Moran |
| | Mr. Murtha |
| | Mr. Obey |
| | Mr. Olver |
| | Mr. Pastor |
| | Mr. Price |
| | Mr. Rodriguez |
| | Mr. Rothman |
| | Ms. Roybal-Allard |
| | Mr. Ryan |
| | Mr. Salazar |
| | Mr. Schiff |
| | Mr. Serrano |
| | Mr. Visclosky |
| | Ms. Wasserman Schultz |
| | Mr. Young |

187

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

ROLL CALL NO. 3

Date:  June 12, 2009
Measure: Homeland Security Appropriations Bill, 2010
Motion by: Kingston
Description of Motion: An amendment to prohibit the use of the bill's funds for contracts with entities eligible for, but do not participate in, the E-Verify program.
Results:  Rejected, 23 yeas to 35 nays.

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Aderholt | Mr. Berry |
| Mr. Alexander | Mr. Bishop |
| Mr. Bonner | Mr. Boyd |
| Mr. Calvert | Mr. Chandler |
| Mr. Carter | Mr. Davis |
| Mr. Cole | Ms. DeLauro |
| Mr. Crenshaw | Mr. Dicks |
| Mr. Culberson | Mr. Edwards |
| Mrs. Emerson | Mr. Farr |
| Mr. Frelinghuysen | Mr. Fattah |
| Ms. Granger | Mr. Hinchey |
| Mr. Kingston | Mr. Honda |
| Mr. Kirk | Mr. Israel |
| Mr. Latham | Mr. Jackson |
| Mr. LaTourette | Ms. Kaptur |
| Mr. Lewis | Ms. Kilpatrick |
| Mr. Rehberg | Ms. Lee |
| Mr. Rogers | Mrs. Lowey |
| Mr. Simpson | Ms. McCollum |
| Mr. Tiahrt | Mr. Mollohan |
| Mr. Wamp | Mr. Moran |
| Mr. Wolf | Mr. Murtha |
| Mr. Young | Mr. Obey |
| | Mr. Olver |
| | Mr. Pastor |
| | Mr. Price |
| | Mr. Rodriguez |
| | Mr. Rothman |
| | Ms. Roybal-Allard |
| | Mr. Ryan |
| | Mr. Salazar |
| | Mr. Schiff |
| | Mr. Serrano |
| | Mr. Visclosky |
| | Ms. Wasserman Schultz |

188

**FULL COMMITTEE VOTES**

Pursuant to the provisions of clause 3(b) of rule XIII of the House of Representatives, the results of each roll call vote on an amendment or on the motion to report, together with the names of those voting for and those voting against, are printed below:

ROLL CALL NO. 4

Date: June 12, 2009
Measure: Homeland Security Appropriations Bill, 2010
Motion by: Tiahrt
Description of Motion: An amendment to rescind all unobligated discretionary funds provided by the economic stimulus law (PL 111-5) to pay for Homeland Security Appropriations in fiscal year 2010.
Results: Rejected, 23 yeas to 35 nays.

| *Members Voting Yea* | *Members Voting Nay* |
|---|---|
| Mr. Aderholt | Mr. Berry |
| Mr. Alexander | Mr. Bishop |
| Mr. Bonner | Mr. Boyd |
| Mr. Calvert | Mr. Chandler |
| Mr. Carter | Mr. Davis |
| Mr. Cole | Ms. DeLauro |
| Mr. Crenshaw | Mr. Dicks |
| Mr. Culberson | Mr. Edwards |
| Mrs. Emerson | Mr. Farr |
| Mr. Frelinghuysen | Mr. Fattah |
| Ms. Granger | Mr. Hinchey |
| Mr. Kingston | Mr. Honda |
| Mr. Kirk | Mr. Israel |
| Mr. Latham | Mr. Jackson |
| Mr. LaTourette | Ms. Kaptur |
| Mr. Lewis | Ms. Kilpatrick |
| Mr. Rehberg | Ms. Lee |
| Mr. Rogers | Mrs. Lowey |
| Mr. Simpson | Ms. McCollum |
| Mr. Tiahrt | Mr. Mollohan |
| Mr. Wamp | Mr. Moran |
| Mr. Wolf | Mr. Murtha |
| Mr. Young | Mr. Obey |
| | Mr. Olver |
| | Mr. Pastor |
| | Mr. Price |
| | Mr. Rodriguez |
| | Mr. Rothman |
| | Ms. Roybal-Allard |
| | Mr. Ryan |
| | Mr. Salazar |
| | Mr. Schiff |
| | Mr. Serrano |
| | Mr. Visclosky |
| | Ms. Wasserman Schultz |

189

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| TITLE I - DEPARTMENTAL MANAGEMENT AND OPERATIONS | | | | | |
| Office of the Secretary and Executive Management: | | | | | |
| Immediate Office of the Secretary | 3,140 | 5,061 | 3,783 | +643 | -1,278 |
| Immediate Office of the Deputy Secretary | 1,400 | 1,810 | 1,440 | +40 | -370 |
| Chief of Staff | 2,693 | 2,595 | 2,926 | +233 | +331 |
| Office of Counternarcotics Enforcement | 3,718 | 3,912 | 3,712 | -6 | -200 |
| Executive Secretary | 7,448 | 8,344 | 7,578 | +130 | -766 |
| Office of Policy | 43,263 | 61,564 | 51,564 | +8,301 | -10,000 |
| Office of Public Affairs | 5,991 | 6,539 | 6,039 | +48 | -500 |
| Office of Legislative Affairs | 4,997 | 7,097 | 6,797 | +1,800 | -300 |
| Office of Intergovernmental Programs | --- | 2,800 | 2,800 | +2,800 | --- |
| Office of General Counsel | 20,114 | 24,028 | 24,028 | +3,914 | --- |
| Office of Civil Rights and Civil Liberties | 17,417 | 22,104 | 22,104 | +4,687 | --- |
| Citizenship and Immigration Services Ombudsman | 6,471 | 6,935 | 6,685 | +214 | -250 |
| Privacy Officer | 6,804 | 7,971 | 7,971 | +1,167 | --- |
| Total, Office of the Secretary and Executive Management | 123,456 | 160,760 | 147,427 | +23,971 | -13,333 |
| Office of the Under Secretary for Management: | | | | | |
| Under Secretary for Management | 2,654 | 2,864 | 2,864 | +210 | --- |
| Emergency appropriations (P. L. 111-5) | 200,000 | --- | --- | -200,000 | --- |
| Subtotal, Under Secretary for Management | 202,654 | 2,864 | 2,864 | -199,790 | --- |
| Office of Security | 60,882 | 95,193 | 95,193 | +34,311 | --- |
| Office of the Chief Procurement Officer | 39,003 | 71,038 | 66,538 | +27,535 | -4,500 |

190

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Office of the Chief Human Capital Officer: | | | | | |
| Salaries and expenses.................. | 28,827 | 34,404 | 33,604 | +4,777 | -800 |
| Human resources....................... | 10,000 | 10,000 | 10,000 | --- | --- |
| Subtotal, Office of the Chief Human Capital Officer.................. | 38,827 | 44,404 | 43,604 | +4,777 | -800 |
| Office of the Chief Administrative Officer: | | | | | |
| Salaries and expenses.................. | 44,427 | 43,491 | 44,491 | +64 | +1,000 |
| Nebraska Avenue Complex (NAC)......... | 6,000 | 6,000 | 6,000 | --- | --- |
| DHS headquarters lease consolidation... | --- | 75,000 | 10,000 | +10,000 | -65,000 |
| Subtotal, Office of the Chief Administrative Officer.................. | 50,427 | 124,491 | 60,491 | +10,064 | -64,000 |
| Total, Office of the Under Secretary for Management................. | 391,793 | 337,990 | 268,690 | -123,103 | -69,300 |
| Office of the Chief Financial Officer.................. | 55,235 | 65,530 | 63,530 | +8,295 | -2,000 |
| Office of the Chief Information Officer: | | | | | |
| Salaries and expenses.................. | 86,928 | 86,912 | 86,912 | -16 | --- |
| Information technology services........ | 44,945 | 51,417 | 51,417 | +6,472 | --- |
| Security activities................... | 92,623 | 152,403 | 113,603 | +20,980 | -38,800 |
| Homeland Secure Data Network (HSDN).... | 47,673 | 47,661 | 47,661 | -12 | --- |
| Subtotal, Office of the Chief Information Officer.................. | 272,169 | 338,393 | 299,593 | +27,424 | -38,800 |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Analysis and Operations................................. | 327,373 | 357,345 | 345,556 | +18,183 | -11,789 |
| Total, Departmental Operations............... | 1,170,026 | 1,260,018 | 1,124,796 | -45,230 | -135,222 |
| Office of the Federal Coordinator for Gulf Coast Rebuilding................................................. | 1,900 | 2,000 | 2,000 | +100 | --- |
| **Office of Inspector General** | | | | | |
| Office of Inspector General.......................... | 98,513 | 127,874 | 111,874 | +13,361 | -16,000 |
| Emergency appropriations (P. L. 111-5)........... | 5,000 | --- | --- | -5,000 | --- |
| Transfer from Disaster Relief..................... | (16,000) | --- | (16,000) | --- | (+16,000) |
| Subtotal, Office of Inspector General (including transfers)............................... | 119,513 | 127,874 | 127,874 | +8,361 | --- |
| Appropriations..................................... | (98,513) | (127,874) | (111,874) | (+13,361) | (-16,000) |
| Emergency appropriations........................... | (5,000) | --- | --- | (-5,000) | --- |
| by transfer....................................... | (16,000) | --- | (16,000) | --- | (+16,000) |
| Total, title I, Departmental Management and Operations (including transfers)............... | 1,291,439 | 1,389,892 | 1,254,670 | -36,769 | -135,222 |
| Appropriations..................................... | (1,070,439) | (1,389,892) | (1,238,670) | (+168,231) | (-151,222) |
| Emergency appropriations........................... | (205,000) | --- | --- | (-205,000) | --- |
| by transfer....................................... | (16,000) | --- | (16,000) | --- | (+16,000) |

192

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| TITLE II - SECURITY, ENFORCEMENT, AND INVESTIGATIONS | | | | | |
| U.S. Customs and Border Protection | | | | | |
| Salaries and expenses: | | | | | |
| Headquarters, Management, and Administration: | | | | | |
| Management and administration, border security inspections and trade facilitation........... | 646,608 | 522,825 | 503,500 | -143,108 | -19,325 |
| Management and administration, border security and control between ports of entry........... | 622,550 | 497,675 | 478,350 | -144,200 | -19,325 |
| Subtotal, Headquarters, Mgt & Admin........ | 1,269,158 | 1,020,500 | 981,850 | -287,308 | -38,650 |
| Border security inspections and trade facilitation: | | | | | |
| Inspections, trade, and travel facilitation at ports of entry...................... | 2,093,988 | 2,255,210 | 2,250,310 | +156,322 | -4,900 |
| Harbor maintenance fee collection (trust fund) | 3,154 | 3,226 | 3,226 | +72 | --- |
| International cargo screening................ | 149,450 | 165,421 | 162,000 | +12,550 | -3,421 |
| Other international programs................. | 10,984 | 11,181 | 11,181 | +197 | --- |
| Customs-Trade Partnership Against Terrorism (C-TPAT)................................. | 64,496 | 62,612 | 62,612 | -1,884 | --- |
| Trusted Traveler programs.................... | 11,274 | 11,274 | 11,274 | --- | --- |
| Inspection and detection technology investments................................ | 145,944 | 143,563 | 143,563 | -2,381 | --- |
| Emergency appropriations (P. L. 111-5)...... | 160,000 | --- | --- | -160,000 | --- |

193

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Subtotal.......................... | 305,944 | 143,563 | 143,563 | -162,381 | --- |
| Automated targeting systems.............. | 32,550 | 32,560 | 32,560 | +10 | --- |
| National Targeting Center............... | 24,481 | 26,355 | 26,355 | +1,874 | --- |
| Training................................ | 24,778 | 24,778 | 24,778 | --- | --- |
| Subtotal, Border security inspections and trade facilitation............. | 2,721,099 | 2,736,180 | 2,727,859 | +6,760 | -8,321 |
| Border security and control between ports of entry: | | | | | |
| Border security and control............. | 3,426,455 | 3,505,008 | 3,505,808 | +79,353 | +800 |
| Training................................ | 74,815 | 51,751 | 51,751 | -23,064 | --- |
| Subtotal, Border security and control between ports of entry............. | 3,501,270 | 3,556,759 | 3,557,559 | +56,289 | +800 |
| Air and Marine Operations.................. | 271,679 | 309,629 | 309,629 | +37,950 | --- |
| Subtotal, Salaries and expenses........... | 7,763,206 | 7,623,068 | 7,576,897 | -186,309 | -46,171 |
| Appropriations........................ | (7,600,052) | (7,619,842) | (7,573,671) | (-26,381) | (-46,171) |
| Emergency appropriations.............. | (160,000) | --- | --- | (-160,000) | --- |
| Harbor maintenance trust fund........ | (3,154) | (3,226) | (3,226) | (+72) | --- |
| Automation modernization: | | | | | |
| Automated commercial environment/International Trade Data System (ITDS)............ | 316,851 | 267,960 | 267,960 | -48,891 | --- |
| Current operations protection and processing support (COPPS)...................... | 194,483 | 194,485 | 194,485 | +2 | --- |

194

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Subtotal, Automation modernization | 511,334 | 462,445 | 462,445 | -48,889 | --- |
| Border security fencing, infrastructure, and technology (BSFIT): | | | | | |
| Development and deployment | 505,000 | 494,000 | 440,000 | -65,000 | -54,000 |
| Operation and maintenance | 150,000 | 200,000 | 200,000 | +50,000 | --- |
| Program management | 120,000 | 85,452 | 92,000 | -28,000 | +6,548 |
| Emergency appropriations (P. L. 111-5) | 100,000 | --- | --- | -100,000 | --- |
| Subtotal, BSFIT | 875,000 | 779,452 | 732,000 | -143,000 | -47,452 |
| Appropriations | (775,000) | (779,452) | (732,000) | (-43,000) | (-47,452) |
| Emergency appropriations | (100,000) | --- | --- | (-100,000) | --- |
| Air and Marine Interdiction, Operations, Maintenance, and Procurement: | | | | | |
| Operations and maintenance | 380,022 | 374,217 | 374,217 | -5,805 | --- |
| Procurement | 147,978 | 131,609 | 139,609 | -8,369 | +8,000 |
| Subtotal, Air and marine interdiction, operations, maintenance, and procurement | 528,000 | 505,826 | 513,826 | -14,174 | +8,000 |
| Facilities management: | | | | | |
| Facility construction and sustainment | 403,201 | 239,357 | 242,857 | -160,344 | +3,500 |
| Rent | --- | 402,263 | 402,263 | +402,263 | --- |
| Program oversight and management | --- | 37,013 | 37,013 | +37,013 | --- |
| Emergency appropriations (P. L. 111-5) | 420,000 | --- | --- | -420,000 | --- |
| Subtotal, Facilities management | 823,201 | 678,633 | 682,133 | -141,068 | +3,500 |

195

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Total, Direct appropriations for Customs and Border Protection................ | 10,500,741 | 10,049,424 | 9,967,301 | -533,440 | -82,123 |
| Fee accounts: | | | | | |
| Immigration inspection user fee................ | (570,059) | (584,000) | (584,000) | (+13,941) | --- |
| Immigration enforcement fines................ | (3,331) | (5,000) | (5,000) | (+1,669) | --- |
| Land border inspection fee................ | (26,880) | (30,000) | (30,000) | (+3,120) | --- |
| COBRA passenger inspection fee................ | (410,666) | (393,000) | (393,000) | (-17,666) | --- |
| APHIS inspection fee................ | (333,433) | (320,000) | (320,000) | (-13,433) | --- |
| Puerto Rico collections................ | (96,719) | (92,000) | (92,000) | (-4,719) | --- |
| Small airport user fees................ | (7,057) | (6,000) | (6,000) | (+943) | --- |
| Subtotal, fee accounts................ | (1,448,145) | (1,432,000) | (1,432,000) | (-16,145) | --- |
| Total, U.S. Customs and Border Protection................ | (11,948,886) | (11,481,424) | (11,399,301) | (-549,585) | (-82,123) |
| Appropriations................ | (9,820,741) | (10,049,424) | (9,967,301) | (+146,560) | (-82,123) |
| Emergency appropriations................ | (680,000) | --- | --- | (-680,000) | --- |
| (Fee accounts)................ | (1,448,145) | (1,432,000) | (1,432,000) | (-16,145) | --- |

U.S. Immigration and Customs Enforcement

Salaries and expenses:
Headquarters Management and Administration
(non-detention and removal operations):

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Personnel compensation and benefits, service and other costs................ | 203,076 | 321,850 | 276,973 | +73,897 | -44,877 |

196

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Headquarters managed IT investment............ | 169,348 | 243,264 | 209,414 | +40,066 | -33,850 |
| Subtotal, Headquarters management and administration.............................. | 372,424 | 565,114 | 486,387 | +113,963 | -78,727 |
| Legal proceedings............................. | 215,035 | 221,666 | 221,666 | +6,631 | --- |
| Investigations: | | | | | |
| Domestic.................................. | 1,519,208 | 1,615,551 | 1,643,360 | +124,152 | +27,809 |
| International investigations: | | | | | |
| International operations.................. | 106,741 | 112,872 | 112,872 | +6,131 | --- |
| Visa security program..................... | 26,800 | 30,186 | 30,186 | +3,386 | --- |
| Subtotal, International investigations... | 133,541 | 143,058 | 143,058 | +9,517 | --- |
| Subtotal, Investigations..................... | 1,652,749 | 1,758,609 | 1,786,418 | +133,669 | +27,809 |
| Intelligence................................. | 55,789 | 67,842 | 67,842 | +12,053 | --- |
| Detention and removal operations: | | | | | |
| Custody Operations........................ | 1,721,268 | 1,771,168 | 1,771,168 | +49,900 | --- |
| Fugitive operations....................... | 226,477 | 229,682 | 229,682 | +3,205 | --- |
| Criminal Alien program.................... | 189,069 | 192,539 | 192,539 | +3,470 | --- |
| Alternatives to detention................. | 63,000 | 63,913 | 73,913 | +10,913 | +10,000 |
| Transportation and removal program........ | 281,399 | 281,878 | 281,878 | +479 | --- |
| Subtotal, Detention and removal operations.. | 2,481,213 | 2,539,180 | 2,549,180 | +67,967 | +10,000 |

197

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Comprehensive identification and removal of criminal aliens: | | | | | |
| criminal aliens........................ | 150,000 | 195,589 | 200,000 | +50,000 | +4,411 |
| Subtotal, Salaries and expenses......... | 4,927,210 | 5,348,000 | 5,311,493 | +384,283 | -36,507 |
| Federal protective service: | | | | | |
| Basic security..................... | 213,673 | --- | 213,673 | --- | +213,673 |
| Building specific security (including capital equipment replacement/acquisition)... | 426,327 | --- | 426,327 | --- | +426,327 |
| Reimbursable security fees (contract guard services)........................ | --- | --- | 475,000 | +475,000 | +475,000 |
| Subtotal, Federal Protective Service.... | 640,000 | --- | 1,115,000 | +475,000 | +1,115,000 |
| Offsetting fee collections............. | -640,000 | --- | -1,115,000 | -475,000 | -1,115,000 |
| Automation modernization............... | 57,000 | 110,000 | 110,000 | +53,000 | --- |
| Emergency appropriations (P. L. 111-5).. | 20,000 | --- | --- | -20,000 | --- |
| Subtotal, Automation modernization...... | 77,000 | 110,000 | 110,000 | +33,000 | --- |
| Construction........................... | 5,000 | --- | 6,818 | +1,818 | +6,818 |
| Total, Direct appropriations for U.S. Immigration Customs Enforcement...... | 5,009,210 | 5,458,000 | 5,428,311 | +419,101 | -29,689 |
| Fee accounts: | | | | | |
| Immigration Inspection user fee........ | (119,000) | (123,000) | (123,000) | (+4,000) | --- |

198

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Breached bond/detention fund... | (60,000) | (75,000) | (75,000) | (+15,000) | --- |
| Student exchange and visitor fee... | (120,000) | (120,000) | (120,000) | --- | --- |
| Subtotal, fee accounts... | (299,000) | (318,000) | (318,000) | (+19,000) | --- |
| Subtotal, U.S. Immigration and Customs Enforcement (gross)... | (5,948,210) | (5,776,000) | (6,861,311) | (+913,101) | (+1,085,311) |
| Offsetting fee collections... | (-640,000) | --- | (-1,115,000) | (-475,000) | (-1,115,000) |
| Total, U.S. Immigration and Customs Enforcement... | (5,308,210) | (5,776,000) | (5,746,311) | (+438,101) | (-29,689) |
| Appropriations... | (4,989,210) | (5,458,000) | (5,428,311) | (+439,101) | (-29,689) |
| Emergency appropriations... | (-20,000) | --- | --- | (-20,000) | --- |
| Fee accounts... | (299,000) | (318,000) | (318,000) | (+19,000) | --- |

Transportation Security Administration

Aviation security:
Screening operations:
Screener workforce:

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Privatized screening... | 151,272 | 149,643 | 149,643 | -1,629 | --- |
| Screener personnel, compensation, and benefits... | 2,716,014 | 2,788,575 | 2,788,575 | +72,561 | --- |
| Subtotal, Screener workforce... | 2,867,286 | 2,938,218 | 2,938,218 | +70,932 | --- |

199

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Screener training and other........................ | 197,318 | 203,463 | 204,713 | +7,395 | +1,250 |
| Checkpoint support................................. | 250,000 | 128,739 | 128,739 | -121,261 | --- |
| | | | | | |
| Emergency appropriations (P. L. 111-5) | 1,000,000 | --- | --- | -1,000,000 | --- |
| | | | | | |
| EDS/ETD Systems: | | | | | |
| EDS procurement and installation........... | 294,000 | 856,591 | 800,000 | +506,000 | -56,591 |
| Screening technology maintenance and utilities.... | 305,625 | 326,825 | 316,625 | +11,000 | -10,000 |
| Operation integration....................... | 21,481 | 21,481 | 21,481 | --- | --- |
| | | | | | |
| Subtotal, EDS/ETD Systems................... | 621,106 | 1,204,697 | 1,138,106 | +517,000 | -66,591 |
| | | | | | |
| Subtotal, Screening operations.................. | 4,935,710 | 4,475,117 | 4,409,776 | -525,934 | -65,341 |
| | | | | | |
| Aviation security direction and enforcement: | | | | | |
| Aviation regulation and other enforcement... | 245,268 | 254,064 | 254,064 | +8,796 | --- |
| Airport management and support.............. | 401,666 | 448,424 | 453,924 | +52,258 | +5,500 |
| FFDO and flight crew training............... | 25,025 | 25,127 | 25,127 | +102 | --- |
| Air cargo................................... | 122,849 | 108,118 | 122,849 | --- | +14,731 |
| Airport perimeter security.................. | 4,000 | --- | --- | -4,000 | --- |
| | | | | | |
| Subtotal, Aviation security direction and enforcement.............................. | 798,808 | 835,733 | 855,964 | +57,156 | +20,231 |
| | | | | | |
| Implementing requirements of P.L. 110-53.......... | 20,000 | --- | --- | -20,000 | --- |
| | | | | | |
| Discretionary fee proposal: | | | | | |
| General aviation at DCA..................... | (75) | (100) | (100) | (+25) | --- |

200

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Indirect air cargo | (200) | (2,600) | (2,600) | (+2,400) | --- |
| Certified cargo screening program | --- | (5,200) | --- | --- | (-5,200) |
| Large aircraft security program | --- | (1,600) | --- | --- | (-1,600) |
| Secure identification display area checks | --- | (10,000) | --- | --- | (-10,000) |
| Other security threat assessments | --- | (100) | --- | --- | (-100) |
| Total, Discretionary fee proposal | (275) | (19,600) | (2,700) | (+2,425) | (-16,900) |
| Aviation security capital fund (mandatory) | (250,000) | (250,000) | (250,000) | --- | --- |
| Total, Aviation security (gross) (including transfers) | 5,754,518 | 5,310,850 | 5,265,740 | -488,778 | -45,110 |
| Offsetting fee collections (non-mandatory) | -2,320,000 | -2,100,000 | -2,100,000 | +220,000 | --- |
| Fee-funded programs (nonadd) | (-275) | (-19,600) | (-2,700) | (-2,425) | (+16,900) |
| Total, Aviation security (net) | 3,434,518 | 3,210,850 | 3,165,740 | -268,778 | -45,110 |
| Appropriations | (2,434,518) | (3,210,850) | (3,165,740) | (+731,222) | (-45,110) |
| Emergency appropriations | (1,000,000) | --- | --- | (-1,000,000) | --- |
| Aviation security capital fund | (250,000) | (250,000) | (250,000) | --- | --- |
| Surface transportation security: | | | | | |
| Staffing and operations | 24,885 | 42,293 | 42,293 | +17,408 | --- |
| Rail security inspectors and canines | 24,721 | 86,123 | 61,123 | +36,402 | -25,000 |
| Subtotal, Surface transportation security | 49,606 | 128,416 | 103,416 | +53,810 | -25,000 |
| Transportation Threat Assessment and Credentialing: | | | | | |
| Secure Flight | 82,211 | 84,363 | 84,363 | +2,152 | --- |

201

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Crew and other vetting programs | 33,807 | 107,636 | 87,636 | +53,829 | -20,000 |
| Registered Traveler Program fees | (10,000) | --- | --- | (-10,000) | --- |
| TWIC fees | (9,000) | (9,000) | (9,000) | --- | --- |
| Hazardous materials fees | (18,000) | (15,000) | (15,000) | (-3,000) | --- |
| Alien Flight School fees (by transfer from DOJ) | (3,000) | (4,000) | (4,000) | (+1,000) | --- |
| Certified cargo screening program | --- | --- | (5,200) | (+5,200) | (+5,200) |
| Large aircraft security program | --- | --- | (1,600) | (+1,600) | (+1,600) |
| Secure identification display area checks | --- | --- | (10,000) | (+10,000) | (+10,000) |
| Other security threat assessments | --- | --- | (100) | (+100) | (+100) |
| | | | | | |
| Subtotal, Transportation Threat Assessment and Credentialing (Gross) | (156,018) | (219,999) | (216,899) | (+60,881) | (-3,100) |
| Fee funded programs | (40,000) | (28,000) | (44,900) | (+4,900) | (+16,900) |
| | | | | | |
| Subtotal, Transportation Threat Assessment and Credentialing (net) | 116,018 | 191,999 | 171,999 | +55,981 | -20,000 |
| | | | | | |
| Transportation security support: | | | | | |
| Headquarters administration | 234,870 | 248,929 | 248,929 | +14,059 | --- |
| Information technology | 472,799 | 501,110 | 489,510 | +16,711 | -11,600 |
| Human capital services | 218,105 | 226,338 | 226,338 | +8,233 | --- |
| Intelligence | 21,961 | 28,203 | 28,203 | +6,242 | --- |
| Sensitive security information (SSI) fees | --- | (20) | (20) | (+20) | --- |
| | | | | | |
| Subtotal, Transportation security support | 947,735 | 1,004,580 | 992,980 | +45,245 | -11,600 |
| | | | | | |
| Federal Air Marshals: | | | | | |
| Management and administration | 725,081 | 762,569 | 762,569 | +37,488 | --- |

202

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Travel and training........................ | 94,400 | 97,542 | 97,542 | +3,142 | --- |
| | | | | | |
| Subtotal, Federal Air Marshals.............. | 819,481 | 860,111 | 860,111 | +40,630 | --- |
| | | | | | |
| Total, Transportation Security Administration (gross) (including transfers)............. | 7,977,358 | 7,773,956 | 7,689,146 | -288,212 | -84,810 |
| | | | | | |
| Offsetting fee collections................. | (-2,320,000) | (-2,100,000) | (-2,100,000) | (+220,000) | --- |
| Aviation security capital fund............. | (250,000) | (250,000) | (250,000) | --- | --- |
| Fee accounts............................... | (40,000) | (28,000) | (44,900) | (+4,900) | (+16,900) |
| | | | | | |
| Total, Transportation Security Administration (net)...................... | 5,367,358 | 5,395,956 | 5,294,246 | -73,112 | -101,710 |
| Appropriations............................. | (4,367,358) | (5,395,956) | (5,294,246) | (+926,888) | (-101,710) |
| Emergency appropriations................... | (1,000,000) | --- | --- | (-1,000,000) | --- |

Coast Guard

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Operating expenses: | | | | | |
| Military pay and allowances................ | 3,061,663 | 3,244,861 | 3,270,978 | +209,315 | +26,117 |
| Civilian pay and benefits.................. | 645,350 | 699,594 | 700,490 | +55,140 | +896 |
| Training and recruiting.................... | 195,919 | 205,970 | 206,776 | +10,857 | +806 |
| Operating funds and unit level maintenance. | 1,177,406 | 1,149,513 | 1,159,562 | -17,844 | +10,049 |
| Centrally managed accounts................. | 262,294 | 353,071 | 331,058 | +68,764 | -22,013 |
| Intermediate and depot level maintenance... | 823,793 | 903,179 | 911,659 | +87,866 | +8,480 |
| Port and vessel security................... | 23,500 | --- | --- | -23,500 | --- |
| Aviation mission hour gap.................. | 5,000 | --- | --- | -5,000 | --- |
| Defense function........................... | (340,000) | (340,000) | (340,000) | --- | --- |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Overseas contingency operations (appropriation)... | --- | --- | 241,503 | +241,503 | +241,503 |
| Overseas contingency operations (by transfer)... | --- | (241,503) | --- | --- | (-241,503) |
| Subtotal, Operating expenses... | 6,194,925 | 6,797,691 | 6,822,026 | +627,101 | +24,335 |
| Appropriations... | (5,854,925) | (6,216,188) | (6,240,523) | (+385,598) | (+24,335) |
| Overseas contingency operations... | --- | --- | (241,503) | (+241,503) | (+241,503) |
| Contingent emergency (by transfer)... | --- | (241,503) | --- | --- | (-241,503) |
| Defense function... | (340,000) | (340,000) | (340,000) | --- | --- |
| Environmental compliance and restoration... | 13,000 | 13,198 | 13,198 | +198 | --- |
| Reserve training... | 130,501 | 133,632 | 133,632 | +3,131 | --- |
| Acquisition, construction, and improvements:<br>Vessels: | | | | | |
| Response boat medium... | 108,000 | 103,000 | 103,000 | -5,000 | --- |
| Inland river tender recapitalization... | 5,000 | --- | --- | -5,000 | --- |
| Subtotal, Vessels... | 113,000 | 103,000 | 103,000 | -10,000 | --- |
| Other equipment: | | | | | |
| Automatic identification system... | 8,600 | --- | --- | -8,600 | --- |
| Defense messaging system (DMS)... | 4,074 | --- | --- | -4,074 | --- |
| National distress and response system<br>modernization (Rescue 21)... | 73,000 | 117,000 | 117,000 | +44,000 | --- |
| HF Recapitalization... | 2,500 | 2,500 | 2,500 | --- | --- |
| Command 21... | 1,000 | --- | --- | -1,000 | --- |
| Subtotal, Other equipment... | 89,174 | 119,500 | 119,500 | +30,326 | --- |

204

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Personnel compensation and benefits: | | | | | |
| Core acquisition costs.................. | 500 | 500 | 500 | --- | --- |
| Direct personnel cost.................. | 92,330 | 99,500 | 99,500 | +7,170 | --- |
| | | | | | |
| Subtotal, Personnel compensation & benefits. | 92,830 | 100,000 | 100,000 | +7,170 | --- |
| | | | | | |
| Integrated deepwater systems: | | | | | |
| Aircraft: | | | | | |
| Aircraft, other.................. | 3,000 | --- | --- | -3,000 | --- |
| Maritime Patrol Aircraft.................. | 86,600 | 175,000 | 138,500 | +51,900 | -36,500 |
| HH-60 conversions.................. | 52,700 | 45,900 | 45,900 | -6,800 | --- |
| HC-130H conversions.................. | 24,500 | 45,300 | 45,300 | +20,800 | --- |
| HH-65 conversion project.................. | 64,500 | 38,000 | 38,000 | -26,500 | --- |
| C-130J fleet introduction.................. | 13,250 | 1,300 | 1,300 | -11,950 | --- |
| | | | | | |
| Subtotal, Aircraft.................. | 244,550 | 305,500 | 269,000 | +24,450 | -36,500 |
| | | | | | |
| Surface ships: | | | | | |
| National Security Cutter.................. | 353,700 | 281,480 | 281,480 | -72,220 | --- |
| Offshore Patrol Cutter.................. | 3,003 | 9,800 | 9,800 | +6,797 | --- |
| Fast Response Cutter.................. | 115,300 | 243,000 | 243,000 | +127,700 | --- |
| IDS small boats.................. | 2,400 | 3,000 | 3,000 | +600 | --- |
| Patrol Boat sustainment.................. | 30,800 | 23,000 | 23,000 | -7,800 | --- |
| Medium endurance cutter sustainment.................. | 35,500 | 31,100 | 31,100 | -4,400 | --- |
| Polar Icebreaker Refurbishment.................. | 30,300 | | | -30,300 | --- |
| | | | | | |
| Subtotal, Surface ships.................. | 571,003 | 591,380 | 591,380 | +20,377 | --- |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Technology obsolescence prevention........... | 1,500 | 1,900 | 1,900 | +400 | --- |
| | | | | | |
| C4ISR................................... | 88,100 | 35,000 | 35,000 | -53,100 | --- |
| Logistics.............................. | 37,700 | 37,700 | 37,700 | --- | --- |
| Systems engineering and management..... | 33,141 | 35,000 | 35,000 | +1,859 | --- |
| Government program management.......... | 58,000 | 45,000 | 45,000 | -13,000 | --- |
| | | | | | |
| Subtotal, Integrated deepwater systems...... | 1,033,994 | 1,051,480 | 1,014,980 | -19,014 | -36,500 |
| | | | | | |
| Shore facilities and aids to navigation........... | 68,000 | 10,000 | 10,000 | -58,000 | --- |
| | | | | | |
| Emergency appropriations (P. L. 111-5)........... | 98,000 | --- | --- | -98,000 | --- |
| | | | | | |
| Subtotal................................. | 166,000 | 10,000 | 10,000 | -156,000 | --- |
| | | | | | |
| Coast Guard/DHS headquarters................. | 97,578 | --- | --- | -97,578 | --- |
| | | | | | |
| Subtotal, Acquisition, construction, and improvements............................. | 1,592,576 | 1,383,980 | 1,347,480 | -245,096 | -36,500 |
| Appropriations........................ | (1,494,576) | (1,383,980) | (1,347,480) | (-147,096) | (-36,500) |
| Emergency appropriations.............. | (98,000) | --- | --- | (-98,000) | --- |
| | | | | | |
| Alteration of bridges.................... | 16,000 | --- | 10,000 | -6,000 | +10,000 |
| Emergency appropriations (P. L. 111-5)... | 142,000 | --- | --- | -142,000 | --- |
| | | | | | |
| Subtotal................................. | 158,000 | --- | 10,000 | -148,000 | +10,000 |
| | | | | | |
| Research, development, test, and evaluation........... | 18,000 | 19,745 | 19,745 | +1,745 | --- |

206

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Health care fund contribution (permanent indefinite discretionary) | 257,305 | 261,000 | 261,000 | +3,695 | --- |
| Subtotal, Coast Guard discretionary | 8,364,307 | 8,367,743 | 8,607,081 | +242,774 | +239,338 |
| Retired pay (mandatory) | 1,236,745 | 1,361,245 | 1,361,245 | +124,500 | --- |
| Total, Coast Guard (including transfers) | 9,601,052 | 9,970,491 | 9,968,326 | +367,274 | -2,165 |
| Appropriations | (9,361,052) | (9,728,988) | (9,726,823) | (+365,771) | (-2,165) |
| Emergency appropriations | (240,000) | --- | --- | (-240,000) | --- |
| Overseas contingency operations | --- | --- | (241,503) | (+241,503) | (+241,503) |
| Contingent emergency (by transfer) | --- | (241,503) | --- | (-241,503) | (-241,503) |

United States Secret Service

Salaries and expenses:

| | | | | | |
|---|---|---|---|---|---|
| Protection: | | | | | |
| Protection of persons and facilities | 705,918 | 759,561 | 755,521 | +49,603 | -4,040 |
| Protective intelligence activities | 59,761 | 67,824 | 67,824 | +8,063 | --- |
| National special security events | 1,000 | 1,000 | 1,000 | --- | --- |
| Presidential candidate nominee protection | 41,082 | --- | --- | -41,082 | --- |
| White House mail screening | 33,701 | 25,315 | 22,415 | -11,286 | -2,900 |
| Subtotal, Protection | 841,462 | 853,700 | 846,760 | +5,298 | -6,940 |

207

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Field operations: | | | | | |
| Domestic field operations........... | 241,772 | 260,892 | 260,892 | +19,120 | --- |
| International field office administration, operations and training........... | 30,000 | 30,705 | 30,705 | +705 | --- |
| Electronic crimes special agent program and electronic crimes task forces........ | 51,836 | 56,541 | 56,541 | +4,705 | --- |
| Support for missing and exploited children... | 8,366 | 8,366 | 8,366 | --- | --- |
| Subtotal, Investigations........... | 331,974 | 356,504 | 356,504 | +24,530 | --- |
| Administration: | | | | | |
| Headquarters, management and administration... | 182,104 | 221,045 | 199,785 | +17,681 | -21,260 |
| Training: | | | | | |
| Rowley training center................... | 53,189 | 54,360 | 54,360 | +1,171 | --- |
| Emergency appropriations (P. L. 111-8)........... | 100,000 | --- | --- | -100,000 | --- |
| Subtotal, Salaries and expenses........... | 1,508,729 | 1,485,609 | 1,457,409 | -51,320 | -28,200 |
| Appropriations......................... | (1,408,729) | (1,485,609) | (1,457,409) | (+48,680) | (-28,200) |
| Emergency appropriations.............. | (100,000) | --- | --- | (-100,000) | --- |
| Acquisition, construction, improvements, and related expenses (Rowley)................... | 4,225 | 3,975 | 3,975 | -250 | --- |
| Total, United States Secret Service........... | 1,512,954 | 1,489,584 | 1,461,384 | -51,570 | -28,200 |
| Appropriations......................... | (1,412,954) | (1,489,584) | (1,461,384) | (+48,430) | (-28,200) |
| Emergency appropriations.............. | (100,000) | --- | --- | (-100,000) | --- |

208

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Total, title II, Security, Enforcement, and Investigations (including transfers)........... | 31,991,315 | 32,363,455 | 32,119,568 | +128,253 | -243,887 |
| Appropriations........................ | (29,951,315) | (32,121,952) | (31,878,065) | (+1,926,750) | (-243,887) |
| Emergency appropriations.............. | (2,040,000) | --- | --- | (-2,040,000) | --- |
| Overseas contingency operations....... | --- | --- | --- | --- | --- |
| Contingent emergency (by transfer).... | --- | (241,503) | (241,503) | (+241,503) | (+241,503) |
| | | | | | |
| (Fee Accounts)........................ | (1,787,145) | (1,778,000) | (1,794,900) | (+7,755) | (+16,900) |
| | | | | | |
| TITLE III - PROTECTION, PREPAREDNESS, RESPONSE, AND RECOVERY | | | | | |
| | | | | | |
| National Protection and Programs Directorate | | | | | |
| | | | | | |
| Management and administration: | | | | | |
| Administrative activities............. | 41,850 | 34,682 | 34,682 | -7,168 | --- |
| Risk management and analysis.......... | 9,500 | 9,895 | 9,895 | +395 | --- |
| | | | | | |
| Total, Management and administration... | 51,350 | 44,577 | 44,577 | -6,773 | --- |
| | | | | | |
| Infrastructure Protection and Information Security: | | | | | |
| Infrastructure protection: | | | | | |
| Identification and analysis........... | 80,603 | 86,610 | 86,610 | +6,007 | --- |
| Coordination and information sharing.. | 62,367 | 50,582 | 62,912 | +545 | +12,330 |
| Mitigation programs................... | 170,830 | 196,111 | 196,961 | +26,131 | +850 |
| | | | | | |
| Subtotal, Infrastructure protection... | 313,800 | 333,303 | 346,483 | +32,683 | +13,180 |

209

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| National Cyber Security Division: | | | | | |
| US Computer Emergency Response Team (US-CERT). | 254,924 | 333,629 | 310,629 | +55,705 | -23,000 |
| Strategic initiatives.......................... | 49,138 | 57,679 | 64,179 | +15,041 | +6,500 |
| Outreach and programs......................... | 9,438 | 9,346 | 7,096 | -2,342 | -2,250 |
| Subtotal, National Cyber Security Division... | 313,500 | 400,654 | 381,904 | +68,404 | -18,750 |
| Office of Emergency Communications............ | 38,300 | 44,060 | 45,060 | +6,760 | +1,000 |
| National Security/Emergency Preparedness Telecommunications: | | | | | |
| Priority telecommunications services.......... | 58,740 | 56,773 | 56,773 | -1,967 | --- |
| Next generation networks...................... | 50,250 | 50,250 | 25,000 | -25,250 | -25,250 |
| Programs to study and enhance telecommunications.......................... | 15,100 | 19,274 | 16,774 | +1,674 | -2,500 |
| Critical infrastructure protection programs... | 11,260 | 13,852 | 11,352 | +92 | -2,500 |
| National command and coordination capability.. | 5,963 | --- | --- | -5,963 | --- |
| Subtotal, National Security/Emergency Preparedness Telecommunications............. | 141,313 | 140,149 | 109,899 | -31,414 | -30,250 |
| Subtotal, Infrastructure Protection and Information Security....................... | 806,913 | 918,166 | 883,346 | +76,433 | -34,820 |
| Federal Protective Service: | | | | | |
| Basic security................................ | --- | 213,673 | --- | --- | -213,673 |
| Building-specific security.................... | --- | 426,327 | --- | --- | -426,327 |
| Reimbursable Security Fees (contract guard services)................................... | --- | 475,000 | --- | --- | -475,000 |

210

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Subtotal, Federal Protective Service......... | --- | 1,115,000 | --- | --- | -1,115,000 |
| Offsetting collections..................... | --- | -1,115,000 | --- | --- | +1,115,000 |
| | | | | | |
| U.S. Visitor and Immigrant Status Indicator Technology | 300,000 | 356,194 | 351,800 | +51,800 | -4,394 |
| | | | | | |
| Total, National Protection and Programs | | | | | |
| Directorate............................. | 1,158,263 | 1,318,937 | 1,279,723 | +121,460 | -39,214 |
| Appropriations......................... | (1,158,263) | (2,433,937) | (1,279,723) | (+121,460) | (-1,154,214) |
| Offsetting collections................. | | (-1,115,000) | --- | --- | (+1,115,000) |
| | | | | | |
| **Office of Health Affairs** | | | | | |
| | | | | | |
| BioWatch.................................... | 111,606 | 94,513 | 79,413 | -32,193 | -15,100 |
| National biosurveillance integration system.... | 8,000 | 8,000 | 13,000 | +5,000 | +5,000 |
| Rapidly deployable chemical detection system... | 2,600 | 2,600 | 2,600 | --- | --- |
| Planning and coordination................... | 5,775 | 2,476 | 2,976 | -2,799 | +500 |
| Salaries and expenses....................... | 29,210 | 30,411 | 30,411 | +1,201 | --- |
| | | | | | |
| Total, Office of Health Affairs........... | 157,191 | 138,000 | 128,400 | -28,791 | -9,600 |
| | | | | | |
| **Federal Emergency Management Agency** | | | | | |
| | | | | | |
| Management and administration: | | | | | |
| Operating activities...................... | 798,595 | 817,205 | 805,005 | +6,410 | -12,200 |
| (Defense function).................... | (94,059) | (107,481) | (93,881) | (-178) | (-13,600) |
| Urban search and rescue response system.... | 32,500 | 28,000 | 32,500 | --- | +4,500 |
| Office of National Capitol Region Coordination..... | 6,342 | 6,995 | 6,995 | +653 | --- |

211

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Transfer from Disaster relief................................. | (105,600) | (50,000) | (90,080) | (-15,520) | (+40,080) |
| Subtotal, Management and administration (including transfers)........ | 943,037 | 902,200 | 934,580 | -8,457 | +32,380 |
| Appropriations........................ | (837,437) | (852,200) | (844,500) | (+7,063) | (-7,700) |
| (Non-defense appropriations)............... | (743,378) | (744,719) | (750,619) | (+7,241) | (+5,900) |
| (Defense appropriations)................. | (94,059) | (107,481) | (93,881) | (-178) | (-13,600) |
| by transfer.............................. | (105,600) | (50,000) | (90,080) | (-15,520) | (+40,080) |
| State and local programs: | | | | | |
| State Homeland Security Grant Program............ | 890,000 | 890,000 | 890,000 | --- | --- |
| Operation Stonegarden.................. | 60,000 | 60,000 | 60,000 | --- | --- |
| Subtotal, State Homeland Security Grant Program........ | 950,000 | 950,000 | 950,000 | --- | --- |
| Urban area security initiative................ | 837,500 | 887,000 | 887,000 | +49,500 | --- |
| Regional catastrophic preparedness grants........ | 35,000 | 35,000 | --- | -35,000 | -35,000 |
| Metropolitan Medical Response System........... | 41,000 | 40,000 | 40,000 | -1,000 | --- |
| Citizen Corps program................. | 15,000 | 15,000 | 15,000 | --- | --- |
| Public transportation security assistance and railroad security assistance........ | 400,000 | 250,000 | 250,000 | -150,000 | --- |
| Emergency appropriations (P. L. 111-5)........ | 150,000 | | | -150,000 | --- |
| Subtotal........................... | 550,000 | 250,000 | 250,000 | -300,000 | --- |
| Port security grants................. | 400,000 | 250,000 | 250,000 | -150,000 | --- |

page number

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Emergency appropriations (P. L. 111-5) | 150,000 | --- | --- | -150,000 | --- |
| Subtotal | 550,000 | 250,000 | 250,000 | -300,000 | --- |
| Over-the-road bus security assistance | 12,000 | --- | 12,000 | --- | +12,000 |
| Trucking industry security grants | 8,000 | --- | --- | -8,000 | --- |
| Buffer Zone Protection Program grants | 50,000 | 50,000 | 50,000 | --- | --- |
| REAL ID Grants | --- | 50,000 | 50,000 | +50,000 | --- |
| Commercial equipment direct assistance program | 8,000 | --- | --- | -8,000 | --- |
| Interoperable emergency communications grant program | 50,000 | 50,000 | 50,000 | --- | --- |
| Emergency Operations Centers | 35,000 | --- | 40,000 | +5,000 | +40,000 |
| Firefighter assistance grants: | | | | | |
| Fire grants | --- | 170,000 | --- | --- | -170,000 |
| Staffing for Adequate Fire and Emergency Response (SAFER) Act grants | --- | 420,000 | --- | --- | -420,000 |
| Subtotal, Firefighter assistance grants | --- | 590,000 | --- | --- | -590,000 |
| Emergency management performance grants | --- | 315,000 | --- | --- | -315,000 |
| National Programs: | | | | | |
| National Domestic Preparedness Consortium | 102,000 | 51,500 | 92,000 | -10,000 | +40,500 |
| Center for Domestic Preparedness | 57,000 | 62,500 | 40,000 | -17,000 | -22,500 |
| Noble Training Center | 5,500 | --- | --- | -5,500 | --- |
| Subtotal, NDPC | 164,500 | 114,000 | 132,000 | -32,500 | +18,000 |

213

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Counterterrorism and Cyber Crime Center | 1,700 | --- | --- | -1,700 | --- |
| National exercise program | 40,000 | 42,000 | 40,000 | --- | -2,000 |
| Technical assistance | 11,000 | 13,000 | 13,000 | +2,000 | --- |
| Continuing training grants | 31,000 | 23,000 | 31,000 | --- | +8,000 |
| Evaluations and assessments | 16,000 | 18,000 | 16,000 | --- | -2,000 |
| Rural Domestic Preparedness Consortium | --- | --- | 3,000 | +3,000 | +3,000 |
| Subtotal, National Programs | 264,200 | 210,000 | 235,000 | -29,200 | +25,000 |
| Management and administration | --- | 175,000 | --- | --- | -175,000 |
| Subtotal, State and Local Programs | 3,405,700 | 3,867,000 | 2,829,000 | -576,700 | -1,038,000 |
| Appropriations | (3,105,700) | (3,867,000) | (2,829,000) | (-276,700) | (-1,038,000) |
| Emergency appropriations | (300,000) | --- | --- | (-300,000) | --- |
| Firefighter assistance grants: | | | | | |
| Fire grants | 565,000 | --- | 380,000 | -185,000 | +380,000 |
| Fire station construction | 210,000 | --- | --- | -210,000 | --- |
| Emergency appropriations (P. L. 111-5) | | | | | |
| Staffing for Adequate Fire and Emergency Response | | | | | |
| (SAFER) Act grants | 210,000 | --- | 420,000 | +210,000 | +420,000 |
| Subtotal, Firefighter assistance grants | 985,000 | --- | 800,000 | -185,000 | +800,000 |
| Appropriations | (775,000) | --- | (800,000) | (+25,000) | (+800,000) |
| Emergency appropriations | (210,000) | --- | --- | (-210,000) | --- |
| Emergency management performance grants | 315,000 | --- | 330,000 | +15,000 | +330,000 |
| Subtotal, Grants and training | 4,705,700 | 3,867,000 | 3,959,000 | -746,700 | +92,000 |

214

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Appropriations............................... | (4,195,700) | (3,867,000) | (3,959,000) | (-236,700) | (+92,000) |
| Emergency appropriations................. | (510,000) | --- | --- | (-510,000) | --- |
| | | | | | |
| Radiological Emergency Preparedness Program.......... | -505 | -265 | -265 | +240 | --- |
| | | | | | |
| United States Fire Administration................... | 44,979 | 45,588 | 45,588 | +609 | --- |
| | | | | | |
| Disaster relief................................. | 1,400,000 | 2,000,000 | 2,000,000 | +600,000 | --- |
| (transfer to Management and Administration)..... | (-105,600) | (-50,000) | (-90,080) | (+15,520) | (-40,080) |
| (transfer to Inspector General)............... | (-16,000) | --- | (-16,000) | --- | (-16,000) |
| | | | | | |
| Subtotal, Disaster Relief................. | 1,278,400 | 1,950,000 | 1,893,920 | +615,520 | -56,080 |
| | | | | | |
| Disaster assistance direct loan program account: | | | | | |
| (Limitation on direct loans)................ | (25,000) | (25,000) | (25,000) | --- | --- |
| Direct loan subsidy......................... | 295 | 295 | 295 | --- | --- |
| | | | | | |
| Flood map modernization fund.................. | 220,000 | 220,000 | 220,000 | --- | --- |
| | | | | | |
| National flood insurance fund: | | | | | |
| Salaries and expenses.................... | 49,418 | 52,149 | 52,149 | +2,731 | --- |
| Flood plain management and mitigation.......... | 107,181 | 107,320 | 107,320 | +139 | --- |
| Offsetting fee collections................. | -156,599 | -159,469 | -159,469 | -2,870 | --- |
| | | | | | |
| National predisaster mitigation fund............. | 90,000 | 150,000 | 100,000 | +10,000 | -50,000 |
| | | | | | |
| Emergency food and shelter................ | 200,000 | 100,000 | 200,000 | --- | +100,000 |
| Emergency appropriations (P. L. 111-5)....... | 100,000 | --- | --- | -100,000 | --- |

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Subtotal, Emergency food and shelter........... | 300,000 | 100,000 | 200,000 | -100,000 | +100,000 |
| Cerro Grande Fire Payments (rescission).......... | -9,000 | --- | --- | +9,000 | --- |
| Total, Federal Emergency Management Agency (including transfers)................... | 7,572,906 | 7,234,818 | 7,353,118 | -219,788 | +118,300 |
| Appropriations.................... | (6,987,906) | (7,234,818) | (7,369,118) | (+381,212) | (+134,300) |
| Emergency appropriations.......... | (610,000) | --- | --- | (-610,000) | --- |
| Rescissions...................... | (-9,000) | --- | --- | (+9,000) | --- |
| by transfer...................... | (105,600) | (50,000) | (90,080) | (-15,520) | (+40,080) |
| transfer out..................... | (-121,600) | (-50,000) | (-106,080) | (+15,520) | (-56,080) |
| (Limitation on direct loans)..................... | (25,000) | (25,000) | (25,000) | --- | --- |
| Total, title III, Protection, Preparedness, Response and Recovery Directorate........... | 8,888,360 | 8,691,755 | 8,761,241 | -127,119 | +69,486 |
| Appropriations.................... | (8,303,360) | (8,691,755) | (8,777,241) | (+473,881) | (+85,486) |
| Emergency appropriations.......... | (610,000) | --- | --- | (-610,000) | --- |
| Rescissions...................... | (-9,000) | --- | --- | (+9,000) | --- |
| By transfer...................... | (105,600) | (50,000) | (90,080) | (-15,520) | (+40,080) |
| Transfer out..................... | (-121,600) | (-50,000) | (-106,080) | (+15,520) | (-56,080) |
| (Limitation on direct loans)..................... | (25,000) | (25,000) | (25,000) | --- | --- |

216

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

TITLE IV - RESEARCH AND DEVELOPMENT, TRAINING,
AND SERVICES

United States Citizenship and Immigration Services

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Appropriations: | | | | | |
| Basic pilot program | 100,000 | 112,000 | 112,000 | +12,000 | --- |
| Benefit parole programs | 540 | --- | --- | -540 | --- |
| Immigration integration programs | 1,200 | 10,000 | 11,000 | +9,800 | +1,000 |
| REAL ID Act implementation | --- | 25,000 | 25,000 | +25,000 | --- |
| Asylum and refugee services | --- | 206,000 | 100,000 | +100,000 | -106,000 |
| Data center consolidation | --- | 11,000 | --- | --- | -11,000 |
| Subtotal | 101,740 | 364,000 | 248,000 | +146,260 | -116,000 |
| | | | | | |
| Adjudication services (fee account): | | | | | |
| Pay and benefits | (780,076) | --- | --- | (-780,076) | --- |
| District operations | (535,156) | (1,132,317) | (1,036,219) | (+501,063) | (-96,098) |
| Service center operations | (345,890) | (549,623) | (513,895) | (+168,005) | (-35,728) |
| Asylum, refugee and international operations | (92,602) | --- | --- | (-92,602) | --- |
| International operations | --- | (64,587) | (123,196) | (+123,196) | (+58,609) |
| Records operations | (85,946) | (107,113) | (106,266) | (+20,320) | (-847) |
| Business transformation | (139,000) | (173,264) | (173,264) | (+34,264) | --- |
| Digitization program (display only, nonadd) | (28,000) | (29,000) | (29,000) | (+1,000) | --- |
| Subtotal, Adjudication services | (1,978,670) | (2,028,904) | (1,952,840) | (-25,830) | (-74,064) |
| | | | | | |
| Information and customer services (fee account): | | | | | |
| Pay and benefits | (92,587) | --- | --- | (-92,587) | --- |

217

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Information and customer service............... | --- | (89,050) | --- | --- | (-89,050) |
| National Customer Service Centers............... | (53,747) | --- | (51,755) | (-1,992) | (+51,755) |
| Information services............... | (21,465) | --- | (102,434) | (+80,969) | (+102,434) |
| Subtotal, Information and customer services...... | (167,799) | (89,050) | (154,189) | (-13,610) | (+65,139) |
| Administration (fee account): | | | | | |
| Administration............... | --- | (365,932) | (374,856) | (+374,856) | (+8,924) |
| Pay and benefits............... | (88,746) | --- | --- | (-88,746) | --- |
| Operating expenses............... | (285,153) | --- | --- | (-285,153) | --- |
| Subtotal, Administration............... | (373,899) | (365,932) | (374,856) | (+957) | (+8,924) |
| Systematic Alien Verification for Entitlements (SAVE) (fee accounts)............... | (18,818) | (21,346) | (21,347) | (+2,529) | (+1) |
| Total, United States Citizenship and Immigration Services............... | (2,640,926) | (2,867,232) | (2,751,232) | (+110,306) | (-116,000) |
| Appropriations............... | (101,740) | (364,000) | (248,000) | (+146,260) | (-116,000) |
| Total Fees............... | (2,539,186) | (2,503,232) | (2,503,232) | (-35,954) | --- |
| (Immigration Examination Fees)............... | (2,495,186) | (2,451,884) | (2,451,884) | (-43,302) | --- |
| (Fraud prevention and detection fees)...... | (31,000) | (38,348) | (38,348) | (+7,348) | --- |
| (H1B Non-Immigrant Petitioner fees)............... | (13,000) | (13,000) | (13,000) | --- | --- |

218

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| **Federal Law Enforcement Training Center** | | | | | |
| Salaries and expenses: | | | | | |
| Law enforcement training............... | 245,240 | 244,047 | 238,047 | -7,193 | -6,000 |
| Accreditation....................... | 1,290 | 1,309 | 1,309 | +19 | --- |
| Subtotal, Salaries and expenses...... | 246,530 | 245,356 | 239,356 | -7,174 | -6,000 |
| Acquisitions, construction, improvements, and related expenses: | | | | | |
| Direct appropriation................. | 86,456 | 43,456 | 43,456 | -43,000 | --- |
| Total, Federal Law Enforcement Training Center... | 332,986 | 288,812 | 282,812 | -50,174 | -6,000 |
| **Science and Technology** | | | | | |
| Management and administration......... | 132,100 | 142,200 | 142,200 | +10,100 | --- |
| Research, development, acquisition, and operations: | | | | | |
| Border and maritime security......... | 33,050 | 40,181 | 40,181 | +7,131 | --- |
| Chemical and biological.............. | 200,408 | 206,800 | 221,900 | +21,492 | +15,100 |
| Command, control, and interoperability. | 74,890 | 80,264 | 80,764 | +5,874 | +500 |
| Explosives........................... | 96,149 | 120,809 | 120,809 | +24,660 | --- |
| Human factors........................ | 12,460 | 15,087 | 16,887 | +4,427 | +1,800 |
| Infrastructure and geophysical....... | 75,816 | 44,342 | 52,093 | -23,723 | +7,351 |
| Innovation........................... | 33,000 | 44,000 | 44,000 | +11,000 | --- |
| Laboratory facilities................ | 161,940 | 154,500 | 123,188 | -38,752 | -31,312 |
| Test and evaluations/standards....... | 28,674 | 28,674 | 29,000 | +326 | +326 |
| Transition........................... | 28,830 | 45,134 | 46,134 | +17,304 | +1,000 |

219

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| University programs............................ | 50,270 | 46,000 | 50,400 | +130 | +4,400 |
| Homeland Security Institute.................... | 5,000 | --- | --- | -5,000 | --- |
| Subtotal, Research, development, acquisition, and operations........................... | 800,487 | 826,191 | 825,356 | +24,869 | -835 |
| Total, Science and Technology................. | 932,587 | 968,391 | 967,556 | +34,969 | -835 |
| **Domestic Nuclear Detection Office** | | | | | |
| Management and administration................. | 37,500 | 39,599 | 39,599 | +2,099 | --- |
| Research, development, and operations: | | | | | |
| Systems engineering and architecture......... | 25,147 | 25,448 | 25,448 | +301 | --- |
| Systems development.......................... | 108,100 | 100,000 | 100,000 | -8,100 | --- |
| Transformational research and development.... | 103,300 | 110,537 | 110,537 | +7,237 | --- |
| Assessments.................................. | 32,000 | 32,416 | 32,416 | +416 | --- |
| Operations support........................... | 37,753 | 38,436 | 38,436 | +683 | --- |
| National Technical Nuclear Forensics Center.. | 16,900 | 19,700 | 19,700 | +2,800 | --- |
| Research, development, and operations....... | 323,200 | 326,537 | 326,537 | +3,337 | --- |
| Systems acquisition: | | | | | |
| RPM/ASP program.............................. | 120,491 | --- | --- | -120,491 | --- |
| Securing the Cities......................... | 20,000 | --- | --- | -20,000 | --- |
| HPRDS program................................ | 13,000 | --- | --- | -13,000 | --- |

220

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Subtotal, Systems acquisition | 153,491 | --- | --- | -153,491 | --- |
| Total, Domestic Nuclear Detection Office | 514,191 | 366,136 | 366,136 | -148,055 | --- |
| Total, title IV, Research and Development, Training, and Services | 1,881,504 | 1,987,389 | 1,864,504 | -17,000 | -122,835 |
| (Fee Accounts) | (2,539,186) | (2,503,232) | (2,503,232) | (-35,954) | --- |

TITLE V - GENERAL PROVISIONS

| Enacted provisions: | | | | | |
|---|---|---|---|---|---|
| Sec. 547: REAL ID Grants | 50,000 | --- | --- | -50,000 | --- |
| Sec. 547: REAL ID Information Sharing and Verification System | 50,000 | --- | --- | -50,000 | --- |
| Sec. 549: Rescission, TSA undistributed carryover | -31,000 | --- | --- | +31,000 | --- |
| Sec. 550: Rescission of unobligated balances, A&O | -21,373 | --- | --- | +21,373 | --- |
| Sec. 551: Rescission of unobligated balances, Coast Guard AC&I | -20,000 | --- | --- | +20,000 | --- |
| Sec. 539: Rescission of unobligated balances, A&O | --- | --- | -2,203 | -2,203 | -2,203 |
| Sec. 542: Rescission of unobligated balances, IPIS | --- | --- | -5,963 | -5,963 | -5,963 |
| Sec. 550: Rescission of unobligated balances, Trucking Industry Security Grants | --- | --- | -5,572 | -5,572 | -5,572 |
| Total, title V, General Provisions | 27,627 | --- | -13,738 | -41,365 | -13,738 |
| Appropriations | (100,000) | --- | --- | (-100,000) | --- |
| Rescissions | (-72,373) | --- | (-13,738) | (+58,635) | (-13,738) |

221

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Grand total............................. | 44,080,245 | 44,190,938 | 43,986,245 | -94,000 | -204,693 |
| Appropriations....................... | (41,306,618) | (44,190,938) | (43,758,480) | (-2,451,862) | (-432,458) |
| (Discretionary)................... | (40,069,873) | (42,829,693) | (42,397,235) | (+2,327,362) | (-432,458) |
| (Mandatory)....................... | (1,236,745) | (1,361,245) | (1,361,245) | (+124,500) | --- |
| Emergency appropriations............. | (2,855,000) | --- | --- | (-2,855,000) | --- |
| Overseas contingent operations....... | --- | --- | (241,503) | (+241,503) | (+241,503) |
| Rescissions.......................... | (-81,373) | --- | (-13,738) | (+67,635) | (-13,738) |
| Fee funded programs.................. | (-4,326,331) | (-4,281,232) | (-4,298,132) | (-28,199) | (+16,900) |
| (Limitation on direct loans)........ | (25,000) | (25,000) | (25,000) | --- | --- |
| (Transfer out)...................... | (-121,600) | (-50,000) | (-106,080) | (+15,520) | (-56,080) |
| (By transfer - contingent emergency). | --- | (241,503) | --- | --- | (-241,503) |
| (By transfer)....................... | (121,600) | (50,000) | (106,080) | (-15,520) | (+56,080) |
| (Overseas contingency operations)... | --- | --- | (241,503) | (+241,503) | (+241,503) |

222

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| **DEPARTMENT OF HOMELAND SECURITY SUMMARY** | | | | | |
| **TITLE I - DEPARTMENTAL MANAGEMENT AND OPERATIONS** | | | | | |
| Departmental operations........................ | 1,170,026 | 1,260,018 | 1,124,796 | -45,230 | -135,222 |
| Office of the Federal Coordinator for Gulf Coast Rebuilding..................................... | 1,900 | 2,000 | 2,000 | +100 | --- |
| Office of Inspector General.................... | 119,513 | 127,874 | 127,874 | +8,361 | --- |
| Total, title I (including transfers)...... | 1,291,439 | 1,389,892 | 1,254,670 | -36,769 | -135,222 |
| **TITLE II - SECURITY, ENFORCEMENT, AND INVESTIGATIONS** | | | | | |
| U.S. Customs and Border Protection............. | 11,948,886 | 11,481,424 | 11,399,301 | -549,585 | -82,123 |
| U.S. Immigration and Customs Enforcement....... | 5,308,210 | 5,776,000 | 5,746,311 | +438,101 | -29,689 |
| Transportation Security Administration......... | 7,977,358 | 7,773,956 | 7,689,146 | -288,212 | -84,810 |
| Coast Guard.................................... | 9,601,052 | 9,970,491 | 9,968,326 | +367,274 | -2,165 |
| (Mandatory appropriations).................. | (1,236,745) | (1,361,245) | (1,361,245) | (+124,500) | --- |
| (Discretionary appropriations)............. | (8,364,307) | (8,609,246) | (8,607,081) | (+242,774) | (-2,165) |
| United States Secret Service.................. | 1,512,954 | 1,489,584 | 1,461,384 | -51,570 | -28,200 |
| Total, title II............................ | 36,348,460 | 36,491,455 | 36,264,468 | -83,992 | -226,987 |
| (Fee accounts)............................. | -1,787,145 | -2,019,503 | -1,794,900 | -7,755 | +224,603 |
| (Capital funds)............................ | -250,000 | -250,000 | -250,000 | --- | --- |
| (Offsetting collections)................... | -2,320,000 | -2,100,000 | -2,100,000 | +220,000 | --- |
| Net total................................ | 31,991,315 | 32,121,952 | 32,119,568 | +128,253 | -2,384 |
| (Discretionary appropriations)............. | (30,754,570) | (30,760,707) | (30,758,323) | (+3,753) | (-2,384) |

223

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| **TITLE III - PROTECTION, PREPAREDNESS, RESPONSE AND RECOVERY** | | | | | |
| National Protection and Programs Directorate.......... | 1,158,263 | 1,318,937 | 1,279,723 | +121,460 | -39,214 |
| Office of Health Affairs.............................. | 157,191 | 138,000 | 128,400 | -28,791 | -9,600 |
| Federal Emergency Management Agency................... | 7,572,906 | 7,234,818 | 7,353,118 | -219,788 | +118,300 |
| Total, title III (including transfers).......... | 8,888,360 | 8,691,755 | 8,761,241 | -127,119 | +69,486 |
| **TITLE IV - RESEARCH AND DEVELOPMENT, TRAINING, AND SERVICES** | | | | | |
| United States Citizenship and Immigration Services.... | 2,640,926 | 2,867,232 | 2,751,232 | +110,306 | -116,000 |
| Fee accounts.......................................... | 2,539,186 | 2,503,232 | 2,503,232 | -35,954 | --- |
| Net total......................................... | 101,740 | 364,000 | 248,000 | +146,260 | -116,000 |
| Federal Law Enforcement Training Center.............. | 332,986 | 288,812 | 282,812 | -50,174 | -6,000 |
| Science and Technology............................... | 932,587 | 968,391 | 967,556 | +34,969 | -835 |
| Domestic Nuclear Detection Office.................... | 514,191 | 366,136 | 366,136 | -148,055 | --- |
| Total, title IV................................... | 4,420,690 | 4,490,571 | 4,367,736 | -52,954 | -122,835 |
| (excluding fee accounts)...................... | (1,881,504) | (1,987,339) | (1,864,504) | (-17,000) | (-122,835) |
| **TITLE V - GENERAL PROVISIONS** | | | | | |
| General provisions................................... | 27,627 | --- | -13,738 | -41,365 | -13,738 |

224

COMPARATIVE STATEMENT OF NEW BUDGET (OBLIGATIONAL) AUTHORITY FOR 2009
AND BUDGET REQUESTS AND AMOUNTS RECOMMENDED IN THE BILL FOR 2010
(Amounts in thousands)

| | FY 2009 Enacted | FY 2010 Request | Bill | Bill vs. Enacted | Bill vs. Request |
|---|---|---|---|---|---|
| Total, title V.......................... | 27,627 | --- | -13,738 | -41,365 | -13,738 |
| | | | | | |
| TOTAL, DEPARTMENT OF HOMELAND SECURITY........... | 43,400,245 | 44,190,938 | 43,986,245 | +586,000 | -204,693 |
| Mandatory.............................. | (1,236,745) | (1,361,245) | (1,361,245) | (+124,500) | --- |
| Discretionary.......................... | (42,163,500) | (42,829,693) | (42,625,000) | (+461,500) | (-204,693) |

# ADDITIONAL VIEWS OF JERRY LEWIS AND HAROLD ROGERS

On June 12, 2009, the full committee unanimously approved the fiscal year 2010 Homeland Security Appropriations bill. This bill continues the Subcommittee's bipartisan tradition, and we sincerely appreciate the majority's willingness to listen to our concerns and accommodate them as much as possible. We are especially appreciative of the majority's commitment to move this bill through the regular appropriations process, including floor consideration under an open rule. However, we note with disappointment the apparent decision to stifle debate through the requirement to have all potential amendments pre-printed in the Congressional Record prior to the bill being considered on the floor of the House of Representatives. Such arbitrary and unnecessary rules inhibit a fair and open airing of views on this important bill and are contrary to the best traditions of the Committee on Appropriations.

## BUDGET PRINCIPLES

We remain concerned about the overall funding level of the President's fiscal year 2010 budget request for the Department of Homeland Security (DHS) and note a 302(b) allocation for this bill that is nearly half a billion dollars lower than the request. We not the majority's insistence to compare a 302(b) allocation that includes $241.5 million in overseas contingency operations funding for the Coast Guard to a discretionary request that does not include such funding. This flawed comparison gives the misleading impression that the majority's fiscal year 2010 allocation for this homeland security bill is a smaller reduction below the President's request. On the contrary and as previously noted, a direct and accurate comparison shows a larger, near half billion dollar reduction below the budget request.

The President's request for and the majority's subsequent endorsement of marginal funding for security relative to enormous and poorly justified increases on domestic spending, constitutes a prioritization of government functions and a fiscal outlook that we do not share. At a time of such economic turmoil, we maintain that a much more fiscally disciplined fiscal year 2010 budget is a far more prudent and responsible course of action. We are supportive of budget priorities that invoke fiscal discipline, reduce overall spending, provide greater support for defense and security-related activities, and limit other government functions to sufficient, inflationary gains.

## CONCERNS WITH THE BILL

As for the substance of the fiscal year 2010 Homeland Security Appropriations bill, we are supportive of this thoughtful and reasonable piece of legislation. The bill provides funding for critical se-

226

curity functions ranging from overseas contingency operations and interdiction efforts, to fortification of our borders and immigration enforcement to improvement of our Nation's preparedness. However, we do have a few specific concerns for homeland security in fiscal year 2010 we wish to note, including: relatively large funding increases for administrative and policy functions compared to marginal gains for operations; a lack of clear planning and consideration of the security implications of the closure of the detention facility at Naval Station Guantanamo Bay, Cuba; an overstatement of the prioritization of immigration enforcement resources upon criminal aliens; and an incomplete commitment to the vital E-Verify system. All of these concerns were addressed during the Committee's consideration of the bill through either an amendment or the statements of several Republican Members.

BUREAUCRACY VS. OPERATIONS

We note the President's misguided priorities contained in his fiscal year 2010 budget proposal that requested a more than 30 percent increase for administrative and policy functions at the Department of Homeland Security (DHS), but a more than 11 percent decrease in CBP's procurement of operational assets and, for the first time we can recall, a decrease in active duty Coast Guard personnel. These flawed priorities are contradicted by the Administration's strategy on Southwest Border enforcement and combating the Mexican drug cartels, released on June 5, 2009 (approximately one month after the fiscal year 2010 budget was submitted to Congress). This strategy professes the need to enhance our intelligence and drug interdiction capabilities; and yet, the President's budget proposal only marginally increases DHS's intelligence office and Border Patrol and actually proposes resource reductions to the very agencies responsible for drug interdiction along our borders and in the source and transit zones, as noted. Given the current threat environment and the pervasive aggression of the Mexican drug cartels, we maintain that now is perhaps the absolute worst time to shortchange operations and to espouse such blatant hypocrisy in the support of such critical security functions. While the majority has endeavored to significantly improve an extremely imbalanced and poorly prioritized request from the President through this spending bill, we continue to believe much more can be done to support our front line Coast Guardsmen, Border Patrol agents, CBP Officers, and ICE and Secret Service investigators.

The fiscal year 2010 Homeland Security Appropriations bill endeavors to make some notable efforts to correct the President's imbalanced request by curtailing increases in bureaucratic functions and somewhat enhancing operations. Therefore, we applaud the majority's increases to ICE's Southwest Border enforcement operations, CBP's Air and Marine Operations Center, and to the Coast Guard's airborne use of force and law enforcement detachment operations. However, we note that the bill still supports a 15.8 percent increase for DHS's administrative offices and that increase is on top of $205 million provided for such functions in the American Recovery and Reinvestment Act (ARRA). We maintain that under the prevailing economic conditions, and with known, yet unfunded operational priorities, it is certainly more than reasonable to ask

227

the headquarters and policy functions of DHS to make due with a funding increase for fiscal year 2010 that is much closer to inflation than a disproportional 15.8 percent increase.

CBP and the Coast Guard both have known personnel and acquisition needs unfunded by both the budget request and by this bill. Whether it is additional aerial surveillance assets or more operational personnel, these resources are absolutely vital to the safety and security of our Nation. Insufficient funding for priorities such as the operational test and evaluation of unmanned aerial systems for cutter applications, additional land-based unmanned aerial systems for maritime and coastal applications, and additional manned surveillance and transport assets along our border, increase the risk of contraband smuggling and illicit penetration of our territorial waters and borders. We maintain that more can and should be done and we will continue to voice our support for the further enhancement of operations.

### SECURITY IMPLICATIONS OF CLOSING THE DETENTION FACILITY AT NAVAL STATION GUANTANAMO BAY, CUBA

As the President moves forward with his pledge to close the detention facility at Naval Station Guantanamo Bay, Cuba, the Congress has voiced a near unanimous concern over the lack of planning for this effort. Given the complexities surrounding this facility and the diplomatic, legal, and security implications of its closure, we strongly believe it is only prudent for the Administration to present its plan to Congress and the American people before undertaking piecemeal efforts to satisfy a campaign promise. Furthermore, we are troubled by the Administration's actions to release and transfer detainees without regard for the concerns currently being expressed by Congress through the pending fiscal year 2009 supplemental appropriations bill and the recently filed fiscal year 2010 Commerce, Justice, Science, and Related Agencies Appropriations bill. Such blatant disregard for Congress by the Administration is unacceptable. Therefore, we are sincerely appreciative of the bipartisan and thoughtful manner in which the Committee approached the debate and adoption of our amendment pertaining to disposition of detainees at Naval Station, Guantanamo Bay, Cuba. This amendment requires the Secretary of Homeland Security to conduct a thorough threat assessment of each and every individual detained at Naval Station Guantanamo Bay, Cuba, as of April 30, 2009, as part of the plan for disposition of the detention facility. The amendment also requires the names of all detainees be placed on the No Fly list and prevents direct appropriations from being used to grant an immigration benefit. We perfected this amendment to allay the majority's concerns and clarify that the limitation on direct appropriations from being used to grant an immigration benefit would not inhibit transfers for the purposes of prosecution.

### PRIORITIZING CRIMINAL ALIENS AT THE EXPENSE OF HOMELAND SECURITY

Over the past few years, the majority has undertaken an effort to concentrate ICE's resources upon the identification and removal of illegal aliens who are convicted of a crime and judged deportable. We fully support this laudable effort, but maintain that an empha-

228

sis upon criminal aliens must not come at the expense of other, critical immigration enforcement functions such as fugitive operations, worksite enforcement, terrorist travel, and transnational criminal investigations. We vigorously oppose efforts to "prioritize" immigration enforcement resources as a means to reform the immigration system. We also remind those who wish to prioritize immigration enforcement resources that none of the 9/11 hijackers could have been classified as "criminal aliens" and that all of those terrorists exploited our legal immigration system. We believe immigration enforcement plays a critical role within our homeland security and should not be inhibited or confined to one subset of illegal aliens. Therefore, we respectfully disagree with the majority's position that, ". . . Congress has emphasized that ICE must have no higher immigration enforcement priority . . ." in reference to criminal aliens and as stated on page 49 of the report accompanying the bill.

### SUPPORTING E-VERIFY AND LAWFUL EMPLOYMENT

The electronic employment eligibility verification system known as E-Verify is the best and only tool available for employers to determine whether potential employees are lawful applicants. We believe that such a system is absolutely essential to the American economy as unemployment remains unacceptably high. We appreciate the bill's inclusion of $112 million, as requested, for E-Verify, but are disappointed by the bill's truncation of the requested three-year extension of E-Verify's underlying authorization to only two years. We are further dismayed that this reduction is based upon a projected timeline for the "completion of comprehensive immigration reform". We do not see this as a realistic timeline or a justifiable excuse for reducing the President's request for a three-year extension. therefore, we were fully supportive of a thoughtful amendment offered during the Committee's consideration of the bill to include a permanent reauthorization of this vital system. Unfortunately, this amendment was defeated on a party-line vote. In addition, we are supportive of efforts to mandate the Federal Government to require its contractors to participate in E-Verify and fail to understand why the current Administration has postponed implementation of such a requirement three times in the last five months. Another thoughtful amendment was offered during the Committee's consideration of the bill that would have required all DHS contractors to participate in E-Verify. Unfortunately, this amendment was also defeated on a party-line vote. Given the sensitivity of the security-related work of DHS, it is only prudent that its contractors be required to verify the eligibility of their employees.

### OTHER FUNDING ISSUES

We note the bill continues to fund State and local first responder grants at a total of nearly $4 billion, or almost ten percent of the bill's discretionary funding. While we are absolutely committed to assisting our State and local homeland security partners and improving our National preparedness, we remain concerned at the slow expenditure of these grants. Including the funds provided in the bill, more than $30 billion have been provided via first re-

229

sponder grants since 9/11 and more than a third of that total is unspent. Unfortunately, there is no way to measure the effectiveness of these funds in terms of how they have either improved our preparedness or reduced our known vulnerabilities. While we appreciate the nascent efforts of FEMA to assess the impacts of grant monies, we believe more can and should be done in that regard. The American people deserve a reasonable, measurable security return on an investment of this magnitude.

We note that the Administration requested no funding for procuring and deploying additional radiation detection equipment and that the bill supports this request. We understand that the decision to provide no funding for the procurement of the still unproven Advanced Spectroscopic Portal monitors was made on the basis of compelling budgetary reasons as opposed to a policy determination. We believe that it is crucial to note, however, that the decision to provide absolutely no funding for additional detection equipment that is presently in use (using the current generation of proven technology) can potentially result in a security liability at a time of persistent threat. We maintain that more can and perhaps should be done in this regard.

While we have been very direct in voicing our concerns, we believe this bill has the potential to do a lot of good. There are many provisions and funding recommendations that we agree with and applaud the bill's efforts in keeping DHS on track to produce results, as well as continuing the Committee's tradition of strict accountability. We look forward to working with the majority as this bill continues to move through the fiscal year 2010 appropriations cycle.

JERRY LEWIS.
HAROLD ROGERS.

○

# EXHIBIT 52



**Research**

# The Labor and Output Declines from Removing All Undocumented Immigrants

BEN GITIS, JACQUELINE VARAS | MAY 5, 2016

## EXECUTIVE SUMMARY

We build on previous American Action Forum (AAF) research that found removing all undocumented immigrants from the United States and preventing all future unlawful entry would cost between $400 billion and $600 billion and reduce real gross domestic product (GDP) by over $1 trillion. In this paper, we examine how removing undocumented immigrant workers would directly impact each major industry.

In 2012 roughly 6.8 million employed workers in the private sector were undocumented immigrants, making up 5.6 percent of all employed people in the private sector. We estimate the direct economic cost of removing these workers from the labor force. We find that even if native and lawful foreign-born residents were to fill jobs left by undocumented immigrants, there were not nearly enough unemployed workers in 2012 to offset a loss of all 6.8 million employed undocumented workers. As a result, the U.S. private sector would face a substantial labor decline. Based on 2012 workforce and production levels, we find that:

- Private sector employment would fall by 4 million to 6.8 million workers, and
- This worker decline by itself would reduce private industry output by between $381.5 billion and $623.2 billion.

Moreover, we find that removing all undocumented immigrant workers would disproportionally affect industries that rely heavily on them. The industries most strained would include agriculture, construction, and leisure and hospitality.

## INTRODUCTION

The question of how to address unauthorized immigration has been among the most prominent issues in the 2016 presidential race. Presidential candidates Donald Trump and Senator Ted Cruz have both proposed that the government fully enforce current law and remove all 11.3 million undocumented immigrants currently living in the country. As AAF previously found, this would be a major task that would severely hamper the U.S. economy: fully enforcing current law towards all undocumented immigrants would take at least 20 years and cost the government $400 billion to $600 billion. Removing all undocumented immigrants in just two years, as Donald Trump has proposed, would require monumental expansions in U.S. immigration enforcement operations. Most importantly, under both the 20-year and 2-year time frames, the U.S. economy would shrink by over $1 trillion.

This economic decline would in large part be driven by the removal of undocumented immigrant workers from

the labor force, inducing substantial labor declines. Since some parts of the economy depend on undocumented immigrants more than others, how would the economic effects of removing all undocumented immigrants differ by industry? Would some industries fair worse than others? In this paper, we build on our previous research by analyzing how removing all undocumented workers would directly impact each major industry's workforce and, in turn, its annual production. Overall, we find that removing all undocumented immigrant workers would directly result in private sector labor declining by 4 million to 6.8 million workers. This reduction would consequently cause production to fall between $381.5 billion and $623.3 billion. As one would expect, the industries that rely the most heavily on undocumented immigrant workers, such as agriculture and construction, are the ones that would suffer the largest declines in both labor and production.

## AAF'S PREVIOUS IMMIGRATION ENFORCEMENT RESEARCH

Last year, AAF estimated the budgetary and economic costs of fully enforcing current law toward undocumented immigrants.[1] We found that the federal government would have to spend $400 billion to $600 billion to remove all undocumented immigrants currently living in the United States and to prevent all future unlawful entry. Depending on how the government conducts its apprehensions, it would need to spend $100 billion to $300 billion arresting and removing all undocumented immigrants residing in the country, a process we estimate would take 20 years based on Immigration and Customs Enforcement's (ICE) current removal capacity. In addition, to prevent the entry of any new undocumented immigrants going forward, the government at a minimum would have to maintain current immigration enforcement levels. This results in an additional $315 billion in continuing enforcement costs over that time period.

More recently, we examined what it would take to execute Donald Trump's promise to remove all undocumented immigrants in just two years.[2] We detailed current immigration enforcement operations and estimated exactly how large each component of the enforcement process would have to be in order to accomplish this task. We found that to remove all undocumented immigrants in two years, the federal government would need to increase federal immigration apprehension workers from 4,844 to 90,582, immigration detention personnel from 5,203 to 53,381, federal immigration attorneys from 1,430 to 32,445, and immigration courts from 58 to 1,316. In addition, the number of immigration detention beds would need to increase from 34,000 to 348,831 and to physically transport all undocumented immigrants out of the country the government would need to charter a minimum of 17,296 flights and 30,701 bus trips each year.

Perhaps most important are the economic costs associated with removing all undocumented immigrants. Under both time frames, we found that removing all undocumented immigrants would cause the economy to decline by over $1 trillion.

## THE SIZE OF THE UNDOCUMENTED IMMIGRANT WORKFORCE

In this paper we estimate the reductions in labor and resulting output declines in each industry that would occur if policymakers removed all undocumented immigrants from the United States. So just how important are undocumented immigrants in the U.S. labor force? Pew estimates that in 2012 they accounted for approximately 5 percent of all people working or searching for work.[3] The prevalence of undocumented immigrant workers, however, varies substantially by industry.[4]

Table 1 contains an estimated number of private sector employees in each industry who were undocumented immigrants in 2012. We derive these numbers by applying Pew's undocumented immigrant industry

proportions to unpublished industry level 2012 Current Population Survey (CPS) labor estimates, which we obtained from the Bureau of Labor Statistics (BLS).[5]’[6]

## Table 1: Employed Undocumented Immigrants by Industry in 2012

| Industry | Undocumented Immigrant Workers | Share of Industry |
|---|---|---|
| Agriculture, Forestry, Fishing, and Hunting | 342,608 | 16.1% |
| Mining | 29,512 | 3.1% |
| Construction | 1,043,222 | 12.2% |
| Manufacturing | 918,729 | 6.3% |
| Wholesale/Retail Trade | 829,500 | 4.2% |
| Transportation and Utilities | 193,644 | 3.3% |
| Information | 77,980 | 2.8% |
| Financial Activities | 215,349 | 2.3% |
| Professional and Business Services | 1,030,144 | 6.4% |
| Educational and Health Services | 375,360 | 1.7% |
| Leisure and Hospitality | 1,148,940 | 9.0% |
| Other Services | 584,578 | 8.2% |
| Total | 6,789,566 | 5.6% |

We estimate that there were over 7.4 million undocumented immigrants either working or searching for work in the private sector in 2012. Of those 7.4 million in the labor force, 6.8 million were employed.

Clearly, undocumented immigrant workers are more highly concentrated in some industries than in others. In education and health services, for example, they only accounted for 1.7 percent of employees in 2012. Meanwhile, undocumented immigrants are very prevalent in the agricultural, forestry, fishing, and hunting

industry, representing 16.1 percent of workers in 2012. Similarly, they are prevalent in construction and leisure and hospitality, accounting for 12.2 percent and 9 percent of employees in those industries in 2012, respectively. These industries would likely suffer the most if lawmakers were to fully enforce current law towards all undocumented immigrants.

# METHODS FOR DERIVING LOWER- AND UPPER-BOUND ESTIMATES

In analyzing the labor declines and resulting impacts on output in each industry, we project a range of estimates. In our lower-bound estimate, we account for the possibility that native and lawful foreign-born workers would fill jobs that undocumented immigrants would have to leave. In our upper-bound estimate, we assume that no native or lawful foreign-born workers would fill any of the jobs left vacant. We perform this analysis with 2012 data because that is the latest year for which Pew examined the prevalence of undocumented immigrant workers in each industry.

For our lower-bound estimate, to find how many employed undocumented immigrants could be replaced by native and lawful foreign-born workers, we first have to estimate how many native and lawful foreign-born workers are actually available to fill the undocumented immigrant workers' jobs. For this, we examine unemployment among native and lawful foreign-born workers in each industry. These are the workers who are jobless and actively looking for work. We assume that these unemployed workers would fill the jobs left by the removed undocumented immigrants until the industry's unemployment rate falls to the long-run natural unemployment rate. The Congressional Budget Office determined that in 2012, the long-run natural unemployment rate was 5.1 percent.[7] Generally hovering around 5 percent, the long-run natural unemployment rate is the rate at which the labor force is considered to be at full employment, as no one is unemployed due to fluctuating economic conditions and those who remain unemployed tend to be transitioning between jobs. With the natural rate of unemployment reached in each industry, we designate the remaining unfilled jobs to be the lower-bound labor decline.

We turn to the unpublished CPS labor force figures to estimate private sector unemployment rates and levels among native and lawful foreign-born workers in each industry. Specifically, we reduce each industry's labor force by size of the undocumented immigrant labor force. Then with the remaining native and lawful foreign-born workers, we calculate 2012 unemployment and unemployment above the long-run natural rate of unemployment. For each industry, the unemployment rate above the long-run natural rate is simply the percentage point difference between the unemployment rate and the long-run natural unemployment rate (5.1 percent). We then multiply that percentage point difference by the native and lawful foreign-born labor force to estimate the number of unemployed workers in each industry above the natural rate. It is important to note that we in effect assume that unemployment rates for undocumented workers are the same as native and lawful foreign-born workers.

Table 2 displays by industry both overall 2012 unemployment among native and lawful foreign-born workers and unemployment above the long-run natural rate of 5.1 percent. The latter represents the number of native and lawful foreign-born workers who are available to replace the employed undocumented immigrants.

**Table 2: Native and Lawful Foreign-Born Worker Unemployment by Industry in 2012**

| Industry | Unemployment | Unemployment Above Natural |
|---|---|---|

| | Rate | Workers | Rate | Workers |
|---|---|---|---|---|
| Agriculture, Forestry, Fishing, and Hunting | 8.1% | 157,732 | 3.0% | 58,633 |
| Mining | 5.8% | 57,171 | 0.7% | 7,208 |
| Construction | 11.7% | 991,262 | 6.6% | 557,811 |
| Manufacturing | 7.1% | 1,051,314 | 2.0% | 300,819 |
| Wholesale/Retail Trade | 7.8% | 1,593,154 | 2.7% | 546,958 |
| Transportation and Utilities | 6.5% | 396,470 | 1.4% | 86,858 |
| Information | 7.3% | 211,896 | 2.2% | 63,031 |
| Financial Activities | 4.7% | 455,282 | -0.4% | -34,468 |
| Professional and Business Services | 7.8% | 1,271,088 | 2.7% | 437,904 |
| Educational and Health Services | 5.3% | 1,211,056 | 0.2% | 42,356 |
| Leisure and Hospitality | 9.9% | 1,276,730 | 4.8% | 619,147 |
| Other Services | 6.2% | 431,460 | 1.1% | 75,690 |
| Total | 7.3% | 9,104,615 | 2.2% | 2,761,947 |

*Negative because the long-run natural rate of unemployment is larger than the unemployment rate in that industry.

To find the lower-bound labor decline estimates in each industry, we subtract the number of unemployed native and lawful foreign-born workers above the long-run natural rate of unemployment (in Table 2) from the estimated number of employed undocumented immigrant workers (in Table 1). Meanwhile, for the upper-bound worker decline estimates, we assume no native or lawful foreign-born workers would fill the jobs left open by the removed undocumented workers. As a result, the upper-bound estimates in each industry are simply the number of employed undocumented immigrant workers in 2012.

We then calculate the decline in output in each industry that would result from removing all undocumented immigrant workers. To accomplish this, we divide real output by the number of employed people in each industry in 2012, which estimates output per employed worker in each industry that year.[8] We then multiply

the estimated output per worker by the lower- and upper-bound reductions in labor to yield lower- and upper-bound declines in output in each industry. This method inherently assumes output per undocumented immigrant worker is the same as native and lawful foreign-born workers.

It is important to note that this analysis has a few shortcomings. Since 2012, unemployment rates have fallen substantially and there are very few industries that have unemployment rates significantly above the long-run natural rate today. This means that today there are likely very few unemployed native and lawful foreign-born workers who are available to replace the employed undocumented immigrants. In this regard, the lower-bound estimates may be larger than we project in this analysis. However, our methods also do not take into account the possibility that native and lawful foreign-born workers not currently looking for work may enter the labor force to fill the jobs that would be left open by removing all undocumented immigrants. Since there is no way of knowing how many workers would enter the labor force, we do not take into account this possibility, which would make the lower-bound labor and output declines smaller than what we project.

# LABOR DECLINES

We find that removing the entire unauthorized workforce would cause private sector employment to decline by 4 million to 6.8 million workers.

### Table 3: Projected Employment Decline by Industry

| Industry | Lower-Bound | Upper-Bound |
|---|---|---|
| Agriculture, Forestry, Fishing, and Hunting | 283,975 | 342,608 |
| Mining | 22,304 | 29,512 |
| Construction | 485,411 | 1,043,222 |
| Manufacturing | 617,910 | 918,729 |
| Wholesale/Retail Trade | 282,542 | 829,500 |
| Transportation and Utilities | 106,786 | 193,644 |
| Information | 14,949 | 77,980 |
| Financial Activities* | 215,349 | 215,349 |
| Professional and Business Services | 592,240 | 1,030,144 |

| | | |
|---|---|---|
| Educational and Health Services | 333,004 | 375,360 |
| Leisure and Hospitality | 529,793 | 1,148,940 |
| Other Services | 508,888 | 584,578 |
| Total | 3,993,152 | 6,789,566 |

\*In financial activities, the labor decline in the lower-bound scenario is the same as in the upper-bound scenario. That is because in 2012 the unemployment rate in financial activities was below the long-run natural rate of unemployment of 5.1 percent. This means that in 2012 there were no native or lawful foreign-born workers in financial activities readily able to replace the undocumented immigrants.

Even if native and lawful foreign-born workers replaced undocumented immigrants until the unemployment rate falls to 5.1 percent in each industry, private sector employment would still decline by approximately 4 million workers. If native and lawful foreign-born workers do not fill any of the jobs left by undocumented immigrants, then U.S. private sector employment would decline by 6.8 million workers. The largest labor declines would occur in construction and leisure and hospitality, as employment each could end up decreasing by over 1 million workers.

# OUTPUT DECLINES

The labor declines would result in a substantial decline in industry output. Overall, removing all undocumented immigrants would cause private sector output to decline by between $381.5 billion and $623.2 billion. This translates to a 2.9 percent to 4.7 percent reduction in total annual output from the private sector. Table 4 contains the decline in output in each industry.

## Table 4: Projected Real Output Decline by Industry (in 2009 dollars)[9]

| Industry | Lower-Bound | | Upper-Bound | |
|---|---|---|---|---|
| | Real Output (in billions) | Percent | Real Output (in billions) | Percent |
| Agriculture, Forestry, Fishing, and Hunting | $16.4 | 13.3% | $19.8 | 16.1% |
| Mining | $7.5 | 2.3% | $9.9 | 3.1% |
| Construction | $32.3 | 5.7% | $69.4 | 12.2% |
| Manufacturing | $77.5 | 4.2% | $115.2 | 6.3% |
| Wholesale/Retail Trade | $25.4 | 1.4% | $74.5 | 4.2% |

| | | | | |
|---|---|---|---|---|
| Transportation and Utilities | $13.0 | 1.8% | $23.6 | 3.3% |
| Information | $4.0 | 0.5% | $20.8 | 2.8% |
| Financial Activities* | $70.6 | 2.3% | $70.6 | 2.3% |
| Professional and Business Services | $68.3 | 3.7% | $118.8 | 6.4% |
| Educational and Health Services | $19.1 | 1.5% | $21.5 | 1.7% |
| Leisure and Hospitality | $23.9 | 4.2% | $51.9 | 9.0% |
| Other Services | $23.5 | 7.1% | $27.0 | 8.2% |
| Total | $381.5 | 2.9% | $623.2 | 4.7% |

*In financial activities, the reduction in output in the lower-bound scenario is the same as in the upper-bound scenario. That is because in 2012 the unemployment rate in financial activities was below the long-run natural rate of unemployment of 5.1 percent. This means that in 2012 there were no native or lawful foreign-born workers in financial activities readily able to replace the undocumented immigrants.

Table 4 shows that industries with the highest proportion of undocumented workers would be hit hardest by fully enforcing current law. For example, output in the agriculture, forestry, fishing, and hunting industry would decrease by 13.3 percent to 16.1 percent ($16.4 billion to $19.8 billion). While output in the construction industry could fall by up to 12.2 percent ($69.4 billion), the industry's high unemployment rate (11.7 percent) for native and lawful foreign-born workers indicates that there are a sizeable number of workers who may be readily able to replace the removed undocumented immigrants. However, even if every available unemployed construction worker took the job of a removed undocumented immigrant until the unemployment rate fell to 5.1 percent, output in the industry would still decrease by 5.7 percent ($32.3 billion). Finally, output in leisure and hospitality would decline a substantial 4.2 percent to 9 percent ($23.9 billion to $51.9 billion).

It is important to understand that the reduction in output captured in this analysis is simply the value of the labor the United States would lose if policymakers were to remove all undocumented immigrants from the country. It does not include the other ways undocumented immigrants contribute to the U.S. economy, such as consumption, investing, and entrepreneurship. Accounting for these factors would likely make the estimated negative economic consequences of removing all undocumented immigrants far more severe.

## CONCLUSION

We estimate that there were approximately 6.8 million employed undocumented immigrants in the private sector in 2012. Although there were quite a few unemployed native and lawful foreign-born workers in each industry, we find that there were not nearly enough to make up for the reduction in labor that would result from removing all undocumented immigrants from the United States. Fully enforcing current law towards all undocumented immigrants would cause private sector employment to decline by 4 million to 6.8 million

workers. As a result, the labor declines by themselves would reduce real private sector output by 2.9 percent to 4.7 percent or $381.5 billion to $623.2 billion. The negative consequences of removing all undocumented workers from the private sector would be particularly harmful to the industries that employ these workers, such as agriculture, construction, and leisure and hospitality.

[1] Ben Gitis & Laura Collins, "The Budgetary and Economic Costs of Addressing Unauthorized Immigration: Alternative Strategies," American Action Forum, March 2015, http://americanactionforum.org/research/the-budgetary-and-economic-costs-of-addressing-unauthorized-immigration-alt

[2] Ben Gitis, "The Personnel and Infrastructure Needed To Remove All Undocumented Immigrants In Two Years," American Action Forum, February 2016, http://www.americanactionforum.org/research/the-personnel-and-infrastructure-needed-to-remove-all-undocumented-immigrants-in-two-years/

[3] Jeffrey S. Passel & D'Vera Cohn, "Unauthorized Immigrant Totals Rise in 7 States, Fall in 14: Decline in Those From Mexico Fuels Most State Decreases," Pew Research Center, November 2014, p. 8, http://www.pewhispanic.org/files/2014/11/2014-11-18_unauthorized-immigration.pdf

[4] Jeffrey S. Passel & D'Vera Cohn, "Share of Unauthorized Immigrant Workers in Production, Construction Jobs Fall Since 2007," Pew Research Center, March 2015, http://www.pewhispanic.org/2015/03/26/share-of-unauthorized-immigrant-workers-in-production-construction-jobs-falls-since-2007/

[5] Unpublished estimates: "Table 4. Employed and experienced unemployed persons by detailed industry and class of workers, Annual Average 2012," Current Population Survey, Bureau of Labor Statistics, 2012; obtained by AAF from the BLS on April 11, 2016.

[6] Pew also provided estimates for the number of undocumented immigrant workers in each industry, which are based on American Community Survey data. However, our analysis depends on unemployment rates in each industry, which are not available in the American Community Survey. The information needed to calculate unemployment rates in each private industry is available in the unpublished CPS estimates that we obtained from the BLS. As a result, instead of directly pulling the undocumented immigrant worker data from Pew, we applied the Pew data on the percent of workers in each industry who are undocumented immigrants to the unpublished CPS industry labor force estimates.

[7] US. Congressional Budget Office, *Natural Rate of Unemployment (Long-Term)* [NROU], retrieved from FRED, Federal Reserve Bank of St. Louis, https://research.stlouisfed.org/fred2/series/NROU

[8] Real Value Added by Industry, Bureau of Economic Analysis, http://www.bea.gov/iTable/iTable.cfm?ReqID=51&step=1#reqid=51&step=51&isuri=1&5114=a&5102=10

[9] Industry output decline figures may not add to total due to rounding.