**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **STATE OF TEXAS,** *et al.*, | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 1:18-cv-00068** |
| | § | |
| **UNITED STATES OF AMERICA,** *et al.*, | § | |
| | § | |
| **Defendants,** | § | |
| | § | |
| **KARLA PEREZ,** *et al.*, | § | |
| | § | |
| **Defendants-Intervenors.** | § | |
| | § | |

# APPENDIX IN SUPPORT OF BRIEF OF 114 COMPANIES AND ASSOCIATIONS AS *AMICI CURIAE*

# VOLUME 3

# EXHIBITS 53-68

# EXHIBIT 53

*6 Immigration Law and Procedure § 72.03*

*Immigration Law and Procedure  >  PART 7 DEPORTABILITY / DEPORTATION  >  CHAPTER 72 Procedure in Deportation Cases*

## § 72.03 Commencement of Deportation Proceeding (Pre-IIRAIRA Law)[*]

### [1] Order to Show Cause

#### [a] Overview and Historical Background

Before February 1956, all deportation proceedings were commenced with the arrest of the respondent.[1] The service of the warrant of arrest marked the opening of the proceeding, and the warrant served the additional function of notifying the respondent of the charges against him or her.[2] Although the respondent ordinarily was released on nominal bail during the pendency of the case, he or she suffered the stigma of arrest.

New procedures begun in 1956 ended the practice of starting the proceeding with an arrest and decreed that thereafter deportation proceedings would be initiated by the issuance and service of an order to show cause (OSC), Form I-221, and the filing of the OSC with an immigration court.[3] The respondent would be arrested only when the public interest required his or her incarceration or when there was substantial basis for a belief that the respondent would abscond.[4]

The three stages in the OSC process—issuance, service, and filing—are distinct concepts. Issuance, the first step, is generally understood as the agency's act of preparing, dating, and releasing an OSC with respect to a particular noncitizen.[5] After the OSC is issued, it is served upon the noncitizen, usually by delivering it personally or sending it by certified mail.[6] Finally, the deportation proceeding formally starts when the OSC is filed or actually received by the appropriate immigration court.[7]

---

[*] The authors thank Nathan Baum and Elizabeth Kerwin-Miller for their assistance in updating various parts of this chapter.

[1] *Harisiades v. Shaughnessy, 187 F.2d 137 (2d Cir. 1951)*, aff'd, *342 U.S. 580 (1952)*.

[2] S. Rep. No. 81-1515, at 625 (1950); *see* *Chew v. Boyd, 309 F.2d 857, 861 (9th Cir. 1962)* (citing this treatise).

[3] *21 Fed. Reg. 99-101 (Jan. 6, 1956)*.

[4] *See infra* § 72.03[4].

[5] The issuance of the OSC is discussed *infra* in § 72.03[1][b].

[6] Service of the OSC is discussed *infra* in § 72.03[1][d].

[7] *See* *8 C.F.R. §§ 1003.13* (definition of "filing"), 1003.14(a) (jurisdiction vests and proceedings commence when charging document filed with Immigration Court); *infra* § 72.03[1][b]. For the purposes of its regulations, the INS changed the name of the tribunal that hears deportation and exclusion proceedings from "Office of the Immigration Judge" to "Immigration Court." *60 Fed. Reg. 34,089 (June 30, 1995)*.

6 Immigration Law and Procedure § 72.03

Although in some respects the language of the Immigration and Nationality Act (INA) did not contemplate such a process, the OSC procedure unquestionably satisfied the statutory mandate.[8] In eliminating arrest as an inevitable prerequisite, the new procedure represented a substantial improvement over the traditional patterns it superseded. Moreover, it afforded the respondent more adequate notice of the charges by spelling out their factual basis in the OSC.[9]

The Immigration Act of 1990 enlarged the function of the OSC as an essential element of the deportation process.[10] That statute added a new INA § 242B, *8 U.S.C. § 1252b*, which amplified the information to be provided in the OSC. The 1990 Act directed that the OSC also advise the respondent of the obligation to inform the Attorney General of his or her whereabouts during the deportation proceeding and of the consequences of failing to comply with this requirement.[11]

Although deportation proceedings are now initiated by the filing of the OSC with the Immigration Court, the INA still authorizes the noncitizen's arrest under the authority of a warrant of arrest.[12] Moreover, designated immigration officers are empowered to make arrests without warrant: (1) when a noncitizen in an officer's presence and view is entering or attempting to enter the United States illegally; (2) when an officer has reason to believe that a noncitizen is in the United States in violation of law and is likely to escape before a warrant can be obtained; (3) for felony violations of the immigration laws; (4) for any federal offense committed in an officer's presence; or (5) for any federal felony.[13] In making arrests it is not improper or unusual for immigration agency officers to cooperate with other law enforcement officers. It is also customary for local police officers to notify the immigration agency of noncitizens arrested or incarcerated for criminal violations, and for the immigration agency to file a "detainer" requesting the local police to hold the noncitizen for the immigration agency after police action or incarceration has been completed.[14]

Ordinarily an arrested noncitizen (other than an aggravated felon) is released upon furnishing a bond in a fixed amount. However, the government has discretion to continue to hold the noncitizen in custody or release the noncitizen on conditional parole. A custody determination by the immigration agency may be renewed before an immigration judge (IJ). The respondent or the

---

[8] *Manuerra v. INS, 390 F.2d 358 (9th Cir. 1968)*; *Ben Huie v. INS, 349 F.2d 1014 (9th Cir. 1965)*; *Matter of Muniz, 151 F. Supp. 173 (W.D. Pa. 1956)*.

[9] *See* INS, U.S. Dep't of Justice, 1956 Annual Report 14-15.

[10] Immigration Act of 1990 (IA90), **Pub. L. No. 101-649**, § 545, **104 Stat. 4978**, 5061. The 1990 Act provided that the new provisions describing the contents of the OSC and the obligations of the respondent would not take effect until a date not earlier than six months after the Attorney General certified to Congress that the central address file system described in then-INA § 242B(a)(4) had been established. These new provisions took effect on June 13, 1992. *See* **57 Fed. Reg. 5180 (Feb. 12, 1992)**. The new notice procedures thus applied only to OSCs served on or after June 13, 1992. *See* Matter of Thao Xuan Cao, 12 Immigr. Rep. B1-64 (BIA Aug. 9, 1993) (nonprecedent).

[11] INA § 242B(a)(1), *8 U.S.C. § 1252b(a)(1)*, enacted by IA90 § 545; *see infra* § 72.03[1][b].

[12] *See infra* § 72.03[4][e].

[13] *See infra* § 72.03[4][d].

[14] *See infra* § 72.03[4][b].

immigration agency may then appeal the IJ's decision to the Board of Immigration Appeals (BIA).[15]

Not all violations of the immigration laws result in deportation. In many situations, noncitizens may avail themselves of specific discretionary remedies to avert deportation such as voluntary departure, asylum, withholding of deportation, or deferred action. Moreover, administrative officers may withhold or defer deportation proceedings in some circumstances to permit the noncitizen to apply for naturalization or other immigration benefits.[16]

## [b] Issuance

As indicated above, every deportation proceeding is preceded by the issuance and service of an OSC on Form I-221. Jurisdiction then vests, and the deportation proceeding commences, when the immigration agency files the OSC with the Immigration Court.[17] There apparently is no bar to bringing a deportation proceeding against a respondent who is legally incompetent or underage.[18]

The OSC must be properly prepared and served to invoke the jurisdiction of the immigration court. Legacy Immigration and Naturalization Service (INS or Service)[19] regulations authorize the following persons to issue OSCs: district directors (except foreign); deputy district directors (except foreign); assistant and deputy assistant district directors for investigations; assistant and deputy assistant district directors for deportation; assistant and deputy assistant district directors for examinations; officers in charge (except foreign); assistant officers in charge (except foreign); chief patrol agents; deputy chief patrol agents; associate and assistant chief patrol agents; the Assistant Commissioner for investigations; service center directors; the director and assistant directors of the Organized Crime Drug Enforcement Task Force; the Assistant Commissioner, Refugees, Asylum and Parole; and supervisory asylum officers.[20] The issuance of an OSC by a person other than the above authorized individuals may be cause for a motion to terminate proceedings for lack of jurisdiction.[21] It is not uncommon for unauthorized officials, such as

---

[15] *See infra* § 72.03[4][f].

[16] *See infra* § 72.03[4][b].

[17] *Uzuegbu v. Caplinger, 745 F. Supp. 1200 (E.D. La. 1990)*; *8 C.F.R. § 1003.14*.

[18] *De Souza v. Barber, 263 F.2d 470 (9th Cir. 1959)*.

[19] The INS, an agency of the Department of Justice, was formally dissolved as of March 1, 2003. Its functions and authority were allocated primarily to the new Department of Homeland Security (DHS). *See* Homeland Security Act of 2002, **Pub. L. No. 107-296, 116 Stat. 2135**; Stanley Mailman & Stephen Yale-Loehr, *Immigration in a Homeland Security Regime*, N.Y.L.J., Dec. 23, 2002, at 3, *reprinted at* 8 Bender's Immigr. Bull. 1 (Jan. 1, 2003). Within DHS, the former INS functions relating to such immigration benefits and services as the processing of visa petitions and applications for adjustment of status and naturalization were allocated to the bureau of Citizenship and Immigration Services (USCIS). Enforcement functions fall to U.S. Customs and Border Protection (CBP, working on the border and at interior ports of entry) and U.S. Immigration and Customs Enforcement (ICE, handling interior enforcement). *68 Fed. Reg. 9824 (Feb. 28, 2003)* (amending various parts of 8 C.F.R., triggering the transfer of functions, and allocating them within DHS agencies). For more detail, see *supra § 3.02*. Even now, not all statutes and regulations have been amended to reflect the changes, especially those dealing with deportation.

[20] Former *8 C.F.R. §§ 239.1(a) (1998)*, 242.1(a) (1995).

[21] *See* Matter of Lodge, 3 Immigr. Rep. B1-207 (BIA Mar. 17, 1986) (nonprecedent) (regulatory requirements not met where OSC was not signed by an authorized person or at the direction of an authorized person; proceedings terminated). *But see Diaz-Soto v. INS, 797 F.2d 262, 264 (5th Cir. 1986)* (approving Service practice of having subordinate officers sign the authorized official's name in some situations);

Border Patrol agents, to issue OSCs.[22] In such situations, a noncitizen may be served with an improperly issued OSC, while a "corrected" version is later filed with the Immigration Court. Practitioners should carefully review the OSC in the court's record before pleading to it.[23]

The timing of issuing the OSC ordinarily is a matter of administrative discretion.[24] However, an OSC must be issued within twenty-four hours of a respondent's arrest.[25] There is likewise no requirement to serve the noncitizen with the OSC or file the OSC with an immigration court within a certain time.[26]

It is important to bear in mind the difference between an exclusion and a deportation proceeding. A noncitizen whose admissibility into the United States is questioned may be detained or allowed in under parole, while the noncitizen's right to enter is being determined. This issue is resolved in an exclusion proceeding.[27] A final order barring a noncitizen from the United States is the culmination of his or her application for entry, and there is no need to issue an OSC to accomplish the exclusion. A noncitizen who was admitted under parole apparently may be apprehended under the order of exclusion.[28] Upon termination of parole the noncitizen's right to remain in the United States is adjudicated in exclusion rather than deportation proceedings.[29] However, if the noncitizen actually has been admitted into the United States, or has entered illegally, even if the entry is brief and temporary, it is necessary to bring deportation proceedings to oust the noncitizen.[30] The issuance of the OSC is the opening step in such a process of expulsion.

---

Rassano v. INS, 377 F.2d 971 (7th Cir. 1967) (endorsing amendment of defective charge by trial attorney, through lodging additional charge at hearing); Matter of Rojas, 10 Immigr. Rep. B1-136 (BIA Oct. 26, 1992) (nonprecedent) (holding that as the list of authorized officials at former 8 C.F.R. § 242.1(a) was an internal agency rule that did not serve a purpose to benefit noncitizens and was not meant to accord noncitizens any rights, "non-compliance with this regulation is not a basis for termination of these deportation proceedings").

[22] See Diaz-Soto v. INS, 797 F.2d 262, 264 (5th Cir. 1986) (upholding INS practice to let Border Patrol agents sign copy of OSC given to noncitizen upon telephonic authorization by designated official, as long as the original OSC filed with the court was signed by a designated official).

[23] See Vera A. Weisz & Niels W. Frenzen, Selected Evidentiary Issues Relating to Deportation Proceedings, in 2 American Immigration Lawyers Association, 1994-95 Immigration & Nationality Law Handbook 463, 467 (R. Patrick Murphy ed., 1994).

[24] Matter of Rios-Carrillo, 10 I. & N. Dec. 291 (BIA 1963) ("[w]hile a matter of due process is advanced, it seems clear that premature issuance of an order to show cause would not alone amount to a denial of due process"). See supra § 72.01, which describes efforts of detained noncitizens, thus far generally unsuccessful, to compel commencement of deportation proceedings.

[25] 8 C.F.R. § 287.3; see Weisz & Frenzen, supra note 23, at 468 (noting that this regulation also arguably requires that the OSC be filed with an immigration court within twenty-four hours of a respondent's arrest).

[26] This lack of time restrictions can be frustrating to a noncitizen who wishes to file affirmatively to apply for discretionary relief, such as suspension of deportation. See generally infra Chapter 74.

[27] See supra § 72.01[2], [3].

[28] See Leng May Ma v. Barber, 357 U.S. 185 (1958); Kaplan v. Tod, 267 U.S. 228 (1925); Pantano v. Corsi, 65 F.2d 322 (2d Cir. 1933).

6 Immigration Law and Procedure § 72.03

One consequence of the issuance of an OSC is that no naturalization petition can be considered while the deportation proceeding is pending.[31]

### [c] Contents

The purpose of the OSC is

> to obtain direct jurisdiction over the person of the alien, to advise him of his alleged violation with sufficient precision to allow him to defend himself, and to set in motion an inquiry in which the Service must establish that a violation occurred, and the alien has an opportunity to defend himself.[32]

The OSC describes the nature of and legal authority for the proceedings and sets forth a concise statement of factual allegations supporting the charges against the respondent. It also designates the statutory provision(s) that the respondent allegedly violated. It is important to check these citations for accuracy, as errors may render the OSC defective and subject to termination.[33] Essentially, the OSC will charge that the respondent is a noncitizen and that he or she is in the United States illegally (e.g., surreptitious entry or overstay of temporary admission), and provide the acts or conduct alleged to be in violation of law, leading to the conclusion that the respondent is subject to deportation.[34]

The time and place of the hearing may be set in the OSC or in a notice of deportation hearing served upon the respondent at a later date.[35] Further, the first deportation hearing cannot be held earlier than fourteen days after service of the OSC, to allow the noncitizen to find counsel, except if the noncitizen requests an earlier hearing in writing.[36] The regulations provide that venue lies at the immigration court where the immigration agency files the charging document.[37] The IJ may change venue for good cause, only upon motion from one of the parties after the other party has

---

[29] *Shung v. Murff, 176 F. Supp. 253 (S.D.N.Y. 1959)*, *aff'd per curiam*, **274 F.2d 667 (2d Cir. 1960)**; *Matter of L-Y-Y-, 9 I. & N. Dec. 70 (Att'y Gen. 1960)*; *see supra* § 62.01[3].

[30] *See* United States *ex rel. Ling Yee Suey v. Spar, 149 F.2d 881 (2d Cir. 1945)*; *Blumen v. Haff, 78 F.2d 833 (9th Cir.)*, *cert. denied*, **296 U.S. 644 (1935)**; *Matter of A-, 9 I. & N. Dec. 356 (BIA 1961)* (stowaway escaped after detention ordered; apprehended two years later); *Matter of V-Q-, 9 I. & N. Dec. 78 (BIA 1960)* (had proceeded only a few feet from checkpoint after admission by immigrant inspector); *supra* § 65.02[2].

[31] *INA § 318*, *8 U.S.C. § 1429*; *Millan-Garcia v. INS, 343 F.2d 825 (9th Cir.)*, *vacated and remanded*, *382 U.S. 69 (1965)* (institution of deportation proceedings while naturalization application pending does not deny due process); *see infra* § 72.03[2][d].

[32] *Matter of Chery and Hasan, 15 I. & N. Dec. 380, 380–81 (BIA 1975)*.

[33] *See* Douglas S. Weigle, *Strategies in Exclusion and Deportation: "Trial by Ambush,"* in 2 American Immigration Lawyers Association, 1995-96 Immigration and Nationality Law Handbook 300, 302 (R. Patrick Murphy ed., 1995).

[34] Former 8 C.F.R. § 242.1(b).

[35] *See* INA § 242B(a)(2), *8 U.S.C. § 1252b(a)(2)*; former INS Operations Instruction (OI) 242.3, *reprinted infra in* Volume 16 and on lexis.com ("The date of the hearing shall normally be at least 7 calendar days from the date of service of the notice of hearing"); *see also Matter of Camarillo, 25 I. & N. Dec. 644* (BIA 2011) (removal case). Although this OI was rescinded in 1997, agency policy appears to remain the same. For discussion of service of the OSC and the notice of deportation hearing, see *infra* § 72.03[1][d].

[36] INA § 242B(b)(1), *8 U.S.C. § 1252b(b)(1) (1995)*.

[37] *8 C.F.R. § 1003.20*; *see infra* § 72.04[3][c].

been given a chance to respond, and only if the respondent provides a fixed street address for notification.[38]

Regulations require the immigration agency to provide the Executive Office of Immigration Review (EOIR) with the following information in the OSC: the noncitizen's name and any known aliases; the noncitizen's address; the noncitizen's registration number; the noncitizen's alleged citizenship and nationality; and the language that the noncitizen understands.[39] The OSC must be written in both English and Spanish.[40] It also must include the following specific information:[41]

- the nature of the proceedings against the noncitizen;

- the legal authority under which the proceedings are conducted;

- the conduct or acts that are alleged to be in violation of law;

- the statutory provisions that the noncitizen allegedly violated, and the charges against the noncitizen;

  - notice that the noncitizen may be represented by counsel (at no cost to the government) or other authorized representative[42] and will be provided with a current list of pro bono attorneys and time to obtain counsel;

- the address of the immigration court where the agency will file the OSC;

- a statement that the noncitizen must provide the Immigration Court with a written record of his or her current address and telephone number, and provide notice of any change in address or telephone number; and

- a statement detailing the consequences of failing to provide the agency with the address and telephone number.

If the noncitizen's address is not provided on the OSC or if the address on the OSC is incorrect, the noncitizen must give the immigration court where the OSC was filed the correct address and telephone number within five days after the OSC is served, and must do the same for any future change of address.[43] Moreover, the noncitizen's failure to provide the current address information or any changes thereto results in a waiver of the government's burden of proving notice in an in

---

[38] *8 C.F.R. § 1003.20.*

[39] *8 C.F.R. § 1003.15.* The omission of any of the listed items does not give a noncitizen any substantive or procedural rights. *See id.*

[40] INA § 242B(a)(3)(A), *8 U.S.C. § 1252b(a)(3)(A) (1995)*, enacted by Immigration Act of 1990, **Pub. L. No. 101-649**, § 545, **104 Stat. 4978**, 5061. The requirement that OSCs be in English and Spanish applies only to orders issued on or after June 13, 1992, the effective date of INA § 242B(a)(3)(A). *See* Matter of Thao Xuan Cao, 12 Immigr. Rep. B1-64 (BIA Aug. 9, 1993); Matter of Melenez-Ramirez, 12 Immigr. Rep. B1-30 (BIA June 18, 1993).

[41] INA § 242B(a)(1), (3), *8 U.S.C. § 1252a(a)(1)*, *(3) (1995)*; *8 C.F.R. § 1003.15(b).*

[42] *See 8 C.F.R. § 292.1.*

[43] *8 C.F.R. § 1003.15(c).* Written notice of changes of address and telephone number are furnished on Form EOIR-33 (change of address form). For further discussion of the requirement to provide notice of changes of address and telephone number, see *infra* § 72.04[3][d].

absentia hearing.[44] However, the BIA has held that a noncitizen cannot be charged with receiving adequate notice where he did not receive the required warnings and advisals of his obligation to apprise the government of his change of address.[45] One court has held that the unwitting failure to file a change of address did not justify the harsh penalty of denying a potentially meritorious asylum claim.[46]

An important consideration to be borne in mind is that the factual statements in the OSC must set forth evidentiary material, rather than conclusions of law. Factual allegations are required to put the respondent fully on notice and to enable him or her to plead to the charges at the hearing.[47]

Few cases have successfully challenged the adequacy of the allegations in the OSC. Guidance may be gleaned, however, from the decisions evaluating the more general accusations formerly set forth in the warrant of arrest. Thus, it was often said that the warrant of arrest need not have the formality and particularity of an indictment.[48] One court criticized the warrant's failure to specify the time and place of the violations, but found that the respondent was not prejudiced since he was sufficiently informed.[49] Another court held that charges stated in the alternative in the warrant were not defective.[50] Also rejected was the contention that the OSC was defective for failure to specify the alternative country of deportation and the specific statutory sanction for such designation.[51] And an OSC alleging procurement of improper preference classification at the time of entry does not have to allege that the respondent was not entitled to another preference classification.[52]

Defects in the initial process will not invalidate the proceeding if the hearing procedure was proper and the order of deportation adequately supported.[53] However, one court ruled that when the OSC alleged that the respondent was born in the United States and was now a noncitizen, without specifying the manner in which he was alleged to have lost his citizenship, the resulting deportation order was invalid.[54] The BIA has not followed this court's lead in requiring a higher

---

[44] INA § 242B(a)(2), (c)(2), 8 U.S.C. § 1252b(a)(2), (c)(2); 8 C.F.R. § 3.26(c); see Matter of Segovia-Serrano, 12 Immigr. Rep. B1-201 (BIA Mar. 8, 1994) (noncitizen did not appear at deportation hearing; termination of deportation proceeding by IJ on the ground that the noncitizen did not receive proper notice of the hearing was improper where noncitizen did not furnish the INS with the address where he could be contacted). For discussion of hearings conducted in absentia, see infra §§ 72.03[1][d], 72.04[11][e].

[45] Matter of Anyelo, 25 I. & N. Dec. 337 (BIA 2010).

[46] Mohammad v. Slattery, 842 F. Supp. 1553 (S.D.N.Y. 1994).

[47] See infra § 72.04[3], [5].

[48] Kostenowczyk v. Nagle, 18 F.2d 834 (9th Cir. 1927); Bauder v. Uhl, 211 F. 628 (2d Cir. 1914); Fougherouse v. Brownell, 163 F. Supp. 580 (D. Or. 1958); Matter of M-, 8 I. & N. Dec. 535 (BIA 1960) (OSC need not meet the strict requirements of a criminal indictment).

[49] Maltez v. Nagle, 27 F.2d 835 (9th Cir. 1928).

[50] Consola v. Karnuth, 108 F.2d 178 (2d Cir. 1939).

[51] Matter of Ho, 12 I. & N. Dec. 516 (BIA 1967), aff'd sub nom. Ho Yeh Sze v. INS, 389 F.2d 978 (2d Cir. 1968).

[52] Matter of Raqueno, 17 I. & N. Dec. 10 (BIA 1979).

[53] United States ex rel. Bilokumsky v. Tod, 263 U.S. 149 (1923); Matter of Rios-Carrillo, 10 I. & N. Dec. 291 (BIA 1963).

[54] MacLeod v. INS, 327 F.2d 453 (9th Cir. 1964).

6 Immigration Law and Procedure § 72.03

degree of formality in the use and substantiation of the allegations of the OSC.[55] Another court, rejecting a challenge that the charges were vague, suggested that any such vagueness could have been corrected by an application for a more definite statement.[56]

Since the role of the OSC is to furnish notice of the general nature of the charges, the proceedings will not necessarily be invalidated merely because of errors or omissions if the correct facts are developed in the proceedings and are reflected in the ultimate finding. Thus, an incorrect statement as to the respondent's date of entry was not fatal where the correct date of entry was sufficiently established in the ensuing proceedings.[57]

A noncitizen may be deportable on several charges. Immigration enforcement officials, on the basis of prosecutorial discretion,[58] may select one or more of the charges, each an independent basis for deportation. And the respondent ordinarily cannot complain because other charges, particularly those that might make the respondent eligible for certain discretionary relief, were not brought.[59] Thus, a person was properly found deportable as an overstayed crewman although he asserted that he actually had intended to remain and should have been deported as an immigrant without documents, which would have given him the benefit of a special statutory waiver for misrepresentations.[60] A person charged with obtaining immigration benefits through a fraudulent marriage can be charged with deportability either under the marriage fraud provisions or for improper entry as a preference immigrant.[61] And a deported noncitizen who unlawfully reenters the United States without permission can be charged alternatively under the special statute dealing with such reentries or under other applicable deportation grounds, e.g., overstaying a temporary admission.[62]

---

[55] *See* Matter of Oparah, 10 Immigr. Rep. B1-123 (BIA July 27, 1992) (OSC alleged that the respondent had been convicted of knowingly procuring an immigrant visa by actual fraud while the order of judgment and judgment referred only to a false statement; OSC held sufficient as it informed the respondent of all salient facts necessary for a proper defense); Matter of Waldron, 9 Immigr. Rep. B1-185 (BIA Jan. 14, 1992) (OSC gave adequate and reasonable notice despite discrepancies in conviction dates).

[56] *Pilapil v. INS, 424 F.2d 6 (10th Cir. 1970).*

[57] *Banez v. Boyd, 236 F.2d 934 (9th Cir. 1956)*; *Matranga v. Mackey, 210 F.2d 160 (2d Cir. 1954)*; *Fougherouse v. Brownell, 163 F. Supp. 580 (D. Or. 1958).*

[58] *See infra* § 72.03[2][a].

[59] The choice of deportation grounds by the agency can have significant consequences for a noncitizen. For a discussion of discretionary relief from deportation, see *infra* Chapter 74.

[60] ***Ntovas v. Ahrens, 276 F.2d 483 (7th Cir. 1960)***; *see Loos v. INS, 407 F.2d 651 (7th Cir. 1969)* (excludable at entry for previous claim of relief from military service); *cf. Matter of V-R-, 9 I. & N. Dec. 340 (BIA 1961)* (Board assumed for purpose of argument that noncitizen had right to have charge presented that would make him eligible for discretionary relief).

[61] *Pena-Urrutia v. INS, 640 F.2d 242 (9th Cir. 1981)* (admitted sham marriage; court upheld deportability for invalid visa (see *supra* § 71.04[2][b]), and rejected contention that charge should have been entry by fraud (see *supra* § 71.04[2][a])); *Matter of T-, 8 I. & N. Dec. 493* (BIA 1959); *cf. Matter of Neto/Domingos, 15 I. & N. Dec. 310 (BIA 1975).*

[62] *Mesina v. Rosenberg, 278 F.2d 291 (9th Cir. 1960).*

Since deportability usually will depend on the charges stated in the OSC, it is important for the OSC to recite the correct basis for deportation.[63] Thus, if the charge is predicated on the wrong statutory section, it is defective. Deportation on a charge not presented in the OSC or at the hearing would offend due process, as well as former INA § 242B, *8 U.S.C. § 1252b*.[64] However, the immigration agency may add charges at the deportation hearing[65]

The failure to issue, serve, and file an OSC is fatal to a deportation proceeding; it is jurisdictional and requires termination of the proceeding.[66]

## [d] Adequate Notice

Due process requires that a person against whom a deportation proceeding is brought be given reasonable notice of the charges and an opportunity to defend. The INA requires that the OSC that initiates a deportation proceeding be served in person or, if that is not practicable, by certified mail to the person or his or her counsel of record.[67] If the respondent is confined to a penal or mental institution or hospital, a copy of the OSC is served upon the respondent and upon the head of the hospital or institution. However, if the respondent is not competent to understand the nature of the proceedings the OSC should be served on multiple people.[68] If the respondent is mentally incompetent, or is a child under fourteen, the OSC must be served upon the person with whom the incompetent or the minor resides.[69] In such cases, a copy of the OSC is also served on the person's guardian, near relative, or friend whenever possible.[70]

---

[63] *See Matter of P-, 9 I. & N. Dec. 368 (BIA 1961)*.

[64] *See, e.g., Hirsch v. INS, 308 F.2d 562 (9th Cir. 1962)*; *Matter of Rios-Carrillo, 10 I. & N. Dec. 291* (BIA 1963).

[65] *8 C.F.R. § 1240.48(d)*; *see, e.g., **Parafinia v. INS, 21 F.3d 1122** (table), 1994 U.S. App. LEXIS 8039 (10th Cir. Apr. 19, 1994)* (summarizing procedures for lodging additional charges; noncitizen's due process rights were not violated by the BIA's reliance on factual allegations not set forth in the original OSC to support its final deportation order; while INS did not follow requirements of 8 C.F.R. § 242.16(d) to introduce additional evidence to support deportation charge, noncitizen was aware that it intended to rely on the evidence and thus was not prejudiced); ***Corneille v. INS, 947 F.2d 949 (9th Cir. 1991)*** (table) (OSC was facially defective, however, as the noncitizen did not raise the issue before the IJ or challenge the BIA's determination that he conceded deportability, he failed to exhaust his administrative remedies and thus the court lacked jurisdiction to consider the merits of his claim). *See generally infra* § 72.04[5][d].

[66] *See, e.g., Matter of L-, 20 I. & N. Dec. 553* (BIA 1992) (noncitizen admitted under visa waiver program, facing removal for deportability, requested asylum; entitled to plenary deportation proceeding; proceeding terminated for lack of OSC); *see supra §§ 12.04[6][d]*, 72.01.

[67] INA § 242B(a)(1), (2), (f)(1), *8 U.S.C. § 1252b(a)(1)*, *(2)*, *(f)(1) (1995)*; *see Matter of Peugnet, 20 I. & N. Dec. 233* (BIA 1991) (defining the terms "personal" and "routine" service, as used in 8 C.F.R. § 242.1(c)); *Matter of Munoz-Santos, 20 I. & N. Dec. 205* (BIA 1990) (if the OSC reflects that the respondent signed various portions of the form, that various forms and advisories had been served on the respondent, and that an INS officer signed the portion of the document certifying service, it may be assumed it was personally served on the respondent); 8 C.F.R. § 242.1(c) (1995).

[68] 8 C.F.R. § 242.3(a) (1995); *see also Matter of E-S-I-, 26 I. & N. Dec. 136, 145 (BIA 2013)* (if a noncitizen in removal proceedings is clearly incompetent, the government should serve the notice to appear on "three individuals: (1) a person with whom the respondent resides, who, when the respondent is detained in a penal or mental institution, will be someone in a position of demonstrated authority in the institution or

6 Immigration Law and Procedure § 72.03

The purpose of this service is to notify the person or persons who are most likely to be responsible for ensuring that a minor noncitizen appears before the immigration court at the scheduled time.[71] Therefore, when no other known guardian exists, the OSC may properly be served on the director of a facility in which the minor is detained[72] or on an adult guardian whose claimed relationship to the minor is dubious.[73]

The BIA has ruled that the OSC is effectively served by certified mail only if the certified mail receipt is signed by the noncitizen or a responsible person at the noncitizen's address and returned.[74] When an OSC is personally served by an immigration officer, the officer must explain the contents of the OSC and advise that any statement the respondent makes may be used against the respondent.[75]

A noncitizen who has not been served with an OSC or has been served with an OSC different from that filed with the Immigration Court should move to terminate proceedings for lack of jurisdiction.[76] So that the noncitizen has the opportunity to secure counsel, the deportation hearing shall not be scheduled earlier than fourteen days after the service of the OSC.[77]

If the OSC is served in person or by certified mail with a signed return receipt and the noncitizen fails to appear at the deportation hearing, an order of deportation may be issued in absentia, provided that the government establishes by clear, unequivocal, and convincing evidence that: (1) written notice of the time and place of the hearing and of the consequences of failure to appear was provided by personal service or by certified mail, return receipt requested; and (2) the noncitizen is deportable.[78] However, such written notice is not required if the noncitizen has failed to provide

---

his or her delegate and, when the respondent is not detained, will be a responsible party in the household, if available; (2) whenever applicable or possible, a relative, guardian, or person similarly close to the respondent; and (3) in most cases, the respondent.").

[69] *Supra* note 68; *see* Matter of Garcia-Hernandez, 13 Immigr. Rep. B1-127 (BIA Sept. 15, 1994) (service on thirteen-year-old noncitizen's foster mother was insufficient where INS failed to demonstrate that noncitizen resided with her).

[70] 8 C.F.R. § 242.3(a) (1995).

[71] *Matter of Amaya-Castro, 21 I. & N. Dec. 583* (BIA 1996).

[72] *Id.*

[73] *Matter of Gomez-Gomez, 23 I. & N. Dec. 522* (BIA 2002).

[74] *See Matter of Grijalva, 21 I. & N. Dec. 472* (BIA 1995) (approving similar holding in *Matter of Huete, 20 I. & N. Dec. 250* (BIA 1991)).

[75] *See* former 8 C.F.R. § 242.1(c). *But see Matter of Hernandez, 21 I. & N. Dec. 224* (BIA 1996) (failure to comply with 8 C.F.R. § 242.1(c) does not necessarily result in prejudice against the noncitizen).

[76] *See* Weisz & Frenzen, *supra* note 23, at 467.

[77] INA § 242B(b)(1), *8 U.S.C. § 1252b(b)(1) (1995).*

[78] INA § 242B(c)(1), *8 U.S.C. § 1252b(c)(1) (1995); see* 8 C.F.R. §§ 3.26(b), 242.1(c) (1995); *infra* § 72.04[12][e]. *But see Matter of Anyelo, 25 I. & N. Dec. 337* (BIA 2010) (an in absentia order of removal is inappropriate where the noncitizen did not receive, or could not be charged with receiving, the notice to appear that was served by mail at an old address); *cf.* Matter of Ceniceros-Arroyo, 13 Immigr. Rep. B1-42 (BIA May 27, 1994) (reversing IJ's order terminating deportation proceedings; OSC was properly served by certified mail where receipt was signed by an individual at the respondent's address; therefore, the IJ should have conducted the hearing in absentia); *Matter of Huete, 20*

the government with a written record of a viable address and telephone number.[79] For a discussion of methods of challenging a deportation order entered in absentia, see § 72.04[12][e], below.

### [e] Disposition of Permanent Resident Card

The immigration agency has authority to retain or confiscate the permanent resident card (green card) of a noncitizen against whom deportation proceedings are pending or contemplated.[80] However, permanent resident noncitizens who are in deportation proceedings are entitled to adequate temporary proof of their status until a final administrative order finds that the status of permanent residence has been abandoned or lost.[81] Such proof may include a "Temporary I-551" stamp in a valid passport or a temporary I-551 created by using an I-94 arrival record.[82]

## [2] Forgoing, Canceling, or Deferring Deportation Proceedings

### [a] In General

Not all violations of criminal law result in prosecutions. By the same token not all violations of the immigration laws result in deportation. In many situations, there are specific discretionary remedies to avert deportation. Moreover, the administrative officials, like all prosecuting officers, may forgo or cancel deportation proceedings if the violation is doubtful or trivial, or if the enforcement of the statute would be harsh or inhumane. Deportation proceedings withheld or canceled for compassionate or humanitarian reasons, e.g. because of the noncitizen's age, health, or family circumstances, originally known as nonpriority and now designated as deferred action cases, are discussed in paragraph [h], below.

Some of the administrative devices that have been fashioned to forgo or cancel deportation proceedings are described in this subsection. In some instances, there are no published criteria or procedures for invoking these measures, and the determinations in such cases generally are individual and individual. However, interested parties may solicit such determinations by making appropriate representations to the responsible administrative officials.

The decision to forgo or terminate deportation proceedings as a matter of prosecutorial discretion may be made before proceedings are begun, while they are pending, and even after a deportation

---

*I. & N. Dec. 250* (BIA 1991) (it would be a denial of due process to proceed with an in absentia hearing where the OSC was served by certified mail, but the return receipt was not signed and returned); *Matter of Peugnet, 20 I. & N. Dec. 233* (BIA 1991) (defining "personal" and "routine" service as used in 8 C.F.R. § 242.1(c); deportation proceeding may not proceed in absentia where the OSC was sent by regular mail and was not personally served). In *Matter of Grijalva, 21 I. & N. Dec. 472* (BIA 1995), the BIA distinguished between service of the OSC and service of the notice of deportation, which informs the noncitizen of the time and place of proceedings. The Board ruled that, provided the OSC is properly served, a hearing in absentia should be ordered where the noncitizen does not appear at the hearing or respond after the notice of deportation was sent by certified mail, even if the certified mail receipt was not signed and returned. *See also Matter of Munoz-Santos, 20 I. & N. Dec. 205* (BIA 1990) (if the OSC reflects that the respondent signed various portions of the form, that various forms and advisories had been served on the respondent, and that an INS officer signed the portion of the document certifying service, it may be assumed that it was personally served on the respondent).

[79] INA § 242B(a)(2), (c)(2), *8 U.S.C. § 1252b(a)(2)*, *(c)(2) (1995)*; 8 C.F.R. § 3.26(c) (1995); *see supra* § 72.03[1][c].

[80] *See Etuk v. Blackman, 748 F. Supp. 990 (E.D.N.Y. 1990)*, *aff'd sub nom. Etuk v. Slattery, 936 F.2d 1433 (2d Cir. 1991)*.

[81] *Etuk v. Slattery, 936 F.2d 1433, 1447 (2d Cir. 1991)*.

[82] *See Etuk v. Slattery, 973 F.2d 60, 62 (2d Cir. 1992)*.

order has been entered.[83] However, the government likely will exercise such discretion as early in the case as possible to preserve government resources otherwise expended on the enforcement proceeding.[84] But in each such instance, the determination to withhold or terminate deportation is confined to administrative discretion.[85] Such discretion usually is exercised by the district director.[86] Efforts to challenge the refusal to exercise such discretion on behalf of specific noncitizens sometimes have been favorably considered by the courts, upon contentions that there was selective prosecution in violation of equal protection or due process, such as improper reliance on political considerations,[87] on racial, religious, or nationality discrimination,[88] on arbitrary or unconstitutional criteria,[89] or on other grounds constituting abuse of discretion.[90]

### [b] Officers Authorized to Act

After the OSC is issued but before jurisdiction has vested with the immigration judge,[91] the authority to cancel the OSC and terminate the proceedings may be exercised by any immigration officer authorized to issue an OSC.[92] Before canceling the OSC, such officers must be satisfied that the respondent is actually a national of the United States; or is not deportable; or is deceased; or is not in the United States; or was placed under proceedings for failure to file a timely petition under *INA § 216(c)*, but such failure was excused; or that the proceeding was improvidently begun.[93] After deportation proceedings have started, such officers may move that the case be dismissed for the foregoing reasons, or that it be remanded for further consideration of foreign policy considerations. Such dismissal or remand is without prejudice to either party.[94] After the hearing has commenced, the proceedings can be canceled only by the IJ, the BIA, or the Attorney

---

[83] *See Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999)* (citing this treatise); *Matter of Vizcarra-Delgadillo, 13 I. & N. Dec. 51* (BIA 1968).

[84] Memorandum from John Morton, Director, U.S. Immigration and Customs Enforcement, Policy No. 10075.1, FEA No. 306-112-0026, *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* (June 17, 2011) [hereinafter Morton Memorandum], *http://www.ice.gov/doclib/secure-communities/pdf/prosecutorial-discretion-memo.pdf*, *reprinted at* 16 Bender's Immigr. Bull. 1218, 1236 (App. C) (July 15, 2011).

[85] *See Johns v. Department of Justice, 653 F.2d 884 (5th Cir. 1981)*; *Wan Shih Hsieh v. Kiley, 569 F.2d 1179 (2d Cir. 1978)*.

[86] *See Rodriguez-Gonzalez v. INS, 640 F.2d 1139, 1142 (9th Cir. 1981)* (IJ "without power to terminate the proceedings on equitable, humanitarian, or other grounds not specified in the statute"); *Lopez-Telles v. INS, 564 F.2d 1302 (9th Cir. 1977)* (citing this treatise) (IJ has no statutory or inherent power to terminate proceedings for humanitarian reasons); *Guan Chow Tok v. INS, 538 F.2d 36, 38 (2d Cir. 1976)* (after proceeding commenced, IJ not authorized to exercise discretion to withhold deportation in contravention of statutory mandate); *Vergel v. INS, 536 F.2d 755 (8th Cir. 1976)* (IJ and BIA not authorized to reopen deportation proceedings to consider stay of deportation on humanitarian grounds; however, court stayed its mandate for ninety days to allow consideration by district director); *Hotel and Restaurant Employees Union, Local 25 v. Smith, 594 F. Supp. 502 (D.D.C. 1984)* (reviewing constitutional and statutory bases for prosecutorial discretion); *Lennon v. United States, 387 F. Supp. 561 (S.D.N.Y. 1975)* (judicial review appropriate on contention that prosecution was selective and that decision to institute deportation proceeding was arbitrary, discriminatory, and in violation of constitutional rights); *Matter of G-N-C-, 22 I. & N. Dec. 281, 287 (BIA 1998)* (BIA does not have jurisdiction to review a reinstated order of deportation); *Matter of Yazdani, 17 I. & N. Dec. 626* (BIA 1981) (so long as INS enforcement officials choose to initiate proceedings against a noncitizen and to prosecute those proceedings to a conclusion, the IJ must go forward).

[87] *See Lennon v. INS, 527 F.2d 187 (2d Cir. 1975)*; *cf. United States v. Cantu, 557 F.2d 1173 (5th Cir. 1977)*.

[88] *See Lennon v. INS, 527 F.2d 187 (2d Cir. 1975)*.

[89] *See id.*; *Matter of Awadh, 15 I. & N. Dec. 775* (BIA 1976).

General.[95] Judicial review of discretionary determinations of such officers is discussed in Chapter 104, below.

Deferment of deportation under this section does not itself confer lawful permanent residence (LPR) status.[96] However, prolonged deferment may help accumulate the time necessary to become eligible for certain types of relief from deportation. See, for example § 212(c) relief and suspension of deportation, discussed in §§ 74.04 and 74.07, below.

## [c] Voluntary Departure

The most frequent exercise of prosecutorial discretion is in permitting a deportable noncitizen to depart from the United States voluntarily without a deportation proceeding or order.[97] Voluntary departure may be granted by the IJ or specified enforcement officers before or during the deportation hearing, or after deportation has been ordered.[98] This route may be advantageous where the noncitizen has a pending visa application or a poor immigration or criminal record and few equities. The noncitizen thus avoids the bar to reentry set up by deportation,[99] while the government avoids expense and, for a pre-conclusion grant, having to go through a hearing.

Voluntary departure also may be sought to defer deportation proceedings so that the noncitizen can procure an immigrant visa.[100] However, the deportable noncitizen has no right to remain in this country until his or her priority dates becomes current and the visa application is processed.[101] Nor is any such right to remain conferred by the approval of a visa petition.[102] The administrative authorities may grant voluntary departure if the issuance of an immigrant visa can be anticipated promptly, i.e., when the noncitizen is admissible as an immigrant, has a priority date not more than

---

[90] *Fuentes v. INS, 765 F.2d 886, 889–90 (9th Cir. 1985)* (court remands case to INS for consideration of placing case in deferred action status, in light of fact that deportation proceeding resulted from employer's reporting to INS undocumented noncitizen employees who were challenging unfair labor practices). *But see Pasquini v. Morris, 700 F.2d 658, 662 (11th Cir. 1983)* (since deferred action practice does not confer a substantive right, court has no authority to review refusal of request for deferred action consideration, in absence of a showing of abuse of discretion); *Nicholas v. INS, 590 F.2d 802, 808 (9th Cir. 1979)* (petition failed to satisfy "great burden" of showing that refusal "so departs from an established pattern of treatment of others similarly situated without reason, as to be arbitrary and capricious, and an abuse of discretion); *Guan Chow Tok v. INS, 538 F.2d 36 (2d Cir. 1976)* (no evidence to indicate that government promised to withhold deportation in exchange for testimony at criminal trial); *Loera v. Nutis, 543 F. Supp. 249, 250 (E.D. Mo. 1982)* ("deferred action is a matter of administrative discretion … the decision of the INS district director, however harsh, was not made arbitrarily or capriciously").

[91] Jurisdiction vests with the immigration judge when the OSC is filed with the Immigration Court. *See 8 C.F.R. § 1003.14.*

[92] *See* 8 C.F.R. §§ 242.7(a), 242.1(a) (1995). The officials authorized to issue an OSC are listed *supra* in § 72.03[1][b].

[93] 8 C.F.R. § 242.7(a) (1995).

[94] 8 C.F.R. § 242.7(b), (c) (1995).

[95] *See* 8 C.F.R. § 242.7 (1995).

[96] *See Zheng Zheng v. Gonzales, 422 F.3d 98, 111 (3d Cir. 2005)* (a deferred action program did not confer lawful status on otherwise unauthorized noncitizens).

[97] *INA §§ 242(b)* and *244(e)*, *8 U.S.C. §§ 1252(b)* and *1254(e) (1995). See generally infra* § 74.02.

[98] *See, e.g., Cuadras v. United States INS, 910 F.2d 567 (9th Cir. 1990)*; *see* 8 C.F.R. §§ 242.5(a)(1), 242.17(b) (1995); *infra* § 74.02 [1].

[99] *See supra* § 63.10[1].

sixty days later than the date shown in the latest Visa Office Bulletin, and has applied for an immigrant visa to a consulate that has accepted jurisdiction.[103]

Sometimes deferred voluntary departure, renewable at regular intervals, has been used as a device to permit the noncitizen to remain in the United States for an extended or indefinite period when deportation would be inappropriate.[104] Extended voluntary departure was allowed until 1990 as a substitute for asylum or to permit the noncitizen to remain in the United States during a period of armed conflict or other disturbed conditions in his or her home country.[105] Congress replaced that concept, however, in 1990 with temporary protected status.[106] In some instances, specific statutory provisions, discussed in Chapters 33 and 34, above, have allowed deferment or elimination of deportability in such situations.

### [d] Deferment Pending Application for Naturalization

Deportation proceedings also may be withheld or canceled to permit the pursuit of a naturalization application, since the pendency of a deportation proceeding or order precludes consideration of a petition for naturalization.[107] Thus, if the noncitizen appears to be both eligible for naturalization and amenable to deportation, the district director, in his or her discretion and on the basis of appealing humanitarian factors, may withhold the issuance of an OSC to enable the petition for naturalization to be presented and considered.

On the same basis, the regulations give specific discretionary authority to an IJ (and thus also to the Board on appeal) to terminate a deportation proceeding to enable the respondent to apply for naturalization if the respondent has established a prima facie case of eligibility and the case involves exceptionally appealing or humanitarian factors.[108] Before ruling on such a request the IJ or the Board will require the respondent to submit a naturalization application to the administrative authorities and to obtain an advisory ruling from them or a declaration from a court concerning the respondent's eligibility for naturalization but for the pendency of the deportation proceedings or the existence of an outstanding order of deportation.[109]

---

[100] *See* 8 C.F.R. § 242.5(a)(2), (3) (1995); *see also Changxu Jiang v. Mukasey, 522 F.3d 266, 270 (2d Cir. 2008)*.

[101] *Matter of Flores, 14 I. & N. Dec. 516* (BIA 1973); *see Hau v. Moyer, 576 F. Supp. 844 (N.D. Ill. 1983)*.

[102] *Para v. Moyer, 1995 U.S. Dist. LEXIS 1836 at *11–12 (N.D. Ill. Feb. 16, 1995)* (collecting cases); *Malhotra v. Meyers, 552 F. Supp. 253 (N.D.N.Y. 1982)*; *Matter of Merced, 14 I. & N. Dec. 644* (BIA 1974).

[103] 8 C.F.R. § 242.5(a)(2) (1995).

[104] *See* 8 C.F.R. § 242.5(a)(2), (3) (1995).

[105] *8 C.F.R. § 245a.4(b)(2) (1995)*; *see Matter of Quintero, 18 I. & N. Dec. 348* (BIA 1982) (granting extended voluntary departure is a function of enforcement officers, and cannot be directed by an IJ or the BIA); *infra* § 74.02[1].

[106] *See supra* § 33.08.

[107] *INA § 318*, *8 U.S.C. § 1429*; *see Petition of Chung, 199 F. Supp. 566 (E.D.N.Y. 1961)*.

[108] 8 C.F.R. § 242.7(e) (1995). The regulation provides that in every other case (i.e., where prima facie eligibility has not been established and/or the matter does not involve exceptionally appealing or humanitarian factors) the deportation hearing "shall be completed as promptly as possible notwithstanding the pendency of an application for naturalization during any state [sic] of the proceedings." *Id.*

[109] INS Interpretation 318.2(c)(1)(ii), *reprinted infra* in Volume 15, and on lexis.com and Lexis Advance.

6 Immigration Law and Procedure § 72.03

As indicated above, the determination whether to withhold or terminate deportation proceedings to enable the noncitizen to apply for naturalization is discretionary.[110] Such discretion ordinarily cannot be questioned, except when arbitrary action is shown.[111] In one case the Board suggested that a stipulation be entered into terminating the outstanding deportation proceeding with the understanding that it would be reinstated if the naturalization petition was unsuccessful.[112]

### [e] Deferment Pending Application for Immigration Benefits

Although proceedings may sometimes be deferred or canceled to enable a noncitizen to qualify for some collateral immigration benefit, a noncitizen has no absolute right to such a dispensation. Thus, noncitizens cannot demand such relief as a matter of right because they have sought collateral benefits that may have a bearing on their deportability.[113] The administrative authorities, in their discretion, may decree that the proceeding shall proceed, and that the respondent may apply thereafter for any relief that may be warranted by the disposition of his or her collateral application.[114] Some courts have suggested that it would be appropriate for the administrative authorities to defer deportation while remedial legislation is under active consideration.[115]

Similar considerations apply when the noncitizen seeks deferment of proceedings to await procurement of an immigrant visa. Such deferment, generally accomplished through a grant of voluntary departure, is discussed in § 72.03[2][c], above. However, a deportable noncitizen has no right to remain in the United States to await the availability of an immigrant visa merely because he or she is the parent of a citizen child.[116]

Mounting backlogs in the adjudication of applications have caused hardships that impelled the Service sometimes to adopt a more generous policy of withholding or deferring deportation proceedings against noncitizens who are the beneficiaries of pending visa petitions or applications for adjustment of status. The agency may withhold proceedings, or defer action at any stage of such proceedings after they have been commenced and before an order is executed, for a noncitizen who has filed an application for adjustment of status for which he or she appears to be prima facie eligible, and for one who is the beneficiary of a pending immediate-relative or family-preference visa petition that upon its approval would make the noncitizen immediately eligible for

---

[110] *Millan-Garcia v. INS, 343 F.2d 825 (9th Cir.)*, *vacated and remanded*, *382 U.S. 69 (1965)*.

[111] *Id.*; *Pignatello v. INS, 350 F.2d 719 (2d Cir. 1965)*; *see INS v. Yueh-Shaio Yang, 519 U.S. 26, 32 (1996)* (while the immigration agency has unfettered discretion, if it announces and follows a policy by which use of discretion is governed, "an irrational departure from that policy … could constitute action that must be overturned as 'capricious, arbitrary, [or] an abuse of discretion' ") (citation omitted); *Jiminez v. District Director, 441 F.2d 1149 (9th Cir. 1971)* (presence in United States not necessary to resolve legal point in naturalization proceedings).

[112] *Matter of T-, 7 I. & N. Dec. 201* (BIA 1956); *see Matter of B-, 6 I. & N. Dec. 713* (Att'y Gen. 1955).

[113] *Kumar v. Gonzales, 2007 U.S. Dist. LEXIS 4450, at \*4–5 (W.D. Wash. Jan. 22, 2007)* (citing this treatise and stating that the "pendency of an application for collateral administrative relief does not entitle a noncitizen to a stay of removal.").

[114] *See Manantan v. INS, 425 F.2d 693 (7th Cir. 1970)*.

[115] *See Shyllon v. INS, 728 F.2d 1087 (8th Cir. 1984)*; *Rios-Pineda v. U.S. Dep't of Justice, 720 F.2d 529, 530–31 (8th Cir. 1983)*, *rev'd sub nom. INS v. Rios-Pineda, 471 U.S. 444 (1985)*.

[116] *Gonzalez-Cuevas v. INS, 515 F.2d 1222 (5th Cir. 1975)*; *Matter of Anaya, 14 I. & N. Dec. 488* (BIA 1973).

adjustment or for voluntary departure.[117] Such dispensations may, however, be refused when the district director determines that the application or petition is frivolous or there are substantive adverse factors that, in his or her opinion, would probably lead to denial of adjustment.[118]

The introduction or the pendency of a private relief bill will not necessarily result in deferment of deportation proceedings.[119] In such cases the deportation process will move to a final determination, and a request for a stay of deportation will be considered at that time.

### [f] Noncitizens Subject to Military Service

The immigration status of a nonimmigrant who entered the armed forces of the United States while in a legal status is suspended during his or her military service.[120] If deportation proceedings are brought against a noncitizen subject to Selective Service requirements, his or her Selective Service board is notified. If a noncitizen serving in the armed forces is found amenable to deportation, no action is taken against the noncitizen until his or her discharge from the service, pursuant to an understanding between the immigration agency and the Department of Defense. In such cases, a letter is addressed to the noncitizen's commanding officer giving information concerning the noncitizen's immigration status and whether the noncitizen may be eligible to apply for naturalization.[121] The commanding officer is asked to notify the agency in advance of the noncitizen's discharge, if he or she has not been naturalized, so that it may discuss with the noncitizen his or her immigration status and possible eligibility for discretionary benefits or for naturalization.[122] In one case, however, termination of deportation proceedings was refused when their pendency would not bar an application for naturalization on the basis of military service and the administrative authorities would stay the execution of the deportation order while the naturalization petition was under consideration.[123]

Before a noncitizen with military service is placed in removal proceedings, Immigration and Customs Enforcement (ICE) agents will conduct a thorough review to determine the noncitizen's eligibility for U.S. citizenship.[124] If the noncitizen is eligible for naturalization, ICE will not start removal proceedings. If the noncitizen is not eligible for naturalization, ICE may weigh various factors to determine whether to initiate removal proceedings. These factors include: the noncitizen's criminal history, as well as any evidence of rehabilitation; family and financial ties to

---

[117] INS OI 242.1(a)(23) (1996). Although this OI was rescinded in 1997, the policy appears to remain the same.

[118] *See, e.g.*, *Oluyemi v. INS, 902 F.2d 1032 (1st Cir. 1990)* (IJ did not abuse discretion in refusing to delay deportation hearing, since he believed that adjustment petition would eventually be denied).

[119] *See infra* § 74.09[1], [3].

[120] INS OI 242.1(c) (1996). Although this OI was rescinded in 1997, policy appears to remain the same.

[121] *See infra* § 97.05.

[122] *Id.*

[123] *Matter of Javier, 12 I. & N. Dec. 782* (BIA 1968).

[124] *INA §§ 328*, *329*, *8 U.S.C. §§ 1439*, *1440*; Memorandum from Marcy M. Forman, Acting Director, Office of Investigations, U.S. Immigration and Customs Enforcement, *Issuance of Notices to Appear, Administrative Orders of Removal, or Reinstatement of a Final Removal Order on Aliens with United States Military Service* (June 21, 2004), *http://www.ice.gov/doclib/foia/prosecutorial-discretion/aliens-us-military-service.pdf*.

the United States; employment history; health; community service; specifics of military service; and other relevant factors.[125]

ICE officials will also consider various factors of the noncitizen's military service. These factors include: duty status (active or reserve); assignment to a war zone; number of years of service; and decorations awarded. Notwithstanding the positive factors of military service, if the noncitizen's criminal history includes violent crimes, aggravated felonies, drug trafficking, or crimes against children, the noncitizen will be considered a threat to public safety and likely will not receive a favorable exercise of prosecutorial discretion.[126] Unauthorized immigrants who have been honorably discharged from the Coast Guard or U.S. Armed Forces and are otherwise not eligible for naturalization may be eligible for deferred action under another program.[127]

### [g] Noncitizens Requesting Asylum

Requests for asylum are made by noncitizens in the United States who seek refuge in this country because they would be subject to persecution in their home countries. If the application for asylum precedes the filing of the OSC with the Immigration Court, jurisdiction will be with an asylum officer.[128] However, immigration judges have exclusive jurisdiction over an asylum application filed by any noncitizen who has been served with an OSC after a copy of the OSC has been filed with the Immigration Court.[129] If an application is denied by the asylum officer there is no direct appeal, except for those cases given to the exclusive jurisdiction of the asylum officers, but the application may be renewed before an IJ.[130]

A general discussion of the right to asylum appears in Chapter 33, above. Asylum applications and procedure are fully discussed in Chapters 33 and 34, above. In addition, since 1952 the INA has also provided for formal consideration of applications to withhold deportation on the ground of anticipated persecution, which is discussed in § 33.06, above.

### [h] Deferred Action Cases

To ameliorate a harsh and unjust outcome, the immigration agency may decline to institute proceedings, may terminate proceedings, or may decline to execute a final order of deportation. This commendable exercise in administrative discretion, developed without express statutory authorization, originally was known as nonpriority and is now designated as deferred action. A case may be selected for deferred action treatment at any stage of the administrative process. Approval of deferred action status means that for the humanitarian reasons described below, no

---

[125] Forman Memo, *supra* note 124.

[126] *Id.*

[127] *See infra* § 72.03[2][h].

[128] *Supra* § 34.02[5].

[129] *8 C.F.R. §§ 208.2(b)*, *208.4(c)(1)*; *see supra* § 34.02[13].

[130] *Supra* § 34.02[11][a]; *see* *8 C.F.R. § 208.14(c)*.

action will thereafter be taken to proceed against an apparently deportable noncitizen, even on grounds normally regarded as aggravated.[131]

Until 1975, the nonpriority program was regarded as an internal administrative arrangement, and was not published in any regulation or other public document. However, as the result of the litigation in the widely publicized case of John Lennon,[132] the INS issued an Operations Instruction describing the nonpriority program, and shortly thereafter revised its name to deferred action.[133]

Initial determination that a case warrants deferred action treatment is made by the district director in a personally signed recommendation to the regional commissioner on Form G-312 (Deferred Action Case Summary). The regional commissioner is authorized to approve the case for deferred action, and the Operations Instruction directs that periodic reviews are to be conducted to determine whether approved cases are to be continued in the deferred action category.[134]

The OI emphasizes that the "consideration of deferred action [is] an act of administrative choice to give some cases lower priority and in no way an entitlement."[135] It directs that in recommending and approving a case for deferred action the factors considered should include the following:[136]

- the likelihood of ultimately removing the noncitizen, including:

    (1) the likelihood that the noncitizen will depart without formal proceedings;

    (2) the age or physical condition affecting ability to travel;

    (3) the likelihood that another country will accept the noncitizen;

    (4) the likelihood that the noncitizen will qualify for some form of relief;

- the presence of sympathetic factors that could lead to a result that could adversely affect future cases or could lead to a large amount of adverse publicity;

- whether the noncitizen is a member of a class of aggravated violators whose cases have been given a high enforcement priority; and

---

[131] *Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 484 (1999)* (citing this treatise).

[132] In Leon Wildes, *The Nonpriority Program of the Immigration and Naturalization Service—A Measure of the Attorney General's Concern for Aliens: Parts I and II*, 53 Interpreter Releases 25 (Jan. 26, 1976); 33 (Jan. 30, 1976), and Leon Wildes, *The Nonpriority Program of the Service*, 14 San Diego L. Rev. 42 (1976), counsel for the Lennons discussed this litigation and summarized the information and administrative action set forth in the reports of 1,843 nonpriority cases furnished to him pursuant to a Freedom of Information Act request.

[133] INS OI 242.1(a)(22) (1996). Although this OI was rescinded in 1997, policy appears to remain the same. *See Johns v. Department of Justice*, 653 F.2d 884, 890 (5th Cir. 1981) (citing this treatise) ("Deportation is not, however, the inevitable consequence of unauthorized presence in the United States. The Attorney General is given discretion … to ameliorate the rigidity of the deportation laws. … In fact, not only does the INS … exercise [the Attorney General's] quasi-prosecutorial discretion to commence or not to commence deportation, but even after a final order of deportation has been entered, the District Director exercises discretion to afford aliens relief from deportation.").

[134] INS OI 242.1(a)(22). Although this OI was rescinded in 1997 and the organization of immigration responsibilities has changed, the policy appears to remain the same.

[135] *Id.*

[136] *Id.; see Johns v. Department of Justice*, 653 F.2d 884, 890 n.14 (5th Cir. 1981) (citing this treatise, and stating the factors relevant in determining whether deferred action is appropriate).

6 Immigration Law and Procedure § 72.03

- whether the noncitizen is a former military deserter who participated in the 1977 Discharge Review Program, who reentered the United States as a member of the armed forces and was exempt from immigration inspection.

While the general deferred action program is still an internal administrative arrangement, with no formal provision for an application or participation by the noncitizen, it is appropriate for the noncitizen or the noncitizen's counsel to call to the attention of the district director the circumstances of a particular case, with appropriate documentation, and to request that consideration be given to placing it in deferred action status. Moreover, arbitrary refusals of such discretion can be challenged in the courts, although such challenges are usually unsuccessful.[137]

The grant of deferred action status is a function of enforcement officials, and neither the IJ nor the Board is authorized to grant such status or to review a refusal to grant it.[138] Certain ICE employees may exercise prosecutorial discretion according to their specific responsibilities and authorities.[139]

A June 2011 memorandum from ICE's director provided guidance on factors the agency should consider when deciding whether to exercise prosecutorial discretion, including deferred action. Though not exhaustive, the list includes:[140]

- The agency's civil immigration enforcement priorities;

---

[137] See, e.g., Romeiro v. Smith, 773 F.2d 1021, 1024 (9th Cir. 1985) (no jurisdiction to review refusal to grant deferred action, since the informal administrative practice "creates no protectible liberty interest in deferred action, nor does it create a protectible interest in being considered for deferred action status"; distinguishing Nicholas and disagreeing with Pasquini, both cited infra); Velasco-Gutierrez v. Crossland, 732 F.2d 792, 793–94, 797 (10th Cir. 1984) ("deferred action is essentially an administrative decision not to deport an otherwise deportable alien"; essentially a "reprieve"; noncitizen's interest in the grant of this relief, in light of the "unfettered discretion, is too remote and insubstantial to rise to the level of a constitutionally protected liberty interest"); Pasquini v. Morris, 700 F.2d 658, 662 (11th Cir. 1983) (since deferred action practice does not confer a substantive right, court has no authority to review refusal of request for deferred action consideration, in absence of a showing of abuse of discretion); Nicholas v. INS, 590 F.2d 802, 808 (9th Cir. 1979) (petition failed to satisfy "great burden" of showing that refusal "so departs from an established pattern of treatment of others similarly situated without reason, as to be arbitrary and capricious, and an abuse of discretion"); Wen v. Ferro, 543 F. Supp. 1016, 1019 (W.D.N.Y. 1982) ("petitioner has no colorable or property interest in, and hence no claim to inclusion in the INS's deferred action category: consequently he has no claim to an explanation of respondent's refusal to recommend his inclusion therein.").

[138] See Ali v. Mukasey, 524 F.3d 145 (2d Cir. 2008) (Neither an IJ nor the BIA has power to review DHS's exercise of discretion about placing a noncitizen in removal proceedings or cancelling a charging document) (citing Matter of Ali, No. 98-769-619 (BIA Feb. 23, 2007)); Velasco-Gutierrez v. Crossland, 732 F.2d 792 (10th Cir. 1984) (Regional Commissioner possesses unfettered discretion in deferred action decisions); Matter of Yauri, 25 I. & N. Dec. 103, 110 (BIA 2009) (DHS use of prosecutorial discretion to grant deferred action is not reviewable by the BIA or an IJ; Matter of Medina, 19 I. & N. Dec. 734 (BIA 1988) (IJ and BIA have no authority to grant extended voluntary departure, deferred action, or withholding of deportation); Matter of Quintero, 18 I. & N. Dec. 348, 350 (BIA 1982) (the prosecutorial discretion exercised by granting deferred action status, which may be requested at any stage of a deportation proceeding, is committed exclusively to the enforcement officials of the Service); INS OI 242.1a(22) (1996). Although this OI was rescinded in 1997, policy appears to remain the same. At least one court has stated that the courts of appeals also do not have the power to order DHS to grant a favorable exercise of prosecutorial discretion to a noncitizen. See Puri v. Att'y Gen., 2013 U.S. App. LEXIS 6089, at *8 (3d Cir. Mar. 27, 2013) (acknowledging that while petitioner is likely a good candidate for deferred action, court lacks jurisdiction to grant such relief); Cheruku v. Att'y Gen., 662 F.3d 198, 211 (3d Cir. 2011) (McKee, C.J., concurring) (noting that it is not the "place" of the court of appeals to tell an administrative agency how to apply its policies regarding prosecutorial discretion).

[139] Morton Memorandum, supra note 84. See generally Shoba Sivaprasad Wadhia, Prosecutorial Discretion in Immigration Agencies: A Year in Review, 2012 Emerging Issues 6173 (on lexis.com); Shoba Sivaprasad Wadhia, Reflections on Prosecutorial Discretion One Year After the Morton Memo, 2012 Emerging Issues 6417.

[140] Morton Memorandum, supra note 84, at 4.

6 Immigration Law and Procedure § 72.03

- The length of presence in the United States, with particular consideration given to presence while in lawful status;

- The circumstances of arrival in the United States and manner of entry, particularly if the noncitizen came to the United States as a young child;

- The pursuit of education in the United States, with particular consideration given to those who have graduated from a U.S. high school or have pursued or are pursuing a college or advanced degree;

- Service in the U.S. military;

- Criminal history;

- Immigration history;

- National security or public safety concerns;

- Ties to the community, including family relationships;

- Ties to the home country and conditions there;

- Age, with particular consideration given to minors and the elderly;

- Whether the person has U.S.-citizen family;

- Whether the person is the primary caretaker of a person who is disabled, a minor, or seriously ill;

- Whether the person or the person's spouse is pregnant or nursing;

- History of severe mental or physical illness;

- Nationality;

- Whether the person is likely to be granted temporary or permanent status or other relief from removal; and

- Whether the person is currently cooperating, or has cooperated, with law enforcement authorities.

Further, the memorandum enumerated specific individuals who warrant particular care, including:[141]

- Veterans and members of the U.S. Armed Forces;

- Long-time LPRs;

- Minors and elderly;

- Individuals present in the United States since childhood;

- Pregnant or nursing women;

- Victims of domestic violence, trafficking, or other serious crimes;

- Individuals who suffer from serious mental or physical disability; and

---

[141] *Id. at 5.*

6 Immigration Law and Procedure § 72.03

    • Individuals with serious health conditions.

The following negative factors also warrant particular care:[142]

    • Individuals who pose a clear threat to national security;

    • Serious felons, repeat offenders, or individuals with a lengthy criminal record of any kind;

    • Known gang members or other individuals who pose a clear threat to public safety; and

    • Individuals with an egregious record of immigration violations, including those with a record of illegal reentry and those who have engaged in immigration fraud.

No one factor is determinative; ICE will consider whether to exercise prosecutorial discretion on a case-by-case basis. Decisions will be based on the totality of the circumstances, with the goal of conforming to ICE's enforcement priorities.[143]

In January 2017, President Trump issued an executive order expanding the federal government's immigration enforcement priorities to include almost everyone alleged to have violated immigration law.[143.1] The executive order also make a priority for removal noncitizens who have "committed acts that constitute a chargeable criminal offense," have abused any public benefits programs, or "[i]n the judgment of an immigration officer, otherwise pose a risk to public safety or national security."[143.2] A February 2017 DHS memorandum expanded on the executive order by limiting the exercise of prosecutorial discretion.[143.3]

Individuals who receive deferred action may apply for employment authorization.[144]

On June 15, 2012, the Department of Homeland Security (DHS) announced that, effective immediately, certain young people who meet several key criteria will be considered for relief from removal.[145] To be considered for prosecutorial discretion under this particular deferred action

---

[142] *Id.*

[143] *Id. at 4*. A March 2011 memorandum from Director Morton highlighted the agency's civil enforcement priorities. The agency's highest priority is the removal of "[a]liens who pose a danger to national security or public safety," followed by "[r]ecent illegal entrants" and "[a]liens who are fugitives or otherwise obstruct immigration controls." The memo further prioritizes within each category. Memorandum from John Morton, Director, ICE, Policy No. 10072.1, FEA No. 601-14, *Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens*, (Mar. 2, 2011), *available on* www.lexis.com, at *http://www.ice.gov/doclib/news/releases/2011/110302washingtondc.pdf*, and *reprinted at* 16 Bender's Immigr. Bull. 541, 557 (App. F) (Mar. 15, 2011).

[143.1] Exec. Order No. 13,768, Enhancing Public Safety in the Interior of the United States (Jan. 25, 2017), *82 Fed. Reg. 8799 (Jan. 30, 2017)*, *reprinted at* 22 Bender's Immigr. Bull. 239 (App. B) (Feb. 15, 2017).

[143.2] *Id.* at § 5.

[143.3] Memorandum from DHS Secretary John Kelly, *Enforcement of the Immigration Laws to Serve the National Interest* 4 (Feb. 20, 2017), *https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf*, *reprinted at* 22 Bender's Immigr. Bull. 323 (App. B) (Mar. 1, 2017).

[144] 8 C.F.R. § 2741.12(c)(14); *see Victoria v. Napolitano, 2013 U.S. Dist. LEXIS 98743 (S.D. Cal. July 15, 2013)* (citing this treatise) (discussing what constitutes deferred action for work-authorization purposes).

[145] Memorandum from Janet Napolitano, Secretary of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* (June 15, 2012) [hereinafter Napolitano DACA Memo], *http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf*, *reprinted at* 17 Bender's Immigr. Bull. 1359, 1374, 1383 (App. A) (July 1, 2012).

6 Immigration Law and Procedure § 72.03

program, known as Deferred Action for Childhood Arrivals (DACA), an individual must satisfy the following requirements:[146]

    1. Was under the age of thirty-one as of June 15, 2012;

    2. Came to the United States before reaching his or her sixteenth birthday;

    3. Has continuously resided in the United States since June 15, 2007;

    4. Was physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action to USCIS;

    5. Entered without inspection before June 15, 2012, or had lawful immigration status expire by June 15, 2012;

    6. Currently is in school, has graduated or obtained a certificate of completion from high school, has obtained a general education development (GED) certificate, or is an honorably discharged veteran of the U.S. Coast Guard or Armed Forces; and

    7. Has not been convicted of a felony, a significant misdemeanor, or three or more other misdemeanors, and does not otherwise pose a threat to national security or public safety.

The seventh requirement, detailing the crime bars for deferred action, may have different meanings in different states.[147] "Felony" is defined as a federal, state, or local criminal offense punishable by imprisonment of more than one year.[148] Thus, an offense in one state may constitute a felony and therefore bar an individual from qualifying for deferred action, but the same crime may not qualify as a felony in another state.[149]

The term "significant misdemeanor" is a new immigration standard specifically established for the DACA program. It refers to an offense defined as a misdemeanor by federal law for which the maximum term of imprisonment is one year or less but greater than five days. Regardless of the sentence imposed, offenses of domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or driving under the influence will be considered significant misdemeanors. Also, any misdemeanor for which the individual was sentenced to more than ninety days in custody will be considered a significant misdemeanor. The sentence must include time to be served in custody, and thus does not include a suspended sentence. Time in custody does not include any time served beyond the sentence based on a state or local law enforcement agency honoring a detainer issued by ICE.[150]

A non-significant misdemeanor is any misdemeanor as defined by federal law that is not one of the enumerated offenses constituting a significant misdemeanor and for which the defendant was

---

[146] USCIS, Frequently Asked Questions (last updated Jan. 18, 2013) [hereinafter USCIS DACA FAQs], *http://www.uscis.gov* > Humanitarian > Deferred Action Process for Young People Who Are Low Enforcement Priorities > Frequently Asked Questions) (FAQ "What guidelines must I meet to be considered for deferred action for childhood arrivals?").

[147] Immigration Legal Resource Center, Understanding the Crime Bars to Deferred Action (June 2012), *http://www.ilrc.org/files/documents/ilrc-understanding_criminal_bars_to_deferred_action.pdf*.

[148] USCIS DACA FAQs, *supra* note 146 (FAQ "What offenses qualify as a felony?").

[149] Immigration Legal Resource Center, *supra* note 147.

[150] USCIS DACA FAQs, *supra* note 146 (FAQ "What offenses constitute a significant misdemeanor?").

sentenced to time in custody of ninety days or less.[151] Convictions for "multiple misdemeanors" will bar an applicant from qualifying for deferred action if he or she has committed at least three "non-significant misdemeanors that did not occur on the same day and did not arise out of the same act, omission, or scheme of misconduct."[152] Minor traffic offenses are not considered misdemeanors for purposes of DACA,[153] nor are immigration-related offenses categorized as felonies or misdemeanors by state immigration laws.[154]

Other convictions, such as juvenile convictions or expunged convictions, will not automatically disqualify a requestor from consideration of DACA. The USCIS will consider such convictions on a case-by-case basis to determine whether a favorable exercise of prosecutorial discretion is warranted.[155] Ultimately, a requestor's entire offense history, including any non-significant misdemeanors, will be considered along with other facts to determine whether he or she warrants a favorable exercise of prosecutorial discretion.[156] Therefore, the absence of a criminal history, or its presence, is not necessarily determinative, but is a factor to be considered in the unreviewable exercise of discretion.[157]

Typically, if an individual has been convicted of a felony, significant misdemeanor, or three or more non-significant misdemeanors he or she will not receive consideration for an exercise of prosecutorial discretion unless DHS determines that there are exceptional circumstances.[158] If a requestor is otherwise determined to be a national security or public safety threat, he or she will not receive consideration for an exercise of prosecutorial discretion unless DHS determines there are exceptional circumstances.[159] DHS has not specified what circumstances are considered

---

[151] *Id*. (FAQ "What offenses constitute a non-significant misdemeanor?").

[152] USCIS, Standard Operating Procedures: Deferred Action for Childhood Arrivals 40 (2012) [hereinafter USCIS DACA SOP], *available at* http://www.legalactioncenter.org/litigation/deferred-action-childhood-arrivals-daca (follow "Response to Penn State Center for Immigrant Rights FOIA request" hyperlink); *see also Immigration Legal Resource Center, Understanding the Crime Bars to Deferred Action, supra note 147* (explaining that "scheme of criminal misconduct" factors include "time, object and purpose, methods and procedures of acts, and identity of participants and victims.").

[153] USCIS DACA FAQs, *supra* note 146 (FAQ "If I have a minor traffic offense, such as driving without a license, will it be considered a non-significant misdemeanor that counts towards the 'three or more non-significant misdemeanors' making me unable to receive consideration for an exercise of prosecutorial discretion under this process?").

[154] *Id*. (FAQ "Will offenses criminalized as felonies or misdemeanors by state immigration laws be considered felonies or misdemeanors for purposes of this process?").

[155] *Id*. (FAQ "Will DHS consider my expunged or juvenile conviction as an offense making me unable to receive an exercise of prosecutorial discretion?"); *see also* USCIS DACA SOP, *supra* note 152, at 77–79 (detailing different court dispositions and whether such dispositions are convictions for immigration purposes).

[156] USCIS DACA FAQs, *supra* note 146 (FAQ "If I have a minor traffic offense, such as driving without a license, will it be considered a non-significant misdemeanor that counts towards the 'three or more non-significant misdemeanors' making me unable to receive consideration for an exercise of prosecutorial discretion under this process?").

[157] *Id*. (FAQ "What offenses constitute a non-significant misdemeanor?").

[158] *Id*. (FAQ "If I have a conviction for a felony offense, a significant misdemeanor offense, or multiple misdemeanors, can I receive an exercise of prosecutorial discretion under this new process?").

"exceptional,"[160] but has stated that determination of exceptional circumstances will be made at the headquarters level and only in extremely rare cases.[161]

Under the DACA directive, individuals who are not in removal proceedings or who are subject to a final order of removal may ask the USCIS to review their cases, along with supporting evidence outlining whether they meet the eligibility criteria.[162]

Individuals who are chosen to receive DACA receive a grant for two years, which may be renewed pending a review of the individual case.[163] Although the process under the new directive will not provide an individual with a pathway to obtaining permanent lawful status, individuals who receive deferred action will be eligible for employment authorization.[164] Forms and additional information regarding DACA have been released in August 2012 and thereafter.[165]

A complete DACA request package must contain the following items:[166]

1. Form I-821D, Consideration of Deferred Action for Childhood Arrivals, properly filed with proper signature;

2. Form I-765, Application for Employment Authorization with I-765WS, properly filed with proper signature;

3. Form I-765 fee and biometrics fee;

4. Evidence of identity including date of birth, to show compliance with upper and lower age limits;

5. Evidence of entry prior to requestor's sixteenth birthday;

6. Evidence of continuous residence since June 15, 2007, up to the date of filing;

7. Evidence of unlawful status as of June 15, 2012, if admitted or has expired parole;

---

[159] *Id.* (FAQ "What qualifies as a national security or public safety threat?") ("Indicators that [a requestor] pose[s] such a threat include, but are not limited to, gang membership, participation in criminal activities, or participation in activities that threaten the United States."); *see also* USCIS DACA SOP, *supra* note 152, at 76 (stating that foreign convictions may be considered to determine whether a person poses a threat to public safety).

[160] Legal Action Ctr., Am. Immigr. Council, Practice Advisory: Deferred Action for Childhood Arrivals 15 (Apr. 22, 2013) [hereinafter DACA Practice Advisory], *http://www.legalactioncenter.org/practice-advisories/deferred-action-childhood-arrivals*.

[161] USCIS, Training Module for Immigr. Officers About DACA 147 (Aug. 2012), *available at http://www.legalactioncenter.org/litigation/deferred-action-childhood-arrivals-daca* (follow "Response to Penn State Center for Immigrant Rights FOIA request" hyperlink).

[162] Napolitano DACA Memo, *supra* note 145.

[163] *Id.*

[164] *Id. See generally* Emily Creighton et al., *A Review of Legal Issues Arising After a Grant of DACA*, in Am. Immigr. Law. Ass'n, Immigration Practice Pointers 2013-14 Edition 819 (Rizwan Hassan et al. eds., 2013).

[165] Forms, an explanation of the process, a video, FAQs, and other information are available through *http://www.uscis.gov* > Humanitarian > Consideration of Deferred Action for Childhood Arrivals Process or *www.uscis.gov/childhoodarrivals* (last visited Oct. 22, 2013). Another source is the ICE Office of Enforcement and Removal's page of FAQs at *http://www.ice.gov/about/offices/enforcement-removal-operations/ero-outreach/deferred-action-process.htm* (last visited Oct. 22, 2013). Also check *Bender's Immigration Bulletin* issues beginning in September 2012 for the latest information and analysis.

[166] USCIS DACA SOP, *supra* note 152, at 76.

6 Immigration Law and Procedure § 72.03

8. Evidence of presence in the United States on June 15, 2012;

9. Evidence that any absences from the United States during the required period of continuous residence were brief, casual, and innocent; and

10. Evidence that the requestor is currently in school, graduated or obtained a certificate of completion from high school, obtained a GED, or is an honorably discharged veteran of the Coast Guard or Armed Forces.

If Form I-821D or Form I-765 is improperly filed, missing a required signature, or lacking the fee, the DACA application will be rejected.[167] If the fee payment is returned for insufficient funds, payment must be made within fourteen calendar days from when the requestor received an invoice. Otherwise Form I-821D will be denied and Form 1-765 rejected.[168]

No fee waivers are available for employment authorization applications connected with a DACA request. In limited cases, a fee exemption may be available, but it must be submitted before the DACA request is sent in without a fee. To qualify for a fee exemption, a requestor must submit a letter and supporting documentation that demonstrates that he or she is:

under eighteen years of age, has an income less than 150% of the U.S. poverty level, and is in foster care or otherwise lacking parental or familial support;

under eighteen and homeless; cannot care for himself or herself because of a serious, chronic disability, and has an income less than 150% of the U.S. poverty level;

at the time of the request, has accumulated $25,000 or more in debt in the past twelve months in unreimbursed medical expenses for himself or herself or an immediate family member, and has an income less than 150% of the U.S. poverty level.[169]

Individuals must show by a preponderance of the evidence that they meet the DACA guidelines. Requestors may submit legible photocopies of supporting documents unless the original document is specifically required.[170] Acceptable evidence proving identity includes passports, birth certificates accompanied by some form of photo identification, national identity documents from the requestor's country of origin bearing the requestor's photo or fingerprint, any U.S. government document bearing the requestor's name and photograph, any school-issued form of identification with a photo, a military identification document with a photo, or any document the requestor

---

[167] *Id. at 21.* Issues that may lead to rejection of Form I-821D include missing family name, address, or date of birth, missing Form I-765, filing from a foreign address, filing Form I-131 for advance parole with Form I-821D, being under the age of fifteen and not subject to removal proceedings or over the age of thirty-one on June 15, 2012.

[168] *Id. at 29.*

[169] USCIS DACA FAQs, *supra* note 146 (FAQ "Can I obtain a fee waiver or fee exemption for this process?") (stating that acceptable evidence to prove qualifications for fee exemption include: affidavits from community-based or religious organizations establishing a requestor's homelessness or lack of parental or familial support; copies of tax returns, bank statements, pay stubs, or other reliable evidence of income level; affidavit from applicant or responsible third party that the applicant does not file tax returns, pays no income tax, and/or has no income to prove income level; and copies of medical records, insurance records, bank statements, or other reliable evidence of unreimbursed medical expenses of at least $25,000).

[170] USCIS, Instructions for Consideration of Deferred Action for Childhood Arrivals, Form I-821D, at 2 (Aug. 15, 2012) [hereinafter I-821D Instructions], *http://www.uscis.gov* > FORMS > Consideration of Deferred Action for Childhood Arrivals > Download Instructions for I-821D, Consideration of Deferred Action for Childhood Arrivals) (last visited June 24, 2013).

considers relevant.[171] The evidence proving the requestor's identity should also establish his or her age. The requestor must have been under the age of thirty-one on June 15, 2012. Unless he or she is in removal proceedings, has a final removal order, or has a voluntary departure order, he or she also must be at least fifteen at the time of filing.[172]

Requestors may prove entry into the United States before age sixteen with a passport with an admission stamp indicating when they entered the United States; an I-94/I-95/I-94W Arrival/Departure Record; any INS or DHS document stating date of entry; travel records; records from schools attended in the United States, showing the names of the schools and periods of school attendance; hospital or medical records, showing the name of the facility or physician and the dates of treatment; official records from a religious entity in the United States confirming participation in a religious ceremony, rite, or passage; or any other document the requestor deems relevant.[173]

Examples of evidence proving that the requestor has continuously resided in the United States from June 15, 2007, until the time of filing include but are not limited to: employment records; receipts, bills, or letters from landlords or utility companies; school records; medical records; memberships in community or religious organizations; and military records.[174] Submitted documentation should account for as much of that period as reasonably possible, but the requestor does not need to account for every day or every month of that period. However, the requestor should submit evidence of residence in the United States for every year of it. If there are lengthy gaps in the documentation demonstrating the requestor's residence in the United States, he or she may submit affidavits to explain them. If the requestor submits affidavits, he or she must submit two or more affidavits, sworn to or affirmed by people other than the requestor who have direct personal knowledge of the events and circumstances during the period of the gap in documentation. The affidavits may be used only to explain gaps in the continuous-residence requirement. They may not be used as evidence for the entire five-year period.[175]

A brief, casual, and innocent absence from the United States will not interrupt the requestor's continuous residence. An absence is considered "brief, casual, and innocent" if it occurred between June 15, 2007, and August 15, 2012, and:

1. was short and reasonably calculated to accomplish its purpose;

2. was not because of an order of exclusion, deportation, or removal;

---

[171] USCIS DACA SOP, *supra* note 152, at 44.

[172] *Id.*

[173] I-821D Instructions, *supra* note 170, at 3–4.

[174] USCIS DACA SOP, *supra* note 152, at 49-50. Other documents that may support the requestor's claim include money order receipts for money sent into or out of the country; passport entries; birth certificates of children born in the United States; dated bank transactions; correspondence; U.S. Social Security card; Selective Service card; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, or contracts to which the requestor is a party; tax receipts; insurance documents, and/or any other relevant document. *Id.*

[175] USCIS DACA FAQs, *supra* note 146 (FAQ "To prove my continuous residence in the United States since June 15, 2007, must I provide evidence documenting my presence for every day, or every month, of that period?").

6 Immigration Law and Procedure § 72.03

3. was not because of an order of voluntary departure, or an administrative grant of voluntary departure before the requestor was placed in exclusion, deportation, or removal proceedings; and

4. did not have a purpose, and the requestor's actions while outside the United States were not, contrary to law.[176]

Evidence establishing that an absence was brief, causal, and innocent includes but is not limited to: transportation tickets or itineraries showing the travel dates; passport entries; hotel receipts showing dates the requestor was abroad; evidence of the purpose of the travel (e.g., requestor attended a funeral or wedding); and copy of any advance parole documents.[177] Requestors should be aware that submission of evidence of departures and reentries may constitute an admission of inadmissibility under *INA § 212(a)(9)(C)*.[178]

Any departure on or after August 15, 2012, no matter how brief, casual, or innocent, and before a grant of deferred action will interrupt the continuous residency required; the requestor will not be considered for deferred action.[179] If deferred action is granted, a requestor may travel outside the United States only when the USCIS has granted advance parole. An application for advance parole cannot be filed until after deferred action has been granted. Once it has been granted, the requestor can apply for advance parole by filing Form I-131, Application for Travel Document, and paying the applicable filing fee. The USCIS will consider each request on a case-by-case basis. The agency will typically grant the request only if the travel is for humanitarian reasons, educational purposes, or employment purposes. Parole likely will not be granted for a vacation.[180] Travel outside the United States after removal action has been deferred but without a grant of advance parole terminates the deferred action under DACA.[181]

Requestors must demonstrate that they were in an unlawful immigration status as of June 15, 2012. A requestor is in an unlawful status when his or her lawful immigration status expired before June 15, 2012; he or she entered the United States without inspection before June 15, 2012; or if he or she was paroled into the United States, the parole expired before June 15, 2012, and he or she did not obtain any other lawful status or parole extension by that date. Documents that may show the requestor's immigration status as of June 15, 2012, include but are not limited to: an I-

---

[176] USCIS DACA FAQs, *supra* note 146 (FAQ "Do brief departures from the United States interrupt the continuous residence requirement?").

[177] USCIS DACA SOP, *supra* note 152, at 51.

[178] DACA Practice Advisory, *supra* note 160, at 10; *see also* **INA § 212(a)(9)(C), 8 U.S.C. § 1182(a)(9)(C)** (stating that a noncitizen "unlawfully present in the United States for an aggregate period of more than one year and who attempt[s] to enter or reenter the United States without being admitted is inadmissible."). *But see* Legal Action Ctr., Am. Immigr. Council, DACA Practice Advisory: "Brief, Casual, and Innocent" Absences From the United States 1-7 (Jan. 29, 2013), *http://www.legalactioncenter.org/practice-advisories/%E2%80%9Cbrief-casual-and-innocent-absences-united-states* (discussing *Rosenberg v. Fleuti, 374 U.S. 449 (1963)*, which created the brief, casual, and innocent absence standard, and arguing that USCIS should apply Fleuti and its progeny when determining whether a DACA requestor's absence was brief, casual, and innocent).

[179] USCIS DACA FAQs, *supra* note 146 (FAQ "May I travel outside the United States before USCIS has determined whether to defer action in my case?").

[180] *Id*. (FAQ "If my case is deferred pursuant to the consideration of deferred action for childhood arrivals process, will I be able to travel outside the United States?").

[181] USCIS DACA SOP, *supra* note 152, at 52.

94/I-95/I-94W Arrival/Departure Record showing the date the requestor's authorized stay expired; a copy of a final order of exclusion, deportation, or removal issued by June 15, 2012, and charging documents, if available; an INS or DHS charging document placing the requestor in deportation, exclusion, or removal proceedings; or any document relating to parole.[182] A requestor admitted for duration of status or for a period that extended past June 14, 2012, but who violated his or her immigration status before June 15, 2012, can be considered for deferred action under DACA only if the EOIR terminated the status by issuing a final order of removal before June 15, 2012.[183]

To qualify for DACA, requestors must show that they were in the United States on June 15, 2012. If the evidence already submitted clearly establishes that the requestor arrived in the United States before June 15, 2007, there is no indication of departure, and the evidence establishing presence on June 15, 2012, is credible, this requirement has been met. Evidence proving presence on June 15, 2012, includes but is not limited to: employment records, receipts, bills, or letters from landlords, utility, or other service companies; school records; medical records; memberships; and military records.[184]

A requestor must also submit evidence that he or she is currently in school, has graduated or obtained a certificate of completion from high school or a GED, or is an honorably discharged veteran from the Coast Guard or the Armed Forces at the time the request is submitted. A requestor will be considered currently in school if enrolled in a public or private elementary school, junior high or middle school, high school, or secondary school; an education, literacy, or career training program (including English as a Second Language course) that is designed to lead to placement in post-secondary education, job training, or employment; an education program assisting students in either obtaining a regular high school diploma or its recognized equivalent under state law, or in passing a GED exam or other equivalent state-authorized exam; or a public or private university, college, or community college.[185] Education, literacy, or career training programs include but are not limited to programs funded in whole or in part by federal or state grants. If the programs are funded by other sources, they may qualify if they are administered by providers of demonstrated effectiveness. To determine that, the USCIS will consider the duration of the program's existence, its track record in helping students obtain a regular high school diploma or its equivalent (including a GED) or in placing students in post-secondary education, job training, or employment, and other indicators of the program's overall quality.[186]

A requestor may prove student status by submitting school records (transcripts, report cards, etc.) from the school he or she is currently attending in the United States showing the name of the school and periods of school attendance and the current educational or grade level; a U.S. high

---

[182] *Id.* at 48.

[183] USCIS DACA FAQs, *supra* note 146 (FAQ "I was admitted for duration of status or for a period of time that extended past June 14, 2012, but violated my immigration status (e.g., by engaging in unauthorized employment, failing to report to my employer, or failing to pursue a full course of study) before June 15, 2012. May I be considered for deferred action under this process?").

[184] USCIS DACA SOP, *supra* note 152, at 45–47.

[185] *Id.* at 53.

[186] USCIS DACA FAQs, *supra* note 146 (FAQ "Who is considered currently in school under the guidelines?").

school diploma or certificate of completion; or a U.S. GED certificate.[187] Proof of honorable discharge can be provided by Form DD-214, Certificate of Release or Discharge from Active Duty; NGB Form 22, National Guard Report of Separation and Record of Service; military personnel records; or military health records.[188]

Circumstantial evidence may be used to establish that the requestor was physically present in the United States on June 15, 2012; came to the United States before his or her sixteenth birthday; and satisfies the five-year continuous resident requirement (direct evidence is required to prove a portion of the five years of continuous residency, but circumstantial evidence can be used to fill in the gaps); and that any travel outside the United States during the five years of continuous residence was brief, casual, and innocent. However, circumstantial evidence may not be used to demonstrate that the requestor was under the age of thirty-one as of June 15, 2012, and is currently in school, has graduated or obtained a certificate of completion from high school, has obtained a GED certificate, or is an honorably discharged veteran. Direct documentary evidence must be submitted to show that the requestor meets these two requirements.[189]

After the requestor submits the DACA package, the USCIS starts to process the request and schedules an appointment for the requestor at an Application Support Center (ASC) to capture fingerprints and other biometric data. At the same time, background and security investigations begin, checking the requestor's identifying information (including any aliases) against government databases to verify that the requestor does not have any disqualifying convictions and does not pose a national security or public safety threat.[190] A requestor who cannot attend the initial ASC appointment may reschedule multiple times within eighty-seven days of the initial appointment. If he or she fails to appear at the ASC within eighty-seven days, the USCIS will deny the DACA request for abandonment. If a requestor does not reschedule the appointment and fails to show up for both the initial appointment and a rescheduled appointment, the request will be denied for abandonment.[191]

If the background and security check shows that the requestor has a prior criminal history, the USCIS will determine whether that prior history constitutes an "Egregious Public Safety" (EPS) concern. If so, the agency will refer the request to ICE and suspend adjudication of the DACA case for sixty days or until ICE provides notification of its action on the case, whichever is earlier.[192] Once the case has been referred to ICE, it has discretion to choose whether to issue a

---

[187] *Id*. (Table "Examples of Documents to Submit to Demonstrate You Meet the Guidelines"); *see also* USCIS DACA SOP, *supra* note 152, at 55–62 (providing a more detailed list of documents that can be used to establish that a requestor is currently in school).

[188] USCIS DACA FAQs, *supra* note 146 (Table "Examples of Documents to Submit to Demonstrate You Meet the Guidelines").

[189] *Id*. (FAQ "Will USCIS consider circumstantial evidence that I have met certain guidelines?").

[190] USCIS DACA SOP, *supra* note 152, at 19–20.

[191] *Id. at 24*.

[192] *Id.* at 83. EPS cases are defined as cases where information indicates the noncitizen is under investigation for, has been arrested for (without disposition), or has been convicted of any of the following: murder, rape, or sexual abuse of a minor; illicit trafficking in firearms or destructive devices; offenses relating to explosive materials or firearms; crimes of violence for which the possible penalty is at least one year; an offense relating to the demand or receipt of ransom; child pornography offenses; peonage, slavery, involuntary servitude, and trafficking-in-persons offenses; alien smuggling offenses; human rights violations, known or suspected street gang membership; or Interpol hits; or reentry after an order of exclusion, deportation, or removal subsequent to a conviction for a felony where a Form I-212, Application for

Notice to Appear (NTA). If ICE chooses not to do so, the USCIS may not issue an NTA. If ICE does not issue an NTA or provide notification to USCIS within sixty days of the referral, USCIS may resume adjudication of the case.[193] In a DACA EPS case, if ICE takes no action or does not respond, the request will be denied unless there are exceptional circumstances.[194]

However, if the prior criminal history is a non-EPS case, the request will be adjudicated taking into account all issues of criminality. Non-EPS cases will not necessarily be denied.[195] If the USCIS denies the DACA application, the case will likely be referred to ICE to decide whether to issue an NTA.[196] If the USCIS denies a DACA application for reasons unrelated to criminal history, national security, fraud, or public safety concerns, the request will not be referred to ICE for removal proceedings.[197]

If the requestor meets the DACA requirements and the background and security check does not return a prior criminal history, the request will likely be approved. Once the request is approved, the requestor will be authorized to work in the United States for two years and will not be subject to removal proceedings,[198] unless the deferral of removal was granted erroneously, the individual obtained the deferral fraudulently, or disqualifying criminal offenses or public safety concerns arise after deferral has been granted.[199] In such cases, deferral granted under DACA may be terminated, and the case may be referred to ICE for a determination to issue an NTA.[200] As long as the program is not terminated, individuals may request an extension of the period of deferred action and employment authorization, as long as they were under the age of thirty-one as of June 15, 2012.[201]

From the beginning of DACA in mid-August 2012 until January 2018, the USCIS received nearly 907,000 initial DACA requests. Of these, over 807,000 applications were approved, and almost 74,000 initial requests were denied. The rest were pending.[201.1] During that same time frame the

---

Permission to Reapply for Admission into U.S. after Deportation or Removal, has not been approved. USCIS, *Policy Memorandum: Revised Guidelines for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens* 3-4 (Nov. 7, 2011) [hereinafter Nov. 2011 NTA Memo], *available at* *http://www.legalactioncenter.org/litigation/deferred-action-childhood-arrivals-daca* (follow Response to Penn State Center for Immigrant Rights FOIA request hyperlink).

[193] Nov. 2011 NTA Memo, *supra* note 192, at 4.

[194] USCIS DACA SOP, *supra* note 152, at 83–84 (stating that whether the criminal case is pending or has reached a final disposition, the DACA request will be denied except in very limited circumstances).

[195] *Id.* at 82.

[196] Nov. 2011 NTA Memo, *supra* note 192, at 5 (stating that if ICE does not issue an NTA, USCIS may not issue an NTA).

[197] USCIS DACA FAQs, *supra* note 146 (FAQ "If USCIS does not exercise deferred action in my case, will I be placed into removal proceedings?").

[198] *See* Napolitano DACA Memo, *supra* note 145.

[199] USCIS DACA SOP, *supra* note 152, at 122–23.

[200] *Id.*

[201] USCIS DACA FAQs, *supra* note 146 (FAQ "Can I extend the period of deferred action in my case?").

[201.1] USCIS, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, and Case Status,             Fiscal             Year[s]             2012–2018             (Jan.             31,             2018),

agency received over 1.1 million DACA renewal applications. Of those, about 1.1 million renewals were approved, and 10,500 renewal applications were denied.[201.2]

In September 2017, President Trump announced that he planned to terminate the DACA program.[201.3] He delayed the termination's effective date until March 5, 2018, to give Congress a chance to enact a legislative solution.[201.4] Congress failed to do so.[201.5]

In the meantime, several lawsuits were started challenging the DACA program's termination. The class actions allege violations of the Administrative Procedure Act. As of March 2018, two injunctions bar the government from terminating the DACA program.[201.6] The Supreme Court rejected the government's request for an expedited appeal.[201.7]

Several people have also challenged individual revocations of their DACA status. Some of these challenges have been successful.[202] In May 2018, several states sued to force termination of DACA.[202.1]

### [i] Other Deferments

Other situations in which deportation proceedings may be withheld or canceled are handled on their own merits. Thus, one case concluded that deportation proceedings would not be terminated or postponed because of the pendency of litigation of a collateral issue, since such deferment would excessively delay the completion of the deportation proceedings.[203] In another case, an outstanding deportation order was withdrawn to await the outcome of a pending extradition proceeding against the respondent.[204]

---

*https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_FY18_Q1_Data_plus_Jan_18.pdf* (last visited Mar. 6, 2018).

[201.2] *Id.*

[201.3] White House Fact Sheet, President Donald J. Trump Restores Responsibility and the Rule of Law to Immigration (Sept. 5, 2017) [hereinafter White House Fact Sheet], *https://www.whitehouse.gov/briefings-statements/president-donald-j-trump-restores-responsibility-rule-law-immigration/* (last visited Feb. 2, 2018); DHS, *Memorandum on Rescission of Deferred Action for Childhood Arrivals* (Sept. 5, 2017), *https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca* (last visited Mar. 2, 2018).

[201.4] White House Fact Sheet, *supra* note 201.3.

[201.5] *See, e.g.*, Dan Nowicki & Daniel Gonzalez, *What's Next for 'Dreamers' After Senate Immigration Bills Fail?*, USA Today, Feb. 16, 2018, *https://www.usatoday.com/story/news/politics/2018/02/16/dreamers-immigration-congress/344512002/* (last visited Mar. 2, 2018).

[201.6] *Vidal v. Nielsen, 2018 U.S. Dist. LEXIS 23547 (E.D.N.Y. Feb. 13, 2018); Regents of the Univ. of California v. U.S. DHS, 2018 U.S. Dist. LEXIS 4036 (N.D. Cal. Jan. 9, 2018).*

[201.7] *DHS. v. Regents of the Univ. of California, 2018 U.S. LEXIS 1508 (Feb. 26, 2018)* (denying petition for a writ of certiorari before judgment). *See generally* Adam Liptak & Michael D. Shear, *Supreme Court Turns Down Trump's Appeal in 'Dreamers' Case*, N.Y. Times, Feb. 26, 2018, *https://www.nytimes.com/2018/02/26/us/politics/supreme-court-trump-daca-dreamers.html* (last visited Mar. 2, 2018).

[202] *See, e.g.*, *Torres v. U.S. DHS, 2017 U.S. Dist. LEXIS 161406 (S.D. Cal. Sept. 29, 2017); Coyotl v. Kelly, 261 F. Supp. 3d 1328 (N.D. Ga. 2017).*

[202.1] Kat Green, *Texas, 6 Other States Sue To End DACA, https://www.law360.com/immigration/articles/1039390/texas-6-other-states-sue-to-end-daca?nl_pk=3943e51a-6cb0-4246-b8e2-f2e3*d693dd1b&utm_source=newsletter&utm_medium=email&utm_campaign=immigration (May 1, 2018).

In late 2001 Congress enacted provisions designed to preserve immigration benefits to noncitizens and their families who were victims of the terrorist attacks on September 11, 2001.[205] Under the USA PATRIOT Act the Attorney General may, for humanitarian purposes or to insure family unity, grant temporary administrative relief to a noncitizen who was lawfully present in the United States on September 10, 2001, and was then the spouse, parent, or child of someone who later died or was disabled as a direct result of the terrorist attacks. This applies to noncitizens who do not fall under any of the other benefit provisions of the USA PATRIOT Act.[206]

Closely related to the subject matter of this section is the procedure for stays of deportation, discussed in § 72.08[1][c], below. Also considered in § 52.07, above, are the special provisions, known as the family fairness and family unity programs, that have permitted certain family members of legalized noncitizens to remain in the United States, with employment authorization, to await the opportunity to regularize their status. For discussion of the related subjects of *INA § 212(c)* waivers of deportation, see § 74.04, below; suspension of deportation, see § 74.07, below; adjustment of status, see chapter 51, above; and private bills, see § 74.09, below.

### [3] Fingerprints and Photographs

The INA provides that "[u]nder regulations of the Attorney General, the Commis-sioner shall provide for the fingerprinting and photographing" of each noncitizen at least fourteen years old "against whom a proceeding is commenced under section 240."[207] The fingerprints and photographs are required to be made available to federal, state, and local law enforcement agencies upon request.[208]

INS regulations direct the fingerprinting and photographing of any noncitizen fourteen years of age or older against whom deportation proceedings are begun by service of an OSC. They also require such a respondent, regardless of age, to be photographed and/or fingerprinted if required by any immigration officer authorized to issue an OSC.[209]

### [4] Arrest and Detention

#### [a] In General

At one time, every deportation proceeding was commenced with the arrest of the respondent. However, as pointed out in § 72.03[1][a], above, regulations effective in February 1956 directed that the proceeding be inaugurated by an OSC. While the INA still authorizes the noncitizen's

---

[203] *Matter of Agarwal, 13 I. & N. Dec. 171* (BIA 1969).

[204] *Matter of Perez-Jimenez, 10 I. & N. Dec. 309* (BIA 1963).

[205] Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), *Pub. L. No. 107-56, 115 Stat. 272*.

[206] USA PATRIOT Act § 425. The USA PATRIOT Act's provisions are discussed throughout this treatise. For an overview of some of the provisions of the USA PATRIOT Act, see *supra §§ 12.08[3]*, 35.11[3].

[207] *INA § 287(f)*, *8 U.S.C. § 1357(f)*. *INA § 240* is *8 U.S.C. § 1229a*.

[208] *INA § 287(f)(2)*, *8 U.S.C. § 1357(f)(2)*; *see infra* § 72.03[4][b].

[209] 8 C.F.R. § 242.4 (1995).

arrest upon a warrant of the Attorney General during the pendency of deportation proceedings,[210] the power to make arrests is invoked most often in making warrantless arrests under the circumstances described in § 72.03[4][d], below. A possibly deportable noncitizen who appears voluntarily at an immigration office is seldom subject to arrest when deportation proceedings are instituted, particularly if he or she is accompanied by counsel.[211]

It is sometimes necessary to determine whether an arrest has occurred in assessing claims to certain constitutional and procedural rights.[212] An interrogation is not in itself an arrest. However, an arrest may occur, even though it is not designated as such, if there has been a meaningful deprivation of freedom of action.[213] But when there has been no such deprivation, an arrest may not have occurred even if the person might have been restrained if he had attempted to leave during the interrogation.[214] Moreover, as noted elsewhere, under appropriate circumstances a proper interrogation by immigration officers may involve some measure of restraint, short of arrest, to complete the interrogation.[215]

A person who believes that he or she has been improperly arrested may have difficulty in challenging the arrest. In the first place, the arrestee must exhaust administrative remedies before court relief can be solicited.[216] And if a deportation order eventually is entered the arrestee will be faced with the doctrine that irregularities in the arresting operation do not necessarily vitiate the deportation order if that order is properly substantiated.[217]

### [b] Cooperation Between Immigration Officers and Local Officials

---

[210] *INA § 242(a), 8 U.S.C. § 1252(a) (1996)*.

[211] *See* Charles Gordon, *Due Process of Law in Immigration Proceedings*, 50 A.B.A.J. 34, 35 (1964). For detention policy in cases of deserting crewmembers, see *supra* Chapter 16.

[212] *See generally* Rebecca Chiao, *Fourth Amendment Limits on Immigration Law Enforcement*, 93-2 Immigr. Briefings (Feb. 1993).

[213] *See* Dunaway v. New York, 442 U.S. 200 (1979) (criminal case, defendant required to accompany officers to station house in car, not free to leave during questioning); Babula v. INS, 665 F.2d 293, 298 (3d Cir. 1981) (arrest did not occur when noncitizen was interrogated by officers, even though officers had surrounded building in which he worked; interrogation developed probable cause for subsequent arrest); Navia-Duran v. INS, 568 F.2d 803, 809 (1st Cir. 1977); Seals v. United States, 325 F.2d 1006 (D.C. Cir. 1963); Matter of Chen, 12 I. & N. Dec. 603 (BIA 1968). *See generally* Immigration and Naturalization Service, U.S. Dep't of Justice, The Law of Arrest, Search, and Seizure for Immigration Officers, Manual No. M-69, at II-3 (1993), *reprinted infra* in Volume 14 and available on the Lexis online research services.

[214] *See* Matter of Doo, 13 I. & N. Dec. 30 (BIA 1968).

[215] *See supra* § 72.02[2]; *cf.* United States v. McDevitt, 508 F.2d 8 (10th Cir. 1974) (random stop of automobile on highway and detention for fifteen or twenty minutes thereafter, without basis for suspicion, was an improper arrest).

[216] *See infra* § 104.02.

[217] United States ex rel. Bilokumsky v. Tod, 263 U.S. 149 (1923); *see* INS v. Lopez-Mendoza, 468 U.S. 1032, 1040 (1984) ("BIA correctly ruled that '[the] mere fact of an illegal arrest has no bearing on a subsequent deportation hearing.'") (citation omitted); Arias v. Rogers, 676 F.2d 1139, 1143 (7th Cir. 1982) (citing this treatise) ("To give a person who has been illegally arrested total immunity from either criminal punishment or deportation is an excessive sanction for an illegal arrest"); Men Keng Chang v. Jiugni, 669 F.2d 275, 279 (5th Cir. 1982) (voluntary admissions before arrest); Ho Chong Tsao v. INS, 538 F.2d 667 (5th Cir. 1976) (independent evidence of overstay in Service files, IJ properly rejected evidence of illegal arrest as irrelevant); Avila-Gallegos v. INS, 525 F.2d 666 (2d Cir. 1975) (admissions at interrogation and at hearing); Huerta-Cabrera v. INS, 466 F.2d 759 (7th Cir. 1972) (admissions at deportation hearing and documents); Matter of Scavo, 14 I. & N. Dec. 326 (BIA 1973); Matter of Chen, 12 I. & N. Dec. 603 (BIA 1968) (challenge to legality of arrest considered and rejected).

6 Immigration Law and Procedure § 72.03

### [i] General Policies

In making arrests it is not improper for ICE officials to cooperate with other law enforcement agents. However, the process of administrative arrest in deportation proceedings cannot be used as a subterfuge for gathering evidence to be used in a criminal case. Such an impropriety may preclude the use of the evidence in the criminal prosecution.[218] Nor can an administrative arrest be used to supply authority that would otherwise be lacking for action by other law enforcement officers.[219]

When authorized by state law, state or local law enforcement officers may have power to arrest for violations of federal criminal laws, including immigration violations.[220] Such arrests must conform to the constitutional requirement of probable cause.[221] The failure to answer questions or to produce documents does not constitute probable cause for arrest.[222] On the other hand, state or local police have no authority to arrest persons believed to be deportable for noncriminal illegal presence, e.g., for overstay of a temporary entry.[223] Nor are state and local law enforcement officers and judges legally bound to report known undocumented noncitizens to ICE.[224] Moreover, local or state law enforcement officials cannot resort to arrest for supposed state violations as a pretext for detention of an noncitizen suspected of violating the federal immigration laws.[225]

However, there is a heightened level of cooperation between the immigration agency and law enforcement agencies regarding convicted criminal noncitizens.[226] When undocumented persons are in the lawful custody of state or local police, they may be questioned about their immigration status and such status may be entered into law enforcement databases.[227] The INS initiated a program to identify criminal noncitizens by screening foreign-born prisoners in state

---

[218] *Abel v. United States, 362 U.S. 217 (1960)* (upholding the power to issue such warrants); *United States v. Alvarado, 321 F.2d 336 (2d Cir. 1963)* (same); *Spinella v. Esperdy, 188 F. Supp. 535 (S.D.N.Y. 1960)* (challenge based on **Fourth Amendment** rejected).

[219] *Martinez-Angosto v. Mason, 344 F.2d 673 (2d Cir. 1965)* (deserter from Spanish naval vessel).

[220] *United States v. Urrieta, 520 F.3d 569, 574 (6th Cir. 2008)* (stating that Tennessee law grants state and local law enforcement power to make warrantless arrests for immigration violations only for felonies or continuing violations); *Gonzales v. City of Peoria, 722 F.2d 468, 474 (9th Cir. 1983)*, *overruled on other grounds*, *Hodgers-Durgin v. De La Vina, 199 F.3d 1037 (9th Cir. 1999)* (such criminal violations may include unlawful entry or reentry or aiding unlawful entry, under which all law enforcement officers are authorized to make arrests). *See generally* Jennifer M. Chacon, *A Diversion of Attention? Immigration Courts and the Adjudication of Fourth and Fifth Amendment Rights*, *59 Duke L.J. 1563, 1582-99 (2010)* (discussing cooperation between ICE and state and local enforcement officers, including authority of local officials to arrest for immigration violations).

[221] *Gonzales v. City of Peoria, 722 F.2d 468, 477 (9th Cir. 1983)*, *overruled on other grounds*, *Hodgers-Durgin v. De La Vina, 199 F.3d 1037 (9th Cir. 1999)*.

[222] *Id.*

[223] *Id. at 476*. In a 1978 press release, the Attorney General emphasized that state and local police have no authority to enforce the immigration laws. Dep't of Justice Press Release (June 23, 1978). *See* Crosland, *Arrest, Interrogation and Detention of Aliens*, 56 Interpreter Releases 408, 412 (Aug. 31, 1979); *supra* § 72.02[2][a]. In 1983, the Attorney General announced new guidelines designed to enhance cooperative enforcement efforts by INS and local officials. *See* 60 Interpreter Releases 172 (Mar. 4, 1983); *see also* *INA § 287(g)*, *8 U.S.C. § 1357(g)* (giving the federal government authority to allow state and local officials to arrest and detain noncitizens); *United States v. Sosa-Carabantes, 561 F.3d 256, 257–58 (4th Cir. 2009)* (describing 287(g) program).

facilities in several key states.[228] The Service's Institutional Hearing Program (IHP) allowed the INS to begin deportation proceedings against noncitizens convicted of aggravated felonies while they were still serving their sentences in federal, state, or local facilities.[229]

A number of cities and municipalities have attempted to regulate the degree of cooperation between local police and immigration agency officials through local ordinances and policies (so-called "sanctuary city" policies). Such ordinances often prohibit local officers and employees from cooperating with immigration investigation, detention, or arrest procedures or releasing information relating to the immigration status of residents. For example, a resolution passed in 1986 by the Los Angeles City Council prohibits its police from reporting undocumented persons to the INS unless they have committed a serious felony or multiple misdemeanors.[230] Ordinances in effect in Chicago and Washington, D.C., prohibit agencies in those cities from requesting information about a person's citizenship or residency status unless legally required.[231] In 1992, a San Francisco ordinance prohibiting certain forms of cooperation between city employees was declared invalid by the California Attorney General, who stated that the ordinance was barred by the *Supremacy Clause of the U.S. Constitution*.[232]

### [ii] Notification to DHS and Detainers

It is customary for local police officers to notify ICE of noncitizens arrested or incarcerated for violation of criminal laws, and for ICE to file a "detainer" requesting the local police to hold the affected individual for ICE after police action or incarceration has been completed. Such ex parte action in continuing to hold a person not afforded any hearing or process, and not

---

[224] *Opinion of California Att'y Gen., Gates v. Superior Court, 193 Cal. App. 3d 205 (1987)*; 67 Ops. Cal. Att'y Gen. 331 (1984), *discussed at* 61 Interpreter Releases 651 (Aug. 17, 1984). But under *8 U.S.C. § 1373*, they also cannot interfere with state or local communications with the immigration agency about immigration status.

[225] *United States v. Perez-Castro, 606 F.2d 251 (9th Cir. 1979)* (criminal case, statements suppressed when taken by immigration officers after illegal arrest by local officers); *United States v. Cruz, 559 F.2d 300 (5th Cir. 1977)*.

[226] *See generally* Chiao, *supra* note 212, at nn.264–68 and 277–81 and related text (noting, however, that some cities have policies or laws preventing such cooperation).

[227] *See* *Am. G.I. Forum v. Miller, 218 Cal. App. 3d 859, 267 Cal. Rptr. 371 (1990)*.

[228] *See* 69 Interpreter Releases 479 (Apr. 20, 1992); *www.ice.gov/criminal-alien-program* (last visited Aug. 2013).

[229] *See* INA § 242A(a)(3)(A), *8 U.S.C. § 1252A(a)(3)(A) (1995)*; 72 Interpreter Releases 414 (Mar. 27, 1995); 71 Interpreter Releases 209 (Feb. 7, 1994); 69 Interpreter Releases 479 (Apr. 20, 1992); *infra* § 72.05[6]. *See generally* Office of the Inspector General, U.S. Dep't of Justice, Audit Report 02-41, Immigration and Naturalization Service Institutional Removal Program (2002), *http://www.justice.gov/oig/reports/INS/a0241/final.pdf*.

[230] *See* 69 Interpreter Releases 1608 (Dec. 21, 1992).

[231] *Id.*

[232] *Opinion of California Att'y Gen. No. 92-607, 75 Ops. Cal. Atty. Gen. 270 (Nov. 19, 1992)*. For more on the *Supremacy Clause* and preemption issues, see *supra* § 9.09.

6 Immigration Law and Procedure § 72.03

confronted with any charges, is manifestly questionable, and is illegal if it results in additional incarceration.[233]

The agency cannot delegate its authority to arrest undocumented noncitizens to local authorities. State authorities who participate in such illegal arrests may incur liability for damages.[234] On the other hand, it is not improper for the agency to lodge a detainer relating to a person imprisoned following conviction for a crime, requesting the prison authorities to turn the prisoner over to ICE custody for deportation proceedings upon his or her discharge from imprisonment.[235]

Federal, state, or local law enforcement officials who arrest a noncitizen for violation of a law relating to controlled substances, and who have reason to believe that the arrested noncitizen is unlawfully in the United States, are required to bring the case to the attention of the ICE.[236] It must then determine expeditiously whether to issue a detainer. If a detainer is issued, the Attorney General is directed to take custody of the noncitizen when the detention in the criminal case terminates. Deportation proceedings are instituted after custody is transferred to the Attorney General.[237]

A detainer may be issued only for a noncitizen whom the agency has reason to believe is amenable to exclusion or deportation.[238] The following officers are authorized to issue detainers: Border Patrol agents, including aircraft pilots; special agents; removal officers; immigration inspectors; immigration examiners; supervisory and managerial personnel who are responsible for supervising the above officers; and designated immigration officers.[239] The criminal justice agency must provide ICE with all relevant records and information, and is authorized to keep the prisoner in temporary custody for forty-eight hours after the noncitizen would otherwise be released, to enable ICE to assume custody.[240] Detainers may be issued

---

[233] Mashi v. INS, 585 F.2d 1309, 1315 (5th Cir. 1978) (citing this treatise); see Argiz v. United States Immigration, 704 F.2d 384 (7th Cir. 1983) (detainer and deferred deportation hearing of noncitizen convicted for crime did not violate Interstate Agreement on Detainers and Speedy Trial Act; however, dicta suggest that Attorney General has statutory duty to proceed with reasonable dispatch in determining deportability). See generally supra § 72.02[2][b].

[234] Chairez v. County of Van Buren, 542 F. Supp. 706 (W.D. Mich. 1982), rev'd sub nom. Chairez v. USINS, 790 F.2d 544 (6th Cir. 1986) (reversing as to federal defendants; liability of state defendants established through settlement).

[235] See Argiz v. United States Immigration, 704 F.2d 384, 388 (7th Cir. 1983) (suggests that deportation proceedings should not be deferred merely because a noncitizen is confined, since the Attorney General is under statutory duty to proceed with reasonable dispatch); supra § 72.02[2][b]. The INS began several programs to improve computer facilities to enable the agency to more easily track criminal noncitizens. See 72 Interpreter Releases 415 (Mar. 27, 1995); 66 Interpreter Releases (Nov. 6, 1989); 65 Interpreter Releases 955 (Sept. 19, 1988). For a discussion of habeas corpus actions challenging the legality of custody, see infra § 104.04.

[236] INA § 287(d), 8 U.S.C. § 1357(d), as added by Anti-Drug Abuse Act of 1986, Pub. L. No. 99-570, § 1751(d), 100 Stat. 3207. This 1986 legislation was the first statutory reference to the standing practice of filing immigration detainers for persons held in custody by local or federal enforcement officers. The regulations were thereafter amplified to codify this practice and to implement the directives of the 1986 legislation. 8 C.F.R. § 242.2(a) (1995).

[237] See United States v. Shaw Yan Xiang, 77 F.3d 771, 773 (4th Cir. 1996) (citing United States v. Sanchez, 923 F.2d 236 (1st Cir. 1991) (per curiam)).

[238] 8 C.F.R. § 242.2(a)(1) (1995).

[239] Id.

[240] 8 C.F.R. § 242.2(a)(2), (4) (1995).

6 Immigration Law and Procedure § 72.03

telephonically, but such telephonic detainers must be confirmed in writing within twenty-four hours on Form I-247 or by electronic communication.[241] ICE assumes no fiscal responsibility under the detainer until it actually assumes custody.[242]

The detainer does not itself transfer custody to ICE until it actually assumes physical custody.[243] Moreover, a detainer does not give a convicted noncitizen a right to compel expeditious commencement of proceedings.[244] On the other hand, prison officials may consider the detainer in assessing the prisoner's security and custody classifications.[245]

Upon a finding that a noncitizen, other than an LPR, may flee or pose a danger to any other person or the community, federal judicial officers are authorized to detain the noncitizen for a period of ten days pending trial, to notify the immigration authorities, and to give ICE an opportunity to take the defendant into custody during that period.[246]

### [c] Authority for Administrative and Criminal Arrest

The power to make administrative or civil arrests under the immigration laws is vested in any officer or employee of the agency.[247] Moreover, immigration officers are not deprived of the power to arrest and detain in deportation proceedings just because the respondent claims to be a U.S. citizen.[248] But the power of administrative arrest must be supported by statutory authority, and can be exercised only as a prelude to deportation proceedings.[249]

In addition, such officers are authorized to make arrests for certain criminal violations of the immigration laws.[250] An immigration officer may also have general authority to arrest for criminal

---

[241] 8 C.F.R. § 242.2(a)(3) (1995). *See generally* Jesse Lloyd et al., *Understanding Form I-247 Immigration Detainers, in* Am. Immigr. Law. Ass'n, Immigration Practice Pointers 2013-14 Edition 520 (Rizwan Hassan et al. eds., 2013).

[242] 8 C.F.R. § 242.2(a)(5) (1995).

[243] *See infra* § 104.04 (discussing the concept of custody with regard to habeas corpus actions).

[244] *Campos v. INS, 62 F.3d 311, 314 (9th Cir. 1995)* (stating that incarcerated noncitizens have no right to compel expeditious scheduling of deportation proceedings); *Silveyra v. Moschorak, 989 F.2d 1012, 1014–15 (9th Cir. 1993)* (per curiam) (right of action not conferred by statutory provisions for mandamus or by Administrative Procedure Act; distinguishes Soler v. Scott, cited *infra*; *United States v. Gonzalez-Mendoza, 985 F.2d 1014 (9th Cir. 1993)* (immigration detainer is not subject to Interstate Agreement on Detainers, which requires expeditious trial in criminal prosecutions); *Giddings v. Chandler, 979 F.2d 1104, 1108 (5th Cir. 1992)* (mandamus statute and APA do not support right of action to compel institution of deportation proceeding; the court noted that Soler, cited *infra*, had become moot while Supreme Court review was pending); *Santana v. Chandler, 961 F.2d 514, 516 (5th Cir. 1992)*; *Aguirre v. Meese, 930 F.2d 1292 (7th Cir. 1991)*; *Prieto v. Gluch, 913 F.2d 1159 (6th Cir. 1990)* (*INA § 242(i)* did not provide noncitizen with a private cause of action); *Gonzalez v. United States INS, 867 F.2d 1108 (8th Cir. 1989)* (noncitizen held not to have a private cause of action to compel expedited deportation proceedings under *INA § 242(i)*; "Implying a private right on the basis of congressional silence is … hazardous … at best" (citation omitted)); *Campillo v. Sullivan, 853 F.2d 593 (8th Cir. 1988)* (while finding the issue of the existence of a private right of action to be "out of place in this case," the court noted that an examination of the statute and its legislative history reveals "that it was intended more as a directive to the INS rather than as a vehicle for incarcerated noncitizens to demand immediate deportation hearings"); *Lartey v. U.S. Dep't of Justice, 790 F. Supp. 130 (W.D. La. 1992)*. *But see Soler v. Scott, 942 F.2d 597 (9th Cir. 1991)* (upholding a prisoner's right of action to compel expeditious scheduling of deportation hearing), *vacated and remanded with directions to dismiss on other ground sub nom. **Sivley v. Soler, 506 U.S. 969 (1992)**; *Abreu v. United States, 796 F. Supp. 50 (D.R.I.1992)* (issuing writ of mandamus ordering the INS to conduct deportation hearings as soon as possible for incarcerated noncitizens and not wait for their release). *See generally* John Kim, *Requiring the INS to Do Its Job: Expeditious Deportation Proceedings and INA § 242(i)*, 70 Interpreter Releases 1225 (Sept. 20, 1993).

6 Immigration Law and Procedure § 72.03

violations of other laws in certain situations.[251] However, the authority to make civil arrests in deportation proceedings does not enlarge the authority of officers in relation to criminal charges. If the defendant is to be charged with a crime he or she must be brought promptly before a committing magistrate, and the defendant's confession cannot be used in a criminal trial unless this is done.[252]

### [d] Arrest Without Warrant

The INA favors the use of an arrest warrant, even for civil arrests.[253] Thus, an immigration officer must obtain a warrant before making an arrest unless an exception to the warrant requirement applies.[254]

Designated immigration officers[255] are empowered to make administrative arrests without a warrant in two situations:[256] (1) when a noncitizen in the officer's presence or view is entering or attempting to enter the United States illegally;[257] and (2) when the officer has "reason to believe" that a noncitizen is in the United States in violation of law and is likely to escape before a warrant can be obtained for his or her arrest.[258] In the absence of such a reasonable apprehension, arrest without a warrant may be unjustified.[259] However, the officer's on-the-spot determination generally will not be upset if there is any reasonable basis for it.[260] The Service instructed that arrests of suspected noncitizens at schools and places of worship and during funerals and other religious ceremonies must be approved in advance.[261]

Designated immigration officers[262] also have the power to arrest any person without a warrant for felony violations of the immigration laws if the officer has reason to believe that the particular

---

[245] *Mohammed v. Sullivan, 866 F.2d 258, 260 (8th Cir. 1989)*.

[246] *18 U.S.C. §§ 3141(b)*, *3142(a)*, *(d)*.

[247] *See* *INA § 287(a)(2)*, *(4)*, *8 U.S.C. § 1357(a)(2)*, *(4)* (if authorized by regulations). The power of immigration officers to make arrests was upheld. *Abel v. United States, 362 U.S. 217 (1960)*; *United States v. Alvarado, 321 F.2d 336 (2d Cir. 1963)*.

[248] *See* *Hernandez-Avila v. Boyd, 294 F.2d 373 (9th Cir. 1961)*; *Application of Marks, 198 F. Supp. 40 (S.D.N.Y. 1961)*; *cf. Guzman-Flores v. INS, 496 F.2d 1245 (7th Cir. 1974)* (court found it unnecessary to consider validity of arrest by state officers). In 2009, the Director of ICE issued a memorandum directing ICE officers, agents, attorneys, and state and local officers with immigration authority to handle claims of U.S. citizenship "with the utmost care and highest priority." The memorandum also directs that individuals with credible claims to U.S. citizenship should not be arrested, and if arrested, should be released. John Morton, Director, U.S. Immigration and Customs Enforcement, Policy No. 16001.1, FEA No. 045-01, *Superseding Guidance on Reporting and Investigating Claims to United States Citizenship* (Nov. 19, 2009), *http://www.ice.gov/doclib/foia/prosecutorial-discretion/reporting-investigating-us-citizen-claims.pdf*, *reprinted at* 15 Bender's Immigr. Bull. 438, 464 (App. K) (Mar. 15, 2010).

[249] *Martinez-Angosto v. Mason, 344 F.2d 673 (2d Cir. 1965)*.

[250] *INA § 287(a)(4)*; *8 U.S.C. § 1357(a)(4)*; *8 C.F.R. § 287.5(c)(2)*, *(5)*.

[251] *INA § 287(a)(5)*, *8 U.S.C. § 1357(a)(5)*; *8 C.F.R. § 287.5(c)(3)*, *(4)*.

[252] *United States v. Valente, 155 F. Supp. 577 (D. Mass. 1957)*; *see* *Culombe v. Connecticut, 367 U.S. 568 (1961)*; *Mallory v. United States, 354 U.S. 449 (1957)*; *McNabb v. United States, 318 U.S. 332 (1943)*; *cf. United States v. Guana-Sanchez, 484 F.2d 590 (7th Cir. 1973)*; *Seals v. United States, 325 F.2d 1006 (D.C. Cir. 1963)* (request to accompany investigating officers was deemed under the particular circumstances of the case equivalent to a formal arrest for this purpose), *cert. denied*, **376 U.S. 964 (1964)**.

person is guilty of the felony and is likely to escape before a warrant is obtained.[263] The INA further authorizes designated immigration officers[264] to make warrantless arrests for any federal offense committed in their presence, or any federal felony, if the officer has reasonable grounds to believe that the person to be arrested has committed or is committing such a felony.[265] At the time of the arrest for any offenses against the United States, the officer must be performing enforcement duties, and it must be likely that the person to be arrested could escape before a warrant could be obtained.[266]

Whenever a warrantless arrest is made, the immigration officer must identify himself or herself as an immigration officer authorized to make such arrests and state that the person is under arrest and the reason for the arrest.[267] The arresting officer in such situations must bring the noncitizen without unnecessary delay before another officer for examination, unless such other officer is not readily available.[268] If the examining officer is satisfied that a prima facie case of deportability is shown, an OSC is issued and the arrested person is held for hearing by an immigration judge.[269] If continued detention is deemed desirable a warrant of arrest is issued, as described in paragraph [e], below.

After the examining officer has determined that formal exclusion or deportation proceedings will be brought, the respondent is advised of the reason for the arrest and of the right to retain counsel. The person is told of the free legal services programs available in the district where the hearing will be held, and furnished with a list of such programs. The person is also advised that any statement he or she makes can be used against him or her in a subsequent proceeding and that a decision regarding custody or bail will be made within forty-eight hours. Within that period the case is also referred to the appropriate ICE office, unless voluntary departure has been granted, to determine whether deportation proceedings will be commenced.[270]

---

[253] *INA § 287(a)*, *8 U.S.C. § 1357(a)*; *8 C.F.R. § 287.8(c)(2)(ii)* ("A warrant of arrest shall be obtained whenever possible prior to the arrest").

[254] *See* Immigration and Naturalization Service, U.S. Dep't of Justice, Manual No. M-69, The Law of Arrest, Search, and Seizure for Immigration Officers, at II-4 (1993), *reprinted infra* in Volume 14 and *available at* www.lexis.com > Immigration > Find Administrative Materials > Immigration Law & Procedure-Agency Manuals.

[255] *See* *8 C.F.R. §§ 287.5(c)(1)*, *287.8(c)(1)*.

[256] *INA § 287(a)(2)*, *8 U.S.C. § 1357(a)(2)*; *8 C.F.R. § 287.5(c)(1)*.

[257] *See* *La Franca v. INS, 413 F.2d 686 (2d Cir. 1969)* (two prior deportations); *Yam Sang Kwai v. INS, 411 F.2d 683 (D.C. Cir.)* (prior deportation), *cert. denied*, **396 U.S. 877 (1969)**; *Matter of Chen, 12 I. & N. Dec. 603* (BIA 1968).

[258] *United States v. Quintana, 623 F.3d 1237, 1241 (8th Cir. 2010)* (reason to believe an individual is a noncitizen likely to escape can arise when preliminary record checks of name, entry, and immigration status do not confirm the noncitizen's claims of legal entry); *Contreras v. United States, 672 F.2d 307, 309 (2d Cir. 1982)* (admission of unlawful entry furnished sufficient basis for reasonable belief of likelihood of escape; in case of second noncitizen, admission of foreign origin, absence of claim of lawful status, and attempt to escape custody satisfied "likely to escape" criterion); *Tejeda-Mata v. INS, 626 F.2d 721, 725 (9th Cir. 1980)* (equating "reason to believe" language with probable cause); *United States v. Reyes-Oropesa, 596 F.2d 399 (9th Cir. 1979)* (proper interrogation based on informant's tip of illegal noncitizen's identity, description, and place of employment, coupled with discovery of altered green card, furnished probable cause for arrest); *United States v. Cantu, 519 F.2d 494 (7th Cir. 1975)* (criminal case; "reason to believe" equivalent to probable cause; finds probable cause of violation and of likelihood of escape); *United States v. Meza-Campos, 500 F.2d 33 (9th Cir. 1974)* (statutory provision unique, noncitizen's manner justified officer's "reason to believe he was likely to escape"); *Matter of King and Yang, 16 I. & N. Dec. 502* (BIA 1978) (restaurant employees stated upon interrogation that identity documents were at home; proper to arrest them because of fear they might escape and for further investigation of their immigration status). *See* INS, The Law of Arrest, Search, and Seizure for Immigration Officers, *supra* note 254, at II-4 (1993) ("The words 'reason to believe' in this statute have been interpreted to mean 'probable cause' ").

6 Immigration Law and Procedure § 72.03

Any person arrested and charged with a criminal violation of federal law must be advised of his or her rights, and this advisement must be documented on appropriate forms and made part of the arrest record.[271] Such persons must be brought without unnecessary delay before a U.S. magistrate, U.S. district judge, or other judicial officer empowered to commit persons charged with such crimes.[272]

As soon as practicable after the apprehension, the arresting officer prepares Form I-213, which sets forth information regarding the arrested person, the particulars regarding the arrest, and the elements alleged to establish the person's deportability.[273] A failure to accord the foregoing procedural right may incur liability for damage suits against the Service and the officers involved in the violations.[274]

### [e] Warrant of Arrest

Absent any emergent circumstances described in paragraph [d], above, an arrest is effected under authority of a warrant of arrest.[275] The INA specifically authorizes a warrant of arrest.[276] It is issued only by certain immigration officers.[277] Moreover, only designated officers may serve the warrant of arrest.[278] The warrant of arrest can be issued with the OSC or at any time thereafter, up to the time that the warrant of deportation is issued.[279]

---

[259] *United States v. Chavez, 705 F.3d 381, 384–85 (8th Cir. 2013)* (a reasonable suspicion of an immigration offense is not sufficient to make a warrantless arrest); *United States v. Perez-Castro, 606 F.2d 251 (9th Cir. 1974)*; *Roa-Rodriquez v. United States, 410 F.2d 1206, 1209 (10th Cir. 1969)* (no violation of nonimmigrant status had yet occurred; "Probable cause is something more than mere suspicion"); *Martinez-Angosto v. Mason, 344 F.2d 673 (2d Cir. 1965)* (no authority to arrest deserter from Spanish naval vessel to turn him over to U.S. naval authorities).

[260] *United States v. Salinas-Calderon, 728 F.2d 1298, 1301–02 (10th Cir. 1984)*; *Contreras v. United States, 672 F.2d 307, 308 (2d. Cir. 1982)*; *Marquez v. Kiley, 436 F. Supp. 100, 108 (S.D.N.Y. 1977)*.

[261] Memorandum from James A. Puleo, Acting Associate Comm'r for Operations, File No. HQ 807-P (May 17, 1993), *reprinted at* 70 Interpreter Releases 885 (July 2, 1993); *see also* David V. Aguilar, Deputy Commissioner, U.S. Customs and Border Protection, *U.S. Customs and Border Protection Enforcement Actions at or Near Certain Community Locations* (Jan. 18, 2013), *reprinted at* 18 Bender's Immigr. Bull. 288, 292 (App. B) (Mar, 15, 2013); John Morton, Director, ICE, Policy No. 10029.2, FEA No. 306-112-002b, *Enforcement Actions at or Focused on Sensitive Locations* (Oct. 24, 2011), *reprinted at* 17 Bender's Immigr. Bull. 1834, 1871 (App. C) (Nov. 15, 2012); Julie L. Myers, Assistant Secretary, ICE, *Field Guidance on Enforcement Actions or Investigative Activities At or Near Sensitive Community Locations* (July 3, 2008), *reprinted at* 15 Bender's Immigr. Bull. 1616, 1637 (App. E) (Nov. 15, 2010).

[262] *8 C.F.R. § 287.5(c)(2)(ii)*.

[263] *INA § 287(a)(4)*, *8 U.S.C. § 1357(a)(4)*; *8 C.F.R. § 287.5(c)(2)*. *See* INS, The Law of Arrest, Search, and Seizure for Immigration Officers, *supra* note 254, at II-5 to 6 (1993) (providing a non-exclusive listing of such felonies under the immigration laws).

[264] *8 C.F.R. § 287.5(c)(3)(ii)*, *(4)(iii)*. Immigration officers authorized to arrest without warrant for federal felonies must be certified as successfully completing a training course covering such arrests and INS enforcement standards. *8 C.F.R. § 287.5(c)(4)(1)(D)*.

[265] *INA § 287(a)(5)*, *8 U.S.C. § 1357(a)(5)*; *see* *8 C.F.R. § 287.5(c)(3)*, *(4)*.

[266] *INA § 287(a)(5)*, *8 U.S.C. § 1357(a)(5)*; **Murillo v. Musegades, 809 F. Supp. 487, 500 (W.D. Tex. 1992)**; *8 C.F.R. § 287.5(c)(3)*, *(4)*.

[267] *8 C.F.R. § 287.8(c)(2)(iii)*. In addition to being designated to make the particular type of arrest under INS regulations, such officers must have completed basic immigration law enforcement training. *8 C.F.R. § 287.5(c)(1)(ii)*, *(2)(ii)*, *(3)(ii)*, *(4)(iii)*; *see* *8 C.F.R. § 287.1(g)*.

6 Immigration Law and Procedure § 72.03

In practice, the warrant of arrest often is issued after the noncitizen is arrested without a warrant, and is usually prepared and served with the OSC. Upon service of the warrant of arrest, the contents of the OSC and the reasons for the arrest are explained to the respondent. The respondent is advised of the right to retain counsel in deportation proceedings and that any statement the respondent makes may be used against him or her. The respondent is informed of the determination concerning custody and of the right to appeal from such determination. The respondent is also given a list of organizations that may provide free legal services, and is told whether he or she will be released from custody and the amount and conditions of any required bond for such release.[280]

If the respondent is confined to a penal or mental institution or hospital, a copy of the warrant of arrest is served upon him and upon the head of the hospital or institution. However, if the respondent is not competent to understand the nature of the proceedings the warrant of arrest is served only on the head of the hospital or institution.[281] A noncitizen confined to a hospital or institution is not taken into physical custody by the Service until it is ready to deport the noncitizen.[282] If the respondent is mentally incompetent, or is a child under fourteen, a copy of the warrant of arrest is served on the person's guardian, near relative, or friend, whenever possible.[283]

### [f] Detention or Release During Pendency of Proceeding

### [i] In General

---

[268] *INA § 287(a)(2)*, *8 U.S.C. § 1357(a)(2)*; *Hung v. United States, 617 F.2d 201, 202 (10th Cir. 1980)* (guiding principle "basically the same as a criminal proceeding before a magistrate on probable cause"); *8 C.F.R. §§ 287.3, 287.8(c)(2)(iv)*; *see United States v. Tejada, 255 F.3d 1, 3 (1st Cir. 2001)* (no requirement that noncitizen arrested for deportation proceeding be brought before magistrate); *Navia-Duran v. INS, 568 F.2d 803, 809 (1st Cir. 1977)* (rejects contention that this requirement applies only when criminal charges lodged; suggests that failure to follow regulation may taint subsequent proceedings); ***Cheung v. INS, 418 F.2d 460 (D.C. Cir. 1969)*** (suggests that function of second officer is for arraignment or detention rather than conducting hearing); *United States v. Alvarado, 321 F.2d 336 (2d Cir. 1963)* (under circumstances, delay in bringing noncitizen before second officer was not unreasonable).

[269] *8 C.F.R. § 287.3*.

[270] *Id.*

[271] *8 C.F.R. § 287.8(c)(2)(vi)*; *see 59 Fed. Reg. 42,206, 42,409 (Aug. 17, 1994)* (supplementary information) (noting that "[t]he law, including constitutional standards, determines when advice of rights must be provided"). For a discussion of *Miranda* warnings generally, see *supra* § 72.02[2][f].

[272] *8 C.F.R. § 287.8(c)(2)(vi)*.

[273] Form I-213, *available at http://nj.fd.org/PDF/forms/IV-25%20INS%20Form%20I-213.pdf*.

[274] *See Papa v. United States, 281 F.3d 1004 (9th Cir. 2002)* (stating that noncitizen can bring an action for alleged due process violations during an immigration detention).

[275] The warrant of arrest should be distinguished from the warrant of deportation, which issues after a final order of deportation is entered. *See infra* § 72.08[1][a].

[276] ***INA § 242(a), 8 U.S.C. § 1252(a) (1996)***.

[277] 8 C.F.R. § 242.2(c)(1) (1995):

6 Immigration Law and Procedure § 72.03

In the ordinary case, an arrested noncitizen is released immediately upon furnishing a bond in a fixed amount. However, such release does not follow as a matter of course. The statute gives the government discretion, pending final determination of deportability, to:[284]

- continue to hold the noncitizen in custody;

- release the noncitizen under bond of at least $500 with security and conditions approved by the Attorney General; or

- to release the noncitizen on conditional parole.

    The INA specifically permits a revocation of the bond or parole, when appropriate, and a return to custody under the original warrant.[285]

Every detained noncitizen is notified that he or she may communicate with his or her country's consular or diplomatic officers in the United States.[286] Even when no such request is made and even when the noncitizen asks that there be no communication, existing treaties with many countries require that their appropriate consular or diplomatic officers be immediately notified when their nationals are detained in exclusion or deportation proceedings.[287] Failure to notify the noncitizen of the right to communicate can be fatal to an ensuing deportation order, but only on a showing that the failure affected the noncitizen's ability to resist deportation.[288]

### [ii] Custody Determination by District Director and Renewal Before Immigration Judge

---

(c) Warrant of arrest. (1) At the time of issuance of the Order to Show Cause, or at any time thereafter and up to the time the respondent becomes the subject of a duly issued warrant of deportation, the respondent may be arrested and taken into custody under the authority of a warrant of arrest, …, such warrant may be issued by no other than a:

(i) District director;

(ii) Acting district director;

(iii) Deputy district director;

(iv) Assistant district director for investigations;

(v) Deputy assistant district director for investigations;

(vi) Assistant district director for deportation;

(vii) Deputy assistant district director for deportation;

(viii) Assistant district director for examinations;

(ix) Deputy assistant district director for examinations;

(x) Assistant district director for anti-smuggling;

(xi) Officer in charge (except foreign);

(xii) Chief patrol agent;

(xiii) Deputy chief patrol agent;

(xiv) Associate chief patrol agent;

(xv) Assistant chief patrol agent;

(xvi) The Assistant Commissioner, Investigations;

(xvii) Director, Organized Crime Drug Enforcement Task Force (OCDETF);

6 Immigration Law and Procedure § 72.03

### [A] In General

Generally speaking, a noncitizen (other than an aggravated felon) may be detained or required to post bond only if there is a finding that the noncitizen is a threat to the community or a poor bail risk.[289] Among the factors that may be considered in determining the necessity for and the amount of bond are: stability of employment, length of residence, family ties, appearance at prior court or administrative proceedings, and previous criminal or immigration violations.[290] Release on bond may be denied on the basis of undisclosed information provided that disclosure of the information would be prejudicial to the public interest, safety, or security.[291]

The determination of whether detention or release is indicated and of the conditions under which such release of an arrested respondent will be ordered may be made in the first instance by any immigration officer authorized to issue the warrant of arrest.[292] The respondent receives written notice of such determination and is advised whether he or she may apply to an IJ for release or modification of the conditions of release or may appeal to the Board. The agency must advise the Immigration Court in writing of the taking of a respondent into custody, a release from custody, or a change in the custody location.[293]

Custody or bond determinations made by the agency may be reviewed by an IJ. Applications for such review may be made orally, in writing or, at the discretion of the IJ, by telephone. Such applications should be directed first to the immigration court having jurisdiction over the place of detention; second, to the immigration court having administrative control of the case; and third, to the office of the Chief IJ for the designation of an appropriate immigration court.[294] There is no limit to the number of requests an IJ

---

(xviii) Assistant Director, Organized Crime Drug Enforcement Task Force (OCDETF), (New York, NY; Houston, TX; Los Angeles, CA; and Miami, FL).

[278] *8 C.F.R. § 287.5(e)(2)*. Issuance and service of the warrant of arrest are "distinct processes." *59 Fed. Reg. 42,406, 42,407 (Aug. 17, 1994)* (supplementary information) ("Issuance of a warrant of arrest entails signature by an immigration officer, while service of the warrant entails a step-by-step process requiring training and proficiency in service of process procedures.").

[279] 8 C.F.R. § 242.2(c)(1) (1995).

[280] 8 C.F.R. § 242.2(c)(2) (1995).

[281] 8 C.F.R. § 242.3(a) (1995).

[282] 8 C.F.R. § 242.3(b) (1995).

[283] 8 C.F.R. § 242.3(a) (1995).

[284] *INA § 242(a)(1), 8 U.S.C. § 1252(a)(1) (1996)*.

[285] *Id.*

[286] 8 C.F.R. § 242.2(g) (1995); INS OI 242.6(e) (1996). Although this OI was rescinded in 1997, the policy appears to remain the same.

[287] 8 C.F.R. § 242.2(g) (1995).

[288] *See Waldron v. INS, 17 F.3d 511 (2d Cir. 1994)* (noncitizen entitled to protection of regulation as "detained" though incarcerated by state for criminal conviction rather than INS; but no showing of prejudice); *United States v. Rangel-Gonzales, 617 F.2d 529, 530 (9th Cir. 1980)* (explaining two-step test introduced in Calderon-Medina, *infra*, to determine whether violation of a regulation invalidates a deportation); United States v. Calderon-Medina, 591 F.2d 529, 532 (9th Cir. 1979) (in prosecution for entry after deportation, remanded for evidence on whether failure to advise was prejudicial to noncitizen in deportation hearing); *see also Tejeda-Mata v. INS, 626 F.2d 721 (9th Cir. 1980)* (citing Calderon-Medina, court nevertheless sustained deportation order, as noncitizen failed to raise issue earlier); *United States v. Bejar-Matrecios, 618 F.2d 81, 82 (9th Cir. 1980)* (error to disallow cross-examination on compliance with this regulation); *United States v.*

may consider regarding a noncitizen's custody status (so long as there is no final order of deportation and the noncitizen has not been released for more than seven days).[295] However, after an initial bond redetermination, subsequent requests must be made in writing and show that the noncitizen's circumstances have materially changed since the initial decision.[296]

The bond redetermination hearing is prompt and informal. It is often conducted by telephone when an IJ is not immediately available, and no formal record is made. For these reasons regulations require the IJ to consider such applications separate and apart from the deportation hearing.[297] The IJ may consider any available information in making the custody determination.[298] Counsel for the detainee should thus attempt to submit any documentary evidence into the record at the initial bond hearing to create a record for further administrative or judicial appeal. The IJ cannot redetermine custody status sua sponte, but is authorized by the regulations to rule on custody status only upon an application from the respondent.[299]

In connection with an application to redetermine the district director's custody determination, the IJ advises the applicant of the right to be represented by counsel (at no expense to the government) and of the availability of free legal services programs in the district where the application is heard, and ascertains whether the applicant has received a list of such programs and a copy of Form I-618 (Written Notice of Appeal Rights).[300] The IJ notifies the respondent and the agency orally or in writing of the reasons for the decision.

---

*Hernandez-Rojas, 617 F.2d 533, 535 (9th Cir. 1980)* (citing Calderon-Medina, court sustained conviction, as trial judge found no prejudice). The Board's position as described in *Waldron* is that absent a showing of prejudice, violation of the regulation is immaterial.

[289] *Reno v. Flores, 507 U.S. 292, 295 (1993)* (quoting *Matter of Patel, 15 I. & N. Dec. 666* (BIA 1976)); Matter of Vea, *18 I. & N. Dec. 171* (BIA 1981) (respondent in process of applying for immigrant visa, and no suggestion of inadmissibility in the record; imposition of bond unjustified since it was unlikely that respondent would jeopardize visa application by absconding); *Matter of Shaw, 17 I. & N. Dec. 177* (BIA 1979); *Matter of Spiliopoulos, 16 I. & N. Dec. 561* (BIA 1978); *Matter of Patel, 15 I. & N. Dec. 666* (BIA 1976) (employed and living with family, no arrests, even minimal bond unjustified). In determining whether a noncitizen should not be released on bond pending removal proceedings, an IJ should consider both direct and circumstantial evidence of dangerousness. *Matter of Fatahi, 26 I. & N. Dec. 791* (BIA 2016). For discussion of release of noncitizens convicted of an aggravated felony, see *infra* § 72.03[4][f][v].

[290] *O'Rourke v. Warden, 539 F. Supp. 1131, 1136 (S.D.N.Y. 1982)* (providing list of factors to consider when setting bail in a deportation case); *see Matter of Andrade, 19 I. & N. Dec. 488* (BIA 1987) (despite long residence and close family ties in United States, and early release from prison and grant of parole, BIA reversed IJ's release on own recognizance, and fixed bail at $10,000; noting, in addition to factors mentioned in text, noncitizen's long and continuing criminal record, and suggesting that the unlikelihood of continuing discretionary relief could be a negative factor, since the prospect of favorable discretion could influence a respondent's decision to appear for hearings); *Matter of Shaw, 17 I. & N. Dec. 177* (BIA 1979) (pending serious criminal charges, manner of entry unknown, no evidence of community ties, $5,000 bond upheld); *see also* Kahn & Larsen, *Bonds, Custody, and Judicial Review*, in 2 American Immigration Lawyers Association, 1994-95 Immigration and Nationality Law Handbook 533, 537 (R. Patrick Murphy ed., 1994) (discussing other positive and negative factors in setting bond).

[291] *Barbour v. District Director, 491 F.2d 573 (5th Cir.)*, cert. denied, *419 U.S. 873 (1974)*; *see* Matter of Bajwa-Singh, 2 Immigr. Rep. B1-147 (BIA Apr. 25, 1985) (nonprecedent) (citing *Barbour* and noting that where the immigration agency relies on ex parte evidence, an affidavit from a responsible immigration officer is required declaring that the disclosure of the information would be prejudicial to the public interest, safety, or security and that the document cannot be "sanitized" by deleting identifying information; "[c]onsistent with safeguarding the material and its source, the alien should be provided as much information as possible with regard to the content of the document to enable him to offer opposing evidence").

[292] 8 C.F.R. § 242.2(c)(2) (1996). Such officers are listed *supra* in § 72.03[4][e].

6 Immigration Law and Procedure § 72.03

Even if the deportation proceeding has been begun by the issuance and filing of an OSC, the IJ has no jurisdiction to make custody determinations until the noncitizen has been transferred to the custody of the agency.[301] The lodging of a detainer with the criminal authorities does not give the IJ jurisdiction until the detainer is exercised and the agency actually takes the noncitizen into custody.[302]

If the respondent has been released from custody, any application by the respondent to the IJ for redetermination of the bail or other conditions imposed must be made within seven days. After this seven-day period, jurisdiction over such requests reverts to the district director.[303] On the other hand, if the respondent remains in custody, he or she may apply to an IJ for a change in custody status at any time before the deportation order becomes administratively final.[304] For requests for redetermination of the conditions of release, the term "custody" means "actual physical restraint or confinement within a given space."[305] While such custody continues, the respondent may also request the IJ to modify the amount or terms of the bond, in effect seeking to reconsider an IJ's prior decision, without the need to make a formal motion to reopen and without a fee for such a request.[306] The IJ will not redetermine the bond conditions after there has been a breach.[307] However, only the district director can determine whether a breach of the bond has occurred.[308]

---

[293] *8 C.F.R. § 1003.19(g)*; 8 C.F.R. §§ 3.19, 242.2(i) (1996).

[294] *8 C.F.R. § 1003.19(c)*; *see* Gilboy, *Setting Bail in Deportation Cases: The Role of the Immigration Judge,* 24 San Diego L. Rev. 347 (1987).

[295] *See* 8 C.F.R. § 242.2(d) (1995); *Matter of Uluocha, 20 I. & N. Dec. 133* (BIA 1989).

[296] *8 C.F.R. § 1003.19(e).*

[297] *8 C.F.R. § 1003.19(d)*; *see Matter of P-C-M-, 20 I. & N. Dec. 432* (BIA 1991) (emphasizing the need to avoid intermingling the custody determinations and the hearing on the merits); *Matter of Chirinos, 16 I. & N. Dec. 276* (BIA 1977).

[298] *8 C.F.R. § 1003.19(d).*

[299] *Matter of P-C-M-, 20 I. & N. Dec. 432* (BIA 1991).

[300] 8 C.F.R. § 242.2(d) (1995).

[301] *Matter of Sanchez, 20 I. & N. Dec. 223* (BIA 1990).

[302] *Id.; see also supra* §§ 72.02[2][b], 72.03[4][b][ii].

[303] *Matter of Sio, 18 I. & N. Dec. 176* (BIA 1981) (appeal dismissed as untimely); *cf.* Matter of Vea, *18 I. & N. Dec. 171* (BIA 1981) (appeal made late, but Board accepted review by certification); 8 C.F.R. § 242.2(d) (1995).

[304] See *Matter of Uluocha, 20 I. & N. Dec. 133* (BIA 1989).

[305] *See Matter of Aguilar-Aquino, 24 I. & N. Dec. 747* (BIA 2009) (finding that a noncitizen released from DHS detention with conditions requiring an electronic monitoring device and home confinement was "released from custody," since such conditions were "terms of release" and not "official detention").

[306] *Id.* Although such action is unusual, the IJ may increase the amount of bond fixed by the immigration agency. *Matter of Spiliopoulos, 16 I. & N. Dec. 561* (BIA 1978).

6 Immigration Law and Procedure § 72.03

### [B] Conditions on Appearance Bond

When release on bail is authorized, the bond, frequently called a delivery or appearance bond, is furnished to the noncitizen. Among the conditions for release on bond or parole are that the noncitizen will appear for hearing and for deportation, if ordered, and for further detention, if required. Release from custody of an arrested noncitizen may be revoked at any time, and any outstanding, unbreached bond canceled, in the discretion of the district director, acting district director, deputy district director, assistant district director for investigations, or officer in charge at designated major suboffices. In the event of such revocation the respondent has the right to seek further consideration and review, in the manner described in the next paragraphs.[309]

For a number of years the Service sought to impose a condition in appearance bonds prohibiting the noncitizen from accepting unauthorized employment. The Attorney General endorsed the propriety of such a condition, provided it was specifically authorized by regulation.[310] Regulations adopted in 1974 authorized, and as amended in 1983 required, the inclusion of a condition barring employment in all appearance bonds for release in deportation or exclusion proceedings.[311] Litigation stayed the validity of this regulation for several years. However, in 1991 the Supreme Court upheld the regulation.[312]

Interim release on bond or parole was refused in relatively few cases, except for aggravated felons. The bond refusals for non-aggravated felons have usually occurred only in cases in which it may reasonably be suspected that the noncitizen will flee.[313] The power to fix administrative bail or, in appropriate cases, to deny bail is not altered by the fact that the respondent claims to be a U.S. citizen.[314]

A person in deportation proceedings may also be prosecuted or have been convicted for a crime. The grant of bail or parole in the criminal case does not deprive the Attorney General of discretion in resolving the noncitizen's custody, including the possible denial of bail, in the deportation proceedings.[315] However, in exercising such discretion the Attorney General will take into account the disposition in the criminal proceeding. When a

---

[307] *Matter of Reczynski, 15 I. & N. Dec. 598 (BIA 1976).*

[308] *Id.*

[309] 8 C.F.R. § 242.2(e) (1995).

[310] *Matter of Toscano-Rivas, 14 I. & N. Dec. 523* (Att'y Gen. 1974).

[311] *8 C.F.R. § 103.6(a)(2).*

[312] *INS v. National Center for Immigrants' Rights, 502 U.S. 183 (1991).*

[313] *See Hernandez-Avila v. Boyd, 294 F.2d 373 (9th Cir. 1961)* (previous history of absconding from criminal prosecution; $25,000 bail upheld); *Application of Marks, 198 F. Supp. 40 (S.D.N.Y. 1961)* (previous history of absconding from criminal prosecution; *Matter of Moise, 12 I. & N. Dec. 102* (BIA 1967) (recently admitted as TWOV transit, clear intention to violate status and to remain indefinitely); *Matter of S-Y-L-, 9 I. & N. Dec. 575* (BIA 1962) (recently arrived crewmen, no family ties or fixed place of abode in United States).

[314] *Hernandez-Avila v. Boyd, 294 F.2d 373 (9th Cir. 1961)* ($25,000 bail upheld); *Application of Marks, 198 F. Supp. 40 (S.D.N.Y. 1961)* (denial of bail upheld).

[315] *Application of Bruno, 224 F. Supp. 152 (D.P.R. 1963)* (exclusion case); *In re Application of Molina, 167 F. Supp. 655 (S.D.N.Y. 1958).*

6 Immigration Law and Procedure § 72.03

noncitizen granted bail in criminal proceedings is detained by the immigration agency, the court may require the noncitizen's production in the criminal proceeding. The noncitizen cannot be removed from the court's jurisdiction, without its permission, while the criminal case is pending.[316] Moreover, in exercising discretion, the Attorney General must take into account the custody directives of the criminal court and must avoid fixing additional bail that is unnecessary or excessive to ensure the noncitizen's availability for deportation.[317]

Dangerous noncitizens, however, may be detained without bond, and the IJ should set bond only after first determining that the noncitizen does not present a danger to the community.[318] For aggravated felons, there is a rebuttable presumption of such a danger.[319] The noncitizen bears the burden of establishing that his or her release would not pose a danger to persons or property.[320]

### [iii] Appeal to BIA

The respondent and the agency may challenge an IJ's bond decision by appeal to the Board of Immigration Appeals. The notice of appeal must be filed within ten days after the bond determination, or thirteen days if the decision was by mail.[321] If the IJ no longer has jurisdiction because the deportation order has become administratively final, or because the seven-day period for recourse to the IJ has expired, the district director has jurisdiction to make determinations regarding the respondent's custody, and the respondent can challenge that custody determination by direct appeal to the Board.[322]

Because no record may have been made at the hearing before the IJ, the bail record forwarded to the Board on such appeal, in addition to the IJ's memorandum, may contain any information that will be helpful to the Board.[323] The IJ's memorandum should be issued contemporaneously with the order fixing the amount of the bond.[324] There is no fee for taking an appeal to the Board from an IJ's or a district director's custody decision.[325]

---

[316] *Application of Bruno, 224 F. Supp. 152 (D.P.R. 1963).*

[317] *Application of Maringolo, 303 F. Supp. 1389 (S.D.N.Y. 1969)* (additional administrative bail found unnecessary, court bail extended to ensure appearance in deportation proceeding); *Matter of San Martin, 15 I. & N. Dec. 167* (BIA 1974) (additional immigration bail necessary in light of previous bail forfeiture in criminal proceedings, immigration violations, and lack of family ties in United States; criteria of Bail Reform Act, *18 U.S.C. § 3146*, taken into account).

[318] *Matter of Urena, 25 I. & N. Dec. 140, 141 (BIA 2009)*; *Matter of Guerra, 24 I. & N. Dec. 37, 38 (BIA 2006).*

[319] *Matter of Drysdale, 20 I. & N. Dec. 815, 816–17 (BIA 1994).*

[320] *Matter of Adeniji, 22 I. & N. Dec. 1102, 1113 (BIA 1999).*

[321] 8 C.F.R. § 3.38(b).

[322] *Matter of Chew, 18 I. & N. Dec. 262* (BIA 1982) (modifying dictum in Matter of Vea, *18 I & N. Dec. 171* (BIA 1981)); 8 C.F.R. § 242.2(d) (1995).

[323] *Matter of Chirinos, 16 I. & N. Dec. 276* (BIA 1977).

[324] *Matter of Spiliopoulos, 16 I. & N. Dec. 561* (BIA 1978).

[325] *8 C.F.R. § 103.7.*

Filing such an appeal does not operate to delay compliance with the custody directive from which the appeal is taken. Nor does taking an appeal stay deportation proceedings or halt actual deportation.[326] Moreover, the foregoing provisions regarding notice and appeal do not apply where the agency notifies the noncitizen that it is ready to execute the order of deportation and takes him or her into custody for that purpose.[327] However, appeal to the Board challenging the district director's determinations regarding custody is not precluded when deportation is stayed during the pendency of proceedings for judicial review brought after the noncitizen is taken into custody for the purpose of executing the deportation order.[328] Under regulations, the IJ has no authority to review the district director's custody determinations after the deportation order becomes administratively final. Only the Board can review such determinations.[329]

The Board's decision is issued in writing, usually in the form of an opinion. The Board can deny release on bond on the basis of undisclosed information, provided disclosure of the information would be prejudicial to the public interest, safety, or security.[330]

### [iv] Judicial Review

An individual arrested will usually be granted release on bail, except for noncitizens convicted of aggravated felonies.[331] If bail is refused or is believed to be excessive, the arrestee can obtain judicial aid through habeas corpus, after exhausting administrative remedies, in challenging arbitrary refusals of such release.[332] However, a court "will generally review a custody determination only for abuse of discretion or for [absence of] facially legitimate reasons for the decision."[333] However, where the INS had not yet begun proceedings to determine deportability but had merely lodged a detainer while the prisoner was held by criminal authorities,[334] courts refused to grant habeas jurisdiction.[335]

---

[326] 8 C.F.R. § 242.2(d) (1995).

[327] *Matter of Tsoi, 14 I. & N. Dec. 205* (BIA 1972); *Matter of Guerra, 13 I. & N. Dec. 40* (BIA 1968).

[328] *Matter of Au, 13 I. & N. Dec. 133* (BIA 1968).

[329] 8 C.F.R. § 242.2(d) (1995).

[330] *Barbour v. District Director, 491 F.2d 573 (5th Cir. 1974); see* Matter of Bajwa-Singh, 2 Immigr. Rep. B1-147 (BIA Apr. 25, 1985) (citing *Barbour* and noting that where the INS relies on ex parte evidence, an affidavit from a responsible immigration officer is required declaring that the disclosure of the information would be prejudicial to the public interest, safety, or security and that the document cannot be "sanitized" by deleting identifying information; "[c]onsistent with safeguarding the material and its source, the alien should be provided as much information as possible with regard to the content of the document to enable him to offer opposing evidence").

[331] *See infra* § 72.03[4][f][v].

[332] *INA § 242(a)(1), 8 U.S.C. § 1252(a)(1)*; *see infra* § 104.04.

[333] Robert E. Kahn & Jeffery Larsen, Bonds, Custody, and Judicial Review, 2 American Immigration Lawyers Association, 1994-95 Immigration and Nationality Law Handbook 533, 548 (R. Patrick Murphy ed., 1994).

[334] *See supra* § 72.03[4][b].

[335] *See Roldan v. Racette, 984 F.2d 85 (2d Cir. 1993); Orozco v. United States INS, 911 F.2d 539 (11th Cir. 1990); Campillo v. Sullivan, 853 F.2d 593 (8th Cir. 1988); cf. Guti v. INS, 908 F.2d 495 (9th Cir. 1990); Vargas v. Swan, 854 F.2d 1028 (7th Cir. 1988). See generally infra* § 104.04[4][b].

6 Immigration Law and Procedure § 72.03

An immigration officer who violates the constitutional rights of an arrestee may be sued civilly under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*.[336] As the doctrine of sovereign immunity bars most suits against federal officers in their official capacities and the federal agency itself,[337] plaintiffs bring such *Bivens* suits against federal officers in their individual capacities for actions taken in the scope of employment.[338] Recoverable damages include actual, compensatory, and punitive damages.[339]

An analogous form of relief under the Federal Torts Claims Act (FTCA)[340] waives sovereign immunity for the torts of federal law enforcement officers acting within the scope of their employment. Under the FTCA, injured parties bring claims against the United States, and may recover damages for personal injury or property damage.[341] Damages available in an FTCA action include actual and compensatory damages, but not punitive damages.[342] A plaintiff who recovers against the government under the FTCA likely will be barred from recovering against federal officers under *Bivens*.[343]

An individual whose constitutional or federal rights have been violated by state or local actions may be able to bring an action under *42 U.S.C. § 1983*.[344] Plaintiffs in § 1983 actions can obtain damages and equitable relief. Punitive damages are available only against public officials acting in their individual, rather than official, capacities.[345]

An officer who willfully deprives a person of constitutional rights also may be subject to criminal penalties.[346]

## [v] Restrictions on Release from Custody for a Noncitizen Convicted of an Aggravated Felony

---

[336] *403 U.S. 388 (1971)*; *see infra* §§ 104.11[9], 109.02[3].

[337] *See infra* § 104.11[9].

[338] *See* Lee Teran, Federal Damage Claims and Administrative Complaints to Remedy INS Misconduct, in 2 American Immigration Lawyers Association, 1995-96 Immigration & Nationality Law Handbook 391, 393 (R. Patrick Murphy ed., 1995); Chiao, *supra* note 212, at nn.353–56 and related text.

[339] *See* Chiao, *supra* note 212, at nn.357–59 and related text.

[340] *28 U.S.C. §§ 2671–80*.

[341] *See* Teran, *supra* note 338, at 397.

[342] *Id. at 398*; *see* Chiao, *supra* note 212, at n.370 and related text; *infra* § 109.02[1].

[343] *Arevalo v. Woods, 811 F.2d 487, 490 (9th Cir. 1987)*.

[344] *See* Chiao, *supra* note 212, at n.386 and related text.

[345] *Id.* at nn. 402–06. See generally *infra* § 109.02[2], 109.03[2].

[346] **18 U.S.C. § 242**; *United States v. McDermott, 918 F.2d 319 (2d Cir. 1990)* (New York City transit officers criminally liable after falsely arresting lawful permanent resident on subway without probable cause and in bad faith); *Arizona v. Manypenny, 445 F. Supp. 1123 (D. Ariz. 1977)* (state prosecution against Border Patrol agent for assault with a deadly weapon).

In general, noncitizens in deportation proceedings are not detained or required to post a bond unless the agency demonstrates that they are threats to the community or likely to abscond.[347] However, noncitizens convicted of an aggravated felony are subject to the more exacting rules discussed below.

A 1988 statute required the Attorney General to take into custody pending deportation proceedings any noncitizen convicted of an aggravated felony, after completion of his or her sentence. This legislation directed the Attorney General not to release such noncitizens from custody under any circumstances[348] and to detain them, to the maximum extent possible, at facilities where other such noncitizens were detained.[349] However, in selecting such facilities, the Attorney General was required to make reasonable efforts to ensure that the noncitizens' access and right to counsel were not impaired.

The Immigration Act of 1990 amended the INA to provide that an aggravated felon shall be detained without bond upon release, regardless of whether such release is on parole, supervised release, or probation, and regardless of whether rearrest or further confinement for the offense is a possibility.[350] In addition, the 1990 Act provided that lawful permanent residents convicted of aggravated felonies could be released on bond if the Attorney General determined that they were likely to appear for scheduled hearings and did not create a threat to the community.[351]

The provision regarding the release from custody of an noncitizen convicted of an aggravated felony was further amended by 1991 legislation, which allowed release of "lawfully admitted" aggravated felons who demonstrate to the satisfaction of the Attorney General that they are not a threat to the community and are likely to appear at future scheduled hearings.[352]

In the BIA's view, former *INA § 242*, *8 U.S.C. § 1252*, provided that lawfully admitted aggravated felons are subject to a rebuttable presumption against release and, to obtain release, have the burden of demonstrating that they are not a threat to the community and are unlikely to abscond.[353] However, once such a noncitizen rebuts the presumption, the likelihood that he

---

[347] *See supra* § 72.03[4][f][i].

[348] Anti-Drug Abuse Act of 1988, **Pub. L. No. 100-690**, § 7343(a), **102 Stat. 4181** (adding **INA § 242(a)(2)**, **8 U.S.C. § 1252(a)(2)**). The BIA has held that "completion of the alien's sentence" (as provided in then-**INA § 242(a)(2)**) refers to the completion of the incarceration or confinement ordered by the court for the conviction. *Matter of Eden, 20 I. & N. Dec. 209* (BIA 1990); *see Paxton v. U.S. INS, 745 F. Supp. 1261 (E.D. Mich. 1990)* (court rejected noncitizen's contention that **INA § 242(a)(2)** could not be applied to him until probationary period of sentence is completed; citing *Matter of Eden*, the court concluded that "sentence" refers to the period of actual confinement); *Morrobel v. Thornburgh, 744 F. Supp. 725, 729 (E.D. Va. 1990)* (the word "sentence," while not defined in the Act, "is not limited to one clear meaning and … refers to the period of incarceration or confinement ordered by the court").

[349] INA § 242A(b), *8 U.S.C. § 1252a(b), as added by* Anti-Drug Abuse Act of 1988, **Pub. L. No. 100-690**, § 7347, **102 Stat. 4181**.

[350] Immigration Act of 1990, **Pub. L. No. 101-649**, § 504, **104 Stat. 4978**, 5049 (amending **INA § 242(a)(2)**, **8 U.S.C. § 1252(a)(2)**).

[351] *Id.* (adding **INA § 242(a)(2)(B)**, **8 U.S.C. § 1252(a)(2)(B)**).

[352] Miscellaneous and Technical Immigration and Naturalization Amendments of 1991 (MTINA), **Pub. L. No. 102-232**, § 306(a)(4), **105 Stat. 1733**; *see* 8 C.F.R. §§ 3.19(h), 242.2(h) (1995). The BIA has noted the 1991 statutory amendment's substitution of "lawfully admitted alien" for "lawfully admitted for permanent residence," and has ruled that the statute's authorization for discretionary release from custody applies to aggravated felons who originally were lawfully admitted, even if such admission was not for permanent residence. *Matter of Ellis, 20 I. & N. Dec. 641* (BIA 1992) (respondent found to be threat to community and bail risk, release denied).

[353] *See Matter of Ellis, 20 I. & N. Dec. 641* (BIA 1992) (modifying *Matter of De La Cruz, 20 I. & N. Dec. 346* (BIA 1991)).

or she will appear for future proceedings is relevant in setting the amount of bond.[354] The restrictions on bond for aggravated felons are activated only if the noncitizen was convicted after the effective date of the legislation making the particular offense an aggravated felony.[355] Moreover, one court has held that the bond restrictions apply only if the noncitizen was charged as an aggravated felon in the OSC.[356]

Noncitizens convicted of drug-trafficking crimes that could render them deportable as aggravated felons challenged former *INA § 242(a)(2)* on the ground that since their convictions were under state law, they were not subject to the restrictions on aggravated felons.[357] In rejecting these challenges, the BIA and courts held that Congress intended to include state convictions that could have been brought under federal law if federal authorities had prosecuted the crime charged.[358] In addition, noncitizens confined after aggravated-felony convictions and then taken into custody at the completion of their sentences pursuant to former *INA § 242(a)(2)* have challenged their detentions on constitutional grounds. While some courts held that the statute is unconstitutional in that it violates due process and/or the Bail Clause of the *Eighth Amendment*,[359] other courts upheld its constitutionality.[360]

---

[354] *See Matter of Drysdale, 20 I. & N. Dec. 815* (BIA 1994).

[355] *Matter of A-A-, 20 I. & N. Dec. 492* (BIA 1992).

[356] *See Probert v. INS, 954 F.2d 1253 (6th Cir. 1992)*. In a later case, the Sixth Circuit rejected a noncitizen's reliance on *Probert*, stating that *Probert* should be read narrowly and noting that the parties in *Probert* acknowledged that the case had been mooted by a statutory amendment. *Nakhleh v. INS, 38 F.3d 829 (6th Cir. 1994)*.

[357] The Immigration Act of 1990, **Pub. L. No. 101-649**, § 501, **104 Stat. 4978**, 5048, amended **INA § 101(a)(43)** in various respects, including providing that the term "aggravated felony" applies to the offenses listed in **INA § 101(a)(43)** "whether in violation of Federal or state law." The statutory definition of aggravated felony is set forth *supra* in § 71.05[2][b].

[358] *Paxton v. U.S. INS, 745 F. Supp. 1261 (E.D. Mich. 1990)* (holding that **INA § 242(a)(2)** "was intended to encompass all comparable criminal activity that would be prosecuted under state law"); *Leader v. Blackman, 744 F. Supp. 500 (S.D.N.Y. 1990)*; *see Kellman v. District Director, USINS, 750 F. Supp. 625, 626 (S.D.N.Y. 1990)* (noncitizen who pleaded guilty in state court to attempted criminal sale of controlled substance and was sentenced to prison term of one to three years was an "aggravated felon" within the meaning of the INA; although noncitizen was not convicted of violating the Controlled Substance Act, his conduct was "punishable under" that statute, "and thus constituted a drug trafficking crime qualifying him as an aggravated felon under the INA"); *Matter of L-G-, 21 I. & N. Dec. 89 (BIA 1995)*; *Matter of Davis, 20 I. & N. Dec. 536* (BIA 1992); *Matter of Barrett, 20 I. & N. Dec. 171* (BIA 1992); *see also supra* § 71.05[2][d][iv][C][II] ("hypothetical federal felony" approach).

[359] *Kellman v. District Director, USINS, 750 F. Supp. 625 (S.D.N.Y. 1990)* (**INA § 242(a)(2)** denial of bail to aggravated felon awaiting deportation held violative of noncitizen's substantive and procedural due process rights); *Probert v. United States INS, 750 F. Supp. 252 (E.D. Mich. 1990)* (noncitizen convicted of importation of drugs, sentenced to a term of three months, given three years' supervised release and a judicial recommendation against deportation, held not subject to enforcement of mandatory-detention provision of **INA § 242**; the court held that **INA § 242(a)(2)** "violates substantive and procedural due process [and] is shocking to the conscience and interferes with the rights implicit in the concept of ordered liberty"), *aff'd on other grounds, 954 F.2d 1253 (6th Cir. 1992)*; *Paxton v. United States INS, 745 F. Supp. 1261 (E.D. Mich. 1990)* (statute held violative of: (1) substantive due process by failing to provide noncitizen a bail hearing; (2) procedural due process as a result of the blanket prohibition against bail for a noncitizen who has been convicted of an aggravated felony; and (3) the **Eighth Amendment**, since a mandatory denial of bail is authorized); *Agunobi v. Thornburgh, 745 F. Supp. 533 (N.D. Ill. 1990)* (statute section held violative of both the **Fifth** and **Eighth Amendments**); *Leader v. Blackman, 744 F. Supp. 500 (S.D.N.Y. 1990)* (statute section violative of substantive and procedural due process and the **Eighth Amendment's** prohibition against excessive bail; however, no violation of equal protection, since Congress's classification of drug trafficking as an aggravated felony "was a rational way of attempting to combat a serious and compelling national problem").

6 Immigration Law and Procedure § 72.03

For a discussion of detention and release issues under current law, see chapter 108, below.

### [vi] Detention and Release of Noncitizen Minors

The Service adopted special protective rules, applicable in both exclusion and deportation proceedings, for the release from custody of juveniles. These rules are discussed in § 61.05[5], above.

Immigration Law and Procedure
Copyright 2018, Matthew Bender & Company, Inc., a member of the LexisNexis Group.

---

**End of Document**

---

[360] *See Le Dinh Tran v. Caplinger, 847 F. Supp. 469 (W.D. La. 1993)* (no violation of due process, equal protection, or the **Eighth Amendment**); *Davis v. Weiss, 749 F. Supp. 47 (D. Conn. 1990)* (no due process violation; the "government's interest in detaining these certain classes of aliens pending deportation is weighty. This provision is part of an Act which is clearly designed to supplement Congress' comprehensive assault on drugs"); *Morrobel v. Thornburgh, 744 F. Supp. 725 (E.D. Va. 1990)* (no violation of substantive or procedural due process, and no violation of **Eighth Amendment**).

# EXHIBIT 54

# The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others

The Department of Homeland Security's proposed policy to prioritize the removal of certain aliens unlawfully present in the United States would be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of U.S. citizens and legal permanent residents would also be a permissible exercise of DHS's discretion to enforce the immigration laws.

The Department of Homeland Security's proposed deferred action program for parents of recipients of deferred action under the Deferred Action for Childhood Arrivals program would not be a permissible exercise of DHS's enforcement discretion.

November 19, 2014

MEMORANDUM OPINION FOR THE SECRETARY OF HOMELAND SECURITY
AND THE COUNSEL TO THE PRESIDENT

You have asked two questions concerning the scope of the Department of Homeland Security's discretion to enforce the immigration laws. First, you have asked whether, in light of the limited resources available to the Department ("DHS") to remove aliens unlawfully present in the United States, it would be legally permissible for the Department to implement a policy prioritizing the removal of certain categories of aliens over others. DHS has explained that although there are approximately 11.3 million undocumented aliens in the country, it has the resources to remove fewer than 400,000 such aliens each year. DHS's proposed policy would prioritize the removal of aliens who present threats to national security, public safety, or border security. Under the proposed policy, DHS officials could remove an alien who did not fall into one of these categories provided that an Immigration and Customs Enforcement ("ICE") Field Office Director determined that "removing such an alien would serve an important federal interest." Draft Memorandum for Thomas S. Winkowski, Acting Director, ICE, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Policies for the Apprehension, Detention, and Removal of Undocumented Immigrants* at 5 (Nov. 17, 2014) ("Johnson Prioritization Memorandum").

Second, you have asked whether it would be permissible for DHS to extend deferred action, a form of temporary administrative relief from removal, to certain aliens who are the parents of children who are present in the United States. Specifically, DHS has proposed to implement a program under which an alien could apply for, and would be eligible to receive, deferred action if he or she is not a DHS removal priority under the policy described above; has continuously resided in the United States since before January 1, 2010; has a child who is either a U.S. citizen or a lawful permanent resident; is physically present in the United

States both when DHS announces its program and at the time of application for deferred action; and presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Draft Memorandum for Leon Rodriguez, Director, U.S. Citizenship and Immigration Services, et al., from Jeh Charles Johnson, Secretary of Homeland Security, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and Others* at 4 (Nov. 17, 2014) ("Johnson Deferred Action Memorandum"). You have also asked whether DHS could implement a similar program for parents of individuals who have received deferred action under the Deferred Action for Childhood Arrivals ("DACA") program.

As has historically been true of deferred action, these proposed deferred action programs would not "legalize" any aliens who are unlawfully present in the United States: Deferred action does not confer any lawful immigration status, nor does it provide a path to obtaining permanent residence or citizenship. Grants of deferred action under the proposed programs would, rather, represent DHS's decision not to seek an alien's removal for a prescribed period of time. *See generally Reno v. Am.-Arab Anti-Discrim. Comm.*, 525 U.S. 471, 483–84 (1999) (describing deferred action). Under decades-old regulations promulgated pursuant to authority delegated by Congress, *see* 8 U.S.C. §§ 1103(a)(3), 1324a(h)(3), aliens who are granted deferred action—like certain other categories of aliens who do not have lawful immigration status, such as asylum applicants—may apply for authorization to work in the United States in certain circumstances, 8 C.F.R. § 274a.12(c)(14) (providing that deferred action recipients may apply for work authorization if they can show an "economic necessity for employment"); *see also* 8 C.F.R. § 109.1(b)(7) (1982). Under DHS policy guidance, a grant of deferred action also suspends an alien's accrual of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I), provisions that restrict the admission of aliens who have departed the United States after having been unlawfully present for specified periods of time. A grant of deferred action under the proposed programs would remain in effect for three years, subject to renewal, and could be terminated at any time at DHS's discretion. *See* Johnson Deferred Action Memorandum at 2, 5.

For the reasons discussed below, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be permissible exercises of DHS's discretion to enforce the immigration laws. We further conclude that, as it has been described to us, the proposed deferred action program for parents of DACA recipients would not be a permissible exercise of enforcement discretion.

## I.

We first address DHS's authority to prioritize the removal of certain categories of aliens over others. We begin by discussing some of the sources and limits of

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

DHS's enforcement discretion under the immigration laws, and then analyze DHS's proposed prioritization policy in light of these considerations.

### A.

DHS's authority to remove aliens from the United States rests on the Immigration and Nationality Act of 1952 ("INA"), as amended, 8 U.S.C. §§ 1101 *et seq.* In the INA, Congress established a comprehensive scheme governing immigration and naturalization. The INA specifies certain categories of aliens who are inadmissible to the United States. *See* 8 U.S.C. § 1182. It also specifies "which aliens may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 132 S. Ct. 2492, 2499 (2012). "Aliens may be removed if they were inadmissible at the time of entry, have been convicted of certain crimes, or meet other criteria set by federal law." *Id.* (citing 8 U.S.C. § 1227); *see* 8 U.S.C. § 1227(a) (providing that "[a]ny alien . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien" falls within one or more classes of deportable aliens); *see also* 8 U.S.C. § 1182(a) (listing classes of aliens ineligible to receive visas or be admitted to the United States). Removal proceedings ordinarily take place in federal immigration courts administered by the Executive Office for Immigration Review, a component of the Department of Justice. *See id.* § 1229a (governing removal proceedings); *see also id.* §§ 1225(b)(1)(A), 1228(b) (setting out expedited removal procedures for certain arriving aliens and certain aliens convicted of aggravated felonies).

Before 2003, the Department of Justice, through the Immigration and Naturalization Service ("INS"), was also responsible for providing immigration-related administrative services and generally enforcing the immigration laws. In the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, Congress transferred most of these functions to DHS, giving it primary responsibility both for initiating removal proceedings and for carrying out final orders of removal. *See* 6 U.S.C. §§ 101 *et seq.*; *see also Clark v. Martinez*, 543 U.S. 371, 374 n.1 (2005) (noting that the immigration authorities previously exercised by the Attorney General and INS "now reside" in the Secretary of Homeland Security and DHS). The Act divided INS's functions among three different agencies within DHS: U.S. Citizenship and Immigration Services ("USCIS"), which oversees legal immigration into the United States and provides immigration and naturalization services to aliens; ICE, which enforces federal laws governing customs, trade, and immigration; and U.S. Customs and Border Protection ("CBP"), which monitors and secures the nation's borders and ports of entry. *See* Pub. L. No. 107-296, §§ 403, 442, 451, 471, 116 Stat. 2135, 2178, 2193, 2195, 2205; *see also Name Change From the Bureau of Citizenship and Immigration Services to U.S. Citizenship and Immigration Services*, 69 Fed. Reg. 60938, 60938 (Oct. 13, 2004); *Name Change of Two DHS Components*, 75 Fed. Reg. 12445, 12445 (Mar. 16, 2010). The Secretary of Homeland Security is thus now "charged with the administration and

3

enforcement of [the INA] and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1).

As a general rule, when Congress vests enforcement authority in an executive agency, that agency has the discretion to decide whether a particular violation of the law warrants prosecution or other enforcement action. This discretion is rooted in the President's constitutional duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and it reflects a recognition that the "faithful[]" execution of the law does not necessarily entail "act[ing] against each technical violation of the statute" that an agency is charged with enforcing. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Rather, as the Supreme Court explained in *Chaney*, the decision whether to initiate enforcement proceedings is a complex judgment that calls on the agency to "balanc[e] . . . a number of factors which are peculiarly within its expertise." *Id.* These factors include "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and . . . whether the agency has enough resources to undertake the action at all." *Id.* at 831; *cf. United States v. Armstrong*, 517 U.S. 456, 465 (1996) (recognizing that exercises of prosecutorial discretion in criminal cases involve consideration of "'[s]uch factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan'" (quoting *Wayte v. United States*, 470 U.S. 598, 607 (1985))). In *Chaney*, the Court considered and rejected a challenge to the Food and Drug Administration's refusal to initiate enforcement proceedings with respect to alleged violations of the Federal Food, Drug, and Cosmetic Act, concluding that an agency's decision not to initiate enforcement proceedings is presumptively immune from judicial review. *See* 470 U.S. at 832. The Court explained that, while Congress may "provide[] guidelines for the agency to follow in exercising its enforcement powers," in the absence of such "legislative direction," an agency's non-enforcement determination is, much like a prosecutor's decision not to indict, a "special province of the Executive." *Id.* at 832–33.

The principles of enforcement discretion discussed in *Chaney* apply with particular force in the context of immigration. Congress enacted the INA against a background understanding that immigration is "a field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950) (internal quotation marks omitted). Consistent with this understanding, the INA vested the Attorney General (now the Secretary of Homeland Security) with broad authority to "establish such regulations; . . . issue such instructions; and perform such other acts as he deems necessary for carrying out his authority" under the statute. 8 U.S.C. § 1103(a)(3). Years later, when Congress created the Department of Homeland Security, it expressly charged DHS with responsibility for "[e]stablishing national immigration enforcement policies and

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

priorities." Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. § 202(5)).

With respect to removal decisions in particular, the Supreme Court has recognized that "the broad discretion exercised by immigration officials" is a "principal feature of the removal system" under the INA. *Arizona*, 132 S. Ct. at 2499. The INA expressly authorizes immigration officials to grant certain forms of discretionary relief from removal for aliens, including parole, 8 U.S.C. § 1182(d)(5)(A); asylum, *id.* § 1158(b)(1)(A); and cancellation of removal, *id.* § 1229b. But in addition to administering these statutory forms of relief, "[f]ederal officials, as an initial matter, must decide whether it makes sense to pursue removal at all." *Arizona*, 132 S. Ct. at 2499. And, as the Court has explained, "[a]t each stage" of the removal process—"commenc[ing] proceedings, adjudicat[ing] cases, [and] execut[ing] removal orders"—immigration officials have "discretion to abandon the endeavor." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483 (quoting 8 U.S.C. § 1252(g) (alterations in original)). Deciding whether to pursue removal at each of these stages implicates a wide range of considerations. As the Court observed in *Arizona*:

> Discretion in the enforcement of immigration law embraces immediate human concerns. Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime. The equities of an individual case may turn on many factors, including whether the alien has children born in the United States, long ties to the community, or a record of distinguished military service. Some discretionary decisions involve policy choices that bear on this Nation's international relations. . . . The foreign state may be mired in civil war, complicit in political persecution, or enduring conditions that create a real risk that the alien or his family will be harmed upon return. The dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy with respect to these and other realities.

132 S. Ct. at 2499.

Immigration officials' discretion in enforcing the laws is not, however, unlimited. Limits on enforcement discretion are both implicit in, and fundamental to, the Constitution's allocation of governmental powers between the two political branches. *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587–88 (1952). These limits, however, are not clearly defined. The open-ended nature of the inquiry under the Take Care Clause—whether a particular exercise of discretion is "faithful[]" to the law enacted by Congress—does not lend itself easily to the application of set formulas or bright-line rules. And because the exercise of enforcement discretion generally is not subject to judicial review, *see*

*Chaney*, 470 U.S. at 831–33, neither the Supreme Court nor the lower federal courts have squarely addressed its constitutional bounds. Rather, the political branches have addressed the proper allocation of enforcement authority through the political process. As the Court noted in *Chaney*, Congress "may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." *Id.* at 833. The history of immigration policy illustrates this principle: Since the INA was enacted, the Executive Branch has on numerous occasions exercised discretion to extend various forms of immigration relief to categories of aliens for humanitarian, foreign policy, and other reasons. When Congress has been dissatisfied with Executive action, it has responded, as *Chaney* suggests, by enacting legislation to limit the Executive's discretion in enforcing the immigration laws.[1]

Nonetheless, the nature of the Take Care duty does point to at least four general (and closely related) principles governing the permissible scope of enforcement discretion that we believe are particularly relevant here. First, enforcement decisions should reflect "factors which are peculiarly within [the enforcing agency's] expertise." *Chaney*, 470 U.S. at 831. Those factors may include considerations related to agency resources, such as "whether the agency has enough resources to undertake the action," or "whether agency resources are best spent on this violation or another." *Id.* Other relevant considerations may include "the proper ordering of [the agency's] priorities," *id.* at 832, and the agency's assessment of "whether the particular enforcement action [at issue] best fits the agency's overall policies," *id.* at 831.

Second, the Executive cannot, under the guise of exercising enforcement discretion, attempt to effectively rewrite the laws to match its policy preferences. *See id.* at 833 (an agency may not "disregard legislative direction in the statutory scheme that [it] administers"). In other words, an agency's enforcement decisions should be consonant with, rather than contrary to, the congressional policy underlying the statutes the agency is charged with administering. *Cf. Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb."); *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (explaining that where Congress has given an agency the power to administer a statutory scheme, a court will not vacate the agency's decision about the proper administration of the statute unless, among other things, the agency "'has relied on factors which Congress had not intended it to consider'" (quoting

---

[1] *See, e.g.*, Adam B. Cox & Cristina M. Rodríguez, *The President and Immigration Law*, 119 Yale L.J. 458, 503–05 (2009) (describing Congress's response to its dissatisfaction with the Executive's use of parole power for refugee populations in the 1960s and 1970s); *see also, e.g., infra* note 5 (discussing legislative limitations on voluntary departure and extended voluntary departure).

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

Third, the Executive Branch ordinarily cannot, as the Court put it in *Chaney*, "'consciously and expressly adopt[] a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities." 470 U.S. at 833 n.4 (quoting *Adams v. Richardson*, 480 F.2d 1159, 1162 (D.C. Cir. 1973) (en banc)); *see id.* (noting that in situations where an agency had adopted such an extreme policy, "the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion'"). Abdication of the duties assigned to the agency by statute is ordinarily incompatible with the constitutional obligation to faithfully execute the laws. *But see, e.g., Presidential Authority to Decline to Execute Unconstitutional Statutes*, 18 Op. O.L.C. 199, 200 (1994) (noting that under the Take Care Clause, "the President is required to act in accordance with the laws—including the Constitution, which takes precedence over other forms of law").

Finally, lower courts, following *Chaney*, have indicated that non-enforcement decisions are most comfortably characterized as judicially unreviewable exercises of enforcement discretion when they are made on a case-by-case basis. *See, e.g., Kenney v. Glickman*, 96 F.3d 1118, 1123 (8th Cir. 1996); *Crowley Caribbean Transp., Inc. v. Peña*, 37 F.3d 671, 676–77 (D.C. Cir. 1994). That reading of *Chaney* reflects a conclusion that case-by-case enforcement decisions generally avoid the concerns mentioned above. Courts have noted that "single-shot non-enforcement decisions" almost inevitably rest on "the sort of mingled assessments of fact, policy, and law . . . that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion." *Crowley Caribbean Transp.*, 37 F.3d at 676–77 (emphasis omitted). Individual enforcement decisions made on the basis of case-specific factors are also unlikely to constitute "general polic[ies] that [are] so extreme as to amount to an abdication of [the agency's] statutory responsibilities." *Id.* at 677 (quoting *Chaney*, 477 U.S. at 833 n.4). That does not mean that all "general policies" respecting non-enforcement are categorically forbidden: Some "general policies" may, for example, merely provide a framework for making individualized, discretionary assessments about whether to initiate enforcement actions in particular cases. *Cf. Reno v. Flores*, 507 U.S. 292, 313 (1993) (explaining that an agency's use of "reasonable presumptions and generic rules" is not incompatible with a requirement to make individualized determinations). But a general policy of non-enforcement that forecloses the exercise of case-by-case discretion poses "special risks" that the agency has exceeded the bounds of its enforcement discretion. *Crowley Caribbean Transp.*, 37 F.3d at 677.

## B.

We now turn, against this backdrop, to DHS's proposed prioritization policy. In their exercise of enforcement discretion, DHS and its predecessor, INS, have long

employed guidance instructing immigration officers to prioritize the enforcement of the immigration laws against certain categories of aliens and to deprioritize their enforcement against others. *See, e.g.*, INS Operating Instructions § 103(a)(1)(i) (1962); Memorandum for All Field Office Directors, ICE, et al., from John Morton, Director, ICE, *Re: Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for the Apprehension, Detention, and Removal of Aliens* (June 17, 2011); Memorandum for All ICE Employees, from John Morton, Director, ICE, *Re: Civil Immigration Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens* (Mar. 2, 2011); Memorandum for Regional Directors, INS, et al., from Doris Meissner, Commissioner, INS, *Re: Exercising Prosecutorial Discretion* (Nov. 17, 2000). The policy DHS proposes, which is similar to but would supersede earlier policy guidance, is designed to "provide clearer and more effective guidance in the pursuit" of DHS's enforcement priorities; namely, "threats to national security, public safety and border security." Johnson Prioritization Memorandum at 1.

Under the proposed policy, DHS would identify three categories of undocumented aliens who would be priorities for removal from the United States. *See generally id.* at 3–5. The highest priority category would include aliens who pose particularly serious threats to national security, border security, or public safety, including aliens engaged in or suspected of espionage or terrorism, aliens convicted of offenses related to participation in criminal street gangs, aliens convicted of certain felony offenses, and aliens apprehended at the border while attempting to enter the United States unlawfully. *See id.* at 3. The second-highest priority would include aliens convicted of multiple or significant misdemeanor offenses; aliens who are apprehended after unlawfully entering the United States who cannot establish that they have been continuously present in the United States since January 1, 2014; and aliens determined to have significantly abused the visa or visa waiver programs. *See id.* at 3–4. The third priority category would include other aliens who have been issued a final order of removal on or after January 1, 2014. *See id.* at 4. The policy would also provide that none of these aliens should be prioritized for removal if they "qualify for asylum or another form of relief under our laws." *Id.* at 3–5.

The policy would instruct that resources should be directed to these priority categories in a manner "commensurate with the level of prioritization identified." *Id.* at 5. It would, however, also leave significant room for immigration officials to evaluate the circumstances of individual cases. *See id.* (stating that the policy "requires DHS personnel to exercise discretion based on individual circumstances"). For example, the policy would permit an ICE Field Office Director, CBP Sector Chief, or CBP Director of Field Operations to deprioritize the removal of an alien falling in the highest priority category if, in her judgment, "there are compelling and exceptional factors that clearly indicate the alien is not a threat to national security, border security, or public safety and should not therefore be an enforcement priority." *Id.* at 3. Similar discretionary provisions would apply to

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

aliens in the second and third priority categories.[2] The policy would also provide a non-exhaustive list of factors DHS personnel should consider in making such deprioritization judgments.[3] In addition, the policy would expressly state that its terms should not be construed "to prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities," and would further provide that "[i]mmigration officers and attorneys may pursue removal of an alien not identified as a priority" if, "in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest." *Id.* at 5.

DHS has explained that the proposed policy is designed to respond to the practical reality that the number of aliens who are removable under the INA vastly exceeds the resources Congress has made available to DHS for processing and carrying out removals. The resource constraints are striking. As noted, DHS has informed us that there are approximately 11.3 million undocumented aliens in the country, but that Congress has appropriated sufficient resources for ICE to remove fewer than 400,000 aliens each year, a significant percentage of whom are typically encountered at or near the border rather than in the interior of the country. *See* E-mail for Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from David Shahoulian, Deputy General Counsel, DHS, *Re: Immigration Opinion* (Nov. 19, 2014) ("Shahoulian E-mail"). The proposed policy explains that, because DHS "cannot respond to all immigration violations or remove all persons illegally in the United States," it seeks to "prioritize the use of enforcement personnel, detention space, and removal assets" to "ensure that use of its limited resources is devoted to the pursuit of" DHS's highest priorities. Johnson Prioritization Memorandum at 2.

In our view, DHS's proposed prioritization policy falls within the scope of its lawful discretion to enforce the immigration laws. To begin with, the policy is based on a factor clearly "within [DHS's] expertise." *Chaney*, 470 U.S. at 831. Faced with sharply limited resources, DHS necessarily must make choices about which removals to pursue and which removals to defer. DHS's organic statute itself recognizes this inevitable fact, instructing the Secretary to establish "national

---

[2] Under the proposed policy, aliens in the second tier could be deprioritized if, "in the judgment of an ICE Field Office Director, CBP Sector Chief, CBP Director of Field Operations, USCIS District Director, or USCIS Service Center Director, there are factors indicating the alien is not a threat to national security, border security, or public safety, and should not therefore be an enforcement priority." Johnson Prioritization Memorandum at 4. Aliens in the third tier could be deprioritized if, "in the judgment of an immigration officer, the alien is not a threat to the integrity of the immigration system or there are factors suggesting the alien should not be an enforcement priority." *Id.* at 5.

[3] These factors include "extenuating circumstances involving the offense of conviction; extended length of time since the offense of conviction; length of time in the United States; military service; family or community ties in the United States; status as a victim, witness or plaintiff in civil or criminal proceedings; or compelling humanitarian factors such as poor health, age, pregnancy, a young child or a seriously ill relative." Johnson Prioritization Memorandum at 6.

immigration enforcement policies and priorities." 6 U.S.C. § 202(5). And an agency's need to ensure that scarce enforcement resources are used in an effective manner is a quintessential basis for the use of prosecutorial discretion. *See Chaney*, 470 U.S. at 831 (among the factors "peculiarly within [an agency's] expertise" are "whether agency resources are best spent on this violation or another" and "whether the agency has enough resources to undertake the action at all").

The policy DHS has proposed, moreover, is consistent with the removal priorities established by Congress. In appropriating funds for DHS's enforcement activities—which, as noted, are sufficient to permit the removal of only a fraction of the undocumented aliens currently in the country—Congress has directed DHS to "prioritize the identification and removal of aliens convicted of a crime by the severity of that crime." Department of Homeland Security Appropriations Act, 2014, Pub. L. No. 113-76, div. F, tit. II, 128 Stat. 5, 251 ("DHS Appropriations Act"). Consistent with this directive, the proposed policy prioritizes individuals convicted of criminal offenses involving active participation in a criminal street gang, most offenses classified as felonies in the convicting jurisdiction, offenses classified as "aggravated felonies" under the INA, and certain misdemeanor offenses. Johnson Prioritization Memorandum at 3–4. The policy ranks these priority categories according to the severity of the crime of conviction. The policy also prioritizes the removal of other categories of aliens who pose threats to national security or border security, matters about which Congress has demonstrated particular concern. *See, e.g.,* 8 U.S.C. § 1226(c)(1)(D) (providing for detention of aliens charged with removability on national security grounds); *id.* § 1225(b) & (c) (providing for an expedited removal process for certain aliens apprehended at the border). The policy thus raises no concern that DHS has relied "on factors which Congress had not intended it to consider." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658.

Further, although the proposed policy is not a "single-shot non-enforcement decision," neither does it amount to an abdication of DHS's statutory responsibilities, or constitute a legislative rule overriding the commands of the substantive statute. *Crowley Caribbean Transp.*, 37 F.3d at 676–77. The proposed policy provides a general framework for exercising enforcement discretion in individual cases, rather than establishing an absolute, inflexible policy of not enforcing the immigration laws in certain categories of cases. Given that the resources Congress has allocated to DHS are sufficient to remove only a small fraction of the total population of undocumented aliens in the United States, setting forth written guidance about how resources should presumptively be allocated in particular cases is a reasonable means of ensuring that DHS's severely limited resources are systematically directed to its highest priorities across a large and diverse agency, as well as ensuring consistency in the administration of the removal system. The proposed policy's identification of categories of aliens who constitute removal

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

priorities is also consistent with the categorical nature of Congress's instruction to prioritize the removal of criminal aliens in the DHS Appropriations Act.

And, significantly, the proposed policy does not identify any category of removable aliens whose removal may not be pursued under any circumstances. Although the proposed policy limits the discretion of immigration officials to expend resources to remove non-priority aliens, it does not eliminate that discretion entirely. It directs immigration officials to use their resources to remove aliens in a manner "commensurate with the level of prioritization identified," but (as noted above) it does not "prohibit or discourage the apprehension, detention, or removal of aliens unlawfully in the United States who are not identified as priorities." Johnson Prioritization Memorandum at 5. Instead, it authorizes the removal of even non-priority aliens if, in the judgment of an ICE Field Office Director, "removing such an alien would serve an important federal interest," a standard the policy leaves open-ended. *Id.* Accordingly, the policy provides for case-by-case determinations about whether an individual alien's circumstances warrant the expenditure of removal resources, employing a broad standard that leaves ample room for the exercise of individualized discretion by responsible officials. For these reasons, the proposed policy avoids the difficulties that might be raised by a more inflexible prioritization policy and dispels any concern that DHS has either undertaken to rewrite the immigration laws or abdicated its statutory responsibilities with respect to non-priority aliens.[4]

## II.

We turn next to the permissibility of DHS's proposed deferred action programs for certain aliens who are parents of U.S. citizens, lawful permanent residents ("LPRs"), or DACA recipients, and who are not removal priorities under the proposed policy discussed above. We begin by discussing the history and current practice of deferred action. We then discuss the legal authorities on which deferred

---

[4] In *Crane v. Napolitano*, a district court recently concluded in a non-precedential opinion that the INA "mandates the initiation of removal proceedings whenever an immigration officer encounters an illegal alien who is not 'clearly and beyond a doubt entitled to be admitted.'" Opinion and Order Respecting Pl. App. for Prelim. Inj. Relief, No. 3:12-cv-03247-O, 2013 WL 1744422, at *5 (N.D. Tex. Apr. 23) (quoting 8 U.S.C. § 1225(b)(2)(A)). The court later dismissed the case for lack of jurisdiction. *See Crane v. Napolitano*, No. 3:12-cv-03247-O, 2013 WL 8211660, at *4 (N.D. Tex. July 31). Although the opinion lacks precedential value, we have nevertheless considered whether, as it suggests, the text of the INA categorically forecloses the exercise of enforcement discretion with respect to aliens who have not been formally admitted. The district court's conclusion is, in our view, inconsistent with the Supreme Court's reading of the INA as permitting immigration officials to exercise enforcement discretion at any stage of the removal process, including when deciding whether to initiate removal proceedings against a particular alien. *See Arizona*, 132 S. Ct. at 2499; *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 483–84. It is also difficult to square with authority holding that the presence of mandatory language in a statute, standing alone, does not necessarily limit the Executive Branch's enforcement discretion, *see, e.g., Chaney*, 470 U.S. at 835; *Inmates of Attica Corr. Facility v. Rockefeller*, 477 F.2d 375, 381 (2d Cir. 1973).

action relies and identify legal principles against which the proposed use of deferred action can be evaluated. Finally, we turn to an analysis of the proposed deferred action programs themselves, beginning with the program for parents of U.S. citizens and LPRs, and concluding with the program for parents of DACA recipients.

## A.

In immigration law, the term "deferred action" refers to an exercise of administrative discretion in which immigration officials temporarily defer the removal of an alien unlawfully present in the United States. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (citing 6 Charles Gordon et al., *Immigration Law and Procedure* § 72.03[2][h] (1998)); *see* USCIS, *Standard Operating Procedures for Handling Deferred Action Requests at USCIS Field Offices* at 3 (2012) ("USCIS SOP"); INS Operating Instructions § 103.1(a)(1)(ii) (1977). It is one of a number of forms of discretionary relief—in addition to such statutory and non-statutory measures as parole, temporary protected status, deferred enforced departure, and extended voluntary departure—that immigration officials have used over the years to temporarily prevent the removal of undocumented aliens.[5]

---

[5] Parole is available to aliens by statute "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Among other things, parole gives aliens the ability to adjust their status without leaving the United States if they are otherwise eligible for adjustment of status, *see id.* § 1255(a), and may eventually qualify them for Federal means-tested benefits, *see id.* §§ 1613, 1641(b)(4). Temporary protected status is available to nationals of designated foreign states affected by armed conflicts, environmental disasters, and other extraordinary conditions. *Id.* § 1254a. Deferred enforced departure, which "has no statutory basis" but rather is an exercise of "the President's constitutional powers to conduct foreign relations," may be granted to nationals of appropriate foreign states. USCIS, Adjudicator's Field Manual § 38.2(a) (2014). Extended voluntary departure was a remedy derived from the voluntary departure statute, which, before its amendment in 1996, permitted the Attorney General to make a finding of removability if an alien agreed to voluntarily depart the United States, without imposing a time limit for the alien's departure. *See* 8 U.S.C. §§ 1252(b), 1254(e) (1988 & Supp. II 1990); *cf.* 8 U.S.C. § 1229c (current provision of the INA providing authority to grant voluntary departure, but limiting such grants to 120 days). Some commentators, however, suggested that extended voluntary departure was in fact a form of "discretionary relief formulated administratively under the Attorney General's general authority for enforcing immigration law." Sharon Stephan, Cong. Research Serv., 85-599 EPW, *Extended Voluntary Departure and Other Grants of Blanket Relief from Deportation* at 1 (Feb. 23, 1985). It appears that extended voluntary departure is no longer used following enactment of the Immigration Act of 1990, which established the temporary protected status program. *See U.S. Citizenship and Immigration Services Fee Schedule*, 75 Fed. Reg. 33446, 33457 (June 11, 2010) (proposed rule) (noting that "since 1990 neither the Attorney General nor the Secretary have designated a class of aliens for nationality-based 'extended voluntary departure,' and there no longer are aliens in the United States benefiting from such a designation," but noting that deferred enforced departure is still used); H.R. Rep. No. 102-123, at 2 (1991) (indicating that in establishing temporary protected status, Congress was "codif[ying] and supersed[ing]" extended voluntary departure). *See generally* Andorra Bruno et al., Cong. Research Serv., *Analysis of June 15, 2012 DHS Memorandum, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 5–10 (July 13, 2012) ("CRS Immigration Report").

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

The practice of granting deferred action dates back several decades. For many years after the INA was enacted, INS exercised prosecutorial discretion to grant "non-priority" status to removable aliens who presented "appealing humanitarian factors." Letter for Leon Wildes, from E. A. Loughran, Associate Commissioner, INS at 2 (July 16, 1973) (defining a "non-priority case" as "one in which the Service in the exercise of discretion determines that adverse action would be unconscionable because of appealing humanitarian factors"); *see* INS Operating Instructions § 103.1(a)(1)(ii) (1962). This form of administrative discretion was later termed "deferred action." *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484; *see* INS Operating Instructions § 103.1(a)(1)(ii) (1977) (instructing immigration officers to recommend deferred action whenever "adverse action would be unconscionable because of the existence of appealing humanitarian factors").

Although the practice of granting deferred action "developed without express statutory authorization," it has become a regular feature of the immigration removal system that has been acknowledged by both Congress and the Supreme Court. *Am.-Arab Anti-Discrim. Comm.*, 525 U.S. at 484 (internal quotation marks omitted); *see id.* at 485 (noting that a congressional enactment limiting judicial review of decisions "to commence proceedings, adjudicate cases, or execute removal orders against any alien under [the INA]" in 8 U.S.C. § 1252(g) "seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations"); *see also, e.g.*, 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV) (providing that certain individuals are "eligible for deferred action"). Deferred action "does not confer any immigration status"—i.e., it does not establish any enforceable legal right to remain in the United States— and it may be revoked by immigration authorities at their discretion. USCIS SOP at 3, 7. Assuming it is not revoked, however, it represents DHS's decision not to seek the alien's removal for a specified period of time.

Under longstanding regulations and policy guidance promulgated pursuant to statutory authority in the INA, deferred action recipients may receive two additional benefits. First, relying on DHS's statutory authority to authorize certain aliens to work in the United States, DHS regulations permit recipients of deferred action to apply for work authorization if they can demonstrate an "economic necessity for employment." 8 C.F.R. § 274a.12(c)(14); *see* 8 U.S.C. § 1324a(h)(3) (defining an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]"). Second, DHS has promulgated regulations and issued policy guidance providing that aliens who receive deferred action will temporarily cease accruing "unlawful presence" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); Memorandum for Field Leadership, from Donald Neufeld, Acting Associate Director, Domestic Operations Directorate, USCIS, *Re: Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections 212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act* at 42

13

(May 6, 2009) ("USCIS Consolidation of Guidance") (noting that "[a]ccrual of unlawful presence stops on the date an alien is granted deferred action"); *see* 8 U.S.C. § 1182(a)(9)(B)(ii) (providing that an alien is "unlawfully present" if, among other things, he "is present in the United States after the expiration of the period of stay authorized by the Attorney General").[6]

Immigration officials today continue to grant deferred action in individual cases for humanitarian and other purposes, a practice we will refer to as "ad hoc deferred action." Recent USCIS guidance provides that personnel may recommend ad hoc deferred action if they "encounter cases during [their] normal course of business that they feel warrant deferred action." USCIS SOP at 4. An alien may also apply for ad hoc deferred action by submitting a signed, written request to USCIS containing "[a]n explanation as to why he or she is seeking deferred action" along with supporting documentation, proof of identity, and other records. *Id.* at 3.

For decades, INS and later DHS have also implemented broader programs that make discretionary relief from removal available for particular classes of aliens. In many instances, these agencies have made such broad-based relief available through the use of parole, temporary protected status, deferred enforced departure, or extended voluntary departure. For example, from 1956 to 1972, INS implemented an extended voluntary departure program for physically present aliens who were beneficiaries of approved visa petitions—known as "Third Preference" visa petitions—relating to a specific class of visas for Eastern Hemisphere natives. *See United States ex rel. Parco v. Morris*, 426 F. Supp. 976, 979–80 (E.D. Pa. 1977). Similarly, for several years beginning in 1978, INS granted extended voluntary departure to nurses who were eligible for H-1 visas. *Voluntary Departure for Out-of-Status Nonimmigrant H-1 Nurses*, 43 Fed. Reg. 2776, 2776 (Jan. 19, 1978). In addition, in more than two dozen instances dating to 1956, INS and later DHS granted parole, temporary protected status, deferred enforced departure, or extended voluntary departure to large numbers of nationals of designated foreign states. *See, e.g.*, CRS Immigration Report at 20–23; Cong. Research Serv., ED206779, *Review of U.S. Refugee Resettlement Programs and Policies* at 9, 12–14 (1980). And in 1990, INS implemented a "Family Fairness" program that authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens who had been granted legal status under the Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 ("IRCA"). *See* Memorandum for Regional Commissioners,

---

[6] Section 1182(a)(9)(B)(i) imposes three- and ten-year bars on the admission of aliens (other than aliens admitted to permanent residence) who departed or were removed from the United States after periods of unlawful presence of between 180 days and one year, or one year or more. Section 1182(a)(9)(C)(i)(I) imposes an indefinite bar on the admission of any alien who, without being admitted, enters or attempts to reenter the United States after previously having been unlawfully present in the United States for an aggregate period of more than one year.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

INS, from Gene McNary, Commissioner, INS, *Re: Family Fairness: Guidelines for Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens* (Feb. 2, 1990) ("Family Fairness Memorandum"); *see also* CRS Immigration Report at 10.

On at least five occasions since the late 1990s, INS and later DHS have also made discretionary relief available to certain classes of aliens through the use of deferred action:

*1. Deferred Action for Battered Aliens Under the Violence Against Women Act.* INS established a class-based deferred action program in 1997 for the benefit of self-petitioners under the Violence Against Women Act of 1994 ("VAWA"), Pub. L. No. 103-322, tit. IV, 108 Stat. 1796, 1902. VAWA authorized certain aliens who have been abused by U.S. citizen or LPR spouses or parents to self-petition for lawful immigration status, without having to rely on their abusive family members to petition on their behalf. *Id.* § 40701(a) (codified as amended at 8 U.S.C. § 1154(a)(1)(A)(iii)–(iv), (vii)). The INS program required immigration officers who approved a VAWA self-petition to assess, "on a case-by-case basis, whether to place the alien in deferred action status" while the alien waited for a visa to become available. Memorandum for Regional Directors et al., INS, from Paul W. Virtue, Acting Executive Associate Commissioner, INS, *Re: Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues* at 3 (May 6, 1997). INS noted that "[b]y their nature, VAWA cases generally possess factors that warrant consideration for deferred action." *Id.* But because "[i]n an unusual case, there may be factors present that would militate against deferred action," the agency instructed officers that requests for deferred action should still "receive individual scrutiny." *Id.* In 2000, INS reported to Congress that, because of this program, no approved VAWA self-petitioner had been removed from the country. *See Battered Women Immigrant Protection Act: Hearings on H.R. 3083 Before the Subcomm. on Immigration and Claims of the H. Comm. on the Judiciary*, 106th Cong. at 43 (July 20, 2000) ("H.R. 3083 Hearings").

*2. Deferred Action for T and U Visa Applicants.* Several years later, INS instituted a similar deferred action program for applicants for nonimmigrant status or visas made available under the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), Pub. L. No. 106-386, 114 Stat. 1464. That Act created two new nonimmigrant classifications: a "T visa" available to victims of human trafficking and their family members, and a "U visa" for victims of certain other crimes and their family members. *Id.* §§ 107(e), 1513(b)(3) (codified at 8 U.S.C. § 1101(a)(15)(T)(i), (U)(i)). In 2001, INS issued a memorandum directing immigration officers to locate "possible victims in the above categories," and to use "[e]xisting authority and mechanisms such as parole, deferred action, and stays of removal" to prevent those victims' removal "until they have had the opportunity to avail themselves of the provisions of the VTVPA." Memorandum

*Opinions of the Office of Legal Counsel in Volume 38*

for Michael A. Pearson, Executive Associate Commissioner, INS, from Michael D. Cronin, Acting Executive Associate Commissioner, INS, *Re: Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy Memorandum #2—"T" and "U" Nonimmigrant Visas* at 2 (Aug. 30, 2001). In subsequent memoranda, INS instructed officers to make "deferred action assessment[s]" for "all [T visa] applicants whose applications have been determined to be bona fide," Memorandum for Johnny N. Williams, Executive Associate Commissioner, INS, from Stuart Anderson, Executive Associate Commissioner, INS, *Re: Deferred Action for Aliens with Bona Fide Applications for T Nonimmigrant Status* at 1 (May 8, 2002), as well as for all U visa applicants "determined to have submitted *prima facie* evidence of [their] eligibility," Memorandum for the Director, Vermont Service Center, INS, from William R. Yates, USCIS, *Re: Centralization of Interim Relief for U Nonimmigrant Status Applicants* at 5 (Oct. 8, 2003). In 2002 and 2007, INS and DHS promulgated regulations embodying these policies. *See* 8 C.F.R. § 214.11(k)(1), (k)(4), (m)(2) (promulgated by *New Classification for Victims of Severe Forms of Trafficking in Persons; Eligibility for "T" Nonimmigrant Status*, 67 Fed. Reg. 4784, 4800–01 (Jan. 31, 2002)) (providing that any T visa applicant who presents "*prima facie* evidence" of his eligibility should have his removal "automatically stay[ed]" and that applicants placed on a waiting list for visas "shall maintain [their] current means to prevent removal (deferred action, parole, or stay of removal)"); *id.* § 214.14(d)(2) (promulgated by *New Classification for Victims of Criminal Activity; Eligibility for "U" Nonimmigrant Status*, 72 Fed. Reg. 53014, 53039 (Sept. 17, 2007)) ("USCIS will grant deferred action or parole to U-1 petitioners and qualifying family members while the U-1 petitioners are on the waiting list" for visas.).

    3. *Deferred Action for Foreign Students Affected by Hurricane Katrina.* As a consequence of the devastation caused by Hurricane Katrina in 2005, several thousand foreign students became temporarily unable to satisfy the requirements for maintaining their lawful status as F-1 nonimmigrant students, which include "pursuit of a 'full course of study.'" USCIS, *Interim Relief for Certain Foreign Academic Students Adversely Affected by Hurricane Katrina: Frequently Asked Questions (FAQ)* at 1 (Nov. 25, 2005) (quoting 8 C.F.R. § 214.2(f)(6)), *available at* http//www.uscis.gov/sites/default/files/USCIS/Humanitarian/Special%20Situati ons/Previous%20Special%20Situations%20By%20Topic/faq-interim-student-relie f-hurricane-katrina.pdf (last visited Nov. 19, 2014). DHS announced that it would grant deferred action to these students "based on the fact that [their] failure to maintain status is directly due to Hurricane Katrina." *Id.* at 7. To apply for deferred action under this program, students were required to send a letter substantiating their need for deferred action, along with an application for work authorization. Press Release, USCIS, *USCIS Announces Interim Relief for Foreign Students Adversely Impacted by Hurricane Katrina* at 1–2 (Nov. 25, 2005), *available at* http://www.uscis.gov/sites/default/files/files/pressrelease/F1Student_ 11_25_05_PR.pdf (last visited Nov. 19, 2014). USCIS explained that such

requests for deferred action would be "decided on a case-by-case basis" and that it could not "provide any assurance that all such requests will be granted." *Id.* at 1.

*4. Deferred Action for Widows and Widowers of U.S. Citizens.* In 2009, DHS implemented a deferred action program for certain widows and widowers of U.S. citizens. USCIS explained that "no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death" and USCIS had not yet adjudicated a visa petition on the spouse's behalf. Memorandum for Field Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, *Re: Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children* at 1 (Sept. 4, 2009). "In order to address humanitarian concerns arising from cases involving surviving spouses of U.S. citizens," USCIS issued guidance permitting covered surviving spouses and "their qualifying children who are residing in the United States" to apply for deferred action. *Id.* at 2, 6. USCIS clarified that such relief would not be automatic, but rather would be unavailable in the presence of, for example, "serious adverse factors, such as national security concerns, significant immigration fraud, commission of other crimes, or public safety reasons." *Id.* at 6.[7]

*5. Deferred Action for Childhood Arrivals.* Announced by DHS in 2012, DACA makes deferred action available to "certain young people who were brought to this country as children" and therefore "[a]s a general matter . . . lacked the intent to violate the law." Memorandum for David Aguilar, Acting Commissioner, CBP, et al., from Janet Napolitano, Secretary, DHS, *Re: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children* at 1 (June 15, 2012) ("Napolitano Memorandum"). An alien is eligible for DACA if she was under the age of 31 when the program began; arrived in the United States before the age of 16; continuously resided in the United States for at least 5 years immediately preceding June 15, 2012; was physically present on June 15, 2012; satisfies certain educational or military service requirements; and neither has a serious criminal history nor "poses a threat to national security or public safety." *See id.* DHS evaluates applicants' eligibility for DACA on a case-by-case basis. *See id.* at 2; USCIS, *Deferred Action for Childhood Arrivals (DACA) Toolkit: Resources for Community Partners* at 11 ("DACA Toolkit"). Successful DACA applicants receive deferred action for a

---

[7] Several months after the deferred action program was announced, Congress eliminated the requirement that an alien be married to a U.S. citizen "for at least 2 years at the time of the citizen's death" to retain his or her eligibility for lawful immigration status. Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 568(c), 123 Stat. 2142, 2186 (2009). Concluding that this legislation rendered its surviving spouse guidance "obsolete," USCIS withdrew its earlier guidance and treated all pending applications for deferred action as visa petitions. *See* Memorandum for Executive Leadership, USCIS, from Donald Neufeld, Acting Associate Director, USCIS, et al., *Re: Additional Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and Their Children (REVISED)* at 3, 10 (Dec. 2, 2009).

period of two years, subject to renewal. *See* DACA Toolkit at 11. DHS has stated that grants of deferred action under DACA may be terminated at any time, *id.* at 16, and "confer[] no substantive right, immigration status or pathway to citizenship," Napolitano Memorandum at 3.[8]

Congress has long been aware of the practice of granting deferred action, including in its categorical variety, and of its salient features; and it has never acted to disapprove or limit the practice.[9] On the contrary, it has enacted several pieces of legislation that have either assumed that deferred action would be available in certain circumstances, or expressly directed that deferred action be extended to certain categories of aliens. For example, as Congress was considering VAWA reauthorization legislation in 2000, INS officials testified before Congress about their deferred action program for VAWA self-petitioners, explaining that "[a]pproved [VAWA] self-petitioners are placed in deferred action status," such that "[n]o battered alien who has filed a[n approved] self petition . . . has been deported." H.R. 3083 Hearings at 43. Congress responded by not only acknowledging but also expanding the deferred action program in the 2000 VAWA reauthorization legislation, providing that children who could no longer self-petition under VAWA because they were over the age of 21 would nonetheless be "eligible for deferred action and work authorization." Victims of Trafficking and

---

[8] Before DACA was announced, our Office was consulted about whether such a program would be legally permissible. As we orally advised, our preliminary view was that such a program would be permissible, provided that immigration officials retained discretion to evaluate each application on an individualized basis. We noted that immigration officials typically consider factors such as having been brought to the United States as a child in exercising their discretion to grant deferred action in individual cases. We explained, however, that extending deferred action to individuals who satisfied these and other specified criteria on a class-wide basis would raise distinct questions not implicated by ad hoc grants of deferred action. We advised that it was critical that, like past policies that made deferred action available to certain classes of aliens, the DACA program require immigration officials to evaluate each application for deferred action on a case-by-case basis, rather than granting deferred action automatically to all applicants who satisfied the threshold eligibility criteria. We also noted that, although the proposed program was predicated on humanitarian concerns that appeared less particularized and acute than those underlying certain prior class-wide deferred action programs, the concerns animating DACA were nonetheless consistent with the types of concerns that have customarily guided the exercise of immigration enforcement discretion.

[9] Congress has considered legislation that would limit the practice of granting deferred action, but it has never enacted such a measure. In 2011, a bill was introduced in both the House and the Senate that would have temporarily suspended DHS's authority to grant deferred action except in narrow circumstances. *See* H.R. 2497, 112th Cong. (2011); S. 1380, 112th Cong. (2011). Neither chamber, however, voted on the bill. This year, the House passed a bill that purported to bar any funding for DACA or other class-wide deferred action programs, H.R. 5272, 113th Cong. (2014), but the Senate has not considered the legislation. Because the Supreme Court has instructed that unenacted legislation is an unreliable indicator of legislative intent, *see Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 381 n.11 (1969), we do not draw any inference regarding congressional policy from these unenacted bills.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

Violence Protection Act of 2000, Pub. L. No. 106-386, § 1503(d)(2), 114 Stat. 1464, 1522 (codified at 8 U.S.C. § 1154(a)(1)(D)(i)(II), (IV)).[10]

Congress demonstrated a similar awareness of INS's (and later DHS's) deferred action program for bona fide T and U visa applicants. As discussed above, that program made deferred action available to nearly all individuals who could make a prima facie showing of eligibility for a T or U visa. In 2008 legislation, Congress authorized DHS to "grant . . . an administrative stay of a final order of removal" to any such individual. William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 204, 122 Stat. 5044, 5060 (codified at 8 U.S.C. § 1227(d)(1)). Congress further clarified that "[t]he denial of a request for an administrative stay of removal under this subsection shall not preclude the alien from applying for . . . deferred action." *Id.* It also directed DHS to compile a report detailing, among other things, how long DHS's "specially trained [VAWA] Unit at the [USCIS] Vermont Service Center" took to adjudicate victim-based immigration applications for "deferred action," along with "steps taken to improve in this area." *Id.* § 238. Representative Berman, the bill's sponsor, explained that the Vermont Service Center should "strive to issue work authorization and deferred action" to "[i]mmigrant victims of domestic violence, sexual assault and other violence crimes . . . in most instances within 60 days of filing." 154 Cong. Rec. 24603 (2008).

In addition, in other enactments, Congress has specified that certain classes of individuals should be made "eligible for deferred action." These classes include certain immediate family members of LPRs who were killed on September 11, 2001, USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361, and certain immediate family members of certain U.S. citizens killed in combat, National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 1703(c)–(d), 117 Stat. 1392, 1694. In the same legislation, Congress made these individuals eligible to obtain lawful status as "family-sponsored immigrant[s]" or "immediate relative[s]" of U.S. citizens. Pub. L. No. 107-56, § 423(b), 115 Stat. 272, 361; Pub. L. No. 108-136, § 1703(c)(1)(A), 117 Stat. 1392, 1694; *see generally Scialabba v. Cuellar de Osorio*, 134 S. Ct. 2191, 2197 (2014) (plurality opinion) (explaining which aliens typically qualify as family-sponsored immigrants or immediate relatives).

Finally, Congress acknowledged the practice of granting deferred action in the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, 119 Stat. 231, 302 (codified at

---

[10] Five years later, in the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960, Congress specified that, "[u]pon the approval of a petition as a VAWA self-petitioner, the alien . . . is eligible for work authorization." *Id.* § 814(b) (codified at 8 U.S.C. § 1154(a)(1)(K)). One of the Act's sponsors explained that while this provision was intended to "give[] DHS statutory authority to grant work authorization . . . without having to rely upon deferred action . . . [t]he current practice of granting deferred action to approved VAWA self-petitioners should continue." 151 Cong. Rec. 29334 (2005) (statement of Rep. Conyers).

49 U.S.C. § 30301 note), which makes a state-issued driver's license or identification card acceptable for federal purposes only if the state verifies, among other things, that the card's recipient has "[e]vidence of [l]awful [s]tatus." Congress specified that, for this purpose, acceptable evidence of lawful status includes proof of, among other things, citizenship, lawful permanent or temporary residence, or "approved deferred action status." *Id.* § 202(c)(2)(B)(viii).

## B.

The practice of granting deferred action, like the practice of setting enforcement priorities, is an exercise of enforcement discretion rooted in DHS's authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed. It is one of several mechanisms by which immigration officials, against a backdrop of limited enforcement resources, exercise their "broad discretion" to administer the removal system—and, more specifically, their discretion to determine whether "it makes sense to pursue removal" in particular circumstances. *Arizona*, 132 S. Ct. at 2499.

Deferred action, however, differs in at least three respects from more familiar and widespread exercises of enforcement discretion. First, unlike (for example) the paradigmatic exercise of prosecutorial discretion in a criminal case, the conferral of deferred action does not represent a decision not to prosecute an individual for past unlawful conduct; it instead represents a decision to openly tolerate an undocumented alien's continued presence in the United States for a fixed period (subject to revocation at the agency's discretion). Second, unlike most exercises of enforcement discretion, deferred action carries with it benefits in addition to non-enforcement itself; specifically, the ability to seek employment authorization and suspension of unlawful presence for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I). Third, class-based deferred action programs, like those for VAWA recipients and victims of Hurricane Katrina, do not merely enable individual immigration officials to select deserving beneficiaries from among those aliens who have been identified or apprehended for possible removal—as is the case with ad hoc deferred action—but rather set forth certain threshold eligibility criteria and then invite individuals who satisfy these criteria to apply for deferred action status.

While these features of deferred action are somewhat unusual among exercises of enforcement discretion, the differences between deferred action and other exercises of enforcement discretion are less significant than they might initially appear. The first feature—the toleration of an alien's continued unlawful presence—is an inevitable element of almost any exercise of discretion in immigration enforcement. Any decision not to remove an unlawfully present alien—even through an exercise of routine enforcement discretion—necessarily carries with it a tacit acknowledgment that the alien will continue to be present in the United States without legal status. Deferred action arguably goes beyond such tacit acknowledgment by expressly communicating to the alien that his or her unlawful

presence will be tolerated for a prescribed period of time. This difference is not, in our view, insignificant. But neither does it fundamentally transform deferred action into something other than an exercise of enforcement discretion: As we have previously noted, deferred action confers no lawful immigration status, provides no path to lawful permanent residence or citizenship, and is revocable at any time in the agency's discretion.

With respect to the second feature, the additional benefits deferred action confers—the ability to apply for work authorization and the tolling of unlawful presence—do not depend on background principles of agency discretion under DHS's general immigration authorities or the Take Care Clause at all, but rather depend on independent and more specific statutory authority rooted in the text of the INA. The first of those authorities, DHS's power to prescribe which aliens are authorized to work in the United States, is grounded in 8 U.S.C. § 1324a(h)(3), which defines an "unauthorized alien" not entitled to work in the United States as an alien who is neither an LPR nor "authorized to be . . . employed by [the INA] or by the Attorney General [now the Secretary of Homeland Security]." This statutory provision has long been understood to recognize the authority of the Secretary (and the Attorney General before him) to grant work authorization to particular classes of aliens. *See* 8 C.F.R. § 274a.12; *see also Perales v. Casillas*, 903 F.2d 1043, 1048–50 (5th Cir. 1990) (describing the authority recognized by section 1324a(h)(3) as "permissive" and largely "unfettered").[11] Although the INA

---

[11] Section 1324a(h)(3) was enacted in 1986 as part of IRCA. Before then, the INA contained no provisions comprehensively addressing the employment of aliens or expressly delegating the authority to regulate the employment of aliens to a responsible federal agency. INS assumed the authority to prescribe the classes of aliens authorized to work in the United States under its general responsibility to administer the immigration laws. In 1981, INS promulgated regulations codifying its existing procedures and criteria for granting employment authorization. *See Employment Authorization to Aliens in the United States*, 46 Fed. Reg. 25079, 25080–81 (May 5, 1981) (citing 8 U.S.C. § 1103(a)). Those regulations permitted certain categories of aliens who lacked lawful immigration status, including deferred action recipients, to apply for work authorization under certain circumstances. 8 C.F.R. § 109.1(b)(7) (1982). In IRCA, Congress introduced a "comprehensive scheme prohibiting the employment of illegal aliens in the United States," *Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002), to be enforced primarily through criminal and civil penalties on employers who knowingly employ an "unauthorized alien." As relevant here, Congress defined an "unauthorized alien" barred from employment in the United States as an alien who "is not . . . either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter *or by the Attorney General*." 8 U.S.C. § 1324a(h)(3) (emphasis added). Shortly after IRCA was enacted, INS denied a petition to rescind its employment authorization regulation, rejecting an argument that "the phrase 'authorized to be so employed by this Act or the Attorney General' does not recognize the Attorney General's authority to grant work authorization except to those aliens who have already been granted specific authorization by the Act." *Employment Authorization; Classes of Aliens Eligible*, 52 Fed. Reg. 46092, 46093 (Dec. 4, 1987). Because the same statutory phrase refers both to aliens authorized to be employed by the INA and aliens authorized to be employed by the Attorney General, INS concluded that the only way to give effect to both references is to conclude "that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined 'unauthorized alien' in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the

requires the Secretary to grant work authorization to particular classes of aliens, *see, e.g.*, 8 U.S.C. § 1158(c)(1)(B) (aliens granted asylum), it places few limitations on the Secretary's authority to grant work authorization to other classes of aliens. Further, and notably, additional provisions of the INA expressly contemplate that the Secretary may grant work authorization to aliens lacking lawful immigration status—even those who are in active removal proceedings or, in certain circumstances, those who have already received final orders of removal. *See id.* § 1226(a)(3) (permitting the Secretary to grant work authorization to an otherwise work-eligible alien who has been arrested and detained pending a decision whether to remove the alien from the United States); *id.* § 1231(a)(7) (permitting the Secretary under certain narrow circumstances to grant work authorization to aliens who have received final orders of removal). Consistent with these provisions, the Secretary has long permitted certain additional classes of aliens who lack lawful immigration status to apply for work authorization, including deferred action recipients who can demonstrate an economic necessity for employment. *See* 8 C.F.R. § 274a.12(c)(14); *see also id.* § 274a.12(c)(8) (applicants for asylum), (c)(10) (applicants for cancellation of removal); *supra* note 11 (discussing 1981 regulations).

The Secretary's authority to suspend the accrual of unlawful presence of deferred action recipients is similarly grounded in the INA. The relevant statutory provision treats an alien as "unlawfully present" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I) if he "is present in the United States after the expiration of the period of stay authorized by the Attorney General." 8 U.S.C. § 1182(a)(9)(B)(ii). That language contemplates that the Attorney General (and now the Secretary) may authorize an alien to stay in the United States without accruing unlawful presence under section 1182(a)(9)(B)(i) or section 1182(a)(9)(C)(i). And DHS regulations and policy guidance interpret a "period of stay authorized by the Attorney General" to include periods during which an alien has been granted deferred action. *See* 8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2); USCIS Consolidation of Guidance at 42.

The final unusual feature of deferred action programs is particular to class-based programs. The breadth of such programs, in combination with the first two features of deferred action, may raise particular concerns about whether immigration officials have undertaken to substantively change the statutory removal system rather than simply adapting its application to individual circumstances. But the salient feature of class-based programs—the establishment of an affirmative application process with threshold eligibility criteria—does not in and of itself cross the line between executing the law and rewriting it. Although every class-wide deferred action program that has been implemented to date has established

---

regulatory process, in addition to those who are authorized employment by statute." *Id.*; *see Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 844 (1986) (stating that "considerable weight must be accorded" an agency's "contemporaneous interpretation of the statute it is entrusted to administer").

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

certain threshold eligibility criteria, each program has also left room for case-by-case determinations, giving immigration officials discretion to deny applications even if the applicant fulfills all of the program criteria. *See supra* pp. 15–18. Like the establishment of enforcement priorities discussed in Part I, the establishment of threshold eligibility criteria can serve to avoid arbitrary enforcement decisions by individual officers, thereby furthering the goal of ensuring consistency across a large agency. The guarantee of individualized, case-by-case review helps avoid potential concerns that, in establishing such eligibility criteria, the Executive is attempting to rewrite the law by defining new categories of aliens who are automatically entitled to particular immigration relief. *See Crowley Caribbean Transp.*, 37 F.3d at 676–77; *see also Chaney*, 470 U.S. at 833 n.4. Furthermore, while permitting potentially eligible individuals to apply for an exercise of enforcement discretion is not especially common, many law enforcement agencies have developed programs that invite violators of the law to identify themselves to the authorities in exchange for leniency.[12] Much as is the case with those programs, inviting eligible aliens to identify themselves through an application process may serve the agency's law enforcement interests by encouraging lower-priority individuals to identify themselves to the agency. In so doing, the process may enable the agency to better focus its scarce resources on higher enforcement priorities.

Apart from the considerations just discussed, perhaps the clearest indication that these features of deferred action programs are not per se impermissible is the fact that Congress, aware of these features, has repeatedly enacted legislation appearing to endorse such programs. As discussed above, Congress has not only directed that certain classes of aliens be made eligible for deferred action programs—and in at least one instance, in the case of VAWA beneficiaries, directed the expansion of an existing program—but also ranked evidence of approved deferred action status as evidence of "lawful status" for purposes of the REAL ID Act. These enactments strongly suggest that when DHS in the past has decided to grant deferred action to an individual or class of individuals, it has been acting in a manner consistent with congressional policy "'rather than embarking on a frolic of its own.'" *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 139

---

[12] For example, since 1978, the Department of Justice's Antitrust Division has implemented a "leniency program" under which a corporation that reveals an antitrust conspiracy in which it participated may receive a conditional promise that it will not be prosecuted. *See* Dep't of Justice, *Frequently Asked Questions Regarding the Antitrust Division's Leniency Program and Model Leniency Letters (November 19, 2008), available at* http://www.justice.gov/atr/public/criminal/239583.pdf (last visited Nov. 19, 2014); *see also* Internal Revenue Manual § 9.5.11.9(2) (Revised IRS Voluntary Disclosure Practice), *available at* http://www.irs.gov/uac/Revised-IRS-Voluntary-Disclosure-Practice (last visited Nov. 19, 2014) (explaining that a taxpayer's voluntary disclosure of misreported tax information "may result in prosecution not being recommended"); U.S. Marshals Service, *Fugitive Safe Surrender FAQs, available at* http://www.usmarshals.gov/safesurrender/faqs.html (last visited Nov. 19, 2014) (stating that fugitives who surrender at designated sites and times under the "Fugitive Safe Surrender" program are likely to receive "favorable consideration").

(1985) (quoting *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 375 (1969)); *cf. id.* at 137–39 (concluding that Congress acquiesced in an agency's assertion of regulatory authority by "refus[ing] . . . to overrule" the agency's view after it was specifically "brought to Congress'[s] attention," and further finding implicit congressional approval in legislation that appeared to acknowledge the regulatory authority in question); *Dames & Moore v. Regan*, 453 U.S. 654, 680 (1981) (finding that Congress "implicitly approved the practice of claim settlement by executive agreement" by enacting the International Claims Settlement Act of 1949, which "create[d] a procedure to implement" those very agreements).

   Congress's apparent endorsement of certain deferred action programs does not mean, of course, that a deferred action program can be lawfully extended to any group of aliens, no matter its characteristics or its scope, and no matter the circumstances in which the program is implemented. Because deferred action, like the prioritization policy discussed above, is an exercise of enforcement discretion rooted in the Secretary's broad authority to enforce the immigration laws and the President's duty to take care that the laws are faithfully executed, it is subject to the same four general principles previously discussed. *See supra* pp. 6–7. Thus, any expansion of deferred action to new classes of aliens must be carefully scrutinized to ensure that it reflects considerations within the agency's expertise, and that it does not seek to effectively rewrite the laws to match the Executive's policy preferences, but rather operates in a manner consonant with congressional policy expressed in the statute. *See supra* pp. 6–7 (citing *Youngstown*, 343 U.S. at 637, and *Nat'l Ass'n of Home Builders*, 551 U.S. at 658). Immigration officials cannot abdicate their statutory responsibilities under the guise of exercising enforcement discretion. *See supra* p. 7 (citing *Chaney*, 470 U.S. at 833 n.4). And any new deferred action program should leave room for individualized evaluation of whether a particular case warrants the expenditure of resources for enforcement. *See supra* p. 7 (citing *Glickman*, 96 F.3d at 1123, and *Crowley Caribbean Transp.*, 37 F.3d at 676–77).

   Furthermore, because deferred action programs depart in certain respects from more familiar and widespread exercises of enforcement discretion, particularly careful examination is needed to ensure that any proposed expansion of deferred action complies with these general principles, so that the proposed program does not, in effect, cross the line between executing the law and rewriting it. In analyzing whether the proposed programs cross this line, we will draw substantial guidance from Congress's history of legislation concerning deferred action. In the absence of express statutory guidance, the nature of deferred action programs Congress has implicitly approved by statute helps to shed light on Congress's own understandings about the permissible uses of deferred action. Those understandings, in turn, help to inform our consideration of whether the proposed deferred action programs are "faithful[]" to the statutory scheme Congress has enacted. U.S. Const. art. II, § 3.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

## C.

We now turn to the specifics of DHS's proposed deferred action programs. DHS has proposed implementing a policy under which an alien could apply for, and would be eligible to receive, deferred action if he or she: (1) is not an enforcement priority under DHS policy; (2) has continuously resided in the United States since before January 1, 2010; (3) is physically present in the United States both when DHS announces its program and at the time of application for deferred action; (4) has a child who is a U.S. citizen or LPR; and (5) presents "no other factors that, in the exercise of discretion, make[] the grant of deferred action inappropriate." Johnson Deferred Action Memorandum at 4. You have also asked about the permissibility of a similar program that would be open to parents of children who have received deferred action under the DACA program. We first address DHS's proposal to implement a deferred action program for the parents of U.S. citizens and LPRs, and then turn to the permissibility of the program for parents of DACA recipients in the next section.

## 1.

We begin by considering whether the proposed program for the parents of U.S. citizens and LPRs reflects considerations within the agency's expertise. DHS has offered two justifications for the proposed program for the parents of U.S. citizens and LPRs. First, as noted above, severe resource constraints make it inevitable that DHS will not remove the vast majority of aliens who are unlawfully present in the United States. Consistent with Congress's instruction, DHS prioritizes the removal of individuals who have significant criminal records, as well as others who present dangers to national security, public safety, or border security. *See supra* p. 10. Parents with longstanding ties to the country and who have no significant criminal records or other risk factors rank among the agency's lowest enforcement priorities; absent significant increases in funding, the likelihood that any individual in that category will be determined to warrant the expenditure of severely limited enforcement resources is very low. Second, DHS has explained that the program would serve an important humanitarian interest in keeping parents together with children who are lawfully present in the United States, in situations where such parents have demonstrated significant ties to community and family in this country. *See* Shahoulian E-mail.

With respect to DHS's first justification, the need to efficiently allocate scarce enforcement resources is a quintessential basis for an agency's exercise of enforcement discretion. *See Chaney*, 470 U.S. at 831. Because, as discussed earlier, Congress has appropriated only a small fraction of the funds needed for full enforcement, DHS can remove no more than a small fraction of the individuals who are removable under the immigration laws. *See supra* p. 9. The agency must therefore make choices about which violations of the immigration laws it

*Opinions of the Office of Legal Counsel in Volume 38*

will prioritize and pursue. And as *Chaney* makes clear, such choices are entrusted largely to the Executive's discretion. 470 U.S. at 831.

The deferred action program DHS proposes would not, of course, be costless. Processing applications for deferred action and its renewal requires manpower and resources. *See Arizona*, 132 S. Ct. at 2521 (Scalia, J., concurring in part and dissenting in part). But DHS has informed us that the costs of administering the proposed program would be borne almost entirely by USCIS through the collection of application fees. *See* Shahoulian E-mail; *see also* 8 U.S.C. § 1356(m); 8 C.F.R. § 103.7(b)(1)(i)(C), (b)(1)(i)(HH). DHS has indicated that the costs of administering the deferred action program would therefore not detract in any significant way from the resources available to ICE and CBP—the enforcement arms of DHS—which rely on money appropriated by Congress to fund their operations. *See* Shahoulian E-mail. DHS has explained that, if anything, the proposed deferred action program might increase ICE's and CBP's efficiency by in effect using USCIS's fee-funded resources to enable those enforcement divisions to more easily identify non-priority aliens and focus their resources on pursuing aliens who are strong candidates for removal. *See id.* The proposed program, in short, might help DHS address its severe resource limitations, and at the very least likely would not exacerbate them. *See id.*

DHS does not, however, attempt to justify the proposed program solely as a cost-saving measure, or suggest that its lack of resources alone is sufficient to justify creating a deferred action program for the proposed class. Rather, as noted above, DHS has explained that the program would also serve a particularized humanitarian interest in promoting family unity by enabling those parents of U.S. citizens and LPRs who are not otherwise enforcement priorities and who have demonstrated community and family ties in the United States (as evidenced by the length of time they have remained in the country) to remain united with their children in the United States. Like determining how best to respond to resource constraints, determining how to address such "human concerns" in the immigration context is a consideration that is generally understood to fall within DHS's expertise. *Arizona*, 132 S. Ct. at 2499.

This second justification for the program also appears consonant with congressional policy embodied in the INA. Numerous provisions of the statute reflect a particular concern with uniting aliens with close relatives who have attained lawful immigration status in the United States. *See, e.g., Fiallo v. Bell*, 430 U.S. 787, 795 n.6 (1977); *INS v. Errico*, 385 U.S. 214, 220 n.9 (1966) ("'The legislative history of the Immigration and Nationality Act clearly indicates that the Congress . . . was concerned with the problem of keeping families of United States citizens and immigrants united.'" (quoting H.R. Rep. No. 85-1199, at 7 (1957)). The INA provides a path to lawful status for the parents, as well as other immediate relatives, of U.S. citizens: U.S. citizens aged twenty-one or over may petition for parents to obtain visas that would permit them to enter and permanently reside

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

in the United States, and there is no limit on the overall number of such petitions that may be granted. *See* 8 U.S.C. § 1151(b)(2)(A)(i); *see also Cuellar de Osorio*, 134 S. Ct. at 2197–99 (describing the process for obtaining a family-based immigrant visa). And although the INA contains no parallel provision permitting LPRs to petition on behalf of their parents, it does provide a path for LPRs to become citizens, at which point they too can petition to obtain visas for their parents. *See, e.g.*, 8 U.S.C. § 1427(a) (providing that aliens are generally eligible to become naturalized citizens after five years of lawful permanent residence); *id.* § 1430(a) (alien spouses of U.S. citizens become eligible after three years of lawful permanent residence); *Demore v. Kim*, 538 U.S. 510, 544 (2003).[13] Additionally, the INA empowers the Attorney General to cancel the removal of, and adjust to lawful permanent resident status, aliens who have been physically present in the United States for a continuous period of not less than ten years, exhibit good moral character, have not been convicted of specified offenses, and have immediate relatives who are U.S. citizens or LPRs and who would suffer exceptional hardship from the alien's removal. 8 U.S.C. § 1229b(b)(1). DHS's proposal to focus on the parents of U.S. citizens and LPRs thus tracks a congressional concern, expressed in the INA, with uniting the immediate families of individuals who have permanent legal ties to the United States.

At the same time, because the temporary relief DHS's proposed program would confer to such parents is sharply limited in comparison to the benefits Congress has made available through statute, DHS's proposed program would not operate to circumvent the limits Congress has placed on the availability of those benefits. The statutory provisions discussed above offer the parents of U.S. citizens and LPRs the prospect of permanent lawful status in the United States. The cancellation of removal provision, moreover, offers the prospect of receiving such status

---

[13] The INA does permit LPRs to petition on behalf of their spouses and children even before they have attained citizenship. *See* 8 U.S.C. § 1153(a)(2). However, the exclusion of LPRs' parents from this provision does not appear to reflect a congressional judgment that, until they attain citizenship, LPRs lack an interest in being united with their parents comparable to their interest in being united with their other immediate relatives. The distinction between parents and other relatives originated with a 1924 statute that exempted the wives and minor children of U.S. citizens from immigration quotas, gave "preference status"—eligibility for a specially designated pool of immigrant visas—to other relatives of U.S. citizens, and gave no favorable treatment to the relatives of LPRs. Immigration Act of 1924, Pub. L. No. 68-139, §§ 4(a), 6, 43 Stat. 153, 155–56. In 1928, Congress extended preference status to LPRs' wives and minor children, reasoning that because such relatives would be eligible for visas without regard to any quota when their LPR relatives became citizens, granting preference status to LPRs' wives and minor children would "hasten[]" the "family reunion." S. Rep. No. 70-245, at 2 (1928); *see* Act of May 29, 1928, ch. 914, 45 Stat. 1009, 1009–10. The special visa status for wives and children of LPRs thus mirrored, and was designed to complement, the special visa status given to wives and minor children of U.S. citizens. In 1965, Congress eliminated the basis on which the distinction had rested by exempting all "immediate relatives" of U.S. citizens, including parents, from numerical restrictions on immigration. Pub. L. No. 89-236, § 1, 79 Stat. 911, 911. But it did not amend eligibility for preference status for relatives of LPRs to reflect that change. We have not been able to discern any rationale for this omission in the legislative history or statutory text of the 1965 law.

immediately, without the delays generally associated with the family-based immigrant visa process. DHS's proposed program, in contrast, would not grant the parents of U.S. citizens and LPRs any lawful immigration status, provide a path to permanent residence or citizenship, or otherwise confer any legally enforceable entitlement to remain in the United States. *See* USCIS SOP at 3. It is true that, as we have discussed, a grant of deferred action would confer eligibility to apply for and obtain work authorization, pursuant to the Secretary's statutory authority to grant such authorization and the longstanding regulations promulgated thereunder. *See supra* pp. 13, 21–22. But unlike the automatic employment eligibility that accompanies LPR status, *see* 8 U.S.C. § 1324a(h)(3), this authorization could be granted only on a showing of economic necessity, and would last only for the limited duration of the deferred action grant, *see* 8 C.F.R. § 274a.12(c)(14).

The other salient features of the proposal are similarly consonant with congressional policy. The proposed program would focus on parents who are not enforcement priorities under the prioritization policy discussed above—a policy that, as explained earlier, comports with the removal priorities set by Congress. *See supra* p. 10. The continuous residence requirement is likewise consistent with legislative judgments that extended periods of continuous residence are indicative of strong family and community ties. *See* IRCA, Pub. L. No. 99-603, § 201(a), 100 Stat. 3359, 3394 (1986) (codified as amended at 8 U.S.C. § 1255a(a)(2)) (granting lawful status to certain aliens unlawfully present in the United States since January 1, 1982); *id.* § 302(a) (codified as amended at 8 U.S.C. § 1160) (granting similar relief to certain agricultural workers); H.R. Rep. No. 99-682, pt. 1, at 49 (1986) (stating that aliens present in the United States for five years "have become a part of their communities[,] . . . have strong family ties here which include U.S. citizens and lawful residents[,] . . . have built social networks in this country[, and] . . . have contributed to the United States in myriad ways"); S. Rep. No. 99-132, at 16 (1985) (deporting aliens who "have become well settled in this country" would be a "wasteful use of the Immigration and Naturalization Service's limited enforcement resources"); *see also Arizona*, 132 S. Ct. at 2499 (noting that "[t]he equities of an individual case" turn on factors "including whether the alien has . . . long ties to the community").

We also do not believe DHS's proposed program amounts to an abdication of its statutory responsibilities, or a legislative rule overriding the commands of the statute. As discussed earlier, DHS's severe resource constraints mean that, unless circumstances change, it could not as a practical matter remove the vast majority of removable aliens present in the United States. The fact that the proposed program would defer the removal of a subset of these removable aliens—a subset that ranks near the bottom of the list of the agency's removal priorities—thus does not, by itself, demonstrate that the program amounts to an abdication of DHS's responsibilities. And the case-by-case discretion given to immigration officials under DHS's proposed program alleviates potential concerns that DHS has

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

abdicated its statutory enforcement responsibilities with respect to, or created a categorical, rule-like entitlement to immigration relief for, the particular class of aliens eligible for the program. An alien who meets all the criteria for deferred action under the program would receive deferred action only if he or she "present[ed] no other factors that, in the exercise of discretion," would "make[] the grant of deferred action inappropriate." Johnson Deferred Action Memorandum at 4. The proposed policy does not specify what would count as such a factor; it thus leaves the relevant USCIS official with substantial discretion to determine whether a grant of deferred action is warranted. In other words, even if an alien is not a removal priority under the proposed policy discussed in Part I, has continuously resided in the United States since before January 1, 2010, is physically present in the country, and is a parent of an LPR or a U.S. citizen, the USCIS official evaluating the alien's deferred action application must still make a judgment, in the exercise of her discretion, about whether that alien presents any other factor that would make a grant of deferred action inappropriate. This feature of the proposed program ensures that it does not create a categorical entitlement to deferred action that could raise concerns that DHS is either impermissibly attempting to rewrite or categorically declining to enforce the law with respect to a particular group of undocumented aliens.

Finally, the proposed deferred action program would resemble in material respects the kinds of deferred action programs Congress has implicitly approved in the past, which provides some indication that the proposal is consonant not only with interests reflected in immigration law as a general matter, but also with congressional understandings about the permissible uses of deferred action. As noted above, the program uses deferred action as an interim measure for a group of aliens to whom Congress has given a prospective entitlement to lawful immigration status. While Congress has provided a path to lawful status for the parents of U.S. citizens and LPRs, the process of obtaining that status "takes time." *Cuellar de Osorio*, 134 S. Ct. at 2199. The proposed program would provide a mechanism for families to remain together, depending on their circumstances, for some or all of the intervening period.[14] Immigration officials have on several

---

[14] DHS's proposed program would likely not permit all potentially eligible parents to remain together with their children for the entire duration of the time until a visa is awarded. In particular, undocumented parents of adult citizens who are physically present in the country would be ineligible to adjust their status without first leaving the country if they had never been "inspected and admitted or paroled into the United States." 8 U.S.C. § 1255(a) (permitting the Attorney General to adjust to permanent resident status certain aliens present in the United States if they become eligible for immigrant visas). They would thus need to leave the country to obtain a visa at a U.S. consulate abroad. *See id.* § 1201(a); *Cuellar de Osorio*, 134 S. Ct. at 2197–99. But once such parents left the country, they would in most instances become subject to the 3- or 10-year bar under 8 U.S.C. § 1182(a)(9)(B)(i) and therefore unable to obtain a visa unless they remained outside the country for the duration of the bar. DHS's proposed program would nevertheless enable other families to stay together without regard to the 3- or 10-year bar. And even as to those families with parents who would become subject to that bar, the proposed deferred action program would have the effect of reducing the

occasions deployed deferred action programs as interim measures for other classes of aliens with prospective entitlements to lawful immigration status, including VAWA self-petitioners, bona fide T and U visa applicants, certain immediate family members of certain U.S. citizens killed in combat, and certain immediate family members of aliens killed on September 11, 2001. As noted above, each of these programs has received Congress's implicit approval—and, indeed, in the case of VAWA self-petitioners, a direction to expand the program beyond its original bounds. *See supra* pp. 18–20.[15] In addition, much like these and other programs Congress has implicitly endorsed, the program serves substantial and particularized humanitarian interests. Removing the parents of U.S. citizens and LPRs—that is, of children who have established permanent legal ties to the United States—would separate them from their nuclear families, potentially for many years, until they were able to secure visas through the path Congress has provided. During that time, both the parents and their U.S. citizen or LPR children would be deprived of both the economic support and the intangible benefits that families provide.

We recognize that the proposed program would likely differ in size from these prior deferred action programs. Although DHS has indicated that there is no reliable way to know how many eligible aliens would actually apply for or would be likely to receive deferred action following individualized consideration under the proposed program, it has informed us that approximately 4 million individuals could be eligible to apply. *See* Shahoulian E-mail. We have thus considered whether the size of the program alone sets it at odds with congressional policy or the Executive's duties under the Take Care Clause. In the absence of express statutory guidance, it is difficult to say exactly how the program's potential size bears on its permissibility as an exercise of executive enforcement discretion. But because the size of DHS's proposed program corresponds to the size of a population to which Congress has granted a prospective entitlement to lawful status

---

amount of time the family had to spend apart, and could enable them to adjust the timing of their separation according to, for example, their children's needs for care and support.

[15] Several extended voluntary departure programs have been animated by a similar rationale, and the most prominent of these programs also received Congress's implicit approval. In particular, as noted above, the Family Fairness policy, implemented in 1990, authorized granting extended voluntary departure and work authorization to the estimated 1.5 million spouses and children of aliens granted legal status under IRCA—aliens who would eventually "acquire lawful permanent resident status" and be able to petition on behalf of their family members. Family Fairness Memorandum at 1; *see supra* pp. 14–15. Later that year, Congress granted the beneficiaries of the Family Fairness program an indefinite stay of deportation. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 301, 104 Stat. 4978, 5030. Although it did not make that grant of relief effective for nearly a year, Congress clarified that "the delay in effectiveness of this section shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date." *Id.* § 301(g). INS's policies for qualifying Third Preference visa applicants and nurses eligible for H-1 nonimmigrant status likewise extended to aliens with prospective entitlements to lawful status. *See supra* p. 14.

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

without numerical restriction, it seems to us difficult to sustain an argument, based on numbers alone, that DHS's proposal to grant a limited form of administrative relief as a temporary interim measure exceeds its enforcement discretion under the INA. Furthermore, while the potential size of the program is large, it is nevertheless only a fraction of the approximately 11 million undocumented aliens who remain in the United States each year because DHS lacks the resources to remove them; and, as we have indicated, the program is limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. There is thus little practical danger that the program, simply by virtue of its size, will impede removals that would otherwise occur in its absence. And although we are aware of no prior exercises of deferred action of the size contemplated here, INS's 1990 Family Fairness policy, which Congress later implicitly approved, made a comparable fraction of undocumented aliens—approximately four in ten—potentially eligible for discretionary extended voluntary departure relief. *Compare* CRS Immigration Report at 22 (estimating the Family Fairness policy extended to 1.5 million undocumented aliens), *with* Office of Policy and Planning, INS, *Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000* at 10 (2003) (estimating an undocumented alien population of 3.5 million in 1990); *see supra* notes 5 & 15 (discussing extended voluntary departure and Congress's implicit approval of the Family Fairness policy). This suggests that DHS's proposed deferred action program is not, simply by virtue of its relative size, inconsistent with what Congress has previously considered a permissible exercise of enforcement discretion in the immigration context.

In light of these considerations, we believe the proposed expansion of deferred action to the parents of U.S. citizens and LPRs is lawful. It reflects considerations—responding to resource constraints and to particularized humanitarian concerns arising in the immigration context—that fall within DHS's expertise. It is consistent with congressional policy, since it focuses on a group—law-abiding parents of lawfully present children who have substantial ties to the community—that Congress itself has granted favorable treatment in the immigration process. The program provides for the exercise of case-by-case discretion, thereby avoiding creating a rule-like entitlement to immigration relief or abdicating DHS's enforcement responsibilities for a particular class of aliens. And, like several deferred action programs Congress has approved in the past, the proposed program provides interim relief that would prevent particularized harm that could otherwise befall both the beneficiaries of the program and their families. We accordingly conclude that the proposed program would constitute a permissible exercise of DHS's enforcement discretion under the INA.

### 2.

We now turn to the proposed deferred action program for the parents of DACA recipients. The relevant considerations are, to a certain extent, similar to those

discussed above: Like the program for the parents of U.S. citizens and LPRs, the proposed program for parents of DACA recipients would respond to severe resource constraints that dramatically limit DHS's ability to remove aliens who are unlawfully present, and would be limited to individuals who would be unlikely to be removed under DHS's proposed prioritization policy. And like the proposed program for LPRs and U.S. citizens, the proposed program for DACA parents would preserve a significant measure of case-by-case discretion not to award deferred action even if the general eligibility criteria are satisfied.

But the proposed program for parents of DACA recipients is unlike the proposed program for parents of U.S. citizens and LPRs in two critical respects. First, although DHS justifies the proposed program in large part based on considerations of family unity, the parents of DACA recipients are differently situated from the parents of U.S. citizens and LPRs under the family-related provisions of the immigration law. Many provisions of the INA reflect Congress's general concern with not separating individuals who are legally entitled to live in the United States from their immediate family members. *See, e.g.*, 8 U.S.C. § 1151(b)(2)(A)(i) (permitting citizens to petition for parents, spouses and children); *id.* § 1229b(b)(1) (allowing cancellation of removal for relatives of citizens and LPRs). But the immigration laws do not express comparable concern for uniting persons who lack lawful status (or prospective lawful status) in the United States with their families. DACA recipients unquestionably lack lawful status in the United States. *See* DACA Toolkit at 8 ("Deferred action . . . does not provide you with a lawful status."). Although they may presumptively remain in the United States, at least for the duration of the grant of deferred action, that grant is both time-limited and contingent, revocable at any time in the agency's discretion. Extending deferred action to the parents of DACA recipients would therefore expand family-based immigration relief in a manner that deviates in important respects from the immigration system Congress has enacted and the policies that system embodies.

Second, as it has been described to us, the proposed deferred action program for the parents of DACA recipients would represent a significant departure from deferred action programs that Congress has implicitly approved in the past. Granting deferred action to the parents of DACA recipients would not operate as an interim measure for individuals to whom Congress has given a prospective entitlement to lawful status. Such parents have no special prospect of obtaining visas, since Congress has not enabled them to self-petition—as it has for VAWA self-petitioners and individuals eligible for T or U visas—or enabled their undocumented children to petition for visas on their behalf. Nor would granting deferred action to parents of DACA recipients, at least in the absence of other factors, serve interests that are comparable to those that have prompted implementation of deferred action programs in the past. Family unity is, as we have discussed, a significant humanitarian concern that underlies many provisions of the INA. But a concern with furthering family unity alone would not justify the

*DHS's Authority to Prioritize Removal of Certain Aliens Unlawfully Present*

proposed program, because in the absence of any family member with lawful status in the United States, it would not explain why that concern should be satisfied by permitting family members to remain in the United States. The decision to grant deferred action to DACA parents thus seems to depend critically on the earlier decision to make deferred action available to their children. But we are aware of no precedent for using deferred action in this way, to respond to humanitarian needs rooted in earlier exercises of deferred action. The logic underlying such an expansion does not have a clear stopping point: It would appear to argue in favor of extending relief not only to parents of DACA recipients, but also to the close relatives of any alien granted deferred action through DACA or any other program, those relatives' close relatives, and perhaps the relatives (and relatives' relatives) of any alien granted any form of discretionary relief from removal by the Executive.

For these reasons, the proposed deferred action program for the parents of DACA recipients is meaningfully different from the proposed program for the parents of U.S. citizens and LPRs. It does not sound in Congress's concern for maintaining the integrity of families of individuals legally entitled to live in the United States. And unlike prior deferred action programs in which Congress has acquiesced, it would treat the Executive's prior decision to extend deferred action to one population as justifying the extension of deferred action to additional populations. DHS, of course, remains free to consider whether to grant deferred action to individual parents of DACA recipients on an ad hoc basis. But in the absence of clearer indications that the proposed class-based deferred action program for DACA parents would be consistent with the congressional policies and priorities embodied in the immigration laws, we conclude that it would not be permissible.

### III.

In sum, for the reasons set forth above, we conclude that DHS's proposed prioritization policy and its proposed deferred action program for parents of U.S. citizens and lawful permanent residents would be legally permissible, but that the proposed deferred action program for parents of DACA recipients would not be permissible.

KARL R. THOMPSON
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*

# EXHIBIT 55



The American Presidency Project™

John Woolley and Gerhard Peters

HOME   DATA   DOCUMENTS   ELECTIONS   MEDIA   LINKS

** NOTE: The American Presidency Project will soon launch a new website with a more contemporary look and improved search capability. While we continue "beta testing" the new site, please excuse lapses in updating this site. We expect to have the new site on-line in June.



**The American Presidency Project Needs Your Support**

Make a Gift

Consider a *tax-deductible* donation & click here



**Document Archive**
- **Public Papers of the Presidents**
- **State of the Union Addresses & Messages**
- Inaugural Addresses
- Farewell Addresses
- Weekly Addresses
- Fireside Chats
- News Conferences
- Executive Orders
- Proclamations
- Signing Statements
- Press Briefings
- **Statements of Administration Policy**
- Economic Report of the President
- Debates
- Convention Speeches
- Party Platforms
- 2016 Election Documents
- 2012 Election Documents
- 2008 Election Documents
- 2004 Election Documents
- 1996 Election Documents
- 1968 Election Documents
- 1960 Election Documents
- 2017 Transition
- 2009 Transition
- 2001 Transition
- **White House Media Pool Reports**

**Data Archive**
Data Index
**Media Archive**
Audio/Video Index
**Elections**
Election Index
Florida 2000
**Links**
Presidential Libraries

**View Public Papers by Month and Year**

Month ▼   Year ▼



■ INCLUDE documents from the Office of the Press Secretary

■ INCLUDE election campaign documents, vice presidential documents, first



# DWIGHT D. EISENHOWER
XXXIV *President of the United States: 1953-1961*

**275 - Statement by the President Concerning the Entry Into the United States of Adopted Foreign-Born Orphans.**
October 26, 1956

Like 14K
Tweet
G+

I HAVE BEEN particularly concerned over the hardship that ensues to American citizens who have adopted foreign-born orphans and who have then found that they cannot bring their adopted children into the United States because quotas under the Walter-McCarran Act and the Refugee Relief Act are exhausted. Many of these foster parents are members of our armed forces who have completed tours of duty overseas and are forced to leave their adopted children behind.

I requested the Secretary of State and the Attorney General to determine whether it is possible to alleviate this problem-within the framework of existing law. The Secretary of State and the Attorney General have just reported to me that this can be done. Provision for bringing these orphans to our country, pending action by Congress to amend the law, will be put into effect immediately.

Citation: Dwight D. Eisenhower: "Statement by the President Concerning the Entry Into the United States of Adopted Foreign-Born Orphans.," October 26, 1956. Online by Gerhard Peters and John T. Woolley, *The American Presidency Project*. http://www.presidency.ucsb.edu/ws/?pid=10677.



COLLECTION:
*Public Papers of the Presidents*

Dwight D. Eisenhower
1956
**Font Size:**
A A A

🖨 Print
**Share**

The American Presidency Project
**facebook**
Name:
The American Presidency Project

Fans:
14289
Promote Your Page Too

lady, and other executive branch officals

| **View PPPUS** |

**Search the Entire Document Archive**

**Enter keyword:** ?

☒ AND ☐ OR ☐ NOT

**Limit by Year**
From: 1789 ▼
To : 2018 ▼
Limit results per page
30 ▼

☐ *INCLUDE* documents from the Office of the Press Secretary
☐ *INCLUDE* election campaign documents, vice presidential documents, first lady, and other executive branch officals

| Search |

Instructions

You can **search** the Public Papers in two ways:

**1. Search by Keyword and Year**
You can search by keyword and choose the range of years within your search by filling out the boxes under Search the Public Papers.

**2. View by Month and/or Year**
Select the month and/or year you would like information about and press View Public Papers. Then choose a Public Paper and the page will load for you.

*Search Engine provided by the Harry S. Truman Library. Our thanks to Jim Borwick and Dr. Rafee Che Kassim at Project Whistlestop for critical assistance in the implementation of the search function, and to Scott Roley at the Truman Library for facilitating this collaboration.*

**Home    Contact**

© 1999-2018 - Gerhard Peters and John T. Woolley - The American Presidency Project ™



# EXHIBIT 56



American Immigration Council (https://www.americanimmigrationcouncil.org)

Home (/) » Research (/topics)

FACT SHEET

# Executive Grants of Temporary Immigration Relief, 1956-Present

October 2, 2014

58

Much has been made of President Obama's Deferred Action for Childhood Arrivals (DACA) program, through which he deferred deportation for young adults brought to the U.S. as children. But as immigration legal scholar Hiroshi Motomura has noted, the president has broad executive authority to shape the enforcement and implementation of immigration laws, including exercising prosecutorial discretion to defer deportations and streamline certain adjudications. In fact, history books reveal that President Obama's action follows a long line of presidents who relied on their executive branch authority to address immigration challenges.

A chart of these decisions below makes clear that presidents have ample legal authority—and abundant historical precedent—supporting their discretion to take action in immigration matters. Since at least 1956, every U.S. president has granted temporary immigration relief to one or more groups in need of assistance. This chart collects 39 examples, which span actions large and small, taken over many years, sometimes by multiple administrations. Some presidents announced programs while legislation was pending. Other presidents responded to humanitarian crises. Still others made compelling choices to assist individuals in need when the law failed to address their needs or changes in circumstance.

Perhaps the most striking historical parallel to today's immigration challenges is the "Family Fairness" policy implemented by Presidents Ronald Reagan and George Bush, Sr. The story behind the fairness policy begins on November 6, 1986, when President Reagan signed the 1986 Immigration Reform and Control Act (IRCA), which gave up to 3 million unauthorized immigrants a path to legalization if they had been "continuously" present in the U.S. since January 1, 1982. But the new law excluded their spouses and children who didn't qualify and forced them to wait in line, creating "split-eligibility" families, as they were called. The U.S. Catholic bishops and immigration groups criticized President Reagan for separating families.

In 1987, Reagan's Immigration and Naturalization Service (INS) commissioner announced a blanket deferral of deportation (logistically similar to today's DACA program) for children under 18 who were living in a two-parent household with both parents legalizing, or with a single parent who was legalizing. Then, in July 1989, the Senate passed legislation to protect a bigger group—prohibiting deportation of all spouses and children of those who were legalizing under IRCA.

But the legislation stalled in the House, and in 1990 President Bush Sr. administratively implemented the Senate bill's provisions. His INS commissioner, saying "We can enforce the law humanely," expanded the blanket deferral to as many as 1.5 million spouses and children of immigrants who were legalizing, provided they met certain criteria. President Bush thus protected over 40 percent of the then-unauthorized population from deportation. The House then passed legislation, and President Bush signed it later that year.

The Family Fairness program is only one example of the common characteristics of presidential decisions to act on immigration. Several decisions were large-scale actions potentially affecting hundreds of thousands or millions of immigrants. Some presidents focused on the necessity of keeping families together. And other presidents acknowledged the absurdity of trying to deport people for whom major legislation in Congress was pending. Some of these examples include:

- **Large-scale actions**: In addition to Family Fairness, other large-scale actions include paroles of up to 600,000 Cubans in the 1960s and over 300,000 Southeast Asians in the 1970s, President Carter's suspension of deportations for over 250,000 visa-holders, and President Reagan's deferral of deportations for up to 200,000 Nicaraguans.
- **Family-based actions:** Other actions to protect families include the suspended deportations of families of visa-holders (Carter), parole of foreign-born orphans (Eisenhower, Obama), deferred action to widows of U.S. citizens and their children (Obama), and parole-in-place to families of military members (Obama).
- **Actions while legislation was pending**: Other actions taken while legislation was pending include parole of Cuban asylum seekers fleeing Castro (Nixon, Kennedy, Johnson), deferred action to battered immigrants whom the Violence Against Women Act (VAWA) would protect (Clinton), parole of orphans (Eisenhower), and DACA (Obama).

View the charts on executive grants of temporary immigration relief, 1956-present (https://www.americanimmigrationcouncil.org/sites/default/files/research/executive_grants_of_temporary_immigration_relief_1956-present_final_0.pdf).

1331 G St. NW, Suite 200, Washington, D.C., 20005 | 202-507-7500
Copyright American Immigration Council. All rights reserved.
Photo Credits (/content/photo-credits) | Sitemap (/sitemap)

# EXHIBIT 57



**Congressional**
**Research**
**Service**

**MEMORANDUM**                                                                July 13, 2012

**To:**        Prepared for Distribution to Multiple Congressional Requesters

**From:**      Andorra Bruno, Specialist in Immigration Policy, 7-7865
               Todd Garvey, Legislative Attorney, 7-0174
               Kate Manuel, Legislative Attorney, 7-4477
               Ruth Ellen Wasem, Specialist in Immigration Policy, 7-7342

**Subject:**   **Analysis of June 15, 2012 DHS Memorandum,** *Exercising Prosecutorial Discretion with*
               *Respect to Individuals Who Came to the United States as Children*

This Congressional Research Service (CRS) memorandum provides background and analysis related to
the memorandum issued by the Department of Homeland Security (DHS) on June 15, 2012, entitled
*Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as*
*Children.* Under the DHS directive, certain individuals who were brought to the United States as children
and meet other criteria will be considered for relief from removal. Intended to respond to a variety of
congressional requests on the policy set forth in the DHS memorandum, this CRS memorandum discusses
the content of the June 15, 2012 memorandum, as well as the unauthorized alien student issue and related
DREAM Act legislation, past administrative exercises of prosecutorial discretion to provide relief from
removal, the legal authority for the actions contemplated in the DHS memorandum, and other related
issues. For further information, please contact Andorra Bruno (unauthorized students and the DREAM
Act), Todd Garvey (constitutional authority), Kate Manuel (other legal issues), or Ruth Wasem
(antecedents of deferred departure and access to federal benefits).

## Overview of Unauthorized Alien Students

The unauthorized alien (noncitizen) population includes minors and young adults who were brought, as
children, to live in the United States by their parents or other adults. These individuals are sometimes
referred to as "unauthorized alien students," or, more colloquially, as "DREAM Act kids" or
"DREAMers."

While living in the United States, unauthorized alien children are able to receive free public education
through high school.[1] Many unauthorized immigrants who graduate from high school and want to attend

---

[1] The legal authority for disallowing state discrimination against unauthorized aliens in elementary and secondary education is
the 1982 Supreme Court decision in Plyler v. Doe. See also CRS Report RS22500, *Unauthorized Alien Students, Higher*
*Education, and In-State Tuition Rates: A Legal Analysis,* by Jody Feder.

AILA InfoNet Doc. No. 12072548. (Posted 07/25/12)

college, however, find it difficult to do so. One reason for this is that they are ineligible for federal student financial aid.[2] Another reason relates to a provision enacted in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA)[3] that discourages states and localities from granting unauthorized aliens certain "postsecondary education benefits" (referred to here as the "1996 provision").[4] More broadly, as unauthorized aliens, they are typically unable to work legally and are subject to removal from the United States.[5]

According to DHS estimates, there were 1.4 million unauthorized alien children under age 18 living in the United States in January 2011. In addition, there were 1.6 million unauthorized individuals aged 18 to 24, and 3.7 million unauthorized individuals aged 25 to 34.[6] These data represent totals and include all individuals in the specified age groups regardless of length of presence in the United States, age at time of initial entry into the United States, or educational status. Numerical estimates of potential beneficiaries of the policy set forth in DHS's June 15, 2012 memorandum are provided below.

# Legislation

Multiple bills have been introduced in recent Congresses to provide relief to unauthorized alien students. These bills have often been entitled the Development, Relief, and Education for Alien Minors Act, or the DREAM Act. A common element in these bills is that they would enable certain unauthorized alien students to obtain legal status through an immigration procedure known as *cancellation of removal*[7] and at some point in the process, to obtain legal permanent resident (LPR) status, provided they meet all the applicable requirements. Multiple DREAM Act bills have been introduced in the 112th Congress but none have seen any legislative action.[8]

## Traditional DREAM Act bills

Since the 109th Congress, "standard" DREAM Act bills have included language to repeal the 1996 provision mentioned above and to enable certain unauthorized alien students to adjust status (that is, to obtain LPR status in the United States). These bills have proposed to grant LPR status on a conditional basis to an alien who, among other requirements, could demonstrate that he or she:

---

[2] Higher Education Act (HEA) of 1965 (P.L. 89-329), as amended, November 8, 1965, 20 U.S.C. §1001 *et seq.*

[3] IIRIRA is Division C of P.L. 104-208, September 30, 1996.

[4] This provision, section 505, nominally bars states from conferring postsecondary education benefits (e.g., in-state tuition) to unauthorized aliens residing within their jurisdictions if similar benefits are not conferred to out-of-state U.S. citizens. Nevertheless, about a dozen states effectively do grant in-state tuition to resident unauthorized aliens without granting similar benefits to out-of-state citizens, and courts that have considered these provisions have upheld them.

[5] For additional information, see CRS Report RL33863, *Unauthorized Alien Students: Issues and "DREAM Act" Legislation*, by Andorra Bruno.

[6] U.S. Department of Homeland Security, Office of Immigration Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2011*, by Michael Hoefer, Nancy Rytina, and Bryan C. Baker.

[7] Cancellation of removal is a discretionary form of relief that an alien can apply for while in removal proceedings before an immigration judge. If cancellation of removal is granted, the alien's status is adjusted to that of a legal permanent resident.

[8] For additional analysis of DREAM Act legislation, see CRS Report RL33863, *Unauthorized Alien Students: Issues and "DREAM Act" Legislation*.

- was continuously physically present in the United States for at least five years preceding the date of enactment;

- was age 15 or younger at the time of initial entry;

- had been a person of good moral character since the time of initial entry;

- was at or below a specified age (age has varied by bill) on the date of enactment; and

- had been admitted to an institution of higher education in the United States or had earned a high school diploma or the equivalent in the United States.

The bills also include special requirements concerning inadmissibility,[9] and some would disqualify any alien convicted of certain state or federal crimes. After six years in conditional LPR status, an alien could have the condition on his or her status removed and become a full-fledged LPR if he or she meets additional requirements, including completing at least two years in a bachelor's or higher degree program in the United States or serving in the uniformed services[10] for at least two years. Two similar bills with these elements (S. 952, H.R. 1842)—both entitled the DREAM Act of 2011—have been introduced in the 112th Congress.

## Other Versions of the DREAM Act

Revised versions of the DREAM Act have also been introduced in Congress in recent years. In the 111th Congress, the House approved one of these DREAM Act measures as part of an unrelated bill, the Removal Clarification Act of 2010 (H.R. 5281).[11] Unlike earlier DREAM Act bills, this measure[12] did not include a repeal of the 1996 provision and proposed to grant eligible individuals an interim legal status prior to enabling them to adjust to LPR status. Under this measure, an alien meeting an initial set of requirements like those included in traditional DREAM Act bills (enumerated in the previous section) would have been granted conditional *nonimmigrant*[13] status for five years. This status could have been extended for another five years if the alien met additional requirements, including completing at least two years in a bachelor's or higher degree program in the United States or serving in the Armed Forces for at least two years. The applications to obtain conditional status initially and to extend this status would have been subject to surcharges. At the end of the second conditional period, the conditional nonimmigrant could have applied to adjust to LPR status.

---

[9] The Immigration and Nationality Act (INA) enumerates classes of inadmissible aliens. Under the INA, except as otherwise provided, aliens who are inadmissible under specified grounds, such as health-related grounds or criminal grounds, are ineligible to receive visas from the Department of State or to be admitted to the United States by the Department of Homeland Security.

[10] As defined in Section 101(a) of Title 10 of the U.S. Code, *uniformed services* means the Armed Forces (Army, Navy, Air Force, Marine Corps, and Coast Guard); the commissioned corps of the National Oceanic and Atmospheric Administration; and the commissioned corps of the Public Health Service.

[11] The Senate failed, on a 55-41 vote, to invoke cloture on a motion to agree to the House-passed DREAM Act amendment, and H.R. 5281 died at the end of the Congress.

[12] The language is the same as that in H.R. 6497 in the 111th Congress.

[13] Nonimmigrants are legal temporary residents of the United States.

Two bills in the 112th Congress—the Adjusted Residency for Military Service Act, or ARMS Act (H.R. 3823) and the Studying Towards Adjusted Residency Status Act, or STARS Act (H.R. 5869)—follow the general outline of the House-approved measure described above, but include some different, more stringent requirements. These bills would provide separate pathways for unauthorized students to obtain LPR status through military service (ARMS Act) or higher education (STARS Act). Neither bill would repeal the 1996 provision and, thus, would not eliminate the statutory restriction on state provision of postsecondary educational benefits to unauthorized aliens.

The initial requirements for conditional nonimmigrant status under the ARMS Act are like those in the traditional DREAM Act bills discussed above. The STARS Act includes most of these requirements, as well as others that are not found in other DREAM Act bills introduced in the 112th Congress. Two new STARS Act requirements for initial conditional status are: (1) admission to an accredited four-year college, and (2) submission of the application for relief before age 19 or, in some cases, before age 21.

Under both the ARMS Act and the STARS Act, the conditional nonimmigrant status would be initially valid for five years and could be extended for an additional five years if applicants meet a set of requirements. In the case of the ARMS Act, these requirements would include service in the Armed Forces on active duty for at least two years or service in a reserve component of the Armed Forces in active status for at least four years. In the case of the STARS Act, the requirements for an extension of status would include graduation from an accredited four-year institution of higher education in the United States. After obtaining an extension of status, an alien could apply to adjust to LPR status, as specified in each bill.

## DHS Memorandum of June 15, 2012

On June 15, 2012, the Obama Administration announced that certain individuals who were brought to the United States as children and meet other criteria would be considered for relief from removal. Under the memorandum, issued by Secretary of Homeland Security Janet Napolitano, these individuals would be eligible for deferred action[14] for two years, subject to renewal, and could apply for employment authorization.[15] The eligibility criteria for deferred action under the June 15, 2012 memorandum are:

- under age 16 at time of entry into the United States;

- continuous residence in the United States for at least five years preceding the date of the memorandum;

---

[14] Deferred action is "a discretionary determination to defer removal action of an individual as an act of prosecutorial discretion." U.S. Department of Homeland Security, "Secretary Napolitano Announces Deferred Action Process for Young People Who Are Low Enforcement Priorities," http://www.dhs.gov/files/enforcement/deferred-action-process-for-young-people-who-are-low-enforcement-priorities.shtm.

[15] U.S. Department of Homeland Security, Memorandum to David V. Aguilar, Acting Commissioner, U.S. Customs and Border Protection, Alejandro Mayorkas, Director, U.S. Citizenship and Immigration Services, John Morton, Director, U.S. Immigration and Customs Enforcement, from Janet Napolitano, Secretary of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*, June 15, 2012, http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

- in school, graduated from high school or obtained general education development certificate, or honorably discharged from the Armed Forces;

- not convicted of a felony offense, a significant misdemeanor offense, or multiple misdemeanor offenses, and not otherwise a threat to national security or public safety; and

- age 30 or below.

These eligibility criteria are similar to those included in DREAM Act bills discussed above. The deferred action process set forth in the June 15, 2012 memorandum, however, would not grant eligible individuals a legal immigration status.[16]

Based on these eligibility criteria, the Pew Hispanic Center has estimated that the policy set forth in the June 15, 2012 memorandum could benefit up to 1.4 million unauthorized aliens in the United States. This potential beneficiary population total includes 0.7 million individuals under age 18 and 0.7 million individuals aged 18 to 30.[17]

## Antecedents of the Policy

The Attorney General and, more recently, the Secretary of Homeland Security have had prosecutorial discretion in exercising the power to remove foreign nationals. In 1959, a major textbook of immigration law stated, "Congress traditionally has entrusted the enforcement of its deportation policies to executive officers and this arrangement has been approved by the courts."[18] Specific guidance on how prosecutorial discretion was applied in individual cases was elusive in the early years.[19] Generally, prosecutorial discretion is the authority that an enforcement agency has in deciding whether to enforce or not enforce the law against someone. In the immigration context, prosecutorial discretion exists across a range of decisions that include: prioritizing certain types of investigations; deciding whom to stop, question and arrest; deciding to detain an alien; issuing a notice to appear (NTA); granting deferred action; agreeing to let the alien depart voluntarily; and executing a removal order. (The legal authority to exercise prosecutorial discretion is discussed separately below.)

---

[16] The DHS memorandum states: "This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law." Ibid., p. 3.

[17] Pew Hispanic Center, "Up to 1.4 Million Unauthorized Immigrants Could Benefit from New Deportation Policy," June 15, 2012, http://www.pewhispanic.org/2012/06/15/up-to-1-4-million-unauthorized-immigrants-could-benefit-from-new-deportation-policy/.

[18] Charles Gordon and Harry N. Rosenfield, *Immigration Law and Procedure*, Albany, New York: Banks and Company, 1959, p. 406.

[19] For example, in 1961, an official with the former Immigration and Naturalization Service (INS) offered his insights on circumstances in which discretionary relief from removal might be provided. The first factor he cited was age: "I have always felt that young people should be treated in our proceedings as are juveniles in the Courts who have violated criminal law.... My personal opinion is that certainly someone under eighteen is entitled to extra consideration." He added that persons over 60 or 65 years of age should be given special consideration. He also emphasized length of residence in the United States as a factor, noting that "five years is a significant mark in immigration law." Other factors he raised included good moral character, family ties in the United States, and exceptional and unusual hardship to the alien as well as family members. Aaron I. Maltin, Special Inquiry Officer, "Relief from Deportation," *Interpreter Releases*, vol. 38, no. 21 (June 9, 1961), pp. 150-155. He also discussed refugee and asylum cases.

Over the next few decades, an official guidance on discretionary relief from removal began to take shape. A 1985 Congressional Research Service "white paper" on discretionary relief from deportation described the policies of Immigration and Naturalization Service (INS)[20] at that time.

> Currently, three such discretionary procedures are relatively routinely used by INS to provide relief from deportation. One of the procedures – stay of deportation – is defined under INS regulations; another—deferred departure or deferred action – is described in INS operating instructions; and the third – extended voluntary departure—has not been formally defined and appears to be evolving.

The CRS "white paper" further noted that the executive branch uses these three forms of prosecutorial discretion "to provide relief the Administration feels is appropriate but which would not be available under the statute."[21]

In an October 24, 2005, memorandum, William Howard, then-Principal Legal Advisor of DHS's Immigration and Customs Enforcement (ICE), cited several policy factors relevant to the need to exercise prosecutorial discretion. One factor he identified was institutional change. He wrote:

> "Gone are the days when INS district counsels... could simply walk down the hall to an INS district director, immigrant agent, adjudicator, or border patrol officer to obtain the client's permission to proceed ... Now the NTA-issuing clients might be in different agencies, in different buildings, and in different cities from our own."

Another issue Howard raised was resources. He pointed out that the Office of Principal Legal Advisor (OPLA) was "handling about 300,000 cases in the immigration courts, 42,000 appeals before the Board of Immigration Appeals (BIA or Board) and 12,000 motions to re-open each year." He further stated:

> "Since 2001, federal immigration court cases have tripled. That year there were 5,435 federal court cases. Four years later, in fiscal year 2004, that number had risen to 14,699 federal court cases. Fiscal year 2005 federal court immigration cases will approximate 15,000."[22]

Howard offered examples of the types of cases to consider for prosecutorial discretion, such as someone who had a clearly approvable petition to adjust to legal permanent resident status, someone who was an immediate relative of military personnel, or someone for whom sympathetic humanitarian circumstances "cry for an exercise of prosecutorial discretion."[23]

In November 2007, then-DHS Assistant Secretary for ICE Julie L. Myers issued a memorandum in which she clarified that the replacement of the "catch and release" procedure with the "catch and return" policy for apprehended aliens (i.e., a zero-tolerance policy for all aliens apprehended at the border) did not "diminish the responsibility of ICE agents and officers to use discretion in identifying and responding to

---

[20] Most of the immigration-related functions of the former INS were transferred to the U.S. Department of Homeland Security when it was created in 2002 by the Homeland Security Act (P.L. 107-296). Three agencies in DHS have important immigration functions in which prosecutorial discretion may come into play: Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), and U.S. Citizenship and Immigration Services (USCIS).

[21] Sharon Stephan, *Extended Voluntary Departure and Other Blanket Forms of Relief from Deportation*, Congressional Research Service, 85-599 EPW, February 23, 1985.

[22] William J. Howard, Principal Legal Advisor, U.S. Immigration and Customs Enforcement, *Prosecutorial Discretion*, memorandum to all OPLA Chief Counsel, October 24, 2005.

[23] *Ibid.*

AILA InfoNet Doc. No. 12072548. (Posted 07/25/12)

meritorious health-related cases and caregiver issues."[24] Assistant Secretary Myers referenced and attached a November 7, 2000, memorandum entitled "Exercising Prosecutorial Discretion," which was written by former INS Commissioner Doris Meissner. The 2000 memorandum stated, in part:

> "Like all law enforcement agencies, the INS has finite resources, and it is not possible to investigate and prosecute all immigration violations. The INS historically has responded to this limitation by setting priorities in order to achieve a variety of goals. These goals include protecting public safety, promoting the integrity of the legal immigration system, and deterring violations of the immigration law.  It is an appropriate exercise of prosecutorial discretion to give priority to investigating, charging, and prosecuting those immigration violations that will have the greatest impact on achieving these goals."[25]

Meissner further stated that prosecutorial discretion should not become "an invitation to violate or ignore the law."[26]

The Meissner, Howard, and Myers memoranda provide historical context for the March 2011 memorandum on prosecutorial discretion written by ICE Director John Morton.[27] Morton published agency guidelines that define a three-tiered priority scheme that applies to all ICE programs and enforcement activities related to civil immigration enforcement.[28] Under these guidelines, ICE's top three civil immigration enforcement priorities are to: (1) apprehend and remove aliens who pose a danger to national security or a risk to public safety, (2) apprehend and remove recent illegal entrants,[29] and (3) apprehend aliens who are fugitives or otherwise obstruct immigration controls.[30]

In a June 17, 2011 memorandum, Morton spells out 18 factors that are among those that should be considered in weighing prosecutorial discretion. The factors include those that might halt removal

---

[24] Julie L. Myers, Assistant Secretary, Immigration and Customs Enforcement, *Prosecutorial and Custody Discretion,* memorandum, November 7, 2007. CRS Report R42057, *Interior Immigration Enforcement: Programs Targeting Criminal Aliens,* by Marc R. Rosenblum and William A. Kandel. (Hereafter CRS R42057, *Interior Immigration Enforcement.*)

[25] Doris Meissner, Commissioner, Immigration and Naturalization Service, *Exercising Prosecutorial Discretion,* memorandum to regional directors, district directors, chief patrol agents, and the regional and district counsels, November 7, 2000.

[26] *Ibid.*

[27] John Morton, Director, Immigration and Customs Enforcement, *Civil Immigration Enforcement Priorities for the Apprehension, Detention, and Removal of Aliens,* memorandum, March 2, 2011.

[28] ICE's mission includes the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration; see ICE, "ICE Overview: Mission," http://www.ice.gov/about/overview/. Laws governing the detention and removal of unauthorized aliens generally fall under ICE's civil enforcement authority, while laws governing the prosecution of crimes, including immigration-related crimes, fall under ICE's criminal enforcement authority. Also see Hiroshi Motomura, "The Discretion That Matters: Federal Immigration Enforcement, State and Local Arrests, and the Civil-Criminal Line," *UCLA Law Review,* vol. 58, no. 6 (August 2011), pp. 1819-1858.

[29] The memorandum does not define "recent illegal entrants." DHS regulations permit immigration officers to summarily exclude an alien present in the United States for less than two years unless the alien expresses an intent to apply for asylum or has a fear of persecution or torture; and DHS policy is to pursue expedited removal proceedings against aliens who are determined to be inadmissible because they lack proper documents, are present in the United States without having been admitted or paroled following inspection by an immigration officer at a designated port of entry, are encountered by an immigration officer within 100 miles of the U.S. border, and have not established to the satisfaction of an immigration officer that they have been physically present in the United States for over 14 days. See CRS Report RL33109, *Immigration Policy on Expedited Removal of Aliens,* by Alison Siskin and Ruth Ellen Wasem.

[30] CRS Report R42057, *Interior Immigration Enforcement: Programs Targeting Criminal Aliens,* by Marc R. Rosenblum and William A. Kandel.

proceedings, such as whether the person's immediate relative is serving in the military, whether the person is a caretaker of a person with physical or mental disabilities, or whether the person has strong ties to the community. The factors Morton lists also include those that might prioritize a removal proceeding, such as whether the person has a criminal history, whether the person poses a national security or public safety risk, whether the person recently arrived in the United States, and how the person entered. At the same time, the memorandum states:

> "This list is not exhaustive and no one factor is determinative. ICE officers, agents and attorneys should always consider prosecutorial discretion on a case-by-case basis. The decisions should be based on the totality of the circumstances, with the goal of conforming to ICE's enforcement priorities."

The Morton memorandum would halt removal proceedings on those foreign nationals that are not prioritized for removal. The foreign nationals whose removals are halted in keeping with the Morton memorandum might be given deferred action or some other relief from removal. [31]

## Deferred Action

In 1975, INS issued guidance on a specific form of prosecutorial discretion known as deferred action, which cited "appealing humanitarian factors." The INS Operating Instructions said that consideration should be given to advanced or tender age, lengthy presence in the United States, physical or mental conditions requiring care or treatment in the United States, and the effect of deportation on the family members in the United States. On the other hand, those INS Operating Instructions made clear that criminal, immoral or subversive conduct or affiliations should also be weighed in denying deferred action.[32] Today within DHS, all three of the immigration-related agencies—ICE, U.S. Citizenship and Immigration Services (USCIS), and Customs and Border Protection (CBP)—possess authority to grant deferred action. A foreign national might be considered for deferred action at any stage of the administrative process.[33]

Because of where the foreign national may be in the process, ICE issuances of deferred action are more likely to be aliens who are detained or in removal proceedings. It is especially important to note, as mentioned above, that not all prosecutorial discretion decisions to halt removal proceedings result in a grant of deferred action to the foreign national. Voluntary departure, for example, might be an alternative outcome of prosecutorial discretion.[34]

---

[31] John Morton, Director of Immigration and Customs Enforcement, *Exercising Prosecutorial Discretion Consistent with the Civil Immigration Enforcement Priorities of the Agency for Apprehension, Detention and Removal of Aliens*, memorandum to field office directors, special agents in charge, and chief counsels, June 17, 2011.

[32] Shoba Sivaprasad Wadhia, "The Role of Prosecutorial Discretion in Immigration Law," *Connecticut Public Interest Law Journal,* Spring 2010.

[33] Charles Gordon, Stanley Mailman, Stephen Yale-Loehr, *Immigration Law and Procedure.* Newark: LexisNexis, vol. 6, §72.03.

[34] Voluntary departure typically means that the alien concedes removability and departs the United States on his or her own recognizance, rather than with a final order of removal.

## Other Forms of Deferred Departure

In addition to deferred action, which is granted on a case-by-case basis, the Administration may use prosecutorial discretion, under certain conditions, to provide relief from deportation that is applied as blanket relief.[35] The statutory authority cited by the agency for these discretionary procedures is generally that portion of the INA that confers on the Attorney General the broad authority for general enforcement and the section of the law covering the authority for voluntary departure.[36]

The two most common uses of prosecutorial discretion to provide blanket relief from deportation have been deferred departure or deferred enforced departure (DED) and extended voluntary departure (EVD).[37] The discretionary procedures of DED and EVD continue to be used to provide relief the Administration feels is appropriate. Foreign nationals who benefit from EVD or DED do not necessarily register for the status with USCIS, but they trigger the protection when they are identified for deportation. If, however, they wish to be employed in the United States, they must apply for a work authorization from USCIS.

The executive branch has provided blanket or categorical deferrals of deportation numerous times over the years. CRS has compiled a list of these administrative actions since 1976 in **Appendix A**.[38] As the table indicates, most of these discretionary deferrals have been done on a country-specific basis, usually in response to war, civil unrest, or natural disasters. In many of these instances, Congress was considering legislative remedies for the affected groups, but had not yet enacted immigration relief for them. The immigration status of those who benefited from these deferrals of deportation often—but not always—was resolved by legislation adjusting their status (**Appendix A**).

## Two Illustrative Examples

Several of the categorical deferrals of deportation that were **not** country-specific bear some similarities to the June 15, 2012 policy directive. Two examples listed in **Appendix A** are summarized below: the "Silva letterholders" class and the "family fairness" relatives. Both of these groups receiving discretionary relief from deportation were unique in their circumstances. While each group included many foreign nationals who would otherwise be eligible for LPR visas, they were supposed to wait in numerically-limited visa categories. These wait times totaled decades for many of them. Congress had considered but not enacted legislation addressing their situations. Ultimately, their cases were resolved by provisions folded into comprehensive immigration legislation.[39]

---

[35] In addition to relief offered through prosecutorial discretion, the INA provides for Temporary Protected Status (TPS). TPS may be granted under the following conditions: there is ongoing armed conflict posing serious threat to personal safety; a foreign state requests TPS because it temporarily cannot handle the return of nationals due to environmental disaster; or there are extraordinary and temporary conditions in a foreign state that prevent aliens from returning, provided that granting TPS is consistent with U.S. national interests. CRS Report RS20844, *Temporary Protected Status: Current Immigration Policy and Issues*, by Ruth Ellen Wasem and Karma Ester.

[36] §240 of INA, 8 U.S.C. §1229a; §240B, 8 U.S.C. §1229c.

[37] As TPS is spelled out in statute, it is not considered a use of prosecutorial discretion, but it does provide blanket relief from removal temporarily.

[38] **Appendix A** only includes those administrative actions that could be confirmed by copies of official government guidance or multiple published accounts. For example, reports of deferred action after Hurricane Katrina or the September 11, 2001, terrorist attacks could not be verified, though it seems likely that the Administration did provide some type of temporary reprieve.

[39] These policies and legal provisions pre-date the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (referenced above), which added substantial new penalties and bars for illegal presence in the United States.

The "Silva letterholders" were foreign nationals from throughout the Western Hemisphere who were in the United States without legal authorization. In 1976, the Attorney General opined that the State Department had been incorrectly charging the visas for Cuban refugees against the Western Hemisphere numerical limits from 1966 to 1976. A class action case named for Mr. Refugio Silva was filed to recapture the 145,000 LPR visas given to Cubans for foreign nationals with approved petitions from other Western Hemisphere nations. Apparently many of the aliens involved in the case were already in the country, out-of-status, even though they had LPR petitions pending. In other words, they had jumped the line. In 1977, the Attorney General temporarily suspended the expulsion while the class action case moved forward. Class members were allowed to apply for work authorization. Meanwhile, Congress passed amendments to the INA in 1978 that put the Western Hemisphere nations under the per-country cap, which further complicated their situation, by making visa availability more difficult for some but not all of the Western Hemisphere countries. The courts ruled for the Silva class, but the 145,000 recaptured visas were inadequate to cover the estimated 250,000 people who had received letters staying their deportation and permitting them to work. When the dependents of the Silva letterholders were included, the estimated number grew to almost half a million.  Most of those in the Silva class who did not get one of the recaptured visas were ultimately eligible to legalize through P.L. 99-603, the Immigration Reform and Control Act (IRCA) of 1986.

Another example are the unauthorized spouses and children of aliens who legalized through IRCA. As Congress was debating IRCA, it weighed and opted not to provide a legalization pathway for the immediate relatives of aliens who met the requirements of IRCA unless they too met those requirements. As IRCA's legalization programs were being implemented, the cases of unauthorized spouses and children who were not eligible to adjust with their family came to the fore. In 1987, Attorney General Edward Meese authorized the INS district directors to defer deportation proceedings where "compelling or humanitarian factors existed." Legislation addressing this population was introduced throughout the 1980s, but not enacted. In 1990, INS Commissioner Gene McNary issued a new "Family Fairness" policy for family members of aliens legalized through IRCA, dropping the where "compelling or humanitarian factors existed" requirement. At the time, McNary stated that an estimated 1.5 million unauthorized aliens would benefit from the policy. The new policy also allowed the unauthorized spouses and children to apply for employment authorizations. Ultimately, the Immigration Act of 1990 (P.L. 101-649) provided relief from deportation and employment authorization to them so they could remain in the United States until a family-based immigration visa became available. P.L. 101-649 also provided additional visas for the family-based LPR preference category in which they were waiting.

## Legal Authority Underlying the June 15, 2012 Memorandum

The Secretary of Homeland Security would appear to have the authority to grant both deferred action and work authorization, as contemplated by the June 15 memorandum, although the basis for such authority is different in the case of deferred action than in the case of work authorization. The determination as to whether to grant deferred action has traditionally been recognized as within the prosecutorial discretion of immigration officers[40] and, thus, has been considered an inherent power of the executive branch, to which

---

[40] *See, e.g.*, Matter of Yauri, 25 I. & N. Dec. 103 (2009) (characterizing a grant of deferred action as within the prosecutorial discretion of immigration officers); Doris Meissner, Commissioner, Immigration and Naturalization Service, *Exercising Prosecutorial Discretion*, Nov. 7, 2000, at 2 (listing "granting deferred action or staying a final order of removal" among the determinations in which immigration officers may exercise prosecutorial discretion).

AILA InfoNet Doc. No. 12072548. (Posted 07/25/12)

the Constitution entrusts decisions about whether to enforce particular cases.[41] While it could perhaps be argued that decisions to refrain from fully enforcing a law might, in some instances, run afoul of particular statutes that set substantive priorities for or otherwise circumscribe an agency's power to discriminate among the cases it will pursue, or run afoul of the President's constitutional obligation to "take care" that the law is faithfully executed, such claims may not lend themselves to judicial resolution.[42] In contrast, when it enacted the Immigration Reform and Control Act of 1986, Congress delegated to the Attorney General (currently, the Secretary of Homeland Security) the authority to grant work authorization to aliens who are unlawfully present.[43]

## Authority to Exercise Prosecutorial Discretion

The established doctrine of "prosecutorial discretion" provides the federal government with "broad" latitude in determining when, whom, and whether to prosecute particular violations of federal law.[44] The decision to prosecute is one that lies "exclusively" with the prosecutor.[45] This doctrine, which is derived from the Constitution's requirement that the President "shall take Care that the Laws be faithfully executed,"[46] has traditionally been considered to be grounded in the constitutional separation of powers.[47] Indeed, both federal and state courts have ruled that the exercise of prosecutorial discretion is an executive function necessary to the proper administration of justice. Thus, prosecutorial discretion may be appropriately characterized as a constitutionally-based doctrine.

### *Prosecutorial Discretion Generally*

In granting discretion to enforcement officials, courts have recognized that the "decision to prosecute is particularly ill-suited to judicial review," as it involves the consideration of factors—such as the strength of evidence, deterrence value, and existing enforcement priorities—"not readily susceptible to the kind of analysis the courts are competent to undertake."[48] Moreover, the Executive Branch has asserted that "because the essential core of the President's constitutional responsibility is the duty to enforce the laws, the Executive Branch has exclusive authority to initiate and prosecute actions to enforce the laws adopted by Congress."[49]

---

[41] *See, e.g.*, United States v. Armstrong, 517 U.S. 456, 464 (1996) (noting that the Attorney General and the United States Attorneys have wide latitude in enforcing federal criminal law because "they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed'").

[42] *See infra* notes 66-85 and accompanying text.

[43] P.L. 99-603, 100 Stat. 3359 (Nov. 6, 1986) (codified, as amended, at 8 U.S.C. §§1324a-1324b).

[44] United States v. Goodwin, 457 U.S. 368, 380 (1982). *See also* Exercising Prosecutorial Discretion, *supra* note 40, at 2 (defining prosecutorial discretion as "the authority of an agency charged with enforcing a law to decide whether to enforce, or not enforce, the law against someone").

[45] *See* United States v. Nixon, 418 U.S. 683, 693 (1974) (citing the *Confiscation Cases*, 7 Wall. 454 (1869) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case…")).

[46] U.S. Const. art. II, §3 ("[H]e shall take Care that the Laws be faithfully executed…").

[47] *See, e.g.*, *Armstrong*, 517 U.S. at 464.

[48] Wayte v. United States, 470 U.S. 598, 607 (1985).

[49] *See Prosecution for Contempt of Congress of an Executive Branch Official Who Has Asserted a Claim of Executive Privilege*, 8 Op. Off. Legal Counsel 101, 114 (1984). This traditional conception, however, may have been qualified in some respects following the Supreme Court's decision in *Morrison v. Olson,* in which the Court upheld a congressional delegation of prosecutorial power to an "independent counsel" under the Ethics in Government Act [49] In sustaining the validity of the statute's (continued...)

An agency decision to initiate an enforcement action in the *administrative* context "shares to some extent the characteristics of the decision of a prosecutor in the executive branch" to initiate a prosecution in the *criminal* context.[50] Thus, just as courts are hesitant to question a prosecutor's decisions with respect to whether to bring a criminal prosecution, so to are courts cautious in reviewing an agency's decision not to bring an enforcement action. In the seminal case of *Heckler v. Cheney*, the Supreme Court held that "an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion."[51] The Court noted that agency enforcement decisions, like prosecution decisions, involve a "complicated balancing" of agency interests and resources—a balancing that the agency is "better equipped" to evaluate than the courts.[52] The *Heckler* opinion proceeded to establish the standard for the reviewability of agency non-enforcement decisions, holding that an "agency's decision not to take enforcement action should be presumed immune from judicial review."[53]  That presumption however, may be overcome "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers," [54] as is discussed below.

## Prosecutorial Discretion in the Immigration Context

In *Reno v. American-Arab Anti-Discrimination Committee*, a majority of the Supreme Court found that the various prudential concerns that prompt deference to the executive branch's determinations as to whether to prosecute criminal offenses are "greatly magnified in the deportation context,"[55] which entails civil (rather than criminal) proceedings. While the reasons cited by the Court for greater deference to exercises of prosecutorial discretion in the immigration context than in other contexts reflect the facts of the case, which arose when certain removable aliens challenged the government's decision *not* to exercise prosecutorial discretion in their favor,[56] the Court's language is broad and arguably can be construed to

---

(...continued)

appointment and removal conditions, the Court suggested that although the independent counsel's prosecutorial powers— including the "no small amount of discretion and judgment [exercised by the counsel] in deciding how to carry out his or her duties under the Act"—were executive in that they had "typically" been performed by Executive Branch officials, the court did not consider such an exercise of prosecutorial power to be "so central to the functioning of the Executive Branch" as to require Presidential control over the independent counsel. 487 U.S. 654 (1988). While the ultimate reach of *Morrison* may be narrow in that the independent counsel was granted only limited jurisdiction and was still subject to the supervision of the Attorney General, it does appear that Congress may vest certain prosecutorial powers, including the exercise of prosecutorial discretion, in an executive branch official who is independent of traditional presidential controls.

[50] Heckler v. Cheney, 470 U.S. 821, 832 (1985).

[51] *Id.* at 831. Accordingly, such decisions are generally precluded from judicial review under the Administrative Procedure Act (APA). 5 U.S.C. §701 (establishing an exception to the APA's presumption of reviewability where "agency action is committed to agency discretion by law.").

[52] *Heckler*, 470 U.S. at 831.

[53] *Id.* at 832.

[54] *Id.* at 833.

[55] 525 U.S. 471, 490 (1999). *See also* United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 543 (1950) (noting that immigration is a "field where flexibility and the adaptation of the congressional policy to infinitely variable conditions constitute the essence of the program").

[56] Specifically, the Court noted that any delays in criminal proceedings caused by judicial review of exercises of prosecutorial discretion would "merely … postpone the criminal's receipt of his just desserts," while delays in removal proceedings would "permit and prolong a continuing violation of United States law," and could potentially permit the alien to acquire a basis for changing his or her status. *Reno*, 525 U.S. at 490. The Court further noted that immigration proceedings are unique in that they can implicate foreign policy objectives and foreign-intelligence techniques that are generally not implicated in criminal (continued...)

encompass decisions to favorably exercise such discretion. More recently, in its decision in *Arizona v. United States*, a majority of the Court arguably similarly affirmed the authority of the executive branch not to seek the removal of certain aliens, noting that "[a] principal feature of the removal system is the broad discretion entrusted to immigration officials," and that "[r]eturning an alien to his own country may be deemed inappropriate even where he has committed a removable offense or fails to meet the criteria for admission."[57] According to the majority, such exercises of prosecutorial discretion may reflect "immediate human concerns" and the "equities of … individual case[s]," such as whether the alien has children born in the United States or ties to the community, as well as "policy choices that bear on … international relations."[58]

In addition to such general affirmations of the executive branch's prosecutorial discretion in the immigration context, other cases have specifically noted that certain decisions are within the prosecutorial discretion afforded first to INS and, later, the immigration components of DHS. These decisions include:

- whether to parole an alien into the United States;[59]

- whether to commence removal proceedings and what charges to lodge against the respondent;[60]

- whether to cancel a Notice to Appear or other charging document before jurisdiction vests in an immigration judge;[61]

- whether to grant deferred action or extended voluntary departure;[62]

- whether to appeal an immigration judge's decision or order, and whether to file a motion to reopen;[63] and

- whether to impose a fine for particular offenses.[64]

The recognition of immigration officers' prosecutorial discretion in granting deferred action is arguably particularly significant here, because the June 15 memorandum contemplates the grant of deferred action to aliens who meet certain criteria (e.g., came to the United States under the age of sixteen).

---

(...continued)

proceedings. *Id.* at 491. It also found that the interest in avoiding selective or otherwise improper prosecution in immigration proceedings, discussed below, is "less compelling" than in criminal proceedings because deportation is not a punishment and may be "necessary to bring to an end *an ongoing violation* of United States law." *Id.* (emphasis in original).

[57] No. 11-182, Opinion of the Court, slip op. at 4-5 (June 25, 2011). Justice Scalia's dissenting opinion, in contrast, specifically cited the June 15 memorandum when asserting that "there is no reason why the Federal Executive's need to allocate *its* scarce enforcement resources should disable Arizona from devoting *its* resources to illegal immigration in Arizona that in its view the Federal Executive has given short shrift." Opinion of Scalia, J., slip op., at 19 (June 25, 2011).

[58] No. 11-182, Opinion of the Court, slip op. at 4-5.

[59] *See, e.g.*, Matter of Artigas, 23 I. & N. Dec. 99 (2001).

[60] *See, e.g.*, Matter of Avetisyan, 25 I. & N. Dec. 688 (2012).

[61] *See, e.g.*, Matter of G-N-C, 22 I. & N. Dec. 281 (1998).

[62] *See, e.g.*, Matter of Yauri, 25 I. & N. Dec. 103 (2009) (deferred action); Hotel & Rest. Employees Union Local 25 v. Smith, 846 F.2d 1499, 1510-11 (D.C. Cir. 1988), *aff'g*, 563 F. Supp. 157 (D.D.C. 1983) (extended voluntary departure).

[63] *See, e.g.*, Matter of Avetisyan, 25 I. & N. Dec. 688 (2012); Matter of York, 22 I. & N. Dec. 660 (1999).

[64] *See, e.g.*, Matter of M/V Saru Meru, 20 I. & N. Dec. 592 (1992).

## Limitations on the Exercise of Prosecutorial Discretion

While the executive branch's prosecutorial discretion is broad, it is not "unfettered,"[65] and has traditionally been exercised pursuant to individualized determinations. Thus, an argument could potentially be made that the permissible scope of prosecutorial or enforcement discretion is exceeded where an agency utilizes its discretion to adopt a broad policy of non-enforcement as to particular populations in an effort to prioritize goals and maximize limited resources. It would appear, especially with respect to agency enforcement actions, that the invocation of prosecutorial discretion does not create an absolute shelter from judicial review, but rather is subject to both statutory and constitutional limitations.[66] As noted by the U.S. Court of Appeals for the District of Columbia Circuit: "the decisions of this court have never allowed the phrase 'prosecutorial discretion' to be treated as a magical incantation which automatically provides a shield for arbitrariness."[67] While it is apparent, then, that the exercise of prosecutorial discretion is subject to certain restrictions, the precise boundaries beyond which the executive may not cross remain unclear. Moreover, even if existing statutory or constitutional restrictions were conceivably applicable to the June 15 memorandum, standing principles would likely prevent judicial resolution of any challenge to the memorandum on these grounds.[68]

### *Potential Statutory Limitations on the Exercise of Prosecutorial Discretion*

With respect to statutory considerations, the presumption following the Supreme Court's decision in *Heckler v. Cheney* has been that agency decisions not to initiate an enforcement action are unreviewable. However, *Heckler* expressly held that this presumption against the reviewability of discretionary enforcement decisions can be overcome "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers."[69] Consistent with *Heckler*, a court may be willing to review a broad agency non-enforcement policy where there is evidence that Congress intended to limit enforcement discretion by "setting substantive priorities, or by otherwise circumscribing the agency's power to discriminate among issues or cases it will pursue."[70] The *Heckler* opinion also suggested that scenarios in which an agency has "'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities" may be subject to a different standard of review.[71]

---

[65] United States v. Batchelder, 442 U.S. 114, 125 (1979).

[66] Nader v. Saxbe, 497 F.2d 676, 679 (D.C. Cir. 1974) ("It would seem to follow that the exercise of prosecutorial discretion, like the exercise of Executive discretion generally, is subject to statutory and constitutional limits enforceable through judicial review.")

[67] *Id.* at 679 (citing *Medical Committee for Human Rights v. SEC*, 432 F.2d 659 (D.C. Cir. 1970)).

[68] In order to satisfy constitutional standing requirements, a prospective plaintiff must have suffered a personal and particularized injury that is "fairly traceable" to the defendant's conduct and is likely to be redressed by the relief requested from the court. *See, e.g.,* Allen v. Wright, 468 U.S. 737 (1984). It is difficult to envision a potential plaintiff who has been adequately injured by the issuance of the June 15 memorandum such that the individual could satisfy the Court's standing requirements. Standing is a threshold justiciability requirement. Thus, unless a plaintiff can attain standing to challenge the DHS directive, it would not appear that a court would have the opportunity to evaluate the directive's validity.

[69] 470 U.S. 821, 833 (1985).

[70] *Id.*

[71] *Id.* at 833 n.4 ("Nor do we have a situation where it could justifiably be found that the agency has 'consciously and expressly adopted a general policy' that is so extreme as to amount to an abdication of its statutory responsibilities. *See, e.g.,* Adams v. Richardson, 480 F.2d 1159 (1973) (en banc). Although we express no opinion on whether such decisions would be unreviewable (continued...)

Reviewability of the policy underlying the June 15 memorandum might, however, be limited even under a broad reading of *Heckler*, in part, because the INA does not generally address deferred action,[72] much less provide guidelines for immigration officers to follow in exercising it. Some commentators have recently asserted that amendments made to Section 235 of the INA by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 removed immigration officers' discretion as to whether to bring removal proceedings against aliens who unlawfully entered the Untied States.[73] Specifically, this argument holds that, pursuant to Section 235, as amended:

1) any alien present in the United States who has not been admitted (i.e., aliens who entered unlawfully) "shall be deemed … an applicant for admission;"

2) all aliens who are applicants for or otherwise seeking admission "shall be inspected by immigration officers;" and

3) in the case of an alien who is an applicant for admission, if the examining immigration officer determines that the alien is not clearly and beyond a doubt entitled to be admitted, the alien "shall be detained" for removal proceedings.[74]

It appears, however, that this argument may have been effectively foreclosed by the majority opinion in *Arizona*, where the Supreme Court expressly noted the "broad discretion exercised by immigration officials" in the removal process.[75] Moreover, the argument apparently relies upon a construction of the word "shall" that has generally been rejected in the context of prosecutions and immigration enforcement actions.[76] Rather than viewing "shall" as indicating mandatory agency actions, courts and the Board of Immigration Appeals (BIA), the highest administrative body responsible for interpreting and applying immigration law in removal cases, have instead generally found that prosecutors and enforcement officers

---

(...continued)

under §701(a)(2), we note that in those situations the statute conferring authority on the agency might indicate that such decisions were not 'committed to agency discretion.'").

[72] The INA uses the phrase "deferred action" only three times, in very specific contexts, none of which correspond to the proposed grant of deferred action contemplated by the June 15 memorandum. *See* 8 U.S.C. §1151 note (addressing the extension of posthumous benefits to certain surviving spouses, children, and parents); 8 U.S.C. §1154(a)(1)(D)(i)(IV) ("Any [victim of domestic violence] described in subclause (III) and any derivative child of a petition described in clause (ii) is eligible for deferred action and work authorization."); 8 U.S.C. §1227(d)(2) (providing that the denial of a request for an administrative stay of removal does not preclude the alien from applying for deferred action, among other things). However, INS and, later, DHS policies have long addressed the use of deferred action in other contexts on humanitarian grounds and as a means of prioritizing cases. *See, e.g.*, Leon Wildes, *The Deferred Action Program of the Bureau of Citizenship and Immigration Services: A Possible Remedy for Impossible Immigration Cases*, 41 SAN DIEGO L. REV. 819, 821 (2004) (discussing a 1970's INA Operations Instruction on deferred action). This Instruction was rescinded in 1997, but the policy remained in place. *See, e.g.*, Charles Gordon, Stanley Mailman, & Stephen Yale-Loehr, 6-72 IMMIGR. L. & PROC. §72.03 (2012).

[73] *See, e.g.*, Kris W. Kobach, *The "DREAM" Order Isn't Legal*, NEW YORK POST, June 21, 2012, http://www.nypost.com/p/news/opinion/opedcolumnists/the_dream_order_isn_legal_4WAYaqJueaEK6MS0onMJCO.

[74] Arizona v. United States, No. 11-182, *Amicus Curiae* Brief of Secure States Initiative in Support of Petitioners, at 8-9 (quoting 8 U.S.C. §1225(a)(1), (a)(3), and (b)(2)(A)).

[75] No. 11-182, Opinion of the Court, slip op. at 4-5.

[76] *Cf.* Exercising Prosecutorial Discretion, *supra* note 40, at 3 ("[A] statute directing that the INS 'shall' remove removable aliens would not be construed by itself to limit prosecutorial discretion.").

retain discretion to take particular actions even when a statute uses "shall" or "must" when discussing these actions.[77]

It is also unclear that the actions contemplated by the June 15 memorandum conflict with any substantive priorities set by Congress, or are "so extreme as to amount to an abdication" of DHS's responsibilities under the INA. For example, it appears that an argument could potentially be made to the contrary that the policy comports with the increased emphasis that Congress has placed upon the removal of "criminal aliens" with amendments made to the INA by IRCA, IIRIRA, and other statutes.[78] The June 15 memorandum expressly excludes from eligibility for deferred action persons who have been convicted of a felony, a significant misdemeanor, or multiple misdemeanors,[79] thereby potentially allowing immigration officers to focus their enforcement activities upon the "criminal aliens" who were identified as higher priorities for removal in earlier Obama Administration guidance on prosecutorial discretion.[80] In addition, Congress has funded immigration enforcement activities at a level that immigration officials have indicated is insufficient for the removal of all persons who are present in the United States without authorization. This level of funding figures prominently in the Obama Administration's rationale for designating certain aliens as lower priorities for removal,[81] and could potentially be said to counter any assertion that the Obama Administration's policy amounts to an "abdication" of its statutory responsibilities.

## *Potential Constitutional Limitations on the Exercise of Prosecutorial Discretion*

With respect to constitutional considerations, it is clear that executive branch officials may not exercise prosecutorial discretion in a manner that is inconsistent with established constitutional protections or other constitutional provisions. Selective prosecution cases commonly illustrate such an abuse of prosecutorial discretion. These cases typically arise where certain enforcement determinations, such as whether to prosecute a specific individual, are made based upon impermissible factors, such as race or religion.[82] A separate constitutional argument may be forwarded, however, in situations where the

---

[77] *See, e.g.*, Matter of E-R-M & L-R-M, 25 I. & N. Dec. 520, 523 (2011) (finding that determinations as to whether to pursue expedited removal proceedings (as opposed to removal proceedings under Section 240 of the INA) are within ICE's discretion, even though the INA uses "shall" in describing who is subject to expedited removal). The Board here specifically noted that, "in the Federal criminal code, Congress has defined most crimes by providing that whoever engages in certain conduct 'shall' be imprisoned or otherwise punished. But this has never been construed to require a Federal prosecutor to bring charges against every person believed to have violated the statute." *Id.* at 522.

[78] *See, e.g.*, IRCA, P.L. 99-603, §701, 100 Stat. 3445 (codified, as amended, at 8 U.S.C. §1229(d)(1)) (making the deportation of aliens who have been convicted of certain crimes an enforcement priority by requiring immigration officers to "begin any deportation proceeding as expeditiously as possible after the date of … conviction"); IIRIRA, P.L. 104-208, div. C, 110 Stat. 3009-546 to 3009-724 (expanding the definition of "aggravated felony," convictions for which can constitute grounds for removal, and creating additional criminal grounds for removal).

[79] Janet Napolitano, Secretary of Homeland Security, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, June 15, 2012, http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[80] *See, e.g.*, John Morton, Director, U.S. ICE, Civil Enforcement: Priorities for the Apprehension, Detention, and Removal of Aliens, Mar. 2, 2011, at 1-2, http://www.ice.gov/doclib/news/releases/2011/110302washingtondc.pdf.

[81] *Id.*, at 1 (estimating that ICE has resources to remove annually less than four percent of the noncitizens who are in the United States without authorization).

[82] Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) (holding that a decision may not be "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification"). *But see Reno*, 525 U.S. at 488 ("[A]s a general matter … an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his (continued...)

executive branch has, in effect, broadly refused to enforce a duly enacted statute by implementing a blanket ban on enforcement such that the agency has "expressly adopted a general policy which is in effect an abdication of its statutory duty."[83] By refusing to fully enforce certain aspects of a statutory provision, such an action may exceed the permissible scope of prosecutorial discretion and violate the President's duty that the "laws be faithfully executed."[84] However, CRS was unable to find a single case in which a court invalidated a policy of non-enforcement founded upon prosecutorial discretion on the grounds that the policy violated the Take Care clause. Moreover, it is unclear whether the June 15 memorandum would constitute an absolute non-enforcement policy so as to amount to an "abdication" of a statutory obligation, as discussed previously. Though establishing a department-wide policy regarding a group of individuals who meet certain criteria, the directive suggests that the listed criteria should be "considered" in each individual case. Thus, the directive could be interpreted as setting forth criteria for consideration in each individual exercise of prosecutorial discretion, rather than implementing a ban on deportation actions for qualified individuals.[85]

## Authority to Grant Work Authorization

The INA grants the Secretary of Homeland Security arguably wide latitude to issue work authorization, including to aliens who are unlawfully present. Since the enactment of IRCA in 1986, federal law has generally prohibited the hiring or employment of "unauthorized aliens."[86] However, the definition of "unauthorized alien" established by IRCA effectively authorizes the Secretary to grant work authorization to aliens who are unlawfully present by defining an "unauthorized alien" as one who:

> with respect to the employment of an alien at a particular time, … is not either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General [currently, Secretary of Homeland Security].[87]

Regulations promulgated by INS and DHS further provide that aliens who have been granted deferred action and can establish an "economic necessity for employment" may apply for work authorization.[88]

When first promulgated in 1987,[89] these regulations were challenged through the administrative process on the grounds that they exceeded INS's statutory authority.[90] Specifically, the challengers asserted that

---

(...continued)

deportation.").

[83] *See* Adams v. Richardson, 480 F.2d 1159, 1162 (D.C. Cir. 1973).

[84] U.S. Const. art. II, §3.

[85] As is discussed elsewhere in this memorandum, there have been other instances where deferred action or extended voluntary departure was granted to individuals who were part of a more broadly defined group (e.g., persons from Nicaragua, surviving spouses and children of deceased U.S. citizens, victims and witnesses of crimes).

[86] *See* 8 U.S.C. §§1324a-1324b.

[87] 8 U.S.C. §1324a(h)(3).

[88] 8 C.F.R. §274a.12(c)(14). Under these regulations, the "basic criteria" for establishing economic necessity are the federal poverty guidelines. *See* 8 C.F.R. §274a.12(e).

[89] *See* INS, Control of Employment of Aliens: Final Rule, 52 Fed. Reg. 16216 (May 1, 1987).

[90] INS, Employment Authorization; Classes of Aliens Eligible, 52 Fed. Reg. 46092 (Dec. 4, 1987) (denying a petition for rulemaking submitted by the Federation for American Immigration Reform, which sought the rescission of certain regulations pertaining to employment authorization for aliens in the United States).

the statutory language referring to aliens "authorized to be … employed by this chapter or by the Attorney General" did not give the Attorney General authority to grant work authorization "except to those aliens who have already been granted specific authorization by the Act."[91] Had this argument prevailed, the authority of INS and, later, DHS to grant work authorization to persons granted deferred action would have been in doubt, because the INA does not expressly authorize the grant of employment documents to such persons. However, INS rejected this argument on the grounds that the:

> only logical way to interpret this phrase is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined "unauthorized alien" in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute.[92]

Subsequent case law has generally affirmed that immigration officials have broad discretion in determining whether to deny or revoke work authorizations to persons granted deferred action, or in other circumstances.[93] These cases would appear to suggest that, by extension, immigration officials have similarly broad discretion to grant work authorization provided any requisite regulatory criteria (e.g., economic necessity) are met.

## Corollary Policy Implications: Access to Federal Benefits

Many observers characterize foreign nationals with relief from removal who obtain temporary work authorizations as "quasi-legal" unauthorized migrants.[94] They may be considered "lawfully present" for some very narrow purposes under the INA (such as whether the time in deferred status counts as illegal presence under the grounds of inadmissibility) but are otherwise unlawfully present. Foreign nationals to whom the government has issued temporary employment authorization documents (EADs) may legally obtain social security numbers (SSNs).[95] Possession of a valid EAD or SSN issued for temporary employment, however, does not trigger eligibility for federal programs and services. In other words, foreign nationals who are granted deferred action may be able to work but are not entitled to federally-funded public assistance, except for specified emergency services.[96]

---

[91] *Id.*

[92] *Id.*

[93] *See, e.g.*, Perales v. Casillas, 903 F.2d 1043, 1045 (5th Cir. 1990) ("[T]he agency's decision to grant voluntary departure and work authorization has been committed to agency discretion by law."); Chan v. Lothridge, No. 94-16936, 1996 U.S. App. LEXIS 8491 (9th Cir. 1996) (finding that INS did not abuse its discretion in denying interim work authorization to the petitioner while his application for asylum was pending); Kaddoura v. Gonzales, No. C06-1402RSL, 2007 U.S. Dist. LEXIS 37211 (W.D. Wash. 2007) (finding that the court lacked jurisdiction to hear a suit seeking to compel U.S. Citizenship and Immigration Services to grant work authorization because such actions are discretionary acts).

[94] The "quasi-legal" unauthorized aliens fall in several categories. The government has given them temporary humanitarian relief from removal, such as Temporary Protected Status (TPS). They have sought asylum in the United States and their cases have been pending for at least 180 days. They are immediate family or fiancées of LPRs who are waiting in the United States for their legal permanent residency cases to be processed. Or, they have overstayed their nonimmigrant visas and have petitions pending to adjust status as employment-based LPRs. These are circumstances in which DHS issues temporary employment authorization documents (EADs) to aliens who are not otherwise considered authorized to reside in the United States.

[95] For further background, see CRS Report RL32004, *Social Security Benefits for Noncitizens*, by Dawn Nuschler and Alison Siskin.

[96] CRS Report RL34500, *Unauthorized Aliens' Access to Federal Benefits: Policy and Issues*, by Ruth Ellen Wasem.

Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) of 1996 (P.L. 104-193) established comprehensive restrictions on the eligibility of all noncitizens for means-tested public assistance, with exceptions for LPRs with a substantial U.S. work history or military connection. Regarding unauthorized aliens, Section 401 of PRWORA barred them from any federal public benefit except the emergency services and programs expressly listed in Section 401(b) of PRWORA. This overarching bar to unauthorized aliens hinges on how broadly the phrase "federal public benefit" is implemented. The law defines this phrase to be

> (A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.[97]

So defined, this bar covers many programs whose enabling statutes do not individually make citizenship or immigration status a criterion for participation.

Thus, beneficiaries of the June 15, 2012 policy directive will be among those "quasi-legal" unauthorized migrants who have EADs and SSNs—but who are not otherwise authorized to reside in the United States.

---

[97] §401(c) of PRWORA, 8 U.S.C. §1611.

# Appendix. Past Administrative Directives on Blanket or Categorical Deferrals of Deportation

## Selected Major Directives, 1976-2011

| Year | Type of Action | Class of Aliens Covered | Estimated Number | Commentary |
|------|----------------|-------------------------|------------------|------------|
| 1976 | Extended voluntary departure (EVD) for Lebanese on a case-by-case basis | Otherwise deportable Lebanese in the United States. | NA | Lebanese received TPS from 1991 to 1993. |
| 1977 | EVD for Ethiopians | Otherwise deportable Ethiopians in the United States. | NA | P.L. 100-204 contained a special extension of the legalization program established by the Immigration Reform and Control Act (IRCA) of 1986 to include otherwise eligible aliens who had been granted EVD status during a time period that included the Ethiopians. |
| 1977 | The Attorney General temporarily suspended the expulsion of certain natives of Western Hemisphere countries, known as the "Silva Letterholders." They were granted stays and permitted to apply for employment authorization. | A group of aliens with approved petitions filed a class action lawsuit to recapture about 145,000 visas assigned to Cubans. | 250,000 | Many of these cases were not resolved until the passage of IRCA. |
| 1978 | EVD for Ugandans | Otherwise deportable Ugandans in the United States. | NA | P.L. 100-204 contained a special extension of the legalization program established by IRCA to include otherwise eligible aliens who had been granted EVD status during a time period that included the Ugandans. |
| 1979 | EVD for Nicaraguans | Otherwise deportable Nicaraguans in the United States. | NA | EVD ended in September 1980. |
| 1979 | EVD for Iranians | Otherwise deportable Iranians in the United States. | NA | EVD ended in December 1979, and they were encouraged to apply for asylum. |

| Year | Type of Action | Class of Aliens Covered | Estimated Number | Commentary |
|------|----------------|-------------------------|------------------|------------|
| 1980 | EVD for Afghans | Otherwise deportable Afghans in the United States. | NA | P.L. 100-204 contained a special extension of the legalization program established by IRCA to include otherwise eligible aliens who had been granted EVD status during a time period that included the Afghans. |
| 1984 | EVD for Poles | Otherwise deportable Poles in the United States. | NA | P.L. 100-204 contained a special extension of the legalization program established by IRCA to include otherwise eligible aliens who had been granted EVD status during a time period that included the Poles. |
| 1987 | Memorandum from Attorney General Edward Meese directing the Immigration and Naturalization Service (INS) not to deport any Nicaraguans and to grant them work authorizations. | Nicaraguans who demonstrated a "well-founded fear of persecution," who had been denied asylum, or had been denied withholding of deportation. | 150,000 to 200,000 | Legislation to grant stays of deportation to Nicaraguans as well as Salvadorans had received action by committees in both chambers during the 1980s. Congress ultimately enacted legislation legalizing the Nicaraguans, the Nicaraguan Adjustment and Central American Relief Act (P.L. 105-100). |
| 1987 | Attorney General Edward Meese authorized INS district directors to defer deportation proceedings of certain family members of aliens legalized through IRCA. | This policy directive applied where "compelling or humanitarian factors existed" in the cases of families that included spouses and children ineligible to legalize under IRCA. | NA | Legislation to enable the immediate family of aliens legalized through IRCA to also adjust status had been introduced. (See 1990 "Family Fairness" directive below.) |
| 1989 | Attorney General Richard Thornburgh instructed INS to defer the enforced departure of any Chinese national in the United States through June 6, 1990. | Chinese nationals whose nonimmigrant visas expired during this time were to report to INS to benefit from this deferral and to apply, if they wished, for work authorizations. | 80,000 | Legislation that included provisions to establish Temporary Protected Status (TPS) was moving through Congress at that time. |

*Congressional Research Service*                                                                 22

| Year | Type of Action | Class of Aliens Covered | Estimated Number | Commentary |
|------|----------------|-------------------------|------------------|------------|
| 1990 | Executive Order 12711 of April 11, 1990, provided temporary protection for certain nationals of the People's Republic of China (PRC) and their dependents. It permitted temporary deferral of enforcement of the departure from the United States and conferred eligibility for certain other benefits through January 1, 1994. | Chinese nationals and dependents who were in the U.S. on or after June 5, 1989, up to and including the date of Executive Order 12711. | 80,000 | The Chinese Student Protection Act of 1992 (CSPA) (P.L. 102-404) enabled Chinese with deferred enforced departure to become lawful permanent residents. |
| 1990 | INS Commissioner Gene McNary issued a new "Family Fairness" policy for family members of aliens legalized through IRCA. The policy dropped the where "compelling or humanitarian factors existed" requirement and allowed the family members to apply for employment authorizations. | Unauthorized spouses and children of aliens legalized under IRCA. | 1.5 million | P.L. 101-649 provided relief from deportation and employment authorization to an eligible alien who was the spouse or unmarried child of a legalized alien holding temporary or permanent residence pursuant to IRCA. |
| 1991 | Presidential directive to Attorney General instructing him to grant deferred enforced departure to Persian Gulf evacuees who were airlifted to the United States after the invasion of Kuwait in 1990 | Aliens who had U.S. citizen relatives or who harbored U.S. citizens during the invasion, largely persons originally from Palestine, India, and the Philippines. | 2,227 | It is not clear how these cases were handled. |
| 1992 | President George H.W. Bush instructed the Attorney General to grant deferred enforced departure (DED) to Salvadorans | Unauthorized Salvadorans who had fled the civil war in the 1980s. | 190,000 | Congress had passed a law in 1990 giving Salvadorans TPS for 18 months. |
| 1997 | President William J. Clinton instructed the Attorney General to grant DED to Haitians for one year. | Haitians who were paroled into the United States or who applied for asylum before December 1, 1995. | 40,000 | Haitians had been provided TPS from 1993-1997. Legislation enabling Haitians to adjust their status passed at the close of the 105th Congress (P.L. 105-277) in 1998. |

| Year | Type of Action | Class of Aliens Covered | Estimated Number | Commentary |
|------|----------------|-------------------------|------------------|------------|
| 1997 | INS General Counsel Paul Virtue issues guidelines for deferred action for certain foreign nationals who might gain relief through the Violence Against Women Act. | Battered aliens with approved LPR self-petitions, and their derivative children listed on the self-petition. | NA | Regulations to implement the U visa portions of P.L. 106-386 were promulgated in 2007. |
| 1998 | Attorney General Janet Reno temporarily suspended the deportation of aliens from El Salvador, Guatemala, Honduras, and Nicaragua. | Unauthorized aliens from El Salvador, Guatemala, Honduras, and Nicaragua. | NA | This relief was provided in response to Hurricane Mitch. Guatemalans and Salvadorans had their stays of removal extended until March 8, 1999. TPS was given to Hondurans and Nicaraguans. |
| 1999 | President William J. Clinton instructed the Attorney General to grant DED to Liberians for one year. | Liberian nationals with TPS who were living in the United States. | 10,000 | Liberians had been provided TPS from 1991 through 1999; they were given TPS again in 2002. |
| 2007 | President George W. Bush directed that DED be provided to Liberians whose TPS expired. | Liberian nationals who had lived in the United States since October 1, 2002, and who had TPS on September 30, 2007. | 3,600 | |
| 2011 | President Barack Obama extended Liberian DED through March 2013. | | | |

**Source:** CRS review of published accounts, archived CRS materials, and government policy documents.

**Notes:** Excludes aliens with criminal records or who "pose a danger to national security." *Estimated Number* refers to estimated number of beneficiaries at time of issuance of directive. *NA* means "not available." Other countries whose nationals had some form of deferred deportation prior to 1976 include Cambodia, Cuba, Chile, Czechoslovakia, Dominican Republic, Hungary, Laos, Rumania, and Vietnam.

# EXHIBIT 58

Case 1:18-cv-00068   Document 204-5   Filed on 07/21/18 in TXSD   Page 120 of 193

INS ANNOUNCES LIMITED POLICY ON FAMILY UNITY , 64 No. 41 Interpreter...

64 No. 41 Interpreter Releases 1191

**Interpreter Releases**
October 26, 1987

INS ANNOUNCES LIMITED POLICY ON FAMILY UNITY

Copyright (c) 1987 Federal Publications Inc.

At the House Immigration Subcommittee's IRCA oversight hearing on October 21, 1987, Commissioner Alan C. Nelson issued a formal INS policy statement addressing the plight of undocumented alien families who have at least one member who is eligible for legalization, but one or more members who are not. The new policy does not break much new ground, but is intended, Commissioner Nelson said, to "clear the air" on the IRCA's impact on families. [5] The statement announces a very slight liberalization of past policy with regard to ineligible minor children of legalized aliens: the INS will not deport such children if both their parents receive amnesty, or in the case of a single parent household, if the parent the child lives with receives amnesty. Four members of the subcommittee urged the Service to go farther and allow minor children to remain in the U.S. if either parent is legalized, but Commissioner Nelson refused to do so. The INS head also said that ineligible spouses will receive no special protection from deportation unless "compelling or humanitarian factors" exist. The policy statement does not define what might constitute a sufficient humanitarian factor. It does say the factor must exist in addition to the family relationship and hardships caused by separation.

The text of the Commissioner's statement is reproduced in Appendix I of this Release.

Chairman Romano L. Mazzoli and other members of the subcommittee urged the INS to do more to implement the IRCA's generous and compassionate goals for legalization applicants. However, Commissioner Nelson angrily defended charges that the INS policy will break up families. "Don't you put us in the position of breaking up families, because we're following the law. We're going to be sure that there's fairness between the legal immigrant who waits in line and the legalized alien. That's the whole point," he said. [6]

The statement reiterates that the confidentiality provisions of IRCA do not permit INS enforcement personnel to have access to information about family members of legalization applicants. Deportations are likely, the INS has said, only in the context of routine INS activities, such as workplace raids, that might catch undocumented spouses and children of legalized aliens.

The family unity issue has been an area of serious concern, and is being blamed for the relatively low turnout rate of amnesty applicants in the Northeast. A survey done for the INS in June by a Los Angeles public relations firm attempted to gauge the effect that family unity concerns are having on the legalization program. The firm's survey of 700 undocumented aliens nationwide showed that only about half had applied for amnesty. Of those who had not applied, **\*1192** about 35 percent gave as their reason that they were afraid their family members did not qualify and would be deported. [7] Los Angeles Archbishop Roger M. Mahony, whose diocesan QDEs have received more than 6,000 amnesty applications, has reported that up to 30 percent of their applications so far have involved "mixed" families where a spouse or children are not eligible. [8]

The American Immigration Lawyers Association (AILA), in a letter dated October 20, 1987, urged Commissioner Nelson to establish a national policy granting immediate relatives of legalization applicants temporary, renewable relief from deportation and employment authorization on a case by case basis. An outline of the AILA proposal is reproduced in Appendix II. Although such a national policy seems to have been ruled out by the October 21 statement, district directors already possess discretionary authority to grant voluntary departure and work authorization in cases where

they determine there are compelling factors warranting relief. While individual district directors may be open to the reasoning developed in the AILA proposal, the prospects are not hopeful. Commissioner Nelson's policy statement instructs district directors to review all evidence submitted, make a recommended finding, and make available all such cases for review and concurrence by the INS Central Office. "This unusual step is being taken," the statement notes, "to ensure the consistency of decisions throughout the Service."

Footnotes

5       This policy statement has been expected; see "Legalization-the Fifth Month," in Interpreter Releases, Vol. 64, No. 34, Sept. 4, 1987, pp. 1021-1027.

6       "INS May Deport Youths Ineligible for Amnesty," Los Angeles Times, October 22, 1987, Pt. 1, p. 1, col. 2. See also "U.S. May Let Some Illegals Stay if Relatives Qualify for Amnesty," New York Times, October 22, 1987, at A1, col. 1.

7       "Many Illegal Immigrants Fear Amnesty Is Two-Edged Sword," Washington Post, October 21, 1987, at C1, col. 1.

8       "Family Unity Called Need of Immigrants," San Diego Tribune, August 8, 1987, at C4, col. 1.

End of Document                                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 59

67 No. 6 Interpreter Releases 153

**Interpreter Releases**
February 5, 1990

INS REVERSES FAMILY FAIRNESS POLICY

Copyright (c) 1990 Federal Publications Inc.

INS Commissioner Gene McNary has announced significant liberalizations to his agency's family fairness policy. Under the changes, most children and spouses of newly legalized aliens here before November 6, 1986 will be allowed to remain in the U.S. and work. The changes may prevent the deportation of up to 100,000 undocumented children and spouses of newly legalized aliens. [2]

Mr. McNary sent a memorandum to all four INS regional commissioners on February 2, 1990, outlining the changes in the Service's family fairness policy. A copy of that memo is reproduced in Appendix I. The changes take effect February 14.

What to do when some but not all members of an alien family qualify for legalization has been a controversial issue since the beginning of the amnesty program. Former INS Commissioner Alan C. Nelson instructed INS offices in late 1987 to automatically grant voluntary departure only for minor children living with their newly legalized parents. Ineligible spouses of legalized aliens had to show "compelling or humanitarian factors" beyond the marriage itself to warrant voluntary departure. [3]

Immigrants' rights advocates attacked that version of the family fairness policy, calling it "overly restrictive, non-responsive to the needs of immigrants and their families, and contrary to the American tradition of keeping families together." [4] They also alleged that local INS offices were inconsistently applying the policy, with some routinely granting voluntary departure to legalized aliens' family members, while other offices denied almost all such requests. At a recent meeting with several national immigrants' rights organizations, new Commissioner McNary agreed to look into the controversy.

At his February 2 press conference announcing the policy change, Mr. McNary acknowledged that the previous policy guidelines were "fairly nebulous," and that they had not been "evenly and uniformly applied" around the country. "I had to set a uniform policy," he told reporters.

Under the new policy, INS district directors must grant voluntary departure to a legalized alien's spouse and unmarried children under 18, if the following conditions are met: (1) the beneficiaries must be living with the legalized alien; (2) they must establish they have been residing in the U.S. since before November 6, 1986; (3) they must be admissible as **\*154** immigrants; (4) they must not have been convicted of a felony or three misdemeanors committed in the U.S.; and (5) they must not have assisted in persecuting others.

Voluntary departure and work authorization will be granted in one-year increments to the beneficiaries of this new policy, with annual reviews by the district directors to see if the aliens have committed crimes or become dependent on public assistance.

Commissioner McNary clarified two points at the press conference that were left ambiguous in his memo. First, the legalized alien and his or her spouse must have married before November 6, 1986 for the undocumented spouse to benefit from the new policy. Second, in response to a question, Mr. McNary said he "would think" that children over 18 won't

be deported. They would continue to receive voluntary departure and work authorization "until they've waited their turn in the queue" to obtain an immigrant visa.

A February 2 telex sent from the INS Central Office to all field offices reiterated Commissioner McNary's policy memo. Paragraph 6 of the telex also added the following clarification:

All cases currently in deportation proceedings should be reviewed for family fairness eligibility before commencement of a hearing or removal. If the alien is found to be eligible, proceedings should be administratively closed to allow them the opportunity to request voluntary departure under this policy.

Asked whether the new policy might encourage other undocumented aliens to seek entry into the U.S., Mr. McNary replied that he would do everything possible within the INS budget to enhance enforcement along the U.S.-Mexico border, including increasing detentions. "It is vital that we enforce the law against illegal entry," he said. "However, we can enforce the law humanely. To split families encourages further violations of the law as they reunite." Mr. McNary also noted that the new INS policy was consistent with provisions in legal immigration reform legislation pending in Congress. [5]

### Footnotes

[2]     See Los Angeles Times, Feb. 3, 1990, at A1, col. 4; New York Times, Feb. 3, 1990, at 28, col. 1; Washington Post, Feb. 3, 1990, at A1, col. 1.

[3]     See 64 Interpreter Releases 1191-92, 1200-04 (Oct. 26, 1987); 1368, 1380-81 (Dec. 14, 1987).

[4]     See 66 Interpreter Releases 562 (May 22, 1989).

[5]     See, e.g., S. 358, §108, discussed in 66 Interpreter Releases 837 (July 31, 1989).

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 60

# Memorandum



| Subject | | Date |
|---|---|---|
| Supplemental Guidance on Battered Alien Self-Petitioning Process and Related Issues | | MAY – 6 1997 |

| To | From |
|---|---|
| Regional Directors<br>District Directors<br>Officers-in-Charge<br>Service Center Directors | Office of Programs |

This memorandum outlines changes in the handling of I-360 self-petitions for immigrant status filed by battered spouses and children of U.S. citizens and permanent residents aliens and addresses related issues.  It should be read as a supplement to the guidance issued by the Office of Programs on April 16, 1996.

## **Background**

The issue of domestic violence and its potential impact on spouses and children who would normally be entitled to immigration benefits under the I-130 petitioning process was first addressed by Congress in the Violence Against Women Act ("VAWA") which was enacted as part of the Violent Crime Control Act of 1994 ("Crime Bill").  The VAWA contains provisions to limit the ability of an abusive U.S. citizen ("USC") or lawful permanent resident ("LPR") to utilize the spouse' or child's immigration status in order to perpetuate the abuse.  The Service published an interim rule on March 26, 1996 (59 FR 13061-13079) establishing the procedures for qualified abused spouses and children to self-petition for immigrant classification using the Form I-360. This rule was accompanied by extensive field instructions in the Office of Programs' memorandum of April 16, 1996.

In the autumn of 1996, Congress enacted various new provisions relating to battered aliens, in both the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA" or "the welfare law") and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA" or "the immigration bill").   None of these new provisions directly affect the legal standards applicable to adjudication of I-360 applications. The new provisions do, however, provide additional benefits and protections for battered aliens, and have created the need for INS to restructure how we handle this category of very sensitive cases.  This memorandum outlines those changes, and instructs field offices on the handling of pending cases and new cases received.

II-30

Guidance on Battered Alien Issues
Page 2

## **Centralization at the Vermont Service Center**

On April 7, 1997, the Service published a notice in the Federal Register at 16607-08 establishing the Vermont Service Center as the direct mail filing location for all Forms I-360 filed by self-petitioning battered spouses and children (Attachment A).  This centralization was necessitated by the new welfare provisions which make certain battered aliens -- including self-petitioners and others -- eligible for public benefits.  In addition to adjudicating I-360 self-petitions, the Vermont Service Center will serve as a central "clearinghouse" for inquiries from federal, state and local benefit-granting agencies regarding pending or recently-adjudicated cases, as discussed in more detail in the Verification section, below.  Finally, as an alien may be eligible for public benefits not only upon the approval of the relevant immigrant status, but also upon having filed a petition which makes a prima facie case for such status, the Vermont Service Center will also begin making prima facie determinations pursuant to an interim rule expected to be published in the Federal Register prior to June 1, 1997.

While these are sensitive cases which require special handling, the move to centralized filing is expected to have only minimal impact on caseloads in the district offices.  Since the beginning of the fiscal year, according to G-22 statistics, fewer than 500 cases have been filed Servicewide.  Centralization allows the Service to have a small corps of officers well-versed in the complexity and sensitivity of VAWA adjudications, and will also allow for better monitoring of the caseload and any fraud trends.

Although the direct mail notice allows self-petitioners to continue to file locally until May 7, INS field offices and the other service centers are encouraged to forward to the Vermont Service Center those I-360s for which review/adjudication has not been initiated.  All I-360 self-petitions received on or after May 7 shall be forwarded to the Vermont Service Center, but the 30 day transition period requires that no office refuse to receive an I-360 submitted before June 6, 1997.  Immediate relatives, who were previously able to file concurrent I-360 self-petitions and I-485 adjustment applications, should be advised to retain their I-485s pending the Vermont Service Center's adjudication of the I-360 self-petition.   The battered alien I-360s are to be mailed to:

INS Vermont Service Center
Attn:  Family Services Product Line (VAWA)
75 Lower Weldon Street
St. Albans, VT  05479-0001

As inquiries from benefit-granting agencies can be expected in many cases, offices are encouraged to expedite handling of all pending cases which they do not forward to the Vermont Service Center.   Nothing in this move to centralize direct mail filing changes the ability of the Vermont Service Center to transfer I-360s to district offices when an interview or investigation of suspected fraud is merited.

II-31

Guidance on Battered Alien Issues
Page 3

## Deferred Action and Employment Authorization

In the April 16 memorandum, INS offices were encouraged to utilize voluntary departure and deferred action in order to provide approved VAWA self-petitioners with employment authorization pending the availability of a visa number. Since that time, in IIRIRA, Congress has limited grants of voluntary departure to no more than 120 days, and INS regulations no longer allow for work authorization during any period of voluntary departure.

Starting June 1, when the Vermont Service Center approves a VAWA self-petition, it will then also assess, on a case-by-case basis, whether to place the alien in deferred action status pursuant to new deferred action guidelines in the Interim Enforcement Procedures (a forthcoming document which will be available on the 96Act bulletin board, as well as in printed versions). By their nature, VAWA cases generally possess factors that warrant consideration for deferred action. In an unusual case, there may be factors present that would militate against deferred action; cases should therefore receive individual scrutiny. Although the Vermont Service Center is not required to obtain Regional Director approval for deferred action, it will report all grants of deferred action to the Eastern Regional Office for statistical and tracking purposes. In addition, a process for periodic review of the deferred action decisions made by the Vermont Service Center is planned.

If the alien is placed in deferred action, the Vermont Service Center will notify the alien that he or she may submit an I-765, Application for Employment Authorization. After the initial deferred action decision and issuance of a one-year employment authorization document, the Vermont Service Center will hold these files and review the deferred action decision upon each application for extension of work authorization. When the Vermont Service Center is notified by the National Visa Center or by an INS district office that the alien is seeking a visa abroad or has filed an adjustment application, the Vermont Service Center will forward the file to the appropriate office.

In cases where the I-360 was approved prior to April 1, many aliens may have current grants of voluntary departure. Upon expiration of voluntary departure, and for other cases adjudicated before June 1, district offices are strongly encouraged to utilize deferred action to provide work authorization pending the availability of a visa. As described in more detail below, battered aliens are now eligible for certain public benefits, which are often necessary for the victim to be able to leave the abusive situation. To deny such aliens work authorization when they are able to obtain public assistance is counter to the spirit of welfare reform. Moreover, for many individuals, the ability to work is necessary in order to save the funds necessary to pay for the adjustment application and the penalty fee. As it has already been determined that these aliens face extreme hardship if returned to the home country and as removal of battered aliens is not an INS priority, the exercise of discretion to place these cases in deferred action status will almost always be appropriate.

JJ-32

Guidance on Battered Alien Issues
Page 4

## Non-Disclosure Provisions and Other Limitations in IIRIRA § 384

Section 384 of IIRIRA strictly prohibits the release of any information relating to a VAWA self-petitioner, and also precludes any INS officer from making an adverse determination of admissibility or deportability based solely on information furnished by an abusive relative. Any violation of this section can subject an INS officer to disciplinary action and a fine of up to $5,000. This provision is discussed in more detail in IIRIRA Implementation Memo #96act.036 (Attachment B).

## Verification of Status for Benefit-Granting Agencies

Section 501 of IIRIRA amends the welfare law to provide that certain battered aliens are "qualified aliens" for purposes of eligibility for some public benefits. This includes not only those aliens who can self-petition for immigrant status under the VAWA provisions, but also other aliens who have been abused by a member of their household. In cases other than VAWA self-petitioning cases, it is the benefit-granting agency, not the INS, which will assess the claims of abuse. Benefit providers, however, will request that INS verify the alien's status or the fact that a petition is pending on behalf of the alien. Detailed procedures for verification of these and other categories of qualified aliens under welfare law are being provided to benefit-granting agencies by the Department of Justice in a document entitled "Interim Guidance on Verification," which is expected to be published in the Federal Register later this month. An INS field directive designed for immigration status verifiers will be issued in conjunction with publication of the Interim Guidance on Verification.

Although some verification inquiries relating to battered aliens will be handled through the normal status verification channels, many of the inquiries will fall outside the type of inquiries which status verifiers typically handle. For example, because of the dynamics of abusive relationships, the abuse victim will not always have access to approval notices or other documentation relating to their cases. Moreover, because aliens can be eligible for public benefits upon filing a petition which makes a prima facie case for status, benefit providers will sometimes be seeking information on pending cases, including a determination as to whether the petition makes a prima facie case for eligibility for the status sought.

The Vermont Service Center will serve as the "clearinghouse" for these unusual types of inquiries, which will be submitted by fax using an inquiry format patterned on the sample at Attachment C. It is anticipated that the Vermont Service Center will be able to handle the vast majority of inquiries, which should pertain to cases pending there or in one of the other service centers. For those inquiries which pertain to cases pending in district offices or sub-offices, the Vermont Service Center will forward the inquiries by fax to the attention of a designated Service

Guidance on Battered Alien Issues
Page 5

Center liaison officer in each district or sub-office. Each district and sub-office should complete the liaison designation form at Attachment D and fax to Lisa Batey at 202/514-9262 prior to May 20 (the list of designees will be shared with INS regional offices and all four Service Centers). The designated liaison should ensure that a response is provided to the requesting agency, with a copy to the Vermont Service Center, within five working days. Information on pending or completed cases should not be given over the telephone, but rather should be sent via facsimile.

As you will note, the sample inquiry format includes a limited waiver of the non-disclosure provisions of IIRIRA § 384. At present, such a waiver is necessary before INS can provide any information relating to a VAWA self-petitioner, even to another governmental entity for purposes of determining eligibility for public benefits. Because of IIRIRA § 642, no waiver is necessary in other categories of cases, such as where the alien seeking benefits is the beneficiary of a spousal I-130 petition, but has suffered abuse at the hands of another household member. If there is any doubt as to whether a waiver is required, the officer should seek guidance from his or her district counsel. If there are waiver questions which cannot be resolved locally, please contact Lisa Batey of the Headquarters Office of Programs, at 202/514-9089.

### Providing Information on Filing of I-360 Self-Petitions

Some battered aliens who are eligible to self-petition have chosen not to do so, instead relying upon the I-130 petition filed by their abuser. This not only allows the abuser to continue to control the spouse's or child's immigration status by withdrawing the petition, but also places a battered spouse at risk should the abuser subsequently obtain a divorce before the spouse is able to adjust status. For these and other reasons, such as easier determinations as to welfare eligibility and employment authorization, an immigration officer who deals with a battered alien should inform that alien about the process for self-petitioning, despite the fact that an I-130 petition is still pending on his or her behalf. The Interim Guidance on Verification similarly urges benefit agency caseworkers to give such aliens the number for the INS Forms Line [1-800-870-3676] and for the National Domestic Violence Hotline [1-800-799-7233] for assistance in preparing self-petitions.

### Making Prima Facie Determinations

As noted above, Section 501 of IIRIRA includes in the definition of "qualified alien" for public benefit purposes those aliens who have filed a self-petition, or are the beneficiary of a spousal or parental petition, which sets forth a prima facie case for immigrant status under a variety of provisions. Specifically, those with approved petitions or pending petitions which make a prima facie case for status under any of the following Immigration and Nationality Act ("INA") provisions are included:

II-34

Guidance on Battered Alien Issues
Page 6

- ◆      spouse or child of a USC under 204(a)(1)(A)(i)

- ◆      spouse, child or unmarried son or daughter of an LPR under 204(a)(1)(B)(i)

- ◆      widow(er) of a USC under 204(a)(1)(A)(ii)

- ◆      self-petitioning battered spouse or child of a USC or LPR under 204(a)(1)(A)(iii)-(iv) or 204(a)(1)(B)(ii)-(iii)

In all but the latter category, battery or abuse will not be part of the INS adjudication, but rather will be assessed by the benefit-granting agency pursuant to the Interim Guidance on Verification.

In the case of self-petitioning battered spouses and children, the Vermont Service Center will begin making prima facie determinations no later than June 1, 1997, following publication of an interim rule in the Federal Register. If the self-petition and accompanying documentation are adequate, the self-petitioner will receive a decision or a Notice of Prima Facie Determination ("NPFD") within three weeks of filing. The approval notice or NPFD may be presented to benefit granting agencies as evidence of the applicant's status as a "qualified alien". The NPFD will be valid for 150 days, to allow time for the submission of any supplemental evidence and for adjudication of the self-petition.

In those cases which are not handled by the Vermont Service Center, benefit-granting agencies will be expecting decisions or prima facie determinations within a similar three-week time frame. As the non-VAWA cases are simpler adjudications based purely on family relationship, there are no plans to define what would constitute a prima facie case. Instead, when a benefit-granting agency inquires about a pending case, INS offices should expedite the adjudication of the case in order to minimize the time during which the alien is unable to receive public assistance for which he or she may be eligible.

## Aliens Seeking Issuance of Notices to Appear

An individual may also be eligible for public benefits if he or she makes a prima facie case for cancellation of removal as a battered spouse or child under INA § 240A(b)(2). INS district offices shall promptly issue a Notice to Appear to any alien who makes a credible request to be placed in proceedings in order to raise a claim for cancellation of removal under section 240A(b)(2). District offices may want to do a search of the CLAIMS system to determine if a self-petition was filed and denied. It is important to note, however, that some individuals who are ineligible for status pursuant to the self-petitioning provisions will be eligible for cancellation (e.g., where the marriage has been terminated). Once proceedings have been initiated, the alien can contact the immigration court to seek a determination that he or she has demonstrated a prima facie case for cancellation of removal.

II-35

Guidance on Battered Alien Issues
Page 7

## Other District Office Issues

While centralizing I-360 adjudications was motivated in part by the goal of having a small corps of officers well-trained in domestic violence issues, district adjudications officers will still interact with self-petitioners during the adjustment process.   The nature of domestic violence and the sensitivity needed in dealing with victims are topics to which few INS officers will have had exposure.   District offices are strongly encouraged to identify two or more officers (depending upon the size of the district) to handle all adjustments following from I-360 approvals.  The designated officers should have the experience, discretion and communications skills to be able to balance sensitivity in dealing with true victims with vigilance against fraud, and would ideally also serve as the designated Service Center liaison officer described at pages 4-5, above.

Recognizing the need for more training on complex and subtle domestic violence issues, Headquarters is looking into opportunities to provide informational materials and perhaps training sessions.  In addition, a number of reputable non-profit organizations throughout the country provide training for personnel who work with domestic violence victims, and are willing to share their expertise with INS offices.  Last year, for example, training for San Francisco adjudicators was provided by representatives of the Family Violence Prevention Fund.  The training was well-received by district personnel, and was given at no cost to the district.  Managers interested in obtaining materials or in fostering contacts with local organizations which work with victims of domestic violence should contact either of the persons named below for information about organizations active in their area.

*     *     *     *     *

The Office of Field Operations concurs with this memorandum.  Addressees are strongly encouraged to distribute copies of this memorandum widely, particularly to adjudications and investigations officers.  Questions about this policy or about the interim rule published in the Federal Register may be directed to Lisa Batey, Headquarters Office of Programs, 202/514-9089, or Karen FitzGerald, Headquarters Benefits Division, at 202/305-4904.

Paul W. Virtue
for  Acting Executive Associate Commissioner

II-36

MAY-29-199⁷  [? ?]                                              ??? ??? 4??? ? P.1?

<u>Attachment C</u>

[sample only – request to be submitted on letterhead of requesting agency]

Fax Request Form – from Benefit Agency to INS

To: INS Vermont Service Center, fax 802/527-3252
     Attn: Battered Alien Review Unit          This fax consists of _____ pages.

**This request is being submitted by:**
Name (printed): _____
Agency name and address: _____
                          _____
Fax number: _____
Agency case tracking number: _____

Item 1:  An alien applicant is seeking ?????? benefit from the agency ???????ed above, pursuant
         to recent welfare reform legis???? ??his applicant fa??? ??? one ?? two categories:

         ____ a) believes an INS Fo??? ??0, Pet???? for ??????????tion, was filed on the
              applicant's beh??? ?? ????????? ?? ??????? ?? ??? ????? self-petitioned as a'
              widow(er) un??? ??? Fo?? ?-?60, ??????? f?? ??????ian, Widow or Special
              Immigrant (co??? ???? ??rt A, ??l?w);

         ____ b) has self-?????? ?? as ? ??????ed w???? or ??? using ?NS Form I-360, Petition for
              Ama???, W????, or ??????l I??????? (complete ??? B, below).

Item 2:  The ?????????????? ?????? requ???? ?h?? INS:  (please check ?? this)
□ Verify th?? ??? att?ched doc??? ?? a valid ?? ??py of the I-797 approval notice, prima facie
   deter????tion or receip? ?ot???.
□ Make a pri?? ????? ??????????? or ex????? adjudication of the petition and notify the
   requesting ??????? ?? ??? ????????.
□ Update the stat?? ?? ??? ??? ????cy's _____ (insert date) request for a prima
   facie determination or ??????? adjudication. (Requesting agency should allow three
   weeks from the request f?? ? prima facie determination or filing of a petition before
   making this reque??.)
□ Determine whether the a??????t has filed a petition or whether a petition has been filed on his
   or her behalf under (a) or (b), as indicated above.  If so, please make a prima facie
   determination or expedited adjudication of the applicant's petition and notify the
   requesting agency of the outcome.

Date: _____     Agency Signature: _____



MAY-29-1997   15:54                                              213 360 4319   P.14

**PART A:** For an Applicant Who Is the Beneficiary of a Petition Filed by Spouse or Parent, or Who Has Self-Petitioned as a Widow(er)

**Step 1:** Does the alien applicant have a copy of an INS Form I-797 indicating that an I-130 was filed on his/her behalf?   [If applicant has self-petitioned as a widow(er), check "No" and proceed to Step 2]

Yes _____ → Attach a copy of the I-797 to this form (you need not complete Step 2)
No _____ → If the applicant has documentation, attach documentation other than a Form I-797, proceed to Step

**Step 2:** If the applicant does not have a Form I-797, please fill out the following information. All blanks, except that noted "if available", must be completed.

Benefit Applicant's full name:

Benefit Applicant's date of birth:

Benefit Applicant's best guess _____ (mo/yr)

Benefit Applicant's best guess _____ (mo/yr)
with which INS office _____

Petitioner's full name:

Petitioner is Applicant's spouse ____ self [widow(er)]   (check one)

Petitioner is a ____ U.S. citizen or ____ lawful permanent resident ("green card holder")

Petitioner's date of ____

Petitioner's Alien Registration Number, if available: A

Petitioner's address ____
street address ____

MAY-29-1997   (illegible)                                   217 790 4718   P.15

**PART B:   For an Applicant Who Has Self-Petitioned as a Battered Spouse or Child**

**Step 1:** Attach a copy of the receipt notice or other documentation evidencing that a Form I-360 has been filed with the INS.   If that documentation does not include the following information, please complete the blanks:

Applicant/self-petitioner's full name:

Applicant/self-petitioner's date of birth:

Date I-360 was filed: _____

Location (city) of INS office where filed:

**Step 2:** A waiver signed by the alien appears b___

This waiver authorizes release of in_____ _____ly ___ _____ ___taining eligibility for federal, state or local ____ benefits. It _____ ____ __ release of information to relatives of the alien ot_ any ___ies ot_ _than those specified in paragraph (3), below.

**(1)**   My name is (print full na_____

**(2)**   My date of birth is _____ 19___

**(3)**   I hereby waive __ restriction on the _____ of ___ _____ relating to me under section 384 of the Ille___ I_____ ___form ___ _____ Respon_____ility Act of 1996 (the "Immigration ____") th__ __ortion _____ary ____mit the Imm_____ion and Naturalization Service ("INS") ___/or __ _____xecutive Office ___ Immigration R___ ("EOIR") to provide, in writing _ _ny federal, ___ local _____ici_l benefit-granting e____ seeking to verify my immigr____on stat__, the ____ __formation ___d required to determi__ my eligibility for federal ____te or local pub__ be___fit ___ __r the Personal Responsibility and Work Opportu____ _____ Act ___ _), as amended by the Immigration Act:  (a) whether an applic____ ___ ___ ____ ___ hasn filed by me or on my behalf under section 204(a)(1)(A) (___ ___ ___ _ _ 204(a)(1)(B) (ii) or (iii), section 216(c)(4)(C), section 244(a)(3) as in effect pri__ to April 1, 1997, or section 240A(b)(2) of the Immigration and Nationality Act, and (b) wh__ther INS or EOIR has made a prima facie determination or final determination of __y eligibility for relief under any of the above provisions, and, if so, the outcome of those d__erminations.

I declare, under penalty of perjury, that the foregoing is true and correct, and that I have executed this waiver knowingly and voluntarily.

Executed on (date): _____

_____
Signature of Applicant

SAMPLE

12.                              '5. (TUE)                              13
                                                                        FROM

II-39

# EXHIBIT 61

# INTERIM RELIEF FOR CERTAIN FOREIGN ACADEMIC STUDENTS ADVERSELY AFFECTED BY HURRICANE KATRINA
## Frequently Asked Questions (FAQ)

On November 25, 2005. U.S. Citizenship and Immigration Services (USCIS) published a Federal Register Notice (Notice), which temporarily suspended the applicability of certain requirements related to on-campus and off-campus employment for a specifically designated group of F-1 students. This temporary relief enables qualified F-1 students, who were adversely affected by Hurricane Katrina, to work additional hours on-campus, or work off-campus if employment authorization is granted.  F-1 students who are granted employment authorization pursuant to the Notice may likewise reduce their course load for the duration of their employment authorization to the minimum course load requirement set forth in the Notice.

Since the Notice does not cover Katrina-impacted foreign academic students who have failed to maintain their F-1 status, such persons, and their F-2 dependents, may request a grant of deferred action and short-term employment authorization based on economic necessity.

**Q.  Why is USCIS taking this action?**

**A.**  Hurricane Katrina caused severe loss of life and extensive property damage, and disrupted normal activities, in the states of Alabama, Louisiana, and Mississippi.  As a result of this catastrophic natural disaster, many of the approximately 5,500 F-1 students, who were enrolled in DHS-approved academic institutions located in the areas adversely affected by Hurricane Katrina, have been suffering severe economic hardship and have been experiencing difficulty in satisfying the normal regulatory requirements for maintaining valid F-1 status, which include the pursuit of a "full course of study."  See 8 CFR 214.2(f)(6).  USCIS is taking action to provide temporary relief to these F-1 students.

**Q.  For whom specifically is USCIS taking this action?**

**A.**  The interim relief covered in this FAQ was developed specifically for F-1 students who: (1) on August 29, 2005, were lawfully present in the United States in F-1 status and were enrolled in a DHS-approved institution located in an area adversely affected by Hurricane Katrina; and (2) are experiencing severe economic hardship as direct result of Hurricane Katrina.  Hereinafter, this group will be referred to as *Affected F-1 Students.*"

**Q.  Which DHS-approved academic institutions have been deemed to be located in the areas adversely affected by Hurricane Katrina?**

**A.**  Following is a list of the specific campuses of DHS-approved academic institutions that have been deemed to be located in the areas adversely affected by Hurricane Katrina.

| SCHOOL NAME | CAMPUS NAME | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| Archdiocese of New Orleans | Academy of the Sacred Heart | New Orleans | LA | 70115 |
| Archdiocese of New Orleans | Christian Brothers School | New Orleans | LA | 70124 |
| Archdiocese of New Orleans | Henriette DeLille | New Orleans | LA | 70126 |
| Archdiocese of New Orleans | Holy Cross | New Orleans | LA | 70117 |
| Archdiocese of New Orleans | Holy Ghost | New Orleans | LA | 70115 |
| Archdiocese of New Orleans | Holy Name of Jesus | New Orleans | LA | 70118 |
| Archdiocese of New Orleans | Holy Rosary Academy | New Orleans | LA | 70119 |
| Archdiocese of New Orleans | House of the Holy Family | New Orleans | LA | 70126 |
| Archdiocese of New Orleans | Immaculate Heart of Mary | New Orleans | LA | 70126 |
| Archdiocese of New Orleans | Marian Central Catholic Middle School | New Orleans | LA | 70122 |
| Archdiocese of New Orleans | Our Lady of Lourdes | New Orleans | LA | 70115 |
| Archdiocese of New Orleans | Resurrection of Our Lord | New Orleans | LA | 70127 |
| Archdiocese of New Orleans | St. Alphonsus | New Orleans | LA | 70130 |
| Archdiocese of New Orleans | St. Anthony of Padua | New Orleans | LA | 70119 |
| Archdiocese of New Orleans | St. Benedict the Moor | New Orleans | LA | 70126 |
| Archdiocese of New Orleans | St. David | New Orleans | LA | 70117 |
| Archdiocese of New Orleans | St. Dominic | New Orleans | LA | 70124 |
| Archdiocese of New Orleans | St. Frances Xavier Cabrini | New Orleans | LA | 70122 |
| Archdiocese of New Orleans | St. Joan of Arc | New Orleans | LA | 70118 |
| Archdiocese of New Orleans | St. Joseph Central Catholic Elementary | New Orleans | LA | 70122 |
| Archdiocese of New Orleans | St. Leo the Great | New Orleans | LA | 70119 |
| Archdiocese of New Orleans | St. Mary of the Angels | New Orleans | LA | 70117 |
| Archdiocese of New Orleans | St. Paul the Apostle | New Orleans | LA | 70126 |
| Archdiocese of New Orleans | St. Pius X | New Orleans | LA | 70124 |
| Archdiocese of New Orleans | St. Raymond | New Orleans | LA | 70122 |
| Archdiocese of New Orleans | St. Stephen | New Orleans | LA | 70115 |
| Archdiocese of New Orleans | Stuart Hall School for Boys | New Orleans | LA | 70118 |
| Archdiocese of New Orleans | Ursuline Academy | New Orleans | LA | 70118 |
| Archdiocese of New Orleans | All Saints | New Orleans | LA | 70114 |
| Archdiocese of New Orleans | Holy Name of Mary | New Orleans | LA | 70114 |
| Archdiocese of New Orleans | Our Lady of Divine Providence | Metairie | LA | 70003 |
| Archdiocese of New Orleans | Our Lady of Perpetual Help | Kenner | LA | 70062 |
| Archdiocese of New Orleans | St. Angela Merici | Metairie | LA | 70002 |
| Archdiocese of New Orleans | St. Benilde | Metairie | LA | 70001 |
| Archdiocese of New Orleans | St. Catherine of Siena | Metairie | LA | 70005 |
| Archdiocese of New Orleans | St. Christopher | Metairie | LA | 70001 |
| Archdiocese of New Orleans | St. Clement of Rome | Metairie | LA | 70002 |
| Archdiocese of New Orleans | St. Edward the Confessor | Metairie | LA | 70001 |
| Archdiocese of New Orleans | St. Elizabeth Ann Seton | Kenner | LA | 70065 |
| Archdiocese of New Orleans | St. Francis Xavier | Metairie | LA | 70005 |
| Archdiocese of New Orleans | St. Louis King of France | Metairie | LA | 70005 |
| Archdiocese of New Orleans | St. Mary Magdalen | Metairie | LA | 70003 |
| Archdiocese of New Orleans | St. Matthew the Apostle | River Ridge | LA | 70123 |

| | | | | |
|---|---|---|---|---|
| Archdiocese of New Orleans | St. Philip Neri | Metairie | LA | 70003 |
| Archdiocese of New Orleans | St. Rita | Harahan | LA | 70123 |
| Archdiocese of New Orleans | Immaculate Conception | Marrero | LA | 70072 |
| Archdiocese of New Orleans | Our Lady of Prompt Succor | Westwego | LA | 70094 |
| Archdiocese of New Orleans | St. Anthony | Gretna | LA | 70053 |
| Archdiocese of New Orleans | St. Cletus | Gretna | LA | 70053 |
| Archdiocese of New Orleans | St. Joseph the Worker | Marrero | LA | 70072 |
| Archdiocese of New Orleans | St. Rosalie | Harvey | LA | 70058 |
| Archdiocese of New Orleans | Visitation of Our Lady | Marrero | LA | 70072 |
| Archdiocese of New Orleans | Our Lady of Perpetual Help | Belle Chasse | LA | 70037 |
| Archdiocese of New Orleans | Our Lady of Prompt Succor | Chalmette | LA | 70043 |
| Archdiocese of New Orleans | St. Louise DeMarillac | Arabi | LA | 70032 |
| Archdiocese of New Orleans | St. Mark | Chalmette | LA | 70043 |
| Archdiocese of New Orleans | St. Robert Bellarmine | Arabi | LA | 70032 |
| Archdiocese of New Orleans | Sacred Heart of Jesus | Norco | LA | 70079 |
| Archdiocese of New Orleans | St. Charles Borromeo | Destrehan | LA | 70047 |
| Archdiocese of New Orleans | Ascension of Our Lord | LaPlace | LA | 70068 |
| Archdiocese of New Orleans | Our Lady of Grace | Reserve | LA | 70084 |
| Archdiocese of New Orleans | St. Joan of Arc | LaPlace | LA | 70068 |
| Archdiocese of New Orleans | St. Peter | Reserve | LA | 70084 |
| Archdiocese of New Orleans | Mary, Queen of Peace | Mandeville | LA | 70471 |
| Archdiocese of New Orleans | Our Lady of Lourdes | Slidell | LA | 70458 |
| Archdiocese of New Orleans | St. Margaret Mary | Slidell | LA | 70458 |
| Archdiocese of New Orleans | St. Peter | Covington | LA | 70433 |
| Archdiocese of New Orleans | Annunciation | Bogalusa | LA | 70427 |
| Archdiocese of New Orleans | Brother Martin | New Orleans | LA | 70122 |
| Archdiocese of New Orleans | Cabrini | New Orleans | LA | 70119 |
| Archdiocese of New Orleans | DeLaSalle | New Orleans | LA | 70115 |
| Archdiocese of New Orleans | Jesuit | New Orleans | LA | 70119 |
| Archdiocese of New Orleans | Mount Carmel Academy | New Orleans | LA | 70124 |
| Archdiocese of New Orleans | Redeemer-Seton | New Orleans | LA | 70122 |
| Archdiocese of New Orleans | St. Augustine | New Orleans | LA | 70119 |
| Archdiocese of New Orleans | St. Gerard Majella Alternative School | New Orleans | LA | 70122 |
| Archdiocese of New Orleans | St. Mary's Academy | New Orleans | LA | 70126 |
| Archdiocese of New Orleans | Xavier University Prep | New Orleans | LA | 70115 |
| Archdiocese of New Orleans | Archbishop Chapelle | Metairie | LA | 70003 |
| Archdiocese of New Orleans | Archbishop Rummel | Metairie | LA | 70001 |
| Archdiocese of New Orleans | Archbishop Blenk | Gretna | LA | 70053 |
| Archdiocese of New Orleans | Archbishop Shaw | Marrero | LA | 70072 |
| Archdiocese of New Orleans | Immaculata | Marrero | LA | 70072 |
| Archdiocese of New Orleans | Archbishop Hannan | Meraux | LA | 70075 |
| Archdiocese of New Orleans | St. Charles Catholic | LaPlace | LA | 70068 |
| Archdiocese of New Orleans | Pope John Paul II | Slidell | LA | 70461 |
| Archdiocese of New Orleans | The Saint Paul's School | Covington | LA | 70433 |
| Archdiocese of New Orleans | St. Scholastica Academy | Covington | LA | 70433 |

| Bass Memorial Academy | Bass Memorial Academy | Lumberton | MS | 39455 |
|---|---|---|---|---|
| Delgado Community College | Delgado Community College | New Orleans | LA | 70119 |
| Dillard University | Dillard University | New Orleans | LA | 70122 |
| East Central Community College | East Central Community College | Decatur | MS | 39327 |
| East Mississippi Community College | Scooba Campus | Scooba | MS | 39358 |
| Ecole Classique | Ecole Classique | New Orleans | LA | 70112 |
| English Language Center | University of South Alabama | Mobile | AL | 36688 |
| Faulkner State Community College | Faulkner State Community College | Bay Minette | AL | 36507 |
| Faulkner University | Faulkner University at Mobile | Mobile | AL | 36609 |
| John Curtis Christian School | John Curtis Christian School | River Ridge | LA | 70123 |
| Kaplan Test Prep, a division of Kaplan, Inc. | Kaplan Test Prep - New Orleans, LA | New Orleans | LA | 70118 |
| Louisiana State University Health Sciences Center | Louisiana State University Health Sciences Center | New Orleans | LA | 70006 |
| Loyola University New Orleans | Loyola University New Orleans | New Orleans | LA | 70118 |
| Lutheran High School | Lutheran High School | Metairie | LA | 70002 |
| Meridian Community College | Meridian Community College | Meridian | MS | 39307 |
| Metairie Park Country Day School | Metairie Park Country Day School | Metairie | LA | 70005 |
| Mississippi Gulf Coast Community College | Perkinston Campus | Perkinston | MS | 39573 |
| Mississippi Gulf Coast Community College | Jefferson Davis Campus | Gulfport | MS | 39507 |
| Mississippi Gulf Coast Community College | Jackson County Campus | Gautier | MS | 39553 |
| Mobile County Public Schools | Division Of Student Support Services | Mobile | AL | 36602 |
| Mobile County Public Schools | Baker High | Mobile | AL | 36608 |
| Mobile County Public Schools | Blount High | Prichard | AL | 36610 |
| Mobile County Public Schools | Bryant High | Irvington | AL | 36544 |
| Mobile County Public Schools | Citronelle High | Citronelle | AL | 36522 |
| Mobile County Public Schools | Davidson High | Mobile | AL | 36609 |
| Mobile County Public Schools | Montgomery High | Semmes | AL | 36575 |
| Mobile County Public Schools | Murphy High | Mobile | AL | 36606 |
| Mobile County Public Schools | Rain High | Mobile | AL | 36605 |
| Mobile County Public Schools | Satsuma High | Satsuma | AL | 36572 |
| Mobile County Public Schools | Shaw High | Mobile | AL | 36608 |
| Mobile County Public Schools | Theodore High | Theodore | AL | 36582 |
| Mobile County Public Schools | Vigor High | Prichard | AL | 36610 |
| Mobile County Public Schools | Williamson High | Mobile | AL | 36605 |
| Modern Languages Institute | Modern Languages Institute | New Orleans | LA | 70130 |
| New Orleans Baptist Theological Seminary | New Orleans Baptist Theological Seminary | New Orleans | LA | 70126 |
| Nicholls State University | Nicholls State University | Thibodaux | LA | 70301 |
| Notre Dame Seminary | Notre Dame Seminary | New Orleans | LA | 70118 |
| Nunez Community College | Nunez Community College | Chalmette | LA | 70043 |
| Our Lady Holy Cross College | Our Lady Holy Cross College | New Orleans | LA | 70131 |
| Picayune School District | Picayune Memorial High School | Picayune | MS | 39466 |
| Remington College | Remington College | Metairie | LA | 70005 |
| Reserve Christian School | Reserve Christian School | Reserve | LA | 70084 |
| Ridgewood Preparatory School | Ridgewood Preparatory School | Metairie | LA | 70001 |
| Riverside Academy Corporation | Riverside Academy | Reserve | LA | 70084 |

4

| | | | | |
|---|---|---|---|---|
| Saint Joseph Seminary College | St. Benedict | St. Benedict | LA | 70457 |
| School of Urban Missions | New Orleans School of Urban Missions | Gretna | LA | 70053 |
| Southeastern Baptist College | Southeastern Baptist College | Laurel | MS | 39440 |
| Southeastern Louisiana University | Southeastern Louisiana University | Hammond | LA | 70402 |
| Southern University at New Orleans | Southern University at New Orleans | New Orleans | LA | 70126 |
| Spring Hill College | Spring Hill College | Mobile | AL | 36608 |
| St. Paul's Episcopal School | St. Paul's Episcopal School | Mobile | AL | 36608 |
| St. Stanislaus College Prep | St. Stanislaus College Prep | Bay St. Louis | MS | 39520 |
| St. Stanislaus College Prep | Mercy Cross High School | Biloxi | MS | 39530 |
| St. Stanislaus College Prep | St. John High School | Gulfport | MS | 39501 |
| St. Stanislaus College Prep | Resurrection Catholic School | Pascagoula | MS | 39567 |
| St. Stanislaus College Prep | Nativity, B. V. M. | Biloxi | MS | 39530 |
| St. Stanislaus College Prep | Sacred Heart | Hattiesburg | MS | 39401 |
| The University of Southern Mississippi | Hattiesburg Campus | Hattiesburg | MS | 39406 |
| The University of Southern Mississippi | English Language Institute | Hattiesburg | MS | 39406 |
| Top Garden School | Top Garden School | Irvington | AL | 36544 |
| Tulane University | Tulane University | New Orleans | LA | 70118 |
| United States Sports Academy | United States Sports Academy | Daphne | AL | 36526 |
| University of Mobile | University of Mobile | Mobile | AL | 36613 |
| University of New Orleans | University of New Orleans | New Orleans | LA | 70148 |
| University of New Orleans | UNO Intensive English Language Program | New Orleans | LA | 70148 |
| University of South Alabama | University of South Alabama | Mobile | AL | 36688 |
| William Carey College | William Carey College | Hattiesburg | MS | 39401 |
| Xavier University of Louisiana | Xavier University of Louisiana | New Orleans | LA | 70125 |

**Q.  Will *Affected F-1 Students* who have since transferred to other DHS-approved institutions still qualify for the interim relief discussed in this FAQ?**

**A.**   *Affected F-1 Students*, who have since transferred to another DHS-approved institution, but who otherwise satisfy the eligibility criteria listed above in this FAQ under the section *"For whom specifically is DHS taking this action,"* remain eligible for the interim relief discussed in this FAQ.

**Q.  Which *Affected F-1 Students* are covered by the Notice and what relief is available to these students?**

**A.**   To be covered by the Notice, an *Affected F-1 Student* must be maintaining valid F-1 status, which includes pursuing a full course of study.  *Affected F-1 Students* covered by the Notice may obtain short-term employment authorization for off-campus employment or additional hours of on-campus employment.  Furthermore, *Affected F-1 Students* who are granted employment authorization pursuant to the Notice may consequently reduce their course load to no less than the minimum course load requirement set forth in the Notice for the duration of their employment authorization.

5

F-2 dependents (spouse or minor children) of *Affected F-1 Students* who are covered by the Notice would be considered, if otherwise eligible, to be maintaining valid F-2 status, provided the *Affected F-1 Student* continues to maintain valid F-1 status.  F-2 dependents of *Affected F-1 Students* covered by the Notice, however, are not authorized to engage in employment in the United States, irrespective of whether the *Affected F-1 Student* has been granted employment authorization.

**Q.   How do *Affected F-1 Students* covered by the Notice apply for on-campus employment authorization pursuant to the Notice?**

**A.**  *Affected F-1 Students* covered by the Notice, who wish to pursue more than 20 hours per week of on-campus employment pursuant to the Notice, must obtain permission from their current Designated School Official (DSO).  Complete instructions can be found in the Notice under the section entitled, *"How may F-1 students covered by this Notice obtain employment authorization pursuant to this Notice?"*

**Q.   How do *Affected F-1 Students* covered by the Notice apply for off-campus employment authorization pursuant to the Notice?**

**A.**   *Affected F-1 Students* covered by the Notice, who wish to obtain off-campus employment authorization pursuant to the Notice, must file a complete Form I-765, Application for Employment Authorization, with required supporting documentation and prescribed fee, with the USCIS Texas Service Center at:

> U.S. Citizenship and Immigration Services
> Texas Service Center
> P.O. Box 853062
> Mesquite, TX  75815-3062

The front of the envelope, on the bottom right-hand side, should include the following notation: "HURRICANE KATRINA SPECIAL STUDENT RELIEF."   Complete instructions can be found in the Notice under the section entitled, *"How may F-1 students covered by this Notice obtain employment authorization pursuant to this Notice?"*

**Q.   What is the minimum course load requirement set forth in the Notice for *Affected F-1 Students* who are granted employment authorization pursuant to the Notice?**

**A.**   *Affected F-1 Students* engaged in undergraduate studies and who are granted employment authorization pursuant to the Notice must remain registered for a minimum of six (6) semester/quarter hours of instruction per academic term.  *Affected F-1 Students* engaged in graduate studies and who are granted employment authorization pursuant to the Notice must remain registered for a minimum of three (3) semester/quarter hours of instruction per academic term.

**Q.  How is off-campus employment authorization granted pursuant to the Notice different from off-campus employment authorization granted pursuant to the existing provision [See 8 CFR 214.2(f)(9)(ii)]?**

**A.**  One key difference between off-campus employment authorization provided by the Notice and off-campus employment authorization under the existing provision is that *Affected F-1 Students* who are granted employment authorization pursuant to the Notice may reduce their course load for the duration of their employment authorization.

**Q.  What relief is available to *Affected F-1 Students* not covered by the Notice?**

**A.**  *Affected F-1 Students* not covered by the Notice may request deferred action and employment authorization based on economic necessity.  A grant of deferred action in this context means that, during the period that the grant of deferred action remains in effect, DHS will not seek the removal of the *Affected F-1 Student* (or his or her F-2 dependents) based on the fact that the *Affected F-1 Student's* failure to maintain status is directly due to Hurricane Katrina.  A grant of deferred action, however, does not provide an alien any legal immigration status in the United States.  *Affected F-1 Students* who are granted deferred action are eligible to apply for short-term employment authorization, provided they demonstrate economic necessity.

F-2 dependents of *Affected F-1 Students* who are granted deferred action would also be eligible for deferred action for the period granted to the *Affected F-1 Student*.  Although F-2 dependents are not authorized to engage in employment in the United States, F-2 dependents who are granted deferred action are eligible to apply for short-term employment authorization, provided they likewise demonstrate economic necessity.

**Q.  Will *Affected F-1 Students* not covered by the Notice who are granted deferred action be required to file for reinstatement?**

**A.**  Yes.  Since deferred action does not confer any lawful status on an alien, *Affected F-1 Students* who were granted deferred action must apply and be approved for reinstatement in order to resume their F-1 status.  See 8 CFR 214.2(f)(16).  F-2 dependents, who were granted deferred action, are not required to apply for reinstatement, but would be considered, if otherwise eligible, to be maintaining valid F-2 status, provided the *Affected F-1 Student* is approved for reinstatement to valid F-1 status.

**Q.  How may *Affected F-1 Students* not covered by the Notice and their F-2 dependents (spouse and minor children) request deferred action and employment authorization based on economic necessity?**

**A.**  *Affected F-1 Students* not covered by the Notice and their F-2 dependents (spouse and minor children) may individually request deferred action by submitting a letter requesting consideration.  The letter must contain the name and the SEVIS ID number of the applicant, and a written affidavit or unsworn declaration confirming that the applicant meets the eligibility criteria listed above in this FAQ under the section *"For whom*

*specifically is DHS taking this action."* Since individuals who are granted deferred action are eligible to apply for employment authorization, *Affected F-1 Students* and their F-2 dependents who are applying for deferred action, may apply concurrently for employment authorization by filing a Form I-765, Application for Employment Authorization, with required supporting documentation and prescribed fee. Both letter requesting deferred action and the completed Form I-765 should be mailed to the USCIS Texas Service Center at:

> U.S. Citizenship and Immigration Services
> Texas Service Center
> P.O. Box 853062
> Mesquite, TX 75815-3062

The front of the envelope, on the bottom right-hand side, should include the following notation: "HURRICANE KATRINA SPECIAL STUDENT RELIEF."

**Q. How may *Affected F-1 Students* request a waiver of the Form I-765 filing fee?**

**A.** An *Affected F-1 Student* who is unable to pay the prescribed Form I-765 filing fee should include with the application package a written affidavit or unsworn declaration, requesting a fee waiver and explaining the reasons why s/he is unable to pay the prescribed fee.

**Q. How long will the interim relief discussed in this FAQ remain in effect?**

**A.** The interim relief discussed in this FAQ will remain in effect until February 1, 2006. Following February 1, 2006, *Affected F-1 Students* will again be subject to the normal regulatory requirements, including those related to employment authorization and maintenance of a full course of study. DHS will continue to monitor the adverse impact of Hurricane Katrina in the affected areas to determine if modification of the interim relief is warranted and will announce any such modifications in the *Federal Register*.

**Q. Is there a cut-off date for filing for the interim relief discussed in this FAQ?**

**A.** No. USCIS has not established a cut-off date for filing for the interim relief discussed in this FAQ. However, any benefits granted pursuant to the interim relief discussed herein will expire no later than February 1, 2006. While USCIS will exercise its best efforts to process such applications in as prompt a manner as possible, *Affected F-1 Students* (and their F-2 dependents) applying for such benefits should bear in mind this expiration date when submitting their application packages.

**Q. Are *Affected F-1 Students* (both those covered by the Notice and those who are not) required to report their current address to DHS?**

**A.** Yes. All aliens who are required to be registered with DHS also are required to inform DHS of their current address. F-1 students (and their F-2 dependents) are among

the aliens who are required to be registered.  Section 265 of the INA requires aliens to report a change of address within 10 days of such change.  If the alien fails to comply with the change of address requirements, s/he may be removable under Section 237(a)(3)(A) of the INA and subject to criminal or monetary penalties under Section 266(b) of the INA.  Under 8 CFR 214.2(f)(17), F-1 students can satisfy this requirement by providing notice of a change of address within 10 days to their DSO, provided the DSO enters this information in SEVIS within 21 days of notification by the student.  F-1 students who are subject to NSEERS must provide required updated information, including any change of address, pursuant to the terms of that program.  See 8 CFR 264.1(f).

**Q.  Where are the cited Forms and additional information available?**

**A.**  Individuals may obtain the cited Forms from the USCIS website at http://uscis.gov/ or by contacting the USCIS Forms Line at 1-800-870-3676.  Additional information is through the USCIS National Customer Service Center at 1-800-375-5283.

See the November 25, 2005 Press Release

Rev: November 25, 2005

Back to USCIS.gov

# EXHIBIT 62



**U.S. Department of Justice**
Immigration and Naturalization Service

HQINV 50/1

*425 I Street NW*
*Washington, DC 20536*

AUG 3 0 2001

MEMORANDUM FOR MICHAEL A. PEARSON
                EXECUTIVE AS **~~OCIATE COMMISSIONER~~**
                OFFICE OF

FROM:      Michael D. Cronin
            Acting Executive Assoc
            Office of Programs

SUBJECT:  Victims of Trafficking and Violence Protection Act of 2000 (VTVPA) Policy
             <u>Memorandum #2 – "T" and "U" Nonimmigrant Visas</u>

      The following instructions provide interim guidance to INS relating to the Victims of
Trafficking and Violence Protection Act of 2000 (VTVPA) Pub. L. No. 106-386, 114 Stat 1464,
(October 28, 2000). This memorandum establishes interim procedures to be followed while the
regulations implementing the T and U visa status are being promulgated by INS. <u>The guidance in
this memorandum is effective immediately</u>, and will remain in effect until regulations on T and
U visa status are in place. This guidance supercedes or augments any previous national or local
guidance on T and U visas.

## BACKGROUND
The VTVPA reflects the United States Government's strong stance against trafficking and its
intent to vigorously pursue the prosecution of traffickers and the protection of victims. It
provides access to social services and benefits for some victims, creates stronger criminal
penalties and enhanced sentencing for traffickers, and creates a new nonimmigrant classification
for victims of severe forms of trafficking ("T Visa" or "T").[1] The VTVPA also reauthorizes and
amends the Violence Against Women Act (VAWA) and adds a second new nonimmigrant
classification for victims of other specific crimes ("U Visa" or "U").[2]

---

[1] The statutory purposes of the Trafficking Victims Protection division of the VTVPA "are to combat trafficking in
persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure
just and effective punishment of traffickers, and to protect their victims." VTVPA§102(a)
[2] The "U Visa" related statutory purpose includes the intent "to create a new nonimmigrant visa classification that
will strengthen the ability of law enforcement agencies to detect, investigate and prosecute cases of domestic
violence, sexual assault, trafficking of aliens and other crimes...committed against aliens, while offering protection
to victims of such offenses in keeping with the humanitarian interests of the United States..."
VTVPA§1513(a)(2)(A)

Memorandum to Michael A. Pearson                                Page 2
Re: VTVPA Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas

## DEFINITIONS
Following are several definitions critical to the understanding of this guidance.

**Severe Forms of Trafficking in Persons** as defined by VTVPA §103(8).  The term "severe forms of trafficking in persons" means-

    (A)    sex trafficking in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age; or

    (B)    the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery.

**Certain Criminal Activity for "U Visa" Purposes** as defined by VTVPA §1513 (b)(3) refers to one or more of the following or any similar activity in violation of Federal, State, or local criminal law: rape; torture; trafficking; incest; domestic violence; sexual assault; abusive sexual contact; prostitution; sexual exploitation; female genital mutilation; being held hostage; peonage; involuntary servitude; slave trade; kidnapping; abduction; unlawful criminal restraint; false imprisonment; blackmail; extortion; manslaughter; murder; felonious assault; witness tampering; obstruction of justice; perjury; or attempt, conspiracy, or solicitation to commit any of the above mentioned crimes.

**Possible Victim** is any alien who may be eligible for benefits under the "T" or "U" visa categories.

## GENERAL GUIDANCE
The VTVPA creates two new nonimmigrant classifications.  These two classifications provide an immigration mechanism for cooperating victims to remain temporarily in the United States to assist in investigations and prosecutions and provide humanitarian protection to victims.  The "T" classification is available to victims of severe forms of trafficking and their families and is limited to 5,000 principal aliens per year.  The "U" classification is available to victims of certain criminal activity (see Definitions) and their families and is limited to 10,000 principals per year.

The "T" and "U" provisions of the VTVPA went into effect upon enactment, but regulations for implementation and for the processing of applications have not yet been finalized.   In the interim, aliens who are identified as possible victims in the above categories **should not be removed from the United States until they have had the opportunity to avail themselves of the provisions of the VTVPA.**  Existing authority and mechanisms such as parole, deferred action, and stays of removal will be used to achieve this objective, including continued presence for victims of severe forms of trafficking, as described in interim policy guidelines for continued presence and in the regulations implementing Section 107 (c) of the VTVPA.

Memorandum to Michael A. Pearson                                    Page 3
Re: VTVPA Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas

## IDENTIFICATION OF POSSIBLE VICTIMS

In the absence of governing regulations, Service personnel should ensure broad interpretation of the guidance to ensure an alien is not removed from the United States if it appears that they fit into one of these victim categories. This guidance is an interim measure aimed only at identifying possible victims who may be eligible for relief under the new nonimmigrant classifications.

Service personnel may encounter possible victims in a variety of circumstances, such as at a Port of Entry (POE), between POEs, in detention, in adjudication processes, in Immigration Court, and/or in the course of investigative activities. At times, Service personnel will be the first point of contact with the possible victim; at other times contact may be established through a prosecutor's office, through a local or federal law enforcement agency, or through an attorney. Regardless of the manner of encounter, if the individual is identified as a possible victim, Service personnel should take the necessary steps to ensure that the individual is not prematurely removed. Circumstances will vary from case to case, and INS personnel should keep in mind that it is better to err on the side of caution than to remove a possible victim to a country where he or she may be harmed by the trafficker or abuser, or by their associates.

**Possible "T" Victims:** The VTVPA specifies that four conditions must be satisfied to classify an alien as a principal "T" nonimmigrant.

1. The alien is or has been a victim of a severe form of trafficking in persons; and

2. The alien is physically present in the United States, American Samoa, or the Commonwealth of the Northern Mariana Islands, or at a POE, on account of such trafficking; and

3. The alien has complied with any reasonable request for assistance in the investigation or prosecution of acts of trafficking - or - the alien is under the age of 15; and

4. The alien would suffer extreme hardship involving unusual and severe harm upon removal.

Additionally, to avoid extreme hardship, the Attorney General may provide "T" nonimmigrant status to the spouses, children, and, in the case of those under age 21, the parents of "T" nonimmigrants.

**Possible "U" Victims:** The VTVPA specifies that four conditions must be satisfied to classify an alien as a principal "U" nonimmigrant:

1. The alien has suffered substantial physical or mental abuse as a result of having been a victim of the certain criminal activity (see Definitions); and

Memorandum to Michael A. Pearson                                   Page 4
Re: VTVPA Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas

2. The alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) possesses information concerning that certain criminal activity described in Definitions;

3. The alien (or in the case of an alien child under the age of 16, the parent, guardian, or next friend of the alien) has been helpful, is being helpful, or is likely to be helpful to a Federal, State, or local law enforcement official; to a Federal, State, or local prosecutor; to a Federal or State judge; to the Service; or to other Federal, State, or local authorities investigating or prosecuting one of the certain criminal activities described in Definitions; and

4. The criminal activity described violated the laws of the United States or occurred in the United States (including in Indian country and military installations) or the territories and possessions of the United States.

Additionally, to avoid extreme hardship, the Attorney General may provide "U" nonimmigrant status to the spouses, children, and, in the case of a child under the age of 16, the parents of "U" nonimmigrants. This would require certification by a government official that an investigation or prosecution would be harmed without the assistance of the spouse, the child, or in the case of an alien child, the parent of the alien. It should be noted that trafficking victims might also be eligible for "U" nonimmigrant classification.

## WORK AUTHORIZATION
Service personnel are instructed to use existing authority and mechanisms to prevent removal of possible "T" and "U" victims. These mechanisms include parole, deferred action, continuances, and stays of removal. Individuals who are identified as possible "T" or "U" victims may be granted work authorization pursuant to existing authority and utilizing existing application procedures. For instance, potential applicants that are paroled may be granted work authorization pursuant to 8 C.F.R. §274a.12(c)(11); potential applicants that are placed on deferred action may be granted work authorization pursuant to 8 C.F.R. §274a.12(c)(14); and potential applicants that are granted a stay of removal may be granted work authorization in accordance with the provisions of 8 C.F.R. §274a.12(c)(18). Governing regulations concerning continued presence for victims and other information related to this topic are also contained in the Department of Justice and Department of State interim rule published in the Federal Register on July 24, 2001 concerning the Protection and Assistance for Victims of Trafficking.

## JUVENILES
Each District has a juvenile coordinator who should be contacted regarding juvenile victims.

## RECORD KEEPING
It is imperative that documentation is maintained on possible victims. As such, information about the possible victim including all pertinent information surrounding the possible victim's circumstances must be maintained in the alien's A-file. If no A-file exists for the individual, one should be created. The use of standard sworn statements and/or applicable question and answer

Memorandum to Michael A. Pearson                                      Page 5
Re: VTVPA Policy Memorandum #2 — "T" and "U" Nonimmigrant Visas

forms must be maintained for the record. As evidence of contact with the possible victim, the
INS investigator and/or officer will include any necessary notes and memorandum for the record.

## CONTINUED PRESENCE

Aliens who are victims of severe forms of trafficking and are potential witnesses may be eligible
for a "T" nonimmigrant classification and shall be processed in accordance with the guidance
contained in the policy memorandum dated August 20, 2001, entitled Interim Guidance #1 —
Continued Presence. Governing regulations concerning continued presence are also contained in
the Department of Justice and Department of State interim rule published in the Federal Register
on July 24, 2001 concerning the Protection and Assistance for Victims of Trafficking, as 28 CFR
Part 1100.35.

## LEGAL PROCEEDINGS

No alien identified as a possible victim eligible for "T" or "U" nonimmigrant classification
should be removed from the United States until they have had the opportunity to avail
themselves of the provisions of the VTVPA. When a possible "T" or "U" victim is encountered
during the course of proceedings, the District Counsel's office should contact the District Victim-
Witness Coordinator so that appropriate action can be taken in accordance with the instructions
in this memo. The District Counsel's office has the discretion to seek a continuance of the
proceedings or to request administrative closure or termination.

## FEDERAL OBLIGATIONS TO VICTIMS

Some of the provisions included in the VTVPA replicate INS responsibilities that are currently
included in 42 U.S.C. 10606-10607 (the Victim's Rights and Restitution Act) and the *Attorney
General Guidelines for Victim and Witness Assistance, 2000 edition*. This includes the referral
of victims of Federal crime to medical care and assistance and the provision of reasonable
protection. Victims who fall into the statutory definition of victim found in the *Attorney General
Guidelines for Victim and Witness Assistance* must be afforded all the rights contained in that
directive.[3] Service personnel should continue to involve the District and Sector Victim-Witness
Coordinators in referring these victims for services.

This guidance is to be followed until such time as the alien's status has been confirmed, and,
where the alien is an actual or possible material witness, the alien has had an opportunity to be
considered for a "T" or a "U" nonimmigrant classification, as appropriate.

---

[3] For purposes of the Attorney General Guidelines for Victim and Witness Assistance, the term "victim" means a
person that has suffered direct physical, emotional, or pecuniary harm as the result of a (federal) crime, including
. ..in the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, another person or
persons as listed in 42 U.S.C. 10607. The Attorney General designated District Directors and Chief Patrol Agents of
the office having primary responsibility for conducting a Federal investigation as the responsible officials to identify
victims of Federal crime.

Memorandum to Michael A. Pearson                                    Page 6
Re: VTVPA Policy Memorandum #2 – "T" and "U" Nonimmigrant Visas

The principles set forth in this memorandum, and internal office procedures adopted hereto, are
intended solely to guide INS personnel in performing their duties.  They are not intended to, do
not, and may not be relied upon to create a right or benefit, substantive or procedural,
enforceable at law by any individual or other party in removal proceedings, in litigation with the
United States, or in any other form or manner.

# EXHIBIT 63

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of Domestic Operations (MS-2110)*
Washington, DC  20529

**U.S. Citizenship
and Immigration
Services**

June 15, 2009

# Memorandum

TO:             Field Leadership

FROM:           Donald Neufeld
                Acting Associate Director, Office of Domestic Operations

SUBJECT:        Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children

## I. Purpose

This memorandum provides guidance to U.S. Citizenship and Immigration Services (USCIS) field offices and service centers regarding the processing of surviving spouses of deceased U.S. citizens and qualifying children of the surviving spouses. It affords a new process by which they may apply for deferred action. This policy guidance will be in effect until further notice and may be revised as needed.

## II. Background

Section 205.1(a)(3)(i)(C) of title 8 of the Code of Federal Regulations (8 CFR) requires that the approval of Form I-130, *Petition for Alien Relative*, be automatically revoked upon the death of the petitioner if the beneficiary[1] has not adjusted status in the United States or been inspected and admitted as an immigrant. In such instances, the beneficiary may request a reinstatement of the approval and USCIS, in its discretion, may grant such a request for humanitarian reasons. 8 CFR 205.1(a)(3)(i)(C)(2).

However, no avenue of immigration relief exists for the surviving spouse of a deceased U.S. citizen if the surviving spouse and the U.S. citizen were married less than 2 years at the time of the citizen's death and (1) the immigrant petition filed by the citizen on behalf of the surviving spouse has not been adjudicated by USCIS at the time of the citizen's death, or (2) no petition was filed by the citizen before the citizen's death. This issue has caused a split among the circuit courts of appeal and is also the subject of proposed legislation in the U.S. Congress (bills S. 815 and H.R. 1870).

---

[1] Depending on context, the term beneficiary in this guidance may include both actual and potential beneficiaries of Forms I-130 filed on their behalf.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 2

## III. Policy Guidance

This policy guidance covers only (1) surviving spouses of U.S. citizens who died before the second anniversary of the marriage, who have not remarried and were not legally separated from the citizen spouse at the time of the citizen's death, and who are residing in the United States,[2] and (2) such surviving spouses' qualifying children. For purposes of this policy guidance, "qualifying children" are any children of the surviving spouse of the deceased U.S. citizen who remain unmarried and under 21 years of age (age determinations for beneficiaries of Forms I-130 should be made as provided in section 201(f) of the INA).

This guidance applies to the aforementioned beneficiaries without regard to their manner of entry into the United States. Such surviving spouses are covered without restrictions on how long the U.S. citizen spouse has been deceased as long as the surviving spouse has not remarried.[3]

This guidance does not cover surviving spouses or qualifying children of deceased U.S. citizens who are residing outside the United States or surviving spouses and children of a lawful permanent resident or other non-U.S. citizen. This guidance also does not cover surviving spouses or qualifying children of deceased U.S. citizens if the surviving spouse remarried at any time after the U.S. citizen's death (regardless of whether the subsequent marriage has been terminated). This guidance does not cover any beneficiary who was legally separated from his or her U.S. citizen spouse at the time of the citizen's death, or such beneficiary's children.

Since current section 201(b)(2)(A)(i) of the Immigration and Nationality Act (INA) treats covered widow(er)s of U.S. citizens and their children as immediate relatives based upon a self-petition, they are not covered by this guidance. They may file a Form I-360, *Petition for Amerasian, Widow(er), or Special Immigrant*, in accordance with the instructions on the Form.

In order to address humanitarian concerns arising from cases involving surviving spouses of U.S. citizens, USCIS is instituting the following policy guidance, which is effective immediately and until further notice.

## A. Form I-130 Approved Prior to the Death of the U.S. Citizen Spouse (Petitioner)

Upon the death of the U.S. citizen petitioner, the approved Form I-130 is automatically revoked pursuant to 8 CFR 205.1(a)(3)(i)(C). The beneficiary, however, may request reinstatement of the revoked petition pursuant to 8 CFR 205.1(a)(3)(i)(C)(2). USCIS may then exercise discretion and grant the reinstatement after considering the facts and humanitarian considerations of the particular

---

[2] Section III(A) of this memorandum, however, regarding humanitarian reinstatement, shall apply to surviving spouses outside the United States.

[3] This guidance is also applicable to a beneficiary who entered the United States on a K-1 Nonimmigrant Visa and married a U.S. citizen other than the U.S. citizen petitioner who filed the I-129F. If the U.S. citizen spouse died before the second anniversary of the marriage, the widow(er) is eligible for deferred action or humanitarian reinstatement as described herein.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 3

case.  If the request for humanitarian reinstatement is approved, the beneficiary may proceed to the adjustment of status or consular processing stage.

This memorandum does not alter the process for reviewing a Form I-130 returned to USCIS by a U.S. Consular Officer overseas when the beneficiary is seeking a humanitarian reinstatement.  If USCIS reinstates the Form I-130 returned by the consular officer, the I-130 should be forwarded to the National Visa Center to allow the beneficiary to resume consular processing.  Section III(A) of this guidance, relating to humanitarian reinstatement, applies to beneficiaries who are within or outside the United States.

If a beneficiary covered by this guidance requests humanitarian reinstatement, adjudicators should presume that humanitarian reasons support a grant of the request.  Absent extraordinary factors or a failure to meet the regulatory requirements of 8 CFR 205.1(a)(3)(i)(C)(2), adjudicators should favorably exercise discretion accordingly.  If the request for reinstatement cannot be granted for any reason other than confirmed or suspected fraud or issues of criminality or national security, the beneficiary should be informed that he or she may request deferred action in the manner described in III(E) below.

In a case governed by First, Sixth or Ninth Circuit law, officers should consult with local USCIS counsel before treating an approved spousal immediate relative petition as "revoked" under 8 CFR 205.1(a)(3)(i)(C).  Courts in those jurisdictions have held that the visa petitioner's death does *not* end a surviving spouse's eligibility for classification as an immediate relative.  Taing v. Napolitano, ____ F.3d ___, 2009 WL 1395836 (1st Cir. 2009); Lockhart v. Napolitano, 561 F.3d 611 (6th Cir. 2009); Freeman v. Gonzales, 444 F.3d 1031 (9th Cir. 2006).

**B.   Form I-130 Pending at the Time of Death of the U.S. Citizen Spouse (Petitioner) – Married Less than 2 Years at Time of Death**

Once USCIS has received a copy of the U.S. citizen petitioner's death certificate, the pending, stand-alone Form I-130 should be held in abeyance at the pending location.  Petitions may be transferred to the Vermont Service Center to be consolidated with the A-file housing a deferred action request, if such a request is made by the beneficiary (see further guidance below).

Any concurrently filed Form I-485, *Application to Register Permanent Residence or Adjust Status*, and Form I-130, should be held in abeyance at the National Benefits Center until further guidance. The beneficiary will remain eligible to receive the interim benefits of advance parole and employment authorization on the basis of the pending adjustment of status application.

If a Form I-485 was not concurrently filed, the beneficiary should be informed that he or she may request deferred action in the manner described in section III(E) below.

Note:  In instances where the beneficiary and deceased U.S. citizen petitioner were married for at least two years at the time of the petitioner's death, the Form I-130 should be denied under existing

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 4

procedures.  Instructions should be provided to the beneficiary regarding the availability of the Form I-360 as a special immigrant widow/widower.  Any associated Form I-485 should also be denied.

**C.  <u>Form I-130 Denied (Prior to the Issuance of this Guidance) due to the Death of the U.S. Citizen Spouse (Petitioner)</u>**

A beneficiary who is the surviving spouse of a U.S. citizen petitioner and whose petition was denied by USCIS (1) due to the death of the U.S. citizen petitioner, and (2) prior to the issuance of this guidance, may request deferred action in the manner described in section III(E) below.

**D.  <u>Form I-130 Not Filed Prior to the Death of the U.S. Citizen Spouse</u>**

A beneficiary who was legally married to a now deceased U.S. citizen at the time of the U.S. citizen's death, but for whom no Form I-130 was filed, may request deferred action in the manner described in section III(E) below.

If the beneficiary was not legally married to, or was legally separated from, the deceased U.S. citizen at the time of the U.S. citizen's death, a qualifying relationship does not exist.  The beneficiary is therefore not eligible to submit Form I-360 based on the specific policy guidance set forth in section III(E) below.

**E.  <u>Required Documentation for Requests for Deferred Action</u>**

Beneficiaries may request deferred action by submitting the following:

1) A Form I-360, *Petition for Amerasian, Widow(er), or Special Immigrant*, with the appropriate, nonwaivable filing fee (currently $375), completed in the format explained below; and
2) All of the documents requested in the Form I-360 filing instructions for widow/widowers.

The beneficiary of the Form I-360 must check box "**m.  Other, explain:**" in Part 2 of the petition and cite the basis for eligibility as "**<u>Deferred Action — Surviving spouse of a deceased U.S. citizen, married less than 2 years</u>**."  The Form I-360 must be submitted to the Vermont Service Center for deferred action consideration.  Note that while USCIS is utilizing Form I-360 for these deferred action requests, such filings are NOT immigrant self-petitions under current law.  They should be adjudicated as requests for deferred action only.  In addition to the Part 2 information described above, the applicant must complete Parts 1, 3, 4, 7, 9, 10 and 11 of the Form I-360.

**F.  <u>Decision on Requests for Deferred Action</u>**

Requests for deferred action based on the specific policy guidance set forth in this memorandum may only be considered for:  1) surviving spouses of U.S. citizens whose U.S. citizen spouse died before the second anniversary of the marriage and who are unmarried and residing in the United States; and 2) their qualifying children who are residing in the United States.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 5

The following persons are ineligible for deferred action: 1) beneficiaries whose visa petition was denied or revoked for any reason other than or in addition to the death of the petitioning U.S. citizen spouse; 2) widow(er)s who have remarried or were legally separated from the U.S. citizen spouse at the time of the U.S. citizen's death; and 3) beneficiaries with other serious adverse factors, such as national security concerns, significant immigration fraud, commission of other crimes, or public safety reasons.   A grant of deferred action is a discretionary action on the part of USCIS.  It is intended that this discretion should be liberally applied to provide a humanitarian benefit to eligible beneficiaries.  However, deferred action may be denied for serious adverse factors, whether or not such factors are specifically identified in this guidance.

Requests for deferred action based on the specific policy guidance set forth in this memorandum will not be considered for beneficiaries who: 1) are surviving spouses or qualifying children of non-U.S. citizens; 2) are residing outside the United States; 3) meet the conditional marriage period set forth in INA 201(b)(2)(A)(i); or 4) have remarried subsequent to the U.S. citizen's death (regardless of whether the subsequent marriage has been terminated).

Once a decision on the request for deferred action has been made, the decision must be communicated to the beneficiary via a decision letter.  If the request has been granted, the deferred action grant letter must state that the beneficiary is eligible to file Form I-765, *Application for Employment Authorization*.  If the request has been denied, the deferred action denial letter must cite the reasons for the denial.  A decision on a request for deferred action falls within the discretion of the Secretary.  A denial of a request for deferred action is not subject to administrative appeal or judicial review, see INA § 242(a)(2)(B), and (g).

## G.  Validity Period for Deferred Action

The validity period of deferred action based on the policy guidance set forth in this memorandum is two (2) years from the date of grant of the Form I-360 request for deferred action.

## H.  Eligibility for Employment Authorization

The appropriate classification for Form I-765 filed on the basis of a deferred action grant is (C)(14) pursuant to 8 CFR 274a.12(c)(14).  Beneficiaries may submit Form I-765, with the appropriate filing fee (currently $340), using this classification at any time after the grant (but prior to the expiration) of deferred action.  However, they must demonstrate an economic necessity.  The validity period for an employment authorization document (EAD) under the classification (C)(14), based on the specific policy guidance set forth in this memorandum is two (2) years, not to exceed the expiration date of the grant of deferred action.

All requests for employment authorization based on the policy guidance set forth in this memorandum must contain the appropriate required supporting documentation.  Applicants must follow currently established filing procedures for the Form I-765 in accordance with the instructions on the form.  Fee waiver of the Form I-765 fee is available on a case-by-case basis for substantiated inability to pay as provided in 8 CFR 103.7(c)(1).

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 6

A beneficiary whose Form I-485 is being held in abeyance may also file a Form I-765, with the appropriate filing fee.  The appropriate classification for employment authorization filed on such a basis is (C)(9) pursuant to 8 CFR 274a.12(c)(9).  Evidence of an economic necessity is not required if using this classification.  A beneficiary whose application is being held in abeyance may have been issued an employment authorization document valid for one year under category (C)(9).  When such an applicant files a Form I-765 for renewal of his or her EAD under the classification (C)(9), based on the specific policy guidance set forth in this memorandum, the validity period will be **two (2) years**.  An applicant with a valid EAD under the classification (C)(9) may file for renewal no more than 90 days prior to the expiration date of the valid document.  The employment authorization may then be granted for two (2) years based on the specific policy guidance set forth in this memorandum.

## I.  Effect of Grant of Deferred Action

The grant of deferred action by USCIS does not confer or alter any immigration status.  It does not convey or imply any waivers of inadmissibility that may exist, regardless of whether that inadmissibility is known to DHS or other agencies at the time of the request for deferred action.  A grant of deferred action also does not eliminate any period of prior unlawful presence.  However, periods of time in deferred action do not count as unlawful presence for the purposes of sections 212(a)(9)(B) and (C) of the INA.  Any period of time in deferred action qualifies as a period of stay authorized by the Secretary of Homeland Security for those purposes.

## J.  Eligibility for Advance Parole

Beneficiaries granted deferred action based on the policy guidance set forth in this memorandum or whose applications for adjustment of status are being held in abeyance may request advance parole.  Such request may be made by filing Form I-131, *Application for Travel Document*, in accordance with the Form I-131 instructions and with the appropriate fee.  Note, however, that departure from the United States and return, even under a grant of advance parole, may adversely affect eligibility for adjustment of status of aliens with past periods of unlawful presence.

## K.  Implementation

USCIS offices and centers are to begin implementing the instructions established in this memorandum immediately.

## L.  Contact Information

Questions regarding this memorandum should be directed to the Office of Domestic Operations through appropriate channels.

Guidance Regarding Surviving Spouses of Deceased U.S. Citizens and their Children
Page 7

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity, by any party against the United States, its departments, agencies or entities, its officers, employees, or agents, or any other person.

**<u>Distribution</u>**:

Regional Directors
District Directors
Field Office Directors
National Benefits Center Director
Service Center Directors

# EXHIBIT 64

117 STAT. 1392      PUBLIC LAW 108–136—NOV. 24, 2003

Public Law 108–136
108th Congress

## An Act

Nov. 24, 2003
[H.R. 1588]

To authorize appropriations for fiscal year 2004 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe personnel strengths for such fiscal year for the Armed Forces, and for other purposes.

National Defense
Authorization
Act for Fiscal
Year 2004.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "National Defense Authorization Act for Fiscal Year 2004".

**SEC. 2. ORGANIZATION OF ACT INTO DIVISIONS; TABLE OF CONTENTS.**

(a) DIVISIONS.—This Act is organized into three divisions as follows:

(1) Division A—Department of Defense Authorizations.
(2) Division B—Military Construction Authorizations.
(3) Division C—Department of Energy National Security Authorizations and Other Authorizations.

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Organization of Act into divisions; table of contents.
Sec. 3. Congressional defense committees defined.

### DIVISION A—DEPARTMENT OF DEFENSE AUTHORIZATIONS

#### TITLE I—PROCUREMENT

##### Subtitle A—Authorization of Appropriations

Sec. 101. Army.
Sec. 102. Navy and Marine Corps.
Sec. 103. Air Force.
Sec. 104. Defense-wide activities.

##### Subtitle B—Army Programs

Sec. 111. Stryker vehicle program.
Sec. 112. CH–47 helicopter program.

##### Subtitle C—Navy Programs

Sec. 121. Multiyear procurement authority for F/A–18 aircraft program.
Sec. 122. Multiyear procurement authority for Tactical Tomahawk cruise missile program.
Sec. 123. Multiyear procurement authority for Virginia class submarine program.
Sec. 124. Multiyear procurement authority for E–2C aircraft program.
Sec. 125. Multiyear procurement authority for Phalanx Close In Weapon System program.
Sec. 126. Pilot program for flexible funding of cruiser conversions and overhauls.

117 STAT. 1694        PUBLIC LAW 108–136—NOV. 24, 2003

death (regardless of changes in age or marital status there-
after), but only if the alien files a petition under subpara-
graph (B) within 2 years after such date.

(B) PETITIONS.—An alien described in subparagraph
(A) may file a petition with the Secretary of Homeland
Security for classification of the alien under section
201(b)(2)(A)(i) of the Immigration and Nationality Act (8
U.S.C. 1151(b)(2)(A)(i)). For purposes of such Act, such
a petition shall be considered a petition filed under section
204(a)(1)(A) of such Act (8 U.S.C. 1154(a)(1)(A)).

(C)        EXCEPTION.—Notwithstanding        section
201(b)(2)(A)(i) of the Immigration and Nationality Act (8
U.S.C. 1151(b)(2)(A)(i)), for purposes of this paragraph, a
citizen described in subparagraph (A) does not have to
be 21 years of age for a parent to benefit under this
paragraph.

8 USC 1151 note.        (b) APPLICATIONS FOR ADJUSTMENT OF STATUS BY SURVIVING
SPOUSES, CHILDREN, AND PARENTS.—

(1) IN GENERAL.—Notwithstanding subsections (a) and (c)
of section 245 of the Immigration and Nationality Act (8 U.S.C.
1255), any alien who was the spouse, child, or parent of an
alien described in paragraph (2), and who applied for adjust-
ment of status prior to the death described in paragraph (2)(B),
may have such application adjudicated as if such death had
not occurred.

(2) ALIEN DESCRIBED.—An alien is described in this para-
graph if the alien—

(A) served honorably in an active duty status in the
military, air, or naval forces of the United States;

(B) died as a result of injury or disease incurred in
or aggravated by combat; and

(C) was granted posthumous citizenship under section
329A of the Immigration and Nationality Act (8 U.S.C.
1440–1).

8 USC 1151 note.        (c) SPOUSES AND CHILDREN OF LAWFUL PERMANENT RESIDENT
ALIENS.—

(1) TREATMENT AS IMMEDIATE RELATIVES.—

(A) IN GENERAL.—A spouse or child of an alien
described in paragraph (3) who is included in a petition
for classification as a family-sponsored immigrant under
section 203(a)(2) of the Immigration and Nationality Act
(8 U.S.C. 1153(a)(2)) that was filed by such alien, shall
be considered (if the spouse or child has not been admitted
or approved for lawful permanent residence by such date)
a valid petitioner for immediate relative status under sec-
tion 201(b)(2)(A)(i) of the Immigration and Nationality Act
(8 U.S.C. 1151(b)(2)(A)(i)). Such spouse or child shall be
eligible for deferred action, advance parole, and work
authorization.

(B) PETITIONS.—An alien spouse or child described in
subparagraph (A) may file a petition with the Secretary
of Homeland Security for classification of the alien under
section 201(b)(2)(A)(i) of the Immigration and Nationality
Act (8 U.S.C. 1151(b)(2)(A)(i)). For purposes of such Act,
such a petition shall be considered a petition filed under
section 204(a)(1)(A) of such Act (8 U.S.C. 1154(a)(1)(A)).

(2) SELF-PETITIONS.—Any spouse or child of an alien described in paragraph (3) who is not a beneficiary of a petition for classification as a family-sponsored immigrant may file a petition for such classification under section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)) with the Secretary of Homeland Security, but only if the spouse or child files a petition within 2 years after such date. Such spouse or child shall be eligible for deferred action, advance parole, and work authorization.

*Deadline.*

(3) ALIEN DESCRIBED.—An alien is described in this paragraph if the alien—

(A) served honorably in an active duty status in the military, air, or naval forces of the United States;

(B) died as a result of injury or disease incurred in or aggravated by combat; and

(C) was granted posthumous citizenship under section 329A of the Immigration and Nationality Act (8 U.S.C. 1440–1).

(d) PARENTS OF LAWFUL PERMANENT RESIDENT ALIENS.—

*8 USC 1151 note.*
*Deadline.*

(1) SELF-PETITIONS.—Any parent of an alien described in paragraph (2) may file a petition for classification under section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)), but only if the parent files a petition within 2 years after such date. For purposes of such Act, such petition shall be considered a petition filed under section 204(a)(1)(A) of such Act (8 U.S.C. 1154(a)(1)(A)). Such parent shall be eligible for deferred action, advance parole, and work authorization.

(2) ALIEN DESCRIBED.—An alien is described in this paragraph if the alien—

(A) served honorably in an active duty status in the military, air, or naval forces of the United States;

(B) died as a result of injury or disease incurred in or aggravated by combat; and

(C) was granted posthumous citizenship under section 329A of the Immigration and Nationality Act (8 U.S.C. 1440–1).

(e) WAIVER OF GROUND FOR INADMISSIBILITY.—In determining the admissibility of any alien accorded an immigration benefit under this section for purposes of the Immigration and Nationality Act, the ground for inadmissibility specified in section 212(a)(4) of such Act (8 U.S.C. 1182(a)(4)) shall not apply.

*8 USC 1151 note.*

(f) NATURALIZATION FOR SURVIVING SPOUSES.—

(1) IN GENERAL.—Section 319(d) of the Immigration and Nationality Act (8 U.S.C. 1430(d)) is amended by adding at the end the following: "For purposes of this subsection, the terms 'United States citizen' and 'citizen spouse' include a person granted posthumous citizenship under section 329A.".

(2) EFFECTIVE DATE.—The amendment made by paragraph (1) shall apply with respect to persons granted posthumous citizenship under section 329A of the Immigration and Nationality Act (8 U.S.C. 1440–1) due to death on or after September 11, 2001.

*8 USC 1430 note.*

(g) BENEFITS TO SURVIVORS; TECHNICAL AMENDMENT.—Section 329A of the Immigration and Nationality Act (8 U.S.C. 1440–1) is amended—

(1) by striking subsection (e); and

# EXHIBIT 65

115 STAT. 272        PUBLIC LAW 107–56—OCT. 26, 2001

Public Law 107–56
107th Congress

An Act

Oct. 26, 2001

[H.R. 3162]

To deter and punish terrorist acts in the United States and around the world,
to enhance law enforcement investigatory tools, and for other purposes.

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled,*

Uniting and
Strengthening
America by
Providing
Appropriate
Tools Required to
Intercept and
Obstruct
Terrorism (USA
PATRIOT ACT)
Act of 2001.
18 USC 1 note.

SECTION 1. SHORT TITLE AND TABLE OF CONTENTS.

(a) SHORT TITLE.—This Act may be cited as the "Uniting and
Strengthening America by Providing Appropriate Tools Required
to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act
of 2001".

(b) TABLE OF CONTENTS.—The table of contents for this Act
is as follows:

Sec. 1. Short title and table of contents.
Sec. 2. Construction; severability.

TITLE I—ENHANCING DOMESTIC SECURITY AGAINST TERRORISM

Sec. 101. Counterterrorism fund.
Sec. 102. Sense of Congress condemning discrimination against Arab and Muslim
          Americans.
Sec. 103. Increased funding for the technical support center at the Federal Bureau
          of Investigation.
Sec. 104. Requests for military assistance to enforce prohibition in certain emer-
          gencies.
Sec. 105. Expansion of National Electronic Crime Task Force Initiative.
Sec. 106. Presidential authority.

TITLE II—ENHANCED SURVEILLANCE PROCEDURES

Sec. 201. Authority to intercept wire, oral, and electronic communications relating
          to terrorism.
Sec. 202. Authority to intercept wire, oral, and electronic communications relating
          to computer fraud and abuse offenses.
Sec. 203. Authority to share criminal investigative information.
Sec. 204. Clarification of intelligence exceptions from limitations on interception
          and disclosure of wire, oral, and electronic communications.
Sec. 205. Employment of translators by the Federal Bureau of Investigation.
Sec. 206. Roving surveillance authority under the Foreign Intelligence Surveillance
          Act of 1978.
Sec. 207. Duration of FISA surveillance of non-United States persons who are
          agents of a foreign power.
Sec. 208. Designation of judges.
Sec. 209. Seizure of voice-mail messages pursuant to warrants.
Sec. 210. Scope of subpoenas for records of electronic communications.
Sec. 211. Clarification of scope.
Sec. 212. Emergency disclosure of electronic communications to protect life and
          limb.
Sec. 213. Authority for delaying notice of the execution of a warrant.
Sec. 214. Pen register and trap and trace authority under FISA.
Sec. 215. Access to records and other items under the Foreign Intelligence Surveil-
          lance Act.
Sec. 216. Modification of authorities relating to use of pen registers and trap and
          trace devices.

an alien spouse described in the second sentence of section 201(b)(2)(A)(i) of such Act.

(2) CHILDREN.—

(A) IN GENERAL.—In the case of an alien who was the child of a citizen of the United States at the time of the citizen's death, if the citizen died as a direct result of a specified terrorist activity, the alien shall be considered, for purposes of section 201(b) of the Immigration and Nationality Act (8 U.S.C. 1151(b)), to remain an immediate relative after the date of the citizen's death (regardless of changes in age or marital status thereafter), but only if the alien files a petition under subparagraph (B) within 2 years after such date.

(B) PETITIONS.—An alien described in subparagraph (A) may file a petition with the Attorney General for classification of the alien under section 201(b)(2)(A)(i) of the Immigration and Nationality Act (8 U.S.C. 1151(b)(2)(A)(i)). For purposes of such Act, such a petition shall be considered a petition filed under section 204(a)(1)(A) of such Act (8 U.S.C. 1154(a)(1)(A)).

(b) SPOUSES, CHILDREN, UNMARRIED SONS AND DAUGHTERS OF LAWFUL PERMANENT RESIDENT ALIENS.—

(1) IN GENERAL.—Any spouse, child, or unmarried son or daughter of an alien described in paragraph (3) who is included in a petition for classification as a family-sponsored immigrant under section 203(a)(2) of the Immigration and Nationality Act (8 U.S.C. 1153(a)(2)) that was filed by such alien before September 11, 2001, shall be considered (if the spouse, child, son, or daughter has not been admitted or approved for lawful permanent residence by such date) a valid petitioner for preference status under such section with the same priority date as that assigned prior to the death described in paragraph (3)(A). No new petition shall be required to be filed. Such spouse, child, son, or daughter may be eligible for deferred action and work authorization.

(2) SELF-PETITIONS.—Any spouse, child, or unmarried son or daughter of an alien described in paragraph (3) who is not a beneficiary of a petition for classification as a family-sponsored immigrant under section 203(a)(2) of the Immigration and Nationality Act may file a petition for such classification with the Attorney General, if the spouse, child, son, or daughter was present in the United States on September 11, 2001. Such spouse, child, son, or daughter may be eligible for deferred action and work authorization.

(3) ALIENS DESCRIBED.—An alien is described in this paragraph if the alien—

(A) died as a direct result of a specified terrorist activity; and

(B) on the day of such death, was lawfully admitted for permanent residence in the United States.

(c) APPLICATIONS FOR ADJUSTMENT OF STATUS BY SURVIVING SPOUSES AND CHILDREN OF EMPLOYMENT-BASED IMMIGRANTS.—

(1) IN GENERAL.—Any alien who was, on September 10, 2001, the spouse or child of an alien described in paragraph (2), and who applied for adjustment of status prior to the death described in paragraph (2)(A), may have such application adjudicated as if such death had not occurred.

# EXHIBIT 66

 KeyCite Yellow Flag - Negative Treatment
Proposed Regulation

Code of Federal Regulations
    Title 8. Aliens and Nationality
        Chapter I. Department of Homeland Security (Refs & Annos)
            Subchapter B. Immigration Regulations
                Part 274a. Control of Employment of Aliens (Refs & Annos)
                    Subpart B. Employment Authorization

8 C.F.R. § 274a.12

§ 274a.12 Classes of aliens authorized to accept employment.

Effective: March 14, 2018

Currentness

(a) Aliens authorized employment incident to status. Pursuant to the statutory or regulatory reference cited, the following classes of aliens are authorized to be employed in the United States without restrictions as to location or type of employment as a condition of their admission or subsequent change to one of the indicated classes. Any alien who is within a class of aliens described in paragraphs (a)(3), (a)(4), (a)(6)–(a)(8), (a)(10)–(a)(15), or (a)(20) of this section, and who seeks to be employed in the United States, must apply to U.S. Citizenship and Immigration Services (USCIS) for a document evidencing such employment authorization. USCIS may, in its discretion, determine the validity period assigned to any document issued evidencing an alien's authorization to work in the United States.

(1) An alien who is a lawful permanent resident (with or without conditions pursuant to section 216 of the Act), as evidenced by Form I–551 issued by the Service. An expiration date on the Form I–551 reflects only that the card must be renewed, not that the bearer's work authorization has expired;

(2) An alien admitted to the United States as a lawful temporary resident pursuant to sections 245A or 210 of the Act, as evidenced by an employment authorization document issued by the Service;

(3) An alien admitted to the United States as a refugee pursuant to section 207 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(4) An alien paroled into the United States as a refugee for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(5) An alien granted asylum under section 208 of the Act for the period of time in that status, as evidenced by an employment authorization document, issued by USCIS to the alien. An expiration date on the employment authorization document issued by USCIS reflects only that the document must be renewed, and not that the bearer's work authorization has expired. Evidence of employment authorization shall be granted in increments not exceeding 5 years for the period of time the alien remains in that status.

(6) An alien admitted to the United States as a nonimmigrant fiancé or fiancée pursuant to section 101(a)(15)(K)(i) of the Act, or an alien admitted as a child of such alien, for the period of admission in that status, as evidenced by an employment authorization document issued by the Service;

(7) An alien admitted as a parent (N–8) or dependent child (N–9) of an alien granted permanent residence under section 101(a)(27)(I) of the Act, as evidenced by an employment authorization document issued by the Service;

(8) An alien admitted to the United States as a nonimmigrant pursuant to the Compact of Free Association between the United States and of the Federated States of Micronesia, the Republic of the Marshall Islands, or the Republic of Palau;

(9) Any alien admitted as a nonimmigrant spouse pursuant to section 101(a)(15)(K)(ii) of the Act, or an alien admitted as a child of such alien, for the period of admission in that status, as evidenced by an employment authorization document, with an expiration date issued by the Service;

(10) An alien granted withholding of deportation or removal for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(11) An alien whose enforced departure from the United States has been deferred in accordance with a directive from the President of the United States to the Secretary. Employment is authorized for the period of time and under the conditions established by the Secretary pursuant to the Presidential directive;

(12) An alien granted Temporary Protected Status under section 244 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(13) An alien granted voluntary departure by the Attorney General under the Family Unity Program established by section 301 of the Immigration Act of 1990, as evidenced by an employment authorization document issued by the Service;

(14) An alien granted Family Unity benefits under section 1504 of the Legal Immigrant Family Equity (LIFE) Act Amendments, Public Law 106–554, and the provisions of 8 CFR part 245a, Subpart C of this chapter, as evidenced by an employment authorization document issued by the Service;

(15) Any alien in V nonimmigrant status as defined in section 101(a)(15)(V) of the Act and 8 CFR 214.15.

(16) Any alien in T–1 nonimmigrant status, pursuant to 8 CFR 214.11, for the period in that status, as evidenced by an employment authorization document issued by USCIS to the alien.

(17), (18) [Reserved by 72 FR 53041]

(19) Any alien in U–1 nonimmigrant status, pursuant to 8 CFR 214.14, for the period of time in that status, as evidenced by an employment authorization document issued by USCIS to the alien.

(20) Any alien in U–2, U–3, U–4, or U–5 nonimmigrant status, pursuant to 8 CFR 214.14, for the period of time in that status, as evidenced by an employment authorization document issued by USCIS to the alien.

(b) Aliens authorized for employment with a specific employer incident to status or parole. The following classes of aliens are authorized to be employed in the United States by the specific employer and subject to any restrictions described in the section(s) of this chapter indicated as a condition of their parole or of their admission in, or subsequent change to, the designated nonimmigrant classification. An alien in one of these classes is not issued an employment authorization document by DHS:

(1) A foreign government official (A–1 or A–2), pursuant to § 214.2(a) of this chapter. An alien in this status may be employed only by the foreign government entity;

(2) An employee of a foreign government official (A–3), pursuant to § 214.2(a) of this chapter. An alien in this status may be employed only by the foreign government official;

(3) A foreign government official in transit (C–2 or C–3), pursuant to § 214.2(c) of this chapter. An alien in this status may be employed only by the foreign government entity;

(4) [Reserved]

(5) A nonimmigrant treaty trader (E–1) or treaty investor (E–2), pursuant to § 214.2(e) of this chapter. An alien in this status may be employed only by the treaty-qualifying company through which the alien attained the status. Employment authorization does not extend to the dependents of the principal treaty trader or treaty investor (also designated "E–1" or "E–2"), other than those specified in paragraph (c)(2) of this section;

(6) A nonimmigrant (F–1) student who is in valid nonimmigrant student status and pursuant to 8 CFR 214.2(f) is seeking:

(i) On-campus employment for not more than twenty hours per week when school is in session or full-time employment when school is not in session if the student intends and is eligible to register for the next term or session. Part-time on-campus employment is authorized by the school and no specific endorsement by a school official or Service officer is necessary;

(ii) [Reserved]

(iii) Curricular practical training (internships, cooperative training programs, or work-study programs which are part of an established curriculum) after having been enrolled full-time in a Service approved institution for one full

academic year. Curricular practical training (part-time or full-time) is authorized by the Designated School Official on the student's Form I–20. No Service endorsement is necessary.

(iv) An Employment Authorization Document, Form I–766 or successor form, under paragraph (c)(3)(i)(C) of this section based on a STEM Optional Practical Training extension, and whose timely filed Form I–765 or successor form is pending and employment authorization and accompanying Form I–766 or successor form issued under paragraph (c)(3)(i)(B) of this section have expired. Employment is authorized beginning on the expiration date of the Form I–766 or successor form issued under paragraph (c)(3)(i)(B) of this section and ending on the date of USCIS' written decision on the current Form I–765 or successor form, but not to exceed 180 days. For this same period, such Form I–766 or successor form is automatically extended and is considered unexpired when combined with a Certificate of Eligibility for Nonimmigrant (F–1/M–1) Students, Form I–20 or successor form, endorsed by the Designated School Official recommending such an extension; or

(v) Pursuant to 8 CFR 214.2(h) is seeking H–1B nonimmigrant status and whose duration of status and employment authorization have been extended pursuant to 8 CFR 214.2(f)(5)(vi).

(7) A representative of an international organization (G–1, G–2, G–3, or G–4), pursuant to § 214.2(g) of this chapter. An alien in this status may be employed only by the foreign government entity or the international organization;

(8) A personal employee of an official or representative of an international organization (G–5), pursuant to § 214.2(g) of this chapter. An alien in this status may be employed only by the official or representative of the international organization;

(9) A temporary worker or trainee (H–1, H–2A, H–2B, or H–3), pursuant to § 214.2(h) of this chapter, or a nonimmigrant specialty occupation worker pursuant to section 101(a)(15)(H)(i)(b1) of the Act. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional H–2B athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after acquisition by the new organization, within which time the new organization is expected to file a new Form I–129 to petition for H–2B classification. If a new Form I–129 is not filed within 30 days, employment authorization will cease. If a new Form I–129 is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease; In the case of a nonimmigrant with H–1B status, employment authorization will automatically continue upon the filing of a qualifying petition under 8 CFR 214.2(h)(2)(i)(H) until such petition is adjudicated, in accordance with section 214(n) of the Act and 8 CFR 214.2(h)(2)(i)(H);

(10) An information media representative (I), pursuant to § 214.2(i) of this chapter. An alien in this status may be employed only for the sponsoring foreign news agency or bureau. Employment authorization does not extend to the dependents of an information media representative (also designated "I");

(11) An exchange visitor (J–1), pursuant to § 214.2(j) of this chapter and 22 CFR part 62. An alien in this status may be employed only by the exchange visitor program sponsor or appropriate designee and within the guidelines of the program approved by the Department of State as set forth in the Form DS–2019, Certificate of Eligibility, issued by the program sponsor;

(12) An intra-company transferee (L–1), pursuant to § 214.2(l) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained;

(13) An alien having extraordinary ability in the sciences, arts, education, business, or athletics (O–1), and an accompanying alien (O–2), pursuant to § 214.2(o) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional O–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new Form I–129 petition for O nonimmigrant classification. If a new Form I–129 is not filed within 30 days, employment authorization will cease. If a new Form I–129 is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

(14) An athlete, artist, or entertainer (P–1, P–2, or P–3), pursuant to § 214.2(p) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional P–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new Form I–129 for P–1 nonimmigrant classification. If a new Form I–129 is not filed within 30 days, employment authorization will cease. If a new Form I–129 is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease;

(15) An international cultural exchange visitor (Q–1), according to § 214.2(q)(1) of this chapter. An alien may only be employed by the petitioner through whom the status was obtained;

(16) An alien having a religious occupation, pursuant to § 214.2(r) of this chapter. An alien in this status may be employed only by the religious organization through whom the status was obtained;

(17) Officers and personnel of the armed services of nations of the North Atlantic Treaty Organization, and representatives, officials, and staff employees of NATO (NATO–1, NATO–2, NATO–3, NATO–4, NATO–5 and NATO–6), pursuant to § 214.2(o) of this chapter. An alien in this status may be employed only by NATO;

(18) An attendant, servant or personal employee (NATO–7) of an alien admitted as a NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6, pursuant to § 214.2(o) of this chapter. An alien admitted under this classification may be employed only by the NATO alien through whom the status was obtained;

(19) A nonimmigrant pursuant to section 214(e) of the Act. An alien in this status must be engaged in business activities at a professional level in accordance with the provisions of Chapter 16 of the North American Free Trade Agreement (NAFTA);

(20) A nonimmigrant alien within the class of aliens described in paragraphs (b)(2), (b)(5), (b)(8), (b)(9), (b)(10), (b)(11), (b)(12), (b)(13), (b)(14), (b)(16), (b)(19), (b)(23) and (b)(25) of this section whose status has expired but on whose behalf an application for an extension of stay was timely filed pursuant to § 214.2 or § 214.6 of this

chapter. These aliens are authorized to continue employment with the same employer for a period not to exceed 240 days beginning on the date of the expiration of the authorized period of stay. Such authorization shall be subject to any conditions and limitations noted on the initial authorization. However, if the district director or service center director adjudicates the application prior to the expiration of this 240 day period and denies the application for extension of stay, the employment authorization under this paragraph shall automatically terminate upon notification of the denial decision;

(21) A nonimmigrant alien within the class of aliens described in 8 CFR 214.2(h)(1)(ii)(C) who filed an application for an extension of stay pursuant to 8 CFR 214.2 during his or her period of admission. Such alien is authorized to be employed by a new employer that has filed an H–2A petition naming the alien as a beneficiary and requesting an extension of stay for the alien for a period not to exceed 120 days beginning from the "Received Date" on Form I–797 (Notice of Action) acknowledging receipt of the petition requesting an extension of stay, provided that the employer has enrolled in and is a participant in good standing in the E–Verify program, as determined by USCIS in its discretion. Such authorization will be subject to any conditions and limitations noted on the initial authorization, except as to the employer and place of employment. However, if the District Director or Service Center director adjudicates the application prior to the expiration of this 120–day period and denies the application for extension of stay, the employment authorization under this paragraph (b)(21) shall automatically terminate upon 15 days after the date of the denial decision. The employment authorization shall also terminate automatically if the employer fails to remain a participant in good standing in the E–Verify program, as determined by USCIS in its discretion;

(22) An alien in E–2 CNMI Investor nonimmigrant status pursuant to 8 CFR 214.2(e)(23). An alien in this status may be employed only by the qualifying company through which the alien attained the status. An alien in E–2 CNMI Investor nonimmigrant status may be employed only in the Commonwealth of the Northern Mariana Islands for a qualifying entity. An alien who attained E–2 CNMI Investor nonimmigrant status based upon a Foreign Retiree Investment Certificate or Certification is not employment-authorized. Employment authorization does not extend to the dependents of the principal investor (also designated E–2 CNMI Investor nonimmigrants) other than those specified in paragraph (c)(12) of this section;

(23) A Commonwealth of the Northern Mariana Islands transitional worker (CW–1) pursuant to 8 CFR 214.2(w). An alien in this status may be employed only in the CNMI during the transition period, and only by the petitioner through whom the status was obtained, or as otherwise authorized by 8 CFR 214.2(w). An alien who is lawfully present in the CNMI (as defined by 8 CFR 214.2(w)(1)(v)) on or before November 27, 2011, is authorized to be employed in the CNMI, and is so employed in the CNMI by an employer properly filing an application under 8 CFR 214.2(w)(14)(ii) on or before such date for a grant of CW–1 status to its employee in the CNMI for the purpose of the alien continuing the employment, is authorized to continue such employment on or after November 27, 2011, until a decision is made on the application;

(24) An alien who is authorized to be employed in the Commonwealth of the Northern Mariana Islands for a period of up to 2 years following the transition program effective date, under section 6(e)(2) of Public Law 94–241, as added by section 702(a) of Public Law 110–229. Such alien is only authorized to continue in the same employment that he or she had on the transition program effective date as defined in 8 CFR 1.1 until the earlier of the date that is 2 years after the transition program effective date or the date of expiration of the alien's employment authorization, unless the alien had unrestricted employment authorization or was otherwise authorized as of the transition program effective date to change employers, in which case the alien may have such employment privileges as were authorized as of the transition program effective date for up to 2 years;

(25) A nonimmigrant treaty alien in a specialty occupation (E–3) pursuant to section 101(a)(15)(E)(iii) of the Act; or

(26) to (36) [Reserved]

(37) An alien paroled into the United States as an entrepreneur pursuant to 8 CFR 212.19 for the period of authorized parole. An entrepreneur who has timely filed a non-frivolous application requesting re-parole with respect to the same start-up entity in accordance with 8 CFR 212.19 prior to the expiration of his or her parole, but whose authorized parole period expires during the pendency of such application, is authorized to continue employment with the same start-up entity for a period not to exceed 240 days beginning on the date of expiration of parole. Such authorization shall be subject to any conditions and limitations on such expired parole. If DHS adjudicates the application prior to the expiration of this 240–day period and denies the application for re-parole, the employment authorization under this paragraph shall automatically terminate upon notification to the alien of the denial decision.

(c) Aliens who must apply for employment authorization. An alien within a class of aliens described in this section must apply for work authorization. If authorized, such an alien may accept employment subject to any restrictions stated in the regulations or cited on the employment authorization document. USCIS, in its discretion, may establish a specific validity period for an employment authorization document, which may include any period when an administrative appeal or judicial review of an application or petition is pending.

(1) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (A–1 or A–2) pursuant to 8 CFR 214.2(a)(2) and who presents an endorsement from an authorized representative of the Department of State;

(2) An alien spouse or unmarried dependent son or daughter of an alien employee of the Coordination Council for North American Affairs (E–1) pursuant to § 214.2(e) of this chapter;

(3) A nonimmigrant (F–1) student who:

(i)(A) Is seeking pre-completion practical training pursuant to 8 CFR 214.2(f)(10)(ii)(A)(1) and (2);

(B) Is seeking authorization to engage in up to 12 months of post-completion Optional Practical Training (OPT) pursuant to 8 CFR 214.2(f)(10)(ii)(A)(3); or

(C) Is seeking a 24–month OPT extension pursuant to 8 CFR 214.2(f)(10)(ii)(C);

(ii) Has been offered employment under the sponsorship of an international organization within the meaning of the International Organization Immunities Act (59 Stat. 669) and who presents a written certification from the international organization that the proposed employment is within the scope of the organization's sponsorship. The F–1 student must also present a Form I–20 ID or SEVIS Form I–20 with employment page completed by DSO certifying eligibility for employment; or

(iii) Is seeking employment because of severe economic hardship pursuant to 8 CFR 214.2(f)(9)(ii)(C) and has filed the Form I–20 ID and Form I–538 (for non–SEVIS schools), or SEVIS Form I–20 with employment page completed by the DSO certifying eligibility, and any other supporting materials such as affidavits which further detail the unforeseen economic circumstances that require the student to seek employment authorization.

(4) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (G–1, G–3 or G–4) pursuant to 8 CFR 214.2(g) and who presents an endorsement from an authorized representative of the Department of State;

(5) An alien spouse or minor child of an exchange visitor (J–2) pursuant to § 214.2(j) of this chapter;

(6) A nonimmigrant (M–1) student seeking employment for practical training pursuant to 8 CFR 214.2(m) following completion of studies. The alien may be employed only in an occupation or vocation directly related to his or her course of study as recommended by the endorsement of the designated school official on the I–20 ID;

(7) A dependent of an alien classified as NATO–1 through NATO–7 pursuant to § 214.2(n) of this chapter;

(8) An alien who has filed a complete application for asylum or withholding of deportation or removal pursuant to 8 CFR part 208, whose application:

(i) Has not been decided, and who is eligible to apply for employment authorization under § 208.7 of this chapter because the 150-day period set forth in that section has expired. Employment authorization may be granted according to the provisions of § 208.7 of this chapter in increments to be determined by the Commissioner and shall expire on a specified date; or

(ii) Has been recommended for approval, but who has not yet received a grant of asylum or withholding or deportation or removal;

(9) An alien who has filed an application for adjustment of status to lawful permanent resident pursuant to part 245 of this chapter. For purposes of section 245(c)(8) of the Act, an alien will not be deemed to be an "unauthorized alien" as defined in section 274A(h)(3) of the Act while his or her properly filed Form I–485 application is pending final adjudication, if the alien has otherwise obtained permission from the Service pursuant to 8 CFR 274a.12 to engage in employment, or if the alien had been granted employment authorization prior to the filing of the adjustment application and such authorization does not expire during the pendency of the adjustment application. Upon meeting these conditions, the adjustment applicant need not file an application for employment authorization to continue employment during the period described in the preceding sentence;

(10) An alien who has filed an application for suspension of deportation under section 244 of the Act (as it existed prior to April 1, 1997), cancellation of removal pursuant to section 240A of the Act, or special rule cancellation of removal under section 309(f)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, enacted as Pub.L. 104–208 (110 Stat. 3009–625) (as amended by the Nicaraguan Adjustment and Central American

Relief Act (NACARA)), title II of Pub.L. 105–100 (111 Stat. 2160, 2193) and whose properly filed application has been accepted by the Service or EOIR;

(11) Except as provided in paragraphs (b)(37) and (c)(34) of this section and § 212.19(h)(4) of this chapter, an alien paroled into the United States temporarily for urgent humanitarian reasons or significant public benefit pursuant to section 212(d)(5) of the Act.

(12) An alien spouse of a long-term investor in the Commonwealth of the Northern Mariana Islands (E–2 CNMI Investor) other than an E–2 CNMI investor who obtained such status based upon a Foreign Retiree Investment Certificate, pursuant to 8 CFR 214.2(e)(23). An alien spouse of an E–2 CNMI Investor is eligible for employment in the CNMI only;

(13) [Reserved]

(14) An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, if the alien establishes an economic necessity for employment;

(15) [Reserved]

(16) Any alien who has filed an application for creation of record of lawful admission for permanent residence pursuant to part 249 of this chapter;

(17) A nonimmigrant visitor for business (B–1) who:

(i) Is a personal or domestic servant who is accompanying or following to join an employer who seeks admission into, or is already in, the United States as a nonimmigrant defined under sections 101(a)(15)(B), (E), (F), (H), (I), (J), (L) or section 214(e) of the Act. The personal or domestic servant shall have a residence abroad which he or she has no intention of abandoning and shall demonstrate at least one year's experience as a personal or domestic servant. The nonimmigrant's employer shall demonstrate that the employer/employee relationship has existed for at least one year prior to the employer's admission to the United States; or, if the employer/employee relationship existed for less than one year, that the employer has regularly employed (either year-round or seasonally) personal or domestic servants over a period of several years preceding the employer's admission to the United States;

(ii) Is a domestic servant of a United States citizen accompanying or following to join his or her United States citizen employer who has a permanent home or is stationed in a foreign country, and who is visiting temporarily in the United States. The employer/employee relationship shall have existed prior to the commencement of the employer's visit to the United States; or

(iii) Is an employee of a foreign airline engaged in international transportation of passengers freight, whose position with the foreign airline would otherwise entitle the employee to classification under section 101(a)(15)(E)(i) of the Immigration and Nationality Act, and who is precluded from such classification solely because the employee is not

a national of the country of the airline's nationality or because there is no treaty of commerce and navigation in effect between the United States and the country of the airline's nationality.

(18) An alien against whom a final order of deportation or removal exists and who is released on an order of supervision under the authority contained in section 241(a)(3) of the Act may be granted employment authorization in the discretion of the district director only if the alien cannot be removed due to the refusal of all countries designated by the alien or under section 241 of the Act to receive the alien, or because the removal of the alien is otherwise impracticable or contrary to the public interest. Additional factors which may be considered by the district director in adjudicating the application for employment authorization include, but are not limited to, the following:

(i) The existence of economic necessity to be employed;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support; and

(iii) The anticipated length of time before the alien can be removed from the United States.

(19) An alien applying for Temporary Protected Status pursuant to section 244 of the Act shall apply for employment authorization only in accordance with the procedures set forth in part 244 of this chapter.

(20) Any alien who has filed a completed legalization application pursuant to section 210 of the Act (and part 210 of this chapter).

(21) A principal nonimmigrant witness or informant in S classification, and qualified dependent family members.

(22) Any alien who has filed a completed legalization application pursuant to section 245A of the Act (and part 245a of this chapter). Employment authorization shall be granted in increments not exceeding 1 year during the period the application is pending (including any period when an administrative appeal is pending) and shall expire on a specified date.

(23) [Reserved by 76 FR 53796]

(24) An alien who has filed an application for adjustment pursuant to section 1104 of the LIFE Act, Public Law 106–553, and the provisions of 8 CFR part 245a, Subpart B of this chapter.

(25) Any alien in T–2, T–3, T–4, T–5, or T–6 nonimmigrant status, pursuant to 8 CFR 214.11, for the period in that status, as evidenced by an employment authorization document issued by USCIS to the alien.

(26) An H–4 nonimmigrant spouse of an H–1B nonimmigrant described as eligible for employment authorization in 8 CFR 214.2(h)(9)(iv).

(27) to (33) [Reserved]

(34) A spouse of an entrepreneur parolee described as eligible for employment authorization in § 212.19(h)(3) of this chapter.

(35) An alien who is the principal beneficiary of a valid immigrant petition under section 203(b)(1), 203(b)(2) or 203(b)(3) of the Act described as eligible for employment authorization in 8 CFR 204.5(p).

(36) A spouse or child of a principal beneficiary of a valid immigrant petition under section 203(b)(1), 203(b)(2) or 203(b)(3) of the Act described as eligible for employment authorization in 8 CFR 204.5(p).

(d) An alien lawfully enlisted in one of the Armed Forces, or whose enlistment the Secretary with jurisdiction over such Armed Force has determined would be vital to the national interest under 10 U.S.C. 504(b)(2), is authorized to be employed by that Armed Force in military service, if such employment is not otherwise authorized under this section and the immigration laws. An alien described in this section is not issued an employment authorization document.

(e) Basic criteria to establish economic necessity. Title 45—Public Welfare, Poverty Guidelines, 45 CFR 1060.2 should be used as the basic criteria to establish eligibility for employment authorization when the alien's economic necessity is identified as a factor. The alien shall submit an application for employment authorization listing his or her assets, income, and expenses as evidence of his or her economic need to work. Permission to work granted on the basis of the alien's application for employment authorization may be revoked under § 274a.14 of this chapter upon a showing that the information contained in the statement was not true and correct.

**Credits**

[53 FR 8614, March 16, 1988; 53 FR 46855, Nov. 21, 1988; 54 FR 16, Jan. 3, 1989; 54 FR 48577, Nov. 24, 1989; 55 FR 5576, Feb. 16, 1990; 55 FR 25935, 25936, June 25, 1990; 56 FR 624, Jan. 7, 1991; 56 FR 23496, 23499, May 22, 1991; 56 FR 41782, 41786, 41787, Aug. 23, 1991; 56 FR 55616, Oct. 29, 1991; 57 FR 6462, Feb. 25, 1992; 57 FR 31956, July 20, 1992; 57 FR 42884, Sept. 17, 1992; 58 FR 48780, Sept. 20, 1993; 58 FR 69217, Dec. 30, 1993; 59 FR 42487, Aug. 15, 1994; 59 FR 47063, Sept. 14, 1994; 59 FR 52894, Oct. 20, 1994; 59 FR 62302, Dec. 5, 1994; 60 FR 14353, March 17, 1995; 60 FR 21976, May 4, 1995; 60 FR 44271, Aug. 25, 1995; 60 FR 66067, 66069, Dec. 21, 1995; 61 FR 46537, Sept. 4, 1996; 62 FR 10389, March 6, 1997; 62 FR 18514, April 16, 1997; 62 FR 39425, July 23, 1997; 62 FR 46553, Sept. 3, 1997; 63 FR 1334, Jan. 9, 1998; 63 FR 27833, May 21, 1998; 63 FR 63597, Nov. 16, 1998; 64 FR 25773, May 12, 1999; 64 FR 27881, May 21, 1999; 65 FR 14780, March 17, 2000; 65 FR 15844, 15846, 15854, March 24, 2000; 65 FR 43680, July 14, 2000; 66 FR 29681, June 1, 2001; 66 FR 42595, Aug. 14, 2001; 66 FR 46704, Sept. 7, 2001; 67 FR 4803, Jan. 31, 2002; 67 FR 38350, June 4, 2002; 67 FR 76280, Dec. 11, 2002; 69 FR 45557, July 30, 2004; 69 FR 47763, Aug. 6, 2004; 72 FR 53041, Sept. 17, 2007; 73 FR 18956, April 8, 2008; 73 FR 76914, Dec. 18, 2008; 74 FR 7995, Feb. 23, 2009; 74 FR 26515, June 3, 2009; 74 FR 55111, Oct. 27, 2009; 74 FR 55740, Oct. 28, 2009; 75 FR 47701, Aug. 9, 2010; 75 FR 58990, Sept. 24, 2010; 75 FR 79277, Dec. 20, 2010; 76 FR 53796, Aug. 29, 2011; 76 FR 55538, Sept. 7, 2011; 80 FR 10311, Feb. 25, 2015; 81 FR 2084, Jan. 15, 2016; 81 FR 13121, March 11, 2016; 81 FR 82491, Nov. 18, 2016; 81 FR 92312, Dec. 19, 2016; 82 FR 5289, Jan. 17, 2017; 82 FR 31887, July 11, 2017]

SOURCE: 52 FR 16221, May 1, 1987; 52 FR 43052, Nov. 9, 1987; 53 FR 8612, March 16, 1988; 55 FR 5576, Feb. 16, 1990; 57 FR 6462, Feb. 25, 1992; 57 FR 42884, Sept. 17, 1992; 64 FR 47101, Aug. 30, 1999; 66 FR 42595, Aug. 14, 2001;

66 FR 46704, Sept. 7, 2001; 68 FR 10923, March 6, 2003; 68 FR 35275, June 13, 2003; 73 FR 10136, Feb. 26, 2008; 74 FR 55739, Oct. 28, 2009; 75 FR 79277, Dec. 20, 2010; 81 FR 43002, July 1, 2016, unless otherwise noted.

AUTHORITY: 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; 8 CFR part 2; Pub.L. 101–410, 104 Stat. 890, as amended by Pub.L. 114–74, 129 Stat. 599.

Notes of Decisions (13)

Current through July 13, 2018; 83 FR 32749.

End of Document © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 67

44 Fed. Reg. 43480
Proposed Rules
DEPARTMENT OF JUSTICE
Immigration and Naturalization Service, Justice
8 CFR Part 109

Proposed Rules for Employment Authorization for Certain Aliens

July 25, 1979

AGENCY:Immigration and Naturalization Service, Justice

ACTION:Proposed Rule.

**SUMMMARY:** The Immigration and Naturalization Service proposes to add a new Part to its regulations to codify the procedures and criteria for the grant of employment authorization to aliens in the United States. Service procedures for the grant of employment authorization are contained in several different places in the Operations Instructions and in various informal policy statements directed at Service field offices and the proposed...

 44 FR 43480-43481

---

**End of Document**
© 2018 Thomson Reuters. No claim to original U.S. Government Works.

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 68

51 FR 39385-01, 1986 WL 113323(F.R.)
PROPOSED RULES
DEPARTMENT OF JUSTICE
Immigration and Naturalization Service
8 CFR Part 109

Employment Authorization

Tuesday, October 28, 1986

**\*39385**  AGENCY: Immigration and Naturalization Service, Justice.

ACTION: Petition for rulemaking.

SUMMARY: Part 109 of 8 CFR, entitled Employment Authorization, describes at § 109.1(a) the classes of aliens who are authorized to be employed in the United States as a condition of their nonimmigrant classification, and at § 109.1(b), the classes of aliens who may apply for work authorization. The Service has received a petition for rulemaking which seeks to rescind 8 CFR 109.1(b) on the ground that the Service has exceeded its statutory authority in promulgating this rule. DATES: Written comments must be submitted on or before December 29, 1986.

ADDRESS: Please submit comments in duplicate to the Director, Office of Policy Directives and Instructions, Immigration and Naturalization Service, 425 I Street, NW., Room 2011, Washington, DC 20536.

FOR FURTHER INFORMATION CONTACT:

For General Information: Loretta Shogren, Director, Policy Directives and Instructions, Immigration and Naturalization Service, 425 I Street, NW., Washington, DC 20536, Telephone: (202) 633-4048

For Specific Information: Michael Shaul, Senior Immigration Examiner, Immigration and Naturalization Service, 425 I Street, NW., Washington DC 20536, Telephone: (202) 633-3946

SUPPLEMENTARY INFORMATION:

**Comments invited**

The Service, in publishing the petition for rulemaking, is inviting the public to comment and assist it in determining whether to proceed with the rulemaking sought by the petition. Interested persons are requested to participate by reviewing the information provided by the petitioner and submitting their views in writing. Comments should agree with or challenge arguments made in the petition and offer additional information in support of their position. It should be noted that the Service is not proposing a regulatory rule for adoption and has not taken a position on the petition. The Service will reach a conclusion on the merits of the petition after it has had an opportunity to evaluate it carefully in the light of the comments received. If the Service concludes that it should initiate rulemaking on the petition, a proposed rule will be published for public comment. For the convenience of commenters, the current regulation at 8 CFR 109.1(b) which the petitioner seeks to rescind is reprinted below, followed by the petition.

Regulation petitioner seeks to rescind:

*§ 109.1 classes of aliens eligible.*

\* \* \* \* \*

 **\*39386**  (b) Aliens who must apply for work authorization. Any alien within a class of aliens described in this section must apply for work authorization to the district director in whose district the alien resides:

(1) Any alien maintaining a lawful nonimmigrant status in one of the following classes may be granted permission to be employed:

(i) Alien spouse or unmarried dependent son or daughter of a foreign government official (A-1) or (A-2) as provided in § 214.2(a)(2) of this title, or the dependent of an employee as provided by § 214.2(a)(3) of this title.

(ii) Alien nonimmigrant student (F-1) as provided in § 214.2(f) of this chapter.

(iii) Alien spouse or an unmarried dependent son or daughter of an officer or employee of an international organization (G-4) as provided in § 214.2(g) of this chapter.

(iv) Alien spouse or minor child of and exchange visitor (J-2) as provided in § 214.2(j) of this title.

(2) Any alien who filed a non-frivolous application for asylum pursuant to Part 208 of this chapter may be granted permission to be employed for the period of time necessary to decide the case.

(3) Any alien who has properly filed an application for adjustment of status to permanent resident alien may be granted permission to be employed for the period of time necessary to decide the case.

(4) Any alien paroled into the United States temporarily for emergent reasons or for reasons deemed strictly in the public interest: Provided, The alien established an economic need to work.

(5) Any alien who has applied to an immigration judge under § 242.17 of this chapter for suspension of deportation pursuant to section 244(a) of the Act may be granted permission to be employed for the period of the time necessary to decide the case: Provided, The alien establishes an economic need to work.

(6) Any deportable alien granted voluntary departure, either prior to hearing or after hearing, for reasons set forth in § 242.5(a)(2) (v), (vi), or (viii) of this chapter may be granted permission to be employed for that period of time prior to the date set for voluntary departure including any extension granted beyond such date. Factors which may be considered in granting employment authorization to an alien who has been granted voluntary departure:

(i) Length of voluntary departure granted;

(ii) Dependent spouse and/or children in the United States who rely on the alien for support;

(III) Reasonable chance that legal status may ensure in the near future; and

(iv) Reasonable basis for consideration of discretionary relief.

(7) Any alien in whose case the district director recommends consideration of deferred action, an act of administrative convenience to the government which gives some cases lower priority; Provided, The alien establishes to the satisfaction of the district director.

(8) Any excludable or deportable alien who has posted an appearance and delivery bond may be granted temporary employment authorization if the District Director determines that employment is appropriate under § 103.6(a)(2)(iii) of this chapter.

\* \* \* \* \*

The petition in full is published below.
DATED: October 22, 1986.
Richard E. Norton,

Associate Commissioner, Examinations, Immigration and Naturalization Service.


Petition:

**I. Introduction**
The Federation for American Immigration Reform ("FAIR"), on behalf of its members throughout the country, hereby requests the Immigration and Naturalization Service ("INS") to rescind 8 CFR 109.1(b). The INS has acted beyond its statutory authority and contrary to the purpose of the Immigration and Nationality Act when it promulgated 8 CFR 109.1(b), which allows illegal or temporarily present aliens to apply for and receive work authorization.


**II. The Issue**
Whether the Attorney General has the authority to grant work authorization to certain classes of aliens who have not been authorized by Congress to work in this country.


**III. Background**
8 CFR 109.1 describes two sets of aliens who may be eligible to seek employment in the United States: Aliens who are authorized to work as a "condition of their admission or subsequent change to one of the indicated classes" [listed in 109.1(a)], and aliens who must apply for work authorization to the district director of the district in which the alien resides [listed in 109.1(b)]. Aliens in the latter category must also prove that they are financially unable to maintain themselves. 8 CFR 109.1(c).

The Immigration and Naturalization Service claims that section 103(a) of the Immigration and Nationality Act, 8 U.S.C.1103(a), which authorizes the Attorney General to establish regulations, issue instructions, and perform any actions necessary for the implementation and administration of the INA, empowers the Attorney General to grant work authorization and issue the regulations in 8 CFR 109.[FN1] The INS also claims the authority of the Attorney General to authorize employment of aliens was "specifically recognized by the Congress in the enactment of section 6 of Pub. L. 95-571."[FN2] This provision amended section 245(c) of the INA, 8 U.S.C. 1155(c),[FN3] to bar from adjustment of status any alien engaged in unauthorized employment.

The INS has been receiving and granting applications for work authorization from the classes of aliens listed in 8 CFR § 109.1(b) even though Congress has not expressly authorized these classes to work.


**IV. Discussion**
The INS is currently granting work authorization to classes of aliens who have not been authorized by the Immigration and Nationality Act to receive work authorization. The Attorney General claims he has the authority to do this under his power to prescribe regulations to carry out the INA as set out in section 103(a), 8 U.S.C. 1103(a).[FN4] When the

INS promulgates regulations, however, such regulations must conform with and further the purposes of the INA. Wang v. Immigration and Naturalization Service, 602 F.2d 211, 213 (9th Cir. 1979).

8 CFR 109.1(b), which authorizes employment to be granted to certain groups of aliens at the discretion of the Attorney General, is contrary to one of the key purposes of the INA, which is to protect American workers and working conditions. As the Supreme Court has stated:

[a] primary purpose in restricting immigration is to preserve jobs for American workers; immigrant aliens are therefore admitted to work in this country only if they "will not adversely affect the wages and working conditions of the workers in the United States similarly employed."

Sure-Tan, Inc. v. NLRB, ——— U.S. ———, 104 S.Ct. 2803, 2810 (1984), quoting 8 U.S.C. 1182(a)(14) and citing S. Rep. No. 748, 89th Cong., lst Sess. 15 (1965), reprinted in 1965 U.S. Code Cong. & Admin. News, p. 3328.

**\*39387  A. The Regulation is Inconsistent With the Purpose of the INA**
One of the principal purposes of American immigration laws has always been to protect American workers and working conditions. As early as 1885, Congress enacted legislation prohibiting the entry of contract laborers. Act of February 26, 1885, 23 Stat. 332.

The intent of the INA was to protect Americans from the importation of cheap foreign labor, which would reduce wages by increasing the supply of labor. H.R. Rep. No. 1365, 82nd Cong., 2d Sess., reprinted in 1952 U.S. Code, Cong. & Admin. News 1653, 1662. In every revision of the INA, Congress re-emphasized the protection of American jobs and working conditions from foreign competition on American soil.[FN5]

In enacting the INA of 1952, Congress expressed its concern for protecting American labor:

While the bill [INA of 1952] will remove the "contract labor clauses" from the law, it provides strong safeguards for American labor. . . . It is the opinion of this committee that [212(a)(14), the labor certification provisions] will adequately provide for the protection of American labor against an influx of aliens entering the United States for the purpose of performing skilled or unskilled labor where the economy of individual localities is not capable of absorbing them at the time they desire to enter this country.

H.Rep. No. 1365, 82d Cong., 2d Sess. (1952), reprinted in 1952 U.S. Code Cong. & Admin. News 1653, 1705 [Emphasis added].
In the legislative history of the Immigration and Nationality Amendments of 1965, Congress repeated its desire to protect U.S. workers from the impact of cheap foreign labor. S. Rep. No. 748, 89th Cong., 1st Sess. (1965), reprinted in 1965 U.S.Code Cong. & Admin. News 3328, 3333. Senator Saltonstall stated that the 1965 Amendments:

. . . have included provisions to facilitate the entry of skilled workers while taking precautionary measures to insure that American jobs and working conditions will be protected.

Cong. Rec.—Senate, September 20, 1965 at 24441. Senator Clark, a cosponsor of the 1965 Amendments, stated:
In this regard let me say that the bill before us offers even more protection to American workers. . . .

Id. at 24500.
Hence, the legislative history of the immigration laws makes clear that one of the INA's key purposes is the protection of American workers and working conditions. This purpose was recently re-affirmed by Congress in the Immigration

and Nationality Act Amendments of 1976, Pub. L. 94-571, 90 Stat. 2703. In the House report accompanying the bill, Congress stated:

The labor certification provision set forth in Section 212(a)(14) of the Immigration and Nationality Act is intended to protect the domestic labor force.

H.R. Rep. No. No. 1553, 94th Cong., 2d Sess. (1976) reprinted in 1976 U.S. Code Cong. & Admin. News 6073, 6082. The courts have also recognized this purpose in numerous opinions. As early as 1929, in Karnuth v. United States, 279 U.S. 231 (1929), the Supreme Court reviewed the legislative history of the INA, and acknowledged Congress' intent to protect U.S. workers from cheap foreign competition:

The various acts of Congress since 1916 evince a progressive policy of restricting immigration. The history of this legislation points clearly to the conclusion that one of its great purposes was to protect American labor against the influx of foreign labor.

Karnuth, 279 U.S. at 242-44 [Emphasis added].

More recent decisions also recognize this purpose. In Virginia Agricultural Growers Association v. U.S. Department of Labor, 756 F. 2d 1025 (4th Cir. 1985), the 4th Circuit Court of Appeals stated that:

VAGA's [Virginia Agricultural Growers Association] argument that the . . . rule contradicts the INA's underlying policy is grounded on the statute's goal of admitting needed seasonal foreign labor. VAGA downplays, however, the statute's concurrent purpose of protecting American Labor.

Id. at 1028 [Emphasis added]. See also, Production Tool Corp. v. Employment and Training Administration, Dept. of Labor, 688 F. 2d 1161, 1168 (7th Cir. 1982) ("Congress enacted § 212(a)(14) to protect the domestic labor force from competition and adverse working conditions as a result of foreign workers entering; the labor market"); Wang v. INS, 602 F.2d 211 (9th Cir. 1979); Mehta v. INS, 574 F. 2d. 701 (2d Cir. 1978); Silva v. Secretary of Labor, 518 F. 2d 301 (lst Cir. 1975).

Finally, the Immigration and Naturalization Service explicitly recognizes as the purpose of the INA the protection of American workers:

The Constitution clearly permits the government to put conditions in the nature of employment restrictions on the entry of aliens into the United States, as part of the nation's sovereign power to limit the entry of aliens. Congress exercised this power by enacting the Immigration and Nationality Act which creates an elaborate scheme for classifying aliens. The scheme was intended to protect American labor; it does so by imposing work-related preconditions, or conditions, on all but a few carefully limited categories of aliens.

Brief for Appellant at 12, National Center for Immigrants Rights, Inc v. Immigration and Naturalization Service, No. 84-5504 (9th Cir.) (appeal of District Court granting of preliminary injunction in favor of appellees) [Emphasis added]. See, National Center for Immigrants Rights, Inc. v. Immigration and Naturalization Service, 743 F.2d 1365 (9th Cir. 1984).

By allowing the classes of aliens listed in 8 CFR 109.1(b) to receive work authorization, the INS is undermining one of the purposes for which Congress enacted the INA: The protection of American jobs. The granting of work authorization to deportable aliens and nonimmigrants not authorized by statute to work allows such aliens to compete directly with American workers for jobs.[FN6] This is in direct conflict with the purpose for which the INA was enacted.

Furthermore, both the INS and the Department of Labor have admitted that the "primary purpose of the work authorization requirement is to monitor the nature and volume of jobs available within the United States which aliens fill." Memorandum of Amici Curiae United States Department of Labor and United States Immigration and Naturalization Service at 17, Ibarra v. Texas Employment Commission, No. L-83-44-CA (E.D. Tex. 1986).

Yet, 8 CFR 109.1 does not contain any requirements that the INS determine whether the granting of work authorization will adversely affect **39388** American labor or working conditions.[FN7] The INS admits that it does not keep statistics on the number of aliens that are granted work authorization under 8 CFR 109.1(b). Letter from Alan C. Nelson, Commissioner, INS to Roger Conner, Executive Director, FAIR (March 28, 1986) (discussing work authorization), supra, n. 1. The INS is granting work authorization without knowing whether the aliens will be competing with American workers for jobs, or whether such authorization is having the effect of lowering wages and working conditions.[FN8] Thus, under the holding in Wang v. Immigration and Naturalization Service, 602 F.2d 211 (9th Cir. 1979), 8 CFR 109.1(b) is an unlawful regulation since it neither conforms with or furthers the purpose of the INA.

### B. The Regulations as Promulgated by the INS is an Ultra Vires Act

The INS claims the authority to grant work authorization to non-immigrants under Section 103 of the INA,[FN9] and that Congress had acquiesced in the Attorney General's power to grant work authorization when it amended section 245(c)[FN10] of the INA.[FN11] 45 Fed. Reg. 19563 (1980).

Not only is 8 CFR 109.1(b) inconsistent with the INA, it was promulgated without proper statutory authorization by Congress. 8 CFR 109.1(b) gives the Attorney General wide discretion to authorize aliens to engage in employment, regardless of whether Congress has authorized employment for that class of alien.

However, in the House report accompanying Pub. L. 94-571 (which amended section 245(c)), Congress indicated that the reason for enacting this provision was to "deter many nonimmigrants from violating the conditions of their admission by obtaining unauthorized employment." H.R. Rep. No. 1553, 94th Cong., 2d Sess., reprinted in 1976 U.S. Code, Cong. & Admin. News 6073, 6084. There is no indication in the Report that Congress had recognized the power of the INS to authorize any or all aliens to seek any and all types of employment in the U.S. Congress continued to allow only a few classes of aliens to work. Congress would not have made such a dramatic shift in emphasis without comment.

A careful review of the language contained in the provisions in the INA that created the classes of aliens listed in 8 CFR 109.1(b),[FN12] along with their accompanying legislative history,[FN13] reveals no Congressional intent to allow these classes of aliens to engage in employment while in the United States. There is no statutory authority for the classes of aliens listed in 8 CFR 109.1(b) to engage in employment. Therefore, the regulation is contrary to the purpose of the INA, and beyond INS's delegated authority.

The political branches of the federal government have plenary authority to establish and implement substantive and procedural rules governing the admission of aliens to this country. Chae Chan Ping v. United States [Chinese Exclusion Case], 130 U.S. 581, 609 (1889). This power lies in the first instance with Congress. United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 542 (1950). "Over no conceivable subject is the legislative power of Congress more complete." Oceanic Steam and Navigation Co. v. Stranahan, 214 U.S. 320 (1909).

Thus, it is up to Congress to decide which classes of aliens may be granted work authorization, not the INS. Lapina v. Williams, 232 U.S. 78 (1914) ( "Congress . . . prescribe[s] the terms and conditions upon which [aliens] may enter and remain in this country.") If Congress wanted the aliens listed in 8 CFR 109.1(b) to engage in employment, it would have passed legislation allowing it. I.N.S v. Phinpathya, 464 U.S. 183, 196 (1984) ("Congress designs the immigration laws, and it is up to Congress to temper the laws' rigidity").

The INS must comply with the grant of statutory authority given it. Lloyd Sabaudo Societa Anonima Per Azioni v. Elting, 287 U.S. 329, 335 (1932). There is no support in the INA for the granting of work authorization to those aliens listed in 8 CFR § 109.1(b). The INS has promulgated a regulation that is beyond its delegated authority. Therefore, the regulation promulgated in 8 CFR 109.1(b) is unlawful and should be rescinded, or amended to include only those aliens who have been authorized by Congress  **39389**  to be engaged in employment in the United States.

### C. The Regulation Undermines the Labor Certification Provision

Congress enacted section 212(a)(14) to protect American jobs and working conditions. 8 CFR 109.1(b) allows an alien effectively to circumvent the labor certification provisions of section 212(a)(14) of the INA, 8 U.S.C. 1182(a)(14). The relevant language of section 212(a)(14) states:

Aliens seeking to enter the United States, for the purpose of performing skilled or unskilled labor, [are ineligible to receive visas and are excluded from admission to the United States], unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that (A) there are not sufficient workers who are able, willing, qualified . . . and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and (B) the employment of such aliens will not adversely affect the wages and working conditions of the workers in the United States similarly employed.

The language of the statute is clear. Aliens may not enter the United States to work if they would compete directly with Americans for jobs or would adversely affect Americans' wages and working conditions. Nor may an alien already here adjust status on the basis of needed skills if they would take jobs away from Americans.

The Secretary of Labor is responsible for certifying to the Attorney General that there is a shortage of workers to perform certain jobs and that the employment of an alien will not adversely affect wages and working conditions. 20 CFR 656.1(a). The burden of proof is on the alien to obtain his labor certification. 20 CFR 656.2(b). The Secretary of Labor has set up two schedules:

Schedule A, which lists occupations for which an alien may apply for labor certification due to insufficient numbers of American workers or lack of adverse effects on wages and working conditions, 20 CFR 656.10; and

Schedule B, which lists occupations that have an ample supply of American workers and for which employment of aliens could adversely affect wages and working condition, 20 CFR 656.11.

There is an elaborate mechanism to implement section 212(a)(14) of the INA involving the INS, the Department of Labor and the Department of State. Allowing statutorily unauthorized aliens to apply for and receive work authorization allows aliens who might otherwise have been turned down for admission to the United States to perform skilled or unskilled labor to circumvent the labor certification process.

For example, an alien who was previously not allowed to enter the U.S. to perform labor listed on Schedule B could simply enter the United States as a visitor for pleasure, overstay his visa, and apply for suspension of deportation or voluntary departure. The alien would receive work authorization until deportation or voluntary departure. Hence, the alien has effectively thwarted the labor certification provisions. The alien has come here for the purpose of employment without being certified by the Department of Labor.

Since the INS does not determine, in granting work authorization, whether the alien's employment will compete with citizens and resident aliens, the alien may be directly competing with Americans for a job which has an ample supply of American workers. Congress wanted to protect American labor through the labor certification process. 8 CFR 109.1(b) negates congressional intent.

International Union of Bricklayers and Allied Craftsmen v. Meese, 616 F.Supp. 1387 (N.D. Cal. 1985) (Bricklayers II; See also, International Union of Bricklayers and Allied Craftsmen v. Meese, 761 F.2d 798 (D.C. Cir. 1985)) (Bricklayers I)), presented a similar problem. In Bricklayers II, a union challenged an INS "Operating Instruction" (OI) issuing visas to foreign laborers.[FN14] The union claimed that the OI in question violated the INA because it was inconsistent with specific provisions and the legislative intent of the Act.[FN15]

The court, in finding for the union, said the OI contravened the language of the two provisions by "[authorizing] the issuance of a B-1 visa to an alien coming to this country to perform skilled or unskilled labor." The court further explained:

More importantly, the Operations Instruction authorizes the issuance of a nonimmigrant visa to a person performing skilled or unskilled labor, though qualified Americans may be available to perform the work involved. The Operations Instruction therefore lacks the safeguards contained in section 101(a)(15)(H)(ii) of the Act . . .

Id., at 1399.
8 CFR 109.1(b) suffers the same problems as the OI in Bricklayers II. The regulation allows aliens granted work authorization to compete with American workers for jobs. Furthermore, the safeguards that section 212(a)(14) of the INA provides to protect American workers and working conditions from the adverse affects of incoming foreign labor are not present in 8 CFR 109.1(b), which covers only aliens applying for work authorization in this country.

The court in Bricklayers stated, after a careful review of the legislative history of the INA:

The foregoing legislative history demonstrates that one of Congress' central purposes in the Act was the protection of American labor. . . . Thus, to the extent that the INS Operations Instruction 214.2(b)(5) permits aliens to circumvent the restrictions enacted by Congress [in sections 101(a)(15)(B) and 101(a)(15)(H)(ii)], the Operations Instruction is inconsistent with both the language and the legislative intent of the Act.

Id., at 1401.
8 CFR 109.1(b) allows aliens who have been denied entry to the U.S. to perform skilled or unskilled labor the possibility of circumventing section 212(a)(14) of the INA. These aliens could enter the country on a nonimmigrant visa or without inspection and later apply for work authorization. Following the holding in Bricklayers, a regulation that is both contrary to the language of the Act, in this case section 212(a)(14), and the legislative intent of the Act, must be withdrawn.

**V. Petition**
Now, therefore, because the INS has promulgated a regulation, **\*39390** 8 CFR 109.1(b), that is inconsistent with the purpose of the INA, undermines the labor certification provisions of section 212(a)(14) of the INA, and grants work authorization to aliens who have not been authorized by Congress to be allowed to seek employment in this country, FAIR respectfully requests that the Immigration and Naturalization Service: Rescind 8 CFR 109.1(b).

Daniel A. Stein,

Barnaby W. Zall,

1424 Sixteenth St. NW.

Washington, DC 20036

(202) 328-7004

Attorneys for the Federation for American Immigration Reform.


[FR Doc. 86-24329 Filed 10-27-86; 8:45 am]

BILLING CODE 4410-10-M


Footnotes

1    44 FR 43480 (1979); See also Letter from Alan C. Nelson, Commissioner, INS to Roger Conner, Executive Director, FAIR (March 28, 1986), attached as Appendix A.

    FN2 44 FR 43480 (1979).

    FN3 Infra, n. 10.

4    When the INS first proposed a rule to codify the procedures and criteria for the grant of employment authorization to aliens in the United States, it published a notice of its proposed rule in the Federal Register. 44 Fed. Reg. 43480 (1979). The INS explained its authority to issue the rule as follows:

    The Attorney General's authority to grant employment authorization stems from section 103(a) of the Immigration and Naturalization Act which authorizes him to establish regulations, issue instructions, and perform any actions necessary for the implementation and administration of the Act.

5    See, H.R. Rep. No. 1015, 65th Cong., 3d Sess. at 8 (1919); H.R. Rep. No. 4, 67th Cong., 1st Sess. at 3 (1921), accompanying the Quota Act of 1921 (42 Stat. 5); H.R. Rep. No. 1621 67th Cong., 4th Sess. at 23-27 (1923); H.R. Rep. No. 176, 68th Cong., 1st Sess. at 15-17 (1924); H.R. Rep. No. 350, 68th Cong., 1st Sess. at 21-23 (1924), accompanying H.R. 7995, which was enacted as the Immigration Act of 1924 (43 Stat. 153).

6    There have been no guidelines promulgated by the INS to determine whether a grant of work authorization to these aliens would adversely affect the wages or working conditions of local citizens or legal aliens. The closest the INS comes to an attempt to protect American labor and labor conditions is in 8 CFR 103.6(a)(iii). This regulation provides a list of factors to be considered in the imposition of the bond condition barring unauthorized employment. The first factor calls for "Safeguarding employment opportunities for United States citizens and legal resident aliens;" and the second factor is the "impact on and dislocation of American workers by alien's employment." However, the factors listed in 8 CFR 103.6(a)(iii) are only to be considered in connection with the imposition of the bond condition barring unauthorized employment on an appearance and delivery bond. There is no language in either 8 CFR 103.6(a)(iii) or 109.1 that states that these factors are to apply in determining whether an alien is granted work authorization, with the exception of 8 CFR 109.1(b)(8).

7    The only provision that provides for such a determination is in section 212(a)(14) of the INA, the labor certification provision. This section calls on the Secretary of Labor to determine and certify that there are not sufficient workers available in the occupation the alien wishes to perform. The labor certification provision does not apply to nonimmigrants seeking work authorization under 8 CFR 109.1, but to aliens who are seeking to enter the U.S. to perform skilled or unskilled labor. See section 212(a)(14) of the INA, 8 U.S.C. 1182(a)(14).

    FN8 Many scholars and the Supreme Court have recognized that the employment of illegal immigrants results in depressed wages and working conditions for American workers, especially lowskilled workers.

    The Supreme Court has recognized the effect that employment of illegal aliens has on the domestic work force:

    Employment of illegal aliens in times of high unemployment deprives citizens and legally admitted aliens of jobs; acceptance by illegal aliens of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens; and employment of illegal aliens under such conditions can diminish the effectiveness of labor unions.

    De Canas v. Bica, 424 U.S. 351, 356 (1976). See also, Sure-Tan, Inc. v. National Labor Relations Board, —— U.S. ——, 104 S.Ct. 2803, 2810 (1984).

    See also North, Testimony before the Select Commission on Immigration and Refugee Policy (The presence of undocumented workers depresses the labor market, resulting in depressed wages and working conditions for people they compete with); Teitelbaum, Immigration, Refugees and American Business, National Chamber Foundation (1984) (Principal losers due to illegal immigration are those domestic workers with labor market characteristics similar to the illegal immigrants, i.e.

youths, women, disadvantage American minorities); Immigration Reform and Control Act: Hearings before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary, 98th Cong., 1st Sess. (1983) (Statement of Robert W. Searby, Deputy Under Secretary of Labor for International Labor Affairs) (The Department of Labor support of employer sanctions as best way to protect low-skilled American and legal immigrant workers from competition with undocumented aliens).

9       Supra, n. 4 and accompanying text.

FN10 Section 245(c) of the INA states:

The provisions of this section [adjustment of status of nonimmigrants to permanent residents] shall not be applicable to . . . (2) an alien (other than an immediate relative as defined in section 201(b)) who hereafter continues in or accepts unauthorized employment prior to filing an application for adjustment of status.

FN11 In the commentary to the proposed rule, the INS explained Congress' acquiescence in the granting of work authorization to aliens as follows:

The authority of the Attorney General to authorize employment of aliens in the United States as a necessary incident of his authority to administer the Act was specifically recognized by the Congress in the enactment of section 6 of Pub. L. 95-571. That provision amended section 245(c) of the Act to bar from adjustment of status any alien (other than an immediate relative of a United States citizen) who after January 1, 1977 engages in unauthorized employment prior to filing an application for adjustment of status.

45 Fed. Reg. 19563 (1980) [Emphasis added].

12      See, Section 214(a), 208(a), 245, 244(a) and (e), 236, 237, 241, 242 of the INA.

FN13 See, Section 208 of the INA, 8 U.S.C. 1158, along with S. Rep. No. 256, 96th Cong., 2nd Sess., reprinted in 1980 U.S. Code Cong. & Ad. News 141, 156 and H. Conf. Rep. No. 781, 96th Cong., 2nd Sess., reprinted in 1980 U.S. Code Cong. & Ad. News 160, 161; Section 214 of the INA, 8 U.S.C. 1184, along with H. Rep. No. 851, 91st Cong., 2nd Sess., reprinted in 1970 U.S. Code Cong. & Ad. News 2750, 2757; Section 245 of the INA, 8 U.S.C. 1255, along with S. Rep. No. 2133, 85th Cong., 2nd Sess., reprinted in 1958 U.S. Code Cong. & Ad. News 3698, S. Rep. No. 748, 89th Cong., lst Sess., reprinted in 1965 U.S. Code Cong. & Ad. News 3328, 3343, H. Conf. Rep. No. 1101, 89th Cong., lst Sess., reprinted in 1965 U.S. Code Cong. & Ad. News 3353, 3354, H. Rep. No. 1553, 94th Cong., 2nd Sess., reprinted in 1976 U.S. Code Cong. & Ad. News 6073, 6084, and H. Rep. No. 264, 97th Cong., lst Sess., reprinted in 1981 U.S. Code Cong. & Ad. News 2577.

The legislative history accompanying the 1952 Immigration and Nationality Act applies to each of the above Sections as well as to Section 244 of the INA, 8 U.S.C. 1152. See, H. Rep. No. 1365, 65th Cong., 2nd Sess., reprinted in 1952 U.S. Code Cong. & Ad. News 1653, and H. Conf. Rep. No. 2096, 65th Cong., 2nd Sess., reprinted in 1952 U.S. Code Cong. & Ad. News 1753.

14      INS Operating Instruction 214.2(b)(5) provided that an alien may be classified as a "temporary visitor for business" nonimmigrant if the alien: Is to receive no salary or other remuneration from a United States source (other than an expense allowance or other reimbursement for expenses incidental to the temporary stay) . . . (and is) coming to install, service, or repair commercial or industrial equipment or machinery purchased from a company outside the U.S. or to train U.S. workers to perform such service . . .

OI 214.2(b)(5) allows foreign laborers to circumvent the labor certification provisions of the INA. The usual procedure for aliens coming to perform skilled or unskilled labor is to apply for a H-2 visa, or "temporary worker" visa. However, in order to receive an H-2 visa, the petitioning employer must apply for labor certification from the Secretary of Labor. Aliens applying for a "temporary visitor for business" visa (B-1), on the other hand, do not have to seek labor certification.

FN15 Sections 101(a)(15)(B), which defines a temporary visitor for business as: An alien (other than one coming for the purpose of study or of performing skilled or unskilled labor or as a representative of foreign press, radio, film or other foreign information media coming to engage in such vocation) having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business . . .

and Section 101(a)(15)(H)(ii), which defines a temporary worker nonimmigrant as: An alien having a residence in a foreign country which he has no intention of abandoning . . . (and ) who is coming temporarily to the United States to perform temporary services or labor, if unemployed persons capable of performing such service or labor cannot be found in this country . . .

       © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.       10