## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,

              Plaintiffs,

      v.

KIRSTJEN M. NIELSEN, *et al.*,

              Defendants,

*and*

KARLA PEREZ, *et al.*,

              Defendant-Intervenors.

Case No. 18-cv-00068

### AMICI CURIAE BRIEF OF KEVIN R. JOHNSON AND SHOBA SIVAPRASAD WADHIA IN SUPPORT OF DEFENDANT-INTERVENORS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# **TABLE OF CONTENTS**

Interest of Amici Curiae ................................................................................................ 1

Summary of Argument .................................................................................................. 2

I.    The Balance of Equities and the Public Interest Weigh Heavily in Favor of
Maintaining the Status Quo and Denying a Preliminary Injunction ................................. 4

    A.    Harm to Individual DACA Recipients .................................................... 4

    B.    Harm to DACA Recipients' Families .................................................... 6

    C.    Harm to DACA Recipients' Employers and Universities ...................................... 7

    D.    Harm to Public Health and Public Safety ............................................... 9

    E.    Harm to State and Local Economies .................................................... 11

II.    Plaintiffs' Six Year Delay Undermines Any Argument That DACA Is Causing
Them Irreparable Harm or That the Equities Point in Their Favor. ................................. 13

Conclusion ................................................................................................................. 16

## TABLE OF AUTHORITIES

**Cases**

*Beame v. Friends of the Earth*,
    434 U.S. 1310 (1977)............................................................................................15

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018)........................................................................................15

*Canal Auth. of State of Fla. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ...............................................................................14

*Fund for Animals v. Frizzell*,
    530 F.2d 982 (D.C. Cir. 1975)............................................................................15

*Gonannies, Inc. v. Goupair.Com, Inc.*,
    464 F. Supp. 2d 603 (N.D. Tex. 2006) ...........................................................14–15

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*,
    762 F.2d 1374 (9th Cir. 1985) ............................................................................15

**Statutes**

8 U.S.C. § 1182(a)(9)(B)–(C)...................................................................................4

8 U.S.C. §§ 1611(b)(2)–(3), 1621(d) .......................................................................4

**Interest of Amici Curiae**

Kevin R. Johnson, Dean of the University of California, Davis, School of Law, and Shoba Sivaprasad Wadhia, Samuel Weiss Faculty Scholar and Clinical Professor of Law at the Pennsylvania State Law School, submit this brief as *amici curiae* in support of defendant-intervenors' opposition to plaintiffs' motion for a preliminary injunction.[1]  Dean Johnson and Professor Wadhia are respected immigration law scholars who, through their teaching, administrative, and advisory duties at the University of California, Davis, School of Law and Pennsylvania State Law School, respectively, have witnessed first-hand the profound impact the Deferred Action for Childhood Arrivals ("DACA") program has had on DACA-recipient students and their families.  They likewise have seen the unique contributions those students have made to their school's respective communities and campuses.

Dean Johnson and Professor Wadhia are deeply familiar with the Deferred Action for Parents of Americans (DAPA) litigation which proceeded before this Court, *Texas v. United States*, No. 1:14-cv-00254, as well as the litigation resulting in the first order preliminarily enjoining DACA's rescission, *Regents of the Univ. of Cal. v. Dep't of Homeland Sec.*, No. 3:17-cv-05211-WHA (N.D. Cal.).  In order to aid the Court's consideration of the pending preliminary injunction motion, Dean Johnson and Professor Wadhia file this brief to emphasize aspects of the factual record compiled in *Regents*, and to highlight the contrast in equities between this matter and the earlier DAPA litigation.

---

[1] Dean Johnson and Professor Wadhia file this brief in their individual capacities.  Their institutional affiliations are noted for informational purposes only and do not signify any institutional endorsement.

## Summary of Argument

In the six years since DACA was announced, it has had a profound impact on DACA recipients, as well as their families, schools, employers, communities, and the country at large. As the empirical data and the experience of individual recipients outlined below makes clear, DACA has been a resounding success, providing individuals with longstanding ties to the United States greater opportunities to make valuable contributions to their families and their communities at large.

Most obviously, DACA has had a significant impact on the lives of DACA recipients, allowing them to obtain driver's licenses, medical insurance, and tuition benefits. It has enabled them to open bank accounts, obtain credit cards, and purchase homes and vehicles. Even more fundamentally, the program has provided its recipients with a sense of dignity and security that leads to demonstrable benefits for their mental and physical health, career and educational prospects, and financial security.

But the significant success of DACA extends far beyond individual recipients, to their families, friends, classmates, colleagues, employers, and our nation at large. Among other things, DACA has broadened and deepened the skill set of our country's workforce, providing recipients access to higher education and training, and then affording them the opportunity to put their talents to use through lawful employment. This in turn has allowed DACA recipients to make vital contributions to our nation's economy as workers, taxpayers, consumers, and, in many cases, employers and entrepreneurs. Businesses across the country have benefited from DACA, as recipients fill critical needs for skilled workers in the American job market. Federal, state, and local governments have realized enormous fiscal benefits from the program, as it has increased wages, leading to increased spending and greater tax revenue.

The preliminary injunction plaintiffs seek would erase these benefits and leave immense harm in its wake—both to DACA recipients and all the other stakeholders benefiting from the program. Therefore, a preliminary injunction would do a disservice to the public interest, and the balance of the equities tips sharply against any such injunction.

On the other side of the ledger, plaintiffs' significant delay in challenging the program points strongly in favor of denying their request for preliminary injunctive relief. DACA has been in place for nearly six years, and during that time plaintiffs never once sought any court's intervention to enjoin the program. During that time, DACA recipients—as well as their educational institutions, employers, and communities—have made significant decisions in reliance on the program. Having sat silent for six years while others made these decisions, plaintiffs cannot now claim that they would face irreparable harm without their requested relief, nor can they establish that the balance of equities lies in their favor.

To the contrary, entering the injunction plaintiffs seek would be an extraordinarily inequitable result, punishing the people who, in reliance on DACA, made momentous and irreversible life decisions and investments, while rewarding plaintiffs' inexcusable six-year delay in pursuing their claims. This result overwhelmingly compels the denial of plaintiffs' motion for a preliminary injunction. Indeed, in the first Texas litigation this Court anticipated the harms that would flow from such an outcome. *See Texas v. United States*, 86 F. Supp. 3d 591, 674 at n.108 (S.D. Tex.), *aff'd*, 809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("[I]f individuals begin receiving benefits under DAPA but DAPA is later declared unlawful, Defendants . . . would suffer irreparable injuries."); *see also infra* Section III. Similarly, here, taking away the benefits DACA recipients were granted nearly six years ago would cause significant harms and is entirely inappropriate under the circumstances.

I.     **The Balance of Equities and the Public Interest Weigh Heavily in Favor of Maintaining the Status Quo and Denying a Preliminary Injunction.**

The factual record submitted in support of the motion for a preliminary injunction in

*Regents of the University of California v. Department of Homeland Security*, No. 3:17-cv-05211-

WHA (N.D. Cal.) (the "California Record") demonstrates in great detail how individual

recipients would face immediate, irreparable harm from an injunction against DACA.[2]  It also

illustrates that federal, state, and local governments stand to lose billions of dollars of economic

activity and tax revenue, and that the preliminary injunction plaintiffs seek would undermine

states and cities' public health, law enforcement, and educational efforts.  Given these

devastating effects from the requested injunction, the balance of hardships and public interest

strongly favor denying plaintiffs' request for provisional relief.

A.     **Harm to Individual DACA Recipients**

If the Court enjoins DACA, approximately 700,000 DACA recipients would immediately

lose work authorization and face the risk of deportation.  For many, that life-altering harm could

not be undone by leaving the United States and seeking reentry, in light of the strict re-entry bars

imposed by the INA.  *See* 8 U.S.C. § 1182(a)(9)(B)–(C) (imposing three-year, ten-year and

permanent bars).

For example, DACA has enabled recipients to obtain medical insurance, research

funding, and tuition benefits.  *See Regents* Dkt. No. 124-2 at 3–4 (Topical Index at Topic 6); *see

also* 8 U.S.C. §§ 1611(b)(2)–(3), 1621(d).  Many received driver's licenses for the first time, and

---

[2] Subsequent citations to plaintiff and third-party declarations from the California Record reference the applicable docket citation from *Regents*, as well as the title of the declaration itself. For the Court's convenience, counsel for amici have compiled those declarations in alphabetical order, by last name of declarant, at goo.gl/o1YnEC.  A Topical Index organizing those declarations by subject matter is also part of the California Record, *see Regents* Dkt. No. 124-2, and has been included with the declarations at goo.gl/o1YnEC.

nearly half became organ donors as a result.  *See Regents* Dkt. No. 119-2 at 50 (Wong Decl. at ¶ 30).  DACA has allowed recipients to open bank accounts, obtain credit cards, and purchase homes and vehicles.  *See Regents* Dkt. No. 124-2 at 1–2 (Topical Index at Topic 2).  These opportunities have had life-altering impacts on DACA recipients.  The California Record makes clear that enjoining DACA would cause grievous, irreparable personal, professional, and economic harms by stripping away these many positive benefits from hundreds of thousands of individuals.  *See, e.g.*, *Regents* Dkt. 111 at 20 (Pls.' Mot. for Provisional Relief at 11) ("[DACA recipients are] making decisions whether to get married, start families, take mortgages, attend college or graduate school, start businesses, or change careers.  Of course, hundreds of thousands of DACA recipients already have made such life-changing decisions in reliance on DACA, and now face devastating personal, professional, and economic losses.").  DACA recipients would lose work authorization, hindering their ability to earn a living, and forcing many to abandon careers that they have spent years and enormous sums of money preparing for.  *See Regents* Dkt. No. 119-2, at 44–48 (Wong Decl. at ¶¶ 17–26) (discussing DACA recipients' wages, comparing individual recipients' pre- and post-DACA earning power, and discussing the fact that compared to the general population, DACA recipients are more likely to pursue bachelor's degrees or higher).

Similarly, DACA recipients who are in graduate programs in the legal and medical fields face a future of being saddled with hundreds of thousands of dollars of student debt and no viable job prospects in their desired fields.  *See, e.g.*, *Regents* Dkt. No. 119-1 at 73–74 (Santos Toledo Decl. ¶¶ 31–33) (declarant estimates that he will graduate from Harvard Law School with $150,000 in student loans but without job opportunities that will enable him to pay off his debt as

anticipated).  Others would lose professional opportunities that they can never recover.  *See, e.g.*, *Regents* Dkt. No. 113-1 at 75–76 (Braddock Decl. ¶¶ 4–5).

Enjoining DACA would result in program recipients being deported, losing their livelihoods, and being forced to abandon their educations and professional training.  These harms alone are more than enough reason for the Court to deny plaintiffs' motion for a preliminary injunction.

### B.      Harm to DACA Recipients' Families

If the Court grants a preliminary injunction, it is not simply DACA recipients who would experience profound injury.  Their families, who often rely upon recipients for support, would also be significantly harmed.

Nearly three quarters of DACA recipients are members of families that include American-citizen siblings, spouses, or children.  *See Regents* Dkt. No. 119-2 at 51–53 (Wong Decl. ¶¶ 31–32).  DACA recipients are parents of approximately 200,000 U.S.-citizen children.  An injunction against DACA would risk tearing these families apart, inflicting extreme suffering on both DACA recipients and their American-citizen family members.  *See id.* (Wong Decl. ¶ 32) ("Another DACA recipient writes . . . 'If DACA ends, I lose the peace of mind that I will be here to raise [my daughter].'").  Even the risk that recipients could be deported will irreparably harm their children because undocumented status leads to dramatic declines in mental health.  For example, one study found that mothers' eligibility for DACA led to significant improvements in their children's mental health—valuable gains that would be lost if DACA is enjoined.  *See Regents* Dkt. No. 119 at 17–18 (Mendoza Decl. ¶¶ 4, 6–8); *Regents* Dkt. No. 118 at 149–52 (Hainmueller Decl. ¶¶ 4-11).  Experts also predict that, without DACA, family separations would increase the number of children relying on government child welfare services

6

programs.  *See Regents* Dkt. No. 118-1 at 248 (Márquez Decl. ¶ 18); *Regents* Dkt. No. 119 at 61

(Menicocci Decl. ¶ 14).

Whether DACA recipients are deported, depart the United States voluntarily, or remain in

the United States without work authorization, they would lose the ability to earn incomes to help

support their families.  *See Regents* Dkt. No. 119-2 at 52–53 (Wong Decl. ¶ 32(d)–(h), 32(l)–

(m)) (reporting DACA recipients' expectation that without DACA status and related work

authorization, they would be unable to provide shelter and put food on the table for their

children); *Regents* Dkt. No. 113-1 at 49 (Ascencion Vasquez Decl. ¶ 20) (describing how she

pays for her siblings' education and significant medical expenses); *Regents* Dkt. No. 119-1 at 72

(Santos Toledo Decl. ¶ 24) (describing how he and his sister pay for the family's living expenses,

including rent, food, and bills).  Thus, if the Court enjoins DACA, it is not only DACA recipients

themselves that would suffer, but their families as well.  The Court should not employ its

discretionary, equitable powers to issue such a harmful provisional remedy.

### C.      Harm to DACA Recipients' Employers and Universities

It is not only DACA recipients' family members who depend on their hard work and

skills; employers and universities rely on the efforts and expertise of DACA recipients.  For

example, institutions of higher education—both public and private—have admitted and hired

DACA recipients, with the expectation that they would be able to live and teach, research, pursue

professional careers, or otherwise work in the United States for the foreseeable future.  *See, e.g.*,

*Regents* Dkt. No. 124-2 at 7–8 (Topical Index at Topic 14).  If DACA is enjoined and its

recipients are forced to abandon their work and studies, their employers and educational

institutions would lose the value of the considerable time, effort, energy, and financial resources

they have invested, as well as the many benefits that they derive from contributions made by

DACA recipients.  *See, e.g.*, *Regents* Dkt. No. 124-2 at 7–8, 10 (Topical Index at Topics 14, 22).

If DACA is enjoined, universities would lose their DACA students, many of whom would not be able to support their education unless they are lawfully permitted to work.  *See, e.g.*, *Regents* Dkt. No. 118 at 200 (Holmes-Sullivan Decl. at ¶ 13) (explaining that financial aid often does not cover the full tuition and that many DACA recipients rely on their ability to work to pay for the remaining tuition).  If that happens, schools would lose the many investments they have made in these students, as well as future tuition revenue and sources of funding.  *See, e.g.*, *Regents* Dkt. No. 113-1 at 93–97 (Brick Decl. ¶¶ 2–19); *Regents* Dkt. No. 119 at 116 (Oakley Decl. at ¶ 8); and *Regents* Dkt. No. 119-2 at 119–20 (Wells Decl. ¶¶ 2–6).  Universities would also lose the contributions these individuals make as students, teaching assistants, and graduate researchers. *See, e.g.*, *Regents* Dkt. No. 118 at 197–98 (Holmes-Sullivan Decl. ¶¶ 4–7).  That would in turn have grave consequences for these institutions' educational missions, research work, and health care facilities as DACA-recipient teachers, scientists, and hospital workers can no longer fill those roles.  *See id.* at 202 (Holmes-Sullivan Decl. ¶ 19) ("Our PhD students and others will not be able to continue as TAs without work authorization. . . . When these students lose DACA status, they can no longer be employed as TAs. . . . UC will also have to scramble to find replacement[s]. . . .").

Moreover, if universities are unable to recruit DACA recipients, or if their current undocumented students feel less comfortable engaging in classroom discussions or campus life, academic diversity would be diminished, to the detriment of all students.  *See, e.g.*, *Regents* Dkt. No. 113-1 at 76 (Braddock Decl. ¶¶ 6–7); *Regents* Dkt. No. 119 at 95–97 (Napolitano Decl. ¶¶ 6, 13); *id.* at 340–42 (Parham Decl. ¶¶ 9–10, 15).

Enjoining DACA would also frustrate K-12 education.  For example, Los Angeles Unified School District believes that a "significant portion of [its] educator workforce may have

DACA status." *Regents* Dkt. No. 118-1 at 270 (Melvoin Decl. ¶ 16).  If these DACA teachers lose their work authorization, the broader community would suffer, because the district is facing a teacher shortage.  To address the shortage, the district currently relies on teacher-interns from Teach For America, which places promising students in underserved communities around the country.  However, many of Teach for America's active corps members are DACA recipients, and without DACA, they would be unable to work in the communities that need their services the most.  *Regents* Dkt. No. 113-1 at 111 (Carrizales Decl. ¶ 10).  The harm to students of DACA teachers is yet another equitable factor pointing against an injunction.

The damaging effects of an injunction are not limited to education: DACA recipients are employed throughout the private and public sectors, and their employers would experience significant hardship if they are deprived of skilled and hard-working employees, and are forced to find and train replacements.  *See, e.g.*, *Regents* Dkt. No. 119 at 281–82 (O'Brien Decl. ¶¶ 3–8) (explaining DACA recipients' contributions to Apple, Inc., and the costs the company would incur if its DACA-recipient employees lost their work authorization); *Regents* Dkt. No. 119 at 355 (Pereira Decl. ¶¶ 8–9) (describing how local businesses in San José, California would lose employees or close, and the harms that this would cause to businesses and the community).

### D.   Harm to Public Health and Public Safety

An injunction against DACA also would severely harm government services— particularly healthcare and law enforcement.

Loss of work authorization and the resulting loss of employment, would deprive current DACA recipients of their employer-provided medical insurance, increasing the burden on emergency services.  *See Regents* Dkt. No. 124-2 at 8 (Topical Index at Topic 15).  Loss of DACA status might make former DACA recipients less likely to seek healthcare at all "because they lack insurance or because they fear being reported to immigration authorities," putting both

themselves and their communities at risk.  *See Regents* Dkt. No. 119-2 at 55 (Wong Decl.

¶ 35(c)) ("[W]hen given a scenario in which they no longer had DACA: 48% reported that they

would be less likely to go to the hospital if they suffered an injury.").

Others, including U.S. citizens, would suffer harm as well due to the loss of DACA-

recipient medical providers.  If DACA recipients are no longer eligible to work, hospitals would

lose doctors, nurses, and support staff, including interpreters.  *See, e.g.*, *Regents* Dkt. No. 119 at

322–23 (Oh Decl. at ¶¶ 4–7, 10) (declarant explains that she graduated nursing school but was

unable to secure employment until she received DACA status and work authorization; now she

works at Stanford University Medical Center as a critical care nurse—a field that is experiencing

a shortage).  Teaching hospitals would also lose medical students and residents.  All of these

positions are difficult to fill.  *See, e.g.*, *Regents* Dkt. No. 118-1 at 234–35 (Madara Decl. ¶¶ 3–5)

(describing the shortage of 8,200 primary care physicians that DACA recipients can help

alleviate).  As a result, communities' access to healthcare would decrease and the public health

would suffer.

Less immediately, an injunction against DACA would frustrate medical schools' ability

to attract certain qualified applicants, including candidates who otherwise would go on to

provide medical care to underserved populations.  *See Regents* Dkt. No. 113-1 at 77 (Braddock

Decl. ¶ 8) (describing how DACA recipients and students from similar backgrounds are

statistically more likely to provide healthcare to underserved communities).

Similarly, the California Record makes plain that public safety would suffer if DACA

were enjoined.  District attorneys, chiefs of police, and sheriffs explain that effective local law

enforcement depends on a trusting relationship between police and the communities they serve.

*See Regents* Dkt. No. 124-2 at 8 (Topical Index at Topic 16).  Law enforcement officers and

district attorneys are concerned that if DACA recipients lose their protection, and fear that interactions with police could end with their deportation, they would be less likely to call the police if they are victimized or if they witness crimes.  *Id.*; *see also Regents* Dkt. No. 119-2 at 55 (Wong Decl. ¶ 35(a)–(b)) ("[W]hen given a scenario in which they no longer had DACA: 53% reported that they would be less likely to report a crime they witnessed; [and] 47% reported that they would be less likely to report a crime even if they were the victim.").  This in turn would make it harder for law enforcement professionals to protect all members of their communities. *See, e.g.*, *Regents* Dkt. No. 118 at 17–20 (Gascón Decl. ¶¶ 3–6, 9–12); *Regents* Dkt. No. 119 at 329–33 (O'Malley Decl. ¶¶ 5–10, 12, 14).

### E.  Harm to State and Local Economies

DACA has promoted upward mobility for its hundreds of thousands of recipients, which has, in turn, benefitted the economy both locally and nationally.  DACA recipients—no longer relegated to the underground economy—have a 91 percent employment rate, and their average hourly wages have increased by 81 percent since DACA was created.  *See Regents* Dkt. No. 119-2 at 41, 44 (Wong Decl. ¶¶ 13, 18).  This increased earning power has enabled them to buy homes and cars, and to pursue advanced degrees that qualify them for even higher paying jobs. All of this has improved local economic output and local tax bases.  Economists estimate that taking DACA away from its nearly 700,000 recipients would cause a loss of $215 billion in U.S. GDP over the next ten years.  *Regents* Dkt. No. 113-1 at 84 (Brannon Decl. ¶ 11).  Nearly 1,400 jobs would be lost each business day if DACA is terminated, causing a massive disruption in businesses across the country.  *See Study: the Impact of Deferred Action for Childhood Arrivals (DACA) Program Repeal on Jobs*, FWD.us, https://dreamers.fwd.us/wp-content/uploads/2017/08/20170823-DACA-Job-Loss-Report.pdf (last visited July 20, 2018).

Preserving the status quo would allow nearly 700,000 current DACA recipients to continue working and generating tax revenue for their communities.  It would enable DACA recipients to continue running their businesses and paying their employees.  *See, e.g.*, *Regents* Dkt. No. 117 at 13–14 (D. Garcia Decl. ¶¶ 50–51) (DACA-recipient declarant owns a two-office law firm); *Regents* Dkt. No. 119 at 355 (Pereira Decl. ¶ 8) (two DACA-recipient-owned businesses employ over 100 workers in San José, California).  Enjoining DACA would shutter businesses run by DACA recipients and destroy the jobs created by those businesses, including jobs for U.S. citizens and permanent residents.

Plaintiffs' sister states of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, Minnesota, Maryland, Maine, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, and Virginia, and the District of Columbia have all urged courts to preserve DACA.  These states, and institutions and municipalities within them, have highlighted the tremendous harms the states face if DACA were to end.  For California alone, economists forecast that ending DACA would result in a loss of $90 billion over ten years—$19 billion of which would be foregone government revenue, *Regents* Dkt. No. 113-1 at 84 (Brannon Decl. ¶ 14); another study estimates that, without DACA, Texas would lose approximately $6.1 billion annually, *see* Silva Mathema, *Ending DACA Will Cost States Billions of Dollars*, Center for American Progress (Jan. 9, 2017, 9:04 AM), https://www.americanprogress.org/issues/immigration/news/2017/01/09/296125/ending-daca-will-cost-states-billions-of-dollars/.  Ending DACA would also cause states to forfeit the investments they have made educating and training DACA recipients, and would prevent qualified students and talented employees from filling jobs in sectors facing workforce shortages. *See, e.g.*, *Regents* Dkt. No. 119 at 117 (Oakley Decl. ¶ 9).

\*      \*      \*

If the Court enjoins DACA, it would harm hundreds of thousands of DACA recipients, their families, their employers, their schools, their communities, and the economies to which they now lawfully contribute.  Accordingly, the balance of hardships and the public interest weigh overwhelmingly in favor of the status quo and against an injunction of DACA.

## II.   Plaintiffs' Six Year Delay Undermines Any Argument That DACA Is Causing Them Irreparable Harm or That the Equities Point in Their Favor.

When this Court concluded in the first *Texas* litigation that DAPA should be preliminarily enjoined before it was implemented, it observed that if DAPA were permitted to take effect, it would be "difficult or even impossible for anyone to 'unscramble the egg.'"  *Texas*, 86 F. Supp. 3d at 673 ("[W]ithout a preliminary injunction, any subsequent ruling that finds DAPA unlawful after it is implemented would result in the States facing the substantially difficult—if not impossible—task of retracting any benefits [issued pursuant to the program]. . . . This genie would be impossible to put back into the bottle.").

Here, the equities are completely reversed.  While plaintiffs were delaying nearly six years in filing a challenge to DACA, hundreds of thousands of recipients and countless other stakeholders were making important—often irreversible—decisions in reliance on the program. Because those decisions cannot now be unwound and because plaintiffs cannot establish that they would suffer irreparable harm without an injunction, the balance of equities and public interest counsel overwhelmingly against a preliminary injunction.

In the six years since DACA was promulgated, more than 800,000 individuals have enlisted in the program.  As the California record illustrates, *see supra* Part I, countless DACA recipients, after enlisting in the program, made momentous life choices on the basis of their DACA grants.  *See, e.g.*, *Regents* Dkt. No. 124-2 at 4–6 (Topical Index at Topics 9–11).  Many

have chosen to marry and to have children.  *See, e.g.*, *Regents* Dkt. No. 119-2 at 51–53 (Wong Decl. ¶ 32).  Countless others have spent vast sums of money and years of their lives pursuing their educations, embarking on careers, and opening businesses.  *See, e.g.*, *Regents* Dkt. No. 119-1 at 73–74 (Santos Toledo Decl. ¶¶ 31–33) (explaining that he would not have attended Harvard Law School if he knew he could not renew his DACA status); *Regents* Dkt. No. 118 at 130–31 (Gorjian Decl. ¶¶ 15–16) (explaining that she would not have taken out loans and attended law school if she knew DACA would end); *Regents* Dkt. No. 117 at 10–12 (D. Garcia Decl. ¶¶ 29–39) (crediting DACA and her work authorization for enabling her to afford law school and enabling her to open her own law firm in Southern California).  Likewise, universities and employers have dedicated substantial resources to educating and training DACA recipients.  *See, e.g.*, *Regents* Dkt. No. 118-1 at 190 (Lucey Decl. ¶ 18) (explaining that, on average, University of California Health invests $70,000 each year in each medical student).  All of these decisions were made with the expectation that DACA would continue, and that its recipients would be permitted to remain in the United States.  These decisions cannot be undone.  An injunction, therefore, would create enormous suffering and inflict harm on millions of people who relied on the government's six-year-old policy, which went unchallenged by plaintiffs in this case.  This extraordinarily inequitable result overwhelmingly compels the denial of plaintiffs' motion.

Nor is the status quo itself causing plaintiffs irreparable harm that might otherwise justify the drastic remedy they seek.  *See Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (explaining that "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury").  As explained above, the states actually have much more to lose than to gain if DACA is enjoined. *See supra* Part I.  Furthermore, "[t]he law is well-established that . . . [a]bsent a good

14

explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *Gonannies, Inc. v. Goupair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006).

Here, the plaintiffs have, without explanation, waited *six years* to bring this action, and have fallen far short of demonstrating any apparent urgency to enjoin DACA as this case proceeds. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("In considering the balance of equities among the parties, . . . plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request."); *Beame v. Friends of the Earth*, 434 U.S. 1310, 1313 (1977) ("The applicants' delay in filing their petition and seeking a stay vitiates much of the force of their allegations of irreparable harm."); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) ("Our conclusion that an injunction should not issue is bolstered by the delay of the appellants in seeking one."); *Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Gonannies*, 64 F. Supp. 2d at 609 (rejecting irreparable harm argument where plaintiff waited over six months to seek a preliminary injunction after learning of injury); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2018) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction."). And, even if plaintiffs could demonstrate some quantum of irreparable injury during the pendency of this action, that harm is vastly outweighed by the harm caused by throwing the lives of DACA recipients into turmoil. *See supra* Parts I–II. For the foregoing reasons, this Court should exercise its discretion to deny plaintiffs' request for a preliminary injunction.

## Conclusion

For the foregoing reasons this Court should deny the plaintiffs' motion for a preliminary injunction.

DATED: July 21, 2018

Respectfully submitted,

*/s/ Jeffrey M. Davidson*
_____

Mark H. Lynch (admitted *pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
E-mail: mlynch@cov.com

Jas Brar (S.D. Tex. Bar No. 892270)
FOGLER, BRAR, FORD,
O'NEIL & GRAY LLP
909 Fannin Street, Suite 1640
Houston, Texas 77010
Telephone: (713) 481-1010
Facsimile: (713) 574-3224
E-mail: jbrar@fbfog.com

Jeffrey M. Davidson (admitted *pro hac vice*)
COVINGTON & BURLING, LLP
One Front Street
San Francisco, California 94111
Telephone: (415) 591-7021
Facsimile: (415) 591-6091
E-mail: jdavidson@cov.com

*Attorneys for Amici Curiae*