UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| State of Texas, *et al.,* | |
| *Plaintiffs,* | |
| *v.* | |
| The United States of America, *et al.,* | Case No. 1:18-cv-00068 |
| *Defendants,* | |
| Karla Perez, *et al.,* | |
| *Defendants-Intervenors,* | |
| *and* | |
| State of New Jersey, | |
| *Defendant-Intervenor.* | |

**APPENDIX TO MEMORANDUM OF LAW FOR AMICI CURIAE THE STATES OF
NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAI'I, ILLINOIS,
IOWA, MAINE, MARYLAND, MASSACHUSETTS, MINNESOTA, NEW MEXICO,
NORTH CAROLINA, OREGON, PENNSYLVANIA, RHODE ISLAND, VIRGINIA,
VERMONT, AND WASHINGTON, AND THE DISTRICT OF COLUMBIA
IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

XAVIER BECERRA
  *Attorney General*
  *State of California*
1300 I St.
Sacramento, CA 95814

BARBARA D. UNDERWOOD
  *Attorney General*
  *State of New York*
28 Liberty Street, 23rd Floor
New York, NY 10005
Telephone: (212) 416-8022
Facsimile: (212) 416-8962

(*Complete counsel list appears on
  Memorandum of Law signature pages.*)

# APPENDIX

## Table of Contents

**Page**

**Executive Branch documents**

Memorandum from Janet Napolitano: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 12, 2012)...................................1

Memorandum from Jeh Charles Johnson: Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents (Nov. 20, 2014) (excerpt).......................................................................................4

Memorandum from Donald Neufeld et al., to Field Leadership, Consolidation of Guidance Concerning Unlawful Presence (May 6, 2009) (excerpt)................................8

Memorandum from Johnny N. Williams, Executive Associate Commissioner, Office of Field Operations, to Regional Directors, *Unlawful Presence* (June 12, 2002)............................10

U.S. Customs and Immigration Service, Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, Quarter, Intake and Case Status...........13

**Congressional documents**

H.R. Rep. No. 111-157 (2009) (excerpt) .......................................................18

S. Rep. No. 99-132 (excerpt) .................................................................22

*Immigration Act of 1989: Hearings Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary*, 101st Cong., 2d Sess. (1990) (excerpts).......................................................................................24

**Court opinion (unpublished)**

*Dillard v. Security Pacific Corp.*, 85 F.3d 621, 1996 WL 254971 (5th Cir. 1996) .........................

**United States v. Texas, 136 S. Ct. 2271 (2016) (No. [15-674])**

Brief for Petitioner United States (excerpt) ...................................................35

Reply Brief for Petitioner United States (excerpt).............................................57

Transcript of Oral Argument (excerpt) .......................................................60

**Page**

***Batalla Vidal v. Nielsen***

*Second Circuit, No. 18-485*

Order, ECF No. 62 (Mar. 8, 2018)................................................................68

Record excerpts, ECF Nos. 115, 122, 127, 128 (Mar. 16, 2018).....................69

*Second Circuit, No. 17-3345 (In re Duke)*

Brief for 113 Companies and Associations as *Amici Curiae* Supporting Respondents, *In re Duke*, ECF No. 91-2 (Nov. 14, 2017) (excerpt) ......................................153

*Eastern District of New York, No. 16-cv-4756*

Defendant Nielsen's Response to Request for Admission, ECF No. 123-4 (excerpt) ...............162

***New York v. Trump*, No. 17-cv-5228 (EDNY)**

Memorandum of Law in Support of Preliminary Injunction ECF No. 96-1 (Dec. 15, 2017) (excerpt).................................................................................164

Record documents, ECF Nos. 97-1, 97-3 (Dec. 15, 2017) (excerpt)..................172

***Regents of the University of California v. DHS***

*Ninth Circuit, No. 18-15068*

Principal and Response Brief for the States of California, Maine, Maryland, and Minnesota, ECF No. 43 (Mar. 13, 2018) (excerpt)..........................................189

Record excerpts, ECF Nos. 45-2 to 45-6 (Mar. 13, 2018)............................194

Order, ECF No. 51 (Mar. 15, 2018)............................................................279

Brief for 102 Companies and Associations as *Amici Curiae* In Support of Appellants (Mar. 20, 2018), ECF No. 73 (excerpt)........................................................283

*Northern District of California, No. 17-cv-5211*

Record excerpts, ECF Nos. 113-1, 118-1, 119, 119-2 (excerpt) ...................293

**Page**

**Miscellaneous authorities**

Chardy, Alfonso, *Record number of deportations took place on Obama's watch*, Miami Herald, Dec. 25, 2016 ............................................................................310

Megan, Kenneth, Bipartisan Policy Ctr., *Immigration and the Labor Force* (Aug. 25, 2015) ............................................................................................315

New American Economic Research Fund, *Examining the Contributions of the DACA-Eligible Population in Key States* (Nov. 6, 2017).......................................320

*Recent Developments*, Interpreter Releases, vol. 67, no. 6 (Feb. 5, 1990) ..................329

***Regents of the University of California v. DHS (continued)***

*Ninth Circuit, No. 18-15068*

Record excerpts, ECF Nos. 45-2 to 45-6 (Mar. 13, 2018) (excerpt) ..........................333

*Secretary*

**U.S. Department of Homeland Security**
Washington, DC 20528



# Homeland
# Security

June 15, 2012

MEMORANDUM FOR:    David V. Aguilar
        Acting Commissioner, U.S. Customs and Border Protection

        Alejandro Mayorkas
        Director, U.S. Citizenship and Immigration Services

        John Morton
        Director, U.S. Immigration and Customs Enforcement

FROM:        Janet Napolitano
        Secretary of Homeland Security

SUBJECT:        Exercising Prosecutorial Discretion with Respect to Individuals
        Who Came to the United States as Children

By this memorandum, I am setting forth how, in the exercise of our prosecutorial discretion, the Department of Homeland Security (DHS) should enforce the Nation's immigration laws against certain young people who were brought to this country as children and know only this country as home. As a general matter, these individuals lacked the intent to violate the law and our ongoing review of pending removal cases is already offering administrative closure to many of them. However, additional measures are necessary to ensure that our enforcement resources are not expended on these low priority cases but are instead appropriately focused on people who meet our enforcement priorities.

The following criteria should be satisfied before an individual is considered for an exercise of prosecutorial discretion pursuant to this memorandum:

- came to the United States under the age of sixteen;
- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;
- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;
- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and
- is not above the age of thirty.

www.dhs.gov  App. 0002

Our Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways. Prosecutorial discretion, which is used in so many other areas, is especially justified here.

As part of this exercise of prosecutorial discretion, the above criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal. No individual should receive deferred action under this memorandum unless they first pass a background check and requests for relief pursuant to this memorandum are to be decided on a case by case basis. DHS cannot provide any assurance that relief will be granted in all cases.

1. With respect to individuals who are encountered by U.S. Immigration and Customs Enforcement (ICE), U.S. Customs and Border Protection (CBP), or U.S. Citizenship and Immigration Services (USCIS):

- With respect to individuals who meet the above criteria, ICE and CBP should immediately exercise their discretion, on an individual basis, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.
- USCIS is instructed to implement this memorandum consistent with its existing guidance regarding the issuance of notices to appear.

2. With respect to individuals who are **in** removal proceedings but not yet subject to a final order of removal, and who meet the above criteria:

- ICE should exercise prosecutorial discretion, on an individual basis, for individuals who meet the above criteria by deferring action for a period of two years, subject to renewal, in order to prevent low priority individuals from being removed from the United States.
- ICE is instructed to use its Office of the Public Advocate to permit individuals who believe they meet the above criteria to identify themselves through a clear and efficient process.
- ICE is directed to begin implementing this process within 60 days of the date of this memorandum.
- ICE is also instructed to immediately begin the process of deferring action against individuals who meet the above criteria whose cases have already been identified through the ongoing review of pending cases before the Executive Office for Immigration Review.

3. With respect to the individuals who are **not** currently in removal proceedings and meet the above criteria, and pass a background check:

- USCIS should establish a clear and efficient process for exercising prosecutorial discretion, on an individual basis, by deferring action against individuals who meet the

above criteria and are at least 15 years old, for a period of two years, subject to renewal, in order to prevent low priority individuals from being placed into removal proceedings or removed from the United States.

- The USCIS process shall also be available to individuals subject to a final order of removal regardless of their age.
- USCIS is directed to begin implementing this process within 60 days of the date of this memorandum.

For individuals who are granted deferred action by either ICE or USCIS, USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action.

This memorandum confers no substantive right, immigration status or pathway to citizenship. Only the Congress, acting through its legislative authority, can confer these rights. It remains for the executive branch, however, to set forth policy for the exercise of discretion within the framework of the existing law. I have done so here.

Janet Napolitano

Secretary
**U.S. Department of Homeland Security**
Washington, DC 20528



# Homeland Security

November 20, 2014

MEMORANDUM FOR:   León Rodríguez
Director
U.S. Citizenship and Immigration Services

Thomas S. Winkowski
Acting Director
U.S. Immigration and Customs Enforcement

R. Gil Kerlikowske
Commissioner
U.S. Customs and Border Protection

FROM:   Jeh Charles Johnson
Secretary

SUBJECT:   **Exercising Prosecutorial Discretion with Respect to
Individuals Who Came to the United States as
Children and with Respect to Certain Individuals
Who Are the Parents of U.S. Citizens or Permanent
Residents**

This memorandum is intended to reflect new policies for the use of deferred action. By memorandum dated June 15, 2012, Secretary Napolitano issued guidance entitled *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*. The following supplements and amends that guidance.

The Department of Homeland Security (DHS) and its immigration components are responsible for enforcing the Nation's immigration laws. Due to limited resources, DHS and its Components cannot respond to all immigration violations or remove all persons illegally in the United States. As is true of virtually every other law enforcement agency, DHS must exercise prosecutorial discretion in the enforcement of the law. Secretary Napolitano noted two years ago, when she issued her prosecutorial discretion guidance regarding children, that "[o]ur Nation's immigration laws must be enforced in a strong and sensible manner. They are not designed to be blindly enforced without consideration given to the individual circumstances of each case."

1
**App-4**

Deferred action is a long-standing administrative mechanism dating back decades, by which the Secretary of Homeland Security may defer the removal of an undocumented immigrant for a period of time.[1]  A form of administrative relief similar to deferred action, known then as "indefinite voluntary departure," was originally authorized by the Reagan and Bush Administrations to defer the deportations of an estimated 1.5 million undocumented spouses and minor children who did not qualify for legalization under the *Immigration Reform and Control Act* of 1986.  Known as the "Family Fairness" program, the policy was specifically implemented to promote the humane enforcement of the law and ensure family unity.

Deferred action is a form of prosecutorial discretion by which the Secretary deprioritizes an individual's case for humanitarian reasons, administrative convenience, or in the interest of the Department's overall enforcement mission.  As an act of prosecutorial discretion, deferred action is legally available so long as it is granted on a case-by-case basis, and it may be terminated at any time at the agency's discretion.  Deferred action does not confer any form of legal status in this country, much less citizenship; it simply means that, for a specified period of time, an individual is permitted to be lawfully present in the United States.  Nor can deferred action itself lead to a green card.  Although deferred action is not expressly conferred by statute, the practice is referenced and therefore endorsed by implication in several federal statutes.[2]

Historically, deferred action has been used on behalf of particular individuals, and on a case-by-case basis, for classes of unlawfully present individuals, such as the spouses and minor children of certain legalized immigrants, widows of U.S. citizens, or victims of trafficking and domestic violence.[3] Most recently, beginning in 2012, Secretary Napolitano issued guidance for case-by-case deferred action with respect to those who came to the United States as children, commonly referred to as "DACA."

---

[1]  Deferred action, in one form or another, dates back to at least the 1960s.  "Deferred action" per se dates back at least as far as 1975. *See*, Immigration and Naturalization Service, Operation Instructions § 103.1(a)(1)(ii) (1975).

[2]  INA § 204(a)(1)(D)(i)(II), (IV) *(Violence Against Women Act (VAWA) self-petitioners not in removal proceedings are "eligible for deferred action and employment authorization");* INA § 237(d)(2) *(DHS may grant stay of removal to applicants for T or U visas but that denial of a stay request "shall not preclude the alien from applying for . . . deferred action");* REAL ID Act of 2005 § 202(c)(2)(B)(viii), Pub. L. 109-13 *(requiring states to examine documentary evidence of lawful status for driver's license eligibility purposes, including "approved deferred action status");* National Defense Authorization Act for Fiscal Year 2004 § 1703(c) (d) Pub. L. 108-136 *(spouse, parent or child of certain U.S. citizen who died as a result of honorable service may self-petition for permanent residence and "shall be eligible for deferred action, advance parole, and work authorization").*

[3]  In August 2001, the former-Immigration and Naturalization Service issued guidance providing deferred action to individuals who were eligible for the recently created U and T visas.  Two years later, USCIS issued subsequent guidance, instructing its officers to use existing mechanisms like deferred action for certain U visa applicants facing potential removal.  More recently, in June 2009, USCIS issued a memorandum providing deferred action to certain surviving spouses of deceased U.S. citizens and their children while Congress considered legislation to allow these individuals to qualify for permanent residence status.

By this memorandum, I am now expanding certain parameters of DACA and issuing guidance for case-by-case use of deferred action for those adults who have been in this country since January 1, 2010, are the parents of U.S. citizens or lawful permanent residents, and who are otherwise not enforcement priorities, as set forth in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum.

The reality is that most individuals in the categories set forth below are hard-working people who have become integrated members of American society. Provided they do not commit serious crimes or otherwise become enforcement priorities, these people are extremely unlikely to be deported given this Department's limited enforcement resources—which must continue to be focused on those who represent threats to national security, public safety, and border security. Case-by-case exercises of deferred action for children and long-standing members of American society who are not enforcement priorities are in this Nation's security and economic interests and make common sense, because they encourage these people to come out of the shadows, submit to background checks, pay fees, apply for work authorization (which by separate authority I may grant), and be counted.

## A.   Expanding DACA

DACA provides that those who were under the age of 31 on June 15, 2012, who entered the United States before June 15, 2007 (5 years prior) as children under the age of 16, and who meet specific educational and public safety criteria, are eligible for deferred action on a case-by-case basis. The initial DACA announcement of June 15, 2012 provided deferred action for a period of two years. On June 5, 2014, U.S. Citizenship and Immigration Services (USCIS) announced that DACA recipients could request to renew their deferred action for an additional two years.

In order to further effectuate this program, I hereby direct USCIS to expand DACA as follows:

**Remove the age cap.** DACA will apply to all otherwise eligible immigrants who entered the United States by the requisite adjusted entry date before the age of sixteen (16), regardless of how old they were in June 2012 or are today. The current age restriction excludes those who were older than 31 on the date of announcement (*i.e.*, those who were born before June 15, 1981). That restriction will no longer apply.

**Extend DACA renewal and work authorization to three-years**. The period for which DACA and the accompanying employment authorization is granted will be extended to three-year increments, rather than the current two-year increments. This change shall apply to all first-time applications as well as all applications for renewal effective November 24, 2014. Beginning on that date, USCIS should issue all work

authorization documents valid for three years, including to those individuals who have applied and are awaiting two-year work authorization documents based on the renewal of their DACA grants.  USCIS should also consider means to extend those two-year renewals already issued to three years.

**Adjust the date-of-entry requirement.**  In order to align the DACA program more closely with the other deferred action authorization outlined below, the eligibility cut-off date by which a DACA applicant must have been in the United States should be adjusted from June 15, 2007 to January 1, 2010.

USCIS should begin accepting applications under the new criteria from applicants no later than ninety (90) days from the date of this announcement.

**B.     Expanding Deferred Action**

I hereby direct USCIS to establish a process, similar to DACA, for exercising prosecutorial discretion through the use of deferred action, on a case-by-case basis, to those individuals who:

- have, on the date of this memorandum, a son or daughter who is a U.S. citizen or lawful permanent resident;

- have continuously resided in the United States since before January 1, 2010;

- are physically present in the United States on the date of this memorandum, *and* at the time of making a request for consideration of deferred action with USCIS;

- have no lawful status on the date of this memorandum;

- are not an enforcement priority as reflected in the November 20, 2014 Policies for the Apprehension, Detention and Removal of Undocumented Immigrants Memorandum; and

- present no other factors that, in the exercise of discretion, makes the grant of deferred action inappropriate.

Applicants must file the requisite applications for deferred action pursuant to the new criteria described above.  Applicants must also submit biometrics for USCIS to conduct background checks similar to the background check that is required for DACA applicants.  Each person who applies for deferred action pursuant to the criteria above shall also be eligible to apply for work authorization for the period of deferred action, pursuant to my authority to grant such authorization reflected in section 274A(h)(3) of

4
**App-7**

App. 0009

**U.S. Department of Homeland Security**
20 Massachusetts Ave., NW
Washington, DC 20529



**U.S. Citizenship
and Immigration
Services**

# Interoffice Memorandum

To: Field Leadership

From: Donald Neufeld /s/
Acting Associate Director
Domestic Operations Directorate

From: Lori Scialabba /s/
Associate Director
Refugee, Asylum and International Operations Directorate

From: Pearl Chang /s/
Acting Chief
Office of Policy and Strategy

Date: May 6, 2009

Re: Consolidation of Guidance Concerning Unlawful Presence for Purposes of Sections
212(a)(9)(B)(i) and 212(a)(9)(C)(i)(I) of the Act

Revision to and Re-designation of *Adjudicator's Field Manual (AFM)* Chapter 30.1(d) as
Chapter 40.9 (*AFM* Update AD 08-03)

## 1. Purpose

Chapter 30.1(d) of the *Adjudicator's Field Manual* consolidates USCIS guidance to adjudicators
for determining when an alien accrues unlawful presence, for purposes of inadmissibility under
section 212(a)(9)(B) or (C) of the Immigration and Nationality Act. This memorandum re-
designates Chapter 30.1(d) of the *AFM* as chapter 40.9 of the *AFM*. This memorandum also
revises newly re-designated Chapter 40.9 to clarify the available guidance, and to incorporate
into Chapter 40.9 prior guidance that was issued after adoption of former Chapter 30.1(d) but not
incorporated into former Chapter 30.1(d).

USCIS intends *AFM* Chapter 40.9 to provide comprehensive guidance to adjudicators
concerning the accrual of unlawful presence and the resulting inadmissibility. Since Chapter
40.9 provides comprehensive guidance, the following prior memoranda are rescinded in their
entirety:

motion to reopen or reconsider during the voluntary departure period automatically terminates the grant of voluntary departure, and makes the alternative removal order effective immediately. Thus, for a grant of voluntary departure on or after January 20, 2009, the alien will no longer be protected from the accrual of unlawful presence beginning the day after the date the alien files a motion to reopen or to reconsider.

(I) **Aliens Granted Stay of Removal**. A stay of removal is an administrative or judicial remedy of temporary relief from removal. The grant of a stay of removal can be automatic or discretionary. *See* sections 240(b)(5) and 241(c)(2) of the Act; 8 CFR 241.6, 8 CFR 1241.6, 8 CFR 1003.6, and 8 CFR 1003.23(b)(1)(v). During a grant of stay of removal, DHS is prevented from executing any outstanding order of removal, deportation, or exclusion. Therefore, an alien granted stay of removal does not accrue unlawful presence during the period of the grant of stay of removal. A stay of removal does not erase any previously accrued unlawful presence.

If an individual is ordered removed in absentia pursuant to section 240(b)(5)(A) of the Act, and he or she challenges the order in a motion to rescind the in absentia order pursuant to section 240(b)(5)(C) of the Act, the alien's removal order will be stayed automatically until the motion is decided. *See* section 240(b)(5)(C) of the Act. The order will be stayed through a possible appeal to the Board of Immigration Appeals (BIA) or Federal court. *See Matter of Rivera-Claros*, 21 I&N Dec. 232 (BIA 1996). For purposes of section 212(a)(9)(B) and (C)(i)(I) of the Act, an individual, who filed a motion to rescind an in absentia order of removal pursuant to section 240(b)(5)(C) of the Act, will not accrue unlawful presence during the pendency of the motion, including any stages of appeal before the BIA or Federal court.

(J) **Aliens Granted Deferred Action**. A DHS field office director may, in his or her discretion, recommend deferral of (removal) action, an act of administrative choice in determining, as a matter of prosecutorial discretion, to give some cases lower enforcement priority. Deferred action is, in no way, an entitlement, and does not make the alien's status lawful. Deferred action simply recognizes that DHS has limited enforcement resources and that every attempt should be made administratively to utilize these resources in a manner which will achieve the greatest impact under the immigration laws. There is no specific authority for deferred action codified in law or regulation although certain types of benefits refer to a grant of deferred action. For more information on Deferred Action, please *see* Detention and Removal Operations Policy and Procedure Manual (DROPPM), Chapter 20.8.

Accrual of unlawful presence stops on the date an alien is granted deferred action and resumes the day after deferred action is terminated. The granting of deferred action does not eliminate any prior periods of unlawful presence.

(K) **Aliens Granted Withholding of Removal under Section 241(b)(3) of the Act or Deportation under Former Section 243 of the Act**. Accrual of unlawful presence



**U.S. Department of Justice**
Immigration and Naturalization Service

HQADN 70/21.1.24-P

Office of the Executive Associate Commissioner                *425 I Street NW*
                                                              *Washington, DC 20536*

JUN 1 2 2002

MEMORANDUM FOR REGIONAL DIRECTORS
                  DEPUTY EXECUTIVE ASSOCIATE COMMISSIONER,
                     IMMIGRATION SERVICES
                  GENERAL COUNSEL

FROM:       Johnny N. Williams
            Executive Associate Commissioner
            Office of Field Operations

SUBJECT:    Unlawful Presence

**Purpose**

        This memorandum addresses issues relating to the 3- and 10-year bars to admission under
section 212(a)(9)(B)(i)(I) and (II) of the Immigration and Nationality Act (Act) and the decision
to designate as a period of stay authorized by the Attorney General the entire period during
which an alien has been granted deferred action by the Immigration and Naturalization Service
(INS). This period of stay authorized by the Attorney General covers only the period during
which deferred action is in effect. It does not eliminate any unlawful presence that accrued
before the alien was granted deferred action.

        The decision to designate deferred action as a period of stay authorized by the
Attorney General does not in any way alter the nature of deferred action or the standards for
granting it. See Chapter 17.7 of the INS's Detention and Deportation Manual. Note that
Chapter 17.7(a) will be amended in the second paragraph to be consistent with the policy
guidance provided herein.

**App-10**

Memorandum for Regional Directors, et. al                          Page 2
Subject: Unlawful Presence

Any adjustment of status application that is pending denial or has been denied because of unlawful presence that the alien accrued while in deferred action status may be re-evaluated in light of this policy memorandum.

This memorandum also provides clarification on the period of stay authorized by the Attorney General with respect to applicants for temporary protected status (TPS) and deferred enforced departure (DED). These policies and procedures are effective immediately and will be included in the Adjudicator's Field Manual (AFM) in the next release of INSERTS.

For purposes of section 212(a)(9)(B)(ii) of the Act, and for no other purpose or benefit under the Act, the INS has designated the following as periods of stay authorized by the Attorney General:

- Current grants of voluntary departure;

- Current grants of deferred action in effect on or after April 1, 1997;

- Refugee status;

- Asylee status;

- Grants of withholding or deferral of removal under the United Nations Convention Against Torture;

- Legalization and special agricultural worker applications for lawful temporary residence which are pending through an administrative appeal;

- Grants of withholding or suspension of deportation, or cancellation of removal;

- Properly filed applications for temporary and permanent residence by Cuban-Haitian entrants under section 202(b) of Pub. L. 99-603 through administrative appeal;

- Current grants of TPS and DED. For TPS, the period of stay authorized by the Attorney General begins on the date a prima facie TPS application is filed with the Service, if that application is ultimately approved. If the TPS application is denied, or if the TPS application does not establish the alien's prima facie eligibility, unlawful presence begins accruing on the date the previous stay

Memorandum for  Regional Directors, et. al                              Page  3
Subject:  Unlawful Presence

          authorized by the Attorney General expired.   For DED, the period of stay
authorized by the Attorney General takes effect beginning on the date specified in
the Executive Order.  When TPS or DED are no longer in effect, the accrual of
unlawful presence resumes;

·     Properly filed, affirmative applications for adjustment of status under
section 245 of the Act [including section 245(i)], and properly filed, affirmative
registry applications under section 249 of the Act. The period of stay authorized
by the Attorney General continues if the application is denied and renewed in
proceedings, through review by the Board of Immigration Appeals. The alien
must, however, be eligible to renew the denied application in proceedings and
have a legal basis for renewing that application; and

·     Certain pending applications for extension of stay or change of status.

     Please direct any further questions relating to operational issues, through supervisory
channels, to Kathy Dominguez in Headquarters Office of Field Services Operations at
202-616-1050 or Danielle Lee in Headquarters Office of Service Center Operations at
202-305-8010.  Direct questions relating to policy issues, through supervisory channels, to
Sophia Cox in Headquarters Office of Adjudications at 202-514-4754.

**App-12**

Case 3:17-cv-05211-WHA   Document 277-1   Filed 07/02/18   Page 1 of 5

**U.S. Citizenship and Immigration Services**

**Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status**
Fiscal Year 2012-2018 (June 30, 2018)

| Period | Requests by Intake and Case Status | | | | | | |
|---|---|---|---|---|---|---|---|
| | Intake[1] | | | | Case Review[6] | | |
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Approved[7] | Denied[8] | Pending[9] |
| **Fiscal Year—Total** | | | | | | | |
| 2012 | 152,431 | 5,395 | 157,826 | 3,629 | 1,680 | - | 150,751 |
| 2013 | 427,617 | 16,350 | 443,967 | 1,697 | 470,351 | 10,968 | 97,025 |
| 2014 | 238,900 | 24,887 | 263,787 | 952 | 158,330 | 20,990 | 156,538 |
| 2014 Initial | 122,460 | 19,064 | 141,524 | 488 | 136,100 | 20,987 | 62,333 |
| 2014 Renewal | 116,440 | 5,823 | 122,263 | 464 | 22,230 | 3 | 94,205 |
| 2015 | 448,857 | 35,474 | 484,331 | 1,781 | 509,969 | 21,350 | 73,902 |
| 2015 Initial | 85,304 | 7,150 | 92,454 | 338 | 90,633 | 19,069 | 37,861 |
| 2015 Renewal | 363,553 | 28,324 | 391,877 | 1,443 | 419,336 | 2,281 | 36,041 |
| 2016 | 260,701 | 12,317 | 273,018 | 1,035 | 198,537 | 14,435 | 120,708 |
| 2016 Initial | 73,351 | 1,151 | 74,502 | 291 | 52,707 | 11,399 | 46,236 |
| 2016 Renewal | 187,350 | 11,166 | 198,516 | 744 | 145,830 | 3,036 | 74,472 |
| 2017 | 472,850 | 43,455 | 516,305 | 1,884 | 462,322 | 13,304 | 117,536 |
| 2017 Initial | 45,597 | 44 | 45,641 | 182 | 47,283 | 9,237 | 35,205 |
| 2017 Renewal | 427,253 | 43,411 | 470,664 | 1,702 | 415,039 | 4,067 | 82,331 |
| 2018 | 161,139 | 24,385 | 185,524 | 857 | 232,696 | 9,416 | 36,393 |
| 2018 Initial | 1,635 | 2 | 1,637 | 9 | 22,202 | 5,923 | 8,700 |
| 2018 Renewal | 159,504 | 24,383 | 183,887 | 848 | 210,494 | 3,493 | 27,693 |
| Total Cumulative | 2,162,495 | 162,263 | 2,324,758 | 1,454 | 2,033,885 | 90,463 | 36,393 |
| Total Cumulative Initial | 908,395 | 49,156 | 957,551 | 611 | 820,956 | 77,583 | 8,700 |
| Total Cumulative Renewal | 1,254,100 | 113,107 | 1,367,207 | 843 | 1,212,929 | 12,880 | 27,693 |

Case 3:17-cv-05211-WHA   Document 277-1   Filed 07/02/18   Page 2 of 5

### Requests by Intake and Case Status

| Period | Intake[1] | | | Average Accepted/Day[5] | Approved[7] | Case Review[6] | Pending[9] |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | | | Denied[8] | |
| **Fiscal Year 2018 by Quarter** | | | | | | | |
| Q1. October - December | 29,527 | 14,537 | 44,064 | 1,139 | 98,633 | 2,542 | 45,863 |
| Q1. October - December Initial | 95 | 1 | 96 | 4 | 5,585 | 1,661 | 28,051 |
| Q1. October - December Renewal | 29,432 | 14,536 | 43,968 | 1,135 | 93,048 | 881 | 17,812 |
| Q2. January-March[10] | 64,501 | 6,239 | 70,740 | 1,141 | 55,040 | 3,899 | 51,347 |
| Q2. January - March Initial[10] | 975 | - | 975 | 17 | 9,635 | 2,151 | 17,234 |
| Q2. January - March Renewal[10] | 63,526 | 6,239 | 69,765 | 1,123 | 45,405 | 1,748 | 34,113 |
| Q3. April - June | 67,111 | 3,609 | 70,720 | 1,049 | 79,023 | 2,975 | 36,393 |
| Q3. April - June Initial | 565 | 1 | 566 | 9 | 6,982 | 2,111 | 8,700 |
| Q3. April - June Renewal | 66,546 | 3,608 | 70,154 | 1,040 | 72,041 | 864 | 27,693 |

D - Data withheld to protect requestors' privacy.

- Represents zero.

[1] Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described in the Secretary of Homeland Security's memorandum issued June 15, 2012.

  Each request is considered on a case-by-case basis.

  See http://www.uscis.gov/childhoodarrivals.

[2] The number of new requests accepted at a Lockbox during the reporting period.

[3] The number of requests rejected at a Lockbox during the reporting period.

[4] The number of requests that were received at a Lockbox during the reporting period.

[5] The number of requests accepted per day at a Lockbox as of the end of the reporting period. Also note the average accepted per day for initial plus renewal will not equal the total average.

[6] The number of new requests received and entered into a case-tracking system during the reporting period.

[7] The number of requests approved during the reporting period.

[8] The number of requests that were denied, terminated, or withdrawn during the reporting period.

[9] The number of requests awaiting a decision as of the end of the reporting period.

[10] The overall number of receipts for Q2 remains consistent with the March 31, 2018 report.  USCIS has adjusted the number of "initial" and "renewal" requests for certain necessary reclassifications of those requests.

NOTE: 1. Some requests approved or denied may have been received in previous reporting periods.

  2. The report reflects the most up-to-date estimate available at the time the report is generated.

3. USCIS previously discovered that the query code used to generate this report had some flaws affecting the data in the "Pending" fields, such that the data in this field was over inclusive because it included cases that were not pending (e.g., cases that had been administratively closed or withdrawn). USCIS believes that it has corrected this issue in the query code and that this report provides a more accurate reflection of pending cases. Note that if this report is compared to versions prior to the March 31, 2018 version that USCIS has published on its website, the prior versions reflect over inclusive data in the "Pending" fields.

4. The Quarterly Report totals may not match the totals provided within the Demographics Reports due to differences in how the data is generated.

Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigration Services Centralized Operation Repository (eCISCOR), June 2018

**App-14**

| Top Countries of Origin | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Grand Total | 908,395 | 1,254,100 | 2,162,495 | 820,956 | 1,212,929 | 2,033,885 |
| Mexico | 707,490 | 984,153 | 1,691,643 | 646,612 | 952,378 | 1,598,990 |
| El Salvador | 34,496 | 47,851 | 82,347 | 29,600 | 46,154 | 75,754 |
| Guatemala | 24,907 | 31,507 | 56,414 | 20,849 | 30,302 | 51,151 |
| Honduras | 22,697 | 29,762 | 52,459 | 19,051 | 28,742 | 47,793 |
| Peru | 9,831 | 14,945 | 24,776 | 9,269 | 14,447 | 23,716 |
| South Korea | 7,903 | 15,129 | 23,032 | 7,413 | 14,489 | 21,902 |
| Brazil | 8,628 | 11,359 | 19,987 | 7,589 | 11,033 | 18,622 |
| Ecuador | 7,796 | 10,678 | 18,474 | 6,857 | 10,291 | 17,148 |
| Colombia | 7,297 | 10,382 | 17,679 | 6,723 | 10,056 | 16,779 |
| Phillippines | 5,127 | 7,830 | 12,957 | 4,778 | 7,619 | 12,397 |
| Argentina | 5,263 | 7,223 | 12,486 | 4,930 | 7,016 | 11,946 |
| India | 3,788 | 5,615 | 9,403 | 3,245 | 5,390 | 8,635 |
| Jamaica | 4,449 | 5,004 | 9,453 | 3,514 | 4,859 | 8,373 |
| Venezuela | 3,489 | 4,855 | 8,344 | 3,179 | 4,705 | 7,884 |
| Dominican Republic | 3,844 | 4,250 | 8,094 | 3,257 | 4,131 | 7,388 |
| Uruguay | 2,643 | 3,410 | 6,053 | 2,471 | 3,317 | 5,788 |
| Bolivia | 2,239 | 3,352 | 5,591 | 2,113 | 3,249 | 5,362 |
| Costa Rica | 2,290 | 3,193 | 5,483 | 2,095 | 3,094 | 5,189 |
| Poland | 2,007 | 2,701 | 4,708 | 1,860 | 2,614 | 4,474 |
| Chile | 1,908 | 2,762 | 4,670 | 1,791 | 2,675 | 4,466 |
| Pakistan | 1,949 | 2,715 | 4,664 | 1,724 | 2,620 | 4,344 |
| Nicaragua | 1,908 | 2,445 | 4,353 | 1,652 | 2,356 | 4,008 |
| Tobago | 2,442 | 1,717 | 4,159 | 2,095 | 1,704 | 3,799 |
| Guyana | 1,487 | 1,984 | 3,471 | 1,297 | 1,927 | 3,224 |
| Not Reported | 1,605 | 1,786 | 3,391 | 1,255 | 1,648 | 2,903 |
| All Others | 30,912 | 37,492 | 68,404 | 25,737 | 36,113 | 61,850 |

D Data withheld to protect requestors' privacy.

- Represents zero.

[1] The number of requests that were accepted to date of the reporting period.

[2] The number of requests that were approved to date of the reporting period.

[3] All fields with a blank in the country of birth field are included in the field "not reported."

NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate data available at the time the report is generated.

3) Ranked by total approvals.

Source: Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigration Services Centralized Operation Repository (eCISCOR), June 2018

**App-15**

Case 3:17-cv-05211-WHA   Document 277-1   Filed 07/02/18   Page 4 of 5

| Residence | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Grand Total | 908,395 | 1,254,100 | 2,162,495 | 820,956 | 1,212,929 | 2,033,885 |
| California | 246,431 | 279,316 | 525,747 | 228,789 | 275,018 | 503,807 |
| Texas | 142,771 | 149,297 | 292,068 | 127,296 | 147,171 | 274,467 |
| New York | 51,571 | 91,473 | 143,044 | 45,101 | 89,873 | 134,974 |
| Florida | 41,686 | 75,537 | 117,223 | 35,482 | 74,323 | 109,805 |
| Illinois | 46,330 | 49,676 | 96,006 | 43,360 | 48,801 | 92,161 |
| New Jersey | 26,542 | 41,523 | 68,065 | 23,381 | 40,846 | 64,227 |
| Arizona | 31,064 | 31,981 | 63,045 | 28,429 | 31,341 | 59,770 |
| North Carolina | 29,908 | 29,201 | 59,109 | 27,820 | 28,720 | 56,540 |
| Georgia | 29,087 | 30,819 | 59,906 | 24,840 | 30,270 | 55,110 |
| Washington | 20,010 | 23,465 | 43,475 | 18,425 | 23,099 | 41,524 |
| Colorado | 19,377 | 19,249 | 38,626 | 17,634 | 18,908 | 36,542 |
| Virginia | 14,377 | 21,516 | 35,893 | 12,779 | 21,117 | 33,896 |
| Nevada | 14,351 | 16,148 | 30,499 | 13,353 | 15,906 | 29,259 |
| Maryland | 11,868 | 17,921 | 29,789 | 10,333 | 17,613 | 27,946 |
| Massachusetts | 9,974 | 19,608 | 29,582 | 8,624 | 19,260 | 27,884 |
| Oregon | 12,225 | 12,713 | 24,938 | 11,518 | 12,501 | 24,019 |
| Pennsylvania | 7,493 | 14,848 | 22,341 | 6,456 | 14,603 | 21,059 |
| Indiana | 10,849 | 10,863 | 21,712 | 10,038 | 10,704 | 20,742 |
| Utah | 10,633 | 9,822 | 20,455 | 9,859 | 9,651 | 19,510 |
| Michigan | 7,587 | 12,189 | 19,776 | 6,803 | 11,951 | 18,754 |
| Tennessee | 9,445 | 9,649 | 19,094 | 8,520 | 9,488 | 18,008 |
| Minnesota | 7,127 | 9,861 | 16,988 | 6,516 | 9,663 | 16,179 |
| Wisconsin | 8,261 | 8,436 | 16,697 | 7,738 | 8,314 | 16,052 |
| Connecticut | 5,866 | 9,543 | 15,409 | 5,240 | 9,383 | 14,623 |
| Oklahoma | 7,573 | 7,763 | 15,336 | 7,007 | 7,662 | 14,669 |
| Kansas | 7,403 | 7,487 | 14,890 | 6,943 | 7,371 | 14,314 |
| New Mexico | 7,505 | 6,953 | 14,458 | 6,954 | 6,858 | 13,812 |
| South Carolina | 7,267 | 7,197 | 14,464 | 6,558 | 7,078 | 13,636 |
| Ohio | 5,484 | 8,882 | 14,366 | 4,743 | 8,703 | 13,446 |
| Arkansas | 5,680 | 5,520 | 11,200 | 5,200 | 5,425 | 10,625 |
| Alabama | 4,870 | 4,931 | 9,801 | 4,376 | 4,857 | 9,233 |
| Missouri | 3,995 | 5,281 | 9,276 | 3,686 | 5,204 | 8,890 |
| Nebraska | 3,852 | 4,284 | 8,136 | 3,488 | 4,206 | 7,694 |
| Kentucky | 3,523 | 4,162 | 7,685 | 3,155 | 4,097 | 7,252 |
| Iowa | 3,217 | 4,224 | 7,441 | 2,899 | 4,143 | 7,042 |
| Idaho | 3,430 | 3,592 | 7,022 | 3,205 | 3,532 | 6,737 |
| Louisiana | 2,496 | 3,730 | 6,226 | 2,159 | 3,672 | 5,831 |
| Rhode Island | 1,510 | 2,941 | 4,451 | 1,321 | 2,885 | 4,206 |
| Hawaii | 861 | 3,458 | 4,319 | 705 | 3,391 | 4,096 |
| Delaware | 1,645 | 2,098 | 3,743 | 1,499 | 2,074 | 3,573 |

**App-16**

| | | | | | |
|---|---|---|---|---|---|
| Mississippi | 1,725 | 1,896 | 3,621 | 1,504 | 1,879 | 3,383 |
| District of Columbia | 988 | 2,019 | 3,007 | 838 | 1,992 | 2,830 |
| Puerto Rico | 575 | 2,261 | 2,836 | 422 | 2,220 | 2,642 |
| New Hampshire | 480 | 1,197 | 1,677 | 418 | 1,171 | 1,589 |
| Wyoming | 699 | 703 | 1,402 | 628 | 689 | 1,317 |
| Alaska | 216 | 872 | 1,088 | 178 | 860 | 1,038 |
| South Dakota | 316 | 546 | 862 | 275 | 535 | 810 |
| Maine | 148 | 634 | 782 | 123 | 618 | 741 |
| Guam | 115 | 649 | 764 | 94 | 637 | 731 |
| North Dakota | 151 | 571 | 722 | 121 | 562 | 683 |
| Virgin Islands | 168 | 420 | 588 | 112 | 404 | 516 |
| West Virginia | 160 | 380 | 540 | 133 | 372 | 505 |
| Montana | 93 | 287 | 380 | 80 | 277 | 357 |
| Vermont | 66 | 307 | 373 | 50 | 304 | 354 |
| Armed Forces-Pacific | 33 | 146 | 179 | 29 | 142 | 171 |
| Armed Forces-Europe, Middle East, Africa, Canada | 28 | 129 | 157 | 21 | 124 | 145 |
| Armed Forces-Americas (except Canada) | 19 | 84 | 103 | 14 | 84 | 98 |
| Northern Mariana Islands | 32 | 39 | 71 | 13 | 35 | 48 |
| Palau | 20 | 20 | 20 | | 19 | 19 |
| Not Reported | 17,239 | 163,783 | 181,022 | 13,671 | 140,323 | 153,994 |

- Represents zero.

[1] The number of requests that were accepted to date of the reporting period.

[2] The number of requests that were approved to date of the reporting period.

[3] All fields with less than 10 or a blank in the state field are included in the field "not reported."

NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate data available at the time the report is generated.

3) Ranked by total approvals.

Source: Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigration Services Centralized Operation Repository (eCISCOR), June 2018

Case 3:17-cv-05211-WHA   Document 277-1   Filed 07/02/18   Page 5 of 5

| 111TH CONGRESS | HOUSE OF REPRESENTATIVES | REPORT |
| 1st Session | | 111–157 |

# DEPARTMENT OF HOMELAND SECURITY APPROPRIATIONS BILL, 2010

---

JUNE 16, 2009.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

Mr. PRICE of North Carolina, from the Committee on Appropriations, submitted the following

# R E P O R T

together with

# ADDITIONAL VIEWS

[To accompany H.R. 2892]

The Committee on Appropriations submits the following report in explanation of the accompanying bill making appropriations for the Department of Homeland Security for the fiscal year ending September 30, 2010.

### INDEX TO BILL AND REPORT

| | Page number Bill | Report |
|---|---|---|
| **TITLE I—DEPARTMENTAL MANAGEMENT AND OPERATIONS** | | |
| Office of the Secretary and Executive Management | 2 | 14 |
| Office of the Under Secretary for Management | 2 | 20 |
| Office of the Chief Financial Officer | 3 | 24 |
| Office of the Chief Information Officer | 3 | 26 |
| Analysis and Operations | 4 | 28 |
| Office of the Federal Coordinator for Gulf Coast Rebuilding | 4 | 29 |
| Office of Inspector General | 5 | 30 |
| **TITLE II—SECURITY, ENFORCEMENT, AND INVESTIGATIONS** | | |
| U.S. Customs and Border Protection | 5 | 32 |
| Salaries and Expenses | 5 | 32 |
| Automation Modernization | 7 | 40 |
| Border Security Fencing, Infrastructure, and Technology | 7 | 41 |
| Air and Marine Interdiction, Operations, Maintenance, and Procurement | 14 | 46 |

50–276

7

quested. These funds will support expansion of critical ICE efforts to target the cartels, such as the Border Enforcement Security Task Force (BEST) initiative; Southwest Border intelligence analysis; criminal gang, drug, weapons smuggling and human trafficking investigations; and Mexico-based investigatory agents who will coordinate U.S. efforts with Mexican law enforcement agencies.

The bill also includes $732,000,000 for the Border Security Fencing, Infrastructure, and Technology (BSFIT) appropriation, of which $692,000,000 is for Southwest Border investments. This will bring total BSFIT funding for the Southwest Border to $4.3 billion since the program began in 2006. The Committee expects this funding to be used for the testing, validation, and deployment of technological solutions for border security, including additional tactical communications capability for the Border Patrol. This sizable appropriation should help maintain and operate the substantial infrastructure investment already placed on the Southwest Border. The bill also provides the resources for the Department to employ the most effective means of environmental planning and mitigation in the execution of the Secure Border Initiative along the Southwest Border.

*Northern Border.*—The Committee strongly supports efforts to secure the 4,000 miles of the sparsely populated, often remote Northern Border between Canada and the 48 continental States, which presents unique challenges. The Committee includes full funding for Border Patrol staffing and recruitment efforts to bring the number of agents stationed along the border to 2,212 by 2010. This will amount to more than six times the 350 agents stationed on that border in 2001 and an increase of more than 140 percent above the number stationed there in 2006.

Technological solutions are essential in this vast area, and the Committee includes an additional $40,000,000 in BSFIT funding as requested to continue investments in mobile and remote video surveillance systems. The Committee also supports the effort to integrate all CBP technology investment along the border, to include legacy systems of monitors, sensors, and communications. As CBP Air and Marine is a key part of the effort to maintain operational control of the Northern Border, the Committee includes the funding requested to add 144 new pilots, interdiction agents, and mission support staff to enable full staffing for the new air branches established along the Northern Border.

In addition, the Committee observes that ARRA included $420,000,000 in new funding to rebuild and upgrade CBP-owned ports of entry. Most of those are on the Northern Border, and the Committee will be carefully monitoring those projects to ensure they are on time and within budget. Related to this, the Committee provides $140,000,000 for the Western Hemisphere Travel Initiative, including $16,000,000 for new initiatives such as communications and outreach for the 2010 Vancouver Olympics, auditing enhanced drivers licenses, and improving the technical infrastructure at ports of entry to expedite secure processing for passengers and pedestrians.

### SETTING IMMIGRATION PRIORITIES

*Immigration Enforcement.*—In fiscal year 2008, DHS's immigration agencies set several new records: deporting the most people in

**App-19**

8

any year in U.S. history (369,409); holding more people in immigration detention per day than ever before (30,429); and initiating 1,191 worksite enforcement investigations that resulted in 6,287 arrests, the largest numbers since the formation of DHS. These figures reflect the billions of dollars the Committee has invested in immigration enforcement activities since 2003. But rather than simply rounding up as many illegal immigrants as possible, which is sometimes achieved by targeting the easiest and least threatening among the undocumented population, DHS must ensure that the government's huge investments in immigration enforcement are producing the maximum return in actually making our country safer. A closer examination of the data may give some pause:

- Since 2002, ICE has increased the deportation of non-criminals by 400 percent, while criminal deportations have only gone up 60 percent.
- Of the nearly 370,000 deported by ICE in fiscal year 2008, less than a third, or 114,358, were ever convicted of a criminal offense. This, despite the fact that up to 450,000 criminals eligible for deportation are in penal custody in any given year, according to ICE estimates.
- Less than one-quarter of those interdicted by ICE's Fugitive Operations Teams last year were actually convicted of criminal offenses.
- Over three-quarters of those arrested in ICE worksite enforcement raids last year were not charged with any crime.

Since 2007, the Committee has emphasized how ICE should have no higher immigration enforcement priority than deporting those who have proved their intent to do harm and have been convicted of serious crimes. In fiscal year 2008, ICE received $200 million to identify incarcerated criminal aliens and remove them once judged deportable. In fiscal year 2009, ICE was directed to use $1 billion of its resources to identify and remove aliens convicted of crimes, whether in custody or at large, and the Congress mandated this be ICE's number one mission. In this bill, the Committee directs ICE to use $1.5 billion of its budget to expand efforts to locate and remove those criminal aliens who have proved they are a threat to our communities.

Over the past 18 months, ICE has developed a promising collaborative approach, working with State and local law enforcement agencies to streamline the identification of individuals who have been convicted of serious crimes and who may be in the country illegally. Known as "Secure Communities," this program allows local law enforcement agencies to check the fingerprints of individuals booked on criminal charges against both national criminal and immigration databases. It is planned for nation-wide deployment by 2011. When individuals are identified as illegally present in the United States, ICE can take appropriate steps to ensure the most dangerous of these criminals are deported upon completion of their jail sentences, while those convicted of lesser crimes are identified and deported as resources allow. This approach respects the traditional separation of local law enforcement responsibilities from the Federal role of enforcing immigration law, and requires no specialized training in Federal immigration law for local officials. The Committee is optimistic that Secure Communities will eventually prove more effective than many of the agreements ICE has estab-

9

lished to delegate immigration enforcement authority to local patrol officers. The Committee also encourages ICE to ensure it is consistently measuring the results of Secure Communities deployments and other State and local partnerships so that these different approaches can be adequately evaluated in the future.

*Effective and Humane Immigration Detention.*—The ICE detention program has expanded dramatically since the creation of the Department of Homeland Security, from an average daily capacity of 19,922 in 2002 to 33,400 in 2009, an increase of more than 67 percent. Based on recent and repeated reports about detainee deaths that appear to have been preventable, the Committee is concerned that ICE has not made adequate improvements in programs that manage and oversee ICE detention activities, particularly those that ICE procures through contracts. Certainly not every death is preventable or avoidable. However, the incidence of deaths among ICE detainees, as well as the conditions under which some of these deaths occurred, raises serious questions about the health care provided by ICE for those it detains and whether the individuals who died were given appropriate and timely medical attention. When ICE holds individuals in federal custody, it has a responsibility to treat those people fairly and humanely, and to provide access to necessary medical care when requested. Unfortunately, ICE and the local and contract prisons it uses to detain illegal immigrants do not always seem able or willing to fulfill that responsibility.

Last year, Congress provided $2,000,000 for ICE and the DHS Office of Health Affairs to hire outside experts to review the ICE medical system and offer recommendations on how it could be improved. The Committee is disappointed that it took ICE more than six months to award the contract for this study, and as a result, that evaluation has not yet been completed. This year, the Committee provides $8,800,000 to expand ICE detention oversight in its field offices and $20,400,000 to initiate acquisition of an electronic health records system for ICE detainees. In addition, the Committee denies a request from ICE to authorize the sale of Federally-owned detention centers to pay for consolidation of ICE field offices, which would result in all ICE detention being provided as a contracted service. The Committee believes this proposal is unwise given the serious questions about ICE's ability to oversee the health care provided to its detainees at some contract facilities. Until ICE is able to prove that it can adequately oversee compliance with detention standards, including the delivery of timely and appropriate medical care by all of its detention contractors, the Committee will not support the liquidation of Federal detention facilities.

*Ensuring a Legal Workforce.*—United States Citizenship and Immigration Services (USCIS) created and maintains an internet-based system through which employers can verify the work eligibility of their new hires. As of May 2009, USCIS had enrolled over 125,000 companies in this system, which is commonly known as E-Verify. The Committee continues to recognize the need for a voluntary computer-based employment verification system, and therefore provides $112,000,000 for the on-going operation, maintenance and enhancement of the E-Verify system. In addition, the Com-

# Calendar No. 282

| 99TH CONGRESS<br>1st Session | SENATE | REPORT<br>99-132 |
|---|---|---|

# IMMIGRATION REFORM AND CONTROL ACT OF 1985

---

## R E P O R T

together with

### MINORITY VIEWS

OF THE

## COMMITTEE ON THE JUDICIARY UNITED STATES SENATE

ON

## S. 1200, as amended



AUGUST 28, 1985.—Ordered to be printed

Under authority of the order of the Senate of August 1 (legislative day, July 16), 1985

---

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1985



16

vided, however, that certain Cuban and Haitian nationals
covered by the legalization will continue to qualify for special benefits.

The bill provides for Federal payment to States of up to $[...] million per year for 3 years, in the form of a capped entitlement program, for the purpose of reimbursing them for the cost of assistance expended as a result of the legalization program, or the cost of incarcerating certain illegal aliens convicted of crimes.

Persons convicted of certain crimes, Nazis and others who have persecuted others, Communists, anarchists, aliens those seeking to overthrow the government, and persons who become public charges, will be excluded from legalization. Most other classes of excludable aliens can qualify, unless a waiver is obtained. For further discussion-by-section analysis relating to section 202.

We seek two major goals through legalization.
The first is to avoid wasteful use of the resources. The legalization Service's limited enforcement resources. States is unlikely to obtain at much money from the Immigration and Naturalization Service, who must deport those who have become well-settled here than to prevent new illegal entry of aliens.

The second is to eliminate an illegal underground society. Not only does their illegal status and uncertain gaining position cause these people to tolerate substandard working conditions, but it also hinders the conditions through them, that of legal residents through the origin. Thus they remain a fearful and exploitable group within the U.S. society.

It is the intent of the Committee that legalized aliens will obtain no special benefits as a result of legalization. They will be required to qualify in the same manner as immediate family members of citizens.

The Committee reiterates that legalization is a "one-time only" program to address a problem that has developed. Future illegal immigration of the same type and on the same scale should be prevented from occurring through employer sanctions and increased enforcement.

**(3) TITLE III—OTHER CHANGES**

The annual legal immigrant quota will be increased from 600 to 5,000. This will reduce the backlog of approved petitions for persons born in Hong Kong.

The bill authorizes the Attorney General and the State jointly to establish a 3-year pilot program to request in the immigration of non-immigrants and cut consular processing of non-immigrant visas. [...]

# IMMIGRATION ACT OF 1989
# (PART 2)

# HEARINGS

**BEFORE THE**

## SUBCOMMITTEE ON IMMIGRATION, REFUGEES, AND INTERNATIONAL LAW

**OF THE**

## COMMITTEE ON THE JUDICIARY
## HOUSE OF REPRESENTATIVES

ONE HUNDRED FIRST CONGRESS

SECOND SESSION

ON

## S. 358, H.R. 672, H.R. 2448, and H.R. 2646

IMMIGRATION ACT OF 1989

FEBRUARY 21, 1990

## Serial No. 21



Printed for the use of the Committee on the Judiciary

**U.S. GOVERNMENT PRINTING OFFICE**

27-565 ± ᵻ          **WASHINGTON : 1990**

*H521-35*

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402

48

Mr. LYMAN. We made our decisions on the Vienna-Rome pipeline and improving processing in Moscow, not based on the implications for emigration to Israel. We did it to improve and increase the processing to the United States. We were encouraged by the negotiations that were going on in terms of the general process of freedom of emigration, but it was not a premise of our own decisions.

To answer your second question, we also are very disturbed about the signs of anti-Semitism. It is of great concern. It has been written about now in the press, et cetera, and it has been raised in our conversations with the Soviet Government, and I think it is a major factor in the increased applications for immigration that we are seeing, as well as Israel and other countries.

Mr. SCHUMER. Right.

Mr. LYMAN. Now as to the question of leverage——

Mr. SCHUMER. Just let me—and I'm sorry—but just to follow up on that second question, have we asked the Soviet Government? Mr. Gorbachev has been somewhat silent—not "somewhat," strike "somewhat"—silent on this issue. As I understand it, there have been very few of the Soviet leadership who have simply spoken out against anti-Semitism. The emigrees and others in the Soviet Union say that speaking out would be very important because everything is in such a state of flux. When Pamyat and these other organizations do what they are doing, no one is sure if this is OK or not OK, et cetera. Have we asked the Soviet Government, in whatever diplomatic way is appropriate, to speak out on this issue?

Mr. LYMAN. Yes.

Mr. SCHUMER. What was the answer?

Mr. LYMAN. I don't know if they gave us a specific answer at the time, but we have made this point more than once.

Mr. SCHUMER. OK, and finally the third, if you could just answer the third question.

Mr. LYMAN. I think that, first and foremost, we have been encouraging and pressing the Soviet Union to continue its liberalization of emigration. A very important law is up now for final passage, and we want to see that law passed which will put into final form the freedom of emigration. We think that is critically important.

Mr. SCHUMER. So do I.

Mr. LYMAN. We have also made clear the distinction, on the point you have made, which is the distinction between the right to emigrate, and indeed for people to emigrate to Israel, and the settlement on the West Bank which we have come out against also. We have made that distinction very important.

We think, in terms of the specifics as to how the arrangements ought to go, that the negotiations going on between the Israel Government and the Soviet Union may be the best way to address this for the time being, and those discussions continue.

Mr. SCHUMER. So, in sum, you feel at this point that pressure from the United States or the State Department will not help?

Mr. LYMAN. Additional pressure I don't think will help.

Mr. SCHUMER. Thank you, Mr. Chairman.

Mr. MORRISON. For the information of the subcommittee, we will be called back into joint session shortly to hear the remarks of the President of Czechoslovakia. We have to make a decision on wheth-

49

er we are going to proceed with the hearing or whether we are going to take a break.

I am prepared to go either way. We do have a hearing at 1 o'clock, jointly with the Education and Labor Committee, with the Labor Department, so that we are operating under some time constraints. I don't know. The gentleman from Texas expressed the hope we might take a break. If people are here and want to continue, and don't plan to go to the floor, what is the pleasure of the membership?

Mr. McCOLLUM. I am here and I would like to continue, at least for my questions.

Mr. MORRISON. I think then we will, if there is no objection to our continuing, continue. Members that wish to go, we will keep going, and when and if they return, assuming we are still going, they can ask questions at that point.

The gentleman from Florida.

Mr. BERMAN. It is safe to say that we will be going. One would not risk not having the hearing continuing when one came back, I think.

Mr. MORRISON. One can make no commitments as to how long members will ask questions.

Mr. BERMAN. But a judgment of a typical hearing of this subcommittee in the recent——

Mr. MORRISON. Oh, but this is a new year, however. You never know.

[Laughter.]

Mr. MORRISON. The gentleman from Florida.

Mr. McCOLLUM. Thank you very much, Mr. Chairman.

Mr. MORRISON. Mr. Berman has waived his right to question.

[Laughter.]

Mr. McCOLLUM. I want to be sure of these legal technicalities with regard to rights. You have to listen very carefully.

Mr. McNary, I want to pursue some of the questions that were raised in your testimony and in some of the earlier questioning about the immediate family relatives. I am interested particularly in seeing if we can put some data on the record that is sort of implied but not in detail here in your testimony.

You say that under the House bills, almost overnight, if we convert the second preference to immediate relatives, the vast majority of the 400,000 second preference visa applicants currently awaiting quota numbers would be immediate relatives. They would be immediately brought in, plus most of the immediate relatives legalized under the provisions of the Immigration Reform and Control Act of 1986 would be come eligible for immediate issuing of immigrant visas.

Do you have any idea, any estimates of how many people we are talking about who are the immediate relatives legalized under the IRCA Act? You know, we are talking about 400,000 under the second preference right now. What kind of numbers are we talking about in addition to that?

Mr. McNARY. Well, we are talking about 1.5 million under IRCA. We have roughly 20 million green cards out.

Mr. McCOLLUM. That sounds like a lot of people.

50

Mr. McNARY. That must be with families. It is 7.5 million, actually.

Mr. SCHUMER. Only 150,000 people but 20 million green cards.

[Laughter.]

Mr. McCOLLUM. The data over there is from Schumer & Co.

The point is, though, that you are talking about a larger group by quite a few numbers, at least multiples, than simply the 400,000 that are backlogged in the second preference, who would become immediately eligible under the immediate relative category if we passed a law changing it in the fashion that is suggested by some of these bills. That is correct.

Mr. McNARY. Yes, sir.

Mr. McCOLLUM. I am also interested in obtaining some further amplification and clarification on your comments regarding the changing of the fifth preference. I am a little confused about that, and I don't think we ought to let the record go without it being very clear what the administration is proposing in that regard.

You are talking about reducing some of the visas assigned to the fifth preference, and you say during fiscal year 1987 only 34 percent of fifth preference visas were issued to brothers or sisters of citizens, while 66 percent of them were issued to immediate family members of these brothers and sisters—that is, brothers-in-law, nieces, nephews, those sort of folks. Now are you envisioning that we whack away, somehow, in whatever law we pass, at that 66 percent of the brothers-in-law, the nieces and the nephews? I mean, that seems to be what you are implying here when you say that the reduction of fifth preference ought to be where we gain some of the numbers for new second preference or for immediate relatives.

Mr. McNARY. Yes, sir. We believe that it is more important to focus on the nuclear family and the immediate family relatives, rather than these distant relations.

Mr. McCOLLUM. Well, would you propose we specifically write that in the law, or give you at INS discretion, or how would we go about doing that?

Mr. McNARY. Well, you could control the numbers that are available in the fifth preference and just move those numbers to the second preference. That would take care of it, by and large—or even eliminate the fifth preference.

Mr. McCOLLUM. Well, the thing maybe I am not clear on—and maybe that is what we would be doing under this— would we take the 34 percent that are issued currently under fifth preference to brothers or sisters of citizens and move them to second preference? In other words, you want to put some emphasis on the brothers and sisters of citizens. Are you proposing we move out of fifth preference those who are brothers and sisters of citizens? See, I am not clear on how——

Mr. McNARY. I guess we are—you know, these are very nebulous numbers, but no, I suppose that offhand we would move the 66 percent that are going to brothers and sisters-in-law to the second preference, but we are not locked into any particular numbers.

Mr. McCOLLUM. In other words, it is a concept you are expressing rather than any specific proposal. I want to be sure of that.

Mr. BERMAN. Say that again. Ninety?

Mr. OGDEN. Ninety percent. We did send a letter to the committee with that result last year, at some point.

Mr. BERMAN. What is the 90-percent figure?

Mr. OGDEN. Ninety percent of the people on the waiting list are seriously pursuing their immigrant visas.

Mr. FISH. Thank you, Mr. Chairman.

Mr. MORRISON. Just a ~~comment,~~ as we get into these numbers: In the absence of any real rationale for what the number is or ought to be, other than that is what the number has been for the last 25 years, it is very hard to take seriously this kind of a movement, that we have to clamp down a little bit on fifth preference.

I mean, if it is a demand-driven situation, obviously the demand on the fifth preference is overwhelming compared to the availability. If it is demand-driven, the demand on the second preference is very large compared to what we can do.

If it is not demand-driven, if it is in some sense driven by a capacity of the United States to absorb these individuals in some way, we are certainly not hearing any data on that. I mean, most of the data that has been coming out lately would suggest that the United States is way under its capacity to absorb immigrants.

That is not necessarily the political wisdom out there, but it seems to be the scholarly wisdom out there for the most part, that there are small pockets of impact that need to be worried about but the general impact of immigration on the United States is positive with respect to economic growth and the like, and that immigrants on the whole do very well here and contribute more than they take by a long shot.

So it seems to me that if you are going to start saying, beyond that the Senate made a politically acceptable judgment at 630,000, that there is some substantive merit to these numbers, you are going to have to come forward with something more than, "We support S. 358." S. 358 is a political judgment that the Senate made under a set of circumstances. It may be that the House would make a similar judgment or a somewhat different judgment, but you are not really helping—I mean, we are the politicians. You guys are the ones who have the obligation of implementing the law, and having also some expertise at your disposal in terms of running the departments.

I would hope that we would hear something more. Otherwise I think that you are not giving us anything on the numbers. This is sort of shuffling deck chairs on the *Titanic* with respect to the backlog. This is really something we ought to avoid.

Commissioner McNary, if I could just focus your attention again a little bit on this second~~-preference~~ issue, let me underscore what Congressman Fish said. In my draft I have a 2-year phase-in at this point, but basically the point of all of that is, I am proposing that we move the minor children and the spouses from second preference to uncapped, and then that we find some way to phase that in so it doesn't swamp the system. I am open to some suggestions, and I would hope you would look at that proposal in that light, rather than draw a line that says 2 years is too short and we are not interested in it at all.

56

You are using the number 400,000. Four hundred thousand is all of the second preference backlog, as I understand it. Is that right, Mr. Ogden?

Mr. OGDEN. Yes. I have a——

Mr. MORRISON. Do you know, out of that 400,000, how many of those are minor children and spouses, as opposed to children of age, adult children?

Mr. OGDEN. Yes, Mr. Chairman. About 58 to 60 percent of current second preference immigrants qualify as spouses or children. About 125,000 applicants are now being registered annually in the second preference. Thus, if 58 to 60 percent of those qualified as immediate relatives, this would add about 72,000 or 75,000 immigrants to the IR category each year.

Mr. MORRISON. And is the backlog, the 400,000, is that a correct number for it?

Mr. OGDEN. Well, yes. Out of that about 235,000 would be moved immediately into the category——

Mr. MORRISON. So the number is not 400,000. The number is 235,000.

Mr. OGDEN. Two hundred and thirty-five thousand, approximately.

Mr. MORRISON. And about 75,000 a year thereafter.

Mr. OGDEN. About that.

Mr. MORRISON. Now, Mr. McNary, you used the number 1.5 million IRCA relatives who are undocumented but who are covered by your family fairness policy. Do I have that number right?

Mr. McNARY. Yes.

Mr. MORRISON. Under your recent administrative order, these 1.5 million people essentially are here to stay, with work and travel privileges. Isn't that right?

Mr. McNARY. We think you are right as to the 1.5 million being here. There is an estimate of another 1.5 million that would come as a result of this change in definition.

Mr. MORRISON. There is another 1.5 million who you think would be eligible to come?

Mr. McNARY. Yes.

Mr. MORRISON. So that would be a concern about any kind of a phase-in. You are saying there are another 1.5 million who are IRCA relatives who do not currently have petitions pending?

Mr. McNARY. That is correct. They are not here. They are——

Mr. MORRISON. Well, I know they are not here and they haven't applied yet, but many of them haven't become permanent residents, so they haven't had a right to petition.

I wonder if Mr. Ogden has any knowledge to share on that score, on those numbers?

Mr. OGDEN. No, sir. I don't think we have seen any large surge of petitions, particularly in Mexico.

Mr. MORRISON. Just with respect to the 1.5 million who are here, if that is the number, they are essentially here to stay. What is it, other than fairness to those people who haven't come yet, which I understand is an issue here—we sort of can get ourselves in a catch-22—other than the question of these people's right to stay who are here already, who we have granted this quasi-legal status, why is it that we don't want them to be able to legalize? Is it only

**App-29**

57

because we don't want them to get ahead in line, ahead of the second preference people who are waiting outside the country?

Mr. McNARY. Mr. Chairman, I think that is certainly an important consideration. It seems to me that we create an incentive or a disincentive to naturalize. We tend to separate those people. There is no incentive to become a citizen in order to bring relatives in, and it is a difficult fine line between the two, because I believe that not to follow your line of thinking is to encourage violations of the law. No question about it. They go ahead and live here anyway. At the same time, if we go completely overboard and include all these people in the definition, then I think we almost create a subculture with millions of people who have no interest in naturalizing, no interest in mainstreaming and becoming American citizens.

Mr. MORRISON. Let me just examine that for a minute. First, that goes to the question of whether you change the second preference people over to the uncapped. That doesn't go to the question of what the reason is for the people you have given this quasi-legal status under the family fairness provision, why you don't want them to be able to have the full permit. That has nothing to do with citizenship.

Or are you saying that you think that 5 years from now when the permanent residents, the IRCA people who are moving from temporary to permanent then will be in a position to become citizens—that is, if we can get administrative naturalization please so that they could be processed in some reasonable amount of time, rather than 2 or 3 more years on top of that—that at that point they will then be able to get these people in immediately? I mean, is that the logic? That seems, to me, pretty tortured.

Is there some evidence, I mean empirical evidence, that this permanent resident/citizenship distinction is a driving force for naturalization of a significant sort? Has a study been done on that? Do we know that is true? There is a slender reed we have here that is holding up an awful lot of weight, and if there is nothing out there but somebody's opinion, that is a little bit of a problem.

Mr. McNARY. Well, we will look into that to determine something more substantive, but I think it is fairly certain that if you broaden that definition, that there are going to be some definite repercussions that are going to be adverse.

Mr. MORRISON. Well, there are big numbers, and that is why I said please consider the phase-in issue, as well. There is a lot of support on the subcommittee, as you know, on both sides of the aisle. Certainly Mr. Fish has been pressing this matter, and there are a number on our side of the aisle who are interested in doing something about the second preference situation. We don't know whether we will have your support for anything, but we would certainly like to have your input for those things that are more problematic and less problematic to you.

Mr. McNARY. Well, the administration's position is to increase those numbers in the second preference. We are addressing that, but by moving the numbers from the fifth preference rather than just unlocking the door and including permanent residents as citizens.

Mr. MORRISON. My last comment on that: "Unlocking the door," those are awfully grudging terms. I mean, your very generous and

**App-30**

85 F.3d 621

This case was not selected for publication in the
Federal Reporter.

Not for Publication in West's Federal Reporter See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Fifth Circuit Rules 28.7,
47.5.3, 47.5.4. (Find CTA5 Rule 28 and Find CTA5
Rule 47)

United States Court of Appeals,
Fifth Circuit.

Carvel G. DILLARD, Plaintiff-Appellant,
v.

SECURITY PACIFIC CORPORATION, Merrill
Lynch, Pierce, Fenner & Smith, Inc., Securities
Industry Association, Inc., Security Pacific
Brokers, Inc., Financial Clearing and Services
Corporation, Jenkens & Gilchrist, a Partnership,
Jenkens & Gilchrist, a Professional Corporation,
Defendants-Appellees.

No. 95-20503.
|
Summary Calendar.
|
April 18, 1996.

Appeal from the United States District Court for the
Southern District of Texas (CA-H-88-2848).

Before REAVLEY, SMITH and PARKER, Circuit
Judges.

**Opinion**

PER CURIAM.[*]

[*]  Pursuant to Local Rule 47.5, the court has determined
that this opinion should not be published and is not
precedent except under the limited circumstances set
forth in Local Rule 47.5.4.

**\*1** Plaintiff-appellant Carvel Gordon Dillard challenges
orders compelling arbitration with defendants Merrill
Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch),
Security Pacific Corporation, Security Pacific Brokers,
Inc., Financial Clearing and Services Corporation
(FCSC), and Jenkens and Gilchrist (J & G), (collectively,

Security Pacific). Dillard also challenges an order
granting summary judgment to Security Industry
Association, Inc. (SIA), a trade association for the
securities industry. Finally, Dillard challenges the denial
of his motions for partial summary judgment and for a
preliminary injunction. We affirm.

I.

The lengthy factual and procedural history of Dillard's
three federal lawsuits is detailed in *Dillard v. Merrill
Lynch, Pierce, Fenner & Smith, Inc.,* 961 F.2d 1148 (5th
Cir.1992) (*Dillard II* ), *cert. denied,* 506 U.S. 1079
(1993), and *Dillard v. Security Pacific Brokers, Inc.,* 835
F.2d 607 (5th Cir.1988) (*Dillard I* ). Dillard brought suit
against the defendants in 1985, 1986, and 1988. This
appeal concerns the 1988 suit. Dillard's causes of action
against the various defendants arose from trades in
margins and options that Merrill Lynch and Security
Pacific made for Dillard in 1983 and 1984. Before Dillard
opened margin and option accounts at the two firms he
signed agreements requiring disputes to be resolved
through arbitration.[1] The central issue in the case is
whether the arbitration clauses are enforceable.

[1]  Paragraph 11 of the Customer Agreement with Merrill
Lynch states:
It is agreed that any controversy between us
arising out of your business or this agreement shall
be submitted to arbitration conducted under the
provisions of the Constitution and Rules of the
Board of Governors of the New York Stock
Exchange, Inc. or pursuant to the Code of
Arbitration Procedure of the National Association
of Securities Dealers, Inc., as the undersigned may
elect.
Dillard's customer agreement and margin agreement
with Security Pacific Brokers contain the following:
To the extent permitted by law, any controversy
arising out of or relating to any of my account(s)
with FiCS or this agreement, shall be submitted to
arbitration conducted under the Constitution and
Rules of the Board of Governors of the New York
Stock Exchange Inc. or the Code of Arbitration
Procedure of the National Association of
Securities Dealers, Inc. or the arbitration panel of
any other exchange which has jurisdiction over the
transaction in dispute[.]

Dillard v. Security Pacific Corp., 85 F.3d 621 (1996)
1996 WL 254971

## A. Merrill Lynch

In his first amended complaint, Dillard asserted causes of action against Merrill Lynch for malicious prosecution, abuse of process, defamation and violations of RICO, civil rights, and antitrust laws. Merrill Lynch filed a motion to compel arbitration, and an alternative motion for summary judgment. The district court granted the motion to compel arbitration, denied as moot the motion for summary judgment, and dismissed the suit against Merrill Lynch. We affirm these orders of the district court.

Merrill Lynch and Dillard signed a contract requiring arbitration of disputes. Dillard does not deny that the language of the arbitration clause is broad enough to cover the claims he has made against Merrill Lynch. In order to have his case heard in court, the party resisting arbitration "must make at least some showing that under prevailing law, he would be relieved of his contractual obligation to arbitrate if his allegations proved to be true." *Dillard II,* 961 F.2d at 1154. Dillard argues that the arbitration provision is unenforceable because it is an unconscionable provision in an adhesion contract, and because it is the product of an antitrust conspiracy. These arguments failed in *Dillard II,* and they fail again here. *Id.* at 1153-55.

Adhesion contracts are not automatically unenforceable; the party seeking to avoid one must generally show that it is unconscionable. *Id.* at 1154. *Dillard II* rejected the argument that arbitration clauses in the securities context are unconscionable as a matter of law, 961 F.2d at 1154-55, and Dillard failed to produce evidence that the agreement to arbitrate was unfair, oppressive, or made under duress. In fact, Dillard admitted that he never even negotiated to have the arbitration clauses removed from either the Merrill Lynch or the Security Pacific contracts.[2]

[2]    In a hearing and in his deposition, Dillard stated that at Merrill Lynch he inquired generally about whether the contract could be changed, but admitted that he did not attempt to negotiate for a change in the arbitration clause, by offering, for example, to pay a higher charge for trades. Dillard also admitted that he made no attempt to change the arbitration clause at Security Pacific.

*2 Dillard's argument that an antitrust conspiracy renders the arbitration clause unenforceable is likewise without merit. Even if such an antitrust conspiracy existed, "this

finding would not compel the invalidation of the agreement to arbitrate ...." *Dillard II,* 961 F.2d at 1155.

Dillard argues vociferously that the arbitration clause violates his Seventh Amendment right to jury trial. This argument is meritless. Private actors such as Merrill Lynch and Security Pacific cannot violate Dillard's constitutional rights, and in *Dillard II* this court held that "the Seventh Amendment does not preclude 'waiver' of the right to jury trial through the signing of a valid arbitration agreement." 961 F.2d at 1155 n. 12. Dillard argues that enforcement of contractual arbitration clauses violates the Seventh Amendment where the contract is one of adhesion and there is a great disparity of bargaining power. Even if Dillard correctly states the law, his argument fails for the reasons given above: Dillard has produced no evidence that the clause is unconscionable, oppressive, or was made under duress.

Because Dillard failed to show that he would be relieved of his contractual obligation to arbitrate, and because all of his claims are arbitrable, his claims were properly ordered to arbitration.

## B. Security Pacific

Dillard asserted claims for malicious prosecution, abuse of process, defamation, and violations of RICO, Hobbs Act, civil rights laws, and antitrust laws, against Security Pacific, Inc., Security Pacific Brokers, Inc., and Financial Clearing & Services Corp. (FCSC). Dillard has agreed to arbitrate his claims against these entities. Dillard asserted all but the antitrust claims against J & G, with whom he opposes arbitration.

Dillard's claims against J & G are based on acts J & G took as an agent of Security Pacific Brokers in matters related to Dillard's margin and option accounts. Claims against an agent of a signatory to an arbitration agreement are arbitrable if such claims fall within the scope of the arbitration agreement. *Taylor v. Investors Assoc., Inc.,* 29 F.3d 211, 213 (5th Cir.1994) (defendant's motion to compel arbitration must be granted where the defendant is an agent or third-party beneficiary of an arbitration agreement between the plaintiff and a co-defendant). Because claims against J & G fall within the scope of the arbitration agreement, the district court properly issued orders compelling arbitration of those claims, dismissing the case against the Security Pacific defendants and J & G, and denying these defendants' motion for summary judgment.

**App-32**

Dillard v. Security Pacific Corp., 85 F.3d 621 (1996)

1996 WL 254971

**C. Securities Industry Association, Inc. (SIA)**

Prior to *Dillard II*, the district court had dismissed the antitrust claims against SIA for failure to state a claim. In *Dillard II*, this court reversed after noting that Dillard was not required to produce facts to support his allegations at that stage in the proceedings. *Dillard II*, 961 F.2d at 1159. Dillard filed an amended complaint in 1993, asserting causes of action for antitrust and RICO violations against SIA. SIA moved for summary judgment on the antitrust and RICO claims on January 20, 1994, and the district court granted the motion on March 27, 1995. Dillard now appeals. We review *de novo* the district court's order granting summary judgment.

**\*3** Under Fed.R.Civ.P. 56(c), the moving party bears the initial burden of demonstrating an absence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S.Ct. 1348, 1355-56 (1986). Once the moving party has met its burden, the non-movant must come forward with specific, admissible evidence demonstrating a genuine issue of material fact for trial. *Matsushita*, 106 S.Ct. at 1356.

In order to prevail on his antitrust claim, Dillard must prove (1) the existence of a conspiracy (2) affecting interstate commerce (3) that imposes an unreasonable restraint of trade. *Dillard II*, 961 F.2d at 1158. If defendants had no rational economic motive to conspire, and if their conduct is consistent with equally plausible, legal explanations, the conduct does not give rise to an inference of conspiracy. *Matsushita*, 106 S.Ct. at 1356. To survive a motion for summary judgment, Dillard must present evidence that tends to exclude the possibility that the alleged conspirators acted independently. *Id.* SIA submitted evidence that brokerage firms use arbitration because it is a quicker and less expensive way to resolve litigation. This meets SIA's burden under Rule 56(c).

Dillard failed to present any evidence of an alleged conspiracy, admitting in his deposition that he lacks specific facts to support his assertion that SIA and its members conspired to establish adhesion arbitration clauses in brokerage contracts. Dillard also admitted that SIA had no control over its members and did not compel members to include arbitration clauses in their contracts governing margin and option accounts.

Dillard argues, however, that sufficient discovery has not been conducted, and that the district court's denial of additional time for discovery was an abuse of discretion. This contention is meritless. The district court points out

that this case has been pending for seven years and related litigation for ten years. SIA responded to Dillard's discovery requests and he served no additional requests on SIA for more than a year before the judge ruled on SIA's motion for summary judgment. Dillard filed no Rule 56(f) affidavit, and although his response to SIA's motion for summary judgment detailed discovery that Dillard believed should have been produced by SIA and Merrill Lynch, he never explained why the information was essential to justify his opposition to SIA's motion, as Rule 56(f) requires. *See* Fed.R.Civ.P. 56(f). Dillard was particularly concerned about copies of newsletters, bulletins, and letters allegedly sent from SIA to the membership "exhorting them to adopt the model [arbitration] clause." Dillard failed to establish, in his motion opposing summary judgment or elsewhere, how an exhortation to adopt an arbitration clause gives rise to an inference of antitrust conspiracy. Simply put, Dillard has failed to present any evidence that tends to exclude the possibility that the alleged conspirators acted independently. *See Matsushita*, 106 S.Ct. at 1356 (requiring antitrust plaintiffs to come forward with such evidence or lose on summary judgment). For all of these reasons, the district court did not abuse its discretion in ruling on the motion for summary judgment before allowing Dillard additional time for discovery.

**\*4** Because Dillard did not introduce evidence raising a fact issue about the existence of a conspiracy, the district court properly granted summary judgment on Dillard's antitrust claims. Dillard's RICO claims fail for the same reason. To establish a RICO claim, a plaintiff must allege and prove the commission of at least two predicate acts. 18 U.S.C. §§ 1962, 1961(5). The predicate acts Dillard alleged all depended on violations of the antitrust laws. Dillard's failure to establish an antitrust violation requires summary judgment on the RICO claims as well.

**D. Denial of Dillard's Preliminary Injunction**

On July 27, 1994, Dillard moved for a preliminary injunction proscribing monopolization and barring the enforcement of arbitration clauses if brokerage firms required traders to sign them as a precondition to trading in securities. The district court denied the injunction without entering findings of fact or conclusions of law, as required by Fed.R.Civ.P. 52(a). Dillard appeals the denial of his motion and the failure to enter findings of fact and conclusions of law. We have jurisdiction over the ruling on the preliminary injunction.[3] We review the district court's denial of a preliminary injunction for abuse of discretion. *Lakedreams v. Taylor*, 932 F.2d 1103, 1107

Dillard v. Security Pacific Corp., 85 F.3d 621 (1996)

1996 WL 254971

(5th Cir.1991).

[3]    After the district court denied Dillard's motion for a preliminary injunction, Dillard timely filed motions for new trial and amendment of the judgment under rules 52(b) and 59. The district court denied these motions on March 27, 1995, the same date on which it issued the final orders forming the basis of this appeal. Dillard again timely moved for new trial or reconsideration under rules 52(b) and 59, which motions the district court again denied. Dillard then timely appealed to this court. Furthermore, while the preliminary injunction is moot with regard to SIA, it is not moot with regard to Merrill Lynch and Security Pacific.

The prerequisites for a preliminary injunction are:

> (1) substantial likelihood of success on the merits; (2) irreparable injury; (3) the threatened injury outweighs the damage the injunction may cause the opposing party; and (4) no adverse effect on the public interest.

*Id.*

Dillard cannot prove irreparable injury because he has an adequate remedy at law-namely, arbitration and this action for damages-and because he waited nearly six years to request injunctive relief, strongly implying that delay was not causing irreparable harm. *See, e.g., Oakland Tribune, Inc. v. Chronicle Pub. Co.,* 762 F.2d 1374, 1377 (9th Cir.1985) (long delay implied lack of irreparable harm in newspaper's action for Sherman Act antitrust violation). As our discussion above demonstrates, Dillard also cannot prove substantial likelihood of success on the merits.

When it denied the injunction, the district court failed to enter findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a). Dillard timely filed motions under Rule 52(b) and 59, asking the court to reconsider or clarify its ruling on the preliminary injunction, and also filed a motion for partial summary judgment. The district court denied these motions after entering findings of fact and conclusions of law in its final orders of March 27, 1995, the orders from which Dillard now appeals. These findings of fact and conclusions of law suffice under Rule 52(a).

II.

For the foregoing reasons, we AFFIRM the orders of the district court (1) compelling arbitration with Merrill Lynch, Security Pacific, and Jenkens & Gilchrist; (2) granting summary judgment to SIA; and (3) denying Dillard's motions for a preliminary injunction and partial summary judgment.

**\*5 AFFIRMED.**

**All Citations**

85 F.3d 621, 1996 WL 254971

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

No. 15-674

# In the Supreme Court of the United States

UNITED STATES OF AMERICA, ET AL., PETITIONERS

*v.*

STATE OF TEXAS, ET AL.

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE FIFTH CIRCUIT*

**BRIEF FOR THE PETITIONERS**

DONALD B. VERRILLI, JR.
*Solicitor General*
*Counsel of Record*
BENJAMIN C. MIZER
*Principal Deputy Assistant*
*Attorney General*
IAN HEATH GERSHENGORN
EDWIN S. KNEEDLER
*Deputy Solicitors General*
BETH S. BRINKMANN
*Deputy Assistant Attorney*
*General*
ZACHARY D. TRIPP
*Assistant to the Solicitor*
*General*
DOUGLAS N. LETTER
SCOTT R. MCINTOSH
JEFFREY CLAIR
WILLIAM E. HAVEMANN
*Attorneys*

STEVAN E. BUNNELL
*General Counsel*
*U.S. Department of*
*Homeland Security*
*Washington, D.C. 20528*

*Department of Justice*
*Washington, D.C. 20530-0001*
*SupremeCtBriefs@usdoj.gov*
*(202) 514-2217*

3

certain crimes, or meet other criteria set by federal law." *Id.* at 2499; see 8 U.S.C. 1182(a), 1227(a).

The federal government cannot remove every removable alien, however.  Rather, "[a] principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 132 S. Ct. at 2499.  DHS, "as an initial matter, must decide whether it makes sense to pursue removal at all." *Ibid.*  It must further decide, *inter alia*, whether to initiate removal proceedings, settle or dismiss, stay a final order, appeal an adverse ruling, and execute a removal order.  J.A. 239-263.  Every step implicates allocation of limited enforcement and detention resources.  And "[a]t each stage the Executive has discretion to abandon the endeavor." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (*AADC*).

3.  Like other agencies exercising enforcement discretion, DHS must balance "a number of factors which are peculiarly within its expertise." *Heckler* v. *Chaney*, 470 U.S. 821, 831 (1985).  Those factors include "whether agency resources are best spent on this violation or another" and "whether the agency has enough resources to undertake the action at all," *ibid.*, as well as "immediate human concerns," such as "whether the alien has children born in the United States [or] long ties to the community," *Arizona*, 132 S. Ct. at 2499.

Limited appropriations make broad discretion a practical necessity.  Although the total undocumented population has not increased in recent years, an estimated 11 million undocumented aliens currently live in the United States.  Pet. App. 5a.  Congress has appropriated approximately $6 billion for "enforce-

4

ment of immigration and customs laws, detention and removals, and investigations." Consolidated Appropriations Act, 2016 (2016 Appropriations Act), Pub. L. No. 114-113, H.R. 2029, Div. F, Tit. II, 114th Cong., 1st Sess. 256; DHS Appropriations Act, 2015 (2015 Appropriations Act), Pub. L. No. 114-4, Tit. II, 129 Stat. 42. Numbers of removals have varied depending on circumstances, with DHS setting records for removals in a year (approximately 440,000 in 2013) and over a six-year span (more than 2.4 million from 2009 through 2014). DHS, *Yearbook of Immigration Statistics: 2013 Enforcement Actions, Tbl. 39, Aliens Removed or Returned: Fiscal Years 1892 to 2013* (2014); DHS Press Release, DHS Releases End of Year Statistics (Dec. 19, 2014). But in any given year, more than 95% of the undocumented population will not be removed, and aliens continue to be apprehended at the border or otherwise become removable.

Congress has mandated certain actions, such as detention of criminal aliens and aliens apprehended illegally crossing the border. See 8 U.S.C. 1225(b), 1226(c). Congress has also directed the Secretary to prioritize removal of criminal aliens "by the severity of th[e] crime," and has directed U.S. Immigration and Customs Enforcement (ICE) to use at least $1.6 billion to identify and remove criminal aliens. 2016 Appropriations Act 256; DHS Appropriations Act, 2009, Pub. L. No. 110-329, Div. D, Tit. II, 122 Stat. 3659. But as relevant here, Congress has otherwise left it to the Secretary's discretion to "[e]stablish[] national immigration enforcement policies and priorities." 6 U.S.C. 202(5).

4. "Deferred action" is one of the well-established ways in which DHS exercises enforcement discretion.

5

Deferred action is "a regular practice" in which the Secretary "exercis[es] [his] discretion for humanitarian reasons or simply for [his] own convenience," to notify an alien of a non-binding decision to forbear from seeking his removal for a designated period. *AADC*, 525 U.S. at 483-484; see 8 C.F.R. 274a.12(c)(14) ("an act of administrative convenience to the government which gives some cases lower priority"). Through "[t]his commendable exercise in administrative discretion, developed without express statutory authorization," *AADC*, 525 U.S. at 484 (quoting 6 Charles Gordon et al., *Immigration Law and Procedure* § 72.03[2][h] (1998)), a removable alien may remain present so long as DHS continues to forbear.

Deferred action does not confer lawful immigration status or provide any defense to removal. An alien with deferred action remains removable at any time, and DHS has absolute discretion to revoke deferred action unilaterally, without notice or process. See *AADC*, 525 U.S. at 484-485. An alien's continued presence during a period of deferred action does not violate any criminal law, because "[r]emoval is a civil, not criminal, matter," and "[a]s a general rule, it is not a crime for a removable alien to remain present in the United States." *Arizona*, 132 S. Ct. at 2499, 2505.

Since 1960, DHS has established more than 20 policies for exercising discretion via deferred action or similar practices for large groups of individuals in defined categories. See pp. 48-60, *infra* (detailing history); see also J.A. 64-65. Among others, a 1960 policy accorded "extended voluntary departure" to undocumented Cuban nationals in the United States after the Cuban revolution. H.R. Rep. No. 627, 100th

**App-38**

22

individual States that disagree with federal policy judgments. Such a rule would enable any State to make an end-run around the structural limitations on its authority and cause the very sort of harms those limitations are intended to prevent.

b. This suit cannot survive these critical limitations on the judicial power. Respondents' claims of injury are nothing more than allegations of indirect or incidental effects from the Guidance, not invasions of any legally-protected interest under the Constitution or the INA.

Respondents' principal claims of injury center on allegations (Br. in Opp. 17) that the Guidance will cause them to incur increased costs of healthcare, education, and law enforcement, and will cause citizens in their States to face increased labor competition. But incidental effects of this sort arise inevitably from a wide range of federal immigration policy decisions. Indeed, the mere presence of any aliens within the country can have such effects.[5] And, beyond immigration, such effects on States and their citizens could result from federal policies of all sorts.

The Framers established a national government with the power to act directly upon individuals, not upon the States as under the Articles of Confederation. See *New York* v. *United States*, 505 U.S. 144,

---

[5] These claims also fail on their own terms. See Pet. App. 309a-310a. The alleged fiscal costs flow from aliens' mere presence in this country, and the Guidance applies only to aliens who have already been living here since 2010 and are "extremely unlikely" to be removed with or without the Guidance. *Id.* at 414a-415a. Respondents' claim that the Guidance will incidentally cause competitive harm in the labor markets is similarly unfounded because the Guidance is designed to *ameliorate* distortions of the labor markets. See p. 46, *infra*.

38

targets." Br. in Opp. 20 n.7 (brackets, citation, and internal quotation marks omitted). That describes deferred action perfectly.

Respondents insist that deferred action goes further and "purports to *alter* [INA] requirements." Br. in Opp. 20 (citation omitted; brackets in original). That is incorrect. It does not change the law in any way or create any new immigration categories. DHS can unilaterally revoke deferred action, without notice or process, and pursue removal. See pp. 4-7, *supra*. Deferred action thus "does not confer any form of legal status in this country." Pet. App. 413a; see *Chaudhry* v. *Holder*, 705 F.3d 289, 292 (7th Cir. 2013) ("[U]nlawful presence and unlawful status are distinct concepts."); 5 *Immigration Law and Procedure* § 63.10[2][c] (2014) (discussing this distinction); *e.g.*, Geoffrey Heeren, *The Status of Nonstatus*, 64 Am. U. L. Rev. 1115, 1122-1133 (2015) (same). "Lawful status" (such as lawful permanent resident status) provides a legally-enforceable defense to removal under the INA. Deferred action does not. See pp. 4-7, *supra*. The label "lawful presence" does not alter this essential legal distinction.

"Lawful presence" in this sense is the result of *every* decision to accord deferred action, on any basis. See Pet. App. 413a. If that were enough to justify APA review, *Heckler* would provide little protection in the immigration context, because countenancing an individual alien's continued presence "is an inevitable element of almost any exercise of discretion in immigration enforcement." J.A. 76. Similar practices are also common outside immigration. For example, the "passive enforcement" policy in *Wayte* v. *United States*, 470 U.S. 598 (1985), countenanced an ongoing

45

Under the Guidance, individual non-priority aliens can come forward, identify themselves, pay a fee to defray expenses, pass a background check, and potentially receive deferred action. Pet. App. 417a. If law-enforcement officials later encounter such an individual, ICE can "quickly confirm the alien's identity through a biometric match" and confirm that he or she does not warrant the commitment of resources for removal. D. Ct. Doc. 150-1 ¶ 15 (Feb. 23, 2015); see *id.* ¶¶ 14-17. Without the Guidance, ICE would have to check that individual's background and immigration history every time—and ICE would foot the bill. See *id.* ¶¶ 14-17; D. Ct. Doc. 150-2 ¶¶ 7-13 (Feb. 23, 2015).

In addition to facilitating DHS's ability to focus on enforcement priorities, the Guidance also takes into account the weighty humanitarian and policy considerations produced by the inescapable fact that millions of aliens will remain in this country. This Court has emphasized that, when exercising its discretion, DHS appropriately considers "whether [an] alien has children born in the United States [or] long ties to the community." *Arizona*, 132 S. Ct. at 2499. The Guidance does just that. Every person under the Guidance has "long ties to the community," *ibid.*, because it only reaches people who have lived in this country continuously since January 1, 2010, or earlier. Pet. App. 416a-417a. Both the original (unchallenged) 2012 DACA policy, and the DACA policy as expanded by the Guidance, reach only people with particularly strong ties to this country: people who came here as children, many of whom have never known another home. *Ibid.* These individuals are removable, but "fundamental conceptions of justice" confirm that people who came to this country as children are not

46

similarly situated to adults. *Plyler*, 457 U.S. at 220; cf. *Montgomery* v. *Louisiana*, 136 S. Ct. 718, 732-734 (2016). The INA itself recognizes this principle, as time when an alien is a minor "shall [not] be taken into account" when calculating periods of "unlawful presence." 8 U.S.C. 1182(a)(9)(B)(iii)(I).

The DAPA policy set forth in the Guidance reaches a group that is compelling for different reasons: parents of U.S. citizens or lawful permanent residents. Pet. App. 417a. Again, the INA embodies the significance of this parent-child relationship. Parents of U.S. citizens qualify for "immediate relative" visas— the "most favored" visa category, *Cuellar de Osorio*, 134 S. Ct. at 2197 (opinion of Kagan, J.)—as soon as their child turns 21. 8 U.S.C. 1151(b)(2)(A)(i). And parents of lawful permanent residents obtain the same treatment once their child becomes a U.S. citizen, which ordinarily may occur after five years or less. See 8 U.S.C. 1427(a). An immigration judge also may grant lawful permanent residence through "[c]ancellation of removal," under certain circumstances, because of the impact of removing an alien parent on a U.S.-citizen or lawful permanent resident child. 8 U.S.C. 1229b(b)(1)(D); see 8 U.S.C. 1182(a)(3)(D)(iv), (g)(1)(B), (h)(1)(B), and (i)(1), 1227(a)(1)(H). Deferred action will give these parents the dignity of coming forward and "be[ing] counted," and their families some limited measure of relief from fear that they will be broken up. Pet. App. 415a.

The Guidance also promotes self-sufficiency and helps protect American workers, see 8 U.S.C. 1324a, 1601, through deferred action's longstanding tie to work authorization for aliens with economic need, 8 C.F.R. 274a.12(c)(14). With or without the Guidance,

**App-42**

47

most of the covered individuals will continue living and working here. See Pet. App. 415a. But without the Guidance, many would work off-the-books, exposing themselves to exploitation while putting American workers and scrupulous employers at a competitive disadvantage. Deferred action and work authorization will "encourage these people to come out of the shadows," work on the books at higher wages, and pay taxes on those higher wages. *Ibid.* That in turn will make those individuals more self-reliant, less dependent on social services, and increase federal and state tax revenues. See States of Wash. et al. Amicus Br. 3-8; see also Cong. Budget Office, *Budgetary Effects of Immigration-Related Provisions of the House-Passed Version of H.R. 240, An Act Making Appropriations for the Department of Homeland Security* 1-8 (Jan. 29, 2015) (estimating that blocking the Guidance would cost the federal government $7.5 billion from 2015-2025).

The Guidance also guards against perverse incentives. To avoid encouraging further migration, it covers only people who have already lived here since 2010—and it helps DHS focus more resources on border enforcement. Pet. App. 416a-417a. DAPA also applies only to people who, by November 20, 2014, are already parents of U.S. citizens or lawful permanent residents. *Id.* at 417a. So individuals cannot become eligible by having children now.

In sum, the Guidance is a policy for responsibly exercising enforcement discretion, under the INA, to address a difficult real-world problem within the Secretary's purview.

48

### B. The History Of Immigration Law Confirms That The Guidance Is A Lawful Exercise Of The Secretary's Authority Under The INA

Current immigration law "is the product of a long history," 1 *Immigration Law and Procedure* § 2.01 (2015), which confirms that the Guidance is within the Secretary's authority. For more than 50 years, the INS and DHS have issued policies for conferring deferred action (or other similar discretionary practices) for aliens living in the United States without lawful status, and doing so on the basis of defined categories targeting large groups—including the 1990 Family Fairness policy targeting approximately 40% of the estimated undocumented population at the time. And these policies have consistently resulted in work authorization. In response, Congress has repeatedly ratified the Secretary's authority to exercise discretion in this way. Respondents' challenge to the Guidance cannot be reconciled with this history.

#### 1. *Past policies for exercising enforcement discretion*

Since 1960, the INS and DHS have established more than 20 policies for using deferred action (or functionally similar forms of enforcement discretion) for large numbers of aliens who were living in the United States without lawful status, and doing so based on their membership in defined categories. See *EVD Report* 6 (collecting examples); J.A. 209-212 (same). From 1960 to 1990, the INS adopted a string of policies for according "extended voluntary departure" to aliens living in the United States, based solely on their nationality. *Ibid.* Extended voluntary departure permitted "otherwise deportable aliens to remain temporarily in the United States," as a matter of dis-

**App-44**

49

cretion, "out of concern that the forced repatriation of these individuals could endanger their lives or safety." *EVD Report* 6; see *Hotel & Rest. Emps. Union* v. *Smith*, 846 F.2d 1499, 1501 (D.C. Cir. 1988) (en banc) (per curiam) (Mikva, J.); *Smith*, 846 F.2d at 1519 (Silberman, J.) ("extrastatutory decision to withhold enforcement" as a matter of discretion). For example, a 1960 policy applied to Cuban nationals; 1975 policies reached Vietnamese, Cambodians, and Laotians; and a 1987 policy reached between 150,000 and 200,000 Nicaraguans during unrest. *EVD Report* 6; J.A. 210.[9]

The INS and DHS have also established many such policies with categories defined based on factors in addition to (or different from) nationality. For example, in the 1970s, the INS accorded extended voluntary departure to approximately 250,000 foreign nationals from the Western Hemisphere who were already living here. J.A. 209. The INS's "Family Fairness" policy, adopted in 1987 and expanded in 1990, invoked indefinite voluntary departure as a means to exercise discretion for as many as 1.5 million unauthorized aliens because they were ineligible spouses or children of certain aliens granted lawful status. J.A. 210-211; see p. 56, *infra*. Policies in 1989 and 1990

---

[9] In 1990, Congress codified the nationality-based practice with a "more formal and orderly mechanism," known as "[t]emporary protected status." 8 U.S.C. 1254a (Supp. II 1990); *EVD Report* 4. Extended voluntary departure has not been used since then. See J.A. 211-212. Congress did not constrain the Secretary's ability to exercise discretion on additional or other grounds, however. Upon signing the act, the President stated that he did not interpret it to do so and that "[a]ny attempt" to displace that authority "would raise serious constitutional questions." President George H.W. Bush, Statement on Signing the Immigration Act of 1990 (Nov. 29, 1990).

50

after the Tiananmen Square protests invoked "deferred enforced departure" for certain Chinese nationals (approximately 80,000 individuals); a 1992 policy covered certain Salvadorans (approximately 190,000); a 1997 policy covered certain Haitians (approximately 40,000); and policies in 1999, 2007, 2011, and 2014 have covered certain Liberians. J.A. 210-212; see Memorandum from President Barack Obama, to Sec'y of Homeland Security, *Deferred Enforced Departure for Liberians* (Sept. 26, 2014).[10]

Since 1997, DHS has used deferred-action policies for battered spouses and victims of human trafficking; foreign students displaced by Hurricane Katrina; widows and widowers of U.S. citizens; and, under DACA, individuals who came to the United States as children and have long made this country their home. See pp. 5-7, *supra*. And Congress has enacted a series of statutes recognizing that the Secretary may accord "deferred action" for aliens in defined categories, and encouraged him to do so more often. *Ibid.*

### 2.  Work authorization as a component of the exercise of discretion

Crucially, INS and DHS have authorized lawful work by aliens who remain in the United States under every deferred-action or similar policy since at least the early 1970s. The INS and DHS have long interpreted their broad authority to administer the immigration laws, 8 U.S.C. 1103(a), to encompass the ability to authorize aliens to work as an exercise of discre-

---

[10] "Deferred enforced departure" is similar to extended voluntary departure and, since 1990, has been directed only by the President. See 8 C.F.R. 274a.12(a)(11); 75 Fed. Reg. 33,457 (June 11, 2010).

51

tion. *E.g.*, 17 Fed. Reg. 11,489 (Dec. 19, 1952) (8 C.F.R. 214.2(c)) (authorizing nonimmigrants to engage in employment if "authorized by the district director or the officer in charge having administrative jurisdiction over the alien's place of temporary residence"). This Court "will normally accord particular deference" where the agency interpretation in question is "of 'longstanding' duration." *Barnhart* v. *Walton*, 535 U.S. 212, 220 (2002) (citation omitted).

By the early 1970s, the INS's ordinary practice was to authorize "illegal aliens" to work when it decided not to pursue deportation—including aliens with "extended voluntary departure" or "whose departure or deportation will not be enforced." Sam Bernsen, INS Gen. Counsel, *Leave to Labor*, 52 No. 35 Interpreter Releases 291, 294 (Sept. 2, 1975); see Sam Bernsen, INS Assistant Comm'r, *Lawful Work for Nonimmigrants*, 48 No. 21 Interpreter Releases 168, 315 (June 21, 1971). To do so, the INS would stamp an immigration form (the I-94) with "Employment Authorized." *Ibid.* At the time, there was no general federal prohibition against hiring unauthorized aliens. See *De Canas* v. *Bica*, 424 U.S. 351, 360-361 (1976). But "[s]ome employers [would] not hire an alien" without "some evidence of authorization to work, and the Social Security Administration [would] not issue a social security card without evidence of work authorization." *Leave to Labor* 294; see 44 Fed. Reg. at 10,371 (Social Security cards issued to aliens with I-94 indicating work authorization).[11] The INS granted work authorization as a component of its exercise of discretion, reasoning that "in such cases gainful employment

---

[11] At the time, aliens were barred from receiving Social Security benefits only if they resided abroad. See 42 U.S.C. 402(t) (1970).

should not be prevented and that it is reasonable to give the alien something that he can present to a prospective employer to show that he can work." *Leave to Labor* 294; see *De Canas*, 424 U.S. at 364-365 (discussing INS issuance of work authorization and State concession that it could not bar employment by aliens with such authorization).

In 1974, Congress ratified the INS's position that it had discretion under the INA to authorize aliens to work. The Farm Labor Contractor Registration Act Amendments of 1974, Pub. L. No. 93-519, 88 Stat. 1652, made it unlawful for farm labor contractors to knowingly employ any "alien not lawfully admitted for permanent residence or who has not been authorized *by the Attorney General* to accept employment." 7 U.S.C. 2045(f) (Supp. IV 1974) (emphasis added); see 7 U.S.C. 2044(b) (1970 & Supp. IV 1974) (license could be revoked on same basis). The clear premise was that "the Attorney General" was already empowered to "authorize[]" aliens "to accept employment." *Ibid.*; see 41 Fed. Reg. 26,825-26,826 (June 29, 1976) (INS Form I-94 designated "H-2" or stamped "Employment Authorized" showed work authorization).[12]

In 1981, the INS promulgated formal regulations codifying its existing practices. 46 Fed. Reg. at 25,080-25,081; see 44 Fed. Reg. 43,480 (July 25, 1979). The INS relied on its general authority to administer the INA under Section 1103(a). See *ibid*; see also 46

---

[12] In 1983, Congress replaced this provision with a similar scheme that prohibited farm-labor contractors from knowingly employing "an alien not lawfully admitted for permanent residence or who has not been authorized by the Attorney General to accept employment." Migrant and Seasonal Agricultural Worker Protection Act, Pub. L. No. 97-470, § 106(a), 96 Stat. 2589-2590.

53

Fed. Reg. at 25,080 ("[E]mployment authorization is a matter of administrative discretion because humanitarian or economic needs warrant administrative action."). From the start, those regulations enabled aliens to work notwithstanding that they lacked lawful immigration status: Aliens with deferred action were covered, as well as any aliens who merely applied for adjustment of status. 46 Fed. Reg. at 25,081. Aliens with extended voluntary departure were added shortly thereafter. 46 Fed. Reg. 55,920-55,921 (Nov. 13, 1981). These regulations thus embody the INS's longstanding interpretation that, as a component of the exercise of discretion, the INA empowers it to authorize lawful work by aliens who lack lawful status.

### 3. IRCA

In the Immigration Reform and Control Act of 1986 (IRCA), Pub. L. No. 99-603, 100 Stat. 3359, Congress adopted a "comprehensive scheme prohibiting the employment of illegal aliens in the United States." *Hoffman Plastic Compounds, Inc.* v. *NLRB*, 535 U.S. 137, 147 (2002). IRCA extended to all employers the sanctions regime that had previously applied only to farm-labor contractors. See § 101(b)(1)(C) and (D), 100 Stat. 3372. IRCA's key provision makes it unlawful for an employer to hire "an unauthorized alien (*as defined in subsection (h)(3)* of this section) with respect to such employment." 8 U.S.C. 1324a(a)(1) (emphasis added). Subsection (h)(3) in turn defines "unauthorized alien" as an alien who is not a lawful permanent resident and not "authorized to be so employed by th[e INA] *or by the Attorney General.*" 8 U.S.C. 1324a(h)(3) (emphasis added). When read "[a]gainst th[e] background understanding in the legal and regulatory system," including experience under

54

the agriculture-specific regime IRCA supplanted, IRCA is "convincing support for the conclusion that Congress accepted and ratified" the INS's preexisting understanding that it could authorize aliens to work as an integral component of the exercise of discretion in administering and enforcing the INA. *Texas Dep't of Hous. & Cmty. Affairs* v. *Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2520 (2015).

The INS formally adopted this straightforward interpretation of IRCA shortly after it became law. An administrative challenge had been filed arguing that the INS's work-authorization regulations were *ultra vires*. See 51 Fed. Reg. 39,385-39,386 (Oct. 28, 1986). In the wake of IRCA, the principal challenger submitted a comment interpreting Section 1324a(h)(3) to mean that the Attorney General lacked authority "to grant work authorization except to those aliens who have already been granted specific authorization by the [INA]." 52 Fed. Reg. 46,093 (Dec. 4, 1987). The INS rejected that view. "[T]he only logical way to interpret" the phrase "authorized to be so employed by th[e INA] or by the Attorney General," the INS explained, "is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined 'unauthorized alien' in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute." *Ibid.* (citation omitted). The INS recodified its work-authorization regulations—including for aliens with deferred action—identifying Sections 1103(a) *and* 1324a as authority. See 52 Fed. Reg. at 16,221, 16,228.

55

The limitations period for challenging those regulations expired decades ago. See 28 U.S.C. 2401(a). DHS's longstanding interpretation of its authority to authorize aliens to work—codified both before and after IRCA—warrants full deference under *Chevron U.S.A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843-844 (1984).

### 4. The Family Fairness policy and the IMMACT

Legislation and administrative practice since IRCA further confirms that the Guidance is a valid deferred-action policy. In IRCA, Congress granted lawful status to millions of undocumented aliens who applied and satisfied certain residency and other requirements. *E.g.*, 8 U.S.C. 1255a(a) and (b). This enabled them to obtain temporary resident status with work authorization, and eventually permanent resident status and naturalization. *Ibid.*; see 8 U.S.C. 1427(a). But Congress pointedly decided *not* to extend legal protection to those aliens' spouses and children who had arrived too recently or were otherwise ineligible. See S. Rep. No. 132, 99th Cong., 1st Sess. 16 (1985) ("It is the intent of the Committee that the families of legalized aliens will obtain no special petitioning rights by virtue of the legalization.").

In October 1987, the INS Commissioner established a "Family Fairness" policy to provide more modest relief, through enforcement discretion, to some members of that same group. See *Recent Developments*, 64 No. 41 Interpreter Releases 1190, App. I, at 1203-1204 (Oct. 26, 1987). The INS announced that it would "indefinitely defer deportation" for (1) ineligible spouses and children who could show compelling or humanitarian factors; and (2) ineligible unmarried minor children who could show that both

56

parents (or their only parent) had achieved lawful temporary resident status. *Ibid.* Those individuals also could obtain work authorization. *Id.* App. II, at 1206.

In 1990, the INS expanded the Family Fairness policy dramatically. As expanded, it provided indefinite voluntary departure for any ineligible spouse or minor child of a legalizing alien who showed that he or she (1) had been residing in the country by the date of IRCA's 1986 enactment; (2) was otherwise inadmissible; (3) had not been convicted of a felony or three misdemeanors; and (4) had not assisted in persecution. J.A. 213-215. The Commissioner explained that "we can enforce the law humanely," and that "[t]o split families encourages further violations of the law as they reunite." *Recent Developments*, 67 No. 6 Interpreter Releases 153, 154 (Feb. 5, 1990). The policy stated that "[w]ork authorization will be granted" to aliens who qualified. J.A. 215.

The INS could only estimate how many people were potentially eligible and how many would actually come forward, but on any estimate the numbers were large. *E.g.*, *Recent Developments*, 67 No. 8 Interpreter Releases 201, 206 (Feb. 26, 1990).[13] The INS Commissioner testified that 1.5 million people were estimated to be eligible. *Immigration Act of 1989: Hear-*

---

[13] *E.g.*, 55 Fed. Reg. 6058 (Feb. 21, 1990) (anticipating requests from "approximately one million" people); J.A. 646 (internal INS memorandum estimating "greater than one million" people "will file"); J.A. 642 ("potentially millions"); see 67 No. 8 Interpreter Releases 206 ("no more than 250,000"); Tim Schreiner, *INS Reverses Policy That Split Alien Families*, S.F. Chron., Feb. 3, 1990, at A15 ("more than 100,000 people" estimated to file); see also Paul Anderson, *New Policy on Illegal Immigrants*, Phila. Inquirer, Feb. 3, 1990, at A10 (it "may run to a million").

57

*ings Before the Subcomm. on Immigration, Refugees, and International Law of the House Comm. on the Judiciary*, 101st Cong., 2d Sess. Pt. 2, at 49, 56 (1990). The estimated undocumented population in 1990 was 3.5 million. Office of Policy & Planning, *Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000*, at 10 (2003).

Congress responded by ratifying the Family Fairness program and by providing for an even broader group to obtain lawful status beginning one year thereafter. Immigration Act of 1990 (IMMACT), Pub. L. No. 101-649, Tit. III, § 301(g), 104 Stat. 5030. Congress stated that this one-year delay "shall not be construed as reflecting a Congressional belief that the existing family fairness program should be modified in any way before such date." *Ibid.*

The IMMACT simultaneously made several amendments to IRCA's key provision on work authorization, 8 U.S.C. 1324a. Tit. V, §§ 521(a), 538, 104 Stat. 5053, 5056. But Congress did not modify the provision recognizing that "the Attorney General" could "authorize[]" aliens to be lawfully employed— even in response to the INS's policy that could have extended work authorization to a large proportion of the total undocumented population. 8 U.S.C. 1324a(h)(3). It is well-settled that "when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Sebelius* v. *Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 827-828 (2013) (citation omitted).

58

*5. Deferred-action statutes*

Since the IMMACT, Congress has enacted a series of statutes acknowledging DHS's authority to defer action and authorize work for aliens in defined categories. For example, in the REAL ID Act of 2005, Congress permitted participating States to issue driver's licenses to aliens with "approved deferred action status." 49 U.S.C. 30301 note. In 2000, Congress similarly made two additional categories of aliens eligible for deferred action. See Victims of Trafficking and Violence Protection Act of 2000 (VTVPA), Pub. L. No. 106-386, Tit. V, § 1503(d)(2)(D)(i)(II) and (IV), 114 Stat. 1522. Those statutes did not purport to create, define, or constrain the category of "deferred action." Rather, they *presuppose* existing authority for deferred action and (in the VTVPA) direct that the Secretary consider exercising that preexisting authority in the identified types of cases. See USA PATRIOT Act § 423(b), 115 Stat. 361 (certain aliens "may be eligible for deferred action and work authorization").

A similar ratification occurred in 2008. In 2001, the INS had instituted a policy to use "[e]xisting authority," including "deferred action," to forbear from removing individual aliens who could make a bona fide showing of eligibility for nonimmigrant T and U visas under 8 U.S.C. 1101(a)(15)(T) and (U) as victims of human trafficking and other crimes, but who did not have any lawful status. J.A. 232. In 2008, Congress ratified (and expanded) that policy. See 8 U.S.C. 1227(d)(1). Congress authorized DHS to grant administrative stays of removal to aliens covered by this same policy, and further provided that the denial of a request for a stay would not "preclude the alien from

**App-54**

59

applying for * * * deferred action." 8 U.S.C.
1227(d)(2).

These statutes powerfully support the Guidance.
Congress's decisions to encourage the Secretary to
accord "deferred action" for more categories of aliens,
to validate under federal law the issuance of driver's
licenses to aliens with deferred action, and to ratify an
existing deferred-action policy targeting a defined
category, "highlight Congress's continued acceptance"
of this "flexible and discretionary" practice. Pet. App.
150a (King, J., dissenting).

### 6. *The DREAM Act, DACA, and DAPA*

In 2012, following Congress's failure to enact the
DREAM Act of 2010, H.R. 5281, 111th Cong., 2d Sess.
(2010), which would have created a lawful status for
undocumented aliens who came here as children, *ibid.*,
DHS announced the original DACA policy. DACA did
not confer lawful status, but instead took the familiar
and more modest course of deferring enforcement
action for such aliens, as a matter of discretion, with
concomitant work authorization. See J.A. 102-106. An
estimated 1.4 million aliens were eligible under this
policy. J.A. 176-177. DHS reports that, through Sep-
tember 2015, more than 836,000 initial requests were
received, of which 787,855 were accepted and 699,832
were granted. USCIS, *Number of I-821D, Considera-
tion of Deferred Action for Childhood Arrivals by
Fiscal Year, Quarter, Intake, Biometrics, and Case
Status: 2012-2015* (Sept. 30, 2015). This suit does not
challenge the original DACA policy. See *Crane* v.
*Johnson*, 783 F.3d 244, 247 (5th Cir. 2015) (dismissing
Mississippi challenge to that policy for lack of stand-
ing).

60

Congress has considered a series of bills that would bar implementation of DACA (and later DAPA) or block funding unless they are rescinded, and that would limit the Secretary's authority to grant work authorization. *E.g.*, H.R. 5759, 113th Cong., 2d. Sess. (2014). None has passed both the House and Senate, much less become law. After much debate, Congress instead has enacted two appropriations bills that fund DHS—leaving DACA and DHS's deferred action and work-authorization authority untouched. 2016 Appropriations Act 256; 2015 Appropriations Act, 129 Stat. 42.

In sum, decades of law, practice and dialogue between the Executive and Congress confirm that the Guidance is lawful. It is no different in kind from more than 20 policies issued over the last 50 years, targeting large groups of aliens; this kind of exercise of enforcement discretion has been tied to work authorization since at least the early 1970s; formal regulations have embodied that practice since 1981; Congress has ratified DHS's longstanding view that it can exercise discretion via deferred action, and can authorize aliens to work lawfully; and Congress has encouraged the Secretary to accord deferred action for more categories of aliens, validated the issuance of driver's licenses to aliens with deferred action, and ratified an existing deferred-action policy targeting a defined category.

### C. Respondents' Counterarguments Lack Merit

Respondents argue (Br. in Opp. 31-37) that the Guidance is unlawful because, in their view, (1) the Secretary lacks statutory authority to accord deferred action for any category of aliens not specifically identified as eligible in the INA itself; and (2) the poten-

**App-56**

No. 15-674

# In the Supreme Court of the United States

UNITED STATES OF AMERICA, ET AL., PETITIONERS

*v.*

STATE OF TEXAS, ET AL.

*ON WRIT OF CERTIORARI*
*TO THE UNITED STATES COURT OF APPEALS*
*FOR THE FIFTH CIRCUIT*

**REPLY BRIEF FOR THE PETITIONERS**

DONALD B. VERRILLI, JR.
  *Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

**App-57**

8

here would leave this country in sufficient numbers to materially reduce those costs, if the Guidance were invalidated. But as respondents recognize (Br. 39), the Department of Homeland Security (DHS) has separately (and validly) exercised its discretion to make these individuals non-priorities for removal. These individuals have lived in this country for years and are particularly unlikely to depart voluntarily, leaving their children behind. And work authorization naturally ameliorates need for state services, and thus should reduce the pressure on the State's fisc. Respondents' alleged social-services costs thus are exceedingly unlikely, not "certainly impending." *Clapper*, 133 S. Ct. at 1147.

### 3. Parens patriae

Respondents' *parens patriae* argument (Br. 30-31) is meritless: "A State does not have standing as *parens patriae* to bring an action against the Federal Government." *Alfred L. Snapp & Son, Inc.* v. *Puerto Rico ex rel. Barez*, 458 U.S. 592, 610 n.16 (1982).

### 4. *"Special solicitude"*

Respondents cannot overcome these obstacles to standing by invoking the "special solicitude" for States referred to in *Massachusetts* v. *EPA*, 549 U.S. 497, 520 (2007). Respondents have not asserted a judicially cognizable "quasi-sovereign interest" protected by a specific "procedural right"—the two considerations *Massachusetts* identified as necessary for its ruling. *Ibid.* The sovereign interest in protecting sovereign territory is well-settled. *Id.* at 519. But third parties generally lack a legally protected interest in enforcement of the immigration laws against others, or the provision of benefits to others. And

**App-58**

15

drawn the line at non-enforcement of removal, and has denied the Secretary the authority to deal with the real-world consequences of his choices. But since 1960, the Executive has established more than 20 policies for according deferred action (or similar forms of discretion) to large groups of aliens living in the United States, including the Family Fairness policy that covered as many as 1.5 million people—and all of those policies enabled aliens to work lawfully. See U.S. Br. 48-57. Indeed, since 1981, regulations have reflected the commonsense proposition that aliens who may remain in this country, as a matter of the Executive's discretion, also should be able to lawfully make ends meet for themselves and their families. 8 C.F.R. 274a.12(c)(14). And Congress has repeatedly ratified the government's position that deferral of enforcement and work authorization go hand in hand. See U.S. Br. 50-57.

Respondents are fundamentally wrong to claim that the Guidance confers on aliens whose presence Congress has deemed unlawful the right to remain lawfully in the United States. Aliens covered by the Guidance, like all aliens afforded deferred action, are violating the law by remaining in the United States, are subject to removal proceedings at the government's discretion, and gain no defense to removal. See pp. 16-18, *infra*. Deferred action itself reflects nothing more than a judgment that the aliens' ongoing presence will be tolerated for a period of time, based on enforcement priorities and humanitarian concerns, and work authorization enables them to support themselves while they remain. If Congress believes that the Secretary's authority should not be exercised in this manner, Congress is free to enact legislation to

Official - Subject to Final Review

1

```
 1            IN THE SUPREME COURT OF THE UNITED STATES

 2    - - - - - - - - - - - - - - - - - x

 3    UNITED STATES, ET AL.,            :

 4              Petitioners            :   No. 15-674

 5         v.                          :

 6    TEXAS, ET AL.,                    :

 7              Respondents.            :

 8    - - - - - - - - - - - - - - - - - x

 9                         Washington, D.C.

10                         Monday, April 18, 2016

11

12            The above-entitled matter came on for oral

13    argument before the Supreme Court of the United States

14    at 10:04 a.m.

15    APPEARANCES:

16    GEN. DONALD B. VERRILLI, JR., ESQ., Solicitor General,

17       Department of Justice, Washington, D.C.; on behalf of

18       Petitioners.

19    THOMAS A. SAENZ, ESQ., Los Angeles, Cal.; on behalf of

20       Intervenor-Respondents in support of Petitioners.

21    SCOTT A. KELLER, ESQ., Solicitor General of Texas,

22       Austin, Tex.; on behalf of Respondents.

23    ERIN E. MURPHY, ESQ., Washington, D.C.; for United

24       States House of Representatives, as amicus curiae,

25       supporting Respondents.
```

Official - Subject to Final Review

87

1   you have a -- you'd have a hard time making that claim

2   given that Congress has made that kind of a judgment.

3              Now, with respect to another point

4   Your Honor made --

5              JUSTICE ALITO:  So your position is that --

6   that there could not be a suit under 1981.

7              GENERAL VERRILLI:  What I'm saying is that

8   Congress made a judgment there that -- that bears very

9   directly on it.

10              But now, with respect to another point that

11   Your Honor raised about specific statutory references to

12   lawful presence, my friends on the other side made a

13   huge deal about this, in particular 8 C.F.R. 1.3, which

14   I think they cite seven or eight times.

15              I urge you to go to look at it.  I urge you

16   to, in fact, read the rulemaking order that went along

17   with it from -- from 1996.  What you'll -- you'll see

18   what it says, that it applies to one thing and one thing

19   only.  That's the accrual of Social Security benefits

20   under Section 1611(b).  And the rulemaking order -- and

21   we quoted this in our reply brief -- specifically says

22   that although we're counting deferred action as lawful

23   presence for the purpose of accruing Social Security

24   benefits for the reason that if you can work lawfully,

25   you ought to be able to accrue benefits.  This does not

88

1   confer any lawful status under the immigration laws.  It

2   specifically says that.

3            And so we can argue about whether the

4   Executive has the authority to consider people with

5   deferred action as lawfully present in that narrow

6   sense.  We think we're right.  Maybe they're right, but

7   that is the tail on the dog here.  That's not --

8            JUSTICE ALITO:  Well, if you -- if the

9   phrase "lawful presence" were stricken from the

10  Guidance, would you take the position that DAPA

11  beneficiaries are not lawfully present for purposes of

12  -- under certain statutes that use that phrase for the

13  re-entry bar, for eligibility for Federal benefits?

14           GENERAL VERRILLI:  It's -- the only Federal

15  benefit is Social Security.

16           JUSTICE ALITO:  Well, would you say they

17  were lawfully present for those two statutory purposes?

18           GENERAL VERRILLI:  No.  There are

19  regulations that say that they are, but we -- and we can

20  fight about that.  But that doesn't -- but that -- as I

21  said, that is the tail on the dog.

22           Now, if I could go to the merits.

23  Repeatedly, you've heard that the Family Fairness policy

24  was pursuant to statutory authorization.  That's just

25  flat wrong.  There's a D.C. Circuit case, and you can

89

1    read Judge Silberman's opinion in that case that we cite

2    at page 49 in our brief which specifically describes it

3    as extra-statutory, which is what it was.

4           Now, the other key point, and I think this

5    is really important.  Their theory about the scope of

6    who can get work authorization is that either Congress

7    has to specifically say you get work authorization, or

8    Congress has to specifically authorize the Attorney

9    General, now DHS, to get -- to grant -- to decide

10   whether people in this particular category can get work

11   authorization.

12          Forget about deferred action.  There are

13   millions of people who get work authorization under

14   existing law now who -- who couldn't get it if -- if

15   that were the proper interpretation of the law.  These

16   millions of people are in proceedings for adjustments of

17   status.  The hundreds of thousands of people who are in

18   proceedings for cancellation of removal.  The hundreds

19   of those of people that have parole.  None of those

20   people qualify under reading of the statute.

21          That is why in 1987, when -- when INS had a

22   rulemaking proceeding about this, they rejected it.  It

23   would completely and totally upend the administration of

24   the immigration laws, and, frankly, it's a reckless

25   suggestion.  And it just -- and -- and they

Official - Subject to Final Review

1    just never --

2              JUSTICE SOTOMAYOR:   People who have asylum

3    don't have a pathway to citizenship.

4              GENERAL VERRILLI:   Exactly.   And there are

5    all kinds of statuses that don't qualify as lawful

6    status that people have always been allowed to get work

7    authorization during the period in which -- time where

8    their presence is tolerated.

9              CHIEF JUSTICE ROBERTS:   How -- how many

10   people are we talking about with those?

11             GENERAL VERRILLI:   Millions.   Millions.

12   There are --

13             CHIEF JUSTICE ROBERTS:   The asylum

14   applications?

15             GENERAL VERRILLI:   No, but the adjustment of

16   status, 4.5 million since 2008, and cancellation

17   removal, 325,000 since 2008.   Huge numbers.

18             Thank you.

19             CHIEF JUSTICE ROBERTS:   Thank you, General.

20             The case is submitted.

21             (Whereupon, at 11:36 a.m., the case in the

22   above-entitled matter was submitted.)

23

24

25

Official - Subject to Final Review

49

1   this --

2               JUSTICE SOTOMAYOR:   Well, it has -- it has

3   acquiesced to larger numbers of Salvadorians,

4   Guatemalans, Hondurans, Haitians, Chinese, the TNU visa

5   applications, those numbers have been much larger than

6   the limited numbers you're quoting right now.

7               MR. KELLER:   And those programs would have

8   been under temporary protective status; humanitarian

9   parole, deferred enforced departure, which is justified

10  -- and has been, at least, under the President's Article

11  II power, and there's no suggestion that -- here DAPA is

12  unprecedented because this is a extra statutory deferred

13  action program that is not bridging lawful status.   The

14  aliens do not have a preexisting status, and they don't

15  have an eminent status.

16              JUSTICE KAGAN:   General, could I take you

17  back a few steps?  General Verrilli said a couple of

18  times that you've essentially conceded the legality of

19  DAPA taking out the work authorization and the Social

20  Security benefits; is that correct?

21              MR. KELLER:   No.   I'll be very clear.   When

22  the Executive is forbearing from removal on a

23  case-by-case basis, that is what this Court in Reno

24  noted was deferred action enforcement discretion.   But

25  when the Executive is transforming unlawful presence

50

1    into lawful presence, and granting eligibility for work

2    authorization and Medicare --

3              JUSTICE KAGAN:  Let me make sure I

4    understand that.  You're saying that the government

5    could do this case-by-case, one by one with respect to

6    all the people in the class, but that the government

7    cannot identify the entire class and say we're

8    forbearing from enforcement; is that correct?

9              MR. KELLER:  While that would be a harder,

10   tougher case, I do believe that they could do it class

11   based if they were simply forbearing from removal.

12             JUSTICE KAGAN:  So that's what I asked

13   originally.  If they were simply forbearing from

14   removal, and there was not work authorization attached

15   to it, and there was not Social Security or any other

16   benefits attached to it, are you conceding that?

17             MR. KELLER:  In this case, given that they

18   are removing 400,000 people a year, we admit that they

19   could do forbearance from removal.  But what they can't

20   do is grant authorization to be in the country.

21             There's a --

22             JUSTICE GINSBURG:  Can I -- can I ask you

23   specifically?  You have a statement in your brief, and

24   that's -- it says that the Executive could give cards,

25   identification cards to all these people saying "low

51

1    priority." Are you adhering to that? Is -- is that
2    what -- what you mean? These people you're objecting to
3    work authorizations, Social Security, but the
4    government, not one by one, but to give everyone who
5    fits into this category a card that says low priority?
6              MR. KELLER: The government, as part of its
7    enforcement discretion, could do that. But that's very
8    different than what they're doing here where they're
9    granting lawful presence. And that matters because
10   that's why we have to grant driver's license. That's
11   why they get --
12             JUSTICE KAGAN: General, are you -- are you
13   just referring to that single phrase in the DAPA
14   memorandum? Is that what you're referring to? Because
15   General Verrilli, of course, says you could strike that
16   phrase today if you wanted to; that that phrase really
17   has no legal consequence whatsoever; that all this
18   document does is do exactly what you said, which is to
19   grant forbearance, to tell people we are -- you are not
20   our enforcement priority, we are not going to deport you
21   until we say otherwise, which we can tomorrow too.
22             MR. KELLER: That lawful presence phrase is
23   key because that's the first time in a deferred-action
24   program the Executive has taken that position. But even
25   if that phrase were struck, that would still not cure

# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 8th day of March, two thousand and eighteen.

Before:       Christopher F. Droney,
                   *Circuit Judge.*

---

Martin Jonathan Batalla Vidal, et al.,

                   Plaintiffs - Appellees,          **ORDER**

v.                                                         Docket No. 18-485

Kirstjen M. Nielsen, Secretary of Homeland
Security, et al.,

                   Defendants - Appellants.

---

State of New York, et al.,

                   Plaintiffs - Appellees,          Docket No. 18-488

v.

Donald J. Trump, President of the United States, et al.,

                   Defendants - Appellants.

---

The Government moves for consolidation of the above-captioned appeals and requests that the Court enter an expedited briefing schedule and hold oral argument as soon as practicable. Plaintiffs-Appellees consent to consolidation but oppose the expedited briefing schedule proposed by the Government.

IT IS HEREBY ORDERED that the request for consolidation is GRANTED. The request to expedite is granted to the following extent: Plaintiffs-Appellees' response briefs are due April 4, 2018; Government's reply brief is due April 16, 2018; and the optional cross-appeal reply briefs are due May 7, 2018.

For the Court:
Catherine O'Hagan Wolfe,
 Clerk of Court



**App-68**

## Declaration of Tom K. Wong

I, Tom K. Wong, declare as follows:

1. My name is Tom K. Wong and I am over eighteen years of age. I have personal knowledge of and could testify in Court concerning the following statements of fact.

2. I am an Associate Professor with tenure at the University of California, San Diego (UCSD). I work in the political science department, which is consistently ranked by U.S. News & World Report as one of the top ten political science departments nationally. I am also the Director of the International Migration Studies Program Minor at UCSD.

3. I am an expert on immigration politics and policy, which includes the Deferred Action for Childhood Arrivals (DACA) policy. I have written two peer-reviewed books and several peer-reviewed journal articles, book chapters, and reports on these subjects. My most recent research on DACA is a national survey of 3,063 DACA recipients conducted in August 2017 (henceforth referred to as the "2017 DACA survey"). The 2017 DACA survey is in addition to two peer-reviewed journal articles on DACA (*International Migration Review* and *Journal on Migration and Human Security*), another forthcoming peer-reviewed journal article on DACA (*Social Problems*), one book-length monograph (supported by a grant from the U.S. Department of Homeland Security [DHS]), and three other reports based on national surveys that I have conducted of DACA recipients.

4. I received a Ph.D. in political science at the end of the 2010-2011 academic year. I was a post-doctoral research fellow during the 2011-2012 academic year. I joined the

DECLARATION OF TOM K. WONG                    1                    ATTORNEY GENERAL OF WASHINGTON
                                                                   800 Fifth Avenue, Suite 2000
                                                                   Seattle, WA 98104-3188
                                                                   (206) 464-7744

political science department at UCSD during the 2012-2013 academic year. I served as an advisor to the White House Initiative on Asian Americans and Pacific Islanders (WHIAAPI), where I worked on the immigration portfolio, during the 2015-2016 academic year.

5. I previously testified as an expert witness in the case, City of El Cenizo, et. al. v. State of Texas, et. al.

6. I am being compensated by the State of Washington in the amount of $5,000.

7. I have attached a true and complete copy of my curriculum vitae as Exhibit A to this Declaration. I have also attached a true and complete copy of the 2017 DACA survey as Exhibit B to this Declaration.

## DACA

1. Since it was first announced on June 15, 2012, the Deferred Action for Childhood Arrivals policy has provided temporary relief from deportation and work authorization to 793,026 people.[1] As of September 4, 2017, there are 689,900 active DACA recipients.[2]

---

[1] Based on the most recent publicly available data from U.S. Citizenship and Immigration Services (USCIS) at the time of this writing, which is up to June 30, 2017. USCIS provides quarterly reports on DACA. See: https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf

[2] The lesser 689,900 figure represents the total number of individuals who, as of September 4, 2017, were "active DACA recipients." For example, those who received DACA may have adjusted to lawful permanent resident (LPR) status. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

DECLARATION OF TOM K. WONG                  2                  ATTORNEY GENERAL OF WASHINGTON
                                                              800 Fifth Avenue, Suite 2000
                                                              Seattle, WA 98104-3188
                                                              (206) 464-7744

**2017 National Survey of DACA Recipients**

2. From August 1, 2017 to August 20, 2017, I conducted a national online survey of DACA recipients. The resulting survey is the largest study to date of DACA recipients with a sample size of 3,063 respondents in forty-six states plus the District of Colombia.

3. Methodologically, several steps were taken to account for the known sources of bias that can result from online panels. To prevent ballot stuffing, meaning one person submitting multiple responses, incentives were not given for each completed survey that was submitted. Moreover, the online survey platform used (Qualtrics) was programmed to prevent one IP address from submitting multiple responses. To prevent spoiled ballots, meaning people who responded to the survey who were not undocumented, I used a unique validation test for undocumented status. Multiple questions were asked about each respondent's migratory history. These questions were asked during different parts of the survey. When a question was repeated, it was posed using different wording. For example, "How old were you when you first came to the U.S.?" and, "In what year did you first come to the U.S.?" (current age was used to tether these answers). If there was agreement in the answers, meaning there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting sample. If there were inconsistencies, the respondent was excluded. Also, Facebook ads were used to improve the geographic representativeness of the resulting sample, as well as to recruit respondents who were outside of the networks of the organizations that conducted outreach for the survey. Because there is no directory of

DECLARATION OF TOM K. WONG                    3                    ATTORNEY GENERAL OF WASHINGTON
                                                                   800 Fifth Avenue, Suite 2000
                                                                   Seattle, WA 98104-3188
                                                                   (206) 464-7744

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 76 of 358
Case 18-485, Document 122, 03/16/2018, 2259132, Page197 of 304

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 453 of 1603 PageID #:
4398

1  undocumented immigrants from which to randomly sample from, researchers need to

2  partner with organizations that interact with undocumented immigrants to conduct such

3  surveys. The outreach partners were United We Dream (UWD), the National

4  Immigration Law Center (NILC), and the Center for American Progress (CAP). These

5  partners distributed the survey link to their respective email lists. Given the nature of

6  online opt-in surveys, it is not possible to construct a valid margin of error.

7  Nevertheless, the survey is methodologically rigorous and sound. Indeed, a peer-

8  reviewed academic journal on DACA based on survey results obtained using the

9  methods described above is forthcoming in a top sociology journal.

10  4.  Evaluating the representativeness of the survey sample requires current and complete

11  data on the characteristics of DACA recipients. The only publicly available data

12  provided by U.S. Citizenship and Immigration Services (USCIS) in its quarterly DACA

13  statistics that are both current and complete is the geographic breakdown of DACA

14  recipients at the state level.[3] Using these data, a two-sample Kolmogorov-Smirnov (K-

15  S) test of equality of distributions can be run to evaluate how well the survey sample

---

[3] USCIS also provides publicly available data on the country of birth of DACA recipients, but these data are incomplete, as only the top twenty-five countries of birth are listed (and one of these is labeled "Unknown"). USCIS has analyzed the demographic characteristics of DACA recipients, but this initial analysis was based on data from August 2012 to September 2013. See: https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Deferred%20Action%20for%20Childhood%20Arrivals/USCIS-DACA-Characteristics-Data-2014-7-10.pdf. More recently, USCIS published an updated analysis (September 2017). A Kolmogorov-Smirnov (K-S) test of equality of distributions shows that the state-by-state breakdown of the survey sample is representative of the state-by-state breakdown of all "active DACA recipients" ($p = .557$) that USCIS analyzed. The null hypothesis for the K-S test is that the two distributions are statistically the same. A $p$ value of .557 means that we are not confident that we can reject the null hypothesis. In other words, this result means we are only 44% confident (1 minus .557) that we can reject the null hypothesis (and thus say that the two distributions are different). By convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result. Moreover, the September 2017 USCIS report indicates that the average age of active DACA recipients is 23.8. The average age of the survey sample is similar at 25.2. The most recent USCIS data do not provide detailed cross-tabulations sufficient for weighting purposes.

DECLARATION OF TOM K. WONG                    4

matches the actual distribution of DACA recipients by state. The results of the K-S test of equality of distributions shows that the state-by-state breakdown of the survey sample is representative of the state-by-state breakdown of all DACA recipients ($p = .570$).[4]

### Characteristics of DACA Recipients

5.   The average age of respondents is 25.2.[5] The average age that respondents first arrived in the U.S. is 6.5.[6] The average number of years that respondents have lived in the U.S. is 18.8.[7] Regarding race and ethnicity, 93% of respondents identify as Hispanic/Latino, 4% identify as Asian or Pacific Islander, 2% identify as White, and 1% identify as Black.[8] Also, 10% of respondents personally identify as lesbian, gay, bisexual, or transgender (LGBT).

### DACA and Economic Integration

6.   DACA has been critical in improving the economic integration of DACA recipients,

---

[4] That is, there is no evidence to suggest that the distribution of survey respondents by state and the actual number of DACA recipients by state is statistically significantly different. Moreover, analyzing and comparing the unweighted and weighted results show that the findings are substantively similar throughout. As previously noted, the null hypothesis for the K-S test is that the two distributions are statistically the same. A $p$ value of .570 means that we are not confident that we can reject the null hypothesis. In other words, this result means we are only 43% confident (1 minus .570) that we can reject the null hypothesis (and thus say that the two distributions are different). By convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result.

[5] As previously noted, a September 2017 USCIS report shows that the average age of "active DACA recipients" is 23.8. The average age of the survey sample is thus similar to the average age of active DACA recipients as reported by USCIS.

[6] In other words, on average, DACA recipients first entered the U.S. during kindergarten or first grade.

[7] Moreover, 38.5% of respondents have lived in the U.S. for 20 years or more.

[8] USCIS does not report race and ethnicity in its quarterly DACA statistics. However, the large majority of the "Top Countries of Origin" listed in the USCIS quarterly reports are Latin American countries.

DECLARATION OF TOM K. WONG                              5                     ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 78 of 358
Case 18-485, Document 122, 03/16/2018, 2259132, Page199 of 304

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 455 of 1603 PageID #: 4400

which is evidenced by their employment rates, their employment in "white collar," higher-skilled jobs, greater job mobility, higher wages, more financial independence, and increased consumer purchasing power, among other indicators.

7. Regarding employment, the data show that 91% of DACA recipients are currently employed. Among those 25 years and older, this percentage climbs to 93%. Moreover, the data show that at least 72% of the top twenty-five Fortune 500 companies employ DACA recipients.

8. DACA recipients are most likely to work in *Office and Administrative Support Occupations* followed by *Sales and Related Occupations* and then *Management, Business, Science, and Arts Occupations*. U.S. Census occupation categories are used to distinguish between types of occupations.[9] Table 1 lists the top ten occupation categories for DACA recipients.

Table 1

| | DACA |
|---|---|
| Office and Administrative Support Occupations | 16.5% |
| Sales and Related Occupations | 11.6% |
| Management, Business, Science, and Arts Occupations | 10.8% |
| Education, Training, and Library Occupations | 9.6% |
| Food Preparation and Serving Occupations | 6.8% |
| Healthcare Support Occupations | 6.4% |
| Healthcare Practitioners and Technical Occupations | 4.6% |
| Community and Social Services Occupations | 4.3% |
| Financial Specialists | 3.4% |
| Legal Occupations | 3.0% |
| Computer and Mathematical Occupations | 3.0% |
| Other | 19.9% |

9. Table 2 below compares the occupations of DACA recipients to native-born workers

---

[9] For detailed occupation listing, see here: https://usa.ipums.org/usa/volii/c2ssoccup.shtml

DECLARATION OF TOM K. WONG                 6                 ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

between the ages of sixteen and thirty-five. As the table shows, DACA recipients are more likely to work in "white-collar" higher-skilled occupations such as *Management, Business, Science, and Arts Occupations*, *Healthcare Support Occupations*, and *Legal Occupations*, and they are less likely to work in "blue-collar" lesser-skilled occupations such as *Building and Grounds Cleaning and Maintenance Occupations*, *Construction and Extraction Occupations*, and *Food Preparation and Serving Occupations*.

Table 2

| | DACA | Native Born | Diff |
|---|---|---|---|
| Management, Business, Science, and Arts Occupations | 10.8% | 6.4% | +4.4% |
| Education, Training, and Library Occupations | 9.6% | 5.9% | +3.7% |
| Healthcare Support Occupations | 6.4% | 3.1% | +3.3% |
| Community and Social Services Occupations | 4.3% | 1.5% | +2.7% |
| Office and Administrative Support Occupations | 16.5% | 13.9% | +2.6% |
| Legal Occupations | 3.0% | 0.9% | +2.2% |
| Financial Specialists | 3.4% | 1.9% | +1.5% |
| Computer and Mathematical Occupations | 3.0% | 2.3% | +0.8% |
| Architecture and Engineering Occupations | 2.1% | 1.5% | +0.6% |
| Business Operations Specialists | 2.8% | 2.3% | +0.4% |
| Life, Physical, and Social Science Occupations | 1.2% | 0.8% | +0.4% |
| Extraction Workers | 0.1% | 0.2% | -0.1% |
| Farming, Fishing, and Forestry Occupations | 0.1% | 0.6% | -0.5% |
| Healthcare Practitioners and Technical Occupations | 4.6% | 5.2% | -0.5% |
| Arts, Design, Entertainment, Sports, and Media | 1.5% | 2.2% | -0.7% |
| Military Specific Occupations | 0.0% | 0.8% | -0.8% |
| Building and Grounds Cleaning and Maintenance | 1.4% | 2.8% | -1.4% |
| Sales and Related Occupations | 11.6% | 13.0% | -1.4% |
| Protective Service Occupations | 0.8% | 2.6% | -1.7% |
| Construction and Extraction Occupations | 1.8% | 3.9% | -2.1% |
| Installation, Maintenance, and Repair Workers | 0.8% | 3.2% | -2.3% |
| Personal Care and Service Occupations | 2.0% | 4.4% | -2.4% |
| Production Occupations | 2.6% | 5.1% | -2.5% |
| Transportation and Material Moving Occupations | 2.7% | 5.7% | -3.0% |
| Food Preparation and Serving Occupations | 6.8% | 9.9% | -3.0% |

Note: percentages may not sum to 100 due to rounding. The column "DACA" refers to DACA recipients. "Native Born" refers to native-born workers who are (a) employed and are (b) between the ages of sixteen and thirty-five. These data come from the U.S. Census 2011-2015 American Community Survey (ACS) 5-year Public Use Microdata, which represents the most up-to-date 5-year file. "Diff" is the difference in the percentage between DACA recipients and comparable native-born workers.

DECLARATION OF TOM K. WONG                    7

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 80 of 358
Case 18-485, Document 122, 03/16/2018, 2259132, Page201 of 304

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 457 of 1603 PageID #: 4402

10. Moreover, after receiving DACA:

    a.  54% got their first job;

    b.  69% got a job with better pay;

    c.  54% got a job that better fits their education and training;

    d.  54% got a job that better fits their long-term career goals;

    e.  57% got a job with health insurance or other benefits;[10]

    f.  56% got a job with improved work conditions; and

    g.  5% started their own businesses.[11]

Table 3 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 3

| | | ≥ 25 |
|---|---|---|
| Got my first job | 54.2% | 35.3% |
| Got a job with better pay | 68.5% | 77.7% |
| Got a job that better fits my education and training | 54.2% | 59.6% |
| Got a job that better fits my long-term career goals | 53.9% | 61.4% |
| Got a job with health insurance or other benefits | 57.3% | 66.9% |
| Got a job with improved work conditions | 56.2% | 64.4% |
| Started my own business | 5.4% | 7.9% |

Note: percentages do not sum to 100 as individuals may select all that apply. $n = 1,662$ for all respondents 25 years and older.

11. Regarding earnings, the data make clear that DACA is having a positive and significant

---

[10] 49.2% of respondents in my 2016 DACA survey reported that they obtained health insurance through their employer and 46.8% of respondents reported that they had "Received health care using [their] newly obtained health insurance."

[11] This rate of business starts is higher than the rate of business starts for the American public as a whole (3.1%).

DECLARATION OF TOM K. WONG          8          ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    effect on the wages of DACA recipients.

2    12. The average hourly wage of DACA recipients has increased by 69% since receiving

3    DACA. Among those 25 years and older, the average hourly wage has increased by

4    81% since receiving DACA. I have noted in previous research that more work (and

5    time) may be needed to parse out the short- and long-run wage effects of DACA, as

6    well as to answer the question of whether short-run gains in wages represent a plateau

7    in earnings or if more robust long-run wage effects exist. This continues to be true.

8    However, because of the continued upward trajectory in the observed wages of DACA

9    recipients, it is likely that there is even more room for wage growth as DACA

10   recipients move further along in their careers. These gains will disappear if these

11   individuals lose their DACA status and the accompanying work authorization.

12   13. The data also show that average annual earnings among DACA recipients is $36,232.

13   Among those 25 years and older, it is $41,621. A multivariate Ordinary Least Squares

14   (OLS) regression regressing annual earnings on age shows that annual earnings

15   increase by $1,583 for each year that a DACA recipient grows older ($p < .001$).[12] These

16   gains will also disappear if these individuals lose their DACA status and the

17   accompanying work authorization.

18   14. Higher wages have meant greater financial independence and consumer purchasing

---

[12] The model controls for number of years in the U.S., whether the DACA recipient is in school, whether the DACA recipient has a bachelor's degree or higher, and state-level fixed effects. The null hypothesis for age is that age has no effect on annual earnings. A $p$ value of less than .001 means that we are over 99.9% confident (1 minus < .001) that we can reject the null hypothesis that age has no effect on annual earnings and thus say that age is positively and statistically significantly related to annual earnings. To recall, by convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result.

DECLARATION OF TOM K. WONG                  9                  ATTORNEY GENERAL OF WASHINGTON
                                                              800 Fifth Avenue, Suite 2000
                                                              Seattle, WA 98104-3188
                                                              (206) 464-7744

1    power for DACA recipients:

2        a.  69% reported that after their DACA application was approved, "[they] have

3            been able to earn more money, which has helped [them] become financially

4            independent";

5

6        b.  71% reported that after their DACA application was approved, "[they] have

7            been able to earn more money, which has helped [their] family financially";

8        c.  Among those who have a bachelor's degree or higher and are no longer in

9            school, 27% reported paying off some or all of their student loans after their

10           DACA application was approved;

11

12        d.  65% purchased their first car after their DACA application was approved; and

13        e.  16% purchased their first home after their DACA application was approved.

14    Table 4 summarizes these results. The column "≥ 25" reports the results for

15    respondents 25 years and older.

16

17                                Table 4

18

|  |  | $\geq 25$ |
|---|---|---|
| I have been able to earn more money, which has helped me become financially independent | ........................................ | 69.0%   73.4% |
| I have been able to earn more money, which has helped my family financially | ........................................ | 70.8%   73.7% |
| Paid off some/all of my student loans | ........................................ | 27.1%   27.4% |
| Bought my first car | ........................................ | 64.5%   67.2% |
| Bought a home | ........................................ | 15.7%   23.5% |

Note: percentages do not sum to 100 as individuals may select all that apply. $n = 1,662$ for all respondents 25 years and older.

DECLARATION OF TOM K. WONG        10

15. Higher wages are indicative of the broader positive economic impact of DACA. For example, higher wages translate into more in Federal Insurance Contributions Act (FICA) contributions, which are mandatory payroll deductions for Social Security and Medicare. Using data on wages and earnings from the 2017 DACA survey, I estimate that DACA recipients will add $39.3 billion in Social Security and Medicare contributions (half in employee contributions and half in employer contributions) over a ten-year period.[13] These contributions will disappear if these individuals lose their DACA status and the accompanying work authorization.[14]

16. In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "If I were to lose DACA the first thing to go with it would be my job as a nurse. This would [...] make it impossible for my family to afford to pay our mortgage. I would lose my home." Another DACA recipient writes, "I will lose my job and the associated health/retirement benefits I have been paying into. Right now my family depends on the income that I make working [...] I'm also paying off a new car that I bought last year. It would be difficult for me to continue paying for it if I'm not able to work where I do now." Another DACA recipient writes, "I will lose my job, which then would have a trickle effect [...] losing my vehicle for

---

[13] This breaks down into $31.8 billion in Social Security contributions and $7.4 billion in Medicare contributions. For a detailed explanation of the methodology used to estimate Social Security and Medicare contributions, see here: https://www.ilrc.org/sites/default/files/resources/2017-09-29_draining_the_trust_funds_final.pdf

[14] Higher wages also translate into more in federal income taxes paid, more in state income taxes paid. Large purchases such as cars add to state tax revenues, as most states collect a percentage of the car purchase in sales tax, along with additional registration and title fees. Similarly, home buying further adds to state and local tax revenues in the form of property taxes. There is a large literature on how home buying creates new jobs and adds new spending in local economies. For job creation, see here: https://www.nar.realtor/topics/home-ownership-matters/jobs-impact-of-an-existing-home-purchase. For spending in local economies, see here: https://www.cnbc.com/2017/04/12/immigrant-households-impact-success-of-real-estate-market-says-report.html

DECLARATION OF TOM K. WONG                    11                    ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 84 of 358
Case 18-485, Document 122, 03/16/2018, 2259132, Page205 of 304
Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 461 of 1603 PageID #: 4406

non-payment, losing my home and being evicted, going into higher debt for not being able to pay credit cards." Another DACA recipient writes, "I have spoken to my supervisors about what would happen if DACA were to end and they informed me that since they know I have DACA they would not be able to keep me on if I did not have work authorization." A DACA recipient who owns a business writes, "our restaurant would disappear." Another DACA recipient writes, "I would no longer be able to work as an EMT." Another DACA recipient writes, "If DACA ends [...] My students would be left without a teacher for the rest of the year." Another DACA recipient writes, "I won't be able to accept [a] fulltime offer from [an employer], which is contingent on my completing my MBA in 2018." Another DACA recipient writes, "I will not be able to practice medicine when I graduate from medical school." Another DACA recipient writes, "I have a degree in engineering, and I want to obtain my professional engineering license. If I do not have DACA, I would not be able to work, thus I would not be able to accumulate the necessary work experience to obtain my PE license." Another DACA recipient writes, "I will lose my career, the opportunity to get my CDL [Commercial Driver License], the opportunity to eventually become a citizen and join the army like I've always wanted since a child."

## DACA and Education

17. DACA improves educational outcomes for DACA recipients.

18. Regarding education, 45% of DACA recipients are currently in school.[15]

---

[15] The percentage of respondents who are currently in school has slowly declined over the four years that I have been surveying DACA recipients. This makes intuitive sense: as DACA recipients grow older, they are

DECLARATION OF TOM K. WONG                    12

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

19. Among those who are currently in school, 94% reported, "[they] pursued educational opportunities that [they] previously could not" because of DACA.

20. Moreover, among those in school, 72% are pursuing a bachelor's degree or higher (an additional 19% are pursuing an associate's degree). The majors and specializations that DACA recipients are pursuing include accounting, biochemistry, business administration, chemical engineering, civil engineering, computer science, early childhood education, economics, environmental science, history, law, mathematics, mechanical engineering, neuroscience, physics, psychology, and social work, to name a few. These majors and specializations concretize how the education that DACA recipients are receiving is contributing to the development of a better prepared and more competitive college-educated workforce.

21. Regarding educational attainment, 36% of respondents 25 years and older have a bachelor's degree or higher. This percentage is higher than the 30% of native-born persons 25 years and older who have a bachelor's degree or higher, but is similar to the 34% of foreign-born naturalized persons 25 years and older who have a bachelor's degree or higher.[16]

22. In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "DACA has given me the opportunity to be someone in life. Ever since I was in elementary school, I was a good student. I liked

---

more likely to transition out of school and into their careers. Moreover, as the USCIS quarterly DACA statistics show, older DACA recipients are not being replaced at anywhere close to the rate in which younger DACA recipients have aged into eligibility.

[16] These data come from the U.S. Census 2011-2015 American Community Survey (ACS) 5-year Public Use Microdata, which represents the most up-to-date 5-year file.

DECLARATION OF TOM K. WONG                    13                    ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

school and I liked to learn […] Depression was really getting to me because I saw my friends pursuing their dreams, and I was not allowed to do the same. It did not matter how smart I was, how much of a hard worker I was, or how much passion I had; I was never going to be able to become who I wanted to be. DACA opened the door, it gave a lot of us hope. Thanks to DACA, I am now a woman who is pursuing an engineering degree." Another DACA recipient writes, "With DACA, I have worked as a researcher and am now starting the grad school application process for PhD programs. I have wanted to be a scientist since I was nine years old, staring out of my first telescope. DACA allows that dream to not be hindered. I still cannot apply for anything funded by the National Science Foundation or work for NASA, but hopefully my status will one day become permanent and those doors will become open to me as well." Another DACA recipient writes, "Without DACA, I would lose the ability to continue working legally and will have to stop attending school since I will not be able to afford it. I will lose the opportunity to become a certified teacher […] and will not be able to fulfill my dreams of being an educator." Another DACA recipient writes, "I will be unable to continue my education in computer science." Another DACA recipient writes, "If DACA ends, I will lose the opportunity of pursuing the career I've been studying for my whole life. I will not be able to work anywhere, so my degree won't matter."

### DACA and Normality in Day-to-Day Life

23. The data further show that DACA has given DACA recipients a sense of normality in their day-to-day lives, which has led to a greater sense of belonging and inclusion and,

DECLARATION OF TOM K. WONG                14                ATTORNEY GENERAL OF WASHINGTON
                                                                            800 Fifth Avenue, Suite 2000
                                                                            Seattle, WA 98104-3188
                                                                            (206) 464-7744

App-82

1   in some cases, improved mental health.

2   24. In the 2017 DACA survey, respondents were asked to describe "what you will lose if

3   DACA ends." One DACA recipient writes, "I will lose my feeling of belonging in the

4   only country I have truly ever known." Another DACA recipient writes, "I would lose

5   my sense of belonging. For the first time I feel safe without fear." Another DACA

6   recipient writes, "Having DACA has changed my life completely, I feel like I have

7   purpose again. I can go to school and work. I can strive now for a better life. Things are

8   more manageable. Before DACA, I lost all hope of ever becoming anything or

9   accomplishing anything. I've regained a lot of that hope and now I have a strong drive

10   to succeed." Another DACA recipient writes, "DACA was a glimpse of what I could

11   have if I had papers and it made me love this country more." Another DACA recipient

12   writes, "DACA has allowed me to feel a sense of hope and security within the nation I

13   grew up in […] its existence provides me with the reassurance that someone cares, that

14   someone is listening, and that we are not alone." Another DACA recipient writes, "I

15   will lose feeling safe and protected." Another DACA recipient writes, "I will lose the

16   independence and freedom I had to wait so many years to have." Another DACA

17   recipient writes, "I will no longer be able to drive to school or work." Another DACA

18   recipient writes, "I will lose a sense of safety. I remember feeling a lot of fear, anxiety,

19   and uncertainty about my future before DACA was passed. I'm worried all of that will

20   come flooding back. Aside from the practical things, like losing my license, my job, my

21   independence, I really don't want to feel that way again. I have become more open with

22   people since DACA, and I don't want to go back to having to worry about what I say

DECLARATION OF TOM K. WONG                15        ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 88 of 358
Case 18-485, Document 122, 03/16/2018, 2259132, Page209 of 304

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 465 of 1603 PageID #:
4410

1   and to who."

2   25. Moreover, despite being brought to the U.S., on average, at the age of 6.5, and despite

3   having lived in the U.S., on average, 18.8 years, it was only after receiving DACA that:

4
5       a.   61% opened a bank account;

6       b.   66% got their first credit card;

7       c.   90% got a driver's license or state identification card for the first time; and

8       d.   49% became organ donors.

9   Table 5 summarizes these results. The column "≥ 25" reports the results for

10  respondents 25 years and older.

11
### Table 5

| | | | ≥ 25 |
|---|---|---|---|
| Opened a bank account | ...................................... | 61.0% | 47.3% |
| Got my first credit card | ...................................... | 65.7% | 67.9% |
| Got my driver's license or state identification card for the first time | ...................................... | 90.3% | 88.3% |
| Became an organ donor | ...................................... | 48.7% | 49.8% |

Note: percentages do not sum to 100 as individuals may select all that apply. $n$ = 1,662 for all respondents 25 years and older.

19  **DACA Recipients and American Citizen Family Members**

20  26. The data also show that DACA recipients are deeply interwoven in families that

21  include American citizen siblings, spouses, and children. Indeed, 73% of DACA

22  recipients have either an American citizen sibling, spouse, or child:

23
24      a.   59% reported having an American citizen sibling;

25      b.   17% reported having an American citizen spouse; and

26

DECLARATION OF TOM K. WONG                16                ATTORNEY GENERAL OF WASHINGTON
                                                                800 Fifth Avenue, Suite 2000
                                                                Seattle, WA 98104-3188
                                                                (206) 464-7744

1       c.   26% reported having an American citizen child.

2    Table 6 summarizes these results.

3 Table 6

| | | |
|---|---|---|
| American citizen spouse | ........................................ | 16.6% |
| American citizen child | ........................................ | 25.7% |
| American citizen sibling | ........................................ | 58.9% |
| American citizen spouse, child, or sibling | ........................................ | 72.7% |

Note: percentages do not sum to 100 as individuals may select all that apply.

27. In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "My daughter is a 4 year old U.S. citizen and everything I do is to give her a better life. I would lose the ability to safely go to school and work. I would constantly worry that my daughter would end up in foster care." Another DACA recipient writes, "I will lose my job and face possible deportation and being separated from my son who is only 3 and needs his mom." Another DACA recipient writes, "Sometimes I can't even sleep just thinking of what's going to happen with DACA […] I'm not only thinking about my future, but my son's." Another DACA recipient writes, "I just had my second child 2 weeks ago […] my plans are to go back to work by next year and I'm truly scared that by that time I won't be able to […] Now more than ever I need DACA to support my kids." Another DACA recipient writes, "a year into my new DACAmented life, my daughter was born and she has been such a blessing, but I am more afraid than ever about the consequences my status might have. If DACA ends, I lose the peace of mind that I will be here to raise her. I work 60+ hours a week at 2 jobs so I can provide for her and if

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 90 of 358
Case 18-485, Document 122, 03/16/2018, 2259132, Page211 of 304

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 467 of 1603 PageID #: 4412

DACA ends I will not be able to do so." Another DACA recipient writes, "we risk being homeless with a new-born child if DACA ends." Another DACA recipient writes, "My kids are U.S. citizens [...] I will lose my job, I will lose the opportunity to give my kids a better life [...] Please, I beg to continue to have DACA. It is not just about being legal, but is also about having a better life for my kids." Another DACA recipient writes, "we would struggle providing for our kids who are all citizens [...] I hope this never happens because our family has so much riding on whether my next permit is approved or not." Another DACA recipient writes, "I have a 3 year old daughter who is heading to Head Start this year and I am currently pregnant. I would miss out on my kid's lives, as they would most likely stay in the U.S. with their dad." Another DACA recipient writes, "I would lose healthcare coverage for me and my son." Another DACA recipient writes, "having my driver's license taken away would be a devastating blow [...] I take my sons to school and childcare almost every day." Another DACA recipient writes, "without my driver's license I won't be able to drive to school or any of my son's doctor's appointments." Another DACA recipient writes, "How do you tell your 5 year old mommy can't bring food to the table because of a simple paper? How do you explain to your child that there will be no more sports because we can no longer drive?" Another DACA recipient writes, "I would lose my job first of all and if I lose my job I will lose my apartment. I will have to stay with family or other people and hopefully find a way to make some money in order to take care of my 3 year old. I will definitely end up in debt without a way to pay my bills and I will have to ask for public assistance to feed my son. It sounds extreme but that's

DECLARATION OF TOM K. WONG                    18

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

what will happen if I cannot work because I have no parents left and no one is going to take care of me or my son." Another DACA recipient writes, "I am married now with a 10 month old daughter […] if DACA ended I would be really scared to be split up from my daughter and husband and family. I have been here since I was 8 months old, this is my home, I don't know my place of birth." Another DACA recipient writes, "My U.S. citizen husband and U.S. citizen children would constantly be worrying about me because the likelihood of deportation would increase greatly." Another DACA recipient writes, "My wife and I have barely just begun our adult lives together. We have medical and student debt, monthly utility expenses, a mortgage, car payments, insurance payments and groceries to buy. We are just like any other young responsible adults trying to kick start their careers to gain financial stability and potentially start a family. Without my job I lose my ability to contribute to our monthly expenses. We would lose our financial stability and could lose everything which could ruin our lives before they even begin." Another DACA recipient writes, "If DACA ended […] it would put a stress on my marriage." Another DACA recipient writes, "I would lose my family […] my husband is a U.S. citizen […] my brother is also a citizen, and a U.S. Marine."

**Many May Go "Into the Shadows" Without DACA**

28. Many DACA recipients may go back into the shadows if these individuals lose their DACA status and the accompanying work authorization.

29. In the 2017 DACA survey, respondents were asked to describe "what you will lose if

DECLARATION OF TOM K. WONG                    19                    ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 92 of 358
Case 18-485, Document 122, 03/16/2018, 2259132, Page213 of 304

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 469 of 1603 PageID #: 4414

1  DACA ends." One DACA recipient writes, "I really can't imagine living in the
2  darkness again [...] I have been a good member of society, I pay my taxes, and I have
3  never gotten in trouble with the law." Another DACA recipient writes, "With DACA I
4  was able to begin planning for a better future, if it's taken away I'll go back to trying to
5  get by day to day." Another DACA recipient writes, "Losing DACA will be
6  devastating because everything that I have built up to this point will be lost. I will lose
7  my current employment, the health insurance provided by my employer, and driver's
8  license for starters. Most importantly, I will return back to the shadows facing certain
9  deportation considering the government already has all of my information." Another
10  DACA recipient writes, "If DACA ends [...] I lose everything. I can no longer work
11  and my mental health will suffer. Currently my mental health is already suffering
12  because of the constant fear about whether DACA will be taken away. This is the only
13  place that I call home and people want to take that away from me. It is a terrible feeling
14  and I hate that I have to be in this position, but none of us chose it and we are trying to
15  do our best to make a living and do things the right way." Another DACA recipient
16  writes, "I would go back to the shadows that I once thought I would never go back too.
17  I would live in fear." Another DACA recipient writes, "I will live in fear and hiding,
18  again." Another DACA recipient writes, "what hurts most is losing my ability to live
19  without fear. To be back in the shadows, to feel less than and incapable of doing
20  anything about the circumstances, [to] feel betrayed by the government who promised
21  to protect us if we came out of the shadows and followed the rules." Another DACA
22  recipient writes, "losing DACA would make me lose faith in a government [that] asked

DECLARATION OF TOM K. WONG                20                    ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

us to come fourth and identify ourselves in exchange for a taste of regular American life." Another DACA recipient writes, "Everything that I've been working so hard for will suddenly mean nothing. All the contributions I've given to this country will be ignored and unrecognized by the government."

30. Moreover, when given a scenario in which they no longer had DACA[17]:

    a. 53% reported that they would be less likely to report a crime they witnessed;

    b. 47% reported that they would be less likely to report a crime even if they were the victim;

    c. 48% reported that they would be less likely to go to the hospital if they suffered an injury; and

    d. 60% reported that they would be less likely to report wage theft by their employer.

31. Moreover, many DACA recipients fear what the government will do with their personal information.

32. Among respondents who were eligible to renew, but had not yet submitted a renewal application[18]:

    a. 18% reported that fear of providing updated information to the government was a prohibitive factor[19]; and

    b. 26% reported that fear that the government will use the information provided in

---

[17] The question was worded, "If you no longer had DACA, would you be more or less likely to do the following…"

[18] This represents 11.2% of respondents.

[19] In my 2016 DACA survey, just 2% of respondents who were eligible to renew, but had not yet submitted a renewal application reported that that fear of providing updated information to the government was a prohibitive factor.

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 94 of 358
Case 18-485, Document 122, 03/16/2018, 2259132, Page215 of 304

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 471 of 1603 PageID #: 4416

the renewal application for immigration enforcement purposes was a prohibitive factor.

33. Among respondents who were not yet eligible to renew,[20] 28% agreed or strongly agreed with the statement, "I'm less likely to apply to renew my DACA status when I become eligible to do so because I fear that the government will use my information for immigration enforcement purposes."

34. The prospect of going back into the shadows and fear about what the government will do with their personal information likely exacerbates the concerns that DACA recipients had when they first applied for DACA.

35. In my 2014 DACA survey, the concerns that DACA recipients had when they first applied included:

    a.  79% reported being concerned about what would happen if DACA ended;

    b.  59% reported being concerned about letting the government know they were undocumented;

    c.  49% reported being concerned about revealing their personal information;

    d.  59% reported being concerned about revealing information about their family;

    e.  59% reported being concerned "that the information [they] revealed in [their] application would be used to put [them] or [their] family in detention and/or deportation proceedings"; and

    f.  32% reported hearing that "the government was not going to use the information in the DACA application for enforcement purposes (e.g., detention

---

[20] This represents 46.9% of respondents.

DECLARATION OF TOM K. WONG       22

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

or deportation)."

### DACA Recipients by State

36. Below are examples of state-specific profiles of DACA recipients. Data from the survey are used to construct these profiles.[21]

### DACA Recipients in the State of Colorado

37. As of September 4, 2017, there were 15,500 active DACA recipients in the State of Colorado.[22]

38. Regarding employment and earnings:

    a. An estimated 14,167 DACA recipients in the State of Colorado are currently employed[23];

    b. An estimated 837 DACA recipients in the State of Colorado are business owners[24]; and

    c. The State of Colorado's DACA recipients earn an estimated $513.3 million

---

[21] To construct state-specific profiles, a previous version of this declaration used USCIS quarterly statistics (published on September 20, 2017 for the 3rd quarter of 2017) on the total number of individuals who received DACA as of June 30, 2017. Recently, USCIS published statistics on the total number of individuals with DACA as of September 4, 2017 (https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf). The state-specific profiles herein use the most up-to-date information at the time of this writing, which is information on the total number of individuals with DACA as of September 4, 2017.

[22] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf

[23] 91.4% of 15,500.

[24] 5.4% of 15,500.

DECLARATION OF TOM K. WONG      23      ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Case 1:18-cv-00068  Document 209-2  Filed on 07/21/18 in TXSD  Page 96 of 358
Case 18-485, Document 122, 03/16/2018, 2259132, Page217 of 304

Case 1:17-cv-05228-NGG-JO  Document 97-1  Filed 12/15/17  Page 473 of 1603 PageID #: 4418

annually.[25]

39. Regarding education:

    a.  An estimated 6,960 DACA recipients in the State of Colorado are currently in school[26];

    b.  Among those currently in school, an estimated 6,514 have "pursued educational opportunities that I previously could not" because of DACA[27]; and

    c.  An estimated 4,976 DACA recipients in the State of Colorado are currently pursuing a bachelor's degree or higher.[28]

40. Regarding American citizen family members:

    a.  An estimated 11,269 DACA recipients in the State of Colorado have an American citizen sibling, spouse, or child.[29]

### DACA Recipients in the State of Connecticut

41. As of September 4, 2017, there were 3,800 active DACA recipients in the State of Connecticut.[30]

42. Regarding employment and earnings:

    a.  An estimated 3,473 DACA recipients in the State of Connecticut are currently

---

[25] 14,167 multiplied by $36,231.91. This translates into $31.8 million annually in Social Security contributions (6.2% per FICA) and $7.4 million annually in Medicare contributions (1.45% per FICA).
[26] 44.9% of 15,500.
[27] 93.6 % of 6,960.
[28] 71.5% of 6,960.
[29] 72.7% of 15,500.
[30] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

DECLARATION OF TOM K. WONG         24         ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

employed[31];

    b.  An estimated 205 DACA recipients in the State of Connecticut are business owners[32]; and

    c.  The State of Connecticut's DACA recipients earn an estimated $125.8 million annually.[33]

43. Regarding education:

    a.  An estimated 1,706 DACA recipients in the State of Connecticut are currently in school[34];

    b.  Among those currently in school, an estimated 1,597 have "pursued educational opportunities that I previously could not" because of DACA[35]; and

    c.  An estimated 1,220 DACA recipients in the State of Connecticut are currently pursuing a bachelor's degree or higher.[36]

44. Regarding American citizen family members:

    a.  An estimated 2,763 DACA recipients in the State of Connecticut have an American citizen sibling, spouse, or child.[37]

**DACA Recipients in the State of Delaware**

45. As of September 4, 2017, there were 1,100 active DACA recipients in the State of

---

[31] 91.4% of 3,800.
[32] 5.4% of 3,800.
[33] 3,473 multiplied by $36,231.91. This translates into $7.8 million annually in Social Security contributions (6.2% per FICA) and $1.8 million annually in Medicare contributions (1.45% per FICA).
[34] 44.9% of 3,800.
[35] 93.6% of 1,706.
[36] 71.5% of 1,706.
[37] 72.7% of 3,800.

DECLARATION OF TOM K. WONG            25

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 98 of 358
Case 18-485, Document 122, 03/16/2018, 2259132, Page219 of 304

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 475 of 1603 PageID #: 4420

Delaware.[38]

46. Regarding employment and earnings:

    a.  An estimated 1,005 DACA recipients in the State of Delaware are currently employed[39]; and

    b.  The State of Delaware's DACA recipients earn an estimated $36.4 million annually.[40]

47. Regarding education:

    a.  An estimated 494 DACA recipients in the State of Delaware are currently in school[41];

    b.  Among those currently in school, an estimated 462 have "pursued educational opportunities that I previously could not" because of DACA[42]; and

    c.  An estimated 353 DACA recipients in the State of Delaware are currently pursuing a bachelor's degree or higher.[43]

48. Regarding American citizen family members:

    a.  An estimated 800 DACA recipients in the State of Delaware have an American citizen sibling, spouse, or child.[44]

---

[38] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[39] 91.4% of 1,100.
[40] 1,005 multiplied by $36,231.91. This translates into $2.3 million annually in Social Security contributions (6.2% per FICA) and $0.5 million annually in Medicare contributions (1.45% per FICA).
[41] 44.9% of 1,100.
[42] 93.6 % of 494.
[43] 71.5% of 494.
[44] 72.7% of 1,100.

DECLARATION OF TOM K. WONG        26

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**DACA Recipients in the District of Columbia**

49. As of September 4, 2017, there were 920 active DACA recipients in the District of Columbia.[45]

50. Regarding employment and earnings:

    a.  An estimated 841 DACA recipients in the District of Columbia are currently employed[46]; and

    b.  The District of Columbia's DACA recipients earn an estimated $30.5 million annually.[47]

51. Regarding education:

    a.  An estimated 413 DACA recipients in the District of Columbia are currently in school[48];

    b.  Among those currently in school, an estimated 387 have "pursued educational opportunities that I previously could not" because of DACA[49]; and

    c.  An estimated 295 DACA recipients in the District of Columbia are currently pursuing a bachelor's degree or higher.[50]

52. Regarding American citizen family members:

    a.  An estimated 669 DACA recipients in the District of Columbia have an

---

[45] As a common rule, smaller sample sizes lead to greater uncertainty around estimates.
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[46] 91.4% of 920.
[47] 841 multiplied by $36,231.91. This translates into $1.9 million annually in Social Security contributions (6.2% per FICA) and $0.4 million annually in Medicare contributions (1.45% per FICA).
[48] 44.9% of 920.
[49] 93.6 % of 413.
[50] 71.5% of 413.

DECLARATION OF TOM K. WONG

27

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

American citizen sibling, spouse, or child.[51]

**DACA Recipients in the State of Hawaii**

53. As of September 4, 2017, there were 320 active DACA recipients in the State of Hawaii.[52]

54. Regarding employment and earnings:

    a.  An estimated 292 DACA recipients in the State of Hawaii are currently employed[53]; and

    b.  The State of Hawaii's DACA recipients earn an estimated $10.6 million annually.[54]

55. Regarding education:

    a.  An estimated 144 DACA recipients in the State of Hawaii are currently in school[55];

    b.  Among those currently in school, an estimated 134 have "pursued educational opportunities that I previously could not" because of DACA[56]; and

    c.  An estimated 103 DACA recipients in the State of Hawaii are currently pursuing a bachelor's degree or higher.[57]

---

[51] 72.7% of 920.
[52] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[53] 91.4% of 320.
[54] 292 multiplied by $36,231.91. This translates into approximately $0.7 million annually in Social Security contributions (6.2% per FICA) and $0.2 million annually in Medicare contributions (1.45% per FICA).
[55] 44.9% of 320.
[56] 93.6 % of 144.
[57] 71.5% of 144.

DECLARATION OF TOM K. WONG      28      ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

56. Regarding American citizen family members:

    a.  An estimated 233 DACA recipients in the State of Hawaii have an American citizen sibling, spouse, or child.[58]

## DACA Recipients in the State of Illinois

57. As of September 4, 2017, there were 35,600 active DACA recipients in the State of Illinois.[59]

58. Regarding employment and earnings:

    a.  An estimated 32,538 DACA recipients in the State of Illinois are currently employed[60];

    b.  An estimated 1,922 DACA recipients in the State of Illinois are business owners[61]; and

    c.  The State of Illinois's DACA recipients earn an estimated $1.2 billion annually.[62]

59. Regarding education:

    a.  An estimated 15,984 DACA recipients in the State of Illinois are currently in school[63];

    b.  Among those currently in school, an estimated 14,961 have "pursued

---

[58] 72.7% of 320.
[59] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[60] 91.4% of 35,600.
[61] 5.4% of 35,600.
[62] 32,538 multiplied by $36,231.91. This translates into $73.1 million annually in Social Security contributions (6.2% per FICA) and $17.1 million annually in Medicare contributions (1.45% per FICA).
[63] 44.9% of 35,600.

DECLARATION OF TOM K. WONG          29         ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

educational opportunities that I previously could not" because of DACA[64]; and

   c. An estimated 11,429 DACA recipients in the State of Illinois are currently pursuing a bachelor's degree or higher.[65]

60. Regarding American citizen family members:

   a. An estimated 25,881 DACA recipients in the State of Illinois have an American citizen sibling, spouse, or child.[66]

**DACA Recipients in the State of Iowa**

61. As of September 4, 2017, there were 2,500 active DACA recipients in the State of Iowa.[67]

62. Regarding employment and earnings:

   a. An estimated 2,285 DACA recipients in the State of Iowa are currently employed[68];

   b. An estimated 135 DACA recipients in the State of Iowa are business owners[69]; and

   c. The State of Iowa's DACA recipients earn an estimated $82.8 million annually.[70]

---

[64] 93.6 % of 15,984.
[65] 71.5% of 15,984.
[66] 72.7% of 35,600.
[67] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[68] 91.4% of 2,500.
[69] 5.4% of 2,500.
[70] 2,285 multiplied by $36,231.91. This translates into $5.1 million annually in Social Security contributions (6.2% per FICA) and $1.2 million annually in Medicare contributions (1.45% per FICA).

DECLARATION OF TOM K. WONG         30         ATTORNEY GENERAL OF WASHINGTON
                                                       800 Fifth Avenue, Suite 2000
                                                       Seattle, WA 98104-3188
                                                       (206) 464-7744

63. Regarding education:

    a.  An estimated 1,123 DACA recipients in the State of Iowa are currently in school[71];

    b.  Among those currently in school, an estimated 1,051 have "pursued educational opportunities that I previously could not" because of DACA[72]; and

    c.  An estimated 803 DACA recipients in the State of Iowa are currently pursuing a bachelor's degree or higher.[73]

64. Regarding American citizen family members:

    a.  An estimated 1,818 DACA recipients in the State of Iowa have an American citizen sibling, spouse, or child.[74]

**DACA Recipients in the State of Massachusetts**

65. As of September 4, 2017, there were 5,900 active DACA recipients in the State of Massachusetts.[75]

66. Regarding employment and earnings:

    a.  An estimated 5,393 DACA recipients in the State of Massachusetts are currently employed[76];

    b.  An estimated 319 DACA recipients in the State of Massachusetts are business

---

[71] 44.9% of 2,500.
[72] 93.6% of 1,123.
[73] 71.5% of 1,123.
[74] 72.7% of 2,500.
[75] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[76] 91.4% of 5,900.

DECLARATION OF TOM K. WONG            31            ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

owners[77]; and

   c. The State of Massachusetts's DACA recipients earn an estimated $195.4 million annually.[78]

67. Regarding education:

   a. An estimated 2,649 DACA recipients in the State of Massachusetts are currently in school[79];

   b. Among those currently in school, an estimated 2,480 have "pursued educational opportunities that I previously could not" because of DACA[80]; and

   c. An estimated 1,894 DACA recipients in the State of Massachusetts are currently pursuing a bachelor's degree or higher.[81]

68. Regarding American citizen family members:

   a. An estimated 4,289 DACA recipients in the State of Massachusetts have an American citizen sibling, spouse, or child.[82]

**DACA Recipients in the State of New Mexico**

69. As of September 4, 2017, there were 6,000 active DACA recipients in the State of New Mexico.[83]

---

[77] 5.4% of 5,900.
[78] 5,393 multiplied by $36,231.91. This translates into $12.1 million annually in Social Security contributions (6.2% per FICA) and $2.8 million annually in Medicare contributions (1.45% per FICA).
[79] 44.9% of 5,900.
[80] 93.6 % of 2,649.
[81] 71.5% of 2,649.
[82] 72.7% of 5,900.
[83]
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

DECLARATION OF TOM K. WONG       32       ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

70. Regarding employment and earnings:

    a. An estimated 5,484 DACA recipients in the State of New Mexico are currently employed[84];

    b. An estimated 324 DACA recipients in the State of New Mexico are business owners[85]; and

    c. The State of New Mexico's DACA recipients earn an estimated $198.7 million annually.[86]

71. Regarding education:

    a. An estimated 2,694 DACA recipients in the State of New Mexico are currently in school[87];

    b. Among those currently in school, an estimated 2,522 have "pursued educational opportunities that I previously could not" because of DACA[88]; and

    c. An estimated 1,926 DACA recipients in the State of New Mexico are currently pursuing a bachelor's degree or higher.[89]

72. Regarding American citizen family members:

    a. An estimated 4,362 DACA recipients in the State of New Mexico have an American citizen sibling, spouse, or child.[90]

---

[84] 91.4% of 6,000.
[85] 5.4% of 6,000.
[86] 5,484 multiplied by $36,231.91. This translates into $12.3 million annually in Social Security contributions (6.2% per FICA) and $2.9 million annually in Medicare contributions (1.45% per FICA).
[87] 44.9% of 6,000.
[88] 93.6% of 2,694.
[89] 71.5% of 2,694.
[90] 72.7% of 6,000.

DECLARATION OF TOM K. WONG          33         

### DACA Recipients in the State of New York

73. As of September 4, 2017, there were 32,900 active DACA recipients in the State of New York.[91]

74. Regarding employment and earnings:

    a. An estimated 30,071 DACA recipients in the State of New York are currently employed[92];

    b. An estimated 1,777 DACA recipients in the State of New York are business owners[93]; and

    c. The State of New York's DACA recipients earn an estimated $1.1 billion annually.[94]

75. Regarding education:

    a. An estimated 14,772 DACA recipients in the State of New York are currently in school[95];

    b. Among those currently in school, an estimated 13,827 have "pursued educational opportunities that I previously could not" because of DACA[96]; and

    c. An estimated 10,562 are currently pursuing a bachelor's degree or higher.[97]

76. Regarding American citizen family members:

---

[91] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[92] 91.4% of 32,900.
[93] 5.4% of 32,900.
[94] 30,071 multiplied by $36,231.91. This translates into $67.5 million annually in Social Security contributions (6.2% per FICA) and $15.8 million annually in Medicare contributions (1.45% per FICA).
[95] 44.9% of 32,900.
[96] 93.6 % of 14,772.
[97] 71.5% of 14,772.

DECLARATION OF TOM K. WONG                    34

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

    a.  An estimated 23,918 DACA recipients in the State of New York have an American citizen sibling, spouse, or child.[98]

**DACA Recipients in the State of North Carolina**

77. As of September 4, 2017, there were 25,100 active DACA recipients in the State of North Carolina.[99]

78. Regarding employment and earnings:

    a.  An estimated 22,941 DACA recipients in the State of North Carolina are currently employed[100];

    b.  An estimated 1,355 DACA recipients in the State of North Carolina are business owners[101]; and

    c.  The State of North Carolina's DACA recipients earn an estimated $831.2 million annually.[102]

79. Regarding education:

    a.  An estimated 11,270 DACA recipients in the State of North Carolina are currently in school[103];

    b.  Among those currently in school, an estimated 10,549 have "pursued

---

[98] 72.7% of 32,900.

[99] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[100] 91.4% of 25,100.

[101] 5.4% of 25,100.

[102] 22,941 multiplied by $36,231.91. This translates into $51.5 million annually in Social Security contributions (6.2% per FICA) and $12.1 million annually in Medicare contributions (1.45% per FICA).

[103] 44.9% of 25,100.

DECLARATION OF TOM K. WONG           35

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

educational opportunities that I previously could not" because of DACA[104]; and

   c.   An estimated 8,058 DACA recipients in the State of North Carolina are currently pursuing a bachelor's degree or higher.[105]

80. Regarding American citizen family members:

   a.   An estimated 18,248 DACA recipients in the State of North Carolina have an American citizen sibling, spouse, or child.[106]

### DACA Recipients in the State of Oregon

81. As of September 4, 2017, there were 10,200 active DACA recipients in the State of Oregon.[107]

82. Regarding employment and earnings:

   a.   An estimated 9,323 DACA recipients in the State of Oregon are currently employed[108];

   b.   An estimated 551 DACA recipients in the State of Oregon are business owners[109]; and

   c.   The State of Oregon's DACA recipients earn an estimated $337.8 million annually.[110]

---

[104] 93.6 % of 11,270.
[105] 71.5% of 11,270.
[106] 72.7% of 25,100.
[107] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[108] 91.4% of 10,200.
[109] 5.4% of 10,200.
[110] 9,323 multiplied by $36,231.91. This translates into $20.9 million annually in Social Security contributions (6.2% per FICA) and $4.9 million annually in Medicare contributions (1.45% per FICA).

DECLARATION OF TOM K. WONG        36

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

83. Regarding education:

   a.  An estimated 4,580 DACA recipients in the State of Oregon are currently in school[111];

   b.  Among those currently in school, an estimated 4,287 have "pursued educational opportunities that I previously could not" because of DACA[112]; and

   c.  An estimated 3,275 DACA recipients in the State of Oregon are currently pursuing a bachelor's degree or higher.[113]

84. Regarding American citizen family members:

   a.  An estimated 7,415 DACA recipients in the State of Oregon have an American citizen sibling, spouse, or child.[114]

### DACA Recipients in the State of Pennsylvania

85. As of September 4, 2017, there were 4,900 active DACA recipients in the State of Pennsylvania.[115]

86. Regarding employment and earnings:

   a.  An estimated 4,479 DACA recipients in the State of Pennsylvania are currently employed[116];

   b.  An estimated 265 DACA recipients in the State of Pennsylvania are business

---

[111] 44.9% of 10,200.
[112] 93.6 % of 4,580.
[113] 71.5% of 4,580.
[114] 72.7% of 10,200.
[115] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf
[116] 91.4% of 4,900.

DECLARATION OF TOM K. WONG         37        
ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 110 of 358
Case 18-485, Document 122, 03/16/2018, 2259132, Page231 of 304

Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 487 of 1603 PageID #:
4432

owners[117]; and

   c. The State of Pennsylvania's DACA recipients earn an estimated $162.3 million annually.[118]

87. Regarding education:

   a. An estimated 2,200 DACA recipients in the State of Pennsylvania are currently in school[119];

   b. Among those currently in school, an estimated 2,059 have "pursued educational opportunities that I previously could not" because of DACA[120]; and

   c. An estimated 1,573 DACA recipients in the State of Pennsylvania are currently pursuing a bachelor's degree or higher.[121]

88. Regarding American citizen family members:

   a. An estimated 3,562 DACA recipients in the State of Pennsylvania have an American citizen sibling, spouse, or child.[122]

**DACA Recipients in the State of Rhode Island**

89. As of September 4, 2017, there were 970 active DACA recipients in the State of Rhode Island.[123]

---

[117] 5.4% of 4,900.
[118] 4,479 multiplied by $36,231.91. This translates into $10.1 million annually in Social Security contributions (6.2% per FICA) and $2.4 million annually in Medicare contributions (1.45% per FICA).
[119] 44.9% of 4,900.
[120] 93.6 % of 2,200.
[121] 71.5% of 2,200.
[122] 72.7% of 4,900.
[123] As a common rule, smaller sample sizes lead to greater uncertainty around estimates. https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

DECLARATION OF TOM K. WONG      38      ATTORNEY GENERAL OF WASHINGTON
                                       800 Fifth Avenue, Suite 2000
                                       Seattle, WA 98104-3188
                                       (206) 464-7744

90. Regarding employment and earnings:

    a.   An estimated 887 DACA recipients in the State of Rhode Island are currently employed[124]; and

    b.   The State of Rhode Island's DACA recipients earn an estimated $32.1 million annually.[125]

91. Regarding education:

    a.   An estimated 436 DACA recipients in the State of Rhode Island are currently in school[126];

    b.   Among those currently in school, an estimated 408 have "pursued educational opportunities that I previously could not" because of DACA[127]; and

    c.   An estimated 311 DACA recipients in the State of Rhode Island are currently pursuing a bachelor's degree or higher.[128]

92. Regarding American citizen family members:

    a.   An estimated 705 DACA recipients in the State of Rhode Island have an American citizen sibling, spouse, or child.[129]

**DACA Recipients in the State of Virginia**

93. As of September 4, 2017, there were 10,100 active DACA recipients in the State of

---

[124] 91.4% of 970.
[125] 887 multiplied by $36,231.91. This translates into $1.9 million annually in Social Security contributions (6.2% per FICA) and $0.5 million annually in Medicare contributions (1.45% per FICA).
[126] 44.9% of 970.
[127] 93.6 % of 436.
[128] 71.5% of 436.
[129] 72.7% of 970.

DECLARATION OF TOM K. WONG        39        ATTORNEY GENERAL OF WASHINGTON
                                      800 Fifth Avenue, Suite 2000
                                      Seattle, WA 98104-3188
                                      (206) 464-7744

Virginia.[130]

94. Regarding employment and earnings:

    a. An estimated 9,231 DACA recipients in the State of Virginia are currently employed[131];

    b. An estimated 545 DACA recipients in the State of Virginia are business owners[132]; and

    c. The State of Virginia's DACA recipients earn an estimated $334.5 million annually.[133]

95. Regarding education:

    a. An estimated 4,535 DACA recipients in the State of Virginia are currently in school[134];

    b. Among those currently in school, an estimated 4,245 have "pursued educational opportunities that I previously could not" because of DACA[135]; and

    c. An estimated 3,242 DACA recipients in the State of Virginia are currently pursuing a bachelor's degree or higher.[136]

96. Regarding American citizen family members:

    a. An estimated 7,343 DACA recipients in the State of Virginia have an American

---

[130] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[131] 91.4% of 10,100.

[132] 5.4% of 10,100.

[133] 9,231 multiplied by $36,231.91. This translates into $20.7 million annually in Social Security contributions (6.2% per FICA) and $4.8 million annually in Medicare contributions (1.45% per FICA).

[134] 44.9% of 10,100.

[135] 93.6 % of 4,535.

[136] 71.5% of 4,535.

citizen sibling, spouse, or child.[137]

### DACA Recipients in the State of Washington

97. As of September 4, 2017, there were 16,300 active DACA recipients in the State of Washington.[138]

98. Regarding employment and earnings:

    a. An estimated 14,898 DACA recipients in the State of Washington are currently employed[139];

    b. An estimated 880 DACA recipients in the State of Washington are business owners[140]; and

    c. The State of Washington's DACA recipients earn an estimated $539.8 million annually.[141]

99. Regarding education:

    a. An estimated 7,319 DACA recipients in the State of Washington are currently in school[142];

    b. Among those currently in school, an estimated 6,850 have "pursued educational opportunities that I previously could not" because of DACA[143]; and

---

[137] 72.7% of 10,100.

[138] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf

[139] 91.4% of 16,300.

[140] 5.4% of 16,300.

[141] 14,898 multiplied by $36,231.91. This translates into $33.5 million annually in Social Security contributions (6.2% per FICA) and $7.8 million annually in Medicare contributions (1.45% per FICA).

[142] 44.9% of 16,300.

[143] 93.6 % of 7,319.

DECLARATION OF TOM K. WONG         41         
ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

c.  An estimated 5,233 DACA recipients in the State of Washington are currently pursuing a bachelor's degree or higher.[144]

100.  Regarding American citizen family members:

a.  An estimated 11,850 DACA recipients in the State of Washington have an American citizen sibling, spouse, or child.[145]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted,

_____

Dr. Tom K. Wong

10/23/2017

_____

Date

---

[144] 71.5% of 7,319.
[145] 72.7% of 16,300.

DECLARATION OF TOM K. WONG                   42                   ATTORNEY GENERAL OF WASHINGTON
                                                                  800 Fifth Avenue, Suite 2000
                                                                  Seattle, WA 98104-3188
                                                                  (206) 464-7744

1    Pursuant to 28 U.S.C. § 1746(2), I, Ayesha Blackwell-Hawkins, hereby declare as
2    follows:
3        1.   I am over the age of eighteen and competent to testify.
4        2.   I am Senior Manager of Mobile Talent and Immigration Strategy at
5    Amazon.com, Inc. and its subsidiaries ("Amazon"). I am responsible for managing the
6    company's global immigration strategy in various countries where Amazon operates. Prior to
7    this role, I led the team that is responsible for providing immigration support for employees
8    and their dependent families and ensuring lawful immigration to and from the various
9    countries in which Amazon operates. I have been employed at Amazon since 2009.
10       3.   Amazon employs more than 40,000 employees in the State of Washington and
11   more than 200,000 employees in the United States.
12       4.   At least nine Amazon employees are grantees under the Deferred Action for
13   Childhood Arrivals program ("DACA"), and we believe, like most large US companies, there
14   are many more. These employees are located in several different states, including Washington
15   and California, and work in a wide range of technical and non-technical job families, from
16   software development to procurement. If these employees lose their status and are deported,
17   Amazon will suffer injury.
18       5.   Amazon has always been committed to equal rights, tolerance, and diversity -
19   and we always will be. As we've grown the company, we've worked hard to attract talented
20   people from all over the world, and we believe this is one of the things that makes Amazon
21   great - a diverse workforce with diverse backgrounds, ideas, and points of view helps us build
22   better products and services for customers.

     I declare under penalty of perjury that the foregoing is true and correct.

     Executed on this 5th day of September, 2017

     _Ayesha Blackwell-Hawkins_
     Ayesha Blackwell-Hawkins

DECLARATION OF AYESHA BLACKWELL-HAWKINS    1

ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

### DECLARATION OF DANA RUBIN

I, Dana Rubin, hereby declare as follows:

1. My name is Dana Rubin.  I am an attorney licensed in the District of Columbia.

2. I have personal knowledge of the matters set forth below.

3. I represent a client named J.S.[1] She is 19 years old. She lives in Washington D.C.

4. J.S. was born in Honduras. Her mother brought her to the United States when she was six years old. She has lived in the United States for thirteen years.

5. J.S. graduated from a public high school in the District of Columbia. She is currently employed full-time at a local small business in the District of Columbia while caring for her young son. She has also taken classes at the University of the District of Columbia.

6. J.S.'s mother kicked her out of the family's home when she was thirteen years old. She stayed with friends for several years, before becoming a ward of the District.

7. Receiving DACA has had an enormous impact on J.S.'s life.

8. She works to support her child. Because of DACA, she was able to get a social security card and employment authorization. If she could not work, she would be reliant on government assistance to support her child.

9. J.S. will age out of foster care when she turns 21. Without DACA, she does not know how she will be able to continue working or support her child or herself.

10. She has no contact with anyone in Honduras and has not been there since she was a small child.

11. J.S.'s home is the District of Columbia. Her family is here. She works and goes to school here.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 27th day of September, 2017,

Dana Rubin

---

[1] My client wishes to remain anonymous due to her fear of repercussions for sharing her story.

**Pursuant to 28 U.S.C. §1746(2), I, Anarelly Morales Sanjuan, hereby declare as follows:**

1.  I am 25 years old. I was born in Mexico, but have lived in the United States since the age of 7, first in North Carolina, and since 2009, in New York City.

2.  On January 16, 2014,  and then again on February 9, 2016, the United States Department of Homeland Security granted me Deferred Action for Childhood Arrivals (DACA), along with work authorization.

3.   I am the mother of two children, both of whom were born in the United States and are United States Citizens. I am also the partner-for the past three years-of a United States Citizen.

4.  I work as a manager at Bluestone Lane, where I am responsible for payroll, stocking and staffing. The store I manage is one of the busiest in our company, with average earnings of approximately $152,000 per month.

5.  At Bluestone Lane, I manage fourteen employees. I have just been informed that, in two weeks, my employer will be promoting me to managing an additional store. I was also recently honored as Manager of the Quarter.

6.  I earn approximately $65,000 per year. These earnings allow my family to live in a two-bedroom apartment in New York City, and to send our children to Catholic School. I am proud that my long hours and commitment to hard work allow my children access to a safe life and a good education.

7.  If DACA is terminated, I will lose the right to work lawfully in the United States. This will cause me to lose my job, and my employer to lose a valuable employee. I have been with the company for four years, and have risen through the ranks after first working in the kitchen.

8.  Also, if I lose my job, our children will have to leave their school, and our family will
    lose our home and our health insurance. We will be unable to survive financially without
    my income.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ⸺ day of September, 2017

Anarelly Morales Sanjuan

1.      I came to the U.S. when I was 11 years old from Mexico with my mother and brother.

2.      I grew up in Keizer, Oregon and graduated from McNary High School in 2011.

3.      I was one of the first Oregonians to apply for the Deferred Action for Childhood Arrivals (DACA) program when the application opened in August 2012.  My application was approved in October of 2012, and I have remained in the program ever since. My deferred action status expires in September of 2018 if it is not renewed.

4.      After my DACA status was approved, in the winter of 2012, I enrolled at Chemeketa Community College.  I was also able to get paid job as a community organizer with Causa.  I pay taxes in Oregon.  During my time as a community organizer with Causa, I worked on issues related to driver cards and tuition equity (eligibility for in-state tuition for undocumented students).

5.      In the fall of 2013 I enrolled at the University of Oregon.  I also applied and became a Wayne Morse Scholar at the Wayne Morse Center for Law and Politics majoring in economics.  I was not receiving any state or federal financial aid.

6.      In Winter of 2015 I got a job working full time for Wells Fargo Bank.  I took a leave of absence from the University of Oregon in order to pursue this employment.  In 2016 I moved to Key Bank, as a full time relationship manager.  Within Key Bank, I have been offered the opportunity to begin investment license training, paid for by the bank, in mid-September of this year.  My job at Key Bank is dependent on maintaining my DACA status.

7.      I have taken advantage of the advance parol program through DACA to visit Mexico for one week in 2015 at the invitation President of Mexico in order to participate in an educational and cultural program to help build a stronger relationship between the United States and Mexico.  Other than that, I have not been back to Mexico since I left when I was 11.  I have a brother and sister also in the DACA program.  My brother has a child who is a U.S. citizen.  I

Page 2 -   DECLARATION OF HUGO NICOLAS
JND/a2c/8480083-v1

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

am concerned that if the program ends, my family might not be split up, not be able to sustain themselves, and not be able to obtain education.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.**

DATED September _5_, 2017.

HUGO DANIEL NICOLAS MUNOS

Page 3 -   DECLARATION OF HUGO NICOLAS
JND/a2c/8480083-v1

Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880 / Fax: (971) 673-5000

I, Laura Carothers Graham, hereby declare as follows:

1.      I am the Managing Attorney for the Delaware Medical-Legal Partnership & Immigration Program in the Delaware Community Legal Aid Society, Inc. ("CLASI").

2.      CLASI provides equal access to justice and has been improving lives since 1946 by providing free civil legal services to marginalized communities.

3.      CLASI is committed to racial and ethnic fairness in the delivery of our services.

4.      As the Managing Attorney for the Delaware Medical-Legal Partnership & Immigration Program, my work with CLASI is to represent immigrant victims of crimes, abuse, and neglect, as well as clients referred through our Medical-Legal Partnerships. Our immigration program is funded by the Federal Office of Violence Against Women, and the State Criminal Justice Council, and we provide immigration services related to the U visa for victims of crime, the T visa for victims of human trafficking, Violence Against Women Act Petitions for victims of family violence, and Special Immigrant Juvenile Petitions for dependent minors who have been abused, abandoned or neglected by their parent(s). Our Medical-Legal Partnership Program partners with several Delaware health-care providers in order to screen for and represent patient-clients on civil legal issues related to the social determinants of their health, including immigration legal issues beyond the scope of the cases enumerated above.

5.      CLASI has 22 attorneys and 49 staff members. Seven attorneys handle immigration cases in the Immigration and Medical-Legal Partnership Program. Twenty percent of CLASI staff are bilingual in the English and Spanish languages.

6.      Currently, CLASI of Delaware handles approximately 150 immigration related cases annually.

7.      Upon information and belief, the State of Delaware bar only has a few practicing immigration attorneys.

8.      The rescission of the Deferred Action for Childhood Arrivals ("DACA") will have a sizable impact on the CLASI's Medical-Legal Partnership caseload and limited resources. CLASI may have to revise its intake of legal representation if the rescission of DACA creates a significant number of immigrant related cases.

9.      I am also the chair of the immigration committee of the Domestic Violence Coordinating Council ("DVCC"). DVCC was created by statute, at 13 *Del. C.* § 2101 *et seq*, in 1993 in order to improve Delaware's response to domestic violence.

10.     In a September 12, 2017 meeting of the DVCC immigration committee, several members of Delaware law enforcement expressed concern about the termination of DACA and the chilling effect that will have on non-Citizens availing themselves to the criminal justice system when they are victims. Law enforcement's expressed concern mirrors what I am experiencing in my immigration cases.

11.    In Delaware, there has been significant decrease in numbers of non-English speaking victims that sought law enforcement help since the election of the current Administration. The Delaware figures correlate with the national figures on this issue.

12.    Delaware's total Protection from Abuse ("PFA") filings – civil petitions seeking a stay away order and ancillary relief for victims of family violence – have increased since last year, but those numbers drop when focusing on non-English speaking victims. Based upon data provided by the Delaware Family Court, from January to April 30, 2016: 931 PFA petitions were filed. From January to April 30, 2017: 1055 PFAs were filed. However, the Domestic Violence Advocacy Program ("DVAP") reports PFA inquiries and filings for non-English speaking victims have decreased. Per DVAP, from January to May 2016: 247 Spanish-speaking victims inquired about the PFA process, and 22 filed PFA petitions. Whereas from January to May 2017: 197 Spanish-speaking victims inquired about the PFA process, and only 7 filed PFA petitions. Thus one can surmise that while the general population of Delaware has increasingly filed PFA petitions, the number of PFAs filed by non-English speaking Delawareans have significantly decreased.

13.    In my legal practice, I have experienced that immigrant victims are rejecting legal advice and are declining to seek law enforcement or Family Court recourse to protect themselves, and often their children, from their assailants, out of fear of federal immigration enforcement or deportation. Specifically, some of my clients, and non-Citizens who have consulted with CLASI about their rights, have avoided seeking PFA orders or contacting law enforcement regarding crimes, because of fear of deportation and federal immigration enforcement. Some of my immigrant victims have expressed such significant concern regarding deportation and immigration enforcement that they will not attend court appearances because this Administration has indicated that it may arrest and seek to deport people near and around courthouses and other public spaces, which were previously not utilized in enforcement actions. That has an outsized effect on the safety of our Delaware community, because when non-Citizens are fearful to report the crimes against them, law enforcement is unable to effectively investigate crimes, rendering all of the Delaware community less safe.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this **27**ᵗʰ day of September, 2017.

Laura Carothers Graham
Managing Attorney
Delaware    Medical-Legal    Partnership    &
Immigration Program
Delaware Community Legal Aid Society, Inc.

### DECLARATION OF THOMAS G. AMBROSINO AND MARY M. BOURQUE

We, Thomas G. Ambrosino and Mary M. Bourque, declare as follows:

1.    We collectively represent the city of Chelsea, Massachusetts, and the Chelsea Public Schools.

    a.    Thomas G. Ambrosino is the City Manager for Chelsea, which is a city of almost 40,000 residents located in Suffolk County. Chelsea is the smallest city in Massachusetts in land area, less than two square miles, and the twenty-sixth most densely populated incorporated place in the country.

    b.    Mary M. Bourque is the Superintendent of Schools for the Chelsea Public Schools, a gateway school system serving a diverse population of 6,338 students from prekindergarten through grade twelve and beyond.

2.    One or both of us has personal knowledge of each of the matters set forth below.

3.    Almost sixty-five percent of Chelsea's population is Latino, and forty-four percent of its population is foreign born, the largest foreign born population in Massachusetts.

4.    Many DACA grantees and DACA-eligible individuals live in Chelsea, although the precise numbers are unknown.

5.    Chelsea's DACA grantees are part of the fabric of our community. They include students, workers, sons and daughters, and parents. Many live in households with family members who depend on them, and some of these family members are American citizens.

6.    The DACA program has made our city stronger, allowing residents to come out of the shadows and pursue educational and workforce opportunities that were previously unavailable to them. DACA has allowed Chelsea residents to access driver's licenses, home and

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 124 of 358
Case 18-485, Document 127, 03/16/2018, 2259141, Page130 of 304

Case 1:17-cv-05228-NGG-JO   Document 97-3   Filed 12/15/17   Page 8 of 397 PageID #: 5831

car loans, and to better support their families. Many of Chelsea's DACA grantees are tax payers, and all are consumers in our local economy.

7.      DACA has had a positive impact on Chelsea's schools.  With the promise of college and career, DACA has motivated more students to graduate and to achieve at higher levels.  At least 20 DACA grantee graduates from the Chelsea High School class of 2017 are currently attending college, and a similar number of DACA grantees graduated and went on to college for the last few years.

8.      Since the federal government's announcement that DACA will be terminated, many Chelsea residents and students are now frightened about their future and wary of going to school and work.  This has already had a negative effect on the City's morale and economy and on the school environment.

9.      If DACA is terminated, it will have a direct, adverse effect on the City of Chelsea and the Chelsea Public Schools.

10.      The City has at least one young, talented employee working in its administration who is a DACA grantee.  She is a rising star in the City's financial organization.  If DACA is terminated and she loses her work authorization, it will adversely impact the City's operations and cost us time, money, and effort in replacing her and training her replacement.

11.      The Chelsea Public Schools have at least one teacher who is a DACA grantee.  If she loses her work authorization, the schools will lose a talented teacher in 2019, when her work authorization expires.  It will cost us time and money to replace her and any other DACA grantee teachers and to train replacements.

12.      The termination of DACA will also have an adverse impact on student achievement across the district.  Students who do not see a future for themselves beyond high

school will not work hard and embrace education toward college and career. Other students who enjoy financial support from a family member's ability to work may have to drop out of school to support themselves financially.

13.     Lower academic achievement and a decrease in students completing high school will negatively impact our schools' and district's "accountability status," and could cause us to fall from a Level 3 to a Level 4 or 5 status. This decrease in status would require removal of administrators and teachers as well as increased funding streams from the Department of Elementary and Secondary Education to engage the schools in turnaround. It would also harm our community, as families are less likely to buy homes in lower-performing school districts.

14.     As DACA grantee students experience greater anxiety about their futures, guidance counselors and other staff will need to spend more time with these students to help support them as they plan for an uncertain future.

15.     DACA's termination will also threaten public safety and welfare. DACA grantees who fear that they could soon be deported are already losing trust in police and other local authorities. In turn, they are less likely to report violence, crime, abuse and other harms to the community.

16.     Finally, the fear and lack of economic resources that will result from the termination of DACA will hurt our local economy. DACA allowed its grantees to spend more money in the local economy; these residents will now be more likely to stay home and cut their expenses. They will be more likely to fall into poverty, hurting the wellbeing and economy of Chelsea and its residents.

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 126 of 358
Case 18-485, Document 127, 03/16/2018, 2259141, Page132 of 304

Case 1:17-cv-05228-NGG-JO   Document 97-3   Filed 12/15/17   Page 10 of 397 PageID #: 5833

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 26th DAY OF
SEPTEMBER, 2017,

Thomas G. Ambrosino

Mary M. Bourque

I, Marcelo M. Suárez-Orozco, declare:

1.     I am the Wasserman Dean of the Graduate School of Education and Information Studies
at the University of California, Los Angeles ("UCLA"). The matters set forth herein are true and correct
of my own personal knowledge and, if called as a witness, I could and would testify competently
thereto.

2.     In my role as the Wasserman Dean of UCLA's Graduate School of Education and
Information Studies, I lead two academic departments, 16 nationally renowned research institutes, and
two innovative demonstration schools. My research focuses on conceptual and empirical problems in
cultural psychology and psychological anthropology with an emphasis on the study of migration,
globalization, and education. I have authored, co-authored, or edited almost 40 books and over 150
articles and book chapters on these topics, including on the relationship between immigration, education,
and achievement. My Curriculum Vitae is attached as Exhibit A.

3.     A substantial body of research documents the negative educational, developmental,
physical, psychological, and other effects that growing up without authorized immigration status has on
children, adolescents, and young adults. DACA provided a safe and reliable mechanism through which
young immigrants who were brought to this country through no fault of their own—often at a young
age—could integrate more fully into the American communities in which they were raised.

4.     DACA has enabled approximately 750,000 young immigrants to integrate into and
contribute more to communities across the country; its rescission will snatch these youngsters from the
stability they have come to expect and force them back into a life in the shadows as unauthorized
immigrants. The research is clear:  current DACA recipients who are forced to return to unauthorized
immigration status will experience myriad negative educational, developmental, physical, psychological,
and other effects because of DACA's rescission.[1]

---

[1] See, e.g., Suárez-Orozco, Carola, *Conferring Disadvantage: Behavioral and Developmental
Implications for Children Growing up in the Shadow of Undocumented Immigration Status*, 38 J.
DEVELOPMENTAL & BEHAV. PEDIATRICS 424 (2017); Hirokazu Yoshikawa, Carola Suarez-Orozco, &
Roberto G. Gonzales, *Unauthorized Status and Youth Development in the United States: Consensus
Statement of the Society for Research on Adolescence*, 27 J. OF RES. ON ADOLESCENCE 4 (2017).

**The Benefits of DACA**

5.     Recipients of DACA status share a number of defining characteristics. First, they came to this country at a young age, through no volition of their own. Because of this, DACA recipients grew up in American society and have been socialized as Americans.

6.     Most DACA recipients received some or all of their K-12 education at American schools. Although their American education created opportunities, such as pursuing higher education, DACA recipients' undocumented status imposed burdens not faced by their citizen peers. For example, without their DACA status, youths cannot legally work in this country and face other hurdles such as the inability to open a bank account or travel freely.

7.     DACA enabled its recipients to engage fully with society and pursue opportunities to better their lives and the lives of those around them. With the promise that they could freely live, work, travel, and pursue an education, DACA recipients enrolled in universities like UCLA, got jobs to help support their families and pay for the educations, and pursued internships and other endeavors that enriched their lives and our communities.

8.     Studies of the impact of DACA reveal the measurable benefits that accrue to individuals gaining legal protections. Participation in DACA has been associated with greater experiences of incorporation and integration into U.S. society. These include greater sense of national belonging,[2] civic participation,[3] and involvement in college activities.[4] Rates of obtaining a driver's license, obtaining health care, opening bank accounts, and applying for credit cards are also higher.[5] There is also some

---

[2] *See, e.g.*, Robert T. Teranishi, Carola Suárez-Orozco, & Marcelo Suárez-Orozco, *In the Shadows of the Ivory Tower: Undocumented Undergraduates in the Uncertain Era of Immigration Reform.* INSTITUTE FOR IMMIGRATION, GLOBALIZATION, AND EDUCATION, UCLA (2015), *available at* http://www.undocuscholars.org/assets/undocuscholarsreport2015.pdf; Tom Wong & Carolina Valdivia, *In Their Own Words: A National Survey of Undocumented Millennials.* UNITED WE DREAM (2014), *available at* https://unitedwedream.org/words-nationwide-survey-undocumented-millennials/

[3] Tom Wong & Carolina Valdivia, *supra* note 2.

[4] Robert T. Teranishi, *et al.*, *supra* note 2.

[5] Roberto G. Gonzales, Veronica Terriquez, & Stephen P. Ruszczyk, *Becoming DACAmented: Assessing the Short-Term Benefits of DACA (Deferred Action for Childhood Arrivals).* 58 AMERICAN BEHAVIORAL SCIENTIST 1852-1872 (2014).

evidence that those who apply for and are awarded DACA attain higher levels of education, although the pathways of causality are not clear (those who apply for DACA may be positively selected).[6]

9.     Put simply, DACA has provided young immigrants with many important benefits. For example, the UCLA study of childhood arrivals by the UndocuScholars Project found that 85.5 percent of students with DACA reported a positive impact on their education. DACA recipients indicated enjoying higher rates of working, greater housing & transportation stability, greater success in gaining access to both scholarships and internships. Lastly, 94 percent of DACA recipients indicated a wish to apply for U.S. citizenship if eligible.[7]

10.     Research points to the mechanisms by which protection against deportation can bring improvement in an immigrant child's life trajectory. First, most simply, such protection eliminates the fear and anxiety that flow from the constant concerns deportation and sudden forced family separations. Like removing a hobble, this allows a child, youth and emerging adult to ascend developmentally, grow psychologically more secure, and attain greater educational success. Second, protections serve to remove tangible barriers to economic opportunity and social integration that arise from unauthorized status. Third, protections foster social trust and civic engagement with the institutions of society. Basic social science research has documented these outcomes in a variety of empirical, conceptual, and methodological traditions.[8]

11.     Research further suggest that even a temporary work permit, such as those granted under DACA, can set in motion a process that brings economic benefits first to the immigrants, in the form of higher wages, and then to the public sector, in the form of higher tax revenue, and then to the nation as a whole, in the form of a more productive labor force. Permission to work under DACA provides unauthorized immigrants with better educational opportunities, a shield against workplace exploitation, and grant freedom to move across the labor market to find work that best suits their skills.

---

[6] Robert T. Teranishi, *et al.*, *supra* note 2.

[7] *Id.*

[8] Robert Suro, Marcelo M. Suárez-Orozco, & Stephanie L. Canizales, *Removing Insecurity: How American Children Will Benefit From President Obama's Executive Action on Immigration.* TOMAS RIVERA POLICY INSTITUTE AT USC & THE INSTITUTE FOR IMMIGRATION, GLOBALIZATION, AND EDUCATION AT UCLA (2015).

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 130 of 358
Case 18-485, Document 127, 03/16/2018, 2259141, Page138 of 304

Case 1:17-cv-05228-NGG-JO   Document 97-3   Filed 12/15/17   Page 16 of 397 PageID #: 5839

### The Negative Effects of The Rescission of DACA

12.     Rescinding DACA will thrust its young recipients back into turmoil and anxiety of living with unauthorized immigration status, thwarting the measurable gains in human and social capital that DACA has enabled.

13.     Research on the negative effects of undocumented status sheds light onto the consequences that DACA recipients will face when they lose the benefits that DACA promised. In particular, DACA recipients who lose their DACA status will likely face a slew of negative educational, developmental, physical, and psychological consequences.

*The Negative Educational and Developmental Consequences of DACA's Rescission*

14.     Multiple studies have shown that children who grow up undocumented exhibit lower levels of cognitive development and emotional well-being throughout early childhood and adolescence than comparable children whose parents have no immigration issues. The research that has produced this finding carefully isolated the impact of immigration status from other factors such as low incomes or low levels of education among the parents.

15.     As early as ages two and three, children growing up undocumented or with undocumented parents had lower cognitive skills as measured by standardized tests than comparable samples of children of parents who have no immigration issues. Research shows that the lack of a documented status is harmful to children's development—particularly their cognitive and language skills. These findings are based on a study of 380 newborns recruited hours after birth in public hospitals in New York City and then followed for three years with assessments of the children and in-depth interviews with the parents. Conducted by Hirokazu Yoshikawa, a developmental psychologist formerly at Harvard and now a professor at New York University's Steinhardt School of Culture, Education, and Human Development, the research offers a detailed assessment of how the everyday experiences of undocumented parents differ from legal immigrants in ways that can affect their children's development.

16.     Professor Yoshikawa's research shows that parents are reluctant to interact with any government agencies to the point that children may not receive any resources for which they are eligible, and fear of interacting with the authorities could leave them vulnerable to criminal exploitation whether by smugglers, loan sharks or unscrupulous landlords. Undocumented immigrants tend to have more

restricted social connections of the sort that can help in childrearing as parents are cautious about interacting with neighbors, coworkers or even a playmate's parents out of fear their status will be discovered. Finally, undocumented parents are more likely to experience exploitative work conditions, including unsafe workplaces, longer hours and lower pay. Professor Yoshikawa's study found evidence of lower cognitive skills as early as twenty-four months and concluded that household-level "economic hardship and psychological distress—feelings of depression, anxiety, and worry—were responsible for this effect." At thirty-six months, additional effects on cognitive skills were associated with undocumented status in the household and "the disastrous work conditions of the undocumented parents in the sample, combined with lower access to center-based child care."[9]

17.     A more generalized study based on a large data set similarly concluded that the children growing up unauthorized are at greater risk of lower levels of development in the grade school years. That finding emerged from an analysis of data from the 2005 California Health Interview Survey, which has a sample of 43,020 households. The large sample enabled a team of researchers from the Institute for Social Science Research at the University of California Los Angeles to study developmental risks for children based on household level immigration status while controlling for other factors such as education, income and employment.[10]

18.     Many of the same impediments to full development observed in early childhood may apply to middle childhood, including less frequent use of service, such as afterschool enrichment programs, and greater social isolation of family networks.

19.     Moreover, by middle childhood, a child's cognitive skills and perspective-taking have developed to a point where he or she may have become aware of legal status—their own and that of their parents and siblings.[11] At this stage in a child's development, "concern over the family's legal

---

[9] HIROKAZU YOSHIKAWA, IMMIGRANTS RAISING CITIZENS: UNDOCUMENTED PARENTS AND THEIR YOUNG CHILDREN (2011).

[10] Alexander N. Ortega et al., *Documentation Status and Parental Concerns about Development in Young U.S. Children of Mexican Origin.* 9 ACADEMIC PEDIATRICS 278-282.

[11] Carola Suárez-Orozco et al., *Growing Up in the Shadows: The Developmental Implications of Unauthorized Status*, 81 HARV. EDUC. REV. 438, 452 (2011).

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 132 of 358
Case 18-485, Document 127, 03/16/2018, 2259141, Page140 of 304

Case 1:17-cv-05228-NGG-JO   Document 97-3   Filed 12/15/17   Page 18 of 397 PageID #: 5841

vulnerabilities begins to seep into consciousness. They become more cognizant of the culture of fear in which they live. Spanish-language television and radio frequently feature stories of deportations, and in some homes, it is a topic of family conversation that children begin to metabolize."[12]

20.    At this stage in a child's development, he or she is beginning to make social comparisons. A child's recognition that his or her family is different can "affect self-esteem, increase anxiety, and produce internalizing symptoms" associated with depression and acting out behaviors.[13]

21.    Development in adolescence implicates additional consequences of not having documented legal status. "[T]he key developmental task of adolescence is the formation of a stable sense of identity, along with finding one's place within the community beyond immediate family. Identity formation is, in part, achieved by mastering culturally marked rites of passage, such as obtaining a driver's license, getting a first job, and, for many, going off to college. Unauthorized youth are unable to fully partake in these normative coming of age rituals; moreover, their identity formation is complicated when they come to face a negative social mirror that portrays them as illegitimate and unwanted. For many adolescents who are unauthorized or are living in mixed-status homes, adolescence is a time when liminality first comes to fully destabilize their fragile world."[14]

22.    Although family and K-12 schooling often provide unauthorized adolescent immigrants with relative protections, moving into young adulthood and the public sphere is shocking and renders youth particularly vulnerable. These youth must "learn to be illegal. Although they might have been under the initial illusion that they would have similar access to the opportunity structure as their authorized peers, they are now confronted with limited life opportunities." These youth learn that they are vulnerable to deportation and have drastically limited educational and employment choices.[15]

---

[12] *Id.*

[13] *Id.*

[14] *Id.* at 453. *See also* CAROLA SUÁREZ-OROZCO & MARCELO M. SUÁREZ-OROZCO, CHILDREN OF IMMIGRATION (2001); CAROLA SUÁREZ-OROZCO, ET AL., LEARNING A NEW LAND: IMMIGRANT STUDENTS IN AMERICAN SOCIETY (2008).

[15] Carola Suárez-Orozco, *supra* note 11, at 454.

23.    The consequences of a young immigrant's undocumented status manifest in a variety of ways. For example, one survey of over 909 college students found statistically higher levels of anxiety in young college students who are unauthorized immigrants compared to standard measures of their peers in the general population.[16]

24.    In sum, the negative consequences of unauthorized status, including limited access to services and opportunities, fear of deportation and forced family separations, have long-term and tangible developmental effects on the lives of their children and youth. Eliminating these negative consequences increases a child's cognitive development and well-being in childhood, middle-childhood, and adolescence.

*The Negative Physical and Health Consequences of DACA's Rescission*

25.    Research suggests household-level undocumented status poses obstacles to access many means-tested benefits. An in-depth study of three communities by Randolph Capps and colleagues at the Urban Institute revealed that families go to great lengths to avoid contact with social service providers despite their children's program or service eligibility for fear of being identified as undocumented and deported.[17]

26.    Researchers from the Center for Family and Demographic Research analyzed data collected by the Survey of Program Dynamics and found that food insecurity among the children of non-citizens has been higher and more persistent since the passing of the Personal Responsibility and Work Opportunity Reconciliation Act, which made non-citizens ineligible for federally funded food assistance programs.

---

[16] Robert T. Teranishi, *et al.*, *supra* note 2.

[17] Children and youth with unauthorized status are excluded from most means-tested federal and associated state programs. This includes sources of health or mental health care such as Medicaid, Medicare, or Children's Health Insurance Programs (CHIP) (aside from emergency care and care provided during the perinatal and immediate postnatal period); publicly funded job training; public housing; Supplemental Nutrition Assistance (SNAP, or Food Stamps); the Earned Income Tax Credit; Social Security; and cash welfare assistance (TANF or Temporary Assistance for Needy Families). Unauthorized immigrants are also ineligible for the expanded health insurance coverage through exchanges provided by the Affordable Care Act.

Case 1:18-cv-00068  Document 209-2  Filed on 07/21/18 in TXSD  Page 134 of 358
Case 18-485, Document 127, 03/16/2018, 2259141, Page142 of 304

Case 1:17-cv-05228-NGG-JO  Document 97-3  Filed 12/15/17  Page 20 of 397 PageID #: 5843

27.  Using national data from the Early Childhood Longitudinal Study—Kindergarten (ECLS-K) cohort, public policy researchers Ariel Kalil and Jen-Hao Chen found that children with immigrant mothers who are not U.S. citizens are more than twice as likely to experience food insecurity than children of mothers with similar socioeconomic characteristics but who are native born. Limited or uncertain access to nutrition can contribute to a range of developmental problems, from lower cognitive skills in early childhood and higher anxiety among adolescents.[18]

*The Negative Psychological Consequences of DACA's Rescission*

28.  The negative impacts of unauthorized status extend to the psychological harm to young, undocumented immigrants. These psychological effects of "unauthorized status on development across the life span are uniformly negative, putting children and youth at risk of lower educational performance, economic stagnation, blocked mobility and ambiguous belonging. In all, the data suggest an alarming psychological formation."[19]

29.  Drawing on interviews with 91 parents and 110 children in 80 households, sociologist Joanna Dreby reports that children in Mexican immigrant families (even when the children are U.S. citizens) express fear and anxiety about potential forced family separations. Notable, she found that children and youth fearing familial separations and deportations come to distrust law enforcement officials.[20] Landale and colleagues found higher internalizing (depression, anxiety, withdrawal) and externalizing (aggressive and acting out) behavioral problems in a sample of Mexican-origin, primary-school-age children with unauthorized parents, relative to their counterparts with documented or citizen parents.[21]

---

[18] Ariel Kalil & Jen-Hao Chen, *Mother's Citizenship Status and Household Food Insecurity Among Low-Income Children of Immigrants.* In H. Yoshikawa and N. Way eds. *Beyond the Family: Contexts of Immigrant Children's Development.* 121 DIRECTIONS FOR CHILD AND ADOLESCENT DEVELOPMENT 43-62.

[19] Carola Suárez-Orozco, *supra* note 11.

[20] JOANNA DREBY, EVERYDAY ILLEGAL: WHEN POLICIES UNDERMINE IMMIGRANT FAMILIES (2015).

[21] Nancy S. Landale, Jessica Halliday Hardie, R.S. Oropesa, & Marianne M. Hillemeier, *Behavioral Functioning Among Mexican-Origin Children: Does Parental Legal Status Matter?* 56 J HEALTH SOC BEHAV. 2-18 (2015).

30.     UCLA scholar Leisy J. Abrego's study based on 200 interviews conducted between 1998 and 2010 with Central American immigrants in Los Angeles and Phoenix and in sending communities, found that fear of detention and deportation generated "normalized but cumulative injurious effects" in work, family and school contexts. Some of those effects include restricted social integration and impeded upward mobility.[22]

31.     A recent UCLA study of undocumented youth who were brought to the United States as children and are now in college found very high levels of anxiety due to fears of deportation. The UndocuScholars Project at UCLA conducted a survey of 909 undocumented undergraduates in 2014 and found that more than three-quarters expressed worries about being deported and more than half reported knowing someone who had been deported. These worries and other aspects of the insecurity that comes from being unauthorized translated into measurable consequences for the respondents' health. Among male subjects 28.5 percent produced scores on a standard anxiety screening that were above the cutoff for a clinical diagnosis; for females, it was 36.7 percent. In comparison, the shares in a population of college students with no reason to fear deportation would be 4 percent and 9 percent, respectively.[23]

32.     In summary, rescinding DACA will return the youth who have benefited from the program back into the shadows of society, and to living in the state of fear and precariousness that triggers the negative consequences described above. Without DACA's promise that they can pursue their education and work and travel freely, these young people—who are Americans in every way except on paper—will likely lose the motivation to pursue their education, the means to work and support themselves and their families, and the psychological and social stability upon which they have come to rely.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on November 27, 2017, at Los Angeles, California.

---

[22] Cecilia Menjivar, & Leisy J. Abrego, *Legal Violence: Immigration Law and the Lives of Central American Immigrants.* 117 AMERICAN JOURNAL OF SOCIOLOGY 1380-1421 (2012).

[23] Robert T. Teranishi, *et al.*, *supra* note 2.

Marcelo M. Suárez-Orozco

### DECLARATION OF ROSSANA ROSADO

Pursuant to 28 U.S.C. § 1746(2), I, Rossana Rosado, hereby declare as follows:

1.     I am the Secretary of State for New York State.

2.     I have compiled the information in the statements set forth below through New York State personnel who have assisted me in gathering this information from New York State agencies.

3.     New York State is the fourth largest state in the United States of America in 2017, with a population of 19.74 million. New York prides itself on its rich ethnic diversity as New Yorkers hail from over 200 nations.

4.     New York State has a strong interest in prohibiting any practice that denies equal protection of the laws or otherwise discriminates on the basis of race, color, or national origin. New York's Constitution guarantees all persons the right to equal treatment under the law and forbids discrimination based on race, color, creed or religion. N.Y. Const. art. I, § 11. New York's statutes reiterate the State's strong interest in combatting discrimination and prejudice. *See* N.Y. Exec. Law § 290.

5.     New York's diversity has always been its greatest strength. For example, in 2016, the Governor's Advisory Council on Diversity and Inclusion was created to help accelerate the rate of progress of recruiting more racial and ethnic minorities to work in state government.  That same year, the New York State Board of Regents passed a resolution permitting Deferred Action for Childhood Arrival ("DACA") recipients to be eligible for teaching and nursing licenses. *See* Comm. of Educ. Regs. §§ 59.4; 80-1.3; Ex. A (New York State Board of Regents Press Release, Feb. 24, 2016).

6.     New York State has over 50 agencies whose missions entail providing or supervising the administration of certain basic services to all residents.  This includes, but is not limited to providing educational aid, family assistance, health, and mental hygiene benefits and services,

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 138 of 358
Case 18-485, Document 127, 03/16/2018, 2259141, Page291 of 304
Case 1:17-cv-05228-NGG-JO   Document 97-3   Filed 12/15/17   Page 169 of 397 PageID #:
5992

financing and maintaining the State's transportation infrastructure, regulating labor practices, protecting the environment, establishing a park system, and providing for the protection and safety of the public.

7.      The DACA program has been beneficial to the people of the State of New York. Obtaining DACA status has allowed DACA recipients, many of whom are long-term residents of New York, to work legally across industries, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits. DACA grantees also contribute significantly to the State and local revenues and tax bases.

8.      Across its various agencies, New York State currently employs at least 5 DACA recipients including a management specialist, an addiction counselor, a senior-level engineer, a student assistant, and of particular note, an Empire State Fellow. The Empire State Fellows Program is a full-time leadership training program that prepares the next generation of talented professionals for careers as New York State policy-makers. New York State invests significant resources in providing educational and professional development programs to the Fellows, and relies on these investments to sustain a diverse workforce in senior leadership roles.

9.      New York State has relied on the work of DACA grantees to not only fulfill their professional duties, but also to help foster an inclusive and diverse and community. But New York State would be prohibited by federal law from continuing to employ DACA grantees once their work authorizations expire.  The termination of the DACA program would therefore pose a grave threat to New York State's ability to have a diverse and inclusive state government workforce, and result in the loss of the unique and significant contributions from these members of its community.

10.     Terminating DACA would significantly disrupt state operations.  To fill the vacancies of DACA grantee employees, New York State would have to expend significant effort, time, and financial resources in order to find and train appropriate replacements. New York State may also experience undesirable delays and disruptions in the provision of necessary services.

11.     Moreover, to have New York State DACA employees living in constant fear of arrest and

deportation due to the termination of DACA is damaging to those individuals and the State

agencies where they work.

12.     More broadly, terminating DACA will cause the State to expend additional resources.

Specifically, it will impose additional health care costs on New York State. New York State

currently funds emergency Medicaid coverage for low-income undocumented immigrants who

have received deferred action, including DACA-eligible immigrants. *See* Ex. 77 of Am. Compl.

(Office of Health Insurance Program, *Children's Health Insurance Program Reauthorization Act*

*(CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens*, May 7, 2013).

Terminating DACA may reduce access to Medicaid for current DACA grantees. Individuals in

New York who are not DACA grantees may only qualify for Medicaid coverage of care and

services necessary to treat an emergency condition. Terminating DACA will require New York

to either seek a State legislative change to maintain current Medicaid coverage formerly DACA-

eligible immigrants with state dollars only or limit Medicaid coverage to treatment of emergency

conditions for some or all of these individuals.

13.     Overall, the termination of DACA will result in significant harm to New York State through

the disruption of state operations and expenditure of additional resources to compensate for the

loss of current or future state employees.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 15th day of December, 2017

                                        /s/ Rossana Rosado
                                        Rossana Rosado

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 140 of 358
Case 18-485, Document 127, 03/16/2018, 2259141, Page290 of 304

Case 1:17-cv-05228-NGG-JO   Document 97-3   Filed 12/15/17   Page 168 of 397 PageID #: 5991

## DECLARATION OF ROSSANA ROSADO

Pursuant to 28 U.S.C. § 1746(2), I, Rossana Rosado, hereby declare as follows:

1.  I am the Secretary of State for New York State.

2.  I have compiled the information in the statements set forth below through New York State personnel who have assisted me in gathering this information from New York State agencies.

3.  New York State is the fourth largest state in the United States of America in 2017, with a population of 19.74 million. New York prides itself on its rich ethnic diversity as New Yorkers hail from over 200 nations.

4.  New York State has a strong interest in prohibiting any practice that denies equal protection of the laws or otherwise discriminates on the basis of race, color, or national origin. New York's Constitution guarantees all persons the right to equal treatment under the law and forbids discrimination based on race, color, creed or religion. N.Y. Const. art. I, § 11. New York's statutes reiterate the State's strong interest in combatting discrimination and prejudice. *See* N.Y. Exec. Law § 290.

5.  New York's diversity has always been its greatest strength. For example, in 2016, the Governor's Advisory Council on Diversity and Inclusion was created to help accelerate the rate of progress of recruiting more racial and ethnic minorities to work in state government.  That same year, the New York State Board of Regents passed a resolution permitting Deferred Action for Childhood Arrival ("DACA") recipients to be eligible for teaching and nursing licenses. *See* Comm. of Educ. Regs. §§ 59.4; 80-1.3; Ex. A (New York State Board of Regents Press Release, Feb. 24, 2016).

6.  New York State has over 50 agencies whose missions entail providing or supervising the administration of certain basic services to all residents.  This includes, but is not limited to providing educational aid, family assistance, health, and mental hygiene benefits and services,

financing and maintaining the State's transportation infrastructure, regulating labor practices, protecting the environment, establishing a park system, and providing for the protection and safety of the public.

7. The DACA program has been beneficial to the people of the State of New York. Obtaining DACA status has allowed DACA recipients, many of whom are long-term residents of New York, to work legally across industries, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits. DACA grantees also contribute significantly to the State and local revenues and tax bases.

8. Across its various agencies, New York State currently employs at least 5 DACA recipients including a management specialist, an addiction counselor, a senior-level engineer, a student assistant, and of particular note, an Empire State Fellow. The Empire State Fellows Program is a full-time leadership training program that prepares the next generation of talented professionals for careers as New York State policy-makers. New York State invests significant resources in providing educational and professional development programs to the Fellows, and relies on these investments to sustain a diverse workforce in senior leadership roles.

9. New York State has relied on the work of DACA grantees to not only fulfill their professional duties, but also to help foster an inclusive and diverse and community. But New York State would be prohibited by federal law from continuing to employ DACA grantees once their work authorizations expire. The termination of the DACA program would therefore pose a grave threat to New York State's ability to have a diverse and inclusive state government workforce, and result in the loss of the unique and significant contributions from these members of its community.

10. Terminating DACA would significantly disrupt state operations. To fill the vacancies of DACA grantee employees, New York State would have to expend significant effort, time, and financial resources in order to find and train appropriate replacements. New York State may also experience undesirable delays and disruptions in the provision of necessary services.

11.     Moreover, to have New York State DACA employees living in constant fear of arrest and deportation due to the termination of DACA is damaging to those individuals and the State agencies where they work.

12.     More broadly, terminating DACA will cause the State to expend additional resources. Specifically, it will impose additional health care costs on New York State. New York State currently funds emergency Medicaid coverage for low-income undocumented immigrants who have received deferred action, including DACA-eligible immigrants. *See* Ex. 77 of Am. Compl. (Office of Health Insurance Program, *Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens*, May 7, 2013). Terminating DACA may reduce access to Medicaid for current DACA grantees. Individuals in New York who are not DACA grantees may only qualify for Medicaid coverage of care and services necessary to treat an emergency condition. Terminating DACA will require New York to either seek a State legislative change to maintain current Medicaid coverage formerly DACA-eligible immigrants with state dollars only or limit Medicaid coverage to treatment of emergency conditions for some or all of these individuals.

13.     Overall, the termination of DACA will result in significant harm to New York State through the disruption of state operations and expenditure of additional resources to compensate for the loss of current or future state employees.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 15th day of December, 2017

/s/ Rossana Rosado
Rossana Rosado

## DECLARATION OF GLORIA ODUYOYE

I, Gloria Oduyoye, declare as follows:

1.  I am over the age of eighteen. I have personal knowledge of the matters stated herein, and
    if called as a witness, I could and would testify competently thereto.

2.  I am a twenty-five year old resident living in Virginia. Virginia is my home.

3.  I am the child of Nigerian immigrants and was born in England. In 1993, when I was one
    year old, I came to the United States from England to live with my father who was in
    medical school.

4.  In 2012, I applied for DACA and attained DACA status. Subsequently, I was able to
    obtain my driver's license, and eventually buy my first car. I graduated with honors from
    Wesleyan College with a dual bachelor's degree in political science and music. I am
    currently enrolled at William & Mary School of Law as a third year law student and
    expect to graduate in January 2018. I could not have achieved any of these things without
    DACA.

5.  Any revocation of DACA would have a huge negative impact in my life.  My entire life
    will change. I will be unable to provide for my family and myself financially or afford to
    continue to pursue my educational goals. Finally, I will lose the hope and protection from
    deportation and return to the shadows that make life so difficult.

6.  As a scholar by nature and an advocate by heart, I have tirelessly applied my education to
    the beginnings of a career in advocacy, public policy, and law. I have contributed to my
    community in Virginia through my consistent community service with the Black Law
    Students Association, the Immigration Law & Service Society, and the Virginia

Page 2 of 3

Intercollegiate Immigrants' Association for the past three years. I am a community leader and influencer.

7. I want to have an opportunity to give back to this country, and to the communities, and academic institutions that have supported me throughout my life. Allowing DACA to continue would allow me to continue to live, work, and contribute to the economy and communities of America which is my home.

Executed on:  September 29, 2017

Gloria Oduyoye

Page **3** of **3**

### DECLARATION OF GLORIA ODUYOYE

I, Gloria Oduyoye, declare as follows:

1. I am over the age of eighteen. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2. I am a twenty-five year old resident living in Virginia. Virginia is my home.

3. I am the child of Nigerian immigrants and was born in England. In 1993, when I was one year old, I came to the United States from England to live with my father who was in medical school.

4. In 2012, I applied for DACA and attained DACA status. Subsequently, I was able to obtain my driver's license, and eventually buy my first car. I graduated with honors from Wesleyan College with a dual bachelor's degree in political science and music. I am currently enrolled at William & Mary School of Law as a third year law student and expect to graduate in January 2018. I could not have achieved any of these things without DACA.

5. Any revocation of DACA would have a huge negative impact in my life. My entire life will change. I will be unable to provide for my family and myself financially or afford to continue to pursue my educational goals. Finally, I will lose the hope and protection from deportation and return to the shadows that make life so difficult.

6. As a scholar by nature and an advocate by heart, I have tirelessly applied my education to the beginnings of a career in advocacy, public policy, and law. I have contributed to my community in Virginia through my consistent community service with the Black Law Students Association, the Immigration Law & Service Society, and the Virginia

Page 2 of 3

Intercollegiate Immigrants' Association for the past three years. I am a community leader and influencer.

7.  I want to have an opportunity to give back to this country, and to the communities, and academic institutions that have supported me throughout my life. Allowing DACA to continue would allow me to continue to live, work, and contribute to the economy and communities of America which is my home.

Executed on:  September 29, 2017

Gloria Oduyoye

### DECLARATION OF I.V.

I, I.V., hereby declare as follows:

1.  My name is I.V.  I am 25 years old and currently live in Massachusetts.

2.  I have personal knowledge of the matters set forth below.

3.  I was born in the Dominican Republic and lived there until I was 8 years old.  At that time, my parents, who were already living in the United States, arranged to bring me to the U.S. to live with them.  I moved to Lawrence, Massachusetts.

4.  I spent the rest of my childhood in Lawrence and attended both private and public schools. In 2014, I graduated with a degree in political science from a public university in Massachusetts.

5.  I applied for DACA almost as soon as it was announced in 2012.  Receiving DACA was a huge help to me.  It allowed me to get a social security card and a driver's license.  I was able to buy a car.  Even though I had already been paying taxes for years, I was finally able to pay with a social security number, not just my temporary tax ID.  I was also able to travel to the Dominican Republic to visit family members who I hadn't seen in over 15 years.

6.  Having DACA status allowed me to get a job as a Resident Assistant at my university.  After I graduated, I was able to get a job working for a local Massachusetts official doing constituent outreach.  I then worked for two years in the office of a private attorney.  After that I got a job working in Massachusetts state government, which I still have today.  None of this would have been possible without the work permit that DACA made possible.

7.  My long-term dream is to attend law school to become an immigration attorney.  I want to help other people with immigration needs.

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 148 of 358
Case 18-485, Document 128, 03/16/2018, 2259142, Page5 of 273

Case 1:17-cv-05228-NGG-JO   Document 97-3   Filed 12/15/17   Page 182 of 397 PageID #:
6005

8. If DACA went away, I would lose my work permit, my driver's license, and my ability to support myself. I would certainly lose my current job. Even the prospect of losing DACA is deeply stressful to think about. I have had DACA for five years and have benefited enormously from the program. Losing it now would be a huge loss.

9. DACA is an incredibly important program. Lots of young people have been able to buy houses, start businesses, build wealth, and get good jobs. DACA has helped not just these individuals, but also their families and communities. Taking it away would not just hurt DACA recipients, it would also hurt their families and communities.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ⸺ day of September, 2017.

⸻

I.V.

2

### DECLARATION OF CHANCELLOR KRISTINA M. JOHNSON

Pursuant to 28 U.S.C. § 1746(2), I, Kristina M. Johnson, hereby declare as follows:

1. I am the Chancellor of the State University of New York ("SUNY" or "university").

2. I have compiled the information in the statements set forth below through SUNY personnel who have assisted me in gathering this information from SUNY campuses.

3. SUNY is the largest comprehensive university system in the United States, comprised of 64 institutions including research universities, academic medical centers, liberal arts colleges, community colleges, colleges of technology and an online learning network. Each year SUNY students and faculty across the state make significant contributions to research in the fields of medicine, engineering, technology, among others.

4. SUNY educates approximately 440,000 students in more than 7,500 degree and certificate programs and nearly 2 million in workforce and professional development programs. SUNY draws students from every state in the United States and 160 nations around the world and has over 3 million alumni.

5. SUNY was founded as a university of opportunity, educating all, including those who would not be admitted to other institutions of higher education because of their race, religion or national origin. As a public university system, SUNY's core mission is to ensure that all of its students, whatever their background, have access to high-quality education and training that develops the skills and knowledge necessary to build a rewarding life and career.

6.  To ensure that SUNY is able to execute its mission, SUNY is equally invested in its employees. This includes attracting and retaining the best and most diverse talent possible to promote a community which reflects its mission as a university of opportunity.

7.  On January 24, 2017, SUNY demonstrated its continuing commitment to diversity, equity, and inclusion when the SUNY Board of Trustees passed a resolution affirming its strong support for the rights of undocumented students and, in particular, the continuation of the DACA program (attached as Exhibit A).

8.  Across its various campuses, SUNY currently employs 37 DACA recipients including two faculty members, four adjunct faculty members, three grant writers, two custodial workers, one registered nurse, one respiratory therapist, one public safety officer, and a variety of assistants including an assistant for Institutional Advancement, four graduate assistants, two nursing assistants, one office assistant, and fifteen general student assistants.

9.  These employees play critical roles within their respective areas of employment, including teaching, performing research, securing funding, providing healthcare, ensuring public safety, cleanliness and maintenance of the campuses, as well as a variety of other necessary services.

10. As a result of the termination of DACA, SUNY employees who are DACA grantees would lose their work authorizations. SUNY would be prohibited by federal law from continuing to employ DACA grantees once their work authorizations expire. Therefore, SUNY would lose the unique and significant contributions from these members of its community. SUNY has relied on the work of DACA grantees to not only fulfill their professional duties, but also to help foster a diverse and inclusive community.

11. To fill the vacancies of DACA grantee employees, SUNY would have to expend time, effort and financial resources in order to find and train suitable replacements. SUNY may also experience undesirable delays and disruptions in the provision of necessary services at some of its campuses.

12. The loss of SUNY's DACA grantee employees could also have a negative impact on the students we serve as well as the SUNY community at large. The loss of faculty, adjunct faculty and graduate assistants may disrupt students' education by requiring new faculty to take over classes, and/or delaying classes while suitable replacements are found. Perhaps more importantly, students will lose the opportunity to learn from these DACA employees and benefit from their unique experiences and knowledge base.

13. Moreover, to have SUNY's DACA employees living in constant fear of arrest and deportation due to the termination of DACA is damaging to those individuals and the SUNY community as a whole.

14. Overall, terminating DACA will weaken SUNY's ability to carry out its mission as a university of opportunity, and cause it to expend time, effort and financial resources to hire and train new employees to replace the DACA grantee employees.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 5th day of December, 2017

/s/ Kristina M. Johnson
Kristina M. Johnson
Chancellor, State University of New York

## DECLARATION OF DONALD STRANEY

I, DONALD STRANEY, do declare and would competently testify as follows:

1.      I am the Vice President for Academic Planning and Policy for the University of Hawai'i System ("UH"). I have over 38 years in higher education experience including 7 years as the Chancellor of the University of Hawai'i at Hilo and 8 years as the Dean of the College of Science and professor of biology at California State Polytechnic University, Pomona. As the Vice President for Academic Planning and Policy, I provide executive leadership in setting forth the system wide academic vision and goals for the university.

2.      I have personal knowledge of the matters set forth herein, or for those matters which I do not have personal knowledge, I have reviewed information gathered from UH records or databases by UH employees.

3.      UH was founded in 1907 and today it includes 3 universities, 7 community colleges, and community based learning centers across Hawai'i. For Fall 2017, more than 51,000 students are enrolled at UH. UH has awarded more than 11,000 degrees for each of the last four academic years to local, national, and international students.

4.      UH is steadfast in its commitment to serve all members of our community, regardless of citizenship status.

5.      Over three years ago, the UH Board of Regents adopted a policy to extend eligibility for resident tuition rates to undocumented students, including but not limited to those who have filed for Deferred Action for Childhood Arrivals ("DACA").

6.      Presently, there are 16 students who have reported their DACA status to UH and who are pursing various degrees at multiple UH campuses.

7.      UH's undocumented students are an integral part of the UH community.  If DACA is terminated abruptly it will have a negative effect upon UH and its faculty and students. Without the benefit of in-state tuition rates, DACA students may have to withdraw from UH and discontinue their education.  Upon information and belief, these students will face possible arrest and deportation despite their contributions to UH and to our broader community.

8.      In academia, the loss of culturally diverse students with different life experiences reduces the quality of classroom discussions and impedes the development of new perspectives and ideas for other students and faculty.

9.      If our undocumented students must withdraw from our university, UH will lose its educational and financial investment in these students who we believe will benefit and serve the local, national, and international workforce.

10.      Terminating DACA will harm UH and its commitment to provide environments in which faculty, staff and students can discover, examine critically, and preserve and transmit the knowledge, wisdom, and values that will help ensure the survival of and quality of life for present and future generations.

        I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

        DATED: Honolulu, Hawai'i. __September 26__, 2017.

                                    _Donald O. Straney_
                                    DONALD O. STRANEY

**DECLARATION OF W. TAYLOR REVELEY, III**

Pursuant to 28 U.S.C. § 1746 (2), I, W. Taylor Reveley III, hereby declare as follows:

1. I am President of the College of William Mary ("William & Mary" or "the university"), and have served in that capacity since September 2008. I had previously served as interim president of the university for six months, and as dean of William & Mary Law School for almost a decade. Before joining William & Mary, I practiced law at Hunton & Williams LLP for 28 years, including nine years as the firm's managing partner. As President, I serve as the chief executive officer of William & Mary. I have personal knowledge of the matters set forth below or have knowledge of those matters based on my review of information and records gathered by members of my staff.

2. William & Mary is a public, liberal arts university with over 6,000 undergraduate students and over 2,300 graduate students.[1] William & Mary recruits and attracts a diverse student body. Our students come from all 50 states, the District of Columbia, and 60 foreign countries. William & Mary is dedicated to a diverse student and faculty population. Among the university's goals, as set out in its Mission Statement, are to attract outstanding students from diverse backgrounds and to develop a diverse faculty which is nationally and internationally recognized for excellence in both teaching and research.[2]

---

[1] See http://www.wm.edu/about/wmataglance/index.php.

[2] See William & Mary Mission Statement at http://www.wm.edu/about/administration/provost/about/mission/index.php.

Page 2 of 4

3.  William & Mary has approximately 23 students enrolled across the university in 2017 who are participants in the Citizenship and Immigration Services' Deferred Action for Childhood Arrivals ("DACA").[3]

4.  William & Mary DACA-enrolled students make valuable contributions to the university, through their classroom participation, their extra-curricular engagements, and their commitment to independent study and research. The DACA program provides meaningful benefits to its DACA student population and the rest of the university community. For instance, the DACA program provides its William & Mary students with legal protections and financial opportunities that have enhanced their ability to take full advantage of our educational programs.[4] The DACA program has also benefitted William & Mary as a whole because DACA students contribute their unique perspectives inside and outside the classroom and help the university foster a culture of inclusion.

5.  For as long as they have active DACA protection, DACA students enrolled at William & Mary can pursue their courses of study and fully invest themselves in their educational endeavors, without fear of sudden detention or removal. Discontinuance of DACA would withdraw the educational opportunities these students enjoy and subject them to deportation.

6.  The elimination of the DACA program would also lessen the effect of William & Mary's investment of significant financial and human resources in its students and in preparing a

---

[3] This calculation reflects students who opted to self-identify. William & Mary estimates that actual numbers are higher.

[4] DACA students domiciled in Virginia are eligible to apply for in-state tuition. See http://www.schev.edu/docs/default-source/tuition-aid-section/financial-aid/dacafaqs.pdf.

Page 3 of 4

well-trained workforce.  Most significantly, the elimination of the DACA program would hinder William & Mary's pursuit of diversity and inclusion and cut against its core goal of attracting outstanding students and faculty from diverse backgrounds.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on:  September 29, 2017

W. Taylor Reveley III

Page 4 of 4

# 17-3345

## United States Court of Appeals for the Second Circuit

*In re* ELAINE DUKE, Acting Secretary of Homeland Security; JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, DONALD J. TRUMP, President of the United States; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and the UNITED STATES OF AMERICA,

Petitioners.

On Petition for a Writ of Mandamus.

### BRIEF OF 113 COMPANIES AND ASSOCIATIONS AS *AMICI CURIAE* SUPPORTING RESPONDENTS

Of Counsel:

Seth Waxman
Patrick J. Carome
Ari Holtzblatt
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 663-6000

*Counsel for* Amici Curiae *Airbnb, Inc., Square, Inc., Twitter, Inc., and Yelp Inc.*

Andrew J. Pincus
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
apincus@mayerbrown.com

Lauren R. Goldman
Karen W. Lin
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020-1001
(212) 506-2500

*Counsel for* Amici Curiae

*Additional counsel on next page*

changed that, and as a result over 91% of the almost 800,000 Dreamers are employed and earn wages commensurate with their skill levels.[2] Permitting Dreamers to stay and work in the country in which they grew up benefits American companies and the American economy as a whole.

*First*, Dreamers directly contribute to the success of numerous U.S. companies. At least 72 percent of the top 25 Fortune 500 companies employ Dreamers—including IBM, Walmart, Apple, General Motors, Amazon, JPMorgan Chase, Home Depot, Wells Fargo, among others.[3]

Many Dreamers are entrepreneurs: According to one survey, five percent of Dreamers started their own businesses after receiving DACA status.  Among those respondents 25 years and older, the figure is eight percent—well above the 3.1% for all Americans.[4] These businesses create new jobs and provide goods and services that expand the economy.[5]

---

[2]  Tom K. Wong et al., *Results from 2017 National DACA Study* 3-4 ("Wong 2017 Results"), https://goo.gl/eyZ3VT.

[3]  *Id.*

[4]  Wong 2017 Results, *supra* n.2, at 3; Tom K. Wong et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, Ctr. for Am. Progress, Aug. 28, 2017, https://goo.gl/dYJV1s.

[5]  *See* Julia Boorstin, *Illegal Entrepreneurs: Maria Has No U.S. Visa, and Jose's Expires Soon. Yet They Own a Profitable California Factory, Pay Taxes, and Create Jobs*, CNNMoney, July 1, 2005, https://goo.gl/jq2Y1C.

engineering, and mathematics (STEM) fields.[20] Even putting aside the skills mismatch, it is unlikely that there are enough available workers to fill the openings: The U.S. unemployment rate is currently quite low, and the number of job openings is high.[21]

Dreamers help fill this gap. They all have a high school degree or equivalent—and a large percentage of Dreamers are pursuing or have received college or post-college degrees and therefore qualify for highly-skilled jobs.[22] In 2016, almost a quarter of Dreamers were employed in the educational or health services industry.[23] Many others work in technology, science, and finance,[24] and more still are majoring in STEM fields.[25]

---

[20] President's Council of Advisors on Science and Technology, *Report to the President: Engage to Excel: Producing One Million Additional College Graduates with Degrees in Science, Technology, Engineering, and Mathematics* 1 (Feb. 2012), https://goo.gl/v2YRVD.

[21] *See* U.S. Dep't of Labor, Bureau of Labor Statistics, Economic News Release Table A-14 (Oct. 6, 2017), https://goo.gl/o8t39g; U.S. Dep't of Labor, Bureau of Labor Statistics, Job Openings and Labor Turnover Survey Highlights August 2017 charts 1 & 2 (Oct. 11, 2017), https://goo.gl/H28XkL.

[22] Wong 2017 Results, *supra* n.2, at 7-8.

[23] Ctr. for Am. Progress, *Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey* 4 (2016), https://goo.gl/pe2i17.

[24] *Id.*

*Amici*'s experiences confirm this: For example, Microsoft employs 27 Dreamers as "software engineers with top technical skills; finance professionals driving [its] business ambitions forward; and retail and sales associates connecting customers to [its] technologies."[26] IBM has identified at least 31 Dreamers within the company who work in areas such as software development and client support.[27] One IBM Dreamer provided critical remote technical support to ensure continuity of IBM's Cloud services when Hurricane Harvey flooded Houston. Lyft employs at least one Dreamer as a software engineer, who serves as one of the tech leads of the team driving critical data projects.

Even Dreamers with lesser-skilled jobs are filling positions for which there is an insufficient labor supply. "Among less-educated workers, those born in the United States tend to have jobs in manufacturing or mining,

---

[25] The UndocuScholars Project, *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform* 8 (2015), https://goo.gl/sEpx1K.

[26] Brad Smith, President and Chief Legal Officer, Microsoft, *DREAMers Make our Country and Communities Stronger*, Aug. 31, 2017, https://goo.gl/kJYDT3.

[27] *See* Tony Romm, *IBM CEO Ginni Rometty Is in D.C. Urging Congress to Save DACA,* Recode.net, Sept. 19, 2017, https://goo.gl/NQeJUc; *My American Dream, Minus the Paperwork*, THINKPolicy Blog, Oct. 3, 2017, https://goo.gl/876JDm; *I Felt Like a Normal American Kid . . . Then Everything Changed*, THINKPolicy Blog, Oct. 9, 2017, https://goo.gl/oV9P7h.

while immigrants tend to have jobs in personal services and agriculture."[28] The latter industries in particular "face[] a critical shortage of workers every year, as citizens are largely unwilling to engage in these physically demanding activities"[29]—even when companies increase wages the maximum amount financially feasible.[30]

In sum, Dreamers are filling jobs that otherwise would remain vacant and are increasing demand for goods and services, which helps to grow the entire economy.

## C.   Rescinding DACA Will Inflict Enormous Harm on Individuals, Companies, and the Economy.

All of the above benefits—and more—will be lost if DACA's rescission is permitted to stand. Over the next decade, our country's GDP will lose $460.3 billion; and Social Security and Medicare tax receipts will drop

---

[28] Peri, *supra* n.12.

[29] Am. Farm Bureau Federation, *Agricultural Labor – Immigration Reform* (Oct. 2016), https://goo.gl/WUAz3e; *see also* Clemens & Pritchett, *supra* n.9, at 3, (predicting that increase in low-skill jobs in the care industry will be more than the total increase in the 25-54 labor force).

[30] *See, e.g.,* Natalie Kitroeff & Geoffrey Mohan, *Wages Rise on California Farms. Americans Still Don't Want the Job*, Los Angeles Times, Mar. 17, 2017, https://goo.gl/r1cH9Z; Octavio Blanco, *The Worker Shortage Facing America's Farmers*, CNN Money, Sept. 29, 2016, https://goo.gl/ZF2Tdx.

11

$24.6 billion.[31]

This economic contraction results directly from Dreamers' loss of work authorization. The approximately 700,000 employed Dreamers would all lose their jobs over the next two years—an average of 1,400 people losing jobs every single business day.[32] In addition to the obvious harm to Dreamers themselves, the loss of so many workers will have severe repercussions for U.S. companies and workers.

The impending March 2018 deadline—and threat of job loss and being forced into a life in the shadows, unable to participate in society, and facing forced removal from the only country they have ever known—is already impacting Dreamers and, by extension, the companies for which they work. The fear for the future that is now a daily part of life for

---

[31] *See* Nicole Prchal Svajlenka et al., *A New Threat to DACA Could Cost States Billions of Dollars*, Ctr. for Am. Progress, July 21, 2017, https://goo.gl/7udtFu; Jose Magana-Salgado, Immigrant Legal Resources Center, *Money on the Table: The Economic Cost of Ending DACA* 4, 6-7 (2016), https://goo.gl/3ZwGVJ; *see also* Brannon & Albright, *supra* n.7 (estimating cost of "immediately eliminating the DACA program and deporting its participants" to be $283 billion reduction in economic growth and over $60 billion reduction to tax revenues over 10 years).

[32] Ctr. for Am. Progress & FWD.us, *Study: The Impact of Deferred Action for Childhood Arrivals (DACA) Program* 3 (2017), https://goo.gl/P3DgPz.

Dreamers and their families affects both physical and mental health.[33] That, in turn, negatively affects employee productivity and performance, illness and absenteeism, accidents, and turnover.[34]

Once Dreamers' work authorizations begin expiring in March 2018, companies will face an estimated $6.3 billion in costs to replace Dreamers—if they can find new employees to fill the empty positions.[35] Companies will forfeit the money they invested in training those employees, and will incur costs recruiting and training new employees, who will be less experienced and therefore less productive.[36] These costs are particularly burdensome for small businesses.

---

[33] *See* Tiziana Rinaldi & Angilee Shah, *Immigration Limbo Is a 'Tug of Emotions.' It's Also a Mental Health Issue*, PRI's The World, Aug. 22, 2017, https://goo.gl/WLXMZ4; Sarah Elizabeth Richards, *How Fear of Deportation Puts Stress on Families*, The Atlantic, Mar. 22, 2017, https://goo.gl/qDgeRf.

[34] *See* World Health Org. & Int'l Labour Org., *Mental Health And Work: Impact, Issues and Good Practices* 1 (2000), https://goo.gl/ecH1Ut.

[35] *See* David Bier, *Ending DACA Will Impose Billions in Employer Compliance Costs*, Cato Institute, Sept. 1, 2017, https://goo.gl/1FMidk; *see also* Magana-Salgado, *supra* n.31, at 4, (estimating turnover costs due to DACA termination to be $3.4 billion).

[36] Heather Boushey & Sarah Jane Glynn, *There Are Significant Business Costs to Replacing Employees*, Ctr. for Am. Progress, Nov. 16, 2012, https://goo.gl/ZSmRLq.

**APPENDIX A**

**LIST OF *AMICI CURIAE***

1.  6Sense Insights, Inc.
2.  A Medium Corporation
3.  Adobe Systems Incorporated
4.  AdRoll, Inc.
5.  Affirm, Inc.
6.  Airbnb, Inc.
7.  Alation, Inc.
8.  Ampush LLC
9.  Appboy, Inc.
10. AppNexus, Inc.
11. Asana, Inc.
12. Atlassian Corp. Plc
13. Azavea Inc.
14. Bigtooth Ventures
15. Box, Inc.
16. Brightcove Inc.
17. Brocade Communications Systems, Inc.
18. BSA | The Software Alliance

19. CareZone Inc.
20. CartoDB Inc.
21. Casper Sleep Inc.
22. Castlight Health, Inc.
23. Cavium, Inc.
24. Chegg, Inc.
25. Chobani, LLC
26. Civis Analytics, Inc.
27. Citrix Systems, Inc.
28. ClassPass Inc.
29. Cloudera, Inc.
30. Cloudflare Inc.
31. Codecademy
32. Color Genomics, Inc.
33. The Copia Institute
34. Credit Karma, Inc.
35. DocuSign, Inc.
36. DoorDash, Inc.
37. Dropbox, Inc.
38. eBay Inc.

39. Edmodo, Inc.
40. Electronic Arts Inc.
41. EquityZen Inc.
42. Facebook, Inc.
43. General Assembly Space, Inc.
44. Glassdoor, Inc.
45. Google Inc.
46. Gusto
47. Greenhouse Software, Inc.
48. Hewlett Packard Enterprise
49. Homer Logistics, Inc.
50. IBM Corporation
51. IDEO LP
52. Imgur Inc.
53. Indiegogo, Inc.
54. Kargo
55. Knotel
56. Lam Research Corporation
57. Levi Strauss & Co.
58. Linden Research, Inc.

59. LinkedIn Corporation
60. Lithium Technologies, LLC
61. Lyft, Inc.
62. Lytro, Inc.
63. Mapbox
64. Marin Software Incorporated
65. Medidata Solutions, Inc.
66. Microsoft Corporation
67. Molecule Software, Inc.
68. MongoDB, Inc.
69. Motivate International Inc.
70. Mozilla
71. NETGEAR, Inc.
72. NewsCred, Inc.
73. NIO U.S.
74. Oath Inc.
75. Patreon, Inc.
76. PayPal Holdings, Inc.
77. Pinterest, Inc.
78. Pixability, Inc.

| | | | | |
|---|---|---|---|---|
| 79. | Postmates Inc. | | 99. | TripAdvisor, Inc. |
| 80. | Quantcast Corp. | | 100. | Tumblr, Inc. |
| 81. | RealNetworks, Inc. | | 101. | Turo Inc. |
| 82. | Reddit, Inc. | | 102. | Twilio Inc. |
| 83. | Redfin Corporation | | 103. | Twitter Inc. |
| 84. | salesforce.com inc. | | 104. | Uber Technologies, Inc. |
| 85. | Scopely, Inc. | | 105. | Udacity Inc. |
| 86. | Shutterstock, Inc. | | 106. | Upwork Inc. |
| 87. | Singularity University | | 107. | Verizon Communications Inc. |
| 88. | Sizmek, Inc. | | 108. | Via |
| 89. | SpaceX | | 109. | Warby Parker |
| 90. | Spokeo, Inc. | | 110. | Work & Co. |
| 91. | Spotify USA Inc. | | 111. | Workday, Inc. |
| 92. | Square, Inc. | | 112. | Yelp Inc. |
| 93. | Squarespace, Inc. | | 113. | Zendesk, Inc. |
| 94. | Strava, Inc. | | | |
| 95. | SurveyMonkey Inc. | | | |
| 96. | Tesla, Inc. | | | |
| 97. | The Software and Information Industry Association. | | | |
| 98. | Thumbtack | | | |

**App-161**

UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARTÍN JONATHAN BATALLA VIDAL, ANTONIO ALARCON, ELIANA FERNANDEZ, CARLOS VARGAS, MARIANO MONDRAGON, and CAROLINA FUNG FENG, on behalf of themselves and all other similarly situated individuals, and MAKE THE ROAD NEW YORK, on behalf of itself, its members, its clients, and all similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>ELAINE C. DUKE, Acting Secretary, Department of Homeland Security, JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, and DONALD J. TRUMP, President of the United States,<br><br>Defendants. | CIVIL ACTION NO. 16-cv-4756<br><br>**DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION TO ELAINE DUKE, ACTING SECRETARY OF HOMELAND SECURITY**<br><br>(Garaufis, J.)<br>(Orenstein, M.J.) |

Pursuant to Federal Rules of Civil Procedure 26 and 36 and the Local Rules of this Court Defendant Elaine Duke, in her official capacity as the Acting Secretary of the Department of Homeland Security ("Defendant"), by and through counsel, provides the following Objections and Responses to Plaintiffs' First Set of Requests for Admission. Defendant's Objections and Responses are based on information known to Defendant at this time, and are made without prejudice to additional objections should Defendant subsequently identify additional grounds for objection. The information submitted

1

**App-162**

for DACA" as misleading to the extent DACA is not an immigration benefit. Defendant objects to the request as vague and undefined to the extent plaintiffs failed to provide a definition for the phrase "third parties."

**RESPONSE TO REQUEST NO. 72:** Defendant admits RFA No. 72 only to the extent that certain DACA requestors may have submitted supplementary documentation that contains information about third parties, including family members and that such information, on occasion, may have concerned the country of birth information of such other individuals. Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 73:** Admit that at least one DACA applicant who met the guidelines of the 2012 DACA memorandum was nonetheless denied DACA.

**OBJECTION TO REQUEST NO. 73:** Defendant incorporates by reference the above objections to the definitions and instructions. Defendant objects to the phrase "applicants for DACA" as misleading to the extent DACA is not an immigration benefit.

**RESPONSE TO REQUEST NO. 73:** Defendant admits only that USCIS has denied a DACA request from at least one DACA requestor who met the threshold criteria for consideration for DACA outlined in the June 15, 2012 memorandum from former Secretary of Homeland Security Janet Napolitano, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,* and the USCIS DACA FAQs archived at
https://www.uscis.gov/archive/frequently-asked-questions (last visited October 17, 2017)). Defendant is without sufficient information to admit or deny any other allegations in this request that may be considered to remain.

**REQUEST NO. 74:** Admit that DHS policy before September 5, 2017 was not to use the information provided in DACA applications for immigration-enforcement purposes except in narrow circumstances, including to identify fraudulent claims, for national security purposes, to adjudicate DACA requests, or for the investigation or prosecution of a criminal offense.

**OBJECTION TO REQUEST NO. 74:** Defendant incorporates by reference the above objections to the definitions and instructions. Defendant objects to the extent the request mischaracterizes or otherwise fails to fully describe the policy at issue. Defendant objects to the request as vague and confusing to the extent plaintiffs have failed to define the phrase "immigration-enforcement purposes," and "narrow circumstances."

**RESPONSE TO REQUEST NO. 74:** Defendant admits RFA No. 74 only to the extent that that the current policy on sharing information provided by DACA requestors and recipients is reflected in USCIS DACA FAQs numbers 19, 20, and 26 (archived at https://www.uscis.gov/archive/frequently-asked-questions (last visited October 17, 2017)), DHS DACA FAQs numbers 7 and 8 (at https://www.dhs.gov/news/2017/09/05/frequentlyasked-

34

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

STATES OF NEW YORK,
MASSACHUSETTS,
WASHINGTON, COLORADO,
CONNECTICUT, DELAWARE,
DISTRICT OF COLUMBIA,
HAWAII, ILLINOIS, IOWA, NEW
MEXICO, NORTH CAROLINA,
OREGON, PENNSYLVANIA,
RHODE ISLAND, VERMONT, and
VIRGINIA,

          Plaintiffs,

      v.

DONALD TRUMP, in his official
capacity as President of the United
States; U.S. DEPARTMENT OF
HOMELAND SECURITY; ELAINE
C. DUKE, in her official capacity; U.S.
CITIZENSHIP AND IMMIGRATION
SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT;
and the UNITED STATES OF
AMERICA,

          Defendants.

CIVIL ACTION NO. 1:17-cv-05228
(NGG) (JO)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STATES'**
**MOTION FOR PRELIMINARY INJUNCTION**

1

**App-164**

In sum, Defendants' decision to terminate DACA was motivated by animus towards Latinos and is therefore unconstitutional. Defendants' termination of DACA is also unconstitutional because there exists no rational relationship between that policy and their stated objectives. This irrationality is especially problematic given the blameless nature of the class affected. Thus, Plaintiff States have shown a likelihood of success on their claim that Defendants' termination of DACA violates Equal Protection.

## III. Defendants' Termination of DACA Violates the Procedural Requirements of the APA and RFA.

In addition to its substantive defects, the termination of DACA is procedurally invalid. By terminating DACA without allowing for notice and comment or conducting a regulatory flexibility analysis, Defendants violated the APA and RFA.

Rules created by federal agencies are generally subject to notice and comment. APA requirements "are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *United States v. Lott*, 750 F.3d 214, 219 (2d Cir. 2014) (internal quotation and citation omitted). The APA requires notice of proposed agency rules and an opportunity to comment for all "legislative" or "substantive" rules,[43] exempting only "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A); *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–303 (1979); *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993). In other words, notice and comment rulemaking applies to all rules other than those that describe "an agency's intended course of

---

[43] While the terms "legislative" and "substantive" are used interchangeably in this context, Plaintiff States use the term "legislative" consistent with the preference identified by the Second Circuit. *White v. Shalala*, 7 F.3d 296, 303 (2d Cir. 1993).

20

action" (general statements of policy), "its tentative view of the meaning of a particular statutory term" (interpretative rules), or "internal house-keeping measures organizing agency activities" (procedural rules). *Perales v. Sullivan*, 948 F.2d 1348, 1354 (2d Cir. 1991) (internal citation and quotations omitted). Notice and comment is required whenever agency action does not fall within these specific exemptions, which "must be narrowly construed." *United States v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989).

When the APA's notice and comment requirements apply, the RFA further requires a regulatory flexibility analysis to assess a prospective rule's impact on small businesses, nonprofits, and small governmental jurisdictions, unless the head of the agency certifies that the rule will not affect small entities.[44] 5 U.S.C. §§ 601(2), 603(a) 604(a), 605(b); *see also U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005) (FCC should have provided notice of a rule under 5 U.S.C. § 553 (Rulemaking), so the RFA's requirements were applicable).

In this case, the termination does not fall under the APA's exemptions for interpretive or procedural rules, because it affects existing rights and interests in profound ways. The termination is not exempt as a general statement of policy because it binds the discretion of DHS and its officials. Moreover, the substantial impact of the rule has engendered significant public interest, which weighs in favor of public input through notice and comment. Yet Defendants terminated DACA after a few brief meetings and without the benefit of input and analysis from

---

[44] The termination directly affects small entities, in that it prohibits them from continuing to employ DACA grantees. *See Aeronautical Repair Station Ass'n v. F.A.A.*, 494 F.3d 161, 177–78 (D.C. Cir. 2007) (a rule that required employees to undergo drug and alcohol testing "directly affected" contractors and subcontractors, not just primary employers). But absent this direct effect, the DHS Secretary would have been required to certify, by publication in the Federal Register, that the rule would not have a significant economic impact on a substantial number of small entities, along with a factual basis for such certification. *See* 5 U.S.C. § 605(b). The DHS Secretary issued no such certification here.

21

**App-166**

numerous stakeholders. Under the APA and the RFA, a more deliberative and public process was required.

### A. The Termination Changed Existing Rights and Interests.

Whether a rule is "legislative" rather than "interpretive" or "procedural" turns on whether the rule "creates new law, rights, or duties in what amounts to a legislative act." *Sweet v. Sheahan,* 235 F.3d 80, 91 (2d Cir. 2000) (quoting *White,* 7 F.3d at 303). Thus, where a rule "change[s] existing rights and obligations," it is a legislative rule. *Donovan v. Red Star Marine Servs., Inc.,* 739 F.2d 774, 783 (2d Cir. 1984) (citing *Lewis-Mota v. Sec'y of Labor*, 469 F.2d 478, 482 (2d Cir.1972) (internal citations omitted). "A procedural rule, by contrast, 'does not alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency.'" *Time Warner Cable Inc. v. F.C.C.*, 729 F.3d 137, 168 (2d Cir. 2013) (quoting *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 5-6 (D.C. Cir. 2011)). And an "interpretive" rule "merely 'clarif[ies] an existing statute or regulation.'" *N.Y. State Elec. & Gas Corp. v. Saranac Power Partners, L.P.*, 267 F.3d 128, 131 (2d Cir. 2001) (internal citations omitted).

Here, the rule terminating DACA significantly altered the rights and interests of hundreds of thousands of DACA grantees and DACA-eligible individuals. Current grantees will lose deferred status and work authorization benefits when their terms expire and they are precluded from the opportunity to renew. DACA grantees were repeatedly assured that their requests for renewal of their lawful presence would be considered if they followed the rules of the DACA program.[45] As Former Secretary of Homeland Security John Kelly affirmed, once an individual

---

[45] *See* Napolitano Memo, June 15, 2012, AR 1; Ex. 41 (USCIS Help Center, DACA FAQs); Ex. 42 (USCIS Help Center, *How will USCIS evaluate my request for renewal of DACA*); Ex. 43 (USCIS DACA Approval Notice).

22

**App-167**

was granted deferred prosecution under DACA, he or she was granted a "commitment ... by the government."[46] Walking away from that "commitment" curtails DACA grantees' existing rights and deeply affects their interests. The termination also categorically disallows all applications for deferred action for all those who satisfy DACA's established criteria. Prospective grantees have lost not only the ability to apply for deferred action based on that criteria, but also access to work authorization, social security cards, advance parole (under 8 U.S.C. § 1182(d)(5)), and numerous collateral benefits. Thus, the rule does not fall under the interpretive or procedural exemptions of the APA.

### B. The Termination Binds the Discretion of DHS and Its Officials.

The termination is more than a "general statement of policy" because it binds DHS discretion. To determine whether the exemption to notice and comment applies, courts look to whether a rule binds the discretion of the agency and its officials. *See Gen. Elec. Co. v. E.P.A.,* 290 F.3d 377, 382–83 (D.C. Cir. 2002) (notice and comment is required when a rule "expresses a change in substantive law or policy (that is not an interpretation) which the agency intends to make binding, or administers with binding effect.") (internal quotation and citation omitted). The "critical factor" in distinguishing a legislative rule from a general statement of policy is "the extent to which the challenged [directive] leaves the agency, or its implementing official, free to exercise discretion to follow, or not to follow, the [announced] policy in an individual case." *Municipality of Anchorage v. United States*, 980 F.2d 1320, 1324 (9th Cir. 1992) (quoting *Mada–Luna v. Fitzpatrick*, 813 F.2d 1006, 1013-14 (9th Cir.1987)). Thus, "cabining of an agency's prosecutorial discretion" rises to the level of a legislative rule where it requires agency

---

[46] Ex. 44 (Ted Hesson & Seung Min Kim, Wary Democrats Look to Kelly for Answers on Immigration, Politico, Mar. 29, 2017).

officials to take a particular approach. *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 948 (D.C. Cir. 1987); *see also Bellarno Intern. Ltd. v. Food & Drug Admin.*, 678 F.Supp. 410, 414 (E.D.N.Y. 1988) (an alert that automatically required detention of certain pharmaceuticals imported into the U.S. was binding on both the government and importers and thus subject to notice and comment).

The Termination Memo eliminates DHS's discretion to grant new DACA applications, to renew existing benefits, or to authorize advance parole. From now on, DHS "*[w]ill* reject *all* DACA initial requests … filed after the date of this memorandum," "*[w]ill* reject *all* DACA renewal requests" outside of a strict wind-down period which has already ended, "*[w]ill* not approve *any* new Form I-131 applications for advance parole," and "*[w]ill* administratively close *all* pending Form I-131 applications for advance parole" by DACA grantees (emphasis added).[47] This type of "mandatory, definitive language is a powerful, even potentially dispositive, factor" in determining whether a rule is substantive. *Young*, 818 F.2d at 947. In fact, DHS officials currently retain *no* discretion to fulfill any DACA-related requests, whether for initial or renewal applications or for advance parole. *Cf. Dimaren v. Immigr. and Naturalization Serv.*, 398 F.Supp. 556, 559 (S.D.N.Y. 1974) (rule was exempt from notice and comment because agency officials were free to give an immigration policy memorandum "whatever weight [they] deemed appropriate," so it did not bind their discretion). Moreover, DACA grantees and DACA-eligible individuals are bound in that they cannot meaningfully request deferred action or advance parole under the framework that they could under DACA.

---

[47] DACA Termination Memo, AR 252-255.

Unlike the DACA termination, deferred action programs usually end when circumstances render them no longer necessary (such as new statutory protections coming from Congress).[48] In one circumstance in which the government attempted to eliminate a prosecutorial discretion program for a class of non-citizens, however, a federal court determined that notice and comment rulemaking was required under the APA. *See Parco v. Morris*, 426 F. Supp. 976, 984-985 (E.D. Pa. 1977). In *Parco,* the federal government attempted to terminate a policy that granted extended stay in the U.S. for individuals awaiting a certain type of visa. Because this decision stripped agency officials of discretion to offer relief, the court found that it was a "flat rule of eligibility" rather than a "general statement of policy." *Id.* The DACA termination allows for even less discretion than that in *Parco*, as the *Parco* termination explicitly left in place discretion to grant relief in "compelling" cases, *id.* at 981, while the DACA termination flatly states that DACA requests will be rejected. *Parco* distinguished the Second Circuit's decision in *Noel v. Chapman*, 508 F.2d 1023, 1029 (2d Cir. 1975), which upheld a different aspect of the same termination decision against an APA challenge. In *Noel*, the challenged aspect of the policy served as only a "guideline" for agency discretion, left relevant determinations in the "sole discretion" of agency officials, and contained an explicit "hardship" exception." *Id.* at 1030. The difference between *Noel* and *Parco* is analogous to the difference between the creation of deferred action policies (such as DACA) and the DACA termination. Deferred action policies for groups of people provide guidance to agency officials in the field to inform their exercise of discretion in individual cases.[49] The DACA termination, on the other hand, mandates that agency

---

[48] *See* Ex. 1, ¶ 76 (Wadhia Decl.).

[49] *See* Ex. 1, ¶ 51, 53 (Wadhia Decl.).

officials reject all requests of a certain type. Thus, the termination cannot be characterized as a statement of policy exempt from notice and comment.

## C. A Strong Public Interest in the Treatment of DACA Grantees Weighs in Favor of Notice and Comment.

Courts also recognize that the question of whether the impact of a rule is substantial enough to trigger notice and comment is "'one of degree' depending upon 'whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA.'" *Elec. Privacy Info. Ctr.*, 653 F.3d at 5-6 (internal citations omitted). A strong public interest in a rule thus weighs in favor of a finding that the rule is legislative in nature, and therefore subject to notice-and-comment rulemaking. *Hoctor v. U.S. Dept. of Agric.*, 82 F.3d 165, 171 (7th Cir. 1996) ("The greater the public interest in a rule, the greater reason to allow the public to participate in its formation.").

There is a strong public interest in the protection of the DACA program, not only from hundreds of thousands of DACA grantees themselves, but also from states, colleges, universities, businesses, non-profits, cities and towns, school districts, family members, and taxpayers who have invested significant resources and benefitted from the DACA program. All of these individuals and entities will be significantly harmed when hundreds of thousands of young people lose the opportunities and security that DACA has provided. *Accord infra* Part IV (cataloguing the irreparable harm that Plaintiff States and their residents will suffer if the termination is not enjoined). This substantial impact merits the opportunity for notice and comment by those affected. Thus, Plaintiff States are likely to succeed on their claim that Defendants violated the APA and RFA by foregoing notice and comment procedures and a regulatory flexibility analysis.

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 176 of 358
Case 1:17-cv-05228-NGG-JO   Document 97-1   Filed 12/15/17   Page 540 of 1603 PageID #:
4485

Pursuant to 28 U.S.C. § 1746(2), I, E. Alexandra Monroe hereby declare as follows:

1. I am over the age of eighteen and competent to testify herein.

2. I am employed at the Washington State Department of Ecology (Ecology) as the Labor Relations and Personnel Operations Manager. I am responsible for providing human resources and labor relations consultation, advice, and services to agency staff and managers, both directly and through a team of human resource consultants, and for providing overall management of the day-to-day personnel operations of the agency.

3. There is at least 1 employee at Ecology who is a recipient of Deferred Action for Childhood Arrivals (DACA).

4. The DACA recipient is employed as an Information Technology Specialist 3, Application Developer, in the Environmental Systems Support unit of the Agency's Information Technology (IT) Services Office. The employee supports the development of complex environmental information systems, using development tools to develop, test, implement, and maintain highly efficient code that delivers the IT systems required by the business of the agency. These systems are relied upon by Agency staff, management, legislators, partner-agencies, and the public to identify, analyze, and reflect the state of the environment in Washington State.

5. Ecology's mission is to protect, preserve, and enhance Washington's environment for current and future generations, with the goals to protect and restore land, air and water; prevent pollution; promote healthy communities and natural resources; and deliver efficient and effective services. A strong technology infrastructure is essential in order for Ecology to meet its mission and goals and information technology specialists are vital to developing, managing, and maintaining that infrastructure. Ecology spends significant time and resources to recruit, hire, train, and supervise its employees. When any employee departs, it creates disruption for our agency and costs us time and resources to replace and train that person. Failure to retain qualified IT specialists to manage agency technology puts the timeliness of IT projects and the Agency's ability to successfully perform its critical day to day work at risk.

6. The termination of DACA will be disruptive to operations and cause us to expend additional resources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 1st day of September, 2017

_E. Alexandra Monroe_

E. Alexandra Monroe

DECLARATION OF E. ALEXANDRA MONROE          1          ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**App-172**

Pursuant to 28 U.S.C. § 1746(2), I, Enola Kaplan hereby declare as follows:

1. I am over the age of eighteen and competent to testify herein.

2. I am employed at Department of Social and Health Services (DSHS)/ Human Resources Division (HRD). My job title is Human Resource Manager. My job description is to manage the delivery of full scope of human resource services to Lakeland Village/Region 1 DDA Field Services/Region 1 State Operated Living Alternative (SOLA) and Consolidated Support Services (CSS). I am responsible for managing a team of human resource professionals in the delivery of exceptional and valued human resource services to a major area of DSHS.

3. There are at least one (1) employees at DSHS/DDA/Lakeland Village who are recipients of Deferred Action for Childhood Arrivals (DACA).

4. One DACA recipient is employed as an Attendant Counselor 1. That employee's job description is to assist, train, monitor and keep intellectually challenged residents free of abuse/neglect in a homelike setting.

5. DSHS/DDA/Lakeland Village spends time and resources to recruit, hire, train, and supervise employees. When any employee departs, it creates disruption for our agency and costs us time and resources to replace and train that person.

6. The termination of DACA will be disruptive to operations and cause us to expend additional resources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _01_ day of September, 2017

Enola Kaplan

---

DECLARATION OF ENOLA KAPLAN                          1                          ATTORNEY GENERAL OF WASHINGTON
                                                                                 800 Fifth Avenue, Suite 2000
                                                                                 Seattle, WA 98104-3188
                                                                                 (206) 464-7744

**App-173**

Pursuant to 28 U.S.C. § 1746(2), I, Rich Jones, hereby declare as follows:

1. I am over the age of eighteen and competent to testify herein.

2. I am employed at Washington State Office of the State Treasurer (OST). My job title is Human Resources Manager and my job description is the responsibility for the management, support, development and implementation of human resources activities and programs and oversight of the organizations most sensitive and complex human resource issues. I manage, supervisor, mentor and guide Human Resource staff in their performance and application of human resources and serve as a member of the Executive Leadership Team.

3. There is one employee at Washington State Office of the State Treasurer who is a recipient of Deferred Action for Childhood Arrivals (DACA)

4. The one DACA recipient is employed as a Senior Secretary in our Administration Division. That employee's job description is to support the organization's mission by performing varied and complex administrative and secretarial functions for the agency's Administration, Debt Management and Investments Divisions within the OST Legislative Building offices. Importantly, this position serves as the first point of contact ensuring communications with the public and other agency visitors/guests to include government officials and legislative leaders shows our commitment to being a transparent and professional organization.

5. The Washington State Office of the State Treasurer spends time and resources to recruit, hire, train, and supervise employees. When any employee departs, it creates disruption for our agency and costs us time and resources to replace and train that person. Moreover, as a small and principal state agency, the loss of a front office staff can create strain and stress on an area of the office that has been developed to operate effectively and efficiently with a minimal staffing level.

6. The termination of DACA will be disruptive to operations and cause us to expend additional resources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 1 day of September, 2017

Rich Jones, Human Resource Manager

Pursuant to 28 U.S.C. § 1746(2), I, Sarah Conly, hereby declare as follows:

1. I am over the age of eighteen and competent to testify herein.

2. I am employed at the Washington Department of Veterans Affairs (WDVA). My job title is Human Resources Director. My position is responsible to manage and integrate the human resources and payroll offices statewide. I have administrative responsibility for developing, implementing and maintaining a full range of human resource and payroll programs and services including planning, recruitment, benefits, leave, compensation, contracts, classification, training, disciplinary actions, affirmative action/equal employment opportunities, employee and labor relations, complaint investigations, and adherence to applicable laws and regulations.

3. There are at least one employee at the WDVA located at the Washington Soldiers Home (WSH) who is a recipient of Deferred Action for Childhood Arrivals (DACA).

4. One DACA recipient is employed as a Nursing Assistant – Certified (NAC). That employee's job description is to assist in delivery of nursing and nursing related care to residents of the WSH. In accordance with current standards of practice, the NAC assists or supervises assigned residents with activities of daily living, i.e., bathing, dressing, grooming, hygiene, toileting and eating at a long term care facility. The NAC promotes resident-centered care and ensures that the veterans are treated with dignity and respect.

5. WDVA spends time and resources to recruit, hire, train, and supervise employees. When any employee departs, it creates disruption for our agency and costs us time and resources to replace and train that person.

6. The termination of DACA will be disruptive to operations and cause us to expend additional resources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21 day of September, 2017

Sarah Conly
Sarah Conly

DECLARATION OF SARAH CONLY                    1                    ATTORNEY GENERAL OF WASHINGTON
                                                                    800 Fifth Avenue, Suite 2000
                                                                    Seattle, WA 98104-3188
                                                                    (206) 464-7744

**App-175**

## DECLARATION OF ROSSANA ROSADO

Pursuant to 28 U.S.C. § 1746(2), I, Rossana Rosado, hereby declare as follows:

1.      I am the Secretary of State for New York State.

2.      I have compiled the information in the statements set forth below through New York State personnel who have assisted me in gathering this information from New York State agencies.

3.      New York State is the fourth largest state in the United States of America in 2017, with a population of 19.74 million. New York prides itself on its rich ethnic diversity as New Yorkers hail from over 200 nations.

4.      New York State has a strong interest in prohibiting any practice that denies equal protection of the laws or otherwise discriminates on the basis of race, color, or national origin. New York's Constitution guarantees all persons the right to equal treatment under the law and forbids discrimination based on race, color, creed or religion. N.Y. Const. art. I, § 11. New York's statutes reiterate the State's strong interest in combatting discrimination and prejudice. *See* N.Y. Exec. Law § 290.

5.      New York's diversity has always been its greatest strength. For example, in 2016, the Governor's Advisory Council on Diversity and Inclusion was created to help accelerate the rate of progress of recruiting more racial and ethnic minorities to work in state government.  That same year, the New York State Board of Regents passed a resolution permitting  Deferred Action for Childhood Arrival ("DACA") recipients to be eligible for teaching and nursing licenses. *See* Comm. of Educ. Regs. §§ 59.4; 80-1.3; Ex. A (New York State Board of Regents Press Release, Feb. 24, 2016).

6.      New York State has over 50 agencies whose missions entail providing or supervising the administration of certain basic services to all residents.  This includes, but is not limited to providing educational aid, family assistance, health, and mental hygiene benefits and services,

**App-176**

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 181 of 358
Case 1:17-cv-05228-NGG-JO   Document 97-3   Filed 12/15/17   Page 169 of 397 PageID #:
5992
financing and maintaining the State's transportation infrastructure, regulating labor practices, protecting the environment, establishing a park system, and providing for the protection and safety of the public.

7.      The DACA program has been beneficial to the people of the State of New York. Obtaining DACA status has allowed DACA recipients, many of whom are long-term residents of New York, to work legally across industries, open bank accounts, access lines of credit, purchase homes and cars, and obtain employer-based health insurance, among other benefits. DACA grantees also contribute significantly to the State and local revenues and tax bases.

8.      Across its various agencies, New York State currently employs at least 5 DACA recipients including a management specialist, an addiction counselor, a senior-level engineer, a student assistant, and of particular note, an Empire State Fellow. The Empire State Fellows Program is a full-time leadership training program that prepares the next generation of talented professionals for careers as New York State policy-makers. New York State invests significant resources in providing educational and professional development programs to the Fellows, and relies on these investments to sustain a diverse workforce in senior leadership roles.

9.      New York State has relied on the work of DACA grantees to not only fulfill their professional duties, but also to help foster an inclusive and diverse and community. But New York State would be prohibited by federal law from continuing to employ DACA grantees once their work authorizations expire. The termination of the DACA program would therefore pose a grave threat to New York State's ability to have a diverse and inclusive state government workforce, and result in the loss of the unique and significant contributions from these members of its community.

10.     Terminating DACA would significantly disrupt state operations. To fill the vacancies of DACA grantee employees, New York State would have to expend significant effort, time, and financial resources in order to find and train appropriate replacements. New York State may also experience undesirable delays and disruptions in the provision of necessary services.

**App-177**

11.     Moreover, to have New York State DACA employees living in constant fear of arrest and deportation due to the termination of DACA is damaging to those individuals and the State agencies where they work.

12.     More broadly, terminating DACA will cause the State to expend additional resources. Specifically, it will impose additional health care costs on New York State. New York State currently funds emergency Medicaid coverage for low-income undocumented immigrants who have received deferred action, including DACA-eligible immigrants. *See* Ex. 77 of Am. Compl. (Office of Health Insurance Program, *Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens*, May 7, 2013). Terminating DACA may reduce access to Medicaid for current DACA grantees. Individuals in New York who are not DACA grantees may only qualify for Medicaid coverage of care and services necessary to treat an emergency condition. Terminating DACA will require New York to either seek a State legislative change to maintain current Medicaid coverage formerly DACA-eligible immigrants with state dollars only or limit Medicaid coverage to treatment of emergency conditions for some or all of these individuals.

13.     Overall, the termination of DACA will result in significant harm to New York State through the disruption of state operations and expenditure of additional resources to compensate for the loss of current or future state employees.

I declare under penalty of perjury that, to the best of my knowledge, the foregoing is true and correct.

Executed on this 15th day of December, 2017

/s/ Rossana Rosado
Rossana Rosado

**App-178**

Pursuant to 28 U.S.C. § 1746(2), I, Camilla Glatt, hereby declare as follows:

1. I am over the age of eighteen and competent to testify herein.

2. I am employed at Columbia Basin College. My job title is Vice President for Human Resources & Legal Affairs. My job description is attached as Document No. 1.

3. There is at least 1 employee at Columbia Basin College who is a recipient of Deferred Action for Childhood Arrivals (DACA).

4. The DACA recipient is employed as an Outreach & Retention Specialist. That employee's job description is attached as Document No. 2. The employee serves students in the Cyber Security Program and others in an effort to meet the mission of the College.

5. Columbia Basin College spends time and resources to recruit, hire, train, and supervise employees. When any employee departs, it creates disruption for our agency and costs us time and resources to replace and train that person.

6. The termination of DACA will be disruptive to operations and cause us to expend additional resources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 1st day of September, 2017

Camilla Glatt

DECLARATION OF CAMILLA GLATT                    1

# JOB DESCRIPTION

Employee Name:      Camilla Glatt
Job Title:      Vice President for Human Resources & Legal Affairs
Reports to:      President
Exempt/FLSA      Yes
Prepared Date:      August 20, 2007
Approved Date:      February 19, 2008

**A   POSITION OBJECTIVES**

The Vice President for Human Resources & Legal Affairs will direct and coordinate all aspects of Human Resources, Labor Relations and Legal Affairs including recruitment, benefits, leaves, compensation, contracts, classification, employee development and training, faculty and classified bargaining, diversity initiatives, discrimination and harassment complaints, and disciplinary actions. Additionally, the position is responsible for the College's legal practices, preparation of written opinions and guidance for college management in regards to grievances, complaints and lawsuits.

The Vice President for Human Resources & Legal Affairs is responsible for coordination and implementation of strategic Human Resources, Labor Relations and Legal Affairs functions. This position plays a key role in advancing the relationships between the institution and the two collective bargaining groups (faculty and classified staff) that are integral to the success of the College's mission and goals.

This is a contracted, exempt management position that reports to the College President.

**B   SUPERVISORY RESPONSIBILITIES**

Yes

**C   ESSENTIAL FUNCTIONS – DUTIES AND RESPONSIBILITIES**

- Develop, recommend and carry out approved personnel/human resources programs in support of the strategic goals identified by the Board of Trustees and the President;
- Review, develop and recommend College policies and procedures and assure consistency/compliance with state and federal regulations; maintain the College's policy Operations Manual and assure of compliance with the Washington Administrative Code;
- Design and execute strategies for the administration and communication of HR law, regulations, and policies as well as industry trends, best practices, and operating guidelines for existing and new developments of the College;
- Serve as the College's primary human resource interface with the Washington State Office of the Attorney General;
- Advise the President and the Board of Trustees, in conjunction with the Assigned Assistant Attorney General, on all personnel

and legal matters concerning the College;

- Serve as the College's Title IX Coordinator assuming all responsibility for leadership, coordination and oversight of the College's Non-Discrimination & Harassment Policy & Grievance Procedure assuring compliance with Title IX of the Educational Amendments Act of 1972;
- Serve as the Affirmative Action Officer, Public Records Officer, and Appointing Authority for Classified Staff Personnel;
- Serve as the lead member of the CBC negotiation team during contract negotiations and promote effective labor/management relations;
- Work in collaboration with CBC managers, investigate and recommend employee disciplinary action consistent with CBC policies, procedures and appropriate collective bargaining agreement(s);
- Research information to develop and implement Board policies or human resource policies and procedures to guide the daily operations of the College;
- Interact with administrators, supervisors and employees to assess department/division human resource needs including, but not limited to, organizational structures, staffing, configurations and organizational development;
- Responsible for the overall coordination and implementation of programs related to the College's Equal Opportunity and Affirmative Action Program including development of the plan, identification of problem areas and assisting in arriving at solutions, serving as liaison between the College and enforcement agencies and community organizations, and providing training to staff to prevent disparate and/or harassment of employees or students who are members of affected groups;
- Coordinate the administration of all salary programs, including application of the provisions of the faculty negotiated agreement, compliance with the Washington State Department of Personnel Classified Staff Salary Schedule guidelines; implementation of the administrative/exempt compensation plan and administration of the hourly pay program;
- Coordinate all aspects of recruitment activities for academic, administrative and classified positions, including implementation of strategies to achieve affirmative action and diversity objectives and goals;
- Serve on College committees and provide leadership to College committees as may be designated by the President; act as the College's liaison to external agencies and organizations regarding human resource matters (i.e. State Board for Community and Technical Colleges, Washington State Department of Personnel, Department of Labor and Industries, Department of Employment Security, Human Rights Commission and other organizations);
- Lead, participate in, or coordinate projects, committees or task

**App-181**

forces as assigned by the President;
- Discharge other administrative assignments, as directed by the President; and
- Fulfill other duties as assigned.

Common Duties Established by the College

1. Serve as a member of the designated College committees, councils, and teams; serve on President's Cabinet;
2. Provide leadership in accordance with the Mission, Vision, and Values established by the College, furthering goals and strategic initiatives;
3. Ensure areas of responsibility operate effectively within the policies and procedures of the College and applicable governing agencies;
4. Train, supervise and evaluate employees in accordance with negotiated agreements, applicable state and federal laws, and College policies and procedures; and
5. Work to achieve and support affirmative action goals as established by the College.

| D | BUDGET RESPONSIBILITY | Human Resources, Legal Affairs and HR College Support |
|---|---|---|

E   COMPETENCIES

- Organizational Strategy – Demonstrated experience aligning and expanding programs based on the organization's mission, structures, and resources.
- Communication – Demonstrated experience creating and maintaining open communications regarding resources, priorities, and expectations. Effective problem-solving skills as well as strong oral and written communication skills.
- Collaboration – Demonstrated experience building and leveraging networks and partnerships to advance the mission, vision, and goals of an institution.
- Budget Management – Demonstrated experience developing and administering operating budgets, preparing financial reports, and ensuring compliance with federal and state regulations.
- Project Management – Demonstrated experience initiating, implementing, and coordinating multiple projects and priorities while meeting timelines.
- Personnel Management – Strong and effective interpersonal skills working with faculty and administration to ensure compliance with state and local policies and procedures.
- Professionalism – Demonstrated courage to take risks, make difficult decisions, and accept responsibility.
- Advocacy – Demonstrated experience working with staff and

student of great diversity in socioeconomic, cultural, and ethnic background, including those with different levels of academic preparation and varying physical and learning abilities.

F   QUALIFICATIONS
- Juris Doctorate degree and five (5) years of progressively responsible leadership in the areas of human resources administration, human resources development, policy and program development, labor and employee/faculty relations, benefits, classification collective bargaining, ADA and FMLA requirements, affirmative action strategic human resource planning and supporting a diverse workforce.

**Preferred/Desired Education**
- Mastery of human resources policies, procedures and regulatory requirements;
- Knowledge of labor relations law and practices, and experience with collective bargaining, contract negotiation and contract administration;
- Strong leadership and coaching skills;
- The ability to balance strategic focus with operational perspective (articulate vision, execute strategic initiatives, and manage the operations of College HR team);
- Excellent communication skills; written, verbal, presentation, and interpersonal;
- The ability to manage a multicultural workforce;
- Experience in public and/or academic environments;
- Familiarity with academic, community college or university institutions.

**Special Requirements/Conditions of Employment**
- Washington State Bar License

G   PHYSICAL REQUIREMENTS
- Occasional need to lift at least 20 pounds;
- Ability to sit and stand for long periods of time;
- Frequent need for oral, written and auditory communication;
- Frequent repetitive hand and wrist motions;
- Occasional need for travel;
- Ability to work in fast paced and sometimes stressful services environment.

H   WORKING CONDITIONS
Work week is Monday – Friday, 7:30 a.m. – 4:30 p.m. however working hours will vary due to work demands and changes in the College's schedule.   Some evening and weekend work is to be expected.

## JOB DESCRIPTION

Employee Name:
Job Title:                            Outreach/Retention Specialist for the Bachelors of Science in Cyber
                                      Security Program
Reports to:                           Associate Dean for Student Retention & Completion
Exempt/FLSA                           Yes
Prepared Date:                        April 8, 2016
Approved Date:                        April 8, 2016 (newly assigned supervisor)

A   POSITION          The Outreach and Retention Specialist for the Bachelors of Applied
    OBJECTIVES        Science (BAS) in Cyber Security Program will develop and then
                      implement a recruiting and retention plan to include strategies to
                      attract a diverse pool of student candidates, coordinate and provide
                      assistance to enrolled students, and monitor student progress toward
                      completion. The Outreach and Retention Specialist will report to the
                      Associate Dean for Student Retention & Completion.

B   SUPERVISORY       N/A
    RESPONSIBILITIES

C   ESSENTIAL         •   Assist the Dean and other Columbia Basin College faculty and
    FUNCTIONS –DUTIES     staff in implementing the Cyber Security Bachelor Program
    AND                   goals and objectives;
    RESPONSIBILITIES   •   Develop strategies to recruit, enroll, retain and graduate
                          students in Bachelor Program and collaborate with existing
                          College departments such as Outreach and Student Success &
                          Engagement in these efforts;
                      •   Collaborate with other campus BAS program staff to support
                          shared marketing, outreach, recruitment, and retention
                          processes and advising programs;
                      •   Assist in the oversight of the Program application process,
                          student handbook, and recruiting materials in both printed and
                          electronic formats;
                      •   Conduct informational sessions on the Program in the
                          community, the College and organizational settings and ensure
                          effective handling of inquiries concerning prerequisites,
                          curriculum, enrollment procedures, transferability of previous
                          coursework, and/or College services from prospective students
                          online, by phone, at events, or in-person;
                      •   Develop and implement an orientation, as well as other student
                          activities/offerings to support and retain students;
                      •   Implement tutoring and other support offerings to assist the
                          special needs of the Bachelor adult-student population;
                      •   Coordinate with Student Services to ensure Cyber Security
                          students receive services and resources to support their
                          continued enrollment as well as specialized services germane to
                          the Program;

**App-184**

- Develop and implement an advising model that assists students in designing and revising educational plans, as necessary, to meet their individual goals;
- Monitor student academic progress and implement student success workshops or other support offerings to maximize cohort retention;
- Recommend BAS in Cyber Security courses and other general education course scheduling;
- Collaborate with Instructional Support to support faculty efforts in utilizing appropriate eLearning technology, establishing Bachelor Program smart classrooms, and supporting faculty efforts to utilize appropriate eLearning technology;
- Maintain accurate records for reporting purposes, assessment activities and ensure accurate student coding;
- Provide other support as needed to the Dean for activities such as assessment, curriculum development, and accreditation; and
- Other duties as assigned.

| | | |
|---|---|---|
| D | BUDGET RESPONSIBILITY | None |
| E | COMPETENCIES | Project Management: Develop project plans; coordinate projects; communicate change and progress; complete projects on time and budget; and manage project team activities. |

Teamwork: Balance team and individual responsibilities; exhibit objectivity and openness to other views; give and welcome feedback; contribute to building a positive team spirit; put success of team above own interest; able to build morale and group commitment to goals and objectives; and support everyone's effort to succeed.

Visionary Leadership: Display passion and optimism; inspire respect and trust; mobilize others to fulfill the vision; and provide vision and inspiration to peers and subordinates.

Change Management: Develop workable implementation plans; communicate changes effectively; build commitment and overcome resistance; prepare and support those affected by change; and monitor transition and evaluate results.

Leadership: Exhibit confidence in self and others; inspire and motivate others to perform well; can effectively influence the actions and opinions of others; accept feedback from others; and give appropriate recognition to others.

Quality Management: Look for ways to improve and promote quality; and demonstrate accuracy and thoroughness.

**App-185**

Business Acumen: Understand business implications of decision; display orientation to profitability; demonstrate knowledge of market and competition; and align work with strategic goals.

Cost Consciousness: Work within approved budget; develop and implement cost savings measures; contribute to profits and revenues; conserve organizational resources.

| | | |
|---|---|---|
| F | REQUIRED QUALIFICATIONS | |

- Bachelor's degree in computer science, education, communications, student development, business administration or related field from an accredited college or university;
- Experience in student recruitment and advising in a college setting;
- Proficient in Microsoft Office; and
- Commitment to diversity and cultural sensitivity with experience in working with diverse populations.

**Preferred Qualifications:**
- Master's degree in computer science, education, communications, student development, business administration or related field;
- Knowledge and understanding of computer science education;
- Experience in advising, retention and other student support services in a college setting;
- Knowledge about current best practices and research findings relative to student retention programs and services; and
- Instructional experience in a college setting.
-

| | | |
|---|---|---|
| G | PHYSICAL REQUIREMENTS | |

- Occasional need to lift at least 20 pounds;
- Ability to sit and stand for long periods of time;
- Frequent need for oral, written and auditory communication;
- Frequent repetitive hand and wrist motions;
- Occasional need for travel;
- Ability to work in fast paced and sometimes stressful services environment.

| | | |
|---|---|---|
| H | WORKING CONDITIONS | |

Work week is Monday – Thursday, 7:00 a.m. – 4:30 p.m. and Friday 7:00 a.m. - Noon; however working hours may vary due to work demands and some evening and weekend work is expected and will be required.

**App-186**

Pursuant to 28 U.S.C. § 1746(2), I, Emily Schuh hereby declare as follows:

1. I am over the age of eighteen and competent to testify herein.

2. I am employed at the City of Anacortes. My job title is Director of Administrative Services. My job is to oversee the City's Administrative Services Department, which provides oversight and management of human resources, risk management, municipal court services, public defense services, Anacortes Senior Activity Center, and municipal fiber.

3. There is at least one employee at the City of Anacortes who is a recipient of Deferred Action for Childhood Arrivals (DACA).

4. The City DACA recipient is a trusted employed whose job duties are essential to City operations. This individual works in a small department whose operations would be severely impacted by the loss of an employee.

5. The City of Anacortes spends time and resources to recruit, hire, train, and supervise employees. When any employee departs, it creates disruption for our agency and costs us time and resources to replace and train that person.

6. The termination of DACA will be disruptive to operations and cause us to expend additional resources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 27ᵗʰ day of September, 2017

ECSchuh SPHR

Emily C Schuh
[Printed Name]

DECLARATION OF [NAME]                    1                    ATTORNEY GENERAL OF WASHINGTON
                                                              800 Fifth Avenue, Suite 2000
                                                              Seattle, WA 98104-3188
                                                              (206) 464-7744

**App-187**

Pursuant to 28 U.S.C. § 1746(2), I, <u>Kimberly Ann Garza</u>, hereby declare as follows:

1.  I am over the age of eighteen and competent to testify herein.

2.  I am employed at Big Bend Community College. My job title is Vice-President of Human Resources & Labor. In this position, I report to the college President and have administrative responsibility for developing, implementing and maintaining a full range of human resource programs and services including planning, recruitment, benefits, leaves, compensation, contracts, classification, training, disciplinary actions, affirmative action/equal employment opportunities, employee and labor relations, complaint investigations, and adherence to applicable laws and regulations.

3.  There are at least 1 full-time and 3 part-time employees at Big Bend Community College who are recipients of Deferred Action for Childhood Arrivals (DACA).

4.  These employees provide direct services to students in areas such as academic support, financial aid, and student programs.

5.  Big Bend Community College spends time and resources to recruit, hire, train, and supervise employees. When any employee departs, it creates disruption for our agency and costs us time and resources to replace and train that person.

6.  The termination of DACA will be disruptive to operations, have a negative impact on the students we serve, and cause us to expend additional resources.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 1 day of September, 2017

[Name]

DECLARATION OF Kimberly Ann Garza                1                ATTORNEY GENERAL OF WASHINGTON
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

Nos. 18-15068, 18-15069, 18-15070, 18-15071,
18-15072, 18-15128, 18-15133, 18-15134

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, *et al.*,
*Plaintiffs-Appellees-Cross-Appellants*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,
*Defendants-Appellants-Cross-Appellees.*

**On Cross-Appeal from the United States District Court
for the Northern District of California**

## PRINCIPAL AND RESPONSE BRIEF OF THE STATES OF
## CALIFORNIA, MAINE, MARYLAND, AND MINNESOTA

JANET T. MILLS
Attorney General of Maine
Susan P. Herman
Deputy Attorney General
*Attorneys for the State of Maine*

BRIAN E. FROSH
Attorney General of Maryland
Steven M. Sullivan
Solicitor General
*Attorneys for the State of Maryland*

LORI SWANSON
Attorney General of Minnesota
Jacob Campion
Assistant Attorney General
*Attorneys for the State of Minnesota*

March 13, 2018

XAVIER BECERRA
Attorney General of California
Edward C. DuMont
Solicitor General
Michael J. Mongan
Deputy Solicitor General
Michael L. Newman
Supervising Deputy Attorney General
James F. Zahradka II
Deputy Attorney General
Samuel P. Siegel
Associate Deputy Solicitor General
CALIFORNIA DEPARTMENT OF JUSTICE
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-3660
(415) 510-3920
michael.mongan@doj.ca.gov
*Attorneys for the State of California*

months after the States' complaint was filed, and the day before defendants' reply
in support of their motion to dismiss was due—stating that the "information-
sharing policy has not changed in any way since it was first announced[.]"  AOB
47.  But the language defendants cite does not restore the protections contained in
the original policy.  To the contrary, it reiterates the troubling terminology found in
the new policy.  *See* USCIS, Guidance on Rejected DACA Requests, https://go.
usa.gov/xnSFj (repeating statement regarding not "proactively provid[ing]"
information, rather than statement that information will be "protected from
disclosure").

## IV.  PLAINTIFFS STATED A CLAIM THAT DEFENDANTS VIOLATED THE APA'S NOTICE-AND-COMMENT REQUIREMENT

Plaintiffs also alleged that defendants violated the APA because they
rescinded DACA without providing the public with notice and an opportunity to
comment on that decision.  The district court dismissed that claim, concluding that
the Acting Secretary's 2017 memorandum was a "general statement[] of policy,"
and was therefore exempt from those procedural requirements.  ER 51; *see* 5
U.S.C. §§ 553(b)(3)(A), 706(2)(D).  It further concluded "that because the original
promulgation of the discretionary program did not require notice and comment, a
return to the status quo ante also does not require notice and comment."  ER 52.
Both conclusions are flawed.

66

A general statement of policy, for which notice-and-comment procedures are not required, "merely provides *guidance* to agency officials in exercising their discretionary powers while preserving their flexibility and their opportunity to make 'individualized determination[s.]'" *Mada-Luna*, 813 F.2d at 1013. In contrast, a directive that "'narrowly limits administrative discretion' or establishes a 'binding norm' . . . effectively replaces agency discretion with a new 'binding rule of substantive law,'" and must go through notice-and-comment rulemaking proceedings. *Id.* at 1014 (emphasis omitted). The "ultimate issue" in deciding whether an agency statement is a policy statement or a substantive rule is "'the agency's intent to be bound.'" *Municipality of Anchorage v. United States*, 980 F.2d 1320, 1325 (9th Cir. 1992) (quoting *Public Citizen, Inc. v. USNRC*, 940 F.2d 679, 681-682 (D.C. Cir. 1991)).

The 2012 memorandum establishing DACA was a policy statement because it furnished agency officials with guidance about how to exercise their discretion in making deferred action decisions, while at the same time preserving their ability to deny requests for relief on a "case by case basis." ER 142. The 2017 memorandum, in contrast, adopts the Attorney General's categorical "legal determination" that DACA was unlawful. ER 129; *see* ER 130, 176; AOB 38. It establishes a new rule of substantive law for the agency: that DHS lacks the legal authority to create (or continue) deferred-action programs like DACA and DAPA.

67

**App-191**

And it leaves no doubt that the agency intends to be bound by this substantive

determination, by asserting that it is "clear that the . . . DACA program should be

terminated"; by requiring agency officials to reject "all DACA initial requests"

filed after September 5, 2017; and by providing that the agency will not approve

"any new Form I-131 applications for advance parole under standards associated

with the DACA program." ER 130-131. The agency intends the 2017

memorandum to be "'finally determinative of the issue[] . . . addressed.'" *Mada-Luna*, 813 F.2d at 1014. Such a rule may only be adopted through notice-and-comment procedures. *Id.*

Even accepting defendants' new position that they were required to go

through the notice-and-comment process before adopting DACA in 2012

(AOB 29-30), that would not excuse them from following those procedures before

terminating the policy. When an agency believes that an existing substantive rule

was defectively promulgated, it still must conduct a notice-and-comment process

to modify or repeal that rule. *See Consumer Energy Council of Am. v. FERC*, 673

F.2d 425, 447 n.79 (D.C. Cir. 1982) (question whether original rule was

defectively promulgated is itself "one worthy of notice and an opportunity to

comment"). Otherwise, agencies could "circumvent the requirements of [Section]

553" any time they wanted to alter a rule, simply by asserting that the rule was

"defective in some respect." *Id.* That principle should apply whether the agency

68

**App-192**

attempts to rescind a substantive rule that was "defectively promulgated" through a notice-and-comment process, *see id.*, or seeks to rescind a substantive rule that it now believes should have been adopted through a notice-and-comment process in the first instance. *Cf. Mada-Luna*, 813 F.2d at 1017 n.12 ("[W]hen the government seeks to repeal a regulation, it is generally not bound for section 553 purposes by the way it classified that regulation at the time of its promulgation.").

Accordingly, regardless of what procedures were required to adopt DACA in the first place, plaintiffs stated a valid claim that the decision to terminate it had to be made using notice-and-comment procedures.

I, KATHRYN ABRAMS, DECLARE:

1. I am a professor of law at the University of California Berkeley ("UC Berkeley"). The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2. I have been a professor of law since 1985 and a professor at UC Berkeley for sixteen years. My research includes examination of dissident and performative citizenship in the undocumented immigrants' rights movement, feminist jurisprudence, voting rights and constitutional law. I teach several classes at UC Berkeley, presently including *Law and Social Change: The Immigrant Rights Movement* and *Constitutional Law*. My primary research project right now is regarding the mobilization of the immigrants' rights movement in Arizona, and in conjunction with this I have collaborated with undergraduate students through the Undergrad Research Apprenticeship Program ("URAP").

3. I am currently working with Joel Sati, a Deferred Action for Childhood Arrivals ("DACA")-recipient student. I first met Joel Sati during the Berkeley JSD admitted students' day. He was a much sought after, promising candidate with an already distinguished academic record.

### Joel's Significant Contributions to My Class at UC Berkeley

4. Joel is now my Graduate Student Instructor ("GSI") for the course *Law and Social Change: The Immigrant Rights Movement*. Our class meets once a week for three hours for approximately 13 weeks during the semester. It includes about 20 students in their second through fourth years of college at UC Berkeley.

5. This fall my father became seriously ill, and I had to leave Berkeley to care for him in Michigan. This posed a serious challenge for delivering my classes as scheduled. I spoke to the Director of Legal Studies, and we decided I would work with several graduate students who could assist with the development of and support for the *Law and Social Change: The Immigrant Rights Movement* course.

6. I worked with Joel and another graduate student to prepare a lecture on the history of DACA and the modern immigrations rights movement, which they were scheduled to co-deliver without me. The night before the lecture, the other grad student unexpectedly dropped the commitment to teach the class. This left me in a difficult position, but Joel immediately stepped up to help. I taught the first

1   hour of class that the other graduate student was supposed to cover, then Joel taught the remaining two

2   hours of the class by himself. He successfully led the students in a discussion of early DREAM Act

3   legislation, including analysis of the legislation, elements of narratives invoked by DREAMERs, and the

4   pros and cons of these narrative choices that were used to appeal to legislators. As Joel explains so

5   eloquently, by focusing on the exceptional characteristics of certain DREAMERs, the narrative in

6   support of this type of legislation excluded other undocumented immigrants from legitimacy in the eyes

7   of the public and from the dialogue on broader immigration reform in the United States.

8       7.      The following week, I checked-in with students on their lecture and discussions with

9   Joel. The students were deeply impressed by Joel's ability to bring the narrative complexity and

10  discussion to life. His experiences as an activist in the immigrants' rights movement—for example,

11  campaigning for the Maryland DREAM Act—were crucial to the class's understanding. Joel conveys

12  his personal narrative in a uniquely compelling way to students. I think the students found his class

13  discussions so meaningful because they can identify with Joel as a peer and role model, who is so

14  accomplished for his age and yet so similar to them. His first-hand perspective is invaluable.

15      8.      Joel's perspective is incredibly unique and important not just for my class, but to our

16  entire field of study. He has a highly unusual trifecta of experience: he has a first-hand understanding of

17  what it means to be personally at risk and affected by immigration status; he has actively participated in

18  shaping legal rights for immigrants; and he is a distinguished scholar in citizenship theory. I study

19  individuals like Joel who are part of the movement, but I am not on the front lines myself, nor am I

20  personally an at-risk immigrant. I have never had the opportunity to co-teach with anyone that has Joel's

21  experiences before. Joel's unique background enables him to act as an essential bridge between the on-

22  the-ground immigrants' rights movements and broader academic theories of citizenship.

23

24      **Harms to Joel, UC Berkeley and Myself from the DACA Rescission**

25      9.      Not having Joel at UC Berkeley would be like losing a unique, bilingual language

26  speaker; Joel has the rare gift of speaking the immigrants' rights movement language and the language

27  of academia. I understand Joel is applying to law school, which will add a further layer of special

28  expertise to his research, making his perspective even more invaluable to the field.

2

10. Joel's work for me is particularly impressive given that he is already acting as a full-time GSI for another class with Professor Sarah Song. It is unusual to serve as a GSI for more than one class. It is even more unusual to take on the significant role of leading lectures and discussion as Joel has done for my class, particularly for a student, like Joel, who is just starting the second year of a Ph.D.

11. Joel's GSI position with my class requires employment authorization. Without DACA employment authorization, Joel will lose his GSI job. This would be a great loss for Joel and for me, as well as for the students in our class and for UC Berkeley, because of the rescission of the DACA policy.

12. Joel's ability to continue in his academic career is also jeopardized by the rescission of the DACA policy. The rescission has produced immediate harm to Joel. He was denied advance parole to attend prestigious academic conferences in Malta and Germany this fall because of the rescission of the DACA policy. It is vital for graduate students to attend such conferences in order to meet their peers and leading academics in their field and learn how to present their work. This is even more so in Joel's field of the international study of citizenship and migration, which by its nature necessitates international study and connections. The inability to travel internationally is a serious impediment to Joel's career. The rescission of DACA is a huge impediment to Joel establishing his academic profile and becoming the significant scholar that he is poised to be and has invested in becoming.

13. I have also engaged with other DACA recipient students who have provided meaningful insight and value to my academic research. For example, I collaborated with another DACA-recipient undergraduate student in conjunction with URAP, and in that role she helped me to understand the reluctance of undocumented populations to confront the mental health challenges engendered by the often precarious day-to-day uncertainty of their lives. Discussions with this student informed the questions that I asked in my later study of emotional strategies used in Arizona's immigrants' rights movements. This helped me to focus my attention on a specific project in Arizona that uses art to help undocumented persons heal from their experiences and provide them with tools to address their emotional trauma. I will be publishing a book on my Arizona research that will include examination of this approach to art and trauma for undocumented immigrants. I relied on DACA students' perspectives for this project, and they are the best-situated to assist with my research and framing for this book as I

3

DECLARATION OF KATHRYN ABRAMS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

**App-196**
**SER291**

1   continue writing it. The rescission of the DACA policy means likely losing the contributions of these

2   DACA students and their unique, firsthand insights that enrich my research at Berkeley.

3       I declare under penalty of perjury under the laws of the United States that the foregoing is true

4   and correct.

5       Executed on October 25, 2017 in Berkeley, California

6

7

8                            KATHRYN ABRAMS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4
DECLARATION OF KATHRYN ABRAMS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0007

I, JORGE A. AGUILAR, declare:

1. I am the Superintendent of the Sacramento City Unified School District ("District"), a school district of more than 43,000 students with many immigrant students from all parts of the world. Students come from families that speak at least 48 different languages, including Spanish, Hmong, Armenian, Korean, Tagalog, Cantonese, Arabic, Vietnamese and Russian.

2. Sixty four percent (64%) of District students qualify for free or reduced lunch. 17,104 students are of Latino descent. In 2015-16, nearly one-third of students were English language learners or non-native speakers.

3. The repeal of DACA has negatively impacted many students' abilities to focus on their studies. When it was announced that DACA would end, many of those students became fearful of what the decision meant for them, their undocumented relatives and friends.

4. Many teachers in the District have reported their students experiencing trauma in the classroom because of this decision. It has been a major distraction in the classroom. In fact, the District has had to create a guide for teachers to help them manage students dealing with this trauma. Teaching and learning cannot happen in our classrooms if students' basic needs are not met.

5. If the DACA program were eliminated, it would have a severe impact on the District's students. The elimination of work authorization for parents and guardians would likely result in many students withdrawing from the District. Students and/or their parents could be subject to deportation, which would undoubtedly impact their long term academic success.

6. The DACA program has increased the diversity of the District's workforce as well. We have a number of employees, both credentialed and classified, with DACA status.

7. These employees have made meaningful connections with our students, especially those students who have shared cultural and linguistic backgrounds.

8. The District desires to retain and continue to hire any such individuals who can benefit its students and the District as a whole by adding to its diversity and improving educational outcomes for all students.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 25, 2017, at Sacramento, California

Jorge A. Aguilar
Superintendent, Sacramento City Unified School District

1

DECLARATION OF JORGE A. AGUILAR
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

I, RON ANDERSON, declare:

1.      I am the Senior Vice Chancellor of Minnesota State, a system of 37 colleges and universities with 54 campuses across the state of Minnesota. I have held this position since June 2015. Prior to my current position, I served as President of Century College, a large and diverse college within the Minnesota State system. The majority of my more than 25 year-long career in higher education has been spent serving within the Minnesota State system.

2.      As Minnesota State's chief academic and student affairs officer, I am in charge of leading the strategic planning, development, and administration of academic and student affairs, initiatives, programs, and policies in fulfillment of the system's commitments to Minnesota.

3.      Minnesota State is the fourth largest system of state colleges and universities in the country. Minnesota State does not include the University of Minnesota. Minnesota State offers higher education to more than 375,000 students every year. Minnesota State colleges and universities are dedicated to helping all Minnesotans improve their futures and to sustaining Minnesota's diverse and vibrant economy by supplying business and industry with a highly educated and skilled workforce. Minnesota State serves a diverse group of students, including 63,000 students of color, 48,500 first-generation college students, and 84,000 students with modest financial means.

4.      Minnesota State has an enduring commitment to enhancing Minnesota's quality of life by developing and fostering understanding and appreciation of a diverse society. It is Minnesota State's goal to recruit and retain diverse students, faculty, and staff and to ensure a welcoming and supportive environment on all of its campuses throughout the state. Minnesota State is committed to ensuring that its campuses are places of inclusion and opportunity for all students and employees. Minnesota State has long benefitted from the economic, scientific, and cultural contributions of students and scholars from diverse backgrounds.

5.      The rescission of DACA will negatively affect Minnesota State's mission.  Rescinding DACA may cause any current Minnesota State students who are DACA recipients to drop out, either because they are unable to afford to meet their educational expenses due to their loss of work authorization or because they are deported.  The loss of these students will deprive the system's colleges and universities of the diverse backgrounds and perspectives of these students and will set back Minnesota State's efforts to recruit and retain diverse students.  The rescission of DACA will also adversely impact the diversity of potential applicants to Minnesota State's universities and colleges.  Many DACA recipients will be unable to apply to Minnesota State institutions because they have been deported or will be deterred from applying because the investment of a college education may not seem worthwhile if they are unable to work after graduation.  As a result, Minnesota State institutions will be denied the diverse ideas and points of view that these potential DACA students would bring to enrich the college and university communities for all students, faculty, and staff.

6.      In addition, rescinding DACA will deprive the Minnesota workforce of these students and the contributions they can bring to Minnesota employers and communities.

7.      The loss of DACA students will produce a corresponding decrease in tuition revenue for Minnesota State institutions.  The rescission of DACA will similarly decrease the pool of potential students, reducing the future stream of tuition revenue for Minnesota State.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on _____, 2017, in St. Paul, Minnesota.

RON ANDERSON

I, CLARENCE BRADDOCK III, DECLARE:

1.    I am Vice Dean of Education at the David Geffen School of Medicine at the University of California Los Angeles ("UCLA Medicine"). The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2.    I have been Vice Dean of Education at UCLA Medicine for nearly four years. In my position, I oversee all aspects of medical education, including undergraduate, graduate, and postgraduate medical programs. I develop, manage, and implement strategies, initiatives and programs to promote and support education and training.

3.    We have several Deferred Action for Childhood Arrivals ("DACA") status medical students at UCLA Medicine, including 4th year medical students. The David Geffen School of Medicine, like the wider University of California system, is dedicated to providing a place for students who are the most qualified, meritorious and committed to their medical training and future patient care. The DACA students currently enrolled at the David Geffen School of Medicine exemplify these qualities. They are emblematic of our fundamental role as an institution of higher learning: to train the most talented, hard-working, passionate young scholars to become the doctors and biomedical researchers of tomorrow, regardless of gender, race, ethnicity or citizenship. These students are here not because of their DACA status, but because they are exceptionally qualified and share a genuine desire to care for, and heal, the sick.

4.    If these UCLA medical student and residents lose their DACA status, they become unemployable as physicians. They will not be able to practice medicine or even complete their residency in the United States as both require employment authorization. Without DACA, these students and residents would have no choice but to leave the United States in order to become practicing physicians. This would result in a loss of promising young doctors from our medical care system.

5.    The DACA policy rescission has also created the specific risk that our fourth year students will not be offered medical residency positions. Because they will lose their employment authorization without DACA status, they will be unable to complete or potentially even start their residency programs. Our faculty and UCLA residency program advisors have shared with me their significant concern about DACA students losing their status before or during residency, which means

1

that our hard-working and bright DACA students might not be offered residency interviews and/or positions at all. This concern has become so acute that UCLA Medicine has offered to include language in the Dean's Letter for our fourth year students explaining DACA status and expressing our support for our DACA students. A Dean's Letter is provided to fourth year students applying for residency to describe each student's potential as a doctor and encourage their acceptance into a residency program. This language is being included in hopes it might help DACA students be considered for residency programs.

6.    Our DACA students have played an important role in enriching UCLA Medicine's educational environment and curriculum. At UCLA Medicine, we consider cultivating a diverse academic community as a way to drive excellence. A significant part of a medical student's training as a future physician is cultural sensitivity and a thoughtful, candid, respectful connection with patients, community members, and peers. Our DACA students come from incredibly diverse backgrounds and in my experience have helped their peers to build a more culturally sensitive and competent educational environment by sharing their perspectives and shaping our curriculum. For example, DACA students have provided unique insight on delivering care to immigrant populations, stemming from their understanding of both the American health system and the challenges immigrant families and communities often face. Our DACA students are often able to draw on their own and their family's experiences—in a way their peers cannot easily do—to provide context for the patient's choices and the right approach to delivering health care to that patient. As a medical educator, I believe that first-hand perspectives help all of our students to develop essential empathy and cross-cultural understanding that makes them better doctors for California's diverse population.

7.    Our DACA students' unique perspectives have also driven specific improvements in our curriculum. Among the foundational concepts of our medical curriculum are understanding concepts like implicit bias, stereotype threat, and micro-aggressions. Our DACA students brought to UCLA Medicine's attention that some of our own case studies contained stereotypical descriptions and bias in the terms used to describe a minority patient and, in another case, a migrant worker. This started conversations about the existence of stereotypes and bias in the healthcare environment led by DACA students, which sparked changes to these cases in our curriculum.

8.     Because of the DACA policy rescission, I believe we will see fewer diverse applicants to our programs from students who would otherwise have received DACA. This frustrates UCLA Medicine's concerted effort to recruit diverse students through programs like Programs in Medical Education ("PRIME"). UCLA PRIME is a five-year concurrent/dual degree program focusing on the development of leaders in medicine by addressing policy, care and research in healthcare for medically underserved communities. We look for candidates who have leadership experience and are experienced with and committed to working with underserved populations. DACA students often have all of these qualifications. About one third of our current UCLA Medical DACA students are also PRIME program students. The rescission of the DACA policy frustrates UCLA Medicine's efforts to select and train these talented future leaders of medical care for Californians.

9.     Finally, I am concerned that the rescission of the DACA policy will have a broader negative impact on the UCLA community, particularly if any DACA recipients become the target of immigration enforcement. Recent news reports of immigration agents arresting undocumented individuals in courthouses and hospitals or near schools have already caused concern among our community. Our undocumented patients may choose to stay at home rather than seek the medical help they need in the face of this heightened immigration enforcement risk.

10.     The decision to rescind the DACA policy harms our DACA recipient students, their peers, UCLA Medicine, their future patients and our broader community.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 25, 2017 in Los Angeles.

_____
CLARENCE BRADDOCK III

We, Ike Brannon and Logan Albright, declare:

1.     I, Ike Brannon, am currently an economist who is president of the consulting firm Capital Policy Analytics. I also have an affiliation with the Cato Institute as a visiting fellow. I received my MA and Ph.D. in Economics from Indiana University. I was an economics professor in the University of Wisconsin System from 1994-2002. In 2001 I was given tenure and promoted to associate professor. Since then I have worked in Washington DC, for (in order) the Office of Management and Budget, the Congressional Joint Economic Committee, The Senate Finance Committee, The U.S. Treasury, and the House Energy and Commerce Committee. In 2008, I was chief economist for the John McCain for president campaign.

2.     My coauthor, Logan Albright, received his Master's Degree in economics in 2011 from Georgia State University, and has worked as a policy analyst in Washington, DC for the last five years, including positions at think tanks and policy organizations such as the American Action Forum, FreedomWorks, Free the People, and Capital Policy Analytics.

### Economic and Fiscal Cost of Repealing DACA

3.     Whereas the President has expressed a desire to end Deferred Action for Childhood Arrivals (DACA) program, we conducted a thorough investigation of the costs that such action would impose on the federal government as well as to the economy as a whole. We published that research in January 2017.

4.     Whereas California contains a disproportionately high number of DACA recipients, we recently updated our analysis to examine that state, using data from the USCIS from September 4, 2017. We also examined the states of Maryland and Minnesota.

5.     We began our analysis by comparing DACA recipients to those immigrants who hold H-1B visas. These are highly-skilled, well-educated immigrants who are demographically analogous to DACA students, all of whom must necessarily enroll in higher education programs in order to be eligible.

6.     The average DACA recipient is 23 years old, employed, and a student. 17 percent of them are on track to complete an advanced degree. The college attrition rate of DACA recipients is

miniscule compared to domestic students[1], an indication of the exceptional caliber and motivation of the DACA students. H-1B holders are generally between 25 and 34, employed, and most have completed degrees. In short, we posit that they look like what DACA recipients will look like in a few years' time.

7.      We begin our analysis by using a study from the Hoover Institute[2] on the economic impact of expanding the H-1B visa program as our baseline. We adjusted that estimate by the difference in the number of recipients and the difference in relative incomes. To conform to the conventions of the federal budget we then compiled a ten year aggregate cost.[3]

8.      We determined that if DACA recipients were completely analogous to H-1B holders their removal would constitute a budgetary loss of $127 billion and a GDP loss of $512 billion. The loss is the result of DACA recipients losing their legal employment and taking jobs in the underground economy, where few of them would pay income or payroll taxes. DACA recipients are also ineligible for most forms of federal assistance, including SNAP, CHIP, TANF, the Affordable Care Act, Medicaid, and Social Security Disability Insurance. Additionally, DACA recipients only become eligible for Social Security Retirement Benefits and Medicare after working and paying taxes for ten years, as well as reaching retirement age.[4] Lack of eligibility for federal benefits means that DACA recipients will cost the government less on average than a citizen.

9.      We adjusted for the fact that DACA recipients, being younger and not completely done with their education, have an income on average roughly 43 percent of what H-1B holders earn. What's more, the population of DACA recipients is about 689,800 compared to the 660,000 H-1B holders the Hoover study examined, for which we also adjusted.

---

[1] Data provided to us from TheDream.US indicates that first year college attrition rate for those who participate in their program is under 5%.

[2] http://www.hoover.org/sites/default/files/uploads/aafs/2013/05/Estimating-the-Economic-and-Budgetary-Effects-of-H-1B-Reform-In-S.744.pdf

[3] We believe that our implicit assumption that the wage growth of DACA recipients will mirror that of H-1B workers is quite conservative, given that DACA recipients are younger--which is when wage growth is highest.

[4] "DACA and DAPA Access to Federal Health and Economic Support Programs," National Immigration Law Center (Jan. 30, 2015).

10.     According to a survey done by Center for American Progress, 91 percent of DACA recipients are employed, a number that rises to 93 percent if we exclude persons under 25 years old.[5]  In the general population the labor force participation rate—the most directly comparable labor market statistic—is 63.1 percent as of September 2017, according to the Bureau of Labor Statistics.

11.     From this, we determined that, over a ten-year window, a repeal of DACA would cost the federal government $60 billion in lost revenue and the economy as a whole $215 billion in lost GDP.

12.     As a way of confirming our result, we compared our results to a study that looks at foreign-born U.S. workers[6] that was done by the National Research Council.[7]  The study points out that immigrants become more productive over time as they learn new skills and become more fluent in English.  The authors concluded that the average immigrant will have a net long-term impact on state, local and federal budgets of $80,000, which includes tax payments as well as the impact of the children of immigrants, who tend to be less costly—and higher-earning—than their parents.  Multiplying this estimate by the number of DACA recipients produces an estimated fiscal impact of $59.3 billion, which is very close to our result of $60 billion.

13.     Residents in the state of California earn an average income higher than that of the country as a whole.  Using Bureau of Labor Statistics data, we adjusted the results to reflect the incomes California DACA recipients are likely to earn.

14.     California has the highest share of DACA recipients of any state at 197,900 or 28.7 percent of the total DACA population.  Making all the adjustments discussed above, for population, age, and income, we estimate the economic cost of ending DACA in California over a ten year window to be $71 billion and the fiscal cost to government revenue to be $19 billion.  This sums a total cost of $90 billion, the highest cost of any state.

---

[5] Tom K Wong et al, "DACA Recipients' Economic and Educational Gains Continue to Grow," Center for American Progress Report (Aug. 28, 2017).
[6] The study includes both legal and illegal immigrants.
[7] James P. Smith and Barry Edmonston, editors, "The New Americans: Economics, Demographic, and Fiscal Effects of Immigration," National Academies Press (Washington: NAP, 1997), p. 346.

15.    By way of comparison, we also looked at DACA in two other states, Maryland and Minnesota.[8] Maryland contains 1.2 percent of DACA recipients and a repeal would cost that state $814 million in lost revenue and $2.9 billion in foregone economic activity over ten years. For Minnesota, the fiscal cost would be $494 million and the economic cost would be $1.8 billion.

16.    In summary, the repeal or rollback of the DACA program would have a significant and negative fiscal and economic impact on the state of California, and would have a disproportionate impact compared to neighbor states. California would, in fact, bear a greater cost of this change—both in absolute and relative terms—than any other state in the nation.

We declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 26, 2017, at Washington, DC.

_____
Ike Brannon, Ph.D

_____
Logan Albright

---

[8] An analysis for Maine was not conducted because it has a relatively small number of DACA recipients.

I, Viridiana Carrizales, declare and state as follows:

1. I am over the age of 18. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2. I am the Managing Director of DACA Corps Member Support at Teach For America (TFA).

3. Teach For America finds, develops, and supports a diverse network of leaders who expand opportunity for children from classrooms, schools, and every sector and field that shapes the broader systems in which schools operate. We recruit remarkable and diverse individuals to become teachers in low-income communities. They commit to teach for two years and are hired by our partner public schools across the country. During these two years, they are called TFA corps members. Since 1990, when our program began, we have brought over 56,000 talented teachers and leaders to classrooms in low-income communities across America, including in the States of California, Maryland, and Minnesota.

4. Teach For America is a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code. While we operate in 53 regions within 36 states and the District of Columbia, and are qualified to do business in 42 states and D.C., we are only incorporated in one state, Connecticut, where we were incorporated as a nonprofit corporation in 1989. TFA is managed and controlled by a Board of Directors; a Chief Executive Officer supervises, manages and controls the general day-to-day administration of TFA, subject to the oversight of the Board. Our headquarters is in New York City.

5. Deferred Action For Childhood Arrivals (DACA) allows qualified young adults to apply for DACA status and receive renewable, two-year work permits and temporary relief from deportation. DACA is life-altering for young immigrants, who are able to work, obtain driver's licenses, get health insurance, open bank accounts and provide for their families.

6. As one of our nation's leading recruiters of teachers in receipt of DACA for public schools, Teach For America has an interest in maintaining DACA because it allows talented, diverse college graduates to serve as teachers and leaders.

**App-208**
**SER381**

7.   In 2013, Teach For America was among the first organizations to recruit college graduates with DACA status into the workforce. Our first DACA cohort consisted of two teachers hired in one district.

8.   Since 2013, our DACA cohort has grown. Nationwide, as of the first day of school in 2017, 188 Teach For America alumni and corps members with DACA status are working in classrooms to expand educational opportunities for more than 10,000 students in 11 states, including California. Another 10 DACA alumni are promoting equity in the nonprofit, corporate, and higher education sectors, including one enrolled in medical school and four on staff at Teach For America.

9.   In the State of California, there are currently 28 DACA TFA corps members and 25 DACA TFA alumni. All 53 corps members and alumni impact thousands of students in California.

10.  In keeping with TFA's mission, our DACA teachers work in shortage-area subjects and hard-to-staff schools.  Some examples: Miriam teaches reading and math at a STEM-focused middle school in Los Angeles, where she uses project-based lessons to instill a love of STEM learning in her students. Her aim is to help more students from low-income communities graduate prepared for STEM colleges and careers by providing them early opportunities to learn and apply math and science in age-appropriate, real-life scenarios. For example, in a recent lesson on ratios, students used applied STEM skills to make homemade ice cream. Jose teaches 7th grade math in Los Angeles. He works to instill a love for math in his students on a daily basis, and aims to incorporate its relevance to their lives in his lessons.  For example, last year, students in Jose's class read about women and people of color in STEM, researched a STEM career they would be interested in pursuing in the future, and applied rational number concepts they had learned throughout the trimester to argue the importance of diversity in STEM related fields.  These are just two examples--many of our DACA teachers are bilingual, focused on STEM, or they bring Ivy League educations to the classroom. Many others serve as role models and navigators for students who face the intersecting challenges of poverty and undocumented status.

11.  If DACA ends, or the administration stops approving or renewing DACA applications, DACA teachers and leaders, including over 200 TFA alumni and corps members with DACA status, would lose their ability to work and would be at risk of deportation—a far cry from the pathway to

citizenship these individuals deserve. Ending DACA would severely undercut TFA's national effort to increase academic success among all students, but particularly undocumented students, since we've learned that DACA teachers provide tremendous help to undocumented youth as they navigate the barriers they face; students would lose the chance to connect with teachers who mirror their life experiences and act as remarkable role models.

12. Ending DACA without a solution in place would have other far-reaching impacts on our students and communities. Many K-12 students in the United States are undocumented or have one undocumented parent at home. If DACA is rescinded, they will lose the legal pathway to driver's licenses, jobs, and higher education. They could be separated from their families or deported to countries they've never known as home.

13. Teach For America is proud of the impact our DACA leaders have made on our corps, communities, and country. We will continue to provide them legal assistance and financial support during this time of uncertainty.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on October 11, 2017 in San Antonio, Texas.

VIRIDIANA CARRIZALES

I, SARA H. CODY, M.D., DECLARE:

1.    I am a resident of the State of California.  I submit this declaration in support of the Plaintiffs' Motions for Preliminary Injunction and for Summary Judgment.  I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth herein.

2.    This declaration provides an overview of the Santa Clara County Public Health Department's work and explains why these efforts are undermined by federal policies that increase immigrants' reluctance to interact with government institutions that play a critical role in protecting public health.

3.    I am the Director of the County of Santa Clara's ("County") Public Health Department, as well as the Health Officer for the County and each of the 15 cities located within Santa Clara County. I have held the Health Officer position from 2013 to the present, and I have held the Public Health Department Director position from 2015 to the present.  In these roles, I provide leadership on public health issues for all of Santa Clara County and oversee approximately 450 Public Health Department employees who provide a wide array of services to safeguard and promote the health of the community.

4.    Prior to becoming the Health Officer for the County and each of its cities, I was employed for 15 years as a Deputy Health Officer/Communicable Disease Controller at the County's Public Health Department, where I oversaw surveillance and investigation of individual cases of communicable diseases, investigated disease outbreaks, participated in planning for public health emergencies, and responded to Severe Acute Respiratory Syndrome (also known as "SARS"), influenza A virus subtype H1N1 (also known as "swine flu" or H1N1), and other public health emergencies.

5.    The mission of the Public Health Department is to promote and protect the health of Santa Clara County's 1.9 million residents.  None of Santa Clara County's 15 cities have a health department.  All 15 cities within the county, and all Santa Clara County residents, rely on the Public Health Department to perform essential public health functions.  The Public Health Department's work is guided by core public health principles of equity, the value of every life, and harm prevention.

6.    The work of the Public Health Department is focused on three main areas: (1) infectious disease and emergency response, (2) maternal, child, and family health, and (3) healthy communities.

7.     First, the Public Health Department is responsible for safeguarding the public health by preventing and controlling the spread of infectious diseases and planning for and responding to public health emergencies.  Programs in this branch of the Public Health Department receive reports on 85 different diseases and conditions; track overall trends in infectious diseases; investigate individual cases of concern; provide long term case management for certain categories of patients (e.g., active tuberculosis cases); provide immunizations and preventive therapy; identify, investigate and control outbreaks; and plan for and respond to public health emergencies.  They also ensure that all children attending school or child care facilities in Santa Clara County comply with State immunization requirements; conduct HIV and other STD testing and education for vulnerable communities; and distribute opioid overdose prevention kits for at-risk individuals.

8.     This branch of the Public Health Department also operates two pharmacies.  One of these pharmacies provides free, donated medicine to individuals who cannot afford the retail cost of such drugs.  The other pharmacy specializes in serving patients with HIV/AIDS, patients with tuberculosis, patients from the Public Health Department's STD clinic, and patients being discharged from the County jail.  Pharmacy staff also support communicable disease control by procuring, storing, maintaining, and distributing essential medications and vaccines during outbreaks; distributing approximately 20,000 state-funded influenza vaccines, annually, to health care providers in Santa Clara County to administer to low-income and elderly residents at no charge; and overseeing all enrollment workers in Santa Clara County for the State-sponsored AIDS Drug Assistance Program.

9.     Second, in the area of maternal, child, and family health, the Public Health Department provides services for Santa Clara County's most vulnerable children and families.  This includes, but is not limited to, (1) the Special Supplemental Nutrition Program for Women, Infants and Children (WIC) program, which provides low-income pregnant, postpartum, and breastfeeding women, infants, and children up to age 5 with nutritious foods to supplement their diets, information on healthy eating, and referrals to health care; (2) the Child Health and Disability Prevention (CHDP) Program, which ensures that low-income children and youth, including foster care youth, receive routine health assessments and treatment services; (3) the Childhood Lead Poisoning Prevention Program, which provides nursing and environmental case management and follow-up for lead-poisoned children,

DECLARATION OF SARA H. CODY, M.D.
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

**App-212**

**SER416**

0176

1   promotes screening for lead poisoning, and provides community education regarding lead poisoning

2   prevention; (4) the California Children's Services (CCS) program, which provides diagnostic and

3   treatment services, medical case management, and physical and occupational therapy to children under

4   21 years of age with CCS-eligible medical conditions, such as cystic fibrosis, hemophilia, cerebral palsy,

5   muscular dystrophy, spina bifida, cancer, and traumatic injuries; and (5) the Nurse Family Partnership,

6   which provides young, low-income first-time mothers with home visitation services from specially-

7   trained nurses to improve pregnancy outcomes and child health and development.

8          10.    Third, to create and maintain healthy communities, the Department conducts localized

9   health assessments and planning throughout Santa Clara County, and works with community partners

10  and County leadership to promote system wide and environmental changes to reduce the incidence of

11  chronic diseases and injuries in Santa Clara County.

12         11.    The Public Health Department's work is undermined by federal policies that increase

13  immigrant communities' reluctance to interact with government institutions. One of the Department's

14  major priorities is to advance health equity to eliminate health disparities, including health disparities

15  that exist between immigrant and non-immigrant communities and different racial and ethnic

16  communities. However, the Department is limited in its ability to develop partnerships with community

17  organizations, to engage communities of color and immigrant and refugee communities, and to improve

18  health equity when such communities and organizations fear or lose trust in the government and are

19  unwilling to access necessary health services.

20         12.    The rescission of DACA would likely lead to greater health inequity within Santa Clara

21  County. I have heard from community-based service providers in Santa Clara County that the current

22  political climate has already caused immigrants to miss medical appointments; to avoid going out in

23  public for fear of being detained by immigration agents; to avoid utilizing public safety services; and to

24  suffer from increased stress, anxiety and depression. Rescission of DACA would only cause more of the

25  same. Through the Department's work in serving vulnerable communities, I am acutely aware that the

26  loss of employment and employer-provided healthcare can mean greater economic instability and stress

27  on the affected individuals and the families they support; less access to food, medicine, other basic

28  necessities, and essential services; and increased need for safety net services.

3

13.     Beyond health equity, the rescission of DACA could negatively impact the Department's core areas of work in controlling infectious disease and providing emergency response; promoting maternal, child, and family health; and ensuring healthy communities. Individuals unwilling to access necessary health services may miss necessary vaccinations. Immigrants—for whom their country of birth can provide important information for risk of diseases such as hepatitis B and tuberculosis—may be reluctant to share their national origin with their health care providers. Infectious individuals who wish to avoid detection by the government may be less likely to cooperate with public health efforts to monitor and control their diseases, thereby putting other community members at risk.

14.     Healthy families and communities cannot be sustained when residents are suffering from illness, injury, or mental health issues but unwilling to access health services, when residents are too afraid to avail themselves of necessary public safety services, and when residents do not dare to leave their homes for fear of being deported.

1    I declare under penalty of perjury under the laws of the State of California that the foregoing is

2    true and correct and that this declaration was executed on _____*Oct 26*_____, 2017 in San

3    José, California.

4

5

6    SARA H. CODY, M.D.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

DECLARATION OF SARA H. CODY, M.D.
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

App-215

SER419

0179

I, Lisa M. Gonzales, declare:

1.      I am the Assistant Superintendent of Educational Services at Dublin Unified School District, and my prior experience includes working as a superintendent, principal, and math/science teacher. I am also currently the President of the Association of California School Administrators (ACSA), and in that capacity I have had the opportunity to speak with educators around the State of California regarding the impact of the federal government's decision to terminate the Deferred Action for Childhood Arrivals (DACA) program. I am providing this declaration in my individual capacity based on my personal knowledge and experience, which includes conversations with students, parents and educators around the state.

2.      One of the responsibilities of my current job is to create the best possible teaching and learning environment for all the students and staff at Dublin USD. Although there are many factors involved in creating an optimal learning environment, without question schools must be considered safe places where students and parents feel welcome. In California, one of the ways we ensure that students feel safe and are ready to learn is that we promise them that the simple act of coming to school will not expose them or their families to federal immigration enforcement action. This is not a matter of taking a position on immigration policy, it is a basic necessity for a school environment where all students can learn and thrive.

3.      My understanding is that the point of the DACA program is to provide security and stability for the "Dreamers," young people who were brought to this country as children and who have demonstrated they will be productive contributors to our society by succeeding in school and in the workforce. Dreamers include college students and young working adults, but within the K-12 public school system they also include high school students, teachers and other school staff, and the parents of our students. As school officials we do not ask our students or parents about their federal immigration status, and do not always know which students and parents are in the DACA program. But we are keenly aware of the school environment in all of our schools, including those serving largely immigrant populations.

---

1

DECLARATION OF LISA M. GONZALES
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

**App-216**

**SER518**

0352

4.      Since the beginning of this year, I have noticed an increasing amount of uncertainty and fear among students, parents and staff due to statements and actions by federal officials related to immigration policy.  From my perspective, there appears to be a cumulative impact of the threat that many members of our community may face deportation, followed by announcements that the federal government would retaliate against state and local entities that declare themselves "sanctuary" jurisdictions, and now the decision to terminate the DACA program.

5.      I am aware of many examples of harm to students, parents and staff from the general actions of the federal government related to immigration enforcement, threatening statements of federal officials, and more specifically, from the decision to terminate the DACA program.  Most of the information I have gathered is from fellow educators from different regions of the state who, like me, are constantly interacting with students, parents and staff in our schools.  The common denominator in these stories is that many California students are effectively being denied an education because threats to their security, and the security of their peers and families, have stolen their hope for the future and left them unwilling or unable to continue to engage and thrive in school.

6.      For example, a colleague and superintendent from Monterey County, has collected some heartbreaking stories about students, former students, parents and teachers who are in the DACA program.  One Dreamer comes from a family in severe poverty and has worked to help support the family while attending high school.  She was recently accepted to the University of California and wants to study medicine and, given her 4.1 GPA, tenacity and work ethic, she was poised to succeed.  The announcement that DACA will be terminated has left her feeling abandoned and she has fallen into depression.  Her grades are falling and she is afraid to commit to a future that may no longer be available for her.

7.      Another student in high school in Salinas, California, dreams of joining the Air Force and studying electronics.  A local teacher describes him as a passionate patriot who wants to serve this country, the only country he has ever known.  She believes the DACA decision could make or break this young man, and potentially deprive our armed forces of an amazing and intelligent talent.

<hr>

2

DECLARATION OF LISA M. GONZALES
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
**App-217**
**SER519**

0353

8. I was provided details of an interview with a parent who, for obvious reasons, wished to remain anonymous. She came to the United States 13 years ago and has three children in the public school system; the eldest is a citizen and the other two are in the DACA program. Although her youngest son has been a straight "A" student and hopes to go to college to study the sciences, his future is now uncertain, his grades are falling, and he has withdrawn from his family and friends.

9. Finally, a principal of a middle school in Riverside County told me that she reviewed the parent sign-in sheets from parent-teacher conferences that were conducted just a couple weeks ago, and found she had 67% less parent participation compared to last year. She also discussed a major drop in parents attending the school's English-Learner Advisory Council, with monthly meetings that used to average about 130 parents down to only 20 to 30 parents during the last two months. She noted that many of the families that do still attend school events are no longer willing to sign-in, and have spoken to her about concerns regarding their safety going to and from school events. I heard a similar account from an elementary school principal in Yolo County.

10. These stories are just a few illustrations of the broad and harmful impact of the termination of DACA on students and parents. Students are showing increased anxiety and fear, decreased engagement and attendance, increased behavioral issues, and a general disillusionment and lack of motivation to complete school and/or continue to progress toward their former goals of attending college or joining the workforce. Parents are no longer participating in classroom and school activities, sometimes not even enrolling their children in free and reduced lunch programs. Many of the students and parents are afraid that their families will be separated in the process of deportation.

11. Many California students attend schools serving largely immigrant populations. But it is important to note that the deteriorating school environment impacts all of our students, not just those threatened by the elimination of DACA. An optimal teaching and learning environment requires a vibrant and diverse community of students, parents and staff. Targeting some members of the community for exclusion harms the entire community. As an educator, I know that we must restore a

3
DECLARATION OF LISA M. GONZALES
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
**App-218**
**SER520**

0354

healthy school environment for all our kids if we hope to ensure our social, economic and political future.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 26, 2017, at Alameda County, California.

Lisa M. Gonzales

**DECLARATION OF LISA M. GONZALES**
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

I, ROBIN HOLMES-SULLIVAN, DECLARE:

1.    I am the Vice President for Student Affairs at the University of California ("UC"). The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2.    In my role as Vice President, I oversee the overall student experience across UC's campuses, and I work closely with the UC President and Provost in efforts to enhance the diversity, experiences, and successes of UC students, especially undergraduate students. This includes not only overseeing the UC undergraduate application process for admissions and financial support program, but also monitoring diversity and campus climate, overseeing student mental health and wellness, overseeing policies guiding student conduct, student activities, admissions and financial aid, and also serving as an intermediary between UC campuses, UC Office of the President, and student groups/leadership. In my role, I visit all UC campuses on a regular basis, where I meet and talk with faculty, staff and students. My office provides overall guidance and support to a plethora of Presidential Initiatives carried out on each of the campuses, including the President's Advisory Council on Undocumented Students, Student Veterans, LGBT Students, Faculty and Staff, the Global Climate Leadership Council, the California Community College Transfer Initiative, and the Global Food Initiative, to name a few. I enjoy a close working relationship with different individuals across our campuses, including student leaders and each Vice Chancellor of Student Affairs.

3.    In my role, I have observed and heard firsthand about the abilities and experiences of DACA students, as well as how the announced rescission of the DACA policy has affected them. UC data shows that with the implementation of DACA in 2012, the first-year persistence rate (i.e., percent of students continuing on to the second year) increased significantly for these students who could count on receiving financial aid, and no longer feared deportation.

4.    Our DACA students are very talented and make important contributions to the State of California and the United States as a whole. From August 1, 2017 to August 20, 2017, Tom K. Wong of the University of California, San Diego; United We Dream (UWD); the National Immigration Law Center (NILC); and the Center for American Progress fielded a national survey to further analyze the economic, employment, educational, and societal experiences of DACA recipients. This is the largest

1

DECLARATION OF DR. ROBIN HOLMES-SULLIVAN
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
**App-220**
**SER608**

0508

study to date of DACA recipients with a sample size of 3,063 respondents in 46 states as well as the District of Columbia. The data illustrate that DACA recipients continue to make positive and significant contributions to the economy, including earning higher wages, which translates into higher tax revenue and economic growth that benefits all Americans (https://www.americanprogress.org/issues/immigration/news/2017/08/28/437956/daca-recipients-economic-educational-gains-continue-grow/).

5.      Additionally, our undocumented and DACA graduate students make amazing contributions to medicine and technology, including through discoveries that have the potential to help communities throughout California. For instance, one of our former DACA PhD students researched the indicators for sudden cardiac death—the leading natural cause of death in Americans. This vital research has the potential to save countless lives.

6.      Due to their talent and chosen fields of study, DACA students serve as academic role models to other students across UC's campuses. DACA students at all 10 of the campuses serve as teaching assistants ("TAs"). There are, for instance, four DACA-recipient PhD students at UC Merced who work as TAs. At UC Merced, 55 percent of the baccalaureate degrees awarded are in science, technology, and math, and several of the DACA PhD students' focuses lie in those fields. The industries that students and graduate students with science, technology, or math degrees enter are among the least diverse sectors of the economy (http://www.air.org/sites/default/files/downloads/report/AGEP_Lit_Review_10-26-09_0.pdf), and part of both the University and UC Merced's mission to diversify historically non-diverse industries. Our DACA-recipient TAs not only promise to diversify those fields upon entering the workforce, but they also serve as inspiration to the diverse undergraduate students in their classes that careers in those fields are attainable for them, too.

7.      Our undocumented and DACA students' influence is not limited to the classroom. Many serve as role models in the broader community. Some of our campuses are located in regions of the state where a fair percentage of K-12 students are undocumented youth or members of the migrant farm community. We have DACA-recipients who volunteer at these K-12 schools, showing local children that a college education is attainable and worthwhile.

8.     UC values diversity, and exposure to other perspectives is a critical part of a complete education. Developing robust cultural competency requires exposure to different cultures and viewpoints, and exposing others to the viewpoints of DACA recipients is an important component of that. Indeed, our undocumented and DACA students are vital members of our community. We have DACA students who serve as leaders of local chapters of national Greek Societies and in various student clubs, are influential student leaders and serve in student government, and are heavily involved in important events, such as performing the national anthem at school commencements. Through this engagement—both in the classroom and around campus—DACA students interact with many people and are able to share their unique perspectives with them. This enriches the social and educational environment for all. The valuable cultural exchange would be impoverished if undocumented students— including DACA recipients—were not on campus or were not as willing to share their stories and perspectives.

9.     DACA recipients are often model students on campus and are valuable to UC. Not only do undocumented students perform very well academically, but also they are highly involved in other aspects of student life and have few disciplinary issues.  For example, at UC Santa Barbara, University Service Awards are given each year to recognize the contributions and achievements of outstanding graduating seniors and graduate students who have performed above and beyond the call of duty in service to the University, the student body, and the community or have succeeded while facing extraordinary challenges.  For the 2016-17 year, several of the annual University Service Awards were given to DACA recipients.

10.     The announcement to rescind the DACA policy has created several harms. Our students report stressors ranging from a fear of deportation, increased discrimination, and the possibility of being unable to continue their studies. The most instantly recognizable impact for me—other than the various psychological and emotional strains our DACA recipients report—is our current inability to provide our students with the counseling resources they need.

11.     I have spoken with DACA students who are afraid that they or their family members will be detained or deported. One DACA student explained that she did not feel safe driving from campus to her parents' house because doing so required passing through an immigration checkpoint. She is afraid

that immigration officers will learn her identity and follow her home or to campus. Not only is she scared, but her fear is preventing her from visiting her family, a valuable support network for her. This is not a unique story. This climate of fear has intensified since the announcement to rescind the DACA policy.

12.     We have observed an increase in anti-immigrant incidents on campus following the 2016 presidential election and the announcement to rescind DACA. On multiple occasions, racist posters targeted at immigrants have been put up on campuses overnight. There have also been several incidents where UC students are presumed to be immigrants and yelled at that they "do not belong" and that they should "go home." Our DACA students are afraid that they will be harassed or attacked because of their immigration status or the fact that they "look like immigrants."

13.     The uncertainty of being able to pay for school is also a significant source of stress for our students. Financial aid often covers part of the full tuition for DACA students, but students are expected to pay for some of the cost—approximately $10,000—out of their own pockets. Many DACA recipients thus rely on their ability to work, pursuant to work authorization, to pay for this cost of attendance. Beyond the need to support themselves, some DACA recipients work to provide for their families. When this is the case, some DACA students view school as a lower priority than working to earn as much as possible before their DACA status—and consequently their work authorization—ends.

14.     One consequence of all these stressors is that DACA students are presently unable to focus on their studies with the same intensity that they have in the past. I have heard from academic counselors who have observed a dip in the academic performance of DACA recipients since the rescission was announced. Professors are also concerned and report that many DACA students have reached out to them to report difficulty studying, completing assignments or focusing on their school work due to the stress they are experiencing. Our campus support staff have received a flood of emails from faculty who are concerned for their DACA students and want to know how to support them. We are working diligently to train our teachers about what resources exist and what they can do personally to help our DACA students.

15.     The uncertainty and stress of the DACA rescission has resulted in a dramatic increase in the number of requests from DACA students for mental health services. For example, at UC Merced,

4

over the weeks following the announcement to rescind DACA, demand for counseling services more than doubled from 11% of the total student population to 23% of the student population. At UC Berkeley, the number of appointments and walk-ins for mental health counseling increased by 90% following the announcement.

16.     I have also heard from my staff and from DACA students themselves that we need psychologists and other experts who are familiar with the challenges faced by undocumented individuals. Again, we are devoting time and rerouting resources to address this. Doing so undoubtedly places more demands on these services by the campus community as a whole. On some campuses we have increased the number of full-time staff members and hired more peer counselors to staff our mental health facilities. We have also reached out to our local contacts and brought in attorneys to run "know your rights" workshops. We have also invested time and money into our UndocuAlly training program, through which we teach our counselors and some of our faculty about what it means to be undocumented in this country. This better prepares our staff to provide our DACA students the services they need.

17.     Our staff is working tirelessly to address the acute demand for services following the announcement to rescind the DACA policy. I have observed the increased hours and emotional toll that this has had on our staff as they try to provide DACA students with information and support, and I am concerned that staff members will burn out and seek employment elsewhere.

18.     I and some of my colleagues are also concerned that the uncertainty surrounding the DACA policy will result in a loss of current and future students. For example, I have heard that two undergraduate students at UCLA called to cancel their enrollment after DACA's rescission was announced. I have heard from several Vice Chancellors who are preparing for the possibility that DACA students will leave on an upcoming break from classes and will not return to school. Some of these students may decide not to return due to a desire to work and support their families while they can or to minimize the student debt they accrue before their DACA status expires. For others, though, the choice is out of their hands. Some families are deciding to leave the country and are taking their children with them. Still others depend on their DACA status for basic necessities. We have at least one DACA student who serves as a resident advisor, a position that comes with room and board but requires work

5

DECLARATION OF DR. ROBIN HOLMES-SULLIVAN
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
**App-224**
**SER612**

0512

1   authorization. If this student loses their work authorization—which they will when their DACA status

2   expires—they will lose their homes.

3       19. Our PhD students and others will not be able to continue as TAs without work

4   authorization. Being a TA is a full-year commitment and part of a TA's compensation is graduate

5   school tuition reduction. When these students lose DACA status, they can no longer be employed as

6   TAs, and their tuition will be higher, directly impacting their ability to pay for graduate school. UC will

7   also have to scramble to find replacement TAs to take over teaching responsibilities mid-term. This, like

8   our other efforts, will require time, energy, and money on UC's part. But beyond the administrative

9   costs, losing our DACA TAs also deprives us of their impact as role models to diverse undergraduates

10  who might be considering advanced degrees in historically non-diverse fields. Accordingly, if we lose

11  these diverse PhD candidates, then our commitment to diversifying these fields is harmed.

12      20. I, my staff, and the high school counselors we interact with are all concerned about a

13  possible decrease in the number of undocumented applicants to UC as a result of the uncertainty created

14  by the rescission of DACA. High school students are concerned about whether they will be accepted by

15  their peers and the institution. They are also worried about the financial burden. As discussed, UC

16  students need to cover some of the cost of attendance, and high school students are worried that, without

17  work authorization, they will be unable to support themselves through school.

18      21. We are trying to respond to the possible loss of both current and future students by

19  creating focused communication campaigns. Currently, we are ramping up our efforts to convince our

20  current students that they belong here and that we are doing all we can to provide them the institutional

21  support they need. One of our staff members is spending time writing and sending out weekly updates

22  discussing DACA-related news and campus resources. Vice Chancellors are spending time personally

23  reaching out to donors, trying to raise money that we can provide to undocumented students and DACA-

24  recipients as stipends or grants.

25      22. In addition to diverting money, we are also spending time and energy making sure that

26  qualified high school students who would normally apply to UC still do so this year. We have hosted

27  outreach conferences around the state in order to provide information to address the current confusion

28  and concern that exists among high school counselors and their students. Nevertheless, the fear and

uncertainty looms large and, according to our outreach counselors, is having a negative impact on the recruitment of students who have DACA, despite our positive messages.

23. We are also trying to secure replacement housing for the DACA RA who faces the looming threat of losing their home. Thus, we are rapidly diverting resources to address these serious, imminent harms.

24. We are not the only institution that has recognized these pending harms, but we are quickly deploying our resources to address them. Other educational institutions like local community colleges and high schools are concerned about the same issues and have reached out to us for help and advice creating their own resources or borrowing from our approach.

25. UC recognizes that the institution and broader community are harmed if we lose current students and qualified future students. By losing our undergraduate and graduate DACA students and by missing out on qualified students who would otherwise attend, we are losing inspiring individuals who have served as role models to various kinds of students, brilliant minds, and a source of diversity that is important to building cultural competency and diversifying traditionally non-diverse professions.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 24, 2017 in Oakland, California.

DR. ROBIN HOLMES-SULLIVAN

I, BRADFORD S. JONES, DECLARE:

1.      I am a Professor at the University of California, Davis. The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2.      I have been teaching political science at the university level for 23 years. My work includes teaching classes focused on Latino studies, and researching issues facing Latino communities, such as how Latinos perceive and cope with discrimination.

3.      I have had DACA recipients, including Doe, as students and as research assistants.

4.      As a professor, I observe firsthand the ways DACA students add to the classroom environment. Doe was in my class on Latino Politics, which covers immigration policy, Latino political behavior, and Latino public opinion. Doe earned an A grade and distinguished herself as a bright student. She spoke frequently in class and provided insight that improved her classmates' educational experience. In that class, 80-85% of my students are Latino, and one of the learning objectives is to expose individuals to the different experiences that exist within the Latino community. I am third-generation Mexican American, some of my students are American citizens born to immigrant parents, and some, like Doe, are undocumented immigrants—either with or without DACA status. We each have different experiences being Latino in America. Given her unique experience, Doe was able to reveal to me and my other students what the undocumented experience is like. Without her voice or the voice of other DACA students, we get only part of the picture in our class discussions.

5.      DACA students are also invaluable to my research. My current research focuses on the increased anxiety of different Latino communities in response to the Trump Administration's proposed immigration policies. For example, in one recent survey, I showed randomized groups of respondents images of Trump and bullet points summarizing his immigration policy. The survey results indicated a statistically significant increase in anxiety among Latinos after mere exposure to these images. The results show that Latino individuals everywhere live in a state of anxiety, but anxiety increases the closer the person is to immigration—if the respondent is an immigrant or is personally close to an immigrant, then they will feel more anxiety each time they are exposed to these triggers.

6.    In conducting this research, I regularly need to distribute surveys. I often use a method called "snowball" surveying: I start the surveys by "seeding" surveys within my personal network, in which volunteers fill out the survey, and then those volunteers distribute it among their own social networks.

7.    My DACA and undocumented students are essential to this method of surveying. In the immigrant communities I study, trust is the most essential factor in encouraging survey responses. My DACA and undocumented students are trusted members of their communities. This is what enables them to distribute surveys, encourage responses, and reassure respondents that their information will be anonymous and never misused.

8.    The result is that my trusted network of DACA students, including Doe, directly improve the response rates of my research surveys. For example, in my recent survey that Doe and other undocumented and DACA students assisted with distributing, the response rate was about 20% among Latino immigrants (who self-identified as immigrants in their responses). I would expect the response rate to be considerably lower for this population without the assistance of my students. This expectation is based on my personal experience conducting snowball method surveys without DACA and undocumented student volunteers. It is also based on surveys I have conducted in which respondents were solicited by a professional survey firm. For example, the comparable response rate among Latino immigrants in the professionally collected data for the same survey was much lower, at only approximately 10%.

9.    The much higher response rate my DACA and undocumented students facilitate in snowball surveying increases the statistical power of my findings. The more responses I collect, the more confident I can be that the conclusions drawn from the research are substantively meaningful. That makes it more likely the research will hold force and persuasiveness with policy and lawmakers.

10.    My DACA and undocumented students are also essential to the diversity of survey responses in my research. Since I am interested in differences between different populations within the Latino community, it is important for me to get responses from different populations, specifically immigrants and non-immigrants.

---

2

DECLARATION OF BRADFORD S. JONES
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

**App-228**

0633

11.     Working with DACA recipients also informs the substance of my research. For example, I am currently studying immigrant coping behaviors in the context of threat, and immigrant status mis-attribution (i.e. identification of individuals as immigrants when they are not). I hold focus groups with volunteer DACA and undocumented students to discuss my current research. They have helped me to understand the threats and discrimination experienced by undocumented and immigrant Latino communities, by explaining how they themselves cope with or handle stress. For example, in one discussion with a group of undocumented and DACA students, I learned that in a threatening environment, in which these students believe people may treat them negatively because of their status or ethnicity, many of the students tend to withdraw from potential interactions.  One student even explained to me that he tried to "imagine his skin was lighter" colored, because of the belief that skin color would impact how he was treated. I am a third-generation Mexican American and my particular experience being Latino American is different from theirs. I can read all the books in the world and still not fully understand their perspective as first-generation immigrants who have been without status in the United States.

12.     The decision to rescind the DACA program is causing negative effects on my DACA and undocumented students. DACA students contact me on a regular basis because students trust and know me as a professor of Latino studies. Lately Daniel's student will come to my office two or three times a week with immigration-related questions while they are in my office. During this recent DACA and other students have visited my office ten or more times. These visits were unusual since many of these students, including Doe, were not in my class at the time. During these visits, Doe and others have discussed with me the looming loss of their legal status in their country and the loss of opportunities and employment opportunities. Now, after all the time, energy, and effort they have put into their education it will for naught and they are worried for their future if support in continuing their education.

13.     During these visits, the students appear scared, anxious, and overwhelmed by the uncertainty caused by the DACA policy rescission. Some of the students have started crying and shaking while in my office. DACA recipients have told me they feel more at risk of deportation than non-DACA recipients, because the government has all their personal information from their DACA application forms, making them easier for immigration enforcement to find.

3

DECLARATION OF BRADFORD S. JONES
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0634

14.    Addressing the stress, anxiety and increased needs of these students as a result of the DACA rescission announcement is necessarily diverting attention and time from my research, class preparation and other academic pursuits that are my core role as a professor at the University of California, Davis.

15.    I expect that undocumented and DACA students in my classes will be less likely to fully participate in their college education than when they had DACA protection. More specifically, I expect that DACA and undocumented students will be less open about their immigration status with me or their classmates due to the fear that identifying themselves will increase the risk of deportation. While in the past students would often share their DACA status in class, already I see that this is no longer the case. DACA students have told me that they are particularly afraid of being at the top of the list for targeting by immigration authorities, because they have provided their detailed information to the government to obtain their DACA status. This fear will impact the quality of discussion of immigration policy in my classes because students who are most knowledgeable and affected by immigration status are rendered less likely to speak up. When UC loses the confidence of students to share their perspectives, the school is robbed of that unique undocumented immigrant narrative.

16. The rescission of the DACA program will cause additional harms in the future. I have observed the tendency of undocumented people to go underground in response to fear of immigration authorities, and I am concerned that the end of the DACA program will cause more students who would otherwise have received DACA to do the same, at the cost of their education. First, I expect that fewer otherwise DACA-eligible students will be able attend college. UC expects students to provide some of the cost of attendance through part-time work or other funding. I anticipate that otherwise DACA-eligible students will have difficulty affording school without DACA work authorization. Second, without DACA status and the protection that it provides from federal immigration agents, some undocumented high school students might not apply to college at all. Applying to and attending college creates risks of being caught by immigration enforcement; students may feel safer not putting themselves out in the open.

17.    The rescission of DACA will therefore also make it more difficult for me to conduct my research, which as described above, relies on DACA students. Students like Doe serve as a conduit

4

DECLARATION OF BRADFORD S. JONES
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

App-230

SER658

0635

between academia and oft-overlooked communities of undocumented immigrants, providing important connections and perspectives on immigration status for research like mine.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 24, 2017 in Davis, California.

BRADFORD S. JONES

DECLARATION OF BRADFORD S. JONES
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

0636

I, PAUL LORENZ, declare:

1.      I am a resident of the State of California.  I have personal knowledge of the facts set forth in this declaration.  If called as a witness, I could and would testify competently to the matters set forth herein.

2.      I am the Chief Executive Officer of Santa Clara Valley Medical Center ("SCVMC"), which is owned and operated by the County of Santa Clara ("the County").  I have held this position since November, 2012.  Prior to my current role at SCVMC, I served as the Chief Deputy Director of the Ventura County Health Care Agency for the County of Ventura.  I have served in public health care for over 25 years.

3.      SCVMC was founded in 1876 and is a fully integrated and comprehensive public health care delivery system.  It provides critical healthcare to residents of the County regardless of their ability to pay.  It is the only public safety net healthcare provider in Santa Clara County, and the second largest such provider in the State of California.  Generally, safety net providers like SCVMC have a primary mission to care for the indigent population and individuals who are uninsured or underinsured, or on Medicaid, which is the federal healthcare insurance program for low income individuals.

4.      SCVMC operates a 574-bed tertiary care hospital, eleven ambulatory care clinics, and four medical and dental units, along with specialized centers that provide trauma, burn, rehabilitation, renal, and ambulatory care.  It has over 6,000 employees, including 350 physicians who train 170 residents and fellows per year as a graduate medical education provider and teaching institution.  SCVMC is a Level 1 Adult Trauma Center and Level 2 Pediatric Trauma Center.  Its burn and rehabilitation centers have been nationally recognized, and its ambulatory specialty center, renal care center, and acute inpatient psychiatric unit are state of the art.  SCVMC provides a full range of health services, including emergency and urgent care, ambulatory care, behavioral health, comprehensive adult and pediatric specialty services, the highest-level neonatal intensive pediatric care unit, women's health, comprehensive hematology/oncology services, and other critical health care services for all residents of Santa Clara County, regardless of their ability to pay.

5.  SCVMC provides the vast majority of the healthcare services in the County that are available to poor and underserved patients.  In fiscal year 2016, there were nearly 800,000 outpatient visits to SCVMC's primary care, express care, specialty clinics, and emergency department, and nearly 125,000 days of inpatient stays in the hospital.  Patients who are uninsured, reliant on California's Medicaid program (Medi-Cal), or on Medicare, which is the federal insurance program for elderly and disabled individuals, were responsible for approximately 90% of outpatient visits and approximately 87% of inpatient days.

6.  If Deferred Action for Childhood Arrivals (DACA) recipients lose their legal status due to the rescission of the DACA program, they may be less likely to seek and receive essential services like health care.  Some SCVMC patients may choose to forgo routine or preventative health care and only seek health care when they experience emergencies.  Such patients could easily increase SCVMC's costs as a public safety net healthcare provider, as it is well-known in the health care industry that emergency care is much costlier to provide than routine or preventative care.[1]  Still other SCVMC patients may choose to forgo necessary health care services altogether.  Under either scenario, health outcomes for some of the County's most vulnerable residents would certainly decline.

7.  If DACA recipients who have employer-sponsored health insurance have additional uncertainty as they contemplate the future loss of work authorizations and thus the employment through which they receive insurance, that uncertainty could pose an additional hurdle for them and family members who would otherwise seek routine and preventative health care at SCVMC.  If they are unable to obtain or keep health insurance, these individuals would likely join SCVMC's uninsured population when they do seek care at SCVMC, thus increasing SCVMC's costs.

///

///

///

---

[1] E.g., Elaine Cox, "Why Do We Continue Using the ER for Care?" US News and World Report, at https://health.usnews.com/health-news/patient-advice/articles/2015-12-14/why-do-we-continue-using-the-er-for-care (last accessed October 25, 2017).

SER715

0716

1    I declare under penalty of perjury under the laws of the State of California that the foregoing is

2    true and correct to the best of my knowledge and belief and that this declaration was executed on

3    _Cccrrber 27_, 2017 in San José, California.

4

5

6                                    PAUL E. LORENZ

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    3
                         **DECLARATION OF PAUL LORENZ**
All DACA Case Nos. _App-234_ 1. 17-5235. 17-5329. 17-5380. 17-5813)

0717

I, Anne McLeod, declare:

1.    I am the Senior Vice President, Health Policy and Innovation, with the California Hospital Association (CHA). I have served at CHA in this, and similar positions, for more than 10 years. CHA represents hospitals and health systems in California on state and federal legislative and regulatory issues. In my role, I provide leadership for developing policy objectives that support the implementation of health care reforms and the transformation of health care in the future. I have worked on health policy issues that include access to care, health care coverage and health care financing and delivery system improvement. In my work I have promoted initiatives aimed at enhancing the health care infrastructure, including developing strategic solutions to meet the demand for health care professionals and supporting education and training programs that promote expanding access to care in all communities in California including underserved areas.

2.    Access to medical insurance is an important component of public health. By providing work authorization, DACA has significantly improved access to employer-based health insurance. More than 90 percent of DACA grantees are employed, and 57 percent of DACA grantees credit the program with securing a job with health insurance or other benefits, according to a 2017 survey.[1] These individuals are not eligible to purchase health insurance in a Marketplace, even at full cost, and they are not eligible for federal tax credits to make private health insurance in the Marketplace affordable.[2] Maintaining access to employer-based heath insurance is, therefore, an important driver for both individual and the health of the communities where DACA grantees live and work.

3.    Having health care coverage helps individuals get the appropriate care when needed, including preventative services and primary care. Further, when kids and families receive necessary preventative care they have better attendance in school and their parents are better able to work. Without access to insurance, their health and the health of the community could be jeopardized.

---

[1] Tom K. Wong et al., *2017 National DACA Study* (last visited Oct. 10, 2017), https://cdn.americanprogress.org/content/uploads/2017/08/27164928/Wong-Et-Al-New-DACA-Survey-2017-Codebook.pdf.

[2] Dinah Wiley, *For DACA Grantees, Health insurance Is (Only) a Dream*, Georgetown University Health Policy Institute (Apr. 11, 2014), https://ccf.georgetown.edu/2014/04/11/for-daca-youth-health-insurance-is-only-a-dream/.

4.     Getting the proper level of treatment in a timely manner helps reduce health costs for everyone.  California hospitals have worked hard to reduce costs through delivery system reform, care coordination and clinical efficiencies.  These innovations mean patients often recover quicker and can return to work and home sooner.  Lower utilization results in lower costs.  When individuals and families don't have health care coverage, they also lose access to care.  Providers don't get paid to treat uninsured individuals.  When patients can't be seen by a primary care doctor, they often turn to hospital emergency rooms—the most expensive place to be treated—as a last resort.  Preserving emergency rooms for those truly needing emergency care ensures life-saving treatment is there when needed for everyone.

5.     Caring for patients in the appropriate setting can lower costs and improve patient well-being. Sometimes the hospital is not the appropriate level of care for patients.  But when a patient is uninsured, other providers such as nursing home, rehabilitative services or other post-acute care settings are not willing to accept hospital patients unless there is a form of payment guaranteed.  This means the uninsured can stay in the hospital longer than what is needed, increasing costs for the entire health care system. Patients recover quicker when they receive timely and appropriate care in the appropriate setting.  And, the proper level of treatment is often less costly.

6.     Hospitals have not directly reported information to CHA as to whether or not they employ DACA recipients.  However, it is estimated that at least 4 percent of DACA recipients are working in health care in some capacity.[3] Further, an estimated 222,000 of the 800,000 total DACA recipients are from California.[4] This means that approximately 8,880 DACA recipients in California are working in health care in some capacity.  Many of those health care jobs could be in hospitals or health systems

---

[3] Randy Capps, et al., *The Education and Work Profiles of the DACA Population*, Migration Policy Institute, p. 6 (Aug. 2017),  https://www.migrationpolicy.org/research/education-and-work-profiles-daca-population.

[4] USCIS, *Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals by Fiscal Year, quarter, Intake Biometrics and Case Status Fiscal Year 2012-2017* (Mar. 31, 2017), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr2.pdf.

with hospitals. This is no small number for an industry already facing significant labor shortages. These individuals are most likely serving diverse communities with health professional shortage designations, like the central valley. In addition, 65 DACA recipients were enrolled in medical school in the 2016-2017 school year, and an additional 113 DACA recipients had applied to medical school in 2016.[5] There are no specific estimates as to how many of the medical students are in California; however, given the high percentage of DACA individuals in California and the high percentage of medical students that are trained in the state, an estimate of one-third of those medical students are likely studying in California. These future physicians are more likely to work in high-need areas where communities face challenges in recruiting new physicians. DACA students are also more likely to be bilingual, come from diverse cultural backgrounds, and understand the challenges of providing health care in diverse communities—attributes that are underrepresented by today's medical professionals. When communities are served by medical professionals that understand the language and cultural sensitivities that are unique to them, care is improved and better outcomes are achieved.

7. As the national debate continues over federal immigration policies, hospitals have reported to CHA that there is a growing level of wariness and fearfulness from individuals who might need medical care but do not seek care for fear of deportation or reporting. In response to this growing concern, CHA developed a comprehensive toolkit of materials on hospital practices related to federal immigration policies for member hospitals and health systems. The toolkit includes resources to help hospitals communicate with their patients, employees and community stakeholders. The resources help convey to patients that hospitals have always provided care to everyone in need, regardless of a person's ability to pay, the language they speak or their immigration status. It is important to preserve the health of communities and protect the public's health. If immigrant groups start avoiding institutions like hospitals because they are fearful of the federal government learning of their status, the health of communities could be at risk.

---

[5] Sunny Nakae, et al., *Considerations for Residency Programs Regarding Accepting Undocumented Students Who Are DACA Recipients*, Association of American Medical Colleges (2017), https://undocu.ucsf.edu/sites/undocu.ucsf.edu/files/Considerations_for_Residency_ Programs _Regarding_DACA_Recipients_2017.pdf.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 24, 2017, at Sacramento, California.

ANNE MCLEOD

I, ROBERT MENICOCCI, DECLARE:

1.     I am a resident of the State of California. I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to the matters set forth herein.

2.     I am employed as the Director of the County of Santa Clara's ("County") Social Services Agency. I have held the Social Services Agency Director position from 2015 to the present. I am responsible for overseeing more than 2,800 Social Services Agency employees who provide a wide array of social services to residents throughout Santa Clara County, including in all 15 cities within the county and in the county's unincorporated areas.

3.     Prior to becoming the Social Services Agency Director, I served in financial management capacities at two California counties, Lake County and Santa Barbara County. I was also employed for two years as a Deputy Commissioner for Management and Budget for the Commonwealth of Massachusetts's Department of Mental Health. I also served for six years as the Chief Financial Officer and Vice President of AP Associates, a consulting firm in Massachusetts that specialized in public consultation on a variety of federal, state, and local rules, regulations, policies, and procedures to enable its public-agency clients to have maximum access to financial resources.

4.     The mission of the County's Social Services Agency is to provide resources and opportunities in order to enhance the quality of life in our community by protecting and delivering necessary services to individuals and families.

5.     In the most recently completed fiscal year, from July 1, 2016 through June 30, 2017, the Social Services Agency's total expenditures were approximately $781 million. Although Fiscal Year 2017-2018 is still in progress, I expect the Social Service Agency's expenditures for this year to be consistent with, and likely somewhat larger than, the previous year.

6.     The Social Services Agency serves County residents through three different departments: (1) the Department of Aging and Adult Services; (2) the Department of Employment and Benefit Services; and (3) the Department of Family and Children's Services.

///

7.     The Department of Aging and Adult Services serves seniors, dependent adults, and the disabled through the delivery of protective services, quality nutrition, and supportive in-home services. In addition, the Department of Aging and Adult Services evaluates community needs, develops programs and services, and advises on matters of policy that concern the welfare of seniors and persons with disabilities. Department of Aging and Adult Services programs include In-Home Supportive Services, the Senior Nutrition Program, and Adult Protective Services.

8.     In-Home Supportive Services is a federally, state-, and locally funded program designed to provide assistance to eligible elderly, blind, and disabled county residents who, without this care, would be unable to remain safely in their own homes. This program provides services according to the recipient's ability to perform daily activities, and can include feeding, bathing, dressing, housekeeping, laundry, shopping, meal preparation and clean up, respiration, bowel and bladder care, moving in and out of bed, accompaniment to medical appointments, paramedical services, and protective supervision. In Fiscal Year 2016-2017, the In-Home Supportive Services (IHSS) program served an average of over 21,000 county residents each month.

9.     With a loss of DACA status, DACA recipients would no longer qualify to be IHSS providers to eligible elderly, blind, and disabled county residents. Their IHSS clients would no longer be safe in their homes. If unable to remain in their homes, these county residents may require additional services from the County's Health and Hospital System.

10.    The Department of Employment and Benefit Services provides low-income county residents with access to programs that provide health insurance, employment services, foster care benefits, food assistance, and support for basic living costs. In doing so, it promotes the transition of public assistance recipients to employment and self-sufficiency.

11.    The Department of Family and Children's Services provides child welfare services to protect, prevent, and remedy abuse and neglect of children while advancing child and family safety and well-being. It promotes diversion, prevention, and in-home services to prevent the removal of children from their homes and to support less restrictive placement options for children that have been removed from their homes. In doing so, the department partners with diverse community organizations to ensure

1   that any child or youth who is at risk or has suffered abuse or neglect is safe, cared for and grows up in a

2   stable, loving family, on a path to reaching their unique potential.

3         12.     Child welfare services include emergency response services, family maintenance

4   services, family reunification services, and permanent placement services for children or youth at risk of

5   abuse and neglect, children in out-of-home placements, and adopted children.

6         13.     The Department of Family and Children's Services provides numerous services to foster

7   care youth, including the following:

8          •   The Independent Living Program provides services designed to assist foster youth ages

9               16 to 21 in their transition to living independently and self-sufficiently.  The services

10              include budgeting education, college enrollment support, driver's education,

11              scholarship application and financial aid support, educational support, housing search

12              assistance, job search assistance, and life skills training.

13          •   The Transitional Housing Placement Program helps participants emancipate

14              successfully by providing a safe environment for youth to practice the skills learned in

15              the Independent Living Program (ILP).  Participants live with roommates in

16              apartments and single-family dwellings with regular support and supervision provided

17              by THPP provider staff, social workers, and ILP coordinators.  The supportive services

18              include regular visits to participants' residences, educational guidance, employment

19              counseling, and assistance reaching emancipation goals outlined in participants'

20              Transitional Independent Living Plans.

21          •   Foster youth are provided job search and employment support.  Participants in these

22              services receive assistance with job leads, help with completing applications,

23              preparing resumes, and interview practice.  The support continues once a participant

24              receives a job offer in the form of mentorship and continued job training.

25          •   Foster youth also receive financial literacy education, in which participants learn about

26              banking, savings, and credit.  They learn to better manage and save money in order to

27              build assets for financial stability

28

- The HUB is a youth-led community resource center that offers a one-stop-shop for support and resources, including access to computers, internet, food, clothing closet, shower, and laundry services.

14.     The rescission of DACA would likely lead to more children entering the County's child welfare services system.  Researchers have found that about one quarter of DACA recipients have children who are U.S. citizens or otherwise documented.  If DACA were to be rescinded and DACA recipients were subject to deportation, mixed-status families may see young U.S. citizen children separated from their DACA-recipient parents.  The Department of Family and Children's Services would invest significantly in any such U.S. citizen child through its reunification efforts (including by coordinating with another country to reunify the child with their parents in that country as necessary), adoption services if reunification is impossible or not in the child's best interests, or placement and services in the absence of reunification or adoption.  Under all three scenarios, the Department of Family and Children's Services would incur costs and expend resources to serve U.S. citizen children separated from DACA-recipient parents.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on October 27, 2017 in San Jose, California.

ROBERT MENICOCCI

1   I, JANET NAPOLITANO, DECLARE:

2       1.    I am President of the University of California ("UC") and have served in that

3   position since September 2013; before that, I served as the United States Secretary of Homeland

4   Security under President Barack Obama from 2009-2013. Unless otherwise explicitly stated, I

5   have personal knowledge of the matters set forth in this Declaration and could competently testify

6   to them if called as a witness.

7       2.    As Governor of Arizona, Secretary of the U.S. Department of Homeland Security

8   ("DHS"), and now president of the largest public research university system in the world, I have

9   seen the consequences of our broken immigration system at every level. Understanding these

10   problems and recognizing that our nation's immigration laws were not designed to be blindly

11   enforced without consideration given to the individual circumstances of each case, on June 15,

12   2012, I launched a new policy at DHS to establish a clear and efficient process for exercising

13   prosecutorial discretion, on an individual basis, by deferring action against individuals who passed

14   an extensive background check and met other exacting criteria. This policy was Deferred Action

15   for Childhood Arrivals (DACA).

16       3.    The policy put in place a rigorous application and security review

17   process. Applicants for DACA were only approved if they were in or had graduated from high

18   school or college, were in the military, or were an honorably discharged veteran. They cannot have

19   been convicted of a felony or significant misdemeanor or otherwise posed a threat to national

20   security or public safety to receive DACA. To date, DACA has protected from deportation nearly

21   800,000 individuals (referred to as "Dreamers") who qualify under the terms of the policy.

22       4.    Protecting these Dreamers, who were brought as children to the United States and

23   in many cases do not know the country where they were born or speak its language, has, in my

24   view, proven to be a smart, effective policy. It directs the U.S. Government's limited law

25   enforcement resources to be spent on those who pose a risk to our communities, not on those who

26   contribute to our state and national economies.

27

28

1

DECLARATION OF JANET NAPOLITANO
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

**DACA Student and Staff Contributions to the University**

5.      UC admits undergraduate and graduate students on the basis of their individual achievements and without regard to their immigration status. I understand that UC currently has approximately 4,000 undocumented students who have earned their place in the UC student body. Most of these students are the first in their families to attend college, and a substantial number of them are DACA recipients. I understand that UC also has employees who are DACA recipients who are not students.

6.      As an institution whose core mission is serving the interests of the State of California, the University seeks "to achieve diversity among its student bodies and among its employees." *See* Academic Senate of the Univ. of Cal., Regents Policy 4400: Policy of University of California Diversity Statement, UNIV. OF CAL.: BOARD OF REGENTS, http://regents.universityofcalifornia.edu/governance/policies/4400.html. The University recognizes the importance of diversity to its academic mission, as it allows "students and faculty [to] learn to interact effectively with each other, preparing them to participate in an increasingly complex and pluralistic society." *Id.* The educational experience of all University students is fuller and more enriching when ideas are "born and nurtured in a diverse community." *Id.*

7.      DACA students at the University are an integral part of our community. Their talent, perspectives, and experiences are invaluable contributions to University life.

8.      DACA recipients also make significant contributions to University life in their role as employees. They fill crucial roles at UC campuses and in UC medical centers as teaching assistants, research assistants, post-docs, and health care providers. DACA recipients often possess valuable foreign language skills.

9.      By allowing DACA recipients to work lawfully, DACA moved recipients out of the informal economy, increasing the pool of talent from which UC could fill positions at the University.

10.     DACA recipients who are enrolled as students rely on their earnings to support themselves and cover a portion of their tuition and total costs of attendance through their part-time

2

DECLARATION OF JANET NAPOLITANO
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1  work. UC expects all of its students to contribute some funding to their studies in this way. For

2  many of these students, DACA work authorization plays a significant role in their ability to attend

3  UC and to continue each year with their chosen program of study.

4      11.   The University has invested considerable resources in recruiting and retaining these

5  individuals—as students and employees. It has made scarce enrollment space available to these

6  students on the basis of their individual achievements. It also has invested substantial time,

7  financial aid, research dollars, housing benefits, and other resources in them on the expectation

8  that these students—like other students—will complete their course of study and become

9  productive members of the communities in which the University operates, and other communities

10  throughout the nation. The University has significant interests in retaining this wealth of talent and

11  in continuing to enjoy the many benefits of their participation in University life.

12      12.   Furthermore, by allowing recipients to receive deferred action and obtain work

13  authorization, DACA opened myriad opportunities to them. As noted above, DACA recipients

14  became eligible for federal work authorization, which significantly improved their opportunities

15  for employment and higher paying jobs. Under the program, DACA recipients received social

16  security numbers and therefore were able to open bank accounts. DACA also enabled recipients to

17  obtain driver's licenses in a number of states where they otherwise could not. It also protected

18  these individuals' right to travel freely by making them eligible to receive "advance parole,"

19  which allowed them to travel abroad temporarily for humanitarian, educational, or employment

20  purposes, and to return to the United States lawfully. *See* 8 C.F.R. § 212.5(f); USCIS FAQs.

21  DACA students rely on their ability to travel freely (domestically and abroad) to take full

22  advantage of the opportunities UC offers its students and to expand the contributions they make to

23  the education, research and service mission of the University.

24  **Negative Impact of DACA's Rescission**

25      13.   Defendants' decision to rescind the program will have immense and devastating

26  effects on the University and all of its students. As a result of the termination of the program, the

27  University and its students will lose the vital contributions that DACA recipients have made as

28

---

DECLARATION OF JANET NAPOLITANO
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1  students and employees. The civic life of the school will be diminished, the exchange of ideas will

2  be reduced, teaching and research will be impaired, and diversity of viewpoints and experiences

3  will be reduced. The University and its students benefit from cohesive family units, robust civic

4  participation, and the strength of social and educational communities. The rescission damages

5  each of these interests, in California and nationwide.

6      14.    The University also will lose the resources it has spent educating students who

7  ultimately are unable to graduate.

8      15.    **As a result of the rescission, DACA students will be unable to work to pay their**

9  **tuition and other expenses. Students subject to these hardships may be forced to withdraw from**

10 **UC altogether.**

11     16.    DACA recipients also will be at risk of removal. Indeed, in a set of "Talking

12 Points" released the same day of the rescission, DHS "urge[d] DACA recipients to use the time

13 remaining on their work authorizations to prepare for and arrange their departure from the United

14 States." *See* Talking Points—DACA Rescission. Removal will self-evidently result in the loss of

15 employment, education, and relationships with others in the United States.

16         I declare under penalty of perjury under the laws of the United States that the

17 foregoing is true and correct.

18     Executed on *Oct. 23*, 2017, at Oakland California.

19

20                          JANET NAPOLITANO

21

22

23

24

25

26

27                        4
                 DECLARATION OF JANET NAPOLITANO
28      All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

**App-246**

I, Eloy Ortiz Oakley, declare:

     1.     I am the current Chancellor of the California Community Colleges.  I assumed my current office in December of 2016, and in this role I am the chief executive officer of the Board of Governors of the California Community Colleges ("Board of Governors"), and the head of the California Community Colleges Chancellor's Office ("CCCCO"), a California state agency.  I am ultimately responsible for developing and implementing statewide policy for the California Community College System, including policies related to ensuring broad access to post-secondary education.  And as the head of the largest community college system in the nation, I am responsible for providing national policy leadership in this area.

     2.     Prior to holding my current position, I served as the Superintendent-President of the Long Beach Community College District ("LBCCD") from 2007 – 2015.  During this phase of my career, I was responsible for implementing educational policy at the college level, and ensuring and measuring successful outcomes for students.  During my tenure at LBCCD, I helped form the "Long Beach College Promise," a program that engages high school administrators and teachers to work with college faculty and staff to create structured pathways for students to follow as they progress from one educational institution to the next.  Long Beach College Promise enhanced access to postsecondary education by extending the promise of a college education to every student in the community.  Long Beach College Promise served as a model for "America's College Promise," a national initiative introduced by President Barack Obama in 2015.

     3.     The California Community College System is the largest post-secondary institution in the United States, with more than 2.1 million students attending one of our 114 colleges.  With low tuition and a longstanding policy of full and open access, the California Community Colleges were established around the principle that higher education should be available to everyone.  Our colleges are the state's most common entry point into collegiate degree programs, the primary system for delivering career technical education and workforce training, a major provider of adult education, apprenticeship and English as a Second Language courses, and a source of lifelong learning opportunities for California's diverse communities.

0904

4.     The California Equity in Higher Education Act establishes the policy of the State of California to afford all persons equal rights and opportunities in postsecondary educational institutions, including the California Community Colleges. Cal. Ed. Code, §§ 66251, 68130.5. The Board of Governors has declared that the California Community Colleges are committed to serving all students who can benefit from a post-secondary education, without regard to race, ethnicity, national origin, or immigration status, and fully supports the promotion of programs, initiatives and policies designed to implement these values of community and inclusion. See Resolution of the Board of Governors No. 2017-01 [January 17, 2017], a true and correct copy of which attached as Exh. A. The Board's commitment to diversity, inclusion, and open access to our colleges, is supported by peer-reviewed academic research that indicates students' college experiences and educational outcomes are enhanced by attending institutions with a diverse student body. See, e.g., "*Does Diversity Make a Difference?*" American Council on Education and American Association of University Professors (2000), a true and correct copy of which is attached as Exh. B.

5.     The State of California is home to approximately 198,000 people who are participating in the federal Deferred Action for Childhood Arrivals ("DACA") program. These young people are now working, studying at college, or enlisting in the armed services. With access to work permits, they are making immediate contributions to our society and economy. Although the CCCCO does not collect data on DACA status, it is likely that significant numbers of California community college students are participating in the DACA program and benefit from the associated legal protections and financial opportunities that provide the stability and security necessary to pursue a higher education. The California community college system is an attractive option for all eligible students in California, including DACA recipients, due to our low costs, open access policy and convenient locations throughout the state.

6.     Many DACA students in the California Community College System qualify for, and presumably receive, financial aid from the State of California. Such aid would include California College Promise Grants, which cover community college enrollment fees for eligible students, and Cal Grants, which cover tuition and other education-related expenses for eligible students (see the CCCCO's *I Can Afford College* campaign website at www.icanaffordcollege.com for more information).

California has invested in our DACA students and the community college system benefits from their perspective, talents and enthusiasm. DACA has allowed our students to take full advantage of a community college education. It furthers our system's efforts to supply an educated and skilled workforce to the state, and is critical to meeting California's civic and economic needs. See CCCCO Report, Task Force on Workforce, Job Creation, and a Strong Economy (2015), a true and correct copy of which is attached as Exh. C.

7.     The Board of Governors has adopted multiple resolutions supporting DACA students and urging the federal government to maintain the DACA program. *See* Resolution of the Board of Governors No. 2017-01 [January 17, 2017], attached as Exh. A, and Resolution No. 2017-04 [September 18, 2017], a true and correct copy of which is attached as Exh. D. Under my direction, the CCCCO has invested substantial time, energy, and resources to support our DACA students. We have alerted them to the federal government's rescission of the program, and ensured they are aware of available resources and of applicable renewal deadlines. These efforts have included the formation of a DACA Rapid Response Committee comprised of members of the Board of Governors, CCCCO staff, representatives from the Academic Senate for California Community Colleges, college presidents and students. The CCCCO has engaged in an extensive multi-lingual and multi-media campaign that has included the preparation of media statements and talking points for community college districts, media interviews and op-eds by the Chancellor, radio spots, posters and other media for every high school and community college in California, and social media content on Facebook, Twitter and Instagram. The CCCCO has also dedicated a section of its website to provide the latest resources and information for DACA students, faculty, and administrators within our system.

8.     If the DACA program is eliminated, it will have a severe impact on the California Community College's DACA students, their families, and the resources of the 114 community colleges throughout the state. The elimination of work authorization would prevent hard-working students from earning wages to pay for education and daily living expenses, and deprive our colleges of talented faculty and staff who help our colleges serve the State of California and meet our educational mission. The threat of deportation would obviously have a negative impact on student retention and academic success. Eighty-two percent of the funding appropriated for community college districts statewide is

apportioned based upon the number of students enrolled in courses. Given that nearly 200,000 young people in California have DACA, the reduced enrollment attributable to the rescission of the DACA program would have a substantial negative fiscal impact on many California community college districts, reducing their ability to provide educational programs and supportive services for our students.

9.    California's society would also be affected adversely. The state has already invested considerable resources in the education and training of DACA recipients, with the expectation that they will develop into contributing members of society, filling jobs, starting businesses, and paying taxes. DACA rescission would needlessly remove a talented, educated, and well-prepared cohort of needed individuals from the state's workforce. Worse, many of these individuals provide skilled labor in areas with existing workforce shortages; their removal will only exacerbate the shortage, and harm the California economy. See CCCCO White Paper, Task Force on Workforce, Job Creation, and a Strong Economy, a true and correct copy of which is attached as Exh. E.

10.    The rescission of DACA would have a harmful impact on the California Community College System, its students, employees, and educational mission.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 26, 2017, at Sacramento, California.

Eloy Ortiz Oakley
Chancellor
The California Community Colleges

I, MITCHELL SANTOS TOLEDO, DECLARE:

1.    I am an immigrant to the United States who was born in Mexico. I am a Harvard Law School student and also a Deferred Action for Childhood Arrivals ("DACA") recipient. The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

### My Life Before DACA

2.    I came to the United States when I was almost two years old, in 1993. I am now 26 years old. I grew up in South Central Los Angeles. Our neighborhood was dangerous and violent. I saw drive-by shootings, gang violence and drug deals being done from the house next door. When I was little, this was just life. As I got older, I started to understand that we lived there because my parents were undocumented, which meant it was hard for them to get the jobs and earn the wages needed to afford to live in a safer neighborhood.

3.    When I was growing up, my parents made it clear that education was the key to success for me and my siblings. I always worked hard in school and got good grades because of my parents.

4.    I remember when I was about to enter high school, a private school recruiter contacted me and another student in my class. He wanted to talk about attending a private high school on a scholarship. I was excited and felt that my hard work and academic success were starting to pay off and be recognized. However, the prospect of applying and going to a private school scared my parents. They worried that the school would ask for my identification and information about where we lived and what my parents did for a living. My parents did not allow me to apply to this private school, which at the time confused and disappointed me, particularly because the other student did get to go on a scholarship. I only understood later that my parents were trying to protect me because of our immigration status. I did not know that I was undocumented at the time.

5.    My parents advocated for my sister and me to be able to attend a public high school in Venice, California, which was a safer and better than the schools in our neighborhood. Our daily bus ride to school was over an hour long.

6.    High school was the first time in my life that I was surrounded by kids whose parents had college degrees. Some of their mothers and fathers worked as professionals. I figured I needed to do

whatever these kids were doing to get into college, since they had knowledge from their parents about the process. I started taking honors and Advanced Placement ("AP") classes and engaging in extracurricular activities, just like my friends.

7.     About a year into high school, my parents knew that I was focusing and preparing for college. That was when sat me down and told me for the first time that I was undocumented. They tried to explain what that meant. What I remember most is my mom apologizing to me. It felt like she was saying sorry for the hopes they had built up. My parents had always said, "keep going to school," "keep getting good grades," as a promise to get ahead, and I did that. Now it seemed like none of that was true.

8.     I did not understand right away what it meant to be undocumented, but I was motivated to get involved in the immigrants' rights movement. Around the time I learned I was undocumented, I began volunteering at grassroots immigration advocacy organizations and student chapters of larger immigrants' rights organizations. I also started to realize in hindsight what being undocumented meant for my family and childhood, where we lived, and why my dad worked the jobs that he did.

9.     I kept at the AP courses and continued earning good grades. Part of me still believed what my parents had always taught me about hard work -- that school was the answer. My dad takes the view that something will come along and life will work out if you stick to it. I had this same sense that if I continued to work harder academically, then maybe something would happen that would make college possible.

10.     In high school I often felt like an outsider because of how my immigration status shaped my life. For instance, people around me would study abroad or go on vacations and I did not. I studied Italian with the same cohort of students in all four years of high school, but then my parents would not allow me to go on a trip to Italy with that group of students when we got to senior year. I could not travel because I was undocumented.

11.     Towards the end of high school, I applied to colleges like my friends. I knew in my heart that there was no way I could afford college. But I applied as a way to keep my immigration status hidden from my friends and teachers. Not even my closest friends knew I was undocumented. I had always done well academically, so I did not want to raise suspicion by not applying.

12.     I was accepted at multiple schools, including the University of California Riverside ("UC Riverside), the University of California Irvine ("UC Irvine"), and the University of California Berkeley ("UC Berkeley"). My parents thought I should stay close to home at UC Riverside or UC Irvine, but UC Berkeley captured my imagination. I grew up thinking of UC Berkeley as the Harvard of the West Coast, that if you were accepted by UC Berkeley it meant you were smart. I also heard that UC Berkeley might be open to students like me.

13.     I sent in my statement of intent to register at UC Berkeley and I was even assigned a student ID number. As far as UC Berkeley was concerned, I was going to attend in the fall. I knew, though, that due to my undocumented status, it would not be possible for me to afford school right away. To buy myself some time to try to figure out a way to attend, I asked the admissions office if I could delay my enrollment. They gave me a semester. This was not long enough, and I knew there was no way I could afford the cost of attendance. It was too expensive for me and my family.

14.     I was very discouraged and disillusioned about not being able to attend college like my friends. I had done everything right; I had the grades and I got accepted. It was frustrating not to be able to go because I did not have some piece of paper or government recognition beyond my control.

15.     My parents, always the champions of education, still pushed me to go to community college. I was able to secure some funding from Santa Monica Community College and I started to attend in 2010. I felt a bit rudderless at this point; my main reason for taking classes was to appease my parents.

16.     I first heard about the DACA program in 2012, about two years in to my community college studies. I was part of some online immigrants' rights groups and there was buzz about it. I was skeptical. When DACA was first announced, it was not clear what information was going to be required, and I did not know how the government would use my information if I gave it to them. There were some mentions in the media that Immigrations and Customs Enforcement would not have access to the United States Citizenship and Immigration Service information, but I was not ready to trust that promise.

17.     Later, I remember downloading an application form to find out more. It asked all kinds of questions that, when you grow up undocumented, you are taught never to answer, such as where do you live, where do you go to school, what was your point of entry into the United States, and when did you

enter the United States. The form includes a section where applicants can provide a statement about how DACA status would benefit them. For me, a major reason was getting work authorization to financially support my family. But including information like that concerned me even more, because then the government would have information about my family. Looking at the form, it felt like I would be giving the government all the information it needed to build a case against me and possibly my family.

18.     I waited for a few months to see what happened to other people who applied. I heard from attorneys at non-profit immigration workshops and DACA town halls about the benefits of the DACA policy. People posted updates to the online forums I visited, explaining that they had received DACA status and were now getting certain forms of identification and student loans. It seemed real. The risk seemed big but so did the benefits. I finally decided to apply.

**My Life with DACA**

19.     I applied for DACA status in December of 2012 and received DACA status and employment authorization in April 2013.

20.     As soon as I got my DACA status for the first time, I went to the Social Security Administration and got a social security number. I then quickly got a California driver's license. Getting this legal identification was an important benefit of DACA status for me. It was physical proof that I belonged in the country, and it meant a lot to me. It gave me a sense of comfort and security I never had before. I could live my life in a more normal way, and if I was stopped by authorities, I could show them my identification.

21.     My DACA status employment authorization also made it possible for me to transfer from community college to UC Berkeley. I would never have been able to get a job to afford UC Berkeley without DACA. While I was still in community college, I worked as a bank teller at Chase Bank and then at a law firm in Los Angeles. I knew that UC Berkeley—or any four year college—would be expensive, so I worked for over a year to build up my savings so that I would be able to afford tuition and living expenses. I wanted to reclaim my spot at UC Berkeley, which I knew I had earned.

22.     I re-applied to UC Berkeley and, in 2014, was accepted into the Legal Studies program in early 2014. UC Berkeley was a big deal to me as somewhere I had dreamed of going before. My parents were nervous, though, about me leaving home and going to Northern California. They worried I would

not have the same support network. But I got the information and resources I needed from UC Berkeley to feel comfortable that I could move there and thrive.

23.   I moved to Berkeley in early August 2014. I immediately began working at an immigration law firm. Later I had a work-study job with UC Berkeley's athletic department to earn money. During my two years at UC Berkeley, I always had a job and worked about 10 to 15 hours a week. My employment authorization, through DACA, was necessary for me to have these jobs, which paid for my tuition and living expenses.

24.   Having a work authorization that enabled me to work also helped my family. The money I earned went to our family's living expenses, including rent, food and bills. My sister and I have been the only ones in our immediate family of six working during certain periods of time. I have been able to help my family financially because of DACA.

25.   DACA also made it possible for me to fly home to Los Angeles from school at UC Berkeley. This was the first time I had travelled by plane, and I was 23 years old. I was raised to not go to airports. Growing up as an undocumented person, the law enforcement checkpoints at airports were up there with driving through the Gates of Hell. With my DACA status, I had a state driver's license that meant I could go to the airport and fly home. Sitting on the plane as it took off toward Los Angeles was an emotional experience. It felt like something I accomplished because of DACA.

26.   It is because of my DACA status that I have health insurance. I get my insurance because I am a student at Harvard, and I could never have continued in school without DACA status. When I became a student at UC Berkeley, it was the first time I ever had health insurance. It was the first time in my life I could just go to the doctor or dentist for a checkup. When I was growing up undocumented, we went to the doctor only for real emergencies. We would have hesitated even if we had medical insurance coverage. Medical treatment was a danger, triggering anxiety and fear, because it meant interacting with a hospital or doctor and providing your personal information. With DACA status, I can get medical care without this worry.

27.   Significantly, my DACA status made me feel safer and more welcome in this country, like a security blanket. It was a huge relief and reassurance day-to-day. I knew that the government knew of my existence and had decided that I could still be in this country. With DACA status, I did not

have to be so afraid of being deported, and that meant I could travel safely to school and work. When I spoke with friends who were eligible for DACA status but who did not apply, it made me realize just what a source of relief DACA status was.

28.     For my undergraduate thesis in legal studies, I wrote about how DACA contributes to the legal consciousness of its recipients, meaning our awareness of our societal role relative to laws and legal institutions. My research involved speaking to DACA recipients, and I observed how DACA made individuals more able to interact with legal institutions in a comfortable, assertive manner. As a DACA recipient, being able to create scholarship about DACA was very meaningful to me. It is still one of my proudest achievements. My thesis advisor even nominated my paper for the Law and Society Association's Undergraduate Student Paper Prize, which I won.

29.     I kept my immigration status mostly to myself during my time at UC Berkeley. Even though I was studying DACA, my own status was still something I hesitated to share. This changed when I was selected as the commencement speaker for my graduating class of Legal Studies majors. My parents were excited and agreed to come up to UC Berkeley for the first time ever, despite their fears of traveling because of their immigration status. For weeks, I balanced writing my speech and the logistics of getting my family up to Northern California, renting them a car and helping them. I realized then that I wanted to tell my story to my classmates, with my parents there so that I could thank them. With my family in the audience, I finally told all of my classmates that I was a DACA recipient. This speech was for my parents, and it was a proud and emotional moment for our family.

30.     I graduated from UC Berkeley with Highest Distinction in Legal Studies in 2016. Since then, I have gone on to Harvard Law School where I am now in my first year. DACA made this possible for me. I would not have been able to continue with school, supporting myself and my family, without the benefits of DACA status.

### Harms to Me from the Rescission of DACA

31.     It was shocking when the rescission of the DACA policy was announced this September. DACA had become a central part of my life. The announcement came just days after I signed a law school loan agreement for my first year at Harvard, taking on a significant amount of debt. I expect to

**App-256**

have about $50,000 in law school debt by the end of my first year alone, and at least three times that by the time I graduate.

32.     I would not have gone to law school or taken out tens of thousands of dollars in loans had I known that DACA was going to be rescinded so quickly. By the time I applied to law school, I was in my third cycle of renewing DACA. My DACA status has been renewed twice, once in April 2015 and again in December 2016 (I applied for renewal early to make sure I got it in time). DACA status had become a part of my long-term plans, and I expected to be able to renew going forward.

33.     Now my DACA work authorization will expire in the middle of my second year of law school in December 2018. During law school summers, I need to work to learn how to be an attorney, earn money for my loans, and open doors for an associate position when I graduate. I have past legal experience, and by adding that to a Harvard Law degree, I thought I would become a strong candidate to work at a law firm. The plan was that I could pay off the loans I had for school through a job as a legal associate. Without DACA status, all of this will be impossible.

34.     Without DACA, I will lose the security, comfort and sense of belonging that enabled me to fully participate in my education. The stability DACA brought and continues to bring to my life has been essential to my health and achievement as I worked my way up from community college to Harvard Law School. DACA gave and continues to give me a strong sense of purpose, has eased the daily fear and anxiety I once had over immigration status, and has made me more comfortable with my own identity. DACA has been and continues to be central to my ability to financially support myself and my family. The rescission of DACA means suddenly returning to a state of anxiety and stress about my everyday life and what will come next for me and my family.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 29th, 2017 in Cambridge, Massachusetts.

MITCHELL SANTOS TOLEDO

9
DECLARATION OF MITCHELL SANTOS TOLEDO
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)
**App-257**
**SER1008**

1312

I, JOEL SATI, DECLARE:

1.    I am an immigrant to the United States who was born in Kenya. The matters set forth herein are true and correct of my own personal knowledge and, if called as a witness, I could and would testify competently thereto.

2.    I came to the United States at the age of nine, in 2002, and have not left the country since then. I am now 24 years old and a second year Ph.D. candidate in Jurisprudence and Social Policy at University of California, Berkeley.

3.    I entered the United States with a family friend. My mother was already in the United States. I have one older sister who is an American citizen through marriage. My mother explained to me that we moved here because there is more to be achieved in the United States. She came here to create opportunities for our family.

4.    My first American home was Kennesaw, Georgia, where I lived for five years. I started school there as a fourth grader. After that, we moved to Maryland, which is where I attended high school.

5.    Growing up in an American suburb, I felt like an outsider. Not only was I a bit of a nerd who enjoyed school, but I felt that I stood out because of my background. I tried to assimilate into the culture but could not quite understand what precisely made me different.

6.    As a child, I remember puzzling over why I could not participate in activities my friends could. One memory from my 8th grade Spanish class stands out. The class was going on a trip to Spain, and I of course wanted to go, too. It was expensive, but I thought if I could somehow convince my mom that it was a great idea for me to go, then we could somehow figure out a way to pay for it. I was surprised that my mother would not even discuss the idea of me going. It was not clear to me why she would not want me to travel and enjoy this opportunity.

7.    As a high school student, I always assumed I would go to college. Academic achievement seemed like a way I could move up in the world even though I was not born in America. It seemed like education was going to be my way to the life I wanted.

8.    My dream in high school was to become a neurosurgeon. To prepare for this path, I took AP biology, physiology, and chemistry. I also volunteered at Suburban Hospital in Maryland from about

1

DECLARATION OF JOEL SATI
All DACA Cases (Nos. 17-521, 17-5235, 17-5329, 17-5380, 17-5813)

1  2008 to 2011. The volunteer position was through a club called Medical Venturing Program that was

2  composed of students interested in going to medical school. I vividly recall having the opportunity to

3  watch an open heart surgery at another hospital, too. It stands out as the moment when I first had the

4  idea that I wanted to be a doctor.

5       9.     I took the SAT in anticipation of heading to college and began filling out my college

6  applications in fall 2010. That was when I first found out I was undocumented. College applications

7  required a social security number, which I had "forgotten" – or so I thought. When I asked my mother

8  for my social security number, she told me that I did not have one because I had no immigration

9  documents.

10       10.     I tried to apply to whichever colleges might accept me even though I was undocumented.

11  Had I been a documented immigrant or citizen, I would have been accepted to higher caliber schools

12  because of my grades and performance. Eventually, I was admitted to Mount St. Mary's University in

13  Emmitsburg, Maryland. I planned to major in biology there. But the first tuition bill landed on my

14  doorstep in summer 2011, before classes started. It was over $10,000. I asked my sister and mother for

15  help, but the tuition was significantly more than we were able to afford. My lack of legal immigration

16  status meant I could not obtain the financial aid or loans I needed. I could not start college because of

17  the cost.

18       11.     Over the next year, I watched my friends apply to colleges and get scholarships. A lot of

19  people thought I was going to college; I thought I was going to college, too. I did not know what to tell

20  friends who asked why I was not going to college. I did not want to admit that I was undocumented,

21  because it was something I felt ashamed about.

22       12.     I went from being a college-bound senior one moment to having no idea what to do next.

23  From July to December 2011, I lived with my sister in Georgia. It was frustrating and depressing not

24  being able to go to college. My friends started college at places like the University of Maryland and

25  Princeton. It felt unfair, because I could be there too, if it was not for my immigration status. I was also

26  not able to work without work authorization. So I stayed home, trying to figure out what to do with my

27  life and feeling defeated.

28

13.    My mother saw how discouraged and unhappy I had become over the loss of my college dream. She helped me figure out how to sign up for community college at Montgomery College in Rockville, Maryland. I began attending in January 2012.

14.    I looked at the course calendar and philosophy seemed like the most difficult thing I could imagine. Since this seemed like my one shot at a semester in college, I wanted to take the hardest, most difficult subject. It did not matter if it got too difficult; I would never have the money to continue with college anyway, so I signed up for four philosophy courses.

15.    While I was at Montgomery College, I campaigned in support of the Maryland DREAM Act. The Act enables DACA recipients who meet certain requirements, including attendance at a Maryland high school for several years, to qualify for lower ("in-state") tuition rates. The difference between in-state and out-of-state tuition rates was significant. I canvassed door-to-door in support of the Act and interviewed with a local ABC affiliate to encourage support for the legislation.

16.    Around the same time, I remember telling my story about being undocumented in public for the first time. It was at a rally in Maryland outside an Immigration and Customs Enforcement (ICE) building. I stood up in front of the crowd and told them about my life. It stands out to me because after that moment, I started to feel comfortable in my own skin, with my own immigration status and my decision to commit myself to the immigrant rights movement.

### The Impact of Obtaining DACA Status on My Life

17.    I applied for DACA status in September 2012, as soon as I could afford the application fee. I received it around January 2013. This was after my first semester of community college.

18.    Receiving DACA status made my day-to-day life much easier in innumerable ways. Because of DACA, I got a social security number. That enabled me to obtain my learner's driving permit/state ID card in New York and later my learner's permit in California. I was also able to open a bank account.

19.    I was able to finish my community college degree because DACA status meant I could work to support myself. Without DACA status, I also would have had to pay a higher tuition rate. I earned my general Associate of Arts from Montgomery College in 2013.

20.     Because I had DACA status and the associated employment authorization, I was able to support myself and pursue my college education further. I entered into the Skadden Arps Honors Program in Legal Studies at City College of New York (CCNY) as a philosophy major in 2013. DACA made it possible for me to work in New York, which was necessary to pay for my college tuition and housing costs while I was at CCNY. I worked at a lot of different jobs, at a coffee shop, in a restaurant and as a paralegal, all to help pay for college.

21.     Even though I was working about 30 hours per week, on top of going to school, I had trouble making rent in winter 2014. Living costs are incredibly high in New York City. I faced homelessness for several weeks. I relied on a friend for temporary housing in his student dorm. Although this was a violation of his student housing rule, he bent the rules to keep me from having to live on the street. Supporting myself as a student in New York was difficult, but it would have been impossible without DACA.

22.     While I was a CCNY student, I volunteered with African Communities Together, mobilizing African youth around the New York State DREAM Act, which made it easier for undocumented students to pursue higher education by making them eligible for in-state tuition and state financial aid. This was important because only 5-10 percent of the estimated 4,500 undocumented students who graduated from New York high schools annually when the legislation was passed were able to pursue a college education due to financial hardship.[1]

23.     At CCNY, I also co-developed the syllabus and taught a course entitled *African American Political Thought* with Professor Richard Bernstein, a leading philosophy, constitutional law, and political science scholar. I delivered lectures in this course to approximately 35 students throughout a semester. The course has since become a permanent offering under Professor Bernstein, having a lasting impact on the curriculum at CCNY.

---

[1] *See* Press Release, New York Assembly Speaker Carl E. Heastie, Assembly to Pass New York State Liberty Act & DREAM Act, (February 6, 2017), http://nyassembly.gov/Press/20170206/.

24.     My DACA status opened the door to an amazing opportunity offered to me by CCNY; I was selected for and participated in an exchange with Stanford University over the summer of 2014. The exchange program covered my travel costs and a stipend. The state ID I had because of DACA made it possible for me to fly domestically in the United States to get to Stanford. I could travel without fear of getting in trouble with immigration authorities. I also needed to provide my DACA employment authorization to be paid the exchange program stipend. Being on the West Coast at Stanford was a transformative experience for me. I started to think about pursuing a graduate degree in California, and how exciting it would be to take this next step in my education.

25.     In 2016, I graduated *summa cum laude* and Phi Beta Kappa with a B.A. in philosophy from CCNY.

### My Current Work at UC Berkeley

26.     In 2016, I was accepted into UC Berkeley Law School's Jurisprudence and Social Policy ("JSP") program. I am currently pursuing my Ph.D. in the JSP program, which is an interdisciplinary graduate program for students interested in the scholarly study of the law, philosophy (or other interdisciplinary pursuits), and policy analysis and in teaching law. Around the same time, I was also accepted into similar programs in philosophy or political science at Rutgers and the University of Pennsylvania, and I was waitlisted at Princeton.

27.     I was able to travel to Berkeley to visit the University of California campus during admitted students weekend for the JSP program because of my DACA status. I met Professor Sarah Song, whose influential research on democratic theory and issues of migration and citizenship was the reason I decided to come to Berkeley. She and Professor Chris Kutz are now my faculty advisors at Berkeley. My academic achievement and eventual admission into the doctorate JSP program were predicated on the benefits of the DACA policy.

28.     At Berkeley, I am currently a second-year Jurisprudence and Social Policy Ph.D. student, a Research Assistant with the Haas Institute's Global Justice Program, and a William K. Coblentz Civil Rights Endowment Research Fellow. My faculty advisors are Professors Song and Kutz, and the head of my program is Dean Calvin Morrill. Dean Morrill and Professor Kutz have also submitted declarations in this litigation.

29.     My research is about legal, political and moral philosophy, with a focus on immigration and citizenship. I examine the political situation of undocumented immigrants along with marginalized people's positions in the ongoing debate on normative citizenship. My research sheds light on the undocumented immigrant experience and develops theories of undocumented immigrant forms of citizenship. I use my advanced training in philosophy and my personal experience to frame the discussions on undocumented immigrants in a way that calls out the dehumanizing, ahistorical rhetoric that we face.

30.     Professor Kutz was my first year advisor, and I have been engaging in an independent study project in legal philosophy with him for a year. I first spoke to Professor Kutz when he called to encourage me to accept Berkeley's offer to join the JSP program. His support has been significant to me on an academic and personal level. After the election of President Donald Trump, uncertainty and stress dominated my life. Professor Kutz went out of his way to check-in and reassured me "you belong here" at Berkeley.

31.     I currently work part time in two Graduate Student Instructor (GSI) roles at Berkeley, both for the Legal Studies Department. I am a Graduate Student Instructor for Professor Song in Theories of Justice (Legal Studies 107), an undergraduate course. In this role, I develop instructional plans, teach discussion sections, and grade papers for approximately 60 students.

32.     I am also a GSI for Professor Kathryn Abrams for the class *Law and Social Change: The Immigrant Rights Movement and Constitutional Law* this semester. The class meets once a week for three hours, for approximately 13 weeks. My role is to help Professor Abrams prepare for classes. When she was unexpectedly absent to be with her ill father, I stepped up to teach the class for her.

33.     I rely on my DACA employment authorization for both of these GSI roles. Both require employment authorization. I am paid a monthly salary for my work as a GSI. More importantly, working in this GSI position also means I receive a credit (remission) that covers all of my tuition and some of the UC Berkeley fees. Without DACA status, I will lose these GSI positions and the tuition and fee credit that comes with them. This would make it difficult to continue in my JSP program.

34.     I am also writing a report on case studies of noncitizen groups and the conceptualization of citizenship, as part of my William K. Coblentz Civil Rights Endowment Research Fellowship. This is

via the Global Justice Program at Haas Institute for a Fair and Inclusive Society. The report will analyze the contemporary crisis of non-citizenship in the American, European, and global contexts. I am using case studies to examine how the lack of legal recognition contributes to the marginalization of noncitizen groups, including the Rohingya in Myanmar, refugee groups in Australia, Somali refugees in Kenya, and undocumented immigrants in America. The report is expected to be released this year.

35.    I am also serving on the UC Office of the President's Advisory Council on the Undocumented Community & Immigration in 2017. The purpose of the Council is to provide input for the UC Office of the President from students on undocumented community issues and immigration related to the UC community. I understand that I am the only Ph.D. student on the Council.

36.    Finally, I am also in the process of founding a non-profit that I hope to launch officially in November 2017. It is called "Undocumental" and is centered around a website where undocumented migrants can publish their political analysis. I have recruited a Board of Directors and filed incorporation paperwork for this project. My goal is to promote dialogue on the political situation of illegalized immigrants by amplifying the voice of those rendered "illegal" by the state in one way or other.

### Impact of the DACA Policy Rescission on Me

37.    My dream is to become a law professor. I knew this was my long term goal and that I would apply to law school, but I was not as sure about when that would happen until President Trump was elected. Witnessing the immigration policies of the Trump Administration made it clear to me that I needed to act with urgency. I submitted law school applications this fall to several J.D. programs.

38.    I understand that many candidates from Berkeley's JSP program go on to become law professors. I hope very much to attend Yale, Berkeley or Stanford Law School. I plan to complete both my Juris Doctor and my Ph.D. program. I know I can bring a new, diverse perspective to the legal professoriate. Becoming a law professor will be more challenging for me now given the DACA policy rescission.

39.    The rescission of DACA on September 5, 2017 had an immediate impact on my ability to pursue my education and career because it ended advance parole with no warning. I was preparing to present my research at the *International Law and Philosophy Conference: Engaging the Contemporary*

*in Social and Political Philosophy* in Malta in Fall 2017 ("Malta Conference"). I was invited to this prestigious conference in my field and had received special funding to go. I understand that it is rare for students to be invited to this conference to present their research. I was also invited to Hamburg, Germany to a conference entitled *Migration and Media Awareness 2017: Telling our Story in a World Gone Mad* occurring in November 2017.

40.     I applied for advance parole in August 2017 so that I could travel to these and other academic conferences. A grant of advance parole would have enabled me to travel abroad temporarily for educational purposes, take advantage of great opportunities to present my research, and then to return to the United States lawfully.

41.     My application for advance parole was denied in September 2017. I received a letter that said advance parole was being denied because of the rescission of the DACA policy earlier in September. Since I was denied advance parole, I cannot attend any of these conferences. Doing so would jeopardize my ability to re-enter the United States and therefore my entire life here. The rescission of the DACA policy has made it impossible for me to travel internationally, limiting my ability to present my research and forge an academic network.

42.     I am trying to present my research to the audiences in Malta and in Germany via teleconference, but Germany has refused to allow this. Malta is still considering it. This would be a poor substitute for attending in person. It would make it more difficult to provide a compelling presentation of my research. It also means I cannot meet and make connections with important researchers in my field who attend these conferences. Such connections are essential to the furtherance of my research and for my future success in academia.

43.     I have presented my research at several domestic conferences in the past. Most notably, I presented my research entitled *Othered Borders: The Illegal as Normative Metaphor* at the Brown Graduate Legal Studies Conference in Providence, Rhode Island in April 2017. Another accomplishment I am proud of is my presentation of my work titled *Other Borders: On Regularizing Undocumented Immigrants* at the Stanford/CCNY Exchange Research Colloquium in August 2014. I have also been a panelist and speaker on several occasions at conferences and other events on the subject of undocumented persons. As part of my research and writing, I also published an opinion piece

1   in the Washington Post entitled "*How DACA pits 'good immigrants' against millions of others*" in

2   September 2017. I argued that DACA is a piecemeal victory in immigration on a policy level, although

3   one I am grateful for on a personal level.

4       44.    The DACA policy rescission has made my future uncertain. I have applied to law

5   schools, but without DACA I may not be able to complete my J.D. My work authorization currently

6   expires in 2019, making it very difficult for me to work to support myself during school. The rescission

7   of my DACA status will also expose me to the stress and constant risk of deportation.

8       45.    DACA allowed me to set and start to achieve my career goals. I am trying to continue on,

9   but the uncertainty of whether I can complete my education is making it difficult to persist in investing

10   the significant time and money it takes to earn a Ph.D. and a J.D. It is not clear that the significant effort

11   and investment will pay off with the impending reality of the end of my DACA status.

12       46.    My mother applied for me to obtain lawful permanent resident ("LPR") status in 2015,

13   when I was 19. This is not a significant consideration in my life plan, however, because the time frame

14   is so lengthy and the outcome uncertain for LPR applications like mine. I know the number of people

15   granted LPR status is limited. I understand that Kenyan LPR petitions similar to mine are only now

16   being considered in chronological order for those filed back in 2011. I have no legal backstop to protect

17   me; my friends, family and community are my only defense. I am fearful of the toll that will be exacted

18   on my relationships from relying so heavily on these people in my life to keep me safe.

19       47.    I have always been able to renew my DACA status in the past, ever since I obtained it in

20   2013. I renewed it in February 2015, and again in February 2017. The renewals seemed like a matter of

21   course, and I relied on them in starting graduate school, because I knew I needed employment

22   authorization to teach as a GSI. DACA status has enabled me to plan my life, and understand what

23   options were open to me.

24       48.    I am experiencing increased anxiety and stress related to the uncertainty of my DACA

25   status, my future and the broader recent animus against immigrants. This has contributed to my need to

26   see a therapist. I am also taking anxiety medication to try and address this anxiety. I rely on the health

27   insurance I receive as a student through UC Berkeley to be able to obtain the mental health services I

28   need. If I can no longer continue as a student, I will also lose my health care coverage.

49.    I am fearful of what will happen to my future without DACA status. It is hard to feel like I belong in this country; I do not feel safe here anymore, if I ever was. I am scared that my work — focused on giving a voice to undocumented immigrants in policy contexts — will not be worth the intense effort I pour into it because I will never be able to achieve outcomes that matter to me or other undocumented immigrants. I know how depressed and unhappy I was before I went to college when I did not have DACA status. DACA changed the future available to me. I do not want to return to that state of uncertainty, sadness and day-to-day worry. I am determined to persevere in my plans, but with DACA under threat, that future is again beginning to seem out of reach.

50.    I have not been back to Kenya since I moved here as a nine-year-old. My life and future are here. I have worked hard for years now to build the foundation for that future and, without DACA, it will disappear.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 26 , 2017 in Berkeley, California.

JOEL SATI

I, Emmanuel Alejandro Mendoza Tabares, declare:

    1.    I currently live in Campbell, California. I have resided in the United States for 19 years.

    2.    I was born in 1987 in Ocotlan, Mexico. I was brought to the United States when I was 10 years old.

    3.    I attended public schools in California from 5th through 12th grade. I have a Bachelor of Science in Civil Engineering from Santa Clara University in Santa Clara, California, and a Masters in Structural Engineering with a minor in Construction Management from San Jose State University in San Jose, California.

    4.    In December 2012, I was approved for Deferred Action for Childhood Arrivals ("DACA") and received employment authorization. My wife was approved for DACA and received employment authorization in September 2013.

    5.    I currently work in the construction industry in California as a Contract Building Inspector and Plan Checker. I have previously worked as a Structural Engineer, Project Engineer, and Field Engineer.

    6.    My wife and I provide substantial financial support for our parents, as well as other family members who live outside of the United States.

    7.    Last year, my wife and I paid $16,174 in federal taxes and $4,749 in state taxes.

    8.    As a DACA recipient with employment authorization, I have been able to work legally and find employment in my field of study. DACA has given me the freedom to find work that not only provides job security, but also brings me personal happiness.

    9.    After being approved for DACA, I was also able for the first time to obtain a social security card, a driver's license, and qualify for credit cards, which enabled me to lease a new car.

    10.    DACA provided me with the freedom to travel within the United States with less stress and fear. Because of DACA, I was able to visit and work in other parts of California that I had never previously been, because of the fear of possible deportation.

    11.    As a DACA recipient, in January 2017, I was able to apply for advance parole and travel for 11 days to Mexico to visit my grandmother and other family members after a 19-year absence. My grandmother in Mexico is my only surviving grandparent and is unable to travel anymore because she

1

1    suffers from various illnesses. I had not seen her in approximately 10 years. While I was very glad to be

2    able to visit my grandmother, I felt like a stranger in Mexico and did not feel a sense of belonging. If I

3    were to return to Mexico permanently, I would feel the same way.

4         12.    Since my current DACA grant expires on October 4, 2018, and my wife's DACA grant

5    expires in April 2019, we are unable to renew under the current DACA termination policy.

6         13.    Without employment authorization, I will be unable to remain an employee for the

7    company I work for and perform contract work for the City of Palo Alto. I recently turned down a much

8    anticipated work position at the City of Palo Alto. Everyone expected the position of "Specialist

9    Inspector" to go to me. Due to the uncertainty regarding DACA and my work authorization, I made the

10   decision to rescind my application, so as to avoid uncomfortable situations for me and my would-be

11   employer in the future.

12        14.    If I lose my job, I will not only lose my source of income, but also the benefits provided

13   through my employment, including health insurance, vision and dental insurance, and my 401k

14   retirement plan. My wife and I will also be unable to continue providing the same level of financial

15   support for our parents and other family members. Furthermore, losing my job will significantly affect

16   my ability to provide for myself, for my wife, and our ability to make ends meet in one of the most

17   expensive areas in the country.

18        15.    My wife is currently in the process of applying to the Masters of Arts in English program at

19   San Jose State University. Until recently, she worked as an English teacher and would someday like to

20   return to a teaching career. However, she will be unable to use her skills as an educator when her

21   employment authorization expires, even though the state of California is experiencing a severe teacher

22   shortage.

23        16.    When I applied for DACA in 2012, I had an inherent understanding that I was "walking into

24   the lion's den" by providing my personal information to the federal government. Many officials made it

25   clear that such information would not be used for enforcement purposes. However, after Attorney

26   General Jeff Sessions' announcement on September 5, 2017 that the DACA program was being

27   rescinded, I began to wonder how the government would and could use the personal information that I

28   provided when I applied for DACA. I am now afraid because the government knows where I live based

1   on the information I provided to apply for DACA, so there is nothing preventing them from coming to

2   my home and detaining me.

3

4         I declare under penalty of perjury under the laws of the United States that the foregoing is

5   true and correct.

6   Executed on OCTOBER 23ᴿᴰ, 2017, at PALO ALTO, California.

7

8                                    _____

9                                    Emmanuel Alejandro Mendoza Tabares

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

3
DECLARATION OF EMMANUEL ALEJANDRO MENDOZA TABARES
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1   I, KATHLEEN TRESEDER, DECLARE:  .

2        1.    I am the Chair of the Ecology and Evolutionary Biology Department, within the School

3   of Biological Sciences at University of California, Irvine ("UCI"). I have also been a professor at UCI

4   for about fourteen years. The matters set forth herein are true and correct of my own personal knowledge

5   and, if called as a witness, I could and would testify competently thereto.

6        2.    Evelyn Valdez-Ward is a Ph.D. student in my Department at UCI. I have had many

7   opportunities to get to know her personally and professionally in my capacity as Department Chair.

8

9                  **Evelyn's Contributions to the Scientific and UCI Communities**

10       3.    Evelyn's research focuses on how climate change is affecting ecosystems and what

11  effects that might have on people. Unlike some scientific research that may have more limited practical

12  results, her research has immediate societal implications for California and the world. By identifying and

13  preventing some of the harms associated with climate change, her results will be important to making

14  the world a better place.

15       4.    Evelyn performs this work in a cross-disciplinary field between microbiology and plant

16  physiology, bringing together subjects that rarely intermingle. The scientific space that her research

17  occupies is therefore also unique and valuable in its own right.

18       5.    Evelyn's research is also site-specific. Her primary focus is on the coastal sage shrub, a

19  plant that is native to specific ecosystems in California. Her research is ongoing and requires vigilant

20  monitoring of a number of plants throughout California. Without Evelyn, the project itself would also

21  likely end. Her longstanding expertise on this project make her almost impossible to replace.

22       6.    Evelyn is also among a prestigious group of Ford Foundation Fellowship recipients. This

23  fellowship is awarded to only 67 students nationwide, and it offers three years of stipend funding for

24  graduate research. In my fourteen years in the Ecology and Evolutionary Biology Department, Evelyn is

25  our Department's first Ford Foundation scholar.

26

27

28

---

1

**DECLARATION OF KATHLEEN TRESEDER**
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

**Evelyn's Student Leadership**

7.      Evelyn's peers recognize her as a social and academic leader. Last year, the Ph.D students elected her as their Graduate Representative. Her role is to formally meet with me to discuss updates and represent the interests of the students. She is also expected to attend all faculty meetings and advocate for her fellow students in that setting. She has approached this role effectively and fearlessly.

8.      Evelyn is a natural leader and an organizer among her peers, and she makes the students around her better and more empowered. She has led the organization of several events to engage students in issues affecting UCI, including events regarding the recently announced rescission of the Deferred Action for Childhood Arrivals ("DACA") policy. A few weeks ago, she organized the Orientation for new students in our Department. Around the same time, Evelyn personally initiated and organized a fundraiser to support the victims of the most recent earthquake in Mexico City. In September, 2017, Evelyn reached out to me to encourage student and staff involvement in a rally to express support for DACA recipients. I attended the rally along with thirteen other students and faculty. Our involvement was covered in the local newspaper, which included this photo:



9.      Evelyn shared information about her personal DACA status with me, and she has kept me updated ever since. I understand that she hopes to apply for permanent residency but has not yet been able to. Evelyn has continued to be fearless and outspoken within our Department and the broader

2
DECLARATION OF KATHLEEN TRESEDER
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1   community about her personal experiences with DACA, and, at her request and my authorization, her

2   story was featured on our Department website.

3

4             **Impacts of the DACA Policy Rescission on Evelyn and Her Research**

5       10.    I understand that Evelyn's Ford Foundation funding requires her to have certain legal

6   immigration status such as DACA or legal permanent residency. This is her most significant source of

7   funding. It pays for her tuition and a living stipend. The loss of this funding would be devastating for

8   Evelyn and would most likely force Evelyn to discontinue her research and graduate education.

9       11.    The threatened loss of funding, even in the future, has immediate effects on Evelyn's

10   research today. Her studies, like many types of ecology research, are over long-time horizons, gathering

11   results for many years. This is important because any fluctuations in climate could drastically affect the

12   results of her research on drought. In order for students to have a high enough "confidence indicator" to

13   produce publishable work, it is imperative that they conduct their studies for multiple years. If Evelyn is

14   uncertain about whether she will be able to continue her research over a definite, long-term period, then

15   there is little purpose in beginning or continuing to invest in that research now.

16       12.    If Evelyn is forced to leave the United States because of her immigration status, the

17   University of California, the State of California and the broader scientific community are likely to lose

18   the social benefits of her research. Her work is specific to a California ecosystem and involves in-person

19   intensive study. Evelyn would not be able to finish the research from any other country. This

20   Department is structured such that no other student, professor, or even Evelyn's supervisor would likely

21   have the time and ability to continue her research.

22       13.    In the near future as well, the end of advance parole could materially affect Evelyn's

23   opportunities for professional development. One of the most prominent conferences in our field is the

24   Ecological Society of America Conference, which is held periodically in international locations. If

25   Evelyn is not allowed to travel outside the United States because of the end of advance parole, she will

26   lose a valuable opportunity to network and learn from prominent researchers around the world.

27

28

3

DECLARATION OF KATHLEEN TRESEDER
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

**Impacts of the DACA Policy Rescission on the Department of Ecology and Evolutionary Biology**

14.     The Ecology and Evolutionary Biology Department is already feeling the effects of the DACA policy rescission. Stress and fear among students and faculty are running high as they see their DACA peers under threat. We have been diverting substantial time and effort to help students and faculty grapple with their many fears and concerns over the DACA policy ending and the potential for immigration enforcement directed at our students. There is grave concern that we will lose talented students like Evelyn from our Department.

15.     In the future, I expect the rescission of the DACA policy will reduce the likelihood that our Department will have exceptional, diverse scientific researchers like Evelyn. It is already difficult for scientists like Evelyn because significant sources of research funding are often limited to students with some form of protected immigration status. For example, my understanding is that National Science Foundation (NSF) funding is not available to undocumented and DACA students. NSF is one of the most significant funding sources for our Department; NSF provides the majority of fellowships for our graduate students. It is a testament to Evelyn's skill and commitment that she managed to secure alternate funding from the Ford Foundation in the past. The rescission of the DACA policy will make it even harder for would-be DACA students who come into our Department to succeed, because without DACA status, they are likely to face funding and travel challenges like those described above for Evelyn.

16.     The loss of diverse students, such as those with DACA status, is harmful to our Department's ability to conduct research on climate change. Research suggests climate change has disproportionate economic and health impacts for minority and low income communities in California. Because of this, our Department has been working to connect with and study these vulnerable communities. Our diverse students are essential to our ability to build trust, knowledge and relevance with these communities. For example, DACA students have helped me to connect and engage with community leaders in environmental justice as part of our Departmental project titled *Increasing the Relevance and Social Impacts of Climate Research at UCI*. Without students like Evelyn, it will be

4
DECLARATION OF KATHLEEN TRESEDER
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

1   much harder for my Department to effectively engage with these communities, and I expect our research

2   will be negatively impacted as a result.

3         I declare under penalty of perjury under the laws of the United States that the foregoing is true

4   and correct.

5         Executed on October 27, 2017 in Irvine, California.

6

7

8   KATHLEEN TRESEDER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Brad Wells, declare:

1.    I am the current Associate Vice Chancellor, Business and Finance for the California State University ("CSU"). The CSU is the State of California acting in its higher education capacity. The CSU Board of Trustees is vested by statute with the authority to manage, administer and control the CSU's institutions of higher learning.

2.    The CSU joined the University of California, the California Community Colleges, the Association of Independent California Colleges and Universities, and the California Department of Education in communicating the message that ending the Federal Deferred Action for Childhood Arrivals ("DACA") program unnecessarily punishes hundreds of thousands of bright young people who are contributing members of American society. Our letter to the California Congressional Delegation can be found here: https://www2.calstate.edu/attend/student-services/resources-for-undocumented-students/Documents/daca-ca-ed-leaders-letter-9-5-17.pdf. As stated in that letter, it is the CSU's position that ending DACA would not only derail the futures of those participating in the program, but would also deprive the State of California of revenue and of the contributions of the program participates to the California workforce, now and in the future.

3.    Since the announcement of the DACA rescission, and in anticipation of the severe negative potential effect of that rescission on DACA participants who are students and employees, as well as the potential negative effect on the entire CSU community, the CSU has expended significant employee time. Evidence of the work involved in the CSU's response to DACA rescission can be found here: https://www2.calstate.edu/attend/student-services/resources-for-undocumented-students/Pages/rescission-of-daca.aspx.

4.    In my role as Associate Vice Chancellor, Business and Finance, I have determined that DACA rescission would likely cause the CSU to lose revenue, due to the loss of tuition and fees currently paid by students participating in the DACA program.

5.    Actual CSU student headcount enrollment for fiscal year 2016-17 was 472,427. Actual CSU annual tuition and fees collected for fiscal year 2016-17 totaled $2,838,185,912.00. Tuition and fees include state university tuition, as well as other mandatory fees required of resident students who enroll in or attend the university. Tuition and fees do not include fees such as student housing or parking, which

are optional, or non-resident tuition. The average annual tuition and fees per student headcount enrollment for fiscal year 2016-17 was calculated by dividing the annual tuition and fees by actual student headcount enrollment. The resulting figure is $6,008.00 per student.

6.     For the fiscal year 2016-17, the CSU collected an average of $6,008.00 in annual tuition and fees per enrolled student. This figure, multiplied by the number of students affected by the rescission of DACA would yield a potential revenue loss to the CSU of $6,008.00 for each student or potential student participating in the DACA program who would be unable to enroll due to rescission of the DACA program.

7.     Under Section 68130.5 of the California Education Code, certain non-resident students are exempt from paying non-resident tuition. This section of the statute became law after Assembly Bill 540 ("AB540") was signed. The CSU has a significant number of students who meet the AB540 guidelines, which include not holding a valid immigrant visa. Many of the AB540 students at CSU are undocumented.

8.     CSU does not collect data according to DACA status. However, it is likely that a large number of current CSU students are participating in the DACA program. The CSU Director of Student Programs provided relevant fall 2016 enrollment data that I reviewed. The total number of AB540 students who earned a degree from CSU in 2016-17 was 2,016. Of those, 1,440 were undocumented.

9.     Many of the AB540 and undocumented students at CSU are enrolled in academic programs that lead to a state license. These degree programs include the following: Nursing, Teacher Education, Counseling, Occupational Therapy, Physical Therapy, Social Work, Landscape Architecture, and Architecture. According to data provided by the CSU Director of Student Programs, as of Fall 2016, there were AB540 and undocumented students enrolled in these degree programs. In Fall 2016, 1,049 AB540 students were enrolled at CSU in academic programs that lead to a state license. Of those, 763 students were undocumented.

10.     If the DACA program is eliminated, the State of California would likely lose trained and qualified students in license programs and would likely lose people who have already obtained licenses in important areas of need in California.

11.     I have also reviewed data provided by the CSU Associate Vice Chancellor, Human Resources, which shows there are more than 700 current CSU employees who are potentially DACA

participants. If DACA is eliminated, it is likely that the CSU would lose current employees who we have invested in and trained.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 31, 2017, at Long Beach, California.

Brad Wells

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

MAR 15 2018

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| REGENTS OF THE UNIVERSITY OF CALIFORNIA and JANET NAPOLITANO, In her official capacity as President of the University of California, | No.   18-15068 |
| | D.C. No. 3:17-cv-05211-WHA Northern District of California, San Francisco |
| Plaintiffs-Appellees, | |
| | ORDER |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY and KIRSTJEN NIELSEN, In her official capacity as Acting Secretary of the Department of Homeland Security, | |
| Defendants-Appellants. | |
| STATE OF CALIFORNIA; et al., | No.   18-15069 |
| Plaintiffs-Appellees, | D.C. No. 3:17-cv-05235-WHA |
| v. | |
| U.S. DEPARTMENT OF HOMELAND SECURITY; et al., | |
| Defendants-Appellants. | |
| CITY OF SAN JOSE, | No.   18-15070 |
| Plaintiff-Appellee, | D.C. No. 3:17-cv-05329-WHA |
| v. | |

AC/MOATT

**App-279**

DONALD J. TRUMP, President of the
United States, in his official capacity; et al.,

           Defendants-Appellants.

---

DULCE GARCIA; et al.,

           Plaintiffs-Appellees,

   v.

UNITED STATES OF AMERICA; et al.,

           Defendants-Appellants.

No.   18-15071

D.C. No. 3:17-cv-05380-WHA

---

COUNTY OF SANTA CLARA and
SERVICE EMPLOYEES
INTERNATIONAL UNION LOCAL 521,

           Plaintiffs-Appellees,

   v.

DONALD J. TRUMP, in his official
capacity as President of the United States; et
al.,

           Defendants-Appellants.

No.   18-15072

D.C. No. 3:17-cv-05813-WHA

---

REGENTS OF THE UNIVERSITY OF
CALIFORNIA; et al.,

           Plaintiffs-Appellees,

   v.

No.   18-15128

D.C. Nos.   3:17-cv-05211-WHA
                3:17-cv-05235-WHA
                3:17-cv-05329-WHA
                3:17-cv-05380-WHA
                3:17-cv-05813-WHA

AC/MOATT

2

| | |
|---|---|
| UNITED STATES OF AMERICA; et al., *Defendants-Appellants.* | |
| REGENTS OF THE UNIVERSITY OF CALIFORNIA; et al., *Plaintiffs-Appellants,* v. UNITED STATES OF AMERICA; et al., *Defendants-Appellees.* | No.   18-15133 D.C. Nos.   3:17-cv-05211-WHA 3:17-cv-05235-WHA 3:17-cv-05329-WHA 3:17-cv-05380-WHA 3:17-cv-05813-WHA |
| DULCE GARCIA; et al., *Plaintiffs-Appellants,* v. UNITED STATES OF AMERICA; et al., *Defendants-Appellees.* | No.   18-15134 D.C. Nos.   3:17-cv-05211-WHA 3:17-cv-05235-WHA 3:17-cv-05329-WHA 3:17-cv-05380-WHA 3:17-cv-05813-WHA |

Before:  SILVERMAN and CHRISTEN, Circuit Judges.

The opposed motion to expedite these consolidated appeals and cross-appeals (Docket Entry No. 39) is granted in part.

To the extent the motion seeks to expedite briefing, it is granted.  The consolidated first and second briefs on cross-appeal have been filed.  The consolidated third brief on cross-appeal is now due April 3, 2018.  The optional

consolidated fourth brief on cross-appeal is now due within 14 days after the filing of the third brief on cross-appeal.

To the extent that the motion seeks expedited calendaring, it is granted.  The Clerk shall calendar these cases before a randomly selected panel of all Ninth Circuit Judges among all possible sittings in May 2018.  *See* 9th Cir. Gen. Ord. 3.3(g), (h).

To the extent that the motion seeks an expedited ruling, it is denied without prejudice to renewal before the panel that will be assigned to decide the merits of these cases.

**Consolidated Case Nos. 18-15068, 18-15069, 18-15070, 18-15071, 18-15072, 18-15128, 18-15133, 18-15134**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

REGENTS OF THE UNIVERSITY OF CALIFORNIA, ET AL.,
*Plaintiffs-Appellees*,

*v.*

U.S. DEP'T OF HOMELAND SECURITY, ET AL.,
*Defendants-Appellants*.

On Appeal from the United States District Court
for the Northern District of California
Case No. 3:15-cv-02281-WHA

### BRIEF OF 102 COMPANIES AND ASSOCIATIONS AS *AMICI CURIAE* IN SUPPORT OF APPELLEES

Of Counsel:

Seth Waxman
Patrick J. Carome
Ari Holtzblatt
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
(202) 663-6000

*Counsel for* Amici Curiae *Airbnb, Inc., Square, Inc., Twitter, Inc., and Yelp Inc.*

Andrew J. Pincus
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
apincus@mayerbrown.com

Lauren R. Goldman
Karen W. Lin
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020-1001
(212) 506-2500

*Counsel for* Amici Curiae

contribute to U.S. companies, which benefits all of us. Rescinding DACA harms not only individual Dreamers and their families, friends, and co-workers; but also the many U.S. businesses that count on them to help fuel continued innovation and economic growth.

## A.   Dreamers Contribute Directly To Our Nation's Economic Growth.

In the over five years since DACA was implemented, Dreamers have become essential contributors to American companies and the American economy. Prior to the DACA program, these young people—who have obtained at least a high school degree and, in many cases, have finished college and graduate school—would have been unable to obtain work authorization, and therefore unable to put their education and skills to use. DACA changed that, and as a result over 91 percent of Dreamers are employed and earn wages commensurate with their skill levels. [3] Permitting Dreamers to stay and work in the country in which they grew up not only benefits those individuals, but also benefits American companies and the American economy as a whole.

*First*, Dreamers directly contribute to the success of numerous U.S. companies. At least 72 percent of the top 25 Fortune 500 companies

---

[3]   Tom K. Wong et al., *Results from 2017 National DACA Study* 3-4 ("Wong 2017 Results"), https://goo.gl/nBZdP2.

employ Dreamers—including IBM, Walmart, Apple, General Motors, Amazon, JPMorgan Chase, Home Depot, and Wells Fargo, among others. Those companies alone generate almost $3 trillion in annual revenue.[4]

Many Dreamers are entrepreneurs who have created their own businesses: According to one survey, five percent of Dreamers started their own businesses after receiving DACA status. Among those respondents 25 years and older, the figure is eight percent—well above the 3.1 percent for all Americans.[5] These businesses create new jobs and provide goods and services that expand the economy.[6]

*Second*, Dreamers pay taxes to federal, state, and local governments.[7] The Cato Institute estimated that over 10 years, DACA recipients will increase federal tax revenues by $93 billion[8]; they will

---

[4]   Tom K. Wong et al., *DACA Recipients' Economic and Educational Gains Continue to Grow*, Ctr. for Am. Progress (Aug. 28, 2017), https://goo.gl/dYJV1s.

[5]   Wong 2017 Results, *supra* n.3, at 3.

[6]   *See* Julia Boorstin, *Illegal Entrepreneurs: Maria Has No U.S. Visa, and Jose's Expires Soon. Yet They Own a Profitable California Factory, Pay Taxes, and Create Jobs*, CNNMoney (July 1, 2005), https://goo.gl/jq2Y1C.

[7]   *See* Silva Mathema, *Assessing the Economic Impacts of Granting Deferred Action Through DACA and DAPA*, Ctr. for Am. Progress (Apr. 2, 2015), https://goo.gl/wxxek1.

[8]   Logan Albright et al., *A New Estimate of the Cost of Reversing DACA* 1, Cato Institute, Feb. 15, 2018, https://goo.gl/pgNGKi.

5

**App-285**

benefited the other group, rather than depriving the other of employment opportunities. [18] And yet other studies have shown that increased immigration levels in the U.S. in the past have had largely *positive* impacts on the employment levels and income of U.S.-born workers.[19]

These findings hold true today. The unemployment rate has been halved since 2012, when DACA was created.[20] The number of total job openings has increased.[21] And studies have found that DACA has not had any significant effect on the wages of U.S.-born workers.[22]

### 2.   Dreamers fill critical labor shortages.

The jobs being filled by Dreamers post-DACA are largely jobs for which there is a shortage of qualified workers—*not* the jobs that are or could be filled by U.S.-born workers. In a recent survey of U.S. employers, 46 percent of respondents reported difficulty filling jobs—particularly in

---

[18]   Buttonwood, *supra* n.16.

[19]   *See* Jacqueline Varas, *How Immigration Helps U.S. Workers and the Economy*, Am. Action Forum (Mar. 20, 2017), https://goo.gl/ovHQEh.

[20]   *See* Nat'l Conference of State Legislatures, National Employment Monthly Update (March 19, 2018) ("NCSL Employment Update"), https://goo.gl/wZBJh8.

[21]   U.S. Dep't of Labor, Bureau of Labor Statistics, Job Openings and Labor Turnover Survey, https://goo.gl/g4n9Ag (last accessed March 18, 2018).

[22]   Francesc Ortega et al., *The Economic Effects of Providing Legal Status to DREAMers* 18, IZA Discussion Paper No. 11281 (Jan. 2018), http://ftp.iza.org/dp11281.pdf.

9

**App-286**

skilled labor positions, such as teachers, accounting and finance staff, nurses, and engineers.[23] Almost a quarter of employers reported a lack of available applicants; another 34 percent cited a shortage of applicants with necessary skills.[24] In 2012, the President's Council of Advisors on Science and Technology warned that within ten years, the U.S. could face a shortfall of nearly one million professionals in the science, technology, engineering, and mathematics (STEM) fields.[25] Even putting aside the skills mismatch, it is unlikely that there are enough available workers to fill the openings: The U.S. unemployment rate is currently quite low, and the number of job openings is high.[26]

Dreamers help fill this gap. They all have a high school degree or equivalent—and a large percentage of Dreamers are pursuing or have

---

[23]   *See* ManpowerGroup, *2016/2017 Talent Shortage Survey: The United States Results* ("ManpowerGroup 2016/2017"), https://goo.gl/rJTKs6; *see* also Rachel Unruh & Amanda Bergson-Shilcock, Nat'l Skills Coalition, *Missing in Action* 3-4 (Feb. 2015), https://goo.gl/gokfJW.

[24]   ManpowerGroup 2016/2017, *supra* n.23.

[25]   President's Council of Advisors on Science and Technology, *Report to the President: Engage to Excel: Producing One Million Additional College Graduates with Degrees in Science, Technology, Engineering, and Mathematics* 1 (Feb. 2012), https://goo.gl/v2YRVD.

[26]   *See* NCSL Employment Update, *supra* n.20; U.S. Dep't of Labor, Bureau of Labor Statistics, Job Openings and Labor Turnover Survey Highlights August 2017 charts 1 & 2 (Oct. 11, 2017), https://goo.gl/H28XkL.

10

received college or post-college degrees and therefore qualify for highly-skilled jobs.[27] In 2016, almost a quarter of Dreamers were employed in the educational or health services industry.[28] Many others work in technology, science, and finance,[29] and more still are majoring in STEM fields.[30] *Amici*'s experiences confirm this: For example, Microsoft employs 27 Dreamers as "software engineers with top technical skills; finance professionals driving [its] business ambitions forward; and retail and sales associates connecting customers to [its] technologies."[31] IBM has identified at least 31 Dreamers within the company who work in areas such as software development and client support.[32] One IBM Dreamer provided

---

[27]   Wong 2017 Results, *supra* n.3, at 7-8.

[28]   Ctr. for Am. Progress, *Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey* 4 (2016), https://goo.gl/pe2i17.

[29]   *Id.*

[30]   The UndocuScholars Project, *In the Shadows of the Ivory Tower: Undocumented Undergraduates and the Liminal State of Immigration Reform* 8 (2015), https://goo.gl/sEpx1K.

[31]   Brad Smith, President and Chief Legal Officer, Microsoft, *DREAMers Make our Country and Communities Stronger* (Aug. 31, 2017), https://goo.gl/kJYDT3.

[32]   *See* Tony Romm, *IBM CEO Ginni Rometty Is in D.C. Urging Congress to Save DACA*, Recode.net (Sept. 19, 2017), https://goo.gl/NQeJUc; *My American Dream, Minus the Paperwork*, THINKPolicy Blog (Oct. 3, 2017), https://goo.gl/876JDm; *I Felt Like a Normal American Kid . . . Then Everything Changed*, THINKPolicy Blog (Oct. 9, 2017), https://goo.gl/oV9P7h.

11

critical remote technical support to ensure continuity of IBM's Cloud services when Hurricane Harvey flooded Houston.[33] Lyft employs at least one Dreamer as a software engineer, who serves as one of the tech leads of the team driving critical data projects.[34]

Dreamers with lesser-skilled jobs are also filling positions for which there is an insufficient labor supply. "Among less-educated workers, those born in the United States tend to have jobs in manufacturing or mining, while immigrants tend to have jobs in personal services and agriculture."[35] The latter industries in particular "face[] a critical shortage of workers every year, as citizens are largely unwilling to engage in these . . . physically . . . demanding activities"[36]—even when companies increase wages the maximum amount financially feasible.[37]

---

[33]    *See* David Kenny, *Kenny: One Dreamer, Weathering Two Storms*, Houston Chronicle (Dec. 3, 2017), https://goo.gl/562Pme.

[34]    *See* Decl. of Emily Nishi ¶ 4, SER841-45.

[35]    Peri, *supra* n.16.

[36]    Am. Farm Bureau Fed'n, *Agricultural Labor – Immigration Reform* (Oct. 2016), https://goo.gl/WUAz3e; *see also* Clemens & Pritchett, *supra* n.13, at 3 (predicting that increase in low-skill jobs in the care industry will be more than the total increase in the age 25-54 labor force).

[37]    *See, e.g.*, Natalie Kitroeff & Geoffrey Mohan, *Wages Rise on California Farms. Americans Still Don't Want the Job*, Los Angeles Times (Mar. 17, 2017), https://goo.gl/r1cH9Z; Octavio Blanco, *The Worker Shortage Facing America's Farmers*, CNN Money (Sept. 29, 2016), https://goo.gl/ZF2Tdx.

12

In sum, Dreamers are filling jobs that otherwise would remain vacant and are increasing demand for goods and services, which helps to grow the entire economy.

## C.   Rescinding DACA Will Inflict Enormous Harm On Individuals, Companies, And The Economy.

All of the above benefits—and more—will be lost if DACA's rescission is permitted to stand. Over the next decade, our country's GDP will lose between $350 and $460.3 billion; and federal tax revenue will drop over $90 billion.[38]

This economic contraction would result directly from Dreamers' loss of work authorization. All of the hundreds of thousands of employed Dreamers would lose their jobs. If DACA's rescission is permitted to go forward, in the first eight months alone, 300,000 would lose their jobs—an average of 1,700 people losing jobs every single business day.[39] In addition to the obvious harm to Dreamers themselves, the loss of so many workers will have severe repercussions for U.S. companies and workers.

---

[38]   *See* Nicole Prchal Svajlenka et al., *A New Threat to DACA Could Cost States Billions of Dollars*, Ctr. for Am. Progress (July 21, 2017), https://goo.gl/7udtFu; Jose Magana-Salgado, Immigrant Legal Resources Center, *Money on the Table: The Economic Cost of Ending DACA* 4, 6-7 (2016), https://goo.gl/3ZwGVJ; *see also* Albright *et al.*, *supra* n.8, at 1.

[39]   FWD.us, *The Impact of DACA Program Repeal on Jobs* (2017), https://goo.gl/gJQHnn.

13

**App-290**

### APPENDIX A
### LIST OF *AMICI CURIAE*

1. Amazon.com, Inc.
2. A Medium Corporation
3. Adobe Systems Incorporated
4. AdRoll Group
5. Airbnb, Inc.
6. Ampush LLC
7. Asana, Inc.
8. Atlassian Corp. Plc
9. Azavea Inc.
10. Ben & Jerry's Homemade, Inc.
11. Bigtooth Ventures
12. Braze
13. Brightcove Inc.
14. BSA | The Software Alliance
15. CareZone Inc.
16. Casper Sleep Inc.
17. Castlight Health, Inc.
18. Chegg, Inc.

A-1

19. Chobani, LLC
20. Civis Analytics, Inc.
21. Citrix Systems, Inc.
22. ClassPass Inc.
23. Cloudera, Inc.
24. Cloudflare Inc.
25. Codecademy
26. Color Genomics, Inc.
27. The Copia Institute
28. Cummins Inc.
29. DocuSign, Inc.
30. Dropbox, Inc.
31. eBay Inc.
32. Edmodo, Inc.
33. Electronic Arts Inc.
34. EquityZen Inc.
35. Exelon Corp.
36. Facebook, Inc.
37. Foosa LLC
38. General Assembly Space, Inc.

A-2

39. Google Inc.
40. Graham Holdings
41. Greenhouse Software, Inc.
42. Gusto
43. Hewlett Packard Enterprise
44. Homer Logistics, Inc.
45. HP Inc.
46. HR Policy Association
47. IBM Corporation
48. IDEO LP
49. Intel Corporation
50. IKEA North America Services LLC
51. Kargo
52. Knotel
53. Lam Research Corporation
54. Levi Strauss & Co.
55. Linden Research, Inc.
56. LinkedIn Corporation
57. Lyft, Inc.
58. Mapbox

A-3

59. Marin Software Incorporated
60. Medidata Solutions, Inc.
61. Microsoft Corporation
62. Molecule Software, Inc.
63. MongoDB, Inc.
64. National Association of Hispanic Real Estate Professionals
65. NETGEAR, Inc.
66. NewsCred, Inc.
67. NIO U.S.
68. Niskanen Center
69. Oath Inc.
70. Patreon, Inc.
71. Postmates Inc.
72. Quantcast Corp.
73. RealNetworks, Inc.
74. Reddit, Inc.
75. Redfin Corporation
76. Red Ventures
77. salesforce.com inc.
78. Scopely, Inc.

A-4

79.  Shutterstock, Inc.

80.  Singularity University

81.  The Software and Information Industry Association

82.  SpaceX

83.  Spokeo, Inc.

84.  Spotify USA Inc.

85.  Square, Inc.

86.  Squarespace, Inc.

87.  SurveyMonkey Inc.

88.  Tesla, Inc.

89.  Thumbtack, Inc.

90.  TPG Capital

91.  TripAdvisor, Inc.

92.  Twilio Inc.

93.  Twitter Inc.

94.  Uber Technologies, Inc.

95.  Udacity Inc.

96.  Upwork Inc.

97.  Verizon Communications Inc.

98.  The Western Union Company

A-5

99.   Work & Co.

100.  Workday, Inc.

101.  Yelp Inc.

102.  Zendesk, Inc.

A-6

I, JORGE A. AGUILAR, declare:

1. I am the Superintendent of the Sacramento City Unified School District ("District"), a school district of more than 43,000 students with many immigrant students from all parts of the world. Students come from families that speak at least 48 different languages, including Spanish, Hmong, Armenian, Korean, Tagalog, Cantonese, Arabic, Vietnamese and Russian.

2. Sixty four percent (64%) of District students qualify for free or reduced lunch. 17,104 students are of Latino descent. In 2015-16, nearly one-third of students were English language learners or non-native speakers.

3. The repeal of DACA has negatively impacted many students' abilities to focus on their studies. When it was announced that DACA would end, many of those students became fearful of what the decision meant for them, their undocumented relatives and friends.

4. Many teachers in the District have reported their students experiencing trauma in the classroom because of this decision. It has been a major distraction in the classroom. In fact, the District has had to create a guide for teachers to help them manage students dealing with this trauma. Teaching and learning cannot happen in our classrooms if students' basic needs are not met.

5. If the DACA program were eliminated, it would have a severe impact on the District's students. The elimination of work authorization for parents and guardians would likely result in many students withdrawing from the District. Students and/or their parents could be subject to deportation, which would undoubtedly impact their long term academic success.

6. The DACA program has increased the diversity of the District's workforce as well. We have a number of employees, both credentialed and classified, with DACA status.

7. These employees have made meaningful connections with our students, especially those students who have shared cultural and linguistic backgrounds.

8. The District desires to retain and continue to hire any such individuals who can benefit its students and the District as a whole by adding to its diversity and improving educational outcomes for all students.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 25, 2017, at Sacramento, California

Jorge A. Aguilar
Superintendent, Sacramento City Unified School District

1

DECLARATION OF JORGE A. AGUILAR
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

**App-293**

0011

1    I, Viridiana Carrizales, declare and state as follows:

2    1.    I am over the age of 18. I have personal knowledge of the matters stated herein, and if

3    called as a witness, I could and would testify competently thereto.

4    2.    I am the Managing Director of DACA Corps Member Support at Teach For America

5    (TFA).

6    3.    Teach For America finds, develops, and supports a diverse network of leaders who

7    expand opportunity for children from classrooms, schools, and every sector and field that shapes the

8    broader systems in which schools operate. We recruit remarkable and diverse individuals to become

9    teachers in low-income communities. They commit to teach for two years and are hired by our partner

10   public schools across the country. During these two years, they are called TFA corps members. Since

11   1990, when our program began, we have brought over 56,000 talented teachers and leaders to

12   classrooms in low-income communities across America, including the States of California,

13   Maryland, and Minnesota.

14   4.    Teach For America is a tax-exempt organization under section 501(c)(3) of the Internal

15   Revenue Code. While we operate in 53 regions within 36 states and the District of Columbia, and are

16   qualified to do business in 42 states and D.C., we are only incorporated in one state, Connecticut,

17   where we were incorporated as a nonprofit corporation in 1989. TFA is managed and controlled by a

18   Board of Directors; a Chief Executive Officer supervises, manages and controls the general day-to-

19   day administration of TFA, subject to the oversight of the Board. Our headquarters is in New York

20   City.

21   5.    Deferred Action For Childhood Arrivals (DACA) allows qualified young adults to apply

22   for DACA status and receive renewable, two-year work permits and temporary relief from

23   deportation. DACA is life-altering for young immigrants, who are able to work, obtain driver's

24   licenses, get health insurance, open bank accounts and provide for their families.

25   6.    As one of our nation's leading recruiters of teachers in receipt of DACA for public

26   schools, Teach For America has an interest in maintaining DACA because it allows talented, diverse

27   college graduates to serve as teachers and leaders.

28

1

7.    In 2013, Teach For America was among the first organizations to recruit college graduates with DACA status into the workforce. Our first DACA cohort consisted of two teachers hired in one district.

8.    Since 2013, our DACA cohort has grown. Nationwide, as of the first day of school in 2017, 188 Teach For America alumni and corps members with DACA status are working in classrooms to expand educational opportunities for more than 10,000 students in 11 states, including California. Another 10 DACA alumni are promoting equity in the nonprofit, corporate, and higher education sectors, including one enrolled in medical school and four on staff at Teach For America.

9.    In the State of California, there are currently 28 DACA TFA corps members and 25 DACA TFA alumni. All 53 corps members and alumni impact thousands of students in California.

10.  In keeping with TFA's mission, our DACA teachers work in shortage-area subjects and hard-to-staff schools.  Some examples: Miriam teaches reading and math at a STEM-focused middle school in Los Angeles, where she uses project-based lessons to instill a love of STEM learning in her students. Her aim is to help more students from low-income communities graduate prepared for STEM colleges and careers by providing them early opportunities to learn and apply math and science in age-appropriate, real-life scenarios. For example, in a recent lesson on ratios, students used applied STEM skills to make homemade ice cream. Jose teaches 7th grade math in Los Angeles. He works to instill a love for math in his students on a daily basis, and aims to incorporate its relevance to their lives in his lessons.  For example, last year, students in Jose's class read about women and people of color in STEM, researched a STEM career they would be interested in pursuing in the future, and applied rational number concepts they had learned throughout the trimester to argue the importance of diversity in STEM related fields.  These are just two examples--many of our DACA teachers are bilingual, focused on STEM, or they bring Ivy League educations to the classroom. Many others serve as role models and navigators for students who face the intersecting challenges of poverty and undocumented status.

11.  If DACA ends, or the administration stops approving or renewing DACA applications, DACA teachers and leaders, including over 200 TFA alumni and corps members with DACA status, would lose their ability to work and would be at risk of deportation—a far cry from the pathway to

2

1   citizenship these individuals deserve. Ending DACA would severely undercut TFA's national effort

2   to increase academic success among all students, but particularly undocumented students, since we've

3   learned that DACA teachers provide tremendous help to undocumented youth as they navigate the

4   barriers they face; students would lose the chance to connect with teachers who mirror their life

5   experiences and act as remarkable role models.

6        12.  Ending DACA without a solution in place would have other far-reaching impacts on our

7   students and communities. Many K-12 students in the United States are undocumented or have one

8   undocumented parent at home. If DACA is rescinded, they will lose the legal pathway to driver's

9   licenses, jobs, and higher education. They could be separated from their families or deported to

10  countries they've never known as home.

11       13.  Teach For America is proud of the impact our DACA leaders have made on our corps,

12  communities, and country. We will continue to provide them legal assistance and financial support

13  during this time of uncertainty.

14

15       I declare under penalty of perjury under the laws of the United States that the foregoing is

16  true and correct and that this declaration was executed on October 11, 2017 in San Antonio,

17  Texas.

18

19

20

21                                         VIRIDIANA CARRIZALES

22

23

24

25

26

27

28

3

Declaration of Viridiana Carrizales
Case No. 17-cv-5235

**App-296**

I, Julie Lee, declare and state as follows:

1. I am over the age of 18. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2. I am the Director of Operations for the California Governor's Office, a position I have held since July 2013. In that capacity, I oversee executive compensation, out-of-state travel, and human resource policies for state government. Prior to working as the Director of Operations, I was a manager at the California Department of Human Resources, where I was in charge of government reorganization.

3. As of September 6, the State of California employs 48 DACA recipients. These individuals are employed in a variety of capacities, including a firefighter, corporation examiner, a registered nurse, and a psychiatric technician. These individuals work for at least 14 State agencies, including the Department of Social Services, Department of State Hospitals, Department of Developmental Services, and the Department of Corrections and Rehabilitation. Hiring these DACA recipients has helped to directly advance the goals of a diversified workforce that reflects the population served by the state workforce.

4. The vast majority of these employees are civil servants, which means they were required to pass a competitive civil service examination. In addition to meeting minimum requirements for a particular position, departments will often look to hire employees who have additional, desirable skills that would be useful for a particular position, such as being multilingual, or having experience with a particular underserved community.

5. In the event that Rescission is implemented and these individuals lose work authorization, each of these agencies will lose the benefit of employing these individuals and the unique talents and attributes they bring to State service. The loss of these valued employees will mean a loss of investment and resources that went into their hiring and training, and will impact the productivity of these agencies.

6. In addition, these agencies will need to incur the administrative burden of terminating the employment of these individuals when their work authorization expires and expending resources to find, hire, and train replacement employees. The Governor's Office estimates that the average cost to replace a State employee is $15,000, which includes the amount of time necessary to post a vacancy, grade

examinations, review applications, and interview potential candidates.  The actual cost may be significantly higher for individual employees with unique skills and attributes.

7.   In addition, the Governor's Office has heard from a number of DACA recipients outside of State employment who are concerned about the effect Rescission will have on educational and employment opportunities, as well as the possibility of enforcement.  The Governor's Office has diverted staff time and resources to addressing these concerns.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on October 27, 2017 in Sacramento, California.

JULIE LEE

1    I, NICK MELVOIN, DECLARE:

2         1.      I proudly serve on the Los Angeles Unified School District ("L.A. Unified") Board of

3    Education ("Board") as the elected Board Member for the District 4 communities, which include

4    portions of Hollywood, the San Fernando Valley and the Westside of Los Angeles.  I also serve as the

5    Vice President of the L.A. Unified Board.

6         2.      I have personal knowledge of the facts set forth in this declaration, and if called as a

7    witness, I could and would competently testify to them.

8         3.      I understand that Plaintiff Saul Jimenez Suarez ("Mr. Jimenez") is an undocumented

9    person serving as a special education teacher within an L.A. Unified school, and was hired as an intern

10   credentialed teacher with authorization to work through the Deferred Action for Childhood Arrivals

11   ("DACA") program.

12        4.      L.A. Unified has been at the forefront of ensuring that our students, families, employees,

13   and community—regardless of immigration status—are welcome and supported in our schools.  This

14   includes L.A. Unified's commitment to affording students a free public education aligned with the

15   United States Supreme Court case of *Plyler v. Doe*, which held that undocumented children have a

16   constitutional right to receive a free public K-12 education to become "self-reliant and self-

17   sufficient participant[s] in society" and to learn the "fundamental values necessary to the maintenance of

18   a democratic political system."

19        5.      L.A. Unified's commitment is embodied in the numerous resolutions passed by the Board

20   in support of immigration reform.

21        6.      For example, when DACA was implemented in 2013, the Board passed a resolution to

22   establish the "DREAMers Program," a centralized process to assist students and graduates of L.A.

23   Unified to obtain educational histories to support their DACA applications.  From 2013-2017,

24   approximately 21,000 students and graduates availed themselves of the program.  This year, educational

25   records for 719 students have been requested.  These figures alone show that L.A. Unified's students,

26   graduates, and community will be significantly and irreparably impacted by the rescission of DACA.

27

28

7.      Additionally, on February 9, 2016, the Board passed a resolution entitled *LAUSD Campuses as Safe Zones and Resource Centers*, which declared every L.A. Unified site a place of support and resource for all students and families, regardless of immigration status.

8.      The Board also adopted the *Reaffirmation of Los Angeles Unified School District as Safe Zones for Families* resolution, which further propelled efforts to provide services to immigrant students and their families, including, but not limited to, (1) a reference guide in the event ICE agents seek access to students or student records; (2) a district-wide campaign to build awareness around immigrant students' rights called *We Are One L.A. Unified: Standing with Immigrant Families*; (3) the Education & Immigration Resource Guide outlining academic, legal, health and wellness, and enrollment information for immigrant families and school communities; and, (4) opening a Center for Education & Immigration Resources in each local district, where families can access information on immigration, enrollment, healthcare services, and other supports.

9.      After the September 5, 2017 announcement on the rescission of DACA, L.A. Unified immediately distributed letters to schools, families, and employees about the termination of DACA and provided referrals to legal resources.  Superintendent Michelle King sent a letter to all employees denouncing the Presidential Administration's decision to end DACA and declaring L.A. Unified's unwavering support to all employees, including teachers in our classrooms and other employees, who may be affected by the rescission of the program.  We did this, in no small part, because we knew that even this announcement of the rescission would have immediate, devastating consequences for the students and families in our community.

10.      Prior to serving as an L.A. Unified Board Member, I served as an L.A. Unified middle school teacher for several years at Markham Middle School, initially serving through an intern credential program in partnership with Teach For America, whereby I provided instruction while simultaneously studying to obtain my teaching credential.  This internship program is similar to the one I understand Mr. Jimenez to be hired through.

11.      In general, L.A. Unified hires intern credentialed teachers for hard-to-fill positions that are experiencing teacher shortages, such as in the field of special education.  These hires are essential to

1     the L.A. Unified given the shortage of qualified candidates in these fields, and we rely on these

2     employees to continue within our teaching force for years to come.

3            12.     If employees like Mr. Jimenez do not have authorization to work, however, L.A. Unified

4     will not be able to hire or continue to employ such individuals to serve our students.

5            13.     Without the availability of intern-credentialed teachers like Mr. Jimenez to work with

6     special education students, L.A. Unified might be forced to resort to staffing special education

7     classrooms with short or long-term substitute teachers, which I believe to be particularly detrimental to

8     these students' academic achievement as well as to their social and emotional development.

9            14.     In addition to filling a high-need position, the shared experience between Mr. Jimenez

10    and our significant population of undocumented students is valuable in helping to ensure that our

11    schools create a safe and welcoming space for all in accordance with L.A. Unified's stated

12    commitments.

13           15.     The impact of the rescission of DACA will be especially dramatic in places like

14    California—and Los Angeles in particular—where there is an incredibly high number of DACA

15    recipients working and serving in their respective communities.

16           16.     L.A. Unified does not have a record of how many of its employees, including teachers

17    credentialed through internship programs or otherwise, are DACA recipients because employment

18    authorization documents do not provide that information and the District does not inquire about an

19    employee's immigration status. However, based on the number of employees who have self-identified

20    as DACA recipients and based on third-party studies of DACA recipients, we believe that a significant

21    portion of our educator workforce may have DACA status. For example, an August 2017 study by the

22    Migration Policy Institute found that, in 2014, approximately 14,000 "immediately eligible DACA

23    population" were in the Education, Training, and Library occupations, and I understand that a significant

24    portion of DACA participants reside in the Los Angeles Region.

25           17.     Additionally, according to Teach for America, more than 190 corps members and alumni

26    have DACA status and reach 10,000 students across 11 states, including California and the Los Angeles

27    region specifically, where teachers largely are placed in L.A. Unified schools or charter schools that are

28    authorized and overseen by L.A. Unified and by myself as an L.A. Unified Board Member.

18.     I believe that the rescission of DACA discriminates against this class of young immigrants like Mr. Jimenez in violation of the Equal Protection guarantee of the Fifth Amendment by depriving them of their substantial interests in pursuing a livelihood, including opportunities in higher education.

19.     I believe that the rescission of DACA will have a significant and negative impact on the DACA participants amongst our teaching force, and on our students and families who rely on those teachers to provide a high quality education and a supportive and welcoming environment.

20.     I believe that the announcement of the rescission of DACA has already had an immediate, significant, and negative impact on the DACA participants amongst our teaching force, and on our students and families who rely on those teachers to provide a high quality education and a supportive and welcoming environment.  I have spoken with several teachers with DACA status and they are particularly frustrated, dismayed, and discouraged because they used their DACA opportunity to be able to give back to the community they felt had given them so much.  The teachers I have spoken with came to work at L.A. Unified after they were granted work authorization because they felt that L.A. Unified and the community it supports provided them with opportunities for success.  Those opportunities are now unfairly being pulled out from underneath them.  These teachers have offered themselves as sources of comfort and as role models for students who are undocumented or who have undocumented family—and now both our teachers and those students have extra anxiety, worry, and stress to cope with on account of the recent announcement that DACA would be discontinued.  The educators I have spoken with are paralyzed with fear and are afraid to pursue any professional opportunities outside of L.A. Unified, one of the increasingly few places they feel supported and understood.  Further, our students are now not only terrified that their family members may be swept away, detained, deported, and disappeared at any moment, but that their trusted educators may be as well.

21.     Every child deserves an opportunity to dream without boundaries and I will not watch from the sidelines as this White House ignores the catastrophic implications of rescinding DACA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 29, 2017, in Los Angeles, California.

_____

Nick Melvoin

**App-303**

0800

I, Minh-Chau N. Nguyen, declare:

1.    Since 2013, I have been a Staff Attorney at Santa Clara County Asian Law Alliance ("ALA"). ALA aims to provide equal access to the legal justice system for low-income and Asian Pacific Islander communities in Santa Clara County so they can develop self-sufficiency, self-reliance, and a better quality of life. ALA serves low-income residents through legal representation, community education and advocacy on issues including immigration, citizenship, public benefits, housing, domestic violence, and civil rights.

2.    ALA has served the community for over 40 years. ALA currently has a staff of 15, including 11 attorneys. The immigration department consists of three staff who focus on immigration relief for victims of crimes and four attorneys who focus on citizenship, DACA, and other immigration cases. All the immigration staff do deportation defense. I am one of the four in the latter group.

3.    ALA invests significant time and resources in recruiting and training volunteers, some of whom are DACA recipients. Volunteers are critical to advancing ALA's mission because volunteers help us answer our phones, conduct initial client intake, fill out immigration forms at our Immigration Clinics, and provide translation services. We spend one and a half hours training them for intake and one and a half hours training them for clinic. Without volunteer assistance, we would not be able to answer every call that comes through, assist every low income resident who needs help, or provide services to Spanish-speaking clients. They are essential in helping us with the sheer volume of our calls. We currently have 18 volunteers in our office every week. These include volunteer attorneys, volunteers awaiting bar results, student volunteers, and retired community members. Currently, there are approximately two DACA volunteers. They assist ALA staff in a variety of areas, including with document translation, intake, and clinic. As DACA recipients, those volunteers can understand the unique circumstances of many of our undocumented clients and communicate with them in a language they understand.

4.    About half of my work consists of assisting people with DACA applications. I help supervise our weekly Tuesday and Friday Immigration Clinics and our monthly Saturday Immigration Clinic for community members. In those clinics, we screen people and set them up with appointments to apply for DACA, citizenship, renewals of green cards, and other family-based immigration petitions.

5.       For the past few years, we have filed 200-250 DACA applications a year. Our fiscal year starts on July 1. Since July 1, 2017, we have filed over 150 applications, over 70 of which have been in the month of September. In one month, we have filed approximately one-third of the applications we typically file in a year.

6.       Since DACA was rescinded on September 5, 2017, ALA has had to divert its resources to assist individuals who have DACA-related inquiries. My colleagues and I have had to clear our schedules and ensure that we were available to address the needs of DACA recipients. Typically, our intake hours are 9-11:30 AM Monday-Friday and 1-3:30 PM on Monday, Wednesday, and Friday. With the DACA rescission, my colleague and I have been responding to calls from DACA clients at any time, even when our intake is closed. We had to prioritize our DACA clients to the detriment of our other clients, who include those applying for citizenship and those in deportation proceedings whose hearings are not for several months. Before the October 5 deadline, we had to keep our schedules clear so there is time for DACA clients making last minute appointments.

7.       ALA typically mails applications out using Priority Mail once a week. Because of the strict October 5 deadline, we had to go the post office two to three times a week before the deadline and use Priority Mail Express to submit the files. Some of our clients told us they save up the whole year in order to pay the USCIS filing fee. Staff coordinated financial assistance for clients with limited resources to help them come up with the filing fees. This put a strain on our financial resources and staff time.

8.       In addition to filling out DACA renewal applications in our Tuesday, Friday, and Saturday Immigration Clinics, ALA held two workshops to assist with individuals seeking to renew DACA before October 5. On Wednesday, September 20, we hosted an all day DACA renewal workshop in our office to help out 34 applicants. On Monday, September 25, we worked with other community-based organizations and San Jose State University to help out 44 applicants. We had to coordinate volunteers to come in on their days off to assist with the increased volume.

9.       Since the announcement, our phones have been flooded and our intake workers have been unable to respond to all calls. Callers were worried, confused, and scared about their status in the United States and unsure they would be able to meet the October 5 deadline. The week before the

October 5 deadline, clients still came in unsure if they were qualified to renew. We had people call whose work permits expired in August 2017 or expire past the March 5, 2018 deadline. There was still much confusion in the community right before October 5, and we are unsure if we were able to reach all eligible applicants in time.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 23, 2017, at San Jose, California.

Minh-Chau N. Nguyen

I, Brad Wells, declare:

1.     I am the current Associate Vice Chancellor, Business and Finance for the California State University ("CSU"). The CSU is the State of California acting in its higher education capacity. The CSU Board of Trustees is vested by statute with the authority to manage, administer and control the CSU's institutions of higher learning.

2.     The CSU joined the University of California, the California Community Colleges, the Association of Independent California Colleges and Universities, and the California Department of Education in communicating the message that ending the Federal Deferred Action for Childhood Arrivals ("DACA") program unnecessarily punishes hundreds of thousands of bright young people who are contributing members of American society. Our letter to the California Congressional Delegation can be found here: https://www2.calstate.edu/attend/student-services/resources-for-undocumented-students/Documents/daca-ca-ed-leaders-letter-9-5-17.pdf. As stated in that letter, it is the CSU's position that ending DACA would not only derail the futures of those participating in the program, but would also deprive the State of California of revenue and of the contributions of the program participates to the California workforce, now and in the future.

3.     Since the announcement of the DACA rescission, and in anticipation of the severe negative potential effect of that rescission on DACA participants who are students and employees, as well as the potential negative effect on the entire CSU community, the CSU has expended significant employee time. Evidence of the work involved in the CSU's response to DACA rescission can be found here: https://www2.calstate.edu/attend/student-services/resources-for-undocumented-students/Pages/rescission-of-daca.aspx.

4.     In my role as Associate Vice Chancellor, Business and Finance, I have determined that DACA rescission would likely cause the CSU to lose revenue, due to the loss of tuition and fees currently paid by students participating in the DACA program.

5.     Actual CSU student headcount enrollment for fiscal year 2016-17 was 472,427. Actual CSU annual tuition and fees collected for fiscal year 2016-17 totaled $2,838,185,912.00. Tuition and fees include state university tuition, as well as other mandatory fees required of resident students who enroll in or attend the university. Tuition and fees do not include fees such as student housing or parking, which

1

are optional, or non-resident tuition. The average annual tuition and fees per student headcount enrollment for fiscal year 2016-17 was calculated by dividing the annual tuition and fees by actual student headcount enrollment. The resulting figure is $6,008.00 per student.

6.     For the fiscal year 2016-17, the CSU collected an average of $6,008.00 in annual tuition and fees per enrolled student. This figure, multiplied by the number of students affected by the rescission of DACA would yield a potential revenue loss to the CSU of $6,008.00 for each student or potential student participating in the DACA program who would be unable to enroll due to rescission of the DACA program.

7.     Under Section 68130.5 of the California Education Code, certain non-resident students are exempt from paying non-resident tuition. This section of the statute became law after Assembly Bill 540 ("AB540") was signed. The CSU has a significant number of students who meet the AB540 guidelines, which include not holding a valid immigrant visa. Many of the AB540 students at CSU are undocumented.

8.     CSU does not collect data according to DACA status. However, it is likely that a large number of current CSU students are participating in the DACA program. The CSU Director of Student Programs provided relevant fall 2016 enrollment data that I reviewed. The total number of AB540 students who earned a degree from CSU in 2016-17 was 2,016. Of those, 1,440 were undocumented.

9.     Many of the AB540 and undocumented students at CSU are enrolled in academic programs that lead to a state license. These degree programs include the following: Nursing, Teacher Education, Counseling, Occupational Therapy, Physical Therapy, Social Work, Landscape Architecture, and Architecture. According to data provided by the CSU Director of Student Programs, as of Fall 2016, there were AB540 and undocumented students enrolled in these degree programs. In Fall 2016, 1,049 AB540 students were enrolled at CSU in academic programs that lead to a state license. Of those, 763 students were undocumented.

10.     If the DACA program is eliminated, the State of California would likely lose trained and qualified students in license programs and would likely lose people who have already obtained licenses in important areas of need in California.

11.     I have also reviewed data provided by the CSU Associate Vice Chancellor, Human Resources, which shows there are more than 700 current CSU employees who are potentially DACA

participants.  If DACA is eliminated, it is likely that the CSU would lose current employees who we have invested in and trained.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 31, 2017, at Long Beach, California.

_Brad Wells_

Brad Wells

DECLARATION OF BRAD WELLS
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)



**IMMIGRATION**

# Record number of deportations took place on Obama's watch

**BY ALFONSO CHARDY**
*achardy@elnuevoherald.com*

December 25, 2016 03:57 PM
Updated December 25, 2016 04:57 PM

Newly released official figures show that during the first seven years of President Barack Obama's presidency, more than 2.7 million foreign nationals were deported — the largest number in more than a century.

Figures contained in the 2015 Yearbook of Immigration Statistics, issued in mid-December, show that from the time Obama was inaugurated as America's first black president on Jan. 20, 2009, through Sept. 30, 2015, a total of 2,749,854 undocumented immigrants were removed from the United States.

That's a record.

**MORE THAN 2.7 MILLION UNDOCUMENTED IMMIGRANTS WERE REMOVED FROM THE U.S. UNDER OBAMA.**

### Breaking News

Be the first to know when big news breaks

Enter Email Address

I'm not a robot

reCAPTCHA
Privacy - Terms

SIGN UP

No president since deportation figures have been kept in the 1890s has been linked to such a high number of removals, according to the Yearbook, considered the "bible" of immigration statistics among people who deal in immigration, such as attorneys who represent immigrants in court, activists who advocate for the rights of immigrants and journalists who cover the immigration beat.

Under President Grover Cleveland, 9,069 foreign nationals were deported, according to Yearbook figures. The runner-up behind Obama was President George W. Bush, under whose watch 2,012,539 were removed. During Bill Clinton's presidency, 869,646 immigrants were kicked out, Yearbook figures show.

Many Obama supporters and some of his own aides have previously disputed assertions that he held the record in the number of immigrant deportations.

For example, in 2014, Secretary of Homeland Security Jeh Johnson told Congress that figures tied to U.S. Immigration and Customs Enforcement (ICE) that indicated a record of deportations under Obama were really not deportations, but quick turn-backs at the border of immigrants detained at or near the boundary line and then sent back to Mexico without a formal deportation process or order.

Johnson's statement came during an exchange with lawmakers at a congressional hearing when a Republican queried him on whether the Obama administration was inflating deportation figures.

"Under the Obama administration, more than half of those removals that were attributed to ICE are actually a result of Border Patrol arrests that wouldn't have been counted in prior administrations?" asked Rep. John Culberson, a Texas Republican, at the March 2014 hearing.

"Correct," Johnson stated, adding: "We are enforcing the law vigorously and effectively, which results in the removal of over 300,000 people a year over the last several years."

Yet, when the 2014 and 2015 Yearbooks came out, there was no correction of removal figures listed in the annual publications and no note attesting to Johnson's clarification. In fact, the figures listed in the Yearbook are clearly labeled as removals or deportations, not border turn-backs.

"Removals are the compulsory and confirmed movement of an inadmissible or deportable alien out of the United States based on an order of removal," according to a footnote in the list labeled removals stretching from 1892 to 2015 published in the Yearbook issued in mid-December. The Yearbook is a publication of the Office of Immigration Statistics, one of the many agencies under the Department of Homeland Security (DHS) that Johnson oversees.

DHS would not comment on the apparent discrepancy between Johnson's statement and Yearbook figures. ICE, meanwhile, made available its removal figures by fiscal year from 2001 to 2015, but noted in an email message that the figures since 2007 included the returns to which Johnson apparently referred.

ICE figures are different from Yearbook figures, but not dramatically so.

For example, for 2007 it showed 291,060 "removals" compared to 319,382 removals in the yearbook. In 2012, ICE showed 409,849 "removals" compared to 416,324 removals in the Yearbook.

Incidentally, returns are listed separately in the Yearbook.

**App312**

Neither ICE nor DHS provide an explanation about how the Yearbook removal figures were compiled.

While the United States has had immigration laws since at least 1798, removal figures have only been reported in the Yearbook of Immigration Statistics since 1892.

At the time, the president was Benjamin Harrison. But the Yearbook does not list the total number of deportations during his term, which ran from March 1889 to March 1893.

The number of deportations per presidential term can only be counted in the Yearbook beginning with Grover Cleveland whose second and last term ran from March 1893 to March 1897. His total was 9,069.

Throughout the 20th Century, according to the Yearbook, deportations never rose higher than those expelled during Bill Clinton's terms that ran from January 1993 to January 2001.

### THE DRAMATIC RISE IN DEPORTATIONS CAN PERHAPS BE ATTRIBUTED TO A CHANGE IN IMMIGRATION LAW IN 1996.

The dramatic rise in deportations noted in the Yearbook from the 141,326 removals under President George H. W. Bush to the 869,647 under Clinton can perhaps be attributed to a change in immigration law in 1996 that made it easier for immigration courts to deport immigrants, especially those with criminal convictions.

During this year's campaign, President-elect Donald Trump claimed that Eisenhower had deported 1.3 million people.

PolitiFact, a fact-checking website run by editors and reporters from the Tampa Bay Times, rated Trump's claim as Half True.

That's because PolitiFact researchers found some evidence that during Eisenhower's presidency the true number of deportations might have been high.

"We came across estimates of forced removals ranging from 250,000 to 1.3 million," PolitiFact said.

It was only in the 21st century when deportations skyrocketed, according to the Yearbook. Under President George W. Bush, whose terms ran from January 2001 to January 2009, at least 2,012,539 foreign nationals were removed, according to the Yearbook.

**App313**

**UNDER PRESIDENT GEORGE W. BUSH, SOME 2 MILLION FOREIGN NATIONALS WERE REMOVED.**

Obama, who took office in January 2009, steps down Jan. 20 when Trump gets sworn in.

During the campaign, Trump threatened repeatedly to deport all 11.1 million undocumented immigrants in the country.

Since voters elected him to take over the White House, however, Trump has tempered that threat, saying he might focus on deporting two or three million foreign nationals with criminal records.



File photo of a protest in Miami earlier this year. Pictured are Janeth Mejia (center) with her two children, Juan David Morales (left), 14, and Valeria Morales (right), 16, whose husband and father Leonardo Morales was detained at Krome Detention Center and was to be deported after living in United States for more than 11 years. **Roberto Koltun** - rkoltun@miamiherald.com

❮      1 of 2      ❯

**SUGGESTED FOR YOU**

Case 1:18-cv-00068 Document 209-2 Filed on 07/21/18 in TXSD Page 319 of 358

*Working to find actionable solutions to the nation's key challenges.*



BIPARTISAN POLICY CENTER

# *Immigration and the Labor Force*

## BY KENNETH MEGAN

*Tuesday, August 25, 2015*

The 2016 presidential campaign has brought immigration back into the spotlight, with candidates crafting messages and policies to address this important issue—particularly as it relates to job creation. In particular, there has been a growing narrative that high levels of immigration have led to declining employment and labor force participation among the native-born population. This has led some to advocate for a more restrictive federal immigration policy.

Though compelling, this argument is overly simplistic and ultimately flawed, as it fails to consider the many factors that influence labor force participation *besides* immigration. Native-born Americans are far more likely to exit the workforce to enroll in school, retire or enter disability, and these factors have driven the decline in employment and labor force participation over the past 15 years—not immigration.[1]

## Population and Labor Force Trends

The foreign-born population in the United States has been growing at a far faster rate than the native-born population. While the native-born population is seven times larger than the foreign-born population, between 2000 and 2014 the number of foreign-born adults increased by almost 50 percent, compared to just a 14 percent increase for the native adult population. This caused the native-born share of the total adult population to decrease from around 87 percent to 84 percent.

**App315**

### Percent of Population that is Native Born and Percent Change in Native and Foreign Born Population, Age 16 and Older, 2000 to 2014



The labor force participation rate[2] has also been on a downward trend among the native adult population. Between 2000 and 2014, native-born individuals realized a 5 percentage point drop in the labor force participation rate, from 67 to 62 percent, while the foreign-born labor force participation rate decreased by just 1 percentage point, from 67 to 66 percent. Similarly, the native-born employment rate[3] declined by 6 percentage points over this period, from 65 percent to 59 percent. Among foreign-born individuals, employment dropped by just 2 percentage points, from 65 percent to 63 percent.

### Labor Force Participation Rate, 16 and Older



**App316**

## Percent Employed, 16 and Older



From the above charts, it is easy to sympathize with the belief that immigration has forced native-born Americans out of the labor market. Under this theory, a glut of foreign workers has decreased the number of available jobs; native-born individuals have suffered the brunt of this trend, plagued with declining levels of employment and labor force participation.

However, despite its superficial appeal, this conclusion is extremely problematic for two reasons:

**Unemployment Rate Parity.** The past several years have seen almost no divergence in foreign- and native-born unemployment rates;[4] the two have remained almost identical since 2000, varying by no more than a few tenths of a percentage point. In 2000, native-born unemployment stood at 3.7 percent, compared to 3.9 percent for foreign-born. By 2014, native-born unemployment had increased to 5.6 percent, compared to 5.3 percent for foreign-born. If immigration were the root cause of declining native-born employment, one would certainly expect the foreign-born population to have a significantly lower unemployment rate than native-born.

## App317

### Unemployment Rate, 16 and Older, 2000-2014



**Lump of Labor Fallacy.** Blaming immigration for declining employment ultimately rests on the flawed belief that economies can only produce a fixed number of jobs and that for every job occupied by an immigrant, a native-born worker must be unemployed. Known as the "lump of labor fallacy," this assumption has been discredited by a large body of economic research. In fact, textbook economics indicates that immigration can actually spur job creation, as population growth boosts aggregate demand, leading to economic growth and employment opportunities. According to Adam Looney of the **Brookings Institution**, "Immigrants and U.S.-born workers generally do not compete for the same jobs; instead, many immigrants complement the work of U.S. employees and increase their productivity." A **paper** by Harry Holzer of Georgetown University echoes this belief, and a study from the San Francisco Federal Reserve Board found **no evidence** that immigrants displace U.S. workers.

This evidence ultimately calls into question the notion that immigration is the driving force behind declining native-born employment and labor force participation. Rather, these trends can be largely attributed to individual labor market decisions. Specifically, native-born individuals are far more likely to exit the workforce to enroll in school, retire, or enter disability. Indeed, between 2000 and 2014, both disability and school enrollment increased by 1.7 percentage points among the native-born population, while retirement rose by 1.9 percentage points. Meanwhile, these factors barely budged for the foreign-born population—rising by less than a half of a percentage point for each.

**App318**

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 323 of 358

### Percent of Population Enrolled in School, in Retirement, and on Disability, 16 and Older, 2000 and 2014



At the heart of these trends lies the fact that native-born individuals generally have a greater amount of options than the foreign-born population with regard to their labor market decisions. Immigrant families have lower median incomes, and are **more likely** to be living below the poverty line—thus they are **less likely** to have the means to enroll in college. Immigrants also tend to have **lower levels of retirement savings**. And undocumented immigrants—which comprise around **28 percent** of the foreign born population—are **unable to qualify** for Social Security Disability Insurance. As such, native-born adults have far more flexibility to exit the workforce in favor of retirement, schooling or disability, which puts downward pressure on native employment and labor force participation, regardless of the presence of immigrants.

Contrary to campaign rhetoric, there is no clear evidence that immigration has brought forth a decline in native-born employment or labor force participation. There has been very little divergence in the native born and foreign born unemployment rates, and a breadth of research indicates that immigration can be complementary to native born employment, as it spurs demand for goods and services. What is ultimately behind the downward trend is the fact that native-born Americans are more likely to have the option to exit the labor market—to attend school, enter retirement, or collect disability insurance. The immigrant population often lacks this flexibility, which has led to higher labor force participation among the foreign-born population.

[1] *This blog uses data from the US Census Bureau's October Current Population Survey from 2000 to 2014. The October Supplement is when the CPS surveys education enrollment. All data is for the population age 16 to 90.*

[2] *Defined as the percentage of the population that is either employed or actively seeking work.*

[3] *Defined as the percent of the adult population (age 16 and older) that is employed.*

[4] *The unemployment rate is the percentage of individuals who do not hold a job—but are actively seeking one.*

**App319**

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 324 of 358

7/19/2018          Examining the Contributions of the DACA-Eligible Population in Key States - Partnership for a New American Economy Research Fund



Menu

# Examining the Contributions of the DACA-Eligible Population in Key States

November 6, 2017

As recent days have made clear, many Americans see plenty of reasons to provide legal status to those eligible for the Deferred Action for Childhood Arrivals, or DACA, program. The initiative, created in 2012, gave undocumented immigrants brought to the country as children a reprieve from deportation, allowing many to legally work, attend school, or join the military for the first time. In the days since the Trump administration announced its plan to phase out the program, more than 400 CEOs have come out in favor of protecting Dreamers, many of whom work at their firms. Prominent university presidents have extolled the character of their DACA students and their role in innovation-rich fields. And 15 states, as well as Washington, D.C., have sued to try to prevent the ending of the program.

Last week, NAE highlighted one of many reasons why Dreamers are an important community to accept and protect: The very real and meaningful economic contributions they make to the U.S. economy. Our analysis of the 1.3 million DACA-eligible individuals, age 16 and above, found that more than 90 percent were actively employed in 2015. That group earned $19.9 billion in income and contributed roughly $3.0 billion in taxes that year. They also formed businesses at higher rates than similarly aged U.S.-born workers, with almost 38,000 working as self-employed entrepreneurs in 2015 alone.

But DACA, of course, gains more resonance when we look beyond the national picture. Every state in the country is currently home to hundreds—or in many cases, thousands—of DACA recipients. Clawing back the protections afforded to this group upsets community networks and schools, and can hurt local employers and businesses dependent upon Dreamers to serve as workers and customers. To better understand how the DACA-eligible population contributes to individual states, this brief provides estimates on the economic activity of the Dreamer population in 26 states across the country—the areas where we estimate the DACA-eligible population exceeded 10,000 people in 2015. Our estimates are derived from the 2013–2015 American Community Survey, and rely on the same

calculation techniques used in previous NAE studies on the subset of undocumented immigrants eligible for the DACA program. (A detailed methodology is available at the end of this report.)

Before diving into economic contributions, it helps to first consider how the DACA-eligible population is distributed geographically. Almost one of out every four DACA-eligible individuals was living in California in 2015, while another one out of every six was Texas-based. Other less expected states, however, had sizeable concentrations of undocumented immigrants eligible for the DACA program. This group includes Arizona and Georgia, two states that had roughly 40,000 or more DACA eligible residents. Another four states—including Maryland, Washington, Virginia, and North Carolina—had 25,000 or more. Colorado and Nevada hovered right below that in the low 20,000s.

**Figure 1: States with the Largest Number of DACA-Eligible Residents, 2015**

|                | Number of DACA Eligible Residents |
| -------------- | ---------------------------------: |
| California     | 316,205 |
| Texas          | 226,195 |
| Florida        | 106,119 |
| New York       | 85,699 |
| Illinois       | 58,890 |
| New Jersey     | 53,780 |
| Georgia        | 46,105 |
| Arizona        | 39,682 |
| North Carolina | 37,894 |
| Virginia       | 30,580 |
| Washington     | 28,054 |
| Maryland       | 25,013 |
| Colorado       | 24,917 |
| Nevada         | 22,772 |
| Massachusetts  | 16,483 |
| Oregon         | 16,062 |
| Pennsylvania   | 15,355 |
| Utah           | 13,627 |
| Tennessee      | 13,290 |
| Connecticut    | 13,195 |
| Michigan       | 12,418 |
| Oklahoma       | 11,672 |

**App321**

| | |
|---|---|
| New Mexico | **10,896** |
| Indiana | **10,691** |
| Ohio | **10,663** |
| Wisconsin | **10,561** |
| South Carolina | **8,885** |

Much like the national picture, our work finds that the DACA-eligible population in each state is largely employed and working. Looking just at those aged 16 and older who are in the labor force and not in school or the military, we find that at least 86 percent of DACA-eligible individuals is employed in every state in our analysis. In some places, a particularly large share of DACA-eligible individuals is working. In Colorado, for instance, more than 95 percent of the state's sizeable DACA-eligible population was employed in 2015. Similarly, the employment rate of Massachusetts' DACA-eligible residents topped 95 percent that year. Meanwhile, in two smaller states—Oklahoma and Oregon—more than 93 percent of DACA-eligible individuals held jobs in 2015.

**Figure 2: Employment Rate of the DACA-Eligible Population in Top States, 2015**

| | Share of DACA Eligible Population in Labor Force that is Employed |
|---|---|
| Arizona | **87.9%** |
| California | **89.4%** |
| Colorado | **95.3%** |
| Connecticut | **87.9%** |
| Florida | **90.0%** |
| Georgia | **91.8%** |
| Illinois | **89.5%** |
| Indiana | **91.4%** |
| Maryland | **86.9%** |
| Massachusetts | **95.2%** |
| Michigan | **92.5%** |
| Nevada | **86.3%** |
| New Jersey | **89.6%** |
| New Mexico | **89.5%** |
| New York | **91.1%** |
| North Carolina | **90.7%** |
| Ohio | **91.3%** |
| Oklahoma | **93.2%** |
| Oregon | **93.6%** |

**App322**

| | |
|---|---|
| Pennsylvania | **87.9%** |
| South Carolina | **90.3%** |
| Tennessee | **89.7%** |
| Texas | **91.2%** |
| Utah | **91.4%** |
| Virginia | **90.6%** |
| Washington | **91.5%** |
| Wisconsin | **92.2%** |

With their high rates of employment, it is little surprise that the DACA-eligible population is also contributing meaningfully to their states and localities as both earners and taxpayers. In 2015, the DACA-eligible population in the 26 states featured here earned a collective $18.6 billion. In each of the four states with the largest number of undocumented immigrants qualifying for the program—Florida, California, Texas, and New York—the DACA-eligible earned more than $1 billion in income that year. While the total in these four states amounts to over $11 billion, their earnings in California were particularly high, reaching almost $5 billion.

As would be the case with any other workers in our economy, some of the income earned by DACA-eligible groups went back to state and local governments in the form of tax revenue. State and local tax payments are essential to fund some of the basic functions of government such as staffing public schools, collecting trash, and maintaining police forces. At the federal level, the payments of DACA-eligible individuals go partially towards sustaining our fragile entitlement programs. In Figure 3 below, we show the amount of state and local taxes and taxes overall paid by DACA-eligible immigrants in each state. Looking beyond the largest states, we can see that even a relatively small DACA-eligible population contributes a significant amount to government tax coffers. In Florida, the subset of Dreamers eligible for the DACA program paid more than $214 million in taxes in 2015. In Illinois and New Jersey, they paid more than $130 million in overall taxes that year.

**Figure 3: Aggregate Earnings and Tax Payments of DACA-Eligible Individuals in Key States, 2015**

| | Aggregate Income (in millions $) | State and Local Taxes Paid (in millions $) | Taxes Paid Overall (in millions $) |
|---|---|---|---|
| Arizona | $438.2 | $40.0 | **$66.3** |
| California | $4,906.8 | $380.4 | **$748.1** |
| Colorado | $374.1 | $17.5 | **$33.0** |
| Connecticut | $208.2 | $17.5 | **$33.0** |

| | | |
|---|---|---|
| Florida | $1,425.5 | $120.6 | **$214.2** |
| Georgia | $530.8 | $42.6 | **$75.6** |
| Illinois | $898.4 | $89.6 | **$146.5** |
| Indiana | $133.7 | $12.6 | **$19.9** |
| Maryland | $466.6 | $37.9 | **$85.0** |
| Massachusetts | $404.2 | $32.3 | **$67.7** |
| Michigan | $182.8 | $13.6 | **$27.0** |
| Nevada | $298.6 | $17.9 | **$36.8** |
| New Jersey | $811.9 | $64.9 | **$132.2** |
| New Mexico | $117.5 | $9.8 | **$16.8** |
| New York | $1,724.6 | $158.2 | **$311.7** |
| North Carolina | $479.4 | $35.7 | **$64.1** |
| Ohio | $168.0 | $14.7 | **$28.8** |
| Oklahoma | $146.3 | $12.1 | **$20.3** |
| Oregon | $208.1 | $13.0 | **$25.2** |
| Pennsylvania | $223.6 | $20.1 | **$35.8** |
| South Carolina | $101.8 | $6.8 | **$11.8** |
| Tennessee | $167.1 | $12.9 | **$24.8** |
| Texas | $3,040.0 | $258.6 | **$473.3** |
| Utah | $176.4 | $13.1 | **$22.2** |
| Virginia | $467.2 | $31.9 | **$70.3** |
| Washington | $503.7 | $53.2 | **$93.7** |
| Wisconsin | $128.3 | $10.1 | **$17.6** |

One important measure of how a given group contributes to the country's economy is the amount they spend each year as consumers. More than three out of every five U.S. jobs were in the broader services sector in 2014, according to the U.S. Bureau of Labor Statistics.[1] Without a steady supply of paying customers, these positions—in fields like retail, hospitality, and medicine—would struggle or cease to exist. Looking at the spending power of the DACA-eligible population, we can see that in many states their power as consumers is notable. In nine states, their spending power was greater than $400 million in 2015. In two of them, it exceeded $2.5 billion. We show the spending power held by immigrants in each of our 26 states in Figure 4.

**Figure 4: Spending Power of DACA-Eligible Individuals in Key States, 2015**

| | Spending Power (in millions $) |
|---|---|
| Arizona | **$371.9** |

**App324**

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 329 of 358

7/19/2018          Examining the Contributions of the DACA-Eligible Population in Key States - Partnership for a New American Economy Research Fund

| California | $4,158.7 |
| Colorado | $322.0 |
| Connecticut | $175.2 |
| Florida | $1,211.3 |
| Georgia | $455.2 |
| Illinois | $751.9 |
| Indiana | $113.7 |
| Maryland | $381.6 |
| Massachusetts | $336.5 |
| Michigan | $155.8 |
| Nevada | $261.8 |
| New Jersey | $679.7 |
| New Mexico | $100.7 |
| New York | $1,412.9 |
| North Carolina | $415.4 |
| Ohio | $139.2 |
| Oklahoma | $126.0 |
| Oregon | $182.8 |
| Pennsylvania | $187.8 |
| South Carolina | $87.3 |
| Tennessee | $142.3 |
| Texas | $2,566.7 |
| Utah | $154.2 |
| Virginia | $396.9 |
| Washington | $409.9 |
| Wisconsin | $110.7 |

DACA-eligible immigrants are not just contributing to our economy through their tax payments and spending, but by starting businesses and creating jobs for American workers as well. Because of limitations in the sample size available for analysis, we are only able to confidently estimate the size of the population of entrepreneurs eligible for DACA in the five largest states. Similar to the national pattern, we find that in four out of the five states the DACA-eligible population has higher rates of entrepreneurship than similarly aged U.S.-born workers, or those ages 16 to 34. In New York, for instance, 5.7 percent of the DACA-eligible population in the workforce is made up of self-employed entrepreneurs, compared to just 4.0 percent of the relevant group of U.S.-born workers. In Florida, the gap between the two entrepreneurship rates is 1.2 percent. Although the entrepreneurship

**App325**

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 330 of 358

7/19/2018          Examining the Contributions of the DACA-Eligible Population in Key States - Partnership for a New American Economy Research Fund

rates of young people can sound small on their face, they do translate into large numbers on the ground. In 2015, California was home to roughly 8,900 DACA-eligible entrepreneurs, while Texas had 7,320.

**Figure 5: Share of DACA-Eligible Workers and U.S.-Born Workers Who Are Entrepreneurs in Selected States, 2015**

| | Share DACA-Eligible, Self-Employed ⸙ | Share of U.S.-Born, ages 16-34, Self-Employed | Number of DACA-Eligible Entrepreneurs |
|---|---|---|---|
| California | 4.5% | 4.9% | **8,905** |
| Texas | 5.4% | 4.1% | **7,229** |
| Florida | 5.6% | 4.4% | **3,676** |
| New York | 5.7% | 4.0% | **3,225** |
| Illinois | 3.8% | 3.5% | **1,507** |

The next few months will likely be decisive for the more than 1.3 million DACA-eligible individuals currently living in the United States. With the administration already winding down the DACA program, Congress has been given six months to find a legislative solution. But while a decent share of the press coverage in recent days has focused on the intense machinations on the issue in Washington, this brief shows just how important the DACA-eligible population is to the economies of a whole host of states—from longtime immigrant destinations like New York and California to states that have only in recent years been popular settlement destinations such as Georgia, North Carolina, and Nevada. Although there are many reasons to enshrine into law protections of the Dreamers, this brief demonstrates that economic contributions should be part of any discussion by policymakers on this issue going forward.

Methodology

We use data from the 2013–2015 American Community Survey (ACS) to identify potential DACA-eligible persons. Due to the small sample size of DACA-eligible population in the one-year ACS sample, we pool the 2013, 2014, and 2015 data and use the average weight of three years to arrive at our final estimates.

To start, we use the same approach our previous work has employed to identify undocumented immigrants from the U.S. Census microdata. This method is similar to the method used by Harvard economist George Borjas to impute undocumented status using several variables in the U.S. Census. As DACA recipients are legally allowed to work in

Case 1:18-cv-00068   Document 209-2   Filed on 07/21/18 in TXSD   Page 331 of 358

7/19/2018          Examining the Contributions of the DACA-Eligible Population in Key States - Partnership for a New American Economy Research Fund

certain occupations that undocumented immigrants cannot work in, we adjust our methodology here to reflect such differences between undocumented immigrants and the DACA-eligible population.

To determine whether a person in the microdata has legal status in the United States, foreign-born individuals who reported naturalization are reclassified as non-citizens if the individual has resided in the United States for less than six years or, if married to a U.S. citizen, for less than three. In both of these cases, it would be virtually impossible to naturalize, making it likely such individuals misreported their status to Census officials. After reclassifying those individuals, we then consider the entire pool of non-naturalized immigrants as potentially undocumented. Using the following criteria, we then remove individuals from the pool who are highly likely to have legal status:

- Arrived in the United States before 1980;

- Citizens and children less than 18 years old reporting at least one U.S.-born parent;

- Spouses of natural born citizens, or naturalized citizens who have resided in the United States for six years or more;

- Recipients of Social Security benefits, Supplemental Security Income, Medicaid, Medicare, or public assistance;

- Households with at least one citizen that received SNAP benefits;

- Refugees; or

- Federal government employees or law enforcement officers.

The remainder of the foreign-born population that does not meet these criteria are reclassified as undocumented. Since DACA-eligible population is a subset of the total undocumented population, we then apply the guidelines for DACA from United States Citizenship and Immigration Services (USCIS) to ACS microdata to restrict our data further. We determine an undocumented person DACA-eligible if the individual:

- Was born after the second quarter of 1981;

- Came to the United States before reaching his or her 16th birthday; and

- Has moved to the United States by 2007.

Case 1:18-cv-00068    Document 209-2    Filed on 07/21/18 in TXSD    Page 332 of 358

7/19/2018          Examining the Contributions of the DACA-Eligible Population in Key States - Partnership for a New American Economy Research Fund

While USCIS guidelines for DACA application also include restrictions on those who have criminal records, it is not possible to determine such information from the U.S. Census. Our final numbers of the DACA-eligible population are the most reliable estimates that one can extrapolate from the Census microdata.

Unlike past NAE papers on income and tax contributions, this brief treats each DACA-eligible individual as a single taxpaying unit. This follows the lead of other groups, such as the nonpartisan Institute on Taxation and Economic Policy (ITEP), that have also sought to quantify the economic and tax contributions of this population.

As in past NAE briefs, we use the term "spending power."[5] Here and elsewhere we define spending power as the disposable income leftover after subtracting federal, state, and local taxes from total household income.

Using the 2013–2015 ACS microdata sample, we then estimate the aggregate household income, tax contributions, and spending power of DACA-eligible households. We estimate state and local taxes using the tax incidence estimates produced by ITEP.[6] For federal tax rate estimates, we use data released by the Congressional Budget Office in 2014 and calculate the federal tax based on their estimates for household federal tax incidence rates by income quintile.[7]

Entrepreneurs in this brief are defined as any worker who reported being self-employed in the 2013–2015 ACS sample.

[1] U.S. Bureau of Labor Statistics, Bureau of Labor Statistics, "Employment by Major Industry Sector," accessed September 21, 2016, http://www.bls.gov/emp/ep_table_201.htm.

---

**Issue:**

**Location:** National

**Type:**

**Share:**

**About Us**

# INTERPRETER RELEASES

### Report and analysis of **immigration and nationality law**

| Vol. 67, No. 6 | February 5, 1990 |
|---|---|

## RECENT DEVELOPMENTS

1. INS Reverses Family Fairness Policy ...........153
2. Courts Uphold INS L–1 Regulations ............154
3. Administration Reported Close to Agreement on Legal Immigration Reform ..................157
4. INS Considers AIDS-Virus Waiver Requests in Five Amnesty Cases...............158
5. INS General Counsel Speaks on IMFA Issues...................................................159
6. Temporary Resident Loses Discrimination Case Against Postal Service....................161
7. INS Publishes Notice on Employment Authorization Document.........................162
8. Seminars ................................................163
9. Correction Notice ......................................163

## RECENT DEVELOPMENTS

### 1. INS Reverses Family Fairness Policy

INS Commissioner Gene McNary has announced significant liberalizations to his agency's family fairness policy. Under the changes, most children and spouses of newly legalized aliens here before November 6, 1986 will be allowed to remain in the U.S. and work. The changes may prevent the deportation of up to 100,000 undocumented children and spouses of newly legalized aliens.[1]

Mr. McNary sent a memorandum to all four INS regional commissioners on February 2, 1990, outlining the changes in the Service's family fairness policy. A copy of that memo is reproduced in Appendix I. The changes take effect February 14.

---

1   See *Los Angeles Times*, Feb. 3, 1990, at A1, col. 4; *New York Times*, Feb. 3, 1990, at 28, col. 1; *Washington Post*, Feb. 3, 1990, at A1, col. 1.

What to do when some but not all members of an alien family qualify for legalization has been a controversial issue since the beginning of the amnesty program. Former INS Commissioner Alan C. Nelson instructed INS offices in late 1987 to automatically grant voluntary departure only for minor children living with their newly legalized parents. Ineligible spouses of legalized aliens had to show "compelling or humanitarian factors" beyond the marriage itself to warrant voluntary departure.[2]

Immigrants' rights advocates attacked that version of the family fairness policy, calling it "overly restrictive, non-responsive to the needs of immigrants and their families, and contrary to the American tradition of keeping families together."[3] They also alleged that local INS offices were inconsistently applying the policy, with some routinely granting voluntary departure to legalized aliens' family members, while other offices denied almost all such requests. At a recent meeting with several national immigrants' rights organizations, new Commissioner McNary agreed to look into the controversy.

At his February 2 press conference announcing the policy change, Mr. McNary acknowledged that the previous policy guidelines were "fairly nebulous," and that they had not been "evenly and uniformly applied" around the country. "I had to...set a uniform policy," he told reporters.

Under the new policy, INS district directors must grant voluntary departure to a legalized alien's spouse and unmarried children under 18, if the following conditions are met: (1) the beneficiaries must be living with the legalized alien; (2) they must establish they have been residing in the U.S. since before November 6, 1986; (3) they must be admissible as

---

2   See 64 *Interpreter Releases* 1191–92, 1200–04 (Oct. 26, 1987); 1368, 1380–81 (Dec. 14, 1987).
3   See 66 *Interpreter Releases* 562 (May 22, 1989).



**Federal Publications Inc.**
1120 20th St. NW, Suite 500 South
Washington, D.C. 20036-3406
(202) 337-7000 (Editorial Office)
(615) 377-3322 (Circulation Office)

Maurice A. Roberts, *Editor*
Stephen Yale-Loehr, *Co-Editor*
Bruce A. Hake, *Assistant Editor*

Copyright © 1990 Federal Publications Inc. All Rights Reserved. No part of this publication may be reproduced, stored in a retrieval system, or transmitted, in any form or by any means, electronic, mechanical, photocopying, xerography, recording, or otherwise, without the prior written permission of the publisher.

INTERPRETER RELEASES (ISSN 0020-9686) is published weekly (except the fourth week in February, the third week in June, the first week in July and the last week in November) by Federal Publications Inc., P.O. Box 41094, Nashville, TN 37204. Annual Subscription $340. Second-class postage paid at Brentwood, TN. POSTMASTER: Send address changes to INTERPRETER RELEASES/Sunbelt Fulfillment Services, P.O. Box 41094, Nashville, TN 37204.

FEB 16 1990

154

immigrants; (4) they must not have been convicted of a felony or three misdemeanors committed in the U.S.; and (5) they must not have assisted in persecuting others.

Voluntary departure and work authorization will be granted in one-year increments to the beneficiaries of this new policy, with annual reviews by the district directors to see if the aliens have committed crimes or become dependent on public assistance.

Commissioner McNary clarified two points at the press conference that were left ambiguous in his memo. First, the legalized alien and his or her spouse must have married before November 6, 1986 for the undocumented spouse to benefit from the new policy. Second, in response to a question, Mr. McNary said he "would think" that children over 18 won't be deported. They would continue to receive voluntary departure and work authorization "until they've waited their turn in the queue" to obtain an immigrant visa.

A February 2 telex sent from the INS Central Office to all field offices reiterated Commissioner McNary's policy memo. Paragraph 6 of the telex also added the following clarification:

> All cases currently in deportation proceedings should be reviewed for family fairness eligibility before commencement of a hearing or removal. If the alien is found to be eligible, proceedings should be administratively closed to allow them the opportunity to request voluntary departure under this policy.

Asked whether the new policy might encourage other undocumented aliens to seek entry into the U.S., Mr. McNary replied that he would do everything possible within the INS budget to enhance enforcement along the U.S.-Mexico border, including increasing detentions. "It is vital that we enforce the law against illegal entry," he said. "However, we can enforce the law humanely. To split families encourages further violations of the law as they reunite." Mr. McNary also noted that the new INS policy was consistent with provisions in legal immigration reform legislation pending in Congress.[1]

---

1   See, e.g., S. 358, § 108, discussed in 66 *Interpreter Releases* 837 (July 31, 1989).

## 2. Courts Uphold INS L–1 Regulations

Two federal courts have recently upheld the INS' regulations defining managers and executives for L–1 intracompany transferee visa purposes. A federal district court in New York upheld the INS' denial of a sixth preference immigrant visa petition filed on behalf of a president of a Taiwanese company's U.S. subsidiary. The court held that although the INS considered the subsidiary's size, it did not place "undue emphasis" on this factor. *Fedin Brothers Co., Ltd. v. Sava*, 724 F. Supp. 1103 (E.D.N.Y. 1989). Similarly, the Fifth Circuit upheld the Service's denial of a sixth preference petition, finding that the INS' definition of "managerial capacity," which requires that an employee "primarily" direct operations, is not inconsistent with the INA. *National Hand Tool Corp. v. Pasquarell*, 889 F.2d 1472 (5th Cir. 1989).

The company in the first case, Fedin Brothers Co., Ltd., filed a sixth preference immigrant visa petition on behalf of Huy-Yin Chen, a citizen of Taiwan. Fedin, a plastic parts manufacturer, is incorporated in Taiwan and has a New York subsidiary. Mr. Chen, Fedin New York's president, holds a nonimmigrant L–1 visa valid until November 1990. The visa petition asserted that Mr. Chen qualified for Schedule A, Group IV blanket labor certification as an L–1 executive and manager under 20 CFR § 656.22(f)(1). Mr. Chen submitted affidavits stating that he performed and will continue to perform executive and managerial duties for Fedin New York.

The INS denied the petition, finding that Mr. Chen did not perform in an executive or managerial capacity. Mr. Chen, the Service said, is primarily providing all the subsidiary's services, not supervising managers. The INS' Administrative Appeals Unit (AAU) dismissed Fedin's appeal on the same ground. Fedin then filed a complaint in federal court. The INS filed a motion for summary judgment.

U.S. District Judge Leonard D. Wexler first noted that in general a reviewing court defers to the construction accorded a statute by the relevant agency. Courts have been especially deferential to INS decisions, he said, given the "respect for the Service's expertise in interpreting and administering the [INA]."

Judge Wexler then turned to the facts before him. The court pointed out that the Service's denial of Fedin's petition accords with congressional intent (724 F. Supp. at 1106 (citations omitted)):

INTERPRETER RELEASES, February 5, 1990

164

Appendix I

## Memorandum



C-1588-P

| Subject Family Fairness:  Guidelines For Voluntary Departure under 8 CFR 242.5 for the Ineligible Spouses and Children of Legalized Aliens | Date FEB   2 1990 |
|---|---|

| To | From |
|---|---|

Regional Commissioners            Office of the
    Eastern                         Commissioner
    Northern
    Southern
    Western

On November 13, 1987, the Service implemented guidelines on granting voluntary departure to the ineligible spouses and children of legalized aliens, the so-called "family fairness" policy.

The Service is likely to face the issue of family fairness for several more years, because of the length of time needed for newly legalized aliens to acquire lawful permanent resident status and then to wait for a visa preference number to become available for family members.  Accordingly, the Service is clarifying its family fairness policy, to assure uniformity in the granting of voluntary departure and work authorization for the ineligible spouses and children of legalized aliens.

Effective February 14, 1990, the following policy is to be implemented by all district directors in determining the eligibility for voluntary departure of ineligible spouses and children of legalized aliens.

1.    Voluntary departure will be granted to the spouse and to unmarried children under 18 years of age, living with the legalized alien, who can establish that they have been residing in the United States since on or before November 6, 1986, if

    - the alien is admissible as an immigrant, except for documentary requirements;

    - the alien has not been convicted of a felony or three misdemeanors committed in the United States;

    - the alien has not assisted in the persecution of any person or persons on account of race, religion,

nationality, membership in a particular social group or political opinion.

2.   Voluntary departure will be granted for a one-year period to aliens who meet these requirements. Cases will be reviewed on an annual basis thereafter by district directors to determine whether extensions of voluntary departure should be issued.

- A grant of voluntary departure based on family fairness will be terminated if the legalized family member loses his or her status.

- A grant of voluntary departure based on family fairness will be terminated if the alien fails to maintain the requirements outlined in Paragraph 1.

- A grant of voluntary departure issued pursuant to this policy shall not be terminated for the sole reasons that the legalized family member has become a lawful permanent resident.

3.   Documentary evidence must be submitted to establish

- the family relationship, through marriage certificates for spouses and birth or baptismal certificates for children and

- residence with the legalized alien, through a sworn affidavit, under penalty of perjury, by the legalized alien.

4.   Work authorization will be granted to aliens who qualify for voluntary departure under Paragraph One and as provided in Paragraph Two.

5.   In the case of a child born after November 6, 1986, no deportation proceedings shall be instituted as long as a parent maintains his or her status as a legalized alien.

The Legalization and Special Agricultural Worker Programs will eventually bring permanent lawful immigration status to nearly 3 million aliens. It is critical that the Service continue to respond to the needs of these aliens and their immediate family members in a consistent and humanitarian manner.

GENE MCNARY
Commissioner

I, George Gascón, declare:

1.    I am the District Attorney for the City and County of San Francisco. I have been the San Francisco District Attorney since 2011. Prior to becoming the District Attorney, I served as the San Francisco Chief of Police from August, 2009 through January, 2011. Before moving to San Francisco, I served as the Chief of Police in Mesa, Arizona for three years, and served in the Los Angeles Police Department for over twenty years. I have over 30 years' experience in law enforcement.

2.    The goal and mission of my agency is to make San Francisco the safest large city in America by working to implement a modern justice system that focuses on crime prevention, victims, and violent offenders. I believe we are safer together when we remove barriers for victims of crime, work with the community to address neighborhood concerns, and provide services to our city's most vulnerable populations.

3.    It is impossible to meet this goal and effectively police and prosecute if the communities you serve do not trust you. The absence of trust leads to reduced reporting of crimes and an unwillingness to work with law enforcement in order to ensure dangerous people are held accountable for their actions. This dynamic results in violent offenders getting away with crimes and recidivating because many members of our community are afraid to come forward. It is naïve to think that unreported crimes and criminals do not pose a threat that extends far beyond immigrant communities.

4.    Immigrants, and in particular undocumented immigrants, fear interactions with law enforcement and distrust government agencies. Research shows that 70 percent of undocumented immigrants polled in a 2013 study were less likely to contact law enforcement authorities if they were victims of a crime. What's worse, 44 percent of Latinos surveyed, not just undocumented immigrants, reported being less likely to contact police officers if they have been the victim of a crime because they fear that police officers will use this interaction as an opportunity to inquire into their immigration status or that of people they know. University of Illinois at Chicago, Lake Research Partners: Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement, May 2013.

5.    The current fear and distrust of law enforcement agencies is currently impacting my agency's ability to effectively ensure public safety. For example, my office recently prosecuted a domestic violence case that went to trial. At trial, a witness was cross-examined by a Deputy Public

Defender about her immigration status, with the line of questioning suggesting that she was testifying in order to secure a U-VISA for her cooperation. A judge ruled that the line of questioning was irrelevant, as the witness learned about the U-VISA program only after having reported the crime. The jury was unable to reach a verdict, and when we sought to retry the case the witness indicated she was unwilling to testify again in part due to the fact that her immigration status had become a focal point during the trial. As a result, we had to dismiss the case and the offender was not held accountable for his violent actions.

6.      That fear and distrust of law enforcement has a detrimental impact on public safety has been my historical experience as well. When I came to Mesa to serve as Chief of Police, the city was experiencing increased violent and property crime. During my tenure there we were able to reduce both kinds of crime substantially. However, during that same time, in the unincorporated area of Maricopa County policed by Joe Arpaio's Sheriff's Department, crime was increasing. Between 2004 and 2007, Sheriff Arpaio presided over a 69 percent *increase* in violent crime rates, a 166 percent *increase* in homicides, and a *plummeting* arrest rate. Bolick, Clint. "Mission Unaccomplished: The Misplaced Priorities of the Maricopa County Sheriff's Office." *Goldwater Institute*, 2 Dec. 2008. We found that a reason crime was going up just across city lines, while in similar communities within city limits crime was going down, was because we began to develop a relationship with our community members who were willing to report crime and work with us. In the case of the Maricopa County Sheriff's Department, people were afraid to report crimes because they did not know if they, or a neighbor, could be deported as a result.

7.      It is these experiences that have led me to take steps to ensure my office is accessible to all communities. For example, in 2013 my agency partnered with local community leaders to launch an immigration fraud public education campaign. The multilingual campaign in English, Spanish, and Chinese educated immigrant communities how to ensure an immigration consultant they had chosen was licensed or bonded. The campaign helped warn immigrant communities about scammers who made false claims of influence with government officials. Many were being defrauded by people who said they could move a client to the front of the line for work permits or U.S. visas. I have also moved our victim advocates out into the community in places where members of our immigrant community feel

1   safe coming to report crimes. It is my experience that undocumented immigrants often do not feel safe

2   entering the Hall of Justice due to the significant police presence.

3       8.    On a citywide basis, a key strategy is San Francisco's Sanctuary City status. This enables

4   victims and witnesses to report crimes without fear that there will be an inquiry into their immigration

5   status or someone they know.

6       9.    Establishing trust will remain difficult as long as undocumented immigrants feel unsafe

7   coming forward. That is why the language we are seeing from our President in the media, which is

8   making entire immigrant communities-our neighbors, friends and family-feel unsafe, is so harmful.

9   These statements are making our immigrant communities less likely to come forward and work with

10  authorities both as victims and witnesses. Our system only functions when the community works with

11  us, and it is incredibly difficult to make people feel like they are part of our community and to bring

12  them out of the shadows and ensure they feel safe reporting crimes to police when they often view local

13  law enforcement authorities as closely associated with the views and aims of the federal government and

14  this President.

15      10.    Having served in multiple states and jurisdictions, and working with various communities

16  as both a police officer and prosecutor, I have seen that public safety is highly dependent on cooperation

17  from all members of our community-including immigrants. In fact, a recent study from the University

18  of California, San Diego demonstrates the benefit of policies proven to enhance cooperation. Their

19  study found that there are broad benefits for local jurisdictions that resist complying with federal

20  immigration enforcement, concluding that there are, on average, 35.5 fewer crimes committed per

21  10,000 people in sanctuary jurisdictions compared to non-sanctuary counties. Wong, Tom. "The Effects

22  of Sanctuary Policies on Crime and the Economy." *Center for American Progress*, 26 Jan. 2017. The

23  study also found that working with federal immigration made it harder for local police agencies to

24  investigate crime because witnesses and victims who were in the country illegally were less likely to

25  come forward if they thought they risked being detained or deported.

26      11.    Based on my own experiences and studies such as the aforementioned, I can conclude

27  that my agency's ability to fulfill its mission depends on immigrants being able to come out of the

28  shadows and work with law enforcement without fear of immigration consequences.

---

12. The rescission of DACA will add to the number of undocumented persons in our community, will perpetuate mistrust of law enforcement authorities and further depress cooperation among immigrant communities with police. Therefore, the rescission of DACA will be detrimental to my agency's ability to maintain public safety and enforce the law.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on October 25, 2017, at San Francisco, California.

George Gascón
San Francisco District Attorney

I, Julie Lee, declare and state as follows:

1.    I am over the age of 18. I have personal knowledge of the matters stated herein, and if called as a witness, I could and would testify competently thereto.

2.    I am the Director of Operations for the California Governor's Office, a position I have held since July 2013. In that capacity, I oversee executive compensation, out-of-state travel, and human resource policies for state government. Prior to working as the Director of Operations, I was a manager at the California Department of Human Resources, where I was in charge of government reorganization.

3.    As of September 6, the State of California employs 48 DACA recipients. These individuals are employed in a variety of capacities, including a firefighter, corporation examiner, a registered nurse, and a psychiatric technician. These individuals work for at least 14 State agencies, including the Department of Social Services, Department of State Hospitals, Department of Developmental Services, and the Department of Corrections and Rehabilitation. Hiring these DACA recipients has helped to directly advance the goals of a diversified workforce that reflects the population served by the state workforce.

4.    The vast majority of these employees are civil servants, which means they were required to pass a competitive civil service examination. In addition to meeting minimum requirements for a particular position, departments will often look to hire employees who have additional, desirable skills that would be useful for a particular position, such as being multilingual, or having experience with a particular underserved community.

5.    In the event that Rescission is implemented and these individuals lose work authorization, each of these agencies will lose the benefit of employing these individuals and the unique talents and attributes they bring to State service. The loss of these valued employees will mean a loss of investment and resources that went into their hiring and training, and will impact the productivity of these agencies.

6.    In addition, these agencies will need to incur the administrative burden of terminating the employment of these individuals when their work authorization expires and expending resources to find, hire, and train replacement employees. The Governor's Office estimates that the average cost to replace a State employee is $15,000, which includes the amount of time necessary to post a vacancy, grade

0706

1  examinations, review applications, and interview potential candidates.  The actual cost may be

2  significantly higher for individual employees with unique skills and attributes.

3      7.  In addition, the Governor's Office has heard from a number of DACA recipients outside of

4  State employment who are concerned about the effect Rescission will have on educational and

5  employment opportunities, as well as the possibility of enforcement.  The Governor's Office has

6  diverted staff time and resources to addressing these concerns.

7

8  I declare under penalty of perjury under the laws of the United States that the foregoing is true and

9  correct and that this declaration was executed on October 27, 2017 in Sacramento, California.

11

12  JULIE LEE

---

2
DECLARATION OF JULIE LEE
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

I, NICK MELVOIN, DECLARE:

1.      I proudly serve on the Los Angeles Unified School District ("L.A. Unified") Board of Education ("Board") as the elected Board Member for the District 4 communities, which include portions of Hollywood, the San Fernando Valley and the Westside of Los Angeles.  I also serve as the Vice President of the L.A. Unified Board.

2.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness, I could and would competently testify to them.

3.      I understand that Plaintiff Saul Jimenez Suarez ("Mr. Jimenez") is an undocumented person serving as a special education teacher within an L.A. Unified school, and was hired as an intern credentialed teacher with authorization to work through the Deferred Action for Childhood Arrivals ("DACA") program.

4.      L.A. Unified has been at the forefront of ensuring that our students, families, employees, and community—regardless of immigration status—are welcome and supported in our schools.  This includes L.A. Unified's commitment to affording students a free public education aligned with the United States Supreme Court case of *Plyler v Doe*, which held that undocumented children have a constitutional right to receive a free public K-12 education to become "self-reliant and self-sufficient participant[s] in society" and to learn the "fundamental values necessary to the maintenance of a democratic political system."

5.      L.A. Unified's commitment is embodied in the numerous resolutions passed by the Board in support of immigration reform.

6.      For example, when DACA was implemented in 2013, the Board passed a resolution to establish the "DREAMers Program," a centralized process to assist students and graduates of L.A. Unified to obtain educational histories to support their DACA applications.  From 2013-2017, approximately 21,000 students and graduates availed themselves of the program.  This year, educational records for 719 students have been requested.  These figures alone show that L.A. Unified's students, graduates, and community will be significantly and irreparably impacted by the rescission of DACA.

7.     Additionally, on February 9, 2016, the Board passed a resolution entitled *LAUSD Campuses as Safe Zones and Resource Centers*, which declared every L.A. Unified site a place of support and resource for all students and families, regardless of immigration status.

8.     The Board also adopted the *Reaffirmation of Los Angeles Unified School District as Safe Zones for Families* resolution, which further propelled efforts to provide services to immigrant students and their families, including, but not limited to, (1) a reference guide in the event ICE agents seek access to students or student records; (2) a district-wide campaign to build awareness around immigrant students' rights called *We Are One L A Unified Standing With Immigrant Families*; (3) the Education & Immigration Resource Guide outlining academic, legal, health and wellness, and enrollment information for immigrant families and school communities; and, (4) opening a Center for Education & Immigration Resources in each local district, where families can access information on immigration, enrollment, healthcare services, and other supports.

9.     After the September 5, 2017 announcement on the rescission of DACA, L.A. Unified immediately distributed letters to schools, families, and employees about the termination of DACA and provided referrals to legal resources.  Superintendent Michelle King sent a letter to all employees denouncing the Presidential Administration's decision to end DACA and declaring L.A. Unified's unwavering support to all employees, including teachers in our classrooms and other employees, who may be affected by the rescission of the program.  We did this, in no small part, because we knew that even this announcement of the rescission would have immediate, devastating consequences for the students and families in our community.

10.    Prior to serving as an L.A. Unified Board Member, I served as an L.A. Unified middle school teacher for several years at Markham Middle School, initially serving through an intern credential program in partnership with Teach For America, whereby I provided instruction while simultaneously studying to obtain my teaching credential.  This internship program is similar to the one I understand Mr. Jimenez to be hired through.

11.    In general, L.A. Unified hires intern credentialed teachers for hard-to-fill positions that are experiencing teacher shortages, such as in the field of special education.  These hires are essential to

1    the L.A. Unified given the shortage of qualified candidates in these fields, and we rely on these

2    employees to continue within our teaching force for years to come.

3           12.    If employees like Mr. Jimenez do not have authorization to work, however, L.A. Unified

4    will not be able to hire or continue to employ such individuals to serve our students.

5           13.    Without the availability of intern-credentialed teachers like Mr. Jimenez to work with

6    special education students, L.A. Unified might be forced to resort to staffing special education

7    classrooms with short or long-term substitute teachers, which I believe to be particularly detrimental to

8    these students' academic achievement as well as to their social and emotional development.

9           14.    In addition to filling a high-need position, the shared experience between Mr. Jimenez

10    and our significant population of undocumented students is valuable in helping to ensure that our

11    schools create a safe and welcoming space for all in accordance with L.A. Unified's stated

12    commitments.

13           15.    The impact of the rescission of DACA will be especially dramatic in places like

14    California—and Los Angeles in particular—where there is an incredibly high number of DACA

15    recipients working and serving in their respective communities.

16           16.    L.A. Unified does not have a record of how many of its employees, including teachers

17    credentialed through internship programs or otherwise, are DACA recipients because employment

18    authorization documents do not provide that information and the District does not inquire about an

19    employee's immigration status.  However, based on the number of employees who have self-identified

20    as DACA recipients and based on third-party studies of DACA recipients, we believe that a significant

21    portion of our educator workforce may have DACA status.  For example, an August 2017 study by the

22    Migration Policy Institute found that, in 2014, approximately 14,000 "immediately eligible DACA

23    population" were in the Education, Training, and Library occupations, and I understand that a significant

24    portion of DACA participants reside in the Los Angeles Region.

25           17.    Additionally, according to Teach for America, more than 190 corps members and alumni

26    have DACA status and reach 10,000 students across 11 states, including California and the Los Angeles

27    region specifically, where teachers largely are placed in L.A. Unified schools or charter schools that are

28    authorized and overseen by L.A. Unified and by myself as an L.A. Unified Board Member.

18.   I believe that the rescission of DACA discriminates against this class of young immigrants like Mr. Jimenez in violation of the Equal Protection guarantee of the Fifth Amendment by depriving them of their substantial interests in pursuing a livelihood, including opportunities in higher education.

19.   I believe that the rescission of DACA will have a significant and negative impact on the DACA participants amongst our teaching force, and on our students and families who rely on those teachers to provide a high quality education and a supportive and welcoming environment.

20.   I believe that the announcement of the rescission of DACA has already had an immediate, significant, and negative impact on the DACA participants amongst our teaching force, and on our students and families who rely on those teachers to provide a high quality education and a supportive and welcoming environment.  I have spoken with several teachers with DACA status and they are particularly frustrated, dismayed, and discouraged because they used their DACA opportunity to be able to give back to the community they felt had given them so much.  The teachers I have spoken with came to work at L.A. Unified after they were granted work authorization because they felt that L.A. Unified and the community it supports provided them with opportunities for success.  Those opportunities are now unfairly being pulled out from underneath them.  These teachers have offered themselves as sources of comfort and as role models for students who are undocumented or who have undocumented family—and now both our teachers and those students have extra anxiety, worry, and stress to cope with on account of the recent announcement that DACA would be discontinued.  The educators I have spoken with are paralyzed with fear and are afraid to pursue any professional opportunities outside of L.A. Unified, one of the increasingly few places they feel supported and understood.  Further, our students are now not only terrified that their family members may be swept away, detained, deported, and disappeared at any moment, but that their trusted educators may be as well.

21.   Every child deserves an opportunity to dream without boundaries and I will not watch from the sidelines as this White House ignores the catastrophic implications of rescinding DACA.

DECLARATION OF NICK MELVOIN
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

App-342
SER770
0799

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 29, 2017, in Los Angeles, California.

_____

Nick Melvoin

I, Nancy E. O'Malley, declare and state as follows:

1. I am Nancy E. O'Malley, the elected District Attorney for the County of Alameda and have served as District Attorney since 2009;

2. I have worked in the Alameda County District Attorney's Office since 1984, beginning as a Deputy District Attorney. I served as the Chief Assistant District Attorney for the Office from 1999 until becoming the District Attorney of Alameda County. There are 410 employees, including 158 attorneys, 75 sworn peace officers, 40 Victim Assistants;

3. While Chief Assistant, I founded the Alameda County Justice Center (ACFJC), a one-stop center, with more than 30 onsite and over 50 offsite agencies providing comprehensive and collaborative responses to victims of domestic violence and their children, to victims of sexual assault and child sexual abuse, elder abuse and importantly, to victims of all forms of human trafficking. The ACFJC is also a place of empowerment for survivors. Children (0-5 years old) are learning to read and growing their vocabularies; their moms who have been victims of domestic violence are learning job skills and career paths; teens who have lived in homes with domestic violence are going to stay-away wilderness camp and receiving homework help; commercially sexually exploited minors are participating in the Young Woman's Saturday Program (YWSP) to begin their recovery from victimization to pathways for a safe, productive and healthy future. Forty-five percent (45%) of the clients at the ACFJC are mono-lingual Spanish and more than 100 languages are spoken. Many clients have quietly disclosed that they are in this country without documentation ("undocumented"). More than 125 young women have participated in the YWSP and several have disclosed that they are protected under DACA. The ACFJC is one of seven (7) Trauma Recovery Centers (TRC) in California providing psychological, behavioral health and health care services to clients;

4. I have worked closely with and supervised our Victim-Witness Assistance Division, which provides a variety of services for victims, witnesses, and their families recovering from the devastating impacts of crime. Annually, the staff works with nearly 10,000 victims and their families, providing nearly 90,000 victim services. The ACFJC serves an additional 14,000 clients per year, including women, their children and approximately 1,000 men;

5. Alameda County is extremely diverse. More than 500,000 of the 1,647,700 million residents were born outside the United States. Almost 650,000 Alameda County residents speak a language other than English at home. The Hispanic community is 22.5% in Alameda County, which also hosts one of the largest Asian immigrant population (30.2%) including Indian, Pakistani, Vietnamese, and Chinese populations, as well as smaller clusters of a dozen other nationalities. More than 136 languages are spoken at home by children who attend Fremont schools alone. Particularly for the Latino and Asian immigrants, there is a cultural distrust of government where, in many countries of origin, the government and particularly law enforcement, were corrupt and dangerous.

6. As a result of the large immigrant population, I have increased the diversity of the Victim-Witness Assistance staff as well the administrative, investigative and attorney staff to reflect the communities we serve. I have created a "Diversity and Shared Community Committee" led by Nahid Aria who is an immigrant from war torn Afghanistan with several Office members who themselves are immigrants. One primary purpose of our Diversity Plan is to work with immigrant communities to build trust and faith that the Office serves them with dignity, respect and honesty. We publish materials for crime victims in several languages, including Spanish, Chinese, and Farsi. Many of our employees are bilingual, and are available to speak with immigrants in their native languages. Through our efforts, I and my staff have also worked closely with young individuals who are immigrants to America and are protected by DACA.

7. My experience in dealing with immigrants and especially with immigrants in this country without documentation is extensive. I have worked with those accused of crimes, with victims of crime, and with organizations that provide services to or advocate for immigrants and particularly those without documentation. It is undeniable that immigrant communities live in fear of being attacked or targeted by those motivated by hate and prejudice. It is undeniable that many immigrant communities have a fear and distrust of government and law enforcement agencies, including my Office based on their experiences or the culture of countries of origin. With current climates across our country, I and we are seeing more immigrants, especially

2

DECLARATION OF NANCY E. O'MALLEY
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

**App-345**

SER882

those without documentation, refusing to seek services or to participate in programs. Those programs include children attending school, seeking medical care as a result of a crime, or going to work. More particularly for undocumented immigrants, we are aware that large numbers of victims of crimes such as human trafficking, domestic violence and sexual assault, robberies and hate crimes are not reporting or are refusing to cooperate with law enforcement or the Office. Many are afraid to come forward and testify in court for fear of being detained by ICE and/or deported. I have been a co-signor of a letter to the United States Attorney General requesting that Courthouses be treated as "safe havens" for victims of crime. The response was not encouraging for those victims who fear ICE and/or deportation, which plainly stated, is keeping them away from my Office or the Courts;

8. I am aware that for many victims of crime, they fear their own deportation, or deportation of their DACA protected children. Many are reaching out to organizations that serve immigrant populations to seek the establishment of legal structures that will protect and care for their American born children if they are deported.

9. The District Attorney's Office cannot proceed with a prosecution without a witness or victim to testify in Court. Through our Hate Hotline, we receive calls reporting hate crimes, but more often than not, the victim of the alleged hate crime will not come forward. Under some circumstances, we would say "the victim is not cooperative" but with immigrant populations, particularly those without documentation, their fear is overwhelming and driving them further underground. The current political climate leaves the victims defenseless and leaves the District Attorney's Office powerless to hold offenders accountable;

10. It is impossible to list every incident where a crime witness or victim was reluctant to cooperate with this Office, but the following serve as examples:

    a. The Office's Environmental Protection Division was called upon to investigate the death of workers in an electroplating shop in East Oakland. While investigating the homicide, the Office learned that the owner of the shop deliberately hired undocumented immigrants from Latin American Companies. These workers were underpaid, and worked under deplorable conditions without adequate safety equipment.

3

DECLARATION OF NANCY E. O'MALLEY
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

**App-346**

**SER883**

1   The Office learned that there had been several previous incidents in which

2   undocumented workers became seriously ill as a result of exposure to toxic chemicals.

3   Some of the surviving workers, who cooperated with the homicide investigation,

4   explained that they never reported the low wages, the substandard equipment, the

5   dangerous conditions, or the prior injuries because they feared they would be deported.

6   Had these witnesses come forward, the Office would have prosecuted the crimes under

7   existing environmental and worker protection regulations.  Such a prosecution would

8   in all likelihood prevented the deaths of these exploited workers;

9   b.   Through an investigation of a human trafficking case in cooperation with other law

10  enforcement agencies, the Office uncovered a ring of brothels operating in and around

11  Alameda County.  The Office learned that the woman working in these brothels were

12  undocumented Asian women, coerced into working by brothel owners.  Their passports

13  were confiscated.  The women were confined to a building or a residence where they

14  were obliged to engage in the sex trade.  Investigative surveillance of these residences

15  revealed that the women would be moved from one brothel to another every ten days.

16  While confined to the brothel, the women did not leave the building for the entirety of

17  their stay.  Investigators were able to close the brothels and to arrest the local managers

18  of the brothels.  The women who worked in the brothels, were not arrested.

19  Investigators were able to obtain sufficient information to successfully prosecute the

20  local operators; however, the women who had been trafficked were reluctant to make

21  statements.  Consequently, the investigation was unable to uncover the higher level

22  operators of this human trafficking operation;

23  c.   A girl of fourteen or fifteen years old was found murdered behind a dumpster at the

24  back of a restaurant in Castro Valley.  Her identity was unknown and investigators

25  were unable even to identify her.  As it was discovered, the young woman was in

26  America without documentation.  As a result, no missing person report had been filed.

27  Without knowing who the victim was, investigators were left with very few leads.

28  Investigators found no witnesses to the crime itself, but through a series of interviews

4

with witnesses, many of whom were themselves undocumented, they were eventually
able to learn her name, and to contact her family in Mexico.  With this information,
they were able to establish that she had come to live with a family friend in the United
States.  With this information, the investigators were able to learn additional facts that
led this Office to charge the family friend with the young girl's murder.  Because of the
girl's undocumented status, however, it took so long to identify her that the defendant
was able to flee to Mexico before the police even became aware of his identity.  Efforts
to locate and extradite the defendant for trial have been hampered in part by the fact
that some of the undocumented witnesses have moved on or otherwise no longer
willing or available to testify.  To this day, the defendant has not faced justice for this
horrible murder of this innocent girl;

11. As stated above, the Office has implemented strategic initiatives to reach out to the immigrant
community to foster a spirit of trust, engagement and cooperation.  Throughout my tenure as
District Attorney, I have emphasized the value of diversity and inclusiveness in the conduct of
the Office.  I have made sure that my Office reaches out to all members of the Alameda
County community, including the many immigrants who call Alameda County their home.
We have maintained a presence in immigrant communities through speaking engagements or
by maintaining information booths during fairs or festivals celebrated by these communities
within our county.  We have assisted victims in seeking "U" or "T" visas."  We provide contact
information and identify resources that will enable ever victim of crime to seek the protection
of the criminal justice system, regardless of country of origin or of immigration status.  We
seek to stress that it is the voice, and not the language of our residents that matters.  However,
we are seeing a decline in engagement of victims of crime from immigrant communities;

12. Despite the Office's best efforts, establishing trust with the immigrant community remains
difficult.  While the Office can assure our victims that we will not ask them for their legal
status, and that we will not take steps to reveal their identities to immigration authorities, we
can make no promises as to what federal immigration authorities will do.  In the current
climate, it is very difficult to convince undocumented victims or witnesses to reveal

5

1    themselves to the criminal justice system because they believe that in so doing they expose

2    themselves to arrest, detention or deportation.

13.  If the Alameda County District Attorney's Office is to continue our mission to protect all of

our residents, we need to assure all victims, especially those without documentation, that they

will not be penalized for stepping forward to tell the truth. Our ability to convince them to

step forward therefore depends on our ability to truthfully inform and convince them that they

have no reason to fear law enforcement or government agencies.

14.  The Deferred Action for Childhood Arrivals (DACA) program is one important tool available

to the Office in protecting residents without documentation. For those who participate, DACA

provides the federal government's assurance that they will not be penalized for cooperating

with the Office. DACA participants know they are able to call the police when they have been

victimized without fear that they will be arrested instead of the criminals who have attacked

them. DACA also benefits others in our community because DACA participants feel free not

only to speak up in their own defense, but also to testify as witnesses for victims of crime who

are here without documentation, who might otherwise be rendered voiceless by their fear of

governmental agencies. However, those victims and other individuals in the community, in

our colleges and in the workplaces, who are currently protected by DACA, are living in dire

fear of losing their residency status in America. Many have shared with me that they have no

memory of nor do they know anyone in their country of origin. There is no question that the

uncertainty of their future is causing tremendous trauma to them and yet, their fear is also

keeping them away from services;

15.  Based on the foregoing, I conclude that the rescission of DACA will be detrimental to my

Office's ability to provide, ensure or uphold public safety and enforcement of the law for all

who live, work or travel into Alameda County.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this declaration was executed on the 24th day of October, 2017.

NANCY E. O'MALLEY
District Attorney of Alameda County

I, JEFFREY F. ROSEN, declare:

1.     I am the District Attorney of Santa Clara County.  Santa Clara County is the sixth largest county in California.  The City of San José is the largest city within Santa Clara County.

2.     I have held this office since January 2011.  Prior to being elected District Attorney, I served as a Deputy District Attorney for 15 years and prosecuted a variety of criminal cases including burglary, robbery, domestic violence, sexual assault, and murder.

3.     Justice and public safety are central to our mission, and we achieve both by working collaboratively with the communities that we serve.  We only know about crimes because community members call the police.  We only secure evidence because community members tell us what they know.  We only prosecute successfully when community members cooperate with us and show up in court.  We only determine just resolutions because community members talk to us freely and without fear.  Accordingly, cooperation and trust between our office and the community that we serve is of vital importance to our mission.  Historically, we have struggled with criminal defendants who try and dissuade witnesses and victims from testifying, but now we struggle when Federal authorities, effectively do the same in service of immigration politics by making immigrant communities fearful of the government, going to court, or cooperating with law enforcement.

4.     Immigrants make up close to 40 percent of the population of Santa Clara County.  They are a vital, dynamic and major part of our community.  Most of these immigrants are documented.  Of those who are undocumented, most are living with citizens and many are living with their own citizen children.  While I understand that immigration is in the purview of the federal government, these federal actions can have devastating impacts on my office's ability to pursue justice and promote public safety for Santa Clara County residents.  For example, when immigrants, particularly undocumented immigrants, fear interaction with law enforcement or government officials, then they fail to report crimes, they are victims of violence and exploitation, they are frightened to show up and testify.  Of course, a mugger doesn't ask for your papers before mugging you, so our failure to protect our immigrants means all of our community members are less safe.  As part of my core mission, both I personally and my deputies cultivate rich connections between my office and the immigrant community.

1

1  I know from this experience firsthand that recent federal actions and rhetoric have triggered

2  unprecedented fear of law enforcement and government in this community.

3      5.      When immigrants in our community, and their friends and family members, fear and

4  distrust our police and prosecutors, they can no longer cooperate freely with us.  This is devastating to

5  our mission.

6      6.      My office does a large amount of work to foster trust with immigrant communities.

7      ▪  We conduct frequent outreach to community and church groups, and through the media

8         to send the message that we will prosecute crimes to protect victims, without regard to

9         whether the victim, or any witness is documented.  Moreover, we have conducted

10        outreach to state to the public that our office does not collect or share information on

11        immigration status.

12     ▪  The District Attorney's Office has taken a lead role in Santa Clara County to foster trust

13        and cooperation with our immigrant communities and law enforcement agencies. In

14        2017, I, and my community prosecutors, spoke before thousands of Latino residents at

15        the area's most respected and populous churches: Sacred Heart, Our Lady of Guadalupe

16        and St. Joseph's Cathedral, all located within the City of San José. The message,

17        delivered in Spanish and English, emphasized that the DA's Office does not ask about or

18        need to know the immigration status of crime witnesses and victims. I quoted The Rev.

19        Martin Luther King: "It is not possible to be in favor of justice for some people and not

20        be in favor of justice for all people."  Echoing the civil rights leader, I told them:

21        "Nothing is more important than Justice, and one person cannot be above or beneath its

22        protection. As the District Attorney of Santa Clara County, I say to everyone in this

23        community that we will do our duty to fight for you as a victim of a crime regardless of

24        your legal status. Human dignity requires no less." My Office has held more than 30

25        "notario" fraud presentations in Spanish and Vietnamese; participated in an Immigration

26        Forum at Santa Clara Law School; participated in a series of immigration resource fairs;

27        sits on the county's Immigration Task Force, and has vigorously prosecuted and

28        publicized cases of "notario" and immigration fraud.

2

1      ▪   We evaluate cases that are not serious or violent to determine whether there is a

2         collateral consequence that outweighs the regular criminal punishment. In those

3         instances, where a severe immigration, employment, military or educational

4         consequence to a certain kind of criminal conviction would result, we offer to change the

5         charge and INCREASE the punishment for the new charge so that the defendant can

6         avoid that collateral consequence. All such offers of resolution are also available to

7         someone who does not have a collateral consequence.

8      ▪   For several years we have evaluated our prosecutions for driving on a suspended license

9         for failure to pay DMV fines and fees, to change some of those where the accused had

10         little or no criminal record, to the infraction of driving on a suspended license (fines and

11         fees but no jail time) rather than a misdemeanor (where jail time is possible) to prevent

12         the incarceration of people who had their licenses suspended largely for failure to pay a

13         fine or fee. Many of those individuals, like so many residents in our County, are

14         immigrants for whom the fear of incarceration was assuaged.

15      ▪   My office works closely with the San José Police Department, which likewise conducts

16         outreach intended to foster a close and productive relationship with the immigrant

17         community. San José police officers do not collect or share information about the

18         immigration status of members of the public who report crimes.

19      7.      The District Attorney's Office employs at least one DACA recipient who makes vital

20 contributions to the office's efforts to connect with Santa Clara County residents and to promote safety

21 and justice for all county residents.

22      8.      Despite these efforts, establishing and maintaining trust with the immigrant community

23 remains a challenge. This is because I cannot guarantee their safety or the integrity of their families

24 when the threat of indiscriminate deportation remains a constant threat. Casting our DACA youth from

25 the embrace of our community back into the shadows only increases the number of community members

26 who will fear working with us and will inevitably harm the trust we have worked so hard to build.

27

28

DECLARATION OF JEFFREY F. ROSEN
All DACA Cases (Nos. 17-5211, 17-5235, 17-5329, 17-5380, 17-5813)

App-353
SER982
1289

1    9.    Accordingly, the core mission of my office in pursuing justice and protecting the public

2    is compromised when immigrants live in fear of the government.  The rescission of DACA will only

3    heighten this fear and vitiate the mission of my office.

4    10.    Therefore, rescinding DACA is detrimental to the ability of the Office of the District

5    Attorney to provide for public safety and enforce the law in Santa Clara County.

6        I declare under penalty of perjury under the laws of the United States that the foregoing is true

7    and correct.

8        Executed on ___10/27___, 2017, in San José, California.

9

10                        _Jeffrey F. Rosen_____

11                        JEFFREY F. ROSEN

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28