# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

|  |  |
|---|---|
| STATE OF TEXAS, ET AL., | |
| Plaintiff | |
| v. | |
| UNITED STATES OF AMERICA, ET AL., | Case No. 1:18-cv-00068 |
| Defendants | |
| and | |
| KARLA PEREZ, ET AL., | |
| Defendants-Intervenors | |

## BRIEF OF *AMICI CURIAE* THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW, ANTI-DEFAMATION LEAGUE, THE LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND ECONOMIC JUSTICE, AND THE MISSISSIPPI CENTER FOR JUSTICE IN SUPPORT OF INTERVENOR DEFENDANTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Jon Greenbaum
Dariely Rodriguez
Dorian Spence
Phylicia Hill
The Lawyers' Committee for
Civil Rights Under Law
1401 New York Avenue NW
Washington, DC  20008
(202) 662-8600

*Attorneys for Amicus Curiae*
*The Lawyers' Committee for*
*Civil Rights Under Law (Of Counsel)*

Dated:  July 21, 2018

William D. Coston* (*pro hac vice*)
Martin L. Saad (*pro hac vice*)
Sameer P. Sheikh (*pro hac vice*)
S. Tyler Hale (of counsel)
Venable LLP
600 Massachusetts Avenue NW
Washington, DC  20001
(202) 344-4813

Alper T. Ertas
Venable LLP
101 California Street – Suite 3800
San Francisco, CA  94111
(415) 343-3214
Texas Bar No. 24065207
S.D. Texas Bar. No. 2780716

*Counsel for Amici Curiae*
*Attorney-in-charge*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, *amici curiae* the Lawyers' Committee for Civil Rights Under Law, the Anti-Defamation League, the Lawyers' Committee for Civil Rights and Economic Justice, and the Mississippi Center for Justice certify that *amici* are not publicly held corporations, that *amici* do not have parent corporations, and that no publicly held corporation owns ten percent or more of their stock.

Dated: July 21, 2018

*/s William D. Coston*
William D. Coston (*pro hac vice*)
VENABLE LLP
600 Massachusetts Ave NW
Washington, DC 20001
(202) 344-4813
wdcoston@venable.com

*Counsel for Amici Curiae*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................................i

STATEMENT OF INTEREST OF *AMICI CURIAE[1]* .............................................1

INTRODUCTION .............................................................................................2

ARGUMENT ....................................................................................................4

I.   PLAINTIFFS' REQUEST FOR AN INJUNCTION IS
     UNTIMELY ..........................................................................................4

II.  A PRELIMINARY INJUNCTION SUSPENDING OR
     REVOKING DACA WOULD CAUSE SUBSTANTIAL AND
     IRREPARABLE HARM ..........................................................................5

     A.   Harm to DACA Students, Educators, and Educational Institutions .........6

     B.   Harm to DACA Homeowners, Their Communities, and Lending
          Institutions......................................................................................10

     C.   Harm to Vital U.S. Military Interests Served by DACA Recipients ......12

III. THE REQUESTED RELIEF IS AGAINST THE PUBLIC
     INTEREST ...........................................................................................14

CONCLUSION .................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*NAACP v. Trump*,
   298 F. Supp. 3d 209 (D.D.C. 2018) ...................................................................... 3

*Plyler v. Doe*,
   457 U.S. 202 (1982) ............................................................................................. 6

*Regents of the Univ. of Cal. v. United States Dep't of Homeland Sec.*,
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) .............................................................. 3

*Texas v. United States*,
   86 F. Supp. 3d 591 (S.D. Tex. 2015) (Hanen, J.) ........................................... 4, 5

*Vidal v. Nielsen*,
   279 F. Supp. 3d 401 (E.D.N.Y. 2018) ........................................................... 3, 5, 6

**Other Authorities**

Alex Horton, *The military looked to 'dreamers' to use their vital
   skills. Now the U.S. might deport them*, Wash. Post (Sept. 7, 2017),
   https://www.washingtonpost.com/news/checkpoint/wp/2017/09/07/
   the-military-looked-to-dreamers-to-use-their-vital-skills-now-the-
   u-s-might-deport-them/ .................................................................................... 14

Alexander Casey, *An Estimated 123,000 'Dreamers' Own Homes and
   Pay $380M in Property Taxes*, Zillow (Sept. 20, 2017),
   https://www.zillow.com/research/daca-homeowners-380m-taxes-
   16629/ ................................................................................................................ 11

Alice Yin, *Education by the Numbers*, N.Y. Times (Sept. 8, 2017),
   https://www.nytimes.com/2017/09/08/magazine/education-by-the-
   numbers.html ...................................................................................................... 8

Angelo Gaunichaux, *What the US Economy Would Look Like Without
   DACA*, Longhorn Global Biznet (Oct. 13, 2017),
   http://sites.utexas.edu/longhornglobalbiznet/US-economy-without-
   DACA/ ................................................................................................................ 15

*Creating an Anti-Bias Learning Environment*, Anti-Defamation League (ADL), https://www.adl.org/education/resources/tools-and-strategies/creating-an-anti-bias-learning-environment (last visited July 12, 2018).................................................................10

*DACA Population Data*, U.S. Citizenship & Immigr. Serv. (May 31, 2018), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_May_31_2018.pdf .....................17

Dianne Solis and James Barragán, *U.S. could lose an estimated 20,000 teachers, many bilingual, as DACA is phased out*, Dall. News (Oct. 5, 2017), https://www.dallasnews.com/news/immigration/2017/10/05/us-lose-estimated-20000-teachers-many-bilingual-daca-phased ............................16

*The Economic Impact of DACA*, Hous. Hisp. Chamber, https://www.houstonhispanicchamber.com/assets/docs/Economic%20Impact%20of%20DACA%20white%20paper3.pdf (last visited July 12, 2018)..............................................................16, 17

Elise Gould, *Local public education employment may have weathered recent storms, but schools are still short 327,000 public educators*, Econ. Pol'y. Inst. (Oct. 6, 2017), https://www.epi.org/publication/teacher-employment-may-have-weathered-recent-storms-but-schools-are-still-short-327000-public-educators/ ......................................................................7

Greg Toppo, *20,000 DACA teachers at risk — and your kids could feel the fallout, too*, USA Today (Oct. 11, 2017, 7:00 AM), https://www.usatoday.com/story/news/2017/10/11/thousands-daca-teachers-risk/752082001/.................................................9

Ike Brannon, *The Economic and Budgetary Cost of Repealing DACA at the State Level*, Cato Inst.: Cato at Liberty (Aug. 31, 2017 4:13 PM), https://www.cato.org/blog/economic-budgetary-cost-repealing-daca-state-level ...........................................................15, 16

Lisette Partelow et al., *America Needs More Teachers of Color*, Ctr.
for Am. Progress (September 14, 2017, 9:00 AM),
https://www.americanprogress.org/issues/education-k-
12/reports/2017/09/14/437667/america-needs-teachers-color-
selective-teaching-profession/ ................................................................. 8

Liz Robbins, *For Teachers Working Through DACA, a Bittersweet
Start to the School Year*, N.Y. Times (Sept. 7, 2017),
https://www.nytimes.com/2017/09/07/nyregion/daca-teachers.html ................. 9

Memorandum from Janet Napolitano, Sec'y of Homeland Sec.,
*Exercising Prosecutorial Discretion with Respect to Individuals
Who Came to the United States as Children* (June 15, 2012),
https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-
discretion-individuals-who-came-to-us-as-children.pdf ...................................... 2

Mia Ibarra, *The National Dream Act:  What's at stake for Texas?*, Ctr.
for Pub. Pol'y Priorities (Dec. 18, 2017),
https://forabettertexas.org/images/EO_2017_Texas_DREAM_Act_
Fiscal_Impacts_Final.pdf ................................................................. 15

*Military Accessions Vital to National Interest (MAVNI) Recruitment
Pilot Program*, U.S. Dep't of Def.,
https://www.defense.gov/news/MAVNI-Fact-Sheet.pdf. ........................... 12, 13

Misha E. Hill and Meg Wieche, *State & Local Tax Contributions of
Young Undocumented Immigrants*, Inst. on Tax'n & Econ. Pol'y
(updated April 2018), https://itep.org/wp-
content/uploads/2018DACA.pdf. ....................................................... 17

Moriah Balingit, *As DACA winds down, 20,000 educators are in
limbo*, Wash. Post (Oct. 25, 2017),
https://www.washingtonpost.com/local/education/as-daca-winds-
down-20000-educators-are-in-limbo/2017/10/25/4cd36de4-b9b3-
11e7-a908-a3470754bbb9_story.html (citing data provided by the
Migration Policy Institute) ................................................................. 7

National Center for Education Statistics, 2016 Digest of Education
Statistics at Table 209.10,
https://nces.ed.gov/programs/digest/d17/tables/dt17_209.10.asp ........................ 8

*The National Homeownership Strategy:  Partners in the American Dream*, U.S. Dep't of Housing and Urb. Dev. (May 1995), https://www.globalurban.org/National_Homeownership_Strategy.pdf ................................................................................ 10

*Quarterly Residential Vacancies And Homeownership, First Quarter 2018*, U.S. Census Bureau (last updated Apr. 26, 2018 10:00 AM), https://www.census.gov/housing/hvs/files/currenthvspress.pdf ........................ 12

Seth Gershenson et al., *The Long-Run Impacts of Same-Race Teachers,* IZA Inst. of Lab. Econ. (Mar. 2017) at 2, http://ftp.iza.org/dp10630.pdf ............................................................. 9

Statement of Nancy E. Weaver, Department of Defense Senior Language Authority, Before the House Armed Services Committee Subcommittee on Oversight and Investigations (June 29, 2010), http://prhome.defense.gov/Portals/52/Documents/RFM/Readiness/DLNSEO/docs/Weaver%20Testimony%20062910.pdf .................................... 13

Tom K. Wong, *Results from Tom K. Wong et al., 2017 National DACA Study*, Ctr. for Am. Progress (Oct. 7, 2017), https://cdn.americanprogress.org/content/uploads/2017/11/02125251/2017_DACA_study_economic_report_updated.pdf. ...................................... 11

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici*, the Lawyers' Committee for Civil Rights Under Law, the Anti-Defamation League, the Lawyers' Committee for Civil Rights and Economic Justice, and the Mississippi Center for Justice, are national and regional civil rights groups and social justice organizations, each committed to the promotion of civil liberties, in the Southern District of Texas and throughout the country, and the elimination of discrimination in any form.[2]   *Amici* are particularly well suited to offer *amicus* assistance to this Court based on their experience working on immigration issues.   *Amici* have observed firsthand the ways in which DACA has improved the lives of undocumented young people and enabled them to make significant social and economic contributions that have made our country greater.

---

[1] *Amici* submit this brief with an accompanying consent motion for leave to file as all parties have consented to its filing.  No counsel for a party has authored this brief in whole or in part, and no party or counsel for a party has made a monetary contribution intended to fund the preparation or submission of the brief.  No person other than amici or their counsel has made a monetary contribution to the preparation or submission of this brief.

[2] List of Individual *Amici Curiae* with Statements of Interest is set forth in the Appendix at A-1.

## INTRODUCTION

*Amici* submit this brief in support of Intervenor Defendants' opposition to the Plaintiff States' motion for a preliminary injunction, which seeks to enjoin the federal government "from implementing the 2012 memorandum that created DACA [Deferred Action for Childhood Arrivals]. . . ."  Mot. for Prelim. Inj. at 4, Dkt. 5.

DACA, announced on June 15, 2012, provided eligible undocumented immigrants deferred action, subject to approval of an initial application and renewal every two years thereafter.  The federal government specifically targeted DACA recipients as "productive young people,"[3] implicitly contemplating that they would be contributive members of our society, and that the nation would benefit from their social and economic contributions.  The government concluded that, with the opportunity to invest in themselves and in the favorable business climate of the United States, DACA recipients would be induced by the promise of being able to achieve financial security for themselves and their families.  The States and the federal government, in turn, would benefit from an increased population of legally employable workers, who pay taxes and make significant contributions to the economy.  As set forth in more detail below, DACA recipients have fulfilled those

---

[3]     *See* Memorandum from Janet Napolitano, Sec'y of Homeland Sec., Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

promises and more over the past six years, serving their communities and our country as educators, home owners, and military service members.

In September 2017, the federal government abruptly eliminated DACA, adversely impacting hundreds of thousands of childhood arrivals who, in an effort to play by the rules, had come out of the shadows to enroll.  Recognizing the massive and irreparable harm that would result from rescinding DACA, three federal district courts have preliminarily enjoined the government's 2017 action, preserving the status quo – allowing DACA recipients to continue to work, teach and study, pay down mortgages, and serve in the military – pending a full adjudication on the merits.  *See NAACP v. Trump*, 298 F. Supp. 3d 209, 249 (D.D.C. 2018); *Vidal v. Nielsen*, 279 F. Supp. 3d 401, 438 (E.D.N.Y. 2018); *Regents of the Univ. of Cal. v. United States Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1049 (N.D. Cal. 2018).

The relief sought by the present motion—which intervenor Defendants and *amici* oppose—would alter the status quo, years after DACA implementation, and conflict with three U.S. District Court injunctions maintaining DACA, leading to mass confusion.  The federal government itself argues that, "[i]n similar situations, courts have typically held that *the appropriate course is for a district court to refrain from issuing a conflicting injunction*."  Fed. Defs' Resp. to Pltfs' Mot. for Prelim. Inj., Dkt. 71, at 17 (emphasis added).  Plaintiffs' motion should be denied.

# ARGUMENT

As set forth below, contrary to Plaintiffs' arguments, (1) the delay in bringing this case will injure DACA recipients; (2) the balance of equities favors the status quo; and (3) a preliminary injunction is against the public interest.

## I.   PLAINTIFFS' REQUEST FOR AN INJUNCTION IS UNTIMELY

In late 2014, certain of the present Plaintiff States, along with approximately nine other states, filed suit in this Court, seeking a preliminary injunction against the United States to prevent implementation of 2014 Deferred Action for Parents of Americans and Lawful Permanent Residents ("DAPA").  DAPA would have provided deferred action to approximately 3.6 million unauthorized immigrants.

In that litigation, as this Court emphasized in its February 2015 opinion granting a preliminary injunction, "[the DAPA] case does not involve the Deferred Action for Childhood Arrivals ("DACA") program."  *Texas v. United States*, 86 F. Supp. 3d 591, 606 (S.D. Tex. 2015) (Hanen, J.) ("*DAPA*").  And the injunction granted there "does not enjoin the previously instituted 2012 DACA program except for the expansions created in . . . DAPA."  *Id.* at 678.

While arguing that DACA was illegal, the plaintiff states in the DAPA litigation deliberately sought not to challenge DACA.  Now, having waited nearly four years from the initiation of the prior suits, the Plaintiff States here have elected to do what they chose not to do previously:  formally challenge DACA, arguing that

4

it is illegal for the same reasons as DAPA.  But in the interim, nearly 800,000 people—including over 100,000 in Texas alone—have relied on DACA to create and continue meaningful and beneficial lives in the United States.

In contrast to *DAPA*, this lawsuit comes many years *after* DACA recipients have obtained deferred action.  They are already, and continue to be, enrolled in school, working in their communities, paying taxes, paying mortgages, driving under license, and serving in the military, all to the country's benefit.

## II.    A PRELIMINARY INJUNCTION SUSPENDING OR REVOKING DACA WOULD CAUSE SUBSTANTIAL AND IRREPARABLE HARM

As the Eastern District of New York explained in the first sentence of its decision preliminarily enjoining DACA rescission, "[s]ince 2012, nearly 800,000 DACA recipients have relied on [DACA] to work, study, and keep building lives in this country."  *See Vidal v. Nielson*, 279 F. Supp. 3d 401, 407 (E.D.N.Y. 2018) (Garaufis, J.).  In that case, the challengers "extensively documented the irreparable harms they will suffer if the DACA program ends."  *See id*. at 434.

By suffering the loss of deferred action, for instance, DACA recipients would lose their work authorization, becoming legally unemployable in this country.  *Id.* Some DACA recipients would also lose their employer-sponsored health care coverage, endangering the recipients and their families, and imposing burdens on public health systems.  *Id.*  Other DACA recipients could lose their homes or need to drop out of school.  *Id.*  And employers would suffer significant economic losses

due to their inability to hire or retain DACA recipients.  *Id.*  These exact same harms would ensue from the preliminary relief sought by Plaintiffs here.

Plaintiff States give short shrift to these harms, arguing *inter alia* that DACA recipients should not have relied on a discretionary grant.  That simplistic argument ignores the many years in which DACA recipients have participated in and contributed to their communities and our country.  Their engagement is highlighted in the areas of education, home ownership, and military service—fundamental pillars of American society.  In these areas, the harms that would ensue from DACA suspension or revocation are manifest as discussed below.

### A.    Harm to DACA Students, Educators, and Educational Institutions

Access to education is vitally important to all persons in the United States— whether citizens, lawful permanent residents, or undocumented persons.  *See Plyler v. Doe*, 457 U.S. 202, 226 (1982).  DACA recipients have invested in their education, sought job-specific training, and enrolled as students in institutions of higher learning.  Public schools and institutions of higher learning have extended opportunities and resources to individuals as students and educators on the basis of and in reliance on applicants' DACA protected status.  The requested relief would immediately and irreparably betray these interests.

Through DACA, tens of thousands of undocumented persons have gained access to higher education.  And many of those individuals, once educated, have entered the education profession as teachers.

DACA educators are a significant asset to our nation's public schools; especially in cities with large, immigrant student populations.  An estimated 20,000 DACA recipients are employed as educators throughout the U.S., and many of them possess in-demand bilingual language skills.[4]  There is currently a severe nationwide shortage of teachers in the public education sector, estimated to be as high as 327,000 public educators.[5]  The consequences of a shortage in public education employment are well known:  larger class sizes, fewer teacher aides, fewer guidance counselors, and fewer extra-curricular activities.

Further, in the past few decades, the racial makeup of the country's student population has drastically shifted, but the overwhelming majority of public school

---

[4]     Moriah Balingit, *As DACA winds down, 20,000 educators are in limbo*, Wash. Post (Oct. 25, 2017), https://www.washingtonpost.com/local/education/as-daca-winds-down-20000-educators-are-in-limbo/2017/10/25/4cd36de4-b9b3-11e7-a908-a3470754bbb9_story.html (citing data provided by the Migration Policy Institute); *see also* Greg Toppo, *20,000 DACA teachers at risk — and your kids could feel the fallout, too*, USA Today (Oct. 11, 2017, 7:00 AM), https://www.usatoday.com/story/news/2017/10/11/thousands-daca-teachers-risk/752082001/.

[5]     Elise Gould, *Local public education employment may have weathered recent storms, but schools are still short 327,000 public educators*, Econ. Pol'y. Inst. (Oct. 6, 2017), https://www.epi.org/publication/teacher-employment-may-have-weathered-recent-storms-but-schools-are-still-short-327000-public-educators/.

teachers continue to be white.[6]  Public schools have seen increased enrollment by students of color, especially by Latinos.[7]  By 2025, it is expected that a majority of high school graduates will be students of color.[8]  DACA has allowed schools to recruit qualified teachers with whom their students can identify.

In already resource-strapped school districts, DACA educators do much more than just fill available positions; they also serve as mentors and role models to minority students.  For many communities, DACA educators mirror the experiences of their immigrant students, which informs their teaching with cultural competence, helps develop positive relationships with students, and creates more welcoming school environments.[9]

Recent research has demonstrated that when students of color have teachers from similar backgrounds, they are more likely to succeed.  A recent study published by the Institute of Labor Economics found that "in North Carolina, we

---

[6]     The latest data shows that about 80 percent of public school teachers are white.  *See* National Center for Education Statistics, 2016 Digest of Education Statistics at Table 209.10, https://nces.ed.gov/programs/digest/d17/tables/dt17_209.10.asp.

[7]     Alice Yin, *Education by the Numbers*, N.Y. Times (Sept. 8, 2017), https://www.nytimes.com/2017/09/08/magazine/education-by-the-numbers.html.

[8]     *Id.*

[9]     Lisette Partelow et al., *America Needs More Teachers of Color*, Ctr. for Am. Progress (September 14, 2017, 9:00 AM), https://www.americanprogress.org/issues/education-k-12/reports/2017/09/14/437667/america-needs-teachers-color-selective-teaching-profession/.

show that black students who are as good as randomly assigned to a black teacher at least once in the third, fourth, or fifth grades are more likely to aspire to college and less likely to drop out of high school."[10]  Viridiana Carrizales of Teach For America aptly noted that "[w]e cannot afford to lose so many teachers and impact so many students . . . . Every time a student loses a teacher, that is a disruption in the student's learning."[11]

Vanessa Lina, a DACA recipient who served as a Teach for America teacher and now serves as a recruiter, told *The New York Times*:  "We're going to lose leaders and lose teachers – it's not only their presence, but having a teacher that can share the same experiences that you possibly had growing up . . . . Their advocacy, their leadership, their resilience is extraordinary because of their own personal journey."[12]

Diversity in classroom teaching is critical to educational equity, and students of all racial and ethnic backgrounds, especially immigrant students, benefit from

---

[10]    Seth Gershenson et al., *The Long-Run Impacts of Same-Race Teachers,* IZA Inst. of Lab. Econ. (Mar. 2017) at 2, http://ftp.iza.org/dp10630.pdf.
[11]    Greg Toppo, *20,000 DACA teachers at risk — and your kids could feel the fallout, too*, USA Today (Oct. 11, 2017, 7:00 AM), https://www.usatoday.com/story/news/2017/10/11/thousands-daca-teachers-risk/752082001/.
[12]    Liz Robbins, *For Teachers Working Through DACA, a Bittersweet Start to the School Year*, N.Y. Times (Sept. 7, 2017), https://www.nytimes.com/2017/09/07/nyregion/daca-teachers.html.

having DACA educators.  School environments that reflect the diversity of communities, the country, and the world help open students' minds to new perspectives and actively engage them in learning.  Prejudice and bias are countered in schools and communities when respect for diversity is taught, modeled, and experienced firsthand by children.[13]

The loss of 20,000 DACA teachers would cause severe and lasting harm to students and their educational trajectories, and more broadly to our country which depends on the great talent of future generations.

### B.   Harm to DACA Homeowners, Their Communities, and Lending Institutions

Homeownership has long been recognized as an integral part of the American Dream and a critical factor in establishing economic security.  Indeed, the federal government and its agencies have developed programs and marketing around that well-accepted precept.[14]  DACA put that dream within reach for recipients and provided them an opportunity to achieve financial security for themselves and their families and to contribute to the economic stability of their communities through

---

[13]    *Creating an Anti-Bias Learning Environment*, Anti-Defamation League (ADL), https://www.adl.org/education/resources/tools-and-strategies/creating-an-anti-bias-learning-environment (last visited July 12, 2018).

[14]    *See, e.g.*, *The National Homeownership Strategy:  Partners in the American Dream*, U.S. Dep't of Housing and Urb. Dev. (May 1995), https://www.globalurban.org/National_Homeownership_Strategy.pdf.

homeownership.  In turn, recipients responded to these incentives and made

significant and life changing investments in reliance on DACA.

The online real estate database company Zillow estimates that 123,000

DACA recipients are homeowners and, indeed, purchased their homes *after* their

DACA applications had been approved.[15]  DACA made it possible for these

individuals to establish roots and purchase homes thanks to access to credit, which

was previously unavailable to them prior to their enrollment.  Lending institutions

extended mortgages to recipients in complete reliance on DACA.

According to a survey of DACA recipients conducted by the Center for

American Progress, nearly 24 percent of respondents over the age of 25 purchased a

home after their DACA application was approved.[16]  Through homeownership,

DACA recipients "pay an estimated $380 million a year in property taxes to their

communities."[17]  Communities that benefit, often to a significant extent, on the

property tax revenues from these DACA recipient homeowners will, in turn, be

financially unsettled.

---

[15]    Alexander Casey, *An Estimated 123,000 'Dreamers' Own Homes and Pay $380M in Property Taxes*, Zillow (Sept. 20, 2017), https://www.zillow.com/research/daca-homeowners-380m-taxes-16629/.

[16]    Tom K. Wong, *Results from Tom K. Wong et al., 2017 National DACA Study*, Ctr. for Am. Progress (Oct. 7, 2017), https://cdn.americanprogress.org/content/uploads/2017/11/02125251/2017_DACA_study_economic_report_updated.pdf.

[17]    Casey, *supra* note 15.

Creating a pathway to homeownership is particularly important for members of communities of color who continue to suffer as a result of the widening racial and ethnic wealth gap in this country.  Owning a home is often the largest investment families make.  Yet, only 48 percent of Hispanics and 42 percent of African Americans own a home, compared to 72 percent of whites.[18]  DACA has allowed undocumented immigrants who had previously faced barriers to homeownership because of their status to accumulate long-term wealth and security in reliance on the government's representations and DACA's implementation.  Suspension or revocation of DACA would abruptly strip these individuals of their most significant investments and disrupt the financial and community stability that they provide.

### C.   <u>Harm to Vital U.S. Military Interests Served by DACA Recipients</u>

DACA recipients also serve in a military program established in 2008 that provides the promise of "expedited citizenship" opportunities in exchange for service vital to the national interest.  The Military Accessions Vital to the National Interest ("MAVNI") program offers fast-tracked citizenship review for enrollees, "whose skills are considered to be vital to the national interest," such as "physicians,

---

[18]    *Quarterly Residential Vacancies And Homeownership, First Quarter 2018*, U.S. Census Bureau (last updated Apr. 26, 2018 10:00 AM), https://www.census.gov/housing/hvs/files/currenthvspress.pdf.

nurses, and certain experts in language with associated cultural backgrounds."[19]
These service members and their skills could be lost immediately if DACA is
suspended or revoked.

The Defense Department's MAVNI materials entice recruits with the
"opportunity for early citizenship, to recognize their contribution and sacrifice."[20]
According to a Defense Department MAVNI fact sheet, "[t]he Law ensures" that
such contribution and sacrifice be recognized.[21]  In testimony to Congress, the
Defense Department made clear the benefit from service in the MAVNI program:
"This program recruits legal non-citizens with critical foreign language and cultural
skills, as well as licensed healthcare professionals, *and as an additional incentive*,
they receive expedited U.S. citizenship processing in return for their service."[22]

Beginning in 2014, the Defense Department granted DACA recipients
eligibility to apply for the MAVNI program.[23]  The Defense Department has

---

[19]     *See Military Accessions Vital to National Interest (MAVNI) Recruitment Pilot Program*, U.S. Dep't of Def., https://www.defense.gov/news/MAVNI-Fact-Sheet.pdf.

[20]     *Id.* at 3.

[21]     *Id.*

[22]     Statement of Nancy E. Weaver, Department of Defense Senior Language Authority, Before the House Armed Services Committee Subcommittee on Oversight and Investigations (June 29, 2010), http://prhome.defense.gov/Portals/52/Documents/RFM/Readiness/DLNSEO/docs/Weaver%20Testimony%20062910.pdf (emphasis added).

[23]     *See* MAVNI Fact Sheet, *supra* note 19.

estimated that up to 900 DACA recipients are either serving or have signed contracts to serve through MAVNI.[24]  DACA enlistees in the MAVNI program would be left in limbo by a suspension or revocation of DACA.

*     *     *

Any proposed revocation or suspension of DACA must take into account these harms to DACA recipients, including those who have offered the ultimate sacrifice in return for their vital service to the United States.

## III.   THE REQUESTED RELIEF IS AGAINST THE PUBLIC INTEREST

In addition to causing irreparable harm to DACA recipients, the requested relief would be against the public interest, including interests not represented by the States (such as students, employers, and banks).  For instance, in Texas alone, multiple economic analyses identify considerable economic harm should DACA be suspended or revoked:

- The University of Texas, in its Longhorn Global Biznet publication, has noted that the United States as a whole will suffer $460.3 billion in gross domestic product loss over the next decade if DACA recipients are removed from the work force.  Of that, Texas will experience GDP losses

---

[24]    Alex Horton, *The military looked to 'dreamers' to use their vital skills. Now the U.S. might deport them*, Wash. Post (Sept. 7, 2017), https://www.washingtonpost.com/news/checkpoint/wp/2017/09/07/the-military-looked-to-dreamers-to-use-their-vital-skills-now-the-u-s-might-deport-them/.

of $6.1 billion.  In that article, University of Texas-Austin School of Law Professor William H. Beardall states that, DACA recipients "are a cornerstone of the U.S. economy.  Altering DACA would reduce the amount of people who can work legally in this country and that would affect everything from GDP to overall employment rates."[25]

- According to the Center for Public Policy Priorities, in an analysis of DACA titled "What's at stake for Texas," the data suggests that those Texas immigrants eligible for DACA contribute a total of $241 million annually to local and state taxes through sales and excise taxes, property taxes, and income tax.[26]

- The Cato Institute has also calculated the enormous costs should DACA be repealed.  According to Cato, the costs to Texas alone from repeal of DACA was estimated to be nearly $24 billion.[27]  It would cost the federal

---

[25]    Angelo Gaunichaux, *What the US Economy Would Look Like Without DACA*, Longhorn Global Biznet (Oct. 13, 2017), http://sites.utexas.edu/longhornglobalbiznet/US-economy-without-DACA/.

[26]    Mia Ibarra, *The National Dream Act:  What's at stake for Texas?*, Ctr. for Pub. Pol'y Priorities (Dec. 18, 2017), https://forabettertexas.org/images/EO_2017_Texas_DREAM_Act_Fiscal_Impacts_Final.pdf (citing *Updated Tax Contributions of Young Undocumented Immigrants*, Inst. on Tax'n & Econ. Pol'y, https://itep.org/updated-tax-contributions-of-young-undocumented-immigrants/ (last updated Dec. 13, 2017)).

[27]    Ike Brannon, *The Economic and Budgetary Cost of Repealing DACA at the State Level*, Cato Inst.:  Cato at Liberty (Aug. 31, 2017 4:13 PM), https://www.cato.org/blog/economic-budgetary-cost-repealing-daca-state-level.

government $60 billion in lost revenue and the impact on the economy over that ten-year period would total at least $215 billion in lost GDP.[28]

- The *Dallas Morning News*, in an October 5, 2017 article, reported that Texas stands to lose about 2,000 teachers who are DACA recipients, part of the as many as 20,000 teachers nationwide who would be affected.[29] Many of these teachers in Texas instruct immigrant families in bilingual education and are a critical part of teaching language skills in public schools.[30]

- The Houston Hispanic Chamber of Commerce, for its part, has noted that, "the positive impacts that the DACA program and its recipients are having on the economy are clear. . . . the reality is that recipients of this program represent one of the most well-educated, economically influential subsets of this country's population."[31]  The Chamber estimated that, within the $6

---

[28]     *Id.*

[29]     Dianne Solis and James Barragán, *U.S. could lose an estimated 20,000 teachers, many bilingual, as DACA is phased out*, Dall. News (Oct. 5, 2017), https://www.dallasnews.com/news/immigration/2017/10/05/us-lose-estimated-20000-teachers-many-bilingual-daca-phased.

[30]     *Id.*

[31]     *The Economic Impact of DACA*, Hous. Hisp. Chamber, https://www.houstonhispanicchamber.com/assets/docs/Economic%20Impact%20of%20DACA%20white%20paper3.pdf (last visited July 12, 2018).

billion loss in annual GDP for the state of Texas, more than $2 billion of that annual economic activity would be in the greater Houston region.[32]

- The U.S. Citizenship and Immigration Services, in a detailed statistical analysis of DACA recipients, calculated that approximately 115,700 active DACA recipients reside in Texas, representing 16.5% of the total U.S. population of DACA recipients.   Of that, 36,900 were in Dallas, 35,440 in Houston, 7,780 in McAllen, 7,660 in Austin, and 5,500 in San Antonio.[33] These recipients are vital to these population centers in the state of Texas.[34]

- Finally, the Institute of Taxation and Economic Policy, for its part, calculated that taxes in Texas would decrease by over $78 million per year if DACA recipients are absent from the economy.[35]

Unlike these studies, Plaintiff States cite the purported costs relating to "unlawfully-present aliens" generally – not specific to DACA recipients.  That data

---

[32]    *Id.*

[33]    *DACA Population Data*, U.S. Citizenship & Immigr. Serv. (May 31, 2018), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_May_31_2018.pdf.

[34]    *The Economic Impact of DACA*, *supra* note 31.

[35]    Misha E. Hill and Meg Wiehe, *State & Local Tax Contributions of Young Undocumented Immigrants*, Inst. on Tax'n & Econ. Pol'y (updated April 2018), https://itep.org/wp-content/uploads/2018DACA.pdf.

is insufficient to override the documented benefits to the public that would be lost by the suspension or revocation of DACA.

## **CONCLUSION**

For the foregoing reasons, *amici* urge this Court to deny the Plaintiff States' Motion for a Preliminary Injunction.

July 21, 2018                                    Respectfully submitted,

                                                 /s/ *William D. Coston*
                                                 William D. Coston* (*pro hac vice*)
                                                 Martin L. Saad (*pro hac vice*)
                                                 Sameer P. Sheikh (*pro hac vice*)
                                                 S. Tyler Hale (of counsel)
                                                 VENABLE LLP
                                                 600 Massachusetts Avenue NW
                                                 Washington, DC 20001
                                                 (202) 344-4813
                                                 wdcoston@venable.com

                                                 Alper T. Ertas
                                                 VENABLE LLP
                                                 101 California Street
                                                 Suite 3800
                                                 San Francisco, CA 94111
                                                 (415) 343-3214
                                                 ATErtas@Venable.com
                                                 Texas Bar No. 24065207
                                                 S.D. Texas Bar. No. 2780716

                                                 *Counsel for Amici Curiae*
                                                 *Attorney-in-charge

# APPENDIX
## List of *Amici Curiae* with Individual Statements of Interest

| | |
|---|---|
| The Lawyers' Committee for Civil Rights Under Law | The Lawyers' Committee for Civil Rights Under Law (the "Lawyers' Committee") is a nonpartisan, nonprofit civil rights organization formed in 1963, at the request of President John F. Kennedy, to enlist the American bar's leadership and resources in defending the civil rights of racial and ethnic minorities. Through the Lawyers' Committee, attorneys have represented thousands of clients in civil rights cases across the country challenging discrimination in virtually all aspects of American life. In furtherance of its commitment to challenge policies that discriminate against immigrants and refugees, the Lawyers' Committee has filed numerous lawsuits and submitted amicus briefs in cases involving issues similar to this one. |
| Anti-Defamation League | The Anti-Defamation League ("ADL") was founded in 1913 "to stop the defamation of the Jewish people, and to secure justice and fair treatment to all." Today, ADL is one of the world's leading civil rights organizations. As an organization founded by immigrants and sworn to protect the interests of religious and ethnic minorities, ADL believes that when our nation's values are threatened, we are duty-bound to return to the founding principles that propelled this nation of immigrants. As such, ADL has advocated for fair and just immigration policies for more than a century, including a pathway to citizenship for young undocumented immigrants brought to this country as children. As part of its commitment to create an ever-more just and inclusive society, ADL has filed amicus briefs in numerous cases challenging policies that undermine the ideal of America as a nation of immigrants. At stake in this case are the lives of 800,000 undocumented immigrants who were brought to the United States as children, their families, communities, and all of us who depend on a future that embraces diversity as a strength. |

| | |
|---|---|
| The Lawyers' Committee for Civil Rights and Economic Justice | The Lawyers' Committee for Civil Rights and Economic Justice ("LCCR") fosters equal opportunity and fights discrimination on behalf of people of color and immigrants. LCCR engages in creative and courageous legal action, education, and advocacy, in collaboration with law firms and community partners. As part of this work, LCCR has long sought to further immigrant justice through impact litigation. Immigrant entrepreneurs also are assisted through LCCR's Economic Justice Project. LCCR thus has a strong interest in ensuring that DACA recipients and DACA-eligible immigrants are not unlawfully deprived of economic, educational, and other opportunities through rescission of DACA. |
| Mississippi Center for Justice | The Mississippi Center for Justice, the Deep South Affiliate of the Lawyers' Committee for Civil Rights Under Law, is a 501(c)(3) nonprofit public interest law organization founded in 2003 in Jackson, Mississippi and committed to advancing racial and economic justice. Supported and staffed by attorneys and other professionals, the Center develops and pursues strategies to combat discrimination and poverty statewide. One of *amicus*' original areas of interest involved predatory loan practices directed at migrant poultry workers, and MCJ has remained concerned about the plight of Mississippi's growing immigrant population for the last decade, particularly in the areas of access to healthcare, education, housing and fair lending. MCJ has signed on as *amicus* for several cases challenging President Trump's travel ban, and it has the same concerns regarding the termination of DACA. |

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing Brief *Amici Curiae* was made, this 21st day of July 2018, through the Court's Case Management/Electronic Case Files system upon the attorneys of record for the parties.

/s Alper T. Ertas

Alper T. Ertas
VENABLE LLP
101 California Street
Suite 3800
San Francisco, CA 94111
(415) 343-3214
ATErtas@Venable.com
Texas Bar No. 24065207
S.D. Texas Bar. No. 2780716

*Counsel for Amici Curiae*