# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,

      Plaintiffs,

      v.

UNITED STATES OF AMERICA, *et al.*,

      Defendants,

and

KARLA PEREZ, *et al.*,

      Defendant-Intervenors,

and

STATE OF NEW JERSEY,

      Defendant-Intervenor.

§§§§§§§§§§§§§§§§§§§§§§

Case No. 1:18-CV-68

## MEMORANDUM OF LAW OF *AMICUS CURIAE* THE LEGAL AID SOCIETY IN SUPPORT OF DEFENDANTS-INTERVENORS' OPPOSITION TO THE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
Jonathan S. Kolodner*
  Attorney In Charge
  (NY Bar No. 3937042)
Jessa DeGroote*
  Of Counsel
  (NY Bar No. 5514716)
One Liberty Plaza
New York, New York 10006
T: 212-225-2000
F: 212-225-3999
*Attorneys for Amicus Curiae*
*The Legal Aid Society*

THE LEGAL AID SOCIETY
Hasan Shafiqullah*
  Of Counsel
  (NY Bar No. 2905072)
199 Water Street
New York, New York 10038
T: 212-577-3300
F: 212-509-8914
*In Pro Se as Amicus Curiae*

*Admitted Pro Hac Vice

## TABLE OF CONTENTS

DISCUSSION ............................................................................................................... 1

I.      INTEREST OF *AMICUS CURIAE* .............................................................. 1

II.     NATURE AND STATE OF THE PROCEEDINGS .......................................... 3

III.    SUMMARY OF THE ARGUMENT ............................................................... 3

IV.     BACKGROUND ........................................................................................... 5

V.      STATEMENT OF THE ISSUE ...................................................................... 6

VI.     ARGUMENT ................................................................................................ 7

        A.   The Widespread Harm an Injunction Would Cause to Dreamers
             and the Public Interest Organizations that Serve Them Tips the
             Balance of Equities Against Such an Injunction ......................................... 7

             1.   The Harm to Public Interest Organizations from Enjoining the Use
                  of DACA Guidelines Would be Real and Immediate ..................... 8

             2.   The Demand on The Society and Other PIOs to Provide Services
                  for Those Facing Immigration Uncertainty Would Far Exceed
                  Resources. .................................................................................... 9

             3.   The Demand on The Society and Other PIOs Would be
                  Particularly Burdensome As Those Organizations Lose Essential
                  Staff Members ............................................................................ 10

        B.   The Balance of Equities Further Weighs Against an Injunction
             Because of the Harm to Communities Across the Country That
             Would Result. ...........................................................................................12

        C.   The Harm to Dreamers Would be Irreversible and Thus Further
             Weighs Against an Injunction .................................................................14

CONCLUSION ..........................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*AMID, Inc. v. Medic Alert Found. U.S., Inc.*,
241 F. Supp. 3d 788 ............................................................................................. 7, 8

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 900 (2016), *reh'g denied*, 136 S.
Ct. 1250 (2016) ....................................................................................................... 8

*Benisek v. Lamone*,
138 S. Ct. 1942 (2018) ........................................................................................... 8

*Crane v. Johnson*,
783 F.3d 244 (5th Cir. 2015) ................................................................................. 8

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
49 F.3d 1551 (Fed. Cir. 1995) ............................................................................... 8

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ............................................................................................... 7

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) ................................................................................................... 7

## Rules and Statutes

8 U.S.C. § 1324a(a)(2) ........................................................................................... 11

## Other Authorities

Better Business Bureau, Find Legal Assistance for DACA, but Watch Out for Fraudsters
(Sept. 7, 2017), https://www.bbb.org/council/news-events/bbb-warnings/2017/09/find-
legal-assistance-for-daca-but-watch-out-for-fraudsters/ ....................................... 10

Donald J. Trump (@RealDonaldTrump), Twitter (Sept. 14, 2017, 3:28 AM),
https://twitter.com/realdonaldtrump/status/908276308265795585?lang=en ...................... 14

*Find Legal Services*, USCIS, https://www.uscis.gov/avoid-scams/find-legal-services (last
visited July 18, 2018) ............................................................................................. 6

*Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/frequently-asked-
questions (last visited July 19, 2018) .................................................................... 18

Memorandum from Elaine C. Duke, Acting Sec'y, U.S. Dep't of Homeland Sec., to James W. McCament, Acting Dir., USCIS, et al., https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca ............................ 10

Memorandum from Janet Napolitano, Sec'y of Homeland Sec., U.S. Dep't of Homeland Sec., to David V. Aguilar, Acting Comm'r, U.S. Customs and Border Prot., et al., (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf ...................................................................... 3

*Undocumented immigrants line up for relief from deportation*, CNN.com (Aug. 17, 2012), http://www.cnn.com/2012/08/15/us/immigration-deferred-deportation/index.html   9

## DISCUSSION

I. **INTEREST OF *AMICUS CURIAE*** [1]

The Legal Aid Society ("The Society") in New York City is the nation's oldest and largest not-for-profit provider of legal services to low-income clients.  Through three major practice areas—Civil, Criminal and Juvenile Rights—The Society handles approximately 300,000 cases a year in city, state and federal courts and uses administrative, legislative and affirmative litigation to impact millions more.  Since the 1980s,  The Society has maintained a citywide Immigration Law Unit ("ILU") within the Civil Practice.  The ILU is a recognized leader in the delivery of free, comprehensive, and high-caliber immigration legal services to low-income immigrants in New York City and surrounding counties. [2]  These immigration legal services range from deportation defense to adjustment of status to legal permanent residence and citizenship applications.  The ILU currently consists of 60 staff attorneys, paralegals, social workers, and supervisors, who together represent immigrants before United States Citizenship and Immigration Services ("USCIS"), before immigration judges in removal proceedings, on appeals to the Board of Immigration Appeals, and in federal court on *habeas corpus* petitions, petitions for review, and affirmative litigation.  ILU staff conduct outreach clinics and trainings at over 13 community-based organizations throughout New York City and at immigration detention centers.

In addition, ILU staff provide regular training to immigrant-serving advocates from community-based organizations, state and local agencies, and judicial and legislative staff on various topics including updates on new immigration laws, policies, and trends.  Through

---

[1] All parties have consented to filing of this *amicus curiae* brief.

[2] Plaintiffs seek a nationwide injunction enjoining the use of DACA across the country and therefore the actions of this Court stand to impact The Society's clients in New York City just as much as those Dreamers living in Texas.

partnerships with other non-profit organizations and coordination of a successful *pro bono* program, the ILU can maximize resources to meet the increasing demand for representation.

ILU staff also assist criminal defendants and their criminal defense attorneys to fashion favorable pleas in Criminal Court in order to avoid adverse immigration consequences, or to allow clients to apply in Immigration Court for discretionary relief from deportation. All of these programs are supported by the Unit's Federal Appellate Project which seeks to protect immigrants' due process rights and to ensure the appropriate administration of the immigration laws.

As part of its immigration practice, The Society assists clients with requests for consideration for Deferred Action for Childhood Arrivals ("DACA"). The Society has advised and represented over 2,200 such clients since the inception of the DACA guidelines.

As a legal services organization working directly with young undocumented immigrants brought to the United States as children through no choice of their own (known as "Dreamers") as well as with many other public interest organizations ("PIOs")[3] that serve Dreamers, The Society understands the irreparable harm that would result from upsetting the status quo and enjoining DACA. Such an injunction would not only burden The Society and unduly tax its scarce resources, but would also force it and its community counterparts, many of which employ individuals who have received deferred action under the DACA guidelines, to lay off valuable staff. The Society therefore has both a direct interest in challenging the unjustified injunction

---

[3] For just a small cross-section of those public interest organizations and more information about the critical work they perform, *see* Mem. of Law of Public Interest Orgs. in Supp. of Pls'. Mot. for Prelim. Injunction at 4, *Batalla Vidal, et al. v. Nielsen*, No. 16-cv-4756-NGG, Dkt. No. 202 (E.D.N.Y. Dec. 22, 2017) ("PIO Br."). References to public interest organizations herein are based on The Society's personal experience working with such organizations in order to best meet the needs of its clients.

sought by Plaintiffs and an informed perspective on the widespread impact such an injunction would have on Dreamers, their families, their communities, and our society more broadly.

## II.    NATURE AND STATE OF THE PROCEEDINGS

Plaintiffs brought suit against the federal government alleging that the government's use of the DACA guidelines is unlawful and seeking a preliminary injunction to enjoin the use of those guidelines.  After the federal government declined to defend the suit, Defendants-Intervenors joined the suit to defend DACA, including opposing the motion for preliminary injunction.  The Society submits this *amicus curiae* brief in support of Defendants-Intervenors' opposition to that motion to illustrate to the Court the widespread harm that would occur were this Court to enjoin DACA from the perspective of a particular segment of the legal community—organizations that provide free or low-cost legal services to immigrants.

## III.   SUMMARY OF THE ARGUMENT

Enjoining DACA would seriously harm not only immigrants themselves but also their families and communities, including the states in which they reside, and the many PIOs, including organizations like The Society, that serve those communities.  That widespread harm far outweighs any harm to Plaintiffs, tips the balance of equities against an injunction, and demonstrates that enjoining DACA is not in the public interest.

When the DACA guidelines were announced in 2012, Dreamers could request deferred action so that they could remain, pursue an education, and work in the United States.  *See* Memorandum from Janet Napolitano, Sec'y of Homeland Sec., U.S. Dep't of Homeland Sec., to David V. Aguilar, Acting Comm'r, U.S. Customs and Border Prot., et al., at 2–3 (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.  Those who were fortunate enough to receive deferred action gained

opportunities—previously denied to them—to attend U.S. colleges and universities, work for living wages, and otherwise fully participate in their communities without fear of imminent removal. The Society and many other organizations saw it as their role to help unlock these opportunities for Dreamers and their families, and from the inception of these guidelines dedicated significant resources to assisting as many young people as possible to obtain and maintain deferred action pursuant to those guidelines.

Now that the DACA guidelines have been in use for over six years, Plaintiffs seek a preliminary injunction that would reverse the status quo that has existed for the past half-decade by upending those guidelines and the relative certainty for Dreamers that came with them. The Society knows firsthand how enjoining DACA would seriously disrupt the lives of Dreamers. It would deprive them of the relative predictability instilled in the individualized deferral determinations by the DACA guidelines, which provided much needed clarity as to the qualifications for deferred action from removal. It would undermine the fabric of the communities to which they have been making significant, positive contributions. With no certainty about their futures in the only country they know as home, it would restrict their ability to support themselves and those who rely on them, including their parents, spouses and U.S. citizen children. In short, it would radically, undisputedly change the status quo and the lives of DACA recipients, all before this Court can conduct a full legal determination on the merits.

Because there is so much at stake for so many, The Society, and similar PIOs have worked tirelessly to find alternative immigration solutions for as many Dreamers as possible. Such organizations have limited capacity to manage the enormous impact of the sudden upending of the individualized determinations made based on the DACA guidelines, with the concomitant and imminent threat of the commencement of removal proceedings for, and possible

detention of, almost 800,000 individuals.  Accordingly, it is not just Dreamers and their communities that would be harmed by enjoining DACA, but The Society and similar organizations would face serious harm as well due to the strain on resources.  The irreparable harm from enjoining DACA would accrue not to Plaintiffs, but to Dreamers, their families, their communities, and the organizations and states which serve them.  The balance of equities, the risk of harm, and the public interest weigh heavily against a preliminary injunction here.

## IV.    BACKGROUND

On a typical day, there are simply not enough legal resources available to meet the immigration-related legal needs of lower-income non-citizens generally.  That shortage was drastically exacerbated by the abrupt rescission of the DACA guidelines on September 5, 2017, and would similarly result from an injunction precluding the government from relying on those guidelines now.  The impact of such an injunction would be felt not only by PIOs like The Society (and of course their Dreamer clients and employees), but also by the partners of these organizations in the private bar, bar associations, and law schools.  Moreover, it would personally affect the advocates at The Society and elsewhere who work around the clock to improve the lives of all immigrants, some of whom are Dreamers themselves.

Since the introduction of the DACA guidelines in 2012, those advocates have played a critical role in ensuring that information on DACA reaches the population eligible to seek deferred action, and that those individuals have the legal support they need to then apply for the deferred action and in some cases for other, more permanent forms of immigration relief.  Relying on multilingual staff, The Society and other PIOs have provided young immigrants with accessible and reliable information about DACA by, for example, creating know-your-rights pamphlets, hosting clinics and information sessions, promoting information through social media and counseling members of their communities.

5

For many clients, these organizations also provide step-by-step assistance to candidates seeking deferred action, including by screening individual candidates for eligibility, providing legal advice as to the policies and practices of USCIS, preparing applications for immigration relief, monitoring and following up with clients and handling renewal applications.  As USCIS itself has recognized, legal assistance is often needed when applying for deferred action under the DACA guidelines.  *See Find Legal Services*, USCIS, https://www.uscis.gov/avoid-scams/find-legal-services (last visited July 18, 2018) ("If [applicants] are not sure . . . which USCIS forms to submit, then [they] may need immigration legal advice from an authorized service provider.").

In addition, The Society and other PIOs provide immigration services beyond assisting with DACA requests and seek to identify individuals eligible for permanent forms of immigration relief through their DACA outreach efforts.  For example, The Society performs comprehensive eligibility screening for DACA requestors in an effort to select and apply for the most advantageous form of immigration relief available for each client, deferred action or otherwise, such as Adjustment of Status; U Nonimmigrant Status (for victims of domestic violence or other violent crimes who have cooperated with law enforcement); cancellation of removal for non-permanent residents; asylum; restriction on removal; or withholding under the Convention Against Torture.  Accordingly, enjoining the use of the DACA guidelines would seriously impact the work of The Society in providing legal services to the immigrant communities it serves.

## V.  STATEMENT OF THE ISSUE

Plaintiffs seek a preliminary injunction enjoining the use of the DACA guidelines by the federal government.  A preliminary injunction is an "extraordinary remedy never awarded as of

right."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24 (2008).  The purpose of this

extraordinary remedy "is merely to preserve the relative positions of the parties until a trial on

the merits can be held."  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).  In order to

succeed in a request for a preliminary injunction, Plaintiffs have the burden to prove each of four

factors:  that they are likely to succeed on the merits, that they are likely to suffer irreparable

harm in the absence of the requested preliminary relief, that the balance of equities tips in their

favor, and that an injunction is in the public interest.  *Winter*, 555 U.S. at 20; *see also AMID, Inc.*

*v. Medic Alert Found. U.S., Inc.*, 241 F. Supp. 3d 788, 800 (S.D. Tex. 2017) (recognizing movant

must establish each factor of the four factors for a court to grant the "extraordinary remedy" of a

preliminary injunction).  Plaintiffs do not come close to satisfying this heavy burden.

## VI.  ARGUMENT

### A.  The Widespread Harm an Injunction Would Cause to Dreamers and the Public Interest Organizations that Serve Them Tips the Balance of Equities Against Such an Injunction.

The balance of equities favors maintaining the status quo because, while Plaintiffs do not

come close to their burden of proving direct and irreparable harm, an injunction would, by

contrast, harm in a very real and immediate way Dreamers, and PIOs—like The Society—that

that serve them, and the communities in which they live.  Hundreds of thousands of Dreamers

would be thrust into uncertainty regarding their deferred action; with limited options, and few

places to turn, PIOs would suddenly be stretched beyond capacity attempting to provide legal

services and other necessary support to Dreamers.  In light of the serious limitation on resources

of PIOs, including organizations like The Society, the result would be tens or even hundreds of

thousands of people suddenly forced into a complicated immigration removal system alone and

without any assistance.  Further, the inability to financially contribute to their families in a

meaningful way would force many Dreamers to rely on charities, their communities, and the

many PIOs that improve the lives of people in our country but that have extremely limited

resources, and could force their U.S. citizen minor children to depend on public assistance.

Ultimately, Plaintiffs have survived their purported harms for nearly six years without an

injunction,[4] but an injunction would seriously, irreparably change the lives of Dreamers and the

PIOs serving them.

> 1. *The Harm to Public Interest Organizations from Enjoining the Use of DACA Guidelines Would be Real and Immediate.*

Legal services organizations have played and continue to play a crucial role in assisting

young adults who were brought to the United States, by no choice of their own, as children.

When the DACA guidelines were announced in 2012, these organizations engaged in the critical

task of ensuring that individuals who met the guidelines for deferred action received the legal

help that they needed to seek that deferral.  Many organizations provided screening assistance,

help preparing DACA requests, follow-up consultations, and help with DACA renewals, tailored

to the specific and often unique circumstances of each requestor, in an effort to demonstrate why

USCIS should exercise its discretion to defer action against these individuals on a case-by-case

basis.  This aid was sorely needed, as acknowledged by USCIS itself.  *See* Mem. of Law of

Public Interest Orgs. in Supp. of Pls'. Mot. for Prelim. Injunction at 4, *Batalla Vidal, et al. v.*

---

[4] Plaintiffs' delay of nearly six years "undermines its assertion that it suffered irreparable injury." *AMID, Inc.*, 241 F. Supp. 3d at 822.  That is because such a delay "demonstrat[es] that there is no apparent urgency to the request for injunctive relief."  *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551 (Fed. Cir. 1995).  Additionally, prior attempts to challenge DACA have been defeated without success on appeal, further demonstrating the futility of Plaintiffs' late-sought challenge.  *Crane v. Johnson*, 783 F.3d 244, 255 (5th Cir. 2015); *Arpaio v. Obama*, 797 F.3d 11, 25 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 900 (2016), *reh'g denied*, 136 S. Ct. 1250 (2016).  Ultimately, the lack of prior success and the failure to move for a preliminary injunction in this case until nearly six years after the initial use of DACA demonstrates a serious lack of "reasonable diligence" and weighs heavily against an injunction. *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018).

*Nielsen*, No. 16-cv-4756-NGG, Dkt. No. 202 (E.D.N.Y. Dec. 22, 2017) ("PIO Br.") (citation

omitted).  Indeed, the demand for legal services was so great that requestors slept on sidewalks

outside of these legal services organizations at night to ensure that they would receive the aid

that they so desperately needed.  *See, e.g.*, *Undocumented immigrants line up for relief from*

*deportation*, CNN.com (Aug. 17, 2012), http://www.cnn.com/2012/08/15/us/immigration-

deferred-deportation/index.html; *see also* PIO Br. at 4.  Because resources were stretched to the

absolute limit, The Society could help about 75 people per clinic day even though that number

was only about half of the total candidates who waited outside The Society's office each day.  *Id.*

This was not an anomaly: partner organizations helped tens of thousands of people navigate their

requests for deferred action under the DACA guidelines, yet tens of thousands of others were

unable to obtain help.  An injunction would bring each of these individuals rushing back for help

from The Society and similar organizations.

> 2.  *The Demand on The Society and Other PIOs to Provide Services for Those*
>     *Facing Immigration Uncertainty Would Far Exceed Resources.*

Action has been deferred against hundreds of thousands of young adults who are now

actively contributing to their families, their communities, the economy, and the country.  The

sought injunction, however, would cause each of these individuals to require immediate legal

help, overwhelming the available legal services.  This is not a purely theoretical prediction.  The

announcement by Acting Department of Homeland Security Secretary Elaine C. Duke on

September 5, 2017 effectively revoking the DACA guidelines but allowing for a narrow window

for certain people to renew their deferrals one more time created mass confusion and gave legal

services organizations very little time to develop a response and prepare for the change in

policy.[5]  As a result, legal service organizations already on shoestring budgets were forced to stretch resources as far as possible, in many cases working twelve or more hours per day, seven days per week, to satisfy as much need as possible.  People had nowhere to turn, and while the organizations made an impact helping thousands of recipients, there was not enough staff to meet the full need, leaving many potential clients without adequate legal help, or worse.[6]  That situation pales in comparison to what would occur were the DACA guidelines to be enjoined entirely.

Ultimately, even a temporary injunction would cause far more severe consequences to The Society and partner organizations than the lack of injunction would cause to Plaintiffs, who have already waited over a half decade to mount their challenge.

### 3. The Demand on The Society and Other PIOs Would be Particularly Burdensome As Those Organizations Lose Essential Staff Members.

The balance of equities further weighs against issuance of an injunction because the hardship to PIOs like The Society that already operate with limited resources would be greatly compounded by the valuable staff who would be lost.  PIOs regularly employ individuals with employment authorization pursuant to the DACA guidelines.  These Dreamer employees have the desirable language skills and cultural competency to work with immigrant communities and are therefore uniquely suited to leverage their experiences, knowledge, existing networks, and trust of their communities to reach and meet the needs of immigrants, including vulnerable and marginalized people.  But enjoining DACA—even if only on a temporary basis—would force

---

[5] Memorandum from Elaine C. Duke, Acting Sec'y, U.S. Dep't of Homeland Sec., to James W. McCament, Acting Dir., USCIS, et al., https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

[6] *See* Better Business Bureau, Find Legal Assistance for DACA, but Watch Out for Fraudsters (Sept. 7, 2017), https://www.bbb.org/council/news-events/bbb-warnings/2017/09/find-legal-assistance-for-daca-but-watch-out-for-fraudsters/.

these employers to lay off crucial Dreamer-employees, thereby reducing the already limited amount of free and low-cost legal services available and undermining the ability of the employers to carry out their missions right when they are needed most.[7]  Organizations with already minimal staff would become even smaller and less effective, sharply hindering their ability to operate.

The needs of Dreamers suddenly thrust into immigration uncertainty would overwhelm PIOs, even before the loss of essential staff, and require that all possible resources be directed toward Dreamers.  *See* PIO Br. at 12-14; 16-17 (detailing harm accruing to PIOs without DACA guidelines).  But PIOs also engage in work that is entirely unrelated to DACA, helping a large cross-section of vulnerable communities who would unnecessarily suffer.  For example, The Society assists individuals in securing various permanent forms of immigration relief such as asylum for refugees fleeing political violence, while also providing legal services across the spectrum, from protecting mistreated prisoners to providing tax advice.  An injunction would require The Society to put all other work on hold so that the emergency needs of Dreamers could be met to the extent possible, but at the expense of the many other communities that depend on PIOs for necessary support.  PIO Br. at 6; 12–13.

Furthermore, the impact would not be limited to legal service organizations but would call upon charities across the country.  PIO Br. at 16.  Without work authorization, it is nearly impossible to provide for oneself, much less a family.  But a preliminary injunction would drastically upset the status quo by putting the jobs of hundreds of thousands of Dreamers at risk and undermining their ability to support their families.  Even if individuals are removed from the

---

[7] 8 U.S.C. § 1324a(a)(2) makes it illegal to hire an alien for employment or to "continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment."

country, many would leave behind children and family members, many of whom are U.S. citizens, who had relied upon them for support. *See* Br. For State Appellees at 63 n.36, *Batalla Vidal, et al. v. Trump et al.*, No. 18-485(L), Dkt. No. 153 (2d Cir. April 5, 2018) (estimating that about 73% of DACA recipients have an immediate family member who is an American citizen). Without that support, families will have no choice but to rely on the good will and charity of others. Children of Dreamers left without parents would need to be placed into foster homes, causing an entirely preventable strain on resources and causing unnecessary psychological harm.

Upending the status quo would place an enormous strain on the resources of PIOs by forcing them to provide otherwise unneeded services—from legal to food services—to individuals who had previously been self-sufficient.[8] Such a result burdens not only PIOs and the Dreamers they seek to support, but also the vulnerable populations from whom those resources must be redirected. Accordingly, the balance of equities cannot support an injunction.

**B. The Balance of Equities Further Weighs Against an Injunction Because of the Harm to Communities Across the Country That Would Result.**

The Society can speak directly to the ways in which enjoining the use of DACA would undermine the communities it supports, but this discussion is only a limited example of the serious and widespread harm an injunction would cause, which the parties and as well as other *amici* are well-positioned to address. Communities that have embraced deferred action and benefited greatly from the contributions of DACA recipients as teachers, nurses, public safety officers, and other valuable members of the community. Just as PIOs would lose essential employees, so would states and communities across the country. The financial investment lost with the dismissal of Dreamer employees is compounded by the cost of hiring and training new

---

[8] *See* Proposed Brief of Legal Services Organizations as *Amici Curiae* in Opposition to Plaintiffs' Motion for Preliminary Injunction at 11–13.

employees.  And even if those positions can be filled with equally-qualified individuals, the detrimental impact to a community that loses its nurses, teachers, and public safety officers is unavoidable.

Those communities would similarly be harmed by the impact on the criminal justice system, which would force necessary witnesses back into the shadows out of fear of deportation. Law enforcement would have a major problem on its hands:  hundreds of thousands of Dreamers (as well as legal citizens with friends or family who are Dreamers) would be afraid to approach law enforcement to report crimes that they witnessed or were the victims of.  If individuals are afraid to report crime because this reporting may lead to deportation, crimes simply will go unreported and will often go unsolved as a result.  Cooperation with law enforcement would needlessly decline and in some cases even cease, hindering the ability of our country to identify the wrongdoers and protect those whose only purported wrongdoing is being brought to this country as children by no choice of their own, and hindering the public safety of all of our communities.

A preliminary injunction would force hundreds of thousands of individuals currently supporting their families back into the shadows, creating a crisis of families unsure how to pay for rent, food, or transportation.  U.S. citizens who enjoyed close-to-normal lives would suddenly be faced with confusion and anxiety as their family's financial stability disappears along with their supporting family member's work authorization.  Children born and raised in the United States would leave home for school each morning without knowing whether their parents would be waiting for them when they return home.  Parents under the sudden threat of deportation would need to make a heartbreaking decision:  whether to leave their U.S. citizen children in the United States, without knowing when they might see them next and without a system of reliable

support, or take them to a country that they fled long ago—and often can no longer remember—in search of the American dream.  These direct harms stand in stark contrast to the attenuated economic harm (or lack thereof) that states would experience by leaving the status quo in place, and weigh heavily against the issuance of a preliminary injunction.

### C.  The Harm to Dreamers Would be Irreversible and Thus Further Weighs Against an Injunction.

A preliminary injunction would cause irreparable harm to DACA recipients, who are hard workers contributing to the communities and states in which they live.  Perversely, it is only without deferred action and the accompanying work authorization that these individuals become the burdens Plaintiffs claim, because it is precisely without DACA that these individuals lose their right to work and—with it—the ability to support themselves and their families.  These individuals are hardworking people who *want* to be able to contribute to society.  *See* Donald J. Trump (@RealDonaldTrump), Twitter (Sept. 14, 2017, 3:28 AM), https://twitter.com/realdonaldtrump/status/908276308265795585?lang=en ("Does anybody really want to throw out good, educated and accomplished young people who have jobs, some serving in the military? Really!.....").

Here are just a few of their stories:[9]

      i.  **A.F.**:  A.F., who is twenty-seven, has lived in New York since he was six years old.  When DACA was first introduced, A.F. had been working delivery and dishwashing jobs to support himself and his family, but no matter how many hours he put in, his employers refused to pay him more than a meager $400 per week, knowing that—without legal documentation—he had no leverage to

---

[9] These stories are based on The Society's firsthand interactions with its clients and the relationships with those clients over long periods of time.

demand fair pay for his hard work.  After A.F. was granted deferred action, he was able to join a union for property service workers.  He has been working there for over three years, paying taxes on his $35,000/year salary and supporting his family, including his two U.S.-citizen children.  Without that work authorization, A.F. will again struggle to support his family.  Without deferred action, A.F. could be separated from his family, which he works so diligently to support, and forced to return to a country he neither remembers nor knows as home.

ii.  **E.S**.:  E.S., who is twenty-eight, came to the United States at the age of seven with her two brothers after her parents fled grave danger in Mexico, including death threats and repeated rapes.  E.S. has lived in New York ever since.  Although she obtained an associate's degree, E.S. was hesitant to pursue further education knowing that she would be unable to have meaningful job opportunities after graduation without work authorization.  After receiving deferred action, E.S. obtained work authorization and therefore found the assurance she needed to pursue higher education.  Studying for a degree in child psychology while also working with children, she hopes to serve vulnerable children in her community.  But, without work authorization, E.S. will be unable to help those kids who need it most.

iii.  **J.P.**:  J.P., who is twenty-four, came to the United States as a young child and has lived in New York ever since.  When J.P. graduated from high school, his family was struggling to meet basic needs, so he began working as a prep cook to help his family pay the bills.  Deferred action encouraged J.P., like E.S., to

15

pursue an education with the hope that he could gain better employment after graduation. So J.P. continued working as a prep cook during the day to pay for his classes in the evening. J.P. earned his associate's degree in Science and has been working toward his Bachelor's Degree at City College, but, without work authorization, he will be unable to continue paying for his education.

iv. **R.B.**: R.B., who is thirty-one, has lived in New York City since the early 1990s, when he was brought to the United States as a toddler. Prior to the introduction of the DACA guidelines, while in high school, R.B. found himself unable to accept an offer for a prestigious information technology internship because of his lack of work authorization. Instead, he began work as a cook at a restaurant where he was both underpaid and mistreated, but unable to contest either due to fear that reprisals could jeopardize both his source of income and life in the United States. After applying for and receiving deferred action, R.B. was able to get placed on the official payroll at work and even earned a promotion. That promotion finally allowed him to save enough money to pursue an associate's degree in network administration while supporting his twin children who were born in the United States. Without deferred action, R.B. will be unable to maintain a job that pays well enough to support his family, including his U.S.-citizen children, and pursue his education. Without deferred action, R.B. could be separated from his twin children and forced to return to a country he cannot even remember.

v. **D.G.**: D.G., who is twenty-nine, has lived in New York City for over half his life. When D.G. arrived in New York City, he immediately began working at a

car wash in order to survive and provide for his parents.  Because D.G.'s employers knew he lacked work authorization, they exploited him by underpaying him, stealing his wages, and treating him differently from his co-workers.  Even still, D.G. has been determined to provide for his daughter, a U.S. citizen, and her mother.  Once D.G. applied for and received deferred action, he was finally able to obtain a better job.  He now supports his family by working at an international coffee chain where he is paid and treated fairly.  Without deferred action, D.G. would be unable to provide for his family or, worse, he would be separated from them entirely.

As these demonstrative individuals highlight, deferred action is critical to enabling individuals who were brought to the United States as children to now support themselves and their own families.  Without it, these individuals will suffer immensely, as will the States to which they pay taxes, the charities on which they need not otherwise rely, and the PIOs which try so strongly to protect them.

The harm that these individuals would suffer as a result of a preliminary injunction is unlikely to be remedied by defendants-intervenors' victory at the end of a prolonged trial.  Dreamers, particularly those who live paycheck to paycheck, support young children, and have deep-rooted ties to their communities, cannot merely put their livelihoods on hold and survive without assistance for the duration of the litigation.  The harm to Dreamers would be real, immediate, and irreparable such that the inequity of an injunction far outweighs any claimed necessity by Plaintiffs.  Moreover, such harm further demonstrates why an injunction is also against the public interest.

The aforementioned resulting harms are plainly not in the public interest, particularly in light of the fact that such an injunction would upset, rather than maintain, the status quo.  If granted by this Court, an injunction would irreparably harm a high-performing and assimilated subset of young individuals who were brought here as children, satisfy the stringent guidelines of DACA,[10] and know only the United States, and their communities within our country, as home. A preliminary injunction that disrupts the continued use of the established DACA guidelines would radically alter the status quo to upset the lives of Dreamers, their families, their communities, and the legal service organizations that try so strongly to protect them.

---

[10] *See Frequently Asked Questions*, USCIS, https://www.uscis.gov/archive/frequently-asked-questions (last visited July 19, 2018) (outlining stringent guidelines for requesting deferred action).

## **CONCLUSION**

In light of the foregoing, this Court should refuse to grant a preliminary injunction, given the serious inequities and harm to the public interest that would result from such a disruption of the status quo.

Dated:  July 21, 2018
         New York, New York


                              Respectfully submitted,


                              */s/ Jonathan S. Kolodner*
                              Jonathan S. Kolodner*
                                 Attorney In Charge
                                 (NY Bar No. 3937042)
                              Jessa DeGroote*
                                 Of Counsel
                                 (NY Bar No. 5514716)
                              CLEARY GOTTLIEB STEEN & HAMILTON LLP
                              One Liberty Plaza
                              New York, New York 10006
                              T: 212-225-2000
                              F: 212-225-3999
                              *Attorneys for Amicus Curiae The Legal Aid Society*


                              Hasan Shafiqullah*
                                 Of Counsel
                                 (NY Bar No. 2905072)
                              THE LEGAL AID SOCIETY
                              199 Water Street
                              New York, New York 10038
                              T: 212-577-3300
                              F: 212-509-8914
                              *In Pro Se as Amicus Curiae*


                               *Admitted *Pro Hac Vice*

19