## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## DEFENDANT-INTERVENOR STATE OF NEW JERSEY'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT .............................. 1

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING .............................. 1

SUMMARY OF ARGUMENT ................................................................................ 6

ARGUMENT ..................................................................................................... 9

I.   PLAINTIFFS HAVE NOT SHOWN THEY ARE LIKELY TO SUCCEED ON THE
     MERITS. ................................................................................................ 10

     A. The Napolitano Memo Is Not Contrary to Federal Law. .................................. 10

        1. Deferred Action Falls Well Within the Executive's Authority to Administer and
           Enforce the INA. ............................................................................... 10

        2. The Napolitano Memo Fits Comfortably Into the Deferred Action Framework. ........ 14

        3. *Texas v. United States* Does Not Hold Otherwise. ................................... 18

     B. The Napolitano Memo, Like Prior Memos Setting Forth Frameworks for Exercising
        Deferred Action, Did Not Require Notice and Comment. .................................. 20

        1. The Napolitano Memo Makes Clear the Agency Is to Exercise Case-By-Case
           Discretion. ...................................................................................... 21

        2. The Extrinsic Evidence in this Case, Unlike in the DAPA Litigation, Confirms the
           Napolitano Memo's Promise of Discretion. ............................................... 22

        3. The Napolitano Memo Itself Does Not Confer Substantive Rights Or Benefits. ........ 26

     C. The Napolitano Memo Does Not Violate the Take Care Clause of the Constitution. ...... 28

II.  PLAINTIFFS HAVE NOT SHOWN THEY WILL BE IRREPARABLY HARMED
     ABSENT AN INJUNCTION. ........................................................................ 29

     A. Plaintiffs Cannot Demonstrate Irreparable Harm Because they Delayed in Seeking a
        Preliminary Injunction for Nearly Six Years. .............................................. 30

     B. Plaintiffs' Claimed Harms Are Either Illusory or Do Not Result from the Napolitano
        Memo. ............................................................................................ 32

        1. Plaintiffs Introduce No Healthcare, Law Enforcement or Education Costs Actually
           Attributable to the Napolitano Memo. ..................................................... 34

2. The Napolitano Memo Actually Benefits Texas. ........................................................ 37

III. PLAINTIFFS HAVE NOT ESTABLISHED THAT THE BALANCE OF EQUITIES
FAVORS AN INJUNCTION. ............................................................................................... 40

IV. PLAINTIFFS HAVE NOT ESTABLISHED THAT AN INJUNCTION IS IN THE PUBLIC
INTEREST. ......................................................................................................................... 46

CONCLUSION .......................................................................................................................... 49

# TABLE OF AUTHORITIES

## Cases

*ADT, LLC v. Capital Connect, Inc.*,
　　145 F. Supp. 3d 671 (N.D. Tex. 2015) ............................................................. 31

*Arizona v. United States*,
　　567 U.S. 387 (2012)..................................................................................... *passim*

*Arpaio v. Obama*,
　　27 F. Supp. 3d 185 (D.D.C. 2014) ............................................................... 1, 11

*Arpaio v. Obama*,
　　797 F.3d 11 (D.C. Cir. 2015) ........................................................................... 11

*Benisek v. Lamone*,
　　138 S. Ct. 1942 (2018) (per curiam) .......................................................... 30, 32

*Bergh v. Washington*,
　　535 F.2d 505 (9th Cir. 1976) ........................................................................... 48

*Byrum v. Landreth*,
　　566 F.3d 442 (5th Cir. 2009) ...................................................................... 29, 40

*Chaudhry v. Holder*,
　　705 F.3d 289 (7th Cir. 2013) ........................................................................... 15

*Cmty. for Creative Non-Violence v. Pierce*,
　　786 F.2d 1199 (D.C. Cir. 1986) ....................................................................... 29

*Crane v. Johnson*,
　　783 F.3d 244 (5th Cir. 2015) ................................................................... *passim*

*Embarcadero Techs., Inc. v. Redgate Software, Inc.*,
　　No. 1:17-cv-444-RP, 2017 U.S. Dist. LEXIS 191317 (W.D. Tex. Nov. 20, 2017) ......... 31

*Enter. Int'l v. Corporacion Estatal Petrolera Ecuatoriana*,
　　762 F.2d 464 (5th Cir. 1985) ........................................................................... 33

*Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*,
    441 F.2d 560 (5th Cir. 1971) ..................................................................... 9, 30

*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ................................................................................... 46

*Feller v. Brock*,
    802 F.2d 722 (4th Cir. 1986) ................................................................. 47, 48

*Fisher v. Univ. of Tex.*,
    136 S. Ct. 2198 (2016) ............................................................................... 45

*GoNannies, Inc. v. GoAuPair.com, Inc.*,
    464 F. Supp. 2d 603 (N.D. Tex. 2006) ................................................. 29, 30

*H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC*,
    No. 3:09-CV-00390-L, 2009 U.S. Dist. LEXIS 52950 (N.D. Tex. Jun. 23, 2009) .......... 31

*Innovation Ventures, LLC v. Ultimate Lifestyles, LLC*,
    No. 4:08-CV-232, 2009 U.S. Dist. LEXIS 132724 (E.D. Tex. Mar. 13, 2009) .............. 31

*Justin Indus., Inc. v. Choctaw Sec., L.P.*,
    920 F.2d 262 (5th Cir. 1990) ..................................................................... 10

*Karaha Bodas Co. v. Negara*,
    335 F.3d 357 (5th Cir. 2003) ....................................................................... 9

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ................................................................................... 20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................... 29

*Martinez v. Mathews*,
    544 F.2d 1233 (5th Cir. 1976) ................................................................... 10

*Montgomery v. Louisiana*,
    136 S. Ct. 718 (2016) as revised (Jan. 27, 2016) ....................................... 19

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018) .................................................................. 5

*NAACP, Jefferson County Branch v. Donovan*,
    558 F. Supp. 218 (D.D.C. 1982) *(NAACP I)* .................................. 47

*NAACP, Jefferson County Branch v. Donovan*,
    566 F. Supp. 1202 (D.D.C. 1983) *(NAACP II)* ......................... 47, 48

*Perales v. Casillas*,
    903 F.2d 1043 (5th Cir. 1990) ....................................................... 16

*Plyler v. Doe*,
    457 U.S. 202 (1982) ...................................................................... 19

*Prof'ls & Patients for Customized Care v. Shalala*,
    56 F.3d 592 (5th Cir. 1995) ........................................................... 20

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) ..................................... 5, 19

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ................................................................ *passim*

*Rimkus Consulting Group, Inc. v. Cammarata*,
    255 F.R.D. 417 (S.D. Tex. 2008) ................................................. 30

*Solofill, LLC v. Rivera*,
    No. CV H-16-2702, 2017 WL 514589 (S.D. Tex. Feb. 8, 2017) .................................... 31

*Talon Transaction Techs., Inc. v. StoneEagle Servs.*,
    No. 3:13-cv-00902-P, 2013 U.S. Dist. LEXIS 200239 (N.D. Tex. Jul. 24, 2013) .......... 31

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016)
    (per curiam) ........................................................................... *passim*

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ...................................... *passim*

*Trump v. Hawaii*,
  132 S. Ct. 2392 (2018) ................................................................................. 10

*United States v. State of Washington*,
  384 F.Supp. 312 (W.D. Wash.), aff'd, 520 F.2d 676 (9th Cir. 1975) ............................. 48

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ....................................................................................... 9

*Vidal v. Nielsen*,
  279 F. Supp. 3d 401 (E.D.N.Y. 2018) ...................................................... 5, 19

*W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. & Gulf Coast Dist. of ILA, AFL-CIO*
  751 F.2d 721 (5th Cir. 1985) ......................................................................... 49

*Winter v. NRDC*, Inc.,
  555 U.S. 7 (2008) .................................................................................. *passim*

*Wireless Agents, L.L.C. v. T-Mobile USA, Inc*.,
  No. 3:05-CV-0094-D, 2006 U.S. Dist. LEXIS 36590 (N.D. Tex. June 6, 2006) ............. 31

## Statutes

5 U.S.C. § 553(b)(3)(A) ................................................................................... 20

6 U.S.C. § 202(5) ............................................................................................ 1

8 U.S.C. § 1103(a) ........................................................................................... 1

8 U.S.C. § 1151 .............................................................................................. 14

8 U.S.C. § 1154(a)(1)(D)(i)(II) ........................................................................ 14

8 U.S.C. § 1182(a)(9)(B)(iii)(I) ........................................................................ 19

8 U.S.C. § 1225……………………………………………………………………1

8 U.S.C. § 1226 ................................................................................................ 1

8 U.S.C. § 1227(d)(2) ..................................................................................... 14

vi

8 U.S.C. § 1255a(a)(2)……………………………………………………………...12

8 U.S.C. § 1324a ................................................................................................ 12, 16

8 U.S.C. § 1611(b)(2) ............................................................................................. 16

28 U.S.C. § 2401(a) ................................................................................................ 15

Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, Div. F., Tit. II, 128 Stat. 5, 251
 (2014)……………………………………………………………………………...1

Immigration Act of 1990, Pub. L. No. 101-649, Tit. III, § 301, 104 Stat. 4978.......................... 13

## Constitutions, Regulations, and Other Authorities

U.S. Const. Art. II, Section 3 ................................................................................. 28

U.S. Const. Art. III, Section 2................................................................................. 29

8 C.F.R. § 274a.12(c)(14) ........................................................................ 2, 11, 15

44 Fed. Reg. 10,371 (Feb. 20, 1979) ..................................................................... 16

46 Fed. Reg. 25,079 (May 5, 1981) ................................................................. 15, 27

52 Fed. Reg. 16,216 (May 1, 1987) ....................................................................... 27

52 Fed. Reg. 46,092 (Dec. 4, 1987) ....................................................................... 16

61 Fed. Reg. 47,039 (Sept. 6, 1996) ...................................................................... 27

76 Fed. Reg. 53,764 (Aug. 29, 2011)...................................................................... 27

80 Fed. Reg. 7,912 (Feb. 12, 2015) ....................................................................... 27

N.J.A.C. § 10:49-5.4 ............................................................................................... 43

S. Rep. No. 99-132 (1985) ...................................................................................... 13

11A Charles Alan Wright & Arthur R. Miller, et al., Fed. Prac. & Pro. § 2948.1 (3d ed., April 2018 update) ................................................................................................................... 30

**STATEMENT OF THE ISSUES TO BE RULED UPON BY THE COURT**

On May 2, 2018, Plaintiffs moved for a preliminary injunction to "enjoin the 2012 memorandum creating DACA." Dkt. 5 at 2. The issue to be ruled upon by the Court is whether Plaintiffs are entitled to a preliminary injunction where they waited nearly six years to bring their motion, they are not likely to succeed on the merits, they have established no harm that they actually suffer from the 2012 memorandum creating Deferred Action for Childhood Arrivals ("DACA") that would be redressed by a grant of preliminary relief, the balance of equities tips decidedly against them, and an injunction would seriously harm the public interest.

**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING**

As of 2014, there were approximately 11.3 million undocumented immigrants in the United States, but Congress had appropriated sufficient funds to remove only about 400,000 each year. *Arpaio v. Obama*, 27 F. Supp. 3d 185, 192-93 (D.D.C. 2014). Thus, "[a] principal feature of the removal system" in the United States is "the broad discretion exercised by immigration officials." *Arizona v. United States*, 567 U.S. 387, 396 (2012). Congress has charged the Secretary of the Department of Homeland Security ("DHS") with the administration and enforcement of the immigration laws, 8 U.S.C. § 1103(a)(1), and with "establishing national immigration enforcement policies and priorities," 6 U.S.C. § 202(5). It has authorized the Secretary to "establish such regulations . . . and perform such other acts as he deems necessary for carrying out his authority." 8 U.S.C. § 1103(a)(3). And it has directed DHS to prioritize the removal of criminal aliens and aliens detained at the border.[1] Federal officials must "decide

---

[1] *See, e.g.*, 8 U.S.C. § 1225 (establishing a special "expedited removal" process for aliens apprehended at the border); *id.* § 1226(c) (providing mandatory detention for aliens convicted of certain crimes); *id.* § 1226a (providing mandatory detention for suspected terrorists); Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, Div. F., Tit. II, 128 Stat. 5, 251

whether it makes sense to pursue removal at all," and whether to afford the alien "discretionary relief allowing [him or her] to remain in the country." *Arizona*, 567 U.S. at 396. In exercising such discretion, DHS may be guided by "immediate humanitarian concerns" and the need to prioritize limited enforcement resources. *Id.*

"Deferred action" is one of the long-standing ways in which DHS has exercised such discretion and established such enforcement priorities. Deferred action is a "regular practice" pursuant to which DHS "for humanitarian reasons or simply for its own convenience" decides "no action will thereafter be taken to proceed against an apparently deportable alien" for a particular period of time. *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 484 (1999). The practice has been explicitly approved by both the Supreme Court and Congress. *See infra*, § I.A. Since 1960, the Executive Branch has established more than 20 policies for exercising discretion to forbear removal of particular classes of aliens from the United States. And since at least 1981, the Executive has permitted those granted deferred action to apply for work authorization and to pay into the Social Security system if they can establish "economic need as a pre-requisite." 46 Fed. Reg. 25,079, 25,081 (May 5, 1981); *see also* 8 C.F.R. § 274a.12(c)(14).

On June 15, 2012, then Secretary of Homeland Security Janet Napolitano issued a memorandum setting forth a framework for deferring action "against the removal of what [DHS] consider[ed] low priority aliens:" "'certain young people who were brought to [the U.S.] as children and know only this country as home.'" *Crane v. Johnson*, 783 F.3d 244, 248 (5th Cir. 2015) (quoting Memorandum from Janet Napolitano, Sec'y of Homeland Security, to David Aguilar, Acting Commissioner, U.S. Customs and Border Protection, et al., *Exercising*

---

(2014) (directing DHS to prioritize "the identification and removal of aliens convicted of a crime").

2

*Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children*
(June 15, 2012) ("Napolitano Memo" or "the Memo," Dkt.6, Ex. 1)). The Napolitano Memo
"permits teenagers and young adults, who were born outside the United States, but raised in this
country, to apply for deferred action status and employment authorizations." *Texas v. United
States*, 86 F. Supp. 3d 591, 606 (S.D. Tex. 2015). Pursuant to the Memo, a person who (1) came
to the United States before turning 16; (2) had continuously resided in the United States since
before June 15, 2007; (3) was in school, had graduated from high school, had obtained a GED, or
was honorably discharged from the military; (4) had not been convicted of a felony or significant
misdemeanor, and did not otherwise pose a threat to national security or public safety; and
(5) was not older than 30 as of June 15, 2012, could apply for an exercise of prosecutorial
discretion for a renewable two-year period. Dkt. 6, Ex. 1 (App. 2-4). The Memo specified that
applications were "to be decided on a case by case basis," and that it "confer[red] no substantive
right, immigration status or pathway to citizenship" for any person. *Id.*

Texas and the other Plaintiffs did not challenge deferred action when it was exercised in
the 1960s. They did not file suit when the Executive issued regulations allowing those granted
deferred action to apply for work authorization in 1981, or again in 1987. They did not challenge
the Napolitano Memo when it issued in 2012.[2] And they did not "sue[] over this practice in
2014." Dkt. 5 at 1. Instead, in 2014, twenty-six states sued DHS over a separate memorandum
from then-Secretary of Homeland Security Jeh Johnson, *Exercising Prosecutorial Discretion
with Respect to Individuals Who Came to the United States as Children and with Respect to*

---

[2] The State of Mississippi, by and through Governor Phil Bryant, did sue on August 23, 2012,
attacking the constitutional and statutory validity of the Napolitano Memo. The district court
dismissed the lawsuit for lack of standing and the Fifth Circuit affirmed, finding that Mississippi
had not demonstrated that it would incur any costs "because of the DACA program." *Crane*, 783
F.3d at 252.

*Certain Individuals Who Are the Parents of U.S. Citizens or Permanent Residents* (November 14, 2014) (the "Johnson Memo" or "DAPA"). *See Texas*, 86 F. Supp. 3d at 604, 677-78. The 2014 complaint was replete with allegations that DACA "had and continue[s] to have dire consequences in the Plaintiff States." Dkt. 6, Ex. 7 (App. 55); *see also id*. at App. 67 ("DACA led directly to a flood of immigration across the Texas-Mexico border and a 'humanitarian crisis' in Texas."). Plaintiffs States nonetheless strategically chose to not challenge the Napolitano Memo or seek to enjoin DACA as it had been operating since 2012.

On February 16, 2015, this Court preliminarily enjoined the 2014 Johnson Memo, explicitly leaving the 2012 Napolitano Memo, and DACA, as it had been operating since 2012, in place. *See Texas*, 86 F. Supp. 3d at 677-78. A divided Fifth Circuit panel affirmed, as did an equally divided Supreme Court. *Texas v. United States*, 809 F.3d 134, 139 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (per curiam).

Between December 2014, when the DAPA litigation commenced, and the Supreme Court's decision on June 23, 2016, Plaintiffs took no action to challenge the Napolitano Memo. After President Trump took office, then Secretary of Homeland Security John Kelly rescinded the Johnson Memo but left the Napolitano Memo in place. *See* Dkt. 1, Ex. 5. On June 29, 2017, more than five years after the Napolitano Memo issued, Texas and ten other states wrote a letter to the Attorney General threatening to amend their original complaint to challenge the Memo if the United States did not rescind it by September 5, 2017. *See* Dkt. 1, Ex. 6. On September 5, 2017, then-Acting Secretary of Homeland Security Elaine Duke issued a memo rescinding the Napolitano Memo. *See* Dkt. 1, Ex. 7.

Various plaintiffs (including twenty States plus the District of Columbia) filed twelve lawsuits in six federal district courts seeking to enjoin the rescission. Neither Texas nor any of

the other Plaintiffs in this action attempted to intervene in those lawsuits or even submit amicus briefs defending their interests to the district courts or courts of appeal. Instead, they sat on the sidelines while three nationwide injunctions were issued enjoining the rescission—two requiring DHS to continue processing DACA renewal applications, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1048 (N.D. Cal. 2018) (enjoining federal defendants from rescinding DACA and ordering them "to maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the rescission on September 5, 2017"); *Vidal v. Nielsen*, 279 F. Supp. 3d 401, 409 (E.D.N.Y. 2018) (enjoining federal defendants from rescinding DACA and ordering them to "continue processing DACA renewal requests under the same terms and conditions that applied before September 5, 2017"), and one requiring DHS to process initial DACA applications as well, *NAACP v. Trump*, 298 F. Supp. 3d 209, 215-16 (D.D.C. 2018) ("Vacatur of DACA's rescission will mean that DHS must accept and process new a well as renewal DACA applications.").[3] Plaintiffs now attempt to collaterally attack those injunctions in this court, requesting a conflicting injunction preventing "Defendants from issuing or renewing DACA permits in the future." Dkt. 1, ¶ 16.

---

[3] The Supreme Court denied the Federal Defendants' request for expedited review over the two injunctions requiring DHS to continue processing DACA renewal applications, and the propriety and scope of those injunctions are currently under review by the Second and Ninth Circuit Courts of Appeal. The D.C. District Court is currently considering supplemental briefing on the third injunction—specifically regarding the impact of a DHS memo of June 22, 2018, that provided an additional explanation of the basis for the rescission. *See* Dkt. 71-1 in *NAACP v. Trump*, Case Nos. 17-1907, 17-2325 (Ex. 52 (NJAPP 588)). ("(Ex. [ ] (NJAPP __))" refers to the Exhibits (and page numbers therein) of New Jersey's Appendix of documents and authorities being filed concurrently in support of this Opposition.)

This Court directed the parties to address what impact, if any, Secretary Nielsen's June 22, 2018, memo has on this case. Because this case concerns only the lawfulness of the Napolitano Memo, and not the lawfulness of any attempted rescission of that memo by the Federal Defendants, the June 22 memo has no impact.

In sum, Plaintiffs waited nearly six years to move to preliminarily enjoin "the 2012 directive creating DACA in the first place." Dkt. 5 at 6. Since then, hundreds of thousands of individuals have built their lives around DACA. As of September 4, 2017, there were 689,800 active DACA grantees, including 17,400 in New Jersey and 113,000 in Texas. *See* Ex. 32 (NJAPP 368). DACA grantees are healthcare professionals, artists, entrepreneurs, teachers, lawyers, software developers, designers, research assistants, and construction workers. They own homes and cars and have United States citizen children, siblings, and spouses.  They are full members of the New Jersey community—our neighbors and friends, teachers and students, brothers, sisters and colleagues. They are causing no harm to Texas or any of the Plaintiffs, yet Plaintiffs request an order from this Court upending their lives, six years in. This Court should refuse.

## SUMMARY OF ARGUMENT

The purpose of a preliminary injunction is to preserve the status quo until a trial can be held on the merits. Here, Plaintiffs seek a preliminary injunction to dramatically upend the status quo and change the lives of 689,000 people. The Court should deny the motion.

**I.** The Napolitano Memo does not conflict with the Immigration and Nationality Act ("INA"). Deferred action in general, and the Napolitano Memo in particular, fall well within the Executive's authority to administer and enforce the INA. The Fifth Circuit's prior decision in *Texas v. United States* does not hold otherwise. The rationale of the Fifth Circuit's statutory holding was that the INA's specific and intricate provisions already directly addressed how a parent could derive an immigration classification from his or her child, and the Executive therefore did not have discretion to provide relief *to the exact same population*, without complying with any of the requirements Congress had imposed. That is not true here. And fundamental conceptions of justice confirm that people who were brought to this country as

6

children are not similarly situated to those who chose to come as adults.

Plaintiffs are also wrong to insist that the Napolitano Memo violates the APA's notice and comment requirements. The Napolitano Memo, by its plain language, leaves discretion to be exercised in individual cases. In the DAPA litigation, this Court and the Fifth Circuit held that discretion "merely pretext" based in part on the declaration of Mr. Kenneth Palinkas, who testified that DACA applications are "rubberstamped." Mr. Palinkas has since admitted that he has no personal knowledge of how DACA applications are adjudicated at all. Specifically, Mr. Palinkas testified that he has no "firsthand" knowledge about the DACA adjudication process because he has "never . . . adjudicated a DACA case." Palinkas Dep. Tr. at 42:15-16 (Ex. 16 (NJAPP 259). Mr. Palinkas also made clear that what he lacks in personal knowledge he makes up for in personal bias against DACA. His declaration therefore cannot be credited, and it certainly cannot be credited over the conflicting declaration of Donald Neufeld, Associate Director for U.S. Citizenship and Immigration Services ("USCIS") Service Center Operations. New Jersey affirmatively requests an evidentiary hearing before any factual findings related to discretion are made.

**II.** Plaintiffs have not shown they will be irreparably harmed absent an injunction. As an initial matter, Plaintiffs' delay of six years in seeking preliminary injunctive relief itself demonstrates that they will suffer no irreparable injury if the Napolitano Memo remains in place until a trial on the merits can be held. Even if Plaintiffs' six-year delay could somehow be excused, Plaintiffs cannot show irreparable harm because the harms they assert are either illusory or do not result from the Napolitano Memo itself and would thus not be remedied by a preliminary injunction. *See, e.g.*, *Texas*, 86 F. Supp. 3d at 634 (concluding that "indirect damages" were "not caused by DAPA" and that the "injunctive relief requested by Plaintiffs

7

would not redress" them).

Unlike in the DAPA litigation, here, Plaintiffs have introduced no evidence regarding the costs of issuing driver's licenses to DACA grantees, and have expressly disclaimed any reliance on such costs. Plaintiffs instead claim harm based on "healthcare, law-enforcement, and education costs imposed by aliens who would not remain in the country but for renewal of their unlawful DACA status." Dkt. 5 at 8. But *Plaintiffs do not actually point to any costs imposed by DACA grantees.* (Actually, Plaintiffs point to no harms at all. Only Texas has submitted any evidence in this case.) Texas's only witness on education costs, for example, submitted a declaration discussing the costs of educating unaccompanied children who arrived in Texas between October 2014 and September 2018. Because only children who arrived in the United States *before June 15, 2007* are eligible for DACA, none of those children can possibly be DACA grantees. Texas runs into a similar problem with healthcare costs. Texas's sole witness on healthcare costs lists the costs Texas supposedly incurs in providing various health services to undocumented immigrants, but offers no evidence whatsoever of what, if any, costs are attributable to DACA or DACA grantees. The record evidence establishes that DACA actually saves Texas money when it comes to healthcare costs, because more than half of DACA grantees receive employer-sponsored health insurance, which they would lose were DACA enjoined.

**III.** In any event, Texas has manifestly failed to show that it would suffer more harm if the Napolitano Memo were not enjoined pending trial than DACA grantees and the State of New Jersey would suffer if the Napolitano Memo were enjoined. The procedural posture of this case is the precise opposite of the procedural posture in the DAPA litigation, where Plaintiffs sought to preserve the status quo. Here, Plaintiffs seek to upend the lives of 689,000 active DACA

grantees, including 17,400 who live in New Jersey and 113,000 who live in Texas. If this Court enjoins the Napolitano Memo, all of these people would be immediately rendered legally unemployable and could be subject to forced separation from their families. The harms to New Jersey that would flow from the issuance of a preliminary injunction far outweigh any harm Texas would suffer if the injunction is denied.

**IV.** Finally, Plaintiffs have not established that an injunction is in the public interest. Any injunction from this Court that prevents DHS from issuing DACA renewals in the future would directly conflict with two existing nationwide injunctions requiring DHS to continue issuing DACA renewals. New Jersey is aware of no case in which a federal district court has issued a nationwide injunction that directly conflicts with a separate nationwide injunction already entered by a different federal district court. This Court should not be the first.

## ARGUMENT

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) (per curiam). In order to obtain a preliminary injunction, a plaintiff must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. NRDC,* Inc., 555 U.S. 7, 20 (2008). "[A] preliminary injunction is 'an extraordinary remedy' which should only be granted if the party seeking the injunction has 'clearly carried the burden of persuasion' on all four requirements." *Karaha Bodas Co. v. Negara*, 335 F.3d 357, 363 (5th Cir. 2003).

Moreover, where, like here, the requested relief goes "beyond simply maintaining the status quo" until trial, and instead requires a change in the status quo, a preliminary injunction

"is particularly disfavored, and should not be issued unless the facts and law *clearly favor the moving party*." *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (emphasis added); *see also Justin Indus., Inc. v. Choctaw Sec., L.P.*, 920 F.2d 262, 268 (5th Cir. 1990) ("[B]ecause [Plaintiff] is seeking a mandatory injunction, it bears the burden of showing a clear entitlement to the relief under the facts and the law."). Because the facts and law do not *clearly favor* Plaintiffs, their motion must be denied.

## I.   PLAINTIFFS HAVE NOT SHOWN THEY ARE LIKELY TO SUCCEED ON THE MERITS.

Plaintiffs contend that "DACA is unlawful" because it (1) "is contrary to substantive federal law," (2) "was issued without the notice-and-comment procedure required by the APA," and (3) "violates the Take Care Clause of the Constitution." Dkt. 5 at 21, 32, 37. "Because plaintiffs have not shown that they are likely to succeed on the merits of their claims," this court may not grant a preliminary injunction. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018).[4]

### A.  The Napolitano Memo Is Not Contrary to Federal Law.

Plaintiffs argue that the Napolitano Memo is contrary to the INA, Dkt. 5 at 21-31, but they point to no specific conflict with the statute—deferred action in general and the Napolitano Memo in particular fall well within the Executive's authority to administer and enforce the INA. And the Fifth Circuit's prior decision in *Texas v. United States* does not hold otherwise.

#### 1.   Deferred Action Falls Well Within the Executive's Authority to Administer and Enforce the INA.

As earlier noted, as of 2014, there were approximately 11.3 million undocumented immigrants in the United States, but Congress had appropriated funds sufficient to remove only

---

[4] This Court directed the parties to address what impact, if any, the Supreme Court's decision in *Trump v. Hawaii* has on this case. New Jersey does not believe that decision is relevant here, except to demonstrate why Plaintiffs are ineligible for a preliminary injunction.

about 400,000 each year. *Arpaio*, 27 F. Supp. 3d at 192. A "principal feature of the removal system" in the United States is therefore "the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. For persons here unlawfully, the Executive has discretion to "decide whether it makes sense to pursue removal at all." *Id.* It may decide to afford various forms "of discretionary relief allowing [the person] to remain in the country." *Reno*, 525 U.S. at 483. And it always "has discretion to abandon the [removal] endeavor" entirely. *Id.* In making these discretionary determinations, the Executive "considers a variety of factors such as the danger posed to the United States of an individual's unlawful presence, the impact of removal on the nation's international relations, and the 'human concerns' of whether the individual 'has children born in the United States, long ties to the community, or a record of distinguished military service.'" *Arpaio v. Obama*, 797 F.3d 11, 16 (D.C. Cir. 2015) (quoting *Arizona*, 567 U.S. at 396).

"Deferred action" is one of the long-standing ways in which DHS has exercised such discretion. Deferred action is a "regular practice" pursuant to which DHS, "for humanitarian reasons or simply for its own convenience," decides "no action will thereafter be taken to proceed against an apparently deportable alien" for a particular period of time. *Reno*, 525 U.S. at 484; *see also* 8 C.F.R. § 274a.12(c)(14) (defining "deferred action" as "an act of administrative convenience to the government which gives some cases lower priority").

Deferred action has been explicitly approved by both the Supreme Court and Congress. As the Supreme Court explained, deferred action is a "commendable exercise in administrative discretion" that was originally "developed without express statutory authorization" and was known as "nonpriority." *Reno*, 525 U.S. at 484. Since the 1950s, the Executive has established more than twenty policies for exercising deferred action or other prosecutorial discretion to

forbear removal of particular classes of aliens from the United States. Early examples of such

policies include: (a) President Eisenhower's parole of Hungarian refugees in 1956, Ex. 23

(NJAPP 304); (b) the parole of more than 600,000 Cubans in the United States through a series

of discretionary programs that took place over the course of four Presidential administrations,

Ex. 25 (NJAPP 312); and (c) President Kennedy's establishment of the Hong Kong Parole

Program, which provided extended voluntary departure to 15,000 Chinese refugees, Ex.30

(NJAPP 339-40). And in 1975, the former Immigration and Naturalization Service ("INS")

issued guidance on deferred action, explaining that "consideration should be given" to

"appealing humanitarian factors" including "advanced or tender age, lengthy presence in the

United States, physical or mental conditions requiring care or treatment in the United States, and

the effect of deportation on the family members in the United States." *See* Dkt. 6, Ex. 7 (App.

220-21).

The "Family Fairness" policies of 1987 and 1990, which covered approximately 1.5

million undocumented immigrants, or 40% of the total undocumented population at that time,

reflect the Executive's broad discretion in this area. Dkt. 6, Ex. 7 (App. 224-25). The

Immigration Reform and Control Act of 1986 ("IRCA") made it illegal for employers to hire

undocumented immigrants, while allowing unauthorized immigrants who had been continuously

present in the United States since January 1, 1982, to legalize their status if they had not

committed any crimes and met certain other requirements. *See* 8 U.S.C. §§ 1324a(a)(1)(A)-(B),

1255a(a)(2). When debating the legislation, Congress intentionally decided not to provide

legalization to unauthorized spouses and children of those who legalized under the new law

unless the spouses and children were themselves qualified under the Act's requirements. Dkt. 6,

Ex. 7 (App. 224).  The Senate Judiciary Committee explained: "[It] is the intent of the

Committee that the families of legalized aliens will obtain no special petitioning right by virtue of the legalization. They will be required to 'wait in line.'" S. Rep. No. 99-132 at 16 (1985) (Ex. 49 (NJAPP 573)). These "split-eligibility" families became a key issue post-IRCA, and legislation to protect them was repeatedly introduced, but never enacted, by Congress. Dkt. 6, Ex. 7 (App. 224, App. 246). Despite this, in 1987, President Reagan's INS announced a Family Fairness policy to forbear from removing children living with parents who were in the process of legalizing status under IRCA, or spouses if "compelling or humanitarian factors existed." *Id.* (App. 224-25, 246, 249-51). Then, in February of 1990, when legislation to address this population was still stalled in Congress, President Bush's INS expanded President Reagan's policy to provide a renewable one-year term of forbearance from removal and work authorization for any ineligible spouse or minor child of a legalized alien who (1) had been residing in the United States since November 6, 1986; (2) was otherwise inadmissible; (3) had not been convicted of a felony or three misdemeanors; and (4) had not assisted in the persecution of any person. *Id.* (App. 249-51).

President Bush's Administration created this deferred action framework without express statutory authorization; in fact, Congress had repeatedly declined to enact legislation between 1986 and 1990. *Id.* (App. 224, App. 246). Yet instead of rejecting the policy as contrary to statute, Congress embraced it. In November of 1990, Congress passed legislation to codify the Family Fairness protections into law, but the law did not go into effect until October 1, 1991. *See* Immigration Act of 1990, Pub. L. No. 101-649, Tit. III, § 301, 104 Stat. 4978. During the interim one-year period, Congress expressly relied on the "existing family fairness program" created by the INS. *Id.* at 5030.

The Fifth Circuit dismissed the "Family Fairness" policies as "interstitial to a statutory

legalization scheme," whereas Congress "has repeatedly declined to enact the Development,

Relief, and Education for Alien Minors Act ('DREAM Act')." *Texas*, 809 F.3d at 185. But the

policies appear "interstitial" only in hindsight—at the time, Congress had expressly chosen not to

provide relief to unauthorized spouses and children, and repeatedly failed to enact legislation to

address this population.

Moreover, in the years since, Congress has continued to ratify and encourage the

Executive's use of deferred action. *See, e.g.*, 8 U.S.C. § 1151 note (stating that immediate family

members of alien U.S. combat veterans are "eligible for deferred action, advance parole, and

work authorization"); 8 U.S.C. § 1154(a)(1)(D)(i)(II) (stating that VAWA petitioners are

"eligible for deferred action and work authorization"); 8 U.S.C. § 1227(d)(2) (stating that a

denial of an administrative stay of removal "shall not preclude the alien from applying for . . .

deferred action").

### 2.   The Napolitano Memo Fits Comfortably Into the Deferred Action Framework.

In the face of all this historical evidence regarding the Executive's use of deferred action

and prosecutorial discretion, Plaintiffs have two principal responses: one, "historical practice . . .

does not, by itself, create power," Dkt. 5 at 31; and two, the Napolitano Memo is different from

deferred action because it illegally grants "legal status and benefits." Dkt. 5 at 1.

As to the former, while Plaintiffs are correct that historical practice does not create

power, where the Executive's actions have been repeatedly ratified and endorsed by Congress,

Plaintiffs cannot be heard to claim that those actions are foreclosed by Congressional law. As to

the latter, the Napolitano Memo *does not itself confer any legal status or benefits*.

As an initial matter, Plaintiffs repeatedly confuse "lawful presence" with "lawful status."

*See, e.g.*, Dkt. 5 at 1 (stating that DACA grants "lawful presence status"). "[U]nlawful presence

14

and unlawful status are distinct concepts" in immigration law, and it is "entirely possible for aliens to be lawfully present (i.e., in a 'period of stay authorized by the Attorney General')" even though they lack *lawful status* that would provide a defense from removal under the INA. *See Chaudhry v. Holder*, 705 F.3d 289, 291-92 (7th Cir. 2013). Deferred action, even though it provides a temporary period of lawful presence, does not provide any alien with lawful status. And of course the Napolitano Memo mentions neither lawful presence *nor* lawful status, except to say, "This memorandum confers no substantive right, immigration status or pathway to citizenship." Dkt. 6, Ex. 1 (App. 0004). As to the "host of attendant benefits" about which Plaintiffs complain, Dkt. 5 at 24, none are actually conferred by the Napolitano Memo itself. Plaintiffs do not claim otherwise.

First, with respect to work authorization, those granted deferred action have been permitted to apply for work authorization since the 1970s, *see, e.g.*, Ex. 29 (NJAPP 329) (aliens can apply for work authorization when the INS "do[es] not intend or [is] unable to enforce the alien's deportation"), and the practice was codified in formal regulation in 1981, *see* 46 Fed. Reg. at 25,081 (May 5, 1981), and again in 1987 after Congress enacted IRCA, *see* 8 C.F.R. § 274a.12(c)(14) (permitting those granted deferred action to apply for work authorization if they can "establish[] an economic necessity for employment"). The ability to obtain work authorization simply does not originate from the Napolitano Memo or distinguish DACA from prior deferred action frameworks.

Plaintiffs argue that the "conferral of work authorization violates congressional statutes." Dkt. 5 at 28. But the time in which to challenge the Executive's 1981 and 1987 regulations has long since expired. *See* 28 U.S.C. § 2401(a) (six-year limitations period to challenge final agency action under the APA). Indeed, such a challenge was already rejected in 1987 because the INA

explicitly defines an "unauthorized alien" who is not permitted to work as one who is not "*authorized to be so employed* by this Act or *by the Attorney General* [now the Secretary of Homeland Security]." 8 U.S.C. § 1324a(h)(3) (emphasis added). As the former INS explained, the "only logical way to interpret this phrase is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority . . . , defined 'unauthorized alien' in such fashion as to exclude aliens who have been *authorized employment by the Attorney General through the regulatory process*, in addition to those who are authorized employment by statute." 52 Fed. Reg. 46,092, 46,093 (Dec. 4, 1987) (emphasis added); *see also Perales v. Casillas*, 903 F.2d 1043, 1045 (5th Cir. 1990) (explaining that "the agency's decision to grant voluntary departure and work authorization has been committed to agency discretion by law").

Plaintiffs also object that DACA grantees can "obtain Social Security, Medicare, and another retirement benefit." Dkt. 5 at 27. But regulations dating back to 1979 require all those who receive work authorization to pay into the Social Security system under the same rules that apply to U.S. citizens. *See* 44 Fed. Reg. 10,371 (Feb. 20, 1979); *see also* 8 U.S.C. § 1611(b)(2) (providing that a bar on Federal public benefits "shall not apply to any benefit payable under title II of the Social Security Act . . . to an alien who is lawfully present in the United States as determined by the Attorney General"). And of course, Plaintiffs cannot point to any DACA grantee (who by definition must have been 30 years old or younger as of June 15, 2012) who has actually received Social Security retirement benefits or Medicare upon turning age 61 or 65. Similarly, Plaintiffs do not even allege that they have been harmed by the ability of DACA grantees to obtain Social Security, the Earned Income Tax Credit, Medicare, or federal railroad retirement benefits. Plaintiffs thus fail to explain how these federal "benefits" to DACA grantees

16

increase *their* fiscal burdens or otherwise cause *them* any harm.

Citing to Senator Grassley's website, Plaintiffs also repeatedly assert that the Executive has unlawfully used DACA to "unilaterally confer United States citizenship on otherwise ineligible aliens." Dkt. 5 at 3 (citing Dkt. 6, Ex. 3 (App. 12)). Specifically, Plaintiffs contend that "as of August 2017, approximately 1,056 DACA recipients have been given citizenship and approximately 39,514 DACA recipients have been given lawful-permanent-resident status (which is a pathway to citizenship)." *Id.* As USCIS has explained, "neither deferred action nor advance parole creates 'a path to citizenship.'" Dkt. 9, Ex. 18 (App. 1172). Plaintiffs do not even allege that the 39,514 DACA recipients they believe have been given LPR status were "given" that status *because of DACA*. Instead, only individuals who qualify under the INA are eligible for lawful permanent residence, and obtaining deferred action or advance parole does not "alter the requirement that an alien must meet all . . . requirements for admissibility." *Id.* Moreover, as of December 31, 2015, a total of 2,994 out of 713,300 individuals who had been granted DACA status had subsequently applied and been approved for advance parole and then been approved for adjustment of status. Dkt. 9, Ex. 18 (App. 1172). Of those 2,994, many "may have been otherwise eligible for adjustment of status regardless of the grant of advance parole"—for example, those who had been "previously admitted (or paroled) into the United States and subsequently fell out of status." *Id.*[5]

Finally, Plaintiffs vaguely allude to the Napolitano Memo being unlawful because it is "class-based." Dkt. 5 at 10; *see also id.* at 38 (the Executive "cannot dispense with statutes addressing unlawful presence by merely declaring a class of aliens to henceforth be present

---

[5] In any event, Plaintiffs do not explain how they could possibly be harmed by any qualifying individual's adjustment to LPR status or citizenship. States suffer no cognizable injury from the presence of additional lawful permanent residents or citizens within their borders.

lawfully"). But "class-based" deferred action has been in place for years (*see supra*, at § I.A.1), and the Solicitor General of Texas, on behalf of the DAPA Plaintiffs, conceded to the Supreme Court that forbearance from removal can be "class-based." *See U.S. v. Texas*, No. 15-674, Tr. of Oral Arg. at 50:9-11 (Ex. 22 (NJAPP 300)).

### 3. *Texas v. United States* Does Not Hold Otherwise.

Plaintiffs' contend that the Fifth Circuit's holding that DAPA is "not authorized by statute," and is "foreclosed by Congress's careful plan," applies equally to DACA. Dkt. 5 at 21. It does not. As the Fifth Circuit acknowledged, "DACA and DAPA are not identical." *Texas*, 809 F.3d at 173. That is true for several important reasons.

*First*, the Fifth Circuit held that through the INA's "specific and intricate provisions, Congress ha[d] directly addressed the precise question at issue" in that case: "how parents may derive an immigration classification on the basis of their child's status." *Id.* at 186 (internal quotation marks omitted). In order to derive a lawful immigration classification from a child's immigration status, an applicant must have a U.S. citizen child who is at least 21-years-old, leave the United States, wait ten years, and then obtain a family-preference visa from a United States consulate. *Id.* at 179-180 (citing 8 U.S.C. §§ 1151(b)(2)(A)(i), 1182(a)(9)(B)(i)(II), 1201(a), 1255). DAPA would have provided relief *to the exact same population*, but "without complying with any of the requirements . . . *Congress ha[d] deliberately imposed*." *Id.* (emphasis added). That is not true here. The INA does not detail requirements for a person brought to the United States as a child, who knows only this country as home, to seek lawful status on that basis, and the Napolitano Memo did not fail to comply with any of the requirements that Congress had deliberately imposed when setting forth a framework for deferred action. Moreover, whereas "the Fifth Circuit inferred that by creating procedures by which alien parents of U.S. citizens

may obtain lawful status, Congress implicitly prohibited the Executive Branch from granting

deferred action and work authorization to such individuals *based on more permissive criteria*,"

*Vidal*, 279 F. Supp. 3d at 426 (emphasis added), no such inference is possible here.

*Second*, the Fifth Circuit repeatedly focused on the number of persons covered by DAPA,

which far exceeded the absolute number impacted by any prior discretionary relief program.

"DAPA would make 4.3 million otherwise removable aliens eligible for lawful presence,

employment authorization, and associated benefits, and we must be guided to a degree by

common sense as to the manner in which Congress is likely to delegate a policy decision of such

economic and political magnitude to an administrative agency." *Texas*, 809 F.3d at 181 (internal

quotations marks omitted). Six years in, there were 689,800 active DACA grantees as of

September 4, 2017. Put simply, "[t]here is a difference between 4.3 million and 689,800."

*Regents*, 279 F. Supp. 3d at 1042.

*Third*, the Napolitano Memo was targeted at "certain young people who were brought to

this country as children and know only this country as home." Dkt 6, App. 2. "As a general

matter, these individuals lacked the intent to violate the law and [DHS's] ongoing review of

pending removal cases [was] already offering administrative closure to many of them." *Id.*

"[F]undamental conceptions of justice" confirm that people who were brought to this country as

children are not similarly situated to those who chose to come as adults. *Plyler v. Doe*, 457 U.S.

202, 220 (1982); *cf. Montgomery v. Louisiana*, 136 S. Ct. 718, 733 (2016) as revised (Jan. 27,

2016) ("[C]hildren are constitutionally different from adults for purposes of sentencing."). The

INA similarly recognizes that children are different. That is why the time when an alien is a

minor "shall [not] be taken into account" in calculating periods of "unlawful presence" in the

United States. 8 U.S.C. § 1182(a)(9)(B)(iii)(I). Any attempt by Plaintiffs to equate DAPA with

DACA ignores this crucial distinction.

### B. The Napolitano Memo, Like Prior Memos Setting Forth Frameworks for Exercising Deferred Action, Did Not Require Notice and Comment.

The Napolitano Memo is exempt from the APA's notice-and-comment requirements because it set forth a framework for the exercise of prosecutorial discretion for people brought to the United States as children, but did not bind agents in particular cases and or give any person a substantive entitlement to obtain deferred action. In fact, the Fifth Circuit has already concluded that individual agents may exercise discretion, on a case-by-case basis, in deciding whether to grant deferred action under DACA. *Crane*, 783 F.3d at 254-55. That is enough to confirm the Napolitano Memo did not need to go through notice-and-comment rulemaking.[6]

The APA requires that substantive or legislative rules go through notice and comment, but it exempts all "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" from this process. 5 U.S.C. § 553(b)(3)(A). The method by which courts distinguish between the two is well established: while the former have the force and effect of law—*i.e.*, they grant legal rights, impose legal obligations, or have a significant effect on the rights of third parties—the latter "'advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.'" *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993) (citation omitted). As the Fifth Circuit has put it, "[a]s long as the agency remains free to consider the individual facts in the various cases that arise, then the agency action in question has not established a binding norm" and the agency need not follow notice-and-comment procedures.

---

[6] The Federal Defendants, who agree with Plaintiffs that DACA is unlawful, ask this Court not to address "whether DACA is . . . procedurally unlawful for failure to undergo notice and comment under the APA," because such a holding "would require a factual determination." Dkt. 71-1 at 15, n.5 (citing *Texas*, 809 F.3d at 172-75). New Jersey agrees that any holding on the procedural APA question would require this Court to make factual findings, and explicitly requests an evidentiary hearing to resolve the conflicting statements discussed herein before this Court makes any such finding.

*Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 596-97 (5th Cir. 1995).

> **1.    The Napolitano Memo Makes Clear the Agency Is to Exercise Case-By-Case Discretion.**

The Napolitano Memo, by its plain language, leaves discretion to be exercised in individual cases going forward. While it lists criteria that "should be satisfied before an individual is considered for an exercise of prosecutorial discretion," it specifically says that consideration must be "given to the individual circumstances of each case." Dkt. 6, Ex. 1 (App. 2-3). The Memo also states that "*requests for relief pursuant to this memorandum are to be decided on a case by case basis.*" *Id.* (App. 3) (emphasis added).

The Napolitano Memo is also crystal clear that it "confers no substantive right, immigration status or pathway to citizenship"; rather, it "set[s] forth policy for the exercise of discretion within the framework of the existing law." *Id.* (App. 4). Thus, no person has any substantive entitlement to obtain deferred action under the Memo, and the Executive retains discretion to remove a grant of deferred action at any time. *See Texas*, 809 F.3d at 148 (recognizing that "'[l]awful presence' is not an enforceable right to remain in the United States and can be revoked at any time"). Case law supports DHS on this: the Supreme Court has held that, despite efforts by applicants to sue after being denied deferred action under prior frameworks, federal laws are "designed to give some measure of protection to 'no deferred action' decisions," and Congress sought to limit "judicial constraints upon [this] prosecutorial discretion." *Reno*, 525 U.S. at 485 & n.9.

This is the paradigmatic example of a general policy statement—a clarification of how an agency vested with discretion plans to use that power, while repeating that its agents still have the authority to decide each case on an individual basis. Indeed, the Fifth Circuit has already held that the Napolitano Memo was a general policy statement that did not tie agents' hands in

individual cases. In *Crane*, a group of ICE agents challenged the Napolitano Memo, contending—as Plaintiffs do now—that the memo required them to grant deferred action even when they believed that doing so would be inappropriate. 783 F.3d at 249. The Fifth Circuit found that the Memo did no such thing: the "fundamental flaw" in the agents' claim, the panel reasoned, is that their "reading of the Directive—that they are always required to grant deferred action . . . is erroneous. [DACA] makes it clear that the Agents shall exercise their discretion in deciding to grant deferred action, and this judgment should be exercised on a case-by-case basis." *Id.* at 254-55.

### 2. The Extrinsic Evidence in this Case, Unlike in the DAPA Litigation, Confirms the Napolitano Memo's Promise of Discretion.

In the DAPA litigation, this Court and the Fifth Circuit held that although the Napolitano Memo facially purported to confer discretion, extrinsic evidence showed that promise was "merely pretext." Both Courts relied on (i) the "declaration by Kenneth Palinkas, the president of the union representing the USCIS employees processing the DACA applications, that . . . DACA applications are simply rubberstamped"; (ii) DACA's Operating Procedures; and (iii) the denial rate of accepted applications. *Texas*, 809 F.3d at 172-73. Plaintiffs argue this same "evidence warrants the same conclusion here." Dkt. 5 at 34. They could not be more wrong.

*First*, in making a factual finding that the promise of case-by-case discretion was "pretext," this Court relied heavily on the declaration of Mr. Palinkas, who testified that DACA applications were "rubberstamped." *Texas*, 809 F.3d at 173. Texas relies on Mr. Palinkas again here, and his new declaration largely repeats the substance of his prior declaration, including his claim that DACA applications are "favorably rubber stamped as long as they meet minimal requirements," and that applicants are "not properly vetted as no DACA applicant is ever interviewed." Dkt. 7, Ex. 14 (App. 1008). But unlike in the DAPA litigation, here Mr. Palinkas

22

had to sit for a deposition. And Mr. Palinkas testified at his deposition that he has no personal knowledge of the DACA adjudication process in general, no personal knowledge of case-by-case discretion in particular, and a strong personal bias against DACA.

Specifically, Mr. Palinkas testified that he has no "firsthand" knowledge of the DACA adjudication process because he has "never . . . adjudicated a DACA case." Palinkas Dep. Tr. at 42:15-16 (Ex. 16 (NJAPP 257)); *see also id.* at 54:7-8 ("I never adjudicated DACA, so I don't know particulars.") As Mr. Palinkas explained, the USCIS office in New York (where he works) does not even process DACA applications, "which is why I have no idea about a lot of details pertaining to it." *Id.* at 88:4-16. Mr. Palinkas also repeatedly confirmed his lack of personal knowledge of the eligibility requirements for a favorable exercise of discretion under the Napolitano Memo. *See, e.g.*, *id*. at 58:22-59:16 (no personal knowledge of the time required for continuous presence); *id*. at 60:7-13 (no personal knowledge about the use of biometrics); *id*. at 91:17-92:3 (no personal knowledge regarding detection of fraud). And when it came to the key issue of whether officers exercise discretion on a case-by-case basis, Mr. Palinkas again flat out admitted that he has no personal knowledge:

> Q.   With respect to exercising discretion in the application[s], would it be fair to say that because you don't adjudicate DACA application[s] that you're not aware of the extent to which discretion is exercised?
> A.   That's true, because I don't know—I'm not familiar with that application.

*Id*. at 95:3-9.

Mr. Palinkas also admitted to a strong personal bias against DACA. He repeatedly testified that he disagreed with DACA because recipients came to the United States illegally. *See, e.g.*, *id.* at 55:21-23 (describing DACA as a "reward system for doing something you shouldn't have done," and asking "when are the parents going to take the responsibility for their children?"); *id.* at 53:4-6 ("I don't think it's equitable to have [DACA recipients] demand and be

entitled to a path to citizenship, because of the [illegal] way they entered [the country]."). He also questioned whether DACA grantees are actually in school. *Id.* at 56:17-25 ("[T]he percentage of DACA recipients that supposedly claim they want to go to school and all this stuff, it's a low percentage, from what I understand. . . . So then what is the real purpose of them coming here, because they're Dreamers, but they're not dreaming.").

Because Mr. Palinkas made clear at his deposition that what he lacks in personal knowledge of how DACA applications are adjudicated he makes up for in personal bias, his declaration cannot be credited. And it certainly cannot be credited over the conflicting declaration of Donald Neufeld, Associate Director for USCIS Service Center Operations, who personally oversaw all four USCIS Service Centers that adjudicated DACA requests and was responsible for all policy, planning, management and execution. Dkt. 6, Ex. 7 (App. 579-96).

In his declaration, Mr. Neufeld described in detail based upon his personal knowledge how "DACA is a multi-step, case-specific process," how adjudication of a DACA application "necessarily involve[s] the consideration of and exercise of USCIS's discretion," and how certain criteria in the Napolitano Memo themselves require adjudicators to exercise case-by-case discretion. *Id.* (App. 585-87.) For example, "[w]hile determining whether a requestor has been convicted of a felony is straight forward, determining whether a requestor 'poses a threat to national security or public safety' necessarily involves the exercise of the agency's discretion" in each individual case. *Id.* (App. 587.) Mr. Neufeld also identifies specific instances of discretionary denials "even when all the DACA guidelines, including public safety considerations, have been met." *Id.* (App. 587-88). And he describes in great detail the numerous ways USCIS adjudicators can utilize their discretion on a case-by-case basis and the specific procedures for such decisions. *See id.* (App. 588-92). Mr. Neufeld also specifically

contradicted Mr. Palinkas's testimony that DACA applicants are "not properly vetted as no DACA applicant is ever interviewed," Dkt. 7, Ex. 14 (App. 1008), explaining the process for adjudicators at the Service Centers to refer applicants to a Field Office for an interview, and explaining when interviews were generally conducted. Dkt. 6, Ex. 7 (App. 0589).

*Second*, as to DACA's Operating Procedures, internal DHS documents produced by the Federal Defendants during discovery confirm that Service Center adjudicators have exercised and continue to exercise discretion on a case-by-case basis. For example, a June 2015 email explained that the Texas Service Center "now denies significantly more DACA cases based on our view of discretionary denials shifting . . . . Every case is different so we have to review the totality of the circumstances of each case. . . . [F]or whatever it's worth, the supervisors and I also like to jokingly say that our standard is *whether or not you would want to live next door to the person*. If you are ever in doubt, please feel free to see me." Ex. 38 (NJAPP 400) (emphasis added). And several documents discuss how to handle applications where there is reason to believe the applicant is a known or suspected criminal street gang member or drug cartel member. Both are to be referred to the DACA Background Check Unit (BCU). If, for example, the BCU determines "that the alien is a drug cartel member or a suspected drug cartel member, then the BCU will deny the request as a matter of discretion using the discretionary checkbox, '*You have not established that you warrant a favorable exercise of prosecutorial discretion*,' and refer the case to ICE." Ex. 37 (NJAPP 398). Similarly, adjudicators were instructed not to "approve anything with any nexus to gangs at all—even a family member." Ex. 36 (NJAPP 394). Indeed, the documents are replete with examples where USCIS management considered discretionary factors and attempted to give individual adjudicators guidance on how to exercise discretion in particular cases.

*Third*, in the DAPA litigation, this Court inferred pretext from the fact that as of the beginning of 2015, approximately 6% of DACA applications had been rejected and an additional 4% of accepted applications had then been denied. *Texas*, 809 F.3d at 172-73, n.130.[7] More recent data shows that since 2012, the denial rate for initial accepted applications has skyrocketed. After the initial flood of applications in 2012 and 2013, the denial rate has been consistently higher—approximately 17% in 2014, 22% in 2015, 15% in 2016, and 20% in 2017. Overall, the denial rate for initial accepted applications has increased to over 8.4% since 2012, with 76,569 initial applications denied.[8] That rate simply does not support the Plaintiffs' contention that DACA applications are being "rubberstamped."

### 3.   The Napolitano Memo Itself Does Not Confer Substantive Rights Or Benefits.

Plaintiffs spend four pages of their brief arguing that "DACA was a substantive rule that had to go through notice-and-comment procedure" because the "litigants challenging the Executive's 2017 decision to wind down DACA" recognized as much by admitting "that aliens

---

[7] The Fifth Circuit acknowledged that a low denial rate was to be expected with DACA, even assuming discretion was being exercised, because (1) "DACA involved issuing benefits to self-selecting applicants, and persons who expected to be denied relief would seem unlikely to apply," and (2) "[e]ligibility for DACA was restricted to a younger and less numerous population which suggests that DACA applicants are less likely to have backgrounds that would warrant a discretionary denial" than other applicants for deferred action. *Texas*, 809 F.3d at 173-74.

[8] The percentages are based on USCIS data for fiscal years 2012-2018. *See* Ex. 33 (NJAPP 371-72). According to this data, in 2014 there were 122,460 accepted filings and 20,987 denials, for a denial rate of 17.14%; in 2015, there were 85,304 accepted filings and 19,069 denials, for a denial rate of 22.35%; in 2016 there were 73,349 accepted filings and 11,399 denials, for a denial rate of 15.54%; and in 2017 there were 45,602 accepted filings and 9,242 denials for a denial rate of 20.27%. In addition, based on evidence produced by the Federal Defendants in discovery, the denial rate for accepted DACA applications in Texas is even higher, at 10%, with nearly 15,000 initial accepted DACA applications in Texas denied since 2012. *See* Ex. 34 (NJAPP 376-82) (showing that between 2012 and June, 2018, there were 149,896 accepted applications in Texas and 14,985 denials, for an aggregate denial rate of 10.0%).

who received DACA status would not have been able—but for DACA—to lawfully obtain jobs and access to certain Social Security and Medicare benefits." Dkt. 5 at 34 (internal quotation marks omitted). Leaving aside the fact that none of those litigants are parties to this case, Plaintiffs have not established that *DACA itself* confers any substantive rights or benefits.

As earlier noted (*supra*, § I.A.2), the collateral consequences of being granted deferred action existed *prior to and independent of* the Napolitano Memo. They therefore have no bearing on whether the Memo was required to go through notice-and-comment rulemaking. The decision that individuals with deferred action may seek authorization to work and contribute to the nation's economy, for example, has nothing to do with DACA—it is the result of a different regulation, one that *has* already gone through notice and comment. *See* 46 Fed. Reg. 25,079 (May 5, 1981); 52 Fed. Reg. 16,216 (May 1, 1987). So when the Napolitano Memo confirmed that "USCIS shall accept applications to determine whether the[] individuals [that received DACA] qualify for work authorization during this period of deferred action," Dkt. 6, Ex. 1, DHS was stating the obvious—that a separate and longstanding regulation, which had gone through a public-comment period decades before, set up that process. The same is true of rules that allow recipients to participate in Social Security retirement and disability and in Medicare, each of which went through notice and comment in the past. *See* 76 Fed. Reg. 53,764 (Aug. 29, 2011); 61 Fed. Reg. 47,039 (Sept. 6, 1996); 80 Fed. Reg. 7,912 (Feb. 12, 2015). In sum, while deferred action implicates "significant legal consequences," *Texas*, 809 F.3d at 148, they all flow from *other* regulations. All the Napolitano Memo did was announce a new policy regarding Executive priorities for deferred action—it did not decide what separate benefits individuals granted deferred action might receive. Since the 1970s, DHS (and its predecessors) has enacted a series of deferred action policies, *see supra*, § I.A.1, all properly without notice and comment. DACA

27

is no different.

This is enough to dispose of Plaintiffs' procedural arguments against DACA. The APA explicitly exempts general statements of policy from notice and comment. DACA, which reserves significant discretion to agents in individual cases, and which does not grant substantive legal rights to anyone, easily qualifies.

### C.  The Napolitano Memo Does Not Violate the Take Care Clause of the Constitution.

The Take Care Clause of the United States Constitution imposes a duty on the Executive to "take care that the laws be faithfully executed." Const. Art II, Section 3. "As a general rule, when Congress vests enforcement authority in an executive agency, that agency has the discretion to decide whether a particular violation of the law warrants prosecution or other enforcement action." Dkt. 9, Ex.19 (App. 1178). Furthermore, "[t]his discretion is rooted in the President's constitutional duty . . . and it reflects a recognition that the 'faithful[]' execution of the law does not necessarily entail 'act[ing] against each technical violation of the statute' that an agency is charged with enforcing." *Id.* (citing *Heckler v. Chaney*, 470 US 821, 831 (1985)).

Recycling all their arguments as to why the Napolitano Memo is unlawful, Plaintiffs argue that it violates the Take Care Clause by "dispens[ing] with certain immigrations statutes" and "declaring lawful conduct that Congress established as unlawful." Dkt. 5 at 37. New Jersey has already explained why the Napolitano Memo does not "dispense" with any immigration statutes or declare lawful any conduct that Congress declared unlawful. *See supra*, § I.A. And none of the cases Plaintiffs cite support the proposition that the Take Care Clause constitutes an independent ground on which to claim that the Executive acted outside of his or her statutory authority.

The use of prosecutorial discretion, which takes into account a variety of different factors

including humanitarian concerns and resource constraints, is an important aspect of the faithful execution of the laws. *See Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986) ("The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws . . . ."). This is especially true in the immigration context, where the Supreme Court has found that "discretion in the enforcement of immigration law embraces immediate human concerns." *Arizona*, 567 U.S. at 396. Plaintiffs claim under the Take Care Clause should be rejected.[9]

## II.   PLAINTIFFS HAVE NOT SHOWN THEY WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION.

The second factor for a preliminary injunction requires that a movant demonstrate a substantial threat of irreparable injury if the injunction is not issued. *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009). "Irreparable harm requires a showing that: (1) harm to [the plaintiff] is imminent; (2) the injury would be irreparable and (3) the [plaintiff has] no other adequate legal remedy." *GoNannies, Inc. v. GoAuPair.com, Inc.*, 464 F. Supp. 2d 603, 608 (N.D. Tex. 2006) (citing *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975)). Speculative injuries do not suffice. Indeed, courts may not issue a preliminary injunction "to prevent the possibility of some remote future injury." *Winter*, 555 U.S. at 51. In addition, the immediate injury must be fairly traceable to the challenged conduct such that it is likely to be redressed by the injunction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). A "long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be

---

[9] Plaintiffs are also unlikely to succeed on the merits for the reasons separately set forth in the Perez Defendant-Intervenors' Motion to Dismiss (Dkt. 118), and in New Jersey's Response to that motion (Dkt. 193). Namely, because Plaintiffs and the Federal Defendants agree that DACA is unlawful, and because what stands in the way of *Plaintiffs and the Federal Defendants* both getting what they want is third parties (not parties to this suit) that challenged the DACA rescission, and district courts (not this court) that agreed with them, this litigation must be dismissed for lack of case or controversy. U.S. Const. Art. III, § 2.

serious enough to justify a preliminary injunction." 11A Charles Alan Wright & Arthur R. Miller, et al., *Fed. Prac. & Pro.* § 2948.1 (3d ed., April 2018 update). Here, Plaintiffs point to no real and immediate injury they are suffering that is fairly traceable to DACA and that would be redressed by a preliminary injunction. And their delay of six years in seeking such relief itself demonstrates that their motion should be denied.

### A. Plaintiffs Cannot Demonstrate Irreparable Harm Because they Delayed in Seeking a Preliminary Injunction for Nearly Six Years.

"[A] party requesting a preliminary injunction must generally show reasonable diligence." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam) (citing *Holmberg v. Armbecht*, 327 U.S. 292, 396 (1946)). Because "[t]he purpose of a preliminary injunction is to preserve the status quo and thus *prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits*," *Exhibitors Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 441 F.2d 560, 561 (5th Cir. 1971) (per curiam) (emphasis added), a delay in seeking a preliminary injunction "weighs heavily against a finding" that plaintiff will be irreparably harmed before trial. *Rimkus Consulting Group, Inc. v. Cammarata*, 255 F.R.D. 417, 438 (S.D. Tex. 2008); *see also GoNannies, Inc.*, 464 F. Supp. 2d at 609 ("The law is well-established that: [D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.").

Here, Plaintiffs' six-year delay in seeking a preliminary injunction defeats their claim that they will be irreparably harmed before a trial on the merits. The history of this litigation has already been discussed in detail, but it suffices to note that, notwithstanding that the Napolitano Memo has been in effect since June 15, 2012, Plaintiffs finally got around to filing for a

preliminary injunction on May 2, 2018, nearly six years later. This delay itself proves that the

alleged harm is not imminent or irreparable. *See, e.g.*, *Solofill, LLC v. Rivera*, No. CV H-16-

2702, 2017 WL 514589, at *4 (S.D. Tex. Feb. 8, 2017) ("Months-long to years-long delays in

seeking an injunction for offending conduct have been enough for courts to hold against a

finding of irreparable injury.").[10]

Especially "[w]here parties fail to explain or justify the delay between the facts

underlying the need for the preliminary injunction and the motion for the injunction, courts

readily decline motions to enjoin for lack of urgency." *ADT, LLC v. Capital Connect, Inc.*, 145

F. Supp. 3d 671, 698 (N.D. Tex. 2015) (citations omitted). Here, Plaintiffs have offered no good

explanation or excuse for the delay, simply declaring that "Defendants cannot argue that the

Plaintiff States were not diligent in pursuing these claims." Dkt. 5 at 42. Plaintiffs make no effort

to explain away their more than two-year delay between the June 15, 2012, Napolitano Memo

and their December 2014 lawsuit seeking to enjoin DAPA. They make no effort to explain why

they did not challenge the Napolitano Memo in their December 2014 complaint (this is

especially egregious because Plaintiffs *pleaded harms related to DACA, but strategically chose*

---

[10] *See also*, *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, No. 1:17-cv-444-RP, 2017 U.S.
Dist. LEXIS 191317, at **10-11 (W.D. Tex. Nov. 20, 2017) (two month delay defeated showing
of irreparable harm for preliminary injunction purposes); *Talon Transaction Techs., Inc. v.
StoneEagle Servs.*, No. 3:13-cv-00902-P, 2013 U.S. Dist. LEXIS 200239, at *5 (N.D. Tex. Jul.
24, 2013) (denying motion for preliminary injunction motion and observing that the nine-month
delay "is at odds with the notion of irreparable harm"); *Innovation Ventures, LLC v. Ultimate
Lifestyles, LLC*, No. 4:08-CV-232, 2009 U.S. Dist. LEXIS 132724, at **7-8 (E.D. Tex. Mar. 13,
2009) (plaintiff's second request for injunctive relief failed "to indicate any urgency or
threatened irreparable harm" where plaintiffs delayed nine months in seeking the preliminary
injunction); *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC*, No. 3:09-CV-00390-L, 2009 U.S.
Dist. LEXIS 52950, at *12 (N.D. Tex. Jun. 23, 2009) (five-month delay in seeking preliminary
injunctive relief was "sufficient to rebut a presumption of irreparable harm"); *Wireless Agents,
L.L.C. v. T-Mobile USA, Inc*, No. 3:05-CV-0094-D, 2006 U.S. Dist. LEXIS 36590, at *3 (N.D.
Tex. June 6, 2006) (denying preliminary injunctive relief where "undue delay [of approximately
one year]" demonstrated there "was no apparent urgency to the request for injunctive relief, and
was of itself sufficient to rebut the presumption of irreparable harm.").

31

*not to challenge the Napolitano Memo* or its implementation). And while Plaintiffs explain that their lawsuit challenging the Johnson Memo was stayed pending appellate review, Dkt. 5 at 43, they make no effort to explain why that has anything to do with their failure to challenge the Napolitano Memo. To be clear, a successful challenge to the 2014 Johnson Memo was in no way a condition precedent to bringing a lawsuit challenging the 2012 Napolitano Memo or seeking preliminary injunctive relief.

For similar reasons, the Supreme Court recently affirmed the district court's denial of a preliminary injunction where "appellants did not move for a preliminary injunction . . . until six years" after the congressional map they challenged was adopted. *Benisek*, 138 S. Ct. at 1944. The court held "that plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request." *Id.*

So too here. That alone defeats Plaintiffs' allegations of irreparable harm.

### B.   Plaintiffs' Claimed Harms Are Either Illusory or Do Not Result from the Napolitano Memo.

Even if Plaintiffs' six-year delay in seeking preliminary injunctive relief could somehow be excused, Plaintiffs cannot show irreparable harm because the harms they assert are either illusory or do not result from the Napolitano Memo itself and would thus not be remedied by a preliminary injunction. *See, e.g.*, *Texas*, 86 F. Supp. 3d at 634 (concluding that "indirect damages" were "not caused by DAPA" and the "injunctive relief requested by Plaintiffs would not redress" them).

Plaintiffs claim harm based on "healthcare, law-enforcement, and education costs imposed by aliens who would not remain in the country *but for renewal of their unlawful DACA status*." Dkt. 5 at 8 (emphasis added). But they point to no costs *actually imposed by anyone with such status*. As the Fifth Circuit has already held, a showing that "illegal immigration is costing

32

[a] state money" is not the same as a showing "that DACA is costing the state money." *Crane*, 783 F.3d at 252.

In *Texas v. United States*, the Fifth Circuit found that Texas[11] had standing to challenge the Johnson Memo because it would incur "millions of dollars of losses" in issuing driver's licenses to DAPA grantees. 809 F.3d at 152-53, 155. This injury was "fairly traceable to DAPA" because it was "undisputed that DAPA would enable beneficiaries to apply for driver's licenses." *Id.* at 156 (internal quotation marks omitted). It would be redressed by a favorable ruling because enjoining DAPA would mean Texas would not have to issue the licenses. *Id.* at 161. And the "millions of dollars of losses" in issuing driver's licenses to DAPA grantees sufficed to show irreparable harm. *Id.* at 186.

Here, Plaintiffs have introduced no evidence regarding the costs of issuing driver's licenses to DACA grantees, and have expressly disclaimed any reliance on driver's license costs to support their motion for preliminary injunction. *See* Ex. 35 (NJAPP 384). The importance of this fact cannot be overstated. Even the United States, which agrees with Plaintiffs "that DACA is unlawful," Dkt. 71-1 at 12, concedes that Plaintiffs can only "establish a basis for injunctive relief under controlling Fifth Circuit precedent" if they can "provide 'evidentiary support' regarding 'the cost of issuing driver's licenses to DACA's beneficiaries.'" *Id.* at 12, 16 (quoting *Crane*, 783 F.3d at 252 n.34)). They cannot.

Attempting to confuse the issue, Plaintiffs misleadingly quote the Fifth Circuit to make it appear that the "millions of dollars of losses" that the Court acknowledged as a basis for standing

---

[11] There is not a single declaration that even mentions any harm to any Plaintiff aside from Texas. All other Plaintiffs have therefore failed to demonstrate irreparable harm, and an injunction may not issue as them. *Enter. Int'l v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) ("[I]f the movant does not succeed in carrying its burden on any one of the four prerequisites, a preliminary injunction may not issue.").

and injunctive relief in the DAPA litigation referred not to driver's license costs, but to Texas's "healthcare, law enforcement, and education costs." Dkt. 5 at 40-41. That is false. The "millions of dollars of losses" that the Fifth Circuit found sufficed for purposes of standing and irreparable harm were the costs Texas would incur in issuing drivers licenses to DAPA grantees—nothing more, nothing less. *Texas*, 809 F.3d at 152-53, 158, 163, 176.

### 1. Plaintiffs Introduce No Healthcare, Law Enforcement or Education Costs Actually Attributable to the Napolitano Memo.

Without driver's license costs, Plaintiffs purport to rely on "healthcare, law enforcement, and education costs imposed by aliens who would not remain in the country but for renewal of their unlawful DACA status"—*i.e.*, costs supposedly imposed by DACA grantees. Dkt. 5 at 8. But the problem with this theory is that *Plaintiffs do not actually point to any costs imposed by DACA grantees.* Indeed, they do not identify a single dollar incurred as a result of DACA. Instead, Texas continues to rely on "losses it suffers generally from illegal immigration." *Texas*, 809 F.3d at 150. Because both this Court and the Fifth Circuit have already rejected that such losses are fairly traceable to DACA, *see id.*; *Crane*, 783 F.3d at 252, Plaintiffs cannot show irreparable harm.

Specifically, as to healthcare and education costs,[12] Texas does not demonstrate any costs that are fairly traceable to any DACA grantees or would actually be redressed by an injunction in this case (and the other Plaintiffs don't mention any such costs at all). Take education costs first. Leonardo Lopez is Texas's sole witness on education costs. His declaration purports to discuss the costs of educating unaccompanied children who arrived in Texas between October 2014 and

---

[12] Plaintiffs mention the phrase "law enforcement costs" four times in their brief, Dkt. 5 at 8, 10, 13, but do not actually allege that they have incurred any "law enforcement costs" due to illegal immigration or DACA. And they submit no declaration that even mentions the phrase. There are thus no law enforcement costs to discuss.

September 2018. *See* Dkt. 7, Ex. 9 (App. 877-78). But only those who arrived in the United States before June 15, 2007, are eligible for DACA, so the children mentioned by Mr. Lopez cannot possibly be DACA grantees. *See* Lopez Dep. Tr. at 51:16-52:8 (Ex. 17 (NJAPP 266)). Texas makes no effort to explain how Mr. Lopez's testimony about unaccompanied children who arrived after 2014 could possibly be relevant to "education costs imposed by aliens who would not remain in the country *but for renewal of their unlawful DACA status*," as none of them have "unlawful DACA status." Dkt. 5 at 8.  And at his deposition, Mr. Lopez admitted that: (1) Texas does not know what proportion of unaccompanied children in Texas actually attend Texas public schools, Lopez Dep. Tr. at 35:23-36:1 (Ex. 17 (NJAPP 266)); (2) unaccompanied children are not the same as DACA grantees, *id*. at 26:23-27:10; and mostly importantly, (3) he does not know how many DACA recipients attend public schools in Texas, *id.* at 30:4-7, 38:2-8. Because Texas provides no information on how many DACA grantees it even educates in its public schools, it cannot show irreparable harm on this basis.

Texas runs into a similar problem with healthcare costs. Monica Smoot, Texas's sole witness on healthcare costs, lists the costs Texas supposedly incurs in providing Emergency Medicaid, Children's Health Insurance Program (CHIP) Perinatal Coverage, the Family Violence Program, and uncompensated medical care from public hospitals *to undocumented immigrations in Texas*. Dkt. 7, Ex. 10 (App. 883). But she offers no evidence as to what, if any, costs are caused by DACA or DACA grantees. *Id.* And none of the reports attached to her declaration calculated costs attributable to DACA or DACA grantees either. *See* Smoot Dep. Tr. at 75:24-76:25 (Ex. 19 (NJAPP 280)).

During her deposition, Ms. Smoot acknowledged that she could not attribute any costs incurred by Texas to DACA, *id.* at 78:21-25, and that she did not know how any of Texas's costs

would be effected if DACA were enjoined, *id* at 92:4-93:4. Further, Ms. Smoot conceded that

she did not know how many DACA grantees in Texas utilized Emergency Medicaid, *id.* at

80:13-23, and that she could not calculate what costs, if any, were attributable to DACA

grantees, *id*. at 42:7-43:5. She similarly could not identify whether DACA recipients had availed

themselves of the Texas Family Violence Prevention program, and could not calculate any costs

attributable to them. *Id.* at 51:17-52:11, 83:9-84:25. And she admitted that Texas does not even

know if undocumented immigrants have utilized the CHIP Perinatal program, let alone DACA

grantees. *Id*. at 61:22-62:9, 86:20-87:5; *see also* Dkt. 7, Ex. 10 ¶ 10 (App. 884).

More fundamentally, Ms. Smoot's declaration ignores that DACA *actually saves Texas
money when it comes to healthcare costs*. More than half of DACA grantees receive employer-
sponsored health insurance. Decl. of Leighton Ku ¶¶ 44 (Ex. 6 (NJAPP 69-70)). If DACA is
enjoined, these DACA grantees would not only lose their jobs, they would lose their employer-
sponsored health insurance. *Id.* They will thus need to rely on emergency Medicaid to finance
care that previously would have been financed by private health insurance plans. *Id.* ¶ 58. In
2018 alone, terminating DACA cost Texas $18 million in emergency Medicaid expenses. *Id.*
¶ 56.

Finally, even if Texas actually had pointed to any healthcare or education costs
attributable to DACA grantees, the claim that these costs would be redressed by a preliminary
injunction hinges entirely on the assertion that these individuals "would not remain in the
country but for renewal of their unlawful DACA status." Dkt. 5 at 8. In support of its contention
that DACA recipients would immediately leave the state if DACA were enjoined, Texas submits
one declaration, from Dr. Lloyd Potter. But Dr. Potter himself admits that young people are less
likely to self-deport than older people, and people who came to the United States as children are

less likely to emigrate than those who came as adults. Dkt. 7, Ex. 8  ¶¶ 9-11 (App. 861). In other words, DACA grantees are those least likely to voluntarily leave the United States. *See, e.g.*, Decl. of Douglas S. Massey ¶¶ 5, 18 (Ex. 50, NJAPP 576, 581-82) (director of nation's oldest population research center, who has published more than 10 books and 100 articles on international migration, testifying that "it is very unlikely that DACA recipients from Mexico and Central American will voluntarily return to their countries of origin if they lose" DACA protections).

At his deposition, Dr. Potter also admitted that he is not an expert in migration studies, none of the studies he cited have anything to do with DACA, he has never written anything on DACA, immigration, the Immigration Reform and Control Act, or emigration (*see* Potter Dep. Tr. at 112:10-114:13 (Ex.18 (NJAPP 273)), and he could not find any research or articles addressing the probability of self-deportation among DACA grantees. *Id.* at 98:24-99:7, 106:3 to 109:17. In addition, while Dr. Potter's declaration asserted that it was "reasonable to conclude that *some* DACA participants would return to their country of origin" if DACA were terminated, Dkt. 7, Ex. 8 ¶ 8 (App. 860), Dr. Potter testified at his deposition that "some" simply means "*[m]ore than one*." Potter Dep. Tr. at 66:10-19 (Ex 18 (NJAPP 273)) (emphasis added). He also testified that any attempt to pinpoint a number would be *pure "speculation*." *Id*. at 68:9-19 (emphasis added). This falls far short of showing irreparable harm that would be redressed by a preliminary injunction.

### 2.  The Napolitano Memo Actually Benefits Texas.

Texas also claims irreparable harm in the form of "increased job competition for Plaintiff States' citizens." Dkt. 5 at 8. For support, Texas relies on testimony from Dr. Donald Deere that the Affordable Care Act's ("ACA") employer penalties make it cheaper for businesses to hire

DACA recipients over citizens. *Id.* at 14-15. Specifically, Dr. Deere hypothesizes that because an employer will only have to pay a penalty for failing to offer an employee qualifying health insurance under the ACA if the employee purchases coverage on an insurance exchange and receives a premium subsidy, and because DACA grantees are not eligible for premium subsidies, it will be cheaper for employers to hire DACA grantees over U.S. citizens because they can fail to provide health insurance without incurring a penalty. Supp. Deere Decl. ¶ 7-16 (Ex. 10 (NJAPP 221-24)). But the ACA's employer penalties only apply to large firms with 50 or more employees. A full 97% of those firms already offer their employees health insurance, and 96% did so even before the ACA. (Ku Decl. ¶¶ 12-15 (Ex. 6 (NJAPP 54-55)).  Therefore, the ACA's employer penalties are "virtually irrelevant to employers" and "should not affect their hiring or wage decisions" at all. *Id.* at ¶ 15.

Dr. Deere also opined that "the addition of some 694,000 work-eligible individuals nationwide, with 114,000 of these in Texas, will, other things equal, put downward pressure on wages and make it more difficult for some U.S. citizens to find employment." Supp. Deere Decl. ¶ 13 (Ex. 10 (NJAPP 223)). But Dr. Deere admitted at his deposition that "some" simply means "*more than zero*." Deere Dep. Tr. at 76:11-17 (Ex. 14 (NJAPP 248)) (emphasis added). He also admitted that U.S. citizens would be harmed if DACA were enjoined. For example, Dr. Deere testified that if 112,000 DACA grantees in Texas were suddenly forced to leave their jobs, Texas businesses would be disrupted and would suffer loss of output or sales and lost productivity, and would have to spend time and money recruiting new employees.  *Id.* at 79:4-80:12, 85:1-25.

This comports with the testimony in the record, which establishes that Texas affirmatively benefits from DACA and would be harmed by its termination. James "Ike" Brannon, an economics professor and consultant who served as chief economist for Senator John

McCain's presidential campaign, concluded that if DACA were terminated, over a ten-year period Texas would lose "$1.04 billion in reduced property taxes, $1.25 billion in lost sales taxes, and $2.29 billion in total taxes" if its former DACA grantees were to remain in the State and work only illegally. Brannon Decl. ¶ 29 (Ex. 4 (NJAPP 25)). If the former-DACA-grantees left the State instead, the loss would be even higher—"$1.85 billion in reduced property taxes and $2.22 billion in lost sales taxes." *Id*. ¶ 28.[13]

In sum, Texas's theoretical and unsupported claims of harm do not come close to showing irreparable harm that would be redressed by a preliminary injunction. *See, e.g.*, *Texas*, 86 F. Supp. 3d at 634 (concluding that "indirect damages" were "not caused by DAPA" and that the "injunctive relief requested by Plaintiffs would not redress" them). Because Texas actually benefits from DACA, its motion for a preliminary injunction should be denied. And despite Plaintiffs' assertions, the Fifth Circuit's observation that "the standing analysis is not an accounting exercise," is of no help to Plaintiffs here. Dkt. 5 at 13 (*quoting Texas*, 809 F.3d at 156). The issue is not one of standing but, rather, an honest analysis of the irreparable harm that Texas would suffer, or not suffer, if DACA were enjoined. For those purposes, all costs and benefits are relevant, and *Texas* did not hint otherwise.

---

[13] In discovery, Texas also produced a Special Report of its State Comptroller, concluding that it *financially benefits from undocumented immigrants overall*—even those without DACA. *See* Undocumented Immigrants in Texas: A Financial Analysis of the Impact to the State Budget and Economy (December 2006) (Ex. 31 (NJAPP 343)). The Comptroller conducted a "comprehensive financial analysis of the impact of undocumented immigrants on a state's budget and economy, looking at gross state product, revenues generated, taxes paid and the cost of state services," concluding that the "absence of the estimated 1.4 million undocumented immigrants in Texas in fiscal 2005 would have been a loss to our gross state product of $17.7 billion." *Id.* at 345. He also concluded that undocumented immigrants "produced $1.58 billion in state revenues, which exceeded the $1.16 billion in state services they received," and that "undocumented immigrants in Texas generate more taxes and other revenue than the state spends on them." *Id.*

## III.    PLAINTIFFS HAVE NOT ESTABLISHED THAT THE BALANCE OF EQUITIES FAVORS AN INJUNCTION.

The third factor requires "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted." *Byrum*, 566 F.3d at 445. Courts must "'balance the competing claims of injury and consider the effect of granting or withholding the requested relief'" on the parties, paying "particular regard [to] the public consequences.'" *Winter*, 555 U.S. at 24 (citations omitted). A movant must thus show that it would suffer more harm without an injunction than the respondent would suffer if the injunction were granted. Here, Plaintiffs do not come close to making this required showing. As discussed (*supra*, § II), Texas would not be harmed by the denial of a preliminary injunction at all. But it would certainly not be harmed by the denial more than DACA grantees and the State of New Jersey would be harmed if DACA were enjoined.

As an initial matter, the procedural posture of this case is the precise opposite of what it was in the DAPA litigation. In *Texas v. United States*, the Plaintiffs sought to "preserve the status quo by enjoining Defendants from" implementing the 2014 Johnson Memo. 86 F. Supp. 3d at 675. The Court was not asked "to order Defendants to take any affirmative action," and preliminarily enjoining Defendants from carrying out the DAPA program would not have been "excessively burdensome" on the Defendants, as almost nothing had yet been done. *Id.* (citations omitted).

This case could not be more different. Plaintiffs seek to upend the status quo by enjoining "the 2012 directive creating DACA in the first place" pending a trial on the merits. Dkt. 5 at 6. Pursuant to that directive, there were 689,000 active DACA grantees, including 17,400 in New Jersey and 113,000 in Texas, as of September 4, 2017. *See* Ex. 32 (NJAPP 368). If this Court immediately "enjoin[ed] the DACA program in its entirety, which would require immediately

cancelling existing permits," Dkt. 5 at 46, 689,800 people would be immediately subject to forced separation from their families and from the only country many of them have ever known. They would also be immediately rendered legally unemployable, and many would lose their jobs. If Defendant-Intervenors then ultimately prevailed at trial, this Court would have drastically altered the lives of 689,800 people for nothing. This Court previously agreed that terminating DAPA after it had been implemented would force the Government to "unscramble the egg," which would be "difficult or even impossible." *Texas*, 86 F. Supp. 3d at 673. That would be a walk in the park compared to terminating DACA after it has been in effect for six years, and then trying to "un-terminate" it after Defendant-Intervenors ultimately prevailed on the merits at trial. If, on the other hand, the Napolitano Memo is not enjoined and Plaintiffs ultimately prevail at a trial on the merits, they will not have been burdened by the continuation of a framework for deferred action that *has already been the status quo for six years*.

In any event, as New Jersey demonstrated in its Amended Memorandum of Law in support of its Motion to Intervene, *see* Dkt. 42 at 7-16, the harm to New Jersey from the issuance of any injunction would be dramatic. A few points bear repeating here.

*State Treasury.* DACA recipients contribute significantly to New Jersey's economy, and terminating DACA would seriously harm the State Treasury. As the New Jersey Chamber of Commerce has recognized, DACA grantees "have lived here virtually all of their lives and have become engrained in our communities. Like the rest of New Jersey's citizens, they work here and they pay taxes here." *See* Ex. 27 (NJAPP 322). New Jersey will suffer direct and substantial economic losses, losses that it will never be able to recoup if this Court enjoins DACA.

DACA recipients contribute to the New Jersey treasury through purchases of goods and services, the tax receipts that those purchases generate, and through paying state taxes.

According to Meg Wiehe and Misha Hill, tax policy experts at the Institute on Taxation and Economic Policy, a non-profit, non-partisan research organization, New Jersey would lose an estimated $18.7 million per year in tax receipts if DACA were terminated. Decl. of Meg Wiehe and Misha Hill ¶ 7 (Ex. 7 (NJAPP 141)); *see also* Wiehe Dep. Tr. at 88:15-22 (Ex. 21 (NJAPP 297)). Ike Brannon, the former chief economist for Senator McCain's presidential campaign, made similar calculations. According to Mr. Brannon, if terminating DACA caused all of New Jersey's former DACA grantees (17,400 people)[14] to leave the state, either voluntarily or forcibly, New Jersey would lose $530 million in property taxes, $253 million in sales taxes, and $255 million in income taxes over the next ten years. Brannon Decl. ¶¶ 24, 30 (Ex. 4 (NJAPP 24-25)). If, instead, New Jersey's former DACA grantees remained in the state and were "employed only as illegal workers," New Jersey would lose $298 million in property taxes, $142 million in lost sales taxes, and $143 million in lost income taxes over the next ten years. *Id*. ¶¶ 25, 31.[15]

Terminating DACA would also harm New Jersey's treasury by adding significant public healthcare costs. Approximately 55-57% of DACA grantees who work receive employer-sponsored health insurance. Decl. Leighton Ku ¶¶ 46-47 (Ex. 6 (NJAPP 70-71)); *see* Costa. Dep. Tr. at 42:25-43:4 (Ex. 15 (NJAPP 253)) (testifying that after receiving DACA, she was able to

---

[14] As Mr. Brannon states in his Declaration, as of September 2017, New Jersey had 17,400 active DACA grantees. *See* Brannon Decl. ¶ 19 (Ex. 4 (NJAPP 24)). Although Mr. Brannon sometimes refers to New Jersey's "DACA-eligible population" (which is significantly larger than the number of active DACA grantees), his calculations and conclusions are based on the 17,400 figure. *See, e.g.* NJOAG001077 (Ex. 39 (NJAPP 405)) (spreadsheet showing calculations based on 17,400 population figure).

[15] As specific, concrete examples, DACA grantee Joana Costa paid $1,216 in New Jersey state taxes in Fiscal Year 2017, and she owns and has paid state sales taxes on two New Jersey-registered cars. Costa Decl. ¶ 8 (Ex. 5 (NJAPP 48)). And DACA grantee Daniela Velez paid $4,628 in state income taxes to the State of New Jersey in 2017 and $1,391 in state income taxes in 2016. Velez Decl. ¶ 8 (Ex. 2 (NJAPP 13)).

obtain health insurance through her employer); Velez Dep. Tr. at 31:19-21 (Ex. 12 (NJAPP 238)) (same). If DACA is enjoined, these DACA grantees would not only lose their jobs, they would lose their employer-sponsored insurance. Ku Decl. ¶ 44 (Ex. 6 (NJAPP 69-70)). In New Jersey, undocumented immigrants who do not have private health insurance can receive state-funded health care through the Medical Emergency Payment Program for Aliens, which pays for medical care (including labor and delivery services and ambulance services) for immigrants who experience a medical emergency and who meet the requirements for Medicaid eligibility except for immigration status. *See* N.J. Admin. Code § 10:49-5.4. New Jersey also runs an "innovative Charity Care-Hospital Care Payment Assistance Program that helps subsidize uncompensated care costs due to inpatient and outpatient hospital care for uninsured patients." Ku Decl. ¶ 57 (Ex. 6 (NJAPP 76-77)). If DACA were terminated, New Jersey's public health care costs would rise by $7.6 million in 2018 alone, including $2.5 million in emergency Medicaid costs and $5.1 million in community-based uncompensated care costs (some of which is paid for by the state through the Charity Care-Hospital Care Payment Assistance Program). *Id.*

 *State Agencies*. Terminating DACA would also harm New Jersey's state agencies that employ DACA grantees. For example, New Jersey's Department of Children and Families, Division of Child Protection and Permanency (DCP&P), employs Ms. Cinthia Osorio and several other DACA grantees as part of a prestigious, highly competitive program for students graduating with undergraduate social work degrees, called the Baccalaureate Child Welfare Education Program (BCWEP). *See* Decl. of Rose Arackathara ¶¶ 2-3 (Ex. 8 (NJAPP 155-56)); Arackathara Dep. Tr. 60:17-21 (Ex. 20 (NJAPP 291)). BCWEP participants receive a full scholarship for their senior year of college in exchange for participating in a year-long internship with DCP&P and a two-year contract to work as full time DCP&P social workers upon

43

graduation. *See* Arackathara Dep. Tr. 35:11-17 (Ex. 20 (NJAPP 291)). If DACA were enjoined,

then the time, money and resources that the state has invested in BCWEP participants who are

DACA grantees, which is "considerable," would be lost. *Id*. at 79:9-81:11; *see also id*. at 73:15-

17 (BCWEP participants receive "about 90 hours of training through the program"); Arackathara

Decl. ¶¶ 2-3 (Ex. 8 (NJAPP 155-56)) (current state employees such as Ms. Arackathara serve as

field instructors for BCWEP students). As to Ms. Osorio in particular, if DACA were enjoined,

New Jersey's children "will lose a particularly skilled, dedicated, and compassionate protector."

Arackathara Decl. ¶ 10 (Ex. 8 (NJAPP 157).

   *Public Colleges and Universities.* New Jersey's 30 public colleges and universities are

aware of approximately 2,200 "students in attendance who are DACA recipients." *See* Decl. of

Diana Gonzalez  ¶¶ 5-7 (Ex. 3 (NJAPP 17)). Enjoining DACA would irreparably harm these

institutions by depriving them of the incredible diversity that DACA students bring, of huge

sums in tuition revenue, and of valuable employees, whom the institutions have spent money

recruiting, training, and retaining. *Id.* ¶¶ 9, 11.

   DACA's work authorization also allows DACA grantees to finance the cost of their New

Jersey education by working. Without the ability to work to support themselves, many DACA

students "will be forced to drop out of school without finishing their degree." Gonzalez Decl. ¶ 8

(Ex. 3 (NJAPP 18)); *see also* Velez Decl. ¶¶ 6, 9 (Ex. 2 (NJAPP 13)) (explaining that she would

not be able to finish her bachelor's degree at Rutgers if DACA were terminated because without

her income she could not afford tuition); Supp. Decl. of Tom Wong Ex. A ¶ 26 (Ex. 9 (NJAPP

175)) (noting that 94% of DACA grantees surveyed who were currently in school reported that

receiving DACA allowed them to pursue "educational opportunities that [they] previously could

not" have pursued). Rescinding DACA would therefore cost New Jersey's Public Colleges

significant sums in lost tuition revenue. Gonzalez Decl. ¶ 9 (Ex. 3 (NJAPP 18)); Gonzalez Dep.

Tr. at 41:24-42:15 (Ex. 13 (NJAPP 241)). It would also harm the schools' compelling interest in

diversity. *See, e.g., Fisher v. Univ. of Tex.*, 136 S. Ct. 2198, 2210 (2016). As the President of the

New Jersey Institute of Technology (NJIT), one of New Jersey's public research universities,

eloquently explained last year:

> Difference is a catalyst for learning and human development, which occur through collaboration, questioning, analysis, and debate. Ultimately, these actions result in a deeper understanding of people, enhanced capability to solve problems of all types, and opportunities to improve quality of life for all. NJIT's DACA students are emblematic of the strength that is gained through diversity. They were born in more than 18 different nations, are majoring in disciplines across the academic spectrum, are represented in every class from freshman to senior as well as our graduate programs, and they maintain a cumulative grade point average above a 3.0. Subtracting such a pool of talent and ambition from any learning community would be a deep and painful loss.

*See* Ex. 26 (NJAPP 319); *see also* Gonzalez Decl. ¶ 9 (Ex. 3 (NJAPP 18)).

New Jersey's Public Colleges would also lose at least 37 valuable employees if DACA

were terminated. Gonzalez Dep Tr. at 18:7 to 19:23; 65:20 to 66:11 (Ex. 13 (NJAPP 241)); *see*

*also* Gonzalez Decl. ¶¶ 5-7 (Ex. 3 (NJAPP 17)). These institutions "have spent money in

recruiting, training, and retention of these employees. If DACA is rescinded, these employees . . .

lose their work authorizations, and these institutions will have to spend valuable public resources

to recruit, train, and retain new employees." Gonzalez Decl. ¶ 11 (Ex. 3 (NJAPP 18-19)).

*Public Safety.* Enjoining DACA would also harm New Jersey's sovereign interest in

enforcing its criminal laws and protecting public safety. Fifty-three percent of DACA recipients

surveyed reported that they would be less likely to report a crime they witnessed if DACA were

terminated. Wong Supp. Decl. Ex. A ¶ 37 (Ex. 9 (NJAPP 183-84)). This comports with evidence

from the field. Angelo Onofri, the County Prosecutor for Mercer County, New Jersey (with over

20 years' experience in that office) testified that, in his opinion, "the termination of DACA

would be detrimental to [the Mercer County Prosecutor's Office's] ability to fulfill its mission of administering justice and protecting the member[s] of the [local] communities." Decl. of Angelo Onofri ¶ 14 (Ex. 1 (NJAPP 7)). "DACA is an important tool" that helps a Prosecutor's "convince immigrants that they have no reason to fear law enforcement agents" and can therefore cooperate with criminal investigations. *Id.* ¶ 11; *see* Onofri Dep. Tr. at 73:10-14 (Ex. 11 (NJAPP 234)) ("[Based on] my understanding of the DACA protections, my view is that those people who have the DACA protections are more likely than someone who is completely undocumented to come forward and report a crime."). Accordingly, if DACA were terminated, "the amount of cooperation [his office would] receive form immigrants communities . . . would decline . . . [and] the public safety will suffer." Onofri Decl. ¶ 13 (Ex. 1 (NJAPP 6-7)).

For all these reasons, the harm to New Jersey that would flow from the issuance of a preliminary injunction far outweighs any harm Texas would suffer if the injunction is denied (and no other have Plaintiffs claimed any harm). Plaintiffs main response is that "[a]ny reliance claims . . . carry no material weight in the equitable analysis, as DACA was explained all along as being temporary and revocable at any time in the Executive's sole discretion." Dkt. 5 at 9. But Plaintiffs fail to acknowledge that a governmental policy can create legitimate reliance interests even where the government remains free to revoke it at any time. *See, e.g.*, *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). That is precisely the case here.

## IV.     PLAINTIFFS HAVE NOT ESTABLISHED THAT AN INJUNCTION IS IN THE PUBLIC INTEREST.

The fourth factor requires plaintiffs to demonstrate "that an injunction is in the public interest." *Winter*, 555 U.S. at 20. "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Id.* at 24.

46

The imposition of a preliminary injunction in this case would be contrary to the public interest in the orderly administration of justice because it would directly conflict with two other injunctions currently in place and make it "impossible for the United States to comply" with the conflicting obligations. Dkt. 71-1 at 17.

As earlier noted (*supra* at 5-6), there are currently two nationwide injunctions in place ordering DHS to continue issuing DACA renewals as it had before September 5, 2017. Any injunction from this Court that would prevent DHS from issuing DACA renewals in the future would conflict with those existing court orders and make DHS subject to conflicting obligations. New Jersey is aware of no case in which a federal district court has issued a nationwide injunction that directly conflicted with a separate nationwide injunction already entered by a different federal district court. This Court should not break new ground.

The only case that comes close is *Feller v. Brock*, 802 F.2d 722 (4th Cir. 1986). *Feller* involved a dispute over the requisite piece rate paid to West Virginia apple pickers under the Department of Labor's temporary foreign worker program. In 1982, a federal district court in Washington, D.C., awarded a permanent injunction prohibiting the Department from certifying growers who did not pay a sufficiently high piece rate at a given productivity level. *See NAACP, Jefferson County Branch v. Donovan*, 558 F. Supp. 218 (D.D.C. 1982) (*NAACP I*). When the Department did not fully comply with the injunction, the NAACP sued in D.C. to obtain a raise in the concomitant piece rate in West Virginia. *See NAACP, Jefferson County Branch v. Donovan*, 566 F. Supp. 1202 (D.D.C. 1983) (*NAACP II*). *NAACP II* concluded with a permanent injunction prohibiting the Department from certifying any grower who failed to adjust its piece rate. In 1985, two West Virginia growers applied for certification to hire foreign apple pickers without paying the adjusted piece rate. *See Feller*, 802 F.2d at 724. Believing it was bound by

the D.C. court's injunction, the Department refused the growers' certification. *See id.* at 725. As a result, the growers sued in West Virginia and the district court there issued a preliminary injunction prohibiting the Department from refusing certification on the basis of the *NAACP II* piece rate. *See id.*

On appeal, the Department challenged the propriety of the preliminary injunction issued in West Virginia because it directly conflicted with the permanent injunction issued by the federal district court in D.C. *Id.* at 724. The Fourth Circuit held that the West Virginia preliminary injunction "forced the defendants to risk contempt in either West Virginia or the District of Columbia, and undermined the public interest in the orderly administration of justice." *Id.* Vacating the West Virginia preliminary injunction, the Fourth Circuit explained, "[p]rudence requires that whenever possible, coordinate courts should avoid issuing conflicting orders" because they do "a grave disservice to the public interest in the orderly administration of justice." *Id.* at 727-28.

Similarly, as discussed in *Bergh v. Washington*, 535 F.2d 505 (9th Cir. 1976), the State of Washington promulgated certain fishing regulations in response to a decision by Judge Boldt in the Western District of Washington in *United States v. State of Washington*, 384 F. Supp. 312 (W.D. Wash.), *aff'd*, 520 F.2d 676 (9th Cir. 1975). Plaintiff, a commercial fisherman, filed a separate lawsuit in the Western District of Washington, this one assigned to Judge Voorhees, attempting to enjoin the regulations as unlawfully discriminatory on the basis of race. *Bergh*, 535 F.2d at 506-07. Judge Voorhees denied the injunction and dismissed the suit, and the Ninth Circuit affirmed, holding that "[w]hen an injunction sought in one federal proceeding would interfere with another federal proceeding, considerations of comity require more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases." *Id.*

at 507; *see also W. Gulf Mar. Ass'n v. ILA Deep Sea Local 24, S. Atl. & Gulf Coast Dist. of ILA, AFL-CIO*, 751 F.2d 721, 728 (5th Cir. 1985) ("The federal courts long have recognized that the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs.").

Here, faced with binding nationwide injunctions in the Northern District of California and the Eastern District of New York, this Court should not issue a conflicting injunction. DHS would immediately be in contempt of this Court's order if it continued to process DACA renewal applications, or in contempt of the Northern District of California and Eastern District of New York orders if it did not. Plaintiffs do not claim otherwise. Instead, they assert, without any support, that "the existence of an injunction issued by the Northern District of California regarding the Executive's September 2017 DACA wind-down memorandum has no effect on this Court's injunctive powers in this lawsuit" because "[t]here is no *pending claim* against the 2012 DACA program in the Northern District of California lawsuit." Dkt. 5 at 49 (emphasis added). Whether there are overlapping *claims* is neither here nor there, because the *relief* Plaintiffs seek in this suit would directly conflict with the relief already ordered by two other district courts. If it grants Plaintiffs' requested preliminary injunction, this Court would do a great disservice to the public interest, and could cause a constitutional crisis. This Court should emphatically deny the invitation.

## CONCLUSION

For the reasons stated herein, this Court should deny the Plaintiffs' motion for preliminary injunction.

Dated: July 21, 2018                              GURBIR S. GREWAL
                                                  ATTORNEY GENERAL OF NEW JERSEY

                                    By:     */s/Rachel Wainer Apter*
                                            Assistant Attorney General
                                            Attorney-in-Charge
                                            (admitted pro hac vice)
                                            Richard J. Hughes Justice Complex
                                            25 Market Street, 8th Floor
                                            Trenton, New Jersey 08625-0116
                                            Phone: (609) 376-2702
                                            Fax: (609) 777-4015
                                            Rachel.Apter@njoag.gov

                                            Jeremy Hollander, Assistant Attorney General
                                            (admitted pro hac vice)
                                            Kenneth S. Levine, Deputy Attorney General
                                            (admitted pro hac vice)
                                            Paul H. Juzdan, Deputy Attorney General
                                            (admitted pro hac vice)
                                            Brian DeVito, Deputy Attorney General
                                            (admitted pro hac vice)
                                            Katherine Gregory, Deputy Attorney General
                                            (admitted pro hac vice)
                                            Nicholas Dolinsky, Deputy Attorney General
                                            (admitted pro hac vice)

                                            *Attorneys for Defendant-Intervenor State of New
                                            Jersey*

50

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that, I caused the foregoing "Appendix" (and exhibits referenced therein) to be electronically filed with the Clerk of the Court on July 21, 2018 using the CM/ECF system, which will send notification of such filings to all counsel of record.


*/s/Rachel Wainer Apter*