**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

**APPENDIX**

Pursuant to this Court's Civil Procedures, Rule 7, Defendant-Intervenor, State of New Jersey, hereby provides the Court with the following table of contents and copies of the documents and authorities cited in its Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction:

| Ex. | Description | Page |
|---|---|---|
| 1. | Declaration of Angelo Onofri | NJAPP0001 |
| 2. | Declaration of Daniela Velez | NJAPP0011 |
| 3. | Declaration of Diana Gonzalez | NJAPP0015 |
| 4. | Declaration of James ("Ike") Brannon | NJAPP0020 |
| 5. | Declaration of Joana Costa | NJAPP0045 |
| 6. | Declaration of Leighton Ku | NJAPP0050 |
| 7. | Declaration of Meg Wiehe and Misha Hill | NJAPP0134 |

| Ex. | Description | Page |
|---|---|---|
| 8. | Declaration of Rose Arackathara | NJAPP0154 |
| 9. | Supplemental Declaration of Tom Wong | NJAPP0159 |
| 10. | Supplemental Donald Deere Declaration | NJAPP0218 |
| 11. | Excerpts from the deposition transcript of Angelo Onofri | NJAPP0234 |
| 12. | Excerpts from the deposition transcript of Daniela Velez | NJAPP0238 |
| 13. | Excerpts from the deposition transcript of Diana Gonzalez | NJAPP0241 |
| 14. | Excerpts from the deposition transcript of Donald Deere | NJAPP0248 |
| 15. | Excerpts from the deposition transcript of Joana Costa | NJAPP0253 |
| 16. | Excerpts from the deposition transcript of Kenneth Palinkas | NJAPP0257 |
| 17. | Excerpts from the deposition transcript of Leo Lopez | NJAPP0266 |
| 18. | Excerpts from the deposition transcript of Lloyd Potter | NJAPP0273 |
| 19. | Excerpts from the deposition transcript of Monica Smoot | NJAPP0280 |
| 20. | Excerpts from the deposition transcript of Rose Arackathara | NJAPP0291 |
| 21. | Excerpts from the deposition transcript of Martha ["Meg"] Wiehe | NJAPP0297 |
| 22. | Excerpt from the Oral Argument Transcript from *United States v. Texas*, U.S. Supreme Court, No. 15-674 | NJAPP0300 |
| 23. | Statement by President Dwight Eisenhower Concerning the Admission of Additional Hungarian Refugees, dated Dec. 1, 1956, available at https://goo.gl/D4DMuS | NJAPP0303 |
| 24. | Intentionally Omitted | NJAPP0306 |
| 25. | Memorandum to President Gerald Ford, "History of the Use of Parole, April 17, 1975, excerpted from and available at: https://www.fordlibrarymuseum.gov/library/document/0164/19077062.pdf | NJAPP0308 |
| 26. | Memorandum from Joel S. Bloom, President, NJIT, to NJIT Cmty. (Sept. 5, 2017), available at:http://www.njit.edu/president/message-president-bloom-0/ | NJAPP0318* |

| Ex. | Description | Page |
|---|---|---|
| 27. | Press Release, New Jersey Chamber of Commerce, NJ Chamber of Commerce President Tom Bracken's Statement on DACA, (Oct. 10, 2017), available at: http://www.njchamber.com/press-releases/449-nj-chamber-of-commerce-president-tom-bracken-s-statement-on-daca | NJAPP0321* |
| 28. | Letter from President John F. Kennedy to Secretary Abraham Ribicoff, dated Jan. 27, 1961, available at: https://goo.gl/Hnf1LL | NJAPP0323 |
| 29. | Sam Bernsen, INS Gen. Counsel, Leave to Labor, 52 No. 35 Interpreter Releases 291 (Sept. 2, 1975) | NJAPP0325* |
| 30. | USCIS publication, "Refugee Timeline," available at: https://goo.gl/5fhA9y | NJAPP0337 |
| 31. | STATE000013-000036 | NJAPP0342 |
| 32. | USCIS, "Approximate Active DACA Recipients: State of Residence, as of September 4, 2017," excerpted from and available at: https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf | NJAPP0367* |
| 33. | USCIS, "Number of Form I-821D,Consideration of Deferred Action for Childhood Arrivals,by Fiscal Year, Quarter, Intake and Case StatusFiscal Year 2012-2018 (May 31, 2018)," available at: https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2018_qtr2_plus_may.pdf | NJAPP0370* |
| 34. | Excerpts from Federal Defendants' Responses to Perez Defendant-Intervenors' Interrogatory #3 | NJAPP0376 |
| 35. | Email Chain ending on June 25, 2018:  "Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits" | NJAPP0383 |
| 36. | DEF 0000272 | NJAPP0393 |
| 37. | DEF 0000894-896 | NJAPP0395 |
| 38. | DEF 0001731-33 | NJAPP0399 |
| 39. | NJOAG001077 (and corresponding sheet from native spreadsheet) | NJAPP0403 |
| 40. | 44 Fed. Reg. 10,370 - 72 (Feb. 20, 1979) | NJAPP0406 |
| 41. | 46 Fed. Reg. 25,079 - 81 (May 5, 1981) | NJAPP0411 |

| Ex. | Description | Page |
|-----|-------------|------|
| 42. | 52 Fed. Reg. 16,216-28 (May 1, 1987) | NJAPP0416 |
| 43. | 52 Fed. Reg. 46,092-93 (Dec. 4, 1987) | NJAPP0431 |
| 44. | 61 Fed. Reg. 47,039-41 (Sept. 6, 1996) | NJAPP0435 |
| 45. | 76 Fed. Reg. 53,764-806 (Aug. 29, 2011) | NJAPP0440 |
| 46. | 80 Fed. Reg. 7,912-66 (Feb. 12, 2015) | NJAPP0485 |
| 47. | 8 C.F.R. § 274a.12 | NJAPP0542 |
| 48. | N.J. Admin. Code § 10:49-5.4 | NJAPP0551 |
| 49. | Excerpted portion of Senate Report No. 99-132 of the Committee on the Judiciary (1985) | NJAPP0554 |
| 50. | Declaration of Douglas S. Massey, Ph.D | NJAPP0574 |
| 51. | 11A   Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (3rd ed. 2014) ("Wright & Miller") (footnotes excluded) | NJAPP0585 |
| 52. | June 22, 2018 "Notice" filed by Defendants in *NAACP v. Trump*, Case Nos. 17-1907, 17-2325 (D.D.C) (Dkts. 71 & 71-1) | NJAPP0588 |
| 53. | *Embarcadero Techs., Inc. v. Redgate Software, Inc.*, 2017 U.S. Dist. LEXIS 191317 (W.D. Tex. Nov. 20, 2017) | NJAPP0594 |
| 54. | *H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC*, 2009 U.S. Dist. LEXIS 52950 (N.D. Tex. Jun. 23, 2009) | NJAPP0604 |
| 55. | *Innovation Ventures, LLC v. Ultimate Lifestyles, LLC*, 2009 U.S. Dist. LEXIS 132724 (E.D. Tex. Mar. 13, 2009) | NJAPP0609 |
| 56. | *Rimkus Consulting Group, Inc. v. Cammarata*, 255 F.R.D. 417 (S.D. Tex. 2008) | NJAPP0614 |
| 57. | *Solofill, LLC v. Rivera*, No. CV H-16-2702, 2017 WL 514589 (S.D. Tex. Feb. 8, 2017) | NJAPP0641 |
| 58. | *Talon Transaction Techs., Inc. v. StoneEagle Servs.*, 2013 U.S. Dist. LEXIS 200239 (N.D. Tex. Jul. 24, 2013) | NJAPP0648 |
| 59. | *Wireless Agents, L.L.C. v. T-Mobile USA, Inc*, No. 3:05-CV-0094-D, 2006 U.S. Dist. LEXIS 36590 (N.D. Tex. June 6, 2006) | NJAPP0654 |

\*  - These documents are supplements to "New Jersey's List of Exhibits" previously exchanged with the parties.

Dated: July 21, 2018

GURBIR S. GREWAL
ATTORNEY GENERAL OF NEW JERSEY

By:     */s/Rachel Wainer Apter*
Assistant Attorney General
Attorney-in-Charge
(admitted pro hac vice)
Richard J. Hughes Justice Complex
25 Market Street, 8th Floor
Trenton, New Jersey 08625-0116
Phone: (609) 376-2702
Fax: (609) 777-4015
Rachel.Apter@njoag.gov

Jeremy Hollander, Assistant Attorney General
(admitted pro hac vice)
Kenneth S. Levine, Deputy Attorney General
(admitted pro hac vice)
Paul H. Juzdan, Deputy Attorney General
(admitted pro hac vice)
Brian DeVito, Deputy Attorney General
(admitted pro hac vice)
Katherine Gregory, Deputy Attorney General
(admitted pro hac vice)
Nicholas Dolinsky, Deputy Attorney General
(admitted pro hac vice)
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101

*Attorneys for Defendant-Intervenor State of New Jersey*

# Exhibit 1

NJAPP0001

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Proposed Defendant-Intervenor. | ) | |

## DECLARATION OF ANGELO J. ONOFRI

I, Angelo J. Onofri, declare and state as follows

1. I am the current County Prosecutor for Mercer County, New Jersey. I was sworn in as the Mercer County Prosecutor on December 28, 2016. I began my career with the Mercer County Prosecutor's Office in May of 1998 as an assistant prosecutor. During my tenure as an assistant prosecutor, I served as the Chief of the Grand Jury Unit, municipal court liaison, case screening supervisor and community outreach/projects coordinator. In August of 2012, I was promoted to First Assistant Prosecutor. In that position, I was responsible for the day-to-day operations of the Mercer County Prosecutor's Office including the Mercer County Homicide Task Force, Victim-Witness Unit and Mercer County Shooting Response Team. My

1

NJAPP0002

responsibilities also included reviewing and approving U-Visa applications. On March 1, 2015, I was appointed as the Acting Mercer County Prosecutor.

2. During my 20 years with the Mercer County Prosecutor's Office, I have participated in and hosted hundreds of community forums, outreach events, and community engagement activities. At these community forums, events, and engagement activities, I have interacted with numerous undocumented persons and listened to their fears and concerns.

3. As I state on my office's website (http://mercercountyprosecutor.com/), it is "the mission of the Mercer County Prosecutor's Office . . . to preserve and enhance the quality of life of Mercer County residents by fostering an environment of law abidingness, safety and security. To that end, this Office is dedicated to the pursuit and attainment of justice." Thus, the fair administration of justice and ensuring the safety of the community we serve are central goals of my office.

4. In order to achieve these goals, it is important that all members of the local community that we police and are sworn to protect must themselves not only be willing to cooperate with us but they must trust my office as well.

5. We rely on members of our local community to report crimes, provide information, to come forward with evidence and to testify in criminal proceedings among other things. Without such help from our community we cannot successfully resolve many of the matters that come through my office, including the prosecution of violent criminal offenses.

6. A lack of trust between community members and law enforcement officers leads to a reduction in the reporting of crimes and negatively impacts the successful prosecution

2

of crime.  That, in turn, can lead to violent offenders avoiding prosecution, which poses a threat to everyone in Mercer County and beyond.

7.  Members of the local immigrant community, particularly those who are undocumented, often live in fear of and maintain a distrust of government and law enforcement agencies, at the state, local and federal level.  Due to this fear and distrust, members of the immigrant community are often unwilling to come forward to report crimes (both as witnesses and as victims) and/or are unwilling to assist in the prosecution of crimes.  This is not necessarily because they do not want to help, but because they fear their own deportation (or deportation of relatives) if they do.

8.  Immigrants make up a substantial portion of our population in Mercer County.  By one government estimate that I have reviewed, 21.8% of the population of Mercer County (approximately 80,951 people) was foreign-born in 2016, and of that over 54% of them are not U.S. citizens.  (*See* Attached Exhibit A; Source: U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates.)

9.  My office has done (and continues to do) a great deal of work to foster trust with immigrant communities.  For example, during my tenure with the Mercer County Prosecutor's Office and as the Mercer County Prosecutor, my office has:

- Partnered with the Latin American Legal Defense and Education Fund to provide information concerning reporting crime, the U-Visa process, the role of ICE, the Internal Affairs process, 287(g) status in Mercer County (Mercer County does not have any 287(g) agreements, but we do cooperate with ICE, especially on criminal immigration enforcement matters), crime prevention

3

tips specific to the undocumented community, and scams being perpetrated against the undocumented community.

- Partnered with El Centro of the Diocese of Trenton to conduct a community concerns forum in the aftermath of the death of Julio Cesar Cruz-Cruz in 2014.  Mr. Cruz-Cruz was an 19-year old Guatemalan immigrant who was killed during a strong arm robbery.  The defendants, who confessed to the crime, indicated that they were "going to whack poppies" that evening (a derogatory term for robbing people of Latin American descent).  When asked why they planned to target people of Latin American descent, the defendants said that they don't have papers and won't talk. There is a perception among the criminal element that people of Latin American descent are easy targets who will not report crime because they are undocumented.  Further, criminals view the Latin American population as walking ATMs because they are undocumented and cannot open bank accounts.

- Prosecuted scams targeting immigrants in Mercer County. For example, we recently broke up a scam in which a person was going to landscaping sites and telling workers that for $1,200, he could get them a driver's license and automobile insurance.

- Hosted outreach events, in partnership with the Guatemalan Civic Association, to discuss U-Visas, victim services, and filing criminal complaints.

- In partnership with the Capital City Community Coalition and My Eternal Family, conducted expungement informational sessions and expungement

4

events where we assisted the attendees in completing expungement documents. At a recent expungement event in March, many undocumented people attended.

- During my 20 year career with this office, we have held numerous of the aforementioned events in order to foster improved relationships and trust with the community. We often times hold these events in churches to make people feel comfortable.

10. I believe that these programs have had positive results and have helped my office build a more trusting relationship with the local immigrant communities.

11. On the other hand, the core missions of my office are undermined when a significant portion of the population is fearful of the government and, particularly, law enforcement, and thus, will not cooperate with us in our effort to protect them. To counter this we must be able to convince immigrants that they have no reason to fear law enforcement agents. I believe that DACA is an important tool to help us to do so.

12. Those who have received protections under DACA can call local police departments to report crimes that they have witnessed (or been the victims of) without fear of their own arrest based on their immigration status. They also can appear in public court proceedings to offer valuable testimony in support of criminal prosecutions without fear of other government agencies using that as an opportunity to detain or arrest them based on their immigration status. This benefits everyone in Mercer County.

13. I also believe, based on my experiences and general knowledge on the topic, that if DACA was to end, the amount of cooperation we receive from immigrant communities (which my office has been working hard to increase, as I have

5

NJAPP0006

discussed) would decline.  And if members of immigrant communities are less likely to report crimes (even in situations where they themselves are the victims) or assist my office in prosecuting crimes, then the public safety will suffer.

14. For all these reasons, I believe that the termination of DACA would be detrimental to my Office's ability to fulfill its mission of administrating justice and protecting the member of the communities in Mercer County.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on June _22_, 2018, in _Trenton_, New Jersey

_____
Angelo J. Onofri
Mercer County Prosecutor

6

# EXHIBIT A

American FactFinder - Results

**B05002**  **PLACE OF BIRTH BY NATIVITY AND CITIZENSHIP STATUS**
**Universe: Total population**
**2012-2016 American Community Survey 5-Year Estimates**

**Tell us what you think.** Provide feedback to help make American Community Survey data more useful for you.

Although the American Community Survey (ACS) produces population, demographic and housing unit estimates, it is the Census Bureau's Population Estimates Program that produces and disseminates the official estimates of the population for the nation, states, counties, cities and towns and estimates of housing units for states and counties.

Supporting documentation on code lists, subject definitions, data accuracy, and statistical testing can be found on the American Community Survey website in the Data and Documentation section.

Sample size and data quality measures (including coverage rates, allocation rates, and response rates) can be found on the American Community Survey website in the Methodology section.

Versions of this table are available for the following years:

2016
2015
2014
2013
2012
2011
2010
2009

| | Mercer County, New Jersey | |
| --- | --- | --- |
| | Estimate | Margin of Error |
| Total: | 371,101 | ***** |
| Native: | 290,150 | +/-2,117 |
| Born in state of residence | 194,012 | +/-2,081 |
| Born in other state in the United States: | 86,868 | +/-1,891 |
| Northeast | 50,155 | +/-1,409 |
| Midwest | 8,985 | +/-782 |
| South | 20,651 | +/-998 |
| West | 7,077 | +/-608 |
| Born outside the United States: | 9,270 | +/-858 |
| Puerto Rico | 5,990 | +/-750 |
| U.S. Island Areas | 67 | +/-66 |
| Born abroad of American parent(s) | 3,213 | +/-425 |
| Foreign born: | 80,951 | +/-2,117 |
| Naturalized U.S. citizen: | 37,207 | +/-1,310 |
| Europe | 7,847 | +/-644 |
| Asia | 15,882 | +/-819 |
| Africa | 2,662 | +/-549 |
| Oceania | 45 | +/-42 |
| Latin America | 10,404 | +/-846 |
| Northern America | 387 | +/-125 |
| Not a U.S. citizen: | 43,744 | +/-1,986 |
| Europe | 6,017 | +/-821 |
| Asia | 11,129 | +/-825 |
| Africa | 2,900 | +/-700 |
| Oceania | 46 | +/-39 |
| Latin America | 23,064 | +/-1,496 |
| Northern America | 588 | +/-190 |

Source: U.S. Census Bureau, 2012-2016 American Community Survey 5-Year Estimates

Explanation of Symbols:
An '*' entry in the margin of error column indicates that either no sample observations or too few sample observations were available to compute a standard error and thus the margin of error. A statistical test is not appropriate.
An '-' entry in the estimate column indicates that either no sample observations or too few sample observations were available to compute an estimate, or a ratio of medians cannot be calculated because one or both of the median estimates falls in the lowest interval or upper interval of an open-ended distribution.

NJAPP0002

An '-' following a median estimate means the median falls in the lowest interval of an open-ended distribution.
An '+' following a median estimate means the median falls in the upper interval of an open-ended distribution.
An '***' entry in the margin of error column indicates that the median falls in the lowest interval or upper interval of an open-ended distribution. A statistical test is not appropriate.
An '*****' entry in the margin of error column indicates that the estimate is controlled. A statistical test for sampling variability is not appropriate.
An 'N' entry in the estimate and margin of error columns indicates that data for this geographic area cannot be displayed because the number of sample cases is too small.
An '(X)' means that the estimate is not applicable or not available.

Data are based on a sample and are subject to sampling variability. The degree of uncertainty for an estimate arising from sampling variability is represented through the use of a margin of error. The value shown here is the 90 percent margin of error. The margin of error can be interpreted roughly as providing a 90 percent probability that the interval defined by the estimate minus the margin of error and the estimate plus the margin of error (the lower and upper confidence bounds) contains the true value. In addition to sampling variability, the ACS estimates are subject to nonsampling error (for a discussion of nonsampling variability, see Accuracy of the Data). The effect of nonsampling error is not represented in these tables.

While the 2012-2016 American Community Survey (ACS) data generally reflect the February 2013 Office of Management and Budget (OMB) definitions of metropolitan and micropolitan statistical areas; in certain instances the names, codes, and boundaries of the principal cities shown in ACS tables may differ from the OMB definitions due to differences in the effective dates of the geographic entities.

Estimates of urban and rural population, housing units, and characteristics reflect boundaries of urban areas defined based on Census 2010 data. As a result, data for urban and rural areas from the ACS do not necessarily reflect the results of ongoing urbanization.

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:18-CV-68 |
| ) | |
| UNITED STATES OF AMERICA, *et al.*, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| KARLA PEREZ, *et al.*, ) | |
| ) | |
| Defendant-Intervenors, ) | |
| and ) | |
| ) | |
| STATE OF NEW JERSEY, ) | |
| ) | |
| Proposed Defendant-Intervenor. ) | |

## DECLARATION OF DANIELA VELEZ

I, Daniela Carolina Velez, hereby declare the following:

1. I arrived in the United States in 2002 when I was nine years old. I have lived for the last 15 years in Burlington County, New Jersey.

2. I first applied for Deferred Action for Childhood Arrivals (DACA) in August of 2012 and received DACA in January 2013. At the time I was a student at Rowan College in Burlington County. After receiving my work authorization, I was able to get a job with a non-profit organization called Servicios Latinos of Burlington County where I worked in a housing and college readiness program for low-income community members and assisted in events and translation for clients. My income helped me to pay for my college tuition and to support myself and my family.

3.  Having work authorization and a social security number through DACA has also allowed me to gain access to credit. I have applied for credit cards, which have provided me a path to finance my education and business.

4.  Since applying for DACA in 2012, I have renewed my status twice.

5.  In 2016, I started my own company called Innovative Lab Designs. We create kits for physics and astronomy classes that allow students to take college courses online. For last two years we have produced over 1000 lab kits for students in Burlington County.

6.  Since graduating from community college with two associates degrees in 2016, I enrolled in Rutgers University to study business. I am currently working towards my bachelor's degree.

7.  I also currently work for an association in New Jersey, where I support businesses across the state by helping them access development services.

8.  In 2017 I paid $4,628 in state income taxes to the state of New Jersey. In 2016 I paid $1391 in state taxes.

9.  My current DACA expires in March 2019. If I lose my DACA I will most likely lose my job, which means I will not be able to finish my college degree because without my income I could not afford tuition. I would also not be able to provide for my family, to whom I provide financial support for bills and groceries.

I declare under penalty of perjury pursuant 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 17th day of May, 2018 in Edgewater Park, New Jersey.

_____
Signature

Daniela Carolina Velez
Printed Name

# Exhibit 3

NJAPP0015

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,                    )
                                             )
            Plaintiffs,                      )
                                             )
      v.                                     )   Case No. 1:18-CV-68
                                             )
UNITED STATES OF AMERICA, *et al.*.          )
                                             )
            Defendants,                      )
                                             )
KARLA PEREZ, *et al.*,                       )
                                             )
            Defendant-Intervenors,           )
and                                          )
                                             )
STATE OF NEW JERSEY,                         )
                                             )
            Proposed Defendant-Intervenor.   )
                                             )

## DECLARATION OF DIANA GONZALEZ, DEPUTY SECRETARY OF HIGHER EDUCATION

I, Diana Gonzalez, hereby declare:

1.      I am Deputy Secretary for the New Jersey Office of the Secretary of Higher
Education (OSHE). a position I have held since January of this year. As Deputy
Secretary, I work to ensure the enrollment, persistence, and completion of students in
higher education throughout the state. In support of this goal, my office is also
responsible for policy and program development to enhance the capacity and
competitiveness of New Jersey's higher education institutions.

2.      Prior to holding this position, I served as Policy Advisor on the Murphy for Governor
campaign. where I was tasked with developing, informing, and promoting, then
gubernatorial candidate, Philip D. Murphy's policy platform with a primary focus on

1

NJAPP0016

secondary and postsecondary education. I have also worked at multiple institutions of higher education in various capacities including Rutgers University, Princeton University, and Georgetown University, where I prioritized access to first-generation college students and underserved populations in my work.

3.   As the Deputy Secretary, I am familiar with the matters set forth below, or have knowledge of the matters based on my review of information and records gathered by members of my staff.

4.   The New Jersey Office of the Secretary of Higher Education maintains data on education related matters such as enrollment, retention, tuition, and graduation rates.

5.   There are four public research universities in New Jersey (Rutgers, The State University of New Jersey; New Jersey Institute of Technology; Rowan University; and Montclair State University), and these colleges are aware of approximately 500 students in attendance who are DACA recipients.  Additionally, DACA recipients are employed by these public research universities.

6.   There are seven additional state colleges and universities in New Jersey (The College of New Jersey; Kean University; New Jersey City University; Ramapo College of New Jersey;  Stockton University; Thomas Edison State University; and William Paterson University), and these colleges are aware of nearly 200 students in attendance who are DACA recipients.

7.    There are also nineteen county community colleges in New Jersey.   These colleges are aware of more than 1,500 students in attendance who are DACA recipients. Many other DACA recipients are employed by these county community colleges.

2

NJAPP0017

8.    The DACA program has provided these students the opportunities to obtain an excellent and affordable New Jersey state education.  Without these opportunities, many DACA grantees will be forced to drop out of school without finishing their degree.

9.    These public educational institutions have much to lose if DACA is repealed.  First, they will lose hundreds of thousands of dollars in tuition revenue if DACA is rescinded.  Second, and maybe more importantly, they lose the richness of diversity that these students bring to the institutions.   These public institutions have emphasized the importance of diversity on their campuses.  Diversity brings different perspectives and ideas to the classroom and adds to the exciting and enthusiastic classroom discussion and overall culture of the campuses.  DACA students are a large part of this diversity, and without them, the institutions and the remaining students lose this educational experience.

10.   DACA grantees who continue to attend school post-termination may not be able to fully participate in a variety of activities—including sports teams, study-abroad programs, research projects, workplace internships, graduate program teaching, and travel opportunities—because they would lack the necessary work and travel authorizations. These factors may shrink the capacity of the state public educational institutions to offer such programming to their entire student body. Public universities may also be forced to alter recruitment of both students and faculty.

11.   These public educational institutions will also lose valuable employees.   The institutions have spent money in recruiting, training, and retention of these employees. If DACA is rescinded, these employees, like the students, lose their work

3

NJAPP0018

authorizations, and these institutions must again spend valuable public resources to recruit, train, and retain new employees.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this  21  day of June, 2018, in  _Trenton, NJ_____

Diana Gonzalez, Deputy Secretary
Office of the Secretary of Higher Education

4

NJAPP0019

# Exhibit 4

NJAPP0020

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Casc No. 1:18-CV-68 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| KARLA PEREZ, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors, | ) | |
| and | ) | |
| | ) | |
| STATE OF NEW JERSEY, | ) | |
| | ) | |
| Proposed Defendant-Intervenor. | ) | |
| | ) | |

**DECLARATION OF IKE BRANNON**

I, James Isaac (Ike) Brannon, declare as follows:

1.      I am currently an economist who is president of the consulting firm Capital Policy

Analytics. I also have an affiliation with the Cato Institute.

2.      I received my MA and Ph.D. in Economics from Indiana University.

3.      I was an economics professor in the University of Wisconsin System from

1994-2002. In 2001 I was granted tenure and promoted to associate professor.

4.      Since then I have worked in Washington D.C., for (in order) the Office of

Management and Budget, the Congressional Joint Economic Committee, The Senate Finance

1

NJAPP0021

Committee, The U.S. Treasury, The Republican Policy Committee for the U.S. Senate, and the House Energy and Commerce Committee.

5.      In 2008 I was chief economist for the John McCain for president campaign.

6.      I have co-authored, along with Logan Albright and M. Kevin McGee, several studies on the economic consequences of the termination of Deferred Action for Childhood Arrivals (DACA).

7.      Albright received his Master's Degree in economics in 2011 from Georgia State University, and has worked as a policy analyst in Washington, DC for the last five years, including positions at think tanks and policy organizations such as the American Action Forum, FreedomWorks, Free the People, and Capital Policy Analytics.  McGee is a retired professor of economics from the University of Wisconsin Oshkosh.

8.      Whereas the President has expressed a desire to end DACA, we conducted a thorough investigation of the economic and fiscal costs that such action would impose on the federal government, and to the economy as a whole and published that research in January 2017.

9.      In February 2018, we wrote a study, "A New Estimate of the Cost of Reversing DACA," which appeared as a Cato Institute Working Paper.  The report is available at https://object.cato.org/sites/cato.org/files/pubs/pdf/working-paper-49.pdf and a true and correct copy of that study is attached as Exhibit A.

10.      In connection with that second study, we received data from Thedream.us on its population of approximately 3,000 scholarship recipients. We used the information on their choice of major and institution and expected graduation date to project an average starting

2

income for each student, using data from the financial technology company payscale.com, which surveyed 2.3 million graduates at over 2,700 colleges.[1]

11.     We averaged these individual starting incomes to estimate a typical average starting income for all DACA recipients who graduate from college.

12.     We used data from the Migration Policy Institute to estimate the proportions of the DACA-eligible population who will finish college, attend some college and not finish, only finish high school, or fail to qualify for DACA.[2] We estimate that by 2027, over two-thirds of the DACA-eligible population will have attended college, and 48% of the DACA-eligible population will have college degrees.

13.     We used data from the Bureau of Labor Statistics to estimate the employment/population ratio for this DACA-eligible population over the next ten years.[3]

14.     We used estimated age-earnings profiles to project forward average earnings profiles for each of these DACA-eligible groups, should DACA be renewed.

15.     From this, we estimated that, if DACA continues, the DACA-eligible population will earn $351 billion from 2019 until 2028, and that they will pay $92.9 billion in federal taxes, which includes payroll taxes. These numbers mostly reflect the increased productivity, and earnings, of the DACA college graduates who would continue to have legal employment status.

16.     All of these calculations assumed an annual inflation rate of 2%. In 2018 dollars, our estimate of DACA-eligible earnings over this decade would be $311 billion.

---

[1]  https://www.payscale.com/college-salary-report
[2] Randy Kapps, Michael Fix, and Elaine Fong, "The Education and Workforce Profiles of the DACA Population," Migration Policy Institute Brief, August 2017.
https://www.migrationpolicy.org/research/education-and-work-profiles-daca-population
[3] https://www.bls.gov/cps/cpsaat04.htm.

NJAPP0023

17.     We use these numbers to estimate the impact that a DACA repeal would have on the state incomes and state tax revenues of New Jersey and Texas.

18.     To do so, we multiply the reduced national income by the share of the DACA recipients in each state.

19.     There are 689,800 DACA recipients as of September 2017. New Jersey has 17,400 DACA recipients (2.5% of the total) and Texas has 113,000, which is 16.4% of all DACA recipients. Our data comes from the U.S. Citizen and Immigration Services website. https://www.uscis.gov/sites/default/files/USCIS/Resources/Repor

20.     We also adjusted for the relative income of workers in each state.

21.     Median income in the U.S. was $57,617 in 2016, the last year for which there is data.

22.     New Jersey's median income is $73,242, 27% above the national median, and Texas's median is $56,139, 2.5% below the national median. This data comes from the U.S. Census Bureau's report entitled Household Income 2016.[4]

23.     The adjustment projects that a DACA-eligible person in New Jersey or Texas would earn 27% more and 2.5% less, respectively, than the average corresponding DACA-eligible in the U.S. This would apply to DACA college graduates as well as to those with less education.

24.     Adjusting for these, we estimate that the loss of income to Texas from the repeal of DACA would be $50 billion over the next decade, and for New Jersey it would be $10.3 billion over the next decade, both in 2018 dollars. These estimates correspond to average annual

---

[4] https://www.census.gov/content/dam/Census/library/publications/2017/acs/acsbr16-02.pdf

NJAPP0024

incomes of $44,200 and $59,500 for DACA-eligibles in Texas and New Jersey respectively. These estimates assume that the DACA-eligible population would either leave the U.S. or be deported.

25.     An alternative assumption would be that the DACA-eligible population would remain in the U.S., but would be employed only as illegal workers. Under this assumption, the loss of income to Texas and New Jersey from the repeal of DACA would be $28.1 billion and $5.8 billion over the next decade respectively, in 2018 dollars.

26.     We also estimated the lost revenue to each state from ending DACA.

27.     To do this we simply computed the ratio of additional total state income projected to be earned by DACA recipients over the next decade provided DACA continues, to the total personal income of the state. We applied that ratio to state property, sales and income tax revenues for 2015.

28.     The result would be $1.85 billion in reduced property taxes and $2.22 billion in lost sales taxes for Texas over that 10 year period (Texas has no income tax) for total taxes of $4.07 billion lost over the next decade, assuming DACA-eligibles leave the state.

29.     If we assume that DACA-eligibles remain in Texas and work as illegals, the losses for Texas would be $1.04 billion in reduced property taxes, $1.25 billion in lost sales taxes, and $2.29 billion in total taxes lost over the next decade.

30.     Applying the same standard to New Jersey we estimate it would lose $530 million in property taxes, $253 million in sales taxes and $255 million in lower state income tax revenue for a total loss of revenue of approximately $1.04 billion over the next ten years if DACA-eligibles left the state.

NJAPP0025

31.     If we assume that DACA-eligibles remain in New Jersey and work as illegals, the losses for New Jersey would be $298 million in reduced property taxes, $142 million in lost sales taxes, $143 million in lost income taxes, and $583 million in total taxes lost over the next decade.

32.     It is our professional opinion that the majority of jobs done by DACA workers could not simply be replaced by domestic workers; an unemployment rate of 3.8 percent suggests that there is simply not enough excess labor to fill those jobs, and the majority of those who would take those jobs would be coming from other jobs.

33.     What's more, foreign-born workers are, statistically, more mobile than workers born in the U.S., which means they are more likely to relocate in communities where there is a genuine shortage of workers. This further reduces the notion that their jobs could easily be filled by native born workers.[5]

34.     In summary, the repeal or rollback of the DACA program would have a significant and negative fiscal and economic impact on the country, and would disproportionately affect the various states in which DACA recipients are most prevalent, including Texas and New Jersey.

35.     Accompanying this statement is a list of my publications over the past decade and a list of all other cases over the past four years in which I have testified as an expert at trial or by deposition.  Exhibit B.

36.     I am to be paid $3,000 for this declaration and $3,000 if I am to give a deposition.

---

[5] See, for example: "Immigrants Equilibrate Labor Markets: Evidence from the Great Recession," https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4991313/

NJAPP0026

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and complete to the best of my knowledge.

James Isaac Brannon, Ph.D.

7

# Exhibit A

NJAPP0028

# A New Estimate of the Cost of Reversing DACA

By Logan Albright
Ike Brannon
M. Kevin McGee

February 15, 2018

## CATO WORKING PAPER
No. 49



1000 Massachusetts Avenue NW
Washington DC 20001

*Cato Working Papers are intended to circulate research in progress for comment and discussion.*
*Available at www.cato.org/workingpapers.*

# A New Estimate of the Cost of Reversing DACA

**Logan Albright[1]**
**Ike Brannon[2]**
**M. Kevin McGee[3]**

February 15, 2018

## Abstract

We obtained data on the age and educational outcomes of nearly 3,000 college students who are DACA recipients—Deferred Action for Childhood Arrivals—and used it to forecast their income in the ensuing decade. We then used this data, along with the income we forecast for DACA recipients not in college, to estimate the total economic and fiscal impact over the next decade of allowing this cohort to remain in the country and legally pursue employment. We estimate that reversing DACA would cost the U.S. economy $351 billion from 2019 to 2028 in lost income and that the U.S. Treasury would lose $92.9 billion in tax revenue.

## Background

As of our publication date, the status of the recipients of the Deferred Action for Childhood Arrivals—or DACA—has yet to be resolved. DACA provides work authorization and protections from deportations for individuals who were transported to the United States as children and who have since proven themselves to be productive members of society by meeting education benchmarks and having refrained from criminal activity. In October, President Trump announced that he was suspending the program—which was originally provided via an executive order from President Obama—but that he would delay its termination by six months to give Congress sufficient time to pass legislation to replace the executive order. Such legislation has proven elusive.

One argument put forth by those opposed to any renewal is that allowing these immigrants to remain in the country would impose a cost on U.S. taxpayers; a CBO study published in December 2017 estimates that legislation reinstating the legal status of the estimated 800,000 DACA immigrants would cost the federal government $26 billion over the next ten years.[4]

1

NJAPP0030

These results were at odds with our own research published in early 2017.[5] In that research, we stated that our *a priori* perspective was that cancelling DACA would make it nearly impossible for this cohort to obtain lawful employment and result in a reduction in tax revenues and economic activity in the domestic economy.

We estimated the economic and fiscal impact by extrapolating from related research that estimated the impact of expanding the pool of H-1B visa holders on economic activity.[6] We compared the demographic characteristics of the H-1B population and the DACA population—in general DACA recipients are younger and a sizeable fraction will likely not complete college. The result is that their income is quite a bit lower than for H-1B holders but it grows at a faster rate. We then estimated income and tax revenue by using the estimates for the H-1B population and adjusting those numbers by the income path and population differences.

We determined that reversing the policy would cost the U.S. economy $280 billion over a ten-year period, and that the resulting loss of government revenue would amount to roughly $60 billion in that decade.

**A Brief History of DACA**

President Barack Obama first established DACA visa executive action in 2012. From 2012 to 2017, roughly 800,000 people received DACA status. While this population could attend most colleges despite their lack of a legal status, the program gave them a temporary work permit and a Social Security number, which allowed them to work as well.

During his presidential campaign, Donald Trump promised to rescind DACA early in his presidency, and in September of 2017, the Attorney General announced that the program was, in fact, being suspended, with DACA recipients given up to a six-month grace period to get their affairs in order. The president challenged Congress to pass its own legislation to protect the status of DACA recipients, and at various times indicated that he felt some empathy for their plight and wanted a humane and reasonable solution of the issue.

This announcement was met with multiple legal challenges from state governments and individuals alike. The U.S. District Court of the Northern District of California has ruled that the reversal of DACA was unlawful, and has ordered the government to continue the program until further notice.

2

One proposed bill under consideration is the DREAM Act of 2017.  The Congressional Budget Office estimated that it would increase budget deficits by approximately $26 billion over the next decade.[7]  The rationale given for this result is that immigrants without work permits pay certain taxes, most notably payroll taxes, but cannot claim benefits. By granting them legal status these workers become eligible for various benefit programs and Social Security but without paying much more in federal income taxes.

**The DACA Population**

To understand the economic impact of reversing DACA it helps to understand what distinguishes DACA recipients from other cohorts of legal and illegal immigrants. Since the DACA population grew up in the United States, they more closely resemble native-born Americans and second-generation immigrants more than first-generation immigrants. Having experienced the American school system and a peer group comprised mainly of Americans, the difficulties presented by language barriers, culture shock, and other obstacles to assimilation have dissipated, thus affording DACA recipients more opportunities for economic success than immigrants as a whole.

Moreover, DACA recipients must necessarily be free from criminal activity, as well as have the ability to enroll and remain in some sort of post-secondary education in order to qualify for the program, leaving us with a cohort that has largely performed well in school and stayed out of trouble.

Analysis done by the Center for American Progress found that DACA recipients tend to perform well in post-secondary education and have lower attrition rates than their peers.[8] A primary reason for this is that the opportunity cost for a DACA student to leave school before completion is higher than for a native student: it is more difficult for DACA students to procure financial aid or scholarships and it becomes nearly impossible to do such a thing if a student leaves school for a spell.

The Migration Policy Institute (MPI) estimated that in 2014 nearly half of the DACA-eligible population who have completed a high school degree had no further education, with an additional 29 percent enrolled in college, 16 percent having completed some post-secondary education, and only 7 percent with college degrees.[9] Since DACA enrollment only began in

3

NJAPP0032

2012, this paucity of college graduates is understandable; more impressive is the surge in college enrollment. For the rest of the U.S. population, approximately 60 percent of high school graduates attended some sort of post-secondary institution and one third of the population eventually obtained a college degree.

These numbers would presumably have been even higher had MPI been able to look only at DACA enrollees. They estimated that in 2016, only 68 percent of the DACA-eligible population enrolled in the program. Clearly, those with at least some post-secondary education have a greater incentive to apply for DACA status than the average DACA-eligible person, since that status opens up legal employment opportunities that substantially increase with education. Therefore, we conclude that those with DACA *status* have a higher college enrollment rate as compared to the entire population of DACA-eligible unlawful immigrants.[10] From that, we assume that the college-enrollment rate among DACA enrollees is around 40 percent in 2014, about a third higher than for all DACA-eligibles, which would in turn suggest that by 2019 the current DACA-enrolled population will be--roughly--evenly divided between those with only a high school degree, those with some post-secondary education, those currently in college, and those with college degrees.[11]

**Methodology**

Estimating the economic production and tax revenues that DACA enrollees are likely to generate over the next decade entails three steps. First, we needed to generate a profile of the DACA-eligible population over time, as its members move from high school either directly into the workforce, or through post-secondary education and then into the workforce. That profile needs to include reasonable transition probabilities that would estimate both high school and college drop out rates that are consistent with the patterns observed in the data.

Second, we needed to estimate reasonable age-earnings profiles for three groups of DACA-eligible individuals: those projected to have only high school degrees, those projected to have some college or other post-secondary education but no degree, and those projected to complete college. Finally, we needed to estimate how many of those DACA-eligible individuals would in fact apply for and be approved for DACA status.

4

NJAPP0033

*DACA-eligible Workforce Entry*

We used Migration Policy Institute research on the characteristics and numbers of the DACA-eligible population to estimate the distribution of educational attainment for this population.[12] Using the Hispanic dropout rates in the Census Department's CPS Historical Time Series Tables on School Enrollment, we generated a plausible pattern of DACA-eligible high school enrollment, which gradually tapered from 98,000 freshmen in 2012 to 8,000 freshmen in 2023.[13] We then assumed that 35 percent of these high school graduates would move directly into the workforce. MPI estimated that there were 396,000 DACA-eligible high school graduates in 2014 who were not pursuing additional education, which would then imply that 309,000 DACA-eligible, unlawful immigrants had already graduated from high school by 2011.

The remaining high school graduates were divided between college enrollment (50 percent) and other post-secondary enrollment (15 percent). Even those numbers were insufficient to generate MPI's estimate of 241,000 DACA-eligible college enrollees in 2014; so we assumed a surge of over 95,000 college enrollees in 2013, from among the population that had previously graduated from high school. Our estimates imply that by 2033, 36.35 percent of the DACA-eligible population will have college degrees, in line with Census department's 2017 estimate that by the age of 34, 36.4 percent of Hispanics who graduate from high school have gone on to earn college degrees.[14]

We assumed that college enrollees have an 81 percent graduation rate, consistent both with the rates observed by thedream.us, an organization that provides scholarship money for DACA students to help cover the cost of college. This is above the national 6-year graduation rates for full-time college students; we attribute this to the fact that a substantial proportion of our sample obtained an associate's degree, which is a common step for this cohort seeking post-college education. We assumed that enrollees in other post-secondary programs had a 50 percent annual attrition rate, either from dropping out or from completion of their program. This gave a flow of DACA-eligibles into the workforce that includes about 44,000 college graduates per year between 2017 and 2023.

We then had to reduce this workforce-entry flow for two reasons. First, not all high school graduates are in the labor force, and not all labor force participants are employed as the population includes those who are unemployed but looking for work. The Bureau of Labor

5

Statistics (BLS) reports a 75.3 percent employment-population ratio among Hispanics age 25 to 34, so we reduced our estimates of labor force entrants accordingly.[15]

Secondly, not all DACA-eligible unlawful immigrants apply for, or are granted, DACA status. MPI estimated that 68 percent of DACA-eligibles have applied for that status with an acceptance rate above 95 percent.[16] We reasoned that since the benefits of DACA status are greater the greater one's earnings potential, we ascribed DACA status to all of the DACA-eligibles with some college or a college degree, but to only one-third of those with only high school degrees. Those assumptions imply that DACA status will slowly rise to 68.8 percent of the eligible population by 2028. If DACA is not just reinstated as a temporary, 2-year renewable status, but is legally enshrined in a permanent status, we would expect DACA participation to rise and the revenue impacts of DACA will increase accordingly.

*DACA-eligible Age-earnings Profiles*

The estimated age-earnings profiles of DACA-eligibles with only high school or some college are based on the corresponding median 2017 weekly earnings for Hispanics as reported by the BLS.[17] For individuals with high school degrees only, median earnings were $33,852 a year; using Thornton and his coauthor's research, real earnings rise by about 1 percent a year until about age 40, and are flat thereafter.[18] The resulting pattern begins at about $27,500 at age 19, when these individuals are assumed to enter the workforce, and rises to the median wage by age 40.

For individuals with some college, median earnings were $38,324 a year. According to Tamborini and his coauthors, median earnings for these workers are 5.6 percent higher than their high school-only counterparts for those aged 20-29, and 12.6 percent higher for those aged 30-39.[19] The resulting estimated real earnings profile consistent with these values rises from $28,000 at age 21 to $39,300 at age 40.

We assigned the starting median salary to all employed DACA-participating individuals at the beginning of their work careers and assumed that their real incomes would rise with age according to the rates above. In reality, some individuals will earn more than those median earnings, and others less. The progressivity of the tax code implies that our revenue estimates for these workers will understate the true revenue impacts, although probably not my much, since

6

NJAPP0035

most of these individuals will remain in a relatively low tax bracket regardless of how much they vary from the median.  Their estimated taxes were based on the tax rates adopted in December 2017 for single individuals. For years after 2018, nominal tax payments were inflated using an annual 2 percent inflation rate. Per CBO custom, we do not discount the income or tax revenues of future years.

To estimate the earnings of the DACA college graduates, we obtained data from thedream.us. Just under 3,000 students have received financial assistance from thedream.us. For these individuals, we have data on the college in which they are currently enrolled, their expected graduation, their choice of major, previous post-secondary education (a substantial proportion have already earned an associates degree), and their city and state of residence. While we do not have data on their academic performance, a student's area of study is much more relevant to post-college income.

We paired the educational data with income data we obtained from the financial technology company payscale.com, which has an estimated starting salary for college students based on degree, school, and major using reported salary data.[20] Our data set had 2,563 usable observations with sufficient data to assign an estimated starting salary. To generate an age-earnings profile, we used estimates from Thornton and his coauthors that found that salaries initially grow at a 4 percent real annual rate, gradually tapering to a 3 percent real annual rate after 10 years.

To account for the fact that most college students begin their employment careers mid-year, we reduced first-year salaries by 60 percent.  With this group as well, our tax estimates were based on the tax rates adopted in December 2017 for single individuals. We calculated estimated taxes for each individual for each year in their earnings profile, and then averaged over our entire sample, giving us a profile of average tax payments per college graduate that does account for earnings variability.  As with the other two groups, we ascribed these average tax payments to each individual college graduate, beginning in the year they enter the labor force. Once again, we reduce the number of entrants to 75.6 percent of all graduates to reflect employment rates, and inflate nominal payments by a 2 percent inflation rate.

*Three Possible Scenarios*

7

The estimate derived above assumes that current DACA recipients are offered a legal way to stay in the country, attend university, and obtain productive employment. From a fiscal standpoint, this would be the most preferred outcome but two others are also possible. The second scenario is that DACA ends and the immigrants currently in the country under its protection will be deported to their countries of origin. Under this scenario, the U.S. government does not only fail to gain any tax revenue from current DACA recipients, but also has to locate and deport 800,000 individuals, a task that would cost over $10 billion if it were feasible.[21]

The more likely scenario if Congress fails to reach a deal and current DACA recipients lose their legal status is that the vast majority remain in the country illegally and work largely in jobs that require little skill but can be done on a cash basis, allowing them to receive their wages under the table. A proportion might be able to obtain employment by using another person's Social Security Number, a common ruse, which would force them to pay income and payroll taxes, albeit without any ability to collect Social Security or other benefits. Of course, as residents and consumers, they would also continue to pay sales and excise taxes. Given that this activity would happen outside of the law, it is impossible to estimate the revenue impact beyond saying that it would fall somewhere between the first two scenarios.

### Estimating the Income and Tax Impacts of Repealing DACA

From the above analysis, we projected the number of DACA recipients in each of the four educational attainment categories for each year and then assigned them an income based on their experience and educational attainment by education (Table 1). For the college graduates we estimated a starting salary based on school and choice of major. The average DACA recipient will earn a salary of approximately $73,921 per year for the 10-year period from 2019 to 2028. These earnings represent an equivalent gain to U.S. gross domestic product. Factoring in the 75.6 percent employment rate cited above and multiplying by the total number of DACA recipients, we estimate the ten-year GDP impact to be $351 billion.

NJAPP0037

Table 1
DACA Recipients by Educational Category

|  | 2019 | 2021 | 2023 | 2025 | 2027 |
|---|---|---|---|---|---|
| **Number** |  |  |  |  |  |
| HS degree only | 184,767 | 199,719 | 209,687 | 216,031 | 218,749 |
| Enrolled in College | 193,389 | 165,564 | 122,726 | 81,945 | 47,128 |
| Some college | 190,547 | 208,521 | 221,908 | 231,164 | 236,846 |
| College degrees | 245,305 | 311,468 | 376,693 | 430,371 | 467,533 |
| Total | 814,008 | 885,272 | 931,014 | 959,511 | 970,256 |
|  |  |  |  |  |  |
| **Percentages** |  |  |  |  |  |
| HS degree only | 22.7% | 22.6% | 22.5% | 22.5% | 22.5% |
| Enrolled in College | 23.8% | 18.7% | 13.2% | 8.5% | 4.9% |
| Some college | 23.4% | 23.6% | 23.8% | 24.1% | 24.4% |
| College degrees | 30.1% | 35.2% | 40.5% | 44.9% | 48.2% |
|  | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
|  |  |  |  |  |  |
| **Average Earnings** |  |  |  |  |  |
| HS degree only | $30,332 | $32,019 | $33,844 | $35,816 | $37,959 |
| Enrolled in College | $0 | $0 | $0 | $0 | $0 |
| Some college | $32,736 | $34,878 | $37,211 | $39,764 | $42,564 |
| College degrees | $63,216 | $69,963 | $76,810 | $84,671 | $93,383 |
| Total | $33,598 | $40,054 | $47,569 | $55,621 | $63,946 |

*Note: "Some college" includes those with more than a high school and less than a college degree who are not currently enrolled in college.*

Applying the appropriate tax rates, we also determined that government would gain $39.2 billion in revenue from DACA recipients over the next ten years. Additionally, we can expect a FICA tax rate of 15.3 percent, resulting in payroll tax revenue of $53.7 billion over the next ten years. Therefore, the total tax revenue impact would be $92.9 billion.[22] The imputed tax revenue adds up to 25 percent of projected income, the majority of which is driven by FICA.

We projected out an additional year and found that, from the ten-year period comprising 2020 through 2029, the GDP impact would be $384 billion, and the revenue impact would be $43.6 billion. If we include the FICA tax (both the employer and employee share), we add an additional $58.8 billion, for a total tax impact of $102.4 billion.

It should be noted that salary estimates are based on data that are a few years old and may understate current incomes, and there is reason to believe that incomes will grow faster than

9

NJAPP0038

during the previous decade. These estimates do not include the cost of actually tracking down and physically removing all 690,000 DACA recipients from the country, a significant expenditure in itself that would increase the fiscal costs of DACA.

**Comparisons with Other Estimates**

The above-mentioned Congressional Budget Office score the DREAM Act finds significantly lower revenue gains from DACA recipients than we do here.[23] There are several reasons for this.  The first is that CBO regards the income of DACA recipients as merely switching over from "underground" to legal status, and does not believe that this would result in much of a gain in income for those workers, an assumption that we think is without merit. What's more, the legislation would make these people become eligible for a large number of federal government welfare programs, which it believes would outweigh any tax revenue boost from their newfound legality.

CBO's methodology essentially assumes the formal employment of DACA recipients merely transfers income from the employer (who would have been taxed on that income had the employee not been hired) to the employee (who is then taxed on the transferred income).  The CBO's estimate also contains offsets for health insurance premium support offered through the Affordable Care Act. However, our analysis suggests that DACA recipients who complete college--a significant proportion of the cohort--become significantly less likely to qualify for premium support soon after completing college.

Finally, CBO makes no allowance for the effects of education and specialization, conducted in a legal environment, on income. DACA recipients who complete college have the potential for considerable income growth, which would result in higher tax obligations and more revenue to the federal government. For these reasons, we estimate that the revenue cost to the federal government of reversing DACA would be substantially higher than the estimate implicitly contained in the DREAM Act.

It should also be noted that our cost estimates look only at the cost of fully reversing the current DACA program, whereas the DREAM Act contains other provisions providing a path to citizenship for immigrants beyond the status quo. A full scoring of the DREAM Act is beyond

10

the scope of this paper, and the differences found in this somewhat apples-to-oranges comparison are to be expected.

## Conclusion

Our revised findings from data of DACA recipients currently matriculating are consistent with our previous analysis and suggest that ending the deferred arrivals program would represent a significant cost to the United States Treasury and the broader economy.  We estimate that reversing DACA would cost the U.S. economy $351 billion from 2019 to 2028 in lost income, and that the U.S. Treasury would lose $92.9 billion in revenue, including payroll taxes.

---

[1] Director of Research at Free the People, labright@freethepeople.org
[2] Visiting fellow at the Cato Institute, ike.brannon@gmail.com
[3] Professor emeritus at the University of Wisconsin Oshkosh, mcgee@uwosh.edu
[4] "S. 1615, Dream Act of 2017," Congressional Budget Office Cost Estimate, December 15, 2017, https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/s1615.pdf.
[5] Ike Brannon and Logan Albright, "The Economic and Fiscal Impact of Repealing DACA," Cato-At-Liberty, January 18, 2017, https://www.cato.org/blog/economic-fiscal-impact-repealing-daca.
[6] Thomas V. Church, "Estimating the Economic and Budgetary Effects of New H-1B Visas in the Senate Gang of Eight's Proposed Immigration Bill," Hoover Institution (Stanford: Hoover, May 7, 2013), http://www.hoover.org/sites/default/files/uploads/aafs/2013/05/Estimating-the-Economic-and-Budgetary-Effects-of-H-1B-Reform-In-S.744.pdf.
[7] "S. 1615, Dream Act of 2017," Congressional Budget Office Cost Estimate, December 15, 2017, https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/s1615.pdf.
[8] Tom K Wong, "Results of Tom K. Wong, National Immigration Law Center, and Center for American Progress national survey National Immigrant Law Center," *Center for American Progress Memo,* June 2015.
[9] Randy Capps, Michael Fix, and Jie Zong, "The Education and Work Profiles of the DACA Population," Migration Policy Institute, August 2017, https://www.migrationpolicy.org/research/education-and-work-profiles-daca-population, p. 4.
[10] Ibid.
[11] Ibid.
[12] Ibid.
[13] "CPS Historical Time Series Tables on School Enrollment," U.S. Census, August 23, 2017, https://www.census.gov/data/tables/time-series/demo/school-enrollment/cps-historical-time-series.html.
[14] "Educational Attainment in the United States: 2017, U.S.," U.S. Census, December 14, 2017, https://www.census.gov/data/tables/2017/demo/education-attainment/cps-detailed-tables.html, Table 1.
[15] "Labor Force Statistics from the Current Population Survey," Bureau of Labor Statistics, January 19, 2018, https://www.bls.gov/cps/cpsaat04.htm.

NJAPP0040

[16] Randy Capps, Michael Fix, and Jie Zong, "The Education and Work Profiles of the DACA Population," Migration Policy Institute, August 2017, https://www.migrationpolicy.org/research/education-and-work-profiles-daca-population, p. 3.

[17] "Usual Weekly Earnings of Wage and Salary Workers, Fourth Quarter 2017," Bureau of Labor Statistics, News Release, January 17, 2018, https://www.bls.gov/news.release/pdf/wkyeng.pdf.

[18] Robert Thornton, James Rogers and Michael Brookshire, "On the Interpretation of Age-Earnings Profiles," *Journal of Labor Research* 18(2) 1997, Table 4.

[19] Christopher R. Tamborini, ChangHwan Kim and Arthur Sakamoto, "Education and Lifetime Earnings in the United States," *Demography* 52 2015.

[20] Paysale.com, About Us Page, https://www.payscale.com/about

[21] John Hudak and Elaine Kamarck, "The Mind-Boggling Cost of DACA Repeal," Brookings Institution, September 7, 2017, https://www.brookings.edu/blog/fixgov/2017/09/07/the-mind-boggling-cost-of-daca-repeal/.

[22] We assume that the personal tax rates will not change and ignore the fact that current law repeals them in 2026.

[23] "S. 1615, Dream Act of 2017," Congressional Budget Office Cost Estimate, December 15, 2017, https://www.cbo.gov/system/files/115th-congress-2017-2018/costestimate/s1615.pdf.

12

NJAPP0041

# Exhibit B

NJAPP0042

# IKE BRANNON, PH.D.

2012 Wyoming Avenue NW, #301, Washington, DC 20009 ● (202) 232-3148 ●
Ike@capitalpolicyanalytics.com

## Professional Experience

### President, Capital Policy Analytics 2012-present
- A consultancy that provides policy research for trade associations, multinational corporations, consortiums, and various government and non-profit entities.
  - Co-authored over one dozen major studies and 50 total publications in 2017.

### Nonresident Fellow, Cato Institute 2015-2018
- Write, appear on media, and give talks

### Nonresident Fellow, George W. Bush Institute, 2012-2015.
- Write, appear on media, and give talks

### Director of Economic Policy & Government Relations, American Action Forum 2011-2012
- Supervise research staff and coordinate Forum research agenda
- Organize Forum events on and off Capitol Hill
- Maintain an independent research agenda & represent the Forum in the media

### Chief Economist, House Energy & Commerce Committee, U.S. Congress, 2009-2011
- Advise Committee members on energy, healthcare, and regulatory matters
- Assist Republican Members with scoring requests pertinent to legislation

### Senior Adviser for Tax Policy, Republican Policy Committee, U.S. Senate 2009
- Advised staffers and members on tax and savings issues
- Presented and coordinated briefings to staffers and members on policy issues

### Senior Adviser and Chief Economist, John McCain 2008 2008
- Coordinated debate preparation for candidates
- Directed outreach with surrogates in battleground states
- Coordinated outside advisers on tax, budget, and financial regulatory issues

### United States Treasury, Senior Adviser for Tax Policy 2007-2008
- Contributed to Administration's economic stimulus & subprime crisis plan
- Helped to coordinate Administration efforts to reform corporate tax code

### The Honorable Orrin G. Hatch, *United States Senator, Washington DC* 2005-2007
*Principal Economic Adviser, Senate Finance Committee*
- Prepared legislation pertinent to tax and investment policy
- Helped create legislation encouraging use of automatic enrollment in 401(k)s

NJAPP0043

**The Joint Economic Committee of Congress** (Senator Robert F. Bennett, Chair)
*Chief Economist*                                                                2004-2005
*Senior Economist*                                                               2002-2004
- Managed and supervised the research of a staff of 15
- Wrote and edited published reports and internal memos for Members and staff

**Office of Management and Budget, Executive Office of the President**          2001-2002
*Senior Economist, Office of Information and Regulatory Affairs*
- Analyzed major regulations promulgated by federal agencies
- Informed White House on major research areas pertinent to cost-benefit analysis

**Department of Economics, University of Wisconsin, Oshkosh, WI**
*Associate Professor of Economics (tenured)*                                    2000-2002
*Assistant Professor of Economics*                                              1994-2000
- Recipient of college teaching award
- Research Associate with the Wisconsin Policy Research Institute, 1999-2001

## Leadership Positions
- Director of the Prosperity Caucus, a group of over 200 economists in DC       2003-
- Director/Founder of the Savings and Retirement Forum                          2009-
- Director for the Tax Economists' Forum, a biweekly seminar group              2006-

## Education/Background
- Ph.D., M.A., Economics, Indiana University, Bloomington, IN
- B.A., Math, Economics, Spanish, Augustana College, Rock Island, IL
  - College Young Alumni of the year, 2004.
- Native of Mossville, Illinois (Peoria County)
- Moderate fluency in Spanish

## Publications and Research

Over 400 publications in last decade--see attached list.

NJAPP0044

# Exhibit 5

NJAPP0045

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*,          ) | |
|        ) | |
|      Plaintiffs,    ) | |
|        ) | |
|    v.        ) | Case No. 1:18-CV-68 |
|        ) | |
| UNITED STATES OF AMERICA, *et al.*,   ) | |
|        ) | |
|     Defendants,   ) | |
|        ) | |
| KARLA PEREZ, *et al.*,     ) | |
|        ) | |
|    Defendant-Intervenors,   ) | |
| and        ) | |
|        ) | |
| STATE OF NEW JERSEY,    ) | |
|        ) | |
|    Proposed Defendant-Intervenor.   ) | |
|        ) | |

## <u>DECLARATION OF JOANA COSTA</u>

I, Joana Costa, hereby declare the following:

1.  I was brought to the United States in 2005 from Portugal when I was fifteen years old
    and have lived in Union, New Jersey ever since.

2.  I started high school one month after I arrived in the United States and quickly
    assimilated to the environment. I was nominated Student of the Month for
    Mathematics four months after my arrival and received excellence awards in my
    senior year. I graduated from Union High School in the top 25 of the 2008 class.

3.  I attended Union County College (UCC), where I obtained an Associates of Arts in
    Biology. Although I was awarded the full tuition NJ STARS scholarship, I was not

1

NJAPP0046

able to accept the scholarship due to my immigration status and paid for my education in full. While at UCC, I received the Distinguished Officer Award for my role as the Vice President of Fundraising in the honors society Phi Theta Kappa and the Service Award for my involvement in the community.

4.  In 2012, I graduated from UCC with a 4.0 GPA and was presented numerous awards. Among others, I received the Biology Award, the Alumni Award for the student with the most credits and the highest GPA, and the Post-Day Memorial Award, presented to the graduate who most nearly exemplifies the ideals of Union County College.

5.  In 2012, I also applied for and was granted Deferred Action for Childhood Arrivals (DACA). With DACA I was able to obtain work authorization, a social security number and a driver's license.

6.  I then attended Bloomfield College on a full-tuition scholarship based on my GPA and Phi Theta Kappa enrollment and completed a Bachelor's degree with a double major in Biology and Chemistry and a concentration in Biochemistry. I graduated in 2014 and was given the Charles Gross Award for Outstanding Work in Science and the New Jersey Institute of Chemists Award.

7.  My employment authorization allowed me to accept a job one month after graduation as an associate chemist. I have worked ever since at Chemetall – BASF and have been promoted twice. In June 2017, I joined the Innovation Team, where I am part of the development of cutting-edge technology in the metalworking industry. I am responsible for the execution of seven projects that have profit margins of $200-250K each.

NJAPP0047

8. In the fiscal year 2017, I paid $6,083.00 in federal taxes and $1,216.00 in New Jersey state taxes. In 2016, my federal and state taxes totaled $6,408.00. I own and have paid state sales taxes on two New Jersey-registered cars. In four years of professional work, I have saved money and have $100,000 in assets, with $44,000 in liquid assets, $28,000 in a retirement plan and $35,000 in IRA accounts. I participate in fundraising for not-for-profits and have donated over $1,000.00 to the colleges I attended.

9. Outside of work, I have participated in a wide range of activities. In January, inspired by the immigrant rights organization Make the Road New Jersey, I started the campaign "I Am DACA." I have written postcards titled "10 Reasons Why" to more than 100 local and state representatives, governors, senators, activists, diplomats, journalists and influential celebrities, outlining the benefits and opportunities the DACA program created for me. In March, I returned to Liberty Science Center, a science museum in Jersey City, where I volunteer. In April, I started Experimental Science, LLC., a company that brings hands-on science experiments to elementary and middle schools and inspires children to pursue STEM careers. My professional career will continue to grow this year, as I will start a Masters in Public Health in July at George Washington University.

10. The renewal of my DACA application in April meant that I could stop worrying about losing my job and could continue focusing on my professional development. DACA has been the platform on which I have built my career, and the reason for my renewed sense of confidence.

11. Without DACA, my life will change drastically. First, I will lose my job and have no source of income. I will not be able to support the life I have worked so hard to build

NJAPP0048

in the United States. I will also lose my driver's license and my ability to pay for

bills, such as car insurance or medical bills. Secondly, the development of my

professional career will cease, as pursuing my masters degree will no longer be a

possibility due to financial constraints. My skills, knowledge and potential will go

unused and uninvested.

I declare under penalty of perjury pursuant 28 U.S.C. § 1746 that the foregoing is true and

correct.


Executed this 17th day of May, 2018 in Union, New Jersey.

_____

Signature

Joana Costa

Printed Name

4

NJAPP0049

# Exhibit 6

NJAPP0050

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant- | § | |
| Intervenors. | § | |

**DECLARATION OF LEIGHTON KU, PhD, MPH**

I, Leighton Ku, declare as follows:

1. My name is Leighton Ku and I am over eighteen years of age.  I have personal
   knowledge of and could testify in Court concerning the following statements of fact.

2. I am a Professor of Health Policy and Management and Director of the Center for Health
   Policy Research at the Milken Institute School of Public Health, George Washington
   University in Washington, DC.  I have attached my Curriculum Vitae as Exhibit A to this
   declaration.

3. I am a nationally-known health policy researcher with over 25 years of experience.  I
   have conducted substantial research about immigrant health, health care, and costs.  I
   have authored or co-authored more than a dozen articles and reports about immigrant
   health issues, including articles in peer-reviewed journals such as <u>Health Affairs</u> and

1

<u>American Journal of Public Health</u>, as well as scholarly reports published by diverse non-profit organizations including the Migration Policy Institute, the Cato Institute and the Commonwealth Fund, as well as many more articles and reports on other subjects.  I have testified before the U.S. Senate Finance Committee about immigrant health issues and provided analyses and advice to state governments and non-governmental organizations in many states about immigrant health.

4.  In November 2017, I provided an expert declaration about the effects of terminating DACA on health insurance coverage and states (*State of New York, et al. v Trump, et al.*).[1]  I have not provided testimony in any other court cases in the past four years.

5.  In addition, I have conducted substantial research about health policy and employment. For example, in 2017, I authored studies about how repealing the Affordable Care Act (ACA) would affect employment levels and state economies, including "Repealing Federal Health Reform: The Economic and Employment Consequences for States" (2017).  This research is attached as Exhibit B.

6.  I also have knowledge of health insurance and employment through my role as a voluntary (unpaid, appointed) Executive Board member for the District of Columbia's Health Benefits Exchange Authority, which governs the District's health insurance marketplace, formed under the federal ACA.  This includes oversight of health insurance for small businesses as well as individual health insurance in the District of Columbia.

7.  I have a PhD in Health Policy from Boston University (1990) and Master of Public Health and Master of Science degrees from the University of California at Berkeley

---

[1] Declaration of Leighton Ku in *State of New York, et al. v Donald Trump, et al.* in U.S. District Court for the Eastern District of New York. Nov. 22, 2017.

NJAPP0052

(1979).  Prior to becoming a faculty member at George Washington University, I was on the staff of the Urban Institute and the Center on Budget and Policy Priorities.

8.  I have been engaged by the Mexican American Legal Defense and Educational Fund and the Office of the Attorney General of the State of New Jersey for this case. I am being paid at a rate of $187.50 per hour.

### Overview

9.  This declaration discusses five topics: (1) a response to the declaration of Dr. Donald Deere on joint effects of Deferred Action for Childhood Arrivals (DACA) and the ACA on employment,[2] (2) the effects of terminating DACA on employment in the health sector and on patient care, (3) a brief description of DACA recipients' eligibility for insurance coverage under the ACA, (4) a review of the effects of DACA on mental health, and (5) the effects of terminating DACA on health expenditures by states.  In that final section, I also briefly discuss the declaration of Ms. Monica Smoot about medical expenditures in Texas for undocumented immigrants.

### DACA and the ACA Do Not Create Incentives to Hire
### DACA Recipients Instead of U.S.-Born Citizens

10.  Dr. Donald Deere, a consultant paid by the Office of the Attorney General of Texas, alleges that the combined effect of the ACA and DACA reduces the employment of citizens in favor of DACA recipients (or as he calls them, "undocumented immigrants who are authorized to work").

11.  Dr. Deere's hypothesis that the ACA creates an incentive to hire DACA recipients instead of citizens is misplaced.  I am not aware of any empirical evidence about the

---

[2] Declaration of Donald Deere, PhD, in *State of Texas, et al. v United States of America, et al.* in the United States District Court for the Southern District of Texas, Brownsville Division.  April 27, 2018.

NJAPP0053

number of citizens who are unemployed because of such a possibility or aware of any

empirical evidence that employers are hiring DACA recipients in lieu of citizens because

of potential differences in ACA-related penalties. Nor does Dr. Deere show any such

actual evidence. His hypothesis is built on a series of unsupported assumptions. His

argument contradicts logic and well-established research.

12. To understand his claim, a brief review of applicable provisions of the ACA is necessary.

Under §1513 of the ACA, a large employer with 50 or more full-time employees may be

assessed federal tax penalties if it fails to offer affordable employer-based insurance and

one or more of its employees instead obtains coverage in a health insurance exchange and

receives federal premium tax credits. Specifically, large employers who do not offer any

health insurance coverage may be penalized $2,320 per full-time employee (minus first

30) if at least one full-time employee receives a federal premium subsidy for marketplace

coverage. Moreover, if the employer offers health insurance but does not cover at least

60% of total allowed costs or the insurance is not affordable because the employee's

share of an individual premium (not the premium for the full family) exceeds 9.56% of

income (in 2018), then the employer may be assessed fines of the lesser of $3,480 per

full-time employee receiving a premium tax credit or $2,320 per full-time employee,

minus the first 30 employees.[3] This provision is also known as the "employer shared

responsibility" requirement or "employer mandate."

---

[3] Cigna. Employer Mandate Fact Sheet. 2018. https://www.cigna.com/assets/docs/about-cigna/informed-on-reform/employer-mandate-fact-sheet.pdf

NJAPP0054

13. The employer shared responsibility does not apply to smaller firms with fewer than 50 employees.[4]

14. The employer shared responsibility was designed to ensure that large employers did not stop offering health insurance to their workers when the exchanges became available.

15. Large firms (50 or more workers) employ about three-quarters of all American workers,[5] and virtually all (97%) of businesses with 50 or more employees offer health insurance coverage to their employees and did so even before the ACA (for example, 96% in 2010). More specifically, in Texas, 97% of firms with 50 or more workers offered health insurance in 2016 and 95% did so in 2010.[6] Thus, the employer penalties are virtually irrelevant to employers with more than 50 workers and should not affect their hiring or wage decisions. The lack of employer-sponsored health insurance coverage is primarily a problem of smaller businesses, but the ACA penalty does not apply to them, so it ought not affect their hiring decisions either.

16. DACA recipients are not eligible for premium tax credits or for the health insurance exchanges (like other undocumented immigrants), in contrast to U.S. citizens or other immigrants like those who are lawful permanent residents.[7]

---

[4] Kaiser Family Foundation. Employer Responsibility Under the Affordable Care Act. Mar. 5, 2018. https://www.kff.org/infographic/employer-responsibility-under-the-affordable-care-act/.
[5] Bureau of Labor Statistics. Distribution of private sector employment by firm size class. ttps://www.bls.gov/web/cewbd/table_f.txt
[6] Agency for Healthcare Research and Quality. Table II.A.2 Percent of private-sector establishments that offer health insurance by firm size and State: United States, 2016. https://meps.ahrq.gov/data_stats/summ_tables/insr/state/series_2/2016/tiia2.pdf; see also https://meps.ahrq.gov/data_stats/summ_tables/insr/state/series_2/2010/tiia2.htm
[7] A more complete review of immigrant eligibility for health benefits is summarized in Ku L, *Strengthening Immigrants' Health Access: Current Opportunities.* GW Department of Health Policy Issue Brief, Dec. 13, 2013. http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29.

NJAPP0055

17. Dr. Deere makes it seem like large numbers of citizen workers could get premium tax credits and therefore could trigger penalties for their employers. This is misleading. In order to be eligible for the health insurance exchanges and premium tax credits, a person cannot be eligible for other insurance coverage, such as employer-sponsored coverage, Medicaid or Medicare. (In unusual cases where the employer coverage is too low, as described above, a person may be eligible for exchange coverage). That is, whether or not an employee takes insurance from his or her employer is irrelevant. The key issue is whether the employer offers insurance to full-time employees. In addition, to get the premium tax credits, people must generally have incomes between 100 and 400 percent of the poverty line. According to Census data for 2017, about 49% percent of adults 18 to 35 (roughly the DACA age range) have incomes in this range, and the other half would not be eligible for tax credits.[8] Therefore, only a small share of citizen workers could get the premium tax credits that might trigger federal tax penalties. The overwhelming majority of citizen workers in large businesses are not eligible for premium tax credits and their employment poses no risk to their employers.

18. Dr. Deere hypothesizes that ACA and DACA policies combined create an incentive for employers to hire DACA recipients instead of citizens, since employers are potentially subject to tax penalties under the employer shared responsibility provisions when they hire citizens but not when they hire DACA recipients, and since citizens are eligible for premium tax credits, but not DACA recipients. He suggests that these policies make it harder for U.S. citizens to find work and depresses their wages. Although he does not indicate how many citizens may be affected, he suggests the number is large by

---

[8] Based on analyses of the Census Bureau's Annual Social and Economic Survey, March 2018, as tabulated by https://www.census.gov/cps/data/cpstablecreator.html

NJAPP0056

mentioning that there are about 683,000 DACA recipients, of which 112,000 are in Texas. This is a huge exaggeration of the potential scope. Dr. Deere also exaggerates the number of people receiving premium tax credits by citing an outdated statistic that 64 million people are eligible for premium tax credits. The actual number receiving them was 8.7 million in 2017.[9]

19. Moreover, the extent to which an employer would hire a DACA recipient in lieu of a citizen worker because the DACA recipient is not eligible for premium tax credits relies on the dubious assumption that many employers are aware of this obscure nuance of health law. To the extent that this minor incentive exists, it may be counteracted by other employment compliance barriers that firms may face in hiring DACA recipients.[10] There are small conflicting conceptual incentives which may favor or disfavor hiring citizens vs. DACA recipients. It is plausible that they balance out and are, in reality, immaterial.

20. At the current time, unemployment rates are at record lows and many businesses have serious problems finding enough qualified workers.[11] In fact, the cancellation of DACA and the resulting loss of work authorization for hundreds of thousands of workers who have DACA will compound this shortage of qualified workers and create a severe hardship for many businesses and their customers. Hundreds of business leaders have

---

[9] Kaiser Family Foundation. Estimated Total Premium Tax Credits Received by Marketplace Enrollees. https://www.kff.org/health-reform/state-indicator/average-monthly-advance-premium-tax-credit-aptc/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

[10] Jones D, Ombok O. DACA and the Challenges Faced by Employers in Workplace Compliance. Association of Corporate Counsel. May 20, 2015. http://www.acc.com/legalresources/quickcounsel/employers-in-workplace-compliance.cfm

[11] Lynch D. 'This is super tight': Companies struggle to find, retain workers in a hot economy." Washington Post. Jan. 12, 2018. https://www.washingtonpost.com/business/economy/this-is-super-tight-companies-struggle-to-find-retain-workers-in-a-hot-economy/2018/01/12/0c1ce97e-f7cf-11e7-b34a-b85626af34ef_story.html?noredirect=on&utm_term=.94ad14c9418e

NJAPP0057

noted that DACA recipients are vital to their firms and to the economy and have opposed its termination.[12]

21. More fundamentally, Dr. Deere's hypothesis about DACA recipients displacing citizen workers is based on a belief that there is a fixed number of jobs available for which citizens and non-citizen immigrants compete and, if one gains, then the other must inherently lose.  If we believe that line of reasoning, then it also follows that hiring women inevitably harms men's employment, hiring African Americans inevitably harms white Americans, etc.  There is not a "fixed number" of jobs in the U.S. economy; the economy is dynamic and having more qualified workers, as well as more entrepreneurs, whether immigrants, women or African Americans, can contribute to economic growth, creating more employment opportunities for both citizens and immigrants alike. It is certainly plausible that, in specific cases, a qualified DACA immigrant may be hired for a job over a similarly qualified citizen worker, or vice versa, but economic growth leads to better employment for both qualified citizens and qualified immigrants.

22. Dr. Deere's belief that DACA and the ACA harm employment is not supported by rigorous research.

23. Evidence suggests that the overall effect of DACA and related policies is to stimulate the economy and thereby to increase employment of both citizens and non-citizens. Analyses conducted in 2014 by the White House Council of Economic Advisers examined the effect of administrative actions on immigration taken by President Obama,

---

[12] America's Voice.  Hundreds of Business Leaders Write Letter in Support of DACA, Dreamers. Sept. 1, 2017.  https://americasvoice.org/blog/business-leaders-support-daca/

NJAPP0058

particularly DACA, on employment and the economy.[13]  Its analyses indicated that these

immigration policies lead to increased growth in the U.S. economy and more jobs and

create no harm to employment or wages of U.S.-born workers.  (It is noteworthy that this

analysis was conducted after the ACA was enacted and includes effects of the Act.)

24. More recently, analyses by the Cato Institute indicated that terminating DACA could

reduce economic growth in the U.S. by $280 billion over the next decade.[14] These

reductions in economic growth ultimately cause a loss of jobs.

25. In a parallel study that I conducted last year, we found that repealing key elements of the

ACA (specifically the Medicaid expansion, health insurance exchanges (or marketplaces)

and premium tax credits) would have caused 3 million jobs to be lost by 2021, almost a

third of which would have been in the health care sector, and would have lowered states'

economies by $1.5 trillion over five years.[15]

26. A recent review of several economic studies, conducted since the ACA was adopted,

found that the Act did not reduce employment or lower wages.[16]

27. More broadly speaking, there is a strong scientific consensus that immigration benefits

the U.S. economy.  A distinguished panel of researchers was convened by the National

---

[13] White House Council of Economic Advisers. *The Economic Effect of Administrative Action on Immigration*. Nov. 2014.
https://obamawhitehouse.archives.gov/sites/default/files/docs/cea_2014_economic_effects_of_immigration_executive_action.pdf
[14] Brannon I, Albright L. *The Economic and Fiscal Impact of Repealing DACA*.  The Cato Institute.  Jan. 18,2017.
[15] Ku L Steinmetz E, Brantley E, Bruen B.  *Repealing Federal Health Reform: The Economic and Employment Consequences for States*.  Brief, Commonwealth Fund, Jan. 6, 2017.
http://www.commonwealthfund.org/Publications/Issue-Briefs/2017/Jan/Repealing-Federal-Health-Reform
[16] Abraham J, Royalty A.  *How Has the Affordable Care Act Affected Work and Wages? Evidence Shows the Law Has Had Little Effect*.  Leonard Davis Institute of Health Economics, University of Pennsylvania.  Jan. 2017.  https://ldi.upenn.edu/brief/how-has-affordable-care-act-affected-work-and-wages

NJAPP0059

Academy of Sciences in 2016 to consider the economic and fiscal impact of immigration in the U.S.[17]  It concluded that, based on many years of rigorous research, that there is little evidence that immigration significantly reduces employment or wages of native-born workers in the U.S.  Even more recently, a letter signed by 1,470 economists, including Nobel Prize winners and former directors of the Office of Management and Budget, the Council of Economic Advisers and Congressional Budget Office from both parties, agreed that immigration strengthens the economy and policies that threaten immigrants would harm the economy.[18]

28. The skills of immigrant workers typically complement those of the U.S.-born workforce, enabling both to be more productive.  For example, the contributions of immigrant construction workers help build homes, office buildings, factories and roads that enable citizens to be employed in other sectors of the economy.  In addition, immigrant entrepreneurs have been important contributors to innovation and economic growth in the United States.[19]  Immigration helps lead to further economic growth and cancelling DACA would set back employment and the economy.

29. A simple and direct way to illustrate the flaw with Dr. Deere's arguments is to present Census data about changes over several years in unemployment levels, comparing U.S.-born citizens and non-citizens who are 18 to 30-year-old adults, the approximate age

---

[17] Blau F, Mackie , eds.  *The Economic and Fiscal Consequences of Immigration.*  National Academy of Sciences.  Washington DC: National Academy Press.  2016.

[18] *An Open Letter from 1,470 Economists on Immigration* (written to President Trump and leaders of both houses of Congress).  April 12, 2017. https://www.newamericaneconomy.org/feature/an-open-letter-from-1470-economists-on-immigration/

[19] Akcigit U, Grigsby J, Nicholas T.  *Research: Immigrants Played an Outsize Role in America's Age of Innovation.  Harvard Business Review.*  April 21, 2017.  https://hbr.org/2017/04/research-immigrants-played-an-outsize-role-in-americas-age-of-innovation?referral=03759&cm_vc=rr_item_page.bottom.

10

NJAPP0060

range for working DACA recipients.  The Census data do not provide the detailed

immigration status that would enable us to separate DACA recipients from other non-

citizen immigrants, including those who are lawful permanent residents, temporary legal

immigrants (e.g., those with work or student visas) and the undocumented.  For the sake

of simplicity, I exclude data about naturalized citizens, who tend to have high

employment levels.  The chart below illustrates trends from 2011 to 2016 for Texas and

the overall United States.[20]



30. Under Dr. Deere's hypothesis that DACA and the ACA increase unemployment by

citizens, we would expect rising unemployment by U.S.-born citizens, while non-citizen

unemployment falls.  In fact, the data reveal that both citizens and non-citizens have had

falling unemployment rates in recent years.  In Texas, a high immigrant state,

unemployment levels fell faster for U.S. born citizens than for non-citizens.  There has

---

[20] These data are tabulated from a web-based application of the U.S. Census Bureau, located at
https://www.census.gov/cps/data/cpstablecreator.html

11

not been any overall decline in employment for U.S. born workers, following the implementation of DACA or the ACA.  DACA, the ACA and the strong economy have combined to fuel employment for citizens and non-citizens alike.

**Effects of the Loss of DACA for Health Care Providers**

31. Termination of DACA will create very specific and substantial harm for those who have DACA and for the employers and customers of the DACA recipients.  One area that exemplifies the harm that will occur is the health care sector.  Many DACA recipients are health care professionals and support staff, such as physicians, nurses, medical aides, etc., who care for patients, including U.S. born citizens and others.  A large share of the nation's health workforce is immigrant.  Immigrant health care professionals not only provide additional manpower, but they also provide diversity, language skills and cultural understanding that help meet the health needs of diverse American patients.  The loss of DACA would cause them to lose work authorization, which would create hardships both for their employers as well as for their potential patients.  DACA termination could also cause students to lose eligibility for educational opportunities or scholarships, which may keep them from becoming health professionals.  States have an inherent interest in maintaining the supply and quality of medical care for their residents, and this jeopardizes that interest.

32. The Migration Policy Institute analyzed data from the Census Bureau's American Community Surveys and estimated that 5,300 current DACA recipients are health care professionals (e.g., doctors, nurses, technicians) and another 8,600 are health care support

12

staff (e.g., medical aides, home health staff, etc.).[21]  More are engaged in other positions

in health care organizations, such as administration, computer services, food service, etc.

It estimated that 40,700 DACA recipients work in education, health care or social

services organizations.  In addition, a large number of DACA recipients are receiving

training to be health care professionals in the future, including doctors, nurses, etc. and

the loss of status would short-circuit their ability to provide those services in the future.

33. Health care executives representing a number of Catholic hospitals have written to

President Trump, explaining the importance of DACA recipients as valued members of

their health care workforce and how their employment is vital to their patients.[22]  The

American Association of Medical Colleges has noted that a substantial number of DACA

recipients have applied for or are enrolled in medical colleges and cancellation of DACA

would imperil their education and their ability to serve patients in the future.[23]  Similar

problems are likely to occur for those in training for nursing and other health professions.

34. The loss of immigrant health workers would have adverse effects on the long-term care

of frail elderly and disabled individuals: large numbers of DACA recipients work as

home health workers, providing nursing home and community-based care to senior

citizens and those with disabilities.[24]  It is particularly worth noting that the Medicaid

---

[21] Zong J, Soto A, Batalova J, Gelatt J, Capps R.  A *Profile of Current DACA Recipients by Education, Industry and Occupation*.  Washington, DC: Migration Policy Institute.  Nov. 2017.  www.migrationpolicy.org.

[22] Hochman R, et al.  Letter to President Trump regarding DACA. Sept. 2, 2017.  https://www.chausa.org/docs/default-source/media-resources/catholic-health-care-system-ceos-ltr-to-president-trump-re-daca-9-2-2017.pdf

[23] Cited by Japsen B.  How Trump's Move to End DACA May Worsen the Doctor Shortage.  *Forbes*.  Sept. 5, 2017.  https://www.forbes.com/sites/brucejapsen/2017/09/05/how-trumps-move-to-end-daca-worsens-the-doctor-shortage/#6a7f47b65b06

[24] Scheiber N, Abrams R.  What Older Americans Stand to Lose If Dreamers are Deported.  *New York Times*.  Sept. 7, 2017.

13

NJAPP0063

program is the leading payer for long-term care services in the U.S.  The lack of suitably

trained long-term care staff will adversely affect state Medicaid programs and limit the

ability of these state programs to provide the care that they are obligated to offer to

Medicaid recipients.

### How DACA Affects Heath Insurance Coverage and Access to Health Care

35. Under DACA, recipients have a temporary deferral of removal proceedings, can receive

   authorization to work legally and can engage in other activities of civil society such as

   continue their education, obtain drivers' licenses, etc.  The survey and analysis conducted

   by Professor Tom Wong of the University of California at San Diego found that most

   DACA recipients are employed and most have private health insurance coverage.[25]

36. Federal law does not accord DACA recipients eligibility for federal health insurance

   benefits, including Medicaid, the health insurance program for low-income populations,

   nor are they permitted to enroll in the health insurance exchanges (marketplaces) formed

   under the ACA or to receive federal health insurance premium tax credits that are

   designed to make this insurance more affordable.  DACA recipients are barred from

   federal health insurance assistance, like other undocumented immigrants.  State or local

   governments may opt to offer public insurance coverage for certain undocumented

   immigrants, including DACA recipients, using state or local funds without federal

   funding support.[26]  For example, the District of Columbia supports a state-funded Health

---

[25] Declaration of Prof. Tom Wong, *State of Texas, et al. v United States of America, et al.* in the United States District Court for the Southern District of Texas, Brownsville Division.  May 16, 2018.
[26] A more complete review of immigrant eligibility for health benefits is summarized in Ku L, *Strengthening Immigrants' Health Access: Current Opportunities.* GW Department of Health

14

NJAPP0064

Care Alliance, which provides medical assistance to low-income adults not eligible for Medicaid including undocumented immigrants and DACA recipients; no federal funding is used.[27]  New York State provides Medicaid coverage to DACA recipients, but not other undocumented immigrants, without federal funding support.[28]

37.  The only federal health insurance benefit available to low-income undocumented immigrants is very limited emergency Medicaid coverage (42 U.S.C. § 1396b(v)).[29]  The costs of their emergency care (e.g., emergency room care, ambulance, etc.) can be covered under Medicaid.  However, this limited benefit does not provide broader coverage for other ambulatory or inpatient hospital services, prescription drugs, etc.  It provides reimbursement to emergency providers for care rendered to low-income undocumented immigrants, including labor and delivery costs for children born to undocumented immigrant mothers.  Hospitals are separately required to provide emergency care, to at least screen and stabilize their emergency medical conditions, to all potential patients regardless of insurance coverage or citizenship status, under the Emergency Medical Treatment and Active Labor Act (EMTALA, 42 U.S.C. § 1395dd).  The Medicaid emergency care benefit essentially provides a mechanism to reimburse providers for the emergency care they are otherwise required to offer to low-income undocumented immigrants.

---

Policy Issue Brief, Dec. 13, 2013.  http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29.
[27] District of Columbia Department of Health Care Finance.  Health Care Alliance.
https://dhcf.dc.gov/service/health-care-alliance
[28] New York State Department of Health.  GIS 13 MA/011: Children's Health Insurance Program Reauthorization Act (CHIPRA) Expanded Coverage for Certain Qualified and PRUCOL Aliens.
https://www.health.ny.gov/health_care/medicaid/publications/gis/13ma011.htm.
[29] A previous limited federal grant program, called "Section 1011," provided federal funding for emergency care for undocumented immigrants separate from Medicaid, but that program has now expired.  https://www.cms.gov/Regulations-and-Guidance/Legislation/UndocAliens/.

15

NJAPP0065

38. In addition, many community-based health care providers provide free- or subsidized ambulatory health care services to needy or uninsured patients, including undocumented immigrants.  Perhaps most important, community health centers that receive federal grants under Section 330 of the Public Health Service Act, sometimes also called Federally Qualified Health Centers (FQHCs), including the subset of Migrant Health Centers that focus on care for migrant workers, are required to provide primary health care to all patients regardless of insurance or immigration status.  Many other "safety net providers – including non-profit, charitable and state or local public clinics – often provide free or subsidized care to uninsured persons, including undocumented immigrants, although the basis for that care varies.  In some cases, state or local laws or regulations require such service, in other cases it is a matter of clinical practice and a belief in charitable mission.

39. Because of the barriers they face in securing health insurance coverage, non-citizen immigrants, which include DACA recipients, undocumented immigrants and other immigrants who have been legally admitted but are not citizens, are much more likely to be uninsured than U.S.-born or naturalized citizens and to have less private insurance and less Medicaid coverage, even when one compares low-income (below 200% of the poverty line) non-citizen immigrants and citizen adults.  The lack of insurance creates financial barriers and as a result non-citizens have substantially less access to and use of medical services, including primary health care services, emergency medical care, hospital care and most other forms of health care, than citizens.[30]

---

[30] Ku L, Jewers M.  Health Care for Immigrants: Policies and Current Issues.  Migration Policy Institute, June 2013.  www.migrationpolicy.org

16

NJAPP0066

40. DACA enables recipients to work and many are thereby able to obtain employment-based private health insurance, which is the dominant form of insurance in the United States. If DACA is lost, the former DACA recipients would lose their work authorization and, as a result, lose their jobs and their employer-based health insurance. If they are not working they have few other options to obtain health insurance, other than emergency Medicaid. Moreover, if the breadwinner in a family loses his or her job and private health insurance, his or her dependents may also lose their insurance coverage, even if they are U.S. born citizens. In principle, a person without employer-based health insurance, Medicaid, or other publicly subsidized coverage, could purchase individual (non-group) health insurance on the private market. The sad reality, however, is that individual health insurance is expensive and a person who is no longer employed or who has low income generally cannot afford individual health insurance premiums. Thus, the health insurance prospects for undocumented immigrants without DACA and unemployed are bleak.

**Mental Health Consequences of the Loss of DACA**

41. Even though DACA does not generally provide health insurance coverage benefits, research indicates that DACA improves the mental health of recipients and their families by reducing stress related to their undocumented status and the fear of adverse actions, such as deportation, loss of work, loss of educational opportunities, separation from their families, etc. Research, including studies published in peer-review journals by investigators at Harvard Medical School,[31] the University of California at Davis,[32] and

---

[31] Venkataramani AS, Shah SJ, O'Brien R, Kawachi I, Tsai AC. Health consequences of the US Deferred Action for Childhood Arrivals (DACA) immigration programme: a quasiexperimental study. *Lancet Public Health.* 2017; 2(4): e175-e181; Venkataramani AS, Tsai AC. Dreams Deferred: The Public Health Consequences of Rescinding DACA. *New England J Medicine.* 2017; 377(18):1707-9.

17

NJAPP0067

the Universities of California at Berkeley and at San Francisco,[33] show that the receipt of

DACA has significantly reduced psychological stress and improves mental health status.

The researchers warn that the loss of DACA will lead to higher stress and additional

mental health problems for hundreds of thousands of people. Recent research by my

colleagues at George Washington University also indicates that recent threats to legal

immigration status have created major psychological stress on immigrant parents, who

are worried about their own status as well as the future well-being of their children.[34]  In

addition, a study by Stanford University researchers found that the DACA that protected

mothers also led to better mental health status for their U.S.-born citizen children;

children feel more secure when their parents do not fear deportation and can safely work.

This shows the broader repercussions of changes in DACA policy which can even affect

citizen children.[35]

42.  The stress caused by loss of DACA could compound the harmful effects of employment

and economic loss and could result in additional demands placed on our mental health

and social welfare systems system and, in some cases, may lead to increased risk of

disruptive behavior that could pose broader risks and further tax our social, educational

---

[32] Patler C, Laster Pirtle W. From undocumented to lawfully present: do changes to legal status impact psychological wellbeing among Latino immigrant young adults? *Social Science and Medicine.* 2017 March 9 (Epub ahead of print).

33 Siemons R, Raymond-Flesh M, Auerswald CL, Brindis CD.  Coming of Age on the Margins: Mental Health and Wellbeing Among Latino Immigrant Young Adults Eligible for Deferred Action for Childhood Arrivals (DACA).  *J Immigr Minor Health.* 2017 Jun;19(3):543-551. doi: 10.1007/s10903-016-0354-x.

[34] Roche K, Vaquera E, White R, Rivera MI.  Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents.  *J Adolescent Health.*  2018 Mar; 62(5): 525–531.

35 Hainmueller J, Lawrence D, Martén L, et al. Protecting unauthorized immigrant mothers improves their children's mental health. *Science* 2017 August 31 (Epub ahead of print).

NJAPP0068

and criminal justice systems. DACA has helped many youth and young adults "come out of the shadows." Loss of DACA will push them back into the shadows and jeopardize the mental health of DACA recipients and their families, with broader societal effects within states. States have an inherent interest in the well-being, public health and safety of their residents. Terminating DACA undermines the interests of states.

### Estimates of Potential Health Costs at State Levels Due to the Loss of DACA

43. The loss of DACA would harm states because the loss of private health insurance coverage will increase public expenditures for emergency Medicaid and other uncompensated care for those who become uninsured, creating additional financial burdens on the states. States would have to bear higher expenditures for medical care that would be rendered to former DACA recipients who become uninsured. Without private health insurance, DACA recipients would become more reliant on emergency Medicaid and community-based uncompensated care. In the analysis below, I describe paths by which undocumented immigrants can get emergency medical care reimbursed by Medicaid and some forms of community-based uncompensated care. Nonetheless, these are not optimal forms of health care and would still leave many former DACA recipients with reduced access to medical care, which could endanger their health.

44. In this section, I estimate potential financial costs for states if DACA is lost. DACA provides work authorization to young adults who would otherwise be without immigration status and thereby enables them to work legally. A majority of working DACA recipients get private health insurance through their jobs. Loss of work authorization would cause them to lose their jobs. The loss of employment would also trigger the loss of employment benefits, like health insurance coverage for them and their

NJAPP0069

dependents.  In principle, some of those losing employment-based insurance might be able to purchase individual (non-group) health insurance on the private market, but without the income of a job, the cost of individual health insurance would be essentially unaffordable.  Undocumented immigrants, including DACA recipients, are ineligible for Medicaid or health insurance marketplaces (exchanges) and premium tax credits.  As a result, former DACA recipients must instead rely on emergency Medicaid coverage and/or community-based care for those without insurance, such as that provided by community health centers or state or local public health clinics.  I use recent national survey data to estimate the costs of emergency Medicaid and community-based care for individual states, as well as for the nation, if DACA recipients lose their status and, as a result, lose employment and private health insurance coverage.

45. I describe the basis and sources of data for my estimates below.  I note that these are estimates and that differences in methods or data sources could change the results somewhat, but the general magnitude and direction of results ought to be robust and valid.

46. For estimates of the number of people affected, I draw on data from the U.S. Citizenship and Immigration Services (USCIS) agency about persons approved for DACA as of June 30, 2017.[36]  I apply these data about the number of DACA recipients to Prof. Tom Wong's estimate that 91.4% of DACA recipients are employed and 57% have employer-based private insurance,[37] based on his survey of DACA recipients, to estimate the effects

---

[36] U.S. Citizenship and Immigration Services.  DACA Performance Data, 3rd Quarter, Fiscal Year 2017.
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_performancedata_fy2017_qtr3.pdf
[37] Declaration of Prof. Tom Wong, *op cit.*

NJAPP0070

of potential loss of employment and private insurance coverage. (A Migration Policy Institute report[38] estimates somewhat lower employment levels, but their data are for DACA-eligible youth, not actual DACA recipients.  For example, they report that 83% of DACA-eligible men 16-32 not in secondary school were employed vs. 79% of average U.S. men that age.  It seems likely that actual DACA recipients work more than those who are DACA-eligible, since they must apply for DACA and receive it in order to get work authorization).

47. I conducted my own analyses of the 2016 National Health Interview Survey, conducted by the Centers for Disease Control and Prevention, and found that 55% of working DACA-eligible immigrants have private insurance (based on the criteria of being non-citizen immigrants between the ages of 18 and 36 residing in the U.S for more than 5 years, excluding Medicaid recipients since DACA recipients are not eligible for Medicaid, except emergency Medicaid coverage).  This level is essentially the same as Prof. Wong's estimate and corroborates it.

48. For estimates of the implications and costs of alternative sources of medical care that former DACA recipients are likely to use I draw on my own analyses of the Center for Disease Control and Prevention's 2016 National Health Interview Survey (NHIS) and the Agency for Healthcare Research and Quality's 2015 Medical Expenditure Panel Survey (MEPS). I am an experienced analyst of these data and have published numerous studies using these nationally representative survey data.

49. The NHIS and MEPS data do not directly indicate who receives DACA, but permit an estimate of DACA eligibility.  I use Prof. Wong's estimate that 57% of employed DACA

---

[38] Capps R, Fix M, Zong J.  The Education and Work Profiles of the DACA Population. August 2017.

NJAPP0071

recipients get insurance through work.  (My analysis of NHIS data show that 55% of the DACA-eligible immigrants, as described above, who are working have private insurance, about the same as Prof. Wong's estimate of employer-based insurance coverage among DACA recipients.  Two separate data sources yield almost the same estimate, corroborating each other). The loss of DACA and work authorization would trigger the loss of their jobs and therefore their private health insurance.

50. The 2016 NHIS data indicates that DACA-type adults who are not working have a 19 percent probability of using emergency room care in the last 12 months.  Since the loss of DACA would result in the loss of work authorization, legal work and employment-based insurance, it is reasonable to assume that about 19% of former DACA recipients would need to rely on emergency Medicaid to pay their emergency medical bills.  Although they may have had incomes above Medicaid eligibility limits when they were employed, the loss of DACA and work authorization will cause them to lose income and often become impoverished, so more will fall within Medicaid income criteria.  To estimate the costs of emergency medical care, I relied on my analyses of MEPS data and estimated that the average annual cost of emergency room care received by an 18-36 year old immigrant who had been in the US for more than five years was $1,275 in 2015.  I used estimates of national health expenditure price increases per capita from 2015 to 2018, conducted by the federal Centers for Medicare and Medicaid Services,[39] to estimate that the annual cost would rise by 13.7% to $1,450 each for the 19% of adults who had previously been

---

[39] Centers for Medicare and Medicaid Services.  National Health Expenditures. https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/index.html

NJAPP0072

privately-insured working DACA recipients in each state, but who would now be uninsured.

51. I estimated the costs of community-based uncompensated care that would be received by the newly uninsured immigrant adults, due to the loss of DACA. For this, I drew on estimates by Teresa Coughlin and her colleagues at the Urban Institute.[40] That study estimated that in 2013, the average uninsured person received uncompensated medical care costing $1,702 per person, of which 26% was provided as uncompensated care at publicly-supported state or local community-based ambulatory sites, such as community health centers or state or local clinics. This is equal to $449 in community-based ambulatory care per uninsured in 2013. This amount was inflated by 24.6% to account for health care cost inflation between 2013 and 2018 to $559 per uninsured person. I multiplied this amount by the number of former DACA recipients who would lose their jobs and private health insurance in each state.

52. Based on the methods and sources, described above, the additional public costs that would be borne at state levels in 2018 are shown in Table 1 below. These are annual costs in 2018; the cumulative costs over several years would be substantially higher. These estimates are conservative, since they do not include the additional costs that might be borne by states if dependents of DACA recipients – their spouses or children – lose private health insurance if the DACA recipient loses his or her job.

53. Table 1 presents estimates for the United States (excluding the territories, such as Puerto Rico and the Virgin Islands), for the seven plaintiff states in this case (Texas, Alabama,

---

[40] Coughlin T, Holahan J, Caswell K, McGrath M. *Uncompensated Care for the Uninsured, 2013: A Detailed Examination.* Kaiser Commission on Medicaid and the Uninsured. May 2014. https://kaiserfamilyfoundation.files.wordpress.com/2014/05/8596-uncompensated-care-for-the-uninsured-in-2013.pdf

23

Arkansas, Louisiana, Nebraska, South Carolina and West Virginia) and for all other states and the District of Columbia. These estimates are based on the loss of employment-based health insurance coverage and the need to rely on public sources of care, such as emergency Medicaid and community-based safety net services.

24

NJAPP0074

Table 1.  Estimates of Additional Public Costs Due to the Loss of DACA Status

| State | Number Currently Employed (1) | Number Who Could Lose Private Insurance If They Lose Their Jobs (2) | Number Who Might Require Emergency Room Use If Uninsured (3) | 2018 Costs of Emergency Room Care (4) | 2018 Cost of Community-Based Uncompensated Care (5) | Total Estimated 2018 Public Costs Due to Loss of DACA (6) |
|---|---|---|---|---|---|---|
| **Total, U.S.** | **716,618** | **408,472** | **77,610** | **$112,508,841** | **$228,521,352** | **$341,030,194** |
| **Plaintiff States** | | | | | | |
| Alabama | 3,918 | 2,233 | 424 | $615,215 | $1,249,406 | **$1,864,531** |
| Arkansas | 4,663 | 2,658 | 505 | $732,126 | $1,487,051 | **$2,219,177** |
| Louisiana | 1,892 | 1,078 | 205 | $297,040 | $603,331 | **$900,372** |
| Nebraska | 3,093 | 1,763 | 335 | $485,597 | $986,315 | **$1,471,912** |
| South Carolina | 5,879 | 3,351 | 637 | $922,978 | $1,874,699 | **$2,797,677** |
| Texas | 114,043 | 65,005 | 12,351 | $17,904,797 | $36,367,172 | **$54,271,969** |
| West Virginia | 108 | 61 | 12 | $16,933 | $34,393 | **$51,326** |
| **Other States** | | | | | | |
| Alaska | 133 | 76 | 14 | $20,951 | $42,554 | **$63,504** |
| Arizona | 25,530 | 14,552 | 2,765 | $4,008,181 | $8,141,182 | **$12,149,363** |
| California | 204,507 | 116,569 | 22,148 | $32,107,494 | $65,214,856 | **$97,322,349** |
| Colorado | 15,821 | 9,018 | 1,713 | $2,483,947 | $5,045,248 | **$7,529,195** |
| Connecticut | 4,560 | 2,599 | 494 | $715,911 | $1,454,116 | **$2,170,026** |
| Delaware | 1,326 | 756 | 144 | $208,215 | $422,915 | **$631,130** |
| Dist Columbia | 707 | 403 | 77 | $110,924 | $225,302 | **$336,226** |
| Florida | 30,351 | 17,300 | 3,287 | $4,765,132 | $9,678,657 | **$14,443,789** |
| Georgia | 22,150 | 12,625 | 2,399 | $3,477,526 | $7,063,347 | **$10,540,873** |
| Hawaii | 532 | 303 | 58 | $83,516 | $169,632 | **$253,148** |
| Idaho | 2,873 | 1,637 | 311 | $451,014 | $916,072 | **$1,367,086** |
| Illinois | 38,879 | 22,161 | 4,211 | $6,103,967 | $12,398,019 | **$18,501,986** |
| Indiana | 9,020 | 5,142 | 977 | $1,416,180 | $2,876,462 | **$4,292,642** |
| Iowa | 2,570 | 1,465 | 278 | $403,516 | $819,598 | **$1,223,114** |
| Kansas | 6,234 | 3,554 | 675 | $978,799 | $1,988,078 | **$2,966,877** |
| Kentucky | 2,814 | 1,604 | 305 | $441,830 | $897,419 | **$1,339,249** |
| Maine | 90 | 51 | 10 | $14,063 | $28,564 | **$42,626** |
| Maryland | 9,023 | 5,143 | 977 | $1,416,610 | $2,877,336 | **$4,293,946** |
| Massachusetts | 7,360 | 4,195 | 797 | $1,155,588 | $2,347,162 | **$3,502,750** |
| Michigan | 5,946 | 3,389 | 644 | $933,597 | $1,896,267 | **$2,829,864** |
| Minnesota | 5,743 | 3,273 | 622 | $901,597 | $1,831,270 | **$2,732,867** |
| Mississippi | 1,344 | 766 | 146 | $211,085 | $428,744 | **$639,829** |
| Missouri | 3,244 | 1,849 | 351 | $509,274 | $1,034,407 | **$1,543,681** |
| Montana | 69 | 40 | 8 | $10,906 | $22,151 | **$33,057** |
| Nevada | 11,988 | 6,833 | 1,298 | $1,882,117 | $3,822,846 | **$5,704,964** |
| New Hampshire | 342 | 195 | 37 | $53,668 | $109,008 | **$162,676** |
| New Jersey | 20,315 | 11,580 | 2,200 | $3,189,526 | $6,478,378 | **$9,667,904** |
| New Mexico | 6,250 | 3,562 | 677 | $981,238 | $1,993,033 | **$2,974,271** |
| New York | 38,848 | 22,143 | 4,207 | $6,099,088 | $12,388,109 | **$18,487,197** |
| North Carolina | 25,094 | 14,304 | 2,718 | $3,939,733 | $8,002,154 | **$11,941,886** |
| North Dakota | 94 | 54 | 10 | $14,780 | $30,021 | **$44,801** |
| Ohio | 4,101 | 2,338 | 444 | $643,875 | $1,307,801 | **$1,951,675** |
| Oklahoma | 6,296 | 3,589 | 682 | $988,413 | $2,007,606 | **$2,996,019** |
| Oregon | 10,347 | 5,898 | 1,121 | $1,624,539 | $3,299,668 | **$4,924,207** |
| Pennsylvania | 5,468 | 3,117 | 592 | $858,404 | $1,743,540 | **$2,601,944** |
| Rhode Island | 1,141 | 650 | 124 | $179,085 | $363,748 | **$542,833** |
| South Dakota | 233 | 133 | 25 | $36,592 | $74,323 | **$110,915** |
| Tennessee | 7,653 | 4,362 | 829 | $1,201,507 | $2,440,431 | **$3,641,938** |
| Utah | 8,895 | 5,070 | 963 | $1,396,521 | $2,836,531 | **$4,233,052** |
| Vermont | 40 | 23 | 4 | $6,314 | $12,824 | **$19,138** |
| Virginia | 11,195 | 6,381 | 1,212 | $1,757,561 | $3,569,855 | **$5,327,417** |
| Washington | 16,394 | 9,345 | 1,776 | $2,573,920 | $5,227,996 | **$7,801,916** |
| Wisconsin | 6,931 | 3,951 | 751 | $1,088,144 | $2,210,174 | **$3,298,318** |
| Wyoming | 569 | 325 | 62 | $89,399 | $181,582 | **$270,981** |

Notes: See text for explanation of the source of estimates.
Analyses by Leighton Ku, June 11, 2018

25

54. For the overall United States (not including the territories), about 408,000 DACA recipients would lose their private health insurance and become uninsured if DACA is terminated. Of them, about 78,000 would require emergency care in 2018, which would lead to about $113 million in additional Medicaid emergency care expenditures. The 408,000 newly uninsured individuals would incur about $229 million in community-based uncompensated care at community health centers, public clinics and other safety net sites. In total, the public costs of increased public health care would rise by about $341 million in 2018 due to the loss of DACA. It is worth noting that, despite the emergency or charity care provided, DACA recipients would still have substantial unmet medical needs because they would lack insurance coverage for other medical costs, such as specialty ambulatory care, medications and inpatient hospital care.

55. I also illustrate the effects for two states: Texas, the largest of the plaintiff states, and for New Jersey.

56. In Texas, the loss of DACA could lead about 65,000 more people to become uninsured. Of them, more than 12,000 would require emergency medical care in 2018, costing about $18 million. And the 65,000 uninsured people would require about $36 million in additional community-based uncompensated care. The total increase in one year in additional public medical expenditures in Texas would equal about $55 million in 2018 as a result of the termination of DACA.

57. For New Jersey, the loss of DACA could cause the number of uninsured people to rise by about 11,500. This would increase public medical care costs by $7.6 million, including $2.5 million in emergency Medicaid costs and $5.1 million in community-based uncompensated care costs. New Jersey also has an innovative Charity Care – Hospital

26

Care Payment Assistance Program that helps subsidize uncompensated care costs due to inpatient and outpatient hospital care for uninsured patients.[41] Increasing the number of uninsured patients, due to loss of DACA, would create additional financial burdens for this program and create hardships for hospitals across the state.

58. In her declaration, Ms. Monica Smoot of the Texas Health and Human Services Commission[42] notes that her agency incurs costs to provide emergency Medicaid services, family violence services and CHIP perinatal coverage for undocumented immigrants, as well as additional uncompensated medical care provided by state public hospitals.  She does not provide estimates of the costs of these services for DACA recipients.  While I cannot comment on the accuracy of her estimates, I note, as described above, that if DACA is lost, then a substantial number of those who currently have employer-sponsored health insurance will lose their work authorization and thereby lose their jobs and private health insurance and will become uninsured (and often become impoverished).  They will still have medical needs, however, and many will have to receive services such as emergency Medicaid or other charity care type facilities (including uncompensated care at state hospitals) that previously could have been financed by their private health insurance.  The loss of DACA will cause public expenditures for emergency Medicaid services and related services for uninsured people to rise even higher, creating additional costs for the state of Texas.

---

[41] New Jersey Department of Health.  Charity Care – New Jersey Hospital Care Payment Assistance Program.  http://www.nj.gov/health/charitycare/
[42] Declaration of Monica Smoot in in *State of Texas, et al. v United States of America, et al.* in the United States District Court for the Southern District of Texas, Brownsville Division.  April 9, 2018.

NJAPP0077

Pursuant to 28 USC § 1746, I declare under penalty of perjury that the forgoing is true and correct.

Respectfully submitted,

_____

Leighton Ku, PhD, MPH

June 15, 2018

28

NJAPP0078

# EXHIBIT A

NJAPP0079

# CURRICULUM VITAE

## LEIGHTON KU

Professor of Health Policy and Management
Director, Center for Health Policy Research
Department of Health Policy and Management
Milken Institute School of Public Health
The George Washington University
950 New Hampshire Ave, NW, 6th Floor
Washington, DC 20052

Telephone:   (202) 994-4143

E-mail:  lku@gwu.edu

## Summary

Leighton Ku, PhD, MPH, is a professor of health policy and management at the George Washington University (GW).  He is a nationally known health policy and health services researcher and expert with more than 25 years of experience.  He has expertise in diverse areas, including health reform, access to care for low-income populations, Medicaid, preventive services, the health care safety net, cost and benefits of health services, and immigrant health.  He directs the Center for Health Policy Research, a multidisciplinary research center, which includes physicians, attorneys, economists, health management and policy experts and others, with more than 20 faculty and dozens of staff; it has a research portfolio in excess of $25 million.   He has been principal investigator for a large number of studies with support from the National Institutes of Health, Centers for Disease Control and Prevention, Centers for Medicare and Medicaid Services, the Commonwealth Fund and Robert Wood Johnson Foundation, and other sources.  In the course of his career at GW, the Center on Budget and Policy Priorities and the Urban Institute, he has worked with federal and state executive and legislative agencies, health care organizations, advocates and others in research, technical assistance, strategic advice and advocacy.   As a faculty, he has taught research methods and policy analysis at the graduate level for more than 20 years and guided a large number of students through dissertations and other research.  As a member of his community, he helped establish and guide the District of Columbia's Health Benefits Exchange Authority as a founding member of its Executive Board.

## Education

| | |
|---|---|
| 1990 | Ph.D., Health Policy, Boston University (Pew Health Policy Fellow in a joint program of Boston University and Brandeis University) |
| 1979 | M.P.H., Public Health, University of California, Berkeley |
| 1979 | M.S., Nutritional Sciences, University of California, Berkeley |
| 1975 | A.B. (honors), Biochemistry, Harvard College |

## Professional Background

| | |
|---|---|
| 2012 - present | Executive Board, District of Columbia Health Benefit Exchange Authority (voluntary position). |
| 2008 - present | Director, Center for Health Policy Research, The George Washington University |
| 2008  - present | Professor of Health Policy and Management (with tenure), Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University. |

NJAPP0080

| 2015- Feb. 2016 | Interim Chair, Department of Health Policy and Management |
| 2000 - 2008 | Senior Fellow, Center on Budget and Policy Priorities, Washington, DC |
| 1992 - present | Adjunct Professor in Public Policy and Public Administration, Trachtenberg School of Public Policy and Administration, The George Washington University. Began as Associate Professorial Lecturer. |
| 1990 - 2000 | Principal Research Associate. The Urban Institute, Washington, DC.  Began as Research Associate I. |
| 1989 - 1990 | Research Manager, SysteMetrics/McGraw-Hill, Cambridge, MA. |
| 1987 - 1989 | Pew Health Policy Fellow, Health Policy Institute, Boston University and the Heller School, Brandeis University |
| 1980 - 1987 | Program Analyst, Office of Analysis and Evaluation and Supplemental Food Programs Division, Food and Nutrition Service, U.S. Dept. of Agriculture, Alexandria, VA and Washington, DC. |
| 1975 - 1976 | Registered Emergency Medical Technician, Dept. of Health and Hospitals, Boston, MA |

## Publications Authored or Co-authored in Peer-Reviewed Journals

[Aggregate measures of scholarly productivity: H-index = 42, I10-index = 98 (according to Google Scholar as of March 31, 2017)]

Lantz P, Miller G, Ryhan C, Rosenbaum S, Ku L, Iovan S.  "Pay for Success" Financing and Home-Based Multicomponent Childhood Asthma Interventions: Modeling Results from the Detroit Medicaid Population.  *Milbank Quarterly*.  2018; 96(2): 272-99.

Brantley E, Greene J, Bruen B, Steinmetz E, Ku L.  Policies Affecting Medicaid Beneficiaries' Smoking Cessation Behaviors. *Nicotine & Tobacco Research,* forthcoming, 2018.

Holla N, Brantley E, Ku L.  Physicians' Recommendations to Medicaid Patients about Tobacco Cessation.  Submitted for publication.

Ku L, Steinmetz E, Bysshe T, Bruen B. Crossing Boundaries: Medicaid and Public Health Collaborations to Help Smokers Quit, Public Health Reports, 2017 Feb, Vol. 132(2) 164-170.

Han X, Luo Q, Ku L.  Medicaid Expansions and Increases in Grant Funding Increased the Capacity of Community Health Centers, Health Affairs, 2017 Jan.; 36 (1):49-56.

Lantz P, Rosenbaum S, Ku L, Iovan S. Pay for Success Initiatives in the U.S.:  Potential and Challenges as a Strategy for Population Health Improvement, Health Affairs, 2016 Nov; 35:2053-2061

Pittman P, Masselink L, Bade L, Frogner B, Ku L. Determining Medical Staff Configurations in Community Health Centers: CEO Perspectives.  Journal of Healthcare Management, 61(5): 364-77, Sept./Oct 2016.

2

NJAPP0081

Frogner B, Pittman P, Masselink Ku L L, Do Years of Experience with EHRs Matter for Productivity in Community Health Centers? Journal of Ambulatory Care Management. 2017 Jan/Mar; 40(1): 36-47.

Ku L, Brantley E, Bysshe T, Steinmetz E, Bruen B. How Medicaid and Other Public Policies Affect Utilization of Tobacco Cessation. Preventing Chronic Diseases, 2016 Oct;13:160234. DOI: http://dx.doi.org/10.5888/pcd13.160234.2016.

Labarthe D. Goldstein L, Antman E, Arnett D, Fonarow G, Alberts M, Hayman L, Khera A, Sallis J, Daniels S, Sacco R, Li S, Ku L, Lantz P, Robinson J, Creager M, Van Horn L, Kris-Etherton P, Bhatnagar A, Whitsel L. Evidence-Based Policy Making: Assessment of the American Heart Association's Strategic Policy Portfolio. Circulation, 2016 May 3; 133(18):e615-53.

Ku L. Letter: Treating Unhealthy Behaviors: The Author Replies. Health Affairs, 35(3):551, March 2016.

Bruen B, Steinmetz E, Bysshe T, Glassman P, Ku L. Care for Potentially Preventable Dental Conditions in Operating Rooms by Medicaid Children, Journal of the American Dental Association, 2016 Sept. :147(9):702-708 (cover story)

Steinmetz E, Berger S, Cabanas J, Horton K, Ranou J, Sasson C, Seiler N, Ku L. Cardiopulmonary Resuscitation Training for High School Students: A Cost-Effectiveness Analysis. under review, 2016.

Ku L, Bysshe T, Steinmetz E, Bruen B. Health Reform, Medicaid Expansions and Women's Cancer Screening, Women's Health Issues, Feb. 2016. http://dx.doi.org/10.1016/j.whi.2016.01.0

August E, Steinmetz E, Gavin L, Rivera M, Pazol K, Moskosky S, Weik T, Ku L. Projecting the Unmet Need and Costs for Contraception Services after Health Care Reform, American Journal of Public Health. 106(2): 334–341, Feb. 2016. doi:10.2105/AJPH.2015.302928

Ku L Bruen B, Steinmetz E, Bysshe T. Medicaid Tobacco Cessation: Big Gaps Remain In Efforts To Get Smokers To Quit, Health Affairs, 35:62-70, Jan. 2016; doi:10.1377/hlthaff.2015.0756

Ku L. Capsule Commentary: Unauthorized Immigrants: Contributing to Medicare, But Left Out, Journal of General Internal Medicine, 31(1):100, Jan. 2016.

Ku L. Immigrants Face Barriers Both as Health Care Patients and Providers, Harvard Health Policy Review, 15(1):22-24, Fall 2015.

Jones E, Ku L. Sharing a Playbook: Integrated Care in Community Health Centers, American Journal of Public Health. 105(1). 2028-2034, October 2015, doi: 10.2105/AJPH.2015.302710

Zur J, Ku L. Factors Associated with Geographic Variation in Psychiatric Prescription Drug Expenditures among Medicaid Beneficiaries, Journal of Behavioral Health Services & Research, epub ahead of print July 24, 2015, doi: 10.1007/s11414-015-9471-x.

Ku L, Frogner B, Steinmetz E, Pittman P. Community Health Centers Use Diverse Staffing and Can Provide Lessons for Other Medical Practices, Health Affairs 34(1):95-103, Jan. 2015.

Jones E, Ku L, Smith S, Lardiere M. County Workforce, Reimbursement, and Organizational Factors Associated with Behavioral Health Capacity in Health Centers, Journal of Behavior and Health Services Research, 2014 Apr;41(2):125-39.

NJAPP0082

Bruen B, Ku L, Lu X, Shin P.   No Evidence That Primary Care Physicians Offer Less Care To Medicaid, Community Health Center Or Uninsured Patients, Health Affairs, 32(9): 1624-30, Sept. 2013.

Ku L, Steinmetz E, Bruen, B. Continuous Eligibility Policies Stabilize Medicaid Coverage for Children and Could Be Extended to Adults with Similar Results, Health Affairs, 32(9): 1576-82, Sept. 2013.

Ku L, Sharac J, Bruen B, Thomas M, Norris L.  Increased Use of Dental Services by Children Covered by Medicaid: 2000-2010 Medicare and Medicaid Research Review 3(3): E1-E12.  July 2013. doi: http://dx.doi.org/10.5600/mmrr.003.03.b01

Levy A, Bruen B, Ku L. Health Care Reform and Women's Insurance Coverage for Breast and Cervical Cancer Screening.  Preventing Chronic Disease.  9: 120069.  Oct. 25, 2012.  DOI: http//dx.doi.org/10.5888/pcd9.120069.

Levy A, Bruen B, Ku L.  The Potential Employment Impact of Health Reform on Working-Age Adults With Disabilities, Journal of Disability Studies.  30 May 2012. DOI: 10.1177/1044207312446225

Willard R, Shah G, Leep C, Ku L.  Impact of the 2008-2010 Economic Recession on Local Health Departments, Journal of Public Health Management and Practice, 18(2):106-114, Mar/Apr. 2012.

Richard P, West K, Ku L. The Return on Investment of a Medicaid Tobacco Cessation Program in Massachusetts PLoS ONE, 7(1): e29665, January 2012.  doi: 10.1371/journal.pone.0029665. Available at http://www.plosone.org/article/info%3Adoi%2F10.1371%2Fjournal.pone.0029665

Rosenbaum S,  Ku L, Lantz P, et al. Examining the Evidentiary Basis of Congress's Commerce Clause Power to Address Individuals' Health Insurance Status, BNA's Health Care Policy Report, Feb. 6, 2012, p 1-9.

Richard P, Ku L, Dor A, Tan E, Shin P, Rosenbaum S.  Cost Savings Associated with the Use of Community Health Centers. Journal of Ambulatory Care Management, 35(1): 50-59. Jan-Mar. 2012.

Ku L, Jones E, Shin P, Burke FR, Long S. Safety-net providers after health care reform: lessons from Massachusetts Archives of Internal Medicine, 171(15): 1379-84, Aug. 8, 2011.

Bruen B, Ku L, Burke M, Buntin M. More Than Four in Five Office-Based Physicians Could Quality for Federal Electronic Health Record Incentives. Health Affairs, 30(3): 472-80, Mar. 2011.

Ku L, Jones K, Shin P, Bruen B, Hayes K.  The States' Next Challenge — Securing Enough Primary Care for an Expanded Medicaid Population. New England Journal of Medicine 364(6):493-95, Feb. 10, 2011. Also supplementary appendix available at http://www.nejm.org/doi/suppl/10.1056/NEJMp1011623/suppl_file/nejmp1011623_appendix.pdf

Ku L  Ready, Set, Plan, Implement.  Executing Medicaid's Expansion. Health Affairs, 29(6): 1173-77, June 2010.

Ku L, Pervez F. Documenting Citizenship in Medicaid: The Struggle Between Ideology and Evidence, Journal of Health Politics, Policy and Law, 35(1): 5-28, February 2010.

Ku L. Medical and Dental Care Utilization and Expenditures Under Medicaid and Private Health Insurance, Medical Care Research and Review, 66(4):456-71, August 2009.

NJAPP0083

Ku L Health Insurance Coverage and Medical Expenditures for Immigrants and Native-Born Citizens in the United States, <u>American Journal of Public Health</u>, 99(7): 1322-28, July 2009.

Ku L, Broaddus M. Public and Private Health Insurance: Stacking Up the Costs, <u>Health Affairs</u>, 27(4):w318-327, June 2008.  Also, Technical Appendix: Public and Private Health Insurance: Stacking Up the Costs, at <u>http://content.healthaffairs.org/cgi/content/full/hlthaff.27.4.w318/DC2</u>.

[Note between 2000 and 2008, I was working at the Center on Budget and Policy Priorities and was not principally working on refereed publications.]

Ku L Improving Health Insurance and Access to Care for Children in Immigrant Families, <u>Ambulatory Pediatrics</u>, 7(6):412-20, November 2007.

Ponce, N.,  Ku L, Cunningham W, Brown ER. Language Barriers to Health Care Access Among Medicare Beneficiaries, <u>Inquiry</u>, 43(1):66–76, Spring 2006.

Ku L, Flores G. Pay Now or Pay Later: Providing Interpreter Services In Health Care, <u>Health Affairs</u>, 24(2) 435-44, March/April 2005.

Park E, Ku L, Broaddus M, More Than 900,000 Children Will Lose Health Insurance Due to Reductions in Federal SCHIP Funding, <u>International Journal of Health Services</u>, 33(2), 2003.

Ku L. The Number of Americans Without Health Insurance Rose in 2001 and Appears to Be Continuing to Rise in 2002, <u>International Journal of Health Services</u>, 33(2), 2003.

Lessard G, Ku L. Gaps in Coverage for Children in Immigrant Families, <u>The Future of Children</u>, 13(1):101-115, Spring 2003.

Ku L, St. Louis M, Black C, Aral S, Turner C, Lindberg L, Sonenstein F. Risk Behaviors, Medical Care and Chlamydial Infection Among Young Men in the United States, <u>American Journal of Public Health</u>, 92(7): 1140-42, July 2002.

Ku L, Matani S. Left Out: Immigrants' Access to Health Care and Insurance, <u>Health Affairs</u>, 20(1):247-56, Jan./Feb. 2001.

Ku L, Ellwood M, Hoag S, Ormond B, Wooldridge J. The Evolution of Medicaid Managed Care Systems and Eligibility Expansions, <u>Health Care Financing Review</u>, 22(2):7-29, Winter 2000.

Coughlin T, Ku L, Kim J., Reforming the Medicaid Disproportionate Share Program in the 1990s,  <u>Health Care Financing Review</u>, 22(2):137-58, Winter 2000.

Ku L, Coughlin T, Sliding Scale Premium Health Insurance Programs: Four States' Experience, <u>Inquiry</u>, 36(4):471-80, Winter 2000.

Lindberg L, Ku L, Sonenstein F, Adolescents' reports of reproductive health education, 1988 and 1995. <u>Family Planning Perspectives</u>, 32(5):220-6, Sept./Oct. 2000.

Porter L, Ku L.  Use of Reproductive Health Services Among Young Men, 1995 <u>Journal of Adolescent Health</u>, 27(3):186-94, September 2000.

NJAPP0084

Bradner C, Ku L, Lindberg L. Older, but Not Wiser: How Do Men Get AIDS and Sexually Transmitted Disease Information after High School?, Family Planning Perspectives, 32(1):33-39, January/February 2000.

Lindberg L, Ku L, Sonenstein F.  Adolescent Males' Combined Use of Condoms with Partners' Use of Female Contraceptive Methods, Maternal and Child Health Journal, 2(4): 201-9, Spring 1999.

Ku L, Sonenstein F, Lindberg L, Bradner C, Boggess S, Pleck J. Understanding Changes in Sexual Activity Among Young Metropolitan Men: 1979 to 1995, Family Planning Perspectives, 30(6): 256-62, November/ December 1998.

Ku L, Hoag S. Medicaid Managed Care and the Marketplace, Inquiry, 35(3):332-45, Fall 1998.

Ellwood MR, Ku L. Welfare and Immigration Reforms: Unintended Side Effects for Medicaid, Health Affairs, 17(3):137-51, May/June 1998.

Sonenstein F, Pleck J, Ku L, Lindberg L, Turner C.  Changes in Sexual Behavior and Condom Use Among Teenaged Males: 1988 to 1995, American Journal of Public Health, 88(6):956-959, June 1998.

Turner C, Ku L, Rogers S, Lindberg L Pleck J, Sonenstein F. Adolescent Sexual Behavior, Drug Use and Violence: New Survey Technology Detects Elevated Prevalence Among U.S. Males, Science, 280:867-73, May 8, 1998.

Ku L, Sonenstein F, Turner C, Aral S, Black C, The Potential of Integrated Representative Surveys about STDs and Risk Behaviors, Sexually Transmitted Diseases, 24(5):299-309, May 1997.

Lindberg L, Sonenstein F, Ku L , Levine G, Young Men's Experience with Condom Breakage, Family Planning Perspectives, 29(3): 132-36, May/June 1997.

Pleck JH, Sonenstein F, Ku L.  Black-white Differences in Adolescent Males' Substance Use: Are They Explained by Underreporting in Blacks?, Journal of Gender, Culture, and Health, 2, 247-265, 1997

Lindberg L, Sonenstein F, Ku L, Martinez G.  Age Differences Between Minors Who Give Birth and Their Adult Partners, Family Planning Perspectives, 29(2):52-60, March/April 1997.

Sonenstein F, Ku L, Schulte M, Reproductive Health Care -- Patterns in a Changing Health Care Market, Western Journal of Medicine, 163(3 Suppl):7-14, September 1995.

Ku L, Coughlin T. Medicaid Disproportionate Share and Other Special Financing Programs, Health Care Financing Review, 16(3): 27-54, Spring 1995.

Holahan J, Coughlin T, Ku L, Lipson D, Rajan S. Insuring the Poor through Medicaid 1115 Waivers, Health Affairs, 14(1): 200-17, Spring 1995.

Coughlin T, Ku L, Holahan J, Heslam D, Winterbottom C. State Responses to the Medicaid Spending Crisis: 1988 to 1992, Journal of Health Politics, Policy and Law, 19(4):837-64, Winter 1994.

Ku L, Sonenstein F, Pleck J. The Dynamics of Young Men's Condom Use During and Between Relationships, Family Planning Perspectives, 26(6): 246-251, November/ December 1994.

Pleck J, Sonenstein F, Ku L. Attitudes Toward Male Roles: A Discriminant Validity Analysis, Sex Roles, 30(7/8):481-501, 1994.

NJAPP0085

Ku L, Sonenstein F, Pleck J. Factors Affecting First Intercourse Among Young Men, Public Health Reports, 108(6):680-94, November/December 1993.

Ku L, Sonenstein F, Pleck J. Neighborhood, Work and Family: Influences on the Premarital Behaviors of Adolescent Men, Social Forces, 72(2):479-503, December 1993.

Ku L, Sonenstein F, Pleck J. Young Men's Risk Behaviors for HIV Infection and Sexually Transmitted Diseases, 1988 through 1991, American Journal of Public Health, 83(11):1609-15, November 1993.

Pleck J, Sonenstein F, Ku L. Changes in Adolescent Males' Use of and Attitudes Towards Condoms: 1988-91, Family Planning Perspectives, 25(3):100-105, 117, May/June 1993.

Pleck J, Sonenstein F, Ku L. Masculine Ideology: Its Impact on Adolescent Males' Heterosexual Relationships, Journal of Social Issues, 49(3):11-30, 1993.

Ku L, Sonenstein F, Pleck J. The Association of AIDS Education and Sex Education with Sexual Behavior and Condom Use Among Teenage Men, Family Planning Perspectives, 24(3):100-106, May/June 1992 (erratum, Family Planning Perspectives, 25(1):36, January/February 1993).

Ku L, Sonenstein F, Pleck J, Patterns of HIV Risk and Preventive Behaviors Among Teenage Men, Public Health Reports, 107(2):131-38, March/April 1992.

Sonenstein F, Pleck J, Ku L, Levels of Sexual Activity Among Adolescent Males in the United States, Family Planning Perspectives, 23(4):162-67, July /August 1991.

Pleck J, Sonenstein F, Ku L, Adolescent Males' Condom Use: The Influence of Perceived Costs-Benefits on Consistency, Journal of Marriage and the Family, 53:733-45, August 1991.

Pleck J, Sonenstein F, Ku L, Contraceptive Attitudes and Intention to Use Condoms in Sexually Experienced and Inexperienced Adolescent Males, Journal of Family Issues, 11(3):294-312, Sept. 1990.

Ku L, Ellwood MR, Klemm J. Deciphering Medicaid Data: Issues and Needs, Health Care Financing Review, 1990 Annual Supplement, p. 35-45.

Ku L, Fisher D, Attitudes of Physicians Toward Health Care Cost Containment Policies, HSR: Health Services Research, 25(1):25-42, April 1990 (Part I).

Sonenstein F, Pleck J, Ku L. Sexual Activity, Condom Use and AIDS Awareness Among Adolescent Males, Family Planning Perspectives, 21(4):152-58, July/August 1989.

Branch L, Ku L. Transition Probabilities to Disability, Institutionalization and Death for the Elderly Over a Decade, Journal of Aging and Health, 1(3):370-408, August 1989.

Ku L. Early Prenatal Enrollment in the WIC Program, Public Health Reports, 104(3): 301-06, May/June 1989.

Ku L, Shapiro L, Crawford P, Huenemann R. Body Composition and Physical Activity in Eight Year Old Children, American Journal of Clinical Nutrition, 34(12):2770-75, 1981.

Persellin R, Ku L. Effects of Steroid Hormones on Human Polymorphonuclear Leukocyte Lysosomes, Journal of Clinical Investigation, 54(4):919-25, 1974.

NJAPP0086

## Books Authored or Co-authored

Ku L, Lin M, Broaddus M, Improving Children's Health: A Chartbook about the Roles of Medicaid and SCHIP:  2007 Edition, Center on Budget and Policy Priorities, Jan. 2007.

Ku L, Nimalendran S. Improving Children's Health: A Chartbook About the Roles of Medicaid and SCHIP, Center on Budget and Policy Priorities, Jan. 15. 2004

Coughlin T, Ku L, Holahan J, Medicaid Since 1980: Costs, Coverage and the Shifting Alliance Between the Federal Government and the States, Washington, DC: Urban Institute Press, 1994.  (Selected by *Choice* as one of ten outstanding academic books for 1994.)

Sorensen, E, Bean F, Ku L, Zimmerman W,  Immigrant Categories and the U.S. Job Market: Do They Make a Difference?, Urban Institute Report 92-1, Washington, DC: Urban Institute Press, 1992.

## Articles or Chapters in Books (Refereed)

Ku L (contributor), CCH;s Law, Explanation and Analysis of the Patient Protection and Affordable Care Act, Vol.1, Commerce Clearinghouse, Wolters Kluwer, 2010.

Ku L. Changes In Immigrants' Use of Medicaid and Food Stamps: the Role of Eligibility and Other Factors, in Immigrants and Welfare, edited by Michael Fix, Russell Sage Foundation and Migration Policy Institute, 2009, p, 153-92.

Ku L, Papademetrios DG. Access to Health Care and Health Insurance: Immigrants and Immigration, in Securing America's Future: U.S. Immigrant Integration Policy Reader, M. Fix, editor, Migration Policy Institute, Feb. 2007.

Sonenstein FL., Ellen J,  Pleck J, Ku L.  Taking Risks: Understanding Adolescents' Behavior, in STDs in Adolescents:  Challenges for the 21st Century, edited by P. Hitchcock,  et al. New York: Oxford University Press Inc.1999.

Ku L, Wooldridge J, Rajan S, Ellwood MR, Dubay L, Coughlin T, Hoag S, Wall  S.  The New Generation of Statewide Medicaid Managed Care Programs: State Health Reform Projects in Hawaii, Oklahoma, Rhode Island and Tennessee in Remaking Medicaid: Managed Care for the Public Good, edited by Steve Davidson and Steve Somers, San Francisco: Jossey-Bass, Inc., 1998, p. 147-78.

Wooldridge J, Ku L, Coughlin T, Dubay L., Ellwood MR, Rajan S, Hoag S, Reforming State Medicaid Programs: First Year Implementation Experiences from Three States, in Contemporary Managed Care, edited by Marsha Gold, Health Administration Press, pp. 211-26, 1998.

Sonenstein F, Ku L, Pleck J.  Measuring Sexual Behavior Among Teenage Males in the U.S., in Researching Sexual Behavior: Methodological Issues, Bancroft, J., ed., Bloomington, IN: Indiana University Press, p. 87-105, 1997.

Turner, CF, Ku L, Sonenstein FL, Pleck JH, Impact of Audio-CASI on Reporting of Male-male Sexual Contacts: Preliminary Findings from the National Survey of Adolescent Males, in Health Survey Research Methods: Conference Proceedings, Warnecke, R.B., ed., Hyattsville, MD: National Center for Health Statistics, p.  171-76, 1995.

8

NJAPP0087

Pleck J, Sonenstein F, Ku L, Problem Behaviors and Masculinity Ideology in Adolescent Males, in Adolescent Problem Behaviors: Issues and Research, R. Ketterlinus and M. Lamb, eds.,  Hillsdale, NJ: Erlbaum, 1994, p. 165-186.

Holahan J, Coughlin T, Ku L, Heslam D, Winterbottom C,  Understanding the Recent Growth in Medicaid Spending, in Medicaid Financing Crisis: Balancing Responsibilities, Priorities and Dollars, D. Rowland, J. Feder and A. Salganicoff, eds., Washington, DC: AAAS Press, 1993, p. 23-44.

Sonenstein F, Pleck J, Ku L. Paternity Risk Among Adolescent Males in Young Unwed Fathers: Changing Roles and Emerging Policies, R. Lerman and T. Ooms, eds., Philadelphia, PA: Temple Univ. Press, p. 99-116, 1993.

Pleck J, Sonenstein F, Ku L. Masculine Ideology and Its Correlates in Gender Issues in Contemporary Society, S. Oskamp and M. Constanzo, eds., Claremont Symposium on Applied Social Psychology, Newbury Park: Sage Publications, p. 85-110, 1993.

## Translational and Other Reports, Briefs and Publications

### *Health Policy*

[Note:  Reports marked with [PR] went through an external peer-review process prior to release.]

Brantley E, Ku L.  Work Requirements: SNAP Data Show Medicaid Losses Could Be Much Faster and Deeper Than Projected.  Health Affairs Blog. April 12, 2018. https://www.healthaffairs.org/do/10.1377/hblog20180412.310199/full/

Ku L.  What is the Evidence of the Effects of the ACA's Individual Mandate and of Its Repeal? DC Health Benefits Exchange Authority. Revised Feb. 12, 2018.

Ku L.  It Makes More Sense to Strengthen SHOP Than to Expand Association Health Plans.  Jan. 4, 2018.  http://gwhealthpolicymatters.com/blog-it-makes-more-sense-strengthen-shop-expand-association-health-plans

Ku L, Steinmetz E.  State Economic and Employment Losses If Community Health Center Funding Is Not Restored.  Geiger Gibson/RCHN Community Health  Foundation Research Collaborative Policy Research Brief # 51. Dec. 4, 2017. [PR] https://publichealth.gwu.edu/sites/default/files/downloads/GGRCHN/State%20Economic%20and%20Employment%20Losses%20if%20CHC%20Funding%20is%20Not%20Restored%2051.pdf

Ku, L.  Declaration about Public Health Effects of Terminating the Deferred Action for Childhood Arrivals (DACA) program.  Filed in support of New York, et al. v. Trump in suit in Federal District Court of Eastern New York, Nov. 22,. 2017.

Ku L.  May You Live in Interesting Times: The Challenges of Health Policy Analysis in a Turbulent Period.  GW Health Policy Matters.  Oct. 2, 2017.  http://gwhealthpolicymatters.com/may-you-live-interesting-times-challenges-health-policy-analysis-turbulent-period-0

Ku L, Steinmetz E, Brantley E, Pillai D. The Graham-Cassidy Proposal Would Eliminate a Third of a Million Jobs, *To the Point*, The Commonwealth Fund, Sept. 26, 2017, [PR] available at: http://www.commonwealthfund.org/publications/blog/2017/sep/graham-cassidy-job-loss.  Methods

NJAPP0088

appendix at http://www.commonwealthfund.org/~/media/files/publications/blog/2017/gc-methods-appendix_final.pdf

Ku L, Seiler N.  Medicaid Expansions Help States Cope with the Opioid Epidemic.  GW Dept of Health Policy and Management.  July 25, 2017. https://publichealth.gwu.edu/sites/default/files/images/Medicaid%20Expansions%20Help%20States%20Cope%20with%20the%20Opioid%20Epidemic%207-25-17%20report.pdf

Ku L.  Cutting immigrants' access to health insurance would drive up costs for many Americans. *Washington Post*, Letter to the Editor.  July 18, 2017.

Ku L, Steinmetz E, Brantley E, Holla N, Bruen B.  The Better Care Reconciliation Act: Economic and Employment Consequences for States.  Commonwealth Fund, July 6, 2017.[PR] http://www.commonwealthfund.org/publications/issue-briefs/2017/jul/bcra-economic-employment-consequences-states

Ku L, Steinmetz E, Brantley E, Holla N, Bruen B.  The American Health Care Act: Economic and Employment Consequences for States.  Commonwealth Fund, June 14, 2017.  [PR] http://www.commonwealthfund.org/publications/issue-briefs/2017/jun/ahca-economic-and-employment-consequences
[Like the January 6th report, the June 14 and July 6 reports gained considerable interest and was widely cited by the media and by federal and state policy officials. This series of reports were among the most often downloaded reports for the Commonwealth Fund.]

Ku L, Paradise J, Thompson V.  Data Note: Medicaid's Role in Providing Access to Preventive Care for Adults. Kaiser Commission for Medicaid and the Uninsured.  May 17, 2017. [PR]http://kff.org/medicaid/issue-brief/data-note-medicaids-role-in-providing-access-to-preventive-care-for-adults/

Ku L  In podcast:  ACA Repeal Waves Goodbye to 3 Million Jobs and $1.5 Trillion.  The Working Life. May 10, 2017.  http://www.workinglife.org/politics/episode-29-aca-repeal-waves-goodbye-to-3-million-jobs-1-5-trillion/

Ku L, Brantley E.  Medicaid Work Requirements: Who's at Risk?  *Health Affairs Blog*, April 12, 2017. http://healthaffairs.org/blog/2017/04/12/medicaid-work-requirements-whos-at-risk/

Ku L, Brantley E.  Myths about the Medicaid Expansion and the "Able-Bodied." *Health Affairs Blog*, March 6, 2017.  http://healthaffairs.org/blog/2017/03/06/myths-about-the-medicaid-expansion-and-the-able-bodied/

Ku L  In podcast: The Financial Consequences of ACA Repeal.  The Commonwealth Fund.  Feb. 15, 2017. http://www.commonwealthfund.org/interactives-and-data/multimedia/podcasts/new-directions-in-health-care/the-impact-of-aca-repeal

Bennett J, Brown C, Ku L, Bruen B.  The Economic, Fiscal and Employment Effects of Health Care Modernization in Oklahoma.  State Chamber (of Commerce) Research Foundation.  Feb. 1, 2017. [PR] http://www.okstatechamber.com/sites/www.okstatechamber.com/files/OK%20Study%20-%20REMI%20FINAL.pdf

NJAPP0089

Mitchell K.  Interview with Leighton Ku.  GW Expert: Repealing Obamacare Would Hurt Patients, Economy.  GW Today.  Jan. 17, 2017.   https://gwtoday.gwu.edu/gw-expert-repealing-obamacare-would-hurt-patients-economy

Ku L Steinmetz E, Brantley E, Bruen B.  Repealing Federal Health Reform: The Economic and Employment Consequences for States.  Brief, Commonwealth Fund, Jan. 6, 2017.  http://www.commonwealthfund.org/Publications/Issue-Briefs/2017/Jan/Repealing-Federal-Health-Reform [PR]

Ku L Steinmetz E, Brantley E, Bruen B.  The Economic and Employment Consequences of Repealing Federal Health Reform: A 50 State Analysis.  Milken Institute School of Public Health, George Washington University.  Jan. 6, 2017.  https://publichealth.gwu.edu/sites/default/files/downloads/HPM/Repealing_Federal_Health_Reform.pdf [PR]

[Note: The Jan. 6 reports were reported widely in numerous media including CBS, NBC, NPR, *Forbes, Fortune, the Atlantic*, etc.  Findings were frequently cited by Congressmen and Senators in Congressional floor debates about repeal of the Affordable Care Act.  One of the most popular Commonwealth Fund reports in 2017]

Ku L, Steinmetz E, Bruen B. Changes in Insurance Coverage and Cardiovascular Risk for U.S. Adults in States Expanding and Not Expanding Medicaid. Dec. 2016  George Washington University and American Heart Association.  [PR]
https://publichealth.gwu.edu/sites/default/files/downloads/HPM/Americans%20Cardiovascular%20Risk%20and%20Changes%20in%20Health%20Insurance%20Coverage%20Dec%2016.pdf

Ku L.   DC Health Link Has Expanded Health Insurance Coverage In The District.  DC Health Benefits Exchange Authority, Sept. 29, 2016 [no author listed]
http://hbx.dc.gov/sites/default/files/dc/sites/hbx/publication/attachments/SurveyReportGainedCoverage%20final.pdf

Ku L. Up in smoke: We'll spend billions tomorrow for not helping poor people quit smoking today, *The Conversation*. July 12, 2016.  https://theconversation.com/up-in-smoke-well-spend-billions-tomorrow-for-not-helping-poor-people-quit-smoking-today-60686

Ku L.  The Role Of Medicaid In Pay For Success Models For Supportive Housing For Chronically Homeless Individuals: Opportunities And Challenges, Report to Office of the Assistant Secretary for Planing and Evaluation, HHS, under review. [PR]

Regenstein M, Jewers M, Nocella K, Goldberg D, Strasser J, Ku L, Mullan F.  Cost Estimates for Training a Resident in a Teaching Health Center.  Report to HRSA.  GW Dept. of Health Policy and Management, Feb. 2016. [PR]

Lantz,P, Rosenbaum S., Ku L et al.  Opportunities for Pay for Success Demonstrations in HHS Programs, Office of the Assistant Secretary for Planning and Evaluation, HHS, forthcoming. [PR]

Ku L, Steinmetz E, Bruen B., Bysshe T.  Effects of the Affordable Care Act on Health Insurance Coverage of Americans at Risk of Cardiovascular Disease, Washington, DC: American Heart Association.  Jan. 2016.

Ku L, Steinmetz, E, Bysshe T.  Continuity of Medicaid Coverage in an Era of Transition, Washington, DC: Association of Community Affiliated Plans, Nov. 1, 2015. [PR]

NJAPP0090

Ku L, Bysshe T, Steinmetz E, Bruen B.  Health Reform and the Implications for Cancer Screening. Report to American Cancer Society, Sept. 2015

Ku L, Bysshe T, Wu. X.  The Changing Community Health Center Workforce: 2007-13, GW Health Workforce Research Center, Sept. 22, 2015. [PR]

Ku L, Mullan F, Serrano C, Barber Z, Shin P.  Teaching Health Centers: A Promising Approach for Building Primary Care Workforce for the 21st Century.  Geiger Gibson / RCHN Community Health Foundation Research Collaborative Policy Research Brief # 40, March 10, 2015. http://www.rchnfoundation.org/?p=4651

Rosenbaum S, Ku l, et al. (unnamed authors).  *Amici Curiae* Brief Of Public Health Deans, Chairs, And Faculty And The American Public Health Association In Support Of Respondents to the Supreme Court of the United States re: *King v Burwell*.  Jan. 28, 2015. [PR]

Ku L.  Covering the Uninsured Through DC Health Link: Report on the First Year.  DC Health Benefits Exchange Authority, Dec. 26, 2014.  http://hbx.dc.gov/node/978322  [PR]

Ku L, Bruen B, Steinmetz E, Bysshe T.  The Economic and Employment Costs of Not Expanding Medicaid in North Carolina: A County-Level Analysis. Dec. 2014.  Cone Health Foundation and Kate B. Reynolds Charitable Trust. At  www.ncmedicaidexpansion.com  {PR}

Ku L, Bruen B, Steinmetz E, Brown C., Motamedi R, Stottlemyer C.  Economic and Employment Effects of Expanding KanCare.  Kansas Hospital Association, Nov. 2014  at http://www.kha-net.org/.

Steinmetz E, Bruen, B, Ku L.  Children's Use of Dental Care in Medicaid:  Federal Fiscal Years 2000 – 2012.  Report to CMS, Oct. 2014.  Posted at http://www.medicaid.gov/medicaid-chip-program-information/by-topics/benefits/dental-trends-2000-to-2012.pdf. [PR]

Stewart A, Cox M, Ku L.  Health Insurance Benefits Advisors: Understanding Responsibilities, Regulations, Restrictions and Relevance in Implementing the Affordable Care Act.  GW Dept of Health Policy, Sept. 2014.  [PR]

Ku L Zur, J. Jones E, Shin P, Rosenbaum S. How Medicaid Expansions and Future Community Health Center Funding Will Shape Capacity to Meet the Nation's Primary Care Needs: A 2014 Update Geiger Gibson / RCHN Community Health Foundation Research Collaborative Policy Research Brief # 37, June 18, 2014.  [PR]

Miller V, Ku L. The Impact of Government Transfer Programs on State and Regional Personal Incomes, Department of Health Policy Issue Brief, April 30, 2014.

Ku L. Strengthening Immigrants' Health Access: Current Opportunities GW Department of Health Policy Issue Brief, Dec. 13, 2013.  http://hsrc.himmelfarb.gwu.edu/sphhs_policy_briefs/29/

Ku L Zur, J. Jones E, Shin P, Rosenbaum S. How Medicaid Expansions and Future Community Health Center Funding Will Shape Capacity to Meet the Nation's Primary Care Needs  Geiger Gibson / RCHN Community Health Foundation Research Collaborative Policy Research Brief # 34, Nov. 18. 2013

Paradise J, Rosenbaum S, Shin P, Sharac J, Alvarez C, Zur J, Ku L. Providing outreach and enrollment assistance: lessons learned from community health centers in Massachusetts. The Henry J. Kaiser Family

NJAPP0091

Foundation. September 24, 2013. Available at: http://kff.org/health-reform/issue-brief/providing-outreach-and-enrollment-assistance-lessons-learned-from-community-health-centers-in-massachusetts/

Ku L, Steinmetz E.  Bridging the Gap: Continuity and Quality of Coverage in Medicaid, Washington DC: Association of Community Affiated Plans. Sept. 2013.  [PR]

Ku L.  The Bipartisan Senate Immigration Bill: Implications for Health Coverage and Health Access, GW Department of Health Policy, Aug. 8, 2013

Ku L. The Senate Immigration Bill's Impact on Health Care, blog posted at www.cmwf.org, Aug. 8, 2013. [PR]

Ku L. Comprehensive Immigration Reform and Health Care: CBO's Analysis of S. 744, Dept of Health Policy report, June 20, 2013.  Also posted on *HealthReformGPS.org*.

Ku L. Explaining Recent Changes in CBO Projections of Health Insurance Coverage and Costs under the Affordable Care Act, Implementation Brief posted on www.*HealthReformGPS.org*, June 5, 2013.

Ku L.  Medicaid Expansions Using Private Plans: The Role of Premium Assistance and Cost-Sharing, commentary in www.*HealthReformGPS*.org April 2013.
http://www.healthreformgps.org/resources/medicaid-expansions-using-private-plans-the-role-of-premium-assistance-and-cost-sharing-2/

Ku L, Bruen B.  Poor Immigrants Use Public Benefits At a Lower Rate than Poor Native-Born Citizens, *Economic Development Bulletin* No. 17, Washington, DC: Cato Institute.  March 4, 2013
http://www.cato.org/sites/cato.org/files/pubs/pdf/edb17.pdf  [PR]

Brown C, Motamedi R, Stottlemeyer C, Bruen B, Ku L.  Economic and Employment Effects of Expanding Medicaid in Iowa, Regional Economic Models, Inc. and George Washington University. Prepared for Iowa Hospital Association. Mar. 2013.
http://blog.iowahospital.org/wp-content/uploads/2013/03/IA-Medicaid-Expansion-Econ-Full-Report.pdf

Brown C, Motamedi R, Stottlemeyer C, Bruen B, Ku L.  Economic and Employment Effects of Expanding Medicaid in Arizona, Regional Economic Models, Inc. and George Washington University. Prepared for Arizona Hospital and Healthcare Association. Feb. 2013.
http://www.azhha.org/member_and_media_resources/documents/ArizonaMedicaidExpansionReportREM12-28-13_000.pdf

Brown C, Motamedi R, Stottlemeyer C, Bruen B, Ku L.  Economic and Employment Effects of Expanding Medicaid in Arkansas, Regional Economic Models, Inc. and George Washington University. Prepared for Arkansas Hospital Association. Feb. 2013.
http://www.arkhospitals.org/Misc.%20Files/ReportBriefAppendix.pdf

Brown, C., Motamedi, R., Stottlemeyer, C., Bruen B and Ku L.  Economic and Employment Effects of Expanding Medicaid in Kansas, Regional Economic Models, Inc. and George Washington University. Prepared for Kansas Hospital Association. Feb. 2013.
http://m.kha-net.org/communications/mediareleases/102615.aspx

Ku L, Bruen B.  The Use of Public Assistance Benefits by Citizens and Non-citizen Immigrants in the United States.  Working Paper, Cato Institute, Feb. 2013. [PR]

Ku L, Jewers M.  Health Care for Immigrants: Policies and Current Issues.  Migration Policy Institute,

13

NJAPP0092

June 2013.  www.migrationpolicy.org [PR]

Ku L, Bruen B, and Steinmetz E.  Task 9: Medicaid DSH Simulation: Final Report Report to the Office of the Assistant Secretary for Planning and Evaluation. Jan. 2013.  [PR]

Ku L, Bruen B, Steinmetz E Beeson T.  Task 7: Medicaid DSH Analytic Report Report to the Office of the Assistant Secretary for Planning and Evaluation. Oct. 2012. [PR]

Ku L Cartwright-Smith L, Sharac J,  Steinmetz E, Lewis J, Shin P. Deteriorating Access to Women's Health Services in Texas: Potential Effects of the Women's Health Program Affiliate Rule, Geiger Gibson/RCHN CHF Research Collaborative Brief, Issue No. 31. October 11, 2012

Ku L, Regenstein M, Shin P, Mead H, Levy A, Buchanan K, Byrne, F.. Coordinating and Integrating Care for Safety Net Patients: Lessons from Six Communities. George Washington University Dept. of Health Policy, May 21, 2012.

Ku L, Levy A, Bruen B.  The Potential Primary Care Crisis in Texas: A County-Based Analysis Report for Methodist Healthcare Ministries, April 2012.

Ku L, Cunningham M, Goetz-Goldberg D., Darnell J, Hiller M.. Quality Incentives for Federally Qualified Health Centers, Rural Health Clinics and Free Clinics: A Report To Congress, report prepared for U.S. Department of Health and Human Services for submission to Congress, January 23, 2012. [PR]

Ku L.  Saving Money: The Massachusetts Medicaid Tobacco Cessation Benefit: A Policy Paper. Partnership for Prevention.  Jan. 2012.
http://www.prevent.org//data/images/roi%20policy%20paper_a.pdf

Ku L, Levy A, Lantz P, Pierre-Matthieu R.  Options for CDC's Cancer Screening Programs: Implications of the Affordable Care Act.  Report to the American Cancer Society and Centers for Disease Control and Prevention, Nov. 15, 2011.  [PR]

Ku L, Regenstein M., Shin P, Mead H, Levy A, Buchanan K, Byrne F. Coordinating and Integrating Care for Safety Net Patients:  Lessons from Six Communities, Draft Report to the Commonwealth Fund, Sept. 2011.  [PR]

Ku L, Regenstein M., Shin P, Bruen B, Byrne FR. Improving the Integration and Coordination of Safety Net Health Providers Under Health Reform: Key Issues, Commonwealth Fund Pub 1552, Oct. 2011. Posted at http://www.commonwealthfund.org/~/media/Files/Publications/Issue%20Brief/2011/Oct/1552_Ku_promoting_integration_safetynet_providers_under_reform_ib.pdf [PR]

Ku L, Shin P, Jones E, Bruen B.  Transforming Community Health Centers into Patient-Centered Medical Homes: The Role of Payment Reform, Report to the Commonwealth Fund, Sept. 28, 2011.  Posted at http://www.commonwealthfund.org/Publications/Fund-Reports/2011/Sep/Transforming-Community-Health-Centers.aspx. [PR]

Ku L, Ferguson C.  Medicaid Works: A Review of How Public Insurance Protects the Health and Finances of Low-Income Families and Individuals. First Focus and George Washington Univ. Dept. of Health Policy, June 2011.

Ku L. Medicaid in the Bull's Eye.: Blog posted at *Health Affairs* blog website.  April 15, 2011.
http://healthaffairs.org/blog/2011/04/15/medicaid-in-the-bulls-eye.

NJAPP0093

Rosenbaum S, Shin P, Ku L. Who Are the Health Center Patients Who Risk Losing Care Under the House of Representatives Proposed FY 2011 Spending Reductions?. Issue No. 20.  Geiger Gibson/RCHN Community Health Foundation Research Collaborative Feb 24, 2011.

Ku L, Richard P, Dor A, Tan E, Shin P, Rosenbaum S.  Strengthening Primary Care to Bend the Cost Curve: The Expansion of Community Health Centers Through Health Reform, Brief No. 19.  Geiger Gibson/RCHN Community Health Foundation Research Collaborative, June 30, 2010.

Ku L, Shin P, Bruen B.  Can Health Care Investments Stimulate the Economy?.  Blog posted at *Health Affairs* blog website, March 16, 2010.
http://healthaffairs.org/blog/2010/03/16/can-health-care-investments-stimulate-the-economy/

Shin P, Bruen B, Jones E, Ku L, Rosenbaum S.  The Economic Stimulus: Gauging the Early Effects of ARRA Funding on Health Centers and Medically Underserved Populations and Communities, Brief No. 17.  Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Feb. 2010.

Shin P, Bruen B, Ku L, Mead KH, Regenstein M, Rosenbaum S, Buchanan K, Smith K. The Early Impact of ARRA on Community Health Centers: Analysis of HCQR2. Report to Health Resources and Services Administration, Rockville, MD. February 2010.

Ku L, Rosenbaum S, Shin P.  Using Primary Care to Bend the Cost Curve: The Potential Impact of Health Center Expansion in Senate Reforms. Brief No. 16. Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Oct 14, 2009.

Shin P, Ku L, Mauery R, Finnegan B, Rosenbaum S. Estimating the Economic Gains for States as a Result of Medicaid Coverage Expansions for Adults, Brief No. 15. Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Oct 7, 2009.

Ku L, Richard P, Dor A, Tan E, Shin P, Rosenbaum S. Using Primary Care to Bend the Curve: Estimating the Impact of a Health Center Expansion on Health Care Costs. Brief No. 14. Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Sep 1, 2009.

Ku L. Do Medicaid and CHIP Measure Errors Correctly?. Dept. of Health Policy, George Washington Univ. Aug. 4, 2009.

Ku L, Shin P, Rosenbaum S. Estimating the Effects of Health Reform on Health Centers' Capacity to Expand to New Medically Underserved Communities and Populations. Issue No. 11. Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Washington, DC. Jul 23, 2009. Rosenbaum S, Jones E, Shin P and Ku L National Health Reform: How Will Medically Underserved Communities Fare? Geiger Gibson / RCHN Community Health Foundation Research Collaborative, Washington, DC. July 9, 2009.

Ku L, MacTaggart P, Pervez F, Rosenbaum S.  Improving Medicaid's Continuity and Quality of Care, Association for Community Affiliated Plans, July 2009.  [PR]

Finnegan B, Ku L, Shin P, Rosenbaum S.  Boosting Health Information Technology in Medicaid: The Potential Effect of the American Recovery and Reinvestment Act. Geiger Gibson / RCHN Community Health Foundation Research Collaborative, Washington, DC. July 7, 2009.

Ku L. Expanding Coverage for Low-income Americans: Medicaid or Health Insurance Exchanges? Blog posted at *Health Affairs* blog website, June 23, 2009.  http://healthaffairs.org/blog/2009/06/23/expanding-coverage-for-low-income-americans-medicaid-of-health-insurance-exchanges/

NJAPP0094

Shin P Ku L, Jones E, Finnegan B, Rosenbaum S.  Financing Community Health Centers As Patient- And Community-Centered Medical Homes:  A Primer, George Washington Univ., May 27, 2009. [PR]

Ku L, Jones E, Finnegan B, Shin P, Rosenbaum S. Community Health Centers in the Midst of Massachusetts' Health Reform:  How Is the Primary Care Safety Net Faring? Kaiser Commission on Medicaid and the Uninsured and Geiger Gibson Community Health Program.  March 2009. [PR]

Ku L. Restoring Medicaid and SCHIP Coverage to Legal Immigrant Children and Pregnant Women: Implications for Community Health and Health Care for Tomorrow's Citizens, Geiger Gibson/RCHN Community Health Foundation Research Brief, Jan. 13, 2009.

Ku L, Feiden K.  Examining the Health Consequences of the 2008-09 Recession, Rapid Public Health Policy Response Project, GW School of Public Health and Health Services, January 2009.

Ku L. The Dial and the Dashboard: The Child Well-Being Index and Public Policy, prepared for the Foundation for Child Development, Jan. 2009.

Jones E, Ku L, Lippi J, Whittington R, Rosenbaum S. Designation of Medically Underserved and Health Professional Shortage Areas: Analysis of the Public Comments on the Withdrawn Proposed Regulation. Geiger Gibson/RCHN Community Health Foundation Research Brief #5. September 2008.

Shin P, Ku L, Jones E, Rosenbaum S. Grantee-Level Estimates Show that 31 Percent of All Health Centers would Fail to Meet Tier Two Status under HRSA's Proposed MUA/MUP/HPSA Designation Regulations. Geiger Gibson/RCHN Community Health Foundation Research Brief #3. May 2008.

Shin P, Ku L, Jones E, Rosenbaum S.  Analysis of the Proposed Rule on Designation of Medically Underserved Populations and Health Professional Shortage Areas, (report and highlights) Geiger Gibson/RCHN Community Health Foundation Research Collaborative, Department of Health Policy, The George Washington University, revised May 1, 2008.

Ku L, Lindblom E. (authors not named) Expanding Children's Health Insurance And Raising Federal Tobacco Taxes Helps Low-Income Families, Joint Paper of the Center on Budget and Policy Priorities and the Campaign for Tobacco-Free Kids, Oct. 16, 2007.
Ku L. 'Crowd-Out' Is Not the Same as Voluntarily Dropping Private Health Insurance for Public Program Coverage, Center on Budget and Policy Priorities, Sept. 27, 2007

Greenstein R, Ku L (authors not named) Charge That Bipartisan SCHIP Compromise Bill Aids Undocumented Immigrants Is False, Center on Budget and Policy Priorities, Sept. 25, 2007.

Ku L. Collateral Damage: Children Can Lose Coverage When Their Parents Lose Health Insurance, Center on Budget and Policy Priorities, Sept. 17, 2007.

Ku L (author not named), More Americans, Including More Children, Now Lack Health Insurance, Center on Budget and Policy Priorities, Aug. 31, 2007.

Ku L, New Research Shows Simplifying Medicaid Can Reduce Children's Hospitalizations, Center on Budget and Policy Priorities, June 11, 2007.

Ku L, Comparing Public and Private Health Insurance for Children, Center on Budget and Policy Priorities, May 11, 2007.

NJAPP0095

Ku L, Reducing Disparities in Health Coverage for Legal Immigrant Children and Pregnant Women, Center on Budget and Policy Priorities, April 20, 2007.

Ku L, Census Revises Estimates of the Number of Uninsured People, Center on Budget and Policy Priorities, April 5, 2007.

Ku L, Schneider A, Solomon J,  The Administration Again Proposes to Shift Federal Medicaid Costs to States, Center on Budget and Policy Priorities, Feb.14, 2007.

Ku L. Medicaid Costs Are Growing More Slowly Than Costs For Medicare or Private Insurance, Center on Budget and Policy Priorities, Nov. 13, 2006.

Ku L, Broaddus M. Coverage of Parents Helps Children, Too, Center on Budget and Policy Priorities, Oct. 20, 2006.

Ku L Paying for Language Services in Medicare: Preliminary Options & Recommendations, National Health Law Program and Center on Budget and Policy Priorities, Oct. 2006. (www.healthlaw.org/library.cfm?fa=detail&id=118637&appView=folder)

Ku L, Broaddus M. Is Medicaid Responsible for the Erosion of Employer-Based Health Coverage?, Center on Budget and Policy Priorities, Sept. 22, 2006.

Greenstein, R., Ku L and Dean, S. Survey Indicates House Bill Could Deny Voting Rights To Millions Of U.S. Citizens, Center on Budget and Policy Priorities, Sept. 22, 2006.

Ku L, Cohen Ross D, Broaddus M.  Documenting Citizenship and Identity Using Data Matches: A Promising Strategy for State Medicaid Programs, Center on Budget and Policy Priorities, Sept. 1, 2006.

Ku L. Why Immigrants Lack Adequate Access to Health Care and Health Insurance, Migration Information Source, Migration Policy Institute, Sept. 2006. [PR](www.migrationinformation.org/Feature/display.cfm?id=417)

Kogan R, KuL, et al. Budget Process Bill Would Result in Deep Cuts in Medicare and Medicaid, Center on Budget and Policy Priorities, Aug. 9, 2006.

Ku L. Revised Medicaid Documentation Requirement Jeopardizes Coverage for 1 To 2 Million Citizens, Center on Budget and Policy Priorities, July 13, 2006.

Ku L. Using Information Technology to Document Citizenship in Medicaid, Center on Budget and Policy Priorities, June 20, 2006.

Ku L. The Slowdown in Medicaid Expenditure Growth, Center on Budget and Policy Priorities, March 13, 2006.

Ku L, Broaddus M.  New Requirement For Birth Certificates or Passports Could Threaten Medicaid Coverage For Vulnerable Beneficiaries: A State-By-State Analysis, Center on Budget and Policy Priorities, Revised Feb. 17, 2006.

Ku L Cohen Ross D. Broaddus M. Survey Indicates Deficit Reduction Act Jeopardizes Medicaid Coverage for 3 to 5 Million U.S. Citizens, Center on Budget and Policy Priorities, Revised Feb. 17, 2006.

NJAPP0096

Schneider A, Ku L, et al. Administration's Medicaid Proposals Would Shift Federal Costs to States, Center on Budget and Policy Priorities, Feb. 14, 2006.

Ku L, Cohen Ross D. New Medicaid Requirement Is Unnecessary and Could Impede Citizens' Coverage, Center on Budget and Policy Priorities, Revised Jan. 4, 2006.

Wachino V, Ku L, et al. Medicaid Provisions of House Reconciliation Bill Both Harmful and Unnecessary Senate Bill Achieves Larger Savings Without Reducing Access to Care, Center on Budget and Policy Priorities, Dec. 9, 2005

Ku L, Wachino V. Greenstein R. The House Reconciliation Bill's Provisions On Medicaid Co-Payments and Premiums: Are They Mild or Harsh? Center on Budget and Policy Priorities, Nov. 22, 2005.

Wachino V, Ku L , et al. An Analysis of The National Governors Association's Proposals For Short-Run Medicaid Reform Center on Budget and Policy Priorities, Oct. 14, 2005.

Ku L and Wachino V. Don't Shift Medicaid's Costs onto Those Who Can Least Afford Them The Hill, July 20, 2005.

Ku L. Medicaid: Improving Health, Saving Lives, Center on Budget and Policy Priorities, July 19, 2005.

Ku L. New Research Sheds Light on Risks from Increasing Medicaid Cost-Sharing and Reducing Medicaid Benefits, Center on Budget and Policy Priorities, July 18, 2005.

Ku L, Wachino V. Medicaid Commission Named By Secretary Leavitt Lacks Balance, Center on Budget and Policy Priorities, July 10, 2005

Ku L, Wachino V. Assessing The National Governors Association's Proposals To Allow Increases In Cost-Sharing Charges To Medicaid Beneficiaries, Center on Budget and Policy Priorities, July 7, 2005.

Ku L, Wachino.V.  The Effect Of Increased Cost-Sharing In Medicaid: A Summary Of Research Findings, Center on Budget and Policy Priorities, Revised, July 7, 2005.

Ku L, Broaddus M. Out-Of-Pocket Medical Expenses For Medicaid Beneficiaries Are Substantial And Growing, Center on Budget and Policy Priorities, May 31, 2005.

Ku L, Solomon, J. Is Missouri's Medicaid Program Out-of-Step and Inefficient?, Center on Budget and Policy Priorities, April 4, 2005.

Wachino V, Schneider A, Ku L. Medicaid Budget Proposals Would Shift Costs To States And Be Likely To Cause Reductions In Health Coverage: Administration's Proposal Also Implies Cap On Federal Funding, Center on Budget and Policy Priorities, Feb. 18, 2005

Ku L, Broaddus M, Wachino, V.. Medicaid and SCHIP Protected Insurance Coverage for Millions of Low-Income Americans, Jan. 31, 2005

Ku L and Wachino V. The Potential Impact of Eliminating TennCare and Reverting to Medicaid: A Preliminary Analysis, Center on Budget and Policy Priorities, Nov. 15, 2004.

Ku L, Deschamps E, Hilman J. The Effects of Copayments on the Use of Medical Services and Prescription Drugs in Utah's Medicaid Program, Center on Budget and Policy Priorities, Nov. 2, 2004.

NJAPP0097

Ku L. Will the New TennCare Cutbacks Help Tennessee's Economy? Center on Budget and Policy Priorities, July 8, 2004.

Ku L, Nimalendran S. Losing Out: States Are Cutting 1.2 to 1.6 Million Low-Income People from Medicaid, SCHIP and Other State Health Insurance Programs, Center on Budget and Policy Priorities, Dec. 22, 2003.

Ku L, Broaddus M. Funding Health Coverage For Low-Income Children In Washington, Center on Budget and Policy Priorities, Nov. 10, 2003.

Ku L, Report Documents Growing Disparities in Health Care Coverage Between Immigrant and Citizen Children as Congress Debates Immigrant Care Legislation, Center on Budget and Policy Priorities, Oct. 14, 2003

Ku L. CDC Data Show Medicaid and SCHIP Played a Critical Counter-Cyclical Role in Strengthening Health Insurance Coverage during the Economic Downturn, Center on Budget and Policy Priorities, Rev. Oct. 8, 2003.

Ku L. How Many Low-Income Medicare Beneficiaries In Each State Would Be Denied The Medicare Prescription Drug Benefit Under The Senate Drug Bill? Center on Budget and Policy Priorities, July 31, 2003.

Ku L. State Fiscal Relief Provides An Opportunity To Safeguard Medicaid Budgets, Center on Budget and Policy Priorities, June 4, 2003

Ku L, Charging the Poor More For Health Care: Cost-Sharing In Medicaid, Center on Budget and Policy Priorities, May 7, 2003.

Ku L, Fremstad S, Broaddus M. Noncitizens' Use Of Public Benefits Has Declined Since 1996, Center on Budget and Policy Priorities, April 14, 2003.

Nathanson M,d Ku L. Proposed State Medicaid Cuts Would Jeopardize Health Insurance Coverage For 1.7 Million People: An Update, Center on Budget and Policy Priorities, Mar. 21, 2003.

Ku L, Shift In Costs From Medicare To Medicaid Is A Principal Reason For Rising State Medicaid Expenditures, Center on Budget and Policy Priorities, March 3, 2003.

Ku L, The Medicaid-Medicare Link: State Medicaid Programs Are Shouldering A Greater Share of The Costs Of Care For Seniors And People With Disabilities, Center on Budget and Policy Priorities, Feb. 25, 2003.

Ku L, Broaddus M. Why Are States' Medicaid Expenditures Rising? Jan. 13, 2003.

Cohen-Ross D, Ku L. Quarterly Status Reporting Could Jeopardize The Health Coverage Of Hundreds Of Thousands Of Eligible Low-Income Californians, Center on Budget and Policy Priorities, Revised Dec. 23, 2002

Ku L, et al., Proposed State Medicaid Cuts Would Jeopardize Health Insurance Coverage for One Million People, Center on Budget and Policy Priorities, Dec. 23, 2002.

NJAPP0098

Ku L, Cohen-Ross D. Staying Covered: The Importance of Retaining Health Insurance Coverage for Low-income Families, Commonwealth Fund, Dec. 2002.  (One of the most frequently downloaded Commonwealth Fund reports in 2006.) [PR]

Ku L, New CDC Data Show the Importance of Sustaining Medicaid and SCHIP Coverage as Private Health Insurance Erodes in 2002, Center on Budget and Policy Priorities, Revised Oct. 8, 2002.

Ku L, Cohen-Ross D, Nathanson M. State Medicaid Cutbacks and the Federal Role In Providing Fiscal Relief to States, Center on Budget and Policy Priorities,  Revised. Aug. 8, 2002

Ku L, Park E., Improving Transitional Medicaid to Promote Work and Strengthen Health Insurance Coverage, Center on Budget and Policy Priorities, April 29, 2002.

Capps R, Ku L, et al. How Are Immigrants Faring After Welfare Reform?  Preliminary Evidence from Los Angeles County and New York City, Report to the Office of the Assistant Secretary for Planning and Evaluation, Dept. of Health and Human Services, March 2002.  Available at http://aspe.hhs.gov/hsp/immigrants-faring02/index.htm.  [PR]

Broaddus M, et al. Expanding Family Coverage: States' Medicaid Eligibility Policies for Working Families in the Year 2000, Center on Budget and Policy Priorities, Revised Feb. 2002.

Ku L, Park E, Administration's Regulation to Reduce Medicaid Upper Payment Limit Would Further Worsen State Budget Crises, Center on Budget and Policy Priorities, Dec. 11, 2001.

Ku L, Park E. Federal Aid to State Medicaid Programs Is Falling While the Economy Weakens, Center on Budget and Policy Priorities, Oct. 6, 2001.

Ku L, Rothbaum E. Many States Are Considering Medicaid Cutbacks in the Midst of the Economic Downturn, Center on Budget and Policy Priorities, October 26, 2001.

Park E, Ku L, Health Care Provisions of House Ways And Means Committee Stimulus Package Offer Little Help for the Health Insurance Needs of Unemployed Workers, Center on Budget and Policy Priorities, Oct. 19, 2001.

Park E, Ku L, Temporary Medicaid Improvements As Part of a Stimulus Package, Center on Budget and Policy Priorities, Oct. 9, 2001.

Ku L, Counting the Uninsured: A Guide for the Perplexed, Center on Budget and Policy Priorities, Sept. 21, 2001

Park E, Ku L. Administration Medicaid and SCHIP Waiver Policy Encourages States to Scale Back Benefits Significantly and Increase Cost-Sharing for Low-Income Beneficiaries, Center on Budget and Policy Priorities, August 15, 2001.

Ku L, Guyer J. Medicaid Spending: Rising Again But Not to Crisis Levels,  Center on Budget and Policy Priorities, April 20, 2001.

Broaddus M, Ku L. Nearly 95 Percent of Low-Income Uninsured Children Now Are Eligible for Medicaid or SCHIP, Center on Budget and Policy Priorities, Dec. 6, 2000.
12/6/00

NJAPP0099

Ku L, Freilich A., Caring for Immigrants: Health Care Safety Nets in Los Angeles, New York, Miami and Houston, Kaiser Commission on Medicaid and the Uninsured, Feb. 2001.

Holahan J, Ku L, Pohl M.. Is Immigration Responsible for the Growth in the Number of Uninsured People? Kaiser Commission on Medicaid and the Uninsured, March 2001.

Ku L, Blaney S. Health Coverage for Legal Immigrant Children: New Census Data Highlight Importance of Restoring Medicaid and SCHIP Coverage, Center on Budget and Policy Priorities, Revised. Oct. 10, 2000.

Ormond B, Ku L and Bruen B. Engine of Change or One Force among Many? Section 1115 Demonstration Projects and Trends in Medicaid Expenditures (Baltimore, MD: Health Care Financing Administration, February 2001).

Ku L, Limiting Abuses of Medicaid Financing: HCFA's Plan to Regulate the Medicaid Upper Payment Limit, Center on Budget and Policy Priorities, Sept. 27, 2000.

Ku L, Broaddus M. The Importance of Family-Based Insurance Expansions: New Research on the Effects of State Health Reforms, Center on Budget and Policy Priorities, September 5, 2000.

Ku L, Matani S. Immigrants' Access to Health Care and Insurance on the Cusp of Welfare Reform, Assessing the New Federalism Discussion Paper 00-03, Washington, DC: The Urban Institute, June 2000.

Ku L, Garrett B. How Welfare Reform and Economic Factors Affected Medicaid Participation: 1984-96, Assessing the New Federalism Discussion Paper 00-01, Washington, DC: The Urban Institute, February 2000.

Ku L, Ellwood MR, Hoag S, Ormond B, Wooldridge J. The Evolution of Medicaid Managed Care Systems and Eligibility Expansions in Section 1115 Projects. Final report to the Health Care Financing Administration, from the Urban Institute and Mathematica Policy Research, Inc., May 2000. [PR]

Coughlin T, Ku L, Kim, J., Reforming the Medicaid Disproportionate Share Program in the 1990s, Assessing the New Federalism, The Urban Institute, Discussion Paper 99-14, (joint release with Commonwealth Fund), 1999. [PR]

Ku L, Bruen B. The Continuing Decline in Medicaid Coverage, Assessing the New Federalism Brief A-37, The Urban Institute, December 1999.

Ku L, Ullman F, Almeida R, What Counts? Determining Medicaid and CHIP Eligibility for Children, Assessing the New Federalism Discussion Paper 99-05, Washington, DC: The Urban Institute, 1999.

Ku L, Hoag S. Medicaid Managed Care and the Marketplace: State Health Reforms in Hawaii, Oklahoma, Rhode Island and Tennessee, Report to the Health Care Financing Administration from the Urban Institute and Mathematica Policy Research, February 1998.

Ku L, Kessler B. The Number and Cost of Immigrants on Medicaid: National and State Estimates, Report to the Office of the Assistant Secretary for Planning and Evaluation from the Urban Institute, December 1997. [PR]

Ku L, Berkowitz, A., Ullman F, Regenstein M. Health Policy for Low-Income People in Mississippi, Assessing the New Federalism, Washington, DC: The Urban Institute, December 1997. [PR]

NJAPP0100

Nichols L, Ku L, Norton S, Wall S. Health Policy for Low-Income People in Washington Assessing the New Federalism, Washington, DC: The Urban Institute, November 1997. [PR]

Ku L, Wall S. The Implementation of Oklahoma's Medicaid Reform Program: SoonerCare, Report to the Health Care Financing Administration from the Urban Institute and Mathematica Policy Research, October 1997. [PR]

Ku L, Coughlin T, The Use of Sliding Scale Premiums in Subsidized Insurance Programs, Urban Institute Working Paper, March 1997. [PR]

Ku L, Coughlin T, How the New Welfare Reform Law Affects Medicaid, Assessing New Federalism Policy Brief No. A-7, the Urban Institute, February 1997. [PR]

Wooldridge J., Ku L, Coughlin T, Dubay L, Ellwood MR, Rajan S, Hoag S., Reforming State Medicaid Programs: First Year Implementation Experiences from Three States, Mathematica Policy Research, January 1997. [PR]

Wooldridge J, Ku L, Coughlin T, Dubay L, Ellwood MR, Rajan S, Hoag S.  Implementing State Health Care Reform: What Have We Learned from the First Year?  The First Annual Report of the Evaluation of Health Reform in Five States.  Report to the Health Care Financing Administration, from  Mathematica Policy Research Inc. and the Urban Institute, December 1996.  [PR]

Ku L, Wade M, Dodds S. How Cost-Reimbursement Affected Patients, Health Centers and Medicaid: The Federally Qualified Health Center Program, Report to the Health Care Financing Administration, from the Urban Institute and Mathematica Policy Research, Inc., August 1996.

Long S, Ciemnecki A, Coughlin T, Kenney G, Ku L, Mitchell J, Rajan S, Rosenbach M, Thornton C, Wade M, Zuckerman S. Designing an Evaluation of the Medicaid Health Reform Demonstrations, Report to the Health Care Financing Administration, from the Urban Institute, Center for Health Economics Research and Mathematica Policy Research, Inc., Feb. 1996.

Holahan J, Coughlin T, Liu K, Ku L, Kuntz C, Wade M, Wall S.  Cutting Medicaid Spending in Response to Budget Caps, Report to the Kaiser Commission on the Future of Medicaid, Sept. 1995. [PR]

Wade M, Ku L, Dodds S. (1995).  The Impact of the Medicaid FQHC Program on Center Users, FQHCs and the Medicaid Program, Urban Institute Working Paper 06428-03, May 1995.

Ku L, Coughlin T.  Medicaid Disproportionate Share and Related Programs: A Fiscal Dilemma for the States and the Federal Government, Report to the Kaiser Commission on the Future of Medicaid from the Urban Institute, December 1994.

Holahan J, Coughlin T, Ku L, Lipson D, Rajan S. Increasing Insurance Coverage through Medicaid Waiver Programs, Urban Institute Working Paper 06433-005-01, November 1994.

Rajan S, Coughlin T, Ku L, Holahan J, Lipson, D. Increasing Insurance Coverage through Medicaid Waiver Programs: Case Studies, Urban Institute Working Paper 06433-005-02, November 1994.

Ku L, Publicly Supported Family Planning in the United States: Financing of Family Planning Services. Report to the Kaiser Family Foundation, The Urban Institute, June 1993.

NJAPP0101

Holahan J, Coughlin T, Ku L, Heslam D, Winterbottom C,  The States' Response to Medicaid Financing Crisis: Case Studies Report, Health Policy Center Report 6272-02, The Urban Institute, December 1992 (revised).

Sonenstein F, Ku L, Juffras J, Cohen B. Promising Prevention Programs for Children,  Report to the United Way of America, The Urban Institute, March 1991.

Ellwood MR, Ku L. Summary and Policy Recommendations: Studies on Health Care Services to Severely Disabled Children, Report Submitted to the Office of the Assistant Secretary for Planning and Evaluation, DHHS, Lexington, MA: SysteMetrics/ McGraw-Hill, August 1990.

Ku L, Who's Paying the Big Bills?: Very High Cost Pediatric Hospitalizations in California in 1987, Report to Office of the Assistant Secretary for Planning and Evaluation, DHHS, Lexington, MA: SysteMetrics/McGraw-Hill, August 1990.

Sonenstein F, Ku L, Adams EK, Orloff T.  Potential Research Strategies to Evaluate the Effect of Transitional Medicaid and Child Care Benefits, Report to the Office of the Assistant Secretary for Planning and Evaluation, DHHS, Lexington, MA: SysteMetrics/McGraw-Hill, May 1990.

### *HIV/AIDS and Reproductive Health*

Lindberg L, Ku L, Sonenstein F.  Minor Mothers and Adult Fathers: Age Differences Between Teen Mothers and Their Partners,  Urban Institute Working Paper, 1996.

Sonenstein FL., Pleck JH, Ku L. Why Young Men Don't Use Condoms: Factors Related to Consistency of Utilization, Sexuality and American Policy Seminar Series, Kaiser Family Foundation and American Enterprise Institute for Public Policy Research, Washington, D.C., May 1995.

Ku L and the NSAM Study Team, Preliminary Results of the Pretest for the National Survey of Adolescent Males, Report to the Centers for Disease Control and Prevention and the National Institute for Child Health and Human Development, November 1994.

Ku L, Levine G, Sonenstein F, State STD Reporting Rules and Research Surveys, Report to the Centers for Disease Control and Prevention, September 1994.

Sonenstein F, Pleck J, Ku L, The Male Side of the Equation, TEC Networks, 33:3-4, June 1992.

Sonenstein F, Pleck J, Ku L,  Influences on Adolescent Male Premarital Sexual Behavior, Final Report to the Office of Population Affairs, DHHS from Urban Institute, May 1992.

Sonenstein F, Pleck J, Ku L, Sex and Contraception Among Adolescent Males,  TEC Networks, 29:1-3, June 1991.

Sonenstein F, Pleck J, Calhoun C, Ku L, 1988 National Survey of Adolescent Males: A User's Guide to the Machine Readable Files and Documentation, Data Set G6, Data Archives on Adolescent Pregnancy and Pregnancy Prevention, Los Altos, CA: Sociometrics Corp, 1991.

Sonenstein F, Pleck J, Calhoun C, Ku L, Determinants of Contraceptive Use by Adolescent Males, Final Report to the National Institute for Child Health and Human Development, Urban Institute, February 1991.

### *Food and Nutrition Policy*

23

Ku L, Debating WIC, The Public Interest, 135: 108-12, Spring 1999. [PR]

Ku L, Cohen B, Pindus N. Full Funding for WIC: A Policy Review, Washington, DC: Urban Institute Press, 1994.

Ku L, Long S, Brayfield A. and others, Low-Income Children's Nutritional Needs and Participation in USDA's Food Assistance Programs. Final Report to the Food and Nutrition Service, USDA from the Urban Institute, September 1993.

Ku L, Institutional Participation in the National School Lunch and Breakfast Programs, Final Report to the Food and Nutrition Service, USDA from the Urban Institute, March 1993.

Ku L, Reported Meal Production Costs and Reimbursement Rates in the National School Lunch Program, Draft Report to the Food and Nutrition Service, USDA from the Urban Institute, April 1992.

Ku L, Brayfield A, and others, Evaluation of Low-Income Children's Nutritional Needs and Participation in USDA's Food Assistance Programs: Conceptual Assessment. Report to Food and Nutrition Service, USDA from the Urban Institute, February 1992.

Ku L, McKearn M. Effects of the Temporary Emergency Food Assistance Program (TEFAP) on Displacement of Commercial Sales, (with the Economic Research Service and Mathematica Policy Research), Report to Congress, U.S. Dept. of Agriculture, August 1987.* [PR]

Ku L, Dalrymple R., Differences Between SIPP and Food and Nutrition Service Program Data on Child Nutrition and WIC Program Participation, Survey of Income and Program Participation (SIPP) Working Papers, No. 8707, Bureau of the Census, May 1987.

Ku L, Nutritional Research Relating to Infant Feeding in the WIC Program, Report to the Assistant Secretary for Food and Consumer Services, June 1986.*

Richman L, Hidelbaugh T, McMahon-Cox N, Ku L, Dayton CM, Goodrich N. Study of WIC Participant and Program Characteristics, Report to Congress, Food and Nutrition Service, U.S. Dept. of Agriculture (with Ebon Research Systems and Abt Associates Inc.), April 1986. [PR]

Ku L, Abbot J, Forchheimer M. The Feasibility, Costs and Impacts of a Universal School Lunch Program, Draft Report to Congress, U.S. Dept. of Agriculture, June 1985.

Puma M, Ku L, Economic Analysis of the Temporary Emergency Food Assistance Program, Report to Congress, Food and Nutrition Service, U.S. Dept. of Agriculture, May 1985.* [PR]

Ku L, Nichols A. Report on the Food Bank Demonstration Project, Report to Congress, Food and Nutrition Service, U.S. Dept. of Agriculture, April 1984.* [PR]

*    These reports were issued as official Agency or Department reports with no listed authors. In addition, Leighton Ku wrote numerous proposed and final regulations and legislative and budget reports while on the staff of the Food and Nutrition Service. In many cases, these were published in the Federal Register, Congressional Record and related Federal series.

NJAPP0103

## Presentations and Testimony

Seiler N, Ku L.  Medicaid's Role in Addressing the Opioid Crisis.  GW seminar, Nov. 16, 2017.

Ku L. Medicaid: Addressing Tobacco & Opioid Addictions.  Presentation at Addressing Addiction: Policy Prescriptions to Preventing Opiate Abuse and Tobacco Use.  Health Policy Institute of Ohio, Columbus, OH, Sept. 26, 2017.

Ku L.  Economic and Employment Effects of the Better Care Reconciliation Act.  Testimony to the Maryland Legislative Health Insurance Coverage Protection Commission, Maryland House of Delegates, Annapolis, MD.  Aug. 1, 2017.  Similar presentation at REMI webinar, Aug. 2, 2017.

Ku L.  Economic and Employment Effects of the American Health Care Act.  Presentation at AcademyHealth Annual Research Conference, New Orleans, June 25, 2017.  Similar presentations at Policy in the Trump Era: National, State, and Regional Economic Impacts Conference, Hall of States, Washington, D.C. June 19, 2017 and at Medicaid Policy Conference, Council of State Governments, Washington, DC, June 29, 2017.

Ku L.  Repealing Obamacare: Effects on the Health Workforce.  Presentation at AcademyHealth Annual Research Conference, New Orleans, June 26, 2017.

Brantley E, Ku L.  Promoting Tobacco Cessation: The Role of Medicaid and Other Policies.  Poster at AcademyHealth Annual Research Conference, New Orleans, June 26, 2017.

Ku L.  The Future of Medicaid.  Conference on Obamacare After Obama.  Southern Illinois Healthcare/Southern Illinois University School of Law.  Springfield, IL, May 19, 2017.

Brantley E, Ku L.  Linking Data to Uncover Medicaid's Role in Cessation.  National Conference on Tobacco or Health, Austin TX, March 23, 2107.

Ku L.  The Future of Medicaid and the Safety Net.  Health Policy Expert Series.  Milken Insitute School of Public Health.  March 21, 2017.

Ku L.  Financial Consequences of ACA Repeal. Podcast, Feb. 15, 2017 http://www.commonwealthfund.org/interactives-and-data/multimedia/podcasts/new-directions-in-health-care/the-impact-of-aca-repeal

Ku L.  Repealing Health Reform: Economic and Employment Consequences for States.  REMI Seminar, Washington, DC.  Jan. 27, 2016.  Similar national webinar Feb. 1, 2017.

Ku L.  Pay for Success Demonstrations of Supportive Housing for Chronically Homeless Individuals: The Role of Medicaid.  Association for Public Policy and Management Research Conference, Washington, DC.  Nov. 4, 2016.

Ku L.  Immigrants and Community Health Centers.  Pennsylvania Association of Community Health Centers, Lancaster PA.  Oct. 12, 2016.

Ku L. Moving Medicaid Data Forward (discussant).  Mathematica Policy Research, Washington, DC Oct. 11, 2016.

Ku L.  Medicaid Can Do More to Help Smokers Quit, Michael Davis Lecture, University of Chicago, Oct. 4, 2016.  Similar seminar at Univ. of Maryland, Sept. 15, 2016.

Ku L, Borkowski L.  Publish or Perish: Advice for Publishing for Peer-Reviewed Journals in Health Policy. GW Department of Health Policy & Management seminar, Sept. 20, 2016.

25

NJAPP0104

Ku L . Family Planning, Health Reform and Potential Restrictions on Coverage or Access,  presented at Contraception Challenged: Putting *Zubik v. Burwell* in Context, sponsored by National Family Planning and Reproductive Health Association meeting at Capitol Visitors Center, Washington, DC, June 7, 2016.

Ku L Russell T. et al.  Debate on the Role of Public Programs in Care for the Poor.  Benjamin Rush Institute, Washington, DC, April 1, 2016.

Brantley E, Ku L. Improved Access and Coverage Under The ACA: Are Immigrants at the Table?, presented at GW Research Day, March 30, 2016.  (Won prize for best policy and practice research.)

Ku L. The Role of the Health Care Safety Net, Virginia Commonwealth University, Richmond, March 17, 2016.

Ku L, Steinmetz E, Bysshe T.  Medicaid Continuity of Coverage in an Era of Transition.  Webinar for Association of Community-Affiliated Plans, Nov. 2, 2015.

Ku L Bruen B, Steinmetz E, Bysshe T.  Trends in Tobacco Cessation Among Medicaid Enrollees, presented at AcademyHealth Annual Research Meeting, Minneapolis, June 15, 2015.

Ku L. Using Economic Impact Analysis in Medicaid Advocacy, presented at AcademyHealth Annual Research Meeting, Minneapolis, June 13, 2015.

Ku L. The Translation of Health Services Research into Policy Related to the Affordable Care Act, Presented at American Association of Medical Colleges, March 20, 2015.

Ku L.  Policy and Market Pressures on Safety Net Providers, National Health Policy Conference, Feb. 10, 2015.

Ku L. 'Economic and Employment Costs of Not Expanding Medicaid in North Carolina, Cone Health Foundation, Greensboro, NC, Jan. 9, 2015.

Ku L . Health Reform: How Did We Get Here, What the Heck Is Going On and What Next? Keynote Address: Medical Librarians Association, Alexandria VA, Oct. 20, 2014.

Ku L. Health Reform and the Safety Net.  Testimony before Maryland Community Health Resources Commission.  Annapolis, MD, Oct. 2, 2014.

Ku L. Some Key Issues in Health Reform. Presented at American Association for the Advancment of Science Health Policy Affinity Group Meeting, Washington, DC July 24, 2014.

Ku L, Curtis D. Barlow P.  District of Columbia's Health Benefits Exchange at the Launch of a State-Based Exchange: Challenges and Lessons Learned Georgetown Law School Summer Session on Health Reform,  July 23, 2014.

Ku L.  The Big Picture on Medicaid for State Legislators  Presented at Council of State Governments. Medicaid Workshop for Health Leaders, Washington, DC June 20, 2014.

Ku L, Frogner B, Steinmetz E, Pittman P.  Many Paths to Primary Care: Flexible Staffing and Productivity in Community Health Centers, Presented at Annual Research Conference AcademyHealth, San Diego, CA, June 10, 2014.

NJAPP0105

Ku L, Zur J., Jones E, Shin, P, Rosenbaum S.  How Medicaid Expansions and Post-ACA Funding Will Affect Community Health Centers' Capacity.  Presented at Annual Research Conference AcademyHealth, San Diego, CA, June 9, 2014.

Ku L. Critical Issues for Community Health Centers, Alliance for Health Reform briefing, Commonwealth Fund, Washington, DC.  May 16, 2014.

Ku L.  Immigrants' Health Access: At the Nexus of Welfare, Health and Immigration Reform, Keynote talk at Leadership Conference on Health Disparities, Harvard Medical School, Boston, MA May 6, 2014.

Ku L.  Wellness and the District of Columbia. District of Columbia Chamber of Commerce forum, Washington, DC, March 11, 2014.

Ku L.  Health Care for Immigrant Families: A National Overview. Congressional Health Justice Summit, Univ. of New Mexico - Robert Wood Johnson Center for Health Policy, Albuquerque, NM, Sept. 7, 2013.

Ku L.  Health Reform: Promoting Cancer Prevention and Care.  Talk to DC Citywide Navigators Network, Washington, DC, July 15, 2013.

Ku L. Analyzing Policies to Promote Prevention and Health Reform.  Seminar at the Centers for Disease Prevention and Promotion, Atlanta, GA.  July 10, 2013.

Ku L. Medicaid: Key Issues for State Legislators.  Council on State Governments, Medicaid Workshop for Health Leaders, Washington, DC, June 22, 2013.

Ku. L.Steinmetz E.  Improving Medicaid's Continuity of Care: An Update.  Association of Community Plans Congressional Briefing, May 10, 2013.

Ku L (with Brown C, Motamedi R, Stottlemeyer C, Bruen B) Economic and Employment Impacts of Medicaid Expansions.  REMI Monthly Policy Seminar, Washington, DC, April 24, 2013.

Ku L. Building Texas' Primary Care Workforce, Legislative Briefing: Health Care Coverage Expansion & Primary Care Access in Texas, Center on Public Priorties and Methodist Healthcare Ministries, Texas Capitol, Austin, TX, Mar. 8, 2013

Ku L, Jewers M.  Health Care for Immigrants: Policies and Issues in a New Year. Presentation to Conference on  After the Election: Policies Affecting Young Children of Immigrants, Migration Policy Institute, Washington, DC, Jan. 17, 2013.

Ku L. Health Reform and the New Health Insurance Exchanges: Issues for Indiana Families, Indiana Family Impact Seminar at Indiana State Legislature, Nov. 19, 2012.

Ku L.  Pediatric Preventive Medical and Dental Care: The Role of Insurance and Poverty, AcademyHealth Annual Research Meeting, Orlando, FL, June 24, 2012.

Ku L. A Medicaid Tobacco Cessation Benefit: Return on Investment, Webinar for Partnership for Prevention and Action to Quit, Feb. 8, 2012.

Ku L. Safety Net Financing Issues, Webinar for National Workgroup on Integrating a Safety Net, National Academy for State Health Policy, Feb. 6, 2012

NJAPP0106

Ku L.  How Medicaid Helps Children: An Introduction.  Briefing to Congressional Children's Health Caucus, Jan. 25, 2012

Ku L. Market Access Webinar: Provider Access: Coordinating Medicaid & Exchanges: Continuity of Services & the Role of Safety Net Providers, Webinar for Center for Consumer Information and Insurance Oversight, Centers for Medicare & Medicaid Services, Dec. 15, 2011.

Ku L. The Safety Net: An Evolving Landscape, Presented to Grantmakers in Health, Washington, DC. Nov. 3, 2011. [Similar talks in Orlando, FL to Blue Cross Blue Shield of Florida Foundation, Feb. 17, 2012 and in Williamsburg, VA to Williamsburg Community Health Foundation Apr. 3, 2012 and to Virginia Health Foundation, Nov. 13, 2012]

Ku L. Open Access Publishing.  Presented at forum for GW Medical Center faculty and staff, Oct. 24, 2011.

Ku L, Levy A.  Implications of Health Reform for CDC's Cancer Screening Programs: Preliminary Results, Presentation to National Breast and Cervical Cancer Early Detection Program and Colorectal Cancer Control Program Directors Meeting, Atlanta, GA, Oct. 21, 2011.

Ku L. Coordinating Medicaid & Exchanges: Continuity of Services & the Role of Safety Net Providers, Presented to America's Health Insurance Plans, Washington, DC. Sept. 16, 2011.

Ku L. The Potential Impact of Health Reform on CDC's Cancer Screening Programs: Preliminary Results, Presented to NBCCEDP Federal Advisory Committee Meeting, Atlanta, GA, Jun. 17, 2011. (Similar presentations to the American Cancer Society, Sept. 2011.)

Ku L. Crystal Balls and Safety Nets: What Happens After Health Reform?  Presented at AcademyHealth, Seattle, WA, June 2011.

Ku L. Strengthening Primary Care to Bend the Cost Curve: Using Research to Inform U.S. Policy, International Community Health Center Conference, Toronto, Canada, June 2011

Ku L. Integrating/Coordinating Care for Safety Net Providers: Issues and Local Examples, International Community Health Center Conference, Toronto, Canada, June 2011.

Ku L. Health Reform: Federal Implementation and More Unanswered Questions Presented at American Society of Public Administration, Baltimore, MD, Mar. 14, 2011.

Ku L.  Key Issues in the Confusing World of Health Reform, Presented to Industrial College of the Armed Forces, National Defense University, Washington, DC, Feb. 25, 2011.

Ku L. Reducing Disparities and Public Policy Conflicts, Institute of Medicine Workshop on Reducing Disparities in Life Expectancy, Washington, DC, Feb. 24, 2011.

Ku L. Primary Care, Hospitalizations and Health Reform, American Enterprise Institute Workshop, Washington, DC, Feb. 17, 2011.

Ku L. The Promise and Perils of Health Policy for Asians in the United States, Invited keynote talk at 4th International Asian Health and Wellbeing Conference, Univ. of Auckland, New Zealand, NZ, July 6, 2010.  Similar talk at symposium sponsored by the New Zealand Office of Ethnic Affairs, Wellington, NZ, July 8, 2010.

NJAPP0107

Ku L, Strengthening Primary Care to Bend the Cost Curve: The Expansion of Community Health Centers Through Health Reform, Briefing for Senate and House staff and media, convened by Sen. Bernie Sanders (VT), Russell Senate Office Building, June 30, 2010.

Ku L. Ready, Set, Plan, Implement.  Executing Medicaid's Expansion, *Health Affairs* Conference on Health Reform, Washington, DC, June 8, 2010.

Ku L. Coordinating Care Among Safety Net Providers, Primary Care Forum, National Academy of State Health Policy, Alexandria, VA, June 2, 2010.

Ku L.Title VI: The Role of Culturally Competent Communication in Reducing Ethnic and Racial Health Care Disparities, National Minority AIDS Education and Training Center Spring Symposium, Howard Univ.  May 29, 2010.

Ku L. American Health Reform as Massive Incrementalism, American Association for Budget and Program Analysis, Nov. 24, 2009.

Ku L. The Health Care Safety Net and Health Reform, National Academy of Public Administration, Conference on Health Care for the Future, Nov. 22, 2009.

Ku L. The Health of Latino Children, National Council of La Raza Symposium on Latino Children and Youth, Oct. 22, 2009.

Ku L. What the Obama Administration Will Mean for Child Health, AcademyHealth preconference session on Child Health, Chicago, IL June 2009.

Ku L. Immigrants and health reform,  6th Annual Immigration and Law Conference, Georgetown Univ. Law School, Migration Policy Institute and Catholic Legal Immigration Network, Washington, DC, June 24, 2009.

Ku L. From the Politics of No! to the Potential for Progress, invited keynote talk about immigrant policy and research to Society for Research in Child Development, Denver, CO, April 1, 2009.

Ku L. Strengthening the Primary Care Safety Net, National Association of Community Health Centers, Policy and Issues Conference, March 26, 2009.

Ku L. The Dial and the Dashboard: Assessing the Child Well-Being Index, Presentation to the Board of the Foundation for Child Development, March 3, 2009.

Ku L. Key Data Concerning Health Coverage for Legal Immigrant Children and Pregnant Women, invited presentation to Senate staff, Jan. 13, 2009.

Ku L. Comparing the Obama and McCain Health Plans, George Washington Univ. Medical School Alumni Conference, Sept. 27, 2008.

Ku L. The Future of Medicaid, Medicaid Congress, sponsored by Avalere Health and Health Affairs, Washington, DC, June 5, 2008.

Ku L. A Brief Appreciation of Health Advocates: Progress Made, Some Setbacks, Challenges Ahead, Public Interest Law Center of Philadelphia Conference, Philadelphia, PA, May 14, 2008.

NJAPP0108

Ku L. Financing Health Care Reform in New Jersey: Making Down Payments on Reform, Rutgers-AARP Conference, New Brunswick, NJ. Mar. 18, 2008

Ku L, Perez T, Lillie-Blanton M.  Immigration and Health Care-What Are the Issues, Kaiser Family Foundation HealthCast, webcast interview March 12, 2008.

Ku L. How Research Might Affect SCHIP Reauthorization, Child Health Services Research Meeting at AcademyHealth, Orlando, FL, June 2, 2007.

Ku L. Immigrant Children and SCHIP Reauthorization, Capital Hill Briefing conducted by the Population Resource Center, April 20, 2007.

Ku L. Health Policy and Think Tanks, Robert Wood Johnson Health Policy Fellows, Institute of Medicine, June 2006.  Similar talk in other years.

Ku L. Medicaid Reform and Mental Health, National Alliance for the Mentally Ill, Annual Conference, Austin, TX, June 20, 2005.

Ku L. Cost-sharing in Medicaid and SCHIP: Research and Issues, National Association of State Medicaid Directors, Washington, DC, Nov. 18, 2004.  Similar talk given to National Academy of State Health Policy, St. Louis, MO, Aug. 2, 2004.

Ku L. Coverage of Poverty-Level Aged and Disabled in Mississippi's Medicaid Program, Testimony to Mississippi Senate Public Health and Welfare Committee, Aug. 24, 2004

Ku L. Medicaid Managed Care Issues, Testimony to Georgia House of Representatives Appropriations Committee, March 2, 2004.

Ku L. Medi-Cal Budget Issues, Testimony to Joint Hearing of California Senate Budget and Health and Human Services Committees, Feb. 26, 2003.

Ku L .New Opportunities to Improve Health Care Access and Coverage, American College of Emergency Physicians, May 1, 2001.

Ku L,. Medicaid DSH and UPL: Perplexing Issues, National Association of Public Hospitals Health Policy Fellows Conference, Washington, DC, Mar. 20, 2001.

Ku L, Insurance Coverage and Health Care Access for Immigrant Families, Testimony Before the U.S. Senate Finance Committee, Washington, DC, March 13, 2001.

Ku L. Increasing Health Insurance Coverage for Low-Income Families and Children, Insuring the Uninsured Project Conference, Sacramento, CA, Feb. 13, 2001.

Ku L, Concerning the Healthy Families Program Parent Expansion Proposal, Testimony
Before a Joint Hearing of the California Senate Health and Human Services and Insurance Committees and Budget and Fiscal Review Subcommittee # 3, Sacramento, CA, January 30, 2001.

Ku L, Insurance Trends and Strategies for Covering the Uninsured, National Health Law Program Conference, Washington, DC, Dec. 3, 2000.

Ku L, Improving Health Care Access and Coverage: New Opportunities for States in 2001, Midwest Leadership Conference, Council of State Governments, Minneapolis, MN, August 6, 2000.

NJAPP0109

Ku L, Health Care for Immigrants: Recent Trends and Policy Issues,  Alliance for Health Reform, Washington, DC, August 2, 2000.  Similar talks in Miami at Florida Governor's Health Care Summit and in San Diego at California Program on Access to Care conference.

Ku L, Matani S, Immigrants' Access to Health Care and Insurance on the Cusp of Welfare Reform, presented at Association for Health Services Research Conference, Los Angeles, CA, June 25, 2000.

Ku L, Matani S. Immigrants and Health Care: Recent Trends and Issues, presented to the Association of Maternal and Child Health Programs meeting, Washington, DC, March 7, 2000.

Ku L, Ellwood MR., Hoag S, Ormond B, Wooldridge J. Building a Newer Mousetrap: the Evolution of Medicaid Managed Care Systems and Eligibility Expansions in Section 1115 Projects, presented at American Public Health Association meeting, Chicago, IL, Nov. 10, 1999.

Ku L. Young Men's Reproductive Health: Risk Behaviors and Medical Care@, presented at D.C. Campaign to Prevent Teen Pregnancy Meeting, Washington, DC, Oct. 19, 1999.

Ku L, Medicaid and Welfare Reform: Recent Data, presented at Getting Kids Covered Conference, sponsored by National Institute for Health Care Management and Health Resources and Services Administration, Washington, DC, Oct. 6, 1999.

Ku L, Garrett B. How Welfare Reform and Economic Factors Affected Medicaid Participation, presented at Association for Health Services Research meeting, Chicago, IL, June 29, 1999.

Ku L. Recent Factors Affecting Young Men's Condom Use, presented to conference sponsored by National Campaign to Prevent Teen Pregnancy and Advocates for Youth, Washington, DC, February 1999.

Medicaid, Welfare Reform and CHIP: The Growing Gulf of Eligibility Between Children and Adults, presented to National Association of Public Hospitals and Health Systems, Washington, DC, and to Generations United, Washington, DC, September 1998.

Ku L. Sliding Scale Premiums and Cost-Sharing: What the Research Shows presented at workshop on CHIP: Implementing Effective Programs and Understanding Their Impacts, Agency for Health Care Policy and Research User Liaison Program, Sanibel Island, FL, June 30, 1998.

Ku L, Sonenstein F, Boggess S, Pleck J. Understanding Changes in Teenage Men's Sexual Activity: 1979 to 1995, presented at 1998 Population Association of America Meetings, Chicago, IL, April 4, 1998.

Ku L. Welfare Reform, Immigrants and Medicaid presented at Annual Meeting of the Association of Maternal and Child Health Programs, Washington, DC, March 9, 1998.  Similar talk presented at Association for Health Services Research Meeting, Washington, DC, June 23, 1998.

Ku L. Medicaid Policy and Data Issues: An Overview presented to National Committee on Vital and Health Statistics, DHHS, September 29, 1997.

Ku L. How Welfare Reform Will Affect Medicaid Coverage presented to National Ryan White Title IV Program Conference, Washington, DC, November 8, 1996.

NJAPP0110

Ku L, Rajan S, Wooldridge J, Ellwood MR, Coughlin T, Dubay L. Using Section 1115 Demonstration Projects to Expand Medicaid Managed Care in Tennessee, Hawaii and Rhode Island, presented at Association of Public Policy and Management, Pittsburgh, Nov. 1, 1996.

Ku L. The Federal-State Partnership in Medicaid: Is Divorce Inevitable or Would Therapy Be Enough? presented to Council of State Governments Conference on Managing the New Fiscal Federalism, Lexington, KY, May 10, 1996.

Ku L. The Male Role in the Prevention of Teen Pregnancy, presented to the Human Services Committee, National Council of State Legislatures, Washington, DC, May 9, 1996

Ku L. Implications of Converting Medicaid to a Block Grant with Budget Caps, presented to American Medical Association State Legislation Meeting, Aventura, FL, Jan. 1996 and to the American Psychiatric Association Public Policy Institute, Ft. Lauderdale, FL, March 1996.

Ku L. Medicaid: Program Under Reconstruction, presented at Speaker's Forum at New York City Council, September 12, 1995.

Ku L.  State Health Reform Through Medicaid Section 1115 Waivers, presented at Pew Health Policy Conference, Chicago, IL, June 3, 1995.

Ku L. Setting Premiums for Participants in Subsidized Insurance Programs, presented at Conference on the Federal-State Partnership for State Health Reform, sponsored by HCFA, the National Academy of State Health Policy and RTI, March 15, 1995.

Ku L.  Medicaid Disproportionate Share and Related Programs: A Fiscal Dilemma for the Federal Government and the States, with Teresa Coughlin, presented to the Kaiser Commission on the Future of Medicaid, November 13, 1994.

Ku L.  Full Funding for WIC: A Policy Review, with Barbara Cohen and Nancy Pindus, presented at Dirksen Senate Office Building, Washington, DC, in a panel hosted by the Center on Budget and Policy Priorities, Bread for the World, the Food Research and Action Center and the National Association of WIC Directors, May 5, 1994.

Ku L. The Financing of Family Planning Services in the U.S., presented at the Institute of Medicine, National Academy of Sciences on February 15, 1994 and at the American Public Health Association meeting, San Francisco, CA, October 25, 1993.

Ku L. Using SUDAAN to Adjust for Complex Survey Design in the National Survey of Adolescent Males, with John Marcotte and Karol Krotki, briefing at National Institute of Child Health and Human Development, Rockville, MD, April 2, 1992.

Ku L.  The Association of HIV/AIDS Education with Sexual Behavior and Condom Use Among Teenage Men in the United States with Freya Sonenstein and Joseph Pleck, presented at the Seventh International Conference on AIDS, Florence, Italy, June 1991.

Ku L.  Patterns of HIV-Related Risk and Preventive Behaviors Among Teenage Men in the United States, with Freya Sonenstein and Joseph Pleck, paper presented at the Sixth International Conference on AIDS, San Francisco, CA, June 23, 1990.

Ku L.  Trends in Teenage Childbearing, Pregnancy and Sexual Behavior, paper presented at the American Sociological Association Meeting, Washington, D.C., August 15, 1990.

NJAPP0111

Ku L.  Research Designs to Assess the Effect of WIC Participation by Pregnant Women on Reducing Neonatal Medicaid Costs, briefing to Congressional staff, February 1987.

Ku L.  Testimony about the Special Supplemental Food Program for Women, Infants and Children (WIC), with Frank Sasinowski, presented to House Education and Labor Committee on behalf of the American Public Health Association, March 1983.

## Media

Leighton Ku has extensive experience with electronic and print media.  He has been interviewed by ABC, NBC, CBS, Fox, PBS, National Public Radio, CNN, Bloomberg TV, BBC and other television or radio news broadcasts and webcasts.  He has been quoted or his research has been cited in the *New York Times, Los Angeles Times, Washington Post, Wall Street Journal, USA Today, Christian Science Monitor, Forbes, Fortune, US News and World Report, Politico, The Hill, Buzzfeed,* and trade publications, such as *Modern Health Care, Nation's Health* or *CQ HealthBeat, Kaiser Health News*, etc.  He has been an online contributor to the *Washington Post.*  He was a regular panelist on a radio talk show about health policy, broadcast on WMAL in the Washington DC region.  He has been cited as an expert by *PolitiFact* and related fact-checking sources.

## Service and Honors

Member, Executive Board, District of Columbia Health Benefits Exchange Authority (2012-now) (The board  governs the new health insurance exchange for the District of Columbia, based on the Patient Protection and Affordable Care Act.  This is a voluntary, unpaid position, appointed by the Mayor and approved by the City Council.  I was reappointed in 2018.) Chair of the Research Committee and Information Technology Committee.  Led working groups that developed the financial sustainability plan for the Exchange, dental plans, standardized benefit plans and changes required in light of threats to the Affordable Care Act.

Commonwealth Fund, two of the top ten most frequently downloaded reports (2017).

Commonwealth Fund, one of top ten most frequently downloaded reports (2006).

Award for promoting racial and economic justice, Mississippi Center for Justice, 2005

Service award from the National WIC Directors Association (2002).

*Choice* (the magazine of the American Library Association for academic publications), top ten academic books of the year (1994)

Pew Health Policy Fellow, Boston University and Brandeis University, 1987-1990.

## Other Service

Faculty Advisor, GW Health Policy Student Association, 2016-now

Member, AcademyHealth/NCHS Health Policy Fellowship Program board.  2016-17.

Affiliated faculty, Jacobs Institute of Women's Health, 2015-now.

Advisory Board, Remaining Uninsured Access to Community Health Centers (REACH) Project, Univ. of

NJAPP0112

California Los Angeles, 2015-present

Member, DC Metro Tobacco Research and Instruction Consortium (MeTRIC). 2014- present

Member, Health Workforce Research Institute, GW, 2013-present.

Member, National Advisory Board, Public Policy Center of University of Iowa, 2014-present

Chair/Vice Chair, Advocacy Interest Group, AcademyHealth, 2014-present.

Member, Advisory Committee on Non-Health Effects of the Affordable Care Act, Russell Sage Foundation, Dec. 2013.

Member, Technical Expert Group on the Affordable Care Act and the National Survey of Family Growth, National Center for Health Statistics, Centers for Disease Control and Prevention, Nov. 2013

Member, Steering Committee, GW Institute of Public Policy, 2013-now

Member, External Review Committee for Department of Family Science for the University of Maryland School of Public Health, 2012.

GW Faculty Senator, representing School of Public Health and Health Services, 2010-12.

Member of numerous University, School and Departmental committees.  2008-present.

Member or chair, numerous faculty and dean search committees, Milken Institute School of Public Health and School of Nursing, George Washington University. 2008-present.

National Institutes of Health, member of various grant review study sections (1996-now).

Invited reviewer.  Committee on National Statistics.  National Academy of Sciences.  Databases for Estimating Health Insurance Coverage for Children.  2010-11.

Grant reviewer.  Robert Wood Johnson Public Health and Law program.  2010.

Invited reviewer, Institute of Medicine report on family planning services in the U.S., 2009.

External reviewer for faculty promotion and tenure for Harvard Medical School, Univ. of California at Los Angeles and at San Diego, Boston University, Baruch College, George Mason University, University of Maryland, University of Iowa, Kansas University, Portland State University, etc., 2008-present.

Submitted expert witness affidavits/declarations in federal, state and local lawsuits including: *New York, et al. v. Trump* (Deferred Action for Childhood Arrivals), *Wood, et al. v. Betlach,* (Medicaid cost sharing), *Lozano v. City of Hazleton* (immigrant rights), *Spry, et al., v. Thompson* (Medicaid cost-sharing), *Dahl v. Goodno* (Medicaid cost-sharing), *Newton-Nations, et al., v. Rogers* (Medicaid cost-sharing) and *Alford v. County of San Diego* (cost-sharing for a local health program).

Board Member and Treasurer, Alliance for Fairness in Reforms to Medicaid (2002-2008)

Urban Institute, founding member, Institutional Review Board (1997-2000)

National Health Research Institute (Taiwan's NIH) grant reviewer (1999).

NJAPP0113

Urban Institute, member, Diversity Task Force (1995)

Pew Health Policy Fellow, Boston University and Brandeis University, 1987-1990.

## Consultant Services

New York State Attorney General, 2017
First Hospital Foundation, Philadelphia PA, 2017
Wilmer Hale/Planned Parenthood Federation, 2017
Centers for Disease Control and Prevention 2016

## Professional Society Memberships and Service

AcademyHealth (formerly Association for Health Services Research), Program Selection Committees (multiple years), chair Advocacy Interest Group (2014-16).
American Public Health Association
Association of Public Policy and Management, Program Selection Committees (many years)

## Editorial Peer Review Service

Associate editor, *BMC Health Services Research,* 2009 – 2013.

Reviewer for numerous journals, including *Health Affairs, New England Journal of Medicine, Journal of the American Medical Association, Pediatrics, American Journal of Public Health, Inquiry, Medical Care, HSR, Medicare and Medicaid Research Review, American Journal of Preventive Medicine, Family Planning Perspectives, Journal of Association of Public Policy and Management,* etc. (1990 to now).  In 2017, I reviewed 16 manuscripts for journals.

## Public Health Practice Portfolio

Member, Executive Board, District of Columbia Health Benefits Exchange Authority (2012-now).   The board governs the new health insurance exchange for the District.  (Nominated by the Mayor and appointed by the City Council; reappointed in 2017).  Chair of the IT and Eligibility Committee, Research Committee and various working groups.

Expert Advisor, Russell Sage Foundation.  Non-health effects of the Affordable Care Act.  (2013).

Expert Advisor, Revisions to the National Survey of Family Growth, National Center for Health Statistics, CDC (2013)

Member, Technical Advisory Committee for Monitoring the Impact of the Market Reform and Coverage Expansions of the Affordable Care Act, sponsored by ASPE. (2013)

Member, Technical Advisory Group for the Design of the Evaluation of the Medicaid Expansion Under the ACA, sponsored by ASPE (2012)

Member, National Workgroup on Integrating the Safety Net, National Academy of State Health Policy, July 2011 – 2013.

Member, National Advisory group for Iowa Safety Net Integration project, 2011-2013.

NJAPP0114

Foundation for Child Development, Selection Committee, Young Scholars Program, 2008-2015.

Foundation for Child Development, Advisory Committee, Child Well-Being Index, 2008-present

Member, National Advisory Board, Center on Social Disparities on Health, University of California at San Francisco, 2005-2008.

National Campaign to Prevent Teen Pregnancy, Member, Effective Programs and Research Task Force (2000)

## Doctoral Students Mentored/Advised

**Dissertations Completed**
Prof. Peter Shin (chair)
Prof. Megan McHugh
Dr. Sarah Benatar
Dr. Emily Jones (chair)
Dr. Saqi Cho (chair)
Dr. DaShawn Groves (chair)
Dr. Heitor Werneck
Dr. Brad Finnegan (chair)
Dr. Maliha Ali
Dr. Christal Ramos

**In Progress**
Evelyn Lucas-Perry (chair)
Brian Bruen
Nina Brown
Darla Bishop
Kyle Peplinski (chair)
Shin Nozaki
Kristal Vardaman (chair)
Ollie Ganz
Jessica Sharac (chair)
Serena Phillips
Mariellen Jewers (chair)
Erin Brantley
Xinxin Han (chair)
Leo Quigley (chair)
Drishti Pillai

## Other Student Advising

Faculty advisor, MPH, health policy.  Provide guidance to about a dozen MPH students per cohort.

NJAPP0115

# EXHIBIT B

NJAPP0116



## ISSUE BRIEF
JANUARY 2017

**EMBARGOED**
Not for release before
12:01 a.m. ET
Friday,
January 6, 2017

The mission of The Commonwealth Fund is to promote a high performance health care system. The Fund carries out this mandate by supporting independent research on health care issues and making grants to improve health care practice and policy. Support for this research was provided by The Commonwealth Fund. The views presented here are those of the authors and not necessarily those of The Commonwealth Fund or its directors, officers, or staff.

Established in July 1997 as the School of Public Health and Health Services, Milken Institute School of Public Health at the George Washington University is the only school of public health in the nation's capital. Today, more than 1,900 students from 54 U.S. states and territories and more than 50 countries pursue undergraduate, graduate and doctoral-level degrees in public health. The school also offers an online Master of Public Health and an online Executive Master of Health Administration, which allow students to pursue their degree from anywhere in the world.

For more information about this brief, please contact:

Leighton Ku, Ph.D., M.P.H.
Director, Center for Health Policy Research
Department of Health Policy and Management
Milken Institute School of Public Health
George Washington University
lku@gwu.edu

To learn more about new publications when they become available, visit the Fund's website and register to receive email alerts.

Commonwealth Fund pub. 1924
Vol. 1

Milken Institute School of Public Health
THE GEORGE WASHINGTON UNIVERSITY

# Repealing Federal Health Reform: Economic and Employment Consequences for States

Leighton Ku, Erika Steinmetz, Erin Brantley, and Brian Bruen

### ABSTRACT

**Issue:** The incoming Trump administration and Republicans in Congress are seeking to repeal the Affordable Care Act (ACA), likely beginning with the law's insurance premium tax credits and expansion of Medicaid eligibility. Research shows that the loss of these two provisions would lead to a doubling of the number of uninsured, higher uncompensated care costs for providers, and higher taxes for low-income Americans. **Goal:** To determine the state-by-state effect of repeal on employment and economic activity. **Methods:** A multistate economic forecasting model (PI+ from Regional Economic Models, Inc.) was used to quantify for each state the effects of the federal spending cuts. **Findings and Conclusions:** Repeal results in a $140 billion loss in federal funding for health care in 2019, leading to the loss of 2.6 million jobs (mostly in the private sector) that year across all states. A third of lost jobs are in health care, with the majority in other industries. If replacement policies are not in place, there will be a cumulative $1.5 trillion loss in gross state products and a $2.6 trillion reduction in business output from 2019 to 2023. States and health care providers will be particularly hard hit by the funding cuts.

## INTRODUCTION

President-elect Donald Trump and Republican leaders of Congress seek to repeal and replace the Affordable Care Act (ACA)—also known as Obamacare—in 2017. A likely strategy is to repeal two key elements of the health reform law: the insurance premium tax credits and the expansion of Medicaid eligibility. A bill passed by Congress in 2015 (H.R. 3762) sought to do just that beginning in 2018—with no replacement plan— but it was vetoed by President Obama. The new Congress could pass a repeal bill in early 2017 but not develop a replacement bill until later.[1]

Recent analyses show canceling the ACA's tax credits and Medicaid expansion would double the number of uninsured Americans.[2,3] As millions lose their insurance, hospitals and other providers would see their uncompensated medical care costs soar by $1.1 trillion from 2019 to 2028, and they would experience major revenue losses as well.

But repeal could also have much broader economic repercussions. Our analysis examines the potential economic and employment effects of repealing the ACA's tax credits and Medicaid expansion, without a replacement plan, for every state and the District of Columbia. We estimate changes in:

- employment—the number of jobs lost in health care, construction, and other sectors of the economy

- economic activity, such as state gross product (the state equivalent of national gross domestic product) and business output

- state and local tax revenues.

## POLICY BACKGROUND

Although the ACA dramatically lowered the number of uninsured,[4,5] Republican leaders believe that the law is harmful and are committed to its repeal.[6] A plausible scenario is that, in 2017, Congress passes a budget resolution requiring the repeal of key ACA provisions. This would be accomplished through a reconciliation bill that could be passed by simple majorities in the House of Representatives and the Senate—the strategy used to pass H.R. 3762 in 2015. Numerous Republican replacement policies have been suggested, though a consensus has yet to emerge.[7] Thus, Congress may pass repeal in early 2017, with implementation delayed for a couple of years, but replacement policies are likely to be developed much later.

Because plans for replacement are unresolved, we focus on the repeal of federal premium tax credits and Medicaid expansion. Key elements of the current policies are:

- ***Federal premium tax credits.*** These help those with low to moderate incomes (100 percent to 400 percent of poverty) who purchase Qualified Health Plans in the health insurance marketplaces. Most are provided as advance premium tax credits paid directly to the insurance plans, so consumers pay only the difference between their tax credits and actual plan premiums. The tax credit varies with income, with higher credits for those with the lowest incomes.

- ***Federal payments to states for expanding Medicaid eligibility.*** These aid individuals newly eligible for Medicaid under the ACA: nonelderly adults with incomes below 138 percent of the federal poverty level. Because the Supreme Court ruled in 2012 that states cannot be required to expand eligibility, 31 states and the District of Columbia have expanded Medicaid while 19 states have not. The federal government covers nearly all the costs of covering newly eligible adults through 2016, with matching rates declining to 90 percent by 2020.[8]

## HOW FEDERAL HEALTH FUNDING STIMULATES JOBS AND STATE ECONOMIES

Health care will comprise almost one-fifth (18.5%) of the nation's economy by 2019.[9] As such, major changes to health care will reverberate across other parts of the economy.

These economic consequences can be projected by analyzing how funding flows from the federal government to states, consumers, and businesses. As illustrated in Exhibit 1, federal tax credits first flow to health insurers. Most of the money, aside from carriers' overhead, flows to hospitals, clinics, pharmacies, and other providers. Similarly, federal funding supports state Medicaid programs, which pay health care providers. These are the *direct effects* of federal funding.

NJAPP0118

Exhibit 1

## How Federal Health Funding Flows Through State Economies



Most of the revenue earned by health care providers is used to hire and pay staff and to purchase goods and services, like clinic space or medical equipment. In turn, those vendors pay their employees and buy additional goods and services. This is the *indirect effect* of federal funding.

The *induced effect* is manifested as workers use their incomes to pay for food, mortgages, rent, transportation, and other goods and services, which provides income to other businesses.

Federal funding thus initiates an economic cycle that ripples throughout the economy, both within and across state borders. The gains from this cycle also generate additional state and local tax revenues. When federal funds are cut, the results play out in the other direction, triggering losses in employment, economic activity, and state and local revenues.

To conduct our analysis of repeal's potential impact, we first projected the level of federal funding for tax credits and state Medicaid expansions that would be cut through repeal. A multistate economic model (PI+ from Regional Economic Models, Inc.) quantified the effects for each state. (See "Summary of Study Methods" on page 9. Detailed methods and data sources are available in the full version of this analysis, *The Economic and Employment Consequences of Repealing Federal Health Reform: A 50 State Analysis,* available at https://publichealth.gwu.edu/sites/default/files/downloads/HPM/Repealing_Federal_Health_Reform.pdf.)

It is important to note that other health policy changes, or even changes to tax policy, could modify our projections. We focus on these two repeal policies alone because it is not yet clear what additional policy changes might be advanced.

## FINDINGS ABOUT POTENTIAL EFFECTS

As seen in Exhibit 2, repeal results in a $140 billion cut in federal funding for health care in 2019. This in turn leads to about 2.6 million jobs lost that year, rising to nearly 3 million by 2021. A third of these lost jobs are in health care, but the majority is in other industries such as construction, real estate, retail trade, and finance. Nearly all are private-sector jobs.

Exhibit 2

## Repeal of Both Premium Tax Credits and Medicaid Expansion: Potential National Impact

|  | 2019 | 2020 | 2021 | 2022 | 2023 | Total 2019–23 |
|---|---|---|---|---|---|---|
| Federal Funding Cut (billions of $) | -$139.5 | -$150.0 | -$161.5 | -$172.0 | -$184.0 | -$807.0 |
| Total Employment Lost (thousands of jobs) | -2,599 | -2,854 | -2,978 | -2,924 | -2,857 | N/A |
| Private Employment | -2,535 | -2,754 | -2,857 | -2,796 | -2,727 | N/A |
| Health Care | -912 | -942 | -974 | -984 | -1,003 | N/A |
| Construction & Real Estate | -292 | -385 | -410 | -383 | -340 | N/A |
| Retail Trade | -261 | -275 | -282 | -275 | -268 | N/A |
| Finance & Insurance | -159 | -165 | -168 | -163 | -159 | N/A |
| All Other Private | -912 | -988 | -1,023 | -991 | -957 | N/A |
| Public Employment | -63 | -100 | -120 | -128 | -130 | N/A |
| Business Output Lost (billions of $) | -$440.5 | -$502.7 | -$542.7 | -$551.6 | -$555.3 | -$2,592.7 |
| Gross State Product Lost (billions of $) | -$255.9 | -$292.1 | -$316.2 | -$322.6 | -$326.1 | -$1,512.8 |
| State & Local Taxes Lost (billions of $) | -$8.2 | -$9.3 | -$10.1 | -$10.3 | -$10.4 | -$48.4 |

Source: George Washington University analyses.

If replacement policies are not in position, state economic losses will rise. From 2019 to 2023, there will be a cumulative $1.5 trillion loss in gross state products and a $2.6 trillion reduction in business output (combined transactions at the production, wholesale, and retail levels).

State and local tax revenues also will fall during this period, dropping by $48 billion. State and local governments could be faced with declining revenues, and safety-net health care providers would see their uncompensated care costs rise sharply as millions of people lose their insurance.

The effects are similar but smaller when the two repeal elements are considered separately. Exhibit 3 shows that tax credit repeal cuts federal funding by $341 billion from 2019 to 2023. This leads to 1.1 million fewer jobs in 2019 alone. Gross state products shrink by $623 billion over five years and state and local tax revenues fall by $21 billion.

NJAPP0120

Exhibit 3

## Repeal of Premium Tax Credits Only: Potential National Impact

|  | 2019 | 2020 | 2021 | 2022 | 2023 | Total 2019-23 |
|---|---|---|---|---|---|---|
| Federal Funding Cut (billions of $) | -$61.0 | -$65.0 | -$68.8 | -$71.8 | -$74.8 | -$341.3 |
| Total Employment Lost (thousands of jobs) | -1,105 | -1,202 | -1,232 | -1,184 | -1,121 | N/A |
| Private Employment | -1,077 | -1,159 | -1,181 | -1,130 | -1,068 | N/A |
| Health Care | -369 | -377 | -382 | -377 | -373 | N/A |
| Construction & Real Estate | -125 | -164 | -172 | -157 | -134 | N/A |
| Retail Trade | -109 | -114 | -115 | -109 | -103 | N/A |
| Finance & Insurance | -88 | -91 | -91 | -88 | -85 | N/A |
| All Other Private | -386 | -414 | -421 | -399 | -373 | N/A |
| Public Employment | -27 | -43 | -51 | -53 | -53 | N/A |
| Business Output Lost (billions of $) | -$188.4 | -$212.5 | -$225.2 | -$224.0 | -$218.6 | -$1,068.7 |
| Gross State Product Lost (billions of $) | -$109.3 | -$123.4 | -$131.1 | -$130.9 | -$128.3 | -$623.0 |
| State & Local Taxes Lost (billions of $) | -$3.7 | -$4.1 | -$4.4 | -$4.4 | -$4.3 | -$20.9 |

Source: George Washington University analyses.

Exhibit 4 shows how canceling states' Medicaid expansions lowers federal funding by $466 billion from 2019 to 2023. This leads to 1.5 million fewer people with jobs in 2019. Moreover, gross state products shrink by nearly $900 billion and state and local tax revenues drop by $29 billion.

The majority of these losses occur in the states that have expanded Medicaid (31, plus the District of Columbia), with nearly 1.2 million jobs lost in 2019. However, the 19 states that have not expanded Medicaid also experience major setbacks: collectively, they lose about 338,000 jobs in 2019, even though they do not receive the direct federal matching funds for Medicaid expansion.

6                                                                    The Commonwealth Fund

Exhibit 4
## Repeal of Medicaid Expansion Only: Potential National Impact

| | 2019 | 2020 | 2021 | 2022 | 2023 | Total 2019–23 |
|---|---|---|---|---|---|---|
| **ALL STATES COMBINED** | | | | | | |
| Federal Funding Cut (billions of $) | –$78.5 | –$85.0 | –$92.8 | –$100.3 | –$109.3 | –$465.8 |
| Total Employment Lost (thousands of jobs) | –1,495 | –1,653 | –1,748 | –1,744 | –1,739 | N/A |
| Health Care | –543 | –566 | –592 | –608 | –631 | N/A |
| All Other | –952 | –1,088 | –1,155 | –1,136 | –1,108 | N/A |
| Business Output Lost (billions of $) | –$252.4 | –$290.4 | –$317.9 | –$328.2 | –$337.3 | –$1,526.1 |
| Gross State Product Lost (billions of $) | –$146.7 | –$168.8 | –$185.3 | –$192.0 | –$198.1 | –$891.0 |
| State & Local Taxes Lost (billions of $) | –$4.7 | –$5.4 | –$6.0 | –$6.2 | –$6.4 | –$28.7 |
| **31 STATES AND DC EXPANDING MEDICAID** | | | | | | |
| Federal Funding Cut (billions of $) | –$78.5 | –$85.0 | –$92.8 | –$100.3 | –$109.3 | –$465.8 |
| Total Employment Lost (thousands of jobs) | –1,158 | –1,277 | –1,354 | –1,361 | –1,369 | N/A |
| Health Care | –451 | –470 | –492 | –506 | –527 | N/A |
| All Other | –707 | –808 | –862 | –855 | –842 | N/A |
| Business Output Lost (billions of $) | –$195.0 | –$223.9 | –$245.7 | –$255.5 | –$264.8 | –$1,185.0 |
| Gross State Product Lost (billions of $) | –$114.0 | –$130.9 | –$144.1 | –$150.4 | –$156.5 | –$695.8 |
| State & Local Taxes Lost (billions of $) | –$3.8 | –$4.3 | –$4.7 | –$5.0 | –$5.2 | –$22.9 |
| **19 STATES NOT EXPANDING MEDICAID** | | | | | | |
| Federal Funding Cut (billions of $) | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 |
| Total Employment Lost (thousands of jobs) | –338 | –376 | –394 | –383 | –369 | N/A |
| Health Care | –86 | –90 | –93 | –95 | –97 | N/A |
| All Other | –251 | –287 | –301 | –288 | –272 | N/A |
| Business Output Lost (billions of $) | –$53.2 | –$61.8 | –$67.1 | –$67.6 | –$67.4 | –$317.1 |
| Gross State Product Lost (billions of $) | –$32.7 | –$37.9 | –$41.2 | –$41.7 | –$41.7 | –$195.2 |
| State & Local Taxes Lost (billions of $) | –$1.0 | –$1.1 | –$1.2 | –$1.2 | –$1.2 | –$5.8 |

Source: George Washington University analyses.

     For example, although Utah has not expanded Medicaid, federal repeal causes the state to lose nearly 9,000 jobs in 2019 (Exhibit 5). Medicaid expansion in other states—like nearby Colorado, Arizona, Nevada, New Mexico, and California—spurs economic growth in those states. But because businesses and individuals there also buy goods and services from Utah firms, Utah's economy benefits, too. Ending Medicaid expansion therefore creates losses for Utah and other nonexpanding states.

     Data for eight selected states, five of which have expanded Medicaid and three of which have not, are shown in Exhibit 5. In the five expansion states, the majority of lost jobs and economic activity are caused by Medicaid expansion repeal. In the other three states, the majority of losses are caused by tax credit repeal. Nonetheless, all eight states experience serious losses when tax credits and Medicaid expansions disappear. Appendix Tables A1 to A4, at the end of this brief, summarize results for every state.

NJAPP0122

REPEALING HEALTH REFORM: ECONOMIC & EMPLOYMENT CONSEQUENCES FOR STATES          7

Exhibit 5
## Summary of Potential Consequences for Eight Selected States

| | Arizona* | Florida | Maine | New York* | Ohio* | Pennsyl-vania* | Utah | West Virginia* |
|---|---|---|---|---|---|---|---|---|
| **REPEAL OF TAX CREDITS & MEDICAID EXPANSION** | | | | | | | | |
| Federal Funding Cut, 2019–23 (billions of $) | –$6.8 | –$54.4 | –$2.7 | –$15.5 | –$34.9 | –$36.9 | –$3.4 | –$7.2 |
| Employment Lost in 2019 | | | | | | | | |
| Total Employment Lost (thousands of jobs) | –33.9 | –181.0 | –13.1 | –130.7 | –126.3 | –137.2 | –18.6 | –16.5 |
|    Health Care | –10.5 | –64.2 | –5.0 | –47.7 | –49.7 | –57.0 | –4.9 | –7.2 |
|    All Other | –23.4 | –116.8 | –8.1 | –83.0 | –76.6 | –80.2 | –13.7 | –9.3 |
| Economic Activity Lost, 2019–23 | | | | | | | | |
| Business Output Lost (billlions of $) | –$29.11 | –$146.46 | –$12.09 | –$154.11 | –$119.52 | –$128.93 | –$17.18 | –$15.97 |
| Gross State Product Lost (billions of $) | –$17.67 | –$90.42 | –$6.88 | –$89.67 | –$69.52 | –$76.47 | –$10.07 | –$9.12 |
| State & Local Taxes Lost (billions of $) | –$0.53 | –$3.03 | –$0.27 | –$3.55 | –$2.20 | –$2.42 | –$0.31 | –$0.35 |
| **REPEAL OF TAX CREDITS ONLY** | | | | | | | | |
| Federal Funding Cut, 2019–23 (billions of $) | –$3.6 | –$54.4 | –$2.7 | –$2.7 | –$5.4 | –$9.9 | –$3.4 | –$1.4 |
| Employment Lost in 2019 | | | | | | | | |
| Total Employment Lost (thousands of jobs) | –13.7 | –140.3 | –7.0 | –44.5 | –38.7 | –46.5 | –9.8 | –5.9 |
|    Health Care | –4.3 | –52.7 | –2.7 | –13.4 | –13.1 | –16.7 | –3.0 | –2.4 |
|    All Other | –9.4 | –87.6 | –4.3 | –31.1 | –25.6 | –29.9 | –6.8 | –3.5 |
| Economic Activity Lost, 2019–23 | | | | | | | | |
| Business Output Lost (billlions of $) | –$11.24 | –$115.47 | –$6.25 | –$54.03 | –$37.26 | –$44.80 | –$8.53 | –$5.78 |
| Gross State Product Lost (billions of $) | –$6.84 | –$71.08 | –$3.64 | –$30.59 | –$21.32 | –$26.16 | –$5.07 | –$3.26 |
| State & Local Taxes Lost (billions of $) | –$0.21 | –$2.38 | –$0.14 | –$1.21 | –$0.67 | –$0.83 | –$0.16 | –$0.12 |
| **REPEAL OF MEDICAID EXPANSION ONLY** | | | | | | | | |
| Federal Funding Cut, 2019–23 (billions of $) | –$3.2 | $0.0 | $0.0 | –$12.8 | –$29.5 | –$26.9 | $0.0 | –$5.8 |
| Employment Lost in 2019 | | | | | | | | |
| Total Employment Lost (thousands of jobs) | –20.3 | –40.8 | –6.0 | –86.3 | –87.6 | –90.7 | –8.8 | –10.6 |
|    Health Care | –6.3 | –11.5 | –2.2 | –34.4 | –36.5 | –40.3 | –1.9 | –4.7 |
|    All Other | –14.0 | –29.3 | –3.8 | –51.9 | –51.1 | –50.4 | –7.0 | –5.9 |
| Economic Activity Lost, 2019–23 | | | | | | | | |
| Business Output Lost (billions of $) | –$17.90 | –$31.05 | –$5.87 | –$100.27 | –$82.29 | –$84.18 | –$8.67 | –$10.19 |
| Gross State Product Lost (billions of $) | –$10.84 | –$19.38 | –$3.26 | –$59.19 | –$48.22 | –$50.34 | –$5.01 | –$5.86 |
| State & Local Taxes Lost (billions of $) | –$0.33 | –$0.65 | –$0.13 | –$2.34 | –$1.52 | –$1.59 | –$0.16 | –$0.22 |

* States expanding Medicaid.
Source: George Washington University analyses.

## DISCUSSION

Repeal of key parts of the Affordable Care Act would lead to major cuts in federal assistance for health care, thereby triggering major losses in employment and serious economic dislocations in all states. These losses would not be limited to hospitals, clinics, and patients; they would have widespread repercussions for businesses and workers as well, affecting multiple sectors of each state's economy. Because economic benefits and losses flow across state lines, even states that did not expand Medicaid would experience losses if Medicaid expansions were canceled.

These findings are noteworthy in part because of the common (and debunked) concern that Obamacare has been a "job killer."[10] Evidence shows that job growth has been robust since the ACA was implemented and the economy has thrived.[11]

The economic burdens for states and health care providers will be particularly detrimental. Because they serve so many uninsured and Medicaid patients, safety-net facilities such as hospitals and community health centers could be especially hard hit. Recent studies demonstrate that Medicaid expansions are associated with lower uncompensated care burdens for hospitals and with increased capacity at nonprofit community health centers, signaling the adverse consequences of reversing them.[12,13] In the end, states could be forced to choose between cutting vital services and raising tax rates.

An important question post-repeal will be what policies might replace existing ones. Some conservatives have recommended the broader use of health insurance tax deductions, in lieu of tax credits, whether for all health coverage or specifically for tax-advantaged health savings accounts (HSAs).[14] While tax deductions can lower costs for higher-income individuals, who have higher marginal tax rates and already are mostly insured, they offer little help to people with low or moderate incomes, who are far more likely to lose their insurance and access to health care if premium tax credits and Medicaid expansions disappear.

Analyses by the RAND Corporation found that the broader tax deductions recommended by the Trump team during the presidential campaign would increase federal costs, with little gain in insurance coverage.[15] Any savings would primarily help those with higher incomes. The ACA's reforms, on the other hand, target assistance to low- and moderate-income families, who use the savings to meet basic needs like housing, food, and transportation. Moreover, such spending creates greater economic stimulus than tax deductions that disproportionately benefit wealthier individuals, who are likely to shift more money into savings, which is less stimulative.

Another key question is whether additional states would be able to expand their Medicaid programs prior to repeal. Some of these states might be more interested in doing so under a Republican administration if they believe they would have more flexibility in designing their expansion. A related question is whether federal funding for expansion would be continued after repeal goes into effect. Speaker of the House Paul Ryan has proposed converting Medicaid into a block grant that would provide more limited funding to states in the future.[16] Presumably, states' federal block-grant funding levels would be based on federal payments for a baseline period. Would Medicaid expansion funds be included in state baselines under block grants so that states could continue to offer expanded coverage in the future? Such an approach could limit some of the economic damage, but current plans in Congress are not clear.

Recent analyses have indicated that ACA repeal could double the number of uninsured Americans, reduce access to health services, and increase burdens for health care facilities.[17,18] This analysis demonstrates that the consequences could extend well beyond the health care system, triggering major reductions in employment and substantial losses in state economic activity and reduced state and local revenues. And these repercussions are likely to reverberate across all states and most sectors of the economy.

## SUMMARY OF STUDY METHODS

To project federal funding losses for every state and the District of Columbia, we used the most recent data from the U.S. Department of Health and Human Services to estimate baseline 2016 federal expenditures for premium tax credits and federal Medicaid expansion funding. Federal funding losses from calendar years 2019 to 2023 were based on Congressional Budget Office (CBO) baseline projections.[19] To be conservative, we did not include projections related to the Affordable Care Act's marketplace cost-sharing reductions or the potential loss of coverage for those already eligible for Medicaid.

State- and year-specific federal funding losses were input into the PI+ (version 2.0) economic forecasting model, developed by Regional Economic Models, Inc.[20] PI+ is a dynamic structural equation model that projects state-level economic and employment forecasts. The model includes elements of input-output, general economic equilibrium, econometric, and economic geography methodologies. The estimated effects are based on differences between a baseline model (control forecast) and models assuming policy changes—in this case, the loss of premium tax credits or federal Medicaid expansion funding. The multiregion model accounts for the flow of funds and goods both within and across states. Most health care is local; patients generally use clinics, hospitals, and pharmacies near their home, but health care income eventually translates into purchases of diverse goods and services, so that funds originating in one state eventually flow across state lines into the interstate economy. We estimate state-level changes in the following measures by calendar year:

1. **Employment:** Number of full- or part-time jobs that could be added or lost in each state, including private health care, construction, real estate, retail, finance, and insurance jobs and public-sector employment.

2. **Business output:** Equivalent to the sum of all transactions at production, wholesale, and retail levels in a state.

3. **Gross state product (GSP):** Net value added within a state. It is the state-level analogue to the gross domestic product for the nation.

4. **State and local tax revenue:** State and local income, sales, and other taxes.

Business output, GSP, and state and local tax revenues are measured in current (nominal) dollars for their respective calendar years.

### Study Limitations

All projections entail uncertainty. The health care market and the general economy are ever changing. We focus solely on the effects of revoking premium tax credits and Medicaid expansions. If cancellation dates for tax credits or Medicaid expansion are shifted up or down by one year, results should be similar but moved forward or backward in time.

Given current legislative uncertainties, we are unable to account for potential Affordable Care Act replacement policies or other economic policy changes. A recent analysis of the economic effects in California assumed changes in health-related taxes and reached conclusions that were consistent with the national analyses reported here.[21] In an analysis like this, an important question is whether the federal funding that is cut would be used for another purpose; this is also unclear. CBO estimated that H.R. 3762 could have reduced the federal deficit.[22] but alternative uses for these savings were not specified. It did not appear that the federal savings would be rechanneled to help states or support health care. Updated analyses may be possible in the future. The study also did not explicitly model the effects of other provisions that might be considered, such as elimination of some taxes and penalties. However, the California study suggests that the effect of these changes on employment would be modest.

A complete description of this study's methods and data sources is available in the full version of this analysis, *The Economic and Employment Consequences of Repealing Federal Health Reform: A 50 State Analysis,* available at https://publichealth.gwu.edu/sites/default/files/downloads/HPM_Repealing_Federal_Health_Reform.pdf.

NJAPP0125

## NOTES

[1]   R. Bade and B. Everett, "GOP May Delay Obamacare Replacement for Years," *Politico,* Dec. 1, 2016.

[2]   L. J. Blumberg M. Buettgens, and J. Holahan, *Implications of Partial Repeal of the ACA Through Reconciliation* (Urban Institute, Dec. 2016).

[3]   A. Dobson, J. DaVanzo, R. Haught et al., *Estimating the Impact of Repealing the Affordable Care Act on Hospitals* (Dobson, DaVanzo & Associates, LLC, Dec. 6, 2016).

[4]   B. Obama, "United States Health Care Reform: Progress and Next Steps," *Journal of the American Medical Association,* Aug. 2, 2016 316(5):525–32.

[5]   Council of Economic Advisers, "The Economic Record of the Obama Administration: Reforming the Health Care System," *The White House Blog,* Dec. 13, 2016.

[6]   Trump–Pence Campaign Website, Healthcare Reform to Make America Great Again, 2016.

[7]   See E. Saltzman and C. Eibner, *Donald Trump's Health Care Reform Proposals: Anticipated Effects on Insurance Coverage, Out-of-Pocket Costs, and the Federal Deficit* (The Commonwealth Fund, Sept. 2016); *A Better Way: Health Care,* House Republican Task Force Report (June 2016), Speaker Paul Ryan's proposal listing many of the Obamacare repeal and related bills proposed by House Republicans during the 114th Congress; and Empowering Patients First Act (H.R. 2300), introduced by Rep. Tom Price, the Health and Human Services secretary-designate.

[8]   R. Rudowitz, *Understanding How States Access the ACA Enhanced Medicaid Matching Rates* (Kaiser Commission on Medicaid and the Uninsured, Sept. 2014).

[9]   S. P. Keehan, J. A. Poisal, G. A. Cuckler et al., "National Health Expenditure Projections, 2015–25: Economy, Prices, and Aging Expected to Shape Spending and Enrollment," *Health Affairs,* Aug. 2016 35(8):1522–31.

[10]  J. Greenberg, "Ted Cruz's Pants on Fire Claim That Health Care Law Is Nation's 'Biggest Job-Killer,'" *Politifact,* Jan. 29, 2016.

[11]  Council of Economic Advisers, "The Economic Record of the Obama Administration: Reforming the Health Care System," *The White House Blog,* Dec. 13, 2016; and C. Schoen, *The Affordable Care Act and the U.S. Economy: A Five-Year Perspective* (The Commonwealth Fund, Feb. 2016).

[12]  D. Dranove, C. Garthwaite, and C. Ody, "Uncompensated Care Decreased at Hospitals in Medicaid Expansion States But Not at Hospitals in Nonexpansion States," *Health Affairs,* Aug. 2016 35(8):1471–79.

[13]  X. Han, E. Luo, and L. Ku, "Medicaid Expansion and Grant Funding Increases Helped Improve Community Health Center Capacity," *Health Affairs,* Jan. 2017 (forthcoming).

[14]  Trump–Pence Campaign Website, Healthcare Reform to Make America Great Again, 2016.

[15]  E. Saltzman and C. Eibner, *Donald Trump's Health Care Reform Proposals: Anticipated Effects on Insurance Coverage, Out-of-Pocket Costs, and the Federal Deficit* (The Commonwealth Fund, Sept. 2016).

[16]  *A Better Way: Health Care,* House Republican Task Force Report (June 2016).

[17]  L. J. Blumberg M. Buettgens, and J. Holahan, *Implications of Partial Repeal of the ACA Through Reconciliation* (Urban Institute, Dec. 2016).

[18]  A. Dobson, J. DaVanzo, R. Haught et al., *Estimating the Impact of Repealing the Affordable Care Act on Hospitals* (Dobson, DaVanzo & Associates, LLC, Dec. 6, 2016).

[19]  Congressional Budget Office, *Federal Subsidies for Health Insurance Coverage for People Under Age 65* (CBO, March 2016).

[20]  Regional Economic Models, Inc., PI+, version 2.0. For more detail about the model and data sources, see http://www.remi.com/products/pi.

[21]  L. Lucia and K. Jacobs, "California's Projected Economic Losses Under ACA Repeal," *UC Berkeley Center for Labor Research and Education Blog,* Dec. 20, 2016.

[22]  K. Hall, director, Congressional Budget Office, letter to the Hon. Mike Enzi, "Budgetary Effects of H.R. 3762, the Restoring Americans' Healthcare Freedom Reconciliation Act, as Passed by the Senate on December 3, 2015" (CBO, Dec. 11, 2015).

NJAPP0127

12   THE COMMONWEALTH FUND

Appendix Table A1

# Potential Jobs Lost Because of Repeal of Tax Credits and Medicaid Expansion in 2019, by State (thousands of jobs)

| | | Private Employment | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Total Employment | Health Care | Construction/ Real Estate | Retail Trade | Finance/ Insurance | All Other Private | Public Employment |
| Alabama | -28.2 | -8.8 | -3.3 | -2.8 | -1.8 | -10.6 | -0.8 |
| Alaska | -5.3 | -2.1 | -0.5 | -0.5 | -0.2 | -1.8 | -0.2 |
| Arizona | -33.9 | -10.5 | -4.2 | -3.4 | -2.7 | -12.5 | -0.7 |
| Arkansas | -27.6 | -9.5 | -3.0 | -3.4 | -1.1 | -9.6 | -1.0 |
| California | -333.6 | -121.3 | -35.2 | -34.6 | -16.4 | -118.6 | -7.5 |
| Colorado | -39.0 | -11.6 | -5.6 | -3.9 | -2.6 | -14.5 | -0.9 |
| Connecticut | -35.9 | -14.2 | -3.9 | -3.3 | -3.1 | -10.6 | -0.8 |
| Delaware | -9.0 | -3.4 | -1.1 | -0.9 | -0.8 | -2.7 | -0.2 |
| District of Columbia | -8.2 | -3.4 | -0.5 | -0.3 | -0.3 | -3.6 | -0.1 |
| Florida | -181.0 | -64.2 | -21.4 | -17.9 | -13.4 | -60.2 | -3.9 |
| Georgia | -71.5 | -21.4 | -8.3 | -6.9 | -5.0 | -28.1 | -1.7 |
| Hawaii | -7.4 | -2.6 | -0.9 | -0.9 | -0.3 | -2.6 | -0.1 |
| Idaho | -11.5 | -3.8 | -1.6 | -1.2 | -0.6 | -3.9 | -0.3 |
| Illinois | -114.3 | -39.3 | -10.9 | -11.2 | -7.9 | -42.5 | -2.6 |
| Indiana | -55.4 | -19.1 | -6.2 | -6.0 | -2.8 | -20.0 | -1.4 |
| Iowa | -25.8 | -8.2 | -3.1 | -3.2 | -2.2 | -8.4 | -0.8 |
| Kansas | -18.8 | -5.8 | -2.0 | -1.7 | -1.6 | -7.1 | -0.5 |
| Kentucky | -44.5 | -17.1 | -4.6 | -6.0 | -2.0 | -13.5 | -1.4 |
| Louisiana | -36.8 | -11.9 | -5.2 | -3.7 | -1.9 | -13.2 | -1.0 |
| Maine | -13.1 | -5.0 | -1.7 | -1.4 | -0.6 | -4.0 | -0.4 |
| Maryland | -52.0 | -20.0 | -6.6 | -5.0 | -2.5 | -16.7 | -1.2 |
| Massachusetts | -56.9 | -20.0 | -6.5 | -4.1 | -3.9 | -21.2 | -1.1 |
| Michigan | -101.5 | -40.2 | -9.8 | -11.3 | -4.5 | -33.2 | -2.5 |
| Minnesota | -52.9 | -18.8 | -5.5 | -5.6 | -3.5 | -18.1 | -1.4 |
| Mississippi | -16.4 | -5.1 | -1.9 | -1.7 | -0.9 | -6.3 | -0.6 |
| Missouri | -46.1 | -15.4 | -5.3 | -4.8 | -3.3 | -16.2 | -1.2 |
| Montana | -8.2 | -3.0 | -1.2 | -0.8 | -0.4 | -2.6 | -0.3 |
| Nebraska | -14.3 | -4.4 | -1.7 | -1.5 | -1.4 | -4.9 | -0.4 |
| Nevada | -22.1 | -6.3 | -2.7 | -2.6 | -1.2 | -8.9 | -0.4 |
| New Hampshire | -13.4 | -4.5 | -1.8 | -1.6 | -0.8 | -4.4 | -0.3 |
| New Jersey | -86.4 | -33.5 | -8.9 | -8.6 | -5.1 | -28.1 | -2.2 |
| New Mexico | -18.8 | -7.8 | -1.9 | -2.4 | -0.6 | -5.3 | -0.8 |
| New York | -130.7 | -47.7 | -11.8 | -9.3 | -11.1 | -47.8 | -3.0 |
| North Carolina | -76.2 | -26.1 | -9.0 | -7.9 | -4.6 | -26.4 | -2.2 |
| North Dakota | -8.2 | -2.4 | -1.2 | -0.8 | -0.5 | -3.0 | -0.2 |
| Ohio | -126.3 | -49.7 | -12.5 | -13.3 | -6.6 | -40.9 | -3.3 |
| Oklahoma | -22.8 | -6.9 | -2.7 | -2.1 | -1.5 | -9.0 | -0.7 |
| Oregon | -45.3 | -18.1 | -4.6 | -5.5 | -1.8 | -14.0 | -1.3 |
| Pennsylvania | -137.2 | -57.0 | -13.8 | -13.1 | -7.4 | -42.9 | -3.0 |
| Rhode Island | -12.1 | -5.4 | -1.2 | -1.1 | -0.6 | -3.5 | -0.3 |
| South Carolina | -28.5 | -8.2 | -3.3 | -3.1 | -2.0 | -11.1 | -0.8 |
| South Dakota | -7.4 | -2.6 | -0.9 | -0.8 | -0.6 | -2.2 | -0.2 |
| Tennessee | -57.0 | -17.0 | -7.2 | -5.9 | -3.3 | -22.0 | -1.5 |
| Texas | -174.7 | -48.3 | -24.9 | -15.8 | -13.2 | -68.9 | -3.6 |
| Utah | -18.6 | -4.9 | -2.6 | -2.0 | -1.5 | -7.2 | -0.4 |
| Vermont | -5.7 | -2.1 | -0.7 | -0.6 | -0.2 | -1.9 | -0.2 |
| Virginia | -51.6 | -15.8 | -6.6 | -4.6 | -3.2 | -20.3 | -1.1 |
| Washington | -40.9 | -14.5 | -4.9 | -4.5 | -2.0 | -14.1 | -0.9 |
| West Virginia | -16.5 | -7.2 | -1.6 | -2.0 | -0.5 | -4.6 | -0.6 |
| Wisconsin | -45.7 | -14.7 | -4.8 | -4.8 | -3.4 | -16.8 | -1.2 |
| Wyoming | -3.6 | -0.8 | -0.6 | -0.3 | -0.2 | -1.6 | -0.1 |

Source: George Washington University analyses.

NJAPP0128

REPEALING HEALTH REFORM: ECONOMIC & EMPLOYMENT CONSEQUENCES FOR STATES    13

Appendix Table A2

## Repeal of Premium Tax Credits in 2019: Potential Impact on Employment, by State (thousands of jobs)

| | | Private Employment | | | | | Public Employment |
|---|---|---|---|---|---|---|---|
| | Total Employment | Health Care | Construction/ Real Estate | Retail Trade | Finance/ Insurance | All Other Private | |
| Alabama | -17.0 | -5.6 | -2.0 | -1.9 | -1.2 | -5.8 | -0.5 |
| Alaska | -2.3 | -1.0 | -0.2 | -0.2 | -0.1 | -0.7 | -0.1 |
| Arizona | -13.7 | -4.3 | -1.6 | -1.3 | -1.3 | -4.9 | -0.3 |
| Arkansas | -8.6 | -3.0 | -0.9 | -0.8 | -0.6 | -3.0 | -0.3 |
| California | -93.8 | -31.8 | -9.8 | -8.4 | -7.0 | -35.1 | -1.8 |
| Colorado | -11.3 | -2.8 | -1.7 | -0.9 | -1.1 | -4.6 | -0.2 |
| Connecticut | -12.3 | -3.9 | -1.4 | -1.2 | -1.6 | -4.0 | -0.3 |
| Delaware | -3.5 | -1.2 | -0.4 | -0.4 | -0.4 | -1.0 | -0.1 |
| District of Columbia | -2.7 | -0.9 | -0.2 | -0.1 | -0.1 | -1.4 | 0.0 |
| Florida | -140.3 | -52.7 | -16.4 | -14.3 | -10.6 | -42.8 | -3.4 |
| Georgia | -46.9 | -15.3 | -5.4 | -4.9 | -3.6 | -16.6 | -1.3 |
| Hawaii | -0.9 | -0.2 | -0.1 | -0.1 | -0.1 | -0.5 | 0.0 |
| Idaho | -5.3 | -2.1 | -0.6 | -0.6 | -0.4 | -1.5 | -0.2 |
| Illinois | -39.8 | -11.7 | -3.9 | -3.6 | -3.9 | -15.9 | -0.9 |
| Indiana | -21.2 | -6.7 | -2.3 | -2.2 | -1.5 | -7.9 | -0.5 |
| Iowa | -9.7 | -2.6 | -1.2 | -1.0 | -1.2 | -3.3 | -0.3 |
| Kansas | -9.9 | -3.1 | -1.1 | -1.0 | -1.0 | -3.4 | -0.3 |
| Kentucky | -13.2 | -4.4 | -1.4 | -1.2 | -1.0 | -4.8 | -0.4 |
| Louisiana | -22.8 | -8.0 | -2.9 | -2.6 | -1.3 | -7.3 | -0.7 |
| Maine | -7.0 | -2.7 | -0.9 | -0.9 | -0.4 | -2.0 | -0.2 |
| Maryland | -17.2 | -5.8 | -2.3 | -1.4 | -1.2 | -6.2 | -0.4 |
| Massachusetts | -24.9 | -8.3 | -2.9 | -2.0 | -2.0 | -9.2 | -0.5 |
| Michigan | -32.2 | -11.4 | -3.2 | -3.3 | -2.1 | -11.5 | -0.7 |
| Minnesota | -15.8 | -4.5 | -1.7 | -1.3 | -1.7 | -6.2 | -0.4 |
| Mississippi | -9.0 | -2.9 | -1.0 | -1.0 | -0.6 | -3.2 | -0.3 |
| Missouri | -25.5 | -8.8 | -2.8 | -3.0 | -2.0 | -8.1 | -0.7 |
| Montana | -3.6 | -1.4 | -0.5 | -0.4 | -0.2 | -1.1 | -0.1 |
| Nebraska | -7.5 | -2.3 | -0.8 | -0.9 | -0.9 | -2.4 | -0.2 |
| Nevada | -6.3 | -1.6 | -0.8 | -0.6 | -0.5 | -2.7 | -0.1 |
| New Hampshire | -5.1 | -1.5 | -0.7 | -0.6 | -0.4 | -1.8 | -0.1 |
| New Jersey | -28.0 | -8.9 | -3.0 | -2.8 | -2.5 | -10.1 | -0.7 |
| New Mexico | -3.8 | -1.3 | -0.4 | -0.3 | -0.2 | -1.4 | -0.1 |
| New York | -44.5 | -13.4 | -4.1 | -3.1 | -5.1 | -17.8 | -1.0 |
| North Carolina | -50.7 | -18.8 | -5.8 | -5.9 | -3.2 | -15.4 | -1.6 |
| North Dakota | -3.0 | -0.9 | -0.4 | -0.3 | -0.2 | -1.1 | -0.1 |
| Ohio | -38.7 | -13.1 | -4.0 | -3.5 | -3.2 | -14.0 | -0.9 |
| Oklahoma | -12.5 | -4.1 | -1.4 | -1.2 | -0.9 | -4.4 | -0.4 |
| Oregon | -8.1 | -2.8 | -0.8 | -0.8 | -0.6 | -2.9 | -0.2 |
| Pennsylvania | -46.5 | -16.7 | -4.8 | -4.4 | -3.8 | -15.9 | -1.0 |
| Rhode Island | -3.8 | -1.4 | -0.4 | -0.3 | -0.3 | -1.3 | -0.1 |
| South Carolina | -18.1 | -5.7 | -2.1 | -2.1 | -1.4 | -6.2 | -0.6 |
| South Dakota | -3.2 | -1.1 | -0.4 | -0.4 | -0.3 | -0.9 | -0.1 |
| Tennessee | -30.3 | -9.3 | -3.7 | -3.3 | -2.0 | -11.0 | -0.9 |
| Texas | -105.6 | -32.7 | -13.7 | -10.2 | -8.6 | -37.7 | -2.5 |
| Utah | -9.8 | -3.0 | -1.2 | -1.0 | -0.9 | -3.4 | -0.2 |
| Vermont | -2.4 | -0.9 | -0.3 | -0.3 | -0.1 | -0.8 | -0.1 |
| Virginia | -27.1 | -9.1 | -3.2 | -2.7 | -1.9 | -9.5 | -0.7 |
| Washington | -9.1 | -2.9 | -1.1 | -0.8 | -0.8 | -3.5 | -0.1 |
| West Virginia | -5.9 | -2.4 | -0.6 | -0.6 | -0.3 | -1.8 | -0.2 |
| Wisconsin | -22.6 | -7.2 | -2.3 | -2.8 | -2.0 | -7.6 | -0.7 |
| Wyoming | -1.6 | -0.4 | -0.2 | -0.2 | -0.1 | -0.6 | -0.1 |

Source: George Washington University analyses.

NJAPP0129

14                                                                    THE COMMONWEALTH FUND

Appendix Table A3
## Potential Jobs Lost Because of Repeal of Medicaid Expansion in 2019, by State (thousands of jobs)

| | | Private Employment | | | | | |
|---|---|---|---|---|---|---|---|
| | Total Employment | Health Care | Construction/ Real Estate | Retail Trade | Finance/ Insurance | All Other Private | Public Employment |
| Alabama | -11.2 | -3.2 | -1.3 | -1.0 | -0.6 | -4.8 | -0.2 |
| Alaska | -3.0 | -1.1 | -0.3 | -0.3 | -0.1 | -1.1 | -0.1 |
| Arizona | -20.3 | -6.3 | -2.6 | -2.1 | -1.3 | -7.6 | -0.4 |
| Arkansas | -18.9 | -6.5 | -2.0 | -2.6 | -0.5 | -6.6 | -0.7 |
| California | -239.9 | -89.5 | -75.5 | -26.2 | -9.4 | -83.5 | -5.7 |
| Colorado | -27.7 | -8.8 | -3.9 | -2.9 | -1.5 | -9.8 | -0.7 |
| Connecticut | -23.6 | -10.3 | -2.5 | -2.1 | -1.5 | -6.6 | -0.5 |
| Delaware | -5.5 | -2.1 | -0.7 | -0.5 | -0.4 | -1.6 | -0.1 |
| District of Columbia | -5.5 | -2.5 | -0.3 | -0.2 | -0.2 | -2.2 | -0.1 |
| Florida | -40.8 | -11.5 | -5.0 | -3.6 | -2.7 | -17.5 | -0.4 |
| Georgia | -24.6 | -6.1 | -2.9 | -2.0 | -1.5 | -11.6 | -0.4 |
| Hawaii | -6.4 | -2.3 | -0.8 | -0.8 | -0.2 | -2.2 | -0.2 |
| Idaho | -6.2 | -1.7 | -0.9 | -0.6 | -0.3 | -2.4 | -0.2 |
| Illinois | -74.6 | -27.6 | -7.0 | -7.7 | -4.0 | -26.6 | -1.7 |
| Indiana | -34.3 | -12.4 | -3.8 | -3.8 | -1.3 | -12.2 | -0.9 |
| Iowa | -16.1 | -5.5 | -1.9 | -2.2 | -1.0 | -5.0 | -0.5 |
| Kansas | -8.9 | -2.7 | -1.0 | -0.7 | -0.6 | -3.7 | -0.2 |
| Kentucky | -31.4 | -12.7 | -3.2 | -4.8 | -1.0 | -8.7 | -1.0 |
| Louisiana | -14.1 | -3.9 | -2.3 | -1.1 | -0.6 | -5.8 | -0.3 |
| Maine | -6.0 | -2.2 | -0.8 | -0.5 | -0.2 | -2.0 | -0.2 |
| Maryland | -34.8 | -14.2 | -4.3 | -3.7 | -1.3 | -10.5 | -0.9 |
| Massachusetts | -32.0 | -11.7 | -3.7 | -2.2 | -1.9 | -12.0 | -0.6 |
| Michigan | -69.3 | -28.8 | -6.6 | -8.0 | -2.4 | -21.7 | -1.8 |
| Minnesota | -37.1 | -14.3 | -3.8 | -4.3 | -1.9 | -11.9 | -1.0 |
| Mississippi | -7.3 | -2.2 | -0.9 | -0.7 | -0.3 | -3.1 | -0.2 |
| Missouri | -20.7 | -6.6 | -2.5 | -1.8 | -1.2 | -8.1 | -0.5 |
| Montana | -4.6 | -1.6 | -0.7 | -0.5 | -0.2 | -1.6 | -0.1 |
| Nebraska | -6.8 | -2.1 | -0.9 | -0.6 | -0.5 | -2.6 | -0.2 |
| Nevada | -15.8 | -4.7 | -1.9 | -2.0 | -0.7 | -6.2 | -0.3 |
| New Hampshire | -8.3 | -3.0 | -1.1 | -1.0 | -0.3 | -2.7 | -0.2 |
| New Jersey | -58.4 | -24.6 | -5.9 | -5.8 | -2.7 | -18.0 | -1.5 |
| New Mexico | -15.0 | -6.6 | -1.4 | -2.1 | -0.3 | -3.9 | -0.6 |
| New York | -86.3 | -34.4 | -7.7 | -6.2 | -6.0 | -30.0 | -2.0 |
| North Carolina | -25.4 | -7.3 | -3.2 | -2.0 | -1.4 | -11.0 | -0.5 |
| North Dakota | -5.2 | -1.6 | -0.8 | -0.5 | -0.2 | -1.9 | -0.2 |
| Ohio | -87.6 | -36.5 | -8.6 | -9.8 | -3.4 | -27.0 | -2.3 |
| Oklahoma | -10.3 | -2.8 | -1.3 | -0.8 | -0.6 | -4.6 | -0.3 |
| Oregon | -37.2 | -15.3 | -3.8 | -4.7 | -1.2 | -11.1 | -1.1 |
| Pennsylvania | -90.7 | -40.3 | -9.0 | -8.7 | -3.7 | -27.0 | -2.0 |
| Rhode Island | -8.3 | -4.1 | -0.8 | -0.7 | -0.3 | -2.2 | -0.2 |
| South Carolina | -10.5 | -2.5 | -1.3 | -1.0 | -0.6 | -4.9 | -0.2 |
| South Dakota | -4.2 | -1.5 | -0.5 | -0.4 | -0.3 | -1.3 | -0.1 |
| Tennessee | -26.8 | -7.7 | -3.5 | -2.6 | -1.3 | -11.1 | -0.7 |
| Texas | -69.3 | -15.6 | -11.2 | -5.6 | -4.6 | -31.2 | -1.1 |
| Utah | -8.8 | -1.9 | -1.4 | -1.0 | -0.6 | -3.8 | -0.2 |
| Vermont | -3.2 | -1.2 | -0.4 | -0.3 | -0.1 | -1.1 | -0.1 |
| Virginia | -24.5 | -6.7 | -3.4 | -1.9 | -1.3 | -10.8 | -0.5 |
| Washington | -31.8 | -11.6 | -3.9 | -3.6 | -1.2 | -10.6 | -0.8 |
| West Virginia | -10.6 | -4.7 | -1.0 | -1.5 | -0.2 | -2.8 | -0.4 |
| Wisconsin | -23.2 | -7.5 | -2.5 | -2.0 | -1.4 | -9.2 | -0.6 |
| Wyoming | -2.1 | -0.4 | -0.4 | -0.1 | -0.1 | -1.0 | -0.1 |

Source: George Washington University analyses.

REPEALING HEALTH REFORM: ECONOMIC & EMPLOYMENT CONSEQUENCES FOR STATES    15

Appendix Table A4

# Repeal of Premium Tax Credits and Medicaid Expansion: Potential Impact on Economy, by State, 2019 to 2023 (millions of $)

|  | Federal Funds Lost | Business Output Lost | Gross State Product Lost | State and Local Taxes Lost |
|---|---|---|---|---|
| Alabama | -$5,886 | -$26,204 | -$14,499 | -$486 |
| Alaska | -$3,174 | -$7,130 | -$3,827 | -$180 |
| Arizona | -$6,764 | -$29,111 | -$17,666 | -$533 |
| Arkansas | -$13,665 | -$29,748 | -$15,791 | -$539 |
| California | -$186,840 | -$348,301 | -$207,719 | -$6,783 |
| Colorado | -$14,647 | -$41,462 | -$24,433 | -$751 |
| Connecticut | -$12,527 | -$39,133 | -$23,303 | -$748 |
| Delaware | -$1,957 | -$9,169 | -$5,356 | -$149 |
| District of Columbia | -$2,863 | -$11,336 | -$6,643 | -$118 |
| Florida | -$54,361 | -$146,457 | -$90,422 | -$3,031 |
| Georgia | -$15,514 | -$67,341 | -$39,432 | -$1,078 |
| Hawaii | -$4,229 | -$7,253 | -$4,195 | -$158 |
| Idaho | -$2,737 | -$10,646 | -$5,900 | -$191 |
| Illinois | -$33,365 | -$113,842 | -$66,052 | -$2,050 |
| Indiana | -$12,426 | -$56,451 | -$30,352 | -$907 |
| Iowa | -$8,087 | -$29,148 | -$14,749 | -$490 |
| Kansas | -$2,336 | -$18,991 | -$10,464 | -$363 |
| Kentucky | -$23,858 | -$40,616 | -$22,926 | -$718 |
| Louisiana | -$7,726 | -$39,092 | -$21,532 | -$640 |
| Maine | -$2,726 | -$12,086 | -$6,877 | -$268 |
| Maryland | -$18,443 | -$49,224 | -$30,619 | -$982 |
| Massachusetts | -$5,521 | -$64,451 | -$38,017 | -$1,149 |
| Michigan | -$34,441 | -$94,340 | -$53,990 | -$1,820 |
| Minnesota | -$14,379 | -$57,465 | -$32,944 | -$1,128 |
| Mississippi | -$2,796 | -$14,563 | -$7,953 | -$327 |
| Missouri | -$8,876 | -$43,443 | -$24,875 | -$711 |
| Montana | -$3,179 | -$8,452 | -$4,482 | -$147 |
| Nebraska | -$2,662 | -$15,147 | -$8,068 | -$247 |
| Nevada | -$10,067 | -$21,458 | -$12,691 | -$377 |
| New Hampshire | -$3,880 | -$13,648 | -$8,042 | -$236 |
| New Jersey | -$31,912 | -$85,048 | -$53,085 | -$1,861 |
| New Mexico | -$12,248 | -$17,306 | -$10,145 | -$380 |
| New York | -$16,098 | -$154,108 | -$89,670 | -$3,550 |
| North Carolina | -$24,971 | -$67,212 | -$39,399 | -$1,197 |
| North Dakota | -$1,177 | -$11,779 | -$6,388 | -$260 |
| Ohio | -$34,777 | -$119,515 | -$69,519 | -$2,197 |
| Oklahoma | -$4,209 | -$23,838 | -$13,603 | -$393 |
| Oregon | -$23,929 | -$42,581 | -$24,884 | -$818 |
| Pennsylvania | -$36,720 | -$128,925 | -$76,468 | -$2,422 |
| Rhode Island | -$4,484 | -$10,568 | -$6,487 | -$234 |
| South Carolina | -$7,253 | -$25,759 | -$14,886 | -$579 |
| South Dakota | -$843 | -$7,548 | -$4,153 | -$108 |
| Tennessee | -$7,576 | -$59,531 | -$34,205 | -$899 |
| Texas | -$30,872 | -$184,425 | -$107,420 | -$2,716 |
| Utah | -$3,389 | -$17,178 | -$10,071 | -$313 |
| Vermont | -$1,241 | -$5,101 | -$2,963 | -$120 |
| Virginia | -$10,986 | -$52,397 | -$31,001 | -$923 |
| Washington | -$18,242 | -$46,366 | -$26,967 | -$807 |
| West Virginia | -$7,145 | -$15,967 | -$9,119 | -$349 |
| Wisconsin | -$7,892 | -$46,513 | -$25,659 | -$846 |
| Wyoming | -$1,163 | -$5,377 | -$2,897 | -$109 |

Source: George Washington University analyses.

## ABOUT THE AUTHORS

*All the authors are members of the Center for Health Policy Research in the Department of Health Policy and Management within the Milken Institute School of Public Health at the George Washington University Washington, D.C.*

Leighton Ku, Ph.D., M.P.H., is a professor of Health Policy and Management and director, Center for Health Policy Research. He has conducted health policy and health services research for over 25 years, focusing on topics such as health reform, Medicaid, and the health care safety net. He has authored articles in *Health Affairs, New England Journal of Medicine, American Journal of Public Health,* the Cato Institute's *Economic Development Bulletin,* and other journals. He is on the board of the District of Columbia's Health Benefits Exchange Authority.

Erika Steinmetz, M.B.A., is a senior research scientist with extensive research experience encompassing Medicare, Medicaid, and private insurance. Ms. Steinmetz's expertise is in efficiently analyzing complex data sources to advance our understanding of public health problems. She previously worked at the Association of American Medical Colleges and the U.S. Census Bureau.

Erin Brantley, M.P.H., Ph.D. (cand.), is a senior research associate. Her research interests focus on using rigorous quantitative and qualitative methods to improve health care and health policy. She has examined issues including the health care safety net and the use of preventive services by low-income populations.

Brian K. Bruen, M.S., Ph.D. (cand.), is a lead research scientist with more than 20 years of experience in health policy analysis focused primarily on Medicaid, Medicare, and pharmaceutical benefit programs. Mr. Bruen is also a lecturer, teaching applied statistics and pharmaceutical policy at the graduate level. He previously worked at Avalere Health, the National Association of Chain Drug Stores, and the Urban Institute.

## ACKNOWLEDGMENTS

This brief was supported by contributions from The Commonwealth Fund, the Geiger Gibson RCHN Community Health Foundation Research Collaborative, and the Milken Institute School of Public Health, George Washington University. The authors are grateful to John Bennett of REMI for technical assistance. Henry Aaron, Sara Rosenbaum, Sara Collins, David Blumenthal, and Sherry Glied offered helpful comments and advice. All opinions in the brief are those of the authors and should not be attributed as positions of the George Washington University or The Commonwealth Fund.

---

*Editorial support was provided by Chris Hollander.*



NJAPP0133

# Exhibit 7

NJAPP0134

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,                  )
                                           )
      Plaintiffs,                    )
                                           )
    v.                                   )   Case No. 1:18-CV-68
                                           )
UNITED STATES OF AMERICA, *et al.*,        )
                                           )
      Defendants,                    )
                                           )
KARLA PEREZ, *et al.*,                     )
                                           )
      Defendant-Intervenors,         )
and                                        )
                                           )
STATE OF NEW JERSEY,                       )
                                           )
      Proposed Defendant-Intervenor. )

## DECLARATION OF MEG WIEHE AND MISHA HILL

    We, Meg Wiehe, and Misha Hill declare as follows:

1. We are tax policy experts working for the Institute on Taxation and Economic Policy (ITEP).  ITEP is a non-profit, nonpartisan research organization that provides in-depth analyses on the effects of federal, state, and local tax policies. ITEP's mission is to ensure the nation has a fair and sustainable tax system that raises enough revenue to fund our common priorities, including education, health care, infrastructure and public safety. ITEP researchers use a tax incidence model to produce distributional and revenue analyses of current tax systems and proposed changes at the federal, state, and local level.

    a. Meg Wiehe is the Deputy Director of ITEP. She has worked with ITEP since 2010. Meg is nationally recognized expert on state and local taxation. She studies, writes and provides commentary and insight to a wide range of audiences on historical and current trends in state tax and budget policy. In particular, her analyses focus both on how tax and budget policies affect low- and moderate-income families as well as the intersection of fiscal policies and state and local

governments' ability to fund basic public priorities, including education, infrastructure and health care. Meg has conducted hundreds of revenue and distributional analyses of proposed tax changes in more than 40 states using ITEP's microsimulation tax model.  She also is a lead author of ITEP's flagship report, *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States.* Meg holds a Master of Public Administration from the Maxwell School at Syracuse University and a Bachelor of Arts in Anthropology from the University of Virginia.

    b.  Misha Hill has been a State Policy Fellow at ITEP since 2016. Misha's work with ITEP has focused, in part, on supporting research and analysis of taxes paid by undocumented immigrants. She is a co-author of ITEP's first report examining the tax contributions of young undocumented immigrants and helped develop the methodology. She has updated analyses and reports on taxes paid by all undocumented immigrants. She has authored half a dozen blog posts related to taxes paid by undocumented immigrants and given Spanish-language press interviews presenting the findings. She holds a Master of Public Policy from The George Washington University and Bachelor of Arts in Hispanic Studies from the University of Pennsylvania.

2.  According to U.S. Citizenship and Immigration Services (USCIS), the agency that administers Deferred Action for Childhood Arrivals (DACA), as of January 31, 2018 over 680,000 young people who were brought to the United States as children without documentation are currently enrolled in DACA.[1] The Migration Policy Institute, a non-profit, non-partisan think tank that analyzes the movement of people worldwide,

---

[1] U.S. Citizenship and Immigration Services, "Deferred Action for Childhood Arrivals (DACA) as of Jan. 31, 2018." Available at:
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigrat ion%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_Jan_31_2018. pdf

NJAPP0136

estimates an additional 643,000 individuals are eligible for DACA but not currently enrolled.[2]

3. We used the above estimates of the current population receiving and eligible for but not receiving Deferred Action for Childhood Arrivals (DACA) in each state to estimate the annual aggregate state and local tax contributions of the DACA-eligible population.

4. Young undocumented immigrants eligible for or enrolled in DACA, like all people living and working in the U.S., pay state and local income, property, sales, and excise taxes. We estimate that the total DACA-eligible population contributes more than $1.7 billion annually in state and local taxes. $1.2 billion of that is from the population currently enrolled in DACA. The following assumptions were made to calculate the sales and excise, income, and property taxes of the DACA-eligible population:

   a. Taxpaying units and employment status:

      i. ITEP's analysis treats each DACA-eligible immigrant who is working as a single taxpaying unit.

      ii. The employment rate of immigrants depends on legal status

      iii. 2017 national survey of 3,063 DACA recipients found that 91 percent of respondents were employed.[3] DACA enrollees pay the same income taxes (in states with income taxes) as other lawfully present individuals. DACA enrollees receive a temporary social security number which allows them to file federal and state income taxes and, additionally payroll taxes are deducted from their paychecks. This declaration assume 100 percent compliance with tax laws by DACA enrollees.

      iv. The previously mentioned national survey also found that prior to obtaining DACA only 44 percent of survey respondents were employed.

---

[2] Migration Policy Institute, "Estimates of DACA-Eligible Population at U.S., State, & County Levels." Available at: http://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles#overlay-context=events
[3] "Results of Tom K. Wong, United We Dream, National Immigration Law Center, and Center for American Progress National Survey." Center for American Progress, https://cdn.americanprogress.org/content/uploads/2017/11/02125251/2017_DACA_study_economic_report_updated.pdf

Our analysis assumes that 44 percent of the population that is eligible for DACA but not currently enrolled are employed.

b. Income of DACA-eligible population

  i. Immigrant wages change depending on legal status. Undocumented workers earn $22,029 a year on average and granting DACA status increases wages by 8.5 percent, according to a 2014 report by the Center for American Progress.[4] The average wages applied to the estimated DACA working population in ITEP's analysis are:

- $23,901 for the DACA-eligible population working and enrolled in the program.
- $22,029 for the DACA-eligible population working, but not enrolled in the program.

c. Estimated effective tax rates (taxes as share of income) for sales, income, and property taxes paid by DACA-eligible population in each state.

  i. ITEP's microsimulation computer model is a sophisticated program that applies the state and local tax laws in each state (including sales, excise, income, and property tax laws) to a statistically valid database of tax returns to generate estimates of the effective tax rates paid by taxpayers at various income levels under state and local tax law in place as of December 31, 2014. In January of 2015, ITEP released the 5th edition of *Who Pays?* which estimates the effect of the state and local tax laws as of January 2015 on taxpayers at 2012 income levels.[5] To estimate effective tax rates for the DACA-eligible population we applied effective tax rates calculated in the 2015 *Who Pays?* report to the DACA-eligible population.

d. We estimate that the DACA-eligible population contributes $287 million in state and local income taxes annually.

---

[4] Oakford, Patrick. "Administrative Action on Immigration Reform." Center for American Program, September 2014.
https://www.americanprogress.org/issues/immigration/reports/2014/09/04/96177/administrative-action-on-immigration-reform/
[5] Davis, Carl, et al. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 5th ed.", Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.

i.   Eligible immigrants enrolled in DACA are required to pay personal income taxes using a temporary social security number. Thus, this study assumes the 682,00 DACA-enrolled workers are fully complying with state personal income taxes. Personal income tax effective rates in each state were applied accordingly. Various studies have estimated between 50 and 75 percent of undocumented immigrants currently pay personal income taxes predominantly using Individual Tax Identification (ITIN) numbers or with false social security numbers.[6] This analysis assumes a 50 percent compliance rate for DACA-eligible immigrants who are not enrolled and applies 50 percent compliance if DACA protections are lost. Personal income tax effective rates in each state were applied to 50 percent of the estimated income.

ii.  Enrolled DACA recipients are eligible to receive the federal Earned Income Tax Credit (EITC) and the state versions of the credit as well, however state EITC benefits were not included in this study for two reasons: 1) all DACA-eligible workers are treated as single taxpaying units and 2) the average income of the enrolled DACA population is above the EITC income eligibility amounts for single workers. The impact of state EITCs was also left out of the other policy options given that DACA-eligible immigrants not enrolled in the program are ineligible for the credit.

e.   We estimate the DACA-eligible population contributes $416 million annually in state and local property taxes.  The DACA-eligible population pays property taxes either directly as homeowners, or indirectly through higher rents as tenants.

---

[6] See among others: Feinleib, Joel, and David Warner. "Issue Brief #1: The Impact of Immigration on Social Security and the National Economy." Social Security Advisory Board, Social Security Advisory Board, Dec. 2005, www.ssab.gov/Portals/0/OUR_WORK/REPORTS/Impact%20of%20Immigration%20on%20Social%20Security%20Brief_2005.pdf; Singer, Paula, and Linda Dodd-Major. "Identification Numbers and U.S. Government Compliance Initiatives." Tax Analysts, 20 Sept. 2004; and Cornelius, Wayne, and Jessica Lewis. Impacts of Border Enforcement on Mexican Migration: The View from Sending Communities, La Jolla, Calif.: University of California at San Diego, Center for Comparative Immigration Studies, 2007.

NJAPP0139

    i.   The first step in calculating property taxes was to identify the share of DACA-eligible immigrants who are homeowners or renters in each state. This analysis used state-by-state data from the Migration Policy Institute to estimate homeownership rates for undocumented immigrants in each state.[7] The ITEP model assumes that for renters, half of the cost of the property tax paid initially by owners of rental properties is passed through to renters.

    f.   We estimate the DACA-eligible population contributes $1 billion annually in state and local sales and excise taxes. The DACA-eligible population, like anyone purchasing goods or services, pays consumption taxes directly at the point of sale on taxable items.

    i.   Sales and excise taxes are collected by retailers every time a purchase is made on a taxable good or service. It is reasonable to assume that DACA eligible immigrants pay sales and excise taxes at similar rates to U.S. citizens and legal immigrants with similar incomes thus the estimated rates in ITEP's *Who Pays?* for each state were applied to the various estimated DACA-eligible population incomes.

5.   A useful way to compare taxes paid across income levels is the effective tax rate. This is the total of all taxes paid - income, property, and sales and excise - as a share of income. The DACA-eligible population pays an average effective tax rate of 8.3 percent.[8] ITEP's 2015 report, *Who Pays: A Distributional Analysis of the Tax Systems in All Fifty States* found that the middle 20% of taxpayers pays on average an effective tax rate of 9.7 percent, and the top 1 percent of taxpayers pays just 7 percent of their income in taxes.[9]

---

[7] Christensen Gee, et al. "Undocumented Immigrants' State and Local Tax Contributions." Institute on Taxation and Economic Policy, Mar. 2017, http://www.itep.org/pdf/immigration2017.pdf. See Appendix 2

[8] Hill, Misha E. and Meg Wiehe. "State and Local Tax Contributions of Young Undocumented Immigrants", Institute on Taxation and Economic Policy, Apr. 2018, https://itep.org/state-local-tax-contributions-of-young-undocumented-immigrants-2/

[9] Davis, Carl, et al. "Who Pays? A Distributional Analysis of the Tax Systems in All 50 States, 5th ed.", Institute on Taxation and Economic Policy, Jan. 2015, www.whopays.org.

This means the DACA-eligible population pays state and local taxes at a similar rate to middle income taxpayers across the country.

6. We also estimate that if DACA protections were lost the population would continue to contribute to state and local revenues, but at much lower levels. We estimate a total loss of $693 million in state and local tax revenues.

   a. DACA protections increase state and local tax contributions because they increase employment rates,[10] increase average salaries,[11] and increase the share paying state personal income taxes from 50 to 100 percent.[12] Surveys of DACA recipients found that after receiving DACA protections respondents were employed at higher rates and earned higher wages. This is likely because the work authorizations and deferral from deportation provided by DACA allow recipients to better compete with legally present workers, pursue advanced degrees, and protects them from wage theft by unscrupulous employers. Thus, a loss of DACA protections would eliminate the revenue gained from the increased salaries DACA affords.

7. Every state revenue stream could be harmed by the loss of DACA protections. In New Jersey, 53,000 residents are eligible for or receiving DACA, given the previously stated assumptions, this represents a contribution $57.2 million in state and local taxes which represents an average effective tax rate 7.9 percent. This includes $7.7 million in state and local income tax, $22.7 million in property tax, and $26.6 million in sales and excise taxes. If DACA protections were lost their contributions would decrease by $18.7 million to $38.4 million.

8. For all the foregoing reasons, in our professional opinions rescinding DACA would reduce the state and local tax contributions of the population eligible for DACA by nearly half in New Jersey and nearly $700 million nationally. This would hamper state and local revenues and hurt their economies.

---

[10] See footnote 3

[11] See footnote 3

[12] See 4.a.3

9.  Attached as **Exhibit A** hereto is a list of publications each of us has authored over the past 10 years and our CVs.

10. Neither of us has testified as an expert at trial or by deposition over the past 4 years.

11. We are each being paid $187.50/hour for our services in connection with this litigation.


We declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of our knowledge.

Respectfully submitted,

_____
Meg Wiehe

6/15/18
Date


_____
Misha Hill

6/15/18
Date

NJAPP0142

# EXHIBIT A

NJAPP0143

# MEG WIEHE

924 Green Street, Durham, NC 27701
(617) 230-3624 ● megwiehe@gmail.com

## EDUCATION

**Maxwell School of Syracuse University,** *Masters of Public Administration, June 2006*

**University of Virginia,** *Bachelor of Arts, Anthropology, May 1998.  Graduated with High Distinction*

## WORK EXPERIENCE

**Institute on Taxation and Economic Policy (ITEP)**                                   **Durham, NC/Washington, DC**
*Deputy Director (2016-present); State Tax Policy Director (2010-2016)*

- Responsible for planning, managing, and implementing ITEP's state and federal tax policy programmatic work.  This includes setting organizational goals and priorities, tracking policy developments in all 50 states and the federal level, ensuring ITEP is informing and influencing key tax debates, and building and maintaining key partnerships.
- Serve as a spokesperson for ITEP through media interviews, presentations, and meetings with policymakers and funders.
- Along with Executive Director, oversee ITEP's fundraising program including grant proposal and report writing, maintaining relationships with funders, and cultivating new donors.
- Directly manage and support six staff members.
- Authored numerous ITEP reports on topics including tax credits for workers and families, documenting the taxes paid by undocumented immigrants, closing tax loopholes, promoting progressive revenue raising options, and comprehensive state and local tax reform.  Co-author on ITEP's flagship report, *Who Pays? A Distributional Analysis of the Tax Systems in All Fifty States.*

**North Carolina Justice Center**                                                          **Raleigh, NC**
*Senior Policy Analyst/Outreach Director; NC Budget and Tax Center (2006-2010)*
- Promoted progressive fiscal policy through coalition building, media outreach, lobbying, and public presentations
- Conducted research and wrote publications on state and local fiscal and economic policy
- Co-coordinator of statewide revenue coalition, Together NC, and led successful campaign to enact a state Earned Income Tax Credit in 2007

**Boston Museum Project**                                                               **Boston, MA**
*Special Projects Coordinator/Project Coordinator (2002-2005)*
- Coordinated development operation laying ground work for $180 million capital campaign through prospect research, donor cultivation, and special events
- Led political and communications strategy including securing a site for project, producing newsletter, managing website content, and regular correspondence with project constituents
- Supervised two staff, conducted weekly staff meetings, and managed high-level Board of Directors

**MASSPIRG**                                                                          **Amherst and Boston, MA**
*Massachusetts Community Water Watch AmeriCorps Program Director (2000-2002)*
- Recruited, trained, and supervised 13 full-time AmeriCorps members
- Built collaborative relationships with non-profits and state and local government leaders
- Revised program mission, developed five year strategic plan, and established performance objectives
*Mass Student PIRG Campus Organizer (1998-2000)*
- Recruited, trained, and supervised college students and community volunteers to lead national, state, and local social change campaigns

NJAPP0144

# Misha E. Hill

(C) 609.234.5931          804 Green St., Apt D-2, Durham, NC 27701          hill.misha@gmail.com

## EDUCATION
**Master of Public Policy,** concentration in Health Policy                                            May 2016
*The George Washington University* | Washington, DC
**B.A. Hispanic Studies,** concentrations in Modern Middle East Studies and Theatre Arts        May 2010
*University of Pennsylvania* | Philadelphia, PA

## POLICY RESEARCH EXPERIENCE
**State Policy Fellow** | *Institute on Taxation and Economic Policy* | Durham, NC          Sept 2016—Present
- ❖ Participated in quantitative and qualitative analyses of the varying impact of fiscal policy by income and citizenship status for the purpose of continuing dialogue within the organization, establishing and developing external written, and responding to technical assistance requests from key stake holders such as the California Attorney General
- ❖ Advocated within the organization for the inclusion of a race equity lens and drafted an internal document to support this advocacy
- ❖ Created written products in collaboration with senior staff and independently on various state tax policy topics, including taxes paid by undocumented immigrants and adding a gendered lens to tax and budget policy
- ❖ Responded to Spanish language media inquiries related to published reports
- ❖ Presented at a national conference on current and upcoming research and analytical capabilities of the organization
- ❖ Tracked state legislative action related to tax policies and identified trends in consumption tax policy

**Income Support Research Assistant** | *Center on Budget and Policy Priorities* | Washington, DC    Nov 2015—Sept 2016
- ❖ Compiled a weekly email for distribution to state and national advocates on the latest news and research related to TANF policies
- ❖ Collected national and state level TANF statistics, including annual spending, caseloads, and applications, from HHS and state agencies to inform internal analyses and future work
- ❖ Tracked state and federal legislative action related to income support programs

**Women's Health Policy Intern** | *The Henry J. Kaiser Family Foundation* | Washington, DC    Jun 2015—Aug 2015
- ❖ Compiled comprehensive database of Medicaid family planning expansion programs to inform future research
- ❖ Performed qualitative research for a fact sheet on financing of maternity care in the US
- ❖ Presented a summary of work to about 20 participants that articulated why Medicaid family planning expansion programs were an important topic for federal fiscal policy

**Income Support Intern** | *Center on Budget and Policy Priorities* | Washington, DC          Sep 2014—May 2015
- ❖ Co-authored a report on state General Assistance programs
- ❖ Drafted briefs for an advocacy tool kit at a national conference on expanding TANF work programs
- ❖ Modeled alternatives of changes to TANF policies displaying the effects on families' incomes
- ❖ Performed literature reviews of prior research related to various income support strategies
- ❖ Monitored and summarized media on state and federal legislative and policy changes to income support programs
- ❖ Compiled data on TANF policies into summaries, fact sheets, graphs, and graphics for organization website

## DIRECT SERVICE EXPERIENCE
**WorkFirst NJ Administrator** | *HomeFront, Inc.* | Lawrence, NJ                    Jun 2010—Oct 2012
- ❖ Supported TANF participants in goal setting, GED preparation, and finding employment

## COMMUNITY SERVICE
**Harm Free Zone Participant** | *SpiritHouse* | Durham, NC                    Jun 2017—Present
- ❖ SpiritHouse uses art, culture, and media to support the empowerment of communities impacted by racism, criminalization, and incarceration. Harm Free Zone is a project that works to build communities that do not rely on law enforcement. Participated in performances, transformative justice, trainings, campaigns and book studies.

**End Shackling Campaign Participant** | *SisterSong, Inc.* | Durham, NC              March 2018—Present
- ❖ Provided fiscal policy insight for campaign to end the shackling of pregnant persons in North Carolina prisons and jails

**Certified Application Counselor** | *Northern Virginia Family Services* | Falls Church, VA    Dec 2014—Mar 2015
- ❖ Assisted primarily Spanish-speaking consumers in applying for health insurance through the ACA Marketplace

## LANGUAGES AND TECHNOLOGY SKILLS
**Language:** Spanish, Fluent in written and oral
**Technology:** STATA and SPSS (academic training), Adobe Illustrator, Microsoft Excel, WordPress, MailChimp, and The Raiser's Edge

Meg Wiehe's Publication

| Organization | Title | Date |
|---|---|---|
| Institute on Taxation and Economic Policy | Lottery, Casino and other Gambling Revenue: A Fiscal Game of Chance | 6/12/2018 |
| Institute on Taxation and Economic Policy | SALT/Charitable Workaround Credits Require a Broad Fix, Not a Narrow One | 5/23/2018 |
| Institute on Taxation and Economic Policy | How Long Has It Been Since Your State Raised Its Gas Tax? | 5/22/2018 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants | 4/30/2018 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants | 4/30/2018 |
| Institute on Taxation and Economic Policy | 10 Things You Should Know about the Nation's Tax System | 4/13/2018 |
| Institute on Taxation and Econom.c Policy | Many Large Corporations Reporting Tax Cut-Inspired Employee Bonuses Were Paying Low T | 4/12/2018 |
| Institute on Taxation and Economic Policy | Fifteen (of Many) Reasons We Need Real Corporate Tax Reform | 4/11/2018 |
| Institute on Taxation and Economic Policy | Who Pays Taxes in America in 2018? | 4/11/2018 |
| Institute on Taxation and Economic Policy | Extensions of the New Tax Law's Temporary Provisions Would Mainly Benefit the Wealthy | 4/10/2018 |
| Institute on Taxation and Economic Policy | Many Localities Are Unprepared to Collect Taxes on Online Purchases: Amazon.com and ot | 3/26/2018 |
| Institute on Taxation and Economic Policy | ITEP Testimony on "Post Tax Reform Evaluation of Recently Expired Tax Provisions" | 3/14/2018 |
| Institute on Taxation and Economic Policy | Preventing State Tax Subsidies for Private K-12 Education in the Wake of the New Federal S | 2/23/2018 |
| Institute on Taxation and Economic Policy | What the Tax Cuts and Jobs Act Means for States – A Guide to Impacts and Options | 1/26/2018 |
| Institute on Taxation and Economic Policy | Key Lessons for States as They Determine Responses to the Federal Tax Bill | 1/26/2018 |
| Institute on Taxation and Economic Policy | National and 50-State Impacts of House and Senate Tax Bills in 2019 and 2027 | 12/6/2017 |
| Institute on Taxation and Economic Policy | How True Tax Reform Would Eliminate Breaks for Real Estate Investors L ke Donald Trump | 12/1/2017 |
| Institute on Taxation and Economic Policy | Six More Things to Know About the Senate Tax Plan | 11/29/2017 |
| Institute on Taxation and Economic Policy | Revised Senate Plan Would Raise Taxes on at Least 29% of Americans and Cause 19 States t | 11/18/2017 |
| Institute on Taxation and Economic Policy | Analysis of the House Tax Cuts and Jobs Act | 11/6/2017 |
| Institute on Taxation and Economic Policy | 9 Things You Should Know About the Tax Debate | 11/3/2017 |
| Institute on Taxation and Economic Policy | The Domestic Production Activities Deduction: Costly, Complex and Ineffective | 10/26/2017 |
| Institute on Taxation and Economic Policy | Trickle-Down Dries Up | 10/26/2017 |
| Institute on Taxation and Economic Policy | Benefits of GOP-Trump Framework Tilted Toward the Richest Taxpayers in Each State | 10/4/2017 |
| Institute on Taxation and Economic Policy | State Tax Codes as Poverty Fighting Tools | 9/14/2017 |
| Institute on Taxation and Economic Policy | State Tax Codes as Poverty Fighting Tools | 9/14/2017 |
| Institute on Taxation and Economic Policy | Trump Proposals Would Reduce the Share of Taxes Paid by the Richest 1%, Raise It for Ever | 9/13/2017 |
| Institute on Taxation and Economic Policy | Reducing the Cost of Child Care Through State Tax Codes in 2017 | 9/11/2017 |
| Institute on Taxation and Economic Policy | Property Tax Circuit Breakers in 2017 | 9/11/2017 |
| Institute on Taxation and Economic Policy | Options for a Less Regressive Sales Tax in 2017 | 9/11/2017 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits in 2017 | 9/11/2017 |
| Institute on Taxation and Economic Policy | Nearly Half of Trump's Proposed Tax Cuts Go to People Making More than $1 Million Annu | 8/17/2017 |

| | | |
|---|---|---|
| Institute on Taxation and Economic Policy | Comment Letter to Treasury on Earnings Stripping Regulations | 8/4/2017 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits | 7/21/2017 |
| Institute on Taxation and Economic Policy | Trump's $4.8 Trillion Tax Proposals Would Not Benefit All States or Taxpayers Equally | 7/20/2017 |
| Institute on Taxation and Economic Policy | Comment Letter on Tax Reform to Senate Finance Chairman | 7/17/2017 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 7/12/2017 |
| Institute on Taxation and Economic Policy | Trump Budget Uses Unrealistic Economic Forecast to Tee Up Tax Cuts | 6/29/2017 |
| Institute on Taxation and Economic Policy | Public Loss Private Gain: How School Voucher Tax Shelters Undermine Public Education | 5/17/2017 |
| Institute on Taxation and Economic Policy | Why States That Offer the Deduction for Federal Income Taxes Paid Get It Wrong | 5/1/2017 |
| Institute on Taxation and Economic Policy | What Real Tax Reform Should Look Like | 4/27/2017 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants (2017) | 4/25/2017 |
| Institute on Taxation and Economic Policy | Comparing the Distributional Impact of Revenue Options in Alaska | 4/24/2017 |
| Institute on Taxation and Economic Policy | State and Local Tax Contributions of Undocumented Californians: County-by-County Data | 4/24/2017 |
| Institute on Taxation and Economic Policy | 10 Things You Should Know on Tax Day | 4/13/2017 |
| Institute on Taxation and Economic Policy | Who Pays Taxes in America in 2017? | 4/13/2017 |
| Institute on Taxation and Economic Policy | The U.S. Is One of the Least Taxed Developed Countries | 4/10/2017 |
| Institute on Taxation and Economic Policy | Testimony before the Alaska House Labor & Commerce Committee On House Bill 36 | 4/4/2017 |
| Institute on Taxation and Economic Policy | Assessing the Distributional Consequences of Alaska's House Bill 115 (Version L) | 3/28/2017 |
| Institute on Taxation and Economic Policy | Affordable Care Act Repeal Includes a $31 Billion Tax Cut for a Handful of the Wealthiest Ta | 3/17/2017 |
| Institute on Taxation and Economic Policy | Taxes and the On-Demand Economy | 3/15/2017 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants' State & Local Tax Contributions | 3/1/2017 |
| Institute on Taxation and Economic Policy | Combined Reporting of State Corporate Income Taxes: A Primer | 2/24/2017 |
| Institute on Taxation and Economic Policy | State Tax & Revenue Information | 1/31/2017 |
| Institute on Taxation and Economic Policy | State-by-State Tax Expenditure Reports | 1/31/2017 |
| Institute on Taxation and Economic Policy | Fairness Matters: A Chart Book on Who Pays State and Local Taxes | 1/26/2017 |
| Institute on Taxation and Economic Policy | State Estate and Inheritance Taxes | 12/21/2016 |
| Institute on Taxation and Economic Policy | The Federal Estate Tax: A Critical and Highly Progressive Revenue Source | 12/7/2016 |
| Institute on Taxation and Economic Policy | Fact Sheet: Preserving the Estate Tax | 12/7/2016 |
| Institute on Taxation and Economic Policy | Privatization, Waste, and Unfunded Projects: The Problems with Trump's Infrastructure Pro | 11/30/2016 |
| Institute on Taxation and Economic Policy | State Tax Preferences for Elderly Taxpayers | 11/28/2016 |
| Institute on Taxation and Economic Policy | Collecting Sales Taxes Owed on Internet Purchases | 11/18/2016 |
| Institute on Taxation and Economic Policy | Fact Sheet: Comparison of House GOP Tax Plan, Trump's Initial Tax Proposal and Trump's R | 11/15/2016 |
| Institute on Taxation and Economic Policy | The Short and Sweet on Taxing Soda | 10/28/2016 |
| Institute on Taxation and Economic Policy | Cigarette Taxes: Issues and Options | 10/18/2016 |
| Institute on Taxation and Economic Policy | State Tax Subsidies for Private K-12 Education | 10/12/2016 |

| Organization | Title | Date |
|---|---|---|
| Institute on Taxation and Economic Policy | Comment Letter to FASB on Income Tax Disclosure | 9/30/2016 |
| Institute on Taxation and Economic Policy | State Tax Codes as Poverty Fighting Tools | 9/15/2016 |
| Institute on Taxation and Economic Policy | Property Tax Circuit Breakers | 9/14/2016 |
| Institute on Taxation and Economic Policy | Reducing the Cost of Child Care Through State Tax Codes | 9/14/2016 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits | 9/14/2016 |
| Institute on Taxation and Economic Policy | Options for a Less Regressive Sales Tax | 9/14/2016 |
| Institute on Taxation and Economic Policy | How State Tax Changes Affect Your Federal Taxes: A Primer on the "Federal Offset" | 8/22/2016 |
| Institute on Taxation and Economic Policy | Indexing Income Taxes for Inflation: Why It Matters | 8/22/2016 |
| Institute on Taxation and Economic Policy | The Folly of State Capital Gains Tax Cuts | 8/17/2016 |
| Institute on Taxation and Economic Policy | Why Sales Taxes Should Apply to Services | 7/27/2016 |
| Institute on Taxation and Economic Policy | Income Tax Offers Alaska a Brighter Fiscal Future | 7/12/2016 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 7/11/2016 |
| Institute on Taxation and Economic Policy | Ryan Tax Plan Reserves Most Tax Cuts for Top 1 percent, Costs $4 Trillion Over 10 Years | 6/29/2016 |
| Institute on Taxation and Economic Policy | Distributional Analyses of Revenue Options for Alaska | 4/13/2016 |
| Institute on Taxation and Economic Policy | Higher Education Income Tax Deductions and Credits in the States | 3/22/2016 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants' State & Local Tax Contributions (2016) | 2/24/2016 |
| Institute on Taxation and Economic Policy | Tennessee Hall Tax Repeal Would Overwhelmingly Benefit the Wealthy, Raise Tennesseans | 2/23/2016 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits | 2/11/2016 |
| Institute on Taxation and Economic Policy | Tax Foundation Model Seeks to Revive Economic Voodoo | 2/11/2016 |
| Institute on Taxation and Economic Policy | Testimony before the Vermont Senate Committee on Finance: Tax Policy Issues with Legali: | 1/19/2016 |
| Institute on Taxation and Economic Policy | ITEP Comments to the Vermont Senate Committee on Finance: Tax Expenditure Evaluation | 1/13/2016 |
| Institute on Taxation and Economic Policy | A Primer on State Rainy Day Funds | 10/20/2015 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools | 9/17/2015 |
| Institute on Taxation and Economic Policy | Rewarding Work Through State Earned Income Tax Credits | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Tennessee is a "Low Tax State" Overall, But Not for Families Living in F | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: South Dakota is a "Low Tax State" Overall, But Not for Families Living | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Washington is a "Low Tax State" Overall, But Not for Families Living in | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Florida is a "Low Tax State" Overall, But Not for Families Living in Pove | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Texas is a "Low Tax State" Overall, But Not for Families Living in Power | 9/17/2015 |
| Institute on Taxation and Economic Policy | Low Tax for Whom?: Arizona is a "Low Tax State" Overall, But Not for Families Living in Pov | 9/17/2015 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 7/22/2015 |
| Institute on Taxation and Economic Policy | Pay-Per-Mile Tax is Only a Partial Fix | 6/24/2015 |
| Institute on Taxation and Economic Policy | Testimony: Adding Sustainability to the Highway Trust Fund | 6/17/2015 |
| Institute on Taxation and Economic Policy | Issues with Taxing Marijuana at the State Level | 5/6/2015 |

| | | |
|---|---|---|
| Institute on Taxation and Economic Policy | Undocumented Immigrants' State & Local Tax Contributions (2015) | 4/15/2015 |
| Institute on Taxation and Economic Policy | State Tax Preferences for Elderly Taxpayers | 3/23/2015 |
| Institute on Taxation and Economic Policy | Grocery Tax Exemption Is No Improvement for Idaho | 2/5/2015 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools | 9/18/2014 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 8/5/2014 |
| Institute on Taxation and Economic Policy | Options for Progressive Sales Tax Relief | 7/30/2014 |
| Institute on Taxation and Economic Policy | State Estate and Inheritance Taxes | 7/21/2014 |
| Institute on Taxation and Economic Policy | Pay-Per-Mile Tax is Only a Partial Fix | 5/28/2014 |
| Institute on Taxation and Economic Policy | STAMP is an Unsound Tool for Gauging the Economic Impact of Taxes | 5/21/2014 |
| Institute on Taxation and Economic Policy | Improving Tax Fairness with a State Earned Income Tax Credit | 5/15/2014 |
| Institute on Taxation and Economic Policy | Tennessee Hall Tax Repeal Would Overwhelmingly Benefit the Wealthy, Raise Tennesseans | 3/24/2014 |
| Institute on Taxation and Economic Policy | Personal Income Tax Reform: Improving the Fairness of Taxes in the District of Columbia | 11/12/2013 |
| Institute on Taxation and Economic Policy | Paying for Education Finance Reform in Colorado | 10/10/2013 |
| Institute on Taxation and Economic Policy | Low Tax for Who? | 9/19/2013 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools | 9/19/2013 |
| Institute on Taxation and Economic Policy | Washington is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | Texas is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | Tennessee is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | South Dakota is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | Florida is a "Low Tax State" Overall, But Not for Families Living in Poverty | 9/19/2013 |
| Institute on Taxation and Economic Policy | Arizona is a "Low Tax State" Overall, But Not for Families Living in Poverty | 8/19/2013 |
| Institute on Taxation and Economic Policy | A Closer Look at TABOR (Taxpayer Bill of Rights) | 8/19/2013 |
| Institute on Taxation and Economic Policy | Tax Expenditure Reports: A Vital Tool with Room for Improvement | 8/14/2013 |
| Institute on Taxation and Economic Policy | Tax Incentives: Costly for States, Drag on the Nation | 8/14/2013 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: An Ineffective Alternative to Real Sales Tax Reform | 7/24/2013 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants' State and Local Tax Contributions (2013) | 7/10/2013 |
| Institute on Taxation and Economic Policy | 5% Cut in Indiana's Income Tax is Stacked in Favor of the Wealthy | 4/26/2013 |
| Institute on Taxation and Economic Policy | Indiana Senate's Income Tax Cut: Just as Lopsided as the Governor's | 4/8/2013 |
| Institute on Taxation and Economic Policy | Kansas House and Senate Proposals Set the Stage for Tax Hikes on Poor and Middle-Income | 4/2/2013 |
| Institute on Taxation and Economic Policy | Governor Jindal's Tax Plan Would Increase Taxes on Poorest 60 Percent of Louisianans | 4/1/2013 |
| Institute on Taxation and Economic Policy | States with "High Rate" Income Taxes are Still Outperforming No-Tax States | 2/28/2013 |
| Institute on Taxation and Economic Policy | Laffer's New Job Growth Factoid is All Rhetoric and No Substance | 2/27/2013 |
| Institute on Taxation and Economic Policy | IDACorp-- Biggest Winner Under Property Tax Plan-- Pays Nothing in State Income Taxes | 2/13/2013 |
| Institute on Taxation and Economic Policy | Kansas Governor's New Plan Increases Taxes on Poor Yet Slashes Revenue by $340 Million | 2/1/2013 |

| | | |
|---|---|---|
| Institute on Taxation and Economic Policy | Who Pays? (Fourth Edition) | 1/30/2013 |
| Institute on Taxation and Economic Policy | More Inaccuracies, Bigger Omissions: Arthur Laffer's Newest Study of Income Tax Repeal Fa | 1/23/2013 |
| Institute on Taxation and Economic Policy | Proposal to Eliminate Income Taxes Amounts to a Tax Increase on Bottom 80 Percent of Lo | 1/11/2013 |
| Institute on Taxation and Economic Policy | Previewing Tax Reform in the States: National Trends and State-specific Prospects for 2013 | 12/13/2012 |
| Institute on Taxation and Economic Policy | Tax Principles: Building Blocks of A Sound Tax System | 12/1/2012 |
| Institute on Taxation and Economic Policy | Five Steps Toward a Better Tax Expenditure Debate | 10/1/2012 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools | 9/13/2012 |
| Institute on Taxation and Economic Policy | Most of Indiana Tax Rate Cut Would Flow to Upper-Income Taxpayers | 8/27/2012 |
| Institute on Taxation and Economic Policy | Corporate Income Tax Apportionment and the "Single Sales Factor" | 8/1/2012 |
| Institute on Taxation and Economic Policy | State Estate and Inheritance Taxes | 8/1/2012 |
| Institute on Taxation and Economic Policy | Four Tax Ideas for Jobs-Focused Governors | 7/15/2012 |
| Institute on Taxation and Economic Policy | The Progressive Income Tax: An Essential Element of Fair and Sustainable State Tax System | 7/1/2012 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: A Boondoggle | 7/1/2012 |
| Institute on Taxation and Economic Policy | Tax Bill Signed by Governor Brownback Makes Kansas an Outlier | 5/24/2012 |
| Institute on Taxation and Economic Policy | Latest Kansas Tax Bill Carries $680 Million Price Tag and Raises Taxes on Those Least Able t | 5/17/2012 |
| Institute on Taxation and Economic Policy | Three Strategies for Making Enacted Kansas Tax Plan Less Unfair and Less Costly | 5/10/2012 |
| Institute on Taxation and Economic Policy | Kansas Tax Bill Would Cost $600 Million a Year While Hiking Taxes on Low-Income Families | 5/8/2012 |
| Institute on Taxation and Economic Policy | How Federal Tax Reform Can Help or Hurt State and Local Governments | 4/25/2012 |
| Institute on Taxation and Economic Policy | Regarding Proposals to Increase Taxes on Upper-Income Rhode Islanders | 4/24/2012 |
| Institute on Taxation and Economic Policy | Repealing Estate Tax Will Not Create An Economic Boom | 4/1/2012 |
| Institute on Taxation and Economic Policy | Idaho House Tax Plan Stacked In Favor of the Wealthy | 3/24/2012 |
| Institute on Taxation and Economic Policy | Alaska Senate State Affairs Committee Regarding SB 29, The Alaska Tax Break Transparency, | 3/6/2012 |
| Institute on Taxation and Economic Policy | Tax Plans Put Kansas on Road Away from Fair & Adequate Tax Reform | 3/3/2012 |
| Institute on Taxation and Economic Policy | Testimony on Reinstating Maryland's "Millionaires' Tax" | 2/29/2012 |
| Institute on Taxation and Economic Policy | Arthur Laffer Regression Analysis is Fundamentally Flawed, Offers No Support for Economic | 2/15/2012 |
| Institute on Taxation and Economic Policy | "High Rate" Income Tax States Are Outperforming No-Tax States | 2/8/2012 |
| Institute on Taxation and Economic Policy | Kansas Governor Tax Proposal: Wealthy Kansans Pay Less, Poor and Middle-Income Kansan | 1/11/2012 |
| Institute on Taxation and Economic Policy | Costs of Personal Income Tax Repeal in Kansas | 1/11/2012 |
| Institute on Taxation and Economic Policy | Tax Expenditures: Spending By Another Name | 10/4/2011 |
| Institute on Taxation and Economic Policy | Cigarette Taxes: Issues and Options | 10/1/2011 |
| Institute on Taxation and Economic Policy | Uncertain Benefits, Hidden Costs: The Perils of State-Sponsored Gambling | 10/1/2011 |
| Institute on Taxation and Economic Policy | State Tax Codes As Poverty Fighting Tools (2011) | 9/22/2011 |
| Institute on Taxation and Economic Policy | Rewarding Work Through Earned Income Tax Credits | 9/1/2011 |
| Institute on Taxation and Economic Policy | State Income Taxes and Older Adults | 9/1/2011 |

NJAPP0150

| | | |
|---|---|---|
| Institute on Taxation and Economic Policy | State Treatment of Itemized Deductions | 9/1/2011 |
| Institute on Taxation and Economic Policy | Property Tax Circuit Breakers | 9/1/2011 |
| Institute on Taxation and Economic Policy | The Folly of State Capital Gains Tax Cuts | 9/1/2011 |
| Institute on Taxation and Economic Policy | Split Roll Property Taxes | 9/1/2011 |
| Institute on Taxation and Economic Policy | Reducing the Cost of Child Care Through Income Tax Credits | 9/1/2011 |
| Institute on Taxation and Economic Policy | Property Tax Homestead Exemptions | 9/1/2011 |
| Institute on Taxation and Economic Policy | Capping Property Taxes: A Primer | 9/1/2011 |
| Institute on Taxation and Economic Policy | Taxes and Economic Development 101 | 9/1/2011 |
| Institute on Taxation and Economic Policy | Fighting Back: Accountable Economic Development Strategies | 9/1/2011 |
| Institute on Taxation and Economic Policy | Examining Economic Development Research | 9/1/2011 |
| Institute on Taxation and Economic Policy | Texas is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Washington is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Tennessee is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Florida is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Arizona is a Low Tax State, But Not for Families Living in Poverty | 8/14/2011 |
| Institute on Taxation and Economic Policy | Why States That Offer the Deduction for Federal Income Taxes Paid Get it Wrong | 8/1/2011 |
| Institute on Taxation and Economic Policy | How State Personal Income Taxes Work | 8/1/2011 |
| Institute on Taxation and Economic Policy | Indexing Income Taxes for Inflation: Why It Matters | 8/1/2011 |
| Institute on Taxation and Economic Policy | How State Tax Changes Affect Your Federal Taxes: A Primer on the "Federal Offset" | 8/1/2011 |
| Institute on Taxation and Economic Policy | How Property Taxes Work | 8/1/2011 |
| Institute on Taxation and Economic Policy | Income Tax Simplification: How to Achieve It | 8/1/2011 |
| Institute on Taxation and Economic Policy | Tax Policy Nuts and Bolts: Understanding the Tax Base and Tax Rate | 8/1/2011 |
| Institute on Taxation and Economic Policy | Introduction to ITEP's Tax Incidence Analysis | 8/1/2011 |
| Institute on Taxation and Economic Policy | "Nowhere Income" and the Throwback Rule | 8/1/2011 |
| Institute on Taxation and Economic Policy | Sales Tax Holidays: A Boondoggle | 7/14/2011 |
| Institute on Taxation and Economic Policy | How Can States Collect Taxes Owed on Internet Sales? | 7/1/2011 |
| Institute on Taxation and Economic Policy | Options for Progressive Sales Tax Relief | 7/1/2011 |
| Institute on Taxation and Economic Policy | Should Sales Taxes Apply to Services? | 7/1/2011 |
| Institute on Taxation and Economic Policy | How Sales and Excise Taxes Work | 7/1/2011 |
| Institute on Taxation and Economic Policy | Illinois Must Ignore CME's Tax Tantrum | 6/11/2011 |
| Institute on Taxation and Economic Policy | ITEP's Testimony on Combined Reporting Legislation | 5/19/2011 |
| Institute on Taxation and Economic Policy | ITEP's Testimony on Tax Expenditure Procedural Reform | 5/19/2011 |
| Institute on Taxation and Economic Policy | Connecticut Takes a Stand for Progressive Tax Policy and a Balanced Budget Approach | 5/14/2011 |
| Institute on Taxation and Economic Policy | States Should Not Allow Amazon.com to Bully Them into Forgoing Sales Tax Reform | 4/14/2011 |

| Organization | Title | Date |
|---|---|---|
| Institute on Taxation and Economic Policy | ITEP's Testimony on Sales Tax Modernization Proposal | 4/13/2011 |
| Institute on Taxation and Economic Policy | Don't Give Up on Pease: States Can Decouple from Recent Federal Tax Cuts for Wealthy Ite | 4/10/2011 |
| Institute on Taxation and Economic Policy | In It for the Long Haul: Why Concerns over Personal Income Tax "Volatility" Are Overblown | 3/31/2011 |
| Institute on Taxation and Economic Policy | Should Illinois Tax Retirement Income? | 3/24/2011 |
| Institute on Taxation and Economic Policy | ITEP's Testimony on EITC Legislation | 3/16/2011 |
| Institute on Taxation and Economic Policy | Topsy-Turvy: State Income Tax Deductions for Federal Income Taxes Turn Tax Fairness on it | 3/10/2011 |
| Institute on Taxation and Economic Policy | Five Reasons to Reinstate Maryland's "Millionaires' Tax" | 3/9/2011 |
| Institute on Taxation and Economic Policy | The ITEP Guide to Fair State and Local Taxes | 3/3/2011 |
| Institute on Taxation and Economic Policy | Dear Wall Street Journal: No Need to File a Missing Persons Report, Oregon's High-income ` | 12/22/2010 |
| Institute on Taxation and Economic Policy | How the Bush Tax Cuts Affect State Revenues | 12/15/2010 |
| Institute on Taxation and Economic Policy | The Good, the Bad and the Ugly: 2010 State Tax Policy Changes | 12/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Washington's Fundamental Tax Mismatch: Washington is a Low Tax Sta | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Texas' Fundamental Tax Mismatch: Texas is a Low Tax State, But Not fo | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Tennessee's Fundamental Tax Mismatch: Tennessee is a Low Tax State, | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Florida's Fundamental Tax Mismatch: Florida is a Low Tax State, But No | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Arkansas Fundamental Tax Mismatch: Arkansas is a Low Tax State, But | 9/15/2010 |
| Institute on Taxation and Economic Policy | Census Data Reveal Arizona's Fundamental Tax Mismatch: Arizona is a Low Tax State, But N | 9/15/2010 |
| Institute on Taxation and Economic Policy | Credit Where Credit is (Over) Due: Four State Tax Policies Could Lessen the Effect that State | 8/24/2010 |
| Institute on Taxation and Economic Policy | "Writing Off" Tax Giveaways: How States Can Help Balance Their Budgets by Reforming or E | 8/13/2010 |
| North Carolina Budget and Tax Center | ITEP's Testimony on TRAC Sales and Use Tax Proposal | 5/25/2010 |
| North Carolina Budget and Tax Center | BTC Report: The Governor's 2010-11 Budget: A reasonable, though painful, approach to the | 4/8/2010 |
| North Carolina Budget and Tax Center | BTC REPORTS: All Hands on Deck: Predictions for the FY 2010-11 and FY 2011-12 budget sh | 1/15/2010 |
| Institute on Taxation and Economic Policy | A Capital Idea | 9/1/2009 |
| North Carolina Budget and Tax Center | BTC REPORTS: The 2009-2011 State Budget: Trifecta of spending cuts, tax increases and fed | 9/1/2009 |
| North Carolina Budget and Tax Center | BTC REPORTS: The House budget: deteriorating revenue picture forces tough decisions | 6/1/2009 |
| North Carolina Budget and Tax Center | BTC REPORTS: The Senate's Proposed Budget: Overall Spending Target Mirrors Governor's | 4/1/2009 |
| North Carolina Budget and Tax Center | BTC BRIEF: Beyond the Crystal Ball: Projecting the 2009-10 General Fund Budget Shortfall | 2/1/2009 |

Misha Hill's Publications

| Organization | Title | Date |
|---|---|---|
| Institute on Taxation and Economic Policy | All Bets are Off: State-Sponsored Sports Betting Isn't Worth the Risk | 6/13/2018 |
| Institute on Taxation and Economic Policy | In the Face of the Trump Administration's Anti-Immigrant Agenda, We Must Rely on Evi | 5/4/2018 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants | 4/30/2018 |
| Institute on Taxation and Economic Policy | Trends We're Watching in 2018, Part 5: 21st Century Consumption Taxes | 4/20/2018 |
| Institute on Taxation and Economic Policy | We Must Protect Dreamers | 1/16/2018 |
| Institute on Taxation and Economic Policy | All I Want for Christmas is a Clean DREAM Act | 12/13/2017 |
| Institute on Taxation and Economic Policy | Poverty is Down, But State Tax Codes Could Bring It Even Lower | 9/15/2017 |
| Institute on Taxation and Economic Policy | Besides Eviscerating the Safety Net, Trump Budget Would Put States in a Fiscal Bind | 5/26/2017 |
| Institute on Taxation and Economic Policy | Trump Budget Plan Would Eliminate Child Tax Credits for Working Families Due to Paren | 5/23/2017 |
| Institute on Taxation and Economic Policy | State & Local Tax Contributions of Young Undocumented Immigrants (2017) | 4/25/2017 |
| Institute on Taxation and Economic Policy | Young Undocumented Immigrants Pay Taxes Too | 4/25/2017 |
| Institute on Taxation and Economic Policy | What to Watch in the States: State Earned Income Tax Credits (EITC) on the Move | 3/24/2017 |
| Institute on Taxation and Economic Policy | A Tax Perspective on International Women's Day | 3/8/2017 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants Pay Taxes | 3/2/2017 |
| Institute on Taxation and Economic Policy | Undocumented Immigrants' State & Local Tax Contributions | 3/1/2017 |
| Institute on Taxation and Economic Policy | What to Watch in the States: Modernizing Sales Taxes for a 21st Century Economy | 2/15/2017 |
| Institute on Taxation and Economic Policy | Lawmakers Should Not Use Disproven Trickle-Down Myth to Ramrod Tax Cuts for the Ri | 2/8/2017 |
| Institute on Taxation and Economic Policy | The Short and Sweet on Taxing Soda | 10/28/2016 |
| Center on Budget and Policy Priorities | State General Assistance Programs Are Weakening Despite Increased Need | 7/9/2015 |

NJAPP0153

# Exhibit 8

NJAPP0154

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,              )
                                       )
      Plaintiffs,                )
                                       )
    v.                              )   Case No. 1:18-CV-68
                                       )
UNITED STATES OF AMERICA, *et al.*,    )
                                       )
      Defendants,                )
                                       )
KARLA PEREZ, *et al.*,                 )
                                       )
      Defendant-Intervenors,     )
and                                    )
                                       )
STATE OF NEW JERSEY,                   )
                                       )
      Proposed Defendant-Intervenor.  )

## DECLARATION OF ROSE ARACKATHARA

I, Rose Arackathara, hereby declare:

1. I am 31 years old and live in Bloomfield, New Jersey. I am a Family Service Specialist at the New Jersey Department of Children and Families (DCF), Division of Child Protection and Permanency (DCP&P).

2. During the past academic year I served as a Field Instructor for the Baccalaureate Child Welfare Education Program (BCWEP). BCWEP is a consortium of undergraduate social work programs in New Jersey that works in concert with the New Jersey Department of Children and Families (DCF), Division of Child Protection & Permanency (DCP&P). BCWEP provides prestigious, highly competitive yearlong internships and two-year employment contracts for students graduating from undergraduate social work programs.

This program makes it possible for our Division to recruit, train, and employ top-notch social work students.

3. From approximately September 2017 to April 2018 I served as Field Instructor to Cinthia Osorio, an undergraduate social work intern in the BCWEP program. Cinthia worked under my supervision, primarily in the Intake Unit. I had an opportunity to closely observe her work.

4. Cinthia teamed up with experienced social workers to conduct initial home visits in Morris County, New Jersey. She and my other colleagues conducted these intake visits in response to referrals involving potential abuse or neglect or other child welfare concerns. They gathered information to determine whether the children at issue faced immediate danger, and referred families to community and contracted services for ongoing assistance.

5. Cinthia also shadowed a social worker in the Passaic County Permanency Unit, where she worked with families to achieve safe, permanent living situations for children with histories of abuse or neglect.

6. Throughout her internship, I observed Cinthia's natural rapport with the families she visited. She has a particular gift for identifying and articulating people's strengths and for making people feel comfortable. Child welfare workers have had a hard time building trust with parents, since our agency has the power to take children out of the home when they are in need of protection. Cinthia's approach to this work sent the message to parents and children alike that our agency was there to help. For example, Cinthia was able to build trust with an adolescent, and obtained information from this adolescent a more experienced social worker could not.

7. Because Cinthia is a DACA recipient who grew up in a low-income immigrant household and speaks Spanish, she was able to truly understand DCP&P's clients and the challenges they have faced, and connect with them in a natural way.

8. In early Spring 2018, I learned that Cinthia had been diagnosed with cancer. Even after beginning chemotherapy, she remained highly motivated to complete her internship, and worked from home so that she could continue to serve New Jersey's families and build her social work skills. Among other projects, she worked on building her skills in the "Nurtured Hearts" approach, which is utilized in working with children with ADHD and can benefit children with histories of trauma.

9. In Spring 2018 Cinthia recently graduated from Centenary College with her Bachelors of Social Work (B.S.W.) degree. She is due to begin fulltime employment at DCP&P this August.

10. As a fulltime DCP&P social worker, Cinthia will play a critical role in protecting New Jersey's most vulnerable children. If DACA is terminated, Cinthia would be unable to work for DCP&P, and our state's children will lose a particularly skilled, dedicated, and compassionate protector.

11. The 2017-2018 cohort of BCWEP interns included several other recipients of Deferred Action for Childhood Arrivals (DACA). These young people will all begin full-time jobs with DCP&P this summer, and they will be filling a critical need in our state. Should DACA be terminated, DCP&P will lose critical current and future employees, and our state will lose some of our strongest and most effective child advocates.

I declare under penalty of perjury that the foregoing is correct to the best of my information and belief.

_____
Rose Arackathara

5/18/18
Date

NJAPP0158

# Exhibit 9

NJAPP0159

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 1:18-CV-68 |
| ) | |
| UNITED STATES OF AMERICA, *et al.*, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| KARLA PEREZ, *et al.*, ) | |
| ) | |
| Defendant-Intervenors, ) | |
| and ) | |
| ) | |
| STATE OF NEW JERSEY, ) | |
| ) | |
| Proposed Defendant-Intervenor. ) | |

<u>**SUPPLEMENTAL DECLARATION OF TOM K. WONG**</u>

I, Tom K. Wong, declare as follows:

1.      In this litigation, I previously submitted a declaration dated and sworn to on May 16, 2018, and exhibits.  I am resubmitting that declaration and exhibits here as <u>**Exhibit A**</u>.

2.      In the past four years, I have testified as an expert at trial in the case of *El Cenizo, Texas, et al. v Texas* and have also testified as an expert by deposition in the case of *United States of America v. California*.

3.      I am being paid an estimated $10,000 to $12,000 for my services in connection with this litigation.

NJAPP0160

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on June 14, 2018 in San Diego, California.

Dr. Tom K. Wong

2

NJAPP0161

Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, *et al.*,          )
                                )
      Plaintiffs,          )
                                )
    v.                    )  Case No. 1:18-CV-68
                                )
UNITED STATES OF AMERICA, *et al.*,  )
                                )
      Defendants,         )
                                )
KARLA PEREZ, *et al.*,        )
                                )
      Defendant-Intervenors,  )
and                        )
                                )
STATE OF NEW JERSEY,      )
                                )
      Proposed Defendant-Intervenor.  )

## DECLARATION OF TOM K. WONG

I, Tom K. Wong, declare as follows:

1.     My name is Tom K. Wong and I am over eighteen years of age. I have personal knowledge of and could testify in Court concerning the following statements of fact.

2.     I am an Associate Professor with tenure at the University of California, San Diego (UCSD). I work in the political science department, which is consistently ranked by U.S. News & World Report as one of the top ten political science departments nationally. I am also the Director of the International Migration Studies Program Minor at UCSD.

3.     I am an expert on immigration politics and policy, which includes the Deferred Action for Childhood Arrivals (DACA) policy. I have written two peer-reviewed

books and several peer-reviewed journal articles, book chapters, and reports on these subjects. My most recent research on DACA is a national survey of 3,063 DACA recipients conducted in August 2017 (henceforth referred to as the "2017 DACA survey"). The 2017 DACA survey is in addition to two peer-reviewed journal articles on DACA (*International Migration Review* and *Journal on Migration and Human Security*), another forthcoming peer-reviewed journal article on DACA (*Social Problems*), one book-length monograph (supported by a grant from the U.S. Department of Homeland Security [DHS]), and three other reports based on national surveys that I have conducted of DACA recipients.

4.  I received a Ph.D. in political science at the end of the 2010-2011 academic year. I was a post-doctoral research fellow during the 2011-2012 academic year. I joined the political science department at UCSD during the 2012-2013 academic year. I served as an advisor to the White House Initiative on Asian Americans and Pacific Islanders (WHIAAPI), where I worked on the immigration portfolio, during the 2015-2016 academic year.

5.  I previously testified as an expert witness in the case, *City of El Cenizo, et. al. v. State of Texas, et. al.*

6.  I am not being compensated by the State of New Jersey.

7.  I have attached a true and complete copy of my curriculum vitae as Exhibit A to this Declaration. I have also attached a true and complete copy of the 2017 DACA survey as Exhibit B to this Declaration.

**DACA**

2

8.   Since it was first announced on June 15, 2012, the Deferred Action for Childhood Arrivals policy has provided temporary relief from deportation and work authorization to 793,026 people.[1] As of September 4, 2017, there are 689,900 active DACA recipients.[2]

### 2017 National Survey of DACA Recipients

9.   From August 1, 2017 to August 20, 2017, I conducted a national online survey of DACA recipients. The resulting survey is the largest study to date of DACA recipients with a sample size of 3,063 respondents in forty-six states plus the District of Colombia.

10.   Methodologically, several steps were taken to account for the known sources of bias that can result from online panels. To prevent ballot stuffing, meaning one person submitting multiple responses, incentives were not given for each completed survey that was submitted. Moreover, the online survey platform used (Qualtrics) was programmed to prevent one IP address from submitting multiple responses. To prevent spoiled ballots, meaning people who responded to the survey who were not undocumented, I used a unique validation test for undocumented status. Multiple questions were asked about each respondent's migratory history. These questions were asked during different parts of the

---

[1] Based on the most recent publicly available data from U.S. Citizenship and Immigration Services (USCIS) at the time of this writing, which is up to June 30, 2017. USCIS provides quarterly reports on DACA. *See* https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20 Data/All%20Form%20Types/DACA/daca_performancedata fy2017 qtr3.pdf.

[2] The lesser 689,900 figure represents the total number of individuals who, as of September 4, 2017, were "active DACA recipients." For example, those who received DACA may have adjusted to lawful permanent resident (LPR) status.
https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20 Data/All%20Form%20Types/DACA/daca_population_data.pdf.

NJAPP0165

survey. When a question was repeated, it was posed using different wording. For example, "How old were you when you first came to the U.S.?" and, "In what year did you first come to the U.S.?" (current age was used to tether these answers). If there was agreement in the answers, meaning there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting sample. If there were inconsistencies, the respondent was excluded. Also, Facebook ads were used to improve the geographic representativeness of the resulting sample, as well as to recruit respondents who were outside of the networks of the organizations that conducted outreach for the survey. Because there is no directory of undocumented immigrants from which to randomly sample from, researchers need to partner with organizations that interact with undocumented immigrants to conduct such surveys. The outreach partners were United We Dream (UWD), the National Immigration Law Center (NILC), and the Center for American Progress (CAP). These partners distributed the survey link to their respective email lists. Given the nature of online opt-in surveys, it is not possible to construct a valid margin of error. Nevertheless, the survey is methodologically rigorous and sound. Indeed, a peer-reviewed academic journal on DACA based on survey results obtained using the methods described above is forthcoming in a top sociology journal.

11. Evaluating the representativeness of the survey sample requires current and complete data on the characteristics of DACA recipients. The only publicly available data provided by U.S. Citizenship and Immigration Services (USCIS) in its quarterly DACA statistics that are both current and complete is the geographic

<div align="center">4</div>

breakdown of DACA recipients at the state level.[3] Using these data, a two-sample Kolmogorov-Smirnov (K-S) test of equality of distributions can be run to evaluate how well the survey sample matches the actual distribution of DACA recipients by state. The results of the K-S test of equality of distributions shows that the state-by-state breakdown of the survey sample is representative of the state-by-state breakdown of all DACA recipients ($p$ = .570).[4]

## Characteristics of DACA Recipients

12.     The average age of respondents is 25.2.[5] The average age that respondents first

---

[3] USCIS also provides publicly available data on the country of birth of DACA recipients, but these data are incomplete, as only the top twenty-five countries of birth are listed (and one of these is labeled "Unknown"). USCIS has analyzed the demographic characteristics of DACA recipients, but this initial analysis was based on data from August 2012 to September 2013. *See* https://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Deferred%20Action%20for%20Childhood%20Arriv als/USCIS-DACA-Characteristics-Data-2014-7-10.pdf. More recently, USCIS published an updated analysis (September 2017). A Kolmogorov-Smirnov (K-S) test of equality of distributions shows that the state-by-state breakdown of the survey sample is representative of the state-by-state breakdown of all "active DACA recipients" ($p$ = .557) that USCIS analyzed. The null hypothesis for the K-S test is that the two distributions are statistically the same. A $p$ value of .557 means that we are not confident that we can reject the null hypothesis. In other words, this result means we are only 44% confident (1 minus .557) that we can reject the null hypothesis (and thus say that the two distributions are different). By convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result. Moreover, the September 2017 USCIS report indicates that the average age of active DACA recipients is 23.8. The average age of the survey sample is similar at 25.2. The most recent USCIS data do not provide detailed cross-tabulations sufficient for weighting purposes.

[4] That is, there is no evidence to suggest that the distribution of survey respondents by state and the actual number of DACA recipients by state is statistically significantly different. Moreover, analyzing and comparing the unweighted and weighted results show that the findings are substantively similar throughout. As previously noted, the null hypothesis for the K-S test is that the two distributions are statistically the same. A $p$ value of .570 means that we are not confident that we can reject the null hypothesis. In other words, this result means we are only 43% confident (1 minus .570) that we can reject the null hypothesis (and thus say that the two distributions are different). By convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result.

[5] As previously noted, a September 2017 USCIS report shows that the average age of "active DACA recipients" is 23.8. The average age of the survey sample is thus similar to the average age of active DACA recipients as reported by USCIS.

NJAPP0167

arrived in the U.S. is 6.5.[6] The average number of years that respondents have lived in the U.S. is 18.8.[7] Regarding race and ethnicity, 93% of respondents identify as Hispanic/Latino, 4% identify as Asian or Pacific Islander, 2% identify as White, and 1% identify as Black.[8] Also, 10% of respondents personally identify as lesbian, gay, bisexual, or transgender (LGBT).

### DACA and Economic Integration

13.　　DACA has been critical in improving the economic integration of DACA recipients, which is evidenced by their employment rates, their employment in "white collar," higher-skilled jobs, greater job mobility, higher wages, more financial independence, and increased consumer purchasing power, among other indicators.

14.　　Regarding employment, the data show that 91% of DACA recipients are currently employed. Among those 25 years and older, this percentage climbs to 93%. Moreover, the data show that at least 72% of the top twenty-five Fortune 500 companies employ DACA recipients.

15.　　DACA recipients are most likely to work in *Office and Administrative Support Occupations* followed by *Sales and Related Occupations* and then *Management, Business, Science, and Arts Occupations*. U.S. Census occupation categories are

---

[6] In other words, on average, DACA recipients first entered the U.S. during kindergarten or first grade.

[7] Moreover, 38.5% of respondents have lived in the U.S. for 20 years or more.

[8] USCIS does not report race and ethnicity in its quarterly DACA statistics. However, the large majority of the "Top Countries of Origin" listed in the USCIS quarterly reports are Latin American countries.

6

NJAPP0168

used to distinguish between types of occupations.[9] Table 1 lists the top ten occupation categories for DACA recipients.

Table 1

| | DACA |
|---|---|
| Office and Administrative Support Occupations | 16.5% |
| Sales and Related Occupations | 11.6% |
| Management, Business, Science, and Arts Occupations | 10.8% |
| Education, Training, and Library Occupations | 9.6% |
| Food Preparation and Serving Occupations | 6.8% |
| Healthcare Support Occupations | 6.4% |
| Healthcare Practitioners and Technical Occupations | 4.6% |
| Community and Social Services Occupations | 4.3% |
| Financial Specialists | 3.4% |
| Legal Occupations | 3.0% |
| Computer and Mathematical Occupations | 3.0% |
| Other | 19.9% |

16.    Table 2 below compares the occupations of DACA recipients to native-born workers between the ages of sixteen and thirty-five. As the table shows, DACA recipients are more likely to work in "white-collar" higher-skilled occupations such as *Management, Business, Science, and Arts Occupations*, H*ealthcare Support Occupations*, and *Legal Occupations*, and they are less likely to work in "blue-collar" lesser-skilled occupations such as *Building and Grounds Cleaning and Maintenance Occupations*, *Construction and Extraction Occupations*, and *Food Preparation and Serving Occupations*.

---

[9] For detailed occupation listing, see https://usa.ipums.org/usa/volii/c2ssoccup.shtml.

7

NJAPP0169

Table 2

| | DACA | Native Born | Diff |
|---|---|---|---|
| Management, Business, Science, and Arts Occupations | 10.8% | 6.4% | +4.4% |
| Education, Training, and Library Occupations | 9.6% | 5.9% | +3.7% |
| Healthcare Support Occupations | 6.4% | 3.1% | +3.3% |
| Community and Social Services Occupations | 4.3% | 1.5% | +2.7% |
| Office and Administrative Support Occupations | 16.5% | 13.9% | +2.6% |
| Legal Occupations | 3.0% | 0.9% | +2.2% |
| Financial Specialists | 3.4% | 1.9% | +1.5% |
| Computer and Mathematical Occupations | 3.0% | 2.3% | +0.8% |
| Architecture and Engineering Occupations | 2.1% | 1.5% | +0.6% |
| Business Operations Specialists | 2.8% | 2.3% | +0.4% |
| Life, Physical, and Social Science Occupations | 1.2% | 0.8% | +0.4% |
| Extraction Workers | 0.1% | 0.2% | -0.1% |
| Farming, Fishing, and Forestry Occupations | 0.1% | 0.6% | -0.5% |
| Healthcare Practitioners and Technical Occupations | 4.6% | 5.2% | -0.5% |
| Arts, Design, Entertainment, Sports, and Media | 1.5% | 2.2% | -0.7% |
| Military Specific Occupations | 0.0% | 0.8% | -0.8% |
| Building and Grounds Cleaning and Maintenance | 1.4% | 2.8% | -1.4% |
| Sales and Related Occupations | 11.6% | 13.0% | -1.4% |
| Protective Service Occupations | 0.8% | 2.6% | -1.7% |
| Construction and Extraction Occupations | 1.8% | 3.9% | -2.1% |
| Installation, Maintenance, and Repair Workers | 0.8% | 3.2% | -2.3% |
| Personal Care and Service Occupations | 2.0% | 4.4% | -2.4% |
| Production Occupations | 2.6% | 5.1% | -2.5% |
| Transportation and Material Moving Occupations | 2.7% | 5.7% | -3.0% |
| Food Preparation and Serving Occupations | 6.8% | 9.9% | -3.0% |

Note: percentages may not sum to 100 due to rounding. The column "DACA" refers to DACA recipients. "Native Born" refers to native-born workers who are (a) employed and are (b) between the ages of sixteen and thirty-five. These data come from the U.S. Census 2011-2015 American Community Survey (ACS) 5-year Public Use Microdata, which represents the most up-to-date 5-year file. "Diff" is the difference in the percentage between DACA recipients and comparable native-born workers.

17.      Moreover, after receiving DACA:

     a.      54% got their first job;

     b.      69% got a job with better pay;

     c.      54% got a job that better fits their education and training;

     d.      54% got a job that better fits their long-term career goals;

8

NJAPP0170

e.      57% got a job with health insurance or other benefits[10];

f.      56% got a job with improved work conditions; and

g.      5% started their own businesses.[11]

Table 3 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 3

|  |  |  | ≥ 25 |
|---|---|---|---|
| Got my first job | ........................................ | 54.2% | 35.3% |
| Got a job with better pay | ........................................ | 68.5% | 77.7% |
| Got a job that better fits my education and training | ........................................ | 54.2% | 59.6% |
| Got a job that better fits my long-term career goals | ........................................ | 53.9% | 61.4% |
| Got a job with health insurance or other benefits | ........................................ | 57.3% | 66.9% |
| Got a job with improved work conditions | ........................................ | 56.2% | 64.4% |
| Started my own business | ........................................ | 5.4% | 7.9% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

18.     Regarding earnings, the data make clear that DACA is having a positive and significant effect on the wages of DACA recipients.

19.     The average hourly wage of DACA recipients has increased by 69% since receiving DACA. Among those 25 years and older, the average hourly wage has increased by 81% since receiving DACA. I have noted in previous research that more work (and time) may be needed to parse out the short- and long-run wage effects of DACA, as well as to answer the question of whether short-run gains in wages represent a plateau in earnings or if more robust long-run wage effects exist. This continues to be true. However, because of the continued upward trajectory in the observed wages of DACA recipients, it is likely that there is even

---

[10] 49.2% of respondents in my 2016 DACA survey reported that they obtained health insurance through their employer and 46.8% of respondents reported that they had "Received health care using [their] newly obtained health insurance."
[11] This rate of business starts is higher than the rate of business starts for the American public as a whole (3.1%).

NJAPP0171

more room for wage growth as DACA recipients move further along in their careers. These gains will disappear if these individuals lose their DACA status and the accompanying work authorization.

20. The data also show that average annual earnings among DACA recipients is $36,232. Among those 25 years and older, it is $41,621. A multivariate Ordinary Least Squares (OLS) regression regressing annual earnings on age shows that annual earnings increase by $1,583 for each year that a DACA recipient grows older ($p < .001$).[12] These gains will also disappear if these individuals lose their DACA status and the accompanying work authorization.

21. Higher wages have meant greater financial independence and consumer purchasing power for DACA recipients:

a. 69% reported that after their DACA application was approved, "[they] have been able to earn more money, which has helped [them] become financially independent";

b. 71% reported that after their DACA application was approved, "[they] have been able to earn more money, which has helped [their] family financially";

c. Among those who have a bachelor's degree or higher and are no longer in school, 27% reported paying off some or all of their student loans after their DACA application was approved;

---

[12] The model controls for number of years in the U.S., whether the DACA recipient is in school, whether the DACA recipient has a bachelor's degree or higher, and state-level fixed effects. The null hypothesis for age is that age has no effect on annual earnings. A $p$ value of less than .001 means that we are over 99.9% confident (1 minus < .001) that we can reject the null hypothesis that age has no effect on annual earnings and thus say that age is positively and statistically significantly related to annual earnings. To recall, by convention, scholars tend to accept a $p$ value of .05 or less as being statistically significant. A $p$ value of .05 means that we are 95% confident (1 minus .05) in a result.

NJAPP0172

    d.      65% purchased their first car after their DACA application was approved; and

    e.      16% purchased their first home after their DACA application was approved.

Table 4 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

Table 4

| | | | ≥ 25 |
|---|---|---|---|
| I have been able to earn more money, which has helped me become financially independent | ................................. | 69.0% | 73.4% |
| I have been able to earn more money, which has helped my family financially | ................................. | 70.8% | 73.7% |
| Paid off some/all of my student loans | ................................. | 27.1% | 27.4% |
| Bought my first car | ................................. | 64.5% | 67.2% |
| Bought a home | ................................. | 15.7% | 23.5% |

Note: percentages do not sum to 100 as individuals may select all that apply. *n* = 1,662 for all respondents 25 years and older.

22.      Higher wages are indicative of the broader positive economic impact of DACA. For example, higher wages translate into more in Federal Insurance Contributions Act (FICA) contributions, which are mandatory payroll deductions for Social Security and Medicare. Using data on wages and earnings from the 2017 DACA survey, I estimate that DACA recipients will add $39.3 billion in Social Security and Medicare contributions (half in employee contributions and half in employer contributions) over a ten-year period.[13] These contributions will disappear if these individuals lose their DACA status and the accompanying work authorization.[14]

---

[13] This breaks down into $31.8 billion in Social Security contributions and $7.4 billion in Medicare contributions. For a detailed explanation of the methodology used to estimate Social Security and Medicare contributions, see https://www.ilrc.org/sites/default/files/resources/2017-09-29_draining_the_trust_funds_final.pdf.

[14] Higher wages also translate into more in federal income taxes paid and more in state income taxes paid. Large purchases, such as cars, add to state tax revenues, as most states collect a percentage of the car purchase in sales tax,

11

23.    In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "If I were to lose DACA the first thing to go with it would be my job as a nurse. This would […] make it impossible for my family to afford to pay our mortgage. I would lose my home." Another DACA recipient writes, "I will lose my job and the associated health/retirement benefits I have been paying into. Right now my family depends on the income that I make working […] I'm also paying off a new car that I bought last year. It would be difficult for me to continue paying for it if I'm not able to work where I do now." Another DACA recipient writes, "I will lose my job, which then would have a trickle effect […] losing my vehicle for non-payment, losing my home and being evicted, going into higher debt for not being able to pay credit cards." Another DACA recipient writes, "I have spoken to my supervisors about what would happen if DACA were to end and they informed me that since they know I have DACA they would not be able to keep me on if I did not have work authorization." A DACA recipient who owns a business writes, "our restaurant would disappear." Another DACA recipient writes, "I would no longer be able to work as an EMT." Another DACA recipient writes, "If DACA ends […] my students would be left without a teacher for the rest of the year." Another DACA recipient writes, "I won't be able to accept [a] fulltime offer from [an employer], which is contingent on my completing my MBA in 2018." Another DACA recipient writes, "I will not be able to practice medicine when I

---

along with additional registration and title fees. Similarly, home buying further adds to state and local tax revenues in the form of property taxes. There is a large literature on how home buying creates new jobs and adds new spending in local economies. For job creation, see https://www.nar.realtor/topics/home-ownership-matters/jobs-impact-of-an-existing-home-purchase. For spending in local economies, see https://www.cnbc.com/2017/04/12/immigrant-households-impact-success-of-real-estate-market-says-report.html.

NJAPP0174

graduate from medical school." Another DACA recipient writes, "I have a degree in engineering, and I want to obtain my professional engineering license. If I do not have DACA, I would not be able to work, thus I would not be able to accumulate the necessary work experience to obtain my PE license." Another DACA recipient writes, "I will lose my career, the opportunity to get my CDL [Commercial Driver License], the opportunity to eventually become a citizen and join the army like I've always wanted since a child."

### DACA and Education

24.     DACA improves educational outcomes for DACA recipients.

25.     Regarding education, 45% of DACA recipients are currently in school.[15]

26.     Among those who are currently in school, 94% reported, "[they] pursued educational opportunities that [they] previously could not" because of DACA.

27.     Moreover, among those in school, 72% are pursuing a bachelor's degree or higher (an additional 19% are pursuing an associate's degree). The majors and specializations that DACA recipients are pursuing include accounting, biochemistry, business administration, chemical engineering, civil engineering, computer science, early childhood education, economics, environmental science, history, law, mathematics, mechanical engineering, neuroscience, physics, psychology, and social work, to name a few. These majors and specializations concretize how the education that DACA recipients are receiving is contributing

---

[15] The percentage of respondents who are currently in school has slowly declined over the four years that I have been surveying DACA recipients. This makes intuitive sense: as DACA recipients grow older, they are more likely to transition out of school and into their careers. Moreover, as the USCIS quarterly DACA statistics show, older DACA recipients are not being replaced at anywhere close to the rate in which younger DACA recipients have aged into eligibility.

NJAPP0175

to the development of a better prepared and more competitive college-educated workforce.

28.     Regarding educational attainment, 36% of respondents 25 years and older have a bachelor's degree or higher. This percentage is higher than the 30% of native-born persons 25 years and older who have a bachelor's degree or higher, but is similar to the 34% of foreign-born naturalized persons 25 years and older who have a bachelor's degree or higher.[16]

29.     In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "DACA has given me the opportunity to be someone in life. Ever since I was in elementary school, I was a good student. I liked school and I liked to learn […] Depression was really getting to me because I saw my friends pursuing their dreams, and I was not allowed to do the same. It did not matter how smart I was, how much of a hard worker I was, or how much passion I had; I was never going to be able to become who I wanted to be. DACA opened the door, it gave a lot of us hope. Thanks to DACA, I am now a woman who is pursuing an engineering degree." Another DACA recipient writes, "With DACA, I have worked as a researcher and am now starting the grad school application process for PhD programs. I have wanted to be a scientist since I was nine years old, staring out of my first telescope. DACA allows that dream to not be hindered. I still cannot apply for anything funded by the National Science Foundation or work for NASA, but hopefully my status will one day become permanent and those doors will become open to me as well." Another DACA

---

[16] These data come from the U.S. Census 2011-2015 American Community Survey (ACS) 5-year Public Use Microdata, which represents the most up-to-date 5-year file.

14

NJAPP0176

recipient writes, "Without DACA, I would lose the ability to continue working legally and will have to stop attending school since I will not be able to afford it. I will lose the opportunity to become a certified teacher [...] and will not be able to fulfill my dreams of being an educator." Another DACA recipient writes, "I will be unable to continue my education in computer science." Another DACA recipient writes, "If DACA ends, I will lose the opportunity of pursuing the career I've been studying for my whole life. I will not be able to work anywhere, so my degree won't matter."

### DACA and Normality in Day-to-Day Life

30.     The data further show that DACA has given DACA recipients a sense of normality in their day-to-day lives, which has led to a greater sense of belonging and inclusion and, in some cases, improved mental health.

31.     In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "I will lose my feeling of belonging in the only country I have truly ever known." Another DACA recipient writes, "I would lose my sense of belonging. For the first time I feel safe without fear." Another DACA recipient writes, "Having DACA has changed my life completely, I feel like I have purpose again. I can go to school and work. I can strive now for a better life. Things are more manageable. Before DACA, I lost all hope of ever becoming anything or accomplishing anything. I've regained a lot of that hope and now I have a strong drive to succeed." Another DACA recipient writes, "DACA was a glimpse of what I could have if I had papers and it made me

15

love this country more." Another DACA recipient writes, "DACA has allowed me to feel a sense of hope and security within the nation I grew up in […] its existence provides me with the reassurance that someone cares, that someone is listening, and that we are not alone." Another DACA recipient writes, "I will lose feeling safe and protected." Another DACA recipient writes, "I will lose the independence and freedom I had to wait so many years to have." Another DACA recipient writes, "I will no longer be able to drive to school or work." Another DACA recipient writes, "I will lose a sense of safety. I remember feeling a lot of fear, anxiety, and uncertainty about my future before DACA was passed. I'm worried all of that will come flooding back. Aside from the practical things, like losing my license, my job, my independence, I really don't want to feel that way again. I have become more open with people since DACA, and I don't want to go back to having to worry about what I say and to who."

32.   Moreover, despite being brought to the U.S., on average, at the age of 6.5, and despite having lived in the U.S., on average, 18.8 years, it was only after receiving DACA that:

    a.     61% opened a bank account;

    b.     66% got their first credit card;

    c.     90% got a driver's license or state identification card for the first time; and

    d.     49% became organ donors.

Table 5 summarizes these results. The column "≥ 25" reports the results for respondents 25 years and older.

<div align="center">Table 5</div>

<div align="center">16</div>

NJAPP0178

|  |  |  | ≥ 25 |
|---|---|---|---|
| Opened a bank account | ......................................... | 61.0% | 47.3% |
| Got my first credit card | ......................................... | 65.7% | 67.9% |
| Got my driver's license or state identification card for the first time | ......................................... | 90.3% | 88.3% |
| Became an organ donor | ......................................... | 48.7% | 49.8% |

Note: percentages do not sum to 100 as individuals may select all that apply. $n = 1,662$ for all respondents 25 years and older.

### DACA Recipients and American Citizen Family Members

33.  The data also show that DACA recipients are deeply interwoven in families that include American citizen siblings, spouses, and children. Indeed, 73% of DACA recipients have either an American citizen sibling, spouse, or child:

   a.  59% reported having an American citizen sibling;

   b.  17% reported having an American citizen spouse; and

   c.  26% reported having an American citizen child.

Table 6 summarizes these results.

Table 6

| American citizen spouse | ......................................... | 16.6% |
|---|---|---|
| American citizen child | ......................................... | 25.7% |
| American citizen sibling | ......................................... | 58.9% |
| American citizen spouse, child, or sibling | ......................................... | 72.7% |

Note: percentages do not sum to 100 as individuals may select all that apply.

34.  In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "My daughter is a 4 year old U.S. citizen and everything I do is to give her a better life. I would lose the ability to safely go to school and work. I would constantly worry that my daughter would end up in foster care." Another DACA recipient writes, "I will lose my job and face possible deportation and being separated from my son who is only 3 and

17

needs his mom." Another DACA recipient writes, "Sometimes I can't even sleep just thinking of what's going to happen with DACA […] I'm not only thinking about my future, but my son's." Another DACA recipient writes, "I just had my second child 2 weeks ago […] my plans are to go back to work by next year and I'm truly scared that by that time I won't be able to […] Now more than ever I need DACA to support my kids." Another DACA recipient writes, "a year into my new DACAmented life, my daughter was born and she has been such a blessing, but I am more afraid than ever about the consequences my status might have. If DACA ends, I lose the peace of mind that I will be here to raise her. I work 60+ hours a week at 2 jobs so I can provide for her and if DACA ends I will not be able to do so." Another DACA recipient writes, "we risk being homeless with a new-born child if DACA ends." Another DACA recipient writes, "My kids are U.S. citizens […] I will lose my job, I will lose the opportunity to give my kids a better life […] Please, I beg to continue to have DACA. It is not just about being legal, but is also about having a better life for my kids." Another DACA recipient writes, "we would struggle providing for our kids who are all citizens […] I hope this never happens because our family has so much riding on whether my next permit is approved or not." Another DACA recipient writes, "I have a 3 year old daughter who is heading to Head Start this year and I am currently pregnant. I would miss out on my kid's lives, as they would most likely stay in the U.S. with their dad." Another DACA recipient writes, "I would lose healthcare coverage for me and my son." Another DACA recipient writes, "having my driver's license taken away would be a devastating blow […] I take my sons to

18

school and childcare almost every day." Another DACA recipient writes, "without my driver's license I won't be able to drive to school or any of my son's doctor's appointments." Another DACA recipient writes, "How do you tell your 5 year old mommy can't bring food to the table because of a simple paper? How do you explain to your child that there will be no more sports because we can no longer drive?" Another DACA recipient writes, "I would lose my job first of all and if I lose my job I will lose my apartment. I will have to stay with family or other people and hopefully find a way to make some money in order to take care of my 3 year old. I will definitely end up in debt without a way to pay my bills and I will have to ask for public assistance to feed my son. It sounds extreme but that's what will happen if I cannot work because I have no parents left and no one is going to take care of me or my son." Another DACA recipient writes, "I am married now with a 10 month old daughter […] if DACA ended I would be really scared to be split up from my daughter and husband and family. I have been here since I was 8 months old, this is my home, I don't know my place of birth." Another DACA recipient writes, "My U.S. citizen husband and U.S. citizen children would constantly be worrying about me because the likelihood of deportation would increase greatly." Another DACA recipient writes, "My wife and I have barely just begun our adult lives together. We have medical and student debt, monthly utility expenses, a mortgage, car payments, insurance payments and groceries to buy. We are just like any other young responsible adults trying to kick start their careers to gain financial stability and potentially start a family. Without my job I lose my ability to contribute to our monthly

19

NJAPP0181

expenses. We would lose our financial stability and could lose everything which could ruin our lives before they even begin." Another DACA recipient writes, "If DACA ended […] it would put a stress on my marriage." Another DACA recipient writes, "I would lose my family […] my husband is a U.S. citizen […] my brother is also a citizen, and a U.S. Marine."

**Many May Go "Into the Shadows" Without DACA**

35.    Many DACA recipients may go back into the shadows if these individuals lose their DACA status and the accompanying work authorization.

36.    In the 2017 DACA survey, respondents were asked to describe "what you will lose if DACA ends." One DACA recipient writes, "I really can't imagine living in the darkness again […] I have been a good member of society, I pay my taxes, and I have never gotten in trouble with the law." Another DACA recipient writes, "With DACA I was able to begin planning for a better future, if it's taken away I'll go back to trying to get by day to day." Another DACA recipient writes, "Losing DACA will be devastating because everything that I have built up to this point will be lost. I will lose my current employment, the health insurance provided by my employer, and driver's license for starters. Most importantly, I will return back to the shadows facing certain deportation considering the government already has all of my information." Another DACA recipient writes, "If DACA ends […] I lose everything. I can no longer work and my mental health will suffer. Currently my mental health is already suffering because of the constant fear about whether DACA will be taken away. This is the only place that

20

I call home and people want to take that away from me. It is a terrible feeling and I hate that I have to be in this position, but none of us chose it and we are trying to do our best to make a living and do things the right way." Another DACA recipient writes, "I would go back to the shadows that I once thought I would never go back to. I would live in fear." Another DACA recipient writes, "I will live in fear and hiding, again." Another DACA recipient writes, "what hurts most is losing my ability to live without fear. To be back in the shadows, to feel less than and incapable of doing anything about the circumstances, [to] feel betrayed by the government who promised to protect us if we came out of the shadows and followed the rules." Another DACA recipient writes, "losing DACA would make me lose faith in a government [that] asked us to come forth and identify ourselves in exchange for a taste of regular American life." Another DACA recipient writes, "Everything that I've been working so hard for will suddenly mean nothing. All the contributions I've given to this country will be ignored and unrecognized by the government."

37. Moreover, when given a scenario in which they no longer had DACA[17]:

    a.    53% reported that they would be less likely to report a crime they witnessed;

    b.    47% reported that they would be less likely to report a crime even if they were the victim;

    c.    48% reported that they would be less likely to go to the hospital if they suffered an injury; and

---

[17] The question was worded, "If you no longer had DACA, would you be more or less likely to do the following . . . ."

NJAPP0183

    d.    60% reported that they would be less likely to report wage theft by their employer.

38.    Moreover, many DACA recipients fear what the government will do with their personal information.

39.    Among respondents who were eligible to renew, but had not yet submitted a renewal application[18]:

    a.    18% reported that fear of providing updated information to the government was a prohibitive factor[19]; and

    b.    26% reported that fear that the government will use the information provided in the renewal application for immigration enforcement purposes was a prohibitive factor.

40.    Among respondents who were not yet eligible to renew,[20] 28% agreed or strongly agreed with the statement, "I'm less likely to apply to renew my DACA status when I become eligible to do so because I fear that the government will use my information for immigration enforcement purposes."

41.    The prospect of going back into the shadows and fear about what the government will do with their personal information likely exacerbates the concerns that DACA recipients had when they first applied for DACA.

42.    In my 2014 DACA survey, the concerns that DACA recipients had when they first applied included:

---

[18] This represents 11.2% of respondents.

[19] In my 2016 DACA survey, just 2% of respondents who were eligible to renew, but had not yet submitted a renewal application, reported that fear of providing updated information to the government was a prohibitive factor.

[20] This represents 46.9% of respondents.

NJAPP0184

a.   79% reported being concerned about what would happen if DACA ended;

b.   59% reported being concerned about letting the government know they were undocumented;

c.   49% reported being concerned about revealing their personal information;

d.   59% reported being concerned about revealing information about their family;

e.   59% reported being concerned "that the information [they] revealed in [their] application would be used to put [them] or [their] family in detention and/or deportation proceedings"; and

f.   32% reported hearing that "the government was not going to use the information in the DACA application for enforcement purposes (e.g., detention or deportation)."

### DACA Recipients by State

43.   Below are examples of state-specific profiles of DACA recipients. Data from the survey, combined with data published by USCIS that identifies the number of DACA recipients by state, are used to construct these profiles.[21]

### DACA Recipients in the State of New Jersey

44.   As of September 4, 2017, there were 17,400 active DACA recipients in the State

---

[21] State-specific profiles are constructed using data published by USCIS on the total number of individuals with DACA as of September 4, 2017. *See* https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

23

NJAPP0185

of New Jersey.[22]

45.     The Migration Policy Institute estimates that there are 53,000 DACA-eligible persons who live in the State of New Jersey.[23]

46.     Regarding employment and earnings:

   a.     An estimated 15,904 DACA recipients in the State of New Jersey are currently employed[24];

   b.     An estimated 940 DACA recipients in the State of New Jersey are business owners[25]; and

   c.     The State of New Jersey's DACA recipients earn an estimated $576.2 million annually.[26]

47.     Regarding education:

   a.     An estimated 7,813 DACA recipients in the State of New Jersey are currently in school[27];

   b.     Among those currently in school, an estimated 7,313 have "pursued educational opportunities that [they] previously could not" because of DACA[28]; and

---

[22] https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20Data/All%20Form%20Types/DACA/daca_population_data.pdf.

[23] https://www.migrationpolicy.org/programs/data-hub/deferred-action-childhood-arrivals-daca-profiles.

[24] 91.4% of 17,400.

[25] 5.4% of 17,400.

[26] 15,904 multiplied by $36,231.91. This translates into $35.7 million annually in Social Security contributions (6.2% per FICA) and $8.4 million annually in Medicare contributions (1.45% per FICA).

[27] 44.9% of 17,400.

[28] 93.6 % of 7,813.

24

NJAPP0186

      c.     An estimated 5,586 DACA recipients in the State of New Jersey are currently pursuing a bachelor's degree or higher.[29]

48.    Regarding American citizen family members:

      a.     An estimated 12,650 DACA recipients in the State of New Jersey have an American citizen sibling, spouse, or child.[30]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __16___ day of May, 2018, in _____San Diego, CA_____

_____
Dr. Tom K. Wong

---

[29] 71.5% of 7,813.

[30] 72.7% of 17,400.

25

NJAPP0187

# Exhibit A

NJAPP0188

Wong: CV (9/2017)

# TOM K. WONG, PH.D.

Email: tomkwong@ucsd.edu | Google Voice: (619) 354-9913
Website: www.tomwongphd.com | bit.ly/tomkwong_citations

## ACADEMIC APPOINTMENTS

2017 -        **ASSOCIATE PROFESSOR, POLITICAL SCIENCE**
              University of California, San Diego

2012 - 2017   **ASSISTANT PROFESSOR, POLITICAL SCIENCE**
              University of California, San Diego

## OTHER POSITIONS

2013 -        **DIRECTOR, INTERNATIONAL MIGRATION STUDIES PROGRAM MINOR**
              University of California, San Diego

2016          **ADVISOR, IMMIGRATION PORTFOLIO**
              **WHITE HOUSE INITIATIVE ON ASIAN AMERICANS AND PACIFIC ISLANDERS**

## EDUCATION

2011          **PH.D. IN POLITICAL SCIENCE**
              University of California, Riverside
              Focus in Comparative Politics, International Relations, and Research Methods
              Dissertation: *Immigration Control in the Age of Migration*

2005          **B.A. IN POLITICAL SCIENCE**
              University of California, Riverside
              Focus in International Relations
              *Magna Cum Laude*

## BOOKS

(2) Tom K. Wong. 2017. *The Politics of Immigration: Partisanship, Changing Demographics, and American National Identity.* Oxford University Press.
NPR, ABC News/Yahoo.com, LA Times, Univision, Monkey Cage

(1) Tom K. Wong. 2015. *Rights, Deportation, and Detention in the Age of Immigration Control.* Stanford University Press. Oxford Law blog

## JOURNAL ARTICLES

(7) Tom K. Wong, Angela Garcia, and Carolina Valdivia. *2018.* "The Political Incorporation of Undocumented Youth," *Social Problems.*

(6) Tom K. Wong and Hillary Kosnac. 2017. "Does the Legalization of Undocumented Immigrants in the US Encourage Unauthorized Immigration from Mexico? An Empirical Analysis of the Moral Hazard of Legalization," *International Migration* vol. 55 no. 2: 159-173.

i

NJAPP0189

(5) Tom K. Wong and Angela Garcia. 2016. "Does Where I Live Affect Whether I Apply? The Contextual Determinants of Applying for Deferred Action for Childhood Arrivals (DACA)," *International Migration Review* vol. 50 no. 3: 699-727.
C-Span, Associated Press

(4) Tom K. Wong, Donald Kerwin, Jeanne M. Atkinson, and Mary Meg McCarthy. 2014. "Paths to Lawful Immigration Status: Results and Implications from the PERSON Survey," *Journal of Migration and Human Security* vol. 2 no 4: 287-304.
NBC News.com

(3) Tom K. Wong. 2014. "The Politics of Interior Immigration Enforcement," *California Journal of Politics and Policy* vol. 6 no 3: 381-399.

(2) Tom K. Wong and Justin Gest. 2013. "Organizing Disorder: Indexing Migrants' Rights and International Migration Policy," *Georgetown Immigration Law Journal* vol. 28 no 1: 257-269.

(1) Tom K. Wong. 2012. "The Politics of Interior Immigration Control in the United States: Explaining Local Cooperation with Federal Immigration Authorities," *Journal of Ethnic and Migration Studies* vol. 38 no. 5: 737-756.


## BOOK CHAPTERS

(4) Tom K. Wong. 2014. "Conceptual Challenges and Contemporary Trends in Immigration Control." In *Controlling Immigration: A Global Perspective* (3rd edition), edited by James F. Hollifield, Philip Martin, and Pia Orrenius. Stanford University Press.

(3) Tom K. Wong. 2014. "Nation of Immigrants or Deportation Nation? Analyzing Deportations and Returns in the United States, 1892-2010." In *The Nation and Its Peoples: Citizens, Denizens, and Migrants*, edited by John S.W. Park and Shannon Gleeson. Routledge.

(2) James F. Hollifield and Tom K. Wong. 2014. "The Politics of International Migration: How Can We 'Bring the State Back In'?" In *Migration Theory: Talking Across Disciplines* (3rd edition), edited by Caroline B. Brettell and James F. Hollifield. Routledge.

(1) Karthick Ramakrishnan and Tom K. Wong. 2010. "Partisanship, Not Spanish: Explaining Municipal Ordinances Affecting Undocumented Immigrants." In *Taking Local Control: Immigration Policy Activism in U.S. Cities and States*, edited by Monica W. Varsanyi. Stanford University Press.


## WORKS UNDER REVIEW/IN PROGRESS (SELECTED LIST)

Tom K. Wong and Justin Gest. "Looks Skin Deep: Do Immigrant Legislators Better Represent Immigrant Interests?"

Tom K. Wong and Carolina Valdivia. "In Their Own Words: A Nationwide Survey of Undocumented Millennials," Working Paper 191, Center for Comparative Immigration Studies.
New York Times, Washington Post, The Hill, La Opinión, Univision, NBC News.com

Tom K. Wong. "President Obama's Executive Actions on Immigration and the 2016 Presidential Election." This project uses a nationally representative survey of Latinos ($n = 820$) and Asians ($n = 950$) fielded in late to analyze how knowing someone who is undocumented and potentially eligible for legal

NJAPP0190

status via programs like DAPA affects the civic engagement of Latino and Asian citizens. The survey was fielded by GfK and commissioned w/Dan Hopkins and Efren Perez.

Tom K. Wong. "Mobilizing Low-Propensity Voters of Color" and "Governing Diversity." These projects examine how demographic changes are reshaping the American electorate and how policymakers are responding. The former project includes multiple voter mobilization experiments utilizing direct voter contact run during the 2016 presidential cycle. These experiments analyze interventions designed to convey the urgency of voting to Latino, Asian, and immigrant-origin voters using political discourse around immigration policy and refugee admissions.

w/Justin Gest  "International Migrants Bill of Rights." This project aims to create cross-national indicators on government respect for and recognition of the human rights of migrants. Funding from the World Bank (obtained by Gest) will be used to pilot a 58 item index across 5 countries.

## REPORTS

Tom K. Wong et al. 2017. *DACA Recipients' Economic and Educational Gains Continue to Grow*. Washington, D.C.: Center for American Progress.

Tom K. Wong. 2017. *The Effects of Sanctuary Policies on Crime and the Economy*. Washington, D.C.: Center for American Progress.

Tom K. Wong et al. 2016. *New Study of DACA Beneficiaries Shows Positive Economic and Educational Outcomes*. Washington, D.C.: Center for American Progress.

Tom K. Wong et al. 2015. *Results from a Nationwide Survey of DACA Recipients Illustrate the Program's Impact*. Washington, D.C.: Center for American Progress.

Tom K. Wong. 2014. *Statistical Analysis Shows that Violence, Not Deferred Action, Is Behind the Surge of Unaccompanied Children Crossing the Border*. Washington, D.C.: Center for American Progress.

Tom K. Wong et al. 2013. *Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals (DACA)*. Washington, D.C.: Center for American Progress.
C-Span, Associated Press

## OTHER PUBLICATIONS

Tom K. Wong. 2017. "The Effects of Sanctuary Policies on Crime and the Economy," *Migration and Citizenship: Newsletter of the American Political Science Association Organized Section on Migration and Citizenship* vol. 5 no. 2.

James F. Hollifield and Tom K. Wong. 2012/2013. "International Migration: Cause or Consequence of Political Change," *Migration and Citizenship: Newsletter of the American Political Science Association Organized Section on Migration and Citizenship* vol. 1 no. 1.

Tom K. Wong. 2012. "The Commission on Wartime Relocation and Internment of Civilians." In *The Encyclopedia of Transitional Justice*, edited by Lavina Stan and Nadya Nedelsky. Cambridge University Press.

Karthick Ramakrishnan, Dino Bozonelos, Louise Hendrickson, and Tom K. Wong. 2008. "Inland Gaps: Civic Inequalities in a High Growth Region," *Policy Matters* vol 2 no 1.

NJAPP0191

Karthick Ramakrishnan and Tom K. Wong. 2007. "Immigration Policies Go Local: The Varying Responses of Local Governments to Undocumented Immigration." Chief Justice Earl Warren Institute on Race, Ethnicity, and Diversity. Working Paper Series on Immigration.

## RESEARCH GRANTS (AS A FACULTY MEMBER)

- $341,127, Multiple Funders, "U.S. Immigration Policy in the 21st Century," 2017-2019
- $22,500, UCSD USMEX Fellowship, 2016-2017
- $16,000, UCLA Institute for Research on Labor and Employment, 2015-2016
- $365,000, MacArthur Foundation, 2015-2017 (partially awarded, terminated after the DAPA program was enjoined by the Supreme Court)
- $25,000, UCSD Frontiers of Innovation Scholars Program Grant, 2015-2016
- $15,000, UCSD Faculty Career Development Program Grant, 2014-2015
- $30,000, Unbound Philanthropy, 2014
- $100,000, Department of Homeland Security, 2013
- $30,000, Center for American Progress, 2013
- $10,000, UCSD Center for International, Comparative, and Area Studies Grant, 2013
- $10,000, UCSD Academic Senate, 2013
- $1,500, UCSD Diversity, Equity, and Inclusion Grant, 2013

## TEACHING AT UCSD

- Diversity, Equity, and Inclusion Teaching Award, 2014-2015
- The Politics of Immigration (upper-division, 280 students)
- International Human Rights Law: Rights of Migrants (upper-division, 200 students)
- The Politics of Multiculturalism (upper-division, 100 students)
- Immigration Politics and Policy (graduate seminar, 4 students)
- Undergraduate Honors Seminar (upper-division, 15 students)

## INVITED PRESENTATIONS (SELECTED)

2018 | "Migrant Rights Database." Comparative Politics Workshop, University of Chicago, April 25, 2018.

Author Meets Critics. Center for the Study of International Migration, UCLA, March 2, 2018.

2017 | "The Future of U.S. Immigration Policy in the Age of Trump." Citizenship and Equality Colloquium, University of Colorado, November 16, 2017.

"The Determinants and Effects of Sanctuary Policies." Cornell University, November 9-10, 2017.

"The Determinants and Effects of Sanctuary Policies." Presentation at the 2017 APPAM Fall Research Conference, Chicago, IL, November 2-4, 2017.

NJAPP0192

"Immigration and the U.S. Constitution." Seminar at the Robert H. Smith Center for the Constitution at James Madison's Montpelier, Orange, VA, July 31-August 2, 2017.

"The Determinants of U.S. Immigration Policy." University of California, Santa Barbara, June 1, 2017.

"Paths to Legal Status for Undocumented Immigrants." Presentation at the CLINIC annual conference, Atlanta, GA, May 25, 2017.

"The Effects of Sanctuary Policies on Crime and the Economy." Presentation at the Sanctuary Cities Convening, New York City Council, New York, NY, March 27-28, 2017.

"The Future of U.S. Immigration Policy in the Age of Trump." Yankelovich Center for Social Science Research, University of California, San Diego, March 15, 2017.

"Child Migration." World Migration Report workshop, International Organization for Migration (IOM) Geneva, Switzerland, March 9-10, 2017.

"The Politics of Immigration." American Academy of Arts and Sciences, San Diego Program Committee, University of California, San Diego, February 9, 2017.

2016 |   "Post-Election Panel." Center for Comparative Immigration Studies (CCIS), University of California, San Diego, November 21, 2016.

"Mobilizing Immigrant Communities in the Age of Trump." Tulane University, October 14, 2016.

"Immigrant Integration and the Obama Administration: DACA, DAPA, and Implications for the 2016 Presidential Election." Institute for Research on Labor and Employment, UCLA, April 28, 2016.

"Mobilizing Low-Propensity Voters of Color: Towards an Electorate That Reflects a Changing America." Presentation at the Asian Americans Advancing Justice conference, Los Angeles, CA, March 31, 2016.

"Immigrants in American Society." Presentation at KPBS, San Diego, CA, March 21, 2016.

"Immigration Policy." Presentation to Mi Familia Vota, Riverside, CA, January 14, 2016.

2015 |   "The European Refugee Crisis." Center for Comparative Immigration Studies (CCIS), the European Studies Program, the Lifelong Learning Program of the EU, and the Scholars Strategy Network (SSN), University of California, San Diego, October 27, 2015.

"U.S. Immigration Politics and the 2016 Presidential Election." Presentation at the Wilson Center, Washington DC, October 26, 2015.

"The Political Incorporation of Undocumented Youth." Presentation at the "Challenging Borders" conference, University of California, Riverside, October 23, 2015.

"The Consequences of Inequality: Why Does it Matter and How." Symposium on Capital in the 21st Century with Thomas Piketty, University of California, San Diego, October 22, 2015.

NJAPP0193

"U.S. Immigration Politics and Policy." Presentation at the U.S. Consulate in Tijuana, October 13, 2015.

"UC National Summit on Undocumented Students." University of California Office of the President, May 7-8, 2015.

"Irregular Migration." Presentation at the "Politics and Policies of International Migration: Europe and the U.S." conference, Université Libre de Bruxelles, Belgium, April 28-29, 2015.

"Opportunities and Limits of the Executive Actions Proposed by President Obama." Presentation at the Mexican Ministry of Foreign Affairs, Mexico City, Mexico, April 13-14, 2015.

"Administrative Relief Implementation and Impact Project." Presentation at the Center for Migration Studies (CMS), New York, NY, March 25, 2015.

"Research Roundtable." Presentation at the "Ready America: Implementing Immigration Action" conference, Washington DC, February 9-11, 2015.

2014 | "Insights from Implementing DACA for Administrative Relief." Presentation at the National Immigrant Integration Conference, Los Angeles, CA, December 16, 2014.

"Deferred Action for Childhood Arrivals." American Immigration Council (AIC), Washington, D.C., November 7, 2014.

"Immigration Policy and the November 2014 Midterm Elections." California Immigrant Policy Center (CIPC), October 29, 2014.

"The Many Paths to Legal Status: Results and Implications from the PERSON Survey." Presentation to the Center for Migration Studies (CMS), New York, NY, September 29, 2014.

"The Congressional Politics of Interior Immigration Enforcement." Presentation at the "Migration During Economic Downturns" workshop, German Historical Institute, Washington, DC, April 4-5, 2014.

"Mapping DACA Renewals." Presentation to U.S. Citizenship and Immigration Services (USCIS), March 13, 2014.

"Latino Politics: Left, Right, or Down the Middle?" Presentation at the Hispanic Radio annual conference, San Diego, CA, March 10, 2014.

2013 | "Undocumented No More: A Nationwide Analysis of Deferred Action for Childhood Arrivals." Center for Comparative Immigration Studies (CCIS), University of California, San Diego, October 2, 2013.

"DACA Turns 1." Presentation at the Center for American Progress, Washington, DC, August 15, 2013. **[Televised on CSPAN]**

"The Prospects for Comprehensive Immigration Reform." Presentation at the Mexican Ministry of Foreign Affairs, Mexico City, Mexico, August 12, 2013.

NJAPP0194

"A Look at the Stats: How Will Congressional Representatives Vote on Comprehensive Immigration Reform?" Presentation at the "Changing Face of America" conference, University of California, Berkeley, May 3, 2013.

"Will Comprehensive Immigration Reform Pass? Predicting Legislative Support and Opposition to CIR." Center for Comparative Immigration Studies (CCIS), Univeristy of California, San Diego, April 29, 2013.

"Race, Ethnicity, the 2012 Elections, and the Politics of Comprehensive Immigration Reform." Presentation at the *Beyond the Headlines* speaker series, UCLA, February 26, 2013.

"International Migrants Bill of Rights (IMBR) Initiative." Georgetown Law School, Washington, DC, February 8-9, 2013.

2012 | "Immigration Policy After the 2012 Elections." Center for the Study of International Migration, UCLA, November 16, 2012.

"PBS Need to Know 2012 Election Special: America by the Numbers." Presentation for KPBS at the Jo and Vi Jacobs Center, San Diego, CA, October 10, 2012.

"Immigrants in American Society." Presentation at the U.S. Citizenship and Immigration Services (USCIS) field office, Dallas, TX, March 6, 2012.

**2011** | "The Radical Right and the Politics of Immigration Control in Europe." University of Neuchâtel, Switzerland, June 16-17, 2011.

"Conceptual Challenges and Contemporary Trends in Immigration Control." Presentation at the "Immigration Policy in an Era of Globalization" conference at the Federal Reserve Bank of Dallas, TX, May 18-20, 2011.

"Enforcing Like a State: A Mixed-Methods Study of the Politics of Immigration Control." Presentation at the University of California Center for New Racial Studies conference, UCLA, April 21, 2011.

"Immigration Enforcement in the Age of Obama." Center for Ideas and Society, University of California, Riverside, March 8, 2011.

2010 | "The Politics and Determinants of Immigration Control: Evidence from 25 Immigrant-Receiving Democracies." Department of Political Science and the Center for Research on Immigration, Population, and Public Policy, University of California, Irvine, December 1, 2010.

"States, Irregular Migrants, and a Theory of Selective Immigration Control: Evidence from European Gateway Cities." Presentation at the "Beyond Arizona: Laws Targeting Immigrants in the US and Europe" conference at the Warren Institute on Race, Ethnicity, and Diversity, University of California, Berkeley, October 25, 2010.

2009 | "Immigration Control in Industrialized Democracies: What Explains Their Variations." Presentation at Metropolis, an initiative of Citizenship and Immigration Canada, Ottawa, Canada, December 2, 2009.

NJAPP0195

## PROFESSIONAL ACTIVITIES

- Reviewer: *National Science Foundation, American Journal of Political Science, American Politics Research, Du Bois Review, International Migration, International Migration Review, International Studies Quarterly, Journal of Ethnic & Migration Studies, Journal of Politics, Journal of Race, Ethnicity, and Politics, Law & Social Inquiry, Political Research Quarterly, Russell Sage Foundation, Social Identities, Social Problems*
- Advisory Board, Center for Comparative Immigration Studies (CCIS), 2012-present
- Advisory Board, Integrated Voter Engagement study, 2016-present
- Advisory Board, Unbound Philanthropy, 2015-2017
- APSA, Executive Committee, Migration and Citizenship Section, Treasurer, 2012-2015
- APSA, Migration and Citizenship Section Program Chair, 2018
- Editorial Board, Journal of Migration and Human Security (JMHS), 2014-present
- Editorial Board, Politics, Groups, and Identities (PGI), 2016-present
- Executive Committee, Center for Comparative Immigration Studies (CCIS), 2015-present
- MPSA, International Relations and Domestic Politics Section Program Chair, 2016
- WPSA, (Im)Migration and Citizenship Section Program Chair, 2015, 2017
- WPSA, Dissertation award committee, 2016

NJAPP0196

# Exhibit B

# Results from Tom K. Wong[1] et al., 2017 National DACA Study

Survey fielded 8/1/2017 to 8/20/2017
$n = 3,063$

| | |
|---|---|
| Methodology | 1 |
| Economic Integration | 2-5 |
| Education | 6-7 |
| Inclusion and Belonging | 8-10 |
| DACA Post-November 2016 | 11-14 |
| Applying/Renewing DACA | 15-17 |

---

[1] Tom K. Wong is associate professor of political science at the University of California, San Diego. tomkwong@ucsd.edu

NJAPP0198

## Methodology

The questionnaire was administered to an online panel of DACA recipients recruited by the partner organizations. Several steps were taken to account for the known sources of bias that result from such online panels. To prevent ballot stuffing—one person submitting multiple responses—the authors did not offer an incentive to respondents for taking the questionnaire and used a state-of-the-art online survey platform that does not allow one IP address to submit multiple responses. To prevent spoiled ballots—meaning people responding who are not undocumented—the authors used a unique validation test for undocumented status. Multiple questions were asked about each respondent's migratory history. These questions were asked at different parts of the questionnaire. When repeated, the questions were posed using different wording. If there was agreement in the answers such that there was consistency regarding the respondent's migratory history, the respondent was kept in the resulting pool of respondents. If not, the respondent was excluded. In order to recruit respondents outside of the networks of the partner organizations, Facebook ads were also used. Because there is no phone book of undocumented immigrants, and given the nature of online opt-in surveys, it is not possible to construct a valid margin of error.

NJAPP0199

## Economic Integration

**Check all that apply. After my DACA application was approved, I...**
($n = 3,063$)

|  |  |  | ≥ 25 |
|---|---|---|---|
| Got my first job | ............................ | 54.2% | 35.3% |
| Got a job with better pay | ............................ | 68.5% | 77.7% |
| Got a job that better fits my education and training | ............................ | 54.2% | 59.6% |
| Got a job that better fits my long-term career goals | ............................ | 53.9% | 61.4% |
| Got a job with health insurance or other benefits | ............................ | 57.3% | 66.9% |
| Got a job with improved work conditions | ............................ | 56.2% | 64.4% |
| Started my own business | ............................ | 5.4% | 7.9% |
| I have been able to earn more money, which has helped me become financially independent | ............................ | 69.0% | 73.4% |
| I have been able to earn more money, which has helped my family financially | ............................ | 70.8% | 73.7% |
| Opened a bank account | ............................ | 61.0% | 47.3% |
| Got my first credit card | ............................ | 65.7% | 67.9% |
| Bought my first car | ............................ | 64.5% | 67.2% |
| Bought a home | ............................ | 15.7% | 23.5% |

Note: percentages do not sum to 100 as individuals may select all that apply. $n = 1,662$ for all respondents 25 years and older.

---

**Are you currently employed?**
($n = 3,063$)

|  |  |  | ≥ 25 |
|---|---|---|---|
| Yes | ............................ | 91.4% | 93.3% |
| No | ............................ | 8.6% | 6.7% |
| No response | ............................ | 0.0% | 0.0% |

Note: percentages may not sum to 100 due to rounding. $n = 1,662$ for all respondents 25 years and older.

---

NJAPP0200

**Please indicate your average hourly wage OR annual salary.**

($n = 2,800$, which represents the 91.4% of all respondents who are currently employed)

|  |  |  | ≥ 25 |
|---|---|---|---|
| Average hourly wage | ......................................... | $17.46 | $20.05 |
| Median hourly wage | ......................................... | $15.34 | $17.90 |
| Average annual earnings | ......................................... | $36,231.91 | $41,621.48 |
| Median annual earnings | ......................................... | $32,000.00 | $37,595.03 |

Note: percentages may not sum to 100 due to rounding. $n = 1,551$ for respondents 25 years and older and currently employed. Figures exclude the bottom 1st and top 99th percentiles

**On average, how many hours do you work per week?**

($n = 2,800$, which represents the 91.4% of all respondents who are currently employed)

|  |  | ≥ 25 |
|---|---|---|
| Average hours worked per week | ......................................... | 37.9 | 39.9 |
| Median hours worked per week | ......................................... | 40.0 | 40.0 |

Note: percentages may not sum to 100 due to rounding. $n = 1,551$ for respondents 25 years and older and currently employed. Figures exclude the bottom 1st and top 99th percentiles

**Were you employed before DACA?**

($n = 2,800$, which represents the 91.4% of all respondents who are currently employed)

|  |  |  | ≥ 25 |
|---|---|---|---|
| Yes | ......................................... | 43.9% | 60.7% |
| No | ......................................... | 55.9% | 38.9% |
| No response | ......................................... | 0.3% | 0.4% |

Note: percentages may not sum to 100 due to rounding. $n = 1,551$ for respondents 25 years and older and currently employed.

NJAPP0201

...... **Please indicate your average hourly wage OR annual salary before DACA.**
($n = 1,229$, which represents the 43.9% of respondents who are currently employed and were also employed before DACA)

|  |  |  | $\geq 25$ |
|---|---|---|---|
| Average hourly wage | ................................. | $10.29 | $10.87 |
| Median hourly wage | ................................. | $9.59 | $10.00 |
| Average annual earnings | ................................. | $20,068.49 | $21,950.47 |
| Median annual earnings | ................................. | $19,000.00 | $20,857.16 |

Note: percentages may not sum to 100 due to rounding. $n = 942$ for respondents 25 years and older, currently employed, and were employed before DACA. Figures exclude the bottom 1st and top 99th percentiles

...... **On average, how many hours did you work per week before DACA?**
($n = 1,229$, which represents the 43.9% of respondents who are currently employed and were also employed before DACA)

|  |  |  | $\geq 25$ |
|---|---|---|---|
| Average hours worked per week | ................................. | 37.7 | 39.2 |
| Median hours worked per week | ................................. | 40.0 | 40.0 |

Note: percentages may not sum to 100 due to rounding. $n = 1,551$ for respondents 25 years and older, currently employed, and were employed before DACA. Figures exclude the bottom 1st and top 99th percentiles.

...... **Does your employer know that you have DACA?**
($n = 2,800$, which represents the 91.4% of all respondents who are currently employed)

|  |  |  |
|---|---|---|
| Yes | ................................. | 50.0% |
| No | ................................. | 11.4% |
| Not applicable | ................................. | 37.7% |
| No response | ................................. | 0.9% |

Note: percentages may not sum to 100 due to rounding.

NJAPP0202

...... **Are you bilingual?**
($n$ = 2,800, which represents the 91.4% of all respondents who are currently employed)

| | | |
|---|---|---|
| Yes | ......................................... | 98.1% |
| No | ......................................... | 1.9% |
| No response | ......................................... | 0.1% |

Note: percentages may not sum to 100 due to rounding.

...... **Do you agree or disagree with the following statement: "My being bilingual has been an asset to my employer."**
($n$ = 2,746, which represents the 98.1% of respondents who are currently employed and are bilingual)

| | | |
|---|---|---|
| Strongly agree | ......................................... | 80.1% |
| Agree | ......................................... | 12.5% |
| Neither agree nor disagree | ......................................... | 6.1% |
| Disagree | ......................................... | 0.8% |
| Strongly disagree | ......................................... | 0.4% |
| No response | ......................................... | 0.2% |
| | | |
| Agree/strongly agree | ......................................... | 92.6% |
| Neither agree nor disagree | ......................................... | 6.1% |
| Disagree/strongly disagree | ......................................... | 1.2% |
| No response | ......................................... | 0.2% |

Note: percentages may not sum to 100 due to rounding.

NJAPP0203

# Education

**Check all that apply. After my DACA application was approved, I...**
($n = 3,063$)

|  |  |  | ≥ 25 |
|---|---|---|---|
| Pursued educational opportunities that I previously could not | ......................................... | 65.3% | 54.2% |
| I haven't pursued more education yet, but I plan to | ......................................... | 33.3% | 42.7% |
| I don't plan to pursue more education | ......................................... | 3.3% | 5.1% |
| Paid off some/all of my student loans | ......................................... | 18.4% | 18.3% |

Note: percentages do not sum to 100 as individuals may select all that apply. $n = 1,662$ for all respondents 25 years and older.

**Are you currently in school?**
($n = 3,063$)

|  |  |  | ≥ 25 |
|---|---|---|---|
| Yes | ......................................... | 44.9% | 30.6% |
| No | ......................................... | 55.0% | 69.3% |
| No response | ......................................... | 0.1% | 0.1% |

Note: percentages may not sum to 100 due to rounding. $n = 1,662$ for all respondents 25 years and older.

## What degree are you currently pursuing?
($n = 1,374$, which represents 44.9% of all respondents who are currently in school)

|  |  |  | ≥ 25 |
|---|---|---|---|
| GED or equivalent | ......................................... | 0.9% | 2.2% |
| High-school diploma | ......................................... | 2.7% | 0.6% |
| Trade/technical/vocational degree or certificate | ......................................... | 4.3% | 6.3% |
| Associate's degree | ......................................... | 19.4% | 18.5% |
| Bachelor's degree | ......................................... | 52.5% | 42.2% |
| Master's degree | ......................................... | 13.1% | 21.0% |
| Professional degree above a master's degree | ......................................... | 2.3% | 3.1% |
| Doctorate degree | ......................................... | 3.6% | 4.9% |
| No response | ......................................... | 1.2% | 1.2% |
|  |  |  |  |
| Bachelor's degree or higher | ......................................... | 71.5% | 71.2% |

Note: percentages may not sum to 100 due to rounding. $n = 509$ for respondents 25 years and older who are currently in school.

NJAPP0204

**What is the highest degree or level of school you have completed?** *If you are currently enrolled in school, what is the highest degree you have received thus far?*
($n$ = 3,063)

|  |  | | ≥ 25 |
|---|---|---:|---:|
| GED or equivalent | ......................................... | 3.4% | 5.4% |
| High-school diploma | ......................................... | 24.0% | 18.1% |
| Trade/technical/vocational degree or certificate | ......................................... | 3.6% | 4.3% |
| Associate's degree | ......................................... | 15.7% | 15.0% |
| Some college | ......................................... | 23.9% | 20.7% |
| Bachelor's degree | ......................................... | 23.2% | 27.3% |
| Master's degree | ......................................... | 4.4% | 7.3% |
| Professional degree above a master's degree | ......................................... | 0.3% | 0.4% |
| Doctorate degree | ......................................... | 0.3% | 0.5% |
| No response | ......................................... | 1.3% | 0.9% |
|  |  |  |  |
| Bachelor's degree or higher | ......................................... | 28.2% | 35.5% |

Note: percentages may not sum to 100 due to rounding. $n$ = 1,662 for all respondents 25 years and older.

- 8 -

NJAPP0205

## Inclusion and Belonging

**Check all that apply. After my DACA application was approved, I...**
($n$ = 3,063)

|  |  |  | ≥ 25 |
|---|---|---|---|
| Got my driver's license for the first time | ..................................... | 79.7% | 80.4% |
| Got a state identification card for the first time | ..................................... | 55.1% | 51.1% |
| Became an organ donor | ..................................... | 48.7% | 49.8% |
| Donated blood for the first time | ..................................... | 17.8% | 13.7% |

Note: percentages do not sum to 100 as individuals may select all that apply. $n$ = 1,662 for all respondents 25 years and older.

**Please indicate the immigration status of your immediate family members, meaning a parent, sibling, spouse, or child. (select all that apply)**
($n$ = 3,063)

| | | |
|---|---|---|
| American citizen spouse | ..................................... | 16.6% |
| American citizen child | ..................................... | 25.7% |
| American citizen sibling | ..................................... | 58.9% |
| American citizen spouse, child, or sibling | ..................................... | 72.7% |

Note: percentages do not sum to 100 as individuals may select all that apply.

**Do you have an immediate family member, meaning a parent, sibling, spouse, or child, who is a U.S. citizen and is 18 years or older?**
($n$ = 3,063)

| | | |
|---|---|---|
| Yes | ..................................... | 44.6% |
| No | ..................................... | 55.0% |
| No response | ..................................... | 0.4% |

Note: percentages may not sum to 100 due to rounding.

NJAPP0206

**Are any of your immediate family members who are U.S. citizens and are 18 years or older registered to vote?**

(*n* = 1,365, which represents 44.6% of all respondents who have immediate relatives who are U.S. citizens that are 18 years or older)

| | | |
|---|---|---|
| Yes | ........................................ | 81.5% |
| No | ........................................ | 18.3% |
| No response | ........................................ | 0.2% |

Note: percentages may not sum to 100 due to rounding.

NJAPP0207

## DACA Post-November 2016

**Thinking about immigration enforcement under the Trump administration, how concerned are you about the following:**
($n = 3,063$)

**Your family's safety**

| | |
|---|---|
| Very concerned | 77.1% |
| Concerned | 11.6% |
| Somewhat concerned | 3.9% |
| Not concerned at all | 2.3% |
| No response | 5.1% |

**Your finances**

| | |
|---|---|
| Very concerned | 70.9% |
| Concerned | 15.7% |
| Somewhat concerned | 5.0% |
| Not concerned at all | 1.7% |
| No response | 6.7% |

**Your property**

| | |
|---|---|
| Very concerned | 60.0% |
| Concerned | 17.3% |
| Somewhat concerned | 10.8% |
| Not concerned at all | 5.5% |
| No response | 6.5% |

**Your future**

| | |
|---|---|
| Very concerned | 85.1% |
| Concerned | 5.7% |
| Somewhat concerned | 2.1% |
| Not concerned at all | 0.8% |
| No response | 6.4% |

Note: percentages may not sum to 100 due to rounding.

NJAPP0208

Do you agree or disagree with the following statement: "Since the November 2016 presidential election, I've become more political active and engaged."
(*n* = 3,063)

| | | |
|---|---|---|
| Strongly agree | .......................................... | 37.3% |
| Agree | .......................................... | 32.5% |
| Neither agree nor disagree | .......................................... | 24.0% |
| Disagree | .......................................... | 3.8% |
| Strongly disagree | .......................................... | 1.4% |
| No response | .......................................... | 0.9% |
| Agree/strongly agree | .......................................... | 69.8% |

Note: percentages may not sum to 100 due to rounding.

Did you know that the Texas Attorney General, along with the attorney generals of 9 other states (Alabama, Arkansas, Idaho, Kansas, Louisiana, Nebraska, South Carolina, Tennessee, and West Virginia) recently sent a letter to the Trump administration demanding an end to DACA?
(*n* = 3,063)

| | | |
|---|---|---|
| Yes | .......................................... | 81.7% |
| No | .......................................... | 18.1% |
| No response | .......................................... | 0.3% |

Note: percentages may not sum to 100 due to rounding.

If DACA ended in the state that you currently live in, but continued in other states, how likely is it that you would move to another state that still had DACA?
(*n* = 3,063)

| | | |
|---|---|---|
| Very likely | .......................................... | 52.9% |
| Likely | .......................................... | 21.2% |
| Neither likely nor unlikely | .......................................... | 14.5% |
| Unlikely | .......................................... | 7.6% |
| Very unlikely | .......................................... | 3.2% |
| No response | .......................................... | 0.6% |
| Likely/very likely | .......................................... | 74.1% |

Note: percentages may not sum to 100 due to rounding.

NJAPP0209

How likely are you to leave the country if DACA ends?
($n$ = 3,063)

| | |
|---|---|
| Very likely | 9.8% |
| Likely | 12.5% |
| Neither likely nor unlikely | 27.1% |
| Unlikely | 18.2% |
| Very unlikely | 31.5% |
| No response | 0.8% |
| | |
| Likely/very likely | 22.3% |

Note: percentages may not sum to 100 due to rounding.

If DACA ends, would you be willing to participate in protest actions (e.g., rallies, marches, and demonstrations)?
($n$ = 3,063)

| | |
|---|---|
| Yes | 84.9% |
| No | 12.9% |
| No response | 2.1% |

Note: percentages may not sum to 100 due to rounding.

If DACA ends, would you be willing to engage in civil disobedience?
($n$ = 3,063)

| | |
|---|---|
| Yes | 34.6% |
| No | 60.7% |
| No response | 4.7% |

Note: percentages may not sum to 100 due to rounding.

NJAPP0210

**If you no longer had DACA, would you be more or less likely to do the following:**
($n$ = 3,063)

### Report a crime you witnessed

| | |
|---|---|
| More likely | 13.7% |
| Neither more nor less likely | 32.1% |
| Less likely | 53.2% |
| No response | 0.9% |

### Report a crime if you were the victim

| | |
|---|---|
| More likely | 20.6% |
| Neither more nor less likely | 31.5% |
| Less likely | 46.9% |
| No response | 0.9% |

### Go to the hospital if you suffered an injury

| | |
|---|---|
| More likely | 14.9% |
| Neither more nor less likely | 35.7% |
| Less likely | 48.3% |
| No response | 1.0% |

### Report wage theft by your employer

| | |
|---|---|
| More likely | 14.7% |
| Neither more nor less likely | 24.4% |
| Less likely | 59.8% |
| No response | 1.1% |

Note: percentages may not sum to 100 due to rounding.

NJAPP0211

## Applying/Renewing DACA

**Did you receive any assistance when you first applied for DACA? (select all that apply)**
($n$ = 3,063)

| | | |
|---|---|---|
| No, I filed on my own | ........................................ | 21.2% |
| I attended an information session put on by an organization, but filed on my own | ........................................ | 9.9% |
| I applied with the assistance of an organization | ........................................ | 22.7% |
| I applied with the assistance of a private attorney/immigration lawyer | ........................................ | 49.5% |

Note: percentages do not sum to 100 as individuals may select all that apply.

**Have you applied to renew your DACA status anytime between January 20, 2017 to present?**
($n$ = 3,063)

| | | |
|---|---|---|
| Yes | ........................................ | 41.3% |
| No: I'm eligible to renew, but I haven't submitted my renewal application | ........................................ | 11.2% |
| No: I'm not eligible to submit my renewal application yet | ........................................ | 46.9% |
| No response | ........................................ | 0.6% |

Note: percentages may not sum to 100 due to rounding.

**What is the status of your DACA renewal?**
($n$ = 1,266, which represents the 41.3% of all respondents who have applied to renew)

| | | |
|---|---|---|
| Approved | ........................................ | 76.1% |
| Pending | ........................................ | 23.8% |
| Denied | ........................................ | 0.0% |
| Request for evidence (RFE) | ........................................ | 0.2% |

Note: percentages may not sum to 100 due to rounding.

NJAPP0212

...... **Was your DACA renewal approved after your initial DACA status expired?**
($n = 978$, which represents the 76.1% of respondents who have applied to renew and have been approved)

| | | |
|---|---|---|
| Yes | ......................................... | 57.8% |
| No | ......................................... | 41.7% |
| No response | ......................................... | 0.5% |

Note: percentages may not sum to 100 due to rounding.

...... **How long was the gap between when your DACA renewal was approved and when your initial DACA status expired?**
($n = 565$, which represents the 57.8% of respondents who have applied to renew and were approved after their DACA status expired)

| | | |
|---|---|---|
| Less than 1 week | ......................................... | 28.7% |
| Between 1-2 weeks | ......................................... | 12.4% |
| Between 2-3 weeks | ......................................... | 8.7% |
| Between 3-4 weeks | ......................................... | 12.4% |
| More than 1 month | ......................................... | 35.4% |
| No response | ......................................... | 2.5% |

Note: percentages may not sum to 100 due to rounding.

...... **Did this delay affect your ability to get or keep a job?**
($n = 565$, which represents the 57.8% of respondents who have applied to renew and were approved after their DACA status expired)

| | | |
|---|---|---|
| Yes | ......................................... | 22.5% |
| No | ......................................... | 57.2% |
| Not applicable | ......................................... | 19.5% |
| No response | ......................................... | 0.9% |

Note: percentages may not sum to 100 due to rounding.

NJAPP0213

**Why have you not submitted your renewal application? (select all that apply)**
(*n* = 343, which represents the 11.2% of all respondents who are eligible to renew, but haven't yet)

| | |
|---|---:|
| I already have another immigration application that I'm waiting on | 24.2% |
| It's too expensive: I don't know about a fee waiver | 20.7% |
| It's too expensive: I don't meet the requirements for a fee waiver | 3.8% |
| It's too expensive: I applied for a fee waiver, but was denied | 0.6% |
| Fear of providing updated information to the government | 18.1% |
| Fear that government will use information for immigration enforcement purposes | 25.7% |
| Criminal record | 0.3% |

Note: percentages do not sum to 100 as individuals may select all that apply.

**Do you agree or disagree with the following statement: "I'm less likely to apply to renew my DACA status when I become eligible to do so because I fear that the government will use my information for immigration enforcement purposes."**
(*n* = 1,436, which represents the 46.9% of all respondents who are not eligible to renew yet)

| | |
|---|---:|
| Strongly agree | 10.9% |
| Agree | 16.7% |
| Neither agree nor disagree | 25.1% |
| Disagree | 26.7% |
| Strongly disagree | 20.5% |
| No response | 0.1% |
| | |
| Agree/strongly agree | 27.6% |

Note: percentages may not sum to 100 due to rounding.

NJAPP0214

**What state do you currently live in?**
($n$ = 3,063)

|  | | %<br>Poll | %<br>DACA |
|---|---|---|---|
| California | ............................... | 24.3% | 28.3% |
| Texas | ............................... | 17.4% | 15.8% |
| New York | ............................... | 4.8% | 5.3% |
| Illinois | ............................... | 4.4% | 5.4% |
| Arizona | ............................... | 4.1% | 3.5% |
| Florida | ............................... | 3.3% | 4.2% |
| North Carolina | ............................... | 3.1% | 3.5% |
| Colorado | ............................... | 2.8% | 2.2% |
| Washington | ............................... | 2.7% | 2.3% |
| Georgia | ............................... | 2.6% | 3.1% |
| New Jersey | ............................... | 1.9% | 2.8% |
| Utah | ............................... | 1.9% | 1.2% |
| Tennessee | ............................... | 1.5% | 1.1% |
| Oregon | ............................... | 1.3% | 1.4% |
| Maryland | ............................... | 1.3% | 1.2% |
| Michigan | ............................... | 1.3% | 0.8% |
| New Mexico | ............................... | 1.2% | 0.9% |
| Massachusetts | ............................... | 1.2% | 1.0% |
| Kansas | ............................... | 1.1% | 0.9% |
| Pennsylvania | ............................... | 1.1% | 0.7% |
| Virginia | ............................... | 1.1% | 1.5% |
| Minnesota | ............................... | 1.0% | 0.8% |
| Nevada | ............................... | 1.0% | 1.7% |
| Oklahoma | ............................... | 1.0% | 0.9% |
| South Carolina | ............................... | 1.0% | 0.8% |
| Arkansas | ............................... | 1.0% | 0.6% |
| Other | ............................... | 10.6% | 8.1% |

Note: percentages may not sum to 100 due to rounding.

NJAPP0215

## What is your race/ethnicity?
($n = 3,063$)

| | | |
|---|---|---:|
| White | ................................. | 1.7% |
| Black | ................................. | 1.1% |
| Hispanic/Latino | ................................. | 92.6% |
| Asian or Pacific Islander | ................................. | 3.5% |
| Other | ................................. | 0.9% |
| No Response | ................................. | 0.2% |

Note: percentages may not sum to 100 due to rounding.

| | | % Poll | % DACA |
|---|---|---:|---:|
| Hispanic/Latino | ................................. | 92.8% | 93.5% |
| Other | ................................. | 7.2% | 6.5% |

## How old are you?
($n = 3,063$)

| | | |
|---|---|---:|
| Average | ................................. | 25.2 |
| Median | ................................. | 25 |
| | | |
| 16 | ................................. | 0.4% |
| 17 | ................................. | 1.6% |
| 18 | ................................. | 3.0% |
| 19 | ................................. | 4.4% |
| 20 | ................................. | 5.2% |
| 21 | ................................. | 6.6% |
| 22 | ................................. | 7.6% |
| 23 | ................................. | 8.9% |
| 24 | ................................. | 8.0% |
| 25 | ................................. | 7.1% |
| 26 | ................................. | 8.6% |
| 27 | ................................. | 7.6% |
| 28 | ................................. | 7.3% |
| 29 | ................................. | 6.2% |
| 30 | ................................. | 5.3% |
| 31 | ................................. | 3.6% |
| 32 | ................................. | 3.3% |
| 33 | ................................. | 2.2% |
| 34 | ................................. | 1.8% |
| 35 | ................................. | 1.4% |

Note: percentages may not sum to 100 due to rounding.

NJAPP0216

How old were you when you first came to the U.S.?
($n = 3,063$)

| | | |
|---|---|---|
| Average | ............................................ | 6.5 |
| Median | ............................................ | 6 |
| | | |
| 0 | ............................................ | 4.5% |
| 1 | ............................................ | 7.6% |
| 2 | ............................................ | 8.3% |
| 3 | ............................................ | 9.7% |
| 4 | ............................................ | 8.0% |
| 5 | ............................................ | 8.7% |
| 6 | ............................................ | 7.4% |
| 7 | ............................................ | 7.4% |
| 8 | ............................................ | 6.5% |
| 9 | ............................................ | 6.2% |
| 10 | ............................................ | 5.6% |
| 11 | ............................................ | 5.0% |
| 12 | ............................................ | 3.9% |
| 13 | ............................................ | 3.5% |
| 14 | ............................................ | 4.1% |
| 15 | ............................................ | 3.7% |

Note: percentages may not sum to 100 due to rounding.

NJAPP0217

# Exhibit 10

NJAPP0218

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

**STATE OF TEXAS**, et al.,          )
                                       )
               Plaintiffs,     )
                                       )
v.                                   )     Civil Action No.
                                       )
**UNITED STATES OF AMERICA**, et al.,   )
                                       )
              Defendants     )

## SUPPLEMENTAL DECLARATION OF DONALD DEERE, Ph.D.

My name is Donald Deere, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

### Qualifications

1. I am a Senior Economist for Welch Consulting, a firm that provides expert services in economics and statistics to the legal community, as well as general consulting in economics and statistics. Previously, I served as a Senior Economist for Unicon Research Corporation, a firm that conducted grant and contract research for U.S. government agencies.

2. In 2007, I retired from the tenured faculty of the Department of Economics at Texas A&M University, where I taught courses in labor economics, statistics, and public finance. I have since served as an Adjunct Associate Professor of Economics at Texas A&M University. Formerly, I was Associate Director of the

DEFINT03516
NJAPP0219

George Bush School of Government and Public Service, where I also taught as a member of the visiting faculty in 2008.

3.    I received training in economics and statistics at the Massachusetts Institute of Technology, where I earned a Ph.D. in Economics in 1983.  I have taught at M.I.T., the University of California, Santa Barbara, and Texas A&M University. My research has been published in numerous professional, peer-reviewed journals, including the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, and the *Journal of Labor Economics*.

4.    Attached to this declaration are true and correct copies of the following documents:

- Appendix 1 includes my curriculum vitae and a list of my publications.
- Appendix 2 sets forth the cases in which I have testified in deposition or at trial during the last four years.

### Scope of Inquiry

5.    I have been retained in this case by the Office of the Attorney General of Texas to examine the potential economic impact on the labor market of the Department of Homeland Security Memorandum dated June 15, 2012 ("DHS Memorandum")[1], with particular focus on the interaction between the DHS Memorandum and the employer mandate provisions in the Affordable Care Act ("ACA").

---

[1] The DHS Memorandum regards the exercise of "prosecutorial discretion" for certain immigrants who are not lawfully present.  The subject of the DHS Memorandum, from Janet Napolitano, Secretary of Homeland Security, is "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."

2

DEFINT03517
NJAPP0220

6.     My billing rate for this matter is $525 per hour.

## Background on the Affordable Care Act
## and the DHS Memorandum

7.     It is my understanding that as a result of the DHS Memorandum the number of immigrants who are not lawfully present with an Employment Authorization Document ("EAD") has expanded nationwide.[2] I also understand that these individuals authorized to work are not eligible for the premium subsidies provided by the ACA.[3]

8.     The Congressional Budget Office and the Joint Committee on Taxation in March 2012 estimated the impact of the ACA on nonelderly workers and their families who were projected to receive employment-based coverage in 2016 *in the absence of the ACA.*  The resulting estimates are that 64 million of these individuals will be eligible for subsidies in the exchanges under the ACA.[4]

---

[2] DACA_Population_Data_Mar_31_2018, available at https://www.uscis.gov/tools/reports-studies/immigration-forms-data.
[3] HealthCare.gov, Immigration status and the Marketplace, available at https://www.healthcare.gov/immigrants/immigration-status. See also, 8 U.S. Code § 1611 - Aliens who are not qualified aliens ineligible for Federal public benefits, and 45 CFR 152.2 - Definitions, Legal Information Institute.
[4] Congressional Budget Office, *CBO and JCT's Estimates of the Effects of the Affordable Care Act on the Number of People Obtaining Employment-Based Health Insurance* at 12-14 (Mar. 2012), available at http://www.cbo.gov/sites/default/files/03-15-ACA_and_Insurance_2.pdf. An estimated 8.7 million Marketplace Enrollees were receiving Advance Premium Tax Credits in February 2017. See Kaiser Family Foundation, *Estimated Total Premium Tax Credits Received by Marketplace Enrollees*, available at https://www.kff.org/state-category/health-reform/february-2017-marketplace-enrollment/.

DEFINT03518
NJAPP0221

9.    The ACA mandates that employers with 50 or more full-time employees offer health insurance that provides "minimum value" and is "affordable" to their full-time employees.[5]

10.    To my knowledge, "minimum value" requires that health insurance pay at least 60% of the cost of covered services for employees and their children up to age 26. The ACA does not require the employer to pay the entire cost of this coverage, but the mandate to be "affordable" requires that the cost to the employee for this coverage be no more than 9.56% of the employee's income.[6]

11.    An employer offering coverage that does not provide "minimum value" or is not "affordable" will owe a penalty under the ACA if any of its employees purchases coverage on the insurance exchange *and receives a premium subsidy*.  It is my understanding that this penalty is the lesser of a) $2,320 per year per employee after the first 30 employees, or b) $3,480 per year per employee receiving a premium subsidy.[7]

---

[5] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act at Question 1 (2018), available at https://www.irs.gov/affordable-care-act/employers/questions-and-answers-on-employer-shared-responsibility-provisions-under-the-affordable-care-act.

[6] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act, *supra*, at Questions 38-41.

[7] Internal Revenue Service, Questions and Answers on Employer Shared Responsibility Provisions Under the Affordable Care Act, *supra*, at Questions 52-54.  See also, Edward A. Morse, *Lifting the Fog: Navigating Penalties in the Affordable Care Act*, 46 CREIGHTON L. REV. 207, 221-22 (2013).  For the $3,480 penalty to apply, the employer must have less than a minimum of 26.7% of its employees receiving a premium subsidy.  This cutoff % rises with the number of employees—to 46.7% for an employer with 100 total employees and to a maximum of 66.7% (the cutoff % equals 2/3 − 20/# employees).

DEFINT03519

NJAPP0222

12.     Because this penalty is not a deductible expense for the employer from federal (and possibly state) income taxes,[8] the before-tax penalty amount, which would be compared to the wage, is even larger.[9]

### Interaction of the DHS Memorandum and the ACA on the Labor Market

13.     As a threshold matter, the addition of some 694,000 work-eligible individuals nationwide, with 114,000 of these in Texas, will, other things equal, put downward pressure on wages and make it more difficult for some U.S. citizens to find employment.[10]   In addition, the interaction of the DHS Memorandum and the ACA will further impact employment and wages in the labor market.[11]

14.     Consider an employer facing this penalty that is considering hiring one of two prospective employees.  These two employees are equally productive and are the same in all relevant aspects to this employer, except that applicant A is a U.S. citizen and applicant B is a DACA recipient holding an EAD.

15.     Assume applicants A and B are relatively low skilled, so that the cost to the employee of the coverage offered by this employer exceeds 9.56% of the wage that would be offered to them.  Also assume that this employer expects less than 25% of its employees to obtain a premium subsidy.

---

[8] Morse, *supra*, at 223.
[9] For an employer facing a 21% federal corporate income tax rate and the $3,480 penalty, the equivalent annual before-tax amount is at least $4,405.06.
[10] See DACA_Population_Data_Mar_31_2018, *supra*.
[11] As an example, for the employer in footnote 9, the penalty would increase the relative annual cost of employing a worker for 30 hours per week at the federal minimum wage who receives a premium subsidy by almost 40%.

DEFINT03520
NJAPP0223

16.     In this scenario, the employer would expect applicant A to be more expensive to employ than applicant B because of the interaction of the ACA penalties described above and the DHS Memorandum.  There is an extra cost of $3,480 per year (plus the tax impact noted above) from hiring applicant A if applicant A will receive a premium subsidy.  In contrast, hiring applicant B entails no extra cost because applicant B is not eligible for a premium subsidy.

17.     An employer subject to the ACA penalties described above that is operating to minimize its expected cost of operations will hire applicant B instead of applicant A.  Applicant A, therefore, will take longer to find employment and the resulting employment is more likely to occur at a lower wage.

18.     Depending on the employee cost of insurance, the incentive to hire applicant B can occur at a range of wage levels, as illustrated in the following two examples.

*Example 1*

19.     In addition to the above facts, suppose that applicants A and B would be paid the federal minimum wage of $7.25 per hour.  Assuming 30 hours per week (the definition of full time in the ACA), a monthly employee cost of $90.10 or greater ($7.25 x 130 hours x 9.56%) would make the employer-provided coverage not "affordable" and would make applicant A eligible for the premium subsidy and potentially trigger the extra $3,480 per year cost (plus the tax impact) from hiring applicant A.[12]  There is no extra cost from hiring applicant B.

---

[12] At 40 hours per week, the monthly employee cost would have to be no more than $120.13 to be "affordable."

DEFINT03521

NJAPP0224

20.    As a result, the employer will hire applicant B instead of applicant A if the employer is operating to minimize its expected cost of operations.

*Example 2*

21.    As an alternative, suppose that applicants A and B would be paid $30,000 per year (about twice the federal minimum wage for 40 hours per week).[13] A monthly employee cost for employee and dependent coverage in excess of $239.00 (9.56% x $30,000/12) would not be "affordable" and would make applicant A eligible for the premium subsidy and potentially trigger the extra $3,480 per year cost (plus the tax impact) from hiring applicant A.  Again, there is no extra cost from hiring applicant B.

22.    Similar to the previous example, the employer in this example would be expected to hire applicant B instead of applicant A in an effort to minimize costs.

## Other Aspects of the Impact of the DHS Memorandum on the Labor Market

23.    Economic theory implies that the demand curve for a labor input slopes downward.[14] In other words, as the price (or wage) of a labor input decreases, other things equal, more of that labor input will be used by employers.  Conversely, as more of a labor input is made available, such as via immigration, the wage of that labor

---

[13] Using 35 hours per week instead of the ACA limit of 30 to define full-time, the U.S. Census Bureau reports that more than 23.8 million persons were employed full-time and full-year in 2016 with annual earnings below $30,000.  U.S. Census Bureau, *Current Population Survey, 2017 Annual Social and Economic Supplement* at Table PINC-10, *available at* https://www.census.gov/data/tables/time-series/demo/income-poverty/cps-pinc-pinc-10.2016.html.

[14] See, for example, Hal R. Varian, *Intermediate Microeconomics: A Modern Approach*, W. W. Norton & Company: New York, 1987, p. 327.

7

input will fall, other things equal.  Although the theoretical implication that, other things equal, immigration reduces the wages of native workers with the same skills is clear, there is no consensus in the economic literature on the magnitude of this effect.[15]

### Conclusion

24.    The DHS Memorandum and its interaction with the mandate provisions of the ACA gives employers a financial incentive to hire an immigrant who is not lawfully present and who is authorized to work instead of an identically skilled citizen in certain instances.

25.    Based on my knowledge and expertise in labor economics, it is my expert opinion that as a result of DHS Memorandum and its interaction with the ACA, there will be relatively less hiring of U.S. citizens and relatively lower wages on average for those who are hired.  The interplay between the DHS Memorandum and the ACA makes some U.S citizens more expensive to hire than equally productive immigrants who are not lawfully present.

26.    This result will have adverse consequences for certain U.S. citizens because some employers will find it financially advantageous to hire an immigrant

---

[15] See, for example, George J. Borjas, "The Labor Demand Curve *Is* Downward Sloping: Reexamining the Impact of Immigration on the Labor Market," *The Quarterly Journal of Economics*, Vol. 118, No. 4 (2003), pp. 1335-1374, and David Card, "Immigrant Inflows, Native Outflows, and the Local Labor Market Impacts of Higher Immigration," *Journal of Labor Economics*, Vol. 19, No. 1 (2001), pp. 22-64.

DEFINT03523
NJAPP0226

who is not lawfully present and who is authorized to work in the U.S. instead of an equally productive U.S. citizen.

27.   All of the facts and information contained within this declaration are within my personal knowledge and are true and correct to the best of my knowledge.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of June, 2018.

_____
DONALD DEERE

9

Appendix 1

DEFINT03525
NJAPP0228



# Donald R. Deere, Ph.D.

**WELCH CONSULTING**
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

Donald R. Deere is a Senior Economist in the Bryan, Texas office of Welch Consulting. Dr. Deere's work has included statistical and economic analysis in cases involving claims of discrimination in employment, housing, transportation and insurance, in cases involving wage and hour violations, and in cases involving lost earnings or commercial damages. He also has conducted analyses of compensation practices for internal and OFCCP audit purposes. Dr. Deere has provided testimony in cases in both state and federal courts.

Dr. Deere has a Ph.D. in economics from the Massachusetts Institute of Technology. In 2007, Dr. Deere retired from the tenured faculty of the Department of Economics at Texas A&M University, where he taught courses in labor economics, economic principles and public finance. While at Texas A&M University, he also taught graduate statistics in, and was Associate Director of the George Bush School of Government and Public Service. Dr. Deere also is Senior Economist for Unicon Research Corporation, where he served as Vice President from 2001-2004. Dr. Deere's research has concentrated primarily on labor markets and public policy affecting wages and employment. His research has been published in numerous professional peer-reviewed journals, including the *American Economic Review*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, and the *Journal of Labor Economics*.

## EDUCATION

Ph.D., Economics
Massachusetts Institute of Technology
Cambridge, Massachusetts
1983

B.S., Economics
Texas A&M University
College Station, Texas
1978

## PROFESSIONAL EXPERIENCE

Senior Economist
Welch Consulting
Bryan, Texas
2005 – Present

Senior Economist
Unicon Research Corporation
Bryan, Texas
2001 – 2016

Adjunct Associate Professor of Economics
Texas A&M University
College Station, Texas
2007 – 2009
2010 – Present

Visiting Faculty
George Bush School of Government
and Public Service
Texas A&M University
College Station, Texas
2008

Associate Professor of Economics
Texas A&M University
College Station, Texas
1990 – 2007

Senior Consultant
Welch Consulting
Bryan, Texas
1991 – 2005

Associate Director for Academic Programs
George Bush School of Government
and Public Service
Texas A&M University
College Station, Texas
1996 – 1999

## PUBLICATIONS

"Analyzing Reductions in Force and Other Termination Decisions," with James E. Pearce in Adverse Impact Analysis:  Understanding Data, Statistics, and Risk, edited by Scott B. Morris and Eric M. Dunleavy, Routledge Taylor & Francis Group, (2017): 239-257.

"Minimum Sense," NBIZ Magazine, (Winter 2006):8-10.  Also found on NBIZMag.com.

"Educational Wage Premia and the U.S. Income Distribution: A Survey," with Jelena Vesovic in Handbook of the Economics of Education, edited by E. Hanushek and F. Welch, Elsevier Science, (2006):255-306.

"Inequality, Incentives, and Opportunity," with F. Welch.  Social Philosophy & Policy, 19, no. 1, (Winter 2002).  Also in Should Differences in Income and Wealth Matter? edited by E.F. Paul, F.D. Miller, Jr. and J. Paul. Cambridge University Press (2002):84-109.

"Trends in Wage Inequality in the United States," in Increasing Inequality in America: The Facts, Causes, and Consequences, edited by F. Welch. University of Chicago Press, (2001):9-35.

"Don't Raise the Minimum Wage - The Bar is Already Too High," Brief Analysis No. 270, NCPA, (June 1998).

"Evidence on Minimum Wages and Employment Following the 1990/91 Increase in the Federal Minimum Wage," with K. Murphy and F. Welch.  In Effects of the Minimum Wage, edited by M. Kosters.  AEI Press, (1996).

"Minimum Sense: Raising Wages from $4.25 to $5.15 an Hour Will Cause Lower Skilled Workers to Lose Their Jobs," Texas Business, (September 1996).

"Employment and the 1990/91 Minimum Wage Hike," with K. Murphy and F. Welch.  American Economic Review, 85, no. 2, (May 1995):232-37.

"Sense and Nonsense on the Minimum Wage," with K. Murphy and F. Welch.  Regulation, 18, no.1, (1995):47-56.

DEFINT03526

NJAPP0229



# Donald R. Deere, Ph.D.

WELCH CONSULTING
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

**PROFESSIONAL EXPERIENCE**
(continued)

Visiting Assistant Professor of Economics
University of California
Santa Barbara, California, 1988 – 1989

Assistant Professor of Economics
Texas A&M University
College Station, Texas
1983 –1990

## PUBLICATIONS (continued)

"Home Equity: Texas Should Unlock This Asset," The Dallas Morning News, April 23, 1995.

"Unionization and Profitability: Evidence of Spillover Effects," with S.G. Bronars,  Journal of Political Economy, (December 1994):1281-87.

"The Effects of Unions on Firm Behavior: An Empirical Analysis using Firm-Level Data," with S.G. Bronars and J.S. Tracy, Industrial Relations, (October 1994):426-51.

"A Study of Nonsubscription to the Texas Workers' Compensation System: The Employee Perspective," (July 1994) Texas Workers' Compensation Research Center.

"A Study of Nonsubscription to the Texas Workers' Compensation System," Texas Workers' Compensation Research Center, (August 1993).

"Union Organizing Activity, Firm Growth, and the Business Cycle," with S.G. Bronars. American Economic Review, (March 1993):203-20.

"Unionization, Incomplete Contracting, and Capital Investment," with S.G. Bronars. The Journal of Business, (January 1993):117-32.

Review of "Labor Unions and the Economic Performance of Firms," Industrial and Labor Relations Review, (July 1993):732-33.

"Unemployment Insurance and Employment." Journal of Labor Economics, (October 1991):307-24.

"The Threat of Unionization, the Use of Debt, and the Preservation of Shareholder Wealth," with S.G. Bronars.  Quarterly Journal of Economics, (February 1991):231-54.

"Union Representation Elections and Firm Profitability," with S.G. Bronars.  Industrial Relations, (Winter 1990):15-37.

"On the Potential for Private Insurers to Reduce the Inefficiencies of Moral Hazard."  International Review of Law and Economics, (December 1989):219-22.

"Internal Labor Markets, Large Personnel Systems, and the Military."  Economics of Defense Manpower Conference Final Report, United States Air Force Academy, (June 1988).

"Bilateral Trading as an Efficient Auction Over Time."  Journal of Political Economy, (February 1988):100-15.

"Labor Turnover, Job-Specific Skills, and Efficiency in a Search Model."  Quarterly Journal of Economics, (November 1987):815-33.

## SELECTED WORKING PAPERS

"Plant Closings, Large Layoffs, and Advance Notice Provision," with S.N. Wiggins.

"Tax Rates, Tax Complexity, and the Usage of Paid Tax Return Preparers," with C. Wolfe.

"Subscription to Workers' Compensation in Texas."

"Heads I Win, Tails You Lose:  The Economic Impact of the Texas Lottery on Demographic Groups," with J. Dyer.



**WELCH CONSULTING**
1716 Briarcrest Drive, Suite 700
Bryan, TX 77802
979.691.0704
DDeere@welchcon.com

# Donald R. Deere, Ph.D.

## SELECTED WORKING PAPERS (continued)

"The Cross Sectional Impact of Unemployment Insurance on Layoffs, Employment, and Wages," with J.A. Miron.

"Part-Time Employment," with S.G. Bronars.

"Union Organizing Activity and Union Membership 1973-1988," with S.G. Bronars.

"Union Membership, Union Organizing Activity, and the Union Wage Differential 1973-1988," with S.G. Bronars.

"Competitive Incentives: School Accountability and Student Outcomes in Texas," with W.E. Strayer.

"Climbing the Economic Ladder," with A.J. Rettenmaier.

## HONORS AND AWARDS

**Fellowships:**
   National Science Foundation Graduate Fellowship.
   Rotary Foundation Graduate Fellowship.
   Sloan Foundation Dissertation Research Fellowship.

**Research Grants/Contracts:**
   Grant from the Smith Richardson Foundation, "Social Security, Wages and Retirement," 1995.

   Four Contracts with the Texas Workers' Compensation Research Center, "Nonsubscription to the Texas Workers' Compensation System," 1992-1995.

   Grant from the Texas Advanced Research Program, "Unionization, Profitability, and Firm Behavior," 1988.

   Grant from the U.S. Department of Health and Human Services, "Demand Variability, Structural Changes in the Labor Market and the Growth of Part-Time Employment," with S.G. Bronars, 1984.

**Peer Review:**

Professional Journals:
   American Economic Review
   Journal of Political Economy
   Quarterly Journal of Economics
   Journal of Labor Economics
   Review of Economic Studies
   Rand Journal of Economics
   Review of Economics and Statistics
   Economic Journal
   Industrial Relations
   Economic Inquiry
   Industrial and Labor Relations Review
   Industrial Relations
   Journal of Labor Research

Grants Competition:
   National Science Foundation

**ABOUT WELCH CONSULTING**

Welch Consulting has more than 30 years experience assisting clients of every size in matters involving employment issues and complex business litigation across a broad spectrum of industries and public sector entities. Our track record in producing rigorous analyses meeting the highest standards of accuracy, clarity and punctuality makes Welch Consulting a consistent choice for industry leading companies and the nation's preeminent law firms.

Welch Consulting has offices in Los Angeles, Texas and Washington DC.

For more information about our professionals and services visit us online at www.welchcon.com

Appendix 2

DEFINT03529
NJAPP0232

### Testimony Given in Last 4 Years by Donald Deere

United States of America and the State of Texas, Ex Rel. Keith Waldmann et al. v.
McAllen Medical Center, et al.
Deposition: 11/10/16
In the United States District Court for the Southern District of Texas McAllen Division
Civil Action No. 7:13-cv-495(M)

AJP Oil Company, LLC, D/B/A Grapeland Fuel and BBQ v. Velvin Oil Company, Inc.
Deposition: 07/12/16
In the 3rd District Court of Houston County, Texas
Civil Action No. 14-0217

Kimberly A. Nice, a Personal Representative of the Estate of Shawn R. Nice v. L-3
Communications Vertex Aerospace, LLC, et al
Deposition: 06/17/16
In the United States District Court for the Northern District of Florida, Pensacola
Division
Civil Action No. 3:12-CV-00009-MCR-CJK

Barbara Semons, as Next Friend and Guardian of William Warren v. Houston Party
Rental, Inc. and Sam Houston Area Council Boy Scouts of America
Deposition: 06/12/15
In the 80th Judicial District Court, Harris County, Texas
Cause No. 201407399

Noll, et al. v. Ebay Inc., et al.
Deposition: 09/29/14
United States District Court Northern District of California, San Jose Division
Case No. 5:11-CV-04585-EJD

2018
DEFINT03530
NJAPP0233

# Exhibit 11

NJAPP0234

STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.
Angelo Onofri on 06/25/2018

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION

 3

 4    STATE OF TEXAS, et al.,           )
                                        )
 5              Plaintiffs,             )
                                        )
 6    v.                                )
                                        )
 7    UNITED STATES OF AMERICA, et al.,)
                                        )
 8              Defendants,             )
                                        )
 9    and                               )Case No.:
                                        )1:18-cv-00068
10    KARLA PEREZ, et al.,              )
                                        )
11              Defendant-Intervenors. )

12

13

14

15              Deposition of ANGELO J. ONOFRI,

16    ESQUIRE taken pursuant to notice, held at the

17    25 Market Street, Sixth Floor, Trenton, New

18    Jersey 08611 commencing at 9:06 a.m., on the

19    above date, before Jennifer P. Miller, RPR,

20    CCR, CRR #30XI00235100 and Notary Public.

21

22

23

24

25
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0235

STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.
Angelo Onofri on 06/25/2018                                    Pages 70..73

Page 70

1  notify ICE if we have someone that's a
2  defendant that they will -- or if someone's
3  charges have been dismissed and there's a
4  detainer we will notify ICE so technically they
5  wouldn't have criminal status at that point.
6              On top of that, my office
7  doesn't control the Mercer County Corrections
8  Center nor does the sheriff, there's a separate
9  Department of Corrections for Mercer County.
10 The current policy for the county corrections
11 department is that if charges are dismissed
12 against an individual that has an ICE detainer,
13 the minute the corrections center finds out
14 about that dismissal they will then -- so,
15 again, technically they're not a defendant at
16 that point.  They will then notify ICE and hold
17 that individual on the ICE detainer until 11:59
18 that evening this way the release could be --
19 the release or transfer could be effectuated
20 that same day.
21    Q.   That makes sense.
22    A.   That's been in existence for as long
23 as I can remember.
24    Q.   Let's go to paragraph 11, please.
25    A.   11?

Page 71

1     Q.   Let me know when you're there.
2     A.   Okay.
3     Q.   "On the other hand, the core missions
4  of my office are undermined when a significant
5  portion of the population is fearful of the
6  government and particularly law enforcement and
7  thus will not cooperate with us in our effort
8  to protect them.  To counter this, we must be
9  able to convince immigrants that they have no
10 reason to fear law enforcement agencies.  I
11 believe that DACA is an important tool to help
12 us to do so."
13             Did I generally read that
14 correctly?
15    A.   Yes, although we used -- I used
16 agents, not agency, but, yes, you did.
17    Q.   Sorry about that.  We talk in terms
18 of agencies more than agents, that's probably
19 why I did that.
20             So do you, as you sit here
21 today, know that the undocumented immigrant
22 population in Mercer County is a significant
23 portion of the population?
24    A.   Could you rephrase that?
25    Q.   Sure.

Page 72

1              You remember earlier when we
2  discussed the --
3     A.   Exhibit A.
4     Q.   Yes, sir.  Do you remember when we
5  discussed Exhibit A and we talked about how
6  being born outside the United States doesn't
7  necessarily indicate an undocumented or
8  unlawful status.  Do you remember that?
9     A.   That's correct, yes.
10    Q.   With that in mind, as you sit here
11 today is it your position that a significant
12 portion of the population in Mercer County is
13 an undocumented immigrant?
14    A.   I believe we have two towns here, the
15 City of Trenton and Hightstown where there are
16 significant -- where there is a significant
17 undocumented population.
18    Q.   Do you have any idea how large that
19 population is?
20    A.   No.  I'm afraid I don't.  There was a
21 lot of talk particularly during the elections
22 that, you know, although the Latino population
23 in the city of Trenton has now eclipsed the
24 African-American population as the majority
25 population.  There was some extrapolation that,

Page 73

1  you know, based on voting numbers it appears a
2  lot of people aren't able to vote because of
3  status.  Again, that's just anecdotal.
4     Q.   Media accounts?
5     A.   Yes.
6     Q.   Last sentence:  "I believe that DACA
7  is an important tool to help us to do so."
8              Why do you believe that DACA is
9  an important tool in that regard?
10    A.   Again, my understanding of the DACA
11 protections, my view is that those people who
12 have the DACA protections are more likely than
13 someone who is completely undocumented to come
14 forward and report a crime.  Again, my concern
15 is that crime gets reported, that the criminal
16 population gets convicted and justice is done
17 for them.
18             And as I mentioned before, a lot
19 of times the criminal element doesn't
20 particularly -- you know, when they rob
21 somebody, they don't ask, "By the way are you
22 documented?"  They just -- they just rob
23 someone.  And if they look like part of that
24 Latino immigration community, I think someone
25 who is a citizen would be likely to be robbed,

www.huseby.com              Huseby, Inc.  Regional Centers              800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0236

STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.
Angelo Onofri on 06/25/2018                    Pages 74..77

Page 74

1  because we do have a lot of people -- of the
2  Latino community that are citizens.  And,
3  again, I view this as a public safety
4  mechanism.
5      Q.  What evidence do you base your belief
6  that DACA is important?
7      A.  I just think, again, it's from the --
8  from doing this for 20 years, I know DACA has
9  been around since 2012.  But when DACA came
10 out, there was a little more of a comfort level
11 in the immigrant community based on what we
12 heard in a lot of the community organization
13 meetings and from the leaders of those
14 communities.
15     Q.  And that comfort level was
16 communicated to you by someone telling you
17 that?
18     A.  Yes.
19     Q.  From 2011 -- actually withdrawn.
20         Was there an increase in
21 reporting of crimes from 2012 to 2011?
22             MR. HOLLANDER:  Objection.
23             THE WITNESS:  In general?
24 BY MR. BIGGS:
25     Q.  Yes.

Page 75

1      A.  I'm sorry.
2      Q.  Let me clarify.
3             MR. HOLLANDER:  You mean between
4  2011 and --
5             MR. BIGGS:  No, we're going to
6  compare the years.
7  BY MR. BIGGS:
8      Q.  So the 2011 numbers compared to the
9  2012 numbers for reporting crimes, was there an
10 increase in Latino population reporting crimes?
11     A.  I can't answer that specifically.  We
12 don't keep track of victim or witness ethnicity
13 through any program that I could push some kind
14 of button and have that material generate.  But
15 what I can tell you is that there has been a
16 steady increase in the reporting of crime in
17 general.  When I first started at the office,
18 we were at about 42 to 4500 indictable
19 complaints, were between 6,000 and 6200 now for
20 indictables.
21     Q.  And you take that increase in
22 indictments as being related to increased
23 reporting of crimes, correct?
24     A.  I take it that people are reporting
25 crime, whether it's specifically the Latino

Page 76

1  population, I couldn't tell you.
2      Q.  Could that increase in indictable
3  offenses also just be an increase in the crime
4  rate?
5      A.  To the best of my knowledge our crime
6  rate has held fairly steady throughout the
7  years.  In fact, we've seen some increases in
8  some areas, but generally overall decreases in
9  a lot of the areas.  I mean, it could also be
10 that there's more indictable crimes now that
11 are being committed.  You know, we have the
12 opioids epidemic here which has caused a lot of
13 the increases in particularly the property
14 crimes and a lot of the strong-arm robberies
15 for people trying to get whatever they can to
16 purchase a deck of heroin.
17     Q.  Would the rescission of the DACA
18 program prevent your office from continuing to
19 conduct community forums to help foster trust
20 between law enforcement and undocumented
21 immigrants?
22     A.  This is something that we've been
23 doing for a long time.  And our job is always
24 to make sure that the crimes get reported.
25 Again, my personal opinion is that if a DACA

Page 77

1  gets rescinded that that's going to perpetuate
2  a little more distrust and I do think we're
3  going to have to continue to do the forums and
4  things along those lines in order to build that
5  trust up again.
6             MR. BIGGS:  Can I get the
7  question read back.
8             -  -  -
9             (Whereupon, a portion of the
10 testimony was read back.)
11            -  -  -
12            MR. HOLLANDER:  I object to
13 answering it a second time.
14            But you can.
15            THE WITNESS:  No.  For the
16 reasons in the long answer.
17 BY MR. BIGGS:
18     Q.  And the "no" is what I was looking
19 for.
20         And would the rescission of DACA
21 make U visas unavailable for victims of crimes?
22     A.  No.  Nor material witnesses.
23     Q.  Would the rescission of DACA
24 eliminate the use of T visas by your office?
25     A.  No, I don't believe it would.  That's

www.huseby.com                    Huseby, Inc.  Regional Centers                    800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0237

# Exhibit 12

NJAPP0238

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Daniela Velez on 06/19/2018

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF TEXAS

 3                  BROWNSVILLE DIVISION

 4                CASE NO. 1:18-cv-00068

 5

 6    --------------------------------X

 7    STATE OF TEXAS, et al.,                 :

 8                          Plaintiffs, :

 9         vs.                               :

10    UNITED STATES OF AMERICA, et al.,   :

11                          Defendants, :

12         and                              :

13    KARLA PEREZ, et al.,                   :

14              Defendant-Intervenors. :

15    --------------------------------X

16

17            DEPOSITION OF DANIELA VELEZ

18                (Taken by Plaintiff)

19               Trenton, New Jersey

20                  June 19, 2018

21

22

23    Reported by:   Catherine Golembeski
                      Certified Court Reporter-NJ
24                    Registered Professional Reporter
                      Notary Public
25
```

www.huseby.com          Huseby, Inc. Regional Centers          800-333-2082
        Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0239

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Daniela Velez on 06/19/2018                                    Pages 30..33

Page 30

1  what inspired your business idea?
2      A.   Yeah, through undergraduate research.
3      Q.   So you started that business in 2016.
4  Did you have any other jobs in addition to this
5  business?
6      A.   My current job.
7      Q.   What is your current job?
8      A.   I work for NJBIA.
9      Q.   Can you tell me what those initials
10 stand for?
11     A.   New Jersey Business and Industry
12 Association.
13     Q.   Okay.  And what's your job there?
14     A.   I do recruitment opportunities for
15 small businesses to take advantage of our programs
16 in the State of New Jersey.
17     Q.   Is this a government job?
18     A.   No.
19     Q.   And what kind of programs do they
20 offer?
21          MS. DROZ:  Objection.
22     A.   Cost savings, insurance, professional
23 development, networking events.
24     Q.   When did you start at that job?
25     A.   July of 2016.

Page 31

1      Q.   When you started at that job, did they
2  ask you to show a work authorization?
3      A.   Yes.
4      Q.   Did you have to fill out human
5  resources forms with the Social Security number?
6      A.   Yes.
7      Q.   Then through your current job, do you
8  have any, like, employee benefits, like, a
9  retirement plan?
10          MS. DROZ:  Objection.
11     Q.   If you know, you can answer.
12     A.   We have a benefits packet, but to be
13 honest, I don't even understand my benefits packet
14 yet.
15     Q.   Okay.  Let me, sometimes people refer
16 to the retirement plan as a 401K.  Do you know if
17 that's part of your benefits package?
18     A.   Yes.
19     Q.   And do you know if you have health
20 insurance through your job?
21     A.   Yes.
22     Q.   Did you have health insurance before
23 you had this job?
24     A.   No.
25     Q.   So I know you said at the beginning

Page 32

1  that when you got that first DACA work
2  authorization, it was valid for two years.  Have
3  you applied for renewals?
4      A.   Yes.
5      Q.   And how many times have you been able
6  to renew?
7      A.   Twice.
8      Q.   What do you have to do for the renewals
9  when you apply for them?
10          MS. DROZ:  Objection.
11     A.   Fill out the application.
12     Q.   Is there anything different from the
13 first time you applied to the renewal?
14     A.   No supporting documents.
15     Q.   And have you been approved for the
16 renewal both times that you applied for it?
17     A.   Yes.
18     Q.   Whenever your work authorization gets
19 renewed, have you had to apply it to your
20 employers?
21          MS. DROZ:  Objection.
22     Q.   I'm sorry, have you had to show it to
23 your employers?
24     A.   Yes.
25     Q.   Do you know when your next renewing is

Page 33

1  due?  Forget that question.  Let me ask it better.
2          How long is your current work
3  authorization valid for?
4      A.   March 2019.
5      Q.   Okay.  I'm looking here at your
6  declaration, and it says that you paid in 2017, you
7  paid state income taxes to New Jersey, and I
8  imagine you also paid Federal income taxes the same
9  year?
10     A.   Yes.
11     Q.   And do you know anything about an
12 earned income credit?
13     A.   No.
14          MS. DROZ:  Objection.
15     Q.   So you mentioned that your work
16 authorization is valid until March 2019.  And have
17 you spoken to your employer about what would happen
18 if DACA was ended and you lost that work
19 authorization?
20          MS. DROZ:  Objection.
21     A.   No.
22     Q.   Do you know if you'd be able to keep
23 the job you have now without the work
24 authorization?
25          MS. DROZ:  Objection.

NJAPP0240

# Exhibit 13

NJAPP0241

STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.
Diana Gonzalez on 06/25/2018

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 BROWNSVILLE DIVISION

 3

 4    STATE OF TEXAS, et al.,           )
                                        )
 5            Plaintiffs,               )
                                        )
 6    v.                                )
                                        )
 7    UNITED STATES OF AMERICA, et al.,)
                                        )
 8            Defendants,               )
                                        )
 9    and                               )Case No.:
                                        )1:18-cv-00068
10                                      )
      KARLA PEREZ, et al.,              )
11                                      )
              Defendant-Intervenors. )
12

13

14

15            Deposition of DIANA GONZALEZ taken

16    pursuant to notice, held at the 25 Market

17    Street, Sixth Floor, Trenton, New Jersey 08611

18    commencing at 1:08 p.m., on the above date,

19    before Jennifer P. Miller, RPR, CCR, CRR

20    #30XI00235100 and Notary Public.

21

22

23

24

25
```

NJAPP0242

**STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.**
Diana Gonzalez on 06/25/2018                     Pages 18..21

Page 18

1  the employment information?
2      A.   I believe it's a number on the I-9
3  that they submit.
4      Q.   So looking at federal immigration
5  paperwork, they could potentially figure out?
6      A.   I think so.
7      Q.   And did you personally ask these
8  universities to tell you how many individuals
9  that worked there have DACA status?
10      A.   I did.
11      Q.   And did they report an approximate
12  number?
13      A.   To the best of their ability.
14      Q.   What was that approximate number?
15      A.   It varies by sector.
16      Q.   What is the largest sector employing
17  DACA recipients?
18      A.   Community colleges.
19      Q.   Do you know how many DACA recipients
20  are employed -- actually, withdrawn.
21           At what community college are
22  the most DACA recipients employed?
23      A.   I don't know.
24      Q.   Do you know the maximum number of
25  DACA recipients, and at any particular community

Page 19

1  college?
2           MR. HOLLANDER:  Objection to
3      form.
4  BY MR. BIGGS:
5      Q.   You can answer.
6      A.   Any particular -- not a particular
7  one, I just know the total.
8      Q.   And what's the total?
9      A.   It's about 30.
10      Q.   And how many -- and those are just
11  community colleges?
12      A.   Yes.
13      Q.   How many community colleges does that
14  encompass?
15      A.   Nineteen.
16      Q.   And then -- so we have community
17  colleges.  What about like these four-year
18  universities, how many DACA recipients work at
19  those four-year universities those being
20  Rutgers, The State University of New Jersey,
21  New Jersey Institute of Technology, Rowan
22  University, and Montclair State University?
23      A.   I think it's about five.
24      Q.   And excluding the ones I just named,
25  how many other universities does New Jersey

Page 20

1  have that are public in nature?
2      A.   Aside from the public research and
3  the community colleges, it would be seven more,
4  those listed in section 6.
5      Q.   And so there's 19 community colleges
6  and then there are 12 research universities?
7      A.   No.  Four research, seven state
8  colleges and universities, and 19 community
9  colleges, but they're all public.
10      Q.   Sure.  Let me back up and ask it a
11  better way:  How many public institutions are
12  there in the state of New Jersey?
13      A.   So it depends how you define
14  "public."  I know, because they're funded very
15  differently and it's a different classification
16  by statute.  So they all receive some sort of
17  fiscal support from the state.  All of the
18  institutions, the amount varies.  So the way
19  that it's classified here in the state is by
20  public research, state college, which is still
21  a public college, and then community college,
22  which is still a public --
23      Q.   I'm glad to hear school financing is
24  confusing to everyone.  So let's ask it -- I'm
25  going to ask a far more broad way.

Page 21

1      A.   Sure.
2      Q.   Just total institutions of higher
3  education public or private regardless of
4  funding stream, how many are there?
5      A.   How many what are there?
6      Q.   In the state of New Jersey.  I'm
7  talking about just --
8      A.   Oh, institutions?
9      Q.   Yes.
10      A.   I think there are over about 50, like
11  over 50.
12      Q.   How many of those over 50 receive
13  fiscal support from the state in any form?
14           MR. HOLLANDER:  Objection to
15      form.
16           THE WITNESS:  Many, many of them
17      do.  I don't want to say the majority, but
18      in some sort of grants and aid, whether
19      it's operating aid, direct appropriation
20      or grants that are awarded to students,
21      many of them.
22  BY MR. BIGGS:
23      Q.   Is operating aid the largest -- I
24  mean, call it a bucket of money, that y'all
25  give out?

NJAPP0243

STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.
Diana Gonzalez on 06/25/2018                                    Pages 38..41

Page 38

1        MR. HOLLANDER:  Objection.
2        THE WITNESS:  Do I agree with
3    you that that assumes they won't have an
4    alternative way?
5 BY MR. BIGGS:
6    Q.   Yes, ma'am.
7    A.   The majority of DACA recipients are
8 from disadvantaged backgrounds from my
9 understanding through conversations with the
10 presidents and a lot of these institutional
11 leaders and they experience a great deal of
12 economic hardship.
13    Q.   And disadvantaged backgrounds and
14 economic hardships are something that qualifies
15 an individual for TAG grants, correct?
16    A.   Yes.
17    Q.   And being from a financially
18 disadvantaged background also helps qualify
19 somebody for an EOF grant, correct?
20    A.   It can.
21    Q.   Okay.  So back to my initial
22 question.  So all I'm looking for is you
23 indicated that a big issue would be if DACA
24 goes away, they won't be able to potentially
25 pay tuition out of pocket.

Page 39

1        MR. HOLLANDER:  Objection.
2        THE WITNESS:  Pay for the entire
3    cost of attendance, not just tuition.
4 BY MR. BIGGS:
5    Q.   So that position you would agree
6 assumes that work authorization is the only
7 source of income that a DACA recipient has?
8        MR. HOLLANDER:  Objection.
9        THE WITNESS:  Work authorization
10    or the ability, like just working?
11 BY MR. BIGGS:
12    Q.   Yes.
13    A.   Yes.
14    Q.   That's a "yes"?
15    A.   Yes.
16    Q.   Sorry.  We got kind of on top of each
17 other there.
18    A.   Yeah.
19    Q.   You'd agree with me that that
20 position about the loss of a work authorization
21 and inability to pay cost of attendance, also
22 assumes that a DACA recipient would not
23 continue to work illegally in the United
24 States?
25        MR. HOLLANDER:  Objection.

Page 40

1        THE WITNESS:  I don't know.  You
2    mean, it assumes -- oh, I don't know that
3    they would do that or not.
4 BY MR. BIGGS:
5    Q.   That wasn't my question.  It was just
6 about the proposition that you're putting out
7 in your declaration.  Is the proposition that
8 it's going to financially impact them, not
9 being able to pay the cost of tuition, does
10 that assume that DACA recipients are all going
11 to cease working immediately?
12        MR. HOLLANDER:  Objection.
13    Because I am not sure that proposition as
14    phrased is in the declaration.
15 BY MR. BIGGS:
16    Q.   Can you answer it?
17    A.   I don't know if it makes that
18 assumption.
19    Q.   Sure.  You know, what, let's unpack
20 it a different way.
21        So would you agree with me that
22 if a DACA recipient after the rescission of
23 DACA continued to work illegally, they would
24 have no real impediment to paying tuition at
25 that point tied to work authorization, correct?

Page 41

1        MR. HOLLANDER:  Objection.
2        THE WITNESS:  It depends on what
3    kind of job they would get and how much
4    that pays and is it enough to cover the
5    cost of tuition which for a family under
6    $30,000 a year, attending two years is
7    about 107 percent of their yearly income
8    and attending a four years is 88 percent
9    of their yearly income.
10 BY MR. BIGGS:
11    Q.   Okay.  If DACA were to be rescinded,
12 how many DACA recipients do you estimate would
13 drop out of school without finishing their
14 degree?
15        MR. HOLLANDER:  Objection.
16        THE WITNESS:  I have no idea.
17 BY MR. BIGGS:
18    Q.   Okay.  Let's go to paragraph 9,
19 please.
20    A.   Okay.
21    Q.   I'm going to break this kind of into
22 pieces.  It's a little long.
23    A.   Sure.
24    Q.   "These public educational
25 institutions have much to lose if DACA is

www.huseby.com                    Huseby, Inc.  Regional Centers                    800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0244

STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.
Diana Gonzalez on 06/25/2018                    Pages 42..45

Page 42

1  repealed.  First, they will lose hundreds of
2  thousands of dollars in tuition revenue if DACA
3  is rescinded."
4        Did I generally read that first
5  sentence -- two sentences correctly?
6     A.  Yes.
7     Q.  Currently, how many hundred of
8  thousands of dollars do the public institutions
9  in the state of New Jersey receive from DACA
10  recipients?
11     A.  I don't know the exact number.  But I
12  know that with the amount that some
13  institutions have reported, and depending on
14  their cost of tuition and fees, it's a lot of
15  money.
16     Q.  But you can't, as you sit here today,
17  give me a precise number of how much -- or how
18  many -- actually, but as you're sitting here
19  today, you can't tell me precisely how much
20  tuition revenue would be lost if DACA is
21  rescinded, right?
22     A.  I can't give an exact amount, no.
23     Q.  Okay.  Let's go to paragraph 10,
24  actually and not worry about the rest of 9.  It
25  says:  "DACA grantees who continue to attend

Page 43

1  school post termination may not be able to
2  fully participate in a variety of activities,
3  including sport teams, study abroad programs,
4  research projects, workplace internships,
5  graduate program teaching, and travel
6  opportunities because they would lack the
7  necessary work and travel authorizations.
8  These factors may shrink the capacity of the
9  state public educational institutions to offer
10  such programs to their entire student body.
11  Public universities may also be forced to alter
12  recruitment of both students and faculty."
13        Did I generally read that
14  correctly?
15     A.  Yes.
16     Q.  So you'll agree with me that if DACA
17  goes away, some DACA recipients will continue
18  to attend school, correct?
19        MR. HOLLANDER:  Objection.
20        THE WITNESS:  Some could.
21  BY MR. BIGGS:
22     Q.  You mentioned a list of things that
23  would be impacted potentially by the rescission
24  of DACA.  And one of them being sports teams.
25  How are sports teams going to be impacted by

Page 44

1  the loss of DACA status?
2     A.  If these athletes were to travel for
3  games outside of the U.S. or something that
4  would require for them to have, like, a work
5  component to their, you know, participation as
6  an athlete.
7     Q.  Currently, are there any collegiate
8  athletes in the state of New Jersey that are
9  DACA recipients?
10     A.  I don't know.
11     Q.  The next one is study abroad
12  programs.  How are study abroad programs going
13  to be impacted if DACA is terminated?
14     A.  Well, if there are DACA recipients,
15  students that are students and wish to
16  participate in a study abroad program, they
17  would not be able to travel.
18     Q.  Currently, how are DACA recipients
19  allowed to travel outside of the country to
20  participate in the study abroad program?
21     A.  My understanding is that they need a
22  travel authorization.
23     Q.  Does DACA allow those individuals who
24  originally entered the country illegally to
25  obtain a travel authorization?

Page 45

1     A.  I'm sorry, can you say that again?
2     Q.  Sure.
3        Does DACA allow those
4  individuals to obtain a travel authorization
5  currently?
6     A.  I think they -- if that's part of
7  what they received with DACA, that they're
8  authorized to travel.
9     Q.  And that ability to travel wouldn't
10  be available if they didn't have DACA, correct?
11        MR. HOLLANDER:  Objection.
12        THE WITNESS:  Yes.
13  BY MR. BIGGS:
14     Q.  Research projects, how would those be
15  impacted by the rescission of DACA?
16     A.  If the research requires travel
17  overseas, outside of the United States.
18     Q.  Workplace internships, how would
19  those be impacted by the rescission of DACA?
20     A.  If they need for experiential
21  learning or an apprenticeship that requires
22  work authorization, they wouldn't be able to
23  participate.
24     Q.  And graduate program teaching, does
25  that also implicate the work authorization?

NJAPP0245

STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.
Diana Gonzalez on 06/25/2018                        Pages 62..65

Page 62

1    Q.   I think you testified that there are
2  in your estimation 50 schools under OSHI's
3  jurisdiction in the state.  They may not use
4  the word jurisdiction, but about 50
5  institutions of higher education in New Jersey?
6    A.   In the state, yes.
7    Q.   Did the 20, we can call them the
8  private schools that you estimate there are,
9  were they part of this outreach when you
10  collected this data?
11    A.   They were not.
12    Q.   Also you earlier testified that the
13  ability to get a Social Security card is not a
14  benefit of DACA.  Is that based on your
15  personal knowledge or is that based on your
16  understanding -- is it based on your
17  understanding of DACA?
18    A.   I was just -- I wasn't sure.  I mean,
19  I thought my personal knowledge.
20    Q.   Okay.  If you could you may need to
21  look at your declaration on this.  In
22  paragraph 10, there's -- in the first sentence,
23  there's a list of activities and programs that
24  you say DACA grantees who would continue to
25  attend school post termination, meaning in the

Page 63

1  event DACA was rescinded, may not be able to
2  fully participate in.
3           Is it your understanding that
4  work authorization is needed to participate in
5  the study abroad program?
6    A.   No.
7    Q.   Would work authorization -- to be
8  involved in a research project as used in
9  paragraph 10, would a student need work
10  authorization?
11    A.   I don't know.  It could.
12    Q.   Okay.  To be in a work -- in an
13  internship, a workplace internship, would a
14  student need work authorization?
15    A.   It depends on the requirements of
16  that work internship.
17    Q.   So there are work internships that
18  you are aware of that would require work
19  authorization?
20    A.   If it's a registered apprenticeship,
21  yeah, it varies.
22    Q.   And for graduate teaching programs, a
23  student would need work authorization?
24    A.   My understanding is yes.
25         MR. HOLLANDER:  That is all the

Page 64

1  questions I have.  So I think -- Aaron?
2           -  -  -
3         E X A M I N A T I O N
4           -  -  -
5  BY MR. GOLDSMITH:
6    Q.   This is Aaron Goldsmith.  I
7  apologize.  There were some questions I had
8  trouble hearing the answers so I just wanted to
9  clarify a few points.
10           There was some testimony about
11  the number of DACA recipients in New Jersey
12  colleges -- public colleges and universities.
13  Could you just clarify where did those numbers
14  come from.
15    A.   They came from the institutions
16  themselves.
17    Q.   From the presidents of those
18  institutions and their staffs?
19    A.   And their staff, yes, yes.
20    Q.   And do you know where the presidents
21  and/or their staffs obtained those numbers?
22    A.   They took some time to liaise with
23  their own staff and their deans and -- to
24  collect those numbers.
25    Q.   From their deans, is that what you

Page 65

1  said?
2    A.   Deans, administrators.
3    Q.   Well, do you know -- do you know
4  specifically who would have that information at
5  the various colleges and universities?
6    A.   I don't know specifically.  I know
7  that they gather it in very different methods.
8    Q.   But whoever had that would provide it
9  to the president and/or their staffs who then
10  in turn provided it to you?
11    A.   Yes, of course.
12         MR. GOLDSMITH:  Okay.  Thank
13  you.
14         MR. HOLLANDER:  I missed one
15  question.
16           -  -  -
17         E X A M I N A T I O N
18           -  -  -
19  BY MR. HOLLANDER:
20    Q.   Just in paragraph 6 of your
21  declaration, you mentioned there's 200 students
22  that the colleges are aware of at those seven
23  state colleges who are DACA recipients.
24  There's no mention of any employees at their
25  colleges.

NJAPP0246

STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.
Diana Gonzalez on 06/25/2018                    Pages 66..68

**Page 66**

1          Did you ask if there were
2   employees at those colleges?
3        A.   Yes.
4        Q.   Are there, that they reported to you?
5        A.   Yes.
6        Q.   And that number was left out of the
7   declaration it appears?
8        A.   Yes.
9        Q.   Do you remember what the number was?
10       A.   I believe it was two.
11       Q.   Okay.
12                    -   -   -
13              E X A M I N A T I O N
14                    -   -   -
15   BY MR. BIGGS:
16       Q.   That's going to spur one more
17   question for me.
18              Why was that number of employees
19   at those universities omitted?
20       A.   I have no idea.  When we were
21   drafting it, we focused on the students and I
22   didn't add it.
23              MR. BIGGS:  Sure.  Pass the
24       witness.  I'm done.
25              MR. HOLLANDER:  I think, Aaron,

**Page 67**

1   that didn't add any questions?
2              MR. GOLDSMITH:  No additional
3   questions.  Thank you.
4              MR. HOLLANDER:  We would like
5   the rough and transcript on the same
6   schedule as this morning.
7                    -   -   -
8              (Whereupon, the deposition
9        was concluded at 2:30 p.m.)
10                   -   -   -
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 68**

1              CERTIFICATE
2        I HEREBY CERTIFY that the
3   proceedings, evidence and objections are
4   contained fully and accurately in the
5   stenographic notes taken by me upon the
6   deposition of DIANA GONZALEZ
7   taken on June 25, 2018, and that this is a
8   true and correct transcript of same.
9
10
11
12
13        Jennifer Miller, RPR, CCR, CRR
14        and Notary Public
15
16
17
18
19
20
21        (The foregoing certification of
22   this transcript does not apply to any
23   reproduction of the same by any means
24   unless under the direct control and/or
25   supervision of the certifying reporter.)

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0247

# Exhibit 14

NJAPP0248

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

BROWNSVILLE DIVISION

STATE OF TEXAS, et al.,          )
     Plaintiffs,            )
                      )
VS.                              )
                      )
UNITED STATES OF AMERICA, et al.,)  Case No. 1:18-CV-68
     Defendants,            )
                      )
and                              )
                      )
KARLA PEREZ, et al.,             )
                      )
     Defendant-Intervenors.  )

*********************************************

ORAL DEPOSITION OF

DONALD R. DEERE, Ph.D.

JUNE 28, 2018

*********************************************

    ORAL DEPOSITION OF DONALD R. DEERE, Ph.D., produced as a witness at the instance of the Defendant-Intervenors, and duly sworn, was taken in the above-styled and numbered cause on the 28th of June, 2018, from 10:15 a.m. to 12:45 p.m., before Kathleen Casey Collins, CSR, in and for the State of Texas, reported by machine shorthand, at the Office of the Attorney General, 301 West Fifteenth Street, Seventh Floor, Austin, Travis County, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Page 74

1  Deere 1 and turn to Page 5. Okay. Paragraph 13. We
2  talked a little bit about all other things equal, that
3  term you use in Paragraph 13, "other things equal."
4      Can you describe some of the
5  characteristics or traits that would be included in
6  "other things equal"? You mentioned relevant
7  characteristics to the job, but could you just describe
8  what some of those could entail?
9      MR. DISHER: Objection, asked and
10  answered.
11      A. Well, the sentence here in which that resides
12  is "As a threshold matter, the addition of some 694,000
13  work-eligible individuals nationwide, with 114,000 of
14  these in Texas, all other things equal, put downward
15  pressure on wages and make it more difficult for some
16  U.S. citizens to find employment."
17      So there the "other things" is really
18  talking about overall market demand conditions. In
19  other words, this factor alone, not changing anything
20  else about the economy, will have this kind of effect.
21  It will put downward pressure on wages and make it more
22  difficult.
23      But does that mean if you go out and you
24  look over a period of time during which DACA recipients
25  expanded and lots of other things were going on, could

Page 75

1  you look at, you know, January of one year and December
2  the next and subtract the employment difference and say,
3  ah, that's the effect of whatever happened in DACA that
4  year, no, you couldn't because there's other things
5  going on, changing.
6      And so that's -- that's really what --
7  it's holding other things that would affect wages and
8  employment in the U.S. and in Texas constant.
9      Q. And what are -- can you give an example of
10  some of those other things?
11      A. The general level of demand from, you know,
12  other countries for U.S. exports; the -- the general
13  level of consumer spending in the U.S.; the birth rate;
14  the other population sources in the U.S., the other
15  sources of immigration. Holding all of that constant.
16      Q. Okay. And what do you mean when you say
17  "work-eligible" in this particular?
18      A. Having -- in this particular, I mean holding
19  an EAD because I'm talking about the DACA recipients.
20      Q. Okay. Does "work-eligible" mean all of those
21  individuals are employed?
22      A. No.
23      Q. Does it mean that they're all seeking
24  employment?
25      A. No.

Page 76

1      Q. So if -- so you can't say how many of those
2  are seeking employment or employed?
3      A. Well, according to the Wong study about
4  91 percent employed. You can take that unemployment
5  rate and then add that in. So, you know, 90-plus
6  percent would be in the labor force if you take the Wong
7  study as a source.
8      Q. Okay. Did you take that as a source in
9  drafting this declaration?
10      A. No.
11      Q. In Paragraph 13, you also say it would make --
12  quote, make it more difficult for some U.S. citizens to
13  find employment, end quote. How many is some?
14      A. More than one -- more than zero.
15      Q. Okay. But you can't give a more exact number
16  than that?
17      A. I've not been asked to calculate that number.
18      Q. Okay.
19      A. I mean, you could -- think of the following
20  mental experiment. Suppose all 694,000 work-eligible
21  individuals disappeared, including the -- whatever
22  percentage of them were actually employed. What would
23  then happen? Would every single employer stay exactly
24  where they are, or would they hire some more people?
25  And if they hired some more people, well, that might

Page 77

1  give you some indication of how many people they might
2  have hired of the 694,000 people that had never been
3  here in the first place.
4      But "some" technically is more than zero.
5      Q. Okay. Let's look at -- okay. Let's look at
6  Paragraph 14. The second sentence says, "These two
7  employees are equally productive and are the same in all
8  relevant aspects to this employer..." I'll end the
9  quote there.
10      We did talk a little bit about some
11  things, but what would be some of the relevant aspects
12  to an employer?
13      MR. DISHER: Objection, asked and
14  answered.
15      A. The characteristics that -- their suitability
16  for the job to which they've applied.
17      Q. So would education be a relevant aspect to a
18  job?
19      A. It certainly could be.
20      Q. Experience?
21      A. Probably.
22      Q. The employer's goals in filling the position?
23      MR. DISHER: Objection, vague.
24      A. I'm not sure what -- I mean, an employer is
25  looking to maximize profit. So they want to get the

## Page 78

1  best worker they can. So I'm not sure how to answer
2  that.
3     Q. Okay. So would salary history be a relevant
4  aspect to an employer?
5     A. The salary history of the two individuals who
6  applied?
7     Q. Yes.
8     A. It might well be; but as you may know, in some
9  jurisdictions it's illegal for the employers to ask
10 about that now.
11    Q. Is it illegal in Texas?
12    A. No.
13    Q. What about salary requirements of the two
14 individuals? Would that be a relevant aspect?
15    A. It could be, and it is legal to ask about that
16 as far as I know.
17    Q. Okay. How many employers in Texas base hiring
18 decisions entirely on costs associated with the ACA?
19    A. I don't know.
20    Q. Are those careers for which it's difficult for
21 employers to find U.S. citizens willing to undertake
22 that labor?
23    A. I don't know.
24    Q. Are there costs associated with replacing
25 employees who leave a business?

## Page 79

1     MR. DISHER: Objection, calls for
2  speculation.
3     A. Generally, there would be.
4     Q. And what kind of costs would be entailed --
5  when an employee leaves a position, what kind of costs
6  does that entail?
7     A. Well, there's the disruption of the employer's
8  business at that point. It depends on, you know, what
9  that person is doing and how many other people can do
10 that job. There's a potential loss of output or sales.
11 There's the cost of recruiting and finding another
12 person to take that job.
13    Q. Potentially lost productivity?
14    A. Well, when the person leaves, they obviously
15 are no longer productive. I don't know that it would
16 reduce anyone else's productivity. It could, I suppose,
17 if you're -- again, the football team. If the
18 quarterback quits and there's no quarterback, yeah, the
19 whole team might be a little less productive than it was
20 before.
21    Q. Okay. Time spent interviewing new applicants,
22 would that be a cost to the business?
23    A. Yes.
24    Q. Okay.
25    A. Well, I mean, look, you may have an on -- if

## Page 80

1  it's a big enough business, an ongoing application
2  process, and that could a pretty small cost. But I
3  still think it's probably not zero. But if it's a
4  unique enough position, it could be a substantial cost
5  to undertake finding a new person.
6     Q. So it's fair to say that if 112,000, roughly,
7  work-eligible DACA recipients suddenly had to be
8  replaced in Texas, Texas businesses would incur some of
9  the those costs?
10    MR. DISHER: Objection, outside the scope
11 of his testimony?
12    A. One would think, yes.
13    Q. Is it a certainty that an employer will fill
14 every open position?
15    A. No. They --
16    Q. Is it possible that -- I'm sorry. Continue.
17    A. They may not get a suitable candidate. They
18 may get -- the budget approval may be rescinded because
19 of changes in market conditions. There's a lot of
20 reasons that positions don't get filled.
21    Q. Is it possible that some employers would
22 choose to leave a position unfilled rather than pay
23 associated ACA costs?
24    A. Say that again.
25    MR. DISHER: Calls for speculation.

## Page 81

1     Q. Is it possible that some employers would leave
2  a position unfilled rather than pay the costs associated
3  with the ACA for hiring a U.S. citizen?
4     A. I think so. I think it's possible, yes.
5     Q. Is it possible that employers would leave a
6  position unfilled if it would -- or positions unfilled
7  if it would bring them under the 50-employee threshold
8  for ACA penalties?
9     A. I suspect yes, or at the margin at least.
10    Q. If businesses did choose to replace employees
11 who are DACA recipients with U.S. citizens, all else
12 being equal, all other things equal, as in your
13 declarations, wouldn't that cost businesses more money?
14    MR. DISHER: I'm sorry. Can you say that
15 again?
16    MS. GREGORY: Sure.
17    Q. So in the hypotheticals in your declarations
18 you say "other things equal," assuming two applicants
19 are the same.
20    There is a cost associated with the ACA
21 regarding the penalties. Correct?
22    A. Yeah.
23    Q. Okay. So if the DACA employee suddenly
24 disappeared and there was an open position that the
25 employer decided to fill with a U.S. citizen, is it fair

## Page 82

1    to say that according to this hypothetical in your

2    declaration, the business would then have to pay the

3    costs associated with that ACA penalty?

4        A.  Yeah.  If they're -- it applies, right, if

5    they're over 50 and a person gets a subsidy.

6        Q.  So when you talk about, in Paragraph 13 of

7    your supplemental declaration, downward pressure on

8    wages, that downward pressure on wages results in lower

9    salary costs for businesses.  Correct?

10        MR. DISHER:  Objection, vague.

11        A.  Yes.

12        Q.  And if wages go up, that leads to increased

13    salary costs for businesses?

14        A.  Yes.

15        Q.  Would you agree with me that some employers

16    may choose to hire fewer people or eliminate positions

17    rather than raise wages?

18        A.  Well, the original part of this says "downward

19    pressure of wages."  So now you're talking about if --

20    if my choices as an employer -- what's your question

21    again?  Sorry.

22        Q.  Okay.  Speaking generally, since you're being

23    presented as an expert, if wages go up, that leads to

24    increased salary costs for businesses.  Correct?

25        A.  Yes.

## Page 83

1        Q.  Okay.  Would some employers choose to hire

2    fewer people if wages go up?

3        A.  They could.

4        Q.  Would some employers eliminate positions

5    rather than pay more people more money if wages go up?

6        A.  Sure.  It's possible, yes.

7        Q.  Looking beyond the ACA penalties, are there

8    costs for businesses to hire DACA recipients over

9    citizens that you're aware of?

10        MR. DISHER:  I'm sorry.  Can you say that

11    one more time?

12        MS. GREGORY:  Sure.

13        Q.  Are you aware of any costs that businesses

14    have to pay when they choose to hire a DACA recipient

15    over a U.S. citizens?

16        A.  Other than the ACA, no.

17        Q.  What if an employer has offered to pay an

18    employee's legal expenses associated with their DACA

19    status?

20        MR. DISHER:  Objection, calls for

21    speculation.

22        A.  Then the employer would pay that money.  I

23    don't --

24        Q.  Okay.  Are you aware that companies such as

25    Microsoft and Apple have offered to pay legal expenses

## Page 84

1    of employees related to their DACA status?

2        A.  I am now.

3        Q.  So that would be an expense that a company

4    would choose to pay for a DACA recipient that they would

5    not have to pay for a U.S. citizen.  Correct?

6        A.  The U.S. citizen would not have DACA-related

7    expenses.  So no, there would be no expenses to pay.  I

8    agree with that.

9        Q.  In Paragraph 17 of your declaration on Page 6,

10    your supplemental declaration, you say that an employer

11    subject to the ACA penalties described above that is

12    operating to minimize its expected cost of operations

13    will hire applicant B instead of applicant A.

14        Did I read that correctly?

15        A.  Yes.

16        Q.  Okay.  How many businesses in Texas operate

17    strictly to minimize their expected costs of operation?

18        A.  Well, I would strict -- I'm not going -- the

19    word "strictly" is -- I'm not sure why you had that

20    there.

21        I would think that companies strive to

22    minimize cost of the output level they produce.  They

23    strive to maximize profit.  So a necessary condition to

24    maximizing profit is to minimize the cost of producing

25    whatever level of output you produce.

## Page 85

1        Q.  If DACA is enjoined in July of 2018, how many

2    U.S. citizens will be hired by Texas businesses?

3        A.  Well, I don't know what "enjoined" would mean,

4    first of all.  Does that mean that those individuals

5    would no longer be able to work?  But let's assume the

6    answer is yes.  It's equivalent to what I said a minute

7    ago about if all 680,000 just disappeared.  I would

8    assume that there would be some hiring to replace them.

9    I do not know the number.  I have not been asked to

10    calculate that.

11        Q.  If DACA were enjoined in July of 2018 and

12    hundreds of thousands of DACA recipients suddenly lost

13    the ability to work, how would Texas businesses be

14    affected?

15        MR. DISHER:  Objection, vague.

16    Objection, outside the scope of his testimony.

17        A.  Some of them would have to -- would be without

18    some employees that they previously had and would have

19    to go from there, either hiring other employees or

20    making other adjustments.

21        Q.  What kinds of other adjustments?

22        MR. DISHER:  Same objection.

23        A.  Cutting back on the output they produce or the

24    level of service they provide.  It depends -- it depends

25    on what industry they're in.

# Exhibit 15

NJAPP0253

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Joana Costa on 06/18/2018

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION
    - - - - - - - - - - - - - - - - - - - - - - - - - -
 3
    STATE OF TEXAS, et al.,          CASE NO. 1:18-CV-08
 4
       Plaintiffs,
 5
              vs.
 6
    UNITED STATES OF AMERICA,
 7  et al.,
 8     Defendants,
 9  KARLA PEREZ, et al.,
10     Defendant-Intervenors,
11  and
12  STATE OF NEW JERSEY,
13     Proposed Defendant-Intervenor
14  - - - - - - - - - - - - - - - - - - - - - - - - - -
15
16                        - - -
17              Monday, June 18, 2018
18                        - - -
19              DEPOSITION OF:
20              JOANA COSTA
21                        - - -
22
23
24
25
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0254

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Joana Costa on 06/18/2018                                    Pages 42..45

**Page 42**

1     A.     Yes.
2     Q.     I just want to make sure we are
3  talking about the same thing.
4     A.     Okay.
5            (Pause)
6     Q.     And since you started working, I'm
7  going to ask you a little bit about some of the
8  benefits that you maybe have at your full-time work
9  or separately.
10    A.     Okay.
11    Q.     If you have any of these -- if you
12 know if you have any of these benefits, then please
13 answer, and if you don't know, say so.
14           And do you know if you have
15 retirement benefits in your job?
16    A.     What do you mean by that?
17    A.     Some -- some jobs, they give you,
18 like, a retirement account.
19           Do you have something like that?
20    A.     Do you mean like a 401K?
21    Q.     Like a 401K.
22    A.     Yes.
23    Q.     Do you have that there?
24    A.     Yes, I do.
25    Q.     Do you have health insurance?

**Page 43**

1     A.     Yes.
2     Q.     And is it through your -- through
3  your work or is it, like, Medicare?
4     A.     Through my job, yes.
5     Q.     Not Medicare.  That is for people
6  much older than you.
7     A.     Yeah.
8     Q.     And I saw in your Declaration that
9  you said you've paid Federal New Jersey taxes.
10    A.     (Witness nods.)
11    Q.     And when you filled out your tax
12 forms, do you know if you ever had the earned income
13 tax credit on your forms?
14    A.     I didn't fill out any tax forms.
15    Q.     Okay.
16           MR. KAPLAN:  Just to clarify, what
17 tax forms are you talking about?
18           Are you talking about the year-end
19 stuff or are you talking about the W-2?
20           MS. MORENO:  The year end.
21           MR. KAPLAN:  Okay.  I just wanted
22 to make sure it is clear.
23           MS. MORENO:  Sure.
24                  - - -
25 CONTINUATION

**Page 44**

1  BY MS. MORENO:
2     Q.     At the end of the year when you --
3            Well, let me back up.
4     A.     End of April.
5     Q.     End of April when you have to file
6  your tax returns.
7     A.     I have an accountant to do that for
8  me.
9     Q.     Okay.
10           And do you know if your accountant
11 asked you about the earned income tax credit?
12    A.     I don't know.
13    Q.     And do you know anything about
14 advanced parole?
15    A.     No.
16    Q.     Is it something you've heard about
17 at all?
18    A.     Does it have to do with, like, when
19 you are home with, like, an ankle bracelet?
20    A.     No.  Let me -- no, that's a --
21 that's a very normal confusion.
22           Advanced parole is a way where you
23 can travel outside the country as you've been
24 granted kind of your DACA card.
25    A.     No.  I'm not familiar.

**Page 45**

1     Q.     Sounds like this is the first time
2  you have heard of that.
3     A.     Yes.
4     Q.     Have you traveled outside the
5  country since receiving your DACA card?
6     A.     No.
7     Q.     Have you traveled outside the
8  country at all since you came from Portugal?
9     A.     No.
10    Q.     Again, I apologize for some of
11 these very personal questions, but are you married?
12    A.     No.
13    Q.     No.  Okay.
14           And do you have any children?
15    A.     No.
16                  - - -
17      (Discussion held off the record.)
18                  - - -
19 CONTINUATION
20 BY MS. MORENO:
21    Q.     Then you mentioned your family came
22 with you when you arrived.
23           Are your -- both your siblings
24 still in United States?
25    A.     Yes.

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0255

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Joana Costa on 06/18/2018                                    Pages 46..49

Page 46

1      Q.     And your mother, is she still in
2  the United States?
3      A.     Yes.
4      Q.     Were either of your siblings able
5  to obtain DACA?
6             MR. KAPLAN:  Objection to form.
7             MS. MORENO:  I could ask specific.
8                    - - -
9  CONTINUATION
10 BY MS. MORENO:
11     Q.     Was your -- was your sister able to
12 obtain DACA?
13     A.     My sister is a DACA recipient.
14     Q.     Okay.
15            I'm just checking on some --
16                    (Pause)
17     Q.     How often do you have to renew your
18 DACA card?
19     A.     I'm not sure.
20            Every two years maybe.
21     Q.     Okay.
22            MR. KAPLAN:  You are not sure or it
23 is every two years?
24            THE WITNESS:  Well, when I have
25 renewed it --

Page 47

1             MR. KAPLAN:  No.
2             The question is; how often you
3  renew it?  You said, "every two years.  I'm not
4  sure.  Every two years?
5             I just want to make sure.
6             You are not sure or it is every two
7  years?
8             THE WITNESS:  I'm not sure.
9             MS. MORENO:  Okay.
10            Let me ask the question a different
11 way.
12                    - - -
13 CONTINUATION
14 BY MS. MORENO:
15     Q.     Have you had to renew your DACA
16 since you obtained it in 2012?
17     A.     Yes.
18     Q.     Do you have -- do you know how many
19 times you had to renew?
20     A.     Three.
21     Q.     When you -- those three times when
22 you have gone through the renewal process, do you
23 have to submit any new forms to your lawyer?
24     A.     I don't remember.
25            She handled all of the paperwork.

Page 48

1      Q.     Okay.
2             Have you had to give her any
3  documents showing her that you are working at
4  Chemetall in order to get the renewal?
5      A.     Yes.  I -- she says, "what have you
6  done?  What have you been doing?"  You know, so I
7  bring in evidence of the tax return.
8      Q.     Okay.
9             So, you have brought her the tax
10 returns from your job to submit as part of the
11 renewal?
12     A.     Yes.
13     Q.     Okay.
14     A.     She might already have that in her
15 files for me at the time.  I don't remember if I
16 brought it to her when she was handling my renewal
17 process.
18     Q.     Okay.
19            Let me clear that up a little bit.
20            It sounds like you are -- it is
21 like an immigration lawyer when you are talking
22 about the lawyer; right?
23     A.     I don't know her title.
24     Q.     All right.
25            But it is different from the man

Page 49

1  who is sitting next to you today?
2      A.     Yes, it is not -- not him.
3      Q.     Okay.
4             And, in fact, I think you said
5  "she" a couple times, so this is a woman.
6      A.     Yes.
7      Q.     And has this lawyer ever asked you
8  to -- to tell her where you are working?
9      A.     Yes.
10     Q.     Okay.
11            And has she ever asked you to give
12 her, like, your tax forms from your work?
13     A.     Yes.
14     Q.     Have you ever been asked by either
15 your lawyer or someone from the government to submit
16 any extra --
17            Let me ask one at a time.
18            Has your lawyer ever told you to
19 give -- that they need more information before they
20 can approve your DACA or renew your DACA?
21     A.     No.
22     Q.     Okay.
23            Has anyone from the Federal
24 government ever sent you something in the mail or on
25 the phone asking you for more information?

NJAPP0256

# Exhibit 16

NJAPP0257

Transcript of the Testimony of

# Kenneth Palinkas

## Date:

June 19, 2018

## Case:

STATE OF TEXAS vs UNITED STATES OF AMERICA

Kenneth Palinkas

Page 42

PALINKAS

1 sufficient time to make proper adjudications, or
2 do you have any specific knowledge about whether
3 USCIS management allowed proper time to make
4 adjudications?
5     A.  In general, for everything?
6     Q.  For DACA?
7     A.  Just specifically for DACA?
8     Q.  Yes.
9     A.  Again, I based it on what I said
10 previously what I just -- that you asked and
11 answered.  I'm basing it on the numbers that were
12 being generated from what I saw, how many
13 approvals were occurring.  That's it, because I
14 didn't have anything firsthand, never having
15 adjudicated a DACA case.  But what perturbed me as
16 council president was here we have an application
17 where people broke the law, and they're not even
18 being interviewed and they're just processing
19 these applications.  So that again, that to me was
20 an inherent problem.
21     Q.  Would it be fair to say then, that it's
22 the number of applications that were getting
23 adjudicated that forms the basis of your statement
24 that applications were being rubber stamped?

*(lines renumbered as printed: 1–25)*

Page 43

PALINKAS

1     A.  Because of the high number of approvals.
2 There didn't seem to be any balance whatsoever,
3 absolutely none.  That's why I said they were
4 being rubber stamped.
5     Q.  When you say "balance," what does that
6 mean?
7     A.  Well, normally it -- just in the normal
8 trend, you're going to have X amount of denials
9 compared to X amount of approvals.  It's just the
10 nature of the beast.  It's going to happen.
11     Q.  Is it correct to say that ISOs at
12 service centers adjudicate applications without
13 conducting interviews?
14     A.  Yes, they do.
15     Q.  So the fact that DACA applicants don't
16 receive an interview is similar to other types of
17 applicants who don't receive an interview whose
18 applications are processed by service centers?
19     A.  Again the difference would be that DACA
20 applicants broke the law.  That to me is a
21 problem.  I don't see how anyone can justify not
22 interviewing these people, given that premise,
23 especially when they broke the law.  You -- that's
24 where the exceptions should have been made, and it

Page 44

PALINKAS

1 wasn't.
2     Q.  I understand.  However, going back to my
3 question, just on a yes or no, is it correct that
4 a DACA applicant whose application is adjudicated
5 in the service center is not interviewed similar
6 to other applicants who are adjudicated in service
7 centers?
8     A.  That's -- they do.  Of course.  I've
9 already answered that.  They do DACA applications
10 at the service centers much like they do
11 employment-based authorizations.
12     Q.  Let's -- would it be fair to say then
13 that somebody who is applying for temporary
14 protected status is also present in the United
15 States unauthorized; is that correct?
16     A.  Correct.
17     Q.  That person who is applying for TPS,
18 that application is processed by the service
19 center; is that correct?
20     A.  Correct.
21     Q.  That person is also not interviewed,
22 correct?
23     A.  I don't know.  That, I can't answer,
24 because I don't know if they've changed.  A lot of

Page 45

PALINKAS

1 things have changed recently, and not being the
2 council president, I believe you may be correct.
3 But I don't know.
4     Q.  Would it be fair to say that when you
5 talk about some of the issues and problems that
6 you saw at the service center, that that
7 information would be current up to the end of your
8 service as council president?
9     A.  That's correct.
10     Q.  Let's talk about somebody who applies
11 for deferred action under the Violence Against
12 Women Act, the self-petitioner.  Is that
13 application adjudicated at the service center?
14     A.  To my knowledge, yes.
15     Q.  Is the self-petitioner typically
16 unauthorized to be in the United States?
17     A.  To my knowledge, yes.
18     Q.  It also correct to say that the VAWA
19 applicant is not interviewed?
20     A.  Again, to my knowledge, yes.
21     Q.  I wanted to ask you a question about
22 advanced parole.  You mentioned advanced parole.
23     A.  Right.
24     Q.  Here, let me get the right paragraph.

Kenneth Palinkas

June 19, 2018
Pages 50 to 53

Page 50

PALINKAS

1      PALINKAS
2      A.  I think that's a distinct possibility,
3  but again I'm not privy to that information,
4  because that's something that management would
5  have more tabs on and I don't know that they can
6  make that public.
7      Q.  You began to proceed into my next set of
8  questions when you talked about the immigration
9  testimony and how it's set up right now.  In the
10  paragraph that starts with the words "the
11  applicants for DACA are asking for temporary
12  protected status," do you see that there?
13      A.  Yes.
14      Q.  The next sentence says "under the
15  present system, there is no process in place to
16  achieve this, and we need to develop criteria that
17  protect the United States citizen at large while
18  we properly vet all DACA applicants."
19      Do you see that there?
20      A.  I see.
21      Q.  Tell me what the criteria is that you
22  believe should be developed that would protect a
23  U.S. States citizen and properly vet the DACA
24  applicant?
25      A.  Certainly they need to be vetted and I

Page 51

PALINKAS

1      PALINKAS
2  think that entails being interviewed, and I go
3  back to my original statement where I say I think
4  that's necessitates an in-depth interview, because
5  you're basing -- you're basing a benefit for a
6  certain class of people who came here illegally.
7      Q.  Would it be fair to say then that your
8  criticism of the DACA criteria is that DACA
9  applicants are not interviewed?
10      A.  No, that's not the only reason.  Again,
11  it's because of illegal entry into the United
12  States.
13      Q.  I see.  So --
14      A.  I don't think that anybody should be
15  given any preferential treatment after breaking
16  the law.  I have an inherent problem that, and in
17  speaking with our membership throughout the United
18  States, that was basically the mindset of the
19  majority of district adjudication officers and
20  ISOs or whatever we were at that time.  I think we
21  were ISOs.
22      Q.  Would it be fair then to say that your
23  position is that DACA applicants should not get
24  deferred action because they were unlawfully
25  present in the United States or are unlawfully

Page 52

PALINKAS

1      PALINKAS
2  present in the United States?
3      A.  I think that they need to be
4  interviewed.  Okay.  I'm not at will to make a
5  decision concerning the final outcome of these
6  people.  I don't think that mass deportation is
7  ever going to happen, because it's not even
8  practical.  But I do believe Congress has to take
9  that action.  They have to do something to make
10  this equitable for everybody.  Certainly most
11  adjudicators feel the same way.  We're not
12  heartless as the media is portraying us to be.
13      Q.  So if there were to be a deferred action
14  program for young people, what would be your
15  criteria in addition to an interview?
16      MR. BITTER:  Objection; speculation,
17  relevance.
18      Q.  You may answer the question.
19      A.  Again, it's difficult for me to answer
20  that because Congress can't even figure this out.
21      Q.  Yes.  But you state in your Declaration
22  that we need to develop criteria.
23      A.  Yes, we do.
24      Q.  So I'm asking you what is the criteria
25  that needs to be developed?

Page 53

PALINKAS

1      PALINKAS
2      A.  Certainly, there has to be some kind of
3  semblance of a differentiation for people that are
4  under DACA, because I don't think it's equitable
5  to have them demand and be entitled to a path to
6  citizenship, because of the way they entered.  I
7  would think that they would have to make certain
8  concessions perhaps.  They could become permanent
9  residents.  But again, this is my opinion and I
10  don't know where it goes.
11      Q.  In terms of the criteria to give
12  somebody DACA, we know that there are some current
13  criteria that you have to fulfill to be able to
14  get DACA.  Are you aware of the current criteria
15  that an applicant has to fulfill to get DACA?
16      A.  I just know what I learned from it
17  originally.  I don't know that it's changed that
18  much.  Please clue me in.
19      Q.  No, no.  Tell me.
20      A.  I don't know that it's any different.
21      Q.  Tell me what you do know about the DACA
22  criteria?
23      A.  Well, the parents came here illegally,
24  correct?
25      Q.  Well, in terms of the applicant, the

Kenneth Palinkas

June 19, 2018
Pages 54 to 57

Page 54

PALINKAS

1
2 applicant would be here unauthorized in the United
3 States to apply for deferred action?
4     A.   Correct.
5     Q.   Are there any other criteria that you're
6 aware of?
7     A.   I never adjudicated DACA, so I don't
8 know particulars.  But because of the fact that
9 how you're applying for this benefit, I think that
10 that has to be addressed and Congress is going to
11 have to make that kind of a decision.  I mean
12 it's --
13     Q.   Is it your position that somebody who's
14 here unauthorized should not be allowed to apply
15 for a deferred action?
16         MR. BITTER:  Objection; relevance,
17     vague.
18     A.   Deferred action is specifically for a
19 certain class, is it not?  A certain situation, is
20 it not?  So people that are here illegally,
21 there's different ways for them to adjust.  They
22 can go back to their country and come in legally.
23 These are the ways to do things.  Do it legally.
24 I don't think that we should hold such a need to
25 accommodate somebody that broke the law.  I think

Page 55

PALINKAS

1
2 that is inherently wrong with immigration to think
3 that way, because it doesn't make any sense.  You
4 might as well just have open borders then.  Why
5 even bother enforcing the law.
6     Q.   Do you have a definition of deferred
7 action yourself?
8     A.   A definition of it?
9     Q.   Yes.  What is deferred action?
10     A.   It's just a temporary protected status.
11 That's all I see it as.  I don't see it as
12 anything other than that.  You know, you can have
13 refugees come in.  You can have certain groups
14 come in because of the chaos that happened in
15 their countries.  They get that protected status,
16 and you never hear what happens with them.  They
17 just disappear into the woodwork, sort of.  The
18 majority go back to their countries.  This is the
19 way that the system works.
20         But DACA, it appears to me that you,
21 know, it's a reward system for doing something you
22 shouldn't have done.  I mean, when are the parents
23 going to take the responsibility for their
24 children?  That's the big question that I have,
25 and I don't see it happening.

Page 56

PALINKAS

1
2     Q.   So if somebody is -- was here
3 unlawfully -- I'm trying to still understand your
4 statement about needing to develop criteria.
5     A.   Okay.
6     Q.   When you say that we need to develop
7 criteria that protect the United States citizen at
8 large while we properly vet DACA applicants,
9 would -- in addition to an interview, which you're
10 already mentioned, what additional criteria would
11 you feel is necessary?
12         MR. BITTER:  Objection; speculation.
13     Objection; vague.  You can answer if you
14     know.
15     Q.   Please answer.
16     A.   I would like to find out, because what I
17 know, the percentage of DACA recipients that
18 supposedly claim they want to go to school and all
19 this stuff, it's a low percentage, from what I
20 understand.  So I would like to know that would be
21 be.  So then what is the real purpose of them
22 coming here, because they're Dreamers, but they're
23 not dreaming.  They're not going anywhere, and I
24 think that needs to be addressed and I don't see
25 it being addressed.

Page 57

PALINKAS

1
2     Q.   In your view perhaps, even though you
3 mentioned developing criteria, in your view
4 perhaps there should not be deferred action for
5 unauthorized youth?
6         MR. BITTER:  Objection; speculation.
7     Objection; relevance.
8     A.   I'd prefer not to answer that.
9     Q.   I'm sorry.  You have to answer.
10     A.   I have to answer?
11     Q.   Yes, you do.  But I -- it's okay.
12 Whatever it is you answer, there's just an
13 exploration here between the two of us about this.
14 So the question is given your concerns that you've
15 expressed so far --
16     A.   Right.  I think that they have to show
17 initiative that that's -- they have to show
18 reasons why they're here and they have to fulfill
19 those reasons.  I don't know under the represent
20 DACA program that's happening.  That's really my
21 main concern there.  But again, is this going to
22 turn into where everybody just applies for DACA,
23 because well hell, this is the easiest way to get
24 to the United States.  They could swing that way
25 very easily.  These people are not stupid.  They

Kenneth Palinkas

June 19, 2018
Pages 58 to 61

Page 58

PALINKAS
1
2  know if they want to get here and get legal
3  footing in the United States, they're going to do
4  it any which way they can, legally, illegally.
5  They want to get here because it's a better life.
6  There's no doubt in anybody's mind.
7       But again, my question is this, when are
8  those parents going to take responsibility for
9  those children?  It's just like these people
10  crossing the borders now that are in camps.
11     Q.  Do you know if it's possible for
12  somebody to have come to the United States, let's
13  say, three years ago as a youth and apply for DACA
14  today?
15     MR. BITTER:  Objection; speculation.
16     Q.  No.  I'm simply asking if you know.
17     A.  No, I don't.  I don't know that.
18     Q.  Do you know if there is any requirement
19  in DACA that you -- that the applicant be present
20  in the U.S. for any period of time?
21     A.  I believe there is, yes.
22     Q.  Do you know what that is?
23     A.  I'm not sure offhand, because I'm not --
24  not having to do the application itself, it never
25  became an issue that was brought up to my

Page 59

PALINKAS
1
2  reasoning to, you know, take that into
3  consideration as far as DACA was concerned,
4  because it didn't seem to have any impact.
5     Q.  Do you know if there's any requirement
6  for DACA to have had continuous presence in the
7  United States for any length of time?
8     A.  Yes, there is.  But I don't --
9     Q.  Do you know what that period is?
10     A.  Not having done the application
11  itself --
12     Q.  Do you know?
13     A.  I know it's between certain ages and
14  things of that nature.  But I don't want to be
15  misquoted, because I don't know off the top of my
16  head.
17     Q.  Would it be fair to say then that you
18  don't know what the top age is that somebody can
19  still apply for DACA?
20     A.  It's 31.
21     Q.  Do you know what the bottom age is?
22     A.  I'm not sure.
23     Q.  What can you tell me -- do you know if
24  DACA applicants submit biometrics?
25     A.  I would hope so.

Page 60

PALINKAS
1
2     Q.  Do you know?
3     A.  Well, if they don't, that's a hell of a
4  thing.  They must be submitting them, because why
5  wouldn't they?  How are we going to identify who
6  these people are?
7     Q.  Do you have any specific knowledge about
8  whether DACA applicants are required to submit
9  biometrics?
10     A.  Not firsthand.  But I would have to
11  assume if they're applying for a benefit that we
12  need to identify them.  So yes, they need to ne
13  fingerprinted.  Why wouldn't they?
14     Q.  Do you have any specific knowledge about
15  what's done with the fingerprint for DACA
16  applicants?
17     A.  What's done with them?
18     Q.  Yes.  What happens after the
19  fingerprints are taken?
20     MR. ROBINS:  Objection.  To the extent
21     that the answer will cause him to disclose
22     law enforcement information, I'll allow the
23     Witness to answer.
24     Q.  Without disclosing anything law
25  enforcement.  So for example, I will say to you --

Page 61

PALINKAS
1
2  let me try this question again.  When individuals
3  apply for immigration benefits, it is often the
4  case that they submit their biometrics, including
5  fingerprints, and those fingerprints are run for a
6  background check.  Are you with me?
7     A.  Yes.
8     Q.  Do you know whether or not that happens
9  with DACA applicants?
10     A.  I would hope so.
11     Q.  Does that mean that you know or that you
12  don't know?
13     A.  I haven't adjudicated these cases so --
14  but I would assume that they're run.  But it
15  depends on the age, because if it's a child, I
16  don't know that they're going to run those prints.
17  There's certain ages.
18     Q.  Would it be fair to say then that
19  because you don't adjudicate DACA applications,
20  that you don't have specific knowledge about
21  what's done with the biometrics data for DACA
22  applicants?
23     A.  I would imagine they would remain in the
24  file.
25     Q.  But if we put aside imagining or what

Kenneth Palinkas

June 19, 2018
Pages 86 to 89

Page 86

PALINKAS

2 since getting DACA?

3    A.  I wouldn't know.

4    Q.  Do you know whether people who have

5 DACA,  people who are undocumented and have DACA

6 could be 245I eligible?

7    A.  Hard to say.  I have no way of

8 ascertaining that.

9    Q.  What is a USCIS service center?

10    A.  It's basically houses -- I'd say eight

11 hundred to one thousand officers and clerks where

12 there are no interviews being done.  They are

13 processing applications.

14    Q.  Do you know where -- how many service

15 centers there in USCIS?

16    A.  I'm aware of -- let me see.  They have

17 the California Service Center, the Texas Service

18 Center, the Nebraska Service Center, the Vermont

19 Service Center.  So that's four.  I think that's

20 it.

21    Q.  Is there one in Texas?

22    A.  Yes, in Dallas.

23    Q.  Is it correct to say that you don't work

24 in a service center?

25    A.  I don't work in a service center.  I've

Page 87

PALINKAS

2 visited every one of them, but I don't work there.

3 The one in California is very interesting.

4    Q.   Is it correct to say that you have never

5 worked in a service center?

6    A.  That's correct.

7    Q.  Do you know the kinds of applications

8 that are adjudicated in service centers?

9    A.  Well, the DACA application, the

10 employment-based -- I believe I90s are done in the

11 service centers.  We also have the National

12 Benefits Center.  That's in Kansas, I believe.

13 There's other extraneous that they lessen the

14 requirements where they said they didn't need to

15 have interviews done, but I don't remember the

16 applications off the top of my head.

17    Q.  Do you know if service centers

18 adjudicate applications for EADs?

19    A.  I would believe they might.  But we used

20 to do that here and they moved it elsewhere.  So I

21 would assume they went to service centers.

22    Q.  Do you know how many applications are

23 approved annually at service centers?

24    A.  No, I don't.

25    Q.  Do you know if service centers

Page 88

PALINKAS

2 adjudicate applications for replacement cards?

3    A.  I believe they do.

4    Q.   Is it correct to say that if an

5 application is processed at a service center, it's

6 not being processed in the New York District

7 Office, meaning if it's the type of application,

8 like an I76 or 5.

9    A.  Again, things have changed and we've

10 been getting applications that were being done in

11 the service centers here in the New York District.

12 So it's transitioning.

13    Q.   Does the New York office process DACA

14 applications?

15    A.  No, which is why I have no idea about a

16 lot of details pertaining to it.

17    Q.  Have you ever adjudicated a VAWA

18 application?

19    A.  Not an adjustment, no.

20    Q.  Have you ever adjudicated a TPS

21 application?

22    A.  No, I have not.

23    Q.  Have you ever adjudicated a U visa

24 application?

25    A.  No, I have not.

Page 89

PALINKAS

2    Q.  Have you ever adjudicated a T visa?

3    A.  No, I haven't.

4    Q.  Have you ever personally adjudicated an

5 I765 for a person who is not applying to adjust

6 status?

7    A.  No.  Again, that goes back to my lack of

8 course training.

9    Q.  Have you ever personally adjudicated an

10 application that resulted in a grant of deferred

11 action?

12    A.  No, I have not.

13    Q.  Do you know where DACA applications are

14 sent by the applicants?

15    A.  I know they're sent to, I think, the

16 Nebraska service center.  I don't know if that's

17 the only place.  I know they go over there,

18 though.  It may go to Texas.

19    Q.  Do you know what the name of the place

20 is called that DACA applications go to, not

21 necessarily name of the office but --

22    A.  I don't know that it's a centralized one

23 location, but it might be at the National Benefits

24 Center.  I'm not really sure.

25    Q.  Have you ever heard of the term lockbox?

Kenneth Palinkas

Page 90

1              PALINKAS
2      A.   Yes, that's at the National Benefit
3  Center, I believe.
4      Q.   Who are the workers at USCIS that
5  adjudicate DACA applications?
6      A.   They would be ISO Levels 1 one and 2 and
7  3.
8      Q.   Do you know how many workers at USCIS
9  adjudicate DACA applications?
10     A.   I wouldn't know the assignment of that
11  specific work, no.
12     Q.   Do you know the documents that are used
13  to guide ISOs in adjudicating DACA applications?
14     A.   They're readily available on the USCIS
15  website what's needed, but off the top of my head
16  I don't know what they use.
17     Q.   Are -- have you ever read the national
18  standard operating procedures for DACA?
19     A.   For DACA?
20     Q.   Yes.
21     A.   I might have in the beginning.  But
22  doesn't ask me about them now.
23     Q.   Would it be fair to say that you are no
24  longer familiar with the national --
25     A.   I'm no longer familiar with those

Page 91

1              PALINKAS
2  procedures, standard operating procedure.
3      Q.   For DACA?
4      A.   For DACA.
5      Q.   Do you know when the SOPs for DACA were
6  last updated?
7      A.   Probably 2017, I would think.  They must
8  have changed them.
9      Q.   Do you have any specific knowledge of
10  the DACA SOPs being updated?
11     A.   No, not specific.  No, I'm just giving a
12  a guesstimate.
13     Q.   Are you familiar with any specialized
14  training that's offered to ISOs that are
15  adjudicating DACA?
16     A.   Not specialized, no.
17     Q.   Would it be correct to say that you're
18  not familiar with the specific procedures set out
19  for DACA adjudicators to address suspected fraud
20  on the application?
21     A.   Not having done the actual application,
22  I am not privy to all the ins and outs of the
23  adjudication process.
24     Q.   So are you not familiar with the
25  procedures set out to address suspected fraud in

Page 92

1              PALINKAS
2  the DACA application?
3      A.   Not in the DACA application, no.
4      Q.   These are similar questions.  Is it
5  correct to say that you're not familiar with the
6  procedures set out for DACA adjudicators to
7  address suspected threats to national security?
8      A.   Again, I would assume all of that gets
9  sent to the fraud -- to FDNS.
10     Q.   Even for national security concerns?
11     A.   Yes.
12     Q.   Is it correct to say then that you're
13  not familiar with the specific procedures set out
14  for DACA adjudicators to assess suspected threats
15  to national security?
16     A.   I'm not privy to that, no.
17     Q.   Is it correct to say that ISOs use their
18  judgment and experience to determine if derogatory
19  information is related to a specific DACA
20  applicant?
21     A.   I'd say that's safe to say, as long as
22  they've been trained properly.
23     Q.   Is it correct to say that ISOs use their
24  judgment and experience to determine if derogatory
25  information about a DACA applicant relates to

Page 93

1              PALINKAS
2  national security immigration fraud or other
3  criminal cases?
4      A.   I'd say it's safe say that they do that,
5  given the time to do it.
6      Q.   Is it correct to say that ISOs
7  adjudicating DACA applications use their
8  discretion to determine if past criminal activity
9  of the applicant is germane to the request for
10  DACA?
11     A.   I would say that's part of their job.
12     Q.   Is it correct to say that ISOs
13  adjudicating DACA applications use their
14  discretion to determine if past credible activity
15  of the applicant makes him or her a public safety
16  concern under --
17     A.   Absolutely.
18     Q.   Is it correct to say that for each
19  related hit in the law enforcement databases for a
20  DACA applicant that there has to be a resolution
21  memorandum created to reconcile that hit?
22     A.   Absolutely.
23     Q.   Is it -- okay -- is it also true that
24  ISOs adjudicating DACA applications when there's a
25  hit in the criminal databases are instructed that

Kenneth Palinkas

Page 94

PALINKAS
1
2  the decision whether to defer action in a
3  particular case is individualized and
4  discretionary?
5      A.  Individualized and discretionary, what
6  do you mean by that?
7      Q.  Well, the question is whether you're
8  aware whether ISOs adjudicating DACA applications
9  are instructed if there is a hit in criminal
10  databases?
11      A.  Yes.
12      Q.  That's a decision whether to defer
13  action is individualized and discretionary?
14      A.  I would think they have to follow
15  standard operating procedure.  So I don't know
16  about this individualized discretionary part.  But
17  we do employ discretion on certain applications.
18  Again, not having done the DACA application, I
19  can't truthfully answer that.
20      Q.  So if there was language in the standard
21  operating procedures for DACA instructing ISOs
22  that the decision whether to defer action in a
23  particular case is individualized and
24  discretionary, then the ISO would follow that
25  procedure?

Page 95

PALINKAS
1
2      A.  Yes, they would.
3      Q.  With respect to exercising discretion in
4  the application, would it be fair to say that
5  because you don't adjudicate DACA application that
6  you're not aware of the extent to which discretion
7  is exercised?
8      A.  That's true, because I don't know -- I'm
9  not familiar with that application.
10      Q.  If DACA requires the ISO to determine if
11  the applicant has a significant misdemeanor
12  conviction, would the ISO use discretion in
13  deciding whether a misdemeanor record was
14  significant or not?
15          MR. ROBINS:  Objection; calls for
16      speculation.
17          MR. BITTER:  We join in that objection.
18      Q.  You may answer.
19      A.  If it's significant, the adjudicator
20  would have to take that as the path to make the
21  decision, the significance of the crime.
22      Q.  And the adjudicator would use
23  experience, knowledge and discretion to determine
24  whether or not a misdemeanor was significant for
25  DACA?

Page 96

PALINKAS
1
2          MR. ROBINS:  Objection; speculation.
3          MR. BITTER:  Same objection.
4      A.  I'm almost positive they would define
5  what a significant misdemeanor would be.
6      Q.  You're saying there would be some more
7  detail there guiding the ISO?
8      A.  Yes.
9      Q.  If there are criteria set out for the
10  ISO to consider whether a misdemeanor conviction
11  was significant, does the ISO use discretion in
12  going through those criteria and deciding whether
13  a misdemeanor is significant?
14          MR. BITTER:  Objection; calls for
15      speculation.
16          MR. ROBINS:  Join in the objection.
17      A.  Can you restate that, because it sounds
18  similar to what you just asked?
19          MS. PERALES:  You can have a running
20      objection on this because I'm going to re-ask
21      the question.
22      Q.  If the standard operating procedures set
23  out criteria to decide what is a significant
24  misdemeanor conviction, is the ISO using
25  knowledge, experience and discretion to decide

Page 97

PALINKAS
1
2  whether a misdemeanor is significant or not?
3      A.  If the SOP allows for it.
4      Q.  We would have to look at the SOP to
5  decide whether there was discretion?
6      A.  Correct.
7      Q.  How would the SOP be worded so that we
8  would understand that the ISO is being given
9  discretion?
10          MR. BITTER:  Objection; calls for
11      speculation.
12      Q.  Based on your familiarity with SOPs?
13      A.  Well, it falls under the term
14  prosecutorial discretion.  It's kind of -- gives
15  some leeway, but you would not make that decision
16  on your own.  You would have to go to discuss it
17  with supervision.
18      Q.  Would your supervisor be somewhere in
19  your office with you?
20      A.  Well, the supervisor is somewhere.
21  That's what they're there for, I would assume.
22  They're supposed to assist you in not just making
23  sure that you're making a proper legal decision.
24  They can't influence your decision.
25      Q.  If the SOPs set out criteria for an ISO

NJAPP0265

# Exhibit 17

NJAPP0266

Transcript of the Testimony of

**Leo Lopez**

**Date:**

June 14, 2018

**Case:**

STATE OF TEXAS vs UNITED STATES OF AMERICA

NJAPP0267

Leo Lopez

June 14, 2018
Pages 26 to 29

Page 26

1    Q.  Sure.  I was just going to do that.
2    A.  Yeah.
3    Q.  When I say "DACA," I'm referring to a 2012
4  program called Deferred Action for Childhood Arrivals.
5         And -- is that your -- also your
6  understanding of DACA?
7    A.  I -- I didn't know the -- the year, you know,
8  but I -- I've heard that acronym.  I just forgot what it
9  stood for.
10    Q.  Sure.  No problem.
11        There is going to be a lot of things today
12  that you know about that I'm going to have to ask you to
13  repeat yourself and ask you questions about.
14        So with respect to -- to undocumented
15  students, you would agree that some might have DACA and
16  some might not?
17    A.  I -- I don't know enough about the issues to
18  know whether or not, but I -- I -- I would say -- I'm
19  sorry.  Are you asking -- I'm sorry.
20        Just -- can you ask the question one more
21  time and I'll try to...
22    Q.  Sure.
23        So let me ask:  So with respect to
24  undocumented students, you'd agree that some of those
25  students have DACA and some do not?

Page 27

1    A.  Based on my understanding, yes, I would agree.
2    Q.  And you'd agree that Texas doesn't track how
3  many students -- how many -- how many of its public
4  school students have DACA?
5    A.  Yes, I would -- I would agree that -- that TEA
6  does not track that information.
7    Q.  And so because Texas does not track how many
8  students have DACA, you're not aware how many DACA
9  recipients in Texas are school aged?
10    A.  That's correct; I am not aware.
11    Q.  And it's correct, isn't it, that undocumented
12  students can't get DACA when they're under 15 years old?
13        MR. BITTER:  Objection.  Speculation.
14    A.  I -- I don't know.
15    Q.  (BY MS. MORENO)  Okay.
16        (Exhibit 4 marked.)
17    Q.  (BY MS. MORENO)  I'd like to hand you what I'm
18  marking as Exhibit 4.  And this is -- this is just to
19  help us along the conversation.
20        MS. PERALES:  I apologize.  We have a
21  complicated choreography with respect to marking
22  exhibits, and it's entirely my fault.  Sorry.
23        THE WITNESS:  That's okay.
24    Q.  (BY MS. MORENO)  Have you ever seen this --
25  this document before?

Page 28

1    A.  No.
2    Q.  I'll represent to you that these are guidelines
3  that I got from the U.S. Customs -- U.S. Citizenship and
4  Immigration Services or USCIS website --
5    A.  Okay.
6    Q.  -- related to guidelines for DACA.
7        And if you'll go with me to page 3 of that
8  document.
9        Do you see, in the middle of the page,
10  where it says "Age Guidelines"?
11    A.  Yes.
12    Q.  And right underneath that, it says that anyone
13  requesting DACA must have been under the age of 31 as of
14  June 15th, 2012.  And the very next line talks -- says
15  (as read):  You must also be at least 15 years or older
16  to request DACA.
17        Do you see that?
18    A.  Yes.
19    Q.  And you'd agree that there aren't any
20  15-year-old elementary students in Texas?
21        MR. BITTER:  Objection.  Speculation.
22    A.  I would -- I would be surprised, but I haven't
23  run the analysis, so I couldn't tell you if there are
24  any 15-year-olds in elementary school.
25    Q.  (BY MS. MORENO)  You're not aware of any

Page 29

1  15-year-olds in elementary school in Texas?
2    A.  I am not aware of any.
3    Q.  And so as far as you're aware, elementary
4  school students could not have DACA?
5    A.  Again, I have --
6        MR. BITTER:  Objection.  Speculation.
7    A.  Again, I haven't run that analysis, so I
8  couldn't tell you one way or the other.
9    Q.  (BY MS. MORENO)  And you would agree that the
10  vast majority of middle school students are under 15?
11        MR. BITTER:  Objection.  Speculation.
12  Objection.  Vague.
13    A.  Again, I haven't run that analysis, so I
14  wouldn't be able to tell you the -- the age-group for
15  middle school students.
16    Q.  (BY MS. MORENO)  Based on your experience
17  working at Austin ISD, you're not aware of any middle
18  school -- you -- you're not aware of any elementary
19  school students under -- over 15?
20    A.  My experience at Austin ISD was limited to the
21  financial operations of the district.  So, again, even
22  though I was with a district for four years, I wouldn't
23  have been able to tell you what the age ranges were for
24  any given type of school.
25    Q.  You're not aware of any middle school students

Leo Lopez

June 14, 2018
Pages 30 to 33

Page 30

1 under 15 -- I'm sorry -- 15 or over?
2      A. I don't have any personal knowledge of any
3 middle school students 15 or older, no.
4      Q. Is it fair to say that you can't put a number
5 of DACA students who are in Texas public schools right
6 now?
7      A. Yes, that's fair.
8      Q. Would it -- would you also agree that you can't
9 put a number on how much money Texas spends on DACA
10 students in Texas?
11      A. On -- I'm sorry.  Can you repeat that question.
12      Q. Is it also fair to say that you can't put a
13 number on how much money Texas pays for DACA students in
14 Texas?
15           MR. BITTER: Objection.  Vague.  Objection.
16 Foundation.
17           You can answer if you know.
18      Q. (BY MS. MORENO)  Is it fair to say that you
19 can't put a number on how much money Texas pays in Texas
20 public schools for DACA students?
21           MR. BITTER:  Same objections.
22      A. Is it --
23      Q. (BY MS. MORENO)  You can go ahead and answer.
24      A. Oh.  Again, my declaration was on the
25 unaccompanied children, so I don't know if it's a

Page 31

1 different population.
2      Q. And we'll talk about that --
3      A. Okay.
4      Q. -- in just a little bit.
5      A. Okay.
6      Q. I'll have some questions for you on that.
7           But right now my question is:  Would I be
8 correct to say that Texas cannot put a number on how
9 much it pays for DACA -- to educate DACA students in
10 Texas?
11           MR. BITTER:  Same objections.
12      A. So I don't have -- I don't have personal
13 knowledge of -- of the DACA counts or numbers of
14 students, so I can't tell you if we have that
15 information somewhere else.  I could tell you that we
16 could certainly estimate the cost if we had estimated
17 numbers of DACA students.
18      Q. (BY MS. MORENO)  So you mentioned...
19           Is it fair to say that you cannot tell me
20 today how much Texas pays to educate DACA students?
21      A. That's fair.
22      Q. You mentioned unaccompanied children in your
23 declaration.
24      A. Yes, ma'am.
25      Q. Will you turn with me to your declaration to

Page 32

1 paragraph 4.
2           So you talk about unaccompanied children.
3 How do you define unaccompanied children?
4      A. I went to the website represented in
5 paragraph 4, the U.S. Health and Human Services Office
6 of Refugee Resettlement, where it had accounts by state,
7 by -- by year.  And I used that as -- as sort of the
8 basis for the numbers in my declaration.  And so that's
9 how I would -- prior -- prior to doing this declaration,
10 I did not have any personal knowledge of DACA or U.S. --
11 or accompanied children.  So I -- I'm relying on -- on
12 their definition on their website.
13      Q. And your -- is it correct that your
14 understanding of -- of this case is that it is about
15 DACA?
16      A. I know -- it's my understanding that it is both
17 DACA and unaccompanied children.
18      Q. And what is -- what is the basis for your
19 belief that this case is about unaccompanied children?
20      A. Well, the basis is that my declaration was --
21 well, I'm using these numbers from the website to
22 provide estimates as to the potential cost of educating
23 those students.
24      Q. So are you -- are you aware that unaccompanied
25 children -- I don't know if you saw this from looking on

Page 33

1 the website, but are you aware that unaccompanied
2 children includes children between -- as -- as young as
3 just born to up to 18 years old?
4      A. I -- I -- I don't remember seeing that, no.
5      Q. Okay.
6           (Exhibit 5 marked.)
7           (Counsel conferring.)
8      Q. (BY MS. MORENO)  I'm going to hand you what I'm
9 marking as Exhibit 5.
10           So I'm handing you what I've marked as
11 Exhibit 5.  And I represent to you that I printed this
12 document from the Office of Refugee Resettlement.  So
13 same main website that you went to --
14      A. Okay.  Okay.
15      Q. -- but a different page.  And you'll see that,
16 at the very top, it has "Facts and Data."
17      A. Yes, ma'am.
18      Q. And can you look at the top where it says
19 "Age"?
20      A. Yes.
21      Q. And you see that the first row, under -- under
22 "Age," it is age zero to 12.
23           Do you see that?
24      A. Yes.
25      Q. And do you see that, for fiscal year 2017,

NJAPP0269

Leo Lopez

June 14, 2018
Pages 34 to 37

Page 34

1  17 percent of all unaccompanied children were age zero
2  to 12?
3     A. Yes.
4     Q. And we don't know how -- from this document,
5  how that group is broken down; right?
6     A. That's correct.
7     Q. But we can tell that the category includes
8  unaccompanied children that are ages zero to four?
9     A. Yes.
10    Q. And Texas doesn't provide education services to
11 all children under the age of five; correct?
12    A. That's -- that's correct.
13    Q. And it's true that the number of unaccompanied
14 children cited in your declaration is not representative
15 of the number of unaccompanied children who actually
16 attend Texas schools; correct?
17       MR. BITTER: Objection. Speculation.
18    A. Can you repeat the question so I can be sure
19 what you're asking.
20    Q. (BY MS. MORENO) So you mentioned earlier that
21 not all students of school age in Texas attend public
22 school.
23    A. That's correct.
24    Q. And so it is correct that not all unaccompanied
25 children of school age attend Texas public

Page 35

1  schools; correct?
2     A. I don't --
3        MR. BITTER: Objection. Speculation.
4     A. I don't know one way or the other.
5     Q. (BY MS. MORENO) So is it fair to say that you
6  cannot tell us what proportion of unaccompanied children
7  go to Texas public schools?
8     A. If -- so in Texas public schools, over
9  5 million students -- I mean -- I'm sorry -- in Texas,
10 over 5 million students attend public schools. And then
11 maybe another 100,000 -- or maybe 3- to 500,000, we
12 estimate, attend private or public school -- or private
13 or homeschool, we estimate.
14       And so it -- it would be reasonable to sort
15 of assume a similar breakdown, if not more towards --
16 for the UAC students, it would be -- or -- I mean for
17 DACA students. I'm sorry. Was that your question?
18 DACA or UAC?
19    Q. UAC. And so --
20    A. Yeah. Yeah. It would be reasonable to assume
21 that -- that most of those students would have attended
22 public school.
23    Q. But it would be fair to say that you would not
24 know of what proportion of unaccompanied children attend
25 public schools in Texas?

Page 36

1     A. Yes, that would be fair.
2     Q. And it's true that you don't track whether any
3  unaccompanied children are homeschooled in Texas?
4     A. That's true; we do not.
5     Q. And -- and it's true that you don't track
6  whether -- what proportion of unaccompanied children
7  attend private schools?
8     A. That's correct; the TEA does not track that.
9     Q. If you'll just be patient with me, I'm going to
10 turn back to your declaration.
11       So if you'll turn to paragraph 4.
12    A. Yes.
13    Q. And would you mind reading the second -- your
14 second sentence there. Would you mind reading your
15 second sentence there.
16    A. (As read): However, I am aware that data from
17 the U.S. Health and Human Services Office of Refugee
18 Resettlement indicates that 3,272 UAC were released to
19 sponsors during the 12-month period covering
20 October 2014 through September 2015, 6,550 UAC were
21 released to sponsors during the 12-month period covering
22 October 2015 through September 2016, and 5,374 UAC were
23 released to sponsors during the 12-month period covering
24 October 2016 through September of 2017.
25    Q. Thank you.

Page 37

1        And is it correct to say that some of these
2  unaccompanied children are released in Texas and some
3  are not?
4        MR. BITTER: Objection. Vague. Objection.
5  Speculation.
6     A. So what I attempted to convey in this sentence
7  was based on the data I saw on the -- on the website
8  referenced earlier, was that all these counts were
9  released to sponsors.
10    Q. (BY MS. MORENO) Can you provide the number of
11 unaccompanied children who remained in Texas after being
12 released to sponsors?
13    A. Can you rephrase the question? Because I'm not
14 sure I understand.
15    Q. Sure.
16       Can you provide the number of unaccompanied
17 children who -- who stayed in Texas after being released
18 to sponsors?
19    A. I made the assumption that -- in my
20 declaration, that those sponsors in Texas, that those
21 students remained in Texas, for purposes of my
22 estimates.
23    Q. And so you're not aware of the number of
24 unaccompanied children who, after being released to
25 sponsors in Texas, remained in Texas?

Leo Lopez

June 14, 2018
Pages 38 to 41

Page 38

1    A.  No, I am not.

2    Q.  You would agree that unaccompanied children

3  enrolled in Texas public schools and DACA recipients

4  enrolled in Texas public schools are -- are two separate

5  categories of -- of students; correct?

6    A.  I would agree that -- yes, that -- that

7  they're -- that they represent a different population or

8  it's a subset.

9    Q.  And when drafting your declaration, why did you

10  decide to use unaccompanied children as -- as a point of

11  reference for this case?

12    A.  So as -- as mentioned before, we don't collect

13  the -- the status of students or the DACA status or how

14  many are enrolled, but we do -- but this information is

15  publicly available from the federal government.  And so

16  you use -- this was sort of used as sort of a proxy to

17  sort of demonstrate the financial costs associated

18  with -- with DACA.  You know, you use -- again, using

19  this as a proxy for it, you know, and then make --

20  making certain assumptions about the programs that would

21  be eligible for, coming up with a cost for the public

22  education system in Texas.  So that -- that's why we --

23  that's why I used UAC.

24    Q.  And so I heard you say you don't collect

25  DACA -- the number of DACA students, and you don't

Page 39

1  collect the number of undocumented students.

2    A.  That's right.

3    Q.  Okay.  Are there any other assumptions -- you

4  said you intended unaccompanied children to be a

5  proxy for DACA.  Are there any other assumptions that

6  you made in -- in drafting the declaration?

7    A.  I mean -- so I assumed that they would -- that

8  they would all be attending the Texas public school

9  system.  And I assumed that each of these students would

10  be eligible for additional bilingual and compensatory

11  education, weighted funding.  And I would assume that

12  they would be in attendance for the entire school year

13  for -- for each of the years.

14    Q.  And when you say "they," you mean unaccompanied

15  children?

16    A.  Yes.  I'm sorry.  UAC.

17    Q.  So what -- what is the overlap, then, between

18  unaccompanied children and DACA student populations in

19  Texas?

20        MR. BITTER:  Objection.  Speculation.

21  Objection.  Vague.

22    A.  I don't know enough about the two to give, I

23  think, a -- a response you're looking -- might be

24  looking for.

25    Q.  (BY MS. MORENO)  Okay.  So it's fair to say

Page 40

1  that you're not aware of the overlap between

2  unaccompanied children and DACA recipients in Texas?

3    A.  So --

4        MR. BITTER:  Objection.  Vague.

5        You can answer if you know.

6    A.  Again, I -- I'm aware that unaccompanied

7  children represent sort of a subset of -- of DACA

8  recipients.

9    Q.  (BY MS. MORENO)  And what is the basis for that

10  assumption?

11    A.  That's just based on -- on, again, reading --

12  reading some -- some -- some -- the page on the -- on

13  the website and then look- -- just being -- having

14  cursory -- very cursory knowledge of the case and in

15  general.

16    Q.  And so you -- I want to make sure I understand.

17        You said that unaccompanied children

18  represent a subset of DACA recipients?

19    A.  Yes, that's my understanding.  Well, it -- yes.

20  I mean, I -- you'd -- I felt that -- that that would be

21  a reasonable proxy for -- given the -- the -- the

22  request that I was requested to make some estimates for

23  this declaration.  So that's why I used those counts.

24    Q.  And if you'll turn back with me to Exhibit 5,

25  where we -- where we, together, went through -- and I'm

Page 41

1  trying to find it here -- under "Age."  And this is

2  for -- this is the Office of Refugee Resettlement.

3  Under the age breakdown of unaccompanied children, the

4  age breakdown is from zero all the way up to

5  17; correct?

6    A.  Yes.

7    Q.  And then if we go back to what I -- I've marked

8  as Exhibit 4, which is the USCIS document -- if we go

9  back to that age breakdown, we discussed, on page 3,

10  that you must be at least 15 years old to request -- or

11  older to request DACA.

12        MR. BITTER:  Are you asking him that

13  question -- is that a question on the table?  Are you

14  asking him what the document says or what his

15  understanding is?  I just want to make sure.

16    A.  I'm sorry.  I didn't know.  Was there a

17  question on the table?  I thought you made a statement.

18        MS. PERALES:  There -- there was a question

19  on the table --

20        THE WITNESS:  I'm sorry.  Okay.

21        MS. PERALES:  -- but then we distracted you

22  by conferring.  So it's my apology.

23    Q.  (BY MS. MORENO)  So we'll -- we'll go back to

24  the Office of Refugee Resettlement document --

25    A.  Yes.

Leo Lopez

June 14, 2018
Pages 50 to 53

Page 50

1    Q. (BY MS. MORENO)  So the earliest date here
2 in -- in that first row is October 2014; correct?
3    A. Yes.
4    Q. And assuming an average length of stay, those
5 students would have arrived in -- in the United States
6 sometime in August?
7    A. So --
8        MR. BITTER: Objection. Sorry, Mr. Lopez.
9        Objection. Vague. Objection.
10 Speculation.
11    A. So what -- what Exhibit 5 -- what the length of
12 stay tells me or the way I'm understanding it is that
13 these -- these children were released to sponsors, and
14 they were in a shelter care for 41 days. But again, I
15 don't know that this means that they were in the U.S.
16 only 41 days. Which, on Exhibit 4, it says must have
17 resided in the U.S. since 2007 -- 2007.
18        So I don't know -- I can't tell from any of
19 these exhibits that the 41 days was -- that they went
20 directly from out of the country into, say, shelter care
21 or --
22    Q. (BY MS. MORENO)  Would you agree with me that
23 if it's required for DACA, that you have to have been
24 living in the United States in 2007, it would mean that,
25 if any of -- of your -- of the unaccompanied children

Page 51

1 that you analyzed were DACA recipients, they would have
2 had to have been in the United States for at least seven
3 years?
4        MR. BITTER: Objection. Speculation.
5 Objection. Vague.
6    A. That -- that sounds right.
7    Q. (BY MS. MORENO)  And so assume with me that --
8 that unaccompanied -- the unaccompanied children that
9 you were looking at in --
10    A. Exhibit 6.
11    Q. -- Exhibit 6 entered the United States the year
12 that they are recorded.
13    A. Okay. Do you want me to make that assumption?
14    Q. Please.
15    A. For the -- okay.
16    Q. You would agree that, under that assumption,
17 none of the 3,272 children that you looked at here
18 could -- could be a DACA recipient; correct?
19        MR. BITTER: Objection. Speculation.
20    A. Right. So assuming that they entered the
21 country in 2014 and then were released to sponsors in
22 2014, based on my understanding of DACA from this
23 Exhibit 4, I would agree with you that none of the 3,272
24 would be eligible for DACA based on the assumption that
25 we sort of agreed to just now.

Page 52

1    Q. (BY MS. MORENO)  And that would be correct for
2 the rest of the children in your analysis in
3 Exhibit 6; correct?
4        MR. BITTER: Objection. Speculation.
5 Objection. Vague.
6    A. If -- if we go with the assumption that you
7 asked me to agree to, then yes, I would -- I would
8 that seems that they would not be DACA recipients.
9        MR. BITTER: Celina, when we have a
10 stopping point, can we take a short break.
11        MS. MORENO: Sure. Do you want to do that
12 now?
13        MR. BITTER: This is good.
14        MS. MORENO: We'll go off the record.
15        (A recess was taken from 10:14 a.m.
16        to 10:29 a.m.)
17        MS. MORENO: We're ready to go back on the
18 record, and New Jersey wanted to make an announcement.
19        New Jersey, are y'all there.
20        MR. DOLINSKY: Yes. I just -- I just
21 wanted to note for the record -- again, this is
22 Nicholas Dolinsky with the State of New Jersey -- that
23 my last pro hac application is submitted, and I just
24 wanted to put that on the record.
25        Thank you.

Page 53

1        MS. MORENO: And we just kind of referred
2 to you collectively as New Jersey.
3        MS. PERALES: Apologies for calling you-all
4 New Jersey.
5        MR. DOLINSKY: It's all right. We are a
6 lot alike over here.
7        MS. MORENO: Well, we get stereotyped all
8 the time over here.
9        MS. PERALES: That's right.
10        MS. MORENO: So we're just giving you some
11 love back.
12        MS. PERALES: We know you think we're all
13 just wearing ten-gallon hats and cowboy boots over here.
14 So...
15    Q. (BY MS. MORENO)  So we're going to continue
16 back on the record.
17        And I wanted to talk a little bit with you
18 about another group of students that you mentioned in
19 your declaration, bilingual education students or -- or
20 students who are receiving the bilingual ed weighted
21 funding.
22    A. Okay.
23    Q. So I'm going to turn back to your declaration.
24        And I'm looking at paragraph 3.
25    A. Yes, ma'am.

# Exhibit 18

NJAPP0273

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

STATE OF TEXAS, et al.,            )
        Plaintiffs,               )
                                   )
VS.                                )
                                   )
UNITED STATES OF AMERICA, et al.,) Case No. 1:18-CV-68
        Defendants,               )
                                   )
and                                )
                                   )
KARLA PEREZ, et al.,              )
                                   )
        Defendant-Intervenors.    )

************************************************

ORAL DEPOSITION OF
LLOYD POTTER, Ph.D.
JUNE 27, 2018

************************************************

        ORAL DEPOSITION OF LLOYD POTTER, Ph.D., produced as
a witness at the instance of the Defendant-Intervenors,
and duly sworn, was taken in the above-styled and
numbered cause on the 27th of June, 2018, from 9:59 a.m.
to 1:46 p.m., before Kathleen Casey Collins, CSR, in and
for the State of Texas, reported by machine shorthand,
at the Offices of the Attorney General, 301 West
Fifteenth Street, Seventh Floor, Austin, Travis County,
Texas, pursuant to the Federal Rules of Civil Procedure
and the provisions stated on the record or attached
hereto.

NJAPP0274

Page 66

1 any -- any specific studies about return migration that
2 you relied on for your declaration other than the ones
3 that are cited in your declaration.
4     A. That I --
5     Q. Relied on while preparing your declaration
6 that are not cited in your declaration.
7     A. Can I cite them today?
8     Q. Yes.
9     A. I don't think I can cite them today.
10     Q. Okay. Let's take a look at Paragraph 8. You
11 say in your first sentence after the comma, and tell me
12 if I read this correctly, quote, It is reasonable to
13 conclude that some DACA participants would return to
14 their country of origin if they lose or are not given
15 permission to work in the U.S., unquote.
16         Did I read that correctly?
17     A. Yes.
18     Q. How many is "some"?
19     A. More than one.
20     Q. Can you help me find a top number for "some"?
21 Do you have --
22     A. All of them.
23     Q. Do you think it's reasonable to conclude that
24 all DACA participants would return to their country of
25 origin if they lost work authorization?

Page 67

1     A. From everything I've looked at and thought
2 about, I don't think I could actually put a number on
3 it.
4     Q. So larger than one but less than all. Is that
5 it?
6     A. Yes.
7     Q. Okay. Do you have any other more specific
8 estimate of the number of DACA participants who would
9 return to their country of origin?
10     A. I do not.
11     Q. Did you perform any analysis yourself
12 personally that would shed light on the number of DACA
13 participants that you think would return to their
14 country of origin if they lost work authorization?
15         MR. DISHER: Objection, vague.
16     A. I did not.
17     Q. Would you agree with me that it is reasonable
18 to conclude that a DACA participant might return to
19 their country of origin for reasons unrelated to
20 employment?
21         MR. DISHER: Objection, calls for
22 speculation.
23     A. I think that's reasonable that some DACA
24 participants do return to their country of origin,
25 not necessarily for employment.

Page 68

1     Q. So, for example, it might be possible that a
2 DACA participant returns to their country of origin to
3 marry. Correct?
4     A. That's possible.
5     Q. Or possible that the person returns to their
6 country of origin to care for an elderly parent. Is
7 that correct?
8     A. Yes.
9     Q. Okay. So given that there are various reasons
10 that DACA participants might return to their home
11 country, do you have any way of quantifying the number
12 of DACA recipients who might leave because of
13 employment-related reasons like losing work
14 authorization?
15     A. I don't. I think to do that you would have to
16 have some information about the number lost and look at
17 changes over time. You'd have to look at it in terms of
18 what actually happens, which would be speculation at
19 this point.
20     Q. Would you say that when you use the word
21 "some" when you say, some DACA participants would return
22 to their country of origin if they lose permission to
23 work in the U.S., that your use of the word "some" there
24 is hypothetical?
25         MR. DISHER: Objection, vague.

Page 69

1     A. When you say "hypothetical"?
2     Q. Meaning that you consider it a theoretical
3 possibility but you don't have a number to assign to
4 that group of "some."
5         MR. DISHER: Objection, vague.
6 Objection, compound.
7     A. I don't have a number.
8         What was the first part of the question?
9     Q. And, thus, the possibility is presented as one
10 that is theoretical but not quantified?
11         MR. DISHER: Same objection.
12     A. Yeah. I mean, I think -- I think it's
13 unlikely that it's just theoretical. I mean, I believe
14 that if DACA participants lost permission to work that
15 would be a motivating factor for some of them to return
16 to their country of origin.
17     Q. But you're -- has any DACA participant told
18 you personally that they would return to their home
19 country if they lost work authorization?
20     A. No.
21     Q. In Paragraph 8, at the bottom of the page and
22 then flowing over to the top of the next page, you have
23 identified some characteristics that would make it more
24 or less likely for some DACA participants to emigrate if
25 they were denied permission to work in the U.S. Is that

Page 98

1   representing a defendant-intervenor in this case. I am
2   just going to touch on a few areas and try not to take
3   up too much more of your time.
4        The same rules apply that Ms. Perales
5   explained earlier. If you don't understand my question,
6   please just let me know and I will try to rephrase it.
7   We'll try not to talk over each other, and hopefully we
8   can move this right along.
9   A. Okay.
10   Q. Okay. I just want to ask a little bit about
11   the articles in your declaration. Did you select the
12   articles that you cited in the declaration?
13   A. Yes.
14   Q. How did you select them?
15   A. Reading that during -- well, during a search
16   through bibliographic software and identifying a lot of
17   articles and sorting through the ones that I thought
18   were relevant to what I was asked to testify about.
19   Q. And why did you choose these particular
20   articles included in your declaration?
21   A. They seemed most relevant to the points that I
22   was hoping to make and also concise. So there's some
23   degree of parsimony was also a factor.
24   Q. Did you select any research or articles
25   included in your declaration that directly address the

Page 99

1   topics of DACA?
2        MR. DISHER: Objection, vague.
3   A. No.
4   Q. Why not?
5   A. They weren't -- I didn't find any that
6   addressed the issue of probability of return migration
7   among DACA participants.
8   Q. In considering which scholarly references to
9   include in your declaration, did you consider the
10   reliability of the authors as a subject matter?
11   A. Yeah. For those that I was familiar with,
12   yes, that was a factor.
13   Q. Which ones are you unfamiliar with?
14   A. I didn't -- I don't know Wishnie. I shouldn't
15   say "know." I've not read Wishnie -- Wishnie's work
16   before. And then Kennan and Walker I wasn't familiar
17   with before. The others I've had some familiarity with
18   before.
19   Q. Okay. So I'd like to go to Paragraph 4 of
20   your declaration, which I believe is Exhibit 3. I
21   believe this is an Emma Aguila article for the research.
22        Are you familiar with her work?
23   A. I'm sorry. I'm -- I'm -- can you point me to
24   where we are?
25   Q. So Paragraph 4, about midway down, there's a

Page 100

1   citation "Aguila 2012."
2   A. Yes.
3   Q. And then in your references, Paragraph 13 says
4   "E. Aguila." Are you familiar with her work?
5        MS. PERALES: "Aguila."
6   Q. "Aguila." I'm sorry. "Aguila." I thought
7   so.
8        Are you familiar with her work?
9   A. Could you maybe start -- somehow I've lost
10   where you're going with this.
11   Q. Okay. In Exhibit 3, your declaration --
12   A. Okay.
13   Q. -- if you look at Paragraph 13, the full
14   citation for Aguila --
15   A. Okay.
16   Q. -- is there.
17   A. Uh-huh.
18   Q. Are you familiar with Aguila's scholarly work?
19   A. Somewhat.
20   Q. Somewhat how?
21   A. I've just -- I read a lot and have -- and I
22   believe that I've read work of hers before.
23   Q. Okay.
24        MS. GREGORY: I'd like to have this
25   marked.

Page 101

1        (Exhibit No. 6 marked)
2        MR. BOBB: Is this six?
3        MR. DISHER: Yes.
4        MS. GREGORY: Yes.
5   Q. Dr. Potter, I'll just say right off the bat
6   that this is an excerpt, but do you recognize this
7   excerpt?
8   A. Yes.
9   Q. And what do you recognize it as?
10   A. I think what I was citing in the declaration.
11   Q. Okay. So the Aguila article, "United States
12   and Mexico Ties That Bind, Issues That Divide"?
13   A. Yes.
14   Q. Okay. Okay. If you could turn to Roman
15   numeral Page IV. Roman numeral Page IV. It's just part
16   of the index. This was a rather lengthy piece, and I
17   didn't want have to go through with all of us here line
18   by line, and so I want to ask you generally.
19        So looking on Page IV, looking at the
20   heading under "Chapter Five," about midway through the
21   page, do you see "Chapter Five"?
22   A. Yes.
23   Q. There's a bold title under "Chapter Five"
24   called "Migration's Effects on Origin and Designation
25   Countries."

Page 106

1 correct?
2    A. Yes.
3    Q. Okay. Have there been any other studies that
4 address this issue in the last 17 years?
5       MR. DISHER: Objection, vague.
6    A. If there are, there aren't many.
7    Q. Okay. You don't know for sure?
8    A. I didn't -- I don't think I found any when I
9 looked that specifically address this.
10    Q. And when we say "this," do we mean young
11 immigrants -- how would you characterize the --
12 the Regan and Olsen research as you cited it here in this
13 paragraph?
14    A. They were looking at return migration --
15    Q. Okay.
16    A. -- of immigrants.
17    Q. Okay.
18       MS. GREGORY: I'd like to have this
19 marked, please.
20       (Exhibit No. 7 marked)
21    Q. Dr. Potter, do you recognize Exhibit 7, titled
22 "You Can Go Home Again: Evidence From Longitudinal
23 Data"?
24    A. Yes.
25    Q. And is this the article that you cited in

Page 107

1 Paragraph 9 of your declaration?
2    A. Yes.
3    Q. Did this study address DACA recipients?
4    A. No.
5    Q. Did this study distinguish between documented
6 and undocumented immigrants?
7    A. No.
8    Q. On Page 339, the first page, looking at the
9 right-hand column, the second full paragraph, it begins
10 "in this paper." Do you see where --
11    A. Yes.
12    Q. Okay. So in this paragraph the author states
13 that they use longitudinal data from the 1979 youth
14 cohort of the National Longitudinal Surveys (NLSY79) to
15 study emigration, with an "E," in one cohort of
16 immigrants.
17       Did I read that correctly?
18    A. Yes.
19    Q. What is the National Longitudinal Surveys?
20    A. It's a survey that follows people over time
21 and asks a range of questions about their
22 characteristics and socioeconomic characteristics.
23    Q. So what would be the 1979 youth cohort of the
24 National Longitudinal Surveys?
25    A. That would be the cohort that they started

Page 108

1 following in 1979.
2    Q. Do you know when -- or what age a cohort is
3 when they begin following them?
4    A. I don't know.
5    Q. Okay. So the sentence immediately after that
6 I just read says that more than 750 NLSY79 respondents
7 were born abroad to foreign nationals.
8       Did I read that correctly?
9    A. Yes.
10    Q. So this particular cohort was born in or
11 before 1979. Is that correct?
12    A. Yes.
13    Q. Let's look at Footnote 2, which is on the same
14 page. The very last sentence says, quote, By 1996, only
15 71 foreign cases were eligible to be interviewed for
16 NLSY79, end quote.
17       Did I read that correctly?
18    A. Yes.
19    Q. So in your reading, does that mean that there
20 were only -- there was only complete data for
21 71 individuals?
22    A. In the survey?
23    Q. Yes.
24    A. Not in the survey, but that they had
25 identified as, quote, unquote, foreign cases in the

Page 109

1 survey.
2    Q. So what does that mean, only 71 foreign cases
3 were eligible to be interviewed? What is your
4 understanding of that?
5    A. So they were looking at people who started in
6 the 1979 cohort and followed them over time; and by
7 1996, they had identified 71 cases who had returned
8 to -- I think to their country of origin or had left the
9 United States.
10    Q. Dr. Potter, are you familiar with the DACA
11 eligibility requirements?
12    A. Vaguely.
13    Q. Are you aware that DACA applicants had to be
14 under 31 years old by 2012 to be eligible for deferred
15 status and, therefore, wouldn't have been born yet in
16 1979?
17    A. Yes.
18    Q. You can set that to the side, Exhibit 7.
19       MS. GREGORY: I'd like to have this
20 marked, please.
21       (Exhibit No. 8 marked)
22    Q. Dr. Potter, you're looking at Exhibit 8. Is
23 this the article that you cite in Paragraph 10 of your
24 declaration?
25    A. Yes.

## Page 110

1   Q.  On Page 2 -- well, so I'm actually looking at
2   Page 3.  Sorry.  The paragraph runs over.  All right.
3       So Page 3, at the very top before the
4   bold "Background" section, the first full sentence on
5   Page 3 states, "We present estimates of emigration,"
6   within an "E," "rates of foreign-born adults, estimate
7   multivariate models to assess the independent
8   association of economic-, social-, and health-related
9   factors."  And the sentence continues, but I'll stop
10  there.
11      Did I read that correctly?
12   A.  Yes.
13   Q.  Okay.  The last sentence of that section
14  reads, "We find that the relative importance of these
15  factors and the direction of their effects vary
16  considerably by age, gender and Mexican origin."
17      Did I read that correctly?
18   A.  Yes.
19   Q.  Dr. Potter, are all DACA recipients adults, as
20  defined by this study?
21   A.  I'm sorry?
22   Q.  Are all DACA recipients adults, as defined in
23  this study in this portion that we just read?
24      So it says, "We present estimates of
25  emigration rates of foreign-born adults."

## Page 111

1       To your knowledge, are all DACA
2   recipients foreign-born adults --
3       MR. DISHER:  Objection, vague.
4    A.  DACA recipients foreign-born adults.  No.
5    Q.  That last sentence also says that the relative
6   importance of these factors and the direction of their
7   effects vary considerably by age, gender and Mexican
8   origin.
9       Are all DACA recipients the same age,
10  gender, and national origin?
11   A.  No.
12   Q.  So is it fair to say that the conclusions in
13  this study vary considerably among DACA recipients?
14   A.  This study doesn't specifically address DACA
15  recipients.
16   Q.  No.  But you cited this study regarding
17  immigration of foreign-born persons according to
18  Paragraph 10 of your declaration.
19   A.  Correct.
20      MR. DISHER:  I'm sorry.  Can we go off
21  the record for one second?
22      MS. GREGORY:  Sure.
23      (DISCUSSION OFF THE RECORD)
24   Q.  (BY MS. GREGORY) And this study says that the
25  relative importance of these factors and the direction

## Page 112

1   of their effects vary considerably by age, gender, and
2   nationality.
3       So is it fair to say that DACA recipients
4   who also vary according to age, gender, and
5   nationality -- that this article's conclusions would
6   also vary among DACA recipients?
7    A.  I'm sorry,  I'm not following you.
8    Q.  I'll move on.
9    A.  Okay.
10   Q.  All right.  Let's turn to Page 4.  Give me one
11  second to find out where I'm looking.  Actually, we can
12  put that to the side.  We're finished with this exhibit.
13      I just have a few questions about your CV
14  and then hopefully I'll be finished.  If you could pull
15  out that exhibit, I believe it's Exhibit 1.
16   A.  Okay.
17   Q.  No.  It is Exhibit 2.  My apologies.
18   A.  Okay.
19   Q.  So Ms. Perales went through this at length and
20  so I'll try to keep this sort.
21      Is it fair to say that this is a
22  comprehensive summary of your life's work?
23   A.  Yeah, of my -- yes, of my work, yes.
24   Q.  Yes, of your work, not of every facet of your
25  life?

## Page 113

1    A.  Correct.
2    Q.  Okay.  Let's turn to the "Research Activities
3   Summary."  It is on Page 3 -- or it starts on Page 3.
4   Under "Peer Reviewed Research Activities Summary," there
5   are, like, 29 different peer-reviewed research
6   activities here.
7       Do any of these 29 peer-reviewed research
8   activities address the topic of immigration?
9    A.  I don't believe so.  I'd have to go through
10  and look.  So let me spend a minute to look at them.
11   Q.  Sure.
12      THE REPORTER:  Is that with an "I"?
13      MS. GREGORY:  Yes.
14   A.  Okay.  The question again.
15   Q.  So the question is of the peer-reviewed --
16  29 peer-reviewed research activities, how many address
17  the topic of immigration?
18   A.  Immigration.
19   Q.  With an "I."
20   A.  Immigration.  I think it would be fair to say
21  none.
22   Q.  What about emigration with an "E"?
23   A.  None.
24   Q.  Okay.  Do any address the topic of the
25  Immigration Reform and Control Act?

## Page 114

1    A.  No.

2    Q.  Do any of these 29 articles address DACA?

3    A.  No.

4    Q.  Okay.  If you turn to the 15 book chapters, it

5  starts on Page 5.  Do any of these 15 book chapters

6  address the topic of immigration with an "I"?

7    A.  No.

8    Q.  Did any of these book chapters address the

9  topic of the Immigration Reform and Control Act?

10   A.  No.

11   Q.  Did any of the book chapters listed address

12 the topic of DACA?

13   A.  No.

14   Q.  And if we turn to Page 6, I believe there's a

15 list of other -- quote, Other publications, about

16 21 listed there.

17       Of these 21 Other publications, do any of

18 them address the topic of immigration?

19   A.  Some of them --

20   Q.  Which ones?

21   A.  -- and none of them directly.

22       Probably under "Other," No. 1, but I'm

23 not sure about that.  I'd have to go back and look at

24 that.  3 probably does.  4 probably does.  6, 9, 10, 11.

25 I think that's it.

## Page 115

1    Q.  Okay.  Do any of the 21 Other publications

2  address the topic of the Immigration Reform and Control

3  Act?

4    A.  No.

5    Q.  Do any of the Other publications -- and I'm

6  using "Other" as the title of that section, Other

7  publications address DACA?

8    A.  No.

9       MS. GREGORY:  I don't have anything

10 further.

11      MR. DISHER:  Mr. Bobb?

12      MR. BOBB:  No, no questions.

13      MS. PERALES:  Are your --

14      MR. DISHER:  I don't have anything.

15      MS. PERALES:  You don't have anything.  I

16 just have one question related to the -- we didn't get

17 any Potter disclosures.

18      MR. DISHER:  In terms of?

19      MS. PERALES:  Like other than the report

20 and the CV --

21      MR. DISHER:  And all the --

22      MS. PERALES:  -- and the articles.

23      MR. DISHER:  And the articles.  That's

24 right.

25      MS. PERALES:  Okay.

## Page 116

1       MR. DISHER:  That's all there was to

2  disclose.

3       MS. PERALES:  That's right?

4       MR. DISHER:  Yes.

5       MS. PERALES:  Okay.  I don't have any

6  others.  I reserve my questions for the time of trial.

7       MR. DISHER:  All right.

8       (END OF DEPOSITION)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 117

1       CHANGES AND SIGNATURE

2  WITNESS NAME:  LLOYD POTTER, Ph.D.

   DATE OF DEPOSITION:  JUNE 27, 2018

3

4  PAGE  LINE    CHANGE        REASON

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

# Exhibit 19

NJAPP0280

Transcript of the Testimony of

**Monica Smoot**

**Date:**

June 19, 2018

**Case:**

STATE OF TEXAS vs UNITED STATES OF AMERICAN

NJAPP0281

Monica Smoot

June 19, 2018
Pages 42 to 45

Page 42

1       So the estimate -- so I asked you that
2 about half of the $349 million expended in Fiscal Year
3 2015 went to undocumented immigrants.
4       So that half would be -- half of that
5 would be 174.8 million, right?
6   A.   1.48 million is the number of people.
7   Q.   Okay.  In the last sentence here, it says,
8 therefore, the estimated amount paid for Emergency
9 Medicaid services to undocumented immigrants residing in
10 Texas is about 174.8 million, right?
11   A.   Correct.
12   Q.   And that is half of the 349 million number?
13   A.   Correct.
14   Q.   Okay.  And so looking at this estimate of
15 174.8 million of Emergency Medicaid services provided to
16 undocumented immigrants, you don't know how much of that
17 $174.8 million went to DACA recipients, correct?
18       MR. DISHER:  Objection; vague.
19   A.   Correct.
20   Q.   (By Mr. Herrera) You don't have an estimate for
21 how much of that went to DACA recipients, correct?
22   A.   I do not.
23   Q.   Therefore, you can't say whether
24 $174.8 million would have been lower had DACA not
25 existed?

Page 43

1       MR. DISHER:  Objection; calls for
2 speculation.
3   A.   I can't attribute any of that.  I cannot.
4   Q.   (By Mr. Herrera) You cannot say?
5   A.   Cannot say.
6       MR. DISHER:  Same objection.
7   Q.   (By Mr. Herrera) On page -- so the next page,
8 Page 7 of Exhibit 6 or App 0938, this is the page of the
9 2015 Rider 59 Report that estimated the Texas share of
10 Medicaid costs, right?
11       And there is a table here.
12       So the -- the estimating procedures we've
13 been talking about in these -- in this report so far,
14 taking the ACS estimate of the number of noncitizens and
15 dividing it by two, that procedure applies to the
16 numbers in this table, right?
17       MR. DISHER:  Objection; vague.
18   Q.   (By Mr. Herrera) And by this table, I mean the
19 only table that's on Page 7.
20       MR. DISHER:  Same objection.
21   A.   It relates to the Fiscal Year 2015 numbers,
22 which are part of this version of the report.
23   Q.   (By Mr. Herrera) And it would not apply to
24 Fiscal Year 2013 numbers?
25   A.   The Fiscal Year 2013 numbers are based on the

Page 44

1 estimate that is reported in the 2013 report.
2   Q.   Okay.  So let's assume for a minute that the
3 estimates of undocumented recipients of Texas Emergency
4 Medicaid -- so that's 1.48 million people -- were real
5 numbers instead of estimate -- estimates divided by
6 estimates.
7       Assume 1.48 million, for the sake of this
8 question, as a hard number.
9       Would you agree with me that you have no
10 basis to assume that documented and undocumented
11 residents receive Emergency Medicaid services at rates
12 equal to their proportion in the immigrant population?
13       MR. DISHER:  Objection; form.  Objection;
14 calls for speculation.  Objection; vague.
15   A.   Can you repeat that.
16   Q.   (By Mr. Herrera) Sure.  Would you agree with me
17 that you have no basis to assume that documented and
18 undocumented immigrants receive Emergency Medicaid
19 services at rates equal to their proportion in the
20 immigrant population?
21       MR. DISHER:  Same objections.
22   A.   I don't know.
23   Q.   (By Mr. Herrera) So you don't have a basis to
24 assume --
25       MR. DISHER:  Same objections.

Page 45

1   Q.   (By Mr. Herrera) -- that?
2   A.   I don't know.
3   Q.   You don't -- you don't know whether they use
4 them at equal rates?
5   A.   Correct.
6   Q.   Okay.  Are you aware that social science
7 research suggests that undocumented immigrants are less
8 likely to avail themselves of available medical services
9 when compared to the rest of the immigrant population?
10       MR. DISHER:  Objection; calls for
11 speculation.
12   A.   I'm not aware that that is a fact.
13   Q.   (By Mr. Herrera) Are you aware of research that
14 suggests that?
15   A.   Somewhat.
16   Q.   Okay.  And can you tell me a little bit about
17 what you are aware of or what you have heard of or read.
18       MR. DISHER:  I'll object; outside the
19 scope of your declaration.
20       But to the extent you can answer it, go
21 ahead.
22   A.   I read that same reference.  That's the extent.
23   Q.   (By Mr. Herrera) But by that same reference,
24 what are you -- is there -- are you talking about
25 another declaration or something?

NJAPP0282

Monica Smoot

June 19, 2018
Pages 50 to 53

---

Page 50

1    Q.   And -- and some may -- some of the recipients
2 of Family Violence Program may be DACA recipients,
3 right?
4    A.   They may be.  I don't know.
5    Q.   So looking back at Exhibit 6.  So App 0939.
6         You use the ACS 2.96 million number for
7 noncitizens in Texas, right?
8         You can take a second to find it.
9    A.   Yes.
10   Q.   Okay.  And much like you did with -- or like
11 you did with the Emergency Medicaid estimate, you
12 estimate, again, that half of those noncitizens are
13 undocumented?
14   A.   Correct.
15   Q.   And then you take that 50 percent number and
16 determine that, therefore, 5.4 percent of the total
17 Texas population is undocumented?
18   A.   Correct.
19   Q.   So then you assume that undocumented people use
20 the Family Violence Program proportional to their
21 estimates present -- their estimated presence in the
22 population, right?
23   A.   Yes.
24   Q.   So if that assumption were incorrect for
25 whatever reason, if for some reason undocumented people

---

Page 51

1 were actually 10 percent of the recipients of Family --
2 the Family Violence Program, the amount of expenditures
3 for that program -- the amount of expenditure shares for
4 undocumented people would be high, right?
5         MR. DISHER:  Objection; vague.
6    A.   Can you repeat that.
7    Q.   (By Mr. Herrera) Sure.  So if that's not right,
8 if for some reason undocumented people were actually
9 10 percent of the recipients, the amount of expenditures
10 shared would be higher?
11   A.   Yes.
12   Q.   Okay.  Or if actually undocumented people were
13 reluctant to avail themselves of the program, fair share
14 of expenditures would be lower than you've estimated
15 here, right?
16   A.   Yes.
17   Q.   And you would agree with me that you actually
18 don't know whether undocumented people use the Family
19 Violence Program at all, right?
20   A.   Correct.
21        MR. DISHER:  Objection; vague.
22   A.   Correct.
23   Q.   (By Mr. Herrera) That's correct?
24   A.   I do -- yes, we do not know.
25   Q.   Okay.  And you don't know if DACA recipients

---

Page 52

1 have availed themselves of this program, right?
2    A.   Correct.  We do not know.
3    Q.   How much less would the Family Violence Program
4 have to spend if DACA were discontinued?
5         MR. DISHER:  Objection; calls for
6 speculation.
7    A.   I don't know.
8    Q.   (By Mr. Herrera) Do you -- do you plan to offer
9 any additional testimony on that -- on that question?
10        MR. DISHER:  Objection; vague.
11   A.   No.
12   Q.   (By Mr. Herrera) The costs of the program of
13 the -- of the Family Violence Program pay for shelters
14 and personnel costs, right?
15   A.   I'm not entirely sure.
16   Q.   Okay.  So you don't know what proportion of the
17 budget of the FVP pays for shelters and personnel costs?
18   A.   The FVP program provided that information.
19   Q.   Okay.
20   A.   I'm not an expert in that program.  So...
21   Q.   Okay.  So up here in the first paragraph at the
22 bottom -- or rather the last sentence, it says, in
23 Fiscal Year 2015, the FV -- the FVP funded 71 nonprofit
24 family violence shelters, 10 nonresidential centers, 20
25 special nonresidential projects, and 17 exceptional item

---

Page 53

1 funding projects providing comprehensive family violence
2 services to victims with a total budget of $27,360,863.
3         MR. DISHER:  And just -- it says 28
4 special nonresidential projects.
5         MR. HERRERA:  Sorry.
6    Q.   (By Mr. Herrera) Okay.  10 nonresidential, 28
7 special nonresidential, and 17 exceptional item funding
8 projects with a total budget of about 27 million, right?
9    A.   Correct.
10   Q.   Okay.  So let's -- we're gonna move on to
11 Page 9, the section that addresses Texas' Children
12 Health Insurance Program perinatal coverage.
13        And this program provides care to
14 low-income women in Texas, right?
15   A.   Yes.
16   Q.   Okay.  So it's gonna be some of the same
17 questions.  But...
18        So this program they -- in this program,
19 the recipients or the people who use the program could
20 be citizens, documented noncitizen, undocumented
21 noncitizens, or people who are recipients of DACA,
22 right?
23   A.   Yes.
24   Q.   And the program doesn't require citizenship
25 documentation, correct?

---

Kim Tindall and Associates, LLC 16414 San Pedro, Suite 900          San Antonio, Texas 78232
210-697-3400                                                        210-697-3408

NJAPP0283

Monica Smoot

June 19, 2018
Pages 58 to 61

Page 58

1    A.   It's not my area.

2    Q.   Do you know what the -- what do you know about
3 the process, generally?

4    A.   I really don't know a whole lot about the
5 process.

6    Q.   What do you know about the process?

7    A.   What I know is what I see in the data after the
8 fact.

9    Q.   Okay.

10    A.   But how that information is collected, at what
11 point any information is collected, I have -- I do not
12 know about that.

13    Q.   So because both documented and undocumented
14 residents or immigrants use CHIP perinatal in Texas,
15 are -- for your estimate, are you assuming that
16 undocumented people use the CHIP program proportional to
17 their estimated presence in the population?

18        MR. DISHER:   Objection; vague.

19    A.   We do make that assumption.

20    Q.   (By Mr. Herrera) So if for some reason that
21 assumption was wrong, and if for some reason
22 undocumented people were actually 10 percent of the
23 recipients of CHIP Perinatal, the amount of expenditures
24 share would be higher, right?

25        MR. DISHER:   Objection; vague.

Page 59

1    A.   Can you repeat that.

2    Q.   (By Mr. Herrera) Sure.  I guess -- let's --
3 let's go back to the calculation here.

4        So Texas CHIP perinatal coverage
5 expenditures, we start with -- in the year -- in Fiscal
6 Year 2015, we start with $202.6 million, right?

7    A.   Yes.

8    Q.   Okay.  And we multiple that by 50 percent, so
9 the percent of noncitizens who are undocumented
10 immigrants, right?

11    A.   Yes.

12    Q.   Okay.  So, effectively -- to begin with,
13 effectively, you're treating CHIP perinatal coverage
14 recipients pretty much as all immigrants, right?

15    A.   Yes.

16    Q.   Okay.  And that's -- that's despite the fact
17 that citizens can receive CHIP perinatal coverage,
18 right?

19        MR. DISHER:   Objection; asked and
20 answered.

21    A.   Yes.

22    Q.   (By Mr. Herrera) So the number you get when
23 you -- when you split the CHIP perinatal coverage number
24 in half, because that's the proportion that you've used
25 as an estimate for undocumented immigrants, that's

Page 60

1 $101 million, right?

2    A.   Yes.

3    Q.   Then you factor in the fact that Texas doesn't
4 pay all of that.

5        I assume the federal government pays part
6 of it, right?

7    A.   That's correct.

8    Q.   So Texas pays about, it says in the report,
9 29.32 percent of expenditures.

10        Therefore, the total estimated state cost
11 for CHIP perinatal coverage to undocumented immigrants
12 residing in Texas in 2015 was about $30 million, right?

13    A.   Correct.

14    Q.   Okay.  So this -- so, again, we -- we are
15 talking about the fact that undocumented people -- that
16 you're assuming that undocumented people use the CHIP
17 program proportional to their estimated presence in the
18 population.  So that 50 percent of the users are -- and
19 you already answered this, but I'm just going back.

20        Fifty percent of undocumented people -- or
21 50 percent of immigrants are undocumented; therefore,
22 CHIP perinatal users, 50 percent of them are
23 undocumented, right?

24        MR. DISHER:   Objection.

25    Q.   (By Mr. Herrera) So you've made that

Page 61

1 assumption.

2        So using that -- so if that were wrong, if
3 for some reason undocumented people were actually
4 10 percent of the recipients, the amount of expenditures
5 by Texas on CHIP perinatal would be higher -- or sorry,
6 not 10 percent, if it were, like, 60 percent --

7        MR. DISHER:   Hold on.

8    Q.   (By Mr. Herrera) -- it would be higher?

9        MR. DISHER:   Objection; vague.  Objection;
10 compound.  Objection; asked and answered.

11        Go ahead.

12    Q.   (By Mr. Herrera) Yes.

13    A.   If it were higher, meaning 60 percent, then,
14 yes, the cost attributed to undocumented immigrants
15 would be higher.

16    Q.   Okay.  So if actually undocumented people were
17 reluctant to avail themselves of the program, it could
18 be lower than you have estimated, right?

19        MR. DISHER:   Objection; vague.  Objection;
20 calls for speculation.

21    A.   Correct.  Could be lower.

22    Q.   (By Mr. Herrera) And you would agree with me
23 that you actually don't know whether undocumented people
24 use the program at all, right?

25    A.   That is correct.  We do not know.

Monica Smoot

June 19, 2018
Pages 62 to 65

Page 62

1   Q.  And you don't know if DACA recipients have
2 availed themselves of CHIP perinatal in Texas?
3   A.  We do not know.
4   Q.  If DACA were discontinued, how much less would
5 Texas have to spend on CHIP perinatal?
6       MR. DISHER:  Objection; calls for
7 speculation.  Objection; outside the scope of her
8 declaration.
9   A.  I don't know.
10   Q.  (By Mr. Herrera) Okay.  Sitting here now, do
11 you -- do you have some idea of where that would go,
12 whether Texas would spend more or less, if DACA were
13 discontinued?
14       MR. DISHER:  Same objections.
15   A.  I don't know.
16   Q.  (By Mr. Herrera) Okay.  Do you plan to develop
17 any kind of estimate on that hypothetical?
18   A.  No.
19   Q.  Okay.  Earlier -- just to go back to something
20 you said earlier about some of the sources.
21       You talked about other documentation you
22 reviewed, the Perryman and Ku declarations, but you also
23 reviewed some of the data files for the Rider Reports
24 and the SAS code.
25       Which is the SAS code what you used to run

Page 63

1 the calculations, like pulling numbers out of the
2 database, or can you describe what that is?
3   A.  The SAS code is used to do the calculations --
4   Q.  Okay.
5   A.  -- for the costs.
6   Q.  Is that like a -- done in a -- in a -- what
7 kind of program do you use to do that -- or did the
8 analyst use to do that?
9   A.  It's called SAS.
10   Q.  Oh, okay.
11   A.  I can't remember what SAS stands for.
12   Q.  And the data files, what -- do you know what
13 data files are included -- were included in that, were
14 used to -- by HHSC?
15       MR. DISHER:  Objection; vague.
16   A.  The data files that were used -- that used SAS
17 with -- to analyze were related to the Emergency
18 Medicaid section.
19   Q.  (By Mr. Herrera) Do you know whether counsel
20 produced those or --
21       MR. HERRERA:  If I --
22       MR. DISHER:  Produced which part?
23       MR. HERRERA:  The data files.
24       MR. DISHER:  The data files, I believe we
25 did.

Page 64

1   Q.  (By Mr. Herrera) All right.
2       So let's move on to the next section here
3 in your declaration -- or the Rider Report, so Exhibit
4 6.
5       The next section is about -- sorry.  We
6 need to go back to a different exhibit.  Let's go to --
7 so, first, let's look at your dec on page -- on
8 Paragraph 11.  And it says, in the 2008 and 2010
9 versions of the Rider 59 Report, HHSC also provided
10 estimates of the amount of the uncompensated medical
11 care provided by state public hospital district
12 facilities to undocumented immigrants.
13       So those estimates were only done in the
14 '08 and 2010 versions of the Rider 59 Report.
15       Do you know why HHSC has not provided any
16 estimates of uncompensated care for undocumented
17 immigrants in more recent years?
18   A.  Yes.
19   Q.  Why is that?
20   A.  The -- the data required to do those
21 calculations do not exist anymore.
22   Q.  And which data were those?
23   A.  There was a survey or data collection
24 instrument that went to the public hospital districts.
25   Q.  Was that the CHASSIS --

Page 65

1   A.  I believe --
2   Q.  -- system?
3   A.  I believe so.
4   Q.  Okay.  So let's look at Exhibit 3, which is the
5 one that says 2010 update on the front.
6   A.  (Witness complies.)
7   Q.  So we go to -- actually -- I'm sorry.  I meant
8 Exhibit 2.  So if we go to Page App 891, which would be
9 Page 6 of this report.  We have the -- the section that
10 says, Texas public hospital districts.
11       So, again, we're looking at Exhibit 2.
12 And these estimates are only for -- or rather these
13 estimates are simply estimates because limited -- and
14 I'm reading from the first paragraph here:  Limited
15 information exists to estimate hospital-specific
16 uncompensated care for undocumented immigrants, right?
17   A.  Correct.
18   Q.  Okay.  And the estimates here were regional,
19 right?
20   A.  (Witness reading document.)
21       I don't -- I don't think I can answer that
22 question.  I'm not -- I do not -- I don't have the
23 knowledge to really answer that question.
24   Q.  Okay.  So it says, as such, the method -- and
25 this is the second sentence there.  As such, the method

Monica Smoot

June 19, 2018
Pages 74 to 77

---

Page 74

1    Q.   (By Mr. Herrera) If a DACA recipient had
2 private health care insurance, is it possible that they
3 would not need to use Emergency Medicaid?
4         MR. DISHER:  Objection; calls for
5 speculation.  Objection; vague.
6    A.   I do not know.
7    Q.   (By Mr. Herrera) But, I mean, is it possible?
8         MR. DISHER:  Same objections.
9    A.   I don't know.  I'm not an expert in eligibility
10 determination.
11    Q.   (By Mr. Herrera) Okay.  If a DACA recipient had
12 private health insurance, do -- do you know whether that
13 person might not use CHIP perinatal?
14         MR. DISHER:  Objection; calls for
15 speculation.
16    A.   I don't know.
17         MR. DISHER:  Objection; vague.
18    Q.   (By Mr. Herrera) Do you -- for CHIP perinatal
19 coverage, are people disqualified from using it if they
20 have a certain level of health care insurance; do you
21 know?
22    A.   I don't know.
23    Q.   Okay.  Do -- does HHSC know the access and --
24 Access and Eligibility Services?
25    A.   Yes.

---

Page 75

1    Q.   Okay.
2    A.   They would know.
3    Q.   Did you do any -- in preparation of your
4 report -- or your declaration, rather, did you do any
5 investigation into whether immigrants possession or --
6 or status as being covered by private health insurance
7 would affect these numbers at all?
8    A.   No.
9    Q.   Okay.
10         MR. HERRERA:  I am almost done.  Could we
11 take a quick break just so I can look over stuff really
12 quickly.
13         MR. DISHER:  That's fine.
14         MR. HERRERA:  Maybe like five minutes.
15         Go off the record.
16         (Recess from 11:33 a.m. to 11:41 a.m.)
17         MR. HERRERA:  Back on the record.
18    Q.   (By Mr. Herrera) I -- earlier I asked you
19 about -- and sorry to go back to them again -- but the
20 data files.  I know counsel said he produced them to us.
21         But I was just wondering, are they -- are
22 those files publicly available?
23    A.   No, they're not.
24    Q.   Okay.  All right.  My only other questions --
25 so just with regard to all of the Rider 59 Reports, none

---

Page 76

1 of them -- none of them are specific to DACA recipients,
2 right?
3         MR. DISHER:  Objection; vague.
4    A.   That's correct.
5    Q.   (By Mr. Herrera) Okay.  Your report does not
6 show how many DACA recipients receive any of the
7 benefits or programs mentioned, right?
8    A.   Correct.
9    Q.   DACA recipients are less likely -- well -- so
10 the numbers in your report are based on estimates from
11 the Rider 59 Reports of undocumented immigrants who use
12 the various programs, right?
13    A.   Correct.
14    Q.   Okay.  And those estimates are not based on
15 individual reporting of whether those individual users
16 or recipients are themselves undocumented immigrants,
17 right?
18         MR. DISHER:  Objection; vague.
19    A.   Can you repeat that.
20    Q.   (By Mr. Herrera) Sure.  So the data that goes
21 into these reports, the -- the baseline level data, does
22 not itself include individual data about whether people
23 are undocumented?
24         MR. DISHER:  Objection; vague.
25    A.   Correct.

---

Page 77

1    Q.   (By Mr. Herrera) Okay.
2         MR. HERRERA:  Those are all my questions.
3 Pass the witness.
4         EXAMINATION
5 BY MS. GREGORY:
6    Q.   Good morning.  It's still morning.
7         My name is Katherine Gregory.  I
8 introduced myself earlier.  But I'm a deputy attorney
9 general with the New Jersey Office of Attorney General.
10 I'm representing a proposed defendant intervenor in this
11 case.
12         I have a few more questions for you.  Some
13 of them may jump around a bit.  If you'll just bear with
14 me.  And, of course, if you don't know the answer,
15 please just let me know.
16    A.   Okay.
17    Q.   We have been discussing DACA a lot today.
18         Do you know what DACA is?
19         MR. DISHER:  Objection; vague.
20    A.   I don't know the specifics about DACA.
21    Q.   (By Ms. Gregory) What is your understanding of
22 DACA?
23    A.   The only thing I really know is that DACA
24 recipients are considered undocumented immigrants.
25    Q.   Are you familiar with the eligibility

---

NJAPP0286

Monica Smoot

June 19, 2018
Pages 78 to 81

Page 78

1 requirements for DACA?

2  A.  I am not.

3  Q.  Do you know when the United States Citizenship

4 Immigration Services began accepting applications for

5 the DACA program?

6  A.  Nope.

7  Q.  What percentage of undocumented immigrants

8 currently residing in Texas are DACA recipients?

9      MR. DISHER:  Objection; calls for

10 speculation, outside the scope.

11  A.  I don't know.

12  Q.  (By Ms. Gregory) Does HHSC collect that

13 information?

14  A.  No.

15  Q.  So you don't know what percentage of

16 undocumented immigrants reside in Texas for any of the

17 fiscal years from 2012 to the present?

18      MR. DISHER:  Objection; asked and

19 answered. Object; vague.

20  A.  We do not know exact numbers.

21  Q.  (By Ms. Gregory) Does your declaration

22 attribute any specific costs incurred by Texas to the

23 DACA program?

24      MR. DISHER:  Objection; vague.

25  A.  No.

Page 79

1  Q.  (By Ms. Gregory) Looking at Exhibit 1,

2 Paragraph 12. Paragraph 12 begins by saying, based on

3 my knowledge, expertise, and research regarding the

4 provision of services and benefits to undocumented

5 immigrants.

6      What is your area of expertise referenced

7 in Paragraph 12?

8  A.  My area of expertise is in relation to

9 utilization of services by Medicaid and CHIP clients.

10  Q.  Do you have any expertise in DACA recipients in

11 the state of Texas?

12      MR. DISHER:  Objection; vague.

13  A.  No, I do not.

14  Q.  (By Ms. Gregory) Do you have any expertise in

15 the area of immigrants residing in the state of Texas?

16      MR. DISHER:  Objection; vague.

17  A.  No, I do not.

18  Q.  (By Ms. Gregory) With regards to Paragraph 12,

19 based on your knowledge, expertise, and research, what

20 research did you perform that's referenced in Paragraph

21 12?

22  A.  That would be my 16 years of experience at HHSC

23 analyzing Medicaid and CHIP claims data.

24  Q.  With regards to this specific declaration,

25 Exhibit 1, did you discuss your research with anyone?

Page 80

1      MR. DISHER:  Instruct the witness not to

2 answer to the extent that it might disclose

3 communications you may have had with counsel.

4      But if you can talk about that outside of

5 discussions with counsel, then go ahead and answer.

6  A.  Discussions were between the analysts within my

7 area and also with financial services to get their

8 opinions on what data sources we may need to include.

9  Q.  (By Ms. Gregory) In Paragraph 8 of your

10 declaration, you reference Emergency Medicaid; is that

11 correct?

12  A.  Yes.

13  Q.  How many DACA grantees in Texas received Texas

14 Emergency Medicaid in Fiscal Year 2007?

15  A.  I don't know.

16  Q.  In Fiscal Year 2009?

17  A.  I don't know.

18  Q.  Fiscal Year 2011?

19  A.  I don't know.

20  Q.  Fiscal Year 2013?

21  A.  I don't know.

22  Q.  And Fiscal Year 2015?

23  A.  I don't know.

24  Q.  There are several dollar amounts referenced in

25 Paragraph 8.

Page 81

1      Of all of those costs described in

2 Paragraph 8, which ones were incurred by active DACA

3 grantees?

4      MR. DISHER:  Objection; vague.

5  A.  I don't know.

6  Q.  (By Ms. Gregory) According to the costs set

7 forth in Paragraph 8, did Texas' Emergency Medicaid

8 costs for undocumented immigrants go up or down from

9 2007 to 2015?

10  A.  It varied.

11  Q.  In Fiscal Year 2007, the dollar amount is

12 approximately $8 million, correct?

13  A.  Correct.

14  Q.  And in Fiscal Year 2015, the amount is

15 approximately $73 million?

16  A.  Correct.

17  Q.  How much of that $7 million [sic] difference is

18 attributable to DACA?

19      MR. DISHER:  Objection; calls for

20 speculation.

21  A.  I don't know.

22  Q.  (By Ms. Gregory) Are the total estimated costs

23 to the State for provision of the services in this

24 paragraph available for Fiscal Year 2012?

25      MR. DISHER:  Objection; vague.

Page 82

1    A.   They're not readily available.

2    Q.   (By Ms. Gregory) And what do you mean by
3 readily available?

4    A.   The calculations have not been done.

5    Q.   Why were they only done for these years?

6    A.   That's when the report was requested for us to
7 produce.

8    Q.   Who was it requested by?

9    A.   I don't know.

10   Q.   Does HHSC only produce these upon request?

11   A.   Other than the first, which was mandated by
12 Rider 59, the others have only been produced upon
13 request.

14   Q.   There was a point earlier in your testimony
15 where residency was discussed quite a bit.

16        Does the Texas Emergency Medicaid Service
17 identify residency in the state of Texas?

18        MR. DISHER:  Objection; vague?

19   A.   It identifies U.S. citizen resi-- residency.

20   Q.   (By Ms. Gregory) In estimating these costs that
21 are identified in Paragraph 8, did the Health and Human
22 Services Commission consider whether undocumented
23 immigrants seek health care at different rates than the
24 population as a whole?

25   A.   I don't know.

Page 83

1    Q.   In estimating these costs in reference to the
2 Medicaid program in Paragraph 8, did HHSC consider
3 whether undocumented immigrants are more or less likely
4 to be uninsured than the population as a whole?

5    A.   I don't know.

6    Q.   Is there someone who would know?

7    A.   The analysts -- the analyst that originally
8 created this report.

9    Q.   With respect to Texas Family Violence Program,
10 how many DACA grantees in Texas received services from
11 the Family Violence Program in Fiscal Year 2007?

12   A.   I don't know.

13   Q.   How about Fiscal Year 2009?

14   A.   I don't know.

15   Q.   Fiscal Year 2011?

16   A.   I don't know.

17   Q.   Fiscal Year 2013?

18   A.   I don't know.

19   Q.   And Fiscal Year 2015?

20   A.   I don't know.

21   Q.   Looking at Paragraph 9 of your declaration,
22 paragraph in Exhibit 1, out of the costs described in
23 this paragraph, which ones were incurred by DACA
24 grantees?

25        MR. DISHER:  Objection; vague.

Page 84

1    A.   I don't know.

2    Q.   (By Ms. Gregory) Is the data referenced in
3 Paragraph 9 available for Fiscal Year 2012?

4    A.   I don't know.

5    Q.   Is it available for Fiscal Year 2014?

6    A.   I don't know.

7    Q.   Is this -- are these costs estimated -- are --
8 are these cost estimates produced every year?

9    A.   No.

10   Q.   When are they produced?

11   A.   Upon request.

12   Q.   So similar to the Emergency Medicaid program
13 cost estimates?

14   A.   Correct.

15   Q.   Okay.  According to costs set forth in
16 Paragraph 9, did the FVP program costs go up or down
17 between 2007 and 2015?

18   A.   They also varied.

19   Q.   And the cost estimate for 2007 is 1.2 million?

20   A.   Yes.

21   Q.   And the cost estimate for 2015 is 1 million?

22   A.   Yes.

23   Q.   How much of that $200,000 decrease in cost is
24 attributable to DACA?

25   A.   I don't know.

Page 85

1    Q.   You spoke before you testified that HHSC uses
2 the percentage of undocumented immigrants as a proxy --
3 or the percentage of the undocumented immigrants in the
4 population as a whole in assisting to determine the
5 percentage of services that they use from the FVP; is
6 that correct?

7        MR. DISHER:  Objection; misstates her
8 testimony.

9    A.   Can you repeat that.

10   Q.   (By Ms. Gregory) Yes.  So HHSC -- and correct
11 me if this is incorrect.

12        So my understanding from your testimony is
13 that FVP estimates the cost of undocumented -- the cost
14 attributable to undocumented immigrants by using the
15 percentage in their population as a whole in applying
16 that to the total number; is that correct?

17   A.   HHSC makes those estimations.

18   Q.   Okay.  Is using the percentage of residents who
19 are undocumented immigrants in the entire population an
20 appropriate way to measure use of specific services by
21 that population?

22   A.   That is the best estimate that we're able to
23 do.

24   Q.   And why is that the best estimate?

25   A.   We have no other information to use.

Monica Smoot

June 19, 2018
Pages 86 to 89

---

Page 86

1    Q.   In estimating the cost for the FVP program that
2 can be attributed to providing services to undocumented
3 immigrants, did HHSC consider whether undocumented
4 immigrants seek government or nonprofit assistance at
5 different rates than the population as a whole?
6    A.   I don't know.
7    Q.   In estimating the cost for the FVP program
8 referenced in Paragraph 9 of Exhibit 1, did the HHSC
9 consider whether undocumented immigrants are victims of
10 crime at different rates than the population as a whole?
11    A.   I don't know.
12    Q.   Can you briefly describe the Texas CHIP
13 perinatal coverage program to your understanding?
14    A.   That program is for women who are at or below a
15 certain federal poverty limit who are not eligible for
16 Medicaid.  They are eligible for prenatal care services,
17 and that -- that's about it.  The eligible -- the
18 eligible person is actually the unborn baby and not the
19 woman.
20    Q.   Okay.  So how many recipients of CHIP Prenatal
21 Coverage were DACA grantees in Fiscal Year 2007?
22    A.   I don't know.
23    Q.   Fiscal Year 2009?
24    A.   I don't know.
25    Q.   Fiscal Year 2011?

---

Page 87

1    A.   I don't know.
2    Q.   Fiscal Year 2103?
3    A.   I don't know.
4    Q.   And Fiscal Year 2015?
5    A.   I don't know.
6    Q.   How many recipients of CHIP perinatal coverage
7 were eligible to apply for DACA in Fiscal Year 2007?
8    A.   I don't know.
9    Q.   Do you know for any of the years between 2008
10 and the present?
11    A.   No, I do not know.
12    Q.   In Paragraph 10 of Exhibit 1, of all of the
13 costs described in that paragraph, which ones were
14 incurred by DACA grantees?
15        MR. DISHER:  Objection; vague.
16    A.   I don't know.
17    Q.   (By Ms. Gregory) Does HHSC collect that
18 information?
19    A.   No.
20    Q.   According to the costs set forth in
21 Paragraph 10, did the CHIP perinatal coverage costs go
22 up or down between 2009 and 2015?
23    A.   It varied.
24    Q.   In 2009, the total estimated cost was
25 approximately 33 million?

---

Page 88

1    A.   Yes.
2    Q.   And it was approximately 30 million in Fiscal
3 Year 2015?
4    A.   Yes.
5    Q.   How much did the $3 million decrease in costs
6 between those years was attributable to DACA?
7        MR. DISHER:  Objection; vague.
8    A.   I don't know.
9    Q.   (By Ms. Gregory) Are the total estimated costs
10 to the State for the provision of services described in
11 Paragraph 10 available for Fiscal Year 2012?
12    A.   They can be made available upon request.
13    Q.   And would that -- would -- could they also be
14 made available for Fiscal Year 2014, '15, and '16?
15    A.   Yes.
16    Q.   What percentage of the undocumented immigrant
17 population in Texas is female?
18    A.   I don't know.
19    Q.   How many women in the undocumented immigrant
20 population are of child-bearing age?
21    A.   I don't know.
22    Q.   How many women of child-bearing age in the
23 undocumented immigrant population are low income?
24    A.   I don't know.
25    Q.   In calculating the cost associated with

---

Page 89

1 undocumented immigrants referenced in Paragraph 10, did
2 HHSC consider what percentage of the population was
3 female?
4    A.   I don't know.
5    Q.   Is using the total percentage of undocumented
6 immigrant residents an appropriate way to measure the
7 specific use of services referenced in Paragraph 10?
8    A.   Can you repeat that.
9    Q.   Sure.  Is using the total percentage of
10 undocumented immigrants in the population as a whole an
11 appropriate way to measure the use of specific services,
12 like CHIP perinatal coverage?
13    A.   That was the best methodology that we were able
14 to discover with the data we had.
15    Q.   And why was it the best available?
16    A.   There's not other -- there are no other sources
17 for us to use.
18    Q.   In Paragraph 11 of Exhibit 1, you reference the
19 amount of uncompensated medical care provided by state
20 public hospital district facilities to undocumented
21 immigrants, correct?
22    A.   Yes.
23    Q.   Of the $596.8 million for Fiscal Year 2006, how
24 much of that care went to active DACA grantees?
25        MR. DISHER:  Objection; vague.

---

Monica Smoot

June 19, 2018
Pages 90 to 93

Page 90

1    A.  I don't know.
2    Q.  (By Ms. Gregory) The 716.8 million in Fiscal
3  Year 2008 referenced in Paragraph 11, how much of that
4  care went to DACA grantees?
5          MR. DISHER:  Same objection.
6    A.  I don't know.
7    Q.  (By Ms. Gregory) Are you aware that more than
8  half of DACA recipients who work have jobs with
9  employer-based private health care insurance?
10   A.  I did not know that.
11   Q.  Are individuals with employer-based private
12 health care insurance more or less likely to qualify for
13 Texas Emergency Medicaid?
14         MR. DISHER:  Objection; calls for
15 speculation.
16   A.  I don't know.
17   Q.  (By Ms. Gregory) Are those with employer-based
18 private health care insurance more or less likely to
19 qualify for the Texas CHIP program?
20         MR. DISHER:  Same objection.
21   A.  I don't know.
22   Q.  (By Ms. Gregory) Are those with employer-based
23 private health insurance more or less likely to receive
24 uncompensated medical care from state public hospital
25 district facilities?

Page 91

1          MR. DISHER:  Same objection.
2    A.  I don't know.
3    Q.  (By Ms. Gregory) If DACA is terminated and DACA
4  recipients lose their jobs, won't they also lose their
5  employer-based private health care insurance?
6          MR. DISHER:  Objection; calls for
7  speculation.
8    A.  I don't know.
9    Q.  (By Ms. Gregory) Would thousands of Texans
10 losing their private health insurance lead to fewer
11 health care costs for the State?
12         MR. DISHER:  Objection; calls for
13 speculation.
14   A.  I don't know.
15   Q.  (By Ms. Gregory) Do you know how many active
16 DACA grantees there are currently in Texas?
17   A.  No.
18   Q.  You testified earlier that you reviewed the
19 declaration of Professor Leighton Ku, K-u, as part of
20 this case?
21   A.  Yes.
22   Q.  Do you recall Professor Ku's estimate that
23 terminating DACA would cost Texas $55 million in
24 increased health care costs due to DACA grantees losing
25 their private health care insurance?

Page 92

1          MR. DISHER:  Objection; calls for
2  speculation.
3    A.  I don't remember that specific number.
4    Q.  (By Ms. Gregory) If DACA were permanently
5  enjoined in July of 2008, how would that affect the
6  costs of the Texas Emergency Medicaid program?
7          MR. DISHER:  Objection; calls for
8  speculation.
9    A.  I don't know.
10   Q.  (By Ms. Gregory) If DACA were permanently
11 enjoined in July of 2008, how would that affect the cost
12 of Texas CHIP perinatal program?
13         MR. DISHER:  Same objection.
14   A.  I don't know.
15   Q.  (By Ms. Gregory) Why -- why don't you know?
16   A.  There are too many factors involved, and I
17 don't have all that information at my disposal.
18   Q.  Does HHSC have that information available?
19         MR. DISHER:  Objection; calls for
20 speculation.  Objection; outside the scope of your
21 testimony.
22   A.  I don't know.
23   Q.  (By Ms. Gregory) If DACA were permanently
24 enjoined in July of 2018, how would the cost of the
25 Texas Family Violence Program be affected?

Page 93

1          MR. DISHER:  Same objection.
2    A.  I don't know.
3          MS. GREGORY:  Just give me one moment.
4          (Brief pause as Ms. Gregory goes over
5          notes.)
6    Q.  (By Ms. Gregory) Ms. Smoot, your declaration is
7  dated April 2018; is that correct?
8          I believe it's the last page --
9    A.  Yes.
10   Q.  -- of Exhibit 1.
11   A.  Yes.
12   Q.  And do you stand by the accuracy of your
13 declaration as we sit here today?
14   A.  Yes, I do.
15         MS. GREGORY:  I have nothing further.
16 Thank you.
17         MR. WYATT:  No questions.
18             EXAMINATION
19 BY MR. DISHER
20   Q.  Ms. Smoot, earlier -- I just want to clear a
21 couple of things up.
22         Earlier, there was a discussion about U.S.
23 citizens using certain types of services and whether
24 those services would then be covered by Texas Emergency
25 Medicaid.

# Exhibit 20

NJAPP0291

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Rose Arackathara on 06/18/2018

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                   BROWNSVILLE DIVISION
        - - - - - - - - - - - - - - - - - - - - - - - - -
 3
      STATE OF TEXAS, et al.,          CASE NO. 1:18-CV-08
 4
          Plaintiffs,
 5
                    vs.
 6
      UNITED STATES OF AMERICA,
 7    et al.,
 8        Defendants,
 9    KARLA PEREZ, et al.,
10        Defendant-Intervenors,
11    and
12    STATE OF NEW JERSEY,
13        Proposed Defendant-Intervenor
14      - - - - - - - - - - - - - - - - - - - - - - - - -
15                        - - -
16                 Monday, June 18, 2018
17                        - - -
18                   DEPOSITION OF:
19                 ROSE ARACKATHARA
20                        - - -
21
22
23
24
25
```

www.huseby.com          Huseby, Inc.  Regional Centers          800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0292

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Rose Arackathara on 06/18/2018                                     Pages 34..37

Page 34

1    contract.
2              Is that right?
3         A.   Yes.
4         Q.   They are just simply parts of the
5    program.
6              Is that fair?
7         A.   Yes.
8         Q.   Do you know from your position how
9    many people apply to the BCWEP program across the
10   State each year?
11        A.   I don't.
12        Q.   Do you have any kind of
13   professional certifications that you have received?
14             MR. HOLLANDER:  Objection.
15             THE WITNESS:  Can you clarify?
16             MR. BITTER:  Sure.
17                    - - -
18   CONTINUATION
19   BY MR. BITTER:
20        Q.   I don't know, in your position, if
21   you have to get any other kind of licensures or
22   certifications for your position beyond -- beyond
23   the Bachelor's and Master's degrees which you
24   pursued.
25             MR. HOLLANDER:  Objection.

Page 35

1              Is there a question there?
2                    - - -
3    CONTINUATION
4    BY MR. BITTER:
5         Q.   Are there any other certifications
6    or -- or licensing that you personally received?
7         A.   I don't.
8         Q.   Okay.
9              Does the -- just to go back to the
10   BCWEP program.
11             Does the BCWEP also provide an
12   academic scholarship for students in their senior
13   year?
14        A.   Yes.  So, that's part of the
15   program.  They get their senior year tuition and
16   fees covered, as well as their internship and the
17   two-year contract.
18        Q.   Beyond your work with DCP&P, are
19   you involved in any groups in the area of immigrant
20   rights?
21        A.   No.
22        Q.   Have you done any kind of advocacy
23   with respect to the DACA program?
24             MR. HOLLANDER:  Objection.
25             THE WITNESS:  Not beyond calling

Page 36

1    Legislators.
2                    - - -
3    CONTINUATION
4    BY MR. BITTER:
5         Q.   Was that through a group or on your
6    own individually?
7         A.   On my own individually.
8         Q.   I'm going to ask you some more
9    about your Declaration.
10             Would you agree that the focus of
11   your Declaration is on your interactions with
12   Ms. Osorio?
13             Is that right?
14        A.   Yes.
15        Q.   You are not offering any testimony
16   on any other DACA recipient who -- who worked for
17   DCP&P.
18             Is that right?
19             MR. HOLLANDER:  Objection.
20             THE WITNESS:  No, I am not.
21                    - - -
22   CONTINUATION
23   BY MR. BITTER:
24        Q.   You are not offering any testimony
25   on any other DACA recipients who may work for the

Page 37

1    umbrella group of the DCF.
2              Is that right?
3              MR. HOLLANDER:  Objection.
4              THE WITNESS:  No, I am not.
5                    - - -
6    CONTINUATION
7    BY MR. BITTER:
8         Q.   You are not offering any testimony
9    on any other DACA recipients just generally.
10             Is that fair?
11             MR. HOLLANDER:  Objection.
12             THE WITNESS:  Yes.
13                    - - -
14   CONTINUATION
15   BY MR. BITTER:
16        Q.   In paragraph three you talk about
17   your time as a Field Instructor to Ms. Osorio.  We
18   talked about the timing a little bit, but you were
19   her Field Instructor from September, 2017 to April,
20   2018.
21             Is that right?
22        A.   Yes.
23        Q.   You indicate that Ms. Osorio worked
24   under your supervision.
25             Is that right?

www.huseby.com                    Huseby, Inc.  Regional Centers                    800-333-2082
Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0293

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Rose Arackathara on 06/18/2018                                    Pages 58..61

**Page 58**

1  providing anything in the Declaration to the
2  negative, if you will, of other interns and other
3  workers within DCP&P.
4          Is that right?
5      A.   Yes.
6          MR. HOLLANDER:  Objection to the
7  question, but you can answer.  Okay.
8              - - -
9  CONTINUATION
10 BY MR. BITTER:
11     Q.   In paragraph seven you indicate
12 that Ms. Osorio was able to truly understand DCP&P
13 clients.
14         Do you see that?
15     A.   Yes.
16     Q.   A couple of things with respect to
17 this paragraph.
18         First of all, Ms. Osorio is fluent
19 in Spanish.
20         Is that correct?
21     A.   Yes.
22     Q.   And what do you mean by the fact
23 that she can truly --
24         Let me rephrase that.
25         What do you mean when you say that,

**Page 59**

1  "Ms. Osorio can truly understand DCP&P clients"?
2      A.   So, when it comes to working with
3  our families, a lot of the time they ask about us
4  personally; how do we know what we are talking about
5  when we never went through what they are going
6  through, and there's two different types of workers
7  in the Division, and there is the worker that, you
8  know, wants to help, and, you know, make a
9  difference in changing lives, but they don't have
10 personal experience, you know, and the difficulties
11 of growing up in a household that may have, you
12 know, safety risk issues in the household.
13         And there is workers who have
14 personally gone through, not necessarily safety
15 issues, but struggle, and it -- they understand from
16 a firsthand perspective other -- other -- other
17 individuals understand intellectually what they are
18 going through, but it is completely different when
19 it is coming from a personal standpoint of what
20 personally you have gone through.
21         In our attachment area, we do have
22 a large population of undocumented individuals that
23 we work with, and those clients are always
24 particularly worried and reluctant to work with us
25 because of the immigration status.

**Page 60**

1          And Cinthia herself had to go
2  through that personal struggle of, "am I going to be
3  able to work in my field of choice," because she was
4  undocumented when she was a teen, and because DACA
5  was going to possibly be rescinded, she can
6  personally speak to those difficulties in her
7  childhood, and that mind frame of going through what
8  our clients go through, being undocumented and
9  having those experiences that come with that.
10     Q.   Are you aware whether, during the
11 time that Ms. Osorio was an intern at DCP&P, there
12 were any other interns in the program who were DACA
13 recipients?
14     A.   Can you -- can you repeat your
15 question?
16     Q.   Sure.
17         When Ms. Osorio was an intern at
18 DCP&P, are you aware whether there were other
19 interns at the same time who were also DACA
20 recipients?
21     A.   I'm aware of others, yes.
22     Q.   And are you aware -- at other
23 times, just beyond the times that Ms. Osorio was
24 there, are you aware whether DACA recipients that
25 were brought on by DCP&P as interns?

**Page 61**

1      A.   I'm sorry.
2          Can you repeat that?
3      Q.   Sure.
4          MR. HOLLANDER:  Do you want it
5  repeated or rephrase it or reread it?
6          THE WITNESS:  Reread, yeah.
7          MR. BITTER:  Why don't I just
8  rephrase it.
9              - - -
10 CONTINUATION
11 BY MR. BITTER:
12     Q.   Beyond the year that Ms. Osorio was
13 an intern at DCP&P, are you aware of DACA recipients
14 working as interns at the Division?
15     A.   Not that I'm aware of.
16     Q.   Within the group of full-time
17 social workers, are you aware that there are any
18 DACA recipients currently working at DCP&P?
19     A.   Not that I personally aware of.
20     Q.   And are you aware whether any DACA
21 recipients have ever worked for DCP&P beyond anyone
22 that may have been an intern there?
23     A.   Not that I'm personally aware.
24     Q.   When you talk -- we talked earlier
25 about your Declaration, something about Ms. Osorio

NJAPP0294

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Rose Arackathara on 06/18/2018                                    Pages 70..73

Page 70

1   whether or what Ms. Osorio would do for employment
2   if she lost her DACA status?
3        A.     No, I don't know.
4        Q.     Do you have an understanding,
5   however, if Ms. Osorio would stay in the United
6   States if she lost her DACA status?
7        A.     She would stay here if it was on
8   her course.
9        Q.     You had indicated before about her
10  possibly not remaining in the country.
11       Do you -- do you mean
12  involuntarily?
13       Is that what you meant before?
14       A.     Yes.  Involuntary.
15       Q.     Do you understand what country she
16  would go to?
17       A.     Well, she was born in Mexico.
18       So, assuming if she was
19  involuntarily not able to stay in the US, that is
20  where she would return to.
21       Q.     Did -- did she indicate to you that
22  -- that she thought she would end up in Mexico if
23  her DACA status was revoked?
24       A.     She did not specifically say that,
25  but it was understood because we both know.

Page 71

1        Q.     Did she indicate to you one way or
2   another or whether it was a possibility that she
3   would voluntarily leave the country if she lost her
4   DACA status?
5        A.     We did not have a conversation in
6   that regard.
7        Q.     On the BCWEP program, are the
8   interns paid during their internship?
9        A.     During Cinthia's internship, no,
10  they weren't.
11       Q.     Has that changed over time?
12       A.     So, I personally was a BCWEP
13  student.  So, when I was in 2009, I received a
14  stipend on top of the scholarship and employment
15  contract.
16       I don't know at what point that was
17  taken out.  I believe it was shortly after I was a
18  BCWEP student personally, but I know now they do not
19  have a stipend.
20       Q.     They do not have a stipend.
21       Is that right?
22       And in Ms. Osorio's class they --
23  they did not have a stipend.
24       Is that correct?
25       A.     Yes, correct.

Page 72

1        Q.     We talked about before, they
2   receive a full-year academic scholarship the next
3   year in their school.
4        Is that correct?
5        A.     Their senior year.
6        MR. HOLLANDER:  Objection.
7        THE WITNESS:  Their senior year.
8        MR. BITTER:  Thank you.
9                   - - -
10  CONTINUATION
11  BY MR. BITTER:
12       Q.     So, their senior year of college
13  they are given a full-year academic scholarship
14  program through the BCWEP program.
15       Is that right?
16       A.     Yes.
17       Q.     And they are also brought on for a
18  two-year employment contract later.
19       Is that correct?
20       MR. HOLLANDER:  Objection.
21       THE WITNESS:  Yes.
22                  - - -
23  CONTINUATION
24  BY MR. BITTER:
25       Q.     Is there any other investment that

Page 73

1   the BCWEP program does for students in the program?
2        A.     The BCWEP program?
3        Well, they work in conjunction with
4   the State and any other -- other schools.
5        So in that capacity, when an
6   employee is first hired through the Division, there
7   is a series of trainings that they are expected to
8   do, but since the students are coming in as interns,
9   and it is known that they are going to be employed
10  by the Division, they go through a training process
11  that is different than what typical new hires go
12  through.  But it is very similar, and covers all the
13  same -- all of the same information that they would
14  have.
15       I believe Cinthia went through
16  about 90 hours of training through the program
17  affiliated with the Division.
18       So, other than that, yeah.
19       Q.     Who is that training provided by?
20       A.     I believe it's mostly through our
21  Training Academy, but I believe there's others as
22  well that provide training, but I know -- I believe
23  most of it is through the Training Academy.
24       Q.     Anyway, it is provided by the
25  State.

NJAPP0295

STATE OF TEXAS, ET AL. vs. UNITED STATES OF AMERICA, ET AL.
Rose Arackathara on 06/18/2018                    Pages 78..81

Page 78

1    A.    Per week.  No.
2          Per semester.  Yes.
3    Q.    Okay.
4    Q.    So, it is supposed to be 210 hours
5    per semester.
6    Q.    And interns can spread that
7    210 hours across any part of the semester.
8          Is that right?
9    A.    Yes.
10   Q.    And are those hours in addition to
11   any classes that a student may be taking at their
12   school?
13   A.    Yes.
14   Q.    Is it typical that interns would
15   have both an internship component and be taking
16   classes at their school?
17   A.    Yes, that's typical.
18   Q.    For Ms. Osorio, do you know whether
19   she had classes at Centenary at the same time she
20   was performing her internship at DCP&P?
21   A.    She did, yes.
22         She also was employed as well.
23   Q.    So, she had a job, an internship,
24   and classes.
25         Is that right?

Page 79

1    A.    Correct.
2    Q.    Do you have an understanding of
3    where she was working?
4    A.    For the majority of the time she
5    was working at TD Bank.  She had also took on a
6    position at Island of the Spirit which is an
7    immigration advocacy group towards the end of her
8    internship.
9    Q.    So, just to circle back on the --
10   the issue of State investment.
11         Obviously, we talked about the
12   internship, the academic scholarship, and the
13   employment contract.
14         You recall talking about those?
15   A.    Yes.
16         MR. HOLLANDER:  Objection.
17               - - -
18   CONTINUATION
19   BY MR. BITTER:
20   Q.    And you also --
21         MR. HOLLANDER:  Each topic?
22               - - -
23   CONTINUATION
24   BY MR. BITTER:
25   Q.    You also talked about the training

Page 80

1    that the State invests.
2          Is that right?
3    A.    Yes.
4    Q.    And the time that social workers at
5    -- social workers, other employees at DCP&P invest
6    to help the intern.
7          Is that right?
8    A.    Yes.
9    Q.    Can you think of any other
10   investments that the State -- that the State of New
11   Jersey makes with respect to BCWEP interns?
12   A.    Personally, that is all that I'm
13   aware of.
14   Q.    Do you know for any one particular
15   BCWEP intern how much that investment is?
16         MR. HOLLANDER:  Objection.
17         THE WITNESS:  I have no idea.
18               - - -
19   CONTINUATION
20   BY MR. BITTER:
21   Q.    You are not aware of -- of the
22   specific dollar amount that is put on that?
23   A.    No.  No.  It is for -- each school
24   has a different tuition, but, you know, in terms of
25   the hours put in, every -- every student has a

Page 81

1    different number of hours that was invested in them.
2          I would say it is pretty similar,
3    but it is hard to pinpoint how many hours per
4    student, and, you know, how that correlates to a
5    dollar amount.
6    Q.    Is it fair to say that the
7    investment that the State puts in for BCWEP interns
8    is considerable?
9          MR. HOLLANDER:  Objection.
10         THE WITNESS:  I -- I would say so,
11   yes.
12               - - -
13   CONTINUATION
14   BY MR. BITTER:
15   Q.    Are you aware that DACA status can
16   be revoked at any time?
17   A.    Yes.
18         MR. HOLLANDER:  Objection.
19               - - -
20   CONTINUATION
21   BY MR. BITTER:
22   Q.    How are you aware of that?
23   A.    Just in general.  I don't know too
24   much about specifics.
25   Q.    And are you aware whether DCP&P

NJAPP0296

# Exhibit 21

NJAPP0297

STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.
Martha Elizabeth Gray Wiehe on 06/25/2018

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE SOUTHERN DISTRICT OF TEXAS

3                    BROWNSVILLE DIVISION

4      _____
                                        )
5      STATE OF TEXAS, et al.,          )
                                        )
6              Plaintiffs,              )
                                        )  Case No.
7      v.                               )  1:18-cv-00068
                                        )
8      UNITED STATES OF AMERICA, et al.,)
                                        )
9              Defendants,              )
                                        )
10     and                              )
                                        )
11     KARLA PEREZ, et al.,             )
                                        )
12             Defendant-Intervenors.   )
       _____ )

13

14         DEPOSITION OF MARTHA ELIZABETH GRAY WIEHE

15

16                  (Taken by Plaintiffs)

17

18                  Durham, North Carolina

19

20                  Monday, June 25, 2018

21

22                      11:23 a.m.

23

24
                    Reported in Stenotype by
25     V. Dario Stanziola, CSR (N.J.), RPR, CRR

www.huseby.com        Huseby, Inc.  Regional Centers        800-333-2082
    Charlotte ~ Atlanta ~ Washington, DC ~ New York ~ Houston ~ San Francisco

NJAPP0298

STATE OF TEXAS, ET AL. v. UNITED STATES OF AMERICA, ET AL.
Martha Elizabeth Gray Wiehe on 06/25/2018                      Pages 86..89

Page 86

1    Q.   Or the 8.5 percent increase?

2    A.   That's correct.

3    Q.   Okay.  And then the share paying state

4  personal income taxes from 50 to a hundred percent,

5  that is your assumption that DACA enrollees are

6  complying a hundred percent with state income tax?

7    A.   That's correct.

8    Q.   Okay.  You mentioned here, the next

9  sentence:  Surveys of DACA recipients found that DACA

10 protection respondents were employed at higher rates

11 and higher wages.  You're referring to the Tom Wong

12 survey, correct?

13   A.   That is correct.

14   Q.   Is there any other survey -- because you

15 say surveys, are you referring to any other survey

16 besides the Tom Wong survey that had multiple

17 questions in it?

18   A.   I think specifically looking at DACA

19 protections for the numbers, for the higher rates,

20 we're referring to the survey.  There are other

21 bodies of research that have suggested that having

22 DACA protection has both increased employment as

23 well as increased -- increased wages.

24   Q.   Okay.  So then a loss of DACA protections

25 in your opinion eliminates that revenue from the

Page 87

1  increased salaries based on the body of work that

2  you've been looking at, referring to?

3    A.   That is correct.

4    Q.   Okay.  Paragraph 7 then refers to state

5  revenue streams -- every state revenue stream could

6  be harmed by the loss of DACA protections.  And then

7  you refer to specifically New Jersey; is that

8  correct?

9    A.   That is correct.

10   Q.   Okay.  The 53,000 residents that are

11 eligible for receiving DACA, where does that number

12 come from?

13        Is that the U.S. Customs and Immigration

14 document that we looked at about an hour or so ago?

15   A.   Sure.  It's two different numbers,

16 actually, because it's that total population.  So

17 one is the exact amount as reported as of

18 January 31st by the U.S. CIS for those eligible and

19 receiving.

20   Q.   Okay.

21   A.   It's then combined with the estimate from

22 the Migration Policy Institute, which is a

23 different exhibit in here, the number eligible, but

24 not receiving.

25   Q.   Okay.  So then you said the 53,000 then is

Page 88

1  just a combination of the two various sources?

2    A.   That is correct.

3    Q.   Okay.  Given the previous assumptions then

4  from the entire report, you then estimated what the

5  contribution in state and local taxes would be to the

6  State of New Jersey for these 53,000 residents,

7  correct?

8    A.   That is correct.

9    Q.   Okay.  The spreadsheet that we were looking

10 at, that would give us a breakdown of how you came to

11 the New Jersey numbers?

12   A.   It would.

13   Q.   Okay.

14   A.   Yes.

15   Q.   And then if DACA protections were lost,

16 then the contributions to the State of New Jersey

17 would decrease by 18.7 million, correct?

18   A.   That is correct.

19   Q.   Okay.  Paragraph 7 only looks at New

20 Jersey.  It does not look at any of the other states,

21 correct?

22   A.   That is correct.

23   Q.   Okay.  For example, nowhere in this

24 declaration do you have what the DACA stream would

25 look like or a loss to the State of Texas, for

Page 89

1  example?

2    A.   That is correct.  But the State of Texas

3  would stand to lose more than $200 million if DACA

4  protections were lost, which is included in the

5  young undocumented immigrants -- I'm starting to

6  get tongue-tied saying it all -- report that is

7  Exhibit 11.

8    Q.   Okay.  So the 2018 version?

9    A.   Correct.  So, in other words, we've made

10 that calculation for each state that is included in

11 that report, but not in the declaration.

12   Q.   Okay.  So then -- it's Appendix 2 then, the

13 detailed estimates of state and local tax

14 contributions, that's where it breaks it down by

15 state?

16   A.   I believe it's actually Appendix 1.

17        Oh, you're right.  Appendix 2 has

18 details.  That's correct.

19   Q.   Okay.  And then Appendix 1 has just the --

20 not as detailed numbers, but it still has some loss

21 if DACA ends, correct?

22   A.   That is correct.

23   Q.   Okay.  But for purposes of your

24 declaration, you only stated New Jersey?

25   A.   That is correct.

NJAPP0299

# Exhibit 22

NJAPP0300

Official - Subject to Final Review

1

```
1              IN THE SUPREME COURT OF THE UNITED STATES
2    - - - - - - - - - - - - - - - - - x
3    UNITED STATES, ET AL.,            :
4              Petitioners            :  No. 15-674
5         v.                          :
6    TEXAS, ET AL.,                    :
7              Respondents.           :
8    - - - - - - - - - - - - - - - - - x
9                        Washington, D.C.
10                       Monday, April 18, 2016
11
12              The above-entitled matter came on for oral
13   argument before the Supreme Court of the United States
14   at 10:04 a.m.
15   APPEARANCES:
16   GEN. DONALD B. VERRILLI, JR., ESQ., Solicitor General,
17      Department of Justice, Washington, D.C.; on behalf of
18      Petitioners.
19   THOMAS A. SAENZ, ESQ., Los Angeles, Cal.; on behalf of
20      Intervenor-Respondents in support of Petitioners.
21   SCOTT A. KELLER, ESQ., Solicitor General of Texas,
22      Austin, Tex.; on behalf of Respondents.
23   ERIN E. MURPHY, ESQ., Washington, D.C.; for United
24      States House of Representatives, as amicus curiae,
25      supporting Respondents.
```

NJAPP0301

Official - Subject to Final Review

50

1   into lawful presence, and granting eligibility for work

2   authorization and Medicare --

3            JUSTICE KAGAN:  Let me make sure I

4   understand that.  You're saying that the government

5   could do this case-by-case, one by one with respect to

6   all the people in the class, but that the government

7   cannot identify the entire class and say we're

8   forbearing from enforcement; is that correct?

9            MR. KELLER:  While that would be a harder,

10  tougher case, I do believe that they could do it class

11  based if they were simply forbearing from removal.

12           JUSTICE KAGAN:  So that's what I asked

13  originally.  If they were simply forbearing from

14  removal, and there was not work authorization attached

15  to it, and there was not Social Security or any other

16  benefits attached to it, are you conceding that?

17           MR. KELLER:  In this case, given that they

18  are removing 400,000 people a year, we admit that they

19  could do forbearance from removal.  But what they can't

20  do is grant authorization to be in the country.

21           There's a --

22           JUSTICE GINSBURG:  Can I -- can I ask you

23  specifically?  You have a statement in your brief, and

24  that's -- it says that the Executive could give cards,

25  identification cards to all these people saying "low

NJAPP0302

# Exhibit 23

NJAPP0303

## The American Presidency Project™



John Woolley and Gerhard Peters

HOME   DATA   DOCUMENTS   ELECTIONS   MEDIA   LINKS

** NOTE: The American Presidency Project will soon launch a new website with a more contemporary look and improved search capability. While we continue "beta testing" the new site, please excuse lapses in updating this site. We expect to have the new site on-line in June.



The American Presidency Project Needs Your Support

**Make a Gift**

Consider a *tax-deductible* donation & click here



### DWIGHT D. EISENHOWER
XXXIV *President of the United States: 1953-1961*

**306 - White House Statement Concerning the Admission of Additional Hungarian Refugees.**
*December 1, 1956.*

Like 14K

Tweet

G+

**Document Archive**
• Public Papers of the Presidents
• State of the Union Addresses & Messages
• Inaugural Addresses
• Farewell Addresses
• Weekly Addresses
• Fireside Chats
• News Conferences
• Executive Orders
• Proclamations
• Signing Statements
• Press Briefings
• Statements of Administration Policy
• Economic Report of the President
• Debates
• Convention Speeches
• Party Platforms
• 2016 Election Documents
• 2012 Election Documents
• 2008 Election Documents
• 2004 Election Documents
• 1996 Election Documents
• 1968 Election Documents
• 1960 Election Documents
• 2017 Transition
• 2009 Transition
• 2001 Transition
• White House Media Pool Reports

**Data Archive**
Data Index

**Media Archive**
Audio/Video Index

**Elections**
Election Index
Florida 2000

**Links**
Presidential Libraries

**View Public Papers by Month and Year**
[Month ▼] [Year ▼]

☐ INCLUDE documents from the Office of the Press Secretary

☐ INCLUDE election campaign documents, vice presidential documents, first lady, and other executive branch officals

COLLECTION:
*Public Papers of the Presidents*

Dwight D. Eisenhower
1956

Font Size:
A A A

🖨 Print

Share

The American Presidency Project

facebook

Name:
The American Presidency Project

Fans:
14288
Promote Your Page Too

THE PRESIDENT ANNOUNCED today that the United States will offer asylum to 21,500 refugees from Hungary. Of these, about 6500 will receive Refugee Relief Act visas under the emergency program initiated three weeks ago. The remaining 15,000 will be admitted to the United States under the provisions of Section 212 (d) (5) of the Immigration and Nationality Act. When these numbers have been exhausted, the situation will be re-examined.

The President emphasized that the flight of refugees into Austria had created an emergency problem which the United States should share with the other countries of the free world. Because of this emergency, those refugees who seek asylum in the United States will be brought here with the utmost practicable speed.

The President pointed out that the immigration visas available for Hungarian escapees under the Refugee Relief Act are practically exhausted and that the emergency compels the only other action which is available, namely, action under the provisions of the Immigration and Nationality Act which authorizes admission on parole.

Persons admitted into the United States on parole have no permanent status in the United States, but the President will request the Congress in January for emergency legislation which will, through the use of unused numbers under the Refugee Relief Act, or otherwise, permit qualified escapees who accept asylum in the United States to obtain permanent residence.

The President also stated that it was his intention to request the Congress to include in such legislation provisions which would allow at least some of the escapees who have proceeded to other countries for asylum to have the opportunity to apply for permanent resettlement in the United States, having in mind particularly the fact that many of those refugees undoubtedly have relatives here.

The President pointed out that other nations have already made increasingly generous offers of asylum and have waived the ordinary restrictions imposed upon immigration.

The President said that he had directed the Secretary of Defense to work out arrangements for the transportation of these refugees to the United States in accordance with agreements to be made with the Austrian Government and the Intergovernmental Committee for European Migration.

In making his announcement, the President said that providing asylum to these Hungarian refugees would give practical effect to the American people's intense desire to help the victims of Soviet oppression. It will also materially assist the Government of Austria, which has responded so generously to the refugees' needs, to carry out its policy of political asylum.

*Note: This statement was released at Augusta, Ca.*

*On December 6, 1956, the White House announced that transportation arrangements had been completed for bringing 21,500 Hungarian refugees to the United States with the utmost possible speed by air-lift and sea-lift.*

**Citation:** Dwight D. Eisenhower: "White House Statement Concerning the Admission of Additional Hungarian Refugees.," December 1, 1956. Online by Gerhard Peters and John T. Woolley, *The American Presidency Project*. http://www.presidency.ucsb.edu/ws/?pid=10712.

NJAPP0304

View PPPUS

**Search the Entire Document Archive**

Enter keyword:  ?

( ) AND ( ) OR ( ) NOT

Limit by Year
From: 1789 ⌄
To : 2018 ⌄
Limit results per page
30 ⌄

☐ *INCLUDE* documents from the Office of the Press Secretary

☐ *INCLUDE* election campaign documents, vice presidential documents, first lady, and other executive branch officals

Search

**Instructions**

You can search the Public Papers in two ways:

**1. Search by Keyword and Year**
You can search by keyword and choose the range of years within your search by filling out the boxes under Search the Public Papers.

**2. View by Month and/or Year**
Select the month and/or year you would like information about and press View Public Papers. Then choose a Public Paper and the page will load for you.

*Search Engine provided by the Harry S. Truman Library. Our thanks to Jim Borwick and Dr. Rafee Che Kassim at Project Whistlestop for critical assistance in the implementation of the search function. and to Scott Roley at the Truman Library for facilitating this collaboration.*

**Home**     **Contact**

© 1999-2018 - Gerhard Peters and John T. Woolley - The American Presidency Project ℠



342,105 Pageviews
Jun 19th - Jul 19th

NJAPP0305

7/19/2018

# Exhibit 24

# Intentionally Omitted

# Exhibit 24

# Intentionally Omitted

NJAPP0307

# Exhibit 25

NJAPP0308

THE WHITE HOUSE

WASHINGTON

April 17, 1975

MEMORANDUM FOR:            THE PRESIDENT                    

FROM:                      PHILIP BUCHEN
                           JOHN MARSH
                           GENERAL SCOWCROFT

Section 212(d)(5) of the Immigration and Nationality Act
provides inter alia that "The Attorney General may in his
discretion parole into the United States temporarily under
such conditions as he may prescribe for emergent reasons
or for reasons deemed strictly in the public interest any
alien applying for admission to the United States...."

A history of the use of this authority is provided at
Tab A.

From April 3 through April 15, 1,703 orphans have been
flown out of Vietnam/Cambodia.  The parole process has
been applied in these cases.  An updated report of this
action is attached at Tab B.

On April 13, authorization for movement of families
accompanying U. S. citizens returning from Vietnam was
given.  Parole is being used in this action.  It is
estimated that between 3,000 and 5,000 persons are involved.

It is now essential to consider additional actions:

1.  There are 1,000 Cambodians now in Thailand who were
evacuated as part of "Eagle Pull" and who may wish to
come to the United States.  The Thai Government has made
it clear that it urgently desires their onward movement.
State and Justice request your authorization to proceed
with parole for these persons.  We recommend your approval.

                    AGREE _____✔_____

                    DISAGREE _____

- 3 -

Department to authorize entry into the United States of all
such persons by parole whenever State determines that the
efforts of the UNHC for Refugees are not successful.
Immigration disagrees.

We recommend that the State Department position be accepted.

> AGREE    ✓_____

> DISAGREE  _____

6.  Planning is also now required for the potential evacuation
of certain high risk Vietnamese.  These include U. S.
employees, labor leaders engaged in the free trade labor move-
ment (particularly those who have worked with U. S. unions),
governmental personnel and others along with their dependents.
There is no clear indication of just how great the number
will be.  Every effort will be made to involve third countries,
both directly and through international mechanisms such as the
UNHCR and the International Committee for European Refugees.
Nevertheless, it is apparent that a large number will wish to
come to the United States.  This will require the Attorney
General's use of parole.

State and INS agree that parole should be exercised for such
Vietnamese, but differ sharply as to numbers.

State believes that we should take our fair share of refugees
who are unable to be settled elsewhere, and recognizes that
the total number, given logistical and political limitations
could be approximately 200,000.  INS would limit the use of
parole to 50,000 or 40% of the total number to be evacuated,
whichever is less.  It is their view that (1) the domestic
impact on our society of admitting a large number is undesir-
able and (2) the Cuban experiences, wherein the President
permitted 675,000 persons to enter the United States, should
not be repeated.  The INS also believes that it may be
necessary to publicly announce this limit to prevent a mass
exodus based on false hopes.

We recommend that the State Department position be accepted.

> AGREE    _____

> DISAGREE  _____

7.  We recommend that you direct establishment of a small
full-time task force with the necessary authority to improve

NJAPP0310





# HISTORY OF THE USE OF PAROLE

Parole is a device by which an inadmissible alien seeking entry is permitted to proceed into the United States, but in contemplation of law is considered to be standing at the water's edge.  He is not deemed to be in the United States within the meaning of the expulsion provisions or other provisions of the Immigration and Nationality Act. Standing at the water's edge, as it were, he may be removed only in exclusion proceedings.

Parole is resorted to only in exceptional situations such as emergent medical treatment, avoiding unwarranted detention, and prosecution of criminals returned to the United States.  It has also been used for refugees and orphans.

The first express statutory authorization for parole appeared in the Immigration and Nationality Act which became effective December 24, 1952. 1/ The statute provides that the Attorney General in his discretion may parole any alien seeking admission for emergent reasons or for reasons deemed strictly in the public interest.

Before 1952, parole was utilized as an administrative expedient. 2/  It's peculair status was recognized by the Supreme Court 50 years ago in the case of Kaplan v. Tod. 3/

There has never been any question concerning the authority to parole individual aliens.  However, questions have been raised by the Congress concerning authority to parole groups of aliens.  For example, a question was raised after 224 Russian Orthodox Old Believers were paroled into the United States in June 1963.  In the House Report on the 1965 Amendments, which established permanent Legislation for the conditional entry of refugees, the following statement was made: "The parole provisions were designed to authorize the Attorney General to act only in emergent, individual and isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside of the limit of the law." 4/

Nevertheless, under the general parole authority of the 1952 Act, large numbers of refugees have been allowed to come into the United States after, as well as before publication of the House Report. 5/   These include:

Over 30,000 refugees from the 1956 Hungarian Revolution, by direction of President Eisenhower.

Over 600,000 refugees from Cuba who began to come to the United States in an almost unbroken stream for more than a decade after the Castro takeover in 1959.  (In 1965 when

NJAPP0312

he signed into law the abolition of the National
Origins System, President Johnson revived the Cuban
parole program despite the House report.)

15,000 Chinese refugees from Hong Kong, by direction
of President Kennedy in 1962.

6,500 Czechoslovak refugees after the Soviet invasion
of that country in 1968, at the urging of Congress.

Several hundred Soviet Jews and other minorities in
the U.S.S.R., at the urging of Congress in 1971.

1,000 stateless Ugandan-Asians, authorized in 1972,
at the urgent request of the State Department.

Following the suppression of the abortive Hungarian revolt
in the Fall of 1956 over 200,000 Hungarian refugees fled
the country, especially to Austria (180,000) and to Yugo-
slovia (20,000).  Resettlement missions from many countries
were eager to accept Hungarian refugees, and the asylum
countries -- especially Austria -- served as staging areas.
President Eisenhower and the American people in general were
eager to accept a generous quota of the Hungarians.  Fewer
than 7,000 refugee visas remained available, however, under
the Refugee Relief Act of 1953 as amended.  These were quickly
used for Hungarians.  At this juncture the decision was made
to invoke Section 212 (d)(5) of the Immigration and National-
ity Act in order to parole larger numbers of Hungarian refu-
gees into the United States.

The sympathetic 85th Congress enacted P.L. 85-559, which
provides for adjustment of status of paroled Hungarians
to that of permanent immigrants to the U.S.  The majority of
the refugees were brought in from Austria into a U.S. staging
area, in Camp Kilmer, New Jersey, administered by the Depart-
ment of the Army.  The refugees were resettled from Camp
Kilmer, primarily through the efforts of interested voluntary
agencies.  A total of 30,701 Hungarian refugees regularized
their status in the United States under P.L. 85-559 during
1958-59.  This represented the overwhelming majority of the
Hungarian refugees who were paroled into this country.

The Cuban refugee situation differs from others in that the
United States was the country of first asylum.  From 1957-
72 this country admitted 621,403 Cuban nationals who fled
from Cuba.  That exodus was generally divided into three
distinct periods:  from the advent of the Castro government
in 1959 to the breaking of diplomatic relations in January
1961; from 1961 until the end of commercial travel in
October, 1962; the subsequent period.  While diplomatic

GERALD R. FORD LI

relations existed, Cubans who wanted to leave Cuba went to
the consulate in Havana.  They were issued B-2 (tourist
visas) which documented them and enabled commercial carriers
to bring them to the United States.  On arrival (usually
Miami) the B-2 visa was cancelled by the Immigration Service
(INS) and they were paroled into the United States under the
parole provisions of the Immigration Act.  The B-2 visa was
"pro-forma" documentation to enable travel to commence.

After the break in diplomatic relations, the United States
initially avoided the use of parole for Cubans fleeing the
island the resorted to the device of waiving the visa re-
quirement on a mass basis on the theory that each case
represented an unforeseen emergency because of the unavail-
ability of consular services in Cuba.  This program largely
terminated at the time of the Cuban Missile Crisis of 1962
because travel out of Cuba became impossible.

In October 1962, all commercial transportation between Cuba
and the U.S. ended.  The Cuban refugee flow was reduced to
a trickle.  In December 1962 the American Red Cross began
sponsoring airflights and vessels which brought Cuban refu-
gees to the United States, primarily relatives of Cubans
already here and prisoners from the "Bay of Pigs" invasion.
These people were directly paroled.

In 1965, Castro announced that certain Cubans who wanted to
leave were free to do so.  President Johnson responded that
the U.S. would accept all.  Direct parole was the method of
entry.  Some Cubans went to third countries (primarily Spain)
as they were unable to get places on the airlifts.  Those with
close relatives in the U.S. were given "pre-parole" documenta-
tion (medicals, affidavit of support, security clearance) by
our consulate in Madrid.  When they arrived at the U.S. port
of entry, they were paroled into the U.S. by INS.  In October,
1973, the Attorney General agreed to a one year parole pro-
gram for those without close relatives here.  Documentation
was prepared by the consulates as with the pre-parole program,
but INS personnel interviewed and issued the actual parole
document in Madrid.  Cubans in the U.S. were received and
processed by the Cuban Refugee Center in Miami run by HEW.
The Act of November 2, 1966 enabled Cuban refugees to adjust
status to permanent residents.





NJAPP0315

16 April 1975

Point Paper for the Special Assistant to the Secretary and
Deputy Secretary of Defense

SUBJECT:  Orphan Evacuation Program - Vietnam/Cambodia

MAIN THRUST OF POINT PAPER

- Provides an update on the orphan evacuation program.

DISCUSSION

- On 3 Apr 75, DOD developed procedures for orphan evacuation.
State/AID wholeheartedly concurred.

-- All orphans, upon verification by US Embassy in Vietnam
and Cambodia, would be airlifted on first available
military or commercial contract aircraft to Clark AB.

-- At Clark AB medical evaluation would be made to determine if
orphans should be hospitalized, proceed on normal airlift,
or be medically evacuated.

-- Flights then proceed to San Francisco or Los Angeles with
Seattle as backup where military and volunteer agency
personnel would further process them.

- From 3 through 15 April a total of 1703 orphans (52 Cambodians)
have been flown out of Vietnam/Cambodia.  Military Airlift Command
(MAC) transported 883 through Clark AFB, Philippines, of which 43
are currently enroute.  Non-DOD carriers, chartered by private
arrangements, transported the balance of 820 orphans.

-- 914 orphans have been moved to San Francisco.

-- 330 orphans have been moved to Los Angeles.

-- 409 orphans have been moved to Seattle.

-- 201 orphans have been moved to Fort Benning, Ga.

(These figures do not total 1703 due to double handling, i.e.,
L.A. and Benning)

- Number and location of orphans currently being processed:

-- Clark AB, Philippines - 5 hospitalized.
Hickam AB, Hawaii - 5 hospitalized.
San Francisco - 65
Los Angeles - 87
Seattle - 18
Fort Benning - 170 (14 hospitalized)



*-- Enroute - 43 from Clark AB to Los Alamedas Air Station, Ca.

- Deaths:

  -- 5 April crash of C-5 - 190 (figure not final)

  -- One died enroute to Clark AB - cause of death, extreme
     dehydration. (Infant)

  -- One died at Clark AB Hospital - cause of death, sepsis
     (absorption of pathogenic microorganisms into blood stream).
     (Infant)
  -- One died enroute to Los Angeles - cause of death, pneumonia,
     dehydration and prematurity.  Reported 24 days old.

  -- Prognosis - No more deaths expected.

- Future orphan airlift requirements:

  --- Known - zero - original "Reported 2000" all processed

  -- Possible - 80 (Vietnam) Rumors of 500 to 5000 more.
     Tracking this.

- Problems:

  -- Despite the official State/AID/DOD system, certain individuals
     have operated as free agents making arrangments for contract
     flights and direct liaison with the orphanages.

  -- This has caused considerable confusion and resulted in less
     than desirable service for the orphans.

  -- News reporters covering commercial arrivals at San
     Francisco and Seattle (outside the State/AID/DOD system)
     cited health problems with orphans on these flights.

- Current funding status (funded by State/AID):

  -- Airlift $1,156,772

  -- Medical    166,938

  -- Support     71,916

  -- Total obligated as of 15 Apr - $1,395,626

Prepared by:  MGEN M.F. Casey, USAF
              DOD Orphan Lift Coordinator
              OX 74121



2

NJAPP0317

# Exhibit 26

NJAPP0318

5/16/2018                                      Message from President Bloom | Office of the President

# Office of the President

# MEMORANDUM

Home » Message from President Bloom

September 6, 2017

| TO: | **NJIT Community** |
|---|---|
| FROM: | Joel S. Bloom |
| DATE: | September 5, 2017 |
| SUBJECT: | Message from President Bloom |

NJIT Community Members,

Today, the United States Attorney General announced that the current U.S. Administration will end the Deferred Action for Childhood Arrivals (DACA) program in six months and that Congress has until then to establish a legislatively enacted program that will cover DACA-eligible immigrants. Unless the Judicial or Legislative branches of the U.S. Government intercede or produce legislation that covers those registered for the DACA program, undocumented students will lose the protections and privileges afforded by DACA. This is a matter of great concern nationally as well as throughout our campus community, and it casts those in the DACA program into a state of stress and uncertainty.

We, at NJIT, recognize the value that our over 50 DACA students bring to our university as well as the incredible importance of diversity within an educational community. Difference is a catalyst for learning and human development, which occur through collaboration, questioning, analysis, and debate. Ultimately, these actions result in a deeper understanding of people, enhanced capability to solve problems of all types, and opportunities to improve quality of life for all. NJIT's DACA students are emblematic of the strength that is gained through diversity. They were born in more than 18 different nations, are majoring in disciplines across the academic spectrum, are represented in every class from freshman to senior as well as our graduate programs, and they maintain a cumulative grade point average above a 3.0. Subtracting such a pool of talent and ambition from any learning community would be a deep and painful loss. As such, we will take every possible step to support our DACA students and to urge our elected representatives to take swift legislative action to protect this population.

As I previously announced last December with regard to immigration issues, NJIT's services as well as the services of Rutgers-Newark Child Advocacy and Immigration Rights Law Center are available to help our students. Those NJIT students who are covered by the New Jersey DREAM Act, which has enabled many undocumented but longtime residents of our state to attend NJIT at in-state tuition rates, will remain eligible for this benefit. NJIT also will maintain admissions policies that do not consider immigration status, and we will not provide student records to any entity unless required by a warrant, subpoena, or court order. Additionally, I will impress directly upon New Jersey's House and Senate representatives the importance of expeditiously passing legislation that protects DACA students.

To NJIT's DACA students, I cannot state in strong enough terms how greatly we value your presence within and contributions to our university community. We appreciate and share your concerns, will work diligently on your behalf, and offer you our unconditional support during this stressful time.

Sincerely,

President Joel S. Bloom

New Jersey Institute of Technology
University Heights Newark, New Jersey 07102

Contact Us | Maps & Directions | A to Z

  

# Exhibit 27

NJAPP0321

(/)

## New Jersey Chamber of Commerce

216 West State Street, Trenton, NJ 08608 | 609-989-7888 (tel:609-989-7888)

🗓 Events (/events)

📷 Photos (/photos)

📖 Member Directory (http://njccdirectory.com)

👥 Join Us (/join)

🏠 (/)   About ⌄ (/about)   News ⌄ (/news)   News Releases (/press-releases)   Events ⌄ (/events)

Photos (/photos)   Member Discounts (/discounts)   ChamberEdge (/edge)   Certificate of Origin (/ecertify)

🔍 (/search)

🐦 (https://twitter.com/njchamber)

f (https://www.facebook.com/New-Jersey-Chamber-of-Commerce-96493193963/)

in (https://www.linkedin.com/company/r jersey-chamber-of-commerce)

#NJCHAMBERNOW

# News Releases

## NJ Chamber of Commerce President Tom Bracken's Statement on DACA

On Sept. 5, the Trump Administration announced the Deferred Action for Childhood Arrivals (DACA) program would end in 2018 unless Congress enacted legislation to encode into law the protections afforded by DACA.

DACA protects children of undocumented immigrants from deportation but these protections exist only in an executive order issued by President Barak Obama rather than in formal legislation.

More than 22,000 New Jersey residents are afforded the protection of DACA. These residents have lived here virtually all of their lives and have become engrained in our communities. Like the rest of our citizens, they work here and they pay taxes here.

The New Jersey Chamber of Commerce joins with the U.S Chamber of Commerce and companies such as Microsoft, Verizon, IBM, and Hewlett Packard in urging the Trump Administration and Congress to work quickly to craft the required legislation that reflects basic American fairness and recognizes the value of DACA children's contributions to New Jersey and the nation.

# Exhibit 28

NJAPP0323



**The American Presidency Project** ™

John Woolley and Gerhard Peters

HOME   DATA   DOCUMENTS   ELECTIONS   MEDIA   LINKS

** NOTE: The American Presidency Project will soon launch a new website with a more contemporary look and improved search capability. While we continue "beta testing" the new site, please excuse lapses in updating this site. We expect to have the new site on-line in June.



The American Presidency Project Needs Your Support

**Make a Gift**

Consider a *tax-deductible* donation & click here



**Document Archive**
- Public Papers of the Presidents
- State of the Union Addresses & Messages
- Inaugural Addresses
- Farewell Addresses
- Weekly Addresses
- Fireside Chats
- News Conferences
- Executive Orders
- Proclamations
- Signing Statements
- Press Briefings
- Statements of Administration Policy
- Economic Report of the President
- Debates
- Convention Speeches
- Party Platforms
- 2016 Election Documents
- 2012 Election Documents
- 2008 Election Documents
- 2004 Election Documents
- 1996 Election Documents
- 1968 Election Documents
- 1960 Election Documents
- 2017 Transition
- 2009 Transition
- 2001 Transition
- White House Media Pool Reports

**Data Archive**
Data Index

**Media Archive**
Audio/Video Index

**Elections**
Election Index
Florida 2000

**Links**
Presidential Libraries

**View Public Papers by Month and Year**

Month ⌄   Year ⌄

☐ INCLUDE documents from the Office of the Press Secretary

☐ INCLUDE election campaign documents, vice presidential documents, first lady, and other executive branch officals



**JOHN F. KENNEDY**
XXXV *President of the United States: 1961-1963*
**9 - Letter to Secretary Ribicoff Requesting Him To Undertake Direction of Cuban Refugee Activities.**
*January 27, 1961*

Dear Mr. Secretary:

I want you to undertake responsibility, effective February 1, for directing the Cuban refugee activities now being conducted by the Executive branch of the Federal government, and to make an on-the-scene investigation of the problem within the next week as my personal representative.

I want you to make concrete my concern and sympathy for those who have been forced from their homes in Cuba, and to assure them that we shall seek to expedite their voluntary return as soon as conditions there facilitate that. I believe that the present program can best be strengthened by directly bringing to bear your personal leadership and the vast welfare, health, and other skills of your Department. I am anxious that you make use of private services available for the refugees to the greatest extent possible.

Both here at home and abroad, I want to re-emphasize most strongly the tradition of the United States as a humanitarian sanctuary, and the many times it has extended its hand and material help to those who are "exiles for conscience's sake." In the presently troubled world, we cannot be a peacemaker if we are not also the protector of those individuals as well as nations who cast with us their personal liberty and hopes for the future.

Immediate action should be taken to assure no interruption in present services for the refugees. I also want your consideration of the use of surplus U.S. foods if needed for them, and possible utilization of the many qualified physicians and other professionally or technically qualified refugees.

In undertaking the task given here, you should coordinate activities in this field with the Secretaries of State, Defense, Labor, and Agriculture, and with the heads of other relevant agencies. Under previous arrangements, funds have already been made available to meet such immediate expenditure as will be requested by you of the Department of State, Department of Defense, or other appropriate agency whose participation in this program of emergency assistance to Cuban refugees you may find essential.

Sincerely,

JOHN F. KENNEDY



COLLECTION:
*Public Papers of the Presidents*

John F. Kennedy
1961
Font Size:
A A A

🖶 Print
Share

The American Presidency Project
**facebook**

Name:
The American Presidency Project

Fans:
14291
Promote Your Page Too

Like 14K
Tweet
G+

**Citation:** John F. Kennedy: "Letter to Secretary Ribicoff Requesting Him To Undertake Direction of Cuban Refugee Activities.," January 27, 1961. Online by Gerhard Peters and John T. Woolley, *The American Presidency Project.* http://www.presidency.ucsb.edu/ws/?pid=8544.

# Exhibit 29

NJAPP0325

# INTERPRETER
# RELEASES

An Information Service
on Immigration, Naturalization and Related Problems

AMERICAN COUNCIL FOR NATIONALITIES SERVICE

20 WEST 40TH STREET, NEW YORK, N. Y. 10018

Maurice A. Roberts
      Editor

Vol. 52, No. 35
September 2, 1975

## LEAVE TO LABOR*

by
Sam Bernsen
General Counsel
Immigration and Naturalization Service
U.S. Department of Justice

The question of alien employment ranges from the alien lawfully admitted as a permanent resident to the alien who is in the United States illegally, with many different situations in between.

With respect to the lawful permanent resident alien, there is very little question but that he has the right to work. He has his blue-green alien registration receipt card, Form I-151, to prove it, and there should be no problem. But there is one caution. If the alien is admitted to the United States as a lawful permanent resident on the basis of a labor certification, it should be kept in mind that he is not free to ignore the terms of the certification by promptly proceeding from the port of arrival to some other employer who has no connection with the certification. If the alien does take a job with another employer, rather than the employer who brought him to the United States, his status as a lawful permanent resident may be in jeopardy. Otherwise, it can be said that there are no restrictions on the employment of lawful permanent residents, insofar as federal immigration laws are concerned.

---

* This is the fifth of a series of presentations made on the occasion of the Annual Conference of the Association of Immigration and Nationality Lawyers in Montreal, Canada from May 28 to May 30, 1975.

We were able to transcribe this presentation and the questions and answers which followed it through the cooperation of Dan Danilov, Esq., who made available a taped recording of the session.

NJAPP0326

Many, if not most, of the aliens who enter the United States as lawful permanent residents on the basis of labor certifications, come for employment as live-in maids. When the petitioner finally gets his certification for a live-in maid, and he files his sixth preference petition, we find him pounding on the door of the Service demanding prompt approval of the petition. Very shortly after the maid arrives in the United States with an immigrant visa, and quits her job, we find the petitioner again pounding on the INS' door, this time demanding prompt deportation of the maid because she left him.

I'd like to mention some interesting aspects of the problems of lawful permanent resident aliens that don't have anything to do with the immigration laws but should be of interest to practicing attorneys. The Supreme Court has held that a <u>State</u> cannot refuse state government employment to a lawful permanent resident alien job applicant on the ground of alienage. The same question is now before the Supreme Court with respect to lawful permanent residents who are applicants for <u>federal</u> government employment. In the private employment sector, the Supreme Court has held that a private employer does not violate the Civil Rights Act by hiring only United States citizens, as long as he hires them without regard to race, religion or national origin.

## Students

With respect to employment for nonimmigrants, I'd like to discuss the special rules that relate to F-1 student employment. These rules attracted a great deal of attention in the past year because INS changed its policy on student summer employment. In the spring of 1974, the Service notified school officials throughout the country that they would not be authorized to grant summer work permission to F-1 students during the summer of that year. Instead, students desiring to obtain employment would be required to make application to the Immigration Service for work permission and establish eligibility under the prescribed rules. This was not one of our most popular changes. We received about 1,000 letters of criticism, almost all from school officials, but the opposition was not unanimous -- we did get a few letters of support. The critics took their case to the Congress and succeeded in having some bills introduced that would give F-1 students blanket permission to work at any time with the approval of school officials. Favorable action has not been taken on the bills as of this time.

By way of background, INS had a summer program for student employment for almost 20 years. Annually, the Labor Department was first consulted before the program was authorized. For about the first 16 or 17 years, the Labor Department invariably said there would be no adverse impact on the domestic labor market if the alien students were allowed to work. Each of those years the Immigration Service sent a notice to school officials advising them that they could grant permission to the foreign students to work during the summer vacation period.

About three of four years ago, the job market began to tighten. The Labor Department then advised INS that it was concerned about the adverse impact of the employment of foreign students. So we thought we'd better get some broader consultation. We began to consult with the State Department. That Department looked at the problem from the foreign relations point of view and expressed a great concern about the effect that termination of the summer employment program would have on foreign relations with the countries the students came from. For several years we followed the advice of the Department of State, rather than the Labor Department, and we continued to let students work during the summer.

-293

In the summer of 1974, we received a very strong letter from the Labor Department, with considerable statistics and data, and we received an equally strong letter from the State Department. INS had to weigh the adverse effect on foreign relations against the adverse effect on the labor market. When we considered the high unemployment among youth, which was much higher than the average unemployment, and the even higher unemployment among minority groups and veterans, we found the scales tipping in favor of not permitting the students to work during the summer. That led to our decision and its subsequent unpopularity.

Well, the seasons moved on, from the summer of '74 to the winter of '74. The Immigration Service announced in the Federal Register that it was terminating once and for all the policy of considering annually whether students would be allowed to work during the summer. The reason for the decision was that it was felt that the grant or denial of a request for student work permission should be made by an officer of the Immigration Service rather than a school official. It's important to note that this does not mean that students cannot work during the summer. It simply means that a different procedure has to be followed if the student wishes to obtain summer employment.

What is our policy on letting students work? The statute defines an F-1 student as an alien who is coming to the United States temporarily for the sole purpose of pursuing a full course of study at a school approved by the Attorney General for attendance by nonimmigrant students. The statute is completely silent on the question of student employment. In 1961 when the International Educational and Cultural Exchange Bill was under consideration by the Congress, there was a provision in that bill that would give students and their spouses blanket permission to work, without first obtaining INS approval. However, as the bill wound its way through the legislative process to enactment, the work provision for students was deleted.

Nevertheless, the Immigration Service view is that F-1 student work is not banned by the statute. The Service takes the position that if a student is to be employed on campus, no permission from the Service is needed. All we are concerned about is that a United States citizen or a United States lawful permanent resident will not be fired from a campus job to provide employment for a nonimmigrant student. But when the student intends to go out into the community to obtain employment, the Service is concerned.

There are two bases on which a student may apply to the Immigration Service for permission to work off the campus, economic necessity and practical training.

In the economic necessity situation, the student must show that the work is needed because of economic necessity arising after entry due to unforeseen circumstances. It should be remembered that the student would have been ineligible for a student visa unless he was able to establish that he could pay the expenses of his entire stay in the United States. If, after the student arrives, he is no longer able to pay his expenses because of inflation or currency restrictions, or because his parents have lost their source of income and are no longer able to support him, he is in a position to show an unforeseen change in circumstances that could support an application for work permission due to economic necessity.

The student must make an application to the District Director having jurisdiction over the area where the school is located. The application has to be endorsed by the responsible school official, who must certify that the student is

NJAPP0328

taking a full course of study and that part-time employment will not interfere with his ability to successfully carry such course.

What is part-time employment? Part-time employment means that the student may work up to 20 hours per week while school is in session. When school is not in session, for example during the summer vacation, Christmas vacation or during the Easter recess, the student may work full-time. When work permission is granted to an F-1 student, his Arrival-Departure Card, Form I-94 is endorsed "part-time employment authorized to (date)." Part-time employment is granted in increments of up to one year, but not to exceed the period of the student's authorized stay in the United States.

Practical training we consider as a continuation of the student's full course of study. The student must make an application for permission to engage in such training. He applies to the District Director having jurisdiction over the place where the school is located. The application must be endorsed by a school official who certifies that the employment is recommended for practical training in a field related to the student's course of study, and that the training is not believed to be available in the alien's home country. When practical training is approved, it is granted in increments of six months, not to exceed 18 months in the aggregate.

The spouse of a student, visa symbol F-2, is not authorized to work. For all practical purposes, she is treated as if she were here as a tourist.


### Illegal Aliens

Work permission for illegal aliens has a rather strange connotation for me. It would seem that if an alien is illegally in the United States, why should he get permission to work? If he gets such permission, that doesn't make his illegal stay here any less illegal. But in certain circumstances, the Service will endorse an illegal alien's I-94 (Arrival-Departure Card) with the notation, "Employment Authorized". This notation is important to the alien. Some employers will not hire an alien unless he is able to show some evidence of authorization to work, and the Social Security Administration will not issue a social security card without evidence of work authorization.

When does the Immigration Service endorse the I-94 of an illegal alien, "Employment Authorized"? In general, the endorsement may be made when we do not intend or are unable to enforce the alien's departure. The thought is that in such cases gainful employment should not be prevented and that it is reasonable to give the alien something that he can present to a prospective employer to show that he can work.

We place the work authorized notation on I-94's in several situations. For example, we grant extended voluntary departure to a native of the Western Hemisphere who entered the United States on or before April 10, 1973 and married a lawful permanent resident alien. In such case, it is Service policy to grant extended voluntary departure until the alien is reached on the visa waiting list, which is backed up for more than two years for the Western Hemisphere. It's also Service policy to give extended voluntary departure to aliens in the United States who are immigrant visa applicants if they are within 60 days of being reached on the visa waiting list.



In the cases of aliens who are granted extended voluntary departure after it is determined that they are eligible for asylum, we also endorse the I-94, "Employment Authorized".

The general rule is that extended voluntary departure is given in cases of compelling circumstances. This provides the flexibility needed to administer this kind of rule, and when we grant VD under those circumstances, we endorse the I-94, "Employment Authorized". We don't do it automatically. The alien has to come to the Service and make a request.

Even aliens found deportable after a hearing before an Immigration Judge may request that their I-94's be stamped "Employment Authorized". Some examples are aliens granted suspension of deportation or a stay of deportation on the basis of persecution, under section 243(h) of the Act. The I-94 is not stamped "Employment Authorized" when the Immigration Judge orders the alien deported with the option of leaving voluntarily prior to a specified date before the order of deportation becomes final.

In certain situations we routinely endorse the I-94, "Employment Authorized", at the time of arrival without a request. Examples are aliens admitted as conditional entrants, and refugees who are paroled into the United States.

The endorsement is also made in the cases of certain applications pending before the Service. If an alien has properly filed an application for adjustment of status to permanent resident under section 245, or if he's filed an application for the creation of a record of lawful entry under section 249, his Form I-94 on request will be endorsed "Employment Authorized". We will not make the endorsement merely on the filing or approval of a visa petition.

So much for the alien worker.

<div align="center">Refugees</div>

I've been asked to make some remarks about the Vietnamese Refugee situation. Originally the Service was planning to parole only those Vietnamese refugees into the United States who were related to United States citizens or lawful permanent residents, or who were U.S. Government employees, or who would be in danger because of their support of the U.S. effort in Southeast Asis if they remained behind. The plan was to screen the aliens in Vietnam, before they arrived in the United States, to be sure that they were admissible and that they met the prescribed criteria.

But events moved too swiftly, these people were evacuated in a great rush. It was not possible to screen all of them. Many were picked up at sea. All were initially brought to Guam or Wake Island. Those who were brought to Guam, the vast majority, were physically within the United States as defined by the Immigration and Nationality Act. We found ourselves in the position of having to screen aliens who were already in the United States.



In the course of the crises, we were in continuous consultation with the House and Senate Judiciary Committees. The situation changed rapidly. The estimates on the number of Vietnamese that would have to be paroled were revised frequently, always upward. We now expect that the number may come to about

NJAPP0330

-296

150,000. That would be the largest number of aliens ever paroled into the United States under a refugee parole program in such a short time span.

In the course of the processing, the Vietnamese refugees will be requested to sign an affidavit that they are admissible under all provisions of the immigration laws except those relating to labor certification, public charge and immigrant visa. The affidavit includes a declaration that the refugee has not participated in any act of persecution against any person because of race, religion or political opinion. A statement concerning assets will also be required. Security checks will be completed before parole is authorized.

On arrival at the mainland the refugees will be sent to one of four military camps, Camp Pendleton, California; Eglin Air Force Base, Florida; Camp Chaffee, Arkansas; and Indiantown Gap, Pennyslvania. The aliens will have to remain in the camp until assurances concerning housing and employment or support are received.

With regard to Vietnamese refugees who are already in the United States, many as students or visitors, the Service will not require them to depart. A Vietnamese nonimmigrant student who requests permission to work because he can no longer get money from home will readily be granted such permission for part-time employment. If he wishes to work full-time, permission would also be granted, but since he could not maintain student status when working full time he would be accorded voluntary departure.

Any Vietnamese alien in the United States who believes he is eligible to apply for permanent residence may do so. If he's found eligible, the application will be approved.

On that happy note, I terminate my remarks.

* * * * * * *

QUESTIONS AND ANSWERS

Q. A number of the questions deal with the permission to work for aliens for whom I-130's have been filed but not approved. The complaint is made that in various offices there is a great time lag between filing and adjudication of the petition. The time lag results in hardship not only to the beneficiary, but also to other members of his family who would like to work. What answer do you see to that problem?

A. I wish I had a happy answer. But the Immigration Service itself is on the verge of filing a petition - a petition in bankruptcy. We are, as you've heard many, many times, badly understaffed, and badly in need of funds. The President, in his budget, has asked for some $30 million additional for the Immigration Service but we don't have those funds. We simply have to do the best we can with what we have.

Q. Could not the permission to work be granted with the filing of the petition which seems proper on its face?

A.   The Service has considered that question a number of times. The Association of Immigration and Nationality Lawyers, through its liaison committee in Washington, has submitted a request to that effect. However, the Service feels that it should not go any further than it has. Until we actually have received an application for permanent residence which is properly filed, the Service will not endorse "Employment Authorized" on the alien's Form I-94. You can submit a section 245 adjustment application at the same time that you file an immediate relative petition. Upon approval of the petition, the sec. 245 application would be considered as properly filed, and the applicant would be in a position to request that his I-94 be stamped "Employment Authorized".

Q.   Where the principal alien applies for adjustment along with his wife, and both ask for employment authorization, some District Directors have endorsed the principal alien's I-94, but have refused to grant the privilege to the spouse. Is there any recourse from this decision?

A.   First, I'd have to say that a refusal to stamp the I-94 of the spouse is incorrect. The recourse would be to immediately take the matter up with the District Director. If you find difficulty there, you should go to the Regional Office. If the problem still remains, your committee can take it up with the Central Office.

Q.   Must the person applying for practical training show that he already has a specific job, or need he come in simply with a proposal to work without having prearranged employment?

A.   For the first period of practical training, a specific job need not be shown. However, when the alien applies for an extension of his practical training, he will have to establish that he is working in a field related to his course of studies.

Q.   You have just stated that an I-485 application may be filed with an I-130. However, New York does not permit this procedure. Can that be corrected?

A.   There is an express provision in the regulations which permits the I-130 visa petition, or any other visa petition, to be submitted with a sec. 245 application, and perhaps that provision of the regulations has been overlooked. You may wish to call it to the District's attention. I believe you'll find it in 8 C.F.R. 245.

Q.   A number of schools, such as Antioch College, have combined study and off-campus work programs as part of their education plans. Does the policy of the Service permit this off-campus employment?

A.   Yes. There are special situations where some schools have a practice of requiring the student to engage in off-campus work for one semester and attending school the following semester. We recognize alternate work-study programs. In fact, work permission is not required for students in such programs. However, the time spent working is counted against the student's practical training period which may not exceed 18 months in the aggregate.

-298

Q. You have stated that in deciding whether to permit students to accept employment, foreign policy considerations were considered along with domestic unemployment rates. Considering those two factors, is it correct to suppose that unemployment rates for particular areas are what is relevant? Second, are the foreign policy considerations for particular countries taken into consideration? For example, it may not affect our foreign relations with Canada, especially since students from that country may have the money to support themselves without working, but this policy for Nigeria may well cut off all students from that country. I guess the question is, are discrete considerations given to particular countries, or are all unemployment rates and all foreign policies lumped together in deciding whether or not students shall be permitted to work?

A. The question was treated on a broad basis. The Service does not have the facilities to determine the job market situation in separate areas throughout the country. And the Labor Department, I suspect, is not in a position to screen applications speedily. We also are not able to determine the foreign policy impact on an individual country basis. The State Department would have to be consulted and the inevitable delay necessarily involved would not be acceptable. If the student from Nigeria, which was the example given, is unable to obtain funds from that country for one reason or another, he'd be in an excellent position to apply for regular work permission based on economic necessity. If that work permission is granted, he could work for the entire year, including the summer.

Q. May the parent of a U.S. citizen child of the Western Hemisphere be authorized to work, while he is waiting for a visa appointment in his home country?

A. He can be authorized to work only if he is within 60 days of being reached on the immigrant visa waiting list. We do not have a special rule for parents in such situations.

Q. The District Director in New York has said that if a Vietnamese student now in the United States wants employment authorization, he must either follow the usual procedures or get out of status and proceed to the Investigations Section for an interview. Isn't this unreasonable? Suppose the student wants to remain in status but wants to work for the summer. Must this student show financial necessity?

A. The student should make an application on the prescribed form, Form I-538. If he is a Vietnamese student who wants to work part-time, that application should be approved just as soon as the adjudicator looks at it and sees that the applicant is a Vietnamese student. We take judicial notice of the situation.

Q. The Immigration and Naturalization Service in Baltimore has sent letters to various employers asking them to provide the names of all aliens in their employment. Since no distinction is made between permanent residents, nonimmigrants who have permission to work, and illegal aliens, do you believe this request by the Baltimore office is proper?

-299

A. I would rather not pass judgment here on what the Baltimore office has done. I think when something like this comes to your attention, and you believe it is wrong, you should take the matter up with the District officials, and if necessary, with the Regional officials. Finally, your liaison committee can take it up with the Central Office if you are not satisfied with the response that you get below.

Q. A serious student has been given INS permission to work. He makes application for an extension, but it takes four to six months for the District to adjudicate his application. What is his status vis-a-vis working and maintaining legal status during the period between the expiration of his original permission to work and the time the INS rules on his extension?

A. I don't believe we have an express instruction or policy on that point. On the initial application for work permission, the student should not work until he receives an approval of his application. Once his application is approved and he makes a timely request for an extension of work permission, I think the Service would be reasonable and would not take any action if he continued to work while waiting for the decision on his extension application.

Q. A man emigrates to the United States to retire, that is, not to enter the work force, but subsequently he begins to work. Does the Immigration and Naturalization Service take any action for violating his retirement status?

A. I think we are talking about an alien who was allowed to immigrate to the United States without obtaining a labor certification because he satisfied the consular and immigration officer that he had sufficient funds to support himself without working and did not intend to work. If this was the bona fide intention of the prospective immigrant and he subsequently has a genuine, legitimate change of mind, I don't think any action would be taken by the Service.

Q. The Hibi cases, Filipino veterans of World War II, are not given employment authorization even though they have petitions pending for naturalization, and no deportation proceedings have been filed against them. Is there any recourse which would give them permission to work?

A. We've never considered whether we should make it a policy to allow aliens who are not lawful permanent residents to work while they are seeking a legal interpretation in the courts concerning eligibility for naturalization. The Association may wish to take that matter up with the Service.

Q. A student applied for change of status to E-2 eighteen months ago. The application has not been adjudicated. May he work in the interim without violating his status? Also, may a business investor work while his application is pending?

A. If a person wants to change from one nonimmigrant status to another, the statute requires that he be in lawful status. He should not engage in employment until his application for change in nonimmigrant classification has been approved.

NJAPP0334

-300

Q.  Regarding the business investor, can someone who has applied under the non-preference portion of the quota for change in status as a business investor work, presumably at something other than his business, or perhaps in his business, while the application is pending?

A.  If a person works while his application for change of status to permanent resident is pending it will not have any effect on his eligibility for status under the present law.  I can't tell you to tell him to go to work.  I can simply point out that his status and his eligibility for adjustment would not be affected if he worked while the application is pending.

Q.  Can an immigration judge grant employment authorization?

A.  The immigration judge does not have authority to grant work permission to an alien.  He cannot endorse an I-94, "Employment Authorized".  That's the prerogative of the District Director or his designee.

Q.  Where a student violates his status by working without permission, but is otherwise a bona fide student, must his departure be required without a second chance, particularly when he shows his need for work and the Central Office has advised the District Director that strict construction should give way to the exercise of discretion based on circumstances?

A.  The Service has a reasonable policy toward students.  When a student unwittingly engages in unauthorized employment we don't make it a practice to rush in to seize him and institute deportation proceedings.  The Service will consider giving him a second chance.  We may make a notation in his file.

Q.  Is this a national policy or a district policy?

A.  It's a policy that depends on the individual circumstances.

Q.  There are no individual circumstances in Philadelphia.  We've got students, some who worked 5 hours over for two weeks, and as soon as their application comes in for an extension, they are given an order to show cause.  They do wait in Philadelphia until the I-538 comes in, and then they schedule the hearings.

A.  When you have a problem with an individual district, where you feel the district is arbitrary and unreasonable, you can take the matter up with the Regional office, and if necessary, with the Central Office.  We do not require that a student be immediately placed under expulsion proceedings when he unwittingly and innocently engages in employment.

Q.  In view of the individual variations among District Directors in handling applications for permission to work or to reinstate students, is there any provision for giving a uniform system of instruction to District Directors?

A.  This is an area where it's very difficult to give uniform instructions.  We have let our people know that students would be treated with consideration, and I can only repeat what I said before, we do not lie in wait to ambush every student who unwittingly takes a job.

(From the audience:  Texas doesn't know it!)



-301

/Editor's Note:  The following questions asked of Mr. Bernsen were of a more general nature._7

Q.  What are the criteria in Section 13 cases?

A.  Well, section 13 is a provision of law which permits certain aliens who came into the United States as diplomats, A-1 or A-2, or as international organization aliens, G-1 or G-2, to obtain permanent residence once they are no longer in official status.  Fifty aliens a year, without regard to visa availability, may be granted permanent residence under this law.  When we receive such an application, we interview the applicant, the State Department is consulted to make security checks.  If the alien meets the statutory criteria, his application is generally approved by the District Director. The facts are then reported to the Congress.  The case has to pend in the Congress for two sessions before approval becomes final.  However, regardless of his visa classification, the applicant has to be a person of diplomatic or semi-diplomatic rank.  Chauffeurs, clerks, butlers, stenographers, typists are not eligible.

Q.  Would alien Chinese who are not Vietnamese citizens but who were brought out on the Vietnamese airlift be granted the same asylum benefits granted to the Vietnamese?

A.  The policy relates to those who are Vietnamese.  The probability is that on an individual case basis, persons of other nationalities who are closely related to Vietnamese nationals may be eligible.

Q.  These are persons who have lived in Vietnam, who are Vietnamese by place of birth under American immigration law, but are regarded by the Chinese as overseas Chinese.  In that circumstance, would they be treated by American immigration law as Vietnamese or Chinese?

A.  If they were born in Vietnam, and applied for immigrant visas, they would be chargeable to the numerical limitation for Vietnam.  The policy statements for parole of Vietnamese refugees apply only to those of Vietnamese nationality with the exceptions mentioned in my response to the previous question.

Q.  Do the broad provisions for Cambodians apply to persons who are natives of and last residents of Cambodia, but not citizens of Cambodia?

A.  The policy for the Vietnamese also applies to Cambodian refugees.

# Exhibit 30

NJAPP0337



**U.S. Citizenship and
Immigration Services**

# Refugee Timeline

### Immigration and Naturalization Service Refugee Law and Policy Timeline, 1891-2003

USCIS began overseeing refugee admissions to the U.S. when it began operations on March 1, 2003. Before then, the Immigration and Naturalization Service (INS) administered refugee admissions. This timeline traces the major events and policies that affected refugee admissions under the INS and its predecessor agencies, from 1891 to 2003.

Note: In 1980, the U.S. formally adopted the United Nation's definition of the term "refugee" for legislative purposes. However, Congress, the INS, and the American public have long used and continue to use the term "refugee" to refer to a migrant who arrived in the U.S. after fleeing persecution or violence in his or her home country or after being displaced by natural disaster. This timeline uses that more general meaning of the word "refugee."

| |
|---|
| 1891: The Bureau of Immigration Established |
| 1910-1920: The Mexican Revolution |
| 1917: The Immigration Act of 1917 |
| 1921-1924: The Quota Acts |
| 1939-1945: World War II |
| 1945: The United Nations Established |
| 1945: Presidential Directive on Displaced Persons |
| 1948: Displaced Persons Act of 1948 |
| 1950-1951: The United Nations High Commissioner for Refugees and the 1951 Convention Relating to the Status of Refugees |
| 1952: Immigration and Nationality Act (INA) |
| 1953: Refugee Relief Act of 1953 |
| 1956-1957: Hungarian Escapee Program |

Following the rapid and violent 1956 Hungarian Revolution against the Soviet Union, thousands of Hungarians fled their homeland and

NJAPP0338

Case 1:18-cv-00068   Document 215-1   Filed on 07/21/18 in TXSD   Page 344 of 666



sought refuge in Austria, which soon became overwhelmed by the influx of refugees. As a result, 36 nations, including the U.S., offered to help resettle the displaced Hungarians. The U.S. admitted 6,130 Hungarian refugees under the Refugee Relief Act of 1953.

Additionally, over 30,000 Hungarians entered the U.S. under the attorney general's parole authority (section 212[d][5] of the INA). INS officers examined these applicants in Austria and again when they arrived in the U.S., where they were temporarily held at Camp Kilmer, New Jersey.

Two years later, on July 25, 1958, Congress passed a law allowing Hungarian parolees to become lawful permanent residents of the United States.

This program set the precedent for using the attorney general's parole authority to admit refugees to the U.S. and for Congress to later pass special legislation allowing the parolees to become lawful permanent residents. This process would be repeated on several occasions during the following decades.

Illustration: A group of Hungarian refugees leaving the Camp Kilmer Reception Center in New Jersey in 1956.
*USCIS History Library

---

1952: Azorean Refugee Act of 1958

---

1959-1960: Fair Share Refugee Act of July 14, 1960

---

1959-1962: Cuban Refugees

---



After the Cuban Revolution that brought Fidel Castro into power on Jan. 1, 1959, thousands of Cubans fled for the U.S.

When the U.S. broke diplomatic relations with Cuba in 1961, Cubans could no longer obtain visas in Havana. Instead, the U.S. admitted them under the attorney general's parole authority. During the years 1961-1962, more than 58,000 Cubans entered the U.S. under this program.

The INS operated special processing centers in the Miami, Florida area, where INS officers screened newly arrived Cubans. The INS also held the Cubans until they could be admitted to the U.S. as refugees.

Illustration: Cuban refugees arriving in the United States, 1962.
*State Library & Archives of Florida.

---

1962: Hong Kong Parole Program

---



Initiated in May 1962, the Hong Kong Parole Program used the Attorney General's parole authority to authorize approximately 15,000 Chinese refugees who had fled from communist China to Hong Kong to enter the U.S. The program ran until 1966 and

 approximately 15,000 Chinese refugees were admitted into the United States.

The 1965 Amendments to the INA included provisions that allowed these refugees to adjust to lawful permanent resident status.

Illustration: Wong Yick Yuen family, last group of Hong Kong parolees in fiscal year 1963. USCIS History Office and Library. Wong Yick Yuen family, last group of Hong Kong parolees in fiscal year 1963.
*USCIS History Office and Library.

---

1962: Migration and Refugee Assistance Act of 1962

---

1965: The 1965 Amendments to the Immigration and Nationality Act (INA)

---

1965: Cuban Airlift

 At the same time that he signed the 1965 Amendments to the Immigration and Nationality Act (INA) into law, President Lyndon B. Johnson announced he would open the U.S. to all Cubans seeking refuge from Fidel Castro's communist regime. Shortly thereafter, hundreds of small boats filled with refugees began making the journey from Cuba to southern Florida.

In order to more safely and efficiently bring Cubans to the U.S., the federal government created an airlift program on Dec. 1, 1965. Under this program, Cubans already in the U.S. could apply to have relatives brought into the country. Cuban refugees were screened in Cuba, flown to Miami, and screened again in special processing centers by the INS and other inspection agencies.

By the conclusion of the airlift program in1973, over 3,000 flights had brought more than 250,000 Cuban refugees to the United States.

Illustration: A group of young Cuban refugees entering the U.S. as part of the Cuban airlift arrive in Miami in 1967.
*USCIS History Library.

---

1966: Cuban Adjustment Act of 1966

 Congress passed the Cuban Adjustment Act of November 2, 1966, in reaction to the influx of Cubans brought by the airlift program. This Act allowed Cuban refugees who had entered the U.S. under the attorney general's parole authority to become lawful permanent residents after two years.

Illustration: Information counter and waiting room at the Cuban Adjustment Center, Miami.
*Annual Report of the Immigration and Naturalization Service, 1967.

Case 1:18-cv-00068   Document 215-1   Filed on 07/21/18 in TXSD   Page 346 of 666

| 1967: The 1967 United Nations High Commissioner for Refugees Refugee Protocol |
| --- |
| 1972: INS Administrative Asylum Policies |
| 1975: Indochinese Immigration and Refugee Act of 1975 |
| 1977: INS Office of Refugee and Parole |
| 1980: Refugee Act of 1980 |
| 1980: Mariel Boatlift |
| 1990: The Lautenberg Amendment |
| 1997: Nicaraguan Adjustment and Central American Relief Act (NACARA) |
| 1998: Haitian Refugee Immigrant Fairness Act |
| 2002-2003: Department of Homeland Security Established, USCIS, CBP, and ICE Created |

Last Reviewed/Updated: 02/20/2018

NJAPP0341

7/20/2018

# Exhibit 31

NJAPP0342



# Special Report

*December 2006*

## UNDOCUMENTED IMMIGRANTS IN TEXAS:

## A Financial Analysis of the Impact to the State Budget and Economy

### CAROLE KEETON STRAYHORN
### Texas Comptroller

STATES000013
NJAPP0343

**STATES000014**
NJAPP0344



# *Special Report*

*December 2006*

**CAROLE KEETON STRAYHORN • Texas Comptroller of Public Accounts**

# UNDOCUMENTED IMMIGRANTS IN TEXAS:

## A Financial Analysis of the Impact to the State Budget and Economy

*"This is the first time any state has done a comprehensive financial analysis of the impact of undocumented immigrants on a state's budget and economy, looking at gross state product, revenues generated, taxes paid and the cost of state services.*

*"The absence of the estimated 1.4 million undocumented immigrants in Texas in fiscal 2005 would have been a loss to our gross state product of $17.7 billion. Undocumented immigrants produced $1.58 billion in state revenues, which exceeded the $1.16 billion in state services they received. However, local governments bore the burden of $1.44 billion in uncompensated health care costs and local law enforcement costs not paid for by the state."*

— **Carole Keeton Strayhorn, Texas Comptroller**

## I. Introduction

Much has been written in recent months about the costs and economic benefits associated with the rising number of undocumented immigrants in Texas and the U.S. as a whole. Most reports tie the costs of the undocumented population to education, medical expenses, incarceration and the effects of low-paid workers on the salaries of legal residents. Revenue gains to governments resulting from undocumented immigrants consist primarily of taxes that cannot be avoided, such as sales taxes, various fees and user taxes on items such as gasoline and motor vehicle inspections.

This financial report focuses on the costs to the state of Texas; that is, services paid for with state revenue, including education, healthcare and incarceration. What government-sponsored services are available to undocumented immigrants is often determined by federal restrictions on spending (**Exhibit 1**). The report also identifies areas of costs to local governments and hospitals. Finally, it analyzes the $17.7 billion impact on the state's economy as well as state revenues generated by undocumented immigrants.

The Comptroller's report estimates that undocumented immigrants in Texas generate more taxes and other revenue than the state spends on them. This finding is

contrary to two recent reports, FAIR's, "The Cost of Illegal Immigration to Texans" and the Bell Policy Center's "Costs of Federally Mandated Services to Undocumented Immigrants in Colorado", both of which identified costs exceeding revenue.

**EXHIBIT 1**

**Major Government-Sponsored Programs and their Availability to Undocumented Immigrants**

| Unavailable | Available |
|---|---|
| Medicare | K-12 Education |
| Medicaid | Emergency Medical Care |
| Cash Assistance (TANF Welfare) | Children with Special Health Care Needs |
| Children's Health Insurance Program (CHIP) | Substance Abuse Services |
| Food Stamps | Mental Health Services |
| Supplemental Security Income (SSI) | Immunizations |
| Public Housing Assistance | Women and Children's Health Services |
| Job Opportunities for Low Income Individuals | Public Health |
| Child Care and Development | EMS |

*Source: United States Department of Health and Human Services.*

**STATES000015**
NJAPP0345

*Special Report:* **Undocumented Immigrants in Texas**

In education, FAIR's report included the costs of legal children to undocumented parents. The inclusion of these children dramatically increased the costs reported. The Comptroller's report focuses its attention on the costs directly attributed to undocumented persons. Colorado's report differed from the Comptroller's report in identifying which undocumented children should be included in any estimates. Colorado assumed all undocumented children between the ages of 5 and 17 were in public schools, and therefore did not account for children that did not attend school or were enrolled in private schools.

For health care costs, FAIR's report estimated costs to local taxpayers and not exclusively the state. Colorado's report states their estimate of state health care costs is overstated due to the fact the authors included legal permanent residents as well as other authorized immigrants in their count of undocumented immigrants.

The difference in the reports also may be related to the tax systems in the two states. Unlike Colorado, Texas has no income tax and relies heavily on consumption taxes at the state and local levels. Texas is more likely to capture tax revenue from workers who do not report income. Whereas income taxes will miss much activity in an underground economy, a sales tax will more likely be collected no matter how one earns an income.

Consumption taxes make up a greater percentage of total state revenue in Texas than in most other states. Since undocumented immigrants are more likely to work in the underground economy from which income taxes may not get collected, the Texas tax system, compared to other states, may capture a greater percentage of all the taxes that should be paid from the economic activity of undocumented immigrants.

As this report shows, calculating the impact of undocumented immigrants on the Texas economy and state budget is at best an educated guess. This is a result of the difficulty in calculating the number of undocumented immigrants in the state and the number who access state paid services. It is difficult to count a population that does not *want* to be counted, particularly when the law allows them access to many government services without regard to citizenship, such as those delivered by public hospitals and public schools.

This report uses some estimates of the Pew Hispanic center when calculating the number of undocumented immigrants in Texas, and of the U.S. Census Bureau when discussing foreign-born residents. Various methods are used in calculating the number of undocumented immigrants that received services.

All levels of government experience costs associated with undocumented immigrants. In fact, this report estimates the largest costs to local governments and hospitals; that is, incarceration and uncompensated health care costs. The Comptroller estimates costs of $1.3 billion for hospitals and $141.9 million for local incarceration attributed to undocumented immigrants. Likewise, the Comptroller estimates undocumented immigrants paid more than $513 million in local taxes. While this report acknowledges those costs, the main focus is the cost to the state of Texas, that is, costs paid with state revenues. While there may be costs of some state paid services not reported or deemed inestimable, the largest cost items are identified. Likewise, there may be some state revenue unaccounted for, but the largest revenue sources are used in the Comptroller's calculations.

As mentioned earlier, the Comptroller's office recognizes that there are costs associated with the legally resident children of undocumented immigrants. The Comptroller has chosen not to estimate these costs or revenues due to uncertainties concerning the estimated population and the question of whether to include the costs and revenues associated only with the first generation or to include subsequent generations, all of which could be seen as costs.

## II. Background

The 2000 Census counted 31.1 million foreign-born residents in the U.S., a 57 percent increase over the 1990 Census total of 19.8 million. The total U.S. population, by contrast, rose by just 13 percent over the same period.[1] The Census Bureau defines the foreign-born population as "immigrants (legal permanent residents), temporary migrants (e.g., students), humanitarian migrants (e.g., refugees), and unauthorized migrants (people illegally residing in the United States)."[2]

Six states—California, New York, Texas, Florida, Illinois and New Jersey—accounted for more than two-thirds of the 2000 foreign-born resident count, with 21.3 million persons. And the immigrant population in these six states is rising rapidly. Their 2000 count of 21.3 million was nearly 50 percent higher than the equivalent 1990 Census count of 14.4 million, for an increase of 6.9 million persons.[3]

Texas, with 2.9 million foreign-born residents, had the third-highest total in the U.S. (after California and New York) and ranked seventh among all states in its percentage of residents who are immigrants, at 13.9 percent. Texas' foreign-born—71 percent of whom come from Mexico or other Latin American countries—are concentrated in the state's urban areas. Even so, the Census found foreign-born Hispanics in every Texas county except Loving County.[4]

STATES000016
NJAPP0346

Texas' foreign-born population is concentrated in seven council of government (COG) regions (Houston-Galveston, North Central Texas, Lower Rio Grande Valley, Upper Rio Grande, Alamo Area, Capital Area and South Texas). In 2000, these seven COGs accounted for almost three-quarters of the state's population and 88 percent of its foreign-born residents, 90 percent of whom were from Mexico or other Latin American countries.

### Undocumented Immigrants

This report uses the term "undocumented immigrants" to refer to foreign-born individuals who reside in the U.S. who are not U.S. citizens or do not possess permanent resident status. Undocumented immigrants also may be foreign-born individuals who entered the U.S. legally but overstayed the authorized time period.

The Pew Hispanic Center estimates that the U.S. had 11.1 million undocumented immigrants in 2005. Of these, Texas accounted for between 1.4 million and 1.6 million. The Center estimates that 30 percent of the foreign-born population is undocumented.[5]

Recent research detailing the demographic characteristics of undocumented immigrants has reported U.S. totals rather than state-level characteristics. Texas is estimated to have about 14 percent of all undocumented immigrants residing in the U.S.[6]

The Pew Hispanic Center estimates that as of March 2005, two-thirds of undocumented immigrants in the U.S. had been in the country for 10 years or less, and 40 percent had been here for five years or less. Adult males composed the largest number of undocumented immigrants. Adults accounted for 84 percent of all undocumented immigrants and males made up 58 percent of all adults.[7]

The largest number of undocumented immigrants came from Latin America, with the majority of those coming from Mexico. In 2005, 6.2 million of the nation's estimated 11.1 million undocumented immigrants came from Mexico, or 56 percent of the total (**Exhibit 2**). From 2000 to 2005, the number of undocumented immigrants from Mexico rose by 31.5 percent.[8]

Undocumented immigrants are more likely to work in low-wage occupations that do not require a high level of educational attainment. The largest numbers of undocumented immigrants (31 percent) work in service occupations, followed by construction (19 percent) and production, installation and repair (15 percent). The fewest number of undocumented immigrants work in farming (4 percent), primarily because farm workers make up a relatively small portion of all occupations in general. Farming, however, has the highest concentration of

undocumented workers. Nearly a quarter (24 percent) of all farm workers are undocumented immigrants.

Other fields with large concentrations of undocumented labor include cleaning (17 percent of all workers), construction (14 percent) and food preparation (12 percent).[9]

## III. Education

Any estimate of state costs associated with undocumented immigrants is imprecise due to the difficulties involved in determining their numbers. In public education, federal guidelines prohibit questions of legal status. In higher education, state residency for tuition purposes is defined by the length of time an individual has lived in the state, regardless of legal status.

### Public Education Costs

Until 1982, Texas law prohibited local school districts from using state funds to educate undocumented immigrant children; furthermore, districts were allowed to deny enrollment to such children. In 1982, however, the Texas law was deemed unconstitutional. In *Plyler v. Doe*, the U.S. Supreme Court ruled that Texas law violated the equal protection provisions of the 14th Amendment. As a result of *Plyler v. Doe*, states may not deny access to public education to immigrant children residing within their boundaries, regardless of their legal status.[10] Subsequent court cases resulted in prohibitions against attempts to identify undocumented children because of the perception that they could then be discriminated against.



**EXHIBIT 2**
**Country of Origin of Undocumented Immigrants in the U.S. March 2005**

Other Latin America 22%
Mexico 56%
Asia 13%
Europe & Canada 6%
Africa & Other 3%

*Source: Pew Hispanic Center.*

STATES000017
NJAPP0347

*Special Report:* **Undocumented Immigrants in Texas**

EXHIBIT 3
**Public Education Cost Comparison**

| | FAIR 1999-2000 | FAIR 2003-2004 | Comptroller 2000-2001 | Comptroller 2004-2005 |
|---|---|---|---|---|
| Avg. Cost Per Student | $6,288 | $7,450 | $6,447 | $7,085 |
| Est. Number of Undocumented Immigrants | 164,000 | 225,000 | 125,000 | 135,000 |
| **Total Cost** | **$1.03 billion** | **$1.68 billion** | **$806 million** | **$957 million** |

Note: FAIR's estimates include federal dollars.
*Sources: Federation for American Immigration Reform and Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

As a result of the state school funding formulas, the cost ($7,085) of any student added to the enrollment of a local school district is borne by the state, regardless of legal status. Because the state system of school finance treats local property tax revenue as interchangeable with appropriated state funds, local and state costs are combined in the cost per student.

The Comptroller's office estimates that there were about 135,000 undocumented children in Texas public schools during the 2004-05 school year, or about 3 percent of total public school enrollment. Dr. Jeffery Passel of the Pew Hispanic Center estimated that there were 140,000 undocumented students in Texas public and private schools in 2001-02.[11] Applying the eight percent growth in total student enrollment from 2001-02 to 2004-05 school year (fiscal 2005) to the estimated 140,000 undocumented students resulted in an estimated 151,182 students in 2004-2005. A U.S. Government Accountability Office report's estimates that 89.3 percent of Texas students are enrolled in public school. That was applied to the estimated number of undocumented children in school, resulting in an estimated 135,013 undocumented students in Texas public schools.[12]

The Texas Education Agency reports that, during 2004-05, the average state and local expenditure per student was $7,085 (this excludes federal funds). Applying this figure to the estimated number of undocumented immigrant children in public schools, the Comptroller estimates that the cost of educating undocumented children in 2004-05 was slightly less than **$957 million (Exhibit 3)**.

This estimate may be conservative, in that other reports have estimated higher costs. The 2004 report by the U.S. Government Accountability Office referenced earlier stated that Texas, in response to a survey, estimated these costs at $932 million in 1999-2000. Applying increases in enrollment and cost per student, this figure implies 2004-05 costs of nearly $1.2 billion. A more recent report by the Federation for American Immigration Reform (FAIR) estimates Texas' costs at nearly $1.7 billion for the 2003-04 school year.[13] These estimates, however, include federal spending, which the Comptroller's office has excluded, as this report focuses on state costs.

In addition, the varying estimates assume different numbers of undocumented children in public schools. FAIR estimated that Texas public schools educated 225,000 undocumented children in 2003-04, substantially more than the Comptroller's estimate. FAIR based its estimate on a 1994 Urban Institute estimate of 93,907.[14] One of the authors of that Urban Institute estimate is Dr. Passel, whose estimate of 140,000 was used in the Comptroller's calculation.

### Higher Education Costs

The number of undocumented immigrants attending college in Texas also is unknown, as is the number of those paying in-state tuition rates, and thus the relevant costs to the state are difficult to estimate.

Prior to fall 2006, students who were not citizens or permanent residents of the U.S. (whether documented or not) still could become classified as Texas residents and thus be entitled to in-state college tuition rates under the provisions of Section 54.052(j) of the Texas Education Code, originally enacted by the 2001 Legislature as House Bill (H.B.) 1403. Prior to H.B. 1403 being signed into law in 2001, these students would have been considered international students, and therefore would have paid the more costly out-of-state tuition.

To qualify, the student must have lived in the state for at least three years before graduating from a Texas high school or receiving a high school equivalency diploma in Texas. The student also must have lived for at least part of that time with a parent or legal guardian and could not have an established residence outside of Texas. In addition, such students were required to sign an affidavit stating that they would apply for permanent residency as soon as they are eligible to do so.

The 2005 Legislature revisited the issue of resident status via Senate Bill (S.B.) 1528, which made residency requirements essentially uniform for all students, regardless of their legal status. As of fall 2006, anyone who has lived in Texas for three years before graduating or receiving a diploma equivalent from a high school, and has also lived in the state for a year prior to enrollment in college, qualifies for in-state tuition as a Texas resident. Any student

STATES000018
NJAPP0348

## *Special Report:* Undocumented Immigrants in Texas

### EXHIBIT 4
### A Comparison of Provisions of H.B. 1403 and S.B. 1528 for Establishing Texas Residency

| H.B. 1403 Requirements<br>To become residents, must<br>(2001) | S.B. 1528 Requirements<br>(2005) |
|---|---|
| 1. have resided with a parent or legal guardian or conservator during at least a portion of the 3 years leading up to high school graduation or the receipt of a GED certificate. | n/a |
| 2. have graduated from a public or private high school or received the equivalent of a high school diploma in this state; | same |
| 3. have resided in this state for at least three years as of the date the person graduated from high school or received the equivalent of a high school diploma; | same |
| 4. have registered as an entering student in an institution of higher education not earlier than the 2001 fall semester; | n/a |
| 5. provide to the institution an affidavit stating that the individual will file an application to become a permanent resident at the earliest opportunity the he or she is eligible to do so; and | Only required if student is not a U.S. Citizen or Permanent Resident |
| 6. have not established a residence outside this state | Must have lived in Texas the 12 months prior to enrollment. |

Note: Opportunity available to all persons meeting these requirements, whatever their citizenship or INS status, including U.S. Citizens and Permanent Residents.
*Source: Texas Higher Education Coordinating Board.*

who is not a U.S. citizen or permanent resident still must sign the affidavit concerning permanent residency. **Exhibit 4** compares previous and current law on this issue.

According to the Texas Higher Education Coordinating Board, in fall 2001, 393 students attended institutions of higher education as Texas residents based on Section 54.052(j) of the Education Code. In fall 2004, nearly 10 times as many students received in-state rates due to Section 54.052(j) provisions—3,792, more than 75 percent of whom attended community colleges (**Exhibit 5**).

As noted in **Exhibit 5**, average state funding per student fell between 2001 and 2004. Consequently, state costs did not go up at the same rate as the number of students; instead, there was about a 446 percent increase in total state funding for these students from 2001 to 2004. The

3,792 students in fall 2004 comprised 0.36 percent of total enrollment in the state's public institutions in 2004 (1,054,586 students in all).

It should be noted that these numbers are for all students who established residency for in-state rates under Section 54.052(j), regardless of their immigration status; not all were undocumented immigrants, despite the fact that the media often describes them as such. There are many types of visas for non-immigrants that could allow a foreign student to fulfill the residency requirements for in-state tuition; for example, the children of ambassadors and diplomats, or their employees. The Comptroller's office cannot determine the share of Section 54.052(j) students representing undocumented immigrants. If all these students were undocumented, the cost to the state in fiscal 2005 would have been **$11.2 million**.

### EXHIBIT 5
### Cost to State of Non-Citizen College Student Classified as Texas Residents

| | Fall 2001<br>Avg. State Cost<br>per Student | Fall 2001<br>Resident<br>Students | Fall 2001<br>Total | Fall 2004<br>Avg. State Cost<br>per Student | Fall 2004<br>Resident<br>Students | Fall 2004<br>Total |
|---|---|---|---|---|---|---|
| Universities | $5,366 | 64 | **$343,424** | $4,816 | 747 | **$3,597,552** |
| Health Related Inst. | $31,693 | 29 | **$919,097** | $25,237 | 16 | **$403,792** |
| Community Colleges | $2,627 | 300 | **$788,100** | $2,239 | 2,894 | **$6,479,666** |
| Tech. Colleges | | 0 | | $5,509 | 120 | **$661,080** |
| State Colleges | | 0 | | $4,265 | 15 | **$63,975** |
| Total | | 393 | **$2,050,621** | | 3,792 | **$11,206,065** |

*Sources: Texas Higher Education Coordinating Board and the University of Texas System.*

Carole Keeton Strayhorn, Texas Comptroller  5

STATES000019
NJAPP0349

*Special Report:* **Undocumented Immigrants in Texas**

EXHIBIT 6
**Estimated State and Federal Medicaid Expenditures**
**for Undocumented Immigrants, 2000 and 2005**

|  | 2000 | 2005 | Difference |
|---|---|---|---|
| Medicaid Expenditures | $45,206,381 | $96,864,943 | 114.3% |
| Medicaid Expenditures (constant 2000 dollars) | $45,206,381 | $89,698,067 | 98.4% |
| Average Number Recipient Months per Month | 1,528 | 2,762 | 80.8% |
| Medicaid Expenditures per Recipient Month | $2,466 | $2,923 | 18.5% |
| Medicaid Expenditures per Recipient Month (constant 2000 dollars) | $2,466 | $2,678 | 8.6% |

Note: Amounts may not add due to rounding.
Note: Recipient month equals one month's coverage for an eligible individual.
*Sources: Texas Health and Human Services Commission and Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

## IV. Health Care

State and federal-funded health benefits for undocumented immigrants are limited in Texas (see **Exhibit 1**). Costs for services are far more likely to fall on local governments, non-profit and private health care facilities.

### State Costs

Health-related benefits available for undocumented immigrants in Texas generally fall into three categories: emergency Medicaid; state-local programs such as mental health services and school-based health centers; and public health programs.

#### Emergency Medicaid

Medicaid is a federal/state funded program that provides healthcare to low income families, pregnant women, elderly people and those with disabilities and dependent children and related caretakers. Eligible persons must meet asset requirements.[15]

Emergency Medicaid payments represent the majority of state costs for medical care provided to undocumented immigrants. In the case of a medical emergency, such as childbirth and labor or other conditions that may threaten an individual's life, the federal government allows Medicaid to pay for services rendered to persons who would otherwise qualify for Medicaid regardless of their immigration status. Not all undocumented immigrants seeking medical care qualify for emergency Medicaid.

Medicaid expenditures for all immigrants, regardless of legal status, more than doubled (114 percent) from 2000 to 2005. When adjusted for inflation, spending rose by 98.4 percent. The average number of recipients per month increased by 81 percent during the same time period.

Because the Texas Health and Human Services Commission makes no distinction between legal immigrants, undocumented immigrants, refugees and those awarded asylum, costs attributed to undocumented immigrants must be estimated. The Pew Hispanic Center estimates that undocumented immigrants account for 30 percent of all immigrants. Based on that estimate, **Exhibit 6** details both state and federal estimated costs to emergency Medicaid.

The state shares the costs of Medicaid with the federal government. Texas pays approximately 40 percent of Medicaid costs; therefore, the total estimated state cost for Medicaid services for undocumented immigrants was **$38.7 million** in fiscal 2005 (**Exhibit 7**).

#### Children with Special Health Care Needs

The U.S. Department of Health and Human Services defines children with special health care needs (CSHCN),

...as those who have or are at increased risk for a chronic physical, developmental, behavioral, or emotional condition and who also require health and related services of a type or amount beyond that required by children generally.[16]

Funding for this program is split between the states and federal Title V, Maternal Child Health Services Block Grants.

EXHIBIT 7
**Estimated State Medicaid Expenditures**
**for Undocumented Immigrants, 2000 and 2005**

|  | 2000 | 2005 | Difference |
|---|---|---|---|
| Medicaid Expenditures | $18,082,552 | $38,745,977 | 114.3% |
| Medicaid Expenditures (constant 2000 dollars) | $18,082,552 | $35,879,227 | 98.4% |

*Sources: Texas Health and Human Services Commission and Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

STATES000020
NJAPP0350

### EXHIBIT 8
### Children with Special Health Care Needs Treated in Texas, All Funds 2005

| | Clients Served | Percent | Expenditures | Percent |
|---|---|---|---|---|
| Citizens/Legal Residents | 633 | 30.0% | $4,177,280 | 20.7% |
| Non-Citizens | 1,452 | 68.8% | $15,960,962 | 78.9% |
| Unknown | 25 | 1.2% | $89,921 | 0.4% |
| Total | 2,110 | 100.0% | $20,228,163 | 100.0% |

*Source: Texas Department of State Health Services.*

State and federal CSHCN expenditures in Texas totaled $20.2 million in fiscal 2005 (**Exhibit 8**).

CSHCN assistance is available for Texas residents, as defined by the Texas Administrative Code, regardless of their citizenship status in the U.S. In **Exhibit 8**, the "Non-Citizens" category accounts for foreign-born Texas residents who have reported to the Texas Department of State Health Services or another state entity that they are neither U.S. citizens nor legal residents. "Non-citizens" thus are likely to be undocumented immigrants.

The federal government requires states to expend at least 30 percent of their Title V funds on CSHCN. The fiscal 2005 block grant amount for Texas totaled $37 million, with a minimum of 30 percent ($11.1 million) dedicated to CSHCN. About 55 percent of the funds expended on CSHCN in fiscal 2005 were federal, with the state supplying the remaining 45 percent.

Applying the state share of 45 percent to the "Non-Citizens" category in **Exhibit 8** indicates that the estimated state cost for CSHCN services provided to undocumented immigrants was **$7.2 million** in fiscal 2005.

#### Substance Abuse Services

The Texas Department of State Health Services (DSHS) spent about $17.3 million in state funding—or 16 percent of all funding—for substance abuse intervention and treatment in fiscal 2005. As with mental health services, substance abuse services base eligibility on diagnosis rather than on income or citizenship. The vast majority of people receiving publicly funded treatment have an order issued by a court of law requiring that they participate in treatment as a part of their sentencing.

DSHS collects data on substance abusers receiving treatment in Texas. The information collected includes age at first drug use, gender, ethnicity, marital status, educational level, homelessness and criminal justice involvement. In 2005, DSHS began collecting citizenship information on individuals receiving publicly-funded substance abuse

treatment. About 5.5 percent or 8,446 of the 152,441 persons who received treatment reported that they were not U.S. citizens.[17]

While DSHS now collects data on citizenship, this information is not linked to the number or types of services individuals receive.

Such factors make it difficult to estimate the state's cost for providing substance abuse services to undocumented immigrants. The Comptroller estimates that the number of undocumented immigrants receiving services is 30 percent of the non-citizens identified above (again based on Pew estimate of percent undocumented), and therefore that 1.66 percent of all individuals receiving state-funded substance abuse services were undocumented immigrants in fiscal 2005. Applying that percentage to state expenditures for substance abuse results in a cost of about **$287,700**.

#### Mental Health Services

Texas pays for state mental hospital services almost entirely with state general revenue. In fiscal 2005, the state spent $225.7 million on state mental hospitals.[18]

Unlike Medicaid, eligibility for mental health services is not means-based, but instead is based on a patient's diagnosis, the severity of his or her illness and the availability of funds. To qualify for state-funded mental health services, an individual must be a member of the "priority population"—those who are significantly functionally impaired and have a diagnosis of schizophrenia, bipolar disease (manic depression) or major clinical depression.[19]

State mental hospitals also are subject to the federal Emergency Medical Treatment and Active Labor Act (EMTALA). EMTALA requires all hospitals receiving payments from Medicaid or Medicare—virtually all hospitals—to screen anyone presenting at an emergency department to determine if an emergency condition exists and, if so, to provide appropriate care regardless of ability to pay.

Therefore, persons entering a state mental hospital with an emergency medical condition cannot be turned away based on citizenship or for any other reason. If the event is an emergency, but a state mental hospital does not have capacity or is not found by staff assessing the person's condition to be the "least restrictive environment," the person is referred to a local mental health authority for care.

Under EMTALA, community mental health centers and state mental hospitals cannot inquire about a person's

STATES000021
NJAPP0351

*Special Report:* **Undocumented Immigrants in Texas**

citizenship status unless the person is likely to qualify for Medicaid-reimbursed mental health services. As discussed earlier, only undocumented immigrants that would otherwise qualify for Medicaid could qualify for such funding, and then only in an outpatient setting, since Medicaid does not cover inpatient mental hospital stays for adults between 19 and 65. For this reason, the need to ask about citizenship would not arise often.

To obtain the most accurate number of undocumented immigrants receiving services in the public mental health system, it would be necessary to conduct primary research through interviews and surveys of local mental health authorities and state mental hospital directors. Using the same methodology used for substance abuse, the Comptroller estimates a state cost for mental health services of **$3.8 million** in fiscal 2005. This estimate assumes 1.66 percent of state expenditures were associated with undocumented immigrants.

### Immunizations

To attend public school, parents must provide proof that their children have been immunized before enrollment. Immunizations may be obtained from numerous outlets that are convenient for undocumented immigrants, including school-based health centers, local public health departments (LPHDs) and federally qualified health centers (FQHCs).

Texas spent about $46.9 million for adult and child immunizations in fiscal 2005, of which 57.3 percent or $26.9 million was state general revenue. In all, 17 immunization doses are required for a child to enter school. **Exhibit 9** summarizes the number and type of vaccinations required for Texas public schools.

#### EXHIBIT 9
#### Vaccinations Required for Public School Admission

| Vaccine | Number of Doses |
|---|---|
| Diphtheria, Tetanus Toxoid, and Pertussis Vaccine (DTaP) | 5 |
| Polio Vaccine (IPV) | 4 |
| Measles, Mumps, Rubella (MMR) | 2 |
| Hepatitis B | 3 |
| Varicella | 1 |
| Hepatitis A (only required in 40 counties in Texas) | 2 |
| **Total Vaccinations** | **17** |

*Source: Texas Department of State Health Services.*

In 2002 (most recent year for which data is available) DSHS administered about 6 million doses of vaccine to persons under the age of 20. As noted in the Education section of this report, the Comptroller estimates 135,000 undocumented immigrants are enrolled in Texas schools. All of these children must have current vaccination records to attend school. Many undocumented children living in Texas, however, receive some or all required immunizations before they arrive in the U.S.

In Mexico, the largest country of origin of undocumented immigrants, almost 96 percent of children under the age of five have received all their vaccinations, compared to 79 percent of U.S. children under age three.[20] As a result, many undocumented school-aged children who arrive in Texas will have all their age-appropriate vaccinations. Students who do not have proof of their vaccinations must either provide documentation or receive another series of vaccinations. While many have documentation, the Comptroller is unable to determine the percent of those who do not.[21]

This makes estimating the state cost of providing immunizations to undocumented children attending Texas public schools difficult to calculate, because there is no way to determine when undocumented children currently enrolled in Texas schools arrived in the U.S., or the percent who had some or all their immunizations before immigrating. Costs associated with undocumented children are miniscule, with the Comptroller's estimate being about **$33,000** in fiscal 2005. This is based on four percent of undocumented children in public schools, or 5,400, receiving immunizations. These 5,400 children account for .12 percent of total school enrollment. This figure was applied to the $26.0 million in state funds.

### Women and Children's Health Services/ School-based Programs

Undocumented immigrant children enrolled in day care, preschools and primary schools may be eligible for state School-Based Health Center Services. These children as well as undocumented women also may receive health care through Women and Children's Health Services.

Texas has more than 100 school-based health centers that deliver services to about 200,000 children annually. DSHS funds four of these health centers. Schools may receive state funding for startup costs of up to $125,000 per year from DSHS.[22] School-based centers may provide comprehensive primary and preventive physical health, dental health, mental health and health education services to children and adolescents.[23]

The state funds school-based health centers to provide a "medical home" for children that otherwise have limited access to healthcare because they are uninsured or have

**STATES000022**
NJAPP0352

disabilities requiring care during the school day. The centers make no distinction between citizen and non-citizen students.

Most visits to the school-based health center are for services such as diagnosis and treatment of a simple illness or minor injury; immunizations; physical examinations, including sports physicals; preventive health visits, including Early Periodic Screening, Diagnosis, and Treatment; and mental health and psychosocial counseling.[24]

Another avenue to medical care for undocumented immigrants is the state Women's and Children's Health Services. Women and Children's Health Services provide community-based maternal and child health services for low-income persons not eligible for Medicaid or the Children's Health Insurance Program (CHIP). These services include preventive, primary and dental care for children and cancer screening for women.

Texas spent $21.9 million in state funds for these programs in fiscal 2005. The Comptroller estimates that slightly more than 3 percent of all students enrolled in public education were undocumented immigrants in fiscal 2005. The number of undocumented immigrant women receiving services is unknown. Therefore, a conservative estimate to the state for both services in fiscal 2005 is slightly more than 3 percent of state expenditures, or about **$674,000**.

### Public Health

State and local public health agencies provide all Texas residents with public health services regardless of citizenship status, because public health services are intended to protect all Texans' health. For example, care and treatment of infectious diseases are provided to anyone requiring them regardless of their ability to pay or citizenship status because such care protects the state's residents against the spread of those diseases.

DSHS funds 65 local public health departments (LPHD) that provide for the control and treatment of infectious diseases, as do some state-funded facilities such as the Texas Center for Infectious Disease and South Texas Health Care (formerly the South Texas Hospital). These two facilities spent $7.8 million and $5.4 million respectively in general revenue funds in fiscal 2005. The state also provided LPHDs and other health and education organizations with $38.1 million in 2005 state general revenue funding for HIV identification, prevention and treatment, while DSHS received about $13 million in state general revenue funds to combat tuberculosis (TB) and Hansen's disease (leprosy).[25]

The federal government also provides DSHS with funding for "Refugee Health Services," which primarily involve treating refugees who may be infected with TB and other infectious diseases.

In 2005, DSHS reported 1,535 cases of TB. Of these, 48.1 percent were foreign-born. Using the 30 percent share used earlier in this report to estimate the percent of foreign-born here without authorization results in an estimated 221 of those infected with TB being undocumented immigrants. The cost per TB case to the state is unknown.

Other high-incidence infectious diseases include HIV/AIDS, sexually transmitted diseases and meningitis. Data on country of origin for these individuals are not available. Assuming slightly more than 6 percent of the state's residents were undocumented immigrants, the Comptroller's estimated costs for fiscal 2005 were **$3.9 million**.

### Emergency Medical Services

In fiscal 2005, Texas spent about $55.2 million in state funds for emergency medical services (EMS), primarily ambulance and other emergency transportation and trauma facilities.

Little centralized demographic information exists for EMS. The U.S./Mexico Border Counties Coalition (U.S./MBCC) surveyed border counties in 2001 and found that about 7 percent of the costs these private and public ambulance service providers incurred was attributable to undocumented immigrants. The method used to identify these costs for the border region could be applied to the entire state with some modification. However, the Comptroller's office would need to know the total revenue for all ambulance providers in Texas to calculate a cost related to undocumented immigrants and that information is not available. Therefore in estimating costs, the Comptroller applies the percent of undocumented immigrants in Texas to total state expenditures. This results in a cost to the state in fiscal 2005 of **$3.4 million**.

The Comptroller estimates the total cost for state funded healthcare services for undocumented immigrants was **$58 million** in fiscal 2005. **Exhibit 10** details the state cost associated with undocumented immigrants and the percent of state funds estimated.

## Local Government and the Private Sector

Local government and private businesses incur the largest share of health-related costs for undocumented immigrants in Texas. The state Indigent Healthcare and Treatment Act requires Texas counties to provide "safety net" services for indigent persons and others not covered

**STATES000023**
NJAPP0353

**Special Report: Undocumented Immigrants in Texas**

### EXHIBIT 10
### State Healthcare Costs Associated with Undocumented Immigrants
### Fiscal 2005

| Service Area | General Revenue | Percent of Expenditures on Undocumented Immigrants | Undocumented Immigrant Costs |
|---|---|---|---|
| Emergency Medicaid* | $129,153,257 | 30.0% | $38,745,977 |
| CSHCN | $9,111,352 | 78.9% | $7,189,280 |
| Substance Abuse | $17,305,929 | 1.7% | $287,651 |
| Mental Health | $225,650,365 | 1.7% | $3,750,650 |
| Immunizations | $26,906,780 | 0.1% | $33,143 |
| Women/School | $21,901,933 | 3.1% | $674,463 |
| Public Health | $64,300,000 | 6.1% | $3,937,888 |
| EMS | $55,156,810 | 6.1% | $3,377,937 |
| **Total** | **$549,486,426** | **10.6%** | **$57,996,990** |

\* Program Type 30 (Foreign-Born: 30 % undocumented)
*Sources: Texas Health and Human Services Commission and Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

by private health insurance or public health insurance programs such as Medicare, Medicaid and CHIP.[26]

Texas law gives counties three basic options for delivering indigent healthcare, including hospital districts, public hospitals and county indigent health care programs (CIHCPs). All of these entities have a statutory obligation to cover a set of basic health care services including primary and preventative services designed to meet the needs of the community as well as inpatient and outpatient and nursing facility services.

*Hospital districts* are special taxing entities that may levy a tax not to exceed 75 cents per $100 in property valuation to fund indigent health care. Texas law requires hospital districts to provide services to persons with incomes below 21 percent of the federal poverty line. Hospital districts can, however, set higher income thresholds. Hospital districts also may receive financing from the state's unclaimed lottery revenue, the federal Disproportionate Share Hospital Program and supplemental Medicaid and Medicare payments to teaching hospitals through the Graduate Medical Education Program. These districts cover 144 of Texas' 254 counties.[27]

*Public hospitals* are funded in Texas by sales and use taxes and are eligible for the same types of funding as hospital districts. Texas law defines a public hospital as a hospital owned, operated, or leased by a county or municipality.[28] Texas public hospitals serve residents in all or parts of 29 Texas counties.[29]

*County indigent health care programs* (CIHCP) use both local and state funds to pay health care providers for services for eligible patients. Counties cover residents whose incomes place them below 21 percent of the federal poverty line, but they may adopt a less restrictive income standard. County CIHCPs' eligibility criteria also may impose resource limits (e.g. bank account balance limits, number/value of vehicles, etc.) and residency requirements. While county *residency* may be a requirement for CIHCP eligibility, *citizenship* is not. The level of state funding is tied to the level of local funding provided. In fiscal 2005, the state set aside $5.2 million to reimburse 21 counties through the CIHCP State Assistance Fund. Counties must spend more than 8 percent of their general revenue tax levy on qualified healthcare expenditures to qualify for state funding. All or some parts of 150 Texas counties operate CIHCPs.[30]

Local indigent health care entities have always been legally responsible for providing emergency medical services to those who met the responsible entity's eligibility criteria. The issue of providing *preventive* health care for undocumented immigrants was addressed in 2003 with the passage of H.B. 2292, which granted local indigent health care entities explicit permission to provide preventive and acute care services to area residents without regard to their immigration status. This legislation eliminated any need to ask a patient about citizenship status for primary and preventive care, and most counties do not ask about citizenship status other than to determine eligibility for a federal or state payment program.

The Harris County Hospital District, the nation's third-busiest public hospital system, estimated about one-in-five of patients seen by the county's healthcare system were undocumented immigrants. Medical care for these patients, both emergency and non-emergency related, accounted for $97.3 million or approximately 14 percent of the system's total operating costs in 2005.[31]

In 2001, the U.S./Mexico Border Counties Coalition (U.S./MBCC) interviewed border hospital chief executive officers and chief financial officers to obtain an estimate of the share of their hospitals' uncompensated care attributable to undocumented immigrants. Based on their responses, the coalition estimated that about 25 percent

STATES000024
NJAPP0354

of these hospitals' uncompensated care costs resulted from uninsured, undocumented immigrants.

Since then, the Indigent Care Collaboration (ICC), an alliance of "safety net" providers in three Central Texas counties (Travis, Williamson and Hays), has begun tracking the percent of uninsured undocumented immigrants they serve using a web-based eligibility screening tool called the Community Health And Social Services Information System (CHASSIS™).

CHASSIS™ is used to screen uninsured/under-insured patients for eligibility in federal, state, and local medical assistance or payment programs (e.g. Medicaid, CHIP, CIHCP, Primary Health Care (PHC), SSI, local charity programs, etc.) In 2005, about 14 percent of all patients screened using CHASSIS™ in hospital settings were found to be undocumented. If only the patients screened through the hospitals' emergency departments are examined, however, the percent of undocumented immigrants increases to 25 percent. This finding regarding the percent of emergency room patients who are undocumented is in keeping with the conclusions of U.S./MBCC's 2001 study on emergency medical services provided to undocumented immigrants in Texas border counties.

Texas hospitals reported $9.2 billion in uncompensated care in 2004.[32] An estimate of 2005 costs was unavailable. Uncompensated care generally encompasses care provided to uninsured and underinsured individuals who cannot pay for the services they receive. Applying the ICC's estimate of 14 percent of patients to total uncompensated care provided by Texas hospitals produces a statewide estimate of uncompensated healthcare costs attributable to undocumented immigrants of **$1.3 billion**.

### Federally Qualified Health Centers

Federally qualified health centers (FQHC) include community health centers, migrant health centers, programs that provide health care for the homeless, public housing primary care programs and urban Indian and tribal health centers. FQHCs are supported by federal grants, Medicaid, Medicare, private insurance payments and state and local contributions.[33] Although anyone may seek services at an FQHC, nearly 71 percent of health center patients have family incomes at or below poverty. In addition, about 40 percent of health centers' patients are uninsured and another 36 percent depend on Medicaid.[34]

According to the Texas Association of Community Health Centers, Texas FQHCs receive about 40 percent of their funding from sources such as Medicaid (27 percent) and state and local funds (13 percent). Grants and contracts -- federal and non-federal -- account for another 41 percent of revenues. Their remaining funds come from a

variety of sources including Medicare, Children's Health Insurance Program (CHIP), private insurance, self-pay patients and other miscellaneous sources.[35]

In 2005, Texas FQHC patients were covered by Medicaid/CHIP (25 percent), Medicare (7 percent), private insurance (7 percent) and other public programs (2 percent). The remaining 59 percent had no insurance.[36] Texas FQHCs served about 6 percent of the state's uninsured in 2004. More than half of the 562,000 patients seen preferred to be served in a language other than English. More than 14,000 were seasonal or migrant farm workers.

Texas FQHCs are not required to and do not collect data on their patients' citizenship status or place of birth. Therefore, it is impossible to estimate the percent of state or local funds spent by FQHCs that are attributable to undocumented immigrants.

### Clinics

Other sources of healthcare for Texas' undocumented immigrants include primary care and free clinics. ICC's member clinics screened about 84,000 patients in 2005.[37] Of those screened, slightly more than 50 percent were found to be undocumented immigrants. An average clinic visit costs about $230. No data are available on the number of clinic visits made by this population, and as a result the Comptroller cannot estimate the cost of clinic services provided to undocumented immigrants.

The Robert Wood Johnson and Annie E. Casey Foundations created the Access Project to assist local communities develop and sustain efforts that improve healthcare and promote universal coverage with a focus on the uninsured. The Access Project reported that Texas counties spent an estimated $870 million on all indigent health care in 1999.[38] The Access Project, however, was examining indigent health care in its entirety and did not distinguish between citizens and noncitizens. U.S./MBCC examined emergency medical care only—that is, care required by federal law. As a result, there are no studies that estimate Texas costs for non-emergency or primary care provided to undocumented immigrants at the county or municipal level.

### Section 1011

As mentioned above, Texas hospitals may be reimbursed for emergency healthcare provided to qualified undocumented immigrants by the Health and Human Services Commission, through the federal Emergency Medicaid program. More recently, the federal government has authorized payment for emergency medical care provided to undocumented immigrants under Section 1011 of the Medicare Modernization Act.

**STATES000025**
NJAPP0355

Section 1011 reimburses hospitals, physicians and ambulance providers based on Medicare reimbursement for services rendered to undocumented immigrants. Beginning in federal fiscal 2005, the federal government will pay about $250 million per year directly to providers that submit qualified claims. Texas' allotment under Section 1011 was $56 million per year for four years. At this time, however, eligible Texas providers, including hospitals, physicians and ambulance services, have not submitted claims for all of the $56 million available.

The difficulty in estimating the cost to LPHDs, physicians or EMS services of care provided to uninsured undocumented immigrants varies depending on the availability of data and the existence of previous primary research.

As a rule, none of these entities maintain data on the citizenship of the patients they treat. This lack of data makes it virtually impossible to place a dollar figure on the cost to these providers related to undocumented immigrants. While no data are available to estimate the magnitude of the cost, it is clear that, other than Emergency Medicaid, Section 1011 and the limited state funds available, local tax dollars or private donations must cover most of the cost of providing care to undocumented immigrants.

## V.   Incarceration

Texas' criminal justice system has three distinct parts. Undocumented immigrants who commit crimes affect all of them:

- law enforcement and criminal prosecution—municipal police, county sheriffs, the Texas Department of Public Safety, district attorneys' offices and technical investigative organizations such as crime labs;
- criminal trial and appeals—the criminal trial and appeals court system, including public defenders, the jury system and other court procedures; and
- corrections—the system of incarceration and parole, including prisons, jails, and parole boards and the capital punishment apparatus.

Many elected officials including state governors and U.S. congressmen argue that the federal government should bear all the cost of capturing, prosecuting and housing undocumented immigrants who commit criminal offenses.[39] Under the Violent Crime Control and Law Enforcement Act (Public Law 103-317, or the Crime Act of 1994), the federal government authorized $1.8 billion over six years to reimburse states and local jurisdictions for criminal justice costs associated with undocumented immigrants.

This act also established the State Criminal Alien Assistance Program (SCAAP), which provides partial reimbursement to states and local jurisdictions for housing

criminal aliens.[40] The federal government limits SCAAP reimbursements to costs incurred related to undocumented immigrants who are convicted of felonies or multiple misdemeanors. SCAAP awards are based solely on a jurisdiction's costs for correctional officers, the number of "eligible" undocumented immigrant offenders and the number of inmate days involved. No other costs are included in the calculation of SCAAP awards.

Two other federal grants partly reimburse local jurisdictions for costs related to undocumented criminals: the Byrne Discretionary Grant and Community Oriented Policing (COP). One of the purposes of the Byrne Grant is to promote projects that are multi-jurisdictional or multinational in scope.[41] COP gives money directly to local jurisdictions including communities along the U.S.-Mexico border to boost the police presence at the community level.

### State Costs

Noncitizens who commit crimes in Texas are prosecuted and punished in the same way as U.S. citizens; after serving their sentences, however, some may be deported back to their home countries. This can apply both to documented and undocumented immigrants, depending on the severity of their crimes.

The Texas Department of Criminal Justice (TDCJ) operates a joint program with federal Immigrations Customs and Enforcement (ICE) to identify criminal aliens incarcerated in Texas, begin deportation proceedings against them while they are incarcerated and deport them after they serve their state prison sentences.

Deportation can occur only after completion of the inmate's sentence. The process begins, however, when the inmate is evaluated at one of TDCJ's intake sites after being sentenced and transported from the local county jail to TDCJ. The simplified process is as follows:

- TDCJ identifies foreign-born offenders during intake.
- TDCJ notifies ICE that the offender claims foreign birth or citizenship or that TDCJ suspects foreign birth or citizenship.
- ICE interviews the offender and may ask TDCJ to hold the offender upon release.
- ICE is notified when the offender's release is pending and assumes custody of the offender upon release, pending federal deportation proceedings.[42]

As of March 31, 2006, TDCJ had a total population of 151,852 inmates. TDCJ does not have an accurate count of undocumented immigrants held in its facilities, but has asked ICE to review its records and provide this number.

STATES000026
NJAPP0356

Of the total incarcerated in state jails and prisons in March 2006, 11,514 claimed to have been born in a foreign country and 10,280 claimed that they hold foreign citizenship. These claims are based on TDCJ's intake interviews and records forwarded with the prisoners and are subject to investigation and verification by ICE.

ICE had issued detainers (requests to detain) for 6,541 prisoners as of March 2006. Due to ICE staffing shortages, however, ICE has been unable to interview all inmates and investigate them to verify their immigration status; an undetermined number of undocumented offenders may be issued a detainer at a later date. ICE had final orders of deportation in place for at least 3,018 inmates as of March 2006, although both TDCJ and ICE say this number is inaccurate and probably low.[43]

Under current procedures, ICE provides TDCJ with information on detainers for male prison inmates only. ICE does not report figures for females in prison units or for both male and female offenders in state jails (**Exhibit 11**).

The process for releasing undocumented immigrant offenders varies for different types of offenders and facilities, which is one reason for the lack of accurate statewide data. For example, female Institutional Division offenders are released from Gatesville and processed by the San Antonio ICE office. State jail offenders are released from the Lyncher State Jail and processed by the Houston ICE office.

The vast majority of TDCJ offenders are males housed by the Institutional Division (ID), which administers the state's traditional prisons. TDCJ transfers male ID offenders who require a deportation hearing to a joint state/federal facility at Huntsville's Goree Unit under the Institutional Removal Program.[44] This process is geared to save money and ensure the deportation of eligible criminal aliens; it is based on a previous recommendation by the Comptroller's Texas Performance Review program.

TDCJ releases inmates who need a deportation hearing directly into federal custody. The federal government maintains detention facilities and a courtroom next to the Goree Unit and court proceedings are held via tele-conferencing with a federal judge located in Houston. TDCJ provides legal counsel for offenders who lack it.

Deportation includes several types of proceedings. *Stipulated* removal occurs when the alien voluntarily concurs with ICE's allegations and agrees to waive a hearing before an immigration judge. The federal immigration judge signs the order but the alien need not be present. *Reinstatement of a removal order* occurs when an alien illegally reenters the U.S. after having been removed before. No hearing is required for deportation in such cases. *Administrative* removal applies if the offender has not been admitted to the country legally and has been convicted of an aggravated felony, and a hearing is needed for a judge to determine the facts and reach a decision.[45]

Comptroller employees visited the Goree Unit in Huntsville in May 2006 to gather information about the Institutional Removal Program. They met with both TDCJ and ICE staff, who explained the program and provided some of the information used in this report. The Comptroller team reported that TDCJ staff members discussed aggregating all joint TDCJ/ICE operations at the Goree Unit to further streamline the process and save money.

### Federal reimbursement

The state of Texas receives partial reimbursement for costs associated with incarcerating illegal aliens from the U.S. Bureau of Justice Assistance's State Criminal Alien Assistance Program (SCAAP). SCAAP reimburses costs only for undocumented aliens who have been convicted of a felony or two or more misdemeanors and have been incarcerated for at least four consecutive days. The key factor is whether the individual was born outside the U.S. and has no reported or documented claim to U.S. citizenship. SCAAP reimburses costs only for a portion of correctional officer salaries and is based on estimates of incarceration days of both known and suspected illegal immigrants.

Texas will receive $18.6 million in SCAAP money to partially offset its costs in 2006. This is up from $17.1 million in 2005, but down sharply from earlier years, when Texas received about $34 million annually. Congress has cut the appropriation level in half, affecting all states and local jurisdictions.[46]

The outlook for federal SCAAP funding remains uncertain. The Bush administration's proposed federal fiscal 2007 budget recommended eliminating SCAAP, calling it no more than a form of revenue sharing and saying that the program has not demonstrated results. Meanwhile, various elected officials across the U.S. have called for

---

#### EXHIBIT 11
#### Noncitizens Incarcerated in the Texas Department of Criminal Justice, March 31, 2006

| | |
|---|---|
| Total TDCJ Population | 151,852 |
| Offenders Claiming Foreign Place of Birth | 11,514 |
| Offenders Claiming Foreign Citizenship | 10,280 |
| Offenders with ICE Detainers | 6,541 |
| Offenders with Final Orders of Deportation | 3,018 |

*Source: Texas Department of Criminal Justice.*

**STATES000027**
NJAPP0357

*Special Report:* Undocumented Immigrants in Texas

more than doubling the current federal appropriation from $405 million to $850 million, saying the federal government has not lived up to its obligation to stop illegal immigration and that locals are bearing the costs.[47]

### State Fiscal Impact

As of June 2006, TDCJ did not have an exact count of the number of undocumented immigrants among its total population of 151,741. TDCJ staff members are investigating this question at the request of the TDCJ board chair and expect results by Winter 2006 at the earliest. Because of inconsistencies in various computer databases, ICE is expected to review thousands of files manually if necessary to obtain an accurate count.

The Legislative Budget Board reports that TDCJ's most recent cost per day per inmate is $40.06.[48] According to TDCJ, illegal aliens are distributed throughout the system, so that this particular subset of inmates should not reflect any different costs for housing or meals.

The lack of accurate data on the number of undocumented offenders in Texas prisons makes it difficult to estimate associated costs, but both the U.S. Government Accountability Office (GAO) and TDCJ have made some estimates. GAO has estimated that Texas spent $130 million to house SCAAP criminal aliens in 2002. GAO multiplied the average daily cost of housing inmates in Texas prisons by the number of days criminal aliens reimbursed under SCAAP were incarcerated in Texas prisons. Federal reimbursements amounted to $15 million, or 11.5 percent of costs. GAO estimated that SCAAP payments represented 25 percent or less of the total cost of incarcerating criminal aliens in the other four large states they evaluated in their 2005 study.[49]

Using a similar approach, TDCJ estimated that incarcerating undocumented immigrants cost the state $132,377,509 in 2005, in response to a request from the Texas Office of State-Federal Relations.[50] Using a similar method and data provided by TDCJ, the Comptroller estimates costs for fiscal 2006 at **$130.6 million**. This total was derived by multiplying the cost per day ($40.06) by the number of days undocumented offenders were incarcerated in Texas prisons as estimated by TDCJ (3,259,818).[51]

This implies that on average there were 8,931 undocumented offenders in TDCJ at any one time during fiscal 2006. TDCJ reported that there were 13,006 unique offenders incarcerated at some point in 2005 that had or were suspected to have had no claim on citizenship. These persons may have been incarcerated one or more times during the period.

### Local Costs

Texas' criminal justice system is based on cooperation and interaction between the state, local and federal governments. Local governments are the front line in the fight against crime, and they face the heaviest financial burden.

Counties are responsible for many aspects of local law enforcement, detention, adult and juvenile prosecution; adult and juvenile indigent defense; lower courts (for misdemeanors); district or superior courts (for felonies); court clerks; adult probation; and juvenile probation and detention.

Each county sheriff's department is responsible for the operation of county jails, criminal investigations, arrests of criminal offenders, warrants and civil papers, and the provision of bailiffs for all state courts. Texas counties have county and district attorneys as well as county and district clerks and elected constables. Each of these various offices can incur a cost whenever an undocumented immigrant commits a crime.

The district attorney (DA) represents the state in felony actions and criminal misdemeanors in county courts at law and justice of the peace courts. Most DAs serve a single county, although some serve more than one (typically in the case of rural areas). County attorneys try misdemeanors and juveniles while district attorneys try felonies.

Texas county courts at law hear both criminal and civil cases. Justices of the peace have original jurisdiction in Class "C" misdemeanor criminal cases subject to fines of up to $500.

Given available data, estimating the cost of undocumented offenders to Texas counties is not a simple matter. A few studies have attempted to quantify the cost to specific jurisdictions. In the mid-1990s, two studies examined the cost of illegal immigration on Texas, one by the Urban Institute and another by Dr. Donald Huddle of Rice University. Both studies examined the state cost of undocumented immigrants in response to a push by state officials to receive federal reimbursement for these costs. Neither study, however, examined costs to local units of government.[52]

Recently, GAO published a report examining costs in five states and five large counties that receive SCAAP funding. Harris County was among the five large counties reviewed. This study, however, included only costs related to county sheriff's offices. Using costs per day provided by these offices, GAO estimated that SCAAP awards cover between 7 percent (Maricopa County, AZ) and 25 percent (Los Angeles County, CA) of the costs reported.

STATES000028
NJAPP0358

## *Special Report:* Undocumented Immigrants in Texas

According to GAO, SCAAP covered about 20 percent of the Harris County Sheriff's office in 2003.[53] While Harris County's correctional salaries increased from slightly more than $76.4 million in 2003 to almost $109 million in 2005, their SCAAP award remained virtually unchanged. In 2003, Harris County received $2,693,979; in 2005, two dollars less—$2,693,977. The percent of incarceration-related costs covered by SCAAP funds appears to have declined between 2003 and 2005.

In federal fiscal 2005, 95 Texas counties received almost $7.9 million in SCAAP funds.[54] Using the method employed by ICE and the Federal Bureau of Justice Assistance to calculate a cost per inmate day, the Comptroller's office divided the reported correctional officer salaries by total inmate days reported for all offenders regardless of their immigration status.

The Comptroller then multiplied the cost per day by the number of ICE and "unknown" inmate days to arrive at a cost per undocumented immigrant offender related to correctional officer salaries of $24.5 million.

The Comptroller examined 2005 approved budgets for 15 of the 95 Texas counties that receive SCAAP funds. These 15 counties received about 88 percent of the 2005 SCAAP funds awarded last year. Salaries account for about 50 percent of county sheriff office budgets.[55] Thus costs related to salaries were doubled to arrive at a cost estimate for county sheriff's offices.

**Exhibit 12** indicates that Texas sheriff's offices spent about **$49.1 million** for undocumented immigrant offenders in 2005.

This, however, tells only part of the story. As noted above, other county offices incur costs related to handling undocumented offenders.

In 2000, the U.S./Mexican Border Counties Coalition (U.S./MBCC) commissioned a study to estimate criminal justice costs to county and municipal governments along the U.S.-Mexico border. The researchers completed detailed examinations of county budgets and cost information, fielded a survey and conducted in-depth interviews with county officials and relevant county staff

### EXHIBIT 12
### Estimated Costs to County Sheriff's Offices for Undocumented Offenders, 2005

| County | SCAAP Award 05 | Total Salaries | Inmate Days (Total) | Cost Per Day | ICE Inmate Days | ICE Inmate Costs | Unknown Inmate Days | "Unknown Inmate" Costs | Costs Sheriff's Salaries Only | Total Costs Sheriff's Ofc. |
|---|---|---|---|---|---|---|---|---|---|---|
| Bexar | $547,366 | $27,883,631 | 1,425,272 | $19.56 | 11,065 | $216,473 | 90,491 | $1,770,341 | $1,986,814 | $3,973,628 |
| Brazos | $87,090 | $3,613,269 | 163,410 | $22.11 | 3,583 | $79,226 | 10,207 | $225,694 | $304,920 | $609,840 |
| Cameron | $29,936 | $4,237,531 | 370,486 | $11.44 | 616 | $7,046 | 8,989 | $102,814 | $109,860 | $219,719 |
| Collin | $303,305 | $9,367,485 | 263,562 | $35.54 | 5,429 | $192,957 | 25,067 | $890,928 | $1,083,885 | $2,167,769 |
| Dallas | $636,166 | $48,828,400 | 2,265,666 | $21.55 | 14,850 | $320,039 | 91,496 | $1,971,872 | $2,291,911 | $4,583,822 |
| Denton | $163,183 | $7,929,953 | 327,021 | $24.25 | 3,679 | $89,212 | 20,493 | $496,936 | $586,148 | $1,172,297 |
| El Paso | $357,084 | $33,530,172 | 878,127 | $38.18 | 20,833 | $795,482 | 8,828 | $337,086 | $1,132,568 | $2,265,136 |
| Fort Bend | $118,802 | $4,981,686 | 251,158 | $19.83 | 2,919 | $57,898 | 18,684 | $370,595 | $428,493 | $856,985 |
| Galveston | $67,131 | $4,688,584 | 240,508 | $19.49 | 1,577 | $30,743 | 11,052 | $215,453 | $246,196 | $492,392 |
| Harris | $2,693,977 | $108,459,258 | 2,839,476 | $38.20 | 61,077 | $2,332,954 | 186,630 | $7,128,693 | $9,461,646 | $18,923,292 |
| Hidalgo | $714,808 | $7,831,155 | 410,487 | $19.08 | 8,271 | $157,792 | 129,367 | $2,468,027 | $2,625,819 | $5,251,638 |
| Tarrant | $403,123 | $24,801,490 | 1,262,382 | $19.65 | 11,490 | $225,739 | 62,126 | $1,220,563 | $1,446,303 | $2,892,605 |
| Travis | $658,636 | $41,826,681 | 929,068 | $45.02 | 9,106 | $409,953 | 43,167 | $1,943,380 | $2,353,333 | $4,706,665 |
| Webb | $64,069 | $4,422,071 | 234,797 | $18.83 | 3,537 | $66,614 | 8,263 | $155,622 | $222,236 | $444,473 |
| Williamson | $107,402 | $4,685,525 | 204,094 | $22.96 | 2,514 | $57,716 | 8,263 | $189,699 | $247,415 | $494,830 |
| Total | $6,952,078 | $337,086,891 | 12,065,514 | $27.94 | 160,546 | $5,039,843 | 723,123 | $19,487,704 | $24,527,546 | $49,055,092 |

*Source: RH2 Consulting, Inc.*

STATES000029
NJAPP0359

**Special Report:** Undocumented Immigrants in Texas

to develop an estimate of the fiscal impacts to 14 Texas border counties. In addition to sheriff's offices, they calculated costs to the following offices for each county:

- District Attorney
- District Court
- District Clerk
- County Attorney
- Court at Law
- County Clerk
- Justice of the Peace
- Indigent Defense
- Adult Probation
- Juvenile Services

They also included an estimated emergency medical care cost, but their estimate included costs for both offenders and non-offenders who are undocumented immigrants. The Comptroller's report includes a separate calculation estimating Texas health care costs for undocumented immigrants, so these costs were subtracted from the U.S./MBCC estimate.

The U.S./MBCC estimated that the cost to these 14 border counties was approximately $21.5 million.[56] Of that amount, sheriff's offices accounted for approximately 60 percent of expenditures for undocumented immigrants. Applying this ratio to the figure calculated for sheriff's office costs produces an estimate of $81.7 million for costs related to processing and incarcerating undocumented immigrant offenders for the 15 highest SCAAP grant recipients.[57] These 15 counties received 88 percent of the 2005 SCAAP money awarded to Texas counties; $81.7 million divided by 0.88 produces an estimated total cost of **$92.9 million.**

This figure represents a conservative estimate, as the SCAAP grantees represent 95 of Texas' 254 counties and 87 percent of the state's population. Some of the remaining counties also may incur criminal justice costs related to the processing and incarceration of undocumented offenders. For example, five of the 14 border counties included in the U.S./MBCC study did not submit SCAAP applications in 2005.

Total estimated costs for education, health care and incarceration are detailed in **Exhibit 13**.

## VI. Economic Benefits

This section analyzes two issues:

- the economic impact of undocumented immigrants in Texas, including their contributions to state employment, wages and revenues over a 20-year period (2005 through 2025); and

- the contributions of undocumented immigrants on Texas government revenues.

### Economic Impact

The Pew Hispanic Center estimates that between 1.4 million and 1.6 million undocumented immigrants resided in Texas in March 2005.[58] To achieve a conservative estimate, this analysis relies on the lower boundary of this range.

Using 2000 Census data for the number of foreign-born residents in Texas counties, it is possible to estimate how many undocumented immigrants reside in each of Texas' 24 Council of Government regions, based on the assumption that immigrants are distributed in the same proportion as the foreign-born. Based on an age profile of foreign-born immigrants into the U.S. from Mexico, it is possible to further disaggregate the estimates into age and gender groups.[59]

These data then can be put into the Comptroller's Regional Economic Model, Inc. (REMI) model to investigate the impact of undocumented immigrants on the Texas economy. This is accomplished by instructing REMI to act as if these immigrants were to suddenly vanish from Texas and then to examine the degree to which the underlying economic forecast for the state and for each region would be affected. The implicit assumption is 1.4 million undocumented immigrants have employment and spending patterns consistent with Hispanics in Texas with similar age and gender profiles.

To gauge the economic impact of undocumented immigrants, one additional change must be made in the REMI model. Because REMI is a general equilibrium model, it tries to compensate for changes in a variety of ways. In the case of workers eliminated from a region, the model assumes new workers will be recruited to make up for their loss.

While this is an expected "real-world" result, a true test of the effects of unauthorized immigrants would be seen only if the REMI model were prevented from importing additional workers into the state in compensation.

**EXHIBIT 13**

**Summary of Estimated State Costs Associated with Undocumented Immigrants (Fiscal 2005)**

| Costs | |
|---|---|
| Education | -$967.8 |
| Healthcare | -$58.0 |
| Incarceration | -$130.6 |
| Total | -$1,156.4 |

STATES000030
NJAPP0360

*Special Report:* **Undocumented Immigrants in Texas**

### EXHIBIT 14
### Estimated Effects of the Loss of 1.4 Million
### Undocumented Immigrants from Texas in 2005

| | Percent Change From Baseline Forecast | | | | |
|---|---|---|---|---|---|
| | 2005 | 2010 | 2015 | 2020 | 2025 |
| Total Employment | -2.3% | -2.1% | -2.1% | -2.0% | -2.0% |
| Total Gross State Product | -2.1% | -1.8% | -1.7% | -1.6% | -1.5% |
| Personal Income | -2.6% | -2.0% | -2.0% | -2.1% | -2.2% |
| Real Disposable Personal Income | -2.8% | -2.2% | -2.1% | -2.1% | -2.1% |
| Relative Cost of Production | 0.2% | 0.3% | 0.1% | 0.0% | -0.1% |
| Relative Labor Intensity | 0.0% | -0.1% | -0.2% | -0.2% | -0.2% |
| Exports to Rest of World | -0.1% | -0.3% | -0.4% | -0.2% | -0.1% |
| Average Annual Compensation Rate | 0.6% | 1.0% | 0.7% | 0.4% | 0.2% |
| Population | -5.7% | -4.2% | -3.5% | -3.1% | -2.8% |
| Labor Force | -6.3% | -3.6% | -2.7% | -2.3% | -2.1% |

*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

The model eliminates the impact of all undocumented immigrants on the Texas economy. Some in-migration was allowed, but drawing in new Hispanic in-migrants in numbers disproportionate to their share of the indigenous population in the U.S. was prohibited. Effectively, this shut off return in-migration from Mexico and other Latin-American countries.

#### Model Results

Probably the easiest way to summarize the contribution of undocumented immigrants to the Texas economy is to consider the percentage changes that might occur in various economic indicators as a result of their removal. (As a yardstick, it should be noted that 1.4 million people account for slightly more than 6 percent of the total Texas population.)

**Exhibit 14** and **15** summarize the changes in key economic indicators, and summarize the economic impact.

Without the undocumented immigrant population, Texas' work force would decrease by 6.3 percent. This decline is actually somewhat lower than the percentage of the work force actually accounted for by undocumented immigrants, since REMI assumes some additional immigration would occur to replace the workers lost. The most significant economic impact of losing undocumented workers would be a noticeable tightening in labor markets.

This tightening would induce increases in wages, as indicated by a rise in average annual compensation rate. Wage rates would rise by 0.6 percent in the first year and stay above the forecast rate throughout the entire 20-year period.

While pay increases can be viewed as a positive social and economic development, when they rise due to labor shortages they affect economic competitiveness. In this case, it would be expressed as a modest decline in the value of Texas' exports.

The remaining broad economic measures all point to an initial impact of undocumented immigrants of about 2.5 percent in terms of the value of production and wages in the Texas economy. Eliminating 1.4 million immigrants would have resulted in a 2.3 percent decline in employment, a 2.6 percent decline in personal income and a 2.8 percent decline in disposable personal income in 2005. This change also would generate a 2.1 percent decline in the gross state product (GSP), the broadest measure of the value of all goods and services produced in Texas.

While none of these changes are surprising, the one finding that may appear unusual is the persistence of the decline. If no in-migration were possible other than from natives or authorized immigrants, employment would remain 2 percent below the baseline forecast 20 years

### EXHIBIT 15
### Estimated Effects of Removing 1.4 Million
### Unauthorized Immigrants from Texas in 2005

| | 2005 | 2010 | 2015 | 2020 | 2025 |
|---|---|---|---|---|---|
| Total Employment loss | 298,000 | 287,100 | 293,800 | 296,300 | 302,700 |
| Total Gross Regional Product loss (Billions of Fixed 2000$) | $17.7 | $18.7 | $20.5 | $21.4 | $22.6 |
| Personal Income loss (Billions, current dollars) | $18.5 | $19.0 | $24.6 | $32.6 | $42.9 |
| Loss in Exports to Rest of World (millions of Fixed 2000$) | $66.5 | $390.1 | $548.0 | $387.7 | $123.9 |
| Net Population loss from baseline | 1,309,000 | 1,033,000 | 899,400 | 831,300 | 784,400 |
| Labor Force Loss | 714,100 | 434,000 | 340,500 | 281,200 | 281,600 |

*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

**Carole Keeton Strayhorn, Texas Comptroller** 17

later. The impact lessens over time, but remains sizable throughout the 20-year forecast period.

The primary adjustment the model makes to compensate for the loss of these undocumented migrants is initially a rise in the wage rate, which would induce some new in-migration into Texas and some additional participation in the labor force from current residents. Moreover, with wages rising relative to capital, there would be some substitution of capital for employees so the need for additional workers is lessened through productivity increases. But the fact that the Texas economy cannot adjust completely to the loss of this labor through these changes and retain its competitiveness ultimately means that relative to the rest of the world the cost of production in Texas is higher, making our goods less competitive in the international marketplace and decreasing the size of the Texas economy.

### Regional Distribution

Assuming that the current distribution of unauthorized immigrants is similar to the distribution of the foreign-born population in Texas from Central America and Mexico, as detailed in the 2000 Census, the economic impact of unauthorized immigrants varies substantially across Texas. As detailed in **Exhibit 16**, the loss of 1.4 million undocumented immigrants from the work force would produce work force declines ranging from 22.7 percent in the South Texas COG region (the Brownsville-McAllen area) to 1.7 percent in Southeast Texas (the Beaumont-Port Arthur area).

Generally, undocumented immigrants have the highest economic and demographic impact in the Border region, but they are a factor in the state's more urbanized areas as well. In all but one case (the Middle Rio Grande COG), Border COGs would see work force declines in excess of 20 percent (the Rio Grande, Lower Rio Grande and South Texas COGs). Even in the Middle Rio Grande COG (including Laredo), the work force impact of undocumented immigration is more than double that in the Houston-Galveston COG.

Other measures of economic impact are distributed similarly. Estimated population, employment and GSP declines would be highest along the border but also high in large metropolitan areas elsewhere in the state. The least affected regions in Texas would be those along the Louisiana and Oklahoma borders.

By 2025, a good portion of the work force and population changes would lessen, but in all regions the employment and gross regional product declines would remain sizable, indicating that the economic impact of undocu-

mented immigrants is unlikely to be replaced by other economic changes (**Exhibit 16**).

### Revenues

Estimating state government revenue attributable to undocumented immigrants is a difficult undertaking because any calculations must be based both on limited data and a number of significant assumptions about spending behavior. A review of the literature found several studies on undocumented immigrant impacts, but none that could be used as a model for Texas. Primarily, these studies focused on the impact of *all* immigrants, regardless of legal status, and the analyses focused on federal or state income tax revenue. Since Texas has no income tax, any estimate of state tax revenue must be based on its mix of consumption and business taxes.

Texas state government receives revenue from a wide variety of sources, but these generally can be grouped as tax collections, federal funding, licenses and fees and all other sources of revenue. In fiscal 2005, $29.8 billion of the state's total revenues of $65.8 billion came from tax collections. Federal revenue contributed $22.8 billion and licenses, fees, fines and penalties accounted for almost $6.2 billion. Other sources, such as interest income and lottery proceeds, generated the rest.

For the purposes of this analysis, major tax sources were analyzed to determine if a significant portion of collections could be attributed to consumer spending. Similarly, some major sources of revenue from fees and fines were identified as appropriate to the analysis. Sources of revenue excluded from the analysis include federal revenue and all other sources that could not be attributed directly to consumer behavior. While the state generates revenue from literally hundreds of taxes and fees, this estimate is based solely on revenue sources reflecting spending by undocumented immigrants.

State revenues included in the analysis can be grouped in five categories: consumption taxes and fees, lottery proceeds, utility taxes, court fees and all other revenue. In addition, local school property tax revenue is estimated. Consumption tax revenue totals are composed primarily of revenue from the sales tax, motor vehicle sales and use tax, gasoline tax, alcoholic beverage taxes, cigarette and tobacco taxes and the hotel tax.

Estimated revenue for each tax is calculated based on information from two sources. The Pew Hispanic Center produces data on average income and demographic characteristics of undocumented immigrants nationwide (again, no detailed demographic data are available at the state level). The estimate of annual average family income used in this analysis is $27,400. In addition,

STATES000032
NJAPP0362

## *Special Report:* Undocumented Immigrants in Texas

data from the Comptroller's tax incidence model shows the tax impact for households at the estimated average income level.

State utility tax revenue mostly comprises the gas, electric, and water utility tax and this estimate uses the same basic data on average income along with the final incidence impact for this tax. Similarly, local school property tax revenue is based on the same data and the incidence specific to the school property tax.

Estimated lottery revenue is based on a Lottery Commission study of the percent of the population that plays lottery games and the average amount spent by each income

level. Court costs and fees were calculated on a per capita basis since they are largely unrelated to income.

"All other revenue" consists of a number of smaller consumer taxes and fees that may well include some amounts paid by undocumented immigrants, but for which no data exist to base an estimate. The largest of these sources is higher education tuition; other sources include state park fees and the fireworks tax. This estimate assumes that undocumented immigrants contribute to the state through these revenues at the same rate as for the major consumption taxes and fees except for higher education tuition and fees. These contributions were calculated in proportion to higher education student enrollment.

**EXHIBIT 16**
**Estimated Regional Effects of the Loss of 1.4 Million**
**Undocumented Immigrants from Texas in 2005**

| Council of Government Region | Percent Change from Baseline in 2005 | | | | Percent Change from Baseline in 2025 | | | |
|---|---|---|---|---|---|---|---|---|
| | Labor Force | Population | Employment | Gross Regional Product | Labor Force | Population | Employment | Gross Regional Product |
| South Texas | -22.7% | -16.4% | -7.6% | -7.4% | -7.3% | -6.8% | -6.4% | -5.2% |
| Rio Grande | -20.7% | -15.3% | -6.9% | -6.8% | -6.4% | -6.0% | -5.8% | -4.7% |
| Lower Rio Grande | -20.6% | -14.8% | -7.9% | -8.1% | -6.5% | -6.2% | -6.4% | -5.7% |
| Middle Rio Grande | -17.9% | -13.0% | -5.2% | -4.7% | -4.3% | -4.2% | -4.0% | -2.8% |
| Houston-Galveston | -7.1% | -6.7% | -2.7% | -2.4% | -2.6% | -3.7% | -2.5% | -2.0% |
| Permian Basin | -6.0% | -5.3% | -1.9% | -1.6% | -1.9% | -2.8% | -1.7% | -1.3% |
| North Central Texas | -5.5% | -5.3% | -2.0% | -1.8% | -1.7% | -2.5% | -1.7% | -1.2% |
| Alamo | -5.0% | -4.1% | -1.9% | -1.9% | -1.5% | -1.6% | -1.5% | -1.3% |
| Capital Area | -4.3% | -3.9% | -2.0% | -1.8% | -1.3% | -1.5% | -1.4% | -1.0% |
| Panhandle | -4.3% | -3.8% | -1.2% | -1.1% | -1.1% | -1.8% | -1.1% | -0.8% |
| Concho Valley | -4.0% | -3.3% | -1.3% | -1.2% | -1.0% | -1.1% | -1.0% | -0.8% |
| Heart of Texas | -3.2% | -2.8% | -1.3% | -1.3% | -1.1% | -1.3% | -1.1% | -1.0% |
| Golden Crescent | -3.0% | -2.4% | -1.3% | -1.3% | -1.2% | -1.3% | -1.1% | -1.1% |
| Coastal Bend | -3.0% | -2.4% | -1.3% | -1.2% | -1.2% | -1.2% | -1.1% | -1.0% |
| Brazos Valley | -2.9% | -2.7% | -1.7% | -1.7% | -1.6% | -2.0% | -1.6% | -1.5% |
| Deep East Texas | -2.5% | -2.3% | -1.2% | -1.1% | -1.2% | -1.4% | -1.1% | -0.9% |
| East Texas | -2.5% | -2.4% | -1.1% | -1.1% | -1.1% | -1.5% | -1.1% | -0.9% |
| South Plains | -2.4% | -2.1% | -1.0% | -1.0% | -0.9% | -1.1% | -0.9% | -0.8% |
| Central Texas | -2.4% | -1.6% | -0.7% | -0.7% | -1.2% | -0.6% | -0.6% | -0.5% |
| West Central Texas | -2.1% | -1.7% | -0.8% | -0.8% | -0.7% | -0.9% | -0.7% | -0.6% |
| Texoma | -2.0% | -1.9% | -1.0% | -0.9% | -1.0% | -1.3% | -0.9% | -0.6% |
| Ark-Tex | -2.0% | -2.0% | -0.8% | -0.8% | -0.8% | -1.4% | -0.8% | -0.6% |
| Nortex | -1.8% | -1.4% | -0.6% | -0.5% | -0.6% | -0.6% | -0.5% | -0.4% |
| South East Texas | -1.7% | -1.7% | -1.0% | -0.9% | -1.0% | -1.4% | -1.0% | -0.8% |

*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

Carole Keeton Strayhorn, Texas Comptroller   19

**Special Report: Undocumented Immigrants in Texas**

**EXHIBIT 17**
**Estimated Revenue from Undocumented Immigrants**
**Fiscal 2005**
**(in millions)**

| Revenue Source | Total Revenue for Selected Taxes and Fees | Estimated Revenue from Undocumented Immigrants | Percent of Total |
|---|---|---|---|
| Major Consumption Taxes and Fees | $23,798.7 | $866.7 | 3.6% |
| Lottery | $1,584.1 | $60.9 | 3.8% |
| Utilities-Related | $664.0 | $19.5 | 2.9% |
| Court Costs and Fees | $337.9 | $20.6 | 6.1% |
| All Other Revenue | $1,640.5 | $31.2 | 1.9% |
| State Revenue Subtotal | $28,025.1 | $999.0 | 3.6% |
| School Property Tax | $20,194.9 | $582.1 | 2.9% |
| Total Estimated Revenue | $48,220.0 | $1,581.1 | 3.3% |

Note: Amounts may not add due to rounding.
*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

As shown in **Exhibit 17**, estimated fiscal 2005 revenue to the state from undocumented immigrants in Texas is about $1.0 billion, or about 3.6 percent of the $28 billion in state revenue considered in this analysis. In addition, an estimated $582.1 million in school property tax revenue can be attributed to undocumented immigrants, or about 2.9 percent of the statewide total. Undocumented immigrants, thus, contributed nearly $1.6 billion in estimated revenue as taxpayers in fiscal 2005.

## VII. Conclusion

The immigration debate has become more heated in 2006. Congressional hearings were held across the U.S. to discuss the impact of undocumented immigrants on the economy and the culture. At the same time, two distinctly different pieces of legislation were voted out of the U.S. House and Senate.

*The Comptroller's office estimates the absence of the estimated 1.4 million undocumented immigrants in Texas in fiscal 2005 would have been a loss to our Gross State Product of $17.7 billion. Also, the Comptroller's office estimates that state revenues collected from undocumented immigrants exceed what the state spent on services, with the difference being $424.7 million* (**Exhibit 18**).

The largest cost factor was education, followed by incarceration and healthcare. Consumption taxes and fees, the largest of which is the sales tax, were the largest revenue generators from undocumented immigrants.

While not the focus of this report, some local costs and revenues were estimated. State-paid health care costs are a small percentage of total health care spending for undocumented immigrants. The Comptroller estimates cost to hospitals not reimbursed by state funds

**EXHIBIT 18**
**State Costs, Revenues and Economic Impact**
**to Texas of Undocumented Immigrants**
**Fiscal Year 2005**
**(in millions)**

| Costs | |
|---|---|
| Education | -$967.8 |
| Healthcare | -$58.0 |
| Incarceration | -$130.6* |
| Total | -$1,156.4 |
| **Revenues** | |
| State Revenue | $999.0 |
| School Property Tax | $582.1 |
| Total | **$1,581.1** |
| Net Impact to State | **$424.7** |
| **Impact on the Economy** | |
| Gross State Product | $17,700.0 |

Notes: Costs are to the state, not local government, special districts or hospitals.
Economic Impact reports loss to Gross State Product in Fixed 2000 dollars.
State costs for higher education are slightly overstated. "State Expenditures" includes all state costs for Section 54.052(j). Not all are undocumented.
*Estimate of incarceration costs is for Fiscal Year 2006.
*Source: Carole Keeton Strayhorn, Texas Comptroller of Public Accounts.*

totaled $1.3 billion in 2004. Similarly, 2005 local costs for incarceration are estimated to be $141.9 million. The Comptroller estimates that undocumented immigrants paid more than $513 million in fiscal 2005 in local taxes, including city, county and special district sales and property taxes. *While state revenues exceed state expenditures for undocumented immigrants, local governments and hospitals experience the opposite, with the estimated difference being $928.9 million for 2005.*

**STATES000034**
NJAPP0364

## *Special Report:* Undocumented Immigrants in Texas

# Endnotes

1   U.S. Census Bureau, "Census 2000 Brief", December 2003 and http://www.census.gov/population/www/documentation/twps0029/tab01.html. (Last visited August 9, 2006.)

2   U.S. Census Bureau, "QuickFacts," http://quickfacts.census.gov/qfd/meta/long_101614.htm. (Last visited June 14, 2006.)

3   U.S. Census Bureau, Census 2000 Summary File 3, PCT19. Place of Birth for the Foreign-Born Population: Texas (County).

4   U.S. Census Bureau, Census 2000 Summary File 3, PCT19. Place of Birth for the Foreign-Born Population: Texas (County) and Census 1990 Summary Tape File (STF-3), PO42. Place of Birth.

5   Pew Hispanic Center, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Washington, D.C., March 7, 2006), p. 4.

6   Pew Hispanic Center, *Unauthorized Migrants: Numbers and Characteristics* (Washington, D.C., June 14, 2005), p. 11.

7   Pew Hispanic Center, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Washington, D.C., March 7, 2006), p. 1.

8   Pew Hispanic Center, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Washington, D.C., March 7, 2006), pp. 5-6.

9   Pew Hispanic Center, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.* (Washington, D.C., March 7, 2006), pp. 10-11.

10   Hunter, James and Craig Howley, *Undocumented Children in Schools: Successful Strategies and Policies*, September, 1990, pp. 1-5.

11   Interview with Jeff Passel, Pew Hispanic Center, Washington, D.C., May 23, 2006. Passel said there were 140,000 undocumented immigrant children in K-12. Based on a 2004 GAO report, the Comptroller staff estimated 89.3 percent were in public school.

12   U.S. General Accounting Office, *Illegal Alien School Children: Issues in Estimating State-by-State Costs* (Washington, D.C., June, 2004), pp. 12-13.

13   Federation for American Immigration Reform, *The Costs of Illegal Immigration to Texans* (Washington, D.C., April, 2005), pp. 7 9.

14   Urban Institute, *Fiscal Impacts of Undocumented Aliens: Selected Estimates for Seven States* (Washington, D.C., September, 1994), Table 4.18.

15   Texas Health and Human Services Commission, *Texas Medicaid in Perspective, Fifth Edition* (Austin, Texas, June, 2004), p. 1-1.

16   U.S. Department of Health and Human Services, Health Resources and Services Administration, Maternal and Child Health Bureau. *Child Health USA 2004* (Rockville, Maryland, 2004), p. 1.

17   E-mail communication, Dave Wanser, deputy commissioner for Behavioral and Community Health services, July 6, 2006.

18   Texas Department of State Health Services, *Operating Budget For Fiscal Year 2006* (Austin, Texas, December 1, 2005).

19   Ball, Andrea, "New Mental Health System Under Way", *Austin American-Statesman* (October 20, 2004).

20   Hegstrom, Edward "Mexico More Effective Than U.S. At Immunizing Children" *Houston Chronicle* (December 22, 2002) viewed at Vaccination News Home Page, http://www.vaccinationnews.com/DailyNews/December2002/MexicoMore22.htm. (Last viewed June 17, 2006.)

21   Interview with Carla Contreras, Region 1 Education Service Center, Edinburg, Texas, July 27, 2006; and Laredo and McAllen ISDs, July 27, 2006.

22   Texas Department of State Health Services, "School-based Health Centers," http://www.dshs.state.tx.us/schoolhealth/healctr.shtm. (Last visited May 18, 2006.)

23   Texas Association of School-based Health Centers, http://www.tasbhc.org. (Last visited May 16, 2006.)

24   Texas Department of State Health Services, School-Based Health Centers, http://www.dshs.state.tx.us/schoolhealth. (Last visited July 5, 2006.)

25   Texas Department of State Health Services, *Operating Budget For Fiscal Year 2006* (Austin, Texas, December 1, 2005).

26   Texas S. B. 1, 69th Leg., First Called Sess., Texas Health and Safety Code, Chapter 61; and Caton M. Fenz, "Providing Health Care to the Uninsured in Texas: A Guide for County Officials." The Access Project, September 2000.

27   Texas Department of State Health Services, "CIHCP Directory of County," www.dshs.state.tx.us/cihcp/CCD_0406.pdf. (Last visited August 8, 2006.)

28   Tex. Health & Safety Code, § 61.002.

29   Texas Department of State Health Services, *County Indigent Health Care Program Provider Manual*, (Austin, Texas, September, 2001); and Texas Department of State Health Services, CIHCP Directory of County, www.dshs.state.tx.us/cihcp/CCD_0406.pdf. (Last visited August 8, 2006.)

30   Texas Department of State Health Services, *County Indigent Health Care Program Provider Manual*, (Austin, Texas, September, 2001); and Texas Department of State Health Services, "CIHCP Directory of County," www.dshs.state.tx.us/cihcp/CCD_0406.pdf. (Last visited August 8, 2006.)

31   Preston, Julia, "Texas Hospitals Reflect Debate on Immigration," *New York Times* (July 18, 2006).

32   Gordon, Jennifer, "The Health Insurance Gamble," *Dallas Business Journal* (April 21, 2006).

33   National Conference of State Legislatures, "Federally Qualified Health Centers," http://www.ncsl.org/programs/health/fqhc.htm. (Last visited May 19, 2006.)

34   National Association of Community Health Centers, Inc., "Fact Sheet," August 2005, www.nachc.com/research/Files/IntrotoHealthCenters8.05.pdf. (Last visited August 8, 2006.)

35   National Association of Community Health Centers, Inc., "Fact Sheet," August 2005, www.nachc.com/research/Files/IntrotoHealthCenters8.05.pdf. (Last visited August 8, 2006.)

36   Texas Association of Community Health Centers, "Fact Sheet," www.tachc.org/Programs/Advocacy/2006%20Fact%20Sheet%20updated.pdf. (Last visited August 8, 2006.)

37   CHASSIS, Interview Analysis, http://www.medicaider.com/medicaid/manager/ListInterviews.asp?next=AnalyzeInterviews.asp. (Last visited July 25, 2006.)

38   The Access Project is a national health care policy initiative supported by the Robert Wood Johnson Foundation and the Anne E. Casey Foundation. For a lengthy discussion of indigent health care in Texas, see "Providing Health Care to the Uninsured in Texas: A Guide for County Officials," Caton M. Fenz, The Access Project, September 2000.

39   "Governor Schwarzengger and Other Governors Call on Congress for More Federal Funding to Offset Criminal Alien Costs," *States News Service* (April 5, 2006).

STATES000035
NJAPP0365

## *Special Report:* Undocumented Immigrants in Texas

40  U.S. Government Accountability Office, *Information on Criminal Aliens Incarcerated in Federal and State Prisons and Local Jails* (Washington, D.C., April 7, 2005), (GAO-05-337R).

41  US/Mexico Boarders Coalition, At the Cross Roads: *US/Mexico Boarder Counties in Transition* (Washington, D.C., March, 2006), pp. 13-11 and 13-12.

42  Interview with Faith Whitley, supervisor, Immigration Customs and Enforcement, Huntsville, Texas, May 19, 2006.

43  Telephone interview with Jeff Baldwin, legislative liaison, Texas Board of Criminal Justice, Austin, Texas, June 6, 2006.

44  Letter from Gary Johnson, executive director, Texas Department of Criminal Justice, to the Honorable Ray Allen, Chair, House Corrections Committee, May 20, 2003.

45  Interview with Faith Whitley, supervisor, Immigration Customs and Enforcement, Huntsville, Texas, May 19, 2006.

46  E-mail communication from Sherry Koenig, assistant budget director, Budget Office, Texas Department of Criminal Justice, June 28, 2006; and telephone interview with Jeff Baldwin, legislative liaison, Texas Board of Criminal Justice, Austin, Texas, December 12, 2005.

47  "Governor Schwarzenegger and Other Governors Call on Congress for More Federal Funding to Offset Criminal Alien Costs," *States News Service* (April 5, 2006).

48  Legislative Budget Board, *Current Correctional Population Indicators, Criminal Justice Uniform Cost Report Tables, Fiscal Years 2003-2004* (Austin, Texas, January, 2005).

49  U.S. Government Accountability Office, *Information on Criminal Aliens Incarcerated in Federal and State Prisons and Local Jails* (Washington, D.C., April 7, 2005), (GAO-05-337R).

50  Telephone interview with Jeff Baldwin, legislative liaison, Texas Board of Criminal Justice, June 16, 2006.

51  E-mail communication from Bob Moore, executive director's office, Texas Department of Criminal Justice, May 24, 2006.

52  Huddle, Donald, *The Net Costs of Immigration to Texas*, March 1994, Carrying Capacity Network, Washington, D.C. and Urban Institute, *Fiscal Impacts of Undocumented Aliens: Selected Estimates for Seven States* (Washington, D.C., September, 1994).

53  U.S. Government Accountability Office, *Information on Criminal Aliens Incarcerated in Federal and State Prisons and Local Jails* (Washington, D.C., April 7, 2005), (GAO-05-337R).

54  U.S. Bureau of Justice Assistance, p. 13-11

55  U.S. Department of Justice, "FY2005 SCAAP Payment List", www.ojp.usdoj.gov/BJA/grant/05SCAAP.pdf. (Last visited August 14, 2006.)

56  The total reported in the US/MBCC report was $23.3 million, however, this report includes $21.5 million after subtracting about $1.8 million in medical care costs.

57  Webb County was included although it was not the 15th highest grant recipient to ensure that border communities with the largest populations were included.

58  Pew Hispanic Center, *Estimates of the Unauthorized Migrant Population for states based on the March 2005 CPS* (Washington, D.C., April 26, 2006).

59  Migration Policy Institute, *Migration Information Source: Age-Sex Pyramids*, http://www.migrationinformation.org/DataTools/pyramids.cfm. (Last visited 5/3/2006.)

## *Special Report*

**CAROLE KEETON STRAYHORN • Texas Comptroller of Public Accounts**

This publication is not copyrighted and may be reproduced. The Comptroller of Public Accounts would appreciate credit for material used and a copy of the reprint.

**Special Reports**
**Carole Keeton Strayhorn**
**Texas Comptroller of Public Accounts**
**P.O. Box 13528**
**Austin, TX  78711-3528**

For more information, call 1-800-531-5441, extension 3-4070.

This publication is also available on the World Wide Web by accessing the Comptroller's Window on State Government Web site at <**http://www.window.state.tx.us/specialrpt/undocumented/**>.

Texas Comptroller of Public Accounts publication #96-1224, December 2006.



PRSRT STD
US POSTAGE PAID
AUSTIN, TX
PERMIT NO. 1411

# Exhibit 32

NJAPP0367

**Approximate Active DACA Recipients:**
**State of Residence**
As of September 4, 2017

| State or Territory of Residence | Number (rounded) | Percent |
|---|---|---|
| **Total** | **689,800** | **100.0** |
| California | 197,900 | 28.7 |
| Texas | 113,000 | 16.4 |
| Illinois | 35,600 | 5.2 |
| New York | 32,900 | 4.8 |
| Florida | 27,000 | 3.9 |
| Arizona | 25,500 | 3.7 |
| North Carolina | 25,100 | 3.6 |
| Georgia | 21,600 | 3.1 |
| New Jersey | 17,400 | 2.5 |
| Washington | 16,300 | 2.4 |
| Colorado | 15,500 | 2.3 |
| Nevada | 12,400 | 1.8 |
| Oregon | 10,200 | 1.5 |
| Virginia | 10,100 | 1.5 |
| Indiana | 9,000 | 1.3 |
| Utah | 8,900 | 1.3 |
| Maryland | 8,100 | 1.2 |
| Tennessee | 7,900 | 1.1 |
| Wisconsin | 6,700 | 1.0 |
| Oklahoma | 6,100 | 0.9 |
| South Carolina | 6,000 | 0.9 |
| New Mexico | 6,000 | 0.9 |
| Massachusetts | 5,900 | 0.9 |
| Kansas | 5,900 | 0.9 |
| Minnesota | 5,500 | 0.8 |
| Michigan | 5,400 | 0.8 |
| Pennsylvania | 4,900 | 0.7 |
| Arkansas | 4,700 | 0.7 |
| Ohio | 4,000 | 0.6 |
| Alabama | 3,900 | 0.6 |
| Connecticut | 3,800 | 0.6 |
| Missouri | 3,300 | 0.5 |
| Nebraska | 3,100 | 0.5 |
| Idaho | 2,900 | 0.4 |
| Kentucky | 2,800 | 0.4 |
| Iowa | 2,500 | 0.4 |
| Louisiana | 1,800 | 0.3 |

U.S. Citizenship and Immigration Services

NJAPP0368

**Approximate Active DACA Recipients:**
**State of Residence**
As of September 4, 2017

| State or Territory of Residence | Number (rounded) | Percent |
|---|---|---|
| Mississippi | 1,200 | 0.2 |
| Delaware | 1,100 | 0.2 |
| Rhode Island | 970 | 0.1 |
| District of Columbia | 920 | 0.1 |
| Wyoming | 450 | 0.1 |
| Hawaii | 320 | 0.1 |
| New Hampshire | 240 | 0.0 |
| South Dakota | 220 | 0.0 |
| Puerto Rico | 120 | 0.0 |
| West Virginia | 100 | 0.0 |
| North Dakota | 80 | 0.0 |
| Alaska | 70 | 0.0 |
| Montana | 60 | 0.0 |
| U.S. Virgin Islands | 40 | 0.0 |
| Maine | 40 | 0.0 |
| Armed Forces overseas | 30 | 0.0 |
| Guam | 20 | 0.0 |
| Northern Mariana Islands | 10 | 0.0 |
| Vermont | 10 | 0.0 |
| Other territories | 10 | 0.0 |
| Not Available | 4,180 | 0.6 |

Notes:
- This table refers to individuals who were granted Deferred Action for Childhood Arrivals (DACA) as of September 4, 2017. The number of individuals who were ever granted DACA as of September 4, 2017 was approximately 800,000. This total excludes persons who applied for an initial grant of DACA and were not approved, as well as initial DACA requestors that were approved at first, but later had their initial request denied or terminated. Nearly 40,000 DACA recipients have adjusted to lawful permanent resident (LPR) status, leaving about 760,000 who are not LPRs. About 70,000 individuals who were granted for DACA either failed to renew at the end of their 2-year validity period or were denied on renewal, leaving approximately 690,000 active DACA recipients as of September 4, 2017.
- State of residence at the time of most recent application.
- Totals do not add due to rounding.
- Territories with less than 10 residents are included in other.
- Not available: data are not available in electronic systems.

Source: U.S. Citizenship and Immigration Services, CLAIMS3 and ELIS Systems.

# Exhibit 33

NJAPP0370

**U.S. Citizenship and Immigration Services**

**Number of Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake and Case Status, Fiscal Year 2012-2018 (May 31, 2018)**

| Period | Requests by Intake and Case Status | | | | | | |
|---|---|---|---|---|---|---|---|
| | Intake[1] | | | | Case Review[6] | | Pending[9] |
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Approved[7] | Denied[8] | |
| **Fiscal Year - Total[6]** | | | | | | | |
| 2012 | 152,431 | 5,395 | 157,826 | 3,629 | 1,680 | - | 150,751 |
| 2013 | 427,617 | 16,350 | 443,967 | 1,697 | 470,351 | 10,968 | 97,025 |
| 2014 | 238,900 | 24,887 | 263,787 | 952 | 158,330 | 20,990 | 156,538 |
| 2014 Initial | 122,460 | 19,064 | 141,524 | 488 | 136,100 | 20,987 | 62,333 |
| 2014 Renewal | 116,440 | 5,823 | 122,263 | 464 | 22,230 | 3 | 94,205 |
| 2015 | 448,857 | 35,474 | 484,331 | 1,781 | 509,969 | 21,350 | 73,902 |
| 2015 Initial | 85,304 | 7,150 | 92,454 | 338 | 90,633 | 19,069 | 37,861 |
| 2015 Renewal | 363,553 | 28,324 | 391,877 | 1,443 | 419,336 | 2,281 | 36,041 |
| 2016 | 260,701 | 12,317 | 273,018 | 1,035 | 198,544 | 14,435 | 120,701 |
| 2016 Initial | 73,349 | 1,151 | 74,500 | 291 | 52,710 | 11,399 | 46,231 |
| 2016 Renewal | 187,352 | 11,166 | 198,518 | 744 | 145,834 | 3,036 | 74,470 |
| 2017 | 472,850 | 43,455 | 516,305 | 1,884 | 462,343 | 13,310 | 117,502 |
| 2017 Initial | 45,602 | 44 | 45,646 | 182 | 47,290 | 9,242 | 35,193 |
| 2017 Renewal | 427,248 | 43,411 | 470,659 | 1,702 | 415,053 | 4,068 | 82,309 |
| 2018 | 137,993 | 23,231 | 161,224 | 826 | 205,659 | 8,128 | 41,556 |
| 2018 Initial | 1,495 | 2 | 1,497 | 9 | 20,573 | 4,904 | 11,198 |
| 2018 Renewal | 136,498 | 23,229 | 159,727 | 817 | 185,086 | 3,224 | 30,358 |
| Total Cumulative | 2,139,349 | 161,109 | 2,300,458 | 1,459 | 2,006,876 | 89,181 | 41,556 |
| Total Cumulative Initial | 908,258 | 49,156 | 957,414 | 619 | 819,337 | 76,569 | 11,198 |
| Total Cumulative Renewal | 1,231,091 | 111,953 | 1,343,044 | 840 | 1,187,539 | 12,612 | 30,358 |

| Period | Intake[1] | | | | Case Review[6] | | |
|---|---|---|---|---|---|---|---|
| | Requests Accepted[2] | Requests Rejected[3] | Total Requests Received[4] | Average Accepted/Day[5] | Approved[7] | Denied[8] | Pending[9] |
| *Fiscal Year 2018 by Quarter[13]* | | | | | | | |
| Q1. October - December | 29,527 | 14,537 | 44,064 | 1,139 | 98,639 | 2,545 | 45,820 |
| Q1. October - December Initial | 95 | 1 | 96 | 4 | 5,585 | 1,664 | 28,036 |
| Q1. October - December Renewal | 29,432 | 14,536 | 43,968 | 1,135 | 93,054 | 881 | 17,784 |
| Q2. January-March | 64,501 | 6,239 | 70,740 | 1,141 | 55,049 | 3,910 | 51,283 |
| Q2. January - March Initial | 977 | 0 | 977 | 17 | 9,637 | 2,162 | 17,208 |
| Q2. January - March Renewal | 63,524 | 6,239 | 69,763 | 1,123 | 45,412 | 1,748 | 34,075 |
| Q3. April - June | 43,965 | 2,455 | 46,420 | 1,022 | 51,971 | 1,673 | 41,556 |
| Q3. April - June Initial | 423 | 1 | 424 | 10 | 5,351 | 1,078 | 11,198 |
| Q3. April - June Renewal | 43,542 | 2,454 | 45,996 | 1,013 | 46,620 | 595 | 30,358 |

D – Data withheld to protect requestors' privacy.

- Represents zero.

[1] Refers to a request for USCIS to consider deferred removal action for an individual based on guidelines described in the Secretary of Homeland Security's memorandum issued June 15, 2012.

Each request is considered on a case-by-case basis.

See http://www.uscis.gov/childhoodarrivals.

[2] The number of new requests accepted at a Lockbox during the reporting period.

[3] The number of requests rejected at a Lockbox during the reporting period.

[4] The number of requests that were received at a Lockbox during the reporting period.

[5] The number of requests accepted per day at a Lockbox as of the end of the reporting period. Also note the average accepted per day for initial plus renewal will not equal the total average.

[6] The number of new requests received and entered into a case-tracking system during the reporting period.

[7] The number of requests approved during the reporting period.

[8] The number of requests that were denied, terminated, or withdrawn during the reporting period.

[9] The number of requests awaiting a decision as of the end of the reporting period.

NOTE: 1. Some requests approved or denied may have been received in previous reporting periods.

2. The report reflects the most up-to-date estimate available at the time the report is generated.

3. USCIS previously discovered that the query code used to generate this report had some flaws affecting the data in the "Pending" fields, such that the data in this field was over inclusive because it included cases that were not pending (e.g., cases that had been administratively closed or withdrawn). USCIS understands that it has corrected these query code issues and that this report provides a more accurate reflection of pending cases. Note that if this report is compared to versions prior to the March 31, 2018 version that USCIS has published on its website, the prior versions reflect over inclusive data in the "Pending" fields.

4. The Quarterly Report totals may not match the totals provided within the Demographics Reports due to differences in how the data is generated.

Source: Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigration Services Centralized Operation Repository (eCISCOR), May 2018

NJAPP0372

| Top Countries of Origin | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Grand Total | 908,258 | 1,231,091 | 2,139,349 | 819,337 | 1,187,539 | 2,006,876 |
| Mexico | 707,370 | 966,230 | 1,673,600 | 645,311 | 932,709 | 1,578,020 |
| El Salvador | 34,497 | 46,917 | 81,414 | 29,540 | 45,094 | 74,634 |
| Guatemala | 24,907 | 30,862 | 55,769 | 20,786 | 29,645 | 50,431 |
| Honduras | 22,697 | 29,281 | 51,978 | 19,007 | 28,237 | 47,244 |
| Peru | 9,830 | 14,646 | 24,476 | 9,261 | 14,089 | 23,350 |
| South Korea | 7,901 | 14,700 | 22,601 | 7,409 | 13,940 | 21,349 |
| Brazil | 8,625 | 11,147 | 19,772 | 7,569 | 10,803 | 18,372 |
| Ecuador | 7,795 | 10,484 | 18,279 | 6,848 | 10,063 | 16,911 |
| Colombia | 7,296 | 10,182 | 17,478 | 6,717 | 9,848 | 16,565 |
| Philippines | 5,127 | 7,671 | 12,798 | 4,770 | 7,389 | 12,159 |
| Argentina | 5,263 | 7,088 | 12,351 | 4,925 | 6,873 | 11,798 |
| India | 3,788 | 5,477 | 9,265 | 3,242 | 5,242 | 8,484 |
| Jamaica | 4,448 | 4,950 | 9,398 | 3,507 | 4,767 | 8,274 |
| Venezuela | 3,489 | 4,743 | 8,232 | 3,174 | 4,604 | 7,778 |
| Dominican Republic | 3,840 | 4,196 | 8,036 | 3,247 | 4,070 | 7,317 |
| Uruguay | 2,643 | 3,357 | 6,000 | 2,468 | 3,251 | 5,719 |
| Bolivia | 2,238 | 3,303 | 5,541 | 2,113 | 3,199 | 5,312 |
| Costa Rica | 2,290 | 3,143 | 5,433 | 2,094 | 3,025 | 5,119 |
| Poland | 2,005 | 2,651 | 4,656 | 1,855 | 2,558 | 4,413 |
| Chile | 1,908 | 2,702 | 4,610 | 1,790 | 2,627 | 4,417 |
| Pakistan | 1,948 | 2,677 | 4,625 | 1,720 | 2,567 | 4,287 |
| Nicaragua | 1,908 | 2,395 | 4,303 | 1,648 | 2,313 | 3,961 |
| Tobago | 2,442 | 1,717 | 4,159 | 2,095 | 1,704 | 3,799 |
| Guyana | 1,486 | 1,954 | 3,440 | 1,297 | 1,905 | 3,202 |
| Not Reported | 1,607 | 1,770 | 3,377 | 1,255 | 1,647 | 2,902 |
| All Others | 30,910 | 36,848 | 67,758 | 25,689 | 35,370 | 61,059 |

D  Data withheld to protect requestors' privacy.

-  Represents zero.

[1]  The number of requests that were accepted to date of the reporting period.

[2]  The number of requests that were approved to date of the reporting period.

[3]  All fields with a blank in the country of birth field are included in the field "not reported."

NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate data available at the time the report is generated.

3) Ranked by total approvals.

Source:  Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigration Services Centralized Operation Repository (eCISCOR), May 2018.

| Residence | Accepted to Date[1] | | | Approved to Date[2] | | |
|---|---|---|---|---|---|---|
| | Initials | Renewals | Total | Initials | Renewals | Total |
| Grand Total | 908,258 | 1,231,091 | 2,139,349 | 819,337 | 1,187,539 | 2,006,876 |
| California | 246,429 | 279,313 | 525,742 | 228,478 | 274,170 | 502,648 |
| Texas | 142,773 | 149,297 | 292,070 | 127,144 | 146,710 | 273,854 |
| New York | 51,572 | 91,472 | 143,044 | 44,955 | 89,487 | 134,442 |
| Florida | 41,685 | 75,536 | 117,221 | 35,338 | 74,036 | 109,374 |
| Illinois | 46,330 | 49,676 | 96,006 | 43,313 | 48,639 | 91,952 |
| New Jersey | 26,542 | 41,524 | 68,066 | 23,323 | 40,709 | 64,032 |
| Arizona | 31,067 | 31,980 | 63,047 | 28,400 | 31,258 | 59,658 |
| North Carolina | 29,909 | 29,200 | 59,109 | 27,786 | 28,634 | 56,420 |
| Georgia | 29,091 | 30,820 | 59,911 | 24,809 | 30,170 | 54,979 |
| Washington | 20,007 | 23,464 | 43,471 | 18,392 | 23,018 | 41,410 |
| Colorado | 19,378 | 19,249 | 38,627 | 17,619 | 18,842 | 36,461 |
| Virginia | 14,378 | 21,515 | 35,893 | 12,746 | 21,041 | 33,787 |
| Nevada | 14,354 | 16,148 | 30,502 | 13,344 | 15,843 | 29,187 |
| Maryland | 11,868 | 17,921 | 29,789 | 10,295 | 17,551 | 27,846 |
| Massachusetts | 9,976 | 19,608 | 29,584 | 8,589 | 19,185 | 27,774 |
| Oregon | 12,224 | 12,715 | 24,939 | 11,506 | 12,477 | 23,983 |
| Pennsylvania | 7,491 | 14,848 | 22,339 | 6,436 | 14,548 | 20,984 |
| Indiana | 10,848 | 10,863 | 21,711 | 10,022 | 10,675 | 20,697 |
| Utah | 10,634 | 9,822 | 20,456 | 9,850 | 9,630 | 19,480 |
| Michigan | 7,587 | 12,189 | 19,776 | 6,783 | 11,904 | 18,687 |
| Tennessee | 9,447 | 9,649 | 19,096 | 8,515 | 9,457 | 17,972 |
| Minnesota | 7,127 | 9,861 | 16,988 | 6,502 | 9,632 | 16,134 |
| Wisconsin | 8,259 | 8,436 | 16,695 | 7,729 | 8,287 | 16,016 |
| Connecticut | 5,865 | 9,543 | 15,408 | 5,223 | 9,358 | 14,581 |
| Oklahoma | 7,573 | 7,763 | 15,336 | 7,002 | 7,638 | 14,640 |
| Kansas | 7,403 | 7,487 | 14,890 | 6,933 | 7,345 | 14,278 |
| New Mexico | 7,504 | 6,953 | 14,457 | 6,945 | 6,838 | 13,783 |
| South Carolina | 7,266 | 7,197 | 14,463 | 6,552 | 7,056 | 13,608 |
| Ohio | 5,485 | 8,882 | 14,367 | 4,729 | 8,679 | 13,408 |
| Arkansas | 5,680 | 5,520 | 11,200 | 5,198 | 5,410 | 10,608 |
| Alabama | 4,870 | 4,931 | 9,801 | 4,370 | 4,841 | 9,211 |
| Missouri | 3,995 | 5,281 | 9,276 | 3,678 | 5,185 | 8,863 |
| Nebraska | 3,852 | 4,285 | 8,137 | 3,476 | 4,198 | 7,674 |
| Kentucky | 3,522 | 4,162 | 7,684 | 3,147 | 4,081 | 7,228 |
| Iowa | 3,218 | 4,224 | 7,442 | 2,890 | 4,129 | 7,019 |
| Idaho | 3,429 | 3,592 | 7,021 | 3,199 | 3,523 | 6,722 |
| Louisiana | 2,496 | 3,730 | 6,226 | 2,153 | 3,661 | 5,814 |
| Rhode Island | 1,509 | 2,941 | 4,450 | 1,316 | 2,871 | 4,187 |
| Hawaii | 861 | 3,458 | 4,319 | 695 | 3,366 | 4,061 |
| Delaware | 1,645 | 2,098 | 3,743 | 1,496 | 2,070 | 3,566 |

| | | | | | |
|---|---|---|---|---|---|
| Mississippi | 1,724 | 1,896 | 3,620 | 1,501 | 1,874 | 3,375 |
| District of Columbia | 988 | 2,019 | 3,007 | 834 | 1,990 | 2,824 |
| Puerto Rico | 575 | 2,261 | 2,836 | 419 | 2,212 | 2,631 |
| New Hampshire | 480 | 1,197 | 1,677 | 415 | 1,168 | 1,583 |
| Wyoming | 699 | 703 | 1,402 | 627 | 686 | 1,313 |
| Alaska | 216 | 872 | 1,088 | 178 | 858 | 1,036 |
| South Dakota | 316 | 546 | 862 | 274 | 532 | 806 |
| Maine | 148 | 634 | 782 | 120 | 618 | 738 |
| Guam | 115 | 649 | 764 | 93 | 634 | 727 |
| North Dakota | 151 | 571 | 722 | 121 | 559 | 680 |
| Virgin Islands | 168 | 420 | 588 | 112 | 403 | 515 |
| West Virginia | 160 | 380 | 540 | 131 | 370 | 501 |
| Montana | 93 | 287 | 380 | 80 | 276 | 356 |
| Vermont | 66 | 307 | 373 | 50 | 302 | 352 |
| Armed Forces-Pacific | 33 | 146 | 179 | 29 | 142 | 171 |
| Armed Forces-Europe, Middle East, Africa, Canada | 28 | 129 | 157 | 21 | 123 | 144 |
| Armed Forces-Americas (except Canada) | 19 | 84 | 103 | 14 | 84 | 98 |
| Northern Mariana Islands | 32 | 39 | 71 | 13 | 35 | 48 |
| Palau | | 20 | 20 | | 19 | 19 |
| Not Reported | 17,098 | 140,778 | 157,876 | 13,429 | 118,502 | 131,931 |

- Represents zero.

[1] The number of requests that were accepted to date of the reporting period.

[2] The number of requests that were approved to date of the reporting period.

[3] All fields with less than 10 or a blank in the state field are included in the field "not reported."

NOTE: 1) Some requests approved or denied may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate data available at the time the report is generated.

3) Ranked by total approvals.

Source: Department of Homeland Security, U.S. Citizenship and Immigration Services, Enterprise Citizenship and Immigration Services Centralized Operation Repository (eCISCOR), May 2018

# Exhibit 34

Interrogatory No. 3

United States Citizenship and Immigration Services (USCIS)
I-821D, Consideration of Deferred Action for Childhood Arrivals
DACA Initials
Accepted Filings, Rejections, Approvals, and Denials by Month and Selected State
August 15, 2012 - June 22, 2018

| State | Received Month | Accepted Filings | Rejections | Total Received | Completion Month | Approved | Denied | Total Completions |
|---|---|---|---|---|---|---|---|---|
| Alabama | August-12 | 228 | 7 | 235 | August-12 | | | |
| Alabama | September-12 | 503 | 18 | 521 | September-12 | 10 | | 10 |
| Alabama | October-12 | 528 | 12 | 540 | October-12 | 109 | | 109 |
| Alabama | November-12 | 386 | 17 | 403 | November-12 | 278 | | 278 |
| Alabama | December-12 | 255 | 11 | 266 | December-12 | 283 | | 283 |
| Alabama | January-13 | 173 | 5 | 178 | January-13 | 266 | | 266 |
| Alabama | February-13 | 148 | 6 | 154 | February-13 | 276 | 2 | 278 |
| Alabama | March-13 | 165 | 12 | 177 | March-13 | 315 | 6 | 321 |
| Alabama | April-13 | 151 | 10 | 161 | April-13 | 169 | 10 | 179 |
| Alabama | May-13 | 133 | 10 | 143 | May-13 | 191 | 13 | 204 |
| Alabama | June-13 | 113 | 6 | 119 | June-13 | 160 | 20 | 180 |
| Alabama | July-13 | 116 | 3 | 119 | July-13 | 118 | 7 | 125 |
| Alabama | August-13 | 79 | 3 | 82 | August-13 | 126 | 12 | 138 |
| Alabama | September-13 | 64 | 5 | 69 | September-13 | 110 | 8 | 118 |
| Alabama | October-13 | 78 | 24 | 102 | October-13 | 133 | 7 | 140 |
| Alabama | November-13 | 76 | 22 | 98 | November-13 | 106 | 17 | 123 |
| Alabama | December-13 | 71 | 16 | 87 | December-13 | 72 | 8 | 80 |
| Alabama | January-14 | 61 | 12 | 73 | January-14 | 71 | 12 | 83 |
| Alabama | February-14 | 60 | 9 | 69 | February-14 | 53 | 12 | 65 |
| Alabama | March-14 | 75 | 13 | 88 | March-14 | 76 | 2 | 78 |
| Alabama | April-14 | 96 | 8 | 104 | April-14 | 63 | 9 | 72 |
| Alabama | May-14 | 81 | 6 | 87 | May-14 | 55 | 11 | 66 |
| Alabama | June-14 | 54 | 28 | 82 | June-14 | 52 | 6 | 58 |
| Alabama | July-14 | 65 | 16 | 81 | July-14 | 76 | 8 | 84 |
| Alabama | August-14 | 49 | 7 | 56 | August-14 | 57 | 15 | 72 |
| Alabama | September-14 | 62 | 15 | 77 | September-14 | 53 | 24 | 77 |
| Alabama | October-14 | 60 | 13 | 73 | October-14 | 85 | 13 | 98 |
| Alabama | November-14 | 55 | 11 | 66 | November-14 | 50 | 11 | 61 |

Interrogatory No. 3

| State | Date | | | | Date | | | |
|---|---|---|---|---|---|---|---|---|
| South Carolina | December-17 | | | | December-17 | 16 | 6 | 22 |
| South Carolina | January-18 | 2 | | 2 | January-18 | 22 | 5 | 27 |
| South Carolina | February-18 | 5 | | 5 | February-18 | 35 | 8 | 43 |
| South Carolina | March-18 | 2 | | 2 | March-18 | 30 | 8 | 38 |
| South Carolina | April-18 | 2 | | 2 | April-18 | 25 | 6 | 31 |
| South Carolina | May-18 | | | | May-18 | 18 | 8 | 26 |
| South Carolina | June-18 | | | | June-18 | 9 | 7 | 16 |
| South Carolina Total | | 7,702 | 458 | 8,160 | | 6,881 | 726 | 7,607 |
| Texas | August-12 | 6,528 | 219 | 6,747 | August-12 | | | |
| Texas | September-12 | 16,873 | 455 | 17,328 | September-12 | 61 | | 61 |
| Texas | October-12 | 19,259 | 480 | 19,739 | October-12 | 3,349 | | 3,349 |
| Texas | November-12 | 11,811 | 298 | 12,109 | November-12 | 8,659 | | 8,659 |
| Texas | December-12 | 7,104 | 183 | 7,287 | December-12 | 10,313 | | 10,313 |
| Texas | January-13 | 4,639 | 198 | 4,837 | January-13 | 10,290 | | 10,290 |
| Texas | February-13 | 5,158 | 190 | 5,348 | February-13 | 8,914 | 27 | 8,941 |
| Texas | March-13 | 5,145 | 175 | 5,320 | March-13 | 7,466 | 143 | 7,609 |
| Texas | April-13 | 4,675 | 186 | 4,861 | April-13 | 4,353 | 152 | 4,505 |
| Texas | May-13 | 4,023 | 146 | 4,169 | May-13 | 5,787 | 185 | 5,972 |
| Texas | June-13 | 3,050 | 128 | 3,178 | June-13 | 4,563 | 201 | 4,764 |
| Texas | July-13 | 2,786 | 107 | 2,893 | July-13 | 4,300 | 244 | 4,544 |
| Texas | August-13 | 2,305 | 103 | 2,408 | August-13 | 4,000 | 185 | 4,185 |
| Texas | September-13 | 2,024 | 83 | 2,107 | September-13 | 3,169 | 171 | 3,340 |
| Texas | October-13 | 1,681 | 343 | 2,024 | October-13 | 3,138 | 220 | 3,358 |
| Texas | November-13 | 1,839 | 249 | 2,088 | November-13 | 2,710 | 174 | 2,884 |
| Texas | December-13 | 1,276 | 196 | 1,472 | December-13 | 1,870 | 159 | 2,029 |
| Texas | January-14 | 1,309 | 140 | 1,449 | January-14 | 1,838 | 226 | 2,064 |
| Texas | February-14 | 1,653 | 155 | 1,808 | February-14 | 1,492 | 164 | 1,656 |
| Texas | March-14 | 2,190 | 184 | 2,374 | March-14 | 1,572 | 196 | 1,768 |
| Texas | April-14 | 2,310 | 156 | 2,466 | April-14 | 1,625 | 124 | 1,749 |
| Texas | May-14 | 2,028 | 111 | 2,139 | May-14 | 1,229 | 161 | 1,390 |
| Texas | June-14 | 1,343 | 628 | 1,971 | June-14 | 1,806 | 318 | 2,124 |
| Texas | July-14 | 1,643 | 301 | 1,944 | July-14 | 1,811 | 883 | 2,694 |
| Texas | August-14 | 1,494 | 189 | 1,683 | August-14 | 1,525 | 1,325 | 2,850 |
| Texas | September-14 | 1,453 | 119 | 1,572 | September-14 | 1,525 | 1,485 | 3,010 |
| Texas | October-14 | 1,630 | 110 | 1,740 | October-14 | 2,133 | 744 | 2,877 |
| Texas | November-14 | 1,284 | 114 | 1,398 | November-14 | 1,205 | 433 | 1,638 |

NJAPP0378

Interrogatory No. 3

12

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Texas | December-14 | 1,119 | 70 | 1,189 | December-14 | 1,931 | 720 | 2,651 |
| Texas | January-15 | 771 | 65 | 836 | January-15 | 2,132 | 630 | 2,762 |
| Texas | February-15 | 1,015 | 162 | 1,177 | February-15 | 1,004 | 365 | 1,369 |
| Texas | March-15 | 1,571 | 86 | 1,657 | March-15 | 935 | 305 | 1,240 |
| Texas | April-15 | 1,178 | 54 | 1,232 | April-15 | 705 | 392 | 1,097 |
| Texas | May-15 | 1,211 | 68 | 1,279 | May-15 | 1,017 | 252 | 1,269 |
| Texas | June-15 | 1,131 | 57 | 1,188 | June-15 | 1,034 | 256 | 1,290 |
| Texas | July-15 | 1,021 | 49 | 1,070 | July-15 | 896 | 177 | 1,073 |
| Texas | August-15 | 902 | 55 | 957 | August-15 | 932 | 156 | 1,088 |
| Texas | September-15 | 838 | 44 | 882 | September-15 | 940 | 140 | 1,080 |
| Texas | October-15 | 1,056 | 38 | 1,094 | October-15 | 791 | 124 | 915 |
| Texas | November-15 | 995 | 43 | 1,038 | November-15 | 722 | 135 | 857 |
| Texas | December-15 | 781 | 33 | 814 | December-15 | 701 | 171 | 872 |
| Texas | January-16 | 695 | 36 | 731 | January-16 | 625 | 135 | 760 |
| Texas | February-16 | 1,175 | | 1,175 | February-16 | 726 | 121 | 847 |
| Texas | March-16 | 1,422 | 1 | 1,423 | March-16 | 862 | 104 | 966 |
| Texas | April-16 | 1,167 | | 1,167 | April-16 | 701 | 85 | 786 |
| Texas | May-16 | 1,277 | 1 | 1,278 | May-16 | 749 | 140 | 889 |
| Texas | June-16 | 1,008 | | 1,008 | June-16 | 695 | 164 | 859 |
| Texas | July-16 | 834 | 1 | 835 | July-16 | 579 | 145 | 724 |
| Texas | August-16 | 878 | 1 | 879 | August-16 | 817 | 125 | 942 |
| Texas | September-16 | 812 | | 812 | September-16 | 602 | 90 | 692 |
| Texas | October-16 | 978 | | 978 | October-16 | 865 | 96 | 961 |
| Texas | November-16 | 937 | | 937 | November-16 | 838 | 85 | 923 |
| Texas | December-16 | 879 | 3 | 882 | December-16 | 1,449 | 80 | 1,529 |
| Texas | January-17 | 433 | 1 | 434 | January-17 | 1,640 | 114 | 1,754 |
| Texas | February-17 | 379 | | 379 | February-17 | 707 | 115 | 822 |
| Texas | March-17 | 616 | | 616 | March-17 | 580 | 135 | 715 |
| Texas | April-17 | 592 | | 592 | April-17 | 371 | 142 | 513 |
| Texas | May-17 | 861 | | 861 | May-17 | 371 | 138 | 509 |
| Texas | June-17 | 777 | | 777 | June-17 | 279 | 118 | 397 |
| Texas | July-17 | 775 | 1 | 776 | July-17 | 324 | 87 | 411 |
| Texas | August-17 | 795 | | 795 | August-17 | 298 | 77 | 375 |
| Texas | September-17 | 275 | | 275 | September-17 | 361 | 52 | 413 |
| Texas | October-17 | 1 | | 1 | October-17 | 352 | 84 | 436 |
| Texas | November-17 | | | | November-17 | 313 | 82 | 395 |

Interrogatory No. 3

| State | Date | | | | Date | | | |
|---|---|---|---|---|---|---|---|---|
| Texas | December-17 | 4 | | 4 | December-17 | 290 | 96 | 386 |
| Texas | January-18 | 21 | | 21 | January-18 | 534 | 93 | 627 |
| Texas | February-18 | 65 | | 65 | February-18 | 657 | 98 | 755 |
| Texas | March-18 | 74 | | 74 | March-18 | 717 | 95 | 812 |
| Texas | April-18 | 32 | | 32 | April-18 | 696 | 55 | 751 |
| Texas | May-18 | 23 | | 23 | May-18 | 557 | 139 | 696 |
| Texas | June-18 | 9 | | 9 | June-18 | 253 | 152 | 405 |
| Texas Total | | 149,896 | 6,815 | 156,711 | | 133,251 | 14,985 | 148,236 |
| West Virginia | August-12 | 7 | | 7 | August-12 | | | |
| West Virginia | September-12 | 17 | | 17 | September-12 | | | |
| West Virginia | October-12 | 13 | | 13 | October-12 | 6 | | 6 |
| West Virginia | November-12 | 13 | | 13 | November-12 | 10 | | 10 |
| West Virginia | December-12 | 3 | 2 | 5 | December-12 | 3 | | 3 |
| West Virginia | January-13 | 2 | | 2 | January-13 | 8 | | 8 |
| West Virginia | February-13 | 4 | 1 | 5 | February-13 | 9 | | 9 |
| West Virginia | March-13 | 3 | | 3 | March-13 | 8 | | 8 |
| West Virginia | April-13 | 2 | | 2 | April-13 | 2 | | 2 |
| West Virginia | May-13 | 4 | | 4 | May-13 | 1 | 1 | 2 |
| West Virginia | June-13 | 1 | | 1 | June-13 | 6 | | 6 |
| West Virginia | July-13 | 1 | 1 | 2 | July-13 | 1 | 1 | 2 |
| West Virginia | August-13 | 3 | 1 | 4 | August-13 | 1 | | 1 |
| West Virginia | September-13 | 1 | | 1 | September-13 | 3 | | 3 |
| West Virginia | October-13 | 1 | 1 | 2 | October-13 | 1 | | 1 |
| West Virginia | November-13 | | | | November-13 | 2 | | 2 |
| West Virginia | December-13 | 3 | | 3 | December-13 | 1 | | 1 |
| West Virginia | January-14 | | | | January-14 | 1 | | 1 |
| West Virginia | February-14 | | | | February-14 | 1 | | 1 |
| West Virginia | March-14 | 5 | | 5 | March-14 | 2 | | 2 |
| West Virginia | April-14 | 2 | | 2 | April-14 | 2 | | 2 |
| West Virginia | May-14 | 2 | 1 | 3 | May-14 | 3 | | 3 |
| West Virginia | June-14 | 1 | | 1 | June-14 | 1 | | 1 |
| West Virginia | July-14 | | | | July-14 | 4 | | 4 |
| West Virginia | August-14 | 2 | 2 | 4 | August-14 | 2 | | 2 |
| West Virginia | September-14 | 2 | | 2 | September-14 | 2 | 1 | 3 |
| West Virginia | October-14 | 3 | | 3 | October-14 | 1 | 1 | 2 |
| West Virginia | November-14 | 2 | 1 | 3 | November-14 | 1 | | 1 |

NJAPP0360

Interrogatory No. 3

14

| State | Month | | | | | |
|---|---|---|---|---|---|---|
| West Virginia | December-14 | 4 | | 4 | | 1 |
| West Virginia | January-15 | 1 | | 2 | 1 | 2 |
| West Virginia | February-15 | 2 | 1 | 4 | | |
| West Virginia | March-15 | 3 | 2 | 3 | 2 | 5 |
| West Virginia | April-15 | 3 | | 3 | 1 | 5 |
| West Virginia | May-15 | 1 | | 1 | 2 | 2 |
| West Virginia | June-15 | 1 | | 1 | | 3 |
| West Virginia | July-15 | 2 | | 2 | 2 | 1 |
| West Virginia | August-15 | | | | | 2 |
| West Virginia | September-15 | 2 | | 2 | | 1 |
| West Virginia | October-15 | 1 | | 1 | | |
| West Virginia | November-15 | 1 | | 1 | | 1 |
| West Virginia | December-15 | 2 | | 2 | 1 | 3 |
| West Virginia | January-16 | 1 | | 1 | | |
| West Virginia | February-16 | 2 | | 2 | | 3 |
| West Virginia | March-16 | 3 | | 3 | | 2 |
| West Virginia | April-16 | 1 | | 1 | | 2 |
| West Virginia | May-16 | 2 | | 2 | 1 | 2 |
| West Virginia | June-16 | 1 | | 1 | | 1 |
| West Virginia | July-16 | 2 | | 2 | | 2 |
| West Virginia | August-16 | 5 | | 5 | | 1 |
| West Virginia | September-16 | | | | | 2 |
| West Virginia | October-16 | 2 | | 2 | | |
| West Virginia | November-16 | 3 | | 3 | | |
| West Virginia | December-16 | 1 | | 1 | | 5 |
| West Virginia | January-17 | | | 4 | | 4 |
| West Virginia | February-17 | 1 | | 1 | | |
| West Virginia | March-17 | 1 | | 1 | | |
| West Virginia | April-17 | 2 | | 2 | | 6 |
| West Virginia | May-17 | 4 | | 4 | | |
| West Virginia | June-17 | | | | | 1 |
| West Virginia | July-17 | 1 | | 1 | | |
| West Virginia | August-17 | | | | | |
| West Virginia | September-17 | | | 1 | | 1 |
| West Virginia | October-17 | | | | 1 | 1 |
| West Virginia | November-17 | | | 2 | | 2 |

NJAPP0381

Interrogatory No. 3

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| West Virginia | December-17 | | | | | December-17 | | | | | | |
| West Virginia | January-18 | | | | | January-18 | | | | | | |
| West Virginia | February-18 | | | | | February-18 | | | 1 | | | 1 |
| West Virginia | March-18 | | | | | March-18 | | | | | | |
| West Virginia | April-18 | | | | | April-18 | | | 1 | 1 | | 2 |
| West Virginia | May-18 | | | | | May-18 | | | | | | |
| West Virginia | June-18 | | | | | June-18 | | | 1 | | 1 | 1 |
| West Virginia Total | | | | | | | | | | | | |
| Total Received | | 175,463 | 152 | 13 | 183,802 | 165 | Total Completions | 156,161 | 17,357 | 128 | 19 | 147 | 173,518 |

Please Note:

1)  The report reflects the most up-to-date data available at the time the report is generated.

2)  Received Month represents the month the DACA Request was received by USCIS.

3)  Requestor State for ELIS filings is only electronically captured for requests rejected at the service centers; requestor State for ELIS filings rejected at the lockbox is not captured electronically. USCIS began processing new DACA filings in ELIS on Nov 1, 2015.

4)  Completion month represents the month the most recent final adjudication action occurred.

5)  Requests approved or denied in a given month may have been received in a previous month.

6)  State is determined by the requestor's address listed on the form I-821D.

Database Queried: June 22, 2018

Report Created: June 22, 2018

Systems: C3 Consolidated, ELIS via SAS

Office of Performance and Quality (OPQ), Performance Analysis and External Reporting (PAER), SN

Parameters

Form(s): I-821D DACA initials

Data Type: Receipts, Rejections, Approvals, and Denials

Time Frame: Aug 15, 2012 - June 22, 2018

NJAPP0382

15

# Exhibit 35

NJAPP0383

**Jeremy Hollander**

| | |
|---|---|
| **From:** | Disher, Todd <Todd.Disher@oag.texas.gov> |
| **Sent:** | Monday, June 25, 2018 10:38 PM |
| **To:** | Nina Perales; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter |
| **Cc:** | Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett; Peroyea, Trent; Moreno, Cristina; Bitter, Adam |
| **Subject:** | RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits |

Nina,

Mr. Peters' calculations related to the potential cost from the influx of new license holders under the DAPA program. As I have already told you, Plaintiff States do not intend to rely on those calculations to support their motion for a preliminary injunction against DACA. We have provided deposition dates for you for all of the witnesses on our witness list and expert disclosures.

Also, your request overlooks your 30 untimely disclosed witnesses for whom you have failed to provide deposition dates. You still have not explained why you need to rely on that testimony, why they were not on your witness list, or why you did not provide dates for their depositions.

Todd

**Todd Lawrence Disher**
Special Counsel for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov

---

**From:** Nina Perales [mailto:nperales@MALDEF.org]
**Sent:** Monday, June 25, 2018 2:37 PM
**To:** Disher, Todd <Todd.Disher@oag.texas.gov>; Ernest Herrera <eherrera@MALDEF.org>; Robins, Jeffrey (CIV) <Jeffrey.Robins@usdoj.gov>; Rachel Wainer Apter <Rachel.Apter@njoag.gov>
**Cc:** Celina Moreno <cmoreno@MALDEF.org>; Kenneth Levine <Kenneth.Levine@law.njoag.gov>; Jeremy Hollander <Jeremy.Hollander@law.njoag.gov>; Biggs, Adam <Adam.Biggs@oag.texas.gov>; Starr, Brantley <Brantley.Starr@oag.texas.gov>; Alejandra Avila <Aavila@MALDEF.org>; Denise M. Hulett <Dhulett@MALDEF.org>; Peroyea, Trent <Trent.Peroyea@oag.texas.gov>; Moreno, Cristina <Cristina.Moreno@oag.texas.gov>; Bitter, Adam <Adam.Bitter@oag.texas.gov>
**Subject:** RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Dear Todd,

In light of Plaintiffs' position declining to withdraw declarations from non-disclosed witnesses that are included in your preliminary injunction submission, Defendant Intervenors would like to take the deposition of Mr. Joe Peters. We can take his deposition in Austin at your location of choice anytime Wed. through Friday this week that is not during the depositions of Dr. Deere or Dr. Potter. In other words, we are available at any time other than:

Wednesday – 1pm – 6pm
Thursday – 10am-3pm

NJAPP0384

Thank you very much,

Nina Perales
Vice President of Litigation
Mexican American Legal Defense
    and Educational Fund, Inc. (MALDEF)
110 Broadway, Suite 300
San Antonio, TX 78205
Ph (210) 224-5476 ext. 206
FAX (210 224-5382

---

**From:** Nina Perales
**Sent:** Friday, June 22, 2018 5:30 PM
**To:** 'Disher, Todd'; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter
**Cc:** Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett; Peroyea, Trent; Moreno, Cristina; Bitter, Adam
**Subject:** RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

I understand and appreciate your communication on this -- and your willingness to find a solution -- even if we are ultimately unsuccessful.

Nina Perales
Vice President of Litigation
Mexican American Legal Defense
    and Educational Fund, Inc. (MALDEF)
110 Broadway, Suite 300
San Antonio, TX 78205
Ph (210) 224-5476 ext. 206
FAX (210 224-5382

---

**From:** Disher, Todd [mailto:Todd.Disher@oag.texas.gov]
**Sent:** Friday, June 22, 2018 5:27 PM
**To:** Nina Perales; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter
**Cc:** Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett; Peroyea, Trent; Moreno, Cristina; Bitter, Adam
**Subject:** RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Thanks, Nina. We are not interested in trying to withdraw portions of an exhibit already on file with the Court, but we will make our intentions clear.

Todd

**Todd Lawrence Disher**
Special Counsel for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov

NJAPP0385

**From:** Nina Perales [mailto:nperales@MALDEF.org]
**Sent:** Friday, June 22, 2018 5:04 PM
**To:** Disher, Todd <Todd.Disher@oag.texas.gov>; Ernest Herrera <eherrera@MALDEF.org>; Robins, Jeffrey (CIV) <Jeffrey.Robins@usdoj.gov>; Rachel Wainer Apter <Rachel.Apter@njoag.gov>
**Cc:** Celina Moreno <cmoreno@MALDEF.org>; Kenneth Levine <Kenneth.Levine@law.njoag.gov>; Jeremy Hollander <Jeremy.Hollander@law.njoag.gov>; Biggs, Adam <Adam.Biggs@oag.texas.gov>; Starr, Brantley <Brantley.Starr@oag.texas.gov>; Alejandra Avila <Aavila@MALDEF.org>; Denise M. Hulett <Dhulett@MALDEF.org>; Peroyea, Trent <Trent.Peroyea@oag.texas.gov>; Moreno, Cristina <Cristina.Moreno@oag.texas.gov>; Bitter, Adam <Adam.Bitter@oag.texas.gov>
**Subject:** RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Todd,

Although we can leave these materials in the record and pledge not to "rely" on them for the PI, they are still in the record and I don't think our intentions will be clear to the court. My suggestion is that Plaintiffs withdraw the eleven non-witness declarations from wherever they appear in the record, and Defendant Intervenors will agree not to file with the court the non-witness declarations that you are concerned about.

Nina Perales
Vice President of Litigation
Mexican American Legal Defense
    and Educational Fund, Inc. (MALDEF)
110 Broadway, Suite 300
San Antonio, TX 78205
Ph (210) 224-5476 ext. 206
FAX (210 224-5382

---

**From:** Disher, Todd [mailto:Todd.Disher@oag.texas.gov]
**Sent:** Friday, June 22, 2018 4:53 PM
**To:** Nina Perales; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter
**Cc:** Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett; Peroyea, Trent; Moreno, Cristina; Bitter, Adam
**Subject:** RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Nina,

So do you agree that MALDEF will rely on sworn testimony only from timely disclosed witnesses if Plaintiff States agree to the same?

Todd

**Todd Lawrence Disher**
Special Counsel for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov

---

**From:** Nina Perales [mailto:nperales@MALDEF.org]
**Sent:** Friday, June 22, 2018 2:51 PM

3

NJAPP0386

**To:** Disher, Todd <Todd.Disher@oag.texas.gov>; Ernest Herrera <eherrera@MALDEF.org>; Robins, Jeffrey (CIV) <Jeffrey.Robins@usdoj.gov>; Rachel Wainer Apter <Rachel.Apter@njoag.gov>
**Cc:** Celina Moreno <cmoreno@MALDEF.org>; Kenneth Levine <Kenneth.Levine@law.njoag.gov>; Jeremy Hollander <Jeremy.Hollander@law.njoag.gov>; Biggs, Adam <Adam.Biggs@oag.texas.gov>; Starr, Brantley <Brantley.Starr@oag.texas.gov>; Alejandra Avila <Aavila@MALDEF.org>; Denise M. Hulett <Dhulett@MALDEF.org>; Peroyea, Trent <Trent.Peroyea@oag.texas.gov>; Moreno, Cristina <Cristina.Moreno@oag.texas.gov>; Bitter, Adam <Adam.Bitter@oag.texas.gov>
**Subject:** RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Todd,

If you file a motion, please note in your certificate of conference that Defendant Intervenors oppose the motion <u>unless</u> Plaintiffs withdraw similar sworn testimony by non-disclosed witnesses that Plaintiffs filed with the court with their Motion for Preliminary Injunction.

Nina Perales
Vice President of Litigation
Mexican American Legal Defense
   and Educational Fund, Inc. (MALDEF)
110 Broadway, Suite 300
San Antonio, TX 78205
Ph (210) 224-5476 ext. 206
FAX (210 224-5382



-----Original Message-----
From: Disher, Todd [mailto:Todd.Disher@oag.texas.gov]
Sent: Friday, June 22, 2018 2:44 PM
To: Nina Perales; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter
Cc: Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett; Peroyea, Trent; Moreno, Cristina; Bitter, Adam
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Nina,

The 11 declarations you reference below are included as part of another exhibit already on file with the Court. Once again, we do not intend to rely on those declarations in support of our motion for preliminary injunction. You have seen our initial briefing included with our motion and know that to be true. We will work with you to schedule depositions should that change.

In contrast, we still do not know why or how you intend to rely on the two dozen additional declarations on your exhibit list and why those witnesses were not included on your witness list. Even now, you still have not offered to withdraw those declarations as part of any agreement we may reach. Given the impending end of the discovery period that you requested, we do not have time to conduct additional negotiations based on your statement that you would consider withdrawing the untimely declarations. We will note your opposition in our motion.

Todd

Todd Lawrence Disher
Special Counsel for Civil Litigation
Office of the Attorney General of Texas

NJAPP0387

P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov

-----Original Message-----
From: Nina Perales [mailto:nperales@MALDEF.org]
Sent: Friday, June 22, 2018 10:30 AM
To: Disher, Todd <Todd.Disher@oag.texas.gov>; Ernest Herrera <eherrera@MALDEF.org>; Robins, Jeffrey (CIV)
<Jeffrey.Robins@usdoj.gov>; Rachel Wainer Apter <Rachel.Apter@njoag.gov>
Cc: Celina Moreno <cmoreno@MALDEF.org>; Kenneth Levine <Kenneth.Levine@law.njoag.gov>; Jeremy Hollander
<Jeremy.Hollander@law.njoag.gov>; Biggs, Adam <Adam.Biggs@oag.texas.gov>; Starr, Brantley
<Brantley.Starr@oag.texas.gov>; Alejandra Avila <Aavila@MALDEF.org>; Denise M. Hulett <Dhulett@MALDEF.org>;
Peroyea, Trent <Trent.Peroyea@oag.texas.gov>; Moreno, Cristina <Cristina.Moreno@oag.texas.gov>; Bitter, Adam
<Adam.Bitter@oag.texas.gov>
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Todd,

Thank you for your email.  Are you willing to withdraw the sworn testimony of non-witnesses that you have placed in
the record (the eleven listed below)?  If so, we would consider withdrawing the Def-Int declarations you identified as
associated with non-disclosed witnesses.

Nina Perales
Vice President of Litigation
Mexican American Legal Defense
    and Educational Fund, Inc. (MALDEF)
110 Broadway, Suite 300
San Antonio, TX 78205
Ph (210) 224-5476 ext. 206
FAX (210 224-5382

-----Original Message-----
From: Disher, Todd [mailto:Todd.Disher@oag.texas.gov]
Sent: Friday, June 22, 2018 9:21 AM
To: Nina Perales; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter
Cc: Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett;
Peroyea, Trent; Moreno, Cristina; Bitter, Adam
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Nina,

We are not interested in a deal that does less than withdraw all of your declarations and deposition testimony from
other cases. You have seen our arguments and know which declarations we used to support our motion for preliminary
injunction. We still have not seen your fully briefed position, and you still have not explained why you need to rely on
testimony from other witnesses in other cases.

Todd

Todd Lawrence Disher

NJAPP0388

Special Counsel for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov

-----Original Message-----
From: Nina Perales [mailto:nperales@MALDEF.org]
Sent: Thursday, June 21, 2018 6:36 PM
To: Disher, Todd <Todd.Disher@oag.texas.gov>; Ernest Herrera <eherrera@MALDEF.org>; Robins, Jeffrey (CIV)
<Jeffrey.Robins@usdoj.gov>; Rachel Wainer Apter <Rachel.Apter@njoag.gov>
Cc: Celina Moreno <cmoreno@MALDEF.org>; Kenneth Levine <Kenneth.Levine@law.njoag.gov>; Jeremy Hollander
<Jeremy.Hollander@law.njoag.gov>; Biggs, Adam <Adam.Biggs@oag.texas.gov>; Starr, Brantley
<Brantley.Starr@oag.texas.gov>; Alejandra Avila <Aavila@MALDEF.org>; Denise M. Hulett <Dhulett@MALDEF.org>;
Peroyea, Trent <Trent.Peroyea@oag.texas.gov>; Moreno, Cristina <Cristina.Moreno@oag.texas.gov>; Bitter, Adam
<Adam.Bitter@oag.texas.gov>
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Dear Todd,

We would oppose a motion to strike our exhibits without a similar withdrawal by Texas of the sworn testimony filed
with your motion for preliminary injunction of the following non-disclosed witnesses:

1. Richard Allgeyer
2. Kevin D. Bailey
3. Lisa Dawn-Fisher
4. Karl Eschbach
5. Patrick A. Fernan
6. Jeffrey M. Gill
7. Joe Peters
8.  Sheri Pollock
9. Donald M. Snemis
10.  Finis Welch
11. David G. Baker

My suggestion is that we discuss the possibility of Defendant Intervenors withdrawing some of the exhibits that have
caused you concern along with Texas withdrawing some of the exhibits that have caused us concern.  We are willing to
have this discussion with you at your convenience.

Nina Perales
Vice President of Litigation
Mexican American Legal Defense
    and Educational Fund, Inc. (MALDEF)
110 Broadway, Suite 300
San Antonio, TX 78205
Ph (210) 224-5476 ext. 206
FAX (210 224-5382

-----Original Message-----

NJAPP0389

From: Disher, Todd [mailto:Todd.Disher@oag.texas.gov]
Sent: Wednesday, June 20, 2018 4:31 PM
To: Nina Perales; Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter
Cc: Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett;
Peroyea, Trent; Moreno, Cristina; Bitter, Adam
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Nina,

As we have told you on the phone, at this time we are not planning on relying on any declarations in support of our
motion for preliminary injunction other than those from the witnesses on our witness list and the experts we have
disclosed. If that changes, we will let you know and make any additional witnesses available to be deposed.

It is still not clear why you intend to rely on two dozen declarations from other proceedings in other jurisdictions. It is
also not clear why you did not include these witnesses on your witness list that the parties agreed to exchange on June 8
or on your expert disclosures due by court order on June 15. We are going to move to strike those declarations. Please
let me know if you oppose that motion.

Todd

Todd Lawrence Disher
Special Counsel for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov

-----Original Message-----
From: Nina Perales [mailto:nperales@MALDEF.org]
Sent: Monday, June 18, 2018 1:15 PM
To: Disher, Todd <Todd.Disher@oag.texas.gov>; Ernest Herrera <eherrera@MALDEF.org>; Robins, Jeffrey (CIV)
<Jeffrey.Robins@usdoj.gov>; Rachel Wainer Apter <Rachel.Apter@njoag.gov>
Cc: Celina Moreno <cmoreno@MALDEF.org>; Kenneth Levine <Kenneth.Levine@law.njoag.gov>; Jeremy Hollander
<Jeremy.Hollander@law.njoag.gov>; Biggs, Adam <Adam.Biggs@oag.texas.gov>; Starr, Brantley
<Brantley.Starr@oag.texas.gov>; Alejandra Avila <Aavila@MALDEF.org>; Denise M. Hulett <Dhulett@MALDEF.org>;
Peroyea, Trent <Trent.Peroyea@oag.texas.gov>; Moreno, Cristina <Cristina.Moreno@oag.texas.gov>; Bitter, Adam
<Adam.Bitter@oag.texas.gov>
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Todd,

Thank you for writing to share your concern.  As I expressed in earlier phone calls, Defendant Intervenors share that
same concern with a number of witnesses whose declarations Plaintiffs have filed with the court in support of their
motion for preliminary injunction.

In total, Plaintiffs have filed with the court, but not disclosed as witnesses, the declarations of 11 individuals:

1. Richard Allgeyer
2. Kevin D. Bailey
3. Lisa Dawn-Fisher
4. Karl Eschbach

NJAPP0390

5. Patrick A. Fernan
6. Jeffrey M. Gill
7. Jose Peters
8. Sheri Pollock
9. Donald M. Snemis
10.  Finis Welch
11. David G. Baker

I think it makes sense to discuss all of these declarations at the same time and try to figure out if we want to take these depositions or come to some other agreement.

Thank you very much,

_____

From: Disher, Todd [Todd.Disher@oag.texas.gov]
Sent: Sunday, June 17, 2018 11:59 AM
To: Ernest Herrera; Robins, Jeffrey (CIV); Rachel Wainer Apter
Cc: Celina Moreno; Kenneth Levine; Jeremy Hollander; Biggs, Adam; Starr, Brantley; Alejandra Avila; Denise M. Hulett; Peroyea, Trent; Moreno, Cristina; Bitter, Adam; Nina Perales
Subject: RE: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Nina,

I write with a concern regarding your exhibit list. With 14 days left in the discovery period, you have now included sworn statements from 25 new witnesses not on your witness list. The parties agreed to disclose by June 8 the identities of all witnesses from whom they were going to rely on sworn statements. These new witnesses provided sworn testimony in different proceedings in different jurisdictions. Please let me know why you intend to rely on this testimony and why these witnesses were not included on your witness list pursuant to our agreement.

Todd

Todd Lawrence Disher
Special Counsel for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>


Todd Lawrence Disher
Special Counsel for Civil Litigation
Office of the Attorney General of Texas
P.O. Box 12548 (MC 001)
Austin, TX 78711-2548
(512) 936-2266
Todd.Disher@oag.texas.gov<mailto:Todd.Disher@oag.texas.gov>

From: Ernest Herrera [mailto:eherrera@MALDEF.org]
Sent: Saturday, June 16, 2018 12:23 AM
To: Disher, Todd <Todd.Disher@oag.texas.gov>; Robins, Jeffrey (CIV) <Jeffrey.Robins@usdoj.gov>; Rachel Wainer Apter <Rachel.Apter@njoag.gov>

8

NJAPP0391

Cc: Celina Moreno <cmoreno@MALDEF.org>; Kenneth Levine <Kenneth.Levine@law.njoag.gov>; Jeremy Hollander
<Jeremy.Hollander@law.njoag.gov>; Biggs, Adam <Adam.Biggs@oag.texas.gov>; Starr, Brantley
<Brantley.Starr@oag.texas.gov>; Alejandra Avila <Aavila@MALDEF.org>; Denise M. Hulett <Dhulett@MALDEF.org>;
Peroyea, Trent <Trent.Peroyea@oag.texas.gov>; Moreno, Cristina <Cristina.Moreno@oag.texas.gov>; Bitter, Adam
<Adam.Bitter@oag.texas.gov>; Nina Perales <nperales@MALDEF.org>
Subject: Texas, et al. v. United States, et al. - Defendant Intervenors' Exhibits

Dear counsel:

Please find Defendant Intervenors' exhibits at the following link: https://urldefense.proofpoint.com/v2/url?u=https-
3A__app.box.com_s_6tvlsrq2kbw5e4d9mqsznbngfzuzt1m8&d=DwIF-
g&c=Z_mC1sqOcfBCM1ZptXokOj7_ss37GsaAMzCZyvOxKN4&r=sJXj47LoI4xQ4zRIYXYPjtSABNiF6feJS5WOFi3VXKU&m=bjr
o5FDmagWI6oDuSQxfccpO05ZTfcoR61gDPK45Gno&s=6qw-
SJxO8kFkaLK3cp8aA4rC8KxIHllR0Jham1DvhXg&e=<https://urldefense.proofpoint.com/v2/url?u=https-
3A__app.box.com_s_6tvlsrq2kbw5e4d9mqsznbngfzuzt1m8&d=DwMFAg&c=Z_mC1sqOcfBCM1ZptXokOj7_ss37GsaAMz
CZyvOxKN4&r=sJXj47LoI4xQ4zRIYXYPjtSABNiF6feJS5WOFi3VXKU&m=OlZiW7dnvrGQ_QsXn_w2-
HrFvtnur5d62tba2viZSc4&s=cAkbEqwCNHKUvdtg2SEExcOrERmNj9JAE5DuMpt_Q5w&e=>


Ernest I. Herrera
Staff Attorney
MALDEF
110 Broadway, Suite 300
San Antonio, TX 78205
P: 210.224.5476 x. 208
F: 210.224.5382
www.maldef.org<https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.maldef.org_&d=DwMFAg&c=Z_mC1sqOcfBCM1ZptXokOj7_ss37GsaAMzCZyvOxKN4&r=sJXj47LoI4xQ4zRIYXYP
jtSABNiF6feJS5WOFi3VXKU&m=OlZiW7dnvrGQ_QsXn_w2-
HrFvtnur5d62tba2viZSc4&s=5xeBav47PiZMjNup0lTg9CSucpsfhb6o0tgs_Ve4sig&e=>

NJAPP0392

# Exhibit 36

NJAPP0393



**From:**     Lewis, Theodore R <T███████@uscis.dhs.gov>
**Sent:**     Tuesday, March 10, 2015 5:20 PM
**To:**       Bagsic, Edgardo L <█████████@uscis.dhs.gov>; Carlson, Deborah M
              <████████)uscis.dhs.gov>; Chhouy, Saobora
              <███████@uscis.dhs.gov>; Doan, Julie N <████████@uscis.dhs.gov>;
              Fletcher, Gregory L <████████████@uscis.dhs.gov>; Gapuz, Brian Y
              <████████@uscis.dhs.gov>; Hansen, Timothy K
              <████████@uscis.dhs.gov>; Huynh, Helen <███████@uscis.dhs.gov>;
              Kim, Kyong Y <██████████@uscis.dhs.gov>; Lesher, Grace B
              <████████@uscis.dhs.gov>; Nelson, Steven K
              <████████@uscis.dhs.gov>; Nguyen, Trinnie C
              <Trinnie.C.Nguyen@uscis.dhs.gov>; Nguyen, Van T <V███████@uscis.dhs.gov>;
              Pascual, Marione L <M███████@uscis.dhs.gov>; Pham, Vincent
              <████████@uscis.dhs.gov>; Phan, Cat Tuong T
              <████████@uscis.dhs.gov>; Ruiz, Jorge A <J█████████@uscis.dhs.gov>;
              Villalobos, Vanessa <Vanessa.Villalobos@uscis.dhs.gov>; Wong, Suong T
              <████████@uscis.dhs.gov>
**Cc:**       Rogers, Kathryne J <Kathie.J.Rogers@uscis.dhs.gov>; Lee, Danielle L
              <Danielle.L.Lee@uscis.dhs.gov>
**Subject:**  Critical new DACA criminality changes

---

DACA Ident Team -

I will schedule a DACA Ident Team meeting on Monday.  There will be a Calendar Invite going out shortly. I
expect that this is just the beginning of a flurry of changes and directives coming from SCOPs.  Van and I will
keep you informed as soon as we are informed of these changes.

1.    Do not approve anything with any nexus to gangs at all – even a family member.  Denials and
      terminations are ok.

2.    Do not approve anything remotely EPS – a spouse of a kingpin for instance.  Any relative who falls
      under EPS, don't approve.  The EPS memo will be updated to show additional info to provide such as
      why the person was found to not fall under EPS.

Regards,

Ted

NJAPP0394

Confidential

DEF - 00000272

# Exhibit 37

NJAPP0395

| | |
|---|---|
| **From:** | Onuk, Semra K <██████████@uscis.dhs.gov> |
| **Sent:** | Thursday, March 12, 2015 5:08 PM |
| **To:** | Derman, Josee-Lynn S <██████████@uscis.dhs.gov>; Etchechury, Joseph <██████████@uscis.dhs.gov>; McGuire, Regina A <██████████@uscis.dhs.gov>; Roye, Donna L <██████████@uscis.dhs.gov>; Van-Wagenen, Lowell F <██████████@uscis.dhs.gov>; Wang, Jerry <██████████dhs.gov> |
| **Subject:** | FW: Internal FAQ - Drug Cartel Membership |
| **Attach:** | Internal DACA FAQ Drug Cartel.pdf |

FYI

**From:** Nguyen, Carolyn Q
**Sent:** Thursday, March 12, 2015 2:04 PM
**To:** Rogers, Kathryne J; Nguyen, Van T; Lewis, Theodore R
**Cc:** McMahon, Gerald K; Dewitty-Davis, Janine L; Dunning, Pacentia M; Elias, Erik Z; Onuk, Semra K; Smith, Andrea G; Tailor, Anisa M; Tran, Linhdieu A
**Subject:** FW: Internal FAQ - Drug Cartel Membership

**From:** Nicholson, Richard E
**Sent:** Thursday, March 12, 2015 1:17 PM
**To:** Nguyen, Carolyn Q
**Subject:** FW: Internal FAQ - Drug Cartel Membership

Sent with Good (www.good.com)
Rich Nicholson
Associate Center Director
Family Branch 2
California Service Center
(949) 389-███

**From:** Rigdon, Jerry L
**Sent:** Thursday, March 12, 2015 4:09:43 PM
**To:** Jacobson, Neil M; Nicholson, Richard E; Holmes-Okeawolam, Malethea S; Parsons, Tracey E
**Cc:** Baran, Kathy A; Campagnolo, Donna P; Hazuda, Mark J; Pearl, Thomas F; Richardson, Gregory A; Thompson, Kirt; Zuchowski, Laura B.; Selby, Cara M (Carrie); Velarde, Barbara Q; Thomas, Ronnie D; Allen, John M; Moran, Karla
**Subject:** Internal FAQ - Drug Cartel Membership

Hello ACDs:

Please see the attached internal FAQ pertaining to known or suspected drug cartel membership. This FAQ has been cleared for dissemination and implementation; however, it in no way supersedes the directive from Barbara Velarde sent yesterday nor the follow up sent today regarding cases presenting EPS and/or criminality concerns.  The guidance from those two messages is pasted directly below for your convenience.

Guillermo will be following up with an email once this FAQ has been loaded to the ECN.

NJAPP0396

DEF - 00000894

Thanks,
Jerry

From Barbara Velarde on 3-11-15:

"It appears that we might have some confusion within the DACA adjudications and de-confliction process on how to appropriately process cases presenting EPS and/or criminality concerns.  HQSCOPS is in the process of preparing DACA refresher training, which will be delivered at each center by SCOPS personnel in the very near future.  Until your Center has received this training, please do **NOT** take a final adjudication action (grant OR deny) for any case with information related to the requestor pertaining to issues of criminality, activities that are defined as EPS cases, including gang related activities, or potentially disqualifying juvenile activity.  These cases must be placed on hold regardless of whether the requestor was/is a juvenile and whether or not the requestor was convicted.  These cases must be forwarded to HQSCOPS via the current RAG process.  Case processing other than a final adjudicative decision, such as issuing an RFE or de-confliction of TECS hits, should continue.  Please let us know if you have any questions or concerns with this directive."

From Barbara Velarde on 3-12-15:

"We have received several questions from the Centers regarding the below directive.  In response to those questions please note that the prescribed procedures are not limited to information received via TECS.  Adjudicators may encounter derogatory information in a variety of ways from a variety of sources to include TECS, fingerprint/biometric checks, other electronic systems, or information contained within the file.

We also heard the concern that clearly deniable cases will be on hold. We appreciate this concern and would like to note that SCOPS intends to vet and reply to most RAGS as quickly as possible and do not intend to create a queue of cases on hold.  Additionally, this process will only be in place until each center has received the refresher training which we are planning to deliver in the next few weeks.

Finally, cases for requestors that ICE has confirmed are an enforcement priority are exempt from this process.  Centers may proceed with the denial or termination of this identified group of cases and properly document this action."

*Jerry Rigdon*
Chief, Waivers and Temporary Services Branch
Service Center Operations Directorate
USCIS Headquarters
202-272-███

NJAPP0397

DEF - 00000895

| Title | Known or Suspected Drug Cartel Membership |
|---|---|
| Question | **How should we handle DACA requests when there is a record that the requestor is a known or suspected drug cartel member?** |
| Answer | The BCU DACA Team should handle any DACA requests when the record indicates that the requestor was, is or may be a member of a drug cartel. Supervisors must refer the following cases to HQSCOPS through the normal chain of command: |

- All DACA requests filed by a known or suspected drug cartel member the Center seeks to approve; and
- Any novel, complex, or sensitive DACA requests filed by a known or suspected drug cartel member the Center seeks to deny.

Therefore, if there is reason to believe the DACA requestor is a known or suspected drug cartel member because the record (e.g., a TECS record, as shown in the image below) indicates that the DACA requestor is under investigation for, or has been arrested for (without disposition), or has been convicted of a crime involving activities that suggest the alien is a drug cartel member or a suspected drug cartel member, the DACA BCU Team should de-conflict further with the record owner. If it is determined that the alien is a drug cartel member or a suspected drug cartel member, then the BCU will deny the request as a matter of discretion using the discretionary checkbox, *"You have not established that you warrant a favorable exercise of prosecutorial discretion,"* and refer the case to ICE.



NJAPP0398

DEF - 00000896

# Exhibit 38

NJAPP0399

| From: | McGee, Daniel J <​_____@uscis.dhs.gov> |
|---|---|
| Sent: | Tuesday, June 26, 2018 11:40 AM |
| To: | Esteb, Jessica M <​_____@uscis.dhs.gov> |
| Subject: | FW: DACA denials and public safety - RP 5 |

**Daniel McGee**
Immigration Services Officer | Texas Service Center | Security and Fraud Team
United States Citizenship and Immigration Services
Office: 214 962-___  Office locator: **7-5N-WAH**

CONFIDENTIALITY NOTICE:  The information contained in (or attached to) this e-mail is For Official Use Only / Law Enforcement Sensitive (FOUO/LES) and should be considered Sensitive but Unclassified. This communication (including attachments) is covered by the Electronic Communication Privacy Act, U.S.C. Sections 2510-2521.  It is intended only for the party to whom it is addressed and may contain privileged and confidential information.  Any unauthorized use, dissemination or copying of this communication is prohibited.  If you have received this communication in error, please notify me immediately by replying to this e-mail and delete any copies from your computer.

**From:** Vogt, Kimberley H
**Sent:** Tuesday, June 02, 2015 3:06 PM
**To:** Kennard, Michael E; Reyes, Juan C; Ortiz, Joseph X; McGee, Daniel J; Johnson, Leslie K; Roberts, Christie E; Lincoln, Quanshateshia A; Denison, Ana M
**Cc:** Lee, Tyronda E; Liu, Jerry; Lopez, Jose M; Nourie, Jeramie T; Brasel, Patricia
**Subject:** FW: DACA denials and public safety
**Importance:** High

Since each of you have been working DACA in some capacity recently I wanted to be sure to reiterate what I previously stated which is that TSC now denies significantly more DACA cases based on our view of discretionary denials shifting to be more in line with HQ ⌐       **DP**       ⌐  Every case is different so we have to review the totality of the circumstances of each case.  However, I want to be clear that this can and will include denying renewals even if the crimes involved were all known before the initial grant.   It can even include looking into DACA grants by other Service Centers when all we have is a 765 for a replacement card or a 131.  It can include cases where there was no conviction and just a series of arrests. That's not to say that we are re-adjudicating the original DACA grant for every renewal case.  But we also aren't looking the other way just because of a previous approval.   If we wouldn't approve it now as an initial, we shouldn't approve it now just because it's a renewal.

Of particular concern are crimes that are violent or sexual in nature, crimes against children, and anything related to gangs or drug cartels.   Below is the list of examples I previously provided.  In addition, for whatever it's worth, the supervisors and I also like to jokingly say our standard is whether or not you would want to live next door to the person.  If you are ever in doubt, please feel free to see me or any of the other BCU supervisors.  We're always happy to help.

Kim

Some examples of things that could be denied based on the totality of the circumstances:
1. Significantly high number of juvenile crimes
2. All juvenile crimes but there's a pattern to the juvenile crimes where the severity of the crime is escalating
3. All juvenile crimes but they are violent or sexual in nature (rape, assault, etc)
4. Two misdemeanors and neither is considered significant but one is for assault and battery.  The assault wasn't domestic violence related but it's still violent in nature so the person could be viewed as a threat to the public.

NJAPP0400

DEF - 00001731

5.  One juvenile misdemeanor, one adult misdemeanor and both were before DACA was granted.  Then a 2nd adult misdemeanor after DACA was granted.  Because one is juvenile, it's not 3 technically misdemeanors and none are considered significant.  But because the new charge came after he was granted DACA along with the pattern of behavior he could be viewed as not meriting a favorable exercise of discretion.

---

**From:** Vogt, Kimberley H
**Sent:** Tuesday, April 07, 2015 3:58 PM
**To:** Andrieu, Robert C; Chan, Victoria S; Cobb, Melissa M; Dacloush, Nabil S; Davis, James S; Denison, Ana M; Edwards, Brenda C; Fry, Alex Z; Haba, Calvin W; Hight, Linda M; Hoe, Christopher J; Hutton, Carolyn K; Johnson, Leslie K; Justus, Russell L; Kennard, Michael E; Lashman, Louis L; Lincoln, Quanshateshia A; Martin, Mary S; McGee, Daniel J; Morin, Amanda A; Ortiz, Joseph X; Parker, John E; Reyes, Juan C; Roberts, Christie E; Six, Marina S (Silvia); Smitherman, Samuel M; Smithey, Christopher M; Tarbet, Jason A; Ursery, Joseph R; Wade, Lynn C; Weisenbach, Gregory X; Whalen, Stephanie R; Williams Stubbs, Velma L
**Cc:** Brasel, Patricia; Liu, Jerry; Lee, Tyronda E; Nourie, Jeramie T
**Subject:** DACA denials and public safety
**Importance:** High

BCU Team,

As we prepare to attend DACA refresher training on Thursday, I just want to be sure everyone is clear on a couple things.

First, DACA can be denied if we determine that the person doesn't merit a favorable exercise of discretion.  One of the reasons we would determine that they don't merit a favorable exercise of discretion is based on possible public safety concerns or the totality of the circumstances.

Second, the definition of a public safety concern for a DACA discretionary denial is <u>not</u> the same definition as the definition of public safety as it relates to referring someone to ICE.   For DACA, first a PS officer determines if we need to do an RTI based on the RTI definition of public safety.   Then once that's done, a BCU DACA officer needs to decide if we need to deny the case and that includes deciding if we need to do a discretionary denial based on the DACA discretionary denial definition of public safety.   Therefore, someone could not meet the definition of EPS for a referral to ICE but still be considered a public safety concern for DACA.



I've listed below some examples of things that could be denied based on the totality of the circumstances:
1.  Significantly high number of juvenile crimes
2.  All juvenile crimes but there's a pattern to the juvenile crimes where the severity of the crime is escalating
3.  All juvenile crimes but they are violent or sexual in nature (rape, assault, etc)
4.  Two misdemeanors and neither is considered significant but one is for assault and battery.  The assault wasn't domestic violence related but it's still violent in nature so the person could be viewed as a threat to the public.
5.  One juvenile misdemeanor, one adult misdemeanor and both were before DACA was granted.  Then a 2nd adult misdemeanor after DACA was granted.  Because one is juvenile, it's not 3 technically misdemeanors and none are considered significant.  But because the new charge came after he was granted DACA along with the pattern of behavior he could be viewed as not meriting a favorable exercise of discretion.

Please bear these issues in mind as we head into DACA refresher training.  I'd hate for anyone to slow the class down trying to debate the definition of Public Safety with the class.   It's different as it relates to the discretionary denial.   No debate is needed on that topic.  Having said that, you are welcome to ask as many questions as you like in the training to attempt to get a better understanding of the appropriate use of the discretion since we will be using it much more in the future.  If you have any questions, comments or concerns, please feel free to let me know.

NJAPP0401

Confidential                                                                   DEF - 00001732

Kim

NJAPP0402

Confidential

DEF - 00001733

# Exhibit 39

NJAPP0403

Brannon Spreadsheet 1
Produced in Native Format

NJOAG001077
**NJAPP0404**

TX-NJ

## Income impact of DACA

### With DACA

| | 2016 Med | DACA | % | Unweighted Real GDP (In $Billions) | Weighted Real GDP | (in $1000s) | Per person per yr |
|---|---|---|---|---|---|---|---|
| US | 57,617 | 689,800 | | $310.66 | | | |
| TX | 56,565 | 113,000 | 16.38% | $50.89 | $49.96 | $49,962,000 | $44,214 |
| NJ | 76,126 | 17,400 | 2.52% | $7.84 | $10.35 | $10,354,000 | $59,506 |

### Without DACA

| | 2016 Med | DACA | % | Unweighted Real GDP | Weighted Real GDP | (in $1000s) | Per person per yr |
|---|---|---|---|---|---|---|---|
| US | 57,617 | 689,800 | | $135.94 | | | |
| TX | 56,565 | 113,000 | 16.38% | $22.27 | $21.86 | $21,862,000 | $19,347 |
| NJ | 76,126 | 17,400 | 2.52% | $3.43 | $4.53 | $4,531,000 | $26,040 |

### Income Difference

| | (in $1000s) |
|---|---|
| TX | $28,100,000 |
| NJ | $5,823,000 |

| | | Y | Yrs | (in $1000s) |
|---|---|---|---|---|
| TX | No Deg | 56,500 | $29,452 | 10 | $16,640,518 |
| | Coll Deg | 56,500 | $58,976 | 10 | $33,321,482 |
| NJ | No Deg | 8,700 | $39,637 | 10 | $3,448,442 |
| | Coll Deg | 8,700 | $79,374 | 10 | $6,905,558 |

Page 1

NJAPP0405

# Exhibit 40

NJAPP0406

Vol. 44—No. 35
2-20-79
PAGES
10353~10497

## TUESDAY, FEBRUARY 20, 1979





# highlights

**INCOME TAX**
Treasury/IRS proposes regulations relating to time requirements for furnishing certain dividend or interest information statements; comments by 4-23-79 ........ 10396
Treasury/IRS proposes to set forth rules with respect to the definition of employee stock purchase plans; comments by 4-23-79 ........ 10397
Treasury/IRS issues final rules relating to consolidated returns ........ 10381

**SOCIAL SECURITY NUMBERS**
HEW/SSA releases new rules on issuance; effective 2-20-79 ........ 10369

**VALUATION OF PLAN BENEFITS**
Pension Benefit Guaranty Corporation proposes to prescribe rates and factors; comments by 3-22-79 ........ 10398

**CONSOLIDATED GRANTS**
HEW/PHS proposes to implement the program to insular areas; comments by 4-23-79 ........ 10404

**STATISTICAL ANALYSIS CENTER**
Justice/LEAA announces competitive research grant; papers by 4-1-79 ........ 10442

**NATIONAL ASSESSMENT OF EDUCATIONAL PROGRESS**
HEW/National Institute of Education prepares to announce competitive award ........ 10432

**ANTIBIOTIC DRUGS**
HEW/FDA revises certification requirements for sterile colistimethate sodium; effective 3-22-79 ........ 10380
HEW/FDA provides for certification of cefoxitin; effective 2-20-79; comments by 3-22-79 ........ 10372
HEW/FDA issues corrections, editorial revisions, and technical changes to update regulations; effective 3-22-79; comments by 4-23-79 ........ 10377

**CERTAIN MEDICAL LICENSES**
NRC amends rules to permit change in conditions ........ 10358

**AGENCY FORMS**
OMB issues list under review ........ 10448

**DEFENSE PRODUCTION**
FRS revises regulations for loan guarantees; effective 2-20-79 ........ 10382

**FREEDOM OF INFORMATION**
USDA/ASCS sets forth procedures for request under the Act; effective 2-20-79 ........ 10353

CONTINUED INSIDE

10370

**RULES AND REGULATIONS**

We received comments on the interim regulations from three individuals and from two representatives of organizations. The comments and suggestions were received, and our responses, are summarized as follows:

1. One person commented that our requirement that persons applying for SSN's give us certain evidence may violate the Constitution, and may be in conflict with the Privacy Act, the Freedom of Information Act, and the Sunshine Act. The person argued that our requirements restrict the liberty of Americans to move around, change jobs, and change identities, if they are threatened by unlawful elements, or a possible change to a totalitarian government.

We do not agree with this comment. The proposed rules are necessary because the social security law requires that each applicant for an SSN furnish evidence necessary to establish his or her age, citizenship or alien status, and true identity.

2. A second comment supported the goal of tightening SSN issuance procedures but suggested that §§ 422.104 (Assignment of social security numbers), and 422.107 (Evidence requirements) allow lawful permanent alien status to be presumed for aliens who have resided in the U.S. since January 1970.

The Social Security Act provides for payment of supplemental security income (SSI) benefits to otherwise qualified aged, blind or disabled individuals who are permanently residing in the United States under color of law. Existing regulations require applicants for SSI benefits to have an SSN. The commenter believes that without the suggested change a percentage of aged, undocumented aliens would be unable to obtain an SSN. The Social Security law requires each alien to prove his or her status. For that reason, we did not adopt this suggestion. To obtain an SSN, any individual in the United States under "color of law" would be required to furnish evidence to establish residence and "color of law" status.

3. A third comment emphasized the inconvenience of having to submit the additional evidence required by the regulations and noted that there was no "rule" that a copy of a document (rather then the actual document itself) be submitted. Also, the commenter claimed that the proposed regulations violate the goal of reducing unnecessary red tape and undue regulation.

The Social Security Act provides that the Secretary shall, through regulations require that applicants for SSN's supply evidence necessary to establish their age, identity, and citizenship or alien status. SSA allows an applicant to use certified copies of some

documents, instead of the documents themselves, as proof if the copies are considered by SSA (based on factors like the type or source) to be acceptable. However, copies of documents whose authenticity may be less certain may not be accepted under a law that requires the Secretary to do everything practicable to assure the accuracy and integrity of the SSN. For these reasons, we did not adopt the change.

4. A fourth comment completely supported the proposed change in the regulations.

5. A fifth comment criticized the rules about which aliens are presumed to have permission to work (§ 422.105). The comment also criticized the requirement that all applicants age 18 or over who ask for a new SSN must be interviewed in person (§ 422.107(a)). The regulations simplify the rules about which aliens are presumed to have authority to work. Also, it will be easier to accomodate changes made by the Immigration and Naturalization Service. We agree, however with the suggestions for dropping references to visas and visa symbols in § 422.105. We have substituted for these references "Form I-94", which shows the nonimmigrant classification. Form I-94 is more accurate and less confusing than the "visa symbols."

We did not adopt the second part of the comment. The in-person interview, we believe is essential for all individuals 18 and over, no matter who they are or what group they belong to. Foreign students may go to any Social Security field office or other office in the United States or they may go to a U.S. foreign service post in their homeland for the in-person interview.

Accordingly, the regulations as set forth below are adopted.

(Secs. 205 and 1102 of the Social Security Act, 53 Stat. 1368, as amended, and 49 Stat. 647, as amended; (42 U.S.C. 405, 1302).)

(Catalog of Federal Domestic Assistance Program Nos. 13.800-13.807, Social Security.)

Dated: January 22, 1979.

STANFORD G. ROSS,
*Commissioner of Social Security.*

Approved: Feburary 10, 1979.

JOSEPH A. CALIFANO, Jr.,
*Secretary of Health,
Education, and Welfare.*

In Chapter III of the Title 20 CFR, Subpart B of Part 422 is amended as follows:

1. Section 422.103 is revised to read as follows:

§ 422.103 Social security numbers.

(a) *General.* The Social Security Administration maintains a record of the earnings reported for each individual assigned a social security number. The individual's name together with the

social security number identifies the record so that the wages of self-employment income reported for or by the individual can be properly posted to the individual's record. Additional procedures concerning social security numbers may be found in Internal Revenue Service, Department of the Treasury regulation 26 CFR 31.6011(b)-2.

(b) *Applying for a number.* Every individual needing a social security number may apply for one by filing a signed form SS-5, "Application for Social Security Number," at any local social security office, or, if the individual is in the Philippines, at the Veterans' Administration regional office, Manila, Philippines. (See § 422.106 for special procedures for immigrants and certain nonimmigrants.) Form SS-5 may be obtained at:

(1) Any local social security office;

(2) The Social Security Administration, Baltimore, Md. 21235;

(3) Offices of District Directors of Internal Revenue;

(4) U.S. Postal Service offices (except the main office in cities having a social security office);

(5) U.S. Employment Service offices in cities which do not have a social security office; and

(6) The Veterans' Administration regional office, Manila, Philippines. Upon request, the social security office will distribute a quantity of application form SS-5 to labor unions, employers, or other representative organizations.

(c) *How numbers are assigned.* Social security numbers are assigned by SSA's central office in Baltimore, Md. Upon receipt of a completed form SS-5, the local social security office, or the Veterans' Administration regional office, Manila, Philippines, will require the applicant to furnish evidence, as necessary, to assist SSA in establishing age, citizenship, or alien status, true identity, and previously assigned social security number(s), if any. A personal interview may be required of the applicant. (See § 422.107 for evidence requirements.) Upon satisfactory establishment of the pertinent items, the social security office or Veterans' Administration regional office forwards the application to the SSA's central office for checking against the SSA's files. If the applicant requests a social security number card immediately, a temporary card (form SSA-5028, Receipt for Application for a Social Security Number) will be issued. If the investigation does not disclose a previously assigned number, the central office assigns a number and forwards to the applicant form OA-702, "Social Security Number Card." If the investigation discloses a previously assigned number, a duplicate social security number card is issued to the applicant.

NJAPP0408

For issuance of social security numbers to aliens and other groups or categories, see § 422.104.

(d) *Replacement of lost or damaged social security number card.* In case of loss of or damage to the social security number card, a duplicate card bearing the same number will be issued. (See § 422.107 for evidence requirements.)

2. Section 422.104 is revised to read as follows:

§ 422.104   To whom social security numbers are assigned.

Social security numbers may be assigned to the following applicants who meet the evidence requirements in § 422.107:

(a) U.S. citizens;

(b) Aliens lawfully admitted to the United States for permanent residence or under other authority of law permitting them to work in the United States (see § 422.105 regarding presumption of authority of nonimmigrant alien to work); and

(c) Aliens who are legally in the United States but not under authority of law permitting them to engage in employment, but only for a nonwork purpose (see § 422.107(e)(1) and (2)).

§ 422.104a   [Redesignated as § 422.105]

3. Section 422.104a is redesignated as § 422.105 and is revised to read as follows:

§ 422.105a   Presumption of authority of nonimmigrant alien to accept employment

The nonimmigrant form I-94 classifications assigned by the Immigration and Naturalization Service shall be used to determine whether a nonimmigrant alien is permitted to work. (See 22 CFR 41.12 for these classifications.) Permission to work shall not be presumed in the case of an alien who has not been issued a form I-94 or whose form I-94 shows any classification symbol designated and provided by the Immigration and Naturalization Service which does not reflect that the alien may work.

4. Section 422.105 is redesignated as § 422.106 and is revised to read as follows:

§ 422.106   Obtaining applications from immigrants and certain nonimmigrant classes.

All newly admitted immigrants and all aliens already in the United States whose status is changed to permanent resident shall apply for SSN's through local SSA offices, with the following exception. The Immigration and Naturalization Service will obtain applications for social security numbers from aliens who have never had a social security number, who entered this country in a temporary admission category and who, after entry became lawful permanent residents of the United States. In these cases the Immigration and Naturalization Service obtains from each alien an application for a social security number and, after verifying the alien's age and identity, forwards the application to SSA's central office for issuance of a social security number.

5. Section 422.107 is revised to read as follows:

§ 422.107   Evidence requirements.

(a) *General.* Applicants for social security numbers must submit evidence which the Secretary regards as convincing of their age, citizenship or alien status, and true identity. Applicants for duplicate or corrected social security cards must submit evidence of identity and may also be required to submit evidence of age and citizenship or alien status. An applicant is also required to submit evidence to assist the SSA in determining the existence and identity of any previously assigned number(s). An applicant who is not a citizen must also give evidence of whether he or she is permitted to work in the United States. A social security number will not be assigned, or a duplicate or corrected card issued, unless all of the evidence requirements are met. An in-person interview will be required of all applicants age 18 or older who apply for an original social security number. All documents submitted as evidence are subject to verification with the custodians of the original records.

(b) *Evidence of age.* All applicants for a social security number are required to submit evidence of age to prove their date of birth. Applicants for a duplicate or corrected social security card may also be required to submit evidence of age to prove their date of birth. Examples of the types of evidence which may be submitted are birth or baptismal certificates, school and church records, census records, insurance policies, marriage records, employment records, and passports.

(c) *Evidence of identity.* All applicants for a social security number or a duplicate or corrected social security card are required to submit corroborative evidence of their identity. Corroborative evidence of identity may consist of a driver's license, a voter registration card, a passport, or other similar document serving to identify the individual. It is preferable that the document contain the applicant's signature for comparison with his or her signature on the application for a social security number. A birth certificate alone is not sufficient evidence to establish identity except where the applicant is a child under 7 years of age, there is no other evidence of identity and there is no reason to doubt the birth certificate or the social security number application.

(d) *Evidence of U.S. citizenship.* Generally, an applicant may prove that he or she is a U.S. citizen by birth by providing evidence of age and identity described in paragraphs (b) and (c) of this section. The applicant must provide additional evidence when the evidence of age or identity does not show place of birth or does not agree with the applicant's allegation of birth in the United States. Where a foreign-born applicant claims U.S. citizenship, the applicant is required to present documentary evidence of U.S. citizenship. Any of the following is acceptable evidence of U.S. citizenship:

(1) Certificate of naturalization;

(2) Certificate of citizenship;

(3) U.S. passport;

(4) U.S. citizen identification card (INS form I-179 or I-197);

(5) Consular report of birth (State Department form FS-240); or

(6) Other verification from the Immigration and Naturalization Service, U.S. Department of State, or Federal or State court records confirming citizenship. If required evidence is not available, a social security number will not be assigned until satisfactory evidence of U.S. citizenship is furnished.

(e) *Evidence of alien status.*—(1) *Citizen of country other than Canada or Mexico.* Where the applicant is a citizen of a foreign country other than Canada or Mexico, the applicant is required to have an Alien Registration Receipt Card (I-151 or I-551) or an Arrival-Departure Record (I-94) and will be asked to produce such document. If the applicant fails to do so, a social security number will not be issued. If the applicant produces an Alien Registration Receipt Card, or produces an Arrival-Departure Record which contains an authorization to work, a social security number card will be issued. However, if the Arrival-Departure Record does not contain authorization to work and the applicant wants a social security number for a work purpose, it will not be issued. If the applicant requests the number for a nonwork purpose, e.g., an Internal Revenue Service purpose, the number will be issued and the record will be marked to show that a number has been issued. In that case, if earnings are later reported to SSA, the Immigration and Naturalization Service will be notified of the report.

(2) *Mexican or Canadian citizen.* If a Canadian or Mexican citizen has an Alien Registration Receipt Card or an Arrival-Departure Record, the rules in paragraph (e)(1) of this section apply. If a Canadian or Mexican citizen is legally in the United States with a border crossing card, or a border visitor's permit (for, in the case of a Canadian citizen, without documentation),

NJAPP0409

but does not have an Alien Registration Receipt Card or an Arrival-Departure Record, and wants a social security number for a nonwork purpose, e.g., an Internal Revenue Service purpose, the number will be issued and the record will be marked to show this. The Immigration and Naturalization Service will be notified if earnings are reported to SSA.

(3) *Failure to submit evidence.* If the applicant does not comply with a request for evidence or other information regarding alien status within a reasonable time, SSA will attempt another contact. If there is still no response, a social security number will not be issued.

(4) *Invalid or expired documents.* The SSA will not issue a social security number when an applicant presents invalid or expired Immigration and Naturalization Service documents. Invalid documents are either forged documents that supposedly were issued by the Immigration and Naturalization Service or properly issued documents that were improperly changed after they were issued. An expired document is one that is good for only a limited time and that time has passed.

(5) *Notice to alien applicant.* An alien who applies for a social security number will be advised that information obtained by SSA in connection with the application for, and issuance of, a social security number might be transmitted to the Immigration and Naturalization Service. If a number is to be issued for nonwork purpose, the applicant will be advised that the Immigration and Naturalization Service will be notified should earnings be reported to SSA.

6. Section 422.110 is revised to read as follows:

§ 422.110  **Individual's request for change in record.**

Form OAAN-7003, "Request for Change in Social Security Records," should be completed and signed by any person who wishes to change the name or other personal identifying information previously submitted. The person must prove his or her identity and may be required to validate the SSN record. (See § 422.107 for evidence requirements.) Form OAAN-7003 may be obtained from any local social security office or from one of the sources noted in § 422.103(b). The completed

request for change in records may be submitted to any SSA office or, if the individual is in the Philippines, to the Veterans' Administration regional office, Manila, Philippines. If the request is for a change in name, a new social security number card bearing the same number previously assigned will be issued to the person making the request.

[FR Doc. 79-5282 Filed 2-16-79; 8:45 am]

[4110-03-M]

Title 21—Food and Drugs

CHAPTER I—FOOD AND DRUG ADMINISTRATION, DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

SUBCHAPTER D—DRUGS FOR HUMAN USE

[Docket No. 78N-0395]

ANTIBIOTIC DRUGS; CEFOXITIN

Certification; Final Rule

AGENCY: Food and Drug Administration.

ACTION: Final rule.

SUMMARY: This document amends the antibiotic drug regulations to provide for the certification of cefoxitin, a new antibiotic drug. The manufacturer has supplied sufficient data and information to establish the safety and efficacy of cefoxitin.

DATES: Effective February 20, 1979; comments by March 22, 1979.

FOR FURTHER INFORMATION CONTACT:

Joan Eckert, Bureau of Drugs (HFD-140), Food and Drug Administration, Department of Health, Education, and Welfare, 5600 Fishers Lane, Rockville, MD 20857, 301-443-4290.

SUPPLEMENTARY INFORMATION: The Commissioner of Food and Drugs has evaluated data submitted in accordance with regulations promulgated under section 507 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 357), as amended, with respect to providing for the certification of a new antibiotic drug, cefoxitin. The Commissioner concludes that the data supplied by the manufacturer on cefoxitin are adequate to establish its safety and efficacy when used as di-

rected in the labeling and that the regulations should be amended in Parts 430, 436, 442, and 460 (21 CFR Parts 430, 436, 442, and 460) to provide for certification of cefoxitin.

Therefore, under the Federal Food, Drug, and Cosmetic Act (sec. 507, 59 Stat. 463, as amended (21 U.S.C. 357)) and under authority delegated to the Commissioner (21 CFR 5.1), Parts 430, 436, 442, and 460 are amended, as follows:

PART 430—ANTIBIOTIC DRUGS; GENERAL

1. Part 430 is amended:
a. In § 430.5 by adding new paragraphs (a)(64) and (b)(64) to read as follows:

§ 430.5  **Definitions of master and working standards.**

(a) * * *
(64) *Cefoxitin.* The term "cefoxitin master standard" means a specific lot of cefoxitin that is designated by the Commissioner as the standard of comparison in determining the potency of the cefoxitin working standard.

*  *  *  *  *

(b) * * *
(64) *Cefoxitin.* The term "cefoxitin working standard" means a specific lot of a homogeneous preparation of cefoxitin.

b. In § 430.6 by adding new paragraph (b)(66), to read as follows:

§ 430.6  **Definitions of the terms "unit" and "microgram" as applied to antibiotic substances.**

(b) * * *
(66) *Cefoxitin.* The term "microgram" applied to cefoxitin means the cefoxitin activity (potency) contained in 1.072 micrograms of the cefoxitin master standard.

PART 436—TESTS AND METHODS OF ASSAY OF ANTIBIOTIC AND ANTIBIOTIC-CONTAINING DRUGS

2. Part 436 is amended, as follows:
a. In § 436.33(b) by alphabetically inserting a new item in the table, as follows:

§ 436.33  **Safety test.**

(b) * * *

NJAPP0410

# Exhibit 41

NJAPP0411

5-5-81
Vol. 46    No. 86
Pages 25077-25288





Tuesday
May 5, 1981

## Highlights

**25077**   Jewish Heritage Week   Presidential proclamation.

**25087**   Mortgage Insurance   HUD/FHC publishes interim rule changing maximum mortgage amounts for single-family mortgage insurance programs.

**25083**   Business Loans   SBA amends regulations covering business loan policy relating to conflicts of interest between lenders and borrowers.

**25204**   Banks, Banking   FDIC publishes final rule regarding securities of nonmember insured banks. (Part II of this issue)

**25161**   Migrant Labor   Labor/ETA announces State Planning estimates of funds expected to be available for migrant and seasonal farmworker programs. Applicants are invited to submit preapplications for Federal assistance by 6-15-81 and funding requests by 7-15-81.

**25113**   Air Pollution Control   EPA extends comment period on proposed national emission standard for benzene emissions from ethylbenzene/styrene plants.

**25709**   Aliens   Justice/INS publishes final rule regarding procedures and criteria for grant of employment authorization to aliens in the United States.

CONTINUED INSIDE

25079

# Rules and Regulations

Federal Register
Vol. 46, No. 86
Tuesday, May 5, 1981

This section of the FEDERAL REGISTER contains regulatory documents having general applicability and legal effect, most of which are keyed to and codified in the Code of Federal Regulations, which is published under 50 titles pursuant to 44 U.S.C. 1510.

The Code of Federal Regulations is sold by the Superintendent of Documents. Prices of new books are listed in the first FEDERAL REGISTER issue of each month.

## DEPARTMENT OF AGRICULTURE

Rural Electrification Administration

7 CFR Part 1701

Public Information; Appendix A—REA Bulletins

**AGENCY:** Rural Electrification Administration; USDA.

**ACTION:** Final rule.

**SUMMARY:** REA hereby amends Appendix A—REA Bulletins to issue a new Bulletin 345–10, REA Standard PC–6, Acceptance Testing Procedures for Cable Television Systems, to establish testing procedures and minimum acceptable performance criteria for REA-financed CATV systems.

**EFFECTIVE DATE:** April 22, 1981.

**FOR FURTHER INFORMATION CONTACT:** Claude F. Buster, Jr., Chief, Transmission Branch, Telecommunications Engineering and Standards Division, Rural Electrification Administration, Room 1367, South Building, U.S. Department of Agriculture, Washington, D.C. 20250, telephone (202) 447–3917 The Final Impact Analysis Statement describing the options considered in developing this rule and the impact of implementing each option is available on request from the above office.

**SUPPLEMENTARY INFORMATION:** Pursuant to the Rural Electrification Act, as amended (7 U.S.C. 901 et seq.), REA hereby issues Bulletin 345–10, Acceptance Testing Procedures for Cable Television Systems. This action is issued in conformance with Executive Order 12291, and has been determined to be "not major."

This program is listed in the Catalog of Federal Domestic Assistance as 10.853, Community Antenna Television Loans and Loan Guarantees.

REA, in its effort to assure the best, most cost-effective telecommunications for rural America, and to assure loan security, hereby issues a new Bulletin 345–10. This action will provide REA borrowers, contractors, engineers, and other interested parties with information on acceptance test procedures and minimum acceptable performance criteria for REA-financed CATV systems.

A notice of Proposed Rule Making was published in the Federal Register on January 16, 1981. However, no public comments were received in response to the notice.

## PART 1701—APPENDIX A [AMENDED]

Appendix A to 7 CFR Part 1701 is amended to include new Bulletin 345–10, PC–6.

Dated: April 22, 1980.
John H. Arneson,
*Assistant Administrator—Telephone.*
[FR Doc. 81–13453 Filed 5–4–81; 8:45 am]
BILLING CODE 3410-15-M

7 CFR Part 1701

Public Information; Appendix A—REA Bulletins, Bulletin 345–52, REA Standards PC–5A, Service Entrance and Station Protector Installations and PC–5B, Station Installations

**AGENCY:** Rural Electrification Administration, USDA.

**ACTION:** Final rule.

**SUMMARY:** REA hereby amends Appendix A—REA Bulletins to revise Bulletin 345–52 to include the REA Standard for Station Installations, PC–5B. Issuance of PC–5B completes the process of separating the original PC–5, Specification for Station Installations, into two documents. This was necessitated by the adoption of the REA 515g Construction Contract. The first portion of the revised bulletin, PC–5A, Standard for Service Entrance and Station Protector Installations, was issued as a final rule on January 22, 1980, in the Federal Register.

**EFFECTIVE DATE:** April 20, 1981.

**FOR FURTHER INFORMATION CONTACT:** Harry M. Hutson, Chief, Outside Plant Branch, Telecommunications Engineering and Standards Division, Rural Electrification Administration, Room 1342, South Building, U.S.

Department of Agriculture, Washington, D.C. 20250, telephone (202) 447–3827. The Impact Analysis Statement describing the options considered in developing this rule and the impact of implementing each option is available on request from the above office.

**SUPPLEMENTARY INFORMATION:** Pursuant to the Rural Electrification Act, as amended (7 U.S.C. 901 et seq.), REA hereby revises Bulletin 345–52 to provide for the inclusion of PC–5B, Station Installations. REA Bulletin 345–52 now includes PC–5A, issued on January 22, 1980, and PC–5B issued herewith. This action has been issued in conformance with Executive Order 12291, Federal Regulations, and has been determined to be "not major."

This program is listed in the Catalog of Federal Domestic Assistance as 10.851 Rural Telephone Loans and Loan Guarantees.

REA, in its effort to assure the best, most cost-effective telecommunications service for rural America, proposed the review of Bulletin 345–52 to include PC–5B. This action will provide REA borrowers, contractors, engineers, and other interested parties with detailed information on station installation practices. A Notice of Proposed Rulemaking was published in the Federal Register on January 13, 1981. However, no public comments were received in response to the notice.

## PART 1701—APPENDIX A [AMENDED]

Appendix A to 7 CFR Part 1701 is amended to include revised bulletin 345–52, REA Standard PC–5B.

Dated: April 20, 1981.
John H. Arneson,
*Assistant Administrator—Telephone.*
[FR Doc. 81–13451 Filed 5–4–81; 8:45 am]
BILLING CODE 3410-15-M

## DEPARTMENT OF JUSTICE

Immigration and Naturalization Service

8 CFR Part 109

Employment Authorization to Aliens in the United States

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Final rule.

25080   Federal Register / Vol. 46, No. 86 / Tuesday, May 5, 1981 / Rules and Regulations

**SUMMARY:** This final rule adds a new Part 109 to Chapter I of Title 8 of the Code of Federal Regulations to codify procedures and criteria for the grant of employment authorization to aliens in the United States. The new rules are necessary to codify the various Service Operations Instructions and policy statements in one place in the regulations so that the public may conveniently locate the rules on employment authorization for aliens and the standards which are applicable.

**EFFECTIVE DATE:** June 4, 1981.

**FOR FURTHER INFORMATION CONTACT:** For General Information: Stanley J. Kieszkiel, Acting Instructions Officer, Immigration and Naturalization Service, 425 Eye Street, NW., Washington, D.C. 20536. Telephone: (202) 633-3048.

For Specific Information: Richard R. Spurlock, Immigration Examiner, Immigration and Naturalization Service, 425 Eye Street, NW., Washington, D.C. 20536. Telephone: (202) 633-2361.

**SUPPLEMENTARY INFORMATION:** On March 26, 1980, a proposed rule was published in the Federal Register (45 FR 19563) to add a new part 109 to Chapter I of existing regulations to codify procedures and criteria for the grant of employment authorization to aliens in the United States. Section 109.1(a) Classes of aliens eligible, identifies the classes of aliens who are authorized to be employed in the United States as a condition of their admission without specific authorization from the Service. "Employment authorization" in § 109.1(a) means that the aliens may engage in activities solely related to the status in which they were admitted. For example, an "A" diplomat may engage in activities related to his diplomatic functions; and an "L-1" intra-company transferee may engage in activities solely related to the purposes set forth in the visa petition. Paragraph (b) of § 109.1 describes the classes of aliens who may apply for discretionary work authorization based upon their financial need and that of their families. Section 109.2 sets forth the criteria under which a district director may revoke previously granted work authorization. It also sets forth notification requirements to the alien and allows submission of rebuttal evidence by the alien.

In response to the publication of the proposed rule in the Federal Register, approximately 30 responses were received from various commenters including immigration reform federations, attorneys, community service groups, and Service employees. All responses were given careful consideration. Most commenters fully supported the codification of criteria

and procedures for work authorization of aliens in the United States. However, there was wide diversity of opinion as to whether the Service should be strict or permissive when granting work authorization.

Several commenters expressed concern that § 109.1(a) did not adequately cover all categories for nonimmigrants who are permitted to work while in the United States. Five additional classes of nonimmigrant aliens who are authorized to work in the United States have been added to this part.

In addition, the wording has been revised for certain categories to conform to the provisions of the Refugee Act of 1980.

There was opposition expressed by several commenters for the showing of economic need as a pre-requisite to work authorization; they contend that such a requirement will unduly burden the alien and Service. To alleviate this burden the regulation has been amended to provide for a simple statement to be submitted by the alien attesting to his/her assets, income and expenses to be used by the district director in granting work permission.

Title 45 Public Welfare, Part 1060, Attachment A, Community Services Administration (CSA) Income Poverty Guidelines, apply to all financially assisted grants under the Economic Opportunity Act. It is provided that agencies may use these guidelines for other administrative or statistical purposes as appropriate. The Service has incorporated the CSA poverty guidelines by reference in § 109.1(b) of the regulations. The acceptance of the alien's statement as to financial status and the use of the income poverty guidelines should overcome objections to the absence of articulated standards or guidelines.

A number of commenters labeled as unfair the requirement that the alien's application for asylum under section 208 of the Act be "prima facie approvable" before his/her employment would be authorized. The wording has been changed to read "non-frivolous application" so as to include any application for asylum where a substantive claim of persecution is made.

It was also suggested that the proposed rule be amended to include nunc-pro-tunc employment authorization for asylum applicants.

Section 209 of the I. & N. Act provides that an alien granted asylum pursuant to section 208 may be adjusted to the status of permanent resident alien notwithstanding the exclusionary provisions of section 245(c) of the Act.

Therefore, the alien granted asylum is not prejudiced by the absence of a nunc-pro-tunc employment authorization provision in Part 109.

Several writers claimed that the principle of due process will be violated because the district director's authority to revoke employment authorization under § 109.2 is not reviewed by someone other than the person who made the initial decision. The Service's position is that the review by a district director is at an appropriate level of responsibility to insure due process.

Section 109.2 provides for the district director to notify the alien of his intent to revoke employment authorization when it appears that one or more of the conditions on which it was granted no longer exist. The alien is given an opportunity to present countervailing evidence within 15 days of the notice as to why his/her permission to work should not be revoked. Employment in the United States is not an inherent right of the aliens described in § 109.1(b). Their employment authorization is a matter of administrative discretion because humanitarian or economic needs warrant administrative action. The Service has authority to withdraw the work authorization when one or more of the factors for eligibility cease to exist, or for good cause shown.

After carefully evaluating the comments received as discussed above, Chapter I of Title 8 of the Code of Federal Regulations is amended by adding a new Part 109 to read as follows:

## PART 109—EMPLOYMENT AUTHORIZATION

Sec.
109.1   Classes of aliens eligible.
109.2   Revocation of employment authorization.

Authority: Sec. 103, 245(c); (8 U.S.C. 1103, 1255(c))

### § 109.1   Classes of aliens eligible.

(a) *Aliens authorized employment incident to status.* The following classes of aliens are authorized to be employed in the United States as a condition of their admission or subsequent change to one of the indicated classes, and specific authorization need not be requested:

(1) A lawful permanent resident alien.

(2) An alien admitted to the United States as a refugee under section 207 of the Act.

(3) An alien paroled into the United States as a refugee.

(4) An alien granted asylum under section 208 of the Act.

NJAPP0414

(5) An alien admitted to the United States as a nonimmigrant fiance or fiancee.

(6) An alien admitted in one of the following classifications, or whose status has been changed to such classification under section 247, 248 of the Act:

(i) A foreign government official (A–1), or (A–2).

(ii) An employee of a foreign government official (A–3).

(iii) A nonimmigrant visitor for business (B–1).

(iv) A nonimmigrant crewman (D–1).

(v) A nonimmigrant treaty trader or investor (E–1), or (E–2).

(vi) A representative of an international organization (G–1), (G–2), (G–3), or (G–4).

(vii) A personal servant of an employee or representative of an international organization (G–5).

(viii) A temporary worker or trainee (H–1), or (H–2), or (H–3).

(ix) An information media representative (I).

(x) An exchange visitor (J–1).

(xi) An intra-company transferee (L–1).

The employment authorization is limited solely to the extent and conditions described for the corresponding classifications in section 101(a)(15) of the Act, 8 CFR Part 214, and 22 CFR 63.24.

(b) *Aliens who must apply for work authorization.* Any alien within a class of aliens described in this section may apply for work authorization to the district director in whose district the alien resides:

(1) Any alien maintaining a lawful nonimmigrant status in one of the following classes may be granted permission to be employed:

(i) Alien spouse or unmarried dependent son or daughter of a foreign government official (A–1), or (A–2) as provided in § 214.2(a) of this chapter.

(ii) Alien nonimmigrant student (F–1) as provided in § 214.2(f) of this chapter.

(iii) Alien spouse or an unmarried dependent son or daughter of an officer or employee of an international organization (G–4) as provided in § 214.2(g) of this chapter.

(iv) Alien spouse of an exchange visitor (J–2) as provided in § 214.2(j) of this chapter.

(2) Any Alien who has filed a non-frivolous application for asylum pursuant to Part 208 of this chapter may be granted permission to be employed for the period of time necessary to decide the case.

(3) Any alien who has properly filed an application for adjustment of status

pursuant to section 245 of the Act may be granted permission to be employed for the period of time necessary to decide the case.

(4) Any alien who has applied to an immigration judge under § 242.17 of this chapter for suspension of deportation pursuant to section 244(a) of the Act may be granted permission to be employed for the period of time necessary to decide the case: *Provided,* The applicant can establish an economic need to work.

(5) Any deportable alien granted voluntary departure prior to commencement of a hearing under § 242.5(a)(v), (vi), or (viii) of this chapter may be granted permission to be employed for the period of time prior to voluntary departure: *Provided,* The alien establishes to the satisfaction of the district director, that he/she is financially unable to maintain himself/herself and family without employment. Factors which may be considered in granting employment authorization to an alien who has been granted voluntary departure:

(i) Length of voluntary departure granted;

(ii) Dependent spouse and/or children in the United States who rely on the alien for support;

(iii) Reasonable chance that legal status may ensue in the near future; and

(iv) Reasonable basis for consideration of discretionary relief.

(6) Any alien in whose case the district director recommends consideration of deferred action, an act of administrative convenience to the government which gives some cases lower priority: *Provided,* The alien establishes to the satisfaction of the district director that he/she is financially unable to maintain himself/herself and family without employment. The Community Service Administration Income Poverty Guidelines, Appendix 22 CFR 42.91(a)(iii) shall be used as the basic criteria to establish economic necessity for employment authorization requests where the alien's need to work is a factor. The applicant shall submit a signed statement listing his/her assets, income, and expenses as evidence of his/her economic need to work. Permission to work granted on the basis of the applicant's statement may be revoked under § 109.2 upon a showing that the information contained in the statement was not true and correct.

§ 109.2   Revocation of employment authorization.

(a) *Basis for revocation of employment authorization.* Employment authorization granted under § 109.1(b) of this part may be revoked by the district

director when it appears that one or more of the conditions upon which it was granted no longer exist, or for good cause shown.

(b) *Notice of intent to revoke employment authorization.* When a district director determines that employment authorization should be revoked, he/she shall serve notice of the reasons and the intention to revoke on the alien. The alien will be granted a period of fifteen days from the date of service of notice in which to submit evidence why the authorization should not be revoked. The decision by the district director shall be final and no appeal shall lie from the decision to revoke the authorization.

Certification

In accordance with 5 U.S.C. 605(b), this rule will not have a significant economic impact on a substantial number of small entities nor is it a major rule as defined in E.O. 12291. The rule codifies, under one part of the regulations, existing Service practice and procedures relating to employment authorization for aliens. This codification will enable the public to find all the rules on employment authorization in one convenient part.

Dated: April 20, 1981.

David Crosland,

*Acting Commissioner of Immigration and Naturalization.*

[FR Doc. 81–13460 Filed 5–4–81; 8:45 am]

BILLING CODE 4410-10-M

---

8 CFR Part 212

Documentary Requirements: Nonimmigrants; Waivers; Admission of Certain Inadmissible Aliens; Parole; Revision of Border Crossing Card Procedures

AGENCY: Immigration and Naturalization Service, Justice.

ACTION: Final rule.

SUMMARY: This final rule adds reference to Form I-586, Nonresident Alien Border Crossing Card, which has replaced the older version, Form I-186. Necessarily included are revised instructions for use, application, voidance, and replacement procedures for border crossing cards, particularly, the new Form I-586.

EFFECTIVE DATE: June 4, 1981.

FOR FURTHER INFORMATION CONTACT:

For general information: Stanley J. Kieszkiel, Acting Instructions Officer, Immigration and Naturalization Service, 425 Eye Street, NW., Washington, DC 20536. Telephone: (202) 633-3048.

# Exhibit 42

NJAPP0416

5-1-87

Vol. 52   No. 84

Pages 15935–16228





**Friday**
**May 1, 1987**

**16216** Federal Register / Vol. 52, No. 84 / Friday, May 1, 1987 / Rules and Regulations

(iii) Paragraph (23) (narcotics), except for a single offense of simple possession of thirty grams or less of marijuana;

(iv) Paragraphs (27) (prejudicial to the public interest), (28) (communists), and (29) (subversive);

(v) Paragraph (33) (participated in Nazi persecution).

(4) *Special rule for determination of public charge.* An alien who has a consistent employment history which shows the ability to support himself or herself and his or her family even though his or her income may be below the poverty level is not excludable under paragraph (g)(3)(ii) of this section. The alien's employment history need not be continuous in that it is uninterrupted. It should be continuous in the sense that the alien shall be regularly attached to the workforce, has an income over a substantial period of the applicable time, and has demonstrated the capacity to exist on his or her income and maintain his or her family without recourse to public cash assistance. This regulation is prospective in that the Service shall determine, based on the alien's history, whether he or she is likely to become a public charge. Past acceptance of public cash assistance within a history of consistent employment will enter into this decision. The weight given in considering applicability of the public charge provisions will depend on many factors, but the length of time an applicant has received public cash assistance will constitute a significant factor.

(5) *Public cash assistance and criminal history verification.* Declarations by an applicant that he or she has not been the recipient of public cash assistance and/or has not had a criminal record are subject to a verification of facts by the Service. The applicant must agree to fully cooperate in the verification process. Failure to assist the Service in verifying information necessary for proper adjudication may result in a denial of the application.

(h) *Departure.* An applicant for adjustment to lawful permanent resident status under section 245A(b)(1) of the Act who was granted lawful temporary resident status under section 245A(a) of the Act, shall be permitted to return to the United States after such brief and casual trips abroad, as long as the alien reflects a continuing intention to adjust to lawful permanent resident status. However, such absences from the United States must not exceed the periods of time specified in § 245a.3(b)(2) of this chapter in order for the alien to maintain continuous residence as specified in the Act.

(i) *Decision.* The applicant shall be notified in writing of the decision, and, if the application is denied, of the reason therefor. A party affected under this part by an adverse decision is entitled to file an appeal on Form I-694.

(j) *Appeal process.* An adverse decision under this part may be appealed to the Associate Commissioner, Examinations (Administrative Appeals Unit). Any appeal with the required fee shall be filed with the Regional Processing Facility within thirty (30) days after service of the Notice of Denial in accordance with the procedures of § 103.3(a) of this chapter. An appeal received after the thirty (30) day period has tolled will not be accepted. The thirty (30) day period includes any time required for service or receipt by mail.

(k) *Motions.* The Regional Processing Facility director may *sua sponte* reopen and reconsider any adverse decision. When an appeal to the Associate Commissioner, Examinations (Administrative Appeals Unit) has been filed, the INS director of the Regional Processing Facility may issue a new decision that will grant the benefit which has been requested. The director's new decision must be served on the appealing party within forty-five (45) days of receipt of any briefs and/or new evidence, or upon expiration of the time allowed for the submission of any briefs.

(l) *Certifications.* The regional processing facility director may, in accordance with § 103.4 of this chapter, certify a decision to the Associate Commissioner, Examinations (Administrative Appeals Unit) when the case involves an unusually complex or novel question of law or fact.

(m) *Date of adjustment to permanent residence.* The status of an alien whose application for permanent resident status is approved shall be adjusted to that of a lawful permanent resident as of the date indicated on the application fee receipt issued at a Service Legalization Office.

Dated: April 28, 1987.

Alan C. Nelson,

*Commissioner.*

[FR Doc. 87-9895 Filed 4-30-87; 8:45 am]

**BILLING CODE 4410-10-M**

---

**8 CFR Parts 109 and 274a**

[INS No. 1023-87]

**Control of Employment of Aliens**

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Final rule.

**SUMMARY:** This rule adds Part 274a and redesignates Part 109 with amendments as Part 274a, Subpart B, by: (1) Defining terms to clarify the regulations; (2) adding new sections to establish procedures for the verification of employment eligibility for workers in the United States; (3) delineating new sections to establish enforcement and process procedures for violations; (4) redesignating Part 109 (Employment Authorization) as Subpart B of Part 274a to consolidate into one part what would otherwise be dispersed regulations. The rule is necessitated by the Immigration Reform and Control Act of 1986, Pub. L. 99-603, which amended the Immigration and Nationality Act (Act) by adding provisions prohibiting the unlawful employment of aliens. These provisions make it unlawful to hire, recruit or refer for a fee for employment, unauthorized aliens in the United States. The rule provides for an employment eligibility verification system designed to prevent the employment of unauthorized aliens. The statute mandates the Attorney General to issue regulations implementing these provisions not later than June 1, 1987.

**EFFECTIVE DATE:** June 1, 1987.

**FOR FURTHER INFORMATION CONTACT:** Walter D. Cadman, Deputy Assistant Commissioner, Investigations Division, Immigration and Naturalization Service, 425 I Street, NW., Washington, DC 20536, Telephone: (202) 633-2997.

**SUPPLEMENTARY INFORMATION:** Since 1972 numerous attempts have been made by Congress and recent Administrations to pass immigration reform legislation. The imposition of sanctions on employers has been a central element of nearly all such attempts with the view that curbing illegal immigration would not be effective without such sanctions. The Select Commission on Immigration and Refugee Policy was established by Congress in October 1978. It was created to review immigration policy issues, assess the impact of legal and illegal immigrants on the nation, and recommend changes in policy and practice. The Commission made a series of over 70 recommendations concerning these issues in its final report in May 1981. Those recommendations included the imposition of employer sanctions to control illegal immigration. Thereafter a Cabinet level task force reviewed the Select Commission Report and other recommendations on immigration reform. In 1981 and 1982 alone some 28 hearings were conducted by House and

Senate immigration subcommittees on proposed immigration reform.

Since 1975 INS has vigorously worked in the spirit of cooperation with employers on an ad hoc basis to encourage a policy of employing only U.S. citizens and aliens lawfully authorized to work in the United States. The success of this effort, called Operation Cooperation, has been encouraging, but with the limits of INS resources and lack of statutory backing such programs have been of limited effectiveness. Mandatory compliance is the only effective mechanism that reduces "pull" factors that encourage rather than discourage illegal immigration.

On November 6, 1986, the President signed into law the Immigration Reform and Control Act of 1986, Pub. L. 99–603, (IRCA). This legislation is the most comprehensive reform of our immigration laws in 35 years. The employer sanctions provisions of IRCA constitute one of three cornerstones on which immigration reform is based. The other two are increased enforcement measures and legalization.

Section 101 of IRCA is designed to control the unlawful employment of aliens in the United States by imposing civil and criminal penalties on those persons and entities that hire, or that recruit or refer for a fee unauthorized aliens. Section 101 of IRCA amends the Act by adding section 274A which closes a large gap in the enforcement of our immigration laws by: (1) Making it unlawful to hire, recruit or refer for a fee unauthorized aliens; (2) requiring those who hire, or who recruit or refer for a fee individuals for employment, to verify both the identity and employment eligibility of such individuals and (3) making it unlawful to continue to employ unauthorized aliens hired after November 6, 1986. While section 112 of IRCA amends section 274(a) of the Act (which sets forth criminal penalties for individuals who harbor illegal aliens), employment of illegal aliens in and of itself does not constitute harboring under section 274(a) of the Act as amended.

Since enactment of IRCA, INS has been working to develop these rules along with a balanced enforcement policy. On January 20, 1987, INS published a notice in the **Federal Register** to solicit comments from the public and other interested parties concerning draft rules implementing the employer provisions of IRCA. Interested parties were also provided with preliminary working drafts for review and comment. Numerous comments were received from a wide cross-section of society.

These comments were reviewed and evaluated in the development of a proposed rule, published in the **Federal Register** on March 19, 1987. The proposed rule invited comment on all issues, particularly those concerning: the nature of verification; the mandatory and universal aspect of the requirements for employers to complete and maintain the designated form; the range of documents which should be accepted under the regulation to establish identity; the guidelines relating to the role of state employment agencies in the issuance of verification certificates; the application of penalties to procedural as well as substantive violations of the Act; and the necessary changes to prior Part 109 of the regulations, redesignated as Subpart B of Part 274a in the proposed rule.

**Public Comments**

*General Information*

Approximately 4,000 comments were received from the public during the comment period. Additionally, hundreds of telephone calls were received. Commentors represented a very broad spectrum of American society and included private citizens; agricultural, business, industrial and labor organizations; Congressional sources and governmental entities at the federal, state, and local levels; educational institutions; voluntary agencies; interest groups and organizations; and law firms. Because many of these commentors provided their views on several different sections of the proposed rules within one response, the figures provided below are approximate as to the number of comments received in each area of concern. INS is appreciative of the number of responses and instructive comments, which clearly reflect the broad public interest in this statute.

The comments received in many instances enlightened Service officials concerning prevailing buisness and industry practices, and the problems which employers face in verification and the other responsibilities imposed by IRCA. As a result, there are some significant refinements in the rule, which INS believes are in the public interest and that represent a logical outgrowth of the comments. While the final rule may not satisfy the concerns of everyone who commented, INS believes that most issues have been addressed in the spirit of mutual dialogue. Every effort has been made to minimize the impact of our requirements on the affected parties, consistent with the statute; and to ensure continuity with other agencies' guidelines and definitions, to the extent possible. Furthermore, INS expects that

these guidelines will prove sufficiently flexible so that employers and others required to comply with statutory and regulatory procedures will be able to do so in ways that suit current personnel hiring, recruiting and referring practices with minimal disruption.

INS will continue to encourage voluntary cooperation and compliance along with traditional enforcement in achieving the goal of this legislation. INS has established a new office for Employer and Labor Relations to administer a program of education and cooperation with employers and other affected entities. Many public appearances have been made by INS officials in the last few months to inform and solicit comments from interested parties. INS envisions a balanced approach between education and cooperation, and strict enforcement of penalties for egregious and persistent violators. INS will continue to develop agency guidelines and policies which further the goals of education, information, and employer awareness as effective methods of ensuring public support and voluntary compliance.

Consistent with this intent, INS wishes to remind the public that IRCA and Title VII of the Civil Rights Act prohibit discrimination in employment, or recruitment or referral for a fee for employment, on the basis of national origin. Additionally, IRCA generally prohibits discrimination on the basis of citizenship status in the case of a citizen or intending citizen. There are serious penalties which may be applied to those who violate the anti-discrimination laws of the United States. It is important to recognize that the purpose of the employer verification provisions of IRCA is not to discriminate against those with the right to work in the United States, regardless of their alienage or citizenship status. Rather, the purpose is to halt unlawful employment of those not entitled to work, and thus to have an ameliorative effect on illegal immigration to the United States. Application of the verification laws and voluntary compliance by employers will enhance job opportunities for lawfully authorized workers.

*Comments Received*

1. Recruiters and Referrers

By far the vast majority of comments (over 3,100), and the most contentious, related to the Service's proposed regulations in regard to recruiters and referrers. Many professionals in this industry were concerned that: (1) They would have to retroactively verify the

NJAPP0419

status of individuals whom they had recruited or referred since enactment of IRCA; (2) they would be prospectively required to perform verification on all individuals recruited or referred, despite the fact that many of these individuals would either express no interest in the recruitment, or would not be hired as the result of referral; and (3) they would have to perform face-to-face verifications, despite prevailing industry practices relating to telephonic recruitments over long distances where there is no opportunity for such verifications.

INS carefully scrutinized the public comments received relating to this issue and performed an analysis of the extent of regulatory flexibility which was permitted by statute. Although it was determined that an absolute waiver of requirements for recruiters and referrers was beyond the permissible statutory scope, the Service has significantly modified the terms under which such entities may comply. Under the final rule: (1) Recruiters and referrers will not be required to retroactively verify individuals recruited or referred during the period, given the impossibility of this task; (2) the regulations have been amended so that referrers and recruiters need to verify within three business days of hiring only those individuals actually hired as the result of the referral; and (3) the verification procedures for recruiters and referrers have been amended to permit completion of the process by those who act as agents in their interest. This includes, but is not limited to affiliates, notaries, attorneys, national organizations, and even employers who hire the referred individuals. In this way, verifications need not be performed in person by the recruiter or referrer. These modifications to the proposed rule will greatly alleviate the concerns expressed by recruiters and referrers over the verification process. By statute, however, liability still rests with the recruiter or referrer.

### 2. Use of Agents

A similar concern expressed in the comments received from some employers and others indicated misunderstanding regarding their ability to use commonly accepted legal principles to delegate verification responsibilities through contractual or business arrangements. Approximately 75 responses were received on this concern. The definition of the term "employer" found in 8 CFR 274a.1(g) and the verification procedures outlined for recruiters and referrers in 8 CFR 274a.2(b)(1)(iv) specifically permit these arrangements. These provisions of the

regulations incorporate the concepts found in the Fair Labor Standards Act. They provide great flexibility in the use of intermediaries for verification, because, rather than establish a restrictive definition of agent, they permit verification by anyone "acting in [the employer's recruiter's or referrer's] interest." Employers, recruiters, and referrers may use central clearing houses or similar organizations to satisfy the document verification requirements of the Act. However, liability remains with the employer, the recruiter, or the referrer for any failure of the third party to satisfy the requirements of law.

### 3. Retroactive Verification

Another similar concern was expressed by employers concerning their responsibility to retroactively verify employees who were hired subsequent to enactment but prior to June 1, 1987. Approximately 50 responses were received on this issue. Recognizing these concerns, INS has taken the following steps in the final rule: (1) Employees who were hired but quit or were terminated within this period need not be verified; (2) employees who were hired within this period and continue to be employed, must be verified on or before September 1, 1987; and (3) as stated above, recruiters and referrers need not verify individuals recruited or referred within the period. Many concerns were expressed to INS about the lack of availability of a final Form I-9 during the public education period prior to June 1. INS recognizes that some employers took the step, in good faith, of commencing retroactive verification of employees using the version of the form which was published for comment with the proposed rule on March 19, 1987. In such instances, INS will accept verifications which were performed using this form as satisfying the requirements of the law and regulations. However, only the finalized Form I-9 should be used for verifications performed on or after June 1.

### 4. Union Hiring Halls

Approximately 60 comments were received on the issue of whether union hiring halls constituted a form of recruitment or referral for a fee based upon union dues paid. Opinions were divided on this matter. The final rule excludes union hiring halls from such definition. INS does not believe inclusion of these entities was within Congressional intent. However, such arrangements may be included in contractual or collective bargaining agreements between unions and

employers where they are in the interests of both parties.

### 5. Definition of Hire

The Service in its proposed rules defined "hire" as the "actual commencement of employment of an employee . . ." This aroused public concern as to the appropriate time for completion of the verification process. Approximately 20 comments were received in this regard. INS realizes that employers with decentralized operations may actually hire an individual well in advance of the time that the employee commences work. While the regulations state that the Service wishes to stress that verification may be completed either at the time of an individual's acceptance of an offer of employment or at the time employment actually commences.

### 6. State Employment Agency Verification

The rule provides for procedures relating to verification by a state employment agency. These procedures were developed on the basis of discussions with state employment agencies. INS also attended several open forums at which state employment agencies were well represented. INS anticipates that future modifications to this rule will be forthcoming in order to further develop standardized certification forms and procedures for all state agencies which choose to exercise the option to issue certifications which is granted them under the statute.

### 7. Pre-enactment ("Grandfather") Status

The proposed rule specified that a pre-enactment employment status is retained by an individual even though temporarily interrupted because of leave for study, illness, pregnancy, or transfer from one location to another with the same company. It provided that status would be lost by termination, exclusion, or deportation. Approximately 15 comments were received from the public, including labor law attorneys familiar with other agencies' definitions and procedures. The commentors recommended that the rule address other temporary employment interruptions. INS has considered these suggestions, and adopted several of them, including: Strikes and layoffs where there is a reasonable basis for believing that the individual will be reemployed with the same employer; promotions or demotions within the same company and intracompany transfers; and other temporary leaves which have been

approved by the employer. The public is directed to the regulations for other examples of interruptions which do not cause loss of the pre-enactment status of the individual.

The public should be aware that pre-enactment status pertains to the continued employment of individuals hired, recruited, or referred prior to November 7, 1986 only. It does not accord an illegal alien the right to remain in the United States.

## 8. Independent Contractor

Several business entities (approximately 25) provided their views on this aspect of the proposed regulations. They recommended that INS include the term "independent contractor" among the definitions in the regulations. The final rule specifies criteria and factors that are to be considered in determining whether a particular business arrangement constitutes an agreement with an independent contractor as opposed to an employee. The criteria and factors which have been enumerated are consistent with current Internal Revenue Service guidelines. Those who engage the labor services of an independent contractor are not responsible for verification of the employment eligibility of the employees of the independent contractor. However, contracts may not be used for the purposes of circumventing the employment eligibility verification requirements of employees.

## 9. Three-day Period for Completion of Verification

Approximately 30 comments were received on this proposed rule from various sources, including governmental employing entities. Commentors generally believed that the three-day period for completion of verification is sufficient. However, it was recommended that an exception be made for an individual who does not possess an acceptable document and needs to secure one for verification. It was noted that even large numbers of United States citizens are not in possession of certain documents and may need additional time to obtain them. Commentors were concerned that failure to provide an exception to the three-day requirement might result in unemployment of authorized workers who are awaiting replacement or initial issuance of documents.

The final rule allows an exception in cases where an individual has lost a document or has not yet obtained a document necessary for either identity or work authorization purposes. In such a case, the individual is required to present a receipt for the application of

the document within three days, and present the required document itself within twenty-one days.

## 10. Identification Documents

The proposed rule required employees to present an employer with a document or documents that establish identity and employment eligibility. With regard to documents that establish identity alone, the proposed rule required presentation of a state-issued driver's license or state-issued identification card except where the individual is under sixteen years old or lives or works in one of the eight states that does not issue an identification card. The statute allows the Attorney General to designate alternative identity documents for individuals covered by the two exceptions.

Approximately 60 responses concerned this issue. Public comment was received from a variety of sources, including private individuals, several colleges, and some agricultural enterprises such as produce farmers. Many strongly opposed these restrictions on the use of alternative documents. Commentors noted that the requirement would be extremely confusing for employers and unnecessarily burdensome for individuals who do not have a driver's license or identification card, yet might have one of the designated alternative documents.

The final rule establishes an expanded list of identity documents and permits parents or guardians to sign the Form I-9 on behalf of minors under sixteen years of age. Documents from this expanded list can be used by anyone in any state for the purpose of establishing identity.

In terms of number and variety, the list contains a wide range of identity documents and is based upon recommendations received in response to the proposed rule. The list has been defined in consideration of the recency of the legislation and in recognition of the fact that a comprehensive but reasonable list is in the interest of the public at this time.

The statute mandates that any alternative identity document provide a "reliable means of identification." The Congress, both in the statute and in its legislative history, expressed a particular concern with fraud in the verification system. For these reasons, INS will closely monitor the reliability and integrity of the list of alternative identity documents. After a sufficient period of time has elapsed to enable the public to become accustomed to and familiar with the law, and based upon information acquired from system

monitoring, INS may propose amendments to this list.

## 11. I-9 Retention

In response to public comment, the one-year period of validity of the I-9 for rehiring purposes has been expanded to three years in the final rule. This period coincides with the minimum retention period required for the Form I-9. Also, INS believes that this three year rehire provision adequately deals with the concerns of temporary help companies. Such temporary help companies can rehire the same individual without limit during a three year period (beginning on the date the Form I-9 was initially completed) as long as the individual remains authorized to work.

## 12. Authority to Inspect I-9

There were numerous public comments on the proposed rule regarding inspection of the Form I-9. The Service believes that the final rule requiring employers to produce the Form I-9 for inspection upon request of an INS officer after three days notice is well within our statutory authority. IRCA provides at section 274A(B)(3) that "the person or entity must retain the form (Form I-9) and make it available for inspection by officers of the Service or the Department of Labor beginning on the date . . ." The final regulations specify that INS will provide employers or others with three days advance notice of an inspectional visit, in order that they may comply with a request for production of the Form I-9. IRCA does not require Service officers to present a subpoena or warrant prior to a request to inspect. Furthermore, they will be permitted to produce the forms to the Service office which is located closest to the place where the forms have been retained, if different from where the demand was made. However, this does not preclude INS from obtaining warrants based on probable cause, for entry onto the premises of suspected violators without advance notice. The past experience of many agencies with similar responsibilities has proven the occasional necessity of such actions, where serious, repeated violators are concerned.

## 13. Good Faith Defense

An employer, recruiter, or referrer who establishes that he or she has acted in good faith to comply with the verification requirements of the regulations will have established an affirmative yet rebuttable defense that he or she has in fact complied with the law with respect to such hiring, recruiting, or referral. An employer,

NJAPP0421

recruiter, or referrer must attest on Form I-9 that he or she has verified the employment eligibility and identity of an individual hired, recruited, or referred. This attestation may be made if the document or combination of documents examined in the verification process reasonably appears on its face to be genuine.

14. Organization of Subpart B: Employment Authorization

The rule redesignates Part 109, with amendments, as Part 274a, Subpart B, employment authorization. In response to public comments, § 274a.12, classes of aliens authorized to accept employment, has been expanded to identify aliens not previously identified in Part 109, and has also been subdivided to clarify and articulate classes of aliens who are or may be authorized to accept employment in the United States. The section contains three paragraphs generally categorizing these classes, which include: (1) Aliens authorized employment incident to status, whose employment authorization is not restricted in terms of location or type of employment and who need not seek employment authorization from INS; (2) aliens authorized employment with a specific employer incident to status, whose employment is subject to the restrictions imposed upon the particular nonimmigrant classification; and (3) aliens who must apply to INS for employment authorization. Within these paragraphs, the rule contains a comprehensive listing of employment authorization classifications.

15. Nonimmigrant Student Employment Authorization

In response to the proposed rule, numerous institutions of higher learning urged INS to retain the procedure concerning on-campus employment for full-time students, and for students in a work-study program which is part of the regular curriculum available within the student's program of study. The final regulations incorporate these recommendations by classifying on-campus employment as employment which is incident to the student's status. Academic institutions will need to comply with the employment verification requirements of IRCA with respect to these nonimmigrant students.

16. Employment Authorization for Temporary Workers, Exchange Visitors, and Intra-company Transferrees

In response to public comments, the final rule provides for an automatic extension of employment authorization for a period of 120 days for H, J, and L

nonimmigrants who have filed timely applications for extensions of stay. The automatic extension of employment authorization is valid only for an alien who continues employment with the same employer. In the event that INS is unable to adjudicate such an application for extension of status within the 120 day period, the alien may apply for employment authorization pursuant to the application procedure defined in the rule. Thus the regulations address continued employment authorization for employment-related classifications of nonimmigrant aliens during periods when extensions of stay are pending. They also recognize the possibility of delays in the processing of applications for extensions of stay, and provide an application procedure in the event of any unusual delay. These provisions were added in direct response to the recommendations of commentors.

17. Interim Employment Authorization

The final rule requires INS to adjudicate an application for employment authorization within sixty days from the date of the receipt by INS of the application or the date of the receipt of a returned application. Any application for employment authorization not adjudicated within sixty days will result in an automatic grant to the applicant of interim employment authorization for a period of up to 120 days. In promulgating this rule, INS recognizes the importance of expeditious processing of employment authorization applications. As in the case of the rule regarding employment authorizations for certain nonimmigrant extension applicants, this regulation was developed in response to public comment.

18. Automatic Termination of Temporary Employment Authorization

In the past, Service practice was not uniform in the grant of temporary work authorization to certain aliens such as nonimmigrants and parolees. These individuals were sometimes granted work authorization for indefinite periods of time despite its "temporary" nature, on Service Form I-94 or other documents. In order to reconcile this inconsistency with the terms of IRCA, INS has specified in the regulations that any temporary employment authorization granted prior to June 1, 1987, pursuant to 8 CFR 109.1(b) or its redesignation as § 274a.12(c), shall automatically terminate on the date specified by the Service on the document issued to the alien, or on June 1, 1988, whichever is earlier. Any document issued by the Service prior to

June 1, 1987 that authorizes temporary employment for an indefinite period beyond June 1, 1988 will become null and void on June 1, 1988, and must be surrendered to the Service on the date of the document's expiration or on June 1, 1988, whichever is earlier. The public is advised that no notice of intent to revoke or other Service advisory is necessary under this rule.

Automatic termination of such employment authorization does not preclude a subsequent application for employment authorization. The rule requires the issuance of a new employment authorization provided that the alien remains eligible for employment in the United States. This regulation is not applicable to an alien whose employment authorization is inherent in his or her status, such as a lawful permanent resident.

This rule is promulgated for the sole purpose of enabling INS to replace the multiplicity of outstanding employment authorization documents with a standard, uniform document. INS is taking this step because it believes this transition to a new uniform document is in the interest of employers and those aliens authorized to work in the United States.

This rule is a major rule within the context of E.O. 12291 in terms of the effect it will have on the national economy. A Regulatory Impact Analysis in conjunction with a Regulatory Flexibility Analysis as required by 5 U.S.C. 603 and 604, is available for review by the public upon request.

The information collection requirements contained in this regulation have been submitted to and cleared by OMB under the Paperwork Reduction Act.

List of Subjects

*8 CFR Part 109*

Aliens, Employment.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment.

For the reasons set out in the preamble, INS amends Chapter I of Title 8 of the Code of Federal Regulations as follows:

PART 109—EMPLOYMENT AUTHORIZATION

1. Part 109 is removed and reserved.

2. A new Part 274a is added to read as follows:

NJAPP0422

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

### Subpart A—Employer Requirements

Sec.
274a.1  Definitions.
274a.2  Verification of employment eligibility.
274a.3  Continuing employment of unauthorized aliens.
274a.4  Good faith defense.
274a.5  Use of labor through contract.
274a.6  State employment agencies.
274a.7  Pre-enactment provisions for employees hired prior to November 7, 1986.
274a.8  Prohibition of indemnity bonds.
274a.9  Enforcement procedures.
274a.10  Penalties.
274a.11  Special rule for legalization, special agricultural worker and Cuban/Haitian entrant adjustment applicants.

### Subpart B—Employment Authorization

274a.12  Classes of aliens authorized to accept employment.
274a.13  Application for employment authorization.
274a.14  Termination of employment authorization.

**Authority:** Secs. 101, 1103, 274A of the Immigration and Nationality Act, 8 U.S.C. 1101, 1103, 1324A.

### Subpart A—Employer Requirements

#### § 274a.1  Definitions.

For the purpose of this chapter—

(a) The term "unauthorized alien" means, with respect to employment of an alien at a particular time, that the alien is not at that time either: (1) Lawfully admitted for permanent residence, or (2) authorized to be so employed by this Act or by the Attorney General;

(b) The term "entity" means any legal entity, including but not limited to, a corporation, partnership, joint venture, governmental body, agency, proprietorship, or association;

(c) The term "hire" means the actual commencement of employment of an employee for wages or other remuneration;

(d) The term "refer for a fee" means the act of sending or directing a person or transmitting documentation or information to another, directly or indirectly, with the intent of obtaining employment in the United States for such person, for remuneration whether on a retainer or contingency basis; however, this term does not include union hiring halls that refer union members or non-union individuals who pay union membership dues;

(e) The term "recruit for a fee" means the act of soliciting a person, directly or indirectly, and referring that person to another with the intent of obtaining employment for that person, for

remuneration whether on a retainer or contingency basis; however, this term does not include union hiring halls that refer union members or non-union individuals who pay union membership dues;

(f) The term "employee" means an individual who provides services or labor for an employer for wages or other remuneration but does not mean independent contractors as defined in paragraph (j) of this section or those engaged in casual domestic employment as stated in paragraph (h) of this section;

(g) The term "employer" means a person or entity, including a agent or anyone acting directly or indirectly in the interest thereof, who engages the services or labor of an employee to be performed in the United States for wages or other remuneration. In the case of an independent contractor or contract labor or services, the term "employer" shall mean the independent contractor or contractor and not the person or entity using the contract labor;

(h) The term "employment" means any service or labor performed by an employee for an employer within the United States, including service or labor performed on a U.S. vessel or U.S. aircraft which touches at a port in the United States, but does not include casual employment by individuals who provide domestic service in a private home that is sporadic, irregular, or intermittent;

(i) The term "State employment agency" means any State government unit designated to cooperate with the United States Employment Service in the operation of the public employment service system;

(j) The term "independent contractor" includes individuals or entities who carry on independent business, contract to do a piece of work according to their own means and methods, and are subject to control only as to results. Whether an individual or entity is an independent contractor, regardless of what the individual or entity calls itself, will be determined on a case-by-case basis. Factors to be considered in that determination include, but are not limited to, whether the individual or entity: Supplies the tools or materials; makes services available to the general public; works for a number of clients at the same time; directs the order or sequence in which the work is to be done and determines the hours during which the work is to be done. The use of labor or services of an independent contractor are subject to the restrictions in section 274A(a)(4) of the Act and § 274a.5 of this part;

(k) The term "pattern or practice" means regular, repeated, and intentional

activities, but does not include isolated, sporadic, or accidental acts.

#### § 274a.2  Verification of employment eligibility.

A. *General.* This section states the requirements and procedures persons or entities must comply with when hiring, or when recruiting or referring for a fee, individuals in the United States, or continuing to employ aliens knowing that the aliens are (or have become) unauthorized aliens. The Form I-9, Employment Eligibility Verification Form, has been designated by the Service as the form to be used in complying with the requirements of this section. The Form I-9 may be obtained in limited quantities at INS District Offices, or ordered from the Superintendent of Documents, Washington, DC 20402. The Form I-9 may be photocopied or printed without regard to the restrictions set forth in § 299.4 of this Chapter. Employers need only complete the Form I-9 for individuals who are hired after November 6, 1986 and continue to be employed after May 31, 1987. Employers shall have until September 1, 1987 to complete the Form I-9 for individuals hired from November 7, 1986 through May 31, 1987. Recruiters and referrers for a fee need complete the Form I-9 only for those individuals who are recruited or referred after May 31, 1987. In conjunction with completing the Form I-9, an employer or recruiter or referrer for a fee must examine documents that evidence the identity and employment eligibility of the individual. The employer or recruiter or referrer for a fee and the individual must each complete an attestation on the Form I-9 under penalty of perjury. However, if an individual attests to an employer or recruiter or referrer for a fee, that he or she is an alien who intends to apply or has applied for benefits under the provisions of section 245A or 210 of the Act or section 202 of the Immigration Reform and Control Act of 1986, then the individual is authorized to work in the United States until September 1, 1987 without providing the employer or the recruiter or referrer for a fee with documentary evidence of work authorization. In this case, the employer, or the recruiter or referrer for a fee, should follow the procedures set forth in § 274a.11 of this part. Employers and recruiters and referrers for a fee who fail to comply with the employment verification requirements set forth in paragraph (b) of this section shall be subject to penalties as stated in § 274a.10 of this part.

**16222**   Federal Register / Vol. 52, No. 84 / Friday, May 1, 1987 / Rules and Regulations

(b) *Employment verification requirements—*(1) *Examination of documents and completion of Form I–9.*

(i) An individual who is hired or is recruited or referred for a fee for employment must:

(A) Complete Section 1—"Employee Information and Verification" on the Form I–9 at the time of hiring; or if an individual is unable to complete the Form I–9 or needs it translated, someone may assist him or her. The preparer or translator must read the Form to the individual, assist him or her in completing Section 1—"Employee Information and Verification," and have the individual sign or mark the Form in the appropriate place. The preparer or translator should then complete the "Preparer/Translator Certification" portion of the Form I–9; and

(B) Present to the employer or the recruiter or referrer for a fee documentation as set forth in paragraph (b)(1)(v) of this section establishing his or her identity and employment eligibility within the time limits set forth in paragraphs (b)(1)(ii) through (v) of this section. However, pursuant to the "Special Rule" set forth in § 274a.11 of this part, legalization, special agricultural worker, and Cuban/Haitian entrant adjustment applicants are authorized to work without presenting documentation establishing work authorization until September 1, 1987.

(ii) except as provided in paragraph (b)(viii) of this section, an employer, his or her agent, or anyone acting directly or indirectly in the interest thereof, must within three business days of the hire:

(A) Physically examine the documentation presented by the individual establishing identity and employment eligibility as set forth in paragraph (b)(1)(v) of this section; and

(B) Complete Section 2—"Employer Review and Verification" on the Form I–9.

(iii) An employer, his or her agent, or anyone acting directly or indirectly in the interest thereof, who hires an individual for employment for a duration of less than three business days must comply with paragraphs (b)(1)(ii)(A)–(B) of this section before the end of the employee's first working day.

(iv) A recruiter or referrer for a fee for employment must comply with paragraphs (b)(1)(ii)(A)–(B) of this section within three business days of the date the referred individual was hired by the employer. Recruiters and referrers may designate agents to complete the employment verification procedures on their behalf including but not limited to notaries, national associations, or employers. If a recruiter or referrer designates an employer to

complete the employment verification procedures, the employer need only provide the recruiter or referrer with a photocopy of the Form I–9.

(v) The individual may present either an original document that establishes both employment authorization and identity, or an original document that establishes employment authorization and a separate original document that establishes identity. The document identification number and expiration date (if any) should be noted in the appropriate space provided on the Form I–9. An employer or a recruiter or referrer for a fee may not specify which document or documents an individual is to present.

(A) The following documents are acceptable to evidence both identity and employment eligibility:

(1) United States passport;

(2) Certificate of United States Citizenship, INS Form N–560 or N–561;

(3) Certificate of Naturalization, INS Form N–550 or N–570;

(4) An unexpired foreign passport which:

(i) contains an unexpired stamp therein which reads, "Processed for I–551. Temporary Evidence of Lawful Admission for permanent residence. Valid until ———. Employment authorized." or

(ii) has attached thereto a Form I–94 bearing the same name as the passport and contains an employment authorization stamp, so long as the period of endorsement has not yet expired and the proposed employment is not in conflict with any restrictions or limitations identified on the Form I–94.

(5) Alien Registration Receipt Card, INS Form I–151 or Resident Alien INS Form I–551, provided that it contains a photograph of the bearer;

(6) Temporary Resident Card, INS Form I–688;

(7) Employment Authorization Card, INS Form I–688A.

(B) The following documents are acceptable to establish identity only:

(1) For individuals 16 years of age or older:

(i) a state-issued driver's license or state-issued identification card containing a photograph. If the driver's license or identification card does not contain a photograph, identifying information should be included such as: Name, date of birth, sex, height, color of eyes, and address;

(ii) School identification card with a photograph;

(iii) Voter's registration card;

(iv) U.S. military card or draft record;

(v) Identification card issued by federal, state, or local government agencies or entities;

(vi) Military dependent's identification card;

(vii) Native American tribal documents;

(viii) United States Coast Guard Merchant Mariner Card;

(ix) Driver's license issued by a Canadian government authority;

(2) For individuals under age 16 who are unable to produce a document listed in paragraph (b)(1)(v)(B)(1) of this section, the following documents are acceptable to establish identity only:

(i) School record or report card;

(ii) Clinic doctor or hospital record;

(iii) Daycare or nursery school record.

(3) Minors under the age of 16 who are unable to produce one of the identity documents listed in paragraph (b)(1)(v)(B) (1) or (2) of this section are exempt from producing one of the following procedures are followed:

(i) The minor's parent or legal guardian completes on the Form I–9 Section 1—"Employee Information and Verification" and in the space for the minor's signature, the parent or legal guardian writes the words, "minor under age 16."

(ii) The minor's parent or legal guardian completes on the Form I–9 the "Preparer/Translator certification."

(iii) The employer or the recruiter or referrer for a fee writes in Section 2—"Employer Review and Verification" under List B in the space after the words "Document Identification #" the words, "minor under age 16."

(C) The following are acceptable documents to establish employment authorization only:

(1) A social security number card other than one which has printed on its face "not valid for employment purposes";

(2) An unexpired reentry permit, INS Form I–327;

(3) An unexpired Refugee Travel document, INS Form I–571;

(4) A Certification of Birth issued by the Department of State, Form FS–545;

(5) A Certification of Birth Abroad issued by the Department of State, Form DS–1350;

(6) An original or certified copy of a birth certificate issued by a State, county, or municipal authority bearing a seal;

(7) An employment authorization document issued by the Immigration and Naturalization Service;

(8) Native American tribal document;

(9) United States Citizen Identification Card, INS Form I–197;

(10) Identification card for use of resident citizen in the United States, INS Form I–179.

NJAPP0424

(vi) If an individual is unable to provide the required document or documents within the time periods specified in paragraphs (b)(1)(ii) and (iv) of this section, the individual must present a receipt for the application of the document or documents within three days of the hire and present the required document or documents within 21 days of the hire.

(vii) If an individual's employment eligibility expires, the employer or the recruiter or referrer for a fee must update the Form I–9 to reflect that the individual is still authorized to work in the United States; otherwise the individual may no longer be employed, recruited, or referred. In order to update the Form I–9, the employee or referred individual must present a document that either shows continuing employment eligibility or is a new grant of work authorization. The employer or the recruiter or referrer for a fee should review this document, and if it appears to be genuine and to relate to the individual, update the form by noting the document's identification number and expiration date of the Form I–9.

(viii) An employer is not required to reverify an employee's employment eligibility as set forth in paragraphs (b)(1)(i)—(v) of this section if the employee is continuing his or her employment and at all times has a reasonable expectation of employment. "Continuing employment" includes but is not limited to situations where:

(A) The employee takes approved paid or unpaid leave on account of study, illness or disability of a family member, illness or pregnancy, maternity or paternity leave, vacation, union business, or other temporary leave approved by the employer;

(B) The employee is promoted, demoted, or gets a pay raise;

(C) The employee is laid off for lack of work;

(D) The employee is on strike or in a labor dispute;

(E) The employee is reinstated after disciplinary suspension for wrongful termination, found unjustified by any court, arbitrator, or administrative body, or otherwise resolved through reinstatement or settlement;

(F) The employee transfers from one distinct unit of an employer to another distinct unit of the same employer; the employer may transfer the employee's Form I–9 to the receiving unit; or

(G) The employee continues his or her employment with a related, successor, or reorganized employer, provided that the employer obtains and maintains from the previous records and Forms I–9 where applicable. For this purpose, a related, successor, or reorganized employer includes:

(*1*) The same employer at another location;

(*2*) An employer who continues to employ some or all of a previous employer's workforce in cases involving a corporate reorganization, merger, or sale of stock or assets; or

(*3*) An employer who continues to employ some or all of another employer's workforce where both employers belong to the same multi-employer association and employees continue to work in the same bargaining unit under the same collective bargaining agreement.

(2) *Retention and Inspection of Form I–9.* (i) Form I–9 must be retained by an employer or a recruiter or referrer for a fee for the following time periods:

(A) In the case of an employer, three years after the date of the hire or one year after the date the individual's employment is terminated, whichever is later; or

(B) In the case of a recruiter or referrer for a fee, three years after the date of the referral.

(ii) Any person or entity required to retain Forms I–9 in accordance with this section shall be provided with at least three days notice prior to an inspection of the Forms by an authorized Service officer. At the time of inspection, the Forms I–9 must be made available at the location where the request for production was made, or if the Forms I–9 are kept at another location, at the nearest Service office to that location. No subpoena or warrant shall be required for such inspection. Any refusal or delay in presentation of the Forms I–9 for inspection is a violation of the retention requirements as set forth in section 274A(b)(3) of the Act. In addition, if the person or entity has not complied with a request to present the Forms I–9, any Service officer listed in section 242.1 of this chapter may compel production of the Forms I–9 by issuing a subpoena.

(3) *Copying of documentation.* An employer or a recruiter or referrer for a fee may, but is not required to, copy a document presented by an individual solely for the purpose of complying with the verification requirements of this section. If such copy is made, it must be retained with the Form I–9. The retention requirements in paragraph (b)(2) of this section do not apply to the photocopies.

(4) *Limitation on use of Form I–9.* Any information contained in or appended to the Form I–9, including copies of documents listed in paragraph (c) of this section used to verify an individual's identity or employment eligibility, may be used only for enforcement of the Act and Sections 1001, 1028, 1546, or 1621 of Title 18, United States Code.

(c) *Employment verification requirements in the case of hiring an individual who was previously employed.* (1) When an employer hires an individual whom he or she has previously employed, if the employer has previously completed the Form I–9 and complied with the verification requirements set forth in paragraph (b) of this section with regard to the individual, the employer may (in lieu of completing a new Form I–9) inspect the previously completed Form I–9 and:

(i) If upon inspection of the Form I–9 relating to the individual, the employer determines that the Form I–9 relates to the individual and that the individual is eligible to work, no additional verification or new Form I–9 need be completed if the individual is hired within three years of the initial execution of the Form I–9; or

(ii) If upon inspection of the Form I–9, the employer determines that the individual is no longer eligible to work in the United States, the employer shall not rehire the individual unless he or she follows the updating procedures in paragraph (b)(1)(vii) of this section.

(2) For purposes of retention of the Form I–9 by an employer for a previously employed individual hired pursuant to paragraph (c)(1) of this section, the employer shall retain the Form I–9 for a period of three years commencing from the date of the initial execution of the Form I–9 or one year after the individual's employment is terminated, whichever is later.

(d) *Employment verification requirements in the case of recruiting or referring for a fee an individual who was previously recruited or referred.* (1) When a recruiter or referrer for a fee refers an individual for whom he or she has previously completed a Form I–9, and the recruiter or referrer has completed the Form I–9 and complied with the verification requirements set forth in paragraph (b) of this section with regard to the individual, the recruiter or referrer may (in lieu of completing a new Form I–9) inspect the previously completed Form I–9 and:

(i) If upon inspection of the Form I–9 relating to the individual, the recruiter or referrer determines that the Form I–9 relates to the individual and that the individual is authorized to work, no additional verification or new Form I–9 need be completed if the individual is referred within three years of the initial execution of the Form I–9; or

(ii) If upon inspection of the Form I–9, the recruiter or referrer determines that

the individual is no longer authorized to work in the United States, the recruiter or referrer shall not refer the individual for employment unless he or she follows the updating procedures in paragraph (b)(1)(vii) of this section.

(2) For purposes of retention of the Form I–9 by a recruiter or referrer for a previously referred individual pursuant to paragraph (d)(1) of this section, the recruiter or referrer shall retain the Form I–9 for a period of three years commencing from the date of the initial execution of the Form I–9.

### § 274a.3  Continuing employment of unauthorized aliens.

An employer who continues the employment of an employee hired after November 6, 1986, knowing that the employee is or has become an unauthorized alien with respect to that employment, is in violation of section 274(a)(2) of the Act.

### § 274a.4  Good faith defense.

An employer or a recruiter or referrer for a fee for employment who shows good faith compliance with the employment verification requirements of § 274a.2(b) of this part shall have established a rebuttable affirmative defense that the person or entity has not violated section 274A(a)(1)(A) of the Act with respect to such hiring, recruiting, or referral.

### § 274a.5  Use of labor through contract.

Any person or entity who knowingly uses a contract, subcontract, or exchange entered into, renegotiated, or extended after the date of enactment, to obtain labor or services of an unauthorized alien shall be considered to have hired the alien for employment in the United States in violation of section 274A(a)(1)(A) of the Act.

### § 274a.6  State employment agencies.

(a) *General.* A state employment agency as defined in § 274a.1 of this part may, but is not required to, verify employment eligibility pursuant to section 274A(b) of the Act. However, should a state employment agency choose to do so, it must:

(1) Complete the verification process for all individuals referred;

(2) Complete the verification process in accordance with the requirements of § 274a.2(b) of this part;

(3) Issue to an individual it refers a certification as set forth in paragraph (c) of this section, in which case an employer who hires the individual shall be deemed to have complied with the verification requirements of § 274a.2(b)(1) of this part, provided that the certification is retained by the employer in the same manner prescribed

for Form I–9 in § 274a.2(b)(2) of this part; and

(4) Require the surrender of the certification back to the agency by the individual referred, if he or she is not hired as a result of the referral.

(b) *Compliance with the provisions of section 274A of the Act.* State employment agencies which choose to verify employment eligibility of individuals pursuant to § 274a.2(b) of this part shall comply with all provisions of section 274A of the Act and the regulations issued thereunder, and are subject to the penalties provided in § 274a.10 of this part for failure to comply.

(c) *Procedures for state employment agency certification.* All certifications issued by a state employment agency pursuant to paragraph (a)(3) of this section shall conform to the following standards. They must:

(1) Be issued on official agency letterhead, signed by an appropriately designated official, and contain the embossed seal of the agency;

(2) Be addressed to the particular employing entity to which the individual is referred, and contain identifying data concerning the individual being referred;

(3) Certify that the state agency has complied with the requirements of section 274A(b) of the Act concerning verification of the identity and employment eligibility of the individual referred, and determined that the individual is authorized to work in the United States;

(4) Clearly stipulate any restrictions, conditions, or other limitations which relate to the individual's employment eligibility in the United States; and

(5) State that the employer is not required to reverify the individual's identity or employment eligibility, but must retain the certification letter in lieu of Form I–9.

(d) *Procedures for individuals who are certified by state employment agencies.* Any individual referred to a potential employer by a state employment agency pursuant to this section shall present the original certification to that employer. If the referred individual is hired, the certification shall be provided by the individual to the employer for retention. If the referred individual is not hired, the original certification shall be surrendered by the individual to the state employment agency which issued the certificate. No copies shall be made of this certification, except as provided in paragraph (e) of this section.

(e) *Retention of state employment agency certifications.* Certifications issued by state employment agencies pursuant to this section shall be retained

in the same manner and for the same period as Form I–9:

(1) In original form by the state employment agency, upon surrender by the individual referred if he or she is not hired; or

(2) In duplicate form by the state employment agency if the individual referred is hired; and

(3) In original form by the employer if the individual referred is hired.

### § 274a.7  Pre-enactment provisions for employees hired prior to November 7, 1986.

(a) The penalties provisions as set forth in section 274A (e) and (f) of the Act for violations of section 274A (a)(2) and (b) of the Act shall not apply to the "continuing employment" of an employee who was hired prior to November 7, 1986. For purposes of this section, "continuing employment" is defined in § 274a.2(b)(vi) of this part.

(b) For purposes of this section, an employee who was hired prior to November 7, 1986 shall lose his or her pre-enactment status if the employee:

(1) Quits; or

(2) Is terminated by the employer; the term termination shall include, but is not limited to, situations in which an employee is subject to seasonal employment; or

(3) Is excluded or deported from the United States or departs the United States under an order of voluntary departure.

### § 274a.8  Prohibition of indemnity bonds.

(a) *General.* It is unlawful for a person or other entity, in hiring or recruiting or referring for a fee for employment of an individual, to require the individual to post a bond or security, to pay or agree to pay an amount, or otherwise to provide a financial guarantee or indemnity, against any potential liability arising under this part relating to such hiring, recruiting, or referring of the individual. However, this prohibition does not apply to performance clauses which are stipulated by agreement between contracting parties.

(b) *Penalty.* Any person or other entity who requires any individual to post a bond or security as stated in this section shall, after notice and opportunity for an administrative hearing in accordance with section 274A(e)(3)(B) of the Act, be subject to a civil fine of $1,000 for each violation and to an administrative order requiring the return to the individual of any amounts received in violation of this section or, if the individual cannot be located, to the general fund of the Treasury.

**§ 274a.9  Enforcement procedures.**

(a) *Procedures for the filing of complaints.* Any person or entity having knowledge of a violation or potential violation of section 274A of the Act may submit a signed, written complaint in person or by mail to the Service office having jurisdiction over the business or residence of the potential violator. The signed, written complaint must contain sufficient information to identify both the complainant and the potential violator, including their names and addresses. The complaint should also contain detailed factual allegations relating to the potential violation including the date, time and place that the alleged violation occurred and the specific act or conduct of the employer alleged to constitute a violation of the Act. Written complaints may be delivered either by mail to the appropriate Service office or by personally appearing before any immigration officer at a Service office.

(b) *Investigation.* The Service may conduct investigations for violations on its own initiative and without having received a written complaint. When the Service receives a complaint from a third party, it shall investigate only those complaints which have a reasonable probability of validity. If it is determined after investigation that the person or entity has violated section 274A of the Act, the Service shall issue and serve upon the alleged violator a citation or a Notice of Intent to Fine. Service officers shall have reasonable access to examine any relevant evidence of any person or entity being investigated.

(c) *Citation and notice of intent to fine.* If after investigation the Service determines that a person or entity has violated section 274A of the Act for the first time during the citation period (June 1, 1987 through May 31, 1988) the Service shall issue a citation. If after investigation the Service determines that a person or entity has violated section 274A of the Act for the second time during the citation period or for the first time after May 31, 1988, the proceeding to assess administrative penalties under section 274A of the Act is commenced by the Service by issuing a Notice of Intent to Fine on Form I-762. Service of this Notice shall be accomplished pursuant to Part 103 of this chapter. The person or entity identified in the Notice of Intent to Fine shall be known as the respondent. The Notice of Intent to Fine may be issued by an officer defined in § 242.1 of this chapter with concurrence of the District Counsel or his or her designee.

(1) *Contents of the notice of intent to fine.* (i) The Notice of Intent to Fine will contain a concise statement of factual allegations informing the respondent of the act or conduct alleged to be in violation of law, a designation of the charge(s) against the respondent, the statutory provisions alleged to have been violated, and the penalty that will be imposed.

(ii) The Notice of Intent to Fine will provide the following advisals to the respondent:

(A) That the person or entity has the right to representation by counsel of his or her own choice at no expense to the government;

(B) That any statement given may be used against the person or entity;

(C) That the person or entity has the right to request a hearing before an Administrative Law Judge pursuant to 5 U.S.C. 554–557, and that such request must be made within 30 days from the service of the Notice of Intent to Fine ;

(D) That the Service will issue a final order in 45 days if a written request for a hearing is not timely received and that there will be no appeal of the final order.

(d) *Answer to notice of intent to fine.* (1) If a respondent contests the issuance of a Notice of Intent to Fine, he or she must, by mail, serve a written answer responding to each allegation listed in the Notice and request a hearing within thirty days from the issuance of the Notice.

(2) If the respondent does not file an answer within thirty days, the Service shall issue a final order to which there is no appeal.

**§ 274a.10  Penalties.**

(a) *Criminal penalties.* An employer or a recruiter or referrer for a fee who engages in a pattern and practice of violating section 274A(a)(1)(A) or (a)(2) of the Act, may be fined not more than $3,000 for each unauthorized alien, imprisoned for not more than six months for the entire pattern or practice, or both, notwithstanding the provisions of any other Federal law relating to fine levels.

(b) *Civil penalties.* An employer or a recruiter or referrer for a fee may face civil penalties for a violation of section 274A of the Act. Civil penalties may be imposed by the Service or an Administrative Law Judge for violations under section 274A of the Act. In determining the level of the penalties that will be imposed, a finding of more than one violation in the course of a single proceeding or determination will be counted as a single violation. However, a single violation will include penalties for each unauthorized alien

who is determined to have been knowingly hired or recruited or referred for a fee.

(1) A respondent found by the Service (if the respondent fails to request a hearing) or an Administrative Law Judge (at a hearing) to have knowingly hired or to have knowingly recruited or referred for a fee unauthorized alien for employment in the United States or to have knowingly continued to employ an unauthorized alien, shall be subject to the following order:

(i) To cease and desist from such behavior;

(ii) To pay a civil fine according to the following schedule:

(A) First violation—not less than $250 and not more than $2,000 for each unauthorized alien; or

(B) Second violation—not less than $2,000 and not more than $5,000 for each unauthorized alien; or

(C) More than two violations—not less than $3,000 and not more than $10,000 for each unauthorized alien; and

(iii) To comply with the requirements of section 274a.2(b) of this part, and to take such other remedial action as is appropriate.

(2) A respondent determined by the Service (if a respondent fails to request a hearing) or by an Administrative Law Judge to have failed to comply with the employment verification requirements as set forth in § 274a.2(b) of this part, shall be subject to a civil penalty in an amount of not less than $100 and not more than $1,000 for each individual with respect to whom such violation occurred. In determining the amount of the penalty, consideration shall be given to:

(i) The size of the business of the employer being charged;

(ii) The good faith of the employer;

(iii) The seriousness of the violation;

(iv) Whether or not the individual was an unauthorized alien; and

(v) The history of previous violations of the employer.

(3) Where an order is issued with respect to a respondent composed of a distinct, physically separate subdivision which does its own hiring or its own recruiting or referring for a fee for employment (without reference to the practices of, or under the control of or common control with, another subdivision) the subdivision shall be considered a separate person or entity.

(c) *Enjoining pattern or practice violations.* If the Attorney General has reasonable cause to believe that a person or entity is engaged in a pattern or practice of employment, recruitment or referral in violation of section 274A(a)(1)(A) or (2) of the Act, the

Attorney General may bring civil action in the appropriate United States District Court requesting relief, including a permanent or temporary injunction, restraining order, or other order against the person or entity, as the Attorney General deems necessary.

### §274a.11  Special rule for legalization, special agricultural worker, and Cuban/Haitian entrant adjustment applicants.

An individual who claims to be eligible, and who intends to apply or has applied, for benefits pursuant to section 245A or 210 of the Act or section 202 of the Immigration and Reform and Control Act of 1986, is authorized to work without presenting an employer or a recruiter or referrer for a fee with documentary evidence of work authorization. When an individual indicates to an employer or a recruiter or referrer for a fee that he or she claims to qualify for such benefits and that he or she intends to apply or has applied for such benefits, he or she shall attest to that fact by checking on the Form I-9, the third box of Part 1 (Employee Information and Verification) and noting "Special Rule" in the space after "Alien Number A_____" and "September 1, 1987" in the space after "expiration of employment authorization." The individual must also provide a document listed in § 274a.2(b)(1)(v)(B) of this part that establishes identity. The employer shall follow all of the employment verification procedures set forth in § 274a.2(b) of this part except that the employer or the recruiter or referrer for a fee shall note on the Form I-9 that the individual has stated his or her intention to seek such benefits by writing on the Form I-9 in Section 2—"Employer Review and Verification" under List C ("Documents that Establish Employment Eligibility") in the space after "Document Identification" the words "Special Rule" and in the space after "Expiration Date," "September 1, 1987". After September 1, 1987, such individuals, employers and recruiters and referrers for a fee will be required to fully comply with all provisions of § 274a.2(b) of this part. Employers, recruiters, and referrers, however, may update the Form I-9 if they follow the procedures set forth in § 274a.2(b)(2) of this part.

### Subpart B—Employment Authorization

### § 274a.12  Classes of aliens authorized to accept employment.

(a) *Aliens authorized employment incident to status.* Pursuant to the statutory or regulatory reference cited, the following classes of aliens are authorized to be employed in the United States without restrictions as to location or type of employment as a condition of their admission or subsequent change to one of the indicated classes, and specific employment authorization need not be requested:

(1) An alien who is a lawful permanent resident (with or without conditions pursuant to section 216 of the Act), as evidenced by Form I-151 or Form I-551 issued by the Service;

(2) An alien admitted to the United States as a lawful temporary resident pursuant to section 245A or 210 of the Act, as evidenced by an employment authorization document issued by the Service;

(3) An alien admitted to the United States as a refugee pursuant to section 207 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(4) An alien paroled into the United States as a refugee for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(5) An alien granted asylum under section 208 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(6) An alien admitted to the United States as a nonimmigrant fiance or fiancee pursuant to section 101(a)(15)(K) of the Act, or an alien admitted as the child of such alien, for the period of admission of the United States, as evidenced by an employment authorization document issued by the Service;

(7) An alien admitted as a parent (N-8) or dependent child (N-9) of an alien granted permanent residence under section 101(a)(27)(I) of the Act, as evidenced by an employment authorization document issued by the Service;

(8) An alien admitted to the United States as a citizen of the Federated States of Micronesia (CFA/FSM) or of the Marshall Islands (CFA/MIS) pursuant to agreements between the United States and the former trust territories, as evidenced by an employment authorization document issued by the Service;

(9) An alien granted suspension of deportation under section 244(a) of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(10) An alien granted withholding of deportation under section 243(h) of the Act for the period of time in that status, as evidenced by an employment

authorization document issued by the Service;

(11) An alien who has been granted extended voluntary departure by the Attorney General as a member of a nationality group pursuant to a request by the Secretary of State. Employment is authorized for the period of time in that status as evidenced by Form I-__ issued by the Service.

(b) *Aliens authorized for employment with a specific employer incident to status.* The following classes of nonimmigrant aliens are authorized to be employed in the United States by the specific employer and subject to the restrictions described in the section(s) of this chapter indicated as a condition of their admission in, or subsequent change to, such classification. An alien in one of these classes is not issued an employment authorization document by the Service:

(1) A foreign government official (A-1 or A-2), pursuant to § 214.2(a) of this chapter. An alien in this status may be employed only by the foreign government entity;

(2) An employee of a foreign government official (A-3), pursuant to § 214.2(a) of this chapter. An alien in this status may be employed only by the foreign government official;

(3) A foreign government official in transit (C-2 or C-3), pursuant to § 214.2(c) of this chapter. An alien in this status may be employed only by the foreign government entity;

(4) A nonimmigrant crewman (D-1 or D-2) pursuant to § 214.2(d), and Parts 252 and 253, of this chapter. An alien in this status may be employed only in a crewman capacity on the vessel or aircraft of arrival, or on a vessel or aircraft of the same transportation company, and may not be employed in connection with domestic flights or movements of a vessel or aircraft;

(5) A nonimmigrant treaty trader (E-1) or treaty investor (E-2), pursuant to § 214.2(e) of this chapter. An alien in this status may be employed only by the treaty-qualifying company through which the alien attained the status. Employment authorization does not extend to the dependents of the principal treaty trader or treaty investor (also designated "E'1" or "E-2"), other than those specified in paragraph (c)(2) of this section;

(6) A nonimmigrant student (F-1) pursuant to § 214.2(f)(9) of this chapter. An alien in this status may be employed only in accordance with the following conditions:

(i) On campus for not more than twenty hours a week while school is in session; or

(ii) On campus full time when school is not in session if the student is eligible and intends to register for the next term or session. In addition, a nonimmigrant student (F–1) may engage in a work-study program as part of the regular curriculum available within the student's program of study in accordance with the conditions specified in § 214.2(f)(10) of this chapter;

(7) A representative of an international organization (G–1, G–2, G–3, or G–4), pursuant to § 214.2(g) of this chapter. An alien in this status may be employed only by the foreign government entity or the international organization;

(8) A personal employee of an official or representative of an international organization (G–5), pursuant to § 214.2(g) of this chapter. An alien in this status may be employed only by the official or representative of the international organization;

(9) A temporary worker or trainee (H–1, H–2A, H–2B, or H–3), pursuant to § 214.2(h) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained;

(10) An information media representative (I), pursuant to § 214.2(i) of this chapter. An alien in this status may be employed only for the sponsoring foreign news agency or bureau. Employment authorization does not extent to the dependents of an information media representative (also designated "I");

(11) An exchange visitor (J–1), pursuant to § 214.2(j) of this chapter. An alien in this status may be employed only by the exchange visitor program sponsor or appropriate designee and within the guidelines of the program approved by the United States Information Agency;

(12) An intra-company transferee (L–1), pursuant to § 214.2(l) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained;

(13) Officers and personnel of the armed services of nations of the North Atlantic Treaty Organization, and representatives, officials, and staff employees of NATO (NATO–1, NATO–2, NATO–3, NATO–4, NATO–5 and NATO–6), pursuant to § 214.2(o) of this chapter. An alien in this status may be employed only by NATO;

(14) An attendant, servant or personal employee (NATO–7) of an alien admitted as a NATO–1, NATO–2, NATO–3, NATO–4, NATO–5, or NATO–6, pursuant to § 214.2(o) of this chapter. An alien admitted under this classification may be employed only by

the NATO alien through whom the status was obtained; or

(15) A nonimmigrant alien within the class of aliens described in paragraphs (b)(9), (11), and (12) of this section whose status has expired but who has filed a timely application for an extension of such status pursuant to §214.2 of this chapter. These aliens are authorized to continue employment with the same employer for a period not to exceed 120 days beginning on the date of the expiration of the authorized period of stay. If the alien's application for extension of stay has not been adjudicated within this period, the alien may apply to the district director for employment authorization pursuant to paragraph (c)(15) of this section.

(c) *Aliens who must apply for employment authorization.* Any alien within a class of aliens described in this section must apply for work authorization. If authorized, such an alien may accept employment subject to any restrictions indicated in the regulations or cited on the employment authorization document:

(1) An alien spouse or unmarried dependent son or daughter of a foreign government official (A–1 or A–2) pursuant to § 214.2(a)(2) of this chapter, or the dependent of an employee of a foreign government official (A–3) pursuant to § 214.2(a)(3) of this chapter;

(2) An alien spouse or unmarried dependent son or daughter of an alien employee of the Coordination Council for North American Affairs (E–1) pursuant to § 214.2(e) of this chapter;

(3) A nonimmigrant (F–1) student who:
(i) Is seeking off-campus employment authorization due to economic necessity pursuant to § 214.2(f) of this Chapter;

(ii) Is seeking employment for purposes of practical training pursuant to § 214.2(f) of this chapter. The alien may be employed only in an occupation which is directly related to his or her course of studies; or

(iii) Has been offered employment under the sponsorship of an international organization within the meaning of the International Organization Immunities Act (59 Stat. 669), if such international organization provides written certification to the district director having jurisdiction over the intended place of employment that the proposed employment is within the scope of the organization's sponsorship;

(4) An alien spouse or unmarried dependent son or daughter of an officer or employee of an international organization (G–4) pursuant to § 214.2(g) of this chapter;

(5) An alien spouse or minor child of an exchange visitor (J–2) pursuant to § 214.2(j) of this chapter;

(6) A nonimmigrant (M–1) student seeking employment for practical training pursuant to § 214.2(m) of this chapter following completion of studies if such employment is directly related to the student's course of study;

(7) A dependent of an alien classified as NATO–1 through NATO–7 pursuant to § 214.2(n) of this chapter;

(8) Any alien who has filed a non-frivolous application for asylum pursuant to Part 208 of this chapter. Employment authorization shall be granted in increments not exceeding one year during the period the application is pending (including any period when an administrative appeal or judicial review is pending) and shall expire on a specified date;

(9) Any alien who has filed an application for adjustment of status to lawful permanent resident pursuant to Part 245 of this chapter. Employment authorization shall be granted in increments not exceeding one year during the period the application is pending (including any period when an administrative appeal or judicial review is pending) and shall expire on a specified date;

(10) Any alien who has filed an application for suspension of deportation pursuant to Part 244 of this chapter, if the alien establishes an economic need to work. Employment authorization shall be granted in increments not exceeding one year during the period the application is pending (including any period when an administrative appeal or judicial review is pending) and shall expire on a specified date;

(11) Any alien paroled into the United States temporarily for emergent reasons or reasons deemed strictly in the public interest pursuant to § 212.5 of this chapter;

(12) Any deportable alien granted voluntary departure, either prior to or after hearing, for reasons set forth in §242.5(a)(2) (v), (vi), or (viii) of this chapter may be granted permission to be employed for that period of time prior to the date set for voluntary departure including any extension granted beyond such date. Factors which may be considered in adjudicating the employment application of an alien who has been granted voluntary departure are the following:

(i) The length of voluntary departure granted;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support;

(iii) Whether there is a reasonable chance that legal status may ensue in the near future; and

**16228**   Federal Register / Vol. 52, No. 84 / Friday, May 1, 1987 / Rules and Regulations

(iv) Whether there is a reasonable basis for consideration of discretionary relief.

(13) Any alien against whom exclusion or deportation proceedings have been instituted, who does not have a final order of deportation or exclusion, and who is not detained may be granted temporary employment authorization if the district director determines that employment is appropriate. Factors which may be considered by the district director in adjudicating the employment application of such an alien are the following:

(i) The existence of the economic necessity to be employed;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support;

(iii) Whether there is a reasonable chance that legal status may ensue in the near future; and

(iv) Whether there is a reasonable basis for consideration of discretionary relief;

(14) An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, if the alien establishes an economic necessity for employment;

(15) A nonimmigrant alien within the class of aliens described in paragraphs (b)(9), (11), and (12) of this section whose application for extension of stay has not been adjudicated within the 120-day period as set forth in paragraph (b)(15) of this section.

(d) *Basic criteria to establish economic necessity.* Title 45—Public Welfare, Poverty Guidelines, 45 CFR 1060.2 should be used as the basic criteria to establish eligibility for employment authorization when the alien's economic necessity is identified as a factor. The alien shall submit an application for employment authorization listing his or her assets, income, and expenses as evidence of his or her economic need to work. Permission to work granted on the basis of the alien's application for employment authorization may be revoked under §274a.14 of this chapter upon a showing that the information contained in the statement was not true and correct.

§ 274a.13  Application for employment authorization.

(a) *General.* An application (in the form of a written request) for employment authorization by an alien under § 274.12(c) of this chapter shall be filed with the district director having jurisdiction over the applicant's residence. Except for paragraph (c)(8) of this section, the approval of an application for employment authorization shall be within the discretion of the district director. Where economic necessity is identified as a factor, the alien must provide information regarding his or her assets, income, and expenses on the application for employment authorization.

(b) *Approval of application.* If the application is granted, the alien shall be notified of the decision and issued employment authorization for a specific period of time. Such authorization shall be subject to any conditions noted on the employment authorization document.

(c) *Denial of application.* If the application is denied, the applicant shall be notified in writing of the decision and the reasons for the denial. There shall be no appeal from the denial of the application.

(d) *Interim employment authorization.* The district director shall adjudicate the application for employment authorization within 60 days from the date of receipt of the application by the Service or the date of receipt of a returned application by the Service. Failure to complete the adjudication within 60 days will result in the grant of interim employment authorization for a period not to exceed 120 days. Such authorization shall be subject to any conditions noted on the employment authorization document. However, if the district director adjudicates the application prior to the expiration date of the interim employment authorization and denies the individual's employment authorization application, the employment authorization granted under this section shall automatically terminate.

§ 274a.14  Termination of employment authorization.

(a) *Automatic termination of employment authorization.*

(1) Employment authorization granted under § 274a.12(c) of this chapter shall automatically terminate upon the occurrence of one of the following events:

(i) The expiration date specified by the Service on the employment authorization document is reached;

(ii) Exclusion or deportation proceedings are instituted (however, this shall not preclude the authorization of employment pursuant to § 274a.12(c) of this part where appropriate); or

(iii) The alien is granted voluntary departure.

(2) Termination of employment authorization pursuant to this paragraph does not require the service of a notice of intent to revoke; employment authorization terminates upon the occurrence of any event enumerated in paragraph (a)(1) of this section.

However, automatic revocation under this section does not preclude the reapplication for employment authorization under § 274.12(c) of this part.

(b) *Revocation of employment authorization—* (1) *Basis for revocation of employment authorization.* Employment authorization granted under § 274a.12(c) of this chapter may be revoked by the district director:

(i) Prior to the expiration date, when it appears that any condition upon which it was granted has not been met or no longer exists, or for good cause shown, or

(ii) Upon a showing that the information contained in the application is not true and correct.

(2) *Notice of intent to revoke employment authorization.* When a district director determines that employment authorization should be revoked prior to the expiration date specified by the Service, he or she shall serve written notice of intent to revoke the employment authorization. The notice will cite the reasons indicating that revocation is warranted. The alien will be granted a period of fifteen days from the date of service of the notice within which to submit countervailing evidence. The decision by the district director shall be final and no appeal shall lie from the decision to revoke the authorization.

(c) *Automatic termination of temporary employment authorization granted prior to June 1, 1987.* (1) Temporary employment authorization granted prior to June 1, 1987, pursuant to 8 CFR 109.1(b), or its redesignation as § 274a.12(c) of this part, shall automatically terminate on the date specified by the Service on the document issued to the alien, or on June 1, 1988, whichever is earlier. Automatic termination of temporary employment authorization does not preclude a subsequent application for temporary employment authorization.

(2) A document issued by the Service prior to June 1, 1987, that authorizes temporary employment authorization for any period beyond June 1, 1988, is null and void pursuant to paragraph (c)(1) of this section, and must be surrendered to the Service on the date that the temporary employment authorization terminates or on June 1, 1988, whichever is earlier. The alien shall be issued a new employment authorization document at the time the document is surrendered to the Service if the alien is eligible for temporary employment authorization pursuant to § 274a.12(c) of this chapter.

(3) No notice of intent to revoke is necessary for the automatic termination of temporary employment authorization pursuant to this part.

Dated: April 28, 1987.

Alan C. Nelson,

*Commissioner, Immigration and Naturalization Service.*

[FR Doc. 87-9896 Filed 4-30-87; 8:45 am]

**BILLING CODE 4410-10-M**

NJAPP0430

# Exhibit 43

NJAPP0431

12-4-87
Vol. 52    No. 233
Pages 46051-46342



**Friday**
**December 4, 1987**

Briefings on How To Use the Federal Register—
For information on briefings in Denver, CO, see
announcement on the inside cover of this issue.

46092

# Proposed Rules

Federal Register

Vol. 52, No. 233

Friday, December 4, 1987

This section of the FEDERAL REGISTER contains notices to the public of the proposed issuance of rules and regulations. The purpose of these notices is to give interested persons an opportunity to participate in the rule making prior to the adoption of the final rules.

---

## DEPARTMENT OF JUSTICE

**Immigration and Naturalization Service**

**8 CFR Part 109**

**[INS Number: 1026–87]**

**Employment Authorization; Classes of Aliens Eligible**

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Petition for rulemaking; denial.

**SUMMARY:** On October 28, 1986 (51 FR 39385) the Immigration and Naturalization Service ("the Service") published a petition for rulemaking submitted by the Federation for American Immigration Reform ("FAIR"). The petition sought the rescission of 8 CFR 109.1(b) relating to employment authorization for aliens in the United States because the petitioner believed that the Service had exceeded its authority in promulgating the regulation. In publishing the FAIR petition, the Service explained that it was taking no position on the issues raised in the petition, but was seeking comments from interested parties. The period for submission of comments was initially designated as from October 28, 1986 to December 29, 1986, but was extended on December 18, 1986 until January 28, 1987 to afford the public an opportunity to submit comments in light of the Immigration Reform and Control Act of 1986. Upon a thorough review of the comments received, the Service now denies the petition.

**DATES:** The petition is denied as of December 4, 1987.

**FOR FURTHER INFORMATION CONTACT:** Michael L. Shaul, Senior Immigration Examiner, Immigration and Naturalization Service, 425 I Street, NW., Washington, DC 20536, Telephone: (202) 633–3946.

**SUPPLEMENTARY INFORMATION:** In publishing the FAIR petition to rescind 8 CFR 109.1(b) the Service sought comments from interested parties concerning the issues raised in the petition. The Service took no position on the merits of the petition at the time of publication, preferring to carefully evaluate the petition in light of comments from the public.

Subsequent to the publication of the petition, the Immigration Reform and Control Act of 1986 (IRCA) became law. Section 101 of IRCA amended the Immigration and Nationality Act by adding section 274(a) relating to the unlawful employment of aliens. Accordingly, on May 1, 1987 (52 FR 16190) the Service published regulations relating to IRCA which (among other things) transferred 8 CFR Part 109 to 8 CFR Part 274a and significantly expanded the material covered. Although 8 CFR Part 109 has now been removed, this denial of rulemaking will continue to refer to the regulation discussed in the petition as 8 CFR Part 109 for the sake of clarity.

The Service received a total of 99 responses during the period designated for submission of comments, and one response from the Department of the Treasury subsequent to the closing date. Of the 99 comments, 46 were in favor of the petition and 53 were opposed. Comments were received from a wide spectrum of interested parties, ranging from local to national to international governmental entities, and from private individuals to business and educational institutions to public interest, groups. Likewise, the extent of the comments ranged from simple statements of support or opposition to fairly thorough legal and historical discussions. Some writers chose to comment only on the one or two aspects of the petition with which they were most familiar, while others chose to comment on all aspects. Regardless of the source, the extent or the scope, all comments were carefully reviewed and the arguments presented taken into account. Finally, the Service would like to express its appreciation to all who took the time to submit comments.

The FAIR petition presented three premises for rescinding the regulation. The remainder of this discussion will deal with each of these premises in light of the comments received from persons on both sides of the issues:

*Premise A: The Regulation is Inconsistent With the Purpose of the Immigration and Nationality Act ("the Act")*

The petitioner contends that the purpose of the Act is the protection of the American labor force, and that because the regulation is inconsistent with this purpose, it should be rescinded. Opponents of the petition counter that FAIR has over-simplified the purpose of the Act. In fact, the Act is a very complex statute which has many different purposes, some of which may appear at time to be in conflict with others. Among the goals of the Act not mentioned by FAIR are: Supporting international exchange, encouraging family reunion, protecting those who fear persecution, facilitating diplomatic relations, fulfilling international treaty requirements, providing due process for deportable aliens, and (in certain instances) providing some measure of humanitarian assistance to meritorious cases. Since each of the categories of aliens authorized to accept employment by 8 CFR 109.1(b) relates to at least one of these goals, the regulation is not inconsistent with the purposes of the Act.

Additionally, FAIR states that the labor certification requirements of section 212(a)(14) of the Act are being circumvented because the Service does not keep statistical records of the number of aliens permitted to work under the provisions of 8 CFR 109.1(b). Although the Service has not kept such records in the past, it has never been unconcerned with the impact of the regulation on the American labor market. While recognizing the other goals of the Act, the Service has taken reasonable measures to protect the labor market. The employment authorized by 8 CFR 109.1(b) is normally of very limited duration and only under conditions set forth in that Part or in other Parts referred to in the regulation. These conditions, combined with the fact that most of the classes enumerated in 8 CFR 109.1(b) are very small to begin with, mean that the total number of aliens authorized to accept employment is quite small and the impact on the labor market is minimal. The regulatory conditions include:

1. The dependent of a foreign government official or international organization employee is not allowed to

accept employment in a "Schedule B" occupation. This schedule, prepared by the Department of Labor, lists those occupations for which a labor certificate may not be granted.

2. A nonimmigrant student may accept on-campus employment only if it does not displace a United States resident, may accept employment for practical training only in areas where such training is not available in his or her homeland, and may accept employment due to economic necessity only after completion of the first year of studies and after establishing that the need was unforeseeable.

3. The spouse of an exchange visitor may not be authorized employment for the support of the principal alien.

4. An asylum applicant who has filed a frivolous application may not be granted employment authorization.

5. An adjustment applicant must first be the beneficiary of an immigrant visa petition (unless the applicant qualifies as a "special immigrant") and an immigrant visa number (if required) must be immediately available.

6. An applicant for suspension of deportation must establish that he or she has an economic need to work.

7. A deportable alien under voluntary departure must establish that he or she merits favorable exercise of the district director's discretion. The regulation sets forth four conditions to be considered by the district director in reaching his decision.

8. An alien who has been placed in deferred action status must establish an economic need to work.

Furthermore, it should be noted that although the number of aliens authorized to work under 8 CFR Part 109 (now 8 CFR Part 274A) is relatively small and was previously considered to be not worth recording statistically, the Service is exploring ways of formalizing procedures for requesting employment authorization which will result in the generation of statistical reports.

*Premise B: The Regulation as Promulgated by the INS is an Ultra Vires Act*

This second premise is directly related to the first. FAIR contends that the Attorney General had no statutory authority to promulgate regulations and rejects the Service's stated position that the relevant authority was conferred upon the Attorney General by section 103(a) of the Act as passed by Congress. That section states, in pertinent part:

The Attorney General shall be charged with the administration and enforcement of this Act and all other laws relating to the

immigration and naturalization of aliens, except, insofar as this Act or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers: *Provided, however,* That determination and ruling by the Attorney General with respect to all questions of law shall be controlling. * * * He shall establish such regulations * * * as he deems necessary for carrying out his authority under the provisions of this Act.

The authority of the Attorney General is not limited to the enforcement of one section of the Act dealing with labor certifications; it extends to the administration and enforcement of the Act as a whole. In determining what regulations are necessary for carrying out his authority, the Attorney General cannot operate in a vacuum, but must view the Act as it relates to multiple national and international policy issues. As Emanuel Celler, Chairman of the House Committee on the Judiciary, stated when the 1952 Act was under consideration: "the law * * * affects basically foreign policy, constitutional guarantees, public welfare, the health, the economy, and the productivity of the Nation." (Congressional and Administrative News, 82nd Congress, Second Session, 1952, v.2, p. 1750). It requires a simplistic view of the purposes of the Act and a narrow view of the mission of the Service to contend that regulations should be promulgated solely for the purpose of preventing any aliens without labor certification from being authorized to accept employment. Assuming for the sake of argument that section 103(a) of the Act did not vest in the Attorney General the necessary authority to promulgate 8 CFR 109.1(b), such authority is apparent in the new section 274A.(h)(3) of the Act which was created by the Immigration Reform and Control Act of 1986. Section 274A.(h)(3) reads:

Definition of Unauthorized Alien.—As used in this section, the term 'unauthorized alien' means, with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act or the Attorney General.

Despite the fact that on December 18, 1986 (51 FR 45338) the Service published this definition and extended the time for submission of comments until January 28, 1987, very few of the petition's proponents even mentioned the new Act. One notable exception was the petitioner itself, which submitted a supplemental statement supporting the petition. The petitioner claimed that the phrase "authorized to be so employed

by this Act or the Attorney General" does not recognize the Attorney General's authority to grant work authorization except to those aliens who have already been granted specific authorization by the Act. On the contrary, the only logical way to interpret this phrase is that Congress, being fully aware of the Attorney General's authority to promulgate regulations, and approving of the manner in which he has exercised that authority in this matter, defined "unauthorized alien" in such fashion as to exclude aliens who have been authorized employment by the Attorney General through the regulatory process, in addition to those who are authorized employment by statute.

*Premise C: The Regulation Undermines the Labor Certification Provision*

While there can be no doubt that the classes of aliens enumerated in the regulation are authorized to work without first having to obtain a labor certification, the contention that the labor certification provision is undermined is without foundation. In creating the labor certification process, Congress intended that it apply only to certain classes of aliens: third, sixth and nonpreference immigrants and H-2 nonimmigrants. Creation of the process in no way implies that Congress intended to restrict the authority of the Attorney General to promulgate regulations necessary for the administration of the Act, including regulations which authorize certain aliens to accept employment under appropriate circumstances. By limiting the circumstances under which aliens may be granted employment authorization (as discussed above), the Attorney General has assured that the regulations do not circumvent the intent of the labor certification provisions of the statute.

Upon consideration of all of the representations made by the petitioner, the comments submitted by interested parties, the legislative history of the Act and other relevant factors, it has been determined that the petition for rulemaking is without merit. Accordingly, the petition is hereby denied.

Dated: November 30, 1987.

**Richard E. Norton,**
*Associate Commissioner, Examinations, Immigration and Naturalization Service.*
[FR Doc. 87-27905 Filed 12-3-87; 8:45 am]
**BILLING CODE 4410-10-M**

# Exhibit 44

NJAPP0435



9–6–96
Vol. 61      No. 174
Pages 47019–47408

**Friday**
**September 6, 1996**



Briefings on How To Use the Federal Register
For information on briefings in New York, NY and
Washington, DC, see announcement on the inside cover
of this issue.



order's termination. However, a handler would continue to be required to maintain records of milk receipts and sales into another Federal order marketing area and report them to the market administrator of the other marketing area. In addition, if a handler's sales into another Federal order marketing area become a large enough percentage of a handler's milk receipts, a handler would be pooled under another order and incur the same reporting, recordkeeping and payment obligations it currently has under the Black Hills order.

Termination of the order will remove government enforcement of minimum prices to handlers and to producers that are determined by supply and demand conditions. It will also remove other stabilizing features of the regulatory program such as: an impartial audit of handler records to insure payment to dairy farmers and to verify the reported uses of milk; the assurance to farmers of accurate weighing, testing, classification and accounting for milk; and the existence of marketing information to evaluate market performance. Thus, it is likely that market conditions would tend to become less orderly or stable. However, it must be assumed that the consequences of the removal of the regulatory program have been considered by the cooperative association that has requested the action, and that possibly other approaches have or will be made to replace the stabilizing influence of the order.

Regardless of the possible economic effects of the order termination on the small entities involved, a termination is required by the Agricultural Marketing Agreement Act of 1937, as amended, whenever a termination is requested by a majority of the producers engaged in the production of milk for sale in the marketing area in a representative period determined by the Secretary. Black Hills Milk Producers, as the cooperative association representing all of the producers whose milk is pooled under the Black Hills milk order, has requested that the order be terminated.

Determination

It is hereby determined that termination of the Black Hills, South Dakota, order, Part 1075, is favored by a majority of the producers engaged in the production of milk for sale in the marketing area in the representative period, determined to be June 1996, and that such producers produced more than 50 percent of the milk produced for sale in the Black Hills, South Dakota, milk marketing area in such representative period.

It is also determined that notice of proposed rule making and public procedure thereon is impracticable, unnecessary and contrary to the public interest. Section 608(c)(16)(B) of the Agricultural Marketing Agreement Act of 1937, as amended, requires that if a majority of the producers engaged in the production of milk for sale in the marketing area in a representative period determined by the Secretary favor termination of the order, and such producers produced more than 50 percent of the milk produced for sale in the marketing area in the representative period, that such order shall be terminated. It is therefore necessary that the provisions of the order, as amended, subject to specific exceptions, be terminated effective October 1, 1996.

List of Subjects in 7 CFR Part 1075

Milk marketing orders.

Order

Pursuant to the provisions of the Agricultural Marketing Agreement Act of 1937, as amended (7 U.S.C. 601 *et seq.*) it is hereby ordered that all provisions of the order, as amended, regulating the handling of milk in the Black Hills, South Dakota, marketing area (7 CFR Part 1075) except § 1075.1, which incorporates the General Provisions in Part 1000, are hereby terminated effective October 1, 1996.

Milk marketing orders.

For the reason set forth in the preamble, 7 CFR Part 1075 is amended as follows:

PART 1075—MILK IN THE BLACK HILLS, SOUTH DAKOTA, MARKETING AREA

1. The authority citation for 7 CFR Part 1075 continues to read as follows:

Authority: (Secs. 1–19, 48 Stat. 31, as amended; 7 U.S.C. 601–674).

§§ 1075.2 through 1075.85   [Removed]

2. In part 1075 §§ 1075.2 through 1075.85 and their undesignated center headings are removed effective October 1, 1996.

Dated: August 30, 1996.

Michael V. Dunn,

*Assistant Secretary, Marketing and Regulatory Programs.*

[FR Doc. 96–22786 Filed 9–5–96; 8:45 am]

BILLING CODE 3410–02–P

DEPARTMENT OF JUSTICE

Immigration and Naturalization Service

8 CFR Part 103

[AG Order No. 2054–96; INS No. 1792–96]

RIN 1115–AE51

Definition of the Term Lawfully Present in the United States for Purposes of Applying for Title II Benefits Under Section 401(b)(2) of Public Law 104–193

AGENCY: Immigration and Naturalization Service, Justice.

ACTION: Interim rule with request for comments.

SUMMARY: This interim rule amends the Immigration and Naturalization Service (Service) regulations to define the term "an alien who is lawfully present in the United States" so that the Social Security Administration may determine which aliens in the United States are eligible for benefits under title II of the Social Security Act. Aliens who are considered "lawfully present in the United States," however, must otherwise satisfy the requirements for benefits under title II of the Social Security Act in order to receive social security benefits.

DATES: This rule is effective September 6, 1996. Written comments must be received on or before November 5, 1996.

ADDRESSES: Please submit written comments, in triplicate, to the Director, Policy Directives and Instructions Branch, Immigration and Naturalization Service, 425 I Street, NW., Room 5307, Washington, DC 20536. To ensure proper handling, please reference INS number 1792–96 on your correspondence. Comments are available for public inspection at this location by calling (202) 514–3048 to arrange an appointment.

FOR FURTHER INFORMATION CONTACT: Derek C. Smith, Assistant General Counsel, Office of the General Counsel; or Sophia Cox, Adjudications Officers, Adjudications Division; Immigration and Naturalization Service, 425 I Street, NW., Room 3214, Washington, DC 20536, telephone (202) 514–2895 or (202) 514–5014.

SUPPLEMENTARY INFORMATION: On August 22, 1996, the President signed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (Personal Responsibility Act), Pub. L. 104–193. Section 401(a) of the Personal Responsibility Act provides that, subject to limited exceptions, only "qualified aliens," as defined under section 431, may receive Federal public benefits,

NJAPP0437

including retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, and unemployment benefits, among others.

Section 431(b) of the Personal Responsibility Act defines the term "qualified alien" to mean the following six groups of aliens:

(1) Aliens who are lawfully admitted for permanent residence under the Immigration and Nationality Act (Act);

(2) Aliens who are granted asylum under section 208 of the Act;

(3) Refugees admitted into the United States under section 207 of the Act;

(4) Aliens who are paroled into the United States under section 212(d)(5) of the Act for a period of at least 1 year;

(5) Aliens whose deportation is being withheld under section 243(h) of the Act; and

(6) Aliens who are granted conditional entry pursuant to section 203(a)(7) of the Act as in effect prior to April 1, 1980.

Section 401(b)(2) of the Personal Responsibility Act, however, provides an exception, which allows aliens who are "lawfully present in the United States," as determined by the Attorney General, to receive benefits under title II of the Social Security Act. (Title II benefits include, for example, retirement benefits.) The purpose of this regulation, therefore, is to define the term "an alien who is lawfully present in the United States," as required under section 401(b)(2) of the Personal Responsibility Act, thereby enabling the Social Security Administration to determine whether aliens who are not "qualified aliens" are eligible to receive title II benefits, if they are lawfully present in this country. This definition is made solely for the purpose of determining an alien's eligibility for payment of title II social security benefits, as required under section 401(b)(2) of the Personal Responsibility Act, and is not intended to confer any immigration status or benefit under the Immigration and Nationality Act.

In determining which aliens are lawfully present for the purposes of section 401(b)(2) of Public Law 104–193, the Service had to distinguish among many classes of aliens in the United States. The characteristic common to all the classes of aliens defined as "lawfully present in the United States" is that their presence in the United States has been sanctioned by a policy determination that a particular class of aliens should be allowed to remain in the United States, and that policy determination has almost always been implemented by an official act having the force of law. Each of the five categories defined as lawfully present fits within this rationale. First, the Service has concluded that Congress intended for qualified aliens, as defined in section 431(b) of the Personal Responsibility Act, to be included in the definition of lawfully present. Second, aliens who have been inspected and admitted to the United States and have not violated their status are lawfully present under the terms of the Immigration and Nationality Act. Third, an alien who has been paroled into the United States is lawfully present pursuant to section 212(d)(5) of the Act. However, persons who are paroled in order to determine whether or not they must be excluded under the Act are not lawfully present because no determination has been made as to the lawfulness of their presence, and they are allowed into the United States to avoid having to keep them in detention while they wait proceedings. Fourth, aliens who belong to one of the seven classes of aliens listed in section 103.12(a)(4) of this rule have been permitted to remain in the United States either by an act of Congress or through some other policy determination affecting that class of aliens. Aliens in temporary resident status pursuant to section 210 or 245A of the Act, aliens under Temporary Protected Status (TPS) pursuant to section 244A of the Act, and Family Unity beneficiaries pursuant to section 301 of Pub. L. 101–649 are all in lawful status under the Act. Cuban-Haitian entrants, aliens in deferred action status, aliens under Deferred Enforced Departure, and aliens who are the spouses and children of a United States citizen with an approved visa petition all remain in the United States under a Presidential or administrative policy that permits them to do so. Finally, applicants for asylum and withholding of deportation are permitted to remain in the United States because section 208(a) of the Act requires the Attorney General to create a procedure for adjudicating claims for asylum made by aliens physically present in the United States. Section 208(a) of the Act was passed to implement the obligations of the United States under the Convention Relating to the Status of Refugees, of July 28, 1951, as incorporated into the Protocol Relating to the Status of Refugees, of January 31, 1967.

## Good Cause Exception

This interim rule is effective upon publication in the Federal Register although the Service invites post-promulgation comments and will address any such comments in a final rule. For the following reasons, the Service finds that good cause exists for adopting this rule without the prior notice and comment period ordinarily required by 5 U.S.C. 553(b). Section 401(b)(2) of Pub. L. 104–193 requires the Attorney General to define the term "an alien lawfully present in the United States" so that the Social Security Administration can determine which aliens are eligible for payment of title II social security benefits under the terms of the Social Security Act. Absent a definition of "an alien lawfully present in the United States," section 401(a) of Pub. L. 104–193 requires the Social Security Administration to suspend payments under title II for aliens who are not "qualified aliens" (as defined under section 431(b)) and who file applications on or after September 1, 1996. It is therefore impracticable to adopt this rule with the prior notice and comment period normally required under 5 U.S.C. 553(b).

## Regulatory Flexibility Act

The Attorney General, in accordance with the Regulatory Flexibility Act (5 U.S.C. 605(b)), has reviewed this regulation and, by approving it, certifies that this rule will not have a significant economic impact on a substantial number of small entities, because this regulation affects individuals, not small entities.

## Executive Order 12866

This interim rule is considered by the Department of Justice, Immigration and Naturalization Service, to be a "significant regulatory action" under E.O. 12866, section 3(f), Regulatory Planning Review, and it has been submitted to the Office of Management and Budget for review under E.O. 12866.

## Executive Order 12988

This interim rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of E.O. 12988.

## Executive Order 12612

This regulation will not have a substantial direct effect on the States, on the relationships between the National government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with E.O. 12612, it is determined that this rule does not have sufficient Federalism implications to warrant the preparation of a Federalism Assessment.

## List of Subjects in 8 CFR Part 103

Administrative practice and procedure, Authority delegations

(Government agencies), Freedom of Information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

Accordingly, part 103 of chapter I of title 8 of the Code of Federal Regulations is amended as follows:

## PART 103—POWERS AND DUTIES OF SERVICE OFFICERS; AVAILABILITY OF SERVICE RECORDS

1. The authority citation for part 103 continues to read as follows:

Authority: 5 U.S.C. 552, 552(a); 8 U.S.C. 1101, 1103, 1201, 1252 note, 1252b, 1304, 1356; 31 U.S.C. 9701; L.E.O. 12356; 47 FR 14874, 15557; 3 CFR 1982 Comp., p. 166; 8 CFR part 2.

2. A new § 103.12 is added to read as follows:

**§ 103.12   Definition of the term ''lawfully present'' aliens for purposes of applying for Title II social security benefits under Public Law 104–193.**

(a) *Definition of the term an ''alien who is lawfully present in the United States.''* For the purposes of section 401(b)(2) of Pub. L. 104–193 only, an ''alien who is lawfully present in the United States'' means:

(1) A qualified alien as defined in section 431(b) of Pub. L. 104–193;

(2) An alien who has been inspected and admitted to the United States and who has not violated the terms of the status under which he or she was admitted or to which he or she has changed after admission;

(3) An alien who has been paroled into the United States pursuant to section 212(d)(5) of the Act for less than 1 year, except:

(i) Aliens paroled for deferred inspection or pending exclusion proceedings under 236(a) of the Act; and

(ii) Aliens paroled into the United States for prosecution pursuant to 8 CFR 212.5(a)(3);

(4) An alien who belongs to one of the following classes of aliens permitted to remain in the United States because the Attorney General has decided for humanitarian or other public policy reasons not to initiate deportation or exclusion proceedings or enforce departure:

(i) Aliens currently in temporary resident status pursuant to section 210 or 245A of the Act;

(ii) Aliens currently under Temporary Protected Status (TPS) pursuant to section 244A of the Act;

(iii) Cuban-Haitian entrants, as defined in section 202(b) Pub. L. 99–603, as amended;

(iv) Family Unity beneficiaries pursuant to section 301 of Pub. L. 101–649, as amended;

(v) Aliens currently under Deferred Enforced Departure (DED) pursuant to a decision made by the President;

(vi) Aliens currently in deferred action status pursuant to Service Operations Instructions at OI 242.1(a)(22);

(vii) Aliens who are the spouse or child of a United States citizen whose visa petition has been approved and who have a pending application for adjustment of status;

(5) Applicants for asylum under section 208(a) of the Act and applicants for withholding of deportation under section 243(h) of the Act who have been granted employment authorization, and such applicants under the age of 14 who have had an application pending for at least 180 days.

(b) *Non-issuance of an Order to Show Cause and non-enforcement of deportation and exclusion orders.* An alien may not be deemed to be lawfully present solely on the basis of the Service's decision not to, or failure to, issue an Order to Show Cause or solely on the basis of the Service's decision not to, or failure to, enforce an outstanding order of deportation or exclusion.

Dated: September 4, 1996.

Janet Reno,

*Attorney General.*

[FR Doc. 96–22963 Filed 9–4–96; 3:10 pm]

BILLING CODE 4410–10–M

## DEPARTMENT OF TRANSPORTATION

### Federal Aviation Administration

**14 CFR Part 39**

**[Docket No. 96–SW–08–AD; Amendment 39–9740; AD 96–18–15]**

**RIN 2120–AA64**

### Airworthiness Directives; Bell Helicopter Textron, A Division of Textron Canada Ltd. Model 222, 222B, 222U, and 230 Helicopters

**AGENCY:** Federal Aviation Administration, DOT.

**ACTION:** Final rule; request for comments.

---

**SUMMARY:** This amendment supersedes an existing airworthiness directive (AD) 96–01–08, which superseded Priority Letter AD 95–23–02, both of which were applicable to certain serial-numbered Bell Helicopter Textron, A Division of Textron Canada Ltd., Model 222, 222B, 222U, and 230 helicopters, that currently requires an initial check of both surfaces of each tail rotor blade (blade) for cracks; an inspection of the blade skin if a crack of a specified size or location is found in the paint; and replacement of the blade if a crack is found in the blade skin. This AD requires the same actions as required by the existing AD, but expands the applicability to include additional blade part numbers (P/N). This amendment is prompted by three incidents in which a crack developed in the stainless steel blade skins due to sanding marks on the blades that occurred during the manufacturing process on BHT Model 230 helicopters, which are similar in design to the Model 222, 222B and 222U helicopters. The actions specified by this AD are intended to prevent failure of a blade due to a fatigue crack, loss of the tail rotor and tail rotor gear box, and subsequent loss of control of the helicopter.

**DATES:** Effective September 23, 1996.

Comments for inclusion in the Rules Docket must be received on or before November 5, 1996.

**ADDRESSES:** Submit comments in triplicate to the Federal Aviation Administration (FAA), Office of the Assistant Chief Counsel, Attention: Rules Docket No. 96–SW–08–AD, 2601 Meacham Blvd., Room 663, Fort Worth, Texas 76137.

**FOR FURTHER INFORMATION CONTACT:** Mr. Charles Harrison, Aerospace Engineer, Rotorcraft Certification Office, Rotorcraft Directorate, FAA, Fort Worth, Texas 76193–0170, telephone (817) 222–5447, fax (817) 222–5960.

**SUPPLEMENTARY INFORMATION:** On November 3, 1995, the FAA issued priority letter AD 95–23–02, applicable to certain serial-numbered BHT Model 222, 222B, 222U, and 230 helicopters, to require an initial check of both surfaces of each blade for cracks; an inspection of the blade skin if a crack of a specified size or location was found in the paint; and replacement of the blade if a crack was found in the blade skin. That action was prompted by two incidents in which a crack developed in the stainless steel blade skins on BHT Model 230 helicopters. In one of these incidents, the blade failed during flight. Subsequent investigation revealed fatigue cracks originating from sanding marks on the blade skin. The cracks were located just outboard of the stainless steel blade doubler. That condition, if not corrected, could result in failure of a blade due to a fatigue crack, loss of the tail rotor and tail rotor gear box, and subsequent loss of control of the helicopter. Subsequent to the issuance of the priority letter AD, the FAA issued AD 96–01–08 to publish the

# Exhibit 45

NJAPP0440





# FEDERAL REGISTER

Vol. 76          Monday,

No. 167          August 29, 2011

Part III

Department of Homeland Security

8 CFR Parts 1, 100, et al.
Immigration Benefits Business Transformation, Increment I; Final Rule

53764     **Federal Register** / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 1, 100, 103, 204, 207, 208, 209, 211, 212, 213a, 214, 223, 235, 236, 238, 240, 241, 244, 245, 245a, 248, 264, 265, 270, 274a, 287, 292, 299, 301, 310, 312, 316, 319, 320, 322, 324, 325, 328, 329, 330, 332, 333, 334, 335, 336, 337, 338, 339, 340, 341, 342, 343, 343a, 343b, 343c, 392, and 499**

[CIS No. 2481–09; DHS Docket No. USCIS–2009–0022]

RIN 1615–AB83

**Immigration Benefits Business Transformation, Increment I**

**AGENCY:** U.S. Citizenship and Immigration Services, DHS.

**ACTION:** Final rule; request for comments.

**SUMMARY:** The Department of Homeland Security (DHS) is amending its regulations to enable U.S. Citizenship and Immigration Services (USCIS) to migrate from a paper file-based, non-integrated systems environment to an electronic customer-focused, centralized case management environment for benefit processing. This transformation process will allow USCIS to streamline benefit processing, eliminate the capture and processing of redundant data, and reduce the number of and automate its forms. This transformation process will be a phased multi-year initiative to restructure USCIS business processes and related information technology systems. DHS is removing references to form numbers, form titles, expired regulatory provisions, and descriptions of internal procedures, many of which will change during transformation. DHS is also finalizing interim rules that permitted submission of benefit requests with an electronic signature when such requests are submitted in an electronic format rather than on a paper form and that removed references to filing locations for immigration benefits. In addition, in this rule DHS is publishing the final rule for six other interim rules published during the past several years, most of which received no public comments.

**DATES:** *Effective date:* This rule is effective November 28, 2011.

*Comment date:* Written comments must be submitted on or before October 28, 2011.

**ADDRESSES:** You may submit comments, identified by DHS docket number USCIS–2009–0022 by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *E-mail:* You may submit comments directly to USCIS by e-mail at *uscisfrcomment@dhs.gov.* Include DHS docket number USCIS–2009–0022 in the subject line of the message.

• *Mail:* Sunday Aigbe, Chief, Regulatory Products Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Suite 5012, Washington, DC 20529–2020. To ensure proper handling, please reference DHS docket number USCIS–2009–0022 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.

• *Hand Delivery/Courier:* Sunday Aigbe, Chief, Regulatory Products Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Suite 5012, Washington, DC 20529–2020. Contact Telephone Number is (202) 272–8377.

**FOR FURTHER INFORMATION CONTACT:** Dan Konnerth, Policy Chief, Office of Transformation Coordination, U.S. Citizenship and Immigration Services, Department of Homeland Security, 633 Third St., NW., Washington, DC 20529–2210. Contact Telephone Number is (202) 233–2381.

**SUPPLEMENTARY INFORMATION:**

**Table of Contents**

I. Public Participation
II. Background
  A. Introduction
  B. Authority
  C. USCIS Transformation Initiative
  D. How Transformation Will Work
  E. Other Regulatory Changes Necessary for the Transformation Initiative
III. The Changes Made by This Rule
  A. Removing References to Form Numbers and Form Titles
  B. Removing References to Position Titles Within USCIS
  C. Replacing "Service" With More Specific Component Names and Removing References to Particular USCIS Offices
  D. Removing Information About Procedures for Filing and Internal Processing of Benefit Requests
  E. Removing Obsolete and Expired Regulatory Provisions; Correcting and Updating Provisions Affected by Statutory Changes
  F. Revising or Reorganizing Sections or Paragraphs for Clarity and Consistency and To Remove Duplicative Information
IV. Discussion of Comments Received in Response to the April 29, 2003, Interim Rule
V. Discussion of Other Interim Final Rules Being Finalized
  A. Application for Refugee Status; Acceptable Sponsorship Agreement
    Guaranty of Transportation, RIN 1615–AA24
  B. Adjustment of Status for Certain Syrian Nationals Granted Asylum in the United States, RIN 1615–AA57
  C. Eliminating the Numerical Cap on Mexican TN Nonimmigrants, RIN 1615–AA96
  D. Allocation of Additional H–1B Visas Created by the H–1B Visa Reform Act of 2004, RIN 1615–AB32
  E. Classification of Certain Scientists of the Commonwealth of Independent States of the Former Soviet Union and the Baltic States as Employment-Based Immigrants, RIN 1615–AB14
  F. Revoking Grants of Naturalization, RIN 1615–AA30
VI. Discussion of Comments Received in Response to the June 5, 2009, Interim Rule
VII. Regulatory Requirements
  A. Administrative Procedure Act
  B. Unfunded Mandates Reform Act of 1995
  C. Small Business Regulatory Enforcement Fairness Act of 1996
  D. Executive Order 12866
  E. Executive Order 13132
  F. Executive Order 12988 Civil Justice Reform
  G. Paperwork Reduction Act
  H. Regulatory Flexibility Act

## I. Public Participation

Interested persons are invited to submit written data, views, or arguments on all aspects of this rule. Comments that will provide the most assistance to USCIS in developing these procedures will reference a specific portion of this rule, explain the reason for any recommended change, and include data, information, or authority that support the recommended change.

*Instructions:* All submissions must include the component name and DHS docket number USCIS–2009–0022. All comments received will be posted without change to *http://www.regulations.gov,* including any personal information provided.

*Docket:* For access to the docket to read background documents or comments received go to *http://www.regulations.gov.* Submitted comments may also be inspected at the Regulatory Products Division, U.S. Citizenship and Immigration Services, Department of Homeland Security, 20 Massachusetts Avenue, NW., Suite 5012, Washington, DC 20529–2020.

## II. Background

*A. Introduction*

U.S. Citizenship and Immigration Services (USCIS) receives approximately six million immigration benefit requests each year, comprised of more than fifty types of applications and petitions. USCIS historically accepted paper applications and depended on paper files. These applications and

paper files were the only means for USCIS to adjudicate applications and petitions and that paper-based process, by contemporary standards, was inefficient. Until recently, USCIS processed on paper all immigration benefits, verified the identity of applicants, and provided other government agencies with the information required to quickly identify criminals and possible terrorists.

USCIS is modernizing its processes and systems in light of the development of technology to accommodate and encourage greater use of electronic data submission, to include e-filing and electronic interaction. USCIS will not eliminate paper filing at this time but will convert the data from paper filing to an electronic medium when the completed form is received. USCIS will then operate in an electronic environment fostering greater operational efficiency, provide transparency, and improve access to information through online accounts for those who do business with USCIS.

The Department of Homeland Security (DHS) and USCIS began the transformation of USCIS operations by eliminating regulatory references to filing locations for immigration benefits, thereby permitting USCIS to more rapidly adjust filing locations to meet demand and operational needs and to provide that information on petition and application forms and through other means, such as on the USCIS Web site. *See Removing References to Filing Locations and Obsolete References to Legacy Immigration and Naturalization Service; Adding a Provision to Facilitate the Expansion of the Use of Approved Electronic Equivalents of Paper Forms,* 74 FR 26933 (June 5, 2009) ("Filing Location Rule").

DHS is expanding on the Filing Location Rule by affording additional flexibility for applicants and petitioners to file, and for USCIS to receive and process, benefit requests, biometrics, and supporting documentation in an electronic environment. For example, amendments in this rule to 8 CFR 103.2(a)(1) (relating to filing), 8 CFR 103.2(a)(7) (relating to receipt dates), and 8 CFR 103.8 (relating to delivery of notices) each replace language geared solely to paper files and benefit requests with language that is equally applicable in a paper or electronic environment.

*B. Authority*

The Government Paperwork Elimination Act (GPEA), Public Law 105–277, tit. XVII, section 1703, 112 Stat. 2681, 2681–749 (Oct. 21, 1998), 44 U.S.C. 3504 note, provides that, when possible, Federal agencies use electronic forms, electronic filing, and electronic submissions to conduct agency business with the public. GPEA establishes the means for the use and acceptance of electronic signatures. This rule will significantly enhance the ability of USCIS to fully implement GPEA. The Homeland Security Act of 2002, Public Law 107–296, section 102, 116 Stat. 2135 (Nov. 25, 2002), 6 U.S.C. 112, and the Immigration and Nationality Act of 1952, as amended (INA or Act), section 103, 8 U.S.C. 1103, charge the Secretary of Homeland Security with administration and enforcement of the immigration and naturalization laws. DHS implemented an electronic signature provision for immigration benefit filings with USCIS in 2003. *Electronic Signature on Applications for Immigration and Naturalization Benefits,* 68 FR 23010 (April 29, 2003). The Secretary promulgates this final rule under the broad authority to administer the Department of Homeland Security, and the authorities provided under the Homeland Security Act of 2002, the immigration and nationality laws, and other delegated authority.

DHS is also adding new fees to the USCIS fee regulations as required by recent legislation. Effective August 13, 2010, Public Law 111–230 imposes additional fees on certain H–1B and L–1 nonimmigrants. 124 Stat. 2485 (Aug. 13, 2010); New 8 CFR 103.7(b)(1)(v).

*C. USCIS Transformation Initiative*

USCIS is engaged in an enterprise-wide transformation effort to implement new business processes and to improve service, operational efficiency, and national security. USCIS's new operational environment will employ online accounts, such as those used by many private sector organizations.

Applicants and petitioners will be able to access individualized accounts that will provide electronic access to information on how to apply for benefits, allow easier filing, and permit applicants and petitioners, and their representatives, to track the status of open applications and petitions. Applicants and petitioners will be able to use a secure USCIS Internet Web site to access accounts "on-demand" in an electronic service environment available at all times.

USCIS will develop new automated case management tools to access data electronically, prevent the loss of information, and provide adjudicators with a comprehensive view of an alien's immigration history. USCIS's electronic environment will facilitate and expedite information collection, reduce benefit fraud and result in more consistent and efficient decisions. USCIS is supplementing existing paper filing options by adding more user-friendly electronic filing options.

USCIS will improve many of its internal security, operational efficiency, and public service capabilities as transformation proceeds. USCIS will first allow the creation of accounts for various applicants, followed by enhanced e-filing and case management capabilities, and then improve reporting and Freedom of Information Act (FOIA), 5 U.S.C. 552, tools. Once deployed, these tools will be applied and made available to the immigrant, humanitarian, and nonimmigrant applicant populations.

USCIS's transformation to an electronic environment is based on three objectives and long-term benefits: enhanced national security and integrity of filings, public service, and operational efficiency. USCIS's transformation will use modern electronic audit and investigative methods to improve national security and integrity by identifying potential fraud and other risks by effectively collecting, analyzing and sharing information used to verify an alien's or other individual's identity and eligibility for various immigration benefits. USCIS will use a more complete picture of an alien's immigration history by analyzing information across benefit applications, thus exposing those attempting to perpetrate fraud or who are otherwise ineligible for immigration benefits. For example, an applicant's or beneficiary's marital or employment history in an existing agency file or in another pending application may provide relevant information that differs from the information in the application or petition being adjudicated. A responsible and transparent approach toward the handling of such personal information protects the rights of individuals and organizations interacting with USCIS and thereby fosters their trust and cooperation. At the same time, this approach facilitates authorized sharing of information with partner components of DHS—such as U.S. Customs and Border Protection (CBP) and U.S. Immigration and Customs Enforcement (ICE)—in a secure environment that better protects against unauthorized disclosures. This approach will facilitate authorized sharing of information with partner agencies—such as the Department of State (DOS) and the Department of Justice (DOJ). In addition, electronic transmission and storage of information is faster, less costly and more secure than the physical movement of paper files.

NJAPP0443

USCIS will improve public service by adjudicating requests for benefits more accurately and quickly, and by providing more timely and accurate information about immigration benefits and the status of benefit requests. Applicants, petitioners, and their representatives will have access to relevant forms, instructions, case status, and other actions and information through online accounts that organize information and transactions to meet their needs. DHS will continue to ensure the confidentiality of its immigration records in accordance with the requirements of the law, including the Privacy Act, 5 U.S.C. 552a,[1] and 8 CFR 208.6. USCIS's transformation to an electronic environment will enable it to become an innovative and agile organization that better understands its workload and best uses all available resources, investing in its people and infrastructure to ensure cost-effective and consistent results.

### D. How Transformation Will Work

USCIS adopted a "person-centric" business approach to transformation based on establishing various types of individual and organizational accounts. The key to this approach is encouraging individual applicants, petitioners, beneficiaries, organizations, legal representatives, and others who interact with USCIS to access their own online accounts. Applicants, petitioners, and others will be able to electronically submit benefit requests with supporting documentation, access status information regarding pending benefit requests, change their addresses and contact information, obtain FOIA-related materials, and comply with some registration requirements of the Immigration and Nationality Act.

USCIS's transformation will create an end-to-end electronic adjudicative process encompassing an alien's entire immigration lifecycle, unlike the current process that uses multiple systems and focuses on each individual benefit request. Data initially provided by account holders will be reused, if appropriate, to reduce data entry required for subsequent benefit requests. Additional and revised data will be

used to update and enhance account information. Account data submitted to support various immigration benefit transactions will be verified, where feasible and appropriate, through links to other internal and external data systems, potentially reducing the need for applicants and petitioners to provide certain forms of supporting evidence and reducing potential requests for evidence from USCIS.

USCIS's transformation will eventually affect all aspects of USCIS benefit processing operations and technology. This operational concept is intended to standardize processes across USCIS operations relating to case intake, biometrics, background checks, adjudication, scheduling, and notifications. USCIS benefit adjudication operations will be changed incrementally from a paper- and hard copy file-based process to an electronic process, making it possible to process benefit requests more efficiently. With the implementation of these improvements, USCIS will enhance the overall process.

### E. Other Regulatory Changes Necessary for the Transformation Initiative

DHS anticipates that additional regulatory changes will be required over the next several years as the transformation of USCIS to an electronic environment progresses. DHS expects, for example, to revise regulations pertaining to filing and handling of immigrant benefit requests to lead to computer system enhancements applied to immigrant applications and benefits. DHS will not make transformation-related changes to 8 CFR part 214 at this time, but will publish a separate rulemaking to address business transformation as well as reorganizing and simplifying that part.

### III. The Changes Made by This Rule

DHS is amending those parts of chapter I of 8 CFR that regulate affidavits of support, citizenship and naturalization, employment authorization, nonimmigrant benefits (other than part 214) and related waivers, permanent resident documents, refugee and asylum processing, Temporary Protected Status, and travel documents. These amendments are best understood by the changes effected, rather than as individual amendments to the regulations.

### A. Removing Form Title and Number References, and Adding Filing Definitions

DHS is removing references to form numbers and form titles. At this time, USCIS will continue to accept paper

submission of most applications, petitions, and benefit requests, although it will phase out references to mandatory use of specific forms for specific purposes in the regulations. Mandating in regulations specific form numbers reduces USCIS's ability to modify its business processes to reflect filing procedures in an electronic environment. Form names and numbers will continue to exist for reference purposes but will not be specifically referenced in the regulations. This rule is an early step in the transformation process and purposely does not remove all form references from all regulations affecting USCIS procedures at this time. Forms identified by number will continue to appear until other parts of DHS regulations are amended to address transformation requirements. The list of prescribed forms will be removed from 8 CFR parts 299 and 499, although USCIS will continue to refer to form numbers on its Internet Web site, at *http://www.uscis.gov*, and public information telephone scripts. DHS components ICE, and CBP will likewise continue to refer to form numbers on their Internet Web sites, *http://www.ice.gov*, and *http://www.cbp.gov*.

In most instances, DHS is removing form names and numbers by replacing the form reference with a generic statement, such as "the form designated by USCIS." Removal of these references from a paragraph or section in some instances, however, requires changes which cannot be achieved through replacement of a term or phrase. In those instances, the entire paragraph is revised.

DHS is removing references to the specific forms known by form numbers: AR–11, G–28, G–325, I–90, I–94, I–102, I–129, I–130, I–131, I–191, I–192, I–193, I–212, I–290B, I–407, I–512, I–539, I–551, I–566, I–589, I–590, I–601, I–602, I–607, I–644, I–688, I–730, I–765, I–797, I–797A, I–797B, I–821, I–854, I–864, I–864A, I–864P, I–865, I–907, I–914, I–917, I–918, N–300, N–400, N–426, N–565, N–600, and N–643. This list is not intended to be exhaustive, nor are all references to the listed forms removed by this final rule. Additional references to these and other USCIS forms will be phased out in subsequent rules. DHS is not removing references to forms that primarily affect the functions of DHS components other than USCIS.

Enumerating OMB control numbers for USCIS information collection requirements in regulations is no longer necessary and, therefore, 8 CFR 100.7 is being removed. OMB control numbers continue to be displayed on USCIS forms pursuant to the Paperwork

---

[1] The Privacy Act grants United States citizens and lawful permanent residents the right to access and amend their records. DHS policy, as a matter of discretion, permits nonimmigrant aliens equivalent ability to access and correct records. *Memorandum for Directorate and Component Leadership from Hugo Teufel III, Chief Privacy Officer, DHS Privacy Policy Regarding Collection, Use, Retention, and Dissemination of Information on Non-U.S. Persons*, Memorandum 2007–1 (January 19, 2007), found at *http://www.dhs.gov/xlibrary/assets/privacy/privacy_policyguide_2007-1.pdf*.

Reduction Act, 44 U.S.C. 3512, and on the USCIS Internet Web site.

DHS is adding new definitions for "application," "petition," and "benefit request" to transition from "forms" to either paper or electronic instruments used to seek various immigration benefits. The terms "application" and "petition" are used together, separately, and interchangeably in many sections of chapter I of the 8 CFR and this rule does not affect every reference to those terms. The term "benefit request" is often used in the sections amended by this rule in place of application or petition in the interest of economy of words, to reduce the ambiguity and confusion resulting from the constant use of both terms, improve readability, and to add flexibility for describing what a particular capability may be called when it is converted to an electronic interaction. No substantive change results from defining these terms in this rule.

As the USCIS transformation initiative progresses, electronic versions of forms and digital images of supporting documents will largely replace paper forms and documents for adjudication and records retention purposes. USCIS will specify the process and standards for the transmission of electronic benefit requests and supporting documents on its Internet Web site, but it is intended that these standards will accommodate the technology in most home and public computers so as to be widely accessible.

DHS is adding a definition of "form instructions" to establish that the term refers to the most recent, approved version of such instructions available through the USCIS Internet Web site, regardless of the fact that other editions of these instructions may exist and be in circulation through other sources. Whether published in paper form or on the USCIS web site, all form and form instructions will continue to comply with Paperwork Reduction Act requirements, including public notice and comment periods. 44 U.S.C. 3507. In addition to traditional instructions appended to a USCIS form, the term as defined by the process information (e.g., filing locations, instructions on the process for submission of supporting documents) that USCIS publishes on its Internet Web site in addition to those traditional instructions, and may also include non-form and non-substantive guidance such as appendices, exhibits, guidebooks, or manuals.

USCIS does not publish its Registration for Classification as Refugee, Form I–590, with instructions for the U.S. Refugee Admissions

Program (USRAP), for general public use. Access to the USRAP is managed by DOS, and implemented by its overseas processing entities (OPEs). OPEs assist targeted populations of refugee applicants with preparation of the Registration for Classification as Refugee. As such, the term "form instructions" includes process information that USCIS publishes about the USRAP.

DHS is adding a definition for the terms "execute" or "executed" when referring to completion of an application or petition to request a benefit to ensure consistency across paper and electronic media.

### B. Removing References to Position Titles Within USCIS

Wherever possible, DHS is removing references to official position titles used within DHS or used in the past by the former Immigration and Naturalization Service (INS). These titles include director, district director, and commissioner as well as position descriptions such as examiner or adjudicator. Both position titles and delegated authority to perform specific duties assigned to USCIS employees are subject to change, potentially rendering regulatory references inaccurate or delaying implementation of planned operational changes. DHS is revising those titles and position descriptions with USCIS, DHS, or other component names, as appropriate and necessary to provide DHS with the operational flexibility required to facilitate adjudication in an electronic environment. DHS is also replacing obsolete references to the Attorney General, substituting the Secretary where appropriate.

DHS is, for example, amending 8 CFR 103.7(d) by removing the specific titles of USCIS employees who are designated to certify official immigration records. DHS and USCIS will delegate authority to appropriate officials who may be required to fulfill this responsibility.

### C. Replacing "Service" With More Specific Component Names and Removing References to Particular USCIS Offices

The definition of "Service" in newly designated 8 CFR 1.2 is amended to provide flexibility and promote the goals of transformation. The regulations in chapter I of the 8 CFR contain provisions that, to varying degrees, govern facets of all of the immigration components of DHS—CBP, ICE, and USCIS. Where DHS has determined that the section being amended by this rule applies only to USCIS, that defined acronym is inserted to replace the

previously named office, position, title, or component. Where the section pertains to an action that may have been taken by INS, or a function that is the purview of or shared with another component, the term "the Service" is retained or inserted. Thus, "the Service" in 8 CFR may refer to any immigration-related component of DHS, including USCIS, ICE, or CBP. As DHS does not purport to revise every paragraph within 8 CFR, the absence of a change to an existing usage of "Service" in a particular context does not necessarily indicate a position with respect to component authority in that context. Similarly, remaining references to the former Immigration and Naturalization Service and the acronym INS are replaced by more accurate terms.

### D. Removing Information About Procedures for Filing and Internal Processing of Benefit Requests

Some parts of the regulations include details of the internal processing and handling of benefit requests or descriptions relating to submission of paper versions of benefit request forms. Administrative filing requirements, locations, and procedures will not be prescribed in regulations but will be outlined in more flexible methods of conveying instructions. This modification will not change eligibility criteria or evidentiary standards. *See, e.g.,* 8 CFR 212.7(a)(3) ("* * * If the application is approved the director shall complete Form I–607 for inclusion in the alien's file."). *See also* 8 CFR 214.2(l)(5)(ii)(E), ("* * * The consular officer shall also endorse all copies of the alien's Form I–129S with the blanket L–1 visa classification and return the original and one copy to the alien. When the alien is inspected for entry into the United States, both copies of the Form I–129S shall be stamped to show a validity period not to exceed three years and the second copy collected and sent to the appropriate Regional Service Center for control purposes.") These details are not essential to the regulations, do not add substantive requirements or impose limitations, and unnecessarily burden the text of the regulations. To the extent that this information is required to be published, 5 U.S.C. 552(a)(1)(A), (B), DHS will publish an organization and functions rule in part 2 of 8 CFR. DHS is removing these types of provisions because they are subject to change during transformation and because such information is more appropriately included within field manuals and other instructional materials that USCIS can readily revise and describe in more detail.

Terms such as ''in writing,'' ''written decision,'' and ''written notice'' have not been removed because an electronic transmission constitutes a valid writing. GPEA provides: ''Electronic records submitted or maintained in accordance with procedures developed under this title, or electronic signatures or other forms of electronic authentication used in accordance with such procedures, shall not be denied legal effect, validity, or enforceability because such records are in electronic form.'' Public Law 105–277, tit. XVII, section 1707, 112 Stat. at 2681–751 (Oct. 21, 1998) . GPEA defines electronic signature as ''* * * a method of signing an electronic message that identifies and authenticates a particular person as the source of the electronic message; and indicates such person's approval of the information contained in the electronic message.'' *Id.* Thus, as provided in GPEA, a notice on the status of a request for benefits, a request for additional evidence, and a notice of approval or denial of a request for benefits may be effected by electronic communication if that method is requested by the person who has requested the benefit, notwithstanding a regulatory provision that requires such notice to be ''in writing.'' Nonetheless, for clarity's sake, 8 CFR 103.8 provides that electronic delivery of notices suffices in appropriate circumstances. *See* new 8 CFR 103.8.

*E. Removing Obsolete and Expired Regulatory Provisions; Correcting and Updating Provisions Affected by Statutory Changes*

DHS is also removing regulatory provisions that have expired because of statutory lapses or self-executing time limits, or that are obsolete, and to make non-discretionary corrections to provisions affected by statutory amendments or extensions of time. In addition, DHS revises obsolete statutory and regulatory citations.

DHS is adding three paragraphs to USCIS fee regulations to reflect statutory fees which are already collected but which were not previously included in regulations. *See* new 8 CFR 103.7(b)(1)(i)(CCC)–(EEE). The additions provide the $1500 or $750 fee for filing certain H–1B petitions required by the American Competitiveness and Workforce Improvement Act (ACWIA), the additional fee of $500 for filing certain H–1B and L petitions established by Section 426 of the Visa Reform Act of 2004, and the additional $150 fee for H–2B petitions required by the Real ID Act of 2005. *See,* respectively, INA section 214(c)(9)(B), 8 U.S.C. 1184(c)(9)(B); INA section 214(c)(12)(C), 8 U.S.C. 1184(c)(12)(C); INA section

214(c)(13)(C), 8 U.S.C. 1184(c)(13)(B). These fees are used, generally, for training, scholarships, and fraud detection and prevention. INA sections 286(s), (v), 8 U.S.C. 1356(s), (v). USCIS determines liability for both of these fees and calculates the amount due through a series of questions on the H and L petition form. The determination process is unchanged by this rulemaking. Provisions are also added to prescribe a fee of $2000 for certain H–1B nonimmigrants or $2250 for certain L–1 nonimmigrants as required by recent legislation. Public Law 111–230, section 402, 124 Stat. 2488 (Aug. 13, 2010). Fees collected pursuant to these sections are deposited in the General Fund of the Treasury. *Id,* at section 402(c). DHS is not required to publish these fees in the CFR since the statute is clear in requiring their collection and use. Nevertheless, most USCIS stakeholders know to refer to 8 CFR 103.7 for the proper USCIS fees, and DHS believes it is a better practice to make sure that these statutorily mandated fees are also clearly delineated along with the fees established administratively by DHS through rulemaking.

Section 209.1(f) is a companion provision to match the existing provision in 8 CFR 209.2(b), which sets out the process and standards for asylees seeking adjustment of status who require a waiver of inadmissibility. Since both refugees and asylees applying for adjustment of status are subject to identical standards for waivers of inadmissibility these standards are now reflected in this section addressing both types of applicants. INA section 209(c), 8 U.S.C. 1159(c).

Since the statutory cap on adjustment by asylees has been removed, the text referencing that cap—at 8 CFR 209.1(a)(1)(vi) and the sentence that follows—are removed. For the same reason, 8 CFR 209.2(a)(2) is revised by removing the last three sentences of the paragraph. *See* Public Law 109–13, tit. I, section 101(g), 119 Stat. 302 (May 11, 2005), 8 U.S.C. 1101 note.

DHS is revising 8 CFR 209.2(d) to clarify that a medical examination, including compliance with vaccination requirements, is required of asylees applying for adjustment of status. The vaccination supplement no longer exists as a stand-alone document but rather is incorporated into the medical examination. Form instructions provide detailed guidance regarding the medical examination requirement.

DHS is removing 8 CFR 212.8 and 212.9, relating to nonpreference investor visas and to former third and sixth

preference employment-based visas, because the provisions are obsolete. The provisions of the Act that provided for these visas were repealed by section 111 of the Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978 (Nov. 29, 1990).

DHS is removing 8 CFR 212.11, which regards the admissibility of an alien who has been convicted of a violation of a law relating to a controlled substance because it is redundant. This section provided that in determining the admissibility of an alien who has been convicted of a violation of any law relating to a controlled substance, the term controlled substance as used in section 212(a)(23) of the Act shall mean the same as that referenced in the Controlled Substances Act, 21 U.S.C. 801, *et seq.* Section 212(a)(2) of the Act governs inadmissibility for criminal acts and Section 212(a)(2)(A)(i)(I) specifically includes violations of the Controlled Substance Act. INA section 212(a)(2)(A)(i)(II), 8 U.S.C. 1182(a)(2)(A)(i)(II).

DHS revised Section 244.17 to reflect current policies and procedures for re-registration of TPS beneficiaries.

DHS is removing 8 CFR 245.1(e)(2) as obsolete. This section provided for the adjustment of status of certain nonimmigrant registered nurses in accordance with the Immigration Nursing Relief Act of 1989, Public Law 101–238, 103 Stat. 2099 (Dec. 18, 1989), 8 U.S.C. 1182 note. The application period for this provision ended on March 20, 1995, and USCIS no longer has pending applications related to this provision. This regulation also makes related conforming changes to 8 CFR 245.1(g)(1) and 245.2(a)(5)(ii).

Section 245.9 is removed. This section provided for adjustment of status for certain Chinese nationals pursuant to the Chinese Student Protection Act, Pub. L. 102–404, 106 Stat. 1969 (Oct. 9, 1992). The application period for this provision ended June 30, 1994, and USCIS no longer has pending applications related to this provision. *Id.*

Section 245.12 is removed. This section provided for adjustment of status for certain Polish and Hungarian parolees pursuant to section 646 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Public Law 104–208, 110 Stat. 3009 (Sep. 30, 1996). Persons eligible for benefits under this provision must have been paroled into the U.S. prior to December 31, 1991. USCIS has not received applications pursuant to this section for several years and is unlikely to receive any in the future. Public Law 104–208, 110 Stat. 3009 (Sep. 30, 1996).

Section 245.13 is removed. This section provided for adjustment of status for certain nationals of Nicaragua and Cuba pursuant to section 202 of the Nicaragua Adjustment and Central American Relief Act, Public Law 105–100, 111 Stat. 2160, 2193 (Nov. 19, 1997). The application period for benefits under this provision ended April 1, 2000. USCIS no longer has pending applications pursuant to this provision. *Id.*

Section 245.20 is removed . This section provided for adjustment of status of Syrians granted asylum under the Syrian Adjustment Act, Public Law 106–378, 114 Stat. 1442 (Oct. 27, 2000). Eligibility under this provision required entry prior to Dec. 31, 1991. USCIS no longer has pending applications pursuant to this provision and is unlikely to receive any in the future.

Section 245.21 is revised because the Consolidated Appropriations Act of 2005 amended the Indochinese Parolee Act to eliminate the 3-year filing window and 5,000 visa limit.

Parts 264 and 265 are revised to encompass management of fingerprinting, registration, and address reporting requirements in an electronic environment and to remove obsolete references.

This rule adds 8 CFR 316.6 and revises 8 CFR 316.5, 8 CFR 322.2, and 8 CFR 341.5 to conform to the amendments to the Act by the National Defense Authorization Act (NDAA 2008), Public Law 110–181, 122 Stat. 3 (Jan. 28, 2008). The NDAA 2008 provides certain immigration benefits for any qualifying spouse or child of a member of the Armed Forces. Specifically, the NDAA 2008 amended section 319(e) of the Act; 8 U.S.C. 1430(e), to allow certain spouses of members of the Armed Forces to count any qualifying time abroad as continuous residence and physical presence in the United States for purposes of naturalization and to permit such naturalization to occur outside the United States. INA section 319(e), 8 U.S.C. 1430(e); INA section 322(d), 8 U.S.C. 1433(d); 8 U.S.C. 1443a.

This rule revises 8 CFR 319.3 to conform to the amendments to the INA by the National Defense Authorization Act (NDAA 2004), Public Law 108–136, 117 Stat. 1565 (Nov. 24, 2003), which provides certain immigration benefits relating to the naturalization of any qualifying surviving child or parent of a member of the Armed Forces. Specifically, NDAA 2004 provides for the naturalization of any qualifying surviving child or parent of a member of the Armed Forces who dies during a period of honorable service, a benefit

only previously afforded to surviving spouses. INA section 319(d), 8 U.S.C. 1430(d).

This rule revises 8 CFR 322.3 to conform to the various legislative amendments to the Act. Specifically, 8 CFR 322.3(a) was revised to conform to the 21st Century Department of Justice Appropriations Authorization Act, Public Law 107–273, enacted on November 2, 2002, which amended section 322 of the Act to allow U.S. citizen grandparents and U.S. citizen legal guardians to apply for naturalization on behalf of a child born and residing outside of the United States. Public Law 107–273, 116 Stat. 1758 (Nov. 2, 2002); *see* INA section 322, 8 U.S.C. 1433(a). Such an application by a U.S. citizen grandparent or U.S. citizen legal guardian can be made within 5 years of the death of a U.S. citizen parent of a child who could otherwise have been the beneficiary of an application for naturalization under section 322 of the Act. *See Id.* This change will conform the regulations to legislation and current practice.

In addition, current 8 CFR 322.3(a) requires the citizen parent (or, as appropriate, grandparent or guardian) to include with the application a request concerning when the applicant would like to have the child's naturalization interview scheduled. The form instructions elicit the information needed to schedule the interview. Therefore, there is no need for a separate provision on this point in 8 CFR 322.3(a).

This rule revises 8 CFR 322.3(b) to conform to the amendments to the Act made by the Intercountry Adoption Act of 2000, Public Law 106–279, which added a definition of certain adoptees to section 101(b)(1)(G) of the Act on October 6, 2000. 114 Stat. 825 (Oct. 6, 2000). The new definition describes children adopted in a foreign state that is a party to the Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption of May 22, 1993. INA section 101(b)(1)(G), 8 U.S.C. 1101(b)(1)(G). That definition under section 101(b)(1)(G) of the Act corresponds to the visa categories IH–3 and IH–4 and became effective when the Hague Adoption Convention entered into force in the United States on April 1, 2008. *See id.* USCIS implemented the Intercountry Adoption Act by publishing an interim rule, "Classification of Aliens as Children of United States Citizens Based on Intercountry Adoptions Under the Hague Convention," on October 4, 2007. *See* 72 FR 56831 (Oct. 4, 2007). The additional changes in this rule conform

to the requirements codified on that date and which have been followed since April 1, 2008.

In addition, several expired and obsolete naturalization-related regulatory provisions have been removed, including 8 CFR: 312.3(a) (standardized citizenship testing), 329.5 (natives of the Philippines with active duty service during World War II), 332.2 (establishment of photographic studios), 334.16–334.18 (naturalization petitions), 335.11–335.13 (naturalization petitions), 338.11 and 338.12 (naturalization court processes), 339.2(c) (reports relating to petitions filed prior to October 1, 1991), and 340.1 (reopening of a naturalization application by a district director pursuant to section 340(h) of the Act).

In 8 CFR 312.3, paragraph (a) is removed because the "standardized citizenship testing" for applicants for naturalization ended on August 30, 1998. *See* 63 FR 25080 (May 6, 1998).

Section 329.5 is removed because the filing period for submitting an application for naturalization under section 405 of the Immigration Act of 1990, the corresponding statutory naturalization authority, expired on February 3, 1995. *See* 8 CFR 329.5(e).

Sections 334.16–334.18, 335.11–335.13, and 339.2(c) are removed because they relate to any "petition for naturalization" filed prior to October 1, 1991. Such petitions were under the jurisdiction of the naturalization court until that date. *See* 8 CFR 310.4; INA section 310, 8 U.S.C. 1421.

### F. Revising or Reorganizing Sections or Paragraphs for Clarity and Consistency, and To Remove Duplicative Information

DHS is reorganizing 8 CFR part 1 (Definitions) and 8 CFR part 103 (Immigration Benefits, Biometric Requirements, Availability of Records), without substantive change. The reorganization of these sections does not introduce new obligations, requirements, or procedures. The reorganization is designed to simplify and rearrange existing regulatory requirements in a manner which is easier for the public to identify and understand. This rulemaking also removes regulatory provisions which repeat statutory or other regulatory information or which restate filing information that USCIS routinely includes in its form instructions. None of the changes made effect a substantive change in the law. DHS is also reorganizing certain parts of 8 CFR without substantive change. DHS intends, in the recodification of these regulations, to conform to the understood policy, intent, and purpose of the original regulations, with such

53770    **Federal Register** / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations

amendments and corrections as will remove ambiguities, contradictions, and other imperfections.

The regulations pertaining to filing and adjudication of immigration benefits are contained in 8 CFR 103.2. That section also incorporates the specific requirements contained in USCIS form instructions. *See* 8 CFR 103.2(a)(1). Repeating or paraphrasing parts of this information within other regulations that relate to specific benefits is unnecessary, possibly confusing, and may be inaccurate. Such repetition can lead the reader to conclude that a provision is somehow uniquely applicable to that particular benefit type. For example, "* * * The director shall consider all the evidence submitted and such other evidence as he or she may independently require to assist his or her adjudication" is repetitive information found within another regulation. *See* 8 CFR 214.2(h)(9)(i). Or, "* * * A copy of a document submitted in support of a visa petition filed pursuant to section 214(d) of the Act and this paragraph may be accepted, though unaccompanied by the original, if the copy bears a certification by an attorney, typed or rubber-stamped, in the language set forth in § 204.2(j) of this chapter. However, the original document shall be submitted if requested by the Service" is both repetitive and inaccurate because the referenced paragraph and procedure no longer exist. *See also* 8 CFR 214.2(k)(1).

This rule organizes 8 CFR part 103 into four subparts: subpart A—Applying for Benefits, Surety Bonds, Fees; subpart B—Biometric Requirements; subpart C—Reserved; and subpart D—Availability of Records.

Section 103.1 is removed. The delegation of authority, formerly found in 8 CFR 103.1(a), was redundant of authority specified in 8 CFR 2.1. Section 103.2(a) is revised, primarily to describe alternate procedures for electronic submission of benefit requests with digital images of supporting documentation. With the definition of "benefit request" added in 8 CFR part 1, the terms "application" and "petition" are being replaced by the term "benefit request" to reduce possible confusion regarding the use of specific paper versions of forms traditionally required to apply for benefits. As stated earlier, the terms "petition" and "application" are not being replaced throughout the rest of this chapter I and will be accorded the meaning now ascribed to them in 8 CFR part 1. Although this paragraph was recently revised, the additional changes made by this rule will clarify filing procedures for both the current

environment and the electronic environment.

Section 103.2, paragraph (a)(7) is revised to describe establishment and recordation of filing dates for benefit requests in an electronic environment. That paragraph had previously described procedures that reflected regular mail, hand delivery, and internal actions of USCIS for physically handling paper, such as stamping files with dates by hand. Specific internal procedures for determining how receipt dates and times are to be associated with a particular benefit request for which date and time are appropriate, or even essential, will be established for requests that will be received electronically, in paper format, or both. USCIS realizes that the date of filing is very important when a benefit request has a deadline or a date-specific impact on eligibility. Such benefit requests are not affected by this rule because the date the benefit request is received by USCIS will still be recorded in the system. While the internal process for recording the date when a request is received or complete will not be promulgated, the ability of filers of a benefit request to obtain a definitive receipt date will not be affected by removing the requirement for USCIS to stamp receipt dates.

In addition, 8 CFR 103.2(a)(7) is revised to eliminate possible inconsistency with 8 CFR 103.2(a)(1), clarifying that USCIS may reject a benefit request if data have not been entered in required fields. Further, 8 CFR 103.2(a)(7)(iii) is added to codify the current policy that there is no appeal when a case is rejected in accordance with this section. In USCIS parlance, the term "rejected" means that the benefit request and fee payment are returned for failure to comply with all filing requirements without being fully considered, and can be re-filed when properly completed, while "denied" means that the request is fully adjudicated and considered, and the applicant is determined ineligible for the benefit sought. Appeals of rejections are generally returned without consideration. Therefore, this change is only clarifying and has no substantive effect.

Section 103.2(b)(1) is revised to update terminology and to clarify that every applicant or petitioner must remain eligible for the benefit request at the time of adjudication and that every benefit request must be submitted with all prescribed supporting documentation. USCIS longstanding policy and practice, as well as a basic tenet of administrative law, is that the decision in a particular case is based on

the administrative record that exists at the time the decision is rendered. *Citizens to Preserve Overton Park* v. *Volpe,* 401 U.S. 402 (1972). Thus, the granting of any benefit request by DHS is not based solely on what is provided at the time of the initial request and is contingent on the fact that circumstances will not change during the processing of a benefit request in such a way so as to render the applicant ineligible. This change will reduce any confusion that may exist for those who believe that eligibility is based solely on what is provided at the time of the initial request and instead will clarify that eligibility is subject to change if circumstances change while processing occurs. This clarification may be especially important in the transformed electronic environment. This revision is not a substantive change in eligibility criteria and is thus appropriate for this final rule.

Sections 103.2, paragraphs (b)(4) and (b)(5) are revised to refer applicants and petitioners to form instructions and other sources for information on the format in which supporting documentation must be submitted. It is generally unnecessary to specify the form that an evidentiary document must be in unless a higher degree of authenticity is required than a photocopy or reasonably legible facsimile. The form instructions for a benefit request will clearly spell out when a copy, original, certified, notarized, or other specific type of document is required to meet the applicable evidentiary standard. In its transformation initiative, DHS wants to accept and use scanned or electronic documents whenever possible and believes that this approach will also be the most convenient method for the public. As stated, regulatory provisions that reflect a paper application process impede this goal. Allowing a digital format instead of a copy would not affect a person's eligibility for a benefit. Thus, this change is made without prior public comment.

This rule also eliminates express reference to Form G–884, currently used to request the return of original documents, and advises the public to follow USCIS instructions for requesting such documents. Eliminating reference to a specific form promotes greater regulatory flexibility and better accommodates future processing efficiencies. USCIS anticipates using the current form for several years during the transformation process and will continue to provide instructions for requesting the return of paper documents retained in DHS files through its Internet Web site, the USCIS

Customer Service Center, or other methods. *See* new 8 CFR 103.2(b)(4).

Section 103.3 is amended by revising the term "shall file" to read "must submit" and revising the phrase "with the office where the unfavorable decision was made" to read "as indicated in the applicable form instructions" in the last sentence in paragraph (a)(2)(i). This change will make this section more consistent with the changes made and terminology used in the Filing Location Rule. The word "shall" is less clear than "must" so substituting "must" clarifies the provision without changing the clear meaning. While the terms "file" and "filing" are not changed throughout 8 CFR by this rule, the amendment is apt in this instance for clarity because the term "file" seems to imply a paper environment, as opposed to "submit," which lends itself more clearly to both paper and electronic submissions. The provision requiring submission to a certain office location is removed in favor of form instructions which, as defined in this rule, will provide the flexibility to centralize or otherwise shift appeals based on future needs and developments. No substantive change is made to eligibility requirements.

As transformation progresses, USCIS develops system interfaces with other government information systems, reducing reliance on various forms of documentation currently supplied by benefit applicants. For example, proof of military service are more readily obtained by USCIS directly from the Department of Defense than from the applicant. Section 103.2, paragraph (b)(5) has been amended to clarify that USCIS may waive submission of documentation that it may obtain through direct interfaces.

Section 103.5a is redesignated as 103.8 and revised. This revision provides for electronic delivery of notices instead of paper notices in appropriate circumstances at the petitioner's or applicant's request. Absent such a request, a mailed paper notice remains the default option at this time. Amendments to the descriptions of routine and personal service used for delivery of notices now include a specific provision for the use of electronic media for such purposes. For consistency of process, this rule amends other sections to remove specific requirements of notice and instead cross references the notice and service provisions in 8 CFR 103.8.

Section 103.5b is redesignated as 103.9 and revised. References to Form I–824, currently used to request further action on an approved benefit request, are removed. As transformation progresses, it is envisioned that the need

for this form will diminish because account holders will request the services currently provided by the form by accessing their own accounts.

Section 103.7, paragraph (d) is amended to remove specific references to officials authorized to certify immigration records. This change will give USCIS flexibility to delegate authority for this activity to various officials as necessary for efficiency.

Section 103.2, paragraph (e), relating to fingerprint requirements, is revised and redesignated as sections 103.16 and 103.17. These sections have been reorganized and revised to reflect that most USCIS biometric collection is now accomplished digitally at USCIS offices. Paragraph (c) of 8 CFR 103.2, explaining the consequences of failure to provide biometric information, must be read in conjunction with 8 CFR 103.2(b)(13), which provides standard exceptions for such failure. This regulation removes references to specific offices where applicants must report for biometrics collection to allow USCIS greater flexibility for handling such matters. USCIS will continue to provide such information through other means.

Newly designated 8 CFR 103.17 describes biometric service fee collection requirements formerly described in 8 CFR 103.2(e). Revisions to this section more clearly reflect existing regulatory requirements regarding the authorized collection of biometrics.

Sections 103.8 through 103.11 and sections 103.21 through 103.36, which pertain to Freedom of Information and Privacy Act requests, are removed because they are outdated. Current DHS policies and procedures on these subjects are contained in 6 CFR part 5. New 8 CFR 103.42 has been added to direct readers to the DHS regulations.

Regulations relating to submission and consideration of benefit requests are located at 8 CFR 103.2(a)(1) (general filing instructions), 8 CFR 103.2(b)(1) (demonstrating eligibility for the benefit), 8 CFR 103.2(b)(16)(ii) (consideration of evidence in discretionary decisions), and in the form instructions such as for Form I–129 "* * * By signing this form you have stated, under penalty of perjury (28 U.S.C. 1746) that all information and documentation submitted with this form are true and correct. You have also authorized the release of any information from your records that USCIS may need to determine eligibility for the benefit you are seeking and consented to USCIS verification of such information." Accordingly, because processing and handling information which is broadly applicable to all USCIS

benefit types is set forth in both 8 CFR 103.2 and in the instructions to various forms, USCIS is removing such information from regulations governing consideration of specific benefits.

Section 207.1(a) is revised to instruct prospective applicants to "submi[t] an application, including biometric information, in accordance with form instructions." The term "form instructions" is in turn defined in 8 CFR 1.2 as those prescribed by USCIS on its official Internet Web site currently, notwithstanding other versions in circulation, and may also include non-form guidance such as appendices, exhibits, guidebooks, or manuals. In the context of the U.S. Refugee Admissions Program (USRAP), USCIS does not publish its Form I–590, with instructions, for general public use. Instead, access to the USRAP is managed by the DOS, and implemented by its contracted overseas processing entities (OPEs). OPEs assist targeted populations of refugee applicants with preparation of the Form I–590. As such, the term "form instructions," as defined in 8 CFR 1.2 and used in 8 CFR 207.1(a), does not refer to traditional instructions appended to a USCIS form, but rather the process information that USCIS publishes about the USRAP.

Sections 207.1, paragraphs (b) and (c) are revised by consolidating the existing firm resettlement rule in paragraph (b) and removing paragraph (c). To emphasize the legal relevance of the firm resettlement analysis, this revision moves the third sentence of original paragraph (b) to the forefront. This consolidated provision more clearly articulates that the "considerations" enumerated in new paragraphs (b)(1) through (b)(3) apply to the firm resettlement analysis generally and not, as may be misconstrued from the existing, bifurcated structure, only to an analysis of whether an applicant is "not firmly resettled." No substantive changes are made by these structural modifications of the firm resettlement rule.

Re-numbered paragraph 207.2(a) has also been re-titled from "hearing" to "interview," to better reflect the nature of USCIS interaction with refugee applicants. No substantive change is intended.

Section 207.7(d) is amended by eliminating an outdated, transitional, alternative date (February 28, 2000) for measuring the 2-year deadline by which such petitions must be filed; there is no change to the discretionary extension for humanitarian reasons. Lastly, in anticipation of future processing efficiencies afforded by transformation, this rule eliminates an express

requirement that "separate" petitions be filed for each qualifying family member, in favor of guidance that petitioners file "in accordance with the form instructions." USCIS contemplates retaining in the "form instructions" the requirement that "separate" petitions be filed for each qualifying family member, until such time that USCIS has in place transformed systems to promote additional processing efficiencies such as consolidating petitions for qualifying family members. This change will accommodate the adoption of such efficiencies without need for a future rulemaking.

Section 207.7(f)(3) is amended by adding an opening phrase to the last sentence, "[f]or a derivative inside or arriving in the United States." While this section, entitled "Benefits," applies to both paragraphs (f)(1) (derivative in the United States) and (f)(2) (derivative outside the United States), the last sentence was added to clarify that the benefit of employment authorization, incident to refugee status, becomes available to overseas beneficiaries, not upon approval of the family petition, but upon travel and their admission into the United States as refugees.

Section 208.1(b) is revised by replacing "The Director of International Affairs" with "The Associate Director of USCIS Refugee, Asylum, and International Operations (RAIO)" where it first appears and with "Associate Director of RAIO" in later references. Similarly, section 208.2(a) is revised by replacing "Office of International Affairs" in the title with "Refugee, Asylum, and International Operations (RAIO)," and by replacing "the Office of International Affairs" wherever it appears with "RAIO." As stated earlier this rule removes specific officers' titles, functions, and authorities where possible, and employee authorities are generally established pursuant to 8 CFR section 2.1. However, DHS has determined that the roles, functions, and authorities of asylum officers and who they report to are sufficiently distinct as provided in the INA so as to preclude substitution of USCIS for those titles where they appear in the Code of Federal Regulations. For example, INA section 235(b)(1)(E), 8 U.S.C. 1225(b)(1)(E), under the expedited removal statute, defines "asylum officer" as an "* * * immigration officer who (i) has had professional training in country conditions, asylum law, and interview techniques comparable to that provided to full-time adjudicators of applications under section 208, and (ii) is supervised by an officer who meets the conditions described in clause (i) and has had

substantial experience adjudicating asylum applications." Retaining these titles is not expected to impair USRAP and RAIO from applying the principles of transformation to their operations in the future.

Section 208.5(b)(1)(ii) is revised to perfect an amendment made in the Filing Location Rule. In that rule, 8 CFR 208.4(b) was revised by referring applicants to the instructions on the Form I–589 for specific filing information and thereafter by eliminating specific instructions contained in former sections 208.4(b)(1)–(5). This rule implements a conforming amendment to that earlier revision by removing the phrase "pursuant to § 208.4(b)" in the last sentence of 8 CFR 208.5(b)(1)(ii).

Moreover, the Filing Location Rule replaced the term "district director" with "DHS office" in two locations. With the elimination of the reference to the "district director" in former 8 CFR 208.4(b)(5) (relating to asylum applications filed with the district director), the remaining reference to "the DHS office" in new 8 CFR 208.5(b)(1)(ii) lacks an anchor to an earlier reference. To avoid confusion as to whether a specific DHS office is empowered under this provision, 8 CFR 208.5(b)(1)(ii) is revised by replacing "the DHS office" with simply "DHS" wherever it appears.

Section 208.7(c) is amended by replacing a mandatory requirement (if applicable) to submit "proof that he or she has continued to pursue his or her asylum application before an immigration judge or sought administrative or judicial review." In anticipation of future system efficiencies afforded by transformation that may allow USCIS to gather the data directly from the Executive Office for Immigration Review (EOIR) within the Department of Justice and federal courts, USCIS is modifying this provision by replacing the mandatory production requirement with more flexible text: "* * * USCIS may require that an alien establish * * *". Until such time that system improvements are in place, USCIS will continue to require production of such evidence and will communicate such requirements through form instructions, as defined in 8 CFR 1.2.

Section 208.21(c) is amended by removing an outdated, transitional, alternative date (February 28, 2000) for measuring the 2-year deadline by which such petitions must be filed; there is no change to the discretionary extension for humanitarian reasons. Lastly, in anticipation of future processing efficiencies afforded by transformation,

this rule eliminates an express requirement that "separate" petitions be filed for each qualifying family member, in favor of "in accordance with the form instructions." USCIS contemplates retaining in the "form instructions" the requirement that "separate" petitions be filed for each qualifying family member, until such time that USCIS has in place transformed systems to promote additional processing efficiencies such as consolidating petitions for qualifying family members.

Section 208.21(d) is revised similar to section 208.21(c) and for the same reasons.

Section 209.1(c) is amended by removing the last clause relating to a vaccination supplement completed by a designated civil surgeon. USCIS recently consolidated the separate vaccination supplement and record of the medical examination into one form, Report of Medical Examination and Vaccination Record. Thus the language referring to a separate supplement is outdated. Relevant guidance will continue to be available in form instructions. This language is also deleted in anticipation of future processing efficiencies wherein civil surgeons may have online accounts through which they may submit reports directly to USCIS instead of completing paper forms.

Section 209.2(e) is revised by removing the first two sentences of the original paragraph, retaining only the last sentence. In the original paragraph, there was an internal inconsistency between the first sentence (requiring interview of all applicants) and the third sentence (allowing USCIS to determine whether an interview was warranted). This revision states only the sentence that allows USCIS to determine on a case-by-case basis whether an interview is warranted. This result is consistent with the companion paragraph at existing 8 CFR 209.1(d) (refugee adjustment interviews) and current USCIS practice.

Section 209.2(f) is revised for purposes of plain language. To align with the companion paragraph at 8 CFR 209.1(e), text was added stating that USCIS will notify a denied applicant of the right to renew an adjustment request in removal proceedings before EOIR. Otherwise, no substantive change is intended.

Section 223.2 is reorganized and revised for clarity in addition to removing references to forms. The revision also clarifies existing authority to accept and process requests for refugee travel documents overseas.

Several paragraphs within 8 CFR part 264 are revised and reorganized for

clarity. Section 264.1 (registration and fingerprinting requirements) is revised and reorganized, removing obsolete instructions, general information duplicated in 8 CFR 103.2, and fingerprinting requirements now described in 8 CFR 103.16. Section 264.5, paragraph (d) (replacement of permanent resident cards for conditional residents) is revised to remove information included on the form instructions for Form I–90. New 8 CFR 264.5(h) is added to replace information previously located in 8 CFR 264.1(h). Section 264.6 is revised to remove obsolete instructions and for clarity.

## IV. Discussion of Comments Received in Response to the April 29, 2003, Interim Rule

DHS published an interim rule with request for comments revising 8 CFR 103.2(a)(2) to permit submission of benefit requests with an electronic signature when such requests are submitted in an electronic format rather than on a paper form. *Electronic Signature on Applications and Petitions for Immigration and Naturalization Benefits,* 68 FR 23010 (April 29, 2003). That rule implemented the electronic filing and the acceptance of electronic signatures requirement of GPEA and meet the requirements of section 461 of the Homeland Security Act of 2002 for a study of the feasibility of online filing and to establish an electronic tracking system for applications in order to provide applicants with access to the status of their applications. Public Law 107–296 title IV, subtitle E, section 461, 118 Stat. 2202 (Nov. 22, 2002), 6 U.S.C. 278.

USCIS received 13 public comments relating to the interim rule. Virtually all commenters supported the use of electronic signatures and urged USCIS to do more to promote a more robust and user-friendly electronic filing environment. Several of the commenters made specific proposals recommending enhancements to the current limited electronic filing procedures available to applicants and petitioners. Various commenters suggested enhancements to the electronic filing process, such as acceptance of credit cards for electronic payment, re-use of data for subsequent transactions, interfaces and compatibility with commercial immigration software, standards for electronic submission of supporting documents, provisions for attorney-client electronic collaboration in the preparation of benefit requests, improvements to current biometric collection procedures, and protection of the privacy of data. DHS encourages

these types of comments in response to this rulemaking. The comments will not be addressed here individually because they exceed the scope of the interim rule, which was limited to the electronic signature process. The broad subject of the comments, electronic filing of USCIS benefit requests, will be more fully addressed as the USCIS transformation progresses.

Several commenters raised concerns about the security of electronic signatures and described the pros and cons of various existing technologies. The interim rule did not specify the technology which will be employed by USCIS for the capture and verification of electronic signatures. As the transformation initiative is implemented, USCIS will explore alternatives and adopt an appropriate solution which is fully compliant with DHS security standards and ensures privacy. Therefore, no changes are made to the interim rule as a result of the comments received and the interim rule is adopted as final without change.

## V. Discussion of Other Interim Final Rules Being Finalized

USCIS conducted a review of current and past agency regulatory activities and identified six interim rules for which no public comments were received and which were never completed as final rulemakings. Because some of the provisions of these interim rules are now either expired or further modified by this rulemaking, DHS is adopting them as final and, where appropriate, removing or revising the regulatory language. The interim rules that are adopted as final include:

• Application for Refugee Status; Acceptable Sponsorship Agreement Guaranty of Transportation, 64 FR 27660 (May 21, 1999);

• Adjustment of Status for Certain Syrian Nationals Granted Asylum in the United States, 66 FR 27445 (May 17, 2001);

• Eliminating the Numerical Cap on Mexican TN Nonimmigrants, 69 FR 11287 (March 10, 2004);

• Allocation of H–1B Visas Created by the H–1B Visa Reform Act of 2004, 70 FR 23775 (May 5, 2005);

• Classification of Certain Scientists of the Commonwealth of Independent States of the Former Soviet Union and Baltic States as Employment-Based Immigrants, 70 FR 21129 (April 25, 2005); and

• Revoking Grants of Naturalization, 65 FR 17127 (March 31, 2000).

A summary of, the legal authority for, the public comments received on, and the changes made to each of these interim rules is as follows:

*A. Application for Refugee Status; Acceptable Sponsorship Agreement Guaranty of Transportation, RIN 1615–AA24*

This interim rule required that all sponsorship agreements be secured before an applicant is granted admission as a refugee at a U.S. port-of-entry (POE). This is a separate decision from whether or not such persons can be admitted to the U.S. in refugee status. This rule permits advantageous treatment for applicants for refugee status who have their eligibility interviews with a DHS officer scheduled before a sponsorship agreement has been secured.

This rule implemented section 702 of the Immigration Act of 1990 (IMMACT 90), Public Law 101–649, 104 Stat. 4978 (Nov. 29, 1990). It allowed a U.S. citizen, a lawful permanent resident petitioner, or an alien applicant for permanent resident status to seek an exemption from the general prohibition against approval of immigration benefits based upon a marriage entered into while the beneficiary or applicant was under deportation, exclusion or related judicial proceedings. The rule established procedures to allow persons with bona fide marriages to obtain immigration benefits without complying with the two year foreign residency requirements instituted by the Immigration Marriage Fraud Amendments of 1988 (IMFA). This rule amended 8 CFR 204.2 and 245.1. USCIS is not modifying these provisions in the current rule.

The Act authorized the Attorney General to admit refugees to the United States under certain conditions. INA section 207, 8 U.S.C. 1157. There is no requirement for an applicant to have secured sponsorship in advance of a determination that he or she meets the Act's definition of refugee. INA section 101(a)(42), 8 U.S.C. 1101(a)(42). This rule clarified that sponsorship is a requirement separate and apart from the determination that an applicant is classified as a refugee.

USCIS received no comments on this interim final rule.

The interim rule amended 8 CFR 207.2. That section is revised further by this rule to accommodate transformation by removing form numbers, job titles, extraneous provisions, and internal procedure. USCIS has not changed the substance of the provisions added by the interim rule.

*B. Adjustment of Status for Certain Syrian Nationals Granted Asylum in the United States, RIN 1615–AA57*

This rule provided adjustment of status to lawful permanent residents for

certain nationals of Syria. The interim rule discusses the eligibility requirements and sets forth procedures for the application of persons wanting to adjust their status.

The Act provides that all aliens granted asylum are eligible to apply for adjustment of status 1 year after being granted asylum, subject to a maximum of 10,000 per year. INA section 209, 8 U.S.C. 1159. Pub. L. 106–378, 114 Stat. 825 (Oct. 27, 2000), waived the annual limit for a group of Jewish Syrian nationals who were allowed to depart Syria and enter the United States after December 31, 1991, and who were subsequently granted asylum in the United States.

No public comments were received.

This final rule removes 8 CFR 245.20 which was added by the interim rule. That provision is obsolete because no eligible applicants remain.

*C. Eliminating the Numerical Cap on Mexican TN Nonimmigrants, RIN 1615–AA96*

This interim rule eliminated the annual numerical cap on Mexican Professionals under the North American Free Trade Agreement (NAFTA). It also eliminated the petition for a Mexican-based NAFTA professional and the corresponding labor condition application (LCA) requirement. Mexican citizens who come to the U.S. under a TN classification must apply directly to DOS for a visa. DOS will then adjudicate the alien's eligibility for TN classification. Upon approval and issuance of a visa, the alien may then apply for admission to the United States. These changes to the regulations are consistent with NAFTA's requirement that the annual numerical cap and petition provisions for Mexican professionals sunset by January 1, 2004.

On December 17, 1992, the United States, Canada and Mexico signed the North American Free Trade Agreement (NAFTA), which entered into force on January 1, 1994. Public Law 103–182, title I, section 101, 107 Stat. 2061 (1993), 19 U.S.C. 3311. NAFTA allows for the temporary entry of qualified businesspersons from each of the parties to the agreement. *See* Public Law 103–182, title III, section 341(a), 107 Stat. 2116 (1993), 19 U.S.C. 3401. Professionals under the NAFTA are admitted to the United States as Trade NAFTA (TN) nonimmigrant aliens. INA section 214(e), 8 U.S.C. 1184(e). In Appendix 1603.D.4 of NAFTA, NAFTA established an annual numerical ceiling of 5,500 on Mexican TN admissions for a period of 10 years. NAFTA Appendix 1603.D.4, INA section 214(e)(4), (5), 8 U.S.C. 1184(e)(4), (5). The interim rule

eliminated the annual numerical cap for citizens of Mexico seeking a TN visa as required by expiration of the 10-year period. *Id.*

No public comments were received.

This rule finalizes the interim rule without change.

*D. Allocation of Additional H–1B Visas Created by the H–1B Visa Reform Act of 2004, RIN 1615–AB32*

This interim rule implemented changes made by the Omnibus Appropriations Act for Fiscal Year 2005 to the numerical limits of H–1B nonimmigrant visa category and the fees for filing of H–1B petitions. It also: (1) Informed the public of procedures USCIS used to allocate in fiscal year 2005, as well as for the future fiscal years starting with fiscal year 2006; (2) amended and clarified the process that USCIS will use in the future in allocating all petitions subject to numerical limitations under the Act; and (3) alerted the public about additional fees that must accompany certain H–1B petitions.

An H–1B nonimmigrant is an alien employed in a specialty occupation or a fashion model of distinguished merit and ability. INA section 101(a)(15)(H), 8 U.S.C. 1101(a)(15)(H); 8 CFR 214.2(h)(4). A specialty occupation requires theoretical and practical application of a body of specialized knowledge and attainment of a bachelor's or higher degree in the specific specialty as a minimum qualification for entry into the United States. *Id.* The Act provides that the number of nonimmigrants who may be issued H–1B visas or granted H–1B status may not exceed 65,000 per fiscal year. INA section 214(g), 8 U.S.C. 1184(g). The 65,000 cap does not include H–1B employees of institutions of higher education, nonprofit research organizations, or governmental research organizations. The H–1B Visa Reform Act of 2004 added a third exception to the 65,000 limit, by providing that an additional 20,000 visas would be available for an alien who has earned a master's or higher degree from a United States institution of higher education. Omnibus Appropriations Act for Fiscal Year 2005, Public Law 108–447, title J, title IV, 118 Stat. 2809 (Dec. 8, 2004); INA section 214(g)(5)(C), 8 U.S.C. 1184(g)(5)(C). This law also raised the American Competitiveness and Workforce Improvement Act of 1998 fee (ACWIA) to $1,500 or $750, depending on the size of the employer, and imposed a $500 fraud prevention and detection fee (fraud fee) on certain employers filing H–1B petitions. *Id;* INA section 214(c)(9), 8 U.S.C. 1184(c)(9).

These fees are required in addition to the base USCIS filing fee.

No public comments were received.

This rule finalizes the interim rule without change.

*E. Classification of Certain Scientists of the Commonwealth of Independent States of the Former Soviet Union and the Baltic States as Employment-Based Immigrants, RIN 1615–AB14*

This interim rule codified the new sunset date of September 30, 2006, for the Soviet Scientists Immigration Act of 1992 (SSIA). The SSIA allowed USCIS to allot visas to eligible scientists or engineers of the independent states of the former Soviet Union and the Baltic states with expertise in nuclear, chemical, biological, or other high-technology field or defense projects. The rule also codified a new numerical limit of 950 visas (excluding spouses and children if accompanying or following to join).

The SSIA provided that up to 950 immigrant visas may be allotted to eligible scientists or engineers of the independent states of the former Soviet Union and the Baltic states if the scientists or engineers had expertise in nuclear, chemical, biological or other high technology fields or were working on such high technology defense projects, as defined by the Attorney General. Public Law 102–395, title VI, section 610, 106 Stat. 1874 (Oct. 6, 1992); INA section 203(b)(2)(A), 8 U.S.C. 1153(b)(2)(A). This program expired on October 24, 1996. The Foreign Relations Authorization Act, Fiscal Year 2003 reinstated the program and, among other changes not applicable to this interim rule, provided that it would expire 4 years from the date of enactment. Public Law 107–228, div. B, title XIII, section 1304(d), 116 Stat. 1437 (Sept. 30, 2002); INA section 203(b)(2)(A), 8 U.S.C. 1153(b)(2)(A).

No public comments were received.

This rule removes provisions pertaining to the SSIA because they have expired. 8 CFR 204.10.

*F. Revoking Grants of Naturalization, RIN 1615–AA30*

This rule amended the process by which the Service would administratively reopen and revoke a grant of naturalization. This interim rule changed the burden of proof that the Service would use in revocation proceedings and made other changes to the administrative process. 65 FR 17127 (March 31, 2000).

The Secretary has sole authority to grant a person naturalization as a United States citizen. INA section 310(a), 8 U.S.C. 1421(a). The Act also provides

Federal Register / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations    53775

DHS with the authority "to correct, reopen, alter, modify, or vacate an order naturalizing [a] person" as a United States citizen. INA section 340(h), 8 U.S.C. 1451.h). The interim rule was promulgated under this authority.

No public comments were received.

This rule removes regulations that were invalidated on July 20, 2000, by the Ninth Circuit Court of Appeals in a nationwide class action lawsuit. *Gorbach* v. *Reno*, 219 F.3d 1087 (9th Cir. 2000) (en banc). That decision held that the Attorney General lacked the statutory authority to promulgate regulations permitting revocation of citizenship of a naturalized citizen through administrative proceedings. *Id. See also* INA sections 310(a), 340(a), (h), 8 U.S.C. 1421(a), 1451(a), (h). The government did not seek Supreme Court review of that decision, thus USCIS is precluded from using those regulations to revoke naturalization. This rule removes the applicable regulations from 8 CFR 340.10.

## VI. Discussion of Comments Received in Response to the June 5, 2009, Interim Rule

On June 5, 2009, DHS published an interim rule in the **Federal Register** "Removing References to Filing Locations and Obsolete References to Legacy Immigration and Naturalization Service; Adding a Provision To Facilitate the Expansion of the Use of Approved Electronic Equivalents of Paper Forms." The rule revised many sections of the 8 CFR, many of which are further revised by this rulemaking.

USCIS received only three comments in response to this rulemaking: one from an immigration practitioner, one from an organization of immigration practitioners, and one from an organization representing businesses which frequently rely on international personnel. A discussion of those comments follows.

One commenter noted that the revision to 8 CFR 214.2(l)(2)(i) apparently unintentionally added to the petitioner's burden by requiring that "the petitioner shall advise * * * whether *a previous petition has been filed* for the same beneficiary *   *  *"* whereas the original language stated "the petitioner shall advise * * * whether *it has filed* a petition for the same beneficiary." (Emphasis in original). Although this change was inadvertent and not intended to affect any right, the requirement as revised is entirely consistent with both the INA and the current form instructions. The Act limits the amount of time an alien can spend in the United States as an L–1 or H nonimmigrant (not just for a

particular petitioner). *See* section 214(c)(2)((D) of the Act, 8 U.S.C. 1184.2(c)(2)(D). The current Form I–129, Supplement L, question 2 requires submission of copies of USCIS-issued documents relating to periods of H or L stay in the United States during the past seven years. It does not limit such submission to documents relating to the current petitioner. Accordingly, USCIS has not adopted the commenter's suggestion that we revert to the prior language.

The commenter made an additional comment regarding the omission of the word "of" from the first sentence in 8 CFR 214.2(l)(2)(ii). USCIS appreciates notification by the commenter of the typographical error which will be corrected in this rule. As previously discussed, 8 CFR part 214 will be reorganized in a future transformation-related rulemaking.

Another commenter suggests that USCIS avail itself of the opportunity to revise 8 CFR 212.7 to reflect the fact that K nonimmigrants may apply for a waiver only pursuant to section 212(d)(3) of the Act and that such persons may only apply for a waiver under section 212(h) or 212(i) of the Act at the time of application for adjustment of status. The commenter noted that both the regulation and form instruction for Form I–601, Application for Waiver of Ground of Inadmissibility, are incorrect. USCIS appreciates the comment and the commenter's suggestions may be addressed in a future rulemaking or with a form revision. However, the interim rule was limited to removing filing jurisdiction limitations from regulations. Thus the commenter's suggestion exceeds the scope of the changes made and will not be adopted in this rulemaking.

The final commenter addressed the removal of filing jurisdictions from regulations. The commenter expresses its concern that an accelerated process for changing filing locations could have an adverse impact on the public. The commenter was especially concerned about situations involving statutory or regulatory deadlines for filing where the public may have insufficient notice of the proposed change.

The same commenter, while supportive of USCIS' transformation efforts, offered several suggestions to minimize the potential adverse impacts of this rulemaking. The commenter recommended that, at each place the regulations are amended, to direct the public to "instructions on the form," and that USCIS add a phrase to explain that form instructions will be available on line, that any change to the filing instructions will be provided to the

public by formal announcement no less than 30 days in advance of the change, and that when a filing jurisdiction changes, USCIS offices formerly designated to receive such filings continue to accept them for at least 180 days after the effective date of the change.

USCIS understands and appreciates the commenter's concerns. We realize that numerous changes in filing instructions and locations may be confusing. It is our intent to reduce filing locations and complexity, and change them less often, not more. In the case of time-sensitive benefit requests, USCIS will keep such factors in mind when making changes and make adjustments to the change schedule so as to not result in missing a deadline because of the filing location change.

The commenter suggested that the preamble language describing the USCIS National Customer Service Center (NCSC) as a source of information regarding filing locations be removed because its membership has not gotten consistently reliable information from this source. The commenter recommended that USCIS customer service representatives be directed to consult the online form instructions before offering any advice to applicants regarding filing location. USCIS regrets any incorrect information that may be provided and always endeavors to provide the NCSC staff with information regarding filing requirements so questions may be answered. USCIS encourages the public to report possible erroneous or outdated messages so that they may be corrected. No change to the interim rule is made as a result of this comment.

The commenter also suggests that information about changes to form and filing instructions be posted in a consistent and prominent location on USCIS Web site along with a chronological list of all changes to form instructions, including filing location changes. As the interim rule stated, filing locations are provided on USCIS form instructions. The current official version of the form and instructions are the versions on the USCIS Internet Web site for forms, *http://www.uscis.gov/forms*. Also, the USCIS home page will alert the public and stakeholders of any recent or planned filing location changes. In addition, USCIS will continue to publicize filing location changes with press releases. Additional suggestions for improving the Web site and information sharing are welcome.

The commenter also suggested that regulations mandate a 180-day transition period for filing location changes, during which USCIS would

accept such benefit requests at both the prior and new filing location. USCIS works to ensure that benefit requests are not rejected as a result of abrupt changes in filing location. USCIS announces filing changes well in advance and generally includes a transition period considering all factors and circumstances surrounding the change. However, forwarding mail from offices that formerly handled requests to the new office is very expensive and an inefficient use of USCIS fee revenue. USCIS will provide as much lead time as possible before making filing changes and will implement the changes in such a way so as to minimize the impacts of the change. However, a 180 day implementation period for each filing change is impracticable and will not be adopted.

The commenter also expressed a concern that USCIS intends to stop producing and distributing a paper version of its form instructions. As transformation continues, the filing of paper forms is expected to decrease substantially as USCIS expects electronic means to become the preferred filing method. As was the goal of GPEA and has been the experience of other Federal agencies that provide electronic filing options, in the future certain forms or requests may lend themselves to a totally electronic submission with no paper option. Nevertheless, at this time, as stated elsewhere in this preamble, USCIS will continue to provide paper versions of most forms and instructions as well as portable document format or other electronic versions through its Internet Web site. Further, the electronic versions of form instructions will parallel the written form instructions precisely, so the method chosen should cause no inconsistencies in benefit eligibility or adjudication.

The commenter also suggested that USCIS provide access to earlier versions of forms and instructions. Following a form's revisions, USCIS often provides that previous version of the form are acceptable until further notice or for a prescribed period. However, when changes are made to a form because eligibility criteria are changed by law or regulation, the previous version of a form may be outdated, incomplete, and unacceptable. Further, for ease of administration and consistency in adjudication, USCIS prefers to receive the most current version so the employee reviewing the form knows where to look for the required data elements. Thus USCIS sees little value in providing previous versions of forms as a general policy or requirement, and

the commenter's suggestion has not been adopted.

The commenter also suggested that any elimination of geographically-based jurisdiction should be coupled with a new model for determining such jurisdiction. The interim rule gave USCIS greater flexibility to alter filing locations, but it does not change how internal responsibilities for adjudicating benefit requests are prescribed. For many benefit requests, notwithstanding their removal from the CFR, filing locations will seldom or not change. USCIS will continue to make changes in filing, appearance or jurisdictional requirements with the convenience of and service to applicants, petitioners, and beneficiaries as a primary concern. Thus, in response to this comment, methods of determining jurisdiction are not revised in this rule.

## VII. Regulatory Requirements

### A. Administrative Procedure Act

The Administrative Procedure Act (APA) requires DHS to provide public notice and seek public comment on substantive regulations. *See* 5 U.S.C. 553. The APA, however, excludes certain types of regulations and permits exceptions for other types of regulations from the public notice and comment requirement. DHS issues this rule without providing the opportunity for prior notice and comment for the reasons described below. DHS nevertheless invites comments on this rule and will consider all timely comments submitted during the public comment period as described in the "Public Participation" section.

*Removal of form numbers and titles, position titles, and procedural guidance, and reorganization and clarification of 8 CFR.* The Administrative Procedure Act (APA) excepts from the prior notice and opportunity for comment requirements "* * * rules of agency organization, procedure or practice." 5 U.S.C. 553(b)(A). This rule removes form numbers and titles, position titles, and procedural guidance, reorganizes and clarifies parts of 8 CFR, and makes changes such as removing Form I–129, district director, instructions for retaining copies of documents, and instructions for forwarding of files. Accordingly, to the extent that this rule adopts rules of agency organization, procedure or practice, those portions of the rule are excepted from the notice-and-comment requirements under 5 U.S.C. 553(b)(A).

*Remove and update outdated provisions.* This rule removes provisions of 8 CFR where statutory authorization has expired, corrects

provisions required by statutory amendments or extensions, removes extraneous or outdated provisions, and corrects erroneous references. For example, this rule removes references to the Irish Peace Process Cultural and Training Program Act because that law was repealed in 2005 and removes nonpreference investor visas and third and sixth preference employment-based visas because authorization for these visas was repealed in 1990. This rule is a ministerial action necessary to conform regulations with law. Therefore, advance public notice and an opportunity for public comment is unnecessary and not in the public interest. *See* 5 U.S.C. 553(b)(3)(B).

### B. Unfunded Mandates Reform Act of 1995

This rule will not result in the expenditure by State, local and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

### C. Small Business Regulatory Enforcement Fairness Act of 1996

This rule is not a major rule as defined by section 804 of the Small Business Regulatory Enforcement Act of 1996. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based companies to compete with foreign-based companies in domestic and export markets.

### D. Executive Orders 13563 and 12866

Executive Orders 13563 and 12866 direct agencies to assess the costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. This rule is not a "significant regulatory action" under section 3(f) of Executive Order 12866, Regulatory Planning and Review, and does not require an assessment of potential costs and benefits under section 6(a)(3) of that Order. The Office

of Management and Budget has not reviewed it under Executive Order 12866.

There will be no additional costs incurred by any individual or business as a result of the changes in this rule. The rule will clarify and revise existing regulations and does not alter the regulations in a significant manner. Once transformation is complete, USCIS applicants, petitioners, representatives, and others will realize a significant savings in time and effort when submitting immigration benefit requests, seeking case status information, and communicating with USCIS.

*E. Executive Order 13132*

This rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988 Civil Justice Reform*

Section 3(c) of Executive Order 12988 requires Executive agencies to review regulations in light of applicable standards in section 3(a) and section 3(b) to determine whether they are met or it is unreasonable to meet one or more of them. DHS has completed the required review and determined that, to the extent permitted by law, this final rule meets the relevant standards of Executive Order 12988.

*G. Paperwork Reduction Act*

Under the Paperwork Reduction Act of 1995, Public Law 104–13, all Departments are required to submit to the Office of Management and Budget (OMB), for review and approval, any reporting and recordkeeping requirements inherent in a rule. Public Law 104–13, 109 Stat. 163 (May 22, 1995). This rule does not impose any new reporting or recordkeeping requirements under the Paperwork Reduction Act.

*H. Regulatory Flexibility Act*

The Regulatory Flexibility Act of 1980 (RFA), 5 U.S.C. 601–612, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, Public Law 104–121 (March 29, 1996), requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. When an agency makes changes effective through a final rule for which notice and comment are not necessary, the RFA does not require an agency to prepare a regulatory flexibility analysis. Accordingly, USCIS has not prepared a regulatory flexibility analysis.

**List of Subjects**

*8 CFR Part 1*

Administrative practice and procedure, Immigration.

*8 CFR Part 100*

Organization and functions (Government agencies).

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations (Government agencies), Freedom of information, Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 204*

Administrative practice and procedure, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 207*

Immigration, Refugees, Reporting and recordkeeping requirements.

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 209*

Aliens, Immigration, Refugees.

*8 CFR Part 211*

Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 213a*

Administrative practice and procedure, Aliens, Immigrants.

*8 CFR Part 223*

Immigration, Refugees, Reporting and recordkeeping requirements.

*8 CFR Part 235*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 236*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 238*

Air Carriers, Aliens, Government contracts, Maritime carriers.

*8 CFR Part 240*

Administrative practice and procedure, Immigration.

*8 CFR Part 241*

Administrative practice and procedure, Aliens, Immigration.

*8 CFR Part 244*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 245a*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 248*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 264*

Reporting and recordkeeping requirements.

*8 CFR Part 265*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 270*

Administrative practice and procedure, Aliens, Employment, Fraud; Penalties.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Employment, Penalties, Reporting and recordkeeping requirements.

*8 CFR Part 287*

Immigration, Law enforcement officers.

*8 CFR Part 292*

Administrative practice and procedure, Immigration, Lawyers, Reporting and recordkeeping requirements.

*8 CFR Part 299*

Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 301*

Citizenship and naturalization, Reporting and recordkeeping requirements.

NJAPP0455

**8 CFR Part 310**

Citizenship and naturalization, Courts.

**8 CFR Part 312**

Citizenship and naturalization, Education.

**8 CFR Part 316**

Citizenship and naturalization, Reporting and recordkeeping requirements.

**8 CFR Part 319**

Citizenship and naturalization, Reporting and recordkeeping requirements.

**8 CFR Part 320**

Citizenship and naturalization, Infants and children, Reporting and recordkeeping requirements.

**8 CFR Part 322**

Citizenship and naturalization, Infants and children, Reporting and recordkeeping requirements.

**8 CFR Part 324**

Citizenship and naturalization, Reporting and recordkeeping requirements.

**8 CFR Part 325**

Citizenship and naturalization, Reporting and recordkeeping requirements.

**8 CFR Part 328**

Citizenship and naturalization, Military personnel, Reporting and recordkeeping requirements.

**8 CFR Part 329**

Citizenship and naturalization, Military personnel, Veterans.

**8 CFR Part 330**

Reporting and recordkeeping requirements, Seamen.

**8 CFR Part 332**

Citizenship and naturalization, Education, Reporting and recordkeeping requirements.

**8 CFR Part 333**

Citizenship and naturalization.

**8 CFR Part 334**

Administrative practice and procedure, Citizenship and naturalization, Courts, Reporting and recordkeeping requirements.

**8 CFR Part 335**

Administrative practice and procedures, Citizenship and naturalization, Courts, Reporting and recordkeeping requirements.

**8 CFR Part 336**

Administrative practice and procedure, Citizenship and naturalization, Courts, Reporting and recordkeeping requirements.

**8 CFR Part 337**

Citizenship and naturalization, Courts.

**8 CFR Part 338**

Citizenship and naturalization, Reporting and recordkeeping requirements.

**8 CFR Part 339**

Citizenship and naturalization, Courts.

**8 CFR Part 340**

Citizenship and naturalization, Law enforcement.

**8 CFR Part 341**

Citizenship and naturalization, Reporting and recordkeeping requirements.

**8 CFR Part 342**

Administrative practice and procedure, Citizenship and naturalization.

**8 CFR Part 343**

Citizenship and naturalization.

**8 CFR Part 343a**

Citizenship and naturalization, Reporting and recordkeeping requirements.

**8 CFR Part 343b**

Citizenship and naturalization, Reporting and recordkeeping requirements.

**8 CFR Part 343c**

Archives and records, Citizenship and naturalization, Courts.

**8 CFR Part 392**

Citizenship and naturalization, Reporting and recordkeeping requirements.

**8 CFR Part 499**

Citizenship and naturalization.

Accordingly, the interim rules published at 68 FR 23010, on April 29, 2003; 64 FR 27660 on May 21, 1999; 66 FR 27445 on May 17, 2001; 69 FR 11287 on March 10, 2004; 70 FR 23775 on May 5, 2005; 70 FR 21129 on April 25, 2005; and 65 FR 17127 on March 31, 2000 are adopted as final without change, and chapter I of title 8 of the Code of Federal Regulations is amended as follows:

■ 1. Part 1 is revised to read as follows:

**PART 1—DEFINITIONS**

Sec.
1.1  Applicability.
1.2  Definitions.
1.3  Lawfully present aliens for purposes of applying for Social Security benefits.

**Authority:** 8 U.S.C. 1101; 8 U.S.C. 1103; 5 U.S.C. 301; Pub. L. 107–296, 116 Stat. 2135; 6 U.S.C. 1 *et seq.*

**§ 1.1  Applicability.**

This part further defines some of the terms already described in section 101 and other sections of the Immigration and Nationality Act (66 Stat. 163), as amended, and such other enactments as pertain to immigration and nationality. These terms are used consistently by components within the Department of Homeland Security including U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, and U.S. Citizenship and Immigration Services.

**§ 1.2  Definitions.**

As used in this chapter I, the term:
*Act* or *INA* means the Immigration and Nationality Act, as amended.
*Aggravated felony* means a crime (or a conspiracy or attempt to commit a crime) described in section 101(a)(43) of the Act. This definition applies to any proceeding, application, custody determination, or adjudication pending on or after September 30, 1996, but shall apply under section 276(b) of the Act only to violations of section 276(a) of the Act occurring on or after that date.
*Application* means benefit request.
*Arriving alien* means an applicant for admission coming or attempting to come into the United States at a port-of-entry, or an alien seeking transit through the United States at a port-of-entry, or an alien interdicted in international or United States waters and brought into the United States by any means, whether or not to a designated port-of-entry, and regardless of the means of transport. An arriving alien remains an arriving alien even if paroled pursuant to section 212(d)(5) of the Act, and even after any such parole is terminated or revoked. However, an arriving alien who was paroled into the United States before April 1, 1997, or who was paroled into the United States on or after April 1, 1997, pursuant to a grant of advance parole which the alien applied for and obtained in the United States prior to the alien's departure from and return to the United States, will not be treated, solely by reason of that grant of parole, as an arriving alien under section 235(b)(1)(A)(i) of the Act.
*Attorney* means any person who is eligible to practice law in, and is a member in good standing of the bar of,

the highest court of any State, possession, territory, or Commonwealth of the United States, or of the District of Columbia, and is not under any order suspending, enjoining, restraining, disbarring, or otherwise restricting him or her in the practice of law.

*Benefit request* means any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit, whether such request is filed on a paper form or submitted in an electronic format, provided such request is submitted in a manner prescribed by DHS for such purpose.

*Board* means the Board of Immigration Appeals within the Executive Office for Immigration Review, Department of Justice, as defined in 8 CFR 1001.1(e).

*Case,* unless the context otherwise requires, means any proceeding arising under any immigration or naturalization law, Executive Order, or Presidential proclamation, or preparation for or incident to such proceeding, including preliminary steps by any private person or corporation preliminary to the filing of the application or petition by which any proceeding under the jurisdiction of the Service or the Board is initiated.

*CBP* means U.S. Customs and Border Protection.

*Commissioner* means the Commissioner of the Immigration and Naturalization Service prior to March 1, 2003. Unless otherwise specified, references after that date mean the Director of U.S. Citizenship and Immigration Services, the Commissioner of U.S. Customs and Border Protection, and the Director of U.S. Immigration and Customs Enforcement, as appropriate in the context in which the term appears.

*Day,* when computing the period of time for taking any action provided in this chapter I including the taking of an appeal, shall include Saturdays, Sundays, and legal holidays, except that when the last day of the period computed falls on a Saturday, Sunday, or a legal holiday, the period shall run until the end of the next day which is not a Saturday, Sunday, or a legal holiday.

*Department or DHS,* unless otherwise noted, means the Department of Homeland Security.

*Director or district director* prior to March 1, 2003, means the district director or regional service center director, unless otherwise specified. On or after March 1, 2003, pursuant to delegation from the Secretary of Homeland Security or any successive re-delegation, the terms mean, to the extent that authority has been delegated to

such official: asylum office director; director, field operations; district director for interior enforcement; district director for services; field office director; service center director; or special agent in charge. The terms also mean such other official, including an official in an acting capacity, within U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, U.S. Immigration and Customs Enforcement, or other component of the Department of Homeland Security who is delegated the function or authority above for a particular geographic district, region, or area.

*EOIR* means the Executive Office for Immigration Review within the Department of Justice.

*Executed* or *execute* means fully completed.

*Form* when used in connection with a benefit or other request to be filed with DHS to request an immigration benefit, means a device for the collection of information in a standard format that may be submitted in paper format or in an electronic format as prescribed by USCIS on its official Internet Web site. The term Form followed by an immigration form number includes an approved electronic equivalent of such form as may be prescribed by the appropriate component on its official Internet Web site.

*Form instructions* means instructions on how to complete and where to file a benefit request, supporting evidence or fees, or any other required or preferred document or instrument with a DHS immigration component. Form instructions prescribed by USCIS or other DHS immigration components on their official Internet Web sites will be considered the currently applicable version, notwithstanding paper or other versions that may be in circulation, and may be issued through non-form guidance such as appendices, exhibits, guidebooks, or manuals.

*ICE* means U.S. Immigration and Customs Enforcement.

*Immigration judge* means an immigration judge as defined in 8 CFR 1001.1(l).

*Immigration officer* means the following employees of the Department of Homeland Security, including senior or supervisory officers of such employees, designated as immigration officers authorized to exercise the powers and duties of such officer as specified by the Act and this chapter I: aircraft pilot, airplane pilot, asylum officer, refugee corps officer, Border Patrol agent, contact representative, deportation officer, detention

enforcement officer, detention officer, fingerprint specialist, forensic document analyst, general attorney (except with respect to CBP, only to the extent that the attorney is performing any immigration function), helicopter pilot, immigration agent (investigations), immigration enforcement agent, immigration information officer, immigration inspector, immigration officer, immigration services officer, investigator, intelligence agent, intelligence officer, investigative assistant, special agent, other officer or employee of the Department of Homeland Security or of the United States as designated by the Secretary of Homeland Security as provided in 8 CFR 2.1.

*Lawfully admitted for permanent residence* means the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed. Such status terminates upon entry of a final administrative order of exclusion, deportation, or removal.

*Petition.* See Benefit request.

*Practice* means the act or acts of any person appearing in any case, either in person or through the preparation or filing of any brief or other document, paper, application, or petition on behalf of another person or client before or with DHS.

*Preparation,* constituting practice, means the study of the facts of a case and the applicable laws, coupled with the giving of advice and auxiliary activities, including the incidental preparation of papers, but does not include the lawful functions of a notary public or service consisting solely of assistance in the completion of blank spaces on printed DHS forms, by one whose remuneration, if any, is nominal and who does not hold himself or herself out as qualified in legal matters or in immigration and naturalization procedure.

*Representation* before DHS includes practice and preparation as defined in this section.

*Representative* refers to a person who is entitled to represent others as provided in 8 CFR 292.1(a)(2) through (6) and 8 CFR 292.1(b).

*Respondent* means an alien named in a Notice to Appear issued in accordance with section 239(a) of the Act, or in an Order to Show Cause issued in accordance with 8 CFR 242.1 (1997) as it existed prior to April 1, 1997.

*Secretary,* unless otherwise noted, means the Secretary of Homeland Security.

*Service* means U.S. Citizenship and Immigration Services, U.S. Customs and Border Protection, and/or U.S. Immigration and Customs Enforcement, as appropriate in the context in which the term appears.

*Service counsel* means any immigration officer assigned to represent the Service in any proceeding before an immigration judge or the Board of Immigration Appeals.

*Transition program effective date as used with respect to extending the immigration laws to the Commonwealth of the Northern Mariana Islands* means November 28, 2009.

*USCIS* means U.S. Citizenship and Immigration Services.

**§ 1.3   Lawfully present aliens for purposes of applying for Social Security benefits.**

(a) *Definition of the term an "alien who is lawfully present in the United States."* For the purposes of 8 U.S.C. 1611(b)(2) only, an "alien who is lawfully present in the United States" means:

(1) A qualified alien as defined in 8 U.S.C. 1641(b);

(2) An alien who has been inspected and admitted to the United States and who has not violated the terms of the status under which he or she was admitted or to which he or she has changed after admission;

(3) An alien who has been paroled into the United States pursuant to section 212(d)(5) of the Act for less than 1 year, except:

(i) Aliens paroled for deferred inspection or pending removal proceedings under section 240 of the Act; and

(ii) Aliens paroled into the United States for prosecution pursuant to 8 CFR 212.5(b)(3);

(4) An alien who belongs to one of the following classes of aliens permitted to remain in the United States because DHS has decided for humanitarian or other public policy reasons not to initiate removal proceedings or enforce departure:

(i) Aliens currently in temporary resident status pursuant to section 210 or 245A of the Act;

(ii) Aliens currently under Temporary Protected Status (TPS) pursuant to section 244 of the Act;

(iii) Cuban-Haitian entrants, as defined in section 202(b) of Pub. L. 99–603, as amended;

(iv) Family Unity beneficiaries pursuant to section 301 of Pub. L. 101–649, as amended;

(v) Aliens currently under Deferred Enforced Departure (DED) pursuant to a decision made by the President;

(vi) Aliens currently in deferred action status;

(vii) Aliens who are the spouse or child of a United States citizen whose visa petition has been approved and who have a pending application for adjustment of status;

(5) Applicants for asylum under section 208(a) of the Act and applicants for withholding of removal under section 241(b)(3) of the Act or under the Convention Against Torture who have been granted employment authorization, and such applicants under the age of 14 who have had an application pending for at least 180 days.

(b) *Non-issuance of a Notice to Appear and non-enforcement of deportation, exclusion, or removal orders.* An alien may not be deemed to be lawfully present solely on the basis of DHS's decision not to, or failure to:

(1) Issue a Notice to Appear; or

(2) Enforce an outstanding order of deportation, exclusion or removal.

**PART 100—STATEMENT OF ORGANIZATION**

■ 2. The authority citation for part 100 continues to read as follows:

**Authority:** 8 U.S.C. 1103; 8 CFR part 2.

**§ 100.7   [Removed]**

■ 3. Section 100.7 is removed.

**PART 103—IMMIGRATION BENEFITS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS**

■ 4. The authority citation for part 103 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135; 6 U.S.C. 1 *et seq.;* E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2.

■ 5. The heading for part 103 is revised as set forth above.

■ 6. In part 103, §§ 103.1 through 103.10 are designated under the following subpart A heading:

**Subpart A—Applying for Benefits, Surety Bonds, Fees**

**§ 103.1   [Removed and Reserved]**

■ 7. Section 103.1 is removed and reserved.

■ 8. Section 103.2 is amended by:

■ a. Removing the phrases "petition or application" and "application or petition" and adding in its place the phrase "benefit request"; and by removing the phrase "petitions and applications" and adding in its place the phrase "benefit requests" whenever they appear in the following places:

■ i. Paragraph (a)(2);

■ ii. Paragraph (a)(3);

■ iii. Paragraph (a)(7)(ii);

■ iv. Paragraph (b)(6);

■ v. Paragraph (b)(7);

■ vi. Paragraph (b)(8)(i);

■ vii. Paragraph (b)(8)(ii);

■ viii. Paragraph (b)(8)(iii);

■ ix. Paragraph (b)(9) introductory text;

■ x. Paragraph (b)(9)(ii);

■ xi. Paragraph (b)(10)(i);

■ xii. Paragraph (b)(10)(ii);

■ xiii. Paragraph (b)(11);

■ xiv. Paragraph (b)(12);

■ xv. Paragraph (b)(13)(i);

■ xvi. Paragraph (b)(13)(ii);

■ xvii. Paragraph (b)(14);

■ xviii. Paragraph (b)(15); and

■ xix. Paragraph (b)(18); and

■ b. Revising the section heading;

■ c. Revising paragraph (a)(1);

■ d. Revising the term "BCIS" to read "USCIS" in paragraph (a)(2) last sentence;

■ e. Revising the term "§ 1.1(f)" to read "§ 1.2" in paragraph (a)(3) first sentence;

■ f. Revising paragraph (a)(6);

■ g. Revising paragraph (a)(7)(i) and adding paragraph (a)(7)(iii);

■ h. Revising paragraph (b)(1);

■ i. Revising paragraph (b)(4);

■ j. Revising the phrase "by submitting a properly completed and signed Form G–884 to the adjudicating USCIS office" to read "in accordance with instructions provided by USCIS" in paragraph (b)(5) last sentence;

■ k. Revising the term "application, petition" to read "benefit request" in paragraph (b)(7) last sentence;

■ l. Revising the term "in writing" to read "communicated by regular or electronic mail" in paragraph (b)(8)(iv) first sentence;

■ m. Revising the second sentence in paragraph (b)(17)(i);

■ n. Revising paragraph (b)(19); and

■ o. Removing paragraph (e).

The revisions and addition read as follows:

**§ 103.2   Submission and adjudication of benefit requests.**

(a) *Filing.* (1) *Preparation and submission.* Every benefit request or other document submitted to DHS must be executed and filed in accordance with the form instructions, notwithstanding any provision of 8 CFR chapter 1 to the contrary, and such instructions are incorporated into the regulations requiring its submission. Each benefit request or other document must be filed with fee(s) as required by regulation. Benefit requests which require a person to submit biometric information must also be filed with the biometric service fee in 8 CFR 103.7(b)(1), for each individual who is required to provide biometrics. Filing fees and biometric service fees are non-refundable and, except as otherwise

provided in this chapter I, must be paid when the benefit request is filed.

\* \* \* \* \*

(6) *Where to file.* All benefit requests must be filed in accordance with the form instructions.

(7) *Receipt date.* (i) *Benefit requests submitted.* A benefit request which is not signed and submitted with the correct fee(s) will be rejected. A benefit request that is not executed may be rejected. Except as provided in 8 CFR parts 204, 245, or 245a, a benefit request will be considered received by USCIS as of the actual date of receipt at the location designated for filing such benefit request whether electronically or in paper format. The receipt date shall be recorded upon receipt by USCIS.

\* \* \* \* \*

(iii) *Rejected benefit requests.* A benefit request which is rejected will not retain a filing date. There is no appeal from such rejection.

(b) *Evidence and processing.* (1) *Demonstrating eligibility.* An applicant or petitioner must establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication. Each benefit request must be properly completed and filed with all initial evidence required by applicable regulations and other USCIS instructions. Any evidence submitted in connection with a benefit request is incorporated into and considered part of the request.

\* \* \* \* \*

(4) *Supporting documents.* Original or photocopied documents which are required to support any benefit request must be submitted in accordance with the form instructions.

\* \* \* \* \*

(17) \* \* \*

(i) \* \* \* These records include alien and other files, arrival manifests, arrival records, Department index cards, Immigrant Identification Cards, Certificates of Registry, Declarations of Intention issued after July 1, 1929, Permanent Resident Cards, or other registration receipt forms (provided that such forms were issued or endorsed to show admission for permanent residence), passports, and reentry permits. \* \* \*

\* \* \* \* \*

(19) *Notification of decision.* The Service will notify applicants, petitioners, and their representatives as defined in 8 CFR part 1 in writing of a decision made on a benefit request. Documents issued based on the approval of a request for benefits will be sent to the applicant or beneficiary.

\* \* \* \* \*

### § 103.3   [Amended]

■ 9. Section 103.3 is amended by:
■ a. Revising the term "shall file" to read "must submit" and revising the phrase "with the office where the unfavorable decision was made" to read "as indicated in the applicable form instructions" in the last sentence in paragraph (a)(2)(i); and
■ b. Revising the term "§ 103.9(a) of this part" to read "8 CFR 103.10(e)" in paragraph (c) last sentence.

### §§ 103.8 through 103.11   [Removed]

■ 10. Sections 103.8 through 103.11 are removed.

### § 103.5a   [Redesignated as § 103.8]

■ 11. Section 103.5a is redesignated as § 103.8.
■ 12. Newly redesignated § 103.8 is amended by:
■ a. Revising the section heading;
■ b. Revising the paragraph (a) heading;
■ c. Revising paragraphs (a)(1);
■ d. Removing the "." at the end of paragraph (a)(2)(iv), and adding a "; or" in its place; and by
■ e. Adding paragraph (a)(2)(v).
The revisions and addition read as follows:

### § 103.8   Service of decisions and other notices.

\* \* \* \* \*

(a) *Types of service*—(1) *Routine service.* (i) Routine service consists of mailing the notice by ordinary mail addressed to the affected party and his or her attorney or representative of record at his or her last known address, or

(ii) If so requested by a party, advising the party of such notice by electronic mail and posting the decision to the party's USCIS account.

(2) \* \* \*

(v) If so requested by a party, advising the party by electronic mail and posting the decision to the party's USCIS account.

\* \* \* \* \*

### § 103.5b   [Redesignated as § 103.9]

■ 13. Section 103.5b is redesignated as § 103.9.
■ 14. Section 103.7 is amended by:
■ a. Revising the term "BCIS" to read "USCIS" wherever that term appears in paragraph (a)(1);
■ b. Adding new paragraphs (b)(1)(i)(CCC), (DDD), and (EEE).
The revisions and addition read as follows:

### § 103.7   Fees.

\* \* \* \* \*

(b) \* \* \*

(1) \* \* \*

(i) \* \* \*

(CCC) *American Competitiveness and Workforce Improvement Act (ACWIA) fee.* $1500 or $750 for filing certain H–1B petitions as described in 8 CFR 214.2(h)(19) and USCIS form instructions.

(DDD) *Fraud detection and prevention fee.* $500 for filing certain H–1B and L petitions, and $150 for H–2B petitions as described in 8 CFR 214.2(h)(19).

(EEE) *Public Law 111–230 fee.* Petitioners who are required to submit the Fraud Detection and Prevention Fee described in paragraph (b)(1)(i)(DDD) of this section are also required to submit an additional $2000 for an H–1B petition or an additional $2250 for an L–1 petition if:

(1) The petitioner employs 50 or more persons in the United States;

(2) More than 50 percent of those employees are in H–1B or L–1 status; and

(3) The petition is filed prior to the expiration of section 402 of Public Law 111–230.

\* \* \* \* \*

■ 15. Newly redesignated § 103.9 is revised to read as follows:

### § 103.9   Request for further action on an approved benefit request.

(a) *Filing a request.* A person may request further action on an approved benefit request as prescribed by the form instructions. Requests for further action may be submitted with the original benefit request or following the approval of such benefit.

(b) *Processing.* The request will be approved if the requester has demonstrated eligibility for the requested action. There is no appeal from the denial of such request.

### § 103.12   [Removed]

■ 16. Section 103.12 is removed.

### § 103.37   [Redesignated as § 103.10]

■ 17. Section 103.37 is redesignated as § 103.10.
■ 18. Newly redesignated § 103.10 is amended by:
■ a. Redesignating paragraphs (g), (h), and (i) as paragraphs (b), (c), and (d) respectively;
■ b. Revising the term "paragraph (f) of this section" to read "paragraph (c) of this section or 8 CFR 1003.1(h)(2)" in newly redesignated paragraph (c)(2); and by
■ c. Adding paragraph (e).
The addition reads as follows:

### § 103.10   Precedent decisions.

\* \* \* \* \*

(e) *Precedent decisions.* Bound volumes of designated precedent

decisions, entitled "Administrative Decisions under Immigration and Nationality Laws of the United States," may be purchased from the Superintendent of Documents, U.S. Government Printing Office. Prior to publication in volume form, current precedent decisions are available from the Department of Justice, Executive Office for Immigration Review's Virtual Law Library at: *http://www.justice.gov/ eoir/vll/libindex.html.*

■ 19. Section 103.16 is added under an added subpart B heading to read as follows:

### Subpart B—Biometric Requirements

**§ 103.16   Collection, use and storage of biometric information.**

(a) *Use of biometric information.* Any individual may be required to submit biometric information if the regulations or form instructions require such information or if requested in accordance with 8 CFR 103.2(b)(9). DHS may collect and store for present or future use, by electronic or other means, the biometric information submitted by an individual. DHS may use this biometric information to conduct background and security checks, adjudicate immigration and naturalization benefits, and perform other functions related to administering and enforcing the immigration and naturalization laws.

(b) *Individuals residing abroad.* An individual who is required to provide biometric information and who is residing outside of the United States must report to a DHS-designated location to have his or her biometric information collected, whether by electronic or non-electronic means.

■ 20. Section 103.17 is added under subpart B to read as follows:

**§ 103.17   Biometric service fee.**

(a) *Required fees.* DHS will charge a fee, as prescribed in 8 CFR 103.7(b)(1), for collecting biometric information at a DHS office, other designated collection site overseas, or a registered State or local law enforcement agency designated by a cooperative agreement with DHS to provide biometric collection services, to conduct required law enforcement checks, and to maintain this biometric information for reuse to support other benefit requests. Requests for benefits must be submitted with the biometric service fee for all individuals who are required to submit biometric information and a biometric services fee and who reside in the United States at the time of filing for the benefit.

(b) *Non-payment of biometric service fee.* (1) If a benefit request is received by DHS without the correct biometric service fee, DHS will notify the applicant, petitioner, and, when appropriate, the applicant or petitioner's representative, of the deficiency, and no further action will be taken on the benefit request until payment is received. Failure to submit the correct biometric service fee in response to a notice of deficiency within the time allotted in the notice will result in denial of the benefit request. There is no appeal from the denial of a benefit request for failure to submit the correct biometric service fee. A motion to reopen a benefit request denied for failure to submit the correct biometric service fee will be granted only on proof that:

(i) The correct biometric service fee was submitted at the time of filing the benefit request;

(ii) The correct biometric service fee was submitted in response to the notice of deficiency within the time allotted in the notice; or

(iii) The notice of deficiency was sent to an address other than the address on the benefit request or the notice of representation, or the applicant or petitioner notified DHS, in writing, of a change of address or change of representation subsequent to filing and before the notice of deficiency was sent and the DHS notice of deficiency was not sent to the new address.

(2) If the reason for the deficiency in the biometric service fee is that a check or financial instrument used to pay the biometric service fee is returned as not payable, the remitter must be allowed 14 calendar days to pay the fee and any associated service charges. If the fee and charges are not paid within 14 calendar days, the benefit request will be denied.

**§§ 103.20–103.36   [Removed and Reserved]**

■ 21. Sections 103.20 through 103.36 are removed.

### Subpart C—[Reserved]

■ 22. Add reserved subpart C.

■ 23. Sections 103.38 through 103.41 are designated under the following subpart D heading:

### Subpart D—Availability of Records

\*   \*   \*   \*   \*

■ 24. In § 103.41, paragraph (c) is revised to read as follows:

**§ 103.41   Genealogy request fees.**

\*   \*   \*   \*   \*

(c) *Manner of submission.* The application and fee must be submitted in accordance with form instructions.

■ 25. Section 103.42 is added under subpart D to read as follows:

**§ 103.42   Rules relating to the Freedom of Information Act (FOIA) and the Privacy Act.**

Immigration-related regulations relating to FOIA and the Privacy Act are located in 6 CFR part 5.

### PART 204—IMMIGRANT PETITIONS

■ 26. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1186a, 1255, 1641; 8 CFR part 2.

**§ 204.3   [Amended]**

■ 27. Section 204.3 is amended by:
■ a. Revising the term "§ 103.2(e) of this chapter" to read "8 CFR 103.16" and the terms "the Service" and "The Service" to read "USCIS" wherever the terms appear in paragraph (c)(3); and by
■ b. Revising the term "BCIS" to read "USCIS", the term "Form I–600" to read "petition", and the term "I–600A" to read "advance processing request" wherever the terms appear in paragraph (h)(3)(ii).

**§ 204.4   [Amended]**

■ 28. Section 204.4 is amended by:
■ a. Revising the term "§ 103.2(e) of this chapter to read "8 CFR 103.16" in the second sentence in paragraph (d)(1); and by
■ b. Removing the phrase ", Form I–360," in the last sentence in paragraph (d)(1).

**§ 204.6   [Amended]**

■ 29. In § 204.6, paragraph (l) is removed and reserved.

**§ 204.10   [Removed and Reserved]**

■ 30. Section 204.10 is removed and reserved.

**§ 204.302   [Amended]**

■ 31. In § 204.302, paragraph (b), first sentence, is amended by revising the term "8 CFR 1.1(i), (j) and (m),", to read "8 CFR 1.2".

**§ 204.310   [Amended]**

■ 32. In § 204.310, paragraph (b), first sentence, is amended by revising the term "8 CFR 103.2(e)" to read "8 CFR 103.16".

### PART 207—ADMISSION OF REFUGEES

■ 33. The authority citation for part 207 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1157, 1159, 1182; 8 CFR part 2.

■ 34. Section 207.1 is revised to read as follows:

## § 207.1  Eligibility.

(a) *Filing.* Any alien who believes he or she is a refugee as defined in section 101(a)(42) of the Act, and is included in a refugee group identified in section 207(a) of the Act, may apply for admission to the United States by submitting an application, including biometric information, in accordance with the form instructions, as defined in 8 CFR 1.2.

(b) *Firmly resettled.* Any applicant (other than an applicant for derivative refugee status under 8 CFR 207.7) who has become firmly resettled in a foreign country is not eligible for refugee status under this chapter I. A refugee is considered to be "firmly resettled" if he or she has been offered resident status, citizenship, or some other type of permanent resettlement by a country other than the United States and has traveled to and entered that country as a consequence of his or her flight from persecution. Any applicant who claims not to be firmly resettled in a foreign country must establish that the conditions of his or her residence in that country are so restrictive as to deny resettlement. In determining whether or not an applicant is firmly resettled in a foreign country, the officer reviewing the matter shall consider the conditions under which other residents of the country live:

(1) Whether permanent or temporary housing is available to the refugee in the foreign country;

(2) Nature of employment available to the refugee in the foreign country; and

(3) Other benefits offered or denied to the refugee by the foreign country which are available to other residents, such as right to property ownership, travel documentation, education, public welfare, and citizenship.

(c) *Immediate relatives and special immigrants.* Any applicant for refugee status who qualifies as an immediate relative or as a special immigrant shall not be processed as a refugee unless it is in the public interest. The alien shall be advised to obtain an immediate relative or special immigrant visa and shall be provided with the proper petition forms to send to any prospective petitioners. An applicant who may be eligible for classification under sections 203(a) or 203(b) of the Act, and for whom a visa number is now available, shall be advised of such eligibility but is not required to apply.

■ 35. Section 207.2 is revised to read as follows:

## § 207.2  Applicant processing.

(a) *Interview.* Each applicant 14 years old or older shall appear in person before an immigration officer for inquiry under oath to determine his or her eligibility for admission as a refugee.

(b) *Medical examination.* Each applicant shall submit to a medical examination as required by sections 221(d) and 232(b) of the Act.

(c) *Sponsorship.* Each applicant must be sponsored by a responsible person or organization. Transportation for the applicant from his or her present abode to the place of resettlement in the United States must be guaranteed by the sponsor.

■ 36. Section 207.3 is revised to read as follows:

## § 207.3  Waivers of inadmissibility.

(a) *Authority.* Section 207(c)(3) of the Act sets forth grounds of inadmissibility under section 212(a) of the Act which are not applicable and those which may be waived in the case of an otherwise qualified refugee and the conditions under which such waivers may be approved.

(b) *Filing requirements.* An applicant may request a waiver by submitting an application for a waiver in accordance with the form instructions. The burden is on the applicant to show that the waiver should be granted based upon humanitarian grounds, family unity, or the public interest. The applicant shall be notified in writing of the decision, including the reasons for denial if the application is denied. There is no appeal from such decision.

■ 37. Section 207.4 is revised to read as follows:

## § 207.4  Approved application.

Approval of a refugee application by USCIS outside the United States authorizes CBP to admit the applicant conditionally as a refugee upon arrival at the port within four months of the date the refugee application was approved. There is no appeal from a denial of refugee status under this chapter.

■ 38. Section 207.5 is revised to read as follows:

## § 207.5  Waiting lists and priority handling.

Waiting lists are maintained for each designated refugee group of special humanitarian concern. Each applicant whose application is accepted for filing by USCIS shall be registered as of the date of filing. The date of filing is the priority date for purposes of case control. Refugees or groups of refugees may be selected from these lists in a manner that will best support the policies and interests of the United States. The Secretary may adopt appropriate criteria for selecting the refugees and assignment of processing priorities for each designated group based upon such considerations as reuniting families, close association with the United States, compelling humanitarian concerns, and public interest factors.

■ 39. Section 207.7 is amended by:

■ a. Revising the term "U.S. Attorney General" to read "Secretary" in paragraph (b)(5);

■ b. Revising paragraph (d);

■ c. Removing the last two sentences in paragraph (e); and

■ d. Revising paragraph (f).

The revisions read as follows:

## § 207.7  Derivatives of refugees.

\* \* \* \* \*

(d) *Filing.* A refugee may request accompanying or following-to-join benefits for his or her spouse and unmarried, minor child(ren) (whether the spouse and children are inside or outside the United States) by filing a petition in accordance with the form instructions. The petition may only be filed by the principal refugee. Family members who derived their refugee status are not eligible to request derivative benefits on behalf of their spouses and child(ren). A petition must be filed for each qualifying family member within 2 years of the refugee's admission to the United States, unless USCIS determines that the filing period should be extended for humanitarian reasons. There is no time limit imposed on a family member's travel to the United States once the petition has been approved, provided that the relationship of spouse or child continues to exist and approval of the petition has not been subsequently revoked. There is no fee for this petition.

\* \* \* \* \*

(f) *Approvals.* (1) *Spouse or child in the United States.* When a spouse or child of a refugee is in the United States and the petition is approved, USCIS will notify the refugee of such approval. Employment will be authorized incident to status.

(2) *Spouse or child outside the United States.* When a spouse or child of a refugee is outside the United States and the petition is approved, USCIS will notify the refugee of such approval. USCIS will send the approved petition to the Department of State for transmission to the U.S. Embassy or Consulate having jurisdiction over the area in which the refugee's spouse or child is located.

(3) *Benefits.* The approval of the petition shall remain valid for the duration of the relationship to the refugee and, in the case of a child, while the child is under 21 years of age and unmarried, provided also that the

NJAPP0461

principal's status has not been revoked. However, the approved petition will cease to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of a refugee. For a derivative inside or arriving in the United States, USCIS will issue a document reflecting the derivative's current status as a refugee to demonstrate employment authorization, or the derivative may apply, under 8 CFR 274a.12(a), for evidence of employment authorization.

* * * * *

■ 40. Section 207.9 is revised to read as follows:

§ 207.9   Termination of refugee status.

The refugee status of any alien (and of the spouse or child of an alien) admitted to the United States under section 207 of the Act will be terminated by USCIS if the alien was not a refugee within the meaning of section 101(a)(42) of the Act at the time of admission. USCIS will notify the alien in writing of its intent to terminate the alien's refugee status. The alien will have 30 days from the date notice is served upon him or her in accordance with 8 CFR 103.8, to present written or oral evidence to show why the alien's refugee status should not be terminated. There is no appeal under this chapter I from the termination of refugee status by USCIS. Upon termination of refugee status, USCIS will process the alien under sections 235, 240, and 241 of the Act.

PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL

■ 41. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

§ 208.1   [Amended]

■ 42. Section 208.1 is amended by:
■ a. Revising in the last sentence of paragraph (a)(1) the term "8 CFR parts 3 and 103, where applicable" to read "8 CFR parts 103 and 1003, as applicable"; and
■ b. Revising in paragraph (b) the term "The Director of International Affairs" to read "The Associate Director of USCIS Refugee, Asylum, and International Operations (RAIO)".

§ 208.2   [Amended]

■ 43. Section 208.2 is amended in paragraph (a) by revising the paragraph heading to read: "Refugee, Asylum, and International Operations (RAIO)" and by revising the terms "the Office of

International Affairs" and "The Office of International Affairs" to read: "RAIO" wherever they appear.

§ 208.5   [Amended]

■ 44. Section 208.5 is amended by:
■ a. Removing the phrase ", pursuant to § 208.4(b)," in the last sentence of paragraph (b)(1)(ii);
■ b. Revising the phrase "The DHS office" to read "the DHS office" and by revising the phrase "the DHS office" to read "DHS" in paragraph (b)(1)(ii); and
■ c. Revising the term "Attorney General" to read "Secretary" in paragraph (b)(2).

■ 45. Section 208.7 is amended by:
■ a. Revising the phrase "submit a Form I–765, Application for Employment Authorization" to read "request employment authorization" in paragraph (a)(1), first sentence;
■ b. Revising the term "Form I–765" to read "employment authorization request" in paragraph (a)(1), last sentence;
■ c. Revising the phrase "the Service" to read "USCIS" in paragraph (a)(2), first sentence;
■ d. Revising the phrase "the Commissioner" to read "USCIS" in paragraph (b), introductory text; and
■ e. Revising paragraph (c), introductory text.

The revision reads as follows:

§ 208.7   Employment authorization.

* * * * *

(c) *Supporting evidence for renewal of employment authorization.* In order for employment authorization to be renewed under this section, the alien must request employment authorization in accordance with the form instructions. USCIS may require that an alien establish that he or she has continued to pursue an asylum application before an immigration judge or sought administrative or judicial review. For purposes of employment authorization, pursuit of an asylum application is established by presenting one of the following, depending on the stage of the alien's immigration proceedings:

* * * * *

§ 208.9   [Amended]

■ 46. In § 208.9, paragraph (b) is amended by removing the phrase "electronically or through any other means designated by the Attorney General".

§ 208.10   [Amended]

■ 47. Section 208.10 is amended by revising the term "the Office of International Affairs" to read "USCIS" in the third sentence.

§ 208.12   [Amended]

■ 48. In § 208.12, paragraph (a) is amended by revising the term "the Office of International Affairs, other Service offices," to read "other USCIS offices".

§ 208.14   [Amended]

■ 49. In § 208.14, paragraph (b) is amended by revising the term "Office of International Affairs" to read "RAIO".
■ 50. Section 208.21 is amended by revising paragraphs (c) and (d) to read as follows:

§ 208.21   Admission of the asylee's spouse and children.

(c) *Spouse or child in the United States.* When a spouse or child of an alien granted asylum is in the United States, but was not included in the asylee's application, the asylee may request accompanying or following-to-join benefits for his or her spouse or child, regardless of the status of that spouse or child in the United States, in accordance with the form instructions. The petition must be filed by the asylee for each qualifying family member within 2 years of the date in which he or she was granted asylum status, unless it is determined by USCIS that this period should be extended for humanitarian reasons. Upon approval of the petition, USCIS will notify the asylee of such approval. Employment will be authorized incident to status. To demonstrate employment authorization, USCIS will issue a document reflecting the derivative's current status as an asylee, or the derivative may apply, under 8 CFR 274a.12(a), for evidence of employment authorization. The approval of the derivative benefits petition shall remain valid for the duration of the relationship to the asylee and, in the case of a child, while the child is under 21 years of age and unmarried, provided also that the principal's status has not been revoked. However, the approved petition will cease to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of an asylee.

(d) *Spouse or child outside the United States.* When a spouse or child of an alien granted asylum is outside of the United States, the asylee may request accompanying or following-to-join benefits for his or her spouse or child(ren) by filing a separate petition for each qualifying family member in accordance with the form instructions. A petition for each qualifying family member must be filed within 2 years of the date in which the asylee was granted asylum, unless USCIS determines that the filing period should be extended for

humanitarian reasons. When a petition is approved, USCIS will notify the asylee of such approval. USCIS will also send the approved petition to the Department of State for transmission to the U.S. Embassy or Consulate having jurisdiction over the area in which the asylee's spouse or child is located. The approval of the petition shall remain valid for the duration of the relationship to the asylee and, in the case of a child, while the child is under 21 years of age and unmarried, provided also that the principal's status has not been revoked. However, the approved petition will cease to confer immigration benefits after it has been used by the beneficiary for admission to the United States as a derivative of an asylee.

\*    \*    \*    \*    \*

■ 51. Section 208.24 is amended by:
■ a. Revising paragraph (a) introductory text;
■ b. Revising paragraph (b) introductory text; and by
■ c. Revising the term "§ 3.2 or § 3.23 of this chapter" to read 8 CFR 1003.2 and 8 CFR 1003.23" and by revising the term "the Service" to read "USCIS", wherever the term appears in paragraph (f).

The revisions read as follows:

§ 208.24    Termination of asylum or withholding of removal or deportation.

(a) *Termination of asylum by USCIS.* Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of asylum made under the jurisdiction of USCIS if, following an interview, the asylum officer determines that:

\*    \*    \*    \*    \*

(b) *Termination of withholding of deportation or removal by USCIS.* Except as provided in paragraph (e) of this section, an asylum officer may terminate a grant of withholding of deportation or removal made under the jurisdiction of USCIS if the asylum officer determines, following an interview, that:

\*    \*    \*    \*    \*

■ 52. Section 208.30 is amended by revising paragraph (d)(3) to read as follows:

§ 208.30    Credible fear determinations involving stowaways and applicants for admission found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act.

\*    \*    \*    \*    \*

(d) \*    \*    \*

(3) The alien may be required to register his or her identity.

\*    \*    \*    \*    \*

§ 208.31    [Amended]

■ 53. In § 208.31, paragraph (a) is amended by revising the term "The Service" to read "USCIS" in the last sentence.

PART 209—ADJUSTMENT OF STATUS OF REFUGEES AND ALIENS GRANTED ASYLUM

■ 54. The authority citation for part 209 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1157, 1158, 1159, 1228, 1252, 1282; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 55. Section 209.1 is amended by:
■ a. Revising paragraph (a)(1);
■ b. Revising paragraph (b);
■ c. Removing from paragraph (c) last sentence the phrase ", by submitting with the adjustment of status application a vaccination supplement, completed by a designated civil surgeon in the United States";
■ d. Revising paragraphs (d) and (e); and
■ e. Adding paragraph (f).

The revisions read as follows:

§ 209.1    Adjustment of status of refugees.

\*    \*    \*    \*    \*

(a) *Eligibility.* (1) Every alien in the United States who is classified as a refugee under 8 CFR part 207, whose status has not been terminated, is required to apply to USCIS one year after entry in order for USCIS to determine his or her admissibility under section 212 of the Act, without regard to paragraphs (4), (5), and (7)(A) of section 212(a) of the Act.

\*    \*    \*    \*    \*

(b) *Application.* Upon admission to the United States, every refugee entrant will be notified of the requirement to submit an application for permanent residence one year after entry. An application for the benefits of section 209(a) of the Act must be submitted along with the biometrics required by 8 CFR 103.16 and in accordance with the applicable form instructions.

\*    \*    \*    \*    \*

(d) *Interview.* USCIS will determine, on a case-by-case basis, whether an interview by an immigration officer is necessary to determine the applicant's admissibility for permanent resident status under this part.

(e) *Decision.* USCIS will notify the applicant in writing of the decision on his or her application. There is no appeal of a denial, but USCIS will notify an applicant of the right to renew the request for permanent residence in removal proceedings under section 240 of the Act. If the applicant is found to be admissible for permanent residence under section 209(a) of the Act, USCIS

will approve the application, admit the applicant for lawful permanent residence as of the date of the alien's arrival in the United States, and issue proof of such status.

(f) *Inadmissible Alien.* An applicant who is inadmissible to the United States as described in 8 CFR 209.1(a)(1), may, under section 209(c) of the Act, have the grounds of inadmissibility waived by USCIS except for those grounds under sections 212(a)(2)(C) and 212(a)(3)(A), (B), (C), or (E) of the Act for humanitarian purposes, to ensure family unity, or when it is otherwise in the public interest. An application for the waiver may be requested with the application for adjustment, in accordance with the form instructions.

■ 56. Section 209.2 is amended by:
■ a. Revising the term "the director" to read "USCIS" whenever that term appears in paragraph (a)(2);
■ b. Removing the undesignated paragraph at the end of paragraph (a)(1);
■ c. Removing the second, third, and last sentences in paragraph (a)(2); and
■ d. Revising paragraphs (b) through (f).

The revisions read as follows:

§ 209.2    Adjustment of status of aliens granted asylum.

\*    \*    \*    \*    \*

(b) *Inadmissible Alien.* An applicant who is not admissible to the United States as described in 8 CFR 209.2(a)(1)(v), may, under section 209(c) of the Act, have the grounds of inadmissibility waived by USCIS except for those grounds under sections 212(a)(2)(C) and 212(a)(3)(A), (B), (C), or (E) of the Act for humanitarian purposes, to ensure family unity, or when it is otherwise in the public interest. An application for the waiver may be requested with the application for adjustment, in accordance with the form instructions. An applicant for adjustment under this part who has had the status of an exchange alien nonimmigrant under section 101(a)(15)(J) of the Act, and who is subject to the foreign resident requirement of section 212(e) of the Act, shall be eligible for adjustment without regard to the foreign residence requirement if otherwise eligible for adjustment.

(c) *Application.* An application for the benefits of section 209(b) of the Act may be filed in accordance with the form instructions. If an alien has been placed in removal, deportation, or exclusion proceedings, the application can be filed and considered only in proceedings under section 240 of the Act.

(d) *Medical examination.* For an alien seeking adjustment of status under section 209(b) of the Act, the alien shall

53786   Federal Register / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations

submit a medical examination to determine whether any grounds of inadmissibility described under section 212(a)(1)(A) of the Act apply. The asylee is also required to establish compliance with the vaccination requirements described under section 212(a)(1)(A)(ii) of the Act.

(e) *Interview.* USCIS will determine, on a case-by-case basis, whether an interview by an immigration officer is necessary to determine the applicant's admissibility for permanent resident status under this part.

(f) *Decision.* USCIS will notify the applicant in writing of the decision on his or her application. There is no appeal of a denial, but USCIS will notify an applicant of the right to renew the request in removal proceedings under section 240 of the Act. If the application is approved, USCIS will record the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application, but not earlier than the date of the approval for asylum in the case of an applicant approved under paragraph (a)(2) of this section.

## PART 211—DOCUMENTARY REQUIREMENTS: IMMIGRANTS; WAIVERS

■ 57. The authority citation for part 211 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1181, 1182, 1203, 1225, 1257; 8 CFR part 2.

■ 58. Section 211.1 is amended by:
■ a. Revising paragraph (b)(3); and
■ b. Removing paragraph (d).
The revision reads as follows:

### § 211.1  Visas.

(b) * * *
(3) If an immigrant alien returning to an unrelinquished lawful permanent residence in the United States after a temporary absence abroad believes that good cause exists for his or her failure to present an unexpired immigrant visa, permanent resident card, or reentry permit, the alien may file an application for a waiver of this requirement with the DHS officer with jurisdiction over the port of entry where the alien arrives. To apply for this waiver, the alien must file the designated form with the fee prescribed in 8 CFR 103.7(b)(1). If the alien's permanent resident card was lost or stolen and the alien has been absent for less than one year, rather than the waiver application the alien must apply for a replacement card as described in 8 CFR 264.5. In the exercise of discretion, the DHS officer who has jurisdiction over the port of entry where the alien arrives may waive the alien's lack of an immigrant visa, permanent

resident card, or reentry permit and admit the alien as a returning resident if DHS is satisfied that the alien has established good cause for the alien's failure to present an immigrant visa, permanent resident card, or reentry permit. Filing a request to replace a lost or stolen card would serve as both application for replacement and as application for waiver of passport and visa, without the obligation to file a separate waiver application.

*    *    *    *    *

### § 211.2  [Amended]

■ 59. In § 211.2, paragraph (b) is amended in the second sentence by revising the phrase "file Form I-193, Application for Waiver of Passport and/or Visa", to read "apply on the form specified by USCIS".
■ 60. Section 211.3 is amended by:
■ a. Revising the section heading; and
■ b. Revising the term "Form I-551" to read "a permanent resident card" whenever the term appears in the first sentence.
The revision reads as follows:

### § 211.3  Expiration of immigrant visa or other travel document.

*    *    *    *    *

### § 211.5  [Amended]

■ 61. Section 211.5 is amended by:
■ a. Revising the phrase "Form I-551 or I-688 shall become" to read "the alien's permanent resident card becomes" in the last sentence in paragraph (b); and
■ b. Revising the term "on Form I-90" to read "in accordance with 8 CFR 264.5" in the last sentence of paragraph (c).

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 62. The authority citation for part 212 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1187, 1223, 1225, 1226, 1227, 1255; 8 U.S.C. 1185 note (Pub. L. 108-458, § 7209, 118 Stat. 3638; Public Law 110-229, tit. VII, 122 Stat. 754; 8 CFR part 2.

### § 212.1  [Amended]

■ 63. In § 212.1, paragraph (n) is removed and reserved.

### § 212.2  [Amended]

■ 64. Section 212.2 is amended by revising the term "the Form I-212" or "Form I-212" to read "the application" wherever it appears in the following places:
■ a. Paragraph (b)(1);

■ b. Paragraph (b)(2);
■ c. Paragraph (e), in the last sentence;
■ d. Paragraph (f);
■ e. Paragraph (i)(1) introductory text; and
■ f. Paragraph (i)(2).
■ 65. Section 212.2 is further amended by:
■ a. Revising the term "sections 212(a)(17) and 212(d)(3)(A) of the Act and § 212.4 of this part" to read "sections 212(a)(9)(A) and 212(d)(3)(A) of the Act and 8 CFR 212.4" in the second sentence of paragraph (b)(1);
■ b. Revising the phrase "Form I-212, Application for Permission to Reapply for Admission into the United States after Deportation or Removal," to read "an application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1), in accordance with the form instructions," in the last sentence of paragraph (b)(1);
■ c. Revising the phrase "an application on Form I-212" to read "the application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1), in accordance with the form instructions" in paragraph (c)(1)(ii);
■ d. Revising the phrase "the Form I-212 to the Service office with jurisdiction over the area within which the consular officer is located" to read "the application to the designated USCIS office" in paragraph (c)(2);
■ e. Revising the phrase "Form I-212" to read "the waiver request on the form designated by USCIS" in the first sentence in paragraph (d);
■ f. Revising the phrase "Form I-601, Application for Waiver of Grounds of Excludability, must be filed simultaneously with the Form I-212" to read "he or she must file both waiver requests simultaneously on the forms designated by USCIS with the fees prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in the last sentence in paragraph (d).
■ g. Revising the phrase "Form I-212, Application for Permission to Reapply" to read "the application on the form designated by USCIS" in the second sentence of paragraph (e);
■ h. Revising the phrase "file Form I-212" to read "apply on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in the first sentence in paragraph (g)(1) introductory text;
■ i. Removing the last sentence in paragraph (g)(1) introductory text;
■ j. Removing paragraphs (g)(1)(i) and (ii);
■ k. Revising the term "8 CFR 245.15(t)(2)" to read "8 CFR 245.15(t)(2) or 8 CFR 245.13(k)(2)" in the first sentence of paragraph (g)(2);

■ l. Revising the phrase "Form I–212 or Form I–601 concurrently with the Form I–131, Application for Travel Document" to read "waiver form concurrently with the parole request" in the first sentence in paragraph (g)(2);

■ m. Removing the last sentence in paragraph (g)(2); and

■ n. Revising the phrase "section 212(a)(16) or (17) of the Act" to read "section 212(a)(9)(A) of the Act" in the second sentence of paragraph (j).

### § 212.3   [Amended]

■ 66. In § 212.3, paragraph (a) is amended by revising the phrase "Form I–191, Application for Advance Permission to Return to Unrelinquished Domicile" to read "the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions".

### § 212.4   [Amended]

■ 67. Section 212.4 is amended by:

■ a. Revising the term "Form I–192 to the district director in charge of the applicant's intended port of entry prior to the applicant's arrival in the United States", to read "the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1), and in accordance with the form instructions" in the first sentence in paragraph (b);

■ b. Removing the term "of Form I–854, Inter-Agency Alien Witness and Informant Record," in the first sentence of paragraph (j)(1); and

■ c. Revising the phrase "the Commissioner shall" to read "USCIS will" in the first sentence in paragraph (j)(1);

■ d. Revising the phrase "The Commissioner" or "the Commissioner" to read "USCIS" wherever the term appears in the second and third sentences in paragraph (j)(1); and

■ e. Revising the phrase "the Commissioner" to read "USCIS" in the second sentence in paragraph (j)(2).

### § 212.5   [Amended]

■ 68. In § 212.5, paragraph (f) is amended by revising the term "Form I–512" to read "an appropriate document authorizing travel".

■ 69. Section 212.7 is amended by:

■ a. Revising the section heading;

■ b. Revising the paragraph (a)(1);

■ c. Revising paragraph (a)(3);

■ d. Revising in paragraph (a)(4), fourth sentence, the phrase "deportable in a deportation proceeding" to read "deportable in deportation proceedings or removable in removal proceedings";

■ e. Revising the paragraph (b)(1);

■ f. Removing paragraph (b)(3);

■ g. Revising in the first sentence in paragraph (b)(4)(i) the phrase "section

212(a) (1) or (3) (because of mental retardation or because of a past history of mental illness)" to read "section 212(a)(1)(A)(iii) of the Act" and the phrase "an executed Form I–601 to the consular or Service office" to read "a waiver request";

■ h. Removing the last sentence in paragraph (b)(4)(i);

■ i. Redesignating paragraphs (b)(4) and (5) as paragraphs (b)(2) and (3), respectively;

■ j. Revising the term "Form I–612" to read "the form designated by USCIS" in paragraph (c)(5);

■ k. Revising the term "the Service" to read "USCIS" in the last sentence in paragraph (c)(9)(vi) introductory text;

■ l. Removing the phrase "with the Service" in the first sentence in paragraph (c)(9)(vi)(B); and

■ m. Revising the term "Form I–797 (and/or I–797A and I–797B)" to read "the USCIS approval notice" in paragraph (c)(9)(vi)(B)(1).

The revisions read as follows:

### § 212.7   Waiver of certain grounds of inadmissibility.

(a) *Filing and adjudication of waivers under sections 212(g), (h), or (i) of the Act.* (1) *Application procedures.* Any alien who is inadmissible under sections 212(g), (h), or (i) of the Act who is eligible for a waiver of such inadmissibility may file on the form designated by USCIS, with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. When filed at the consular section of an embassy or consulate, the Department of State will forward the application to USCIS for a decision after the consular official concludes that the alien is otherwise admissible.

\*    \*    \*    \*    \*

(3) *Decision.* USCIS will provide a written decision and, if denied, advise the applicant of appeal procedures in accordance with 8 CFR 103.3.

\*    \*    \*    \*    \*

(b) *Section 212(g) waivers for certain medical conditions.* (1) *Application.* Any alien who is inadmissible under section 212(a)(1)(A)(i), (ii), or (iii) of the Act and who is eligible for a waiver under section 212(g) of the Act may file an application as described in paragraph (a)(1) of this section. The family member specified in section 212(g) of the Act may file the waiver application for the applicant if the applicant is incompetent to file the waiver personally.

\*    \*    \*    \*    \*

### § 212.8   [Removed and Reserved]

■ 70. Section 212.8 is removed and reserved.

### § 212.9   [Removed and Reserved]

■ 71. Section 212.9 is removed and reserved.

■ 72. Section 212.10 is revised to read as follows:

### § 212.10   Section 212(k) waiver.

Any applicant for admission who is in possession of an immigrant visa, and who is inadmissible under section 212(a)(5)(A) or 212(a)(7)(A)(i) of the Act, may apply at the port of entry for a waiver under section 212(k) of the Act. If the application for waiver is denied, the application may be renewed in removal proceedings before an immigration judge as provided in 8 CFR part 1240.

### § 212.11   [Removed and Reserved]

■ 73. Section 212.11 is removed and reserved.

### § 212.14   [Amended]

■ 74. Section 212.14 is amended by:

■ a. Revising the phrase "a completed Form I–854, Inter-Agency Alien Witness and Informant Record," to read "an application on the form designated for such purposes" in paragraph (a)(1)(i);

■ b. Revising the phrase "a completed Form I–854" to read "the completed application" in the first sentence of paragraph (a)(2)(iii);

■ c. Revising the phrase "Form I–854 requesting" to read "completed application for" in the second sentence of paragraph (a)(2)(iii); and

■ d. Revising the phrase "a Form I–854" to read "the application" in paragraph (a)(2)(iii), last sentence.

### § 212.15   [Amended]

■ 75. Section 212.15 is amended by:

■ a. Revising the phrase "shall submit Form I–905, Application for Authorization to Issue Certification for Health Care Workers" to read "must apply on the form designated by USCIS in accordance with the form instructions" in the first sentence of paragraph (j)(1) introductory text;

■ b. Revising the phrase "As required on Form I–905, the" to read "The" in the last sentence of paragraph (j)(1), introductory text;

■ c. Revising the term "shall submit Form I–905" to read "must apply" in the first sentence of paragraph (j)(2)(i);

■ d. Revising the phrase "shall submit Form I–905, Application for Authorization to Issue Certification for Health Care Workers with the appropriate fee contained in 8 CFR 103.7(b)(1)" to read "must apply on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in

accordance with the form instructions'' in the first sentence in paragraph (j)(2)(ii);

■ e. Revising the phrase ''After receipt of Form I–905, USCIS shall, in all cases,'' to read ''USCIS will'' in paragraph (j)(3)(i);

■ f. Removing the phrase ''to the Associate Commissioner for Examinations'' from paragraph (j)(3)(iii);

■ g. Revising the phrase ''a Form I–905 requesting,'' to read ''a request for'' in the second sentence of paragraph (l); and

■ h. Revising the term ''Form I–905'' to read ''the request'' in the second sentence of paragraph (m)(2) introductory text.

§ 212.16   [Amended]

■ 76. Section 212.16 is amended by
■ a. Revising the term ''Form I–192'' to read ''the request on the form designated by USCIS'', by revising the term ''the Service'' to read ''USCIS'', and by revising the phrase ''completed Form I–914 application package'' to read ''application'' in paragraph (a);

■ b. Revising the terms ''the Commissioner'', ''The Service'', and ''the Service'' to read ''USCIS'' wherever those terms appear in paragraph (b); and by

■ c. Revising the term ''The Commissioner'' to read ''USCIS'' in paragraph (d).

■ 77. Section 212.17 is amended by:
■ a. Revising paragraph (a); and by
■ b. Revising the term ''Form I–192'' to read ''the waiver'' wherever the term appears in paragraph (b).

The revision reads as follows:

§ 212.17   Applications for the exercise of discretion relating to U nonimmigrant status.

(a) *Filing the waiver application.* An alien applying for a waiver of inadmissibility under section 212(d)(3)(B) or (d)(14) of the Act (waivers of inadmissibility), 8 U.S.C. 1182(d)(3)(B) or (d)(14), in connection with a petition for U nonimmigrant status being filed pursuant to 8 CFR 214.14, must submit the waiver request and the petition for U nonimmigrant status on the forms designated by USCIS in accordance with the form instructions. An alien in U nonimmigrant status who is seeking a waiver of section 212(a)(9)(B) of the Act, 8 U.S.C. 1182(a)(9)(B) (unlawful presence ground of inadmissibility triggered by departure from the United States), must file the waiver request prior to his or her application for reentry to the United States in accordance with the form instructions.

\*     \*     \*     \*     \*

## PART 213A—AFFIDAVITS OF SUPPORT ON BEHALF OF ALIENS

■ 78. The authority citation for part 213a continues to read as follows:

**Authority:** 8 U.S.C. 1183a; 8 CFR part 2.

§ 213a.1   [Amended]

■ 79. Section 213a.1 is amended by:
■ a. Revising in the definition of *household income* the phrase ''signed a U.S. Citizenship and Immigration Services (USCIS) Form I–864A, Affidavit of Support Contract Between Sponsor and Household Member'' to read ''signed the form designated by USCIS for this purpose'';

■ b. Revising in the definition of *household size*, in the second sentence in paragraph (1), the term ''Form I–864'' to read ''affidavit of support'', wherever the term appears;

■ c. Revising in the definition of *joint sponsor* the term ''a Form I–864'' to read ''an affidavit of support'';

■ d. Revising in the definition of *sponsor* the term ''a Form I–864'' to read ''an affidavit of support''; and

■ e. Revising in the definition of *substitute sponsor* the term ''a Form I–864'' to read ''the affidavit of support'' and the term ''the Form I–130 or I–129F'' to read ''a relative or fiancé(e) petition''.

■ 80–82. Section 213a.2 is amended by:
■ a. Revising paragraphs (a)(1)(i) through (a)(1)(v)(A);

■ b. Revising the phrase ''Form I–864 or Form I–864A'' to read ''affidavit of support or required affidavit of support attachment form'' in the first sentence of paragraph (a)(1)(v)(B);

■ c. Revising the phrase ''Form I–864 and any Form I–864A'' to read ''affidavit of support and any required affidavit of support attachment'' in the last sentence of paragraph (a)(1)(v)(B);

■ d. Revising the phrase ''the Form I–130 or Form I–600 immigrant visa petition (or the Form I–129F petition, for a K nonimmigrant seeking adjustment)'' to read ''relative, orphan or fiancé(e) petition'' in the first sentence of paragraph (b)(1);

■ e. Revising the phrase ''in Form I–864P Poverty Guidelines'' to read ''the Poverty Guidelines'' in paragraph (c)(2)(i)(A);

■ f. Revising the term ''Form I–864'' to read ''affidavit of support'' in paragraph (c)(2)(iii)(A)(2);

■ g. Revising paragraph (c)(2)(iii)(C);

■ h. Revising the phrase ''filed USCIS Form I–407, Abandonment of Lawful Permanent Resident Status'' to read ''abandoned permanent resident status, executing the form designated by USCIS for recording such action'' in paragraph (e)(2)(i)(C);

■ i. Revising the phrase ''Form I–864 or Form I–864A'' to read '' affidavit of support and any required attachments'' wherever the term appears in paragraph (f);

■ j. Revising the phrase ''the signed Form(s) I–864 (and any Form(s) I–864A)'' to read ''any relevant affidavit(s) and attachments'' in paragraph (g)(1); and

■ k. Revising paragraphs (g)(2)(i) and (ii).

■ l. Section 213a.2 is further amended by revising the terms ''Form I–864'', ''the Form I–864'', and ''a Form I–864'' to read ''an affidavit of support'' wherever those terms or phrases appear in the following places:
■ i. Paragraph (b), introductory text;
■ ii. Paragraph (b)(1);
■ iii. Paragraph (b)(2);
■ iv. Paragraph (c)(1)(ii)(B);
■ v. Paragraph (c)(2)(i)(A);
■ vi. Paragraph (c)(2)(i)(B);
■ vii. Paragraph (c)(2)(i)(C)(2);
■ viii. Paragraph (c)(2)(i)(C)(4);
■ ix. Paragraph (c)(2)(i)(D);
■ x. Paragraph (c)(2)(ii)(C);
■ xi. Paragraph (c)(2)(iii)(D);
■ xii. Paragraph (c)(2)(v);
■ xiii. Paragraph (c)(2)(vi);
■ xiv. Paragraph (d);
■ xv. Paragraph (e)(1);
■ xvi. Paragraph (e)(2)(i) introductory text;
■ xvii. Paragraph (e)(2)(i)(D);
■ xviii. Paragraph (e)(2)(ii);
■ xix. Paragraph (e)(3); and
■ xx. Paragraph (f) heading.

■ m. Section 213a.2 is further amended by revising the terms ''Form I–864A'', ''the Form I–864A'', or ''a Form I–864A'' to read ''an affidavit of support attachment'' wherever those terms or phrases appear in the following places:
■ i. Paragraph (c)(2)(i)(C)(1);
■ ii. Paragraph (c)(2)(i)(C)(2);
■ iii. Paragraph (c)(2)(i)(C)(3);
■ iv. Paragraph (c)(2)(i)(C)(4);
■ v. Paragraph (c)(2)(i)(C)(5);
■ vi. Paragraph (c)(2)(i)(D);
■ vii. Paragraph (c)(2)(iii)(B) introductory text;
■ viii. Paragraph (c)(2)(v);
■ ix. Paragraph (c)(2)(vi);
■ x. Paragraph (e)(1);
■ xi. Paragraph (e)(2)(i) introductory text;
■ xii. Paragraph (e)(2)(i)(D);
■ xiii. Paragraph (e)(2)(ii);
■ xiv. Paragraph (e)(3); and
■ xv. Paragraph (f) heading.

The revisions read as follows:

§ 213a.2   Use of affidavit of support.

(a) *Applicability of section 213a affidavit of support.* (1)(i)(A) In any case specified in paragraph (a)(2) of this section, an intending immigrant is

inadmissible as an alien likely to become a public charge, unless the qualified sponsor specified in paragraph (b) of this section or a substitute sponsor and, if necessary, a joint sponsor, has executed on behalf of the intending immigrant an affidavit of support on the applicable form designated by USCIS in accordance with the requirements of section 213A of the Act and the form instructions. Each reference in this section to the affidavit of support or the form is deemed to be a reference to all such forms designated by USCIS for use by a sponsor for compliance with section 213A of the Act.

(B) If the intending immigrant claims that, under paragraph (a)(2)(ii)(A), (C), or (E) of this section, the intending immigrant is exempt from the requirement to file an affidavit of support, the intending immigrant must include with his or her application for an immigrant visa or adjustment of status an exemption request on the form designated by USCIS for this purpose.

(ii) An affidavit of support is executed when a sponsor signs and submits the appropriate forms in accordance with the form instructions to USCIS or the Department of State, as appropriate.

(iii) A separate affidavit of support is required for each principal beneficiary.

(iv) Each immigrant who will accompany the principal intending immigrant must be included on the affidavit. See paragraph (f) of this section for further information concerning immigrants who intend to accompany or follow the principal intending immigrant to the United States.

(v)(A) Except as provided for under paragraph (a)(1)(v)(B) of this section, the Department of State consular officer, immigration officer, or immigration judge will determine the sufficiency of the affidavit of support based on the sponsor's, substitute sponsor's, or joint sponsor's reasonably expected household income in the year in which the intending immigrant filed the application for an immigrant visa or for adjustment of status, and based on the evidence submitted with the affidavit of support and the Poverty Guidelines in effect when the intending immigrant filed the application for an immigrant visa or adjustment of status.

*       *       *       *       *

(c) *   *   *
(2) *   *   *
(iii) *   *   *

(C) Joint sponsor. A joint sponsor must execute a separate affidavit of support on behalf of the intending immigrant(s) and be willing to accept joint and several liabilities with the sponsor or substitute sponsor. A joint sponsor must meet all the eligibility requirements under paragraph (c)(1) of this section, except that the joint sponsor is not required to file a visa petition on behalf of the intending immigrant. The joint sponsor must demonstrate his or her ability to support the intending immigrant in the manner specified in paragraph (c)(2) of this section. A joint sponsor's household income must meet or exceed the income requirement in paragraph (c)(2)(iii) of this section unless the joint sponsor can demonstrate significant assets as provided in paragraph (c)(2)(iv)(A) of this section. The joint sponsor's household income must equal at least 125 percent of the Poverty Guidelines for the joint sponsor's household size, unless the joint sponsor is on active duty in the Armed Forces and the intending immigrant is the joint sponsor's spouse or child, in which case the joint sponsor's household income is sufficient if it equals at least 100 percent of the Poverty Guidelines for the joint sponsor's household size. An intending immigrant may not have more than one joint sponsor, but, if the joint sponsor's household income is not sufficient to meet the income requirement with respect to the principal intending immigrant, any spouse and all the children who, under section 203(d) of the Act, seek to accompany the principal intending immigrant, then the joint sponsor may specify on the affidavit that it is submitted only on behalf of the principal intending immigrant and those accompanying family members specifically listed on the affidavit. The remaining accompanying family members will then be inadmissible under section 212(a)(4) of the Act unless a second joint sponsor submits an affidavit(s) on behalf of all the remaining family members who seek to accompany the principal intending immigrant and who are not included in the first joint sponsor's affidavit. There may not be more than two joint sponsors for the family group consisting of the principal intending immigrant and the accompanying spouse and children.

*       *       *       *       *

(g) *   *   *

(2)(i) To avoid inadmissibility under section 212(a)(4) of the Act, an alien who applies for an immigrant visa, admission, or adjustment of status as an alien who is following-to-join a principal intending immigrant must submit a new affidavit(s) of support, together with all documents or other evidence necessary to prove that the new affidavits comply with the requirements of section 213A of the Act and 8 CFR part 213a.

(ii) When paragraph (g)(2)(i) of this section requires the filing of a new affidavit for an alien who seeks to follow-to-join a principal sponsored immigrant, the same sponsor who filed the visa petition and affidavit of support for the principal sponsored immigrant must file the new affidavit on behalf of the alien seeking to follow-to-join. If that person has died, then the alien seeking to follow-to-join is inadmissible unless a substitute sponsor, as defined by 8 CFR 213a.1, signs a new affidavit that meets the requirements of this section. Persons other than the person or persons who signed the original joint affidavits on behalf of the principal sponsored immigrant may sign a new joint affidavit on behalf of an alien who seeks to follow-to-join a principal sponsored immigrant.

*       *       *       *       *

■ 83. Section 213a.3 is revised to read as follows:

§ 213a.3   Change of address.

(a) Submission of address change. (1) Filing requirements. If the address of a sponsor (including a substitute sponsor or joint sponsor) changes while the sponsor's support obligation is in effect, the sponsor shall file a change of address notice within 30 days, in a manner as prescribed by USCIS on its address change form instructions.

(2) Proof of mailing. USCIS will accept a photocopy of the change of address form together with proof of the form's delivery to USCIS as evidence that the sponsor has complied with this requirement.

(3) Electronic notices. USCIS will provide the sponsor with a receipt notice for an address change.

(4) Alien sponsors. If the sponsor is an alien, the sponsor must still comply with the requirements of 8 CFR 265.1 to notify USCIS of his or her change of address.

(b) Civil penalty. If the sponsor fails to give notice in accordance with paragraph (a) of this section, DHS may impose on the sponsor a civil penalty in an amount within the penalty range established in section 213A(d)(2)(A) of the Act. Except, if the sponsor, knowing that the sponsored immigrant has received any means-tested public benefit, fails to give notice in accordance with paragraph (a) of this section, DHS may impose on the sponsor a civil penalty in an amount within the penalty range established in section 213A(d)(2)(B) of the Act. The procedure for imposing a civil penalty is established at 8 CFR part 280.

§ 213a.4   [Amended]

■ 84. Section 213a.4 is amended by:
■ a. Revising the term "8 CFR 103.5a(a)(2)" to read "8 CFR 103.8(a)(2)" in paragraph (a)(1)(i); and
■ b. Revising the phrases "a Form I–864 or Form I–864A" and "the Form I–864 or Form I–864A" to read "an affidavit of support" in the first sentence in paragraph (a)(3).

■ 85. Section 213a.5 is revised to read as follows:

§ 213a.5   Relationship of this part to other affidavits of support.

Nothing in this part precludes the continued use of other affidavits of support provided by USCIS in a case other than a case described in § 213a.2(a)(2). The obligations of section 213A of the Act do not bind a person who executes such other USCIS affidavits of support. Persons sponsoring an Amerasian alien described in section 204(f)(2) of the Act remain subject to the provisions of section 204(f)(4)(B) of the Act and 8 CFR 204.4(i), as appropriate.

## PART 223—REENTRY PERMITS, REFUGEE TRAVEL DOCUMENTS, AND ADVANCE PAROLE DOCUMENTS

■ 86. The authority citation for part 223 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1181, 1182, 1186a, 1203, 1225, 1226, 1227, 1251; Protocol Relating to the Status of Refugees, Nov. 1, 1968, 19 U.S.T. 6223 (TIAS) 6577; 8 CFR part 2.

■ 87. Section 223.2 is revised to read as follows:

§ 223.2   Application and processing.

(a) *Application.* An applicant must submit an application for a reentry permit, refugee travel document, or advance parole on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

(b) *Filing eligibility.* (1) *Reentry permit.* An applicant for a reentry permit must file such application while in the United States and in status as a lawful permanent resident or conditional permanent resident.

(2) *Refugee travel document.* (i) Except as provided in paragraph (b)(2)(ii) of this section, an applicant for a refugee travel document must submit the application while in the United States and in valid refugee status under section 207 of the Act, valid asylum status under section 208 of the Act or is a permanent resident who received such status as a direct result of his or her asylum or refugee status.

(ii) *Discretionary authority to accept a refugee travel document application from an alien not within the United States.* As a matter of discretion, the Service office with jurisdiction over a port-of-entry or pre-flight inspection location where the alien is seeking admission, or the overseas Service office where the alien is physically present, may accept and adjudicate an application for a refugee travel document from an alien who previously had been admitted to the United States as a refugee, or who previously had been granted asylum status in the United States, then who departed from the United States without having applied for such refugee travel document, provided the officer:

(A) Is satisfied that the alien did not intend to abandon his or her refugee or asylum status at the time of departure from the United States;

(B) The alien did not engage in any activities while outside the United States that would be inconsistent with continued refugee or asylum status; and

(C) The alien has been outside the United States for less than 1 year since his or her last departure.

(c) *Ineligibility.* (1) *Prior document still valid.* An application for a reentry permit or refugee travel document will be denied if the applicant was previously issued a reentry permit or refugee travel document which is still valid, unless it was returned to USCIS or it is demonstrated that it was lost.

(2) *Extended absences.* A reentry permit issued to a person who, since becoming a permanent resident or during the last five years, whichever is less, has been outside the United States for more than four years in the aggregate, shall be limited to a validity of one year, except that a permit with a validity of two years may be issued to:

(i) A permanent resident described in 8 CFR 211.1(a)(6) or (a)(7);

(ii) A permanent resident employed by a public international organization of which the United States is a member by treaty or statute, and his or her permanent resident spouse and children; or

(iii) A permanent resident who is a professional athlete who regularly competes in the United States and worldwide.

(3) *Permanent resident entitled to nonimmigrant diplomatic or treaty status.* A permanent resident entitled to nonimmigrant status under section 101(a)(15)(A), (E), or (G) of the Act because of occupational status may only be issued a reentry permit if the applicant executes and submits with the application, or has previously executed

and submitted, a written waiver as required by 8 CFR part 247.

(d) *Effect of travel before a decision is made.* Departure from the United States before a decision is made on an application for a reentry permit or refugee travel document will not affect the application.

(e) *Processing.* USCIS may approve or deny a request for a reentry permit or refugee travel document as an exercise of discretion. If it approves the application, USCIS will issue an appropriate document.

(f) *Effect on proceedings.* Issuance of a reentry permit or refugee travel document to a person in exclusion, deportation, or removal proceedings shall not affect those proceedings.

(g) *Appeal.* Denial of an application for a reentry permit or refugee travel document may be appealed in accordance with 8 CFR 103.3.

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

■ 88. The authority citation for part 235 is revised to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103, 1183, 1185 (pursuant to E.O. 13323, published January 2, 2004), 1201, 1224, 1225, 1226, 1228, 1365a note, 1379, 1731–32; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 U.S.C. 1185 note (Pub. L. 108–458, § 7209, 118 Stat. 3638).

§ 235.3   [Amended]

■ 89. In § 235.3, paragraph (b)(1)(i) is amended by revising the term "§ 1.1(q) of this chapter" to read "8 CFR 1.2".

§ 235.8   [Amended]

■ 90. In § 235.8, paragraph (e) is amended by revising the term "§ 1.1(q) of this chapter" to read "8 CFR 1.2".

## PART 236—APPREHENSION AND DETENTION OF INADMISSIBLE AND DEPORTABLE ALIENS; REMOVAL OF ALIENS ORDERED REMOVED

■ 91. The authority citation for part 236 continues to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1103, 1182, 1224, 1225, 1226, 1227, 1231, 1362; 18 U.S.C. 4002, 4013(c)(4); 8 CFR part 2.

§ 236.2   [Amended]

■ 92. In § 236.2, paragraph (a) is amended by revising the term "§ 103.5a(c) of this chapter" to read "8 CFR 103.8(c)".

§ 236.16   [Amended]

■ 93. Section 236.16 is amended by revising the phrase "using Form I–131, Application for Travel Document" to read "in accordance with 8 CFR

NJAPP0468

223.2(a)"in the first sentence and revising the phrase "the district director" to read "USCIS" in the second sentence.

§ 236.18   [Amended]

■ 94. In § 236.18, paragraph (b) is amended by revising the term "§ 103.5a of this chapter" to read "8 CFR 103.8(a)(2)" wherever that term appears.

## PART 238—EXPEDITED REMOVAL OF AGGRAVATED FELONS

■ 95. The authority citation for part 238 continues to read as follows:

   **Authority:** 8 U.S.C. 1228; 8 CFR part 2.

■ 96. In § 238.1, paragraph (b)(2)(i) is amended by revising the term "§§ 103.5a(a)(2) and 103.5a(c)(2) of this chapter" to read "8 CFR 103.8".

## PART 240—VOLUNTARY DEPARTURE, SUSPENSION OF DEPORTATION AND SPECIAL RULE CANCELLATION OF REMOVAL

■ 97. The heading for part 240 is revised as set forth above.
■ 98. The authority citation for part 240 continues to read as follows:

   **Authority:** 8 U.S.C. 1103, 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; sections 202 and 203, Pub. L. 105–100, 111 Stat. 2160, 2193; section 902, Pub. L. 105–277, 112 Stat. 2681; 8 CFR part 2.

■ 99. Section 240.67 is amended by revising paragraph (a) introductory text to read as follows:

§ 240.67   Procedure for interview before an asylum officer.

   (a) *Fingerprinting requirements.* USCIS will notify each applicant 14 years of age or older to appear for an interview only after the applicant has complied with fingerprinting requirements pursuant to 8 CFR 103.16, and USCIS has received a definitive response from the FBI that a full criminal background check has been completed. A definitive response that a full criminal background check on an applicant has been completed includes:

*     *     *     *     *

## PART 241—APPREHENSION AND DETENTION OF ALIENS ORDERED REMOVED

■ 100. The authority citation for part 241 continues to read as follows:

   **Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1103, 1182, 1223, 1224, 1225, 1226, 1227, 1228, 1231, 1251, 1253, 1255, 1330, 1362; 18 U.S.C. 4002, 4013(c)(4); Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 101, et seq.); 8 CFR part 2.

§ 241.4   [Amended]

■ 101. In § 241.4, paragraph (d)(2), first sentence is amended by revising the term "8 CFR 103.5a" to read "8 CFR 103.8".
■ 102. Section 241.5 is amended by revising paragraph (a)(5) to read as follows:

§ 241.5   Conditions of release after removal period.

   (a) * * *
   (5) A requirement that the alien provide DHS with written notice of any change of address in the prescribed manner.

*     *     *     *     *

## PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

■ 103. The authority citation for part 244 continues to read as follows:

   **Authority:** 8 U.S.C. 1103, 1254, 1254a note, 8 CFR part 2.

§ 244.3   [Amended]

■ 104. Section 244.3 is amended by:
■ a. Revising the term "the Service" to read "USCIS" in the first sentence in paragraph (b);
■ b. Removing the phrase "of grounds of inadmissibility on Form I–601 (Application for waiver of grounds of excludability)" in the second sentence in paragraph (b);
■ c. Revising the term "The Service" to read "USCIS" in paragraph (c) introductory text.

§ 244.4   [Amended]

■ 105. In § 244.4, paragraph (b) is amended by revising the term "section 243(h)(2) of the Act" to read "section 208(b)(2)(A) of the Act".

§ 244.5   [Amended]

■ 106. In § 244.5, paragraph (a) is amended by revising the term "the Attorney General" to read "DHS" wherever the term appears.
■ 107. Section 244.6 is revised to read as follows:

§ 244.6   Application.

   (a) An application for Temporary Protected Status must be submitted in accordance with the form instructions, the applicable country-specific Federal Register notice that announces the procedures for TPS registration or re-registration, and 8 CFR 103.2, except as otherwise provided in this section, with the appropriate fees and biometric information as described in 8 CFR 103.7(b)(1), 103.16, and 103.17.
   (b) An applicant for TPS may also request employment authorization

pursuant to 8 CFR 274a. Those applicants between the ages of 14 and 65 who are not requesting authorization to work will not be charged a fee for an application for employment authorization.

§ 244.7   [Amended]

■ 108. Section 244.7 is amended by:
■ a. Revising the phrase "Form I–821, Application for Temporary Protected Status" to read "the form designated by USCIS with any prescribed fees and in accordance with the form instructions" in paragraph (a); and
■ b. Revising the term "Attorney General" to read "DHS" in paragraph (b).

§ 244.9   [Amended]

■ 109. In § 244.9, paragraph (a)(4) is amended by revising the phrase "Form I–551 or Form I–94" to read "evidence of admission for lawful permanent residence or nonimmigrant status".
■ 110. Section 244.10 is amended by:
■ a. Revising the section heading; and
■ b. Revising paragraphs (a), (b) (c) and (d)
   The revisions read as follows:

§ 244.10   Decision and appeal.

   (a) *Temporary treatment benefits.* USCIS will grant temporary treatment benefits to the applicant if the applicant establishes prima facie eligibility for Temporary Protected Status in accordance with 8 CFR 244.5.
   (b) *Temporary Protected Status.* Upon review of the evidence presented, USCIS may approve or deny the application for Temporary Protected Status in the exercise of discretion, consistent with the standards for eligibility in 8 CFR 244.2, 244.3, and 244.4.
   (c) *Denial.* The initial decision to deny Temporary Protected Status, a waiver of inadmissibility, or temporary treatment benefits shall be in writing served in person or by mail to the alien's most recent address provided to the Service and shall state the reason(s) for the denial. Except as otherwise provided in this section, the alien will be given written notice of his or her right to appeal. If an appeal is filed, the administrative record shall be forwarded to the USCIS AAO for review and decision, except as otherwise provided in this section.
   (1) If the basis for the denial of the Temporary Protected Status constitutes a ground for deportability or inadmissibility which renders the alien ineligible for Temporary Protected Status under § 244.4 or inadmissible under § 244.3(c), the decision shall

53792  **Federal Register**/Vol. 76, No. 167/Monday, August 29, 2011/Rules and Regulations

include a charging document which sets forth such ground(s).

(2) If such a charging document is issued, the alien shall not have the right to appeal the USCIS decision denying Temporary Protected Status as provided in 8 CFR 103.3. However, the decision will also apprise the alien of his or her right to a *de novo* determination of his or her eligibility for Temporary Protected Status in removal proceedings pursuant to section 240 of the Act and 8 CFR 1244.18.

(d) *Administrative appeal.* The appellate decision will be served in accordance with 8 CFR 103.8. If the appeal is dismissed, the decision must state the reasons for dismissal.

(1) If the appeal is dismissed on appeal under 8 CFR 244.18(b), the decision shall also apprise the alien of his or her right to a *de novo* determination of eligibility for Temporary Protected Status in removal proceedings pursuant to section 240 of the Act and 8 CFR 1244.18.

(2) If the appeal is dismissed, USCIS may issue a charging document if no charging document is presently filed with the Immigration Court.

(3) If a charging document has previously been filed or is pending before the Immigration Court, either party may move to re-calendar the case after the administrative appeal is dismissed.

*    *    *    *    *

**§ 244.11  [Amended]**

■ 111. Section 244.11 is amended by revising the term "§ 3.3 of this chapter" to read "8 CFR 1003".

**§ 244.12  [Amended]**

■ 112. Section 244.12, is amended by:
■ a. Revising the term "the INS" to read "USCIS" in paragraphs (a) and (c); and
■ b. Revising the phrase "appealed to the Administrative Appeals Unit" to read "pending administrative appeal" in paragraph (d).

**§ 244.14  [Amended]**

■ 113. Section 244.14 is amended by:
■ a. Revising the term *"director"* to read *"USCIS"* in paragraph (a) heading;
■ b. Revising the "The director" to read "USCIS" in paragraph (a) introductory text;
■ c. Revising the term "the district director" to read "USCIS" in paragraph (a)(2) last sentence;
■ d. Revising the term "Attorney General" to read "DHS" in paragraph (a)(3);
■ e. Revising the term *"director"* to read *"USCIS"* in paragraph (b) heading; and by

■ f. Revising the term "§ 240.14(a)(3)" to read "8 CFR 244.14(a)(3)" and the term "§ 103.5a of this chapter" to read "8 CFR 103.8(a)(2)" in paragraph (b)(1).

**§ 244.16  [Amended]**

■ 114. In § 244.16, the term "the Department of Justice" is revised to read "DHS".

■ 115. Section 244.17 is revised to read as follows:

**§ 244.17  Periodic registration.**

(a) Aliens granted Temporary Protected Status must re-register periodically in accordance with USCIS instructions. Such registration applies to nationals of those foreign states designated or redesignated for more than one year by DHS. Applicants for periodic re-registration must apply during the registration period provided by USCIS. Re-registering applicants will not need to re-pay the TPS application fee that was required for initial registration except that aliens requesting employment authorization must submit the application fee for employment authorization. The biometric service fee described in 103.7(b), or an approved fee waiver, will be required of applicants age 14 and over. By completing the application, applicants attest to their continuing eligibility. Such applicants do not need to submit additional supporting documents unless USCIS requests them to do so.

(b) If an alien fails to register without good cause, USCIS will withdraw Temporary Protected Status. USCIS may, for good cause, accept and approve an untimely registration request.

■ 116. Section 244.18 is amended by revising paragraphs (b) and (d) to read as follows:

**§ 244.18  Issuance of charging documents; detention.**

*    *    *    *    *

(b) The filing of the charging document by DHS with the Immigration Court renders inapplicable any other administrative, adjudication or review of eligibility for Temporary Protected Status. The alien shall have the right to a *de novo* determination of his or her eligibility for Temporary Protected Status in removal proceedings pursuant to section 240 of the Act and 8 CFR 1244.18. Review by the Board of Immigration Appeals shall be the exclusive administrative appellate review procedure. If an appeal is already pending before the Administrative Appeals Office (AAO), USCIS will notify the AAO of the filing of the charging document, in which case the pending appeal shall be dismissed and the record of proceeding returned to

the jurisdiction where the charging document was filed.

*    *    *    *    *

(d) An alien who is determined by USCIS deportable or inadmissible upon grounds which would have rendered the alien ineligible for such status as provided in 8 CFR 244.3(c) and 8 CFR 244.4 may be detained under the provisions of this chapter pending removal proceedings. Such alien may be removed from the United States upon entry of a final order of removal.

**PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE**

■ 117. The authority citation for part 245 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1255; Pub. L. 105–100, section 202, 111 Stat. 2160, 2193; Pub. L. 105–277, section 902, 112 Stat. 2681; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 118. Section 245.1 is amended by:
■ a. Revising the term to "section 214(k)" to read: "section 214(l)" in the last sentence in paragraph (c)(2);
■ b. Removing and reserving paragraph (e)(2);
■ c. Revising the third sentence in paragraph (g)(1); and by
■ d. Removing the fourth sentence in paragraph (g)(1).
    The revision reads as follows:

**§ 245.1  Eligibility.**

*    *    *    *    *

(g) * * *

(1) * * * A preference immigrant visa is considered available for accepting and processing if the applicant has a priority date on the waiting list which is earlier than the date shown in the Bulletin (or the Bulletin shows that numbers for visa applicants in his or her category are current). * * *

*    *    *    *    *

**§ 245.2  [Amended]**

■ 119. Section 245.2 is amended by removing the phrase ", except when the applicant has established eligibility for the benefits of Public Law 101–238" in the second sentence in paragraph (a)(5)(ii).

■ 120. In § 245.7, paragraph (a) is revised to read as follows:

*§ 245.7  Adjustment of status of certain Soviet and Indochinese parolees under the Foreign Operations Appropriations Act for Fiscal Year 1990 (Pub. L. 101–167).* (a) *Application.* Each person applying for benefits under section 599E of Public Law 101–167, 103 Stat. 1195, 1263, must file an application on the form prescribed by

USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

\*     \*     \*     \*     \*

§ 245.9   [Removed and Reserved]

■ 121. Section 245.9 is removed and reserved.

■ 122. In § 245.10, paragraph (n)(2) is revised to read as follows:

§ 245.10   Adjustment of status upon payment of additional sum under Public Law 103–317.

\*     \*     \*     \*     \*

(n) \* \* \*

(2) To demonstrate physical presence on December 21, 2000, the alien may submit copies of documents issued by the former INS or EOIR such as arrival-departure forms or notices to appear in immigration court.

\*     \*     \*     \*     \*

■ 123. In § 245.11, remove the last two sentences in paragraph (f) and add a new sentence to read as follows:

§ 245.11   Adjustment of aliens in S nonimmigrant classification.

\*     \*     \*     \*     \*

(f) \* \* \* The applicant may request employment authorization or permission to travel outside the United States while the application is pending by filing an application pursuant to 8 CFR 274a.13 or 8 CFR 223.2.

\*     \*     \*     \*     \*

§ 245.12   [Removed and Reserved]

■ 124. Section 245.12 is removed and reserved.

§ 245.13   [Removed and Reserved]

■ 125. Section 245.13 is removed and reserved.

■ 126. Section 245.15 is amended by:
■ a. Revising the phrase "Advance Authorization for Parole (Form I–512)" to read "advance parole authorization" and revising the phrase "Advance Authorization for Parole" to read "authorization" in paragraph (c)(4)(ii);
■ b. Revising paragraph (g)(1);
■ c. Revising paragraph (n)(1);
■ d. Revising the phrase "the Director of the Nebraska Service Center verifies that Service" to read "USCIS verifies that DHS" and by revising the term "the Director may approve" to read "USCIS may approve" in the first sentence in paragraph (n)(2);
■ e. Revising the term "the Service" to read "USCIS" in the second sentence in paragraph (n)(2);
■ f. Revising paragraph (s)(1);
■ g. Revising paragraph (t)(1);
■ h. Revising the phrase "an Application for Travel Document (Form

I–131) with the Nebraska Service Center, at P.O. Box 87245, Lincoln, NE 68501–7245" to read "a request on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in the first sentence of paragraph (t)(2)(i); and
■ i. Revising the term "Form I–485" to read "application for adjustment of status" in the second sentence in paragraph (t)(2)(i).

The revisions read as follows:

§ 245.15   Adjustment of Status of Certain Haitian Nationals under the Haitian Refugee Immigrant Fairness Act of 1998 (HRIFA).

\*     \*     \*     \*     \*

(g) \* \* \*

(1) *Filing of applications with USCIS.* USCIS has jurisdiction over all applications for the benefits of section 902 of HRIFA as a principal applicant or as a dependent under this section, except for applications filed by aliens who are in pending immigration proceedings as provided in paragraph (g)(2) of this section. All applications filed with USCIS for the benefits of section 902 of HRIFA must be submitted on the form designated by USCIS with the fees prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. After proper filing of the application, USCIS will instruct the applicant to appear for biometrics collection as prescribed in 8 CFR 103.16.

\*     \*     \*     \*     \*

(n) \* \* \*

(1) *Application for employment authorization.* An applicant for adjustment of status under section 902 of HRIFA who wishes to obtain initial or continued employment authorization during the pendency of the adjustment application must file an application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. The applicant may submit the application either concurrently with or subsequent to the filing of the application for HRIFA benefits.

\*     \*     \*     \*     \*

(s) *Action of immigration judge upon referral of decision by a notice of certification.* (1) *General.* Upon the referral by a notice of certification of a decision to deny the application, in accordance with paragraph (r)(3) of this section, the immigration judge will conduct a hearing to determine whether the alien is eligible for adjustment of status under section 902 of HRIFA in accordance with this paragraph (s)(1).

\*     \*     \*     \*     \*

(t) \* \* \*

(1) *Travel from and return to the United States while the application for adjustment of status is pending.* If an applicant for benefits under section 902 of HRIFA desires to travel outside, and return to, the United States while the application for adjustment of status is pending, he or she must file a request for advance parole authorization on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. Unless the applicant files an advance parole request prior to departing from the United States and USCIS approves such request, his or her application for adjustment of status under section 902 of HRIFA is deemed to be abandoned as of the moment of departure. Parole may only be authorized pursuant to the authority contained in, and the standards prescribed in, section 212(d)(5) of the Act.

\*     \*     \*     \*     \*

■ 127. Section 245.18 is amended by:
■ a. Revising the section heading;
■ b. Revising paragraph (d)(1);
■ c. Revising the term "the Service" to read "USCIS" in paragraph (d)(2); and
■ d. Revising the last sentence in paragraph (k).

The revisions read as follows:

§ 245.18   Physicians with approved employment-based petitions serving in a medically underserved area or a Veterans Affairs facility.

\*     \*     \*     \*     \*

(d) *Employment authorization.* (1) Once USCIS has approved a petition described in paragraph (a) of this section, the alien physician may apply for permanent residence and employment authorization on the forms designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

\*     \*     \*     \*     \*

(k) \* \* \* Such physicians may apply for advance parole on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

\*     \*     \*     \*     \*

§ 245.20   [Removed and Reserved]

■ 128. Section 245.20 is removed and reserved.

■ 129–130. Section 245.21 is amended by:
■ a. Adding the word "and" at the end of paragraph (a)(3);
■ b. Removing paragraph (a)(4);
■ c. Redesignating paragraph (a)(5) as paragraph (a)(4);
■ d. Revising paragraph (b);
■ e. Revising the second sentence in paragraph (d)(1);

53794   Federal Register / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations

■ f. Revising paragraph (d)(2);

■ g. Revising the last sentence in paragraph (f);

■ h. Revising paragraph (h);

■ i. Revising paragraph (i);

■ j. Revising the terms, "Service" and "Service's" to read "USCIS'" in paragraph (j);

■ k. Removing paragraph (m); and

■ l. By revising the terms "The Service" and "the Service" to read "USCIS" wherever the terms appear in the following paragraphs:

■ i. Paragraph (a) introductory text;

■ ii. Paragraph (c);

■ iii. Paragraph (d) introductory text;

■ iv. Paragraph (d)(4);

■ v. Paragraph (g)(3);

■ vi. Paragraph (j);

■ vii. Paragraph (k); and

■ viii. Paragraph (l).

The revisions read as follows:

§ 245.21  Adjustment of status of certain nationals of Vietnam, Cambodia, and Laos.

*     *     *     *     *

(b) *Application.* An applicant must submit an application on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions. Applicants who are 14 through 79 years of age must also submit the biometrics service fee described in 8 CFR 103.17.

*     *     *     *     *

(d) * * *

(1) * * * An alien who is eligible for adjustment of status under section 586 of Public Law 106–429 may request a stay of removal during the pendency of the application. * * *

(2) DHS will exercise its discretion not to grant a stay of removal, deportation, or exclusion with respect to an alien who is inadmissible on any of the grounds specified in paragraph (m)(3) of this section, unless there is substantial reason to believe that USCIS will grant the necessary waivers of inadmissibility.

*     *     *     *     *

(f) * * * In order to obtain a waiver for any of these grounds, the applicant must submit an application on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

*     *     *     *     *

(h) *Employment authorization.* Applicants who want to obtain employment authorization based on a pending application for adjustment of status under this section may apply on the form specified by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

(i) *Travel while an application to adjust status is pending.* An applicant who wishes to travel outside the United States while the application is pending must obtain advance permission by filing the application specified by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

*     *     *     *     *

■ 131. In § 245.22, paragraph (c) is revised to read as follows:

§ 245.22  Evidence to demonstrate an alien's physical presence in the United States on a specific date.

*     *     *     *     *

(c) *DHS-issued documentation.* An applicant for permanent residence may demonstrate physical presence by submitting DHS-issued (or predecessor agency-issued) documentation such as an arrival-departure form or notice to appear in immigration proceedings.

*     *     *     *     *

PART 245a—ADJUSTMENT OF STATUS TO THAT OF PERSONS ADMITTED FOR TEMPORARY OR PERMANENT RESIDENT STATUS UNDER SECTION 245A OF THE IMMIGRATION AND NATIONALITY ACT

■ 132. The authority citation for part 245a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1255a, and 1255a note.

■ 133. The heading for part 245a is revised as set forth above.

§ 245a.4   [Amended]

■ 134. In § 245a.4, paragraph (b)(16), third sentence is amended by revising the term "§ 103.5a(b) of this Act" to read "8 CFR 103.8(b)".

§ 245a.12   [Amended]

■ 135. In § 245a.12, paragraph (b) introductory text, third sentence is amended by revising the term "fingerprinting as prescribed in § 103.2(e) of this chapter" to read "fingerprinting as prescribed in 8 CFR 103.16".

§ 245a.37   [Amended]

■ 136. In § 245a.37, paragraph (b) is amended by revising the term "§ 103.5a of this chapter" to read "8 CFR 103.8" wherever that term appears.

PART 248—CHANGE OF NONIMMIGRANT CLASSIFICATION

■ 137. The authority citation for part 248 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1184, 1258; 8 CFR part 2.

§ 248.1   [Amended]

■ 138. Section 248.1 is amended by:

■ a. Revising the term "the Service" to read "USCIS" in paragraph (b) introductory text;

■ b. Revising the term "the Service" to read "USCIS" in paragraph (b)(1);

■ c. Revising the phrase "The district director or service center director shall" to read "USCIS will" in the second sentence in paragraph (c)(1);

■ d. Revising the phrase "The district director or service center director" to read "USCIS" in the last sentence in paragraph (c)(3); and

■ e. Removing the phrase "before the Service" in the last sentence in paragraph (c)(3).

■ 139. Section 248.3 is amended by:

■ a. Adding introductory text;

■ b. Revising paragraph (a);

■ c. Revising paragraph (b);

■ d. Revising the phrase "Form I–539 and be accompanied by a Form I–566, completed and endorsed in accordance with the instructions on that form" to read "the prescribed application accompanied by the appropriate endorsement from the Department of State recommending the change of status" in the second sentence in paragraph (c);

■ e. Removing and reserving paragraph (d);

■ f. Revising the term "sections 101(a)(15)(E), (H), (I), (J), (L), or (Q)(ii) of the Act" to read "sections 101(a)(15)(E), (H); (I), (J), or (L) of the Act" in paragraph (e)(2);

■ g. Revising the term "the district director" to read "USCIS" in the last sentence in paragraph (f); and

■ h. Revising the phrase "Form I–539, Application to Extend/Change Nonimmigrant Status, with the appropriate fee, and Form I–854, Inter-Agency Alien Witness and Informant Record, with attachments" to read "the forms designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in paragraph (h) introductory text.

The revisions read as follows:

§ 248.3   Petition and application.

Requests for a change of status must be filed on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b) and in accordance with the form instructions.

(a) *Petition by employer.* An employer must submit a petition for a change of status to E–1 treaty trader, E–2 treaty investor, H–1C, H–1B, H–2A, H–2B, H–3, L–1, O–1, O–2, P–1, P–2, P–3, Q–1, R–1, or TN nonimmigrant.

(b) *Application by nonimmigrant.* (1) *Individual applicant.* Any nonimmigrant who seeks to change status to:

(i) A dependent nonimmigrant classification as the spouse or child of

a principal whose nonimmigrant classification is listed in paragraph (a) of this section, or

(ii) Any other nonimmigrant classification not listed in paragraph (a) of this section must apply for a change of status on his or her own behalf.

(2) *Multiple applicants.* More than one person may be included in an application where the co-applicants are all members of a single family group and either all hold the same nonimmigrant status or one holds a nonimmigrant status and the co-applicants are his or her spouse and/or children who hold derivative nonimmigrant status based on the principal's nonimmigrant status.

\* \* \* \* \*

## PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

■ 140. The authority citation for part 264 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1201, 1201a, 1301–1305; 8 CFR part 2.

■ 141. Section 264.1 is amended by:
■ a. Removing the entry for Form "I–485A" from the table in paragraph (a);
■ b. Removing the entries for Forms "I–688", "I–688A" and "I–688B" from the table in paragraph (b);
■ c. Adding the entries for "Form I–862" and "Form I–863" in proper numerical sequence in the table in paragraph (b);
■ d. Revising paragraph (c);
■ e. Revising the term "Service" to read "USCIS" in paragraph (d);
■ f. Revising paragraph (g); and
■ g. Removing paragraphs (h) and (i).
The revisions read as follows:

### § 264.1   Registration and fingerprinting.

\* \* \* \* \*

(b) \* \* \*

Form No. and Class

\* \* \* \* \*

Form I–862, Notice to Appear—Aliens against whom removal proceedings are being instituted.
Form I–863, Notice of Referral to Immigration Judge—Aliens against whom removal proceedings are being instituted.

\* \* \* \* \*

(c) *Replacement of alien registration.* Any alien whose registration document is not available for any reason must immediately apply for a replacement document in the manner prescribed by USCIS.

\* \* \* \* \*

(g) *Registration and fingerprinting of children who reach age 14.* Within 30

days after reaching the age of 14, any alien in the United States not exempt from alien registration under the Act and this chapter must apply for registration and fingerprinting, unless fingerprinting is waived under paragraph (e) of this section, in accordance with applicable form instructions.

(1) *Permanent residents.* If such alien is a lawful permanent resident of the United States and is temporarily absent from the United States when he reaches the age of 14, he must apply for registration and provide a photograph within 30 days of his or her return to the United States in accordance with applicable form instructions. The alien, if a lawful permanent resident of the United States, must surrender any prior evidence of alien registration. USCIS will issue the alien new evidence of alien registration.

(2) *Others.* In the case of an alien who is not a lawful permanent resident, the alien's previously issued registration document will be noted to show that he or she has been registered and the date of registration.

### § 264.2   [Amended]

■ 142. In § 264.2, paragraph (d) is amended by revising the term "be fingerprinted on Form FD–258, Applicant Card, as prescribed in § 103.2(e) of this chapter" to read "be fingerprinted as prescribed in 8 CFR 103.16."

■ 143. Section 264.5 is amended by:
■ a. Revising paragraph (a);
■ b. Revising the term "Form I–90" to read "the designated form" wherever the term appears in paragraphs (c)(1) and (2);
■ c. Revising paragraph (d) introductory text;
■ d. Revising paragraph (e);
■ e. Revising paragraph (g) and by
■ f. Adding paragraphs (h) and (i).
The revisions read as follows:

### § 264.5   Application for replacement Permanent Resident Card.

(a) *Filing instructions.* A request to replace a Permanent Resident Card must be filed in accordance with the appropriate form instructions and with the fee specified in 8 CFR 103.7(b)(1); except that no fee is required for an application filed pursuant to paragraphs (b)(7) through (9) of this section, or paragraphs (d)(2) or (4) of this section.

\* \* \* \* \*

(d) *Conditional permanent residents required to file.* A conditional permanent resident whose card is expiring may apply to have the conditions on residence removed in accordance with 8 CFR 216.4 or 8 CFR

216.6. A conditional resident who seeks to replace a permanent resident card that is not expiring within 90 days may apply for a replacement card on the form prescribed by USCIS:

\* \* \* \* \*

(e) *Supporting documentation.* (1) The prior Permanent Resident Card must be surrendered to USCIS if a new card is being requested in accordance with paragraphs (b)(2) through (5) and (b)(8) and (9) of this section.

(2) A request to replace a Permanent Resident Card filed pursuant to paragraph (b)(4) of this section must include evidence of the name change such as a court order or marriage certificate.

(3) A request to replace a Permanent Resident Card in order to change any other biographic data on the card must include documentary evidence verifying the new data.

\* \* \* \* \*

(g) *Eligibility for evidence of permanent residence while in deportation, exclusion, or removal proceedings.* A person in deportation, exclusion, or removal proceedings is entitled to evidence of permanent resident status until ordered excluded, deported, or removed. USCIS will issue such evidence in the form of a temporary permanent resident document that will remain valid until the proceedings are concluded. Issuance of evidence of permanent residence to an alien who had permanent resident status when the proceedings commenced shall not affect those proceedings.

(h) *Temporary evidence of registration.* USCIS may issue temporary evidence of registration and lawful permanent resident status to a lawful permanent resident alien who is departing temporarily from the United States and has applied for issuance of a replacement permanent resident card if USCIS is unable to issue and deliver such card prior to the alien's contemplated return to the United States. The alien must surrender such temporary evidence upon receipt of his or her permanent resident card.

(i) *Waiver of requirements.* USCIS may waive the photograph, in person filing, and fingerprinting requirements of this section in cases of confinement due to advanced age or physical infirmity.

■ 144. Section 264.6 is revised to read as follows:

### § 264.6   Application for a nonimmigrant arrival-departure record.

(a) *Eligibility.* USCIS may issue a new or replacement arrival-departure record to a nonimmigrant who seeks:

**53796**   Federal Register / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations

(1) To replace a lost or stolen record;

(2) To replace a mutilated record; or

(3) Was not issued an arrival-departure record pursuant to 8 CFR 235.1(h)(1)(i), (iii), (iv), (v), or (vi) when last admitted as a nonimmigrant, and has not since been issued such record but now requires one.

(b) *Application.* A nonimmigrant may request issuance or replacement of a nonimmigrant arrival-departure record by applying on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

(c) *Processing.* A pending application filed under paragraph (a) of this section is temporary evidence of registration. If the application is approved, USCIS will issue an arrival-departure document. There is no appeal from the denial of this application.

## PART 265—NOTICES OF ADDRESS

■ 145. The authority citation for part 265 is revised to read as follows:

**Authority:** 8 U.S.C. 1103 and 1305.

■ 146. Section 265.1 is revised to read as follows:

### §265.1   Reporting change of address.

Except for those exempted by section 263(b) of the Act, all aliens in the United States required to register under section 262 of the Act must report each change of address and new address within 10 days of such change in accordance with instructions provided by USCIS.

## PART 270—PENALTIES FOR DOCUMENT FRAUD

■ 147. The authority citation for part 270 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, and 1324c; Pub. L. 101–410, 104 Stat. 890, as amended by Pub. L. 104–134, 110 Stat. 1321.

### §270.2   [Amended]

■ 148. Section 270.2 is amended by revising the term "§ 103.5a(a)(2) of this chapter" to read "8 CFR 103.8(a)(2)" wherever that term appears in the following places:

■ a. Paragraph (d) and
■ b. Paragraph (i).

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 149. The authority citation for part 274a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 8 CFR part 2.

■ 150. Section 274a.12 is amended by:
■ a. Revising the term "BCIS" to read "USCIS" wherever that term appears in paragraph (a)(5);

■ b. Revising paragraph (b)(6)(iv);
■ c. Revising the term "BCIS" to read "USCIS" in paragraph (c) introductory text;
■ d. Revising paragraph (c)(1);
■ e. Revising paragraph (c)(4); and
■ f. Removing and reserving paragraph (c)(23).

The revisions read as follows:

### §274a.12   Classes of aliens authorized to accept employment.

\*      \*      \*      \*      \*

(b) \* \* \*

(6) \* \* \*

(iv) An employment authorization document under paragraph (c)(3)(i)(C) of this section based on a 17-month STEM Optional Practical Training extension, and whose timely filed employment authorization request is pending and employment authorization issued under paragraph (c)(3)(i)(B) of this section has expired. Employment is authorized beginning on the expiration date of the authorization issued under paragraph (c)(3)(i)(B) of this section and ending on the date of USCIS' written decision on the current employment authorization request, but not to exceed 180 days; or

\*      \*      \*      \*      \*

(c) \* \* \*

(1) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (A–1 or A–2) pursuant to 8 CFR 214.2(a)(2) and who presents an endorsement from an authorized representative of the Department of State;

\*      \*      \*      \*      \*

(4) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (G–1, G–3 or G–4) pursuant to 8 CFR 214.2(g) and who presents an endorsement from an authorized representative of the Department of State;

\*      \*      \*      \*      \*

■ 151. Section 274a.13 is amended by:
■ a. Revising paragraph (a);
■ b. Removing the term "INS" in paragraph (b); and
■ c. Revising paragraph (d).

The revision reads as follows:

### §274a.13   Application for employment authorization.

(a) *Application.* Aliens authorized to be employed under sections 274a.12(a)(3), (4), (6) through (8), (a)(10) through (15), and (a)(20) must file an application in order to obtain documentation evidencing this fact.

(1) Aliens who may apply for employment authorization under 8 CFR 274a.12(c), except for those who may apply under 8 CFR 274a.12(c)(8), must apply on the form designated by USCIS

with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. The approval of applications filed under 8 CFR 274a.12(c), except for 8 CFR 274a.12(c)(8), are within the discretion of USCIS. Where economic necessity has been identified as a factor, the alien must provide information regarding his or her assets, income, and expenses.

(2) An initial employment authorization request for asylum applicants under 8 CFR 274a.12(c)(8) must be filed on the form designated by USCIS in accordance with the form instructions. The applicant also must submit a copy of the underlying application for asylum or withholding of deportation, together with evidence that the application has been filed in accordance with 8 CFR 208.3 and 208.4. An application for an initial employment authorization or for a renewal of employment authorization filed in relation to a pending claim for asylum shall be adjudicated in accordance with 8 CFR 208.7. An application for renewal or replacement of employment authorization submitted in relation to a pending claim for asylum, as provided in 8 CFR 208.7, must be filed, with fee or application for waiver of such fee.

\*      \*      \*      \*      \*

(d) *Interim employment authorization.* USCIS will adjudicate the application within 90 days from the date of receipt of the application, except in the case of an initial application for employment authorization under 8 CFR 274a.12(c)(8), which is governed by paragraph (a)(2) of this section, and 8 CFR 274a.12(c)(9) in so far as it is governed by 8 CFR 245.13(j) and 245.15(n). Failure to complete the adjudication within 90 days will result in the grant of an employment authorization document for a period not to exceed 240 days. Such authorization will be subject to any conditions noted on the employment authorization document. However, if USCIS adjudicates the application prior to the expiration date of the interim employment authorization and denies the individual's employment authorization application, the interim employment authorization granted under this section will automatically terminate as of the date of the adjudication and denial.

## PART 287—FIELD OFFICERS; POWERS AND DUTIES

■ 152. The authority citation for part 287 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1182, 1225, 1226, 1251, 1252, 1357; Homeland Security Act of

NJAPP0474

2002, Pub. L. 107–296 (6 U.S.C. 1, *et seq.*); 8 CFR part 2.

§ 287.5 [Amended]

■ 153. Section 287.5 is amended by:
■ a. Removing the phrase "as defined in 8 CFR 103.1(b)" in paragraph (a) introductory text;
■ b. Revising the term "the BCIS" to read "USCIS" in paragraph (c)(1)(viii); and
■ c. Revising the term "the BCIS" to read "USCIS" in paragraph (c)(2)(viii).

§ 287.7 [Amended]

■ 154. In § 287.7, paragraph (b)(8) is amended by revising the term "the BCIS" to read "USCIS".

## PART 292—REPRESENTATION AND APPEARANCES

■ 155. The authority citation for part 292 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1252b, 1362.

§ 292.1 [Amended]

■ 156. Section 292.1 is amended by revising the terms "§ 1.1(f) of this chapter" and "8 CFR 1.1(f)" to read "8 CFR 1.2" wherever the term appears in the following places:
■ a. Paragraph (a)(1); and
■ b. Paragraph (a)(6) first sentence.

§ 292.3 [Amended]

■ 157. Section 292.3 is amended by revising the terms "8 CFR 1.1(f)" and "8 CFR 1.1(j)", to read "8 CFR 1.2" in paragraph (a)(2);
■ 158. Section 292.4 is amended by revising paragraph (b) to read as follows:

**§ 292.4 Appearances.**

* * * * *

(b) A party to a proceeding and his or her attorney or representative will be permitted to examine the record of proceeding in accordance with 6 CFR part 5.

## PART 299—IMMIGRATION FORMS

■ 159. The authority citation for part 299 continues to read as follows:

**Authority:** 8 U.S.C. 1101 and note, 1103; 8 CFR Part 2.

■ 160. Section 299.1 is revised to read as follows:

**§ 299.1 Prescribed forms.**

A listing of USCIS, ICE, and CBP approved forms referenced in chapter I can be viewed on the Office of Management and Budget Web site at *http://www.reginfo.gov.* A listing of approved USCIS forms can also be viewed on its Internet Web site.

§ 299.3 [Removed and Reserved]

■ 161. Section 299.3 is removed and reserved.

§ 299.5 [Removed and Reserved]

■ 162. Section 299.5 is removed and reserved.

## PART 301—NATIONALS AND CITIZENS OF THE UNITED STATES AT BIRTH

■ 163. The authority citation for part 301 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1401; 8 CFR part 2.

■ 164. Section 301.1 is amended by revising paragraph (a)(1) to read as follows:

**§ 301.1 Procedures.**

(a) * * *

(1) As provided in 8 CFR part 341, a person residing in the United States who desires to be documented as a United States citizen pursuant to section 301(h) of the Act may apply for a passport at a United States passport agency or may submit an application on the form specified by USCIS in accordance with the form instructions and with the fee prescribed by 8 CFR 103.7(b)(1). The applicant will be notified when and where to appear before a USCIS officer for examination on his or her application.

* * * * *

## PART 310—NATURALIZATION AUTHORITY

■ 165. The authority citation for part 310 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1421, 1443, 1447, 1448; 8 CFR 2.1.

§ 310.2 [Amended]

■ 166. Section 310.2, first sentence, is amended by revising the term "The Service" to read "USCIS" and the term "Service district" to read "Service district, as defined in 8 CFR 316.1,"

## PART 312—EDUCATIONAL REQUIREMENTS FOR NATURALIZATION

■ 167. The authority citation for part 312 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1423, 1443, 1447, 1448.

■ 168. Section 312.1 is amended by revising paragraph (c) to read as follows:

**§ 312.1 Literacy requirements.**

* * * * *

(c) *Literacy examination.* (1) *Verbal skills.* The ability of an applicant to speak English will be determined by a designated immigration officer from the applicant's answers to questions normally asked in the course of the examination.

(2) *Reading and writing skills.* Except as noted in 8 CFR 312.3, an applicant's ability to read and write English must be tested in a manner prescribed by USCIS. USCIS will provide a description of test study materials and testing procedures on the USCIS Internet Web site.

■ 169. Section 312.2 is amended by revising paragraph (c) to read as follows:

**§ 312.2 Knowledge of history and government of the United States.**

* * * * *

(c) *History and government examination.* (1) *Procedure.* The examination of an applicant's knowledge of the history and form of government of the United States must be given orally in English by a designated immigration officer, except:

(i) If the applicant is exempt from the English literacy requirement under 8 CFR 312.1(b), the examination may be conducted in the applicant's native language with the assistance of an interpreter selected in accordance with 8 CFR 312.4 but only if the applicant's command of spoken English is insufficient to conduct a valid examination in English;

(ii) The examination may be conducted in the applicant's native language, with the assistance of an interpreter selected in accordance with 8 CFR 312.4, if the applicant is required to satisfy and has satisfied the English literacy requirement under 8 CFR 312.1(a), but the officer conducting the examination determines that an inaccurate or incomplete record of the examination would result if the examination on technical or complex issues were conducted in English, or

(iii) The applicant has met the requirements of 8 CFR 312.3.

(2) *Scope and substance.* The scope of the examination will be limited to subject matters prescribed by USCIS. In choosing the subject matters, in phrasing questions and in evaluating responses, due consideration must be given to the applicant's:

(i) Education,
(ii) Background,
(iii) Age,
(iv) Length of residence in the United States,
(v) Opportunities available and efforts made to acquire the requisite knowledge, and
(vi) Any other elements or factors relevant to an appraisal of the adequacy of the applicant's knowledge and understanding.

■ 170. Section 312.3 is revised to read as follows:

§ 312.3   Testing of applicants who obtained permanent residence pursuant to section 245A of the Act.

An applicant who has obtained lawful permanent resident alien status pursuant to section 245A of the Act, and who, at that time, demonstrated English language proficiency in reading and writing, and knowledge of the government and history of the United States through either an examination administered by USCIS or the INS or a standardized section 312 test authorized by the USCIS or the INS for use with Legalization applicants as provided in section 245A(b)(1)(D)(iii) of the Act, will not be reexamined on those skills at the time of the naturalization interview. However, such applicant, unless otherwise exempt, must still demonstrate his or her ability to speak and understand English in accordance with 8 CFR 312.1(c)(1) and establish eligibility for naturalization through testimony in the English language.

PART 316—GENERAL REQUIREMENTS FOR NATURALIZATION

■ 171. The authority citation for part 316 continues to read as follows:

Authority: 8 U.S.C. 1103, 1181, 1182, 1427, 1443, 1447; 8 CFR part 2.

■ 172. Section 316.1 is revised to read as follows:

§ 316.1   Definitions.

As used in this part, the term:

Application means any form, as defined in 8 CFR part 1, on which an applicant requests a benefit relating to naturalization.

Residence in the Service district where the application is filed means residence in the geographical area over which a particular local field office of USCIS ordinarily has jurisdiction for purposes of naturalization, regardless of where or how USCIS may require such benefit request to be submitted, or whether jurisdiction for the purpose of adjudication is relocated or internally reassigned to another USCIS office.

Service district means the geographical area over which a particular local field office of USCIS ordinarily has jurisdiction for purposes of naturalization.

§ 316.2   [Amended]

■ 173. In § 316.2, paragraph (a)(5) is amended by removing the end the phrase '', and in which the alien seeks to file the application''.

■ 174. Section 316.4 is amended by:

■ a. Revising paragraph (a);

■ b. Removing paragraph (b); and

■ c. Redesignating paragraph (c) as paragraph (b).

The revision reads as follows:

§ 316.4   Applications; documents.

(a) The applicant will apply for naturalization in accordance with instructions provided on the form prescribed by USCIS for that purpose.

*       *       *       *       *

■ 175. Section 316.5 is amended by adding paragraph (b)(6) to read as follows:

§ 316.5   Residence in the United States.

*       *       *       *       *

(b) * * *

(6) Spouse of military personnel. Pursuant to section 319(e) of the Act, any period of time the spouse of a United States citizen resides abroad will be treated as residence in any State or district of the United States for purposes of naturalization under section 316(a) or 319(a) of the Act if, during the period of time abroad, the applicant establishes that he or she was:

(i) The spouse of a member of the Armed Forces;

(ii) Authorized to accompany and reside abroad with that member of the Armed Forces pursuant to the member's official orders; and

(iii) Accompanying and residing abroad with that member of the Armed Forces in marital union in accordance with 8 CFR 319.1(b).

*       *       *       *       *

■ 176. Section 316.6 is added to read as follows:

§ 316.6   Physical presence for certain spouses of military personnel.

Pursuant to section 319(e) of the Act, any period of time the spouse of a United States citizen resides abroad will be treated as physical presence in any State or district of the United States for purposes of naturalization under section 316(a) or 319(a) of the Act if, during the period of time abroad, the applicant establishes that he or she was:

(a) The spouse of a member of the Armed Forces;

(b) Authorized to accompany and reside abroad with that member of the Armed Forces pursuant to the member's official orders; and

(c) Accompanying and residing abroad with that member of the Armed Forces in marital union in accordance with 8 CFR 319.1(b).

PART 319—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: SPOUSES OF UNITED STATES CITIZENS

■ 177. The authority citation for part 319 continues to read as follows:

Authority: 8 U.S.C. 1103, 1430, 1443.

§ 319.1   [Amended]

■ 178. In § 319.1, paragraph (a)(5) is amended by removing the phrase ''and in which the alien has filed the application''

■ 179. Section 319.3 is amended by revising paragraph (a) to read as follows:

§ 319.3   Surviving spouse, child, or parent of a United States citizen who died during a period of honorable service in an active duty status in the Armed Forces of the United States.

(a) Eligibility. To be eligible for naturalization under section 319(d) of the Act, the surviving spouse, child, or parent of a United States citizen must:

(1) Establish that his or her citizen spouse, child, or parent died during a period of honorable service in an active duty status in the Armed Forces of the United States and, in the case of a surviving spouse, establish that he or she was living in marital union with the citizen spouse, in accordance with 8 CFR 319.1(b), at the time of the citizen spouse's death;

(2) At the time of examination on the application for naturalization, reside in the United States pursuant to a lawful admission for permanent residence;

(3) Be a person of good moral character, attached to the principles of the Constitution of the United States, and favorably disposed toward the good order and happiness of the United States; and

(4) Comply with all other requirements for naturalization as provided in 8 CFR 316, except for those contained in 8 CFR 316.2(a)(3) through (6).

*       *       *       *       *

■ 180. Section 319.11 is amended by revising paragraph (a) introductory text to read as follows:

§ 319.11   Filing of application.

(a) General. An applicant under this part must submit an application for naturalization in accordance with the form instructions with the fee required by 8 CFR 103.7(b)(1). An alien spouse applying for naturalization under section 319(b) of the Act who is described in 8 CFR 319.2 must also submit a statement of intent containing the following information about the

citizen spouse's employment and future intent:

\*    \*    \*    \*    \*

## PART 320—CHILD BORN OUTSIDE THE UNITED STATES AND RESIDING PERMANENTLY IN THE UNITED STATES; REQUIREMENTS FOR AUTOMATIC ACQUISITION OF CITIZENSHIP

■ 181. The authority citation for part 320 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

■ 182. Section 320.3 is amended by:
■ a. Revising paragraph (a); and
■ b. Revising paragraph (b)(1) introductory text.

The revisions read as follows:

### § 320.3  How, where, and what forms and other documents should be filed?

(a) *Application.* Individuals who are applying for a certificate of citizenship on their own behalf should submit the request in accordance with the form instructions on the form prescribed by USCIS for that purpose. An application for a certificate of citizenship under this section on behalf of a child who has not reached the age of 18 years must be submitted by that child's U.S. citizen biological or adoptive parent(s), or legal guardian.

(b) *Evidence.* (1) An applicant under this section must establish eligibility as described in 8 CFR 320.2. An applicant must submit the following supporting evidence unless such evidence is already contained in USCIS administrative file(s):

\*    \*    \*    \*    \*

■ 183. Section 320.5 is revised to read as follows:

### § 320.5  Decision.

(a) *Approval of application.* If the application for the certificate of citizenship is approved, after the applicant takes the oath of allegiance prescribed in 8 CFR 337.1 (unless the oath is waived), USCIS will issue a certificate of citizenship.

(b) *Denial of application.* If the decision of USCIS is to deny the application for a certificate of citizenship under this section, the applicant will be advised in writing of the reasons for denial and of the right to appeal in accordance with 8 CFR 103.3(a). An applicant may file an appeal within 30 days of service of the decision in accordance with the instructions on the form prescribed by USCIS for that purpose, and with the fee required by 8 CFR 103.7(b)(1).

(c) *Subsequent application.* After an application for a certificate of

citizenship has been denied and the time for appeal has expired, USCIS will reject a subsequent application submitted by the same individual and the applicant will be instructed to submit a motion for reopening or reconsideration in accordance with 8 CFR 103.5. The motion must be accompanied by the rejected application and the fee specified in 8 CFR 103.7(b)(1).

## PART 322—CHILD BORN OUTSIDE THE UNITED STATES; REQUIREMENTS FOR APPLICATION FOR CERTIFICATE OF CITIZENSHIP

■ 184. The authority citation for part 322 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

### § 322.1  [Amended]

■ 185. Section 322.1 is amended, in the definition of "adopted child" by revising "section 101(b)(1)(E) or (F)" to read "section 101(b)(1)(E), (F) or (G)".
■ 186. Section 322.2 is amended by:
■ a. Revising the section heading; and by
■ b. Adding paragraph (c) to read as follows:

### § 322.2  Eligibility.

\*    \*    \*    \*    \*

(c) *Exceptions for children of military personnel.* Pursuant to section 322(d) of the Act, a child of a member of the Armed Forces of the United States residing abroad is exempt from the temporary physical presence, lawful admission, and maintenance of lawful status requirements under 8 CFR 322.2(a)(5), if the child:

(1) Is authorized to accompany and reside abroad with the member of the Armed Forces pursuant to the member's official orders; and

(2) Is accompanying and residing abroad with the member of the Armed Forces.

■ 187. Section 322.3 is amended by:
■ a. Revising the section heading;
■ b. Revising paragraph (a);
■ c. Revising paragraph (b)(1)(viii);
■ d. Revising paragraph (b)(1)(xi);
■ e. Revising paragraph (b)(1)(xii);
■ f. Revising paragraph (b)(1)(xiii); and
■ g. Revising paragraph (b)(2), the first sentence.

The revisions read as follows:

### § 322.3  Application and supporting documents.

(a) *Application.* A U.S. citizen parent of an alien child (including an adopted child) may file an application for the child to become a citizen and obtain a certificate of citizenship under section

322 of the Act by submitting an application on the form prescribed by USCIS in accordance with the form instructions and with the fee prescribed by 8 CFR 103.7(b)(1). If the U.S. citizen parent has died, the child's U.S. citizen grandparent or U.S. citizen legal guardian may submit the application, provided the application is filed not more than 5 years after the death of the U.S. citizen parent.

(b) \*    \*    \*

(1) \*    \*    \*

(viii) Evidence that the child is present in the United States pursuant to a lawful admission and is maintaining such lawful status, or evidence establishing that the child qualifies for an exception to these requirements as provided in 8 CFR 322.2(c) pursuant to section 322(d) of the Act. Such evidence may be presented at the time of interview when appropriate;

\*    \*    \*    \*    \*

(xi) For adopted orphans applying under section 322 of the Act, a copy of notice of approval of the orphan petition and supporting documentation for such petition (except the home study) or evidence that the child has been admitted for lawful permanent residence in the United States with the immigrant classification of IR–3 (Orphan adopted abroad by a U.S. citizen) or IR–4 (Orphan to be adopted by a U.S. citizen);

(xii) For a Hague Convention adoptee applying under section 322 of the Act, a copy of the notice of approval of the Convention adoptee petition and its supporting documentation, or evidence that the child has been admitted for lawful permanent residence in the United States with the immigrant classification of IH–3 (Hague Convention Orphan adopted abroad by a U.S. citizen) or IH–4 (Hague Convention Orphan to be adopted by a U.S. citizen); and

(xiii) Evidence of all legal name changes, if applicable, for the child, U.S. citizen parent, U.S. citizen grandparent, or U.S. citizen legal guardian.

(2) If USCIS requires any additional documentation to make a decision on the application, the parents may be asked to provide that documentation under separate cover or at the time of interview. \*    \*    \*

■ 188. Section 322.4 is revised to read as follows:

### § 322.4  Interview.

The U.S. citizen parent and the child must appear in person before a USCIS officer for examination on the application under this section. If the U.S. citizen parent is deceased, the

child's U.S. citizen grandparent or U.S. citizen legal guardian who filed the application on the child's behalf must appear.

■ 189. Section 322.5 is revised to read as follows:

### § 322.5   Decision.

(a) *Approval of application.* If the application for certificate of citizenship is approved, after the applicant takes the oath of allegiance prescribed in 8 CFR 337.1 (unless the oath is waived), USCIS will issue a certificate of citizenship. The child is a citizen as of the date of approval and administration of the oath of allegiance.

(b) *Denial of application.* If the USCIS decision is to deny the application for a certificate of citizenship under this section, the applicant will be furnished with the reasons for denial and advised of the right to appeal in accordance with the provisions of 8 CFR 103.3(a). An applicant may file an appeal within 30 days of service of the decision in accordance with the instructions on the form prescribed by USCIS for that purpose, and with the fee required by 8 CFR 103.7(b)(1).

(c) *Subsequent application.* After an application for a certificate of citizenship has been denied and the time for appeal has expired, USCIS will reject a subsequent application submitted by the same individual and the applicant will be instructed to submit a motion for reopening or reconsideration in accordance with 8 CFR 103.5. The motion must be accompanied by the rejected application and the fee specified in 8 CFR 103.7(b)(1).

## PART 324—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: WOMEN WHO HAVE LOST UNITED STATES CITIZENSHIP BY MARRIAGE AND FORMER CITIZENS WHOSE NATURALIZATION IS AUTHORIZED BY PRIVATE LAW

■ 190. The authority citation for part 324 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1435, 1443, 1448, 1101 note.

### § 324.2   [Amended]

■ 191. In § 324.2, paragraph (b) is amended by revising the term "N–400, as required by § 316.4 of this chapter" to read "the form designated by USCIS in accordance with the form instructions and with the fee prescribed in 8 CFR 103.7(b)(1) as required by 8 CFR 316.4".

### § 324.3   [Amended]

■ 192. In § 324.3, paragraph (b)(1) is amended by revising the phrase "an Application for Naturalization, form N–400, to USCIS" to read "an application for naturalization on the form prescribed by USCIS".

■ 193. Section 324.5 is revised to read as follows:

### § 324.5   Former citizen of the United States whose naturalization by taking the oath is authorized by a private law.

A former citizen of the United States whose naturalization by taking the oath before any naturalization court or office of USCIS within the United States is authorized by a private law must submit an application on the form specified by USCIS, without fee, in accordance with the form instructions.

## PART 325—NATIONALS BUT NOT CITIZENS OF THE UNITED STATES; RESIDENCE WITHIN OUTLYING POSSESSIONS

■ 194. The authority citation for part 325 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1436, 1443.

### § 325.4   [Amended]

■ 195. In § 325.4, paragraph (b)(3) is amended by revising the term "Service district in the United States where the application is filed" to read "Service district, as defined in 8 CFR 316.1,".

## PART 328—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS WITH 1 YEAR OF SERVICE IN THE UNITED STATES ARMED FORCES

■ 196. The authority citation for part 328 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1439, 1443.

■ 197. Section 328.4 is revised to read as follows:

### § 328.4   Application and evidence.

(a) *Application.* An applicant for naturalization under section 328 of the Act must submit an application on the form prescribed by USCIS in accordance with the form instructions and as provided in 8 CFR 316.4.

(b) *Evidence.* The applicant's eligibility for naturalization under 8 CFR 328.2(a) or (b) will be established only by the certification of honorable service by the executive department under which the applicant served or is serving.

## PART 329—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS WITH ACTIVE DUTY OR CERTAIN READY RESERVE SERVICE IN THE UNITED STATES ARMED FORCES DURING SPECIFIED PERIODS OF HOSTILITIES

■ 198. The authority citation for part 329 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1440, 1443; 8 CFR part 2.

■ 199. Revise § 329.4 to read as follows:

### § 329.4   Application and evidence.

(a) *Application.* An applicant for naturalization under section 329 of the Act must submit an application on the form prescribed by USCIS in accordance with the form instructions and as provided in 8 CFR 316.4.

(b) *Evidence.* The applicant's eligibility for naturalization under 8 CFR 329.2(a), (b), or (c)(2) will be established only by a certification of honorable service by the executive department under which the applicant served or is serving.

### § 329.5   [Removed]

■ 200. Section 329.5 is removed.

## PART 330—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: SEAMEN

■ 201. The authority citation for part 330 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443.

### § 330.2   [Amended]

■ 202. In § 330.2, paragraph (a) is amended by revising the phrase "Application for Naturalization, Form N–400." to read "application on the form designated by USCIS.".

## PART 332—NATURALIZATION ADMINISTRATION

■ 203. The authority citation for part 332 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1447.

■ 204. Section 332.1 is revised to read as follows:

### § 332.1   Designation of USCIS employees to administer oaths and conduct examinations and hearings.

(a) *Examinations.* All USCIS officers are hereby designated to conduct the examination for naturalization required under section 335 of the Act, provided that each officer so designated has received appropriate training.

(b) *Hearings.* Section 336 of the Act authorizes USCIS officers who are designated under paragraph (a) of this

NJAPP0478

section to conduct hearings under that section.

(c) *Depositions.* All USCIS officers who are designated under paragraph (a) of this section are hereby designated to take depositions in matters relating to the administration of naturalization and citizenship laws.

(d) *Oaths and affirmations.* All USCIS officers who are designated under paragraph (a) of this section are hereby designated to administer oaths or affirmations except for the oath of allegiance as provided in 8 CFR 337.2.

§§ 332.2, 332.3, and 332.4 [Removed and Reserved]

■ 205. Sections 332.2, 332.3, and 332.4 are removed and reserved.

## PART 333—PHOTOGRAPHS

■ 206. The authority citation for part 333 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443.

■ 207. In § 333.1, paragraph (a) is revised to read as follows:

### § 333.1   Description of required photographs.

(a) Every applicant who is required to provide photographs under section 333 of the Act must do so as prescribed by USCIS in its form instructions.

\*     \*     \*     \*     \*

■ 208. Section 333.2 is revised to read as follows:

### § 333.2   Attachment of photographs to documents.

A photograph of the applicant must be securely and permanently attached to each certificate of naturalization or citizenship, or to any other document that requires a photograph, in a manner prescribed by USCIS.

## PART 334—APPLICATION FOR NATURALIZATION

■ 209. The authority citation for part 334 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443.

■ 210. In § 334.2, paragraph (a) is revised to read as follows:

### § 334.2   Application for naturalization.

(a) An applicant may file an application for naturalization with required initial evidence in accordance with the general form instructions for naturalization. The applicant must include the fee as required in 8 CFR 103.7(b)(1).

\*     \*     \*     \*     \*

■ 211. Section 334.11 is amended by:
■ a. Revising the term "Form N–300" to read "the form specified by USCIS, in accordance with the form instructions" in paragraph (a); and by

■ b. Revising paragraph (b).
The revision reads as follows:

### § 334.11   Declaration of intention.

\*     \*     \*     \*     \*

(b) *Approval.* If approved, USCIS will retain the application in the file and advise the applicant of the action taken.

\*     \*     \*     \*     \*

§§ 334.16–334.18   [Removed]

■ 212. Sections 334.16 through 334.18 are removed.

## PART 335—EXAMINATION ON APPLICATION FOR NATURALIZATION

■ 213. The authority citation for part 335 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1447.

■ 214. Section 335.2 is amended by:
■ a. Revising the term "Service" to read "USCIS" and the term "§ 332.1 of this chapter" to read "8 CFR 332.1" in paragraph (a);
■ b. Revising the terms "The Service" and "Service" to read "USCIS" wherever that term appears in paragraph (b) introductory text;
■ c. Revising paragraph (b)(3);
■ d. Revising the terms "the Service officer", "The Service officer" and "the Service" to read "USCIS" wherever the terms appear in paragraph (c);
■ e. Revising paragraph (d)(2);
■ f. Revising the term "Service" to read "USCIS" wherever the term appears in paragraph (e); and
■ g. Revising the term "Service" to read "USCIS" and the term "§ 312.4 of this chapter" to read "8 CFR 312.4" wherever the terms appear in paragraph (f).

The revisions read as follows:

### § 335.2   Examination of applicant.

\*     \*     \*     \*     \*

(b) \*  \*  \*

(3) Confirmation from the Federal Bureau of Investigation that the fingerprint data submitted for the criminal background check has been rejected.

\*     \*     \*     \*     \*

(d) \*  \*  \*

(2) *Service of subpoenas.* Subpoenas will be issued on the form designated by USCIS and a record will be made of service. The subpoena may be served by any person over 18 years of age, not a party to the case, designated to make such service by USCIS.

\*     \*     \*     \*     \*

### § 335.3   [Amended]

■ 215. Section 335.3 is amended by revising the terms "The Service officer" and "the Service officer" to read

"USCIS" wherever the terms appear in the following places:
■ a. Paragraph (a); and
■ b. Paragraph (b).

### § 335.4   [Amended]

■ 216. Section 335.4 is amended by revising the phrase "the Service officer designated in § 332.1 of this chapter" to read "the USCIS officer described in 8 CFR 332.1".

### § 335.5   [Amended]

■ 217. Section 335.5 is amended by revising the terms "the Service" and "The Service" to read "USCIS" wherever the terms appear.

■ 218. Section 335.6 is amended by revising the term "the Service" to read "USCIS" wherever the term appears in the following places:
■ a. Paragraph (a);
■ b. Paragraph (b); and
■ c. Paragraph (c).
■ 219. Section 335.7 is revised to read as follows:

### § 335.7   Failure to prosecute application after initial examination.

An applicant for naturalization who has appeared for the examination on his or her application as provided in 8 CFR 335.2 will be considered as failing to prosecute such application if he or she, without good cause being shown, either failed to excuse an absence from a subsequently required appearance, or fails to provide within a reasonable period of time such documents, information, or testimony deemed by USCIS to be necessary to establish his or her eligibility for naturalization. USCIS will deliver notice of requests for appearance or evidence as provided in 8 CFR 103.8. In the event that the applicant fails to respond within 30 days of the date of notification, USCIS will adjudicate the application on the merits pursuant to 8 CFR 336.1.

### § 335.9   [Amended]

■ 220. Section 335.9 is amended by:
■ a. Revising the phrase "Service office to the Service office" to read "USCIS office to the USCIS office" in paragraph (a); and
■ b. Revising the term "district director" to read "USCIS" and the term "the Service's" to read "USCIS'" in paragraph (b).

### § 335.10   [Amended]

■ 221. Section 335.10 is amended by revising the terms "the Service" and "the district director" to read "USCIS" wherever the terms appear.

53802   Federal Register / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations

**§§ 335.11 through 335.13   [Removed]**

■ 222. Sections 335.11 through 335.13 are removed.

**PART 336—HEARINGS ON DENIALS OF APPLICATIONS FOR NATURALIZATION**

■ 223. The authority citation for section 336 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1447, 1448.

**§ 336.1   [Amended]**

■ 224. Section 336.1 is amended by:
■ a. Revising the phrase ''the Service shall'' to read ''USCIS will'' in the first sentence in paragraph (a); and
■ b. Revising the phrase ''may be made in person or by certified mail to the applicant's last known address'' to read ''must be by personal service as described in 8 CFR 103.8'' in paragraph (c).

■ 225. Section 336.2 is revised to read as follows:

**§ 336.2   USCIS hearing.**

(a) The applicant, or his or her authorized representative, may request a hearing on the denial of the applicant's application for naturalization by filing a request with USCIS within thirty days after the applicant receives the notice of denial.

(b) Upon receipt of a timely request for a hearing, USCIS will schedule a review hearing, within a reasonable period of time not to exceed 180 days from the date upon which the appeal is filed. The review will be with an officer other than the one who conducted the original examination or who rendered determination upon which the hearing is based, and who is classified at a grade level equal to or higher than the grade of the examining officer. The reviewing officer will have the authority and discretion to review the application for naturalization, to examine the applicant, and either to affirm the findings and determination of the original examining officer or to re-determine the original decision in whole or in part. The reviewing officer will also have the discretion to review any administrative record which was created as part of the examination procedures as well USCIS files and reports. He or she may receive new evidence or take such additional testimony as may be deemed relevant to the applicant's eligibility for naturalization or which the applicant seeks to provide. Based upon the complexity of the issues to be reviewed or determined, and upon the necessity of conducting further examinations with respect to essential naturalization requirements, such as literacy or civics knowledge, the reviewing immigration officer may, in his or her discretion, conduct a full *de novo* hearing or may utilize a less formal review procedure, as he or she deems reasonable and in the interest of justice.

(c) *Improperly filed request for hearing.* (1) *Request for hearing filed by a person or entity not entitled to file.* (i) *Rejection without refund of filing fee.* A request for hearing filed by a person or entity who is not entitled to file such a request must be rejected as improperly filed. In such a case, any filing fee will not be refunded.

(ii) *Request for hearing by attorney or representative without proper Form G–28.* If a request for hearing is filed by an attorney or representative who has not properly filed a notice of entry of appearance as attorney or representative entitling that person to file the request for hearing, the appeal will be considered as improperly filed. In such a case, any filing fee will not be refunded regardless of the action taken. The reviewing official will ask the attorney or representative to submit a proper notice of entry within 15 days of the request. If such notice is not submitted within the time allowed, the official may, on his or her own motion, under 8 CFR 103.5(a)(5)(i), make a new decision favorable to the affected party without notifying the attorney or representative. The request for hearing may be considered properly filed as of its original filing date if the attorney or representative submits a properly executed notice entitling that person to file the request for hearing.

(2) *Untimely request for hearing.* (i) *Rejection without refund of filing fee.* A request for hearing which is not filed within the time period allowed must be rejected as improperly filed. In such a case, any filing fee will not be refunded.

(ii) *Untimely request for hearing treated as motion.* If an untimely request for hearing meets the requirements of a motion to reopen as described in 8 CFR 103.5(a)(2) or a motion to reconsider as described in 8 CFR 103.5(a)(3), the request for hearing must be treated as a motion and a decision must be made on the merits of the case.

■ 226. Section 336.9 is amended by:
■ a. Revising the term ''the Service'' to read ''USCIS'' in paragraph (a);
■ b. Revising paragraph (b); and
■ c. Revising the term ''Service'' to read ''USCIS'' in paragraph (d).

The revision reads as follows:

*   *   *   *   *

(b) *Filing a petition.* Under these procedures, an applicant must file a petition for review in the United States District Court having jurisdiction over his or her place of residence, in accordance with Chapter 7 of Title 5, United States Code, within a period of not more than 120 days after the USCIS final determination. The petition for review must be brought against USCIS, and service of the petition for review must be made upon DHS and upon the USCIS office where the hearing was held pursuant to 8 CFR 336.2.

*   *   *   *   *

**PART 337—OATH OF ALLEGIANCE**

■ 227. The authority citation for part 337 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1448; 8 CFR Part 2.

■ 228. Section 337.2 is revised to read as follows:

**§ 337.2   Oath administered by USCIS or EOIR.**

(a) *Public ceremony.* An applicant for naturalization who has elected to have his or her oath of allegiance administered by USCIS or an immigration judge and is not subject to the exclusive oath administration authority of an eligible court pursuant to section 310(b) of the Act must appear in person in a public ceremony, unless such appearance is specifically excused under the terms and conditions set forth in this part. Such ceremony will be held at a time and place designated by USCIS or EOIR within the United States (or abroad as permitted for certain applicants in accordance with 8 U.S.C. 1443a) and within the jurisdiction where the application for naturalization was filed, or into which the application for naturalization was transferred pursuant to 8 CFR 335.9. Naturalization ceremonies will be conducted at regular intervals as frequently as necessary to ensure timely naturalization, but in all events at least once monthly where it is required to minimize unreasonable delays. Naturalization ceremonies will be presented in such a manner as to preserve the dignity and significance of the occasion.

(b) *Authority to administer oath of allegiance.* The Secretary may delegate authority to administer the oath of allegiance prescribed in section 337 of the Act to such officials of DHS and to immigration judges or officials designated by the Attorney General as may be necessary for the efficient administration of the naturalization program.

(c) *Execution of questionnaire.* Immediately prior to being administered the oath of allegiance, each applicant must complete the questionnaire on the

form designated by USCIS. USCIS will review each completed questionnaire and may further question the applicant regarding the responses provided. If derogatory information is revealed, USCIS will remove the applicant's name from the list of eligible persons as provided in 8 CFR 335.5 and he or she will not be administered the oath.

### § 337.3   [Amended]

■ 229. Section 337.3 is amended by revising the terms ''the Service'' and ''the district director'' to read ''USCIS'' whenever the terms appear in the following places:
■ a. Paragraph (a) introductory text;
■ b. Paragraph (a)(4);
■ c. Paragraph (b); and
■ d. Paragraph (c).

### § 337.7   [Amended]

■ 230. Section 337.7 is amended by revising the terms ''the Service'' and ''Service'' to read ''USCIS'' whenever the terms appear in the following places:
■ a. Paragraph (a); and
■ b. Paragraph (b).
■ 231. Section 337.8 is revised to read as follows:

### § 337.8   Oath administered by the courts.

(a) *Notification of election.* An applicant for naturalization not subject to the exclusive jurisdiction of 8 CFR 310.2(d) must notify USCIS at the time of the filing of, or no later than at the examination on, the application of his or her election to have the oath of allegiance administered in an appropriate court having jurisdiction over the applicant's place of residence.

(b) *Certificate of eligibility.* (1) *Exclusive jurisdiction.* In those instances falling within the exclusive jurisdiction provision of section 310(b)(1)(B) of the Act, USCIS will notify the court of the applicant's eligibility for admission to United States citizenship by notifying the clerk of the court within 10 days of the approval of the application.

(2) *Non-exclusive jurisdiction.* In those instances in which the applicant has elected to have the oath administered in a court ceremony, USCIS will notify the clerk of the court in writing that the applicant has been determined by the USCIS to be eligible for admission to United States citizenship upon taking the requisite oath of allegiance and renunciation in a public ceremony. If a scheduled hearing date is not available at the time of notification, USCIS will notify the applicant in writing that the applicant has been approved but no ceremony date is yet available.

(c) *Preparation of lists.* (1) At or prior to the oath administration ceremony, the representative attending the ceremony will submit to the court, in duplicate, lists of persons to be administered the oath of allegiance and renunciation. After the ceremony, and after any required amendments and notations have been made to the lists, the clerk of the court will sign the lists.

(2) The originals of all court lists specified in this section will be filed permanently in the court, and the duplicates returned by the clerk of the court to USCIS. The same disposition will be made of any list presented to, but not approved by, the court.

(d) *Personal representation of the government at oath administration ceremonies.* An oath administration ceremony must be attended by a representative of USCIS who will review each completed questionnaire and may further question the applicant regarding the responses provided. If derogatory information is revealed, the USCIS representative will remove the applicant's name from the list of eligible persons as provided in 8 CFR 335.5 and the court will not administer the oath to such applicant.

(e) *Written report in lieu of personal representation.* If it is impractical for a USCIS representative to be present at a judicial oath administration ceremony, written notice of that fact will be given by the USCIS to the court. The list of persons to be administered the oath of allegiance and renunciation, forms, memoranda, and certificates will be transmitted to the clerk of the court, who will submit the appropriate lists to the court.

(f) *Withdrawal from court.* An applicant for naturalization not subject to the exclusive jurisdiction of 8 CFR 310.3(d) who has elected to have the oath administered in a court oath ceremony may, for good cause shown, request that his or her name be removed from the list of persons eligible to be administered the oath at a court oath ceremony and request that the oath be administered by an immigration judge or USCIS. Such request must be in writing to the USCIS office which granted the application and must cite the reasons for the request. USCIS will consider the good cause shown and the best interests of the applicant in making a decision. If it is determined that the applicant will be permitted to withdraw his or her name from the court ceremony, USCIS will give written notice to the court of the applicant's withdrawal, and the applicant will be scheduled for the next available oath ceremony, conducted by an Immigration

Judge or USCIS, as if he or she had never elected the court ceremony.

### § 337.9   [Amended]

■ 232. In § 337.9, paragraph (a) is amended by removing the phrase '', administered either by the Service or an immigration judge''.

## PART 338—CERTIFICATE OF NATURALIZATION

■ 233. The authority citation for part 338 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443; 8 CFR part 2.

■ 234. Section 338.1 is revised to read as follows:

### § 338.1   Execution and issuance of certificate.

(a) *Issuance.* When an applicant for naturalization has taken and subscribed to the oath of allegiance in accordance with 8 CFR part 337, USCIS will issue a Certificate of Naturalization at the conclusion of the oath administration ceremony.

(b) *Contents of certificate.* The certificate must be issued to the applicant in accordance with section 338 of the Act in his or her true, full, and correct name as it exists at the time of the administration of the oath of allegiance. The certificate must show, under ''country of former nationality,'' the name of the applicant's last country of citizenship, as shown in the application and USCIS records, even though the applicant may be stateless at the time of admission to citizenship.

### § 338.3   [Amended]

■ 235. Section 338.3 is amended by revising the terms ''the Service'' and the term ''the district director'' to read ''USCIS''.

■ 236. Section 338.5 is revised to read as follows:

### § 338.5   Correction of certificates.

(a) *Application.* Whenever a Certificate of Naturalization has been delivered which does not conform to the facts shown on the application for naturalization, or a clerical error was made in preparing the certificate, an application for issuance of a corrected certificate may be filed, without fee, in accordance with the form instructions.

(b) *Court-issued certificates.* If the certificate was originally issued by a clerk of court under a prior statute and USCIS finds that a correction is justified and can be made without mutilating the certificate, USCIS will authorize the issuing court to make the necessary correction and to place a dated endorsement of the court on the reverse

of the certificate explaining the correction. The authorization will be filed with the naturalization record of the court, the corrected certificate will be returned to the naturalized person, and the duplicate will be endorsed to show the date and nature of the correction and endorsement made, and then returned to USCIS. No fee will be charged the naturalized person for the correction.

(c) *USCIS-issued certificates.* If the certificate was originally issued by USCIS (or its predecessor agency), and USCIS finds that a correction was justified, the correction shall be made to the certificate and a dated endorsement made on the reverse of the certificate.

(d) *Administrative actions.* When a correction made pursuant to paragraphs (b) or (c) of this section would or does result in mutilation of a certificate, USCIS will issue a replacement Certificate of Naturalization and destroy the surrendered certificate.

(e) *Data change.* The correction will not be deemed to be justified where the naturalized person later alleges that the name or date of birth which the applicant stated to be his or her correct name or date of birth at the time of naturalization was not in fact his or her name or date of birth at the time of naturalization.

**§§ 338.11 through 338.13   [Removed and Reserved]**

■ 237. Sections 338.11 through 338.13 are removed and reserved.

**PART 339—FUNCTIONS AND DUTIES OF CLERKS OF COURT REGARDING NATURALIZATION PROCEEDINGS**

■ 238. The authority citation for part 339 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1448.

**§ 339.1   [Amended]**

■ 239. Section 339.1 is amended by revising the phrase "the Service pursuant to § 338.1 of this chapter" to read "USCIS in accordance with 8 CFR 338.1".

■ 240. Section 339.2 is revised to read as follows:

**§ 339.2   Monthly reports.**

(a) *Oath administration ceremonies.* Clerks of court will on the first day of each month or immediately following each oath ceremony submit to USCIS a report listing all oath administration ceremonies held and the total number of persons issued the oath at each ceremony, in accordance with USCIS instructions. The report will include a list of persons attending naturalization oath ceremonies during the month, and

certified copies of any court orders granting changes of name.

(b) *Petitions filed for de novo hearings.* The clerk of court must submit to USCIS a monthly report of all persons who have filed *de novo* review petitions before the court. The report shall include each petitioner's name, alien registration number, date of filing of the petition for a *de novo* review, and, once an order has been entered, the disposition.

(c) *Other proceedings and orders.* The clerk of court must forward to USCIS copies of the records of such other proceedings and other orders instituted on or issued by the court affecting or relating to the naturalization of any person as may be required from time to time.

(d) *Use of reports for accounting purposes.* State and federal courts may use the reports as a monthly billing document, submitted to USCIS for reimbursement in accordance with section 344(f)(1) of the Act. USCIS will use the information submitted to calculate costs incurred by courts in performing their naturalization functions. State and federal courts will be reimbursed pursuant to terms set forth in annual agreements entered into between DHS and the Administrative Office of United States Courts.

**PART 340—REVOCATION OF NATURALIZATION**

■ 241. The authority citation for part 340 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443.

**§ 340.1   [Removed and reserved]**

■ 242. Section 340.1 is removed and reserved.

■ 243. Section 340.2 is revised to read as follows:

**§ 340.2   Revocation proceedings pursuant to section 340(a) of the Act.**

(a) *Recommendations for institution of revocation proceedings.* Whenever it appears that any grant of naturalization may have been illegally procured or procured by concealment of a material fact or by willful misrepresentation, and a prima facie case exists for revocation pursuant to section 340(a) of the Act, USCIS will make a recommendation regarding revocation.

(b) *Recommendation for criminal prosecution.* If it appears to USCIS that a case described in paragraph (a) of this section is amenable to criminal penalties under 18 U.S.C. 1425 for unlawful procurement of citizenship or naturalization, the facts will be reported to the appropriate United States

Attorney for possible criminal prosecution.

**PART 341—CERTIFICATES OF CITIZENSHIP**

■ 244. The authority citation for part 341 continues to read as follows:

**Authority:** Pub. L. 82–414, 66 Stat. 173, 238, 254, 264, as amended; 8 U.S.C. 1103, 1409(c), 1443, 1444, 1448, 1452, 1455; 8 CFR part 2.

■ 245. Section 341.1 is revised to read as follows:

**§ 341.1   Application.**

An application for a certificate of citizenship by or on behalf of a person who claims to have acquired United States citizenship under section 309(c) of the Act or to have acquired or derived United States citizenship as specified in section 341 of the Act must be submitted on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the instructions on the form.

■ 246. Section 341.2 is amended by:
■ a. Revising paragraph (a)(1) introductory text;
■ b. Revising the phrase "at the district director's option" to read "at the discretion of USCIS" in paragraph (b)(1);
■ c. Revising the phrase "A district director shall assign an officer of the Service to" to read "USCIS will" in the first sentence in paragraph (d);
■ d. Removing the phrase "to the district director" in the last sentence in paragraph (d); and
■ e. Removing paragraph (g).

The revision reads as follows:

**§ 341.2   Examination upon application.**

(a) * * *

(1) *When testimony may be omitted.* An application may be processed without interview if the USCIS officer adjudicating the case has in the administrative file(s) all the required documentation necessary to establish the applicant's eligibility for U.S. citizenship, or if the application is accompanied by one of the following:

*   *   *   *   *

**§ 341.3   [Amended]**

■ 247. Section 341.3 is amended by revising the phrase "an officer of the Service or a United States consular official" to read "a DHS or Department of State official".

■ 248. Section 341.5 is revised to read as follows:

**§ 341.5   Decision.**

(a) *Adjudication.* USCIS may adjudicate the application only after the

appropriate approving official has reviewed the report, findings, recommendation, and endorsement of the USCIS officer assigned to adjudicate the application.

(b) *Approval.* If the application is granted, USCIS will prepare a certificate of citizenship and, unless the claimant is unable by reason of mental incapacity or young age to understand the meaning of the oath, he or she must take and subscribe the oath of renunciation and allegiance prescribed by 8 CFR 337 before USCIS within the United States. Except as provided in paragraph (c), delivery of the certificate in accordance with 8 CFR 103.2(b)(19) and 8 CFR 103.8 must be made in the United States to the claimant or the acting parent or guardian.

(c) *Approval pursuant to section 322(d) of the Act.* Persons eligible for naturalization pursuant to section 322(d) of the Act may subscribe to the oath of renunciation and allegiance and may be issued a certificate of citizenship outside of the United States, in accordance with 8 U.S.C. 1443a.

(d) *Denial.* If USCIS denies the application, the applicant will be furnished the reasons for denial and advised of the right to appeal in accordance with 8 CFR 103.3.

(e) *Subsequent application.* After an application for a certificate of citizenship has been denied and the time for appeal has expired, USCIS will reject a subsequent application submitted by the same individual and the applicant will be instructed to submit a motion to reopen or reconsider in accordance with 8 CFR 103.5. The motion must be accompanied by the rejected application and the fee specified in 8 CFR 103.7.

### §§ 341.6 and 341.7   [Removed]

■ 249. Sections 341.6 and 341.7 are removed.

## PART 342—ADMINISTRATIVE CANCELLATION OF CERTIFICATES, DOCUMENTS OR RECORDS

■ 250. The authority citation for part 342 is revised to read as follows:

**Authority:** 8 U.S.C. 1103, 1453.

■ 251. Section 342.2 is revised to read as follows:

### § 342.2   Service of notice.

The notice required by 8 CFR 342.1 must be by personal service as described in 8 CFR 103.8(a)(2).

## PART 343—CERTIFICATE OF NATURALIZATION OR REPATRIATION; PERSONS WHO RESUMED CITIZENSHIP UNDER SECTION 323 OF THE NATIONALITY ACT OF 1940, AS AMENDED, OR SECTION 4 OF THE ACT OF JUNE 29, 1906

■ 252. The authority citation for part 343 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1443, 1454, and 1455.

### § 343.1   [Amended]

■ 253. Section 343.1 is amended in the first sentence by revising the term "therefor on Form N–580" to read: "in accordance with USCIS instructions".

## PART 343a—NATURALIZATION AND CITIZENSHIP PAPERS LOST, MUTILATED, OR DESTROYED; NEW CERTIFICATE IN CHANGED NAME; CERTIFIED COPY OF REPATRIATION PROCEEDINGS

■ 254. The authority citation for part 343a is revised to read as follows:

**Authority:** 8 U.S.C. 1101 note, 1103, 1435, 1443, 1454, and 1455.

■ 255. Section 343a.1 is amended by:
■ a. Revising the phrase "shall apply on Form N–565 for a new paper in lieu thereof" to read "must apply on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions" in paragraph (a);
■ b. Revising the phrase "shall apply on Form N–565" to read "must apply" in paragraph (b); and
■ c. Revising paragraph (c).
The revision reads as follows:

### § 343a.1   Application for replacement of or new papers relating to naturalization, citizenship, or repatriation.

\*          \*          \*          \*          \*

(c) *Adjudication and disposition.* (1) *Interview.* The applicant shall only be required to appear in person for interview under oath or affirmation in specific cases. Those cases which necessitate an interview enabling an officer to properly adjudicate the application at the office having jurisdiction will be determined by USCIS.

(2) *Approval.* If an application for a new certificate of naturalization, citizenship, or repatriation or a new declaration of intention is approved, the new certificate or declaration will be issued and delivered by personal service in accordance with 8 CFR 103.8(a)(2). If an application for a new certified copy of the proceedings under the Act of June 25, 1936, as amended, or under section

317(b) of the Nationality Act of 1940, or under section 324(c) of the Immigration and Nationality Act, or under the provisions of any private law is approved, a certified photocopy of the record of the proceedings will be issued. If, subsequent to naturalization or repatriation, the applicant's name was changed by marriage, the certification of the photocopy will show both the name in which the proceedings were conducted and the changed name. The new certified copy will be delivered to the applicant in accordance with 8 CFR 103.8(a)(2).

(3) *Denial.* If the application is denied, the applicant shall be notified of the reasons for the denial and of the right to appeal in accordance with 8 CFR 103.3.

### § 343a.2   [Amended]

■ 256. Section 343a.2 is amended by revising the terms "Service" and "the Service" to read "USCIS" and the term "Form N–565" to read "an application" wherever those terms appear.

## PART 343b—SPECIAL CERTIFICATE OF NATURALIZATION FOR RECOGNITION BY A FOREIGN STATE

■ 257. The authority citation for part 343b continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1443, 1454, 1455.

### § 343b.1   [Amended]

■ 258. Section 343b.1 is amended by revising the term "Form N–565" to read "the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions".
■ 259. Section 343b.3 is revised to read as follows:

### § 343b.3   Interview.

When the application presents a prima facie case, USCIS may issue a certificate without first interviewing the applicant. In all other cases, the applicant must be interviewed. The interviewing officer must provide a complete written report of the interview before forwarding the application for issuance of the certificate.

■ 260. Section 343b.4 is revised to read as follows:

### § 343b.4   Applicant outside of United States.

If the application is received by a DHS office outside the United States, an officer will, when practicable, interview the applicant before the application is forwarded to USCIS for issuance of the certificate. When an interview is not practicable, or is not conducted because the application is submitted directly to USCIS in the United States, the

53806    **Federal Register** / Vol. 76, No. 167 / Monday, August 29, 2011 / Rules and Regulations

certificate may nevertheless be issued and the recommendation conditioned upon satisfactory interview by the Department of State. When forwarding the certificate in such a case, USCIS will inform the Secretary of State that the applicant has not been interviewed, and request to have the applicant interviewed regarding identity and possible expatriation. If identity is not established or if expatriation has occurred, the Department of State will return the certificate to USCIS for disposition.

■ 261. Section 343b.11 is revised to read as follows:

### § 343b.11  Disposition of application.

(a) *Approval.* If the application is granted, USCIS will prepare a special certificate of naturalization and forward it to the Secretary of State for transmission to the proper authority of the foreign state in accordance with procedures agreed to between DHS and the Department of State, retain the application and a record of the disposition in the DHS file, and notify the applicant of the actions taken.

(b) *Denial.* If the application is denied, the applicant will be notified of the reasons for denial and of the right to appeal in accordance with 8 CFR 103.3.

## PART 343c—CERTIFICATIONS FROM RECORDS

■ 262. The authority citation for part 343c is revised to read as follows:

**Authority:** 5 U.S.C. 552; 8 U.S.C. 1103.

### § 343c.1  [Amended]

■ 263. Section 343c.1 is amended by revising the term "Form G–641" to read "the form designated by USCIS in accordance with the form instructions".

## PART 392—SPECIAL CLASSES OF PERSONS WHO MAY BE NATURALIZED: PERSONS WHO DIE WHILE SERVING ON ACTIVE DUTY WITH THE UNITED STATES ARMED FORCES DURING CERTAIN PERIODS OF HOSTILITIES

■ 264. The authority citation for part 392 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1440 and note, and 1440–1; 8 CFR part 2.

■ 265. In § 392.2, paragraph (d)(2) is revised to read as follows:

### § 392.2  Eligibility for posthumous citizenship.

\*    \*    \*    \*    \*

(d) \* \* \*

(2) The certification required by section 329A(c)(2) of the Act to prove military service and service-connected death must be requested by the applicant on the form designated by USCIS in accordance with the form instructions. The form will also be used to verify the decedent's place of induction, enlistment, or reenlistment.

■ 266. Section 392.3 is amended by:
■ a. Revising the term "the Service" to read "USCIS" in the last sentence in paragraph (a)(2);
■ b. Revising paragraph (b); and
■ c. Revising paragraph (c).

The revisions read as follows:

### § 392.3  Application for posthumous citizenship.

\*    \*    \*    \*    \*

(b) *Application.* An application for posthumous citizenship must be submitted on the form designated by USCIS in accordance with the form instructions.

(c) *Application period.* An application for posthumous citizenship must be filed no later than two years after the date of the decedent's death.

\*    \*    \*    \*    \*

■ 267. In § 392.4, paragraphs (a) and (e) are revised to read as follows:

### § 392.4  Issuance of a certificate of citizenship.

(a) *Approval of application.* When an application for posthumous citizenship under this part has been approved, USCIS will issue a Certificate of Citizenship to the applicant in the name of the decedent.

\*    \*    \*    \*    \*

(e) *Replacement certificate.* An application for a replacement Certificate of Citizenship must be submitted on the form designated by USCIS with the fee specified in 8 CFR 103.7(b)(1) and in accordance with the form instructions.

## PART 499—[REMOVED]

■ 268. Part 499 is removed.

Janet Napolitano,
*Secretary.*
[FR Doc. 2011–20990 Filed 8–26–11; 8:45 am]
**BILLING CODE 9111–97–P**

# Exhibit 46

NJAPP0485





# FEDERAL REGISTER

Vol. 80

No. 29

Thursday,

February 12, 2015

Part II

## Department of Health and Human Services

Centers for Medicare & Medicaid Services

42 CFR Parts 417, 422, and 423

Medicare Program; Contract Year 2016 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs; Final Rule

7912    **Federal Register** / Vol. 80, No. 29 / Thursday, February 12, 2015 / Rules and Regulations

**Department of Health and Human Services**

**Centers for Medicare & Medicaid Services**

**42 CFR Parts 417, 422, and 423**

[CMS–4159–F2]

RIN 0938–AS20

**Medicare Program; Contract Year 2016 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs**

**AGENCY:** Centers for Medicare & Medicaid Services (CMS), HHS.

**ACTION:** Final rule.

**SUMMARY:** This final rule amends the Medicare Advantage (MA) program (Part C) regulations and Medicare Prescription Drug Benefit Program (Part D) regulations to implement statutory requirements; improve program efficiencies; strengthen beneficiary protections; clarify program requirements; improve payment accuracy; and make various technical changes. Additionally, this rule finalizes two technical changes that reinstate previously approved but erroneously removed regulation text sections.

**DATES:** This rule is effective March 16, 2015, except amendments to § 423.154, which are effective January 1, 2016.

*Applicability Dates:* Except as specified in Table 1, the applicability date of these provisions is January 1, 2016. In the Supplemental section of this final rule, we provide a table (Table 1) that lists changes in this final rule that have either an effective date other than March 16, 2015 or an applicability date other than January 1, 2016, for Contract Year 2016.

**FOR FURTHER INFORMATION CONTACT:** Christopher McClintick, (410) 786–

4682, Part C issues. Marie Manteuffel, (410) 786–3447, Part D issues. Kristy Nishimoto, (206) 615–2367, Part C and D enrollment and appeals issues. Whitney Johnson, (410) 786–0490, Part C and D payment issues. Joscelyn Lissone, (410) 786–5116, Part C and D compliance issues.

**SUPPLEMENTARY INFORMATION:** The majority of the provisions listed in this rule are intended for implementation for contract year 2016. Changes in the Code of Federal Regulations (CFR) will be consistent with the effective date of the applicable provision. Table 1 lists those provisions with effective dates other than 30 days after the date of publication of this final rule or applicability dates other than January 1, 2016 for contract year 2016. The applicability and effective dates are discussed in the preamble for each of these items.

TABLE 1—APPLICABILITY AND EFFECTIVE DATES OF SELECT PROVISIONS OF THE FINAL RULE

| Preamble section | Section title | Effective date | Applicability date |
|---|---|---|---|
| II.A.2. ............ | Enrollment Eligibility for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, and 423.44). | .......................... | June 1, 2015. |
| II.A.5. ............ | Efficient Dispensing in Long-Term Care Facilities and Other Changes (§ 423.154) ....... | January 1, 2016. | |

## Table of Contents

I. Executive Summary and Background
   A. Executive Summary
   1. Purpose
   2. Summary of the Major Provisions
   a. Changes To Audit and Inspection Authority (§§ 422.503(d)(2), 423.504(d)(2))
   b. Enrollment Eligibility for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, 423.44)
   c. Business Continuity for MA Organizations & PDP Sponsors (§§ 422.504(o) and 423.505(p))
   d. Efficient Dispensing in Long Term Care Facilities and Other Changes (§ 423.154)
   3. Summary of Costs and Benefits
   B. Background
   1. General Overview and Regulatory History
   2. Issuance of the Proposed Rule
   3. Public Comments Received in Response to the Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs Proposed Rule
II. Provisions of the Proposed Regulations
   A. Clarifying Various Program Participation Requirements
   1. Changes to Audit & Inspection Authority (§§ 422.503(d)(2), 423.504(d)(2))
   2. Enrollment Eligibility for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, 423.44)
   3. Part D Notice of Changes (§ 423.128(g))
   4. Business Continuity for MA Organizations & PDP Sponsors (§§ 422.504(o), 423.505(p))
   5. Efficient Dispensing in Long Term Care Facilities and Other Changes (§ 423.154)
   6. Medicare Coverage Gap Discount Program and Employer Group Waiver Plans (§ 423.2325)
   7. Transfer of TrOOP Between PDP Sponsors Due To Enrollment Changes During the Coverage Year (§ 423.464)
   8. Expand Quality Improvement Program Regulations (§ 422.152)
   B. Improving Payment Accuracy
   1. Determination of Payments (§ 423.329)
   2. Reopening (§ 423.346)
   3. Payment Appeals (§ 423.350)
   4. Payment Processes for Part D Sponsors (§ 423.2320)
   5. Risk Adjustment Data Requirements—Proposal Regarding Annual Deadline for MAO Submission of Final Risk Adjustment Data (§ 422.310 (g)(2)(ii))
   C. Strengthening Beneficiary Protections
   1. MA–PD Coordination Requirements for Drugs Covered Under Parts A, B, and D (§ 422.112)
   2. Good Cause Processes (§§ 417.460, 422.74, 423.44)
   3. MA Organizations' Extension of Adjudication Timeframes for Organization Determinations and Reconsiderations (§§ 422.568, 422.572, 422.590, 422.618, 422.619)
   D. Strengthening Our Ability To Distinguish Stronger Applicants for Part C and D Program Participation and To Remove Consistently Poor Performers
   1. Two-Year Prohibition When Organizations Terminate Their Contracts (§ 422.502, § 422.503, § 422.506, § 422.508, § 423.507)
   2. Withdrawal of Stand-Alone Prescription Drug Plan Bid Prior to Contract Execution (§ 423.503)
   3. Essential Operations Test Requirement for Part D (§ 423.503(a) and (c), § 423.504(b)(10), § 423.505(b)(28), § 423.509)
   E. Implementing Other Technical Changes
   1. Requirements for Urgently Needed Services (§ 422.113)
   2. Agent and Broker Training and Testing Requirements (§§ 422.2274, 423.2274)
   3. Deemed Approval of Marketing Materials (§§ 422.2262, 422.2266, 423.2262, 423.2266)
   4. Cross-Reference Change in the Part C Disclosure Requirements (§ 422.111)
   5. Managing Disclosure and Recusal in P&T Conflicts of Interest (§ 423.120(b)(1))
   6. Thirty-Six Month Coordination of Benefits (COB) Limit (§ 423.466(b))
   7. Application and Calculation of Daily Cost-Sharing Rates (§ 423.153)
   8. Technical Change To Align Regulatory Requirements for Delivery of Standardized Pharmacy Notice (§ 423.562)

9. MA Organization Responsibilities in Disasters and Emergencies (§ 422.100)
10. Technical Changes To Align Part C and Part D Contract Determination Appeal Provisions (§§ 422.641, 422.644)
11. Technical Changes To Align Parts C and D Appeal Provisions (§§ 422.660, 423.650)
12. Technical Change to the Restrictions on Use of Information Under Part D (§ 423.322)
13. Technical Changes to Regulation Text at § 423.104—Requirements Related to Qualified Prescription Drug Coverage
14. Technical Changes to Regulation Text at § 423.100—Definition of Supplemental Benefits
III. Collection of Information Requirements
A. ICRs Related to Eligibility of Enrollment for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, and 423.44)
B. ICRs Related to Good Cause Processes (§§ 417.460, 422.74, 423.44)
C. ICRs Related To Expanding Quality Improvement Program Regulations (§ 422.152)
D. ICRs Related To Changes to Audit and Inspection Authority (§§ 422.503(d)(2), and 423.504(d)(2))
E. ICRs Related to Business Continuity for MA Organizations and PDP Sponsors (§§ 422.504(o) and 423.505(p))
F. Submission of PRA-Related Comments
IV. Regulatory Impact Statement

**Regulations Text**

**Acronyms**

ADS   Automatic Dispensing System
AHFS   American Hospital Formulary Service
AHFS–DI   American Hospital Formulary Service-Drug Information
AHRQ   Agency for Health Care Research and Quality
ANOC   Annual Notice of Change
AO   Accrediting Organization
ALR   Assisted Living Residence
BBA   Balanced Budget Act of 1997 (Pub. L. 105–33)
BBRA   [Medicare, Medicaid and State Child Health Insurance Program] Balanced Budget Refinement Act of 1999 (Pub. L. 106–113)
BIPA   [Medicare, Medicaid, and SCHIP] Benefits Improvement Protection Act of 2000 (Pub. L. 106–554)
BLA   Biologics License Application
BLS   Bureau of Labor Statistics
CAHPS   Consumer Assessment Health Providers Survey
CAP   Corrective Action Plan
CCIP   Chronic Care Improvement Program
CC/MCC   Complication/Comorbidity and Major Complication/Comorbidity
CCS   Certified Coding Specialist
CDC   Centers for Disease Control
CGDP   Coverage Gap Discount Program
CHIP   Children's Health Insurance Programs
CMP   Civil Money Penalty
CMR   Comprehensive Medical Review
CMS   Centers for Medicare & Medicaid Services
CMS–HCC   CMS Hierarchal Condition Category

CTM   Complaints Tracking Module
COB   Coordination of Benefits
CORF   Comprehensive Outpatient Rehabilitation Facility
CPC   Certified Professional Coder
CY   Calendar Year
DEA   Drug Enforcement Administration
DIR   Direct and Indirect Remuneration
DHS   Department of Homeland Security
DME   Durable Medical Equipment
DMEPOS   Durable Medical Equipment, Prosthetic, Orthotics, and Supplies
D-SNPs   Dual Eligible SNPs
DOL   U.S. Department of Labor
DUR   Drug Utilization Review
EAJR   Expedited Access to Judicial Review
EGWP   Employer Group/Union-Sponsored Waiver Plan
EOB   Explanation of Benefits
EOC   Evidence of Coverage
ESRD   End-Stage Renal Disease
FACA   Federal Advisory Committee Act
FDA   Food and Drug Administration
FDR   First-tier, Downstream, and Related Entities
FEHBP   Federal Employees Health Benefits Plan
FFS   Fee-For-Service
FIDE   Fully-integrated Dual Eligible
FIDE   SNPs Fully-integrated Dual Eligible Special Needs Plans
FMV   Fair Market Value
FY   Fiscal Year
GAO   Government Accountability Office
HAC   Hospital-Acquired Conditions
HCPP   Health Care Prepayment Plans
HEDIS   HealthCare Effectiveness Data and Information Set
HHS   [U.S. Department of] Health and Human Services
HIPAA   Health Insurance Portability and Accountability Act of 1996 (Pub. L. 104–191)
HMO   Health Maintenance Organization
HOS   Health Outcome Survey
HPMS   Health Plan Management System
ICFs/IID Intermediate care facilities for the mentally retarded
ICL   Initial Coverage Limit
ICR   Information Collection Requirement
ID   Identification
IMD   Institutes for mental disease
IT   Information Technology
I/T/U Pharmacies   Indian Health Service, Tribes and Tribal organizations, and urban Indian organizations (collectively referred to as "I/T/U").
IVC   Initial Validation Contractor
LCD   Local Coverage Determination
LEP   Late Enrollment Penalty
LIS   Low-Income Subsidy
LPPO   Local Preferred Provider Organization
LTC   Long Term Care
MA   Medicare Advantage
MAAA   Member of the American Academy of Actuaries
MA–PD   Medicare Advantage-Prescription Drug Plan
MCO   Managed Care Organization
MIPPA   Medicare Improvements for Patients and Providers Act of 2008 (Pub. L. 110–275)
MOC   Medicare Options Compare
MOOP   Maximum Out-of-Pocket
MPDPF   Medicare Prescription Drug Plan Finder

MMA   Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. 108–173)
MS–DRG   Medicare Severity Diagnosis Related Group
MSA   Metropolitan Statistical Area
MSAs   Medical Savings Accounts
MSP   Medicare Secondary Payer
MTM   Medication Therapy Management
MTMP   Medication Therapy Management Program
NAIC   National Association of Insurance Commissioners
NCPDP   National Council for Prescription Drug Programs
NCQA   National Committee for Quality Assurance
NDA   New Drug Application
NDC   National Drug Code
NGC   National Guideline Clearinghouse
NIH   National Institutes of Health
NOMNC   Notice of Medicare Non-Coverage
NPI   National Provider Identifier
OES   Occupational Employment Statistics
OIG   Office of Inspector General
OMB   Office of Management and Budget
OPM   Office of Personnel Management
OTC   Over the Counter
PACE   Programs of the All-Inclusive Care for the Elderly
Part C   Medicare Advantage
Part D   Medicare Prescription Drug Benefit Program
Part D IRMAA   Part D Income Related Monthly Adjustment Amount
PBM   Pharmacy Benefit Manager
PDE   Prescription Drug Event
PDP   Prescription Drug Plan
PFFS   Private Fee For Service Plan
POA   Present on Admission (Indicator)
POS   Point-of-Sale
PPO   Preferred Provider Organization
PPS   Prospective Payment System
P&T   Pharmacy & Therapeutics
QRS   Quality Review Study
PACE   Programs of All Inclusive Care for the Elderly
PRWORA   Personal Responsibility and Work Opportunity Reconciliation Act of 1996
RADV   Risk Adjustment Data Validation
RAC   Recovery Audit Contractor
RAPS   Risk Adjustment Payment System
RPPO   Regional Preferred Provider Organization
RTO   Return to Operations/Recovery Time Objective
SBA   Small Business Association
SCORM   Sharable Content Object Reference Model
SEP   Special Enrollment Period
SHIP   State Health Insurance Assistance Programs
SNF   Skilled Nursing Facility
SNP   Special Needs Plan
SNP   MOC Special Needs Plan Model of Care
SPAP   State Pharmaceutical Assistance Programs
SSA   Social Security Administration
SSI   Supplemental Security Income
T&C   Terms and Conditions
TPA   Third Party Administrator
TrOOP   True Out-of-Pocket
U&C   Usual and Customary
UPIN   Uniform Provider Identification Number

**7914**    Federal Register / Vol. 80, No. 29 / Thursday, February 12, 2015 / Rules and Regulations

USP    U.S. Pharmacopoeia
ZPIC   Zone Program Integrity Contractor

# I. Executive Summary and Background

## A. Executive Summary

### 1. Purpose

The purpose of this final rule is to revise the Medicare Advantage (MA) program (Part C) regulations and Medicare Prescription Drug Benefit Program (Part D) regulations to implement statutory requirements, improve program efficiencies, strengthen beneficiary protections, clarify program requirements, improve payment accuracy, and make various technical changes for contract year 2016.

### 2. Summary of the Major Provisions

#### a. Changes to Audit and Inspection Authority (§§ 422.503(d)(2), 423.504(d)(2))

We proposed three changes to our audit and inspection authority. Due to significant concerns raised during the public comment period, we are finalizing only two of those three proposals. First, under section 6408 of the Affordable Care Act, new authority was provided to the Secretary that now requires that each contract provide the right to "timely" inspection and audit.

We are revising both §§ 422.503(d)(2) and 423.504(d)(2) to insert the word "timely" at the end of both of the introductory paragraphs.

We are also adding language to §§ 422.503(d)(2) and 423.504(d)(2) that will allow us to require that a sponsoring organization hire an independent auditor, working in accordance with CMS specifications, to validate if the deficiencies that were found during a CMS full or partial program audit have been corrected and provide CMS with a copy of the audit findings.

The proposal to require MA organizations and Part D plan sponsors to hire an independent auditor to conduct full or partial program audits will not be finalized.

#### b. Enrollment Eligibility for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, 423.44)

After consideration of the public comments, we are finalizing the policies

mostly as proposed, with the exception of changes to the regulation text at §§ 417.422, 417.460, 422.50, 423.1, 423.3 and 423.44 to clarify that any individual not lawfully present is no longer eligible to remain enrolled in a cost, MA, or Part D plan, to establish the disenrollment effective date to be the first of the month following notice by CMS of ineligibility, and to delete the term "qualified alien." Further, we are redesignating the current text at § 417.460(b)(2)(iv) as paragraph (b)(2)(v) and finalizing the provision establishing a lack of lawful presence as a basis for disenrollment from a cost plan at paragraph (b)(2)(iv). This provision is consistent with the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) and with recommendations made by the Office of the Inspector General (OIG) in its January 2013 and October 2013 reports.

#### c. Business Continuity for MA Organizations & PDP Sponsors (§§ 422.504(o) and 423.505(p))

To respond to concerns raised during the comment period, we revised the regulation text by providing a 72, rather than 24 hour, restoration time period for MA organizations and Part D sponsors after a systems failure. We also revised text as necessary to make clear that we require MA organizations and sponsors to "plan to" restore essential functions within the 72-hour time period, rather than guarantee complete restoration within the timeframe. Some commenters thought our intent was to require continuous operations under all conditions, and we revised language from the proposed regulation to make clear that that was not the case in our final rule. Lastly commenters distinguished between Part C and D operations and noted, for instance, that provider payments are not a 24-hour critical function for MA plans since payment is allowed to be made within 30 days and that health and safety would not be put at risk by failure of Part C claims processing and appeals processing. We removed language related to that requirement for MA plans.

#### d. Efficient Dispensing in Long Term Care Facilities and Other Changes (§ 423.154)

We are finalizing changes to the rule requiring efficient dispensing to Medicare Part D enrollees in long term care (LTC) facilities. Some Part D sponsors (or their pharmacy benefit managers) implemented the short-cycle dispensing requirement by pro-rating monthly dispensing fees, which penalize the offering and adoption of more efficient LTC dispensing techniques compared to less efficient LTC dispensing techniques. This is because when a medication is discontinued before a month's supply has been dispensed, a pharmacy that dispenses the maximum amount of the medication at a time permitted under § 423.154 (which is 14 days' supplies), collects more in dispensing fees than a pharmacy that utilizes dispensing techniques that result in less than maximum quantities being dispensed at a time. In other words, a less efficient pharmacy collects more in dispensing fees than a more efficient pharmacy. This is contrary to the Congress' intent in enacting section 3310 of the Affordable Care Act, which is to reduce medication waste. Therefore, we have finalized a prohibition on payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed. We have also finalized a requirement to ensure that any difference in payment methodology among LTC pharmacies incentivizes more efficient dispensing techniques. Other changes to the rule requiring efficient dispensing to Medicare Part D enrollees in LTC facilities are eliminating language that has been misinterpreted as requiring the proration of dispensing fees and making a technical change to the requirement that Part D sponsors report on the nature and quantity of unused brand and generic drugs. We are not finalizing an additional waiver for LTC pharmacies using restock and reuse dispensing methodologies under certain conditions at this time.

### 3. Summary of Costs and Benefits

TABLE 2—SUMMARY OF COSTS AND BENEFITS

| Provision | Total costs | Transfers |
|---|---|---|
| Changes to Audit and Inspection | We estimate that this change would require an annual cost of $2 million for the time and effort for all MA organizations or Part D sponsors with audit results that reveal non-compliance with CMS requirements to hire independent auditors to validate that correction has occurred. The total cost for 2015–2019 is estimated to be $10 million. | |
| Eligibility of enrollment for individuals not lawfully present in the U.S. | N/A | We estimate that this change could save the MA program up to $5 million in 2015, increasing to $8 million in 2019 (total of $32 million over this period), and could save the Part D program (includes the Part D portion of MA–PD plans) up to $5 million in 2015, increasing to $9 million in 2019 (total of $35 million over this period). |
| Business Continuity Operations | We estimate that this change would require a first year cost of $8 million in 2015, for the time and effort for affected organizations to comply with the business continuity requirements. In subsequent years, 2016–2019, the cost for maintaining the business continuity is estimated to be $4 million. The total cost over the period 2015–2019 is estimated to be $24 million. | |

## B. Background

### 1. General Overview and Regulatory History

The Balanced Budget Act of 1997 (BBA) (Pub. L. 105–33) created a new "Part C" in the Medicare statute (sections 1851 through 1859 of the Social Security Act (the Act)) which established what is now known as the MA program. The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA) (Pub. L. 108–173), enacted on December 8, 2003, added a new "Part D" to the Medicare statute (sections 1860D–1 through 42 of the Act) entitled the Medicare Prescription Drug Benefit Program (Part D), and made significant changes to the existing Part C program, which it named the Medicare Advantage (MA) Program. The MMA directed that important aspects of the Part D program be similar to, and coordinated with, regulations for the MA program. Generally, the provisions enacted in the MMA took effect January 1, 2006. The final rules implementing the MMA for the MA and Part D prescription drug programs appeared in the **Federal Register** on January 28, 2005 (70 FR 4588 through 4741 and 70 FR 4194 through 4585, respectively).

Since the inception of both Parts C and D, we have periodically revised our regulations either to implement statutory directives or to incorporate knowledge obtained through experience with both programs. For instance, in the September 18, 2008 and January 12, 2009 **Federal Register** (73 FR 54226 and 74 FR 1494, respectively), we issued Part C and D regulations to implement provisions in the Medicare Improvement for Patients and Providers Act (MIPPA) (Pub. L. 110–275). We promulgated a separate interim final rule on January 16, 2009 (74 FR 2881) to address MIPPA provisions related to Part D plan formularies. In the final rule that appeared in the April 15, 2010 **Federal Register** (75 FR 19678), we made changes to the Part C and D regulations which strengthened various program participation and exit requirements; strengthened beneficiary protections; ensured that plan offerings to beneficiaries included meaningful differences; improved plan payment rules and processes; improved data collection for oversight and quality assessment; implemented new policies; and clarified existing program policy.

In a final rule that appeared in the April 15, 2011 **Federal Register** (76 FR 21432), we continued our process of implementing improvements in policy consistent with those included in the April 2010 final rule, and also implemented changes to the Part C and Part D programs made by recent legislative changes. The Patient Protection and Affordable Care Act (Pub. L. 111–148), as amended by the Health Care and Education Reconciliation Act (Pub. L. 111–152) (collectively the Affordable Care Act or ACA) added a number of new Medicare provisions and modified many existing provisions. The Affordable Care Act included significant reforms to both the private health insurance industry and the Medicare and Medicaid programs. Provisions in the Affordable Care Act concerning the Part C and D programs largely focused on beneficiary protections, MA payments, and simplification of MA and Part D program processes. These provisions affected implementation of our policies regarding beneficiary cost-sharing, assessing bids for meaningful differences, and ensuring that cost-sharing structures in a plan are transparent to beneficiaries and not excessive. In the April 2011 final rule, we revised regulations on a variety of issues based on the Affordable Care Act and our experience in administering the MA and Part D programs. The rule covered areas such as marketing, including agent/broker training; payments to MA organizations based on quality ratings; standards for determining if organizations are fiscally sound; low income subsidy policy under the Part D program; payment rules for non-contract health care providers; extending current network adequacy standards to Medicare medical savings account (MSA) plans that employ a network of providers; establishing limits on out-of-pocket expenses for MA enrollees; and several revisions to the special needs plan requirements, including changes concerning SNP approvals.

In a final rule that appeared in the April 12, 2012 **Federal Register** (77 FR 22072 through 22175), we made several changes to the Part C and Part D

NJAPP0490

programs required by statute, including the Affordable Care Act, and made improvements to both programs through modifications reflecting experience we have obtained administering the Part C and Part D programs. Key provisions of that final rule implemented changes closing the Part D coverage gap, or "donut hole," for Medicare beneficiaries who do not already receive low-income subsidies from us by establishing the Medicare Coverage Gap Discount Program. We also included provisions providing new benefit flexibility for fully-integrated dual eligible special needs plans, clarifying coverage of durable medical equipment, and combatting possible fraudulent activity by requiring Part D sponsors to include an active and valid prescriber National Provider Identifier on prescription drug event records.

2. Issuance of the Proposed Rule

In the proposed rule titled "Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs," which appeared in the January 10, 2014 **Federal Register** (79 FR 1918), we proposed to revise the MA program (Part C) regulations and Medicare Prescription Drug Benefit Program (Part D) regulations to implement statutory requirements; strengthen beneficiary protections; improve program efficiencies; and clarify program requirements. The proposed rule also included several provisions designed to improve payment accuracy.

3. Public Comments Received in Response to the Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs Proposed Rule

We received approximately 7,600 timely pieces of correspondence containing multiple comments on the CY 2015 proposed rule. The majority of correspondence received was in reference to provisions that were either finalized in the final rule that appeared in the **Federal Register** on May 23, 2014 (79 FR 29844) (May 2014 final rule) or that will not be finalized. While we are finalizing in whole or in part approximately 30 of the provisions from the proposed rule in this final rule, there remain a small number of provisions from the proposed rule that were not finalized in the May 2014 final rule and that we are not finalizing in this rule. These provisions are listed later in this section in Table 2.

Public comments on the provisions finalized in this rule were submitted between January 10, 2014 and March 7, 2014. We note that some of the public comments were outside of the scope of the proposed rule provisions that we are finalizing here. These out-of-scope public comments are not addressed in this final rule. Summaries of the public comments that are within the scope of the proposed rule and our responses to those public comments are set forth in the various sections of this final rule under the appropriate heading. However, we note that in this final rule we are not addressing comments received with respect to the provisions of the proposed rule that we are not finalizing.

TABLE 2—PROVISIONS NOT BEING FINALIZED

| Proposed Rule January 10, 2014 **Federal Register** (79 FR 1918), section | Topic |
| --- | --- |
| **Clarifying Various Program Participation Requirements** | |
| III.A.2 | Two-year Limitation on Submitting a New Bid in an Area Where an MA has been Required to Terminate a Low-enrollment MA Plan (§ 422.504(a)(19)). |
| III.A.9 | Collections of Premiums and Cost Sharing (§ 423.294). |
| III.A.12 | Separating the Annual Notice of Change (ANOC) from the Evidence of Coverage (EOC) (§ 422.111(a)(3) and 423.128(a)(3)). |
| III.A.14 | Exceptions to Drug Categories or Classes of Clinical Concern (§ 423.120(b)(2)(vi)). |
| III.A.15 | Medication Therapy Management Program (MTMP) under Part D (§ 423.153(d)(1)(v)(A))—outreach strategies. |
| III.A.23 | Medicare Coverage Gap Discount Program and Employer Group Waiver Plans (§ 423.2325)—disclosure requirement for Part D sponsors. |
| III.A.26 | Payments to PDP Plan Sponsors For Qualified Prescription Drug Coverage (§ 423.308) and Payments to Sponsors of Retiree Prescription Drug Plans (§ 423.882). |
| III.A.38 | Authorization of Expansion of Automatic or Passive Enrollment Non-Renewing Dual Eligible SNPs (D-SNPs) to another D-SNP to Support Alignment Procedures (§ 422.60). |
| **Strengthening Beneficiary Protections** | |
| III.C.1 | Providing High Quality Health Care (§ 422.504(a)(3) and § 423.505(b)(27)). |
| III.C.4 | Definition of Organization Determination (§ 422.566). |
| **Strengthening our Ability To Distinguish Stronger Applicants for Part C and D Program Participation and To Remove Consistently Poor Performers** | |
| III.D.4 | Termination of the Contracts of Medicare Advantage Organizations Offering PDP for Failure for 3 Consecutive Years to Achieve 3 Stars on Both Part C and Part D Summary Star Ratings in the Same Contract Year (§ 422.510). |
| **Implementing Other Technical Changes** | |
| III.E.2 | Skilled Nursing Facility Stays (§§ 422.101 and 422.102). |

NJAPP0491

## II. Provisions of the Proposed Regulations and Analysis of and Responses to Public Comments

### A. Clarifying Various Program Participation Requirements

#### 1. Changes to Audit and Inspection Authority (§§ 422.503(d)(2), 423.504(d)(2))

Sections 1857(d)(2)(A) and 1860D–12(b)(3)(C) of the Act specify that each contract under these sections must state that CMS has the right to audit and inspect the facilities and records of each organization. We proposed three changes to our audit and inspection authority. First, under section 6408 of the Affordable Care Act, new authority was provided to the Secretary that now requires that each contract provide the right to "timely" inspection and audit.

We proposed to revise both §§ 422.503(d)(2) and 423.504(d)(2) to reflect this change. Specifically, we proposed to insert the word "timely" at the end of the introductory paragraphs for §§ 422.503(d)(2) and 423.504(d)(2).

We also proposed to add language to §§ 422.503(d)(2) and 423.504(d)(2) that will allow us to require an MA organization or Part D plan sponsor to hire an independent auditor, working in accordance with CMS specifications, to perform full or partial program audits to determine compliance with CMS requirements and provide to CMS an attestation affirming that the audit has been completed as required.

Lastly, we proposed to add language to §§ 422.503(d)(2) and 423.504(d)(2) that would allow us to require that a sponsoring organization hire an independent auditor, working in accordance with CMS specifications, to validate if the deficiencies that were found during a CMS full or partial program audit have been corrected and provide CMS with a copy of the audit findings.

We received the following comments and our responses follow:

*Comment:* Some commenters requested that CMS define "timely" as it is being added to § 422.503(d)(2) and § 423.504(d)(2) and that CMS define the existing language from paragraph (2) in that same section, specifically: "when there is reasonable evidence for some need for such inspection."

*Response:* We are following the exact working of the statute in adding the word "timely" to our current audit and inspection authority. We believe that the Congress recognized that what would be considered "timely" is based on a reasonableness standard that may change based on the specific

circumstances leading up to the audit. For example, we currently give sponsors 4-weeks notice prior to the start of a routine program audit and we do not envision this change altering that practice. However, if we were to become aware of a situation where beneficiaries' health or safety may be at risk based on a plan's poor performance, we will reserve the right to request records or any needed documentation in an expedited fashion. Therefore, we will not put restrictions on the broadly stated statutory language and believe that this is in line with the spirit and intent of the statutory change. Similarly, the language in paragraph (2) in that same section is not a change, but existing language from our regulations. Again, we believe that the wording is appropriate and does not require additional definition or explanation.

*Comment:* One commenter suggested we utilize the NCPDP audit standard as a means of standardizing audit communications.

*Response:* We appreciate the commenter's suggestion and believe this would be a more appropriate approach if our audits largely focused on claim level audits between MA and Part D organizations and the providers or entities they pay. However, program audits cover a wide range of our program areas and corresponding programmatic requirements, many of which go well beyond claim determinations. We have received positive feedback from MA and Part D organizations in the past regarding the level of detail and useful information and feedback in our audit reports, which sponsors rely upon as they work towards implementing any necessary corrective actions. By limiting the communication to the codes and auditing standards used by NCPDP, we believe that—(1) many of our findings would not be adequately covered by these standards; and (2) they would not provide enough detail in many cases to allow for an organization to undertake meaningful correction.

*Comment:* A commenter suggested that CMS specify that the same organization that performed the audit also perform the validation in order to ensure consistency in interpretation and try to keep costs down, or at the very least require at least one member from the original audit team be a member of the validation team.

*Response:* We will not be finalizing the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing the proposal that we may require an organization to hire an independent auditor to validate

correction of audit deficiencies. We will consider the recommendation to include a member from the original audit team in any validation activities whether they be performed by CMS internally or by an independent auditor hired by the MA or Part D organization at CMS' request.

*Comment:* Some commenters requested if CMS would set a time limit in which audits must be completed or conducted.

*Response:* We will not be finalizing the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing our proposal that we may require an organization to hire an independent auditor to validate correction of audit deficiencies. We will establish a timeframe in subregulatory guidance based on our current internal validation audit timeline. However, we recognize that some correction activities require more time than others, we will reserve the right to alter those timelines for deficiencies that we believe—(1) a more immediate correction is warranted due to the potential for beneficiary harm; or (2) require a longer correction timeline due to the technical or difficult nature of correction (for example, rebuilding or completely restructuring systems infrastructure).

*Comment:* A commenter requested if CMS would pay for the cost to hire an independent auditor.

*Response:* Our proposal was that an MA or Part D organization would retain the independent auditing firm to conduct the audit, but that the plan could account for the costs in their bid. However, we will not be finalizing the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing our proposal that we may require an organization to hire an independent auditor to validate correction of audit deficiencies.

*Comment:* Some commenters requested that CMS cap fees that independent audit firms would charge MA and Part D organizations to perform program audits.

*Response:* If we decide to pursue this proposal in the future, we will explore our ability to cap the costs of performing these audit activities.

*Comment:* Many commenters suggested that instead of requiring MA and Part D organizations to hire independent auditors to expand the number of audits conducted each year that we look to the various other compliance and monitoring activities the Agency engages in, which could be used to better target audits or results could be utilized in lieu of audit activities.

NJAPP0492

*Response:* We do utilize the data and information obtained about sponsor performance to target our audit efforts as part of the overall risk assessment used to select sponsors for audit. We have also utilized data and information from our various monitoring efforts to assist in determining if certain deficiencies discovered during an audit may have been corrected (for example, if a sponsor had multiple deficiencies in a program area that will at a later date be the subject of a monitoring activity, we may use passing results from that monitoring activity as proof of correction).

*Comment:* A commenter requested that CMS release the data driven elements of the risk assessment and define a sponsor who is high risk.

*Response:* We believe that this comment is outside the scope of this final rule. However, we use a variety of existing data points from Medicare Star ratings, past performance and plan reported data, as a few examples, to develop our risk assessment. We focus on metrics that have the potential to affect beneficiary access to medications and services, and also look for operational metrics that program experience has demonstrated can cause contracting organizations to develop performance problems in core program areas (that is, large increases in enrollment over a short period of time). We do not release our risk assessment in its entirety, but these are the areas we focus on when conducting the analysis. Organizations should note that it is our goal to audit all organizations in the MA and Part D program, and the risk assessment is one way plans are selected for audit.

*Comment:* Some commenters raised concerns over their available recourse if they disagreed with an independent auditor's findings, given the impact on Medicare Star ratings and past performance.

*Response:* We will not be finalizing the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing the proposal that we may require an organization to hire an independent auditor to validate correction of audit deficiencies. Validation results have no impact on Medicare Star ratings or past performance. However, we stated in the proposal that organizations would have an opportunity to rebut audit findings, this would include during validation efforts, and CMS would be reviewing both draft and final reports from the independent auditor. Therefore, we would give organizations an avenue to dispute findings or policy interpretations that organizations

believed to be erroneous, even in the more limited use of an independent auditor to validate correction of deficiencies.

*Comment:* A commenter stated that our proposal did not clarify how organizations hiring an independent auditor to conduct full or partial program audits would affect or involve the Zone Program Integrity Contractors (ZPICs) or the Recovery Audit Contractors (RACs).

*Response:* The proposal to utilize an independent auditor to conduct full or partial program audits or validations has no impact on ZPICs or RACs, which is why they are not mentioned in our proposal.

*Comment:* Several commenters suggested that CMS develop a core set of SNP auditors regardless of whether or not we implement our independent auditor proposal, given what the industry perceives as inexperienced or inconsistent SNP findings amongst auditors, which many SNPs believed would be aggravated if organizations were required to retain an independent audit firm. Some suggested that SNP auditors should be accredited by NCQA prior to being allowed to conduct SNP audits.

*Response:* We believe that this is outside the scope of this proposal, but we thank the commenter for their suggestion to continue to strengthen the CMS MA and Part D program. We have conducted additional training and continue to welcome feedback on all of our audit processes and protocols. After the piloting of the SNP MOC protocols in 2013, we conducted specialized feedback sessions with organizations subject to SNP MOC audits and made changes to our protocols, methods of evaluation and training of auditors based on the industry's feedback. We welcome additional feedback and hope that organizations will see continual improvements in our audit processes in 2014 and future years.

*Comment:* A commenter inquired if the independent auditor proposals applied to PACE organizations.

*Response:* No, these proposals do not apply to PACE organizations. These regulatory provisions do not apply to PACE plans because we are only proposing changes to Parts 422 and 423 which govern MA, other Managed care plans, and Part D organizations. PACE plans are governed by the regulations in part 460. With respect to this change applying to cost plans, we select sponsors for audit at their parent organization level, and if they have an 1876 cost plan, that contract would be included in our audit. Therefore, the parent organization may be requested to

hire an independent auditor to validate the correction of their audit deficiencies. However, if an organization was a standalone cost plan, with no MA or Part D contracts under parts 422 or 423, this requirement would not apply to those organizations, as cost plans are governed by part 417.

*Comment:* A commenter suggested that CMS develop and implement a robust annual or biannual training program for independent auditors to ensure that they were competent to perform program audits properly.

*Response:* We will not be finalizing the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing the proposal that CMS may require an organization to hire an independent auditor to validate correction of audit deficiencies. We will consider this suggestion if we repropose the larger full scale use of independent auditors to conduct full or partial program audits in the future. We will also share whatever materials we have developed and can provide technical assistance if we request an organization to retain an independent auditor to validate correction of audit deficiencies.

*Comment:* A commenter suggested that instead of requiring plans to hire an independent auditor we require plans to conduct a robust internal audit and share the results with CMS.

*Response:* We will not be finalizing the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing the proposal that CMS may require an organization to hire an independent auditor to validate correction of audit deficiencies. We currently require organizations to conduct internal auditing and monitoring as part of having an effective compliance program, which we believe for purposes of a healthy and robust compliance program, such activities are appropriate.

*Comment:* A commenter recommended that much like CMS' use of independent auditors to conduct data validation audits, CMS should set criteria regarding who can conduct program audits. For example, the commenter suggested CMS clarify that organizations that currently assist plans with operations, compliance or consulting are disqualified from performing as independent auditors.

*Response:* We will not be finalizing the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing the proposal that CMS may require an organization to hire an independent auditor to validate

correction of audit deficiencies. We thank the commenter for their suggestion with respect to whom a contracting organization may retain to perform validation of correction of audit deficiencies. We will consider including any key criteria regarding who can perform these validations in subsequent subregulatory guidance.

*Comment:* A few commenters questioned whether CMS has the statutory authority to require contracting organizations to retain an independent auditor to conduct full or partial program audits. These commenters raised many related issues, such as CMS trying to inappropriately expand their appropriation by requiring contracting organizations to bear the cost of hiring an audit firm to perform a function that the Congress has tasked CMS with performing. Other commenters stated that to the extent these funds expended by plans were later reimbursed by plans through the bid process, it could implicate the Anti-Deficiency Act.

*Response:* We will not finalize the proposal requiring organizations to hire an independent auditor to conduct full or partial program audits, but we are finalizing the proposal that we may require an organization to hire an independent auditor to validate correction of audit deficiencies. We do not agree that our proposal allowing us the option to request a plan sponsor to retain an independent auditor to verify that deficiencies that we determined existed during our audit have been corrected implicates the concerns that organizations previously raised regarding our current appropriation or statutory authority. The proposal simply mirrors our current authority where we may require organizations under sanction to retain an independent auditor to perform an independent review to validate that the deficiencies upon which the sanction was based have been corrected and are not likely to recur.

After consideration of all of the comments received, we are finalizing our proposal to revise both §§ 422.503(d)(2) and 423.504(d)(2) to insert the word "timely" at the end of both of the introductory paragraphs for §§ 422.503(d)(2) and 423.504(d)(2), and our proposal to have the option to require contracting organizations who were found to have deficiencies during a CMS program audit to hire an independent auditor to validate correction of those deficiencies.

However, based on the strong opposition and valid concerns raised by contracting organizations, we have decided at this time not to finalize our proposal to require plan sponsors to hire an independent auditor no less than every 3 years to conduct full or partial program audits.

2. Enrollment Eligibility for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, and 423.44)

a. Basic Enrollment Requirements

Sections 226 and 226A of the Act establish the conditions for Medicare Part A entitlement for individuals who have attained age 65, are disabled or have end stage renal disease (ESRD), and are entitled to monthly Social Security benefits under section 202 of the Act; individuals entitled to Part A under these sections do not have to pay premiums for such coverage, and they may, but are not required to, enroll in Medicare Part B. Section 1818 of the Act establishes the conditions for Medicare enrollment for individuals who are not entitled to Medicare Part A without a premium under sections 226 or 226A of the Act. Individuals must have Part B (under section 1836 of the Act) and must also meet citizenship or alien status requirements in order to purchase Part A hospital insurance under section 1818 of the Act; individuals covered under section 1836 of the Act must meet citizenship or alien status requirements, in addition to other requirements, in order to enroll in Part B if they are not entitled to premium-free Medicare under sections 226 or 226A.

Sections 1851(a)(3)(B), 1860D 1(a)(3)(A), and 1876(a)(1)(A) of the Act outline the eligibility requirements to enroll in MA (Part C), Medicare prescription drug coverage (Part D), and Medicare cost plans. To be eligible for MA, Part D, or cost plan coverage, individuals must have active Medicare coverage. Specifically, to enroll in MA, an individual must be entitled to benefits under Part A and be enrolled in Part B; to enroll in Part D, an individual must be entitled to Part A and/or enrolled in Part B; to enroll in a Medicare cost plan, an individual must be enrolled in Part B (Part A entitlement is not required).

b. Medicare Eligibility and Lawful Presence

Section 401 of the PRWORA, amended by section 5561 of the Balanced Budget Act, limits the eligibility of individuals who are not qualified aliens to receive benefits under certain federal programs, including benefits under Title XVIII of the Act (Medicare); these provisions are codified at 8 U.S.C. 1611 and 1641. In

general pursuant to 8 U.S.C. 1611(a), an alien who is not a qualified alien is not eligible to receive any federal public benefit. The Congress has established some exceptions to this general rule. One exception, at 8 U.S.C. 1611(b)(3), permits certain aliens to obtain Medicare benefits and applies to an alien who is: (1) Lawfully present in the United States, as determined by the Attorney General and (2) was authorized to be employed with respect to wages attributable to employment, which were counted for the purpose of determining Medicare entitlement under Part A [1]. An alien who is eligible under this exception is able to receive any benefit payable under Medicare. In contrast, an alien that is not lawfully present in the United States is not eligible to receive benefits under Medicare.

As a result, individuals meeting certain criteria are able to earn qualified credits towards Social Security retirement benefits as outlined in 8 U.S.C. 1631 (federal attribution of sponsor's income and resources to alien) and 8 U.S.C. 1645 (Qualifying quarters). Such individuals may earn the total number of qualified credits to be eligible under the Act to receive retirement benefits under sections 226 and 226A of the Act. However, should such individuals be unlawfully present in the United States, under PRWORA they are not eligible to receive the Social Security benefits they have earned for as long as they remain unlawfully present. When they are again lawfully present in the United States, or live outside the United States, they would regain eligibility to receive Social Security payments.

Similarly, when those not lawfully present become eligible for Medicare based on age or disability under the Act, they would also automatically be entitled under the Act to premium free Part A benefits and be eligible under the Act to enroll in Part B during a valid enrollment period. Furthermore, if these same individuals were receiving Social Security retirement benefits 4 months prior to turning 65, or in their 21st month of receiving Social Security disability benefits, they would also automatically be enrolled into both Part A and Part B, consistent with section 1837 of the Act and the enrollment process outlined in § 407.17. However, again under the PRWORA limitations previously discussed, payments for Medicare benefits cannot be made on behalf of these individuals as long as they are not lawfully present in the United States. Only upon becoming lawfully present would they become

---

[1] This includes qualified aliens.

eligible to receive the Medicare benefits to which they would otherwise be entitled by paying into Social Security for the requisite number of quarters or paying premiums.

We note that current regulations at §§ 406.28 and 407.27 outline the reasons for loss of premium Part A and Part B enrollment, and do not include the absence of lawful presence or citizenship as a reason for loss of entitlement. Similarly, individuals who are entitled to Part A and enrolled in Part B based on eligibility for Social Security benefits currently may be enrolled in Medicare even if they are not lawfully present in the United States. However, as previously outlined, Medicare benefits are not payable for individuals who are not lawfully present even if such individuals are enrolled in Medicare. Thus, there is a distinction between being "entitled to Part A" or "enrolled in Part B" as provided for in the Act and being eligible to receive the Part A and Part B benefits that ordinarily flow from such entitlement and enrollment.

c. Alignment of MA, Part D, and Cost Plan Eligibility With Fee for Service (FFS) Payment Exclusion Policy

In order to implement 8 U.S.C. 1611 and ensure that benefits are not incorrectly paid for individuals who are present in the United States unlawfully, the Social Security Administration (SSA) established internal policies and procedures to suspend Social Security benefits during periods in which individuals are not lawfully present in the United States. Because Medicare entitlement flows from entitlement to Social Security retirement and disability benefits, Medicare has also implemented this provision through its own payment exclusion process.

Under Medicare's payment exclusion process, data on lawful presence are transmitted to CMS from the Department of Homeland Security (DHS) via regular data exchanges with SSA. Once the data are received by CMS, lawful presence status is noted on an individual's record and is retained in the FFS claims processing systems. As a result, payment of Part A and Part B claims for non-citizens is denied where lawful presence is not established on their record, and continues to be denied until these individuals regain lawful presence status. Although payment is being denied for claims, individuals who are entitled to Medicare per section 226 of the Act, maintain Part A entitlement and remain enrolled in Part B on Medicare's records as long as Part B premiums are paid. Similarly, individuals who are enrolled in

premium Part A or Part B or both under sections 1818 and 1836 of the Act, maintain their enrollment status as long as premiums are paid.

We proposed to align eligibility for enrollment in MA, Part D, and cost plans (and resulting Medicare payments to plans and by plans that would violate PRWORA) with the FFS payment exclusion policy to ensure that Medicare is only paying for benefits and services rendered to individuals who are eligible to receive them. These steps align with the recommendations made by the Office of Inspector General (OIG) in its January 2013 report (A–07–12–01116)[2] regarding the need for CMS to maintain adequate controls to detect and prevent improper payments for Medicare services rendered to beneficiaries who are not lawfully present. Accordingly, we proposed to revise the regulations to establish U.S. citizenship and lawful presence as eligibility requirements for enrollment in MA, Part D, and cost plans. Further, we proposed that individuals who are not lawfully present in the United States would be involuntarily disenrolled from MA, Part D, and cost plans, based on the date on which they lose their lawful presence status. Under our proposal, disenrollments would have been effective the first of the month following the loss of lawful presence status, and the disenrollment process would follow the process currently set forth in the regulations for an individual who is no longer eligible to be enrolled in a plan. Such disenrolled individuals would continue to be considered entitled to Medicare Part A and (if enrolled) enrolled in Part B coverage, provided they continue to pay premiums, as applicable, but as noted payment of FFS claims would be denied based on unlawfully present status.

These proposed regulatory changes were intended to prevent an individual known not to be lawfully present in the United States from enrolling in a Part C, Part D, or cost plan and/or remaining enrolled in such a plan, meaning that payments would not be made to plans or by plans with respect to such individuals during that period. This policy was intended to facilitate compliance with 8 U.S.C. 1611. We proposed the following changes in the regulations to refine the eligibility requirements for the MA and Part D programs and give MA and Part D plans the ability to disenroll individuals who

are not lawfully present in the United States:

• Sections 417.420, 417.422, 422.50, and 423.30 would be amended to add lawful presence or United States citizenship as eligibility criteria for enrollment in a cost, MA, or Part D plan.

• Sections 417.460, 422.74, and 423.44 would be amended to require the involuntary disenrollment of individuals from cost, MA or Part D plans if they lose lawful presence status.

• Conforming changes would be made to §§ 417.2, 422.1, and 423.1 to outline the authority for the aforementioned requirements, from 8 U.S.C. 1611 (Aliens who are not qualified aliens ineligible for federal public benefits).

We received the following comments on our proposals:

*Comment:* Overall we received general support for our proposal. Many commenters requested clarification about who would be responsible for verifying eligibility based on lawful presence. A few of these commenters stated specifically that CMS should verify this aspect of eligibility and that plans should not be expected or permitted to request proof of lawful presence from individuals. A commenter, who did not agree with the proposed change, expressed concern that plans do not have access to data to validate residency/lawful status for Medicare beneficiaries and requested what source would be used for status changes.

*Response:* We appreciate the support expressed by most commenters. We agree that CMS would have to provide lawful presence information to plans. In most cases, the DHS determines citizenship and lawful presence status and that information is passed to SSA. SSA also has mechanisms to address changes in lawful presence status reported by beneficiaries themselves or other third parties. CMS receives the lawful presence information from SSA after it completes its processes related to such changes in status. Then, we will notify the plan if an individual is not eligible for MA, Part D or cost plan enrollment based on lawful presence and the plan must either deny the enrollment request or process the involuntary disenrollment. Plans are not expected to independently determine lawful presence when processing the enrollment request, nor should they request proof of citizenship from the beneficiary or include lawful presence as an element on the enrollment form. We will notify plans of ineligibility due to unlawful presence, through the same administrative mechanisms currently utilized to notify plans about other

---

[2] Medicare Improperly Paid Providers Millions of Dollars for Unlawfully Present Beneficiaries Who Received Services During 2009 Through 2011 (A–07–12–01116), available at *http://oig.hhs.gov/oas/reports/region7/71201116.asp.*

involuntary disenrollments. Additionally, we will be providing more detailed information about the necessary processes and procedures in subregulatory guidance.

*Comment:* A few commenters suggested that we amend the regulations to require a notice for the beneficiaries if they are disenrolled for absence or loss of lawful presence status. Other commenters suggested revisions for the content of a disenrollment notice, specifically suggesting that it contain pertinent information regarding loss of eligibility for enrollment and related impacts to unlawfully present individuals.

*Response:* Under existing processes at SSA, individuals are notified of their potential change to lawful presence status and are provided an opportunity to be heard in advance of any final changes in status in SSA records (that is, before the information is transmitted to us[3]). We believe that this process by SSA provides adequate notification to the beneficiary and, at this time, CMS will not require an additional notice from the plan at the time of disenrollment. This policy on notification from the plan is similar to CMS processes and regulations for other involuntary disenrollments based on information from CMS,[4] but we will take into consideration the possibility of requiring notice in future rulemaking.

In our existing subregulatory guidance, MA, Part D and cost plans are strongly encouraged to send confirmation of disenrollment to members even when it is not required. We agree that a notice regarding the reason for involuntary disenrollment and the impact unlawful presence status has on the payment of Medicare services would reinforce the messages already provided by SSA, and CMS encourages plans to send such notices in this situation. Sending a confirmation of disenrollment would ensure that these beneficiaries understand the restrictions of their Medicare coverage as they transfer to the FFS program. We appreciate the suggested notice language provided by the commenters and will consider it as we establish a model notice in Chapter 2 and Chapter 17-Subchapter D of the Medicare Managed Care Manual and Chapter 3 of the Medicare Prescription Drug Benefit Manual.

Further, for instances where an unlawfully present individual is denied enrollment into a MA, Part D, or cost plan due to ineligibility, we currently require that the plan provide written notice of the denial.[5] We will consider the suggested language as we modify the existing model denial notices in these subregulatory chapters.

*Comment:* Several commenters expressed concern about the effective date of disenrollment if it is based on the date of loss of lawful presence status. Specifically, commenters suggested that involuntary disenrollments be prospective because the plan provides coverage on the reasonable assumption of eligibility to receive services. Further, commenters were concerned about the recoupment of capitation payments as a result of these retroactive disenrollments.

*Response:* In the proposed rule, we proposed that disenrollments would be effective the first of the month following the loss of eligibility to receive federal benefits because this is in line with the statutory requirement that individuals not receive federal benefits when they are not lawfully present in the United States. Operationally, we did not believe it was feasible to maintain enrollment in a Part C, Part D or cost plan for a period for which we would be required to recoup capitations retroactively. Therefore, we proposed a procedural mechanism to default enrollment for such individuals to Original Medicare, where the FFS payment exclusion policy would be applied. Any retroactive disenrollments would under our proposed approach result in recoupment of payments, as supported by existing regulations in §§ 417.464(a)(1), 422.308(f)(1), 423.315(f) and 423.343(a), which require CMS to retroactively adjust plan payments due to changes in enrollment status. At the time we made this proposal, it was consistent with the approach adopted under FFS Medicare, which also made retroactive recoupments in cases in which someone receiving Medicare benefits is determined to not have been eligible for them.

While we believed that this approach was the best way to implement our obligation to comply with PRWORA, in considering comments received on the proposal, we are reconsidering the issue of retroactive disenrollment. First, while our proposal was consistent at the time it was made with FFS policy on retroactive recoupments, we have

revised that policy, based on section 1870 of the Act, and are now denying payments only prospectively. We are also aware of due process arguments that may apply to retroactive recoupment. Because, under our systems, retroactive disenrollment would automatically result in retroactive recoupment, and we are reconsidering the issue of whether such retroactive recoupment in the case of Part C, Part D and cost plans is appropriate, we are not finalizing the retroactive aspect of our proposal on disenrollment, and at this time are finalizing only the prospective period of disenrollment provided for in the proposed rule. We are moving forward with finalizing prospective disenrollment while reconsidering the issue of retroactive enrollment because we believe that prospective disenrollment should be put in place as soon as possible, both to implement the prohibition on benefit payments to individuals who are unlawfully present in the United States, and minimize the period of any potential retroactive recoupment in the event we decide at a future point to proceed with our original proposal to disenroll individuals retroactively.

Therefore, we are finalizing text different from our original proposal to make all disenrollments effective the first of the month following the loss of eligibility to receive federal benefits (that is, retroactively), and instead at this time will revise §§ 417.460(j), 422.74(d)(8), and 423.44(d)(8) to provide that disenrollments are effective the first of the month following notice by CMS that the individual is ineligible. This adjustment will ensure that CMS establishes the required mechanisms to permit prospective enrollment into MA, Part D and cost plans only for individuals eligible to receive Medicare benefits, and prospectively disenroll beneficiaries currently enrolled in plans as of this provision's applicability date.

As discussed in the proposed rule, the OIG noted in a January 2013 report that CMS needed to increase efforts to detect and prevent improper payments for Medicare services rendered to unlawfully present beneficiaries. In a subsequent report published in October 2013[6], the OIG specifically recommended that CMS develop and implement controls to ensure that Medicare does not pay for prescription drugs for unlawfully present beneficiaries and that CMS do so by

---

[3] Social Security Administration Program Operations Manual System (POMS) RS 00204.010 Lawful Presence Payment Provisions and RS 00204.080 Postentitlement Suspension—Alien is no Longer Lawfully Present.

[4] Notices are required from the plans in cases of certain disenrollments. See 42 CFR.417.430, 422.74(c), and 423.44(c).

[5] Notices are required from the plans in cases of enrollment denials. See 42 CFR 417.430(b)(3), 422.50(e)(3), and 423.32(d).

[6] Medicare Improperly Paid Providers Millions of Dollars for Prescription Drugs Provided to Unlawfully Present Beneficiaries During 2009 Through 2011 (A–07–12–006038) (*http:// oig.hhs.gov/oas/reports/region7/71206038.pdf*).

preventing enrollment of unlawfully present beneficiaries, disenrolling any currently enrolled unlawfully present beneficiaries, and automatically rejecting PDE records submitted by sponsors for prescription drugs provided to this population. We believe that prospective disenrollments address these recommendations, and serve as an initial step in ensuring that payment is made for only individuals eligible to receive services. As we move forward with implementation, we will carefully consider enrollment retroactivity and resulting recoupments, and if determined appropriate, propose changes or additional regulations through future rulemaking.

Lastly, we believe it is important to note while CMS is dependent upon the data received by the DHS through SSA, we ensure that the data are passed to the plans within 24 hours of receipt via the Daily Transaction Reply Report. In addition, we will work with these agencies to explore options for receiving these data in the most efficient and timely means possible.

*Comment:* A few commenters suggested that beneficiaries who are involuntarily disenrolled due to unlawful presence should be entitled to appeal their disenrollment.

*Response:* We thank these commenters for their suggestion to ensure that affected individuals have the opportunity to appeal the reason for their disenrollment from their plan. Currently, there is no right of appeal associated with MA, Part D or cost plans eligibility or enrollment, because enrollment in such plans is voluntary and involuntary disenrollments are not considered initial determinations as outlined in § 405.924(a). We reiterate that individuals disenrolled from MA, cost or Part D plans are defaulted to coverage under FFS Medicare unless Parts A and B entitlement and enrollment ends under 42 CFR part 406, subpart B and §§ 406.28 and 407.27. However, individuals who are subject to involuntary disenrollment from these plans due to lawful presence status are provided with due process prior to any change in their status by SSA and exchange of any data to CMS and loss of MA, Part D, or cost coverage (or denial of claims for an individual enrolled in the FFS program).

These individuals are provided with advance notification in writing of the possible status change and an opportunity to respond or submit the necessary documentation to maintain a lawful presence status under existing

SSA processes.[7] Following a status change to lawful presence status by SSA, individuals are also provided an opportunity to appeal the determination as outlined in 20 CFR 404.902. SSA has existing processes to accept and review evidence from individuals who believe that they are lawfully present and to update SSA's records. These individuals, based on the date of regaining lawful presence status, would then have the opportunity to re-enroll and, in certain cases of government error, be reinstated into their former plans. As we prepare for implementation of this rule, we intend to consider these issues carefully to ensure beneficiaries are notified of the consequences to Medicare coverage that flow from changes in lawful presence status.

*Comment:* A few commenters requested that CMS put in place a special enrollment period (SEP) for individuals who are disenrolled from their MA or Part D plan based on unlawful presence and then later regain lawful presence status and wish to re-enroll in a Part D or MA plan. In addition, commenters requested that if an individual is involuntarily disenrolled from a Part D plan due to unlawful presence, and that individual later regains lawful presence status, the individual should not be subject to a late enrollment penalty (LEP) for the period of time they did not have Part D (or other creditable) coverage.

*Response:* We appreciate the concern expressed by the commenters about ensuring access to Medicare coverage and limiting financial consequences after a beneficiary gains, or regains, lawful presence status. Medicare beneficiaries may incur an LEP for Part D if there is a continuous period of 63 days or more at any time after the end of the individual's Part D initial enrollment period (IEP) during which they were eligible for, but did not enroll in, a Medicare Part D plan and were not covered under any creditable prescription drug coverage. If an individual is disenrolled from a Part D plan because of loss of lawful presence status, this is not considered a break in creditable prescription drug coverage because the individual is not eligible for Part D benefits during this time. Therefore, an LEP would not apply for that period of time. If an individual regains lawful presence status and, as a result, also regains Part C and/or Part D

eligibility, the individual does not get a new IEP, but we acknowledge that an SEP is warranted to allow these individuals to enroll in an MA or Part D plan, including a cost plan's optional supplemental Part D benefit, under §§ 422.62(b)(4) and 423.36(c)(8)(ii) if the individual is not otherwise eligible for an SEP. The change in lawful presence status of an individual necessary to trigger a change in eligibility under these rules is extraordinary enough to justify the provision of a SEP under the existing authority of §§ 422.62(b)(4) and 423.36(c)(8)(ii), even without the additional concern that late enrollment penalties could be incurred by beneficiaries who are not able to enroll following their regained eligibility for Part D coverage. The parameters of this SEP will be outlined in subregulatory guidance. However, we note that in this scenario if the newly eligible individual does not take advantage of the SEP to enroll in a plan providing Part D coverage and has no other creditable prescription drug coverage, the individual may be subject to an LEP for any future Part D enrollment.

*Comment:* A few commenters provided feedback regarding the proposed use of the term "qualified alien" in the proposed text at §§ 417.422, 417.460, 422.50, 423.1, 423.3, and 423.44. Commenters suggested changing it to more accurately reflect the lawful presence eligibility requirements for Medicare benefits outlined in 8 CFR 1.3 so that we are not restricting eligibility to only qualified noncitizens to enroll in or maintain their benefits. The broader term "lawfully present" for this purpose includes "qualified aliens" as well as several other categories of non-citizens, whereas the proposed terminology only included "qualified aliens" which is one of the subcategories included in those lawfully present.

*Response:* We agree with the concern raised by commenters and are finalizing the regulatory language at §§ 417.422(h), 417.460(b)(2)(iv), 417.460(j), 422.50(a)(7), 422.74(b)(2)(v), 422.74(d)(8), 423.1(a)(3), 423.30(a)(1)(iii), 423.44(b)(2)(iv), and 423.44(d)(8) without references to qualified aliens; the final regulatory language encompasses all individuals who are lawfully present consistent with 8 CFR 1.3.

After consideration of the public comments received, we are finalizing the policies and regulations text as proposed, with the following exceptions:

• At §§ 417.422, 417.460, 422.50, 423.1, 423.3 and 423.44, we are deleting the term "qualified alien."

---

[7] Social Security Administration, Policy and Operations Manual System (POMS): RS 00204.010. Lawful Presence Payment Provisions, GN 03001.005 Notice Requirements for Title II Due Process Actions, and GN 03001.015 Notices Required Before And After Taking a Title II Adverse Action.

• At §§ 417.460(j), 422.74(d)(8), and 423.44(d)(8), we are modifying the effective date of the involuntary disenrollment to be the first of the month following notification by CMS.

• At § 417.460, we are redesignating paragraph (b)(2)(iv) as paragraph (b)(2)(v) and finalizing the provision establishing a lack of lawful presence as a basis for disenrollment from a cost plan at paragraph (b)(2)(iv).

3. Part D Notice of Changes (§ 423.128(g))

Section 1860D–4(a) of the Act requires Part D sponsors to disclose to beneficiaries information about their Part D drug plans in standardized form. The Act further directs Part D sponsors to include, as appropriate, information that MA organizations must disclose under section 1852(c)(1) of the Act, which includes a detailed description of benefits. (In guidance, we refer to the document containing this information and delivered to beneficiaries as the Evidence of Coverage (EOC).) To make informed decisions, enrollees need to understand how their benefits, including premiums and cost sharing, would change from one year to the next, should they reenroll in the same plan. (In guidance, we refer to the documents containing this information and delivered to beneficiaries as the Annual Notice of Change (ANOC).) Enrollees also need to be aware of changes that may take place during the course of the year as well. Part D regulations currently do not include language found in the Part C regulations at § 422.111(d) requiring notice of changes to the plan to be provided to CMS for review pursuant to procedures for marketing material review and to all enrollees at least 15 days prior to the annual coordinated election period. Given that guidance applicable to both programs discusses notice of changes, we proposed to require, for Part D, delivery of an ANOC.

Specifically, we proposed to adopt in Part D, with modifications, the language contained in § 422.111(d). As is the case with the MA regulation, proposed § 423.128(g) would require that Part D sponsors submit their changes to us under the procedures contained in subpart V of part 423, and, for those changes taking effect on January 1, provide a notice of changes to all enrollees 15 days before the beginning of the annual election period. While part 422 requires a minimum of 30 days notice before the effective date for all other changes, we proposed at § 423.128(g)(3) that Part D sponsors remain subject to all other notice requirements specified elsewhere in the

Part D regulations. Our proposal reflected a programmatic difference between Parts C and D: Under Part D it is not unusual for access to drugs listed on a plan's formulary to change during the course of a year. Changes can include changes to formulary status, tier placement, and utilization management or other restrictions. It is vital that beneficiaries currently taking a drug receive timely notice before such changes take place in order that they can decide whether to, for instance, change drugs or request an exception to cover the drug. Accordingly, our regulations currently specify when sponsors must provide notice of these kinds of changes. Our proposal to require the delivery of an ANOC was not intended to disrupt or change those existing notice requirements.

In the proposed rule, we also took the opportunity to comment on the particular importance for Part D sponsors to provide notice in the ANOC of any changes they are making that will affect the amount of cost sharing that enrollees must pay for each drug belonging to a specific tier. As has been articulated in guidance for several years, we expect that sponsors will provide notice of such changes to all enrollees, including enrollees moved to a consolidated plan. Generally, sponsors compare information such as cost sharing for the same plan from one year to the next in the ANOC. However, comparing information for the same plan would not benefit individuals moved from one plan to another. For instance, when a sponsor crosswalks members from a non-renewing plan to a consolidated renewal plan from one year to the next, cost sharing may change at the drug-tier level. An enrollee who previously had zero cost sharing for all covered Part D drugs within the preferred generic tier may find that the consolidated plan now requires copays for drugs in that tier depending on how many months' supplies he or she orders, and whether he or she obtains those drugs at a retail level pharmacy or through mail order. We expect that enrollees will receive ANOCs that clearly compare the non-renewed and consolidated plans' copayments or coinsurance for all drugs within each tier.

We received the following comments on this proposal and our response follows:

*Comment:* Commenters supported this proposal for informing beneficiaries about their coverage options. Several pointed out that it was important and appropriate for CMS to communicate cost-sharing changes through the Part D ANOC in addition to formulary

information. One commenter urged us to perform ongoing monitoring of formulary changes including cost sharing to ensure they are justified and appropriately communicated to beneficiaries.

*Response:* We thank the commenters for the support. While we appreciate the concerns about monitoring, we did not propose any changes with respect to monitoring of formulary changes, and we decline to address that issue in this final rule.

*Comment:* Several commenters observed that, while many Part D sponsors already provide this annual notice under CMS guidance, they thought it important that this requirement be made explicit through rulemaking. In contrast, a commenter noted that developing a Part D ANOC was not necessary because of information provided through other material. Another commenter suggested that, if possible, Part D information should be incorporated into the Part C ANOC to avoid the potential for confusion, missing information, and duplicate costs.

*Response:* We thank the commenters for the support and can confirm that our goal in revising § 423.128(g) is to codify existing guidance. Our existing model ANOC includes sections on both Parts C and D, and CMS produces nine standardized model ANOCs and EOCs for all plan types.

*Comment:* A commenter requested that CMS confirm that this provision would merely codify existing guidance and would not necessitate any changes in practice for Part D sponsors that already deliver ANOCs that address plan changes consistent with existing CMS guidance.

*Response:* Section 423.128(g) will not affect current practice for Part D sponsors that that already deliver ANOCs consistent with our model notices.

*Comment:* A few commenters pointed out that finalizing this revision would add costs due to increased printing and administration requirements, with one commenter noting premiums could possibly increase.

*Response:* We disagree. Because we did not propose here to change existing practices, but rather only to codify existing guidance, we do not believe the revision to § 423.128(g) will increase costs.

*Comment:* A commenter suggested that MA organizations and Part D sponsors be required to share ANOCs with LTC providers in plan networks to enable them to better coordinate and support the beneficiaries in making informed decisions when their health

NJAPP0498

conditions limit their ability to effectively communicate about their coverage. Another commenter suggested that we add language to the Part D ANOC advising beneficiaries for the future that it was important to review the new contract year formulary.

*Response:* We appreciate these suggestions and will take them into consideration for the future for our guidance on the model notices. However we decline to accept the commenter's suggestion to add this to the regulation text because, as previously noted, our proposal was intended to codify existing guidance.

After review of the public comments received, we are finalizing this provision as proposed without modification.

4. Business Continuity for MA Organizations and Part D Sponsors (§ 422.504(o) and § 423.505(p))

A variety of events ranging from power outages to disasters and warnings of disasters can disrupt normal business operations, and when these events occur it is important that MA organizations and Part D sponsors have a plan to ensure beneficiary access to health care services and drugs. Sections 1852(d) and 1860D–4(b) of the Act, respectively applicable to Parts C and D, establish access to services and covered Part D drugs as a core beneficiary protection. After Hurricane Sandy it became apparent that a few entities, particularly those with operational centers and/or information technology (IT) resources physically located in the affected areas, did not have consistent continuity plans or back-up systems and processes to ensure ongoing coordinated deployment of critical staff to alternate locations.

Sections 1857(e)(1) and 1860D–12(b)(3)(D) of the Act authorize the Secretary to adopt additional contract terms for, respectively, MA organizations and Part D sponsors, including section 1876 cost contracts and Programs of the All-Inclusive Care for the Elderly (PACE) organizations that provide qualified prescription drug coverage, that are not inconsistent with Parts C and D, respectively, of Title XVIII of the Act, when the Secretary finds it necessary and appropriate. While a limited number of beneficiaries were affected by problems on the part of a small number of entities as a result of Hurricane Sandy, we have a goal of consistent disaster response for plans within the scope of our proposal. Therefore, we proposed that all MA organizations and Part D sponsors limit the impact on beneficiaries of unavoidable disruptions and establish a plan to ensure rapid restoration of operations. The scope of our proposal included section 1876 cost contract and PACE organizations that provide qualified prescription drug coverage under Part D. We also proposed to add contract provisions to require that MA organizations and Part D sponsors develop and maintain business continuity plans in order to better anticipate the types of disruptions that could occur and implement policies and procedures to reduce interference with business operations. Our proposal was based on a belief that such planning is appropriate and necessary to better ensure that Medicare beneficiaries have access to the care and coverage contemplated by the statute.

The proposed provisions, in §§ 422.504(o)(1) and 423.505(p)(1), would require that every MA organization and Part D sponsor develop, maintain, and implement a business continuity plan that meets certain minimum standards. In §§ 422.504(o)(1)(i) and 423.505(p)(1)(i), we proposed that the business continuity plan assess risks posed to critical business operations by disasters and other disruptions to business as usual; in the preamble, we clarified that our proposal would apply regardless whether the risks, disasters or disruptions are natural, human, or environmental. In paragraph (1)(ii) of §§ 422.504(o) and 423.505(p), we proposed to require MA organizations and Part D sponsors to mitigate those risks through a variety of strategies, at a minimum by: (1) Identifying events (triggers) that would activate the business continuity plan; (2) developing contingency plans to maintain the availability and, as applicable, the confidentiality of hard copy and electronic essential records, including a disaster recovery plan for IT and beneficiary communication systems; (3) establishing a chain of command, which would better ensure that employees know the rules of succession; (4) creating a communications plan that includes emergency capabilities and means to communicate with employees and third parties; (5) establishing procedures to address management of space and transfer of employee functions; and (6) establishing a restoration plan with procedures to transition back to normal operations. Finally, we also proposed, in §§ 422.504(o)(1)(ii)(G) and 423.505(p)(1)(ii)(G), that the business continuity plan comply with all applicable federal, state, and local laws. In light of the nature of the records an MA organization or Part D sponsor would have in its possession, we proposed to emphasize continuing compliance with the contingency plan requirements of the Health Insurance Portability and Accountability Act of 1996 (HIPAA) Security Rule (45 CFR parts 160 and 164, subparts A and C) by including a cross-reference to these requirements in paragraph (1)(ii)(B)(2) of each proposed regulation. These areas of responsibility are essential to continuing the business operations that allow beneficiaries to access health care services and covered Part D drugs.

To better ensure that a business continuity plan works as a practical matter, we next proposed in §§ 422.504(o)(1)(iii) and (iv) and 423.505(p)(1)(iii) and (iv) to require that on an annual basis, each MA organization and Part D sponsor test and revise the plan as necessary, and train employees on their responsibilities under the plan. Proposed §§ 422.504(o)(1)(v) and 423.505(p)(1)(v) would require that MA organizations and Part D sponsors keep records of their business continuity plans that would be available to CMS upon request.

We stated our belief that the broad list of areas that we proposed to cover as part of business continuity plans were not new to MA organizations and Part D sponsors. We stated these topics typically appear in standard business continuity plans and that we also were building on some requirements that already existed under federal and state laws. For instance, with respect to electronic protected health information, health plans have long had to comply with the contingency plan requirements found in the HIPAA Security Rule. We indicated our goal was to provide a list broad enough to align with the business contingency plans that we believed most, if not the vast majority, of MA organizations and Part D sponsors already had in place.

In contrast to the aforementioned list of broad content requirements, we stated that the need to protect beneficiary access required a prescriptive approach for some functions. In proposed §§ 422.504(o)(2) and 423.505(p)(2), as part of the proposal that essential functions must be restored within 24 hours of failure (whether due to disaster, emergency, or other disruption), we identified what we believed to be the minimum essential functions for both MA and Part D plans: Benefit authorization, if authorization requirements have not been waived; claims adjudication and processing; an exceptions and appeals process; and call center operations. We stated that given the mandate of the Act to ensure beneficiary access to health care and

covered Part D drugs and the inability of many beneficiaries to pay for services or drugs without the Medicare benefit, we believed that the operations listed in the proposed regulations were the most essential operations because they directly supported the provision of Part C and D benefits. We stated that they ensured immediate electronic communication on the availability and extent of Part C and D benefits and also provided support that makes it more likely that Medicare benefits will be appropriately and timely provided (for example, by providing telephone assistance to beneficiaries with questions on how to obtain benefits and maintaining a forum in which beneficiaries can challenge benefit denials). We observed that without real time provision of Medicare benefits, beneficiaries might not pay for the entire cost of the services or drugs and therefore go without necessary treatment.

We also proposed a list of the operations that we believed were essential operations that had to be restored in a rapid time frame. We intended our proposed deadline of the proposed 24 hours to be the outside limit and at that time articulated an expectation that MA organizations and Part D sponsors restore operation of essential functions as soon as possible but not later than 24 hours after they fail or otherwise stop functioning as usual. We stated the clock would begin running in cases of total failure (for example, a computer or telecommunications system crashes or stops working after disruption of the power supply) and also when significant problems occur (for example, a central database is corrupted).

We stated that the need to ensure correct claims adjudication and benefit administration of health care services and drugs is no less acute during disasters or other emergencies, and that such disruptions in one part of the country might disable MA organization and Part D sponsor systems that affect enrollees in other regions. We noted that beneficiaries in those unaffected areas who are denied health care or drug benefits (that is, access to drugs or reimbursement for claims paid out of pocket) before the disruption took place should not be denied the right to immediately challenge those denials or to learn timely the resolution of earlier challenges. As proposed, §§ 422.504(o)(2)(i) and 423.505(p)(2)(i) identified benefit authorization (if not waived) and claim adjudication and processing as essential functions which had to be operational within 24 hours. Our proposal required restoration of

those operations for services rendered at a hospital, clinic, provider office, or at the point of sale for Part D covered drugs. We also stated in the proposed rule that this function was essential for both MA and Part D plans.

In addition, we proposed standards specific to Part D sponsors in § 423.505(p)(2)(ii) and (iii) to ensure that a beneficiary who presents at a pharmacy with an appropriate prescription for a covered Part D drug during a disruption would be more likely to receive the drug at the point of sale. The first three prongs under proposed § 423.505(p)(2) classified as essential the following functions: (i) Authorization, adjudication, and processing of pharmacy claims at the point of sale; (ii) administration and tracking of enrollee's drug benefits in real time, including automated coordination of benefits with other payers; and (iii) provision of pharmacy technical assistance. We noted these essential tasks entail numerous subfunctions. For instance, we stated that Part D sponsors would need to restore within the 24 hour return to operations (RTO) all computer and other systems that meet all privacy and security requirements in order to communicate to pharmacies information about topics including: coverage under Part D and the specific plan; cost-sharing and deductibles; any restrictions such as prior authorization, step therapy, or quantity limit edits; and coordination of benefits from other insurers and any low income subsidies. Additionally, we noted that the sponsor would need to undertake a concurrent drug utilization review (DUR) to address, for instance, safety issues, as well as restore its pharmacy help desk to provide prompt answers to any questions pharmacies might have. (For more detail on some of these functions and sub-functions, as related to Part D, please see section III. A.10, "Requirement for Applicants or their Contracted First Tier, Downstream, or Related Entities to Have Experience in the Part D Program Providing Key Part D Functions" of the May 23, 2014 final rule (79 FR 29867)).

Proposed §§ 422.504(o)(2)(ii) and 423.505(p)(2)(iv) each classified as an essential operation an enrollee exceptions and appeals process including coverage determinations. Under these proposed rules we specified that, within 24 hours of failure, MA organizations and Part D sponsors would need to restore all IT and workforce support necessary to maintain the "safety net" that ensures beneficiaries the rights to appeal or to seek a formulary exception.

Finally, for both MA organizations and Part D sponsors, we proposed that the operation of the call center be an essential function which must be restored within 24 hours. We stated that by classifying operation of the call center as essential, proposed §§ 422.504(o)(2)(iii) and 423.505(p)(2)(v) would ensure that beneficiaries could receive the information necessary to find out where they need to go to access benefits and learn about any special rules that might apply (for example, whether pre-authorization requirements are waived or beneficiaries can obtain benefits at out-of-network providers or pharmacies). We stated that enabling a beneficiary who has just been denied Part D coverage at his or her usual pharmacy to call immediately and speak to a customer service representative while still standing in that pharmacy could ensure that he or she obtained drugs appropriately covered by his or her Part D plan before returning home or moving to a safer area.

Furthermore, in the proposed rule we stated that because it might be difficult during a disaster to get to a provider's office or a pharmacy, we believed it was important that benefit authorization, claims adjudication, and call center operations be restored within 24 hours after failure. While our proposed provisions required both MA organizations and Part D sponsors to coordinate their workforce, facilities, and IT and other systems support to meet a 24 hour RTO, in the preamble to the proposed rule we noted our belief that the vast majority of MA organizations and Part D sponsors already met, or would be able to meet, this requirement with their current resources, based on our knowledge of the industry and as evidenced by the lack of widespread problems with MA organization and Part D operations after recent natural disasters in different parts of the country. We observed that MA organizations and Part D sponsors would not be required to take any prescribed specific actions (for example, there was no requirement for redundant systems located at certain distances apart) to meet these standards. Rather, we stated that the proposed 24-hour RTO would allow MA organizations and Part D sponsors the flexibility to continue to seek their own disaster preparedness solutions (for instance, vendor sites or functions spread across facilities).

We stated that our goal in proposing a contractual requirement for business continuity plans was to better ensure beneficiary access to health care services and Part D drugs during disasters and other interruptions to

NJAPP0500

7926   Federal Register / Vol. 80, No. 29 / Thursday, February 12, 2015 / Rules and Regulations

regular business operations, and we viewed prior planning as essential to achieving this goal. We specifically solicited comments regarding which functions should be identified as essential operations and the 24-hour timeframe for RTO and stated that we would appreciate any information unique to the role of MA organizations and Part D sponsors.

We received the following comments on these proposals and our response follows:

*Comment:* Some commenters strongly supported the proposed provision and noted that it was absolutely critical that MA organizations develop and test business continuity plans to ensure that beneficiary needs are met and commended CMS for its commitment to ensure beneficiary access to Medicare benefits. A number of commenters specifically approved that part of the proposed regulation that set forth minimum standards. Additionally, several commenters, including some who did not support the specific requirements of the proposed provision, agreed that there was a need for "robust" business continuity plans.

*Response:* We thank those commenters who support the proposal in its entirety or approved the general outline of minimum requirements, as well as those who recognized there is a need for MA organizations and Part D sponsors to have business continuity plans.

*Comment:* Noting that CMS acknowledged in the preamble there were relatively few problems in the past, some commenters stated that industry practices were adequate and questioned the need for detailed provisions that classified certain functions as essential which had to be restored within a 24-hour RTO deadline. A few commenters pointed to the fact, also acknowledged by CMS in the preamble, that the requirements overlapped with other existing federal, state, and local requirements such as the HIPAA Security Rule and stated that they saw no need for an additional layer of regulation. In contrast, another commenter stated that developing a business continuity plan should not be overly burdensome because the HIPAA Security Rule already requires development of such a plan.

*Response:* We appreciate the fact that, as far as we are aware, only a limited number of beneficiaries experienced problems as the result of inadequate continuity planning in the wake of Hurricane Sandy. However, there were some beneficiaries who were unable to access benefits, and contingency planning might have prevented some of

those problems. Having a business continuity plan to prepare for business disruptions is an established business practice; the fact that most MA organizations and Part D sponsors successfully handled the disaster does not excuse those entities that did not.

We do not believe that requiring a business continuity plan is imposing an unnecessary level of regulation. However, we would like to clarify that HIPAA requirements are distinct from our business continuity provision. As we noted previously, with respect to electronic protected health information, health plans have long had to comply with the contingency plan requirements found in the HIPAA Security Rule. Referencing this rule created no additional burden.

*Comment:* Commenters stated that the regulation was significantly more detailed than necessary. While some commenters pointed to concerns regarding paragraph (1) of §§ 422.504(o) and 423.505(p) which lists basic minimum requirements (addressed later in this section), most commenters noted concern with paragraph (2) of §§ 422.504(o) and 423.505(p) which identified as essential specific functions and required that MA organizations and Part D sponsors restore them within 24 hours of failure or loss of function.

• The majority of commenters opposed the requirement that MA organizations and Part D sponsors restore essential functions within 24 hours, with several stating this was not feasible. Many commenters noted that because catastrophes are by their nature hard to predict, out of the control of MA organizations and Part D sponsors, and result in major disruptions that have the potential to last for weeks (for instance, power outages), a 24-hour RTO deadline would hamper the flexibility of MA organizations and Part D sponsors to prioritize. A commenter suggested that we institute a "force majeure" clause to provide relief for causes beyond the control of MA organizations and Part D.

• Commenters indicated that they generally agreed with CMS that the emphasis should be on quickly getting care to those beneficiaries who need it, and there was some consensus that providing drugs and services at point-of-sale (POS) should remain an essential function. Several commenters observed that, consistent with industry standards, Part D sponsors were generally able to restore the systems necessary to allow beneficiaries to obtain drugs within approximately 24 hours. For instance, a commenter identified benefit authorization, claims adjudication, and pharmacy services as higher priorities. Some commenters specifically

identified call center services as time-sensitive functions requiring a 24-hour recovery.

• However, there was no clear consensus on the specific functions that should be considered essential or even how to prioritize among all of them. For instance, a commenter noted normal appeals would fall into a longer category than 24 hours recovery, but that expedited appeals might possibly fall within the 24 hour time line. Several commenters suggested that different functions would require different RTO time frames. Several commenters mentioned a 72-hour timeframe, with one noting it restored functions less critical for health and safety within 72, rather than 24, hours.

• In evaluating essential functions, a number of commenters distinguished between the Part C and D programs. Commenters observed, for instance, that provider payments are not a 24-hour critical function for MA plans since payment is allowed to be made within 30 days and that in a disaster or emergency MA organizations should not be required to prioritize claims processing for services already rendered. In contrast, a few commenters agreed that the 24-hour restoration requirement could be applied to Part D point-of-sale claims that require immediate adjudication.

*Response:* These commenters persuaded us that we need to build more flexibility into our business continuity plan requirements for RTO for essential functions and we are accordingly finalizing the regulation with changes from our proposal. In paragraph (2) of §§ 422.504(o) and 423.505(p), we are providing that MA organizations and Part D sponsors must plan to restore essential functions within 72, rather than 24, hours after any one of the essential functions fail or otherwise stop functioning as usual. As discussed in more detail later in this section, we also finalize regulation text to clarify that we require MA organizations and sponsors to "plan to" restore essential functions within the 72-hour time period, rather than guarantee complete restoration within the time frame. Given the lack of a clear consensus on how to prioritize all essential functions, we believe that this will provide MA organizations and Part D sponsors with the flexibility the commenters advocated, and still address our concerns about planning to better ensure beneficiary access to the Medicare benefit.

However, we underscore that although we are finalizing a more flexible regulatory mandate, we expect that Part D sponsors will plan for a 24-

hour RTO deadline for POS transactions. We are concerned that beneficiaries who are not able to access their Part D drug coverage may in fact suffer adverse health effects. Our decision not to explicitly require a plan for a 24-hour restoration for POS drug transactions is informed by the fact that commenters suggested that a 24-hour RTO for POS transactions is an industry standard already generally met, and that relatively few problems were reported in the aftermath of recent disasters. We want to ensure that that track record not only continues but improves. We will continue to closely monitor the timing of POS transaction in the aftermath of disasters, emergencies, and other disruptions and take any necessary actions. We also will revisit the regulation if necessary.

We also agreed with commenters that there are distinctions between the Part C and D programs relative to identifying what services are of the highest priority for speedy restoration. For instance, beneficiaries need to know whether they have Part D Medicare coverage at the POS because usually they rely on the benefit to obtain prescription drugs. For most beneficiaries, such claim denials may mean they leave pharmacies without medications or pay out-of-pocket for costs that are their plans' responsibility. In contrast, this is often not the case for Part C health care services. Provision of Part C services is not so closely tied to plan authorizations and a provider may not bill the MA organization for services until days or weeks after the service is furnished. Thus, because beneficiary health and safety would not be put at risk by failure of Part C claims processing and appeals processes, we agree with the commenters that those systems are not essential functions to which the 72-hour timeframe would apply. Furthermore, as finalized in section II.E.9. of this final rule (MA Organization Responsibilities in Disasters and Emergencies (§ 422.100)), beneficiary access to health care services is protected in the more limited circumstances of disasters and public health emergencies and we believe that provision, in conjunction with § 422.504(o)(2), ensures, to the extent possible, that beneficiaries enrolled in MA organizations will have continued access to needed health care services when there are disruptions to normal business operations.

Accordingly we are finalizing § 422.504(o)(2) to define as essential services, for Part C purposes, benefit authorization (if not waived) for services to be immediately furnished at a hospital, clinic, provider office, or other

place of service instead of the broader requirement that was proposed. This final rule text would include benefit authorization to the extent that members and providers contact the MA organization to request such authorizations even when the MA organization has waived that requirement.

Similarly, we agree that restoration of Part C claims processing and appeals processes are not essential functions in that beneficiary health and safety is not put at risk by a failure of those systems that lasts for longer than 72 hours. We agree with the commenters that in a disaster or emergency, MA organizations should not be required to prioritize claims for services already rendered, but we do not want beneficiaries to lose access to necessary treatment at provider offices. Accordingly, for Part C, we are no longer characterizing "Operation of an enrollee exceptions and appeals process including coverage determinations" as an essential function and are not finalizing that part of our proposal for § 422.504(o)(2).

Lastly, we agree with the commenters that characterized call center services as high priorities for both Part C and Part D plans. In a disaster or other emergency, normal procedures may be disrupted and beneficiaries need to be able to find out how and where they can obtain health care services and drugs by having contact with the plan.

In contrast, for Part D we plan to finalize § 423.505(p)(2) as proposed. We discussed the importance of the elements in more detail in the preamble to the proposed rule, but would like to note here that a beneficiary cannot obtain Part D coverage without benefits authorization, adjudication, and processing of drug claims at the point of sale. A pharmacy's inability to obtain, for instance, coordination of benefits information may affect the beneficiary's ability to obtain the drug as well; and pharmacy technical assistance is critical in case the dispensing pharmacy has questions. We also believe the operation of the enrollee exceptions and appeals process is essential—a beneficiary who has been denied Part D coverage will want to resolve quickly any issues so he or she can obtain the drug timely. Lastly, as previously noted, we believe call center operations are essential.

*Comment:* A commenter suggested there was a need for more detail in addition to that provided in the regulation as to exactly when the 24-hour clock would start and that CMS would, for instance, need to clarify if the clock would begin running when the disaster was declared or when it

occurred. Another commenter suggested the proposed 24-hour RTO should begin running when the incident management team made the determination of action or after a specified amount of time after the disruption was reported.

*Response:* We believe that the language we proposed, namely that the clock will start running "after any of the essential functions fail or otherwise stop functioning as usual," provides adequate direction to MA organizations and Part D sponsors. We are finalizing a clearly defined time period—72 hours (rather than the 24-hour time period proposed)—in which MA organizations and Part D sponsors must plan to restore essential operations. In contrast, we deliberately chose to provide more flexibility to MA organizations and Part D sponsors to determine the precise point at which the 72-hour clock starts running. Essential functions could fail in an infinite variety of ways depending on the circumstances and the systems and supports in place (for instance, claims processing systems might fail in different ways than operation of the exceptions and appeals process). We believe that MA organizations and Part D sponsors are in the best position to both learn about failures or disruptions in usual functions or the facts that might potentially cause them and, in the aftermath of such occurrences, gather as much information as possible internally and from outside sources (such as first-tier, downstream and related entities (FDRs) and local authorities and utilities). We will revisit this regulation if problems arise in the future.

*Comment:* A couple of commenters expressed concern that the requirement that MA organizations and Part D sponsors return functions to "normal" operations would not permit them to utilize temporary alternative workflows that could be more effective than normal business operations in preserving member access to care.

*Response:* We disagree with this conclusion. Our proposal does not require MA organizations and Part D sponsors to return immediately to normal operations but rather, views that as an ultimate goal in an ongoing transition process. Paragraph (1)(ii) of §§ 422.504(o) and 423.505(p) requires MA organizations and Part D sponsors to create a mitigation strategy to "prioritize the order in which to restore [essential and] other functions to normal operations", while paragraph (1)(ii)(F) of §§ 422.504(o) and 423.505(p) requires MA organizations and Part D sponsors to "[e]stablish a restoration plan including procedures to transition to normal operations." Additionally, we do not define "normal operations." In

fact, depending on the severity of a disaster or emergency, "normal operations" certainly might not be operations performed exactly the same as they were before the event. We do not prescribe when or how normal functions are performed; an MA organization or Part D sponsor may achieve a comparable level of performance (for example, in terms of appeals being heard on a timely basis at the same rate as before the disaster) and consider normal operations achieved even if different personnel or offices now perform those functions. We view "normal operations" as an operational level at which MA organizations and Part D sponsors are able to administer the benefit correctly and fulfill contract requirements.

*Comment:* A commenter stated that the proposed provisions were inconsistent with Executive Order 13563 which requires that proposed rules specify performance objectives rather than the behavior or manner of compliance that regulated entities must adopt.

*Response:* We disagree with this commenter. The first part of our proposed provisions simply lists basic areas that business continuity plans must cover. We also view as performance objectives the list of essential functions for which we require MA organizations and Part D sponsors to plan a 72-hour RTO. As revised, the regulation requires that each entity plan to restore those functions that directly support the timely provision of Part C and D Medicare benefits to beneficiaries. We leave it to the MA organizations and Part D sponsors to determine the manner by which they plan to meet these requirements timely after a failure occurs.

*Comment:* Commenters took issue with the costs associated with the proposal. A number of commenters expressed concerns that we were requiring continuous service which would give rise to enormous costs to create systems redundancy, while several commenters were concerned about the cost of testing IT systems on an annual basis.

*Response:* Although we believe the proposed regulation was clear in paragraphs (1)(ii)(B)(*1*) of §§ 422.504(o) and 423.505(p) that we do not expect plans to be able to maintain continuous service under all circumstances, we are revising both of these regulation paragraphs in this final rule to clarify the language that we believe caused this confusion. We are revising the language in the proposed paragraph (1) of §§ 422.504(o) and 423.505(p) to require MA organizations and Part D sponsors

to plan to restore business operations following disruptions, rather than plan to continue business operations during disruptions.

To clarify, we do not expect MA organizations and Part D sponsors to prevent any disruptions on an absolute basis but rather to plan to ensure operations are restored as best they can when business operations fail. It is understood that disasters, emergencies, and other events may cause severe disruptions outside of the control of MA organizations and Part D sponsors; the reason we are requiring business continuity plans is to ensure that MA organizations and Part D sponsors are better equipped to handle those problems when they occur.

Additionally, proposed §§ 422.504(o)(2) and 423.505(p)(2) required that MA organizations and Part D sponsors "restore" essential functions within the specified timeframe, which we believe raises the same concerns expressed by the commenter. We want to make it clear that the actual restoration of essential functions within 72 hours is the goal of the business continuity plan, not a requirement that is to be met in all circumstances. Accordingly, the regulation is being finalized to require that MA organizations and Part D sponsors plan to restore essential functions within the 72-hour time period. The business continuity plan must be designed with this 72-hour period as a deadline.

As to the commenters' concern about the cost of annual IT training, paragraph (1)(iii) of §§ 422.504(o) and 423.505(p) requires MA organizations and Part D sponsors to test and update the business operations continuity plan on at least an annual basis. This broad description does not detail specific kinds of testing but relies upon MA organizations and Part D sponsor discretion to adequately test and update the business continuity plan. This would include determining exactly what must be tested and how such testing must occur.

*Comment:* A commenter expressed concern that the rule would require annual training for "all" employees, which might not be necessary under all conditions.

*Response:* We agree that it is best left to MA organizations and Part D sponsors to determine which employees would most appropriately require annual training on the business continuity plan. We are finalizing the regulations to require annual training of appropriate employees rather than all employees, as well as making changes to make the language applying to both Parts C and D consistent. Specifically, we are removing the phrase "all

employees, including contract staff" from § 422.504(o)(1)(iv) and "all new and existing employees" from § 423.505(p)(1)(iv), and replacing them both with "appropriate employees".

*Comment:* Several commenters suggested that our regulatory impact analysis (RIA) significantly underestimated costs. Concerns were raised about the high cost of creating systems' redundancy to avoid any disruption of processing of claims; one commenter mentioned that the requirement would necessitate spending millions of dollars. Another commenter mentioned that many business continuity plans currently in place for MA organizations and Part D sponsors would not meet requirements such as the restoration of essential functions within 24 hours. A commenter was concerned that the estimate did not take into account resources needed to ascertain the extent of damage and evaluate options.

*Response:* We believe that the modifications, clarifications, and comments discussed previously about this final rule address the vast majority of concerns raised about the RIA. We are also well aware of the major expense of creating redundant computer systems to ensure there is no interruption in claims processing—and repeat that we are not requiring MA organizations and Part D sponsors to absolutely ensure that systems never fail or to build redundant systems to avoid any potential failure. We are requiring that MA organizations and Part D sponsors plan to avoid such system and other failures and, in the event they do occur, to be prepared to recover essential functions within a certain timeframe. We appreciate that while contracting organizations may plan—even plan well—to avoid such disruptions and to recover from them within 72 hours, there may be scenarios in which a return of functionality for essential operations within the timeframe of paragraph (2) of §§ 422.504(o) and 423.505(p) is impossible . We also believe that providing the greater flexibility to plan for a 72-hour, rather than 24-hour, RTO for MA organizations and Part D sponsors should further alleviate concerns about high costs.

In this final rule, we also are revising the regulations to clarify that we require annual training of "appropriate" rather than "all" employees. As noted earlier, our requirement for annual testing of the business continuity plan does not specify exactly what must be tested or how such testing must be conducted. As to the last comment, MA organizations and Part D sponsors need to assess damages and evaluate alternatives

NJAPP0503

regardless of whether they have business continuity plans.

Additionally, we have revised our cost estimates to account for costs of what we believe will be, at most, minimal changes to existing business continuity plans. We base this on: (1) The fact that we believe most MA organizations and Part D sponsors with existing business continuity plans already cover the same broad list of areas we require in this rule; and (2) revisions to our rule that provide flexibility that enables most MA organizations and Part D sponsors to follow the same industry standards commenters suggested they currently follow. (See section IV. Regulatory Impact Statement of this final rule.)

*Comment:* A commenter stated that MA organizations and Part D sponsors could incur potentially very large additional costs to come into compliance with the new requirements which would amount to unexpected expenses that would unfairly count against a plan's administrative expenses on its medical loss ratio (MLR) calculation.

*Response:* Items that count as MLR are outside of the scope of this final rule. However, we note that this final rule will apply to all MA organizations and Part D sponsors and that we believe strongly that planning for the least disruption to operations and better provision of health care and drug benefits during disasters is an important function for insurance companies, and that such work will also benefit the MA organizations and Part D sponsors themselves.

*Comment:* Noting that they are confidential and contain blueprint information on processes and supporting resources, a commenter requested that rather than make business continuity plans available to CMS upon request, that CMS require an in-camera review of certain elements. In contrast, another commenter recommended that CMS review such plans as part of the Medicare Part D application process as well as via regular CMS compliance audits. A third requested whether there would be an audit element that focuses on business continuity plans.

*Response:* We appreciate the commenter's concerns about confidentiality. First, we would like to note that we are not requiring MA organizations and Part D sponsors to submit these business continuity plans and materials as a matter of course or to make such plans publicly available. Furthermore, if we do request these documents, we do not intend to voluntarily disclose them to any parties outside of the government. Under the Freedom of Information Act (FOIA), members of the public may request government records, which may include documents submitted to us. MA organizations and Part D sponsors may seek to protect their information from disclosure under FOIA by claiming FOIA exemption 4 and taking the appropriate steps—including labelling the information in question as "confidential" or "proprietary." Furthermore, redaction of especially sensitive information is sometimes an option, depending on what information CMS needs and the nature of the information the organization seeks to redact. We will consider both compliance and confidentiality needs as we develop application and audit requirements related to this provision.

*Comment:* A commenter requested that CMS require PACE and long term care services and support providers (such as skilled nursing facilities (SNFs) and assisted living residences (ALRs)) to create plans that deal with natural and other disasters.

*Response:* As discussed in this final rule, the requirements in this regulation that are applicable to Part D sponsors also apply to 1876 cost contracts and PACE organizations that provide qualified prescription drug coverage. On December 27, 2013, we proposed regulations on emergency preparedness requirements for Medicare and Medicaid participating providers and suppliers (78 FR 79082). The emergency preparedness requirements of that regulation would apply to PACE organizations in their capacity as providers and, as we noted earlier, the Part D proposed requirements apply to PACE organizations to the extent they function as Part D sponsors.

Both that proposed rule and this finalized Part C and D rule have the same goal of ensuring the least interruption to beneficiary health care and drugs as a result of disasters and emergencies by requiring entities to assess possible risks and lessen their impact through planning. However, this final rule applies to the entities providing coverage of the benefits (MA organizations and Part D sponsors), while the other rule, "Medicare and Medicaid Programs; Emergency Preparedness Requirements for Medicare and Medicaid Participating Providers and Suppliers" would apply to entities directly providing the services. Specifically, this Part C and D rule applies to MA organizations and Part D sponsors to better ensure that beneficiaries enrolled in their plans have access in a timely manner to the Medicare covered items and services, supplemental benefits and prescription drugs. In contrast, the emergency preparedness rule would apply to both the Medicare and Medicaid programs and would require providers and suppliers to be adequately prepared to meet the direct health care needs of patients, residents, clients, and participants during disasters and emergencies.

*Comment:* Commenters expressed concerns that the proposed regulation did not take into account disparate circumstances. A commenter noted that MA organizations and Part D sponsors typically were located in the same area where members experiencing disasters or emergencies were living, while other commenters suggested the requirement would particularly burden smaller entities or entities with less experience that might, for example, need to contract with third parties to meet RTO obligations.

*Response:* We appreciate that different MA organizations and Part D sponsors will face different challenges during disasters and emergencies. However, we drafted broad areas of coverage to provide as much flexibility as possible to different entities. Given that emergencies and disasters are varied and unpredictable, we believe it would not be prudent for CMS to try and create different requirements based on different circumstances. We also believe that most of these concerns about costs and sufficient flexibility have been addressed through revisions or clarification of this proposed regulatory change.

*Comment:* A commenter stated that it was not aware of any reason that there should be different standards for the protection of Medicare beneficiaries during disasters than those generally applicable to the rest of the population.

*Response:* The treatment of individuals who are not Medicare beneficiaries is outside the scope of this regulation. However, we note that we are the steward of the Federal Trust Fund with direct authority over the Medicare program. Disasters, emergencies, and disruptions not only can limit beneficiary access to Medicare benefits, but they pose direct threats to the health of beneficiaries which in turn could create greater needs for health care services and drugs. Our core function is to ensure as best we can that beneficiaries are able to access their Medicare benefits; we believe the requirement that MA organizations and Part D sponsors establish business continuity plans that better enable them to deal with disasters is central to achieving this goal.

NJAPP0504

After consideration of the public comments received, we are finalizing our business continuity proposal with the following modifications as discussed and as follows:

• In §§ 422.504(o)(1) and 423.505(p)(1) we are replacing the phrase "ensure the continuation of business operations during disruptions" with the phrase "ensure the restoration of business operations following disruptions".

• In § 422.504(o)(1)(iv) we are replacing the phrase "all employees, including contract staff" with the phrase "appropriate employees".

• In § 423.505(p)(1)(iv), we are replacing the phrase "all new and existing employees" with the phrase "appropriate employees".

• In §§ 422.504(o)(2) and§ 423.505(p)(2), we are inserting the words "plan to" before the phrase "restore essential functions" in order that it reads "plan to restore essential functions." We are also replacing the number "24" with "72".

• In § 422.504(o)(2)(i), we are replacing the phrase "Benefit authorization, adjudication, and processing of health care claims for services furnished at a hospital, clinic, provider office or other place of service" with "Benefit authorization (if not waived) for services to be immediately furnished at a hospital, clinic, provider office, or other place of service."

• We are removing proposed paragraph (ii) of § 422.504(o)(2) ("Operation of an enrollee exceptions and appeals process including coverage determinations.") and renumbering proposed paragraph (iii).

### 5. Efficient Dispensing in Long Term Care Facilities and Other Changes (§ 423.154)

We proposed changes to the rule requiring efficient dispensing to Medicare Part D enrollees in long term care (LTC) facilities. For background, section 3310 of the Affordable Care Act amended the Act to add a new paragraph (3) to section 1860D–4(c) of the Act. Section 1860D–4(c)(3) of the Act provides that the Secretary shall require Medicare Part D sponsors of prescription drug plans to utilize specific, uniform dispensing techniques, such as weekly, daily or automated dose dispensing, when dispensing covered Part D drugs to enrollees who reside in an LTC facility in order to reduce waste associated with 30-day fills. The section states that the techniques shall be determined by the Secretary in consultation with relevant stakeholders.

After extensive consultation with stakeholders, in the April 15, 2011 **Federal Register**, we published a final rule entitled "Medicare Program; Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs for Contract Year 2012 and Other Changes" ("April 15, 2011 final rule"), which governs the dispensing of prescription drugs in LTC facilities under Part D plans. In accordance with § 423.154, Part D sponsors generally must require their network pharmacies to dispense certain solid oral brand covered Part D drugs in quantities of 14 days or less, unless an exemption applies. As a clarification to the April 15, 2011 final rule, we proposed in the January 2014 proposed rule the following specific changes to the LTC short cycle dispensing requirements:

• Add a prohibition on payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed, and a requirement to ensure that any difference in payment methodology among LTC pharmacies incentivizes more efficient dispensing techniques.

• Eliminate language that has been misinterpreted as requiring the proration of dispensing fees.

• Incorporate an additional waiver for LTC pharmacies using restock and reuse dispensing methodologies under certain conditions.

• Make a technical change to eliminate the requirement that Part D sponsors report on the nature and quantity of unused brand and generic drugs.

After providing a summary of the current LTC short cycle dispensing rule in the proposed rule, we addressed each proposed change in more detail.

#### a. Prohibition on Payment Arrangements That Penalize the Offering and Adoption of More Efficient LTC Dispensing Techniques (§ 423.154)

Our first proposed change was to add a paragraph to § 423.154 prohibiting payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed, and a requirement to ensure that any difference in payment methodology among LTC pharmacies incentivizes more efficient dispensing techniques. Certain dispensing fee payment arrangements, for example, some proration arrangements, penalize the offering and adoption of more efficient LTC dispensing. For instance, if a medication is discontinued before a

month's supply has been dispensed, a pharmacy that dispenses the maximum amount of the medication at a time permitted under § 423.154 (for example, 14 days), collects more in dispensing fees than a pharmacy that utilizes dispensing techniques that result in less than maximum quantities being dispensed at a time. In other words, the least efficient pharmacy collects more in dispensing fees than a more efficient pharmacy.

In the proposed rule, we provided the following example of two pharmacies—one more efficient at dispensing than the other—to illustrate our concern: A monthly $4.00 dispensing fee for a 30-days' supply is prorated, and a medication is discontinued after 21 days. The first pharmacy dispenses 14-days' supply at a time and receives approximately $3.73 in total dispensing fees for a 28-days' supply ($0.1333 × 28), which results in 7 days' worth of medication waste. The second pharmacy dispenses 3-days' supply at a time and receives approximately $2.80 in dispensing fees for a 21-days' supply in total ($0.1333 × 21), which results in no medication waste.

We believe this example is contrary to the Congress' intent in enacting section 3310 of the Affordable Care Act, which was to reduce medication waste. In this example, the second pharmacy's more efficient dispensing techniques results in less medication waste, but the pharmacy itself receives less in dispensing fees than it would if it had dispensed in 14-day increments, which result in more medication waste. This approach creates a perverse incentive for LTC pharmacies to adopt the least efficient dispensing technique, if available, which is to dispense drugs in 14 days supplies. This encourages wasteful dispensing to the Part D program.

Given the clear intent of the Affordable Care Act to reduce wasteful dispensing in the LTC setting, we proposed to prohibit payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by adding a new requirement that would state a Part D sponsor must not, or must require its intermediary contracting organizations not to, penalize long term care facilities' choice of more efficient uniform dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed. We proposed that this requirement would also state that a sponsor or its intermediary contracting organizations must ensure that any difference in payment methodology among LTC pharmacies incentivizes more efficient dispensing techniques.

b. Misinterpretation of Language as Requiring the Proration of Dispensing Fees (§ 423.154)

Our second proposed change to § 423.154 was to eliminate paragraph (e), which we believe has caused confusion. Section 423.154(e) currently states that regardless of the number of incremental dispensing events, the total cost sharing for a Part D drug to which the dispensing requirements under this paragraph (a) apply must be no greater than the total cost sharing that would be imposed for such Part D drug if the requirements under paragraph (a) of this section did not apply. The purpose of this language was to ensure that sponsors did not assess multiple monthly copayments for each incremental dispensing event in LTCs. We believe misinterpretation of paragraph (e) may have prompted some sponsors to prorate dispensing fees in a way that penalizes the offering and adoption of more efficient LTC dispensing techniques, even though the current regulation does not address dispensing fees.

Moreover, effective January 1, 2014, the daily cost-sharing rate requirement in § 423.153(b)(4)(i) applies whenever a prescription is dispensed by a network pharmacy for less than a month's supply, unless the drug is excepted, regardless of the setting in which the drug is dispensed. In other words, the daily cost-sharing rate requirement applies to brand drugs dispensed in LTC facilities to the extent they must be dispensed in supplies less than 30 days under § 423.154, and to generic drugs, to the extent a sponsor voluntarily dispenses generic drugs in LTC facilities in supplies less than a month's supply. Consequently, the requirement of § 423.153(b)(4)(i) makes § 423.154(e) unnecessary, and we believe retaining both provisions could cause further confusion. For these reasons, we proposed to delete § 423.154(e).

c. Additional Waiver for LTC Pharmacies Using Restock and Reuse Dispensing Methodologies Under Certain Conditions (§ 423.154)

Our third proposed change to § 423.154 was to waive the short-cycle dispensing requirements for LTC pharmacies meeting certain conditions. Currently, § 423.154(c) waives the requirements for pharmacies when they dispense brand name Part D drugs to enrollees residing in intermediate care facilities for the mentally retarded and institutes for mental disease, as well as for I/T/U pharmacies. We have learned that some institutional pharmacies maintain custody of medications within

the LTC facilities through operating a closed pharmacy within the facility, and as a result can ensure sufficient quality control over these medications to return all unused medications to stock for reuse that are eligible for return and reuse under applicable law. This has led us to believe there is another category of pharmacies, such as some on site pharmacies in veterans' homes, for which a waiver from the LTC short-cycle dispensing requirement may be appropriate, if they meet certain conditions that demonstrate that applying the 14-day dispensing requirements in these instances would not serve to reduce waste.

In light of this, we proposed to waive the requirements of § 423.154(a) for an LTC pharmacy that exclusively uses the dispensing technique of returning all unused medications to stock that can be restocked under applicable law for reuse and rebating full credit for the ingredient costs of the unused medication to the PDP sponsor. The proposed waiver also would require that for those drugs that cannot be returned for full credit and reuse under applicable law, such as controlled substances, the pharmacy uses a dispensing methodology that results in the delivery of no more than 14 days of a drug at a time. We proposed that the waiver would apply on a uniform basis to all similarly situated LTC pharmacies, but not to a pharmacy organization that is contracted to use this technique at some, but not all, of its pharmacies. Rather, the waiver would apply only to the qualifying pharmacies themselves. We proposed that we would not require the pharmacies to credit back any amount of the dispensing fee when the pharmacies return a drug to stock for reuse, since the level of effort for the pharmacies would not be expected to decrease. We stated that, if anything, the level of effort would be increased, since the pharmacies have to implement the appropriate internal controls for inspection and return to inventory of the unused medication.

We further solicited comments on our proposal that to qualify for the waiver, a pharmacy would have to dispense any drugs that cannot be restocked under applicable law, such as controlled substances, in no greater than 14-day supply increments. Our rationale in proposing this condition to the waiver is that we do not want the waiver to inadvertently result in large quantities of medications being dispensed to Part D enrollees serviced by the pharmacies that would qualify for the waiver because they cannot be restocked under applicable law.

d. Technical Change To Eliminate the Requirement That PDP Sponsors Report on the Nature and Quantity of Unused Brand and Generic Drugs (§ 423.154)

Finally, we proposed to make a technical change to § 423.154(a)(2), which requires Part D sponsors to collect and report information, in a form and manner specified by CMS, on the dispensing methodology used for each dispensing event described by paragraph (a)(1) of this section, as well as on the nature and quantity of unused brand and generic drugs dispensed by the pharmacy to enrollees residing in an LTC facility. This latter reporting requirement is waived for sponsors for drugs dispensed by pharmacies that dispense both brand and generic drugs in no greater than 7-day increments.

In a memorandum titled, "Modifications to the Drug Data Processing System (DDPS) in Relation to Appropriate Dispensing of Prescription Drugs in Long Term Care Facilities," issued by CMS on August 3, 2012, we explained that we planned to use the PDE data in conjunction with other CMS data (such as MDS) to determine the extent to which 14 day or less dispensing to enrollees in LTC facilities reduces the amount of unused drugs in LTC. We did this to lessen the burden on sponsors that would be created by a separate reporting requirement. Therefore, it is no longer necessary to waive the reporting requirement for any Part D sponsor, because Part D sponsors comply with the requirement (in the form and manner we specified in the previously-referenced memorandum) via PDE submission. Thus, we proposed deleting the language in in § 423.154(a)(2) that appeared to require separate reporting, to eliminate any confusion.

We received the following comments on this proposal and our responses follow:

*Comment:* Numerous commenters support the proposal to add a prohibition on payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed, and a requirement to ensure that any difference in payment methodology among long term care pharmacies incentivizes more efficient dispensing. Many of these comments in particular supported CMS' view that there is not a justifiable reason for proration of monthly dispensing fees since the cost of dispensing is not directly related to the quantity dispensed. These commenters asserted that proration of dispensing fees ignored

the clinical oversight and fixed costs for pharmacy professional services for each dispense. These commenters acknowledged that prorated professional fees have resulted in a perverse economic model that encourages pharmacies to dispense the maximum allowable quantity of drugs (for example, 14 days supplies) in each prescription drug event transaction.

Other commenters opposed this proposal, stating that it would increase costs by requiring a full dispensing fee with each dispensing event in an LTC facility, and that since the LTC pharmacies determine dispensing increments, this will incentivize them to select the system that provides the highest number of dispensing fees. These commenters also noted that the Affordable Care Act did not specify a new LTC dispensing fee structure.

A commenter provided an illustrative example of prorated monthly dispensing fees that may not penalize the offering and adoption of more efficient LTC dispensing techniques. Specifically, the example demonstrates how an increased dispensing fee with proration can create appropriate incentives to reduce waste and cost in LTC facilities. The example provided for a $10 base dispensing fee for a 30-day supply for a pharmacy with technology that dispenses in 7-day increments and a $4.00 base dispensing fee for a pharmacy that dispenses in 14-day increments. Under this scenario, the more efficient pharmacy would receive $2.31 for dispensing 7 days of medication ($10/30 = $0.33 × 7) and the less efficient pharmacy would receive $1.82 ($4/30 = $0.13 × 14) for dispensing 14 days of medication. This commenter urged us to allow for any dispensing structure where the daily dispensing fee encourages all pharmacies, regardless of their size or negotiation capabilities, to use the most efficient dispensing technologies.

*Response:* We thank the supportive commenters for their comments. With respect to the commenters that opposed the proposal, we note that the proposal did not require a full monthly dispensing fee with each dispensing event, or any specific dispensing fee or methodology for that matter. The intent of this rule is to prohibit dispensing fees that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed. This rule also adds a requirement to ensure that any difference in payment methodology among long-term care pharmacies incentivizes more efficient dispensing techniques.

With respect to the one commenter that pointed out that certain prorated dispensing fees may not penalize the offering and adoption of more efficient LTC dispensing techniques in certain instances, we take no position at this time on whether specific dispensing fee arrangements would be compliant with this rule. We reiterate that this rule does not require a specific dispensing fee or methodology, but rather, prohibits payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed. In addition, this rule requires that any difference in payment methodology among LTC pharmacies incentivizes more efficient dispensing techniques.

*Comment:* A commenter stated that because its data shows 80 percent of all LTC dispense claims are for generic medications, modifying dispensing fees will not truly affect the use of short-cycle methodology. This commenter requested that CMS provide any research demonstrating the increased utilization of short-cycle fill in dispensing in pharmacies whose dispensing fees did not change to a prorated fee. Alternatively, this commenter requested CMS' observations and supporting data demonstrating that a daily dispensing fee actively discourages pharmacies from short-cycle filling medications.

*Response:* We do not believe the research and data requested are necessary to finalizing this proposal. We believe it is self-evident that proration of the same monthly dispensing fee based on days' supply or quantity dispensed (which results in a type of daily dispensing fee or rate) penalizes more efficient pharmacies relative to less efficient ones—the more efficient pharmacy is reimbursed less per dispense because it dispenses in smaller increments. Moreover, that prorated dispensing fee decreases per dispense the more efficiently the pharmacy dispenses.

*Comment:* A commenter stated that CMS confuses prorated dispensing fees with daily dispensing fees that are not necessarily pro rata adjustments of otherwise applicable dispensing fees.

*Response:* Our prohibition of proration that penalizes more efficient dispensing would apply both to proration of a monthly dispensing fee amount and proration determined by setting a daily rate that is applied to the number of days dispensed. The intent is of our rule is to prohibit payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating

dispensing fees based on days' supply or quantity dispensed, and to require that any difference in payment methodology among LTC pharmacies incentivizes more efficient dispensing techniques.

*Comment:* A commenter stated that PBMs have very little leverage in negotiating cost effective strategies with LTC pharmacies on behalf of Part D sponsors, as the LTC landscape is controlled by three very large LTC pharmacy organizations that make up an estimated 80 percent of the market share, and that in many cases, only one of them is the provider of prescription medications in LTC facilities. This commenter further stated that these LTC pharmacy organizations dictated the contractual requirement to prorate dispensing fees, asserting that their member LTC pharmacies needed compensation for every prescription fill.

*Response:* This rule prohibits payment arrangements that penalize the offering and adoption of more efficient LTC dispensing techniques by prorating dispensing fees based on days' supply or quantity dispensed. For example, this rule prohibits payment arrangements that penalize LTC dispensing techniques of less than 14 days supplies of drugs at a time. This rule also requires that any difference in payment methodology among LTC pharmacies incentivizes more efficient dispensing techniques. For example, this rule requires that differences in payment methodologies among LTC pharmacies incentivize dispensing techniques of less than 14 days supplies of drugs at a time. If the prorated dispensing fees by days' supply or quantity dispensed do not penalize the offering of more efficient dispensing techniques by these LTC pharmacies, and any difference in payment methodology relative to other LTC pharmacies incentivizes more efficient dispensing techniques, then this regulatory provision is not implicated.

*Comment:* Some commenters asserted that our proposal was a violation of the non-interference clause and exceeded our delegated authority.

*Response:* We disagree. Section 1860D–4(c)(3) of the Act provides that the Secretary shall require Medicare Part D sponsors of prescription drug plans to utilize specific, uniform dispensing techniques, such as weekly, daily, or automated dose dispensing, when dispensing covered Part D drugs to enrollees who reside in a LTC facility in order to reduce waste associated with 30-day fills. Thus, the Congress gave the Secretary authority to regulate with respect to reducing waste of covered Part D drugs in LTC facilities. Moreover,

NJAPP0507

this requirement does not dictate any specific dispensing fee amounts or methodologies, but rather prohibits only those dispensing fees that penalize more efficient dispensing and requires that any difference in payment methodology among LTC pharmacies incentivizes more efficient dispensing techniques. For the reasons stated previously, we believe this is consistent with the statutory directive to reduce waste associated with 30-day fills in LTC facilities.

*Comment:* A commenter stated the regulatory text was vague.

*Response:* We disagree. The policy reflected in the preamble and regulatory text is clear—to prohibit the prorated LTC dispensing fees in the Part D market today that are financially penalizing more efficient LTC pharmacies. In addition, we believe the discussion in this preamble, with examples provided, makes clear how sponsors may not penalize more efficient dispensing techniques in LTC facilities by prorating dispensing fees based on days' supply or quantity dispensed and that any difference in payment methodologies among LTC pharmacies must incentivize more efficient dispensing techniques. We have deliberately struck a balance in drafting the regulatory text to be specific enough to accomplish the policy goal without being so specific as to dictate the particular dispensing fee arrangements that are permissible.

*Comment:* A commenter requested whether this new requirement applies to all payments to LTC pharmacies; whether it applies to all prescriptions in LTC facilities or only to those subject to the short-cycle dispensing methodology; and whether a Part D sponsor must prove to each LTC pharmacy how its payment methodology incentivizes more efficient dispensing techniques.

*Response:* The requirement in this final rule applies to payments to pharmacies related to the dispensing of Part D drugs to residents in LTC facilities, including those Part D drugs that are not subject to the short-cycle dispensing requirement. As noted previously, this rule does not address specific negotiations between Part D sponsors and pharmacies.

*Comment:* One commenter stated that the regulatory text was confusing and contained three negatives.

*Response:* We are moving the proposed language to § 423.154(a)(2) and (3) and revising the regulation text. We believe this will make the regulatory text less confusing. However, because we did not propose to waive this requirement with respect to pharmacies when they dispense Part D drugs to

residents of intermediate care facilities for the mentally retarded (ICFs/IID) and institutes for mental disease (IMDs) and for I/T/U pharmacies, we are making conforming changes to § 423.154(c) to make clear that the requirements of paragraph (a)(2) and (3) are not waived for with respect to these pharmacies.

*Comment:* A commenter stated that it was unnecessary for CMS to memorialize the fact that the rule applies to contracting intermediaries in addition to Part D sponsors in the regulatory text.

*Response:* We agree. The reference to "intermediary contracting organizations" in the regulatory text is now unnecessary because we are moving the requirement to § 423.154(a)(2) and (3), as noted just previously.

Based on all the comments received, we are finalizing our proposal with the changes previously described in this section.

*Comment:* Some commenters supported the removal of the language in § 423,154(e) that CMS believes may have been misinterpreted as requiring the proration of dispensing fee. A few commenters opposed this proposal. One of these commenters that opposed this proposal stated that plans did not interpret the provision as requiring the proration of dispensing fees, but rather as permitting it.

*Response:* Based on the comments received, we are finalizing the removal of this language from the current regulatory text. As noted previously, this provision was intended to address cost sharing for short-cycle dispensing in LTC facilities, but the daily cost-sharing rate rule at § 423.153(b)(iv)(i) now addresses cost-sharing when less than a month's supply of a Part D drug is dispensed. Thus, this regulatory text is no longer necessary. Moreover, we believe the comments support our view that the language was confusing.

*Comment:* Several commenters supported CMS' proposal in principle for an additional waiver from the short-cycle dispensing requirements for certain LTC pharmacies that maintain custody of medications by operating a closed pharmacy within the facility, but these commenters expressed concerns about how the waiver would be implemented. Specifically, these commenters pointed out that there is no current transaction standard that accommodates transmitting a net quantity for payment following the acceptance of a returned medication applied against a quantity dispensed for ingredient cost credit, and that use of an existing transaction to accomplish this would violate HIPAA. These

commenters stated that a new HIPAA standard transaction would be required to support a waiver based on return and reuse billing.

*Response:* In the proposed regulation, while we used an industry term of art "restock and reuse," we did not intend to implicate a billing standard that does not exist. This term, as used in the industry, encompasses a billing system that modifies pharmacy claims as unused medications are returned to stock. We are aware of the current limitations of this particular system.

The type of pharmacy that would qualify for the waiver, as we described in the proposed rule, is an institutional, on-site, closed pharmacy, such as a pharmacy in a veteran's home, which maintains custody of medications within the LTC facility, such that all unused medications that are eligible under applicable law are restocked and reused. In other words, such a pharmacy has such quality control over medications in the LTC facility that it does not have to dispense in 14-day supplies or less in order to reduce waste. Such pharmacies may use post-consumption billing, a reverse and rebill system, or some other billing method to only charge a Part D sponsor for the medications that are actually used.

Given the misunderstanding of our proposed additional waiver from the LTC short-cycle dispensing rule, we are not finalizing it at this time. We will consider proposing the waiver again in future rulemaking.

*Comment:* We received no comment on our proposal to delete language in § 423.154(a)(2) to eliminate any confusion about that there is a separate reporting requirement.

*Response:* We are finalizing this deletion, except that we are redesignating the remaining language in (a)(2) as (a)(4) in light of the other changes previously described.

*Comment:* Some commenters requested a delay in the effective date of this requirement until 2016, asserting that the requirement will necessitate significant changes in adjudication and network contracting logic to accommodate the replacement of prorated dispensing fees with standard dispensing fees. One commenter requested clarification of the effective date of this requirement.

*Response:* The effective date of this requirement is January 1, 2016.

## 6. Medicare Coverage Gap Discount Program and Employer Group Waiver Plans (§ 423.2325)

Section 3301 of the Affordable Care Act, codified in section 1860D–43 and 1860D–14A of the Act, established the

Medicare Coverage Gap Discount Program (Discount Program), beginning in 2011. Under the Discount Program, manufacturer discounts are made available to applicable Medicare beneficiaries receiving applicable covered Part D drugs while in the coverage gap. Section 1860D–14A(c)(1)(A)(ii) of the Act requires the manufacturer discount to be provided to beneficiaries at the point-of-sale. Employer Group Waiver Plans (EGWPs) are customized employer-offered plans available exclusively to employer/union health plan Part D eligible retirees and/or their Part D eligible spouse and dependents. Section 423.458(c)(4) requires sponsors offering EGWPs to comply with all Part D requirements unless those requirements have been specifically waived or modified by CMS using our authority under section 1860D–22(b) of the Act. The Affordable Care Act did not exclude EGWP enrollees that otherwise meet the definition of an applicable beneficiary (as defined in § 423.100) from the Discount Program. Therefore, in order for an applicable drug to be covered by EGWPs, it must be covered under a manufacturer agreement, and the manufacturer must pay applicable discounts for applicable beneficiaries as invoiced.

Beginning in 2014, all EGWP benefits beyond the parameters of the defined standard benefit will be treated as non-Medicare Other Health Insurance (OHI) that wraps around Part D. We excluded supplemental coverage offered through EGWPs from the definition of Part D supplemental benefit in § 423.100 in our 2012 rulemaking. However, as discussed in section II.E.14. of this final rule, the change was erroneously not included in the CFR. Therefore, we are making a technical change to rectify that problem. The change with respect to EGWPs was made so that the discount amount could be consistently and reliably determined. This was necessary to ensure that we can determine that the discount is always calculated accurately since we do not collect information on all EGWP retiree benefit arrangements to determine actual supplemental benefits. Not only would collecting such information be impractical, but we also believe instituting a requirement to collect the specific information on all such benefits would be so burdensome as to hinder the design of, the offering of, or the enrollment in employer plans. Consequently, the discount calculation is based upon the Part D Defined Standard benefit for all EGWPs beginning in 2014. While we believed that our justification for excluding any

supplemental benefits offered through EGWPs from Part D benefits clearly indicated that the basic EGWP Part D benefits would be limited to Defined Standard benefit because that is the only way we can determine that the discount is calculated accurately, we took the opportunity to propose this specific requirement in § 423.2325(h)(1) to remove any ambiguity.

*Comment:* Some commenters strongly urged CMS to revise the policy established in our April 2012 rule that considers EGWP plan supplemental benefits to be outside of Part D, and therefore OHI. These commenters stated that treating EGWP benefits as OHI is inconsistent with the statute as it does not, on its face appear to result in direct reductions in beneficiary cost sharing. They state that since many EGWP enrollees do not experience a coverage gap the discounts are not used to offset beneficiary spending in the gap which is the original statutory intent. A few commenters stated that the current policy has led employer groups to migrate from Retiree Drug Subsidy plans to EGWPs which is costly to the taxpayer.

*Response:* We did not propose any changes to our existing policy with respect to EGWP supplemental benefits, and we decline to do so now. For the reasons set forth in our April 2012 rulemaking, we believe our current regulation is consistent with the statute. The purpose of this final rule is solely to clarify that basic EGWP benefits are to be based upon the Defined Standard benefit.

After considering the comments received, we are finalizing the portion of the provision which proposed that Part D sponsors offering employer group waiver plans must provide applicable discounts to EGWP plans as determined consistent with the Defined Standard benefit, except we are making a technical change to clarify that applicable discounts are available only to applicable beneficiaries enrolled in the EGWPs. We are not finalizing the proposed requirement that Part D sponsors of EGWPs disclose to each employer group the projected and actual manufacturer discount payments under the Discount Program attributable to the employer group's enrollees, at least annually or upon request.

**7. Transfer of TrOOP Between PDP Sponsors Due to Enrollment Changes During the Coverage Year (§ 423.464)**

Sections 1860D–23 and 1860D–24 of the Act specify that requirements for Part D sponsor coordination of benefits with State Pharmaceutical Assistance Programs and other plans providing

prescription drug coverage, including treatment of expenses incurred by these payers toward a beneficiary's out-of-pocket (TrOOP) threshold. Part D coordination of benefit requirements are codified at § 423.464, which defines "other prescription drug coverage" for COB purposes to include, among other entities, other Part D plans, and specifies Part D plan requirements for determining when an enrollee has satisfied the out-of-pocket threshold.

Related regulations at § 423.104(d), codifying the requirements in section 1860D–2(b) of the Act, require sponsors to track beneficiary TrOOP and gross covered drug costs and correctly apply these costs to the benefit limits to correctly position the beneficiary in the benefit and provide the catastrophic level of coverage at the appropriate time. When a beneficiary transfers enrollment between Part D plans during the coverage year, the enrollee's gross covered drug costs and TrOOP must be transferred between plans and applied by the subsequent plan in its administration of the Part D benefit. The process for a prior plan to report these TrOOP-related data and for the new plan of record to receive, upload, and use the data position the beneficiary in the correct phase of the benefit was initially manual.

In 2009, this process was replaced by an automated process for TrOOP-related data transfer. Our guidance released in 2008 (HPMS memorandum dated October 21, 2008 titled, "Updated Part D Sponsor Automated TrOOP Balance Transfer Operational Guidance") described sponsor implementation of the automated TrOOP balance transfer process and reiterated sponsor requirements for data reporting by the prior plan and use of the data for proper positioning of the beneficiary in the benefit by the current plan. We have continued to specify these requirements in subsequent updated versions of the guidance.

To ensure Part D benefits are correctly administered when a beneficiary transfers enrollment during the coverage year, we proposed to codify these requirements in federal regulations. Specifically, we proposed to amend § 423.464(f)(2) by adding a new paragraph (C) requiring Part D sponsors to—

• Report benefit accumulator data in real time in accordance with the procedures established by CMS;

• Accept in real-time data reported in accordance with CMS-established procedures by any prior plans in which the beneficiary was enrolled, or that paid claims on the beneficiary's behalf, during the coverage year; and

• Apply these costs promptly.

In our guidance on automated TrOOP balance transfer, we express our expectation that sponsors successfully transfer accumulator data for beneficiaries making enrollment changes during the coverage year in a timely manner 100 percent of the time. Although sponsors may be reporting and accepting these data in accordance with our expectations, we have been informed that some sponsors may not be promptly loading the data received into their systems so it is available for claims processing. As a result, the beneficiary's previously incurred costs and gross covered drug costs are not considered in the processing of claims received by the new plan sponsor soon after the enrollment change.

*Comment:* One commenter objected to the provision claiming it was vague and ill-defined and requested we include additional detail in lieu of deferring to sub-regulatory guidance.

*Response:* We disagree. The proposed regulatory text specifies the requirements for sponsors to report, accept and apply accumulator data. We believe the details of the transfer process are more appropriately addressed in guidance because they are procedural, and retaining them in guidance will preserve flexibility to adapt these procedures as the need arises. CMS and the industry developed the automated data transfer process in collaboration with National Council for Prescription Drug Programs (NCPDP) and have continued to work collaboratively to refine and improve the process. When a change in the transfer process is agreed upon and substantive requirements are unaffected, use of guidance permits us to issue updated instructions in a timely manner.

*Comment:* Three commenters expressed support for the provision.

*Response:* We appreciate the support for this provision and are adopting this provision as proposed with a minor change. That is, we are redesignating the current paragraph (B) in § 423.464(f)(2)(i)(B) as (C) and adding this provision as paragraph (B) to more logically sequence the requirements.

8. Expand Quality Improvement Program Regulations (§ 422.152)

Section 1852(e) of the Act requires MA organizations to have an ongoing quality improvement program for the purpose of improving the quality of care provided to enrollees.

We proposed revising paragraph (a) of § 422.152 in order to codify our recent expansion of the quality improvement program policies and revising paragraph

(c) of § 422.152 to codify our recently expanded chronic care improvement program policies. The proposed revisions to these paragraphs more accurately reflect current quality care improvement program policies and requirements.

Additionally, paragraph (g) of § 422.152 lists quality improvement program requirements that are specific to special needs plans (SNPs). We proposed revising paragraph (g) to clarify that the requirements listed there are in addition to program requirements listed in paragraphs (a) and (f) of § 422.152 and are not instead of the regular quality improvement program requirements.

Finally, we proposed to delete paragraph (h)(2) of § 422.152 as it pertains to contract year 2010 and is no longer relevant.

We received the following comments and our responses are as follows:

*Comment:* We received several comments that supported § 422.152 overall and CMS efforts to implement policies that ensure high quality health care for enrollees.

*Response:* We thank the commenters for their support.

*Comment:* One commenter requested clarification as to what exactly has changed under § 422.152(c), ''Chronic care improvement program requirements,'' as it appears to expand only one requirement and reorder the others.

*Response:* Our proposal, and the finalized rule here, revises paragraphs (c)(1)(ii) to add a requirement for the MA organization to evaluate participant outcomes (such as changes in health status), and add paragraphs (c)(1)(iii), (c)(1)(iv), and (c)(2). Paragraph (c)(1)(iii) requires performance assessments that use quality indicators that are objective, clearly and unambiguously defined, and based on current clinical knowledge or research, and (c)(1)(iv) requires systematic and ongoing follow-up on the effects of the chronic care improvement program. Finally, new paragraph (c)(2) requires that the organization report to CMS on the results of each chronic care program. The proposed changes also included reorganization of the section to parallel requirements in paragraph (d), ''Quality improvement projects.''

*Comment:* One commenter requested whether recent changes to the SNP Model of Care (MOC) requirements would be the vehicle for evaluating compliance in relation to the effectiveness of a plan's Model of Care.

*Response:* This comment is outside the scope of the proposed changes to this provision because we did not

propose, and are not finalizing in this rule, any changes to the SNP MOC requirements. Information about the MOC and associated requirements can be found in Chapter 5 of the Medicare Managed Care Manual.

*Comment:* One commenter requested clarification on the additional quality improvement program requirements for SNP plans.

*Comment:* The changes made to this provision do not create any new quality improvement program requirements for SNPs. The changes are to clarify the requirement that SNPs must comply with the requirements under paragraph (g) as well as those in paragraphs (a) through (f). The SNP-specific requirements in paragraph (g) do not replace the requirements in paragraphs (a) through (f), which apply to all plans, including SNPs.

*Comment:* A commenter requested whether Quality Improvement Project and Chronic Care Improvement Program results will be included in Star Rating measurements in the near future.

*Response:* This comment is outside the scope of the proposed changes to this provision as we did not propose, and are not finalizing in this rule, any Star Rating measures in connection with the quality improvement program requirement.

*Comment:* A commenter expressed opposition to expanded quality improvement requirements as a whole because MA organizations respond to such requirements by setting unrealistic targets for physicians. The commenter added that compliance must often be at 100 percent for a physician to qualify for a payment incentive.

*Response:* Our proposal codifies our recent expansion of the quality improvement program policies and revises paragraph (c) of § 422.152 to codify our recently expanded chronic care improvement program policies. The proposed revisions to these paragraphs more accurately reflect current quality care improvement program policies and requirements that are already in practice. While we understand the commenter's concern, we do not agree that codifying requirements that are already in practice will place any further burden on MA organizations and thus tangentially increase the burden on physicians. Additionally, while we understand that our recent expansion of our quality improvement program policies may have impacted MA organizations and, in turn, providers, the requirements do not specify any provider requirements or address payment incentives of any type. MA organizations and providers remain free to contract and make agreements on

NJAPP0510

these topics without CMS interference, thus MA organizations have flexibility when shaping their provider processes, policies, and overall framework.

*Comment:* A commenter stated that CMS's guidance with respect to Quality Improvement Projects and Chronic Care Improvement Programs for SNP plans has been unclear.

*Response:* Our proposal, and this final rule, revises paragraph (g) to clarify that the requirements listed there are in addition to program requirements listed in paragraphs (a) and (f) of § 422.152 and are not in lieu of the quality improvement program requirements presented in paragraphs (a) and (f). We believe the revisions to the regulation clarify that Quality Improvement Project and Chronic Care Improvement Program requirements are the same for SNP and non-SNP plans.

After consideration of the public comments received, we are finalizing the proposed codification and clarification of our Quality Improvement Program regulation at § 422.152 without modification.

*B. Improving Payment Accuracy*

1. Determination of Payments (§ 423.329)

In the January 2014 proposed rule, we proposed a technical change to § 423.329(d) to correctly describe the low-income cost-sharing subsidy payment amount as it is intended by statute and has been implemented and described in interpretive guidance by CMS. That amount had been defined in the regulation as the amount described in § 423.782. However, § 423.782 refers to the cost sharing paid by the beneficiary, not the cost-sharing subsidy paid on behalf of the low-income subsidy-eligible individual. The low-income cost-sharing subsidy amount is correctly described in Chapter 13 of our Medicare Prescription Drug Benefit Manual, Premium and Cost Sharing Subsidies for Low Income Individuals ((Rev. 13, 07–29–11), at *http:// www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/Chapter13.pdf*). As we stated in the proposed rule, under the basic benefit defined at § 423.100, the low-income cost-sharing subsidy payment amount is the difference between the Part D cost sharing for a non-LIS beneficiary under the Part D plan and the statutory cost-sharing for the LIS-eligible beneficiary. Under an enhanced alternative plan described at § 423.104(f), the cost-sharing subsidy applies to the beneficiary liability after the plan's supplemental benefit is applied. We proposed to amend

§ 423.329(d) consistent with this guidance.

We also explained in our proposed rule that pursuant to § 423.2305, any coverage or financial assistance other than basic prescription drug coverage, as defined in § 423.100, offered by an employer group health or waiver plan is considered "other health or prescription drug coverage." This definition applied to all of Medicare Part D. (See the April 12, 2012 final rule titled "Medicare Program; Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs for Contract Year 2013 and Other Changes" (77 FR 22082)). Therefore, the subsidy amount received by an employer group health or waiver plan is the subsidy amount received by a Part D plan offering defined standard coverage, as defined in § 423.100.

Based on the preceding, we proposed to amend § 423.329(d) by deleting the reference to §§ 423.782 and amending 423.329(d) to define the low-income cost-sharing subsidy payment amount on behalf of a low-income subsidy-eligible individual enrolled in a Part D plan for a coverage year as the difference between the cost sharing for a non low-income subsidy eligible beneficiary under the Part D plan and the statutory cost sharing for a low-income subsidy-eligible beneficiary.

In order to clarify that enhanced alternative benefits apply prior to determining the low-income cost-sharing subsidy payment amount, we clarify in this preamble and in the final regulation text that the low-income cost-sharing subsidy payment amount is the difference between the cost sharing (not the "Part D cost sharing," as proposed) for a non-LIS beneficiary under the Part D plan and the statutory cost sharing for the LIS-eligible beneficiary.

We received no comments on this proposal and are finalizing with a minor modification, as discussed previously.

2. Reopening (§ 423.346)

We proposed to amend the reopening provisions such that we may perform one reopening within 5 years after the date of the notice of the initial payment determination to the Part D sponsors. We also proposed to amend the provision to accommodate reopening the Coverage Gap Discount Reconciliation described at § 423.2320(b).

As we stated in the proposed rule, we had originally patterned the reopening provisions after the Medicare claims reopening regulations found in part 405, but now with a better understanding of the need for reopening a payment determination, we proposed to modify

our regulation at § 423.346 to align with our experience. We stated that our experience indicates to us that we will likely have to perform a reopening of the initial payment determination for every contract year, and we proposed to remove the current timeframes for a reopening described in § 423.346(a)(1) through (a)(3), remove paragraph (b) describing "good cause" referred to in paragraph (a)(2), modify paragraph (c) to eliminate the reference to "good cause," and amend paragraph (a) such that CMS may reopen one time within 5-years of notice of the initial payment determination.

As stated in the proposed rule, we believe that data stability will occur within 5 years of the notice of the initial payment determination. Within 5-years of the notice of the initial payment determination, additional prescription drug event (PDE) data or PDE adjustments associated with coordination of benefits will be submitted by Part D sponsors consistent with the timeframe described at § 423.466(b). We know that audits and other post reconciliation oversight activity often take place more than 5-years from notice of the initial payment determination. However, in light of the overpayment provision at section 6402(a) of the Affordable Care Act, which established section 1128J(d) of the Act and that we proposed to codify at § 423.360, we stated that we do not believe that it is necessary to reopen a payment reconciliation after that 5-year period, and that we believe it is not necessary to reopen a reconsidered payment determination. Therefore, we proposed to amend § 423.346(a) such that we will only reopen the initial payment determination and will not reopen a reconsidered payment determination.

With respect to determining whether to reopen a contract year, we stated that we will consider a number of issues, including, but not limited to, whether the contract has terminated and received a final settlement. We stated that we will not approve a request to reopen for a contract that has terminated and received a final settlement. We also stated that when we performed a reopening on our own initiative, contracts that have been terminated and settled will not be included in the reopening.

In addition, we proposed to establish a reopening provision for the Coverage Gap Discount Reconciliation for the same reasons and under the same authority that we established a reopening provision for the Part D payment reconciliation process described in our January 28, 2005 final

NJAPP0511

rule titled, "Medicare Program; Medicare Prescription Drug Benefit" (70 FR 4316). We noted that in a Health Plan Management System (HPMS) memorandum dated April 30, 2010, we stated that the final reconciled discount program payments are subject to the reopening provision in § 423.346. Due to the invoicing process that continues to occur after the reconciliation process, we do not anticipate the need to reopen the Coverage Gap Discount Reconciliation. However, we want to leave open the option to reopen if unforeseen events result in underpayments or overpayments to Part D sponsors. Therefore, we proposed to amend § 423.346 to accommodate reopening a Coverage Gap Discount Reconciliation.

Based on the preceding, we proposed to revise § 423.346 by removing the phrase "or reconsidered" from paragraph (a), amending paragraph (a) to account for the proposed timing of the Part D reopening, removing paragraphs (a)(1) through (3) and (b)(1) through (3); adding a new paragraph (b) to accommodate a Coverage Gap Discount Reconciliation reopening; and revising paragraph (c) to eliminate the reference to "good cause."

We received the following comments and our responses follow:

*Comment:* A commenter stated that the past 6 years indicate that unforeseen issues arise and require multiple reopenings to address them properly. A commenter recommended that CMS relax the proposed regulation and not unnecessarily restrict CMS's ability to conduct more than one reopening. A commenter supported the goal of one reopening per contract year, but recommended that CMS set a threshold, such as a dollar amount, to restrict reopenings while preserving an appropriate amount of flexibility in the regulation to accommodate circumstances with a degree of materiality.

*Response:* We agree with the commenter that multiple reopenings may be necessary. We know from experience that there are unforeseen circumstances that require us to do multiple global or targeted reopenings for a contract year. Target reopenings include reopening for a specific plan type (for example, PACE organizations) or for specific contracts or parent organizations. For this reason and also due to potential conflicts between the 5-year time frame of this proposed provision and the 6-year look-back period associated with the overpayment provision recently codified at § 423.360 (see 79 FR 29847), we are not finalizing the proposal to reopen one time within

5 years after the date of the notice of the initial determination to the Part D sponsors.

Our proposal to do one reopening within 5 years after the date of the notice of the initial determination may create difficulties for Part D sponsors to return overpayments that they identify and are required to report and return under § 423.360. Section 423.360 creates a 6-year look-back period at § 423.360(f). In accordance with § 423.360(f), a Part D sponsor must report and return any overpayment identified within the 6 most recent completed payment years. In our May 23, 2014 final rule, (79 FR 29843), we stated that CMS would recover plan-identified overpayment amounts through routine processing. For Part D, that means that if an overpayment is discovered, the Part D sponsor may fulfill its obligation to return the overpayment by requesting a reopening and submitting corrected data prior to CMS conducting the reopening. (For more information, see 79 FR 29923). To the extent possible, we want to allow for overpayments to be recovered through routine payment processes through the entire 6-year look-back period. The decision not to finalize our proposal to conduct one reopening within a 5-year period gives the Part D sponsor more flexibility to return overpayments and CMS more flexibility to collect overpayments through routine payment processes. Therefore, we are not finalizing the proposed provision that CMS will reopen one time within 5 years after the date of the notice of the initial determination to the Part D sponsors.

We note that we agree with the commenter that making the decision whether to reopen could be based on a dollar amount threshold. We currently consider several factors, including dollar amount, to determine whether to do a reopening. However, the decision of whether or not to do a reopening beyond the initial global reopening will be decided based on factors specific to the circumstance. For that reason, we will not codify a threshold or any other list of factors that would give rise to multiple reopenings.

*Comment:* A few commenters disagreed with our approach to do one global reopening. A commenter stated that unfocused reopenings would place a great burden on Part D sponsors, particularly when looking back as much as 5 years, and recommended that the current rule, requiring "good cause" for a reopening after 1 year after the final payment determination, remain in place. A commenter also considered the possibility of extending the timeframe

beyond the current 4 years to 5 years for reopening with cause.

*Response:* Although we are not finalizing the proposed provision that we will reopen one time within 5 years after the date of the notice of the initial determination to the Part D sponsors, we disagree with the commenter's statement that unfocused reopenings will place a great burden on Part D sponsors. We conduct reopenings after we see stability in the PDE and DIR data. We track the number of PDEs that we receive for each contract year on a weekly basis. We know that the Part D sponsors and their contracted pharmacy benefit managers (PBMs) submit significant amounts of data after the Part D payment reconciliation cut-off date. The data continues to be submitted well after 1 year of the notice of the initial payment determination. Given the volume of new data that we receive after the notice of the initial payment determination, we believe that it is necessary to conduct at least 1 global reopening for every contract year in order to accurately reconcile the prospective payment made to Part D sponsors with the corresponding actual costs reported by the Part D sponsor on the PDEs.

In addition, and subsequent to our decision not to finalize the proposal that CMS perform one reopening within 5 year of the notice of the initial payment determination, we are not finalizing our proposal to remove the current timeframes for a reopening described in § 423.346 (a)(1) through (a)(3), remove paragraph (b) describing good cause referred to in paragraph (a)(2), or modify paragraph (c) to eliminate the reference to "good cause." In other words, Part D plan payment reopenings will continue to be conducted as described at the current regulation at § 423.346.

*Comment:* A commenter stated that experience would suggest that over the years since the Part D program's inception, we have all improved in our efforts at the reconciliation and reopening of the Part D financial books, and therefore, encouraged CMS to enforce a shorter reopening timeframe after plan year initial closure. Specifically, the commenter recommended that CMS decrease the amount of time that plan years remain not finally reconciled to 4 years, not 5 years. This commenter encouraged a shorter time frame than 5 years, because from financial and compliance perspectives, this commenter thought that it would be beneficial to have a true final "closure" of the plan year earlier rather than later, to reduce uncertainty and risk.

NJAPP0512

*Response:* We agree with the commenter that experience suggests that we have all improved our efforts at reconciliations and reopenings. We are also sympathetic to the Part D sponsors' desires to "close" a plan year. However, we are not finalizing the proposal that CMS will reopen one time within 5 years after the date of the notice of the initial determination to the Part D sponsors. As previously stated, we believe that the proposal, if finalized, may create difficulties for Part D sponsors to return overpayments that they identify and are required to report and return under § 423.360.

*Comment:* A commenter requested that CMS consider setting a time period for when global reopenings occur, so that the industry has some clarity and predictability around timing of the reopenings. This commenter thought that knowing when a reopening is expected would make planning for Part D sponsors and CMS much easier and more efficient.

*Response:* Although we are not finalizing the proposal to reopen one time within 5 years after the date of the notice of the initial payment determination to the Part D sponsors, we agree with the commenter that setting a time period for when global reopenings occur would provide clarity and predictability around timing of the reopenings. As our experience and efficiencies improve, we expect that the reopenings will fall into a predictable, yearly schedule. Based upon recent historical experience, we anticipate beginning the global reopening process for a benefit year 4 years after releasing the initial reconciliation reports. We, at our discretion, may conduct reopenings after this time to rectify overpayments or unexpected issues resulting from the initial reopening.

After consideration of the public comments we received, we are not finalizing the proposal that we will reopen one time within 5 years after the date of the notice of the initial payment determination to the Part D sponsors. Consequently, we are not finalizing our proposal to remove the current timeframes for a reopening described in § 423.346 (a)(1) through (a)(3), remove paragraphs (b) describing good cause referred to in paragraph (a)(2), or modify paragraph (c) to eliminate the reference to "good cause."

We did not receive specific comments on our proposal to modify § 423.346 to accommodate the Coverage Gap Discount Reconciliation. We proposed that, similar to the Part D plan payment reopening, the reopening for the Coverage Gap Discount would be conducted one time in a 5-year period.

For the same reasons previously stated for the Part D plan payment reopening, we are not finalizing that the Coverage Gap Discount reopening be conducted once in a 5-year period. However, consistent with that proposal, we are incorporating the Coverage Gap Discount reopening into the reopening process described at § 423.346. Therefore, we finalize the Coverage Gap Discount Reconciliation reopening by modifying § 423.346(a) by adding the phrase "or the Coverage Gap Discount Reconciliation (as described at § 423.2320(b))" to the end of the introductory paragraph.

3. Payment Appeals (§ 423.350)

In our proposed rule, we proposed to revise § 423.350 to accommodate a Coverage Gap Discount Reconciliation appeals process under the same authority with which we established the Part D payment appeals process under section 1860D–15(d)(1) of the Act. Consistent with the Part D payment appeals process currently described at § 423.350, the proposed changes establish an appeals process where the final reconciliation of the interim Coverage Gap Discount Program (CGDP) payments may be subject to appeal. Consistent with the Part D payment appeals process, we also proposed to amend § 423.350(a)(2) to include information that is submitted and reconciled under § 423.2320(b) is final and may not be appealed nor may the appeals process be used to submit new information after the submission of information necessary to determine retroactive adjustments and reconciliations. Also consistent with the Part D payment appeals process, we proposed that the request for a reconsideration of the Coverage Gap Discount Reconciliation must be filed within 15 days from the date of the final payment, which is the date of the final reconciled payment made under § 423.2320(b).

Based on the preceding, we proposed to revise § 423.350 by adding a new paragraph (a)(1)(v) to allow for an appeal of a reconciled coverage gap payment under § 423.2320(b), by revising paragraph (a)(2) to indicate that the payment information submitted to CMS and reconciled under § 423.2320(b) is final and may not be appealed, and by adding a new paragraph (b)(1)(iv) to define the timeframe for appealing the final reconciled payment under § 423.2320(b).

We received the following comment and our response follows:

*Comment:* A few commenters requested that CMS extend the proposed

15-day deadline to file a request for reconsideration to 30 days due to the complexity of the CGDP. A commenter noted that 30 days would be more consistent with the existing plan-to-plan process. Another commenter stated that the 15-day deadline would result in more "defensive" appeal from plans attempting to protect their interest in payments prior to the expiration of the appeal period, even where the subject plan may not yet, at this time of appeal, conclude that any payment discrepancies were in fact the result of methodological errors. A commenter believed that the proposed 15-day deadline would increase the administrative burden for CMS in processing unnecessary appeals and impair the efficient use of plan resources, which raises overall plan administrative costs.

*Response:* We decline to modify § 423.350(b)(1) to extend the proposed 15-day deadline to file a request for reconsideration to 30 days for the CGDP. We believe that some commenters may think that the appeals process under § 423.350 is broader than it actually is. Section 423.350 describes the appeals process for the Part D payment reconciliation and, as we proposed, the Coverage Gap Discount Reconciliation. An appeal can be filed if a Part D sponsor believes that CMS did not correctly apply its stated payment methodology. An appeal for any other reason will be dismissed. If a sponsor identifies a data discrepancy, the sponsor would not file an appeal but would file a reopening request under § 423.346.

The Part D sponsors are in possession of the same data CMS uses to determine the Coverage Gap Discount Reconciliation. The Part D sponsors will have the data in advance of the reconciliation and can validate the data prior to the reconciliation. Therefore, we believe that the proposed 15-day deadline is an adequate time for a Part D sponsor to determine whether CMS has correctly applied its stated payment methodology and, if necessary, file a request for reconsideration.

After consideration of the public comments we received, we are finalizing § 423.350 as proposed.

4. Payment Processes for Part D Sponsors (§ 423.2320)

In our proposed rule, we proposed to amend § 423.2320 such that we will assume financial liability for the applicable discount by covering the costs of the quarterly invoices that go unpaid by a bankrupt manufacturer at the time of the Coverage Gap Discount Reconciliation described at

§ 423.2320(b). This will ensure that the Part D sponsors have the funds available to advance the gap discounts at the point of sale, as required under section 1860D–14A(c)(1)(A)(ii) of the Act. We also stated that we would file a proof of claim with the bankruptcy court to recover costs from the bankrupt manufacturer. We proposed that we would implement our policy by adjusting the Coverage Gap Discount Reconciliation for manufacturer discount amounts as they are reported on PDEs submitted by the submission deadline for the Part D reconciliation.

Based on the preceding, we proposed to add a new paragraph (c) to § 423.2320 to describe a process for accounting for quarterly invoiced amounts that go unpaid by a bankrupt manufacturer.

We received the following comment and our response follows:

*Comment:* Commenters strongly supported our proposal. One commenter requested that CMS expand upon the section to include scenarios other than bankruptcy.

*Response:* We appreciate the support expressed for our proposal. However, we will not be expanding § 423.2320(c) to include scenarios other than bankruptcy. We will cover the costs of unpaid quarterly invoices only in the event that a manufacturer becomes bankrupt and fails to pay the invoices. As stated in the proposed rule, if a manufacturer becomes bankrupt, we are concerned that a court will modify or reduce the amount of the civil money penalties (CMPs), rendering the CMPs ineffective for covering the cost of the invoices and leaving the Part D sponsor in the position of having to cover the costs of the gap discount. In all other scenarios, CMPs, described at § 423.2340, will cover the cost of the unpaid invoices.

In light of the comment that we received recommending that we expand our proposal to include scenarios other than bankruptcy, we clarify that this provision will apply only to adjust for quarterly invoices that go unpaid after the manufacturer has declared bankruptcy. As previously stated, in all other cases, CMPs will cover the costs of unpaid quarterly invoices.

Also, consistent with our proposal to adjust the Coverage Gap Discount Reconciliation amount of each of the affected Part D sponsors to account for the total unpaid quarterly invoiced amount owed to each of the Part D sponsors in the contract year being reconciled, we clarify in the regulation that we will only adjust the Coverage Gap Discount Reconciliation amount for unpaid quarterly invoices used for that particular Coverage Gap Reconciliation.

Use of a particular set of quarterly invoices in a Coverage Gap Discount Reconciliation is consistent with our current process, and we are not modifying that process for the purposes of this provision. Therefore, we clarify that we will not adjust the Coverage Gap Reconciliation amount for unpaid quarterly invoices that are not specifically used in that contract year's Coverage Gap Reconciliation.

After consideration of the public comments we received, we are finalizing § 423.2320(c) as proposed, with the minor clarifications discussed.

**5. Risk Adjustment Data Requirements (§ 422.310)**

In addition to the provisions addressed in the May 23, 2014 final rule (79 FR 29847),[8] we proposed to align § 422.310 regarding submission of risk adjustment data with § 422.326 by making a change in paragraph (g); specifically, we proposed the deletion of the January 31 deadline in paragraph (g)(2)(ii) and replacing it with the statement that CMS will announce the deadline by which final risk adjustment data must be submitted to CMS or its contractor. This would allow the risk adjustment data submission deadline to also function as the Part C applicable reconciliation date for purposes of § 422.326 on overpayment rules because § 422.326(a) refers to the annual final deadline for risk adjustment data submission as a date "announced by CMS each year."

In response to the January 10, 2014 proposed rule, we received approximately six pieces of correspondence from organizations and individuals regarding this specific proposal to replace the January 31 deadline with a date announced annually by CMS. We received the following public comments and our responses follow.

*Comment:* A few commenters supported CMS' proposal to remove the current date of January 31 as the annual final risk adjustment data submission deadline and replace it with the provision that CMS will announce the deadline annually, with the proviso that CMS' timing of this annual deadline always allow sufficient opportunity for organizations to make final data submissions. Several other commenters stated their concern about this proposed

change in deadline, including a concern that CMS might announce a deadline earlier than January 31 in some years. These commenters requested that CMS clarify that the annual deadline would never be before January 31, and a few commenters suggested that the regulation state that the deadline is January 31 but may be extended. Finally, a few commenters requested that CMS not change the January 31 date to a floating date, in order to allow operational stability.

*Response:* Our goal for eliminating January 31 as the final risk adjustment data submission deadline was to align this deadline at § 422.310(g)(2)(ii) with the overpayment provisions in § 422.326, so that the final risk adjustment data submission deadline would also function as the Part C applicable reconciliation date set forth in the overpayment provisions. As noted in the proposed rule, in order to align with the overpayment provisions, each year we expect to announce a date that would accommodate the current subregulatory guidance that MA organizations review the monthly enrollment and payment reports they receive from CMS within 45 days of the availability of the reports. We make these reports available to MA organizations each month according to an operational schedule that we release each year. Therefore, we expect to announce a final risk adjustment data submission deadline that falls on or just after the conclusion of this 45-day period for the January payment, which would be about 6 weeks after the end of the payment year, and no earlier than the current January 31 deadline.

We do not expect the date of the annual final risk adjustment data submission deadline to vary much from year to year but we believe that providing flexibility in the regulation text is necessary to accommodate the operational routines of our systems.

In response to comments, we are finalizing our provision at § 422.310(g)(ii) with modification, stating that the final risk adjustment data submission deadline will be announced by CMS each year and will be no earlier than January 31.

**C. Strengthening Beneficiary Protections**

1. MA–PD Coordination Requirements for Drugs Covered Under Parts A, B, and D (§ 422.112)

Under § 422.112(b) of the MA program regulations, coordinated care plans must ensure continuity of care and integration of services through arrangements with contracted providers. We believe that an important aspect of

---

[8] We proposed three amendments to § 422.310 in our January 10, 2014 proposed rule. In the May 23, 2014 final rule, we finalized one proposal, stated that we would not finalize the second proposal, and would finalize the third proposal at a later time. (See the May 23, 2014 final rule (79 FR 29848, 29925, and 29926). The third proposal is addressed in this final rule.

**7940**  **Federal Register** / Vol. 80, No. 29 / Thursday, February 12, 2015 / Rules and Regulations

this coordination is ensuring that all needed services, including drug therapies, are provided in a timely manner. Certain drug classes, including certain infusion agents, oral anticancer therapies, oral anti-emetics, immunosuppressants, and injectables, may be covered by Part D only when coverage under Parts A or B is not available. Because coverage of these drugs cannot generally be determined based solely on the drug, plan formularies often apply prior authorization criteria before claims can be paid at the point-of-sale (POS). Additionally, when an MA–PD plan issues an adverse Part D coverage determination because they have determined the drug is covered under Parts A or B, we expect MA–PD plans to ensure the drug is provided under the Parts A and B basic benefit.

In the January 2014 proposed rule, we proposed to add a new paragraph (b)(7)(i) to § 422.112 to require MA–PDs to establish and maintain a process to ensure that appropriate payment is assigned at the POS. In the preamble, we characterized this as a proposal to require MA–PDs to establish adequate messaging and processing standards with network pharmacies to achieve this goal.

We also proposed to add a new paragraph (b)(7)(ii) to § 422.112 to require that MA–PD plans issue the determination and authorize or provide the benefit under the applicable part (A, B or D)—which would require the MA–PD plan to proactively coordinate their enrollees' prescription drug coverage under Parts A, B and D—in order to ensure that enrollees receive Medicare covered prescription drugs as expeditiously as the enrollee's health condition requires. We stated in the preamble that if a denial under Part D is based on the existence of coverage under Parts A or B, the MA–PD plan should authorize or provide the drug under that other benefit without requiring the enrollee to make a subsequent request for coverage under that other benefit. Such determinations about the coverage of the drug would have to be provided in accordance with part 422, subpart M and part 423, subpart M, when a party requests a coverage determination.

We received the following comments on this proposal and our responses follow:

*Comment:* Beneficiary advocacy groups, some health plans, and pharmacy groups expressed their support for our proposal to strengthen coordination of benefit requirements applicable to MA–PD plans. Those commenters believe that requiring more

appropriate messaging at the POS would decrease enrollees' confusion and serve to improve coordination of benefits.

One commenter urged CMS to adopt a policy to treat presentation of a prescription at the pharmacy counter by an enrollee as a request for a Part D coverage determination and the response from the plan as an initial coverage determination, giving the enrollee access to the appeals process. The commenter stated it is especially important for claims rejected at the POS under Part D because coverage may be available under Part A or Part B from the same MA entity, to be treated as a request for a coverage determination to avoid delays in access.

Another commenter stated that CMS' longstanding policy that presentation of a prescription at the pharmacy counter is not considered a request for a coverage determination may seem like CMS is requiring the enrollee to request an initial coverage determination twice, contrary to our statement in the proposed rule that enrollees should not have to make an initial request more than once. Furthermore, the comment states that many, if not most, plans do not choose to treat presentation of a prescription as a request for a coverage determination because the pharmacy is not a representative of the plan trained to accept such requests on the plan's behalf, including collecting all the necessary information from the enrollee, conveying it to the plan within the required timeframe, and documenting its activities in this regard.

*Response:* We appreciate the commenters' support for our proposal, but would like to clarify that we are not requiring MA–PDs to pay at the POS for all drugs that might be covered under Parts A, B or D in all circumstances, nor are we requiring plans to treat a POS claim transaction as a request for a coverage determination. As we have stated since the inception of the Part D program, neither the presentation of a prescription at the pharmacy, nor a POS claim transaction constitutes a coverage determination or a request for a coverage determination by the plan. If a rejected claim cannot be resolved at the POS, the Part D plan is required to transmit a code to the network pharmacy instructing the pharmacy to provide the enrollee with the standardized pharmacy notice that advises the enrollee of the right to request a coverage determination from the plan. A coverage determination request must be made directly to the Part D plan by the enrollee, the enrollee's representative, or the prescriber. Pharmacy staff does not have all of the information necessary to make

a coverage determination on behalf of the plan.

*Comment:* A commenter requested that CMS clarify that it does not prevent pharmacies from accessing readily available information to assist with appropriate payment determinations at the POS.

*Response:* We would like to clarify that we do not prohibit pharmacies from using or transmitting to the MA–PD plan readily available information for purposes of determining appropriate payment at POS. This final rule does not change the guidance contained at section 20.2.2 of Chapter 6 of the Medicare Prescription Drug Benefit Manual, (Rev 10, 2–19–10), with respect to readily available information accessed by the pharmacy. The MA–PD plan will have met appropriate due diligence standards under Part D and the regulations implemented via this final rule without further contacting a physician if necessary and sufficient information is provided on the prescription, and the contracted pharmacy is able to communicate this information to the sponsor to assist in assigning appropriate payment at the POS.

*Comment:* A few commenters requested that CMS extend this proposal to out-of-network pharmacies.

*Response:* We disagree with these commenters. Plans do not have an established relationship with out of network pharmacies and, therefore, applying this proposal to them would be impractical.

*Comment:* Most commenters expressed strong support regarding CMS' proposal to coordinate Parts A, B, and D drug coverage during the coverage determination process.

*Response:* We thank commenters for their support. We will continue to work with stakeholders to explore program enhancements that may be more uniquely suited for plans that offer both Parts A, B and D benefits. We are exploring the possibility for future subregulatory guidance on this topic.

*Comment:* Several commenters suggested that CMS work with the Congress to simplify Medicare drug coverage by establishing clearer and simpler rules such as covering all prescription drugs under Part D instead of having coverage also under Parts A and B. Furthermore, a commenter urged CMS to consider using its regulatory authority to achieve some simplification by, for example, covering exclusively under Part D all drugs that are currently covered under Part D in the vast majority of cases.

*Response:* We appreciate commenters' desire for simpler coverage policies for

NJAPP0515

Medicare-covered prescription drugs. However, as recognized in the comments, statutory changes would be needed to simplify coverage and payment rules, which is outside the scope of this rulemaking. We will evaluate what appropriate simplifications we may be able to make using current regulatory authority.

*Comment:* Many commenters stated that although they are supportive of CMS' intention to ensure that beneficiaries are able to obtain their prescriptions without the inconvenience and delays that are due to differences in the coverage rules for drugs under Parts A, B, and D, there are going to be circumstances that require the enrollee or someone on the enrollee's behalf to request a coverage determination from the MA–PD. They suggested that CMS revise the proposed rule language to recognize that "timely" adjudication might not, and often cannot, occur at the POS because information that is essential to determining whether a drug is covered under Parts A or B often is not available at the POS and must be obtained from the prescriber and sometimes an organization determination also is required from the MA–PD. Pharmacy groups say they follow up with prescribers and MA–PDs, but delays are inevitable when those steps have to be taken.

*Response:* As indicated in the proposed rule, our intention is to add proposed § 422.112(b)(7)(i) to our regulatory provisions in an effort to improve at the POS the care continuity and coordination between Part D drug benefits and Parts A and B drug benefits administered by the MA–PD, not to establish a requirement that pharmacies be responsible for making coverage determinations. Although plans have the discretion to treat POS transactions as coverage determinations, it is our understanding that network pharmacies do not receive all of the information needed to act on behalf of hundreds of Part D sponsors in making robust coverage determinations and generating the required denial notice with detailed formulary information and appeal rights. Additionally, the current HIPAA transaction standards do not support the type and volume of information that would be necessary to treat POS rejections as adverse coverage determinations.

We realize that there will be circumstances in which the information necessary to determine whether a drug that is not covered under Part D will be covered under Parts A or B will not be available at the POS. In those cases, enrollees will receive the standardized pharmacy notice that explains the right

to contact the plan for a coverage determination. However, we do believe that MA–PDs, by working with their network pharmacies and prescribers, are capable of a high degree of coordination and continuity. Through those collaborative efforts, the network pharmacy can often acquire information needed to obtain an edit override from the plan or otherwise ensure that the claim can be processed and paid at the POS.

*Comment:* Some commenters suggested that CMS adopt use of specific prior authorization codes, increased interoperability across electronic systems, and changes to Medicare's Common Working File (CWF) in order to make drug coverage determinations possible at the POS and decrease billing errors.

*Response:* We appreciate those suggestions and expect that MA–PDs and their network pharmacies will explore enhancements to their systems to improve communications and otherwise streamline their processes in order to ensure timely and accurate processing of POS transactions. We welcome suggestions for appropriate approaches that would support such improvements but decline to adopt rules to that effect at this time.

*Comment:* A few commenters stated that CMS' proposal to have plans pay for a drug and subsequently chase the responsible party for reimbursement would be inefficient and costly.

*Response:* We clarify for those commenters that neither our proposed nor this final rule include any provision that will require MA–PDs to pay for or cover a drug for an enrollee when another payor is responsible for that payment, or when a payment determination cannot be made at the POS. We agree that a "pay and chase" policy would not be efficient, and is not always in the best interest of the enrollee. As we discussed in the proposed rule, implementing a requirement to authorize all claims at the POS may interfere with medically appropriate pre-authorization requirements and may trigger retrospective enrollee liability depending on the difference in enrollee cost-sharing for coverage under Parts A, B, and D, retrospective TROOP adjustments and Part D reconciliation (79 FR 2009). We are finalizing the proposal to require MA–PDs to coordinate with their network pharmacies and prescribers to improve existing processes and develop new ones in order to ensure that enrollees receive their Medicare-covered prescribed medications, without delay,

when they present at the network pharmacy.

After considering the comments, we are revising § 422.112(b)(7)(i) by deleting the reference to "claims adjudication" so there is a clearer distinction between the POS requirements addressed in paragraph (b)(7)(i) from the coverage determination requirements referenced in paragraph (b)(7)(ii). We are finalizing paragraph (b)(7)(i) to state that MA–PD plans must establish and maintain a process to ensure timely and accurate POS transactions. Compliance with this requirement may be achieved using adequate messaging and other procedures with network pharmacies to ensure care continuity and coordination at the POS between Part D drug benefits and Parts A or B drug benefits administered by the MA–PD.

When processing a coverage determination for a prescription drug that may be covered under Parts A, B or D, if the MA–PD determines, as part of the coverage determination process, that the requested drug is not covered under Part D, it must then evaluate whether the drug in question is covered under Parts A or B. The MA–PD is responsible for providing a clear explanation of its decision, including the decision to cover the requested drug under a different benefit and how to obtain the drug (for example, instructions to take the plan decision notice to the pharmacy to obtain the requested drug) in the Part D standardized denial notice. We expect to work with stakeholders to explore program enhancements that may be more uniquely suited for plans that offer both Parts A, B, and D benefits. We are finalizing, as proposed, § 422.112(b)(7)(ii) and are exploring possibilities for future subregulatory guidance on this topic.

2. Good Cause Processes (§§ 417.460, 422.74 and 423.44)

Section 1851(g)(3)(B)(i) of the Act provides that MA organizations may terminate the enrollment of individuals who fail to pay basic and supplemental premiums after a grace period established by the plan. Section 1860D–1(b)(1)(B) of the Act generally directs us to establish regulations related to enrollment, disenrollment, and termination for Part D plan sponsors that are similar to those established for MA organizations under section 1851 of the Act. In addition, section 1860D–13(a)(7) of the Act mandates that the premiums paid by individuals with higher incomes be increased by the applicable Part D income related monthly adjustment amount (Part D IRMAA), for the months in which they

are enrolled in Part D coverage. Consistent with these sections of the Act, subpart B in both the Part C and Part D regulations sets forth requirements with respect to involuntary disenrollment procedures at § 422.74 and § 423.44, respectively. An MA or Part D plan that chooses to disenroll beneficiaries for failure to pay premiums must be able to demonstrate that it made a reasonable effort to collect the unpaid amounts by notifying the beneficiary of the delinquency, providing the beneficiary a period of no less than 2 months in which to resolve the delinquency, and advising the beneficiary of the termination of coverage if the amounts owed are not paid by the end of the grace period.

In addition, current regulations at § 417.460(c) specify that a cost plan, specifically a health maintenance organization (HMO) or competitive medical plan may disenroll a member who fails to pay premiums or other charges imposed by the plan for deductible and coinsurance amounts. With the exception of the grace period, the procedural requirements for cost plans to disenroll a member for failure to pay premiums are similar to those for MA and Part D plans. The cost plan must demonstrate that it made reasonable efforts to collect the unpaid amount and sent the enrollee written notice of the pending disenrollment at least 20 days before the disenrollment effective date.

In the April 2011 final rule (76 FR 21432), we amended both the Parts C and D regulations at § 422.74(d)(1)(v), § 423.44(d)(1), and § 423.44(e)(3) regarding involuntary disenrollment for nonpayment of premiums or Part D IRMAA to allow for reinstatement of the beneficiary's enrollment into the plan for good cause. In the April 2012 final rule (77 FR 22071), we extended the policy of reinstatement for good cause to include beneficiaries enrolled in cost plans in § 417.460(c)(3), thus aligning the cost plan reinstatement provision with the MA and PDP provisions. These good cause provisions authorize us to reinstate a disenrolled individual's enrollment without an interruption in coverage in certain circumstances where the non-payment was due to circumstances that the individual could not reasonably foresee or could not control, such as an unexpected hospitalization. Since its inception, the process of accepting, reviewing, and processing beneficiary requests for reinstatement for good cause has been carried out exclusively by CMS. However, we have received feedback from plans on ways to improve the good cause process and make it more efficient

for both the plans and CMS. Based on this feedback, we updated Chapter 2 of the Medicare Managed Care Manual and Chapter 3 of the Medicare Prescription Drug Benefit Manual to clarify the language of the notice provided to beneficiaries, and the process and timing of receiving payments during the extended grace period in connection with § 417.460(c)(3), § 422.74(d)(1)(vi), and § 423.44(d)(1)(vi). In addition, we updated the Complaints Tracking Module (CTM) Standard Operating Procedures (SOP) to permit plans to transfer requests for reinstatement for good cause to CMS.

In light of ongoing feedback, in the January 2014 proposed rule we proposed to amend § 417.460(c)(3), § 422.74(d)(1)(v), and § 423.44(d)(1)(vi) to permit an entity acting on behalf of CMS to effectuate reinstatements when good cause criteria are met. This proposal would allow us to designate another entity, including a plan (MA organization, Part D sponsor, or entity offering a cost plan) to carry out portions or all of the good cause process. While we envisioned an expanded role for plans to accept incoming requests for reinstatement directly from former enrollees, which would allow them to be more responsive to their current and former members, we stated that ensuring objectivity in the review of these cases and equity among beneficiaries regarding the determination of good cause was critically important. Accordingly, we indicated that we would establish operational policy and processes in subregulatory guidance to set parameters for the application of the good cause standard, including the submission to us of certain cases for review to ensure that plans remain impartial and equitable in their assessment and treatment of former members who have been disenrolled for nonpayment of premiums. These changes would be accompanied by the development of an oversight protocol for any activities assigned to a designee that are currently carried out by CMS.

In addition, we proposed a technical change to the language in § 417.460 to clarify that good cause protections for enrollees in cost plans apply to instances where there was a failure to pay either plan premiums or other charges.

We received the following comments and our responses follow:

*Comment:* Commenters expressed both support for and opposition to our proposal to allow an entity acting on behalf of CMS to effectuate reinstatements when it is determined that good cause criteria are met. Several

commenters agreed that plans or an independent contractor could perform this function if provided appropriate guidance and that this new process could produce efficiencies that would be advantageous to beneficiaries, plans and CMS. Other commenters believed that only CMS or an independent contractor would have the knowledge and impartiality to consider these cases appropriately. In addition, a few commenters expressed concerns with the quality of work currently performed by plans and CMS contractors and did not believe that their current performance warranted an increase in responsibility.

*Response:* We thank commenters for their feedback in response to this proposal. We continue to believe that with proper guidelines, instructions and oversight, entities to which we assign this activity could review and process good cause requests in an appropriate manner. Given the feedback we have received since establishing the good cause review process handled exclusively by us, we have learned that some good cause reinstatement requests could be resolved more efficiently by plans since they can readily access a former enrollee's premium billing and payment history, and as such, are well positioned to more easily resolve disenrollment disputes that are erroneously being treated, at least initially, as good cause requests.

We fully understand that impartiality would be a key concern if this function is performed by plans. That is why we noted in the January 2014 proposed rule that if we were to exercise the authority we proposed to include in these regulations, an oversight protocol would be developed and CMS would retain the right to review cases to ensure that determinations made by a CMS designee are in line with our guidance.

*Comment:* Under the assumption that plans would be given the responsibility to perform good cause reviews, a few commenters had questions about the plans' scope of responsibility. Specifically, a commenter questioned whether plans would be permitted to refer a case to CMS for review and decision. Another commenter questioned whether plans would be able to opt out of this work if they did not want to take on the burden or costs related to this activity. Lastly, a commenter questioned whether or not beneficiaries would be able to appeal the plan's decision.

*Response:* In the event we assign the good cause process to plans, the expectation would be that they perform the work from start to finish (that is, intake, research, decision, notification,

and effectuation). We would provide guidance regarding these activities in our enrollment manuals (Chapter 2 and Chapter 17, Subchapter D, of the Medicare Managed Care Manual and Chapter 3 of the Medicare Prescription Drug Benefit Manual) and, as part of the designation, we would retain the authority to review both favorable and unfavorable decisions to ensure that results are fair and sound. In addition, as mentioned previously, we would develop an oversight protocol to ensure that plans are compliant with our guidelines. As with other MA and Part D policies, we realize that sometimes plans need feedback or guidance from us to address certain unique issues. That would continue to be the case for good cause reviews, but the expectation would be that once we assign this process to plans, they would develop their own internal processes for reviews, based on our guidance, and carry out the majority of this workload without involving us.

Beneficiaries do not currently have the right to appeal good cause determinations. Ultimately, our goal is to streamline the good cause review process and make it easier for all parties (beneficiaries, plans, and CMS) to navigate. As such, we believe that the key to any successful delegation of this work to the plans would be providing clear and complete guidance to plans, but not adding another layer of review to the process.

Finally, should we conclude that plans are appropriate entities to perform good cause reviews, we would assign this function to all plans, and under the revisions to the regulations being finalized here, we would require plans to accept this additional responsibility. Specifically, we are finalizing the revisions to the applicable regulations to provide that a third party to which CMS has assigned this responsibility, such as an entity offering a cost plan, a MA organization, or a Part D plan sponsor, may reinstate an enrollee based upon the good cause showing. We believe it would be more complicated operationally, and confusing to beneficiaries, if we did not implement a uniform process for handling requests for reinstatement.

*Comment:* A commenter expressed support for the proposed revision to include language regarding a cost plan enrollee's ability to request reinstatement for good cause not only for failure to pay premiums, but also for nonpayment of "other charges" including deductibles and cost-sharing.

*Response:* We thank the commenter for their support for this regulatory change and for confirmation of the need

to expand this beneficiary protection to cost plan enrollees.

After careful consideration of these comments, we are finalizing the proposed amendments to the regulations with modifications to clarify that the third party to which CMS may assign this responsibility may be an MA organization, a Part D sponsor or an entity offering a cost plan.

3. MA Organizations' Extension of Adjudication Timeframes for Organization Determinations and Reconsiderations (§ 422.568, § 422.572, § 422.590, § 422.618, § 422.619)

Sections 1852(g)(1)(A) and 1852(g)(2) of the Act respectively require MA organizations to make all organization determinations on a timely basis, and to provide for reconsideration, or review, of organization determinations within a timeframe specified by the Secretary, but no later than 60 days from the date of receipt of the request for reconsideration. Section 1852(g)(3)(B) of the Act requires MA organizations to maintain procedures for expediting organization determinations and reconsiderations when a physician's request indicates that applying the standard timeframe could seriously jeopardize the life or health of the enrollee or the enrollee's ability to regain maximum function or when, in the case of an enrollee's request, the MA organization makes such a determination on its own. In expedited cases, the MA organization generally must issue its decision no later than 72 hours from receipt of the request. Section 1852(g)(3)(B)(iii) of the Act permits the Secretary to extend this 72-hour decision-making timeframe in certain cases.

Our existing regulations at 42 CFR part 422, subpart M, codify the procedures MA organizations must follow in issuing standard and expedited organization determinations and reconsiderations, including setting forth the required adjudication timeframes and the circumstances under which plans are permitted to extend those timeframes.

As stated in the proposed rule (79 FR 2011), we believe the current language that permits extension of the adjudication timeframes set forth in § 422.568(b), § 422.572(b), § 422.590(a)(1), and § 422.590(d)(2) is being interpreted more broadly than we intended and that MA organizations are regularly invoking extensions of the adjudication timeframes for organization determinations and reconsiderations. Based on information ascertained during recent MA program audits, we have seen circumstances in

which MA organizations are routinely and inappropriately invoking the 14-day extension in cases where the plan: (1) Lacks adequate internal controls to ensure coverage requests are reviewed and adjudicated within the required regulatory timeframe; and (2) is awaiting receipt of supporting clinical documentation from one of its contract providers.

Routinely invoking an extension of the applicable adjudication timeframe is counter to the intent of the statutory and regulatory requirements for timely determinations that emphasize the health needs of the beneficiary in determining the appropriate adjudication timeframe. Extensions that are not affirmatively requested by the enrollee should be permitted only in limited circumstances, and only if the extension is in the enrollee's interest. MA organizations are required by regulation to render all coverage decisions as expeditiously as the enrollee's health condition requires. When plans choose to subject an item or service to a prior authorization requirement, we expect them to have the resources to process those requests in a timely manner.

In the proposed rule, we suggested revising these regulatory provisions to clarify our intended standard for when it is appropriate for an MA organization to extend an adjudication timeframe. Specifically, we proposed the following changes:

• At § 422.568(b), § 422.572(b), and § 422.590(e), to add new text and to restructure the regulation paragraphs for clarity.

• At § 422.568(b)(1)(ii), § 422.572(b)(1)(ii), and § 422.590(e)(1)(ii), to clarify that an extension may be justified and in the enrollee's interest due to the need to obtain additional medical information, which may result in changing the MA organization's denial of coverage of an item or service only from a non-contract provider.

• At new § 422.568(b)(1)(iii), § 422.572(b)(1)(iii), and § 422.590(e)(1)(iii), to clarify that an extension of the adjudication timeframe may be permitted when the extension is justified due to extraordinary, exigent or other non-routine circumstances, and it is in the enrollee's interest.

• To make corresponding technical edits to subpart M to improve clarity in our guidance related to extensions and to remove duplicative language (that is, to remove § 422.590(d)(2) and add a new § 422.590(e), to update cross references in § 422.618(a)(1) and § 422.619(a), to make changes within § 422.568(b), § 422.572(b), and § 422.590(d) to ensure

consistency in the structure and language of these provisions).

We received the following comments on this proposal and our responses follow:

*Comment:* Several commenters expressed general agreement that extensions to adjudication timeframes for organization determinations and reconsiderations should not be invoked routinely. Some commenters expressed strong support for this proposal and stated that it would reduce inappropriate delays in coverage decision-making and, therefore, reduce current delays in access to needed care that result from more routine use of extensions.

*Response:* We appreciate the support expressed by these commenters. The clarifications we proposed reinforce longstanding statutory and regulatory program requirements for timely decision-making that emphasize the beneficiary's health condition and the urgency of the requested item or service.

*Comment:* A few commenters who did not support the proposal stated that both contract and noncontract providers are not always responsive to plan requests for clinical information. A commenter further stated that MA organizations should not be penalized for delays resulting from third parties' failure to provide documentation necessary for a timely coverage decision. Another commenter added that it is not realistic to expect contract providers to produce complete medical documentation in response to every coverage request, and that it is not reasonable to expect provider contracting to ensure that full documentation is produced without the need for extensions. Because of those concerns, these commenters did not believe MA organizations should be restricted from using extensions on the basis of the provider's contracting status.

*Response:* We have considered contract providers as agents of the MA organization offering the plan, and we believe it is reasonable to expect MA organizations to use provider contracting to establish a wide range of expectations for network providers to ensure compliance with program rules, including timely receipt of relevant clinical documentation. MA organizations remain responsible for compliance with MA rules and requirements, even when using contractors or other entities to fulfill those responsibilities. (For more detailed information, see § 422.504(i).) We expect the contract terms between MA organizations and their contract providers to properly incentivize

contract providers, as necessary, to produce requested clinical records in a timely manner.

We appreciate that health care providers working with managed care plans must navigate a complex and changing health care environment and routinely contract with multiple plans. However, we do not agree that these challenges should prevent MA organizations from rendering coverage decisions that are expeditiously as the enrollee's health condition requires. The contractual arrangement with network providers is an important tool plans can use to ensure compliance with these beneficiary protections.

We expect plans to promptly solicit and obtain contract providers' clinical documentation when an enrollee requests coverage of an item or service. When the case file contains incomplete information, we expect plans to work diligently with contract providers to cure the defect while adhering to the requirement to issue all decisions as expeditiously as the enrollee's health condition requires. As stated previously and described in more detail later in this final rule, the new regulation text at § 422.568(b)(1)(iii), § 422.572(b)(1)(iii) and § 422.590(e)(1)(iii) clarifies that extensions are permitted—regardless of provider contracting status—if necessary clinical documentation is not readily available due to extraordinary, exigent or other non-routine circumstances.

We believe that plans can mitigate overuse of extensions by correcting other common compliance problems. For example, plans often receive audit findings for failure to conduct timely or sufficient outreach to providers to obtain necessary clinical information during the coverage determination process. Ensuring reasonable and diligent provider outreach will improve the plan's ability to issue timely decisions based on consideration of complete clinical information.

We expect plans to make reasonable, timely, and diligent efforts to obtain medical records from both contract and non-contract providers without having to extend the adjudication timeframe. However, we agree with the commenters that MA organizations have little control over a non-contract provider who does not respond to the plan's requests for documentation. For this reason, we are clarifying at § 422.568(b)(1)(ii), § 422.572(b)(1)(ii) and § 422.590(e)(1)(ii) that extensions are permitted when the plan is seeking clinical information from a noncontract provider, as long as the extension is in the enrollee's best interest. While we acknowledge this

limitation, we nevertheless expect plans to make reasonable efforts to obtain necessary information from noncontract providers in a manner which affords the enrollee a timely decision.

We believe our proposed changes strike the appropriate balance between minimizing the burden on MA plans and providers (both contract and non-contract) and protecting enrollees' statutory right to timely decisions and to timely access to the appeals process.

*Comment:* A few commenters disagreed with our proposal because they believed that CMS was eliminating all extensions.

*Response:* It appears that these commenters misunderstood our proposed change. This change will not eliminate extensions. Extensions of up to 14 days will continue to exist for both standard and expedited requests for organization determinations and reconsiderations. As we stated in the proposed rule, we proposed these changes to clarify our existing intent that extensions at the MA organization's behest should only be taken on a limited basis and only when they are in the enrollee's interest.

*Comment:* Several commenters—both supportive and not supportive of CMS' proposal—noted that consideration of complete clinical documentation during the coverage decision process is in the best interest of the enrollee. Some of those commenters who disagreed with our proposal also stated that use of extensions to obtain missing clinical information when the plan is seeking that information is, therefore, also in the best interest of the enrollee. Likewise, some of these commenters expressed a belief that not taking an extension would be detrimental to enrollees by resulting in increased denials and delays in access to care.

*Response:* While we agree that it is in the best interest of an enrollee that the MA organization reviews complete clinical information when adjudicating a coverage request, we disagree with the commenters that use of extensions is in the best interest of the enrollee when such extensions are taken in the absence of extraordinary, exigent, or other non-routine circumstances. Section 1852(d) of the Act requires reasonably prompt access to medically necessary services—including compliance with provider network adequacy requirements established at § 422.112 of the regulations—and section 1852(g) of the Act requires timely coverage decisions that emphasize the health needs of the beneficiary in determining the appropriate adjudication timeframe. We do not believe that complete consideration of clinical documentation

and adjudication within the established timeframes are mutually exclusive activities. We established MA adjudication timeframes with strong support from stakeholders, including the managed care industry, and physician groups. (For a more detailed discussion, see the June 29, 2000 **Federal Register** (65 FR 40278)). Therefore, we do not believe that our proposed changes will cause a delay in access to care since MA organizations should be able to obtain the necessary information and render a decision within the established timeframes.

The new regulatory provisions at § 422.568(b)(1)(iii), § 422.572(b)(1)(iii) and § 422.590(e)(1)(iii) permits MA plans to invoke an extension in limited circumstances where timely receipt of necessary clinical information is not possible, for example, if a provider's office is flooded and additional time is needed to reach the provider and/or to obtain off-site or electronic records that would support a favorable coverage decision. We recognize that these extraordinary, exigent or other non-routine circumstances may arise regardless of whether the provider(s) involved has a contract with the plan; therefore, these extensions are not restricted to noncontract providers.

*Comment:* A commenter recommended that, instead of finalizing this proposal, CMS should use its existing oversight authority to take compliance or enforcement action against the MA organizations that over utilize extensions of adjudication timeframes.

*Response:* We agree with this commenter that imposing corrective action on MA organizations that are routinely noncompliant with required decision-making timeframes is an appropriate use of CMS' oversight authority, but we disagree that this should be done in lieu of our proposed changes. Based on recent program experience, we believe our intended restrictions from the original adoption of these rules on the use of extensions are broadly misinterpreted and that our proposed changes to clarify our policy will enhance beneficiary protections by reducing inappropriate delays in access to care and access to the appeals process.

Relying on compliance and enforcement authority alone is not a sufficient response to identification of a broadly misinterpreted policy. By clarifying our intent that extensions are appropriate only in a limited set of circumstances, we aim to assist MA plans in their development of operational policies and procedures related to processing coverage decisions

and, ultimately, to meet our goal of overall program compliance in the absence of corrective action and the beneficiary risks that may come with it.

After consideration of the comments received on this proposal, and for the reasons noted in our January 2014 proposed rule, we are finalizing without modification the proposal to clarify that an extension to an adjudication timeframe for organization determinations and reconsiderations should be permitted only in limited circumstances.

*D. Strengthening Our Ability To Distinguish Stronger Applicants for Part C and D Program Participation and To Remove Consistently Poor Performers*

1. Two-Year Prohibition When Organizations Terminate Their Contracts (§§ 422.502, 422.503, 422.506, 422.508, and 422.512)

Section 1857(c)(4)(A) of the Act prohibits organizations from re-entering the MA program in the event that a previous contract with the organization was terminated at the request of the organization within the preceding 2-year period, except in circumstances that warrant special consideration.

We proposed to amend the text of the regulations implementing these provisions to maintain consistency in their application and harmony with our policy. Specifically, we proposed to amend the regulations at §§ 422.502(b)(3), 422.506(a)(4), and 422.512(e)(1) to explicitly apply the 2-year prohibition to applications for service area expansions in addition to applications for new contracts. These changes to §§ 422.502(b)(3), 422.506(a)(4), and 422.512(e)(1) would make the text of these regulations consistent with the text at §§ 422.503(b)(7) and 422.508(c) with regard to the 2-year prohibition imposed as a condition of a mutual termination of an MA contract.

We also proposed to amend our policy on the current application of regulations implementing the 2-year prohibition to avoid unnecessarily narrowing the scope of the 2-year prohibition or precluding us from preventing poor performing MA organizations from reentering the MA program. We proposed to interpret §§ 422.503(b)(6) and 422.503(b)(7) as authorizing denials of new contracts and service area expansions, consistent with the proposed text for §§ 422.502, 422.506 and 422.512, regardless of the contract type, product type, or service area of the previous nonrenewal. We further proposed adding a sentence to paragraphs (c) and (d) of § 422.508 to

make it clear that a mutual termination of a MA contract would result in a ban on all contract types and service area expansions.

We received the following comments on this proposal and our responses follow:

*Comment:* A commenter supported the proposal, stating that it will prevent poor performing organizations from re-entering the program through another product type of extension of an existing service area.

*Response:* We thank the commenter for this support.

*Comment:* A commenter supported CMS's interpretation of the 2-year prohibition rule to voluntary nonrenewals and mutual terminations and CMS's efforts to ensure poor performing MA organizations do not re-enter the marketplace.

*Response:* We thank the commenter for this support.

*Comment:* A commenter requested that CMS consider only applying the 2-year prohibition to the legal entity level, rather than applying the 2-year prohibition to the parent organization level, as this would be an overly broad application which could affect multiple legal entities and numerous contracts.

*Response:* We currently apply the 2-year prohibition at the legal entity level and will continue to do so.

We are finalizing the amendments to §§ 422.502(b)(3), 422.506(a)(4), 422.508(c) and 422.512(e) as proposed. Although we discussed the amendments to § 422.508(c) and § 422.508(d) in the preamble to the January 6, 2014 proposed rule, we inadvertently omitted the proposed amendments to §§ 422.508(c) and 422.508(d) from the proposed regulation text. We are including the revision to § 422.508(c) in this final rule. We are not finalizing the proposed amendment to § 422.508(d) as upon further consideration we believe that this amendment is not appropriate. We are also amending § 422.506(a)(4) by removing the word "special" before "circumstances warranting special consideration" in order to maintain consistency with the regulation text at § 422.503(b)(6), § 422.508(c) and § 422.512(e), as we do not differentiate between circumstances warranting special consideration and special circumstances warranting special consideration in our administration of these regulations. We believe the use of "special" in § 422.506(a)(4) is redundant and its removal does not affect our interpretation of the provision and its inclusion potentially leads to ambiguity in § 422.506(a)(4). We are also finalizing, without modification, our proposal regarding the interpretation of

NJAPP0520

related regulations that implement the 2-year prohibition. We clarify here that the 2-year prohibition, for purposes of §§ 422.502, 422.506, 422.508, and 422.512, is applied at the legal entity level. We are further clarifying that the 2-year ban is applicable for the 2 contract years following the year in which the non-renewal or termination of an organization's contract is effective. For example, if an organization does not renew its contract for an effective date of December 31, 2015 then we would not enter into a contract with the organization for contract years 2016 and 2017 unless there are circumstances that warrant special consideration. The organization can apply to contract with us in contract year 2017 to operate in contract year 2018. Likewise, if an organization enters a mutual termination for a contract with CMS midyear during 2015, then we will not enter into a contract with the organization for contract years 2016 and 2017 absent circumstances warranting special consideration, but the organization can apply to contract with us in 2017 to operate in contract year 2018. We understand there are a variety of reasons that an organization may decide to terminate or to renew a contract, and subsequently want to re-enter the program. We will consider these circumstances on a case-by-case basis.

## 2. Withdrawal of Stand-Alone Prescription Drug Plan Bid Prior to Contract Execution (§ 423.503)

Occasionally, organizations new to Part D that have qualified for a Medicare PDP sponsor contract withdraw their bids after we have announced the low-income subsidy (LIS) benchmark but prior to executing the contract for the coming year. These withdrawals interfere with our administration of the Part D program, in particular the auto-assignment of LIS beneficiaries. To address this problem, we proposed to adopt regulatory provisions that would impose a 2-year application ban on organizations not yet under contract with us as PDP sponsors that withdraw their applications and bids after we have issued our approvals. We made this proposal under our authority at section 1860D–12(b)(3)(D) of the Act to adopt additional contract terms, including the conditions under which we would enter into contracts, not inconsistent with the Part D statute.

In February of each year, we solicit applications from organizations seeking to qualify to enter into a contract to offer stand-alone PDPs in the upcoming plan year. These organizations, along with current PDP sponsors who wish to continue participating in the Part D program, submit bids in June for our review and approval. We review these applications and bids with the expectation that, upon approval, the organizations would enter into PDP sponsor contracts with us in September to provide the Part D benefit for the plan year starting the following January.

As part of the annual bid review, we calculate the LIS benchmark for each PDP Region based on the bids for basic PDPs submitted annually by current PDP sponsors that will operate in that region in the coming year. Sponsors whose monthly premiums fall at or below the benchmark in a region receive auto enrollments from us of LIS eligible beneficiaries in those regions. We normally announce the LIS benchmark in late July or early August.

In recent years, some organizations have withdrawn their applications and bids following the announcement of the LIS benchmark. Because these organizations withdrew prior to executing a contract, and we cannot compel them to sign the contract, they are not subject to our compliance or oversight authority, and nothing in our current regulations prevents these applicants from withdrawing their applications late enough in the process to cause significant disruption. In contrast, when an existing PDP sponsor withdraws its bid, we treat such an action as an election by the PDP sponsor to non-renew its contract in that PDP Region, which renders the sponsor ineligible to submit another application for 2 years, under our regulations at § 423.507(a)(3). We proposed to make a regulatory change to ensure equal treatment between new applicants and existing PDP plan sponsors, which would allow us to maintain an accurate depiction of the contracting landscape. Specifically, we proposed to amend § 423.503 by adding paragraph (d) which would impose a 2-year Part D application ban on organizations approved by CMS as qualified to enter into stand-alone PDP sponsor contracts but which elect, after our announcement of the LIS benchmark, not to enter into such contract and withdraw their PDP bids. This proposed regulatory change, in effect, would subject a withdrawing applicant to the same penalty we may apply to an organization already under contract that elects to terminate or not renew its PDP contract.

It is critical that we have an accurate portrayal of the number and type of plan benefit packages that would be available to beneficiaries in every PDP Region, especially during the end of the summer when much of the bid review, both the formulary and actuarial components, has been completed. During this period, we need to confirm that there is the required minimum number of plans available in each PDP region. We also need accurate plan information at the end of the summer so that we can meet the production deadlines associated with the annual election period, including publication of the Medicare & You handbook as well as updating the Medicare Plan Finder Web site and our payment and enrollment systems. An applicant that withdraws its application late in the process alters the contracting landscape, potentially disrupting preparations we have already made, including those related to the auto assignment of LIS beneficiaries, for the upcoming plan year. In adopting the proposed regulatory authority, we would place a reasonable limit on prospective PDP sponsors' option to withdraw bids and applications without penalty. By imposing consequences on applicants that withdraw their bids following the announcement of the LIS benchmark, we also would discourage any "gaming" of the bid review and auto assignment processes (for example, by participating in the bid review process until it learns that it will not qualify for auto-assignments) that can occur when applicants opt out of participation in the PDP at the last minute.

We received the following comments and our response follows:

*Comment:* A number of commenters expressed support for CMS' proposal.

*Response:* We appreciate the commenters' support of our proposal.

We received only supportive comments for this proposal; therefore, we are finalizing this provision without modification.

## 3. Essential Operations Test Requirement for Part D (§§ 423.503(a) and (c), 423.504(b)(10), 423.505(b)(28), and 423.509)

We proposed to create, through regulation, an essential operations test, which will be a new step in the application and contracting process with newly contracted entities operating as stand-alone PDP sponsors or MA organizations offering Part D plans (MA–PDs). This step will be administered to "newly contracted entities." We used the term "newly contracted entity" in the proposed rule and in this final rule to describe an organization that has entered or applied to enter into a Part D contract with us for the first time for the upcoming plan year, and neither it, nor another subsidiary of the organization's parent organization, is offering Part D benefits during the current benefit year. This

would include organizations that are offering EGWPs for the first time. Existing plan sponsors or new sponsors that are subsidiaries of a parent company that currently operates a Part D plan through another subsidiary would not be subject to the proposed essential operations test.

The essential operations test will allow us to test whether an organization's arrangements appear likely to allow the organization to effectively administer its contract. We proposed to require organizations to pass an essential operations test either—(1) as a qualification to contract, with failure to pass the test nullifying our approval of the application; or (2) after contract execution as a contract requirement but prior to the start of the benefit year, with a failure to pass the test triggering an immediate contract termination under § 423.509.

Pursuant to section 1860D–12(b)(3)(D) of the Act, which incorporates by reference section 1857(e)(1) of the Act, we have the authority to add contract provisions that are necessary and appropriate to carry out the Part D program; section 1860D–11(b) of the Act provides authority for the collection of additional information as part of the bid as we may require to carry out the Part D program. Based on this authority we proposed adding § 423.504(b)(10) and § 423.505(b)(28) to include passing an "essential operations test" as a condition to enter into and a term of the Part D contract. Additionally, pursuant to our authority at section 1860D–12(b)(3)(B) and (b)(3)(F) of the Act (which incorporate by reference section 1857(c)(2) and (h) of the Act, respectively, to apply to the Part D program), the current regulations at § 423.509(a) and (b)(2)(i), authorize immediate termination of contracts with Medicare Part D plan sponsors in certain circumstances. We believe that immediate termination would be authorized under the standard of section 1857(h)(2) of the Act because the inability of a plan sponsor to ensure future members' access their drug benefit, as evidenced by failure to pass the essential operations test, would constitute an imminent and serious risk to beneficiary health and safety. We proposed adding § 423.509(a)(4)(xii) and revising § 423.509(b)(2)(i)(C) to subpart K to reflect this new cause for immediate termination. Additionally, we proposed to explicitly include the essential operations test as a means to evaluate Part D applicants in § 423.503(a)(1) and to add § 423.503(c)(4) to subpart K to establish failure of an essential operations test as

grounds for nullifying our approval of the application notice.

Given that the heart of the Part D benefit is the sponsor's ability to process claims for prescription drugs in real time, we proposed the essential operations test and associated regulatory changes because of our experience with certain newly contracted entities in the Part D program that experienced significant operational difficulties at the start of the benefit year as a result of their inexperience administering Part D benefits. To prevent the recurrence of this problem and ensure that new sponsors are prepared to and actually can deliver Part D benefits at an acceptable level, starting with the 2015 contract year application cycle, we proposed that we may require newly contracted entities to pass an essential operations test conducted by us beginning in the fall of 2014. In response to the later anticipated date of the finalization of this provision, we expect to adjust our proposed timing and begin requiring newly contracted entities to pass an essential operations test with the 2016 contract year application cycle.

The essential operations test for newly contracted entities will entail testing of sponsors' command of Part D benefit administration rules and systems related to these areas. Initially, the testing will consist of scenario testing with sponsors' key staff to show us that they have a firm grasp of the Part D policies and essential operations. The test will be able to verify whether an applicant's administrative and management arrangements, as attested to in its application, are sufficient for the applicant to carry out functions listed in § 423.504(b)(4)(ii) such as furnishing prescription drug services and implementing utilization management programs.

Provided we have the resources, in the future, the test will likely become significantly more sophisticated and involve live testing of sponsors' systems with test data. The more involved test would also likely include testing the processes related to enrollment such as MARx communication and processing; LIS processing and determinations; coverage determinations, appeals, and grievances (CDAG) processing; and real-time coordination of benefits data exchange and processing. For instance, the sponsor would need to demonstrate the ability to pay test claims correctly in real-time consistent with its CMS-approved benefit packages (including formulary) and the Part D transition fill policy.

a. Failing Essential Operations Test as Cause for Immediate Termination

Once a sponsor signs its contract, it is obligated to perform all of the required functions to support the benefits described in the contract even though the sponsor does not start offering benefits until January 1. If we find that, based on the results of the essential operations test, a sponsor does not have the requisite systems and processes in place to offer Part D benefits in real time, our proposal was to consider this cause for immediate termination of the sponsor's Part D contract in order to protect beneficiaries from harm at the start of the contract year.

In accordance with section 1857(h)(2) of the Act (incorporated by reference into PDP by section 1860D–12(b)(3)(F) of the Act), we have the authority to immediately terminate a contract with a sponsor (without notice and opportunity for a hearing) when a delay in termination would pose an imminent and serious risk to the health of beneficiaries enrolled in the sponsor's plans. Also, under §§ 423.509(b)(2)(i) and 423.652(b)(2), unlike standard CMS terminations, the effective date of an immediate termination is not stayed when the sponsor requests a hearing under § 423.650(a)(2). Because enrollment and accurate benefit administration through real time claims processing are so fundamental to the delivery of the Part D benefit, if a sponsor fails to demonstrate to us that it can perform these essential operations, we would view this as a substantial failure to meet the Part D contract requirements on the following grounds: (1) Evidence that the sponsor was carrying out the contract in a manner that was inconsistent with the effective and efficient administration of the plan; and (2) evidence that the sponsor did not substantially meet the applicable conditions set out in the Part D regulations which would ultimately justify, depending upon timing of the test, our termination of a contract consistent with § 423.509(a)(1) through (3) based on the sponsor's failure to meet our proposed contract terms at § 423.504(b)(10) and § 423.505(b)(28). We believe that a newly contracted entity's failure to demonstrate certain critical capabilities and failing the essential operations test represents a substantial failure to carry out its Part D contract. Such a failure poses an unacceptable risk to the new sponsor's future members' access to Part D drugs, which would constitute an imminent and serious risk to beneficiary health and safety, justifying our immediate termination of the sponsor's contract.

NJAPP0522

For MA organizations that must offer Part D benefits pursuant to § 423.104(f)(3)(i), failing the test would support the termination of the organization's Part D addendum as well as its MA contract under § 422.510(a)(3) because the inability to offer Part D benefits means that the organization no longer meets the applicable conditions associated with offering Part C benefits.

b. Failing Essential Operations Test as Failure of a Qualification to Contract and Grounds for Nullification of Approval

If an organization fails an essential operations test we conducted prior to contract signature, we proposed that no termination would be necessary and that we would nullify our previous conditional approval of the organization's Part D contract qualification application. We proposed to explicitly include the essential operations test as a qualification to contract at § 423.503(a)(1) to authorize our use of the test and any information learned in the course of the essential operations test in making the contract determination.

We would view failure of the essential operations test as evidence that the applicant is not qualified to contract with us. As a result, we would nullify our approval based on determining the entity is not qualified. Successful applicants receive a conditional approval at the end of May of their Part D application in accordance with § 423.503(c)(1). The letter informs applicants that the conditional approval is based on the information contained in their application, and if we subsequently determined that any of the information was inaccurate or that qualification requirements are not met, we would withdraw the approval of the application. Through that notice, we preserve the right to nullify our approval. If that occurs, we would not provide the appeal rights described in part 423, subpart N to applicants that have their approval nullified based on failing the essential operations test because an appeals process started at that point could not be completed by the September 1 deadline imposed by § 423.650(c) for contracts to be effective on January 1 of the following year.

We received the following comments and our response follows.

*Comment:* Most commenters strongly supported CMS' proposals.

*Response:* We appreciate the support for these proposals.

*Comment:* Several commenters requested that CMS elaborate on the content of the essential operations test.

*Response:* Our plan is to initially offer the essential operations test in scenario format rather than in practice. Scenario format means that we will provide the applicant or newly contracted sponsor with written scenarios or stories about fictional beneficiaries. The scenarios will describe the characteristics of the beneficiary such as plan enrollment, LIS level, prior drug claims data, prior authorization criteria information, application date, and any other details necessary for answering our questions. The questions would pertain to topics such as determining the correct effective date of coverage; the appropriate timeframes for specific notifications; drug dispensing formats and requirements; drug coverage and costs; coverage determination process; coordination of benefits; and demonstrating knowledge of new requirements for the upcoming year. The real time test, which may also be combined with scenario tests, would involve electronic data exchanges between CMS and the new organization and/or its PBM, claims processor, enrollment processor, and any other entity contracted with the new organization to carry out key Part D functions.

*Comment:* Several commenters expressed concern that CMS would expect the new organization to demonstrate full system readiness in September. Other commenters provided information about the development schedule that their organizations follow for the upcoming benefit year.

*Response:* It is not our expectation that a new organization would have all systems ready to implement the Part D benefit in September. We appreciated the information regarding the development schedule, and we will use the information to inform, in part, our expectations of system readiness when we administer a real time test.

*Comment:* Several commenters requested that CMS provide new organizations with information about the system requirements of the essential operations test no later than May of each year.

*Response:* We are aware that new organizations would need time to ensure that the proper infrastructure is in place for real time communication and electronic data exchange with CMS (and our contractors). Therefore, within sufficient time to allow it to make necessary arrangements prior to the test, we will inform the new organization of the types of data files that we will send or exchange. We are unlikely to provide this information before the end of May because, at that time, new organizations will have not yet submitted bids. The

essential operations test criteria may be developed based upon areas of concern we identify during the application, bid, and formulary review processes; therefore, in May we may not be certain of the test contents and parameters.

*Comment:* Several commenters suggested that CMS complete the essential operations test before November 1 due to the heavy workload in the last quarter of the year.

*Response:* We are aware of the heavy workload at the end of the year created by the annual election period and preparations for the start of the new benefit year. We will try to complete essential operations tests prior to November 1.

*Comment:* A commenter, a current Part D sponsor, was concerned that this provision would apply to existing or experienced sponsors.

*Response:* We clarify that this provision would not apply to existing sponsors. Rather, as stated at § 423.503(c)(4)(ii), the essential operations test will only be required of new organizations that do not have any Part D experience or a subsidiary/parent relationship with an experienced organization. If the new organization's parent company currently has other subsidiary organizations that are already offering Part D plans, then the new organization would not be subject to the essential operations test.

We note that the proposed provisions of §§ 423.504(b)(10) and 423.505(b)(28) each began with the phrase, "Effective contract year 2015,". This language, originally published in January 2014 as part of a proposal that at the time was expected to be made final in the middle of 2014, has since become outdated and therefore has been deleted from the final version of the rule. The proposed language was intended to make clear that even though the rule was expected to be finalized during the CY 2015 application review cycle we would apply the essential operations test to eligible applicants during that cycle. These provisions are now being made final after the period during which CY 2015 essential operations tests would have been conducted (that is, the fall of 2014). They will also be finalized well in advance of the start of the CY 2016 application cycle in late February 2015, so there is no need to provide a special signal to CY 2016 applicants that they may be subject to the essential operations test other than through the publication of this final rule.

We also note that we are finalizing with modification the proposed provision of § 423.505(b)(28). We are finalizing this provision as

§ 423.505(b)(27), instead of § 423.505(b)(28).

In summary, given the support for this proposal, we are finalizing these provisions with only the technical modifications described previously.

### E. Implementing Other Technical Changes

#### 1. Requirements for Urgently Needed Services (§ 422.113)

Many MA plans have responded to the need to provide urgently needed services outside of the network's business hours, for example, during the weekend or at night, by contracting with clinics that have hours of operation well beyond those of traditional physicians' offices to furnish services to their enrollees when the plan network is not available.

To better align the regulations with current practices regarding access to urgently needed care services, we proposed to revise the regulation by removing the phrase "under extraordinary and unusual circumstances" from the definition of "urgently needed services" at § 422.113(b)(1)(iii). The revised regulatory language would ensure that enrollees have access to out-of-network facilities in non-extraordinary circumstances.

We received the following comments on this proposal and our response follows:

*Comment:* Several commenters supported the policy because it provides improved access to enrollees.

*Response:* We thank these commenters for their support.

*Comment:* A commenter stated that CMS' proposed revision would be burdensome on plans and would not improve health care to enrollees.

*Response:* In the January 10, 2014 proposed rule, we noted that many plans already contract with clinics that operate 24 hours/day, 7 days/week (24/7) to address the needs of enrollees who need care on weekends or after normal business hours (79 FR 2018). We also noted that there are a small number of appeals each year from enrollees who sought care out-of-network on weekends or after normal business hours and were denied coverage.

We do not believe our proposal adds any burden to health plans. Our proposed revision to the regulation aligns it with current practices for provision of urgently needed services and our intent that enrollees have access to needed care. In fact, we believe that plans could realize savings by making urgently needed services available in settings that are more appropriate to the

enrollees' needs than more costly hospital emergency departments.

*Comment:* A commenter expressed concern that the proposed regulatory language does not specify the circumstances under which the organization's provider network is temporarily unavailable or inaccessible and that, as a result, enrollees might frequently leave the network to obtain care.

*Response:* Circumstances under which the organization's provider network is temporarily unavailable or inaccessible would largely include weekends or after normal business hours, which we believe is clearly understood from the discussion in the notice of proposed rulemaking. If more extreme situations, such as a natural disaster, result in the network being temporarily unavailable, this rule would apply in those situations as well.

*Comment:* A commenter requested greater clarification of the definition of urgently needed services.

*Response:* The definition of urgently needed services, provided at § 422.113(b)(1)(iii), presents several specific requirements for a service to be classified as urgently needed. Additional clarification of the definition of urgently needed services may be found in the preamble to the June 29, 2000 final rule establishing the Medicare+Choice program (65 FR 40198 and 40199). We believe this definition, as modified by the removal of the phrase "extraordinary and unusual circumstances," is sufficient.

After review of the public comments received, we are finalizing the proposed revision to § 422.113 without modification.

#### 2. Agent and Broker Training and Testing Requirements (§§ 422.2274 and 423.2274)

We proposed to revise §§ 422.2274(b) and (c) and 423.2274 (b) and (c) to accomplish the following: (i) Remove CMS-endorsed or approved training and testing as an option; (ii) require that agents and brokers be trained annually on Medicare rules and regulations and details specific to the plan products they intend to sell; and (iii) require annual training to ensure appropriate knowledge and understanding of Medicare rules and specific plan products. Pursuant to our authority under sections 1851(h)(2), 1860D–1(b)(1)(B)(vi), 1851(j)(2)(E), and 1860D–4(l)(2) of the Act, we previously codified agent and broker training and testing requirements at §§ 422.2274 (b) and (c) and 423.2274 (b) and (c) to require all agents and brokers selling Medicare products be trained and tested annually

through a CMS-endorsed or approved training program, or as specified by us, on Medicare rules and regulations specific to the plan products they intend to sell.

As we noted in the preamble to the proposed rule, since the training and testing requirements were implemented, we have embarked on various activities to improve and ensure the efficacy of training and testing. We also noted that, through our monitoring efforts, plans are complying with the annual guidance and providing an adequate level of detailed information. Furthermore, our ability to nationally accommodate agents and brokers through various training and testing modules creates a significant burden. We also noted in the preamble to the proposed rule that our ability to maintain consistency with endorsing other entities that would facilitate the training and testing and oversee these entities is limited.

We also proposed that the provisions for "Reducing the Burden of the Compliance Program Training Requirements" (§§ 422.503(b)(4)(vi)(C) and 423.504(b)(4)(vi)(C)) require a standardized compliance training program and that, under those provisions, MA organizations and Part D sponsors would not be permitted to develop and implement plan specific training materials or supplemental materials. The requirement in this section is exclusive for agent and broker marketing activities under the MA and Part D program.

We received the following comments and our response follows:

*Comment:* A commenter supported the provision. However, the commenter requested clarification as to whether CMS will continue to provide annual guidance on training and testing requirements for agents and brokers.

*Response:* We appreciate the commenter's support and will continue to provide annual guidance on the training and testing requirements.

*Comment:* A commenter stated that the provision assigns responsibility for the annual agent/broker training to the MA organization, which is an operational burden and additional cost.

*Response:* We disagree. Since MA organizations and Part D sponsors currently facilitate the agent broker training and testing or contract with a third party, our proposal would not create an operational burden or cost.

*Comment:* A few commenters stated that this provision potentially conflicts with the proposed requirement under § 422.503 that MA organizations and Part D sponsors use only CMS training for general compliance. A commenter requested clarification on how the first

NJAPP0524

tier. downstream, and related entities' standardized training applies to agents and brokers.

*Response:* We believe that this provision does not conflict with the proposed provision in § 422.503. The provision in this section is specific to marketing activities for MA organizations and Part D sponsors.

After review of the public comment received on this proposed provision, we are finalizing this provision without modification.

**3. Deemed Approval of Marketing Materials (§§ 422.2262, 422.2266, 423.2262, and 423.2266)**

In the January 10, 2014 proposed rule, we proposed to move the substance of the current requirements in §§ 422.2266 and 423.2266 to 422.2262(a)(2) and 423.2262(a)(2), respectively. As previously noted, §§ 422.2266 and 423.2266 provide the regulatory requirements for materials that are deemed approved. These requirements are part of the review and distribution process of marketing materials. Therefore, the provisions were moved to align with the requirements in §§ 422.2262 and 423.2262. Additionally, we proposed reserving §§ 422.2266 and 423.2266 to further clarify the requirements for deemed materials by revising them to state that, if CMS does not approve or disapprove marketing materials within the specified review timeframe, the materials will be deemed approved. Deemed approved means that an MA organization or Part D sponsor may use the material. We believe that this change clarifies the present regulatory requirement for deemed marketing materials.

We received several comments regarding this provision, and our responses follow.

*Comment:* Several commenters supported this provision. However, a few commenters did request clarification, while others emphasized the importance of streamlining the review and approval process for FIDE SNPs. A commenter also stated that CMS, Medicaid, and the plans should work closer to benefit enrollees.

*Response:* We thank the commenters for supporting our proposal to revise this provision. In response to the request for further clarification, we will consider including additional guidance in the Medicare Marketing Guidelines as that is the appropriate vehicle for providing detail on the requirements. We also appreciate the concerns with streamlining the review and approval process for FIDE SNPs; however, the comment is outside the scope of this rule.

*Comment:* A commenter opposed this provision on the grounds that MA organizations are expanding and offering more plan offerings with higher penetration rates in certain counties and regions. The commenter also stated that CMS is responsible for ensuring that marketing practices and materials are carefully monitored.

*Response:* While we appreciate the commenter's concern, we do not believe that the expansion of plan offerings will have an impact on this provision. Since this provision has been in existence, our analysis of deemed materials has shown that very few marketing materials have been approved through this process. Furthermore, we have protocols in place to monitor marketing materials, including materials that are deemed approved. We note in the Medicare Marketing Guidelines that we may require an MA organization or Part D sponsor to change any previously approved marketing materials if found to be inaccurate, altered or otherwise noncompliant.

After review of the public comments received on this proposal, we are finalizing this proposed provision without modification.

**4. Cross-Reference Change in the Part C Disclosure Requirements (§ 422.111)**

In the January 10, 2014 proposed rule, we proposed a technical correction to § 422.111(d)(1) to reflect the correct cross reference for procedures that MA organizations must follow when submitting changes to their rules for review. Section 422.111(d)(1) currently references § 422.80, which was removed when the marketing requirements were moved to subpart V, Medicare Marketing Requirements. We noted previously that subpart V, Medicare Marketing Requirements, was published in the September 18, 2008, final rule (73 FR 54208).

We received no comments on our proposal and therefore are finalizing this provision without modification.

**5. Managing Disclosure and Recusal in P&T Conflicts of Interest: Formulary Development and Revision by a Pharmacy and Therapeutics Committee Under Part D (§ 423.120(b)(1))**

Section 1860D–4(b)(3)(A)(ii) of the Act requires Part D sponsors who use formularies to include on their P&T committees at least one practicing physician and at least one practicing pharmacist, each of whom is independent and free of conflict with respect to the sponsor and the plan and who has expertise in the care of elderly or disabled persons. In our August 3, 2004 proposed rule (69 FR 46659), we

proposed to interpret "independent and free of conflict" to mean that such P&T committee members could have no stake, financial or otherwise, in formulary determinations. In our January 28, 2005 final rule (70 FR 4256), we adopted this interpretation, and clarified that we would consider a P&T committee member not to be free of conflict of interest if he or she had any direct or indirect financial interest in any entity—including Part D plans and pharmaceutical manufacturers—that would benefit from decisions regarding plan formularies.

In a recent report ("Gaps in Oversight of Conflicts Of Interest in Medicare Prescription Drug Decisions," OEI–05–10–00450), the HHS OIG recommended improvements in our requirements for Part D plan P&T committees. Specifically, the OIG report recommended that we establish minimum standards to ensure that these committees have clearly articulated and objective processes to determine whether disclosed financial interests are conflicts and to manage recusals due to conflicts of interests. The OIG report also suggested that we tell sponsors that they need to designate an objective party, such as a compliance officer, to flag and enforce the necessary recusals. In other words, the identification and evaluation of whether a disclosed financial interest represents a conflict of interest should be made by a knowledgeable and accountable representative of the sponsor's organization, such as the compliance officer, and not solely by the P&T committee members themselves. We concurred that P&T committees should have clearly articulated and objective processes to determine whether disclosed financial interests are conflicts, and to manage recusals arising from any such conflicts. Therefore, we proposed to revise our regulations at § 423.120(b)(1) to renumber the existing provisions and add a new paragraph (b)(1)(iv) to require that the sponsor's P&T committee clearly articulates and documents processes to determine that the requirements under paragraphs (b)(1)(i) through (iii) have been met, including the determination by an objective party of whether disclosed financial interests are conflicts of interest and the management of any recusals due to such conflicts.

We also solicited comment on the pros and cons of defining PBMs as entities that could benefit from formulary decisions from which one practicing physician and one practicing pharmacist on the P&T committee must be free of conflict of interest.

NJAPP0525

We received the following comments and our response follows:

*Comment:* A commenter noted that the current CMS formulary review process provides the necessary protections to beneficiaries and ensures that formularies are developed and managed in accordance with best practices. This commenter also pointed out that since the P&T committee members do not generally provide their services for free, it is standard practice that the PBM compensates the committee members for their committee-related activities; thereby, providing a financial conflict of interest. The commenter believes that without this financial compensation it would be difficult to engage qualified clinicians for the committee.

*Response:* While the compensation that P & T committee members receive from PBMs for performing committee-related activities could be seen as a potential conflict of interest, this practice is widely known and generally accepted as necessary to engage the most qualified clinicians. Moreover, we agree with the commenter that the current CMS formulary review process provides the necessary protections to beneficiaries and ensures that formularies are developed and managed in accordance with best practices. We have devoted extensive resources to the oversight of plan formularies and the audit of P&T committee proceedings to ensure that they comply with industry best practices and ensure beneficiaries' access to clinically appropriate therapies. As discussed more fully in the January 10, 2014 proposed rule (79 FR 2019), we believe that our current formulary review process confers appropriate protections to beneficiaries from any potential adverse effects of conflicts of interest.

The OIG report recommended that the P & T committee should have clearly articulated and objective processes to determine if disclosed financial interests are conflicts, and to manage any recusals if conflicts are found. We concur with this recommendation and proposed to revise our formulary requirements pertaining to the development and revision by a P & T committee at § 423.120(b)(1) to make it clear that the Part D sponsor must establish these processes. In our response to the OIG report, we noted that statutory and regulatory provisions (section 1860D–4(b)(3) of the Act and 42 CFR 423.120(b)) indicate that it is the plan's responsibility to meet the formulary requirements; which include the development of these processes.

*Comment:* Several commenters supported CMS' proposal that P&T committee processes must be clearly articulated, documented, and enforced by an objective party. However, a commenter requested that CMS better define the term "objective party" to include a knowledgeable and accountable person at the PBM.

*Response:* We agree with the commenter and clarify that the objective party may be a representative of the PBM, as long as that representative is not also a member of the sponsor's P&T committee. The objective party should be someone not on the P & T committee, and may include a representative from the PBM that is not on the P & T committee.

*Comment:* A commenter pointed out that while the proposed recusal process is logical, it is duplicative and the current P&T policy is sufficient for dealing with conflicts of interest.

*Response:* We disagree with the commenter and concurred with the OIG report's recommendation (as discussed in the January 2014 proposed rule) that P&T committees should have clearly articulated and objective processes to determine conflicts of interest and manage any recusals. We are implementing these requirements on the recommendation of OIG. These requirements are supplemental to the beneficiary protections outlined in existing P&T policy, which does not address recusal and only provides that committee members should sign a conflict of interest statement revealing economic or other relationships with entities affected by drug coverage decisions that could influence committee decisions.

After review of the comments received, we are finalizing this provision without modification.

## 6. Thirty-Six Month Coordination of Benefits (COB) Limit (§ 423.466(b))

In our April 15, 2010 final rule (75 FR 19819), we exercised our authority under sections 1860D–23 and 1860D–24 of the Act to impose a timeframe on the coordination of benefits between Part D sponsors and other payers including State Pharmaceutical Assistance Programs (SPAPs), other providers of prescription drug coverage, or other payers. In the April 15, 2010 final rule, we explained our approach to determining the 3-year timeframe, including the benefits derived from its establishment.

We stated in our regulation at § 423.466(b) that, Part D sponsors must coordinate benefits with SPAPs, other entities providing prescription drug coverage, beneficiaries, and others paying on the beneficiaries' behalf for a period not to exceed 3 years from the date on which the prescription for a covered Part D drug was filled. The phrase "a period not to exceed 3 years" has caused confusion among some sponsors, who interpreted this to mean that the coordination of benefits period could be shorter than 3 years and have consequently imposed tighter timeframes for coordination of benefits.

To clarify the requirement and avoid further confusion, we proposed to remove from the regulation the phrase "not to exceed," and add the word "of." This would clarify that sponsors must employ a coordination of benefits period of 3 years, and would remove any uncertainty about whether they may impose a shorter coordination of benefits period.

We also proposed to revise the heading of § 423.466 to reference claims adjustments, which are addressed in § 423.466(a).

*Comment:* A commenter indicated the proposed change was an appropriate modification.

*Response:* We appreciate the support for this provision.

*Comment:* A few commenters suggested we define the date on which the 3-year COB limit begins as the date the drug is dispensed or the first date of service.

*Response:* The regulation already specifies the 36-month period begins on the date the prescription for a covered Part D drug was filled. However, we note the date of fill as referenced in the regulation is synonymous with the NCPDP date of service (Field # 401–D1) included in HIPAA standard transactions, such as the billing transaction, and required on the Part D prescription drug event record.

After review of the public comments received in response to this proposal, we are finalizing the provision as proposed.

## 7. Application and Calculation of Daily Cost-Sharing Rates (§ 423.153)

We proposed technical changes to the daily cost-sharing rate regulation to clarify the application and calculation of daily cost-sharing rates and cost sharing under the regulations. Section 423.153(b)(4)(i) requires sponsors to establish and apply a daily cost-sharing rate whenever a prescription is dispensed by a network pharmacy for less than a 30-days' supply, unless the drug is excepted in the regulation. Currently, under § 423.100, in cases when a copayment is applicable, "daily cost-sharing rate" is defined as the monthly copayment under the enrollee's Part D plan, divided by 30 or 31 and rounded to the nearest lower dollar amount, if any, or to another amount,

but in no event to an amount that would require the enrollee to pay more for a month's supply of the prescription than would otherwise be the case. We proposed to replace the numbers with the phrase "the number of days in the approved month's supply for the drug dispensed" to address how Part D sponsors that have other days' supplies as their month's supplies are to calculate daily cost-sharing rates.

Also, under our existing definition of "daily cost-sharing rate" in § 423.100, as noted previously, and with respect to copayments, the daily copayment cannot be an amount that would require the enrollee to pay more for a month's supply of the prescription than would otherwise be the case. In other words, rounding up is not permitted under the current definition of "daily cost-sharing rate" and this has been another cause of confusion for some Part D sponsors. While our original intention was to prohibit significant increases in cost sharing, such as charging the full 30-day copay for both the trial supply and any subsequent refill of a medication, the current limitation on any increase in cost sharing over the 30-day supply amount has reportedly led to unnecessarily complicated programming, as well as proration of other amounts on the claim, such as the dispensing fees. Therefore, we proposed to replace the language "lower dollar amount, if any, or to another amount," with "the nearest cent." We believe this language better conveys the concept of rounding, while realizing this language allows Part D sponsors to round daily cost-sharing rates up or down to the nearest 2 decimal places.

We also proposed other technical changes to the daily cost-sharing rate regulation at § 423.153(b)(4)(i) to improve the regulation's clarity. First, we proposed to consolidate the language of § 423.153(b)(4)(i)(A) into § 423.153(b)(4)(i) and to consolidate § 423.153(b)(4)(i)(B)(1) and (2) into a new paragraph § 423.153(b)(4)(ii). Second, we proposed that the language in § 423.153(b)(4)(i) that addresses the application of the daily cost-sharing rate in the case of a monthly copayment be revised for clarity, and moved to a new paragraph (b)(4)(iii)(A). This paragraph states that in the case of a drug that would incur a copayment, the Part D sponsor must apply cost-sharing as calculated by multiplying the applicable daily cost sharing rate by the days' supply actually dispensed when the beneficiary receives less than a 30-days' supply. Third, we proposed that § 423.153(b)(4)(iii)(B) states that, in the case of a drug that would incur a coinsurance percentage, the Part D

sponsor must apply the coinsurance percentage for the drug to the days' supply actually dispensed. We note that this means, with respect to dispensing fees, that the enrollee's portion of additional dispensing fees for the incremental supply is calculated by application of this percentage. These technical clarifications should assist sponsors in correctly setting, calculating, and applying daily cost-sharing rates in the retail and LTC settings whenever a prescription is dispensed by a network pharmacy for less than a 30-days' supply, unless the drug is excepted in the regulation. The proposal solicited comments on whether sponsors needed additional guidance surrounding the rounding methodology.

We received the following comments and our responses follow:

*Comment:* We received several comments in support of our proposal to clarify the daily cost sharing rule.

*Response:* We thank the commenters for their supportive comments on our proposal.

*Comment:* A commenter requesting that the application of the daily cost-sharing rule should be consistent with the changes CMS proposed to the definition of the "daily cost-sharing rate." In other words, the commenter recommended that the daily cost-sharing rule apply whenever less than the approved month's supply is dispensed; rather than, whenever less than a 30-day supply is dispensed. The commenter highlighted that this change would ensure beneficiaries are not required to pay more than they otherwise would have. This is consistent with CMS' intent that even when the member does receive the remainder of a month's supply, the total payment not exceed the 1-month's cost sharing, except by a nominal rounding amount. This commenter provided the following example: A plan's approved month's supply is 34 days, and the applicable copayment is $30. If a member first obtains a 30-day supply and then a 4-day supply, under the current regulatory language, which provides that the daily cost-sharing rule applies when a covered Part D drug is dispensed for a supply less than 30 days, the member would pay $30 for the first supply since it is not for "less than 30 days" and then $3.52 (4 × $0.88) for the second supply, for a total of $33.52. However, if the daily cost-sharing rule applied whenever less than the approved month's supply is dispensed, the member would pay $26.40 (30 × $0.88) for the first supply and $3.52 (4 × $0.88) for the second, for a total of $29.92.

*Response:* We were persuaded by the comments that this suggested change is necessary to avoid confusion with the technical change that we proposed, by making the terminology consistent with the regulatory text. Therefore, we are making the following change to the final regulatory text: Replace "30 days" with "approved month's supply" in § 423.153(b)(4)(i) and (iii).

*Comment:* Several commenters indicated that CMS guidance is needed regarding the rounding methodology.

*Response:* We will provide additional rounding guidance, if needed, after publication of this final rule.

Based on comments received, we are finalizing this proposal as proposed and with the following modification: replacing "30 days" with "approved month's supply" where applicable in § 423.153(b)(4)(i) and (iii).

## 8. Technical Change To Align Regulatory Requirements for Delivery of the Standardized Pharmacy Notice (§ 423.562)

The current regulations at § 423.562(a)(3) require Part D plan sponsors to make arrangements with their network pharmacies to distribute notices instructing enrollees how to contact their plans to obtain a coverage determination or request an exception. This is accomplished through delivery of a standardized notice, CMS–10147—"Medicare Prescription Drug Coverage and Your Rights" ("pharmacy notice"). Section 423.562(a)(3) cross-references § 423.128(b)(7)(iii), added in our April 2011 final rule (76 FR 21432), which requires plans to have a system in place that transmits codes to network pharmacies so the pharmacy is notified to deliver the pharmacy notice at the POS in designated circumstances where the prescription cannot be filled as written.

Pursuant to the 2011 regulatory change, we issued subsequent guidance (HPMS memoranda dated October 14, 2011 ("Revised Standardized Pharmacy Notice") and December 27, 2012 ("Revised Guidance for Distribution of Standardized Pharmacy Notice")) which clarifies that distribution of the pharmacy notice is required upon receipt of certain transaction responses indicating that the claim is not covered by Part D, as well as revised manual guidance in Chapter 18, section 40.3.1 of the Medicare Prescription Drug Benefit Manual related to operationalization of this requirement specific to a variety of specialty pharmacy settings.

In practice, we have never based distribution of or referral to the pharmacy notice on whether or not the

enrollee disagrees with information provided by the pharmacist, but rather on whether the drug in question can be provided under Part D and whether the enrollee is able to obtain coverage for the drug at the pharmacy counter. Because the existing regulation text at § 423.562(a)(3) ties delivery of the pharmacy notice to the enrollee's disagreement with information provided by the pharmacist, we proposed to remove this reference.

This proposed technical change would not alter the circumstances under which the pharmacy notice must be delivered to an enrollee and will align the regulation and the operational requirements for distribution of the pharmacy notice. In addition, this proposed change would be consistent with both the current OMB-approved instructions regarding the pharmacy notice and current CMS manual guidance.

We do not prohibit distribution of the pharmacy notice in any circumstance, so pharmacies may choose to also provide a copy of the notice in circumstances where the enrollee disagrees with the information provided (for example, if the enrollee believes they are being charged an incorrect cost-sharing amount), but the notice is not required under the standards established in § 423.128(b)(7)(iii). Provision of the pharmacy notice is not a prerequisite for an enrollee to request a coverage determination or access the appeals process. Similarly, a plan sponsor's failure to comply with the requirements of § 423.128(b)(7)(iii) or § 423.562(a)(3) does not in any way limit an enrollee's right to request a coverage determination or appeal.

We received no comments on this proposal and therefore are finalizing the proposed revision to this provision without modification.

9. MA Organization Responsibilities in Disasters and Emergencies (§ 422.100)

We proposed to add paragraph (m) to § 422.100 to codify and further clarify an MA organization's responsibilities when health plan services are affected by public health emergencies or disasters in order to ensure that beneficiaries continue to have access to care in situations in which normal business operations are disrupted due to public health emergencies or disasters and enable out-of-network providers to be informed of the terms of payment for furnishing services to affected enrollees during public health emergencies or disasters.

The proposed new paragraph would require MA organizations to ensure access, at in-network cost sharing, to

covered services even when furnished by noncontracted providers when disruption in the service area impedes enrollees' ability to access contracted providers and/or contracted providers' ability to provide needed services. The new paragraph also provides the basis for determining the beginning and end of a disaster or emergency, and requires that the organization annually post on its Web site and notify enrollees and contracted providers of its disaster and emergency policies.

We received the following comments on this proposal and our response follows:

*Comment:* A commenter requested clarification of whether this proposed requirement applies if plan service delivery is not affected even though in a declared disaster area.

*Response:* Generally, a disaster creates multiple disruptions. For example, although provider offices may be operating as usual, transportation, electricity and phone service may be disrupted. Consequently, the proposed requirements would apply to all MA plans from the time the disaster is declared and continue to apply until the end of the disaster, as described in the proposed paragraph (m)(3).

*Comment:* Several commenters stated that the proposed revision should only apply to emergency and urgently needed services that are sought during a public health emergency or disaster.

*Response:* To the extent possible, we expect MA plans to provide continued and uninterrupted access to all health care services covered by the plan, whether routine or unforeseen. Disruption to a plan's network does not relieve an MA plan from fulfilling its contractual obligation to furnish all covered services to enrollees, even if it must do so by covering services furnished to its enrollees by noncontracted providers.

*Comment:* A commenter suggested that reduced out-of-network cost sharing be required only if contracted providers are unavailable or not accessible.

*Response:* Availability of networks depends on several factors—the status of provider offices, transportation, phone service, electric service, etc.—which may be impacted to varying degrees during a disaster. The primary goal during a disaster is the provision of continued and uninterrupted access of health care to all enrollees. To achieve this goal, enrollees must be allowed to obtain medically necessary plan-covered services without prior approval, at in-network cost sharing, from qualified providers, even if those providers are out-of-network.

*Comment:* A commenter stated that CMS should reconsider how this proposed regulation may manipulate enrollee incentives, reduce access for enrollees that need services more urgently and increase costs to MA organizations and the MA program.

*Response:* We recognize that disasters can create unavoidable disruptions and increased costs for MA organizations. Our primary goal during a disaster is the provision of continued and uninterrupted access to medically necessary plan-covered services for all enrollees. Our intention is to facilitate achievement of this goal by ensuring that plans facilitate increased access to providers from whom enrollees in the disaster area may seek high quality services at in-network cost sharing. We do not believe that these temporary and unusual episodes of increased access will incentivize enrollees in a negative way or result in significant cost increases for affected MA organizations.

After review of the public comments received on this proposal, we are finalizing the proposed provisions with modification. To provide for greater readability, we are finalizing paragraph (m)(1)(iii) with slight revisions to the text from the proposed version.

10. Technical Changes To Align Part C and Part D Contract Determination Appeal Provisions (§§ 422.641 and 422.644)

Sections 1857(h) and 1860D–12(b)(3)(F) of the Act describe the procedures for termination for both MA organizations and Part D Plan sponsors, respectively. These statutory provisions provide a contracting organization with an opportunity for a hearing before its contract is terminated. Appeal procedures were established under sections 1856(b)(2) and 1860D–12(b)(3) of the Act for both Part C and Part D sponsors, respectively. Sections 422.641 and 423.641 list the types of Part C and Part D contract determinations that may be appealed.

a. Technical Change (§ 422.641)

Currently in § 422.641, the contract termination is discussed in paragraph (b) and contract non-renewal is discussed in (c). Conversely, in § 423.641 the contract terminations are discussed in paragraph (c) and contract non-renewal is discussed in (b). Therefore, we proposed to align § 423.641 with the current list order for (b) and (c) in the contract determinations section at § 422.641.

NJAPP0528

b. Technical Changes (§ 422.644(a) and (b))

Sections 1857(h)(1)(B) and 1860D–12(b)(3)(F) of the Act describe the procedures for contract terminations for both MA organizations and Part D sponsors, respectively. In § 423.642(a) we specify that the notice is based upon a contract determination made "under § 423.641." Therefore, since Part C and Part D language should be consistent, the same reference should be made in the corresponding Part C § 422.644(a). To remedy this, we proposed to insert "under § 422.641" into § 422.644(a) for Part C contract determinations.

In addition, the Part D plan sponsor language in § 423.642(b) states "(b) The notice specifies the—(1) Reasons for the determination; and". The corresponding Part C language in § 422.644(b) states that "(b) The notice specifies—(1) The reasons for the determination; and". We proposed to change § 422.644(b) by moving the word "the" and revising it to read "(b) The notice specifies the—(1) Reasons for the determination; and".

We received no comments on this proposal and therefore are finalizing these changes without modification.

11. Technical Changes To Align Parts C and D Appeal Provisions (§§ 422.660 and 423.650)

Sections 1857(h)(1)(B) and 1860D–12(b)(3)(F) of the Act provide organizations with an opportunity for a hearing before its contract is terminated in the Part C and Part D programs, respectively. Appeal procedures were established under section 1856(b)(2) of the Act for both MA organizations and Part D plan sponsors.

We proposed to replace the term "under" with the phrase "in accordance with" in § 422.660(a)(2), § 422.660(a)(3), and § 423.650(a)(2). We proposed to replace the word "and" with "through" in § 423.560(a)(4) to ensure consistency between § 422.660(a)(4) and § 423.650(a)(4). In addition, we proposed to modify § 422.660(b)(4) and § 423.650(b)(4) to add the language "§ 422.752(a) through (b)" and "§ 423.752(a) through (b)", respectively, to refer the reader to the applicable regulations for intermediate sanctions.

We received no comments on this proposal and therefore are finalizing this provision without modification.

12. Technical Change to the Restrictions on Use of Information Under Part D (§ 423.322)

We proposed a technical change to § 423.322 due to section 6402(b)(1) of the Affordable Care Act which amended section 1860D–15(f)(2) of the Act. For background, most of the payment provisions for the Part D program are found in section 1860D–15 of the Act, and as originally enacted, both subsections (d) and (f) authorized the Secretary to collect any information needed to carry out this section but also stated that information disclosed or obtained pursuant to section 1860D–15 of the Act may be used by officers, employees, and contractors of HHS only for the purposes of, and to the extent necessary in, carrying out section 1860D–15 of the Act.

Section 6402(b)(1) of the Affordable Care Act amended section 1860D–15(f)(2) of the Act to relax the limitation on the use of information that is disclosed or obtained under section 1860D–15 of the Act. Specifically, the Affordable Care Act removed the word "only" from subsection (f)(2)(A) and added a new subsection (ii) which states that information disclosed or obtained under section 1860D–15 of the Act may be used by officers, employees, and contractors of HHS for the purposes of, and to the extent necessary, in conducting oversight, evaluation, and enforcement under this title. Section 6402(b)(1) of the Affordable Care Act also added a new subsection (B) which states that information disclosed or obtained pursuant to section 1860D–15 of the Act may be used by the Attorney General and the Comptroller General of the United States for the purposes of, and to the extent necessary, in carrying out health oversight activities. Thus, the Affordable Care Act considerably broadened the purposes for which HHS, its contractors, and the Attorney General and Comptroller General may use such information. However, we note, that the Affordable Care Act did not change the existing restriction on the use of information under subsection (d).

In light of the Affordable Care Act amendment to section 1860D–15(f) of the Act, we proposed to make conforming changes to § 423.322.

We received no comments regarding this proposal and are finalizing the proposed amendments to this provision without modification.

13. Technical Changes to Requirements Related to Qualified Prescription Drug Coverage (§ 423.104)

In the April 15, 2010 **Federal Register** (75 FR 19711), we finalized new requirements at § 423.104 related to qualified prescription drug coverage. At that time, we codified a new paragraph, § 423.104(d)(2)(iii) stating that tiered cost sharing under (d)(2)(ii) of the same paragraph may not exceed levels annually determined by CMS to be discriminatory. In the April 15, 2011

**Federal Register** (76 FR 21432), the language at (d)(2)(iii) was inadvertently removed when making other revisions to § 423.104.

To reinstate the language that was removed, we are including a technical change to add this language back to § 423.104. This technical correction does not represent a change in policy.

14. Technical Changes to the Definition of Supplemental Benefits (§ 423.100)

In the April 12, 2012 **Federal Register** (77 FR 22169), we revised the definition of supplemental benefits at § 423.100 by defining supplemental benefits as benefits offered by Part D plans, other than employer group health or waiver plans, that meet the requirements of § 423.104(f)(1)(ii). We subsequently issued a correction notice in the June 1 2012 **Federal Register** (77 FR 32407) with unrelated changes that inadvertently resulted in the revised definition not being included in the CFR.

To address this omission, we are issuing a technical change at this time to include the definition of supplemental benefits finalized in the April 12, 2012 **Federal Register** (77 FR 22169). This technical correction does not represent a change in policy.

**III. Collection of Information Requirements**

Under the Paperwork Reduction Act of 1995 (hereafter, "PRA"), we are required to provide 30-day notice in the **Federal Register** and solicit public comment before a collection of information requirement is submitted to the Office of Management and Budget (OMB) for review and approval. To fairly evaluate whether an information collection should be approved by OMB, section 3506(c)(2)(A) of the PRA requires that we solicit comment on the following issues:

• The need for the information collection and its usefulness in carrying out the proper functions of our agency.

• The accuracy of our estimate of the information collection burden.

• The quality, utility, and clarity of the information to be collected.

• Recommendations to minimize the information collection burden on the affected public, including automated collection techniques.

In the January 10, 2014, proposed rule (79 FR 1917) we solicited public comment on each of the following provisions that contained information collection requirements (ICRs).

*A. ICRs Related to Eligibility of Enrollment for Individuals Not Lawfully Present in the United States (§§ 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, and 423.44)*

As amended here sections 417.2, 417.420, 417.422, 417.460, 422.1, 422.50, 422.74, 423.1, 423.30, and 423.44 set out the eligibility requirement of citizenship or lawful presence to enroll in MA, Part D, and cost plans. To implement these provisions, we will: (1) Relay data regarding an individual's lawful presence status to plans through the MARx system so that the plans will be aware of an individual's eligibility when requesting enrollment; and (2) notify plans of loss of eligibility for current members based on unlawful presence status. In this final rule, we explicitly direct MA organizations, Part D sponsors, and entities offering cost plans not to request or solicit information about lawful presence from Medicare beneficiaries in connection with this rule as CMS will provide the necessary information. This data is already available to us; thus no new data will be collected.

We received no comments on the proposed ICR assessment. Consequently, we are finalizing that assessment without modification.

*B. ICRs Related to Good Cause Processes (§ § 417.460, 422.74, and 423.44)*

Sections 417.460, 422.74, and 423.44 establish the ability for an entity other than CMS to implement the good cause process. If we assign the good cause process to entities operating a cost plan, MA organization, or a Part D sponsor, the plan would already have the enrollment data necessary to make the determinations required by the process. In addition, the former enrollee is already required by the applicable regulations to provide a credible statement to establish good cause for the failure to make timely payments. Thus no additional data will be collected by the plan. However, if we designate plans to implement good cause processes, there would be additional burden to each plan. The burden would consist of completing the operational process, such as—(1) responding to requests for reinstatement from former members; (2) gathering the attestation from the individual regarding his or her reason for not paying the plan premiums within the grace period; (3) making the determination as to whether the individual meets the good cause criteria; and (4) maintaining the case notes and documentation to support its

determination should it need to be reviewed. As plans already provide customer service to their current and past members, we estimate 30 minutes for each reinstatement request. According to the most recent wage data provided by the Bureau of Labor Statistics (BLS) for May 2013, the mean hourly wage for the category of ''Customer Service Representatives''—which we believe, considering the common point of entry for all issues at the plan, is the most appropriate category is $16.04/hr. With fringe benefits and overhead, the rate is $23.74/hr. It is calculated that the cost for 30 minutes would be $11.87. Not all plans disenroll for nonpayment of premiums. However, for those who do implement this voluntary policy, it results in an average of 20,000 disenrollments each month. In response, we receive an average of 698 requests for reinstatement per month. The plan representative cost of $11.87 for each case is multiplied by 698 cases. Therefore, under the revised regulations, handling of these requests would result in a total monthly cost of $8,285 (or $99,423 and 4,188 hours, annually) for all plans in the MA, Part D, and cost plan programs. The requirements and burden will be submitted to OMB under control number 0938–New (CMS–10544).

We received no comments on the proposed ICR assessment. Consequently, we are finalizing this assessment with only a minor modification in order to reflect the updated 2013 wage data.

*C. ICRs Related To Expanding Quality Improvement Program Regulations (§ 422.152)*

We explained in the proposed rule that we do not believe this provision would impose any new or revised collection requirements or burden because it codifies a submission process that currently applies for quality improvement program information. PRA approval is current under OMB control number 0938–1023 (CMS–10209).

We received no comments on the ICRs for this proposal and are finalizing these provisions without modification.

*D. ICRs Related To Changes to Audit and Inspection Authority (§§ 422.503(d)(2) and 423.504(d)(2))*

In §§ 422.503(d)(2) and 423.504(d)(2), MA organizations and Part D sponsors are required to hire an independent auditor to perform validation exercises to confirm correction of deficiencies found during an audit. We currently conduct these validation exercises and collect data associated with these

activities under OMB control number 0938–1000 (CMS–10191). We believe the provision will not impose any additional burden on MA organizations or Part D sponsors.

*E. ICRs Related to Business Continuity for MA Organizations and PDP Sponsors (§§ 422.504(o) and 423.505(p))*

This provision requires MA organizations and Part D sponsors to develop, maintain, and implement business continuity plans that meet certain minimum standards. The proposed provision was modified due to public comment. Specifically, in this final rule MA organizations and Part D sponsors plan to restore essential operations within 72, rather than 24, hours of a failure. While the cost estimates are set out under this rule's Regulatory Impact Analysis, the PRA-related burden will be made available for public comment through a separate **Federal Register** notice under OMB control number 0938–0964 (CMS–10141).

*F. Submission of PRA-Related Comments*

We have submitted a copy of this rule to OMB for its review of the rule's information collection and recordkeeping requirements. These requirements are not effective until they have been approved by OMB.

To obtain copies of the supporting statement and any related forms for the paperwork collections referenced above, access CMS' Web site at *http://www.cms.hhs.gov/PaperworkReductionActof1995;* email your request, including your address, phone number, OMB number, and CMS document identifier, to *Paperwork@cms.hhs.gov;* or call the Reports Clearance Office at 410–786–1326.

When commenting on the stated information collections, please reference the document identifier or OMB control number. To be assured consideration, comments and recommendations must be received by the OMB desk officer via one of the following transmissions: *Mail:* OMB, Office of Information and Regulatory Affairs, *Attention:* CMS Desk Officer, *Fax:* (202) 395–5806, OR *Email: OIRA_submission@omb.eop.gov.*

PRA-related comments must be received on/by March 16, 2015.

**IV. Regulatory Impact Statement**

We examined the impact of this final rule as required by Executive Order 12866 on Regulatory Planning and Review (September 30, 1993), Executive Order 13563 on Improving Regulation and Regulatory Review (January 18, 2011), the Regulatory Flexibility Act

(RFA) (September 19, 1980, Pub. L. 96–354), Section 1102(b) of the Social Security Act, Section 202 of the Unfunded Mandates Reform Act of 1995 (March 22, 1995; Pub. L. 104–4), Executive Order 13132 on Federalism (August 4, 1999) and the Congressional Review Act (5 U.S.C. 804(2)).

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). A regulatory impact analysis (RIA) must be prepared for major rules with economically significant effects ($100 million or more in any 1 year).

We determined that this final rule does not reach the threshold for being considered economically significant, and thus, is not considered a major rule. There are five provisions with non-measurable impact: Efficient dispensing, requirements for drugs covered under Part D, two-year prohibition when organizations terminate their contract, requirements for urgently needed services, and MA organization responsibilities in disasters and emergencies.

Some of these provisions do not impose new requirements or costs but rather, clarify the necessary actions to meet existing regulatory requirements, and therefore, are expected to have no impact. Other provisions reflect widespread industry practices or would only impact a few plans and therefore are expected to have no, or minimal, impact.

There are three provisions with measurable impacts: Citizenship or lawful presence; audit and inspection authority; and business continuity operations. We discuss these three provisions as follows.

*Citizenship or Lawful Presence.* This final rule adds "citizenship or lawful presence" as an eligibility requirement to enroll and remain enrolled in MA, Part D, and section 1876 cost contracts to comply with section 401 of the Personal Responsibility and Work Opportunity Act, which mandates that aliens who are not lawfully present in the United States are not eligible to receive any federal benefit, including Medicare.

As indicated in the proposed rule of January 10, 2014 (79 FR 1918), based on estimates reflecting scoring by the CMS Office of the Actuary and 2012 lawful presence data provided by the SSA, this provision has an anticipated savings of $67 million over 5 years.

We estimate 10 million dollars expected savings for 2015 consisting of $5 million savings for Medicare Advantage (MA) and $5 million savings for Part D. These savings increase annually and by 2019, we estimate $17 million consisting of $8 million for MA and $9 million for Part D.

*Audit and Inspection Authority.* This rule finalizes some, but not all, proposed changes to the audit and inspection authority included in the proposed rule. We proposed two changes to §§ 422.503(d)(2) and 423.504(d)(2) that would allow CMS to require sponsors (MA organizations and Part D sponsors) to hire an independent auditor to conduct full or partial program audits of the sponsors' operational areas and/or correction validation exercises. Under the first proposal, each MA organization and/or Part D sponsor would have been required to hire an independent auditor to perform a full or partial program audit at least every 3 years. However, due to public comment, we are not finalizing this proposal.

We also proposed to revise our regulations to permit CMS to require MA organizations or Part D sponsors with audit results that reveal noncompliance with CMS requirements to hire an independent auditor to validate that correction has occurred. With our existing resources we currently conduct approximately 30 audits per year.

We received numerous comments indicating that our initial estimate was not accurate and considerably lower than the sponsors' actual costs. Based on the public comments, we reevaluated our methods of estimating the sponsor costs associated with procuring an independent auditor to conduct validations and as a result we decreased: (1) The number of organizations that may be subject to a validation each year; and (2) the number of team members likely required to perform the validation exercise; and increased: (3) The estimated total cost per hour for the audit team. The estimate for 23 sponsors is closer to the maximum number of sponsors that would be expected to hire an independent auditor to validate correction of audit deficiencies that we identified. As additional organizations are subject to a CMS program audit or utilize CMS' audit protocols to perform their own internal auditing, we expect that the performance of these organizations and the industry in general will improve; this in turn will reduce the likelihood that an organization would need to hire an independent auditor to validate

correction of audit deficiencies. Therefore, we expect the total number of organizations that may be required to hire an independent auditor to validate correction of audit deficiencies will decline over time.

While some sponsor audit findings can be validated through means other than a full-scale validation audit, we have found several organizations with significant performance deficiencies. We estimate that approximately 75 percent of the 30 organizations we audit per year (23 organizations) may be requested to retain an independent auditor to validate correction of their audit deficiencies.

Under these circumstances we estimated that the independent auditor hired would need to have a team consisting of the following professionals:

- Formulary and Benefits Administration—pharmacist, a senior claims analyst, and a senior auditor.
- Coverage Determinations, Part D Appeals, Part D Grievances—physician, pharmacist and senior auditor.
- Organization Determinations, Part C Appeals, Part C Grievances—physician, nurse practitioner, and senior auditor.
- Compliance Program effectiveness—two senior auditors.
- Special Needs Plan Model of Care (SNP MOC) implementation—nurse practitioner and senior auditor.

We used 2013 wage statistics supplied by the Bureau of Labor and Statistics, along with benefit and overhead included to develop estimates of direct wages. The estimated total cost per hour for each audit team is $1,202.00. A team of 13 professionals (listed previously) is necessary for the performance of each validation effort. The estimated total number of hours the team will need to perform the validation per sponsor is 80. The total cost per sponsor to procure and support the independent audit team is therefore: 80 (hours) × $1,202.00 = $96,160.00. The validation costs will be allowable costs in the plan's bid. Under existing regulations, the estimated total annual burden related to the time and effort for sponsors to perform the validation is $2,211,680.00 (23 sponsors × $96,160.00 per sponsor).

Since only 30 sponsors are audited per year and only those with the most serious findings would likely be subjected to hiring an independent auditor to conduct validation, the cost per sponsor per year is $2,211,680 ÷ 193 (unique parent organizations) = $11,459 per year. The number 193 represents the 193 unique parent organizations as of June 2014. This figure includes all coordinated care plans (CCPs), private fee for service (PFFS) plans, section

NJAPP0531

1876 Medicare cost plans whose parent organizations also have an MA or Part D plan, stand-alone prescription drug plans (PDPs), and employer group waiver plans (800 series). Sponsors will be allowed to account for this cost in their bid.

*Business Continuity.* Commenters in general took issue with the costs associated with the proposal for Business Continuity for MA organizations and Part D Sponsors (§§ 422.504(o) and 423.505(p)). Several commenters suggested that our RIA significantly underestimated costs because requiring MA organizations and Part D sponsors to restore essential functions within 24 hours would necessitate systems redundancy. Other commenters were concerned about the cost of testing IT systems on an annual basis; another commenter questioned the need to train "all" employees.

As detailed in section II.A.4. of this final rule (Business Continuity for MA organizations and Part D Sponsors (§§ 422.504(o) and 423.505(p)), we believe that the modifications to regulatory text that we are finalizing in this final rule, as well as clarifications provided in our responses (for instance, we are not requiring systems redundancy), address the vast majority of concerns raised about the RIA.

Business continuity plans are well established in the business community, and we believe that most MA organizations and Part D sponsors already have business continuity plans in place which cover the basic proposed subject areas. We still estimate that 5 percent of MA organizations and Part D sponsors do not have business continuity plans, but are updating our estimates from our proposed rule to reflect the most recent data available. For 2015, there are 568 MA organizations and Part D sponsors, resulting in an estimated 28 (5 percent × 568) affected entities. More recent May 2013 wage data from the BLS OES sets the hourly rate for an emergency management director, General Medical and Surgical Hospitals, at $36.90. We now estimate the first year burden of a full time emergency management director to help design the plan to be 58,240 hours (28 entities × 2,080 hours). The estimated cost associated with such an expert is the estimated number of hours multiplied by the estimated hourly rate of $36.90, plus 100 percent for fringe benefits and overhead, which equals a first year estimated cost of $4,298,112.

In subsequent years, the estimated burden associated with this requirement will be the cost of an emergency management director working on a part time basis for an ongoing burden of 29,120 hours (28 entities × 1,040 hours). The estimated cost associated with such an expert would be the estimated number of hours multiplied by the estimated hourly rate of $36.90 plus 100 percent for fringe benefits and overhead, which equals an estimated annual cost of $2,149,056 for subsequent years.

Additionally, as discussed in section II.A.4. of this final rule, we agree with the commenters that the regulation may require some changes, which we believe are minimal, to existing business continuity plans and are adding estimates to cover those costs. We estimate that an additional 10 percent of the 568 contracting entities, or about 57 entities, will be affected by this requirement. This means the estimated first year burden of a part time emergency management director to conform the existing business continuity plans will be 59,280 hours (57 entities × 1,040 hours). The estimated cost associated with such an expert is the estimated number of hours multiplied by the estimated hourly rate of $36.90 plus 100 percent for fringe benefits and overhead, which equals a first year estimated cost of $4,373,864.

In subsequent years, we estimate the burden associated with this requirement for MA organizations and Part D sponsors that are continuing to conform their business continuity plans with our regulation will decrease, for an ongoing burden of 29,640 hours (57 entities × 520 hours). The estimated cost associated with such an expert is the estimated number of hours multiplied by the estimated hourly rate of $36.90 plus 100 percent for fringe benefits and overhead, which equals a first year cost of $2,187,432.

Lastly, as previously discussed in our summary of the proposed effects, we believe that savings that we cannot capture will be realized by this regulation, especially for those MA organizations and Part D sponsors that do not currently have business continuity plans in place. Business continuity planning helps to protect resources and minimize losses. If as a consequence, MA organizations and Part D sponsors, that currently do not have these plans in place, provide Medicare benefits more efficiently after disasters and disruptions, this could result in fewer risks to beneficiary health.

Our analyses of the three provisions with measurable impact—unlawful presence, audit and inspection authority and business continuity operations—show that aggregate savings over 5 years is $33 million. Estimated savings for 2015 is $0 million and the savings

increase annually to $11 million for 2019. Consequently, the savings do not reach the $100 million threshold and therefore this final rule is not a major rule.

The Regulatory Flexibility Analysis (RFA), as amended, requires agencies to analyze options for regulatory relief of small businesses, if a rule has a significant impact on a substantial number of small entities. For purposes of the RFA, small entities include small businesses, nonprofit organizations, and small governmental jurisdictions.

The health insurance industry was examined in depth in the RIA prepared for the proposed rule on establishment of the MA program (69 FR 46866, August 3, 2004). It was determined, in that analysis, that there were few, if any, "insurance firms," including HMOs that fell below the size thresholds for "small" business established by the Small Business Administration (SBA). We assume that the "insurance firms" are synonymous with health plans that conduct standard transactions with other covered entities and are, therefore, the entities that will have costs associated with the new requirements finalized in this rule. At the time the analysis for the MA program was conducted, the market for health insurance was and remains, dominated by a handful of firms with substantial market share.

However, we estimate that the costs of this rule on "small" health plans do not approach the amounts necessary to be a "significant economic impact" on firms with revenues of tens of millions of dollars. Therefore, this rule would not have a significant economic impact on a substantial number of small entities.

In addition, section 1102(b) of the Act requires us to prepare a regulatory analysis for any rule or regulation proposed under Title XVIII, Title XIX, or Part B of the Act that may have significant impact on the operations of a substantial number of small rural hospitals. We are not preparing an analysis for section 1102(b) of the Act because the Secretary certifies that this rule will not have a significant impact on the operations of a substantial number of small rural hospitals.

Section 202 of the Unfunded Mandates Reform Act of 1995 (UMRA) also requires that agencies assess anticipated costs and benefits before issuing any rule whose mandates require spending in any 1 year by state, local, or tribal governments, in the aggregate, or by the private sector of $100 million in 1995 dollars, updated annually for inflation. In 2014, that threshold is approximately $141

million. This final rule is not expected to reach this spending threshold.

Executive Order 13132 establishes certain requirements that an agency must meet when it promulgates a proposed rule (and subsequent final rule) that imposes substantial direct requirement costs on state and local governments, preempts state law, or otherwise has federalism implications. Since this rule does not impose any substantial costs on state or local governments, the requirements of Executive Order 13132 are not applicable.

In accordance with the provisions of Executive Order 12866, this rule was reviewed by the Office of Management and Budget.

## List of Subjects

### 42 CFR Part 417

Administrative practice and procedure, Grant programs-health, Health care, Health insurance, Health maintenance organizations (HMO), Loan programs-health, Medicare, Reporting and recordkeeping requirements.

### 42 CFR Part 422

Administrative practice and procedure, Health facilities, Health maintenance organizations (HMO), Medicare, Penalties, Privacy, Reporting and recordkeeping requirements.

### 42 CFR Part 423

Administrative practice and procedure, Emergency medical services, Health facilities, Health maintenance organizations (HMO), Health professionals, Medicare, Penalties, Privacy, Reporting and recordkeeping requirements.

For the reasons set forth in the preamble, the Centers for Medicare & Medicaid Services amends 42 CFR Chapter IV as follows:

## PART 417—HEALTH MAINTENANCE ORGANIZATION, COMPETITIVE MEDICAL PLANS, AND HEALTH CARE PREPAYMENT PLANS

■ 1. The authority citation for part 417 continues to read as follows:

**Authority:** Secs. 1102 and 1871 of the Social Security Act (42 U.S.C. 1302 and 1395hh), secs. 1301, 1306, and 1310 of the Public Health Service Act (42 U.S.C. 300e, 300e-5, and 300e-9), and 31 U.S.C. 9701.

■ 2. Amend § 417.2 by revising paragraph (b) to read as follows:

### § 417.2   Basis and scope.

\*   \*   \*   \*   \*

(b) Subparts G through R of this part set forth the rules for Medicare contracts with, and payment to, HMOs and competitive medical plans (CMPs) under section 1876 of the Act and 8 U.S.C. 1611.

\*   \*   \*   \*   \*

### § 417.420   [Amended]

■ 3. Amend § 417.420, paragraph (a) by removing the phrase "Individuals who are entitled to" and adding in its place the phrase "Eligible individuals who are entitled to".

■ 4. Amend § 417.422 as follows:
■ a. In the introductory text, by removing the phrase "any individual who—" and adding in its place the phrase "any individual who meets all of the following:"
■ b. In paragraphs (a) through (e), by removing the ";" and adding in its place ".".
■ c. In paragraph (f), by removing the "; and" and adding in its place ".".
■ d. Adding paragraph (h).

The addition reads as follows:

### § 417.422   Eligibility to enroll in an HMO or CMP.

\*   \*   \*   \*   \*

(h) Is a United States citizen or an individual who is lawfully present in the United States as determined in 8 CFR 1.3.

■ 5. Amend § 417.460 as follows:
■ a. In paragraph (b)(2)(i) by removing "." and adding in its place ";".
■ b. In paragraph (b)(2)(iii) by removing "; or" and adding in its place ";".
■ c. Redesignating paragraph (b)(2)(iv) as paragraph (b)(2)(v).
■ d. Adding a new paragraph (b)(2)(iv).
■ e. In paragraph (b)(3), by removing the cross-reference "paragraphs (c) through (i)" and adding in its place the cross-reference "paragraphs (c) through (j)".
■ f. By revising paragraph (c)(3).
■ g. In paragraph (c)(4), by removing the phrase "non-payment of premiums." and adding in its place the phrase "non-payment of premiums or other charges."
■ h. By adding paragraph (j).

The revisions and the additions read as follows:

### § 417.460   Disenrollment of beneficiaries by an HMO or CMP.

\*   \*   \*   \*   \*

(b) \*   \*   \*
(2) \*   \*   \*
(iv) Is not lawfully present in the United States; or

\*   \*   \*   \*   \*

(c) \*   \*   \*
(3) *Good cause and reinstatement.* When an individual is disenrolled for failure to pay premiums or other charges imposed by the HMO or CMP for deductible and coinsurance amounts for which the enrollee is liable, CMS (or a third party to which CMS has assigned this responsibility, such as an HMO or CMP) may reinstate enrollment in the plan, without interruption of coverage, if the individual shows good cause for failure to pay and pays all overdue premiums or other charges within 3 calendar months after the disenrollment date. The individual must establish by a credible statement that failure to pay premiums or other charges was due to circumstances for which the individual had no control, or which the individual could not reasonably have been expected to foresee.

\*   \*   \*   \*   \*

(j) *Enrollee is not lawfully present in the United States.* Disenrollment is effective the first day of the month following notice by CMS that the individual is ineligible in accordance with § 417.422(h).

## PART 422—MEDICARE ADVANTAGE PROGRAM

■ 6. The authority citation for part 422 continues to read as follows:

**Authority:** Secs. 1102 and 1871 of the Social Security Act (42 U.S.C. 1302 and 1395hh).

■ 7. Amend § 422.1 by revising paragraph (a) to read as follows:

### § 422.1   Basis and scope.

(a) *Basis.* This part is based on the indicated provisions of the following:
(1) The following provisions of the Act:
(i) 1128J(d)—Reporting and Returning of Overpayments.
(ii) 1851—Eligibility, election, and enrollment.
(iii) 1852—Benefits and beneficiary protections.
(iv) 1853—Payments to Medicare Advantage (MA) organizations.
(v) 1854—Premiums.
(vi) 1855—Organization, licensure, and solvency of MA organizations.
(vii) 1856—Standards.
(viii) 1857—Contract requirements.
(ix) 1858—Special rules for MA Regional Plans.
(x) 1859—Definitions; enrollment restriction for certain MA plans.
(2) 8 U.S.C. 1611—Aliens who are not qualified aliens ineligible for Federal public benefits.

\*   \*   \*   \*   \*

■ 8. Amend § 422.50 as follows:
■ a. In paragraph (a) introductory text, by removing the phrase " if he or she—" and adding in its place the phrase "if he or she meets all of the following:"
■ b. In paragraphs (a)(1) and (4), by removing ";" and adding in its place ".".

NJAPP0533

■ c. In paragraph (a)(5), by removing "; and" and adding in its place ".".
■ d. By adding paragraph (a)(7).
The addition reads as follows:

§ 422.50   Eligibility to elect an MA plan.

*      *      *      *      *

(a) * * *
(7) Is a United States citizen or is lawfully present in the United States as determined in 8 CFR 1.3.

*      *      *      *      *

■ 9. Amend § 422.74 as follows:
■ a. By adding paragraph (b)(2)(v).
■ b. By revising paragraph (d)(1)(v).
■ c. By adding paragraph (d)(8).
The additions and revision read as follows:

§ 422.74   Disenrollment by the MA organization.

*      *      *      *      *

(b) * * *
(2) * * *
(v) The individual is not lawfully present in the United States.

*      *      *      *      *

(d) * * *
(1) * * *
(v) *Extension of grace period for good cause and reinstatement.* When an individual is disenrolled for failure to pay the plan premium, CMS (or a third party to which CMS has assigned this responsibility, such as an MA organization) may reinstate enrollment in the MA plan, without interruption of coverage, if the individual—
(A) Shows good cause for failure to pay within the initial grace period; and
(B) Pays all overdue premiums within 3 calendar months after the disenrollment date; and
(C) Establishes by a credible statement that failure to pay premiums within the initial grace period was due to circumstances for which the individual had no control, or which the individual could not reasonably have been expected to foresee.

*      *      *      *      *

(8) *Enrollee is not lawfully present in the United States.* Disenrollment is effective the first day of the month following notice by CMS that the individual is ineligible in accordance with § 417.422(h) of this chapter.

*      *      *      *      *

■ 10. Amend § 422.100 by adding paragraph (m) to read as follows:

§ 422.100   General requirements.

*      *      *      *      *

(m) *Special requirements during a disaster or emergency.* (1) When a state of disaster is declared as described in paragraph (m)(2) of this section, an MA organization offering an MA plan must,

until one of the conditions described in paragraph (m)(3) of this section occurs, ensure access to benefits in the following manner:
(i) Cover Medicare Parts A and B services and supplemental Part C plan benefits furnished at non-contracted facilities subject to § 422.204(b)(3).
(ii) Waive, in full, requirements for gatekeeper referrals where applicable.
(iii) Provide the same cost-sharing for the enrollee as if the service or benefit had been furnished at a plan-contracted facility.
(iv) Make changes that benefit the enrollee effective immediately without the 30-day notification requirement at § 422.111(d)(3).
(2) *Declarations of disasters.* A declaration of disaster will identify the geographic area affected by the event and may be made as one of the following:
(i) Presidential declaration of a disaster or emergency under the either of the following:
(A) Stafford Act.
(B) National Emergencies Act.
(ii)(A) Secretarial declaration of a public health emergency under section 319 of the Public Health Service Act.
(B) If the President has declared a disaster as described in paragraph (m)(2)(i) or (ii) of this section, then the Secretary may also authorize waivers or modifications under section 1135 of the Act.
(iii) Declaration by the Governor of a State or Protectorate.
(3) *End of the disaster.* The public health emergency or state of disaster ends when any of the following occur:
(i) The source that declared the public health emergency or state of disaster declares an end.
(ii) The CMS declares an end of the public health emergency or state of disaster.
(iii) Thirty days have elapsed since the declaration of the public health emergency or state of disaster and no end date was identified in paragraph (m)(3)(i) or (ii) of this section.
(4) *MA plans unable to operate.* An MA plan that cannot resume normal operations by the end of the public health emergency or state of disaster must notify CMS.
(5) *Disclosure.* In addition to other requirements of annual disclosure under § 422.111, an organization must do all of the following:
(i) Indicate the terms and conditions of payment during the public health emergency or disaster for non-contracted providers furnishing benefits to plan enrollees residing in the state-of-disaster area.

(ii) Annually notify enrollees of the information listed in paragraphs (m)(1) through (3) and (m)(5) of this section.
(iii) Provide the information described in paragraphs (m)(1), (2), (3), and (4)(i) of this section on its Web site.

■ 11. Amend § 422.111 by revising paragraph (d)(1) to read as follows:

§ 422.111   Disclosure requirements.

*      *      *      *      *

(d) * * *
(1) Submit the changes for CMS review under procedures of subpart V of this part.

*      *      *      *      *

■ 12. Amend § 422.112 by adding paragraph (b)(7) to read as follows:

§ 422.112   Access to services.

*      *      *      *      *

(b) * * *
(7) With respect to drugs for which payment as so prescribed and dispensed or administered to an individual may be available under Part A or Part B, or under Part D, MA–PD plans must coordinate all benefits administered by the plan and—
(i) Establish and maintain a process to ensure timely and accurate point-of-sale transactions; and
(ii) Issue the determination and authorize or provide the benefit under Part A or Part B or as a benefit under Part D as expeditiously as the enrollee's health condition requires, in accordance with the requirements of subpart M of this part and subpart M of part 423 of this chapter, as appropriate, when a party requests a coverage determination.

*      *      *      *      *

■ 13. Amend § 422.113 by revising paragraph (b)(1)(iii) introductory text to read as follows:

§ 422.113   Special rules for ambulance services, emergency and urgently needed services, and maintenance and post-stabilization care services.

*      *      *      *      *

(b) * * *
(1) * * *
(iii) *Urgently needed services* means covered services that are not emergency services as defined in this section, provided when an enrollee is temporarily absent from the MA plan's service (or, if applicable, continuation) area (or provided when the enrollee is in the service or continuation area but the organization's provider network is temporarily unavailable or inaccessible) when the services are medically necessary and immediately required—

*      *      *      *      *

■ 14. Amend § 422.152 as follows:
■ a. Revising paragraph (a) introductory text.

■ b. Redesignating paragraphs (a)(1) through (3) as paragraphs (a)(2) through (4), respectively.

■ c. Adding new paragraph (a)(1).

■ d. In newly redesignated (a)(2), by removing the "; " and adding a ".".

■ e. In newly redesignated (a)(3), by removing the "; and" and adding a ".".

■ f. Revising paragraph (c).

■ g. Revising paragraph (g) introductory text.

■ h. Revising paragraph (h).

The revisions and addition read as follows:

### § 422.152  Quality improvement program.

(a) *General rule.* Each MA organization that offers one or more MA plan must have, for each plan, an ongoing quality improvement program that meets applicable requirements of this section for the service it furnishes to its MA enrollees. As part of its ongoing quality improvement program, a plan must do all of the following:

(1) Create a quality improvement program plan that sufficiently outlines the elements of the plan's quality improvement program.

\*   \*   \*   \*   \*

(c) *Chronic care improvement program requirements.* (1) Develop criteria for a chronic care improvement program. These criteria must include the following:

(i) Methods for identifying MA enrollees with multiple or sufficiently severe chronic conditions that would benefit from participating in a chronic care improvement program.

(ii) Mechanisms for monitoring MA enrollees that are participating in the chronic improvement program and evaluating participant outcomes such as changes in health status.

(iii) Performance assessments that use quality indicators that are objective, clearly and unambiguously defined, and based on current clinical knowledge or research.

(iv) Systematic and ongoing follow-up on the effect of the program.

(2) The organization must report the status and results of each program to CMS as requested.

\*   \*   \*   \*   \*

(g) *Special requirements for specialized MA plans for special needs individuals.* All special needs plans (SNPs) must be approved by the National Committee for Quality Assurance (NCQA) effective January 1, 2012 and subsequent years. SNPs must submit their model of care (MOC), as defined under § 422.101(f), to CMS for NCQA evaluation and approval, in accordance with CMS guidance. In addition to the requirements under paragraphs (a) and (f) of this section, a SNP must conduct a quality improvement program that does the following:

\*   \*   \*   \*   \*

(h) *Requirements for MA private-fee-for-service plans and Medicare medical savings account plans.* MA PFFS and MSA plans are subject to the requirement that may not exceed the requirement specified in § 422.152(e).

■ 15. Amend § 422.310 by revising paragraph (g)(2)(ii) to read as follows:

### § 422.310  Risk adjustment data.

\*   \*   \*   \*   \*

(g) \* \* \*

(2) \* \* \*

(ii) After the final risk adjustment data submission deadline, which is a date announced by CMS that is no earlier than January 31 of the year following the payment year, an MA organization can submit data to correct overpayments but cannot submit diagnoses for additional payment.

### § 422.502  [Amended]

■ 16. Amend § 422.502(b)(3) by removing the phrase "CMS may deny an application based on the applicant's" and adding in its place the phrase "CMS may deny an application for a new contract or service area expansion based on the applicant's".

■ 17. Amend § 422.503 by adding paragraph (d)(2)(iv) to read as follows:

### § 422.503  General provisions.

\*   \*   \*   \*   \*

(d) \* \* \*

(2) \* \* \*

(iv) CMS may require that the MA organization hire an independent auditor to provide CMS with additional information to determine if deficiencies found during an audit or inspection have been corrected and are not likely to recur. The independent auditor must work in accordance with CMS specifications and must be willing to attest that a complete and full independent review has been performed.

\*   \*   \*   \*   \*

■ 18. Amend § 422.504 by adding paragraph (o) to read as follows:

### § 422.504  Contract provisions.

\*   \*   \*   \*   \*

(o) *Business continuity.* (1) The MA organization agrees to develop, maintain, and implement a business continuity plan containing policies and procedures to ensure the restoration of business operations following disruptions to business operations which would include natural or man-made disasters, system failures, emergencies, and other similar circumstances and the threat of such occurrences. To meet the requirement, the business continuity plan must, at a minimum, include the following:

(i) *Risk assessment.* Identify threats and vulnerabilities that might affect business operations.

(ii) *Mitigation strategy.* Design strategies to mitigate hazards. Identify essential functions in addition to those specified in paragraph (o)(2) of this section and prioritize the order in which to restore all other functions to normal operations. At a minimum, each MA organization must do the following:

(A) Identify specific events that will activate the business continuity plan.

(B) Develop a contingency plan to maintain, during any business disruption, the availability and, as applicable, confidentiality of communication systems and essential records in all forms (including electronic and paper copies). The contingency plan must do the following:

(*1*) Ensure that during any business disruption the following systems will operate continuously or, should they fail, be restored to operational capacity on a timely basis:

(*i*) Information technology (IT) systems including those supporting claims processing at point of service.

(*ii*) Provider and enrollee communication systems including telephone, Web site, and email.

(*2*) With respect to electronic protected health information, comply with the contingency plan requirements of the Health Insurance Portability and Accountability Act of 1996 Security Regulations at 45 CFR parts 160 and 164, subparts A and C.

(C) Establish a chain of command.

(D) Establish a business communication plan that includes emergency capabilities and procedures to contact and communicate with the following:

(*1*) Employees.

(*2*) First tier, downstream, and related entities.

(*3*) Other third parties (including pharmacies, providers, suppliers, and government and emergency management officials).

(E) Establish employee and facility management plans to ensure that essential operations and job responsibilities can be assumed by other employees or moved to alternate sites as necessary.

(F) Establish a restoration plan including procedures to transition to normal operations.

(G) Comply with all applicable Federal, State, and local laws.

NJAPP0535

(iii) *Testing and revision.* On at least an annual basis, test and update the business operations continuity plan to ensure the following:

(A) That it can be implemented in emergency situations.

(B) That employees understand how it is to be executed.

(iv) *Training.* On at least an annual basis, educate appropriate employees about the business continuity plan and their own respective roles.

(v) *Records.* (A) Develop and maintain records documenting the elements of the business continuity plan described in paragraphs (o)(1)(i) through (iv) of this section.

(B) Make the information specified in paragraph (o)(1)(v)(A) of this section available to CMS upon request.

(2) *Restoration of essential functions.* Every MA organization must plan to restore essential functions within 72 hours after any of the essential functions fail or otherwise stop functioning as usual. In addition to any essential functions that the MA organization identifies under paragraph (o)(1)(ii) of this section, for purposes of this paragraph (o)(2) of the section essential functions include, at a minimum, the following:

(i) Benefit authorization (if not waived) for services to be immediately furnished at a hospital, clinic, provider office, or other place of service.

(ii) Operation of call center customer services.

■ 19. Amend § 422.506 by revising paragraph (a)(4) to read as follows:

### § 422.506   Nonrenewal of contract.

(a) * * *

(4) If an MA organization does not renew a contract under paragraph (a) of this section, CMS may deny an application for a new contract or a service area expansion from the MA organization for 2 years unless there are circumstances that warrant special consideration, as determined by CMS. This prohibition may apply regardless of the product type, contract type or service area of the previous contract.

* * * * *

■ 20. Amend § 422.508 by revising paragraph (c) to read as follows:

### § 422.508   Modification or termination of contract by mutual consent.

* * * * *

(c) *Agreement to limit new MA applications.* As a condition of the consent to a mutual termination CMS will require, as a provision of the termination agreement language prohibiting the MA organization from applying for new contracts or service area expansions for a period of 2 years,

absent circumstances warranting special consideration. This prohibition may apply regardless of the product type, contract type or service area of the previous contract.

* * * * *

■ 21. Amend § 422.512 by revising paragraph (e)(1) to read as follows:

### § 422.512   Termination of contract by the MA organization.

* * * * *

(e) * * *

(1) CMS may deny an application for a new contract or a service area expansion from an MA organization that has terminated its contract within the preceding 2 years unless there are circumstances that warrant special consideration, as determined by CMS. This prohibition may apply regardless of the contract type, product type, or service area of the previous contract.

* * * * *

■ 22. Amend § 422.568 by revising paragraph (b) to read as follows:

### § 422.568   Standard timeframes and notice requirements for organization determinations.

* * * * *

(b) *Timeframe for requests for service.* Except as provided in paragraph (b)(1) of this section, when a party has made a request for a service, the MA organization must notify the enrollee of its determination as expeditiously as the enrollee's health condition requires, but no later than 14 calendar days after the date the organization receives the request for a standard organization determination.

(1) *Extensions.* The MA organization may extend the timeframe by up to 14 calendar days if—

(i) The enrollee requests the extension;

(ii) The extension is justified and in the enrollee's interest due to the need for additional medical evidence from a noncontract provider that may change an MA organization's decision to deny an item or service; or

(iii) The extension is justified due to extraordinary, exigent, or other non-routine circumstances and is in the enrollee's interest.

(2) *Notice of extension.* When the MA organization extends the timeframe, it must notify the enrollee in writing of the reasons for the delay, and inform the enrollee of the right to file an expedited grievance if he or she disagrees with the MA organization's decision to grant an extension. The MA organization must notify the enrollee of its determination as expeditiously as the enrollee's health

condition requires, but no later than upon expiration of the extension.

* * * * *

■ 23. Amend § 422.572 by revising paragraph (b) to read as follows:

### § 422.572   Timeframes and notice requirements for expedited organization determinations.

* * * * *

(b) *Extensions.* (1) The MA organization may extend the 72-hour deadline by up to 14 calendar days if—

(i) The enrollee requests the extension;

(ii) The extension is justified and in the enrollee's interest due to the need for additional medical evidence from a noncontract provider that may change an MA organization's decision to deny an item or service; or

(iii) The extension is justified due to extraordinary, exigent, or other nonroutine circumstances and is in the enrollee's interest.

(2) *Notice of extension.* When the MA organization extends the deadline, it must notify the enrollee in writing of the reasons for the delay and inform the enrollee of the right to file an expedited grievance if he or she disagrees with the MA organization's decision to grant an extension. The MA organization must notify the enrollee of its determination as expeditiously as the enrollee's health condition requires, but no later than upon expiration of the extension.

* * * * *

■ 24. Amend § 422.590 as follows:
■ a. By revising paragraph (a)(1).
■ b. In paragraph (d)(1), by removing the cross-reference "paragraph (d)(2) of this section" and adding in its place the cross-reference "paragraph (e) of this section".
■ c. By removing paragraph (d)(2).
■ d. By redesignating paragraphs (d)(3) through (5) as paragraphs (d)(2) through (4), respectively.
■ e. By redesignating paragraphs (e) through (g) as paragraphs (f) through (h), respectively;
■ f. By adding paragraph (e).
The addition and revision read as follows:

### § 422.590   Timeframes and responsibility for reconsiderations.

(a) * * *

(1) Except as provided in paragraph (e) of this section, if the MA organization makes a reconsidered determination that is completely favorable to the enrollee, the MA organization must issue the determination (and effectuate it in accordance with § 422.618(a)) as expeditiously as the enrollee's health condition requires, but no later than 30

NJAPP0536

calendar days from the date it receives the request for a standard reconsideration.

*    *    *    *    *

(e) *Extensions.* (1) As described in paragraphs (e)(1)(i) through (iii) of this section, the MA organization may extend the standard or expedited reconsideration deadline by up to 14 calendar days if—

(i) The enrollee requests the extension; or

(ii) The extension is justified and in the enrollee's interest due to the need for additional medical evidence from a noncontract provider that may change an MA organization's decision to deny an item or service; or

(iii) The extension is justified due to extraordinary, exigent or other non-routine circumstances and is in the enrollee's interest.

(2) *Notice of extension.* When the MA organization extends the deadline, it must notify the enrollee in writing of the reasons for the delay and inform the enrollee of the right to file an expedited grievance if he or she disagrees with the MA organization's decision to grant an extension. The MA organization must notify the enrollee of its determination as expeditiously as the enrollee's health condition requires, but no later than upon expiration of the extension.

*    *    *    *    *

§ 422.618   [Amended]

■ 25. In § 422.618, amend paragraph (a)(1) by removing the cross-reference "§ 422.590(a)(1)" and adding in its place the cross-reference "§ 422.590(e)".

§ 422.619   [Amended]

■ 26. In § 422.619, amend paragraph (a) by removing the cross-reference "§ 422.590(d)(2)" and adding in its place the cross-reference "§ 422.590(e)".
■ 27. Amend § 422.641 by revising paragraphs (b) and (c) to read as follows:

§ 422.641   Contract determinations.

*    *    *    *    *

(b) A determination not to authorize a renewal of a contract with an MA organization in accordance with § 422.506(b).

(c) A determination to terminate a contract with an MA organization in accordance with § 422.510(a).

*    *    *    *    *

■ 28. Amend § 422.644 by revising paragraphs (a), (b)(1), and (c)(1) to read as follows:

§ 422.644   Notice of contract determination.

*    *    *    *    *

(a) When CMS makes a contract determination under § 422.641, it gives the MA organization written notice.

(b) *    *    *
(1) Reasons for the determination; and

*    *    *    *    *

(c) *    *    *
(1) *General rule.* Except as provided in paragraph (c)(2) of this section, CMS mails notice to the MA organization 45 calendar days before the anticipated effective date of the termination.

*    *    *    *    *

■ 29. Amend § 422.660 by revising paragraphs (a)(2) and (3) and (b)(4) to read as follows:

§ 422.660   Right to a hearing, burden of proof, standard of proof, and standards of review.

(a) *    *    *
(2) An MA organization whose contract has been terminated in accordance with § 422.510.

(3) An MA organization whose contract has not been renewed in accordance with § 422.506.

*    *    *    *    *

(b) *    *    *
(4) During a hearing to review the imposition of an intermediate sanction as described at § 422.750, the MA organization has the burden of proving by a preponderance of the evidence that CMS' determination was inconsistent with the requirements of § 422.752(a) and (b).

*    *    *    *    *

■ 30. Amend § 422.2262 by adding paragraph (a)(2) to read as follows:

§ 422.2262   Review and distribution of marketing materials.

(a) *    *    *
(2) If CMS does not approve or disapprove marketing materials within the specified review timeframe, the materials will be deemed approved. Deemed approved means that the MA organization may use the material.

*    *    *    *    *

§ 422.2266   [Removed and Reserved]

■ 31. Section 422.2266 is removed and reserved.
■ 32. Amend § 422.2274 by revising paragraphs (c) and (d) to read as follows:

§ 422.2274   Broker and agent requirements.

*    *    *    *    *

(c) *Annual training.* The MA organization must ensure that all agents and brokers selling Medicare products are trained annually on the following:

(1) Medicare rules and regulations.
(2) Details specific to the plan products they intend to sell.

(d) *Annual testing.* It must ensure that all agents and brokers selling Medicare products are tested annually, to ensure the following:

(1) Appropriate knowledge and understanding of Medicare rules and regulations.

(2) Details specific to the plan products they intend to sell.

*    *    *    *    *

PART 423—VOLUNTARY MEDICARE PRESCRIPTION DRUG BENEFIT

■ 33. The authority citation for part 423 continues to read as follows:

Authority: Sections 1102, 1106, 1860D–1 through 1860D–42, and 1871 of the Social Security Act (42 U.S.C. 1302, 1306, 1395w–101 through 1395w–152, and 1395hh).

■ 34. Amend § 423.1 by adding paragraph (a)(3) to read as follows:

§ 423.1   Basis and scope.

(a) *    *    *
(3) Section 1611 of Title 8 of the United States Code regarding individuals who are not lawfully present and ineligible for Federal public benefits.

*    *    *    *    *

■ 35. Amend § 423.30 as follows:
■ a. In paragraph (a)(1) introductory text, by removing the phrase "if he or she:" and adding in its place the phrase "if he or she does all of the following:".
■ b. In paragraph (a)(1)(i), by removing "; and" and adding in its place ".".
■ c. By adding paragraph (a)(1)(iii).
   The addition reads as follows:

§ 423.30   Eligibility and enrollment.

(a) *    *    *
(1) *    *    *
(iii) Is a United States citizen or is lawfully present in the United States as determined in 8 CFR 1.3.

*    *    *    *    *

■ 36. Amend § 423.44 as follows:
■ a. Adding paragraph (b)(2)(vi).
■ b. Revising paragraph (d)(1)(vi).
■ c. Adding paragraph (d)(8).
   The additions and revision read as follows:

§ 423.44   Involuntary disenrollment from Part D coverage.

(b) *    *    *
(2) *    *    *
(vi) The individual is not lawfully present in the United States.

*    *    *    *    *

(d) *    *    *
(1) *    *    *
(vi) *Extension of grace period for good cause and reinstatement.* When an individual is disenrolled for failure to pay the plan premium, CMS (or a third party to which CMS has assigned this responsibility, such as a Part D sponsor) may reinstate enrollment in the PDP,

without interruption of coverage, if the individual shows good cause for failure to pay within the initial grace period, and pays all overdue premiums within 3 calendar months after the disenrollment date. The individual must establish by a credible statement that failure to pay premiums within the initial grace period was due to circumstances for which the individual had no control, or which the individual could not reasonably have been expected to foresee.

*   *   *   *   *

(8) *Individual is not lawfully present in the United States.* Disenrollment is effective the first day of the month following notice by CMS that the individual is ineligible in accordance with § 423.30(a)(1)(iii).

*   *   *   *   *

■ 37. Amend § 423.100 by revising the definitions of "Daily cost-sharing rate" and "Supplemental benefits" to read as follows:

§ 423.100   Definitions.

*   *   *   *   *

*Daily cost-sharing rate* means, as applicable, the established—
(1) Monthly copayment under the enrollee's Part D plan, divided by the number of days in the approved month's supply for the drug dispensed and rounded to the nearest cent; or
(2) Coinsurance percentage under the enrollee's Part D plan.

*   *   *   *   *

*Supplemental benefits* means benefits offered by Part D plans, other than employer group health or waiver plans, that meet the requirements of § 423.104(f)(1)(ii).

*   *   *   *   *

■ 38. Amend § 423.104 by adding paragraph (d)(2)(iii) to read as follows:

§ 423.104   Requirements related to qualified prescription drug coverage.

*   *   *   *   *

(d)   *   *   *
(2)   *   *   *
(iii) Tiered cost sharing under paragraph (d)(2)(ii) of this section may not exceed levels annually determined by CMS to be discriminatory.

*   *   *   *   *

■ 39. Amend § 423.120 by redesignating paragraphs (b)(1)(iv) through (x) as paragraphs (b)(1)(v) through (xi), respectively, and adding paragraph (b)(1)(iv) to read as follows:

§ 423.120   Access to covered Part D drugs.

*   *   *   *   *

(b)   *   *   *
(1)   *   *   *
(iv) Clearly articulates and documents processes to determine that the requirements under paragraphs (b)(1)(i) through (iii) of this section have been met, including the determination by an objective party of whether disclosed financial interests are conflicts of interest and the management of any recusals due to such conflicts.

*   *   *   *   *

■ 40. Amend § 423.128 by adding paragraph (g) to read as follows:

§ 423.128   Dissemination of Part D information.

(g) *Changes in rules.* If a Part D sponsor intends to change its rules for a Part D plan, it must do all of the following:
(1) Submit the changes for CMS review under the procedures of Subpart V of this part.
(2) For changes that take effect on January 1, notify all enrollees at least 15 days before the beginning of the Annual Coordinated Election Period as defined in section 1860D–1(b)(1)(B) of the Act.
(3) Provide notice of all other changes in accordance with notice requirements as specified in this part.

■ 41. Amend § 423.153 by revising paragraph (b)(4) to read as follows:

§ 423.153   Drug utilization management, quality assurance, and medication therapy management programs (MTMPs).

*   *   *   *   *

(b)   *   *   *
(4)(i) *Daily cost sharing rate.* Subject to paragraph (b)(4)(ii) of this section, establishes a daily cost-sharing rate (as defined in § 423.100) and applies it to a prescription presented to a network pharmacy for a covered Part D drug that is dispensed for a supply less than the approved month's supply, if the drug is in the form of a solid oral dose and may be dispensed for less than the approved month's supply under applicable law.
(ii) *Exceptions.* The requirements of paragraph (b)(4)(i) of this section do not apply to either of the following:
(A) Solid oral doses of antibiotics.
(B) Solid oral doses that are dispensed in their original container as indicated in the Food and Drug Administration Prescribing Information or are customarily dispensed in their original packaging to assist patients with compliance.
(iii) *Cost-sharing—*(A) *Copayments.* In the case of a drug that would incur a copayment, the Part D sponsor must apply cost-sharing as calculated by multiplying the applicable daily cost-sharing rate by the days' supply actually dispensed when the beneficiary receives less than the approved month's supply.
(B) *Coinsurance.* In the case of a drug that would incur a coinsurance percentage, the Part D sponsor must apply the coinsurance percentage for the drug to the days' supply actually dispensed.

*   *   *   *   *

■ 42. Amend § 423.154 as follows:
■ a. By redesignating paragraph (a)(2) as paragraph (a)(4).
■ b. By adding paragraphs (a)(2) and (3).
■ c. By revising newly designated paragraph (a)(4).
■ d. By revising paragraph (c).
■ e. By removing paragraph (e).
■ f. By redesignating paragraph (f) as paragraph (e).
The revisions and addition read as follows:

§ 423.154   Appropriate dispensing of prescription drugs in long-term care facilities under PDPs and MA–PD plans.

(a)   *   *   *
(2) Not penalize long-term care facilities' choice of more efficient uniform dispensing techniques described in paragraph (a)(1)(ii) of this section by prorating dispensing fees based on days' supply or quantity dispensed.
(3) Ensure that any difference in payment methodology among long-term care pharmacies incentivizes more efficient dispensing techniques.
(4) Collect and report information, in a form and manner specified by CMS, on the dispensing methodology used for each dispensing event described by paragraph (a)(1) of this section.

*   *   *   *   *

(c) *Waivers.* CMS waives the requirements under paragraph (a) of this section, except paragraphs (a)(2) and (3), for pharmacies when they service intermediate care facilities for the mentally retarded (ICFs/IID) and institutes for mental disease (IMDs) as defined in § 435.1010 and for I/T/U pharmacies (as defined in § 423.100).

*   *   *   *   *

■ 43. Amend § 423.322 by revising paragraph (b) to read as follows:

§ 423.322   Requirement for disclosure of information.

*   *   *   *   *

(b) *Restrictions on use of information.* (1) Officers, employees, and contractors of the Department of Health and Human Services may use the information disclosed or obtained in accordance with the provisions of this subpart for the purposes of, and to the extent necessary—
(i) In carrying out this subpart, including, but not limited to, determination of payments, and payment-related oversight and program integrity activities.

(ii) In conducting oversight, evaluation, and enforcement under Title XVIII of the Act.

(2) The United States Attorney General and the Comptroller General of the United States may use the information disclosed or obtained in accordance with the provisions of this subpart for purposes of, and to the extent necessary in, carrying out health oversight activities.

(3) The restrictions described in paragraphs (b)(1) and (2) of this section do not limit either of the following:

(i) OIG's authority to fulfill the Inspector General's responsibilities in accordance with applicable Federal law.

(ii) CMS' ability to use data regarding drug claims in accordance with section 1848(m) of the Act.

§ 423.329  [Amended]

■ 44. Amend § 423.329(d)(1), by removing the phrase ''the amount described in § 423.782.'' and adding in its place the phrase ''the difference between the cost sharing for a non-low-income subsidy eligible beneficiary under the Part D plan and the statutory cost sharing for a low-income subsidy eligible beneficiary.''

§ 423.346  [Amended]

■ 45. Amend § 423.346(a) introductory text by removing the phrase ''as described in § 423.336)—'' and adding in its place the phrase ''as described in § 423.336) or the Coverage Gap Discount Reconciliation (as described at § 423.2320(b))—'' .

■ 46. Amend § 423.350 as follows:
■ a. In paragraph (a)(1)(iii), by removing ''; or'' and adding in its place ''.''.
■ b. In paragraph (a)(1)(iv), by removing '')'' adding in its place ''.''.
■ c. By adding paragraph (a)(1)(v).
■ d. By revising paragraph (a)(2).
■ e. By adding paragraph (b)(1)(iv).

The additions and revision read as follows:

§ 423.350  Payment appeals.

(a) * * *
(1) * * *
(v) The reconciled coverage gap discount payment under § 423.2320(b).

(2) *Payment information not subject to appeal.* Payment information submitted to CMS under § 423.322 and reconciled under § 423.343 or submitted and reconciled under § 423.2320(b) is final and may not be appealed nor may the appeals process be used to submit new information after the submission of information necessary to determine retroactive adjustments and reconciliations.

(b) * * *
(1) * * *

(iv) For the Coverage Gap Discount Program, the date of the final reconciled payment under § 423.2320(b).

*   *   *   *   *

■ 47. Amend § 423.464 by redesignating paragraph (f)(2)(i)(B) as paragraph (f)(2)(i)(C) and adding paragraph (f)(2)(i)(B) to read as follows:

§ 423.464  Coordination of benefits with other providers of prescription drug coverage.

*   *   *   *   *

(f) * * *
(2) * * *
(i) * * *
(B) Report, accept and apply benefit accumulator data in a timeframe and manner determined by CMS.

*   *   *   *   *

■ 48. Amend § 423.466 by revising the section heading and, in paragraph (b), removing the phrase ''a period not to exceed 3 years'' and adding in its place the phrase ''a period of 3 years'' to read as follows:

§ 423.466  Timeframes for coordination of benefits and claims adjustments.

*   *   *   *   *

■ 49. Amend § 423.503 by revising paragraph (a)(1) and adding paragraphs (c)(4) and (d) to read as follows:

§ 423.503  Evaluation and determination procedures for applications to be determined qualified to act as a sponsor.

(a) * * *
(1) With the exception of evaluations conducted under paragraph (b) of this section, CMS evaluates an entity's application solely on the basis of information contained in the application itself and any additional information that CMS obtains through on-site visits and any essential operations test.

*   *   *   *   *

(c) * * *
(4) *Nullification of approval of application.* If CMS discovers through any means that an applicant is not qualified to contract based on information gained subsequent to application approval (for example, failure of an essential operations test, absence of required employees, etc.), CMS gives the applicant written notice indicating that the approval issued under paragraph (c)(1) of this section is nullified and the applicant no longer qualifies to contract as a Part D plan sponsor.

(i) This determination is not subject to the appeals provisions in subpart N of this part.

(ii) This provision only applies to applicants that have not previously entered into a Part D contract with CMS

and neither it, nor another subsidiary of the applicant's parent organization, is offering Part D benefits during the current year.

(d) *Withdrawal of application and bid in a previous year.* An applicant that withdraws its application and corresponding bid after the release of the low-income subsidy benchmark is not eligible to be approved as a Part D plan sponsor for the 2 succeeding annual contracting cycles.

■ 50. Amend § 423.504 by adding paragraphs (b)(10) and (d)(2)(iv) to read as follows:

§ 423.504  General provisions.

*   *   *   *   *

(b) * * *
(10) Pass an essential operations test prior to the start of the benefit year. This provision only applies to new sponsors that have not previously entered into a Part D contract with CMS when neither it, nor another subsidiary of the applicant's parent organization, is offering Part D benefits during the current year.

*   *   *   *   *

(d) * * *
(2) * * *
(iv) CMS may require that the Part D Plan sponsor hire an independent auditor to provide CMS with additional information to determine if deficiencies found during an audit or inspection have been corrected and are not likely to recur. The independent auditor must work in accordance with CMS specifications and must be willing to attest that a complete and full independent review has been performed.

*   *   *   *   *

■ 51. Amend § 423.505 by adding paragraphs (b)(27) and (p) to read as follows:

§ 423.505  Contact provisions.

*   *   *   *   *

(b) * * *
(27) Pass an essential operations test prior to the start of the benefit year. This provision only applies to new sponsors that have not previously entered into a Part D contract with CMS and neither it, nor another subsidiary of the applicant's parent organization, is offering Part D benefits during the current year.

*   *   *   *   *

(p) *Business continuity.* (1) The Part D sponsor agrees to develop, maintain, and implement a business continuity plan containing policies and procedures to ensure the restoration of business operations following disruptions to business operations during disruptions to business operations which would

include natural or man-made disasters, system failures, emergencies, and other similar circumstances and the threat of such occurrences. To meet the requirement, the business continuity plan must, at a minimum, include the following:

(i) *Risk assessment.* Identify threats and vulnerabilities that might affect business operations.

(ii) *Mitigation strategy.* Design strategies to mitigate hazards. Identify essential functions in addition to those specified in paragraph (p)(2) of this section and prioritize the order in which to restore all other functions to normal operations. At a minimum, each Part D sponsor must do the following:

(A) Identify specific events that will activate the business continuity plan.

(B) Develop a contingency plan to maintain, during any business disruption, the availability and, as applicable, confidentiality of communication systems and essential records in all forms (including electronic and paper copies). The contingency plan must do the following:

(*1*) Ensure that during any business disruption the following systems will operate continuously or, should they fail, be restored to operational capacity on a timely basis:

(*i*) Information technology (IT) systems including those supporting claims processing at point of service.

(*ii*) Provider and enrollee communication systems including telephone, Web site, and email.

(*2*) With respect to electronic protected health information, comply with the contingency plan requirements of the Health Insurance Portability and Accountability Act of 1996 Security Regulations at 45 CFR parts 160 and 164, subparts A and C.

(C) Establish a chain of command.

(D) Establish a business communication plan that includes emergency capabilities and procedures to contact and communicate with the following:

(*1*) Employees.

(*2*) First tier, downstream, and related entities.

(*3*) Other third parties (including pharmacies, providers, suppliers, and government and emergency management officials).

(E) Establish employee and facility management plans to ensure that essential operations and job responsibilities can be assumed by other employees or moved to alternate sites as necessary or both.

(F) Establish a restoration plan including procedures to transition to normal operations.

(G) Comply with all applicable Federal, State, and local laws.

(iii) *Testing and revision.* On at least an annual basis, test and update the business operations continuity plan to ensure the following:

(A) That it can be implemented in emergency situations.

(B) That employees understand how it is to be executed.

(iv) *Training.* On at least an annual basis, educate appropriate employees about the business continuity plan and their own respective roles.

(v) *Records.* (A) Develop and maintain records documenting the elements of the business continuity plan described in paragraph (p)(1)(i) through (iv) of this section.

(B) Make the information specified in paragraph (p)(1)(v)(A) of this section available to CMS upon request.

(2) *Restoration of essential functions.* Every Part D sponsor must plan to restore essential functions within 72 hours after any of the essential functions fail or otherwise stop functioning as usual. In addition to any essential functions that the Part D sponsor identifies under paragraph (p)(1)(ii) of this section, for purposes of this paragraph (p)(2) of this section essential functions include at a minimum, the following:

(i) Benefit authorization (if not waived), adjudication, and processing of prescription drug claims at the point of sale.

(ii) Administration and tracking of enrollees' drug benefits in real time, including automated coordination of benefits with other payers.

(iii) Provision of pharmacy technical assistance.

(iv) Operation of an enrollee exceptions and appeals process including coverage determinations.

(v) Operation of call center customer services.

■ 52. Amend § 423.509 by adding paragraph (a)(4)(xii) and revising paragraph (b)(2)(i)(C) to read as follows:

### § 423.509  Termination of a contract by CMS.

(a) * * *

(4) * * *

(xii) Failure of an essential operations test before the start of the benefit year by an organization that has entered into a Part D contract with CMS when neither it, nor another subsidiary of the organization's parent organization, is offering Part D benefits during the current year.

(b) * * *

(2) * * *

(i) * * *

(C) The contract is being terminated based on the grounds specified in

paragraphs (a)(4)(i) and (xii) of this section.

* * * * *

### § 423.562  [Amended]

■ 53. Amend § 423.562(a)(3) by removing the phrase "request an exception if they disagree with the information provided by the pharmacist." and adding in its place the phrase "request an exception.".

### § 423.650  [Amended]

■ 54. Amend § 423.650 as follows:

■ a. In paragraph (a)(2), by removing the term "under" and adding in its place the phrase "in accordance with".

■ b. In paragraph (a)(4), by removing the cross-reference "§ 423.752(a) and (b) of this part" and adding in its place the cross-reference "§ 423.752(a) through (b)".

■ 55. Amend § 423.2262 by adding paragraph (a)(2) to read as follows:

### § 423.2262  Review and distribution of marketing materials.

(a) * * *

(2) If CMS does not approve or does not disapprove marketing materials within the specified review timeframe, the materials are deemed approved and the Part D sponsor may use the material.

* * * * *

### § 423.2266  [Removed and Reserved]

■ 56. Section 423.2266 is removed and reserved.

■ 57. Amend § 423.2274 by revising paragraphs (c) and (d) to read as follows:

### § 423.2274  Broker and agent requirements.

* * * * *

(c) *Annual training.* The Part D sponsor must ensure that all agents and brokers selling Medicare products are trained annually on the following:

(1) Medicare rules and regulations.

(2) Details specific to the plan products they intend to sell.

(d) *Annual testing.* The Part D sponsor must ensure that all agents and brokers selling Medicare products are tested annually, to ensure the following:

(1) Appropriate knowledge and understanding of Medicare rules and regulations.

(2) Details specific to the plan products they intend to sell.

* * * * *

■ 58. Amend § 423.2320 by adding paragraph (c) to read as follows:

### § 423.2320  Payment processes for Part D sponsors.

* * * * *

(c) *Manufacturer bankruptcy.* In the event that a manufacturer declares

NJAPP0540

bankruptcy, as described in Title 11 of the United States Code, and as a result of the bankruptcy, does not pay the quarterly invoices described in § 423.2315(b)(10) used for a particular contract year's Coverage Gap Discount Reconciliation described in paragraph (b) of this section, CMS adjusts the Coverage Gap Discount Reconciliation amount of each of the affected Part D sponsors to account for the total unpaid quarterly invoiced amount owed to each of the Part D sponsors for that particular contract year being reconciled.

■ 59. Amend § 423.2325 by adding paragraph (h) to read as follows:

§ 423.2325   Provision of applicable discounts.

*      *      *      *      *

(h) *Treatment of employer group waiver plans.* As of 2014, Part D sponsors offering employer group waiver plans must provide applicable discounts to applicable beneficiaries who are employer group waiver plan enrollees as determined consistent with the defined standard benefit.

Dated: December 18, 2014.

**Marilyn Tavenner,**
*Administrator, Centers for Medicare & Medicaid Services.*

Approved: February 4, 2015.

**Sylvia M. Burwell,**
*Secretary, Department of Health and Human Services.*

[FR Doc. 2015–02671 Filed 2–6–15; 4:15 pm]

**BILLING CODE 4120–01–P**

NJAPP0541

# Exhibit 47

NJAPP0542

(v) The history of previous violations of the employer.

(3) Where an order is issued with respect to a respondent composed of distinct, physically separate subdivisions which do their own hiring, or their own recruiting or referring for a fee for employment (without reference to the practices of, and under the control of, or common control with another subdivision) the subdivision shall be considered a separate person or entity.

(c) *Enjoining pattern or practice violations.* If the Attorney General has reasonable cause to believe that a person or entity is engaged in a pattern or practice of employment, recruitment or referral in violation of section 274A(a)(1)(A) or (2) of the Act, the Attorney General may bring civil action in the appropriate United States District Court requesting relief, including a permanent or temporary injunction, restraining order, or other order against the person or entity, as the Attorney General deems necessary.

[52 FR 16221, May 1, 1987, as amended at 55 FR 25935, June 25, 1990; 56 FR 41786, Aug. 23, 1991; 64 FR 47101, Aug. 30, 1999; 73 FR 10136, Feb. 26, 2008]

§ 274a.11  [Reserved]

## Subpart B—Employment Authorization

### § 274a.12  Classes of aliens authorized to accept employment.

(a) *Aliens authorized employment incident to status.* Pursuant to the statutory or regulatory reference cited, the following classes of aliens are authorized to be employed in the United States without restrictions as to location or type of employment as a condition of their admission or subsequent change to one of the indicated classes. Any alien who is within a class of aliens described in paragraphs (a)(3), (a)(4), (a)(6)–(a)(8), (a)(10)–(a)(15), or (a)(20) of this section, and who seeks to be employed in the United States, must apply to U.S. Citizenship and Immigration Services (USCIS) for a document evidencing such employment authorization. USCIS may, in its discretion, determine the validity period assigned to any document issued evidencing an alien's authorization to work in the United States.

(1) An alien who is a lawful permanent resident (with or without conditions pursuant to section 216 of the Act), as evidenced by Form I–551 issued by the Service. An expiration date on the Form I–551 reflects only that the card must be renewed, not that the bearer's work authorization has expired;

(2) An alien admitted to the United States as a lawful temporary resident pursuant to sections 245A or 210 of the Act, as evidenced by an employment authorization document issued by the Service;

(3) An alien admitted to the United States as a refugee pursuant to section 207 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(4) An alien paroled into the United States as a refugee for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(5) An alien granted asylum under section 208 of the Act for the period of time in that status, as evidenced by an employment authorization document, issued by USCIS to the alien. An expiration date on the employment authorization document issued by USCIS reflects only that the document must be renewed, and not that the bearer's work authorization has expired. Evidence of employment authorization shall be granted in increments not exceeding 5 years for the period of time the alien remains in that status.

(6) An alien admitted to the United States as a nonimmigrant fiancé or fiancée pursuant to section 101(a)(15)(K)(1) of the Act, or an alien admitted as a child of such alien, for the period of admission in that status, as evidenced by an employment authorization document issued by the Service;

(7) An alien admitted as a parent (N–8) or dependent child (N–9) of an alien granted permanent residence under section 101(a)(27)(I) of the Act, as evidenced by an employment authorization document issued by the Service;

(8) An alien admitted to the United States as a nonimmigrant pursuant to

690

NJAPP0543

the Compact of Free Association between the United States and of the Federated States of Micronesia, the Republic of the Marshall Islands, or the Republic of Palau;

(9) Any alien admitted as a non-immigrant spouse pursuant to section 101(a)(15)(K)(ii) of the Act, or an alien admitted as a child of such alien, for the period of admission in that status, as evidenced by an employment authorization document, with an expiration date issued by the Service;

(10) An alien granted withholding of deportation or removal for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(11) An alien whose enforced departure from the United States has been deferred in accordance with a directive from the President of the United States to the Secretary. Employment is authorized for the period of time and under the conditions established by the Secretary pursuant to the Presidential directive;

(12) An alien granted Temporary Protected Status under section 244 of the Act for the period of time in that status, as evidenced by an employment authorization document issued by the Service;

(13) An alien granted voluntary departure by the Attorney General under the Family Unity Program established by section 301 of the Immigration Act of 1990, as evidenced by an employment authorization document issued by the Service;

(14) An alien granted Family Unity benefits under section 1504 of the Legal Immigrant Family Equity (LIFE) Act Amendments, Public Law 106–554, and the provisions of 8 CFR part 245a, Subpart C of this chapter, as evidenced by an employment authorization document issued by the Service;

(15) Any alien in V nonimmigrant status as defined in section 101(a)(15)(V) of the Act and 8 CFR 214.15.

(16) An alien authorized to be admitted to or remain in the United States as a nonimmigrant alien victim of a severe form of trafficking in persons under section 101(a)(15)(T)(i) of the Act. Employment authorization granted under this paragraph shall expire upon the expiration of the underlying T–1 nonimmigrant status granted by the Service;

(17)–(18) [Reserved]

(19) Any alien in U–1 nonimmigrant status, pursuant to 8 CFR 214.14, for the period of time in that status, as evidenced by an employment authorization document issued by USCIS to the alien.

(20) Any alien in U–2, U–3, U–4, or U–5 nonimmigrant status, pursuant to 8 CFR 214.14, for the period of time in that status, as evidenced by an employment authorization document issued by USCIS to the alien.

(b) *Aliens authorized for employment with a specific employer incident to status.* The following classes of nonimmigrant aliens are authorized to be employed in the United States by the specific employer and subject to the restrictions described in the section(s) of this chapter indicated as a condition of their admission in, or subsequent change to, such classification. An alien in one of these classes is not issued an employment authorization document by the Service:

(1) A foreign government official (A–1 or A–2), pursuant to §214.2(a) of this chapter. An alien in this status may be employed only by the foreign government entity;

(2) An employee of a foreign government official (A–3), pursuant to §214.2(a) of this chapter. An alien in this status may be employed only by the foreign government official;

(3) A foreign government official in transit (C–2 or C–3), pursuant to §214.2(c) of this chapter. An alien in this status may be employed only by the foreign government entity;

(4) [Reserved]

(5) A nonimmigrant treaty trader (E–1) or treaty investor (E–2), pursuant to §214.2(e) of this chapter. An alien in this status may be employed only by the treaty-qualifying company through which the alien attained the status. Employment authorization does not extend to the dependents of the principal treaty trader or treaty investor (also designated "E–1" or "E–2"), other than those specified in paragraph (c)(2) of this section;

(6) A nonimmigrant (F–1) student who is in valid nonimmigrant student

NJAPP0544

status and pursuant to 8 CFR 214.2(f) is seeking:

(1) On-campus employment for not more than twenty hours per week when school is in session or full-time employment when school is not in session if the student intends and is eligible to register for the next term or session. Part-time on-campus employment is authorized by the school and no specific endorsement by a school official or Service officer is necessary;

(ii) [Reserved]

(iii) Curricular practical training (internships, cooperative training programs, or work-study programs which are part of an established curriculum) after having been enrolled full-time in a Service approved institution for one full academic year. Curricular practical training (part-time or full-time) is authorized by the Designated School Official on the student's Form I–20. No Service endorsement is necessary.

(iv) An employment authorization document under paragraph (c)(3)(i)(C) of this section based on a 17-month STEM Optional Practical Training extension, and whose timely filed employment authorization request is pending and employment authorization issued under paragraph (c)(3)(i)(B) of this section has expired. Employment is authorized beginning on the expiration date of the authorization issued under paragraph (c)(3)(i)(B) of this section and ending on the date of USCIS' written decision on the current employment authorization request, but not to exceed 180 days; or

(v) Pursuant to 8 CFR 214.2(h) is seeking H–1B nonimmigrant status and whose duration of status and employment authorization have been extended pursuant to 8 CFR 214.2(f)(5)(vi).

(7) A representative of an international organization (G–1, G–2, G–3, or G–4), pursuant to § 214.2(g) of this chapter. An alien in this status may be employed only by the foreign government entity or the international organization;

(8) A personal employee of an official or representative of an international organization (G–5), pursuant to § 214.2(g) of this chapter. An alien in this status may be employed only by the official or representative of the international organization;

(9) A temporary worker or trainee (H–1, H–2A, H–2B, or H–3), pursuant to § 214.2(h) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional H–2B athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after acquisition by the new organization, within which time the new organization is expected to file a new Form I–129 to petition for H–2B classification. If a new Form I–129 is not filed within 30 days, employment authorization will cease. If a new Form I–129 is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease;

(10) An information media representative (I), pursuant to § 214.2(i) of this chapter. An alien in this status may be employed only for the sponsoring foreign news agency or bureau. Employment authorization does not extend to the dependents of an information media representative (also designated "I");

(11) An exchange visitor (J–1), pursuant to § 214.2(j) of this chapter and 22 CFR part 62. An alien in this status may be employed only by the exchange visitor program sponsor or appropriate designee and within the guidelines of the program approved by the Department of State as set forth in the Form DS–2019, Certificate of Eligibility, issued by the program sponsor;

(12) An intra-company transferee (L–1), pursuant to § 214.2(l) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained;

(13) An alien having extraordinary ability in the sciences, arts, education, business, or athletics (O–1), and any accompanying alien (O–2), pursuant to § 214.2(o) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional O–1 athlete who is traded from one organization to another organization, employment authorization

**Department of Homeland Security**

§274a.12

for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new Form I-129 petition for O nonimmigrant classification. If a new Form I-129 is not filed within 30 days, employment authorization will cease. If a new Form I-129 is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

(14) An athlete, artist, or entertainer (P-1, P-2, or P-3), pursuant to §214.2(p) of this chapter. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional P-1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new Form I-129 for P-1 nonimmigrant classification. If a new Form I-129 is not filed within 30 days, employment authorization will cease. If a new Form I-129 is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease;

(15) An international cultural exchange visitor (Q-1), according to §214.2(q)(1) of this chapter. An alien may only be employed by the petitioner through whom the status was obtained;

(16) An alien having a religious occupation, pursuant to §214.2(r) of this chapter. An alien in this status may be employed only by the religious organization through whom the status was obtained;

(17) Officers and personnel of the armed services of nations of the North Atlantic Treaty Organization, and representatives, officials, and staff employees of NATO (NATO-1, NATO-2, NATO-3, NATO-4, NATO-5 and NATO-6), pursuant to §214.2(o) of this chapter. An alien in this status may be employed only by NATO;

(18) An attendant, servant or personal employee (NATO-7) of an alien admitted as a NATO-1, NATO-2, NATO-3, NATO-4, NATO-5, or NATO-6, pursuant to §214.2(o) of this chapter. An alien admitted under this classification may be employed only by the NATO alien through whom the status was obtained;

(19) A nonimmigrant pursuant to section 214(e) of the Act. An alien in this status must be engaged in business activities at a professional level in accordance with the provisions of Chapter 16 of the North American Free Trade Agreement (NAFTA);

(20) A nonimmigrant alien within the class of aliens described in paragraphs (b)(2), (b)(5), (h)(8), (h)(9), (h)(10), (h)(11), (b)(12), (b)(13), (b)(14), (b)(16), and (b)(19) of this section whose status has expired but who has filed a timely application for an extension of such stay pursuant to §§214.2 or 214.6 of this chapter. These aliens are authorized to continue employment with the same employer for a period not to exceed 240 days beginning on the date of the expiration of the authorized period of stay. Such authorization shall be subject to any conditions and limitations noted on the initial authorization. However, if the district director or service center director adjudicates the application prior to the expiration of this 240 day period and denies the application for extension of stay, the employment authorization under this paragraph shall automatically terminate upon notification of the denial decision;

(21) A nonimmigrant alien within the class of aliens described in 8 CFR 214.2(h)(1)(ii)(C) who filed an application for an extension of stay pursuant to 8 CFR 214.2 during his or her period of admission. Such alien is authorized to be employed by a new employer that has filed an H-2A petition naming the alien as a beneficiary and requesting an extension of stay for the alien for a period not to exceed 120 days beginning from the "Received Date" on Form I-797 (Notice of Action) acknowledging receipt of the petition requesting an extension of stay, provided that the employer has enrolled in and is a participant in good standing in the E-Verify program, as determined by

693

NJAPP0546

USCIS in its discretion. Such authorization will be subject to any conditions and limitations noted on the initial authorization, except as to the employer and place of employment. However, if the District Director or Service Center director adjudicates the application prior to the expiration of this 120-day period and denies the application for extension of stay, the employment authorization under this paragraph (b)(21) shall automatically terminate upon 15 days after the date of the denial decision. The employment authorization shall also terminate automatically if the employer fails to remain a participant in good standing in the E-Verify program, as determined by USCIS in its discretion;

(22) An alien in E-2 CNMI Investor nonimmigrant status pursuant to 8 CFR 214.2(e)(23). An alien in this status may be employed only by the qualifying company through which the alien attained the status. An alien in E-2 CNMI Investor nonimmigrant status may be employed only in the Commonwealth of the Northern Mariana Islands for a qualifying entity. An alien who attained E-2 CNMI Investor nonimmigrant status based upon a Foreign Retiree Investment Certificate or Certification is not employment-authorized. Employment authorization does not extend to the dependents of the principal investor (also designated E-2 CNMI Investor nonimmigrants) other than those specified in paragraph (c)(12) of this section;

(23) A Commonwealth of the Northern Mariana Islands transitional worker (CW–1) pursuant to 8 CFR 214.2(w). An alien in this status may be employed only in the CNMI during the transition period, and only by the petitioner through whom the status was obtained, or as otherwise authorized by 8 CFR 214.2(w). An alien who is lawfully present in the CNMI (as defined by 8 CFR 214.2(w)(1)(v)) on or before November 27, 2011, is authorized to be employed in the CNMI, and is so employed in the CNMI by an employer properly filing an application under 8 CFR 214.2(w)(14)(ii) on or before such date for a grant of CW–1 status to its employee in the CNMI for the purpose of the alien continuing the employment, is authorized to continue such employ-

ment on or after November 27, 2011, until a decision is made on the application; or

(24) An alien who is authorized to be employed in the Commonwealth of the Northern Mariana Islands for a period of up to 2 years following the transition program effective date, under section 6(e)(2) of Public Law 94–241, as added by section 702(a) of Public Law 110–229. Such alien is only authorized to continue in the same employment that he or she had on the transition program effective date as defined in 8 CFR 1.1 until the earlier of the date that is 2 years after the transition program effective date or the date of expiration of the alien's employment authorization, unless the alien had unrestricted employment authorization or was otherwise authorized as of the transition program effective date to change employers, in which case the alien may have such employment privileges as were authorized as of the transition program effective date for up to 2 years.

(c) *Aliens who must apply for employment authorization.* An alien within a class of aliens described in this section must apply for work authorization. If authorized, such an alien may accept employment subject to any restrictions stated in the regulations or cited on the employment authorization document. USCIS, in its discretion, may establish a specific validity period for an employment authorization document, which may include any period when an administrative appeal or judicial review of an application or petition is pending.

(1) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (A–1 or A–2) pursuant to 8 CFR 214.2(a)(2) and who presents an endorsement from an authorized representative of the Department of State;

(2) An alien spouse or unmarried dependent son or daughter of an alien employee of the Coordination Council for North American Affairs (E–1) pursuant to § 214.2(e) of this chapter;

(3) A nonimmigrant (F–1) student who:

(i)(A) Is seeking pre-completion practical training pursuant to 8 CFR 214.2(f)(10)(ii)(A)(*1*)–(2);

694

(B) Is seeking authorization to engage in post-completion Optional Practical Training (OPT) pursuant to 8 CFR 214.2(f)(10)(ii)(A)(3); or

(C) Is seeking a 17-month STEM OPT extension pursuant to 8 CFR 214.2(f)(10)(ii)(C);

(ii) Has been offered employment under the sponsorship of an international organization within the meaning of the International Organization Immunities Act (59 Stat. 669) and who presents a written certification from the international organization that the proposed employment is within the scope of the organization's sponsorship. The F-1 student must also present a Form I-20 ID or SEVIS Form I-20 with employment page completed by DSO certifying eligibility for employment; or

(iii) Is seeking employment because of severe economic hardship pursuant to 8 CFR 214.2(f)(9)(ii)(C) and has filed the Form I-20 ID and Form I-538 (for non-SEVIS schools), or SEVIS Form I-20 with employment page completed by the DSO certifying eligibility, and any other supporting materials such as affidavits which further detail the unforeseen economic circumstances that require the student to seek employment authorization.

(4) An alien spouse or unmarried dependent child; son or daughter of a foreign government official (G-1, G-3 or G-4) pursuant to 8 CFR 214.2(g) and who presents an endorsement from an authorized representative of the Department of State;

(5) An alien spouse or minor child of an exchange visitor (J-2) pursuant to §214.2(j) of this chapter;

(6) A nonimmigrant (M-1) student seeking employment for practical training pursuant to 8 CFR 214.2(m) following completion of studies. The alien may be employed only in an occupation or vocation directly related to his or her course of study as recommended by the endorsement of the designated school official on the I-20 ID;

(7) A dependent of an alien classified as NATO-1 through NATO-7 pursuant to §214.2(n) of this chapter;

(8) An alien who has filed a complete application for asylum or withholding of deportation or removal pursuant to 8 CFR part 208, whose application:

(i) Has not been decided, and who is eligible to apply for employment authorization under §208.7 of this chapter because the 150-day period set forth in that section has expired. Employment authorization may be granted according to the provisions of §208.7 of this chapter in increments to be determined by the Commissioner and shall expire on a specified date; or

(ii) Has been recommended for approval, but who has not yet received a grant of asylum or withholding or deportation or removal;

(9) An alien who has filed an application for adjustment of status to lawful permanent resident pursuant to part 245 of this chapter. For purposes of section 245(c)(8) of the Act, an alien will not be deemed to be an "unauthorized alien" as defined in section 274A(h)(3) of the Act while his or her properly filed Form I-485 application is pending final adjudication, if the alien has otherwise obtained permission from the Service pursuant to 8 CFR 274a.12 to engage in employment, or if the alien had been granted employment authorization prior to the filing of the adjustment application and such authorization does not expire during the pendency of the adjustment application. Upon meeting these conditions, the adjustment applicant need not file an application for employment authorization to continue employment during the period described in the preceding sentence;

(10) An alien who has filed an application for suspension of deportation under section 244 of the Act (as it existed prior to April 1, 1997), cancellation of removal pursuant to section 240A of the Act, or special rule cancellation of removal under section 309(f)(1) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, enacted as Pub. L. 104-208 (110 Stat. 3009-625) (as amended by the Nicaraguan Adjustment and Central American Relief Act (NACARA)), title II of Pub. L. 105-100 (111 Stat. 2160, 2193) and whose properly filed application has been accepted by the Service or EOIR.

(11) An alien paroled into the United States temporarily for emergency reasons or reasons deemed strictly in the

NJAPP0548

public interest pursuant to § 212.5 of this chapter;

(12) An alien spouse of a long-term investor in the Commonwealth of the Northern Mariana Islands (E–2 CNMI Investor) other than an E–2 CNMI investor who obtained such status based upon a Foreign Retiree Investment Certificate, pursuant to 8 CFR 214.2(e)(23). An alien spouse of an E–2 CNMI Investor is eligible for employment in the CNMI only;

(13) [Reserved]

(14) An alien who has been granted deferred action, an act of administrative convenience to the government which gives some cases lower priority, if the alien establishes an economic necessity for employment;

(15) [Reserved]

(16) Any alien who has filed an application for creation of record of lawful admission for permanent residence pursuant to part 249 of this chapter.

(17) A nonimmigrant visitor for business (B–1) who:

(i) Is a personal or domestic servant who is accompanying or following to join an employer who seeks admission into, or is already in, the United States as a nonimmigrant defined under sections 101(a)(15) (B), (E), (F), (H), (I), (J), (L) or section 214(e) of the Act. The personal or domestic servant shall have a residence abroad which he or she has no intention of abandoning and shall demonstrate at least one year's experience as a personal or domestic servant. The nonimmigrant's employer shall demonstrate that the employer/employee relationship has existed for at least one year prior to the employer's admission to the United States; or, if the employer/employee relationship existed for less than one year, that the employer has regularly employed (either year-round or seasonally) personal or domestic servants over a period of several years preceding the employer's admission to the United States;

(ii) Is a domestic servant of a United States citizen accompanying or following to join his or her United States citizen employer who has a permanent home or is stationed in a foreign country, and who is visiting temporarily in the United States. The employer/employee relationship shall have existed prior to the commencement of the employer's visit to the United States; or

(iii) Is an employee of a foreign airline engaged in international transportation of passengers freight, whose position with the foreign airline would otherwise entitle the employee to classification under section 101(a)(15)(E)(i) of the Immigration and Nationality Act, and who is precluded from such classification solely because the employee is not a national of the country of the airline's nationality or because there is no treaty of commerce and navigation in effect between the United States and the country of the airline's nationality.

(18) An alien against whom a final order of deportation or removal exists and who is released on an order of supervision under the authority contained in section 241(a)(3) of the Act may be granted employment authorization in the discretion of the district director only if the alien cannot be removed due to the refusal of all countries designated by the alien or under section 241 of the Act to receive the alien, or because the removal of the alien is otherwise impracticable or contrary to the public interest. Additional factors which may be considered by the district director in adjudicating the application for employment authorization include, but are not limited to, the following:

(i) The existence of economic necessity to be employed;

(ii) The existence of a dependent spouse and/or children in the United States who rely on the alien for support; and

(iii) The anticipated length of time before the alien can be removed from the United States.

(19) An alien applying for Temporary Protected Status pursuant to section 244 of the Act shall apply for employment authorization only in accordance with the procedures set forth in part 244 of this chapter.

(20) Any alien who has filed a completed legalization application pursuant to section 210 of the Act (and part 210 of this chapter).

(21) A principal nonimmigrant witness or informant in S classification, and qualified dependent family members.

NJAPP0549

Department of Homeland Security §274a.13

(22) Any alien who has filed a completed legalization application pursuant to section 245A of the Act (and part 245a of this chapter). Employment authorization shall be granted in increments not exceeding 1 year during the period the application is pending (including any period when an administrative appeal is pending) and shall expire on a specified date.

(23) [Reserved]

(24) An alien who has filed an application for adjustment pursuant to section 1104 of the LIFE Act, Public Law 106–553, and the provisions of 8 CFR part 245a, Subpart B of this chapter.

(25) An immediate family member of a T–1 victim of a severe form of trafficking in persons designated as a T–2, T–3 or T–4 nonimmigrant pursuant to §214.11 of this chapter. Aliens in this status shall only be authorized to work for the duration of their T nonimmigrant status.

(d) An alien lawfully enlisted in one of the Armed Forces, or whose enlistment the Secretary with jurisdiction over such Armed Force has determined would be vital to the national interest under 10 U.S.C. 504(b)(2), is authorized to be employed by that Armed Force in military service, if such employment is not otherwise authorized under this section and the immigration laws. An alien described in this section is not issued an employment authorization document.

(e) *Basic criteria to establish economic necessity.* Title 45—Public Welfare, Poverty Guidelines, 45 CFR 1060.2 should be used as the basic criteria to establish eligibility for employment authorization when the alien's economic necessity is identified as a factor. The alien shall submit an application for employment authorization listing his or her assets, income, and expenses as evidence of his or her economic need to work. Permission to work granted on the basis of the alien's application for employment authorization may be revoked under §274a.14 of this chapter upon a showing that the information contained in the statement was not true and correct.

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting §274a.12, see the List of CFR Sections Affected, which appears in the Finding Aids section in the printed volume and at *www.fdsys.gov.*

§274a.13 Application for employment authorization.

(a) *Application.* Aliens authorized to be employed under sections 274a.12(a)(3), (4), (6) through (8), (a)(10) through (15), and (a)(20) must file an application in order to obtain documentation evidencing this fact.

(1) Aliens who may apply for employment authorization under 8 CFR 274a.12(c), except for those who may apply under 8 CFR 274a.12(c)(8), must apply on the form designated by USCIS with the fee prescribed in 8 CFR 103.7(b)(1) and in accordance with the form instructions. The approval of applications filed under 8 CFR 274a.12(c), except for 8 CFR 274a.12(c)(8), are within the discretion of USCIS. Where economic necessity has been identified as a factor, the alien must provide information regarding his or her assets, income, and expenses.

(2) An initial employment authorization request for asylum applicants under 8 CFR 274a.12(c)(8) must be filed on the form designated by USCIS in accordance with the form instructions. The applicant also must submit a copy of the underlying application for asylum or withholding of deportation, together with evidence that the application has been filed in accordance with 8 CFR 208.3 and 208.4. An application for an initial employment authorization or for a renewal of employment authorization filed in relation to a pending claim for asylum shall be adjudicated in accordance with 8 CFR 208.7. An application for renewal or replacement of employment authorization submitted in relation to a pending claim for asylum, as provided in 8 CFR 208.7, must be filed, with fee or application for waiver of such fee.

(b) *Approval of application.* If the application is granted, the alien shall be notified of the decision and issued an employment authorization document valid for a specific period and subject to any terms and conditions as noted.

(c) *Denial of application.* If the application is denied, the applicant shall be notified in writing of the decision and the reasons for the denial. There shall

697

# Exhibit 48

NJAPP0551

<u>*N.J.A.C. 10:49-5.4*</u>

This file includes all Regulations adopted and published through the   New Jersey Register, Vol. 50 No. 14, July 16, 2018

***New Jersey Administrative Code*  >  *TITLE 10. HUMAN SERVICES*  >  *CHAPTER 49. ADMINISTRATION MANUAL*  >  *SUBCHAPTER 5. SERVICES COVERED BY MEDICAID AND THE NJ FAMILYCARE PROGRAMS***

## § 10:49-5.4 Emergency medical services for aliens and prenatal care for specified pregnant alien women

**(a)**Most legal aliens who entered the United States on or after August 22, 1996 are restricted in their entitlement to emergency services for five years from their date of entry. Undocumented aliens and temporarily documented aliens, that is visitors, workers, and students, are also restricted in their entitlement to emergency services. These emergency medical services are only available to individuals who, except for their alien status, would be eligible for Medicaid, Medically Needy, New Jersey Care . . . Special Medicaid Programs, AFDC-related Medicaid, or NJ FamilyCare-Plan A. Applicants who would otherwise be eligible for NJ FamilyCare-Plans B, C and D are not eligible for these emergency medical services for aliens.

1.Except as noted in (a)2 below, emergency services are defined as care provided in an acute care general hospital (emergency outpatient services and/or inpatient services) for a medical condition (including labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in:

i.Placing the patient's health in serious jeopardy;

ii.Serious impairment to bodily functions; or

iii.Serious dysfunction of any bodily organ or part.

2.For labor and delivery services, the place of service is not limited to an acute care general hospital. Services provided in birth centers are also eligible for reimbursement under this program.

3.Diagnoses are classified as emergency or non-emergency services in accordance with the above definition of an emergency. Those diagnoses that correspond with emergency care are defined as emergencies and thus do not require any authorization by the attending physician. Those diagnoses that correspond with urgent care require a Certification of Treatment of Emergency Medical Condition signed by the attending physician confirming the emergency nature of the encounter to be attached to the claim when submitted for reimbursement.

i.Emergency care is provided for life-threatening or organ threatening, or potentially life or organ threatening condition that requires immediate care.

ii.Urgent care is provided for a condition that is potentially harmful to a patient's health and determined by the physician to be medically necessary for treatment within 12 hours to prevent deterioration.

4.To be eligible for emergency services, an alien meeting the medical criteria listed in (a)1 above must also meet all financial and categorical eligibility requirements for NJ FamilyCare-Plan A, Medicaid, Medically Needy, New Jersey Care … Special Medicaid Programs or AFDC-related Medicaid.

N.J.A.C. 10:49-5.4

**(b)** Lawfully admitted aliens who entered the United States prior to August 22, 1996 and other aliens who are refugees, asylees, Cuban/Haitian entrants, American Indians born in Canada, Amerasian immigrants, and aliens who are honorably discharged or are on active duty in the Armed Forces of the United States and their spouses and unmarried dependent children, may qualify for full NJ FamilyCare-Plan A, Medicaid, Medically Needy, New Jersey Care ... Special Medicaid Programs or AFDC-related Medicaid, if they meet all other programmatic eligibility requirements. These aliens should be referred to the appropriate eligibility determination agency of their choice to apply for full benefits. See *N.J.A.C. 10:70-3.2(a)*, *10:71-3.3(c)*, *10:72-3.2(a)*, and *10:79-3.2(b)*.

**(c)** Legally admitted pregnant alien women who entered the United States on or after August 22, 1996, who would otherwise be eligible for New Jersey Care . . . Special Medicaid Programs, except for the alien requirements are also eligible for routine prenatal care services. Prenatal care includes services provided in the outpatient hospital department, or by a physician, certified nurse practitioner or certified nurse midwife, as well as laboratory, radiological and pharmaceutical services.

## History

**HISTORY:**

New Rule, R.1998 d.116, effective January 30, 1998 (operative February 1, 1998; to expire July 31, 1998).

See: *30 N.J.R. 713(a)*.

Former *N.J.A.C. 10:49-5.4.*, Services not covered by the Medicaid program, recodified to *N.J.A.C. 10:49-5.5*.

Adopted concurrent proposal, R.1998 d.426, effective July 24, 1998.

See: *30 N.J.R. 713(a)*, *30 N.J.R. 3034(a)*.

Readopted provisions of R.1998 d.116 without change.

Amended by R.1999 d.253, effective August 2, 1999.

See: *31 N.J.R. 97(a)*, *31 N.J.R. 2203(b)*.

Rewrote the section.

Emergency amendment R.1999 d.254, effective July 12, 1999 (to expire September 10, 1999).

See: *31 N.J.R. 2252(a)*.

Rewrote the section.

Adopted concurrent proposal, R.1999 d.345, effective September 10, 1999.

See: *31 N.J.R. 2252(a)*, *31 N.J.R. 2880(a)*.

Readopted provisions of R.1999 d.254 without change.

Amended by R.2003 d.82, effective February 18, 2003.

See: *34 N.J.R. 2650(a)*, *35 N.J.R. 1118(a)*.

In (a), inserted "in their entitlement" following "restricted" throughout.

Annotations

## Notes

NJAPP0553

# Exhibit 49

NJAPP0554

Calendar No. 282

| 99TH CONGRESS 1st Session | SENATE | REPORT 99-132 |
| --- | --- | --- |

# IMMIGRATION REFORM AND CONTROL ACT OF 1985

---

# REPORT

together with

## MINORITY VIEWS

OF THE

## COMMITTEE ON THE JUDICIARY UNITED STATES SENATE

ON

## S. 1200, as amended



AUGUST 28, 1985.—Ordered to be printed

Filed under authority of the order of the Senate of August 1 (legislative day, July 16), 1985

---

U.S. GOVERNMENT PRINTING OFFICE

WASHINGTON : 1985

51-567 O

NJAPP0555

## COMMITTEE ON THE JUDICIARY

STROM THURMOND, South Carolina, *Chairman*

CHARLES McC. MATHIAS, Jr., Maryland
PAUL LAXALT, Nevada
ORRIN G. HATCH, Utah
ALAN K. SIMPSON, Wyoming
JOHN P. EAST, North Carolina
CHARLES E. GRASSLEY, Iowa
JEREMIAH DENTON, Alabama
ARLEN SPECTER, Pennsylvania
MITCH McCONNELL, Kentucky

JOSEPH R. BIDEN, Jr., Delaware
EDWARD M. KENNEDY, Massachusetts
ROBERT C. BYRD, West Virginia
HOWARD M. METZENBAUM, Ohio
DENNIS DeCONCINI, Arizona
PATRICK J. LEAHY, Vermont
HOWELL HEFLIN, Alabama
PAUL SIMON, Illinois

DENNIS W. SHEDD, *Chief Counsel and Staff Director*
DIANA L. WATERMAN, *General Counsel*
DEBORAH G. BERNSTEIN, *Chief Clerk*
MARK H. GITENSTEIN, *Minority Chief Counsel*

———

## SUBCOMMITTEE ON IMMIGRATION AND REFUGEE POLICY

ALAN K. SIMPSON, Wyoming, *Chairman*

CHARLES E. GRASSLEY, Iowa
JEREMIAH DENTON, Alabama

EDWARD M. KENNEDY, Massachusetts
PAUL SIMON, Illinois

RICHARD W. DAY, *Chief Counsel and Staff Director*
CHARLES O. WOOD, *Special Counsel*
CARL W. HAMPE, *Counsel*
JERRY M. TINKER, *Minority Counsel*

(II)

# CONTENTS

| | Page |
|---|---|
| I. Purpose and summary | 1 |
| II. General statement | 2 |
| A. Introduction | 2 |
| B. The national interest | 3 |
| C. Current problems | 4 |
| D. The solution—S. 1200 | 7 |
| (1) Title I—Control of illegal immigration | 7 |
| a. Reducing the incentive of employment | 7 |
| b. Enforcement and fees | 13 |
| c. Agricultural labor | 13 |
| (2) Title II—Legalization | 15 |
| (3) Title III—Other changes | 16 |
| (4) Title IV—Reports to Congress | 17 |
| (5) Title V—U.S.-Mexico Commission | 18 |
| III. Recent immigration studies and reform efforts | 18 |
| A. History, 92d–96th Congresses (1971–1980) | 18 |
| B. Ford administration proposals | 20 |
| C. Carter administration proposals | 20 |
| D. Select Commission on Immigration and Refugee Policy | 21 |
| E. Reagan administration proposals | 23 |
| F. 97th Congress (1981–1982) | 24 |
| G. 98th Congress (1983–1984) | 25 |
| IV. Committee proceedings | 26 |
| V. Section-by-section analysis | 29 |
| VI. Cost estimate | 57 |
| VII. Regulatory impact evaluation | 68 |
| VIII. Changes in existing law | 68 |
| Minority views of Mr. Kennedy | 103 |
| Minority views of Mr. Simon | 107 |

(III)

Calendar No. 282

| 99TH CONGRESS<br>*1st Session* | SENATE | REPORT<br>99–132 |
|---|---|---|

# IMMIGRATION REFORM AND CONTROL ACT OF 1985

AUGUST 28, 1985.—Ordered to be printed

Filed under authority of the order of the Senate of August 1 (legislative day, July 16), 1985

Mr. THURMOND, from the Committee on the Judiciary, submitted the following

# R E P O R T

together with

## MINORITY VIEWS

[To accompany S. 1200, as amended]

The Committee on the Judiciary, to which was referred the bill (S. 1200) to amend the Immigration and Nationality Act, and for other purposes, having considered the same, reports favorably thereon, with amendments, and recommends that the bill as amended do pass.

## I. PURPOSE AND SUMMARY

The Committee bill is intended to increase control over illegal immigration.

The primary incentive for illegal immigration is the availability of U.S. employment. In order to reduce this incentive, the bill makes unlawful the knowing employment, or the recruitment or referral for a fee, of illegal aliens; provides for a system to verify work eligibility; and establishes appropriate penalties for violations. In addition, the bill establishes new crimes for certain activities involving fraudulent documents and for bringing illegal aliens to the United States; states the sense of Congress that resources for conventional enforcement and immigration services should be increased; allows the imposition of fees for immigration services and for the use of Immigration and Naturalization Service border and other facilities; and prohibits adjustments of status by visa abusers.

51–567 O

(1)

2

S. 1200 also makes several changes in the system of legal immigration. Special immigration benefits are provided for four categories of individuals who have resided in the United States for many years: certain children of employees of international organizations, surviving spouses of deceased such employees, and retired such employees and their spouses. The colonial quota is increased from 600 to 3,000 visas per year. While no changes are made in the current immigrant preference system, the Committee strongly believes that changes should be considered after the provisions of this bill have been enacted into law.

The bill also amends certain provisions of the law relating to nonimmigrants. The H-2 temporary worker program is revised in order to assist agricultural employers in adjusting to the reduced availability of illegal foreign workers. In addition the bill establishes a 3-year transition program for employers of agricultural labor, and creates a commission to further study agricultural labor issues. A pilot visa waiver program is authorized for up to eight countries with low rates of visa denial, exclusion, and visa abuse.

The bill further provides that under certain circumstances illegal aliens who entered the United States prior to January 1, 1980, may obtain temporary legal resident status. Such aliens will have an opportunity to adjust to permanent status after 3 years if they have satisfied certain conditions, including the presentation of evidence that they have some knowledge of U.S. history, government, and the English language, or have enrolled in a program to acquire such knowledge. The legalization program will not begin until 3 years after enactment unless a presidentially appointed commission, whose members support the concept of legalization in the bill, finds that Federal programs to enforce the immigration laws are in place and are effective enough to prevent legalization from encouraging more illegal immigration. If such finding is made within 3 years after enactment, legalization will begin at the earlier time.

Finally, the bill requires certain reports from the President to Congress with respect to the employer sanctions and employment verification provisions, legal and illegal immigration, the legalization program, and the visa waiver program. A report is also required from the Comptroller General of the United States with respect to the implementation of employer sanctions provisions, including whether a pattern of discrimination on the basis of national origin has resulted against citizens or aliens authorized to work in the United States.

## II. GENERAL STATEMENT

### A. Introduction

No other country in the world attracts potential migrants as strongly as the United States of America. No other country approaches the United States in the number of legal immigrants accepted or refugees permanently resettled. The Committee believes that most Americans are proud of both the reputation and the history of this country as a land of opportunity and refuge. We believe that this reputation and this history have generally had a positive effect on America.

NJAPP0559

3

However, current U.S. immigration policy is no longer adequate to deal with modern conditions, including the growing immigration pressure on the United States. Immigration to the United States is "out of control" and it is perceived that way at all levels of government and by the American people—indeed by people all over the world.

The Committee believes that reform is imperative. This does not mean the United States must isolate itself from the rest of the world. Immigration can continue to serve the national interest, but only if the law is reasonably amended to be appropriate for contemporary conditions, and only if the law can be enforced. This will in no way be inconsistent with American tradition. Immigration to the United States has been limited in various ways for more than a century and has been subject to forms of numerical limitation for over 60 years.

The moving words on the Statue of Liberty are cited in nearly all discussions of U.S. immigration policy and are certainly consistent with the traditional hospitality and charity of the American people. It is imperative, however, that Americans perceive that this great country is no longer one of vast, undeveloped space and resources, with a relatively small population.

In an earlier time, the Nation could welcome millions of newcomers, many of whom brought few skills, but did bring a willingness to work hard. In a smaller America with a simpler, labor-intensive economy and a labor shortage, that was often quite enough—that, plus their intense drive to become Americans.

Immigrants can still greatly benefit America, but they should be limited to an appropriate number and selected within that number on the basis of immediate family reunification and skills which would truly serve the interest of a highly developed nation. The major purpose of this bill is to make progress toward the day when the American people can be assured that the limitations and selection criteria contained in the immigration statutes are actually implemented through adequate enforcement.

## B. The National Interest

The Committee believes that the paramount obligation of any nation's government, indeed the very reason for its existence and the justification for its power, is to promote the national interest—the long-term welfare of the majority of its citizens and their descendants.

Consequently, we believe that the formulation of U.S. immigration policy must involve a judgment of what would promote the interests of American citizens—as they are at the present time and as they and their descendants are likely to be in the foreseeable future. An immigration policy which would be detrimental to the long-term well-being of the American people should not be adopted.

We certainly do not mean to suggest that charity and compassion should not play a role in U.S. immigration policy. Even if a particular charitable policy would not promote the national interest, as long as it would not be harmful to that interest and was supported by a majority of the American people, then it should of course be adopted.

4

Because the well-being of individuals is affected by both economic and noneconomic circumstances, an immigration policy which serves the national interest should be based on an analysis of both the economic and noneconomic impacts of immigration. Economic variables include unemployment, wages, working conditions, productivity and per capita gross national product (GNP). Noneconomic matters include population size, other demographic phenomena, and such cultural elements as values, customs, institutions, and degree of unity or of tension between subcultures.

There is an additional component of the national interest which a realistic analysis must not ignore. This is related to the ability of human beings to experience change without discomfort and it exists regardless of whether any objectively adverse impacts occur. Although the desire of immigrants from other lands to change their lives totally by coming to the United States is obviously greater than their reluctance to leave their homes, the ability of the American people to welcome aliens into their day-to-day life experiences has limits. These limits depend in part on the degree and kind of change which will be caused in their lives. We see evidence that if the newcomers to a community do not excessively disrupt or change the attributes of the community which make it familiar to its residents and uniquely their "home" (as compared with foreign areas, which they may respect highly but are not "home" to them), then the newcomers may well be welcome, especially if they make positive contributions to the community's economic and general well-being. On the other hand, it is seen that if the newcomers remain "foreign," they may not be welcome, especially if they seek to carve out separate enclaves to embrace only their own language and culture and if their numbers and the areas of the community which they directly affect are great. Perhaps this should not be so in the "ideal" world, but it is real.

## C. Current Problems

In the last 9 years, total legal permanent admission to the United States increased from a little over 450,000 in 1976 to 510,000 in 1984. A level of 800,000 was reached in 1980 (if the 145,000 Cubans and Haitians entering that year are counted). As recently as 1965, the total was under 300,000.

During the same 9-year period, the category of "immediate relatives" of U.S. citizens grew 56 percent, from 114,000 to 177,000. Under present law there are no numerical limits on this type of family reunification. In this same period, refugee admissions have ranged from 5,000 in 1977 to a high of over 200,000 in 1980 (excluding the Cubans and Haitains entering that year), to 68,000 in 1984. It should be noted that the United States continues to take more legal immigrants and refugees for permanent resettlement than the rest of the world combined. It is because of these two categories, "immediate relatives" and refugees, neither of which is subject to firm annual numerical limits, that immigration to the United States has increased to such a large extent.

The level of refugee admissions is set by the President after consultation with this Committee and with the Committee on the Judiciary of the House of Representatives. As a result of the maturing

NJAPP0561

of the consultation process which has occurred in the period since the enactment of the Refugee Act of 1980, the Committee believes that the process provides an appropriate degree of control over this category of entrants not subject to firm statutory limits.

In addition, hundreds of thousands of illegal immigrants now enter the United States every year. Some estimate the net annual inflow at 500,000. The present inflow appears to have become substantially higher in recent years. At least some indication of this can be found in the dramatically increased number of apprehensions. In 1965 the number was just over 100,000. By 1972 it had reached one-half million. Today it is over 1 million.

The number of illegal aliens already in the country is unknown. The Select Commission on Immigration and Refugee Policy used the figure of 3.5 to 6 million as the best guess for 1978. Whatever the number 7 years ago, there are surely many more now.

Immigration—legal plus illegal—now appears to be accounting for 30 to 50 percent of our annual population growth of about 2 million.

At the present time, net immigration—legal plus illegal—probably exceeds 750,000 per year. A net annual immigration of 750,000 would lead to a U.S. population in 100 years of 300 million, if it is assumed that the fertility rate of the existing population remains at its present low level—which seems unlikely—and the fertility rate of the new immigrants immediately declines to that of the present population as a whole—which is even less likely, given the high fertility rates of the less developed countries from which most of the immigrants come. One-third of this 300 million would consist of immigrants arriving after 1980 and their descendants.

Indeed, these figures actually underestimate the impact of immigration. Since it is concentrated in only a few regions of the country, the impact on these regions is of much greater significance than the overall figure suggests. For example, under the same assumptions and assuming continuance of existing settlement patterns, the population of California would double by 2080. Over one-half of that State's population would consist of post-1980 immigrants and their descendants.

The problems which may be caused by excessive population growth are well known and we shall not discuss them here.

Not only is there a very large number of legal and illegal immigrants, but only a small fraction of them are individually selected on the basis of labor market skills which have been determined to benefit the Nation as a whole rather than primarily the interests of the immigrants themselves or their U.S. relatives.

As a result of this and of the fact that the present labor certification process may be of limited effectiveness, we believe there have been adverse job impacts, especially on low-income, low-skilled Americans, who are the most likely to face direct competition, even though we also preceive a degree of short-term economic advantage from the use of "cheap" labor. Such adverse impacts include both unemployment and less favorable wages and working conditions. Not only does this cause economic harm to the directly affected Americans and their families, and in many cases a burden on the taxpayers, but it may also affect society as a whole in the form of social problems associated with unemployment and poverty.

6

Opponents of more effective measures to enforce the immigration laws have claimed that Americans will not take certain "menial" jobs. The Committee believes that this claim has been overstated.

First, many illegal aliens are working in nonmenial jobs which unemployed, underemployed, or less well-paid Americans would clearly take. This will be increasingly true if Federal and State support for various public assistance programs continue to be reduced.

Second, there is evidence that the recruitment policies of firms which rely on illegal aliens for "menial" jobs effectively exclude U.S. workers through limiting access to information about job vacancies. If no information is available concerning vacancies in such jobs, it is unlikely that U.S. workers will apply for them.

Third, many other jobs, which are not now attractive to a sufficient number of qualified Americans, could be made so if employers were to offer higher wages, better working conditions, or a reasonable training program. If a job cannot be filled by Americans at an affordable cost, then if possible it should be mechanized through additional capital investment and more advanced technology. Alternatively, a business might relocate some labor-intensive production overseas or the product or service might be imported from a foreign firm or simply forgone.

The Committee believes that bringing in foreign labor should be a very last resort. Even when no direct displacement of Americans occurs and even when there are short-term economic benefits to a majority of the current population, such action will frequently reduce this country's average productivity and per capita gross national product (GNP), a commonly used measure of a nation's prosperity.

In any case, if it is concluded that the use of foreign labor is beneficial under certain circumstances, then the law should allow this use under the appropriate limitations and conditions. Obviously, however, if the necessary limitations and conditions cannot be enforced, then no beneficial results can be assured.

Although population and direct economic impacts are of great significance, we think most people would agree that the national interest of the American people also includes certain even more important and fundamental aspects, such as the preservation of freedom, personal safety, and political stability—as well as the public cultural qualities and the political institutions which are their foundation.

No one seeking to enter the United States is now barred because of race, color, or religion, as has sometimes happened in the past. This Nation does have a right, however, to expect that anyone wishing to obtain the freedom and opportunity which have been created by the American people will apply lawfully for entry and that those who are selected to immigrate will seek to assimilate into American society, adopting and supporting the public values, beliefs, and customs underlying America's success, and not seek to recreate their homeland here in America.

In the past several years over 80 percent of the new legal immigrants joining American citizens and permanent residents in the United States have come from Latin America, Asia, and the Caribbean area. With respect to illegal immigrants, it is estimated that

7

Mexico is the source of at least 50–60 percent of the total, other parts of Latin America 10–15 percent, and the Caribbean area 5–10 percent.

To a large extent, the effect of such patterns will depend upon the degree and the pace at which immigrants and their descendants follow the historical pattern of earlier immigrant groups in assimilating into American society and culture.

A desire to assimilate is often reflected by the rate at which an immigrant completes the naturalization process necessary to become a U.S. citizen. There is considerable variation in the naturalization rates of immigrants from different countries of origin. A sample of those granted permanent resident status in 1971 was examined by the staff of the Select Commission on Immigration and Refugee Policy. Of those of Mexican origin who remained in the United States at the end of 7 years, only 5 percent had naturalized. For the entire region of South America the rate was 24.6 percent, for Europe 42.6 percent, for Asia 80.3 percent (excluding China, India, Korea, and the Philippines, whose rates were, respectively, 73.8 percent, 67.8 percent, 80.9 percent, and 67.6 percent). Interestingly, the naturalization rate of immigrants from Canada, who in most cases already share our language and much of our way of life, was 3.4 percent.

If immigration is continued at a high level, yet a substantial portion of these new persons and their descendants do not assimilate into the society, they have the potential to create in America a measure of the same social, political, and economic problems which exist in the countries from which they have chosen to depart. Furthermore, if language and cultural separatism rise above a certain level, the unity and political stability of the Nation will—in time—be seriously diminished. Pluralism, within a united American nation, has been the single greatest strength of this country. This unity comes from a common language and a core public culture of certain shared values, beliefs, and customs which make us distinctly "Americans."

### D. The Solution—S. 1200

#### (1) Title I—Control of Illegal Immigration

Most importantly, S. 1200 contains provisions intended to reduce the problem of illegal immigration.

Obviously, the potential benefits and protections sought under even the most carefully designed statutory standards for determining who may enter the United States, as well as for how long and under what conditions they may remain, will not be available in practice if those statutory standards cannot be enforced.

#### a. Reducing the incentive of employment

There are only two types of solutions available to the problem of illegal immigration.

The first is direct enforcement:

(A) To physically prevent illegal entry into the United States, for example through border control, fences, and interdiction, and

8

(B) To find and deport those who are successful in entering illegally, as well as those who enter legally and then violate the terms of their visa.

The second type of solution involves reducing the incentives to enter.

All objective, comprehensive studies of the problem of illegal immigration, including those by the Ford, Carter, and Reagan administrations, as well as the Select Commission on Immigration and Refugee Policy, have concluded that adequate enforcement of U.S. immigration laws cannot be achieved by direct enforcement alone. The Committee agrees.

Reliance on direct enforcement alone would require massive increases in enforcement in the interior—in both neighborhoods and work places—as well as at the border. This would be more costly and intrusive, as well as less effective, than a program which combines direct enforcement at reasonable levels with a reduction in the incentives to enter the United States.

At the present time there is a substantial disparity in job opportunity between the United States and Third World countries—a disparity which may well continue or even widen as a result of political and social conditions in those countries. Such disparity exists not only in rates of unemployment, but also in wages and working conditions. Even if the unemployment rates were reduced, a difficult task in light of the high birth rates in these countries, the disparity in wages and working conditions would remain.

As long as greater job opportunities are available to foreign nationals who succeed in physically entering this country, intense illegal immigration pressure on the United States will continue. This pressue will decline only if the availability of U.S. employment is eliminated, or the disparity in wages and working conditions is reduced, through improvement in the Third World or deterioration in the United States.

The United States should, of course, assist Third World development, but the achievement of substantially higher living standards there is a propsect only for the long run, and probably depends more than anything else on political and cultural change not in the control of the United States. Furthermore, in the short run, Third World development may actually increase migration to the United States. Since deterioration in the United States is certainly not an attractive resolution, only one approach remains: to prohibit the knowing employment of illegal aliens.

S. 1200 provides for penalties against employers who knowingly employ illegal aliens and also against persons who knowingly and for a fee or other consideration recruit or refer for employment such illegal aliens.

In order to protect both the persons subject to penalties and the members of minority groups legally in this country, the bill provides a system to verify that employees and potential employees are eligible to work in the United States. A formal, effective verification system combined with an affirmative defense for those who in good faith follow the proper procedure is imperative. Otherwise, the system cannot both be effective and avoid discrimination. If employers, recruiters, and referrers are given no protection, they will feel insecure and seek to avoid penalties by avoiding persons

NJAPP0565

9

who they suspect might be illegal aliens, in other words, those who "look or sound foreign" to them. If, on the other hand, they are given protection by utilizing a verification system which is easily defeated, then very little screening is likely to occur, even if the vast majority of employers, recruiters, and referrers seek to obey the law, which we believe will be the case.

Concern has been expressed that the employer sanctions provisions of S. 1200 will cause some employers to discriminate on the basis of natural origin against certain U.S. citizens or aliens authorized to work in the United States. The Committee does not believe that such discrimination will occur. No convincing evidence or argument has been presented that it will occur, and the evidence that is available to the Committee indicates that it will not.

An innocent employer is protected by the verification system and will have no reason to discriminate. This will be more fully explained below. An employer who wants to avoid hiring certain persons because of their race or national origin could continue to try to do so, but he would be subject to a suit under title VII of the Civil Rights Act of 1964. The employer sanctions law would provide no protection for such an employer. Such an employer might allege that his decision not to hire was motivated by a fear of employer sanctions. If, however, the plaintiff were to show by a preponderance of the evidence that the employer did not actually have such fear, then such allegation would not have helped the defendant's case. The most likely form of such evidence would be a sworn statement that documents had been presented to the employer showing that the applicant was authorized to be so employed, along with the documentary evidence itself (which would of course be in the possession of the applicant). If the documents appeared on their face to be genuine and to belong to the applicant, and if the employer were unable to present equally convincing evidence that such documents had not been presented or that despite the documents the employer had reasonable grounds for believing the applicant to be an alien ineligible to be so employed, then the judge or jury would conclude that the employer's reason for deciding against hiring the applicant was something other than a fear of employer sanctions.

The best evidence that is available—that derived from the experience of several European countries, including France, which is a multiracial society—shows that increased discrimination on the basis of race, ethnicity, or national origin does not result from employer sanctions.

Existing documents will be used for the verification system. It will involve examination of either—

(a) A U.S. passport, certificate of citizenship, certificate of naturalization, unexpired foreign passport with appropriate, unexpired endorsements authorizing U.S. employment, or certain forms of resident alien card or other alien representation card; or

(b) Two other documents, one to verify that the applicant is presenting his true identity, such as State drivers license, or State identification card, and one to verify that he is authorized to work, such as certain forms of the social security account number card, or certificate of birth in the United States.

10

The user of the system will then sign under penalty of perjury a statement that the required documents have been examined, and obtain the signature of the prospective employee on a written statement that he is a U.S. citizen, permanent resident alien, or alien authorized to perform the particular work. In many cases existing application forms or something very similar could be used. In addition, the employer will be responsible for retaining these signed forms for 3 years or until 1 year after the employment ends, whichever is later. The Committee emphasizes that the user of the system will not be responsible for the genuineness of the documents, only that such documents reasonably appear on their face to be genuine.

The bill requires the executive branch to monitor and evaluate the verification system in order to make it more secure against fraudulent use. To the extent that existing documents are found not to be secure, the President is directed to implement such changes as are necessary to make the system secure in determining employment eligibility. For example, if an improved system were based on a card or other document or on a verifying telephone call to a government office, it would have to be resistant to use by imposters. If the system were to utilize a card or other document, such document would have to be resistant to counterfeiting and tampering. In an improved system, any underlying nonsecure documents, such as current forms of the birth certificate, would be examined by immigration experts. Users would utilize only the more secure system based upon them.

The President is required to give notice to Congress before implementing an improved system. If a minor change is involved (such as improvements in the current Social Security card), 60 days' notice is required. If a major change is involved (such as the creation of a new card or a telephone verification system), 2 years' notice is required, and funds must be specifically provided by Congress before the change is implemented. The President is authorized to undertake demonstration projects consistent with the statutory requirements for any new system. The project may not, however, last longer than 3 years.

Use of the verification system will not be mandatory. However, any employer who uses the system for all applicants will have an affirmative defense against the penalties. Furthermore, if an employer of four or more employees does not use the system, and an illegal alien is found in his employ, the employer will be presumed to have knowingly hired the alien. Such employer could rebut this presumption by "clear and convincing evidence."

It has been claimed that a new verification system would be too costly and that it would pose a threat to privacy and civil liberties.

On the cost issue the Committee believes that several points should be made. First, there are also tremendous costs in inadequate enforcement. The Congressional Budget Office has estimated that each unemployed person in the United States receives an average of about $7,000 per year in unemployment and welfare benefits. If the number of illegal aliens in the United States today is estimated at 6 million and if even 1 percent hold jobs which unemployed Americans would take, then the savings would be $420 million per year; if the displacement is 2 percent, the figure would

11

be $840 million per year, etc. Actual displacement is probably substantially higher.

The Social Security Administration recently estimated that the cost of replacing all Social Security cards with a tamper- and counterfeit-resistant version would be $108 million per year for 10 years. The actual cost of this option should be lower since replacement of all cards would not be necessary. The Department of Labor has estimated the cost of a verification system utilizing telephone calls to a government data bank as averaging $333 million per year for the first 5 years and about $200 million per year thereafter. Doubling the number of interior Immigration and Naturalization Service investigators would add $25–$30 million per year. Thus, a new system to verify work eligibility may well not exceed in cost the amount directly saved as a result of reduced public assistance alone, not even considering the value of the other benefits of reducing illegal immigration. Furthermore, a small fee could be utilized to raise the necessary revenue.

With respect to civil liberties, the Committee has given considerable thought to the question of how, for example, changing the form of the Social Security card, which is one of the alternatives that is available, could pose risks to liberty.

That question was asked of many witnesses at the hearings of the Subcommittee on Immigration and Refugee Policy—from the American Civil Liberties Union to Arthur Flemming of the U.S. Commission on Civil Rights. No one has yet given a satisfactory answer. Others never known for their neglect of civil and human liberties agree with us, including Father Ted Hesburgh, former Chairman of the Select Commission on Immigration and Refugee Policy and of the U.S. Commission on Civil Rights, as well as the editorial writers of the New York Times, Washington Post, Los Angeles Times, Boston Globe, and other major newspapers across the country, and former Attorneys General Elliot Richardson and Benjamin Civiletti.

We wish to emphasize that no likely future verification system would require personal data that is not already available in other government data banks. Thus, an improved verification system would either utilize a preexisting data bank or a new one with less information.

Furthermore, the bill contains specific safeguards intended to minimize the risk of undue invasion of privacy and the risk of government abuse in connection with any improved verification system:

(1) Personal information utilized by the system would not lawfully be available to government agencies, employers, and other persons except to the extent necessary for the purpose of verifying work eligibility.

(2) A withholding of verification would not be lawful except on the basis that the employee or prospective employee had failed to show that he was a U.S. citizen, an alien lawfully admitted for permanent residence, or an alien authorized to be so employed by the immigration law or the Attorney General.

(3) The system would not lawfully be available for law enforcement except to enforce the immigration laws or several

12

statutory provisions relating to false or fraudulent statements or documents.

(4) If the system required individuals to present a card or other document, then such document could not lawfully be required to be presented for any purpose other than verification of employment eligibility or the enforcement of several statutory provisions relating to false or fraudulent statements or documents, and could not lawfully be required to be carried on the person.

The Committee is most emphatically not requiring or permitting the development of an "internal passport" or "national I.D. card." The 2-year notice to Congress requirement adds an additional safeguard.

In addition to the protective provisions in the bill, there are far stronger protections already in place. The most important safeguard of the civil liberties of Americans is not "the law," which can always be changed, but rather the public cultural elements which underlie the law, including the values and traditions of our form of government, which are part of the American character. As long as the American people themselves do not come to accept and adopt forms of government like those of nations more willing to tolerate repression in their political system and leaders, then no danger exists. There is no "slippery slope" toward loss of liberties, only a long staircase where each step downward must be tolerated by the American people and by their leaders. The Committee does not believe that the system being proposed, or the improved systems which the safeguards would permit, would involve any form of a step toward loss of civil liberties.

With respect to the penalties for knowing employment or knowing recruitment or referral for employment, the bill's provisions are, in the view of the Committee, quite reasonable. Indeed, no penalty at all will be imposed during the first 6 months after enactment, nor will any violation during that period be counted for purposes of determining the level of penalty for later violations. Even in the second 6 months after enactment, the initial violation will be subject only to a warning and will not be counted for the purpose of determining the level of penalty later. For this first year of enactment the bill directs various government agencies to cooperate in disseminating forms and information to employers and other Americans, and otherwise educating the public about the requirements of the program.

Under the normal penalty structure, which becomes effective 12 months after enactment, the first assessment of penalties will include a cease-and-desist order issued by an immigration judge and a fine of between $100 and $2,000 per illegal alien. This will be a civil, not a criminal, penalty. For a violation occurring after at least one prior penalty has been assessed and opportunity for a hearing has been provided, a civil penalty of between $2,000 and $5,000 per illegal alien may be imposed, as well as the cease-and-desist order.

For a "pattern or practice" of violations, a fine of between $3,000 and $10,000 per illegal alien is available. In addition, the Attorney General is instructed to seek compliance with the cease-and-desist orders in Federal district court. Failure to so comply could result in

13

"contempt of court" penalties—fines and imprisonment—for the offending employer.

If there is a pattern or practice of violations subsequent to the imposition of a penalty for a prior pattern or practice of violations, a criminal penalty may be imposed—a fine of no more than $3,000 per alien, a term of imprisonment of no more than 6 months for the entire pattern or practice, or both.

Stiff criminal penalties are provided for the fraudulent production, sale, distribution, or use of any document which may be presented to satisfy a requirement of the immigration laws.

*b. Enforcement and fees*

S. 1200 states the sense of Congress that there are two essential elements in the program of immigration control established by the bill:

(1) An increase in border patrol and other inspection and enforcement activities of the INS and other appropriate Federal agencies; and

(2) An increase in the examinations and service activities of the INS and other agencies.

The bill authorizes $840 million in fiscal year 1987 and $830 million in fiscal year 1988 for the INS. This includes approximately $125 million per year for the 2 years for administration of the legalization program. The authorization level of INS for fiscal year 1985 is $584 million.

The bill also authorizes additional sums for enforcement activities in connection with the bill by the Wage and Hour Division and the Office of Federal Contract Compliance Programs of the Department of Labor.

In addition, S. 1200 provides authority to the Attorney General, in consultation with the Secretary of State, to impose fees for use of border and other INS facilities and services in an amount commensurate with cost.

The bill also creates a new criminal offense for bringing an alien to the United States with knowledge or in reckless disregard of the fact that the alien has not received *prior* official authorization to enter. No intent to smuggle is required.

*c. Agricultural labor*

The bill amends the H-2 temporary worker program to establish a special procedure for seasonal workers in agriculture:

Employers may not be required by the Secretary of Labor to apply for a "labor certification" more than 65 days in advance of need;

The application must show—

(A) That there are not sufficient U.S. workers who are able, willing, and qualified and who will be available at the time and place needed to perform the work required; and

(B) That employment of the requested alien workers will not adversely affect the wages and working conditions of U.S. workers similarly employed.

If the Secretary of Labor does not notify the employer within 14 days of the filing of the application that the application does not

14

meet the requirements, then it shall be considered to have met such requirements.

The Secretary of Labor is directed to make the certification at least 20 days in advance of need if requirements for the certification have been complied with and the employer does not have alternative employees.

Special, expedited procedures will be available to agricultural employers in the following instances:

(1) Certification is denied;

(2) U.S. workers appear to perform agricultural labor, but are not qualified;

(3) U.S. workers are referred to agricultural employers, but do not show up on the day of need; and

(4) Unforeseen circumstances create a critical need for agricultural labor.

The bill provides that all regulations implementing the program must be approved by the Attorney General after consultation with the Secretary of Labor and Secretary of Agriculture.

The Secretary of Labor is authorized to monitor and enforce terms and conditions of the program. There is $10 million authorized for such monitoring and enforcement, and for the recruitment of U.S. workers.

A 3-year transition program is made available to agricultural employers for the purpose of enabling them to phase out their illegal labor and phase in legal workers. An employer will be allowed to use 100 percent of his prior alien work force in the first year, 67 percent in the second year, and 33 percent in the third year. Domestic workers or lawful temporary agricultural workers must be used thereafter.

In addition, a 12-member commission on agricultural worker programs is created to further examine the many issues surrounding temporary workers. Members will be appointed by the House, Senate, Departments of Labor and Agriculture, and the Attorney General. The Commission is required to report within 2½ years after enactment with specific legislative recommendations.

The Committee rejected proposals to adopt a massive new temporary or "guestworker" program. Such a program would create significant dangers, including adverse impacts on U.S. workers, especially if the temporary workers were not limited to the particular job or job category where they were allegedly needed.

Many of the temporary workers could choose to stay permanently, as they have in Europe, where significant social problems resulted, and where there is now widespread doubt that the guestworker program had been a beneficial idea. Permanent stays are especially likely if the workers may bring in their family, if they have U.S. citizen children, if they are not restricted to a particular job or job category, or if they are authorized to stay for long periods in the United States. Such long periods of stay increase ties to the United States, and also the likelihood that the workers will bring in their family even if it is illegal, or, if they have no family, that they will start a family in the United States.

To the extent that temporary workers believe that they will be returning to their home country, they will tend not to learn English and otherwise integrate into American life. They will tend to

form foreign enclaves, with associated social problems, and may even delay the integration of lawful permanent residents from the same country of origin.

### (2) TITLE II—LEGALIZATION

The United States has become home for millions of illegal aliens, a large number of whom have been here for many years. The Committee strongly believes that those with the deepest roots should be allowed to stay, but also that no program to legalize these individuals should be adopted which would encourage new waves of illegal immigrants. As stated by the Select Commission on Immigration and Refugee Policy:

> Without more effective enforcement than the United States has had in the past, legalization could serve as a stimulus to further illegal entry. The Select Commission is opposed to *any* program that could precipitate such movement. [Emphasis in the original.]

If legalization occurs before more effective enforcement has been achieved, the illegal population will immediately begin to grow again. This will create pressure for additional legalizations. Periodic legalizations would in effect be a repeal of U.S. immigration law. Furthermore, legalization in the absence of more effective enforcement is likely to *increase* the illegal flow by encouraging illegal entries in anticipation of further legalizations.

Because of these risks and because of significant public and congressional opposition to prior legalization proposals, the Committee believes that a legalization program should not go into effect for 3 years unless a presidentially appointed legalization commission determines that enforcement has become effective enough to prevent legalization from encouraging more illegal immigration.

In order to insure that this statutory requirement is not interpreted by an unsympathetic legalization commission in a way which unduly delays legalization, S. 1200 requires that members of the commission "support the concept of legalization in section 202." The details of the selection of the commission are explained below in the section-by-section analysis.

The bill provides for the legalization, once the program begins, of two categories of illegal aliens who have been physically present in the United States since enactment and are otherwise admissible:

> (1) Illegal aliens who arrived in the United States before January 1, 1980, and have continuously resided in the United States in an unlawful status since that date; and
>
> (2) "Special Cuban or Haitian entrants" (defined in section 202(a)(2)(D) of the bill) who have continuously resided in the United States since January 1, 1981.

Such aliens will qualify for temporary resident status. An alien in either group may adjust to permanent status after 3 years if the alien has or is acquiring the understanding of U.S. history, government, and the English language required for naturalization.

Federally funded public assistance will not be available to those granted the temporary status for 6 years (including the initial several years after they have received permanent resident status), pro-

NJAPP0572

16

vided, however, that certain Cuban and Haitian nationals who are covered by the legalization will continue to qualify for existing special benefits.

The bill provides for Federal payment to States of up to $600 million per year for 3 years, in the form of a capped entitlement program, for the purpose of reimbursing them for the cost of public assistance expended as a result of the legalization program and for the cost of incarcerating certain illegal aliens convicted of a felony.

Persons convicted of certain crimes, Nazis and other persons who have persecuted others, Communists, anarchists, saboteurs, and those seeking to overthrow the government, and persons likely to become public charges, will be excluded from each category of legalization. Most other classes of excludable aliens will also not qualify, unless a waiver is obtained. For further details see the section-by-section analysis relating to section 202.

We seek two major goals through legalization:

The first is to avoid wasteful use of the Immigration and Naturalization Service's limited enforcement resources. The United States is unlikely to obtain as much enforcement for its dollar if the Immigration and Naturalization Service attempts to locate and deport those who have become well settled in this country, rather than to prevent new illegal entry or visa abuse.

The second is to eliminate the illegal subclass now present in our society. Not only does their illegal status and resulting weak bargaining position cause these people to depress U.S. wages and working conditions, but it also hinders their full assimilation and, through them, that of legal residents from the same country of origin. Thus they remain a fearful and clearly exploitable group within the U.S. society.

It is the intent of the Committee that the families of legalized aliens will obtain no special petitioning rights by virtue of the legalization. They will be required to "wait in line" in the same manner as immediate family members of other new resident aliens.

The Committee reiterates that legalization will be a "one-time only" program to address a problem resulting from the large-scale illegal immigration of the past. Illegal immigration on the same scale should be prevented from occurring in the future by the employer sanctions and increased enforcement provisions of the bill.

### (3) TITLE III—OTHER CHANGES

The annual legal immigrant quota for dependent colonies is increased from 600 to 3,000. This will help reduce the substantial backlog of approved petitions for preference status held by persons born in Hong Kong.

The bill authorizes the Attorney General and the Secretary of State jointly to establish a 3-year pilot visa waiver program subsequent to the implementation of an automated nonimmigrant entry and exit control system. Under the program the requirement of a visitor's visa would be waived for the nationals of up to eight countries selected from those which extend or agree to extend reciprocal privileges to U.S. citizens and for whose nationals the rate of visa denial, exclusion, and visa abuse is very low. In order to qualify, such persons would be required to have a round trip, nonre-

# Exhibit 50

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 1:18-CV-68 |
| | § | |
| UNITED STATES OF AMERICA, *et al.*, | § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| KARLA PEREZ, *et al.*, | § | |
| | § | |
| Defendant-Intervenors. | § | |

## DECLARATION OF DOUGLAS S. MASSEY, PH.D

1.    My name is Douglas S. Massey and I am over the age of 18 and fully competent to make this declaration.

2.    I was asked by Defendant-Intervenor's counsel to serve as an expert witness in this case. I am being compensated for my time in preparing this report at the rate of $250 per hour.

3.    A complete list of my qualifications, including a list of all publications authored in the previous 10 years, is included in my curriculum vitae, attached hereto as Exhibit A to this declaration. I have not served as an expert witness in any litigation in the last 4 years.

4.    I have 38 years of experience on the faculties of the University of Pennsylvania, the University of Chicago, and Princeton University. In the course of my career, I have accumulated substantial expertise on documented and undocumented migration from Latin America to the United States, and on the status and behavior of Latin American migrants within

the United States.

5.    I am currently the Henry G. Bryant Professor of Sociology and Public Affairs at Princeton University where I direct the Office of Population Research, the nation's oldest Population Research Center. I also direct the New Immigrant Survey, the Latin American Migration Project, and the Mexican Migration Project, which together collect and disseminate data on documented and undocumented migration to data users throughout the world.  I have published more than 10 books and 100 refereed articles on the subject of international migration. I hold a 1978 Ph.D. from Princeton and am an elected member of the National Academy of Sciences, the American Academy of Arts and Sciences, and the American Philosophical Society. I am Past-President of the American Academy of Political and Social Science, the American Sociological Association, and the Population Association of America. In 2009 I won the Distinguished Career Award of the International Migration Section of the American Sociological Association, and the Mexican Migration Project has been recognized by a MERIT Award from the National Institutes of Health as well as the Malinowski Award from the Society for Applied Anthropology, bestowed to honor the project's "efforts to understand and serve the needs of the world through the use of social science."

6.    The Mexican Migration Project (MMP), which I have directed for 30 years, is the largest and most reliable source of data on documented and undocumented migration to the United States. Since 1987 it has annually collected detailed data on Mexico-U.S. migration through representative surveys of Mexican communities and targeted surveys of U.S. destination areas. The database currently includes surveys from 161 communities located throughout Mexico, which together contain data on 27,113 households and 169,945 individuals, 26,446 of whom reported U.S. migratory experience. All MMP data are publicly available from the project

NJAPP0576

website at http://mmp.opr.princeton.edu/, which currently has 4,757 registered data users worldwide.

7.      Since 1998 I have also directed the Latin American Migration Project (LAMP), which uses methods developed on the MMP to carry out surveys of migrant sending communities in other nations throughout Latin America, including Costa Rica, Colombia, the Dominican Republic, Ecuador, El Salvador, Guatemala, Haiti, Nicaragua, Peru, and Puerto Rico. The LAMP database currently includes 10,388 households and 57,433 persons, 5,520 with international migratory experience and has 1,882 registered users. The references authored or coauthored by me and cited in this declaration rely on the MMP database for findings reported on Mexico and the LAMP database for findings on Central America.

8.      Migration from Mexico to the United States began in the early 20th as a result of direct recruitment by private employers and expanded rapidly during the First World War with U.S. government recruitment and accelerated further during the 1920s in response high labor demand in the United States (Massey et al. 1987; Massey, Durand, and Malone 2002). After a hiatus during the Great Depression in the 1930s, Mexico-U.S. migration was revived in 1942 by the Bracero Program, a binational agreement negotiated by federal authorities with Mexico to allow the annual importation of Mexican laborers for short-term work on temporary visas. By the late 1950s, around 450,000 Bracero migrants were entering the United States each year, along with around 50,000 permanent residents (Massey and Pren 2012).

9.      The Bracero Program was terminated by Congress at the end of 1964, by which time some 4.6 million Mexican Braceros had entered and worked the United States. In 1965 Congress amended U.S. immigration law to enact the first-ever numerical restrictions on legal immigration from the Americas. These restrictions were tightened by additional legislation in

NJAPP0577

1976, which imposed an annual quota of 20,000 permanent resident visas on all nations in the Western Hemisphere (Massey, Durand, and Malone 2002). As opportunities for legal entry constricted, Mexicans increasingly entered without authorization in response to ongoing U.S. labor demand and higher wages north of the border (Massey, Durand, and Pren 2014).

10.     Unauthorized migration grew from 1965 to 1979, then stabilized and thereafter fluctuated in response to economic conditions in Mexico and the United States. Before 1986 unauthorized migration was heavily circular, with 85% of undocumented entries offset by departures, yielding a slowly growing unauthorized population (Massey and Singer 1995). In 1986 the United States began a sustained militarization of the Mexico-U.S. border. By 2010 the number of Border Patrol agents had multiplied 5.6 times and the agency's budget had increased nearly 24 times (Massey 2015, 2016). The intensification of border enforcement dramatically increased the financial costs and physical risks of unauthorized border crossing and in response migrants minimized crossing, not by remaining in Mexico but by staying longer in the United States, steadily lowering the rate of return migration back to Mexico (Massey, Durand, and Pren 2015).

11.     Since net migration equals in-migration minus out-migration, the ultimate effect of border militarization was to increase the net volume of unauthorized migration and accelerate growth in the undocumented population, which rose from 2 million in 1988 to 12 million in 2008. As male workers stayed longer in the United States, they increasingly arranged for the entry of their spouses and children (Massey, Durand, and Pren 2016). These children are today's Dreamers and DACA recipients. Once families were reunited north of the border, husbands and wives began having U.S.-born citizen children, as did single male migrants who over time formed romantic partnerships in the United States. As of 2016, some 5.1 million children were

4

NJAPP0578

estimated to reside in the U.S. with an undocumented parent, 79% of whom were U.S. citizens and 2% were legal permanent residents (Capps, Fix, and Zong 2016).

12.     Mexico's fertility rate began a precipitous decline during the 1970s and approached replacement levels after the year 2000, leading to the aging of Mexican society and a steady rise in Mexico's average age. Migration is strongly age-dependent, with rates rising from the late teens through the early 20s and then declining to low levels by age 30. Owing to the fertility decline, the average age in Mexico rose from around 17 years in the 1970s to 29 years today. As a result, unauthorized migration began to decline around 2000 and according to the best estimates (Passel and Cohn 2017) in 2008 the net inflow turned negative (with departures exceeding arrivals). At this point, undocumented Mexican migration has been negative for a decade, the size of the undocumented is falling, and number of Mexicans being apprehended at the border is at its lowest point since the 1940s. Owing to its demographic transition to low fertility, undocumented migration from Mexico is over, and despite persistent employment demand and higher wages in the United States, it is unlikely to revive (Massey, Durand and Pren 2016).

13.     Migration from Central America to the United States began in the 1980s as a direct result of the U.S. political and military intervention in the region, which covertly supported death squads in El Salvador and Guatemala while training and equipping an army of "Contras" based in Honduras in an effort to topple the leftist Sandinista regime in Nicaragua and thereby prevent the spread of communism in Latin America (Lundquist and Massey 2005). From 1980 to 1986, civil violence spread, deaths multiplied, and as a result of ongoing violence the region's economy constricted. In response, Central Americans fled northward and crossed the border without authorization. While Nicaraguan refugees were allowed to adjust status and

5

become legal permanent residents (since they were fleeing a nation with a leftist government opposed by the United States), refugees fleeing El Salvador, Honduras, and Guatemala (governed by right-wing regimes allied with the United States) were not recognized and remained undocumented (Massey, Durand, and Pren 2014). The Central American minors seeking asylum at the border today are a legacy of this outflow, seeking to escape horrendous conditions caused by the U.S. intervention by reuniting with family members in the United States who had fled the region during the 1980s and 1990s.

14.     Although research indicates that unauthorized Mexican migrants to the United States originally came and went in response to economic circumstances on both sides of the border (Massey 1987; Massey and Espinosa 1997), the connection between return migration and economic conditions in Mexico was broken by the militarization of the border after 1986, causing rates of return to drop precipitously toward levels near zero, where they remain today (Massey, Durand, and Pren 2015). Studies show that, controlling for economic conditions on both sides of the border, rates of return migration fall steadily as migrants spend more time in the United States (Massey 1986; Massey and Espinosa 1997).

15.     Even during the era of circular migration before 1986, once established in the United States as settlers, the likelihood of returning to Mexico after five years in the United States was close to zero (Massey 1987). Similar findings hold for migrants from Central America, who are even less likely to return because of endemic violence in their regions of origin. As with Mexican migrants, the likelihood of returning home also falls sharply for Central Americans with time spent in the United States (Massey and Riosmena 2010) and has steadily fallen over time for Central American migrants generally, with one study finding a zero likelihood of return migration to the region as of 2005 (Massey, Durand, and Pren 2014).

6

NJAPP0580

16.     According to the latest statistics from U.S. Citizen and Immigrant Services (2018), there are 814,000 young people registered for DACA. Of these, 79% are Mexicans, 9% are Central Americans, and 6% are from elsewhere in Latin America. This population is not representative of undocumented U.S. residents generally, only 50% of whom are Mexican with 16% coming from Central America (Passel and Cohn 2017). Two-thirds of DACA recipients are under age 25 (compared to just 23% of all undocumented migrants), 54% are female (with a figure of 46% for all undocumented migrants), and 83% are single (compared with 40% for undocumented migrants generally) according to data reported by Lopez and Krogstad (2017) and the Migration Policy Institute (2018).

17.     These differences are not surprising given the criteria required to qualify for DACA. All recipients must have entered the United States before their 16th birthday, have been under the age of 31 as of June 15, 2012, physically residing in the country on that date, and also present at the time of their application. Moreover, all were high school graduates, GED holders, or persons honorably discharged from the U.S. Armed Forces who had lived continuously in the United States since June 15, 2007. None has ever been convicted of a felony or even a significant misdemeanor and all have been judged to pose no threat to national security or public safety by the U.S. Department of Homeland Security, a level of vetting far stricter than experienced by new legal permanent residents.

18.     Based the foregoing profile and the findings summarized above, I conclude it is very unlikely that DACA recipients from Mexico and Central America will voluntarily return to their countries of origin if they lose the legal right to remain in the United States. All available data indicate a strong attachment to the United States, and their many years of U.S. experience from a young age render them unrepresentative of subjects included in prior studies of return

NJAPP0581

migration. Earlier studies overwhelmingly focused on persons who began migrating as adult labor migrants, not children who were brought into the United States at young ages, who grew up speaking fluent English, attending U.S. schools, and consuming American culture. In addition, DACA recipients are unprepared for life and labor in their countries of birth. Most speak elementary household Spanish, cannot read or write very well in that language, and are unfamiliar with the culture and customs of nations they left long ago.

19.     Ultimately, by virtue of applying for DACA the recipients have signaled their ardent wish to remain in the United States and identify as Americans, despite the risks of coming out of the shadows and registering their presence with federal authorities. They had no real say about their being brought to the United States as minors, but by registering with DACA they are exercising their will to have a say about where they spend the rest of their lives, expressing a clear intent to remain where they grew up and in the only country they really know, whatever the challenges they face in achieving that end.  I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 13th day of June, 2018 in Jamaica, Vermont.

_____
Douglas S. Massey, Ph.D
Henry G. Bryant Professor of Sociology and Public Affairs
Princeton University

8

NJAPP0582

# REFERENCES

Capps, Randy, Michael Fix, and Jie Zong. 2016. *A Profile of Children with Unauthorized Immigrant Parents*. Washington, DC: Migration Policy Institute.

López, Gustavo, and Jens Manuel Krogstad. 2017. *Key Facts about Unauthorized Immigrants Enrolled in DACA. Washington, DC: Pew Research Center*. http://www.pewresearch.org/fact-tank/2017/09/25/key-facts-about-unauthorized-immigrants-enrolled-in-daca/

Lundquist, Jennifer H., and Douglas S. Massey. 2005. "Politics or Economics? International Migration During the Nicaraguan Contra War." *Journal of Latin American Studies* 37:29-53.

Massey, Douglas S. 1986. "The Settlement Process Among Mexican Migrants to the United States." *American Sociological Review* 51:670-85.

Massey, Douglas S. 1987. "Understanding Mexican Migration to the United States." *American Journal of Sociology* 92:1372-1403.

Massey, Douglas S. 2015. "Militarization of the Mexico-U.S. Border and its Effect on the Circularity of Migrants." Pp. 23-33 in Diego Acosta and Anja Wiesbrock, eds., *Global Migration: Old Assumptions and New Dynamics*, Volume 1. New York: Praeger.

Massey, Douglas S. 2016. "The Mexico-U.S. Border in the American Imagination." *Proceedings of the American Philosophical Society* 160(2):160-177.

Massey, Douglas S., Rafael Alarcón, Jorge Durand, and Humberto González. 1987. *Return to Aztlan: The Social Process of International Migration from Western Mexico*. Berkeley and Los Angeles: University of California Press.

Massey, Douglas S. Jorge Durand, and Nolan Malone. 2002. *Beyond Smoke and Mirrors: Mexican Immigration in an Age of Economic Integration*. New York: Russell Sage Foundation.

Massey, Douglas S., Jorge Durand, and Karen A. Pren. 2014. "Explaining Undocumented Migration." *International Migration Review* 48(4):1028-1061.

Massey, Douglas S., Jorge Durand, and Karen A. Pren. 2015. "Border Enforcement and Return Migration by Documented and Undocumented Mexicans." *Journal of Ethnic and Migration Studies* 41(7): 1015-1040,

Massey, Douglas S., Jorge Durand, and Karen A. Pren. 2016. "Why Border Enforcement Backfired." *American Journal of Sociology* 121 (5): 1557– 1600.

Massey, Douglas S., and Kristen E. Espinosa. 1997. "What's Driving Mexico-U.S. Migration? A Theoretical, Empirical and Policy Analysis." *American Journal of Sociology* 102:939-999.

Massey, Douglas S., and Karen A. Pren 2012. "Unintended Consequences of US Immigration

NJAPP0583

Policy: Explaining the Post-1965 Surge from Latin America." *Population and Development Review* 38:1-29.

Massey, Douglas S., and Fernando Riosmena. 2010. "Undocumented Migration from Latin America in an Era of Rising U.S. Enforcement." *Annals of the American Academy of Political and Social Science* 630(1):137-161.

Massey, Douglas S., and Audrey Singer. 1995.  "New Estimates of Undocumented Mexican Migration and the Probability of Apprehension." *Demography* 32:203-13.

Migration Policy Institute. 2018. *Profile of the Unauthorized Population: United States*. Washington, DC: Migration Policy Institute. https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/US#

Passel, Jeffrey S., and D'Vera Cohn. 2017. *As Mexican Share Declined, U.S. Unauthorized Iimmigrant Population Ffell in 2015 Below Recession Level*. Washington, DC: Pew Research Center. http://www.pewresearch.org/fact-tank/2017/04/25/as-mexican-share-declined-u-s-unauthorized-immigrant-population-fell-in-2015-below-recession-level/

U.S. Citizenship and Immigration Services. 2018. "Data Set: Form I-821D Deferred Action for Childhood Arrivals."  Washington, DC: U.S. Citizenship and Immigration Services. https://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-821d-deferred-action-childhood-arrivals

NJAPP0584

# Exhibit 51

NJAPP0585

Case 1:18-cv-00068   Document 215-1   Filed on 07/21/18 in TXSD   Page 591 of 666

§ 2948.1Grounds for Granting or Denying a Preliminary..., 11A Fed. Prac. &...

**11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.)**

Federal Practice & Procedure  |  April 2018 Update
Federal Rules Of Civil Procedure
The Late Charles Alan Wright [a168], Arthur R. Miller [a169], Mary Kay Kane [a170], Richard L. Marcus [a171], A. Benjamin Spencer [a172], Adam N. Steinman [a173]

Federal Rules of Civil Procedure
Chapter 9. Provisional and Final Remedies and Special Proceedings
Mary Kay Kane [a524]

Rule 65. Injunctions and Restraining Orders
B. Preliminary Injunctions

§ 2948.1 Grounds for Granting or Denying a Preliminary Injunction—Irreparable Harm

Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered. Only when the threatened harm would impair the court's ability to grant an effective remedy is there really a need for preliminary relief. Therefore, if a trial on the merits can be conducted before the injury would occur there is no need for interlocutory relief. [1] In a similar vein, a preliminary injunction usually will be denied if it appears that the applicant has an adequate alternate remedy in the form of money damages [2] or other relief. [3] Thus, for example, the termination of business agreements or of employment typically are not found to result in irreparable injury because, if wrongful, damages will provide adequate compensation for any losses. [4] Even if a loss is fully compensable by an award of money damages, however, extraordinary circumstances, [5] such as a risk that the defendant will become insolvent before a judgment can be collected, [6] may give rise to the irreparable harm necessary for a preliminary injunction. Not surprisingly, a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted. [7]

There must be a likelihood that irreparable harm will occur. [8] Speculative injury is not sufficient; [9] there must be more than an unfounded fear on the part of the applicant. [10] Thus, a preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. A presently existing actual threat must be shown. [11] However, the injury need not have been inflicted when application is made or be certain to occur; [12] a strong threat of irreparable injury before trial is an adequate basis. A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction. [13] Additional illustrative cases finding no irreparable injury are set out in the note below. [14]

The courts have found irreparable injury in a wide range of contexts. The following cases simply illustrate some of the situations in which the standard has been held to have been met. A preliminary injunction has been issued to prevent harm to the environment, [15] as, for example, enjoining dredging operations in living coral reefs that were about to be declared a national monument, [16] or enjoining a proposed highway reconstruction project through a rain forest when the project posed imminent danger to endangered species. [17] Irreparable harm also has been found in the loss by an athletic team of the services of a star athlete, [18] suspension of the boxing license of the World Heavyweight Champion, [19]

NJAPP0586

Case 1:18-cv-00068   Document 215-1   Filed on 07/21/18 in TXSD   Page 592 of 666

§ 2948.1Grounds for Granting or Denying a Preliminary..., 11A Fed. Prac. &...

and the payment of an allegedly unconstitutional tax when state law did not provide a remedy for its return should the statute ultimately be adjudged invalid. [20]

Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable. [21] Thus, for example, loss of goodwill often supports a finding of irreparable injury in cases in which employers seek to enforce restrictive covenants against their former employees to prevent them from contacting their customers. [22] Furthermore, when the potential economic loss is so great as to threaten the existence of the moving party's business, then a preliminary injunction may be granted, even though the amount of direct financial harm is readily ascertainable. [23]

When an alleged deprivation of a constitutional right is involved, such as the right to free speech [24] or freedom of religion, [25] most courts hold that no further showing of irreparable injury is necessary. [26] Similarly, proof that a copyright is valid and infringed has been held sufficient to justify the grant of a preliminary injunction without a detailed showing of irreparable injury. [27] However, in 2011, the Ninth Circuit rejected its longstanding rule allowing a presumption of irreparable harm in copyright actions if there is a reasonable likelihood of success on the merits. It found that the presumption was irreconcilable with the reasoning by the Supreme Court in its 2006 decision in eBay Inc v. MercExchange, L.L.C., [28] holding that the generally applicable four-factor balancing test for a permanent injunction applies to suits under the Patent Act. Thus, under this reasoning the propriety of preliminary injunctions in copyright cases must be determined by balancing all factors and not by using presumptions. [29] Similarly, no presumption of irreparable harm applies in trademark cases. [29.50] In trademark-infringement cases, a showing of "likelihood of confusion" between trademarks suffices to establish both irreparable injury and likelihood of success on the merits. [30] Additional illustrative cases finding irreparable injury are set out in the note below. [31]

Westlaw. © 2018 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

Footnotes

| | |
|---|---|
| a168 | Charles Alan Wright Chair in Federal Courts, The University of Texas. |
| a169 | University Professor, New York University. Formerly Bruce Bromley Professor of Law, Harvard University. |
| a170 | John F. Digardi Distinguished Professor of Law, Chancellor and Dean Emeritus, University of California, Hastings College of the Law. |
| a171 | Horace O. Coil ('57) Chair in Litigation, University of California, Hastings College of the Law. |
| a172 | Earle K. Shawe Professor of Law, University of Virginia School of Law. |
| a173 | University Research Professor of Law, University of Alabama. |
| a524 | John F. Digardi Distinguished Professor of Law, Chancellor and Dean Emeritus, University of California, Hastings College of the Law. |
| 1 | **Accelerated trial**<br>RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1210 (10th Cir. 2009), **citing Wright, Miller & Kane**. Former high-school student failed to establish the prospect of irreparable harm required for a preliminary injunction requiring the school to expunge references to the 10-day suspension from the student's records pending trial on the student's claim that the suspension violated due process; even though the reference to the suspension in the records could have affected the student's ability to get into graduate school or secure employment after college, she was more than three years away from college graduation, and thus the requested relief could await a full-dress trial on the merits. Matos ex rel. Matos v. Clinton School Dist., 367 F.3d 68, 74 (1st Cir. 2004), **citing Wright, Miller & Kane**. |

NJAPP0587

# Exhibit 52

NJAPP0588

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (NAACP), *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, *et al.*, <br><br> Defendants. | No. 17-cv-1907 (JDB) |
| THE TRUSTEES OF PRINCETON UNIVERSITY, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, *et al.*, <br><br> Defendants. | No. 17-cv-2325 (JDB) |

**NOTICE**

On April 24, 2018, this Court vacated and remanded a 2017 memorandum from Acting Secretary of Homeland Security Elaine Duke rescinding the Deferred Action for Childhood Arrivals (DACA) policy. *See* Order, ECF No. 69; Mem. Op., ECF No. 70. The Court stayed its vacatur order for 90 days, however, to give the Department of Homeland Security an opportunity to provide an additional explanation for the rescission of DACA.

In response to that order, on June 22, 2018, Secretary Nielsen issued a memorandum providing such explanation. *See* Memorandum of Secretary Kirjsten M. Nielsen (attached hereto as Exhibit A). As explained in the attached memorandum, Secretary Nielsen concurred with, and

declined to disturb, the Duke memorandum's rescission of the DACA policy. The Nielsen

memorandum further explains that the DACA rescission is supported by several independent and

sufficient reasons: the DACA policy was contrary to law, there are serious doubts about DACA's

legality (whether or not it is ultimately illegal), and there are enforcement policy reasons not to

continue such a deferred action policy.

Defendants intend to confer with Plaintiffs to discuss the parties' positions on further

proceedings in this case, after which the parties will file the joint status report required by the

Court's April 24, 2018 Order.

Dated: June 22, 2018               Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BRETT A. SHUMATE
Deputy Assistant Attorney General

JENNIFER D. RICKETTS
Director

JOHN R. TYLER
Assistant Branch Director

/s/   *Kathryn C. Davis*
KATHRYN C. DAVIS (DC Bar No. 985055)
RACHAEL WESTMORELAND
KATE BAILEY
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue NW
Washington, DC 20530
Phone: (202) 616-8298
Fax: (202) 616-8470
Email: Kathryn.C.Davis@usdoj.gov

*Counsel for Defendants*

*Secretary*
**U.S. Department of Homeland Security**
Washington, DC 20528



# Homeland Security

June 22, 2018

<u>MEMORANDUM FROM SECRETARY KIRSTJEN M. NIELSEN</u>

On September 5, 2017, Acting Secretary of Homeland Security Elaine C. Duke issued a memorandum (the "Duke memorandum") rescinding the enforcement policy known as Deferred Action for Childhood Arrivals (DACA). Acting Secretary Duke concluded that, "[t]aking into consideration the Supreme Court's and the Fifth Circuit's rulings in the ongoing litigation [over the enforcement policy known as Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA)], and the September 4, 2017 letter from the Attorney General [concerning DACA], it is clear that the June 15, 2012 DACA program should be terminated." Accordingly, "in the exercise of [her] authority in establishing national immigration policies and priorities," she "rescind[ed] the June 15, 2012 memorandum," subject to certain exceptions.

On April 24, 2018, the U.S. District Court for the District of Columbia held that the Duke memorandum was subject to judicial review under the Administrative Procedure Act and that it provided insufficient justification for rescinding the DACA policy. The court vacated the Duke memorandum and remanded to the Department of Homeland Security (DHS). The court issued a 90-day stay of vacatur, however, to afford DHS an opportunity to provide further explanation for rescinding the DACA policy.

Because the D.C. district court has requested further explanation, I am providing such explanation here. Having considered the Duke memorandum and Acting Secretary Duke's accompanying statement, the administrative record for the Duke memorandum that was produced in litigation, and the judicial opinions reviewing the Duke memorandum, I decline to disturb the Duke memorandum's rescission of the DACA policy, and it is my understanding that the Department of Justice will continue to seek appellate review of preliminary injunctions that restrict DHS from implementing the Duke memorandum and rescinding the DACA policy. This explanation reflects my understanding of the Duke memorandum and why the decision to rescind the DACA policy was, and remains, sound.

The Secretary of Homeland Security is vested with authority over "the administration and enforcement" of the immigration laws, 8 U.S.C. § 1103(a)(1), including the discretion to "[e]stablish[ ] national immigration enforcement policies and priorities," 6 U.S.C. § 202(5). The DACA policy of deferred action was cast as an exercise of enforcement discretion to forbear from removing a certain class of aliens who are subject to removal under law. DHS also had concluded that under pre-existing statutory and regulatory provisions a grant of deferred action would trigger certain collateral benefits for such aliens, such as eligibility for employment authorization. In considering how DHS's discretion to establish enforcement policies and priorities should be exercised, the DACA policy properly was—and should be—rescinded, for several separate and independently sufficient reasons.

First, as the Attorney General concluded, the DACA policy was contrary to law. The Fifth Circuit ruled that DAPA should be enjoined on a nationwide basis on the ground, among other things, that it likely was contrary to the statutory scheme of the Immigration and Nationality Act (INA). As the Fifth Circuit held, "the INA does not grant the Secretary discretion to grant deferred action and lawful presence on a class-wide basis to 4.3 million otherwise removable aliens." *Texas v. United States*, 809 F.3d 134, 186 n.202 (5th Cir. 2015). An equally divided Supreme Court affirmed that decision. In light of those decisions and other factors, Secretary Kelly rescinded the DAPA policy in June 2017. Any arguable distinctions between the DAPA and DACA policies are not sufficiently material to convince me that the DACA policy is lawful.

The memorandum announcing the DAPA policy both expanded the DACA policy by loosening the age and residency criteria and adopted a similar deferred action policy for parents of U.S. citizens and lawful permanent residents. The Fifth Circuit's rejection of DAPA and expanded DACA did not turn on whether the covered aliens had a pathway to lawful status (which not all of them had). Rather, it turned on the incompatibility of such a major non-enforcement policy with the INA's comprehensive scheme. The Attorney General concluded that the DACA policy has the same statutory defects that the Fifth Circuit identified with DAPA—a determination and ruling by the Attorney General that, in any event, I am bound by pursuant to 8 U.S.C. § 1103(a)(1).

Second, regardless of whether the DACA policy is ultimately illegal, it was appropriately rescinded by DHS because there are, at a minimum, serious doubts about its legality. A central aspect of the exercise of a discretionary enforcement policy is a judgment concerning whether DHS has sufficient confidence in the legality of such policy. Like Acting Secretary Duke, I lack sufficient confidence in the DACA policy's legality to continue this non-enforcement policy, whether the courts would ultimately uphold it or not.

There are sound reasons for a law enforcement agency to avoid discretionary policies that are legally questionable. Those reasons include the risk that such policies may undermine public confidence in and reliance on the agency and the rule of law, and the threat of burdensome litigation that distracts from the agency's work.   The fact that some courts have recently held or suggested that the DACA policy is legal does not change my view that the DACA policy's legality is too questionable to warrant continuing the policy, especially in light of the Attorney General's contrary determination and ruling about the DACA policy and the contrary implication of the decisions of the Fifth Circuit Court of Appeals and the Supreme Court invalidating the DAPA policy.

Third, regardless of whether these concerns about the DACA policy render it illegal or legally questionable, there are sound reasons of enforcement policy to rescind the DACA policy. To start, DHS should enforce the policies reflected in the laws adopted by Congress and should not adopt public policies of non-enforcement of those laws for broad classes and categories of aliens under the guise of prosecutorial discretion—particularly a class that Congress has repeatedly considered but declined to protect. Even if a policy such as DACA could be implemented lawfully through the exercise of prosecutorial discretion, it would necessarily lack the permanence and detail of statutory law. DACA recipients continue to be illegally present, unless and until Congress gives them permanent status.

NJAPP0592

Accordingly, I agree with Acting Secretary Duke and the Attorney General that if a policy concerning the ability of this class of aliens to remain in the United States is to be adopted, it should be enacted legislatively.

In addition, DHS should only exercise its prosecutorial discretion not to enforce the immigration laws on a truly individualized, case-by-case basis. While the DACA policy on its face did allow for individual considerations, a categorical deferred-action policy, at the very least, tilts the scales significantly and has the practical effect of inhibiting assessments of whether deferred action is appropriate in a particular case. Without the DACA policy, DHS may consider deferred action on a case-by-case basis, consistent with the INA. Moreover, considering the fact that tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years and then have been released into the country owing to loopholes in our laws—and that pattern continues to occur at unacceptably high levels to the detriment of the immigration system—it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws against all classes and categories of aliens. All of those considerations lead me to conclude that Acting Secretary Duke's decision to rescind the DACA policy was, and remains, sound as a matter of both legal judgment and enforcement policy discretion.

I do not come to these conclusions lightly. I am keenly aware that DACA recipients have availed themselves of the policy in continuing their presence in this country and pursuing their lives. Nevertheless, in considering DHS enforcement policy, I do not believe that the asserted reliance interests outweigh the questionable legality of the DACA policy and the other reasons for ending the policy discussed above. That is especially so because issues of reliance would best be considered by Congress, which can assess and weigh a range of options. In contrast, the DACA policy was announced as a temporary stopgap measure, not a permanent fix; it was expressly limited to two-year renewal periods, it expressly conferred no substantive rights, and it was revocable at any time. In my judgment, neither any individual's reliance on the expected continuation of the DACA policy nor the sympathetic circumstances of DACA recipients as a class overcomes the legal and institutional concerns with sanctioning the continued presence of hundreds of thousands of aliens who are illegally present in violation of the laws passed by Congress, a status that the DACA non-enforcement policy did not change. And in all events, the rescission of the DACA policy does not preclude the exercise of deferred action in individual cases if circumstances warrant.

For these reasons, in setting DHS enforcement policies and priorities, I concur with and decline to disturb Acting Secretary Duke's decision to rescind the DACA policy.

Kirstjen M. Nielsen
Secretary

3

# Exhibit 53

NJAPP0594

 Neutral

As of: July 19, 2018 8:16 PM Z

## *Embarcadero Techs., Inc. v. Redgate Software, Inc.*

United States District Court for the Western District of Texas, Austin Division

November 20, 2017, Decided; November 20, 2017, Filed

1:17-cv-444-RP

Reporter
2017 U.S. Dist. LEXIS 191317 *; 2017 WL 5588190

EMBARCADERO TECHNOLOGIES, INC., and IDERA, INC., Plaintiffs, v. REDGATE SOFTWARE, INC., REDGATE SOFTWARE, LTD., DAVID FRIGNOCA, and DUSTIN ABNEY, Defendants.

**Subsequent History:** Dismissed by, in part, Claim dismissed by *Embarcadero Techs., Inc. v. Redgate Software, Inc., 2018 U.S. Dist. LEXIS 1902 (W.D. Tex., Jan. 4, 2018)*

## Core Terms

customers, preliminary injunction, irreparable harm, documents, injunction, covenant, serviced, application for preliminary injunction, injunctive relief, sales, geographic, compete, trade secret, nationwide, employees, territory, misappropriation, solicit, parties, confidential information, non-solicitation, delete, breach of fiduciary duty, declines, equities, stemming, feared, joined, notice, days

**Counsel:** [*1] For Embarcadero Technologies, Inc., Idera, Inc., Plaintiffs, Counter Defendants: Allison Fisher, LEAD ATTORNEY, PRO HAC VICE, Hicks Thomas LLP, Houston, TX; James W. Henges, LEAD ATTORNEY, PRO HAC VICE, Hicks Thomas, LLP, Beaumont, TX; James R. Old, LEAD ATTORNEY, Hicks Thomas, LLP, Beaumont, TX; Stewart Hoffer, LEAD ATTORNEY, John B. Thomas, Hicks Thomas LLP, Houston, TX.

For Red Gate Software, Inc., Red Gate Software, Ltd., Defendants: Carlos R. Soltero, LEAD ATTORNEY, Cleveland Terrazas PLLC, Austin, TX; Michael Kabat, LEAD ATTORNEY, McGinnis Lochridge & Kilgore LLP, Austin, TX; John Charles Hernandez, McGinnis Lochridge and Kilgore, Austin, TX.

For David Frignoca, Defendant, Counter Plaintiff: Jason Scott Boulette, LEAD ATTORNEY, Boulette Golden & Marin L.L.P., Austin, TX.

For Dustin Abney, Defendant, Counter Plaintiff: Thomas A. Nesbitt, LEAD ATTORNEY, Laura J. Goodson, DeShazo & Nesbitt, LLP, Austin, TX.

For Embarcadero Technologies, Inc., Idera, Inc., Counter Defendants: John B. Thomas, LEAD ATTORNEY, Hicks Thomas LLP, Houston, TX.

**Judges:** ROBERT PITMAN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** ROBERT PITMAN

## Opinion

### ORDER

Before the Court are the Application for Preliminary Injunction, (Dkt. 1), and the Motion **[*2]** for Entry of Amended Order Granting Plaintiffs' Application for Preliminary Injunction, (Dkt. 74), filed by Plaintiffs Embarcadero Technologies, Inc. ("Embarcadero") and Idera, Inc. ("Idera") (together, "Plaintiffs"). The Court held a hearing on the application for a preliminary injunction on October 20, 2017, and October 23, 2017. After considering the pleadings, the briefs, the evidence presented, and the relevant law, the Court **DENIES** the application for a preliminary injunction.

### BACKGROUND

On May 11, 2017, Plaintiffs brought an action in this Court against four defendants, alleging eight claims. (Pls.' Orig. Compl., Dkt. 1). The claims arose from the departure of four employees of Embarcadero,[1] David

---

[1] Embarcadero was acquired by Idera in 2015. Defendants Frignoca and Abney worked for Embarcadero before the acquisition. After Idera acquired Embarcadero, Frignoca and

Frignoca ("Frignoca"), Dustin Abney ("Abney") and two others, each of whom left Embarcadero and joined the same company. That company, Redgate Ltd., is incorporated in the United Kingdom and has a subsidiary called Redgate Inc., (together, "the Redgate Defendants"), which is incorporated in California. Frignoca left his position at Embarcadero in October 2016 and joined Redgate Ltd. by the end of the month. Plaintiffs contend that he did so in violation of a contract he had signed. Additionally, **[*3]** while employed by Embarcadero, Frignoca uploaded various Embarcadero documents to his personal Google Drive and accessed them a few times after his employment with Embarcadero ceased. Plaintiffs contend that doing so constituted a misappropriation of trade secrets and a breach of his fiduciary duty to the company. Finally, since three former Embarcadero sales employees left to join Redgate after Frignoca did, Plaintiffs claim that he improperly solicited them in violation of his contract. Plaintiffs brought suit against Frignoca, Abney, Redgate Ltd., and Redgate Inc., alleging the following claims: (1) breach of contract (Frignoca); (2) breach of fiduciary duty (Frignoca); (3) aiding and abetting breach of fiduciary duty (the Redgate Defendants); (4) misappropriation of trade secrets in violation of the Federal Defend Trade Secrets Act of 2016, *18 U.S.C. § 1836, et seq.* (Frignoca and the Redgate Defendants); (5) misappropriation of trade secrets in violation of the Texas Uniform Trade Secrets Act, *Tex. Civ. Prac. & Rem. Code § 134A.001, et seq.* (Frignoca and the Redgate Defendants); (6) violation of the federal Computer Fraud and Abuse Act, *18 U.S.C. § 1030, et seq.* (Frignoca); (7) violation of the Texas Harmful Access by Computer Act, *Tex. Civ. Prac & Rem. Code § 143.001, et seq.* (Frignoca); and (8) breach of contract (Abney). **[*4]** (Am. Compl., Dkt. 33, ¶¶ 32-69). Plaintiffs seek various remedies, but relevant here is their request for a preliminary injunction.

Plaintiffs filed a brief in support of their motion for a preliminary injunction and a request for a hearing on June 12, 2017. (Dkt. 14). On June 28, 2017, the Court scheduled a hearing on the application for a preliminary injunction for July 25, 2017. (Dkt. 26). Plaintiffs requested an extension of the hearing on July 14, 2017, (Dkt. 30), stating their preference for a date in early September, which the Court granted by resetting the hearing for September 6, 2017, (Dkt. 37). The Court needed to reschedule the hearing, so the Court reset

the date for August 31, 2017, while giving the parties the option to have the hearing on October 20, 2017, if they preferred. (Dkt. 56). The parties agreed to the October 20 hearing date, (Dkt. 60), so the Court rescheduled the hearing for October 20, 2017. (Dkt. 64). The hearing was held on October 20, 2017 and continued on October 23, 2017.

The relief sought by Plaintiffs has been characterized in a few different ways. In their original complaint, Plaintiffs requested a preliminary injunction that

> a. orders Defendants to **[*5]** return to Plaintiffs all confidential, proprietary and trade secret information of Plaintiffs within their possession, custody, or control, as permitted by *18 U.S.C. § 1836(b)(3)(A)(ii)* and applicable state law;
> b. prohibits Defendants from using in any manner any confidential, proprietary and trade secret information of Plaintiffs, including confidential information regarding Plaintiffs' customers and products, including to solicit, switch and/or convert Plaintiffs' customers;
> c. prohibits Defendants from soliciting any of Plaintiffs' employees; and
>
> d. because there is, or will be, evidence of misappropriation and threatened misappropriation, prohibits Frignoca and Abney from continuing to work for or provide services to Redgate in which these individuals will be permitted to sell competing services to the customers that they personally serviced, or to the customers that their subordinates personally serviced, while employed with Plaintiffs, as permitted by *18 U.S.C. § 1836(b)(3)(A)(i)(I)* and applicable state law.

(Orig. Compl., Dkt. 1, at ¶ 80). In their brief in support of their application for a preliminary injunction, Plaintiffs requested that the Court issue a preliminary injunction to

> prevent Defendants from: (a) using Plaintiffs' confidential **[*6]** information to solicit Plaintiffs' customers and leads for the purpose of selling products in competition with Plaintiffs; (b) otherwise disclosing or commercially using Plaintiffs' confidential information; (c) soliciting Plaintiffs' existing employees to terminate their employment with Plaintiffs, and (d) allowing Frignoca and Abney to engage in any business that competes with Plaintiffs in the United States.

(Mem. Supp. Appl. Prelim. Inj., Dkt. 14, at 2). Following

---

Abney continued to sell what are referred to as Embarcadero legacy products—products that Embarcadero sold before the acquisition.

the hearing, Plaintiffs submitted a request for a much broader injunction, which would include an absolute prohibition on Frignoca and Abney working for Redgate for a year and would force two employees of Redgate who are not parties to this suit to stop working at Redgate for three months and ten days. (Pls.' Mot. Entry Am. Order, Dkt. 74).

## DISCUSSION

### I. Post-Hearing Request for Amended Scope of Relief

Three days after the conclusion of the hearing, on October 26, 2017, Plaintiffs submitted a much more detailed request for injunctive relief tailored to each defendant. (Pls.' Mot. Entry Am. Order, Dkt. 74). In their request for entry of an amended order, Plaintiffs explain that they "have decided to change the scope of the [*7] requested injunctive relief." (*Id.* at 1). The scope of relief requested is significantly broader than that outlined in Plaintiffs' application for a preliminary injunction and brief in support of that application. For example, in their briefs, Plaintiffs indicated that they sought injunctions preventing Frignoca and Abney from working for Redgate only on a nationwide basis. (Pls.' Reply Abney Resp. Appl. Prelim. Inj., Dkt. 27, at 4 ("A nation-wide restriction on Abney's competition with Plaintiffs is warranted.")); Pls.' Reply Frignoca Resp. Appl. Prelim. Inj., Dkt. 29, at 4 ("[A] nation-wide exclusion is presently being sought by Plaintiffs.")). The newly proposed injunction seeks to prevent Frignoca and Abney from working for Redgate on a global basis. (Pls.' Mot. Entry Am. Order, Dkt. 74-1, at 5, 7). Plaintiffs also request in the proposed order, for the first time, relief against two former Embarcadero employees, Chad Tewis and Adam Altman, who are not parties to this suit. (*Id.* at 8) (requesting that the Court enter an order requiring that Redgate "place Chad Tewis and Adam Altman on leave with pay or leave without pay (at Redgate's election) until three months and 10 days from the date the Court [*8] signs this Order"). The rationale is the alleged violation by Frignoca of a non-solicitation agreement, but Plaintiffs have pointed to no case law supporting the position that the appropriate remedy for the violation of a non-solicitation agreement is to prohibit the solicited employees (not parties to the non-solicitation agreement) from working. More to the point, Plaintiffs gave no notice of their desire to expand the scope of their requested relief prior to or during the hearing.

Because of its timing, three days after the conclusion of the hearing and five months after the original request for a preliminary injunction, the Court declines to consider the amended request for relief to the extent it differs from Plaintiffs' previous characterizations of the scope of the injunction desired. Plaintiffs had plenty of opportunities to outline the contours of the injunctive relief sought prior to the hearing. To consider a new request for a broader injunction following the hearing would prejudice Defendants, who did not have an opportunity either before or during the hearing to respond to the expanded scope of relief requested after the hearing. Federal courts may issue preliminary injunctions [*9] "only on notice to the adverse party." *Fed. R. Civ. P. 65(a)(1)*. The notice requirement, "with few exceptions, implies 'a hearing in which the defendant is given a fair opportunity to oppose the application and to prepare for such opposition.'" *Williams v. McKeithen, 939 F.2d 1100, 1105 (5th Cir. 1991)* (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda, 415 U.S. 423, 432 n.7, 94 S. Ct. 1113, 39 L. Ed. 2d 435 (1974))*. Here, the Defendants had ample notice that Plaintiffs were seeking a preliminary injunction, but they did not have notice of the specific relief requested on October 26, three days after the conclusion of the hearing. Therefore, the Court declines to consider this post-hearing request seeking a broader injunction.

### II. Preliminary Injunction

A preliminary injunction is an extraordinary remedy; the decision to grant one is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd., 118 F.3d 1047, 1050 (5th Cir. 1997)*. A plaintiff seeking a preliminary injunction must establish that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Winter v. NRDC, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008)*. The party seeking injunctive relief must "carr[y] the burden of persuasion on all four requirements." *PCI Transp., Inc. v. Ft. Worth & W. R.R. Co., 418 F.3d 535, 545 (5th Cir. 2005)* (quotation marks and citation omitted). [*10]

Plaintiffs' delay in seeking injunctive relief is fatal to their request for a preliminary injunction. To the extent they have suffered any harm as a result of the events underlying their claims, much of that harm will have

already occurred due to the delay; the appropriate remedy is therefore damages. The delay exhibited by Plaintiffs in seeking a preliminary injunction also casts doubt upon the supposed irreparability of the harm alleged. Further, to the extent that Plaintiffs could suffer irreparable harm from Frignoca's retention of the documents belonging to Plaintiffs on his Google Drive, his agreement to delete all such documents and turn them over to Plaintiffs negates the potential for any such harm.

With respect to Plaintiffs' effort to force Abney to cease employment with Redgate, in addition to the obstacle to demonstrating irreparable harm posed by Plaintiffs' delay in seeking relief, the covenant sought to be enforced against Abney is unreasonable, and the Court declines to reform the covenant at this stage of the proceeding because doing so would be inequitable.

**A. Irreparable Harm**

Plaintiffs have failed to make a sufficient showing of irreparable harm with respect to all [*11] of their claims primarily because of the extensive delay they have exhibited in seeking a preliminary injunction. "A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction." CHARLES ALAN WRIGHT & ARTHUR R. MILLER, ET AL., 11A FEDERAL PRACTICE & PROCEDURE § 2948.1 (3d ed., April 2017 update). Undue delay in seeking a preliminary injunction tends to negate the contention that the feared harm will truly be irreparable. See GoNannies, Inc. v. GoAuPair.com, Inc., 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (finding that a delay of over six months rebutted any presumption of irreparable harm); see also id. ("Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief.") (quoting Wireless Agents, L.L.C. v. T-Mobile USA, Inc., 2006 U.S. Dist. LEXIS 36590, 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006)); Boire v. Pilot Freight Carriers, Inc., 515 F.2d 1185, 1193 (5th Cir. 1975) (affirming district court's denial of temporary injunctive relief under the Taft-Hartley Act in light of, in part, a three-month delay in seeking the relief).

There was a significant delay between the time that Plaintiffs discovered that Frignoca was employed by Redgate—the genesis of this lawsuit—and when they sought an injunction. Plaintiffs [*12] were aware that

Frignoca was working at Redgate as early as November 11, 2016, when Michael Shea told Embarcadero and Idera CEO Randy Jacobs that Frignoca was now working at Redgate. (Shea email, Defs.' Exh. 509, Dkt. 72-6, at 41). Although Jacobs suggested at the hearing that he was not completely certain that this information was correct until a few months later, when he saw Frignoca's name on a United Kingdom document listing members of boards of directors, Jacobs testified that Shea had not given him inaccurate information in the past. Additionally, shortly thereafter, on November 17, 2016, Embarcadero acted upon this information by having an attorney send Frignoca a cease-and-desist letter reminding him of the agreement he signed while employed at Embarcadero. (Letter, Def.'s Exh. 510, Dkt 72-6, at 45). This action was filed on May 11, 2017, about six months later. (Compl., Dkt. 1). Plaintiffs did not request a hearing on or file a brief in support of their application for a preliminary injunction until June 13. When the Court set a hearing for July 25, Plaintiffs sought a delay of the hearing to a date in early September, nearly five months after they became aware of all of [*13] the facts underlying their claims in this lawsuit.

Plaintiffs point to Daily Instruments Corp. v. Heidt to support their argument that the delay in pursuing the preliminary injunction was reasonable. 998 F. Supp. 2d 553, 570 (S.D. Tex. 2014) ("[D]elay will not negate a finding of irreparable harm where the plaintiff has a good explanation."). Here, Plaintiffs' explanation is not good enough. The court in Daily Instruments found it significant that the plaintiff was "a small company with no in-house attorney," and exercised diligence in pursuing the claims after waiting for four months to engage a forensic expert to examine its former employee's laptop. Id. Additionally, the Daily Instruments court noted that the defendants contributed to the delay by waiting until the final business day before the state-court hearing was scheduled to remove the case to federal court and by opposing accelerated discovery in both state and federal court. Id. Here, Plaintiffs have not put forward similarly good reasons. Plaintiffs' contention that this delay was reasonable because Frignoca concealed his new employment from Idera and Embarcadero is unpersuasive in light of the evidence—the Shea email to Jacobs and the cease-and-desist letter sent from [*14] Embarcadero to Frignoca—that Plaintiffs learned this information through other means in November 2016. And there is no evidence that the defendants in this case undertook any bad-faith efforts, as did the Daily Instruments defendants, to delay the Plaintiffs' opportunity to seek

preliminary relief.

There was also significant delay between the time that Plaintiffs became aware of the other factors in this litigation—Frignoca's alleged solicitation of former Embarcadero employees,[2] Frignoca's downloading of Embarcadero files onto his Google Drive and failure to delete those files upon his departure from Embarcadero,[3] and Abney's employment with Redgate—and when Plaintiffs sought preliminary injunctive relief. If the harm Plaintiffs feared were indeed irreparable, it is unclear why they, knowing all of the primary facts forming the basis for their claims by April at the latest, filed the complaint on May 11, did not request a hearing or file a brief supporting their application for a preliminary injunction until June 12, and, once the Court set a hearing for July 25, requested that the hearing be moved to early September.

**1. Breach of Contract: Frignoca**

Plaintiffs' delay in pursuing injunctive **[*15]** relief against Frignoca for breach of his employment agreement (the "Unit Agreement") is fatal to their application for a preliminary injunction barring Frignoca from employment with Redgate. The delay was so substantial that by the first day of the preliminary injunction hearing, October 20, 2017, one year had passed since Frignoca's last day at Embarcadero. (*See* Frignoca Termination Letter, Pls.' Ex. 13, Dkt. 72-2, at 69). The Unit Agreement's restriction of one year for noncompetition, (Unit Agreement, Pls.' Ex. 5A, Dkt. 72-2, at 9) had already expired. *See Rimkus Consulting Grp., Inc. v. Cammarata 255 F.R.D. 417, 438 (S.D. Tex. 2008)* (citing *Gaylord Broadcasting Co. v. Cosmos*

---

[2] Chad Tewis and Adam Altman, both of whom formerly worked at Embarcadero and currently work at Redgate, resigned in December 2016, (Tewis Resignation and Altman Resignation, Pls.' Ex. 21, Dkt. 72-3, at 102-03), and were working at Redgate by March 2017 (Frignoca email to Altman, Tewis, and Abney, Def.'s Ex. 515, Dkt. 72-6, at 57). Abney left Embarcadero in January 2017 and began to work at Redgate in March 2017. (Abney Resignation, Pls.' Ex. 29, Dkt. 72-4, at 33; Abney Decl., Def.'s Ex. 3, Dkt. 72-6, at 3). Jacobs testified at the hearing that he was aware that Tewis, Altman, and Abney (unlike Frignoca) had all updated their social media information within a month of joining Redgate, which means that he was aware they had joined Redgate by April 2017.

[3] Jacobs testified that he ordered a forensic investigation of Frignoca's laptop in late March after a conversation with Redgate CEO Simon Galbraith.

*Broadcasting Corp., 746 F.2d 251, 254 (5th Cir. 1984)* (denying a preliminary injunction in part because "Rimkus's delay in seeking injunctive relief in this court consumed most of the covenants' stated period"). Eleven months had passed since Jacobs was notified that Frignoca had gone to Redgate and had acted on that knowledge by directing an attorney to send him a cease-and-desist letter. At most five weeks of this delay can be attributed to Plaintiffs' accommodation of the schedules of the Defendants and of the Court. The remaining ten months of delay was caused by Plaintiffs—they waited until May 11, to file their complaint; they waited until June 13 to file a **[*16]** brief in support and request a hearing; they requested an extension of the hearing the Court originally set for July 25 to a date in early September. The delay counsels against a finding that any feared future harm will be irreparable. It also suggests that any harm that may stem from Frignoca's departure for Redgate, if doing so was in fact a breach of the Unit Agreement,[4] has already occurred and therefore can be compensated adequately with a remedy at law—damages. Idera and Embarcadero CEO Randy Jacobs testified that he believes that as of now, Plaintiffs have provable damages. Any harm likely to occur has already occurred, and Plaintiffs will be entitled to recover for any such harm monetarily if they make the requisite showing at trial. The Court finds that the delay between the discovery of Frignoca's new employment and the date Plaintiff sought a preliminary injunction means that the threat of irreparable harm with respect to Frignoca's employment with Redgate is insufficient to justify granting the extraordinary relief sought.

Plaintiffs' delay is also fatal to their attempt to show irreparable harm stemming from Frignoca's alleged breach of the non-solicitation portion of the **[*17]** Unit Agreement. Plaintiffs could not have learned of the events forming the basis of their non-solicitation agreement—the departure of Abney, Tewis, and Altman and their subsequent arrival at Redgate—until after Frignoca left, so the delay is not as extreme as the delay with respect to the non-compete portion of the Unit Agreement. However, Jacobs testified at the hearing that he was aware that Tewis, Altman, and Abney, (*see supra* note 2), had all updated their social

---

[4] Frignoca has challenged the validity of the Unit Agreement on numerous grounds. Because the Court declines the request for a preliminary injunction on the basis of the Unit Agreement due to the failure to demonstrate irreparable harm, the Court need not consider the validity of the Unit Agreement at this time.

2017 U.S. Dist. LEXIS 191317, *17

media accounts to reflect that they had moved to Redgate within a month. Because Tewis, Altman, and Abney were all working at Redgate by mid-March, Jacops was aware of the events underlying Plaintiffs' non-solicitation breach-of-contract claim by mid-April at the latest. And yet Plaintiffs did not find the harm feared pressing enough to require a hearing on their application for a preliminary injunction until early September, nearly five months later.

### 2. Breach of Contract: Abney

As mentioned above, Plaintiffs were aware that Abney was working at Redgate, the basis for their breach of contract claim against him, by mid-April. They delayed their chance to present their case for a preliminary injunction to the Court until [*18] early September. This defeats their attempt to show irreparable harm stemming from Abney's alleged breach of his employment agreement.

### 3. Misappropriation of Trade Secrets

Plaintiffs' delay in seeking a preliminary injunction, by itself, supports a finding that they have not met their burden to show irreparable harm with respect to their trade secret claims. But the Court has an additional basis for finding that an injunction is not needed to prevent the irreparable harm feared by Plaintiffs arising from Frignoca's continued possession of Embarcadero files in his Google Drive. Frignoca has agreed to delete all of these documents from his Google Drive and turn them over to Plaintiffs. Therefore, Plaintiffs are unlikely to suffer any harm in the future from Frignoca's possession of these documents on his Google Drive that would merit a preliminary injunction.

Plaintiffs' concern about the documents on Frignoca's Google Drive is understandable. Even if, as Frignoca has stated, he has only accessed a few documents and did not use them for any improper purposes, if the documents were to remain in his possession, the threat of irreparable harm to Plaintiffs could still be significant. Three [*19] examples of documents contained on Frignoca's Google Drive brought to light at the hearing are: (1) a spreadsheet containing worldwide information on all of Embarcadero's and Idera's business, including deals in various stages of fruition, (Pls.' Ex. 22, Dkt. 72-3, at 123); (2) Plaintiffs' pricing model, (Pls.' Ex. 18, Dkt. 72-3, at 1), which Plaintiffs' COO Chris Smith testified that he considers highly confidential because it is an

algorithm for determining how to adjust pricing and how different price adjustments would affect Plaintiffs' business; and (3) a document titled "Historic Sales," (id.), which includes detailed information concerning past sales made by Plaintiffs.

For one thing, Frignoca admits that he accessed documents located in his Google Drive that originated from Embarcadero after leaving Embarcadero. Frignoca stated that he only did so because he was poking around to see examples of certain reports he wanted to run for his sales team at Redgate. Frignoca also said that when he accessed a document containing a trove of Embarcadero sales data, he only viewed the cover sheet, which does not include confidential information. The information on his Google Drive includes [*20] many Embarcadero documents, some of which may include confidential information, and some of which do not. While it will be the burden of Plaintiffs to show at trial that particular documents included information that merits trade secret protection, Plaintiffs have demonstrated that they could be in danger of suffering irreparable harm if Frignoca were to retain access to all of the documents on his Google Drive.

However, in light of the representations made by counsel for Frignoca, it is unnecessary for the Court to mandate injunctive relief for Frignoca to delete the documents from Embarcadero contained in his Google Drive. In Frignoca's response to Plaintiff's Application for a Preliminary Injunction, he noted that he did not disagree with Plaintiff's request to prohibit him from using confidential information, (Frignoca Resp. Appl. Prelim. Inj., Dkt. 24, ¶ 40), which in that iteration was defined by Plaintiffs as:

> the written and electronically stored versions of Plaintiffs' database, which contains information such as the identities of the decision-makers for each customer or potential customer, their contact information, customer relationship history, and the details of the ongoing [*21] maintenance contracts that Plaintiffs has with its customers (including such details as the length of the contract, the specific services the customer needs performed at various locations, the customer contacts for the job, the revenue to be earned during the contract, and customer payment history).
>
> (Pls.' Proposed Order, Dkt. 14, at 3)).

Frignoca declared through briefing that "with Plaintiffs' approval Frignoca would like to delete the files from his Google Drive." (Frignoca Resp. Appl. Prelim. Inj., Dkt. 24, ¶ 42). Additionally, at the hearing, counsel for

2017 U.S. Dist. LEXIS 191317, *21

Frignoca declared that Frignoca was ready to turn over and delete all information on his Google Drive belonging to Embarcadero or Idera, and counsel for Plaintiffs recognized Frignoca's cooperation in this regard. In light of these circumstances, the Court finds that a preliminary injunction is not necessary to prevent potential harm stemming from Frignoca's possession of the Embarcadero and Idera documents in his Google Drive.[5] If any difficulties regarding the documents on Frignoca's Google Drive arise, however, the parties may notify the Court.

**4. Breach of Fiduciary Duty**

The breach of fiduciary duty claim against Frignoca and the **[*22]** aiding and abetting breach of fiduciary duty claim against the Redgate Defendants arise from the same facts as the misappropriation of trade secrets claims do—Frignoca's uploading Embarcadero documents to his Google Drive and retention of them after departing Embarcadero. (Pls.' Mem. Appl. Prelim. Inj., Dkt. 14, at 12). The delay between Plaintiffs' discovery of these facts and pursuing injunctive relief based on these claims also prevents a showing of irreparable harm. Plaintiffs have therefore failed to demonstrate the requisite danger of irreparable harm to support a preliminary injunction with respect to these two claims, as well.

**B. Likelihood of Success and Balance of the Equities: Abney**

Plaintiffs' failure to show a likelihood of irreparable harm absent an injunction prohibiting Abney from working for Redgate serves as an independent basis for denying the injunction against Abney. But the Court further finds that Plaintiffs are insufficiently likely to succeed on the merits on the contract claim against Abney as Plaintiffs desire to enforce it and that the equities do not support reformation of the covenant not to compete at this stage. Plaintiffs seek a nationwide injunction **[*23]** preventing Abney from working for Redgate at all. In the alternative, they have indicated that they would like for the Court to reform the agreement to conform with the requirements imposed on covenants not to compete by

Texas law.[6] (Pls.' Mem. Supp. Appl. Prelim. Inj., Dkt. 14, at 11 n.6 ("Even if the Court finds that portions of the non-compete are unreasonable, the proper approach is to reform the agreement to conform with the requirements of the statute.")). However, Plaintiffs have been less than forthcoming in divulging information regarding which customers Abney serviced while employed by Embarcadero—information stored on the Salesforce database to which they have access but Abney does not—that would enable a reasonable reformation of the covenant. Because of Plaintiffs' reluctance to look for information in their possession, preferring instead to seek an overly broad nationwide restriction on Abney's employment with Redgate, the equities do not favor Plaintiffs.

"Covenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees are restraints on trade and are governed by the [Covenants Not to **[*24]** Compete] Act." _Marsh USA, Inc. v. Cook, 354 S.W.3d 764, 768 (Tex. 2011)_. The _Texas Covenants Not to Compete Act_ states that non-compete agreements are enforceable if they contain "limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." _Tex. Bus. & Com. Code § 15.50(a)_. If the agreement contains limitations that are not reasonable or impose a greater restraint than is necessary, "the court shall reform the covenant to the extent necessary" to render it reasonable. _Id. § 15.51(c)_.

Covenants not to compete are deemed unreasonable in scope if they prohibit contact with customers with whom the defendant had no contact while employed. _See Peat Marwick Main & Co. v. Haass, 818 S.W.2d 381, 386-87 (Tex. 1991)_ (invalidating an agreement applying to "any of [the employer's] clients worldwide," not just those clients with which the employee "had some actual contact"). Geographically, "a reasonable area for purposes of a covenant not to compete is considered to be the territory in which the employee worked while in the employment of his employer." _Butler v. Arrow Mirror & Glass, Inc., 51 S.W.3d 787, 793 (Tex. App.—Houston [1st Dist.] 2001, no pet.)_ (affirming trial court's reformation of geographic area of covenant to Harris

---

[5] Because Plaintiffs' claims for misappropriation of trade secrets and computer violations under both federal and state law (four in total) all stem from the same underlying Google Drive information, this finding of failure to show irreparable harm applies to all four claims.

---

[6] While Plaintiffs disagree with Frignoca about whether Delaware law or Texas law applies to his Unit Agreement, the parties agree that Texas law governs Abney's contract.

2017 U.S. Dist. LEXIS 191317, *24

County and Fort Bend County, where the majority of Butler's customers [*25] were when employed by Arrow). "A covenant not to compete with a broad geographical scope is unenforceable, particularly when no evidence establishes the employee actually worked in all areas covered by the covenant." *Id. at 793-94*.

In *Peat Marwick*, the Texas Supreme Court held a provision that "[i]nhibt[ed] departing partners from engaging accounting services for clients who were acquired after the partner left, or with whom the accountant had no contact while associated with the firm" to be "overbroad and unreasonable" because it was "not reasonably necessary to protect" the business interest of preventing the former employee from establishing rapport with clients and then, after departing, taking those clients with him. *Peat Marwick, 818 S.W.2d at 388*.

Abney was hired in September 2015 to work for Embarcadero through Insight Global, a staffing company. (Abney Decl., Dkt. 72-6, at 1). He was on Insight Global's payroll but worked for Embarcadero—he went to work at Embarcadero's place of business, reported to Embarcadero managers, and sold Embarcadero software. (*Id.*). His title was "lead development representative," and it was his responsibility to assist sales account executives in the sales process for Embarcadero's software (now referred [*26] to as the Embarcadero legacy products). (*Id.* 1-2). On January 11, 2016, a few months after Idera's acquisition of Embarcadero, he was formally declared to be an employee of Idera and placed on Idera's payroll. (*Id.* at 2). On this date he also signed an agreement including a covenant not to compete. (*Id.*). Beginning July 1, 2016, Abney became a sales account representative (a "geo rep") and was assigned a specific geographic territory for sales. (*Id.*).

In Abney's first position as a lead development representative, his duties included "communicating with and helping sales representatives sell products to accounts on a national basis." (Abney Dep., Pls.' Ex. 48, 173:9-16 (hereinafter "Abney Dep.")). His duties were nationwide from the time of his hiring until April 2016, when he took over a specific territory. (Abney Dep., 76:9-20). This geographic area was composed of eight states: Colorado, Nebraska, Kansas, Oklahoma, Iowa, Missouri, Illinois, and Indiana. (Def.'s Exh. 4, Dkt. 72-6, at 8-9). At Redgate, Abney has two sets of responsibilities: (1) a list of assigned accounts of existing clients and (2) a geographic region over which he has free rein to develop leads as he sees fit. (Abney

Dep., 160:10-24). [*27] The existing clients Abney services are in that same geographic region. (Abney Decl., Def.'s Ex. 3, Dkt. 72-6, at 4). All of his current existing clients are the same as the existing clients he was assigned when he first began working at Redgate in March. (Abney Dep., 188:9-12). His sales territory at Redgate—Vermont, Maine, Maryland, Rhode Island, Delaware, New Jersey, New Hampshire, and Massachusetts, (Abney Decl., Def.'s Ex. 3, Dkt. 72-6, at 3)—contains no geographical overlap with his territory at Embarcadero. His original declaration indicated that, to the best of his memory, he thought his territory at Embarcadero included Maryland and Rhode Island, but Embarcadero's documents reveal that these two states were not included in his territory there. (Def.'s Exh. 4, Dkt. 72-6, at 8-9). Therefore, there is no geographical overlap between his Embarcadero territory and his Redgate territory.

Despite this geographic limitation in Abney's duties after his promotion at Embarcadero, Plaintiffs contend that they are nonetheless entitled to a nationwide injunction because prior to his promotion, Abney's job as a sales lead representative entailed working on sales leads on a nationwide basis. [*28] However, even though they likely possess the information regarding which clients and potential clients Abney served as a sales lead representative in their Salesforce database, they have not produced such a list. If the Court were to issue an injunction worded as Plaintiffs requested in their original application for a preliminary injunction, prohibiting Abney from "continuing to work for or provide services to Redgate in which [he] will be permitted to sell competing services to the customers that [he] personally serviced, or to the customers that [his] subordinates personally serviced, while employed with Plaintiffs," (Orig. Compl., Dkt. 1, at ¶ 80), it would be difficult to obey without knowledge of who those customers were. Such an injunction might be more appropriately tailored to the reasonableness required by Texas courts for covenants not to compete than would a nationwide injunction, but it would be impossible for Abney to follow faithfully if he did not have a list of all of the customers he personally serviced while at Embarcadero. It would also be impossible for the Court to determine whether Abney was following the order for enforcement purposes.

Abney testified in his [*29] deposition that to the best of his knowledge he has not talked to any potential customers while employed by Redgate that he did while working for Embarcadero. (Abney Dep., at 153:1-23). In the interest of figuring out which customers he had

serviced while at Embarcadero, he asked Embarcadero through counsel for a list of customers that he serviced while employed by Embarcadero but received little helpful information in response. (Nesbitt letter, Def.'s Ex. 8, Dkt. 72-6, at 19-20 (asking which customers Abney personally served); Pls.' Objs. Reqs. Produc. Interrogs., Def.'s Ex. 7, Dkt. 72-6, at 14 (refusing to identify customers personally serviced by Abney on the basis of various objections and referring Abney to approximately 10,500 pages of documents)). Plaintiffs likely had access to that information and probably could have generated a list of Abney's customers, since he kept track of them via his Salesforce database, but COO Chris Smith testified at the hearing that he had not directed anyone to attempt to generate such a list, nor was he aware of anyone having done so.

Here, Plaintiffs seek an injunction preventing Abney from working for Redgate for any customer, regardless of whether [*30] Abney had any contact with that customer. This proves too broad. Plaintiffs have not provided the Court—nor have they pointed to any attempts to provide the Court—with a list of customers that Abney serviced. They would rather have the Court issue a sweeping injunction prohibiting Abney from working for Redgate at all. Without the tools to properly reform Abney's covenant, the Court declines to do so at this stage.

## CONCLUSION

Plaintiffs have failed to demonstrate that they would suffer irreparable harm absent a preliminary injunction. Further, Plaintiffs have failed to demonstrate a likelihood of success on the merits or that the equities are in their favor with respect to their claim against Abney. Plaintiffs' application for a preliminary injunction, (Dkt 1), is **DENIED**. The Court further **DENIES** Plaintiff's Motion for Entry of an Amended Order Granting Plaintiffs' Application for Preliminary Injunction, (Dkt. 74).

**SIGNED** on November 20, 2017.

/s/ Robert Pitman

ROBERT PITMAN

UNITED STATES DISTRICT JUDGE

End of Document

# Exhibit 54

NJAPP0604

⚠ Caution
As of: July 19, 2018 8:17 PM Z

## _H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC_

United States District Court for the Northern District of Texas, Dallas Division

June 23, 2009, Decided; June 23, 2009, Filed

CIVIL ACTION NO. 3:09-CV-00390-L

**Reporter**
2009 U.S. Dist. LEXIS 52950 *; 2009 WL 1766095

H.D. VEST, INC., Plaintiff, v. H.D. VEST MANAGEMENT AND SERVICES, LLC AND HERB VEST, Defendants.

## Core Terms

preliminary injunction, services, irreparable harm, website, infringement, AdShuffle, marks, entity, irreparable, damages, temporary restraining order, trademark infringement, financial services, injunctive relief, goodwill, provides

**Counsel:** [*1] For HD Vest Inc, Plaintiff: William G Barber, IV, LEAD ATTORNEY, Pirkey Barber, Austin, TX; Felicia J Boyd, Leita Walker, Faegre & Benson LLP, Minneapolis, MN.

For HD Vest Management and Services, LLC, Herb Vest, Defendants: Vic H Henry, LEAD ATTORNEY, Henry Oddo Austin & Fletcher, Dallas, TX; David M Kelly, Julia Anne Matheson, Stephanie H Bald, PRO HAC VICE, Finnegan Henderson Farabow Garrett & Dunner, Washington, DC; Katherine Knight, Henry Oddo Austin & Fletcher PC, Dallas, TX.

**Judges:** Sam A. Lindsay, United States District Judge.

**Opinion by:** Sam A. Lindsay

## Opinion

### MEMORANDUM OPINION AND ORDER

Before the court is Plaintiffs' Motion for Preliminary Injunction, filed March 3, 2009. Having considered the motion, response, reply, appendices submitted by both parties in support of their briefing, record, and applicable law, the court **denies** Plaintiffs' Motion for Preliminary Injunction.

### I. Factual and Procedural Background

This is a trademark infringement action. In 1983, Defendant Herb Darwin Vest ("Mr. Vest") founded a financial services firm called H.D. Vest Investment Securities, now H.D. Vest, Inc. ("H.D. Vest"). H.D. Vest registered the mark "HD Vest Financial Services (R)," which issued on March 25, 1997, for [*2] use with financial investment and insurance services.

In 2001, Mr. Vest sold H.D. Vest to Wells Fargo & Company ("Wells Fargo"). H.D. Vest registered the mark "HDVLINK (R)," which issued on April 16, 2002, for use with the provision of online business and financial information and publications. H.D. Vest continues to provide "tax and financial consulting services to the public." Pl.'s Mot. 1. In connection with the promotion and sale of its services, H.D. Vest uses the following trademarks and service marks: "H.D. Vest," "HD Vest Financial Services (R)," and "HDVLINK (R)" (the "Marks"). H.D. Vest also incorporates these marks in the logos used in its promotional materials. H.D. Vest operates the website _www.hdvest.com_ to promote its services.

Since the sale of H.D. Vest, Mr. Vest formed four limited liability companies in Texas: H.D. Vest Advanced Systems LLC; H.D. Vest Management and Services LLC; H.D. Vest Investigations LLC; and H.D. Vest Interactive Broadcasting LLC.

The first entity, H.D. Vest Advanced Systems LLC, does business as AdShuffle. AdShuffle provides online advertising and marketing services to businesses. All of AdShuffle's promotional literature displays only the "ADSHUFFLE" [*3] mark. AdShuffle operates the website _www.adshuffle.com_. The H.D. Vest Advanced Systems name appears in the copyright notice at the bottom of each page of this website. Also, Mr. Vest's personal biography ("bio") is included on the website,

2009 U.S. Dist. LEXIS 52950, *3

which is accessible through the "Management Team" link on the "about us" page. The only references to H.D. Vest contained in the bio are the description of Mr. Vest as the chairman and founder of H.D. Vest Management and Services LLC ("HDVMS") and a statement that Mr. Vest was the founder and chief executive officer of H.D. Vest Financial Services, which traded under the HDS symbol until it merged with Wells Fargo in 2001. None of these references identifies any services offered by AdShuffle.

The second entity, HDMVS, "provides human resources, personnel placement, IT, and other support services to Mr. Vest's other companies." Defs.' Resp. App. 12. The company does not offer services to the public or operate a website. In connection with the services it provides to Mr. Vest's other companies, HDMVS uses the logo depicted below:

[SEE LOGO IN ORIGINAL]

The third entity, H.D. Vest Investigations LLC, is dedicated to the investigation of the 1946 homicide [*4] of Mr. Vest's father. This entity does not offer any services to the public. The fourth entity, H.D. Vest Interactive Broadcasting LLC, does not currently offer any services.

Mr. Vest also operates a personal website at www.herbvest.com. This website offers information about True, Mr. Vest's online relationship service; Adshuffle; Metric, his interactive marketing service agency; and provides links to these services. There is a link to the HDVMS page on the website, which gives a one-sentence description of HDVMS and provides links to the True, AdShuffle, and Metric Interactive websites. Along with links to Mr. Vest's resume, a book that he wrote, a website with information about his father's death; and a page about meeting his wife, the website also contains a link to an H.D.Vest Financial page. This page describes Wells Fargo's acquisition of H.D. Vest and includes a link to the H.D. Vest website.

In April 2008, Wells Fargo objected to Mr. Vest's use of "H.D. Vest" in the names of his Texas entities. It renewed its objection in August 2008. On October 13, 2008, while attempting to resolve its issues with Mr. Vest and his entities, Wells Fargo became aware that Mr. Vest and HDVMS were [*5] in the process of leasing office space. * On November 3, 2008, Wells

Fargo sent a letter to Mr. Vest, in which it demanded that he "immediately cease and desist from any further use of the H.D. Vest trademark either alone or in connection with any business or corporate name." Defs.' Resp. App. 82. On March 2, 2009, H.D. Vest sued Mr. Vest and HDVMS ("Defendants"). In its Complaint, Plaintiff alleges that Defendants' use of "H.D. Vest," "H.D. Vest Financial," "HDVLINK (R)," "H.D. Vest Management & Services," and the HDVMS acronym, without its consent or authorization, constitutes trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1051, et seq. Plaintiff also alleges a violation of the Texas anti-dilution statute, trademark infringement and unfair competition under the common law, and unjust enrichment.

On March 3, 2009, approximately five months after discovering Defendants' allegedly infringing use, Plaintiff filed a Motion for a Preliminary [*6] Injunction seeking an order from the court to enjoin Defendants from "infringing the H.D.Vest, H.D. Vest Financial Services (R), and HDVLINK (R) marks." Pl.'s Mot. 20.

## II. Applicable Legal Standard

There are four prerequisites for the extraordinary relief of a temporary restraining order or preliminary injunction. To prevail, Plaintiff must demonstrate: (i) a substantial likelihood of success on the merits; (ii) a substantial threat of immediate and irreparable harm, for which he has no adequate remedy at law; (iii) that greater injury will result from denying the temporary restraining order than from granting it; and (iv) that a temporary restraining order will not disserve the public interest. Clark v. Prichard, 812 F.2d 991, 993 (5th Cir. 1987); Canal Auth. of the State of Florida v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974) (en banc). The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted. Mississippi Power and Light Co. v. United Gas Pipeline, 760 F.2d 618, 621 (5th Cir. 1985); Clark, 812 F.2d at 993. Otherwise stated, if a party fails to meet any [*7] of the four requirements, the court cannot grant the temporary restraining order or preliminary injunction.

## III. Discussion

---

* The court infers that Wells Fargo received notice around October 13, 2008, because the press release regarding the

office space lease that is included in Plaintiff's appendix was printed on October 13, 2008.

2009 U.S. Dist. LEXIS 52950, *7

To prevail on its application for a preliminary injunction, Plaintiff must establish each of the required elements herein set forth. Because the court determines that the second element is dispositive, it addresses only whether there is a substantial threat of immediate and irreparable harm.

In support of this element, Plaintiff argues that Defendants' continued use of the Marks is likely to cause confusion among consumers as to the source and affiliation of Defendants' products and services and that "[b]ecause a likelihood of confusion exists, this Court should follow the lead of the Southern District of Texas and presume irreparable harm." Pl.'s Mot. 18. Plaintiff recognizes that the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit") has not adopted this irreparable harm presumption and argues in the alternative that it independently satisfies the irreparable harm requirement.

Plaintiff contends that its harm is imminent because of Defendants' use of the internet to infringe the Marks in "a forum of near-infinite scope and instantaneous speed." **[*8]** *Id.* at 18-19. It also contends that its harm is irreparable because "Defendants' continued infringement threatens to undermine the effectiveness of millions of dollars worth of advertising and years of goodwill." (quotations and alteration omitted) (quoting *Service Merch. Co. v. Service Jewelry Stores, Inc., 737 F.Supp. 983, 990 (S.D. Tex. 1990).* Plaintiff further contends that it has no adequate remedy at law because "money damages in trademark cases are notoriously difficult to calculate, and once calculated relatively ineffective in restoring the injured parties' reputations and the valuable goodwill built up in their marks." *Id.* at 19 (citation omitted).

Defendants respond that Plaintiff's delay in seeking the preliminary injunction "militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." Defs.' Resp. 23 (quotation and citation omitted). The court agrees.

Irreparable harm requires a showing that: (1) the harm to Plaintiff is imminent (2) the injury would be irreparable and (3) that Plaintiff has no other adequate legal remedy. *See Chacon v. Granata, 515 F.2d 922, 925 (5th Cir. 1975).* In the **[*9]** Fifth Circuit, "preliminary injunctions will be denied based on a failure to prove separately each of the four elements of the four prong test for obtaining the injunction." *See GTE Card Servs., Inc. v. AT&T Corp.,* 1997 WL 74712, *2 (N.D. Tex. Feb.

12, 1997) (Fitzwater, J.), *aff'd, 124 F.3d 191* (Table Decision) (5th Cir. 1997) (quoting *Plains Cotton Coop. Ass'n of Lubbock, Tex. v. Goodpasture Computer Serv., Inc., 807 F.2d 1256, 1261 (5th Cir.)* (holding in copyright infringement case that rule of presumed injury upon finding of likelihood of success on the merits is not established in Fifth Circuit, and affirming denial of preliminary injunction where appellant did not persuade district court or circuit court that "any harm stemming from the alleged infringement . . . is not compensable in damages"), *cert. denied,* 484 U.S. 821, 108 S. Ct. 80, 98 L. Ed. 2d 42 (1987)). Similarly, in the context of a claim for trademark infringement under the Lanham Act, the Fifth Circuit has declined to presume the existence of irreparable harm. *Id.* (and cases therein cited ). The Fifth Circuit has stated in a Lanham Act case that "a plaintiff must also show that it will suffer irreparable harm if the injunction is not granted." *Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1390 (5th Cir.1996)* **[*10]** (addressing denial of permanent injunction in Lanham Act *§ 43(a)* claim)).

Assuming without holding that Plaintiff established a substantial likelihood of prevailing on the merits and, in so doing, established the existence of a likelihood of confusion, the court rejects its argument that a substantial threat of irreparable injury is to be presumed in such a case. The Fifth Circuit has not so held, and authority from other district courts is not binding on this court. Also, the court determines that Plaintiff fails to carry its burden of persuasion that its real or threatened injuries cannot be compensated by monetary damages. Plaintiff pointed to no evidence in the record to show a threat of irreparable injury that cannot be adequately compensated by monetary damages. Plaintiff merely states, based on language it quotes from cases decided by other district courts, that its harm is imminent because of Defendants' use of the internet; its harm is irreparable because Defendants' continued infringement threatens to "undermine the effectiveness of millions of dollars worth of advertising and years of goodwill;" and that it has no adequate remedy at law because money damages are difficult **[*11]** to calculate in trademark cases and relatively ineffective in restoring the reputation and goodwill attained in its marks. Such statements, however, are not evidence. Plaintiff fails to show specifically how Defendants' use of the internet makes its harm imminent, especially in light of its five-month delay in seeking injunctive relief, as fully discussed below. Plaintiff also fails to establish how Defendants' alleged infringement undermines its investment in advertising or its goodwill. Plaintiff further fails to show specifically why its injury cannot be

2009 U.S. Dist. LEXIS 52950, *11

compensated by money damages.

Moreover, even if the Fifth Circuit were to entertain a presumption of irreparable harm under the circumstances presented in this case, the court agrees with Defendants' argument that Plaintiffs' delay in seeking a preliminary injunction rebuts any presumption of irreparable harm. The law is well-established that:

> [D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive [*12] relief. Evidence of an undue delay in bringing suit may be sufficient to rebut the presumption of irreparable harm.

*Wireless Agents, L.L.C. v. T-Mobile USA, Inc., 2006 U.S. Dist. LEXIS 36590, 2006 WL 1540587, *3 (N.D. Tex. June 6, 2006)* (Fitzwater, J.) (internal citations and punctuation omitted). Although Plaintiff first learned of the alleged infringing conduct around October 13, 2008, it did not file the present motion seeking injunctive relief until March 3, 2009, almost five months later. Based on these facts, the court determines that Plaintiff's undue delay is sufficient to rebut a presumption of irreparable harm. *See generally Tough Traveler v. Outbound Prods., 60 F.3d 964, 968 (2nd Cir. 1995)* (vacating preliminary injunction where movant waited four months to seek a preliminary injunction after filing suit); *Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2nd Cir. 1985)* (ten-week delay in seeking injunction for trademark infringement undercut claim of irreparable harm); *Boire v. Pilot Freight Carriers, Inc., 515 F.2d 1185, 1193 (5th Cir. 1975)* (affirming district court's denial of temporary injunctive relief where movant, among other things, delayed three months in making its request).

**IV. Conclusion**

For [*13] the reasons set forth above, the court **denies** Plaintiffs' Motion for Preliminary Injunction. As set forth above, Plaintiff fails to demonstrate that it will suffer immediate and irreparable injury for which it has no adequate remedy at law and therefore fails to satisfy each element required to prevail on its application for a preliminary injunction.

**It is so ordered** this 23rd day of June, 2009.

/s/ Sam A. Lindsay

Sam A. Lindsay

United States District Judge

Ɛnd of Document

# Exhibit 55

NJAPP0609

 Positive
As of: July 19, 2018 8:17 PM Z

## _Innovation Ventures, LLC v. Ultimate Lifestyles, LLC_

United States District Court for the Eastern District of Texas, Sherman Division

March 13, 2009, Decided; March 16, 2009, Filed

CIVIL ACTION NO. 4:08-CV-232

**Reporter**
2009 U.S. Dist. LEXIS 132724 *

INNOVATION VENTURES, LLC D/B/A LIVING ESSENTIALS, Plaintiff, v. ULTIMATE LIFESTYLES, LLC AND CUSTOM NUTRITION LABORATORIES, LLC, Defendants.

**Subsequent History:** Adopted by, Injunction denied by, Objection overruled by _Innovation Ventures, LLC v. Ultimate Lifestyles, LLC, 2009 U.S. Dist. LEXIS 44448 (E.D. Tex., May 26, 2009)_

**Prior History:** _Innovation Ventures, LLC v. Ultimate Lifestyles, LLC, 2008 U.S. Dist. LEXIS 62227 (E.D. Tex., Aug. 14, 2008)_

## Core Terms

drink, energy, manufacturing, irreparable harm, preliminary injunction, recommendations, non-compete, injunctive relief, injunction, presenting evidence, argues, merits

**Counsel:** [*1] Debra Hankinson, Mediator, Pro se, Dallas, TX.

For Innovation Ventures LLC, doing business as Living Essentials, Plaintiff: Howard Louis Close, LEAD ATTORNEY, Wright Brown & Close LLP, Houston, TX; Darin Michael Klemchuk, Klemchuk Kubasta, LLP - Dallas, Dallas, TX; Harvey G Brown , Jr, Patrick Boone McAndrew, Thomas Clark Wright, Wright & Close LLP, Houston, TX; James Joseph Doyle , III, Patrick William Powers, Powers Taylor LLP - Dallas, Dallas, TX; Michelle M Wezner, PRO HAC VICE, Howard & Howard, Bloomheld Hills, MI; Patrick M McCarthy, PRO HAC VICE, Howard & Howard Attorneys PC, Ann Arbor, MI.

For Ultimate Lifestyles LLC, Custom Nutrition Laboratories LLC, Defendants, Counter Claimants: Baxter Ward Banowsky, Scott Doulgas Levine, Banowsky & Levine, P.C., Dallas, TX; Kurt Compton Banowsky, City of Garland, Garland, TX.

For Alan Jones, Mike Norwood, Defendants, Counter Claimants: Baxter Ward Banowsky, LEAD ATTORNEY, Banowsky & Levine, P.C., Dallas, TX; Kurt Compton Banowsky, City of Garland, Garland, TX.

For Innovation Ventures LLC, Counter Defendant: Howard Louis Close, Wright Brown & Close LLP, Houston, TX.

For Innovation Ventures LLC, Counter Defendant: Howard Louis Close, LEAD ATTORNEY, [*2] Howard Louis Close, Wright Brown & Close LLP, Houston, TX; Darin Michael Klemchuk, Klemchuk Kubasta, LLP - Dallas, Dallas, TX; Harvey G Brown , Jr, Patrick Boone McAndrew, Thomas Clark Wright, Wright & Close LLP, Houston, TX; James Joseph Doyle , III, Patrick William Powers, Powers Taylor LLP - Dallas, Dallas, TX; Michelle M Wezner, Howard & Howard, Bloomheld Hills, MI; Patrick M McCarthy, Howard & Howard Attorneys PC, Ann Arbor, MI.

**Judges:** DON D. BUSH, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** DON D. BUSH

## Opinion

### REPORT AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE REGARDING PLAINTIFF'S APPLICATION FOR SECOND PRELIMINARY INJUNCTION

On February 25, 2009, the Court held a hearing on Plaintiff Living Essentials' Application for Second Preliminary Injunction (Dkt. 58). After having heard the arguments of counsel and evidence presented and as stated on the record at the hearing, the Court recommends the motion be DENIED.

2009 U.S. Dist. LEXIS 132724, *2

## BACKGROUND

Plaintiff sells a two-fluid-ounce liquid energy supplement called "5-hour Energy." Defendant Custom Nutrition Laboratories, CNL, was a former contract packager of the energy drink which manufactured and packaged the drink for Plaintiff. Defendant Ultimate Lifestyles is also apparently **[*3]** in the business of selling its own nutritional and energy-related products.

In prior injunction proceedings before this Court, Plaintiff alleged that Defendants have either manufactured, marketed, distributed, offered to sell, and/or sold through unauthorized channels adulterated or counterfeit bottles of Plaintiff's energy drink. The Court subsequently entered an preliminary injunction order restraining Defendants from manufacturing, selling or marketing any goods bearing the trademark "5 Hour Energy" and from using Living Essentials' 5 Hour Energy trademark and packaging trade dress, including labels, to market, sell, advertise, or identify nutritional energy products, liquid energy supplements, dietary supplements, or any other related goods or services.

Plaintiff seeks a second preliminary injunction order. In this motion, Plaintiff claims that Defendant is selling its own 2-ounce energy drink, "6 Hour Mini Thin Rush," in violation of the non-compete provision within the manufacturing agreement between Plaintiff and Defendant.

The manufacturing agreement contains the following provision:

### Non-Compete —

During the Term of this Agreement and for a period of three years immediately following **[*4]** any termination by either party, CNL agrees that it will not manufacture or formulate any liquid Energy Drink in 2 fluid ounce packaging, excluding those required by CNL's current customer base (Appendix A) or for sale through the Network Marketing Channel (Network Marketing is defined as businesses retailing products by using independent distributors and allowing these distributors to build and manage their own sales force by recruiting, motivating, supplying, and training others to sell their products.)

Plaintiff argues that it terminated the manufacturing agreement in 2007 because Defendant's sale of a competing product constituted a breach of the agreement. Defendant argues that Plaintiff failed to provide written notice of the alleged breach and was not given the opportunity to cure it. Defendant further argues that CNL has not agreed to terminate the 2007 manufacturing agreement, that it was Plaintiff, not CNL, who breached the agreement, and that the adjudication of any issues related to the breach of the manufacturing agreement is properly the subject of a state court action (filed prior to the date of the filing of this action) currently pending in Dallas County court. [1] As **[*5]** to the allegations regarding the sale of the competing 6-hour energy drink, Defendant claims that it is merely a contract manufacturer of the drink for a third party distributor, not a party to this suit, called Body Dynamics, Inc., or BDI.

## STANDARD

Under _Rule 65 of the Federal Rules of Civil Procedure_, "[e]very order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail ... the act or acts sought to be restrained...." _Fed. R. Civ. P. 65(d)_. Plaintiffs seeking injunctive relief must show:

(1) a substantial likelihood of success on the merits,
(2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted,

(3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and

(4) that the injunction will not disserve the public interest.

_Nichols v. Alcatel USA, Inc., 532 F.3d 364, 372 (5th Cir. 2008)_.

Having heard the evidence presented **[*6]** at the injunction hearing, the Court finds Plaintiff has not made a satisfactory showing for injunctive relief under _Rule 65_ and governing authorities. Specifically, the Court finds that Plaintiff did not show the irreparable harm it would suffer if the Court does not enjoin the sale of the 6-hour energy drink. A showing of a _possibility_ of irreparable harm is not enough; the threat of irreparable harm must

---

[1] Plaintiff also filed suit against Defendant in the United States District Court for the Eastern District of Michigan, but that suit was dismissed in favor of the prior filed Texas action.

be *likely*. <u>Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 129 S. Ct. 365, 375, 172 L. Ed. 2d 249 (2008)</u>.

Despite Plaintiff's arguments, the Court is not convinced the sale of the 6-hour drink will likely result in irreparable harm to Plaintiff. Although Plaintiff's representative testified that it would be difficult to calculate the economic profit to Defendant from the sale of the drinks since Defendant was not the ultimate seller of the product to the consumer, difficulty in calculating damages is not enough to show irreparable harm. "An injury is 'irreparable' only if it cannot be undone through monetary remedies." <u>Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. 1981)</u>. Here, Plaintiff did not show that the sale of the 6-ounce drink would result in loss of good will, business [*7] reputation, or some other intangible infringement. The Court finds that, absent any additional showing by Plaintiff as to the threatened harm, monetary damages would remedy any harm done by the sale of the competing drink.

Moreover, the Court notes that Plaintiff appears to have delayed in seeking the injunctive relief it seeks. As noted by one court:

> [D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief. Evidence of an undue delay in bringing suit may be sufficient to rebut the presumption of irreparable harm.

<u>GoNannies, Inc. v. GoAuPair.com, Inc., 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006)</u>. According to the testimony before the Court, it appears Plaintiff has been aware of the sale of the 6-hour energy drink since at least March 2008, yet, this injunction motion was not filed until December 23, 2008 - 9 months after learning of the sale and more than 5 months after Plaintiff's first request for injunctive relief. The Court finds that Plaintiff's [*8] second request for injunctive relief fails to indicate any urgency or threatened irreparable harm. For that reason, the motion should be denied.

Further, the Court finds that, even had Plaintiff adequately demonstrated the irreparable harm that threatens it, Plaintiff did not satisfy its burden in showing likelihood of success on the merits. Primarily, as the Court expressed on the record at the hearing, the underlying contract dispute is currently pending before

the state court. While the Court will not totally abate this case in deference to the state court matter, the Court notes that — as to the enforcement of the non-compete provision specifically — that issue is likely squarely within the purview of the state court and should not be resolved here.

Nonetheless, Plaintiff failed to show, with the evidence presented to the Court at the preliminary injunction hearing, a likelihood of success on the merits in enforcing the non-compete provisions. Plaintiff argues that, by its own terms, the parties' manufacturing agreement is governed by Michigan law. [2] Under Michigan law, "the enforceability of non-competition agreements depends on their reasonableness." <u>St Clair Med., P.C. v. Borgiel, 270 Mich. App. 260, 715 N.W.2d 914, 918 (Mich. Ct. App. 2006)</u>; [*9] *see also* <u>Coates v. Bastian Bros., Inc., 276 Mich. App. 498, 741 N.W.2d 539, 545-47 (Mich. Ct. App. 2007)</u>. In evaluating a non-competition clause for reasonableness, a court will look at the clause's duration, geographic scope, and the competitive business interests justifying the clause. *See, e.g.,* <u>St. Clair Med., 715 N.W.2d at 919</u>; <u>Whirlpool Corp. v. Burns, 457 F. Supp. 2d 806, 812 (W.D. Mich. 2006)</u>; *see also* <u>Mich. Comp. Laws § 445.774a(1)</u>.

The evidence presented at the hearing did not show that Plaintiff would likely succeed in showing that the non-compete provision in the manufacturing agreement was reasonable. There is clearly much dispute as to who terminated or breached the manufacturing agreement and the reasons for doing so, calling [*10] into question Plaintiff's ability to enforce the clause. Moreover, the witnesses could not offer any explanation as to the meaning of the term "Energy Drink" in the clause, and the scope of the provision remains ambiguous to the Court, even after hearing evidence. Apparently, there are numerous 2-ounce drinks made by at least 120 other manufacturers, some of which Plaintiff states would qualify as an "Energy Drink," and others, such as one for sexual enhancement, which Plaintiff states would not.

And, while the fact that the clause does not contain a

---

[2] The Court has applied Michigan law to the facts before it since this is what Plaintiff argues here, and the Court is evaluating the facts in the light most favorable to Plaintiff. This report and recommendations shall not be construed as a ruling on the merits of Plaintiff's choice of law argument. Moreover, the Court finds, having heard the evidence, that Plaintiff did not show the likelihood of success on the merits even if Texas law regarding non-competes were applied.

NJAPP0612

2009 U.S. Dist. LEXIS 132724, *10

restriction on geographic scope does not as a matter of law make it unreasonable under Michigan law, the evidence presented by Plaintiff did not show that Plaintiff would succeed in proving that the lack of geographic restrictions was reasonable here. In Michigan, "[g]eographic limitations in non-competition agreements must be tailored so that the scope of the agreement is no greater than is reasonably necessary to protect the employer's legitimate business interests." _Whirlpool Corp. v. Burns, 457 F. Supp.2d 806, 813 (W.D. Mich. 2006)_. The Court finds that Plaintiff did not adequately show how the non-compete provision, as applied to 2-ounce **[*11]** energy drinks, was limited in scope and construction to Plaintiff's reasonable competitive business interests. "Michigan law is clear that the burden of demonstrating the validity of the agreement is on the party seeking enforcement." _Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d 535, 546 (5th Cir. 2007)_. Having heard the testimony and considered the evidence presented, the Court finds that Plaintiff did not satisfy its burden in showing that it would likely succeed in its enforcement of the non-compete provision.

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." _Winter, 555 U.S. 7, 129 S. Ct. 365, 376, 172 L. Ed. 2d 249 (2008)_ (citing _Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed.2d 162 (1997)_ (per curiam)). Plaintiff has simply not made such a showing here to justify the extraordinary relief it requests. Therefore, the motion should be DENIED.

## Recommendation

Based on the foregoing, the Court recommends that Plaintiff Living Essentials' Application for Second Preliminary Injunction (Dkt. 58) be DENIED.

Within ten (10) days after service of the magistrate judge's report, any party **[*12]** may serve and file written objections to the findings and recommendations of the magistrate judge. _28 U.S.C.A. § 636(b)(1)(C)._

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from _de novo_ review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice.

_Thomas v. Arn, 474 U.S. 140, 148, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985)_; _Rodriguez v. Bowen, 857 F.2d 275, 276-77 (5th Cir. 1988)_.

**SIGNED this 13th day of March, 2009.**

/s/ Don D. Bush

DON D. BUSH

UNITED STATES MAGISTRATE JUDGE

End of Document

# Exhibit 56

NJAPP0614

 Positive
As of: July 19, 2018 8:18 PM Z

## *Rimkus Consulting Group, Inc. v. Cammarata*

United States District Court for the Southern District of Texas, Houston Division

August 13, 2008, Decided; August 13, 2008, Filed

CIVIL ACTION NO. H-07-0405

**Reporter**
255 F.R.D. 417 *; 2008 U.S. Dist. LEXIS 61791 **; 28 I.E.R. Cas. (BNA) 345

RIMKUS CONSULTING GROUP, INC., Plaintiff, v. NICKIE G. CAMMARATA, Defendant.

**Subsequent History:** Motion granted by *Rimkus Consulting Group, Inc. v. Cammarata, 2008 U.S. Dist. LEXIS 100498 (S.D. Tex., Dec. 12, 2008)*

Reconsideration denied by, Motion granted by, Motion denied by *Rimkus Consulting Group, Inc. v. Cammarata, 257 F.R.D. 127, 2009 U.S. Dist. LEXIS 23259 (S.D. Tex., 2009)*

**Prior History:** *Rimkus Consulting Group, Inc. v. Cammarata, 2007 U.S. Dist. LEXIS 87807 (S.D. Tex., Nov. 29, 2007)*

## Core Terms

Forensic, covenant, parties, nonsolicitation, confidential, noncompetition, trade secret, enforceable, customers, employment agreement, proprietary, provisions, business plan, choice-of-law, solicit, preliminary injunction, compete, unenforceable, Company's, database, format, confidential information, pet, noncompete covenant, annually, engineering, price information, termination, employees, geographic area

## Case Summary

### Procedural Posture
Plaintiff former employer sought preliminary injunctive relief against defendants, a former employee and his new firm, to enforce noncompetition and nonsolicitation covenants in an employment agreement and to enjoin the use or disclosure of trade secrets and confidential information. The employee argued a Louisiana state court previously found that Louisiana law applied to the agreement and that under Louisiana law, the covenants were invalid.

### Overview
The Louisiana ruling, that in Louisiana the contractual forum-selection (Texas), choice-of-law (Texas), and covenant provisions were unenforceable, was preclusive. Whether or not the ruling was entitled to preclusive effect in Texas, injunctive relief was not proper. While the choice-of-law provision would be enforceable outside Louisiana, because the agreement covered many areas where the employee had not worked for the employer, under Texas law the noncompetition clause was geographically too broad under *Tex. Bus. & Com. Code Ann. § 15.50*. And, the delay in seeking an injunction weighed against any irreparable injury. Suit was not filed until a year after the employee left and the covenants' time periods expired while it was pending. An extension was not necessary since any secret information was outdated and could not provide an unfair advantage. The nonsolicitation covenant was unreasonable because it applied to all the employer's customers, and the employee had solicited few clients, and no other employees, outside Louisiana. There was no evidence defendants used any trade secrets or that the new firm's growth was due to such use instead of the growth of the industry.

### Outcome
The employer's request for a preliminary injunction was denied.

## LexisNexis® Headnotes

Civil Procedure > ... > Preclusion of Judgments > Full Faith & Credit > Full Faith & Credit Statutes

255 F.R.D. 417, *417; 2008 U.S. Dist. LEXIS 61791, **61791

Civil Procedure > ... > Preclusion of
Judgments > Full Faith & Credit > General Overview

*HN1*[⬇] **Full Faith & Credit, Full Faith & Credit Statutes**

The _Full Faith and Credit Clause of the United States Constitution_ and its implementing statute, _28 U.S.C.S. § 1738_, govern the preclusive effect of a state-court judgment in a subsequent federal action. Final judgments of state courts have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory, or Possession from which they are taken. _28 U.S.C.S. § 1738_. Under Full Faith and Credit, a final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land. For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains nationwide force.

Civil Procedure > ... > Preclusion of
Judgments > Full Faith & Credit > General Overview

*HN2*[⬇] **Preclusion of Judgments, Full Faith & Credit**

See _U.S. Const. art IV, § 1_.

Civil Procedure > ... > Preclusion of
Judgments > Full Faith & Credit > Full Faith & Credit Statutes

*HN3*[⬇] **Full Faith & Credit, Full Faith & Credit Statutes**

See _28 U.S.C.S. § 1738_.

Civil Procedure > ... > Preclusion of
Judgments > Full Faith & Credit > Full Faith & Credit Statutes

Civil Procedure > ... > Preclusion of
Judgments > Full Faith & Credit > General Overview

*HN4*[⬇] **Full Faith & Credit, Full Faith & Credit Statutes**

A federal court applies the rendering state's preclusion law to determine whether to accord a state court's final judgment preclusive effect. _28 U.S.C.S. § 1738_. This rule applies even if the rendering state's judgment is based on public policy offensive to the enforcing state. Because enforcing states decide the scope of a judgment, a rendering state can determine the extraterritorial effect of its judgment only indirectly by prescribing the effect of its judgments within the State. To vest the power of determining the extraterritorial effect of a State's own judgments in the State itself risks the very kind of parochial entrenchment on the interests of other States that it was the purpose of the _Full Faith and Credit Clause_ and other provisions of U.S. Const. art. IV to prevent.

Civil Procedure > Judgments > Preclusion of
Judgments > Res Judicata

*HN5*[⬇] **Preclusion of Judgments, Res Judicata**

Under Louisiana law, the doctrine of res judicata precludes subsequent litigation when all of the following are satisfied: (1) the judgment is valid; (2) the judgment is final; (3) the parties in the two matters are the same; (4) the cause or causes of action asserted in the second suit existed at the time of the final judgment in the first litigation; and (5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation. A final judgment is conclusive, in any subsequent action between the plaintiff and the defendant, with respect to any issue actually litigated and determined if its determination was essential to that judgment. _La. Rev. Stat. Ann. § 13:4231_ (2006).

Civil Procedure > ... > Preclusion of
Judgments > Estoppel > Collateral Estoppel

Civil Procedure > Judgments > Preclusion of
Judgments > Res Judicata

*HN6*[⬇] **Estoppel, Collateral Estoppel**

Louisiana cases on preclusion emphasize that the issue in the rendering court and the later court must be identical.

Civil Procedure > ... > Federal & State

255 F.R.D. 417, *417; 2008 U.S. Dist. LEXIS 61791, **61791

Interrelationships > Choice of Law > Forum & Place

### HN7[⬇] Choice of Law, Forum & Place

In diversity cases, district courts apply the choice-of-law rules of the forum state.

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > Forum & Place

### HN8[⬇] Choice of Law, Forum & Place

Texas determines the enforceability of choice-of-law provisions under the following rules: (1) the law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue; (2) the law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which would be the state of the applicable law in the absence of an effective choice of law by the parties; and (3) in the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > Forum & Place

### HN9[⬇] Choice of Law, Forum & Place

The parties' contractual choice of Texas law in a contract controls unless (1) Texas has no substantial relationship to the parties or the transaction, or (2) another state has a materially greater interest than Texas in the enforceability of the agreement, and that state's law would apply in the absence of an effective choice of law by the parties.

Civil Procedure > ... > Federal & State

Interrelationships > Choice of Law > General Overview

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > Significant Relationships

### HN10[⬇] Federal & State Interrelationships, Choice of Law

The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under certain principles. In the absence of an effective choice of law by the parties, the contacts to be taken into account in applying the principles to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation, and place of business of the parties. These contacts are to be evaluated according to their relative importance with respect to the particular issue. If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided by other considerations.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > General Overview

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

### HN11[⬇] Injunctions, Grounds for Injunctions

To obtain a preliminary injunction, a plaintiff must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat that the plaintiff will suffer irreparable harm if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest. A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiff has clearly carried the burden of persuasion on all four requirements. An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard.

Case 1:18-cv-00068   Document 215-1   Filed on 07/21/18 in TXSD   Page 623 of 666

Page 4 of 26

255 F.R.D. 417, *417; 2008 U.S. Dist. LEXIS 61791, **61791

A plaintiff seeking a preliminary, as opposed to a permanent, injunction must show that the irreparable injury will occur during the pendency of the litigation unless the preliminary injunction issues.

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN12*[🔽]  **Trade Secrets & Unfair Competition, Noncompetition & Nondisclosure Agreements**

Under Texas law, a noncompetition covenant is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee. *Tex. Bus. & Com. Code Ann. § 15.50.* For a noncompetition covenant to be ancillary to or part of an otherwise enforceable agreement, the employer must establish that: (1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; and (2) the covenant must be designed to enforce the employee's consideration or return promise for the otherwise enforceable agreement. An agreement must give rise to an interest worthy of protection by a noncompetition covenant, such as business goodwill and confidential or proprietary information. An employer's promise to provide an employee with confidential or proprietary information and an employee's reciprocal promise not to disclose such confidential information would meet the requirement that the covenant be designed to enforce the employee's consideration provided in the agreement.

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN13*[🔽]  **Employment  Relationships,  At  Will**

**Employment**

In cases involving at-will employment in which the employer is at liberty to fire the employee before providing the promised confidential or proprietary information, the Texas Supreme Court has held that a noncompetition covenant becomes enforceable if, after the employment agreement is made, the employer performs its promise under the agreement and a unilateral contract is formed and all other requirements under the Covenants Not to Compete Act are met.

Labor & Employment Law > Employment Relationships > At Will Employment > General Overview

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN14*[🔽]  **Employment Relationships, At Will Employment**

An employer's promise to provide confidential or proprietary information can support an enforceable noncompetition covenant because such a promise does give rise to the employer's interest in restraining the employee from competing. In an at-will employment relationship, the employer's promise to provide confidential or proprietary information is executory -- and an employees' promise not to compete is unenforceable -- until the employer performs by providing the promised information.

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN15*[🔽]  **Trade Secrets & Unfair Competition, Noncompetition & Nondisclosure Agreements**

Texas courts have found that noncompetition covenants that cover areas where the employee did not actually work or clients whom the employee did not actually serve during his employment are overbroad and unenforceable.

255 F.R.D. 417, *417; 2008 U.S. Dist. LEXIS 61791, **61791

Contracts Law > Remedies > Reformation

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN16*[🔽] **Remedies, Reformation**

Instead of invalidating overbroad covenants not to compete, Texas courts attempt to reform the unenforceable provisions to make them reasonable as to time, geographical area, or scope of activity to be restrained.

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Noncompetition & Nondisclosure Agreements

*HN17*[🔽] **Trade Secrets & Unfair Competition, Noncompetition & Nondisclosure Agreements**

Texas courts have upheld covenants restricting competition for periods between one and two years, but only if the evidence showed a need for such a lengthy period.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

*HN18*[🔽] **Grounds for Injunctions, Irreparable Harm**

Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief. Evidence of an undue delay in bringing suit may be sufficient to rebut the presumption of irreparable harm.

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Customers of Former Employer

*HN19*[🔽] **Trade Secrets & Unfair Competition, Customers of Former Employer**

A nonsolicitation covenant in an employment contract is a restraint on trade and competition and must meet the criteria of *Tex. Bus. & Com. Code Ann. § 15.50* to be enforceable. Nonsolicitation covenants will be enforceable if they are ancillary to or part of an otherwise enforceable agreement at the time the agreement and contain reasonable limitations as to time, geographical area, and scope of activity to be restrained that do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee. *Tex. Bus. & Com. Code Ann. § 15.50*.

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Customers of Former Employer

*HN20*[🔽] **Trade Secrets & Unfair Competition, Customers of Former Employer**

Texas courts have held that nonsolicitation covenants that cover clients with whom the employee had no contact while working for the employer are overbroad and not reasonably necessary to protect the employer's legitimate business interest in maintaining its client base.

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets

*HN21*[🔽] **Trade Secrets & Unfair Competition, Trade Secrets**

To state a claim for trade secret misappropriation under Texas law, a plaintiff must (1) establish that a trade secret existed; (2) demonstrate that the trade secret was acquired by the defendant through a breach of a confidential relationship or discovered by improper means; and (3) show that the defendant used the trade secret without authorization from the plaintiff.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Likelihood of Success

Labor & Employment Law > ... > Conditions &

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Customers of Former Employer

255 F.R.D. 417, *417; 2008 U.S. Dist. LEXIS 61791, **61791

Terms > Trade Secrets & Unfair Competition > Trade Secrets

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

*HN22*[🔽]  **Grounds for Injunctions, Likelihood of Success**

At the preliminary injunction stage on a claim for trade secret misappropriation, the trial court determines whether the applicant for preliminary injunction has established that the information is entitled to trade secret protection until a trial on the merits. A preliminary injunction applicant meets its burden by showing a probability of success in proving that its confidential information is entitled to trade secret protection.

Evidence > Burdens of Proof > Allocation

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets

*HN23*[🔽]  **Burdens of Proof, Allocation**

The Texas Supreme Court has stated that a trade secret is any formula, pattern, device, or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it. To determine whether there is a trade secret protected from disclosure or use, a court must examine six relevant but nonexclusive criteria: (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Although the party claiming a trade secret need not satisfy all six factors because trade secrets do not fit neatly into each factor every time, it is the burden of the party claiming secrecy status to prove secrecy.

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair

Competition > Trade Secrets

*HN24*[🔽]  **Trade Secrets & Unfair Competition, Trade Secrets**

Customer lists, pricing information, client information, customer preferences, buyer contacts, and marketing strategies have all been recognized as trade secrets.

Labor & Employment Law > ... > Conditions & Terms > Trade Secrets & Unfair Competition > Trade Secrets

*HN25*[🔽]  **Trade Secrets & Unfair Competition, Trade Secrets**

The obligation not to use confidential or proprietary information acquired during an employment relationship in a manner adverse to the employer does not bar a former employee from using the general knowledge, skill, and experience that the employee acquired during the employment to compete with the employer.

Civil Procedure > ... > Pleadings > Counterclaims > Compulsory Counterclaims

*HN26*[🔽]  **Counterclaims, Compulsory Counterclaims**

Under *Fed. R. Civ. P. 13*, a party must state compulsory counterclaims in the party's pleading.

**Counsel:** [**1] For Rimkus Consulting Group Inc, Plaintiff: David Allen Ward, Jr, The Ward Law Firm, The Woodlands, TX.

For Nickie G Cammarata, U.S. Forensic, LLC, Defendants: Larry E Demmons, LEAD ATTORNEY, Taggart Morton Ogden Staub, New Orleans, LA; Jonathan M Pierce, Conley Rose PC, Houston, TX.

For Nickie G Cammarata, Counter Claimant: Larry E Demmons, LEAD ATTORNEY, Taggart Morton Ogden Staub, New Orleans, LA; Jonathan M Pierce, Conley Rose PC, Houston, TX.

For Rimkus Consulting Group Inc, Counter Defendant: David Allen Ward, Jr, The Ward Law Firm, The Woodlands, TX.

**Judges:** Lee H. Rosenthal, United States District

255 F.R.D. 417, *417; 2008 U.S. Dist. LEXIS 61791, **1

Judge.

**Opinion by:** Lee H. Rosenthal

# Opinion

### [*421] MEMORANDUM AND OPINION

On January 30, 2007, Rimkus Consulting Group, Inc. ("Rimkus") sued Nickie G. Cammarata seeking to enforce noncompetition and nonsolicitation covenants in an employment agreement Cammarata signed and to enjoin him from using or disclosing trade secrets and confidential information. This suit was filed after Cammarata had sued Rimkus in Louisiana seeking a declaratory judgment that the noncompetition and nonsolicitation provisions in the employment agreement were invalid. The employment agreement specified that Texas law applied; Cammarata lived in Louisiana [**2] and primarily worked in Louisiana. Under Louisiana law, noncompetition and nonsolicitation covenants are generally unenforceable as against that forum's public policy, as are forum-selection and choice-of-law clauses in employment agreements. On July 26, 2007, the Louisiana state court granted Cammarata's motion for partial summary judgment, concluding that Louisiana law rather than Texas law applied to the agreement and "that, pursuant to Louisiana law, the covenant not to compete clauses contained in Paragraphs 8(a) and the non-solicitation of customer(s) clauses contained in Paragraphs 8(c) of the respective contracts are invalid and unenforceable." (Docket Entry No. 71, Ex. H). On February 6, 2008, Rimkus filed an amended complaint in this federal suit to add U.S. Forensic, Cammarata's new employer, as a defendant. (Docket Entry No. 81). On April 21, 2008, Cammarata counterclaimed, asserting that Rimkus violated the Texas Business and Commerce Code by seeking to enforce the noncompetition and nonsolicitation covenants knowing that they were unreasonably broad. (Docket Entry No. 125).

This court held a three-day hearing on Rimkus's preliminary injunction application. (Docket Entry [**3] Nos. 126, 130, 139, 143, 147). The following motions are pending in addition to Rimkus's preliminary injunction application:

. Cammarata has filed two motions to dismiss Rimkus's claims for breach of the noncompetition and nonsolicitation provisions on the basis of the preclusive effect of the Louisiana state court's ruling. (Docket Entry Nos. 71, 105). Rimkus has responded, (Docket Entry Nos. 78, 113); Cammarata has replied, (Docket Entry No. 79); and Rimkus has surreplied (Docket Entry No. 80). Cammarata has filed supplemental briefs, (Docket Entry Nos. 104, 112, 144, 152), and Rimkus has [*422] filed a supplemental brief, (Docket Entry No. 142).

. Rimkus has moved to strike certain exhibits on Cammarata's exhibit list. (Docket Entry No. 131).

. Rimkus has moved to strike two witnesses on Cammarata's witness list. (Docket Entry No. 132).

. Rimkus has moved for default judgment against U.S. Forensic. (Docket Entry No. 127).

. Rimkus has moved for attorneys' fees incurred in attending an October 12, 2007 mediation. (Docket Entry No. 39). Cammarata has responded, (Docket Entry No. 41), and Rimkus has replied, (Docket Entry No. 43).

. Rimkus has moved to strike Cammarata's counterclaim as untimely. [**4] (Docket Entry No. 128). Cammarata has responded. (Docket Entry No. 148).

Based on a careful review of the preliminary injunction request, the parties' submissions and briefs, the arguments of counsel, the record, and the applicable law, this court denies Rimkus's request for a preliminary injunction. Cammarata's motions to dismiss Rimkus's claims are denied as moot. Rimkus's motions to strike are denied as moot. Rimkus's motion for default judgment is denied. Rimkus's motion for attorney's fees is denied. Rimkus's motion to strike Cammarata's counterclaim as untimely is granted. The reasons for these rulings are set out below.

## I. The Evidence in the Preliminary Injunction Hearing

Rimkus presented testimony from Ralph Graham and Curtis Brown, both senior vice-presidents of Rimkus Consulting Group, Inc. Cammarata testified, as did Gary Bell, another ex-Rimkus employee and a cofounder with Cammarata of U.S. Forensic.

### A. The Parties

Rimkus, a Texas company with its principal place of business in Houston, Texas, is a forensic engineering contractor. Forensic engineering is a specialized area of

255 F.R.D. 417, *422; 2008 U.S. Dist. LEXIS 61791, **4

engineering. Rimkus has been in existence since 1983, one of the earliest firms to offer such forensic [**5] engineering contract work. Rimkus now has 30 offices in 18 states and performs forensic engineering services across the country. Rimkus analyzes unexpected accidents and occurrences that cause damage to people or property, generally for use in insurance disputes or litigation. Rimkus's work covers a broad range of property damage, including foundation and roof damage, fire damage, storm, wind, and hail damage, plumbing leaks, mold evaluation, and construction-defect analysis. Rimkus also works on industrial and vehicle accidents. Rimkus's work is primarily used in insurance and liability claims, disputes, and litigation. According to the evidence at the hearing, competition among forensic engineering firms is based primarily on price.

Cammarata is a Louisiana resident with a bachelor of science degree in civil engineering. In October 1996, Rimkus hired Cammarata as a full-time salaried employee to provide forensic engineering services. Cammarata was hired at Rimkus's office in Houston, Texas, where he signed an Employment Agreement with Rimkus. Cammarata worked for Rimkus Consulting Group of Louisiana ("RCGL"), which Rimkus formed as a wholly owned subsidiary because Louisiana regulations [**6] about performing engineering services in that state required the formation of a separate company. Cammarata worked in RCGL's Metairie, Louisiana office. Cammarata received his paycheck and W-2 forms from RCGL but was provided access to Rimkus customer information, Rimkus business plans, and Rimkus operations information. Cammarata worked on civil engineering aspects of property damage claims. He did not work on personal injury claims, vehicle accidents, or industrial accidents. When he left Rimkus, Cammarata was the central region property manager. His geographic area of responsibility covered the central region from Louisiana to the Canadian border.

Cammarata resigned from Rimkus on November 15, 2006. With two other former Rimkus employees who worked at RCGL in Louisiana, Gary Bell and Mike DeHarde, Cammarata created and immediately began to work for U.S. Forensic. Like Rimkus, [*423] U.S. Forensic provides investigative and forensic services, primarily to determine the cause, origin, and extent of losses from failures and accidents. The parties do not dispute that U.S. Forensic competes with Rimkus in providing investigative and forensic engineering services, although U.S. Forensic does [**7] not offer as broad a range of services as Rimkus. U.S. Forensic

currently has offices in Louisiana, Mississippi, and Florida and employs engineers registered in twenty states. The majority of U.S. Forensic's clients are in Louisiana and the majority of the company's work is performed in that state.

Although Rimkus attempted to show that Cammarata and the other employees who left to found U.S. Forensic were competing against Rimkus even before they left, the evidence does not support that contention. Cammarata, Bell, and DeHarde were planning to leave and were setting up U.S. Forensic before they left their jobs with Rimkus. However, there is no evidence that Cammarata or the cofounders of U.S. Forensic actually began competing with Rimkus before they resigned.

**B. The Employment Agreement**

Rimkus interviewed and hired Cammarata in the Houston office. Cammarata signed the Employment Agreement in that office. The Agreement was between the "Company," defined as Rimkus Consulting Group, Inc., and the "Employee," defined as Cammarata. The provisions at issue are the noncompetition, nonsolicitation, and nondisclosure clauses.

The Agreement's noncompetition provision states as follows:

> a. Employee [**8] will not, directly or indirectly, own, manage, finance, control, or participate in the ownership, financing, or control of, or be connected as a partner, principal, agent, employee, independent contractor, management advisor, and/or management consultant with, or use or permit his name or resume to be used in connection with any business or enterprise performing consulting services similar to those which are carried on by the Company in the "Designated Geographic Area." For the purposes of this Agreement "Designated Geographic Area" shall mean any standard metropolitan statistical area (or if a client is not located in a standard metropolitan statistical area, then the city, town, or township in which such client is located and the counties or parishes contiguous thereto) in which a client or clients of the Company are located and from which such client or clients have engaged Company on not less than five (5) separate files or engagements during the five (5) calendar years proceeding termination of Employee's employment with Company. If Company has received less than five (5) such assignments or engagements from a client

NJAPP0622

255 F.R.D. 417, *423; 2008 U.S. Dist. LEXIS 61791, **8

in any Designated Geographic Area, then Employee shall be free [**9] to compete in such Designated Geographic Area. "Client" shall mean any person or entity represented by the Company on an assignment or engagement, and shall include, but not be limited to, an owner, an operating entity, an insurance company, and independent adjustment firm, a governmental agency, [or] a law firm. Employee further agrees that during the effective period of this Agreement and this covenant, he will not do any act which is intended, or reasonably expected, to have a detrimental effect on the business of the Company. This covenant against competition shall be construed as a separate covenant covering competition within the State of Texas, or in any other State where the Company, directly or indirectly, whether through itself or its representative or agents, conducts business; . . .

(Docket Entry No. 1, Ex. A at 4-5).

The Agreement also contained a clause prohibiting solicitation of the Company's employees and of the Company's customers:

b. Employee agrees that after termination of employment with the Company, he will not, directly or indirectly, solicit, employ, or in any other fashion, hire persons who are, or were, employees, [*424] officers, or agents of the Company, until such [**10] person has terminated his employment with the Company for a period of eighteen (18) months; c. Employee agrees, that for a period lasting until eighteen (18) months after termination of his employment, he will not at any time, directly or indirectly, solicit the Company's customers.

(Docket Entry No. 1, Ex. A at 5).

The Employment Agreement also contains a nondisclosure provision that states as follows:

a. The parties acknowledge and agree that the Company has spent and continues to spend considerable time, effort and money to maintain the Company's existing client and client contact data bases for its various clients, and to continue to add new client and client contacts respectively to the Company's client and client contact data bases. This information is proprietary and a valuable asset to Company obtained at considerable time and expense. Employee further acknowledges and confirms that prior to his employment by the Company, he did not have any definitive knowledge with respect to the Company's client base or the

individuals employed by Company's clients who are responsible for letting work to the Company for the types of work Company performs.

b. Employee also agrees that all workpapers, [**11] documents, writings, materials, photographs, video tapes, drawings, job assignment sheets, time sheets, reports to or correspondence to or from clients, accounting data or reports or information of any nature or configuration, client and client contact lists, job or job status reports, rolodex or business card files, computer software and data discs, invoices, daily and monthly reports or analysis sheets, client lists and data, evidentiary exhibits, graphics and other written presentations, contract files and client files in Employee's possession and/or used or intended for use by Employee in connection with his duties are the property of the Company and Employee agrees that, within twenty-four (24) hours of the termination of employment from the Company or within twenty-four (24) hours of demand by Company, all such items and any copies or reproductions thereof shall be returned to the Company by Employee, and Employee shall execute a certificate, substantially in the form of Exhibit "A" attached hereto, attesting his compliance with this provision;

c. Employee agrees he shall not, except in the performance of his duties, make or cause to be made any copies, pictures, duplicates, facsimiles [**12] or other reproductions or recordings or any abstracts or summaries of any such workpapers, documents, writings, materials, photographs, video tapes, drawings, job assignment sheets, time sheets, reports to or correspondence to or from clients, accounting data or reports or information of any nature or configuration, client and client contact lists, job or job status reports, rolodex or business card files, or computer software and data discs, invoices, daily and monthly reports or analysis sheets, client lists and data, evidentiary exhibits, graphics and other written presentations, contract files and client files, or remove same from the premises of the Company except in the performance of his duties. Employee agrees to surrender all items to the Company within twenty-four (24) hours of the termination of employment or within twenty-four (24) hours of demand by Company, and Employee shall execute a certificate, substantially in the form of Exhibit "A" attached hereto, attesting to his compliance with this provision;

255 F.R.D. 417, *424; 2008 U.S. Dist. LEXIS 61791, **12

d. In the course of his relationship with the Company because of the nature of his responsibilities and the experience to be acquired at the Company, the Employee will **[\*\*13]** acquire valuable and confidential information and trade secrets with respect to the Company's successful business operations, including, but not limited to, the Company's **[\*425]** existing and contemplated business and financial methods and practices, plans, and special methods and processes involved in the operation of the Company's business, and lists of the Company's clients as reflected in part by the items described in 9b and 9c above. In addition, the Employee will develop, on behalf of the Company and at the Company's expense, a personal acquaintance with the Company's clients which acquaintance may constitute the Company's only, primary, or best contact with such clients. Also, Employee may develop or be exposed to confidential or trade secret information of the Company's clients or others with whom the Company does business. As a consequence thereof, the Employee will occupy a position of trust and confidence with respect to the Company's affairs, services and clients. Maintenance of the confidential and proprietary character of confidential or trade secret information of the Company, the Company's clients or others with whom the Company does business is important to the Company. Employee **[\*\*14]** agrees that during the period he is engaged to work for the Company and after such engagement, for so long as such confidential information or trade secrets may remain confidential, secret or otherwise totally or partially protectable or proprietary, he will not use or divulge such information except as permitted or required by his duties in connection with his work with the Company.

(Docket Entry No. 1, Ex. A at 6-8).

The Agreement contained the following provision as to the applicable law:

This Agreement and all rights, obligations and liabilities arising hereunder shall be governed by, and construed and enforced in accordance with the laws of the State of Texas (excluding its conflicts of law provisions) applicable to contracts made and to be performed therein.

(Docket Entry No. 1, Ex. A at 11).

In this suit, Rimkus asserts that it is entitled to a preliminary injunction for 18 months from the present date prohibiting Cammarata and U.S. Forensic from

competing with Rimkus in the defined geographic areas and from soliciting any Rimkus (or RCGL) customer. Rimkus also asserts that it is entitled to a preliminary injunction prohibiting Cammarata and U.S. Forensic from soliciting any Rimkus **[\*\*15]** (or RCGL) employee for 18 months after that employee leaves Rimkus or RCGL. Cammarata asserts that the provisions are unenforceable because the Louisiana court judgment to that effect is entitled to Full Faith and Credit and because the provisions are unreasonable in the length of time and the breadth of the prohibitions imposed. Cammarata also asserts that he signed the Agreement with Rimkus but worked only for RCGL and has only hired former RCGL employees.

Cammarata's primary arguments beyond the preclusive effect of the Louisiana court's judgment are that the provisions are broader than necessary to protect Rimkus's legitimate business interests in its confidential, proprietary, or secret information and its customer relationships; that Cammarata has not taken or used any protected information in competing with Rimkus through his work with U.S. Forensic; and that there is no basis to extend the contractual period of the bar on competition -- which expired mid-May 2008 -- when Rimkus itself delayed in seeking to enforce it.

## C. Rimkus's Confidential, Proprietary, and Trade Secret Information

Rimkus presented testimony from two of its senior vice-presidents, Ralph Graham and Curtis Brown, **[\*\*16]** about what Rimkus considers to be confidential, proprietary, or trade secret information and the steps taken to protect it. Brown testified that Rimkus considers the following categories of information to be confidential, proprietary, or trade secrets:

1. The client database. This database includes client names, location, and contact person. The database also includes information about the number of projects done for a client, how frequently that client uses Rimkus's services, the type and size of the projects done for that client, and how much **[\*426]** time was spent on each project. Rimkus uses the information for conflicts checks, among other purposes. Access is restricted; an employee needs special permission to access the database for customers outside that employee's region or responsibility.

Cammarata had access to the client database in the Louisiana office where he worked, although he

255 F.R.D. 417, *426; 2008 U.S. Dist. LEXIS 61791, **16

needed permission to access information about customers outside his region. Cammarata could not access the database from his own laptop. Cammarata testified that he did not print out any client list, did not download any client list, and did not take any written client list with him when he left. Cammarata [**17] testified that he believed he had returned all the Rimkus property he had when he left. He subsequently discovered that he had some reports in a box at his house but did not use them.

Some of the information on the Rimkus client database is publicly available in the *Casualty Adjuster's Guide* ("CAG"), which is a directory published for particular regions with the names and addresses of adjusters and others in the insurance business. The CAG provides only contact information. It provides no information about the projects that an adjuster has given a company such as Rimkus. The database does contain proprietary and confidential information about Rimkus customers, but it is information that becomes outdated quickly because of personnel changes and other changes that affect the business relationships.

2. Pricing information. The evidence shows that Rimkus set its pricing for most jobs by area. The prices for most jobs are not negotiated individually but disclosed to clients or prospective clients in the terms and conditions that Rimkus provides. The terms and conditions do not require a client to keep the pricing information for a project confidential.

Rimkus reviews its prices and changes [**18] them annually. A small group of clients have national agreements with Rimkus, called "master service agreements," which are negotiated annually or even more frequently. There is no evidence that Cammarata took written information relating to Rimkus's pricing with him when he left. There is no evidence as to U.S. Forensic's pricing. There is no evidence as to any use by Cammarata of Rimkus's pricing information in his work for U.S. Forensic.

3. Investigative methods, report formats, and operations manuals. Graham and Brown both testified that the method Rimkus uses to investigate casualty losses and the format it uses to report the investigation results are confidential. The record, however, showed that neither is confidential, proprietary, or trade secret. The investigative method used depends most heavily on the area of engineering expertise involved, which is not proprietary to Rimkus. In investigating, Rimkus, like

other firms and individuals engaged in forensic engineering, travels to the location, gathers and reviews the information, and comes to a conclusion about what occurred and why.

Rimkus attempted to characterize the way in which it puts its reports together as proprietary [**19] because it begins with a summary of the results and uses words that nonengineers can understand. This amounts to a claim that using an executive summary and clear words is confidential, proprietary, or secret. The record and law provide no support for the contention that such report formats are entitled to such protection. Moreover, the reports are often designed to meet state and federal requirements for expert reports in litigation and are often included in publicly available court files. Graham testified that Rimkus does not publish its investigative reports or its methods for producing such reports, but once Rimkus's reports are given to clients, they become the clients' property. With Rimkus's knowledge and involvement, the reports are often disseminated in presenting insurance claims and in pursuing or defending litigation.

Bell testified that U.S. Forensic has at least fifteen report formats and did not rely on Rimkus's reports in developing the [*427] U.S. Forensic report format. There is no basis in the record to conclude that the portions of the Rimkus operations manual describing investigative methods or report formats are confidential, proprietary, or secret.

There was scant testimony [**20] as to the Rimkus operations manual. The record is insufficient to conclude that it is confidential, proprietary, or a trade secret. There was no evidence that Cammarata had access to a recent operations manual.

4. The business plan. Rimkus distributes an annual business plan to its officers, managers, marketers, and sales people. The business plan includes a mission statement and an executive summary that identifies growth areas and key business strategies for the upcoming year. The plan includes historical information, such as analyses of which offices have had the most growth over a one-, three- and five-year period, of the man-hours per file to show changes in particular markets, changes in particular regions, identification of markets other than law firms and insurance companies, and the seminars Rimkus attends for marketing purposes. The plan

255 F.R.D. 417, *427; 2008 U.S. Dist. LEXIS 61791, **20

also includes projections, including staffing requirements for one, three and five years and what new offices should be opened. The plan includes Rimkus's growth plans and its perception of its own strengths, weaknesses, and opportunities. The business plan does have confidential, proprietary, and secret information that could be valuable [**21] to competitors if obtained before the information became outdated or superseded. The business plan is revised annually. Each year's business plan is distributed in January.

Cammarata left Rimkus in November 2006. He had no access to the Rimkus 2007 business plan. There is no evidence that he took the January 2006 business plan or any earlier business plan with him when he left. Although the business plan does contain sensitive, propriety, and confidential information, it is replaced annually. There is no evidence that Cammarata had access to the Rimkus 2007 business plan or that he took, used, or disclosed information in the January 2006 or prior business plans in his work for U.S. Forensic.

### D. Cammarata's Work for Rimkus and for U.S. Forensic

Cammarata worked primarily in Louisiana while employed by Rimkus. During his ten years of employment with Rimkus, Cammarata testified that he did no work in any Texas city. He testified that he worked on two jobs in Gulfport, Mississippi and three jobs in Jackson, Mississippi. That work was more than three years ago and the jobs each took less than one day. Cammarata did some work in Alabama when he worked for Rimkus, but not in any of the counties [**22] or cities that would be covered by the Rimkus noncompete provision. He worked on two jobs in Florida in areas covered by the Rimkus noncompete provision: one job in Panama City that took one day, and four jobs in Pensacola that took a total of three to four days. (Docket Entry No. 150 at 14-17). Most of Cammarata's work outside Louisiana during the time he worked at Rimkus was in Illinois, Arkansas, Nevada, and Lake City, Florida and Gulf Shores and Orange Beach, Alabama.

Since leaving Rimkus and becoming a partner of U.S. Forensic, Cammarata has not worked in any of the places that Rimkus identifies as noncompetition areas. Cammarata has done one job in Texas since he began U.S. Forensic and none in Mississippi, Alabama, or Florida. Most of his work and that of U.S. Forensic has

been in Louisiana. Cammarata has talked to the Mississippi State Bar and the Mississippi Claims Association to attempt to get work there in the future, as well as to a group of flood-claim adjusters in Florida.

Bell also testified that most U.S. Forensic clients are in Louisiana and most of U.S. Forensic's work is performed in Louisiana. U.S. Forensic solicits clients through its website, attending conferences, [**23] and telephone calls to clients listed in the *Casualty Adjusters Guide*. There is no evidence in the record that Cammarata directly solicited Rimkus [*428] clients or did work for clients he had worked with at Rimkus outside Louisiana.

### II. The Effect of the Louisiana Court Ruling

### A. The Procedural History

On the date he resigned from Rimkus, November 15, 2006, Cammarata sued Rimkus in Louisiana state court. Cammarata sought a declaratory judgment that the noncompetition and nonsolicitation covenants in the Employment Agreement were unenforceable. In January 2007, Rimkus sued Cammarata in this federal case, alleging that Cammarata had violated the noncompetition covenant, had solicited business from Rimkus clients, had solicited Rimkus employees, and had misappropriated Rimkus's trade secrets. Rimkus sought to enjoin Cammarata from continuing to work in competition with Rimkus during the period of the noncompetition provision, from soliciting Rimkus employees and customers, and from using Rimkus trade secrets. Rimkus also seeks damages. (Docket Entry No. 1, Ex. A at 4-5).

The Louisiana state court issued an order on March 26, 2007, stating that "it is the ruling of this court that it will apply [**24] Louisiana law to the claims of the plaintiffs." (Docket Entry No. 19, Ex. D). On July 26, 2007, the Louisiana state court issued a final judgment that "pursuant to Louisiana law, the covenant not to compete clauses contained in Paragraphs 8(a) and the non-solicitation of customer(s) clauses contained in Paragraphs 8(c) of the respective contracts are invalid and unenforceable." (Docket Entry No. 71, Ex. H). Rimkus appealed. On March 25, 2008, the Louisiana Fifth Circuit Court of Appeal affirmed the trial court's decision that Louisiana law applied to the parties' agreement and that the noncompetition and nonsolicitation covenants were unenforceable. *Bell v.*

255 F.R.D. 417, *428; 2008 U.S. Dist. LEXIS 61791, **24

*Rimkus Consulting Group, Inc. of La., 983 So.2d 927 (La. Ct. App. 2008).*

In finding that Louisiana law applied to the 1996 employment agreement despite the choice- of-law clause specifying that Texas law would apply, the Louisiana court of appeals stated:

> Forum selection clauses will be upheld unless they contravene strong public policy of the forum in which the suit is brought. *LA. C.C. art. 3450. LA. R.S. 23:921(A)(2)*, a provision which was added by the legislature in 1999, is an expression of strong Louisiana public policy concerning **[**25]** forum selection clauses. . . .

> Louisiana law expressly provides that conventional obligations are governed by the law of the state whose policies would be most seriously impaired if its law were not applied to the issue. Further, issues of conventional obligations may be governed by law chosen by the parties, *except to the extent that law contravenes the public policy of the state whose law would be applicable under La. C.C. art 3537.*
> As previously stated herein, Louisiana has a longstanding public policy to prohibit or severely restrict non-competition provisions in employment agreement which curtail an employee's right to earn his livelihood. These agreements are in derogation of the common right, and they must be strictly construed against the party seeking their enforcement. Application of Texas law to this dispute would thwart Louisiana's longstanding public policy and interest in this type of matter.
> According to well established Louisiana law and jurisprudence, the forum selection and choice of law provisions contained in the 1995 and 1996 employment contracts are null and void. Thus, the agreements in this case are governed by Louisiana law.

*Bell, 983 So.2d at 932-33* (citations **[**26]** omitted). [1]

---

[1] *Article 3540 of the Louisiana Civil Code* states:

> All other issues of conventional obligations are governed by the law expressly chosen or clearly relied upon by the parties, except to the extent that law contravenes the public policy of the state whose law would otherwise be applicable under Article 3537.

*LA. C.C. art 3540.*

*Article 3537 of the Louisiana Civil Code* states:

Rimkus asked this court for a hearing on the preliminary injunction application on November **[*429]** 5, 2007, almost a **[**28]** year after Cammarata had left his job and begun competing with Rimkus. A hearing on the preliminary injunction application was set for January 7, 2008. This hearing was rescheduled multiple times due to scheduling conflicts and discovery disputes between the parties. The hearing was held on April 24 and 25, 2008, and May 1, 2008.

**B. Cammarata's Motions to Dismiss**

> Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.

> That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate **[**27]** commercial intercourse, and of protecting one party from undue imposition by the other.

*LA. C.C. art. 3537.*

*Section 921(A) of the Louisiana Revised Statutes* states:

> A. (1) Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void.

> (2) The provisions of every employment contract or agreement, or provisions thereof, by which any foreign or domestic employer or any other person or entity includes a choice of forum clause or choice of law clause in an employee's contract of employment or collective bargaining agreement, or attempts to enforce either a choice of forum clause or choice of law clause in any civil or administrative action involving an employee, shall be null and void except where the choice of forum clause or choice of law clause is expressly, knowingly, and voluntarily agreed to and ratified by the employee after the occurrence of the incident which is the subject of the civil or administrative action.

*LA. R.S. 23:921(A).*

255 F.R.D. 417, *429; 2008 U.S. Dist. LEXIS 61791, **27

Cammarata has moved to dismiss Rimkus's claims for breach of the noncompetition and nonsolicitation covenants as barred by the *Full Faith and Credit Clause* and *res judicata*. (Docket Entry Nos. 71, 105). Citing *28 U.S.C. § 1738* and *Lance v. Dennis, 546 U.S. 459, 126 S. Ct. 1198, 163 L. Ed. 2d 1059 (2006)*, Cammarata argues that in determining whether to accord a state court's final judgment preclusive effect, a federal court applies the rendering state's preclusion law. Cammarata argues that because the elements of *res judicata* under Louisiana state law are met, "the issue of what law should apply in this case, as well as the determination of the validity of the non-competition and non-solicitation provisions of Mr. Cammarata's 1996 Employment Contract are barred by *res judicata* and must be dismissed." (Docket Entry No. 71 at 6).

Rimkus responds that the preclusive **[**29]** effect of the Louisiana state-court judgment "is limited to the enforceability under Louisiana law of Cammarata's promises not to compete with Rimkus and not to solicit Rimkus customers" because "[t]here was no decision as to Rimkus's claims that Cammarata has breached and continues to breach those promises pursuant to Texas law." (Docket Entry No. 78 at 1). Rimkus contends that the Louisiana court "was asked solely to declare whether the noncompete provisions were unenforceable under Louisiana law," not to decide the issue before this court, "whether the provisions of the employment agreement are enforceable under Texas law" as chosen by the parties in the Employment Agreement. (Docket Entry No. 80 at 3-4). Rimkus argues that the Louisiana state court's choice-of-law decision was "based on a special Louisiana statute making choice-of-law provisions invalid under special circumstances." (Docket Entry No. 113 at 6). Rimkus contends that the Louisiana state court did not decide the issue before this court-- whether the choice-of-law provision is valid under Texas choice-of-law principles. Rimkus argues that because Louisiana and Texas apply different legal standards to the choice-of-law **[**30]** analysis, the legal issues presented in this case are not the same as the issues decided by the Louisiana state court, making *res judicata* inapplicable.

*HN1*[⬆] The *Full Faith and Credit Clause of the United States Constitution* and its implementing statute, *28 U.S.C. § 1738*, governs the preclusive effect of a state-court judgment in a subsequent federal action. [2] Final

**[*430]** judgments of state courts "have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." *Id.* Under Full Faith and Credit, "[a] final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land. For claim and issue preclusion (res judicata) purposes, in other words, the judgment of the rendering State gains nationwide force." *Baker v. General Motors Corp., 522 U.S. 222, 233, 118 S. Ct. 657, 139 L. Ed. 2d 580 (1998)* (footnote and citations omitted).

*HN4*[⬆] A federal court applies the rendering state's preclusion law to determine whether to accord a state court's final judgment preclusive effect. *28 U.S.C. § 1738*; *Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81, 104 S. Ct. 892, 79 L. Ed. 2d 56 (1984)*; see also *Norris v. Hearst Trust, 500 F.3d 454, 460-61 (5th Cir. 2007)*. This rule applies even if the rendering state's judgment is based on public policy offensive to the enforcing state. *Baker, 522 U.S. at 233-34*. Because enforcing states decide the scope of a judgment, a rendering state can "determine the extraterritorial effect of its judgement . . . only . . . indirectly by prescribing the effect of **[**32]** its judgments within the State." *Thomas v. Washington Gas Light Co., 448 U.S. 261, 270, 100 S. Ct. 2647, 65 L. Ed. 2d 757, (1980)*. "To vest the power of determining the extraterritorial effect of a State's own . . . judgments in the State itself risks the very kind of parochial entrenchment on the interests of other States that it was the purpose of the *Full Faith and Credit Clause* and other provisions of Art. IV of the Constitution

---

*HN2*[⬆] Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings **[**31]** of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof.

*U.S. CONST. art IV, § 1.*

Title *28 U.S.C. § 1738* states in relevant part:

*HN3*[⬆] The records and judicial proceedings of any court of any . . . State, Territory or Possession . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have now by law or usage in the courts of such State, Territory or Possession from which they are taken.

---

[2] The *Full Faith and Credit Clause* states:

Case 1:18-cv-00068   Document 215-1   Filed on 07/21/18 in TXSD   Page 634 of 666

Page 15 of 26

255 F.R.D. 417, *430; 2008 U.S. Dist. LEXIS 61791, **31

to prevent." *Id. at 272*.

HN5[↑] Under Louisiana law, "[t]he doctrine of res judicata precludes subsequent litigation when all of the following are satisfied: (1) the judgment is valid; (2) the judgment is final; (3) the parties in the two matters are the same; (4) the cause or causes of action asserted in the second suit existed at the time of the final judgment in the first litigation; and (5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation." *Smith v. State, 899 So.2d 516, 529-30 (La. 2005)* (citations omitted). A final judgment is "conclusive, in any subsequent action between [the plaintiff and defendant], with respect to any issue actually litigated and determined if its determination was essential [**33] to that judgment." *LA. REV. STAT. § 13:4231* (2006).

The primary dispute affecting the Full Faith and Credit and preclusion analysis in this case is whether the issues decided by the Louisiana state court are the same as the issues before this court, such that the Louisiana judgment precludes further litigation of those issues in this court. Citing several federal cases holding that "a court's ruling on a 'choice-of-law' issue should be afforded *res judicata* effect in any other proceeding between the same parties attempting to relitigate that issue," Cammarata argues that the choice-of-law issue "was fully litigated" in the Louisiana state court and that the *Bell* court found that the Texas choice-of-law provision in the Employment Agreement was unenforceable under Louisiana law. (Docket Entry No. 104 at 1). Rimkus argues that the Louisiana court decided only that Louisiana law applied in Louisiana because under Louisiana law, such noncompetition and nonsolicitation covenants and forum selection or choice-of-law provisions are invalid. Rimkus contends that the Louisiana state court considered whether the contractual choice-of-law [*431] provision and the noncompetition and nonsolicitation covenants [**34] are enforceable in Louisiana, and that *res judicata* does not preclude this court from considering whether the parties' choice of Texas law is enforceable in a jurisdiction that does not invalidate a choice-of-law or forum-selection clause and, if so, whether the provisions are enforceable under Texas law.

The Louisiana state court's judgment clearly precludes relitigation of the issue of whether the forum-selection and choice-of-law provision, as well as the noncompetition and nonsolicitation covenants, are unenforceable in Louisiana, under Louisiana law. The more difficult issue is whether the Louisiana state court's judgment precludes this Texas court from considering whether Texas choice-of-law rules apply and the enforceability of the contractual choice-of-law provision and the covenants under Texas law.

Courts have struggled with the application of Full Faith and Credit and preclusion in the context of parallel or successive actions involving choice-of-law, forum selection, noncompetition, and nonsolicitation contractual provisions, which are prohibited under the public policy of some states and permitted, with varying restrictions, in other states. "An especially difficult problem [**35] is presented by choice-of-law determinations. If successive actions are brought between the same parties . . . in different forums with different choice-of-law principles, the question [of issue preclusion] is more difficult." 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4417 (2d ed. 2002). In *Keener v. Convergys Corp., 342 F.3d 1264 (11th Cir. 2003)*, the appellate court held that a district court abused its discretion by enjoining the enforcement of an agreement nationwide, when the agreement, invalid under Georgia law and public policy, had selected another state's law. The plaintiff, Keener, had been employed by an Ohio corporation, worked in Illinois and Ohio, and signed an agreement designating Ohio law as its governing law. Keener then accepted a job at a competitor located in Georgia. He brought an action in federal district court in Georgia and sought declaratory and injunctive relief as to the validity and enforceability of the agreement. The appellate court found that the agreement was unenforceable under Georgia law but that the district court should have limited the injunction prohibiting its enforcement to Georgia. *Id. at 1269-70*. [**36] The court noted that while "Georgia cannot in effect apply its public policy decisions nationwide--the public policy of Georgia is not that everywhere," *id. at 1269*, the agreement "is unenforceable under Georgia law, in Georgia." *Id. at 1270*. The court later clarified that this restrictive language referred to Georgia's "power to enforce nationwide, by way of a nationwide injunction, its public policy interests." *Palmer & Cay, Inc. v. Marsh & McLennan Cos., Inc., 404 F.3d 1297, 1308-10 (11th Cir. 2005)*. It did not, however, apply to a declaratory judgment that the agreement was unenforceable. Examining the Georgia law of preclusion in a fashion consistent with Full Faith and Credit -- while recognizing that Full Faith and Credit did not apply to the enforceability of an earlier federal--court judgment - the court concluded that the declaratory judgment finding

255 F.R.D. 417, *431; 2008 U.S. Dist. LEXIS 61791, **36

the agreement unenforceable under Georgia law was not limited to Georgia. *Palmer & Cay, 404 F.3d at 1308-10.* In that case, the court found Georgia cases specifically holding that under the Georgia law of claim and issue preclusion, a final declaratory judgment with respect to a noncompetition agreement precludes subsequent claims **[**37]** or issues from being relitigated in other states. *See, e.g., Hostetler v. Answerthink, 267 Ga. App. 325, 599 S.E.2d 271, 275 (2004).* The parties in this case have not cited similar Louisiana case law. To the contrary, the **HN6[↑]** Louisiana cases on preclusion emphasize that the issue in the rendering court and the later court must be identical. *See, e.g., Anaya v. Legg Mason Wood Walker, Inc., 985 So. 2d 281, 2008 La. App. LEXIS 709, 2008 WL 2080746, at \*9 (La. Ct. App. 2008)* ("[O]nce a court decides an issue of fact or law necessary to its judgment, that decision precludes re-litigation *of the same issue* in a different cause of action between the same parties." (emphasis added, quoting *Segal v. Smith, Jones & Fawer, L.L. P., 838 So.2d 62, 65 (La. Ct. App. 2003)); Am. Nat'l Gen. Ins. Co. v. Howard, 981 So.2d 863, 865 (La. Ct. App. 2008)* ("[T]he Court should assess whether the suits involve the same parties, in **[*432]** the same capacities, addressing the same issues, and with the same object.").

For the reasons outlined below, this court does not resolve the issue of whether, under Full Faith and Credit, the Louisiana court's ruling that Louisiana law applies despite the choice of Texas law in the parties' Employment Agreement invalidates **[**38]** the choice-of-law, noncompetition, and nonsolicitation provisions in all states. It is clear, and Rimkus admits, that at a minimum the Louisiana court determined that in Louisiana, the contractual forum-selection, choice-of-law, noncompetition, and nonsolicitation provisions are unenforceable. That ruling is entitled to preclusive effect in this court. This court finds and concludes that even assuming -- without deciding -- that it is free to analyze whether the noncompetition and nonsolicitation provisions are enforceable under the Texas law the parties chose, Rimkus is not entitled to the preliminary injunction it seeks. As a result, Rimkus's request for a preliminary injunction is denied. Cammarata's motions to dismiss Rimkus's claims as barred by *res judicata* are denied as moot.

**III. Rimkus's Motion for a Preliminary Injunction**

**A. The Texas Choice-of-Law Analysis**

**HN7[↑]** In diversity cases, district courts apply the choice-of-law rules of the forum state. *See Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941); Int'l Interests, L.P. v. Hardy, 448 F.3d 303, 306 (5th Cir. 2006)* (citing *Mayo v. Hartford Life Ins. Co., 354 F.3d 400, 403 (5th Cir. 2004)).* In the Employment Agreement, Cammarata **[**39]** agreed that disputes arising out of that Agreement would be adjudicated in Harris County, Texas and that Texas law would govern. (Docket Entry No. 1, Ex. A at 11). **HN8[↑]** Texas determines the enforceability of choice-of-law provisions under the RESTATEMENT (SECOND) OF CONFLICT OF LAWS ("RESTATEMENT "). *See DeSantis v. Wackenhut, 793 S.W.2d 670, 677-78 (Tex. 1990)* (stating that because the issue of whether a noncompetition agreement is enforceable "is not 'one which the parties could have resolved by an explicit provision in their agreement,'" *section 187(2)* governs the enforceability of such an agreement (quoting *RESTATEMENT § 187 cmt. d* (1971))).

*Section 187 of the RESTATEMENT* states:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.
>
> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either
>
>> (a) **[**40]** the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.
>
> (3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

*RESTATEMENT § 187.* Under *section 187(2)*, **HN9[↑]** the parties' contractual choice of Texas law controls

NJAPP0630

255 F.R.D. 417, *432; 2008 U.S. Dist. LEXIS 61791, **40

unless 1) Texas has no substantial relationship to the parties or the transaction, or 2) another state has a materially greater interest than Texas in the enforceability of the agreement, and that state's law would apply "in the absence of an effective choice of law by the parties" under *section 188*.

*Section 188 of the RESTATEMENT* states:

(1) *HN10*[⬆] The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that **[**41]** issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

**[*433]** (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,
(b) the place of negotiation of the contract,
(c) the place of performance,
(d) the location of the subject matter of the contract, and
(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and 203.

*RESTATEMENT § 188*.

The record shows that Texas has a substantial relationship to the parties and the transaction. The parties signed the employment agreement in Texas. Rimkus is headquartered in Texas. Both Rimkus and U.S. Forensic advertise and do business in Texas. During his employment with Rimkus, Cammarata **[**42]** received work assignments from Texas and traveled to Texas for training and other employment-related purposes.

Cammarata argues that Louisiana law should apply because the Louisiana court has already determined that Louisiana law, not Texas law, governs the employment agreement. In reaching this decision, the Louisiana court of appeals noted that "Louisiana law

expressly provides that conventional obligations are governed by the law of the state whose policies would be most seriously impaired if its law were not applied to the issue." *Bell, 983 So.2d at 933*. To the extent that the Louisiana state court's judgment does not preclude this court from considering the enforceability of the noncompetition and nonsolicitation covenants under Texas law, the Texas choice-of-law provision in the Employment Agreement is enforceable. Louisiana does not have a materially greater interest than Texas in the enforceability of the Employment Agreement outside Louisiana.

Because Texas has a substantial relationship with the parties and the transaction and no other state has a materially greater interest in the enforceability of the Agreement, the parties' contractual choice of law is enforceable under **[**43]** the Texas choice-of-law rules.

**B. Analysis**

*HN11*[⬆] To obtain a preliminary injunction, Rimkus must show: (1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiffs will suffer irreparable harm if the injunction is not granted, (3) that the threatened injury outweighs any damage that the injunction might cause the defendant, and (4) that the injunction will not disserve the public interest. *Nichols v. Alcatel USA, Inc., 532 F.3d 364, 372 (5th Cir. 2008)*. "A preliminary injunction is an 'extraordinary remedy' and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Id.; see also Butnaru v. Ford Motor Co., 84 S.W.3d 198, 204 (Tex. 2002)* (citing *Walling v. Metcalfe, 863 S.W.2d 56, 57 (Tex. 1993)*; *Sun Oil Co. v. Whitaker, 424 S.W.2d 216, 218 (Tex. 1968))*. An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru, 84 S.W.3d at 204* (citing *Canteen Corp. v. Republic of Tex. Props., Inc., 773 S.W.2d 398, 401 (Tex. App.--Dallas 1989, no writ))*. A plaintiff seeking a preliminary, as opposed to a **[**44]** permanent, injunction must show that the irreparable injury will occur "during the pendency of the litigation" unless the preliminary injunction issues. *Justin Inds., Inc. v. Choctaw Secs., L.P., 920 F.2d 262, 268 n.7 (5th Cir. 1990)*; *see also Alabama v. United States Army Corps of Eng'rs, 424 F.3d 1117, 1128 (11th Cir. 2005)*. For the reasons explained below, the scope of the restrictions defeats Rimkus's showing a substantial likelihood of success on the merits and the delay in seeking enforcement defeats

255 F.R.D. 417, *433; 2008 U.S. Dist. LEXIS 61791, **44

Rimkus's showing of irreparable harm.

[*434]  *1. The Noncompetition Covenant*

HN12[⬆] Under Texas law, a noncompetition covenant is enforceable "if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." *TEX. BUS. & COM. CODE § 15.50.* For a noncompetition covenant to be ancillary to or part of an otherwise enforceable agreement, the employer must establish that: "(1) the consideration given by the employer [**45] in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; and (2) the covenant must be designed to enforce the employee's consideration or return promise for the otherwise enforceable agreement." *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson, 209 S.W.3d 644, 649 (Tex. 2006)* (quoting *Light v. Centel Cellular Co., 883 S.W.2d 642, 647 & n.15 (Tex. 1994)).* An agreement must give rise to an "interest worthy of protection" by a noncompetition covenant, such as business goodwill and confidential or proprietary information. *Id.* (citing *Light, 883 S.W.2d at 647*). An employer's promise to provide an employee with confidential or proprietary information and an employee's reciprocal promise not to disclose such confidential information "would meet the requirement that the covenant be designed to enforce the employee's consideration provided in the agreement." *Id.* (citing *Light, 883 S.W.2d at 647*).

*a. Is the Noncompetition Covenant Ancillary to or Part of an Otherwise Enforceable Agreement?*

Cammarata's employment with Rimkus was at will. Cammarata had the right to terminate his employment at any time with two weeks of advance notice; [**46] Rimkus had the right to terminate Cammarata's employment at any time for "cause" or because of a reduction in work force. (Docket Entry No. 1, Ex. A at 2-3). HN13[⬆] In cases involving at-will employment in which the employer is at liberty to fire the employee before providing the promised confidential or proprietary information, the Texas Supreme Court has held that a noncompetition covenant becomes enforceable if, after the employment agreement is made, "the employer performs his promise under the agreement and a unilateral contract is formed . . . [and] all other

requirements under the [Covenants Not to Compete Act] are met." *Alex Sheshunoff, 209 S.W.3d at 655.*

HN14[⬆] An employer's promise to provide confidential or proprietary information can support an enforceable noncompetition covenant because such a promise does give rise to the employer's interest in restraining the employee from competing. *See Alex Sheshunoff, 209 S.W.3d at 650-61.* In an at-will employment relationship, the employer's promise to provide confidential or proprietary information is executory--and an employees' promise not to compete is unenforceable--until the employer performs by providing the promised information. *See id.* [**47] The *Alex Sheshunoff* court found that an employer's noncompetition covenant was enforceable because by the time the employee left his job, the employer had provided confidential information and specialized training to the employee as promised in the parties' employment agreement and the employee "had promised in return to preserve the confidences of his employer." *Id.* The covenant prohibited the employee from calling on the employer's clients for one year after the termination of his employment.

The Employment Agreement stated that in consideration for Cammarata's agreement not to compete with Rimkus for 18 months after his employment ended, Rimkus would provide him access "to customer names and files, and the methods and techniques of the Company, in-company and external training provided by Company, [and] trade secrets and other proprietary and confidential information." (Docket Entry No. 1, Ex. A at 4). The record shows that during his employment with Rimkus, Cammarata received training and was given access to confidential information, such as Rimkus's client database. Because Rimkus provided Cammarata with promised training and confidential information, by the time Cammarata left [**48] Rimkus, [*435] "the [parties' non-competition] agreement had become an enforceable unilateral contract." *Alex Sheshunoff, 209 S.W.3d at 655; see also Hardy v. Mann Frankfort Stein & Lipp Advisors, Inc. No. 01-05-01080-CV, 263 S.W.3d 232, 2007 Tex. App. LEXIS 3442, 2007 WL 1299661, at *10-11 (Tex. App.--Houston [1st Dist.] May 3, 2007, pet. filed).*

**b. Are the Noncompetition Covenant's Restrictions Reasonable?**

The noncompetition covenant states that "so long as [Cammarata] is employed by [Rimkus] and for eighteen (18) months after such employment for any reason," Cammarata will not compete with Rimkus in the

255 F.R.D. 417, *435; 2008 U.S. Dist. LEXIS 61791, **48

"Designated Geographic Area." (Docket Entry No. 1, Ex. A at 4). The Employment Agreement defines the "Designated Geographic Area" as follows:

> any standard metropolitan statistical area (or if a client is not located in a standard metropolitan statistical area, then the city, town or township in which client is located and the counties or parishes contiguous thereto) in which a client or clients of the Company are located and from which such client or clients have engaged [Rimkus] on not less than five (5) separate files or engagements during the five (5) calendar years proceeding termination of [Cammarata's] employment [**49] with [Rimkus].

(*Id.*, Ex. A at 5).

Rimkus explained that prohibiting competition only in areas where it had done five projects in the prior five years was an effort to impose a reasonable geographic limitation on the prohibition. Doing five projects in the preceding five years meant that Rimkus had an ongoing association with one or more clients or was building such an association in the area. The geographic limitation was a narrower approach than an industry-wide prohibition. Rimkus introduced evidence as to what "designated geographic areas" were covered in Florida, Mississippi, Alabama, and Texas. The record showed that U.S. Forensic had an ability to compete in these states. The record also showed that U.S. Forensic and Cammarata have done very little work outside Louisiana since U.S. Forensic began operating in November 2006.

*HN15*[⬆] Texas courts have found that noncompetition covenants that cover areas where the employee did not actually work or clients whom the employee did not actually serve during his employment are overbroad and unenforceable. *See, e.g., Wright v. Sport Supply Group, Inc., 137 S.W.3d 289, 298 (Tex. App.--Beaumont 2004, no pet.)* ("[A] covenant not to compete that extends [**50] to clients with whom a salesman had no dealings during his employment is unenforceable.") (citing *John R. Ray & Sons, Inc. v. Stroman, 923 S.W.2d 80, 85 (Tex. App.--Houston [14th Dist.] 1996, writ denied)); Butler v. Arrow Mirror & Glass, Inc., 51 S.W.3d 787, 793-94 (Tex. App.--Houston [1st Dist.] 2001, no pet.)* ("A covenant not to compete with a broad geographical scope is unenforceable, particularly when no evidence establishes the employee actually worked in all areas covered by the covenant.") (citing *Evan's World Travel, Inc. v. Adams, 978 S.W.2d 225, 232-33 (Tex. App.--Texarkana 1998, no pet.); Evan's, 978 S.W.2d at 233* (finding that a noncompetition covenant that restricted

the employee from working in "any State in which [the employer] . . . has conducted its business'" during the employee's term of employment was "greater than necessary to protect [the employer's] legitimate business interest); *accord Curtis v. Ziff Energy Group, Ltd., 12 S.W.3d 114, 119 (Tex. App.--Houston [14th Dist.] 1999, no pet.)* ("Generally, a reasonable area for purposes of a covenant not to compete is considered to be the territory in which the employee worked while in the employment of his employer" [**51] (citing *Zep Mfg. Co. v. Harthcock, 824 S.W.2d 654, 660 (Tex. App.--Dallas 1992, no pet.))).*

The record contains lists of the cities and standard metropolitan statistical areas that Rimkus asserts are covered by the Employment Agreement. (Plaintiff's Exhibits 2, 3). These lists include multiple cities and counties in Texas, Mississippi, Alabama, and Florida. Cammarata testified, and Rimkus did not dispute, that he worked primarily in Louisiana while employed by Rimkus. (Docket Entry No. 150 at 14). Cammarata testified that during his ten years of employment with Rimkus, he did no work in Texas; he did two jobs in Gulfport, Mississippi and three jobs in [*436] Jackson, Mississippi, each job taking less than one day; he did no work in any of the listed Alabama counties or cities that would be covered by the noncompetition provision; he did one job in Panama City, Florida that took one day; and he did four jobs in Pensacola, Florida that took a total of three to four days. (*Id.* at 14-17). Cammarata also performed a total of approximately ten jobs during the ten years in locations outside Louisiana including Chicago, Illinois; Arkansas; Las Vegas, Nevada; Lake City, Florida; and Gulf Shores and [**52] Orange Beach, Alabama. (*Id.* at 47).

Since leaving Rimkus and becoming a partner of U.S. Forensic, Cammarata has not worked in the places that Rimkus identifies as noncompetition areas. Cammarata has done one job in Texas since he began at U.S. Forensic, but none in Mississippi, Alabama, or Florida. Most of his work and that of U.S. Forensic generally has been in Louisiana. Cammarata has talked to the Mississippi State Bar and the Mississippi Claims Association to attempt to get work there in the future, as well as a group of flood-claim adjusters in Florida, but his work and that of U.S. Forensic has largely been confined to Louisiana.

Because the Employment Agreement covers many areas outside Louisiana where Cammarata did not work while employed by Rimkus, under Texas law the noncompetition covenant is broader in geographical

255 F.R.D. 417, *436; 2008 U.S. Dist. LEXIS 61791, **52

scope than necessary to protect Rimkus's legitimate business interests. *See Wright, 137 S.W.3d at 298; Butler v. Arrow Mirror & Glass, Inc., 51 S.W.3d at 793-94; Curtis v. Ziff Energy Group, Ltd., 12 S.W.3d 114; Evan's, 978 S.W.2d at 233; John R. Ray & Sons, 923 S.W.2d at 85.* The noncompetition prohibition does not merely restrict Cammarata from working where he [**53] previously worked for Rimkus, but every place where Rimkus has done five jobs in the previous five years.

*HN16*[⬆]] Instead of invalidating overbroad covenants not to compete, Texas courts attempt to reform the unenforceable provisions to make them reasonable as to time, geographical area, or scope of activity to be restrained. *See Butler, 51 S.W.3d at 794.* In this case, to be reasonable, the geographic range of a reformed noncompetition covenant would be limited to certain cities in Mississippi and Florida.

Cammarata also challenges the 18-month period as unreasonable. Rimkus asks this court not only to find that period reasonable, but to apply it from the date the injunction is issued rather than from the date of Cammarata's resignation from Rimkus.

*HN17*[⬆]] Texas courts have upheld covenants restricting competition for periods between one and two years, *see, e.g., Alex Sheshunoff, 209 S.W.3d at 657* (enforcing covenant prohibiting employee from providing consulting services to employer's clients for one year and from selling competing product for two years); *Property Tax Assoc. v. Staffeldt, 800 S.W.2d 349, 350 (Tex. App.--El Paso, writ denied)* (finding two-year restriction to be reasonable), but only [**54] if the evidence showed a need for such a lengthy period. In this case, even if the evidence supported an 18-month period, the delay in seeking an injunction to enforce the prohibition weighs heavily against its issuance. The 18-month period from Cammarata's departure from Rimkus expired in mid-May 2008. The issue is whether the 18-month period was reasonable and whether this court should use its equitable authority to extend the prohibition to 18 months from the present date.

Both Graham and Brown testified on behalf of Rimkus that Rimkus's business plan, pricing information, client information, and operations manual are considered confidential, proprietary, and secret. Both testified that this information would give a competitor an advantage and that Cammarata had access to this information during his employment.

The business plan does contain confidential, proprietary, and trade-secret information. It contains Rimkus's business goals and strategies for the next three- and five-year periods, as well as man-hour data forecasts, efficiency analyses, and staffing requirements. Brown testified that the business plan is revised annually and that each year's business plan is distributed in [**55] January. Cammarata left Rimkus in November [*437] 2006 and had no access to the Rimkus 2007 business plan.

Pricing information is also confidential but revised at least annually. Graham testified that Rimkus's pricing information is revised annually and that the pricing structure for master service agreements for certain clients is subject to revision even more frequently.

Rimkus's client database contained confidential information, mixed with publicly available information from sources such as the *Casualty Adjuster's Guide.* That information is changed to reflect new jobs, personnel changes, and other events. That information also becomes outdated in approximately 18 months.

Some of the information Rimkus characterized as confidential or proprietary does not fit within this category under Texas law. Rimkus asserted that its investigation methods and its report formats are confidential and proprietary, but the record shows that the way in which Rimkus does its investigations and the format in which it presents its reports are not confidential, proprietary, or a trade secret. Rimkus relies on professional engineers to apply the techniques and skills of the relevant engineering discipline. Although [**56] Rimkus argued that its use of an "executive summary" in the beginning of its reports and its effort to use nontechnical language was confidential and proprietary, the evidence does not support this assertion. Not only are these common characteristics of many kinds of reports, they are not kept confidential. Rimkus reports are presented to clients and become the clients' property. Rimkus reports are often disseminated to parties to insurance disputes and litigation. Every time a report is filed in court, the format is publicly disclosed.

Rimkus also claimed that its operations manual was confidential and proprietary. There was inadequate information presented to conclude that the operations manual is confidential, proprietary, or a trade secret. Moreover, Cammarata testified that Rimkus collected its operations manual from "any employees that had them" in 2001 or 2002 and that he never received another copy. (Docket Entry No. 150 at 28).

255 F.R.D. 417, *437; 2008 U.S. Dist. LEXIS 61791, **56

The record showed that Rimkus's business plan, pricing terms, and client database are confidential, proprietary, and contain trade secret information. The record also showed that these materials and information become outdated in approximately 12 to 18 [**57] months and no longer provide a competitive advantage. Even if the 18-month period from the date Cammarata left Rimkus was a reasonable period for the noncompetition clause based on the need to protect confidential and proprietary information, Rimkus has not shown that it is entitled to a preliminary injunction enforcing that clause for 18 months from the present date. The record shows that Rimkus delayed in seeking a preliminary injunction to prevent Cammarata from competing against Rimkus. Cammarata resigned from Rimkus on November 15, 2006. On same day, he and the two other cofounders of U.S. Forensic, Gary Bell and Mike DeHarde, sued Rimkus in Louisiana state court, seeking a declaratory judgment that the noncompetition covenant in the Employment Agreement they had signed was unenforceable. Rimkus did not file suit against Cammarata to enforce the noncompetition and nonsolicitation covenants until January 30, 2007. Rimkus did not request a preliminary injunction hearing in this court until November 5, 2007, almost one year after Cammarata resigned and began competing through U.S. Forensic. After a hearing was set for January 7, 2008, it was continued multiple times due to requests [**58] by both parties and discovery disputes. [3] The hearing took place on April 24 and 25 and May 1, [*438] 2008, two weeks before the covenant's expiration date.

Rimkus's delay in seeking injunctive relief in this court weighs heavily against a finding of irreparable injury. *See Gonannies, Inc. v. Goaupair.Com, Inc., 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006)* (*HN18*[⬆]) "Delay in seeking a remedy is an important factor bearing on the need for [**59] a preliminary injunction. Absent a good

explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief. Evidence of an undue delay in bringing suit may be sufficient to rebut the presumption of irreparable harm.") (citation omitted). Rimkus's delay in seeking injunctive relief in this court consumed most of the covenants' stated period. *See Gaylord Broadcasting Co. v. Cosmos Broadcasting Co., 746 F.2d 251, 254 (5th Cir. 1984)* (holding that an employer "cannot enforce specifically the terms of the now-lapsed covenant to compete" because the employer's right to enforce the covenant had already expired); *MedX, Inc. v. Ranger, 788 F. Supp. 288, 291 (E.D. La. 1992)* (noting that "[t]here is substantial support among the Federal courts of appeals for the proposition that it is inappropriate to grant an injunction to enforce an agreement by a former employee not to compete after the period during which the employee agreed not to compete has expired" (internal punctuation omitted) (citing *Econ. Lab., Inc. v. Donnolo, 612 F.2d 405, 408 (9th Cir. 1979)).*

Cammarata points [**60] out that in the declaratory-judgment action in Louisiana state court, Rimkus requested a preliminary injunction against Mike DeHarde on January 9, 2007 and asked that its preliminary injunction request be set for hearing immediately. On January 10, 2007, the Louisiana district court set a hearing on Rimkus's request for injunctive relief for January 17, 2008. Cammarata also notes that on February 27, 2007, Rimkus sought and obtained an *ex parte* temporary restraining order against Gary Bell in a separate Texas state-court action. Rimkus's actions in seeking timely injunctive relief against the other founders of U.S. Forensic highlight Rimkus's delay in pursuing injunctive relief against Cammarata in this suit. These actions are consistent with the fact that U.S. Forensic and Cammarata are basically doing business in Louisiana; that their competitive activities in Texas, Alabama, Florida, and Mississippi are very limited; and that there was no threat of irreparable harm to Rimkus from those activities during the period of the contractual restrictions on competition and on solicitation.

Rimkus did not file this suit against Cammarata for two and a half months after Cammarata sought a declaratory [**61] judgment in Louisiana state court as to the Employment Agreement's enforceability. Rimkus did not request a preliminary injunction hearing in this suit until approximately one year after Cammarata had resigned and begun working for U.S. Forensic. The hearing was continued for at least three months due to

---

[3] Cammarata asked this court to continue the hearing until January 10, 2008. (Docket Entry No. 54). Rimkus then asked this court to continue the hearing until February 4, 2008. (Docket Entry No. 63). The hearing was set for February 15, 2008. (Docket Entry No. 65). On February 15, 2008, this court heard discovery disputes between the parties and rescheduled the preliminary injunction hearing for March 24, 2008 or April 1, 2008, depending on this court's docket. (Docket Entry No. 91). This court subsequently held multiple discovery hearings by telephone and in person on March 12, 14, and 21, 2008 and April 15, 2008. (Docket Entry Nos. 101, 109, 110). At the March 24, 2008 hearing, the preliminary injunction hearing was reset for April 24, 2008. (Docket Entry No. 110).

255 F.R.D. 417, *438; 2008 U.S. Dist. LEXIS 61791, **61

requests by both parties and discovery disputes. To enforce the 18-month restriction from the present date is not necessary to protect Rimkus's confidential, proprietary, or secret information. The record shows that this information is now outdated and cannot provide Cammarata an unfair competitive advantage. There is no justification to extend the prohibition on competition beyond the contractual period based on litigation delay.

Based on the record, Rimkus's application for a preliminary injunction enforcing the noncompetition covenant in the parties' Employment Agreement is denied.

*2. The Nonsolicitation Covenants*

Although this court considers the covenants not to solicit either Rimkus employees or Rimkus customers separately from the covenant not to compete, the nonsolicitation provisions in the parties' Employment Agreement form part of the noncompetition covenant and fall under **[**62]** the heading, "Covenant not to Compete." To the extent that the nonsolicitation provisions constitute a separate covenant, such *HN19*[⬆] a nonsolicitation covenant is also a restraint on trade and competition and must meet the criteria of *section 15.50 of the Texas Business and Commerce Code* to be enforceable. *See Shoreline Gas, Inc. v. McGaughey, No. 13-07-364-CV, 2008 Tex. App. LEXIS 2760, 2008 WL 1747624, at *10 (Tex. App.--Corpus [*439] Christi April 17, 2008, no pet.)* ("[N]on-solicitation agreements are subject to the same analysis as covenants not to compete. . . . A non-solicitation agreement is sufficiently analogous to a covenant not to compete such that the provisions of the Act must apply fully to such agreements.") (citations omitted); *Miller Paper Co. v. Roberts Paper Co., 901 S.W.2d 593, 599-600 (Tex. App.--Amarillo 1995, no pet.)* ("Both [nonsolicitation covenants and noncompetition covenants] prevent the employee from soliciting customers or business enjoyed by the employer. Both contain geographic and durational parameters. Both effectively restrict competition. Moreover, both allegedly serve to protect goodwill."); *accord Guy Carpenter & Co., Inc. v. Provenzale, 334 F.3d 459, 465 (5th Cir. 2003)* (noting that **[**63]** "non-solicitation covenants restrain trade and competition" and are governed by *section 15.50*). The nonsolicitation covenants will be enforceable if they are "ancillary to or part of an otherwise enforceable agreement at the time the agreement" and contain reasonable "limitations as to time, geographical area, and scope of activity to be restrained" that "do not impose a greater restraint than is necessary to protect

the goodwill or other business interest of the promisee." *TEX. BUS. & COM. CODE § 15.50.*

*a. Are the Nonsolicitation Covenants Ancillary to or Part of an Otherwise Enforceable Agreement?*

As noted above, because Rimkus provided Cammarata with training and confidential information, by the time Cammarata left Rimkus, "the [parties' nonsolicitation] agreement had become an enforceable unilateral contract." *Alex Sheshunoff, 209 S.W.3d at 655.*

*b. Are the Nonsolicitation Covenant Restrictions Reasonable?*

The nonsolicitation covenant states as follows:

> b. Employee agrees that after terminate of employment with the Company, he will not, directly or indirectly, solicit, employ or in any other fashion, hire persons who are, or were, employees, officers or agents of the Company, until such **[**64]** person has terminated his employment with the Company for a period of eighteen (18) months);
>
> c. Employee agrees, that for a period lasting until eighteen (18) months after termination of his employment, he will not at any time, directly or indirectly, solicit the Company's customers . . . .

(Docket Entry No. 1, Ex. A at 5).

Based on the record and applicable Texas law, the covenant not to solicit Rimkus's customers is unreasonable because it applies to all Rimkus customers. *HN20*[⬆] Texas courts have held that nonsolicitation covenants that cover clients with whom the employee had no contact while working for the employer are overbroad and not reasonably necessary to protect the employer's legitimate business interest in maintaining its client base. *See Peat Marwick Main & Co. v. Haass, 818 S.W.2d 381, 387-88 (Tex. 1981)* ("Inhibiting departing partners from engaging accounting services for clients who were acquired after the partner left, or with whom the accountant had no contact while associated with the firm, does not further and is not reasonably necessary to protect that interest [in preventing the former partner or employee from establishing rapport with the clients and upon termination **[**65]** taking part of the client base with him]. We hold that the [nonsolicitation] provision is overbroad and unreasonable."); *Hardy v. Mann Frankfort Stein & Lipp Advisors, Inc., 263 S.W.3d 232, 2007 Tex. App. LEXIS 3442, 2007 WL 1299661, at *12 (Tex. App.--Houston [1st Dist.] May 3, 2007, pet. filed)* (finding that a restrictive covenant preventing an

255 F.R.D. 417, *439; 2008 U.S. Dist. LEXIS 61791, **65

employee from calling or soliciting "any Clients of the Firm" for 24 months to be overbroad because it did not "require a connection between the clients and the person who is restricted by the covenant"); _Wright v. Sport Supply Group, Inc., 137 S.W.3d 289, 298 (Tex. App.--Beaumont 2004, no pet.)_ (refusing to enforce an agreement that prohibited an employee from doing business with the employer's "customers, suppliers, clients, licensors, licensees, distributors, dealers, or independent salespersons" because the agreement was not limited "just to customers with whom [the employee] had dealings while he was employed by [the employer]"); _Hargrave v. Giuffre, No. 09-98-007 [*440] CV, 1999 Tex. App. LEXIS 9618, 1999 WL 1270783, at *1 (Tex. App.--Beaumont Dec. 30, 1999, no pet.)_ (finding a nonsolicitation covenant to be unreasonable "with regard to the scope of activity to be restrained in that it is not limited [**66] to those clients whom [the employee] serviced or had dealings with while at the agency"); _John R. Ray & Sons, Inc. v. Stroman, 923 S.W.2d 80, 85 (Tex. App.--Houston [14th Dist.] 1996, writ denied)_ ("In the case of covenants applied to a personal services occupation . . . a restraint on client solicitation is overbroad and unreasonable when it extends to clients with whom the employee had no dealings during his employment.") (citations omitted). Because the covenant not to solicit customers extends to all Rimkus clients, the covenant is broader than necessary to protect Rimkus's legitimate business interest in protecting its client base and is unenforceable.

The record does not support this court's reformation of the nonsolicitation covenant. The record shows that Cammarata's work for Rimkus involved primarily Louisiana clients and the nonsolicitation prohibition is unenforceable in Louisiana. The record also shows no basis for extending the prohibition beyond the contractual period.

The record also shows that the Rimkus or RCGL employees Cammarata solicited or employed for U.S. Forensic live and work in Louisiana. The covenant not to solicit is unenforceable in Louisiana. Because Cammarata [**67] solicited few clients and solicited no Rimkus employees outside Louisiana, Rimkus has failed to show either a probable right to the preliminary injunctive relief it seeks or a probable, imminent, irreparable injury.

Based on the current record, Rimkus's request for a preliminary injunction enforcing the nonsolicitation provisions in the parties' Employment Agreement is

denied.

*3. Trade Secrets and Confidential Information*

**HN21**[⬆] "To state a claim for trade secret misappropriation under Texas law, a plaintiff must (1) establish that a trade secret existed; (2) demonstrate that the trade secret was acquired by the defendant through a breach of a confidential relationship or discovered by improper means; and (3) show that the defendant used the trade secret without authorization from the plaintiff." _Gen. Univ. Sys., Inc. v. HAL, Inc., 379 F.3d 131, 149-50 (5th Cir. 2004)_. The parties primarily dispute whether the information that Rimkus claims is confidential is entitled to trade secret protection and whether Cammarata used this information without Rimkus's authorization. These two issues are examined separately below.

*a. The Existence of a Trade Secret*

**HN22**[⬆] At the preliminary injunction stage, "the trial [**68] court . . . determines whether the applicant [for preliminary injunction] has established that the information is entitled to trade secret protection until a trial on the merits." _Fox v. Tropical Warehouses, Inc., 121 S.W.3d 853, 858 (Tex. App.--Forth Worth 2004, no pet.)_. A preliminary injunction applicant meets its burden by showing a probability of success in proving that its confidential information is entitled to trade secret protection. _Mabrey v. SandStream, Inc., 124 S.W.3d 302, 311 & n.21 (Tex. App.--Fort Worth 2003, no pet.)_.

**HN23**[⬆] The Texas Supreme Court has stated that "a trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." _In re Bass, 113 S.W.3d 735, 739 (Tex. 2003)_ (quoting _Computer Assocs. Int'l, Inc. v. Altai, Inc., 918 S.W.2d 453, 455 (Tex. 1994)_). To determine whether there is a trade secret protected from disclosure or use, a court must examine six "relevant but nonexclusive" criteria: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved [**69] in the business; (3) the extent of measures taken to safeguard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." _Gen. Univ. Sys., 379 F.3d at 150_ (citing _In re_

255 F.R.D. 417, *440; 2008 U.S. Dist. LEXIS 61791, **69

*Bass, 113 S.W.3d at 739-40*); *see* **[\*441]** *also Computer Assocs. Int'l, Inc., 918 S.W.2d at 455*; *T-N-T Motorsports, Inc. v. Hennessey Motorsports, Inc., 965 S.W.2d 18, 22 (Tex. App.--Houston [1st Dist.] 1998, pet. dism'd)*. Although the party claiming a trade secret need not satisfy all six factors "'because trade secrets do not fit neatly into each factor every time,'" *Gen. Univ. Sys., 379 F.3d at 150* (citing *In re Bass, 113 S.W.3d at 740*), it is "the burden of the party claiming secrecy status to prove secrecy," *Stewart & Stevenson Servs., Inc. v. Serv-Tech, Inc., 879 S.W.2d 89, 99 (Tex. App.--Houston [14th Dist.] 1994, writ denied)*.

**HN24[⬆]** Customer lists, pricing information, client information, customer preferences, buyer contacts, and marketing strategies have all been recognized as trade secrets. *See Global Water Group, Inc. v. Atchley, 244 S.W.3d 924, 928 (Tex. App.--Dallas 2008, pet. denied)* **[\*\*70]** (citing *T-N-T Motorsports, 965 S.W.2d at 22*). The record shows that Rimkus has expended significant time, effort, and money to develop and protect the information contained in its client database, pricing structure, and annual business plan. Brown testified that Rimkus's customer database contains information about all of Rimkus's jobs and clients. The database details each client's location and contact person, how frequently the clients use Rimkus's services, and information about each project performed for that client, including the project type, the resources devoted to the project, and how much the client was billed. Employee access to Rimkus's customer database is limited.

Brown also testified that Rimkus revises its pricing information annually in committee meetings at which attendance is limited. Rimkus's pricing varies based on the type of project and the client's location. Rimkus also has national pricing agreements with specific clients that may be revised more often. Because forensic engineering firms compete by price, a firm's pricing information would give a competitor an advantage in bidding for projects.

Brown testified that Rimkus distributes a business plan annually **[\*\*71]** to its managerial employees. The plan contains Rimkus's marketing strategies for the next one to five years and includes a synopsis of the state of Rimkus's business and of the industry as a whole. It contains a mission statement and an executive summary that identifies growth areas and potential new niche markets, key business strategies for the upcoming year, man-hour data forecasts, market and efficiency analyses, and a three-year and five-year outlook for Rimkus's business.

The record shows that Rimkus's customer database, pricing information, and the marketing strategies contained in its annual business plan are confidential and not widely known to others in the industry. *See Trilogy Software, Inc. v. Callidus Software, Inc., 143 S.W.3d 452, 467 (Tex. App.--Austin 2004, pet. denied)* (noting that trade secrets are "not generally known or readily ascertainable by independent investigation") (citation omitted). Rimkus takes significant measures to safeguard this information, which would provide competitors with an advantage in the field. Rimkus has cultivated its customer database, pricing structure, and market strategies with significant effort, and it would be difficult for another **[\*\*72]** firm to acquire or duplicate the same information. Rimkus has shown that its customer database, pricing information, and annual business plan are entitled to trade secret protection.

Rimkus's investigative methods and report formats are, by contrast, not trade secrets under Texas law. Graham testified that there are no industry standards for evaluating property damage in forensic engineering. Rimkus was one of the first companies to offer forensic engineering services. On cross-examination, Graham admitted that the investigative methods used for a particular job depend on the area of expertise required for the project and an investigator's substantive knowledge in that area. Rimkus has not shown that its investigative methods are proprietary, rather than a product of the knowledge, skill, and experience common in the industry. *See Trilogy, 143 S.W.3d at 467* ("[I]nformation that is generally known and readily available is not protectable."). Rimkus has not shown that its investigative methods required extensive development, such that a competitor would have difficulty in developing similar methods. Based on the **[\*442]** current record, Rimkus's investigative methods do not warrant trade secret **[\*\*73]** protection. Nor does the record support an inference that Rimkus's investigative report format constitutes a protectable trade secret. Graham testified that in response to client preferences, Rimkus developed a report format that first provides a brief summary of the investigation's findings and conclusions before providing a more detailed explanation of the investigation. The reports also use simplified language that laypeople will be able to understand better. Graham distinguished this format from other engineering reports that provide an abstract of the investigation at the beginning and do not discuss the investigation's findings and conclusions until the end. Although Graham testified that Rimkus's report format is not published, he admitted that he has seen reports from other competitors in the industry that are

255 F.R.D. 417, *442; 2008 U.S. Dist. LEXIS 61791, **73

similar to Rimkus's reports. He also testified that Rimkus's reports can and have been used in litigation and that they are designed to comply with procedural rules for expert reports. Rimkus points to no evidence showing that its report format is unique or unknown to others in the industry, such that competitors would have difficulty in duplicating a similar format. **[**74]** See _Trilogy, 143 S.W.3d at 467_. Rimkus has not shown that its report format is entitled to trade secret protection. [4]

_c. Did Cammarata Use Rimkus's Trade Secrets Without Authorization?_

Although Rimkus has shown that its customer database, pricing information, and annual business plan are entitled to trade-secret protection, Rimkus has failed to show a probable right to the injunctive relief it seeks there is no evidence that Cammarata or U.S. Forensic have used Rimkus's trade secrets. Rimkus primarily argues that U.S. Forensic could not have grown as quickly as it did if Cammarata had not taken and used Rimkus's trade secrets and confidential information. Brown testified that it took Rimkus three years to perform a thousand jobs and eleven years to open six offices. In contrast, U.S. Forensic has opened six service **[**75]** locations within approximately one and a half years.

U.S. Forensic's growth does not support the argument that Cammarata used Rimkus's trade secrets without authorization. As both Graham and Brown acknowledged, the industry has grown significantly since Rimkus first started doing business in 1983. U.S. Forensic began operating at a time and in an area of the country--the Gulf Coast--that had a large demand for forensic engineering services because of natural-disaster-related claims and litigation. Rimkus points to no evidence showing that U.S. Forensic's growth is a result of Cammarata's unauthorized use of Rimkus's trade secrets, rather than a result of the growth of the industry as a whole and heavy regional demand for such services.

Much of Rimkus's confidential information is time-sensitive and becomes outdated within 12 to 18 months.

_____

[4] Rimkus asserted that its operations manual constitutes confidential information. The record is sparse as to the information contained in the manual. The only evidence in the record is that Cammarata did not have access to such a manual after 2002. There is no basis to find the manual a trade secret or that it could provide a competitive advantage to Cammarata or U.S. Forensic.

Cammarata testified, and Rimkus did not dispute, that he did not download or otherwise take any information from Rimkus's customer database or, after resigning from Rimkus, immediately record his recollections as to which adjusters listed in the _Casualty Adjusters Guide_ were Rimkus clients. Cammarata further testified that he did not take from Rimkus **[**76]** any pricing information or the 2006 business plan when he left Rimkus in November 2006. He stated that he had no access to Rimkus's 2007 business plan, which Rimkus distributed to its employees in January 2007. Rimkus revises its business plan and pricing information annually. Bell testified that U.S. Forensic has expended significant effort to develop its own client base. Bell stated that he relies heavily on the _Casualty Adjusters Guide_, which is published annually, and that he makes calls to adjusters listed in the Guide "every day." Bell further testified that he researches potential customers on the Internet, including web pages maintained by state governments that list licensed insurers and **[*443]** adjusters. U.S. Forensic sends representatives to trade shows and industry conferences and maintains a website that provides a 1-800 phone number.

_HN25_[⬆] The obligation not to use confidential or proprietary information acquired during an employment relationship in a manner adverse to the employer does not bar a former employee from using the general knowledge, skill, and experience that the employee acquired during the employment to compete with the employer. See _Sharma v. Vinmar Int'l, Ltd., 231 S.W.3d 405, 425 (Tex. App.--Houston [14th Dist.] 2007, no pet.)_; **[**77]** _Anderson Chem. Co., Inc. v. Green, 66 S.W.3d 434, 442 (Tex. App.--Amarillo 2001, no pet.)_. Rimkus has not shown that Cammarata used Rimkus's trade secrets without authorization.

Based on the current record, Rimkus's request for a preliminary injunction preventing Cammarata from possessing, distributing, or using Rimkus's trade secrets or proprietary or confidential information is denied.

### IV. The Remaining Motions

Rimkus's motions to strike certain exhibits in Cammarata's exhibit list and to strike two witnesses in Cammarata's witness list are denied as moot. Cammarata did not attempt to admit the exhibits in question and the witnesses did not testify at the preliminary injunction hearing.

Rimkus's motion for a default judgment against U.S.

255 F.R.D. 417, *443; 2008 U.S. Dist. LEXIS 61791, **77

Forensic is denied as moot. U.S. Forensic has filed an answer.

Rimkus's motion for attorneys' fees incurred in a mediation attempt is denied. Rimkus has not shown a sufficient basis to support the award of attorneys' fees.

Rimkus's motion to strike Cammarata's counterclaim as untimely is granted. Cammarata filed his answer to Rimkus's original complaint on January 3, 2008. He filed his counterclaim asserting a cause of action under *TEX. BUS. & COM. CODE § 15.51(c)* [**78] against Rimkus on April 21, 2008. In his counterclaim, Cammarata seeks attorneys' fees incurred in defending an action to enforce noncompetition and nonsolicitation covenants that the party seeking enforcement knew contained unreasonable restrictions as to the time, geographical area, and scope of activity to be restrained. Cammarata's counterclaim is compulsory under *Federal Rule of Civil Procedure 13(a)* because it arises out of the same transaction or occurrence that is the subject matter of Rimkus's claim. *HN26*[↑] Under *Federal Rule of Civil Procedure 13*, a party must state compulsory counterclaims in the party's pleading. Because Cammarata failed timely to amend his answer to assert his counterclaim as a matter of course under *Rule 15(a)(1)*, he had to seek Rimkus's written consent or this court's leave to amend his answer under *Rule 15(a)(2)* and failed to do so. Rimkus's motion to strike Cammarata's counterclaim is granted.

**V. Conclusion**

Rimkus's request for a preliminary injunction is denied. Cammarata's motions to dismiss Rimkus's claims are denied as moot. Rimkus's motions to strike are denied as moot. Rimkus's motion for default judgment is denied as moot. Rimkus's motion for attorney's [**79] fees is denied. Rimkus's motion to strike Cammarata's counterclaim is granted.

Cammarata's motion to abstain is denied.

SIGNED on August 13, 2008, at Houston, Texas.

/s/ Lee H. Rosenthal

Lee H. Rosenthal

United States District Judge

End of Document

# Exhibit 57

NJAPP0641

⚠ Caution
As of: July 19, 2018 8:18 PM Z

## *Solofill, LLC v. Rivera*

United States District Court for the Southern District of Texas, Houston Division

February 8, 2017, Decided; February 8, 2017, Filed

CIVIL ACTION H-16-2702

**Reporter**
2017 U.S. Dist. LEXIS 17604 *; 2017 WL 514589

SOLOFILL, LLC, Plaintiff, v. ADRIEN RIVERA, et al., Defendants.

**Subsequent History:** Transferred by *Solofill, LLC v. Rivera, 2017 U.S. Dist. LEXIS 56374 (S.D. Tex., Apr. 13, 2017)*

## Core Terms

sales, injunctive relief, infringement, trademark, trademark infringement, preliminary injunction, injunction, likelihood of confusion, irreparable injury, irreparable harm, packaging, supplemental briefing, alleges, declining, patent, permanent injunction, trade dress, delayed, machine, offers, logo, damages, parties, argues, coffee, movant, rebuts, marks

**Counsel:** [*1] For Solofill, LLC., Plaintiff: Sandeep Seth, SethLaw, Houston, Tx.

For Adrian Rivera, Adrian Rivera Maynez Enterprises, Inc., Defendants: Aaron Douglas Davidson, LEAD ATTORNEY, Darin Michael Klemchuk, Klemchuk LLP, Dallas, TX; Sudip Kundu, Kundu PLLC, Washington, DC.

**Judges:** Gray H. Miller, United States District Judge.

**Opinion by:** Gray H. Miller

## Opinion

### MEMORANDUM OPINION AND ORDER

Pending before the court is plaintiff Solofill, LLC's ("Solofill") application for preliminary injunctive relief to require defendants Adrien Rivera, individually, and Adrian Rivera Maynez Enterprises, Inc. (collectively "Rivera") to cease any trademark and trade dress infringement against Solofill. Dkt. 22. An oral hearing

was held on December 14, 2016, and the court informed the parties it would rule on Solofill's requests for both preliminary and permanent injunctions (Dkt. 1). Dkt. 35. After the hearing, both parties filed supplemental briefings. Dkts. 31, 32. Rivera objected to Solofill's supplemental briefing. Dkt. 33. Based on the complaint, the motion, the response, the evidence presented at the injunction hearing, the supplemental briefings and the objections thereto, and the applicable law, the court finds that Solofill's motion [*2] for preliminary injunctive relief and permanent injunctive relief should be DENIED.

### I. BACKGROUND

This case is a trademark and trade dress controversy between two producers of after-market reusable brewing containers designed to be used with a Keurig coffee maker, known as "K-cups." Dkt. 1 at 2. Solofill is organized and has a principle place of business in Texas. *Id.* at 1. Adrian Rivera is the owner of Adrian Rivera Maynez Enterprises, a California company which sells its reusable brewing containers under the name "ECO-FILL." *Id.* Solofill and Rivera have also been engaged in litigation in the International Trade Commission and the Southern District of California arising from Rivera's allegations that Solofill is infringing on its patent for reusable brewing container technology. Dkt. 22 at 5-6. In its complaint, Solofill asserts claims against Rivera for trademark and trade dress infringement claims under the Lanham Act and under common law, unfair competition, unfair and deceptive trade practices, misappropriation, and unjust enrichment. Dkt. 1 at 20-23.

On September 28, 2010, Solofill entered the market with the "K1," the first version of its podless reusable K-cup under its mark. Dkt. 22 [*3] at 1. During its first two years on the market, Solofill sold nearly 1.5 million units through retailers such as Bed, Bath and Beyond, Target, and Walmart. Dkt. 22, Vu Dec. at 1, 8. At the same time,

2017 U.S. Dist. LEXIS 17604, *3

Rivera was also operating in the K-cup market, selling a product called "EZ-Cup." Dkt. 22, Vu Dec at 4, Ex. D. The EZ-Cup, unlike the K1, was only semi-reusable because it featured disposable mesh filters that are discarded after brewing. *Id.* In October 2011, Solofill updated its product to the "K2" version, and with that update, changed its bubble-style packaging to a new rectangular box-style packaging. Dkt. 22 at 2, Vu Dec. at 9, 11-13, Exs. E, F, G. In 2012, Rivera introduced a fully-reusable pod under the name "ECO-FILL," which Solofill alleges has a similar look and design to its own packaging. Dkt. 22 at 3.

On April 23, 2013, Solofill registered a trademark for its company name with the U.S. Patent and Trademark Office, Reg. No. 4,322, 850. Dkt. 22, Ex. B. Solofill also asserts that it has common law trademarks and trade dress protection for the design of its packaging, the naming of its "Octoflo" and "Decaflo" technology that injects water into the cup, and the design of its logo. Dkt. 22, Ex. G, H, Vu Dec. at 21. Solofill [*4] describes its packaging as "an opaque back, [with] clear sides and front with opaque upper and lower banners" and displaying a distinct set of pictorials, logos, and text. Dkt. 22 at 2, Ex. H, J. Solofill's logo contains a coffee cup as part of its lettering, with a stylized steam that emanates from the cup. Dkt. 22, Vu Dec. at 14.

On November 6, 2012, Rivera registered a trademark for the name ECO-FILL with the U.S. Patent and Trademark Office, Reg. No. 4,239,190. Dkt. 24, Ex. C. ECO-FILL is sold in a rectangular box, with clear sides, an opaque upper and lower banner, with instructional pictorials and text. Dkt. 22, Vu Dec. at 18-19, Ex. H; Dkt. 24, Ex. C. ECO-FILL uses a water injection system called "POLY-FLO." *Id.* ECO-FILL's logo contains a coffee cup in the lettering with stylized steam. *Id.* In December 2012, Solofill updated its product to the "K3" version, and darkened the color scheme of its packaging; Rivera also made similar changes to the ECO-FILL packaging. *Id.* at 5, Vu Dec. at 22-23, Exs. H, J.

Robert Vu, the owner of SOLOFILL, alleges that he was not aware of the ECO-FILL K-cup when it was introduced in 2012. Dkt. 22, Vu Dec. at 15-16. Solofill alleges it learned of ECO-FILL's existence in April 2014, when Rivera sued Solofill for patent [*5] infringement. Dkt. 22 at 5, Vu Dec. at 24. On September 6, 2016, Solofill filed its original complaint against Rivera for trademark and trade dress infringement. Dkt. 1. On November 4, 2016, Rivera filed a motion to dismiss. Dkt. 14. Solofill responded on November 28, 2016, and

Rivera replied. Dkts. 18, 21.

On December 6, 2016, Solofill motioned for a preliminary injunction. Dkt. 8. Rivera responded to the motion. Dkt. 24. On December 14, 2016, the court held an oral hearing on the motion for a preliminary injunction and gave the parties ten days to file any supplemental briefing. At the oral hearing, Solofill's counsel told the court he did not need to clarify any arguments with a supplemental briefing. Dkt. 35 at 91. However, both parties did file supplemental briefings, and Solofill added new evidence to its supplemental briefing. Dkts. 31, 32. Rivera objects to the new evidence attached to Solofill's supplemental briefing, because Solofill had ample opportunity to present that evidence at the hearing. Dkt. 33.

## II. LEGAL STANDARDS

### A. Injunctive Relief

The decision to grant or deny a preliminary injunction lies within the sound discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 621 (5th Cir. 1985)*. A preliminary injunction is an extraordinary [*6] and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion. *Harris Cty. v. CarMax Auto Superstores, Inc., 177 F.3d 306, 312 (5th Cir. 1999)*. To obtain a preliminary injunction, the movant must establish the following: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the preliminary injunction is denied; (3) that the potential injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the preliminary injunction will not disservice the public interest. *Guy Carpenter & Co. v. Provenzale, 334 F.3d 459, 464 (5th Cir. 2003)*.

The requirements for issuing a permanent injunction are the same as a preliminary injunction except that a likelihood of success on the merits is not a required showing. In order to receive a permanent injunction, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that

2017 U.S. Dist. LEXIS 17604, *6

the public interest would not be disserved by a permanent [*7] injunction." *eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)*. A party seeking a permanent injunction in a trademark infringement case must show (1) that the mark is protectable; (2) the party is a senior user; and (3) there is a likelihood of confusion between the two marks that (4) will actually result in irreparable injury for which there is no adequate legal remedy. *Union Nat. Bank of Tex., Laredo, Tex. v. Union Nat. Bank of Tex., Austin, 909 F.2d 839, 844 (5th Cir. 1990)*.

### B. Trademark Infringement

To prevail on a claim of trademark infringement under the Lanham Act, plaintiff must show: (1) it possesses a valid mark; and (2) defendant's use of its trademarks creates a likelihood of confusion as to source, affiliation, or sponsorship. *Elvis Presley Enter., Inc. v. Capece, 141 F.3d 188, 193 (5th Cir. 1998)*. However, it is important to remember that "mere reproduction of a trademark does not constitute trademark infringement if there is no likelihood of confusion." 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:28 (4th ed. 2009). And, "likelihood of confusion" is not *possible* confusion, it is *probable* confusion. *Bd. of Supervisors for LSU A&M Coll. v. Smack Apparel Co., 550 F.3d 465, 478 (5th Cir. 2008)*. In this respect, "[c]ontext is especially critical," and a court is required to "consider the marks in the context that a customer perceives them in the marketplace." *Scott Fetzer Co. v. House of Vacuums Inc., 381 F.3d 477, 485 (5th Cir. 2004)*.

### III. ANALYSIS

The "extraordinary equitable remedy" of an injunction requires that the plaintiff demonstrate that, [*8] without injunctive relief, he will suffer an irreparable injury for which damages are an inadequate remedy. *Brennan's, Inc. v. Brennan, 289 F. App'x 706, 707 (5th Cir. 2008)*; *Ridgely v. FEMA, 512 F.3d 727, 734 (5th Cir. 2008)*. The Fifth Circuit has opined that, in some circumstances, irreparable injury can be presumed based on a showing of a likelihood of confusion in a trademark infringement claim. *Abraham v. Alpha Chi Omega, 708 F.3d 614, 627 (5th Cir. 2013)* (holding that "[a]ll that must be proven to establish liability and the need for an injunction against infringement is the likelihood of confusion, injury is presumed."); *see also Paulsson Geophysical Servs., Inc. v. Sigmar, 529 F.3d*

303, 313 (5th Cir. 2008)* (commenting that "[w]hen likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods or services constitutes an immediate and irreparable injury, regardless of the actual quality of the goods or services . . . ." but also noting "[t]his Court has avoided 'expressly adopting this presumption of irreparable injury. . .'" (quoting *Quantum Fitness Corp. v. Quantum Lifestyle Ctrs., LLC, 83 F. Supp. 2d 810, 831 (S.D. Tex. 1999)* (Rosenthal, J.) and *S. Monorail Co. v. Robbins & Myers, Inc., 666 F.2d 185, 188 (5th Cir. 1982))*.

Solofill argues that there is a likelihood of confusion by presenting evidence supporting the validity of its marks and trade dress and providing examples of actual and possible confusion. *See* Dkt. 22 at 11-20. Rivera challenges the validity of Solofill's marks and the existence of confusion. *See* Dkt. 24 at 3-5. However, the court does not need to [*9] reach any conclusions regarding whether Solofill's succeeded in establishing the validity of its marks or likelihood of confusion because Solofill has not established irreparable harm.[1]

The court will first consider whether Solofill's delay in requesting injunctive relief rebuts the presumption that likelihood of confusion causes an irreparable injury to Solofill and then consider whether the remaining injuries alleged by Solofill are caused by the infringement.

### A. Delay

Rivera contends that Solofill's delay in seeking injunctive relief precludes a finding of irreparable harm. Even though likelihood of confusion can give rise to the presumption of irreparable harm, a plaintiff's delay in seeking relief without an adequate excuse rebuts that presumption. The Fifth Circuit opined "[t]here is no doubt that laches may defeat claims for injunctive relief." *Abraham v. Alpha Chi Omega, 708 F.3d 614, 626 (5th Cir. 2013)* (citing *Armco, Inc. v. Armco Burglar Alarm Co., Inc., 693 F.2d 1155, 1161 n.14 (5th Cir.1982))*; *Symetra Life Ins. Co. v. Rapid Settlements Ltd., 612 F. Supp. 2d 759, 774 (S.D. Tex. 2007)* (Rosenthal, J.) ("[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent

---

[1] In its supplemental briefing, Solofill offers a market study and additional declarations in support of its claims of confusion. Dkt. 31. The defense objects to the introduction of this new evidence after the hearing. Dkt. 33. However, the court need not rule on the admissibility of this evidence, because it is not performing a likelihood of confusion analysis.

2017 U.S. Dist. LEXIS 17604, *9

a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief. Evidence of an [*10] undue delay in bringing suit may be sufficient to rebut the presumption of irreparable harm." (quoting *Wireless Agents, L.L.C. v. T-Mobile USA, Inc., No. 3:050094D, 2006 U.S. Dist. LEXIS 37783, 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006)*)).

However, there are two ways a court may find irreparable harm and enjoin a defendant even after a delay: (1) if the plaintiff offers a good explanation or excuse for the delay, or (2) if there is a showing of bad faith on the part of the defendant. *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co., 550 F.3d 465, 490 (5th Cir. 2008); Symetra Life Ins., 612 F. Supp. 2d at 774.* First, the court will consider Solofill's delay in seeking injunctive relief, and then address whether Solofill mitigated that delay with a good explanation or with an allegation of bad faith on the part of the defendant.

First, the court finds that Solofill has delayed between three months and two years in seeking injunctive relief. Months-long to years-long delays in seeking an injunction for offending conduct have been enough for courts to hold against a finding of irreparable injury. *See, e.g. State of Tex. v. Seatrain Int'l, S. A., 518 F.2d 175, 182 (5th Cir. 1975)* (finding a nine-month delay in seeking a preliminary injunction allows "a faint shade of laches to fall on their cause."); *ADT, LLC v. Capital Connect, Inc., 145 F. Supp. 3d 671, 698 (N.D. Tex. 2015)* (finding an eight-month delay in seeking injunctive relief without justification meant failure to prove imminent need); [*11] *Galvotec Alloys, Inc. v. Gaus Anodes Int'l, LLC, No. 7:13-CV-664, 2014 U.S. Dist. LEXIS 86873, 2014 WL 2918581, at *3 (S.D. Tex. June 26, 2014)* (holding that a multiple year delay in seeking an injunction "counsels against finding irreparable injury would result"); *Innovation Ventures, LLC v. Ultimate Lifestyles, LLC, No. 4:08-CV-232, 2009 U.S. Dist. LEXIS 132724, 2009 WL 1490588, at *3 (E.D.Tex. May 27, 2009)* (no irreparable injury where plaintiff waited nine months after learning of an infringing sale and provided no explanation for the delay); *Ellipse Commc'ns, Inc. v. Caven, No. CIV.A.3-07-CV-1922-O, 2008 U.S. Dist. LEXIS 125204, 2009 WL 497268, at *2 (N.D. Tex. Feb. 26, 2009)* (denying an injunction because a seven-month delay, with no excuse, rebuts the presumption of irreparable harm).

Here, the alleged trademark infringement began when the ECO-FILL product entered the market in 2012. Dkt. 22 at 3; Dkt. 24 at 9. Solofill claims it became aware of the existence of ECO-FILL and its similarity in name, packaging, and design when Rivera sued Solofill for patent infringement in August 2014. Dkt. 22 at 7-8, Vu Dec. at 24. Solofill waited over two years to file its current law suit, and it did not move for a preliminary injunction until three months after that. Dkts. 1, 22.

Thus, despite the existence of ongoing related litigation between these two parties and Solofill's awareness of ECO-FILL's similar packaging, logo, and style, Solofill took over two years to [*12] file a complaint for trademark infringement. Dkt. 22, Vu Dec. at 35. Then, Solofill waited three more months between filing a trademark infringement complaint and requesting a preliminary injunction. Dkt. 22.

Solofill first attempts to mitigate the delay by offering explanations for the reason it did not file for an injunction until December 2016. Delay does not negate a finding of irreparable harm if the plaintiff has a good explanation or excuse for the delay. *See PIU Mgmt., LLC v. Inflatable Zone Inc., CIV.A. H-08-2719, 2010 WL 681914, at *7 (S.D.Tex. Feb. 25, 2010)* (Miller, J.) (finding "that the Plaintiffs have established 'a good explanation' for delaying the filing of their request for preliminary relief" where plaintiffs first tried to negotiate the dispute with defendant before filing suit, and defendant contributed to delay by resisting service (internal quotations omitted)).

Solofill makes three arguments for the court to excuse its delay—(1) that it was delayed by the ITC action, (2) that it needed time to find counsel, and (3) that it only became aware of declining sales recently. Dkt. 22. First, Solofill alleges "we were completely fed up with his false claim that we copied him, and not vice versa, from August 2014 until now." Dkt. 22, Vu Dec. at 35. The court does not find this a reasonable excuse [*13] because the patent infringement lawsuit certainly did not preclude Solofill from making counterclaims in trademark infringement simultaneously. Second, Solofill argues that it delayed because it needed to find new counsel for the trademark infringement claim. Dkt. 35 at 38. Mr. Vu testified that he did not turn his attention to the trademark case until the ITC case completed in April 2016. *Id.* Then, he took several months to select an attorney to represent his company in the trademark infringement case before securing his present counsel in August 2016. *Id.* However, the court does not find this a reasonable excuse either. Even if this excuse explains the four months of delay between April and the filing of

2017 U.S. Dist. LEXIS 17604, *13

the complaint, it does not explain the three-month delay between filing the complaint and the motion for the injunction.

Third, Solofill alleges that it did not become aware of damages from declining sales until recently. Jacqueline Vu, who manages Solofill's finances, testified that because of the way ordering in the business works sales declines may not be noticeable on a month-to-month basis. Dkt. 26. Therefore, she testified that Solofill did not notice a drop in sales until November [*14] 2015 when it became possible to make a year-to-year comparison. Id. However, even if the court accepts this premise, it still does not explain why Solofill took another year to seek relief. Even when viewed in the light most favorable to Solofill, none of these three excuses offers an explanation for the delay between the filing of the complaint in September and the filing of the motion for an injunction three months later or why Solofill did not litigate the trademark claim simultaneously with the patent infringement claim. Therefore, even when the court considers these three excuses together, the delay does not appear to be warranted.

Next, Solofill attempts to mitigate the delay by arguing that Rivera has "engaged in a systematic pattern of willful infringement and copying." Dkt. 22 at 24. In Smack Apparel Co., the Fifth Circuit held that an issue of delay can be overcome if the defendant acted in bad faith. 550 F.3d at 490. However, in that case, the defendant admitted that he intentionally incorporated the plaintiff university's logo, colors, and indicia specifically to call attention to the university through its products and to derive a benefit from the university's reputation. Id. Here, Solofill [*15] failed to provide any similarly compelling evidence of Rivera's bad intentions. Instead, Solofill offers conclusory statements that Rivera's pattern of changing his product packaging to match Solofill's demonstrates bad intention. Dkt. 11, Vu Dec. at 19. The court does not find this alleged pattern of conduct sufficient to establish an issue of Rivera's intentions..

The delay in requesting injunctive relief, without an adequate excuse and lacking proof of Rivera's bad faith, leads the court to conclude that Solofill is not experiencing irreparable harm.

## B. Causation

Solofill also alleges it is being harmed in the form of lost

sales which demands injunctive relief. Solofill makes the argument that its declining sales and loss of business from major retailers provides evidence of the irreparable harm caused by the alleged infringement. Dkt. 22, Vu Dec. at 25-27. Solofill argues that it lost customers and contracts at big box retailers, amounting to a loss of millions in revenue, along with lost value from advertising, development costs, packaging, art work, and promotional materials. Id. To the extent that an injunction, rather than monetary damages, is an appropriate remedy for such a decline, Solofill does not offer [*16] any evidence to show that its decline in sales was caused by confusion with Rivera's allegedly infringing ECO-FILL product. See Decks Appeal v. GTE Directories Sales Corp., 81 F.3d 154, 155 (5th Cir. 1996) (citing to Univ. Computing Co. v. Mgmt. Science Am., Inc., 810 F.2d 1395, 1398 (5th Cir.1987)) (holding that evidence of declining sales is "speculative" because the plaintiff "fails to present a basis for determining how much of its damages resulted from [defendant's] wrongful acts").

Here, Solofill offers evidence of harm through records of its declining sales between 2014 and 2016. Dkt. 28, Exs. N, O, P, Q. Though Solofill accuses Rivera of beginning its infringing activities in 2012, Solofill's sales actually grew through 2014 before beginning to fall off.[2] Id.; Dkt. 31 at 3. Rivera argues that it could not have harmed Solofill by any trademark infringement because Solofill's sales actually increased from 2012 to 2014 despite ECO-FILL's presence in the marketplace. Dkt. 31 at 3. But, the court observes, even if Solofill's sales increased during this time, the sales may have been increasing at a lower rate because of a competing product causing confusion.

However, Rivera also offers a compelling alternate theory of causation for Solofill's decline in sales that also tracks the sales data—compatibility with the Keurig Version 2.0 coffee [*17] machine. The Keurig Version 2.0 machine was introduced in 2014 and requires an updated K-cup design to interface with its sensor. Dkt. 31, Rivera Dec. at 3. ECO-FILL's 2.0 product, introduced in 2014, is compatible with Keurig 2.0 machines. Id.; Dkt. 35 at 58. Solofill did not develop a compatible product until sometime in 2015, and it is unclear if it was ever widely sold. Dkt. 35 at 58-59. Ms.

---

[2] Solofill presented additional evidence in its supplemental briefing regarding the sales drop off. Dkt. 31. Rivera objects to admitting the evidence. Dkt. 33. The court need not rule on the objection because none of this additional evidence conflicts with the sales history already available in the record.

2017 U.S. Dist. LEXIS 17604, *17

Vu's testimony and exhibits regarding declining sales only referenced the K1, K2, and K3 Solofill products that were compatible with the original Keurig Version 1.0 coffee machine. To further rebut Solofill's allegations that consumers were choosing ECO-FILL out of trademark confusion, rather than compatibility with the new Keurig machine, Rivera argues that ECO-FILL is actually a more expensive product. Dkt. 31, Rivera Dec. at 4-5.

The court observes that Solofill's decline in sales seems to be more directly correlated with the arrival of the Keurig Version 2.0 machine in 2014 than with the alleged trademark infringement that began in 2012. Therefore, Solofill has not sufficiently demonstrated that trademark infringement caused this harm to its business.

In conclusion, Solofill fails to demonstrate that it has experienced or [*18] will experience irreparable harm that can only be cured with injunctive relief because (1) it delayed in moving for an injunction and (2) it failed to demonstrate its injuries were caused by Rivera's alleged infringing conduct. Because irreparable harm is a required element for the court to issue a preliminary or permanent injunction, Solofill's motion for injunctive relief is DENIED. Dkts. 1, 22.

## IV. CONCLUSION

Solofill's motion for preliminary (Dkt. 22) and permanent (Dkt. 1) injunctive relief is DENIED.

Signed at Houston, Texas on February 8, 2017.

/s/ Gray H. Miller

Gray H. Miller

United States District Judge

---

End of Document

# Exhibit 58

NJAPP0648

 Positive

As of: July 19, 2018 8:19 PM Z

## *Talon Transaction Techs., Inc. v. StoneEagle Servs.*

United States District Court for the Northern District of Texas, Dallas Division

July 24, 2013, Decided; July 24, 2013, Filed

3:13-cv-00902-P

**Reporter**

2013 U.S. Dist. LEXIS 200239 *; 2013 WL 12173219

TALON TRANSACTION TECHNOLOGIES, INC., et al., Plaintiffs, v. STONEEAGLE SERVICES, INC., et al., Defendants.

**Subsequent History:** Dismissed by, in part, Motion denied by, in part, Claim dismissed by *Talon Transaction Techs., Inc. v. Stoneeagle Servs., Inc., 2013 U.S. Dist. LEXIS 201725 (N.D. Tex., Aug. 15, 2013)*

Later proceeding at *Talon Transaction Techs., Inc. v. StoneEagle Servs., Inc., 2014 U.S. Dist. LEXIS 167898 (N.D. Tex., Dec. 4, 2014)*

Motion granted by, in part, Motion denied by, in part *Talon Transaction Techs., Inc. v. Stoneeagle Servs., 2015 U.S. Dist. LEXIS 178965 (N.D. Tex., Apr. 6, 2015)*

**Prior History:** *StoneEagle Servs. v. Valentine, 2013 U.S. Dist. LEXIS 188512 (N.D. Tex., June 5, 2013)*

## Core Terms

preliminary injunction, lawsuit, parties, irreparable harm, injunctive relief, discovery, motion to strike, injunction, Hacking, temporary, database

**Counsel:** **[*1]** For Talon Transaction Technologies Inc, NexPay Inc, Plaintiffs: Matthew E Yarbrough, LEAD ATTORNEY, Yarbrough Law Group, Dallas, TX; Devon N Conrad, Yarbrough Law Group, Dallas, TX; James T Jacks, Squire Patton Boggs LLP, Dallas, TX; Joshua J Bennett, Carter Scholer Arnett Hamada & Mockler PLLC, Dallas, TX; Sean T Hamada, Carter Scholer Arnett Hamada & Mockler, PLLC, Dallas, TX; Todd Shadle, Godwin Lewis PC, Dallas, TX; Victor C Johnson, Dykema Cox Smith, Dallas, TX.

For David Gillman, Plaintiff: Joshua J Bennett, Carter Scholer Arnett Hamada & Mockler PLLC, Dallas, TX; Sean T Hamada, Carter Scholer Arnett Hamada & Mockler, PLLC, Dallas, TX.

For StoneEagle Services Inc, VPay Inc, Robert Mark Allen, Phillip Andrew Bogner, Jeffrey Warren Brown, Richard Alan Maxwell, Defendants: Beverly A Whitley, LEAD ATTORNEY, Bell Nunnally & Martin LLP, Dallas, TX; Christopher B Trowbridge, Bell Nunnally & Martin LLP, Dallas, TX; R Heath Cheek, Bell Nunnally & Martin LLP, Dallas, TX; Ross Angus Williams, Bell Nunnally & Martin LLP, Dallas, TX.

For Jeffrey Warren Brown, VPay Inc, Robert Mark Allen, Richard Alan Maxwell, Phillip Andrew Bogner, StoneEagle Services Inc, Counter Claimants: Beverly A Whitley, **[*2]** LEAD ATTORNEY, Bell Nunnally & Martin LLP, Dallas, TX; Christopher B Trowbridge, Bell Nunnally & Martin LLP, Dallas, TX; R Heath Cheek, Bell Nunnally & Martin LLP, Dallas, TX; Ross Angus Williams, Bell Nunnally & Martin LLP, Dallas, TX.

For NexPay Inc, Talon Transaction Technologies Inc, Counter Defendant: Matthew E Yarbrough, LEAD ATTORNEY, Yarbrough Law Group, Dallas, TX; Devon N Conrad, Yarbrough Law Group, Dallas, TX; James T Jacks, Squire Patton Boggs LLP, Dallas, TX; Joshua J Bennett, Carter Scholer Arnett Hamada & Mockler PLLC, Dallas, TX; Todd Shadle, Godwin Lewis PC, Dallas, TX; Victor C Johnson, Dykema Cox Smith, Dallas, TX.

For David Gillman, Counter Defendant: Joshua J Bennett, Carter Scholer Arnett Hamada & Mockler PLLC, Dallas, TX; Sean T Hamada, Carter Scholer Arnett Hamada & Mockler, PLLC, Dallas, TX.

For NexPay Inc, Talon Transaction Technologies Inc, Counter Defendants: Matthew E Yarbrough, LEAD ATTORNEY, Yarbrough Law Group, Dallas, TX; Devon N Conrad, Yarbrough Law Group, Dallas, TX; James T Jacks, Squire Patton Boggs LLP, Dallas, TX; Joshua J Bennett, Carter Scholer Arnett Hamada & Mockler PLLC, Dallas, TX; Sean T Hamada, Carter Scholer Arnett Hamada & Mockler, PLLC, **[*3]** Dallas, TX; Todd Shadle, Godwin Lewis PC, Dallas, TX; Victor C Johnson, Dykema Cox Smith, Dallas, TX.

2013 U.S. Dist. LEXIS 200239, *3

**Judges:** JORGE A. SOLIS, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JORGE A. SOLIS

# Opinion

## ORDER

Now before the Court are two Motions. First, Plaintiffs filed an Application for a Preliminary and Permanent Injunction on February 27, 2013. (Doc. 4) After an intervening extension, Defendants filed a Response on April 2, 2013. (Doc. 15) Plaintiffs filed a Reply on April 16, 2013. (Doc. 19) Second, Defendants filed a Motion to Strike on April 2, 2013. (Doc. 13) Plaintiffs filed a Response on April 23, 2013. (Doc. 28) Defendants filed a Reply on May 6, 2013. (Doc. 36) After reviewing the parties' briefing, the evidence, and the applicable law, the Court DENIES Plaintiffs' Application for a Preliminary Injunction and GRANTS Defendants' Motion to Strike.

## I. Background

The parties in this lawsuit are frequent legal adversaries.[1] Talon Transaction Technologies, Inc. ("Talon") and NexPay, Inc. ("NexPay") (collectively, "Plaintiffs") are service and software providers to the healthcare industry. (Doc. 4, p. 1) Plaintiffs use copyrighted software designed to facilitate payments between third party businesses and healthcare providers. [*4] (Id. at 1-2) As early as the 1990s, Talon began to develop and create a database that includes provider and payer information pertaining to the administration of healthcare claims. (Id. at 2) In September 2008, Talon granted StoneEagle Services, Inc. ("StoneEagle") limited access to the database. (Id.)

After a falling out among the parties, on May 22, 2012, StoneEagle allegedly gained access to Talon's database through illegal means by way of a

---

[1] In this Court alone, there are two related lawsuits involving similar parties and similar facts. (See StoneEagle Services, Inc. v. Gillman et al., 3:11-cv-02408-P; Stoneeagle Services Inc., et al. v. Valentine, et al., 3:12-cv-01687-P) As the ensuing establishes, even the Eastern District of Texas boasted a similar lawsuit. (See Talon Transaction Technologies, Inc. v. StroneEagle Services, Inc., et al., 4:12-cv-00440)

sophisticated computer program. (Doc. 1, pp. 16-19) Talon's employees discovered "StoneEagle's illegal intrusion" that same day. (Id. at 18) On July 13, 2012, Talon sued StoneEagle among others in the Eastern District of Texas for causes related to this incident.[2] (See Doc. 1, 4:12-cv-00440) Talon did not request temporary injunctive relief in that lawsuit. On or around October 4, 2012, the parties agreed to transfer the case to the Northern District of Texas. (Doc. 17, 4:12-cv-00440) On October 20, 2012, Talon voluntarily dismissed that lawsuit before any order was entered relating to the pending [*5] request to transfer. (Doc. 19, 4:12-cv-00440)

On February 27, 2013, Talon and NexPay filed this instant lawsuit premised on activities that once again arose from the events of May 22, 2012. (See Doc. 1) Plaintiffs now move for preliminary injunctive relief and Defendants move to strike certain portions of the pleadings.[3]

## II. Discussion

### a. Plaintiffs' Application for a Preliminary Injunction

#### i. Legal Standard

A federal court may issue a preliminary injunction to restrain or require certain acts. See Fed. R. Civ. P. 65(a)-(b). For this type of relief, a movant must

---

[2] Comparing the instant lawsuit with the Eastern District litigation, the instant lawsuit contains the same parties as the Eastern District litigation and then some. Further, the party alignments are the same.

[3] On the same day that Defendants moved for a preliminary injunction, they also requested expedited computer imaging and discovery. (See Doc. 3) On May 14, 2013, following an order of reference, Judge Horan denied Plaintiffs' request for expedited discovery related to taking certain depositions and serving written discovery before the **Federal Rule of Civil Procedure 26(f)** conference. (See Doc. 40) Three days later, acting under the same order of reference, Judge Horan amended a previous order and permitted expedited computer imaging and preservation for the purposes of ensuring that certain electronic evidence was preserved for litigation. (See Doc. 42) Judge Horan ordered the parties to complete this discovery by May 31, 2013 and file a report by June 7, 2013. (Id. at 11) Thereafter, the report was emailed to Judge Horan's chambers.

NJAPP0650

2013 U.S. Dist. LEXIS 200239, *5

establish:

(1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest.

La Union del Pueblo Entero v. FEMA, 608 F.3d 217, 219 (5th Cir. 2010); see also Clark v. Prichard, 812 F.2d 991, 993 (5th Cir. 1987) ("The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a temporary restraining order or preliminary injunction can be granted.").

With respect to the second requisite, a delayed filing normally is at odds with the notion of irreparable harm. See R&L Publ'g, Ltd. v. Success Res. USA LLC, No. 3:12-CV-3785-N, 2013 U.S. Dist. LEXIS 88789, at *2 (N.D. Tex. June 25, 2013) [*6] ("First, under the second element, VPI's delay in filing this motion leads the Court to conclude that there is no substantial threat of irreparable injury absent a TRO.").

[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction. Absent a good explanation, a substantial period of delay militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency for the request for injunctive relief.

GoNannies, Inc. v. GoAuPair.com, Inc., 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (citation omitted and denying temporary relief for a motion filed six months after discovering the alleged wrongful conduct). Generally, courts will trace back to the date of the alleged wrongful conduct and review forward for any intervening factual discoveries before pronouncing a lack of irreparable harm. See Ty, Inc. v. Jones Grp., Inc., 237 F.3d 891, 903 (7th Cir. 2001) ("Delay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm if a preliminary injunction is not entered."); Kan. Health Care Assoc., Inc. v. Kan. Dep't of Soc. & Rehabilitation Servs., 31 F.3d 1536, 1544 (10th Cir. 1994)("As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury."); Majorica, S.A. v. R.H. Macy & Co., 762 F.2d 7, 8 (2d Cir. 1985) ("Lack of diligence, standing alone, may . . . preclude the granting of [*7] preliminary injunctive relief, because it goes primarily to the issue of irreparable harm."); GTE Corp. v. Williams, 731 F.2d 676, 678 (10th Cir. 1984)

("Although plaintiff contends that it will be irreparably harmed should defendants' activities not be enjoined, it has waited nearly a year before seeking any relief." (citations omitted)).

Preliminary injunctions are "extraordinary" and "drastic" remedies that "should not be granted unless the movant clearly carries the burden of persuasion." Canal Auth. of Fla. v. Callaway, 489 F.2d 567, 573 (5th Cir. 1974). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981). Thus, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Id. The Court may accept otherwise inadmissible evidence, including hearsay evidence, "in the form of deposition transcripts and affidavits." Sierra Club, Lone Star Chapter v. FDIC, 992 F.2d 545, 551 (5th Cir. 1993) ("Although the district court may employ informal procedures and rely on generally inadmissible evidence, the record must nevertheless support the district court's decision."). "[T]he burdens at the preliminary injunction stage track the burdens at trial." Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418, 429, 126 S. Ct. 1211, 163 L. Ed. 2d 1017 (2006).

A court "may issue a preliminary injunction only [*8] on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Where facts are in dispute, "parties must be given a fair opportunity and a meaningful hearing to present their differing versions of those facts before a preliminary injunction may be granted." Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 628 (5th Cir. 1996) (quoting Commerce Park at DFW Freeport v. Mardian Construction Co., 729 F.2d 334, 342 (5th Cir. 1984)). Absent a factual dispute, a hearing is not required and "under such circumstances the parties need only be given 'ample opportunity to present their respective views of the legal issues involved.'" Id. (quoting and citing Commerce Park, 729 F.2d at 341; Federal Savings and Loan Insurance Corp. v. Dixon, 835 F.2d 554, 558 (5th Cir. 1987)).

## ii. Analysis

Plaintiffs move for a preliminary injunction to restrain and require certain acts by StoneEagle and others affiliated with the fateful events on May 22, 2012. (Doc. 4, pp. 1-11) Defendants respond by arguing that, inter

Case 1:18-cv-00068   Document 215-1   Filed on 07/21/18 in TXSD   Page 657 of 666

Page 4 of 5
2013 U.S. Dist. LEXIS 200239, *8

*alia*, Plaintiffs cannot show a threat of irreparable harm because the conduct at issue was roughly nine months before the instant lawsuit was filed. (Doc. 15, pp. 7-10) Plaintiffs maintain that although they were aware of a heightened level of computer-related access activity on May 22, 2012, it was not apparent what information was being downloaded or whether there was intent to use this information in a competitive fashion. (Doc. 19, pp. 8-9) A careful review of the Eastern District complaint under **[\*9]** case number 4:12-cv-00440 reveals minimal factual distinctions from that case and the instant lawsuit. (*See* Doc. 1, 4:12-cv-00400) Defendants highlight that the new allegations include a specific reference to StoneEagle engaging one of Talon's former customers, HealthSmart Holdings, Inc., and various representations found on StoneEagle's website. (Doc. 1, p. 23; Doc. 15, p. 9) Plaintiffs do not challenge this itemization of factual differences; rather they opt to characterize these facts as new discoveries since the Eastern District litigation ended. Plaintiffs allege that between November 2012 and February 2013, the time period between the lawsuits, they were able to glean that the entire database was accessed—as opposed to some lesser quantity—with the intent to elicit direct competition because facts came to light that StoneEagle engaged one of Talon's former costumers. (Doc. 19, p. 9) These surprises spurred the hiring of a new set of attorneys who have greater expertise in this area of the law. (*Id.* at 9-10) According to Plaintiffs, all of this amounts to new information necessitating preliminary relief (*Id.* at 8-10)

Reviewing the evidence and having determined there to be no factual dispute regarding **[\*10]** the timeline of this litigation, Plaintiffs' injunctive request is denied because they cannot establish a substantial threat of irreparable harm if a preliminary injunction were to not issue.[4] Chronologically, the events giving rise to this instant lawsuit occurred nine months before any filing in this Court (May 22, 2012 to February 27, 2013). Plaintiffs knew about this alleged illicit activity the day it occurred. (*See* Doc. 1, p. 18) Roughly two months after May 22, 2012, Talon sued StoneEagle and others under substantially similar facts and did not request temporary relief. Although Plaintiffs assert that the four-month period between the lawsuits shed light on Plaintiffs' mental state, the extent that the database was

accessed, and the emergence of a former customer who was contacted by StoneEagle—these revelations are not the fresh type of discoveries that necessitate immediate relief Indeed, Plaintiffs fail to articulate or explain why these new happenings transform or amplify the harm originally perceived in the first lawsuit. Moreover, a change-of-the-guard among attorneys does not bolster the insistence of temporary relief. Finally, the hanging threat of irreparable harm is **[\*11]** further undermined by an agreed motion to extend response deadlines for this and other related motions and pleadings. (*See* Doc. 9) All told, the passage of time and lack of new facts to conjure the presence of irreparable harm dooms this application for preliminary relief.

In short, preliminary relief is denied. *See, e.g., H.D. Vest, Inc. v. H.D. Vest Mgmt. & Servs., LLC, No. 3:09-CV-00390-L, 2009 U.S. Dist. LEXIS 52950, at \*12 (N.D. Tex. June 23, 2009)* ("Although Plaintiff first learned of the alleged infringing conduct around October 13, 2008, it did not file the present motion seeking injunctive relief until March 3, 2009, *almost five months later.* Based on these facts, the court determines that Plaintiff's undue delay is sufficient to rebut a presumption of irreparable harm." (emphasis added)); *Innovation Ventures, LLC v. Ultimate Lifestyles, LLC, No. 4:08-CV-232, 2009 U.S. Dist. LEXIS 132724, at \*7-8 (E.D. Tex. Mar. 13, 2009)* ("According to the testimony before the Court, it appears Plaintiff has been aware of the sale of the 6-hour energy drink since at least March 2008, yet, this injunction motion was not filed until December 23, 2008-*9 months* after learning of the sale and *more than 5 months* after Plaintiff's first request for injunctive relief. The Court finds that Plaintiff's second request **[\*12]** for injunctive relief fails to indicate any urgency or threatened irreparable harm. For that reason, the motion should be denied." (emphasis added)).

**b. Defendants' Motion to Strike**

**i. Legal Standard**

As reflected in *Federal Rule of Civil Procedure 12(f)*, a court may strike from a pleading any "redundant, immaterial, impertinent, or scandalous matter." *Fed. R. Civ. P. 12(f)*. Motions to strike a portion of a pleading generally are viewed with disfavor and are seldom granted because such motions seek a "drastic remedy" and often are "sought by the movant simply as a dilatory tactic." *FDIC v. Niblo, 821 F. Supp. 441, 449 (N.D. Tex. 1993)* (citing *Augustus v. Bd. of Public Instruction of*

---

[4] Although the record plainly shows otherwise, to the extent that the parties could suggest there is a dispute regarding the chronology of this lawsuit, the Court takes the *factual* assertions by Plaintiffs as true and still denies relief.

NJAPP0652

2013 U.S. Dist. LEXIS 200239, *12

_Escambia Cnty., 306 F.2d 862, 868 (5th Cir. 1962))_. A motion to strike should be denied if there is any question concerning law or fact. _Id._ ("The court must deny a motion to strike if there is any question of fact or law."). "'Redundant' matter consists of allegations that constitute a needless repetition of other averments in the pleadings." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1382, 456 (3d ed. 2004). "Scandalous" describes "any allegation that unnecessarily reflects on the moral character of an individual or states anything in repulsive language that detracts from the dignity of the court." _Veranda Assocs., L.P. v. Hooper, No. H-11-42062012, 2012 U.S. Dist. LEXIS 22707, at *11 (S.D. Tex. Feb. 23, 2012)_ [*13] (citations omitted).

## ii. Analysis

Defendants move to strike the use of the term "Hacking Defendants" which is propagated by Plaintiffs in various court filings. (Doc. 13) Defendants principally argue that the term "Hacking Defendants" is impertinent and improper because it amounts to insult and is otherwise unnecessary. (_Id._ at 2) Plaintiffs counter that an order striking the term is not appropriate because the act of "hacking" is "at the very heart of the litigation." (Doc. 28, p. 3) Moreover, the term is not "confusing" nor "internally complex." (_Id._ at 4)

Upon consideration, the Court strikes the term "Hacking Defendants" from any filings in this lawsuit because the term "hacking" is unnecessary and provocative. As defined in the Original Complaint and subsequent filings, "Hacking Defendants" actually includes all Defendants—not just a subset. Given the factual allegations and legal claims at bar, the extra descriptive phrasing is _de mimimis_ substantively and invites discord facially. To hold otherwise would invite needless labels without an ounce of utility (e.g., Breaching Defendants, Trespassing Defendants, Wrongful Foreclosing Defendants, Promissorily Estopped Plaintiffs, [*14] Uncleanly Handed Plaintiffs, etc.). Going forward, the Court strikes the use of this term and orders Plaintiffs to stick with plain ole' "Defendants" or similar phrasing. _See, e.g., Sadler v. Benson Motors Corp., No. 97-1083 SECTION "T" (2), 1997 U.S. Dist. LEXIS 7118, at *3 (E.D. La. May 15, 1997)_ (striking and noting "Plaintiff can show that defendant's alleged actions were racially discriminatory without using the inflammatory term 'Ku Klux Klan'").

## III. Conclusion

For the foregoing reasons, the Court DENIES Plaintiffs' Application for a Preliminary Injunction and GRANTS Defendants' Motion to Strike.

**IT IS SO ORDERED**.

Signed this 24th day of July, 2013.

/s/ Jorge A. Solis

JORGE A. SOLIS

UNITED STATES DISTRICT JUDGE

---

End of Document

# Exhibit 59

NJAPP0654

⚠ **Caution**
As of: July 19, 2018 8:19 PM Z

## *Wireless Agents, L.L.C. v. T-Mobile USA, Inc.*

United States District Court for the Northern District of Texas, Dallas Division

June 6, 2006, Decided ; June 6, 2006, Filed

Civil Action No. 3:05-CV-0094-D

**Reporter**
2006 U.S. Dist. LEXIS 36590 *; 82 U.S.P.Q.2D (BNA) 1779 **

WIRELESS AGENTS, L.L.C., Plaintiff-Counterdefendant, vs. T-MOBILE USA, INC., et al., Defendants-Counterplaintiffs.

**Prior History:** *Wireless Agents, L.L.C. v. Sony Ericsson Mobile Communs. AB, 2006 U.S. Dist. LEXIS 28426 (N.D. Tex., May 3, 2006)*

## Core Terms

Wireless, patent, irreparable harm, license, preliminary injunction, devices, manufacturers, infringement, rebutting a presumption, negotiating, rebutted, factors, reply, invention, resellers, merits, likelihood of success, injunctive relief, one year, demonstrates, injunction, royalties, sells

## Case Summary

### Procedural Posture

In a patent infringement action, plaintiff patentee moves for a preliminary injunction.

### Overview

The dispositive question was whether the patentee would suffer irreparable harm if an injunction were not granted. The court assumed the patentee had clearly demonstrated a likelihood of success on the merits, thereby creating a presumption that it would be irreparably harmed unless a preliminary injunction issued. However, defendants rebutted the presumption because the patentee could recover through damages what it sought from its licensing efforts -- royalties from a non-exclusive license. The patentee's willingness to license the patent on a non-exclusive basis suggested that it was willing to accept royalties in lieu of exclusion. Further, the patentee's undue delay in filing this action demonstrated that there was no apparent urgency to the request for injunctive relief, and was of itself sufficient to rebut the presumption of irreparable harm; the patentee

knew of the accused device as early as January 2004 but did not file this action until one year later. Even if neither the licensing efforts nor the delay in seeking injunctive relief was alone sufficient to rebut the presumption of irreparable harm, the presumption was rebutted when the circumstances were viewed together.

### Outcome

The motion for preliminary injunction was denied.

## LexisNexis® Headnotes

Civil
Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

Patent Law > Remedies > Equitable Relief > Injunctions

*HN1*[⬇] **Injunctions, Preliminary & Temporary Injunctions**

In a patent infringement case, the decision whether to issue a preliminary injunction is within the court's discretion.

Civil
Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

*HN2*[⬇] **Injunctions, Preliminary & Temporary Injunctions**

A preliminary injunction is a drastic and extraordinary remedy that is not to be routinely granted.

NJAPP0655

2006 U.S. Dist. LEXIS 36590, *36590; 82 U.S.P.Q.2D (BNA) 1779, **1779

Civil Procedure > ... > Injunctions > Grounds for Injunctions > General Overview

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

*HN3*[🔖]  Injunctions, Grounds for Injunctions

In deciding whether to grant a motion for a preliminary injunction, a court considers (1) whether the movant has demonstrated a reasonable likelihood of success on the merits, (2) whether the movant will suffer irreparable harm if an injunction is not granted, (3) whether the balance of hardships tips in the movant's favor, and (4) whether and to what extent granting the injunction would have a positive impact on the public interest. No individual factor is dispositive, and the court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested. For the preliminary injunction to issue, however, the movant must establish each of the first two elements.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > General Overview

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

*HN4*[🔖]  Injunctions, Grounds for Injunctions

For reasons of judicial economy and aid of appellate review, a court generally analyzes all four factors in deciding a preliminary injunction motion. More limited analysis, however, may support the court's denial of a preliminary injunction. For example, the court need not make findings concerning the third and fourth factors if the movant fails to establish either of the first two factors.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

Patent Law > Remedies > Equitable Relief > Injunctions

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

*HN5*[🔖]  Grounds for Injunctions, Irreparable Harm

Because of the very nature of a patent, which provides the right to exclude, infringement of a valid patent inherently causes irreparable harm in the absence of certain exceptions. Thus if the party moving for a preliminary injunction clearly establishes likelihood of success on the merits, it is entitled to a presumption of irreparable harm. The presumption, however, is rebuttable. The presumption of irreparable harm acts as a procedural device which places the ultimate burden of production on the question of irreparable harm onto the alleged infringer. If the court affords the movant the benefit of the presumption and concludes that the non-movants have rebutted it, the court need not decide whether the movant has demonstrated likelihood of success on the merits.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

Patent Law > Remedies > Equitable Relief > Injunctions

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

*HN6*[🔖]  Grounds for Injunctions, Irreparable Harm

In the context of a motion for a preliminary injunction in a patent infringement action, a presumption of irreparable harm may be rebutted by evidence that (1) the non-movant has or will soon cease the allegedly infringing activities, thus making an injunction unnecessary; (2) movants have engaged in a pattern of granting licenses under the patent, such that it may be reasonable to expect that invasion of the patent right can be recompensed with a royalty rather than with an injunction; or (3) movants unduly delayed in bringing suit, thereby negating the idea of irreparability.

Civil Procedure > ... > Injunctions > Grounds for Injunctions > General Overview

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions

*HN7*[🔖]  Injunctions, Grounds for Injunctions

NJAPP0656

2006 U.S. Dist. LEXIS 36590, *36590; 82 U.S.P.Q.2D (BNA) 1779, **1779

In the context of a motion for preliminary injunction, a trial court need not make findings concerning the third and fourth factors if the moving party fails to establish either of the first two factors. Similarly, a trial court need not make a finding on a movant's likelihood of success on the merits if it affords the movant the benefit of the presumption of irreparable harm and properly finds that presumption rebutted by the non-movant.

**Counsel: [*1]** For Wireless Agents LLC, Plaintiff: Jeff J Horn, Jr, Vance P Freeman, Ohashi & Horn, Dallas, TX; Michael W Shore, Alfonso Garcia Chan, Gerald Bill Hrycyszyn, Joseph F DePumpo, Raj K Krishnan, Shore Chan Bragalone, Dallas, TX; Rick H Rosenblum, Akin Gump Strauss Hauer & Feld -- San Antonio, San Antonio, TX.

For T-Mobile USA Inc, Danger Inc, Sharp Electronics Corp, Defendants: Josh A Krevitt, Orin S Snyder, Gibson Dunn & Crutcher -- New York, New York, NY; Sarah V Toraason, M Sean Royall, Gibson Dunn & Crutcher -- Dallas, Dallas, TX; David J Healey, Weil Gotshal & Manges -- Houston, Houston, TX; Frederick Chung, Stuart Rosenberg, Gibson Dunn & Crutcher -- Palo Alto, Palo Alto, CA; S Ashlie Beringer, Gibson Dunn & Crutcher -- Denver, Denver, CO.

**Judges:** SIDNEY A. FITZWATER, UNITED STATES DISTRICT JUDGE.

**Opinion by:** SIDNEY A. FITZWATER

## Opinion

**[**1779]** <u>MEMORANDUM OPINION AND ORDER</u>

In this patent infringement action concerning United States Patent No. 6,665,173 ("the '173 patent") entitled, "Physical Configuration of a Hand-Held Electronic Communication Device," plaintiff-counterdefendant Wireless Agents, L.L.C. ("Wireless") moves for a **[**1780]** preliminary injunction, presenting the dispositive question whether **[*2]** it will suffer irreparable harm if an injunction is not granted. Affording Wireless a presumption of irreparable harm and concluding that defendants-counterplaintiffs have rebutted the presumption, the court holds that Wireless will not suffer irreparable harm and denies the motion. [1]

I

Wireless sues defendants-counterplaintiffs T-Mobile USA, Inc. ("T-Mobile"), Danger, Inc. ("Danger"), and Sharp **[*3]** Corporation ("Sharp") for infringing the '173 patent based on defendants' manufacture and sale of the Sidekick line of devices, comprising the Sidekick and the Sidekick II. [2] Defendants assert, *inter alia*, the affirmative defense of patent invalidity, and they bring counterclaims for non-infringement and invalidity.

Wireless is the patentee and owner of the '173 patent. Wireless does not itself manufacture or sell the patented invention. Rather, it has a program of patent licensing and enforcement, whereby it seeks to license rights under the patent to manufacturers and resellers and enforces its patent rights against infringers.

T-Mobile is **[*4]** a wireless-communications company that sells communications devices and provides wireless voice and data services. Danger is a technology company that designs mobile communications devices and the software platforms that run them. Sharp is a consumer-electronics manufacturer.

The Sidekick was publicly released in October 2002, over one year before the '173 patent issued, and was sold until the Sidekick II was introduced in September 2004. Danger designed the original Sidekick device and had it manufactured by subcontractors. Sharp, under license from Danger, manufactures the Sidekick II and sells it to T-Mobile, who in turn brands the devices with the "Sidekick" name and sells them to consumers for use on T-Mobile's wireless voice and data network. Danger provides device software to Sharp and provides email services to T-Mobile for use on the Sidekick devices.

---

being decided on the papers, without an evidentiary hearing. *See, e.g., <u>Jones v. Bush, 122 F.Supp.2d 713, 715 (N.D. Tex.)</u>* (Fitzwater, J.), *aff'd,* **244 F.3d 134 (5th Cir. 2000)** (per curiam) (unpublished table decision). Briefing was completed on May 15, 2006, when Wireless filed its reply brief. As permitted by <u>Rule 52(a)</u>, the court sets out its findings of fact and conclusions of law in this memorandum opinion and order.

[2] In its first amended complaint, Wireless identifies the accused devices as the "Sidekick," the "Sidekick II," the "hiptop," and the "hiptop2." 1st Am. Compl. P 12. On the present record, however, it appears that "hiptop" and "hiptop2" are alternative brand names for the Sidekick and Sidekick II devices and that there are thus two accused devices rather than four.

---

[1] Wireless's preliminary injunction motion is before the court under the procedure permitted by <u>Fed. R. Civ. P. 43(e)</u> and is

2006 U.S. Dist. LEXIS 36590, *4; 82 U.S.P.Q.2D (BNA) 1779, **1780

The '173 patent issued on December 16, 2003. Wireless became aware of the Sidekick device no later than January 2004, at which time Wireless contacted Danger and stated its belief that they had "overlapping intellectual property." Ds. App. 21-22. Wireless did not file suit against defendants until January 15, 2005, and it did **[*5]** not file the motion for preliminary injunction until February 1, 2006, more than one year after filing suit and more than two years after learning about the accused Sidekick device.

II

*HN1*[⬆] In a patent infringement case, the decision whether to issue a preliminary injunction is within the court's discretion. *Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001)*; *Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993)*. *HN2*[⬆] "A preliminary injunction is a 'drastic and extraordinary remedy that is not to be routinely granted.'" *Nat'l Steel Car, Ltd. v. Canadian Pac. Ry., Ltd., 357 F.3d 1319, 1319 (Fed. Cir. 2004)* (quoting *Intel Corp., 995 F.2d at 1568*). *HN3*[⬆] In deciding whether to grant Wireless's motion, the court considers (1) whether Wireless has demonstrated a reasonable likelihood of success on the merits, (2) whether Wireless will suffer irreparable harm if an injunction is not granted, (3) whether the balance of hardships tips in Wireless's favor, and (4) whether and to what extent granting the injunction would have a positive impact on the public interest. *See Amazon.com, 239 F.3d at 1350.* **[*6]** No individual factor is dispositive, and the court "must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Id.* For the preliminary injunction to issue, however, Wireless must establish each of the first two elements. *See id.*

*HN4*[⬆] For reasons of judicial economy and aid of appellate review, the court generally analyzes all four factors in deciding a preliminary injunction [***1781] motion. *Polymer Techs., Inc. v. Bridwell, 103 F.3d 970, 973 (Fed. Cir. 1996)* (quoting *Reebok Int'l Ltd. v. Baker, Inc., 32 F.3d 1552, 1557 (Fed. Cir. 1994))*. More limited analysis, however, may support the court's denial of a preliminary injunction. *Id.* For example, the "court need not make findings concerning the third and fourth factors if [Wireless] fails to establish either of the first two factors." *Id. at 973-74* (citing *Reebok Int'l, 32 F.3d at 1556*).

*HN5*[⬆] "Because of the very nature of a patent, which provides the right to exclude, infringement of a valid

patent inherently causes irreparable harm in the absence of [certain] exceptions." *Id. at 975* (internal citation omitted). **[*7]** Thus if Wireless clearly establishes likelihood of success on the merits, it is entitled to a presumption of irreparable harm. *See Pfizer, Inc. v. Teva Pharms. USA, Inc., 429 F.3d 1364, 1381 (Fed. Cir. 2005)*; *Reebok Int'l, 32 F.3d at 1556*. The presumption, however, is rebuttable. *See, e.g., Reebok Int'l, 32 F.3d at 1556*. "The presumption of irreparable harm acts 'as a procedural device which places the ultimate burden of production on the question of irreparable harm onto the alleged infringer.'" *Polymer Techs., 103 F.3d at 974* (quoting *id. at 1556*). If the court affords Wireless the benefit of the presumption and concludes that defendants have rebutted it, the court need not decide whether Wireless has demonstrated likelihood of success on the merits. *Id. at 974* (citing *Reebok Int'l, 32 F.3d at 1557*).

III

A

The court assumes *arguendo* that Wireless has clearly demonstrated a likelihood of success on the merits, thereby creating a presumption that it will be irreparably harmed unless a preliminary injunction issues. The presumption of irreparable harm places the burden on **[*8]** defendants to adduce sufficient evidence to rebut the presumption. *Id.*

> Various types of evidence have been found sufficient for this purpose. For example, *HN6*[⬆] the presumption may be rebutted by evidence that (1) the non-movant has or will soon cease the allegedly infringing activities, thus making an injunction unnecessary; (2) movants have engaged in a pattern of granting licenses under the patent, such that it may be reasonable to expect that invasion of the patent right can be recompensed with a royalty rather than with an injunction; or (3) movants unduly delayed in bringing suit, thereby negating the idea of irreparability.

*Id.* (internal citations omitted).

In its brief in support of its preliminary injunction motion, Wireless relies principally on the presumption of irreparable harm, but it also maintains that it is suffering actual irreparable harm to its negotiating position in its discussions with other manufacturers over potential licenses. Wireless avers that it is currently negotiating licenses of the '173 patent with several device manufacturers and resellers and that its negotiating

2006 U.S. Dist. LEXIS 36590, *8; 82 U.S.P.Q.2D (BNA) 1779, **1781

position is harmed by defendants' continued infringement accompanied [*9] by a refusal to negotiate in good faith, "because it demonstrates to other potential licensees that a competitor can refuse a license but still continue violating the '173 patent with impunity." P. Br. 30.

Defendants contend the presumption of irreparable harm is rebutted because Wireless's alleged harm to its licensing efforts does not constitute irreparable harm as a matter of law, since the presumption does not arise until the plaintiff has made a clear showing of validity and infringement; and, even if Wireless is entitled to the presumption of irreparable harm, the presumption has been conclusively rebutted because harm to licensing efforts does not constitute irreparable harm as a matter of law, Wireless has not demonstrated any such harm, and Wireless's extraordinary delay in seeking a preliminary injunction precludes a finding of irreparable harm.

B

The court first considers the effect of Wireless's licensing efforts on the presumption of irreparable harm. A patentee's granting of a non-exclusive license is "incompatible with the emphasis on the right to exclude that is the basis for the presumption in a proper case." *T.J. Smith & Nephew Ltd. v. Consol. Med. Equip., Inc., 821 F.2d 646, 648 (Fed. Cir. 1987).* [*10] The offer of a license demonstrates that the patentee "is willing to forgo its patent rights for compensation" and "suggests that any injury suffered by [the patentee] would be compensable in damages assessed as part of the final judgment in the case." *High Tech Med. Instrumentation, Inc. v. [**1782] New Image Indus., Inc., 49 F.3d 1551, 1557 (Fed. Cir. 1995).* It is the type of evidence that has been found sufficient to rebut the presumption of irreparable harm. *Polymer Techs., 103 F.3d at 974.*

Wireless does not itself manufacture the patented invention; indeed, it lacks the capacity to do so. P. Reply Br. 22. Rather, Wireless's business includes "a program of patent licensing and enforcement." P. Br. 30. Wireless avers in its initial brief that it "is currently negotiating such licenses with several device manufacturers and resellers." *Id.* Wireless's willingness to license the '173 patent on a non-exclusive basis suggests that it is willing to accept royalties in lieu of exclusion.

Wireless asserts in its reply brief that the right to exclude is more critical in the early stages of a new product category because a "first-mover" is often able to entrench [*11] itself when early customers have no choice but the first-mover's products. Wireless alleges that it was on the leading edge of designing new handheld mobile computing devices that overcame the data entry and output problems associated with previous devices. It avers that it has pending patent applications for a system to deliver content to these devices and maintains that it must be able to license its patents to first-movers and provide them with exclusive rights to manufacture and sell the invention. Wireless argues that if defendants are permitted to continue manufacturing and selling infringing devices during the course of the litigation, the infringing devices will become entrenched, and Wireless will lose its ability to guide the market for its invention, license its new technology related to content delivery, or leverage its relationships with its licensees to expand the uses of its invention. Wireless posits that this cannot be remedied by damages.

Wireless's argument might have more bearing to this case if the invention's product category were actually in its early stages. But defendants began selling one of the accused devices in October 2002, and several other devices that [*12] Wireless contends infringe the '173 patent have been and continue to be manufactured and sold, as evidenced by Wireless's other pending lawsuits in this court. *See Wireless Agents, L.L.C. v. Sony Ericsson Mobile Commc'ns AB, No. 390 F. Supp. 2d 532 (N.D. Tex.);* *Wireless Agents, L.L.C. v. Kyocera Wireless Corp.,* No. 3:05-CV-0290-D (N.D. Tex.). Moreover, if defendants' devices have become or are becoming entrenched, it is due in part to Wireless's own undue delay in bringing this suit and in seeking a preliminary injunction, as the court explains below.

Wireless admits that at this point it is not seeking to license the '173 patent on an exclusive basis; rather, since the patent issued in December 2003 Wireless has "sought to . . . license rights under the '173 patent to *several* computing device manufacturers and resellers, P. Br. 2 (emphasis added), it is "currently negotiating . . . licenses with several device manufacturers and resellers," *id.* at 30 (emphasis added), and it desires to "leverage its relationships with its licensees," P. Reply Br. 23. The intended result of a "program of patent licensing," P. Br. 30, would be royalties. If an infringing manufacturer or reseller [*13] refuses to pay Wireless for a license, Wireless may be recompensed for its loss of royalties through damages in a successful infringement action. Because Wireless can recover through damages what it seeks from its licensing efforts -- royalties from a non-exclusive license -- the court

NJAPP0659

2006 U.S. Dist. LEXIS 36590, *13; 82 U.S.P.Q.2D (BNA) 1779, **1782

holds that defendants have rebutted the presumption of irreparable harm. See Polymer Techs., 103 F.3d at 974.

C

Defendants additionally maintain that Wireless's delay in seeking a preliminary injunction rebuts the presumption of irreparable harm. "Delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." High Tech Med. Instrumentation, 49 F.3d at 1557. "Absent a good explanation, . . . a substantial period of delay . . . militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." Id. Evidence of an undue delay in bringing suit may be sufficient to rebut the presumption of irreparable harm. See Polymer Techs., 103 F.3d at 974.

Defendants submit evidence demonstrating that Wireless became aware of the accused devices [*14] no later than January 2004. Robert Kay ("Kay"), one of the inventors listed on the '173 patent, sent Danger an email on January 11, 2004 stating that he was aware of Danger's Sidekick device and indicating that Danger and Wireless had "overlapping intellectual property." D. App. 21-22. Kay was so surprised by the similarity between Danger's patent and his own that he stated in the email: [**1783] "I don't know how both patents issued." Id. at 22. Wireless's counsel also sent Danger a January 15, 2004 letter discussing the '173 patent and asking to "meet and discuss a business arrangement regarding [their] technology." Id. at 45-46.

Although Wireless knew of the Sidekick device as early as January 2004, it nonetheless did not file this action until January 15, 2005, one year later. Wireless did not file the present motion until February 1, 2006, over one year after filing suit and over two years after first learning about the Sidekick device.

Wireless contends in its reply brief that it has a good explanation for the delay: it was caused by defendants' counsel. Wireless avers that it repeatedly contacted Danger and its counsel to meet and confer, Danger's counsel continuously promised [*15] meaningful talks and then came up with excuses why they could not occur, moving for a preliminary injunction in light of Danger's counsel's promises to negotiate in good faith would not have been a wise business decision, and Wireless did not move for preliminary injunctive relief "as a token of its own good faith." P. Reply Br. 24. Beyond these statements in its brief, however, Wireless does not direct the court to evidence that defendants are responsible for the delay, nor does it seek leave to

file with its reply brief a supplemental appendix containing such evidence. Even if Wireless did proffer evidence that defendants repeatedly promised and postponed substantive negotiations, and even if this evidence would justify some delay in seeking injunctive relief, it would certainly not support Wireless's delay of over one year from the time of filing suit until seeking a preliminary injunction. Wireless's undue delay "demonstrates that there is no apparent urgency to the request for injunctive relief," High Tech Med. Instrumentation, 49 F.3d at 1557, and is of itself sufficient to rebut the presumption of irreparable harm, see Polymer Techs., 103 F.3d at 974. [*16]

D

Even if neither Wireless's licensing efforts nor its delay in seeking injunctive relief is alone sufficient to rebut the presumption of irreparable harm, the court holds that the presumption is rebutted when these circumstances are viewed together. Cf. T.J. Smith, 821 F.2d at 648 (stating presumption of irreparable harm rebutted by 15-month delay in seeking preliminary injunction and grant of licenses).

Affording Wireless the benefit of the presumption of irreparable harm, the court concludes that defendants have rebutted the presumption and that Wireless will not suffer irreparable harm from the denial of a preliminary injunction. Because this conclusion is sufficient to deny Wireless's motion, the court does not reach the remaining factors. Polymer Techs., 103 F.3d at 973-74 HN7[⬆] ("[A] trial court need not make findings concerning the third and fourth factors if the moving party fails to establish either of the first two factors. Similarly, a trial court need not make a finding on a movant's likelihood of success on the merits if it affords the movant the benefit of the presumption of irreparable harm and properly finds that presumption rebutted [*17] by the non-movant." (internal citations omitted)).

IV

Wireless filed on May 26, 2006 a motion for leave to submit rebuttal expert report. Wireless seeks leave to submit the report of Gerhard Deffner, Ph.D. ("Dr. Deffner"), in order to rebut the expert report defendants submitted with their response to the preliminary injunction motion. Dr. Deffner's report relates only to issues associated with Wireless's likelihood of success on the merits. Because the court does not reach this factor in denying Wireless's motion for preliminary injunction, the court denies as moot Wireless's motion for leave to submit Dr. Deffner's report.

NJAPP0660

2006 U.S. Dist. LEXIS 36590, *17; 82 U.S.P.Q.2D (BNA) 1779, **1783

Wireless filed on June 1, 2006 a motion for evidentiary hearing on its motion for preliminary injunction and on claim construction. For similar reasons as make it unnecessary to consider Dr. Deffner's report, and because a hearing is unnecessary under the provisions of the court's February 2, 2006 order, the motion is denied.

* * *

Wireless's February 1, 2006 motion for preliminary injunction is denied.

**SO ORDERED. [**1784]**

June 6, 2006.

SIDNEY A. FITZWATER

UNITED STATES DISTRICT JUDGE

End of Document