## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | |
|---|---|
| STATE OF TEXAS; | ) |
| | ) |
| STATE OF ALABAMA; | ) |
| | ) |
| STATE OF ARKANSAS; | ) |
| | ) |
| STATE OF KANSAS; | ) |
| | ) |
| STATE OF LOUISIANA; | ) |
| | ) |
| STATE OF NEBRASKA; | ) |
| | ) |
| STATE OF SOUTH CAROLINA; | ) |
| | ) |
| STATE OF WEST VIRGINIA, | ) |
| | ) |
| GOVERNOR PHIL BRYANT, STATE OF MISSISSIPPI; AND | ) |
| | ) |
| GOVERNOR PAUL R. LEPAGE, STATE OF MAINE, | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| *vs.* | ) Case No. 1:18-cv-00068 |
| | ) |
| UNITED STATES OF AMERICA, ET AL.; | ) |
| | ) |
| *Defendants,* | ) |
| | ) |
| *And* | ) |
| | ) |
| KARLA PEREZ, ET AL.; | ) |
| | ) |
| STATE OF NEW JERSEY, | ) |
| | ) |
| *Defendants-Intervenors.* | ) |

## PLAINTIFF STATES' POST-DISCOVERY BRIEF IN SUPPORT OF THEIR
## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of contents ................................................................................. i

Table of authorities .......................................................................... iii

Introduction ........................................................................................ 1

Summary of argument ........................................................................ 5

Argument ............................................................................................. 9

    I.    Plaintiffs are likely to prevail on the merits. ......................... 9

        A.    DACA is unlawful. ...................................................... 10

            1.    DACA is contrary to substantive federal law. ................. 11

            2.    DACA was unlawfully issued without APA notice and comment. ................................................. 17

            3.    DACA violates the Take Care Clause of the Constitution. .................................................. 19

            4.    The Executive's decision to override duly enacted immigration statutes on lawful presence and work authorization is markedly different than the Executive's use of its broad, statutorily delegated power to deny aliens entry upheld in *Trump v. Hawaii*. ................................................ 20

            5.    Other district court decisions enjoining the Executive's separate 2017 DACA wind-down memo are wrong and do not prove DACA's lawfulness. ................................................. 21

        B.    Plaintiff States have standing. ................................. 27

            1.    The financial harm of DACA to Plaintiffs— through healthcare, education, and law-enforcement costs—provides an injury sufficient to support standing. ......................................... 28

                a.    It is beyond dispute that Plaintiff States incur costs to provide healthcare, education, and law-enforcement services to DACA recipients. ................................ 29

         b.    The continuation of DACA causes Plaintiff States to incur more healthcare, education, and law-enforcement costs by incentivizing unlawfully present aliens to remain in the United States. ................................. 33

         c.    The costs incurred by Plaintiff States are not weighed against any alleged benefits, because standing is not an accounting exercise. ..................................... 37

     2.    Just like the interest New Jersey sought to protect through its intervention, Plaintiff States have *parens patriae* standing to protect their quasi-sovereign interest in the health and well-being of their citizens....................................................... 39

     3.    Plaintiffs also have standing based on the institutional injury they suffer from DACA's dispensing and abdication of congressional statutes on lawful presence and work authorization that preempt state prerogatives. ............. 41

     4.    Standing is an easy question here in light of the "special solicitude" afforded States in the standing inquiry................................................ 43

  C.    DACA is reviewable agency action. ............................................. 44

  D.    This case is not moot. ................................................................ 46

  E.    Because there is no genuine dispute as to any material fact that Plaintiff States have standing and DACA is unlawful, Plaintiff States are entitled to summary judgment as a matter of law. ....................................... 47

II.    Plaintiffs will incur irreparable injuries if DACA is not enjoined.................................................................................... 48

III.    The balance of equities and the public interest favor an injunction................................................................................. 51

IV.    The injunction should apply nationwide and would not contradict injunctions entered by other courts. .................................... 55

Conclusion........................................................................................ 56

Certificate of Service.......................................................................... 58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Line Pilots Ass'n, Int'l v. Alaska Airlines, Inc.*,
    898 F.2d 1393 (9th Cir. 1990) ................................................................ 48

*Alaska v. U.S. Dep't of Transp.*,
    868 F.2d 441 (D.C. Cir. 1989) ................................................................ 42

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982) ................................................................ 7, 39, 41

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
    135 S. Ct. 2652 (2015) ................................................................ 42

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................ 11, 12

*Batalla Vidal v. Nielsen*,
    279 F. Supp. 3d 401 (E.D.N.Y. 2018) ................................................................ *passim*

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................ 54

*Casa de Md. v. U.S. Dep't of Homeland Sec.*,
    284 F. Supp. 3d 758 (D. Md. 2018) ................................................................ 11, 22, 53

*Crane v. Johnson*,
    783 F.3d 244 (5th Cir. 2015) ................................................................ 29, 32, 33, 43

*Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*,
    112 F.3d 1283 (5th Cir. 1997) ................................................................ 54

*Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare*,
    601 F.2d 199 (5th Cir. 1979) ................................................................ 8, 48

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ................................................................ 27

*Galvan v. Press*,
    347 U.S. 522 (1954) ................................................................ 11

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ...................................................................... 45, 46

*Kendall v. United States ex rel. Stokes*,
    37 U.S. 524 (1838) ............................................................................. 19

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) ........................................................................... 50

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) ............................................................... 8

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ...................................................................*passim*

*Meinecke v. H&R Block of Hous.*,
    66 F.3d 77 (5th Cir. 1995) (per curiam) .............................................. 50

*Mendoza v. Perez*,
    754 F.3d 1002 (D.C. Cir. 2014) .................................................... 43, 54

*N.D. Family All. v. Bader*,
    361 F. Supp. 2d 1021 (D.N.D. 2005) ................................................... 1

*NAACP v. Trump*,
    298 F. Supp. 3d 209 (D.D.C. 2018) ..............................................*passim*

*NCAA v. Gov. of N.J.*,
    730 F.3d 208 (3d Cir. 2013) ............................................................... 38

*PDK Labs Inc. v. Ashcroft*,
    338 F. Supp. 2d 1 (D.D.C. 2004) .......................................................... 1

*Ramming v. Nat. Gas Pipeline Co. of Am.*,
    390 F.3d 366 (5th Cir. 2004) .............................................................. 50

*Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
    279 F. Supp. 3d 1011 (N.D. Cal. 2018) ........................................*passim*

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ...................................................................... 45, 46

*SmallBizPros, Inc. v. MacDonald*,
    618 F.3d 458 (5th Cir. 2010) (per curiam) .......................................... 50

*Susan B. Anthony List v. Driehaus*,
  134 S. Ct. 2334 (2014) ...................................................................... 27

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) .................................................*passim*
  86 F. Supp. 3d 591 (S.D. Tex. 2015)....................................*passim*

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ........................................... 4, 6, 20, 21

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  136 S. Ct. 1807 (2016) ...................................................................... 54

*United States v. Dixon*,
  132 F.3d 192 (5th Cir. 1997) ....................................................... 35

*United States v. Jones*,
  873 F.3d 482 (5th Cir. 2017) ....................................................... 35

**Constitutional Provisions, Statutes, and Rules**

U.S. Const.:
  art. I, § 8, cl. 4.................................................................................... 11
  art. II, § 3 ...............................................................................*passim*

Administrative Procedure Act, 5 U.S.C.:....................................*passim*
  § 553(b)(A) ........................................................................................ 18
  § 701(a)(2) ......................................................................................... 45

Immigration and Nationality Act, 8 U.S.C.:.............................*passim*
  § 1182(a)(6)(A)(i).............................................................................. 14
  § 1182(a)(9)(B)(ii)............................................................................. 26
  § 1182(d)(5)(A) ................................................................................. 12
  § 1182(f) ...................................................................................... 20, 21
  § 1227(a)(1)(B) ................................................................................. 14

28 U.S.C. § 2401 ................................................................................. 54

Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) ............... 40

Gen. Appropriations Act for the 2018-19 Biennium, 85th Leg., Reg.
  Sess. (Tex. 2017).................................................................... 31, 37

Gen. Appropriations Act for the 2016-17 Biennium, 84th Leg., Reg.
  Sess. (Tex. 2015).......................................................................... 37

Immigration Reform and Control Act of 1986, Pub. L. No. 99-603,
  100 Stat. 3359 ...................................................................................... 36

Tex. Educ. Code:
  § 56.073 ............................................................................................... 31
  § 56.075(a)(1) ...................................................................................... 31

Fed. R. Civ. P.
  R. 41 ............................................................................................. 50, 51
  R. 41(a) ................................................................................................ 50
  R. 41(a)(i)(A)(ii) .................................................................................. 50
  R. 56(a) ..................................................................................... 2, 47, 48
  R. 56(f) ........................................................................................... 1, 48
  R. 65(a)(2) ...................................................................................... 1, 47

Fed. R. Evid. 801(d)(2)(A) ..................................................................... 35

19 Tex. Admin. Code:
  § 21.24(a)(d)(5) ................................................................................... 31
  § 22.128(12) ........................................................................................ 31

## Other Authorities

H.R. Rep. No. 99-682(I) (1986) ............................................................... 36

Memorandum from Johnny N. Williams, Exec. Assoc. Comm'r, Office of Field
  Operations, to Reg'l Dirs. et al., *Unlawful Presence* (June 12, 2002) ................. 26

Michael X. Marinelli, INS Enforcement of the Immigration Reform and
  Control Act of 1986: Employer Sanctions During the Citation
  Period, 37 Cath. U. L.R. 829 (1988) ....................................................... 36

Oral Arg., *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
  No. 18-15068 (9th Cir. May 15, 2018) ............................................*passim*

Scheduling Order, *NAACP v. Trump*, No. 1:17-cv-1907
  (D.D.C. June 27, 2018), ECF No. 24 ........................................................ 46

*Texas v. United States*, No. 1:14-cv-254 (S.D. Tex.)
  Compl., ECF No. 1 ................................................................................ 51
  Am. Compl., ECF No. 14 ...................................................................... 51
  Stipulation of Voluntary Dismissal, ECF No. 473 ........................ 49, 50
  Order, ECF No. 474 ............................................................................. 50

*United States v. Texas*, 136 S. Ct. 2271 (2016)
    Br. for the State Respondents, 2016 WL 1213267 ............................................... 16
    Br. for Petitioners, 2016 WL 836758 ................................................................... 26

## INTRODUCTION

When the Fifth Circuit affirmed this Court's injunction of DAPA and Expanded DACA, it effectively decided this case too. As with DAPA and Expanded DACA, DACA is manifestly unlawful, and its continued existence harms Plaintiff States' sovereign, quasi-sovereign, and economic interests. DACA's continuation amounts to the complete abdication of the Executive's duty to enforce duly enacted immigration laws regarding lawful presence and work authorization, and DACA creates "millions of dollars of losses" and additional benefits that cannot be "retract[ed]." *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015). And because the "public interest in protecting separation of powers by curtailing unlawful executive action . . . easily favors an injunction," *id.* at 187, one should issue here.

The case against DACA has only become stronger now that the parties have completed extensive discovery. In fact, in light of discovery and admissions from Intervenors' own experts and witnesses, there is no dispute of material fact on standing or the merits; thus, the Court may grant summary judgment for Plaintiff States on the record before it.[1] While the Plaintiff States' witnesses provided testimony that the States suffer financial injuries caused by DACA, the Court need

---

[1] *See* Fed. R. Civ. P. 56(f) (court may *sua sponte* grant summary judgment after notice and an opportunity to respond); *id.* 65(a)(2) (district courts may consolidate a preliminary injunction hearing with a trial on the merits); *see, e.g.*, *N.D. Family All. v. Bader*, 361 F. Supp. 2d 1021, 1030 (D.N.D. 2005) (converting a preliminary-injunction into a summary-judgment motion); *PDK Labs Inc. v. Ashcroft*, 338 F. Supp. 2d 1, 6 (D.D.C. 2004) (granting summary judgment based on a preliminary-injunction motion).

not rely on that testimony to rule for Plaintiffs: *Intervenors' own experts* concede that DACA itself causes Plaintiff States to spend hundreds of millions of dollars on healthcare, education, and law-enforcement programs. For example, one of Intervenors' experts found that Texas spends over $250 million per year to provide such services to DACA recipients. *See* Exh. 21, Estimated Annual Net Fiscal Benefits of DACA Recipients in Texas 1 (App. 1246) (estimating that Texas incurs $250,007,800 in costs each year due to DACA recipients). And Intervenors' own expert conducted a survey of DACA recipients confirming that many DACA recipients will leave the country if DACA is rescinded. *See* Exh. 22, Results from Tom K. Wong et al., 2017 National DACA Study 13 (App. 1251) (showing 22.3% of DACA respondents would be likely or very likely to leave the country if DACA ends). These concessions are further proof that there is no genuine dispute of material fact and Plaintiff States are entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

Likewise, the merits of the case against DACA are now even stronger than when this Court enjoined DAPA and Expanded DACA in *Texas v. United States*, 86 F. Supp. 3d 591 (S.D. Tex. 2015). The Executive has granted thousands of DACA recipients citizenship or a pathway to citizenship—that would not have been available but for DACA. The evidence before this Court shows that DACA recipients can apply for "advance parole" to gain a grant of lawful reentry into the United States.

Pls.' Mot. for Prelim. Inj. 25-26, ECF No. 5.[2] That has allowed many DACA recipients to adjust their immigration status to lawful permanent resident (also known as holding a green card), which then allows them to apply for full U.S. citizenship. Am. Compl. ¶ 107, ECF No. 104. In fact, one of the individual DACA recipients who intervened in this case (an immigration lawyer) co-authored a memorandum *instructing DACA recipients on precisely how to exploit this newly created pathway to citizenship. See* Exh. 23, Immigrant Legal Res. Ctr., Practice Advisory: DACA, Advance Parole, and Family Petitions 2-3, 7 (June 2016) (App. 1254-55, 1259). And one of the DACA Intervenors' retained expert witnesses (also an immigration lawyer and long-time immigrant-rights advocate) admits not only that "a DACA recipient who travels on advance parole and later marries a U.S. citizen can apply for her green card," but also that potentially thousands of DACA recipients have adjusted their status—and therefore obtained a pathway to citizenship—by that means. *See* Exh. 24, June 26, 2018 Depo. of B. Hines 74:3-9, 76:17-25 (App. 1267, 1269).

It is absurd to pretend that this is merely an exercise of "prosecutorial discretion" for deciding whether to pursue an alien's removal. Pls.' Mot. for Prelim. Inj. Exh. 1 at 1, 2. In reality, DACA grants lawful-presence status, work-authorization eligibility, and other benefits to hundreds of thousands of unlawfully present aliens. The Executive grants those benefits by rubber-stamping applications

---

[2] Plaintiff States herein incorporate by reference their entire Motion for Preliminary Injunction and Amended Complaint.

that meet the stated DACA criteria and cannot identify a *single* denial of a DACA application for discretionary reasons. Pls.' Mot. for Prelim. Inj. Exh. 5 n.1 (App. 22-23). Congress may choose to adopt policies like DACA, Expanded DACA, and DAPA through the compromise of legislation. But Congress has not given the Executive the broad and express statutory grant of discretion to unilaterally take such action. *Cf. Trump v. Hawaii*, 138 S. Ct. 2392, 2407-09 (2018) (noting statutes granting Executive broad discretion to deny aliens entry). And the Executive Branch is not free to ignore governing statutes by conferring legal status, numerous benefits, and a pathway to citizenship contrary to substantive immigration law, contrary to procedural administrative law, and contrary to the Take Care Clause of the Constitution.

The recent district court orders enjoining the Executive's 2017 DACA wind-down memorandum make a preliminary injunction from this Court only more imperative. Plaintiff States dismissed their challenge to the Executive's improper use of deferred action based on the understanding that the harms caused to Plaintiff States by such programs would end with the announced rescission of DACA. As it stands now, that rescission is enjoined for the indefinite future, and the district court in the District of Columbia vacated the rescission of DACA entirely. *NAACP v. Trump*, 298 F. Supp. 3d 209, 215-16, 248-49 (D.D.C. 2018). While the D.C. court stayed the vacatur of the DACA rescission pending further briefing, the stay of the D.C. court's vacatur does nothing to address the costs incurred by Plaintiff States due to the preliminary injunctions issued by the courts in California and New York. And as soon as the D.C. court lifts its stay, the Executive will continue to accept not only

DACA renewal applications (the subject of the two preliminary injunctions), but it will begin processing new DACA applications as well as new applications for advance parole.

Plaintiff States' instant lawsuit does not address the legality of the 2017 Executive action to wind down DACA. Rather, Plaintiffs States challenge the Executive's unilateral granting—and the continued conferral—of lawful presence and a host of benefits to potentially millions of unlawfully present aliens. Because controlling Fifth Circuit precedent on DAPA and Expanded DACA dictates that DACA, too, is unlawful, the Plaintiff States are entitled to a preliminary injunction or summary judgment.

## SUMMARY OF ARGUMENT

**I.**     Plaintiffs are likely to prevail on their claims. *Texas v. United States* requires a preliminary injunction, given that the Fifth Circuit affirmed this Court's injunction of the materially indistinguishable Expanded DACA program. Moreover, no threshold issue bars review.

DACA is unlawful for three reasons. First, the DACA memo violated the substantive requirements of the Administrative Procedure Act ("APA") because it is contrary to the statutory regime enacted by Congress that delineates in detail which aliens are lawfully present and eligible for work authorization. The Fifth Circuit correctly concluded that the Executive lacks the power to unilaterally confer lawful presence and work authorization to potentially millions of individuals. *Texas*, 809 F.3d at 186. Second, DACA violated the procedural requirements of the APA because

5

it was created without notice and comment, in the same way that the Fifth Circuit ruled that DAPA and Expanded DACA were procedurally improper. *Id.* at 178. Third, DACA violates the President's obligation to "take Care that the Laws be faithfully executed" because DACA makes lawful what Congress has declared unlawful, thus dispensing with Congress's duly enacted statutory scheme. U.S. CONST. art. II, § 3. Such dispensation is in stark contrast to the Executive's use of an affirmative broad grant of statutory discretion upheld by the Supreme Court in *Trump v. Hawaii*, 138 S. Ct. at 2407-09. Indeed, the Court found that the statute granting the Executive the discretion to suspend entry "exudes deference to the President in every clause." *Id.* at 2408. No such statute allows the Executive to unilaterally grant lawful presence, a host of benefits, and a pathway to citizenship to a class of aliens Congress has determined are removable.

As with Expanded DACA and DAPA, Plaintiff States have standing to challenge DACA. No court has denied a State standing in any of the DACA-related challenges since the Fifth Circuit affirmed this Court's preliminary injunction against DAPA and Expanded DACA. And the evidence before this Court confirms that Plaintiff States have a uniquely "personal stake" in the outcome of this case. Intervenors' own experts concede that DACA causes Plaintiff States to spend hundreds of millions of dollars on healthcare, education, and law-enforcement programs. *See* Exh. 21 (App. 1246), estimating that Texas spends $250,007,800 to provide such services to DACA recipients, *and* Exh. 22 (App. 1251), survey showing 22.3% of DACA respondents would be likely or very likely to leave the country if

DACA ends. Additionally, Plaintiff States have the right to protect their citizens from unlawful distortions of the labor market caused by granting work authorization to almost 700,000 people *contrary* to Congress's complex statutory scheme. *E.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982). And Plaintiff States—forced to rely on Congress's determinations regarding lawful presence and work authorization—are harmed by the Executive's abdication on a massive scale of its responsibility to faithfully enforce those laws. Those injuries are far more concrete and particularized than the States' interests in the Environmental Protection Agency's nonregulation of greenhouse gases coming from new automobiles and that nonregulation's supposed effect on rising sea levels. So the States' standing here is much clearer than it was in *Massachusetts v. EPA*, 549 U.S. 497 (2007).

DACA is also reviewable by courts because it is not mere prosecutorial discretion. Instead, DACA created a massive bureaucracy to grant the status of lawful presence and substantial benefits—including a pathway to citizenship—to otherwise unlawfully present aliens. Relatedly, no court in any of the other DACA-related litigation has found DACA's 2017 rescission unreviewable on the theory that DACA or its rescission are merely prosecutorial discretion.

Nor can the Federal Defendants or the Intervenors show that this case is moot in light of Defendant Secretary Nielsen's recent memorandum affirming the September 2017 rescission memorandum. That the Executive stands by its 2017 rescission memorandum, which currently stands enjoined, means that the Executive has taken no new action to rescind DACA. In light of the various nationwide

injunctions against DACA's 2017 rescissions currently in place, DACA is currently in place and will be for the foreseeable future, so this case cannot be moot.

Finally, the preliminary-injunction discovery which has proceeded over the past several weeks confirms that there are no genuine issues of material fact about standing or DACA's unlawfulness. The Court could thus grant summary judgment for Plaintiff States without analyzing the remaining preliminary-injunction factors.

**II-IV.** In any event, the remaining preliminary-injunction factors support a preliminary injunction, particularly in light of Plaintiff States' high likelihood of success on the merits. *Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979); *see also Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013).

First, Plaintiff States will suffer irreparable injuries on an ongoing basis without a preliminary injunction because they will be forced to continue spending millions of dollars to remediate DACA's consequences. Plaintiff States will suffer ongoing irreparable injuries such as the uncompensated healthcare, education, and law-enforcement costs imposed by aliens who would not remain in the country but for renewal of their unlawful DACA status and increased job competition for Plaintiff States' citizens. A preliminary injunction is especially justified because the Executive's decision to voluntarily wind down DACA has been enjoined indefinitely, and the Executive will be forced to begin processing *new* DACA applications and *new* applications for advance parole once the D.C. court's order becomes effective. Pls.' Mot. for Prelim. Inj. 8 (citing *NAACP*, 298 F. Supp. 3d at 215-16, 249). That means

8

the harm suffered by Plaintiff States from the Executive's abdication of immigration law continues today and stands to get worse, including by allowing additional unlawfully present aliens to become eligible for full U.S. citizenship.

Second, the balance of equities favors an injunction. Plaintiff States face significant irreparable injuries while the Federal Defendants face none because they have already agreed to end DACA. The DACA recipients who have intervened in this case—as well as New Jersey and its alleged interest in the continuation of DACA— do not affect the balance of equities because DACA is and always has been explained as temporary and revocable at any time in the Executive's sole discretion.

Finally, a preliminary injunction favors the public interest. A preliminary injunction would support the laws enacted by the People's representatives in Congress. DACA violates the public interest because it flouts those immigration laws and the separation of powers. Such a dangerously broad conception of Executive power is "an untenable position in light of the INA's intricate system of immigration classifications and employment eligibility." *Texas*, 809 F.3d at 184.

**V.** The injunction should apply nationwide, just as this Court ruled when it enjoined DAPA and Expanded DACA, and which the Fifth Circuit upheld.

## ARGUMENT

## I.     Plaintiffs Are Likely to Prevail on the Merits.

As the Federal Defendants concede, DACA is unlawful. Fed. Defs.' Resp. to Pls.' Mot. for Prelim. Inj. 13, ECF No. 71. The Federal Defendants further conceded just weeks ago at oral argument in the California DACA-rescission litigation that the

Executive decided to wind down DACA because Plaintiff States are likely to prevail on the merits in this lawsuit. Oral Arg. at 28:45-50, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.* ("*Cal. Regents*"), No. 18-15068 (9th Cir. May 15, 2018), https://www.ca9.uscourts.gov/media/view_video.php?pk_vid=0000013676 (noting that Plaintiff States are "likely to succeed" in this suit "because it is being brought in the same forum that already has controlling precedent on these issues"). There is controlling precedent on these issues, and there is no material difference between DACA and the DAPA and Expanded DACA programs this Court enjoined. The Federal Defendants and the Intervenors advance no reason to conclude Plaintiffs are unlikely to succeed on the merits: plaintiffs have standing, DACA is reviewable, and the case is not moot. In fact, because of the extensive discovery already conducted, the Court may grant summary judgment for Plaintiff States on the record before it.

### A.    DACA is unlawful.

The Executive has conceded in the California litigation that "DACA is illegal." Oral Arg. at 27:26-27, *Cal. Regents.* So, too, here. Fed. Defs.' Resp. to Pls.' Mot. for Prelim. Inj. 13. As noted in Part I.C, DACA does not differ from DAPA or Expanded DACA in any meaningful way. Defendant DHS Secretary Nielsen just days ago explained that "[a]ny arguable distinctions between the DAPA and DACA policies are not sufficiently material to convince [her] that the DACA policy is lawful." Exh. 25, Mem. from Sec. Kirstjen M. Nielsen 2 (June 22, 2018) (hereinafter "June 22 Memo") (App. 1275). DACA is contrary to law because its violates congressional statutes, it

lacks the notice-and-comment procedure required for a program like this, and it violates the Take Care Clause of the Constitution.

### 1. DACA is contrary to substantive federal law.

Like DAPA and Expanded DACA, DACA is contrary to law because it is "not authorized by statute," *Texas*, 809 F.3d at 184, and is "foreclosed by Congress's careful plan," *id.* at 186; *see also Casa de Md. v. U.S. Dep't of Homeland Sec.*, 284 F. Supp. 3d 758, 772 (D. Md. 2018) ("DAPA—an analogous program, promulgated by analogous means—had been defeated less than a year prior. The litigation that stopped DAPA included expansions of DACA itself."). That DACA is unlawful because it grants lawful presence and a host of attendant benefits, as well as work authorization, to a group of people for whom Congress has foreclosed those benefits has been admitted by the DACA Intervenors. Proposed Def.-Intervenors' Memo. of Law in Support of Mot. for Leave to Intervene 1, ECF No. 14 ("All Proposed Defendant-Intervenors have *authorized presence* in the United States, are *authorized to work*, and are eligible for renewals of their grants of deferred action.") (emphasis added). And that point has been thoroughly explained by Plaintiff States (Pls.' Mot. for Prelim. Inj. 21-32) and the Fifth Circuit, *Texas*, 809 F.3d at 178-86.

a. "Policies pertaining to the entry of aliens and their right to remain here are . . . entrusted exclusively to Congress"—not the Executive. *Arizona v. United States*, 567 U.S. 387, 409 (2012) (citing *Galvan v. Press*, 347 U.S. 522, 531 (1954)); *see* U.S. Const. art. I, § 8, cl. 4. Congress has not given the Executive carte blanche to permit aliens to be lawfully present in the country. Pls.' Mot. for Prelim. Inj. 22-23.

Congress uses a person's "lawful presence" (or "unlawful presence") in this country as the predicate for numerous legal consequences, including removability, a reentry bar, eligibility for "advance parole" (which allows a pathway to citizenship), and eligibility for numerous federal benefits. *See Texas*, 809 F.3d at 179, 180, 183, 184. Congress has accordingly enacted "extensive and complex" statutory provisions governing when aliens may be lawfully present in the country. *Arizona*, 567 U.S. at 395. "Entirely absent from those specific classes is the group of . . . illegal aliens who would be eligible for lawful presence under" DACA. *Texas*, 809 F.3d at 179. As the Fifth Circuit held with respect to Expanded DACA and DAPA, the Executive has no power to unilaterally create immigration classifications that authorize aliens' presence in this country, for "the INA expressly and carefully provides legal designations allowing defined classes of aliens to be lawfully present." *Id.*

DACA is directly contrary to the statutory mechanisms that Congress enacted to discourage aliens from being unlawfully present in the country. DACA gives unlawfully present aliens access to advance parole, which allows them to leave and reenter the country; this, in turn, removes a barrier to lawful permanent resident status and provides a pathway to citizenship for potentially thousands of DACA recipients. Pls.' Mot. for Prelim. Inj. 25-26 (citing 8 U.S.C. § 1182(d)(5)(A)); *see also* Exh. 26, USCIS, DACA Frequently Asked Questions 17 (App. 1294).

Discovery has made DACA's pathway to citizenship crystal clear. In fact, one of the individual DACA Intervenors actively encouraged DACA recipients to exploit advance parole to gain lawful reentry into the United States, which is a significant

impediment for otherwise unlawfully present aliens to seek adjustment to lawful-permanent-resident status. *See* Exh. 23 (App. 1252-62). That same DACA Intervenor—a party to this case—admitted that "DACA recipients who entered without inspection . . . may be able to adjust status as immediate relatives, if they successfully obtain a grant of advance parole and are paroled back into the United States after travel." *Id.* at 10 (App. 1262); *see also id.* at 7-8 (App. 1259-60) ("A person who has not been lawfully admitted or paroled into the country is therefore not eligible for adjustment of status. Traveling and reentering the country with advance parole, however, overcomes this problem because the person has now been paroled into the United States."). And multiple DACA Intervenors themselves have used advance parole to gain lawful reentry into the United States.[3] DACA Intervenors'

---

[3] Plaintiff States are prepared to present the testimony from the individual DACA Intervenors to prove this point. During their depositions, DACA Intervenors expressed a desire to designate some portions of this testimony as confidential. Plaintiff States disagree that the manner of entry, the current immigration status, and the use of advance parole by DACA Intervenors—parties who requested to join this lawsuit—is confidential. Such testimony goes to the heart of this case and proves the benefits granted to DACA recipients and DACA's pathway to citizenship. DACA Intervenors agreed to seek relief from the Court to designate such testimony as confidential, and Plaintiff States made clear they disagreed with such designation and would not file any testimony under seal unless DACA Intervenors secured a Court order requiring them to do so. In over a month after the depositions, DACA Intervenors sought no such relief. The night before this brief was due, DACA Intervenors again requested that Plaintiff States file such testimony under seal. Plaintiff States will not agree to do so, particularly without a court order, because the testimony is not confidential. However, in one last effort to satisfy any of DACA Intervenors' concerns, Plaintiff States will present evidence relating to DACA Intervenors' use of advance parole in their responsive post-discovery brief. Plaintiff States will not file such testimony under seal unless DACA Intervenors secure an order from this Court requiring them to do so.

own retained expert witness cites to figures from USCIS showing that thousands of DACA recipients have filed for adjustment of their immigration status after obtaining advance parole. Exh. 24, June 26, 2018 Depo. of B. Hines 75:15-76:1 (App. 1268-69). She admits that some percentage of those thousands of DACA recipients could not have done so without first obtaining advance parole. *Id.* 76:17-25 (App. 1269).

Moreover, the lawful presence purportedly granted by DACA appears to negate the charge that an alien is removable. Pls.' Mot. for Prelim. Inj. 23-24 (citing 8 U.S.C. §§ 1182(a)(6)(A)(i), 1227(a)(1)(B)). DACA also vitiates the INA's reentry bar because the INA does not authorize the Executive to stop this clock for any alien of its choosing or to admit or parole aliens into the country merely because they are not priorities for removal proceedings. *Id.* at 24-25. Again, DACA Intervenors' expert admitted that DACA does indeed toll the running of the clock against DACA recipients' reentry bar. Exh. 24, June 26, 2018 Depo. of B. Hines 78:24-79:2 (App. 1270-71).

Finally, DACA violates Congress's 1996 decision to eliminate most federal benefits for unlawfully present aliens whom the Executive has not yet removed. Congress introduced "lawful presence" as a requirement for benefits eligibility in 1996. Pls.' Mot. for Prelim. Inj. 26-27. DACA purports to enable access to those benefits even though extensive statutory criteria define when an alien's presence is lawful, and these provisions do not give the Executive discretion to deem any alien in the country lawfully present. *See id.* at 22-23.

b.      Likewise, DACA's conferral of work authorization violates congressional statutes because Congress has not given the Executive free rein to grant work

authorization. *Id.* at 28-31. DACA recipients are not included among the approximately 20 nonimmigrant-visa categories that directly authorize employment or require or allow the Executive to authorize employment. *Id.* at 28-29. When Congress wanted to provide work-authorization eligibility to four narrow classes of deferred-action recipients, it did so by statute—those statutes do not apply here. *Id.* at 30. Those federal statutes defining which aliens are eligible for work authorization make "no mention of the class of persons whom" DACA "would make eligible for work authorization." *Texas*, 809 F.3d at 181. DACA's work-authorization component thus flouts numerous restrictions that Congress imposed on the employment of unauthorized aliens, including employer sanctions and status-adjustment consequences for the alien—not to mention enabling access to Social Security numbers and the Earned Income Tax Credit. Pls.' Mot. for Prelim. Inj. 30-31.

c.      Reliance on historical practice of past Executive immigration actions is misplaced. *See id.* at 31-32. Previous programs are not like DACA. *Id.* As the Fifth Circuit recognized, "many of the previous programs were bridges from one legal status to another, whereas [DACA] awards lawful presence to persons who have never had a legal status and may never receive one." *Texas*, 809 F.3d at 184. Unlike other programs, with DACA, some recipients have even obtained U.S. citizenship or a pathway to citizenship—without any statutory authorization from Congress. Pls.' Mot. for Prelim. Inj. 31-32; Am. Compl. ¶¶ 84-116. The Executive has purported to use "humanitarian parole" as the avenue for conferring this citizenship benefit once an alien gets DACA status, yet it has not complied with Congress's limited conditions

15

for granting humanitarian parole. *See* Am. Compl. ¶¶ 98-102. And other programs were based on Executive authority that Congress has since removed. *See* Br. for the State Respondents 54-59, *United States v. Texas*, 136 S. Ct. 2271 (2016) (No. 15-674), 2016 WL 1213267.

      d.    Although the Fifth Circuit's reasons for enjoining DAPA and Expanded DACA apply equally to DACA, several courts have enjoined the Executive's 2017 DACA rescission memo on the basis that the Fifth Circuit's ruling was not controlling because DAPA and DACA are distinguishable. The purported distinction, however— that DACA lacks the "path" to citizenship that purportedly existed for DAPA recipients—is unavailing. *See Regents of Univ. of Cal. v. U.S. Dep't of Homeland Sec.* ("*Cal. Regents*"), 279 F. Supp. 3d 1011, 1042 (N.D. Cal. 2018) ("An important criticism against DAPA would *not* apply against DACA, namely the fact that Congress had already established a pathway to lawful presence for alien parents of citizens (so that DAPA simply constituted a more lenient substitute route). DACA, by contrast, has no such analogue in the INA."); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 426 (E.D.N.Y. 2018) (concluding that the Fifth Circuit's reasoning "would not apply to DACA, because there is no analogous procedure by which aliens brought to the United States as children may seek to obtain lawful status on that basis"); *NAACP*, 298 F. Supp. 3d at 239 ("DACA has 'no analogue in the INA.'" Thus, the Fifth Circuit's statutory analysis is inapposite." (citations omitted)).

      As an initial matter, this distinction means—at most—that DACA is even *more unlawful* than DAPA. After all, if there was a potential pathway to citizenship for

putative DAPA recipients and DAPA was nevertheless unlawful, the fact that DACA recipients do not possibly have an analogous pathway to citizenship means there is even less of a statutory basis for DACA.

Regardless, as Defendant Nielsen recently conceded, "[t]he Fifth Circuit's rejection of DAPA and expanded DACA did not turn on whether the covered aliens had a pathway to lawful status," but on the incompatibility of such a major non-enforcement policy with the INA's comprehensive scheme." June 22 Memo 2. As the Federal Defendants correctly note, the premise of this purported distinction based on DAPA recipients' path to lawful status fails because "not all of them had" one. *Id.* In the *California Regents* litigation, the Executive argued that premise is "not even true for DAPA itself because DAPA applied to two sets of people, it applied to parents of U.S. citizens and parents of LPRs, lawful permanent residents. There is—was no path to citizenship or lawful status for LPRs and the Fifth Circuit noted that." Oral Arg. at 14:55-15:30, *Cal. Regents* (citing *Texas*, 809 F.3d at 179-80).

Thus, there is no reason to distinguish the Fifth Circuit precedent holding that DAPA and Expanded DACA are substantively unlawful. And given the use of advance parole as a pathway to citizenship, the case against DACA is only stronger.

## 2. DACA was unlawfully issued without APA notice and comment.

As the Federal Defendants concede, ECF No. 71 at 15 n.5, "[b]ecause DACA is substantively unlawful under the INA and this Court can so hold as a pure question of law, this Court need not address whether DACA is also procedurally unlawful for failure to undergo notice and comment under the APA." Plaintiff States agree, and a

preliminary injunction or summary judgment may be based on the substantive APA violation alone. Nevertheless, the Executive's procedural violation in announcing DACA stands as an independent reason that DACA is invalid and should be enjoined.

      a.      DACA is one of the largest immigration policy changes in our Nation's history. Even somehow assuming substantive authority existed to create DACA, the program is unlawful because it was created without notice and comment. Pls.' Mot. for Prelim. Inj. 32-37. DACA modified substantive rights and interests, as it conferred on recipients lawful presence and eligibility for attendant benefits. *See Texas*, 809 F.3d at 176-77. The DACA Intervenors admit as much. Proposed Def.-Intervenors' Memo. of Law in Support of Mot. for Leave to Intervene 1, ECF No. 14 ("All Proposed Defendant-Intervenors have *authorized presence* in the United States, are *authorized to work*, and are eligible for renewal of their grants of deferred action." (emphases added)). Following Fifth Circuit precedent on DAPA and Expanded DACA, DACA required Administrative Procedure Act's notice-and-comment procedure. 5 U.S.C. § 553(b)(A); *see Texas*, 809 F.3d at 171-78 (citing 5 U.S.C. § 553(b)(A)).

DACA also required notice-and-comment for an independent reason: It does not genuinely leave the agency and its decisionmaker free to exercise discretion. Pls.' Mot. for Prelim. Inj. 32-33; *see supra* pp. 3-4. This Court previously found that "[n]othing about DAPA '*genuinely* leaves the agency and its [employees] free to exercise discretion.'" *Texas*, 809 F.3d at 172 (alteration in original) (quoting *Texas*, 86 F. Supp. 3d at 670). And this Court based that finding on "the implementation of DACA." *Id.* That same evidence warrants the same conclusion here. *See* Pls.' Mot. for

Prelim. Inj. Exhs. 15, 16, 17. In the 2017 memorandum rescinding DACA, Acting DHS Secretary Elaine Duke confirmed that "USCIS has not been able to identify specific denial cases where an applicant appeared to satisfy the programmatic categorical criteria as outlined in the June 15, 2012 memorandum, but still had his or her application denied based solely upon discretion." Pls.' Mot. for Prelim. Inj. Exh. 5 n.1 (App. 22-23). Simply put, the Executive has now admitted what this Court and the Fifth Circuit already found: DACA is devoid of discretion.

b.    Even the litigants challenging the Executive's 2017 decision to wind down DACA recognize that DACA was a substantive rule that had to go through notice-and-comment procedure. Pls.' Mot. for Prelim. Inj. 34. Those litigants alleged that the DACA rescission affected substantive rights, so it had to go through notice and comment. *Id.* If DACA's rescission affected substantial rights, as these plaintiffs allege, then DACA did so too. The necessary implication of those plaintiffs' arguments is that DACA was unlawful the entire time, as it was issued without the required APA notice-and-comment procedure, and cannot now be enforced.

### 3.    DACA violates the Take Care Clause of the Constitution.

Even if DACA allowed for the decisionmaker to exercise some discretion—which it does not—DACA still violates the Take Care Clause of the Constitution. DACA "dispens[es]" with Congress's duly enacted immigration statutes by declaring lawful conduct that Congress established as unlawful. *Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 613 (1838); Pls.' Mot. for Prelim Inj. 37-38. Under the Constitution, the Executive cannot exercise such legislative power—it cannot

19

dispense with statutes addressing unlawful presence by declaring a class of aliens to henceforth be present lawfully. Yet the Executive did just that through DACA. *See Texas*, 809 F.3d at 166 ("Deferred action, however, is much more than nonenforcement: It would affirmatively confer 'lawful presence' and associated benefits on a class of unlawfully present aliens."). Worse yet, the Executive then used this lawful-presence dispensation to grant a pathway to citizenship to potentially tens of thousands of otherwise unlawfully-present aliens. Pls.' Mot. for Prelim. Inj. 38. Thus, DACA violates the Take Care Clause even under the analytical framework used by the Obama Administration's Office of Legal Counsel. *Id.* at 38-40; *id.* Exh. 19 at 21 (App. 1195) ("As we have previously noted, deferred action confers no lawful immigration status, *provides no path to lawful permanent residence or citizenship*, and is revocable at any time in the agency's discretion." (emphasis added)).

> ### 4. The Executive's decision to override duly enacted immigration statutes on lawful presence and work authorization is markedly different than the Executive's use of its broad, statutorily delegated power to deny aliens entry upheld in *Trump v. Hawaii.*

The unlawfulness of DAPA, Expanded DACA, and DACA itself is not affected by the Supreme Court's recent decision in *Trump v. Hawaii*, 138 S. Ct. 2392 (2018). The Court there recognized that Congress expressly granted the President broad power to deny aliens entry into the country. *Id.* at 2407-09.

> *Whenever* the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, *he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens* as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1182(f) (emphases added). The Court held that Congress, in 8 U.S.C. § 1182(f), gave the President the "authority to restrict the entry of aliens whenever he finds that their entry 'would be detrimental to the interests of the United States.'" *Trump*, 138 S. Ct. at 2403 (citation omitted). "By its terms, § 1182(f) exudes deference to the President in every clause." *Id.* at 2408.

A similar statutory grant of discretion regarding lawful presence or work authorization is wholly lacking. While Congress provided the Executive broad authority to *exclude* aliens from the country under § 1182(f), Congress simultaneously imposed detailed criteria to significantly restrict the Executive's ability to unilaterally *allow* aliens to be lawfully present in the country. Congress created a complex statutory scheme of 40 different classes of aliens who could be lawfully present and approximately 20 classes of aliens whose status authorized employment. *See supra* pp. 11-15. This statutory scheme demonstrates that Congress did not delegate to the Executive the power to grant lawful presence or work authorization to whomever the Executive simply chooses not to deport, and any attempt to grant such sweeping benefits overrides Congress's carefully designed plan. As the Court confirmed in *Trump v. Hawaii*, the President cannot "override particular provisions of the INA." 138 S. Ct. at 2411.

> **5.    Other district court decisions enjoining the Executive's separate 2017 DACA wind-down memo are wrong and do not prove DACA's lawfulness.**

The Plaintiffs and Defendants now agree that DACA is unlawful, but as noted by the Federal Defendants, ECF No. 71 at 6-10, multiple district courts have enjoined

the Executive's 2017 rescission of DACA.[4] That is ultimately no obstacle to this Court's determination of the case before it, though, for at least three reasons. First, the other courts have missed the mark badly. DACA proponents have alleged from the beginning that DACA is an instance of prosecutorial discretion—so that the Executive could unilaterally implement it—and thus could be revoked at any time. The time has come. Second, the other cases are all based on the alleged unlawfulness of the 2017 memorandum in which the Executive attempted to rescind DACA—not the Executive's creation and continued implementation of the original 2012 DACA memo and program. Third, those courts were not bound by the Fifth Circuit precedent affirming this Court's preliminary injunctions of DAPA and Expanded DACA.

The argument that the other courts have found persuasive so far is that the explanations in the 2017 rescission memo and the letter from U.S. Attorney General Sessions to the Acting Director of DHS for winding down DACA were inadequate. The other courts did not actually rule that DACA was lawful. Because those courts have not fully examined all the arguments, and because DACA's lawfulness it is a different—albeit related—issue from the DACA rescission memo's lawfulness, this Court is free to rule on the legality of the original DACA program by considering all of the arguments against the program.

---

[4] A fourth district court found that the DACA Rescission Memo was valid and constitutional. *Casa de Md.*, 284 F. Supp. 3d at 771-79.

The district courts that have enjoined DACA's wind down have relied heavily on a belief that deferred action in a group-wide setting, as set forth by the various programs, is consistent with the discretion normally afforded DHS in enforcing the INA. First, in the combined cases from California, the district court issued an injunction against the rescission of DACA because it believed the rescission was based on a flawed legal premise. *Cal. Regents*, 279 F. Supp. 3d at 1037-43. The court relied on a 2014 determination by OLC that "programmatic deferred action is a permissible exercise of DHS's enforcement discretion," highlighting that Congress has previously enacted legislation that allows deferred action in certain circumstances. *Id.* at 1037-38. The court rejected theories set forth by the U.S. Attorney General in his 2017 letter to the Acting Secretary that outlined why he believed DACA was illegal. *Id.* at 1040-41. Significantly, though the court recognized that "at least some of the [Fifth Circuit]'s reasons for holding DAPA illegal would apply to DACA, . . . our court of appeals [(i.e., the Ninth Circuit)] will likely hold that DACA was and remains a lawful exercise of authority by DHS." *Id.* at 1042.

Second, in *Batalla Vidal v. Nielsen* and *New York v. Trump*, the district court likewise found that the government had not explained adequately why DACA was illegal and that such a reason for rescinding the program was erroneous. *Batalla Vidal*, 279 F. Supp. 3d at 420-27. In refuting the letter from Attorney General Sessions, the court held that unilateral executive action was acceptable and was "aware of no principled reason why the Executive Branch may grant deferred action to particular immigrants but may not create a program by which individual

immigrants who meet certain prescribed criteria are eligible to request deferred action." *Id.* at 422. It was inconsequential to the court that the same result was not accomplished when the DREAM Act failed to pass. *Id.* at 423. Thus, the reasons offered by General Sessions in his letter to the Acting Secretary were not persuasive to the court on this question, though it specifically "d[id] not address whether the DACA program might be unconstitutional on grounds other than those identified by the Attorney General, as any such grounds are not fairly before the court." *Id.* The court also rejected the argument that DACA was legally equivalent to DAPA with respect to the reasons this Court and the Fifth Circuit previously cited for invalidating DAPA. *Id.* at 423-27. But in doing so, the court relied on finding the Fifth Circuit's analysis unpersuasive, looking instead to the dissent in *Texas v. United States* and the prior administration's justifications. *Id.* at 426.

Third, the district court in *NAACP v. Trump* and *Trustees of Princeton Univ. v. United States* similarly held that "the Department's decision to rescind DACA was predicated primarily on its legal judgment that the program was unlawful" but that since "[t]hat legal judgment was virtually unexplained . . . it cannot support the agency's decision." 298 F. Supp. 3d at 249. The court believed DHS to be acting on an erroneous view of the law, *id.* at 237-39, and it also invoked the 2014 OLC letter that emphasized the discretion available to the agency in enforcing immigration law, *id.* at 239-40. The court held that the Fifth Circuit's statutory analysis of DAPA was inapposite to the case before it and that the federal government had failed to identify the lack of genuine discretion in DACA—a key factor in the prior analysis of DAPA

24

and expanded DACA—as a reason to jettison the program. *Id.* at 239 & n.20. But the court, recognizing that DACA's legality was just one factor in the rescission decision—and that the argument had not been fully made to the court—stayed its vacatur of the rescission memo for 90 days "to afford DHS an opportunity to better explain its view that DACA is unlawful." *Id.* at 249. As the Federal Defendants recently advised this Court, ECF No. 100, DHS's explanation confirming the original 2017 rescission memo has now been filed in the D.C. District Court.

Each time a court upheld DACA's continued existence, it was because it found that the 2017 memo was not a lawful attempt to rescind DACA. Each court disagreed with the legal analysis, such as it was, offered in the 2017 letter from General Sessions and treated that as a faulty reason—and thus insufficient under the APA—to change course on the program. But the legality of the 2012 memo was not fully at issue—just the brief critique offered in the 2017 letter—and so DACA's lawfulness could not be finally decided by any of the courts. Indeed, the New York court admitted that it was not ruling on all DACA-related arguments, *Batalla Vidal*, 279 F. Supp. 3d at 423, and the D.C. court noted that it was not addressing several arguments the government had not made in the memo or letter, *NAACP*, 298 F. Supp. 3d at 239 n.20, 239 n.21.

To the extent, however, that these other courts could hold DACA lawful in adjudicating the lawfulness of the rescission memo, it was based on a rationale that the federal government had the authority to extend programmatic deferred action to unlawfully present aliens. *Cal. Regents*, 279 F. Supp. 3d at 1038; *Batalla Vidal*, 279

F. Supp. 3d at 422-23; *NAACP*, 298 F. Supp. 3d at 238-40. That is the precise argument that both this Court and the Fifth Circuit have previously rejected. *Texas*, 809 F.3d at 184; *see also Texas*, 86 F. Supp. 3d at 638 (recognizing the pretext of the administration's argument). An explicit rejection of the logic of the majority in *Texas v. United States*—in favor of the dissent—may be allowable in other courts, but not in the Fifth Circuit.

As this Court—and the Fifth Circuit—have recognized, DAPA and Expanded DACA both left the agency without genuine enforcement discretion, and therefore failed to satisfy the APA because they were substantive rules passed without notice and comment. *Texas*, 809 F.3d at 171-72, 176. And DACA fails for the exact same reason. In fact, the chance of lessened discretion makes DACA even more suspect than DAPA on that score. *See id.* at 174. And like the subsequent programs that were an outgrowth of the original 2012 memo, DACA also confers substantive benefits—as the California court recognized (*Cal. Regents*, 279 F. Supp. 3d at 1022-23)—and thus required notice and comment rulemaking prior to passage for that reason, too. As the federal government conceded in the DAPA litigation, "DHS treats deferred action as a 'period of stay authorized by the [Secretary]'" under 8 U.S.C. § 1182(a)(9)(B)(ii). Br. for Petitioners 9 n.3, *Texas*, 136 S. Ct. 2271 (No. 15-674), 2016 WL 836758 (quoting Memorandum from Johnny N. Williams, Exec. Assoc. Comm'r, Office of Field Operations, to Reg'l Dirs. et al., *Unlawful Presence,* at 1 (June 12, 2002)). Such a status change for unlawfully present aliens on a class basis may not be done through an agency-wide memo, and no court has yet to explain this away.

In sum, the partial analyses (and injunctions) from other district courts around the country—not tasked with fully explicating and determining DACA's lawfulness—are no obstacle to this Court's consideration of the question.

### B. Plaintiff States have standing.

Since the Fifth Circuit's decision affirming this Court's preliminary injunction in *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), no court has denied standing to state challengers in any DACA-related case—and there is absolutely no basis for this Court to change course now. In fact, the discovery obtained from Intervenors in this case confirms beyond any doubt that Plaintiffs States have standing.

For years, Plaintiff States have been involved in a significant Article III "case or controversy" litigating the validity of the Obama Administration's unilateral conferral of lawful presence and work authorization via class-based deferred-action programs. Plaintiff States plainly have a "personal stake" in the outcome of that dispute about who may lawfully reside and work within their borders. *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014). Plaintiff States have several "personal interest[s]" to create a "Case" or "Controversy" under Article III. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000).

The DACA Defendant Intervenors practically conceded standing in their motion to dismiss by suggesting that Plaintiff States would be proper defendants in the Northern District of California and District for the District of Columbia cases challenging the 2017 DACA rescission. *See* Def. Intervenors' Mem. in Support of Mot. to Dism. 11 n.8, 14, ECF No. 52. And New Jersey asked to intervene to "represent

27

New Jersey's proprietary, sovereign, and quasi-sovereign interests in this case." *See* New Jersey's Reply in Support of Mot. to Intervene 1-2, ECF No. 73. The Court granted it party status to do just that, and Plaintiff States likewise have the right to challenge the program that affects those state-specific interests.

Plaintiff States have standing because (1) DACA forces the States to spend hundreds of millions of dollars on healthcare, education, and law-enforcement programs; (2) DACA distorts labor and employment markets in the Plaintiff States; (3) Plaintiff States have suffered an institutional injury because of DACA's dispensation and abdication of lawful-presence and work-authorization statutes; and (4) Plaintiff States are entitled to "special solicitude" under *Massachusetts v. EPA* in this analysis, *Texas*, 809 F.3d at 151. Plaintiff States have thus suffered, and will continue to suffer, concrete and particularized injuries that are traceable to DACA, and an injunction of DACA and will redress those injuries. Consistent with several grounds discussed by this Court and the Fifth Circuit, the Plaintiff States have established standing.

> **1.    The financial harm of DACA to Plaintiffs—through healthcare, education, and law-enforcement costs— provides an injury sufficient to support standing.**

Plaintiff States have standing because DACA has caused and will cause them to incur financial injuries in the form of education, healthcare, and law-enforcement costs—and discovery confirms that *Intervenors' own experts concede this*. As this Court recognized previously, Plaintiff States would not otherwise incur certain costs associated with education, healthcare, and law enforcement but for DACA. *See Texas*,

86 F. Supp. 3d at 629-30 (noting Texas's costs for providing these services to aliens). And the Fifth Circuit clarified that the standing analysis does not ask whether those costs are potentially offset by any alleged benefits that Intervenors claim result from DACA. *Texas*, 809 F.3d at 156. Because the Plaintiff States have shown they "will incur costs because of the DACA program" and supported that claim with facts— including facts conceded by Intervenor's own experts—the burden for establishing standing has been met. *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015).

> a.   **It is beyond dispute that Plaintiff States incur costs to provide healthcare, education, and law-enforcement services to DACA recipients.**

Intervenors do not seriously dispute that Plaintiff States incur costs caused by DACA. In fact, the DACA Intervenors' own economist—Ray Perryman—estimates that Texas incurs $250,007,800 annually to provide services, including healthcare, education, and law enforcement, to DACA recipients. Exh. 21 (App. 1246)[5]; *see also* Exh. 28, June 27, 2018 Depo. of R. Perryman 47:9-17 (App. 1319) ("Q. So, again, just to reiterate, you say 'There are costs associated with the undocumented population which accrue to governmental entities such as education, social services and health care.' You still agree with that statement? A. Yes, sir. Q. And when you say

---

[5] The chart attached as Exhibit 21 comes from Dr. Perryman's computer program that estimates the total direct costs and benefits to governmental entities from a certain population. Exh. 28, June 27, 2018 Depo. of R. Perryman 69:15-18 (App. 1323). These calculations are the product of the same program that Dr. Perryman used to calculate the costs and benefits of undocumented workers generally (which included DACA recipients) included in a report that he authored cited in footnote 35 of Dr. Perryman's declaration. *Id.* at 67:7-18 (App. 1322).

29

undocumented population, that includes DACA recipients? A. I believe it would, yes."); *id.* 76:13-24 (App. 1324) ("Q. [Y]ou don't dispute that the State of Texas does indeed incur a cost to provide health care to DACA recipients? . . . A. Again, the only clarification I would give is, again, for the undocumented population, since they use it, a little bit less for the DACA based population, but nonetheless I assume there would be some people in the DACA population who are likely to have some type of care that is reimbursed in some way by the state."); *id.* 99:11-16 (App. 1326) (acknowledging that Texas bears a cost to educate DACA recipients); *id.* 46:9-47:3 (App. 1318-19) (explaining how DACA recipients can lead to additional law-enforcement costs). Such state expenditures are also confirmed by New Jersey's deputy secretary for higher education. Exh. 29, June 25, 2018 Depo. of Diana Gonzalez 54:13-16 (App. 1332) ("Q. Would you agree with me that public funds are spent in New Jersey to educate DACA recipients? A. Yes.").

More broadly, Dr. Perryman estimates that Texas alone incurs $3.1 billion each year in direct costs to provide such services to unlawfully present aliens, some of whom are DACA recipients. Exh. 28, June 26, 2018 Depo. of R. Perryman 53:12-19 ("Q. So this $3.1 billion dollars to the State of Texas is the cost you estimated Texas incurred because of its provision of services to the undocumented population in Texas? A. Correct. Q. And that undocumented population included the DACA population? A. I believe it would have, yes."). Dr. Perryman then applied a 3-times multiplier to estimate the total cost to Texas due to its provision of services to unlawfully present aliens. *Id.* at 59:7-17; *see also id.* at 42:1-9 ("Q. Can costs have a

multiplier effect? A. Oh, of course. Q. How so? A. Similar thing. If you are spending money on health care, or whatever the case may be, if you were not spending that money on that, you would spend it on something else that would have a productive use in society."). That means, according to the DACA Intervenors' own expert, unlawfully present aliens (including DACA recipients) account for approximately $9 billion in multiplied costs to Texas every year.

The Texas college work-study program also provides a clear example of the educational costs DACA imposes on Plaintiff States, as the granting of DACA makes recipients eligible for state-subsidized wages. In the current biennium, the Texas Legislature has allocated $18.8 million to subsidize the wages of certain qualifying student-employees. Exh. 34, Gen. Appropriations Act for the 2018-19 Biennium art. III, 85th Leg., Reg. Sess. (Tex. 2017) (App. 1398). The program is authorized by section 56.073 of the Texas Education Code, and a student is eligible only if he or she is a Texas resident. *Id.* § 56.075(a)(1). Without DACA, an unlawfully present alien generally would not qualify for the work study program since "[n]onresident students who are eligible to pay resident tuition rates are not residents of Texas" for purposes of the work-study program. 19 Tex. Admin. Code § 22.128(12). However, aliens who are "granted deferred action status by USCIS" are "eligible to establish and maintain domicile in [Texas]" for purposes of showing Texas residency. *Id.* § 21.24(a)(d)(5). Thus, a DACA recipient in Texas could qualify for the work-study program. *See* Exh. 27, June 16, 2018 Depo. of K. Perez 74:24-75:25 (App. 1306-07).

31

All of that is in addition to the continued costs cited in Plaintiff States' motion for preliminary injunction. Pls.' Mot. for Prelim. Inj. 11-12 (citing Exhs. 8, 9, 10). In the 2017 fiscal year alone, Texas incurred at least $63,000,000 in additional education costs stemming from illegal immigration. *Id.* Exh. 9 ¶ 4. Texas spent approximately $375,000,000 to provide Emergency Medicaid services to unlawfully present aliens over the last 11 years for which data are available. *Id.* Exh. 10 ¶ 8. Texas spent approximately $136,000,000 to provide CHIP Perinatal Coverage to unlawfully present aliens over the last 9 years for which data are available. *Id.* Exh. 10 ¶ 10. Likewise, Texas spent approximately $6,000,000 to provide Family Violence Program services to undocumented immigrants over the last 9 years for which data are available. *Id.* Exh. 10 ¶ 9. While Defendants and Intervenors may quibble about how to estimate the amount spent to provide these services to DACA recipients, it is beyond dispute that Plaintiff States—and Texas in particular—incur costs by providing healthcare, education, and law-enforcement services to unlawfully present aliens generally and DACA recipients in particular.

In short, the healthcare, education, and law-enforcement costs incurred by Plaintiff States to provide services to DACA recipients are not the type of speculation that the Fifth Circuit rejected in *Crane*. In *Crane*, the State of Mississippi did not support its claim of injury with any facts—the injury was purely speculative on the record before the district court. 783 F.3d at 252 ("Mississippi submitted no evidence that any DACA eligible immigrants resided in the state. Nor did Mississippi produce evidence of costs it would incur if some DACA-approved immigrants came to the state.

Instead, Mississippi only asserts (based on the 2006 study) that DACA will cost the state money because the state provides social benefits to illegal immigrants."). Here, the evidence shows that, as of September 30, 2017, DACA relief had been conferred on approximately 125,000 aliens in Texas alone. *See* Am. Compl. Exh. 2 at 2 (125,239 initial applications and 128,812 renewal applications approved for Texas residents from 2012 through September 2017).

Moreover, unlike the scenario in *Crane*, Plaintiff States' evidence is current and reflects post-DACA costs. None of the other parties' experts dispute that Texas incurs costs to provide healthcare, education, and law enforcement to DACA recipients, and Dr. Perryman confirms that cost is in the hundreds of millions of dollars to Texas alone. Plaintiff States have provided Defendants' own estimates of the number of DACA recipients in Texas and the other states. *See* Exh. 30, USCIS, Approximate Active DACA Recipients 6-7 (App. 1340-41). And proof of the link between DACA and Plaintiff States' concrete monetary injury has only become stronger since this Court found as such in its prior ruling on deferred-action programs.

> **b.    The continuation of DACA causes Plaintiff States to incur more healthcare, education, and law-enforcement costs by incentivizing unlawfully present aliens to remain in the United States.**

As the Court found in enjoining DAPA and Expanded DACA, DACA increases the health care, education, and law-enforcement costs incurred by Plaintiff States because granting lawful presence and work authorization incentivizes aliens—who would otherwise be unlawfully present and unauthorized to work—to remain in the

country, including in Plaintiff States. *Texas*, 86 F. Supp. 3d at 634. Once again, the evidence proving that incentive has only grown stronger since the Court made that common-sense finding. *Intervenors' own experts* concede this point too.

Most notably, survey results from a demographer retained by both groups of intervenors in this case—Tom Wong—show that a high percentage of DACA recipients would leave the United States if DACA ends. Exh. 22 (App. 1251). Of the 3,063 DACA recipients to take Dr. Wong's survey, 22.3% of the respondents said they were either likely or very likely to leave the country if DACA ended. *Id.* Another 27.1% said they were neither likely nor unlikely to leave. Only less than half of the respondents said they were unlikely or very unlikely to leave voluntarily. Those results confirm the Court's prior holding, the testimony of Plaintiff States' demographer, Pls.' Mot. for Prelim. Inj. Exh. 8, Decl. of Lloyd B. Potter ¶¶ 8, 11 (App. 860, 861-62), and the statements of the individual DACA recipients designated by Intervenors as fact witnesses, Exh. 31, June 19, 2018 Depo. of D. Velez Exh. 2 (App. 1348-51) (February 2018 news article quoting New Jersey's witness Daniela Velez as saying "If DACA ends, I will leave with [my brother]. I will close my business, leave work and school."); Decl. of K. Perez ¶ 9, ECF No. 14-1 ("Receiving deferred action is critical to my ability to live and work in the United States . . . ."); Decl. of N. Adossi ¶ 10, ECF No. 14-1 (same).

In addition to the evidence that some percentage of DACA recipients would leave the country if DACA ends, the Federal Defendants have admitted that programs like DACA increase illegal crossings. In a recent interview, former Acting

34

ICE Director Tom Homan, a named defendant in this litigation at the time, acknowledged the link between immigration policies of receiving countries and the flow of immigrants to those countries:

> MS. VAUGHAN: Do you think that talk of an amnesty has contributed to the spiking of numbers that we're seeing now?
>
> MR. HOMAN: Yes, absolutely. In my experience, if you look at every time you talk about some sort of benefit – whether it's amnesty, whether it's DACA – even though you may set the rules up where you've got be in the country this long, you've got this – people are going to take that chance, so it certainly increases the illegal crossings. That has been proven for the last three decades I've been around."

Exh. 32, Jessica M. Vaughan and Tom Homan, Center for Immigration Studies, *Immigration Newsmaker*: A Conversation with ICE Deputy Director Tom Homan 19 (App. 1372), *available at* https://www.c-span.org/video/?c4733459/tom-homan&start=3859. The Court may consider these statements as the admission of a party opponent. *See, e.g.*, *United States v. Jones*, 873 F.3d 482, 496 (5th Cir. 2017) (citing Fed. R. Evid. 801(d)(2)(A); *United States v. Dixon*, 132 F.3d 192, 199 (5th Cir. 1997)).

Other federal officials agree that giving benefits incentivizes illegal immigration, or causes such aliens to stay in the country. Defendant DHS Secretary Nielsen recently confirmed that rescinding DACA was "sound as a matter of both legal judgment and enforcement policy discretion" since, "considering the fact that tens of thousands of minor aliens have illegally crossed or been smuggled across our border in recent years and then have been released into the country owing to loopholes in our laws—and that pattern continues to occur at unacceptably high

levels to the detriment of the immigration system—it is critically important for DHS to project a message that leaves no doubt regarding the clear, consistent, and transparent enforcement of the immigration laws against all classes and categories of aliens." June 22 Memo 3. And Sarah Saldaña, the Director of ICE from 2014 to 2017 and witness for the DACA Intervenors in this case, testified that immigration benefits provided by the receiving country (here, the United States) are a potential "pull" factor in an immigrant's decision about where to go. Exh. 33, June 29, 2018 Depo. of S. Saldaña 48:6-49:9 (App. 1383-84).

Indeed, a recognition of the incentive provided by work authorization, lawful presence, and attendant access to numerous benefits is at the heart of Congress's detailed statutory scheme that the Executive ignored when it created DACA. When Congress enacted IRCA in 1986 to limit unlawfully present aliens' access to employment, "Congress postulated that unauthorized aliens currently in the United States would be encouraged to depart." *See* Memorandum of Law of Certain Congressmen as Amici Curiae 9, ECF No. 70 (quoting Michael X. Marinelli, INS Enforcement of the Immigration Reform and Control Act of 1986: Employer Sanctions During the Citation Period, 37 Cath. U. L.R. 829, 833-34 & n.40 (1988) (citing H.R. Rep. No. 99-682(I), at 46 (1986))). Congress believed that the main benefit of presence in this country—employment, which DACA authorizes—was the "magnet that lures [unlawfully present aliens] to this country." H.R. Rep. No. 99-682(I), at 45-46.

Through the INA, the IRCA, and other duly enacted statutes, Congress has made policy decisions on how to regulate the factors that motivate immigration into

and out of the country. Those policy decisions have a massive effect on Plaintiff States. For example, in addition to the costs detailed above, Texas has allocated over $1.6 billion in state funds to provide border security over the past two biennia. Exh. 34, Gen. Appropriations Act for the 2018-19 Biennium art. IX, 85th Leg., Reg. Sess. (Tex. 2017) (App. 1413-14); Exh. 35, Gen. Appropriations Act for the 2016-17 Biennium art. IX, 84th Leg., Reg. Sess. (Tex. 2015) (App. 1426-27). Former ICE Director Saldaña acknowledges that the groups who profit by smuggling aliens are also involved in trafficking narcotics, often along the same routes. Exh. 33, June 29, 2018 Depo. of S. Saldaña 25:13-26:4 (App. 1381-82). It is difficult to overstate the toll that those narcotics take on Plaintiff States. Plaintiff State Nebraska recently seized enough fentanyl to kill 26 million people, Exh. 36 (App. 1431-32), a drug which often enters the country over the southern border, Exh. 37 (App. 1435). Because Plaintiff States bear much of the costs related to Congress's regulation of immigration, they plainly have a "personal stake" to ensure that the Executive does not act contrary to Congress's carefully considered statutory framework.

>   c.   **The costs incurred by Plaintiff States are not weighed against any alleged benefits, because standing is not an accounting exercise.**

The Fifth Circuit has already foreclosed the "offset" response given by the Intervenors and Defendants regarding the undisputed costs incurred by Plaintiff States to provide services to DACA recipients. Any alleged benefits that Plaintiff States may realize due to the presence of DACA recipients is not tallied against the costs incurred by Plaintiff States, and the standing theory does not analyze the

"offset" of purported benefits to the states from the disputed policy. *Texas*, 809 F.3d at 156. "[The] standing analysis is not an accounting exercise." *Id.* & n.61 (quoting *NCAA v. Gov. of N.J.*, 730 F.3d 208, 223 (3d Cir. 2013)).

The Court should also reject the argument that Plaintiff States' injuries are too "remote" to support standing. *E.g.*, Proposed Sched. Ord. for Proposed Def.-Int. State of N.J. 5, ECF No. 48. It is inaccurate to state that "this Court found 'the type of possible remote future injury that will not support a preliminary injunction' in the DAPA litigation" present in the "'healthcare, law enforcement, and education costs imposed by aliens who would not remain in the country but for DACA.'" *Id.* at 5 (quoting *Texas*, 86 F. Supp. 3d at 672; Pls.' Mot. for Prelim. Inj. 41). As an initial matter, the record compiled here—after discovery showed that Intervenors' own experts concede that these costs are massive, definite, and not speculative—confirms that these costs are not hypothetical or remote. Regardless, the Court's previous explanation on this point turned on the "offset" argument squarely rejected by the Fifth Circuit: The Court explained that these costs did not support a preliminary injunction "[f]or the same reasons the Court denied standing" based on those costs, in part because those costs might theoretically be "offset" by other hypothetical future benefits to the States from DAPA. *Texas*, 86 F. Supp. 3d at 635, 672. But any notion that costs are offset has been squarely rejected by the Fifth Circuit, which held that there is no such broad-ranging "offset" inquiry under the Article III standing analysis. *Texas*, 809 F.3d at 155-56. Accordingly, the Fifth Circuit has dispensed with the only obstacle identified by this Court to finding standing based on healthcare, education,

38

and law-enforcement costs caused by DACA. Those harms give the Plaintiff States

standing to bring this suit.

> **2.    Just like the interest New Jersey sought to protect through its intervention, Plaintiff States have *parens patriae* standing to protect their quasi-sovereign interest in the health and well-being of their citizens.**

Independent of the financial injury suffered by Plaintiff States as a result of

DACA, Plaintiff States also have *parens patriae* standing. Pls.' Mot. for Prelim. Inj.

13-15. This allows States to protect their citizens against such competitive harm from

unlawfully present aliens and serves as an independent basis of standing in this

lawsuit. *Id.* at 14 (citing *Snapp*, 458 U.S. at 607). As New Jersey has argued in this

very case, Mot. to Intervene 7, 14, ECF No. 39, States may seek to ensure compliance

with federal statutes in order to protect their citizens' "economic and commercial

interests." *Snapp*, 458 U.S. at 609; *cf. Massachusetts v. EPA*, 549 U.S. at 520 n.17.

The labor market distortions caused by DACA are just such an economic force from

which the Plaintiff States may guard their citizens. Proposed Def.-Int. State of N.J.'s

Reply in Further Support of Mot. to Intervene 8 n.1, ECF No. 73 (relying on this as a

basis to intervene).

The injunction here is necessary for Plaintiff States "to assure [their] residents

that they will have the full benefit of federal laws designed to address th[e] problem"

of labor-market distortion from unlawfully present aliens. *Snapp*, 458 U.S. at 609-10.

Congress's comprehensive framework to foreclose employment for precisely the group

of unlawfully present aliens covered by DACA is clear. *See* Pls.' Mot. for Prelim. Inj.

13-15. DACA not only ignores that framework but denies jobs to U.S. citizens and

other lawfully present workers in Plaintiff States and increases competition for available jobs. *Id.* at 14 (citing Exhs. 6, 11); *see also* Decl. of T. Wong ¶ 23, ECF No. 40, App. A, Tab 1 (survey responses from a number of DACA recipients who reported career opportunities as what they would "lose if DACA ends"). Intervenors' experts cannot seriously dispute that harm. *See, e.g.,* Decl. of M. Wiehe & M. Hill ¶ 6a ("[T]he work authorizations and deferral from deportation provided by DACA allow recipients to better compete with legally present workers . . . ."); Exh. 28, June 27, 2018 Depo. of R. Perryman 97:13-17 (App. 1325); Exh. 38, June 26, 2018 Depo. of I. Brannon 95:8-96:3 (App. 1442-43). And testimony from Intervenors in this case confirm that DACA recipients have been hired to fill jobs for which other applicants applied. *See, e.g.*, Exh. 39, June 15, 2018 Depo. of E. Jeon 37:21-39:7 (App. 1448-50); Decl. of R. Arackathara ¶ 9, ECF No. 40, App. A, Tab 18; Exh. 40, June 18, 2018 Depo. of R. Arackathara 65:2-7 (App. 1457).

The influx of additional workers not only increases competition, it potentially depresses wages for similarly skilled workers. Exh. 41, Supplemental Decl. of Donald Deere ¶ 23 (App. 1466-67). Dr. Perryman agreed, as he must, that decreasing the number of workers in the workforce can lead to an increase in wages. Exh. 28, June 27, 2018 Depo. of R. Perryman 28:1-5 (App. 1316).

That problem is exacerbated by the Affordable Care Act, which incentivizes employers to save money by hiring DACA recipients instead of citizens. Exh. 41, Supplemental Decl. of Donald Deere ¶ 24 (App. 1467); *see also* Exh. 42, June 27, 2018 Depo. of L. Ku 68:13-17 (App. 1479). Dr. Perryman estimates that Texas employers

alone may have saved over $13,000,000 in ACA penalties as a result of hiring DACA recipients instead of workers who would be subject to the ACA. Decl. of R. Perryman ¶ 58. Thus, although the States' interest in the competitiveness of its citizens in employment would be enough to confer standing, the additional competitive injury to the economic well-being of the Plaintiff States' citizens from the ACA "is within the quasi-sovereign interests traditionally protected by *parens patriae* actions." *Texas*, 86 F. Supp. 3d at 627.

Although this Court previously disagreed with the states' *parens patriae* standing theory in the DAPA litigation, *id.* at 625-28, that was because the claim was not yet ripe, *id.* at 628. But here, it is clearly ripe. DACA is already having the adverse economic impact which this Court previously recognized triggered Plaintiff States' ability to protect their citizens through *parens patriae* actions. *Id.* at 627-28. The Federal Defendants' claim that a "'State does not have standing as *parens patriae* to bring an action against the Federal Government' on behalf of its citizens," ECF No. 71 at 16, misreads both *Snapp*, 458 U.S. at 609-10, and this Court's previous instruction. The economic well-being of Plaintiff States' citizens thus provides another independent ground for standing here.

> **3.   Plaintiffs also have standing based on the institutional injury they suffer from DACA's dispensing and abdication of congressional statutes on lawful presence and work authorization that preempt state prerogatives.**

Wholly independent from financial injuries or *parens patriae* interests, Plaintiff States have standing to challenge DACA as the Executive Branch's unlawful dispensing of statutes on lawful presence and work authorization that preempt state

prerogatives. Pls.' Mot. for Prelim. Inj. 15-17. In short, States plainly have sovereign interests and standing regarding policies dictating who is lawfully present within their borders.

Plaintiffs are "institutional plaintiff[s]" under *Arizona State Legislature v. Arizona Independent Redistricting Commission*, 135 S. Ct. 2652, 2664 (2015), and thus have standing for their "institutional injury." *Id.* That injury here exists because Plaintiffs' immigration prerogatives have been "strip[ped]" or "nullif[ied]." *Id.* at 2663, 2665. Due to the preemption of their sovereign prerogative to determine who is lawfully present and able to work within their borders, States have at least a "quasi-sovereign," if not purely sovereign, interest in the enforcement of federal laws that preempt the States' surrendered prerogatives to determine who is lawfully present within their borders. *Massachusetts v. EPA*, 549 U.S. at 520. So when the Executive Branch "has abdicated its responsibility under [federal statutes]," it negates the basis on which the States agreed to allow federal preemption of their sovereign prerogatives. *Id.* at 505; *cf. Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 & n.1 (D.C. Cir. 1989) (States have a "sovereign interest" in "the power to create and enforce a legal code.").

Thus, as this Court previously concluded, States have "abdication standing" to challenge federal Executive agency action that dispenses with statutes passed by Congress when those statutes preempt state prerogatives. *Texas*, 86 F. Supp. 3d at 636-43. Plaintiff States' abdication basis for standing has not been "rejected" by any court in the DAPA litigation. Fed. Defs.' Resp. to Pls.' Mot. for Prelim. Inj. 16. It was

42

found waived in *Crane*, 783 F.3d at 252 n.34, and unnecessary to reach in *Texas*, 809 F.3d at 150. Yet this basis for standing follows directly from Supreme Court precedent and is a viable basis for challenging Executive policies regarding lawful presence and work authorization.

As explained in the complaint, Plaintiff States also have standing because, in challenging this act of Executive abdication, they also "seek to vindicate a procedural right—namely, the right to be heard under the APA's notice-and-comment procedures." Am. Compl. ¶ 246. As this Court already explained in the DAPA litigation, "[w]hen seeking review of agency action under the APA's procedural provisions, Plaintiffs are also operating under a favorable presumption. They are presumed to satisfy the necessary requirements for standing." 86 F. Supp. 3d at 615 (citing *Mendoza v. Perez*, 754 F.3d 1002, 1012 (D.C. Cir. 2014)). "'[P]laintiffs asserting a procedural rights challenge need not show the agency action would have been different had it been consummated in a procedurally valid manner—the courts will assume this portion of the causal link.'" *Id.* at 615-16 (quoting *Mendoza*, 754 F.3d at 1012). Because the DAPA standing and merits arguments under the APA were "intertwined," the Court found APA standing and likelihood of success on the merits hand in hand. *Id.* at 625. The States have standing on that basis here as well.

### 4. Standing is an easy question here in light of the "special solicitude" afforded States in the standing inquiry.

Were there any doubt about Plaintiff States' standing, it must be resolved in favor of the States due to the "special solicitude" they receive in the standing analysis under *Massachusetts v. EPA*, 549 U.S. at 520. *See* Pls.' Mot. for Prelim. Inj. 17. The

Fifth Circuit has made this clear. *See Texas*, 809 F.3d at 151. DACA, like DAPA and expanded DACA, "is complete abdication" of immigration law, *Texas*, 86 F. Supp. 3d at 663, and the Plaintiff States' risk of harm is even more certain than that of the States who had standing in *Massachusetts v. EPA. See Texas*, 809 F.3d at 159 ("Texas is entitled to the same 'special solicitude' as was Massachusetts, and the causal link is even closer here."). Because the federal government has "abdicated its responsibility" to enforce federal statutes—even if it is no longer by choice at this point, *see* DOJ Resp. Br. 13-15—this Court's prior analysis remains intact. *Texas*, 86 F. Supp. 3d at 663.

### C.   DACA is reviewable agency action.

DACA is reviewable agency action under the APA. As the Executive recently conceded at oral argument before the Ninth Circuit in the California litigation, DACA is "completely indistinguishable" from the DAPA and Expanded DACA programs that binding Fifth Circuit precedent holds is reviewable. Oral Arg. at 15:57-59, *Cal. Regents*. Plaintiffs are within the zone of interests of the federal laws violated (Pls. Mot. for Prelim. Inj. 18) and DACA does not qualify for the narrow "committed to agency discretion by law" exception to APA review (*id.* at 17). Defendants conceded at the Ninth Circuit oral argument in the *California Regents* litigation that DACA is illegal because it "exceeds the scope of permissible prosecutorial discretion," and a "policy of such sweeping magnitude and such categorical nature . . . is not a permissible exercise of enforcement discretion." Oral Arg. 16:42-56, *Cal. Regents*. Indeed, in the rescission memo, the Executive could not identify *even one instance* of

a discretionary DACA denial. Pls.' Mot. for Prelim. Inj. Exh. 5 n.1 (App. 22-23). Thus, DACA does not fall under the "very narrow" exception to judicial review for agency decisions that are "committed to agency discretion by law. 5 U.S.C. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 828, 830 (1985).

DACA is not unreviewable prosecutorial discretion for the same reasons the Fifth Circuit held that Expanded DACA and DAPA are not. *See Texas*, 809 F.3d at 169. Indeed, the fact that DACA was agency action, and not mere prosecutorial discretion, has been admitted by the federal government's own attorney in the course of the California litigation. *See* Pls.' Mot. for Prelim. Inj. Exh. 12 at 12 ("[DACA] is materially indistinguishable from the DAPA and expanded DACA policies that the Fifth Circuit held were contrary to federal immigration law in a decision that four Justices of this Court voted to affirm"); *Id.* Exh. 12 at 26 ("The entirety of the Fifth Circuit's reasoning applies equally to the original DACA policy"). The Executive admitted in the *California Regents* oral argument that DACA and Expanded DACA are so similar that they required no separate analysis by the Fifth Circuit. Oral Arg. at 16:14-31, *Cal. Regents*. Because the Fifth Circuit has already ruled that Expanded DACA is reviewable, DACA is reviewable.

To be clear, this lawsuit does not challenge the Executive's enforcement priorities. For example, DHS has separately defined priorities for "enforcement and removal activities," Pls.' Mot. for Prelim. Inj. Exh. 13 at 1 (Feb. 20, 2017 memorandum). This lawsuit does not challenge the Executive's "discretion to abandon" the "initiation or prosecution of various stages in the deportation process."

*Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999). But "[d]eclining to prosecute does not transform presence deemed unlawful by Congress into lawful presence and confer eligibility for otherwise unavailable benefits based on that change." *Texas*, 809 F.3d at 167. Like Expanded DACA and DAPA, DACA is executive action creating a massive bureaucracy to confer lawful-presence status and attendant benefits; that executive action provides a "focus for judicial review." *Heckler*, 470 U.S. at 832.

**D.    This case is not moot.**

As noted above (at p. 10), Defendant DHS Secretary Nielsen issued a memo on June 22, 2018 affirming the Executive's 2017 DACA rescission memo. The District of Columbia court has ordered supplemental briefing on the effect of that memo and has further stayed its order vacating the 2017 DACA rescission memo, Scheduling Order, *NAACP v. Trump*, No. 1:17-cv-1907 (D.D.C. June 27, 2018), ECF No. 24, which the court had initially issued "to afford DHS an opportunity to better explain its view that DACA is unlawful," *NAACP*, 298 F. Supp. 3d at 249.

The June 22, 2018 memo does not moot this case, however, because DACA remains in effect. Plaintiff States challenge the 2012 DACA program's creation and its continued implementation. That DACA program remains in effect and in operation today, so this case cannot be moot.

Moreover, the June 22, 2018 memo is not a new, separate attempt to rescind DACA: it expressly states that the federal defendants are not taking any new action, but rather leaving the previous rescission memo in place. June 22 Memo 3. It merely

"concur[s] with and decline[s] to disturb Acting Secretary Duke's decision to rescind the DACA policy." *Id.* Moreover, assuming it did in fact take a new action to rescind DACA, any argument that the June 22, 2018 Memo somehow moots this case rests on the assumption that other parties would not try to challenge this new memo. But there is no basis for that assumption.

In light of the various injunctions in place, DACA is currently in existence and will be for the foreseeable future, so this case cannot be moot. Even with respect to the *NAACP* action, the June 22 Memo upholding the September 2017 Memo will have no effect unless and until the court decides to vacate its previous ruling invalidating the rescission. If, however, the June 22 Memo somehow moots this case, it would also moot the other pending cases challenging the September 2017 rescission memo.

### E.   Because there is no genuine dispute as to any material fact that Plaintiff States have standing and DACA is unlawful, Plaintiff States are entitled to summary judgment as a matter of law.

For the reasons explained above, Plaintiff States are entitled not only to relief enjoining DACA, but to judgment as a matter of law that DACA is unlawful. The Court can convert Plaintiff States' preliminary-injunction motion into a summary-judgment motion because there is no genuine dispute as to any material fact that DACA is unlawful, that Plaintiff States have standing, and that this suit is justiciable. *See* Fed. R. Civ. P. 56(a); *see also id.* 65(a)(2) (the court may consolidate the preliminary-injunction and merits proceedings).

The parties here have engaged in extensive discovery and the Intervenors who dispute DACA's unlawfulness have deposed the State's witnesses and received

information from the Federal Defendants regarding the DACA program. Thus, this case has effectively progressed well beyond a typical preliminary-injunction posture. Plus, as explained above in Part I.A.1, that discovery removes any doubt that DACA is unlawful. The court may thus convert plaintiffs' motion for a preliminary injunction to a motion for summary judgment and enter final judgment for Plaintiff States. *See* Fed. R. Civ. P. 56(a), (f) (court may award summary judgment on motion or *sua sponte* after notice and an opportunity to respond); *e.g.*, *Air Line Pilots Ass'n, Int'l v. Alaska Airlines, Inc.*, 898 F.2d 1393, 1397 n.4 (9th Cir. 1990) ("A district court might also convert a decision on a preliminary injunction into a final disposition of the merits by granting summary judgment on the basis of the factual record available at the preliminary injunction stage."); *see also supra* note 1 (citing additional cases).

Regardless of whether the Court decides to grant summary judgment for Plaintiff States at this stage, the Court should at least enjoin DACA because, as explained below, Plaintiff States have satisfied all requirements for a preliminary injunction.

## II.   Plaintiffs Will Incur Irreparable Injuries if DACA Is Not Enjoined.

The "sliding scale" approach endorsed by the Fifth Circuit for preliminary injunctions applies especially to this case: because Plaintiff States' likelihood of success on the merits is especially high, the harm that must be shown to merit an injunction is far less. Pls.' Mot. for Prelim. Inj. 7 (quoting *Fla. Med. Ass'n, Inc.*, 601 F.2d at 203 n.2). Nevertheless, as in the DAPA litigation, Plaintiff States' "substantial threat of irreparable injury if the injunction is not issued" is manifest. *Texas*, 809

F.3d at 186. Plaintiff States' past harms cannot be reversed because the states will suffer ongoing harms such as (a) the healthcare, law enforcement, and education costs imposed by aliens who would not remain in the country but for renewal of their unlawful lawful-presence status and work authorization; and (b) injury to citizens of the States in attempting to secure employment. *See supra* pp. 28-41. It is difficult or impossible to recover those costs. *See Texas*, 809 F.3d at 186. And these irreparable injuries are being caused on an ongoing basis and will compound continuously absent a preliminary injunction. There is no reason to countenance the continued future infliction of such harms. These ongoing irreparable injuries have already recognized as present in DACA's analogous lawful-presence programs (DAPA and Expanded DACA). And those injuries are in addition to the institutional injury that Plaintiff States suffer by the Executive's complete abdication of Congress's carefully designed scheme for granting lawful presence (including full U.S. citizenship) and work authorization.

Because the Executive's decision to voluntarily wind down the program has been enjoined indefinitely, these irreparable injuries to support a preliminary injunction. Plaintiff States are injured every day that DACA is in effect. Pls.' Mot. for Prelim. Inj. 41-42.

The harm Plaintiff States face continues even though these same parties voluntarily dismissed the then-pending DAPA and Expanded DACA lawsuits in 2017. *See* Stipulation of Voluntary Dismissal, *Texas v. United States*, No. 1:14-cv-254 (S.D. Tex. Sept. 12, 2017), ECF No. 473. That voluntary dismissal, pursuant to Rule 41(a),

was "effective upon filing and d[id] not require the approval of the court." *Ramming v. Nat. Gas Pipeline Co. of Am.*, 390 F.3d 366, 369 n. 1 (5th Cir. 2004); *see also Meinecke v. H&R Block of Hous.*, 66 F.3d 77, 82 (5th Cir. 1995) (per curiam) ("According to [Rule 41(a)(i)(A)(ii)], such stipulations take effect when *filed* and do not require an order of the court. Therefore, the district court's order approving the dismissal is of no consequence." (citation omitted)). The parties executed the dismissal because the Executive issued "memoranda rescinding the DAPA program and phasing out the DACA and Expanded DACA programs." Stipulation of Voluntary Dismissal at 1, *Texas*, No. 1:14-cv-254, ECF No. 473. As this Court recognized at the May 30, 2018 hearing, the rescission of DACA now has been enjoined—thus defeating the purpose motivating the Rule 41 dismissal in *Texas*. *See NAACP*, 298 F. Supp. 3d 209, at 215-16, 248-49.[6]

---

[6] At the May 30 hearing, this Court asked whether the D.D.C. court's order in *NAACP* results in a "breach" or "lack of consideration" of the agreement leading to the Rule 41 dismissal in *Texas*. Hrg. Tr. at 22. Because a Rule 41 dismissal is self-executing and requires no court approval, it does not become undone when subsequent events undermine the reason for the dismissal. *See SmallBizPros, Inc. v. MacDonald*, 618 F.3d 458, 462 (5th Cir. 2010) (per curiam) ("it is clear that the parties to a case may enter into a settlement agreement, sign and file a stipulation of dismissal with the district court, and the dismissal will be effective upon filing notwithstanding any other action by the district court"). However, "a district court may incorporate or embody the terms of a settlement agreement in a dismissal order or expressly retain jurisdiction over a settlement agreement by clearly indicating such intent in a dismissal order." *Id*. at 462-63 (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381–82 (1994)). And in that event, "parties must agree to such jurisdiction." *Id*. at 463. Here, the district court entered no order of dismissal incorporating the reasons set out in the parties' joint stipulation. *See* Order, *Texas v. United States*, No. 1:14-cv-254 (S.D. Tex. Sept. 14, 2017), ECF No. 474. Consequently, the judicial orders

Finally, that DACA has existed for several years has no bearing on the States' irreparable injury. *E.g.*, Proposed Sched. Ord. for Proposed Def.-Int. State of N.J. 5 ("Whereas Plaintiff States filed the DAPA lawsuit within days after the DAPA Memo issued, and months before DAPA was to go into effect, here Plaintiff States waited almost six years after DACA had been in full force and effect to challenge it."). The Plaintiff States first brought legal action against DAPA and Expanded DACA in 2014. *See* Compl., *Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex. Dec. 3, 2014), ECF No. 1. That action, which sought to avoid similar costs to Plaintiff States here, described DACA as a "violation of the Nation's immigration laws." Am. Compl. ¶ 13, *Texas v. United States*, No. 1:14-cv-00254 (S.D. Tex. Dec. 9, 2014), ECF No. 14. The harms to the Plaintiff States will continue regardless of when that litigation was filed.

## III.   The Balance of Equities and the Public Interest Favor an Injunction.

The equitable factors overwhelmingly favor a preliminary injunction because the Plaintiff States face ongoing irreparable injury. *See* Pls.' Mot. for Prelim. Inj. 42-47. Enjoining the granting of DACA renewal applications and new DACA applications now will not only stop that harm, but it will also avoid creating new allegations of supposed reliance on DACA that will have to be addressed later. Plaintiff States' requested injunction would not conflict with the orders in the California, New York, and District of Columbia lawsuits because those orders address the Executive's 2017

---

enjoining DACA's rescission do not legally undo the Rule 41 dismissal in *Texas*, although they practically nullified the basis for the stipulation as explained below.

wind-down memorandum, not DACA itself. In other words, even assuming that the Executive's explanation in 2017 for winding down DACA was arbitrary (although it was not) or needed to go through notice-and-comment rulemaking, that has no bearing on whether the DACA program's initial 2012 creation and continued implementation is lawful. Furthermore, no court has enjoined the Executive's withdrawal memo with respect to new issuances or advance parole.

Plaintiff States were diligent in pursuing their claims. The Plaintiff States demonstrated in the DAPA suit that the legal theories underpinning both DAPA, as well as DACA, were unsupportable. Pls.' Mot. for Prelim. Inj. 42-45. DACA and expanded DACA are, in the Executive's words, "completely indistinguishable." Oral Arg. at 15:57-59, *Cal. Regents*.

And the passage of time between the litigation over DAPA and Expanded DACA and this suit cannot be attributed to any unjust delay by Plaintiff States. Pls.' Mot. for Prelim. Inj. 42-43. President Obama announced his intention to create the DACA program on June 15, 2012. *See* Am. Compl. ¶ 52. In November 2014, the Obama Administration announced the "Expanded DACA" program. *See id.* ¶¶ 2, 3; *see also Texas*, 809 F.3d at 147 (discussing "Expanded DACA"). The States promptly challenged that action, and this Court enjoined the Expanded DACA program in 2015. *Texas*, 86 F. Supp. 3d at 677-78. The Fifth Circuit affirmed. 809 F.3d at 187-88. In 2017, the Executive announced its decision to rescind DACA. *See* Am. Compl. ¶¶ 3, 4, 5. That rescission was enjoined by another district court on April 24, 2018. *NAACP*, 298 F. Supp. 3d 209 at 215-16, 248-49.

During that time, the States challenged DAPA and Expanded DACA as unlawful. It also became public during that time that the Executive was granting LPR status and a pathway to citizenship to DACA recipients. *See* Pls.' Mot. for Prelim. Inj. 25-26 & nn.3-4; *supra* pp. 2-3, 12-15. Because the legal principles at issue in that case would control the legality of DACA, plaintiffs abided DACA while awaiting resolution of the DAPA and Expanded DACA litigation and while the Executive weighed DACA's lawfulness. When the Executive announced its intention to rescind DACA, it foreclosed any need for litigation. *See* Am. Compl. ¶ 5. But when the D.C. court issued its order vacating DACA's rescission on April 24, 2018, *NAACP*, 298 F. Supp. 3d 209 at 215-16, 248-49, the States brought this action one week later. *See* Am. Compl.

That uncontested timeline shows that the States created no delay at all. Although the parties in this case subsequently resolved the DAPA and Expanded DACA litigation through a stipulation of voluntary dismissal, subsequent actions in the California, New York, and District of Columbia courts have nullified the basis for that stipulation. Pls.' Mot. for Prelim. Inj. 44.

Nor are there any reliance interests by DACA recipients compelling enough to change the balance. Nothing in DACA suggested that the program would last forever or even guaranteed that individual DACA terms would be renewed. *Id.* (citing *Casa de Md.*, 284 F. Supp. 3d at 778). Quite the contrary: The Executive has expressly warned since DACA begun that "DHS can terminate or renew deferred action at any time, at the agency's discretion." Pls.' Mot. for Prelim. Inj. Exh. 20 at 10; *see also* Exh.

53

1. Nor is there a denial of fundamental fairness in rescinding DACA because the program has always been legally suspect, and the enforcement of immigration laws passed by Congress is not itself inequitable. Pls.' Mot. for Prelim. Inj. 44-45.

Nor are Plaintiff States' claims time barred. As all sides agree, the applicable statute of limitations has not expired. The States' claims are subject to the six-year limitations period set out in 28 U.S.C. § 2401. *See Mendoza*, 754 F.3d at 1018 ("Unless another statute provides otherwise, civil claims against the United States—including those brought pursuant to the APA—are subject to the [six-year] statute of limitations contained in 28 U.S.C. § 2401."); *accord Dunn-McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 112 F.3d 1283, 1286 (5th Cir. 1997).

All the relevant Executive actions—even the Obama Administration's initial announcement of DACA on June 15, 2012—occurred less than six years before the States brought this suit on May 1, 2018. *See* Am. Compl. That forecloses any argument that the States' claims are untimely. *See* 28 U.S.C. § 2401. It is immaterial for limitations purposes that DACA purports to confer benefits by reference to previously enacted regulations governing access to benefits like work authorization. DACA itself triggered a new limitations period (Pls.' Mot. for Prelim. Inj. 46-47) because it "gives rise to 'direct and appreciable legal consequences.'" *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1814 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)).

Finally, an injunction is undoubtedly in the public interest. Pls.' Mot. for Prelim. Inj. 47; *see Texas*, 809 F.3d at 187 ("The public interest easily favors an

injunction."). A preliminary injunction upholding the separation of powers would support the public interest by rejecting the idea that the Constitution allows unilateral lawmaking like DACA. Insofar as DACA recipients claim a public interest in renewing their DACA terms, that is a policy determination for Congress, not the Court.

## IV.    The Injunction Should Apply Nationwide and Would Not Contradict Injunctions Entered by Other Courts.

Consistent with the Fifth Circuit's holding in the DAPA litigation, the Court's injunction should apply nationwide. Pls.' Mot. for Prelim. Inj. 48-49 (citing *Texas*, 809 F.3d at 187-88). Because DACA was invalid in its entirety from its inception, a nationwide injunction of DACA is warranted. *Id.* There is no plausible basis to confine the preliminary injunction to Texas or the Plaintiff States, given that DACA confers lawful presence and work permits that are valid *nationwide* and do not limit themselves to only particular States. *Id.* Regardless of whether nationwide injunctions should issue in facial challenges to other Executive actions, only a nationwide injunction can suffice in this particular context—an action dictating who can be lawfully present and authorized to work anywhere in the nation.

The existence of injunctions issued by the California and New York district courts regarding the Executive's September 2017 DACA wind-down memorandum have no effect on this Court's injunctive powers in this lawsuit. Those injunctions involve a subsequent, 2017 Executive memo concerning a different executive action. *See* Pls.' Mot. for Prelim. Inj. 48-49. Nor do they require accepting new DACA applications or advance-parole applications. *See Cal. Regents*, 279 F. Supp. 3d at

1048; *Batalla Vidal*, 279 F. Supp. 3d at 437. Those injunctions thus have no bearing on Plaintiffs' ability to challenge to the 2012 DACA program, especially because Plaintiff States' injunction request does not extend to existing DACA permits. An order entered in this case enjoining new DACA applications and advance parole would not conflict with the Northern District of California injunction or the Eastern District of New York injunction. Moreover, the injunctions entered in the California and New York litigation were also overbroad in light of the district courts' findings. *See supra* Part I.A.5. There was no need to issue a mandatory injunction to keep DACA going—finding the 2017 rescission memo invalid would support only enjoining that rescission memo itself. Irrespective of whether enjoining DACA might arguably conflict with the California and New York injunctions, because those mandatory inunctions are overbroad, the public interest and equities would still favor an injunction here. And, of course, because the district court for the District of Columbia, unlike the California and New York courts, did not issue a mandatory injunction to continue DACA, enjoining DACA would not conflict with that order.

## CONCLUSION

Plaintiff States respectfully request that the Court grant them summary judgement or a preliminary injunction.

July 21, 2018

Respectfully submitted.

STEVE MARSHALL
Attorney General of Alabama

KEN PAXTON
Attorney General of Texas

LESLIE RUTLEDGE
Attorney General of Arkansas

JEFFREY C. MATEER
First Assistant Attorney General

JEFF LANDRY
Attorney General of Louisiana

BRANTLEY STARR
Deputy First Assistant Attorney General

DOUGLAS J. PETERSON
Attorney General of Nebraska

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

ALAN WILSON
Attorney General of South Carolina

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Attorney-in-Charge
Special Counsel for Civil Litigation
Tx. State Bar No. 24081854
Southern District of Texas No. 2985472
Tel.: (512) 463-2100; Fax: (512) 936-0545
todd.disher@oag.texas.gov
P.O. Box 12548
Austin, Texas 78711-2548

PATRICK MORRISEY
Attorney General of West Virginia

ADAM ARTHUR BIGGS
Special Counsel for Civil Litigation

ADAM N. BITTER
Assistant Attorney General

**COUNSEL FOR PLAINTIFF STATES**

57

## CERTIFICATE OF SERVICE

I certify that on July 21, 2018, this document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Todd Lawrence Disher*
TODD LAWRENCE DISHER
Special Counsel for Civil Litigation

**COUNSEL FOR PLAINTIFF STATES**