# Exhibit 28

App. 1311

# Transcript of the Testimony of
# Ray Perryman

**Date:**

June 27, 2018

**Case:**

STATE OF TEXAS vs UNITED STATES of AMERICA

Ray Perryman  June 27, 2018

```
             IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
                      BROWNSVILLE DIVISION


STATE OF TEXAS,                    )
         Plaintiffs,               ) Case No.
         vs.                       ) 1:18-cv-00068
UNITED STATES OF AMERICA, et al., )
         Defendants,               )
         and                       )
KARLA PEREZ, et al.,               )
         Defendant-Intervenors.    )
------------------------------------------------
                     ORAL DEPOSITION OF
                         RAY PERRYMAN
                   Wednesday, June 27, 2018
------------------------------------------------
```

Oral deposition of RAY PERRYMAN, produced as a witness at the instance of the Plaintiff States, and duly sworn, was taken in the above-styled and numbered cause on the 27th day of June, 2018, from 2:00 p.m. to 4:44 p.m., before Deborah L. Endler, Notary Public in and for the State of Texas, reported by stenographic means, at the offices of the Attorney General, 300 West 15th Street, 11th Floor, Austin, Texas 78701,

1  pursuant to the Federal Rules of Civil Procedure and
2  the provisions stated on the record or attached
3  hereto.

```
 1              A P P E A R A N C E S
 2   FOR THE PLAINTIFF STATES:
 3   Todd Lawrence Disher, Attorney-in-Charge
 4   OAG - Assistant Attorney General
 5   Special Counsel for Civil Litigation
 6   General Litigation Division
 7   300 West 15th Street, 11th Floor
 8   Austin, Texas 78701
 9   512.463.2008
10   todd.disher@oag.texas.gov
11
12   FOR THE DEFENDANTS:
13   Keith Edward Wyatt, Assistant U.S. Attorney
14   U.S. Department of Justice, Civil Division
15   Southern District of Texas
16   1000 Louisiana Street, Suite 2300
17   Houston, Texas 77002
18   713.567.9713
19   keith.wyatt@usdoj.gov
20                        (continued)
21
22
23
24
25
```

```
 1   APPEARANCES: (continued)
 2   FOR THE DEFENDANT-INTERVENORS:
 3   Katherine A. Gregory
 4   Office of the Attorney General of New Jersey
 5   25 Market Street, 8th Floor
 6   Trenton, New Jersey 08625
 7   katherine.gregory@dol.lps.state.nj.us
 8
 9   FOR MALDEF:
10   Ernest I. Herrera, Esquire
11   Mexican American Legal Defense and Educational Fund
12   1100 Broadway, Suite 300
13   San Antonio, Texas 78205
14   eherrera@maldef.org
15
16   ALSO PRESENT:   Joseph Shaneyfelt, Baylor Law Student
17
18
19
20
21
22
23
24
25
```

```
 1  different way.  If there are fewer workers in the
 2  workforce, that can potentially increase wages?
 3       A.    It can.  That's an unproductive thing to
 4  have happen in society, but that can be one
 5  consequence.
 6       Q.    Okay.  Now, if we go down, it says retirees
 7  have also been rehired?  Do you see that?
 8       A.    Yes, sir.
 9       Q.    So that's saying in response to the labor
10  shortage, retirees have also been rehired; right?
11       A.    I talk about several things.  That's one of
12  them, yes, sir.
13       Q.    Those retirees would have been outside of
14  the labor force participation prior to being rehired;
15  correct?
16       A.    That's correct.
17       Q.    So a labor shortage could potentially
18  increase labor force participation?
19       A.    Well, depending on how people respond to
20  it, it can.  What tends to happen is you have a trend
21  going on.  It's going to be socially going up or going
22  down.  And then depending on the economic conditions
23  you get fluctuations in that month to month.  The
24  trend has been going down for a long time.
25       Q.    Okay.
```

```
 1   benefits can have a multiplier effect.  Can costs have
 2   a multiplier effect?
 3        A.   Oh, of course.
 4        Q.   How so?
 5        A.   Similar thing.  If you are spending money
 6   on health care, or whatever the case may be, if you
 7   were not spending that money on that, you would spend
 8   it on something else that would have a productive use
 9   in society.
10        Q.   Okay.  So when you do the net benefits,
11   let's first talk about the direct net benefits, and I
12   understand that you netted out the costs; right?
13        A.   Correct.
14        Q.   And those would be the direct costs?
15        A.   Right.
16        Q.   Then under the total net benefits, which
17   include the multiplier effects, you netted out the
18   multiplier benefits and the multiplier costs?
19        A.   Correct.
20        Q.   All right.  Thank you.
21        A.   Yes, sir.
22        Q.   If you go to page 17, please.
23        A.   17.  Yes, sir.
24        Q.   So in my mind this first paragraph gives
25   kind of a good summary of what you have done in this
```

1  I've done a lot of work over the years is the area of
2  hunger and the food banks, food pantries, that sort of
3  thing, that provide that service to people
4  irrespective of immigration status, do get some
5  support from the state, so that might be one example.
6      Q.    Okay.  Anything else you can think of?
7      A.    I'm sure there are others.  That's one that
8  comes to mind.
9      Q.    What about law enforcement?  How does the
10 state incur a cost providing law enforcement services
11 related to undocumented workers?
12           MR. HERRERA:  Objection, vague.
13     A.    Well, generally we all benefit from the
14 availability.  If you are in an area, you benefit from
15 the availability of law enforcement.  But more
16 specifically, like any large group of people you
17 probably going to have some of these folks do some
18 things they shouldn't do and end up in the law
19 enforcement system which involves potentially court
20 costs, prosecutorial costs, costs of incarcerating
21 people, things of that nature.
22     Q.    On this sentence on page 17 when you say
23 "costs involved with undocumented workers," as we
24 talked about earlier, that phrase "undocumented
25 workers" includes the DACA population?

```
 1      A.     Again, it more than likely does because as
 2   I understand it that's technically how they are still
 3   classified.
 4      Q.     Okay.  Let's move on.  Go to page 19,
 5   please.
 6      A.     Yes, sir.
 7      Q.     The bottom paragraph on that page.
 8      A.     Yes, sir.
 9      Q.     So, again, just to reiterate, you say
10   "There are costs associated with the undocumented
11   population which accrue to governmental entities such
12   as education, social services and health care."  You
13   still agree with that statement?
14      A.     Yes, sir.
15      Q.     And when you say undocumented population,
16   that includes DACA recipients?
17      A.     I believe it would, yes.
18      Q.     And then you say "The Perryman Group
19   measured these costs based on the best available
20   information from various sources."  When I read that,
21   to me that sounds like it's an estimate; is that fair
22   to say?
23      A.     Well, certainly.  We don't know exactly a
24   lot of these.  There is not exact measures of
25   anything.  We don't know the exact amount.
```

Ray Perryman                                             June 27, 2018
                                                              Page 53

```
 1   break it down then.  Do you know how you calculated
 2   the $3 billion estimated expense to the federal
 3   government caused by the undocumented population?
 4        A.   Not without working back through all the
 5   information from the time.  I'm sorry.
 6        Q.   What about the $3.1 billion to the State of
 7   Texas?
 8        A.   I would have to give the same answer there.
 9        Q.   And same for the $6.7 billion for local
10   entities?
11        A.   Yes.
12        Q.   So this $3.1 billion to the State of Texas
13   is the cost you estimated Texas incurred because of
14   its provision of services to the undocumented
15   population in Texas?
16        A.   Correct.
17        Q.   And that undocumented population included
18   the DACA population?
19        A.   I believe it would have, yes.
20        Q.   All right.
21        A.   As they are a percentage of it, and I would
22   have to probably use fewer services, but yes.
23        Q.   All right.  And you said fewer services but
24   you are not saying that the DACA population used none
25   of these services?
```

1    Q.    I understand.
2    A.    But the overall impact on the state would
3 include multiplier effects which have already been
4 netted out because they have been netted out when we
5 did the first part of this.  So the taxes are in this
6 net benefits.  Yes, it would be a larger number.
7    Q.    So if you looked at, and again, I
8 understand that you do a subtraction equation to get
9 the net benefits, but if we are just looking at what
10 goes into that equation, you have the multiplied
11 benefits and you have the multiplied costs, and in
12 your estimation the figure that you would use to
13 calculate the multiplied costs to the State of Texas
14 would be roughly $9 billion?
15         MR. HERRERA:  Objection, asked and
16 answered.
17    A.    Approximately.  If we can go back to page
18 21 for a moment, I might say something that might
19 clarify this.
20    Q.    Of course.
21    A.    Another way you could have presented this
22 table would have been the direct tax receipts, the
23 indirect and induced gross tax receipts, which would
24 be that bigger number than 16.3 for federal, for
25 example, okay.  Then added up that total, which would

1  it, but I think it was fine.
2      Q.    Now let's look at paragraph 39.  In here
3  you are talking about the benefits to the United
4  States and Texas because of the business activity
5  associated with DACA recipients?
6      A.    Correct.
7      Q.    Now, how did you calculate those benefits?
8      A.    The process was very similar to the one in
9  the report that you and I just went through at some
10 length.  Basically we took that same basic model and
11 made some adjustments to it.  One adjustment was it
12 was a couple years later so we had to do some price
13 adjustments.
14     But beyond that, we looked at the relative
15 wages of the DACA population versus the non-DACA and
16 made some of those type of adjustments.  But the
17 modeling structure process was the same as the one
18 that we used in the study that you referenced earlier.
19         (Deposition Exhibit 8 was marked.)
20     Q.    All right, I'm going to show you Exhibit 8.
21 This is from the production your counsel made to us --
22     A.    Yes, sir.
23     Q.    -- regarding your work file.
24     A.    Yes, sir.
25     Q.    These are the numbers that are ultimately

```
 1       A.    Yes, sir.
 2       Q.    Okay.  So that's talking about the direct
 3   benefits; right?
 4       A.    Correct.
 5       Q.    And then if we look on Exhibit 8, we see
 6   the total benefits for Texas, and I assume that's the
 7   multiplied benefits?
 8       A.    Multiplied benefits.
 9       Q.    Okay.
10       A.    And they are all nets as well.
11       Q.    How do we know that they are nets?
12       A.    Because that's how I set up the system.
13   It's exactly the same modeling structure that was used
14   in the prior report.
15       Q.    Okay.  So when you set up the system, it
16   did, in fact, calculate the projected costs incurred
17   by Texas because of DACA recipients in the state?
18       A.    Yes.
19       Q.    Is that information that you can provide to
20   your counsel?
21       A.    By cost, you're talking about the net cost
22   and benefits to the government as opposed to the --
23       Q.    Yes, sir.  So, for example, if we look at
24   Exhibit 3 --
25       A.    Yes.
```

```
 1   they all stayed, I don't think the number would
 2   change.  But clearly to the extent people are
 3   classified as DACA, persons who are in the high school
 4   at this point in time, their education is being
 5   funded.  But it's not because they are in DACA, it's
 6   because they are here.
 7        Q.    And is being funded in part by the State of
 8   Texas?
 9        A.    Correct, yes.
10        Q.    And I jumped ahead of myself there.  I
11   meant to ask you about health care.
12        A.    Okay.
13        Q.    But same question as a lead-in, you don't
14   dispute that the State of Texas does indeed incur a
15   cost to provide health care to DACA recipients?
16              MR. HERRERA:  Objection, asked and
17   answered.
18        A.    Again, the only clarification I would give
19   is, again, for the undocumented population, since they
20   use it, a little bit less for the DACA based
21   population, but nonetheless I assume there would be
22   some people in the DACA population who are likely to
23   have some type of care that is reimbursed in some way
24   by the state.
25        Q.    And those types of care would be things
```

1       MR. HERRERA:  Objection, calls for
2  speculation.
3       A.    Again, there is no way to know with
4  certainty.  That would not be a shocking thing to have
5  happen, that you occasionally had something like that
6  occur.
7       Q.    Do you think it's likely to happen?
8            MR. HERRERA:  Objection, calls for
9  speculation.
10      A.    Again, I'm not sure how else I can answer
11 it.  It's certainly a theoretical possibility that it
12 could occur.
13      Q.    Do you know from 2012 to present whether an
14 employer has hired a DACA recipient for a job that a
15 U.S. citizen also applied for?
16      A.    I don't know one way or the other.  It very
17 well could have happened, but I don't know.
18      Q.    And going forward into the future, do you
19 know whether it is likely to happen again that an
20 employer will hire a DACA recipient to fill a job that
21 a U.S. citizen has also applied for?
22           MR. HERRERA:  Objection, calls for
23 speculation and mischaracterizes the witness's
24 testimony.
25      A.    Again, I have no way of knowing that.  It's

```
 1      A.    Oh, no, sir, that wasn't my role at all.
 2      Q.    All right.  Then "not considering the
 3   likely market response to removing the DACA
 4   recipients," that was one of your criticisms of his
 5   work?
 6      A.    Yes.
 7      Q.    And then third was "not accounting for the
 8   net benefits when all costs (including education) are
 9   considered in a dynamic context;" right?
10      A.    Yes, sir.
11      Q.    But again, you don't dispute that there are
12   educational costs to the State of Texas incurred by
13   the state because of DACA recipients?
14      A.    Subject to all qualifications I gave before
15   about net and gross, wiper blades and cars, that sort
16   of thing, yes, sir.
17      Q.    Okay.  How many times have you been
18   retained as an expert witness by a party in
19   litigation?
20      A.    It would be a rough estimate.  I would say
21   300, 400, something like that.
22      Q.    Over about how many years?
23      A.    Almost 40.
24      Q.    And I believe you are charging, if you go
25   back to page 1 of your Declaration?
```

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     BROWNSVILLE DIVISION

 3
   STATE OF TEXAS,                    )
 4      Plaintiffs,                   ) Case No.
        vs.                           ) 1:18-cv-00068
 5 UNITED STATES OF AMERICA, et al.,  )
        Defendants,                   )
 6           and                      )
   KARLA PEREZ, et al.,               )
 7      Defendant-Intervenors.        )

 8                REPORTER'S CERTIFICATION
                DEPOSITION OF RAY PERRYMAN
 9                    June 27, 2018

10           I, Deborah Endler, Shorthand Reporter in and

11 for the State of Texas, do hereby certify that the

12 foregoing deposition is a full, true and correct

13 transcript:

14           That the foregoing deposition of RAY

15 PERRYMAN, the Witness, hereinbefore named was at the

16 time named, taken by me in stenograph on June 27,

17 2018, the said Witness having been by me first duly

18 cautioned and sworn to tell the truth, the whole truth

19 and nothing but the truth and the same were thereafter

20 reduced to typewriting by me or under my direction.

21           ( ) That by agreement of counsel, a reading

22 condensed copy of the deposition transcript along with

23 the full-sized original Changes and Signature Sheet

24 has been sent to _____ on

25 _____ for review and signature within 30 days
```

```
 1  and if any corrections returned are attached hereto.
 2          ( ) That the Witness shall have thirty (30)
 3  days for review and signature of the original
 4  transcript and if any corrections returned are
 5  attached hereto.
 6          ( ) That the signed transcript ( ) was ( )
 7  was not received from the Witness within 30 days.
 8          That the amount of time used by each party at
 9  the deposition is as follows:
10          Mr. Disher - 2 hours, 44 minutes
11          That before the completion of the deposition,
12  the Deponent, andor the Plaintiff/Defendant ____ did
13  ____ did not request to review the transcript.
14          I further certify that I am neither counsel
15  for, related to, nor employed by any of the parties or
16  attorneys in this action in which this proceeding was
17  taken, and further that I am not financially or
18  otherwise interested in the outcome of the action.
19          WITNESS MY HAND, this the 28th day of June,
20  2018.
21
22              DEBORAH L. ENDLER, Reporter
                EXPIRATION DATE:
23              Firm Registration No. 631
                Kim Tindall & Associates, LLC
24              16414 San Pedro, Suite 900
                San Antonio, Texas 78232
25              Phone 210-697-3400
```