# Exhibit 32

 # Center for Immigration Studies

# *Immigration Newsmaker*: A Conversation with ICE Deputy Director Tom Homan

## Event Transcript

By Jessica M. Vaughan and Tom Homan on June 6, 2018

## Media

Event Press Release

Event Video

## Event Summary

Thomas D. Homan, Deputy Director of U.S. Immigration and Customs Enforcement (ICE), was featured in an *Immigration Newsmaker* conversation hosted by the Center for Immigration Studies on **Tuesday, June 5 at 9:30am** at the National Press Club.

Deputy Director Homan, who has served under six presidents, recently announced he will retire this summer after a 34-year career in federal law enforcement. ICE'S mission is to protect America from the cross-border crime and illegal immigration that threaten national security and public safety. This mission is executed through the enforcement of more than 400 federal statutes and focuses on smart immigration enforcement, preventing terrorism and combating the illegal movement of people and goods. The second-largest criminal investigative agency in the U.S., Homeland Security Investigations, is a component of ICE.

**Date:** Tuesday, June 5, 2018, at 9:30a.m.

**Location:** National Press Club, 529 14th St, NW, 13th Floor, Washington, D.C.

## Introduction and Moderator

**Jessica M. Vaughan**
Director of Policy Studies, Center for Immigration Studies

## Participant

**Tom Homan**
Deputy Director, Immigration and Customs Enforcement

**JESSICA M. VAUGHAN:** All set?

**THOMAS D. HOMAN:** Yeah, let's go.

**MS. VAUGHAN:** All right. Good morning, everyone, and thank you for coming. This is the second in our series of newsmaker interviews with prominent people in the immigration world, and today we are speaking with ICE – Acting ICE Director Tom Homan, Immigration and Customs Enforcement. And we're going to have a wide-ranging conversation on everything from sanctuary policies to the influx of illegal immigrants over the border to potential congressional legislation, deportations, worksite enforcement, and so on.

So the way this works is that Tom and I will be speaking for a while, and then we have a process for submitting questions that my colleague Marguerite Telford will be organizing. And she'll pass me those at the end of our time here. So thanks for being here, and let's get started.

You know, I appreciate your being here today. One member of Congress, Representative Joe Crowley from New York, issued a letter yesterday suggesting that you back out of this event today, saying that it is inappropriate for you to be speaking with a group that he describes as a white supremacist and anti-Semitic organization. So I'm glad – I'm glad you were able to be with us today. It doesn't look like you took him too seriously.

**MR. HOMAN:** Well, look, you know, I'm at the National Press Club. What better way to speak about immigration to the American public than be here?

So I heard about that letter this morning. I haven't seen the letter. But, you know, I – to call the CIS racist, I'd like to know, did Representative Crowley send a similar letter to his fellow congresswoman, Yvette Clarke in New York, when she stood in front of the ICE building and called us the Gestapo, the Nazis, the most prolific hate group in the history of the world? Did he do that?

So I'm here to speak to the American people, and the National Press Club I think is the perfect place to do it. There's a lot of misinformation about what's going on in immigration enforcement. I'll take every opportunity I can to talk to the American people and set the record straight.

**MS. VAUGHAN:** All right, great. Well, that's why we're here. And I'm hoping that you'll reflect a little bit on your time as ICE director. It's been announced that you're retiring at the end of the month, so I can ask you some hard questions and this is your chance to have your say. (Laughs.)

**MR. HOMAN:** Well, I've always answered hard questions. I'm not afraid of hard questions, whether I'm retiring or not. Your questions are going to get the same answers today you got a week ago, so.

**MS. VAUGHAN:** All right. Good.

**MR. HOMAN:** The answers don't change with who I'm talking to. I can guarantee you that.

**MS. VAUGHAN:** So how many years have you been working for – on the immigration issue?

**MR. HOMAN:** I became a Border Patrol agent in 1984, so 34 years. I started in the Border Patrol, worked the front line. I spent 20 years with investigations, special agent investigating groups that smuggle aliens and traffic aliens into the country. Then I ran Enforcement and Removal Operations, another division of ICE, which deals with the detention and arrest of aliens inside of the United States and their removal. And now I'm the acting director. So one benefit I have is I've lived the entire illegal immigration lifecycle from the beginning to the end, so I know illegal immigration pretty well.

**MS. VAUGHAN:** Oh, I think so. I think you're highly qualified. (Laughs.) What was your favorite job or place to be?

**MR. HOMAN:** You know, there is no one favorite. I was – I was most proud to wear the green uniform. The United States Border Patrol, there's 40,000 American patriots that put their life on the line every day. I was most proud of that. But I most proud of being a special agent. I can't pick one. And when the president asked me to come back to

**App. 1355**

be the ICE director, I'm proud of that moment because, you know, I was able to get back to enforcing the law, which we hadn't been able to do in the prior administration – enforce the laws the way they're written. So I'm equally proud of that.

So I can't pick one. I think everything I've done within ICE is a positive experience for me. I think there's no one favorite. I got to say that they're all equally important. The border is important. Interior enforcement is important. Policy and legislation is important. I had my fingers in all of it.

Look, I got a front-row seat to the biggest issue facing this country. And I think ICE has made a dramatic impact in the past year, a 45-year low in illegal immigration last year. That's not a coincidence. That's because we have a president, President Trump, who's allowing us to do our job. And it shows. When you enforce the law in a meaningful way, it's going to deter further illegal entry. We've proven that. Forty-five-year low, that's not a coincidence. That's because this president is letting us enforce the law.

**MS. VAUGHAN:** And you were, of course, legacy INS. What's different about ICE and enforcement today from the INS, which was a much-maligned agency, as you –

**MR. HOMAN:** Well, look, and INS – people want to complain about what ICE does. I can tell you, back in the INS days, you know, area control. You know, back in those days you would drive around the streets and you would go to airport and you look for people and get reasonable suspicion of alien, you know?

One thing that's changed, which is the most important change that's occurred, in the INS days we'd be arresting whoever we found here in the country illegally, and meanwhile there are sexual predators and criminal aliens walking out of county jails all across the country that we had no idea they were there. So Secure Communities was the biggest thing that happened for immigration enforcement. It gave us a virtual presence in every jail across the country. If I get arrested and I get fingerprinted, I'll be screened by Secure Communities. You know, it's colorblind to those things.

So what it's done is make us focus on the worst of the worst. So Secure Communities gives us a picture in every county jail across the country letting you know you have a criminal sitting in this jail. That's something we didn't have in the INS days. So it helps us in our prioritization. It helped us with finding those that are most public safety threats. So that's the biggest difference I've seen in the 34 years that I've been here.

**MS. VAUGHAN:** Yeah, it has made a huge impact. On the other hand, it could be argued – and some have – that the ramp up of the Secure Communities program really energized folks who were uncomfortable with immigration enforcement, and that has led to the proliferation of sanctuary policies. And actually, one of the things that I think is a really significant accomplishment of you and your leadership is focusing public attention on the impact of sanctuary policies and how they're proliferating and why they're a problem. Do you have a count on sanctuary jurisdictions at ICE?

**MR. HOMAN:** Yes. And sanctuary jurisdictions is something I'm very strongly opposed to and, of course, I've been talking about for a year.

But let's talk about Secure Communities for a minute. We're talking about having access to people who have been arrested, right? So, for those groups and those representatives who say ICE should concentrate on criminal aliens – you should concentrate on criminals, you should concentrate on criminals, I hear it all the time – well, we do. But you can't say concentrate on criminals and not let me in the county jail. That's just ridiculous, right? And we're talking about access to people that state and local enforcement arrested and locked up. They took their liberty away and put them in a jail cell because they thought they're either a public safety threat or a – or a flight risk. So they already made that choice. They're in a county jail. And to be at a point where a federal law enforcement officer, a sworn officer who enforces immigration law, cannot get access to a taxpayer-funded county jail to talk to somebody who's, number one, illegally in the United States – and entering this country illegally is a crime. That's something I've been pushing on. You've got to remember that, entering this country is a crime if you enter illegally.

And, number two, they got arrested for yet another crime. These are exactly the people we should be talking to, and Secure Communities has helped us in that. Yeah, you got those folks who that want to say Secure Communities has, you know, sown hatred, but it's done quite the opposite.

Let me – as far as sanctuary cities are concerned, you know, the message people want to push is, well, we're a sanctuary city because we're protecting the immigrant community. No, you are not. You're doing quite the opposite. Let me explain why.

First of all, sanctuary cities, to be clear, we're not asking anybody to be an immigration officer. We're the immigration officers. I'm not asking you to pull a car over and ask them their immigration status. I don't want you – I don't want you to enforce immigration law. What I want is you to give me access to your county jail, where you already chose to arrest somebody and lock them in a jail cell, like you would any other federal law enforcement agency. That's what we're asking for. So let's get that clear. We're not asking anybody to be an immigration officer. We're asking you to give access of sworn federal law enforcement officers to a jail to talk to a criminal that's in the country illegally. That, to me, is common sense.

But they say sanctuary cities, they want to – they want to protect the immigrant community. Let me be clear what sanctuary cities does.

Number one, when you release a criminal alien from a jail, that criminal alien is going to return to his community and victimize the very communities in which he lives, which are immigrant communities. So what you've done with sanctuary cities by releasing that criminal alien back into the community is put the immigrant community at greater risk of crime.

Number two, my job is to find them and arrest them. That is my job. So if I can't arrest them in the safety and security and privacy of a county jail, safe for everybody, you're going to force my officers to go into the community and knock on a door. It puts them at severe risk because now you're on their turf where they have access to who knows what weapons. It's dangerous for the alien and it's dangerous for my officers. So you put my officers at great risk.

But what you've really done to the immigrant community is now I'm in the community and I'm going to find this target of the – of the arrest. And chances are he may be with others, others that weren't even on my radar, and now they're going to be arrested because under executive orders we don't turn a blind eye anymore.

So what have sanctuary cities done so far? They've put them at greater risk of crime because the criminal is back in the neighborhood. They've put them at greater risk of immigration arrest. And they've put my officers at risk.

And by pushing this sanctuary cities message out there, you are enticing further illegal entry. If they don't think a criminal organization – which I know; I've done this for 34 years. These criminal organizations are using sanctuary cities as a selling point: Look, I'll get you to San Francisco for this much money, and you can even get arrested for committing a crime; they're not going to work with immigration. Sanctuary cities are going to see a huge increase of illegal immigration to their cities because they think they're safe. They think immigration – you know, they're not working with immigration, they're safe – they've got some sort of amnesty, got some sort of sanctuary. Well, they don't. There's no sanctuary from federal law enforcement.

The last thing I will say is by enticing further illegal entry you are bankrolling criminal organizations, the transnational criminal organizations that smuggle aliens into this country. You are smuggling their business – I mean, you are – you are enticing further illegal entry, which is profit for their business. You are bankrolling criminal organizations that smuggle guns, that smuggle dope. They don't care what they smuggle. We have many investigations, many intelligence that they smuggle anything for money. And when – and these are the same criminal organizations that have murdered my agents, that have murdered Border Patrol agents. We're bankrolling criminal organizations with sanctuary cities.

**App. 1357**

And the last thing I will say for anybody that doubts what I'm saying, I dare anybody to go into an immigrant community and ask them one simple question: Would you rather have ICE agents working in the county jail or in your neighborhood? What do you think they're going to say?

So this whole thing about sanctuary cities protect the immigrant community is just false, it's inaccurate, and it's just politics – putting politics over public safety. That's all – that's all it is.

MS. VAUGHAN: Yeah. This idea – I've studied this for many years, as you –

MR. HOMAN: Long answer, but I'm really emotional about this one.

MS. VAUGHAN: No, that's OK. This idea that there is some kind of chilling effect on crime reporting when local law enforcement agencies are cooperating with ICE, I mean, I've studied the academic literature and the government statistics on it, and it is a myth. And anybody who has talked to a local law enforcement officer or an ICE agent will tell you the same thing, that what the immigrants are afraid of is the criminals who are coming back to the community to reoffend. Now –

MR. HOMAN: Well, the whole victim – let me talk about the whole victim thing because that's, again, intentional mis-messaging. When you intentionally mis-message that we arrest people in churches, we arrest people in hospitals, we arrest people in schools, which ICE has not done – we have not arrested anybody in a hospital. We have not arrested anybody in a church. We haven't arrested people on school grounds. So when you constantly push that message, you cause fear in the community.

And, look, unless a local law enforcement agency is arresting a victim or a witness of a crime, I don't even know they exist. And if I know they exist, there's certain immigration benefits a victim/witness can get.

So it's just – it's just inaccurate information that's pushing this. And, you know, it's just – it's unfortunate because the reality is, is that we are focused on the criminals. If you look at our numbers last year, 72 percent of everybody we arrested was a convicted criminal. If you look at criminal history, those that were either convicted or pending criminal charges, 89 percent of everybody we arrested last year had a criminal history. That's nine out of 10. That's prioritization, for people that say we don't prioritize. And even now they say, well, your non-criminal arrests are way up. But, you know, 66 percent of the non-criminals we got through the criminal justice system. That means criminal charges are pending or they're been arrested. So, you know, for that story out there saying that we're not prioritizing, we actually are prioritizing.

MS. VAUGHAN: Right. And the word – the term "non-criminal" has a specific meaning in your statistics sense, which is just people who have not been convicted of a crime. And many organizations point to the percentage of non-criminals in the arrest numbers. By the time they're removed, are they still non-criminals?

MR. HOMAN: No, many of them are criminals because they've been convicted since. But we've got to look at who those non-criminals are. Our priorities are national security/public safety, which are criminals, fugitives, reentrants.

And let's talk about it real quick, the non-criminals. Most of them are fugitives and reentrants. Who are they?

Reentrants: these are people that have been formally removed from the country by a judge and reentered illegally, which is a felony. So that's one piece of the non-criminals.

The other piece of the non-criminals are fugitives. These are – these are folks who had due process at great taxpayer expense. This country spends billions of dollars a year on border security, immigration court, attorneys, judges. So everybody wants – they deserve due process. You've got to give them due process. Their case needs to be heard, and we'll do that. But once a federal judge makes a decision, our job is to execute that order. And folks that become fugitives ignore the judge's order.

If you and I ignored a federal judge's order, what would happen? We'd be arrested and removed. But there's folks out there saying, well, yeah, they've been ordered removed, they've been here five years, you shouldn't arrest them. No. If those orders by an immigration judge don't mean anything, if they're not executed, then there's no integrity in the entire system. Just open the border up because there is no penalty. You can violate the laws, had the due process at great taxpayer expense, and you get amnesty? You're immune from the law? Absolutely not. There has to be integrity in the system. So we'll give you due process, but just because you don't like the decision of the immigration judge doesn't make it OK to stay here illegally.

**MS. VAUGHAN:** Right, right. Well, New York's Governor Cuomo has asked you to cease and desist all enforcement operations in the state of New York. What do you think that would do to public safety?

**MR. HOMAN:** First of all, it's not going to happen. We're not going to cease and desist doing anything in New York. I'm a native New Yorker.

**MS. VAUGHAN:** You're not intimidated by that?

**MR. HOMAN:** No, I'm not intimidated. I was born in New York. I was – I was a police officer in New York. My father was a police officer in New York. My father – my grandfather was a police officer in New York. I love New York. I'm a native New Yorker. And we're not going to cease and desist doing what we're doing.

If you look at what – let me tell you, one thing we did in New York, last year we arrested nearly 5,000 criminal aliens off the street – off the streets of New York.

**MS. VAUGHAN:** Five thousand.

**MR. HOMAN:** Nearly 5,000 criminal aliens. So, rather than a cease-and-desist letter, a letter of thank you would be appreciated. (Laughter.) I'm not asking for anybody to, you know, cut us slack. But what I'm asking for is a little – is a little decency, a little recognition of the – of the 20,000 men and women that work for ICE that leave the safety and security of their home every day and strap a gun to their hip to defend this nation and defend the communities. A little recognition of that would be nice, rather than a cease-and-desist letter.

**MS. VAUGHAN:** Another governor, Governor Brown of California, says ICE is lying about all this.

**MR. HOMAN:** Look, when you look at sanctuary laws in the state of California, you know, the federal government's suing them, which I think is the right thing to do. The California Sheriffs' Association, the governor's own sheriffs, agree with us that SB 54 prevents communication with ICE, and dangerous criminals, like gang members, those that assault police officers, are being released in jails throughout California. So the California Sheriffs' Association – his own sheriffs agree SB 54 is damaging. And there's been at least 15 cities and jurisdictions that have joined the lawsuit to sue their very own state.

So, look, SB 54, Governor Brown's wrong. Any policy that results in the release of a public safety threat back into the public to reoffend is just bad policy. Anybody in this room can Google recidivism rates. Fifty percent of these folks will create a – commit another crime in the first year of their release. Seventy-five –

**MS. VAUGHAN:** Just like American criminals.

**MR. HOMAN:** Yeah. Seventy-five percent will reoffend within five years. So it's – to prevent a federal law enforcement officer to take custody of somebody that's in the country illegally and committed a crime is just wrong.

And so, no, he's wrong. No one's lying about California's sanctuary laws, and we'll let the court settle it.

**MS. VAUGHAN:** I mean, it seems to me from looking at the numbers that there is no shortage of criminal targets for ICE to be going after. There are – the agency has stated before there are about 2 million estimated criminal aliens in the country, 1 million of whom are at large. You have enough criminal targets. You don't need to be going around arresting grandmothers on their way to church or college students or cancer patients or anything like that. So –

**App. 1359**

**MR. HOMAN:** Well, let me just talk about one thing real quick on that because you just – something sparked. The biggest hit we take from folks in some media outlets and groups are, why did you arrest that person that's been here 12 years and has two U.S. citizen children? Why did you arrest him? Because he's a fugitive. If the message we want to keep sending the rest of the world is it's OK to violate laws in this country, even though we're a sovereign country – you can go ahead and enter this country illegally and hide out successfully, or just ignore a judge's order, and have a U.S. citizen child by the fact of born in this country – if that's the message we want to send – enter the country illegally, hide, and have a child, now you're immune from law enforcement – if that's the message we want to send the rest of this world, you're never going to solve the immigration crisis because they're going to keep coming, right?

So the laws are on the books. We need to enforce the laws. And I'm one to say Congress needs to look at the immigration laws. There needs to be some reforms and fixes. But ignoring the law isn't the answer. Just because you entered the country illegally and successfully hid out for a while doesn't make it OK.

**MS. VAUGHAN:** When someone is released, a criminal alien released out from under an ICE detainer or because a local law enforcement agency didn't contact ICE or because they have a policy of non-cooperation or ICE isn't allowed in the jail, a lot of law enforcement agencies will say, well, ICE can go get these people anytime; they know where they are. Can you explain why that's not so easy?

**MR. HOMAN:** Well, first of all, once they get released they're harder to find, right? First of all, what we do is, just to make it clear, targeted enforcement operation. We don't go in the neighborhood to do sweeps, as you read in the paper – some papers. We don't do sweeps. We don't do raids. We do a targeted enforcement operation, which means we go look for a specific person at a specific location based on a lot of intelligence and criminal investigative work. We know who we're going to look for and we know hopefully where they're going to be. So we're not locking down a neighborhood. We're not doing roadblocks.

It's difficult. It creates a lot of work, first of all, in the targeting, in the – in the intelligence and investigative work trying to locate this person because they don't want to be found, right? They're in the country illegally and they – and if they're a criminal, the more likely they don't want to be found. So it's a lot of work.

But what it does is put my officers at great risk. You know, when we arrest somebody in a county jail, we know they don't have weapons. The officers are safe. The alien's safe. The neighborhood's safe. But when you release him, we got to go find him.

And that is – you know, I got a lot of attacks when California passed the sanctuary cities law. I made a statement: California better hold on tight because they're about to see a lot more agents than they've ever seen. That is a fact. It wasn't a threat. It wasn't retaliation. When one officer can sit in a country jail and process 10 illegal aliens in a shift, now you release that very – those 10 aliens to the street, I got to send a whole team out to try and locate one. So when I said you're about to see a lot more agents, that is a direct result of SB 54 because I've lost my efficiency of being in a county jail where one agent can deal with 10. Now I've got to send a whole fugitive operations team, which is five to six guys, to go look for one. So that's why there was a surge in resources into California, because you just made my job a lot more difficult and I lost the efficiency. That was the message.

**MS. VAUGHAN:** With the exact kind of enforcement that the advocacy groups say that they're opposed to, in the neighborhoods and workplace –

**MR. HOMAN:** More officers – simple math: more officers in the county jail equals less officers in the community. That's just – that's just operational reality. So, again, if people want to me to focus on criminal aliens, which we're doing – I just explained it to you, nine out of 10, right? – but if – I can do more if I have access to a county jail. So don't tell me to prioritize criminals, but you can't come to my county jail. That's just – it just doesn't make sense.

**MS. VAUGHAN:** Well, now, then there are these law enforcement agencies, and actually mostly the ACLU and their allies, that will say, well, look, it's – we should have law enforcement agencies cooperate, but you know, why can't you just provide a judicial warrant? Why can't you just get a criminal warrant if you want us to hold somebody for you?

**MR. HOMAN:** Because there is no law that dictates that. When Congress passed the Immigration and Nationality Act, there was no process in place to get a judicial warrant. It's an administrative process. The law is clear. So there is no mechanism in place to get a judicial warrant. The law doesn't require a judicial warrant. I mean –

**MS. VAUGHAN:** Who could issue a judicial warrant?

**MR. HOMAN:** It would have to be a magistrate. But –

**MS. VAUGHAN:** Do they have that authority?

**MR. HOMAN:** No, they don't have the authority. So that's what, again, you don't hear, right? They don't have the authority to issue a judicial warrant, a criminal judicial warrant, for an administrative immigration law violation. It doesn't exist.

**MS. VAUGHAN:** It's a red herring, in other words. Is that what you're saying?

**MR. HOMAN:** Yes, absolutely. And we got to remember, the detainers – a lot of litigation on the detainers, well, we don't find it constitutional. Well, the Fifth Circuit just said they were, right? So we have courts that say they're constitutional.

And what the detainer has changed in the last several years, the new detainer, there is a statement of probable cause within that detainer. We have probable cause that that person's in the United States illegally based on our investigation. Probable cause standards is new to the detainer in the last couple years, so that's where it's changed.

And let's talk about detainers for a minute. Even if you choose not to honor a detainer because your attorney general or your county attorney says we think they're illegal, if you read the detainer, they have an option on that detainer: hold him for 48 hours until we can come get him, or notify us before you release him. So there is no liability to say we're going to contact ICE before we release a person on our charges. Don't hold him a minute past when you would normally hold him; just let us know before you release him on your charges. That's an option, and a lot of sheriffs take that option because a lot of sheriffs want to work with us despite the court controversy on detainers. They chose the option that we're going to notify ICE before we release him on our charges, and we'll be there to take custody of him.

**MS. VAUGHAN:** All right. Well, let's change to another subject now, to one that's been in the news a lot in the last couple weeks, about the influx of people arriving illegally from Central America, both families and kids. There have been, since 2014, more than 300,000 family units or unaccompanied minors who have arrived illegally and been resettled into American communities all over the United States, and many of them are making asylum claims. And the ones who are kids – there are two issues, really. There are the issue of the families and the issue of the kids.

There was a headline recently about 1,400 "missing" children that the government has lost track of. Did you lose track of 1,400 kids?

**MR. HOMAN:** No. First of –

**MS. VAUGHAN:** Are you the worst foster parent in the world, as one senator said? (Laughter.)

**MR. HOMAN:** First of all, it's Health and Human Services. They didn't lose track of them. The majority of them are hiding. That's just fact.

When we did an operation under the last administration, Operation Border Guardian, we went and looked for families that had their due process and got a final order of removal. So we got a whole list of these folks that had their final orders of removal and we went looking for them. A majority of them we couldn't find.

Look, these children, a majority are being released to illegal-alien parents or illegal-alien relatives. They don't want to be found. They don't want to – they don't want to present themselves to the United States government. Now –

**MS. VAUGHAN:** Why don't they want to present themselves?

**MR. HOMAN:** Because they're illegally in the United States. They don't want to be held accountable for themselves violating immigration law.

So can I say every alien out there is hiding? No. I'm telling you, based on my experience based on what we've done in the last several years, a majority of them are hiding. They don't want to be found by the U.S. government. That's why a vast majority of these families don't show up in immigration court and they get an order in absentia, because they – not only did they enter the country illegally and go into hiding, they won't appear in front of an immigration judge.

So that's just fact. I mean, you know, and I'm sure tomorrow I'll read that – you know, that I'm wrong. But, you know, wear my shoes for 34 years, do what I do, and look at the facts of what's going on, look at how many – how many families do not get a final fear finding from a judge – because most don't; like 80 percent of them do not.

**MS. VAUGHAN:** Eighty, yeah. That's what I've seen.

**MR. HOMAN:** So there's a lot of fraud going on. And they know it, and they're certainly not going to show up to a judge and, you know, present a fraudulent case. And 80 percent don't get a fear finding. So, in my opinion, many of them – now, let me be clear, do I think some of these people are escaping fear and persecution and they have a solid case? Yeah, I think there are some. I'd be – I'd be a fool to say there's not. But I think a majority of them are taking advantage of a low threshold, and there's a lot of asylum fraud going on, and they're hiding.

I have over half-a-million fugitives on my docket. These are people that have had their due process, been ordered removed, and they're in hiding, and we got to go locate them. And for these families that get a final order, there needs to be – there needs to be a consequence. You can't say I want my due process, just because you don't like the decision by a federal judge, ignore it and go into hiding. We are – we actively looking for those people now, and that's what we should be doing. We need – we need to execute these orders issued by a federal judge like every other federal law enforcement agency execute orders by a federal judge. People don't have the right to ignore a federal judge's order, and we're going to make sure that these orders are executed. And that's our job.

So that headline was very misleading. I think a lot of people retracted it. But it was – again, it's another attempt by those that want to mis-message what's going on in this country in immigration enforcement.

**MS. VAUGHAN:** Well, let's talk about this influx. I mean, as I said, we had more than 300,000, at least, who have been resettled. And the problem did abate for a while last year, and it looks, according to the Border Patrol statistics, that we're definitely seeing a big spike in the number of illegal arrivals. And a much larger percentage of the people arriving illegally now are families, as opposed to single men or, you know, older men arriving and crossing illegally. Why do you think there are so many people coming all of a sudden – not all of a sudden, but again, after the numbers abated last year?

**MR. HOMAN:** They figured out the loopholes. They figured that, as I just said, they can come and have due process at great taxpayer expense and just disappear into society. There are – we have asked Congress – myself, the head of CBP, the head of CIS – we have sent a list of policy issues up to Congress and legislative fixes that will fix those loopholes.

MS. VAUGHAN: OK. Well, how – so they are – they're arriving at the border and they're apprehended by the Border Patrol, or some are coming to the legal ports of entry, you know, in caravans because they – I mean, I've seen those lines of people. I recently visited San Ysidro and – this was last year – and saw that they had a dedicated lane for asylum-seekers. That's how many there were. And they said most of them actually at that time were Mexican. Haitians come in there. They're taken into custody at the port of entry if they make an asylum claim. How do they make it into ICE custody? Why is – why are the families an issue for ICE?

MR. HOMAN: Well, let's talk about a couple of things because, again, misinformation is being thrown out there to the American public. First of all, I've read a hundred stories in the past week that ICE is separating families. People are protesting ICE facilities.

First, ICE isn't separating families. It's happening on the Border Patrol. CBP decides who we're prosecuting, and because of that prosecution, they're separating families. And I'm getting – I transport the children to an HHS facility as – that's our job under – the Homeland Security Act of 2002, the Trafficking Victims Protection Act says we can't detain children for over 72 hours. They must be given over to Health and Human Services. So we're doing what we are congressionally mandated to do. But the separation is happening at the border by CBP.

And I'm not throwing CBP under the bus; I support it because what people don't understand – if families come to the port of entry and claim asylum, which they have a right to do, they won't be separated because they have a right to claim asylum, and they will get their due process, and they'll have the same judicial process they should have. But those who chose to violate law, come between the ports of entry, are committing a crime.

So I was a police officer in New York. That's how I started my law enforcement career. Children and parents get separated every day across this country when a parent is charged with a criminal offense. I've taken fathers out of homes for domestic violence. It's sad to see the children cry when you take a parent out of the home. But because it's sad, it doesn't mean we ignore the law. It's unfortunate, and I've said it many times.

MS. VAUGHAN: I have four kids.

MR. HOMAN: Right.

MS. VAUGHAN: What laws can I get away with breaking?

MR. HOMAN: So every – I just want to make things clear. We're not talking about separating them because they enter the country illegally and it's just an immigration issue. No. They are being separated because a parent is being charged with a crime. They'll be taken into custody by the U.S. marshals.

That child can't go into a U.S. marshals facility. First of all, if you detain children, and we – at our family residential centers there are high standards for children – educational, you know, pediatrics – all these things are required, so HHS, according to law, has to have custody of children. So it isn't separating children just for the sake of separating them. You are prosecuting a parent, and even American citizens get separated when you prosecute a parent. And that's only in those cases between the ports of entry.

But when they get a family unit, if they don't – if they enter through a port of entry, if they don't, you know, get prosecuted, we take custody of the family after they get processed through our border, and they go to a family residential center, and we further process them there and, you know, there's a Ninth Circuit Court decision that says we can't detain them over 20 days. So, again, that's a loophole. If we can only detain a family for a couple of weeks, and they get released and never show up in court, that's a problem. So one loophole that we need to fix is the Ninth Circuit decision saying that there's a limit how long we hold families.

And for those people who say, well, these are terrible centers – no, the inspector general actually went and did surprise inspections and said this is a very good run facility. And I've been to these facilities many times, and these families that came into the country illegally that are in our FRCs, these children –

MS. VAUGHAN: Family residential center.

**App. 1363**

**MR. HOMAN:** Yes. We have medical on site, we have a psychologist on site, we have education on site and, you know, they have access to unlimited amount of foods, you know. How many U.S. citizen children in this country don't have unlimited access to fruits and vegetables, milk, juice, I mean, medical care, dental care. You know, all this talk about FRCs are terrible places, there's – a lot of U.S. citizen children don't get that type of care, but we're providing this care at great taxpayer expense to these families.

**MS. VAUGHAN:** It's not a correctional situation.

**MR. HOMAN:** No.

**MS. VAUGHAN:** It's a different kind of – it's a holding center –

**MR. HOMAN:** Right, and look –

**MS. VAUGHAN:** – so that due process can – but isn't that –

**MR. HOMAN:** But what –

**MS. VAUGHAN:** – that's a tough situation – go ahead.

**MR. HOMAN:** The FRCs are important because we've to make sure we know who these people are, we'll follow through on where they're going, and we'll make sure the family members and the kids don't have any, you know, diseases, you know, because last year we had a huge issue with chicken pox and lice, had some measles, I think, a few years ago, so we've got to make sure that when they are released, they're not going into the community and cause a public health crisis. So we give them a full medical, make sure they're OK. We provide vaccinations, if needed. So, you know, we do a lot to take care of these families.

But the issue is once they get released and they don't show up in court, there is no consequence to their illegal activity, right? Back when we were able to hold families beyond 20 days until they get a – had a hearing from an immigration judge, they were actually getting removal hearings, and we were removing them. That can't happen in 20 days. That can't happen – that takes months now once you release them. So that's the issue. So we want that loophole fixed so we can actually detain people until they have the hearing from the immigration judge which will take, you know, maybe 30 days.

**MS. VAUGHAN:** Why does it – why does it take so long? Is there no way to expedite those hearings?

**MR. HOMAN:** There's actually a lot of – of course, EOIR immigration court has a huge backlog –

**MS. VAUGHAN:** Right. I know that's –

**MR. HOMAN:** – but I asked the same question – why can't we have a hearing from the judge within that 20 days – because there are certain requirements that the defense counsel has, like 10 days to provide information. I'm not a lawyer, but there are certain requirements within the whole immigration administration judicial process that takes that time frame beyond 20 days, so it just can't be done.

You know, they can do it within 30 days, sometimes, you know, within 45 days, but it's just a process. It's a process, and the rights that the alien can impose, and through a representative certain things they can do, it just can't happen that quickly because of the process. I don't understand it all completely because I'm not an attorney, but I've asked that question many times myself, and the answer is can't be done because of – the process is burdensome, and there's a lot of requirements we have to follow.

**MS. VAUGHAN:** So you are stuck between operational knowledge that this is a group of arrivals who historically have not pursued their asylum claims because they are absconding from the – you know, they are skipping out on their hearings, they're sometimes not even filing asylum applications, and those that do go through the process are

**App. 1364**

often not – are found not qualified for asylum. So, you know, there's a – you have a challenge in actually – you know, complying with the due process and enforcing the law, the completion, and a judge, who has imposed this arbitrary time frame to keep people in custody that doesn't match the reality of how long it's going to take.

**MR. HOMAN:** It's just – it's just common sense. If you look at, like 80 percent don't get a fear finding from a judge after they have their due process, and they go into hiding. And wouldn't it make sense, if they really have an asylum claim, it needs to be heard. So if you want to claim asylum and enter the country, and be released after 15 days, you should follow up and make sure you have your hearing, and plead your case in front of a judge, and get a finding.

So knowing that 80 percent don't get it and get released, and we can't find them, it only makes sense you should detain them until they have their hearing. Give them their due process. But we can offer due process, but they should be in a position to accept due process and follow through with the commitment of the judicial hearing. So that's why we need to detain them longer, so we make sure they see a judge and hear the case heard – have the case heard. That only makes sense. I mean, doing what we're doing now is – and unless we close these loopholes, you're going to see this keep happening and families keep coming because they know: I'll spend two weeks in an ICE facility, and we'll get taken care of – the children will be taken care of – to be released, not to show up in court – that's why the numbers are high because the loopholes – loopholes such as this.

The UACs that come in by themselves, you know, they get turned over to HHS, and they will eventually get released to a sponsor – many times illegal alien parents or relatives – and they don't show up in court. So I personally think – we just signed an MOU with Health and Human Services, we're working on sharing information. My opinion is that parent or that sponsor – mostly parents, so if they're in the country illegally, and they have paid a criminal organization to smuggle their children into the United States – which is not safe at all, that whole smuggling trip from Central America into the United States by a criminal organization –

**MS. VAUGHAN:** Yeah, these are not charities that are bringing them in.

**MR. HOMAN:** No. And we have many cases that these kids have been trafficked in, these kids – there's cases where they're been brought in by non-relatives, so we're – now we have a bigger information sharing with HHS – ICE is – and my personal opinion is if you are an illegal alien parent who had your child smuggled through a criminal organization to the United States, you should be in proceedings along with your child. You can't keep hiding in the shadows.

If you have a – if you have a valid fear claim of asylum and persecution, I would think the parent would want to stand shoulder-to-shoulder with that child – their child – and plead their case as a family. I think that's the right thing to do. Instead of having a child standing in front of an immigration judge by themselves, the parents should be there, side-by-side, and say, look, if you truly believe he escaped from fear and persecution, and you paid this money to have him smuggled, go as a family in front of the immigration judge and plead your case. You'll get your due process, you'll get your process, and let's see where it plays out. But –

**MS. VAUGHAN:** Why do you think they are – the families are OK with having the child pursue their own application for relief?

**MR. HOMAN:** Because – in many of the cases, they are illegally in the United States, and they don't want to face an immigration judge themselves.

**MS. VAUGHAN:** OK.

**MR. HOMAN:** It's just – that is just – that is just fact. So this mis-messaging, you know – I'm trying to speak fact versus fiction – that's what the issue is. The issue is they have immigration issues themselves. They want to remain in the shadows.

**MS. VAUGHAN:** How do we fix this? What needs to happen?

**MR. HOMAN:** I think we need some legislation passed, we need some policy fixes, the list of things we sent up to the Hill about illegal immigration.

**MS. VAUGHAN:** What would be your priorities because we're getting ready to move into a month where there – it looks like Congress may actually be considering some immigration legislation, so what would you like them to do?

**MR. HOMAN:** My priorities are a short list: first would be sanctuary cities, releasing criminal aliens back in the public because of public safety threat – it's an American public safety threat. We've got to stop putting American citizens – and even those who are in immigrant communities – at risk of further crime. So sanctuary cities – we have to address sanctuary cities.

We need to talk about TVPRA – Trafficking Victims Act – I know it adds a great – there's a great reason for it there. But –

**MS. VAUGHAN:** That's the law that governs how minors –

**MR. HOMAN:** Yeah, so if you are a UAC from Canada to the United States, and you enter the United States – if you are a UAC from Mexico of Canada and you enter the country illegally, once it's determined you are not a victim of trafficking, they can be returned quickly. If you are from Central America, that's not an option. You've got a right to go through the whole hearing process, so we want the TVRPA (sic; TVPRA) fixed. Once you verify they're not victim trafficking, we don't care where they're from. If they're not a victim of trafficking, and we can show that and prove, they need to have the same repatriation agreements as Mexico and Canada.

Another thing we need to talk about is the Flores settlement.

**MS. VAUGHAN:** Let me – do you think they would do that – the Central American countries? Would they be willing to sign such an agreement like we have?

**MR. HOMAN:** Well, it's – no, it's not – it's not a Central American decision. It's the United States – it's a decision under TVPRA – Trafficking Victims Act –

**MS. VAUGHAN:** OK.

**MR. HOMAN:** – to say, look, this is – we want to treat all children equally. But we return UACs to countries every year. I think last year we removed over a thousand of them, and so – and we removed UACs to the triangle countries – the three countries down in Central America, so they do issue travel documents and accept them.

So I would address sanctuary cities, I would address the TVPRA, I would address the Flores decision where it says we can only detain families for a certain amount of days. I would like to detain them until they have immigration proceedings. That is right. If you want –

**MS. VAUGHAN:** Like other asylum-seekers.

**MR. HOMAN:** If you want to be a part – look, I can't blame anybody for wanting to be a part of the greatest country on earth, but there's a right way to do it and a wrong way to do it. So if you have a fear of persecution claim, there should be no problem with us, you know – you know, you enter the country, we detain you until you have your immigration hearing, and if you get a finding of fear, then you are released and you can pursue, you know, life in the United States. But if the answer is no, you enter the country illegally, you don't – or you don't have the right to this relief, and here's your order of removal, it needs to be executed.

So I think, again, sanctuary cities, TVPRA, the Flores settlement agreement that limits how long we can detain families. I think we need to look at E-Verify. I think E-Verify is a necessary tool. I think – because, as I said, illegal employment in this country is a magnet that pulls people into this country, so I think E-Verify should be mandated in the United States across the board. I think they'd be my biggest ones.

**MS. VAUGHAN:** Well, that's – you raised a good point about most experts agree that the main attraction for illegal migration is –

**MR. HOMAN:** Let me interrupt you.

**MS. VAUGHAN:** – job opportunity.

**MR. HOMAN:** I forgot one major one as you were talking.

The last thing I would push – it's not the last thing, but it is priority – is to look at the asylum process, and the threshold from CIS is so low that, you know, nearly 90 percent of the people that get their initial interview by CIS get a positive fear finding because the thresholds are so low. And I understand why they are low. They want to make sure they don't make a mistake sending some back to be persecuted. I get that. But the thresholds are so low that 90 percent go through their first interview and get a finding.

But when they see an immigration judge, it's less than 20 percent –

**MS. VAUGHAN:** That are – that are actually approved.

**MR. HOMAN:** Yes, so there's too big of a delta, so we need to change the asylum process and raise the bar to make sure that when people claim asylum, they actually have an asylum claim that is accepted under the statute that meets requirements of the statute. So we need to look at that asylum process also.

**MS. VAUGHAN:** So they may say that they are coming to seek asylum and that they have a fear of return, but when they are interviewed by others – say, reporters who are talking with them – often they say that they are here to make money, to seek a better life for their families – what are sometimes referred to as economic migrants ultimately. And we see that when, you know, they're not actually pursuing their official asylum application, they are looking for employment – and just like, you know, others arriving as well.

So what's the – different administrations in the past have approached the job magnet and worksite enforcement in different ways. Under the Bush administration, we saw a lot of operations take place at work sites where ICE would show up, talk to everyone there, make arrests of illegal workers – sometimes hundreds at a time.

Under the Obama administration, the focus shifted to worksite audits – audits of paperwork essentially, what the people called a "virtual" raid. What is your approach now that you are ramping up worksite enforcement?

**MR. HOMAN:** I think, as I committed to last year, that we need to increase worksite enforcement by three or four times because there wasn't enough being done. Again, that's a magnet.

And I want to make a couple of things clear. Employers don't give illegal aliens jobs out of the goodness of their heart. They usually pay them less wages, they work under terrible situations many times. There is, you know, trafficking going on, there is peonage, so the employer is simply intentionally violating the federal law, and he's got one up on his competitor who is hiring a workforce. So he is paying less so he gets some unfair advantage in the marketplace.

So what we're doing differently? So far we've increased worksite enforcement by over 300 percent, and we're going to continue doing that, and what we're doing is not only conducting criminal investigations of employers where we have evidence there is criminal behavior, we're also – we're doing the audits, and we're arresting illegal employees. That's our job. So it needs to happen from both. It needs to happen with the alien workforce and the employers.

**MS. VAUGHAN:** How do they – how does it –

**MR. HOMAN:** And what people don't understand – I'm thinking – people say, oh, the worksite enforcement is out of control, but if you look at worksite enforcement in the cases we've done, there is a lot of criminal activity going on. It's just not – it's just not employing a(n) illegal alien. There's tax fraud going on, right, because the employers

**App. 1367**

aren't paying their taxes. There's identify theft going on. A lot of these illegal alien workers are using the Social Security number of U.S. citizens.

So there's identify theft, there's tax fraud, there's trafficking – so there's a criminal aspect to worksite enforcement which people don't understand. You know, there's a lot of victims out there – U.S. citizen victims who have their identities stolen and their Social Security number used by people who shouldn't be using them.

So there's more to this than just illegal employment. There's a lot of criminal violations we're investigating in concert with worksite enforcement.

**MS. VAUGHAN:** Do you think there are adequate penalties in the law for employers?

**MR. HOMAN:** I think they could be harsher, but the first thing we need to do is enforce those laws, so that's what I've done differently, and this is – what the president has done is letting us enforce laws the way they were written.

And it would be a good point to say this: a lot of people want to attack ICE. I see it every day. They want to call ICE racist, they want to call us Nazis. I'll show –

**MS. VAUGHAN:** On the other hand, there were people cheering sometimes outside when employees get raided.

**MR. HOMAN:** But what I want to make clear is, you can not like what we do, but don't vilify the men and women that took a sworn – because they're a law enforcement officer that took an oath to enforce the law. If you don't like what we do, then talk to your congressman and senator and tell them you don't like the law. But we're simply enforcing the laws on the books. That's what we're doing. We're not making this up; we've enforcing the law. So don't vilify the men and women. The law enforcement officers are simply doing their job. They're putting their life on the line every day. It's just wrong.

We enforce laws unpopular among some people, so rather than standing in front of an ICE office and protesting what we do, maybe you ought to be up on the Hill talking to your congressman and telling him what you don't like about the law. But don't vilify the men and women of ICE. Don't vilify the men and women of the Border Patrol for simply doing their jobs.

And it's unfortunate that, you know – I was shown a video the other day. I did an interview the other day, and the reporter showed me a video of a father being arrested, and the children in the car were crying, and it was on video, and they asked me how I felt about it. I feel bad. I mean, law enforcement officers throughout this country see sad things every day, but we have a job to do. It doesn't mean it's sad so we're going to ignore it – no.

And one thing – you've got – we've got to remember, so that parent who is arrested and his child crying – feel bad about it, get it – but what responsibility does he have in this? He chose to enter the country illegally in violation of federal law. He chose to do that intentionally. Does he have any responsibility for violating that law? He had due process at great taxpayer expense in front of an immigration judge and ignored that court order. If you and I ignored a court order, we'd be arrested and put in jail.

Does he deserve any responsibility in the fact that he had due process and he ignored a court's order? And he chose to have a U.S. citizen child while he knew he was in the country illegally. He put himself in the position. So that arrest – who is at fault for that arrest? He is. He entered the country illegally, he ignored a federal judge's order, he chose to have a U.S. citizen child knowing that he was in the country illegally, so when it comes time that the law catches up with him, the law enforcement officers are simply doing their job.

And the video makes it, like, oh, these terrible ICE agents making this child cry. The father had put them – he needs to take responsibility because he had done several things that put his family in the position of that even happening.

So let's – we've got to focus on that. Instead of focusing on the actions of ICE all the time, focus on the people we are arresting and what they did to put themselves in that position.

**App. 1368**

**MS. VAUGHAN:** Mmm hmm. And that's true even of worksite enforcement because some people have criticized it, saying that, oh, well, you know, you were just arresting hard workers and – who are here to feed their family. But there are these other crimes associated with it, especially identify fraud, and there are real victims created when identities are stolen of U.S. citizens and, you know, there are huge problems, as you know, with Puerto Rican Social Security numbers being stolen.

I remember reading an interview with an illegal alien who had been arrested in a worksite operation, and was asked, you know, about his prosecution for using a stolen Social Security number, and he said, oh, I didn't steal it; I bought it. And there's this attitude that some people have about – you know, that this is what illegal aliens have to do, that that's why, you know, the – enforcing laws against identity theft and fraud are – shouldn't be enforced because the illegal aliens are forced into doing that. And yet, there are real victims created.

Do you – I mean, are you still running the document and benefit fraud task forces that used to focus on identity fraud? Is that – like, how is that being dealt with as an enforcement priority under ICE now?

**MR. HOMAN:** Well, under worksite enforcement operations we are looking at those who have taken IDs and prioritizing, and some of them we have prosecuted. We have a fraud division within ICE that looks at that type of stuff. So now that we've ramped up worksite enforcement, that division is getting busy, too, because there is a lot of fraud in worksite enforcement.

But I'll say this: for the folks that say it's not such a big deal to use someone else's Social Security number, I'll tell you, it depends on what side of that crime you are on. If they use your Social Security number and steal your identity, I can tell you from personal experience, it's hell to deal with that and try to get the record straight. So when you think about, well, it's no big deal, think about if they took your Social Security number and you would feel, or if your credit was affected by it or, you know, think about what would have happened to you – everything is OK because it's not happening to me; it's happening to other folks. It can happen to you, and it's just – look, it's a crime, and we're just not going to turn a blind eye to it. We can't.

**MS. VAUGHAN:** Yeah, Utah had a huge problem with the document fraud rings selling the Social Security numbers that had not yet been issued, and then a couple of years later, those numbers are assigned to children, and some of those American parents and immigrant parents were signing up their kids for programs like Head Start and other social service programs that they qualified for because they were low-income families, and then they were told, well, your child is not getting into Head Start because she has $30,000 a year income from working at McDonald's in California.

So it really does create new victims.

**MR. HOMAN:** It is very prevalent; you just don't hear about it. But, look, it's – I've said it many times. Illegal immigration is not a victimless crime.

**MS. VAUGHAN:** Right.

**MR. HOMAN:** And, you know, I know I'm sitting here talking about enforcement an awful lot. I want to make something clear, and I hope this makes the cut.

This isn't just about enforcing the laws of this country; it's about saving lives. The more you entice illegal entry – whether it's families, children, adults that want to enter this country illegally – because there the enticement of sanctuary cities, or they can get illegally employed, or they reunite, you know – if we don't do and fix these policies, and control our border, and take these enticements away, more people are going to take that dangerous journey to enter this country illegally. More children will die crossing that river, more women will be abused by these criminal organizations, which – we have plenty of examples of that.

**App. 1369**

I've been in this business a long time. I often talk about it – that I have seen, when I was a Border Patrol agent, illegal aliens abandoned on the trail because they couldn't make the trip, and they died. I've seen that. I've been there. I've stood there and seen it.

I was in Phoenix, Arizona, during Operation Ice Storm where people were being held hostage because they were making a deal – we'll move you to the United States for 5,000 (dollars). Once they get there and get into the load house, they call the relatives and say, OK, it's 10,000 (dollars). Well, you said it was 5(,000 dollars). Well, now it's 10(,000 dollars). If you don't pay it, we'll kill them. And they did.

I remember in one case we tracked a cell phone to a hostage situation, and this man was in a closet, bound by his hands and feet behind him, with his face duct taped with a hole poked in to breathe through a straw. I've seen it; been there.

I was in Victoria, Texas, when I got called there to run an alien smuggling operation from headquarters. Headquarters coordinated the investigation because most of my career was in alien smuggling. I stood in the back of a tractor-trailer surrounded by 19 dead aliens.

I grew up in a town of 2,000 people, so people who don't think this is a crime that affects people are wrong. I stood there, surrounded by 19 dead aliens, including a 5-year-old little boy who suffocated to death in back of that tractor-trailer. And for those people who don't think entering this country illegally is serious, what do you think – put yourself in a position of that father who – that child died in his arms, what that father was going through the last 30 minutes of his life, that he put his son in such a condition, and watched his son die in his arms – suffer because he couldn't breathe. Think about what the child went through the last 30 minutes of his life.

So I know I'm tough about talking about this enforcement – we're doing our job, we've got to enforce the law. It's also about saving lives. We can't keep enticing illegal entry into this country because people that are enticed will make the dangerous journey, and people will die. People will be abused. So it's just not about enforcing law, folks. This is about saving lives. I know it. I've seen it.

The 40,000 men and women wearing the green uniform see this every day. The men and women that work for ICE see this every day. So let's talk about that. Let's – you know, it's more than enforcing law. It's about saving lives, about people being put in the position of these criminal organizations that don't care about them. These criminal organization that smuggle people, they care about the dollar. They care about how much money they can make. They certainly – there has been a lot of examples of tractor-trailer smuggling. There's been a lot of examples of trafficking of women and children.

We've got to put a stop to it, and the only way to put a stop to it is to control this border and hold people accountable, because all we're doing by ignoring the fact is bankrolling criminal organizations and putting people who are already in a desperate situation at risk. And I've said many times I feel bad about the plight of some of these people – of course I do. I'm a father, I'm a husband, you know, I have a child, but there's a right way and a wrong way into this country. And like I say, we're the most giving country. We've accepted more people as refugees to this country. We have more people who have become great members of our society the right way, but we cannot keep ignoring illegal immigration because it's dangerous. It's just – again – I'll say it again, it's just not about enforcing laws. It's about saving lives, it's about enticing people to make that journey. We've got to – you know, we've got to fix this.

We know how to fix it. We had a 45-year low last year. We know how to fix it. We have the willpower and knowledge to fix it, but we need Congress to sit down with us, and let's fix it.

I would think everybody – whether you are Republican or Democrat – would want a secure border. I would think everybody – whether Republican or Democrat – wants to save lives. And it's puzzling to me that we can't have that conversation in a meaningful way and fix this. It's just – it's unfortunate.

**MS. VAUGHAN:** Well, we may have that opportunity in the coming weeks – we'll see. I hope members of Congress are tuned in today listening to you.

I'm going to ask you one more question before we go to the questions from our audience. Has a replacement been named for you – excuse me, a successor?

**MR. HOMAN:** No.

**MS. VAUGHAN:** OK. All right.

And I want to say – before we run out of time also that – thank you so much for your dedication to this job and to ICE's mission, and to all your accomplishments and work on behalf of our country. I know it's really appreciated.

**MR. HOMAN:** I appreciate that. And, look, I have 34 years doing it. I was a police officer before that, so I have, you know, almost 35 ½ years of law enforcement. It's the greatest honor of my life serving this country. And when I was asked to come back from retirement, I left a lot of money on the table to come back and serve as the director for this president.

And let me say this. I'm going to get political for a minute. You can like or love this president. You have a right to your opinion. But no president – and I've worked for six of them, starting with Ronald Reagan, and I respect every president I've ever worked for. I respect them greatly because they were president of the United States. And what a tough job, right? And I respected all of them greatly. But no president has done more for border security and public safety than this president. You cannot deny that. You cannot deny what he has done when it comes to border security and public safety. So his success would be the success for the entire country.

**MS. VAUGHAN:** Mmm hmm, that's right.

**MR. HOMAN:** So I'll just say that.

**MS. VAUGHAN:** All right.

Here's a question. In worksite enforcement, has ICE arrested employers? And how important is it to penalize both illegal workers and their employers?

**MR. HOMAN:** It's very important. That's what we are doing. We will hold employers accountable, and if they violate law, they will be held accountable to that. There will be – many of these operations you read about in the paper, criminal charges will come out of it, but I've instructed HSI that we will not turn a blind eye to people who are here illegally either, so they need also be arrested. So we're going to come from both sides.

Look, Congress needs to address it. One thing people don't understand – don't know about me, I actually think the guest worker program for people in agriculture, it's an important thing. I actually think dairy farms ought to be part of H-2A. I believe where there's a need, we need to have law to do it legally, not illegally. So I support a legal fix. I just don't support someone knowingly violating the laws.

**MS. VAUGHAN:** Will ICE ever get back to the days of 400,000-plus removals? And, if so, what resources and policy changes would that take?

**MR. HOMAN:** Well, first of all, there's no quota. I don't put a quota on – you've got to arrest this many people.

Look, it's more difficult – I was head of ERO when we had the 400,000 removals. That was a record for the agency. But if you look at it, 400,000 – if there's 11 million illegal aliens here, that's, what, 3 percent, so we need more resources to do that, more officers.

But it's more difficult now because, with the sanctuary cities – like I said, instead of one person processing 10, now you've got to send a whole team out. So our job is much more difficult now, and it shouldn't be. Like I said, everybody should care about border security, everybody should care about public safety. Our job is hard.

**App. 1371**

So will we get to 400,000? I don't know. We're just going to keep enforcing law the way we are supposed to, the way it's on the books, and whatever the results are, that's the results. I mean, I've not put any quotas out there other than saying you're going to increase – or saying to enforcement – and you're going to increase.

Look, by the president coming out and with the executive orders, instead of that – the executive orders came out and all the writing he had to – he could have said it in one sentence, saying you will now enforce the laws on the books, and that's what we're doing, and we're going to keep doing it. We're going to enforce the laws as enacted by Congress. That is the oath we took. That's our job.

**MS. VAUGHAN:** The president supports a deal to address the situation of the people who have DACA, and the levels of legal migration – chain migration in particular – and the diversity lottery, and the – more border security; in particular, a wall.

But doesn't amnesty encourage more illegal immigration? That's the question.

**MR. HOMAN:** I think when you reward illegal behavior, it certainly does. I mean, that's just a fact.

If Congress chooses to pass legislation on DACA, what I've said many times is you can't – in my opinion, you can't pass a clean DACA bill without talking about the underlying reasons for illegal immigration. You've got to address that as part of the fix because, if you don't, these families coming across now will be your next DACA in 10 years.

So let's stop kicking that can down the road. If you want to do a fix on DACA, let's talk about the overarching issues of illegal immigration, and let's fix that so we don't have a DACA every 10 years, we don't have an amnesty every, you know, 15, 20 years. Let's fix it.

**MS. VAUGHAN:** Do you think that talk of an amnesty has contributed to the spiking of numbers that we're seeing now?

**MR. HOMAN:** Yes, absolutely. In my experience, if you look at every time you talk about some sort of benefit – whether it's amnesty, whether it's DACA – even though you may set the rules up where you've got be in the country this long, you've got this – people are going to take that chance, so it certainly increases the illegal crossings. That has been proven for the last three decades I've been around.

**MS. VAUGHAN:** All police agencies disclose arrests, including the identity of the person, the name of the person who was arrested, and sometimes other information about them, except for CBP and ICE.

Why is it that ICE does not release information on people – the names and identities of people arrested like other law enforcement agencies?

**MR. HOMAN:** That is something I'm working. I know that's a privacy issue from my attorneys in my privacy office. I think we should be releasing them.

So if you are a criminal that we've arrested – my personal opinion – it should be released, and I'll let the lawyers in privacy deal with that, but they know how I feel, so I certainly think we need to be as transparent as we can, and that's what I'm pushing for. So I've got to abide by department policy, and I've got to abide by the law. And again, I'm not an attorney, but I've asked the same question and asked what we can do differently within the confines of the law.

**MS. VAUGHAN:** But the Privacy Act – correct me if I'm wrong – applies to U.S. citizens and has been interpreted to be applied to lawful, permanent residents. Most of the people that you are arresting are not in either of those categories.

**MR. HOMAN:** Yes, I agree with you.

**MS. VAUGHAN:** OK.

**MR. HOMAN:** I'm just being frank. I mean, in my personal opinion we should, and we're working toward it.

Again, I'm not a lawyer, I don't know all the rules, but as a cop, I think transparency is good for everybody.

**MS. VAUGHAN:** Speaking of releasing information, I rely on government data to do a lot of my work and submit Freedom of Information Act requests. And I actually applaud the Trump administration for pressing agencies to – especially the immigration agencies – to release more information. USCIS is posting a lot more administrative statistics, and CBP as well, and ICE is putting up more as well.

Is there more you can do in this area? I mean, it seems to me that there might be other data that a lot of people are requesting. I mean, I've got a FOIA request that's pending for now about a year and a half. Why does it take so long to get a FOIA request answered?

**MR. HOMAN:** I can tell you – look, if you look – even in the recent omnibus bill we didn't get a lot of money for hiring additional people. We get like 1,500 FOIA requests a week.

**MS. VAUGHAN:** A week?

**MR. HOMAN:** Fifteen hundred. So, you know, we're working as quick as we can and, you know, a lot – again, it would help – we're trying to be transparent, put as much stuff on the website as possible so that people can read that, but it's a struggle. I think every federal – I mean, the Secret Service has had an issue, I believe. I think CBP – we're all having issue with FOIAs because there's so many of them. Think about it, 1,500 a week.

**MS. VAUGHAN:** Now some of those are kind of routine with immigration lawyers seeking information about their client's case, right, but how – do you know –

**MR. HOMAN:** But it – but it takes manpower. It takes someone to sit there and respond to the FOIA. So we certainly have looked at – we actually got the backlog knocked down last year. The numbers are up again this year, so we're addressing it. We've assigned more resources to FOIA. The only thing I can tell you is there's more FOIAs than there are people in ICE, so we're going through it as quick as we can.

**MS. VAUGHAN:** OK. States such as Tennessee and Iowa have recently adopted anti-sanctuary legislation. From your perspective, are these state-level measures effective in combating anti-enforcement efforts or is a more federal solution needed? Does the state law –

**MR. HOMAN:** If a state chooses to be a state where they don't allow sanctuary jurisdiction –

**MS. VAUGHAN:** Texas is another one.

**MR. HOMAN:** God bless them, because it's going to keep my officers safer and it's going to keep the community safer. But like I said, one of my priorities that we pushed on the Hill was that legislative fix of sanctuary cities from the federal perspective. But, you know, these jurisdictions or states who have said, well, no sanctuary in this state, look, that's clearly going to help improve public safety, it's clearly going to help the safety of my officers.

Look, I've got 51 names on the national law enforcement wall down the street of men and women that made the ultimate sacrifice serving their nation. I don't want one more name added to that wall because a criminal alien got released from jail that we could have arrested in the safety of jail. One of my officers didn't go home that night to his family because they had to knock on a door. They should never have knocked on the door, so I – you know, I wish more states and cities would do it, but I think the ultimate fix is for the Congress to address it from a federal perspective.

**MS. VAUGHAN:** We've got time for one more question. It's a quickie. If you had to pick one, what is the worst sanctuary jurisdiction right now?

**MR. HOMAN:** I can't pick just one. Sanctuary jurisdictions –

**MS. VAUGHAN:** (Laughs.) There are so many.

**App. 1373**

**MR. HOMAN:** Look, it's a dangerous thing to make yourself a sanctuary. As I explained earlier, you're not protecting the immigrant community; you are putting them at greater risk. And you are putting the law enforcement officers at greater risk.

And let me make this clear because this is something that didn't come out through the interview. I want to make this clear. This isn't just about immigration enforcement. Let's take California, for example. This affected HSI, the criminal investigative portion of ICE. There are law enforcement agencies that have left trafficking task forces, terrorism task forces because of ICE participation on these task forces. It had nothing to do with immigration enforcement. We're talking about national security, criminal investigations, but because they have an ICE moniker, they walked away from the task forces.

I actually gave a speech last week to the Coast Guard, the day before the change of command at the Coast Guard, and one of the commandants stood up who works in California saying, local law enforcement walked away from some of their investigations that deal with national security and massive drug seizures on – maritime because they were part of DHS. I didn't even know that until he mentioned that to me last week after my speech. So we're looking at that.

So sanctuary jurisdictions isn't just about immigration enforcement. It affects criminal investigations, too. Like in California, we no longer have access to their gang database – CalGang is a database – when they encounter gang members, they go on this database. They took our access away, all right? So you are talking about gang members. So this went beyond immigration. This went to a whole new level. This is anti-enforcement. This is anti-criminal-enforcement. This is anti-national-security effort. So it went beyond that, so I won't pick any jurisdiction. I think they are all bad.

**MS. VAUGHAN:** OK. Well, I'm going to let you out of the hot seat now, and I appreciate your time –

**MR. HOMAN:** Look, first of all, it's not a hot seat. I look forward – look, we've got to get this story out, we've got to talk about this because there is so much misinformation out there. I just want to make it clear that, look, we've got to tell the American people what's going on. We've got to tell the American people there's a fix if we want to take a fix.

And I'll end with this. For the men and women in this room and those that may see this on who know what – YouTube or the media – I'm asking for one thing. I'm asking for people to sit back and look at this issue, and stop attacking the men and women that work the front lines. They are doing a job they took an oath to do, to defend this nation, and it really – it just – it's unfortunate that they be called names and – you know, assault to my officers are up, failure to complies are up which means people won't comply when arrested, so there's a struggle that ensures, and some of them get hurt. We just – we've got to look at the facts of what's going on, and – you know, for instance, people say, hey, ICE is separating families. They are misinformed. We've got to be informed about this issue.

But as the director of ICE, who has carried a badge and gun for 34 years, you can't attack law enforcement who are simply enacting the law. If you think ICE is racist, is Congress racist because they enacted these laws? I mean, think about that for a minute, for the men and women in ICE deserve thanks from this country. They have arrested a lot of criminal aliens and taken them off the street. They have made America safer.

HSI, the other branch of ICE – how many child predators did they arrest? And people that want to call us Nazis or racists, do you know how many war criminals ICE has actually arrested, real Nazi criminals that we've arrested and removed from this country – let's talk about that. So let's talk about the real issue here, and stop attacking the 20,000 American patriots that work at ICE who are simply doing their job and upholding the oath they have taken to enact the laws enacted by the United States Congress.

**App. 1374**

**MS. VAUGHAN:** For a democratic process – well, thank you, Tom. Thank you so much. I wish you good luck in the future. It's easy for me to see why the men and women of ICE admire you and love having you as ICE director – because you are a real champion for them and for the mission, and that's really great to see. And I thank you so much for coming in today.

And thank you all for being here as well. I hope you will come back to some of our future events.

Thank you. (Applause.)

**MR. HOMAN:** Thank you. I appreciate it.

**(END)**

Topics: Immigration and Customs Enforcement (ICE)
Transcript